Daniel J. Pochoda (SBA 021979)
James Duff Lyall (SBA 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 N. 7th Street, Suite 235
Phoenix, AZ  85013
Telephone: (602) 650-1854
dpochoda@acluaz.org
jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Robert Gamez, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Victor Parsons, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells,
on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Jennifer Alewelt (SBA 027366)
Ruth Szanto (SBA 029073)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington St. Suite 202
Phoenix, AZ  85034
Telephone (602) 274-6287
jalewelt@azdisabilitylaw.org
rszanto@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants | No. <br><br> **CLASS ACTION** <br><br> **CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

**NATURE OF THE ACTION**

1.      Prisoner Plaintiffs and the Plaintiff Class are housed in Arizona Department of Corrections ("ADC") state prisons, and seek declaratory and injunctive relief against Charles Ryan and Michael Pratt, (collectively, "Defendants") in their official capacities. Prisoner Plaintiffs and the Plaintiff Class are entirely dependent on Defendants for their basic health care.  However, the system under which Defendants Ryan and Pratt provide medical, mental health, and dental care (collectively, "health care") to prisoners is grossly inadequate and subjects all prisoners to a substantial risk of serious harm, including unnecessary pain and suffering, preventable injury, amputation, disfigurement, and death. For years, the health care provided by Defendants in Arizona's prisons has fallen short of minimum constitutional requirements and failed to meet prisoners' basic health needs. Critically ill prisoners have begged prison officials for treatment, only to be told "be patient," "it's all in your head," or "pray" to be cured.  Despite warnings from their own employees, prisoners and their family members, and advocates about the risk of serious injury and death to prisoners, Defendants are deliberately indifferent to the substantial risk of pain and suffering to prisoners, including deaths, which occur due to Defendants' failure to provide minimally adequate health care, in violation of the Eighth Amendment. "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care.  A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. __, 131 S.Ct. 1910, 1928 (2011).

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

2.     Arizona prisoners also suffer serious harm and are subject to a substantial risk of serious harm as a result of Defendants holding prisoners in isolation in supermax Special Management Units ("SMUs") in cruel and unusual conditions of confinement. Defendants continue to be deliberately indifferent to the substantial risk of pain and suffering, including deaths, which occur due to their systemic failure to provide minimally adequate conditions to prisoners in isolation, in violation of the Eighth Amendment.

3.     Plaintiffs seek injunctive relief to compel Defendants to immediately provide prisoner-Plaintiffs and the class members they represent with constitutionally adequate health care and with protection from unconstitutional conditions of confinement.

**JURISDICTION**

4.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  This civil action seeks declaratory and injunctive relief under 28 U.S.C. §§1343, 2201, and 2202; and 42 U.S.C. § 1983.

**VENUE**

5.     Venue is proper under 28 U.S.C. § 1391(b), because the Defendants reside in the District of Arizona, and because a substantial part or all of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Arizona.

**PARTIES**

**Plaintiffs**

6.     Plaintiff Victor Parsons is a prisoner in ADC's Lewis complex.  Mr. Parsons has been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) with a

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

possible history of bipolar disorder.  Mr. Parsons has received inadequate mental health care, including abrupt stopping and starting of medication, inappropriate medication, and delays in follow up appointments.  For example, in June 2010, Mr. Parsons' medications were suddenly discontinued without explanation.  After he began to decompensate and experience psychiatric symptoms, he submitted an HNR requesting treatment.  Mr. Parsons' medication was abruptly restarted without titrating, placing him at high risk for severe side effects.  Mr. Parsons has also experienced delays in his dental care.  Mr. Parsons filed four HNRs in 2009 complaining that a temporary filling had fallen out of his tooth.  Each time he was seen, Parsons was given another temporary filling that would fall out weeks later, forcing him to restart the process.  He was told that the only alternative was to have his tooth pulled, but he refused.  After five months, he finally received a permanent filling.

7.      Plaintiff Shawn Jensen is a prisoner in ADC's Tucson complex.  Defendants have failed to provide him with adequate and timely medical care, causing him harm and permanent injury.  Mr. Jensen has a history of prostate cancer.  In ADC custody, he encountered delays in having the cancer diagnosed and treated and continues to experience harm and injuries caused by Defendants' inadequate medical care.  In November 2006, Mr. Jensen was tested with a Prostate Antigen (PSA) Test and found to have an elevated score of 8.4 and a nodule on the prostate.  Once the PSA is over 7, most clinicians order a biopsy.  A prison doctor referred him for a biopsy in January 2007, but he did not receive the biopsy until October 2009, after his PSA score had risen to 9.3.  The

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

biopsy revealed he had Stage 2 prostate cancer, an aggressive form, and by February 2010 his PSA score was 12 and urologists recommended aggressive treatment of the cancer, a bone scan to determine the extent of the cancer, and surgery to remove the tumor.  Mr. Jensen experienced gaps as long as two months in getting from the prison pharmacy the chemotherapy medication that was prescribed for him by outside urologists.  He did not have the surgery until mid-July 2010.  When he returned to prison after the surgery, Defendants provided incompetent medical care, and Mr. Jensen suffered harm and permanent injuries due to staff performing medical procedures for which they were not qualified.

8.     Plaintiff Stephen Swartz is a prisoner in ADC's Lewis complex.   In February 2010, Mr. Swartz suffered eye injuries and extensive facial fractures as a result of an inmate assault.  He did not receive timely follow-up with a plastic surgeon or ophthalmologist, but was instead referred to an oral surgeon to treat the facial fractures. Despite multiple referrals from prison doctors for specialty care, Mr. Swartz did not see an ophthalmologist until January 2011, almost a year after he was assaulted, and has permanent partial paralysis to his face.  Mr. Swartz filed numerous HNRs to address untreated neuropathic pain, and repeatedly waited months to learn whether pain medications would be approved and provided.  He continues to report chronic pain.  Mr. Swartz is also diagnosed with bipolar disorder and major depressive disorder, and despite multiple incidents of self-harm, has received inadequate mental health care while on suicide watch and in isolation in a SMU.  Additionally, Mr. Swartz has had a cracked

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

molar for two years.  When he went to the dentist for the pain, Mr. Swartz was refused a filling and told the only available treatment was to pull the tooth.

9.     Plaintiff Dustin Brislan is a prisoner in ADC's Eyman complex, housed in a SMU.  Mr. Brislan is diagnosed with bipolar disorder, schizoaffective disorder, and borderline personality disorder, and he has a designation of Serious Mental Illness ("SMI").  He engages in severe self-injurious behavior – including cutting, head banging, and self-starvation.   As a result of his mental illness, he experiences depression, hallucinations, suicidal ideation, and paranoia.  Despite the severity of Mr. Brislan's condition, Defendants have failed to provide him with minimally adequate mental health care.  Mr. Brislan has received improper medication, and has experienced delays in receiving and abrupt changes to his medication.  Mr. Brislan has not been monitored regularly by a psychiatrist, or received therapeutic treatment to address his extreme self-harming behavior.  Instead, he has been placed on suicide watch for excessive lengths of time, where he did not receive adequate treatment and continued to commit repeated acts of self-harm.

10.     Plaintiff Sonia Rodriguez is a prisoner in ADC's Perryville complex.  She is designated as SMI, and she experiences depression, anxiety, and hallucinations. Defendants have failed to provide Ms. Rodriguez with minimally adequate mental health care, and she has experienced poor medication management, lack of therapeutic treatment, and conditions of cruel and inhumane confinement in Perryville's SMU and on suicide watch.  The harsh conditions and extreme isolation of the SMU and on suicide watch have

worsened her mental conditions.   Ms. Rodriguez has asthma, and has experienced multiple asthma attacks and breathing problems due to the ongoing use of pepper spray by correctional staff on the women housed in the SMU and in suicide watch.   On multiple occasions, her medications have been abruptly discontinued or changed and her dosage adjusted without explanation or proper monitoring.   As a result, Ms. Rodriguez has suffered severe side effects, including uncontrolled shaking, difficulty speaking, and physical "slowing" and lethargy, and a worsening of her mental health symptoms.

11.   Plaintiff Christina Verduzco is a prisoner in ADC's Perryville complex, housed in a SMU.   Ms. Verduzco is diagnosed with paranoid schizophrenia, bipolar disorder, and borderline personality disorder.   She experiences a variety of symptoms, including auditory and visual hallucinations, anxiety, paranoia, and self-harm by cutting herself.   Defendants have failed to provide her with minimally adequate mental health care.   She is confined in isolation in Perryville's SMU and has been placed on suicide watch on multiple occasions, most recently in February 2012.   While on suicide watch, Ms. Verduzco is forced to wear a smock that barely comes to the top of her thighs, such that her legs and arms are exposed to cold air.   While on suicide watch, she has no way to turn out the lights, which are sometimes left on 24 hours a day, and she is subjected to safety checks every 10 to 30 minutes, where correctional staff wake her up if she is asleep. As a result, she cannot sleep, which aggravates her condition.   Ms. Verduzco has minimal human contact, cannot go outside, brush her teeth, or bathe regularly.   Outside of suicide watch in the SMU, her experience is similar:   extended isolation, limited exercise, and

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

limited therapeutic treatment.  Ms. Verduzco has asthma, but she has been pepper sprayed repeatedly by corrections officers.  After being sprayed, she has been dragged out of her cell, hosed down, and thrown back into her cell.  Ms. Verduzco has been pepper sprayed so much and so often that she now says she is developing a tolerance to the spray.

12.    Plaintiff Jackie Thomas is a prisoner in ADC's Eyman complex, housed in a SMU.  Mr. Thomas has been diagnosed with depression and seizure disorders.  Although Mr. Thomas did not have suicidal ideation when he first arrived at the SMU, his mental and medical conditions have deteriorated over time as he has experienced prolonged periods of isolation in the SMU.  While isolated in the SMU, he has become suicidal and committed multiple acts of self-harm, has developed insomnia and lost a great deal of weight.  As a result, he has been placed in suicide watch multiple times, where he received minimal mental health care.  Mr. Thomas has experienced multiple failures in the administration of his mental health care, including improper cessation and initiation of psychotropic medications, failure to administer prescribed medication, repeated use of ineffective medications and medications with severe side effects, lack of informed consent, and long delays in follow up and psychiatric evaluation.  In November 2011, Mr. Thomas overdosed on Diclofenac and did not receive medical attention.

13.    Plaintiff Jeremy Smith is a prisoner in ADC's Eyman complex, housed in a SMU.  Mr. Smith is diagnosed with depression, a condition aggravated by interruptions in his mental health treatment and his prolonged and indefinite incarceration in the SMU. Mr. Smith's medications have been abruptly discontinued without explanation and

restarted at inappropriate times, after lengthy delays, and without proper evaluation by a psychiatrist.  Mr. Smith also has been prescribed powerful medications not indicated for depression.   For example, beginning in April 2008, Mr. Smith was given a potent antipsychotic medication carrying a risk of severe side effects, without first being seen by the doctor.  His file contains no documentation as to why that medication was prescribed or any indication that Mr. Smith gave his informed consent to receive it.  The impact of Mr. Smith's improper care is compounded by the extreme isolation he experiences in the SMU.  Mr. Smith has formally renounced his former gang membership ("debriefed") and is thus eligible to be placed in a less restrictive setting; however, despite his mental health condition ADC refuses to transfer him out of the SMU.

14.     Plaintiff Robert Gamez is a prisoner in ADC's Eyman complex, housed in a SMU.   Mr. Gamez suffered a childhood head injury and has been diagnosed with borderline IQ, possible Post-Traumatic Stress Disorder (PTSD), and possible frontal lobe dysfunction, symptoms of which include major depression, panic and anxiety.  Although Mr. Gamez displays symptoms consistent with frontal lobe dysfunction and an initial screen was positive, ADC never conducted follow up tests to confirm his diagnosis.  Mr. Gamez has experienced multiple interruptions in care, including delays in responses to his Health Needs Requests ("HNRs"), delays in receiving and abrupt changes to his medication, receiving improper medication, inadequate monitoring and follow up visits, and a lack of psychological services for pronounced mental health deterioration during his prolonged isolation in the SMU.  For example, beginning in August 2009, Mr. Gamez

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

submitted multiple HNRs describing symptoms of paranoia, anxiety, panic, and psychosis, and asking to be taken off his medications and out of isolation.  Despite experiencing acute symptoms, Mr. Gamez was not seen for five months.  Mr. Gamez's care was managed by a nurse practitioner, and he was not seen by a psychiatrist from 2007 to 2011 despite referrals from staff, multiple HNRs and deteriorating mental and physical health.

15.   Plaintiff Maryanne Chisholm is a prisoner in ADC's Perryville complex. Ms. Chisholm has been diagnosed with hypertension, but was not referred to a cardiologist for eight months, despite experiencing chest pains and shortness of breath. Ms. Chisholm has been diagnosed with bipolar disorder, Obsessive Compulsive Disorder, and depressive disorder.  She has experienced significant delays and interruptions in medication delivery and psychiatric care and follow-up, which have contributed to worsening symptoms.  In April 2011, Ms. Chisholm reported experiencing a nervous breakdown and requested an adjustment of medication; however, she was not seen by a psychiatrist for one month and did not receive a follow up appointment as scheduled.  Ms. Chisholm's mental health has also been adversely impacted by custodial harassment. Shortly after first meeting with Plaintiffs' counsel in October 2011, Ms. Chisholm was subjected to three aggressive room searches in as many weeks.  When she asked for an explanation Ms. Chisholm was told that she was "causing problems."  In February 2012, staff again searched her cell three separate times, and confiscated a book of art and her art supplies, which Ms. Chisholm relies on to manage her mental health symptoms.  The art supplies were taken because she had painted a shelf in her cell without permission – in

2008.  She also has a broken tooth and another tooth with a missing crown.  The dentist told her the only available treatment was to pull her teeth, which she has refused.

16.     Plaintiff Desiree Licci is an inmate in ADC's Perryville complex.  Ms. Licci has a family history of cancer and was herself treated for cancer ten years ago.  In 2010 she observed multiple masses growing on her breasts, mouth, and arms, and reported discomfort in her cervix.  Starting in December 2010, Ms. Licci requested testing, and in April 2011 the prison doctor referred her to an oncologist.  However, she has still not seen an oncologist and was not sent for a CT scan until September 2011.  In the interim, Ms. Licci began experiencing frequent diarrhea, nausea, exhaustion, weight loss, pain, and other alarming symptoms.  The CT scan detected multiple masses in Ms. Licci's reproductive organs and biopsies and a colonoscopy were ordered.  Still, the Perryville gynecologist insisted that nothing was wrong with her reproductive organs.  Ms. Licci did not receive an MRI until December 2011, and it was not properly administered.  Ms. Licci had to submit a grievance and wait another month before receiving a second MRI, which confirmed multiple masses on both ovaries.  In January 2012, Ms. Licci asked the Perryville Facility Health Administrator (FHA) why she still had not seen an oncologist approximately eight months after being referred by the prison doctor.  The FHA told Ms. Licci the oncologist refused to see her without her complete file and that ADC "didn't have" Volume I of her file.  However, ADC has Ms. Licci's complete file, as it was produced to Plaintiffs' counsel in January 2012.  Additionally, Ms. Licci has a Port-a-cath implanted in her chest; however, nothing in her file indicates whether or not it was

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

properly flushed by medical staff prior to November 2011.

17.     Plaintiff Joseph Hefner is a prisoner in ADC's Lewis complex.  Mr. Hefner has impaired vision and experiences eye pain as a result of Defendants' failure to provide him with minimally adequate health care.  In 2006, Mr. Hefner's vision deteriorated rapidly after an ADC nurse gave him expired eye drops.  In 2006, and again in 2008, Mr. Hefner did not timely receive doctor-prescribed eye medication following eye surgery. Although he has submitted numerous HNRs for recurrent eye pain and twice been referred by an optometrist to see an ophthalmologist, Mr. Hefner has been waiting to see an ophthalmologist for over three years.  In March 2011, Mr. Hefner was hospitalized for injuries sustained in a prison altercation.  His outside medical records were not requested by the prison physician until three months later, after Mr. Hefner submitted multiple HNRs describing persistent pain and requesting treatment.   The records were never reviewed.  A CT scan was not done until October 2011, seven months after Mr. Hefner's injury.  Mr. Hefner also has chronic gastroesophageal reflux disease (GERD) but his requests for a medical diet have been denied.

18.     Plaintiff Joshua Polson is a prisoner in ADC's Eyman complex, housed in a SMU.  Mr. Polson has been diagnosed with bipolar disorder, mood disorder, and psychosis.  He experiences mood swings, hallucinations, paranoia, and depression, all of which are caused or worsened as a result of Defendants' failure to provide him with minimally adequate mental health care.  Mr. Polson has a family history of suicide and he has attempted suicide three times.  Nonetheless, he is incarcerated in isolation, where he

has minimal human contact, which results in increased suicidal ideation.   He has experienced repeated gaps in his medication and sporadic monitoring of his medication levels.   Additionally, Mr. Polson experiences chronic ear infections and has permanent hearing loss in his right ear following significant delays in care, including delays in seeing a physician, delays in follow-up appointments, and delays in referrals to outside specialists.  After losing hearing in his right ear, Mr. Polson submitted multiple HNRs for chronic pain in his left ear, but was not evaluated by a doctor for over a month.   Mr. Polson also experienced multiple problems with his dental care.  He had long delays in treatment for teeth that were broken, and waited three years to receive partial dentures for many missing teeth.  Mr. Polson filed a request to see the dentist about a front tooth that had broken off and was causing him a great deal of pain. He was told in response that he was requesting routine care, and he had to wait five months to see the dentist.   The remaining portion of the tooth was not extracted until a year after it broke off.

19.    Plaintiff Charlotte Wells is a prisoner in ADC's Perryville complex.  Ms. Wells has a history of heart disease and high blood pressure, and suffered a heart attack prior to being incarcerated.  She arrived to ADC custody in October 2009 complaining of chronic chest pains, and continued to experience dizziness and high blood pressure but was not evaluated by a cardiologist until she was hospitalized four months later for a blocked artery.  Ms. Wells received a stent, but two days after returning to Perryville she again reported chest pains.  Ms. Wells was not seen by a doctor or returned to the hospital, despite her history and the high risk of arterial clogging and heart attack immediately

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

following the placement of a stent.  She experienced chest pain and high blood pressure, for which she was repeatedly evaluated not by an outside cardiologist but rather by the Perryville gynecologist.  Ms. Wells continues to have problems with her blood pressure and intermittent chest pain.  Additionally, Ms. Wells experienced broken fillings in two of her teeth in 2010.  She complained of pain and requested the fillings be repaired, but was told the only option was to have the teeth pulled, or submit a HNR and wait months to have the fillings approved.  She did this, and endured pain for several months before her filings were replaced; however, when she got the filling, the dentist cracked an adjacent tooth.  Again, she was told she could have the tooth pulled, or to submit another HNR and wait for a filling.  She has waited since November 2011 for repair to the damaged tooth.

20.    Plaintiff Arizona Center for Disability Law ("ACDL") is designated as Arizona's authorized protection and advocacy agency under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C. § 10801, *et. seq*.  ACDL has statutory authority to pursue legal, administrative, and other appropriate remedies to ensure the protection of individuals with mental illness who are or will be receiving care and treatment in the State of Arizona.  42 U.S.C. § 10805(a)(1).  ACDL is pursuing this action to protect and advocate for the rights and interests of prisoners who are "individuals with mental illness" as that term is defined in 42 U.S.C. § 10802. The interests that ACDL seeks to vindicate by bringing this lawsuit – the protection of the rights of individuals with mental illness – are central to ACDL's purpose.

**Defendants**

-14-

21.     Defendant Charles Ryan is the Director of the ADC, and he is sued herein in his official capacity. As the Director of the ADC, Mr. Ryan is responsible for establishing, monitoring, and enforcing overall operations, policies, and practices of the Arizona state prison system, which includes the provision of constitutionally adequate medical, mental health, and dental care for all prisoners committed to the custody of ADC.  A.R.S. §§ 31-201, 41-1604 (A), 41-1608.   As Director, Mr. Ryan is responsible for decisions concerning staff hiring, supervision, deployment, and training that directly affect prisoners' abilities to obtain adequate and necessary health services.  He is responsible for providing constitutional conditions of confinement in all units, including but not limited to isolation units.  At all times relevant hereto, he has acted under color of state law.

22.     Defendant Richard Pratt, P.A.,[1] is the Interim Division Director of the Health Services Division of the ADC and is sued in his official capacity.  As Division Director, Mr. Pratt is responsible for establishing, monitoring, and enforcing system-wide health care policies and practices.  He is responsible for supervising the provision of adequate medical, mental health, and dental care for all prisoners within the custody of the department, including but not limited to isolation units.  At all times relevant hereto, he has acted under color of state law.

## FACTUAL ALLEGATIONS

---

[1] Mr. Pratt's Physician Assistant license (#2342) with the Arizona Regulatory Board of Physician Assistants expired on Oct. 1, 2004 and has not been renewed as of the date of this filing.  Mr. Pratt recently replaced Michael Adu-Tutu, D.D.S., as Division Director of Health Services.  Plaintiffs' allegations refer to Defendant Pratt because he is the current Division Director, and notwithstanding that the majority of acts and omissions described herein occurred during the tenure of Mr. Pratt's predecessor, Dr. Adu-Tutu.

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

23.    Defendants promise prisoners through written policies to provide sufficient resources to provide the "community standard of health care," but fall far below that measure.  ADC Dept. Order 1101.01, 1.1.  Defendants' written policies are more honored in the breach than in the observance, leaving prisoners at the mercy of de facto policies that put their lives and health at risk.[2]  Defendants are well aware of severe system-wide deficiencies that have caused and continue to cause significant harm to the prisoners in their custody, yet they have failed to take reasonable measures to abate the impermissible risk of harm.  In recent years, Defendants ignored repeated warnings of the inadequacies of the health care system and of the dangerous conditions in their isolation units that they received from inmate grievances, reports from outside groups, and complaints from prison personnel, including their own staff.  For example, in December 2009, a prison physician emailed Defendant Ryan complaining that ADC officials were breaking the law by not providing adequate health care.  James Baird, M.D., the Director of Medical Services, responded on behalf of Defendant Ryan and stated, "[t]he Department has not been found, as yet, to be deliberately indifferent. … Is the Department being deliberately indifferent?  Maybe.  Probably.  That would be up to a Federal Judge to decide.  I do think that there would be numerous experts in the field that would opine that deliberate indifference has occurred."

24.    The Deputy Medical Director for Psychiatry at the Eyman prison warned Defendant Ryan and Defendant Pratt's predecessor as Health Services Director, Michael

---

[2] As used hereafter, "policy and practice" includes unwritten policies, customs, and actual practices of Defendants.

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Adu-Tutu, D.D.S., in a series of emails in the fall of 2009 that prisoners "are not receiving a reasonable level of psychiatric care.  We are out of compliance with our own policies regarding minimum frequency of contact with a provider, as well as community standards for adequate care. The lack of treatment represents an escalating danger to the community, the staff and the inmates."

25.    On October 12, 2011, counsel for Plaintiffs submitted a 21-page demand letter to Defendant Ryan, describing numerous systemic problems in the health care system and isolation units operated by Defendants, and detailing multiple examples of harm and injuries to prisoners resulting from these inadequate policies and practices. Defendant Ryan initially responded by requesting three months to investigate these problems.  In the subsequent months, counsel for Plaintiffs continued to notify Defendants of individual prisoners asking for immediate attention to health care problems.  However, as of this date, Defendant Ryan has not provided any substantive response to the issues raised in the letter other than to say that he did not think the ADC health care system had any systemic problems.

**I. Defendants Deprive Plaintiffs of Constitutionally Adequate Health Care in Violation of the Eighth Amendment**

26.    Plaintiffs and the Plaintiff class allege the following.  Defendants Ryan and Pratt have a policy and practice of failing to provide prisoners with adequate health care, and are deliberately indifferent to the fact that the systemic failure to do so results in significant injury and a substantial risk of serious harm.

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**A. Prisoners Face Lengthy and Dangerous Delays in Receiving and Outright Denials of Health Care**

27.     Defendants have a policy and practice of failing to provide timely access to health care and are deliberately indifferent to the risk of harm and injury to prisoners that results from this systemic failure.  To request health care, prisoners must submit a HNR form, describing the need for medical, dental, or mental health attention, regardless of whether they have informed medical staff about their symptoms.  Prisoners face numerous barriers in submitting this required form:  oftentimes, there are no HNR forms in living units; staff give prisoners photocopies of HNR forms that are later rejected for not being originals; correctional officers refuse to provide forms to prisoners or discourage them from filing them; and officers read completed HNRs and tell prisoners they are not sick, and refuse to accept or forward the HNR to health care personnel.

28.     In addition, officers sometimes prohibit prisoners from assisting fellow inmates in completing HNRs, even though the officers are aware that this prevents some prisoners from filing requests.  This prohibition also harms prisoners who are acutely ill, experiencing severe mental health problems, vision-impaired, developmentally disabled, illiterate, have injuries or permanent disabilities that make it difficult to write, or are otherwise unable to fill out the forms, especially because staff members will not provide assistance.  For example, Plaintiff Smith has an injury to his hand that prevents him from writing.  He asked officers to assist him in completing the HNRs, but the officers stated they were prohibited by ADC policy from helping him.

29.     In addition to restricting the ability of prisoners to request health care,

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Defendants have a policy and practice of failing to provide care after receiving notice of prisoners' needs, and are deliberately indifferent to the harm that results. Even if the completed HNR is forwarded to health care staff, it is not processed in a timely manner, so prisoners have to file multiple HNRs and face long delays of many weeks and often months before they receive medicine or are examined by qualified clinicians, and experience harm and unnecessary pain and suffering as a result.

30.     Oftentimes, medical staff members respond to a HNR stating only that the prisoner is on a waiting list to see a physician, dentist, psychiatrist, or outside specialist, even in response to HNRs alleging serious injuries that require immediate action. Plaintiffs Hefner, Gamez, and Swartz have received responses telling them to "be patient" to HNRs alleging serious pain or injuries. Plaintiff Licci was told by the Perryville Facility Health Administrator (FHA) that she was "hindering [her] own care" by filing grievances and HNRs about not seeing an outside specialist about numerous suspicious masses on her reproductive organs. Plaintiff Verduzco, who has a history of self-harm and multiple suicide attempts, filed a HNR reporting headaches, that she was experiencing auditory hallucinations, and that she needed help with her psychotropic medication, begging, "I'm scarde [sic]. Confused." She received a written response three days later, stating "You will be put on the waiting list to be seen." A prisoner who had a stent implanted at an outside hospital in August 2011 after a heart attack was ordered by the surgeon to see a cardiologist within a month. The prisoner has filed multiple HNRs asking to be referred to a cardiologist, but the most recent response he received to his

HNR in January 2012 was "Medical aware. Please be patient. Thanks."  Another prisoner with major disabilities and multiple chronic medical problems received a response to one HNR stating, "due to the fact that the provider has to see a large amount of inmates, the number of issues addressed per inmate will be limited to one main issue."  He was told in a different response that he "must learn to accept and live with [the] reality" of pain and discomfort.  A staff member told a prisoner who filed multiple HNRs over a two-month period for untreated high blood pressure, seeing stars, and having problems getting out of bed, that a two month wait for medical care is acceptable, and that he should "pray" for his health issues to be cured.

31.     Defendants have been warned repeatedly about these unreasonable delays in access to health care.  In April 2009, a physician at the Eyman complex sent an email entitled "Deficient access to care, Risk exposure" to Defendant Pratt's predecessor as Health Services Director, Dr. Adu-Tutu, and other prison officials, noting it took prisoners "about 6 weeks to be seen" after the medical department receives a HNR, and that the situation was a "multi car accident waiting to happen."  The delays have only grown worse:  in February 2011 a Perryville psychiatrist warned Dr. Ben Shaw, the Director of Mental Health Services who reports to Defendant Pratt, that "we are backed up 3-4 months with the HNRs and longer for regular follow-ups."

32.     Lengthy delays in responding to HNRs and providing necessary health care are the system-wide norm, as reflected in countless examples.  Plaintiff Hefner filed multiple HNRs in the spring of 2011 about pain and injuries to his ribs and torso after an

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

attack, but was not seen by a doctor for three months.  Plaintiff Polson has recurrent ear infections, but when he has them he must file multiple HNRs and wait anywhere from three to six weeks to be seen and given antibiotics or ear drops.

33.     This failure to timely respond to HNRs is compounded by Defendants' failure to create an effective tracking and scheduling system for health care appointments or of prisoners' medical records.  There also are no standardized protocols or timeframes dictating deadlines by which a prisoner requesting care must receive a face-to-face appointment with a nurse, doctor, or other clinician.  As a result, inadequately-trained lower-level staff triage the HNRs and decide whether to schedule an examination, without sufficient information.

34.     The harm from the delays in care is aggravated by Defendants' policy and practice of having ADC clinicians make treatment decisions without examining prisoners, instead relying on brief notes or descriptions from lower-level medical assistants and even correctional officers who have no medical training.  In the unsupervised gatekeeping role Defendants force on them, these lower level medical and custody staff often do not recognize or acknowledge the symptoms a patient displays until the condition has become so acute as to be life threatening or results in permanent injury.  For example, Plaintiff Polson had chronic ear infections for months that were not being cured with basic antibiotics.  During that time, he was only seen by a Licensed Practical Nurse (LPN) or medical assistant who would consult with a doctor over the phone; the physician would not physically examine him.  He had blood oozing out of his ear after multiple ear

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

infections, but was told by a physicians' assistant and a LPN that it was just a scratch. Due to Mr. Polson's recurrent untreatable infections and a prior diagnosis of the particularly antibiotic-resistant methicillin-resistant staphylococcus aureus ("MRSA"), the minimum standard of care requires the physician to personally examine Mr. Polson and culture his ear to make sure a different medicine would work. This was not done, and Mr. Polson suffered permanent hearing loss.

35.    Plaintiff Hefner has a complicated ophthalmological history including surgery for glaucoma and cataracts, and experiences iritis (recurrent inflammation of the iris) after being given expired eye drops by a prison nurse in 2006. He submitted seven HNRs for eye pain and problems between August 2009 and October 2011. Because HNRs are not reviewed by a physician or clinical staff member, the staff who review the HNRs have repeatedly chosen to triage his request by placing him on a waitlist to see an optometrist, rather than an ophthalmologist. As of January 2012, he still had not yet seen an ophthalmologist, despite twice being referred by the optometrist.

36.    Defendants also have a policy and practice of relying on unqualified personnel to perform medical procedures for which they are unqualified, with horrific results. For example, Plaintiff Jensen had prostate cancer surgery in July 2010 and returned to the Tucson prison with an internal Foley catheter connecting his bladder to his urethra through the bladder neck. The catheter was to stay in place for three weeks and be removed only by the outside urologist or surgeon. Two weeks after his return, the catheter began to leak urine. Mr. Jensen submitted two HNRs but was not seen until 48

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

hours later by a nurse who said he could wait until his scheduled follow-up appointment. The next day, still experiencing pain and leaking urine, he was seen by a nursing assistant ("NA") who requested a doctor's order to irrigate the Foley catheter.  The physician did not examine Mr. Jensen before authorizing the procedure.  When the NA attempted to irrigate Mr. Jensen's catheter, she instead shoved it deeper inside him and twisted it 180 degrees, causing excruciating pain.  The improper manipulation of the catheter tore out his internal stitches, and the catheter ended up outside his bladder, lying freely in his abdomen, such that urine drained from his torn bladder directly into his abdominal cavity. Despite Mr. Jensen's excruciating pain, and the absence of urine, he was not taken to the ER or to see an outside specialist until his previously scheduled follow-up appointment three days later, at which point the outside clinicians rushed him to the operating room for emergency surgery.  As a result of the injuries sustained during the NA's attempt to irrigate the catheter, he has required multiple follow up surgeries to repair the bladder, remove scar tissue, and treat infections.  In February 2012, Mr. Jensen was told by an outside urologist that he needed surgery to replace his irreparably destroyed bladder.

**B. Defendants Do Not Provide Prisoners With Timely Emergency Treatment**

37.    Defendants Ryan and Pratt have a policy and practice of not providing prisoners with timely emergency responses and treatment, and do not have an adequate system for responding to health care emergencies.

38.    There is not an adequate number of on-duty health care staff to respond to possible emergencies.  For example, the Tucson complex's Whetstone Unit, designated

for prisoners with the gravest and most complex medical needs, does not have clinical staff on duty between the hours of 6 pm and 6 am.

39.     Defendants have not adequately trained security and health care staff on how to handle health care emergencies, and as a result of this failure to respond properly and timely to emergencies, prisoners suffer avoidable harm and injuries, including unnecessary deaths.  While trained in basic first aid, correctional officers are not trained to evaluate medical situations.   Yet correctional staff act as gatekeepers, making critical decisions about whether emergency care is warranted.  In July 2010, correctional officers at the Tucson prison stood by and watched a severely mentally ill prisoner named Tony Lester bleed to death after his second suicide attempt.  Mr. Lester, who had paranoid schizophrenia, multiple personality disorder, and auditory hallucinations, had been taken off suicide watch, taken off his medications, and housed in the general population, where he was given a hygiene kit that included a razor.  He used the razor blade to slit his throat, groin, and wrists, and he wrote the word "VOICES" in his blood on an envelope.  An ADC internal investigation found that the four responding officers stood by and did not administer any basic first aid.  One officer told investigators he didn't want to be "wallowing through" Mr. Lester's blood, and another said his limited training did not teach him how to stop bleeding.  When an internal investigator asked one officer, "So you guys just stood around for 23 minutes and watched this guy bleed to death?", the officer stated that his response was to call Mr. Lester's name and to try to elicit a reaction.

40.     In October 2011, a prisoner at the Eyman prison collapsed in his living unit

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

from a heart attack.  Other prisoners yelled for security staff to contact medical staff.  Officers told the prisoners to "wait and see what happens," and did not summon help or provide assistance to the stricken prisoner.  In desperation, another inmate checked the prisoner's pulse, and finding none, began to perform CPR.  After a few minutes, the prisoner began breathing again.  Only then did officers summon medical staff.  Three hours later, the prisoner was sent from the medical unit back to his living unit and told he had a medical appointment in a few days.  The prisoner had another heart attack the next day and died.  After his death, the prisoner who saved his life after the first heart attack by performing CPR was issued a disciplinary write-up for violating a rule that prisoners may not perform medical procedures on other inmates.

41.     It is not only correctional staff that lack necessary training in responding to emergency situations.  Lower level medical staff, who serve as the first line of response to prisoners' requests for medical assistance, often do not recognize when a prisoner is experiencing an emergency.  In September 2011, Plaintiff Swartz swallowed a metal spring and copper wire, and told medical staff he had done so.  The mental health staff members did not believe him and joked about how they would need to cut him open.  They had him screened with a metal detector or metal wand, and told him he would have to wait to pass the pieces of metal.  Using a metal detector to detect the presence of objects in adults does not comport with the appropriate standard of care, which requires physicians to obtain X-rays and/or CT scans to determine the location of the object, and to emergently remove sharp objects from the esophagus, stomach, or small intestine via

endoscopy.  Mr. Swartz had an X-ray the following day, after he swallowed yet another object, this time a sharpened paper clip.  The X-ray revealed multiple pieces of metal in his stomach, including the spring and paper clip, but the prison doctor did not refer him for an endoscopy, and instead told Mr. Swartz he would have to pass the objects, which he did painfully several weeks later.  Ignoring sharp ingested objects puts a patient at risk for perforation of internal organs and death.

42.    In another example, in May 2011, a prisoner who was four months pregnant began experiencing painful contractions and spotting blood, and went to Perryville's medical unit.  The staff person on duty told her it was nothing serious, that her problems were "all in your head," and that she could not see a clinician for evaluation or treatment.  She was sent back to her living unit, and she continued to experience great pain and cramping for an hour and a half, until she miscarried.

43.    Even when properly responding to an emergency, medical staff face barriers to providing timely emergency assistance. For example, a prisoner in the Yuma prison has three to four seizures per week because he does not regularly receive epilepsy medication.  He regularly encounters delays in the emergency response during his seizures because of the configuration of his living unit – the entrance door is 34 inches wide, and facing the entrance is a wall approximately four feet high.  As a result, medical staff cannot get a gurney through the doorway without spending critical time contorting the gurney through the door and around the wall.  Other prisoners or officers must help lift the gurney over the wall, or drag the convulsing prisoner to the door of the unit.

## C. Defendants Fail to Provide Necessary Medication and Medical Devices to Prisoners

44.     Defendants have a policy and practice of failing to prescribe, provide, and properly manage medication, or of only providing incorrect, interrupted, or incomplete dosages of medication.  Defendants also have a policy and practice of failing to provide necessary medical devices and supplies.  Prisoners experience delays and gaps in receiving medicine or supplies, including those prescribed by outside doctors.  Delays and gaps also occur when prisoners transfer from one ADC prison to another.  Prisoners face abrupt discontinuation of their medications for weeks or months, before being seen by a new provider.  For example, Plaintiff Swartz was transferred in December 2011 from Phoenix to Lewis, but had to file multiple HNRs and wait several weeks before he began receiving the psychotropic medications prescribed by Phoenix physicians.

45.     Defendants have a policy and practice of not providing prisoners with the full course of their medication, not providing prisoners medication as prescribed or in a timely fashion, and inappropriately starting and stopping medication.  As a result, prisoners suffer unnecessary harm, and in the cases of prisoners with psychotic and mood disorders, suffer withdrawal symptoms and the recurrence of symptoms such as hallucinations and suicidal ideation.  For example, Plaintiff Parsons' medications were abruptly discontinued without any clinical explanation and he was not seen for his resulting psychiatric problems for two weeks.  At that point he was prescribed an entirely different medication.

46.     Psychotropic medications that are to be taken daily regularly go

-27-

undelivered, without explanation or warning.   Plaintiff Gamez has had medications abruptly started, stopped and restarted, including a potent antipsychotic medication. Plaintiff Rodriguez was switched multiple times from Risperdal to Haldol to treat her psychosis, but with no documented explanation for the changes, and with a more rapid titrating on and tapering off the medications than is consistent with the therapeutic indications of use.

47.   Prisoners also are given expired medication or incorrect dosages of medication, resulting in harm.   When Plaintiff Hefner originally suffered his eye injury, a nurse at the Safford prison gave him eye medication that had expired more than three months previously.   When he used the medication, his vision dramatically worsened, and he developed iritis.   A prisoner at the Tucson complex was given the incorrect dosage of medication to treat his seizures in September 2011.   He suffered a stroke, and despite pleas for help from his fellow inmates, waited more than a day before medical staff saw him and referred him to an outside hospital's Intensive Care Unit.   Now, due to the stroke, he slurs his speech, has difficulty walking and relies on a wheelchair, and is incontinent.

48.   Defendants have a policy and practice of only providing medicine listed on a limited formulary of approved medication, and routinely substitute doctor-approved drug regimens with drugs on the ADC-approved formulary.   As a result of this policy and practice, prisoners are deprived of medications that are well-established as effective for their health conditions, and receive inferior, ineffective, or obsolete medications, or nothing at all.   For example, when Plaintiff Brislan was incarcerated, mental health staff

discontinued his prior, effective medications because they were not listed on the formulary.  Instead, he was prescribed Buspar, an older anti-anxiety medication, even though he told the nurse it had not worked for him in the past.  His mental health symptoms continued to worsen while on Buspar.  Plaintiff Parsons was given a potent antipsychotic medication for hyperactivity, a condition for which the drug is not normally prescribed, and had other psychiatric medications discontinued several times.  On multiple occasions, Plaintiff Gamez was prescribed antipsychotic and anti-epileptic medications such as Thorazine and Tegretol for off-label treatment of irritability and mood disorder caused by a childhood traumatic brain injury, even though there are other drugs that are more effective for treating these symptoms, with fewer side effects.

49.    According to the 2011 deposition testimony of one of ADC's doctors, the prescription of non-formulary medication is frequently subject to delay and erroneous denial.  ADC policies restricting these prescriptions result in multiple requests by prison doctors over months until an ad-hoc committee of medical and administrative staff at ADC's central office reviews the request. As a result, prisoners experience delays in treatment and unnecessary harm.  For example, Plaintiff Swartz went for more than six weeks without medication for pain from his serious injuries and broken facial bones from an assault, while awaiting central office approval of the physician's prescription for Tramadol.  However, he was not prescribed a different pain medication on the formulary list pending the approval of Tramadol.  Without the medication, he experienced intense pain and had problems eating.

50.     Defendants have a policy and practice of not providing medically necessary devices, thus depriving these prisoners of basic sanitation.   Plaintiff Jensen and other prisoners who need catheters are given fewer clean catheters than they need, and thus have to re-use the catheters, putting them at risk of bladder and urinary tract infections. Plaintiff Jensen has repeatedly not been provided an adequate number of catheters, and at times has had to rely on his wife to order and pay for the catheters, and have them delivered to the prison.   Prisoners who need incontinence briefs or wipes often go without them, or are told they only are allowed one diaper per day.   As with Plaintiff Jensen, prisoners fortunate enough to have the assistance of family members often rely on them to obtain toileting supplies and have them delivered to the prison.

**D. Defendants Employ Insufficient Health Care Staff**

51.     Many of the severe deficiencies in ADC's health care system are caused by Defendants' failure to employ sufficient health care staff positions to provide adequate health care to prisoners.   There are simply insufficient medical, dental, and mental health clinicians (i.e. physicians, psychiatrists, dentists, physicians' assistants, registered nurses, and other qualified clinicians) on staff to meet the significant and documented health care needs of the almost 33,100 prisoners in ADC custody.

52.     As an ADC doctor at the Florence prison testified in September 2011, "we are chronically and consistently understaffed."   The same doctor had previously noted this problem in an email to prison staff, stating that "[s]omething bad is going to happen sometime" and pleading for help.   In an email to Defendant Pratt's predecessor, Dr. Adu-

Tutu, and other administrative and medical officials, this same physician noted that "[w]e just don't have the man power to do our assigned duties," are "unable to meet our policy and constitutional mandates," and the provision of health care "continue[s] to be a multi-car accident waiting to happen." And in an email to other ADC medical staff, the doctor noted that "inadequate staffing levels and unrealistic workloads lead to significant breakdowns in the front line services we are trying to provide" and concluded that "we are not meeting our own or anybody else's standard of care."

53. Defendants' policy and practice of chronically and consistently understaffing health care positions results in multiple deficiencies and inadequate health care: there is not enough staff to timely respond to prisoners' requests for health care and to emergencies, to provide uninterrupted medication delivery, or to adequately screen, monitor and provide follow-up care to prisoners with serious and chronic illnesses. The inadequate health care staffing is caused by Defendants' systematic elimination of health care staffing positions in recent years, including physicians, dentists, registered nurses, and psychiatrists, and Defendants' failure to actively recruit, hire, train, supervise and retain sufficient and competent health care staff.

54. Despite rising health care costs across the country, ADC spending on health care staff positions dropped more than $4.4 million, or 8.4%, from Fiscal Year ("FY") 2009 to FY 2011 while the overall state prison population declined by less than 1%. These positions were eliminated despite warnings from Defendants' own health care staff that prisoners would suffer serious harm from the resulting delays in access to care,

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

emergency response, specialty care referrals, and inadequate chronic care and medication management.  For example, in February 2011, the sole psychiatrist on staff at Perryville – a complex with 3,500 prisoners and multiple special mental health units for female prisoners – wrote an email entitled "Please help" to prison officials, warning them that mental health staffing was "abysmal," and as a result mental health staff had to "renew meds for dozens of people per week without getting to see them because there is not enough time."  The psychiatrist concluded, "I'm doing the best I can but it is still not enough.  I do not want to leave my position here as I feel that I do some good for the women here and society in general but I am stretched very thin."  In June 2011 the same psychiatrist wrote an email entitled "Please assist Florence" to Defendant Ryan and Defendant Pratt's predecessor Dr. Adu-Tutu, and other ADC officials describing the "dire situation" at Florence as it was the last day that complex would have a psychiatric provider.  She described the problems the remaining low-level staff were having in providing medication for prisoners.  Defendant Ryan's response was, "Your concerns are not falling on 'deaf ears'.  I acknowledge your messages."

55.    The harm resulting from staffing shortages is not limited to Perryville and Florence.  The Deputy Medical Director for Psychiatry at Eyman warned Defendant Ryan and Dr. Adu-Tutu in a series of emails in the fall of 2009 that prisoners "are not receiving a reasonable level of psychiatric care.  We are out of compliance with our own policies regarding minimum frequency of contact with a provider, as well as community standards for adequate care. The lack of treatment represents an escalating danger to the community,

the staff and the inmates."   Defendant Ryan responded with a brusque one sentence response that "a strategy is being pursued."

56.     That strategy, if one was indeed pursued, has failed.  As of August 2011, more than half of all mental health staff positions were vacant at the Eyman complex, which houses multiple mental health units and two SMUs, where prisoners are held in isolation.  As of October 31, 2011, there was not a single psychiatrist on staff for the entire Eyman complex.  Nor are any psychiatrists currently employed on staff at the Florence, Lewis, and Tucson complexes, which along with Eyman are designated to house prisoners classified as "MH-4: High Need," signifying the prisoners need specialized placement in a mental health program and intensive psychiatric staffing and services.  As of August 2011, the Yuma prison housed 52 prisoners classified as MH-3, which ADC's criteria describe as prisoners who require "regular, full-time psychological and psychiatric staffing and services" and who need mental health treatment and supervision.  Yet as of November 2011, the only mental health staff person for the entire Yuma complex was a lower-level, Psychology Associate II.  That position does not require medical training or a Ph.D., but rather only a degree in counseling or social work.  A Psychology Associate II cannot manage or prescribe medications under current state law, and should be supervised by a psychologist.

57.     Defendants have knowingly ignored the warnings of their own staff and others about the staffing shortages, and as a result prisoners continue to suffer from constitutionally inadequate health care and substantial risk of serious harm due to

Defendants' deliberate indifference to the impact of the system-wide staffing shortages.

## II.   Even If Prisoners See Health Care Providers, They Do Not Receive Adequate Medical, Dental, or Mental Health Care

### A. Substandard Medical Care

58.     Plaintiffs Jensen, Swartz, Chisholm, Licci, Hefner, Polson, and Wells, and the Medical Subclass, allege the following.  Defendants Ryan and Pratt have a policy and practice of failing to provide prisoners with adequate medical care, and are deliberately indifferent to the fact that the systemic failure to do so results in significant injury and an substantial risk of serious harm to prisoners.  Defendants' failure to provide adequate medical care results in prisoners experiencing prolonged, unnecessary pain and suffering, preventable injury, amputation, disfigurement, and death.

#### 1.   Defendants Fail to Provide Prisoners With Care for Chronic Diseases and Protection From Infectious Disease

59.     Defendants have a policy and practice of failing to provide prisoners with medically necessary care to address ongoing medical needs or diseases.  Defendants' deliberate indifference to their systemic failure to properly treat or manage prisoners' chronic illnesses exacerbates prisoners' conditions, and frequently leads to preventable permanent injuries or deaths.  For example, a prisoner who needed medical care for gastrointestinal bleeding and an untreated hernia tragically did not receive proper treatment even after Defendants were aware of his problems.  His hernia ruptured his stomach lining and he was found dead after "vomiting up his insides," according to witnesses.  Prior to his death, he reported that a prison doctor told him the hernia was

-34-

"merely cosmetic," yet when the prisoner asked about his prognosis, the doctor joked, "I wouldn't go to Vegas with you."  A prisoner who has Hepatitis C requested treatment in a HNR, but was told in response that since he had received a disciplinary ticket, he was not eligible for treatment until one year after the date of the ticket.

60.     Defendants also have a policy and practice of not providing medical diets ordered by clinicians for prisoners with chronic conditions such as high blood pressure, high cholesterol, kidney failure, and diabetes.  Instead, all prisoners, including those with chronic conditions requiring special diets, are given a nutritionally inadequate, high-fat and high-sodium diet.  Plaintiff Hefner has chronic gastroesophageal reflux disease (GERD) and requires a special diet.  However, his request for a medical diet was denied, and the meals he is given often aggravate his condition, forcing him to choose between eating food that will cause physical distress, or eating nothing.

61.     Defendants also have a policy and practice of failing to effectively enforce state law prohibiting smoking inside buildings, endangering the health of prisoners and Defendants' employees with chronic medical conditions such as asthma, chronic obstructive pulmonary disease, allergies, or emphysema, and posing a health risk to prisoners and staff exposed to second-hand smoke.  Plaintiffs Gamez and Thomas both have asthma, and report that second-hand cigarette smoke has triggered asthma attacks.

62.     Defendants have a policy and practice of failing to mitigate the risk of infectious and communicable diseases, such as MRSA, Vancomycin-Resistant Enterococcus (VRE), Hepatitis C, and tuberculosis.  Defendants fail to maintain basic

sanitation to prevent the exacerbation of chronic conditions and the spread of infectious diseases.   Many sections of ADC's prisons are filthy, fail to meet basic sanitation standards, and expose prisoners to serious, and sometimes fatal, communicable diseases. These conditions include urine-soaked mattresses, uncontrolled infestations of vermin, and cell walls and floors covered with black mold or smeared with the feces, spit, and blood of other inmates.   Prisoners with cuts or other injuries to their bodies have contracted serious infections from the unsanitary conditions of the prison.   A prisoner living in unsanitary conditions in the Tucson complex developed a staph infection but was not examined by medical staff until the infection had spread to his eyes.   He now has minimal vision in his right eye and has lost vision in his left eye.

### 2.   Defendants Fail to Provide Timely Access to Medically Necessary Specialty Care

63.   Defendants have a policy and practice of failing to provide prisoners with specialty care, or doing so only after extensive and unreasonable delays, often resulting in unnecessary pain and suffering, permanent injuries, and death.   Defendants do not employ medical specialists, but instead send prisoners to contracted outside specialists.   In 2009, reimbursement rates for prison medical contractors were capped so as to be no higher than those paid by the State's Medicaid program, the Arizona Health Care Cost Containment System.   Defendants knew of the impending change to the reimbursement system, but failed to take steps to ameliorate the foreseeable impact of the change in policy.   As a result, all outside medical providers ended their contracts with ADC.   For much of 2009 and 2010, Defendants had no contracts in place with outside providers, and even today

have few outside specialists under contract to treat ADC prisoners.  Prior to the rate change, ADC's spending on outside medical services in FY 2009 was $70,860,190.  In FY 2011, the first full year following the change in rates, spending on specialty services had plummeted by 38% to $43,807,120, while there was no corresponding decline in the number of prisoners in ADC's custody.  Two years later, as a result of the accumulation of pending referrals and the smaller number of contracted providers, prisoners still encounter lengthy delays in getting specialized care for serious medical needs.

64.    Defendants have been warned repeatedly by their own prison doctors and are well aware that delays in referrals, including those caused by an overly burdensome approval process for outside specialists harm prisoners, but Defendants are deliberately indifferent to the resulting harm.  An ADC physician testified that it takes months for specialty referrals to be processed and that physicians are not notified of the decision from ADC headquarters as to whether the referral will be granted.  This doctor told prison officials "the referral system has broken down."  Another ADC physician described in an email to prison officials how difficult it was to refer to a specialist a patient with a suspected carcinoma of the lip.  After repeatedly submitting urgent referrals, he finally sent the request directly to the Division Director of Health Services.  The physician described a system where referrals are "falling through cracks," and estimated that "an extensive list of examples… would probably exceed 30% of [his] consults."

65.    Defendants' policy and practice of systematically failing to provide timely access to outside specialists causes prisoners unnecessary harm.  In late February 2010,

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff Swartz was attacked by other inmates and suffered eye injuries and fractures of his cheek bone, orbital bone around his eye, and upper jaw bone – fractures that, if not treated, result in the person's face caving in, and in permanent disfigurement.  Outside emergency room doctors advised that he be seen within a week by an ophthalmologist and plastic surgeon. Prison doctors submitted these referrals to the review committee, but they were not approved.  Instead, Mr. Swartz was sent to an oral surgeon, who operated on his face without an anesthesiologist present.  Mr. Swartz was over-sedated and had to have an antidote to be revived.  His face was partially paralyzed due to nerve damage from the botched surgery and over-sedation, and his eyelid drooped, causing dryness to his cornea.  It was not until almost eleven months after the injury that he finally saw an ophthalmologist regarding his various injuries.  Almost two years after the attack, he has yet to have his eye and facial damage repaired by a specialist.

66.    In another tragic case, medical staff at the Tucson prison complex did not diagnose, treat, or refer to specialists a prisoner named Ferdinand Dix who had untreated small cell lung cancer that had spread to his liver, lymph nodes, and other major organs, causing sepsis, liver failure, and kidney failure.  For two years, Mr. Dix had filed multiple HNRs and exhibited many symptoms consistent with lung cancer, including a chronic cough and persistent shortness of breath, and he tested positive for tuberculosis.  Due to the metastasized cancer, Mr. Dix's liver was infested with tumors and grossly enlarged to four times normal size, pressing on other internal organs and impeding his ability to eat, but no medical staff even performed a simple palpation of his abdomen.  Instead, medical

-38-

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

staff told him to drink energy shakes.  When Mr. Dix was finally taken to an outside hospital in a non-responsive state in February 2011, his abdomen was distended to the size of that of a full-term pregnant woman, as seen in the photograph below.  Mr. Dix died from the untreated cancer a few days after ADC finally sent him to the hospital.



67.     Defendants have a policy and practice of failing to order or approve outside diagnostic testing, including biopsies of suspicious tumors and growths, and are deliberately indifferent to the resulting harm to prisoners.  For example, Plaintiff Jensen waited more than two years to have a biopsy of the mass in his prostate, because contracts with outside providers were cancelled.  By the time he was finally seen and treated, the cancer was much worse, resulting in more invasive surgery and the need to permanently use a catheter.  Beginning in 2010 Plaintiff Licci observed multiple masses growing on her breasts, mouth, and arms, and reported discomfort in her cervix.  The masses were observable in physical examinations.  She began experiencing frequent diarrhea, nausea,

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

exhaustion, weight loss, pain, and other alarming symptoms.  Ms. Licci has a family history of cancer and was treated for cancer in 2001.  Starting in December 2010 she requested testing and a prison doctor ordered a referral to an oncologist.  However, Ms. Licci was not sent to an oncologist and did not receive a CT scan until late September 2011.  At that time the masses were described as "lighting [the CT scan] up like a Christmas tree," and the specialist ordered biopsies and a colonoscopy.  Still, the Perryville gynecologist insisted that nothing was wrong with her.  She finally had an MRI in December 2011, but it was not properly administered.  Ms. Licci had to file additional HNRs and grievances before receiving a second MRI, which confirmed multiple masses on both ovaries.  She still has not seen an oncologist or had biopsies.

68.    A prison physician submitted a request that Plaintiff Hefner have a CT scan to rule out a rib fracture and injury to his spleen in March 2011 after he was injured in an attack, but the request was never reviewed or completed.  Mr. Hefner experienced persistent pain and submitted three different HNRs in April and May of 2011, but was not seen by a doctor until June 29, 2011, at which time the CT scan was again requested.  He did not get a CT scan until late October, 2011, suffering unnecessary pain in the interim.

69.    When outside physicians see prisoners, they often prescribe treatment regimens and medication.  However, when prisoners return to prison, Defendants fail to monitor symptoms or provide follow-up treatment ordered by outside hospital physicians in accordance with the prescribed treatment regimens and medical standards of care.  As a result, prisoners suffer infections and unnecessary setbacks in their recovery and must

return to the hospital.

**B. Substandard Dental Care**

70.    Plaintiffs Swartz, Parsons, Chisholm, Polson, and Wells, and the Dental Subclass, allege the following.  Defendants Ryan and Pratt have a policy and practice of failing to provide medically necessary dental services, and are deliberately indifferent to the fact that the systemic failure to do so results in injury and a substantial risk of serious harm to prisoners.

71.    Prisoners wait months or years for basic dental treatment and suffer significant pain and other harm.  Plaintiff Polson was put on the "routine care" waiting list for dental treatment even though he has multiple teeth that are visibly missing or broken. The prison dentist designated him as qualified for partial dentures in April 2008, but they were not fitted until April 2011.  He regularly does not receive his soft food diet.  He also filed a HNR after a dead front tooth broke, asking to be seen by the dentist, and to receive a soft diet, and inquiring about the status of receiving the dentures.  The only response on the HNR was "You are requesting ROUTINE care. You are on ROUTINE care list."  He was not seen by the dentist until five months later.

72.    The primary dental service provided by Defendants is tooth extraction, even if a much less invasive procedure such as a filling is medically appropriate and necessary. Prisoners regularly face the horrible dilemma of saving a tooth and suffering pain, or ending the pain and losing a tooth that otherwise could be saved.  Plaintiff Swartz is currently in this position.  Some prisoners initially refuse the extractions, but eventually

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

acquiesce after suffering pain for a long period of time, or their condition worsens until extraction is the only treatment option available.  After Plaintiff Wells reported missing fillings in two of her teeth in December 2010, the prison dentist recommended they be extracted.  She refused, and the dentist told her to file an HNR requesting replacement fillings.  Ms. Wells endured pain for several months before her fillings were replaced; however, in the process an adjacent tooth was cracked, exposing a nerve.  She was told by the dentist to submit another HNR to get that tooth repaired.  Several months later, she still has not received appropriate care and suffers pain.

73.     Prisoners who are fortunate enough to get fillings are not given permanent fillings, but rather temporary fillings that are not designed to last more than a few months at most.  Plaintiff Parsons filed an HNR in June 2008 regarding a cavity, but was not seen until September of that year, at which time he was given a temporary filling.  He filed four HNRs in 2009 complaining that the temporary filling had fallen out of his tooth.  Each time, he was given another temporary filling that would fall out weeks later, and he would have to restart the process.

**C. Substandard Mental Health Care**

74.     Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Parsons, Chisholm, and Polson, Plaintiff Arizona Center for Disability Law, and the Mental Health Subclass, allege the following.  Defendants Ryan and Pratt have a policy and practice of failing to provide prisoners with adequate mental health care, and are deliberately indifferent to the fact that the systemic failure to do so results in injury and a

substantial risk of serious harm to prisoners.

### 1. Defendants Deny Mentally Ill Prisoners Medically Necessary Mental Health Treatment, Including the Proper Management and Administration of Psychotropic Medication, Therapy, and Inpatient Treatment

75.     Defendants have a policy and practice of denying treatment or providing inadequate treatment to prisoners with serious mental health needs.  Because of chronic understaffing, mentally ill prisoners have insufficient interactions with psychiatrists; many receive at most a five- or ten-minute interactions once or twice a year in which they are asked only if their medications are working.  According to Defendants' own records, some contacts with mental health staff are as brief as two minutes.  As a result, clinicians cannot make informed decisions about care.  For example, Plaintiff Gamez did not see a psychiatrist from 2007 to 2011, despite exhibiting worsening mental health and behaviors such as paranoia, anxiety, panic, and psychosis.  Instead, a nurse practitioner merely prescribed a variety of psychotropic medications, including drugs not indicated for his diagnosis and behavior.  On two separate occasions when Plaintiff Brislan was placed in suicide watch for weeks for engaging in self-harming behavior and suffering severe side effects from a variety of psychotropic medications, he did not see a psychiatrist for stretches of five and seven months.

76.     Since they possess at most a glancing familiarity with their patients, clinicians are unable to meaningfully evaluate crucial decisions affecting safety and health, such as the clinical appropriateness of indefinite confinement in SMUs and other units that hold prisoners in long-term isolation with minimal opportunities for human

interaction.  For example, Plaintiff Gamez experienced hallucinations and deterioration in his mental health due to abrupt interruptions in his medication, yet for two years he never saw a psychiatrist while in Eyman's SMU.  Similarly, while in Eyman's SMU, Plaintiff Thomas did not see a psychiatrist for almost a year even though he had been moved to the suicide watch unit multiple times.

77.    This systemic failure of mental health treatment extends to the management of psychotropic medication.  Defendants have a policy and practice of failing to monitor and provide follow-up treatment after prescribing psychotropic medications.  In addition, prisoners who are on psychotropic medications that increase heat sensitivity are exposed to levels of heat that pose potentially lethal risks.  Defendants are aware of the resulting problems and the risk of serious harm to prisoners.  In June 2011, the sole psychiatrist at Perryville emailed Defendant Ryan and other prison officials about the "dire situation" at the Florence prison, as it was the last day a psychiatric provider would be on staff.  As a result of the staff shortage, she said she was contacted by nursing staff at the Florence prison, asking her to prescribe or renew medications for patients she had never examined, and who were housed at a prison 90 miles away from where she worked.  The psychiatrist told Defendants that

> These are patients I have never met or treated.  The liability for treating patients without evaluating and monitoring them is not one I am willing to undertake.  It is unreasonable for administration to expect that its (very few) providers that it has left to carry the burden of treating patients unseen.  In the past, I have been willing to fill meds for a day or two until the patient could be seen by the facility psych provider, but I am not willing to prescribe meds for long periods of time without seeing the inmate. …I hope for the sake of the patients and the staff at Florence that

-44-

you will drop everything else you are doing and work on getting a provider for them.

78.    Defendant Ryan's response was "[y]our concerns are not falling on 'deaf ears'."  Yet the problem the psychiatrist raised in June continues.  According to ADC staffing reports, as of November 2011, four of the six prisons designated by Defendants for Level MH-4 seriously mentally ill prisoners – Eyman, Florence, Lewis, and Tucson – do not have a single psychiatrist on staff; it is therefore unclear who is writing or renewing prescriptions for psychotropic medication at those complexes.  The Phoenix facility, which is located on the grounds of the Arizona State Hospital and is designated for the highest two levels of prisoners in need of inpatient mental health care, has only one psychiatrist on staff.  As of February 28, 2012, 197 prisoners were housed in these mental health units at Phoenix.

79.    Because prisoners on psychotropic medications rarely if ever see a psychiatrist due to staffing shortages, there is little or no follow-up to evaluate the efficacy of prescribed medications, to ensure that dosages are adjusted properly to achieve therapeutic levels, or to evaluate prisoners for possible adverse side effects.  For example, Plaintiffs Parsons, Polson, and Gamez did not have their blood regularly drawn to test for dangerous side effects of medication.  Similarly, without any documentation of the basis for their decisions, mental health staff prescribed Plaintiff Rodriguez high doses of Haldol, an old medication that carries a much greater risk than newer medications of side effects and long QTc syndrome, which puts a person at risk of heart arrhythmias.  Ms. Rodriguez had a history of long QTc measurements, and exhibited symptoms including

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

lack of spontaneous speech, muscle and jaw stiffness, involuntary movements, and grimacing.  Ms. Rodriguez finally started to refuse Haldol because of the side effects, aggravating her symptoms of mental illness.  While housed in Eyman and Lewis prisons, Plaintiff Brislan demonstrated ongoing self-harming behaviors and dangerous side effects from multiple psychotropic medications, but he was rarely evaluated by a psychiatrist to see if medication adjustments might be helpful for his symptoms.  Psychiatrists renewed the prescriptions, but the clinical notes did not indicate that the psychiatrist had ever seen Brislan, a clear violation of the applicable standard of care.

80.     Defendants have a policy and practice of allowing ongoing monitoring of prisoners on psychotropic medication by LPNs, psychology assistants, or medication assistants who hand out the medications.  These lower level mental health staff are not qualified to adequately convey a prisoner's concerns to a psychiatrist.  Furthermore, staff at this level should not be ordering or authorizing the dispensation of medication.  Plaintiff Swartz saw only lower level mental health staff at his cell front and did not see a psychiatrist for over a year, even though he had multiple suicide attempts and was put on a variety of psychotropic medication, and the dosages were regularly changed.  Similarly, in June 2008, Plaintiff Smith was prescribed Celexa, but did not receive it for nearly a year.  He was also prescribed lithium; however, despite the need for close monitoring for side effects from the lithium, he was not seen by a doctor for three months.  His lithium was renewed without Mr. Smith having seen a doctor for six months.  In November 2009, Mr. Smith submitted a HNR reporting that he was vomiting when given lithium without

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

food.  He was given Tums and was not seen by a doctor.  When he reported continuing symptoms in January 2010, he was told to submit another HNR and was not seen by a doctor until March 2010, four months after first reporting symptoms.  Plaintiff Verduzco goes months without seeing the Perryville psychiatrist, despite demonstrating multiple symptoms of severe psychological distress including hallucinations and acts of self-harm.

81.     According to Defendants' own records, approximately 1,350 ADC prisoners are "severely mentally ill."  Some of these prisoners suffer from psychosis, a disorder that is marked by loss of contact with reality and disorganized thinking.  Persons suffering from psychosis may have perceptual disturbances such as hallucinations, paranoia, delusional beliefs, and bizarre behaviors. Some of these very mentally ill prisoners require an inpatient level of care – a structured program of psychosocial rehabilitation services coupled with individual therapy and appropriate medication management – but they do not receive it.  Defendants have failed to reliably provide inpatient mental health care to those prisoners whose serious mental health needs require it.   Plaintiffs Brislan, Rodriguez, and Verduzco are among those who require but have not received inpatient mental health care.

**2. Defendants Deprive Suicidal and Self-Harming Prisoners of Basic Mental Health Care**

82.     Defendants have a policy and practice of housing prisoners with serious mental health needs in unsafe conditions that heighten their risk of suicide.  In FY 2011, there were 13 suicides in ADC prisons, out of a population that averaged 34,000 during that time.  That is a rate of 38 suicides per 100,000 prisoners per year, more than double

-47-

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

the national average suicide rate in state prisons of 16.67 per 100,000.  Three prisoners committed suicide in one week in late January 2012, including a 19-year-old woman.

83.     One factor responsible for such a high suicide rate is Defendants' policy and practice of maintaining suicide watch facilities that offer no meaningful treatment. Usually the only people who interact with prisoners on suicide watch are correctional officers who check on them periodically, medication assistants who dispense pills, or psychology assistants who talk to them through the front of their cell.  Plaintiff Swartz did not receive psychotherapy for more than two months in the summer of 2011 while on suicide watch at the Lewis facility.  After he swallowed glass and was taken to an outside hospital, the hospital psychiatrist recommended that he be taken to an inpatient mental health unit.  These units are in the Phoenix complex.  Instead, Mr. Swartz remained at Lewis where he continued to harm himself.  He finally was moved to the Phoenix inpatient unit almost three months after the hospital psychiatrist had made that recommendation, but after a short period of time he was again returned to Lewis.  Plaintiff Thomas did not see a psychiatrist for 11 months despite being placed on suicide watch multiple times.

84.     Defendants also have a policy and practice of holding suicidal and mentally ill prisoners in conditions that violate all notions of minimally adequate mental health care and basic human dignity, and are not compatible with civilized standards of humanity and decency.  Suicide watch cells are often filthy, with walls and food slots smeared with other prisoners' blood and feces, reeking of human waste.  Mental health staff show a lack

of professionalism and little compassion for prisoners enduring these conditions: for example, prisoners in suicide cells are taunted for being in "the feces cells." When Plaintiff Swartz complained to a LPN about the unhygienic conditions of the suicide cell at Lewis, the LPN described him in the mental health notes from the encounter as "bitching about cleanliness – germs and disease."

85. Defendants have a policy and practice of keeping suicide watch cells at very cold temperatures. Prisoners are stripped of all clothing and given only a stiff suicide smock and a thin blanket, making the extreme cold even harder to tolerate. Plaintiffs Rodriguez and Verduzco report that the suicide smock used in Perryville barely comes to the top of female prisoners' thighs, so both their legs and arms are exposed to cold air. Many prisoners are also deprived of mattresses and as a result must sleep on bare steel bed frames, or on the floor made filthy with the bodily fluids of prior inhabitants. Plaintiff Brislan spent several weeks in a frigid suicide cell with no mattress.

86. Defendants have a policy and practice of exposing prisoners on suicide watch to gratuitously harsh, degrading, and damaging conditions of confinement. Prisoners are given only two cold meals a day, and are denied the opportunity to go outside, brush their teeth, or take showers. The only monitoring prisoners receive in suicide watch is when correctional officers force them awake every ten to 30 minutes, around the clock, ostensibly to check on their safety. In some suicide cells, bright lights are left on 24 hours a day. The resulting inability to sleep aggravates the prisoners' psychological distress.

87.    Mentally ill prisoners on suicide watch complain of correctional staff behavior that interferes with any therapeutic effect of being on suicide watch, including harassment, insults and taunts, and the excessive and practically sporting use of pepper spray.  Prisoners at the Perryville suicide watch units, including Plaintiff Verduzco, have jerked awake when awoken by staff on the "safety checks," and are pepper sprayed for allegedly attempting to assault the officers.  Guards in the Perryville suicide watch units also frequently pepper spray female prisoners in their eyes and throats when they are delusional or hallucinating.  Plaintiffs Rodriguez and Verduzco have asthma and rely upon inhalers, and they have had asthma attacks from the regular use of pepper spray in the women's suicide watch unit.  On multiple occasions after she was pepper sprayed in the eyes, nose, and mouth, Ms. Verduzco was dragged to a shower, stripped naked, and sprayed with extremely cold water to rinse away the pepper spray; she was then left naked to wait for a new vest and blanket.  A prisoner in the Florence prison's suicide watch unit reports that while there he was handed razor blades to swallow by other prisoners, and told "just die right away."  He started to swallow the blades, and security staff pepper sprayed him while he coughed up blood, and did not provide other emergency response.

88.    Defendants' policy and practice of holding suicidal prisoners in excessively harsh conditions does not prevent but rather promotes self-injurious behavior.  Plaintiff Brislan has cut himself numerous times with razors and pieces of metal while on suicide watch at multiple prisons, including Tucson, Lewis, and Eyman's SMU 1 and Browning units.  At the Tucson prison, staff put him on suicide watch in a cell with broken glass on

the floor which he used to cut himself.  During another stay in suicide watch, Mr. Brislan was given a razor blade that he used to deeply lacerate both of his thighs.  While on suicide watch in the Lewis prison during the summer of 2011, Plaintiff Swartz, on separate occasions, swallowed multiple foreign objects, including two large staples, plastic wrap, a piece of glass, a lead-head concrete nail, a spork, two pens, sharpened paper clips, a metal spring, a steel bolt, and two copper wires.  As with Plaintiff Brislan, Mr. Swartz's repeated suicidal gestures and ability to access dangerous objects while on suicide watch confirms that he was not being properly monitored and that any mental health treatment he might have been receiving was inadequate.

89.    Defendants also have a policy and practice of improperly using the suicide watch cells to punish prisoners for alleged disciplinary infractions.  An Eyman prisoner who went on a hunger strike to protest prison policies, but did not display signs of mental illness or distress, was put in a suicide watch cell for several weeks and was told by a mental health provider, "If you weren't on this hunger strike, you wouldn't have to live in the feces cell."

**III.   Defendants Subject Prisoners in Isolation to Unconstitutional Conditions**

90.    Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, and Polson, Plaintiff Arizona Center for Disability Law, and the Isolation Subclass allege the following.  Defendants have a policy and practice of confining thousands of prisoners in isolation (defined as confinement in a cell for 22 hours or more each day or confinement in Eyman – SMU 1, Eyman – Browning Unit, Florence – Central Unit, or

Perryville – Lumley Unit Special Management Area (SMA)), in conditions of enforced idleness, social isolation, and sensory deprivation, and are deliberately indifferent to the resulting substantial risk of serious physical and psychiatric harm.

91.    The large majority of prisoners in isolation are held in four facilities:  two SMUs at the Eyman prison (SMU 1 and Browning Units); the Florence complex's Central Unit; and the Perryville complex's Lumley SMA for female prisoners.  However, other prisoners are held in isolation in Complex Detention Units (CDUs) and other restricted housing units throughout ADC.

92.    Prisoners in isolation leave their cells no more than three times a week, for a brief shower and no more than two hours of "exercise" in the "rec pen" – a barren, windowless concrete cell with high walls that is not much larger than the cells in which prisoners live, with no exercise equipment.  Many prisoners refuse to go to the rec pen, because it is so small that it does not allow meaningful exercise, and because prisoners are placed in restraints and strip-searched when going to and returning from the rec pen.  In addition, prisoners sometimes are not allowed to take water to the rec pen, even at the height of Arizona's summer heat.  For those prisoners who do wish to go to the rec pen, even this brief respite is often denied:  exercise is sometimes cancelled due to staffing shortages.  Prisoners in Florence's Central Unit, including Plaintiff Gamez, are not allowed to go to recreation if they are not clean-shaven, but are often deprived of shaving supplies and are thus denied exercise.  Some prisoners in isolation receive no outdoor exercise at all for months or years on end; others receive insufficient exercise to preserve

their physical and mental health.

93.     Conditions of isolation are designed to minimize human contact and environmental stimulation.  Most or all of these prisoners are held in cells with a solid steel door and no window to the outside.  Some prisoners have no means of telling the time and become disoriented and confused, not knowing the date or whether it is day or night.  The cells are often illuminated 24 hours a day, making sleep difficult and further contributing to prisoners' disorientation and mental deterioration.  Chronic sleep deprivation is common.  Plaintiff Thomas reported an inability to sleep and requested Ambien, but was not prescribed a sleep aid.  Property is extremely limited.  Many prisoners have no radio or television, and many are illiterate or have difficulty reading, leaving them in a state of enforced idleness with nothing to do but sleep, sit, or pace in their cells.

94.     Prisoners in isolation often go months or years without any meaningful human interaction.  Unless they are fortunate enough to receive a brief medical or legal appointment or a visit, prisoners are isolated from virtually all human contact.  Their only regular interaction with another human being occurs when officers deliver their food trays, or place them in restraints and strip-search them while taking them to or from the rec pen.

95.     Defendants have a policy and practice of denying prisoners in isolation adequate nutrition, which Defendants justify on the basis that, because these prisoners receive virtually no exercise, they burn fewer calories and therefore need less food.  Some

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

prisoners in isolation receive only two meals per day, which do not meet their minimal nutritional needs.  Prisoners experience constant hunger pangs and some lose significant weight as a result of Defendants' policy of providing inadequate nutrition.  Plaintiff Thomas lost 30 pounds while in isolation.  Plaintiff Smith, who is in isolation supposedly for his own protection after leaving a gang, often cannot eat the limited amount of food he is given, as it is tampered with by the prisoner kitchen workers who target him for retaliation.  He has complained to prison staff, to no avail.

96.    The devastating effects of these conditions of extreme social isolation and environmental deprivation are well known to Defendants.  An abundant psychiatric literature spanning nearly two hundred years has documented the adverse mental health effects of isolation, and Arizona prisoners are no exception.  Even prisoners who have no mental illness when first placed in isolation often experience a dramatic deterioration in their mental health, developing symptoms such as paranoia, anxiety, depression, and post-traumatic stress disorder.  For example, Mr. Thomas did not suffer from suicidal ideation when he was put in isolation, but as time went on, his mental and physical state deteriorated.  He developed suicidal ideation and physically harmed himself several times.  Plaintiff Smith's file notes that on January 5, 2010, he reported mental health problems while housed in isolation, but he could not be seen due to a "psych RN shortage."  Even those prisoners who withstand isolation better than most are subjected to intolerable conditions, as they are forced to endure the hallucinations and screaming of prisoners suffering the debilitating effects of isolation.

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

97.     Isolation is even more predictably damaging to prisoners with a pre-existing mental illness.  For these prisoners, isolation poses a grave risk of exacerbation of mental health symptoms, psychiatric injury such as PTSD, self-harm, and suicide.  Deprived of the social interaction that is essential to keep them grounded in reality, many prisoners with mental illness experience catastrophic and often irreversible psychiatric deterioration.  Unlike prison officials in many states, Defendants' policy and practice allows the isolation of prisoners with mental illness, and Defendants knowingly hold prisoners designated as seriously mentally ill in isolation.

98.     The harm to prisoners in isolation is exacerbated by the policy and practice of Defendants of failing to provide adequate mental health care staffing and treatment.  In addition, the harsh regime and severe limits on human contact in isolation render appropriate mental health treatment effectively impossible.  Prisoners in isolation do not receive regular contact with psychiatrists or mental health clinicians, nor do they receive the limited group therapy that is sometimes provided to prisoners in other ADC facilities.  Defendants stated in response to a public records request that they keep no records of the mental health programming provided to prisoners in isolation.  These prisoners' rare interactions with mental health staff usually consist of "cellfront" contacts in which the staff member shouts through the cell door, within earshot of both officers and other prisoners.  There is currently no psychiatrist on staff at Eyman, which has two SMUs.

99.     The most common form of mental health treatment for prisoners in isolation is the administration of powerful psychotropic medications, with little or no supervision

by a psychiatrist.  For example, Plaintiff Gamez was not seen by a psychiatrist from 2007 through 2011 despite worsening mental health symptoms.  His mental health deteriorated extensively while held in isolation from 2009 through 2011, yet he did not see a psychiatrist or receive psychotherapy despite filing multiple HNRs detailing his symptoms.  Similarly, Plaintiffs Brislan and Swartz had psychotropic medications renewed without any contact with a psychiatrist, despite increasing incidents of self-harming behavior and side effects while in isolation.  Prisoners who require an inpatient level of mental health care, like Plaintiffs Brislan and Verduzco, do not receive it, and are instead left in isolation where their condition worsens.

100.   The predictable outcomes of these cruel conditions of isolation are psychiatric deterioration, self-injury, and death.  Plaintiffs Swartz and Brislan attempted to commit suicide on multiple occasions while in isolation.   Recently a prisoner with depression who was housed in isolation at Florence-Central Unit repeatedly asked custodial staff and medical staff passing by if he could be seen by mental health because he was suicidal.  Nothing was done for him, and he committed suicide by hanging on January 28, 2012.

## CLASS ACTION ALLEGATIONS

### Plaintiff Class

101.   All prisoner Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all prisoners who are now, or will in the future be, subjected to the medical,

mental health, and dental care (collectively "health care") policies and practices of the ADC (the "Plaintiff Class").

Numerosity: Fed. R. Civ. P. 23(a)(1)

102.    The class is so numerous that joinder of all members is impracticable.  Fed. R. Civ. P. 23(a)(1).  As of March 1, 2012, there are approximately 33,100 prisoners in the custody of ADC's prisons, all of whom are dependent entirely on Defendants for the provision of health care.  Due to Defendants' policies and practices, all ADC prisoners, numbering tens of thousands annually, receive or are at risk of receiving inadequate health care while in ADC prisons.[3]

103.    The Plaintiff Class members are identifiable using records maintained in the ordinary course of business by the ADC.

Commonality: Fed. R. Civ. P. 23(a)(2)

104.    There are questions of law and fact common to the members of the class. Such questions include, but are not limited to:

(a)    whether Defendants' failure to operate a health care system providing minimally adequate health care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b)    whether Defendants have been deliberately indifferent to the serious health care needs of class members.

Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

---

[3] This proposed class does not include the approximately 6,400 Arizona prisoners housed in private for-profit prisons pursuant to contracts with ADC.

-57-

1

Typicality: Fed. R. Civ. P. 23(a)(3)

2

105. The claims of the Plaintiffs are typical of those of the Plaintiff Class, as their

3

4

claims arise from the same policies, practices, or courses of conduct; and their claims are

5

based on the same theory of law as the class's claims.

6

///

7

Adequacy: Fed. R. Civ. P. 23(a)(4)

8

106. Plaintiffs are capable of fairly and adequately protecting the interests of the

9

10

Plaintiff class because Plaintiffs do not have any interests antagonistic to the class.

11

Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and

12

omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced in

13

14

civil rights litigation, prisoners' rights litigation, and complex class action litigation.

15

Fed. R. Civ. P. 23(b)(1)(A) and (B)

16

107. This action is maintainable as a class action pursuant to Fed. R. Civ. P.

17

23(b)(1) because the number of class members is approximately 33,100, and the

18

19

prosecution of separate actions by individuals would create a risk of inconsistent and

20

varying adjudications, which in turn would establish incompatible standards of conduct

21

for Defendants Ryan and Pratt. Additionally, the prosecution of separate actions by

22

individual members could result in adjudications with respect to individual members that,

23

24

as a practical matter, would substantially impair the ability of other members to protect

25

their interests.

26

Fed. R. Civ. P. 23(b)(2)

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

108.    This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class.   All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central headquarters of ADC by Defendants Ryan and Pratt.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff class.

**Medical Subclass**

109.    Plaintiffs Jensen, Swartz, Chisholm, Licci, Hefner, Polson, and Wells bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all prisoners (hereinafter "Medical Subclass") who are now, or will in the future be, subjected to the medical care policies and practices of the ADC.  "Medical care" includes care related to hearing and vision.

Numerosity: Fed. R. Civ. P. 23(a)(1)

110.    The Medical Subclass is so numerous that joinder of all members is impracticable.  As of March 1, 2012, there are approximately 33,100 prisoners in the custody of ADC's prisons, all of whom are dependent entirely on Defendants for the provision of medical care.  Due to Defendants' policies and practices, all ADC prisoners, numbering tens of thousands annually, receive or are at risk of receiving inadequate

medical care while in ADC prisons.

111.   The Medical Subclass members are identifiable using records maintained in the ordinary course of business by the ADC.

Commonality: Fed. R. Civ. P. 23(a)(2)

112.   There are questions of law and fact common to the members of the Medical Subclass.  Such questions include, but are not limited to:

(a)   whether Defendants' failure to operate a medical care system providing minimally adequate medical care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b)   whether Defendants have been deliberately indifferent to the resulting harm and risk of harm to Medical Subclass members who are deprived of minimally adequate medical care.

Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

Typicality: Fed. R. Civ. P. 23(a)(3)

113.   The claims of the Plaintiffs are typical of those of the Medical Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

Adequacy: Fed. R. Civ. P. 23(a)(4)

114.   Plaintiffs are capable of fairly and adequately protecting the interests of the Medical Subclass because Plaintiffs do not have any interests antagonistic to the subclass. Plaintiffs, as well as the Medical Subclass members, seek to enjoin the unlawful acts and omissions of Defendants.  The Plaintiffs are represented by counsel experienced in civil

-60-

rights litigation, prisoners' rights litigation, and complex class action litigation.

Fed. R. Civ. P. 23(b)(1)(A) and (B)

115.    Since the number of Medical Subclass members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants Ryan and Pratt.

116.    Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

Fed. R. Civ. P. 23(b)(2)

117.    Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Medical Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.  All state-wide medical policies are centrally promulgated, disseminated, and enforced from the central headquarters of ADC by Defendants Ryan and Pratt.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.

**Dental Subclass**

118.    Plaintiffs Swartz, Parsons, Chisholm, Polson, and Wells bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all prisoners (hereinafter "Dental Subclass")

who are now, or will in the future be, subjected to the dental care policies and practices of the ADC.

Numerosity: Fed. R. Civ. P. 23(a)(1)

119.    The Dental Subclass is so numerous that joinder of all members is impracticable.   As of March 1, 2012, there are approximately 33,100 prisoners in the custody of ADC's prisons, all of whom are dependent entirely on Defendants for the provision of dental care.   Due to Defendants' policies and practices, all ADC prisoners, numbering tens of thousands annually, receive or are at risk of receiving inadequate dental care while in ADC prisons.

120.    The Dental Subclass members are identifiable using records maintained in the ordinary course of business by the ADC.

Commonality: Fed. R. Civ. P. 23(a)(2)

121.    There are questions of law and fact common to the members of the Dental Subclass.   Such questions include, but are not limited to:

(a)    whether Defendants' failure to operate a dental care system providing minimally adequate dental care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b)    whether Defendants have been deliberately indifferent to the resulting harm and risk of harm to Dental Subclass members who are deprived of minimally adequate dental care.

Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

Typicality: Fed. R. Civ. P. 23(a)(3)

-62-

122.    The claims of the Plaintiffs are typical of those of the Dental Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

Adequacy: Fed. R. Civ. P. 23(a)(4)

123.    Plaintiffs are capable of fairly and adequately protecting the interests of the Dental Subclass because Plaintiffs do not have any interests antagonistic to the subclass. Plaintiffs, as well as the Dental Subclass members, seek to enjoin the unlawful acts and omissions of Defendants.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

Fed. R. Civ. P. 23(b)(1)(A) and (B)

124.    Since the number of Dental Subclass members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants Ryan and Pratt.   Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

Fed. R. Civ. P. 23(b)(2)

125.    Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Dental Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

to all members of the subclass.  All state-wide dental policies are centrally promulgated, disseminated, and enforced from the central headquarters of ADC by Defendants Ryan and Pratt.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.

///

### Mental Health Subclass

126.   Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Smith, Parsons, Chisholm, and Polson, bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all prisoners (hereinafter "Mental Health Subclass") who are now, or will in the future be, subjected to the mental health care policies and practices of the ADC.

Numerosity: Fed. R. Civ. P. 23(a)(1)

127.   The Mental Health Subclass is so numerous that joinder of all members is impracticable.  As of March 1, 2012, there are approximately 33,100 prisoners in the custody of ADC's prisons, all of whom are dependent entirely on Defendants for the provision of mental health care.  Due to Defendants' policies and practices, all ADC prisoners, numbering tens of thousands annually, receive or are at risk of receiving inadequate mental health care while in ADC prisons.  The Mental Health Subclass members are identifiable using records maintained in the ordinary course of business by the ADC.

Commonality: Fed. R. Civ. P. 23(a)(2)

128.    There are questions of law and fact common to the members of the Mental Health Subclass.  Such questions include, but are not limited to:

(a)    whether Defendants' failure to operate a mental health care system providing minimally adequate mental health care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b)    whether Defendants have been deliberately indifferent to the resulting harm and risk of harm to Mental Health Subclass members who are deprived of minimally adequate mental health care.

Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

Typicality: Fed. R. Civ. P. 23(a)(3)

129.    The claims of the Plaintiffs are typical of those of the Mental Health Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

Adequacy: Fed. R. Civ. P. 23(a)(4)

130.    Plaintiffs are capable of fairly and adequately protecting the interests of the Mental Health Subclass because Plaintiffs do not have any interests antagonistic to the subclass.  Plaintiffs, as well as the Mental Health Subclass members, seek to enjoin the unlawful acts and omissions of Defendants.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

Fed. R. Civ. P. 23(b)(1)(A) and (B)

131.    Since the number of Mental Health Subclass members is so large, the

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants Ryan and Pratt.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

Fed. R. Civ. P. 23(b)(2)

132.    Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Mental Health Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.  All state-wide mental health policies are centrally promulgated, disseminated, and enforced from the central headquarters of ADC by Defendants Ryan and Pratt.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the subclasses.

**Isolation Subclass**

133.    Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, and Polson bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, against Defendants Ryan and Pratt on behalf of a subclass of all prisoners (hereinafter "Isolation Subclass") who are now, or will in the future be, subject by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in Eyman - SMU 1, Eyman - Browning Unit,

Florence - Central Unit, or Perryville - Lumley Unit Special Management Area (SMA).

Numerosity: Fed. R. Civ. P. 23(a)(1)

134.   The Isolation Subclass is so numerous that joinder of all members is impracticable.   Each year approximately 3,000 prisoners are subjected to Defendants' policies and practices of denying minimally adequate conditions of confinement while in isolation.   The Isolation Subclass members are identifiable using records maintained in the ordinary course of business by the ADC.

Commonality: Fed. R. Civ. P. 23(a)(2)

135.   There are questions of law and fact common to the members of the Isolation Subclass.   Such questions include, but are not limited to:

(a)   whether Defendants' policy and practice of not providing a housing environment free of debilitating isolation and inhumane conditions to prisoners subjected to isolation violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b)   whether Defendants have been deliberately indifferent to the Isolation Subclass members' risk of injury and harm from the debilitating isolation and inhumane conditions to which they are subjected.

Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

Typicality: Fed. R. Civ. P. 23(a)(3)

136.   The claims of the Plaintiffs are typical of those of the Isolation Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

Adequacy: Fed. R. Civ. P. 23(a)(4)

137.    Plaintiffs are capable of fairly and adequately protecting the interests of the Isolation Subclass because Plaintiffs do not have any interests antagonistic to the subclass. Plaintiffs, as well as the Isolation Subclass members, seek to enjoin the unlawful acts and omissions of Defendants.   Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

Fed. R. Civ. P. 23(b)(1)(A) and (B)

138.    Since the number of Isolation Subclass members is approximately 3,000, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants Ryan and Pratt.   Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

Fed. R. Civ. P. 23(b)(2)

139.    Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Isolation Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.   All state-wide policies on the conditions of isolation are centrally promulgated, disseminated, and enforced from the central headquarters of ADC by Defendants Ryan and Pratt.   The injunctive and declaratory relief sought is appropriate

and will apply to all members of the subclass.

## CLAIMS FOR RELIEF

### First Cause of Action
(All Prisoner Plaintiffs and the Plaintiff Class v. Defendants Ryan and Pratt)
(42 U.S.C. § 1983; Eighth Amendment)

140.   By their policies and practices described herein, Defendants subject all prisoner Plaintiffs and the Plaintiff class to a substantial risk of serious harm and injury from inadequate health care.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Plaintiff Class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

141.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Second Cause of Action
(Plaintiffs Jensen, Swartz, Chisholm, Licci, Hefner, Polson, and Wells; and
Medical Subclass v. Defendants Ryan and Pratt)
(42 U.S.C. § 1983; Eighth Amendment)

142.   By their policies and practices described herein, Defendants subject Plaintiffs Jensen, Swartz, Chisholm, Licci, Hefner, Polson, and Wells, and the Medical Subclass to a substantial risk of serious harm and injury from inadequate medical care.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs'

and the Medical Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

143.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

///

**Third Cause of Action**
(Plaintiffs Swartz, Parsons, Chisholm, Polson, and Wells; and
Dental Subclass v. Defendants Ryan and Pratt)
(42 U.S.C. § 1983; Eighth Amendment)

144.    By their policies and practices described herein, Defendants subject Plaintiffs Swartz, Parsons, Chisholm, Polson, and Wells, and the Dental Subclass to a substantial risk of serious harm and injury from inadequate dental care.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Dental Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

145.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

**Fourth Cause of Action**
(Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Parsons,
Chisholm, and Polson; Plaintiff Arizona Center for Disability Law; and
Mental Health Subclass v. Defendants Ryan and Pratt)
(42 U.S.C. § 1983; Eighth Amendment)

146.    By their policies and practices described herein, Defendants subject

-70-

Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Parsons, Chisholm, and Polson, and the Mental Health Subclass to a substantial risk of serious harm and injury from inadequate mental health care.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Mental Health Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

147.    Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Fifth Cause of Action
(Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, and Polson; and Plaintiff Arizona Center for Disability Law; and Isolation Subclass v. Defendants Ryan and Pratt)
(42 U.S.C. § 1983; Eighth Amendment)

148.    By their policies and practices described herein, Defendants subject Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, and Polson, and the Isolation Subclass to a substantial risk of serious harm and injury from inadequate physical exercise, inadequate nutrition, inadequate mental health treatment, and conditions of extreme social isolation and environmental deprivation.  These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Isolation

Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

149.   Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

///

### **PRAYER FOR RELIEF**

150.   Plaintiffs and the classes they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants Ryan and Pratt, as alleged herein, unless Plaintiffs and the classes they represent are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

151.   WHEREFORE, the named plaintiffs and the classes they represent request that this Court grant them the following relief:

A.   Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

B.   Adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of prisoner Plaintiffs and the classes they represent under the Cruel and Unusual

Punishments Clause of the Eighth Amendment, which grants constitutional protection to the Plaintiffs and the class they represent;

C.    Preliminarily and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting prisoner Plaintiffs and the Plaintiff Class to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above.

D.    Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that prisoner Plaintiffs and members of the Plaintiff Class suffer due to Defendants' inadequate medical, mental health, and dental care, and due to Defendants' isolation policies.  Defendants' plan shall include at a minimum the following:

    1.   Staffing:  Staffing shall be sufficient to provide prisoner Plaintiffs and the Plaintiff Class with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

    2.   Access:  Policies and practices that provide timely access to health care;

    3.   Screening:  Policies and practices that reliably screen for medical, dental, and mental health conditions that need treatment;

    4.   Emergency Response:   Timely and competent responses to health care emergencies;

    5.   Medication and Supplies:   Timely prescription and distribution of medications and supplies necessary for medically adequate care;

    6.   Chronic Care:  Timely access to competent care for chronic diseases;

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

7. Environmental Conditions:  Basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections, including but not limited to a smoke-free environment;

8. Mental Health Treatment:  Timely access to necessary treatment for serious mental illness, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch;

9. Quality Assurance:  A regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

10. Isolation:  Prohibition of confinement of prisoner Plaintiffs and the Isolation Subclass under conditions of social isolation and sensory deprivation that put prisoners at substantial risk of serious physical and mental harm.  Providing prisoner Plaintiffs and the Isolation Subclass with necessary nutrition and regular outdoor exercise to preserve their physical and mental health.

E.     Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

F.     Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

G.     Award such other and further relief as the Court deems just and proper.

Dated:  March 22, 2012                    **ACLU FOUNDATION OF ARIZONA**


By:___*/s/ Daniel J. Pochoda*_____
        Daniel J. Pochoda
        James Duff Lyall

-74-

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, CA  94710
Telephone: (510) 280-2621
dspecter@prisonlaw.com
ahardy@prisonlaw.com
snorman@prisonlaw.com
ckendrick@prisonlaw.com

*Application for *pro hac vice* pending

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883) *
**ACLU NATIONAL PRISON
PROJECT**
915 15th St. N.W., 7th Floor
Washington, D.C.  20005
Telephone:  (202) 548-6603
dfathi@npp-aclu.org
afettig@npp-aclu.org

*Application for *pro hac vice* pending

Daniel C. Barr (SBA 010149)
Jill L. Ripke (SBA 024837)
James A. Ahlers (SBA 026660)
Kirstin T. Eidenbach (SBA 027341)
John H. Gray (SBA 028107)
Thomas D. Ryerson (SBA 028073)
Matthew B. Du Mée (SBA 028468)
**PERKINS COIE LLP**
2901 N. Central Ave., Suite 2000
Phoenix, AZ  85012-2788
Telephone:  (602) 351-8000
dbarr@perkinscoie.com
jripke@perkinscoie.com
jahlers@perkinscoie.com
keidenbach@perkinscoie.com
jhgray@perkinscoie.com
tryerson@perkinscoie.com
mdumee@perkinscoie.com

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1
2
3
4
5

Caroline Mitchell (Cal. 143124)*
Douglas Roberts (Cal. 264451)*
**JONES DAY**
555 California St., 26th Floor
San Francisco, CA 94104
Telephone: (415) 875-5712
cnmitchell@jonesday.com
douglasroberts@jonesday.com

6

*Application for *pro hac vice* pending

7
8
9
10

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

11
12

**ARIZONA CENTER FOR DISABILITY LAW**

13
14
15
16
17

By: */s/ Jennifer Alewelt*
Jennifer Alewelt (SBA 027366)
Ruth Szanto (SBA 029073)
5025 East Washington St. Suite 202
Phoenix, AZ  85034
Telephone (602) 274-6287
jalewelt@azdisabilitylaw.org
rszanto@azdisabilitylaw.org

18
19

*Attorneys for Plaintiff Arizona Center for Disability Law*

20
21
22
23
24
25
26

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1

## CERTIFICATE OF SERVICE

2

3        ☒        I hereby certify that on March 22, 2012, I electronically transmitted the

4   attached documents to the Clerk's Office using the CM/ECF System.

5

6                                    /s/ Gloria Torres

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**