**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

———————

| | |
|---|---|
| **Victor Antonio Parsons**, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) NO. **CV 12-601 PHX-NVW** |
| | ) |
| **Charles L. Ryan**, et al., | ) Phoenix, Arizona |
| | ) July 20, 2012 |
| | ) 10:20 a.m. |
| Defendants. | ) |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**(Scheduling Conference)**

**BEFORE THE HONORABLE NEIL V. WAKE**

Court Reporter:          Merilyn A. Sanchez, CRR
                         Sandra Day O'Connor U.S. Courthouse
                         401 W. Washington Street SPC-37
                         Phoenix, Arizona  85003-2118
                         (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

<u>A P P E A R A N C E S</u>

For the Plaintiffs:          **Donald H. Specter**, Esq.
                             Prison Law Office
                             General Delivery
                             San Quentin, California

                             **David C. Fathi**, Esq.
                             ACLU National Prison Project
                             1630 Connecticut Avenue NW, Suite 500
                             Washington, District of Columbia

                             **Caroline N. Mitchell**, Esq.
                             Jones Day
                             555 California Street
                             26th Floor
                             San Francisco, California 94104

                             **Jennifer Alewelt**, Esq.
                             Arizona Center for Disability Law
                             5025 E. Washington Street, Suite 202
                             Phoenix, Arizona  85034


For the Defendants:          **Kathleen L. Wieneke**, Esq.
                             Struck, Wieneke & Love
                             3100 West Ray Road, Suite 300
                             Chandler, Arizona


                             **Michael Gottfried**, Esq.
                             Assistant Attorney General
                             1275 W. Washington Street
                             Phoenix, Arizona 85007-2926


                             **Timothy J. Bojanowski**, Esq.
                             P.O. Box 73427
                             Phoenix, Arizona

1                    P R O C E E D I N G S

2

3          THE COURTROOM DEPUTY CLERK:  This is civil case

4   2012-601, Victor Antonio Parsons, et al., versus Charles L.

5   Ryan, et al.  This is the time set for a scheduling conference.

6          Counsel, please announce for the record.

7          MR. SPECTER:  Good morning, Your Honor, Donald

8   Specter.

9          THE COURT:  Speak into the microphone.

10         MR. SPECTER:  Good morning, Your Honor, Donald Specter

11  from the Prison Law Office for the plaintiffs.  And with me

12  today is David Fathi from the National Prison Project, Carolyn

13  Mitchell from Jones Day, and Jennifer Alewelt for the Center

14  for Disability Law.

15         THE COURT:  Give me all those names again.  Here is my

16  list of lawyers.  I have to find who is here.

17         MR. SPECTER:  Okay.  My name is down near the end on

18  the first page.  Specter.

19         THE COURT:  Yes.  All right.

20         MR. SPECTER:  Also joining me is David Fathi, Caroline

21  Mitchell, and Jennifer Alewelt.

22         THE COURT:  All right.  I'm sorry, what was your last

23  person's name?

24         MS. ALEWELT:  Alewelt, Jennifer Alewelt, with an A.

25         THE COURT:  I don't have your name on my list, but --

```
 1    oh, I see, okay.  All right.

 2            And for the defendant?

 3            MS. WIENEKE:  Good morning, Your Honor, Kathleen

 4    Wieneke for the defendants along with --

 5            MR. GOTTFRIED:  Good morning, Your Honor, Michael

 6    Gottfried from the Attorney General's Office for the

 7    defendants.

 8            MR. BOJANOWSKI:  And Tim Bojanowski for the

 9    defendants.

10            THE COURT:  All right.  Let's see.  When was this

11    action filed again, Mr. Specter?

12            MR. SPECTER:  In March of this year, Your Honor.

13            THE COURT:  All right.  All right.  And the initial

14    disclosures have been exchanged, so we will fill that in as

15    having been done.

16            There's a lot to talk about here.  Here's a quick

17    question with a quick answer, Mr. Specter, what's the

18    difference between your adequate healthcare claims and your

19    adequate medical care claims?

20            MR. SPECTER:  Well, health care is the broader issue,

21    and medical care is a subset, and mental healthcare is another

22    subset, dental care is another subset.

23            THE COURT:  All right.  And, Mr. Specter, what's your

24    proposed time frame for presenting a motion for class

25    certification?  This is a (b)(2) class, right?
```

```
 1            MR. SPECTER:  Exactly, Your Honor.  We are prepared to

 2   file the motion on February 1st, Your Honor, if that's

 3   acceptable.

 4            THE COURT:  Well, that's a long ways away.

 5            MR. SPECTER:  You're right.  The reason we are pushing

 6   it that far is because we intend to take discovery on issues

 7   relevant to class certification and given the Wal-Mart --

 8   recent Wal-Mart case, we are concerned about that.

 9            THE COURT:  Well, that was -- that was -- well, I

10   don't remember all the details, but that was a (b)(3) class,

11   wasn't it?

12            MR. SPECTER:  It was mostly a (b)(3) class.

13            THE COURT:  Okay, this is a (b)(2) class.

14            MR. SPECTER:  My co-counsel says it was a (b)(2)

15   class.

16            THE COURT:  It was both, wasn't it both?

17            MR. SPECTER:  Okay, my co-counsel says it's only

18   (b)(2).  And I take his word for it.

19            THE COURT:  All right.  I'm so glad I didn't have that

20   case.  So --

21            MR. SPECTER:  But there was -- it was for damages,

22   Your Honor.  And so that does distinguish it quite a bit from

23   this case.

24            THE COURT:  All right.  There's no damage claim in

25   this case.
```

1          MR. SPECTER:  No, Your Honor.

2          THE COURT:  This is just a straight injunction class.

3          MR. SPECTER:  Just a straight injunction class, right.

4          THE COURT:  And for that we have issues of typicality,

5    adequacy of representation.  The adequacy of representation

6    would seem to be not all that difficult.  Typicality would

7    require some discovery, but it doesn't seem like the discovery

8    on class certification should be -- should take all that much

9    time if it's just an injunction class.

10          MR. SPECTER:  Right, Your Honor.  Under -- under the

11    Court's understanding of -- of what that class certification

12    motion requires, we agree with you.  We are prepared to move

13    that time up.  We will need to take some discovery and one of

14    the ways we think we can do that efficiently for class

15    certification is through some of the 30(b)(6) depositions that

16    we intend to notice.

17          THE COURT:  Let me -- let me spoil some of the

18    suspense for all of you.  Congress has provided that civil

19    cases should be concluded within three years of filing.  Other

20    than some cases I had when I came to the court that already

21    couldn't meet that, I have never had a case that violated that

22    deadline of the Civil Justice Reform Act.  I don't intend to

23    break my record for you or any other case.

24          So we are going to have this case, if necessary,

25    through trial and final judgment within three years of filing.

1    And that's March of 2015.  So we can all just count backwards

2    and figure out what time there is to do things.  And I'm not

3    optimistic that there will be any slack anywhere because we are

4    going to have this case to final judgment by March 2015, no

5    matter what.  So we will get everything done that we can get

6    done.  But as I said, I don't expect that there is going to be

7    any slack in the schedule.

8         So if you just think backwards, if we want to have

9    this -- just let's assume a worst-case scenario, that we go the

10   distance on everything, we need to start a trial no later than

11   late 2014 to make sure it's concluded by March of 2015.  Giving

12   account for possibility of scheduling -- little things going

13   wrong.  That means we need to have summary judgments ready to

14   file, briefed and -- because of the magnitude of the case,

15   there could be a lot to do for counsel and for the Court.

16        So just roughly, we need to start the process of final

17   summary judgment briefing in early 2014 to give us eight, ten

18   months to get briefs argued and whatnot and a decision.  Which

19   means that we have, for everything else, about a year and a

20   half.

21        So, when I look at a year and a half, Mr. Specter, I'm

22   just queasy to give you six months for a class certification,

23   because it needs to be briefed and ruled on.  So you would be

24   burning off the better part of a year just to get to class

25   certification.

```
 1              MR. SPECTER:  Yes, Your Honor, we are prepared to move

 2    it up.  We can file it in the late fall or, you know --

 3              THE COURT:  Let me -- now, again, in the most

 4    important sense, Ms. Wieneke, I know I can't hold anybody to

 5    anything absolutely certain, but what do you think you are

 6    going to fight over on class certification?

 7              MS. WIENEKE:  Commonality and typicality, Your Honor.

 8              THE COURT:  Can you elaborate on that?

 9              MS. WIENEKE:  Well, Your Honor, plaintiffs have

10    alleged through 14 plaintiffs inadequate medical care for many

11    of them.  But when you go to the doctor, you present certain

12    symptoms.  They all have a variety of different symptoms and

13    there's different plans to treat those symptoms.  So they all

14    have their individual claims.  And that's what we are concerned

15    about, is whether they are adequate representatives of the

16    class and whether they present common questions.

17              What we propose is limited class discovery for a short

18    period of time so that the issue of class certification can be

19    presented to the Court, and then open it up, after that issue

20    is resolved, to the entire case.

21              THE COURT:  Let me step back and just looking at this

22    case, my very general sense, that's all it is, is that the

23    plaintiffs are not going to be challenging so much this -- they

24    kind of have to challenge the specifics of their medical care

25    and treatment, but that they are -- also have to prove much
```

1   more than that.  They have to prove not just that they got

2   constitutionally deficient medical care, but that the cause for

3   their constitutionally deficient medical care was systemic

4   failures in the department's planning and structures for

5   providing medical care.

6         So my working assumption, and you can all correct me,

7   is that that is what this case is really going to be about.  We

8   are -- well, as you all know, we see innumerable cases

9   involving medical care, almost all of them pro per.  And we are

10  used to dealing with them on an individualized basis.

11        So it's -- again, let me summarize my own thought.  It

12  appears to me that the real thrust of discovery and facts in

13  this case will not be -- that they will require proof of

14  constitutionally inadequate medical care with deliberate

15  indifference for the individuals, but it's going to go far

16  beyond that to make the case for a structured injunction,

17  whether it's a class injunction or just for individuals.

18        Mr. Specter, do I have that wrong?

19        MR. SPECTER:  You have it exactly right, Your Honor.

20        MS. WIENEKE:  Yes, Your Honor, if I may.  What

21  complicates this case is that after the plaintiff filed the

22  lawsuit, effective July 1, the entire delivery system for the

23  medical care for the entire ADOC system was taken on by a

24  private contractor, Wexford, who is not a party to this

25  litigation.

1          THE COURT:  Well, we will come back to that for a

2     minute because that is throughout your case management report.

3     But we are talking about class certification now.

4          So to what extent -- well, Ms. Wieneke, if your

5     argument is that we do an adequate job in general, there may

6     be -- there's slippage here as there and there will be in any

7     system, but the system itself is not structurally

8     constitutionally inadequate.  How does that interplay with the

9     class certification which -- where we are really looking at not

10    the merits of the claims, but the typicality of adequacy of

11    representation and common questions which I guess would --

12         Well, Mr. Specter, what do you think you need to prove

13    with respect to class certification?  How far do we have to get

14    into the merits to certify the class?

15         MR. SPECTER:  Well, as you know, Your Honor, in order

16    to certify the class, you need either one common question of

17    fact or law.  We believe that we have to prove that there is a

18    common question of law or fact and we believe that there are

19    many.  But the overall arching position that we are taking is

20    that the medical care system, health care system run by the

21    defendants, creates an unreasonable risk of harm to the

22    plaintiff class.  And so we want to show that there are

23    policies and patterns and practices that are indicative of --

24    or are relevant to that determination of whether there's an

25    unreasonable risk of harm.

1          The merits issue will be whether those patterns and

2     practices do in fact and policies do in fact create an

3     unreasonable risk of harm.

4          We believe that in a system as large as Arizona's,

5     they cannot possibly run a system without policies that are

6     promulgated and enforced throughout and patterns and practices

7     of behavior in the medical system which are common throughout.

8     So that will be -- that will be the thrust of our position.

9          THE COURT:  You don't have to say anything,

10    Ms. Wieneke.  You are free to if you wish.

11         MS. WIENEKE:  Oh, dear.  That's fraught with peril.

12         THE COURT:  That's what I tell the defendants right

13    before I sentence them.

14         MS. WIENEKE:  I'll let Mr. Gottfried take this one.

15         THE COURT:  Well, all right.  Well, as you can see, I

16    am averse to having this class certification phase swallow up

17    merits litigation.

18         Now, I'll also tell you that I don't see any problem

19    at all with having merit discovery going immediately at the

20    same time.  I mean, that's just -- there's no reason to delay

21    class merits discovery.  On a worst-case scenario for the

22    plaintiff, they are seeking injunctions for 14 plaintiffs.  On

23    best-case scenario, they are seeking for a class.  But it's

24    pretty much the same injunction.

25         So we don't need to delay the merits discovery.  And

1    then that comes back to how quickly we can do the class

2    discovery.

3              And, you know, for a (b)(2) class, the principal,

4    practical effect of certification is that you greatly extend

5    the scope of res judicata.  That's about it.  Injunction --

6    well, and I don't want to say too much, but the injunction

7    could well be very similar with or without the certification.

8              Well, tell me, Ms. Wieneke, why can't -- here we are,

9    it's July, August, September, October.  Why can't we have this

10   motion for class certification filed before Thanksgiving, so at

11   least they have a good Thanksgiving?

12             MS. WIENEKE:  Can I take the Fifth again?

13             THE COURT:  I mean, you know, I'm not really -- we are

14   here to have a dialogue.

15             MS. WIENEKE:  Right.

16             THE COURT:  I'm not trying to intimidate anybody about

17   anything.

18             MS. WIENEKE:  We would actually prefer a shorter

19   period of time to submit the motion for class certification

20   with, of course, the discovery period in the interim being

21   limited to those class issues in the interests of the economy.

22             THE COURT:  What do you propose then in terms of a

23   time for them to file their motion?

24             MS. WIENEKE:  Well, we -- we wouldn't object to having

25   them file it by Thanksgiving.  And then the discovery in the

```
 1   interim be limited to discovery issues to the class, not open

 2   wide to 40,000 inmates within the system.

 3           THE COURT:  I think I walked on the bench with you

 4   already having lost that issue.

 5           MS. WIENEKE:  Well, you said you wanted a dialogue.

 6           THE COURT:  Right.

 7           MS. WIENEKE:  So you invited conversation.

 8           THE COURT:  I did.  No, and seriously, what would

 9   be -- what would be achieved by delaying merits discovery?  I

10   couldn't think of what would be achieved, so you tell me.

11           MS. WIENEKE:  Well, I think you can see the

12   differences in the proposed discovery of the parties, 750

13   interrogatories.

14           THE COURT:  No, wait a minute.  We are going to come

15   to that later.

16           MS. WIENEKE:  Well, that's our fear.

17           THE COURT:  Okay.

18           MS. WIENEKE:  So, you know, 40,000 inmates in our

19   system, and that we would be inundated with doing this

20   discovery when, in fact, you know, we could be limited to 14

21   claims.  And on overreaching, Your Honor, I cannot emphasize

22   this enough.  We feel, and of course we filed our motion to

23   dismiss, which addresses many of these claims, yesterday.

24           THE COURT:  Oh, I haven't seen that.

25           MS. WIENEKE:  Oh, we just filed it yesterday, Your
```

1    Honor.

2           THE COURT:  So what's wrong with their Complaint, 25

3    words or less.

4           MS. WIENEKE:  Article III standing, mootness,

5    exhaustion, I think there is --

6           THE COURT:  Actually, well --

7           MS. WIENEKE:  But the whole Wexford issue, Your Honor,

8    really, because they are asking for prospective relief.  And we

9    are no longer the provider of the healthcare for which they

10   seek redress.  And we -- we want and we've asked for -- also

11   asked for a stay, Your Honor, so that we can see is this

12   contractor, who is required to provide constitutionally

13   adequate care, going to live up to its expectations.

14          THE COURT:  Well, I want to talk about these things

15   one at a time.  But all right, and I may -- I have the right to

16   change my mind before the end of this discussion, but for now

17   I'm thinking that four months is plenty for the plaintiff to

18   file a motion for class certification and that, of course,

19   they -- both sides can do discovery as to that.  You know,

20   Ms. Wieneke, I assume you are not going to be contesting the

21   adequacy of representation on the other side, so it's really

22   what you told me, typicality, common questions and whatnot.

23          MS. WIENEKE:  With the right to change my mind as

24   well, Your Honor.

25          THE COURT:  Right.  Right.  So, tell you what.  I'll

```
 1   set November 2 for the deadline for filing motion for class

 2   certification, and, Ms. Wieneke, I'm going to factor out

 3   Thanksgiving week.  I'm just going to take it out of my

 4   calculation.  And we will set a time for you to respond.  That

 5   gives you really three weeks, not counting the Thanksgiving

 6   week, so that will be November 30.

 7             MS. WIENEKE:  Thank you.

 8             THE COURT:  And the reply by December 14.  That's

 9   right before the holidays, and I'll set something for an oral

10   argument on that the first week of January.  I don't think

11   lawyers work in the last two weeks of December.

12             Now, let's go back to the, you know, I wondered about

13   the exhaustion.  Have they exhausted their administrative

14   remedies under the PLRA, Ms. Wieneke, or do you say no?

15             MS. WIENEKE:  We say no.

16             THE COURT:  So what do you say, Mr. Specter?

17             MR. SPECTER:  I have a -- we entered into a tolling

18   agreement with the defendants prior to filing the lawsuit in

19   November of 2011.  And one of the provisions of the tolling

20   agreement was that they irrevocably waive exhaustion on behalf

21   of the clients who we represent.

22             THE COURT:  Really?

23             MR. SPECTER:  Yes, and I have a copy of it for you.

24             THE COURT:  Hand that up.  I've never heard of that

25   before.
```

1        MR. SPECTER:  Specifically, Your Honor, paragraph 3(c)

2   and 3(h) are relevant to this discussion.

3        THE COURT:  All right.  You can pick that up

4   afterwards.

5        What's the answer to that, Ms. Wieneke?

6        MS. WIENEKE:  Your Honor, my understanding is that was

7   a tolling agreement that was only in effect during the time

8   period in which they were negotiating and doing discovery.  And

9   I also understand it was with ADOC and not with the State of

10  Arizona.

11       MR. SPECTER:  Well, it was signed by Charles Ryan, the

12  director of the Department of Corrections.

13       THE COURT:  Exactly.

14       MS. WIENEKE:  But more importantly, Your Honor, that

15  time period in which it was -- it was only during the time

16  period in which they were negotiating.

17       MR. SPECTER:  If you would look to paragraph (c) says

18  they irrevocably waive and will not assert in any civil

19  lawsuit.  Obviously that contemplates something after the

20  negotiation period.  And (h) says:  All material terms of this

21  agreement will survive termination of this agreement.  So --

22       THE COURT:  It looks pretty clear, Ms. Wieneke.  So

23  the only other question is somehow is it invalid.

24       Well, we will deal with that.  But I wondered about

25  that just looking at this, as to -- actually, you know, it is

1    exhaustion is an affirmative defense.  It has to be pleaded and

2    presented.  There was a good case to be made otherwise, but the

3    Supreme Court rejected it.

4          All right, so then -- and what were you -- and, you

5    know, very briefly, Ms. Wieneke, what were your other issues

6    you raised in, I guess it was your 12(b) motion you just filed.

7          MS. WIENEKE:  We raised the issue of mootness,

8    Your Honor, based upon the Wexford and standing.

9          THE COURT:  And what's the standing issue?

10         MS. WIENEKE:  It has to do with the various plaintiffs

11   that have not suffered actual injury, Your Honor.  They are

12   alleging injury to other inmates, but not to them.

13         THE COURT:  Well, really, what about that,

14   Mr. Specter?

15         MR. SPECTER:  We kindly, but respectfully, but firmly

16   disagree with her interpretation of the allegations in our

17   Complaint, Your Honor.

18         THE COURT:  All right.  You know, I have discretion

19   under Rule 12(c) motion.  And one thing that's just occurring

20   to me right now is because at least the standing seems to

21   overlap the class certification issues.  And one option I might

22   defer that to decide at the same time as class certification.

23   I don't know.  I'll look at it and the other side will respond

24   to your motion.

25         Now, there's this issue of the Wexford contract that

```
1    keeps coming up.  And this -- this -- actually this folds into
2    your motion -- are you asking for a stay in that motion?
3            MS. WIENEKE:  Yes, Your Honor.
4            THE COURT:  Because you say here in your report that
5    you were going to do that.  Well, the immediate answer is
6    there's no stay until there's a stay.  So things are going
7    unless I stop them.
8            And I guess we will see what the other side has to
9    say.  I'll just tell you preliminarily, this again, studying
10   the case and your case management report, it seems like a bit
11   of a stretch for the State to say:  Well, we are being sued for
12   something, but we don't want to deal with it because -- in
13   court because we might want to deal with it on our own.
14   Generally you don't stop a lawsuit on that ground.
15           You can stop a lawsuit by coming and proving that you
16   have changed whatever is the basis of the actual conduct.  But
17   not on the basis that what you said.
18           So, you know, my sense for now, and I'll tell you
19   briefly from this and we will have a lot to talk about is for
20   purposes of scheduling this case, I'm not disposed to delay
21   anything on that basis, but I'll hear your motion and see what
22   the other side says in response and might rethink that.
23           But, you know, I do remember reading in the newspaper
24   about the new vendor and don't worry about this, because I
25   don't know what the truth is, but I remember reading that the
```

1   idea was to spend less money and build in a profit component

2   for the vendor, which seemed like a bit of a challenge for also

3   improving service.  But I also saw that it is actually costing

4   more money, so I don't know.

5            So for now, we will go forward and we will consider

6   your motion when it's ready, whether I should stay these

7   proceedings.

8            Now, oh, with respect to amendments, it would not be

9   at all surprising that perhaps in a case like this if some

10  plaintiffs drop out and some others get added in except that we

11  are not going to delay the case.  That may happen in due

12  course, but we are not going delay the case for it.  So if

13  anybody wants to make any motions, do it quickly.  And I think

14  that can probably happen, but it won't have to delay the case.

15           Now, if there are -- do you have a problem,

16  Mr. Specter, about this Wexford company coming in?  Is that

17  something you need to amend to name them?

18           MR. SPECTER:  Well, my co-counsel, Mr. Fathi, will

19  address that.

20           THE COURT:  All right, Mr. Fathi.

21           MR. FATHI:  Thank you, Your Honor.  I'm David Fathi

22  with the ACLU National Prison Project.

23           The whole Wexford issue really is kind of a red

24  herring.  The department has a nondelegable duty under the

25  Eighth Amendment to provide constitutional conditions in

1    confinement, and they can do that with state employees, or they

2    can do it with private contractors.  But the duty remains

3    theirs.  And, therefore, they are the appropriate defendants

4    and it's not necessary for a contractor to also be a defendant.

5              I can tell the Court, as -- just as a factual matter,

6    that we litigate cases all the time in which the agency it --

7    there is a private contractor but the agency is the only

8    defendant.  The contractor is not involved in the litigation at

9    all.

10             THE COURT:  And do you have any dispute about that,

11   Ms. Wieneke?

12             MS. WIENEKE:  Well, I think, Your Honor, that we will

13   be litigating that issue.

14             THE COURT:  Okay.  And it sort of roughly sounds like

15   a nondelegable duty anyway.  I'm not prejudging it.

16             MS. WIENEKE:  Your Honor, I think the issue of whether

17   the way they are doing it now is constitutionally adequate, and

18   the contract with Wexford requires them to do so.

19             THE COURT:  On the other hand, I'm sure you're not

20   going to stand up here and tell me that before this contract

21   was entered into, the Department of Corrections was knowingly

22   doing it to any lesser standard, are you?

23             MS. WIENEKE:  Correct.

24             THE COURT:  So -- all right, let's go on.  I want to

25   cover as many of these things as we can deal with.  You all

1    raised this issue of preservation of documents.  Of course, you

2    know, just off the top of my head, the difficulty I'm seeing

3    here is that the generality of the allegations, and you couple

4    that with preservation of documents, it sounds like perhaps,

5    Mr. Specter saying you don't want them to purge any documents

6    in the normal course.  And every institution does have policies

7    for nonretention in the normal course.

8             And I would hope that -- have you all dialogued about

9    that yet as to what their normal process of retention is?

10            MR. SPECTER:  Your Honor, we haven't.  We've served a

11   deposition 30(b)(6) subpoena to explore that issue.  And once

12   we have that information, we hope to come to a reasonable

13   understanding of what they need us to do and what they should

14   do in the future.

15            THE COURT:  The ideal outcome would be that if their

16   normal document retention policy is adequate that no changes

17   have to be made.

18            MR. SPECTER:  Right.

19            THE COURT:  I think I'll leave that to you and it's

20   really not something I can deal with not.  But to impose

21   changes on document retention can be very burdensome or costly,

22   or not.  So see what they are doing and see if it is adequate.

23   If not, you will have to bring it back for me to resolve.

24            You have this issue of cost for copying documents.

25   Again, I have a feeling this may be the same in that it is

1    affected by what the scope of the document requests are.  If

2    they are extremely voluminous, it's a big issue.  And in

3    general -- in general my thought is that these costs should not

4    exceed what you can get an outside vendor to do.  And the easy

5    way to do that is if you send it to an outside vendor.

6            Now, there's still costs in getting together and

7    getting it over there and getting it back.  So I know it's not

8    that simple.  And, again, this seems to be very much affected

9    by what the scope of the requests are.

10           And let me warn you, Mr. Specter, my approach to

11   voluminous document discovery is I don't make people produce

12   things that are not going to be looked at.

13           MR. SPECTER:  Your Honor, we are -- we don't have any

14   interest in making this as -- as -- we have every interest in

15   making this as efficient as possible.  We've been doing this a

16   long time, and we think we can target what we need.

17           THE COURT:  All right, then, I'm going to leave that

18   to you all.  If this really goes to -- takes a wrong turn on

19   the road, I might end up having to set a discovery master, but

20   I'm hoping not to do that, that with adequate direction from me

21   where necessary, you all can get this done without the great

22   expense of a discovery master.

23           And I have not -- I could, but I have not referred

24   this case to a magistrate judge, at least not yet, because I

25   figured it was going to require some very substantial case

1   management and that I could do it more efficiently.  However,

2   although I'm really not disposed to sending this case generally

3   to a magistrate judge, there might be a discrete task that gets

4   sent to a magistrate judge, if necessary.  So --.

5          Well, I'm already on page 9 of your 19-page report, so

6   we are making progress.

7          This issue of depositions and the number of discovery

8   in general, it's probably premature to try to set that, but let

9   me give you some -- a general sense.

10         First of all, as you know, the rules charge me with

11  managing discovery so that it's efficient, economical, and

12  proportionate to the issues.  And although I can see the

13  defendants assert the Court doesn't have authority to limit the

14  number of document requests, I read Rule 26(b)(2) otherwise.

15  It charges the Court with managing all discovery.  So that I've

16  got -- I have authority to set limits on all discovery.  And as

17  to depositions, well, these -- these presumptive numbers in the

18  federal rules are starting points of thinking.  They are not

19  the ending points of thinking.

20         So and again, this is -- well -- and indeed, I don't

21  view numbers of depositions as an entitlement for anyone.  I

22  view it all as something to be managed in light of what the

23  issues are, what the purposes are.  Just taking depositions, I

24  don't believe taking depositions of somebody just because they

25  got listed as a witness.

1              A better way to do that is to request, and I'll allow

2      it, interrogatories that say what that witness is going to say.

3      You don't have to -- it can be abbreviated but substantive.

4              And a lot of times you find you don't need to depose

5      that person for that.  You make focus judgments about what

6      witnesses are important enough.  And a lot of witnesses, you

7      pretty much know what they are going to say.  You know what

8      you're going to do.  You can cross-examine them without having

9      seen them before contrary to popular belief, If they're -- if

10     they are, shall I say routine witnesses on matters that are not

11     of critical importance.

12             But my point is that you all need to think of -- you

13     need to look at the more efficient ways of getting the

14     discovery about what the evidence is going to be and then make

15     focused decisions about who you are going to depose.  I don't

16     like depositions as a first line of discovery because they are

17     so wasteful and expensive.

18             So now with that said, once you go through them, you

19     may still have disagreements, in which event, you come back and

20     we will have whatever we need in terms of discovery

21     conferences.  As I said, on a worst-case scenario I might make

22     you hire a discovery master.  But so far, I have not done that

23     in any case because of the expense and the delay that's built

24     into it.  But I might, so --.

25             Hard for me to see 75 depositions.  So I think again

1    on this I'm not going to set limits now.  I'll leave you with

2    general directions with the direction to confer and be

3    practical and then you can bring disputes to me.

4             Oh, and -- 750 interrogatories, well, it's really the

5    same point that we've got this initial thing about the

6    discovery on the class certification.  And yet since I'm

7    viewing that as not encompassing, it encompasses the issues but

8    not the outcome of the issues of the merits of the case.

9             So what do you really think, Mr. Specter, in -- I

10   mean, in particular about -- and just a rough sense of the

11   magnitude of the interrogatories you will need -- well,

12   actually no.  I'm not limiting you to the class certification.

13   I'm going to allow you to do all of the discovery relevant to

14   your 14 plaintiffs commensurate -- in fact, I've basically

15   required it.

16             MR. SPECTER:  Yes, Your Honor.

17             THE COURT:  So what --

18             MR. SPECTER:  Well -- sorry.

19             THE COURT:  Well, you are not going to get 750

20   interrogatories, so what is realistic?

21             MR. SPECTER:  Well, I think it's probably better to do

22   it in the real world than in the abstract along with your other

23   thinking.  And if we have a problem, we can come back to you.

24             Can I address --

25             THE COURT:  You may.

1          MR. SPECTER:  -- the deposition issue?

2          THE COURT:  Yes.

3          MR. SPECTER:  This is a case where the defendants have

4  vir- -- access to virtually all of the information that is

5  going to be relevant to the case, our individual plaintiffs.

6  The only documents they really have are the medical records

7  that the defendants have authored and have themselves already.

8          So in my experience, Your Honor, it is important for

9  us to be able to depose not a lot, but people with knowledge of

10  key issues so that we understand in the real world what

11  actually their practices are, because if we submit

12  interrogatories about how you provide sick call to people, and

13  the lawyer answers them, we will get an answer to an

14  interrogatory which exactly mimics the written policy that they

15  have.  And in many of these cases, the proof is not the written

16  policies.  It is the fact that they have a pattern and practice

17  of not following the written policy.

18          THE COURT:  I'm okay with that.  And again, I'm

19  uncomfortable with these expansive claims up front.  So I'm

20  asking as a practical matter, yes, some amount.  And, of

21  course, the defendants are going to want to do some depositions

22  early on as well.

23          MR. SPECTER:  Certainly.

24          THE COURT:  Well, maybe -- so I'm not -- I understand.

25  I don't have a problem with that.

```
1              MR. SPECTER:  Okay.

2              THE COURT:  The question is I want you all to be

3    focused and practical about it.

4              MR. SPECTER:  And again, I'm sorry, Your Honor.

5              THE COURT:  No, go ahead.

6              MR. SPECTER:  Well, you know, this is -- depositions

7    cost a lot of money.  We understand that.  We are a nonprofit

8    organization, as is the ACLU.  We have no interest in spending

9    more money on a case that we have no -- we are not getting paid

10   to do this.  So we would like to keep it as efficient as

11   possible.

12             THE COURT:  So, Mr. Specter, are you that -- are you

13   that group that won the California prison case?

14             MR. SPECTER:  Exactly, Your Honor.

15             THE COURT:  So then -- yes.  All right.  Okay.  Did

16   you want to say something?

17             MS. WIENEKE:  I was just contemplating, Your Honor,

18   that with respect to the proposed interrogatory that

19   Mr. Specter just posited, the answer would be in Wexford's

20   hands, really, not ADOC's, which complicates the matter.

21             So it's just one of those issues that we are going to

22   be dealing with in this case.  And as far as our contractor, we

23   would cooperate with them and ask them to cooperate with us for

24   the information, but it's one of the complicating factors.

25             THE COURT:  What -- what's the -- what was the
```

1    changeover date?

2            MS. WIENEKE:  July 1 was the effective date, Your

3    Honor.

4            THE COURT:  Now, I had, and again, I -- I just have a

5    general recollection of reading the newspaper without any

6    premonition that I would actually have to know what they said.

7    But weren't they pretty much taking on a lot of the DOC

8    employees?

9            MS. WIENEKE:  Some of them were hired on as Wexford

10   employees.  Some of them have been hired as monitors to monitor

11   the conditions of the contract.  That's correct, Your Honor.

12           THE COURT:  So give me just a ballpark figure of how

13   many employees Wexford is going to have on running these

14   contracts.

15           MS. WIENEKE:  Mike, do you know the answer?

16           We do not know the answer to that, Your Honor.

17           THE COURT:  How many people did DOC have doing it,

18   roughly?

19           MS. WIENEKE:  How many former DOC are now hired by

20   Wexford?

21           THE COURT:  No.  No. When DOC was doing the operation,

22   how many, roughly, how many employees did they have doing that?

23           MS. WIENEKE:  Let me confer with DOC's counsel.

24           THE COURT:  All right.

25           MS. WIENEKE:  You've stumped the panel, Your Honor.

1   Ms. Northrup is DOC's counsel, and she does not know the number

2   of total DOC employees dedicated to the delivery of healthcare

3   prior to July 1.  I apologize, Your Honor.

4           THE COURT:  Because if in fact -- well, there's a lot

5   of things here.  But if there are a lot of DOC employees who

6   are just changing hats, I guess you are going to do discovery

7   on both ends of it.  Plaintiff needs to prove their case, and

8   they need to prove what's going to happen going forward, so

9   it's all open for discovery.  So --.

10          So, of course, you know there is another possibility,

11  and I don't -- I don't want anyone to be -- sometimes I really

12  scare the lawyers by saying things off the top of my head.  I'm

13  not prejudging anything, but with this tolling agreement the

14  plaintiffs have, and with this change, have the plaintiffs

15  thought about the possibility of simply dismissing this case

16  subject to coming back in six months?  I'm not trying to -- we

17  are here to try cases.  I'm not trying to talk you into

18  anything.  But it's a matter of -- and I know about your

19  outfit, Mr. Specter.  You guys have to win to get paid, right?

20          MR. SPECTER:  Correct, Your Honor.

21          THE COURT:  So there's no incentive for you to do

22  anything that isn't calculated to result in success.

23          MR. SPECTER:  You are exactly right.  I make that

24  calculation every day.

25          THE COURT:  So have you thought about this?  And, in

1    fact, now I remember there was something in your report about

2    on July 6, you said you were going to think about something.

3    Was it this?

4              MR. SPECTER:  Yes, Your Honor, it was.

5              THE COURT:  Speak into the microphone.

6              MR. SPECTER:  Sorry, everybody -- my voice is soft and

7    I get called on that quite a bit.

8              Yes, we have.  The defendants, or Mr. Struck, who is

9    not here, and I, and Mr. Fathi had a telephone conversation

10   where we talked about this issue.  And in his proposed status

11   report, he had said, you know, we will give you the discovery

12   you need to effectively evaluate whether Wexford is doing a

13   good job.

14             And so we said, okay, if you really mean that, and we

15   can determine whether or not Wexford is doing a good job,

16   because as you said, if they are providing constitutional care,

17   we are happy because our clients will be happy, and we don't

18   want to spend a fortune litigating a case which we are not

19   going to win.

20             So we proposed a stipulation which would give us the

21   discovery we thought we would need and also firm up the -- the

22   conditions under which we would be operating during this little

23   period.  And I got a letter back from the defense counsel

24   yesterday or the day before basically rejecting many of those

25   points.

1           So I don't really think that we can come to any

2  effective agreement.  And more importantly, Your Honor, we've

3  continued to gather information.  We've been visiting prisoners

4  recently.  And our opinion is that the care is not getting

5  better based on the limited information we've been able to

6  gather.

7           So we are not really inclined to stop anything at the

8  moment.  I think if in fact there is a point where our opinion

9  changes, we will certainly let you know.  But as of this point,

10  we are where we think we need to move forward with the trial

11  schedule that you've outlined.

12           THE COURT:  And I'll do that unless everybody agrees

13  to something else.  But my comment was more not so much a

14  matter of whether you think in the 20 days they have changed

15  things, but whether you might think it wise, simply to give

16  them a better chance to, A, do better, and, which in turn gives

17  you a better prospect when you come back in full force and have

18  the new status quo that's easier to discover.

19           So I wasn't thinking that you would just accept where

20  they are, but I was thinking you might want to give them the

21  chance to either improve things or give you a better record

22  than you can make if you would go full bore the next four to

23  six months.

24           And, you know, the reality is for a structural

25  injunction case, even though I will get this done in three

1    years, that the time that would be passing would not be

2    significant in terms of you achieving the ultimate objections

3    you want to achieve at the back end.

4         Now, that's really -- it's whether you have to think

5    that Wexford is taking this lawsuit seriously.  If you just

6    think that six months from now they are going to be doing

7    nothing different than they are now, there's no reason to wait.

8         MR. FATHI:  That's right, Your Honor.  If I may, to

9    just to add to Mr. Specter's comments, we are very concerned

10   about further delay.  Just to put this in context, there have

11   been, since the first of the year, at least four suicides in

12   the prison system, at least 36 other deaths, including people

13   as young as their 20s.  And this is a case of ongoing violation

14   of fundamental constitutional rights.  So we are very concerned

15   about the delay that would be occasioned by dismissing and

16   refiling.

17        Obviously the defendants have made a mootness

18   argument, they certainly have the right to come forward with

19   evidence and meet what the Supreme Court has characterized as a

20   heavy burden of showing that the violations have been cured and

21   cannot be expected to recur.  But we believe that should occur

22   in the context of this lawsuit, Your Honor.

23        THE COURT:  All right.  Well, that's -- as I view it,

24   you all would have to agree to a course of action like that;

25   otherwise, we are going forward with the lawsuit.

1          MR. SPECTER:  That's acceptable to us, Your Honor.

2          THE COURT:  I do urge you to continue a dialogue,

3    because the first question is whether the department and

4    Wexford really do think they want to change and improve things.

5    If you are content that the status quo is acceptable,

6    constitutionally and otherwise, and you want to defend it,

7    that's fine.  But that's this lawsuit.  And there will be no

8    reason to delay anything.  But if in fact you want to persuade

9    the other side that you want to use this transition in a way to

10   deal with whatever systemic issues that some of the systemic

11   issues that they have in mind, it might make sense simply to

12   defer this some number of months so that the effort they are

13   going to spend will be more productive.

14          Well, I'll leave you -- yes.

15          MS. WIENEKE:  Your Honor, if I may, and we certainly

16   have no objection to an early referral to a magistrate to

17   assist the parties in the discussion in this regard, because --

18   because of this upcoming conference, the careful review of

19   proposed stipulation was somewhat rushed.  And we are very

20   interested in pursuing and meting out the details of this and

21   we think it's in everyone's best interest to pursue such an

22   agreement.

23          THE COURT:  And, well, Mr. Specter, what about that?

24   So what she's suggesting now is an earnest early discussion

25   facilitated by a neutral --

1          MR. SPECTER:  You know, I don't have any basic

2    objection to that, Your Honor, but I'll be perfectly blunt with

3    you.  We've done many of these cases, we -- we know what we

4    need.  We know what we don't need.  And a magistrate who is

5    very busy with a lot of other things with no particular

6    expertise in these kind of issues, you know, it's a burden.

7    And since it's got to be voluntary anyway, like you said, I

8    have no interest in doing something that costs anymore money.

9    So if we can come to an agreement, I would be happy to do that.

10   We will always give serious consideration to their proposals.

11         THE COURT:  Well, let me -- it may be that a

12   magistrate judge is not necessary if both sides are able to

13   dialogue in a candid, nonpositional way that begins with --

14   without any commitments, but with an openness to change.

15         And for you, that means taking less than you would

16   like, and for you it means meaningful change.

17         I don't believe in -- well, I don't know.  I -- when I

18   was a lawyer, I never made demands for precommitments to

19   negotiation.  I thought they were an impediment to discussion.

20   You find out pretty quickly in discussion whether there's a

21   lack of interest.  But you don't have to spit into someone's

22   face before they come into the room.

23         MR. SPECTER:  Right.

24         THE COURT:  So I am not going to ask you all to tell

25   me right now.  I urge you both to -- to address this.  And, you

1    know, it doesn't -- it doesn't do any good to set up that kind

2    of a discussion just to find out if the other side is going to

3    cave in.  It really has to be an interest in both sides to make

4    some meaningful accommodation.

5        MR. FATHI:  Your Honor, if I may, Ms. Wieneke and I

6    litigated a very similar case in front of Judge Muecke.  And

7    while we were both obviously much younger at that time, I have

8    to say that we worked together and productively.

9        THE COURT:  She was 14 at the time.

10       MR. FATHI:  Exactly.  But my point in raising this

11   ancient history, Your Honor, is that we worked together well

12   then.  I think I can assure the Court then that we will

13   similarly do so in this case.

14       MS. WIENEKE:  I think it was 25 years ago.

15       THE COURT:  I don't know if you both want to do that.

16   Does that impact on our schedule at all?

17       MR. SPECTER:  No, Your Honor.

18       THE COURT:  Okay.  Now, let me add if -- if you have

19   discussions that continue, I urge you to think about -- you'll

20   understand how discussions are going, and you will have a sense

21   for whether they might be aided by a neutral.  And if you think

22   that there are resources -- and you're right, magistrate judges

23   are great for a finite time.  But they are not great for the

24   recurring meetings, because of the scheduling difficulties they

25   have.  But even -- even people who other than the privately

paid mediators, there are people available, there are neutrals
that can assist you with some efforts, if you find someone that
you have mutual trust in and I urge you all to think that
through as you proceed.

All right.  Where were we?  We were -- oh, we got off
on to this talking about interrogatories and other discovery.

I guess, I think the way we had that resolved is I'm
not setting any limitations, but I'm urging you to be
economical and focused for what you need early on.

And, again, if there are disputes, you can bring them
back to me.  And again, when you get my case management order,
I don't allow discovery motions as such.  I require counsel to
personally confer.  And you have to talk to each other.
E-mails don't count.  And, you have to actually reach an
impasse on something concrete.  It's not enough to have generic
disharmony.  You actually have to have something exact and
concrete that you have an impasse.

Then you can submit a brief written statement of that.
I shoot for one page, but it's not limited to one page, that
identifies the problem, states the position of both sides, and
certifies that you have actually spoken to each other about it
and that you've reached an impasse.

Sometimes I rule just based on that.  But more often,
I'll set if for hearing within 24 hours and we will talk about
it.

1          I will say in a minority of the cases I can't decide

2     it on that basis and then I'll allow formal discovery motion

3     where I need more paper to resolve it.

4          All right.  Now, let's -- hmmm.  Page 12, the -- with

5     respect to the length of depositions, I'm going to formally

6     adhere to the federal rule, which is seven hours per

7     deposition.  However, I also follow, because I think it's a

8     great rule.  I follow the practice under the Arizona Rules of

9     Civil Procedure, which also set a presumptive limit.  It's

10    actually four hours over there.  But the Arizona rules also

11    provide that the lawyers have to agree to more time if it's

12    justified.  So that the rule is not an absolute rule.  And

13    there are situations where the depositions are productive, and

14    it's important, and I expect the lawyers to agree to more time.

15         I will warn you, though, if you spend two hours asking

16    the witness about things in their life before you get to this

17    lawsuit, you will never get any more time from me, because that

18    proved you didn't even need the seven hours.  So and I've had

19    some of these where it got ugly.  And I read the deposition.

20    And I -- let me tell you, I can tell whether a deposition is

21    being unproductive.

22         Also, if witnesses are being evasive and

23    nonresponsive, I pretty much never set any limits on those

24    depositions until the witness starts answering the question

25    straight up.

```
 1              So now, let's go back to my three-year schedule.  We

 2     want to have this in a -- ready for motions for summary

 3     judgment to be filed early in 2014, so that basically leaves a

 4     year and a half for us to get everything up to that point.

 5     That is actually plenty of time, provided that we don't lose

 6     time.

 7              MR. SPECTER:  I'm --

 8              THE COURT:  Yes.

 9              MR. SPECTER:  This is just a thought.  I know it's not

10     standard procedure, so just take it with a grain of salt.  But

11     these cases, summary judgment is almost impossible because

12     there's going to be basically a dispute about the facts.

13              THE COURT:  I know, but that doesn't stop defendants

14     from filing them.

15              MR. SPECTER:  I understand that.  That's why I'm

16     saying they can file it, but to revolve the whole case around

17     it is -- is something I thought you might want to consider.

18     Because they need expert declarations to prove their case, and

19     we have contrary declarations and there you go.

20              THE COURT:  But you know, the trial preparation

21     process, and to some extent motion for summary judgment in a

22     case like this they often do have a good prospect of narrowing

23     the case.  They don't end the case, but you knock off the

24     peripheral things and they --

25              MR. SPECTER:  Right.
```

1          MS. WIENEKE:  Well, Your Honor, there are conditions

2     of confinement issues in this case which are subject to --

3          THE COURT:  Actually, I didn't -- that's the SMU where

4     we haven't even talked about that.  I'll come to that.  That's

5     a good point.  Actually, maybe we should talk about that now

6     before we get to the schedule.

7          Well, Mr. Specter, you know, we've had a lot of cases

8     in our court challenging SMU and I've had some myself.  And

9     they've all failed.  And the ones that have been appealed, have

10    all been affirmed by the Court of Appeals.  And now that

11    doesn't mean that you cannot in good faith try to do something

12    new.  I'm just saying that the department's SMU policy, I know

13    of a number of cases that have upheld.  I personally went

14    through two of them at great length and was a little surprised

15    to learn what the law was.  And they can do an awful lot, so --

16         MR. FATHI:  Well, Your Honor, I've read at least some

17    of those decisions, including at least one I believe by you.

18    My recollection is that most or all of those cases were pro se

19    without counsel.  And certainly without experts who can testify

20    as to the effects of long-term solitary confinement.

21         So we are very much aware of the contours of the law.

22    But we believe that those cases have limited precedential value

23    because they were uncounseled and without experts.

24         THE COURT:  I believe Judge Bolton had a case right

25    before mine, and I think she did have some experts in that

1  case.  I don't remember if there was a lawyer in the case.  But

2  now, I don't remember much about it.  But and again, I'm not

3  saying you don't have the right to try to come in and change

4  the law.  But maybe that part of it we can move on a different

5  track and move it more quickly.

6          MR. FATHI:  Well, Your Honor, I don't think that will

7  work, because there's not really a bright line between the two

8  sets of claims.  For example, deep -- the group that is the

9  most vulnerable to the long-term solitary confinement are

10 people with serious mental illness.  And there is a long line

11 of cases holding that confinement of people with serious mental

12 illness in long-term segregation does violate the Eighth

13 Amendment.  And so that sort of bleeds over into the mental

14 health portion of the case.  And so we don't believe that they

15 should proceed on separate tracks.  We think that our -- there

16 is some significant overlap at least with that population.

17         THE COURT:  How many of your 14 people are seriously

18 mentally ill?

19         MR. FATHI:  I believe six or seven.

20         THE COURT:  All right.  Well, Ms. Wieneke?  How could

21 we move that on a faster track?

22         MS. WIENEKE:  Well, Your Honor, according to their

23 Complaint, the conditions of confinement claims pertain to the

24 conditions in the cells, the rec opportunities.  To the extent

25 that those folks also are claiming serious mental health,

1    that's going to be litigated in the deliberate indifference

2    claims.

3            But I don't see how we can't segregate those out and

4    we would be more than happy to have a separate motion of

5    summary judgment just on conditions of confinement and move

6    that up and get that litigated earlier.

7            THE COURT:  Frankly, I had understood that the

8    challenge to the SMU was not limited to seriously mentally ill.

9    I thought you were challenging it more generally.

10            MR. FATHI:  That's correct, Your Honor, but again, one

11    significant portion of the SMU challenge does involve the

12    seriously mentally ill.  So these are going to be the same

13    mental health experts that will be working on the mental

14    healthcare portion of the case.  And so I just don't -- I think

15    there would actually be some diseconomies of trying to move

16    those two parts of the case on different tracks.

17            THE COURT:  Well, you know, Ms. Wieneke, maybe if --

18    this separate issue about seriously mentally ill, that's a

19    wrangle I haven't seen in my prior cases.  So I don't prejudge

20    that.  But, on the other hand, you have a high level of

21    confidence you are going to win that in general, right?

22            MS. WIENEKE:  Correct.

23            THE COURT:  So why do you need an early decision?  And

24    to the extent that this -- we are dealing with both seriously

25    mentally ill and others, it does sound like he's right, that

1    the presentation of the facts and experts, at least for the

2    ones that are seriously mentally ill is going to take as much

3    time as the others.  So I guess I am persuaded that we cannot

4    achieve any speed and economy and that there's no real benefit

5    to you, to the defendants, in trying to do it.

6         Any last word on that?

7         MS. WIENEKE:  Only, Your Honor, I think do think it

8    would knock out some plaintiffs that otherwise would not be

9    affected by the SMI (sic) issues.  But I defer to the Court on

10   that.

11        THE COURT:  Tell you what, when we get to summary

12   judgment, you know, I expect that's going to be a replay of

13   ones I've seen in prior cases for SMU in general and with new

14   issues about the seriously mentally ill.  But it doesn't sound

15   like we can effectively likely move that up.  So I'm going to

16   leave that all on the same schedule for now.

17        And that brings us to what is now just about the last

18   thing, and that is the schedule.  Well, it looks to me like we

19   have to go with the plaintiffs' schedule, because the

20   defendants' proposed schedule will not meet my 2015 date.

21        So let me just -- it would be -- completion of fact

22   discovery by May 31, 2013; plaintiffs' expert disclosures by

23   June 28, 2013; defendants' by August 16; purely rebuttal

24   disclosures from the plaintiff by September 27.

25        Actually, you know, your deadlines for expert

1  disclosure depos don't work for me for the plaintiff because

2  you have three different deadlines.  That doesn't seem

3  practical to me.  It seems to me like we need to have one

4  deadline for depositions all of the experts.  Now, granted, you

5  can't do it all in the last week so you have to plan it.

6  But --

7           MR. SPECTER:  Then we can move it all to the last

8  deadline, Your Honor.

9           THE COURT:  That's what I was saying, October 18,

10  2013, for the close of expert discovery.

11           MS. WIENEKE:  Your Honor, if I may, that only leaves,

12  what, two weeks from the date of plaintiffs' disclosure of

13  rebuttal to schedule a deposition.

14           THE COURT:  Actually, let's -- let's, I think the

15  answer is tighten that up a little bit.  Yes.  Well,

16  plaintiffs' expert by June 28.

17           Do you really need seven or eight weeks, Ms. Wieneke,

18  to do yours after that?  Because your people know what -- your

19  people are going to be working on this before you get the

20  plaintiffs' reports.

21           MS. WIENEKE:  Well, this was plaintiffs' schedule, but

22  the only reason for that, Your Honor, is it is the summer.

23           THE COURT:  Right.

24           MS. WIENEKE:  And so we would prefer that kind of

25  spacing.

1          THE COURT:  Well, then, this is getting a little

2     tight.  And, Mr. Specter, I view rebuttal expert disclosures as

3     extremely rare.

4          MR. SPECTER:  Yes, as I understand, Your Honor.

5          THE COURT:  It's not a chance to beef up your report.

6     It's only to respond to things you could not have anticipated.

7          MR. SPECTER:  I understand.

8          THE COURT:  Let's give you three weeks to do that.

9     That would be September -- September 13 for the plaintiffs'

10     expert rebuttal reports.  And that would be five weeks to fit

11     the depositions in.

12          MS. WIENEKE:  That's acceptable, thank you, Your

13     Honor.

14          THE COURT:  All right, fine.

15          Nick, did you get those dates or should I say them

16     again?

17          THE COURTROOM DEPUTY CLERK:  I've got them.

18          THE COURT:  Deadline for dispositive motions, November

19     17.  And that will have the response due mid -- mid-December,

20     about December 20.  And --

21          THE COURTROOM DEPUTY CLERK:  November 17 is Sunday.

22          THE COURT:  Oh, 2013.  What is the Friday before that?

23          THE COURTROOM DEPUTY CLERK:  15th.

24          THE COURT:  All right, make that dispositive motions

25     due November 15.  And I don't have a calendar for 2013.  What's

1    the Friday before the holiday week in that December, Nick?

2              THE COURTROOM DEPUTY CLERK:  In December, it would be

3    the 20th.

4              THE COURT:  December 20th, set December 20 for

5    responses to dispositive motions.

6              Let me tell you why.  I do not require lawyers to do

7    any work in the last two weeks of December, so we will give you

8    extensions for briefs that give you full time to respond

9    without having to take that during your holidays.  And then we

10   will have that ready for ruling.  So -- and oral argument.

11             As I said, I don't know what's going to happen.  But

12   it seems very likely that at least those motions will narrow

13   the issues as to what plaintiffs want to present and what the

14   defendants want to fight over.  Which, of course, you can do

15   that more efficiently if you all sat down in a conference room

16   ahead of time and dealt candidly with your case.  You wouldn't

17   have to file a motion for summary judgment, you could narrow it

18   down to what pretty much you might consider actually doing

19   that.  But if you don't, just file your motions for summary

20   judgment.

21             Now, I think we have just a little bit more.

22             MS. WIENEKE:  Your Honor, on the motion, may I ask?

23             THE COURT:  Yes.

24             MS. WIENEKE:  Would it be permissible if we filed a

25   separate motion on the conditions and then a separate motion on

1   all the rest of the issues?

2          THE COURT:  Any problem with that?  That's basically

3   SMU versus health.

4          MR. FATHI:  Well, again, Your Honor, I think there's

5   some overlap.  I suppose we could -- it would require sort of

6   repetitive briefing of some issues.  So again, I don't think

7   it's efficient, but if that's what the Court prefers.

8          MS. WIENEKE:  We could do a joint statement of fact as

9   to both motions.

10          THE COURT:  What's the benefit of doing separate?  I

11   am sure I will have to give you extra pages for these motions.

12          MS. WIENEKE:  Candidly that's what I'm concerned

13   about, Your Honor.

14          THE COURT:  I tell you what, let's do them all in one

15   motion, but with respect to extra pages, you won't get it done

16   in 70 pages.  Let me tell you what I do, I don't allow you

17   extra pages until you submit your proposed brief to me and I

18   read it.  And if it's repetitive and if it asserts points that

19   are obviously not appropriate for summary judgment, if it's not

20   efficient, I'm going to deny the extra pages.  But if it's

21   justified, then I'll allow the extra pages.

22          MS. WIENEKE:  Fair enough, thank you.

23          THE COURT:  That we already talked about documents --

24   well, we really haven't talked about the e-discovery, have we?

25   Is that something -- what you've laid out here is really, it

1   looks to me like the report to me about the status of your

2   dialogue rather than anything final about e-discovery plan.  Is

3   that correct?

4           MS. MITCHELL:  Your Honor, Caroline Mitchell from

5   Jones Day.  I think that that's correct.  There was conferral

6   with the defendants this morning about talking further about

7   the 30(b)(6) notice we propounded on that.  So I think we both

8   have to have an understanding of what the systems are before we

9   can come up with a reasonable proposal on e-discovery.

10          THE COURT:  Then I'm not going to speak to that now

11  but I want you to continue and promptly to address that.  And

12  it seems to me that this -- well, you know, I'm not sure you

13  are going to need a whole lot of e-discovery with search terms

14  and all that, because if the real thrust of this case is

15  structural deficiencies in the healthcare system, you are going

16  to find that more directly without searching tens of thousands

17  of documents about cases.

18          MR. SPECTER:  Your Honor, but there is a deliberate

19  indifference component to it, so that's what some of the

20  document production is directed towards.  You're right about

21  the fact, you know, the actual practice of the care.

22          THE COURT:  Right.  You want the smoking gun e-mail?

23          MR. SPECTER:  Yes, Your Honor, they are always there.

24          THE COURT:  Are they?

25          MR. SPECTER:  Uh-huh.

1          MS. WIENEKE:  It's right here.

2          THE COURT:  Well, all right, I'm going to leave that

3    to you.  You know, the cost is a big issue.  And if -- if you

4    can have really focused search terms and costs are manageable,

5    that's one thing.  But I'll warn you, I have, in a variety of

6    commercial cases, I have just shut all that down.  I haven't

7    made the parties on either side spend the money for that,

8    because when they come and talk to me, they haven't been able

9    to persuade me that it's focused, and likely to yield much.

10   And so I save everybody a few hundred thousand dollars.

11         So all right.  I think we are just about done.

12         Now, I don't think I am -- I don't think I'm really

13   seeing a dispute here about jury trial.  There's really nothing

14   suggesting jury trial here.  And so we don't have to worry

15   about that.

16         And now, with respect to trial time, that's something,

17   as I said, when we get -- I might -- at the pretrial, actual

18   pretrial conference, I get a lot done, including settling jury

19   instructions, all pretrial motions, everything that I can

20   decide ahead of trial I do because I know it's so helpful to

21   the lawyers when they do their final trial preparation to know

22   what the answers are to those questions.

23         I usually set a trial date then.  But for this, I'm

24   probably going to have to -- when we get close, I'll probably

25   have to set a time in advance of the actual pretrial conference

1   to talk about trial scheduling and how long it would take.

2           MR. SPECTER:  Can I --

3           THE COURT:  Yes.

4           MR. SPECTER:  Sorry, can I ask when you envision

5   generally trying the case?

6           THE COURT:  Yeah.  I am -- as I said at the beginning

7   of our discussion, I would start this no later than January

8   2015, which is two months before the time it has to be done.

9   However, I -- it would be much better if we would do it in the

10  fall of 2014.  Part of this just -- this is going to be a big

11  trial to fit in on my calendar.  And there needs to be a little

12  time for things to go wrong.

13          So if we have -- realistically, you know, I would be

14  shooting for sometime in the fall of 2014.

15          I might even shoot for the summer, but it's hard to

16  set a trial this length in the summer.  There just -- lawyers

17  and witnesses and experts are just -- you can't fit a time in.

18  So the fall is the realistic time to expect it.

19          So -- and all right, I think -- I think that's

20  everything on your list.

21          Let me ask counsel if there's anything either of you

22  would like to bring up that would assist us processing the

23  case.  Mr. Specter?

24          MR. SPECTER:  Well, I just want to go over what I

25  understand, not including the days because your clerk will send

```
1    those to us so that there's no confusion between us after we

2    leave if that's okay.

3            The copying cost, this dispute should be resolved.

4    And it should be equivalent to what an outside vendor charges.

5            THE COURT:  Well, that's the target.  Now, I'm giving

6    allowance for the fact that there may well be other internal

7    costs to the department.  So I'm not just setting a mechanical

8    thing, so that's the target.

9            MR. SPECTER:  Target, it should be around that point.

10           THE COURT:  Right.  Right.

11           MR. SPECTER:  All right, fair enough.

12           THE COURT:  Now, look -- anything that can

13   conveniently be sent to outside people, just do it.

14           MR. SPECTER:  I know.

15           THE COURT:  Don't worry about that, what they charge

16   you.

17           MR. SPECTER:  Well, we've asked them to do that and

18   they've said for their own reasons, they don't necessary --

19           THE COURT:  Well, they may have security reasons, I

20   suppose.

21           MR. SPECTER:  They have to decide what to do.  No stay

22   until there's a stay.

23           THE COURT:  Right.

24           MR. SPECTER:  Fact and class discovery are open now.

25           THE COURT:  Correct.
```

1              MR. SPECTER:  No limit on the discovery, but you've

2     given us general guidelines, which I won't dare try to repeat.

3              THE COURT:  Don't -- actually, I don't like the way

4     you phrase it.

5              MS. WIENEKE:  Nor do I.

6              THE COURT:  I'll say exactly, there's plenty of

7     limits, and if I have to set them, I will.

8              MR. SPECTER:  All right.

9              THE COURT:  And I wanted you all to dialogue about it

10    with the general direction I gave you.

11             MR. SPECTER:  Okay.  And those are the -- and the

12    class certification motion will proceed on the 2nd of November.

13    And we, to do that, we will need to do our discovery very

14    quickly.

15             THE COURT:  Yes.

16             MR. SPECTER:  So if there are problems, we are going

17    to bring them to you right away.  Okay?

18             THE COURT:  Yes.

19             MR. SPECTER:  Okay.

20             THE COURT:  All right.  And there are a couple of

21    things I did omit.  I will set pretty much as a place holder

22    August 17 as a deadline for filing motions to amend pleadings

23    or bring in any additional parties.  But as you know, under

24    Rule 15, that's not an absolute deadline.  If circumstances

25    would justify amendments later and you could meet the

1    four-factor test, you can always file a motion, and if you need

2    it I will allow it.  The key thing is to avoid the prejudice to

3    the other side and delay the case.

4          And I will, since I'm -- I'm expecting a motion for

5    summary judgment at least on the SMU issue, I don't set a

6    pretrial conference -- oh.  Actually, well, I'll tell you what.

7    Yes, I will.  In the off chance that there is no motion for

8    summary judgment, I will set a contingent date for submissions

9    of proposed joint final pretrial statement and I'll make

10   that -- make that December 20 of 2013.  But that date falls out

11   if any motion for summary judgment is filed, to be reset after

12   ruling on the motion for summary judgment.  And so, I'll set --

13   reset that date when I've made that ruling.

14         And also after ruling on summary judgment, I'll also

15   set a time for the final proposed pretrial order, which is

16   typically about four to six weeks after I rule on the motion

17   for summary judgment.

18         Now, also, I require in every case that the parties

19   and counsel meet to discuss settlement.  But it sounds like you

20   already have processes for that.  I'm not sure I need to worry

21   about that in this case.

22         What do you think, Mr. Specter?

23         MR. SPECTER:  I think we need to get a little -- I

24   think we need to get a little farther down the road, given what

25   their position is at the moment, and for discovery to disclose

1    some of the facts either way before we can have productive

2    discussions.

3         THE COURT:  I'm willing to leave that date blank now.

4    I do that in normal cases to break through the barriers to

5    communication that exist in a lot of cases and also to force

6    everybody to think about the case at the same time.  But this

7    is an unusual case, so I'm going to leave that blank for now.

8    Maybe later on as we've progressed, I'll discuss it with you.

9    And if there have not been earnest settlement discussions, then

10   I'll set -- I'll make you do it.  But I agree, it's too early

11   to set a deadline now.

12        MR. SPECTER:  Thank you, Your Honor.

13        THE COURT:  And I think that's everything.

14        Anything else, Ms. Wieneke?

15        MS. WIENEKE:  Yes, Your Honor.  Two issues.  One is

16   that we've been asked to produce medical records from inmates.

17   And we do require releases for the production of those records.

18   So --

19        THE COURT:  Yes.  That's pretty customary.

20        Any problem with that, Mr. Specter?

21        MR. SPECTER:  Yes, Your Honor, we need, as -- we need

22   the medical records to prove our case, both for the class

23   certification motion and for the ultimate trial.  So what

24   usually we propose, and have done in many other cases, is get

25   the medical records under a protective order.

```
1              THE COURT:  Well, with respect to your clients, your
2      named plaintiffs.
3              MR. SPECTER:  We already have those records,
4      Your Honor.
5              THE COURT:  So what are we talking about here?
6              MR. SPECTER:  We are talking about proving systemic
7      problems, which means we have to get records of other prisoners
8      or we can't prove perspective systemic problems on the basis of
9      14 prisoners.
10             THE COURT:  Actually, you know what I've done in the
11     previous one of these cases I've had, after the class
12     certification, when they are class members, it's a lot easier
13     to deal with that.
14             MR. SPECTER:  Yes, you're right, Your Honor, but it's
15     a little of a chicken and egg problem, because to prove
16     systemic patterns and practices, you need to look at records to
17     show that they are doing things in certain ways.  So, in other
18     words, to do that, you need to look at the records.  So, in
19     order to do that, to make that proof, you kind of need the
20     records.
21              So I think that the protective order method will allow
22     protection of the privacy interests of the prisoners, while
23     allowing us access to the information we need to give you to
24     show that there's sufficient common problems to merit class
25     certification.
```

1          THE COURT:  But, you know, right now we are in the

2   precertification phase.

3          MR. SPECTER:  Right.

4          THE COURT:  So why do you need that before class cert?

5   I'm not quarreling with you.  I'm just asking you, why do you

6   need that before class certification?  That is, medical records

7   of your putative class members.

8          MR. SPECTER:  Right.

9          In order to prove pattern, that there are patterns and

10   practices which are common to the class.

11          THE COURT:  Well, but, you know, it goes back to our

12   discussion at the very beginning that you need to prove, for

13   your injunction, systemic deficiencies?

14          MR. SPECTER:  Right.

15          THE COURT:  Which, well, I suppose one way to prove

16   that is that a huge volume of failures.  But, on the other

17   hand, well, this is -- this is problematic because we are

18   dealing with people's medical records.

19          What do you suggest, Ms. Wieneke?

20          MS. WIENEKE:  Your Honor, we are not in a position to

21   waive the privilege on behalf of unrepresented inmates.  So --

22   and the -- we've provided access for legal visitations if they

23   want to come and get releases, and we will certainly

24   accommodate their requests to come and have visitation.

25          THE COURT:  Well, Mr. Specter, I am a bit queasy about

1    this.

2           MR. SPECTER:  So I will -- let me say two things.

3    First, the center is a protection and advocacy group.  They

4    have access to records under federal law.  And they have filed

5    a motion for -- to have the Court issue a protective order,

6    which is before you.  It was filed -- yesterday?  Yesterday.

7    So you might not have seen it yet.

8           THE COURT:  No, I have not.

9           MR. SPECTER:  So there's different access rules for

10   them.  And there are a couple of issues we haven't been able to

11   agree on with the defendants yet about that access.

12          Second of all, we could provide you with more

13   authority on this issue if you would like.

14          THE COURT:  Yes, I think I would.  I think -- there

15   may be something out there I need to learn that I'm not

16   familiar with.

17          MR. SPECTER:  Okay.

18          THE COURT:  In general, if you're not the lawyer for

19   the prisoner, and you don't have a written consent, you're

20   going to have a high burden of persuasion with me.  But, on the

21   other hand, you may become their lawyer by certifying the

22   class.  So --

23          MR. SPECTER:  Right.  And -- well, I'm not --

24          THE COURT:  I tell you what, I'm going to leave that.

25          MR. SPECTER:  I'm going to let my brief do the

1    talking, if that's okay.  I don't want to say anything that --

2              THE COURT:  You can file whatever you want and I'll

3    resolve it promptly upon completion of briefing.

4              All right, anything else?

5              MS. WIENEKE:  One more issue, Your Honor.  With the

6    30(b)(6) notice issue to the State, there accompanied a Rule 45

7    subpoena for the production of records.  And we've had the

8    discussion with the plaintiffs about this, that we do not

9    believe that a subpoena issued to a party is the appropriate

10   means to obtain records.

11             THE COURT:  I don't think so -- I don't think it is,

12   no.  I mean --

13             MS. MITCHELL:  Your Honor, we are prepared to do

14   briefing on that too, because --

15             THE COURT:  All right, you can brief that.

16             MS. MITCHELL:  Okay.

17             MS. WIENEKE:  In the meantime, Your Honor, the

18   production date is next week, can we get a stay of the --

19             THE COURT:  Well, how voluminous is it?

20             MS. WIENEKE:  Very big.  It's four electronic -- it's

21   for policy -- it covers the ESI information, which is a

22   dialogue we still need to have with counsel.

23             THE COURT:  Ms. Mitchell, I'm just not familiar with

24   that.  I remember that you don't get to subpoena the other

25   party.  The rules of discovery give you a lot of avenues to

1   deal with it, but you don't get to circumvent the discovery

2   rules by just subpoenaing the opposing party.

3          MS. MITCHELL:  Your Honor, in part that's right.  You

4   have to, when you serve a subpoena on a party, comport with the

5   requirements of Rule 34 in terms of the time that you give a

6   party, and we did that with our subpoena.  But a subpoena can

7   be used against a party or you can just serve a deposition

8   notice.  And we elected to serve the subpoena.

9          But I think that you'll find that a subpoena is a

10  perfectly viable way to take discovery from a party.

11         THE COURT:  If it operates under the same criteria as

12  discovery to a party, then I have the authority to grant

13  extensions or limit it.  And this really comes back to the

14  earlier discussion we had about managing the discovery in a way

15  that is reasonable and appropriate and proportionate.

16         So I'm going to treat this like a discovery request,

17  so I'm leaving you to dialogue on it and if you have a problem,

18  you could present it to me like a discovery dispute.

19         Now, again, I do not expect you all to be bringing

20  things to me on any regular basis.  It's counsel's

21  responsibility to understand the rules and the process and to

22  be reasonable with one another with respect to, you know,

23  what's being sought and the burden and the relevancy and the

24  cost and all of that.

25         I don't have many discovery motions.  I have very few

```
 1    discovery motions.  And a lot of the ones I have is because
 2    from lawyers who, not in this case, lawyers who don't
 3    understand the process.  So I trust you all.
 4           Now, you have -- if you have an honest dispute, bring
 5    it to me and I'll decide it.  But I expect you all to resolve
 6    most of them on your own.
 7           Anything else?
 8           MR. SPECTER:  No, Your Honor.
 9           MS. WIENEKE:  No, thank you, Your Honor.
10           THE COURT:  Very well then, I'm going to take a
11    five-minute recess before the next case.
12                            *     *     *
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C E R T I F I C A T E

          I, MERILYN A. SANCHEZ, do hereby certify that I am

duly appointed and qualified to act as Official Court Reporter

for the United States District Court for the District of

Arizona.

          I FURTHER CERTIFY that the foregoing pages constitute

a full, true, and accurate transcript of all of that portion of

the proceedings contained herein, had in the above-entitled

cause on the date specified therein, and that said transcript

was prepared under my direction and control.


          DATED at Phoenix, Arizona, this 25th day of July,

2012.



                         S/Merilyn A. Sanchez

                         MERILYN A. SANCHEZ, CRR