<u>Victor Parsons, et al. v. Charles Ryan, et al.</u>

No. CV 12-00601-PHX-NVW (MEA)

Index to Exhibits To Declaration of Donald Specter
in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss


Exhibit 1:      Tolling Agreement, dated November 7, 2011

Exhibit 2:      Prison Law Office Letter to Arizona Department of Corrections, dated
                October 12, 2011

Exhibit 3       Arizona Department of Corrections Letter to Prison Law Office, dated
                October 31, 2011


78204-0001/LEGAL24344776.1

Exhibit 1

# TOLLING AGREEMENT

## 1. Parties

The parties to this Agreement are: Charles Ryan, Director of the Arizona Department of Corrections (ADOC) on behalf of the ADOC, and Plaintiffs' counsel (the Prison Law Office, the National Prison Project of the ACLU, the ACLU of Arizona, Jones Day, and Perkins Coie LLP) on behalf of their clients, prisoners who are or will be under the custody and control of the ADOC.

For consideration that is acknowledged by all parties here to be adequate, the parties agree as follows:

## 2. Purposes

The purposes of this agreement are:

a.     To protect the interests of all parties during the time the ADOC is investigating and responding to the allegations contained in plaintiffs' counsel's letter of October 12, 2011; and

b.     To give the parties time to determine whether the issues described in the letter of October 12, 2011 can be resolved without the need for active litigation.

## 3. Terms

a.     The parties recognize and agree that, as used in this Agreement, the term "claims" includes any and all claims for injunctive or declaratory relief that could be brought in a civil lawsuit alleging violations of the Eighth Amendment to the U.S. Constitution, or other federal and state laws related to the medical care, mental health care, dental care, and conditions in the Special Management Units and other restricted housing units within the ADOC.

b.     Commencing on the effective date of this Agreement, the statute of limitations is tolled for all claims brought by Plaintiffs' counsel on behalf of prisoners in the custody of the ADOC. This tolling provision will remain in effect for 90 days, or until terminated by one of the parties, whichever is later in time.

c.     Charles Ryan and the ADOC agree to irrevocably waive and not assert in any civil lawsuit brought by plaintiffs' counsel on behalf of prisoners in the custody of

the ADOC any defense based on allegations that plaintiffs failed to exhaust administrative remedies.

     d.     This Agreement may be terminated by either of the signatories to this Agreement by providing writing in notice by overnight delivery to the other signatory. The termination shall be effective upon receipt. In the event of termination, the period from the effective date of this Agreement to termination or January 12, 2012, whichever is later, shall be removed from any calculation of the statute of limitations period brought by Plaintiffs' counsel on behalf of prisoners in the custody of the ADOC, whether asserted before or after termination.

     e.     The Parties stipulate, covenant, and agree that any additional bases prisoners in the custody of ADOC may have for tolling of any of claim are preserved and are not in any way limited by this Agreement. Prisoners shall retain the benefit of any such tolling, and this Agreement shall have no effect on, or otherwise waive, any such bases for tolling.

     f.     The provisions of this Agreement comprise all of the terms, conditions, agreements and representations of the Parties respecting the tolling of the claims brought by Plaintiffs' counsel on behalf of prisoners in the custody of the ADOC. This Agreement may not be altered or amended except by written agreement executed by both Parties.

     g.     Donald Specter represents that he is authorized to sign this Agreement. Charles Ryan represents that he is authorized to sign this Agreement on behalf of the ADOC and all of its agents.

     h.     All material terms of this Agreement will survive termination of this Agreement.

## 4. No Admission of Liability

The parties expressly recognize and agree that entering into this agreement does not in any way constitute an admission of liability or any wrongdoing by any party.

## 5. Effective Date

The effective date of this Agreement will be the date of the last signature below.

Dated:  November 16, 2011

CHARLES RYAN, Director Arizona
Department of Corrections

Dated:  November 7, 2011

DONALD SPECTER on behalf of
Plaintiffs' Counsel

3

Exhibit 2



**PRISON LAW OFFICE**

General Delivery, San Quentin CA. 94964

Telephone (510) 280-2621 ● Fax (510) 280-2704

www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Susan Christian
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

October 12, 2011

Mr. Charles L. Ryan, Director
Ms. Karyn Klausner, General Counsel
Arizona Department of Corrections
1601 W. Jefferson
Phoenix, AZ 85007

Dear Mr. Ryan and Ms. Klausner:

We write to inform you of dangerous and injurious conditions we have found in Arizona's state prisons and to demand that you remedy them. The denial of adequate medical and mental health care to Arizona prisoners is chronic, systemic, and clearly violates federal law, as set forth below.

In coming to these conclusions, we have interviewed and corresponded with dozens of prisoners at the Eyman, Florence, Tucson, Lewis, and Perryville complexes and have reviewed thousands of pages of documents, including public reports and investigations, prisoner grievances and responses, court filings, media accounts, ADC policies and official documents, and staffing and staff complaint information you have provided in response to our Public Records Act request.

As you know, Arizona has already spent many years under federal court supervision in *Casey v. Lewis*, filed in 1990 by the ACLU National Prison Project and the ACLU of Arizona. After extensive pretrial litigation and a lengthy trial, the court found violations in the areas of medical, mental health, and dental care, and the accommodation of prisoners with disabilities, and issued remedial orders. *Casey v. Lewis*, 834 F. Supp. 1477 (D. Ariz. 1993) (medical, mental health, and dental care); 834 F. Supp. 1569 (D. Ariz. 1993) (prisoners with disabilities). While we are ready to fully litigate this matter in federal court once more, we believe that it would be in the best interests of all parties at this time to resolve these violations through a stipulated injunction.

## 1.    Arizona deprives its prisoners of constitutionally adequate mental health care

Arizona has an obligation under the Eighth Amendment to the U.S. Constitution to provide for prisoners' basic human needs, including adequate mental health care. *Doty v.*

Board of Directors
Penelope Cooper, President ● Michele WalkinHawk, Vice President ● Marshall Krause, Treasurer
Honorable John Burton ● Felecia Gaston ● Christiane Hipps ● Margaret Johns
Cesar Lagleva ● Laura Magnani ● Michael Marcum ● Ruth Morgan ● Dennis Roberts

*Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994); *Hoptowit v. Ray*, 682 F.2d 1237 1253 (9th Cir. 1982); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995); *H.B. v. Lewis*, 803 F.Supp. 246, 248-249 (D. Ariz. 1992). A failure to meet this obligation "transgresses the substantive limits on state action set by the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) *quoting DeShaney v. Winnebago County Dep't of Soc. Svcs.*, 489 U.S. 189, 199-200 (1989).

As the evidence set forth below demonstrates, Arizona's prisons fail to meet this obligation: the mental health care delivery system is profoundly inadequate, with serious deficiencies in diagnosis, staffing, medication delivery, therapeutic treatment, and provisions to address self-harming behavior. These systemic failures result in significant injury and the unnecessary and wanton infliction of pain, in violation of the Eighth Amendment. *See McGuckin v. Smith*, 974 F.2d 1050, 1059-1060 (9th Cir. 1992). The injuries include an alarming suicide rate, barbaric conditions on suicide watch, exacerbated mental illness from extreme isolation and sensory deprivation conditions, severe reactions from inadequate and frequently interrupted medication delivery, and escalating symptoms of mental illness due to the lack of therapeutic treatment, as described in more detail below.

Arizona prison officials have long been informed of these serious deficiencies and the harm they have caused to prisoners through numerous inmate grievances and health needs requests, reports from outside advocates, and complaints from your own personnel, including detailed and specific concerns raised by a Deputy Medical Director for Psychiatry and a former Deputy Warden. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (deliberate indifference to serious health care needs violates the Eighth Amendment).

**(a)    ADC lacks sufficient staff to provide constitutionally adequate health care**

Prison facilities must have adequate staffing levels to deliver medical and mental health services to prisoners. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *5-12 (N.D. Cal. 2005); *Madrid v. Gomez*, 889 F.Supp. 1146, 1257 (N.D. Cal. 1995); *see also French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985). Furthermore, prison systems must have medical care performed by qualified personnel. *Toussaint v. McCarthy*, 801 F.2d 1080, 1112 (9th Cir. 1986); *Plata*, 2005 WL 2932253, at *5; *see also Casey v. Lewis*, 834 F.Supp.1477, 1545 (D. Ariz. 1993).

ADC's mental health treatment staffing is utterly inadequate. In 2009, the Eyman complex had only one half-time psychiatrist for more than one thousand patients on psychotropic medications, resulting in a situation in which, according to the Deputy Medical Director for Psychiatry, inmates "are not receiving a reasonable level of

psychiatric care. We are out of compliance with our own policies regarding minimum frequency of contact with a provider, as well as community standards for adequate care. The lack of treatment represents an escalating danger to the community, the staff and the inmates. . . . It is foreseeable that such untreated mental illness will present a danger to the community, the staff and the inmates." The situation now is even worse: there is not a single psychiatrist for the Eyman complex. Other mental health staffing at Eyman – psychologists and psychiatric nurses – continues to be inadequate as well.

This dire situation is not unique to Eyman. Earlier this year, the sole psychiatrist at Perryville reported the mental health staffing there as "abysmal," with approximately 1300 inmates on psychiatric medications, some of whom "have not been seen for 6 months or longer." The psychiatrist was thus forced to "renew meds for dozens of people per week without getting to see them because there is not enough time." In addition to the single psychiatrist, there were only three psychologists, four psychology associates, three PRNs, and one recreational therapist, for 1300 mentally ill prisoners – clearly inadequate numbers to provide constitutional care.

The grossly inadequate staffing makes it impossible for clinicians to appropriately diagnose, treat, and follow up with psychiatric patients.

- Prisoners on powerful psychotropic medications have no avenue to discuss adverse side effects or inefficacy, and are forced to suffer depression, anxiety, psychosis, and other damaging symptoms unnecessarily (see Section 1(b), below).

- Other prisoners suffer through the lack of meaningful therapeutic interventions, including at times of high risk, such as when they are suicidal or following sexual assaults (see Sections 1(c) and 1(d), below).

- Staffing is so inadequate, some prisoners are driven to harm themselves in an attempt to be seen, although as noted above and discussed in Section 1(c), many prisoners on suicide watch are deprived of meaningful clinical interaction.

Pharmacy staffing is also inadequate, contributing to the frequent disruption of medication delivery, as described in more detail in the following section.

**(b)    ADC denies mentally ill prisoners access to necessary psychotropic medications and medication management**

Arizona systematically fails to prescribe, provide, and manage necessary psychotropic medications to mentally ill prisoners, in violation of the Eighth Amendment. *See Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996) (deliberate

indifference can be found in abrupt and unsupported discontinuation of medications); *Gates v. Cook*, 376 F.3d 323, 342-43 (5th Cir. 2004) (monitoring and assessment of psychotropic medication levels required); *Wellman v. Faulkner*, 715 F.2d 269, 272-73 (7th Cir. 1983) (psychiatrist must supervise psychotropic medication); *Ginest v. Board of Cnty. Comm'rs of Carbon Cnty.*, 222 F. Supp. 2d 1190, 1201 (D. Wyo. 2004) (duty of prison officials to monitor psychotropic medications for efficacy and side effects); *Page v. Norvell*, 186 F. Supp. 2d 1134, 1139 (D. Ore. 2000) (denial of medical review could constitute deliberate indifference); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 & n.10, 1309-12 (E.D. Cal. 1995) (psychotropic medications must be appropriately supervised and periodically evaluated).

Tellingly, ADC's expenditures on mental health medications declined from $2,244,594 in FY 2009 to $1,553,878 in FY 2010, despite a stable prison population and skyrocketing prescription costs. The massive drop in cost is reflected in the deprivations that harm mental health patients in Arizona prisons.

Arizona prisoners are denied appropriate access to medication in the following ways:

- Prisoners entering the system or transferring from one prison to another face abrupt discontinuation of their psychotropic medications for weeks or months, until they are eventually seen by a new provider.

- Prisoners are deprived of psychotropic medications that work, such as Seroquel and Wellbutrin, and instead are given ineffective medications or nothing at all.

- There is little or no follow-up to determine whether the prescribed medications are having the desired effects or to ensure that the dosage is adjusted properly: prisoners on psychotropic medications routinely see a psychiatrist only once or twice a year, for five minutes, and their questions and concerns about medications go unanswered.

- Prisoners regularly suffer through skipped psychotropic medication deliveries. Some prisoners are deprived of their daily medications once or twice a week; others face long periods -- weeks or months – of unexplained and dangerous deprivation of their prescribed medications. A variety of side effects, some dangerous, occur as a result of abruptly stopping the use of antipsychotic and antidepressant medications.

In addition, prisoners who are on psychotropic medications that increase heat sensitivity are exposed to levels of heat that pose potentially lethal risks. *See Graves v. Arpaio*, 623 F.3d 1043, 1049-50 (9th Cir. 2010) (affirming district court order that prisoners taking psychotropic medications be housed in areas where the temperature does not exceed 85 degrees Fahrenheit).

Prisoners are also forcibly medicated with no due process, a violation of their rights under the Arizona Constitution and the Fourteenth Amendment to the U.S. Constitution. *See Large v. Superior Court*, 148 Ariz. 229, 714 P.2d 399, 408-09 (1986); *Washington v. Harper*, 494 U.S. 210, 227, 233-36 (1990); *Maul v. Constan*, 928 F.2d 784, 785 (7th Cir. 1991); *Bee v. Greaves*, 910 F.2d 686, 687-99 (10th Cir. 1990); *U.S. v. Gonzalez-Aguilar*, 446 F.Supp.2d 1099, 1101-1102 (D. Ariz. 1996).

(c)      **Mentally ill prisoners are denied medically necessary therapeutic treatment**

Arizona prisoners are denied necessary therapeutic treatment. Seriously mentally ill prisoners have minimal, if any, meaningful interactions with mental health clinicians; many describe five- or ten-minute interactions once or twice a year, in which they are asked only whether their medications are working, but during which no attention is paid to any questions or concerns. Prisoners experience similar deprivations even when placed on suicide watch, a time when mentally ill people require careful supervision and treatment, including counseling by trained clinicians. One mentally ill prisoner received no mental health attention after several sexual assaults. Others explained that the little care they did receive focused entirely on psychotropic medications. As a result, clinicians do not make informed decisions about care. "[W]hen the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995); *see also Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996) (denying summary judgment to prison doctor who had been told the plaintiff received psychiatric medication in part because of suicide risk, but discontinued it based on a cursory interview without reviewing medical records); *King v. Frank*, 328 F. Supp. 2d 940, 947-48 (W.D. Wis. 2004) (failure to provide "mental health programming" and inadequate clinical staff violates the Eighth Amendment).

Further, since they possess at most a glancing familiarity with their patients, clinicians are unable to weigh in meaningfully on crucial custodial decisions that impact the safety and health of prisoners, such as confinement in isolation units such as SMU 1 and Browning. Such failures amount to constitutional violations. *Madrid v. Gomez*, 889 F. Supp. 1146, 1221 (N.D. Cal. 1995) (lack of input by mental health staff concerning

housing decisions even where they impact mental health supports deliberate indifference finding).

### (d) Prisoners who are suicidal or self-harming are treated with brutality and deprived of basic rights and constitutional care

Arizona's responses to prisoners who exhibit self-harming behavior or express self-harming intentions are grossly inadequate. From July 2010 to June 2011, there were 14 suicides in the ADC, out of a total population of approximately 40,000. That is a rate of 35 per 100,000. According to the U.S. Department of Justice's Bureau of Justice Statistics, the average suicide rate for U.S. state prisons from 2005-2007 was 16.67 per 100,000. Arizona's prison suicide rate is thus more than double the national average. In fact, as recently as a week ago, a prisoner confined to SMU 1 committed suicide.

One reason for this shockingly high suicide rate is that prisoners housed under conditions of severe isolation are more likely to exhibit self-harming behavior, and Arizona fails to exclude serious mentally ill prisoners from its supermax isolation units, as discussed in the following section. Prisoners describe feelings of hopelessness, severe depression, and the desire to harm themselves as a result of their extremely harsh living conditions.

Another factor in the unusually high suicide rate is Arizona's immediate response to self-harming behavior or expression, which is to confine prisoners to abusive and dangerously punitive suicide watch facilities with no meaningful treatment, in violation of the Eighth Amendment. *See Buckley v. Rogerson,* 113 F.3d 1125, 1127-1130 (8th Cir. 1998) (deprivation of clothing, blankets, bed, and mattress in segregation); *Young v. City of Augusta, GA through DeVaney*, 59 F.3d 1160, 1164, 1173 (11th Cir. 1995) (plaintiff held in isolation naked and chained to a bed among filth and excrement); *Scott v. Plante*, 641 F.2d 117, 128 (3d Cir. 1981), *vacated*, 458 U.S. 1101 (1982), *on remand*, 691 F.2d 634, 637 (3d Cir. 1982); *McCray v. Burrell*, 516 F.2d 357, 369 (4th Cir. 1975) (en banc); *Tillery v. Owens*, 719 F. Supp. 1256, 1303-04 (W.D. Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990) (filthy, infested, unfurnished psychiatric cells). Suicide watch in Arizona prisons, which can last for many weeks, includes the following conditions:

- Suicide watch cells are often filthy and reek of urine and feces. One prisoner was placed on suicide watch in a cell with a toilet that did not flush; after three days, the stench was revolting.

- Prisoners are deprived of hygiene and cleaning materials and must live in their own filth and their filthy surroundings with no possibility of improvement.

- Suicide watch cells are cold, and prisoners are provided only inadequate suicide smocks and no bedding; as a result, they shiver without stopping.

- Many prisoners are deprived of mattresses and must sleep on bare steel bed frames.

- Prisoners on suicide watch have minimal or no interaction with treatment staff. They are provided no meaningful counseling to address the factors that made them want to harm themselves.

- Some prisoners describe being housed with bright lights on for 24 hours a day.

- Many complain of abusive treatment from custody staff while on suicide watch, including excessive use of pepper spray.

- The excessively harsh conditions do not even effectively prevent self-injurious behavior. One prisoner has cut himself with razors and pieces of metal while on suicide watch multiple times – at Tucson, Buckeye, and SMU 1. At Tucson, staff put him on suicide watch in a cell with broken glass on the floor; he cut himself.

As a result of these horrific conditions, some prisoners do not tell staff when they are suicidal or self-harming. And even if increased access to mental health care could alleviate some of these problems, Arizona is not providing this care.

**(e)     Arizona's failure to exclude seriously mentally ill prisoners from supermax and other units characterized by severe isolation is unconstitutional**

Arizona houses seriously mentally ill prisoners in its isolation units. Courts have repeatedly found the confinement of seriously mentally ill prisoners in conditions of extreme isolation unconstitutional. *Casey v. Lewis*, 834 F. Supp. 1477, 1548-49 (D. Ariz. 1993); *H.B. v. Lewis*, 803 F.Supp. 246, 258 (D. Ariz. 1992); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (prisoners with mental illness received inappropriate treatment and placement in segregation units); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995) (retention of mentally ill prisoners in Pelican Bay isolation unit unconstitutional); *see also Jones'El v. Berge*, 164 F. Supp. 2d 1096, 1116-25 (W.D. Wis. 2001) (granting preliminary injunction requiring removal of seriously mentally ill from supermax prison); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999); *rev'd and remanded on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975, 984-86 (S.D. Tex. 2001).

Conditions in the supermax units in Eyman and in lock-up units such as Central's Kasson in the Florence complex constitute the type of extreme isolation that courts have found unsuitable for mentally ill prisoners. These inmates are confined to their cells nearly all of the time. Prisoners in SMU 1 and Browning leave their cells no more than three times a week, for a brief shower and no more than two hours of "exercise" in a barren, windowless concrete cell barely larger than the cells in which they live. Often, even those limited out-of-cell times are denied: prisoners are not allowed to go to recreation if they are not clean-shaven, but are often denied the means to shave and are therefore denied the ability to exercise. Recreation is sometimes cancelled due to staffing shortages. On rare occasions, some prisoners have a brief medical or mental health appointment, or a telephone call or visit, but otherwise the prisoners in these units spend 24 hours in their cells on most days, isolated from human contact. Their allowable property is severely limited. The lights are on nearly all of the time; they are slightly dimmer during only a few night-time hours, but not enough to allow for a meaningful opportunity to sleep.

Mentally ill prisoners in the isolation units demonstrate the deterioration that courts have found elsewhere under similar conditions: they exhibit increased symptoms of paranoia, anxiety, delusional thinking, auditory hallucinations and self-harming behavior.

Housing people with serious mental illness in isolation units creates intolerable conditions for the other prisoners, who must endure the screaming and yelling of psychotic, inadequately medicated, delusional fellow prisoners. Mentally ill prisoners also throw and smear feces on their cells and those of other prisoners. These conditions violate the Eighth Amendment. *Casey v. Lewis*, 834 F. Supp. 1477, 1548-49 (condemning delays that resulted in psychotic inmates remaining in lockdown); *Gates v. Cook*, 376 F.3d 323, 342-43 (5th Cir. 2004) (prisoners with psychosis and severe mental illness must be held separately from other prisoners); *Thaddeus-X v. Blatter*, 175 F.3d 378, 403 (6th Cir. 1999) (en banc) (Eighth Amendment claim stated by non-mentally ill placed with mentally ill prisoners who throw human waste and urine, repeatedly bang and make noise, and there is a constant foul odor); *DeMallory v. Cullen*, 855 F.2d 442, 444-45 (7th Cir. 1988) (allegation that mentally ill inmates were knowingly housed with non-mentally ill in a high-security unit and that they caused filthy and dangerous conditions stated an Eighth Amendment claim against prison officials); *Hassine v. Jeffes*, 846 F.2d 169, 178 n. 5 (3d Cir. 1988) (prisoners could seek relief from the consequences of other inmates' failure to receive adequate mental health services); *Carty v. Farrelly,* 957 F.Supp. 727, 738-39 (D.V.I. 1997) ("Failure to house mentally ill inmates apart from the general prison population also violates the constitutional rights of both groups."); *Tillery v. Owens*, 719 F. Supp. 1256, 1303-04 (W.D. Pa. 1989)(citing increased tension for

psychologically normal inmates and danger of retaliation against mentally ill), *aff'd*, 907
F.2d 418 (3d Cir. 1990).

The deprivations in these isolation units, such as SMU 1, Browning, and Kasson,
also constitute Eighth Amendment violations in the areas of adequate exercise and
nutrition. Courts have found that outdoor exercise is necessary for good physical and
mental health of inmates. *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979)
(Kennedy, J.) ("[t]here is substantial agreement among the cases in this area that some
form of regular outdoor exercise is extremely important to the psychological and physical
well being of the inmates"); *Toussaint v. McCarthy*, 597 F. Supp 1388, 1393 (N.D. Cal.
1984*), aff'd in part, rev'd in part and remanded*, 801 F.2d 1080 (9th Cir.1986);
*Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988) ("[W]e are impressed by
the number of decisions that hold or suggest that a failure to provide inmates. . . with the
opportunity for at least five hours a week of exercise outside the cell raises serious
constitutional questions"). Through policy and practice, Arizona fails to provide
prisoners in its isolation units constitutional access to outdoor exercise.

Similarly, Arizona prisoners are deprived of adequate nutrition, in violation of the
Eighth Amendment. *See Graves v. Arpaio*, 623 F.3d 1043, 1050-51 (9th Cir. 2010);
*Leeds v. Watson*, 630 F.2d 674, 676 (9th Cir. 1980); *Phelps v. Kapnolas*, 308 F.3d 180,
186 (2d Cir. 2002); *Cunningham v. Jones*, 567 F.2d 653, 657-60 (6th Cir. 1977).
Prisoners in the isolation units complain of constant hunger pangs and significant weight
loss; prisoners have complained of weight loss of 30 pounds and more since being placed
on the reduced calorie "sedentary" diets provided in these units.

## 2.    Arizona deprives its prisoners of constitutionally adequate medical care

Our investigation has uncovered extensive evidence that ADC is deliberately
indifferent to the serious medical needs of prisoners in the state's custody and fails to
provide prisoners with adequate and necessary medical care. Prisoners have a
constitutional right to adequate and necessary medical care, *Brown v. Plata*, 563 U.S. --,
131 S. Ct. 1910, 1928 (2011), and a prison's failure to provide such care can rise to cruel
and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97,
103-104 (1976); *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986); *Casey v. Lewis*,
834 F. Supp. 1477, 1543 (D. Ariz. 1993); *H.B. v. Lewis*, 803 F.Supp. 246, 255 (D. Ariz.
1992).

As detailed below, ADC violates the rights of prisoners and does not meet the
basic requirements of correctional medical care. State prison officials are deliberately
indifferent to the serious health care needs of prisoners, and to the prisoners' resulting
unnecessary and significant pain, suffering, and even deaths. Among other deficiencies,
ADC does not have sufficient qualified staff at its facilities, resulting in delayed,

substandard, or no treatment; fails to provide proper medication to prisoners; fails to provide appropriate chronic care; and fails to provide prisoners with specialty care or abide by the treatment recommendations of medical specialists.

### (a)   ADC lacks sufficient staff to provide adequate medical care

Prison facilities must have adequate staffing levels to deliver medical and mental health services to prisoners. *Plata v. Schwarzenegger*, 2005 WL 2932253, at \*5-12 (N.D. Cal. 2005); *Madrid v. Gomez,* 889 F.Supp. 1146, 1257 (N.D. Cal. 1995); *see also French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985). Furthermore, prison systems must have medical care performed by qualified personnel. *Toussaint v. McCarthy*, 801 F.2d 1080, 1112 (9th Cir. 1986); *Plata*, 2005 WL 2932253, at \*5; *see also Casey v. Lewis*, 834 F.Supp.1477, 1545 (D. Ariz. 1993). Nonetheless, ADC is grossly understaffed, with the result that prisoners are unable to receive the most rudimentary of medical care. The department does not have enough qualified physicians and other medical professionals on staff to provide adequate health care to prisoners.

ADC's own statistics show a shortage of medical doctors. In April 2011, ASPC-Eyman, housing 5,169 prisoners, had 2.5 doctors working at the facility and two vacant physician positions. ASPC-Tucson, had only two physicians serving the 5,162 prisoners in the complex. The Tucson complex had three unfilled physician positions. In April of this year, the Health Services Division had a total of 798.2 full-time medical, mental health, dental, and office positions at all levels, and 189.0, or 23%, were vacant.

As a result of the small number of doctors, most day-to-day medical assessment and treatment falls upon nurses, nursing assistants, and medical technicians, who are not always qualified to perform the role that is thrust upon them. *Ramos v. Lamm,* 639 F.2d 559, 576 (10th Cir. 1980) (use of untrained "physician substitutes" and "standing orders" inadequate); *Madrid v. Gomez*, 889 F. Supp. 1146, 1258 (N.D. Cal. 1993) ("medical technicians cannot be left to operate in a vacuum"); *Casey v. Lewis*, 834 F. Supp. 1477, 1543-44 (D. Ariz. 1993).

### (b)   ADC lacks a functioning system by which prisoners can request health care, resulting in delays in treatment

Prison officials may not subject prisoners to unreasonable delays in providing medical treatment and prisoners must be able to request care. The Eighth Amendment requires that prisons "provide a system of ready access to adequate medical care." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), and prisoners should not experience unreasonable delays in receiving treatment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Plata v. Schwarzenegger*, 2005 WL 2932253, at \*13 (N.D. Cal. 2005);

*Madrid v. Gomez*, 889 F. Supp. 1146, 1205-12061256 (N.D.Cal. 1995); *Casey v. Lewis* 834 F. Supp. 1477, 1545 (D. Ariz. 1993).

Our investigation has uncovered numerous shortcomings at ADC, including: correctional staff fail to forward prisoners' completed health need requests (HNRs) to medical staff; HNR forms are not available in living units; correctional staff refuse to provide HNR forms; if completed by a prisoner, staff refuse to accept or throw away the requests; or if the completed HNR is forwarded to medical staff, prisoners must file multiple HNRs before they actually see a doctor. In addition, some correctional staff have told prisoners that they may not assist their fellow inmates in completing HNRs or grievances. This creates problems for prisoners who are acutely ill, developmentally disabled, vision-impaired, illiterate, have injuries or permanent disabilities that make it difficult to write, or are otherwise unable to fill out the relevant forms. For example, a prisoner who has partial paralysis and injuries to his hands cannot write out HNRs without a great deal of pain. He has had several HNRs and grievances returned to him not addressing his request, stating that his handwriting was illegible.

Some ADC prisoners must submit multiple HNRs and experience long delays to receive medical treatment. For example:

- A prisoner suffered a neck and back injury that caused him debilitating pain filed multiple HNRs and waited for eight months before he finally saw the prison doctor.

- A prisoner has a cataract in one of his eyes has filed HNRs for over two years asking for an examination, but still has not been seen about it.

- A prisoner has filed multiple HNRs and grievances has waited for more than two years to have removed from his hand several pins that were incorrectly inserted in a surgery.

These methods of discouraging prisoners from filing HNRs are reflected in the department's own statistics. ADC's reports show a dramatic drop from FY 2009 to 2010 in the number of on-site medical, nursing, and dental HNRs filed at four of the prison complexes designated as being able to serve prisoners with the highest medical needs. This occurred even though the overall prison population remained steady. For example, at ASPC-Florence, prisoners filed 27,599 HNRs in FY 2009, but only 18,771 were recorded in FY 2010, a decrease of more than 30%. During this time, the inmate population at Florence stayed relatively level, and certainly did not decrease to such a degree as to explain the precipitous drop in HNRs filed by prisoners. Perryville, which

experienced a drop of more than 2,000 HNRs in that same time frame, has waits of up to four months for a prisoner to be seen by medical staff after she files a HNR.

### (c)   ADC lacks an adequate response system to respond to emergencies

Prisoners have a clear right to emergency medical treatment. *Casey v. Lewis*, 834 F. Supp. 1477, 1544 (D. Ariz. 1993) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)) ("[T]he prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison."); *see also Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995). Prison medical staff also must be trained to cope with emergencies. *Madrid*, 889 F. Supp. at 1257.

Prisoners experiencing emergencies and suffering from obvious medical distress often are ignored by ADC facility and medical staff, resulting in permanent, long-lasting injuries. For example:

- In the spring of this year, a prisoner broke his hand so badly that a bone was sticking out. Despite the obvious seriousness of his injury, the on-call doctor did not refer him to an off-site emergency room or even order an X-ray. Instead, the doctor directed a yard nurse to splint the hand and give him ibuprofen. His hand was finally X-rayed 4 days later, but he still has not been seen by an orthopedist or had his hand put in a proper cast. He reports that his hand still causes him a great deal of pain, and is healing in a deformed manner.

- Another prisoner broke his hand and several knuckles in the spring of 2010, and when he requested emergency care he was told by guards that he had to file a HNR to be seen by a doctor. He saw a yard nurse the next day, but she refused to give him ibuprofen and said she said she could not do anything for him until he had X-rays. The prisoner waited another two weeks for an X-ray. Over a year later, his hand has healed improperly and it is difficult for him to use it.

### (d)   Prisoners receive inadequate medical treatment or no treatment at all

Prisoners' Eighth Amendment rights to adequate medical care are violated when prison officials are deliberately indifferent to their clear medical needs, with the result of further significant injury or the unnecessary and wanton infliction of pain. *Scott v. Ambani*, 575 F.3d 642 (6th Cir. 2009); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir.

2002); *Madrid v. Gomez*, 889 F. Supp. 1146, 1206, 1256 (N.D. Cal. 1995). ADC regularly fails to provide treatment for prisoners' serious medical needs, and prisoners experience further injury and pain. For example, in 2008, a prison doctor ordered that a prisoner undergo a test of his upper gastrointestinal system. Three years later, despite the doctor's orders and the prisoner filing multiple HNRs, he still is waiting to have the tests, and he has lost a great deal of weight.

When prisoners receive medical treatment, prison medical staff must conduct adequate examinations, ask necessary questions, take a medical history, review patient charts, and conduct diagnostic tests called for by the prisoners' symptoms. Failure to conduct adequate examinations raises Eighth Amendment claims. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *12 (N.D. Cal. 2005) ("An adequate intake exam should take fifteen to twenty minutes for a young healthy prisoner and thirty to forty minutes for prisoners with more complicated health problems."); *see also Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008); *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004); *Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996).

When ADC prisoners finally receive medical treatment, it often is cursory, incomplete, or incompetent. For example, we learned of a prisoner who had a hydrocele hernia that went untreated for more than five years. His multiple HNRs were unanswered or he had cursory medical appointments where he was told that it was not a serious problem. However, because the problem was not addressed properly for so long, he developed complications and ultimately had to have a testicle removed.

**(e)      ADC fails to provide chronic care or protect prisoners from infectious
         disease**

ADC fails to provide medically necessary chronic care to address ongoing medical needs or diseases. Courts require prisons to provide ongoing treatment and disease management to inmates who have chronic conditions, for example, high blood pressure, asthma, epilepsy, end-stage renal disease, or diabetes. *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005) (asthma); *Plata v. Schwarzenegger*, 2005 WL 2932253, *6 (N.D. Cal. 2005) (renal failure and high blood pressure) *Kenney v. Paderes*, 217 F. Supp. 2d 1095, 1100 (D. Haw. 2002) (neurological disorder); *Casey v. Lewis*, 834 F. Supp. 1477, 1546 (D. Ariz. 1993) (chronic care). ADC's failure to properly treat prisoners' chronic illnesses exacerbates the prisoners' conditions, and leads to catastrophic and permanent side effects. Our investigation has uncovered multiple examples of prisoners not receiving chronic care, including:

Mr. Charles L. Ryan
Ms. Karyn Klausner
October 12, 2011
Page 14

- A prisoner who was diagnosed with diabetes in an out-of-state prison several years ago was taking insulin regularly to manage his disease. In early June 2011, he was returned to ADC custody, and since that day has not received insulin. In the intervening 3-1/2 months, he has lost sight completely in one eye, and the vision in the other eye is extremely blurred – even though he had 20/20 vision upon his arrival. Although the prison doctor has ordered that he receive insulin, he still is not receiving any from the pharmacy, and was threatened with retaliation by a nurse if he kept complaining.

- More than two years ago, a prisoner with renal failure was prescribed dialysis three times a week, and a permanent graft was installed in his arm for his dialysis. ADC does not provide him with the dialysis. Each time he sees a doctor, they tell him that his kidney is not working and that he needs the dialysis, but the prison will not provide it to him.

- A prisoner who is HIV positive came into ADC custody in September 2010, and for the first four months in prison did not receive any of the HIV medications he was taking before. He suffered side effects including skin rashes, eye and mouth infections, headaches, rectal bleeding, and pain and discomfort. Although he now receives the medication, he has encountered delays or gaps in receiving prescriptions. He states he has filed seven separate HNRs seeking adequate care and his medications.

- A prisoner with emphysema has received no treatment or medication to improve his breathing while in ADC custody. He has filed multiple HNRs requesting breathing treatments and medications, but most of his requests have not been answered, and the only answers have been rejections. He reports being in constant pain and having difficulty sleeping due to his inability to breathe normally.

- A prisoner with epilepsy was not receiving his prescribed medication, with the result that he has several seizures a week, injuring himself in the process.

Prison officials must protect prisoners from the risk of infectious diseases, such as Hepatitis C, HIV/AIDS, or Methicillin-Resistant Staphyloccus Aureus (MRSA). *Helling v McKinney*, 509 U.S. 25, 33 (1993) ("infectious maladies such as hepatitis and venereal disease"); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (failure to provide Hepatitis C treatment states a claim); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (withdrawal of prisoner's HIV treatment states a Constitutional claim);

*Lopez v. McGrath*, No. C 04-4782, 2007WL 1577893, at \*5 (N.D. Cal. May 31, 2007) (exposure to MRSA is a serious medical need); *Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995) (prisons must screen for infectious disease).

ADC fails to maintain a basic level of sanitation in its prisons to prevent the spread of infectious diseases such as HIV, MRSA or tuberculosis. Many sections of ADC's prisons are filthy and expose prisoners to serious, and sometimes fatal, communicable diseases. *See Plata v. Schwarzenegger*, 2005 WL 2932253, at \*14 (N.D. Cal. 2005) (medical clinics must "meet basic sanitation standards); *see also Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir.2001) (prisoners' "exposure to the human waste of others" carries "a significant risk of contracting infectious diseases such as Hepatitis A, shigella, and others"). Prisoners report cell walls and floors smeared with feces and blood of other prisoners, food slots in cells covered in feces, being given urine-soaked mattresses to sleep on, and infestations of vermin. (See Sections 1(d) and 1(e) on suicide watch and solitary confinement.) Prisoners who request cleaning supplies are ignored, or are given diluted chemicals that are little more than water.

ADC fails to provide treatment for communicable diseases. Multiple prisoners with Hepatitis C report that they receive no treatment for the disease, despite filing numerous HNRs. Other prisoners who have experienced cuts or other injuries to their bodies have had them get infected due to the unclean conditions of the prison, and experienced delays in treatment for the infections.

**(f)      ADC is deliberately indifferent to prisoners' need for specialty care and fails to provide timely access to outside specialists**

If prison medical staff cannot treat certain medical conditions, they must "refer prisoners to others who can" and such referrals must be "reasonably speedy." *Casey v. Lewis*, 834 F. Supp. 1477, 1544, 1546 (D. Ariz. 1993) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)); *see also Greeno v. Daley,* 414 F.3d 645, 655 (7th Cir. 2005); *LaMarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir. 2001) ("if a doctor knows of a substantial risk of serious harm to a patient and is aware that he must either seek immediate assistance from another doctor to prevent further serious harm or must inform the patient to seek immediate assistance elsewhere, and then fails to do in a timely manner what his training indicates is necessary to prevent such harm, that doctor has treated the patient with deliberate indifference"); *Plata v. Schwarzenegger*, 2005 WL 2932253, at \*16 (N.D. Cal. 2005); *Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995). ADC has long failed to refer prisoners for specialty care or outside treatment, or has done so only after extensive and unreasonable delays, often resulting in prisoners experiencing unnecessary pain and suffering, and permanent injuries.

In 2009, the Arizona Legislature enacted Ariz. Rev. Stat. § 41-1608 to cap reimbursement rates for prison medical contractors to be no higher than those paid by the Arizona Health Care Cost Containment System.  As a result, all outside medical providers ended their contracts with ADC.  For many months in 2009 and 2010, ADC had no contracts in place with outside medical providers or specialists, and when contracts were reinstated, there were not enough outside medical professionals willing to treat ADC prisoners at the reduced reimbursement rates.

The practical effect of the accumulation of pending referrals, as well as the smaller number of contracted providers, left most prisoners without any way of getting specialized care for serious medical needs for close to a year.  While contracts are now back in place, there still is a long wait.

In our investigation, we discovered multiple examples of ADC's failure to refer prisoners to specialists, or prisoners experiencing unreasonable delays in obtaining treatment from outside doctors, resulting in wanton and unnecessary pain and suffering:

- A prisoner who had previously been treated for cancer on his face waited more than seven months to see a specialist about a suspicious growth on his lip, which both the prison doctor and dentist thought was cancerous.  The specialist confirmed it was cancer, and told the prisoner that because of the long delay, much more of his lip and mouth had to be excised – resulting in permanent disfigurement to his mouth – than if he had been seen at the time of the referral.

- A prisoner who had a heart attack last December was taken to an outside hospital for treatment and to have stents implanted.  Hospital doctors said he had to see a cardiologist within ten days.  Despite experiencing on-going chest pains since his heart attack and submitting multiple HNRs, he still has not seen a cardiologist.

- A prisoner who suffered from gallstones waited 13 months after the referral was made before he finally had gall bladder surgery. He was not given any medication for the pain during those months.

- A prisoner who suffered a neck and back injury and waited eight months to see the prison doctor was referred at least five times by the prison doctor for a neurosurgery consult before the prison's Medical Review Committee finally authorized the visit more than three months after the first referral. He suffered a great deal of pain that impaired his day-to-day functioning.

- A prisoner waited more than 15 months to see a urologist after a prison doctor made the referral for surgery for his enlarged prostate.

- A prisoner has been waiting since May 2009 for surgery to reinstall a suprapubic catheter that was forcibly removed when she was sexually assaulted in the prison. A 2011 response to a HNR asking when she would see an urologist stated that the doctor was "aware" of the bladder issues and the delays and "will come see you soon." Since the assault, she has had to rely upon an external catheter and urine bag, which carries a much higher risk of infection.

In addition to delayed medical referrals, it takes months for ADC doctors to obtain diagnostic tests by outside providers or to receive the results of diagnostic or lab tests conducted by outside contractors. We uncovered examples including:

- A prisoner needed a biopsy of his liver, but it was not done for months because there was no contract in place or money to fund biopsies.

- A different prisoner categorized as "urgent" was referred out by prison doctors multiple times for a biopsy on what the doctors thought was cancer, and did not have the appointment scheduled for more than five months.

- A prisoner, who had previously been treated for cancer in an out-of-state prison, began developing in 2009 a tumor in his neck, and painful abdominal masses that have caused him to lose more than 40 pounds. To this day, he has not yet had a CAT scan of his abdominal area to check for cancer. An outside doctor told him in 2010 ADC would not pay for a full body scan, and so he only had a CAT scan of his head at that time.

**(g)**      **Prisoners are unable to receive treatment due to custodial interference**

Security and other prison staff cannot wantonly override or ignore medical orders, as this interference can rise to deliberate indifference such that a constitutional violation occurs. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *15 (N.D. Cal. 2005) ("custody staff present a determined and persistent impediment" and have "a common lack of respect" for medical staff); *Madrid v. Gomez*, 889 F. Supp. 1147, 1257-58 (N.D. Cal. 1995) (prison officials are precluded from preventing treatment which is medically necessary in the judgment of the treating doctor); *Casey v. Lewis*, 834 F. Supp. 1477, 1545 (D. Ariz. 1993) (same).

ADC custodial staff and prison officials often ignore, interfere with, and override the directives of medical professionals. Prisoners report that yard nurses, medical techs, and pharmacists often ignore the medical orders and prescriptions written by prison doctors. Doctors may issue limitations on a prisoners' housing or duty assignment, which are ignored. Problems our investigation has uncovered include:

- As detailed above in part 2(e), prison officials refuse to honor doctors' orders regarding life-saving treatment such as dialysis or anti-retroviral medications;

- Doctors ordered that a prisoner be moved from an upstairs cell to a ground level cell due to a severely infected leg that caused him great pain and affected his ability to put any weight on it. When moving him, the guards handcuffed his hands behind his back, ordered him to go down the stairs, and refused his request for assistance or to be allowed to be uncuffed going down the stairs. He tried to go down the stairs using his good leg, but he lost his balance and tumbled down the stairs, injuring his neck, shoulder, back, and knee. The officers who refused to help him down the stairs laughed at him. To this day his neck and collarbone still hurt, and he suffers from extremely painful headaches.

- A prisoner from ASPC-Perryville who was assigned to work at an off-site farm was taken to a hospital for chest pains and exhaustion while working. The hospital emergency room doctor ordered that she be exempted from the farm work and any physical exertion for four days, but upon her return to Perryville that evening, she was told by the prison nurse that she had to go work on the farm the next day or face a disciplinary write up.

**(h)     Prisoners do not receive medically necessary prescriptions or medical devices**

In our investigation, we discovered multiple prisoners who did not receive medication, experienced delays in receiving medication, or were provided with less than the prescribed dosage, in violation of the Eighth Amendment, as detailed in part 1(b):

- As detailed above in part 2(e), prisoners were not provided with medication to manage diabetes, renal failure, or HIV, or had the levels of medication reduced arbitrarily contrary to the doctor's orders;

- A prisoner who has severe psoriasis and requires a variety of topical and oral medications to manage its effects has encountered continual problems

in getting refills for his medication.  He filed a multitude of HNRs and told the doctor about how the pharmacy was not providing the medications. The prisoner stated that the doctor would not follow up with the pharmacy but would simply write another prescription;

- A prisoner who uses a wheelchair needs catheters, wipes, and other medical devices for his toileting.  The facility has told him that they did not have his needed medical supplies, and he states that his mother had to send him clean catheters and toileting supplies.

## 3.   ADC is deliberately indifferent to prisoners' serious dental needs

Deliberate indifference to prisoners' serious dental needs is unconstitutional, and prisons must have "a system of ready access to adequate dental care." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989); *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980) ("Dental care is one of the most important medical needs" of prisoners); *Halla v. Schriro*, No. CV 05-0320-PHX-MHM (ECV), 2006 WL 3735983, at *6 (D. Ariz. Dec. 15, 2006).  The failure to provide reasonable and relatively prompt dental care violates the Constitution.  *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003) (15 month delay for a prisoner to receive dentures raised an Eight Amendment claim).  In our investigation, we heard from prisoners who report not receiving dental care, including:

- A prisoner has lost four teeth while in prison due to the lack of preventative dental care in the facility.  He filed several HNRs and waited for more than a year to see a dentist.  When he finally saw the dentist in November 2010, he was told there was a five month backlog of dental appointments before he could be seen and be given new caps or crowns.  Eleven months after that encounter, he still has not seen the dentist again, despite submitting several HNRs.  Because of his difficulty in eating without teeth he has lost more than 40 pounds since 2010.

- An HIV positive prisoner reports that the dental provider refused to treat him for complications from mouth infections that he was experiencing due to not being given his HIV medication for more than four months.

- Dental staff "fixed" a prisoner's injured front tooth by bending a paper clip into a brace to hold the tooth in place.  Two months later, the paper clip had turned black, was starting to rot out the tooth, and caused the prisoner a great deal of severe pain, headaches, lock-jaw symptoms, and a constant sore throat.

**4.     Preservation of evidence**

Based on the information gained during our investigation and review of public documents, we see no basis for ADC to dispute that it fails to comply with constitutional standards in the delivery of mental health and medical care throughout its system. Consequently, we are prepared to litigate these issues on a class-wide basis on behalf of prisoners, and believe that we would prevail in any such litigation. As you know, this potential future litigation triggers ADC's duty to preserve all relevant, material evidence. As an Arizona district court recently explained, "[i]t is well established that … the duty to preserve is triggered 'not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation.'" *Surowiec v. Capital Title Agency, Inc.*, 2011 WL 1671925, at *5 (D.Ariz. May 4, 2011) (citation omitted); *see also Reed v. Honeywell Intern., Inc.*, 2009 WL 886844, at *10 (D.Ariz. Mar. 31, 2009). This letter is sufficient under federal law to put ADC "on notice that litigation is reasonably foreseeable and the duty to preserve evidence relevant to that dispute is triggered." *Surowiec*, 2011 WL 1671925, at *6 (noting that a letter threatening litigation put the recipient on notice to the potential future litigation, triggering the duty to preserve evidence relevant to that dispute). As such, we ask that ADC and all of its agents with responsibilities that impact medical and mental health care, including those with security, medical, supervisory, managerial and document management responsibilities, take all necessary steps to avoid the destruction of relevant evidence, including the immediate issuance of a litigation hold.

**5.     Negotiations**

We hope that once you have had a chance to review this letter, you will agree that an early resolution of this case would be worth exploring. To that end, we ask that you enter into a tolling agreement, to waive both the relevant statutes of limitations and the exhaustion requirement, while we engage in negotiations regarding the substance of our concerns as set forth in this letter. Please let us know by November 2, 2011 if you are amenable to entering into such an agreement and negotiations. We look forward to discussing this matter at your earliest convenience.

Sincerely,

Donald Specter, Executive Director
Sara Norman, Managing Attorney
Corene Kendrick, Staff Attorney
PRISON LAW OFFICE

Mr. Charles L. Ryan
Ms. Karyn Klausner
October 12, 2011
Page 21

General Delivery
San Quentin, CA 94964
(510) 280-2621

David C. Fathi, Director*
ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
*Not admitted in DC; practice limited to federal
courts

Daniel Pochoda, Staff Attorney
James Duff Lyall, Staff Attorney
ACLU of Arizona
P.O. Box 17148
Phoenix, AZ 85011-0148
(602) 773-6001

Daniel C. Barr
Rusty D. Crandell
James A. Ahlers
Kirstin T. Eidenbach
John H. Gray
Matthew B. du Mee
Perkins Coie LLP
2901 North Central Ave., Ste. 2000
Phoenix, AZ 85012-2788
(602) 351-8268

Caroline Mitchell
Jones Day
555 California St., 26th Floor
San Francisco, CA  94104-1500
(415) 875-5712

Exhibit 3

# Arizona Department of Corrections



1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR

October 31, 2011

RECEIVED
NOV 07 2011

Donald Specter, Executive Director
Prison Law Office
General Delivery
San Quentin, CA  94964

Re:  Correspondence of October 12, 2011

Dear Mr. Specter:

I appreciated the opportunity to speak with you regarding your October 27, 2011 correspondence to myself and Director Ryan.  During our conversation I advised you that we were reviewing the allegations made regarding medical and mental health treatment claimed to be lacking within our prison system.  It is my understanding that the allegations are not yet verified, nor fully substantiated.

You stated that the claims made in your letter are based in part on "a pattern of information" provided by inmates.  We do not know how many of the inmates you have spoken with, nor with whom you have spoken, and therefore we cannot assume that the information provided is trustworthy.  If you cannot give us more detail, we cannot engage in any meaningful dialogue on these issues.

We are taking the information you have provided to determine if we can identify any systemic issues that must be addressed, and we are certainly treating the matter with the highest priority. I have requested that you provide us with an additional ninety days to respond in writing, and it is my understanding you will let me know if you agree after speaking with your colleagues. We will agree to sign a tolling agreement if given this additional time to respond.

We cannot reasonably assure that a review of these allegations can be undertaken in a manner allowing us to conduct an accurate analysis of the shortcomings alleged, unless you are more forthcoming with the basis upon which you have alleged inadequate care.  You have agreed to discuss with your clients whether they are willing to waive the privilege of confidentiality so we can properly decipher what factual information exists to support their complaints.

Finally, your proposal that we reduce our copying fees or allow a private copying service to come onto prison grounds will be considered upon receipt of more detailed information as set forth above.

Thank you in advance for your cooperation and courtesies herein.

Sincerely,

Karyn Klausner
General Counsel

Cc:  Charles L. Ryan, Director
     Jeff Hood, Deputy Director
     Michael Adu Tutu, Division Director, Health Services