**ATTACHMENT A**

Pursuant to Rules 30(b)(6) of the Federal Rules of Civil Procedure, the Arizona Department of Corrections (ADC) shall designate one or more officers, directors, or managing agents, or other person who consent to testify on its behalf, to testify on the topics identified below.

**DEFINITIONS**

For the purposes of this deposition notice the following definitions shall apply.

1.      "ADC" means the Arizona Department of Corrections, including all its subdivisions, agents, employees, contractors, and attorneys.

2.      "COMMUNICATIONS" means any transmittal of information from one person or entity to another by any means, including letters, correspondence, notes, memoranda, records,  reports, papers, facsimiles, electronic mail (whether to, from, copied or blind copied), electronic mail generated from a hand held personal device including a Blackberry or iPhone, instant messaging, electronic mail generated from business or personal email accounts, internet relay chat, news group, group or collaboration servers, electronic bulletin boards, electronic discussion boards, dictation tapes, video recordings, audio recordings, digital recordings, memoranda, telegrams, telecopies and telexes, teleconference, collaboration servers (including share point servers), web-based or software virtual meetings including Web-X and any other meeting software and share point servers, and oral contact such as face-to-face discussions or meetings, telephone conversations, and voice mail messages.

3.      "COMPLAINTS" means any DOCUMENTS, formal or informal, REGARDING specific or general problems, issues, deficiencies, unanswered questions, challenges, shortcomings, disagreements, or requests brought to the attention of the ADC or any ADC STAFF.

4.      "CONDITIONS OF CONFINEMENT" means all circumstances REGARDING the state of being imprisoned.

5.     "CORRECTIONAL STAFF" means custody staff employed or paid by the ADC to serve in a security or operational capacity.

6.     "COST CONTAINMENT" means contemplated, discussed, or actual actions to restrict, reduce, contain, or limit costs or expenses by DEFENDANTS, the ADC or any personnel working in any capacity for the ADC or the Arizona State Government, including any agents of the foregoing.

7.     "DEATH RECORDS" means any DOCUMENT REGARDING the death of a PRISONER, including audits, REVIEWS, studies, interview notes, videos, audio-recordings, EXTERNAL INVESTIGATIONS or INTERNAL INVESTIGATIONS.

8.     "DESCRIBE" and "DESCRIPTION" means to provide all available INFORMATION.

9.     "DISCIPLINE" means any formal or informal discipline, punishment, reprimand, warning, or comment given to any person as a result of substandard or unacceptable conduct.

10.     "DOCUMENT" and "DOCUMENTS" have the same scope used in Rule 34(a)(1) of the Federal Rules of Civil Procedure and shall encompass every writing or record of every type and DESCRIPTION and every tangible thing that is or has been in the possession, custody, or control of DEFENDANTS and the ADC, to which they have access, or of which they have knowledge, including, but not limited to, COMMUNICATIONS, newspaper articles, magazine articles, news articles, correspondence, letters, contracts, files, electronic mail, memoranda, stenographic notes, handwritten notes, drafts, studies, publications, books, pamphlets, catalogs, purchase orders, receipts, advertisements, direct mail solicitations, point-of-sale and point-of-purchase materials, notebooks, diaries, models, devices, pictures, photographs, films, audiotapes, videotapes, computer records, voice recordings, maps, reports, surveys, MINUTES, data compilations, and statistical compilations, regardless of whether a particular DOCUMENT is privileged or confidential, and regardless of the form of

2

SFI-740668v1

storage (including, but not limited to, paper, microfiche, magnetic tape, magnetic disk (hard disk or floppy disk), CD-ROM, DVD, optical disk, or electronic storage device). "DOCUMENT" and "DOCUMENTS" includes, but is not limited to, all DOCUMENTS generated by or maintained in the Director's Project Tracking System, official ADC papers, and the ADC's intranet.

11.     "EMERGENCY HEALTH CARE SERVICES" means treatment or care to address a mental health, medical, or dental injury or illness that is acute, causes substantial pain, and/or and poses a substantial and immediate risk to the life or long term health of a person.

12.     "ENTRY-LEVEL PRACTITIONERS" means unlicensed persons who provide HEALTH CARE to PRISONERS at the ADC subordinate to MID-LEVEL PRACTITIONERS or HEALTH CARE CLINICIANS.

13.     "EXTERNAL INVESTIGATIONS" means investigations, REVIEWS, audits, or studies, whether formal or informal, conducted by a person who is not employed by the ADC or an entity that is not the ADC.  It is immaterial to the definition whether the EXTERNAL INVESTIGATION was conducted at the ADC's behest or direction.

14.     "GRIEVANCES" means COMPLAINTS or requests made by PRISONERS to the ADC, and the exhaustion of claims raised or stated therein.

15.     "HEALTH CARE" means the provision of care, including adequate diet, to address the mental health, medical, or dental needs of a PRISONER, whether those needs arise as a result of injury, illness, disease, or other trauma, or care provided for diagnostic or preventive purposes.

16.     "HEALTH CARE CLINICIANS" means persons independently licensed to provide HEALTH CARE to PRISONERS at the ADC facilities, including but not limited to M.D., D.O., D.D.S., and Ph.D. credentialed staff.

SFI-740668v1

17.    "HEALTH CARE DIRECTIVES" means DOCUMENTS REGARDING advance medical care directives, living wills, personal directives, advance directives, or instructions of any kind in which individuals specify what actions should or should not be taken for their HEALTH CARE in the event they are no longer able to make decisions due to illness, injury, or incapacity

18.    "HEALTH CARE PRIVATIZATION CONTRACT" means Solicitation No. ADOC12-00001105, Privatization for All Correctional Health Care, and the Offer and Acceptance Between ADC and WEXFORD.

19.    "HEALTH CARE RECORDS" means any and all documents maintained and recorded, whether in electronic or paper format, for individual PRISONERS regarding the HEALTH CARE they are receiving or requesting.

20.    "HEALTH CARE SHORTAGES" means any deficiencies involving HEALTH CARE, including but not limited to a lack of or insufficient number of medicines, drugs, medical supplies, medical equipment, transportation, or HEALTH CARE STAFFING.

21.    "HEALTH CARE STAFF" means all staff employed or paid by the ADC, or paid indirectly by the ADC through the HEALTH CARE PRIVATIZATION CONTRACT with WEXFORD who are responsible for providing HEALTH CARE to ADC PRISONERS, including but not limited to HEALTH CARE CLINICIANS, MID-LEVEL PRACTITIONERS, ENTRY-LEVEL PRACTITIONERS, PHARMACISTS, and administrative and support staff.

22.    "HEALTH CARE STAFFING" means the provision of HEALTH CARE STAFF to provide HEALTH CARE.

23.    "HEALTH CARE SUBCONTRACTOR" means any person or entity contracting with the ADC or WEXFORD to provide HEALTH CARE to PRISONERS, either on-site at ADC prisons or off-site.  "HEALTH GRIEVANCES" means requests for HEALTH CARE or COMPLAINTS REGARDING the need for, adequacy of,

4

SFI-740668v1

quality of, or timing of HEALTH CARE made by PRISONERS to the ADC, including but not limited to the submission of Health Needs Request ("HNR") forms and the exhaustion of claims stated therein.

24.     "HNR POLICIES AND PROCEDURES" means policies, procedures, or practices, whether written or established through custom or use, REGARDING HNR submissions by PRISONERS, including but not limited to the distribution, disposal, processing, rejection of, responses to, provision of HEALTH CARE pursuant to, and exhaustion of claims raised by such submissions.  This includes policies, procedures, or practices that are in draft form and have not been approved and/or implemented.

25.     "HOSPITALIZED PRISONER" means any PRISONER who is sent to a hospital or other off-site medical or mental health facility, or who is admitted to an on-site hospital, while in the custody of the ADC.

26.     "HOURS OF OPERATION" means the time periods during which a facility, unit, or other ADC facility housing PRISONERS is able to provide HEALTH CARE to PRISONERS by on-site HEALTH CARE STAFF.

27.     "IDENTIFY" and "IDENTIFICATION" with respect to (a) a PRISONER or former PRISONER, means to state the PRISONER'S full name, ADC number, date of birth, current or most recent mental health score (MH-1 through MH-5), medical score (M-1 through M-5), public risk score, institutional risk score, and current housing location (if still in ADC custody) or last known address and telephone number (if no longer in ADC custody); (b) a person other than a PRISONER or former PRISONER, means to state the person's full name and specify whether or not the person is or has been an ADC STAFF member, and if so, to state the staff member's position title, facility location, work schedule, responsibilities, date ADC employment began, date ADC employment terminated, dates of any changes in position titles or responsibilities, DESCRIPTIONS of any changes in position titles or responsibilities and, if the person is not currently employed by ADC, the person's last known address and telephone

5

SFI-740668v1

number; and (c) a third-party contractor or entity means to state the name of the contractor or entity, the type of entity (e.g., corporation, partnership, etc.); its address and telephone number; and any persons YOU are aware of who acted on behalf of that contractor or entity with respect to the events at issue in the discovery request; (d) IDENTIFY in any other context means to provide as much INFORMATION REGARDING the thing to be identified as is in the possession of DEFENDANTS or the ADC.

28.    "INFORMATION" means any knowledge YOU have, any evidence of any type, any facts of which YOU are aware and any inferences or speculation of which YOU are aware, all regardless of the source.  When INFORMATION YOU provide is based solely on inference or speculation, specifically so state in YOUR response.  When providing INFORMATION, provide the names of involved individuals, actions relevant to the requested INFORMATION, dates and times when known, locations, and any other knowledge YOU have about the subject of the discovery request.  When asked to provide INFORMATION about one or more individuals, IDENTIFY the individual or individuals and provide any other INFORMATION YOU have about such person or persons.

29.    "INTERNAL INVESTIGATION" means an investigation, REVIEW, audit, study, interview notes, videos, or audio recordings, whether formal or informal, conducted by the ADC.

30.    "ISOLATION" means confinement in a cell for 22 hours or more each day; confinement in Eyman-Special Management Unit ("SMU") 1, Eyman-Browning Unit, Florence-Central Unit, Florence-Kasson Unit, or Perryville-Lumley Special Management Area ("SMA"); or confinement in a Complex Detention Unit ("CDU").

31.    "JOB PERFORMANCE EVALUATION" means any evaluation, whether formal or informal, of the work of an ADC STAFF member or contractor performing services for the ADC.

6

SFI-740668v1

32.     "MID-LEVEL PRACTITIONERS" means licensed professionals who provide HEALTH CARE to PRISONERS at the ADC under supervision by HEALTH CARE CLINICIANS.

33.     "MINUTES" means notes or any other recording reflecting the content of a meeting, whether written contemporaneously with or subsequent to the meeting.

34.     "ORGANIZATIONAL STRUCTURE" means the structure of who reports to whom within the ADC up to and including defendant Charles Ryan, including specifically all HEALTH CARE STAFF and each individual's job title and DESCRIPTION of duties.

35.     "OUTDOOR EXERCISE" means periods during which PRISONERS are permitted to exercise in the outdoors.

36.     "PHARMACIST" means a professional who practices pharmacy.

37.     "POLICIES AND PROCEDURES" means policies, procedures, criteria, or practices, whether written or established through custom or use, including but not limited to policy and procedure manuals, directors' orders, protocols, directives, flowcharts, institution post orders, and any other DOCUMENTS designed to direct the actions of ADC personnel, ADC contractors, and/or PRISONERS.

38.     "PRISONER" means a person incarcerated by the ADC.

39.     "QUALITY ASSURANCE" means any activities implemented for the purpose of examining, assessing, evaluating, investigating, analyzing, or identifying the quality of a product or service.

40.     "REFERRAL" means a recommendation that a PRISONER obtain HEALTH CARE at ADC or non ADC facilities, whether or not such HEALTH CARE is in fact ever provided.

41.     "REFERRED CARE" means HEALTH CARE pursuant to a REFERRAL.

42.     "REFERRED PRISONER" means a PRISONER who received a REFERRAL while in the legal custody of the ADC.

7

SFI-740668v1

43.     "REGARDING" or "REGARDED" to any given subject matter means, without limitation, anything that, in whole or in part, analyzes, comments upon, comprises, concerns, constitutes, contains, describes, discusses, embodies, evidences, explains, identifies, manifests, mentions, pertains directly or indirectly to, reflects, refers to, relates to, responds to, states, summarizes, or is in any way relevant to the particular subject matter identified.

44.     "RESPONSE DATE" means date upon which YOU respond to these discovery requests, or, if YOU amend or supplement YOUR response, the date of YOUR amendment or supplement.

45.     "REVIEWS" means examinations, assessments, evaluations, or investigations performed by or at the direction of ADC staff or officials.

46.     "STAFFING SCHEDULE" means the days, hours, and/or shifts for which each member of the HEALTH CARE STAFF was scheduled to work, including overtime, on call and call-in coverage.

47.     "SUFFICIENT TO SHOW" means demonstrating or evidencing complete INFORMATION on the requested topic, without the need to produce every DOCUMENT REGARDING the topic.

48.     "YOU," "YOUR," "YOURSELF," and "DEFENDANTS" means defendants Charles Ryan and Richard Pratt, and their predecessors, successors, employees, subordinates, contractors, agents, and attorneys.

49.     "WEXFORD" means Wexford Health Sources, Incorporated.

## **TOPICS**

1.     Practices, policies and procedures for health screening and intake when prisoners are initially received into ADC custody.

2.     Practices, policies and procedures for submitting and processing Health Needs Requests.

3.     Grievance procedures for medical issues.

8

4.    Tracking and scheduling system for health care appointments.

5.    Practices, policies and procedures for access to physicians and nurses.

6.    Practices, policies and procedures for access to specialty care providers, including provisions for second opinions.

7.    Practices, policies and procedures for providing care by outside health care providers.

8.    Practices, policies and procedures for responding to emergency medical needs.

9.    Practices, policies and procedures for follow-up medical care and monitoring, including timeliness of such care.

10.   Practices, policies and procedures for in-house infirmary care, including intake, discharge, and any protocols for determining acuity levels for patients and the monitoring required by RNs, advanced level practitioners such as PAs and APNs, and MDs for each patient acuity level.

11.   Practices, policies and procedures for obtaining informed consent.

12.   Practices, policies and procedures for providing care to prisoners with chronic illnesses or conditions; the number of prisoners enrolled in chronic care clinics; and the number diagnosed with chronic diseases.

13.   Practices, policies and procedures diagnosing, treating and preventing the spread of infectious diseases.

14.   The nature and extent of clinical space for medical treatment.

15.   Practices, policies and procedures for quality assurance and quality improvement, including, but not limited to, reviews of deaths and sentinel events.

16.   Reports, evaluations and statistical data regarding the provision of and need for medical care.

17.   Practices, policies and procedures for prescribing, ordering, delivering, repairing and replacing health care appliances to prisoners, including any changes planned

9

SFI-740668v1

1    or implemented by Wexford compared to the practices, policies or procedures of

2    the ADOC.

3    18.    Practices, policies and procedures for utilization review.

10

SFI-740668v1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTACHMENT B**

Pursuant to Rules 30(b)(2) and 34 of the Federal Rules of Civil Procedure, Plaintiffs hereby request that the ADC produce the following documents for inspection and copying at Perkins Coie LLP, 2901 N. Central Avenue, Suite 2000, Phoenix, AZ 84012 no later than September 17, 2012, at 10:00 am.

**DEFINITIONS**

For the purposes of this deposition notice the following definitions shall apply.

1.      "ADC" means the Arizona Department of Corrections, including all its subdivisions, agents, employees, contractors, and attorneys.

2.      "COMMUNICATIONS" means any transmittal of information from one person or entity to another by any means, including letters, correspondence, notes, memoranda, records,  reports, papers, facsimiles, electronic mail (whether to, from, copied or blind copied), electronic mail generated from a hand held personal device including a Blackberry or iPhone, instant messaging, electronic mail generated from business or personal email accounts, internet relay chat, news group, group or collaboration servers, electronic bulletin boards, electronic discussion boards, dictation tapes, video recordings, audio recordings, digital recordings, memoranda, telegrams, telecopies and telexes, teleconference, collaboration servers (including share point servers), web-based or software virtual meetings including Web-X and any other meeting software and share point servers, and oral contact such as face-to-face discussions or meetings, telephone conversations, and voice mail messages.

3.      "COMPLAINTS" means any DOCUMENTS, formal or informal, REGARDING specific or general problems, issues, deficiencies, unanswered questions, challenges, shortcomings, disagreements, or requests brought to the attention of the ADC or any ADC STAFF.

4.      "CONDITIONS OF CONFINEMENT" means all circumstances REGARDING the state of being imprisoned.

11

SFI-740668v1

5.      "CORRECTIONAL STAFF" means custody staff employed or paid by the ADC to serve in a security or operational capacity.

6.      "COST CONTAINMENT" means contemplated, discussed, or actual actions to restrict, reduce, contain, or limit costs or expenses by DEFENDANTS, the ADC or any personnel working in any capacity for the ADC or the Arizona State Government, including any agents of the foregoing.

7.      "DEATH RECORDS" means any DOCUMENT REGARDING the death of a PRISONER, including audits, REVIEWS, studies, interview notes, videos, audio-recordings, EXTERNAL INVESTIGATIONS or INTERNAL INVESTIGATIONS.

8.       "DESCRIBE" and "DESCRIPTION" means to provide all available INFORMATION.

9.      "DISCIPLINE" means any formal or informal discipline, punishment, reprimand, warning, or comment given to any person as a result of substandard or unacceptable conduct.

10.      "DOCUMENT" and "DOCUMENTS" have the same scope used in Rule 34(a)(1) of the Federal Rules of Civil Procedure and shall encompass every writing or record of every type and DESCRIPTION and every tangible thing that is or has been in the possession, custody, or control of DEFENDANTS and the ADC, to which they have access, or of which they have knowledge, including, but not limited to, COMMUNICATIONS, newspaper articles, magazine articles, news articles, correspondence, letters, contracts, files, electronic mail, memoranda, stenographic notes, handwritten notes, drafts, studies, publications, books, pamphlets, catalogs, purchase orders, receipts, advertisements, direct mail solicitations, point-of-sale and point-of-purchase materials, notebooks, diaries, models, devices, pictures, photographs, films, audiotapes, videotapes, computer records, voice recordings, maps, reports, surveys, MINUTES, data compilations, and statistical compilations, regardless of whether a particular DOCUMENT is privileged or confidential, and regardless of the form of

12

SFI-740668v1

storage (including, but not limited to, paper, microfiche, magnetic tape, magnetic disk (hard disk or floppy disk), CD-ROM, DVD, optical disk, or electronic storage device). "DOCUMENT" and "DOCUMENTS" includes, but is not limited to, all DOCUMENTS generated by or maintained in the Director's Project Tracking System, official ADC papers, and the ADC's intranet.

11. "EMERGENCY HEALTH CARE SERVICES" means treatment or care to address a mental health, medical, or dental injury or illness that is acute, causes substantial pain, and/or and poses a substantial and immediate risk to the life or long term health of a person.

12. "ENTRY-LEVEL PRACTITIONERS" means unlicensed persons who provide HEALTH CARE to PRISONERS at the ADC subordinate to MID-LEVEL PRACTITIONERS or HEALTH CARE CLINICIANS.

13. "EXTERNAL INVESTIGATIONS" means investigations, REVIEWS, audits, or studies, whether formal or informal, conducted by a person who is not employed by the ADC or an entity that is not the ADC. It is immaterial to the definition whether the EXTERNAL INVESTIGATION was conducted at the ADC's behest or direction.

14. "GRIEVANCES" means COMPLAINTS or requests made by PRISONERS to the ADC, and the exhaustion of claims raised or stated therein.

15. "HEALTH CARE" means the provision of care, including adequate diet, to address the mental health, medical, or dental needs of a PRISONER, whether those needs arise as a result of injury, illness, disease, or other trauma, or care provided for diagnostic or preventive purposes.

16. "HEALTH CARE CLINICIANS" means persons independently licensed to provide HEALTH CARE to PRISONERS at the ADC facilities, including but not limited to M.D., D.O., D.D.S., and Ph.D. credentialed staff.

13

SFI-740668v1

17.     "HEALTH CARE DIRECTIVES" means DOCUMENTS REGARDING advance medical care directives, living wills, personal directives, advance directives, or instructions of any kind in which individuals specify what actions should or should not be taken for their HEALTH CARE in the event they are no longer able to make decisions due to illness, injury, or incapacity

18.     "HEALTH CARE PRIVATIZATION CONTRACT" means Solicitation No. ADOC12-00001105, Privatization for All Correctional Health Care, and the Offer and Acceptance Between ADC and WEXFORD.

19.     "HEALTH CARE RECORDS" means any and all documents maintained and recorded, whether in electronic or paper format, for individual PRISONERS regarding the HEALTH CARE they are receiving or requesting.

20.     "HEALTH CARE SHORTAGES" means any deficiencies involving HEALTH CARE, including but not limited to a lack of or insufficient number of medicines, drugs, medical supplies, medical equipment, transportation, or HEALTH CARE STAFFING.

21.     "HEALTH CARE STAFF" means all staff employed or paid by the ADC, or paid indirectly by the ADC through the HEALTH CARE PRIVATIZATION CONTRACT with WEXFORD who are responsible for providing HEALTH CARE to ADC PRISONERS, including but not limited to HEALTH CARE CLINICIANS, MID-LEVEL PRACTITIONERS, ENTRY-LEVEL PRACTITIONERS, PHARMACISTS, and administrative and support staff.

22.     "HEALTH CARE STAFFING" means the provision of HEALTH CARE STAFF to provide HEALTH CARE.

23.     "HEALTH CARE SUBCONTRACTOR" means any person or entity contracting with the ADC or WEXFORD to provide HEALTH CARE to PRISONERS, either on-site at ADC prisons or off-site.

14

SFI-740668v1

24.     "HEALTH GRIEVANCES" means requests for HEALTH CARE or COMPLAINTS REGARDING the need for, adequacy of, quality of, or timing of HEALTH CARE made by PRISONERS to the ADC, including but not limited to the submission of Health Needs Request ("HNR") forms and the exhaustion of claims stated therein.

25.     "HNR POLICIES AND PROCEDURES" means policies, procedures, or practices, whether written or established through custom or use, REGARDING HNR submissions by PRISONERS, including but not limited to the distribution, disposal, processing, rejection of, responses to, provision of HEALTH CARE pursuant to, and exhaustion of claims raised by such submissions.  This includes policies, procedures, or practices that are in draft form and have not been approved and/or implemented.

26.     "HOSPITALIZED PRISONER" means any PRISONER who is sent to a hospital or other off-site medical or mental health facility, or who is admitted to an on-site hospital, while in the custody of the ADC.

27.     "HOURS OF OPERATION" means the time periods during which a facility, unit, or other ADC facility housing PRISONERS is able to provide HEALTH CARE to PRISONERS by on-site HEALTH CARE STAFF.

28.     "IDENTIFY" and "IDENTIFICATION" with respect to (a) a PRISONER or former PRISONER, means to state the PRISONER'S full name, ADC number, date of birth, current or most recent mental health score (MH-1 through MH-5), medical score (M-1 through M-5), public risk score, institutional risk score, and current housing location (if still in ADC custody) or last known address and telephone number (if no longer in ADC custody); (b) a person other than a PRISONER or former PRISONER, means to state the person's full name and specify whether or not the person is or has been an ADC STAFF member, and if so, to state the staff member's position title, facility location, work schedule, responsibilities, date ADC employment began, date ADC employment terminated, dates of any changes in position titles or responsibilities,

15

SFI-740668v1

DESCRIPTIONS of any changes in position titles or responsibilities and, if the person is not currently employed by ADC, the person's last known address and telephone number; and (c) a third-party contractor or entity means to state the name of the contractor or entity, the type of entity (e.g., corporation, partnership, etc.); its address and telephone number; and any persons YOU are aware of who acted on behalf of that contractor or entity with respect to the events at issue in the discovery request; (d) IDENTIFY in any other context means to provide as much INFORMATION REGARDING the thing to be identified as is in the possession of DEFENDANTS or the ADC.

29. "INFORMATION" means any knowledge YOU have, any evidence of any type, any facts of which YOU are aware and any inferences or speculation of which YOU are aware, all regardless of the source. When INFORMATION YOU provide is based solely on inference or speculation, specifically so state in YOUR response. When providing INFORMATION, provide the names of involved individuals, actions relevant to the requested INFORMATION, dates and times when known, locations, and any other knowledge YOU have about the subject of the discovery request. When asked to provide INFORMATION about one or more individuals, IDENTIFY the individual or individuals and provide any other INFORMATION YOU have about such person or persons.

30. "INTERNAL INVESTIGATION" means an investigation, REVIEW, audit, study, interview notes, videos, or audio recordings, whether formal or informal, conducted by the ADC.

31. "ISOLATION" means confinement in a cell for 22 hours or more each day; confinement in Eyman-Special Management Unit ("SMU") 1, Eyman-Browning Unit, Florence-Central Unit, Florence-Kasson Unit, or Perryville-Lumley Special Management Area ("SMA"); or confinement in a Complex Detention Unit ("CDU").

SFI-740668v1

32.     "JOB PERFORMANCE EVALUATION" means any evaluation, whether formal or informal, of the work of an ADC STAFF member or contractor performing services for the ADC.

33.     "MID-LEVEL PRACTITIONERS" means licensed professionals who provide HEALTH CARE to PRISONERS at the ADC under supervision by HEALTH CARE CLINICIANS.

34.     "MINUTES" means notes or any other recording reflecting the content of a meeting, whether written contemporaneously with or subsequent to the meeting.

35.     "ORGANIZATIONAL STRUCTURE" means the structure of who reports to whom within the ADC up to and including defendant Charles Ryan, including specifically all HEALTH CARE STAFF and each individual's job title and DESCRIPTION of duties.

36.     "OUTDOOR EXERCISE" means periods during which PRISONERS are permitted to exercise in the outdoors.

37.     "PHARMACIST" means a professional who practices pharmacy.

38.      "POLICIES AND PROCEDURES" means policies, procedures, criteria, or practices, whether written or established through custom or use, including but not limited to policy and procedure manuals, directors' orders, protocols, directives, flowcharts, institution post orders, and any other DOCUMENTS designed to direct the actions of ADC personnel, ADC contractors, and/or PRISONERS.

39.     "PRISONER" means a person incarcerated by the ADC.

40.     "QUALITY ASSURANCE" means any activities implemented for the purpose of examining, assessing, evaluating, investigating, analyzing, or identifying the quality of a product or service.

41.     "REFERRAL" means a recommendation that a PRISONER obtain HEALTH CARE at ADC or non ADC facilities, whether or not such HEALTH CARE is in fact ever provided.

SFI-740668v1

42.     "REFERRED CARE" means HEALTH CARE pursuant to a REFERRAL.

43.     "REFERRED PRISONER" means a PRISONER who received a REFERRAL while in the legal custody of the ADC.

44.     "REGARDING" or "REGARDED" to any given subject matter means, without limitation, anything that, in whole or in part, analyzes, comments upon, comprises, concerns, constitutes, contains, describes, discusses, embodies, evidences, explains, identifies, manifests, mentions, pertains directly or indirectly to, reflects, refers to, relates to, responds to, states, summarizes, or is in any way relevant to the particular subject matter identified.

45.     "RESPONSE DATE" means date upon which YOU respond to these discovery requests, or, if YOU amend or supplement YOUR response, the date of YOUR amendment or supplement.

46.     "REVIEWS" means examinations, assessments, evaluations, or investigations performed by or at the direction of ADC staff or officials.

47.     "STAFFING SCHEDULE" means the days, hours, and/or shifts for which each member of the HEALTH CARE STAFF was scheduled to work, including overtime, on call and call-in coverage.

48.     "SUFFICIENT TO SHOW" means demonstrating or evidencing complete INFORMATION on the requested topic, without the need to produce every DOCUMENT REGARDING the topic.

49.     "YOU," "YOUR," "YOURSELF," and "DEFENDANTS" means defendants Charles Ryan and Richard Pratt, and their predecessors, successors, employees, subordinates, contractors, agents, and attorneys.

50.     "WEXFORD" means Wexford Health Sources, Incorporated.

## **INSTRUCTIONS**

1.     YOU are required to furnish all DOCUMENTS in YOUR possession, custody, or control, including those DOCUMENTS that are in YOUR possession,

18

SFI-740668v1

custody, or control in the normal course of YOUR employment obligations, and those in the possession, custody or control of your (1) employer; (2) consultants; (3) attorneys; (4) representatives; (5) agents; or (6) any other person acting or purporting to act on YOUR behalf or at YOUR direction, whether doing so directly or at the direction of YOUR subordinates.  Possession, custody, or control includes DOCUMENTS stored in electronic form by third party service providers but accessible to the Defendant, including but not limited to email accounts, FTP servers, portable storage media such as USB drives, cloud storage services such as Dropbox or SharePoint , and online workspaces such as WebEx.

2. All non-identical copies of every DOCUMENT whose production is sought shall be separately produced.

3. Each request herein constitutes a request for DOCUMENTS in their entirety, with all enclosures and attachments, and without abbreviation, redaction, or expurgation.  DOCUMENTS attached to each other, including but not limited to, by staple, clip, tape, email attachment, or "Post-It" note, should not be separated, although any page on which a Post-It note covers or obscures text on the DOCUMENT should be produced both with and without the Post-It note.  The production must also include, where applicable, any index tabs, file dividers, designations, binder spine labels, or other similar information as to the source and/or location of the DOCUMENTS.

4. DEFENDANTS shall produce any and all drafts and copies of each DOCUMENT that are responsive to any request, including but not limited to copies containing handwritten notes, markings, stamps, or interlineations.  The author(s) of all hand-written notes should be identified.

5. YOU shall produce all responsive DOCUMENTS as they have been kept in the ordinary course of business.

19

SFI-740668v1

6.      Responsive DOCUMENTS that exist only in paper form shall be organized as they have been kept in the ordinary course of business and shall be produced according to the following protocol:

    a.      Paper DOCUMENTS shall be scanned and produced in TIFF image form at a resolution sufficient to enable the generation of searchable text using Optical Character Recognition ("OCR").

7.      Responsive DOCUMENTS that exist in electronic form, even if such DOCUMENTS also exist in paper form, shall be produced in electronic form according to the following protocol:

    a.      Electronic DOCUMENTS shall be produced electronically as single page, uniquely and sequentially numbered Group IV TIFF image files of not less than 300 dots per inch resolution, together with DOCUMENT level load files wherein the full text was extracted directly from the native file where possible.

    b.      For files produced in TIFF image form, each page of a produced DOCUMENT shall have a legible, unique production number electronically "burned" onto the TIFF image in such a manner that information from the source DOCUMENT is not obliterated, concealed, or interfered with, preferably in the lower right corner of the DOCUMENT. The production number shall contain at least six digits. There shall be no other legend or stamp placed on the DOCUMENT image, unless a DOCUMENT qualifies for confidential treatment pursuant to the terms of any protective order in this matter, or if the DOCUMENT requires redaction. In the case of confidential materials as defined by any protective order in this matter, any applicable designation may be "burned" onto the DOCUMENT's image at a location that does not obliterate or obscure any information from the source DOCUMENT, preferably in the lower left corner.

    c.      Each DOCUMENT image file shall be named with the unique production number of the page of the DOCUMENT in question, followed by the extension ".tif". File names should not be more than 20 characters long or contain spaces.

    d.      For files produced in TIFF image format, each page of a DOCUMENT shall be electronically saved as an image file. If a DOCUMENT is more than one page, the unitization of the DOCUMENT and any attachments and/or affixed notes shall be maintained as they existed in the original DOCUMENT.

    e.      TIFF images shall be accompanied by a standard load file containing the metadata and other fields identified in Paragraph 7(j) of these Instructions, below. The load file shall be produced in one of the following industry-standard formats: (1) Concordance delimited file (".dat"); (2) comma-separated value file (".csv"); or (3) TAB delimited

20

SFI-740668v1

file.  TIFF images shall also be accompanied by either an Opticon delimited cross-reference file (".opt") or IPRO View LFP comma-delimited file showing DOCUMENT breaks and appropriate DOCUMENT unitization.

f.       In addition to TIFF images, each production of electronic DOCUMENTS shall include searchable text files corresponding to the TIFF images for each DOCUMENT.  The full text of each native electronic DOCUMENT, excluding redacted DOCUMENTS, shall be extracted directly from the native file and produced in a DOCUMENT-level related text file (the "Extracted Text"). The Extracted Text shall be provided in searchable ASCII text format (or Unicode text format if the text is in a foreign language) and shall be named with the unique production number of the first page of the corresponding TIFF DOCUMENT followed by the extension ".txt".  YOU shall also perform OCR on certain types of non-text based static image ESI, such as native PDF image files, and produce the corresponding DOCUMENT-level related text files.  Searchable text files shall be generated from Extracted Text where available.

g.       DOCUMENTS shall be produced on optical media (CD or DVD) or external hard drives or similar, readily accessible electronic media (the "Production Media").  Each piece of Production Media shall IDENTIFY a production number corresponding to the party and production with which the DOCUMENTS on the Production Media are associated (e.g., "RYAN 001"), as well as the volume of the material in that production (e.g., "-001", "-002").  For example, if the first production wave by YOU comprises DOCUMENT images on three hard drives, YOU shall label each hard drive in the following manner: "RYAN 001-001", "RYAN 001-002", and "RYAN 001-003."  The face of each piece of Production Media shall also IDENTIFY:  (1) the production date; and (2) the production number range of the materials contained on the Production Media.

h.       Presentation DOCUMENTS (such as Microsoft PowerPoint DOCUMENTS) shall be produced with one slide per page together with any "Speaker's Notes" or similar pages appended to, or otherwise associated with, each slide. Presentation DOCUMENTS shall also be produced according to all other applicable Instructions set forth in this set of requests.

i.       Unless redaction is required, spreadsheet DOCUMENTS (such as Microsoft Excel DOCUMENTS) shall be produced in native format, together with a single page TIFF placeholder bearing the legend "Native File Produced" and load files containing the agreed upon metadata, extracted text, production numbers and any applicable confidentiality labels as described above.  If redaction is required, then spreadsheets shall be produced in TIFF image format as set forth above.

j.       For all DOCUMENTS for which metadata exists, the load files described above shall be produced including the following fields:

| Fields for all DOCUMENTS | Description |
| --- | --- |

21

SFI-740668v1

| BegProd | Beginning production number assigned to each DOCUMENT |
|---|---|
| EndProd | Ending production number assigned to each DOCUMENT |
| BegAttach | Beginning production number assigned to the group of DOCUMENTS to which the parent DOCUMENT and any attachment DOCUMENTS are associated |
| EndAttach | Ending production number assigned to the group of DOCUMENTS to which the parent DOCUMENT and any attachment DOCUMENTS are associated |
| Custodian | The name of the person or source from which the DOCUMENT was obtained |
| FileName | Original file name |
| FilePath | Original file path |
| DocExt | DOCUMENT type as identified by metadata associated with the native DOCUMENT indicating the extension of the application that created the native DOCUMENT (e.g., .doc, .ppt, etc.) |
| HashValue | The unique identifying value assigned to a DOCUMENT based on hash coding algorithms |
| Author | The person or source that originated the DOCUMENT |
| DateCreated | Date that the DOCUMENT was created (as reflected by metadata) |
| LastModifiedDate | Date that the file was last modified (as reflected by metadata) |
| FullText | The path or link to the searchable Extracted or OCR text for a DOCUMENT |
| NativeFile | The path or link to a processed and produced native file, to the extent the production contains native files |
| Confidentiality | The confidentiality designation for the DOCUMENT, as defined by any protective order in this matter |
| **Additional Fields for Email** | **Description** |
| To | All information contained in the "To" |

SFI-740668v1

|  | field of an email |
|---|---|
| From | All information contained in the "From" field of an email |
| CC | All information contained in the "CC" field of an email |
| BCC | All information contained in the "BCC" field of an email |
| DateSent | Date the email was sent, including month, day and year |
| TimeSent | Time the email was sent, including hour, minute, second and time zone. To the extent this information is already included in the DateSent field in the metadata, YOU need not parse TimeSent as a separate field. |
| DateReceived | Date the email was received, including the month, day and year |
| TimeReceived | Time the email was received, including hour, minute, second and time zone. To the extent this information is already included in the DateReceived field in the metadata, YOU need not parse TimeReceived as a separate field. |
| Subject | Subject or "Re:" line, as stated in the email |

8.     If with respect to any request there are no responsive DOCUMENTS, so state in writing.

9.     The following rules of construction shall be applied herein: (a) the words "and" and "or" shall be construed conjunctively or disjunctively as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope ; (b) the use of the singular form of any word shall be taken to mean the plural as well as the singular, and the use of the plural form of any word shall be taken to mean the singular as well as the plural; (c) the words "any," "all," "each" and "every" all include any, all, each, and every and shall be understood in either their most or least inclusive sense as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope; and (d) the use

23

SFI-740668v1

of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of the DOCUMENT requests all responses that might otherwise be construed to be outside of their scope.

10.   If YOU object to a portion or an aspect of a request, state the grounds for your objection with specificity and respond to the remainder of the DOCUMENT request.  If any DOCUMENTS, or portion thereof, are withheld because YOU claim that such information is protected under the attorney-client privilege, work product doctrine, or other privilege or doctrine,  YOU are required to provide a privilege log setting forth the specific basis for the claim of privilege or protection and for each DOCUMENT provide the following:

a.   the subject matter of the DOCUMENT;

b.   the title, heading or caption of the DOCUMENT, if any;

c.   the date appearing on the DOCUMENT or, if no date appears thereon, the date or approximate date on which the DOCUMENT was prepared;

d.   the type of DOCUMENT (e.g., whether it is a letter, memorandum, MINUTES of meeting, etc.) and the number of pages of which it consists;

e.   the identity of the person who signed the DOCUMENT or, if it was not signed, the person who prepared it;

f.   the identity of each person to whom the DOCUMENT was addressed and the identity of each person to whom a copy thereof was sent; and

g.   the identity of each person who has custody of a copy of each such DOCUMENT.

11.   If YOU claim that a portion of a DOCUMENT is protected from disclosure for any reason, produce such DOCUMENT with redaction of only the portion claimed to be protected.  When such redactions for privilege or protection are made, YOU shall place a legend similar to "REDACTION – PRIVILEGE" on the copy of the DOCUMENT produced.  All redactions shall also be included on the privilege log described in Instruction #4.

SFI-740668v1

12.     If you object that a request is vague or ambiguous, IDENTIFY the objectionable aspect of the request.

13.     If a request cannot be responded to in full, YOU shall respond to the extent possible, specify the reason for YOUR inability to respond to the remainder, and state whatever information or knowledge YOU have REGARDING the portion to which YOU have not responded.

14.     If any DOCUMENT called for by these requests has been destroyed, lost, discarded, or is otherwise no longer in your possession, custody, or control, IDENTIFY such DOCUMENT as completely as possible, and specify the date of disposal of the DOCUMENT, the manner of disposal, the reason for disposal, the person authorizing disposal, and the person disposing of the DOCUMENT.

15.     These requests are sequentially numbered and each numbered paragraph constitutes a single request.  Defined terms may be capitalized for the convenience of the parties; the definitions herein apply whether or not the term is capitalized.

16.     Except where expressly stated, these requests are not limited in any way by geography.

17.     These requests shall be deemed continuing in nature in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.  Supplemental responses are required if additional responsive information is acquired or discovered between the time of responding to this request and the time of trial.

18.     Unless otherwise specified, the relevant time period, and the period for which YOU are required to provide responsive DOCUMENTS, is from and including January 1, 2011 up to and including the date of the Rule 30(b)(6) deposition.

## **DOCUMENTS REQUESTED**

1.     All DOCUMENTS that the deponent used or may need to use to refresh his or her recollection as to any of the topics in the accompanying 30(b)(6) Notice..

SFI-740668v1

2.      All DOCUMENTS that the deponent consulted or relied upon to learn the information known or reasonably available to the ADC on the topics in the accompanying 30(b)(6) Notice..

3.      All DOCUMENTS that refer or relate to the topics in the accompanying 30(b)(6) Notice.

26

SFI-740668v1