Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
STRUCK WIENEKE, & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
Telephone: (480) 420-1600
Fax: (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-NVW<br><br>**LODGED: Proposed DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS Attached** |

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
STRUCK WIENEKE, & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-NVW <br><br> **DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS** |

Defendants' Motion to Dismiss should be granted as requested.

I. **FAILURE TO STATE A CLAIM**

Plaintiffs have turned an already amorphous and deficient Complaint into something even more vague and improper. They contend that there are only *five* claims in their 74-page Complaint: "(1) inadequate health care (including medical, mental health, and dental care); (2) inadequate medical care; (3) inadequate dental care; (4) inadequate mental health care; and (4) unconstitutional conditions of confinement in isolation." Then, to get around the standing issue raised by Defendants, they argue that the list of claims identified in Defendants' Motion are not "claims for relief," but merely "illustrations" in support of their five titled claims. Plaintiffs cannot proceed this way.

Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id*. (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. A complaint must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Factual allegations that are "merely consistent with" a defendant's liability is insufficient. *Id*. By themselves, Plaintiffs' five stated claims do not satisfy this standard. They are the type of "bald" and "conclusory" allegations that *Iqbal* prohibits, and, standing alone, they cannot comprise a plausible claim for relief. *See Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (bare allegation that defendant's "policies, practices and customs subject Plaintiffs to unreasonable searches [and] unreasonable force" not sufficient). They should be dismissed if defined that way.

The only way to avoid dismissal is to read these five purported claims *in pari materia* with each of the underlying factual allegations. For example, the claims must be defined as: inadequate health care based on Defendants' failure to provide medically necessary devices (Claim 3f); inadequate medical care based on Defendants'

1

failure to provide timely access to outside medical specialists (Claim 9); inadequate dental care based on Defendants' delay in dental treatment (Claim 12); inadequate mental health care based on Defendants' failure to sufficiently manage psychotropic medications (Claim 16); and unconstitutional conditions of confinement in isolation cells based on the deprivation of outdoor recreation (Claim 32). The "conclusory statement" must be paired with an underlying factual allegation to state a claim for relief. *Iqbal*, 556 U.S. at 678.

This specificity is necessary, not only to avoid dismissal under *Iqbal*, so that Defendants know exactly what claims they are defending against. Defining the claims is necessary for discovery, dispositive motions, class certification briefing, and trial. For example, on summary judgment, Defendants need to know what conditions of confinement are actually being challenged as unconstitutional. An Eighth Amendment violation cannot be based on the "totality of conditions" at a prison. *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). "To find an Eighth Amendment violation, courts must identify specific conditions that fail to meet Eighth Amendment requirements." *Id*. at 1247. In class certification briefing, Plaintiffs must show that there are "common" questions of fact or law and that their claims are "typical" of class claims. *See* Rule 23(a)(2) & (3), Fed.R.Civ.P. Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Merely stating that they have all received "inadequate health care" is too vague to resolve the issue. *See Id*. at 2551 (question, "Is that an unlawful practice?" is not sufficient to obtain class certification). The test for typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts*, 976 F.2d 497, 508 (9th Cir. 1992). Simply alleging that all class members have received "inadequate dental care" does not answer these questions.[1]

---

[1] The instant Motion presents another issue. Plaintiffs cannot contend that the underlying factual allegations are not claims, just "illustrations" of other constitutional

2

The standing issue raised in Defendants' Motion should be analyzed within this framework – i.e., each "illustration" is a separate claim.  Under that framework, those Plaintiffs who are tied to a specific claim have standing to proceed on those claims only.  They cannot raise claims in which they are not named, including claims in which other Plaintiffs are named or in which no Plaintiff is named. Standing requires a plaintiff to demonstrate that he or she "'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (injunctive relief requires showing that plaintiff is under threat of suffering a "concrete and particularized" injury in fact.)  "Abstract injury is not enough." *Lyons*, 461 U.S. at 101.[2]

Plaintiffs cannot meet this burden and take great pains to dilute it. Plaintiffs' first conflate this standard with the Eighth Amendment standard for liability ("substantial risk of serious harm"), and then they modify that standard significantly ("risk of future harm").  That is their starting point.  Then they argue that, because Plaintiffs are all ADC inmates (albeit housed at different facilities) there is a risk that they could experience the same incidents alleged by other ADC inmates. This allegation comes nowhere close to the standard for standing; it does not demonstrate that Plaintiffs are "immediately in danger of sustaining some direct injury."  It is purely "hypothetical" and "abstract."  For example, Plaintiff Brislan alleges that he received inadequate health care

---

violations, and then turn around and use these allegations to support other claims. Doing so would allow them to circumvent exhaustion. For example, Gamez alleged that he was deprived of outdoor recreation while in isolation (Claim 32), a claim which he properly exhausted. He did not, however, exhaust Claim 31 (can only leave his cell three times per week to shower and two hours per week for "exercise" in the "rec pen") or Claim 36 (extreme isolation). Yet, under Plaintiffs' theory, he would be able to use these allegations to support his outdoor recreation claim (Claim 32). This should not be permitted.

[2] The failure to denote (in the Motion) the quoted passage in *Allee v. Medrano* as a concurring/dissenting opinion was inadvertent. The proposition was a neutral one, often quoted by other courts. *See*, *e.g.*, *Lindquist v. Farmers Ins. Co. of Ariz.*, 2008 WL 343299, at *9 (D. Ariz. 2008).

when staff discontinued his medications because they were not listed on the formulary (Claim 3e). (Dkt. # 1, ¶ 48.) Yet, under Plaintiffs' theory, he can raise claims that Defendants fail to provide medically necessary devices (Claim 3f), provide an inadequate number of staff to respond to emergencies (2a), and do not process medical forms in a timely manner (1a), despite no allegation that he requires a medical device, suffered an emergency, or experienced delays in medical form responses, simply because he is an inmate at ADC and any of these events could happen in the future. Similarly, Plaintiff Polson alleges that he received inadequate dental care because he waited three years for partial dentures (Claim 12). (Dkt. # 1, ¶¶ 18, 71.) Despite no allegation that he was only given a temporary filling instead of a permanent filling (Claim 14), or that he was only offered extraction instead of a less-intrusive alternative (Claim 13), Plaintiffs' theory is that he can still raise these claims because he is an ADC inmate with teeth (presumably).

This Court should reject this faulty logic and allow Plaintiffs to bring only those claims that relate to themselves. All others should be dismissed. (See cases cited in Motion at 5–6.)[3]

## II. FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES

### A. The Tolling Agreement

On October 12, 2011, Mr. Donald Specter, Director of the Prison Law Office in California, sent a 20-page letter to ADC Director Charles Ryan and his General Counsel Karyn Klausner. (Dkt. # 74–1 at 7–27.) That letter lodged dozens of serious allegations of deficient health care at ADC, and recounted alleged injuries and deteriorating health conditions of numerous unidentified inmates in ADC custody. (*Id*.) The letter stated that Mr. Specter was prepared to file a lawsuit, but also indicated that he

---

[3] Plaintiffs summarily dismiss these cases as not controlling because they involved pro se prisoner plaintiffs seeking money damages. This is not entirely true. The plaintiff in *Lyman* was represented by counsel; *Downing*, *Vance*, *Oliver*, and *Jackson* all involved injunctive relief; and *Clagett*, *Maxwell*, *Burton*, and *Ortiz* did not specify what relief was involved. Regardless, none of the cases turned on the type of relief requested or on the fact that the plaintiff was pro se. Furthermore, "federal courts are required sua sponte to examine jurisdictional issues such as standing." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011).

was open to negotiate a stipulated injunction so long as ADC entered into a tolling agreement. (*Id*. at 7, 26.) Ms. Klausner contacted Mr. Specter to discuss the issues raised in his October 12, 2011 letter, and continued a dialogue with him by telephone, email, and letter. (Ex. 1, ¶ 4.) Ms. Klausner informed Mr. Specter that ADC had started reviewing the allegations, but noted that it would be difficult without knowing the identity of the inmates described in the letter. (Dkt. # 74–1 at 29.) She also expressed a willingness to enter into some form of tolling agreement. (*Id*.) On November 3, 2011, Mr. Specter responded (by email) that his "clients" were concerned about retaliation if their identities were disclosed, and therefore he needed to obtain their permission before doing so. (Ex. 1, Att. 1: 11/3/11 Email.) He also attached a proposed tolling agreement. (*Id*.)

On November 8, 2011, Ms. Klausner informed Mr. Specter that she could not agree "to the language regarding 'exhaustion of remedies' as to all ADC inmates." (Ex. 1, Att. A: 11/8/11, 12:09 p.m., Email.) She elaborated:

> We are not intending *to suspend* the medical grievance process for the entire prison population. We will be agreeable to doing *this* for an enumerated list of inmates--it seems that you have some specific inmates in mind for this matter. Please advise.

(Ex. 1, Att. 1: 11/8/11, 12:56 p.m., Email, emphasis added.) This email prompted a telephone conversation between the two. (Ex. 1, ¶ 8.) During that conversation, Ms. Klausner told Mr. Specter that she understood that the inmates he was representing had to agree to provide their names and that he was not at liberty to waive this privilege without their consent, but that it was imperative that he provide a list of those inmates who were allegedly in crisis and not receiving care as quickly as possible so that ADC could investigate their claims and provide care to those who needed it. (*Id*.) She also assured Mr. Specter that there would not be any retaliation against those inmates who did identify themselves, and reiterated that ADC's goal was to provide adequate health care to everyone. (*Id*.) Mr. Specter's response to this request was shocking. (*Id*.) He told Ms. Klausner: *if I give you names, then you are going to address the health care problems and then it jeopardizes our certifying a class* (or words to that effect). (*Id*.) Nonetheless,

1  Mr. Specter agreed to provide a list of inmates. (Ex. 1, Att. 1: 11/8/11, 5:08 p.m., Email.)

2  Following this exchange, Mr. Specter informed Mr. Daniel Pochoda, an
3  attorney with the ACLU (and co-counsel for the Prisoner Plaintiffs), of the pending
4  agreement. (Ex. 1, Att. 1: 11/8/11, 5:22 p.m., Email.) Mr. Pochoda mocked the deal and
5  directed Mr. Specter to not disclose any names that could be tied back to the ACLU. (*Id*.)
6  Unfortunately for Mr. Pochoda and Mr. Specter, Mr. Pochoda inadvertently copied Ms.
7  Klausner on this communication. (*Id*.) Ms. Klausner responded to Ms. Specter and said
8  that she had read Mr. Pochoda's email, and could not help but "feel that whatever list you
9  do provide is simply to placate me." (Ex. 1, Att. 1: 11/10/11, 3:41 p.m., Email.) She also
10 expressed her concern over what Mr. Specter had told her during their November 8
11 telephone conversation:

> I am deeply concerned that in our conversation you expressed a fear that if you provided names to me it might mean ADC would address these medical issues with the individual inmates, which you believe might interfere with your ability to certify a class of inmates. As I stated, there is no question that we will address any and all individual problems brought to our attention. ADC has a responsibility to provide constitutionally appropriate care. I am perplexed that you might know of an inmate who you believe is suffering and hesitate to identify him for us because you have concerns about structuring future potential litigation; however, I will continue to proceed as I have in our discussions, and remain hopeful that my assessment proves incorrect.

19 (*Id*.) She ended by again requesting a list of those inmates that would be covered by the
20 tolling agreement. (*Id*.) Mr. Specter responded three days later, but did not disclaim the
21 statements he had made regarding his inability to proceed with a lawsuit if he disclosed a
22 list of inmates. (Ex. 1, Att. 1: 11/13/11, 12:56 p.m., Email.) He only stated that her
23 "assessment of our *intentions* in [sic] incorrect" and that he undertook "this project" to
24 ensure his clients received appropriate health care. (*Id*., emphasis added.) Mr. Specter
25 forwarded a list of 221 inmates the following day. (*Id.*, Att. 1: 11/14/11, 3:28 p.m. Email.)

26 The Director signed the Tolling Agreement on November 16, 2011 "on
27 behalf of the ADOC." (Dkt. # 74–1 at 3–5.) Under the Agreement, the parties agreed that
28 the tolling provision would remain in effect for 90 days, or until terminated by one of the

6

parties, whichever is later in time." (*Id*. at 3.) The Agreement could be terminated by either party at any time by providing written notice. (*Id*. at 4.) There were two stated purposes: (1) "To protect the interests of all parties during the time the ADOC is investigating and responding to the allegations contained in plaintiffs' counsel's letter of October 12, 2011"; and (2) "To give the parties time to determine whether the issues described in the letter of October 12, 2011 can be resolved without the need for active litigation." (*Id*. at 3.) At issue in this lawsuit is the following additional provision:

> 3c. *Charles Ryan and the ADOC* agree to irrevocably waive and not assert in any civil lawsuit brought by plaintiffs' counsel on behalf of prisoners in the custody of the ADOC any defense based on allegations that plaintiffs failed to exhaust administrative remedies.

(*Id*., emphasis added.)

On December 6, 2011, Ms. Klausner sent a letter to Mr. Specter informing him that she recently learned about two mass mailings he had sent to ADC inmates, one in September 2011 and one in November 2011, which demonstrated that he was "client shopping" for a potential lawsuit: "In this correspondence which includes a 'survey' for the inmate, you advise that you are conducting an 'investigation,' and go on to state that if 'ADC did not fix the problems, PLO along with the ACLU would pursue a lawsuit." (Ex. 1, Att. 2.) The letter also restated Mr. Specter's prior reluctance to provide a list of inmates because of his concern that ADC "would use it to address individual inmate issues and thereby interfere in some manner with [their] ability to certify a class action." Ms. Klausner stated that it was her belief that Mr. Specter was "posturing to obtain a certified class of inmates to represent in a lawsuit against ADC," "engaging in direct solicitation, notwithstanding an attempt to obscure this by referring to [their] process as an 'investigation,'" and "operating with a thinly-veiled agenda to use ADC's time and resources in effort to find out whether you have sufficient grounds to establish a class action lawsuit." (*Id*.) Nonetheless, Ms. Klausner stated they would continue to honor the Tolling Agreement in hopes that Mr. Specter would continue in good faith. (*Id*.)

On February 17, 2012, the Director sent a letter to Mr. Specter terminating the Tolling Agreement. (Ex. 1, Att. 3.) The letter indicated that ADC had investigated the allegations in the October 12, 2011 letter and reviewed all of the health care concerns based on the list of inmates provided, and determined that there was not a system-wide deficit in the delivery of health care. (*Id*.) The letter further outlined additional instances of "wholesale direct solicitation" with ADC inmates, and stated the obvious: the Tolling Agreement was a charade "to simply gather Plaintiffs for a lawsuit [he was] set on filing." (*Id*.) The Director asked Mr. Specter to provide any additional details that could help specify the basis for his allegations, and expressed his willingness to explore them. (*Id*.) Mr. Specter responded by filing this lawsuit. (Dkt. # 1.)

### B. **Defendants Did Not Waive Exhaustion**[4]

Defendants did not waive the right to raise an exhaustion defense. First, this lawsuit is brought against Director Ryan and Interim Division Director Pratt in their official capacities. (Dkt. # 1, ¶¶ 21–22.) "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). ADC is a non-jural entity and therefore not subject to suit. *Seawright v. Arizona*, 2012 WL 2191709, at *3 (D. Ariz. 2012). Thus, this lawsuit is really "a suit against the State itself," not against Ryan, Pratt, or ADC. *Will*, 491 U.S. at 71; *see Maier v. N.Y.C. Police Dep't,* 2009 WL 2915211, at *2 (E.D.N.Y. 2009) ("'[A] case against the Police Department or any other non-suable agency of the City is really a suit against the City itself, which is a suable entity.'") (quoting *Morales v. N.Y.C. Police Dep't,* 1999 WL 169533, at *1 (S.D.N.Y. 1999)).

The Tolling Agreement, however, was entered into by Director Ryan "on behalf of the ADOC." (Dkt. # 74–1 at 3.) It was not entered into on behalf of the State of Arizona.[5] Thus, the State is not a party to that Agreement and it cannot be used against it

---

[4] Plaintiffs have served Defendants' counsel with a Rule 11 Motion for Sanctions based on Defendants' raising exhaustion as a basis for dismissal.

[5] The exhaustion provision also only applies to "Charles Ryan and the ADOC." (Dkt. # 74–1 at 3.)

8

1 in this lawsuit. Plaintiffs cannot feign ignorance. Their counsel drafted the Tolling
2 Agreement and framed the parties as they did. *See Harford v. Nat'l Life & Cas. Ins. Co.*,
3 299 P.2d 635, 637 (Ariz. 1956) ("It is a fundamental principle of law that a contract will
4 be construed most strongly against the drafter."). Furthermore, "Arizona law is clear that
5 'persons dealing with public officers are bound, at their peril, to know the extent and
6 limits of their power and that no right can be acquired except that predicated upon
7 authorized acts of such officers.'" *Kaman Aerospace v. Arizona Bd. of Regents*, 171 P.3d
8 599, 604, ¶ 20 (Ariz. App. 2007) (quoting *Pinal County v. Pomeroy,* 139 P.2d 451, 454–
9 55 (Ariz. 1943)); *see also Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 (1947)
10 ("Whatever the form in which the Government functions, anyone entering into an
11 arrangement with the Government takes the risk of having accurately ascertained that he
12 who purports to act for the Government stays within the bounds of his authority.").

13 Validity aside, the exhaustion provision is very narrow in scope, and does
14 not bar Defendants from raising exhaustion as a defense to the claims raised in Plaintiffs'
15 Complaint. The provision only served to waive exhaustion on claims that accrued during
16 the life of the Tolling Agreement. Most of Plaintiffs' claims, however, accrued before it
17 was entered into. The "paramount purpose" of interpreting a contract "is to determine the
18 intent of the parties at the time the contract was made." *Duhame v. Navopache Elec. Co-*
19 *op., Inc.*, 488 P.2d 184, 189 (Ariz. App. 1971). In doing so, a court must "adopt a
20 construction of a contract which will harmonize all of its parts, and apparently conflicting
21 parts must be reconciled, if possible, by any reasonable interpretation." *U.S. Insulation,*
22 *Inc. v. Hilro Const. Co., Inc.*, 705 P.2d 490, 499 (Ariz. App. 1985). "An interpretation of a
23 contract which renders it unreasonable should be avoided." *Custom Roofing Co., Inc. v.*
24 *Transamerica Ins. Co.*, 584 P.2d 1187, 1189 (Ariz. App. 1978).

25 Defendants' interpretation is consistent with these principles. The purpose
26 of the Tolling Agreement is stated explicitly therein: to allow ADC to investigate the
27 allegations in the October 12, 2011 letter; to protect the interests of both parties during
28 that time, and to give the parties an opportunity during that time to resolve the issues

9

without the need for litigation. (Dkt. # 74–1 at 3.) The Tolling Agreement had a duration of 90 days or upon termination, whichever was later. (*Id.*) Nothing in the Agreement indicates an intent to protect either parties' interests *before* it went into effect *or after* it was terminated. The focus is the time in which the Agreement was in effect – from November 16, 2011 until February 17, 2012. The statute of limitations provision – which was the heart of the Agreement – was to be tolled *only* for the life of the Agreement. (*Id.* at 3–4.) It did not toll the statute of limitations indefinitely.

Plaintiffs' interpretation that the provision waived exhaustion with respect to *any and all* claims accrued at *any* time is not supported by either the plain language or the purpose of the Agreement. First the exhaustion provision does not describe which *claims* it applies to. The word "claims" is not even mentioned in that provision. Plaintiffs focus on the phrase "in any civil lawsuit," but again that does not define which *claims* in the lawsuit it applies to – those that accrued before, during, and/or after the Tolling Agreement. Most of Plaintiffs' claims were laid out in the October 12, 2011 letter. (Compare Dkt. # 1 with Dkt. # 74–1 at 7–27.) Thus, they had already accrued as of that time (before the Tolling Agreement went into effect).[6] It is unreasonable to interpret the Agreement in such a way that ADC agreed to waive a defense to claims that had already accrued, which it was aware of, and were certain to be included in a lawsuit. Plaintiffs' interpretation, taken to its logical end, would extend the exhaustion waiver in perpetuity, and it would apply to any lawsuit filed at any time, involving any claim of any type by any of the 221 inmates listed. There would be no limitations. That is absurd. ADC entered the Agreement so that they could investigate the October 12, 2011 allegations, and in turn it agreed to waive any exhaustion defense with respect to new claims that accrued

---

[6] Some claims raised in the Complaint, that were not mentioned in the letter, either allege an accrual date before the effective date of the Tolling Agreement or do not specify that they accrued during the life of the Agreement. These claims are also not saved by the exhaustion waiver. There are only two claims raised in the Complaint that allegedly (and specifically) accrued during the tolling period and therefore are not waived: (1) Plaintiff Swartz's claim (3a) that his medication was disrupted upon his transfer in December 2011 (Dkt. # 1, ¶ 44); and (2) Plaintiff Licci's claim (10) that she was denied an MRI until December 2011 (Dkt. # 1, ¶ 67).

during that investigation period. That is precisely how Ms. Klausner interpreted it: "We are not intending *to suspend* the medical grievance process for the entire prison population. We will be agreeable to doing *this* for an enumerated list of inmate." (Ex. 1, Att. 1: 11/8/11, 12:56 p.m., Email, emphasis added.) This interpretation is also consistent with Mr. Specter's concern about retaliation. Inmates who identified themselves were not required to exhaust their remedies during that period if a medical issue arose.

Plaintiffs' reliance on the word "irrevocably" in the exhaustion provision and the survival provision (3h) – which states, "All material terms of this Agreement will survive termination of this Agreement" – are also misplaced. Defendants' agreement to waive their exhaustion defense "irrevocably" simply meant that, once they terminated the Agreement (either before or after the 90-day period), it did not undue their waiver of an exhaustion defense to claims that accrued during the life of the Agreement (which was a minimum of 90 days). It was "irrevocabl[e]" in that sense only. The survival provision served the same purpose (and also covers the tolling provision). Even if the Agreement was terminated, Plaintiffs could invoke the exhaustion waiver in a subsequent lawsuit, *but only* with respect to claims that accrued during the life of the Agreement. Defendants did not waive their right to raise exhaustion as a defense in this lawsuit.[7]

### III. PLAINTIFFS' HEALTH CARE CLAIMS ARE MOOT

Plaintiffs do not disagree that there is no longer a present controversy as to which effective relief can be granted, the standard for determining whether a claim is moot. *See Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). Instead, they urge this Court to grant them an exemption to mootness – the voluntary cessation doctrine. (Response at 8, citing *Laidlaw*.) "Generally, a case should not be considered moot if the defendant voluntarily ceases the allegedly improper behavior in response to a suit, but is free to return to it at any time." *Native Vill. of*

---

[7] Plaintiffs do not disagree that they failed to exhaust their administrative remedies. Nor do they provide any argument or evidence for their bald assertion that administrative remedies were not "available." (Response at 4 n.2.) Thus, if this Court agrees that there was no waiver, it should find lack of exhaustion on those claims identified in the Motion.

11

*Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994).  Here, however, Defendants did not voluntarily cease anything.  The Legislature *required* ADC to privatize the provision of health care.  *See Log Cabin Republicans v. United States*, 658 F.3d 1162, 1167 (9th Cir. 2011) ("Voluntary cessation is different from a statutory amendment or repeal."). Moreover, that statutory mandate was set in motion and approved by the Governor long before Defendants even had notice of this lawsuit; it was not enacted in response to this suit.  *See Native Vill. of Noatak*, 38 F.3d at 1511 (voluntary cessation exception did not apply where legislature repealed challenged statute before lawsuit was initiated).

Furthermore, "[v]oluntary cessation does not moot a case or controversy unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) (internal quotations and citation omitted). The Wexford Contract does just that.  Defendants' Motion sets forth the provisions in the Contract that address Plaintiffs' request for prospective injunctive relief. Notably, Plaintiffs do not challenge the substance of the Contract, nor do they even assert that the Contract does not do enough.  They simply argue that the "mere signing of a contract" does not establish that the alleged violations cannot reasonably be expected to recur.  But the cases they cite in support of that proposition are inapposite.  This is not a case involving the post-litigation pronouncement of new policies that Defendants can opt to ignore or rescind once this case is terminated.  *See Morrison v. Hall*, 261 F.3d 896, 900 n.5 (9th Cir. 2001); *Gluth v. Kangas*, 951 F.2d 1504, 1507 (9th Cir. 1991); *Casey v. Lewis*, 834 F.Supp. 1477, 1547 (D. Ariz. 1993). The Contract for the provision of health care is required by statute.  Once that Contract expires, or if it is terminated before its expiration, ADC cannot then continue providing health care.  It must re-contract with another private entity to provide it.  For as long as the statute is on the books, ADC cannot personally deliver health care to its inmates.  "[I]t is generally fair to say that when a change of position is wrought by a statutory provision, the change is neither voluntary nor likely to be resiled from at any time in the foreseeable future." *Smith v. Univ. of Washington, Law*

12

1  *Sch.*, 233 F.3d 1188, 1194-95 (9th Cir. 2000). That a future Legislature may repeal the
2  statute is too speculative to invoke the voluntary cessation doctrine. *See Log Cabin*
3  *Republicans*, 658 F.3d at 1167 (speculation as to what a future Congress might do is not
4  sufficient); *Smith*, 233 F.3d at 1195 ("There can be no real expectation that the alleged
5  wrongs will recur now that the people of the state have prohibited them. Nor can we
6  address Smith's fear of 'the *possibility* that the state's allegedly discriminatory policy will
7  manifest itself under the new statute. Federal courts are not authorized to address such
8  theoretical possibilities.'"); *Native Vill. of Noatak*, 38 F.3d at 1510 ("A statutory change
9  … is usually enough to render a case moot, even if the legislature possesses the power to
10 reenact the statute after the lawsuit is dismissed.").

11          Lastly, Plaintiffs' non-delegable duty argument misses the mark entirely.
12 Mootness and duty are two distinct issues. Whereas a non-delegable duty is a theory of
13 liability, *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705–06 (11th Cir. 1985),
14 "[m]ootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear a case
15 that is moot, that is, where no actual or live controversy exists.'" *Foster v. Carson*, 347
16 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala,* 166 F.3d 986,
17 989 (9th Cir.1999)). Mootness is "the doctrine of standing set in a time frame: The
18 requisite personal interest that must exist at the commencement of the litigation (standing)
19 must continue throughout its existence (mootness)." *Id*. Plaintiffs' complaint is directed
20 only at Defendants Ryan and Pratt – *ADC* officials – and *ADC* policies, and they only
21 seek to enjoin and modify those *ADC* policies. (Dkt. # 1, ¶¶ 21–22, 151.) As of July 1,
22 2012, however, Wexford is responsible for the provision of healthcare to ADC inmates,
23 and the Wexford Contract implements policies that are consistent with Plaintiff's
24 proposed "plan." Therefore, the allegations in the complaint no longer support a live
25 controversy (or a request for prospective relief) between Plaintiffs and *ADC*.[8]

---

[8] Defendants do not subscribe to Plaintiffs' theory that Defendants can be held vicariously liable for Wexford's conduct under § 1983 based on a non-delegable duty. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding that vicarious liability is inapplicable to § 1983 suits and that a plaintiff must plead that each government official defendant

13

## IV. REQUEST FOR STAY

"The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997). The circumstances underlying Defendants' request for a stay are not typical.[9] Plaintiffs' October 12, 2011 demand letter set forth allegations pertaining to ADC's provision of health care. (Dkt. # 74–1 at 7–27.) That demand letter recites alleged deficiencies *prior to* the filing of the complaint. (Dkt. # 74–1 at 7.) These alleged deficiencies are the basis of Plaintiffs' complaint. (Dkt. # 1.) After the complaint was filed, however, Wexford took over health care services at ADC facilities.

Defendants' request for a stay is made in the event that this Court cannot conclude that the request for prospective relief is moot at this time. Indeed, Wexford has only been providing healthcare services for a month. It is simply not possible to demonstrate a systemic failure in health care during that limited period.[10] Staying the health care claims for six-to-nine months will allow two things to happen: (1) Wexford can perform under the contract; and (2) Plaintiffs can evaluate whether Wexford's performance is sufficient enough to discontinue this lawsuit. If Plaintiffs believe that their health care is still deficient, they can continue with their existing claims or with modified ones. There are several benefits to proceeding this way. The best case scenario is that the

---

violated the constitution through his own individual actions); *Ammons v. Wash. Dep't of Soc. & Health Services*, 648 F.3d 1020, 1037 (9th Cir. 2011) ("§ 1983 liability cannot be established solely on a theory of *respondeat superior.*"); *Reynolds v. Giuliani*, 506 F.3d 183, 193–95 (2nd Cir. 2007) (rejecting plaintiff's non-delegable duty theory on § 1983 claim because doing so would "swallow[] *Monell* whole," "sidestep[] *Monell's* rigorous culpability and causation standards," and impose "*de facto respondeat superior* liability"). Counsel for Defendants have been unable to find any Ninth Circuit cases adopting Plaintiffs' position. Nevertheless, even if valid, Plaintiffs' complaint does not sufficiently allege ADC liability under a non-delegable duty theory. There is no mention of a non-delegable duty, Wexford, Wexford's policies, or Wexford's relationship with ADC, nor are there any allegations pertaining to causation or failed supervision.

[9] Nor is this a *Landis* stay situation. *See*, *e.g.*, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109–1110 (9th Cir. 2005); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).

[10] Notably, Plaintiffs did not argue in their Response that Wexford's care has been deficient.

14

1  health care claims no longer need to be litigated, or they are at least narrowed. This
2  would spare the parties extensive discovery, briefing class certification and dispositive
3  motions, and trying those issues. It would also relieve this Court.
4         Plaintiffs' counter-arguments are not persuasive. First, any claim of
5  prejudice by Plaintiffs is not credible. They initially raised their allegations in October
6  2011; they urged Defendants to enter into a 90-day Tolling Agreement; that Tolling
7  Agreement ended in February 2012; and then Plaintiffs waited more than a month to file
8  their Complaint – 5 months after their initial allegations. Second, although Plaintiffs seek
9  "injunctive relief from ongoing violations," even they cannot say that there are currently
10 ongoing violations, because a new health care provider is in place. Thus, the potential for
11 harm, if any, is diminished significantly. Third, any expense in reviewing Wexford's
12 performance at the end of the stay will be nominal compared to what could be saved if its
13 performance is deemed satisfactory. Fourth, a stay would not mean that this case "sits on
14 the Court's docket." The stay only applies to the health care claims; Plaintiffs'
15 conditions-of-confinement claims would still move forward towards resolution. And
16 finally, unlike the stay request in *Melendres*, the stay request here is not "indefinite." *See*
17 *Melendres v. Maricopa County*, 2009 WL 2515618, at *2 (D. Ariz. 2009).
18        Plaintiffs' opposition to a stay is consistent with their counsel's reluctance
19 to allow ADC/Wexford the opportunity to cure the alleged individual deficiencies last fall.
20 If the motivation for this lawsuit is really injunctive relief, one would think that Plaintiffs
21 would be receptive to the idea of a stay in order to provide ADC with specific instances of
22 what they perceive to be a systemic failure to provide constitutionally mandated health
23 care and allow ADC/Wexford an opportunity to address those concerns. Their
24 unwillingness to do so raises serious questions as to the validity of their claims.
25 **V. ACDL CLAIMS**
26        Defendants' Motion to Dismiss applies equally to Plaintiff ACDL.
27 Defendants do not dispute that ACDL is statutorily authorized to "pursue … legal …
28 remedies to ensure the protection of *individuals with mental illness*." 42 U.S.C.

15

§ 10805(a)(1)(B) (emphasis added).  But the phrase "individuals with mental illness" is explicitly defined to mean an individual "who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; *and* … who is an inpatient or resident in a facility rendering care or treatment."  42 U.S.C. § 10802(4)(A) & (B)(i)(I) (emphasis added).  The Complaint, however, fails to allege that it is bringing this action on behalf ADC inmates who meet that precise definition.  (Dkt. # 1, ¶¶ 9, 78–81, 99, 126–132, 146, 148.)

Furthermore, the statute requires ACDL to "exhaust in a timely manner all administrative remedies where appropriate."  42 U.S.C. § 10807(a).  ACDL should not be allowed to proceed with the lawsuit on those claims that were not exhausted by any of the Prisoner Plaintiffs. To do so would essentially circumvent the PLRA's exhaustion requirement.  The Tolling Agreement does not apply to ACDL, and ACDL does not argue that administrative remedies were not "available" to those who it represents, nor does it demonstrate that it exhausted administrative remedies. *See Wis. Coal. for Advocacy Inc. v. Wis. Dept. of Pub. Instruction*, 407 F.Supp.2d 988, 993 (W.D. Wis. 2005) (PAIMI claims failed where plaintiff failed to show that it exhausted administrative remedies or that it was unreasonable to do so); *Gonzalez v. Martinez*, 756 F.Supp. 1533, 1539 (S.D. Fla. 1991) (whether administrative remedies under PAIMI have been exhausted should be decided on a case-by-case basis).

## **CONCLUSION**

The relief requested in Defendants' Motion should be granted.

/ / /

/ / /

16

DATED this 16th day of August, 2012

        STRUCK WIENEKE, & LOVE, P.L.C.

By /s/ Nicholas D. Acedo
Daniel P. Struck
Kathleen L. Wieneke
Timothy J. Bojanowski
Nicholas D. Acedo
Courtney R. Cloman
Ashlee B. Fletcher
STRUCK WIENEKE, & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on August 16, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:      ahardy@prisonlaw.com

Amy Fettig:      afettig@npp-aclu.org

Caroline N. Mitchell:    cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:    ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:    DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

Daniel Joseph Pochoda:    dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

David Cyrus Fathi:    dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org

Donald Specter:    dspecter@prisonlaw.com

17

| | | |
|---|---|---|
| Ilham A. Hosseini: | ihosseini@jonesday.com; areyes@jonesday.com | |
| James Anthony Ahlers: | jahlers@perkinscoie.com; docketphx@perkinscoie.com; jroe@perkinscoie.com | |
| James Duff Lyall: | jlyall@acluaz.org; gtorres@acluaz.org | |
| Jennifer Ann Alewelt: | jalewelt@azdisabilitylaw.org; emyers@azdisabilitylaw.org; mlauritzen@azdisabilitylaw.org | |
| Jill Louise Ripke: | jripke@perkinscoie.com; jgable@perkinscoie.com | |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com | |
| Kelly Joyce Flood: | kflood@acluaz.org; gtorres@acluaz.org | |
| Kirstin T. Eidenbach: | keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com | |
| Matthew Benjamin de Mee: | mdumee@perkinscoie.com; cwendt@perkinscoie.com | |
| Michael Evan Gottfried: | Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov | |
| Sara Norman: | snorman@prisonlaw.com | |
| Sophia Calderon: | scalderon@jonesday.com; lwong@jonesday.com | |
| Thomas Dean Ryerson: | tryerson@perkinscoie.com; docketphx@perkinscoie.com; rboen@perkinscoie.com | |
| Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; mlauritzen@azdisabilitylaw.org | |
| Sarah Rauh: | srauh@jonesday.com; treyes@jonesday.com | |
| David C. Kiernan: | dkiernan@jonesday.com; lwong@jonesday.com | |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ Nicholas D. Acedo

2658229.1

18