1  Arizona Attorney General Thomas C. Horne
   Office of the Attorney General
2  Michael E. Gottfried, Bar No. 010623
   Assistant Attorney General
3  1275 W. Washington Street
   Phoenix, Arizona 85007-2926
4  Telephone: (602) 542-4951
   Fax: (602) 542-7670
5  Michael.Gottfried@azag.gov

6  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
7  Timothy J. Bojanowski, Bar No. 22126
   Nicholas D. Acedo, Bar No. 021644
8  Courtney R. Cloman, Bar No. 023155
   Ashlee B. Fletcher, Bar No. 028874
9  STRUCK WIENEKE, & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
10 Chandler, Arizona  85226
   Telephone:  (480) 420-1600
11 Fax:  (480) 420-1696
   dstruck@swlfirm.com
12 kwieneke@swlfirm.com
   tbojanowski@swlfirm.com
13 nacedo@swlfirm.com
   ccloman@swlfirm.com
14 afletcher@swlfirm.com

15 *Attorneys for Defendants*

16              **UNITED STATES DISTRICT COURT**

17                  **DISTRICT OF ARIZONA**

18 Victor Parsons; Shawn Jensen; Stephen          NO. 2:12-cv-00601-NVW
   Swartz; Dustin Brislan; Sonia Rodriguez;
19 Christina Verduzco; Jackie Thomas; Jeremy      **DEFENDANTS' REPLY IN**
   Smith; Robert Gamez; Maryanne Chisholm;        **SUPPORT OF MOTION TO**
20 Desiree Licci; Joseph Hefner; Joshua Polson;   **DISMISS**
   and Charlotte Wells, on behalf of themselves
21 and all others similarly situated; and Arizona
   Center for Disability Law,
22
23                               Plaintiffs,
24              v.
25 Charles Ryan, Director, Arizona Department
   of Corrections; and Richard Pratt, Interim
26 Division Director, Division of Health Services,
   Arizona Department of Corrections, in their
27 official capacities,
28                               Defendants.

1    Defendants' Motion to Dismiss should be granted as requested.

2    **I.    FAILURE TO STATE A CLAIM**

3    Plaintiffs have turned an already amorphous and deficient Complaint into

4    something even more vague and improper.  They contend that there are only *five* claims in

5    their 74-page Complaint: "(1) inadequate health care (including medical, mental health,

6    and dental care); (2) inadequate medical care; (3) inadequate dental care; (4) inadequate

7    mental health care; and (4) unconstitutional conditions of confinement in isolation."

8    Then, to get around the standing issue raised by Defendants, they argue that the list of

9    claims identified in Defendants' Motion are not "claims for relief," but merely

10   "illustrations" in support of their five titled claims.  Plaintiffs cannot proceed this way.

11   Rule 8 "demands more than an unadorned, the-defendant-unlawfully-

12   harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that

13   offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

14   action will not do.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555

15   (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere

16   conclusory statements, do not suffice." *Id.*  A complaint must plead "factual content that

17   allows the court to draw the reasonable inference that the defendant is liable for the

18   misconduct alleged." *Id.*  Factual allegations that are "merely consistent with" a

19   defendant's liability is insufficient. *Id.*  By themselves, Plaintiffs' five stated claims do

20   not satisfy this standard.  They are the type of "bald" and "conclusory" allegations that

21   *Iqbal* prohibits, and, standing alone, they cannot comprise a plausible claim for relief. *See*

22   *Hydrick v. Hunter*, 669 F.3d 937, 942 (9th Cir. 2012) (bare allegation that defendant's

23   "policies, practices and customs subject Plaintiffs to unreasonable searches [and]

24   unreasonable force" not sufficient).  They should be dismissed if defined that way.

25   The only way to avoid dismissal is to read these five purported claims

26   *in pari materia* with each of the underlying factual allegations.  For example, the claims

27   must be defined as: inadequate health care based on Defendants' failure to provide

28   medically necessary devices (Claim 3f); inadequate medical care based on Defendants'

1

failure to provide timely access to outside medical specialists (Claim 9); inadequate dental care based on Defendants' delay in dental treatment (Claim 12); inadequate mental health care based on Defendants' failure to sufficiently manage psychotropic medications (Claim 16); and unconstitutional conditions of confinement in isolation cells based on the deprivation of outdoor recreation (Claim 32). The "conclusory statement" must be paired with an underlying factual allegation to state a claim for relief. *Iqbal*, 556 U.S. at 678.

This specificity is necessary, not only to avoid dismissal under *Iqbal*, so that Defendants know exactly what claims they are defending against. Defining the claims is necessary for discovery, dispositive motions, class certification briefing, and trial. For example, on summary judgment, Defendants need to know what conditions of confinement are actually being challenged as unconstitutional. An Eighth Amendment violation cannot be based on the "totality of conditions" at a prison. *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982). "To find an Eighth Amendment violation, courts must identify specific conditions that fail to meet Eighth Amendment requirements." *Id.* at 1247. In class certification briefing, Plaintiffs must show that there are "common" questions of fact or law and that their claims are "typical" of class claims. *See* Rule 23(a)(2) & (3), Fed.R.Civ.P. Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011). Merely stating that they have all received "inadequate health care" is too vague to resolve the issue. *See Id.* at 2551 (question, "Is that an unlawful practice?" is not sufficient to obtain class certification). The test for typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts*, 976 F.2d 497, 508 (9th Cir. 1992). Simply alleging that all class members have received "inadequate dental care" does not answer these questions.[1]

---

[1] The instant Motion presents another issue. Plaintiffs cannot contend that the underlying factual allegations are not claims, just "illustrations" of other constitutional

The standing issue raised in Defendants' Motion should be analyzed within this framework – i.e., each "illustration" is a separate claim.  Under that framework, those Plaintiffs who are tied to a specific claim have standing to proceed on those claims only. They cannot raise claims in which they are not  named, including claims in which other Plaintiffs are named or in which no Plaintiff is named. Standing requires a plaintiff to demonstrate that he or she "'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (injunctive relief requires showing that plaintiff is under threat of suffering a "concrete and particularized" injury in fact.)  "Abstract injury is not enough." *Lyons*, 461 U.S. at 101.[2]

Plaintiffs cannot meet this burden and take great pains to dilute it. Plaintiffs' first conflate this standard with the Eighth Amendment standard for liability ("substantial risk of serious harm"), and then they modify that standard significantly ("risk of future harm").  That is their starting point.  Then they argue that, because Plaintiffs are all ADC inmates (albeit housed at different facilities) there is a risk that they could experience the same incidents alleged by other ADC inmates. This allegation comes nowhere close to the standard for standing; it does not demonstrate that Plaintiffs are "immediately in danger of sustaining some direct injury."  It is purely "hypothetical" and "abstract."  For example, Plaintiff Brislan alleges that he received inadequate health care

---

violations, and then turn around and use these allegations to support other claims. Doing so would allow them to circumvent exhaustion. For example, Gamez alleged that he was deprived of outdoor recreation while in isolation (Claim 32), a claim which he properly exhausted. He did not, however, exhaust Claim 31 (can only leave his cell three times per week to shower and two hours per week for "exercise" in the "rec pen") or Claim 36 (extreme isolation). Yet, under Plaintiffs' theory, he would be able to use these allegations to support his outdoor recreation claim (Claim 32). This should not be permitted.

[2] The failure to denote (in the Motion) the quoted passage in *Allee v. Medrano* as a concurring/dissenting opinion was inadvertent. The proposition was a neutral one, often quoted by other courts. *See, e.g., Lindquist v. Farmers Ins. Co. of Ariz.*, 2008 WL 343299, at *9 (D. Ariz. 2008).

3

1     when staff discontinued his medications because they were not listed on the formulary
2     (Claim 3e). (Dkt. # 1, ¶ 48.) Yet, under Plaintiffs' theory, he can raise claims that
3     Defendants fail to provide medically necessary devices (Claim 3f), provide an inadequate
4     number of staff to respond to emergencies (2a), and do not process medical forms in a
5     timely manner (1a), despite no allegation that he requires a medical device, suffered an
6     emergency, or experienced delays in medical form responses, simply because he is an
7     inmate at ADC and any of these events could happen in the future.  Similarly, Plaintiff
8     Polson alleges that he received inadequate dental care because he waited three years for
9     partial dentures (Claim 12).  (Dkt. # 1, ¶¶ 18, 71.)  Despite no allegation that he was only
10    given a temporary filling instead of a permanent filling (Claim 14), or that he was only
11    offered extraction instead of a less-intrusive alternative (Claim 13), Plaintiffs' theory is
12    that he can still raise these claims because he is an ADC inmate with teeth (presumably).

13            This Court should reject this faulty logic and allow Plaintiffs to bring only
14    those claims that relate to themselves.  All others should be dismissed. (See cases cited in
15    Motion at 5–6.)[3]

16    **II.     FAILURE TO EXHAUST ADMINISTRATIVE REMEDIES**

17            **A.     The Tolling Agreement**

18            On October 12, 2011, Mr. Donald Specter, Director of the Prison Law
19    Office in California, sent a 20-page letter to ADC Director Charles Ryan and his General
20    Counsel Karyn Klausner.  (Dkt. # 74–1 at 7–27.)  That letter lodged dozens of serious
21    allegations of deficient health care at ADC, and recounted alleged injuries and
22    deteriorating health conditions of numerous unidentified inmates in ADC custody.  (*Id.*)
23    The letter stated that Mr. Specter was prepared to file a lawsuit, but also indicated that he

24    _____
25    [3] Plaintiffs summarily dismiss these cases as not controlling because they involved pro se prisoner plaintiffs seeking money damages. This is not entirely true. The plaintiff in *Lyman* was represented by counsel; *Downing*, *Vance*, *Oliver*, and *Jackson* all involved injunctive relief; and *Clagett*, *Maxwell*, *Burton*, and *Ortiz* did not specify what relief was involved. Regardless, none of the cases turned on the type of relief requested or on the fact that the plaintiff was pro se. Furthermore, "federal courts are required sua sponte to examine jurisdictional issues such as standing." *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 954 (9th Cir. 2011).

was open to negotiate a stipulated injunction so long as ADC entered into a tolling agreement. (*Id.* at 7, 26.) Ms. Klausner contacted Mr. Specter to discuss the issues raised in his October 12, 2011 letter, and continued a dialogue with him by telephone, email, and letter. (Ex. 1, ¶ 4.) Ms. Klausner informed Mr. Specter that ADC had started reviewing the allegations, but noted that it would be difficult without knowing the identity of the inmates described in the letter. (Dkt. # 74–1 at 29.) She also expressed a willingness to enter into some form of tolling agreement. (*Id.*) On November 3, 2011, Mr. Specter responded (by email) that his "clients" were concerned about retaliation if their identities were disclosed, and therefore he needed to obtain their permission before doing so. (Ex. 1, Att. 1: 11/3/11 Email.) He also attached a proposed tolling agreement. (*Id.*)

On November 8, 2011, Ms. Klausner informed Mr. Specter that she could not agree "to the language regarding 'exhaustion of remedies' as to all ADC inmates." (Ex. 1, Att. A: 11/8/11, 12:09 p.m., Email.) She elaborated:

> We are not intending *to suspend* the medical grievance process for the entire prison population. We will be agreeable to doing *this* for an enumerated list of inmates--it seems that you have some specific inmates in mind for this matter. Please advise.

(Ex. 1, Att. 1: 11/8/11, 12:56 p.m., Email, emphasis added.) This email prompted a telephone conversation between the two. (Ex. 1, ¶ 8.) During that conversation, Ms. Klausner told Mr. Specter that she understood that the inmates he was representing had to agree to provide their names and that he was not at liberty to waive this privilege without their consent, but that it was imperative that he provide a list of those inmates who were allegedly in crisis and not receiving care as quickly as possible so that ADC could investigate their claims and provide care to those who needed it. (*Id.*) She also assured Mr. Specter that there would not be any retaliation against those inmates who did identify themselves, and reiterated that ADC's goal was to provide adequate health care to everyone. (*Id.*) Mr. Specter's response to this request was shocking. (*Id.*) He told Ms. Klausner: *if I give you names, then you are going to address the health care problems and then it jeopardizes our certifying a class* (or words to that effect). (*Id.*) Nonetheless,

1   Mr. Specter agreed to provide a list of inmates.  (Ex. 1, Att. 1: 11/8/11, 5:08 p.m., Email.)

2           Following this exchange, Mr. Specter informed Mr. Daniel Pochoda, an

3   attorney with the ACLU (and co-counsel for the Prisoner Plaintiffs), of the pending

4   agreement. (Ex. 1, Att. 1: 11/8/11, 5:22 p.m., Email.) Mr. Pochoda mocked the deal and

5   directed Mr. Specter to not disclose any names that could be tied back to the ACLU. (*Id.*)

6   Unfortunately for Mr. Pochoda and Mr. Specter, Mr. Pochoda inadvertently copied Ms.

7   Klausner on this communication.  (*Id.*)  Ms. Klausner responded to Ms. Specter and said

8   that she had read Mr. Pochoda's email, and could not help but "feel that whatever list you

9   do provide is simply to placate me."  (Ex. 1, Att. 1: 11/10/11, 3:41 p.m., Email.)  She also

10  expressed her concern over what Mr. Specter had told her during their November 8

11  telephone conversation:

12          I am deeply concerned that in our conversation you expressed
        a fear that if you provided names to me it might mean ADC
13      would address these medical issues with the individual
        inmates, which you believe might interfere with your ability to
14      certify a class of inmates. As I stated, there is no question that
        we will address any and all individual problems brought to our
15      attention. ADC has a responsibility to provide constitutionally
        appropriate care. I am perplexed that you might know of an
16      inmate who you believe is suffering and hesitate to identify
        him for us because you have concerns about structuring future
17      potential litigation; however, I will continue to proceed as I
        have in our discussions, and remain hopeful that my
18      assessment proves incorrect.

19  (*Id.*)  She ended by again requesting a list of those inmates that would be covered by the

20  tolling agreement.  (*Id.*)  Mr. Specter responded three days later, but did not disclaim the

21  statements he had made regarding his inability to proceed with a lawsuit if he disclosed a

22  list of inmates. (Ex. 1, Att. 1: 11/13/11, 12:56 p.m., Email.) He only stated that her

23  "assessment of our *intentions* in [sic] incorrect" and that he undertook "this project" to

24  ensure his clients received appropriate health care.  (*Id.*, emphasis added.)  Mr. Specter

25  forwarded a list of 221 inmates the following day. (*Id.*, Att. 1: 11/14/11, 3:28 p.m. Email.)

26          The Director signed the Tolling Agreement on November 16, 2011 "on

27  behalf of the ADOC."  (Dkt. # 74–1 at 3–5.)  Under the Agreement, the parties agreed that

28  the tolling provision would remain in effect for 90 days, or until terminated by one of the

parties, whichever is later in time." (*Id.* at 3.)  The Agreement could be terminated by either party at any time by providing written notice. (*Id.* at 4.) There were two stated purposes: (1) "To protect the interests of all parties during the time the ADOC is investigating and responding to the allegations contained in plaintiffs' counsel's letter of October 12, 2011"; and (2) "To give the parties time to determine whether the issues described in the letter of October 12, 2011 can be resolved without the need for active litigation." (*Id.* at 3.)  At issue in this lawsuit is the following additional provision:

> 3c.  *Charles Ryan and the ADOC* agree to irrevocably waive and not assert in any civil lawsuit brought by plaintiffs' counsel on behalf of prisoners in the custody of the ADOC any defense based on allegations that plaintiffs failed to exhaust administrative remedies.

(*Id.*, emphasis added.)

On December 6, 2011, Ms. Klausner sent a letter to Mr. Specter informing him that she recently learned about two mass mailings he had sent to ADC inmates, one in September 2011 and one in November 2011, which demonstrated that he was "client shopping" for a potential lawsuit: "In this correspondence which includes a 'survey' for the inmate, you advise that you are conducting an 'investigation,' and go on to state that if 'ADC did not fix the problems, PLO along with the ACLU would pursue a lawsuit." (Ex. 1, Att. 2.) The letter also restated Mr. Specter's prior reluctance to provide a list of inmates because of his concern that ADC "would use it to address individual inmate issues and thereby interfere in some manner with [their] ability to certify a class action." Ms. Klausner stated that it was her belief that Mr. Specter was "posturing to obtain a certified class of inmates to represent in a lawsuit against ADC," "engaging in direct solicitation, notwithstanding an attempt to obscure this by referring to [their] process as an 'investigation,'" and "operating with a thinly-veiled agenda to use ADC's time and resources in effort to find out whether you have sufficient grounds to establish a class action lawsuit." (*Id.*)  Nonetheless, Ms. Klausner stated they would continue to honor the Tolling Agreement in hopes that Mr. Specter would continue in good faith.  (*Id.*)

7

On February 17, 2012, the Director sent a letter to Mr. Specter terminating the Tolling Agreement. (Ex. 1, Att. 3.) The letter indicated that ADC had investigated the allegations in the October 12, 2011 letter and reviewed all of the health care concerns based on the list of inmates provided, and determined that there was not a system-wide deficit in the delivery of health care. (*Id.*) The letter further outlined additional instances of "wholesale direct solicitation" with ADC inmates, and stated the obvious: the Tolling Agreement was a charade "to simply gather Plaintiffs for a lawsuit [he was] set on filing." (*Id.*) The Director asked Mr. Specter to provide any additional details that could help specify the basis for his allegations, and expressed his willingness to explore them. (*Id.*) Mr. Specter responded by filing this lawsuit. (Dkt. # 1.)

### B.   Defendants Did Not Waive Exhaustion[4]

Defendants did not waive the right to raise an exhaustion defense. First, this lawsuit is brought against Director Ryan and Interim Division Director Pratt in their official capacities. (Dkt. # 1, ¶¶ 21–22.) "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). ADC is a non-jural entity and therefore not subject to suit. *Seawright v. Arizona*, 2012 WL 2191709, at *3 (D. Ariz. 2012). Thus, this lawsuit is really "a suit against the State itself," not against Ryan, Pratt, or ADC. *Will*, 491 U.S. at 71; *see Maier v. N.Y.C. Police Dep't,* 2009 WL 2915211, at *2 (E.D.N.Y. 2009) ("'[A] case against the Police Department or any other non-suable agency of the City is really a suit against the City itself, which is a suable entity.'") (quoting *Morales v. N.Y.C. Police Dep't,* 1999 WL 169533, at *1 (S.D.N.Y. 1999)).

The Tolling Agreement, however, was entered into by Director Ryan "on behalf of the ADOC." (Dkt. # 74–1 at 3.) It was not entered into on behalf of the State of Arizona.[5] Thus, the State is not a party to that Agreement and it cannot be used against it

---

[4] Plaintiffs have served Defendants' counsel with a Rule 11 Motion for Sanctions based on Defendants' raising exhaustion as a basis for dismissal.

[5] The exhaustion provision also only applies to "Charles Ryan and the ADOC." (Dkt. # 74–1 at 3.)

in this lawsuit. Plaintiffs cannot feign ignorance. Their counsel drafted the Tolling Agreement and framed the parties as they did. *See Harford v. Nat'l Life & Cas. Ins. Co.*, 299 P.2d 635, 637 (Ariz. 1956) ("It is a fundamental principle of law that a contract will be construed most strongly against the drafter."). Furthermore, "Arizona law is clear that 'persons dealing with public officers are bound, at their peril, to know the extent and limits of their power and that no right can be acquired except that predicated upon authorized acts of such officers.'" *Kaman Aerospace v. Arizona Bd. of Regents*, 171 P.3d 599, 604, ¶ 20 (Ariz. App. 2007) (quoting *Pinal County v. Pomeroy,* 139 P.2d 451, 454–55 (Ariz. 1943)); *see also Fed. Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384 (1947) ("Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.").

Validity aside, the exhaustion provision is very narrow in scope, and does not bar Defendants from raising exhaustion as a defense to the claims raised in Plaintiffs' Complaint. The provision only served to waive exhaustion on claims that accrued during the life of the Tolling Agreement. Most of Plaintiffs' claims, however, accrued before it was entered into. The "paramount purpose" of interpreting a contract "is to determine the intent of the parties at the time the contract was made." *Duhame v. Navopache Elec. Co-op., Inc.*, 488 P.2d 184, 189 (Ariz. App. 1971). In doing so, a court must "adopt a construction of a contract which will harmonize all of its parts, and apparently conflicting parts must be reconciled, if possible, by any reasonable interpretation." *U.S. Insulation, Inc. v. Hilro Const. Co., Inc.*, 705 P.2d 490, 499 (Ariz. App. 1985). "An interpretation of a contract which renders it unreasonable should be avoided." *Custom Roofing Co., Inc. v. Transamerica Ins. Co.*, 584 P.2d 1187, 1189 (Ariz. App. 1978).

Defendants' interpretation is consistent with these principles. The purpose of the Tolling Agreement is stated explicitly therein: to allow ADC to investigate the allegations in the October 12, 2011 letter; to protect the interests of both parties during that time, and to give the parties an opportunity during that time to resolve the issues

without the need for litigation.  (Dkt. # 74–1 at 3.)  The Tolling Agreement had a duration of 90 days or upon termination, whichever was later. (*Id*.) Nothing in the Agreement indicates an intent to protect either parties' interests *before* it went into effect *or after* it was terminated.  The focus is the time in which the Agreement was in effect – from November 16, 2011 until February 17, 2012.  The statute of limitations provision – which was the heart of the Agreement – was to be tolled *only* for the life of the Agreement. (*Id*. at 3–4.)  It did not toll the statute of limitations indefinitely.

Plaintiffs' interpretation that the provision waived exhaustion with respect to *any and all* <u>claims</u> accrued at *any* time is not supported by either the plain language or the purpose of the Agreement.  First the exhaustion provision does not describe which *claims* it applies to.  The word "claims" is not even mentioned in that provision.  Plaintiffs focus on the phrase "in any civil lawsuit," but again that does not define which *claims* in the lawsuit it applies to – those that accrued before, during, and/or after the Tolling Agreement. Most of Plaintiffs' claims were laid out in the October 12, 2011 letter. (Compare Dkt. # 1 with Dkt. # 74–1 at 7–27.)  Thus, they had already accrued as of that time (before the Tolling Agreement went into effect).[6]  It is unreasonable to interpret the Agreement in such a way that ADC agreed to waive a defense to claims that had already accrued, which it was aware of, and were certain to be included in a lawsuit.  Plaintiffs' interpretation, taken to its logical end, would extend the exhaustion waiver in perpetuity, and it would apply to any lawsuit filed at any time, involving any claim of any type by any of the 221 inmates listed.  There would be no limitations.  That is absurd.  ADC entered the Agreement so that they could investigate the October 12, 2011 allegations, and in turn it agreed to waive any exhaustion defense with respect to new claims that accrued

_____

[6] Some claims raised in the Complaint, that were not mentioned in the letter, either allege an accrual date before the effective date of the Tolling Agreement or do not specify that they accrued during the life of the Agreement. These claims are also not saved by the exhaustion waiver. There are only two claims raised in the Complaint that allegedly (and specifically) accrued during the tolling period and therefore are not waived: (1) Plaintiff Swartz's claim (3a) that his medication was disrupted upon his transfer in December 2011 (Dkt. # 1, ¶ 44); and (2) Plaintiff Licci's claim (10) that she was denied an MRI until December 2011 (Dkt. # 1, ¶ 67).

1    during that investigation period.  That is precisely how Ms. Klausner interpreted it:  "We

2    are not intending *to suspend* the medical grievance process for the entire prison

3    population. We will be agreeable to doing *this* for an enumerated list of inmate."  (Ex. 1,

4    Att. 1: 11/8/11, 12:56 p.m., Email, emphasis added.)  This interpretation is also consistent

5    with Mr. Specter's concern about retaliation.  Inmates who identified themselves were not

6    required to exhaust their remedies during that period if a medical issue arose.

7           Plaintiffs' reliance on the word "irrevocably" in the exhaustion provision

8    and the survival provision (3h) – which states, "All material terms of this Agreement will

9    survive termination of this Agreement" – are also misplaced.  Defendants' agreement to

10   waive their exhaustion defense "irrevocably" simply meant that, once they terminated the

11   Agreement (either before or after the 90-day period), it did not undue their waiver of an

12   exhaustion defense to claims that accrued during the life of the Agreement (which was a

13   minimum of 90 days).  It was "irrevocabl[e]" in that sense only.  The survival provision

14   served the same purpose (and also covers the tolling provision).  Even if the Agreement

15   was terminated, Plaintiffs could invoke the exhaustion waiver in a subsequent lawsuit, *but

16   only* with respect to claims that accrued during the life of the Agreement.  Defendants did

17   not waive their right to raise exhaustion as a defense in this lawsuit.[7]

18   **III.    PLAINTIFFS' HEALTH CARE CLAIMS ARE MOOT**

19          Plaintiffs do not disagree that there is no longer a present controversy as to

20   which effective relief can be granted, the standard for determining whether a claim is

21   moot.  *See Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir.

22   2007).  Instead, they urge this Court to grant them an exemption to mootness – the

23   voluntary cessation doctrine.  (Response at 8, citing *Laidlaw*.)  "Generally, a case should

24   not be considered moot if the defendant voluntarily ceases the allegedly improper

25   behavior in response to a suit, but is free to return to it at any time."  *Native Vill. of*

26   _____

27          [7] Plaintiffs do not disagree that they failed to exhaust their administrative remedies.
     Nor do they provide any argument or evidence for their bald assertion that administrative
     remedies were not "available." (Response at 4 n.2.) Thus, if this Court agrees that there
28   was no waiver, it should find lack of exhaustion on those claims identified in the Motion.

1    *Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994).  Here, however, Defendants did

2    not voluntarily cease anything.  The Legislature *required* ADC to privatize the provision

3    of health care.  *See Log Cabin Republicans v. United States*, 658 F.3d 1162, 1167 (9th Cir.

4    2011) ("Voluntary cessation is different from a statutory amendment or repeal.").

5    Moreover, that statutory mandate was set in motion and approved by the Governor long

6    before Defendants even had notice of this lawsuit; it was not enacted in response to this

7    suit.  *See Native Vill. of Noatak*, 38 F.3d at 1511 (voluntary cessation exception did not

8    apply where legislature repealed challenged statute before lawsuit was initiated).

9            Furthermore, "[v]oluntary cessation does not moot a case or controversy

10   unless subsequent events make it absolutely clear that the allegedly wrongful behavior

11   could not reasonably be expected to recur."  *Parents Involved in Cmty. Sch. v. Seattle Sch.*

12   *Dist. No. 1*, 551 U.S. 701, 719 (2007) (internal quotations and citation omitted). The

13   Wexford Contract does just that.  Defendants' Motion sets forth the provisions in the

14   Contract that address Plaintiffs' request for prospective injunctive relief.  Notably,

15   Plaintiffs do not challenge the substance of the Contract, nor do they even assert that the

16   Contract does not do enough.  They simply argue that the "mere signing of a contract"

17   does not establish that the alleged violations cannot reasonably be expected to recur.  But

18   the cases they cite in support of that proposition are inapposite.   This is not a case

19   involving the post-litigation pronouncement of new policies that Defendants can opt to

20   ignore or rescind once this case is terminated.  *See Morrison v. Hall*, 261 F.3d 896, 900

21   n.5 (9th Cir. 2001); *Gluth v. Kangas*, 951 F.2d 1504, 1507 (9th Cir. 1991); *Casey v. Lewis*,

22   834 F.Supp. 1477, 1547 (D. Ariz. 1993). The Contract for the provision of health care is

23   required by statute.  Once that Contract expires, or if it is terminated before its expiration,

24   ADC cannot then continue providing health care.  It must re-contract with another private

25   entity to provide it.  For as long as the statute is on the books, ADC cannot personally

26   deliver health care to its inmates.  "[I]t is generally fair to say that when a change of

27   position is wrought by a statutory provision, the change is neither voluntary nor likely to

28   be resiled from at any time in the foreseeable future."  *Smith v. Univ. of Washington, Law*

                                                          12

*Sch.*, 233 F.3d 1188, 1194-95 (9th Cir. 2000).  That a future Legislature may repeal the statute is too speculative to invoke the voluntary cessation doctrine.  *See Log Cabin Republicans*, 658 F.3d at 1167 (speculation as to what a future Congress might do is not sufficient); *Smith*, 233 F.3d at 1195 ("There can be no real expectation that the alleged wrongs will recur now that the people of the state have prohibited them. Nor can we address Smith's fear of 'the *possibility* that the state's allegedly discriminatory policy will manifest itself under the new statute. Federal courts are not authorized to address such theoretical possibilities.'"); *Native Vill. of Noatak*, 38 F.3d at 1510 ("A statutory change … is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.").

Lastly, Plaintiffs' non-delegable duty argument misses the mark entirely. Mootness and duty are two distinct issues.  Whereas a non-delegable duty is a theory of liability, *Ancata v. Prison Health Services, Inc.*, 769 F.2d 700, 705–06 (11th Cir. 1985), "[m]ootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear a case that is moot, that is, where no actual or live controversy exists.'" *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala,* 166 F.3d 986, 989 (9th Cir.1999)). Mootness is "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."  *Id.*  Plaintiffs' complaint is directed only at Defendants Ryan and Pratt – *ADC* officials – and *ADC* policies, and they only seek to enjoin and modify those *ADC* policies.  (Dkt. # 1, ¶¶ 21–22, 151.)  As of July 1, 2012, however, Wexford is responsible for the provision of healthcare to ADC inmates, and the Wexford Contract implements policies that are consistent with Plaintiff's proposed "plan." Therefore, the allegations in the complaint no longer support a live controversy (or a request for prospective relief) between Plaintiffs and *ADC*.[8]

---

[8] Defendants do not subscribe to Plaintiffs' theory that Defendants can be held vicariously liable for Wexford's conduct under § 1983 based on a non-delegable duty. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) (holding that vicarious liability is inapplicable to § 1983 suits and that a plaintiff must plead that each government official defendant

## IV.   <u>REQUEST FOR STAY</u>

"The District Court has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997).  The circumstances underlying Defendants' request for a stay are not typical.[9]  Plaintiffs' October 12, 2011 demand letter set forth allegations pertaining to ADC's provision of health care. (Dkt. # 74–1 at 7–27.)  That demand letter recites alleged deficiencies *prior to* the filing of the complaint.  (Dkt. # 74–1 at 7.) These alleged deficiencies are the basis of Plaintiffs' complaint.  (Dkt. # 1.)  After the complaint was filed, however, Wexford took over health care services at ADC facilities.

Defendants' request for a stay is made in the event that this Court cannot conclude that the request for prospective relief is moot at this time.  Indeed, Wexford has only been providing healthcare services for a month. It is simply not possible to demonstrate a systemic failure in health care during that limited period.[10]  Staying the health care claims for six-to-nine months will allow two things to happen: (1) Wexford can perform under the contract; and (2) Plaintiffs can evaluate whether Wexford's performance is sufficient enough to discontinue this lawsuit.  If Plaintiffs believe that their health care is still deficient, they can continue with their existing claims or with modified ones.  There are several benefits to proceeding this way.  The best case scenario is that the

---

violated the constitution through his own individual actions); *Ammons v. Wash. Dep't of Soc. & Health Services*, 648 F.3d 1020, 1037 (9th Cir. 2011) ("§ 1983 liability cannot be established solely on a theory of *respondeat superior.*"); *Reynolds v. Giuliani*, 506 F.3d 183, 193–95 (2nd Cir. 2007) (rejecting plaintiff's non-delegable duty theory on § 1983 claim because doing so would "swallow[] *Monell* whole," "sidestep[] *Monell's* rigorous culpability and causation standards," and impose "*de facto respondeat superior* liability"). Counsel for Defendants have been unable to find any Ninth Circuit cases adopting Plaintiffs' position. Nevertheless, even if valid, Plaintiffs' complaint does not sufficiently allege ADC liability under a non-delegable duty theory. There is no mention of a non-delegable duty, Wexford, Wexford's policies, or Wexford's relationship with ADC, nor are there any allegations pertaining to causation or failed supervision.

[9] Nor is this a *Landis* stay situation.  *See, e.g.*, *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1109–1110 (9th Cir. 2005); *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962).

[10] Notably, Plaintiffs did not argue in their Response that Wexford's care has been deficient.

1   health care claims no longer need to be litigated, or they are at least narrowed. This
2   would spare the parties extensive discovery, briefing class certification and dispositive
3   motions, and trying those issues. It would also relieve this Court.

4         Plaintiffs' counter-arguments are not persuasive. First, any claim of
5   prejudice by Plaintiffs is not credible. They initially raised their allegations in October
6   2011; they urged Defendants to enter into a 90-day Tolling Agreement; that Tolling
7   Agreement ended in February 2012; and then Plaintiffs waited more than a month to file
8   their Complaint – 5 months after their initial allegations. Second, although Plaintiffs seek
9   "injunctive relief from ongoing violations," even they cannot say that there are currently
10  ongoing violations, because a new health care provider is in place. Thus, the potential for
11  harm, if any, is diminished significantly. Third, any expense in reviewing Wexford's
12  performance at the end of the stay will be nominal compared to what could be saved if its
13  performance is deemed satisfactory. Fourth, a stay would not mean that this case "sits on
14  the Court's docket." The stay only applies to the health care claims; Plaintiffs'
15  conditions-of-confinement claims would still move forward towards resolution. And
16  finally, unlike the stay request in *Melendres*, the stay request here is not "indefinite." *See*
17  *Melendres v. Maricopa County*, 2009 WL 2515618, at *2 (D. Ariz. 2009).

18        Plaintiffs' opposition to a stay is consistent with their counsel's reluctance
19  to allow ADC/Wexford the opportunity to cure the alleged individual deficiencies last fall.
20  If the motivation for this lawsuit is really injunctive relief, one would think that Plaintiffs
21  would be receptive to the idea of a stay in order to provide ADC with specific instances of
22  what they perceive to be a systemic failure to provide constitutionally mandated health
23  care and allow ADC/Wexford an opportunity to address those concerns. Their
24  unwillingness to do so raises serious questions as to the validity of their claims.

25  **V.   ACDL CLAIMS**

26        Defendants' Motion to Dismiss applies equally to Plaintiff ACDL.
27  Defendants do not dispute that ACDL is statutorily authorized to "pursue … legal …
28  remedies to ensure the protection of *individuals with mental illness*." 42 U.S.C.

§ 10805(a)(1)(B) (emphasis added).  But the phrase "individuals with mental illness" is explicitly defined to mean an individual "who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; *and* … who is an inpatient or resident in a facility rendering care or treatment."  42 U.S.C. § 10802(4)(A) & (B)(i)(I) (emphasis added).  The Complaint, however, fails to allege that it is bringing this action on behalf ADC inmates who meet that precise definition.  (Dkt. # 1, ¶¶ 9, 78–81, 99, 126–132, 146, 148.)

Furthermore, the statute requires ACDL to "exhaust in a timely manner all administrative remedies where appropriate." 42 U.S.C. § 10807(a).  ACDL should not be allowed to proceed with the lawsuit on those claims that were not exhausted by any of the Prisoner Plaintiffs. To do so would essentially circumvent the PLRA's exhaustion requirement.  The Tolling Agreement does not apply to ACDL, and ACDL does not argue that administrative remedies were not "available" to those who it represents, nor does it demonstrate that it exhausted administrative remedies. *See Wis. Coal. for Advocacy Inc. v. Wis. Dept. of Pub. Instruction*, 407 F.Supp.2d 988, 993 (W.D. Wis. 2005) (PAIMI claims failed where plaintiff failed to show that it exhausted administrative remedies or that it was unreasonable to do so); *Gonzalez v. Martinez*, 756 F.Supp. 1533, 1539 (S.D. Fla. 1991) (whether administrative remedies under PAIMI have been exhausted should be decided on a case-by-case basis).

## CONCLUSION

The relief requested in Defendants' Motion should be granted.

/ / /

/ / /

16

DATED this 16th day of August, 2012

STRUCK WIENEKE, & LOVE, P.L.C.

By /s/ Nicholas D. Acedo
　　Daniel P. Struck
　　Kathleen L. Wieneke
　　Timothy J. Bojanowski
　　Nicholas D. Acedo
　　Courtney R. Cloman
　　Ashlee B. Fletcher
　　STRUCK WIENEKE, & LOVE, P.L.C.
　　3100 West Ray Road, Suite 300
　　Chandler, Arizona  85226

　　Arizona Attorney General Thomas C. Horne
　　Office of the Attorney General
　　Michael E. Gottfried
　　Assistant Attorney General
　　1275 W. Washington Street
　　Phoenix, Arizona 85007-2926

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2012, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:　　ahardy@prisonlaw.com

Amy Fettig:　　afettig@npp-aclu.org

Caroline N. Mitchell:　cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:　ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:　DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

Daniel Joseph Pochoda:　dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

David Cyrus Fathi:　dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org

Donald Specter:　dspecter@prisonlaw.com

17

1    Ilham A. Hosseini:        ihosseini@jonesday.com; areyes@jonesday.com

2    James Anthony Ahlers: jahlers@perkinscoie.com; docketphx@perkinscoie.com;
                            jroe@perkinscoie.com

3
     James Duff Lyall:         jlyall@acluaz.org; gtorres@acluaz.org
4
     Jennifer Ann Alewelt: jalewelt@azdisabilitylaw.org; emyers@azdisabilitylaw.org;
5                          mlauritzen@azdisabilitylaw.org

6    Jill Louise Ripke:        jripke@perkinscoie.com; jgable@perkinscoie.com

7    John Howard Gray:         jhgray@perkinscoie.com; slawson@perkinscoie.com

8    Kelly Joyce Flood:        kflood@acluaz.org; gtorres@acluaz.org

9    Kirstin T. Eidenbach: keidenbach@perkinscoie.com; dfreouf@perkinscoie.com;
                           docketphx@perkinscoie.com
10
     Matthew Benjamin de Mee:mdumee@perkinscoie.com; cwendt@perkinscoie.com
11
     Michael Evan Gottfried: Michael.gottfried@azag.gov; colleen.jordan@azag.gov;
12                           lucy.rand@azag.gov

13   Sara Norman:              snorman@prisonlaw.com

14   Sophia Calderon:          scalderon@jonesday.com; lwong@jonesday.com

15   Thomas Dean Ryerson: tryerson@perkinscoie.com; docketphx@perkinscoie.com;
                          rboen@perkinscoie.com
16

17   Asim Varma:               avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org;
                               mlauritzen@azdisabilitylaw.org
18
     Sarah Rauh:               srauh@jonesday.com; treyes@jonesday.com
19
     David C. Kiernan:         dkiernan@jonesday.com; lwong@jonesday.com
20

21       I hereby certify that on this same date, I served the attached document by U.S.

22   Mail, postage prepaid, on the following, who is not a registered participant of the

23   CM/ECF System:

24       N/A

25                                          /s/ Nicholas D. Acedo

26
     2658229.1
27

28
                                        18

**EXHIBIT 1**

1    Arizona Attorney General Thomas C. Horne
     Office of the Attorney General
2    Michael E. Gottfried, Bar No. 010623
     Assistant Attorney General
3    1275 W. Washington Street
     Phoenix, Arizona 85007-2926
4    Telephone: (602) 542-4951
     Fax: (602) 542-7670
5    Michael.Gottfried@azag.gov

6    Daniel P. Struck, Bar No. 012377
     Kathleen L. Wieneke, Bar No. 011139
7    Timothy J. Bojanowski, Bar No. 22126
     Nicholas D. Acedo, Bar No. 021644
8    Courtney R. Cloman, Bar No. 023155
     Ashlee B. Fletcher, Bar No. 028874
9    STRUCK WIENEKE, & LOVE, P.L.C.
     3100 West Ray Road, Suite 300
10   Chandler, Arizona  85226
     Telephone:  (480) 420-1600
11   Fax:  (480) 420-1696
     dstruck@swlfirm.com
12   kwieneke@swlfirm.com
     tbojanowski@swlfirm.com
13   nacedo@swlfirm.com
     ccloman@swlfirm.com
14   afletcher@swlfirm.com

15   *Attorneys for Defendants*

16                   **UNITED STATES DISTRICT COURT**

17                        **DISTRICT OF ARIZONA**

18   Victor Parsons; Shawn Jensen; Stephen         NO. 2:12-cv-00601-NVW
     Swartz; Dustin Brislan; Sonia Rodriguez;
19   Christina Verduzco; Jackie Thomas; Jeremy     **DECLARATION OF KARYN**
     Smith; Robert Gamez; Maryanne Chisholm;       **KLAUSNER**
20   Desiree Licci; Joseph Hefner; Joshua Polson;
     and Charlotte Wells, on behalf of themselves
21   and all others similarly situated; and Arizona
     Center for Disability Law,
22
                                       Plaintiffs,
23
                 v.
24
25   Charles Ryan, Director, Arizona Department
     of Corrections; and Richard Pratt, Interim
26   Division Director, Division of Health Services,
     Arizona Department of Corrections, in their
27   official capacities,

28                                   Defendants.

1    I, **KARYN KLAUSNER**, declare under penalty of perjury that the

2    following information is true to the best of my information, knowledge, and belief:

3    1.    I was formerly general counsel for the Director of the Department of

4    Corrections ("Director") from March 30, 2009 until May 1, 2012. I have personal

5    knowledge of, and am competent to testify to, the matters set forth in this Declaration.

6    2.    In my capacity as general counsel, I acted solely as in-house counsel

7    for, and provided legal advice to, the Director.

8    3.    On or about October 12, 2011, I received a letter from Mr. Donald

9    Specter, the Director of the Prison Law Office. That letter lodged several serious

10   allegations of deficient health care at ADC, and recounted alleged injuries and

11   deteriorating health conditions of dozens of unidentified inmates in ADC custody.  The

12   letter stated that Mr. Specter was prepared to file a lawsuit, but also indicated that he was

13   open to negotiate a stipulated injunction so long as ADC entered into a tolling agreement.

14   4.    I contacted Mr. Specter to discuss the issues raised in his October 12,

15   2011 letter, and continued a dialogue with him by telephone, email, and letter.

16   5.    Attached as Attachment 1 is a true and correct copy of email

17   correspondence between myself and Mr. Specter regarding the tolling agreement.

18   6.    Attached as Attachment 2 is a true and correct copy of a letter dated

19   December 6, 2011, which I authored and sent to Mr. Specter.

20   7.    Attached as Attachment 3 is a true and correct copy of a letter dated

21   February 17, 2012, which I authored and sent to Mr. Specter.

22   8.    On or about November 8, 2011, I spoke with Mr. Specter by

23   telephone, and told him that I understood that the inmates he was representing had to

24   agree to provide their names and ADC number and that he was not at liberty to waive this

25   privilege without their consent, but that it was imperative that he provide a list of those

26   inmates who were allegedly in crisis and not receiving care as quickly as possible so that

27   ADC could investigate their claims and provide care to those who needed it.  I also

28   assured Mr. Specter that there would not be any retaliation against those inmates who did

2679457                                                          2

1   identify themselves, and reiterated that our goal was to provide adequate health care to

2   everyone.  Mr. Specter's response to the request was, *if I give you names, then you are*

3   *going to address the health care problems and then it jeopardizes our certifying a class*

4   (or words to that effect).  I was shocked by his response and documented it in an email to

5   Mr. Specter, dated November 10, 2011.  (See Attachment 1.)

6          I declare under penalty of perjury that the foregoing is true and correct.

7          EXECUTED this 16 day of August, 2012.

8

9

10  Karyn Klausner

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2679457                            3

**Attachment 1**

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Thursday, November 17, 2011 1:59 PM
**To:** KLAUSNER, KARYN
**Subject:** RE: Tolling Agreement and other matters

Karyn,

Thanks for sending the tolling agreement.  I'm glad that we were able to resolve that issue.

You previously mentioned that you would get back to me about the copying costs once the tolling agreement was done, so could you please let me know today or tomorrow whether your Department is willing to reduce the price per page or to let us bring in a copy service.

Also, we have received some responses to our letters asking whether prisoners in need of health care want us to disclose their names to you.  I attach the names of those prisoners and a very short description of at least one of the health care problems of each prisoner.  This description is not intended to be all inclusive of the health care needs of these prisoners.

In addition, I am attaching a document signed by numerous prisoners requesting that we inform you that they have serious health care needs that are not being addressed.  We haven't interviewed or received information from most, if not all, of this last group.

We expect to continue to receive more responses permitting disclosure.  Would you like us to forward those names to you as we receive them or on more regular basis such as once a week?

Thanks

Don

**From:** KLAUSNER, KARYN [mailto:KKLAUSNER@azcorrections.gov]
**Sent:** Wednesday, November 16, 2011 12:51 PM
**To:** 'Don Specter'
**Subject:** RE: Tolling Agreement and other matters

Mr. Specter:

1

Tolling agreement attached.

Regards,
Karyn Klausner

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 16, 2011 11:01 AM
**To:** KLAUSNER, KARYN
**Subject:** FW: Tolling Agreement and other matters

Karyn,

Please send the signed tolling agreement to me today.

Thanks

Don

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Monday, November 14, 2011 5:47 PM
**To:** arizona@prisonlaw.com
**Subject:** FW: Tolling Agreement and other matters

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Monday, November 14, 2011 3:28 PM
**To:** 'KLAUSNER, KARYN'
**Subject:** RE: Tolling Agreement and other matters

Karen,

Attached is the list.  I look forward to receiving the signed agreement.

Thanks

Don

**From:** KLAUSNER, KARYN [mailto:KKLAUSNER@azcorrections.gov]
**Sent:** Monday, November 14, 2011 7:09 AM
**To:** 'Don Specter'
**Subject:** RE: Tolling Agreement and other matters

When I receive your list, you will receive the tolling agreement.

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Sunday, November 13, 2011 12:56 PM
**To:** KLAUSNER, KARYN
**Subject:** Re: Tolling Agreement and other matters

Dear Karyn,

It is true that your assessment of our intentions in incorrect.  The reason we are undertaking this project is to ensure that these and all other prisoners who need it receive appropriate health care and live under conditions consistent with the Constitution.

We remain willing to provide you a list of names of prisoners that will be covered by the agreement. I will be ready to send that list to you tomorrow.  Just so that we are perfectly clear, please confirm at your earliest convenience tomorrow that upon receipt of that list your client will immediately sign and return the tolling agreement that I have already signed and sent you.

Thank you.

Don

On Thu, Nov 10, 2011 at 3:41 PM, KLAUSNER, KARYN <KKLAUSNER@azcorrections.gov> wrote:

Mr. Specter:

As you will see from below, (though I suspect you are already aware), Mr. Pochoda inadvertently cc'd me on his comments to you regarding the discussion you and I had about the tolling agreement and providing a list of inmates to us.  I was not aware that Mr. Pochoda did not intend his email to be sent my way until I read it; it became patently clear to me that while I operate to work with you in good faith, you have an additional agenda in process.  I am well aware that Mr. Pochoda and you are in a collaborative relationship, but it is hard not to feel that whatever list you do provide is simply to placate me.

Having said that, we are still willing to sign the tolling agreement upon receipt of the list of inmates it is intended to cover.  Mr. Pochoda's "outside" involvement, notwithstanding, I am awaiting your information.  Mr. Pochoda has requested numerous inmate visits for several attorneys for the Eyman complex on November 22.  We will set those up once I have received the tolling agreement and list from you.

I am deeply concerned that in our conversation you expressed a fear that if you provided names to me it might mean ADC would address these medical issues with individual inmates, which you believe might interfere with your ability to certify a class of inmates.  As I stated, there is no question that we will address any and all individual problems brought to our attention.  ADC has a responsibility to provide constitutionally appropriate care.  I am perplexed that you might know of an inmate who you believe is suffering and hesitate to identify him for us because you have concerns about structuring future potential litigation; however, I will continue to proceed as I have in our discussions, and remain hopeful that my assessment proves incorrect.

As I stated, upon receipt of the list of inmates and the agreement along with the understanding that it is effective for 90 days from the date of signing, I will let you know if we can reduce our copying costs.

I assume I will receive the agreed upon documents from you shortly.

Regards,

Karyn Klausner

General Counsel

Arizona Department of Corrections

---

**From:** Daniel Pochoda [mailto:dpochoda@acluaz.org]
**Sent:** Tuesday, November 08, 2011 5:22 PM
**To:** Don Specter
**Cc:** KLAUSNER, KARYN
**Subject:** Re: Tolling Agreement and other matters

A good 'quo'... thanks. Good to get accommodation for at least records of any forwarded & avoid turning over names with ADC having direct access with us still on outside. Dan

On Nov 8, 2011, at 5:08 PM, "Don Specter" <dspecter@prisonlaw.com> wrote:

> Karen,

> During our telephone conversation just now we agreed that the exhaustion provision of the tolling agreement would apply to a set of prisoners that I will provide to you.  I informed you that this list could include all the prisoners we have interviewed and others that we have information about, and you agreed that this would be acceptable.  Once you have that list, you indicated that Mr. Ryan would sign the agreement.  Please confirm that this is your understanding of our agreement, and we will provide the list to you shortly.

> You also agreed to discuss with Mr. Ryan a cost effective method for us to copy medical records and provide me with a response shortly.

> Thank you.

> Don

**From:** KLAUSNER, KARYN [mailto:KKLAUSNER@azcorrections.gov]
**Sent:** Tuesday, November 08, 2011 12:56 PM
**To:** 'Don Specter'
**Subject:** RE: Tolling Agreement and other matters

Don:

We are not intending to suspend the medical grievance process for the entire prison population.  We will be agreeable to doing this for an enumerated list of inmates--it seems that you have some specific inmates in mind for this matter.  Please advise.

Karyn

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Tuesday, November 08, 2011 1:33 PM
**To:** KLAUSNER, KARYN
**Subject:** RE: Tolling Agreement and other matters

Karen,

Exactly what more information do you need about the copying.

Don

**From:** KLAUSNER, KARYN [mailto:KKLAUSNER@azcorrections.gov]
**Sent:** Tuesday, November 08, 2011 12:09 PM
**To:** 'Don Specter'
**Subject:** RE: Tolling Agreement and other matters

Don:

I am acquainted with how civil litigation works.  Having said that, I cannot make any offers on copying without more information.  Also, we have no objection to the tolling agreement, but cannot agree to the language regarding "exhaustion of remedies" as to all ADC inmates.  If we have a list of who you represent then we will attach that as an addendum to the agreement so we are all on the same page.  Let me know.

Karyn

---

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Tuesday, November 08, 2011 1:06 PM
**To:** KLAUSNER, KARYN
**Subject:** RE: Tolling Agreement and other matters

Karyn,

Thanks.  I look forward to receiving the signed tolling agreement by Thursday.

It's difficult for me to give you a precise or conclusive number of files we will need because we are not sure how you are going to respond to our substantive demands and won't know until you get back to us in three months.  At this time, we would like to start with about 20-25 files.  It seem like the most efficient method for your purposes would be to allow us or a copy service to scan the records, which would free your employees from that task.   Also, as I'm sure you're aware, in the event that we are successful in this litigation, the State would be obligated to reimburse us for the costs so it seems in the best interests of all concerned to do this in the most economical way possible.  In any event, we would like to get this process started, so please get back to me by the end of the week.

Don

---

**From:** KLAUSNER, KARYN [mailto:KKLAUSNER@azcorrections.gov]
**Sent:** Monday, November 07, 2011 3:21 PM
**To:** 'Don Specter'
**Subject:** RE: Tolling Agreement and other matters

Don:

Thank you for the quick response.  I will convey this to the Director for his review.  It would certainly help me to know the amount of documents you will be requesting.  Even a list of inmates would be helpful in that regard.  I need to be able to communicate what is anticipated in order to have the Director make a further commitment on any copying fees.  Thank you for amending the 90 day frame of reference on the tolling agreement to the signing date.  I anticipate I will have this back to you no later than Thursday.

Regards,

Karyn

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Monday, November 07, 2011 3:19 PM
**To:** KLAUSNER, KARYN
**Subject:** RE: Tolling Agreement and other matters

Dear Karyn,

I have modified the Tolling Agreement so that it is effective for 90 days from the date of signing, which I assume will occur very shortly.  The only modifications to the Agreement that I made were in paragraphs 3 and 5.  Please have Mr. Ryan sign the attached agreement and return it to me by email and mail.

We understand your need for more detailed information, and as I explained to you in Thursday's email we are engaged in the time consuming process of obtaining releases from the prisoners.  We will be able to provide you with more information if we are able to review the records of these prisoners in a timely manner.  As I explained before, the cost of reviewing these files is prohibitive.  Since you seem unable to resolve the cost per page issue, we propose either that your department scan  the records instead of copying them and then send us a disk, or that we be provided access to review the records and we will bring our own portable scanner to scan the records that we need.

Thank you for considering these proposals and for agreeing to the tolling agreement.

Don

**From:** KLAUSNER, KARYN [mailto:KKLAUSNER@azcorrections.gov]
**Sent:** Monday, November 07, 2011 10:39 AM
**To:** 'Don Specter'
**Subject:** RE: Tolling Agreement and other matters

Mr. Specter:

I have shared the agreement with Director Ryan.  We are amenable to signing it if the 90 extension dates from the date of signing, and not from the original date of your letter.  If that is agreeable, we will sign it and return it.  Please understand that we need to have more detailed information about the allegations in your letter before we can agree to any other requests from your end.  I look forward to hearing from you soon.

Regards,

Karyn Klausner

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Thursday, November 03, 2011 1:53 PM
**To:** KLAUSNER, KARYN
**Subject:** Tolling Agreement and other matters

Dear Karyn,

Thank you for your call last week in response to our letter of October 12, 2011.  During that call you stated that you needed 90 days to investigate and respond to the claims made in our letter and indicated that your clients would be willing to enter into a tolling agreement.  Our proposed tolling agreement is attached for your review.  We look forward to learning whether you find it acceptable.

You also requested that we disclose the names of prisoners whose cases we described in the October 12 letter so that you could ensure that they receive treatment.

I informed you that because of our clients' concern about retaliation we would have to contact them individually to determine whether they want us to disclose to you the information that they provided to us.  We are in the process of doing that and will provide you with a list of names and a very brief description of the problem for each prisoners who authorizes such disclosure.  That list may also include other prisoners who have serious health care problems, but whose cases we did not use in the letter.

We also discussed the issue of copying medical and other records.  I requested that your department either reduce the charge per page to a reasonable amount or permit us to send in a copy service to copy the records.  You stated that you would discuss that issue with your clients and get back to me.  We would appreciate a prompt response as we are ready to inspect and copy records.  As I mentioned, we have releases from all the prisoners whose records we would like to inspect and/or copy.

Thank you in advance for your response to these issues.  I look forward to hearing from you.


Don

**Attachment 2**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR

December 6, 2011

Don Specter
Prison Law Office
Sent Via E-Mail

Mr. Specter:

The purpose of this correspondence is to address a number of issues with you. You have asked me to consider either a reduction in copying fees or to allow a copying service to come onto the prison grounds to copy records in order to provide a cost-savings to your organization. At this time, we intend to provide all requested records accompanied by a proper authorization from the inmate, at our standard rate of .50/page. Based on the "history" of your representations thus far, I see no basis to negotiate these costs.

In early October, we spoke by phone. You began the conversation by alleging that the Arizona Department of Corrections (ADC), was not providing adequate medical or mental health care to inmates. I requested that you provide me with written information to include as much detail as possible in order to start a meaningful dialogue. You were certain to let me know of your litigation success in California and of the risk ADC would be taking if we would no sit down and negotiate with your group. What has become obvious since that discussion, is that while ADC remains transparent, your organization is operating with a thinly-veiled agenda to use ADC's time and resources in effort to find out whether you have sufficient grounds to establish a class action lawsuit. Your actions to this point belie little evidence of good faith.

On October 12, 2011 a number of days after this initial call, you sent a 21 page correspondence that can only be described as a collection of unsubstantiated anecdotal allegations, voluminous references to case law, and devoid of any specific information that would allow ADC to legitimately respond to matters causing medical or mental health distress to any particular inmates. On October 31, 2011 I responded in writing that we could not meaningfully address the concerns without more specificity. We then spoke on the phone and I advised that ADC would sign the tolling agreement, but not before we received a list of inmates you intended to have covered by the agreement. You were very reluctant to provide this information, suggesting that I would use it to address individual inmate issues and thereby interfere in some manner with your ability to certify a class action. Ultimately you reluctantly agree to provide a list of inmates and I agreed to have the tolling agreement signed and returned to you upon receipt of that list.

On November 3, 2011 you sent an email that in part stated:

*I informed you that because of our clients' concern about retaliation we would have to contact them individually to determine whether they want us to disclose to you the information that they provided to us. We are in the process of doing that and will provide you with a list of names and a very brief description of the problem for each prisoner who authorizes such disclosure. That list may also include other prisoners who have serious health care problems, but whose cases we did not use in the letter.*

On November 14, 2011 you sent a list of 221 inmates to be covered by the tolling agreement; there was no evidence that these inmates had either spoken to you or consented to inclusion on this list. Nevertheless, the Director signed the agreement and it was emailed to you on November 16, 2011.

Prison Law Office
Page 2

On November 23, 2011 you then provided a new list that contained approximately 45 named inmates (5 of whom on not part of the larger list), with a brief description of the allegations regarding medical and/or mental health care that was lacking.   This list was not accompanied by any authorizations from the inmates named, but you did represent their consent to be identified and to list the specific complaints. You also sent along a handwritten list with 215 inmate names, numbers and complaints, but advised you could not include these inmates with complaints you could confirm.  On November 28, 2011 you sent a new list containing the names of 12 inmates who did provide authorizations and you have requested copies of each of their medical records.  Of the 12 inmates listed, only 3 are contained in the list of 45 you provided.

It has come to my attention that you also sent out two mass mailings to inmates; one on September 7, 2011 to prepare for your group visitation that was accommodated on September 20, 2011 by ADC.  A second mass mailing dated November, 2011 (the specific date was left off), was sent out by your office which can only be characterized as further demonstration of bad faith and client shopping on the part of your organization.  In this correspondence which includes a "survey" for the inmate, you advise that you are conducting an "investigation," and go on to state that if "[ADC] did not fix the problems, [PLO along with the ACLU] would pursue a lawsuit."  You also state that "in response, ADC's General Counsel, Karyn Klausner, has asked us for the names and ADC numbers of prisoners who currently have medical and/or mental health problems that needs attention."

It is clear from this chain of events that you and the two major law firms along with the thirteen other lawyers listed in your 21 page correspondence to ADC are posturing to obtain a certified class of inmates to represent in a lawsuit against ADC.  You are engaging in direct solicitation, notwithstanding an attempt to obscure this by referring to your process as an "investigation."  You have used my name specifically and in such a way to suggest that I would seek to retaliate in some manner upon learning the identities of the inmates in need of assistance.  I find your tactics wholly unprofessional and believe that my efforts to operate in good faith are being represented improperly to these inmates.

I have recommended that we continue to honor the tolling agreement for now.  I remain hopeful that you will recognize our concerns about what has occurred thus far, and will strive to move forward at this point in a good faith effort at constructive dialog as opposed to legal posturing.  We continue to remain open to an on-going dialogue, but not to intimidating nor questionable tactics designed to enhance a discovery process.

We are in the process of totaling the number of pages of records requested to date in order to give you an estimate of the associated costs.  I will continue to request that any special group visitations be arranged through my office in order that I may consult with staff about any security and/or safety concerns at the prison complexes.

Sincerely,
Karyn Klausner
General Counsel

CC: Charles L. Ryan, Director
     File

**Attachment 3**



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



**JANICE K. BREWER**
GOVERNOR

**CHARLES L. RYAN**
DIRECTOR

February 17, 2012

Donald Specter, Executive Director
Prison Law Office
General Delivery
San Quentin, CA  94964

Sent Via E-Mail
dspecter@prisonlaw.com

RE:  Tolling Agreement and Inmate Health Care

Dear Mr. Specter:

The Arizona Department of Corrections (ADC) has decided to terminate participation in the tolling agreement from November 17, 2011 and does not wish to renew this agreement with your office.  We have looked closely at the issues raised in your October 21, 2011 letter and have reviewed all of the inmate health care concerns based upon the lists that you have been providing to our General Counsel, Karyn Klausner.

ADC acknowledges that there have been some delays in delivery of health care services to inmates in certain instances.  There are a number of reasons for these delays, but nevertheless ADC is working with the Health Services Division toward a solution to the problems identified. There has not been evidence that delays have caused undue negative health consequences to the inmates who have had to wait for consultations.   The health care staff has done an admirable job of triaging medical and mental health needs of individual inmates and urgent and emergent care has been appropriately and promptly delivered.

We have identified some factors that influence delays in individual cases:  human error, loss of contracts due to change in rates permitted for private providers to charge for treating inmates, and replacing and maintaining staffing levels due to the mandated privatization of health care for the entire prison system.  Even with these challenges, however, ADC stands by its internal auditing of the concerns brought to our attention, and have concluded that there is not a system-wide deficit in the delivery of health care.  Staff turnover can certainly contribute to issues of communication regarding treatment needed in individual cases, but ADC has continued to address these changes to prevent important health care needs from being overlooked.

In looking at the community standard for health care, especially in the area of specialty consultations, ADC has not systemically failed in delivering necessary services to our inmates. While there have been some delays, there is no evidence deliberate indifference by ADC or any

Donald Specter
February 17, 2012
Page 2 of 2

member of its health care services staff.  Our internal review does not support the wholesale allegations you have made in your original correspondence from October.

What has become abundantly clear is that your main focus has been to simply gather Plaintiffs for a lawsuit you are set on filing.  We have numerous pieces of correspondence provided by inmates either as attached to motions they have filed, or in at least one instance by an inmate who did not appreciate being visited in connection with this matter, that demonstrates wholesale direct solicitation—an ethically questionable practice.

You have used ADC time, staff, security and resources to actively solicit clients who did not initially contact you.  You have improperly insinuated that there could be retaliation for inmates providing information to ADC and have truly failed to demonstrate that you are acting out of any real concern for individual inmates, but more to promote your public forum.

ADC will also be terminating visitation in the manner you have previously been afforded as of today.  You may have legal visits on days set for these visits as available.  You may contact your clients by mail at any time, and may have reasonable phone access when arranged as per ADC policy.  See Department Orders, 902, and 911 for further detailed requirements.  We have permitted an ongoing exception to visitation during the term of the tolling agreement but we will not continue special visitation arrangements any further.

Finally, we would again ask for you to provide us a detailed written response that suggests what you have found to be specifically lacking within the policies and application of the policies regarding the health care of ADC inmates.  We request that you specifically identify what you have found to be a systemic issue that has not been properly addressed, or where there has been any evidence of systemic deliberate indifference.

If the Prison Law Office, the ACLU, Jones Day, and/or Perkins Coie have actually come to some definitive results and have concrete suggestions for improvement, then ADC is certainly open to meaningful dialogue.  If you have only been focused on collecting clients for a lawsuit then you have had ample time to do so.  We look forward to any constructive input you may have, and remain willing to hear where you may have reached different conclusions from our own.

Sincerely,

Charles L. Ryan
Director

cc:  Jeff Hood, Deputy Director
     Karyn Klausner, General Counsel
     Richard Pratt, Interim Division Director, Health Services
     Michael Gottfried, Section Chief, Liability Management Section, Arizona Attorney
     General's Office