# Exhibit A



PRISON LAW OFFICE

General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Susan Christian
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

October 12, 2011

Mr. Charles L. Ryan, Director
Ms. Karyn Klausner, General Counsel
Arizona Department of Corrections
1601 W. Jefferson
Phoenix, AZ 85007

Dear Mr. Ryan and Ms. Klausner:

We write to inform you of dangerous and injurious conditions we have found in Arizona's state prisons and to demand that you remedy them. The denial of adequate medical and mental health care to Arizona prisoners is chronic, systemic, and clearly violates federal law, as set forth below.

In coming to these conclusions, we have interviewed and corresponded with dozens of prisoners at the Eyman, Florence, Tucson, Lewis, and Perryville complexes and have reviewed thousands of pages of documents, including public reports and investigations, prisoner grievances and responses, court filings, media accounts, ADC policies and official documents, and staffing and staff complaint information you have provided in response to our Public Records Act request.

As you know, Arizona has already spent many years under federal court supervision in *Casey v. Lewis*, filed in 1990 by the ACLU National Prison Project and the ACLU of Arizona. After extensive pretrial litigation and a lengthy trial, the court found violations in the areas of medical, mental health, and dental care, and the accommodation of prisoners with disabilities, and issued remedial orders. *Casey v. Lewis*, 834 F. Supp. 1477 (D. Ariz. 1993) (medical, mental health, and dental care); 834 F. Supp. 1569 (D. Ariz. 1993) (prisoners with disabilities). While we are ready to fully litigate this matter in federal court once more, we believe that it would be in the best interests of all parties at this time to resolve these violations through a stipulated injunction.

## 1.    Arizona deprives its prisoners of constitutionally adequate mental health care

Arizona has an obligation under the Eighth Amendment to the U.S. Constitution to provide for prisoners' basic human needs, including adequate mental health care. *Doty v.*

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Honorable John Burton • Felecia Gaston • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

*Cnty. of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994); *Hoptowit v. Ray*, 682 F.2d 1237 1253 (9th Cir. 1982); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995); *H.B. v. Lewis*, 803 F.Supp. 246, 248-249 (D. Ariz. 1992). A failure to meet this obligation "transgresses the substantive limits on state action set by the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) *quoting DeShaney v. Winnebago County Dep't of Soc. Svcs.*, 489 U.S. 189, 199-200 (1989).

As the evidence set forth below demonstrates, Arizona's prisons fail to meet this obligation: the mental health care delivery system is profoundly inadequate, with serious deficiencies in diagnosis, staffing, medication delivery, therapeutic treatment, and provisions to address self-harming behavior. These systemic failures result in significant injury and the unnecessary and wanton infliction of pain, in violation of the Eighth Amendment. *See McGuckin v. Smith*, 974 F.2d 1050, 1059-1060 (9th Cir. 1992). The injuries include an alarming suicide rate, barbaric conditions on suicide watch, exacerbated mental illness from extreme isolation and sensory deprivation conditions, severe reactions from inadequate and frequently interrupted medication delivery, and escalating symptoms of mental illness due to the lack of therapeutic treatment, as described in more detail below.

Arizona prison officials have long been informed of these serious deficiencies and the harm they have caused to prisoners through numerous inmate grievances and health needs requests, reports from outside advocates, and complaints from your own personnel, including detailed and specific concerns raised by a Deputy Medical Director for Psychiatry and a former Deputy Warden. *See Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (deliberate indifference to serious health care needs violates the Eighth Amendment).

### (a)   ADC lacks sufficient staff to provide constitutionally adequate health care

Prison facilities must have adequate staffing levels to deliver medical and mental health services to prisoners. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *5-12 (N.D. Cal. 2005); *Madrid v. Gomez*, 889 F.Supp. 1146, 1257 (N.D. Cal. 1995); *see also French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985). Furthermore, prison systems must have medical care performed by qualified personnel. *Toussaint v. McCarthy*, 801 F.2d 1080, 1112 (9th Cir. 1986); *Plata*, 2005 WL 2932253, at *5; *see also Casey v. Lewis*, 834 F.Supp.1477, 1545 (D. Ariz. 1993).

ADC's mental health treatment staffing is utterly inadequate. In 2009, the Eyman complex had only one half-time psychiatrist for more than one thousand patients on psychotropic medications, resulting in a situation in which, according to the Deputy Medical Director for Psychiatry, inmates "are not receiving a reasonable level of

psychiatric care. We are out of compliance with our own policies regarding minimum frequency of contact with a provider, as well as community standards for adequate care. The lack of treatment represents an escalating danger to the community, the staff and the inmates. . . . It is foreseeable that such untreated mental illness will present a danger to the community, the staff and the inmates." The situation now is even worse: there is not a single psychiatrist for the Eyman complex. Other mental health staffing at Eyman – psychologists and psychiatric nurses – continues to be inadequate as well.

This dire situation is not unique to Eyman. Earlier this year, the sole psychiatrist at Perryville reported the mental health staffing there as "abysmal," with approximately 1300 inmates on psychiatric medications, some of whom "have not been seen for 6 months or longer." The psychiatrist was thus forced to "renew meds for dozens of people per week without getting to see them because there is not enough time." In addition to the single psychiatrist, there were only three psychologists, four psychology associates, three PRNs, and one recreational therapist, for 1300 mentally ill prisoners – clearly inadequate numbers to provide constitutional care.

The grossly inadequate staffing makes it impossible for clinicians to appropriately diagnose, treat, and follow up with psychiatric patients.

- Prisoners on powerful psychotropic medications have no avenue to discuss adverse side effects or inefficacy, and are forced to suffer depression, anxiety, psychosis, and other damaging symptoms unnecessarily (see Section 1(b), below).

- Other prisoners suffer through the lack of meaningful therapeutic interventions, including at times of high risk, such as when they are suicidal or following sexual assaults (see Sections 1(c) and 1(d), below).

- Staffing is so inadequate, some prisoners are driven to harm themselves in an attempt to be seen, although as noted above and discussed in Section 1(c), many prisoners on suicide watch are deprived of meaningful clinical interaction.

Pharmacy staffing is also inadequate, contributing to the frequent disruption of medication delivery, as described in more detail in the following section.

### (b) ADC denies mentally ill prisoners access to necessary psychotropic medications and medication management

Arizona systematically fails to prescribe, provide, and manage necessary psychotropic medications to mentally ill prisoners, in violation of the Eighth Amendment. *See Steele v. Shah*, 87 F.3d 1266, 1269-70 (11th Cir. 1996) (deliberate

indifference can be found in abrupt and unsupported discontinuation of medications); *Gates v. Cook*, 376 F.3d 323, 342-43 (5th Cir. 2004) (monitoring and assessment of psychotropic medication levels required); *Wellman v. Faulkner*, 715 F.2d 269, 272-73 (7th Cir. 1983) (psychiatrist must supervise psychotropic medication); *Ginest v. Board of Cnty. Comm'rs of Carbon Cnty.*, 222 F. Supp. 2d 1190, 1201 (D. Wyo. 2004) (duty of prison officials to monitor psychotropic medications for efficacy and side effects); *Page v. Norvell*, 186 F. Supp. 2d 1134, 1139 (D. Ore. 2000) (denial of medical review could constitute deliberate indifference); *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 & n.10, 1309-12 (E.D. Cal. 1995) (psychotropic medications must be appropriately supervised and periodically evaluated).

Tellingly, ADC's expenditures on mental health medications declined from $2,244,594 in FY 2009 to $1,553,878 in FY 2010, despite a stable prison population and skyrocketing prescription costs. The massive drop in cost is reflected in the deprivations that harm mental health patients in Arizona prisons.

Arizona prisoners are denied appropriate access to medication in the following ways:

- Prisoners entering the system or transferring from one prison to another face abrupt discontinuation of their psychotropic medications for weeks or months, until they are eventually seen by a new provider.

- Prisoners are deprived of psychotropic medications that work, such as Seroquel and Wellbutrin, and instead are given ineffective medications or nothing at all.

- There is little or no follow-up to determine whether the prescribed medications are having the desired effects or to ensure that the dosage is adjusted properly: prisoners on psychotropic medications routinely see a psychiatrist only once or twice a year, for five minutes, and their questions and concerns about medications go unanswered.

- Prisoners regularly suffer through skipped psychotropic medication deliveries. Some prisoners are deprived of their daily medications once or twice a week; others face long periods -- weeks or months – of unexplained and dangerous deprivation of their prescribed medications. A variety of side effects, some dangerous, occur as a result of abruptly stopping the use of antipsychotic and antidepressant medications.

In addition, prisoners who are on psychotropic medications that increase heat sensitivity are exposed to levels of heat that pose potentially lethal risks. *See Graves v. Arpaio*, 623 F.3d 1043, 1049-50 (9th Cir. 2010) (affirming district court order that prisoners taking psychotropic medications be housed in areas where the temperature does not exceed 85 degrees Fahrenheit).

Prisoners are also forcibly medicated with no due process, a violation of their rights under the Arizona Constitution and the Fourteenth Amendment to the U.S. Constitution. *See Large v. Superior Court*, 148 Ariz. 229, 714 P.2d 399, 408-09 (1986); *Washington v. Harper*, 494 U.S. 210, 227, 233-36 (1990); *Maul v. Constan*, 928 F.2d 784, 785 (7th Cir. 1991); *Bee v. Greaves*, 910 F.2d 686, 687-99 (10th Cir. 1990); *U.S. v. Gonzalez-Aguilar*, 446 F.Supp.2d 1099, 1101-1102 (D. Ariz. 1996).

(c) **Mentally ill prisoners are denied medically necessary therapeutic treatment**

Arizona prisoners are denied necessary therapeutic treatment. Seriously mentally ill prisoners have minimal, if any, meaningful interactions with mental health clinicians; many describe five- or ten-minute interactions once or twice a year, in which they are asked only whether their medications are working, but during which no attention is paid to any questions or concerns. Prisoners experience similar deprivations even when placed on suicide watch, a time when mentally ill people require careful supervision and treatment, including counseling by trained clinicians. One mentally ill prisoner received no mental health attention after several sexual assaults. Others explained that the little care they did receive focused entirely on psychotropic medications. As a result, clinicians do not make informed decisions about care. "[W]hen the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference." *Adams v. Poag*, 61 F.3d 1537, 1544 (11th Cir. 1995); *see also Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996) (denying summary judgment to prison doctor who had been told the plaintiff received psychiatric medication in part because of suicide risk, but discontinued it based on a cursory interview without reviewing medical records); *King v. Frank*, 328 F. Supp. 2d 940, 947-48 (W.D. Wis. 2004) (failure to provide "mental health programming" and inadequate clinical staff violates the Eighth Amendment).

Further, since they possess at most a glancing familiarity with their patients, clinicians are unable to weigh in meaningfully on crucial custodial decisions that impact the safety and health of prisoners, such as confinement in isolation units such as SMU 1 and Browning. Such failures amount to constitutional violations. *Madrid v. Gomez*, 889 F. Supp. 1146, 1221 (N.D. Cal. 1995) (lack of input by mental health staff concerning

housing decisions even where they impact mental health supports deliberate indifference finding).

### (d)   Prisoners who are suicidal or self-harming are treated with brutality and deprived of basic rights and constitutional care

Arizona's responses to prisoners who exhibit self-harming behavior or express self-harming intentions are grossly inadequate. From July 2010 to June 2011, there were 14 suicides in the ADC, out of a total population of approximately 40,000. That is a rate of 35 per 100,000. According to the U.S. Department of Justice's Bureau of Justice Statistics, the average suicide rate for U.S. state prisons from 2005-2007 was 16.67 per 100,000. Arizona's prison suicide rate is thus more than double the national average. In fact, as recently as a week ago, a prisoner confined to SMU 1 committed suicide.

One reason for this shockingly high suicide rate is that prisoners housed under conditions of severe isolation are more likely to exhibit self-harming behavior, and Arizona fails to exclude serious mentally ill prisoners from its supermax isolation units, as discussed in the following section. Prisoners describe feelings of hopelessness, severe depression, and the desire to harm themselves as a result of their extremely harsh living conditions.

Another factor in the unusually high suicide rate is Arizona's immediate response to self-harming behavior or expression, which is to confine prisoners to abusive and dangerously punitive suicide watch facilities with no meaningful treatment, in violation of the Eighth Amendment. *See Buckley v. Rogerson,* 113 F.3d 1125, 1127-1130 (8th Cir. 1998) (deprivation of clothing, blankets, bed, and mattress in segregation); *Young v. City of Augusta, GA through DeVaney*, 59 F.3d 1160, 1164, 1173 (11th Cir. 1995) (plaintiff held in isolation naked and chained to a bed among filth and excrement); *Scott v. Plante*, 641 F.2d 117, 128 (3d Cir. 1981), *vacated*, 458 U.S. 1101 (1982), *on remand*, 691 F.2d 634, 637 (3d Cir. 1982); *McCray v. Burrell*, 516 F.2d 357, 369 (4th Cir. 1975) (en banc); *Tillery v. Owens*, 719 F. Supp. 1256, 1303-04 (W.D. Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990) (filthy, infested, unfurnished psychiatric cells). Suicide watch in Arizona prisons, which can last for many weeks, includes the following conditions:

- Suicide watch cells are often filthy and reek of urine and feces. One prisoner was placed on suicide watch in a cell with a toilet that did not flush; after three days, the stench was revolting.

- Prisoners are deprived of hygiene and cleaning materials and must live in their own filth and their filthy surroundings with no possibility of improvement.

- Suicide watch cells are cold, and prisoners are provided only inadequate suicide smocks and no bedding; as a result, they shiver without stopping.

- Many prisoners are deprived of mattresses and must sleep on bare steel bed frames.

- Prisoners on suicide watch have minimal or no interaction with treatment staff. They are provided no meaningful counseling to address the factors that made them want to harm themselves.

- Some prisoners describe being housed with bright lights on for 24 hours a day.

- Many complain of abusive treatment from custody staff while on suicide watch, including excessive use of pepper spray.

- The excessively harsh conditions do not even effectively prevent self-injurious behavior. One prisoner has cut himself with razors and pieces of metal while on suicide watch multiple times – at Tucson, Buckeye, and SMU 1. At Tucson, staff put him on suicide watch in a cell with broken glass on the floor; he cut himself.

As a result of these horrific conditions, some prisoners do not tell staff when they are suicidal or self-harming. And even if increased access to mental health care could alleviate some of these problems, Arizona is not providing this care.

**(e)    Arizona's failure to exclude seriously mentally ill prisoners from supermax and other units characterized by severe isolation is unconstitutional**

Arizona houses seriously mentally ill prisoners in its isolation units. Courts have repeatedly found the confinement of seriously mentally ill prisoners in conditions of extreme isolation unconstitutional. *Casey v. Lewis*, 834 F. Supp. 1477, 1548-49 (D. Ariz. 1993); *H.B. v. Lewis*, 803 F.Supp. 246, 258 (D. Ariz. 1992); *Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (prisoners with mental illness received inappropriate treatment and placement in segregation units); *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995) (retention of mentally ill prisoners in Pelican Bay isolation unit unconstitutional); *see also Jones'El v. Berge*, 164 F. Supp. 2d 1096, 1116-25 (W.D. Wis. 2001) (granting preliminary injunction requiring removal of seriously mentally ill from supermax prison); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 915 (S.D. Tex. 1999); *rev'd and remanded on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975, 984-86 (S.D. Tex. 2001).

Conditions in the supermax units in Eyman and in lock-up units such as Central's Kasson in the Florence complex constitute the type of extreme isolation that courts have found unsuitable for mentally ill prisoners.  These inmates are confined to their cells nearly all of the time.  Prisoners in SMU 1 and Browning leave their cells no more than three times a week, for a brief shower and no more than two hours of "exercise" in a barren, windowless concrete cell barely larger than the cells in which they live.  Often, even those limited out-of-cell times are denied: prisoners are not allowed to go to recreation if they are not clean-shaven, but are often denied the means to shave and are therefore denied the ability to exercise.  Recreation is sometimes cancelled due to staffing shortages.  On rare occasions, some prisoners have a brief medical or mental health appointment, or a telephone call or visit, but otherwise the prisoners in these units spend 24 hours in their cells on most days, isolated from human contact.  Their allowable property is severely limited.  The lights are on nearly all of the time; they are slightly dimmer during only a few night-time hours, but not enough to allow for a meaningful opportunity to sleep.

Mentally ill prisoners in the isolation units demonstrate the deterioration that courts have found elsewhere under similar conditions: they exhibit increased symptoms of paranoia, anxiety, delusional thinking, auditory hallucinations and self-harming behavior.

Housing people with serious mental illness in isolation units creates intolerable conditions for the other prisoners, who must endure the screaming and yelling of psychotic, inadequately medicated, delusional fellow prisoners.  Mentally ill prisoners also throw and smear feces on their cells and those of other prisoners.  These conditions violate the Eighth Amendment.  *Casey v. Lewis*, 834 F. Supp. 1477, 1548-49 (condemning delays that resulted in psychotic inmates remaining in lockdown);  *Gates v. Cook*, 376 F.3d 323, 342-43 (5th Cir. 2004) (prisoners with psychosis and severe mental illness must be held separately from other prisoners); *Thaddeus-X v. Blatter*, 175 F.3d 378, 403 (6th Cir. 1999) (en banc) (Eighth Amendment claim stated by non-mentally ill placed with mentally ill prisoners who throw human waste and urine, repeatedly bang and make noise, and there is a constant foul odor); *DeMallory v. Cullen*, 855 F.2d 442, 444-45 (7th Cir. 1988) (allegation that mentally ill inmates were knowingly housed with non-mentally ill in a high-security unit and that they caused filthy and dangerous conditions stated an Eighth Amendment claim against prison officials); *Hassine v. Jeffes*, 846 F.2d 169, 178 n. 5 (3d Cir. 1988) (prisoners could seek relief from the consequences of other inmates' failure to receive adequate mental health services); *Carty v. Farrelly,* 957 F.Supp. 727, 738-39 (D.V.I. 1997) ("Failure to house mentally ill inmates apart from the general prison population also violates the constitutional rights of both groups."); *Tillery v. Owens*, 719 F. Supp. 1256, 1303-04 (W.D. Pa. 1989)(citing increased tension for

psychologically normal inmates and danger of retaliation against mentally ill), *aff'd*, 907 F.2d 418 (3d Cir. 1990).

The deprivations in these isolation units, such as SMU 1, Browning, and Kasson, also constitute Eighth Amendment violations in the areas of adequate exercise and nutrition. Courts have found that outdoor exercise is necessary for good physical and mental health of inmates. *Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979) (Kennedy, J.) ("[t]here is substantial agreement among the cases in this area that some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates"); *Toussaint v. McCarthy*, 597 F. Supp 1388, 1393 (N.D. Cal. 1984*), aff'd in part, rev'd in part and remanded*, 801 F.2d 1080 (9th Cir.1986); *Davenport v. DeRobertis*, 844 F.2d 1310, 1315 (7th Cir. 1988) ("[W]e are impressed by the number of decisions that hold or suggest that a failure to provide inmates. . . with the opportunity for at least five hours a week of exercise outside the cell raises serious constitutional questions"). Through policy and practice, Arizona fails to provide prisoners in its isolation units constitutional access to outdoor exercise.

Similarly, Arizona prisoners are deprived of adequate nutrition, in violation of the Eighth Amendment. *See Graves v. Arpaio*, 623 F.3d 1043, 1050-51 (9th Cir. 2010); *Leeds v. Watson*, 630 F.2d 674, 676 (9th Cir. 1980); *Phelps v. Kapnolas*, 308 F.3d 180, 186 (2d Cir. 2002); *Cunningham v. Jones*, 567 F.2d 653, 657-60 (6th Cir. 1977). Prisoners in the isolation units complain of constant hunger pangs and significant weight loss; prisoners have complained of weight loss of 30 pounds and more since being placed on the reduced calorie "sedentary" diets provided in these units.

## 2.   Arizona deprives its prisoners of constitutionally adequate medical care

Our investigation has uncovered extensive evidence that ADC is deliberately indifferent to the serious medical needs of prisoners in the state's custody and fails to provide prisoners with adequate and necessary medical care. Prisoners have a constitutional right to adequate and necessary medical care, *Brown v. Plata*, 563 U.S. --, 131 S. Ct. 1910, 1928 (2011), and a prison's failure to provide such care can rise to cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976); *Jones v. Johnson*, 781 F.2d 769, 771 (9th Cir. 1986); *Casey v. Lewis*, 834 F. Supp. 1477, 1543 (D. Ariz. 1993); *H.B. v. Lewis*, 803 F.Supp. 246, 255 (D. Ariz. 1992).

As detailed below, ADC violates the rights of prisoners and does not meet the basic requirements of correctional medical care. State prison officials are deliberately indifferent to the serious health care needs of prisoners, and to the prisoners' resulting unnecessary and significant pain, suffering, and even deaths. Among other deficiencies, ADC does not have sufficient qualified staff at its facilities, resulting in delayed,

substandard, or no treatment; fails to provide proper medication to prisoners; fails to provide appropriate chronic care; and fails to provide prisoners with specialty care or abide by the treatment recommendations of medical specialists.

### (a)  ADC lacks sufficient staff to provide adequate medical care

Prison facilities must have adequate staffing levels to deliver medical and mental health services to prisoners. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *5-12 (N.D. Cal. 2005); *Madrid v. Gomez,* 889 F.Supp. 1146, 1257 (N.D. Cal. 1995); *see also French v. Owens*, 777 F.2d 1250, 1254 (7th Cir. 1985). Furthermore, prison systems must have medical care performed by qualified personnel. *Toussaint v. McCarthy*, 801 F.2d 1080, 1112 (9th Cir. 1986); *Plata*, 2005 WL 2932253, at *5; *see also Casey v. Lewis*, 834 F.Supp.1477, 1545 (D. Ariz. 1993). Nonetheless, ADC is grossly understaffed, with the result that prisoners are unable to receive the most rudimentary of medical care. The department does not have enough qualified physicians and other medical professionals on staff to provide adequate health care to prisoners.

ADC's own statistics show a shortage of medical doctors. In April 2011, ASPC-Eyman, housing 5,169 prisoners, had 2.5 doctors working at the facility and two vacant physician positions. ASPC-Tucson, had only two physicians serving the 5,162 prisoners in the complex. The Tucson complex had three unfilled physician positions. In April of this year, the Health Services Division had a total of 798.2 full-time medical, mental health, dental, and office positions at all levels, and 189.0, or 23%, were vacant.

As a result of the small number of doctors, most day-to-day medical assessment and treatment falls upon nurses, nursing assistants, and medical technicians, who are not always qualified to perform the role that is thrust upon them. *Ramos v. Lamm,* 639 F.2d 559, 576 (10th Cir. 1980) (use of untrained "physician substitutes" and "standing orders" inadequate); *Madrid v. Gomez*, 889 F. Supp. 1146, 1258 (N.D. Cal. 1993) ("medical technicians cannot be left to operate in a vacuum"); *Casey v. Lewis*, 834 F. Supp. 1477, 1543-44 (D. Ariz. 1993).

### (b)  ADC lacks a functioning system by which prisoners can request health care, resulting in delays in treatment

Prison officials may not subject prisoners to unreasonable delays in providing medical treatment and prisoners must be able to request care. The Eighth Amendment requires that prisons "provide a system of ready access to adequate medical care." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982), and prisoners should not experience unreasonable delays in receiving treatment. *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Plata v. Schwarzenegger*, 2005 WL 2932253, at *13 (N.D. Cal. 2005);

*Madrid v. Gomez*, 889 F. Supp. 1146, 1205-12061256 (N.D.Cal. 1995); *Casey v. Lewis*
834 F. Supp. 1477, 1545 (D. Ariz. 1993).

Our investigation has uncovered numerous shortcomings at ADC, including:
correctional staff fail to forward prisoners' completed health need requests (HNRs) to
medical staff; HNR forms are not available in living units; correctional staff refuse to
provide HNR forms; if completed by a prisoner, staff refuse to accept or throw away the
requests; or if the completed HNR is forwarded to medical staff, prisoners must file
multiple HNRs before they actually see a doctor.  In addition, some correctional staff
have told prisoners that they may not assist their fellow inmates in completing HNRs or
grievances.  This creates problems for prisoners who are acutely ill, developmentally
disabled, vision-impaired, illiterate, have injuries or permanent disabilities that make it
difficult to write, or are otherwise unable to fill out the relevant forms.  For example, a
prisoner who has partial paralysis and injuries to his hands cannot write out HNRs
without a great deal of pain.  He has had several HNRs and grievances returned to him
not addressing his request, stating that his handwriting was illegible.

Some ADC prisoners must submit multiple HNRs and experience long delays to
receive medical treatment.  For example:

- A prisoner suffered a neck and back injury that caused him debilitating pain
  filed multiple HNRs and waited for eight months before he finally saw the
  prison doctor.

- A prisoner has a cataract in one of his eyes has filed HNRs for over two
  years asking for an examination, but still has not been seen about it.

- A prisoner has filed multiple HNRs and grievances has waited for more
  than two years to have removed from his hand several pins that were
  incorrectly inserted in a surgery.

These methods of discouraging prisoners from filing HNRs are reflected in the
department's own statistics.  ADC's reports show a dramatic drop from FY 2009 to 2010
in the number of on-site medical, nursing, and dental HNRs filed at four of the prison
complexes designated as being able to serve prisoners with the highest medical needs.
This occurred even though the overall prison population remained steady.  For example,
at ASPC-Florence, prisoners filed 27,599 HNRs in FY 2009, but only 18,771 were
recorded in FY 2010, a decrease of more than 30%.  During this time, the inmate
population at Florence stayed relatively level, and certainly did not decrease to such a
degree as to explain the precipitous drop in HNRs filed by prisoners.  Perryville, which

experienced a drop of more than 2,000 HNRs in that same time frame, has waits of up to four months for a prisoner to be seen by medical staff after she files a HNR.

**(c)     ADC lacks an adequate response system to respond to emergencies**

Prisoners have a clear right to emergency medical treatment. *Casey v. Lewis*, 834 F. Supp. 1477, 1544 (D. Ariz. 1993) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)) ("[T]he prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison."); *see also Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995). Prison medical staff also must be trained to cope with emergencies. *Madrid*, 889 F. Supp. at 1257.

Prisoners experiencing emergencies and suffering from obvious medical distress often are ignored by ADC facility and medical staff, resulting in permanent, long-lasting injuries. For example:

- In the spring of this year, a prisoner broke his hand so badly that a bone was sticking out. Despite the obvious seriousness of his injury, the on-call doctor did not refer him to an off-site emergency room or even order an X-ray. Instead, the doctor directed a yard nurse to splint the hand and give him ibuprofen. His hand was finally X-rayed 4 days later, but he still has not been seen by an orthopedist or had his hand put in a proper cast. He reports that his hand still causes him a great deal of pain, and is healing in a deformed manner.

- Another prisoner broke his hand and several knuckles in the spring of 2010, and when he requested emergency care he was told by guards that he had to file a HNR to be seen by a doctor. He saw a yard nurse the next day, but she refused to give him ibuprofen and said she said she could not do anything for him until he had X-rays. The prisoner waited another two weeks for an X-ray. Over a year later, his hand has healed improperly and it is difficult for him to use it.

**(d)     Prisoners receive inadequate medical treatment or no treatment at all**

Prisoners' Eighth Amendment rights to adequate medical care are violated when prison officials are deliberately indifferent to their clear medical needs, with the result of further significant injury or the unnecessary and wanton infliction of pain. *Scott v. Ambani*, 575 F.3d 642 (6th Cir. 2009); *Clement v. Gomez*, 298 F.3d 898, 904 (9th Cir.

2002); *Madrid v. Gomez*, 889 F. Supp. 1146, 1206, 1256 (N.D. Cal. 1995). ADC regularly fails to provide treatment for prisoners' serious medical needs, and prisoners experience further injury and pain. For example, in 2008, a prison doctor ordered that a prisoner undergo a test of his upper gastrointestinal system. Three years later, despite the doctor's orders and the prisoner filing multiple HNRs, he still is waiting to have the tests, and he has lost a great deal of weight.

When prisoners receive medical treatment, prison medical staff must conduct adequate examinations, ask necessary questions, take a medical history, review patient charts, and conduct diagnostic tests called for by the prisoners' symptoms. Failure to conduct adequate examinations raises Eighth Amendment claims. *Plata v. Schwarzenegger*, 2005 WL 2932253, at *12 (N.D. Cal. 2005) ("An adequate intake exam should take fifteen to twenty minutes for a young healthy prisoner and thirty to forty minutes for prisoners with more complicated health problems."); *see also Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008); *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); *Spruill v. Gillis*, 372 F.3d 218, 237 (3d Cir. 2004); *Steele v. Shah*, 87 F.3d 1266, 1270 (11th Cir. 1996).

When ADC prisoners finally receive medical treatment, it often is cursory, incomplete, or incompetent. For example, we learned of a prisoner who had a hydrocele hernia that went untreated for more than five years. His multiple HNRs were unanswered or he had cursory medical appointments where he was told that it was not a serious problem. However, because the problem was not addressed properly for so long, he developed complications and ultimately had to have a testicle removed.

**(e)   ADC fails to provide chronic care or protect prisoners from infectious disease**

ADC fails to provide medically necessary chronic care to address ongoing medical needs or diseases. Courts require prisons to provide ongoing treatment and disease management to inmates who have chronic conditions, for example, high blood pressure, asthma, epilepsy, end-stage renal disease, or diabetes. *Board v. Farnham*, 394 F.3d 469, 484 (7th Cir. 2005) (asthma); *Plata v. Schwarzenegger*, 2005 WL 2932253, *6 (N.D. Cal. 2005) (renal failure and high blood pressure) *Kenney v. Paderes*, 217 F. Supp. 2d 1095, 1100 (D. Haw. 2002) (neurological disorder); *Casey v. Lewis*, 834 F. Supp. 1477, 1546 (D. Ariz. 1993) (chronic care). ADC's failure to properly treat prisoners' chronic illnesses exacerbates the prisoners' conditions, and leads to catastrophic and permanent side effects. Our investigation has uncovered multiple examples of prisoners not receiving chronic care, including:

- A prisoner who was diagnosed with diabetes in an out-of-state prison several years ago was taking insulin regularly to manage his disease. In early June 2011, he was returned to ADC custody, and since that day has not received insulin. In the intervening 3-1/2 months, he has lost sight completely in one eye, and the vision in the other eye is extremely blurred – even though he had 20/20 vision upon his arrival. Although the prison doctor has ordered that he receive insulin, he still is not receiving any from the pharmacy, and was threatened with retaliation by a nurse if he kept complaining.

- More than two years ago, a prisoner with renal failure was prescribed dialysis three times a week, and a permanent graft was installed in his arm for his dialysis. ADC does not provide him with the dialysis. Each time he sees a doctor, they tell him that his kidney is not working and that he needs the dialysis, but the prison will not provide it to him.

- A prisoner who is HIV positive came into ADC custody in September 2010, and for the first four months in prison did not receive any of the HIV medications he was taking before. He suffered side effects including skin rashes, eye and mouth infections, headaches, rectal bleeding, and pain and discomfort. Although he now receives the medication, he has encountered delays or gaps in receiving prescriptions. He states he has filed seven separate HNRs seeking adequate care and his medications.

- A prisoner with emphysema has received no treatment or medication to improve his breathing while in ADC custody. He has filed multiple HNRs requesting breathing treatments and medications, but most of his requests have not been answered, and the only answers have been rejections. He reports being in constant pain and having difficulty sleeping due to his inability to breathe normally.

- A prisoner with epilepsy was not receiving his prescribed medication, with the result that he has several seizures a week, injuring himself in the process.

Prison officials must protect prisoners from the risk of infectious diseases, such as Hepatitis C, HIV/AIDS, or Methicillin-Resistant Staphyloccus Aureus (MRSA). *Helling v McKinney*, 509 U.S. 25, 33 (1993) ("infectious maladies such as hepatitis and venereal disease"); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam) (failure to provide Hepatitis C treatment states a claim); *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir. 2004) (withdrawal of prisoner's HIV treatment states a Constitutional claim);

*Lopez v. McGrath*, No. C 04-4782, 2007WL 1577893, at *5 (N.D. Cal. May 31, 2007) (exposure to MRSA is a serious medical need); *Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995) (prisons must screen for infectious disease).

ADC fails to maintain a basic level of sanitation in its prisons to prevent the spread of infectious diseases such as HIV, MRSA or tuberculosis. Many sections of ADC's prisons are filthy and expose prisoners to serious, and sometimes fatal, communicable diseases. *See Plata v. Schwarzenegger*, 2005 WL 2932253, at *14 (N.D. Cal. 2005) (medical clinics must "meet basic sanitation standards); *see also Shannon v. Graves*, 257 F.3d 1164, 1168 (10th Cir.2001) (prisoners' "exposure to the human waste of others" carries "a significant risk of contracting infectious diseases such as Hepatitis A, shigella, and others"). Prisoners report cell walls and floors smeared with feces and blood of other prisoners, food slots in cells covered in feces, being given urine-soaked mattresses to sleep on, and infestations of vermin. (See Sections 1(d) and 1(e) on suicide watch and solitary confinement.) Prisoners who request cleaning supplies are ignored, or are given diluted chemicals that are little more than water.

ADC fails to provide treatment for communicable diseases. Multiple prisoners with Hepatitis C report that they receive no treatment for the disease, despite filing numerous HNRs. Other prisoners who have experienced cuts or other injuries to their bodies have had them get infected due to the unclean conditions of the prison, and experienced delays in treatment for the infections.

**(f)     ADC is deliberately indifferent to prisoners' need for specialty care and fails to provide timely access to outside specialists**

If prison medical staff cannot treat certain medical conditions, they must "refer prisoners to others who can" and such referrals must be "reasonably speedy." *Casey v. Lewis*, 834 F. Supp. 1477, 1544, 1546 (D. Ariz. 1993) (quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982)); *see also Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005); *LaMarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir. 2001) ("if a doctor knows of a substantial risk of serious harm to a patient and is aware that he must either seek immediate assistance from another doctor to prevent further serious harm or must inform the patient to seek immediate assistance elsewhere, and then fails to do in a timely manner what his training indicates is necessary to prevent such harm, that doctor has treated the patient with deliberate indifference"); *Plata v. Schwarzenegger*, 2005 WL 2932253, at *16 (N.D. Cal. 2005); *Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995). ADC has long failed to refer prisoners for specialty care or outside treatment, or has done so only after extensive and unreasonable delays, often resulting in prisoners experiencing unnecessary pain and suffering, and permanent injuries.

In 2009, the Arizona Legislature enacted Ariz. Rev. Stat. § 41-1608 to cap reimbursement rates for prison medical contractors to be no higher than those paid by the Arizona Health Care Cost Containment System.  As a result, all outside medical providers ended their contracts with ADC.  For many months in 2009 and 2010, ADC had no contracts in place with outside medical providers or specialists, and when contracts were reinstated, there were not enough outside medical professionals willing to treat ADC prisoners at the reduced reimbursement rates.

The practical effect of the accumulation of pending referrals, as well as the smaller number of contracted providers, left most prisoners without any way of getting specialized care for serious medical needs for close to a year.  While contracts are now back in place, there still is a long wait.

In our investigation, we discovered multiple examples of ADC's failure to refer prisoners to specialists, or prisoners experiencing unreasonable delays in obtaining treatment from outside doctors, resulting in wanton and unnecessary pain and suffering:

- A prisoner who had previously been treated for cancer on his face waited more than seven months to see a specialist about a suspicious growth on his lip, which both the prison doctor and dentist thought was cancerous.  The specialist confirmed it was cancer, and told the prisoner that because of the long delay, much more of his lip and mouth had to be excised – resulting in permanent disfigurement to his mouth – than if he had been seen at the time of the referral.

- A prisoner who had a heart attack last December was taken to an outside hospital for treatment and to have stents implanted.  Hospital doctors said he had to see a cardiologist within ten days.  Despite experiencing on-going chest pains since his heart attack and submitting multiple HNRs, he still has not seen a cardiologist.

- A prisoner who suffered from gallstones waited 13 months after the referral was made before he finally had gall bladder surgery. He was not given any medication for the pain during those months.

- A prisoner who suffered a neck and back injury and waited eight months to see the prison doctor was referred at least five times by the prison doctor for a neurosurgery consult before the prison's Medical Review Committee finally authorized the visit more than three months after the first referral. He suffered a great deal of pain that impaired his day-to-day functioning.

- A prisoner waited more than 15 months to see a urologist after a prison doctor made the referral for surgery for his enlarged prostate.

- A prisoner has been waiting since May 2009 for surgery to reinstall a suprapubic catheter that was forcibly removed when she was sexually assaulted in the prison.  A 2011 response to a HNR asking when she would see an urologist stated that the doctor was "aware" of the bladder issues and the delays and "will come see you soon."   Since the assault, she has had to rely upon an external catheter and urine bag, which carries a much higher risk of infection.

In addition to delayed medical referrals, it takes months for ADC doctors to obtain diagnostic tests by outside providers or to receive the results of diagnostic or lab tests conducted by outside contractors.  We uncovered examples including:

- A prisoner needed a biopsy of his liver, but it was not done for months because there was no contract in place or money to fund biopsies.

- A different prisoner categorized as "urgent" was referred out by prison doctors multiple times for a biopsy on what the doctors thought was cancer, and did not have the appointment scheduled for more than five months.

- A prisoner, who had previously been treated for cancer in an out-of-state prison, began developing in 2009 a tumor in his neck, and painful abdominal masses that have caused him to lose more than 40 pounds.  To this day, he has not yet had a CAT scan of his abdominal area to check for cancer.  An outside doctor told him in 2010 ADC would not pay for a full body scan, and so he only had a CAT scan of his head at that time.

**(g)     Prisoners are unable to receive treatment due to custodial interference**

Security and other prison staff cannot wantonly override or ignore medical orders, as this interference can rise to deliberate indifference such that a constitutional violation occurs.  *Plata v. Schwarzenegger*, 2005 WL 2932253, at *15 (N.D. Cal. 2005) ("custody staff present a determined and persistent impediment" and have "a common lack of respect" for medical staff); *Madrid v. Gomez*, 889 F. Supp. 1147, 1257-58 (N.D. Cal. 1995) (prison officials are precluded from preventing treatment which is medically necessary in the judgment of the treating doctor); *Casey v. Lewis*, 834 F. Supp. 1477, 1545 (D. Ariz. 1993) (same).

ADC custodial staff and prison officials often ignore, interfere with, and override the directives of medical professionals. Prisoners report that yard nurses, medical techs, and pharmacists often ignore the medical orders and prescriptions written by prison doctors. Doctors may issue limitations on a prisoners' housing or duty assignment, which are ignored. Problems our investigation has uncovered include:

- As detailed above in part 2(e), prison officials refuse to honor doctors' orders regarding life-saving treatment such as dialysis or anti-retroviral medications;

- Doctors ordered that a prisoner be moved from an upstairs cell to a ground level cell due to a severely infected leg that caused him great pain and affected his ability to put any weight on it. When moving him, the guards handcuffed his hands behind his back, ordered him to go down the stairs, and refused his request for assistance or to be allowed to be uncuffed going down the stairs. He tried to go down the stairs using his good leg, but he lost his balance and tumbled down the stairs, injuring his neck, shoulder, back, and knee. The officers who refused to help him down the stairs laughed at him. To this day his neck and collarbone still hurt, and he suffers from extremely painful headaches.

- A prisoner from ASPC-Perryville who was assigned to work at an off-site farm was taken to a hospital for chest pains and exhaustion while working. The hospital emergency room doctor ordered that she be exempted from the farm work and any physical exertion for four days, but upon her return to Perryville that evening, she was told by the prison nurse that she had to go work on the farm the next day or face a disciplinary write up.

**(h)    Prisoners do not receive medically necessary prescriptions or medical devices**

In our investigation, we discovered multiple prisoners who did not receive medication, experienced delays in receiving medication, or were provided with less than the prescribed dosage, in violation of the Eighth Amendment, as detailed in part 1(b):

- As detailed above in part 2(e), prisoners were not provided with medication to manage diabetes, renal failure, or HIV, or had the levels of medication reduced arbitrarily contrary to the doctor's orders;

- A prisoner who has severe psoriasis and requires a variety of topical and oral medications to manage its effects has encountered continual problems

in getting refills for his medication.  He filed a multitude of HNRs and told
the doctor about how the pharmacy was not providing the medications.
The prisoner stated that the doctor would not follow up with the pharmacy
but would simply write another prescription;

- A prisoner who uses a wheelchair needs catheters, wipes, and other medical
  devices for his toileting.  The facility has told him that they did not have his
  needed medical supplies, and he states that his mother had to send him
  clean catheters and toileting supplies.

## 3.      ADC is deliberately indifferent to prisoners' serious dental needs

Deliberate indifference to prisoners' serious dental needs is unconstitutional, and
prisons must have "a system of ready access to adequate dental care." *Hunt v. Dental
Dep't*, 865 F.2d 198, 200 (9th Cir. 1989); *Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir.
1980) ("Dental care is one of the most important medical needs" of prisoners); *Halla v.
Schriro*, No. CV 05-0320-PHX-MHM (ECV), 2006 WL 3735983, at *6 (D. Ariz. Dec.
15, 2006).  The failure to provide reasonable and relatively prompt dental care violates
the Constitution. *Farrow v. West*, 320 F.3d 1235, 1247 (11th Cir. 2003) (15 month delay
for a prisoner to receive dentures raised an Eight Amendment claim).  In our
investigation, we heard from prisoners who report not receiving dental care, including:

- A prisoner has lost four teeth while in prison due to the lack of preventative
  dental care in the facility.  He filed several HNRs and waited for more than
  a year to see a dentist.  When he finally saw the dentist in November 2010,
  he was told there was a five month backlog of dental appointments before
  he could be seen and be given new caps or crowns.  Eleven months after
  that encounter, he still has not seen the dentist again, despite submitting
  several HNRs.  Because of his difficulty in eating without teeth he has lost
  more than 40 pounds since 2010.

- An HIV positive prisoner reports that the dental provider refused to treat
  him for complications from mouth infections that he was experiencing due
  to not being given his HIV medication for more than four months.

- Dental staff "fixed" a prisoner's injured front tooth by bending a paper clip
  into a brace to hold the tooth in place.  Two months later, the paper clip had
  turned black, was starting to rot out the tooth, and caused the prisoner a
  great deal of severe pain, headaches, lock-jaw symptoms, and a constant
  sore throat.

**4.      Preservation of evidence**

Based on the information gained during our investigation and review of public documents, we see no basis for ADC to dispute that it fails to comply with constitutional standards in the delivery of mental health and medical care throughout its system. Consequently, we are prepared to litigate these issues on a class-wide basis on behalf of prisoners, and believe that we would prevail in any such litigation. As you know, this potential future litigation triggers ADC's duty to preserve all relevant, material evidence. As an Arizona district court recently explained, "[i]t is well established that … the duty to preserve is triggered 'not only during litigation, but also extends to the period before litigation when a party should reasonably know that evidence may be relevant to anticipated litigation.'" *Surowiec v. Capital Title Agency, Inc.*, 2011 WL 1671925, at *5 (D.Ariz. May 4, 2011) (citation omitted); *see also Reed v. Honeywell Intern., Inc.*, 2009 WL 886844, at *10 (D.Ariz. Mar. 31, 2009). This letter is sufficient under federal law to put ADC "on notice that litigation is reasonably foreseeable and the duty to preserve evidence relevant to that dispute is triggered." *Surowiec*, 2011 WL 1671925, at *6 (noting that a letter threatening litigation put the recipient on notice to the potential future litigation, triggering the duty to preserve evidence relevant to that dispute). As such, we ask that ADC and all of its agents with responsibilities that impact medical and mental health care, including those with security, medical, supervisory, managerial and document management responsibilities, take all necessary steps to avoid the destruction of relevant evidence, including the immediate issuance of a litigation hold.

**5.      Negotiations**

We hope that once you have had a chance to review this letter, you will agree that an early resolution of this case would be worth exploring. To that end, we ask that you enter into a tolling agreement, to waive both the relevant statutes of limitations and the exhaustion requirement, while we engage in negotiations regarding the substance of our concerns as set forth in this letter. Please let us know by November 2, 2011 if you are amenable to entering into such an agreement and negotiations. We look forward to discussing this matter at your earliest convenience.

Sincerely,

Donald Specter

Donald Specter, Executive Director
Sara Norman, Managing Attorney
Corene Kendrick, Staff Attorney
PRISON LAW OFFICE

General Delivery
San Quentin, CA 94964
(510) 280-2621

David C. Fathi, Director*
ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
*Not admitted in DC; practice limited to federal
courts

Daniel Pochoda, Staff Attorney
James Duff Lyall, Staff Attorney
ACLU of Arizona
P.O. Box 17148
Phoenix, AZ 85011-0148
(602) 773-6001

Daniel C. Barr
Rusty D. Crandell
James A. Ahlers
Kirstin T. Eidenbach
John H. Gray
Matthew B. du Mee
Perkins Coie LLP
2901 North Central Ave., Ste. 2000
Phoenix, AZ 85012-2788
(602) 351-8268

Caroline Mitchell
Jones Day
555 California St., 26th Floor
San Francisco, CA  94104-1500
(415) 875-5712

# Exhibit B

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

```
                  UNITED STATES DISTRICT COURT
                      DISTRICT OF ARIZONA

Victor Parsons; Shawn        )   No.:
Jensen; Stephen Swartz;      )   CV12-00601-PHX-NVW
Dustin Brislan; Sonia        )   (MEA)
Rodriguez; Christina         )
Verduzco; Jackie Thomas;     )
Jeremy Smith; Robert Gamez;  )
Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua )
Polson; and Charlotte Wells, )
on behalf of themselves and  )
all others similarly         )
situated; and Arizona Center )
for Disability Law,          )
              Plaintiffs,    )
     v.                      )
Charles Ryan, Director,      )
Arizona Department of        )
Corrections; and Richard     )
Pratt, Interim Division      )
Director, Division of Health )
Services, Arizona Department )
of Corrections, in their     )
official capacities,         )
              Defendants.    )
                             )


        30(b)(6) ARIZONA DEPARTMENT OF CORRECTIONS
                     (CURT CZARSTY)
     E-DISCOVERY - TOPIC NOS. 1-6, 10, 11, 12, 14, 15


                   August 20, 2012
                     9:03 a.m.
                  Phoenix, Arizona


                     Prepared by:
                     Marcella Daughtry, RPR
                     Arizona Certified
                     Reporter No. 50623

                     Prepared for:

                     (Copy)
```

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 11

1      A    There's -- there's some question as to --
2    there was an October 12th letter that I had not seen
3    until last week actually, so, you know, our -- our --
4    specifically did we do a lot?  You know, I can only
5    work with what I've seen.
6      Q    So is the answer no, there has not been a
7    litigation hold yet in this case?
8                   MR. BOJANOWSKI:  Form.
9                   Go ahead and answer if you know.
10                  THE WITNESS:  Specifically in this case,
11   I suspect that there has been, but I don't send the
12   litigation hold letters.  Those go through our legal
13   services department.
14     Q    BY MR. MEDSKER:  Okay.  What have you done to
15   prepare for today's deposition?  And I'm going to ask
16   you, do your counsel a favor, not to reveal any
17   conversations that you and he had that might be
18   privileged.
19     A    I'm sorry.  I'm going to have to ask you
20   to --
21     Q    Sure.  Have you met with your counsel prior to
22   today?
23     A    Yes.
24     Q    When?
25     A    We met on two occasions, one just as a general

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 63

```
  1                THE WITNESS:  That's Exhibit 4, yes.  I
  2      know it's in 102, yes.
  3                MR. BOJANOWSKI:  Do you have a policy
  4      cite, Scott?
  5                MR. MEDSKER:  I'm wondering if it's 103.
  6      No, I'm sorry, check page -- 1.7, page 4.
  7                THE WITNESS:  1.7, purging and
  8      archiving?
  9                MR. BOJANOWSKI:  Is that what you are
 10      looking at?
 11          Q    BY MR. MEDSKER:  Is that the -- that's what
 12      I'm looking at, yeah.
 13          A    Yes.
 14          Q    And if you look at 1.7.3, that refers to
 15      GroupWise e-mail?
 16          A    Correct.
 17          Q    And 1.7.4, first WordPerfect e-mail.  Correct?
 18          A    Which doesn't exist.
 19          Q    Okay.  Do you see anywhere in here where
 20      Microsoft Exchange is addressed?
 21          A    No.
 22          Q    Is the policy for e-mail preservation on
 23      Microsoft Exchange the same as the policy that it was
 24      for GroupWise e-mail?
 25          A    Actually, we give them longer.  Here they talk
```

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections - Curt Czarsty - 8/17/2012

Page 64

1    about 30 days, and Exchange, we give them 90 days.

2         Q    Okay.  So let's -- let's talk about just the

3    Microsoft Exchange policy first.  How long are e-mails

4    retained if they are in the inbox?

5         A    In all but central office, 90 days.

6         Q    What's the policy in central office?

7         A    There is no -- there is no purge.  There is no

8    auto-delete in central office.

9         Q    But in the facility, those e-mails are

10   auto-purged after 90 days?

11        A    If the user does not put them into a manage

12   retention folder, they are purged after 90 days, yes.

13        Q    What's the policy for retention of e-mails in

14   the outbox in central office?

15        A    The outbox is something that is completely

16   transitory that you -- when you push the send button,

17   that -- the item goes into the outbox until it sends,

18   which in almost any case would be immediately, so the

19   outbox is an empty folder.

20        Q    Okay.  How about the sent file?

21        A    Sent items, 90 days.

22        Q    Okay.  Are those auto-purged in central

23   office?

24        A    No, sir.

25        Q    So that 90-day is for the noncentral office

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 65

1    e-mails?

2         A    For the prison facilities, yes.

3         Q    Is there an auto-purge for items that are in

4    the trash container?

5         A    14 days.

6         Q    Is there an auto-purge in central office?

7         A    No, sir.

8         Q    Looking at 1.7.3, if you look at 1.7.3.2,

9    which is the outbox, you corrected me, should that be

10   the sent folder?

11        A    I believe that should probably read sent

12   items, yes.

13        Q    Okay.  Now, you noted that one way the e-mails

14   might not be auto-purged is if someone saved them.  Is

15   that right?

16        A    Yes.  Everyone has what's called a manage

17   retention folder, and if there were something in your

18   inbox that you did not want auto-purged in 90 days, you

19   simply drag it and drop it into the retention folders.

20        Q    How does an employee determine whether or not

21   they -- okay.  Are there policies that control when

22   employees are required to put something in a manage

23   retention folder?

24        A    I'm not aware of a specific policy that tells

25   the employee that something needs to be moved to a

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page  93

1      Q     Okay.  Do you have policies that set a minimum
2     time period for when documents must be retained?
3      A     Oh, I see what you are saying.  Not to my
4     knowledge, no.
5      Q     Okay.  If you would look at your notice of
6     deposition, topic number 6, please, it asks about the
7     duration for which electronic documents are maintained,
8     archived, indexed and folders.  How long are documents
9     other than e-mails archived for?
10      A     An indefinite period.
11      Q     Is that -- is ADC's policy on document
12     retention for non-e-mail electronic documents written?
13      A     If it is, I am not familiar with it.
14      Q     Does ADC have any -- now I'm talking about
15     deletion -- any document deletion or auto-purge
16     policies other than those applicable to e-mails?
17      A     Not to my knowledge.
18      Q     Is it ADC's policy that those non-e-mail
19     documents are indefinitely retained?
20      A     That's my understanding.
21      Q     Where are those documents generally retained?
22      A     Either on their H drive or on those shared
23     directories.
24      Q     At the beginning of the deposition, we looked
25     at a stack of documents.  I'm just asking generally if

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 96

1    under that policy, after some period of time, the only

2    place they reside is on backup tapes.  Is that correct?

3         A    Or in the Barracuda archiver if that person is

4    subject to litigation hold.

5         Q    Okay.  Do you know whether ADC has any policy

6    or procedure that requires employees to permanently

7    retain all non-e-mail electronic documents?

8         A    I am not aware of a policy of that nature, no.

9         Q    But that's the Department's expectation.

10   Correct?

11                   MR. BOJANOWSKI:  Form.

12                   Go ahead.

13                   THE WITNESS:  Yeah, I couldn't -- I --

14   that would be strictly supposition.  I couldn't even

15   begin to answer that.

16        Q    BY MR. MEDSKER:  Aside from e-mails, do you

17   know whether there is any retention policy for

18   Microsoft Exchange calendars?

19        A    I -- I know that there is no purging of

20   calendar items.  They are not covered by purge

21   policies.

22        Q    So you would expect all that information to be

23   somewhere on the e-mail servers?

24        A    Yes.

25        Q    What about Word documents?  Are you aware of

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 101

1     Q    Okay.  So your understanding of ADC's policy
2   is that electronic documents are never to be deleted,
3   correct?
4     A    I'm saying we don't have a policy that governs
5   that.
6     Q    Okay.  What I've understood you to say is
7   that -- is it correct to say it's your expectation that
8   those documents will stay there?
9     A    From our side, we don't delete users'
10  documents.
11    Q    Our side being the networks team?
12    A    Network team, correct.
13    Q    Okay.  But that's just your understanding of
14  what you've done in the past.  Correct?
15                MR. BOJANOWSKI:  Form.
16                Go ahead.
17                THE WITNESS:  Correct, yes.
18    Q    BY MR. MEDSKER:  Okay.  Do you use any
19  hardware to assist in the retention of documents?
20    A    Other than backup tape, you mean?
21    Q    Okay.  Other than backup tapes, yes.
22    A    No.  We have no document management system, no
23  document retention system.
24    Q    I guess I'm thinking about other types of
25  hardware, like the Barracuda server that you use?

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 103

1    finish.

2         A    I'm sorry.

3         Q    To your knowledge, ADC does not have any

4    written policy governing the retention of electronic

5    documents; is that correct?

6         A    Correct.

7         Q    Okay.  Now, look at topic number 10, which is

8    similar, but it's about data destruction.  Okay?

9         A    Okay.

10        Q    Are you aware of whether ADC has any policies

11   or procedures other than the e-mail policies we've

12   already discussed regarding the destruction of

13   electronic documents since January 1, 2011?

14        A    Of electronic documents, no, I am not aware of

15   any policies or procedures regarding data destruction.

16        Q    Okay.  What about nonelectronic documents?

17        A    That's outside of my area entirely.

18        Q    Okay.  Well, you've been designated for topic

19   number 10.

20        A    Well, but that talks about hardware and

21   software used to facilitate deletion of data, so if we

22   are talking electronic, there's nothing that I am aware

23   of that's destroying data at this point.

24        Q    Okay.  When IT purges an e-mail account, does

25   IT ever actively purge an e-mail account?

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 105

1              MR. BOJANOWSKI:  Okay.

2      Q    BY MR. MEDSKER:  Why were you given the

3  letter?

4              MR. BOJANOWSKI:  Well, objection to the

5  extent that that involves any discussions you and I

6  had.

7              THE WITNESS:  Right.

8              MR. BOJANOWSKI:  Do not answer.

9              THE WITNESS:  Right.

10             MR. BOJANOWSKI:  If you can answer the

11 question without getting into --

12             THE WITNESS:  No, I could not.

13     Q    BY MR. MEDSKER:  Okay.  Have you or anybody on

14 your network team been asked to preserve or collect

15 data in regards to this case?

16             MR. BOJANOWSKI:  Form.

17             Go ahead and answer.

18             THE WITNESS:  No, we have not.

19     Q    BY MR. MEDSKER:  Okay.  When you are

20 performing your job responsibility assisting legal

21 teams with responding to requests for documents, what

22 does that entail?

23     A    They will generally, by e-mail, send me an

24 e-mail saying, you know, I have got the hold letters,

25 you know, that I get copied on from the Attorney

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 116

1    make sure I understand what you are asking

2    specifically.

3         Q    Please do.

4         A    Could you rephrase?

5         Q    Sure.  So if a litigation hold in this case

6    were to identify specific individuals, including

7    Mr. Ryan and Dr. Adu-Tutu, among others --

8         A    Uh-huh.

9         Q    -- we've talked about the process you would go

10   through for those individuals?

11        A    Correct.

12        Q    Do the letters, then, ever include a request

13   for a type of data that is not specific to a person;

14   for instance, all CIPS data after --

15        A    No, I've -- I'm sorry.  I've never seen

16   anything asking for CIPS data or, you know, things of

17   that nature.

18        Q    Or any other kind of generalized data that's

19   not sourced to a specific person.

20        A    No.  I've never seen a hold letter asking for

21   that type of data.

22        Q    So if a hold letter doesn't identify

23   individuals that asks for -- and I think you said all

24   e-mails, electronic documents, IMs related to, does it

25   then provide you a subject matter?

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page  117

```
 1              MR. BOJANOWSKI:  Form.
 2              Go ahead.
 3              THE WITNESS:  Not always, no.
 4      Q    BY MR. MEDSKER:  So how do you know what you
 5   are supposed to preserve?
 6      A    Quite often I do not.
 7      Q    And that's when you follow up and ask for
 8   individuals?
 9      A    Correct.
10      Q    Who actually performs the step of putting an
11   individual's e-mail account into Barracuda or applying
12   Barracuda to that account?
13      A    Me.
14      Q    Do you specifically recall doing that in this
15   case?
16      A    Again, the parties that we've discussed here,
17   those -- those parties have all been subject to
18   the -- through virtue of other cases along the way,
19   they have all been subject to archive for quite some
20   time.
21      Q    Once an individual like -- I think you said
22   Mr. Ryan, who I assume might be involved in multiple
23   lawsuits --
24      A    Yes, daily.
25      Q    -- is put into Barracuda, does there become a
```

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections -  Curt Czarsty - 8/17/2012

Page 128

1    to their e-mails.  Correct?

2        A    Yes.

3        Q    If they work out in a facility away from

4    central staffing?

5        A    Correct.

6        Q    When those employees ended their employment,

7    whether -- let's start with central staffing.  When

8    central staffing employees no longer work for ADC and

9    then move to Wexford, what happened to their e-mail

10   accounts?

11       A    Right now they are sitting still in the same

12   place they were when they left.

13       Q    And no e-mails are being deleted from that

14   because auto-purge does not apply.  Correct?

15       A    In central office, that would be correct.

16       Q    Do you know if those individuals had been

17   subject to Barracuda?

18       A    There are approximately 550 to 600 people that

19   are subject to Barracuda.

20       Q    Do you know if any of those individuals have

21   been placed in the Barracuda server because of this

22   case?

23       A    I do not know of anyone specifically in this

24   case who was not already subject to the Barracuda.  The

25   names that we discussed this morning, Director Ryan and

Parsons v. Ryan
30(b)(6) AZ Dept of Corrections - Curt Czarsty - 8/17/2012

Page 129

1    Dr. Adu-Tutu and Carson McWilliams, people -- those

2    names have long been in the system.

3        Q    So am I right in understanding that you

4    haven't actually added anybody to Barracuda because of

5    this case but the people who were there --

6        A    They were there existing already, yes.

7        Q    -- were already there --

8        A    Correct.

9        Q    -- because of other litigation?

10       A    Correct.

11       Q    Okay.  Now, for the people who were not in

12   central staffing, so for instance, a nurse or a doctor

13   at a facility --

14       A    Uh-huh.

15       Q    -- who went from ADC to Wexford --

16       A    Right.

17       Q    -- what would have happened to their e-mails?

18       A    Their -- we have not closed any of those.

19   Those folks have not been deleted from the system as of

20   yet.  They are still there.

21       Q    But they would be subject to the auto-purge

22   policies.  Correct?

23       A    They would conceivably be subject to that

24   policy, yes.

25       Q    And you haven't turned that policy off for any

# Exhibit C

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn Jensen; | ) | No. CV12-00601- |
| Stephen Swartz; Dustin Brislan; | ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco; | ) | |
| Jackie Thomas; Jeremy Smith; Robert | ) | |
| Gamez; Maryanne Chisholm; Desiree | ) | |
| Licci; Joseph Hefner; Joshua Polson; | ) | |
| and Charlotte Wells, on behalf of | ) | |
| themselves and all others similarly | ) | |
| situated; and Arizona Center for | ) | |
| Disability Law, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| Charles Ryan, Director, Arizona | ) | |
| Department of Corrections; and | ) | |
| Richard Pratt, Interim Division | ) | |
| Director, Division of Health | ) | |
| Services, Arizona Department of | ) | 30(b)(6) DEPOSITION |
| Corrections, in their official | ) | OF |
| capacities, | ) | ARIZONA DEPARTMENT |
| | ) | OF CORRECTIONS |
| Defendants. | ) | |
| | ) | |

JOSEPH NICOLETTI
E-discovery Topic 7
September 21, 2012
12:09 p.m.
Phoenix, Arizona


Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Pars
AZ Dept of Corrections 30(b)(6) - Joseph Nicoletti - 9/21/2012

Page 12

1    NS-1s?

2         A.    Via email.

3         Q.    If you would, explain who the NS-1s are.

4         A.    NS-1s are network specialists.  They are

5    support people out at the prison complexes around the

6    state.

7         Q.    Does each prison complex have its own NS-1s?

8         A.    Yes.

9         Q.    And are the NS-1s the individuals who are

10   responsible for performing the backup?

11        A.    Yes.

12        Q.    Is the ADC's primary method of backup by using

13   tape?

14        A.    Correct, yes.

15        Q.    Looking at the third page of Exhibit 14, I see

16   there for Data, it says Monday to Thursday differential

17   backups, Friday full backups; is that correct?

18        A.    Right.

19        Q.    And then are those tapes retained for 30 days?

20        A.    Yes.

21        Q.    What happens at the end of that 30-day period?

22        A.    They go back into rotation.

23        Q.    So are they recycled?

24        A.    Yes.

25        Q.    Are those tapes wiped before they --

Pars
AZ Dept of Corrections 30(b)(6) - Joseph Nicoletti - 9/21/2012

Page 13

1      A.      They're erased before they're --

2      Q.      You need to let me finish the questions.

3              Are those tapes wiped before you put them

4      back into rotation?

5      A.      They're erased when they're put back into the

6      machine, the auto loaders.  When they're loaded into the

7      machines, then they're erased.

8      Q.      When the tape is erased, what happens to the

9      data that was on the tape previously?

10     A.      The data remains there.  What happens when

11     they're erased is the header information on the tapes is

12     removed.  So it flags it as a writable media.  The data

13     sits in there until it's overwritten.  When the backup is

14     run, it will overwrite that previous data.

15     Q.      When the data is overwritten, does it become

16     inaccessible at that point?

17     A.      Correct, yes.

18     Q.      All right.  And tapes are overwritten every 30

19     days?

20     A.      Yes.

21     Q.      The front page of Exhibit 14, third paragraph

22     says:  ADC has purchased Symantec Backup Exec.  Is that a

23     software program?

24     A.      Yes.

25     Q.      Would you explain how that software works.

# Exhibit D

# ADC Backup Procedures

One of the most important functions as a System Administrator is to maintain the integrity of the data on your system. Since hardware does fail and people make mistakes it is imperative that you make frequent backups of the file systems. That way in the event of a disk crash or accidental deletion of files you can recover a recent version of the data or programs.

Backups are an often-neglected task, even by experienced system managers. Although it is often looked upon as a tedious and time consuming task, backup are perhaps the most vital job function. The real danger of skipping backups is that one day someone may call and need data retrieved and the data cannot restore it, that reflects negatively on our IT staff and makes customers unhappy with us.  On the other hand if something happens and you are able to restore services and keep business running, you will make a favorable impression of IT.  Data can be valuable and may be impossible to replace.  Loosing data can be catastrophic and can cost the Department a fortune.  Such a loss is likely to adversely affect our careers as Systems Administrators who are responsible for data integrity and protection.  There is a saying "You are only as good as your last Backup." It is therefore imperative that all ADC network specialists have a knowledge and understanding of what is expected of them.  This document will specify what is expected and how backups should be performed.

ADC has purchased *Symantec Backup Exec*, a program that allows for easy setup of backup scheduling, file selection, backup policies, file restores, log files, and email notification to keep you informed of any issues with the backup job. With all ADC servers using the same backup program we can set up a procedure for everyone to follow.

The important elements needed for this are as follows.
1) Knowing what data needs to be backed up.
2) When to schedule the backups.
3) Is there enough media to accomplish all of this?
4) How to catalog the media.
5) Media rotation.
6) Is there media being sent off site or moved to a location away from the data servers.
7) Drive cleaning.
8) Cross training.

1) **What data needs to be backed up?**
Typically this is your SHARED and USERS folder on your production file server.  In addition your Exchange Information Store will need to be backed up to protect the mail. Each location may have other directories that require backing up of the data within those locations.

EXHIBIT NO. 14
Nicoletti
9-21-12

**2) <u>When to schedule the backups.</u>**
   The best time to schedule your backups is going to be after normal business hours. Between the hour's of 6:00PM and 7:00PM, is a good time to start the backups.   With Exchange being in the mix and the size of these files…a daytime schedule for Exchange is recommended.  Exchange uses VSS shadow copy, so a backup during the daytime can happen without locking files or impacting the Exchange Services. The jobs should be monitored and time as to not interfere with each other.

**3) <u>Do you have enough media?</u>**
   There should be enough media in your inventory to enable you to set tapes aside or take off-site for 30 days depending on the routine that is being used.   Once you know how many tapes it takes to do full backups of your *Data directories* for one week, this will give you a baseline to go by.

**4) <u>Catalog your media.</u>**
   It is very important for you to keep records of your media.  Label the tape case with the date of the backup.  If it is daily or weekly, label it as such.  Keep a spreadsheet or a file that will allow easy lookup of the backup media by all who are involved with this process.

**5) <u>Media rotation.</u>**
   Media rotation is another key to good data protection. The goal is to be able to query and retrieve any given tape in your rotation if a restore is needed.  Keeping your tapes in a safe place is also very important to your rotation. Keep them stored in a lock box, safe or a locking file cabinet where possible.  Store the tapes in their protective case.

**6) <u>Offsite storage.</u>**
   Offsite storage of backup media is ideal if that option is available.  If not, consider keeping your media in another building that has easy access for you or any person you have as your backup.  Key here is to move the backed up data away from where the servers are located.

**7) <u>Drive cleaning.</u>**
   It is very important not to neglect this often-overlooked task.   To keep drive failures to a minimum, a cleaning schedule should be followed 100%.  The tape heads should be cleaned once per week.  Make sure you have the proper cleaning tape for your drive.

**8) <u>Do you have someone who can take care of backup issues if you are not there?</u>**
   Cross-train someone to take your place should anything keeps you from performing these duties.  The reason for having a standard policy is to make it very easy for another NS1 or any member from the IT team, to come in and perform a restore or to help with backups in case of a long absence of the local tech.

Backup technology includes the following:

Central Office

Backup Exec 2010 R3

HP MSL 4048 G2 LTO3 Auto loader
HP MSL 4048 G3 LTO5 Auto loader

Data:
Friday full backups
Monday – Thursday Differential backups

Exchange:
Full backups Monday – Friday


Backup retention is 30 days.

# Exhibit E



PRISON LAW OFFICE

General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

September 21, 2012

Ms. Courtney Cloman
Struck Wieneke & Love
3100 W. Ray Rd., Ste. 300
Chandler AZ 85226

RE:  *Parsons v. Ryan*, Sept. 24, 2012 meet and confer

Dear Ms. Cloman,

I write in response to the letter you sent Counsel for Plaintiffs this morning. Thank you for agreeing to meet and confer with Plaintiffs on Monday, September 24 regarding the issues raised in my letter from yesterday.  In addition, please be prepared to discuss and resolve the following issues, all of which have been previously provided to you with more than the 48 hour notice that you have requested for meet and confer agendas.  Please be prepared to discuss them and have present individual(s) with decisionmaking authority from ADC.

1)     September 8, 2012 letter from Scott Medsker (attached) regarding preservation of evidence.  Defendants refused to discuss this at the last meet and confer on September 10, 2012.  Defendants also stated in their section of the one page dispute summary that there had not been a meet and confer on this topic.

2)     September 18, 2012 letter from Laurens Wilkes (attached) regarding production of documents.  Mr. Wilkes requested a meet and confer in his letter, including a proposal of 1 pm on the 24th.

3)     September 20, 2012 letter from Don Specter (attached) regarding the September 19, 2012 deposition and gathering and producing documents responsive to deposition duces tecum notices. In the one pager outlining this same problem at the Sept. 13 deposition, Defendants stated there had not been a meet and confer on this topic although Mr. Bojanowski and I discussed the issue on the record.

4)     The disputed issue of Defendants not producing documents on a revised proposed schedule, as previously agreed upon in meet-and-confers.  In the one page

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Felecia Gaston • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

summary of the dispute, Defendants asserted that there had not been a meet and confer on this issue.

The Arizona Center for Disability Law has requested meet and confers with you on issues related to their discovery request, and Ms. Alewelt will be writing you separately to list those items.

We think that it would be productive to have a court reporter present during the meet and confer to ensure that there is no confusion about agreements made or not made during the meeting.  We will split the cost with Defendants.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001-2113
TELEPHONE: 202-879-3939 • FACSIMILE: 202-626-1700

Direct Number:  (202) 879-3837
rsmedsker@JonesDay.com

JP008786                        September 8, 2012

VIA E-MAIL AND UPS NEXT DAY AIR
TBOJANOWSKI@SWLFIRM.COM

Timothy J. Bojanowski
Struck Wienke & Love
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

Re:  *Parsons, et al. v. Ryan & Pratt*
U.S. District Court of Arizona; 2:12-cv-00601

Dear Tim:

I am writing to outline the issues we would like to discuss in Monday's meet-and-confer regarding the deponents produced in response Plaintiffs' Notice of Rule 30(b)(6) Deposition Document No. 44 ("Doc. No. 44").

First, Defendants have failed to produce individuals who are adequately knowledgeable or prepared to provide testimony on the 30(b)(6) topics for which they were designated as the 30(b)(6) deponent. *See, e.g., EEOC v. Swissport Fueling, Inc.*, No. CV-10-2101-PHX-GMS, 2012 BL 116595 (D. Ariz. May 10, 2012) (requiring EEOC to produce additional deponents when "[a]lthough [the deponent] was able to provide some answers, she did not have adequate knowledge, familiarity or preparation in many of the areas of inquiry to adequately respond."); *Jeske v. Persolve LLC*, No. MC 11-00124-PHX-FJM, 2012 BL 21881 (D. Ariz. Jan. 27, 2012) ("When a notice of deposition of an entity describes with particularity the subjects for examination, the entity must designate people to testify on its behalf about information known or reasonably available to the organization."). Parties are required to produce a witness to testify to "matters known *or reasonably available*" to them, which "implicitly requires designated persons to review all matters known or reasonably available to them in preparation for a Rule 30(b)(6) deposition." *E.g., EEOC v. The Boeing Co.*, No. CV 05-03034-PHX-JFM, 2007 BL 7062 at *2 (D. Ariz. Apr. 17, 2007). The witnesses you have produced did not discharge this obligation.

Initially, two of ADC's three 30(b)(6) witnesses admitted to being unqualified to testify on their designated topics. Ronda Lee was designated for Topic 9: "Policies and Procedures regarding the retention or destruction of documents, including documents in the possession, custody or control of an ADC employee or contractor, a departing ADC employee or contractor, or an ADC employee or contractor who has already departed." Although Ms. Lee testified that she was aware that her topic included retention and destruction policies and procedures for

**JONES DAY**

Timothy J. Bojanowski
September 8, 2012
Page 2

electronic documents, she admitted that she was not qualified to testify regarding the retention or deletion policies for electronic documents. (*See* 30(b)(6) (Lee), Aug. 21, 2012 (Lee. Tr.) 11:1-4.) Likewise, she was aware that her topic covered policies applicable to former employees and ADC contractors, but she was also unable to testify regarding those topics. (*Id.* 51:8-55:9.)

Carol Pearson was also unprepared to testify on portions of the topics for which she had been designated. Specifically, Ms. Pearson was designated to testify on Topic 8: "The manner in and duration for which paper DOCUMENTS are indexed, stored, located (including onsite and/or offsite storage,) and maintained." However, Ms. Pearson testified that she was only responsible for the maintenance of paper medical records and that she had no responsibility for nonmedical records. (*See* 30(b)(6) (Pearson), Aug. 21, 2012 (Pearson Tr.) 11:4-22.) As a result, she did not believe that she was qualified to testify about the manner in which ADC indexes, stores, locates and maintains nonmedical record paper documents covered by Topic 8. (*Id.* 13:14-17.)

Further, to the extent that any of the witnesses thought that they were personally qualified to testify on the designated topic, none of them had taken any steps to prepare for the deposition or to obtain information reasonably available to them. (*See* Lee Tr. 9:9-23; 54:2-16; Pearson Tr. 12:8-17; 16:9-17; 30(b)(6) (Czarsty), Aug. 20, 2012 (Czarsty Tr.) 12:3-13:1; 133:1-5.) The witnesses' failure to make any attempt to ascertain all of the knowledge within the possession of ADC essentially transforms the 30(b)(6) deposition into a deposition limited to the witnesses' own personal knowledge.

In short, Defendants have failed to produce witnesses to testify to "matters known *or reasonably available*" to them by their failure to "review all matters known or reasonably available to them in preparation for a Rule 30(b)(6) deposition." *E.g., EEOC v. The Boeing Co.*, 2007 BL 7062 at *2. Parties designating witnesses who are inadequate on the designated topic have an obligation to substitute "'an appropriate deponent when it becomes apparent that the pervious deponent is unable to respond to certain relevant areas of inquiry.'" *Id.* (quoting *Alexander v. FBI*, 186 F.R.D. 137, 141 (D.D.C. 1998)).

We believe that Ms. Lee's admitted inability to testify on significant portions of Topic 9, coupled with her total lack of effort to gain information reasonably available to her, requires the ADC to designate an additional witness to complete the testimony with respect to Topic No. 9. Further, in the event that either Mr. Nicoletti or Ms. Pearson appear on September 21, 2012 and are unable to testify completely on their designated topics, we will seek an additional witness on those topics as well.

The second topic on which Plaintiffs request a meet and confer concerns Defendants' efforts to preserve documents relevant to this litigation. As you are aware, counsel for Plaintiffs sent Defendants a letter on October 12, 2011, alerting Defendants of the potential for litigation

**JONES DAY**

Timothy J. Bojanowski
September 8, 2012
Page 3

and seeking early resolution of the case.  The letter contained a provision entitled "Preservation of evidence," which, relying on federal law from the U.S. District Court of Arizona, advised Defendants of their obligations to preserve all relevant, material evidence.

ADC designated Curt Czarsty as the witness for Topics 14 and 15 regarding the ADC's efforts to preserve such relevant, material evidence.  As you will recall, Mr. Czarsty testified that he would be the "primary person" on the network team who would place holds on e-mail accounts and to assist with the collection of data.  (Czarsty Tr. 10:12-15; 10:20-24; 25:17-26:3.) However, Mr. Czarsty also testified that he had not seen the October 12, 2011 letter until mid-August, (*Id.* 11:1-5) and that neither he nor anyone on his team had, at any time, been asked to preserve or collect data regarding the *Parsons* litigation.  (*Id.* 105:13-18.)

Mr. Czarsty also testified regarding the ADC's e-mail retention procedures, stating that e-mails remaining in an employee's inbox for longer than 90 days are automatically purged from the e-mail system unless the employee (1) works in the central staffing offices; (2) manually saves the e-mail; or (3) has been added to the Barracuda server.  (*Id.* 63:19-65:7; 65:13-19; 70:25-72:10; Ex. 4.)  Significantly, while Mr. Czarsty thought he may have received a litigation hold notice in June, he admitted that he had not added a single employee to the Barracuda archive as a result of the *Parsons* litigation.  (Czarsty Tr. 128:20-129.10).

Even if Mr. Czarsty had added all relevant individuals to the Barracuda system, that action was not taken until June, 2012.  In light of Mr. Czarsty's testimony that ADC never disables the auto-delete function on e-mails, (*id.* 107:8-12), it appears that a significant portion of e-mails and relevant attachments for non-central office employees were subject to the ADC's auto-purge policies during the period when ADC had an obligation to preserve such documents. Similarly, it appears that the former ADC employees now working for Wexford may have their e-mail accounts subject to the Microsoft Exchange auto-purge function despite the highly relevant nature of their former positions with ADC.  (*Id.* 85:4-25; 129:11-24.)

Finally, Mr. Czarsty also admitted that ADC had no written policy prohibiting the alteration or deletion of non-email electronic documents maintained on local C Drives, personal H Drive folders, or shared H Drive folders.  (*Id.* 93:11-20; 96:5-8; 101:13-17; 103:3-6.)  Further, while Mr. Czarsty noted that he had not been asked to perform any data searches in this case, he also admitted that while litigation holds will occasionally mention "all electronic documents," (*id.* 109:15-19), it is not his or ADC's policy to search across the various locations where electronic documents might be stored, instead relying solely on the backup tapes as ADC's method of archiving information.  (*Id.* 113:23-115:6.)

In light of this testimony, Plaintiffs are concerned that Defendants have wholly failed to comply with their preservation obligations addressing the specific issues presented in this case. Further, Mr. Czarsty's testimony strongly suggests that ADC is not moving with due diligence to

**JONES DAY**

Timothy J. Bojanowski
September 8, 2012
Page 4

preserve or obtain documents responsive to Plaintiffs' discovery served in July.  Accordingly, we would like to discuss Defendants' spoliation of relevant evidence and efforts to obtain responsive documents at Monday's meet-and-confer.

The U.S. District Court of Arizona recently reiterated that the destruction of evidence or failure to preserve evidence constitutes spoliation of evidence and may result in sanctions including direct findings of liability and awarding of attorneys' fees.  *See Aviva USA Corp. v. Vazirani*, No. CV 11-03639-PHX-JAT, 2012 BL 7595 (D. Ariz. Jan. 10, 2012).  "An organization is put on notice that evidence must be preserved…as soon as a potential claim is identified."  *E.g.*, *Melendres v. Arpaio*, No. CV-07-2513-PHX-GMS, 2011 BL 327180 (D. Ariz. Dec. 23, 2011).  Here, that obligation attached on October 12, 2011, when Plaintiffs' counsel not only made ADC aware of the potential claim, but specifically raised ADC's obligation to preserve evidence.  *See, e.g.*, *Surowiec v. Capital Title Agency, Inc.*, 790 F. Supp. 2d 997 (D. Ariz. 2011) (finding that letter between counsel advising of potential litigation triggered duty to preserve).

Based on Mr. Czarsty's testimony regarding ADC's efforts to preserve documents, Plaintiffs believe that Defendants have likely engaged in spoliation by culpably failing to preserve evidence that was relevant to the claims identified this case.  In attempt to avoid the need for court intervention and to amicably resolve the issue, we would appreciate the opportunity to meet and confer regarding ADC's preservation efforts since October 12, 2011.  At the meet-and-confer, Plaintiffs' hope to ascertain any and all efforts Defendants have made to identify and preserve relevant information, including but not limited to

- the issuance of a litigation hold notice, including everyone who received the notice, how those individuals were selected, when the notice was circulated, the content of the notice, and when any revisions were circulated, including supporting documentation;

- any and all efforts taken to preserve e-mail accounts of ADC employees, contractors, or former employees or contractors, including but not limited to efforts to identify custodians of relevant e-mails;

- steps taken to add such e-mail custodians to the Barracuda archiving system or otherwise preserve their potentially relevant e-mails, including all individuals currently archived on the Barracuda server, when such individuals were added to the Barracuda system, any individual removed from the Barracuda system after October 12, 2011, and any other supporting documentation regarding ADC's efforts to preserve relevant e-mails;

**JONES DAY**

Timothy J. Bojanowski
September 8, 2012
Page 5

- any and all efforts to preserve non-email electronic documents residing on the C Drives or H Drives (including public folders and shared folders), of former ADC employees, contractors, or former employees or contractors, including but not limited to efforts to identify custodians of relevant documents and steps taken to preserve those documents, including supporting documentation;

- efforts to avoid the loss of potentially relevant data through the salvaging or sanitization of local hard drives, including supporting documentation; and

- any and all other efforts Defendants have made to identify and preserve potentially relevant evidence.

To facilitate our meet-and-confer, this letter has laid out in detail Plaintiffs' concerns regarding Defendants' potential spoliation of evidence. To further expedite the resolution of these issues, we request that you provide the information requested in this letter no later than five (5) days prior to the September 21, 2012 continuation of 30(b)(6) depositions related to ADC's preservation efforts. In the event that Monday's meet-and-confer leaves any of these issues unresolved, we would like to resolve those issues when we are together in Phoenix on September 21.

Best regards,

R. Scott Medsker

# JONES DAY

717 TEXAS • SUITE 3300 • HOUSTON, TEXAS 77002.2712

TELEPHONE: +1.832.239.3939 • FACSIMILE: +1.832.239.3600

Direct Number: (832) 239-3796
jlwilkes@JonesDay.com

JP011915                        September 18, 2012

Timothy J. Bojanowski, Esq.                    VIA EMAIL AND U.S. MAIL
Courtney Cloman, Esq.
Struck Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

     Re:    Defendants' Document Production in *Parsons v. Ryan*

Dear Mr. Bojanowski:

    We request a meet-and-confer regarding the form of Defendants' document production in this case to date. Specifically, the document production associated with Defendant Richard Pratt's and Defendant Charles Ryan's First Supplemental Joint Responses to Plaintiff Parson's Request for Production and the Supplemental Disclosure Statement contained only TIFF images and this form does not comply with Plaintiffs' discovery requests or the Federal Rules of Civil Procedure.

    In response to Plaintiffs' Request for Production, Defendants produced approximately 3,500 pages of TIFF files that are not OCR text searchable and without any load file or associated metadata. In addition, Defendants sent another 105 pages without any of this material with the Supplemental Disclosure Statement.

    As permitted by Federal Rule of Civil Procedure 34(b)(1)(C), in the Request for Production, Plaintiffs specified the following instructions:

    6. Responsive DOCUMENTS that exist only in paper form shall be organized as they have been kept in the ordinary course of business and shall be produced according to the following protocol:
        a. Paper DOCUMENTS shall be scanned and produced in TIFF image format at a resolution sufficient to enable the generation of searchable text using Optical Character Recognition ("OCR").

HUI-154246v1

ALKHOBAR • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI
FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID • MEXICO CITY
MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

JONES DAY

September 18, 2012
Page 2

    7.  Responsive DOCUMENTS that exist in electronic form, even if such DOCUMENTS also exist in paper form, shall be produced in electronic form according to the following protocol:

> e.  TIFF images shall be accompanied by a standard load file containing the metadata and other fields identified in Paragraph 7(j) of these Instructions, below. The load file shall be produced in one of the following industry-standard formats: (1) Concordance delimited file (".dat"); (2) comma-separated value file (".csv"); or (3) TAB delimited file.  TIFF images shall also be accompanied by either an Opticon delimited cross-reference file (".opt") or IPRO View LFP comma-delimited file showing DOCUMENT breaks and appropriate DOCUMENT unitization.

Paragraph 7(j) specified the fields requested for documents containing metadata, such as Custodian, Author, DateCreated, and other fields for emails.

    Defendants did not object to this request in the supplemental responses, nor did Defendants state the form or forms Defendants intended to use, as required under Rule 34(b)(2)(D).  Further, Defendants specifically acknowledged in their initial responses that they are required to "produce [documents] in a form or forms in which [they are] ordinarily maintained or in a reasonably usable form or forms."  Fed. R. Civ. Proc. 34(b)(2)(E)(ii).

    As noted above, the files Defendants produced on the CDs are not reasonably usable in the form produced.  "Absent party agreement or court order specifying the form or forms of production, production should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form, *taking into account the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search and display* the information as the producing party where appropriate or necessary in light of the nature of the information and the needs of the case."  *Romero v. Allstate Ins. Co.*, 271 F.R.D. 96, 107 (E.D. Pa. 2010) (quoting Principle 12 of the Sedona Principles and compelling production of metadata).  "If the responding party ordinarily maintains the information it is producing in a way that makes it searchable by electronic means, *the information should not be produced in a form that removes or significantly degrades this feature*." *Goodbys Creek, LLC v. Arch Ins. Co.*, 2008 BL 207000 *3-4 (M.D. Fla. Sept. 15, 2008).  TIFF documents "do not contain information such as the creation and modification dates of a document, e-mail attachments and recipients and metadata."  *Hagenbuch v. 3B6 Sistemi Elettronici Industriali S.R.L.*, 2006 WL 665005, *3-4 (N.D. Ill. Mar. 8, 2006) (finding TIFF images unacceptable).

    Please let us know your availability to meet-and-confer on these issues on September 19 from 12:30 pm to 4:30 pm PDT, September 20 from 8:00 am to 12:00 pm PDT, and September

JONES DAY

September 18, 2012
Page 3

24 from 1:00 pm to 4:30 pm PDT.  We are willing to discuss a mutually acceptable form of production for both sides and reasonable modifications to Plaintiffs' production instructions as appropriate.  Further, we expect that Defendants can explain what types of documents these are (hard copy, electronic, etc.) at the meet-and-confer.  Plaintiffs reserve all rights with regard to the form of Defendants' already produced documents.  If we are not able to reach an agreement quickly, Plaintiffs will incur the cost to make these documents usable and specifically seek to recover these costs based on the failure to comply with the requests and the rules.

Regards,

*J. Laurens Wilkes*

J. Laurens Wilkes



PRISON LAW OFFICE
General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

September 20, 2012

VIA EMAIL ONLY

Ms. Kathy Wieneke
Struck Wieneke & Love
3100 W. Ray Rd., Ste. 300
Chandler AZ 85226

> Re:   *Parsons, et al. v. Ryan, et al.*; 30(b)(6) Deposition on Sept. 19, 2012

Dear Kathy,

I write about some of the issues that surfaced at yesterday's deposition.

First, at the Rule 30(b)(6) deposition yesterday you instructed the deponent, Dr. Rowe, not to answer questions related to the mortality reviews that he conducts for the ADC on the basis of the state law peer review privilege. Dr. Rowe followed your instruction and did not answer substantive questions on that topic.

Plaintiffs do not agree that the mortality reviews conducted by Dr. Rowe are peer review. Even if those reviews are covered by the Arizona peer review statute, the Ninth Circuit has held that that state law privilege is not recognized in federal question cases in federal court. In a case arising out of an Arizona correctional facility the Court held that "federal law recognizes no privilege of peer review in the context of a case involving the death of a prisoner." *Agster v. Maricopa County*, 422 F.3d 836, 837 (9th Cir. 2005). The Court affirmed the district court's ruling requiring the disclosure of a mortality review conducted by jail authorities. *Id.* at 839. Accordingly, your instruction to Dr. Rowe had no legal basis.

Plaintiffs therefore request that you produce all mortality reviews in possession of ADC, including those produced by Dr. Rowe, from January 1, 2010 to the present and that you make Dr. Rowe available for deposition to answer questions about those mortality reviews.

Second, Dr. Rowe testified that he had emails that were responsive to some of the deposition topics but had not been asked to search for them and did not produce any pursuant to the Notice of Deposition Duces Tecum. At the deposition I requested that those emails be produced but you did not respond to that request, stating that you first had to consult with your clients and other members of your team. Plaintiffs again request that those emails be produced

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Felecia Gaston • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

immediately and that Dr. Rowe be made available for deposition to answer any questions about those emails.

Third, it is apparent that Defendants did not conduct any other search for documents to comply with the Notice and the accompanying request for documents, despite the fact that it was clear from Dr. Rowe's testimony that others, including Mr. Taylor and Mr. Pratt, may have knowledge or information on the noticed topics and may possess responsive documents. Plaintiffs request that Defendants search for and produce all emails, memoranda and other documents listed in the Notice (Dkt #78) relevant to the listed topics.

Fourth, it is perfectly clear from yesterday's deposition that Defendants made no attempt to ensure that Dr. Rowe could "testify about information known or reasonably available to" ADC. Fed. Rule Civ. Proc., Rule 30(b)(6). Dr. Rowe testified that he worked less than half time and had very limited responsibilities for health care and that for the most part he was charged with reviewing charts and answering questions from Mr. Pratt and others regarding clinical issues specific to individual patients. In addition, Dr. Rowe, whom Defendants designated to cover multiple topics, did nothing to prepare for the deposition besides having a three to four hour conversation with you and reviewing a few policies. Thus, Defendants did not designate the person most knowledgeable on these subjects and made no attempt to provide information "reasonably available to the organization." This is not the first time 30(b)(6) deponents have been unprepared or that we have complained about that fact.

Finally, we discussed issues two and four at length at the deposition so I see no need to meet and confer about that further. We are available on September 21 and 24 to meet and confer about the other two issues.

I look forward to your prompt response.

Sincerely,

/s/

Donald Specter

# Exhibit F



STRUCK WIENEKE & LOVE          [ 3100 West Ray Road, Suite 300   Chandler, Arizona 85226   **480.420.1600**   swlfirm.com ]

September 21, 2012

Daniel P. Struck
PARTNER

Kathleen L. Wieneke
PARTNER

Rachel Love
PARTNER

Timothy J. Bojanowski
PARTNER

Christina Retts
SENIOR ASSOCIATE

Jamie D. Guzman
ASSOCIATE

Nicholas D. Acedo
ASSOCIATE

Tara B. Zoellner
ASSOCIATE

Amy L. Nguyen
ASSOCIATE

Steven Serbalik
ASSOCIATE

Ashlee B. Fletcher
ASSOCIATE

Jennifer Holsman
OF COUNSEL

David C. Lewis
OF COUNSEL

Via Email

Kirstin T. Eidenbach
Stephen Brookman
Nicholaus Podsiadlik
PERKINS COIE LLP
2901 N. Central Ave., Suite 2000
Phoenix, AZ 85012-2788

Scott Medsker
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104

David C. Fathi
ACLU NATIONAL PRISON
PROJECT
915 15th St. N.W., 7th Floor
Washington, D.C. 20005

Jennifer A. Alewelt
ARIZONA CENTER FOR
DISABILITY LAW
5025 East Washington Street,
Suite 202
Phoenix, AZ 85034

Corene T. Kendrick
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, CA 94710

Caroline N. Mitchell
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104

Re:   *Parsons, et al. v. Ryan and Pratt*
      U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

We have previously informed Plaintiffs that any topics not submitted *within two business days,* not 48 hours, of a meet-and-confer will not be added to the agenda for that particular meet-and-confer. The topics you listed in today's letter were not contained in the letter you sent yesterday - which outlined the agenda for Monday's meet-and-confer. Simply because those topics allegedly were previously discussed, at some time, does not make them eligible for discussion at any meet-and-confer subsequent to the alleged discussion. Again, an *agenda* for the meet and confer must be given within two business days. It is not appropriate for Plaintiffs to add any issue that may have been previously discussed, but that was not included on the agenda for the meet-and-confer.

With regards to the September 24, 2012 meet-and-confer, we specifically agreed to discuss the contents of, and our response to, Corene Kendrick's September

20, 2012 letter.   As such, only the topics contained in those two letters will be discussed.   The additional topics added in today's letter will not be discussed at Monday's meet-and-confer.

Sincerely,

*Courtney R. Cloman*

Courtney R. Cloman
For the Firm

CRC:ee
cc:       Michael Gottfried, Esq.
          Dawn Northup, Esq
          Kelly Dudley