**Index to Exhibits to Declaration of Alison Hardy in Support of Plaintiffs' Motion to Compel Production Of Death Records And Mortality Reviews And To Compel Response To Deposition Questions Regarding Mortality Reviews—and Memorandum in Support**

Exhibit 1:   Plaintiffs' First Set of Requests for Production, Req. 40 served June 15, 2012

Exhibit 2:   Letter dated August 31, 2012 from Caroline Mitchell to Timothy Bojanowski

Exhibit 3:   Deposition Excerpts of 30(b)(6) designee, Dr. Richard Rowe, on September 19, 2012

Exhibit 4:   Letter dated September 20, 2012 from Donald Specter to Kathy Wieneke

Exhibit 5:   Letter dated October 10, 2012 from Courtney Cloman to Donald Specter

Exhibit 6:   Letter dated September 21, 2012 from Joe Profiri to Wexford Health Services

Exhibit 7:   ADC memorandum dated August 13, 2012 from Matthew Musson to Joe Profiri

Exhibit 8:   ADC memorandum dated August 10, 2012 from John Mitchell to Joe Profiri

Exhibit 9:   Email dated October 9, 2012 from Donald Specter to Kathy Wieneke

Exhibit 10:  Email dated September 26, 2012 from Caroline Mitchell to Kathy Wieneke, et al.

Exhibit 11:  Letter dated September 27, 2012 from Ashlee B. Fletcher to Counsel of Record

# EXHIBIT 1

1    Daniel Pochoda (Bar No. 021979)
     Kelly J. Flood (Bar No. 019772)
2    James Duff Lyall (Bar No. 330045)*
     **ACLU FOUNDATION OF ARIZONA**
3    3707 North 7th Street, Suite 235
     Phoenix, Arizona 85013
4    Telephone: (602) 650-1854
     Email: dpochoda@acluaaz.org;
5         kflood@acluaz.org
          jlyall@acluaz.org
6    *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

7    *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
     *Stephen Swartz, Dustin Brislan, Sonia Rodriquez,*
8    *Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert*
     *Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
9    *Joshua Polson, and Charlotte Wells, on behalf of*
     *themselves and all others similarly situated*

10   **[ADDITIONAL COUNSEL LISTED ON**
        **SIGNATURE PAGE]**
11
     Jennifer Alewelt (Bar No. 027366)
12   Ruth Szanto (Bar No. 029073)
     Asim Varma (Bar No. 027927)
13   **ARIZONA CENTER FOR DISABILITY LAW**
     5025 East Washington Street, Suite 202
14   Phoenix, Arizona 85034
     Telephone: (602) 274-6287
15   Email: jalewelt@azdisabilitylaw.org
          rszanto@azdisabilitylaw.org
16        avarma@azdisabilitylaw.org
     *Attorneys for Plaintiff Arizona Center of Disability Law*
17
                 UNITED STATES DISTRICT COURT
18
                      DISTRICT OF ARIZONA
19
20   Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
     Dustin Brislan; Sonia Rodriquez; Christina               (MEA)
21   Verduzco; Jackie Thomas; Jeremy Smith; Robert
     Gamez; Maryanne Chisholm; Desiree Licci; Joseph
22   Hefner; Joshua Polson; and Charlotte Wells, on       **PLAINTIFF VICTOR**
     behalf of themselves and all others similarly        **ANTONIO PARSONS' FIRST**
23   situated; and Arizona Center for Disability Law,     **SET OF REQUESTS FOR**
                                                          **PRODUCTION OF**
                         Plaintiffs,                      **DOCUMENTS TO**
24                                                        **DEFENDANTS**
            v.
25
     Charles Ryan, Director, Arizona Department of
26   Corrections; and Richard Pratt, Interim Division
     Director, Division of Health Services, Arizona
27   Department of Corrections, in their official
     capacities,
28                       Defendants.

1

2        Pursuant to Rule 34 of the Federal Rules of Civil Procedure, plaintiff <u>Victor</u>

3   <u>Antonio Parsons</u>, by and through undersigned counsel, requests that defendants respond,

4   within 30 days and produce the following documents for inspection and copying at ACLU

5   Foundation of Arizona, 3707 N. 7th Street, Suite 235, Phoenix, AZ 85013.

6                              **DEFINITIONS**

7        For purposes of these requests, the following definitions shall apply:

8        1.      "ADC" means the Arizona Department of Corrections, including all its

9   subdivisions, agents, employees, contractors, and attorneys.

10       2.      "ADC STAFF" means all persons employed by ADC, including

11  "CORRECTIONAL STAFF" and "HEALTH CARE STAFF."

12       3.      "COMMUNICATIONS" means any transmittal of information from one

13  person or entity to another by any means, including letters, correspondence, notes,

14  memoranda, records,  reports, papers, facsimiles, electronic mail (whether to, from, copied

15  or blind copied), electronic mail generated from a hand held personal device including a

16  Blackberry or iPhone, instant messaging, electronic mail generated from business or

17  personal email accounts, internet relay chat, news group, group or collaboration servers,

18  electronic bulletin boards, electronic discussion boards, dictation tapes, video recordings,

19  audio recordings, digital recordings, memoranda, telegrams, telecopies and telexes,

20  teleconference, collaboration servers (including share point servers), web-based or

21  software virtual meetings including Web-X and any other meeting software and share

22  point servers, and oral contact such as face-to-face discussions or meetings, telephone

23  conversations, and voice mail messages.

24       4.      "COMPLAINTS" means any DOCUMENTS, formal or informal,

25  REGARDING specific or general problems, issues, deficiencies, unanswered questions,

26  challenges, shortcomings, disagreements, or requests brought to the attention of the ADC

27  or any ADC STAFF.

28       5.      "CONDITIONS OF CONFINEMENT" means all circumstances

REGARDING the state of being imprisoned.

6.     "CONTRACTOR" means "LOCUM TENENS CONTRACTOR" and "SPECIALTY CONTRACTOR."

7.     "CORRECTIONAL STAFF" means custody staff employed or paid by the ADC to serve in a security or operational capacity.

8.     "COST CONTAINMENT" means contemplated, discussed, or actual actions to restrict, reduce, contain, or limit costs or expenses by DEFENDANTS, the ADC or any personnel working in any capacity for the ADC or the Arizona State Government, including agents of the foregoing.

9.     "DEATH RECORDS" means any DOCUMENT REGARDING the death of a PRISONER, including audits, REVIEWS, studies, interview notes, videos, audio-recordings, EXTERNAL INVESTIGATIONS or INTERNAL INVESTIGATIONS.

10.    "DESCRIBE" and "DESCRIPTION" means to provide all available INFORMATION.

11.    "DISCIPLINE" means any formal or informal discipline, punishment, reprimand, warning, or comment given to any person as a result of substandard or unacceptable conduct.

12.    "DOCUMENT" and "DOCUMENTS" have the same scope used in Rule 34(a)(1) of the Federal Rules of Civil Procedure and shall encompass every writing or record of every type and DESCRIPTION and every tangible thing that is or has been in the possession, custody, or control of DEFENDANTS and the ADC, to which they have access, or of which they have knowledge, including, but not limited to, newspaper articles, magazine articles, news articles, correspondence, letters, contracts, files, electronic mail, memoranda, stenographic notes, handwritten notes, drafts, studies, publications, books, pamphlets, catalogs, purchase orders, receipts, advertisements, direct mail solicitations, point-of-sale and point-of-purchase materials, notebooks, diaries, models, devices, pictures, photographs, films, audiotapes, videotapes, computer records, voice recordings, maps, reports, surveys, MINUTES, data compilations, and statistical compilations, regardless of whether a particular DOCUMENT is privileged or confidential, and

regardless of the form of storage (including, but not limited to, paper, microfiche, magnetic tape, magnetic disk (hard disk or floppy disk), CD-ROM, DVD, optical disk, or electronic storage device). "DOCUMENT" and "DOCUMENTS" includes, but is not limited to, all DOCUMENTS generated by or maintained in the Director's Project Tracking System, official ADC papers, and the ADC's intranet.

13.     "EMERGENCY HEALTH CARE SERVICES" means treatment or care to address a mental health, medical, or dental injury or illness that is acute, causes substantial pain, and/or and poses a substantial and immediate risk to the life or long term health of a person.

14.     "ENTRY-LEVEL PRACTITIONERS" means unlicensed persons who provide HEALTH CARE to PRISONERS at the ADC subordinate to MID-LEVEL PRACTITIONERS or HEALTH CARE CLINICIANS.

15.     "EXTERNAL INVESTIGATIONS" means investigations, REVIEWS, audits, or studies, whether formal or informal, conducted by a person who is not employed by the ADC or an entity that is not the ADC.  It is immaterial to the definition whether the EXTERNAL INVESTIGATION was conducted at the ADC's behest or direction.

16.     "GRIEVANCES" means COMPLAINTS or requests made by PRISONERS to the ADC, and the exhaustion of claims raised or stated therein.

17.     "HEALTH CARE" means the provision of care, including adequate diet, to address the mental health, medical, or dental needs of a PRISONER, whether those needs arise as a result of injury, illness, disease, or other trauma, or care provided for diagnostic or preventive purposes.

18.     "HEALTH CARE CLINICIANS" means persons independently licensed to provide HEALTH CARE to PRISONERS at the ADC facilities, including but not limited to M.D., D.O., D.D.S., and Ph.D. credentialed staff.

19.     "HEALTH CARE DIRECTIVES" means DOCUMENTS REGARDING advance medical care directives, living wills, personal directives, advance directives, or instructions of any kind in which individuals specify what actions should or should not be

-3-

taken for their HEALTH CARE in the event they are no longer able to make decisions due to illness, injury, or incapacity

20.     "HEALTH CARE SHORTAGES" means any deficiencies involving HEALTH CARE, including but not limited to a lack of or insufficient number of medicines, drugs, medical supplies, medical equipment, transportation, or HEALTH CARE STAFFING.

21.     "HEALTH CARE STAFF" means all staff employed or paid by the ADC, LOCUM TENENS CONTRACTORS, or SPECIALTY CONTRACTORS (other than CORRECTIONAL STAFF) who are responsible for providing HEALTH CARE to ADC PRISONERS, including but not limited to HEALTH CARE CLINICIANS, MID-LEVEL PRACTITIONERS, ENTRY-LEVEL PRACTITIONERS, PHARMACISTS, and administrative and support staff.

22.     "HEALTH CARE STAFFING" means the provision of HEALTH CARE STAFF to provide HEALTH CARE.

23.     "HEALTH GRIEVANCES" means requests for HEALTH CARE or COMPLAINTS REGARDING the need for, adequacy of, quality of, or timing of HEALTH CARE made by PRISONERS to the ADC, including but not limited to the submission of Health Needs Request ("HNR") forms and the exhaustion of claims stated therein.

24.     "HNR POLICIES AND PROCEDURES" means policies, procedures, or practices, whether written or established through custom or use, REGARDING HNR submissions by PRISONERS, including but not limited to the distribution, disposal, processing, rejection of, responses to, provision of HEALTH CARE pursuant to, and exhaustion of claims raised by such submissions. This includes policies, procedures, or practices that are in draft form and have not been approved and/or implemented.

25.     "HOSPITALIZED PRISONER" means any PRISONER who is sent to a hospital or other off-site medical or mental health facility, or who is admitted to an on-site hospital, while in the custody of the ADC.

26.    "HOURS OF OPERATION" means the time periods during which a facility, unit, or other ADC facility housing PRISONERS is able to provide HEALTH CARE to PRISONERS by on-site HEALTH CARE STAFF.

27.    "IDENTIFY" and "IDENTIFICATION" with respect to (a) a PRISONER or former PRISONER, means to state the PRISONER'S full name, ADC number, date of birth, current or most recent mental health score (MH-1 through MH-5), medical score (M-1 through M-5), public risk score, institutional risk score, and current housing location (if still in ADC custody) or last known address and telephone number (if no longer in ADC custody); (b) a person other than a PRISONER or former PRISONER, means to state the person's full name and specify whether or not the person is or has been an ADC STAFF member, and if so, to state the staff member's position title, facility location, work schedule, responsibilities, date ADC employment began, date ADC employment terminated, dates of any changes in position titles or responsibilities, DESCRIPTIONS of any changes in position titles or responsibilities and, if the person is not currently employed by ADC, the person's last known address and telephone number; and (c) a third-party contractor or entity means to state the name of the contractor or entity, the type of entity (e.g., corporation, partnership, etc.); its address and telephone number; and any persons YOU are aware of who acted on behalf of that contractor or entity with respect to the events at issue in the discovery request; (d) IDENTIFY in any other context means to provide as much INFORMATION REGARDING the thing to be identified as is in the possession of DEFENDANTS or the ADC.

28.    "INFORMATION" means any knowledge YOU have, any evidence of any type, any facts of which YOU are aware and any inferences or speculation of which YOU are aware, all regardless of the source.  When INFORMATION YOU provide is based solely on inference or speculation, specifically so state in YOUR response.  When providing INFORMATION, provide the names of involved individuals, actions relevant to the requested INFORMATION, dates and times when known, locations, and any other knowledge YOU have about the subject of the discovery request.  When asked to provide

INFORMATION about one or more individuals, IDENTIFY the individual or individuals and provide any other INFORMATION YOU have about such person or persons.

29.    "INTERNAL INVESTIGATION" means an investigation, REVIEW, audit, study, interview notes, videos, or audio recordings, whether formal or informal, conducted by the ADC.

30.    "ISOLATION" means confinement in a cell for 22 hours or more each day; confinement in Eyman-Special Management Unit ("SMU") 1, Eyman-Browning Unit, Florence-Central Unit, Florence-Kasson Unit, or Perryville-Lumley Special Management Area ("SMA"); or confinement in a Complex Detention Unit ("CDU").

31.    "JOB PERFORMANCE EVALUATION" means any evaluation, whether formal or informal, of the work of an ADC STAFF member or contractor performing services for the ADC.

32.    "LOCUM TENENS CONTRACTOR" means any person or entity contracting with ADC to provide HEALTH CARE to ADC PRISONERS.

33.    "MID-LEVEL PRACTITIONERS" means licensed professionals who provide HEALTH CARE to PRISONERS at the ADC under supervision by HEALTH CARE CLINICIANS.

34.    "MINUTES" means notes or any other recording reflecting the content of a meeting, whether written contemporaneously with or subsequent to the meeting.

35.    "ORGANIZATIONAL STRUCTURE" means the structure of who reports to whom within the ADC up to and including defendant Charles Ryan, including specifically all HEALTH CARE STAFF and each individual's job title and DESCRIPTION of duties.

36.    "OUTDOOR EXERCISE" means periods during which PRISONERS are permitted to exercise in the outdoors.

37.    "PHARMACIST" means a professional who practices pharmacy.

38.    "POLICIES AND PROCEDURES" means policies, procedures, criteria, or practices, whether written or established through custom or use, including but not limited

VICTOR ANTONIO PARSONS' FIRST SET
OF REQUESTS FOR PRODUCTION
2:12-CV-00601-NVW--MEA

to policy and procedure manuals, directors' orders, protocols, directives, flowcharts, institution post orders, and any other DOCUMENTS designed to direct the actions of ADC personnel, ADC contractors, and/or PRISONERS.

39.    "PRISONER" means a person incarcerated by the ADC.

40.    "QUALITY ASSURANCE" means any activities implemented for the purpose of examining, assessing, evaluating, investigating, analyzing, or identifying the quality of a product or service.

41.    "REFERRAL" means a recommendation that a PRISONER obtain HEALTH CARE from HEALTH CARE STAFF at ADC or non ADC facilities, whether or not such HEALTH CARE is in fact ever provided.

42.    "REFERRED CARE" means HEALTH CARE pursuant to a REFERRAL.

43.    "REFERRED PRISONER" means a PRISONER who received a REFERRAL while in the legal custody of the ADC.

44.    "REGARDING" or "REGARDED" to any given subject matter means, without limitation, anything that, in whole or in part, analyzes, comments upon, comprises, concerns, constitutes, contains, describes, discusses, embodies, evidences, explains, identifies, manifests, mentions, pertains directly or indirectly to, reflects, refers to, relates to, responds to, states, summarizes, or is in any way relevant to the particular subject matter identified.

45.    "RESPONSE DATE" means date upon which YOU respond to these discovery requests, or, if YOU amend or supplement YOUR response, the date of YOUR amendment or supplement.

46.    "REVIEWS" means examinations, assessments, evaluations, or investigations performed by or at the direction of ADC STAFF or officials.

47.    "SPECIALTY CONTRACTOR" means any person or entity contracting with the ADC to provide HEALTH CARE to PRISONERS who is not a LOCUM TENENS CONTRACTOR.

48.   "STAFFING SCHEDULE" means the days, hours, and/or shifts for which each member of the HEALTH CARE STAFF was scheduled to work, including overtime, on call and call-in coverage.

49.   "SUFFICIENT TO SHOW" means demonstrating or evidencing complete INFORMATION on the requested topic, without the need to produce every DOCUMENT REGARDING the topic.

50.   "YOU," "YOUR," "YOURSELF," and "DEFENDANTS" means defendants Charles Ryan and Richard Pratt, and their predecessors, successors, employees, subordinates, contractors, agents, and attorneys.

## INSTRUCTIONS

1.   YOU are required to furnish all DOCUMENTS in YOUR possession, custody, or control, including those DOCUMENTS that are in YOUR possession, custody, or control in the normal course of YOUR employment obligations, and those in the possession, custody or control of your (1) employer; (2) consultants; (3) attorneys; (4) representatives; (5) agents; or (6) any other person acting or purporting to act on YOUR behalf or at YOUR direction, whether doing so directly or at the direction of YOUR subordinates.  Possession, custody, or control includes DOCUMENTS stored in electronic form by third party service providers but accessible to the Defendant, including but not limited to email accounts, FTP servers, portable storage media such as USB drives, cloud storage services such as Dropbox or SharePoint , and online workspaces such as WebEx.

2.   All non-identical copies of every DOCUMENT whose production is sought shall be separately produced.

3.   Each request herein constitutes a request for DOCUMENTS in their entirety, with all enclosures and attachments, and without abbreviation, redaction, or expurgation. DOCUMENTS attached to each other, including but not limited to, by staple, clip, tape, email attachment, or "Post-It" note, should not be separated, although any page on which a Post-It note covers or obscures text on the DOCUMENT should be

-8-

produced both with and without the Post-It note. The production must also include, where applicable, any index tabs, file dividers, designations, binder spine labels, or other similar information as to the source and/or location of the DOCUMENTS.

4.      DEFENDANTS shall produce any and all drafts and copies of each DOCUMENT that are responsive to any request, including but not limited to copies containing handwritten notes, markings, stamps, or interlineations. The author(s) of all hand-written notes should be identified.

5.      YOU shall produce all responsive DOCUMENTS as they have been kept in the ordinary course of business.

6.      Responsive DOCUMENTS that exist only in paper form shall be organized as they have been kept in the ordinary course of business and shall be produced according to the following protocol:

   a.      Paper DOCUMENTS shall be scanned and produced in TIFF image form at a resolution sufficient to enable the generation of searchable text using Optical Character Recognition ("OCR").

7.      Responsive DOCUMENTS that exist in electronic form, even if such DOCUMENTS also exist in paper form, shall be produced in electronic form according to the following protocol:

   a.      Electronic DOCUMENTS shall be produced electronically as single page, uniquely and sequentially numbered Group IV TIFF image files of not less than 300 dots per inch resolution, together with DOCUMENT level load files wherein the full text was extracted directly from the native file where possible.

   b.      For files produced in TIFF image form, each page of a produced DOCUMENT shall have a legible, unique production number electronically "burned" onto the TIFF image in such a manner that information from the source DOCUMENT is not obliterated, concealed, or interfered with, preferably in the lower right corner of the DOCUMENT. The production

-9-

number shall contain at least six digits.  There shall be no other legend or stamp placed on the DOCUMENT image, unless a DOCUMENT qualifies for confidential treatment pursuant to the terms of any protective order in this matter, or if the DOCUMENT requires redaction.  In the case of confidential materials as defined by any protective order in this matter, any applicable designation may be "burned" onto the DOCUMENT's image at a location that does not obliterate or obscure any information from the source DOCUMENT, preferably in the lower left corner.

c.      Each DOCUMENT image file shall be named with the unique production number of the page of the DOCUMENT in question, followed by the extension ".tif".  File names should not be more than 20 characters long or contain spaces.

d.      For files produced in TIFF image format, each page of a DOCUMENT shall be electronically saved as an image file.  If a DOCUMENT is more than one page, the unitization of the DOCUMENT and any attachments and/or affixed notes shall be maintained as they existed in the original DOCUMENT.

e.      TIFF images shall be accompanied by a standard load file containing the metadata and other fields identified in Paragraph 7(j) of these Instructions, below.  The load file shall be produced in one of the following industry-standard formats:  (1) Concordance delimited file (".dat"); (2) comma-separated value file (".csv"); or (3) TAB delimited file.  TIFF images shall also be accompanied by either an Opticon delimited cross-reference file (".opt") or IPRO View LFP comma-delimited file showing DOCUMENT breaks and appropriate DOCUMENT unitization.

f.      In addition to TIFF images, each production of electronic DOCUMENTS shall include searchable text files corresponding to the TIFF images for each DOCUMENT.  The full text of each native electronic

DOCUMENT, excluding redacted DOCUMENTS, shall be extracted directly from the native file and produced in a DOCUMENT-level related text file (the "Extracted Text"). The Extracted Text shall be provided in searchable ASCII text format (or Unicode text format if the text is in a foreign language) and shall be named with the unique production number of the first page of the corresponding TIFF DOCUMENT followed by the extension ".txt". YOU shall also perform OCR on certain types of non-text based static image ESI, such as native PDF image files, and produce the corresponding DOCUMENT-level related text files. Searchable text files shall be generated from Extracted Text where available.

g.       DOCUMENTS shall be produced on optical media (CD or DVD) or external hard drives or similar, readily accessible electronic media (the "Production Media"). Each piece of Production Media shall IDENTIFY a production number corresponding to the party and production with which the DOCUMENTS on the Production Media are associated (e.g., "RYAN 001"), as well as the volume of the material in that production (e.g., "- 001", "-002"). For example, if the first production wave by YOU comprises DOCUMENT images on three hard drives, YOU shall label each hard drive in the following manner: "RYAN 001-001", "RYAN 001-002", and "RYAN 001-003." The face of each piece of Production Media shall also IDENTIFY:  (1) the production date; and (2) the production number range of the materials contained on the Production Media.

h.       Presentation DOCUMENTS (such as Microsoft PowerPoint DOCUMENTS) shall be produced with one slide per page together with any "Speaker's Notes" or similar pages appended to, or otherwise associated with, each slide. Presentation DOCUMENTS shall also be produced according to all other applicable Instructions set forth in this set of requests.

i.      Unless redaction is required, spreadsheet DOCUMENTS (such as Microsoft Excel DOCUMENTS) shall be produced in native format, together with a single page TIFF placeholder bearing the legend "Native File Produced" and load files containing the agreed upon metadata, extracted text, production numbers and any applicable confidentiality labels as described above.  If redaction is required, then spreadsheets shall be produced in TIFF image format as set forth above.

j.      For all DOCUMENTS for which metadata exists, the load files described above shall be produced including the following fields:

| Fields for all DOCUMENTS | Description |
| --- | --- |
| BegProd | Beginning production number assigned to each DOCUMENT |
| EndProd | Ending production number assigned to each DOCUMENT |
| BegAttach | Beginning production number assigned to the group of DOCUMENTS to which the parent DOCUMENT and any attachment DOCUMENTS are associated |
| EndAttach | Ending production number assigned to the group of DOCUMENTS to which the parent DOCUMENT and any attachment DOCUMENTS are associated |
| Custodian | The name of the person or source from which the DOCUMENT was obtained |
| FileName | Original file name |
| FilePath | Original file path |
| DocExt | DOCUMENT type as identified by metadata associated with the native DOCUMENT indicating the extension of the application that created the native DOCUMENT (e.g., .doc, .ppt, etc.) |
| HashValue | The unique identifying value assigned to a DOCUMENT based on hash coding algorithms |
| Author | The person or source that originated the DOCUMENT |

| DateCreated | Date that the DOCUMENT was created (as reflected by metadata) |
|---|---|
| LastModifiedDate | Date that the file was last modified (as reflected by metadata) |
| FullText | The path or link to the searchable Extracted or OCR text for a DOCUMENT |
| NativeFile | The path or link to a processed and produced native file, to the extent the production contains native files |
| Confidentiality | The confidentiality designation for the DOCUMENT, as defined by any protective order in this matter |
| **Additional Fields for Email** | **Description** |
| To | All information contained in the "To" field of an email |
| From | All information contained in the "From" field of an email |
| CC | All information contained in the "CC" field of an email |
| BCC | All information contained in the "BCC" field of an email |
| DateSent | Date the email was sent, including month, day and year |
| TimeSent | Time the email was sent, including hour, minute, second and time zone. To the extent this information is already included in the DateSent field in the metadata, YOU need not parse TimeSent as a separate field. |
| DateReceived | Date the email was received, including the month, day and year |
| TimeReceived | Time the email was received, including hour, minute, second and time zone. To the extent this information is already included in the DateReceived field in the metadata, YOU need not parse TimeReceived as a separate field. |
| Subject | Subject or "Re:" line, as stated in the email |

8.     If with respect to any request there are no responsive DOCUMENTS, so state in writing.

-13-

9.     The following rules of construction shall be applied herein: (a) the words "and" and "or" shall be construed conjunctively or disjunctively as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope ; (b) the use of the singular form of any word shall be taken to mean the plural as well as the singular, and the use of the plural form of any word shall be taken to mean the singular as well as the plural; (c) the words "any," "all," "each" and "every" all include any, all, each, and every and shall be understood in either their most or least inclusive sense as necessary to bring within the scope of the requests all responses that might otherwise be construed to be outside of their scope; and (d) the use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of the DOCUMENT requests all responses that might otherwise be construed to be outside of their scope.

10.     If YOU object to a portion or an aspect of a request, state the grounds for your objection with specificity and respond to the remainder of the DOCUMENT request. If any DOCUMENTS, or portion thereof, are withheld because YOU claim that such information is protected under the attorney-client privilege, work product doctrine, or other privilege or doctrine,  YOU are required to provide a privilege log setting forth the specific basis for the claim of privilege or protection and for each DOCUMENT provide the following:

        a.     the subject matter of the DOCUMENT;

        b.     the title, heading or caption of the DOCUMENT, if any;

        c.     the date appearing on the DOCUMENT or, if no date appears thereon, the date or approximate date on which the DOCUMENT was prepared;

        d.     the type of the DOCUMENT (e.g., whether it is a letter, memorandum, MINUTES of meeting, etc.) and the number of pages of which it consists;

        e.     the identity of the person who signed the DOCUMENT or, if it was not signed, the person who prepared it;

-14-

f.      the identity of each person to whom the DOCUMENT was addressed and the identity of each person to whom a copy thereof was sent; and

g.      the identity of each person who has custody of a copy of each such DOCUMENT.

11.     If YOU claim that a portion of a DOCUMENT is protected from disclosure for any reason, produce such DOCUMENT with redaction of only the portion claimed to be protected.  When such redactions for privilege or protection are made, YOU shall place a legend similar to "REDACTION – PRIVILEGE" on the copy of the DOCUMENT produced.  All redactions shall also be included on the privilege log described in Instruction #4.

12.     If you object that a request is vague or ambiguous, IDENTIFY the objectionable aspect of the request.

13.     If a request cannot be responded to in full, YOU shall respond to the extent possible, specify the reason for YOUR inability to respond to the remainder, and state whatever information or knowledge YOU have REGARDING the portion to which YOU have not responded.

14.     If any DOCUMENT called for by these requests has been destroyed, lost, discarded, or is otherwise no longer in your possession, custody, or control, IDENTIFY such DOCUMENT as completely as possible, and specify the date of disposal of the DOCUMENT, the manner of disposal, the reason for disposal, the person authorizing disposal, and the person disposing of the DOCUMENT.

15.     These requests are sequentially numbered and each numbered paragraph constitutes a single request.  Defined terms may be capitalized for the convenience of the parties; the definitions herein apply whether or not the term is capitalized.

16.     Except where expressly stated, these requests are not limited in any way by geography.

17.     These requests shall be deemed continuing in nature in accordance with Rule 26(e) of the Federal Rules of Civil Procedure.  Supplemental responses are required

if additional responsive information is acquired or discovered between the time of responding to this request and the time of trial.

18.    Unless otherwise specified, the relevant time period, and the period for which YOU are required to provide responsive DOCUMENTS, is from and including January 1, 2011 up to and including the RESPONSE DATE.

## DOCUMENTS REQUESTED

## POLICIES AND PROCEDURES

**REQUEST FOR PRODUCTION NO. 1.:**

All ADC POLICIES AND PROCEDURES REGARDING HEALTH CARE in effect from January 1, 2011 through the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 2.:**

All ADC POLICIES AND PROCEDURES in draft form or that have not been approved or implemented REGARDING HEALTH CARE from January 1, 2011 through the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 3.:**

All POLICIES AND PROCEDURES REGARDING prescriptions of non-formulary medicine made by HEALTH CARE STAFF.

**REQUEST FOR PRODUCTION NO. 4.:**

All POLICIES AND PROCEDURES REGARDING the provision of medications to ADC PRISONERS, including both formulary and non-formulary medications.

**REQUEST FOR PRODUCTION NO. 5.:**

All DOCUMENTS REGARDING POLICIES AND PROCEDURES for obtaining executed HEALTH CARE DIRECTIVES from PRISONERS.

**REQUEST FOR PRODUCTION NO. 6.:**

All POLICIES AND PROCEDURES REGARDING QUALITY ASSURANCE of HEALTH CARE, including but not limited to required reports, meetings, in-service trainings, audits, evaluations, or peer review systems.

VICTOR ANTONIO PARSONS' FIRST SET
OF REQUESTS FOR PRODUCTION
2:12-CV-00601-NVW--MEA

**REQUEST FOR PRODUCTION NO. 7.:**

All POLICIES AND PROCEDURES REGARDING the extraction of a PRISONER'S tooth or teeth, including but not limited to alternative treatments presented to the PRISONER and the consequences of a PRISONER'S selection of alternative treatment.

**REQUEST FOR PRODUCTION NO. 8.:**

All POLICIES AND PROCEDURES REGARDING CORRECTIONAL STAFF's and HEALTH CARE STAFF's response to a non-responsive PRISONER in his/her cell for whom HEALTH CARE assistance has been requested or appears necessary.

**REQUEST FOR PRODUCTION NO. 9.:**

All POLICIES AND PROCEDURES REGARDING confinement of PRISONERS in ISOLATION, including but not limited to placement in, retention in, or removal from ISOLATION, CONDITIONS OF CONFINEMENT, diet, and OUTDOOR EXERCISE while in ISOLATION.

**REQUEST FOR PRODUCTION NO. 10.:**

All DOCUMENTS REGARDING HNR POLICIES AND PROCEDURES, other than DOCUMENTS specific to specific PRISONERS, including but not limited to DOCUMENTS REGARDING actual timeframes for processing and the necessary qualifications of personnel, including HEALTH CARE STAFF, responsible for processing HNRs from PRISONERS.

**REQUEST FOR PRODUCTION NO. 11.:**

All POLICIES AND PROCEDURES REGARDING PRISONERS' requests for second opinions when the first opinion was given by HEALTH CARE STAFF or an external provider.

**REQUEST FOR PRODUCTION NO. 12.:**

All POLICIES AND PROCEDURES REGARDING CORRECTIONAL STAFF assisting PRISONERS with completing HNRs.

VICTOR ANTONIO PARSONS' FIRST SET
OF REQUESTS FOR PRODUCTION
2:12-CV-00601-NVW--MEA

**REQUEST FOR PRODUCTION NO. 13.:**

All POLICIES AND PROCEDURES REGARDING screening PRISONERS when they are initially received into custody, including but not limited to any reviews of medical history, physical examinations, and communicable diseases screening.

**REQUEST FOR PRODUCTION NO. 14.:**

All POLICIES AND PROCEDURES REGARDING COST CONTAINMENT, including any changes in the POLICIES AND PROCEDURES.

**REQUEST FOR PRODUCTION NO. 15.:**

All DOCUMENTS REGARDING the development and adoption of HEALTH CARE DIRECTIVES.

**REQUEST FOR PRODUCTION NO. 16.:**

All MINUTES from meetings attended by ADC HEALTH CARE STAFF, and any other meetings at which the HEALTH CARE of PRISONERS, HEALTH CARE POLICIES AND PROCEDURES, HEALTH CARE STAFFING, or any issue related to HEALTH CARE was discussed.

**REQUEST FOR PRODUCTION NO. 17.:**

One copy of each standardized DOCUMENT used by the ADC REGARDING the provision of HEALTH CARE.

**REQUEST FOR PRODUCTION NO. 18.:**

All DOCUMENTS REGARDING HEALTH CARE statistics of any kind at the ADC, including but not limited to DOCUMENTS that track disease or condition prevalence, outcomes, delays in service, care provided, and costs.

**STAFFING**

**REQUEST FOR PRODUCTION NO. 19.:**

DOCUMENTS SUFFICIENT TO SHOW the HOURS OF OPERATION, STAFFING SCHEDULES, and HEALTH CARE STAFFING levels for each facility operated by the ADC from January 1, 2011 through the RESPONSE DATE.

1

2 **REQUEST FOR PRODUCTION NO. 20.:**

3        All DOCUMENTS REGARDING HEALTH CARE STAFFING in ADC for each

4 fiscal year from 2005 to the RESPONSE DATE, including but not limited to

5 DOCUMENTS sufficient to show the total number of HEALTH CARE STAFF, the

6 existing positions for HEALTH CARE STAFF, whether they are permanent ADC

7 employees or LOCUM TENENS CONTRACTORS, the number of full-time employees

8 for each position, the number of vacancies and the duration of vacancies, and the total

9 hours worked by HEALTH CARE STAFF and LOCUM TENENS CONTRACTORS

10 who provided HEALTH CARE to ADC PRISONERS.

11 **REQUEST FOR PRODUCTION NO. 21.:**

12        DOCUMENTS SUFFICIENT TO SHOW ADC'S HEALTH CARE STAFFING

13 plan at each facility, including but not limited to DOCUMENTS REGARDING (a) the

14 minimum qualifications (e.g., M.D., R.N., L.P.N., etc.) for each position, whether (i)

15 HEALTH CARE STAFF, (ii) non-patient care-giving staff (such as medical file clerks),

16 or (iii) CORRECTIONAL STAFF, required in the infirmary within the facility; (b) a

17 general DESCRIPTION of the function of each position listed; (c) the training required of

18 each position (e.g., pre-service or in-service trainings); (d) the number of hours required

19 per week for each position; (e) any difference in coverage on holidays or weekends for

20 any staff position; (f) whether each position is filled or vacant as of the RESPONSE

21 DATE; and (g) the identity of the staff members currently filling each position, with

22 provider number (if applicable), shift, duties and degrees for each staff member identified.

23 **REQUEST FOR PRODUCTION NO. 22.:**

24        All JOB PERFORMANCE EVALUATIONS of HEALTH CARE STAFF or

25 LOCUM TENENS CONTRACTORS REGARDING whether the staff member or

26 contractor provided insufficient, inappropriate, or suboptimal HEALTH CARE

27 SERVICES and/or resulting in DISCIPLINE being taken against the staff member or

28 contractor.

1

2  **REQUEST FOR PRODUCTION NO. 23.:**

3      All JOB PERFORMANCE EVALUATIONS OF CORRECTIONAL STAFF

4  finding that the staff member or contractor provided insufficient, inappropriate, or

5  suboptimal EMERGENCY HEALTH CARE SERVICES and/or resulting in

6  DISCIPLINE being taken against the staff member or contractor due to the

7  EMERGENCY HEALTH CARE SERVICES provided.

8  **REQUEST FOR PRODUCTION NO. 24.:**

9      All DOCUMENTS REGARDING COMPLAINTS, from 2009 through the

10  RESPONSE DATE, REGARDING HEALTH CARE STAFFING or the STAFFING

11  SCHEDULE at each facility, including but not limited to COMMUNICATIONS from

12  ADC personnel that refer to or comment on any aspect of the adequacy of HEALTH

13  CARE STAFFING.

14                              **TRAINING**

15  **REQUEST FOR PRODUCTION NO. 25.:**

16      All DOCUMENTS REGARDING formal and informal HEALTH CARE training

17  provided to HEALTH CARE STAFF and CORRECTIONAL STAFF, REGARDING (a)

18  the provision of HEALTH CARE, (b) administrative responsibilities REGARDING the

19  provision of HEALTH CARE, (c) the processing of HNR forms and other PRISONER

20  COMPLAINTS, and (d) the procedures to ensure that PRISONERS have access to

21  HEALTH CARE.

22  **REQUEST FOR PRODUCTION NO. 26.:**

23      All DOCUMENTS REGARDING HEALTH CARE training materials provided to

24  ADC staff, including but not limited to to DOCUMENTS REGARDING first aid,

25  cardiopulmonary resuscitation, and suicide prevention.

26                              **CONTRACTORS**

27  **REQUEST FOR PRODUCTION NO. 27.:**

28      DOCUMENTS SUFFICIENT TO SHOW the names and contact INFORMATION for

each agency or entity providing ADC with temporary or long-term HEALTH CARE contractors.

**REQUEST FOR PRODUCTION NO. 28.:**

DOCUMENTS SUFFICIENT TO SHOW each contract or agreement that has been fully executed REGARDING each agency, entity or contracting individual providing ADC with temporary or long-term HEALTH CARE contractors.

**REQUEST FOR PRODUCTION NO. 29.:**

DOCUMENTS SUFFICIENT TO SHOW the amounts paid to each agency, entity, or contracting individual providing ADC with temporary or long-term HEALTH CARE contractors, with sufficient detail to ascertain the number, type, and credentials of each temporary or long-term contractor provided to the ADC, and the duration of each contractor's work for the ADC.

**REQUEST FOR PRODUCTION NO. 30.:**

All POLICIES AND PROCEDURES for establishing agreements, contracts, or understandings with LOCUM TENENS CONTRACTORS, SPECIALTY CONTRACTORS, professionals, clinics, and institutions who provide HEALTH CARE to PRISONERS.

**REQUEST FOR PRODUCTION NO. 31.:**

All DOCUMENTS REGARDING the rates of reimbursement or payment to providers contracting with ADC and/or the State of Arizona to provide HEALTH CARE to PRISONERS.

**COMPLAINTS**

**REQUEST FOR PRODUCTION NO. 32.:**

All COMPLAINTS REGARDING HEALTH CARE DIRECTIVES.

**REQUEST FOR PRODUCTION NO. 33.:**

DOCUMENTS SUFFICIENT TO SHOW the name of the PRISONER and counsel, if any, REGARDING every HEALTH CARE COMPLAINT for which the ADC, on behalf of itself or an employee, paid money to a PRISONER or a PRISONER'S estate or heirs to resolve.  Where the COMPLAINT was filed in a court, include DOCUMENTS sufficient to show the court in which it was filed and the case number.

1

2  **REQUEST FOR PRODUCTION NO. 34.:**

3       All DOCUMENTS REGARDING HEALTH CARE STAFF and CORRECTIONAL

4  STAFF who have filed COMPLAINTS REGARDING the provision of HEALTH CARE.

5                                    **REFERRALS**

6  **REQUEST FOR PRODUCTION NO. 35.:**

7       DOCUMENTS SUFFICIENT TO SHOW how REFERRALS are processed,

8  including persons involved in the decision-making process to approve or deny the

9  REFERRAL.

10 **REQUEST FOR PRODUCTION NO. 36.:**

11      All DOCUMENTS REGARDING submitted REFERRALS, including the name of

12 the referring HEALTH CARE CLINICIAN, the name and identification number of the

13 PRISONER for whom the REFERRAL was made, the PRISONER'S current housing

14 location, the reason the REFERRAL was made, the date the REFERRAL was approved or

15 denied, the reasons for approving or denying the REFERRAL, and the name of the facility

16 where the REFERRED CARE was actually or proposed to be provided.

17 **REQUEST FOR PRODUCTION NO. 37.:**

18      All DOCUMENTS REGARDING criticisms; critiques; or identification of

19 possible, perceived, or actual deficiencies in HEALTH CARE made by current or former

20 HEALTH CARE STAFF and other ADC staff, current or former LOCUM TENENS

21 CONTRACTORS, or current or former SPECIALTY CONTRACTORS made from

22 January 1, 2009 to the RESPONSE DATE.

23 **REQUEST FOR PRODUCTION NO. 38.:**

24      All DOCUMENTS REGARDING HEALTH CARE for REFERRED

25 PRISONERS, including DOCUMENTS REGARDING any REVIEWS that occurred

26 REGARDING the REFERRAL.

27 **REQUEST FOR PRODUCTION NO. 39.:**

28      All DOCUMENTS REGARDING the denial or delay of transportation for

REFERRED PRISONERS to and from appointments with the HEALTH CARE providers

                                    -22-                    VICTOR ANTONIO PARSONS' FIRST SET
                                                           OF REQUESTS FOR PRODUCTION
                                                           2:12-CV-00601-NVW--MEA

to which they were referred.

**PRISONERS**

**REQUEST FOR PRODUCTION NO. 40.:**

All DOCUMENTS REGARDING DEATH RECORDS.

**REQUEST FOR PRODUCTION NO. 41.:**

All DOCUMENTS REGARDING any REVIEWS done of HEALTH CARE for HOSPITALIZED PRISONERS, whether done before or after the hospitalization of any HOSPITALIZED PRISONER.

**REQUEST FOR PRODUCTION NO. 42.:**

DOCUMENTS SUFFICIENT TO SHOW the population of PRISONERS in each ADC operated facility by month for each year from 2009 through the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 43.:**

All DOCUMENTS REGARDING the conditions in which PRISONERS are held at Tempe St. Luke's Hospital.

**COSTS AND BUDGET**

**REQUEST FOR PRODUCTION NO. 44.:**

All DOCUMENTS REGARDING HEALTH CARE COST CONTAINMENT.

**REQUEST FOR PRODUCTION NO. 45.:**

All DOCUMENTS REGARDING HEALTH CARE cost analysis done by the ADC, whether over all or for particular types of care or medical procedures.

**REQUEST FOR PRODUCTION NO. 46.:**

All DOCUMENTS REGARDING the ADC's budget, including all amounts budgeted for HEALTH CARE, for each year from 2007 to the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 47.:**

DOCUMENTS SUFFICIENT TO SHOW the actual amounts expended on HEALTH CARE for ADC PRISONERS for each year from 2007 to the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 48.:**

All DOCUMENTS REGARDING requests for funding made by the ADC to the Governor or legislature of Arizona from January 1, 2007 to the RESPONSE DATE.

**PRISONERS IN ISOLATION**

**REQUEST FOR PRODUCTION NO. 49.:**

All DOCUMENTS REGARDING criticisms; critiques; or identification of possible, perceived, or actual deficiencies in CONDITIONS OF CONFINEMENT for ADC PRISONERS in ISOLATION from January 1, 2009 to the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 50.:**

All COMPLAINTS REGARDING CONDITIONS OF CONFINEMENT for PRISONERS in ISOLATION, or the delivery of HEALTH SERVICES to PRISONERS in ISOLATION, made by current or former ADC personnel.

**REQUEST FOR PRODUCTION NO. 51.:**

All DOCUMENTS REGARDING INTERNAL INVESTIGATIONS OR EXTERNAL INVESTIGATIONS REGARDING CONDITIONS OF CONFINEMENT for PRISONERS in ISOLATION from January 1, 2009 to the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 52.:**

All DOCUMENTS REGARDING INTERNAL INVESTIGATIONS OR EXTERNAL INVESTIGATIONS REGARDING the delivery of HEALTH SERVICES to PRISONERS in ISOLATION from January 1, 2009 to the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 53.:**

DOCUMENTS SUFFICIENT TO SHOW the duration of confinement in ISOLATION, including but not limited to the mean, median, and maximum length of confinement in ISOLATION for ADC PRISONERS.

**REQUEST FOR PRODUCTION NO. 54.:**

All DOCUMENTS REGARDING the provision of OUTDOOR EXERCISE to PRISONERS in ISOLATION, including but not limited to POLICIES AND PROCEDURES; schedules for the provision of OUTDOOR EXERCISE; DOCUMENTS

SUFFICIENT TO SHOW when and for how long PRISONERS actually received OUTDOOR EXERCISE, including any DOCUMENTS REGARDING cancellation or truncation of scheduled OUTDOOR EXERCISE; plans of the areas in which OUTDOOR EXERCISE is provided; and exercise equipment in the OUTDOOR EXERCISE areas.

**REQUEST FOR PRODUCTION NO. 55.:**

All DOCUMENTS REGARDING exhausted GRIEVANCES REGARDING HEALTH CARE or ISOLATION from January 1, 2010 through the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 56.:**

All DOCUMENTS REGARDING GRIEVANCES REGARDING CONDITIONS OF CONFINEMENT in ISOLATION.

**REQUEST FOR PRODUCTION NO. 57.:**

All DOCUMENTS REGARDING the provision of food to PRISONERS in ISOLATION, including but not limited to POLICIES AND PROCEDURES; schedules for delivery of food; menus; nutritional analyses of menus; and DOCUMENTS SUFFICIENT TO SHOW when PRISONERS actually received food and what food they received, including any DOCUMENTS REGARDING deviation from the schedule for delivery of food or from the planned menu.

**DOCUMENTS FROM ADC OFFICIALS**

**REQUEST FOR PRODUCTION NO. 58.:**

All DOCUMENTS authored by or sent from defendant Charles Ryan REGARDING HEALTH CARE.

**REQUEST FOR PRODUCTION NO. 59.:**

All DOCUMENTS authored by or sent from defendant Richard Pratt REGARDING HEALTH CARE.

**REQUEST FOR PRODUCTION NO. 60.:**

All DOCUMENTS authored by or sent from Michael Adu-Tutu REGARDING HEALTH CARE.

**OTHER**

**REQUEST FOR PRODUCTION NO. 61.:**

DOCUMENTS SUFFICIENT TO SHOW the ORGANIZATIONAL STRUCTURE of the ADC for the time period from January 1, 2011 through the RESPONSE DATE.

**REQUEST FOR PRODUCTION NO. 62.:**

All DOCUMENTS REGARDING HEALTH CARE SHORTAGES.

**REQUEST FOR PRODUCTION NO. 63.:**

For each custodian for whom you produce DOCUMENTS, produce an image of the folder structure, including all sub-folders, of any email accounts for that custodian.

-26-

Dated:  June 15, 2012                    **JONES DAY**

By: _Caroline Mitchell_
Caroline Mitchell (Cal. 143124)*
Ilham Hosseini (Cal. 256274)*
Sophia Calderon (Cal. 278315)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          ihosseini@jonesday.com
          scalderon@jonesday.com

*Admitted *pro hac vice*

Attorneys for Defendants

Daniel J. Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaaz.org;
          kflood@acluaz.org
          jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

-27-

1

2      David C. Fathi (Wash. 24893)*
       Amy Fettig (D.C. 484883)**
3      **ACLU NATIONAL PRISON
       PROJECT**
4      915 15th Street N.W., 7th Floor
       Washington, D.C. 20005
5      Telephone:  (202) 548-6603
       Email:    dfathi@npp-aclu.org
6                afettig@npp-aclu.org

7      *Admitted *pro hac vice*.  Not admitted
        in DC; practice limited to federal
8        courts.
       **Admitted *pro hac vice*
9      Daniel C. Barr (Bar No. 010149)
       Jill L. Ripke (Bar No. 024837)
10     James A. Ahlers (Bar No. 026660)
       Kirstin T. Eidenbach (Bar No. 027341)
11     John H. Gray (Bar No. 028107)
       Thomas D. Ryerson (Bar No. 028073)
12     Matthew B. du Mée (Bar No. 028468)
       **PERKINS COIE LLP**
13     2901 N. Central Avenue, Suite 2000
       Phoenix, Arizona 85012
14     Telephone:  (602) 351-8000
       Email:    dbarr@perkinscoie.com
15               rjipke@perkinscoie.com
                 jahlers@perkinscoie.com
16               keidenbach@perkinscoie.com
                 jhgray@perkinscoie.com
17               tryerson@perkinscoie.com
                 mdumee@perkinscoie.com
18
       *Attorneys for Plaintiffs Victor Parsons;*
19     *Shawn Jensen; Stephen Swartz; Dustin*
       *Brislan; Sonia Rodriquez; Christina*
20     *Verduzco; Jackie Thomas; Jeremy Smith;*
       *Robert Gamez; Maryanne Chisholm;*
21     *Desiree Licci; Joseph Hefner; Joshua*
       *Polson; and Charlotte Wells, on behalf of*
22     *themselves and all others similarly situated*
23
24
25
26
27
28

VICTOR ANTONIO PARSONS' FIRST SET
OF REQUESTS FOR PRODUCTION
2:12-CV-00601-NVW--MEA

1

2          **ARIZONA CENTER FOR DISABILITY LAW**

3          Jennifer Alewelt
4          Ruth Szanto
           Asim Varma
5          5025 East Washington Street, Suite 202
           Phoenix, Arizona 85034
6          Telephone:  (602) 274-6287
           Email:    jalewelt@azdisabilitylaw.org
7                    rszanto@azdisabilitylaw.org
                     avarma@azdisabilitylaw.org
8
           *Attorneys for Plaintiff Arizona Center for*
9          *Disability Law*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                   VICTOR ANTONIO PARSONS' FIRST SET
                                   OF REQUESTS FOR PRODUCTION
                                   2:12-CV-00601-NVW--MEA

1

2

### CERTIFICATE OF SERVICE

3        I hereby certify that on June 15, 2012, I served the foregoing document by mail on

4   the following:

5

6        Arizona Attorney General Thomas C. Horne
         Office of the Attorney General
         Michael E. Gotfried

7        Assistant Attorney General
         1275 W. Washington Street

8        Phoenix, AZ  85007-2926
         Telephone: 602-542-4951

9        Facsimile: 602-542-7670

10       Daniel P. Struck
         Kathleen L. Wieneke

11       Timothy J. Bojanowski
         Nicholas D. Acedo

12       Courtney R. Cloman
         Ashlee B. Fletcher

13       Struck Wieneke & Love, PLC
         3100 West Ray Rd., Ste. 300

14       Chandler, AZ  85226
         Telephone: 480-420-1600

15       Facsimile 480-420-1696

16

17

18

19                                              Sophia Calderón

20   SFI-735993v1

21

22

23

24

25

26

27

28

-30-

# EXHIBIT 2

# JONES DAY

555 CALIFORNIA STREET • 26TH FLOOR • SAN FRANCISCO, CALIFORNIA 94104-1500
TELEPHONE: 415-626-3939 • FACSIMILE: 415-875-5700

Direct Number:  (415) 875-5712
cnmitchell@JonesDay.com

JP005615                                      August 31, 2012

<u>VIA EMAIL AND U.S. MAIL</u>

Timothy J. Bojanowski, Esq.
Courtney Cloman, Esq.
Struck Wieneke & Love
3100 W. Ray Road, Ste. 300
Chandler, AZ  85226

            Re:   *Parsons v. Ryan*

Dear Tim and Courtney:

        Pursuant to the meet-and-confer discussion yesterday on death records, here is the list of deceased inmates whose files we request you produce as a first wave production of death records:

James Adams, 131965
Louis Balon, 11078
David Bandstra, 68441
Eric Bybee, 171555
Jesse Cabonias, 231666
Lasasha Cherry, 244426
Juan Corrales-Palomares
Jesus Cota, 151319
Duron Cunningham, 245305
Forrest Day, 258301
Velma Dickson, 33766
Ferdinand Dix, 20547
Mark Edwards, 261680
Alfonso Farmer, 219587
Geshell Fernandez, 28196933
James Galloway, 233906
David Hunt, 109305
Nelson Johnson, 143345
Anthony Lester, 253529
Susan Lopez, 184221
Kenneth Lucas, 13755

SFI-743120v1

JONES DAY

Mr. Timothy J. Bojanowski,
Ms.Courtney Cloman
August 31, 2012
Page 2


Jerry McCoy, 108159
Robert Medina, 121433
David Moreno, 72673
Robert Mulhern, 235987
Anthony Olea, 153946
Michael Pellicier, 241648
Karot Phothong, 98842
Daniel Porter, 61424
Alvin Rhodes, 264597
Ronald Richie, 109391
Rosario Rodriguez-Bojorquez, 256497
Patrick Ross, 168595
Kenneth Soffel, 246697
Michael Tovar, 241095
T. Ray Washington, 240344
John Zimmerman, 66146

Please let me know your availability for a meet-and-confer on this issue on September 4
or 5.

Very truly yours,

Caroline N. Mitchell

# EXHIBIT 3

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn          )  No.:
Jensen; Stephen Swartz;        )  CV12-00601-PHX-NVW
Dustin Brislan; Sonia          )  (MEA)
Rodriguez; Christina           )
Verduzco; Jackie Thomas;       )
Jeremy Smith; Robert Gamez;    )
Maryanne Chisholm; Desiree     )
Licci; Joseph Hefner; Joshua   )
Polson; and Charlotte Wells,   )
on behalf of themselves and    )
all others similarly           )
situated; and Arizona Center   )
for Disability Law,            )
                Plaintiffs,    )
        v.                     )
Charles Ryan, Director,        )
Arizona Department of          )
Corrections; and Richard       )
Pratt, Interim Division        )
Director, Division of Health   )
Services, Arizona Department   )
of Corrections, in their       )
official capacities,           )
                Defendants.    )
                               )

30(b)(6) ARIZONA DEPARTMENT OF CORRECTIONS
(RICHARD H. ROWE, M.D.)
TOPIC NOS. 1, 2, 5, 6, 7, 8, 9, 10, 12, 13, 15, 17

September 19, 2012
9:49 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

1     Q    In the last, say, six months, how many times
2  have you -- how many charts have you reviewed?
3     A    Oh, boy, I would say probably -- and this is a
4  guess -- 20, 25.  Just a wild guess.  At least that
5  many.
6     Q    That's your best estimate?
7     A    I'm sorry?
8     Q    That's your best estimate?
9     A    That's my best estimate.
10    Q    And how many of those cases have you had
11  concerns about the adequacy of care?
12             MS. WIENEKE:  Then I will object and
13  insert confidentiality of care.
14    Q    BY MR. SPECTER:  You can answer.
15             MS. WIENEKE:  No, I'm going to ask you
16  not to answer.
17    Q    BY MR. SPECTER:  Are you going to follow your
18  attorney's instruction or are you going to answer?
19    A    I'm going to follow my attorney's advice.
20             MR. SPECTER:  I don't understand why the
21  numbers would be confidential.
22             MS. WIENEKE:  Because by providing the
23  numbers, you are providing the content of the
24  conclusion.
25             MR. SPECTER:  Well, okay.  I disagree

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 80

1    with that, but we can --

2                MS. WIENEKE:  I understand.

3                MR. SPECTER:  So going -- I can ask him

4    a thousand questions about this, but if you are going

5    to continue to assert the same objection and instruct

6    him not to answer, can we have an agreement that -- or

7    can you explain what you are going to object to and

8    what you are not going to object to so we can move

9    faster?

10               MS. WIENEKE:  Certainly, Mr. Specter.

11   Anything that would require Dr. Rowe to reveal the

12   content of his confidential analysis regarding his

13   death reviews we are asserting a privilege and I would

14   instruct him not to answer, and he will follow that

15   advice.  And perhaps that's something that we can take

16   up at another time and resolve.

17               MR. SPECTER:  Sure.

18               MS. WIENEKE:  Thank you.

19               MR. SPECTER:  And with that, would your

20   instruction -- would your objection be any different

21   once the court enters a protective order, or would you

22   still assert the same objection?

23               MS. WIENEKE:  You know, that's a good

24   question.  I would want to consider that, but I don't

25   think that a protective order would adequately resolve

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 81

1    the issue, but I would certainly want to ruminate on

2    that a little bit.

3              MR. SPECTER:  Okay.  I don't have to ask

4    him all these questions?

5              MS. WIENEKE:  No.

6              MR. SPECTER:  We have an agreement --

7              MS. WIENEKE:  Right.

8              MR. SPECTER:  -- that we will just try

9    to resolve the issue, and if it's resolved in our

10   favor, we will come back and ask him the questions, and

11   if not, then we won't get that information?

12             MS. WIENEKE:  I will agree that that's

13   the risk that I take.

14             MR. SPECTER:  Okay.  Thank you very much

15   for that.

16     Q    BY MR. SPECTER:  Let me ask you a question

17   about the peer-review process as it works in Arizona.

18   And this is not about any specific case, but in

19   California, at least, there are peer-review committees.

20   Are there peer-review committees in Arizona, or do you

21   know?

22     A    As it relates to what discipline?  Any

23   discipline?

24     Q    Yes.

25     A    In the Department of Corrections we don't have

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 82

1   a peer-review committee.  Peer review is done

2   one-on-one with the supervising physician locally.

3       Q    I see.  And your part of the peer-review

4   process is -- is -- you believe you are part of the

5   peer-review process?

6       A    I do.  I provide peer review for the physician

7   supervisors who provide peer review for their physician

8   that works on it.

9       Q    Okay.  So when -- when the peer-review process

10  finds that there is some problem, what -- are -- do

11  they lose privileges to practice in the Department of

12  Corrections, or what happens?

13      A    And it all depends on what the situation is.

14  The practitioner is usually counseled about the

15  practice pattern.  And I recall one case where it was

16  before I came into that position where I think a

17  practitioner was reported to the board, so it may even

18  be to the medical board, so it may even elevate to that

19  level.  I have not reported anyone.

20      Q    Okay.  So are there any minutes kept of these

21  peer-review sessions besides the form you fill out?

22      A    Just the form.

23      Q    Okay.  And that's sent to Mr. Pratt; is that

24  right?

25      A    Those peer reviews, which is confidential, is

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 83

1    kept by me.  And if there are reasons to discuss it

2    with him about some concerns, yes, it's not sent to

3    him.  He does not keep copies of it.

4        Q    Okay.  You may object to this, but I will ask

5    it.  And how many cases in the last six months have you

6    discussed a case with Mr. Pratt?

7                 MS. WIENEKE:  I think that's just the

8    same question but asked a little differently.

9                 MR. SPECTER:  Yeah.

10                MS. WIENEKE:  So I'm going to object and

11   instruct him not to answer.

12       Q    BY MR. SPECTER:  And are you going to follow

13   that instruction?

14       A    I will follow that.

15                MS. WIENEKE:  But nice try.

16       Q    BY MR. SPECTER:  In one of the documents we

17   received from your attorneys, it said that in response

18   to an audit by NCCHC, 21 out of the 33 deaths were from

19   HIV -- this was a 2010 audit -- with two by suicide,

20   one by homicide and one by natural causes.  Are you

21   aware of that figure?

22       A    Not the breakdown as such.

23       Q    Right.  Does it sound right to you, that 21

24   out of 33 deaths were HIV?  This doesn't have anything

25   to do with peer review; it's just death.

# EXHIBIT 4



PRISON LAW OFFICE
General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

September 20, 2012

VIA EMAIL ONLY

Ms. Kathy Wieneke
Struck Wieneke & Love
3100 W. Ray Rd., Ste. 300
Chandler AZ 85226

Re:   *Parsons, et al. v. Ryan, et al.*; 30(b)(6) Deposition on Sept. 19, 2012

Dear Kathy,

I write about some of the issues that surfaced at yesterday's deposition.

First, at the Rule 30(b)(6) deposition yesterday you instructed the deponent, Dr. Rowe, not to answer questions related to the mortality reviews that he conducts for the ADC on the basis of the state law peer review privilege. Dr. Rowe followed your instruction and did not answer substantive questions on that topic.

Plaintiffs do not agree that the mortality reviews conducted by Dr. Rowe are peer review. Even if those reviews are covered by the Arizona peer review statute, the Ninth Circuit has held that that state law privilege is not recognized in federal question cases in federal court. In a case arising out of an Arizona correctional facility the Court held that "federal law recognizes no privilege of peer review in the context of a case involving the death of a prisoner." *Agster v. Maricopa County*, 422 F.3d 836, 837 (9th Cir. 2005). The Court affirmed the district court's ruling requiring the disclosure of a mortality review conducted by jail authorities. *Id.* at 839. Accordingly, your instruction to Dr. Rowe had no legal basis.

Plaintiffs therefore request that you produce all mortality reviews in possession of ADC, including those produced by Dr. Rowe, from January 1, 2010 to the present and that you make Dr. Rowe available for deposition to answer questions about those mortality reviews.

Second, Dr. Rowe testified that he had emails that were responsive to some of the deposition topics but had not been asked to search for them and did not produce any pursuant to the Notice of Deposition Duces Tecum. At the deposition I requested that those emails be produced but you did not respond to that request, stating that you first had to consult with your clients and other members of your team. Plaintiffs again request that those emails be produced

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Felecia Gaston • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Ms. Kathy Wieneke
RE: *Parsons v. Ryan*
September 20, 2012
Page 2

immediately and that Dr. Rowe be made available for deposition to answer any questions about those emails.

Third, it is apparent that Defendants did not conduct any other search for documents to comply with the Notice and the accompanying request for documents, despite the fact that it was clear from Dr. Rowe's testimony that others, including Mr. Taylor and Mr. Pratt, may have knowledge or information on the noticed topics and may possess responsive documents. Plaintiffs request that Defendants search for and produce all emails, memoranda and other documents listed in the Notice (Dkt #78) relevant to the listed topics.

Fourth, it is perfectly clear from yesterday's deposition that Defendants made no attempt to ensure that Dr. Rowe could "testify about information known or reasonably available to" ADC. Fed. Rule Civ. Proc., Rule 30(b)(6). Dr. Rowe testified that he worked less than half time and had very limited responsibilities for health care and that for the most part he was charged with reviewing charts and answering questions from Mr. Pratt and others regarding clinical issues specific to individual patients. In addition, Dr. Rowe, whom Defendants designated to cover multiple topics, did nothing to prepare for the deposition besides having a three to four hour conversation with you and reviewing a few policies. Thus, Defendants did not designate the person most knowledgeable on these subjects and made no attempt to provide information "reasonably available to the organization." This is not the first time 30(b)(6) deponents have been unprepared or that we have complained about that fact.

Finally, we discussed issues two and four at length at the deposition so I see no need to meet and confer about that further. We are available on September 21 and 24 to meet and confer about the other two issues.

I look forward to your prompt response.


Sincerely,

/s/

Donald Specter

# EXHIBIT 5



**STRUCK WIENEKE & LOVE**  [ 3100 West Ray Road, Suite 300   Chandler, Arizona 85226   480.420.1600   swlfirm.com ]

October 10, 2012

**VIA EMAIL ONLY**

Jennifer Alewelt:  jalewelt@azdisabilitylaw.org
Caroline N. Mitchell:  cnmitchell@jonesday.com
Donald Specter:  dspecter@prisonlaw.org
David C. Fathi:  dfathi@npp-aclu.org

Re:   Parsons, et al. v. Ryan and Pratt
      U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

    This letter responds to Don Specter's October 9, 2012 email regarding Dr. Rowe's deposition.  The issue of the mortality reviews and Dr. Rowe's testimony is currently before the Court.  (*See* Third Joint Notice of Discovery Dispute, Doc. # 156.)  Further, the issue of Plaintiffs' extreme and overly broad 30(b)(6) Notices, which encompass Dr. Rowe's testimony, is also before the Court.  (*See* Joint Notice of Discovery Dispute (Rule 30(b)(6) Notices Generally), Doc. # 158.)  There is no reason to conduct a further meet and confer on these issues.  Once the Court rules on the dispute, we will assess what steps need to be taken to ensure compliance with the Court's ruling.

Sincerely,

Courtney R. Cloman
For the Firm

CRC/slw
2697181.1

cc:   Michael E. Gottfried
      Dawn Northup
      Kelly Dudley

# EXHIBIT 6



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR

<u>Hand Delivered, Electronic Mail, and
Certified Mail – Return Receipt Requested</u>

September 21, 2012

Karen Mullenix, Director
Wexford Health Sources
1850 N. Central Avenue, Suite 1050
Phoenix, Arizona 85004

Re:    Written Cure Notification - Contract No. 120075DC

Dear Ms. Mullenix:

The purpose of this letter is notify you of details of non-compliance, required corrective actions, and timeline for action to the above referenced contract between Wexford Health Sources ("Wexford") and the Arizona Department of Corrections ("ADC").

The action is being made in accordance with the contract's Special Terms and Conditions, Section 2.19 Contract Monitoring General Requirements, paragraph 2.19.5, which states:

> If non-compliance issues, other than those identified in Subsection 2.19.6, are identified during a quarterly audit required under Section 2.20, or any other monitoring activity, the Department Monitoring Staff shall provide a written cure notice to the Contractor's Arizona CEO and Area Manager regarding the details of the non-compliance, the required corrective action, and the period of time allowed to bring performance back into compliance with Contract requirements.

> If, at the end of the specified time period, the Contractor has complied with the cure notice requirements, the Department shall take no further action. (2.19.5.1)

> If, however, the Contractor has not complied with the cure notice requirements, the Department Contract Monitor shall notify the Contractor's Arizona CEO and Area Manager in writing that the matter shall be referred to the Chief Procurement Officer to take action against the Contractor, including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the Contract. (2.19.5.2)

- 1 -

Confidential Information - Subject to Protective Order

Several events detailing significant issues of non-compliance are described below:

1.  August 17, 2012, ASPC-Perryville/Lumley Unit

On August 17, 2012, Wexford nursing personnel were distributing medication on Lumley Unit - Yard 24 to include "watch swallow" medications. In accordance with "watch swallow" protocols, certain medications in powder form require administration to be completed via "floating" the medication in a small cup of water, which the patient drinks. During this distribution of medication, Wexford nurses depleted their stock of cups prior to completing medication distribution to the inmate population. Wexford nurses failed to stop the medication line and retrieve additional plastic cups, as would have been appropriate. Rather than refilling the supply of cups, a Wexford nurse placed the powdered "watch swallow" medication in an inmate's hand, directing the inmate to lick the powdered medication from her own hand.

This improper administration of medication instigated disorderly behavior by the affected inmate, requiring a security response. The nurses' disregard for proper protocol in administering this inmate's medication and their disrespect for the inmate are significant non-compliance issues that require corrective action.

2.  August 22, 2012, Medication Expiration Report (Statewide)

During the month of August 2012, ADC conducted random reviews of prescriptions, utilizing the Medication Expiration Report published by Wexford for July 1 – August 11, 2012. In completing this review, ADC learned that a significant number of inmates may not have been receiving their medications as prescribed due to expired prescription(s) and inappropriate renewals or refills. Approximately 8,358 prescriptions required review and potential renewal to ensure inmates received their required medications.

Wexford's lack of communication to its field supervisors regarding the necessary process for reviewing the Medication Expiration Report for renewal of medication, together with Wexford's delayed response and lack of urgency to correct the identified problem, contributed to this significant non-compliance issue. Specifically, during a meeting on August 22, 2012, between ADC's Monitoring Bureau leadership and Wexford Regional and Corporate personnel, it was apparent, based on statements from Wexford's Corporate Pharmacist, Denise Mervis, Pharm.D., that Wexford was aware of the expired medication issue, but had not taken adequate, if any, action to correct it. In this meeting, Dr. Mervis referred to the expired medication renewals as a critical issue.

When asked on August 22, 2012 what actions Wexford had undertaken to correct this problem, Wexford leadership advised that they intended to conduct an initial review of the July 1, 2012 – August 11, 2012 Medication Expiration Report beginning August 27, 2012. Wexford's decision to wait five days to begin reviewing the Medication Expiration Report was an inadequate response to a significant issue of grave concern to ADC. As a result of Wexford's delayed response, ADC deployed State resources on August 23, 2012 to ADC prison complexes statewide to review various data sources in an effort to identify inmates in need of medication renewal and to ensure that renewal actually occurred. Multiple ADC prison complexes also enhanced security vigilance by increasing the rate of security checks to 30-minute intervals on all inmates to ensure the well-being of the inmate population.

Confidential Information - Subject to Protective Order001

ADC028058

### 3. August 23, 2012, ASPC-Florence/Central Unit

On August 23, 2012, an inmate was found hanging from a sheet in his housing location. ADC staff removed the sheet, placed the inmate on a gurney, and arranged for air transport to an outside hospital. The inmate (MH-3) was last seen by an ADC psychiatrist provider on May 1, 2012. At that time, the provider prescribed lithium carbonate, a "watch swallow" medication used as a mood stabilizer, for 180 days. Medication Administration Records (MARs) showed this inmate received his medication in May, June, and July. On July 18, 2012, during a psychiatric follow-up, the inmate reported that the lithium carbonate had been helpful in stabilizing his mood. During ADC's investigation of this incident, ADC determined that this inmate had not received his psychotropic medication for the first 23 days of August 2012, as evidenced by the fact that no MAR had been generated. Failing to deliver psychotropic medication as prescribed is a significant, non-compliance issue.

### 4. August 27, 2012, ASPC-Lewis/Morey Unit

On August 27, 2012, between approximately 0600 and 0630 hours, while conducting diabetic insulin line in the medical unit at ASPC – Lewis – Morey Unit, Licensed Practical Nurse (LPN) N. Nwaohia contaminated a vial of insulin being used on the line. This contamination occurred when LPN Nwaohia drew insulin with a syringe for a Hepatitis-C positive inmate from a vial of "Regular" insulin and injected this insulin into the inmate. Utilizing the same syringe, she then drew a second dose of insulin from a vial of "Lantus" insulin and injected the secondary dose into the same inmate. LPN Nwaohia's actions contaminated the multi-dose "Lantus" vial. This vial was then utilized to provide insulin to other insulin dependent inmates.

Despite Wexford's Nurse Lindsay Stephen becoming aware of this information on August 27, 2012, Ms. Stephen did not file an Incident Report on the event, in accordance with ADC policy, until September 4, 2012. Rather, on August 27, 2012, she disposed of the insulin vials thought to have been involved in the contamination event and failed to notify Wexford management or appropriate ADC staff of the contamination event or her actions in destroying the insulin vials.

Wexford Site Manager Sumi Erno reported contacting Wexford Regional Manager Linda Maschner on August 28, 2012, to report the incident to her. Ms. Erno reported being directed by Ms. Maschner to begin identifying Insulin Dependent Diabetes Mellitus (IDDM) inmates so that baseline testing for Hepatitis-C could commence. As a precaution, baseline testing was also conducted for HIV. (The index inmate, although known to be positive for Hepatitis-C, was subsequently tested for both Hepatitis-C and HIV.) Pending receipt of those test results, plans were implemented to test all inmates potentially exposed through this event for both Hepatitis-C and HIV. Test results for the index inmate later confirmed him as positive for Hepatitis-C and negative for HIV.

Also, on August 28, 2012, upon direction of Wexford Management, Wexford RN Supervisor Sienkiewicz contacted AB Staffing, the subcontracted employer of LPN Nwaohia. Ms. Sienkiewicz reportedly advised AB Staffing that LPN Nwaohia would be prohibited from performing nursing services in support of Wexford contracts in the state. Wexford requested that AB Staffing file a complaint with the Arizona State Board of Nursing regarding LPN Nwaohia's actions. One week later, on September 4, 2012, while following up at ADC's request, Wexford learned that no complaint regarding LPN Nwaohia had been received by the Board. Wexford Regional Manager Maschner then formally submitted the complaint on the afternoon of September 4, 2012.

Confidential Information - Subject to Protective Order002                                     ADC028059

In identifying IDDM inmates, Ms. Erno initially reported on August 28, 2012, as having 105 inmates at Lewis that receive insulin. This number later changed to 103, following review of a spreadsheet created by Wexford medical personnel at the Lewis Complex listing inmates receiving insulin at Lewis. In review of this list, duplication of some inmates was noted, thus the 103 number derived from this list was determined questionable.

Additionally, the Department received a report from Wexford generated from the online reporting system of their subcontracted Pharmacy (Diamond Pharmacy Service) on September 5, 2012, which reflected 91 inmates receiving insulin at Lewis. In an email coinciding with the provision of this report, Wexford Director Karen Mullenix, stipulated that the report was generated by Wexford's Site Manager at Lewis (Sumi Erno) and that she (Mullenix) had concerns with the validity of the information Ms. Erno had provided thus far.

On September 5, 2012, during a meeting with inmates at ASPC-Lewis, an additional 9 inmates not previously identified by Wexford were added to the list of those potentially exposed.

Due to the continued fluctuation of information from Wexford and the lack of systems in place to readily identify insulin dependent/chronic care inmates, ADC deployed additional compliance monitoring staff to ASPC-Lewis on September 5, 6, & 7. Wexford did not deploy additional resources to the site until September 6, 2012. It was not until Friday, September 7, 2012, that the total population of insulin dependent inmates and the subset of potentially exposed inmates were identified with certainty. Further, baseline testing of this population was not completed until September 10, 2012, despite Wexford's earlier reporting that this had been completed on September 4, 2012.

The failure to follow established nursing protocols, poor record keeping, mismanagement of documentation, inadequate and inaccurate communication, lack of timely managerial or administrative support, and failure to ensure that corrective action had been completed represent serious issues of non-compliance.

### 5. September 13, 2012, ASPC-Perryville/Santa Rosa Unit

On September 13, 2012, at approximately 1715 hours, Wexford Director Karen Mullenix notified ADC of a possible case of pertussis (whooping cough) at ASPC-Perryville. Wexford management did not know the name(s) or number(s) of inmate(s) affected, or the unit(s) identified with the reported case. Wexford's notification of the reported pertussis case was inadequate and inconsistent. Further, without sufficient factual detail of the incident, Wexford reported no action plan to address the situation.

Ms. Mullenix further reported that Wexford's Dr. Palmer spoke to both the County and State Health Departments about the case. She also reported that Dr. Bell (Regional Medical Manager) was called about this issue two days prior, September 11, 2012, and although he was aware of the potential diagnosis, that information had not been communicated to either Ms. Mullenix or the ADC Site Monitors. ADC Audit Nurse Mendoza contacted Wexford facility personnel and determined that an inmate tested positive for pertussis on August 13, 2012, approximately 30 days prior to Wexford's notification to ADC. ADC Audit Nurse Mendoza also confirmed the inmate's name, number and location.

Confidential Information - Subject to Protective Order003

ADC028060

In a phone conversation later that evening with Site Manager Deb Cherry and Richard Pratt, ADC Interim Assistant Director, Health Services Monitoring Bureau, it was reported that Dr. Palmer had seen the inmate who tested positive for pertussis approximately 10 days prior to Wexford's notification to ADC. Ms. Cherry also advised she was aware of this issue up to 10 days prior and failed to advise either Ms. Mullenix or ADC Site Monitors at that time. During ADC's investigation, Ms. Cherry speculated that the patient may have unknowingly contracted the disease through inmate visitation in the past few weeks, as the inmate was later contacted by her visitor to advise she or her child had been diagnosed with pertussis. Ms. Cherry also reported that Dr. Palmer contacted the County Health Department regarding the case and that she ordered 25 test kits from the Maricopa County Health Department to test any additional suspected cases of pertussis. That, in fact, was not the case. Ms. Cherry sent an "undeliverable" e-mail to the County's website, requesting the test kits.

A known case of a reportable infectious disease went unreported to ADC staff and Wexford State Level Management for 30 days, indicating a lack of urgency, a lack of awareness of the situation's potential seriousness, a breakdown of communication between field personnel and management, or all of the above. Further, Wexford's failure to independently engage in developing a plan by which to identify/confirm current and future suspected cases of pertussis is a significant non-compliance issue.

## Required CURE actions

The aforementioned significant events have necessitated ADC to substantially supplement Wexford with personnel resources, operational modifications, and specific direction that should not be expected and are not required under this contract. ADC expects Wexford to effect sustained, systemic operational improvements in the management and delivery of health care services to ADC inmates. ADC is not contractually obligated to deploy its resources to manage Wexford's day-to-day, as well as crisis operations.

The following non-compliance issues, as identified here and/or in previously provided monitoring reports, require corrective action:

STAFFING: Inadequate staffing levels in multiple program areas at multiple locations

1. Inadequate support from corporate staff to field staff during normal and crisis operations

2. Staffing levels creating inappropriate scheduling gaps in on-site medical coverage, including In-Patient Component

3. Staffing levels forcing existing staff to work excessive hours, creating fatigue risks

MEDICATION/DOCUMENTATION: Incorrect, incomplete, inconsistent medication administration or documentation of care provided

4. Quantitative decrease in routine institutional care: backlog of prescription medication expiration review

5. Incorrect or incomplete pharmacy prescriptions (medication not matching chart order, wrong dosage)

- 5 -

Confidential Information - Subject to Protective Order 004                ADC028061

6.  Inappropriate discontinuation/change of medication

7.  Inconsistent non-formulary medication approval process

8.  Inconsistent or contradictory medication refill and/or return procedures

9.  Inadequate pharmacy reports

10. Inconsistent documentation of Medication Administration Records (MARs)

11. Inconsistent provision of release, transfer, and/or renewal medications

12. Inability to readily identify specific groups of inmates or chronic conditions based upon medications prescribed (e.g., diabetics)

SENSE OF URGENCY RESPONSE, and COMMUNICATION:  ADC deployment of resources to intervene in healthcare operations as a result of corporate inaction

13. Inadequate/untimely communication between field staff, corporate staff, and ADC

14. Lack of responsiveness and/or lack of awareness of incident urgency and reporting requirements

15. Quantitative decrease in routine institutional care: backlog of chart reviews

16. Quantitative decrease in routine institutional care: backlog of provider line appointments

17. Quantitative decrease in routine institutional care: untimely handling of Health Needs Requests

18. Quantitative decrease in routine institutional care: backlog/cancellation of outside specialty consultations

19. Unresponsive approach to ADC inquiries on patient information

20. Unresponsive approach to inmate grievance process

ADC expects Wexford to provide a proposed corrective action plan for all of the identified deficiencies by October 1, 2012. Although Wexford is afforded 7, 30, 60, or 90 days to complete corrective action, it is ADC's expectation that Wexford will begin corrective action on all identified deficiencies immediately. Corrective action must be ongoing throughout the 90-day cure period, and Wexford must regularly demonstrate to ADC Contract Monitors that corrective action is ongoing and being completed throughout the 90-day cure period.

This letter shall also serve as a demand for Right to Assurance in accordance with section 8.1 of the Uniform Terms and Conditions, that it is Wexford's intent to perform and comply with all provisions of the contract. Accordingly, Wexford has ten (10) calendar days from the date of this letter to respond to the demand for assurance.

Confidential Information - Subject to Protective Order005   ADC028062

In accordance with the contract's Special Terms and Conditions, Section 2.19 Contract Monitoring General Requirements, paragraph 2.19.7, Wexford has ten (10) calendar days from the date of this letter to submit a written appeal of this Cure Notice.

Wexford's failure to provide written assurance of its intent to perform and comply with all contractual provisions within ten (10) calendar days, or its failure to cure all deficiencies noted herein within ninety (90) calendar days from the date of this letter may, at the State's option, be the basis for terminating the contract under the Uniform Terms and Conditions or other rights and remedies available by law or provided by the contract.

Sincerely,

Joe Profiri
Contract Beds Operations Director
Arizona Department of Corrections


Enclosures:    Cure Matrix Monitoring Report
               Cure Matrix Monitoring Summary Report


c:    Charles L. Ryan, Director - ADC
      Jeff Hood, Deputy Director - ADC
      Dawn Northup, General Counsel - ADC
      Michael Kearns, Division Director, Administrative Services - ADC
      Richard Pratt, Interim Assistant Director, Health Services - ADC
      Leon George, Chief Procurement Officer - ADC
      Mark W. Hale, President and Chief Executive Officer - Wexford
      Daniel L. Conn, Executive Vice President and COO - Wexford
      John Froehlich, Vice President of Finance - Wexford

- 7 -

ADC028063

# EXHIBIT 7

# ARIZONA DEPARTMENT OF CORRECTIONS
## HEALTH SERVICES CONTRACT MONITORING BUREAU
## MEMORANDUM

**TO:**      **Joe Profiri, Contract Beds Operations Director**

**THROUGH:**  Jim Taylor, Health Services Compliance Administrator
Richard Pratt, Health Services Interim Division Director

**FROM:**   Matthew Musson, ASPC-Eyman Compliance Monitor II

**DATE:**    8/13/12

**SUBJECT:**  Actionable Compliance Issues as of 8/13/12

---

**Family Follow-up:**   Today I have received 14 voice mails from inmate's friend and family. Each requires an expeditious response which includes review of the inmate's records, securing the release of medical information (if necessary), and phone time with the family. This does not include Director's project responses and other official requests for investigation. According to my phone call log, nearly 29.15 hours was spent last week in completing research and subsequently communicating with family/friends.

This process could be streamlined somewhat if the Wexford hospital and utilization review (UR) report was more helpful. In its current form it is practically useless as it does not provide current status of the patient; this is the primary piece of reportable information. To problem solve this I call the Wexford UR nurse daily and take report on the Eyman patients currently in hospital care.

I have also been informed that I am permitted to request records from Wexford staff, but should only expect to receive these records if completing this tasks does not interfere with the ability of the Wexford MRL to complete his/her assigned tasks. To problem solve this issue, I am going to the units myself to obtain the records necessary to respond to family/friends inquires.

**Provider Staffing:**   The Wexford staffing pattern released under Solicitation #ADOC12-00001105 indicates that ASPC-Eyman is to have two full-time Physicians (2 FTEs) four (4 FTEs) full-time Mid-level Providers. There is also a half-time Medical Director position noted on the staffing pattern.

At present, ASPC-Eyman is operating with no full-time Physicians, and three full time Mid-level Providers. They <u>do</u> have the part-time services of the Wexford Medical Director. However, some issues are not being addressed in a timely

Confidential Information - Subject to Protective Order001

manner. This is especially true on units that do not have routine Provider staff (e.g, Meadows, Browning). For example, IM ed: Security C was discharged from hospital care on 8/6/12. He was returned with 25+ pages of hospital reporting, including four consultation reports for specialty care. None of this reporting is noted as having been reviewed by the Provider, nor is there any soap note entry indicating that the reporting has been reviewed.

Also, I was advised today that the Cook Unit Provider has submitted her resignation effective Thursday next week. This will leave two Mid-levels and the half-time Medical Director as the only Provider staff at Eyman. The Nursing monitor and I will continue to watch for critical issues at all units, as the Provider coverage will no doubt be spread even further in the absence of the Cook Unit Medical Provider.

**Mental Health Staffing:**

The Wexford staffing pattern released under Solicitation #ADOC12-00001105 indicates that ASPC-Eyman is to have combination of 13.5 FTE for various positions, with three FTE specifically allocated for evening shift. The half time Psychiatrist position is filled, as are 9 other day shift FTE's. However, this leaves Wexford deficient the three FTEs for night shift. None of these evening shift positions have been filled.

**Return Medications:**

Wexford has yet to provide direction on the process for returning medications which were previously issued by the Eyman pharmacy. Expired, contraband, and/or refused medications are being returned to the Medication Technicians in the daily totes and stockpiled in the medication area. The Medication Technicians are awaiting direction from Wexford on what to do with these medications. A request for this process was sent by Paulette Boothby to Denise Mervis on 7/25/12. No response has been received by either me or Paulette as of last Thursday when I last met with Paulette.

As these are medications were issued by the state prior to the Wexford acquisition of services, I suggest that they be returned according to the same process used when we shut down Pharmacy Services. This would include packaging the medications and sending them to Diamond to be destroyed.

**Medication Reporting:**

The Diamond Online Reporting (ORP) system was touted as being the equivalent of CIPS. However, this is not the case as several pieces of critical information are not present on the available reporting. Most notability is the lack of any reporting for medications that have or are about to expire. I am unable to run such a report at the user level in the local ORP, although I have been informed that Wexford is getting this reporting directly from Diamond. I have asked for this reporting to be sent to me, but have yet to receive. I cannot stress enough the utility of a CIPS-like system in the day to day functioning of the health unit. We discussed this in some detail during last week's meeting.

Confidential Information - Subject to Protective Order002

# EXHIBIT 8

# ARIZONA DEPARTMENT OF CORRECTIONS
## HEALTH SERVICES CONTRACT MONITORING BUREAU
## MEMORANDUM

TO:        Joe Profiri: Health Services Monitoring Bureau Team Leader

THROUGH: Jim Taylor: Health Services Monitoring Bureau

FROM:      John Mitchell: Winslow Compliance Monitor

DATE:      8/10/12

SUBJECT:   Daily report

The Registry Doctor expressed frustration at the lack of direction given by Wexford and the inability of being able to get a return phone call or E-mail response. Today's complaint specifically was about concerns he had expressed to Denise Mervis, via E-mail, about the formulary not having any appropriate alternatives for medications recommended by consultants. One consultant had recommended Chlorhexadine for a dermatological condition and there is no comparable alternative on the formulary. Another concern was that there was no Proton Pump Inhibitor for the treatment of GERD. The next issue he had was that Lantus is not on the formulary which he believes better controls Diabetics. He sent the E-mail 8/3/12 and still has not received a response. He attempted to address the issue during collegial review and was told that was not the correct forum.

Lack of staffing continues to be the major issue and has an adverse effect on numerous other areas. Outside consults continue to be put off because there is not a Clinical Coordinator. The Site Manager used to perform that function in Winslow and has not been able to work on consults while trying to do her new job, increase staffing levels, and work as a line nurse herself to compensate for the lack of staff. The nurses that were retained have all worked lots of overtime and this will undoubtedly lead to a greater incidence of mistakes as they reach burnout. Chart checks for the providers continue to wait several days prior to being addressed as the providers continue to catch up on provider line because there was no provider for several weeks after the transition. I have monitored the charts and insured there weren't any emergent issues that were being missed but there has certainly been a delay in care.

Wexford staff are not consistently being notified of releases. They do receive a list of tentative releases one to one and a half weeks prior to release. I received eight different E-mails from four different people regarding five different inmates being released that were not on the list of tentative releases that medical had received. I forwarded them to Wexford staff, but it would be far more efficient if there were a single sender and it went directly to Wexford.

Confidential Information - Subject to Protective Order001                                    ADC028163

# ARIZONA DEPARTMENT OF CORRECTIONS
## HEALTH SERVICES CONTRACT MONITORING BUREAU
### MEMORANDUM

**TO:**      Joe Profiri: Health Services Monitoring Bureau Team Leader

**THROUGH:** Jim Taylor: Health Services Monitoring Bureau

**FROM:**    John Mitchell: Winslow Compliance Monitor

**DATE:**    8/13/12

**SUBJECT:**  Daily report

The Site Manager has been advised that ADC staff shall not be used in any capacity to pick up, deliver, transport, or in any other way be involved in the medication delivery process. ADC staff had been used prior to privatization to pick up prescriptions at the pharmacy and deliver them to nursing to dispense when medical and security all worked for ADC. This was only done when there was only one nurse working the complex and he or she could not leave the unit uncovered. I suggested to the Site manager that she may have to call in additional staff if a similar situation occurs. I also suggested that she work with her superiors to increase their supply and variety of on site medications to lessen the need for after hour's trips to the local pharmacy.

Winslow DW of Quality Control, Wayne Mooney, noted that a finding during the recent audit indicated that medical staff was not using form# 1101-13p per DO 1101.03 1.2.2 for scheduling medical appointments. The use of this form has been replaced by entering the appointments on the TOSS system on the computer. This change is not yet reflected by an amendment to the DO 1101.

The use of registry nurses and providers continues to cause problems. The Registry doctor is continuing to leave at the end of the day without completing his charting. This is a dangerous practice because if there is an emergency involving that inmate prior to the provider returning to complete his note nobody will know what was done. A registry nurse, Katonah Viarrick, who worked this weekend refused to sign the count books and continuously complained that they did it differently at Eyman where she had previously worked. These examples again point to the need for Wexford to address staffing concerns. The use of registry will never provide the high level of care that a dedicated full time would. Problems of poor communication and lack of training are only increased when registry is used.

There was still a stack of 25-30 charts that had not been noted by nursing this morning, even after the weekend. They were left over from Thursday and Friday. The Site Manager came over and helped with them. This points to lack of staffing and lack of training for the registry

ADC028164

# EXHIBIT 9

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Tuesday, October 09, 2012 5:43 PM
**To:** Kathy Wieneke
**Cc:** Alison Hardy; Fathi, David; Caroline N Mitchell; Corene Kendrick; tbojanowski@swlfirm.com; Courtney Cloman; NORTHUP, DAWN; Ashlee Fletcher; Michael.gottfried@azag.gov
**Subject:** Mortality Reviews, emails and Dr. Rowe's Depo

Dear Kathy,

I write to follow-up my voice message, which I left a few minutes ago.

We would like to meet and confer about deposing Dr. Rowe on the mortality reviews if the Court grants our motion to compel those documents.  We discussed this in person at his deposition.  I also wrote to you on September 20, 2012 about this issue and said I was available to discuss this issue on September 21 and 24.  I have not heard from you since on this topic, and would like to wrap up the meet and confer on this issue. Please call me at 510-280-2621 at your earliest convenience at any time, but no later than Friday morning.  If I am not available, please speak to Alison Hardy, who is informed about this issue and is available to discuss it with you.

Thanks very much for your cooperation.

Don

1

# EXHIBIT 10

| | |
|---|---|
| **From:** | parsonsdiscovery@prisonlaw.com on behalf of Caroline N Mitchell <cnmitchell@JonesDay.com> |
| **Sent:** | Wednesday, September 26, 2012 12:28 PM |
| **To:** | Kathy Wieneke; Tim Bojanowski; Jennifer Alewelt; Courtney Cloman |
| **Subject:** | Discovery Issues |

Dear Jennifer,Tim, Kathy, and Courtney,

In an effort to move discovery along efficiently and cooperatively, I am writing to address some of the pending issues:

1. **Document Production**: The protective order has issued, so we request immediate production of Defendants' documents responsive to our requests. I do not anticipate that this should be a problem for Defendants because you should have been gathering them in anticipation of the protective order issuing. We understand from Kathy that Defendants want a claw-back provision and that Defendants are drafting one. We will agree that any of the documents produced from this date forward are subject to any claw-back provision adopted by the Court, so that should pose no impediment to immediate production, providing that the ACDL agrees.

2. **Meet-and-Confers**: We have run into real issues scheduling timely meet and confer sessions on pressing discovery issues. To ensure that meet and confers are held on a timely basis and to ensure that everyone has timely notice of the topics to be covered during those meet and confers, we propose that: (1) the parties set a standing weekly meet and confer; (2) that the location alternate between Plaintiffs' and Defendants' offices; and (3) that 2 business days in advance of a given meet and confer, each party list the issues to be covered in that meet and confer. We propose that the meet and confers be held either on Tuesdays or Thursdays at 3 p.m. Arizona time, but we can be flexible as to the date/time we select for the standing meeting. We propose to address in these meet and confers all of the issues that both parties have raised to date that have not yet been addressed in meet and confers.

Please let me know by noon on Friday whether you agree, so that we can start the meet and confers next week.

Thank you,

Caroline

Caroline Mitchell
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104-1500

Telephone: (415) 875-5712
Fax: (415) 875-5700
e-mail: cnmitchell@jonesday.com

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

1

# EXHIBIT 11

 STRUCK WIENEKE & LOVE [ ·································· 480.420.1600 ··········· ]

September 27, 2012

**VIA EMAIL ONLY**

To: All Counsel of Record

Re:     Parsons, et al. v. Ryan and Pratt
        U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

This letter responds to Caroline Mitchell's September 26, 2012 email.

**Document Production**

We expect to produce additional documents responsive to your discovery requests by October 1. This production will include medical records, master files, and death records. We are currently working with a vendor to determine the volume of the data contained in the email accounts of Charles Ryan, Richard Pratt, and Dr. Adu Tutu and to obtain quotes for processing the data. We will be happy to discuss anticipated timeframes for processing and producing these documents with you when we receive that information from the vendor. We also expect to receive supplementation of your responses to our discovery requests by October 1.

Additionally, we will send you a proposed clawback agreement in a separate correspondence.

**Meet-and-Confers**

Unfortunately, we cannot agree to weekly meet-and-confers. Although we appreciate the effort to efficiently resolve any and all discovery disputes, we simply do not have the manpower to commit to a weekly meet-and-confer. This is especially so given Plaintiffs are noticing depositions during this same time, sometimes two on the same day. As always, we remain committed to effectively and promptly resolving all discovery disputes and will continue to fulfill our commitment to attending meet-and-confers after given two business days' notice and an agreed upon agenda.

Sincerely,

Ashlee B. Fletcher
For the Firm

All Counsel of Record
September 27, 2012
Page 2


ABF/slw
2692838.1

cc:      Dawn Northup, Esq.
         Kelly Dudley

All Counsel of Record
September 27, 2012
Page 3


**Counsel of Record:**

**PERKINS COIE, LLP**
Daniel Clayton Barr:            DBarr@perkinscoie.com
James Anthony Ahlers:           jahlers@perkinscoie.com
Jill Louise Ripke:              jripke@perkinscoie.com
John Howard Gray:               jhgray@perkinscoie.com
Kirstin T. Eidenbach:           keidenbach@perkinscoie.com
Matthew Benjamin du Mee:        mdumee@perkinscoie.com
Thomas Dean Ryerson:            tryerson@perkinscoie.com

**JONES DAY**
Caroline N. Mitchell:           cnmitchell@jonesday.com
Sophia Calderon:                scalderon@jonesday.com
Sarah Rauh:                     srauh@jonesday.com
David C. Kiernan:               dkiernan@jonesday.com
R. Scott Medsker:               rsmedsker@JonesDay.com
John Laurens Wilkes:            jlwilkes@JonesDay.com
Kamilla Mamedova:               kmamedova@jonesday.com
Jennifer K. Messina:            jkmessina@jonesday.com

**Prison Law Office**
Donald Specter:                 dspecter@prisonlaw.com
Alison Hardy:                   ahardy@prisonlaw.com
Corene Kendrick:                ckendrick@prisonlaw.com
Sara Norman:                    snorman@prisonlaw.com

**ACLU National Prison Project**
David C. Fathi:                 dfathi@npp-aclu.org
Amy Fettig:                     afettig@npp-aclu.org

**ACLU Foundation of Arizona**
Daniel J. Pochoda:              dpochoda@acluaz.org
Kelly J. Flood:                 kflood@acluaz.org
James Duff Lyall:               jlyall@acluaz.org

**ACDL**
Jennifer Alewelt:               jalewelt@azdisabilitylaw.org
Asim Varma:                     avarma@azdisabilitylaw.org
Sarah Kader:                    skader@azdisabilitylaw.org

**Office of the Attorney General**
Michael E. Gottfried:           Michael.gottfried@azag.gov