**INDEX OF EXHIBITS TO DECLARATION OF DAVID C. FATHI
IN SUPPORT OF PRISONER PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

*Parsons v. Ryan*

**CV 12-00601-PHX-NVW (MEA)**

| | |
|---|---|
| A. | Resume of David Fathi |
| B. | Declaration of Pablo Stewart, M.D. |
| C. | Declaration of Robert L. Cohen |
| D. | Declaration of Jay D. Shulman |
| E. | Declaration of Craig Haney, Ph.D., J.D. |
| F. | Declaration of Dustin Brislan |
| G. | Declaration of Robert Gamez |
| H. | Declaration of Maryanne Chisholm |
| I. | Declaration of Victor Parsons |
| J. | Declaration of Sonia Rodriguez |
| K. | Declaration of Jeremy Smith |
| L. | Declaration of Stephen Swartz |
| M. | Declaration of Jackie Thomas |
| N. | Declaration of Desiree Licci |
| O. | Declaration of Shawn Jensen |
| P. | Declaration of Joseph Hefner |
| Q. | Declaration of Charlotte Wells |
| R. | Declaration of Joshua Polson |
| S. | Declaration of Christina Verduzco |
| T. | Excerpts of Deposition Transcript of Ben L. Shaw, Ph.D., Oct. 3, 2012 |
| U. | Excerpts of Deposition Transcript of Richard Pratt, Oct. 4, 2012 |
| V. | Excerpts of Deposition Transcript of Tracy Crews, M.D., Oct. 3, 2012 |

W.        Excerpts of Deposition Transcript of Jeffrey Alan Sharp, M.D., Oct. 9, 2012

X.        Excerpts of Deposition Transcript of Karen Ingram, Sept. 13, 2012

Y.        Excerpts of Deposition Transcript of Richard H. Rowe, M.D., Sept. 19, 2012

Z.        Excerpts of Deposition Transcript of Carmelo Echeverria, M.D., Oct. 5, 2012

AA.       Excerpts of Deposition Transcript of Michael Adu-Tutu, D.D.S., Oct. 1, 2012

BB.       Omitted

CC.       Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2) to Defendant Charles Ryan *and Defendant Charles Ryan's Answers Thereto*, Sept. 24, 2012

DD.       Reporter's Transcript of Proceedings (Scheduling Conference), July 20, 2012, excerpt 8:9-16

EE.       Letter from Joe Profiri to Karen Mullenix, Sept. 21, 2012 (ADC027854 - 69)

FF.       Letter from Karen Mullenix to Joe Profiri, Oct. 1, 2012 (ADC027941 – 43)

GG.       Letter from Deputy Warden McCarville to [redacted] Alcaraz, Apr. 27, 2011 (ADC025768 - 70)

HH.       Email from Tracy Crews to Ben Shaw, Feb. 3, 2011 (PLTF-PARSONS-000007)

II.        Email from Sumi Erno to Karen Mullenix and Linda Maschner, Sept. 5, 2012, subject: "LPN Nwaohia" (ADC027911)

JJ.       Memo from Lewis Medical/Wexford Health Services to Lewis Complex Inmates, June 26, 2011 [sic] (PLTF-PARSONS-013132)

KK.       Memo from Ben Shaw to Joe Profiri, Aug. 13, 2012 (ADC027770 - 71)

LL.       Memo from Paulette Boothby to Joe Profiri, Aug. 17, 2012 (ADC027794 - 804)

MM.       Memo from Terry L. Allred to Joe Profiri, Aug. 13, 2012 (ADC028112 -14)

NN.       Memo from Helena Valenzuela to Joe Profiri, Aug. 13, 2012 (ADC028140 - 42)

OO.       Memo from O. Valencia to Warden Hetmer, Mar. 26, 2012 (ADC026930-45)

PP.       Memo from Karyn Christie to Joe Profiri, Aug. 13, 2012 (ADC028148 – 49)

QQ.       Memo from John Mitchell to Joe Profiri, Aug. 17, 2012 (ADC028171 – 72)

RR.       Memo from John Mitchell to Joe Profiri, Aug. 10, 2012 (ADC028163)

SS.       Memo from John Mitchell to Joe Profiri, Aug. 13, 2012 (ADC028164 – 65)

TT.       Memo from Dennis Chenail to Joe Profiri, Aug. 13, 2012 (ADC028167)

UU.      Memo from Dennis Kendall to Joe Profiri, Aug. 13, 2012 (ADC028123 – 26)

VV.      Memo from Kathy Campbell to Joe Profiri, Aug. 20, 2012 (ADC028159 – 61)

WW.      Memo from Kathy Campbell to Joe Profiri, Aug. 20, 2012 (ADC028128 - 29)

XX.      Memo from Kathy Campbell to Joe Profiri, Aug. 13, 2012 (ADC028143)

YY.      Memo from Vanessa Headstream to Joe Profiri, Aug. 17, 2012 (ADC028144 – 46)

ZZ.      Memo from Vanessa Headstream to Joe Profiri, Aug. 17, 2012 (ADC028168 - 70)

AAA.     Memo from Karen Mullenix to Joe Profiri, Jeff Hood, and Dan Conn, Sept. 17, 2012 (ADC027890 - 96)

BBB.     Death Investigation of                    (ADC025110 - 38)

CCC.     Death Investigation of                    (ADC024171 - 221)

DDD.     Death Investigation of                    (ADC024949 - 82)

EEE.     Death Investigation of                    (ADC025140 - 71)

FFF.     Death Investigation of                    (ADC026957 - 7022)

GGG.     ADC Internal Investigation Report, Apr. 26, 2012 (ADC026964 - 93)

HHH.     Excerpts of ADC Notice of Request for Proposal for Privatization of Health Care and Wexford Health Inc.'s Bid, 2.8.12.1 QM/CQI Program Description Requirements (ADC014103 – 6042)

III.     Arizona Vacancies and FTE Fill Percentages, Aug. 8, 2012

JJJ.     Weekly Non-Compliance Report, ASPC-Perryville, Aug. 13, 2012 (ADC028131 – 33)

KKK.     Wexford Health Sources Inmate Wait Times, Aug. 2012 (ADC028020 - 22)

LLL.     ADC Mental Health Technical Manual, Chapter 5, Section 19.0 (Effective Date Aug. 15, 2011)

MMM.     MH Levels Statistical Summary, July 23, 2012 (ADC027759 - 68)

NNN.     Medical and Mental Health Score Inmate Distribution by Complex for FY 2011 (PLTF-PARSONS-013203 - 04)

OOO.     Dep't Ord. 809, Earned Incentive Program (Jan. 11, 2011) (ADC013994 -4004)

PPP.     Excerpts of Arizona Department of Corrections Departmental Order 1103. Technical Manual: Health Services (Effective Date: Jan. 1, 2010) (ADC010554 - 10635)

QQQ.    ADC Institutional Capacity & Committed Population, October 31, 2012, available at http://www.azcorrections.gov/adc/reports/capacity/bed_2012/bed_capacity_oct12.pdf

RRR.    Memo from Dennis G. Chenail to Joe Profiri, Aug. 20, 2012 (ADC028173)

SSS.    Memo from Dennis Kendall to Joe Profiri, Aug. 17, 2012 (ADC028107 - 10)

TTT.    Excerpts of Contract Monitoring Bureau Report, Aug. 8-13, 2012

UUU.    Wexford Vacancies Report, July 31, 2012 (ADC028188)

VVV.    Excerpts of health records of Maryanne Chisholm, inmate #200825

WWW.    Excerpts of health records of Victor Parsons, inmate #123589

XXX.    Excerpts of health records of Joshua Polson, inmate #187716

YYY.    Excerpts of health records of Stephen Swartz, inmate #102486

ZZZ.    Excerpts of health records of Charlotte Wells, inmate #247188

AAAA.    Email from Jeffrey Sharp to James Baird and Steve Grabowski, Sept. 9, 2009 (PLTF-PARSONS-000030)

BBBB.    Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2) to Defendant Charles Ryan *and Defendant Charles Ryan's First Supplemental Answers Thereto*, Oct. 17, 2012

78204-0001/LEGAL25128733.1

# EXHIBIT A

# DAVID C. FATHI

915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@npp-aclu.org

## BAR ADMISSIONS

Supreme Court of the United States
Supreme Court of Washington
Supreme Court of California (Inactive)
United States Courts of Appeals for the Fourth, Seventh, Ninth, and Tenth Circuits
Numerous United States District Courts

## EMPLOYMENT

| | |
|---|---|
| 2010-present | **Director** |
| 1990-93, | **Staff Counsel, Senior Staff Counsel** |
| 2000-07 | **American Civil Liberties Union** |
| | National Prison Project |
| | Washington, DC |
| | Legal challenges to conditions of confinement in prisons and jails throughout the United States. |
| | |
| 2007-10 | **Director, US Program** |
| | **Human Rights Watch** |
| | Washington, DC |
| | Management and supervision of research and advocacy on criminal justice, immigration, and other US human rights issues. |
| | |
| 1996-2000 | **Staff Attorney** |
| | **Columbia Legal Services, Institutions Project** |
| | Seattle, Washington |
| | Legal challenges to conditions of confinement in prisons, jails, and other institutions. |
| | |
| 1994-95 | **Articled Student** |
| | **British Columbia Public Interest Advocacy Centre** |
| | Vancouver, Canada |
| | Civil rights and poverty litigation. |

**EDUCATION**

1993        **Federation of Law Societies of Canada**
            **Committee of Canadian Law Deans**
            Ottawa, Canada
            Certificate of Qualification, November 1993
                    (Equivalent to Canadian law degree)

1985-88     **University of California, Berkeley**
            **Boalt Hall School of Law**
            J.D., May 1988
                    American Jurisprudence Award, Contracts
                    Prosser Prize, Employment Discrimination
                    Prosser Prize, Race and American Law

1979-84     **University of Washington**
            Seattle, Washington
            B.S., Psychology, March 1984
                    Summa Cum Laude, with College Honors


**SELECTED CASES**

**United States Supreme Court**

> Johnson v. California, 543 U.S. 499 (2005) (holding that California state prison
>     system's segregation of prisoners by race is subject to strict scrutiny) (co-
>     author of ACLU amicus curiae brief in Supreme Court).
>
> Overton v. Bazzetta, 539 U.S. 126 (2003) (considering restrictions on prison
>     visiting) (co-author of ACLU amicus curiae brief in Supreme Court).
>
> Booth v. Churner, 532 U.S. 731 (2001) (defining the scope of the Prison
>     Litigation Reform Act's administrative exhaustion requirement) (co-
>     author of ACLU amicus curiae brief in Supreme Court).
>
> Edwards v. Balisok, 520 U.S. 641 (1997) (considering the availability of 42
>     U.S.C. § 1983 as a vehicle for challenging prison disciplinary
>     proceedings) (principal author of ACLU amicus curiae brief in Supreme
>     Court).
>
> Helling v. McKinney, 509 U.S. 25 (1993) (holding that compelled exposure of
>     prisoners to second-hand cigarette smoke can constitute cruel and unusual
>     punishment in violation of the Eighth Amendment) (principal author of
>     ACLU amicus curiae brief in Supreme Court).

Denton v. Hernandez, 504 U.S. 25 (1992) (clarifying the standard for dismissal of a prisoner's in forma pauperis complaint as "frivolous" under 28 U.S.C. § 1915(d)) (co-author of ACLU amicus curiae brief in Supreme Court).

Hudson v. McMillian, 503 U.S. 1 (1992) (rejecting the contention that an unjustified beating of a prisoner by guards does not violate the Eighth Amendment unless the prisoner suffers "significant injury") (co-author of briefs in Supreme Court).

Rufo v. Inmates of Suffolk County Jail, 502 U.S. 367 (1992) (clarifying the standard for modification of consent decrees governing prisons and jails) (co-author of ACLU amicus curiae brief in Supreme Court).

Wilson v. Seiter, 501 U.S. 294 (1991) (holding that Court of Appeals erred in applying "persistent malicious cruelty" test to prison conditions case; vacating dismissal of prisoner's claims to permit application of proper "deliberate indifference" standard) (co-counsel in Supreme Court).

**United States Courts of Appeals**

Shook v. El Paso County, 386 F.3d 963 (10th Cir. 2004), cert. denied, 544 U.S. 978 (2005) (reversing district court's denial of class certification in challenge to inadequate mental health care in El Paso County (Colorado) Jail; holding that Prison Litigation Reform Act does not affect class certification in prison conditions cases) (argued in Court of Appeals).

Jones'El v. Berge, 374 F.3d 541 (7th Cir. 2004) (affirming district court's order to air condition cells in "supermax" prison to prevent injury or death during summer heat waves) (argued in Court of Appeals).

Hallett v. Stewart, 287 F.3d 1193, amended, 296 F.3d 732 (9th Cir. 2002) (affirming in part and reversing in part district court judgment denying motion for further relief, denying contempt motion, and terminating decree in challenge to health care at Washington women's prison) (co-counsel in Court of Appeals).

Gotcher v. Wood, 122 F.3d 39 (9th Cir. 1997) (considering the availability of 42 U.S.C. § 1983 as a vehicle for challenging prison disciplinary proceedings) (counsel on remand from Supreme Court).

Johnson v. Robinson, 987 F.2d 1043 (4th Cir. 1993) (considering whether district court acted properly in granting further relief on environmental and fire safety issues in Maryland prison case) (argued in Court of Appeals).

Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991) (vacating and remanding dismissal of claim under Rehabilitation Act of 1973; vacating and remanding dismissal of legal access claim; affirming dismissal of privacy and medical care claims of HIV-positive prisoners in Alabama state prisons) (co-author of briefs in Court of Appeals).

**United States District Courts**

Martinez v. Maketa, 2011 WL 2222129 (D. Colo. 2011) and Clay v. Pelle, 2011 WL 843920 (D. Colo. 2011)  (successful challenges to policies limiting prisoner mail to postcards in two Colorado county jails).

Flynn v. Doyle, 2007 WL 805788 (E.D. Wis. 2007) (class action challenge to inadequate medical, mental health, and dental care in Wisconsin's largest women's prison).

Inmates of the Rhode Island Training School v. Martinez, 465 F.Supp.2d 131 (D.R.I. 2006), 2007 WL 2031536 (D.R.I. 2007) (monitoring compliance with consent decree in challenge to conditions at juvenile correctional facility).

Hart v. Arpaio, No. CIV 77-479 PHX EHC (D. Ariz.) (resisting sheriff's motion to terminate consent decree governing conditions of confinement for class of 5500 pretrial detainees in Maricopa County Jail).

Office of Protection and Advocacy v. Choinski, Civil No. 3:03CV1352 (RNC) (D. Conn.) (challenge to conditions of confinement for mentally ill persons in Connecticut's "supermax" prison).

Canadian Coalition Against the Death Penalty v. Ryan, 269 F.Supp.2d 1199 (D. Ariz. 2003) (invalidating Arizona statute that required punishment of prisoners whose names appear on internet web pages).

Jones'El v. Berge, 172 F.Supp.2d 1128, 164 F.Supp.2d 1096 (W.D. Wis. 2001) (class action challenge to conditions in Wisconsin's "supermax" prison; resulted in preliminary injunction directing removal of mentally ill prisoners and ultimately in comprehensive consent decree).

Caldwell v. District of Columbia, 201 F.Supp.2d 27 (D.D.C. 2001) (jury trial in individual prisoner's challenge to conditions of confinement; resulted in award of $175,000, including $50,000 in punitive damages).

Joslyn v. Armstrong, 2001 WL 1464780 (D. Conn. 2001) (challenge to transfer of Connecticut prisoners to Virginia "supermax" prison; prisoners were returned to Connecticut during pendency of litigation).

Prison Legal News v. Crawford, No. CV-N-00-0373-HDM-RAM (D. Nev.)
(challenge to censorship of publications in Nevada state prison system;
resulted in consent decree substantially revising censorship policy).

Duffy v. Riveland, Atkins v. Lehman, No. C96-1985R (W.D. Wash.)
(consolidated) (statewide class action challenge to prison officials' failure
to accommodate the needs of deaf prisoners; resulted in settlement that
improved accommodations for deaf prisoners statewide).

Hoptowit v. Ray, No. 79-359-WFN (E.D. Wash.) (compliance monitoring in class
action challenge to conditions of confinement at Washington State
Penitentiary).

Hallett v. Payne, No. 93-5496 (W.D. Wash.) (compliance monitoring and
contempt proceedings, including two-week evidentiary hearing, in class
action challenge to medical care at Washington Corrections Center for
Women).

Hammer v. King County, No. C89-521R (W.D. Wash.) (compliance monitoring
and negotiation of post-PLRA "private settlement agreement" in class
action challenge to conditions of confinement at King County (Seattle)
Jail).

Lopez v. Riveland, No. 93-1030 (W.D. Wash.) (compliance monitoring in
challenge to prison officials' failure to provide translation services for
Spanish-speaking prisoners).

Dudek v. Blair, No. C76-226 RJM (E.D. Wash.) (compliance monitoring in class
action challenge to conditions of confinement in Yakima County Jail).

Casey v. Lewis, 773 F. Supp. 1365 (D. Ariz. 1991), rev'd, 4 F.3d 1516 (9th Cir.
1993); 834 F. Supp. 1477 (D. Ariz. 1993); 834 F. Supp. 1553 (D. Ariz.
1992), aff'd in part and vacated in part, 43 F.3d 1261 (9th Cir. 1994),
rev'd, 518 U.S. 343 (1996); 834 F. Supp. 1569 (D. Ariz. 1993); 837 F.
Supp. 1009 (D. Ariz. 1993) (extensive discovery, trial preparation, and
five-week trial in statewide challenge to conditions of confinement in nine
Arizona state prisons; resulted in trial court finding that mental health
care, accommodations for disabled prisoners, and access to courts were
unconstitutionally deficient).

Austin v. Department of Corrections, 876 F. Supp. 1437 (E.D. Pa. 1995), 1993
WL 9042 (E.D. Pa. 1993), 1992 WL 277511 (E.D. Pa. 1992) (responsible
for mental health issues in statewide challenge to conditions of
confinement in thirteen Pennsylvania state prisons).

Johnson v. Galley, No. WN-77-113 (D. Md.); Washington v. Tinney, No. WN-78-1730 (D. Md.) (postjudgment compliance monitoring in consolidated challenges to conditions of confinement at two Maryland prisons).

Congdon v. Murray, No. 3:90 CV00536 (E.D. Va.) (challenge to conditions of confinement at Virginia State Penitentiary; prison was permanently closed during the pendency of the lawsuit).

Inman v. Board of Supervisors, No. 2:91 CV00658 (E.D. Va.) (challenge to conditions of confinement at Northampton County Jail in eastern Virginia; after filing of lawsuit, overcrowding at Jail was significantly reduced and extensive health and safety repairs were undertaken).

Palmigiano v. DiPrete, 737 F. Supp. 1257 (D.R.I. 1990) (postjudgment compliance monitoring, including three-day contempt hearing, in challenge to conditions of confinement at Rhode Island prisons).

**State Courts**

Dean v. Lehman, 143 Wn.2d 12 (2001) (challenge to seizure of funds sent by free persons to their incarcerated spouses) (author of amicus curiae brief in Washington Supreme Court).

In re Meyer, 142 Wn.2d 608 (2001) (due process challenge to Washington's sex offender "community notification" regime) (co-counsel in Washington Supreme Court).

Tunstall v. Bergeson, 141 Wn.2d 201 (2000) (establishing state constitutional right to education for youth incarcerated in adult prisons) (argued in Washington Supreme Court).

Nelson v. McClatchy Newspapers, Inc., 131 Wn.2d 523 (1997) (holding that Washington Fair Campaign Practices Act prohibits an employer from discriminating against an employee because of the employee's off-duty political activities) (co-author of amicus curiae brief in Washington Supreme Court).

**SELECTED PUBLICATIONS**

**Reports and law review articles**

Fathi, <u>The Prison Litigation Reform Act:  A Threat to Civil Rights</u>, 24 Fed. Sent'g Rep. 260 (2012).

Fathi, <u>The Challenge of Prison Oversight</u>, 47 Am. Crim. L. Rev. 1453 (2010).

Human Rights Watch, <u>No Equal Justice:  The Prison Litigation Reform Act in the United States</u> (2009).

Fathi, <u>The Common Law of Supermax Litigation</u>, 24 Pace L. Rev. 675 (2004).

Boston, Fathi, and Alexander, <u>Farmer v. Brennan:  Defining Deliberate Indifference Under the Eighth Amendment</u>, 14 St. Louis U. Pub. L. Rev. 83 (1994).

Alexander and Fathi, <u>Smoking, the Perception of Risk, and the Eighth Amendment</u>, 13 St. Louis U. Pub. L. Rev. 691 (1994).

**Guest editorials**

"Overcrowded state prisons put all Californians at risk," <u>Los Angeles Daily News</u>, December 2, 2010.

"Nursing homes with razor wire," <u>Los Angeles Times</u>, December 23, 2009.

"An unfair prison litigation system," <u>Boston Globe</u>, August 25, 2009.

"Texas increasingly out of step on death penalty," <u>Houston Chronicle</u>, May 23, 2009.

"Lock 'em up?  It costs you," <u>Chicago Tribune</u>, April 1, 2009.

"Dangers of a preventive detention law," <u>Boston Globe</u>, January 1, 2009.

**INVITED PRESENTATIONS**

"Segregation" in <u>Prison Law 2012</u>, Practising Law Institute, New York, August 2012.

Moderator, <u>The Increased Use of Solitary Confinement in New York State Prisons</u>, New York State Bar Association Committee on Civil Rights, New York, January 2012.

"Combining Litigation with Other Methods of Advocacy" in <u>Cross-national Collaboration: Protecting Prisoners in the US and Russia</u>, American Bar Association Central European and Eurasian Law Initiative, Moscow, January 2012.

Participant, <u>Overcriminalization/Excessive Punishment:  Uncoupling Pipelines to Prison</u>, Yale Law School, New Haven, December 2011.

"Conditions of Confinement" in <u>The Civil Rights Crisis in the Federal System Post-9/11</u>, Brooklyn, New York, October 2011.

"Supreme Court Review" in <u>Prison Law 2011</u>, Practising Law Institute, New York, August 2011.

"Structural Discrimination Against People of African Descent in the Administration of Justice," invited presentation to the United Nations Working Group of Experts on People of African Descent, Geneva, Switzerland, April 2010.

"The Hardening of Prison Conditions:  Supermax, Segregation, and Solitary Confinement," in <u>Imprisoned:  The Thirteenth Annual Liman Colloquium</u>, Yale Law School, New Haven, March 2010.

 "Bringing Human Rights Home:  International Human Rights Law in U.S. Courts," National Legal Aid & Defender Association annual conference, Denver, November 2009.

"Has Change Come?  Human Rights in the United States under the Obama Administration," The Rothko Chapel, Houston, April 2009.

"Human Rights in the Southeast," Fourth Annual Working in the Public Interest Law Conference, University of Georgia, Athens, February 2009.

"The Death Penalty and International Human Rights Law," National Coalition to Abolish the Death Penalty Annual Conference, Harrisburg, Pennsylvania, January 2009.

"Post-9/11 Human Rights Violations in the United States," The Rothko Chapel, Houston, June 2008.

"The Limits of Punishment" in The Constitution and the Prison:  Incarceration American Style, Amherst College, Amherst, Massachusetts, May 2008.

"Prison Conditions Litigation:  What We Can Do," Ad Hoc Capital Representation Task Force, Annual Summer Meeting, Washington, July 2007.

"American Prison Conditions and Legal Advocacy Strategies for Prisoners' Rights Protection," Renmin University of China School of Law, Beijing, November 2006.

"Tickets to Limbo:  Psychiatric Disability in the Criminal Justice System," National Association for Rights Protection and Advocacy 25th Annual Conference, Baltimore, November 2006.

"The Right to Health Care for Incarcerated Persons" in Advocating for Health Care as a Human Right:  Health Care in Prison and Detention, American Bar Association Midyear Meeting, Chicago, February 2006.

"Prison Litigation Reform Act:  Current Issues" and "Creative Approaches to Solving Institutional Problems," in Prisoners' Rights Litigation:  A Workshop for Plaintiff Attorneys, USC Law School, Los Angeles, October 2005.

"Prison Litigation and Prisoner Rights" and "Keeping the Mentally Ill out of Restrictive Housing Units," National Association of Protection and Advocacy Systems 28th Annual Conference, Alexandria, Virginia, June 2005.

"Litigating Conditions of Confinement," Ninth Annual National Federal Habeas Corpus Seminar, St. Louis, August 2004.

"CRIPA and Other Laws Affecting Institutionalized Persons," National Bar Association 79th Annual Convention, Charlotte, North Carolina, August 2004.

"New Substantive Areas of Law" and "Mental Health and Supermax Issues," in Prisoners' Rights Litigation:  A Workshop for Experienced Plaintiff Attorneys (sponsored by the Yale Law School Jerome N. Frank Legal Services Organization), New Haven, May 2004.

"Obstacles Facing the Litigator Today," in <u>Prison Reform Revisited:  The Unfinished Agenda</u>, Pace Law School, White Plains, New York, October 2003.

"Dealing With Client Despair," NAACP Legal Defense & Educational Fund 24th Annual Capital Punishment Training Conference, Warrenton, Virginia, July 2003.

"Prison Litigation:  Thinking Through and Framing Your Legal Claims," National Association of Protection and Advocacy Systems 26th Annual Conference, Washington, DC, May 2003.

"Section 1983 and the Prison Litigation Reform Act," in <u>Prisoners' Rights Litigation: A Workshop for Plaintiff Attorneys</u> (sponsored by the Yale Law School Jerome N. Frank Legal Services Organization), New Haven, April 2003.

"Constitutional Law Governing Prison and Jail Conditions Cases" in <u>Prisoners' Rights Litigation:  Identifying and Trying Winning Cases</u> (Texas State Bar Association Individual Rights and Responsibilities Section CLE), Austin, March 2003.

"Challenging Death Row Conditions of Confinement" (training sponsored by Arizona Capital Representation Project), Tucson, December 2002.

"Prison Conditions Litigation and Other Ways to Improve Your Client's Mental State," Seventh Annual National Federal Habeas Corpus Seminar, Nashville, August 2002.

"Prison Law Libraries After <u>Lewis v. Casey</u>," American Association of Law Libraries, 95th Annual Meeting and Conference, Orlando, Florida, July 2002.

"Litigating Prison and Jail Mental Health Care," National Association of Protection and Advocacy Systems 25th Annual Conference, Washington, DC, June 2002.

"The Business of Supermax," Episcopal Church Province III Conference on Jail and Prison Ministry, Richmond, Virginia, April 2002.

"Prison Rape," Syracuse University Law School, Syracuse, New York, November 2001.

"Litigation: Is It Still Relevant?"  Critical Resistance Northeast Regional Conference, Columbia University Law School, New York City, March 2001.

"Supermax Prisons," Amnesty International Mid-Atlantic Regional Conference, Richmond, Virginia, November 2000.

"The Court's Next Federalism Battleground:  Should the ADA Apply to State and Local Prisons?"  National Press Club, Washington, DC, September 2000.

"Death Row Conditions and PLRA Litigation," Fifth Annual National Federal Habeas Corpus Seminar, Nashville, August 2000.

"Death Row Conditions Roundtable," NAACP Legal Defense & Educational Fund 21st Annual Capital Punishment Training Conference, Warrenton, Virginia, July 2000.

"Prison Law Basics" in When The Door Closes:  Preparing Your Client For Incarceration (Washington Association of Criminal Defense Lawyers CLE), Seattle, May 1998.

"The Prison Litigation Reform Act of 1995" in Government Accountability: Enforcing Individual Rights (Washington State Trial Lawyers Association CLE), Seattle, July 1997.

"Cultural and Religious Rights of Native American Prisoners" in Introduction to Indian Law (King County Volunteer Legal Services Program CLE), Seattle, March 1997.

"The Rights of Prisoners and Ex-Offenders," Second Annual People's Lawyers Conference, Columbia University Law School, New York City, November 1992.

"The Supreme Court's Decision in Rufo v. Inmates of the Suffolk County Jail: Legal Implications for Correctional Health Care," 16th National Conference on Correctional Health Care, Chicago, September 1992.

# EXHIBIT B

**Portions of this document are subject to the Protective Order**

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone: (602) 650-1854
    Email: dpochoda@acluaz.org
5          kflood@acluaz.org
           jlyall@acluaz.org
6
7   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

8   *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
    Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
9   Christina Verduzco, Jackie Thomas, Jeremy Smith,
    Robert Gamez, Maryanne Chisholm, Desiree Licci,
10  Joseph Hefner, Joshua Polson, and Charlotte Wells, on
    behalf of themselves and all others similarly situated
11
12  **[ADDITIONAL COUNSEL LISTED BELOW]**

13              UNITED STATES DISTRICT COURT

14                  DISTRICT OF ARIZONA

15
16  Victor Parsons; Shawn Jensen; Stephen Swartz;      No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina         (MEA)
17  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
18  Hefner; Joshua Polson; and Charlotte Wells, on     **DECLARATION OF PABLO**
    behalf of themselves and all others similarly      **STEWART, M.D.**
19  situated; and Arizona Center for Disability Law,

20                  Plaintiffs,

21          v.

22  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
23  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
24  capacities,

25                  Defendants.

26

27

28

29

30

I, PABLO STEWART, M.D., DECLARE:

1.     I am a board-certified psychiatrist and Clinical Professor in the Department of Psychiatry, University of California, San Francisco.  My curriculum vitae is attached hereto as Exhibit 1.  I have more than 20 years of experience in correctional mental health care, including serving as the court's expert in class action cases challenging the provision of mental health care to prisoners.

2.     I have been asked to render an opinion as to the policies and practices of the Arizona Department of Corrections (ADC) and its agents as they relate to the provision of mental health care to ADC prisoners.

3.     I have reviewed the following documents:

1. Deposition of Ben Shaw, Ph.D., October 3, 2012
2. Deposition of Tracy Crews, M.D., October 3, 2012
3. Deposition of Richard Pratt, P.A., October 4, 2012
4. Deposition of Jeffrey Alan Sharp, M.D., October 9, 2012
5. Memo from Ben Shaw to Joe Profiri, August 13, 2012 (ADC 27770-71)
6. Letter from Joe Profiri to Karen Mullenix, September 21, 2012 (ADC027854-60)
7. Memo from Paulette Boothby to Joe Profiri, August 17, 2012 (ADC 27794-804)
8. Email from Tracy Crews to Ben Shaw, February 3, 2011 (PLTF-PARSONS-000007)
9. Memo from Lewis Medical/Wexford Health Services to Lewis Complex Inmates, 6/26/11 [sic] (PLTF-PARSONS-013132)
10. ADC Mental Health Technical Manual, Chapter 5, Section 19.0, Effective Date 8/15/11
11. Memo from Helena Valenzuela to Joe Profiri, August 13, 2012 (ADC 28140-42)
12. Memo from Terry L. Allred to Joe Profiri, August 13, 2012 (ADC 28112-14)
13. Memo from O. Valencia to Warden Hetmer, March 26, 2012 (ADC 26930-45)
14. Letter from Deputy Warden McCarville to [redacted] Alcaraz, April 27, 2011 (ADC 25768-70)

15. Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2) to Defendant Charles Ryan, and Defendant Charles Ryan's First Supplemental Answers Thereto.

16. Declaration of Plaintiff Dustin Brislan, October 30, 2012

17. Declaration of Plaintiff Maryanne Chisholm, October 18, 2012

18. Declaration of Plaintiff Jackie Thomas, October 16, 2012

19. Declaration of Plaintiff Christina Verduzco, October 18, 2012

20. Declaration of Plaintiff Joshua Polson, November 1, 2012

4.     My opinions at this early stage of this case are necessarily constrained by the limited amount of information I have. For example, I have not yet been able to make an on-site visit to ADC facilities, speak with prisoners and staff, or review prisoner records and other relevant documents. Nevertheless, based upon the documents listed above, I am able to reach the following preliminary opinions. These should not be taken as an exhaustive list of the opinions I will reach in this case, and I reserve the right to supplement or modify these opinions as more information becomes available.

5.     Based upon my review, it is apparent that mental health care services at ADC are in a state of disarray, and have been for some time. The lack of a functioning mental health program poses a substantial risk of serious harm to prisoners with mental health needs. Although the day-to-day provision of health care, including mental health care, was privatized by the state and since July 1, 2012 has been performed by Wexford Health Sources (Wexford), all relevant policies and procedures for the provision of mental health care are centralized with statewide application. (Fathi Decl. Ex. T, at 157:13-24)[1]. ADC has a statewide Monitoring Bureau that monitors Wexford's provision of health care at all state-owned and operated prisons. (Ex. U, at 19:10-24, 40:7-9). Furthermore, the systemic problems that I have identified existed prior to July 1, 2012, when ADC directly provided mental health care to the prisoners in its custody.

---

[1] All excerpts of deposition transcripts, plaintiff declarations, and documents referenced herein are attached as exhibits to the Declaration of D. Fathi. For ease of reading and economy all such exhibits will be referenced hereinafter as simply "Ex. ___".

6.     As I detail below, the shortage of mental health staff, delays in providing or outright failure to provide mental health treatment, and the gross inadequacies in the provision of psychiatric medications are statewide systemic problems, and prisoners who need mental health care have already experienced, or will experience, a serious risk of injury to their health if these problems are not addressed.  Additionally, the problems that Plaintiffs experienced and continue to experience with ADC's mental health system are typical of the problems one would expect to see as a result of this wholly inadequate correctional mental health system.  In my experience in correctional mental health care, these types of systemic problems have been addressed through an injunction directed against the directors and administrators of the prison system.

**Staffing**

7.     The provision of sufficient numbers of qualified mental health staff is the foundation of any minimally adequate prison mental health care system.  Without a sufficient number of properly qualified mental health staff, it is impossible to provide adequate mental health treatment.  It is apparent that there have been and continue to be severe systemwide shortages of mental health staff in ADC, both before and after health care services were privatized on July 1, 2012.

8.     In an August 13, 2012 memo to Joe Profiri, ADC Contract Beds Operations Director, Dr. Ben Shaw, ADC Mental Health Contract Monitor, detailed how mentally ill prisoners receiving psychiatric medications were not receiving the required face-to-face meeting with psychiatry providers every three months due to staffing shortages:

> Wexford's current level of psychiatry staffing is grossly insufficient to meet [its] contractual requirement.  Further, this staffing level is so limited that patient safety and orderly operation of ADOC facilities may be significantly compromised. … Wexford currently has 14.85 psychiatry FTE's allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications.  Wexford now employs a total of 5.95 FTE psychiatry providers (approximately 33% of their allocation) which 8.9 FTE's are vacant (leaving a vacancy rate of 66%).  Audit findings that

1     support the position that Wexford's psychiatry staffing is insufficient to

2     provide a safe level of services are as follows:  [findings omitted]

3

4 (Ex. KK, at ADC027770).

5    9.  In his October 3, 2012 deposition regarding the provision of mental health

6 care at ADC prisons, Dr. Shaw testified that as of August 2012, the Perryville, Lewis,

7 Eyman, Florence, and Tucson complexes, which collectively house 90 to 95% of the

8 mental health population, each had less than half of their psychiatric provider full time

9 equivalent (FTE) positions filled.  (Ex. T, at 126:22-127:10). In a September 21, 2012

10 letter sent to Wexford, ADC cited "inadequate staffing levels in multiple program areas at

11 multiple locations;" "staffing levels creating inappropriate scheduling gaps in on-site

12 medical coverage, including In-Patient Component;" and "Staffing levels forcing existing

13 staff to work excessive hours, creating fatigue risks."  (Ex. EE, at ADC027858).

14    10.  In his October 3, 2012 deposition, Dr. Shaw testified to numerous current

15 vacancies statewide among mental health staff.  (Ex. T, at 60:6 – 67:4).  For example, he

16 testified that, as of that date, 0 of 2 psychiatric nurse practitioner/physician assistant

17 positions were filled (Ex. T, at 64:2-9); 1 out of 5 psych supervisor psychiatrist positions

18 were filled (Ex. T, at 64:22-65:9), and 0.5 out of 3 psychiatrist positions were filled (Ex.

19 T, at 65:23-25).  Dr. Shaw also testified that, as of August 8, 2012, there was no

20 psychiatrist at either the Florence or Lewis complexes (Ex. T, at 76:22-77:1, 78:19-22).

21    11.  Dr. Shaw also testified to mental health staffing shortages that existed

22 before the July 1, 2012 privatization of health care.  (Ex. T, at 83:7 – 97:3).  He testified

23 that, as of June 20, 2012:

24    a.  the psychiatrist, nurse practitioner, and midlevel care provider positions at

25 Florence were all vacant, as were two out of four psychologist positions (Ex. T, at 86:16-

26 88:5).

27    b.  The clinical director position, psychiatrist supervisor position, and one of

28 two psych nurse coordinator positions at Phoenix were all vacant (Ex. T, at 93:10-94:11).

29

30

c.      All four psychiatrist positions at Tucson were vacant (Ex. T, at 95:21-96:14).  ADC concentrates higher-acuity mental health prisoners at Tucson (Ex. T, at 97:4-12).

12.     Dr. Shaw further testified that as of June 20, 2012, some of these positions had been vacant for approximately one year (Ex. T, at 86:8-11, 93:16-17).  It appears that ADC's staffing shortages are longstanding; Dr. Shaw testified that as of February 2011, only 2.5 out of 14 ADC psychiatric provider positions were filled by state employees. (Ex. T, at 102:14-21).  Dr. Tracy Crews testified that she was the sole psychiatry provider for the entire Perryville complex from August 2010 until March 2011, when a psychiatry nurse practitioner finally was hired.  (Ex. V, at 36:10-37:24, 83:4-22).  She testified that given 2011 statistics indicating 1,382 female prisoners classified as higher mental health needs (MH-4 or MH-3), a single psychiatrist with a caseload this high does not meet the acceptable standard of care.  (Ex. V, at 84:9-22).  I concur in her opinion – such a psychiatrist staffing ratio does not meet basic requirements for adequate mental health care.

**Medication Management and Continuity of Care**

13.     Prisoners with mental illness need to be monitored on a regular basis by qualified mental health staff.  The administration of psychotropic medications needs to be supervised by a psychiatrist.  And prisoners need to be able to make their mental health needs known and have those needs promptly assessed by qualified staff.  The practices and policies of ADC and its agents in this area pose a substantial risk of serious harm to prisoners.

14.     In a September 21, 2012 letter to Wexford, Mr. Profiri describes a situation in which "a significant number of inmates may not have been receiving their medications as prescribed due to expired prescription(s) and inappropriate renewals or refills."  (Ex. EE, at ADC027855).  In his deposition, Dr. Shaw testified that this problem involved approximately 5,000 prisoners, about 1,500 of whom were prescribed psychotropic medications.  (Ex. T, at 49:14 – 51:1). These prisoners did not receive their medications for periods ranging from a few days to up to a month.  (Ex. T, at 50:16 - 21).  Mr. Profiri wrote in his letter that "it was apparent … that Wexford was aware of the expired

1    medication issue, but had not taken adequate, if any, action to correct it." (Ex. EE, at

2    ADC027855).  Failure to provide medications as prescribed poses a serious risk to patient

3    health and safety.

4           15.    The same September 21 letter from ADC to Wexford describes a prisoner in

5    Florence-Central Unit who was found hanging from a sheet on August 23, 2012. (Ex. EE,

6    at ADC027856).  The prisoner had been prescribed a mood stabilizer, but did not receive

7    his medication for the first 23 days of August.  (Ex. EE, at ADC027856).  I agree with Mr.

8    Profiri that "[f]ailing to deliver psychotropic medication as prescribed is a significant,

9    non-compliance issue." (Ex. EE, at ADC027856).  Furthermore, I believe that incidents

10   such as this prisoner's suicide attempt are the foreseeable result of the failure to provide

11   him with his necessary psychotropic medication.

12          16.    ADC admits that it lacks a reliable system for ensuring the delivery of

13   prescribed medications.  In its September 21, 2012 letter to Wexford, ADC describes

14   problems with "[i]ncorrect, incomplete, inconsistent medication administration or

15   documentation of care provided," including:  a backlog of prescriptions that were expiring

16   or had expired, and needed review/renewal; incorrect or incomplete pharmacy

17   prescriptions (i.e., medication not matching chart order, wrong dosage); inappropriate

18   discontinuation of or change of medication; inconsistent process to approve non-

19   formulary medication; inconsistent or contradictory medication refill and/or return

20   procedures; inadequate pharmacy reports; inconsistent documentation of Medication

21   Administration Records (MARs); and inconsistent provision of release, transfer, and/or

22   renewal medications.  (Ex. EE, at ADC027858-59).

23          17.    In addition to the situation described in paragraph 14 above, in his August

24   13, 2012 memorandum, Dr. Shaw wrote that an August 1, 2012 audit at Perryville found

25   54 patients' medications had expired in July.  (Ex. KK, at ADC027770)  In addition,

26   there were 75 women at Perryville who had been prescribed and stabilized on

27   psychotropic medications at County Jail facilities, none of whom had had their

28   medications prescribed and continued, as ADC policy requires.  (Ex. KK, at ADC027770-

29   71).

30

1    18.    Richard Pratt testified that the delivery of medication has deteriorated since

2  Wexford took over on July 1, 2012.  (Ex. U, at 36:17-37:1, 51:12-52:1).  Mr. Pratt, who is

3  the interim assistant director of the Monitoring Bureau, testified that he did not know

4  whether Wexford has fixed these medication delivery problems.  (Ex. U, at 63:21-65:13).

5  Similarly, in an August 17, 2012 memo from Paulette Boothby, ADC Pharmacy Monitor,

6  to Mr. Profiri, Ms. Boothby writes that at the Florence complex, "many inmates have gone

7  without Psych meds for 30 days or more."  (Ex. LL, at ADC027796).  Ms. Boothby's

8  memo repeatedly refers to staffing shortages adversely affecting pharmacy operations (id.

9  at ADC027795, ("[Wexford's] staffing levels on site are a big concern"); id. at

10  ADC027796, ("there are not enough staff to accomplish this task"); id. at ADC027797

11  ("More staff is needed immediately to provide continuity of care")).

12    19.    In light of these facts, I am particularly concerned by a memo to Lewis

13  Complex Inmates from Wexford and ADC, dated June 26, 2011.[2]  This memo states that

14  "chronic care medications will no longer be refilled automatically" and "medications will

15  not be refilled without an HNR [Health Needs Request form]."  (Ex. JJ, at PLTF-

16  PARSONS-013132).  In light of the dysfunctions of the HNR system detailed below, this

17  medication distribution system poses a significant risk of interruption of psychotropic

18  medications, with potentially grave results.

19    20.    Mr. Pratt states that in his judgment as a medical professional, it would be

20  better if a person with a need for chronic care medications, which include psychotropic

21  medications, were provided a continual supply of his or her medication. (Ex. U, at 83:5-

22  10).  In her deposition, Dr. Crews described the problems that are associated with patients

23  having their psychotropic medication run out or expire – they can have a relapse of their

24  problems, and there is a "kindling effect" with bipolar and psychotic disorders where the

25  more times a patient goes off medications and has symptoms the harder it will be to get

26  control of those symptoms and treat her.  (Ex. V, at 82:10-24).

27

28

29

30      [2] Based on the balance of the memo, the correct date appears to be June 26, 2012.  I
understand that counsel for ADC and Wexford have stipulated that the correct date is
2012.

21.     These problems in the delivery of medication appear to pre-date the transfer of responsibility to Wexford.  Dr. Crews, the Perryville supervising psychiatrist for six years prior to Wexford's takeover, testified that if she could not see the patient before her prescription(s) expired, "each month the nurse would lay down […] a stack of scripts for me, and I would fill them until the patient could be seen." (Ex. V, at 77:4-77:6).  In 2011, Dr. Crews refused to renew or write prescriptions for psychotropic medication for Florence prisoners she had never seen, and would never see.  (Ex. V, at 92:1-13; 93:11-17).  In his October 9, 2012 deposition, Dr. Jeffrey Sharp, a primary care physician at Perryville, testified that he is expected to renew psychotropic medications for patients whom he has never seen.  (Ex. W, at 85:17-86:8).  Dr. Sharp testified that he does not feel competent to do so or comfortable doing so.  (Ex. W, at 85:17-87:14).  This is an inappropriate practice that puts patients at risk of harm.

**Delays or Outright Failure to Provide Mental Health Treatment**

22.     ADC does not have a reliable means for prisoners to make their mental health needs known in a timely manner to qualified staff.  According to Dr. Shaw, the Health Needs Request (HNR) form is the primary means by which prisoners access non-routine mental health care (Ex. T, at 104:1-11).  Dr. Shaw wrote in his August 13, 2012 memo:

> At the Perryville-Lumley Unit 123 HNR's were found requesting to be seen by a psychiatry provider.  These patients were waiting to be seen for up to 60 days.  None of the patients had been seen or scheduled to be seen at that point in time.

(Ex. KK, at ADC027771).

23.     Similarly, in ADC's September 21, 2012 letter to Wexford, the Department cited "untimely handling of Health Needs Requests."  (Ex. EE, at ADC027859).  In a February 3, 2011 email to Dr. Shaw, titled "Please Help," Dr. Tracy Crews, then the psychiatrist supervisor at Perryville, wrote "[c]urrently, on most yards here, we are backed

1  up 3-4 months with the HNRs and longer for regular follow-ups." (Ex. HH, at 1 PLTF-
2  PARSONS-000007).

3      24.    ADC appears to lack a reliable system to ensure that prisoners taking
4  psychotropic medications and those with mental illness are meaningfully evaluated on a
5  regular basis by qualified mental health staff. In Dr. Shaw's August 13, 2012 memo he
6  wrote that "Wexford's current level of psychiatry staffing is grossly insufficient" to meet
7  the requirement that mentally ill inmates receiving psychotropic medications are assessed
8  face to face every three months. (Ex. KK, at ADC027770). He also noted that:

9

10      Audit at Lewis on 8/5/2012 found that of the 10 charts evaluated, none (0%) had
11      been seen by psychiatry provider in the past 30 days.

12

13      Audit at Eyman on 8/6/2012 found that of the 20 charts evaluated, none (0%) had
14      been seen by psychiatry provider in the past 30 days.

15

16  (Ex. KK, at ADC027771).

17      25.

18

19

20

21

22                                    In a February 3, 2011 email to her
23  supervisors, Dr. Crews stated that some patients on psychotropic medications at Perryville
24  "have not been seen for 6 months or longer." (Ex. HH, at PLTF-PARSONS-000007).

25      26.    Finally, it appears that ADC lacks a reliable system to ensure that prisoners
26  needing a higher level of mental health care are transferred in a timely fashion to
27  appropriate facilities. Dr. Crews, former psychiatrist supervisor at Perryville, testified that
28  she has "seen it take weeks" to get a prisoner transferred to ADC's mental health facilities
29  in Phoenix (Ex. V, at 117:1-13). Dr. Crews also testified that ADC policy bars prisoners
30  classified as security level five, including Plaintiff Christina Verduzco, from being placed

1  at Phoenix's Flamenco Unit, an inpatient facility with more intensive treatment (Ex. V, at

2  136:20-137:19).  Dr. Crews, who left Perryville in late June 2012, testified specifically

3  about

4                                                    Flamenco is the only ADC inpatient facility

5  available to female prisoners. (Ex. T, at 216:2-4).  Dr. Crews agreed that Plaintiff

6

7

8

9      27.    In any event, there is a serious question whether the Phoenix facilities are

10  currently able to provide appropriate inpatient care.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                    Needless to say, watching television is not

28  group mental health programming, and it is disturbing that it is being represented as such

29  at what I understand to be ADC's dedicated mental health facility.

30

1   **Isolated Confinement**

2   28.    Isolated confinement – that is, confinement in a cell for 22 or more hours

3   each day with limited social interaction and environmental stimulation – can be

4   profoundly damaging to mental health even for prisoners with no known mental illness.

5   For those with serious mental illness, such as psychotic disorders and major mood

6   disorders, it can be devastating, leading to severe deterioration in mental health, self-harm,

7   or suicide.  These facts appear to be well known to ADC; Dr. Crews, psychiatrist

8   supervisor at Perryville, testified that "[a] person who doesn't have mental illness being

9   isolated for long periods could develop mental illness or mental illness symptoms from

10  being isolated," and that "almost all" mental illnesses can be exacerbated by long periods

11  of isolation (Ex. V, at 127:3-14)  Yet Dr. Shaw testified that there is no ADC policy

12  barring the housing of prisoners with serious mental illness in isolated confinement, and

13  that such prisoners are currently housed in SMU 1, Browning, Florence-Central, Florence-

14  Kasson, and Perryville-SMA.  (Ex. T, at 135:21- 137:2).

15  29.    I have reviewed the declarations of Plaintiffs who suffer from serious

16  mental illness and who have been housed in isolated confinement in ADC.  The

17  experiences they describe – including exacerbation of symptoms, paranoia, and

18  hallucinations – are typical of the reactions I would expect from seriously mentally ill

19  persons exposed to these conditions.

20  **Suicide Prevention**

21  30.    One of the most critical functions of a prison mental health system is the

22  prevention of suicide.  In his October 3 deposition, Dr. Shaw acknowledged "a serious

23  gap in our ability to provide suicide prevention."  (Ex. T, at 284:24 – 285:3)  I agree with

24  Dr. Shaw that there are deficiencies in ADC's suicide prevention policies and practices,

25  and believe that these systemic policies and practices pose a substantial risk of serious

26  harm to ADC prisoners.

27  31.    First, there are problems with ADC's use of suicide watch.  If a prisoner is

28  placed on watch because he or she is believed to be at risk of suicide, it is critically

29  important that the watch be supervised by qualified mental health staff.  However, ADC

30  policy does not require that a prisoner on suicide watch be evaluated face-to-face by a

psychiatrist (Ex. T, at 164:15-19).  In addition, ADC policy allows a prisoner to be taken off suicide watch by an unlicensed mental health staff member (Ex. T, at 234:12-235:16). The decision to remove a prisoner from suicide watch is one of the most significant decisions prison mental health staff make; it should be entrusted to highly trained, licensed mental health professionals.

32.    In addition, ADC policy permits the use of chemical agents (such as pepper spray) on prisoners while they are on suicide watch or other mental health watch, or when they are engaging in self-harm.  (Ex. T, at 130:20-131:10).  ADC policy also permits the use of chemical agents on prisoners who are seriously mentally ill (Ex. V, at 114:5-8) and those who are taking psychotropic medications.  (Ex. CC, at Req. for Admis. No. 38 - 43). Taken together, these policies permit the use of chemical agents in ways that would actually increase the risk of suicide, in addition to leading to physical harm.

33.    Finally, it appears that ADC fails to ensure that correctional staff conducts regular security checks on prisoners.  Such checks are essential to ensure that suicidal behavior is detected promptly so that suicides can be prevented.

**Protection of Prisoners on Psychotropic Medications from Heat Injury**

34.    Many psychotropic medications make the patient highly sensitive to heat. This sensitivity can result in the patient suffering serious injury or death if exposed to temperatures that would not be harmful to persons not on such medication.  I have reviewed the ADC Mental Health Technical Manual, Chapter 5, Section 19.0, "Management of Heat Intolerance Reactions to Medications," and believe that this policy does not provide adequate protection against heat injury in two important respects.

35. First, it does not provide for any prophylactic action to protect prisoners from heat injury; rather, it requires an "unequivocal diagnosis of hyperthermia (body temperature above 99.5 degrees) or orthostatic hypotension (drop of 20 mm HG or greater on rising)." (Ex. LLL, at 84). This requirement creates a needless risk of harm to prisoners taking psychotropic medications. Heat sensitivity is an entirely predictable side effect of certain commonly-used psychotropic medications, and prisoners prescribed those medications should be proactively protected from heat, without requiring that they first manifest potentially dangerous clinical signs such as hyperthermia and hypotension.

36. Second, the only available accommodation for those with heat sensitivity (other than discontinuing the medication) is "a duty status to minimize heat exposure." (Ex. LLL, at 84). In a hot climate like Arizona's, there is a significant risk that prisoners on psychotropic medications will be exposed to dangerous levels of heat regardless of their duty status. For example, Dr. Crews testified about a prisoner taking psychotropic medication who died of heatstroke (Ex. V, at 103:5 - 104: 3). An effective policy must take account of this risk and ensure that prisoners on psychotropic medications are protected from dangerous heat levels in their housing units. For example, by court order, the Maricopa County Jail requires that prisoners taking psychotropic medications be housed in areas where the temperature does not exceed 85 degrees Fahrenheit. By contrast, ADC has no policy specifying temperature limits for areas housing prisoners taking psychotropic medications. (Ex.CC, at Req. for Admis. No. 33). Dr. Crews testified that Perryville did not keep a master list of prisoners on psychotropic medications to ensure that they would not be housed in hot temperatures (Ex. V, at 100:2-11).

**Conclusion**

37. Based upon the information summarized above, it is my opinion that the current state of mental health care services in the Arizona Department of Corrections poses a substantial risk of serious harm to prisoners who require mental health care. I have reviewed the declarations of Plaintiffs who have raised mental health claims in this case. These declarations describe problems such as HNRs receiving delayed or no response; brief, infrequent, and superficial interactions with mental health staff; difficulties in receiving psychotropic medications; and endemic delays in receiving any

1   kind of mental health care.  These problems are entirely typical and predictable outcomes
2   of the systemic deficiencies I have described above.

3          38.     Of course not all ADC prisoners will be harmed by these deficiencies in
4   exactly the same way – some will die, some will suffer injury short of death, and some
5   will be lucky enough to escape permanent injury altogether.  But the problems described
6   above are systemic in nature, and require systemic solutions.  The ADC mental health care
7   system is highly centralized, governed by policies of statewide application. (Ex. T, at
8   157:13-24).  In my experience as a court expert in other class action lawsuits challenging
9   mental health services in prisons, court orders directed at prison administrators who
10  oversee the entire system can bring about the needed changes to provide relief to the class
11  as a whole, by reducing the risk of harm faced by all prisoners.

12

13         I declare, under penalty of perjury, that the foregoing is true and correct.

-14-

1    Executed this 6TH day of November, 2012 at San Francisco, California.

3
4
5    PABLO STEWART, M.D.

-15-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     dpochoda@acluaz.org
           kflood@acluaz.org
           jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@npp-aclu.org
           afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
           rjipke@perkinscoie.com
           jahlers@perkinscoie.com
           keidenbach@perkinscoie.com
           jhgray@perkinscoie.com
           tryerson@perkinscoie.com
           mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
           dkiernan@jonesday.com
           scalderon@jonesday.com
           srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:     rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com
           ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
           jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT 1

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated 10/2011)**

| | |
|---|---|
| <u>EDUCATION:</u> | University of California School of Medicine, San Francisco, California, M.D., 1982 |
| | United States Naval Academy Annapolis, MD, B.S. 1973, Major: Chemistry |
| <u>LICENSURE:</u> | California Medical License #GO50899<br>Hawai'i Medical License #MD11784<br>Federal Drug Enforcement Agency #BS0546981<br>Diplomate in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

<u>ACADEMIC APPOINTMENTS:</u>

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u>  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u>  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u>  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation. |

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco</u>.  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

2

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco, CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u>  Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u>  Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u>  Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident.  The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship.  One of sixteen nation-wide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry.  Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 - | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| | |
|---|---|
| February 2006-<br>January 2007 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>Present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.   Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

<u>TEACHING RESPONSIBILITIES:</u>

| | |
|---|---|
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health."  This is a 1-unit course, which covers the unique health needs of prisoners. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |

| | |
|---|---|
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 - August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

<u>COMMUNITY SERVICE:</u>

| | |
|---|---|
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>Present | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).   This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project.   This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities.  NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs.  NCCD ceased to be the monitoring agency for this project in June 1999.  At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency.  The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |

| | |
|---|---|
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-<br>July 1997 | Psychiatric Expert for the U. S. Federal Court in the case of Madrid v. Gomez.  Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 -<br>January 2000 | Psychiatric Expert for the U.S. Federal Court in the case of Gates v. Deukmejian.   Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July -<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego.  Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists.  (9/10/94).  "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar.   (12/1/1994).  "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry.  (1/24/1995).  "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.   (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01).  "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered.  (3/10/1995).  "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995).  "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.   (11/23/95).  "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California.   (1/19/96).  "Understanding Alcoholism and its Impact on the Legal Profession."   MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting.  (2/10/96).  "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.     Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.     Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.     DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.     The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.     The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California.  (2/12/98)

36.     American Group Psychotherapy Association, Annual Training Institute, (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.     "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., in conjunction sponsored this seminar with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.     "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference.  (6/4/1998)

39.     Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.     Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.     Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.     "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer."  The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.     Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.     "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii.  (9/2/98)

46.     9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco.  "Care Issues and Pain Management for Chemically Dependent Patients."   San Francisco, CA.  (9/10/98)

47.     Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000."  "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA.  (9/18/98)

48.     Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder."  Napa, CA.  (9/23/98)

49.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA.  (9/30/98)

50.     "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA.  (10/13/98)

51.     California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient."  Concord, CA.  (10/15/98)

52.     California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel.  (10/15/98)

53.     Northwest GTA Health Corporation, PEEL MEMORIAL HOSPITAL, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada.  (10/23/98)

54.     1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders."  Sacramento, CA.  (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA.  (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder."  (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA.  (1/22 & 2/5/99)

58.     Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender."  (2/17/99)

59.    American Group Psychotherapy Association, Annual Training Institute, (2/22-2/24/1999).  Entry Level Process Group Leader.

60.    "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.    "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.    "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.    "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.    Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.    "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.    California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.    State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.    11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.    The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", Third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87.     "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88.     "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.     "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.     "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.     "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.     "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.     "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.     "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.     "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.     "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.     "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.     "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunderoad Adolescent Treatment Centers, Inc., Oakland, California.  (6/29 & 7/27/00)

105. "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106. "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107. Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.  "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108. "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (11/1/00, 3/13/01)

109. "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110. "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111. "Wasn't One Problem Enough?"  Mental Health and Substance Abuse Issues. 2001California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112. "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."  County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113. "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114. "Dual Diagnosis-Assessment and treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115. Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."  I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders."  San Jose, California.  (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington.  (11/15/01)

119. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

120.   Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

121.   3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System."  (6/5/02)

122.   New Mexico Department of Corrections, "Group Psychotherapy Training."  Santa Fe, New Mexico.  (8/5/02)

123.   Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California.  (8/15/02)

124.   California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California.  (8/22/02)

125.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

126.   First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas."  El Centro, California.  (1/28/02)

127.   Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128.   Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.   "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (10/1/03), (12/3/03)

130.   "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California.  (10/18/03)

131.   "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Pasadena, California.  (4/2/04)

132.   Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134.   "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.   "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.   Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.   "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.   "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada.  (4/10/08)

149.   "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program.  Chelan, Washington.  (6/3/08)

150.   "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference.  Burlingame, California.  (6/19/08)

151.   Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.   2010 B. E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th.)

153.   Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist the Federal Court to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.   Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011)


PUBLICATIONS:

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and outcome in a short-term therapy group for schizophrenic outpatients*.  Hospital and Community Psychiatry, 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group process in short-term outpatient therapy groups for schizophrenics.*  Group, Volume 13, Number 2, Summer 1989.

3)   Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.*  Journal of Psychoactive Drugs, Vol. 23(4) Oct-Dec 1991, 387395.

4)   Banys, P., Clark, W.H., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, W.H., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.*  The Journal of Nervous and Mental Disease, Vol 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W. O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trail Of Tyrosine for Cocaine Dependence.*  Journal of Psychoactive Drugs, Vol. 28(3), July-September 1996

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999

8)   Stewart, P. (1999).  *New Approaches and Future Strategies Toward Understanding Substance Abuse.*  Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002).  *Treatment Is A Right, Not A Privilege. Chapter in the book, Understanding Addictions-From Illness to Recovery and Rebirth,* ed. By Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10) Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11) James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12) Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13) Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon

14) Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon

# EXHIBIT C

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-NVW (MEA)<br><br>**DECLARATION OF ROBERT L. COHEN** |

I, Robert L. Cohen, declare,

1.     I am a medical doctor and expert in the field of Correctional Medicine, with 30 years of experience in the field.  My Curriculum Vitae is attached.  I have been appointed by federal courts to serve as a monitor in cases challenging the provision of medical care to prisoners, including in Michigan, New York State and Florida.  I have also been a member of the New York City Board of Corrections since 2009, served as a representative on the National Commission on Correctional Health care for 17 years, provided primary care to jail inmates at Rikers Island, and published extensively on health care for the incarcerated.

**Expert Opinion**[1]

2.     I have been retained by plaintiffs' counsel in the *Parsons* case as an expert in correctional health care.  I have been asked to render my opinion with respect to whether the current widespread deficiencies in the medical care provided by the Arizona Department of Corrections health care delivery system are systemic and whether the deficiencies are amenable to a common remedy that will resolve the litigation.

3.     The opinions set forth in this declaration are based on my extensive experience studying and researching correctional systems, my service in the field, and my experience as an expert and monitor in prison conditions cases.  They are also based on my review of the following documents:

Deposition of Tracy Crews, M.D., October 3, 2012

Deposition of Carmelo Echeverria, M.D., October 5, 2012

Deposition of Karen Ingram, September 13, 2012

Deposition of Richard Pratt, P.A., October 4, 2012

Deposition of Richard Rowe, M.D., September 19, 2012

Deposition of Jeffrey Alan Sharp, M.D., October 9, 2012

---

[1] All excerpts of deposition transcripts, plaintiff declarations and documents referenced herein are attached as exhibits to the Declaration of D. Fathi to which this declaration is also attached.

1    Deposition of Ben Shaw, Ph.D., October 3, 2012

2    Summary Judgment Order, *Arenberg v. Ryan*, Case No. 2:10-cv00228-JWS (D.

3    Ariz. October 9, 2012)

4    ADC Notice of Request for Proposal for Privatization of Health Care and Wexford

5    Health Inc.'s Bid, (ADC014103 – ADC016042)

6    Death Investigation, Inmate                    (ADC02949 – ADC024982)

7    Death Investigation, Inmate                   (ADC025110 – ADC025138)

8    Death Investigation, Inmate                   (ADC024171 – ADC024221)

9    Death investigation, Inmate                    (ADC026930 – ADC026955)

10   Death Investigation, Inmate         (ADC025140 – ADC025171)

11   Letter from Joe Profiri to Karen Mullenix, September 21, 2012 (ADC027854 -

12   ADC027869)

13   Letter from Karen Mullenix to Joe Profiri, October 1, 2012 (ADC027941 –

14   ADC027943)

15   Memo from Jim Taylor to Joe Profiri, August 13, 2012 (ADC028112 –

16   ADC028114)

17   Spreadsheet: Arizona Vacancies and FTE Fill Percentages, August 8, 2012

18   (ADC028019)

19   Wexford Health Sources Inmate Wait Times, Arizona, August 1-31, 2012

20   (ADC028020 – ADC028022)

21   Memo from Dennis Kendall to Joe Profiri, August 13, 2012 (ADC028123 –

22   ADC028126)

23   Memo from Kathy Campbell to Joe Profiri, August 20, 2012 (ADC028128 –

24   ADC028129)

25   Weekly Non-Compliance Report, ASPC-Perryville, August 13, 2012 (ADC028131

26   – ADC028133)

27   Memo from Helena Valenzuela to Joe Profiri, August 13, 2012 (ADC028140 –

28   ADC028142)

1    Memo from Kathy Campbell to Joe Profiri, August 13, 2012 (ADC028143)

2    Memo from Vanessa Headstream to Joe Profiri, August 17, 2012 (ADC028144 –

3    ADC028146

4    Memo from Karyn Christie to Joe Profiri, August 13, 2012 (ADC028148 –

5    ADC028149)

6    Memo from Kathy Campbell to Joe Profiri, August 20, 2012 (ADC028159 –

7    ADC028161)

8    Memo from John Mitchell to Joe Profiri, August 10, 2012 (ADC028163)

9    Memo from John Mitchell to Joe Profiri, August 13, 2012 (ADC028164 –

10   ADC028165)

11   Memo from Dennis Chenail to Joe Profiri, August 13, 2012 (ADC028167)

12   Memo from Vanessa Headstream to Joe Profiri, August 17, 2012 (ADC028168 –

13   ADC028170)

14   Memo from John Mitchell to Joe Profiri, August 17, 2012 (ADC028171 –

15   ADC028172)

16   Medical Records for and Declarations of the Following Named Plaintiffs

17        Maryanne Chisholm

18        Joseph Hefner

19        Shawn Jensen

20        Desiree Licci

21        Joshua Polson

22        Stephen Swartz

23        Charlotte Wells

24

25   **Centralized Organization**

26        4.    Defendant Richard Pratt, an unlicensed physician's assistant and the current

27   Interim Health Services Division Director, is charged with "oversee[ing] the entire Health

28   Services Division."  (Ex. U, at 7:20-22; 9:15-18; 27:15-16 ("I'm responsible for the

-3-

quality and the clinical care in the field.))  Under Mr. Pratt's direction, defendants operate a top-down centralized health care system.  The staffing patterns, the medical policies and the guidelines for treatment are developed in the ADC's central office and must be followed at each prison.  (Ex. Y, at 51:13-52:1; 165:2-12.)  Any local policies developed at the prison level must be consistent with departmental policies.  (*Id*. at 165:20-23.)  The contract to privatize health care for state prisoners requires Wexford Health Sources to follow these policies and guidelines.  (Ex. U, at 105:23-106:3.)

5.       Based on the materials I have reviewed, I have concluded that defendants directing this centralized system, Pratt and Ryan, have neglected the serious medical needs of the Arizona state prisoners by failing to manage, support, supervise and administer medical care to prisoners in the ten state facilities.  Because of this neglect, these prisoners are at serious risk of harm, and in some cases, death.

6.       The defendants' contracting process demonstrates their failure to properly manage the system.  When contracting with an agent to perform health care in a large system like Arizona, it is critical that the state carefully investigate the track record and capacity of the bidders.  Defendants, however, failed to adequately investigate the capacity of Wexford to administer a system of ADC's size and complexity.  (*See* Ex. X, at 67:21-94:5.)  For example, defendants were apparently unaware that the Arizona Medical Board had placed Wexford's proposed Chief Medical Officer, Dr. Malcolm Wilkinson, on probation for 15 years, had issued him a letter of reprimand for conduct that might be harmful to patients, and suspended him from practicing general surgery for 15 years.  (Ex. X, at 89:2-91:16.)  Defendants also apparently failed to review publicly available news articles regarding Washington State's decision against renewing their Wexford contract, and Wexford's loss of their New Mexico contract after the New Mexico Director of Corrections was placed on leave for having an improper relationship with a Wexford lobbyist.  (Ex. X, at 75:1-78:19.)

7.       Once a contract of this size and complexity is awarded, it is essential that the state work with the contractor during the transition period to ensure success of the new

1   program.  Instead of cooperating with their new agent, the defendants sabotaged

2   Wexford's efforts to set up an experienced management team.  Defendants hired most first

3   and second level site management personnel from each prison complex to form its

4   contract management team, barring Wexford from making counter-offers to those

5   managers.

9   (Ex. FF, at ADC027941 –43).

10   8.

18   (Ex. FF,

19   at ADC027942-943).  I share the opinion that the ADC's actions have critically

20   undermined Wexford's ability to deliver adequate care.

21   9.

26   10.   This letter from Wexford to the ADC followed a letter from the ADC to

27   Wexford, citing a laundry list of areas in which the ADC reports Wexford has failed to

28   comply with their new contract and demanding corrective actions.  (Ex. EE, at

-5-

1    ADC027854 –69).  This list included shocking examples of appalling care at several

2    prisons, including at ASPC-Perryville, where a Wexford nurse directed a patient to lick

3    powdered medications from her own hand, at ASPC-Lewis where more than 100

4    prisoners were exposed to Hepatitis C after a subcontracted nurse reused a syringe and at

5    ASPC-Florence, where a prisoner who was found hanging in his cell had not received his

6    psychotropic medication for 23 days.  (Ex. EE, at ADC027855-56).  The letter also

7    identified systemic problems found during Wexford's first few months in the prisons,

8    including the failure to properly review and renew over 8000 prescriptions, inadequate

9    staffing creating scheduling gaps, including for inpatients, and backlogs in provider line

10   appointments, chart reviews, sick call requests and delayed and cancelled outside

11   specialty consults.  (Ex. EE, at ADC027855-59).

12              **Statewide Health Care System is Highly Dysfunctional**

13              11.     A sound health care delivery system for a large prison system like

14   Arizona's must include at least the following nine elements: (1) a centralized

15   organizational and management structure; (2) written policies and procedures that are

16   implemented and followed consistently; (3) qualified medical staffing; (4) intake

17   screening; (5) timely access to medical care; (6) adequate clinical facilities; (7) medication

18   distribution system; (8) a functioning medical records system; and (9) quality assurance.

19   Based on my review of materials, it is my opinion that these elements are critically

20   deficient in Arizona's prison system.

21              **Centralized Management Structure**

22              12.     As I have explained above, the management structure for the ADC is

23   centralized, but is highly dysfunctional, with ultimate responsibility for delivering care in

24   the hands of defendants, who are now quarrelling with the agent that they have recently

25   hired to provide care.

26              13.

27

28

1

2

3

4

5          **Written Procedures**

6          14.      A constitutionally adequate correctional medical care delivery system for a

7   prison system with 33,000 prisoners must have and consistently follow comprehensive

8   written policies and procedures.  My review of documents, including the correspondence

9   between ADC and Wexford, establishes that there is a system-wide practice of not

10  following the policies and procedures because, among other things, defendants have failed

11  to provide adequate staffing, supervision and resources to promote compliance.

12         15.

13

14

15

16

17

18         16.      Written policies and procedures are often viewed by providers and their

19  supervisors as setting unrealistic requirements, and therefore are ignored.  (Ex. V, at 24:2-

20  13; 38:11-40:3).  As of June 2012, mental health providers at ASPC-Perryville were still

21  not using the updated 2011 Mental Health Technical Manual, but instead, were following

22  the requirements of the 2009 manual.  (Ex. V, at 23:17-21).  Wexford's Medical Director

23  for ASPC-Lewis reported he was given four binders of Wexford policy, but he had not

24  read them.  (Ex. Z, at 54:9; 55:23-56:6).  The Lewis Medical Director testified that he

25  "wouldn't pay attention to the ADC policy" when he was a subcontracted provider prior

26  to privatization. (Ex. Z, at 58:18-21).  "I provided health care. I don't need no policy."

27  (Ex. Z, at 59:6-7).

28

**Qualified Staffing**

17.     Defendants Pratt and Ryan and their agent Wexford have pursued a policy and practice of not providing adequate medical professional staffing in headquarters and at the individual prisons, as demonstrated by staffing data throughout the system.  As of August 8, 2012, the system had a 65.4% fill rate, meaning that it was operating on less than two thirds of the staff it was budgeted to employ.  (Ex. III, at ADC016148).  The Florence facility had fewer than half the contracted staff positions filled, as did the Regional Office.  (*Id.*);

18.     ADC found "[i]nadequate staffing levels in multiple program areas at multiple locations", which created "inappropriate scheduling gaps" and forced existing staff to work excessive hours, "creating fatigue risks."  (Ex. EE, at ADC027858).  There has been a "[q]uantitative decrease in routine institutional care," prescriptions that provide the wrong dosage or do not match the physician orders, inappropriate discontinuation of medication, and a contradictory process for the approval of non-formulary medication. (*Id.* at ADC027858-59).  The result has been a crisis in delayed care from a backlog of appointments to see a clinician, untimely processing of prisoners requests for care, delay in specialty consultations, and not surprisingly, an unresponsive approach to prisoner grievances. ( *Id.* at ADC027859).

19.     Institutions were not fully staffed by ADC during the April 2-July 1, 2012 transition period.  (Ex. U, at 22:10-12).  One doctor characterized that time as a period of "a great exodus of staff, both from the mental health and medical areas that weren't being filled."  (Ex. V, at 18:11-12).

20.     Staffing continues to be a problem under Wexford.  "It was an understood" that staffing levels at the institutions was one of Wexford's concerns prior to taking over

delivery of health care.  (Ex. U, at 29:6-10).  "A smaller staffing ratio creates a greater risk." (Ex. T, at 125:5-6)

21.    There currently is not enough medical staff at ASPC-Perryville to provide adequate care to prisoners.  (Ex. W, at 50:20-51:1).  Lack of staff has been a concern for Dr. Jeffrey Sharp, currently a primary care provider at ASCP-Perryville, since he worked at ASPC-Winslow [1991-2003], at Eyman and Florence [2004-2012] and continues today. (Ex. W, at 47:5-17).

22.    Staffing problems create delays in providing medical care which can create a serious medical risk in some instances. (Ex. W, at 53:1-9).  "I know I had several cases when I worked at Florence South of people who had their chemotherapy interrupted, people who had their radiation therapy interrupted, Dr. Wohler's case with the guy who had the cancer on his lip." (Ex. W, at. 175:24-176:14);

23.    Chronic staffing shortages have resulted in frequent use of temporary registry staff.

1    　　　　　I concur that the use of registry clinical staff, while useful on a short-term

2    basis, cannot be used as a permanent fix for chronic staffing shortages or as a substitute

3    for hiring permanent medical providers.

4    **Intake Screening**

5    24.　　Prompt intake screening is essential in a correctional setting to ensure,

6    among other things, that patients receive timely medications for serious medical

7    conditions, are screened for communicable diseases and are identified as requiring

8    ongoing attention from specialty consultants.  Defendants have a practice of not

9    complying with their own requirement that health care records be reviewed within 12

10   hours of an inmate's arrival goes widely unmet.

11

12

13

14

15   **Timely Access to Medical Care**

16   25.　　Prisons must have a system for prisoners to make their health care needs

17   known, and for those needs to be addressed in a timely manner.  Prisoners with more

18   acute health care needs must be housed in facilities that offer access to a higher level of

19   care.  The ADC has pursued a practice and unwritten policy of delaying and/or denying

20   prisoners access to necessary care for serious medical needs.

21

22

23

24   　　　　　There are backlogs in the review of HNRs due to lack

25   of staff under both ADC and Wexford.  (Ex. W, at 36:11-37:16.)  These serious delays

26   pose a threat of significant harm to the prisoner patients.

27   **Sick Call**

28   26.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15    **Emergency Care**

16        28.    Defendants have pursued a practice and unwritten policy of not providing

17   sufficient, trained staff to competently respond to emergencies.

18

19

20

21

22

23

24

25        29.    The lack of an adequate emergency response system may have contributed

26   to patient deaths.

27

28

1

2

3

4

5

6          30.     Defendants' practice and unwritten policy of not adequately staffing their

7    facilities with custody officers makes it impossible for the prisons to timely respond to

8    emergencies.  Although prisoners are supposed to have health and security checks every

9    30 – 60 minutes while in their cells,

10

11

12

13

14

15         **Chronic Care**

16         31.     Defendants acknowledge that it is important to monitor chronic conditions

17   to avoid serious adverse effects.  (Ex. Y, at 129:14-15).  However, Dr. Sharp

18   acknowledges that chronic care patients are not always timely seen because of lack of

19   staffing.  (Ex. W, at 54:16-20).  This is the case currently at Perryville, (Ex. W, at 189:13-

20   18), and was the way at Florence and Eyman – chronic cases are "way backlogged." (Ex.

21   W, at 190:4-8)

22         **Specialty Care**

23         32.     Defendants have pursued a policy and practice of reimbursing specialty care

24   providers at low rates and this has made it challenging to find specialists who will provide

25   treatment to prisoners.  (Ex. Y, at 88:17-21).  This Court concluded in a  summary

26   judgment order in *Arenberg v. Ryan*, Case No. 2:10-cv-02228-JWS (D. Ariz. October 9,

27   2012), page 18, lines 14-15 that  "The evidence shows that ADC did not enter into new

28   contracts for inpatient and outpatient medical services until late 2010 – a year after the

-12-

2009 cancellations." (citations omitted).  Dr. Sharp's concerns about tertiary care and the consultation process have "loomed larger with time" and continue today.  (Ex. W, at 47:18-48:2).

33.     It currently takes about two to four weeks from the time a doctor orders an x-ray to the time he gets a radiology report, and that this delay can and has posed a serious risk to prison inmates.  (Ex. W, at 54:21-56:5).  In one instance, the x-ray report of a prisoner with a cavitary lesion in her lung was delivered around two months after the x-ray was done.  (*Id.* at 56:6-11).  The x-ray was done June of 2012, and he believes the report came back in August or September. (*Id.* at 178:12-179:14). Because this cavitary lesion carries a high risk for tuberculosis, he was "shocked" at "what [this could] have resulted in." (*Id.* at 179:2-4).  I agree that this delay is shocking as it put the prisoner, as well as all prisoners and staff she came in contact with, at risk for contracting a deadly disease.

34.     Delays in a specialist seeing a malignant melanoma (such as the one described in Ex. AAAA, at PLTF-PARSONS-000030) can have serious consequences, including death. (Ex. W, at 147:6-18).  Defendant Pratt, who is responsible for monitoring all clinical care provided by Wexford testified that he does not know if the timeliness of referrals to outside providers has changed under Wexford.  (Ex. U, at 37:5-10).

35.     Dr. Rowe, ADC Medical Program Manager, has had 5 or 6 calls from prison physicians in the past six months reporting problems with getting a consultation with an outside specialist.  (Ex. Y, at 86:20-87:11).

**Appropriate Medical Housing**

36.     Prisoners with serious medical conditions may be too fragile to house with healthy prisoners in the general population, and some will require housing in a staffed infirmary or hospital setting.  I was alarmed to review several death reviews that showed prisoners with very serious conditions dying in their cells, rather than a medical setting.

1

2

3      **Adequate Clinical Facilities**

4      37.    Prisoners must be able to receive medical treatment in properly outfitted

5 clinic rooms that afford confidentiality.  Defendants have a practice and unwritten policy

6 of conducting exams in non-confidential settings.  The lack of space for mental health

7 staff at ASPC-Perryville resulted in examinations and interviews occurring in staff break

8 rooms and where medical records are stored. (Ex. V, at 27:1-5).  Multiple psychiatry and

9 psychology staff shared one 12 foot by 12 foot office in Perryville's Lumley Unit, which

10 houses the most seriously mentally ill female prisoners. (Ex. V, at 54:15-55:15).

11

12

13      **Medication Distribution Systems**

14      38.    Prisoners must be able to receive necessary medications for their serious

15 medical needs.  Defendants' practice and unwritten policy of failing to supervise, manage

16 and support medication distribution has created a system that is profoundly dysfunctional

17 resulting in serious risk of harm to patients throughout the state.

18

19

20

21

22

23

24

25

26

27      39.    Defendant Pratt testified that the delivery of medication to prisoners by the

28 health care system has deteriorated since July 1, 2012.  (Ex. U, at 36:17-37:1; 51:12-52:1).

Dr. Sharp testified that things were "chaotic at best" during the first couple months of the transition, which created "innumerable problems with medications" including prisoners not getting medications, medications not being refilled, and medications being incorrectly labeled as "watch swallow" when the prisoner could keep them on person. (Ex. W, at 152:7-153:9). ADC informed Wexford of the problems with medication distribution in a September 21, 2012 letter, and previously met with Wexford administration about the problems in August 2012. (Ex. U, at 60:12-16).

40.   Under ADC, there was a separation between mental health and medical, so primary physicians were not allowed or expected to prescribe psychotropic medication. (Ex. W, at 84:10-19). However, under Wexford, primary physicians are expected to refill and renew those prescriptions, and do so in some cases without even seeing the patient first. (*Id.* at 84:20-85:10; 86:18-87:4; Ex. T, at 115:15-116:3). In most cases, providers should see their patients before renewing medications for serious medical conditions, and it is below the standard of care in the community for a physician to renew medications for a patient he or she is not familiar with. Additionally, some general practitioners may, justifiably, consider themselves not qualified to prescribe psychiatric medications. Requiring those physicians to prescribe mental health medications could put patients at risk of harm.

41.   The monitoring bureau director testified he does not know whether Wexford has fixed the problems with medication delivery, and he has not received any sort of regular update from Wexford about how they are fixing the problem with medication delivery. (Ex. U, at 63:21-65:13). Doctor Sharp's concerns about access to appropriate medication started when ADC ran medical care, have escalated over time, and have escalated under Wexford. (Ex. W, at 50:7-16).

**Medical Records**

42.   An accurate, organized and up-to-date medical record is an essential tool for delivering adequate health care.

1

2

3

4

5

6          43.      Some medical record-keeping is excessively back-logged.

7

8

9

10

11         44.      Medical charts do not always accompany the patients on transfer.

12

13

14

15         45.      There was no written document listing all of the insulin dependent prisoners

16   at Lewis so that staff could identify all prisoners who were exposed to Hep C.  It took

17   "probably three or four days" for staff to identify and track down the prisoners on insulin.

18   (Ex. U, at 55:5-21).  Pratt does not know if all exposed prisoners have been tested for

19   HCV or HIV as of the date of the deposition.  (*Id.* at 57:13-14).  In my opinion, it is

20   impossible to ensure patient safety in a system that cannot timely identify which of its

21   patients require life-sustaining medications.

22         **Quality Assurance**

23         46.      Health care delivery systems, including prison medical systems, must have a

24   system for evaluating the delivery of services and quality of care for patients.  The

25   contract with Wexford required the company to submit a "Quality Management Program

26   Description encompassing the Continuous Quality Improvement Program structure"

27   within sixty days of the award of the contract. (Ex. HHH, at, ADC015178).  Although he

28   testified that he is responsible for quality of medical care, defendant Pratt indicated that he

1    was not familiar with Wexford's quality management program, and had not received any
2    of their quality improvement reports.  (Ex. U, at 27:15-16, 113:17-114:10.)  In the absence
3    of a structured program to examine health care quality, life-threatening practitioner errors
4    and systemic problems may be overlooked or ignored, creating a potentially dangerous
5    situation for patients.

6            **Typicality of Named Plaintiffs' Claims**

7            47.     I reviewed the medical records and declarations for the named plaintiffs who
8    have raised medical care claims.  In these records, I found a pattern of patient care delays
9    affecting, among other things, the review of HNR's, access to nurse triage and primary
10   care providers, access to medically necessary specialty care, and the prescription and
11   delivery of necessary medications.  It is my opinion that these types of delays are typical
12   of those I would expect to find in a system with the serious deficiencies that currently
13   exist in the ADC.

14           **Conclusion**

15           48.     Based upon the information summarized above, it is my opinion that
16   medical care delivery system in the Arizona Department of Corrections poses a substantial
17   risk of serious harm to prisoners who require medical care.  The extensive problems I
18   have described are systemic, and are similar to problems I have encountered in other
19   prison class action lawsuits where I have been an expert.  In those actions, the federal
20   courts have successfully enjoined the defendants to develop systemic solutions to remedy
21   the ongoing harm to the prisoner class.

22

23

24

25

26

27

28

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 7ᵗʰ day of November 2012 in New York City, New York.

ROBERT L. COHEN

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
       kflood@acluaz.org
       jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
       ahardy@prisonlaw.com
       snorman@prisonlaw.com
       ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
       afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:      dbarr@perkinscoie.com
            rjipke@perkinscoie.com
            jahlers@perkinscoie.com
            keidenbach@perkinscoie.com
            jhgray@perkinscoie.com
            tryerson@perkinscoie.com
            mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:      cnmitchell@jonesday.com
            dkiernan@jonesday.com
            scalderon@jonesday.com
            srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:      rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:      jlwilkes@jonesday.com
            ksuh@jonesday.com

*Admitted *pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
            jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT 1

Robert L. Cohen, MD

130 Barrow Street, Apt. 102     (H) 212-242-5062
New York, NY  10014

314 West 14th Street          (W) 212-620-0144
New York, NY  10014            (F) 212-691-8588

BobbyCohen@aol.com

**EDUCATION**

A.B., Princeton University, 1970
M.D., Rush Medical College, 1975

**POSTGRADUATE TRAINING**

Residency, Medicine, Cook County Hospital, 1978
Chief Residency, Cook County Hospital, 1979
Board Certification, Internal Medicine - 1978

**PROFESSIONAL EMPLOYMENT**

Clinical Practice in General Internal Medicine
New York City
1988 –

Medical Director
Cicatelli Associates
New York, NY
2007 --

Attending Physician
Department of Medicine
Langone Medical Center
New York University School of Medicine
2010 –

Attending Physician
St. Vincent's Hospital and Medical Center
1988-2010

Medical Director
AIDS Center
St. Vincent's Hospital and Medical Center, NYC
January 1989 - October 1990.

Robert L. Cohen, MD
Page #2

Vice President for Medical Operations
New York City Health and Hospitals Corporation
1986-1988

Director
Montefiore Medical Center
Rikers Island Health Services
1982 - 1986

Associate Medical Director
Montefiore Medical Center
Rikers Island Health Services
1981 - 1982

Attending Physician
Department of Medicine
Cook County Hospital
1979 - 1981


**FACULTY APPOINTMENT**

Clinical Assistant Professor
Department of Social Medicine and Clinical Epidemiology
Albert Einstein College of Medicine
1985 – 2008

Clinical Instructor
Department of Medicine
New York University School of Medicine
2010 --


**FACULTY COMMITTEES**

Vice Chairman
Institutional Review Board
Montefiore Medical Center
1984 - 1986

Member
Institutional Review Board
Hunter College, City University of New York
2000 – present

Robert L. Cohen, MD
Page #3

## MEDICAL EXPERT -- PRISON HEALTH

### Federal Court Appointed Monitoring of Health Care in Prisons and Jails

Michigan, *Hadix v. Johnson*, 2003 -- present
Court Appointed monitor for oversight of medical care of 4 prisons in Michigan

Ohio, *Austin v. Wilkinson*, 2002 -- 2005
Member of two person Medical Monitoring Team to monitor compliance with settlement agreement regarding medical care in Ohio State Penitentiary

Connecticut, *Doe v. Meachum*, 1990 -- present
Medical expert at trial and court appointed monitor of compliance with settlement agreement covering care of all HIV infected prisoners in Connecticut.

New York State, *Milburn v. Coughlin*, 1989 -- present
Continuing review of compliance with health care consent agreement

Washington, D.C.  1986 - 2000
Court appointed medical expert involved in monitoring compliance with several consent agreements regarding medical care at the DC Jail as well as DC prisons at Lorton (VA)

Florida, *Costello v. Wainwright*, 1983 through 1988
Review of compliance with settlement agreement in all Florida Prisons

### State Court Appointed Monitor

Philadelphia, PA, *Jackson v. Hendricks*, 1991 -- 1999
Review of compliance with consent agreement on medical care within Philadelphia jails

### Department of Justice Appointed Medical Expert

Cook County Jail, 1982 (Chicago, IL)

Essex County Youth House, 1995 – 1999

Robert L. Cohen, MD
Page #4

## RECENT PRESENTATIONS

Mass Incarceration and Correctional Medicine: The Dialectics of Caring for Prisoners,
Albert Einstein College of Medicine Social Medicine Lecture Series
February 16, 2010

Strategies for assuring the civil rights of detained persons: U.S. and International Perspectives;
American Public Health Association
November 8, 2010, Denver, CO

Why the United States Should Adopt the Optional Protocol to the Convention Against Torture;
International Conference on Prison Health Care/WHO Health in Prison Project
Madrid, Spain, November, 2009

What is the Physician's Responsibility in an era of Mass Incarceration,
Offender Health Research Network, Manchester, England, May 2009
(http://www.ohrn.nhs.uk/conferences/past/14May2009MassIncarceration.pdf)

Health Care for Immigration Detainees: What Should Be The Standard?
Panel of the ABA Council on Immigration
American Bar Association
February 13, 2009, Boston, MA

Medical Consequences of Mass Incarceration
2ème Université d'Eté de Médecine en Milieu Pénitentiaire
Association of French Correctional Medicine Physicians
Perpignan France, May 21, 2008

American Exceptionalism: The Health Consequences of Mass Incarceration
2nd Annual Conference of the International Journal of Prison Health Care
Varna, Bulgaria, October 21, 2007

HIV/AIDS in Custody:  Advocacy for Prevention, Care and Treatment In Correctional Settings and on Reentry, New York City Bar Association, Committee on AIDS, Committee on Corrections, and the Committee on Mental Health Law
Wednesday, January 10, 2007
(http://abcny.org/PressRoom/PressRelease/2007_0110.htm)

Robert L. Cohen, MD
Page #5

Prison Health Care –  Does Court Intervention Improve Quality of Care?
New York University Law School, Health Law Forum
February 15, 2006
http://its.law.nyu.edu/cal/Views/EventView.cfm?EventId=10756

The Commission on Safety and Abuse in America's Prisons
Expert Testimony on the Quality of Medical Care – July 20, 2005
http://www.prisoncommission.org/statements/cohen_robert.pdf

Lessons Learned from Human Rights Based Approaches to Health
Emory University Conference Center, Atlanta, Georgia, USA - April 16, 2005
Prison health in US controlled prisons: Uplifting prisoners' rights to preserve
human rights  http://cesr.org/node/view/698

**BOARD AND COMMITTEE MEMBERSHIPS**

New York City Board of Correction
Appointed by New York City Council
2009 – present

International Journal of Prison Health Care
Editorial Board
2009 - present

Housing Works
Board Member
AIDS Day Treatment Centers and Housing Programs
1994 - present

National Commission on Correctional Health Care
Representative, American Public Health Association
1994 – 2011

World Health Organization – European Region
Health in Prison Project
APHA Invited Observer 2003 – present

**PUBLICATIONS**.

Allen-S, Wakeman-S, Cohen-R, Rich-J, Doctors in US Prisons in the Era of Mass Incarceration, International Journal of Prisoner Health, 6(3):99–106, 2010

Cohen-R., "Health and Public Health Advocacy for Prisoners" in Puisis-M, et.al, *Clinical Practice in Correctional Medicine*, Elsevier, 2006.

deLone-M, Cohen-R, et.al, <u>Standards for Health Services in Correctional Institutions</u>, 3rd edition, American Public Heatlh Association  2003

Cohen-R., The Medical Intake Examination, in Puisis-M, Cohen-R, et al, *Textbook of Correctional Medicine, Mosby, St. Louis, 1998.*

Frickhofen-N, Abkowitz-JL, Safford-M, Berry-M, Antunez-De-Mayolo-J., Astrow-A, Cohen-RL, King-LN,et.al., <u>Persistent B19 Parvovirus Infection in Patients Infected with HIV-1: A treatable cause of anemia in AIDS</u>., Annals of Internal Medicine, Vol. 113, No. 12,   926-933, Dec. 15, 1990.

Laudicina, S., Goldfield, N., Cohen, R., <u>Financing for AIDS Care</u>, The Journal of Ambulatory Care Management,Vol. II, No. 2, 55-66, May 1988.

Selwyn, Peter A., Feiner, Cheryl, Cox, Charles P., Lipshutz, Carl & Cohen, Robert L., <u>Knowledge about AIDS  and High-Risk Behavior Among Intravenous Drug Users in   New York City</u>, AIDS, Vol. 1, No. 4, 247-254, 1987.

Cohen, Robert L.<u>, Case Studies: A Prisoner in Need of a Bone Marrow Transplant</u>, Hastings Center Report, Vol. 17, No. 5, 26-27, 1987.

Bayer, Ronald, Carol Levine, Susan M. Wolf et. al. <u>HIV Anti-body Screening: An Ethical Framework for Evaluating Proposed Programs</u>. JAMA  Vol. 256, No. 3: 1768-1774, 1986.

Cohen, Robert L., Oliver Dennis, Pollard-Sigwanz, Cathy, <u>Leukopenia and Anergy as Predictors of AIDS</u>, JAMA, Vol. 255, No. 10, 1289, 1986.

Whitman S, King L, and Cohen R<u>, Epilepsy and Violence: A Scientific and Social Analysis.</u>  In: Whitman S, and Hermann B, ed. The Social Dimensions of Psycho pathology.  Oxford University Press, 1986.

Cohen, R., <u>AIDS: The Impending Quarantine</u>, Bulletin of   the Health Policy Advisory Committee, Vol. 17, No. 3,   9-14, 1985.

Whitman S, Coleman T, Patron C, 6.0
Desi B, Cohen R, King L, <u>Epilepsy in Prison: Elevated Prevalence and No Relationship to Violence</u>. Neurology, Vol. 34, No. 6,   June, 1984.

Cohen, Robert L., <u>Imprisoned Plasma Donors: A Medical-Ethical Case and Comment</u>, Journal of Prison & Jail Health, Vol. 2, No. 1, 41-46, 1982.

# EXHIBIT D

## Portions of this document are subject to Protective Order

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
          kflood@acluaz.org
          jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
*Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
*Christina Verduzco, Jackie Thomas, Jeremy Smith,*
*Robert Gamez, Maryanne Chisholm, Desiree Licci,*
*Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
*behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **DECLARATION OF JAY D. SHULMAN** |

I, Jay D. Shulman declare as follows:

1.      I am a dentist experienced in the field of Correctional Dentistry.  I have been retained by prisoner plaintiffs' counsel in the *Parsons* case as an expert in dental care in correctional institutions.  I have been asked to render my opinion with respect to whether there are current systemic deficiencies in the dental care provided by the Arizona Department of Corrections ("ADC") that are amenable to a common remedy that will reduce the risk of harm to inmates.

2.      The opinions stated below are based on a review of health records of the named prisoner plaintiffs, documents, reports, and depositions available at this time, as listed in Exhibit 2, as well as the scientific literature.  In addition, the opinions are based on my professional experience set forth below, and are based on a reasonable degree of dental certainty.

**SUMMARY OF OPINIONS**

3.      It is my opinion that the consistently inadequate care documented in the records I reviewed is attributable to systemic problems caused by inadequate and poorly monitored policies and procedures in the ADC's Dental Department.  Specifically, ADC's policies and practices with regard to staffing, inmate health requests, pain management, dental appliances, tooth extraction, and informed consent combine into a system that fails to adequately identify, or properly and timely treat, dental issues experienced by inmates.  ADC's policies on these issues are in many cases themselves below the standard of care.  Moreover, regular practices often fall even further short, with ADC having a common practice of a lack of oversight and control over dental care, thus ensuring that inmates are at risk of receiving inadequate care.  These failures place all inmates at risk not only of preventable pain, but also of tooth decay and unnecessary loss of teeth.  My review of the dental injuries of various inmates is consistent with this opinion.  The inadequacies in dental care experienced by the named plaintiffs are typical of the risk of inadequate dental care for all inmates.  Consequently, all present and future inmates with dental problems are at risk for preventable pain and tooth morbidity.  In my experience as Court Expert /

Monitor in *Fussell v. Wilkinson* and *Perez v. Tilton*, both large dental prisoner class actions, I have seen systemic problems of this type addressed successfully by mandated changes in the dental care system.

### A.    Insufficient Dental Staffing

4.    It is my opinion that the ADC lacks an adequate treatment capacity because it does not employ enough dentists, even by ADC's own standards.   Lacking dental personnel is a systemic problem that makes it increasingly difficult for ADC to address all dental needs in a timely and adequate way.   ADC's inadequate treatment capacity also results in assignment of inmates to the Routine Care List who typically have inordinately long waits to be scheduled, often resulting in unnecessary pain and deterioration of tooth structure and needless extractions.   This is below the standard of care.

### B.    Inadequate Process for Triaging Inmates Requiring Dental Treatment

5.    It is my opinion that the Dental Department's policies for triaging inmates requiring dental treatment places inmates at an unreasonable risk of receiving untimely or inadequate dental care.   For instance, the process for responding to Health Needs Requests ("HNRs") places many inmates at risk of suffering preventable pain and tooth morbidity. ADC has a policy or practice of allowing dental assistants, who are not licensed providers, too much discretion in determining when and if treatment will take place based on HNRs, and they have too large a role in examining patients.   In addition, the HNR triage process does not appropriately address the progression of tooth decay and other chronic issues and does not ensure that inmates suffering tooth pain will receive timely urgent dental treatment.   This is below the standard of care.

### C.    Inappropriate Treatment of Pain

6.    It is my opinion that the Dental Department's response to HNRs that mention pain places many inmates at risk of suffering preventable pain and tooth morbidity.   Neither ADC's policies, nor actual practices I have observed through records, adequately address patients' pain or the likelihood of increased pain and decay over time. This is below the standard of care.

LEGAL25073157.3

### D.     De Facto Extraction Only Policy

7.     It is my opinion that ADC dentists encourage inmates to allow the dentists to extract teeth that could be filled.  It is fundamentally unfair to encourage the acceptance of a lesser alternative (tooth extraction) to patients in pain by telling them that it will take "months" to be scheduled for the clinically acceptable treatment (a filling).  This occurs because of the scheduling and triaging policies of the ADC as well as the ADC's failure to exercise oversight and prevent such conduct.  Moreover, the Refusal to Submit to Treatment forms, when present, were often inadequate, misleading, and clinically insufficient.  This is a subtle form of an extraction only policy and is below the standard of care.

### E.     Inadequate Treatment of Chewing Difficulty

8.     It is my opinion that ADC policy and practice regarding patients unable to adequately chew their food is flawed and places inmates at risk of preventable pain, poor nutrition, and inability to take necessary medications.  ADC policy does not address timing or monitoring of patients waiting to receive dental devices, thus permitting inappropriate delays and problems in receiving a proper diet.  This is below the standard of care.

### F.     Inadequacy of NCCHC Dental Program Evaluation

9.     It is my opinion that accreditation by the National Commission for Correctional Health Care ("NCCHC") is insufficient to meet the standard of care, because the NCCHC audit does not focus on record reviews by dentist-auditors and the NCCHC Oral Care Standard does not mandate specific timelines for treatment.

**PROFESSIONAL QUALIFICATIONS**

10.     I have been a dentist for over 40 years and have had careers in the military, dental education, and correctional dentistry consulting.  I am certified by the American Board of Dental Public Health, one of the nine specialties recognized by the American Dental Association.  Moreover, I have extensive experience auditing educational, military,

and correctional programs.  A true and correct copy of my *curriculum vitae* is attached as Exhibit 1.

11.    During my 22-year military career, I had clinical, research, administrative, and command assignments in the United States, Okinawa, and Germany.  Among my assignments, I served as the Army Surgeon General's Dental Public Health Consultant and wrote dental public health policy, procedures, and technical guidance.  As Commander of the 86th Medical Detachment, I directed dental care delivery for the Army in North Central Germany and operated six clinics with 20 dentists and 60 ancillary personnel.  I was responsible for the dental health of 25,000 soldiers and family members. Among the studies I planned when I was in a research position were several on the Army's Dental Fitness Classification System in which dentists assign patients to treatment priority groups based on the severity of dental needs.

12.    I have written 55 peer-reviewed articles and three book chapters, have served as a reviewer for several dental journals, and was on the editorial board of the Journal of Public Health Dentistry, the official journal of my specialty.  Most of the papers I wrote during my academic career related to the epidemiology of dental caries (tooth decay) and oral lesions.  Three publications relate to correctional dentistry, one of which involved surveying dental programs in state corrections departments.

### Correctional Dentistry Experience

13.    I have served as a correctional dentistry consultant, court expert / representative, and expert witness several times since 2005.  As a Court Expert in two major class action settlements involving prisoner dental care, I developed an audit process based on clinical records review and performed system-wide audits of programs in California (roughly 170,000 inmates in 33 institutions) and Ohio (roughly 50,000 inmates in 30 institutions) over a multi-year period.  Moreover, I have performed clinical dentistry and supervised dental and dental hygiene students at the Dallas County Juvenile Detention Center.

4

**PROGRESSION OF DENTAL CARIES**

14.     Dental caries (tooth decay) is an infectious disease characterized by progressive destruction of tooth substance, beginning on the outer (enamel) surface or the exposed root surface.  Left untreated, the decay can progress, causing pain and leading to tooth loss, localized infection (dental abscess), and occasionally, systemic infection.

15.     Caries is typically diagnosed visually and/or radiographically.  The visual appearance ranges from a "white spot" on the enamel (outer layer of the tooth) to a gaping hole in the tooth with black staining characteristic of end-stage caries.  Figure 1 is a representation of how different stages of caries may appear on a radiograph.

**Figure 1.  Interproximal Decay as Seen on a Radiograph**

|  **A. Incipient**  |  **B. Moderate / Advanced**  |  **C. Severe**  |



16.     An incipient lesion (Figure 1A) may not be readily identified clinically because there is no "cavity" in the tooth and too little tooth has been affected to be seen on a radiograph.  Once the lesion reaches the dentin—a tissue that is less resistant to decay than enamel (early Figure 1B)—the patient should be scheduled for treatment.  Figure 1C shows an advanced lesion that is almost through the dentin to the pulp.  When decay reaches the pulp, the tooth will require either endodontic (root canal) treatment or extraction.[1]  Caries that is radiographically at or beyond the dentin should receive prioritized treatment to prevent deterioration to the point that the only practical alternative will be extraction.

---

[1]  In the ADC, endodontic treatment (especially on posterior teeth) is rare and these teeth will almost always be slated for extraction.

LEGAL25073157.3

17.   A tooth that is classified as requiring routine (as opposed to urgent) treatment will typically not remain asymptomatic indefinitely.  Caries, especially once the enamel is penetrated, generally progresses and the more time that passes before the tooth is treated (*i.e.*, filled), the greater the likelihood that decay will progress, destroying tooth structure, possibly causing an abscess, and generally requiring the tooth to be extracted. Consequently, any classification system must have timelines to ensure that teeth that did not have a severe problem at the time of classification do not develop a severe problem due to untimely treatment.

**STANDARD OF DENTAL CARE IN PRISON**

18.   The standard for quality is the same in a correctional institution as it is in the community at large.  Makrides *et al.* at 557.[2]  The focus of correctional dentistry is the control of acute and chronic dental pain, stabilization of dental pathology, and maintenance or restoration of function.   Dental treatment should not be limited to extractions and should include restorations (fillings).  *Id.*

**A.    *Timeliness of Care***

19.   The Civil Rights Division of the U.S. Department of Justice ("DOJ") enforces the *Civil Rights of Institutionalized Persons Act* ("*CRIPA*"), which authorizes the Attorney General to enforce the constitutional rights of prisoners subject to unconstitutional conditions.   The DOJ has held that prisoner dental care must be consistent with generally accepted professional standards and sufficient treatment capacity must be provided to ensure care is provided in a timely manner.  Dallas County at ¶ 13 (injunction related to conditions of confinement at the County Jail); *see also* Cook County Letter at 89 (setting forth DOJ recommendations for Cook County Jail, including "ensure that inmates receive adequate dental care in accordance with generally accepted professional standards of care. Such care should be provided in a timely manner.").

---

[2] A full list of materials cited and considered can be found in Exhibit 2.  Materials that have been attached to the David Fathi declaration for consideration by the Court include the lettered exhibit in the citation.

6

**B.     *The National Commission for Correctional Health Care***

20.     The NCCHC describes itself as an organization "dedicated to improving the quality of correctional health care services and helping correctional facilities provide effective and efficient care."  NCCHC 2008 at vi.

21.     The NCCHC provides accreditation to correctional institutions based on compliance with, among other standards, the NCCHC Oral Care Standard.  The Oral Care Standard measures an institution's processes for providing care, requiring that it provides a full range of dental care (rather than just extractions) and has a priority system to determine the need for more urgent care.  *See* NCCHC Oral Care Standard (P-E-06), NCCHC 2008 at 69, and Compliance Indicators, NCCHC 2008 at 70.

22.     However, NCCHC accreditation does not require any auditing by dentists of the care actually performed at an institution to evaluate health outcomes.  Additionally, some NCCHC standards, such as its requirement that care be "timely" do not specify auditable standards, and thus even compliance does not indicate that an institution meets the standard of care.  Accordingly, relying on NCCHC standards or accreditation, as Dr. Adu-Tutu repeatedly explained the ADC does, fails to demonstrate that an institution comports with the appropriate standard of care.  To the contrary, the shortcomings of the NCCHC standards reinforce the systemic failures within the ADC.

**DENTAL CARE IN THE ARIZONA DEPARTMENT OF CORRECTIONS**

23.     In evaluating dental care in the ADC, I relied, among other documents, on the Dental Services Technical Manual updated in 2010 ("ADC P&P"), which is publicly available on the ADC website and identified as the current dental policies and procedures.  According to the deposition of Dr. Carlos Weekly, ADC dental staff currently operates under a very similar document drafted by Wexford, but I have been unable to obtain a copy.

24.     I also reviewed the health records of the named prisoner plaintiffs, although without dental x-rays.  As described in further detail below, the named prisoner plaintiffs'

7

records are consistent with the risks of inadequate care one would expect to result from the ADC's inadequate polices that are in turn poorly implemented and poorly monitored.

### A.    Dental Staffing

25.    To achieve the necessary standard of timely care requires sufficient dental staffing.  A letter from the DOJ summarizing the findings of its investigation of the Lake County, Indiana Jail identified that "[i]nsufficient dentist time inappropriately limits dental care to prescription for antibiotics and extractions."  Lake County Letter at 15. With respect to waiting time for dental care, the letter stated:  "[c]onsequently, this wait for medical care violates constitutional minimums, leaving significant inmate medical needs inadequately addressed or completely unmet.   For example, inmates wait approximately eight weeks for dental care."  *Id*. at 15.  Among the minimum remedial measures was "[e]nsure dental hours accommodate the need for dental care."  *Id.* at 29.

26.    In developing a staffing model for a dental program, one should consider the appropriate mix of dentists, dental hygienists, and dental assistants.  Makrides *et al* at 557. Dental hygienists perform skilled but routine dental care, such as cleanings and periodontal disease maintenance, that then do not have to be performed by a dentist, thus increasing the number of patients that the dentist can treat for more complicated issues. Makrides *et al*. recommend an inmate to dentist ratio of 1,000:1 under the assumption that dental hygiene support will be provided (independent of the dentist ratio).  *Id.* at p. 557.

27.    Dental staffing in the ADC has decreased markedly in the past 16 years.  In a 1996 survey, the ADC reported an inmate to dentist ratio of 763:1.  Makrides and Shulman at 299.  In a follow-up study in January 2007, the ADC reported an inmate census of 34,864 and 33 dentist full-time equivalents ("FTE")—a ratio of 1,056:1. However, ADC reported that only 26.5 FTEs were filled, resulting in a vacancy rate of 19.7 percent.  ADC NIC 2007.  The adjusted ratio was 1,315:1.

28.    It is important to note that the ADC has no dental hygienists.  Consequently, to the extent that the ADC provides teeth cleaning and scaling to treat and prevent periodontal disease, it is performed by dentists at the expense of providing other

8

treatment.   Since the 1,000:1 ratio recommended by Makrides *et al*. was based on the presence of dental hygienists, the ADC ratio overstates treatment capacity.

29.     Wexford proposed to staff the ADC with 30 dentist FTEs, which, assuming an inmate census of 33,206, yields an inmate to dentist ratio of 1,107:1.  *See* ADC Count, Wexford Contract, Ex.  HHH at ADC015761.  The Wexford staffing plan also does not include dental hygienists.

30.

31.

32.     It is my understanding that each ADC dental clinic maintains a Routine Care List, and it schedules inmates with issues classified as routine on a space-available basis each day, after taking care of more urgent needs.  Dental staffing, including both the number of dentists and the lack of hygienists, directly impacts the number of routine care patients that can be seen each day, and in turn the length of the Routine Care List.

33.     My review of the named prisoner plaintiff medical records shows numerous instances of inmates requesting a filling or other routine care who did not have their requests filled until 4-16 months later.  Table 1 shows that treatment time for a filling

9

from the Routine Treatment List ranged from 85 to 292 days, with an average of 225 days.[3]

34.

35.

36.

37.     Each of these examples of injuries to the named prisoner plaintiffs is consistent with the risk of harm I would expect to occur as a result of ADC's systemic staffing deficiencies.

38.     It is my opinion based on a reasonable degree of dental certainty that the ADC has inadequate treatment capacity that results in inmates who are assigned to the Routine Care List typically having inordinately long waits to be scheduled, often resulting in unnecessary pain and deterioration of tooth structure and needless extractions.  Dental

_____

[3] This inordinate delay is not idiosyncratic to one clinic since the data shown in Table 1 reflect care provided at Lewis, Eyman, and Perryville over a 9-year period.

LEGAL25073157.3

1   disease progresses faster than the ADC is able to treat the initially asymptomatic inmates

2   placed on the Routine Care List.  This is below the standard of care.

3   **B.   *Inappropriate Triage of Inmate Health Needs Requests***

4   39.   Dental emergencies are rare.   Typically they comprise conditions (*e.g.*,

5   facial fractures, uncontrollable post-extraction bleeding, difficulty breathing due to an oral

6   infection, or an abscess involving orofacial spaces) that require immediate attention and

7   often immediate transport to a hospital.   Urgent care comprises conditions such as

8   toothache, post-extraction pain, and abscesses not involving the orofacial spaces.  "Care

9   [should be] timely and include[s] immediate access for urgent or painful conditions."

10   NCCHC 2008 at 69.

11   40.   A priority system can be a reasonable and efficient way to ensure that

12   patients with the greatest need receive timely treatment.   An appropriate dental

13   classification system properly identifies teeth with dental disease sufficiently acute as to

14   require urgent care while appropriately delaying treatment of other teeth on a "routine"

15   basis.

16   41.   The value of a classification system depends on the extent to which the

17   system is capable of identifying patients with the greatest need and moving them to the

18   head of the treatment queue.   But the system fails when the treatment queue for the

19   remaining patients (*i.e.*, the Routine Care List) is so long that teeth whose treatment was

20   classified as routine becomes urgent because of disease progression.

21   42.   ADC practices and procedures do not adequately ensure appropriate

22   classification and treatment of patients reporting dental issues.   First, ADC Dental

23   Procedure 770.2, which defines urgent care, provides no timelines as to how soon a

24   patient identified as having an urgent care problem must be treated although the HNR

25   must be reviewed by a dental assistant "and an appropriate dentist's acknowledgment

26   within one business day (24 hours)."[4]   ADC Procedure 787, Ex. PPP at ADC010634 ¶ 5.3.

27   

28   [4] "If the reviewing provider has any question as to the significance of the dental assistant's evaluation, the dentist is to see the inmate within the next 24 hours or sooner."

11

1   So while there is an auditable timeline for the dental assistant's referral to a dentist, there

2   is thus no clear (or auditable) requirement that inmates gain immediate or even expedited

3   treatment for urgent care needs.[5]

4        43.    Nor are there any timelines for routine treatment.  As a result, an inmate

5   with a decayed tooth placed in Priority 3 (routine care) may remain there indefinitely—

6   perhaps until the decay progresses to the point that tooth structure is lost, making

7   restoration difficult (*i.e.*, requiring a larger filling with a poor prognosis) or requiring that

8   the tooth be extracted.  Dental Procedure 770.2 provides that "[t]he scheduling of dental

9   appointments for inmates will be based on the current relative priority of the inmate's

10   dental condition within the dental classification system," but there is no requirement for

11   follow-up analysis of the inmate's condition and thus scheduling is based on the priority

12   set based on the inmate's HNR.  Ex. PPP at ADC010584-85.

13        44.    Wexford agreed to ensure that an inmate with routine dental needs is seen

14   within 90 calendar days of receipt of a HNR for treatment.  Wexford Contract at

15   ADC015398, Ex. HHH.  While this is an improvement over Dental Procedure 770.2,

16   ADC monitors reported estimated dental appointment wait times between five and seven

17   months at Douglas and four to five months at Safford.  Monitor Report 8/8/12, Ex. TTT at

18   ADC028081; ADC028087.  In addition, "Dental emergent [urgent] care apt wait time is

19   5.5-6.5 days."  *Id*.  Moreover, the time from when an HNR is submitted until a patient is

20   seen is not necessarily the same as the time between when a condition presents and when

21   it is treated.  It is my understanding that if a patient requests to be seen by dental staff

22   (rather than specifically requesting a filling), and is at that visit then identified as needing

23   a filling, he or she will be placed on the Routine Care List *again* before receiving the

24   filling, with no monitoring for further decay in the interim.

25

26

---

27   *Id*. at ¶ 5.4.

   [5]   The Wexford Contract, however, requires that "an inmate with urgent care needs

28   is seen within 72 hours."  Wexford Contract at ADC015397-98, Ex. HHH.

45.     Inmates submit HNRs to inform the Dental Department that they have dental problems or to communicate a request.  The evaluation of dental HNRs is primarily a responsibility of a dental assistant.  According to Dental Procedure 787, dental assistants are responsible for evaluating the HNRs based on the Dental Classification System and assigning any inmate whose request is considered "emergency" or "urgent" to be evaluated by the dental assistant that day or the next clinical day.  Ex. PPP at ADC010634.  If the dental assistant decides that the HNR merits routine rather than urgent care, the inmate will be placed on the Routine Care List and will not be seen until the routine care appointment.

46.     Dental Procedure 787 requires that if a patient is brought into the dental clinic based on an urgent need, that the dental assistant "will review the inmate health history, perform an oral evaluation, and take dental radiographs, to assist in determining the severity of the dental condition."  *Id.*  Moreover, the dental assistant is to make notes in the Inmate Health Record and take x-rays.  *Id.* at ADC010635.

47.     Dental assistants, who are required to have little or no specialized training, are performing more than ministerial acts.  First they review the HNR and map the patient's description of the problem to a priority category.  This requires more understanding of oral disease that one can reasonably expect a dental assistant to have.  Second, they perform an oral evaluation (*i.e.*, an assessment or examination) and the review patient's health history—activities well beyond the training of a high school graduate.  *See* Wexford Dental Assistant (describing required qualifications for Wexford dental assistant positions).  Third, they take dental radiographs.  Allowing a dental assistant to take x-rays without specific authorization of a dentist is below the standard of care.[6]  Finally, the dental assistant, a non-clinician, makes clinical notes in the Inmate Health Record.

---

[6] Moreover, the *Arizona Dental Practice Act* requires that in order to legally operate dental x-ray equipment and perform dental radiographic procedures, a dental assistant must hold a current Arizona board approved certificate in radiology.  AZ Dental Assistant at 10.

13

48.     This procedure gives far too much discretion to a dental assistant who is not a licensed individual.  The dental assistant effectively has the power to determine who will be seen promptly, eventually, or not at all, an evaluation that should be performed by those with the most experience and education.

49.     It is my opinion based on a reasonable degree of dental certainty that the ADC priority system does not adequately deal with the progressive nature of tooth decay, ADC procedures do not ensure that patients will be treated in a timely matter, and triaging decisions are inappropriately made by dental assistants not trained to make such assessments.   Accordingly, the Dental Department's policies for triaging inmates requiring dental treatment places inmates at an unreasonable risk of receiving untimely or inadequate dental care.

### C.     *Inadequate Treatment of Pain*

50.     Regardless of the size of an institution or the level of dental care provided, the requirement to treat toothaches is common to all correctional facilities.  Shulman and Sauter at 63.  Managing patients' pain is a standard element of dental practice.  Pain is managed by the appropriate use of analgesics as well as expediting the treatment of patients whose complaints of pain are clinically validated.  For most infections, the appropriate treatment is establishing drainage through the tooth (if the tooth is to be saved) or extracting the tooth as soon as possible.  *Id*. at 66.  "Delayed treatment of the original focus of infection may turn a minor problem into a serious condition."  Makrides *et al*. at 559.

51.     NCCHC restorative dentistry guidance[7] concurs, noting that, "although restorative dental care is usually classified as routine, correctional systems need to place significant importance in providing such care to their inmates.  *Delaying or deferring restorative care in a correctional setting simply leads to an increase in oral pain, infection, or tooth loss.*  As a result, dental services become inundated with emergency

---

[7] Based on a white paper written by Dr. Adu-Tutu.  NCCHC 2008 at 174.

dental sick call requests and more procedures to replace lost teeth with removable prosthetics.  NCCHC 2008 at 170 (emphasis added).

52.     Occasionally, maxillofacial pain is not of dental origin.  If a problem cannot be resolved at the institution, professional standards dictate that the patient be referred to specialists expeditiously.  Failing to address chronic pain is below the standard of care.

53.

54.

55.     The experiences of the named prisoner plaintiffs is consistent with the risk of harm I would expect to result from the ADC's policies and practices regarding HNR processing, triaging, and pain management.

56.     It is my opinion that the Dental Department's response to HNRs that mention pain places many inmates at risk of suffering preventable pain and tooth morbidity.  Rather than expediting treatment for these inmates, they were kept on the Routine Treatment List.  This is below the standard of care.

LEGAL25073157.3

### D.     *De Facto Extraction Only Policy*

57.     While extractions are a large portion of a correctional practice, extractions should be limited to teeth that cannot be restored (*i.e.*, filled).  An "extraction only policy" is unacceptable.  NCCHC at 70; APHA at 90.

58.     When an extraction is recommended, it is a generally accepted standard of care that the patient should be fully informed of the reason, the consequences of not consenting to the procedure, and the existence of alternative treatments if there are any.  This information and the patient's refusal should be documented in writing.  *See, e.g.*, NCCHC Standard P-I-05 (NCCHC Informed Consent and Right to Refuse Standard), NCCHC 2008 at 129.

59.     Recommending that a tooth that can be filled be extracted because it is more expedient is not consistent with the generally accepted standard of care.   Similarly, advising a patient in pain that a salvageable tooth could be extracted expeditiously but the wait to get it filled may be months is below the standard of care and constitutes a *de facto* extraction only policy.  Where a dental system does not have the resources or oversight to treat salvageable teeth or where a dental system incorrectly triages patients, this also can create a *de facto* extraction only policy if the result is that inmates are at a systemic risk of receiving extractions when less invasive dental care could have prevented the extraction.

60.     Dental Procedure 773.5 (Informed Consent and Right to Refuse) states that

> When an inmate gives the dentist permission to perform an invasive dental procedure, he/she will be informed of the possible risks/consequences of the procedure.  If the procedure includes the removal of one or more teeth, then the inmate will be notified if he/she is eligible for replacement teeth.

> If the inmate refuses the examination, treatment or procedure, dental services for that appointment will be not be provided and a Refusal of Treatment Form will be completed.  The risks of the inmate's action shall be explained to him/her.

Ex. PPP at ADC010620.

61.     Both these directives are incomplete because they do not require the dentist to discuss alternative treatments and memorialize that discussion in the consent form.  So,

16

for example, a patient who signs a consent form for an extraction without having been informed that the tooth could be filled did not sign an informed consent.  Because the written directives are incomplete and leave room for such inadequate care, it is my opinion that this results in a de facto policy of lack of oversight and control, in turn resulting in a de facto extraction-only policy.

62.

63.

64.     While there are statements in the clinical notes I reviewed that inmates signed Refusal to Submit to Treatment forms, the forms are often absent, creating uncertainty as to whether the consent was truly informed.  Moreover, many of the forms I was able to review provided inadequate clinical information, and one form omitted critical information.

17

65.     The experiences of the named prisoner plaintiffs is consistent with the risk of harm I would expect to result from the ADC's policies and practices regarding HNR processing, triaging, and pain management.

66.     It is my opinion, based on a reasonable degree of dental certainty, that ADC dentists encouraged inmates to allow the dentists to extract teeth that could be filled.  It is fundamentally unfair to encourage the acceptance of lesser alternative (tooth extraction) to a patient in pain by telling him/her that it will take "months" to be scheduled for a filling appointment (the clinically acceptable treatment).   Moreover, Refusal to Submit to Treatment forms, when present, were inadequate, misleading, and clinically insufficient. This is a subtle form of an extraction only policy.

### E.     Inadequate Treatment of Chewing Difficulty

67.     Individuals lacking sufficient opposing teeth to chew adequately, absent an appropriate diet, are at risk for pain and nutritional problems.  According to Procedure 770.2, inmates who are partially edentulous and are determined to have inadequate chewing ability set forth in Procedure 771.5 may request to be placed on the Routine Care List for removable partial dentures.  Ex. PPP, at ADC010585; see also 010603-64.

68.

69.     At deposition, Dr. Adu-Tutu was asked about ADC policy with respect to dentures and conflated emergency care (treatment for a life-threatening problem) and urgent care (treatment for a painful condition).  Deposition of M. Adu-Tutu, Ex. AA, at 139:10-23.  While it is not appropriate to send partially or fully edentulous patients who have documented weight loss and problems chewing to an emergency room, it surely is reasonable to expedite their care.  Moreover, he states that, on average, it should take less than six months.  *Id*. at 140:10-11.  This was not Mr. Polson's experience—on two occasions.

70.     The experiences of the named prisoner plaintiffs is consistent with the risk of harm I would expect to result from the ADC's policies and practices regarding HNR processing, triaging, and pain management.

71.     It is my opinion to a reasonable degree of dental certainty that the ADC's policies and practices regarding patients who have difficulty chewing does not adequately address their need for timely treatment.  Without any requirements that patients receive dental devices within a particular timeframe, or that patients be monitored while they are waiting, ADC policy places inmate at risk of preventable pain, poor nutrition resulting from the inability to eat, and inability to take necessary medications.

***Limitations of My Review***

72.     The material I reviewed was limited by the discovery process and time deadlines.  I was not provided dental radiographs.  Reviewing radiographs would give me insight into quality of care; for example, whether they were taken when clinically

LEGAL25073157.3

1  indicated, whether they were clinically acceptable, and whether the decisions that were

2  made were consistent with the radiographs.[8]

3      73.    Except for what is cited herein, I was not provided with any written policies,

4  wait lists, or reports from ADC or Wexford, which I understand have not yet been

5  produced.

6      74.    I was not able to review a large number of records to comprehensively and

7  independently analyze treatment practices and outcomes, because such records are not

8  available at this time.

9      75.    Despite these limitations however, the consistency of my findings was such

10 that based on my experience auditing correctional institutions, I had sufficient data to base

11 the opinions I set forth.

12 **CONCLUSIONS**

13     76.    It is my opinion, based on a reasonable degree of dental certainty, that the

14 consistently inadequate care documented in the records I reviewed is attributable to

15 systemic problems, primarily, inadequate staffing and inadequate and poorly monitored

16 policies and procedures.  The resulting inadequacies in dental care experienced by the

17 named plaintiffs are typical of the risk of inadequate dental care for all inmates.

18 Consequently, all present and future inmates with dental problems are at risk for

19 preventable pain and tooth morbidity.  In my experience as Court Expert / Monitor in

20 *Fussell v. Wilkinson* and *Perez v. Tilton*, I have seen systemic problems of this type

21 addressed successfully by mandated changes in the dental care system.

22     //

23     //

24     //

25

26

27

28

---

[8] For example, it is a standard of care that a tooth should not be extracted without a clinically appropriate x-ray.

LEGAL25073157.3

I, Jay D. Shulman, declare under penalty of perjury that the foregoing is true and correct and that this declaration was completed and signed on _11 5_____, 2012 at _Dallas_ , _Texas_

Jay D. Shulman

**Table 1.       Time Between HNR Submission And Completion Of Treatment**

|  | A | B | C | D | E |
|---|---|---|---|---|---|
| **Patient** | **Treatment** | **Problem Identified at Examination** | **HNR Submitted** | **Treatment provided** | **Days to Completion** |
|  |  |  |  |  |  |
| **Wells** | Fill #13 | 11/13/2009 | 11/16/2009 | 11/3/2010 | 354 |
|  | Fill #14 | 11/13/2009 | 11/16/2009 | 8/1/2011 | 242 |
|  | Fill #18 | 11/13/2009 | 11/16/2009 | 5/9/2011 | 141 |
|  | Fill #14 |  | 7/28/2011 | 11/7/2011 | 102 |
|  |  |  |  |  |  |
| **Parsons** | Fill #13 | 2/5/2002 | 6/22/2002 | 11/6/2002 | 137 |
|  | Fill #21 | 2/5/2002 | 11/13/2005 | 9/1/2006 | 292 |
|  | Fill #28 | 2/5/2002 | 11/13/2005 | 9/1/2006 | 292 |
|  | Fill #2 | 2/5/2002 | 11/10/2005 | 4/10/2007 | 516 |
|  | Fill #12 | 2/5/2002 | 6/26/2008 | 9/19/2008 | 85 |
|  | Fill #13 | 3/13/2009 | 3/13/2009 | 8/28/2009 | 168 |
|  |  |  |  |  |  |
| **Polson** | Fill #10 | 8/17/2004 | 10/7/2004 |  | 146 |
|  | Partial dentures |  | 12/23/2009 | 4/26/2011 | 489 |
|  |  |  | Average (all treatment) |  | 247 |
|  |  |  | Average (fillings) |  | 225 |

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
          afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          rjipke@perkinscoie.com
          jahlers@perkinscoie.com
          keidenbach@perkinscoie.com
          jhgray@perkinscoie.com
          tryerson@perkinscoie.com
          mdumee@perkinscoie.com

23

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
           dkiernan@jonesday.com
           scalderon@jonesday.com
           srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:     rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com
           ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
           jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

24

**Exhibit 1**

**Curriculum Vitae**

**Jay D. Shulman, DMD, MA, MSPH**

# CURRICULUM VITAE - JAY D. SHULMAN

## PERSONAL INFORMATION

Address:     9647 Hilldale Drive, Dallas, Texas  75231

Telephone:  (214) 923-8359

E-mail:      jayshulman@sbcglobal.net

## EDUCATION

1982     Master of Science in Public Health

University of North Carolina

1979     Master of Arts in Education and Human Development

George Washington University

1971     Doctor of Dental Medicine

University of Pennsylvania

1967     Bachelor of Arts (Biology)

New York University

## POSITIONS HELD

### Academic

2007 –     Adjunct Professor, Department of Periodontics

Baylor College of Dentistry

2003 - 07  Professor (Tenure), Department of Public Health Sciences

Baylor College of Dentistry (retired October, 2007)

1993 - 03  Associate Professor, Department of Public Health Sciences

Baylor College of Dentistry

**Military**

1971 - 93   Active duty, U.S. Army. Retired July 1993 in grade of Colonel.

1990 - 93   Chief, Dental Studies Division & Interim Commander (1993),
US Army Health Care Studies and Clinical Investigation Activity

Directed Army Dental Corps' oral epidemiologic and health services research. Supervised a team of public health dentists, statisticians, and management analysts. Designed and conducted research in oral epidemiology, healthcare management and policy.

1987 - 90   Director, Dental Services Giessen (Germany) Military Community and Commander, 86th Medical Detachment. Public Health & Preventive Dentistry Consultant, US Army 7th Medical Command.

Directed dental care for Army in North Central Germany. Operated 6 clinics with 20 dentists and 60 ancillary personnel. Responsible for the dental health of 25,000 soldiers and family members and for providing dental services during wartime using portable equipment. Provided technical supervision of public health and preventive dentistry programs for the Army in Europe.

1984 - 87   Chief, Dental Studies Division US Army Health Care Studies & Clinical Investigation Activity. Public Health & Preventive Dentistry Consultant to Army Surgeon General.

Directed Army Corps' oral epidemiologic and health services research. Supervised a multi-disciplinary team of public health dentists, statisticians, and management analysts. Designed and conducted research in oral epidemiology, healthcare management and policy. Technical supervision of all Army public health and preventive dentistry programs worldwide.

1982 - 84   Assistant Director for Research, US Army Institute of Dental Research.

Responsible for Management of extramural research program, performing epidemiologic research, and teaching biostatistics and epidemiology to Walter Reed Army Medical Center dental residents.

1980 - 82   Full-time graduate student (Army Dental Public Health Training Fellowship) at the School for Public Health, University of North Carolina at Chapel Hill.

1976 - 80   Director, Dental Automation

US Army Tri-Service Medical Information Systems Agency

Walter Reed Army Medical Center, Washington, DC

Directed a team of computer scientists in the development of an automated management system for the Army dental clinics and upper management.

1975 - 76   Clinical Dentist, Pentagon Dental Clinic, Washington, DC

1974 - 75   Clinical Dentist, US Army Hospital Okinawa, Japan

1971 - 74   Clinical Dentist, US Army Dental, Clinic Fort McPherson, Georgia

## BOARD CERTIFICATION AND STATE LICENSE

**Dental Licensure.**

Texas #17518 (retired)

**Board Certification.**

Certified by the American Board of Dental Public Health since 1984 (active).

## RESEARCH - AREAS OF INTEREST

Oral epidemiology, health services research, health policy, military and correctional health.

LEGAL25073157.3

**RECENT FUNDED RESEARCH**

2010 - 12    Instrument system and technique for minimally invasive periodontal surgery (MIS). National Institutes of Health SBIR Grant 2R44DE017829-02A1 ($368,270). Principal Investigator: Dr. Stephen Harrel. Role: Paid consultant.

**CURRENT SOCIETY AND ORGANIZATION MEMBERSHIPS**

1984 –    American Board of Dental Public Health

1982 –    American Association of Public Health Dentistry

2011 –    Texas Oral Health Coalition

**PROFESSIONAL ACTIVITIES**

**Presentations.**

Apr 2012    Public Health, Public Policy, And Legal Issues Associated with Health Care in Prisons: A Dental Perspective. Presented at the University of Texas Health Science Center, San Antonio.

Apr 2009    Public Health, Public Policy, And Legal Issues Associated with Health Care in Prisons: A Dental Perspective. Presented at the University of Iowa

Mar 2008    Public Health and Public Policy Issues Related to Dental Care in Prisons. Presented at University of North Carolina School of Public Health, Chapel Hill, NC.

Jun 2007    Characteristics of Dental Care Systems of State Departments of Corrections. Presented to annual meeting of Federal Bureau of Prisons dentists, Norman OK.

Jun 2006    Public Health Aspects of Correctional Dentistry. Presented to annual meeting of Federal Bureau of Prisons dentists, Fort Worth, TX.

Oct 2006    Opportunities for Dental Research Using the National Health and Nutrition Examination Survey. Indiana University School of Dentistry.

LEGAL25073157.3

| | |
|---|---|
| Aug 2006 | Dental Public Health and Legal Issues Associated with Correctional Dentistry. Federal Bureau of Prisons. |
| Dec 2005 | Opportunities for Faculty Research Using Secondary Data. Frontiers in Dentistry Lecture. University of the Pacific School of Dentistry. |
| Feb 2005 | Advanced Education in Dental Public Health. University of Missouri, Kansas City, School of Dentistry. |

**Consultant Activities**

| | |
|---|---|
| 2012 – | Expert witness. *Parsons et al. v. Ryan et al*. 2:12-cv-00601-NVW (D. AZ). |
| 2012 – | Expert witness. *John Smentek et al. v. Thomas Dart, Sheriff of Cook County et al*. 1:09-cv-00529 (N.D. IL). |
| 2012 – | Expert witness. *Quentin Hall et al. v. Margaret Mimms, Sheriff of Fresno County et al*. 1:11-cv-02047-LJO-BAM (E.D. CA) |
| 2009 - 11 | Expert witness. Inmates of the *Northumberland County Prison, et al. v. Ralph Reish, et al*. 08-CV-345 (M.D. PA). |
| 2007 - 09 | Expert witness. *Flynn v. Doyle* 06-C-537-RTR (E.D. WI.) |
| 2006 - 12 | Rule 706 expert witness (monitor) and Court Representative, *Perez v. Tilton* (*Perez v. Cate*) federal class action lawsuit settlement. C05-5241 JSW (N.D. CA).

Responsible to *Perez* Court for coordinating remedies between dental (*Perez v. Tilton / Cate*), medical (*Plata v. Schwarzenegger*), and mental health (*Coleman v. Schwarzenegger*). Monitored compliance with *Perez* stipulated injunction. Monitoring completed June 2012. |
| 2005 - 10 | Rule 706 expert witness (monitor), *Fussell v. Wilkinson* federal class action lawsuit settlement. 1:03-cv-00704-SSB (S.D. OH).

Performed initial fact finding, provided dental input to stipulated injunction and monitored compliance. Monitoring completed. |

| 1999 - 03 | Editorial Board *Journal of Public Health Dentistry* |
|---|---|
| 1996 - 05 | Editorial Board, Mosby's Dental Drug Reference |
| 1993 - 07 | *Ad hoc* reviewer: *J Public Health Dent* (10);*J Amer Dent Assoc* (6); *J Dent Educ* (3); *Pediatr* (1); *Community Dent and Oral Epidemiol* (3); *Cleft Palate Craniofacial J* (3); *Pediatr Int* (3); *J Dent Res* (2); *Caries Res* (4); *Oral Dis* (2); *J Oral Rehab* (2) |
| 1995 - 97 | Consultant, Fluoride Steering Subcommittee, Oral Health Coordinating Committee, US Department of Health and Human Services |
| 1996 - 08 | Editorial Board, Mosby's Dental Drug Reference |
| 1997 | Reviewer (primary), Total Fluoride Intake, CDC Fluoride Recommendations Workshop |
| 1999 - 04 | Editorial Board *Journal of Public Health Dentistry* |
| 2000 - 06 | Predoctoral Consultant to ADA Commission on Dental Accreditation |
| 2000 - 06 | Postdoctoral Consultant:  Advanced Education (Dental Public Health) Commission on Dental Accreditation |
| 2000 - 03 | Editorial Board, Journal of Public Health Dentistry |
| 2005 | National Institute of Dental Research Special Emphasis Panel -- PAR 04-091 "NIDCR Small Research Grants for Data Analysis and Statistical Methodology |

**Teaching**

Predoctoral

| 1993 - 2007 | Director, Principles of Biostatistics |
|---|---|
| 1993 - 2007 | Lecturer, Applied Preventive Dentistry |
| 1993 - 2007 | Clinical Supervisor, Preventive Dentistry |
| 2006 - 2007 | Clinical Supervisor and Care Provider, Dallas County Juvenile Detention Center Dental Clinic |
| 1994 - 2005 | Director, Epidemiology & Prevention |

| 1993 - 2005 | Director, Epidemiology & Prevention |
| 1995 - 2003 | Director, Dental Public Health |

<u>Postdoctoral</u>

| 2007 – | Research mentor, Department of Periodontics, Baylor College of Dentistry |
| 1994 - 2007 | Director, Dental Public Health Residency |
| 1994 - 2007 | Lecturer, Research Methods |
| 2001 - 2006 | Director, Applied Biostatistics |

## PUBLICATIONS

### Peer Reviewed (55)

1. Bansal R, Bolin KA, Abdellatif HM, Shulman JD. Knowledge, Attitude and use of fluorides among dentists in Texas. *J Contemp Dent Pract* 2012;13(3):371-375.

2. Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *J Correctional Health Care* (2012) 18:1, 58 - 65.

3. Barker TS, Cueva MA, Rivera-Hidalgo F, Beach MM, Rossman JA, Kerns DG, Crump TB, Shulman JD. A comparative study of root coverage using two different acellular dermal matrix products. *J. Periodontology* (2010) 81:11, 1596-1603.

4. Maupomé G, Shulman JD, Medina-Solis CE, Ladeinde O. Is there a relationship between asthma and dental caries? A critical review of the literature. *Journal of the American Dental Association* 2010;141(9):1061-1074.

5. Puttaiah R, Shulman JD, Youngblood D, Bedi R, Tse E, Shetty S, Almas K, Du M. Sample infection control needs assessment survey data from eight countries. *Indian Dental Journal* 2009; 59, 271-276.

6. Fransen JN, He J, Glickman GN, Rios A, Shulman JD, Honeyman A. Comparative Assessment of ActiV GP/Glass Ionomer Sealer, Resilon/Epiphany, and Gutta-Percha/AH Plus Obturation: A Bacterial Leakage Study. *Journal of Endodontics* 2008; 34(6), 725-27.

7.    Beach MM, Shulman JD, Johns G, Paas J. Assessing the viability of the independent practice of dental hygiene. *J Public Health Dent.2007;*67(4):250-4.

8.    Blackwelder A, Shulman JD. Texas dentists' attitudes towards the dental Medicaid program. *Pediatr Dent* 2007;29:40-4.

9.    Massey CC, Shulman JD. Acute ethanol toxicity from ingesting mouthwash in children younger than 6 years of age, 1989-2003. *Pediatr Dent*. 2006; 28:405-409.

10.   Shulman JD, Carpenter WM. Prevalence and risk factors associated with geographic tongue among US adults. *Oral Dis*. 2006;12:381-386.

11.   Clark DC, Shulman JD, Maupomé G, Levy SM. Changes in dental fluorosis following cessation of water fluoridation. *Community Dent Oral Epidemiol*. 2006;34: 197-204.

12.   Shulman JD, Sutherland JN. Reports to the National Practitioner Data Bank involving dentists, 1990-2004. *J Am Dent Assoc* 2006;137:523-528.

13.   Holyfield LJ, Bolin KA, Rankin KV, Shulman JD, Jones DL, Eden BD. Use of computer technology to modify objective structured clinical examinations. *J Dent Educ* 2005;10:1133-1136.

14.   Benson BW, Shulman JD. Inclusion of tobacco exposure as a predictive factor for decreased bone mineral content. *Nicotine Tob Res* 2005;719-724.

15.   Shulman JD, Rivera-Hidalgo F, Beach MM. Risk factors associated with denture stomatitis in the United States. *J Oral Path Med* 2005;340-346.

16.   Shulman JD. Is there an association between low birth weight and caries in the primary dentition? *Caries Res* 2005;39:161-167.

17.   Shulman JD. The prevalence of oral mucosal lesions in U.S. children and youth. *Int J Pediatr Dent.*2005;15:89-97.

18.   Bolin KA, Shulman JD. Nationwide dentist survey of salaries, retention issues, and work environment perceptions in community health centers. *J Am Dent Assoc* 2005;136 (2): 214-220.

LEGAL25073157.3

19. Shulman JD. Recurrent herpes labialis in US children and youth. *Community Dent Oral Epidemiol* 2004; 32: 402-9.

20. Shulman JD. An exploration of point, annual, and lifetime prevalence in characterizing recurrent aphthous stomatitis in USA children and youth. *J Oral Path Med.* 2004;33: 558.66.

21. Shulman JD, Beach MM, Rivera-Hidalgo F. The prevalence of oral mucosal lesions in U.S. Adults: Data from the Third National Health and Nutrition Examination Survey. *J Am Dent Assoc* 2004;135:1279-86.

22. Bolin KA, Shulman JD. Nationwide survey of dentist recruitment and salaries in community health centers. *J. Health Care for the Poor and Underserved* 2004; 15:161-9.

23. Shulman JD, Maupomé G, Clark DC, Levy SM. Perceptions of tooth color and dental fluorosis among parents, dentists, and children. *J Am Dent Assoc* 2004;135(5):595-604.

24. Rivera-Hidalgo F, Shulman JD, Beach MM. The association of tobacco and other factors with recurrent aphthous stomatitis. *Oral Dis.* 2004;10:335-345.

25. Shulman JD, Peterson J. The association between occlusal characteristics and incisal trauma in individuals 8 - 50 years of age. *Dental Traumatology* 2004; 20: 67-74.

26. Buschang PH, Shulman JD. Crowding in treated and untreated subjects 17-50 years of age. *The Angle Orthodontist* 2003; 73(5):502-8.

27. Maupomé G, Shulman JD, Clark DC, Levy SM. Socio-demographic features and fluoride technologies contributing to higher TFI scores in permanent teeth of Canadian children. *Caries Res* 2003; 37(5):327-34.

28. Shulman JD, Nunn ME, Taylor SE, Rivera-Hidalgo F. The prevalence of periodontal-related changes in adolescents with asthma: Results of the Third Annual National Health and Nutrition Examination Survey. *Pediatr Dent* 2003; 25(3):279-84.

29. Makrides NS, Shulman JD. Dental health care of prison populations. *J Corr Health Care* 2002; 9(3):291-306.

30. Shulman JD, Ezemobi EE, Sutherland JN. Louisiana dentists' attitudes toward the Dental Medicaid program. *Pediatr Dent* 2001; 23(5):395-400.

31. Shulman JD, Taylor SE, Nunn ME. The association between asthma and dental caries in children and adolescents: A population-based case-control study. *Caries Res* 2001; 35:4:240-246.

32. Maupomé G, Shulman JD, Clark DC, Levy SM, Berkowitz J. Tooth-surface progression and reversal changes in fluoridated and no-longer-fluoridated communities over a 3-year period. *Caries Res* 2001; 35:2:95-105.

33. Trautmann G, Gutmann JL, Nunn ME, Witherspoon DE, Shulman JD. Restoring teeth that are endodontically treated through existing crowns. Part I: Survey of pulpal status on access. *Quintessence Int* 2000; 31(10):713-18.

34. Trautmann G, Gutmann JL, Nunn ME, Witherspoon DE, Shulman JD. Restoring teeth that are endodontically treated through existing crowns. Part II: Survey of restorative materials commonly used. *Quintessence Int* 2000; 31(10):719-28.

35. Lalumandier JA, McPhee SD, Riddle S, Shulman JD, Daigle WW. Carpal tunnel syndrome: Effect on Army dental personnel. *Milit Med* 165:372-78,May 2000.

36. McFadyen JA, Shulman JD**.** Orofacial injuries in youth soccer. *Pediatr Dent* 1999; 21:192-96.

37. Cederberg RA, Fredricksen NL, Benson BW, Shulman JD. Influence of the digital image display monitor quality on observer performance. *Dentomaxillofacial Radiology* 1999; 28:203-7.

38. Shulman JD, Niessen LC, Kress GC, DeSpain B, Duffy R. Dental public health for the 21st century: Implications for specialty education and practice. *J Public Health Dent* 1998; 58 (Suppl 1):75-83.

LEGAL25073157.3

39. Cederberg RA, Fredricksen NL, Benson BW, Shulman JD. Effect of different lighting conditions on diagnostic performance of digital film images. *Dentomaxillofacial Radiology* 1998; 27:293-97.

40. Shulman JD, Lewis DL, Carpenter WM. The prevalence of chapped lips during an Army hot weather exercise. *Milit Med* 1997; 162:817-19.

41. Shulman JD, Wells LM. Acute toxicity due to ethanol ingestion from mouthrinses in children less than six years of age. *Pediatr Dent* 1997; 19(6):404-8.

42. Kress G, Shulman JD. Consumer satisfaction with dental care: where have we been, where are we going? *J Am Coll Dent* 1997; 64 (1):9-15**.**

43. Shulman JD, Wells LM. Acute toxicity in children under the age of six from ingesting home fluoride products: an update. *J Public Health Dent* 1995; 57(3):150-8.

44. McFadyen JA, Seidler KL, Shulman JD, Wells, LM. Provision of free and discounted dental services to selected populations: A survey of attitudes and practices of dentists attending the 1996 Dallas Midwinter Meeting. *Texas Dent J* 1996; 113 (12):10-18.

45. Shulman JD**.** Potential effects of patient opportunity cost on dental school patients. *J Dent Educ* 1996; 60 (8):693-700.

46. Shulman JD, Lalumandier JA, Grabenstein JD. The average daily dose of fluoride: a model based on fluid consumption. *Pediatr Dent* 1995; 17 (1):13-18.

47. Solomon ES, Hasegawa TK, Shulman JD, Walker PO. An application: the cost of clinic care by dental students and its relationship to clinic fees. *J Dent Educ* 1994; 58 (11-12):832-5.

48. Shulman JD, Williams TR, Lalumandier JA. Treatment needs and treatment time for soldiers in Dental Fitness Class 2. *Milit Med* 159, 2:135-138, 1994.

LEGAL25073157.3

49. Shulman JD, Williams TR, Tupa JE, Lalumandier JA, Richter NW, Olexa BJ. A comparison of dental fitness classification using different class 3 criteria. *Milit Med* 1994; 159 (1):5-10.

50. Amstutz RD, Shulman JD. Perceived needs for dental continuing education within the Army Dental Care System. *Milit Med* 1994; 159 (1):1-4.

51. Shulman JD, Carpenter WM, Lewis DL. The prevalence of recurrent herpes labialis during an Army hot weather exercise. *J Public Health Dent* 1992; 52 (4):198-203.

52. Brusch WA, Shulman JD, Chandler HT. Survey of Army dental practice. *J Am Coll Dent* 1987; 54 (1):54-63.

53. Lewis DM, Shulman JD, Carpenter WM. The prevalence of acute lip damage during a US Army cold weather exercise. *Milit Med* 1985; 150 (2):87-90.

54. Freund DA, Shulman JD. Regulation of the professions, results from dentistry. In Scheffler, Richard (ed.). *Advances in Health Economics and Health Services Research IV* 1984; 5(1):161-180.

55. Baumgartner JC, Brown CM, Mader CL, Peters DD, Shulman JD. Scanning electron microscopic evaluation of root canal irrigation with saline, sodium hypochlorite, and citric acid. *J Endodon.* 1984; 10 (11):525-531.

**Book Chapters Monographs, and Non-Peer Reviewed Articles**

1. Cappelli DP, Shulman JD. Epidemiology of Periodontal Diseases. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008), 14-26.

2. Shulman JD, Gonzales CK. Epidemiology of Oral Cancer. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008), 2-13.

3. Shulman JD, Cappelli DP. Epidemiology of Dental Caries. In Cappelli DP, Mosley C, eds. Prevention in Clinical Oral Health Care. Elsevier (2008), 27-43.

4. Shulman JD, Heng C. Meth Mouth: What We Know and What We Don't Know. *Fortune News* 2006;52(1):12-13.

**Abstracts Presented (27 since 2002)**

1. Yanus M, Rivera-Hidalgo F, Solomon E, Roshan S, Shulman J, Rees TD, Hummel S, Boluri A. Relationship of Candida to Oral Factors in Complete Denture Wearers. *J Dent Res 89* (Special Issue):#4445, 2010.

2. Abraham C, Rivera-Hidalgo F, Kessler H, Rees T, SL Cheng, Y, Shulman J, Solomon E. Inter-Examiner Evaluation of Fluorescence in Oral Lesions. *J Dent Res 89* (Special Issue): #4404, 2010.

3. He J, Solomon E, Shulman J, Rivera-Hidalgo F. Treatment Outcome of Endodontic Therapy with or without Patency Filing. *J Dent Res 89* (Special Issue):#1277, 2010.

4. Harrel SK, Rivera-Hidalgo F, Hamilton K, Shulman JD. Comparison of Ultrasonic Scaling Wear and Roughness Produced In Vitro. *J Dent Res* 87 (Special Issue): # 1018, 2008.

5. Harrel SK, Rivera-Hidalgo F, Shulman JD. Comparison of Surgical Instrumentation Systems for Minimally Invasive Periodontal Surgery. *J Dent Res* 87 (Special Issue): # 1020, 2008.

6. Shulman JD, Bolin KA. Characterizing Disparities in Root Surface Caries in the US. *J Dent Res* 85 (Special Issue): # 476, 2006.

7. Shulman JD, Bolin KA. Is Root Surface Caries Associated with Xerogenic Medications? *J Dent Res* 85 (Special Issue): # 477, 2006.

8. Shulman JD, Carpenter WM. Risk Factors Associated with Geographic Tongue among US Children. *J Dent Res* 85 (Special Issue): # 1205, 2006.

9. Shulman JD, Bolin KA, Eden BD. Socio-demographic Factors Associated with Root Surface Caries Prevalence. *J Dent Res* 84 (Special Issue): # 3279, 2005.

10. Shulman JD, Carpenter WM, Rivera-Hidalgo F. Prevalence of Hairy Tongue among US Adults. *J Dent Res* 84 (Special Issue): # 1396, 2005.

11. Eden BD, Shulman JD. Root Caries in the US by Tooth Type and Surface. *J Dent Res* 84 (Special Issue): # 2622, 2005.

12. Mobley CC, Shulman JD. Birth Weight and Caries in the Permanent Dentition of Children. *J Dent Res* 84 (Special Issue): # 86, 2005.

13. Puttaiah R, Shulman JD, Bedi R, Youngblood D, Tse E. Infection Control Profile Scores of Practitioners from Eight Countries. *J Dent Res* 84 (Special Issue): # 1026, 2005.

14. Puttaiah R, Youngblood D, Shulman JD, Bedi R, Tse E. Infection Control Practice Comparisons between Practitioners from Eight Countries. *J Dent Res* 84 (Special Issue): # 3207, 2005.

15. Foyle DM, Rivera-Hidalgo F, Shulman JD, Williams F, Hallmon W, Taylor S. Effect of Selected Therapies on Healing in Rat Calvarial Defects. *J Dent Res* 84 (Special Issue): # 1172, 2005.

16. Puttaiah R, Lin SM, Svoboda KKH, Cederberg R, Shulman JD. Quantitative Comparison of Scanning Electron and Laser Confocal Microscopy Techniques. *J Dent Res* 84 (Special Issue): # 3425, 2005.

17. Holyfield LJ, Bolin KA, Rankin KV, Shulman JD, Jones DL, Eden BD. Use of computer technology to modify objective structured clinical examinations. *J Dent Educ* 69 (1):147 # 113, 2005.

18. Benson BW, Shulman JD. Effect of antepartum natural background radiation on infant low birth weight: a pilot study. American Academy of Oral & Maxillofacial Radiology; Denver, CO. 11/6/04.

19. Shulman JD, Beach MM, Rivera-Hidalgo F. Risk factors associated with denture stomatitis in U.S. adults. *J Dent Res* 83 (Special Issue): # 422, 2004.

20. Puttaiah R, Shulman JD, Bedi R. A multi-country survey data on dental infection control KAP. *J Dent Res*; 82 (Spec Issue):# 3394, 2003

LEGAL25073157.3

21. Eden BD, Shulman JD. Perceived need for denture care and professional assessment of dentures. *J of Dent Res* 83 (Special Issue): # 1604.

22. Benson BW, Shulman JD. Inclusion of tobacco exposure as a predictive factor for decreased bone mineral content. *Oral Surg, Oral Med, Oral Pathol, Oral Radiol & Endo* 97(2): 266-267

23. Eden BD, Shulman JD. Factors influencing self-perceived need for periodontal therapy: Data from the Third National Health and Nutrition Survey (NHANES III). *J Dent Res* 2003; 82(Spec Issue):#0481.

24. Shulman JD, Beach MM, Rivera-Hidalgo F. The Prevalence of oral mucosal lesions among US adults: Results from the Third National Health and Nutrition Survey. *J Dent Res* 82 (Special Issue A): # 1472, 2003.

25. Rivera-Hidalgo F, Shulman JD, Beach MM. Recurrence of aphthous ulcerations in adult tobacco smokers. *JDent Res* 82 (Special Issue A): # 0759, 2003.

26. Shulman, JD, Nunn, ME, Taylor SE. The association between asthma and periodontal health in adolescents using data from NHANES 3. *J Dent Res* 81 (AADR Abstracts): # 2971, 2002.

27. Buschang PH, Shulman, JD. Patterns of maxillary and mandibular incisor irregularity. *J Dent Res* 81 (AADR Abstracts): # 3951, 2002.

28. Maupome G, Shulman, JD, Clark DC, Levy SM. TFI measurements in the BC fluoridation cessation study. *J Dent Res* 81 (AADR Abstracts): # 547, 2002.

LEGAL25073157.3

**Exhibit 2**

**Materials Considered**

**MATERIALS CONSIDERED**

1. Arizona Department of Corrections Departmental Order 1103. Technical Manual: Health Services. Supersedes: April 1, 2000; Effective Date: January 1, 2010. ADC010554-10647. ("ADC P&P 2010")

2. Arizona Department of Corrections Departmental Order 1103. Technical Manual: Health Services. Supersedes: April1, 1997; Effective Date: April 1, 2000. ("ADC P&P 2000").

3. ADC Institutional Capacity & Committed Population, October 31, 2012, *available at* http://www.azcorrections.gov/adc/reports/capacity/bed_2012/bed_capacity_oct12.pdf ("ADC Count")

4. Arizona Department of Corrections reports and correspondence, ADC028025-254, including:

   ▪ Arizona Department of Corrections. Arizona State Prison – Yuma Complex. Memorandum from Dennis G. Chenail to Joe Profiri re Wexford Health Deficiencies at ASPC-Yuma. August 20, 2012. ADC028173. ("Yuma Deficiencies")

   ▪ Arizona Department of Corrections. Arizona State Prison – Yuma Complex. Memorandum from Dennis Kendall to Joe Profiri re Florence Weekly Monitoring Report. August 17, 2012. ADC028107-10. ("Florence Deficiencies")

   ▪ Arizona Department of Corrections Contract Monitoring Bureau Report, 8/8-8/13.12 ADC028081-90. ("Monitor Report 8/8/12")

   ▪ Wexford Vacancies Report 7/31/12. ADC28188. ("Wexford Vacancies 7/31")

5. Arizona Vacancies and FTE Percentages – Compared to Contracted Staff Plan (External). August 8, 2011; Rev. 0. ADC016148 - 16176 ("ADC Vacancies").

6. Arizona Revised Statutes. Article 1. Dental Board. ("Dental Board")

7.    Dental Assistant Functions List. Dental Assisting National Board, 2012. http://www.dalefoundation.org/resources-and-state-requirements/State-Dental-Assistant-Requirements/Arizona. Accessed 10/20/12 ("AZ Dental Assistant")

8.    Deposition of Dr. Michael Adu-Tutu

9.    Deposition of Dr. Carlos Weekly

10.   *Fussell v. Wilkinson*. Joint Notice of Filing Dental Agreement. C-103-704 S. D. OH, Document 181-1 February 26, 2007. "*Fussell* Dental Agreement".

11.   Health records of the following ADC inmates

- Maryanne Chisholm #200825
- Victor Parsons #123589
- Joshua Polson  #187716
- Stephen Swartz  #102486
- Charlotte Wells #247188

12.   Lake County Jail Settlement Findings Letter. Re: Investigation of the Lake County Jail. December 7, 2009. Accessed at http://www.justice.gov/crt/about/spl/documents/Lake_County_Jail_findlet_12-07-09.pdf October 18, 2012. ("Lake County Letter")

13.   Letter from U.S. Department of Justice, Civil Rights Division, to Board President and Sheriff of Cook County dated July 11, 2008, subject: Cook County Jail, Chicago,                                                                                           Illinois. http://www.justice.gov/crt/split/documents/CookCountyJail_findingsletter_7-11-08.pdf. Accessed 2/7/01. ("Cook County Letter").

14.   Makrides NS, Costa JN, Hickey DJ, Woods PD, Bajuscak R. Correctional Dental Services. In Puisis M, Clinical Practice of Correctional Medicine, 2nd ed. Philadelphia: Mosby Elsevier, 2006. ("Makrides *et al*., 2006").

15.   Makrides NS, Shulman JD. Dental health care of prison populations. *J Corr Health Care* 2002; 9(3):291-306. ("Makrides and Shulman, 2002").

16.  National Institute of Corrections Survey on Correctional Dentistry, 2006. Arizona Department of Corrections Response from Dr. Michael Adu-Tutu, Dental Program Manager, January 25, 2007. ("ADC NIC 2007").

17.  *Parsons et al. v. Ryan et al*., Class Action Complaint. 2:12-cv-00601-NVW--MEA Document 1 Filed 03/22/12

18.  *Parsons et a;. v. Ryan et al*., Answer. 2:12-cv-00601-NVW Document 30 Filed 05/14/12

19.  Shulman JD, Heng C. Meth Mouth: What We Know and What We Don't Know. *Fortune News* 2006;52(1):12-13.

20.  Shulman JD, Williams TR, Lalumandier JA. Treatment needs and treatment time for soldiers in Dental Fitness Class 2. *Milit Med* 159, 2:135-138, 1994.

21.  Shulman JD, Williams TR, Tupa JE, Lalumandier JA, Richter NW, Olexa BJ. A comparison of dental fitness classification using different class 3 criteria. *Milit Med* 1994; 159 (1):5-10.

22.  Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *J Correctional Health Care* (2012) 18:1, 58 - 65.

23.  Settlement Agreement. *U.S. v. Lupe Valdez, Sheriff of Dallas County, Texas*. U.S. District Court for the Northern District of Texas, Civil No. 307 CV 1559-N. Accessed at http://www.justice.gov/crt/split/documents/dallas_county_order_11-06-07.pdf December 11, 2009. ("Dallas County").

24.  ORDER APPOINTING COURT EXPERTS AS COURT REPRESENTATIVES, C-05-241 JSW (N.D.Cal. February 8, 2007). ("*Perez* Court Representative Order").

25.  Standards for Health Services in Correctional Institutions. Washington, DC: American Public Health Association, 2003. ("APHA 2003")

26.  Standards for Health Services in Prisons.  National Commission on Correctional Health Care. Chicago, Illinois, 2008. ("NCCHC 2008")

27.  STIPULATION AND ORDER RE: DISMISSAL OF CASE WITH PREJUDICE AND TERMINATION OF ALL PROVISIONS OF CONSENT DECREE

3

EXCEPT PROVISION RELATED TO RENOVATION PROJECTS, C-05-05241 JSW (N.D.Cal.  August 15, 2012). ("*Perez* Termination Order")

28.     Wexford Health. Human Resources Job Description, Dental Assistant – Arizona. Accessed at http://jobs.wexfordhealth.com/careers/dental-jobs.

29.     Wexford    Health.    Solicitation    #ADOG12-00001105.    ADC014103-16042 ("Wexford Contract")

30.     United States v. Tom Dart, Cook County Sheriff et al. Agreed Order. 1:10-cv-02946 Document 3-1 filed 5/13/10. ("Cook County Order").

# EXHIBIT E

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br><br> **DECLARATION OF CRAIG HANEY, Ph.D., J.D.** |

I, Craig Haney, Ph.D, J.D., declare:

**I. Expert Qualifications**

1.      I am a Professor of Psychology at the University of California, Santa Cruz, where I also currently serve as the Director of the Legal Studies Program, and the Director of the Graduate Program in Social Psychology. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards.

2.      I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement. In addition to these scholarly articles and book chapters, I have published two books: Death by Design: Capital Punishment as a Social Psychological System (Oxford University Press, 2005), and Reforming Punishment: Psychological Limits to the Pains of Imprisonment (American Psychological Association Books, 2006).

3.      In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional histories in explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

1

4.     I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, and the United States Department of Justice.  For example, in the summer of 2000, I was invited to attend and participated in a White House Forum on the uses of science and technology to improve crime and prison policy, and in 2001 participated in a conference jointly sponsored by the United States Department of Health and Human Services (DHHS) concerning government policies and programs that could better address the needs of formerly incarcerated persons as they were reintegrated into their communities. I continued to work with DHHS on the issue of how best to insure the successful reintegration of prisoners into the communities from which they have come. More recently, I have served as a consultant to the Department of Homeland Security, a consultant to and an expert witness before the United States Congress, and was appointed in 2012 as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. (A copy of my curriculum vitae is attached to this Declaration as Exhibit 1).

5.     My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field, demonstrating the power of institutional settings

2

to change and transform the people who enter them.[1]

6.     Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement).  In the course of that work, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, and Mexico. I also have conducted numerous interviews with correctional officials, guards, and prisoners to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.[2]

---

[1]  For example, see Craig Haney, Curtis Banks & Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney & Philip Zimbardo, The Socialization into Criminality:  On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society: Psychological and Legal Issues. (J. Tapp and F. Levine, eds., 1977); and Craig Haney & Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

[2] For example, Craig Haney & Philip Zimbardo, The Socialization into Criminality:  On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223). (J. Tapp and F. Levine, eds., 1977); Craig Haney, Infamous Punishment: The Psychological Effects of Isolation, 8 National Prison Project Journal 3 (1993); Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of

7.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Arkansas, California, Georgia, Texas, and Washington, and in numerous state courts, including courts in Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[3]

## II. Nature and Basis of Expert Opinion

8.     I have been retained by counsel for the plaintiffs in Parsons v. Ryan to provide expert opinions on three inter-related topics: a) a summary of what is known about the negative psychological consequences of confinement in isolation or "supermax" prisons; b) an explanation of whether and how those negative consequences can be exacerbated for prisoners who are suffering from serious mental illness (""SMI");[4] and,

---

Prison Violence, University of Missouri-Kansas City Law Review, 77, 911-946 (2009); Craig Haney, Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," Connecticut Public Interest Law Review, 9, 139-196 (2010); Craig Haney, The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, American Criminal Law Review, 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; and Craig Haney, Prison Effects in the Age of Mass Imprisonment, The Prison Journal, 92, 1-24 (2012).

[3] For example, see Brown v. Plata, 131 S.Ct. 1910 (2011).

[4] The definition of a serious mental illness or SMI generally includes persons with a current diagnosis or significant recent history of types of DSM-IV-TR Axis I diagnoses (including schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic disorder, psychotic disorder not otherwise specified, major depressive disorders, and bipolar disorder I and II), persons who suffer from other diagnosed Axis I psychiatric disorders commonly characterized by breaks with reality, or

4

finally, c) based on the case-specific discovery that I have been provided and reviewed, the extent to which prisoners housed in the Arizona Department of Corrections, including those who suffer from SMI, are subjected to solitary-type confinement that may place them at a serious risk of psychological harm.

9.    My opinions on these topics are based on a number of sources. In addition to my own direct experience interviewing and evaluating prisoners housed in solitary confinement (including some who were suffering from SMI), I reviewed the extensive published literature that addresses the psychological effects of solitary confinement. In addition, I requested and have been provided with a set of official documents that pertain to the use of solitary confinement within the Arizona Department of Corrections ("ADC"). The discovery documents that I reviewed include: the Class Action Complaint for Injunctive and Declaratory Relief in Parsons v. Ryan; an April, 2012 Amnesty International report on conditions in ADC's Special Management Units entitled "Cruel Isolation: Amnesty International's Concerns about Conditions in Arizona Maximum Security Prisons"; a document entitled "Arizona Department of Corrections Medical (M) and Mental Health (MH) Score Inmate Distribution by Complex for FY 2011"; a document entitled "Arizona Department of Corrections MH Levels Statistical Summary as of: 07/23/2012"; excerpts of an October 3, 2012 Deposition of Tracy Crews, M.D.; excerpts from an October 3, 2012 deposition of Ben Shaw, Ph.D.;  March 18, 2011 Letter from ADC Mental Health Director Ben Shaw, Ph.D., and Deputy Director Charles Flanagan to the ADC Commission; Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (dated 10/17/12); Department Order 809, Earned Incentive Program (Jan. 11, 2011); Declaration of Plaintiff Dustin

---

perceptions of reality, or that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health, and persons diagnosed with severe personality disorders that are manifested by episodes of psychosis or depression, and result in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

Brislan; Declaration of Plaintiff Joshua Polson; Declaration of Plaintiff Christina Verduzco; Declaration of Plaintiff Jackie Thomas.

10.    By way of summary, it is my expert opinion that being housed in solitary or isolated confinement can produce a number of negative psychological effects and places prisoners at grave risk of psychological harm. I believe that these effects are now well understood and described in the scientific literature. Scientific knowledge of these effects derives from numerous empirical studies. The findings are "robust"—that is, they come from studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, were completed and published over a period of many decades, and are empirically very consistent. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm that they confront.

11.    In addition, the empirical conclusions are theoretically sound. That is, there are numerous sound theoretical reasons to expect that long-term isolation, the absence of meaningful social interaction and activity, and the other severe deprivations that are common under conditions of isolated or solitary confinement would have harmful psychological consequences. Those conditions and experiences are known to produce adverse psychological effects in contexts other than prison and it makes perfect theoretical sense that they produce similar outcomes in correctional settings.

12.    In addition, there are sound theoretical reasons to expect that prisoners who suffer from SMI would have a more difficult time tolerating the painful experience of isolation or solitary confinement. This is in part because of the greater vulnerability of the mentally ill in general to stressful, traumatic conditions, and in part because some of the extraordinary conditions of isolation adversely impact the particular symptoms from which mentally ill prisoners suffer (such as depression) or directly aggravate aspects of their pre-existing psychiatric conditions.

13.    It is my opinion that the failure of the Arizona Department of Corrections

6

(ADC) to exclude categorically prisoners who suffer from SMI from its isolation units is inconsistent with sound corrections and mental health practice and places all such prisoners at substantial risk of harm.  It is also my opinion that the policies, practices and admissions of ADC regarding conditions of confinement in its isolation units, as depicted in the documents and materials I have reviewed, reflect the type of conditions that my own experience and research—which is also supported by decades of scientific research and study by others—have found to be potentially detrimental to all human beings, regardless of pre-existing mental illness.  As such, all ADC prisoners are at risk of substantial psychological harm under ADC's current isolation policy and practice.

14.   I should note that my opinions concerning the use, nature, and effects of isolated confinement in the ADC are partial and preliminary.  It is my understanding that additional information will be forthcoming during the course of the litigation.   For example, I have not been able to tour the ADC facilities; interview staff or prisoners; or review prisoner files and other documents.  Despite this, based on the documents and materials that I have reviewed (as listed in paragraph 9 above), I am able to formulate preliminary opinions about ADC's isolation policies and practices.  This is not a complete list of the opinions that I anticipate I will reach in this case and these opinions will be developed and supplemented as more information becomes available.

**III. The Adverse Psychological Effects of Isolation**

15.   "Solitary confinement" and "isolated confinement" are terms of art in correctional practice and scholarship. For perhaps obvious reasons, total and absolute solitary confinement—literally complete isolation from any form of human contact—does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that is entirely consistent with its use in the broader correctional literature, as:

> [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where

7

prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[5]

Indeed, because their extreme isolation from the mainstream prisoner population, their near or complete exclusion from prison activities and programs, and the fact that they are confined in their cells virtually around-the-clock, even prisoners in "isolated confinement" who are double-celled (i.e., housed with another prisoner) may suffer some of the worst effects described in the following paragraphs. Indeed, in some ways, these prisoners have the worst of both worlds: "crowded" and confined with another person inside a small cell but simultaneously deprived of even minimal freedoms, access to programs, and "normal" and meaningful forms of social interaction.

16.     Presumably designed to limit and control violence by keeping prisoners isolated from one another, solitary confinement or "supermax" prisons subject prisoners to especially harsh and deprived conditions of confinement that come with a significant risk of psychological harm. As a general matter, as I noted in passing above, psychologists know from studies of behavior and adjustment in free society that social isolation in general is potentially very harmful and can cause irreparable damage to  overall psychological functioning.[6] Its effects are no less harmful in prison.

17.     Indeed, there is now a reasonably large and growing literature on the many ways that solitary or so-called "supermax" confinement can very seriously damage the overall mental health of prisoners. The long-term absence of meaningful human contact and social interaction, the enforced idleness and inactivity, and the oppressive security and

---

[5] Craig Haney, The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful, Prison Service Journal, 12 (January, 2009), at n.1.

[6] For example, see: Graham Thornicroft, Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, British Journal of Psychiatry, 158, 475-484 (1991).

surveillance procedures (and the weapons, hardware, and other paraphernalia that go along with them) all combine to create starkly deprived conditions of confinement. These conditions predictably impair the cognitive and mental health functioning of many prisoners who are subjected to them.[7]  For some, these impairments can be permanent and life-threatening.

18.   In the admitted absence of a single "perfect" study of the phenomenon,[8] there is a substantial body of published literature that clearly documents the distinctive patterns of psychological harm that can and do occur when persons are placed in solitary confinement. These broad patterns have been consistently identified in personal accounts written by persons confined in isolation, in descriptive studies authored by mental health

---

[7]  For example, see: Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample, Criminal Justice and Behavior, 33, 760-781 (2006): Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement. Crime & Delinquency, 49, 124-156 (2003); and Peter Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[8]  No more than basic knowledge of research methodology is required to design the "perfect" study of the effects of solitary confinement: dividing a representative sample of prisoners (who had never been in solitary confinement) into two groups by randomly assigning half to either a treatment condition (say, two or more years in solitary confinement) or a control condition (the same length of time residing in a typical prison housing unit), and conducting longitudinal assessments of both groups (i.e., before, during, and after their experiences), by impartial researchers skilled at gaining the trust of prisoners (including ones perceived by the prisoner-participants as having absolutely no connection to the prison administration). Unfortunately, no more than basic knowledge of the realities of prison life and the practicalities of conducting research in prisons is required to understand why such a study would be impossible to ever conduct. Moreover, any prison system that allowed truly independent, experienced researchers to perform even a reasonable approximation of such a study would be, almost by definition, so atypical as to call the generalizability of the results into question. Keep in mind also that the assessment process itself—depending on who carried it out, how often it was done, and in what manner—might well provide the solitary confinement participants with more meaningful social contact than they are currently afforded in a number of such units with which I am familiar, thereby significantly changing (and improving) the conditions of their confinement.

professionals who worked in many such places, and in systematic research conducted on the nature and effects of solitary or "supermax" confinement. The studies have now spanned a period of over four decades, and were conducted in locations across several continents by researchers with different professional expertise, ranging from psychiatrists to sociologists and architects. [9]

19.    For example, mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[10] The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances." [11]

20.    A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important

---

[9] For example, see: Arrigo, B., & Bullock, J., The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change, International Journal of Offender Therapy and Comparative Criminology, 52, 622-640 (2008); Haney, C., supra note 6; Haney, C., & Lynch, M., Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, New York University Review of Law and Social Change 23, 477-570 (1997); Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in M. Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[10] For detailed reviews of all of these psychological issues, and references to the many empirical studies that support these statements, see: Craig Haney and Mona Lynch, supra note 9, and Craig Haney, supra note 7.

[11] Bruno M. Cormier & Paul J. Williams, Excessive Deprivation of Liberty, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, Canadian Psychiatric Association Journal, 12, 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, Effect of Solitary Confinement on Prisoners, American Journal of Psychiatry, 119, 771-773 (1963).

observations about the effects of isolation.[12] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[13] Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[14]

21. More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[15]

---

[12] Hans Toch, Men in Crisis: Human Breakdowns in Prisons. Aldine Publishing Co.: Chicago (1975).

[13] Id. at 54.

[14] Ibid.

[15] In addition to the numerous studies cited in the articles referenced *supra* at notes 7 and 8, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, L'Isolement Carceral, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, Einzelhaft: Eine Literaturubersicht (Solitary confinement: A literature survey), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983)

11

22.    In addition, there are correlational studies of the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry

(reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization").  See, also, Ida Koch, Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, Long-Term Mental Sequelae of Political Imprisonment in East Germany, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

12

Hughes attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[16] These authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[17] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[18]

23. The painfulness and damaging potential of extreme forms of solitary confinement is underscored by its use in so-called "brainwashing" and certain forms of torture. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress

---

[16] Raymond Patterson & Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, Psychiatric Services, 59, 676-682 (2008), at p. 678.

[17] Ibid. See also: Lindsay M. Hayes, National Study of Jail Suicides: Seven Years Later. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, Vulnerability and Prison Suicide, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, Prison Suicide and Prisoner Coping, Crime and Justice, 26, 283-359 (1999).

[18] For example, see: Howard Bidna, Effects of Increased Security on Prison Violence, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, Felon Self-Mutilation: Correlate of Stress in Prison, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, The Implications of Research Explaining Prison Violence and Disruption, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, A Prison Environment: Its Effect on Health Care Utilization, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, Managing Violent Individuals in Correctional Settings, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, Using Situational Factors to Predict Types of Prison Violence, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture techniques.[19]

24.     The prevalence of psychological symptoms (that is, the extent to which prisoners who are placed in these units suffer from these and related symptoms) is often very high. For example, in a study that I conducted of a representative sample of one hundred prisoners who were housed in the Security Housing Unit at Pelican Bay Prison, in California—a facility that California prison officials acknowledged was "modeled" on Arizona's SMU I facility that they toured in advance of Pelican Bay's construction—I found that every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners who were interviewed.[20] Many of the symptoms were reported by two-thirds or more of the prisoners assessed in this isolated housing unit, and some were suffered by nearly everyone. Well over half of the Pelican Bay isolated prisoners in this study reported a constellation of symptoms— headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension.

25.     I also found that almost all of the prisoners whom I evaluated reported ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger

---

[19] Solitary confinement is among the most frequently used psychological torture techniques. In D. Foster, Detention & Torture in South Africa: Psychological, Legal & Historical Studies, Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at p. 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at p. 136). See also: Matthew Lippman, The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 27 Boston College International & Comparative Law Review, 27, 275 (1994); Tim Shallice, Solitary Confinement—A Torture Revived? New Scientist, November 28, 1974; F.E. Somnier & I.K. Genefke, Psychotherapy for Victims of Torture, British Journal of Psychiatry, 149, 323-329 (1986); and Shaun R. Whittaker, Counseling Torture Victims, The Counseling Psychologist, 16, 272-278 (1988).

[20] See Haney, supra note 7.

and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

26.    Although these specific symptoms of psychological stress and the psychopathological reactions to isolation are numerous and well-documented, and certainly provide one index of the magnitude of the risk of harm this kind of experience presents, they do not encompass all of the psychological pain and dysfunction that such confinement can incur, the magnitude of the negative changes it may bring about, or even the full range of the risk of harm it represents. Among other things, such extreme deprivation of social contact can undermine an individual's social identity, destabilize his sense of self, and ultimately destroy his ability to function in free society.

27.    Depriving people of contact with others for long periods of time is psychologically harmful and potentially destabilizing for another, related set of reasons. The importance of "affiliation"—the opportunity to have meaningful contact with others—in reducing anxiety in the face of uncertain or fear-arousing stimuli is long-established in social psychological literature.[21] In addition, one of the ways that people determine the appropriateness of their feelings—indeed, how we establish the very nature and tenor of our emotions—is through contact with others.[22]

---

[21] For example, see: Stanley Schachter, The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness. Stanford, CA: Stanford University Press (1959); Irving Sarnoff & Philip Zimbardo, Anxiety, Fear, and Social Affiliation, Journal of Abnormal Social Psychology, 62, 356-363 (1961); Philip Zimbardo & Robert Formica, Emotional Comparison and Self-Esteem as Determinants of Affiliation, Journal of Personality, 31, 141-162 (1963).

[22] For example, see: A. Fischer, A. Manstead, & R. Zaalberg, Social Influences on the Emotion Process, in M. Hewstone & W. Stroebe (Eds.), European Review of Social

28.     Solitary confinement is a socially pathological environment that forces long-term inhabitants to develop their own socially pathological adaptations—ones premised on the absence of meaningful contact with people—in order to function and survive. As a result, prisoners gradually change their patterns of thinking, acting and feeling to cope with their largely asocial world and the impossibility of relying on social support or the routine feedback that comes from normal contact with others. Clearly, then, these adaptations represent "social pathologies" brought about by the socially pathological environment of isolation. However, although they are functional and even necessary under these circumstances, they can become especially painful and disabling if taken to extremes, or if and when they are internalized so deeply that they persist long after time in isolation has ended.

29.     For example, some prisoners cope with the asociality of their daily existence by paradoxically creating even more. That is, they socially withdraw further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. Others move from initially being starved for social contact to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence. [23]

30.     Although social deprivation is at the core of solitary confinement, and what

---

Psychology (pp. 171-202). Volume 14. Wiley Press (2004); C. Saarni, The Development of Emotional Competence. New York: Guilford Press (1999); Stanley Schachter & Jerome Singer, Cognitive, Social, and Physiological Determinants of Emotional State, Psychological Review, 69, 379-399 (1962); L. Tiedens & C. Leach (Eds.), The Social Life of Emotions. New York: Cambridge University Press (2004); and S. Truax, Determinants of Emotion Attributions: A Unifying View, Motivation and Emotion, 8, 33-54 (1984).

[23] For evidence that solitary confinement may lead to a withdrawal from social contact or an increased tendency to find the presence of people increasingly aversive or anxiety-arousing, see: Cormier, B., & Williams, supra note 11; Haney, supra note 7; H. Miller & G. Young, Prison Segregation: Administrative Detention Remedy or Mental Health Problem?, Criminal Behaviour and Mental Health, 7, 85-94 (1997); Scott & Gendreau, supra note 11; Toch, supra note 112; and Waligora, supra note 15.

seemingly accounts for its most intense psychological pain and the greatest risk of harm, prison isolation units also deprive prisoners of more than social contact. Thus, there are characteristically high levels of repressive control, enforced idleness, reduced environmental stimulation, and physical deprivations that also lead to psychological distress and can create even more lasting negative consequences. Indeed, most of the things that we know are beneficial to prisoners—such as increased participation in institutional programming, visits with persons from outside the prison, physical exercise, and so on[24]—are either functionally denied or greatly restricted to prisoners housed in isolation units. In addition to the social pathologies that are created by the experience of solitary confinement, as I say, these other stressors also can produce additional negative psychological effects.

31.    In addition, of course, people require a certain level of mental and physical activity in order to remain healthy. The near total lack of movement and opportunity for exercise experienced by most prisoners in isolation unquestionably impacts their mental health.  Simply put, human beings need movement and exercise to maintain healthy mental functioning—without the possibility for such normal and necessary human activity, prisoners in isolation suffer a risk of serious mental harm.

32.    Apart from the profound social, mental and physical deprivations that solitary confinement can produce, prisoners housed in these units experience prolonged periods of monotony and idleness. Many of them experience a form sensory deprivation— there is an unvarying sameness to the physical stimuli that surround them, they exist within the same limited spaces and are subjected to the same repetitive routines, and there is little or no external variation to the experiences they are permitted to have or can create for themselves. This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important related skills and capacities.[25]

---

[24] J. Wooldredge, Inmate Experiences and Psychological Well-Being, Criminal Justice and Behavior, 26, 235-250 (1999).
[25] For examples of this range of symptoms, see: Brodsky & Scogin, Inmates in Protective

33.    I hasten to add that not every isolated prisoner experiences all or even most of the range of adverse reactions I have described above. But the nature and magnitude of the negative psychological consequences themselves underscore the stressfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of harm that is created by isolation and its broad range of severe stressors and deprivations. The devastating effects of the conditions typically found in isolation units are repeatedly played out in the characteristically high numbers of suicide deaths, incidents of self-harm and self-mutilation. Given the years of sustained research on solitary confinement and the observable outcomes produced by this form of incarceration across time and locality, there can be no doubt that the negative psychological impact of confinement in these environments is often severe and, for some prisoners, sets in motion a set of cognitive, emotional, and behavioral changes that are long-lasting. Indeed, they can persist beyond the time that prisoners are housed in isolation and, for some, will prove irreversible.

## IV. The Exacerbating Effects of Isolation on Mental   Illness

34.    Although isolated confinement creates obvious risks of harm for all, most experts acknowledge that the adverse psychological effects of isolated or solitary confinement vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences) but also as a function of the characteristics of the prisoners subjected to it. Unusually resilient prisoners may be able to withstand even harsh forms of solitary confinement with few or minor adverse effects. Conversely, some

---

Custody:  First Data on Emotional Effects, Forensic Reports, 1, 267-280 (1988); Grassian, S., Psychopathological Effects of Solitary Confinement, American Journal of Psychiatry, 140, 1450-54 (1983); Haney, supra note 7; Miller & Young, supra note 23; and Volkart, et al., supra note 15.

prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement. Mentally ill prisoners are particularly at risk in these environments and have been precluded from them precisely because of this. There are several reasons why this is so.

35.   For one, as I have noted, solitary confinement or isolation is a significantly more stressful and psychologically painful form of prison confinement for most prisoners. Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the benign and socially supportive atmosphere that mental health clinicians seek to create within therapeutic environments. Not surprisingly, mentally ill prisoners generally deteriorate and decompensate when they are placed in isolation units.

36.   Some of the exacerbation of mental illness that occurs in isolated confinement comes about as a result of the critically important role that social contact and social interaction play in maintaining psychological equilibrium. The esteemed psychiatrist Harry Stack Sullivan once summarized the clinical importance of meaningful social contact by observing that "[w]e can't be alone in things and be very clear on what happened to us, and we… can't be alone and be very clear even on what is happening in us very long—excepting that it gets simpler and simpler, and more primitive and more primitive, and less and less socially acceptable."[26] Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

37.   Thus, one of the most fundamental ways in which isolation psychologically destabilizes prisoners is that it undermines their sense of self or social identity and erodes their connection to a shared social reality. Isolated prisoners have few if any opportunities

---

[26] Harry Stack Sullivan, The Illusion of Personal Individuality, Psychiatry, 12, 317-332 (1971), at p. 326.

to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[27]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, so bizarre, and so impossible to make sense of that some prisoners create their own reality— they live in a world of fantasy instead of the intolerable one that surrounds them.

38.    Finally, many of the direct negative psychological effects of isolation are very similar if not identical to certain symptoms of mental illness. Even though these specific effects are typically thought to be be less chronic or persistent when produced by the prisoner's conditions of confinement than those that derive from a diagnosable mental illness, when they occur in combination they are likely to exacerbate not only the outward manifestation of the symptoms but also the internal experience of the disorder. For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depressed mood. For clinically depressed prisoners, these situational effects are likely to exacerbate their pre-existing chronic condition and lead to worsening of their depressed state. Similarly, the mood swings that some prisoners report in isolation would be expected to amplify the emotional instability that prisoners diagnosed with bi-polar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made

_____

[27] Compare, also, Margaret K. Cooke & Jeffrey H. Goldstein, Social Isolation and Violent Behavior, <u>Forensic Reports</u>, <u>2</u>, 287-294 (1989), at p. 288.

1   worse by the frustration, irritability, and anger that many isolated prisoners report
2   experiencing. And prisoners prone to psychotic breaks may suffer more in isolated
3   confinement due to conditions that deny them the stabilizing influence of social feedback.

4          39.    As a result of the special vulnerability of mentally ill prisoners to the
5   psychological effects of isolated or supermax confinement, corrections officials and courts
6   that have considered the issue have prohibited them from being placed in such units. In
7   addition, mental health staff in most prison systems with which I am familiar are charged
8   with the responsibility not only of screening prisoners in advance of their possibly being
9   placed in isolation (so that the mentally ill can be excluded) but also of monitoring
10  prisoners who are currently housed in solitary confinement for signs of emerging mental
11  illness (so that they, too, can be removed).  For example, one court that was presented
12  with systematic evidence of the psychological risk of harm that supermax-type
13  confinement entailed concluded that the seriously mentally ill must be excluded from such
14  environments. Thus, the court noted that those prisoners for whom the psychological risks
15  were "particularly"—and unacceptably—high included anyone suffering from "overt
16  paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness
17  as a result of the conditions in [solitary confinement]."[28] The court elaborated on this
18  conclusion by noting that those who should be excluded from isolated, "supermax"
19  confinement included:

20

21          [T]he already mentally ill, as well as persons with borderline
            personality disorders, brain damage or mental retardation,
22          impulse-ridden personalities, or a history of prior psychiatric
            problems or chronic depression. For these inmates, placing
23          them in [isolated confinement] is the mental equivalent of
            putting an asthmatic in a place with little air to breathe. The
24          risk is high enough, and the consequences serious enough, that
            we have no hesitancy in finding that the risk is plainly
25          "unreasonable."[29]
26

27  _____
    [28] Madrid v. Gomez, 889 F.Supp. 1146, 1265 (N.D. Cal. 1995).
28  [29] Ibid.

                                           21

40.     The accumulated weight of the scientific evidence that I have cited to and summarized above demonstrates the negative psychological effects of isolated confinement—what happens to people who are deprived of normal social contact for extended periods of time. This evidence underscores the dangers isolation creates for human beings in the form of mental pain and suffering and increased tendencies towards self-harm and suicide.  This evidence further underscores the psychological importance of meaningful social contact and interaction, and in essence establishes these things as identifiable human needs. Over the long-term, they may be as essential to a person's psychological well-being as adequate food, clothing, and shelter are to his or her physical well-being.

## V. The Use of Solitary Confinement in the Arizona Department of Corrections[30]

41.     As I noted above, the adverse psychological effects of solitary confinement are thought to vary as a function of the specific nature and duration of the isolated conditions to which prisoners are exposed. In this regard, there are better and worse isolation or supermax units, including some that seek to ameliorate the harsh conditions that they impose and try minimize the harm that they inflict on prisoners. And, as I also noted, there are more and less resilient prisoners, including some who seem able to withstand the painfulness of these environments and to recover from the experience with few if any lasting effects. But neither of these facts challenges the overall consensus that has emerged on the harmful effects of long-term isolation and the serious risk of such harm that this form of confinement poses for all prisoners who are subjected to it.

42.     As I noted in my initial summary of my expert opinions, my evaluation of the exact nature and the effects of the conditions of isolation in the Arizona Department of Corrections has just begun.  I look forward to conducting onsite inspections of conditions of confinement at a number of specific facilities, interviewing samples of prisoners who

---

[30] Exhibits referenced in this declaration are attached to the Declaration of D. Fathi.

are confined in them, and reviewing a substantial amount of requested discovery materials.

43.     However, there are several things that I can say at the outset of this analysis. The first is that what is referred to as "maximum custody" in the Arizona prison system is essentially what is commonly known as isolated, solitary or supermax-type confinement. Conditions of confinement in the isolation units – mandated by statewide policy –include extremely limited out-of cell time.  Policy allows for only 6 hours of exercise a week in three two hour blocks which means that prisoners are essentially confined to their cells for 23-24 hours per day.[31]  Their "exercise" takes place in specially designed "enclosures" that are constructed of chain link fencing or steel mesh or concrete walls, in which the only "equipment" to which they may be allowed access is a handball.[32]

44.     Prisoners who are housed in the Special Management Unit (SMU) and those who are sentenced to death (which automatically results in their isolated confinement) are denied access to the prison's educational programming.[33]   Indeed, access to any programming or activity of any kind appears extremely limited in these units.[34] The stark conditions in isolation are further exacerbated by ADC's policies that allow for 24 hour illumination in some isolation cells;[35] limited property, including lack of access to TVs or radios;[36] infrequent, reduced calorie meals;[37]  and the years and years that many prisoners spend in such conditions.[38]

45.     It is my opinion that the conditions of extreme social isolation and enforced

---

[31] Ex. FFFF, Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (dated 10/17/12), at p. 9-10.
[32] Id. at p. 10-12.
[33] Id. at p. 19.
[34] Ex. OOO, Dep't Ord. 809, Earned Incentive Program (Jan. 11, 2011), at ADC014001-ADC014004.
[35] Ex. FFFF, Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (dated 10/17/12), at p. 14-15.
[36] Id. at p.15-16.
[37] Id. at p. 20-22.
[38] Id. at p. 17-18.

1   idleness that were described in the documents that I have reviewed are very similar if not
2   virtually identical to the types of isolation conditions that I have seen and studied in other
3   correctional institutions. Such conditions are harsh and severe and are precisely the kind
4   that create a risk of substantial harm for all the prisoners who are subjected to them.
5   Indeed, ADC's own mental health practitioners appear to be fully aware of the inherent
6   risks and harms of these conditions.  The former psychiatrist supervisor at Perryville, Dr.
7   Crews, testified that "a person who doesn't have mental illness being isolated for long
8   periods could develop mental illness or mental illness symptoms from being isolated."[39]  I
9   agree with Dr. Crews and have witnessed the significant mental damage that isolation
10  often wreaks on prisoners in units like those in ADC.

11       46.     A substantial number of ADC prisoners appear to be subjected to these
12  kinds of conditions. Specifically, based on the documents that I have reviewed, I would
13  preliminarily estimate that approximately 3000 prisoners may be housed in units that
14  impose this kind of isolated confinement.[40] As I noted in passing above, the fact that some
15  minority of these prisoners may be housed with cellmates (i.e., are "double-celled") does
16  not mitigate, and indeed may exacerbate, the psychological impact of their deprived
17  conditions. The kind of forced and strained "interactions" that take place between
18  prisoners who are confined nearly around-the-clock in a small cell hardly constitute
19  meaningful social contact. In fact, under these harsh and deprived conditions, the forced
20  presence of another person may become an additional stressor and source of tension (even
21  conflict) that exacerbates some of the negative reactions brought about by this kind of
22  segregated confinement. Indeed, in my experience, assaults (and sometime lethal
23  violence) between cellmates who are in isolated confinement is a serious problem in many
24  of these units. This is one tragic measure of the way in which double-celling can
25  exacerbate rather than ameliorate the worst aspects of isolated confinement.

26
27  _____

[39] Ex. V, Crews Dep. 127:3-12.
28  [40] See: http://www.azcorrections.gov/adc/PDF/count/10222012%20count%20sheet.pdf

24

47.    In addition, the documents that I reviewed indicated that the Arizona Department of Corrections (ADC)  has no written policy prohibiting prisoners suffering from what is traditionally referred to as serious mental illness (SMI) in what are traditionally referred to as solitary confinement or supermax-type units. Indeed, it is clear that such prisoners are currently housed in such units within ADC.[41] Moreover, contrary to sound correctional and clinical practice, there is apparently no written policy requiring that a face-to-face mental health evaluation be conducted before placing a prisoner in one of these units.[42]  It also seems apparent from the documents I reviewed that all prisoners who are confined in the ADC isolation units—including those who are identified as severely mentally ill—are subject to inadequate monitoring due to policy shortfalls and chronic mental health understaffing.[43] In addition, there is apparently no written ADC policy that provides for ADC mental health staff to take action when the mental health of a severely mentally ill—or any—prisoner deteriorates in isolation unless inpatient care is determined necessary.[44]

48.    It is further apparent that some of the seriously mentally ill prisoners in these units, including those who are on psychotropic medications, have been subjected to the use of chemical agents, a practice that is apparently permitted by ADC policy.[45]  In my professional opinion, this practice poses a substantial risk of harm. Mentally ill prisoners are prone to deterioration and decompensation under isolated conditions, as I have noted. Their worsening behavior, which often includes acting out and rule infractions, is

---

[41] Ex. FFFF, Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (dated 10/17/12), at p. 2-5; Ex. T, Shaw Dep. 135:21- 137:2; 168:5-7; Ex. MMM, MH Levels Statistical Summary, ADC027759-27768; Ex. NNN, Medical and Mental Health Score Inmate Distribution by Complex for FY 2011 at PLT PARSONS-013204.

[42] Ex. FFFF, Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (dated 10/17/12), at p. 6-7.

[43] Ex. T, Shaw Dep. 53:16-54:5; 86:16-88:5; 126:22-127:10; 139:4-143:17.

[44] Ex. T. Shaw Dep. 148:3-9.

[45] Ex.FFFF, Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (dated 10/17/12), at  23-25.  Ex. T, Shaw Dep. 130:20-131:10.

typically the product of their mental illness and the fact of their improper placement in isolation in the first place. Punishing them in these harsh and potentially dangerous ways for behavior that they cannot control, and that has been exacerbated by the decisions of corrections officials themselves, is singularly inappropriate and can exacerbate mental illness.

49.     I reviewed the declarations of several named plaintiffs who are now or have previously been confined in the ADC isolation units.  These plaintiffs describe symptoms of mental suffering, increased mental illness, suicidal thoughts and acts, and incidents of self-harm, including repeated acts of self-mutilation.[46]  The problems described by the plaintiffs are consistent with the types of symptoms and suffering that I would expect to find in a system with the isolation policies and practices I have noted in ADC.

50.     Finally, it should be noted that the placement of seriously mentally ill prisoners in isolated confinement is not only harmful to  them, but also increases the risks and harmfulness of isolated confinement for other prisoners as well. Out-of-control mentally ill prisoners whose conditions may worsen in isolated confinement may become assaultive to staff and other prisoners, may engage in loud and otherwise noxious behavior (e.g., smearing themselves in feces), and precipitate forceful interventions (e.g., the use of chemical agents) that adversely affect the well-being of everyone in the housing unit.

## VI.    Conclusion

51.     As I noted repeatedly above, there is a robust scientific literature that establishes the adverse psychological effects of solitary or isolated confinement and the severe risk of harm to which prisoners in these units are exposed.

52.     For a variety of previously stated reasons, mentally ill prisoners are especially vulnerable to the painful stressors of isolated confinement and the risk that they

---

[46] See Ex. R, Declaration of Joshua Polson, at ¶¶ 17-18; Ex. S, Declaration of Christina Verduzco, at ¶¶ 11-14; Ex. F, Declaration of Dustin Brislan, at ¶¶ 8, 11, 15-16; Ex. M, Declaration of Jackie Thomas, at . ¶¶ 6-8.

incur from placement in such units are especially high. Indeed, they are so high as to lead correctional officials and courts across the country to exclude them from being placed there. In my professional opinion all prisoners with a diagnosis of severe mental illness should be categorically excluded from isolation housing, because they face a substantial risk of serious harm in that setting.

53.    Based on the documents that I have reviewed, the descriptions of the policies, procedures, and conditions that exist in and apply to ADC's isolation units render these units very similar if not identical to the conditions where adverse effects were identified in the scientific literature I identified and the solitary or "supermax" units that exist elsewhere in the country and in which many of these adverse psychological effects have been observed.

54.    Contrary to sound correctional practice and the weight of psychological and psychiatric opinion, ADC currently houses seriously mentally ill prisoners in its isolation units. ADC's failure to have and implement policy that excludes these prisoners from these units places these prisoners at an unreasonable risk of harm.  In addition, as I have noted, conditions of extreme isolation can create enormous harm in even previously healthy individuals.  ADC's apparent failure to put in place careful mental health monitoring policies for all prisoners subject to the extremely isolated conditions in their maximum security/isolation units, places all prisoners subject to such conditions at an unreasonable risk of harm.  And these harms are extremely serious and sometimes irreversible, including loss of psychological stability, impaired mental functioning, self-mutilation, and even death.

55.    In my experience working with correctional systems and the federal courts to address these issues in different states across the country, the policies and practices that are now in place in the ADC system that are creating significant risks of harm for prisoners who are subjected to isolated confinement can be effectively addressed through system-wide relief that is ordered by the courts.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the __8th__ day of __November__ 2012 in Santa Cruz, CA.


_Craig Haney Ph.D, J.D._

Craig Haney, Ph.D, J.D.

28

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
     kflood@acluaz.org
     jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
     ahardy@prisonlaw.com
     snorman@prisonlaw.com
     ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@npp-aclu.org
           afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
           rjipke@perkinscoie.com
           jahlers@perkinscoie.com
           keidenbach@perkinscoie.com
           jhgray@perkinscoie.com
           tryerson@perkinscoie.com
           mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
           dkiernan@jonesday.com
           scalderon@jonesday.com
           srauh@jonesday.com

*Admitted *pro hac vice*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com
                ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
                jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT 1

CURRICULUM VITAE


Craig William Haney
Professor of Psychology
Department of Psychology
University of California, Santa Cruz 95064

home address:      317 Ocean View Ave.
                   Santa Cruz, California 95062
phone:             (831) 459-2153
fax:               (831) 425-3664
email:             psylaw@ucsc.edu

## PREVIOUS EMPLOYMENT

| | |
|---|---|
| 1985-present | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |


## EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |
| 1972 | Stanford University, M.A. (Psychology) |
| 1970 | University of Pennsylvania, B.A. |

HONORS AWARDS GRANTS

| | |
|---|---|
| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
| | Invited Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>). |
| | Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Lecturer, University of California, Santa Cruz. |
| | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |
| | Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley). |
| 2004 | "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz. |
| | National Science Foundation Grant to Study Capital Jury Decision-making |

2002    Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000    Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999    American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997    National Science Foundation Grant to Study Capital Jury Decision-making.

1996    Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995    Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994    Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992    Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

1991    Alumni Association Teaching Award ("Favorite Professor")

3

| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
|------|---------------------------------------------------------------|
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
|  | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

UNIVERSITY SERVICE AND ADMINISTRATION

| 2010-present | Director, Legal Studies Program |
|--------------|----------------------------------|
| 2010-present | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |

| 1990-1992 | Committee on Academic Personnel |
|---|---|
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

## WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Context and Criminality: Social History and Circumstance in Crime Causation (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

## PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

| 2006 | Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books. |
|---|---|
| 2005 | Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press. |

Monographs and Technical Reports

| 1989 | Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation. |
|---|---|

Articles in Professional Journals and Book Chapters

2012        "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" West Virginia Law Review, 114, 373-414.

"Prison Effects in the Age of Mass Imprisonment," Prison Journal, in press.

"The Pains of Imprisonment: Prisonization and the Psychological Consequences of Incarceration," in J. Petersilia & K. Reitz (Eds.), Oxford Handbook of Sentencing and Corrections (pp. 584-605). New York: Oxford University Press.

2011        "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," American Criminal Law Review, 48, 121-141. [Reprinted in: S. Ferguson (Ed.), Readings in Race, Gender, Sexuality, and Social Class. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), Law and Society Review, 45, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), Law and Human Behavior, 35, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.), Understanding the Disenfranchisement of Latino Males: Contemporary Perspectives on Cultural and Structural Factors (pp. 101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making on the Capital Jury" (with Mona Lynch), Michigan State Law Review, 2011, 573-608.

2010        "Demonizing the 'Enemy': The Role of Science in Declaring the 'War on Prisoners,'" Connecticut Public Interest Law Review, 9, 139-196.

"Hiding From the Death Penalty," Huffington Post, July 26, 2010 [www.huffingtonpost.com/craig-haney/hiding-from-the-death-pen-pen_b_659940.html]; reprinted in Sentencing and Justice Reform Advocate, 2, 3 (February, 2011).

6

2009    "Capital Jury Deliberation: Effects on Death Sentencing, Comprehension, and Discrimination" (with Mona Lynch), Law and Human Behavior, 33, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful," Prison Service Journal UK (Solitary Confinement Special Issue), Issue 181, 12-20. [Reprinted: California Prison Focus, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg (Eds.), Encyclopedia of Group Processes and Intergroup Relations. Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," DePaul Law Review, 58, 689-740. (Reprinted: Capital Litigation Update, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence," University of Missouri-Kansas City Law Review, 77, 911-946.

"Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse," (with P. Zimbardo), Personality and Social Psychology Bulletin, 35, 807-814.

2008    "Counting Casualties in the War on Prisoners," University of San Francisco Law Review, 43, 87-138.

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), <u>The Encyclopedia of Psychology and the Law</u> (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006       "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," <u>Washington University Journal of Law & Policy</u>, <u>22</u>, 265-293. [Reprinted in: N. Berlatsky, <u>Opposing Viewpoints: America's Prisons</u>. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," <u>Golden Gate Law Review</u>, <u>37</u>, 131-173.

"Preface," D. Jones (Ed.), <u>Humane Prisons</u>. San Francisco, CA: Radcliffe Medical Press.

2005       "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment</u> (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004       "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), Psychology, Public Policy, and Law, 10, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), Psychology, Public Policy, and Law, 10, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," DePaul Law Review, 53, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), Analyses of Social Issues and Public Policy (ASAP), 4, 1-22.

"Abu Ghraib and the American Prison System," The Commonwealth, 98 (#16), 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), Encyclopedia of U.S. Prisons and Correctional Facilities (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime & Delinquency (special issue on mental health and the criminal justice system), 49, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," Capital University Law Review, in press.

2002    "Making Law Modern: Toward a Contextual Model of Justice, Psychology, Public Policy, and Law, 7, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom

Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001   "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000   "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

1999   "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998   "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); in <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The</u> <u>American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional</u>

10

Contexts: Contemporary and Classical Readings. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," Hastings Women's Law Journal, 9, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), La Raza Law Journal, 10, 645-690.

1997        "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), New York University Review of Law and Social Change, 23, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," Psychology, Public Policy, and Law, 3, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" Psychology, Public Policy, and Law, 3, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," Stanford Law Review, 49, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), Law and Human Behavior, 21, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" Studies in Law, Politics, and Society, 16, 3-69.

1995        "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," Santa Clara Law Review, 35, 547-609. [Reprinted in part in David Papke (Ed.), Law and Popular Culture, Lexis/Nexis Publications, 2011)].

11

"Taking Capital Jurors Seriously," <u>Indiana Law Journal</u>, <u>70</u>, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," <u>California Criminal Defense Practice Reporter</u>, <u>1995(1)</u>, 1-7.

1994    "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), <u>Law and Human Behavior</u>, <u>18</u>, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), <u>Law and Human Behavior</u>, <u>18</u>, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), <u>Law and Human Behavior</u>, <u>18</u>, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo), <u>Journal of Social Issues</u> (special issue on the death penalty in the United States), <u>50</u>, 149-176. [Reprinted in Koosed, M. (Ed.), <u>Capital Punishment</u>. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), <u>Law and Human Behavior</u>, <u>18</u>, 619-633.

"Processing the Mad, Badly," <u>Contemporary Psychology</u>, <u>39</u>, 898-899.

"Language is Power," <u>Contemporary Psychology</u>, <u>39</u>, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," <u>National Prison Project Journal</u>, <u>8</u>, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u> (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), <u>Correctional Perspectives: Views from Academics, Practitioners,</u>

and Prisoners (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," Law and Human Behavior, 17, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

1992      "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). Forum, 19, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. Behavioral Science and Law, 10, 179-195.

1991      "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," Law and Human Behavior, 15, 183-204.

1988      "In Defense of the Jury," Contemporary Psychology, 33, 653-655.

1986      "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), Journal of Community Psychology, 14, 267-277.

1984      "Editor's Introduction.  Special Issue on Death Qualification," Law and Human Behavior, 8, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," Law and Human Behavior, 8, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," Law and Human Behavior, 8, 133-151.

"Evolving Standards and the Capital Jury," Law and Human Behavior, 8, 153-158.

"Postscript," Law and Human Behavior, 8, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman,

A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983    "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>.  Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.:  Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982    "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981    "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive</u> <u>Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980    "Juries and the Death Penalty:  Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," Law and Human Behavior, 6, 191-235. [Reprinted in Loh, Wallace (Ed.), Social Research and the Judicial Process. New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), The People's Law Review. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), Readings on the Social Animal. San Francisco, W.H. Freeman, pp. 125-136.

1979     "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), Challenges and Alternatives to the Criminal Justice System. Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), Social Psychology and Modern Life. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), Law and Society Review, 13, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), Criminal Law and Its Processes. Boston: Little, Brown, 1983.]

1977     "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard"  (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society:  Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976     "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975     "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings,"

15

Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978.]

1973         "Social Roles, Role-Playing, and Education" (with P. Zimbardo), The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), International Journal of Criminology and Penology, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) Examining Deviance Experimentally. New York: Alfred Publishing, 1975, Golden, P. (Ed.) The Research Experience. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. Justice and Corrections. New York: John Wiley, 1978; Research Methods in Education and Social Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern Sociology. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison. Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), Social Science in Law: Cases, Materials, and Problems. Foundation Press, 1985: Siuta, Jerzy (Ed.), The Context of Human Behavior. Jagiellonian

University Press, 2001; Ferguson, Susan (Ed.), <u>Mapping the Social Landscape: Readings in Sociology</u>. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), <u>Menschenversuche (Experiments with Humans)</u>. Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  <u>Naval Research Reviews</u>, <u>1</u>-<u>17</u>.  [Reprinted in Aronson, E. (Ed.) <u>Readings About the Social Animal</u>. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) <u>Key Studies in Psychology</u>. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), <u>Basic Themes in Law and Jurisprudence</u>. Anderson Publishing, 2000.]

## MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

## INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC MEETINGS AND RELATED SETTINGS (SELECTED)

2012    "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

2011    "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing

Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address, Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007        "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006        "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on

19

Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005        "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers, United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004        "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference,  After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

20

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address, American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003      "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

21

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002    "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001    "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000    "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999    "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998    "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997      "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996      "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995      "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994      "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992        "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991        "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990        "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989        "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

            "Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

            "The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

1987        "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August.

            "The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July.

1986        Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August.

            "Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985        "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983    "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982    "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982    "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982    "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980    "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

"On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

"Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975    "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2011-present     Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present     Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present     Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present     Editorial Board Member, <u>Journal of Offender Behavior and Rehabilitation</u>.

2004-present     Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003     Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

2000-present     Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues)

1997-present     Editorial Board Member, <u>Psychology, Public Policy, and Law</u>

1991     Editorial Consultant, Brooks/Cole Publishing

1989     Editorial Consultant, <u>Journal of Personality and Social Psychology</u>

1988-     Editorial Consultant, <u>American Psychologist</u>

1985     Editorial Consultant, <u>American Bar Foundation Research Journal</u>

1985-2006     <u>Law and Human Behavior</u>, Editorial Board Member

1985     Editorial Consultant, Columbia University Press

1985     Editorial Consultant, <u>Law and Social Inquiry</u>

1980-present   Reviewer, National Science Foundation

1997     Reviewer, National Institutes of Mental Health

1980-present   Editorial Consultant, <u>Law and Society Review</u>

1979-1985     Editorial Consultant, <u>Law and Human Behavior</u>

1997-present    Editorial Consultant, <u>Legal and Criminological Psychology</u>

1993-present    <u>Psychology, Public Policy, and Law</u>, Editorial Consultant


<u>GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING</u>

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County
  Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974,
  1980-1981 (effects of prison conditions, evaluation of proposed prison
  legislation).

Reviewer, National Science Foundation (Law and Social Science, Research
  Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail
  overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and
  guard  training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982
  (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case
  evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of
  proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes

and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCRIF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-present.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs

29

designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of aliens, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

## PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION

Hoptowit v. Ray  [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown  (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy  [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest  (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle  [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

Atascadero State Hospital  (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock  (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey  (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson  (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy  [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya  (United States District Court, 1987-1988).  Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989).  Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990).  Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening

procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 131 S.Ct. 1910 (2011).]

# EXHIBIT F

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
     kflood@acluaz.org
     jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **DECLARATION OF DUSTIN BRISLAN** |

1    1.    I, Dustin Brislan, am a named plaintiff in this case. I am a prisoner in the

2    custody of the Arizona Department of Corrections ("ADC") and my prisoner number is

3    164993. I am 30 years old. I am currently housed at Arizona State Prison Complex in the

4    Browning Unit, and have been housed at Eyman, SMU 1. I have been in and out of ADC

5    custody since December 31, 2001, and in Eyman most recently since September 2009.

6    2.    I agreed to be a named plaintiff in this case because I would like to represent

7    other prisoners who have had problems similar to what I have experienced while in

8    ADC's prisons. I want to help make an improvement in health care and conditions in

9    isolation for all prisoners. I have been cooperating fully with my counsel and am

10   responding to all requests for information to the best of my ability and recollection, and

11   will continue to do so in the future. My lawyers keep me updated on the progress of this

12   case, and I will review all materials provided to me and provide my input to the best of

13   my ability. When I have questions about the case I will ask the attorneys for help to

14   understand everything to the best of my ability.

15   3.

16

17

18

19

20

21   4.

22

23

24   5.

25

26

27

28

2

1

2

3

4

5          6.

6

7

8

9

10

11

12

13

14

15          7.

16

17

18

19

20

21

22          8.

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10      9.

11

12

13

14

15

16      10.

17

18

19

20

21

22

23      11.     In the SMU I am locked alone in my cell between 22 and 24 hours a day.
24      We are supposed to get 6 hours a week of exercise outside our cells, but exercise is often
25      canceled so we get less than that.  In some isolation units,  they keep the lights on 24

26

27

28

4

1  hours a day, which causes insomnia and makes it difficult to keep track of whether it is

2  day or night.  This is very disorienting.

3      12.   After this lawsuit was filed, I began to be frequently transferred to different

4  complexes and different units.  I have gone back and forth between Browning and SMU1

5  in Florence, and a unit at the Lewis Complex, where I was treated very badly. All the

6  moving around has been stressful,

7

8

9      13.

10

11

12

13

14

15      14.   In the SMU we are fed only twice a day, and sometimes food is missing

16  from our bag lunches.  I am not getting enough food to eat and have lost a lot of weight.  I

17  am 6 feet tall.  When I came into ADC in 2009 I weighed 180 pounds; now I weigh only

18  between 150-160 pounds.

19      15.   Because I have been in isolation for so long, my vision is blurry if I get to

20  go outside my cell.  I used to have 20/20 vision, but now if I am allowed outside my cell it

21  is difficult for my eyes to adjust.

22      16.

23

24

25

26

27

28

1    I, Dustin Brislan, declare under penalty of perjury that the foregoing is true and

2 correct and that this declaration was reviewed and signed on October 30, 2012 at

3 Florence, Arizona.

4

5                                      10-30-12

6                              Dustin Brislan

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:      dspecter@prisonlaw.com
            ahardy@prisonlaw.com
            snorman@prisonlaw.com
            ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:      dfathi@npp-aclu.org
            afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:      dbarr@perkinscoie.com
            rjipke@perkinscoie.com
            jahlers@perkinscoie.com
            keidenbach@perkinscoie.com
            jhgray@perkinscoie.com
            tryerson@perkinscoie.com
            mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

8

# EXHIBIT

# 1

1                          UNITED STATES DISTRICT COURT

2                                DISTRICT OF ARIZONA

3

4

5

6   Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina           (MEA)
7   Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
8   Hefner; Joshua Polson; and Charlotte Wells, on
    behalf of themselves and all others similarly
9   situated; and Arizona Center for Disability Law,

           Plaintiffs,

10
           v.
11
    Charles Ryan, Director, Arizona Department of
12  Corrections; and Richard Pratt, Interim Division
    Director, Division of Health Services, Arizona
13  Department of Corrections, in their official
    capacities,

           Defendants.

14

15

16      **This document is subject to a protective order issued by the Court (Dkt. 140)**
        **and shall not be copied or examined except in compliance with that order.**
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-NVW (MEA)

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# EXHIBIT

# 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-NVW (MEA)

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# EXHIBIT G

**Portions of this document are subject to the Protective Order**

1  Daniel Pochoda (Bar No. 021979)
   Kelly J. Flood (Bar No. 019772)
2  James Duff Lyall (Bar No. 330045)*
   **ACLU FOUNDATION OF ARIZONA**
3  3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
4  Telephone:  (602) 650-1854
   Email: dpochoda@acluaz.org
5          kflood@acluaz.org
           jlyall@acluaz.org
6
   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)
7
   *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
8  *Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
   *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
9  *Robert Gamez, Maryanne Chisholm, Desiree Licci,*
   *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
10 *behalf of themselves and all others similarly situated*

11 **[ADDITIONAL COUNSEL LISTED BELOW]**

12                UNITED STATES DISTRICT COURT

13                    DISTRICT OF ARIZONA

14

15 Victor Parsons; Shawn Jensen; Stephen Swartz;      No. CV 12-00601-PHX-NVW
   Dustin Brislan; Sonia Rodriguez; Christina         (MEA)
16 Verduzco; Jackie Thomas; Jeremy Smith; Robert
   Gamez; Maryanne Chisholm; Desiree Licci; Joseph
17 Hefner; Joshua Polson; and Charlotte Wells, on     **DECLARATION OF**
   behalf of themselves and all others similarly      **ROBERT GAMEZ**
18 situated; and Arizona Center for Disability Law,

19              Plaintiffs,

20        v.

21 Charles Ryan, Director, Arizona Department of
   Corrections; and Richard Pratt, Interim Division
22 Director, Division of Health Services, Arizona
   Department of Corrections, in their official
23 capacities,

24              Defendants.

25

26

27

28

1          1.       I, Robert C. Gamez, am a named plaintiff in this case.  I am a prisoner in the

2    custody of the Arizona Department of Corrections ("ADC") and my prisoner number is

3    131401.  I am 34 years old.  I am housed at Arizona State Prison Complex – Eyman,

4    Browning Unit (formerly known as SMU 2).  I have been in ADC custody since July 1,

5    2003.

6          2.       I agreed to be a named plaintiff in this case because I would like to represent

7    other prisoners who have had problems similar to what I have experienced while in

8    ADC's prisons.  I want to help make a change and improve health care and conditions in

9    isolation for all prisoners.   I have been cooperating fully with my lawyers and am

10   responding to all requests for information to the best of my ability and recollection, and

11   will continue to do that.  My lawyers keep me updated on the progress of this case, and I

12   will review all materials provided to me and provide my input to the best of my ability.

13   When I have questions about the case I will ask the attorneys to make sure I understand

14   everything to the best of my ability.

15          3.

16

17

18          4.

19

20

21

22

23          5.

24

25

26

27

28

1   6.

2

3

4

5

6

7

8   7.

9

10

11

12

13   8.

14

15

16

17

18

19

20   9.

21

22

23

24   10.

25

26

27

28

11.

12.

13.

14.

15.

16.

17.

18.

19.

20.

21.

22.

23.

24.

1     I, Robert Gamez, declare under penalty of perjury that the foregoing is true and

2 correct and that this declaration was completed and signed on October 30 , 2012 at

3 Florence, Arizona.

_____

Robert C. Gamez

1  **ADDITIONAL COUNSEL:**

2
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
3
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
4
**PRISON LAW OFFICE**
1917 Fifth Street
5
Berkeley, California 94710
Telephone: (510) 280-2621
6
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
7
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com
8
*Admitted *pro hac vice*
9
David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
10
**ACLU NATIONAL PRISON
PROJECT**
11
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
12
Telephone: (202) 548-6603
Email:    dfathi@npp-aclu.org
13
          afettig@npp-aclu.org
14
*Admitted *pro hac vice*.  Not admitted
in DC; practice limited to federal
15
courts.
**Admitted *pro hac vice*
16
Daniel C. Barr (Bar No. 010149)
17
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
18
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
19
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
20
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
21
Phoenix, Arizona 85012
Telephone: (602) 351-8000
22
Email:    dbarr@perkinscoie.com
          rjipke@perkinscoie.com
23
          jahlers@perkinscoie.com
          keidenbach@perkinscoie.com
24
          jhgray@perkinscoie.com
          tryerson@perkinscoie.com
25
          mdumee@perkinscoie.com

26

27

28

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

Exhibit 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

Exhibit 3

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF ARIZONA

3

4

5

6   Victor Parsons; Shawn Jensen; Stephen Swartz;
    Dustin Brislan; Sonia Rodriguez; Christina
7   Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
8   Hefner; Joshua Polson; and Charlotte Wells, on
    behalf of themselves and all others similarly
9   situated; and Arizona Center for Disability Law,

    Plaintiffs,
10
        v.
11
    Charles Ryan, Director, Arizona Department of
12  Corrections; and Richard Pratt, Interim Division
    Director, Division of Health Services, Arizona
13  Department of Corrections, in their official
    capacities,

    Defendants.

No. CV 12-00601-PHX-NVW
(MEA)

14

15

16   **This document is subject to a protective order issued by the Court (Dkt. 140)
17   and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

Exhibit 4

1          UNITED STATES DISTRICT COURT

2             DISTRICT OF ARIZONA

3

4

5

6   Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina              (MEA)
    Verduzco; Jackie Thomas; Jeremy Smith; Robert
7   Gamez; Maryanne Chisholm; Desiree Licci; Joseph
    Hefner; Joshua Polson; and Charlotte Wells, on
8   behalf of themselves and all others similarly
    situated; and Arizona Center for Disability Law,
9
              Plaintiffs,
10
         v.
11
    Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
12  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
13  capacities,

14            Defendants.

15

16   **This document is subject to a protective order issued by the Court (Dkt. 140)
17   and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

Exhibit 5

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

Exhibit 6

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

Exhibit 7

1

UNITED STATES DISTRICT COURT

2

DISTRICT OF ARIZONA

3

4

5

6

Victor Parsons; Shawn Jensen; Stephen Swartz;
Dustin Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith; Robert
Gamez; Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others similarly
situated; and Arizona Center for Disability Law,

No. CV 12-00601-PHX-NVW
(MEA)

7

8

9

Plaintiffs,

10

v.

11

12

13

Charles Ryan, Director, Arizona Department of
Corrections; and Richard Pratt, Interim Division
Director, Division of Health Services, Arizona
Department of Corrections, in their official
capacities,

Defendants.

14

15

16

17

**This document is subject to a protective order issued by the Court (Dkt. 140)
and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

Exhibit 8

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# EXHIBIT H

**Portions of this document are subject to the Protective Order**

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone:  (602) 650-1854
    Email: dpochoda@acluaz.org
5        kflood@acluaz.org
         jlyall@acluaz.org
6
    *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)
7
    *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
8   *Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
    *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
9   *Robert Gamez, Maryanne Chisholm, Desiree Licci,*
    *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
10  *behalf of themselves and all others similarly situated*

11  **[ADDITIONAL COUNSEL LISTED BELOW]**

12                    UNITED STATES DISTRICT COURT

13                         DISTRICT OF ARIZONA

14

15  Victor Parsons; Shawn Jensen; Stephen Swartz;      No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina         (MEA)
16  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
17  Hefner; Joshua Polson; and Charlotte Wells, on     **DECLARATION OF**
    behalf of themselves and all others similarly      **MARYANNE CHISHOLM**
18  situated; and Arizona Center for Disability Law,

19                   Plaintiffs,

20       v.

21  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
22  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
23  capacities,

24                   Defendants.

25

26

27

28

1.     I, Maryanne Chisholm, am a named plaintiff in the above-captioned matter. I am a prisoner in the custody of the Arizona Department of Corrections ("ADC") and my prisoner number is 200825.  I am 47 years old.

2.     I am currently housed at Arizona State Prison Complex - Perryville.  I have been in the custody of ADC and incarcerated at the Perryville prison since December 2005, with the exception of approximately two years from May 2006 to September 2008 during which time I was incarcerated in a federal jail operated by Corrections Corporation of America (CCA) facility in Florence, Arizona.

3.     I have experienced regular delays, interruptions, and other problems in receiving my medication in ADC custody.

4.

5.

1  6.

2

3

4

5  7.

6

7

8

9

10

11

12  8.

13

14

15

16

17

18

19  9.

20

21

22

23

24  10.

25

26

27  11.

28

1

2

3

4

5

6

7

8

9

10

11

12    12.    In February 2012, someone was burning cottonwood brush outside my

13   housing unit and the cells were full of smoke, making it very difficult to breathe; one

14   inmate collapsed and several had to receive medical treatment.

15    13.                                              I was sent to the medical unit and

16   told to sit in the hallway outside one of the examination rooms.  Through the door, I could

17   hear that Perryville Facility Health Administrator (FHA) Kenton and Deputy Warden

18   Coleman were inside.  I heard Deputy Warden Coleman yelling, "Fuck her and her illness,

19   what's wrong with her?  If she wants more attention, let's just put her on constant watch,

20   or send her where no one can find her."

21    14.    I was then sent to the Perryville's Intensive Patient Care (IPC).  None of the

22   other inmates who were receiving breathing treatments were sent to the IPC, and medical

23   staff in the IPC did not know why I was there.  I did not know how long I would be there,

24   and I felt afraid, anxious, and confused.  After a couple of days I was returned to my cell.

25    15.    Custodial harassment extends to the grievance process as well.

26

27                                                                  When I wanted to

28   pursue another grievance in August 2012, Officer Abbott warned me that if I did so, "they

3

1    would make [my] life hell." I have repeatedly been made to feel that I will be punished if
2    I ask for help.

3         16.    I have experienced similar delays and difficulties in accessing medical
4    attention.

6         17.

12        18.

20        19.

22        20.

25        21.

27        22.

4

23.

24.

25.

26.    My dental health needs are not the result of drug abuse.

27.    From observing and speaking with the women in this prison, I believe that ADC has a regular practice of pulling teeth that could be filled.

28.    As a plaintiff in this lawsuit, I have been cooperating fully with my counsel and am responding to all requests for information to the best of my ability and recollection, and will continue to do so in the future.  My attorneys keep me updated on the progress of this case, and I review all materials provided to me and provide my input to the best of my ability.  When I have questions about the case ask my attorneys for help to understand everything to the best of my ability.

29.    I agreed to be a named plaintiff in this case because I want to represent other prisoners with problems similar to what I have experienced while in ADC's prisons.  I want to help make improvements in health care for all ADC prisoners.

/ / /

/ / /

/ / /

/ / /

1

2      I, Maryanne Chisholm, declare under penalty of perjury that the foregoing is true

3   and correct and that this declaration was completed and signed on

4   *October 18th*, 2012 at *Goodyear*, Arizona.

5

6                                                    *Maryanne Chisholm*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
          afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          rjipke@perkinscoie.com
          jahlers@perkinscoie.com
          keidenbach@perkinscoie.com
          jhgray@perkinscoie.com
          tryerson@perkinscoie.com
          mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# Exhibit 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-NVW (MEA)

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# Exhibit 2

1

UNITED STATES DISTRICT COURT

2

DISTRICT OF ARIZONA

3

4

5

6   Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina              (MEA)
7   Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
8   Hefner; Joshua Polson; and Charlotte Wells, on
    behalf of themselves and all others similarly
9   situated; and Arizona Center for Disability Law,

    Plaintiffs,

10

        v.

11
    Charles Ryan, Director, Arizona Department of
12  Corrections; and Richard Pratt, Interim Division
    Director, Division of Health Services, Arizona
13  Department of Corrections, in their official
    capacities,

14          Defendants.

15

16      **This document is subject to a protective order issued by the Court (Dkt. 140)**
17      **and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# Exhibit 4

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# Exhibit 5

1                         UNITED STATES DISTRICT COURT

2                           DISTRICT OF ARIZONA

3

4

5

6    Victor Parsons; Shawn Jensen; Stephen Swartz;   No. CV 12-00601-PHX-NVW
     Dustin Brislan; Sonia Rodriguez; Christina      (MEA)

7    Verduzco; Jackie Thomas; Jeremy Smith; Robert
     Gamez; Maryanne Chisholm; Desiree Licci; Joseph

8    Hefner; Joshua Polson; and Charlotte Wells, on
     behalf of themselves and all others similarly

9    situated; and Arizona Center for Disability Law,

                    Plaintiffs,

10        v.

11   Charles Ryan, Director, Arizona Department of
     Corrections; and Richard Pratt, Interim Division

12   Director, Division of Health Services, Arizona
     Department of Corrections, in their official

13   capacities,

                   Defendants.

14

15

16     **This document is subject to a protective order issued by the Court (Dkt. 140)**

17      **and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 6

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# EXHIBIT I

**Portions of this document are subject to the Protective Order**

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone: (602) 650-1854
    Email: dpochoda@acluaz.org
5          kflood@acluaz.org
           jlyall@acluaz.org
6
7   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

8   *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
    Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
9   Christina Verduzco, Jackie Thomas, Jeremy Smith,
    Robert Gamez, Maryanne Chisholm, Desiree Licci,
10  Joseph Hefner, Joshua Polson, and Charlotte Wells, on
    behalf of themselves and all others similarly situated*

11  **[ADDITIONAL COUNSEL LISTED BELOW]**

12                  UNITED STATES DISTRICT COURT

13                        DISTRICT OF ARIZONA

14

15  | Victor Parsons; Shawn Jensen; Stephen Swartz; | No. CV 12-00601-PHX-NVW |
    | Dustin Brislan; Sonia Rodriguez; Christina | (MEA) |
16  | Verduzco; Jackie Thomas; Jeremy Smith; Robert | |
    | Gamez; Maryanne Chisholm; Desiree Licci; Joseph | |
17  | Hefner; Joshua Polson; and Charlotte Wells, on | **DECLARATION OF VICTOR** |
    | behalf of themselves and all others similarly | **PARSONS** |
18  | situated; and Arizona Center for Disability Law, | |
    | | |
19  | Plaintiffs, | |
    | | |
20  | v. | |
    | | |
21  | Charles Ryan, Director, Arizona Department of | |
    | Corrections; and Richard Pratt, Interim Division | |
22  | Director, Division of Health Services, Arizona | |
    | Department of Corrections, in their official | |
23  | capacities, | |
    | | |
24  | Defendants. | |

25

26

27

28

I, Victor Parsons, declare:

1.  I am an inmate at ASPC-Lewis.  My inmate number is 123589.  I make this declaration in support of Prisoner Plaintiffs' Motion for Class Certification and to provide evidence of my mistreatment within the ADC prison system.

2.  I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would competently testify to them.

3.  I agreed to be a named plaintiff in this case because I want to represent other prisoners who have had problems similar to what I have experienced while in ADC's prisons.  I want to help make an improvement in health care and conditions in isolation for all prisoners.  I have been cooperating fully with my counsel and am responding to all requests for information to the best of my ability and recollection, and will continue to do so in the future.  My attorneys keep me updated on the progress of this case, and I will review all materials provided to me and provide my input to the best of my ability.  When I have questions about the case, I will ask the attorneys for help to understand everything to the best of my ability.

4.  To the best of my knowledge, my dental health needs are not the result of drug abuse.

5.  I have had many experiences with ADC's dental care system.  For example,

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

1        16.

2

3        17.

4

5        18.

6        19.

7

8        20.

9

10

11

12

13       21.

14

15

16

17

18       22.

19

20

21

22       23.

23

24

25

26

27       24.

28

1    25.

2

3    26.

4

5

6

7

8    27.

9         I was experiencing anxiety and was having trouble sleeping.

10   28.

11

12

13

14

15

16   29.

17

18   30.

19

20

21

22   31.

23

24

25

26

27

28

1     32.

2

3

4     33.

5

6

7     34.

`8

9

10

11    35.

12

13

14    36.

15

16

17

18

19    37.

20

21

22

23

24    38.

25

26

27

28

1   39.

2

3

4

5   I declare, under penalty of perjury, that the foregoing is true and correct.

6   Executed on the _1_ day of _November_____ 2012 in Buckeye, Arizona.

7

8                                                Victor Parsons

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ADDITIONAL COUNSEL:

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:     dfathi@npp-aclu.org
           afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
  in DC; practice limited to federal
  courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:     dbarr@perkinscoie.com
           rjipke@perkinscoie.com
           jahlers@perkinscoie.com
           keidenbach@perkinscoie.com
           jhgray@perkinscoie.com
           tryerson@perkinscoie.com
           mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:     cnmitchell@jonesday.com
              dkiernan@jonesday.com
              scalderon@jonesday.com
              srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:     rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:     jlwilkes@jonesday.com
              ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:     kmamedova@jonesday.com
              jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT J

**Portions of this document are subject to the Protective Order**

1  Daniel Pochoda (Bar No. 021979)
   Kelly J. Flood (Bar No. 019772)
2  James Duff Lyall (Bar No. 330045)*
   **ACLU FOUNDATION OF ARIZONA**
3  3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
4  Telephone:  (602) 650-1854
   Email: dpochoda@acluaz.org
5          kflood@acluaz.org
           jlyall@acluaz.org
6
   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)
7
   *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
8  *Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
   *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
9  *Robert Gamez, Maryanne Chisholm, Desiree Licci,*
   *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
10 *behalf of themselves and all others similarly situated*

11 **[ADDITIONAL COUNSEL LISTED BELOW]**

12               UNITED STATES DISTRICT COURT

13                   DISTRICT OF ARIZONA

14 Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
   Dustin Brislan; Sonia Rodriguez; Christina           (MEA)
15 Verduzco; Jackie Thomas; Jeremy Smith; Robert
   Gamez; Maryanne Chisholm; Desiree Licci; Joseph
16 Hefner; Joshua Polson; and Charlotte Wells, on
   behalf of themselves and all others similarly        **DECLARATION OF SONIA**
17 situated; and Arizona Center for Disability Law,     **RODRIGUEZ**

18                      Plaintiffs,

19          v.

20 Charles Ryan, Director, Arizona Department of
   Corrections; and Richard Pratt, Interim Division
21 Director, Division of Health Services, Arizona
   Department of Corrections, in their official
22 capacities,

23                      Defendants.

24

25

26

27

28

78204-0001/LEGAL25014187.2

1      1.     I, Sonia Rodriguez, am a named plaintiff in the above-captioned matter.  I

2    am a prisoner in the custody of the Arizona Department of Corrections ("ADC") and my

3    prisoner number is 103830.  I am housed at Arizona State Prison Complex ("ASPC") –

4    Perryville, Lumley Unit.  I have been in Arizona state prison since June 2009.

5      2.     I agreed to be a named plaintiff in this case because I would like to help

6    improve conditions for all prisoners who have had problems like those I have experienced

7    while in ADC's prisons.  I want to help make an improvement in mental health care and

8    conditions in isolation for myself and other prisoners.  I cooperate with my attorneys and

9    am responding to all requests for information to the best of my ability and memory, and

10    will do so in the future.  My attorneys keep me updated on the progress of this case, and I

11    review all materials provided to me and provide my input to the best of my ability.  When

12    I have questions about the case I ask the attorneys for help to understand everything.

13      3.

14

15

16

17      4.

18

19

20

21

22      5.

23

24

25

26      6.

27

28

1
2
3
4
5
6
7.
8
9
10
11
12
8.
14
15
16
17
18
19
20
21
22
9.
24
25
26
27
28

1          10.

2

3

4

5

6

7          11.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26          12.

27

28

1

2

3

4          13.

5

6

7

8

9

10         14.

11

12

13

14

15

16         I, Sonia Rodriguez, declare under penalty of perjury that the foregoing is true and

17  correct and that this declaration was completed and signed on *NOVEMBER, 3*,

18  2012 in *GOODYEAR*, Arizona.

19

20                                                *Sonia Rodriguez*

21         Sonia Rodriquez

22

23

24

25

26

27

28

1

**ADDITIONAL COUNSEL:**

2

3

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
             ahardy@prisonlaw.com
             snorman@prisonlaw.com
             ckendrick@prisonlaw.com

4

5

6

7

8

*Admitted *pro hac vice*

9

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
             afettig@npp-aclu.org

10

11

12

13

14

*Admitted *pro hac vice*.  Not admitted
   in DC; practice limited to federal
   courts.
**Admitted *pro hac vice*

15

16

17

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
             rjipke@perkinscoie.com
             jahlers@perkinscoie.com
             keidenbach@perkinscoie.com
             jhgray@perkinscoie.com
             tryerson@perkinscoie.com
             mdumee@perkinscoie.com

18

19

20

21

22

23

24

25

26

27

28

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com
         dkiernan@jonesday.com
         scalderon@jonesday.com
         srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:   rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com
         ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:   kmamedova@jonesday.com
         jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT

# 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# EXHIBIT

# 2

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF ARIZONA

3

4

5

6    Victor Parsons; Shawn Jensen; Stephen Swartz;      No. CV 12-00601-PHX-NVW
     Dustin Brislan; Sonia Rodriguez; Christina           (MEA)
     Verduzco; Jackie Thomas; Jeremy Smith; Robert
7    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
     Hefner; Joshua Polson; and Charlotte Wells, on
8    behalf of themselves and all others similarly
     situated; and Arizona Center for Disability Law,
9
                    Plaintiffs,
10
          v.
11
     Charles Ryan, Director, Arizona Department of
     Corrections; and Richard Pratt, Interim Division
12   Director, Division of Health Services, Arizona
     Department of Corrections, in their official
13   capacities,
                    Defendants.
14

15

16      **This document is subject to a protective order issued by the Court (Dkt. 140)
17        and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT K

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: dpochoda@acluaz.org
         kflood@acluaz.org
         jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | No. CV 12-00601-PHX-NVW (MEA)<br><br><br>**DECLARATION OF JEREMY SMITH** |

1      I, Jeremy Smith, declare:

2      1.    I am a named plaintiff in this case. I am a prisoner in the custody of the

3 Arizona Department of Corrections ("ADC"). My prisoner number is 129438. I am 33

4 years old.

5      2.    I am housed at Arizona State Prison Complex – Lewis, Buckley Unit. My

6 incarceration began in March 2008

7      3.    I agreed to be a named plaintiff in this case because I want to help prevent

8 ADC from continuing to ignore the needs of people with mental health needs. I want to

9 make a difference for others by improving mental health care for all prisoners who need it.

10     4.    My lawyers keep me updated on the progress of this case, and I will review

11 all materials provided to me and provide my input to the best of my ability. When I have

12 questions about the case my attorneys are available to help me understand everything to

13 the best of my ability. I have been cooperating fully with my counsel and am responding

14 to all requests for information to the best of my ability and recollection, and will continue

15 to do so in the future.

16     5.

17

18

19

20

21     6.

22

23

24

25

26

27     7.

28

1

2

3

4          8.

5

6

7          9.

8

9

10         10.

11

12

13

14

15         11.

16

17

18

19         12.

20

21         13.

22

23         14.

24

25

26         15.

27

28

16.     My understanding of the reason that I have been in isolation is because of

I was told by COIV Pinney that I would have to do the remainder of my sentence in SMU even though I have had no major disciplinary issues that would prevent me from being reclassified.

17.

When I asked for help in writing the HNR, I was told by corrections officers and nurses that they were prohibited from helping me by ADC policy.

18.     On February 21, 2012, I had a legal visit about this lawsuit shortly after the death of an inmate.  After I got back to my cell, one of the correctional officers told me that I was never going to get out of SMU because I was working with attorneys.

1       I, Jeremy Smith, declare under penalty of perjury that the foregoing is true and

2   correct and that this declaration was completed and signed on November ___7___ , 2012 in

3   Lewis Complex , Arizona.

4

5                                    *Jeremy Smith*

6                                      Jeremy Smith

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:  dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:  dfathi@npp-aclu.org
         afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:  dbarr@perkinscoie.com
         rjipke@perkinscoie.com
         jahlers@perkinscoie.com
         keidenbach@perkinscoie.com
         jhgray@perkinscoie.com
         tryerson@perkinscoie.com
         mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com
         dkiernan@jonesday.com
         scalderon@jonesday.com
         srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:   rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com
         ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:   kmamedova@jonesday.com
         jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT L

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **DECLARATION OF STEPHEN SWARTZ** |

I, Stephen Swartz, declare:

1.     I am a named plaintiff in the above-captioned matter.  I am a prisoner in the custody of the Arizona Department of Corrections ("ADC") and my prisoner number is 102486.  I am housed at Arizona State Prison Complex - Lewis.  I have been in prison since November 2009.

2.     I have personal knowledge of the facts contained in this declaration and, if called as a witness, could and would competently testify to them.

3.     I agreed to be a named plaintiff in this case because I would like to represent other prisoners who have had problems similar to what I have experienced while in ADC's prisons.  I want to help make an improvement in health care and conditions in isolation for all prisoners.  I have been cooperating fully with my counsel and am responding to all requests for information to the best of my ability and recollection, and will continue to do so in the future.  My attorneys keep me updated on the progress of this case, and I will review all materials provided to me and provide my input to the best of my ability.  When I have questions about the case, I will ask the attorneys for help to understand everything to the best of my ability.

4.     On February 26, 2010, I was attacked by several other prisoners, who beat me so severely

5.

78204-0001/LEGAL24879530.2

6.

7.

8.

9.

10.

11.

12.

13.

14.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the _1ST_ day of _November_ 2012 in _BuckEye_ , Arizona.

Stephen Swartz

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@npp-aclu.org
          afettig@npp-aclu.org

*Admitted *pro hac vice*. Not admitted
in DC; practice limited to federal
courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:    dbarr@perkinscoie.com
          rjipke@perkinscoie.com
          jahlers@perkinscoie.com
          keidenbach@perkinscoie.com
          jhgray@perkinscoie.com
          tryerson@perkinscoie.com
          mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:   rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:   kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*