# EXHIBIT M

**Portions of this document are subject to the Protective Order**

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone: (602) 650-1854
    Email: dpochoda@acluaz.org
5         kflood@acluaz.org
          jlyall@acluaz.org
6
    *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)
7
    *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
8   *Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
    *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
9   *Robert Gamez, Maryanne Chisholm, Desiree Licci,*
    *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
10  *behalf of themselves and all others similarly situated*

11  **[ADDITIONAL COUNSEL LISTED BELOW]**

12                  UNITED STATES DISTRICT COURT

13                      DISTRICT OF ARIZONA

14

15  Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina             (MEA)
16  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
17  Hefner; Joshua Polson; and Charlotte Wells, on         **DECLARATION OF JACKIE**
    behalf of themselves and all others similarly          **THOMAS**
18  situated; and Arizona Center for Disability Law,

19                      Plaintiffs,

20          v.

21  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
22  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
23  capacities,

24                      Defendants.

25

26

27

28

1.     Jackie Thomas, am a named plaintiff in this case.  I am a prisoner in the custody of the Arizona Department of Corrections ("ADC") and my prisoner number is 211267.  I am 28 years old.  I am housed at Arizona State Prison Complex – Eyman, SMU 1.  I have been in ADC custody since November 8, 2006.

2.     I agreed to be a named plaintiff in this case because I would like to represent other prisoners who have had problems similar to what I have experienced while in ADC's prisons.  I want to help make an improvement in health care and conditions in isolation for all prisoners.  I have been cooperating fully with my counsel and am responding to all requests for information to the best of my ability and recollection, and will continue to do so in the future.  My lawyers keep me updated on the progress of this case, and I will review all materials provided to me and provide my input to the best of my ability.  When I have questions about the case I will ask the attorneys for help to understand everything to the best of my ability.

3.

4.

5.

1

2

3      6.      I have been back and forth between SMU 1 or SMU 2 continuously since

4    December 31, 2007.  In SMU 1, I am locked alone in my cell for at least 22 hours a day.

5    Here I am isolated, I get no meaningful contact or exercise, and access to things like

6    showers are allowed only once per week.  I sometimes have to miss my once-weekly

7    shower, though, if the unit is on lockdown.  So, sometimes I don't get my once-a-week

8    shower for two weeks.

9      7.

10

11

12

13

14

15

16      8.

17

18

19

20      9.

21

22      10.

23

24

25

26

27      11.      In SMU 1 we receive only two meals per day.  I have lost about 30 pounds

28    since I have been in SMU 1.  I am 5 foot 8, and weigh less than 150 pounds.

1    I, Jackie Thomas, declare under penalty of perjury that the foregoing is true and

2    correct and that this declaration was completed and signed on October 16th, 2012 at

3    Florence, Arizona.

4

5    *Jackie Roberts-Thomas, Jr.*

6            Jackie Thomas

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
          afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          rjipke@perkinscoie.com
          jahlers@perkinscoie.com
          keidenbach@perkinscoie.com
          jhgray@perkinscoie.com
          tryerson@perkinscoie.com
          mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT N

**Portions of this document are
subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **DECLARATION OF DESIREE LICCI** |

1        1.     I, Desiree Licci, am a named plaintiff in the above-captioned matter.  I am a prisoner in the custody of the Arizona Department of Corrections ("ADC") and my prisoner number is 150051.  I am currently housed at Arizona State Prison Complex - Perryville.

2.     I am 46 years old and have been incarcerated at the Perryville prison since August 2009.  During that time, ADC has failed to respond to my medical condition in a timely manner, and has downplayed and ignored my repeated requests for help.

3.

4.

5.

6.

7.

8.

1        9.

2

3

4        10.

5

6

7

8        11.

9

10

11

12

13       12.

14

15

16       13.

17

18

19

20       14.

21

22

23

24       15.

25

26       16.

27

28

1

2

3          17.

4

5

6

7

8

9          18.

10

11

12

13          19.

14

15

16

17

18

19

20          20.

21

22          21.

23

24

25          22.

26

27

28

1

23.

2

3

4

24.

5

6

7

8

9

10

11

12

13

14

15

16

25.

17

18

19

20

26.

21

22

23

24

25

27.

26

27

28.

28

29.

30.     I feel that it is wrong for ADC to discourage me from seeking medical attention

31.     After this lawsuit was filed, I was subjected to weekly cell searches for about six weeks, more than I had previously experienced in three prior years in ADC custody.  No explanation was given as to why staff suddenly was searching my cell so often.

32.     As a plaintiff in this lawsuit, I have been cooperating fully with my attorneys and am responding to all requests for information to the best of my ability and recollection, and will do so in the future.  My attorneys give me updates on all major developments in this case, and I review all materials provided to me and provide my input to the best of my ability.  I work with my attorney to understand what is happening in this case to the best of my ability.  I agreed to be a named plaintiff in this case because I want to represent other prisoners with problems similar to what I have experienced while in ADC's prisons.  I want to help make improvements in health care for all ADC prisoners.

1

2

        I, Desiree Licci, declare under penalty of perjury that the foregoing is true and

3

correct and that this declaration was completed and signed on _October 18th_,

4

2012 at _Goodyear_, Arizona.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    **ADDITIONAL COUNSEL:**

2
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
3
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
4
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
5
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
6
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
7
          ckendrick@prisonlaw.com

8    *Admitted *pro hac vice*

9
David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
10
**ACLU NATIONAL PRISON
PROJECT**
11
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
12
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
13
          afettig@npp-aclu.org

14
*Admitted *pro hac vice*.  Not admitted
in DC; practice limited to federal
15
courts.
**Admitted *pro hac vice*

16
Daniel C. Barr (Bar No. 010149)
17
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
18
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
19
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
20
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
21
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
22
Email:    dbarr@perkinscoie.com
          rjipke@perkinscoie.com
23
          jahlers@perkinscoie.com
          keidenbach@perkinscoie.com
24
          jhgray@perkinscoie.com
          tryerson@perkinscoie.com
25
          mdumee@perkinscoie.com

26

27

28

7

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com
         dkiernan@jonesday.com
         scalderon@jonesday.com
         srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:   rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com
         ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:   kmamedova@jonesday.com
         jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# Exhibit 1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3

4

5

6   Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina           (MEA)
7   Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
8   Hefner; Joshua Polson; and Charlotte Wells, on
    behalf of themselves and all others similarly
9   situated; and Arizona Center for Disability Law,

10                              Plaintiffs,

          v.

11  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
12  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
13  capacities,

                                Defendants.

14

15

16      **This document is subject to a protective order issued by the Court (Dkt. 140)
        and shall not be copied or examined except in compliance with that order.**

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 2

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# Exhibit 3

1     UNITED STATES DISTRICT COURT

2      DISTRICT OF ARIZONA

3

4

5

6

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |

      Plaintiffs,

   v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

      Defendants.

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# Exhibit 4

1           UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3

4

5

6  Victor Parsons; Shawn Jensen; Stephen Swartz;   No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina       (MEA)

7  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph

8  Hefner; Joshua Polson; and Charlotte Wells, on
    behalf of themselves and all others similarly

9  situated; and Arizona Center for Disability Law,
                      Plaintiffs,

10

11        v.

    Charles Ryan, Director, Arizona Department of

12  Corrections; and Richard Pratt, Interim Division
    Director, Division of Health Services, Arizona

13  Department of Corrections, in their official
    capacities,

14                   Defendants.

15

16     **This document is subject to a protective order issued by the Court (Dkt. 140)**

17      **and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz;
Dustin Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith; Robert
Gamez; Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others similarly
situated; and Arizona Center for Disability Law,

                Plaintiffs,

    v.

Charles Ryan, Director, Arizona Department of
Corrections; and Richard Pratt, Interim Division
Director, Division of Health Services, Arizona
Department of Corrections, in their official
capacities,

                Defendants.

No. CV 12-00601-PHX-NVW
(MEA)

**This document is subject to a protective order issued by the Court (Dkt. 140)
and shall not be copied or examined except in compliance with that order.**

# Exhibit 6

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF ARIZONA

3

4

5
     Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
6    Dustin Brislan; Sonia Rodriguez; Christina               (MEA)
     Verduzco; Jackie Thomas; Jeremy Smith; Robert
7    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
     Hefner; Joshua Polson; and Charlotte Wells, on
8    behalf of themselves and all others similarly
     situated; and Arizona Center for Disability Law,
9
                        Plaintiffs,
10
            v.
11
     Charles Ryan, Director, Arizona Department of
12   Corrections; and Richard Pratt, Interim Division
     Director, Division of Health Services, Arizona
13   Department of Corrections, in their official
     capacities,
14                      Defendants.

15

16      **This document is subject to a protective order issued by the Court (Dkt. 140)**
        **and shall not be copied or examined except in compliance with that order.**
17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 7

1                       UNITED STATES DISTRICT COURT

2                          DISTRICT OF ARIZONA

3

4

5

6 Victor Parsons; Shawn Jensen; Stephen Swartz;     No. CV 12-00601-PHX-NVW
Dustin Brislan; Sonia Rodriguez; Christina         (MEA)

7 Verduzco; Jackie Thomas; Jeremy Smith; Robert
Gamez; Maryanne Chisholm; Desiree Licci; Joseph

8 Hefner; Joshua Polson; and Charlotte Wells, on
behalf of themselves and all others similarly

9 situated; and Arizona Center for Disability Law,

                  Plaintiffs,

10       v.

11 Charles Ryan, Director, Arizona Department of
Corrections; and Richard Pratt, Interim Division

12 Director, Division of Health Services, Arizona
Department of Corrections, in their official

13 capacities,

                  Defendants.

14

15

16     **This document is subject to a protective order issued by the Court (Dkt. 140)**

17     **and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 8

1                      UNITED STATES DISTRICT COURT

2                        DISTRICT OF ARIZONA

|  |  |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
|                Plaintiffs, |  |
|     v. |  |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, |  |
|               Defendants. |  |

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# Exhibit 9

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

                Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

                Defendants.

No. CV 12-00601-PHX-NVW (MEA)

**This document is subject to a protective order issued by the Court (Dkt. 140) and shall not be copied or examined except in compliance with that order.**

# EXHIBIT O

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
         kflood@acluaz.org
         jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) **DECLARATION OF SHAWN JENSEN** |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

1    I, Shawn Jensen, declare:

2        1.    I am an inmate at ASPC-Manzanita.  My inmate number is 32465.  I make

3    this declaration in support of Prisoner Plaintiffs' Motion for Class Certification and to

4    provide evidence of my mistreatment within the ADC prison system.

5        2.    I agreed to be a named plaintiff in this case because I want to help make an

6    improvement in health care for all prisoners by representing other prisoners who have had

7    problems similar to what I have experienced while in ADC's prisons.  I have not yet filed

8    a grievance because I have wanted to avoid retaliation from ADC staff.  Now, however, I

9    hope that this suit can help other prisoners in the future.  I have cooperated fully with my

10   counsel and I have responded to all requests for information to the best of my ability and

11   recollection.  I will continue to cooperate and be forthcoming in the future by reviewing

12   materials provided to me and by providing my input to the best of my ability.  When I

13   have questions about the case, I will ask my counsel for help so I can understand and

14   participate to the best of my ability.

15       3.    I have personal knowledge of the facts contained in this declaration and, if

16   called as a witness, could and would competently testify to them.

17       4.    I have been a prisoner in the ADC system since 1973 and I have had several

18   experiences with healthcare in the ADC system.

19

20

21

22

23       5.

24

25

26

27

28

1
2
3      6.
4
5
6
7
8      7.
9
10
11     8.
12
13
14
15
16
17
18     9.
19
20
21     10.
22
23
24
25     11.
26
27
28

1

2

3          12.

4          13.

5

6

7

8

9          14.

10

11

12

13

14

15          15.

16

17

18

19

20

21

22

23

24

25          16.

26

27

28

1          17.

2

3

4

5

6

7          18.

8

9

10

11

12

13          19.

14

15          20.

16

17

18

19

20

21

22          21.

23

24

25

26

27

28

22.

23.

24.

25.

26.

27.

28.

29.

1    30.

2

3

4    31.

5

6

7    32.

8

9    33.

10

11

12

13

14    34.

15

16

17    35.

18

19    36.

20

21

22

23    37.

24

25

26

27    38.

28

1    39.

2

3    40.

4

5

6    41.

7

8

9

10

11    42.

12

13

14    43.

15

16    44.

17

18

19

20    45.

21

22

23

24

25

26    46.    In early March, 2012, prisoners at ASPC-Tucson were told to report to the

27    offices of their CO III (Correctional Officer III) to pick up several medical forms, and to

28

1    complete them and return them to their CO III.  I have been in ADC custody since 1973

2    and I had never seen such forms or ever been asked to sign them.

3         47.    The first form was two pages long and entitled "Living Will (End of Life

4    Care)" and was dated January 31, 2012, and assigned form number 1101-98.  A true and

5    correct copy of the form prisoners were given is attached as Exhibit 1 to this declaration.

6         48.    Prisoners were also given a three-page form entitled "Durable Health Care

7    Power of Attorney," which was dated January 31, 2012, and assigned form number 1101-

8    97.  A true and correct copy of the form is attached as Exhibit 2 to this declaration.

9         49.    The third form distributed was entitled "Pre-Hospital Medical Care

10   Directive (Do Not Resuscitate)" and was dated January 31, 2012, and assigned form

11   number 1101-83.  This form states that "In the event of cardiac or respiratory arrest, I

12   refuse any resuscitation measures including cardiac compression, endotracheal intubation

13   and  other  advanced  airway  management,  artificial  ventilation,  defibrillation,

14   administration of advanced cardiac life support drugs and related emergency medical

15   procedures."   A true and correct copy of the form is attached as Exhibit 3 to this

16   declaration.

17        50.    I was concerned when I read these forms, especially the Do Not Resuscitate

18   form 1101-83, because prisoners were not told why we needed to complete them.

19   Multiple prisoners who cannot read or write well brought the forms to me and asked me to

20   read and explain them.  Prisoners who are illiterate said they were told by ADC staff to

21   sign the forms, but did not know what they were signing.  Prisoners who are monolingual

22   Spanish speakers were given the form and no assistance with translation.  There was a lot

23   of confusion about why we were supposed to fill out these forms, and health care staff

24   were not made available to answer questions about the forms.   Only CO IIIs were

25   speaking with inmates about this, and many were told it was mandatory.

26        51.    Prisoners were told that these forms could be revoked or modified, but we

27   were not given a form or other document we could use to change the three forms.

28

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the ___6th___ day of ___November___ 2012 in Tucson, Arizona.

Shawn Jensen

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@npp-aclu.org
         afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
         rjipke@perkinscoie.com
         jahlers@perkinscoie.com
         keidenbach@perkinscoie.com
         jhgray@perkinscoie.com
         tryerson@perkinscoie.com
         mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT

# 1

PLTF-PARSONS-013624

 **ARIZONA DEPARTMENT OF CORRECTIONS**

**Living Will (End of Life Care)**

---

**GENERAL INSTRUCTIONS:** Use this Living Will form to make decisions now about your medical care if you are ever in a terminal condition, a persistent vegetative state or an irreversible coma. You can ask your health provider about what these terms mean. The Living Will states what choices you would have made for yourself if you were able to communicate. It is your written directions to your health care representative if you have one, your family, and others you trust about your choices. You may talk to your family members, friends and others you trust about your choices.

If you decide this is the form you want to use, complete the form. **Do not sign the Living Will until** a witness is present to watch you sign it. These are further instructions for you about signing on page 2.

**1.   Information about me:** (I am called the "Principal")

| My Name *(Last, First M.I.)* | | My Age | My Social Security Number |
|---|---|---|---|
| My ADC Number | | My Date of Birth | |

---

**2.   My decisions about End of Life Care:**

**NOTE:** Here are some general statements about choices you have as to health care you want at the end of your life. They are listed in the order provided by Arizona Law. You can initial any combination of paragraphs A, B, C, and D.  **If you initial Paragraph E, do not initial any other paragraphs.**    Read all of the statements carefully before initialing to indicate your choice.  You can also write your own statement concerning life-sustaining treatments and other matters relating to your health care at Section 2 of this form.

_____  **A.  Comfort Care Only:**   If I have a terminal condition I do not want my life to be prolonged, and I do not want life-sustaining treatment, beyond comfort care, that would serve only to artificially delay the moment of my death.  (NOTE: "Comfort Care" means treatment in an attempt to protect and enhance the quality of life without artificially prolonging life.)

_____  **B.  Specific Limitations on Medical Treatments I want:**  (NOTE: Initial or mark or if more choices, talk to your doctor about your choices.)  If I have a terminal condition, or am in an irreversible coma or a persistent vegetative state that my doctors reasonably believe to be irreversible or incurable, I do want the medical treatment necessary to provide care that would keep me comfortable, but I **do not want the following:**

 _____  1. Cardiopulmonary resuscitation, for example, the use of drugs, electric shock, and artificial breathing.

 _____  2. Artificially administered food and fluids.

 _____  3. To be taken to a hospital if it is at all avoidable.

_____  **C.  Pregnancy:** Regardless of any other directions I have given in this Living Will, if I am known to be pregnant I do not want life-sustaining treatment withheld or withdrawn if it is possible that the embryo/fetus will develop to the point of live birth with the continued application of life-sustaining treatment.

_____  **D.  Treatment Until My Medical Condition is Reasonably Known:**   Regardless of the directions I have made in this Living Will, I  want the use of all medical care necessary to treat my condition until my doctors reasonably conclude that my condition is terminal or is irreversible and incurable, or I am in a persistent vegetative state.

_____  **E.  Direction to Prolong My Life:**  I want my life to be prolonged to the greatest extent possible.

PLTF-PARSONS-013625

**Living Will (End of Life Care) - Continued**

**3. Other statements or wishes I want followed For End of Life Care:**

**If you initial Paragraph E, do not initial any other paragraphs.** Read all of the statements carefully before initialing to indicate your choice.

_____ A. I have attached additional special provisions or limitations about End of Life Care I want.

_____ B. I have NOT attached additional special provisions or limitations about End of Life Care I want.

_____ C. Other _____

_____ I am signing this Living Will as follows:  Inmate Signature _____ Date _____

---

**SIGNATURE OF WITNESS** (Person observing Inmate signing)

**NOTE:**  At least one adult witness must witness you signing this document and then sign it.  The witness CANNOT be: (a) an Inmate; (b) under the age of 18; (c) Related to you by blood, adoption, or marriage; (d) entitled to any part of your estate; (e) appointed as your representative; or (f) involved in providing your health care at the time this document is signed.

**A.  Witness:** I certify that I witnessed the signing of this document by the Principal.  I confirm the following:

► I am not currently designated to make medical decisions for this person.

► I am not directly involved in administering health care to this person.

► I am not entitled to any portion of this person's estate upon his or her death under a will or by operation of law.

► I am not related to this person by blood, marriage, or adoption.

| Name *(Person observing inmate signing) (Please print)* | | |
|---|---|---|
| Address | State | Zip Code |
| Signature *(Person observing inmate signing)* | Date | |

Distribution: Original - Master Records File
Copy - Medical Records File
Copy - Institution File
Copy - Inmate

1101-98
1/31/12

# EXHIBIT 2

PLTF-PARSONS-013626

 **ARIZONA DEPARTMENT OF CORRECTIONS**

**Durable Health Care Power of Attorney**

**GENERAL INSTRUCTIONS:** Use this Durable Health Care Power of Attorney form if you want to select a person to make future health care decisions for you so that if you become too ill or cannot make those decisions for yourself the person you choose and trust can make medical decisions for you. You may talk to your family, friends, and others you trust about your choices.

Be sure you understand the importance of this document. If you decide this is the form you want to use, complete the form.

**Do not sign this form without a witness.**

**1.  Information about me:** *(I am called the "Principal")*

| Inmate Name *(Last, First M.I.)* | My Age |
|---|---|
| My ADC Number | My Date of Birth |

**2.  Selection of my Health care representative and alternate:** *(Also called an "agent or "surrogate") (Cannot be another inmate)*

I choose the following person to act as an alternate representative to make health care decisions for me:

| Name *(Last, First M.I.)* | | Home Phone Number | |
|---|---|---|---|
| Street Address | | Work Phone Number | |
| City | State | Zip Code | Cell Phone Number |

I choose the following person to act as an alternate representative to make the care decisions for me if my first representative is unavailable, unwilling, or unable to make decisions for me:

| Name *(Last, First M.I.)* | | Home Phone Number | |
|---|---|---|---|
| Street Address | | Work Phone Number | |
| City | State | Zip Code | Cell Phone Number |

**3.  What I AUTHORIZE if I am unable to make medical care decisions for myself if my first representative is unavailable, unwilling, or unable to make decisions for me:**

I authorize my health care representative to make health care decisions for me when I cannot make or communicate my own health care decisions due to mental or physical illness, injury, disability, or incapacity. I want my representative to make all such decisions for me except those decisions that I have expressly stated in Part 4 below that I do not authorize him/her to make. If I am able to communicate in any manner, my representative should explain to me any choices he or she made if I am able to understand. This appointment is effective unless and until it is revoked by me or by an order of a court.

The types of health care decisions I authorize to be made on my behalf include but are not limited to the following:

To consent to or refuse medical care, including diagnostic, surgical or therapeutic procedures.

To authorize the physicians, nurses, therapists and other health care providers of his/her choice to provide care for me, and to obligate my resources or my estate to pay reasonable compensation for these services.

1101-97
1/31/12

PLTF-PARSONS-013627

## Durable Health Care Power of Attorney - Continued

**4.   DECISIONS I EXPRESSLY DO NOT AUTHORIZE my Representative to make for me:**

I do not want my representative to make the following health care decisions for me *(describe or write in "not applicable")*:

_____

_____

_____

**5.   Funeral and Burial Disposition:** *(Optional Directive)*

My agent has authority to carry out all matters relating to my funeral and burial disposition wishes in accordance with this power of attorney, which is effective upon my death.  My wishes are reflected below:

**Initial or put a check mark by those choices you wish to select.**

_____ Upon my death, I direct my body to be buried.

_____ Upon my death, I direct my body to be buried in _____

_____. *(Optional Directive)*

_____ I understand that in the event that there is no agent authorized to handle any funeral and burial disposition, ADC will take responsibility for funeral and burial disposition but cannot by law cremate an inmate's remains.

_____ Upon my death, I direct my body to be cremated.

_____ Upon my death, I direct my body to be  cremated with my ashes to be _____

_____. *(Optional Directive)*

_____ My agent will make all funeral and burial disposition decisions. *(Optional Directive)*

**6.   About a Living Will:**

_____ A. I have SIGNED AND ATTACHED a completed Living Will in addition to this Durable Health Care Power of Attorney to state decisions I have made about end of life health care if I am unable to communicate or make my own decisions at that time.

_____ B. I have NOT SIGNED a Living Will.

**7.   About a Prehospital Medical Care Directive or Do Not Resuscitate Directive.**

_____ A.  I HAVE SIGNED a Prehospital Medical Care Directive or Do Not Resuscitate Directive on paper with ORANGE background in the event that 911 or Emergency Medical Technicians or hospital emergency personnel are called and my heart or breathing has stopped.

_____ B. I have NOT SIGNED a Prehospital Medical Care Directive or Do Not Resuscitate Directive.

### HIPAA WAIVER OF CONFIDENTIALITY FOR MY AGENT/REPRESENTATIVE

_____ **(Initial)** I intend for my agent to be treated as I would be with respect to my rights regarding the use and disclosure of my individually identifiable health information or other medical records.  This release authority applies to any information governed by the Health Insurance Portability and Accountability Act of 1996 (aka HIPAA) 42 USC 1320d and 45 CFR 160-164.

1101-97
1/31/12

PLTF-PARSONS-013628

**Durable Health Care Power of Attorney - Continued**

### SIGNATURE OF VERIFICATION

_____ A. I am signing this Durable Health Care Power of Attorney:

| My Signature | Date |
|---|---|
|  |  |

### SIGNATURE OF WITNESS *(Person observing inmate signing)*

**NOTE:** At least one adult witness must witness the signing of this document and then sign it. The witness CANNOT be: (a) an Inmate; (b) under the age of 18; (c) related to you by blood, adoption, or marriage; (d) entitled to any part of your estate; (e) appointed as your representative; or (f) involved in providing your health care at the time this form is signed.

**A. Witness:** I Certify that I witnessed the signing of this document by the Principal. I understand the requirements of being a witness and I confirm the following:

► I am not currently designated to make medical decisions for this person.

► I am not directly involved in administering health care to this person.

► I am not entitled to any portion of this person's estate upon his or her death under a will or by operation of law.

► I am not related to this person by blood, marriage or adoption.

| Name *(Person observing inmate signing) (Please print)* | | |
|---|---|---|
| Address | State | Zip Code |
| Signature *(Person observing inmate signing)* | Date | |

**Distribution:** Original - Master Records File
Copy - Medical Records File
Copy - Institutional File
Copy - Inmate

1101-97
1/31/12

# EXHIBIT

# 3

PLTF-PARSONS-013629

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Pre-Hospital Medical Care Directive (DO NOT RESUSCITATE)**
**(IMPORTANT-This Document Must Be On Paper With ORANGE Background)**

---

**GENERAL INFORMATION AND INSTRUCTIONS:** A Pre-Hospital Medical Care directive is a document signed by you and your doctor that informs emergency medical technicians (EMT's) or hospital emergency personnel not to resuscitate you. This is called a DNR - Do Not Resuscitate. If you have this form, EMT's and other emergency personnel will not use equipment, drugs or devices to restart your heart or breathing, but they will not withold medical interventions that are necessary to provide comfort care or to alleviate pain. IMPORTANT: **Under Arizona law a Pre-hospital Medical Care Directive or DNR must be on letter sized paper or wallet sized paper on an ORANGE background to be Valid.**

**You can either attach a picture to this form, or complete the personal Information. You must also complete the form and sign it in front of a witness. Your health care provider and your witness must sign this form.**

---

**My Directive and My Signature**

In the event of cardiac or respiratory arrest, I refuse any resuscitation measures including cardiac compression, endotracheal intubation and other advanced airway management, artificial ventilation, defibrillation, administration of advanced cardiac life support drugs and related emergency medical procedures.

*Patient (Signature or Mark):* _____   Date: _____

---

***PROVIDE THE FOLLOWING INFORMATION: OR***

| Inmate Name *(Last, First M.I.)* | | ADC Number | |
|---|---|---|---|
| Date of Birth | Sex | Race | |
| Eye Color | | Hair Color | |

*ATTACH RECENT PHOTOGRAPH HERE* [a]

PHOTO

| Name of Health Care Provider *(Last, First M.I. )* | Signature of Health care Provider | Date |
|---|---|---|

---

I was present when this was signed (or marked).

| Name *(Last, First M.I.) (Person observing inmate signature)* | Date |
|---|---|

---

Distribution:   Original - Master Records File
                Copy - Medical Records File
                Copy - Institutional File
                Copy - Inmate

TOMAS  Solano-LUQUE
235260

1101-83
1/31/12

Page 1 of 1

# EXHIBIT P

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | **DECLARATION OF JOSEPH HEFNER** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

1    I, Joseph Hefner, declare:

2    1.    I am a named plaintiff in the above-captioned matter.  I am a prisoner in the

3    custody of the Arizona Department of Corrections ("ADC") and my prisoner number is

4    203653.   I make this declaration in support of Prisoner Plaintiffs' Motion for Class

5    Certification and to provide evidence of my mistreatment within the ADC prison system.

6    2.    I have personal knowledge of the facts contained in this declaration and, if

7    called as a witness, could and would competently testify to them.

8    3.    I currently am housed at Arizona State Prison Complex (ASPC) – Lewis.

9    4.    I am a named plaintiff in this case because I want to be an advocate for other

10   prisoners who had problems with medical care.  I help my attorneys and answer all

11   information requests to the best of my ability and recollection.  I will do so in the future.  I

12   am willing to testify and answer all questions honestly.  My attorneys send me regular

13   updates on this case, and I read everything sent to me, and give my input on it.  I ask my

14   attorneys for more information when I have questions about the case.

15   5.

16

17

18

19

20

21   6.

22

23

24

25

26   7.

27

28

8.

9.

10.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the ___1___ day of ~~October~~ November, 2012 in _Buckeye_ , Arizona.

Joseph Hefner

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@npp-aclu.org
          afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:    dbarr@perkinscoie.com
          rjipke@perkinscoie.com
          jahlers@perkinscoie.com
          keidenbach@perkinscoie.com
          jhgray@perkinscoie.com
          tryerson@perkinscoie.com
          mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT Q

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: dpochoda@acluaz.org
      kflood@acluaz.org
      jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>               Plaintiffs,<br><br>    v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>               Defendants. | No. CV 12-00601-PHX-NVW (MEA)<br><br>**DECLARATION OF CHARLOTTE WELLS** |

1.     I, Charlotte Wells, am a named plaintiff in the above-captioned matter. I am a prisoner in the custody of the Arizona Department of Corrections ("ADC") and my prisoner number is 247188. I am currently housed at Arizona State Prison Complex (ASPC) - Perryville. I make this declaration in support of Plaintiffs' Motion for Class Certification.

2.     I am 55 years old and have been incarcerated at the Perryville prison since October 2009.

3.

4.

5.

6.

7.

8.

9.

10.

11.

12.

13.

14.

15.

16.

17.

18.

1    19.

2

3    20.

4

5    21.    As a named plaintiff in this lawsuit, I have been working with my counsel,

6    reviewing materials provided to me, and responding to requests for information to the best

7    of my recollection and ability.  I will continue to do so in the future.  My attorneys are

8    keeping me updated on the progress of this case, and when I have questions about the

9    case, I ask my attorneys.

10    22.    I agreed to be a named plaintiff in this case because I want to represent other

11    prisoners with problems similar to what I have experienced while in ADC's prisons.  I

12    want to help make improvements in health care and conditions in isolation for all ADC

13    prisoners.

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

I, Charlotte Wells, declare under penalty of perjury that the foregoing is true and correct and that this declaration was completed and signed on _Oct 18_____, 2012 at _Goodyear_____, Arizona.

_C Wells_____

1    **ADDITIONAL COUNSEL:**

2

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
3    Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
4    1917 Fifth Street
Berkeley, California 94710
5    Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
6                ahardy@prisonlaw.com
snorman@prisonlaw.com
7                ckendrick@prisonlaw.com

8            *Admitted *pro hac vice*

9

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
10    **ACLU NATIONAL PRISON
PROJECT**
11    915 15th Street N.W., 7th Floor
Washington, D.C. 20005
12    Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
13                afettig@npp-aclu.org

14            *Admitted *pro hac vice*.  Not admitted
in DC; practice limited to federal
15             courts.
**Admitted *pro hac vice*
16

Daniel C. Barr (Bar No. 010149)
17    Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
18    Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
19    Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
20    **PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
21    Phoenix, Arizona 85012
Telephone:  (602) 351-8000
22    Email:    dbarr@perkinscoie.com
rjipke@perkinscoie.com
23                jahlers@perkinscoie.com
keidenbach@perkinscoie.com
24                jhgray@perkinscoie.com
tryerson@perkinscoie.com
25                mdumee@perkinscoie.com

26

27

28

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT R

**Portions of this document are subject to the Protective Order**

1  Daniel Pochoda (Bar No. 021979)
   Kelly J. Flood (Bar No. 019772)
2  James Duff Lyall (Bar No. 330045)*
   **ACLU FOUNDATION OF ARIZONA**
3  3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
4  Telephone: (602) 650-1854
   Email: dpochoda@acluaz.org
5           kflood@acluaz.org
            jlyall@acluaz.org
6
   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)
7
   *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
8  *Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
   *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
9  *Robert Gamez, Maryanne Chisholm, Desiree Licci,*
   *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
10 *behalf of themselves and all others similarly situated*

11 **[ADDITIONAL COUNSEL LISTED BELOW]**

12                 UNITED STATES DISTRICT COURT

13                      DISTRICT OF ARIZONA

14
   Victor Parsons; Shawn Jensen; Stephen Swartz;       No. CV 12-00601-PHX-NVW
15 Dustin Brislan; Sonia Rodriguez; Christina          (MEA)
   Verduzco; Jackie Thomas; Jeremy Smith; Robert
16 Gamez; Maryanne Chisholm; Desiree Licci; Joseph
   Hefner; Joshua Polson; and Charlotte Wells, on      **DECLARATION OF JOSHUA**
17 behalf of themselves and all others similarly       **POLSON**
   situated; and Arizona Center for Disability Law,
18
                       Plaintiffs,
19
         v.
20
   Charles Ryan, Director, Arizona Department of
21 Corrections; and Richard Pratt, Interim Division
   Director, Division of Health Services, Arizona
22 Department of Corrections, in their official
   capacities,
23
                       Defendants.
24

25

26

27

28

1       I, Joshua W. Polson, declare:

2       1.    I am an inmate in the custody of the Arizona Department of Corrections.

3   My inmate number is 187716. I make this declaration in support of Prisoner Plaintiffs'

4   Motion for Class Certification and to provide evidence of my mistreatment within the

5   ADC prison system.

6       2.    I have personal knowledge of the facts contained in this declaration and, if

7   called as a witness, could and would competently testify to them.

8       3.    I currently am housed at Arizona State Prison Complex (ASPC) – Lewis

9   Rast Unit, but I was housed in ASPC-Eyman's Special Management Unit (SMU)

10   beginning in February 2009, and was only moved to Lewis in April 2012 after this case

11   was filed. I have been threatened with being sent back to isolation in the SMU.

12       4.    I am a named plaintiff in this case because I want to speak on behalf of other

13   prisoners who had problems like mine when I was housed in isolation, and who have not

14   received adequate mental health or medical care. I don't want my experiences to be in

15   vain. I help my attorneys, and answer all information requests to the best of my ability

16   and recollection, and will do so in the future. I am willing to testify and answer all

17   questions honestly. My attorneys send me regular updates on the progress of this case,

18   and I read everything sent to me, and give my input on it. When I have questions about the

19   case I ask my attorneys for more information.

20

21

22       5.

23

24

25

26       6.

27

28

1       7.

2

3

4       8.

5

6

7       9.

8

9       10.

10

11

12      11.

13

14      12.

15

16      13.

17

18      14.

19

20

21

22

23

24      15.

25

26

27

28

1       16.

2

3

4       17.

5

6

7

8

9

10

11      18.

12

13

14

15

16

17

18

19      19.

20

21

22

23

24

25

26      20.

27

28

21.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on the ___1___ day of ___NOV___ 2012 in Buckeye, Arizona.

Joshua Polson

**ADDITIONAL COUNSEL:**

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@npp-aclu.org
         afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
         rjipke@perkinscoie.com
         jahlers@perkinscoie.com
         keidenbach@perkinscoie.com
         jhgray@perkinscoie.com
         tryerson@perkinscoie.com
         mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone: (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT S

**Portions of this document are subject to the Protective Order**

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | **DECLARATION OF CHRISTINA VERDUZCO** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

1.      I, Christina Verduzco, am a named plaintiff in the above-captioned matter. I am a prisoner in the custody of the Arizona Department of Corrections ("ADC") and my prisoner number is 205576. I am currently housed at Arizona State Prison Complex (ASPC) - Perryville.

2.      I am 27 years old and have been incarcerated at Perryville since May 2006. The majority of that time I have been housed in the Special Management Area (SMA) in Perryville's Lumley Unit.

3.

4.

5.

6.

7.

8.

9.

1

2

3

4

5

6

7

8          10.

9

10

11          11.

12

13

14          12.

15

16

17          13.

18

19

20

21          14.

22

23          15.

24

25

26

27          16.

28

1    17.    As a plaintiff in this lawsuit, I have been working with my attorneys to

2  review materials provided to me, and respond to requests for information to the best of my

3  memory and ability.  I will continue to do so in the future.

4    18.    My attorneys are keeping me updated on the progress of this case.  When I

5  have questions about the case, I ask my attorneys.

6    19.    I agreed to be a named plaintiff in this case because I want to represent other

7  prisoners with problems similar to what I have experienced while in ADC's prisons.  I

8  want to help make improvements in mental health care and conditions in isolation for all

9  ADC prisoners.

10    //

11    //

12    //

13    //

14    //

15    //

16    //

17    //

18    //

19    //

20    //

21    //

22    //

23    //

24    //

25    //

26    //

27    //

28    //

3

1

2      I, Christina Verduzco, declare under penalty of perjury that the foregoing is true

3 and correct and that this declaration was completed and signed on

4   _OCTOBER 18th_____, 2012 at ___GOODYEAR____, Arizona.

5

6                                        _Christina A Verduzco_

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**ADDITIONAL COUNSEL:**

2

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
3

Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
4

1917 Fifth Street
Berkeley, California 94710
5

Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
6

           ahardy@prisonlaw.com
           snorman@prisonlaw.com
7

           ckendrick@prisonlaw.com

8

*Admitted *pro hac vice*

9

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
10

**ACLU NATIONAL PRISON
PROJECT**
11

915 15th Street N.W., 7th Floor
Washington, D.C. 20005
12

Telephone:  (202) 548-6603
Email:     dfathi@npp-aclu.org
13

           afettig@npp-aclu.org

14

*Admitted *pro hac vice*.  Not admitted
in DC; practice limited to federal
15

courts.
**Admitted *pro hac vice*
16

17

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
18

Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
19

Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
20

**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
21

Phoenix, Arizona 85012
Telephone:  (602) 351-8000
22

Email:     dbarr@perkinscoie.com
           rjipke@perkinscoie.com
23

           jahlers@perkinscoie.com
           keidenbach@perkinscoie.com
24

           jhgray@perkinscoie.com
           tryerson@perkinscoie.com
25

           mdumee@perkinscoie.com

26

27

28

5

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:      cnmitchell@jonesday.com
            dkiernan@jonesday.com
            scalderon@jonesday.com
            srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:      jlwilkes@jonesday.com
            ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:      kmamedova@jonesday.com
            jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

6

# EXHIBIT T

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;　)
Stephen Swartz; Dustin Brislan;)
Sonia Rodriguez; Christina　　　)
Verduzco; Jackie Thomas; Jeremy)
Smith; Robert Gamez; Maryanne　)
Chisholm; Desiree Licci; Joseph)
Hefner; Joshua Polson; and　　　)
Charlotte Wells, on behalf of　)
themselves and all others　　　 )
similarly situated; and Arizona)
Center for Disability Law,　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Plaintiffs,　　　　)
　　　　　　　　　　　　　　　　　　　) NO.:
v.　　　　　　　　　　　　　　　　　) CV 12-00601-PHX-NVW(MEA)
　　　　　　　　　　　　　　　　　　　)
Charles Ryan, Director, Arizona)
Department of Corrections; and )
Richard Pratt, Interim Division)
Director, Division of Health　　)
Services, Arizona Department of)
Corrections, in their official )
capacities,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　Defendants.　　　　)
　　　　　　　　　　　　　　　　　　　)

30(b)(6) DEPOSITION OF BEN L. SHAW, Ph.D.

Phoenix, Arizona
October 3, 2012
9:08 a.m.

Prepared by:
Kate E. Roundy, RPR
Arizona Certified
Reporter Number 50582

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 46

1      A.    No.

2      Q.    This is the one and only memo you have written

3  regarding Wexford's performance in mental health?

4      A.    That's right.

5      Q.    Have you written any other documents -- and I'm

6  including e-mails -- regarding Wexford's performance in

7  providing mental healthcare?

8      A.    Any written documents that relate to the general

9  provision of medication renewals and delivery.

10      Q.    By Wexford?

11      A.    By Wexford.

12      Q.    And describe those documents for me.

13      A.    Those documents are a compilation of findings

14  from our pharmacy program monitor as well as our medical

15  staff in terms of the general level of medication renewals

16  by Wexford offer the past 90 days.

17      Q.    And did those documents reveal any deficiencies

18  in Wexford's performance?

19      A.    The initial documents it revealed some

20  significant deficits in their renewal services.

21          Recent documents continue to show some deficits,

22  but again, a very significant improvement in that area.

23          MR. FATHI:   Okay.   Kathy, we would request those

24  documents as well.

25  BY MR. FATHI:

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 49

```
1       A.   No, I have not.

2       Q.   Did you have any role in drafting the letter?

3       A.   No, I did not.

4            (Exhibit 21 was marked for identification.)

5   BY MR. FATHI:

6       Q.   Doctor, showing you Exhibit 21, which is a

7   seven-page letter to Karen Mullenix at Wexford Health

8   Services from Joe Profiri, a seven-page letter with a

9   number of attachments dated September 21st.

10           Have you seen this document before?

11      A.   No, I have not.

12      Q.   Would you look, please, at the second page of the

13  letter.

14           The first paragraph under heading No. 2, it says,

15  "ADC learned that a significant number of inmates may not

16  have been receiving their medications as prescribed due to

17  expired prescriptions and inappropriate renewals or

18  refills."

19           Do you see that language?

20      A.   Actually, I don't.  That is on page 2?

21      Q.   Page 2, it's in the first paragraph under heading

22  No. 2.

23      A.   Okay.  Yes, I do see it now.

24      Q.   All right.  Do you know anything about the

25  situation referenced here?
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 50

```
 1      A.    Yes, I do know something about that situation.
 2      Q.    Did the medications that were not received
 3 include psychotropic medications?
 4      A.    Yes, they did.
 5      Q.    And when it says "a significant number of
 6 inmates," how many prisoners are we talking about here?
 7            MS. WIENEKE:   Foundation.
 8            THE WITNESS:   Are you asking overall or
 9 psychotropic medications?
10 BY MR. FATHI:
11      Q.    I think I'm asking both.
12      A.    Okay.  My rough estimate was that the number of
13 psychotropic medications was in the area of 1500.
14 Overall, again, a very rough estimate, would have been
15 5,000.
16      Q.    And for how long did these prisoners not receive
17 their medications?
18            MS. WIENEKE:   Foundation.
19            THE WITNESS:   I believe that would have
20 depended -- it would have gone anywhere from a few days to
21 up to a month.
22 BY MR. FATHI:
23      Q.    Okay.  Does not receiving medications as
24 prescribed create a risk to patient health or safety?
25            MS. WIENEKE:   Objection; form and foundation.
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 51

1           THE WITNESS:  Yes, it does.

2   BY MR. FATHI:

3       Q.   I'm sorry.  Your answer?

4       A.   Yes, it does.

5       Q.   What did ADC do in response to this situation?

6       A.   ADC dispatched many of our monitors to review

7   medication renewals.  The pharmacy monitor and myself had

8   requested some special reports from the pharmacy that

9   services Wexford.  Utilizing those reports, both ADC and

10  Wexford staff reviewed the names of inmates who had

11  apparently had expired medications and those were renewed

12  in a process of identifying and renewing.

13      Q.   And how long did that process take?

14      A.   After the initial identification, about

15  two weeks.

16      Q.   So is it your testimony that all the prisoners

17  who are identified as not receiving their medications

18  subsequently did receive their medications?

19      A.   Can I say all, no.  I think -- I think the vast

20  majority did.  I don't know of any exceptions, but I would

21  be reticent to say yes, every one of them.

22      Q.   Okay.  Please look at the next page of the

23  letter, and I'm going to ask you about the first paragraph

24  on page 3.

25           That paragraph refers to a prisoner in

Page 53

```
 1        A.    I believe this prisoner is currently at the
 2   Phoenix Mental Health Program Unit.
 3        Q.    And why is he no longer at the Central Unit?
 4        A.    Following the hanging attempt, he was moved there
 5   for a higher level of observation treatment.
 6        Q.    Do you believe that Wexford provided an
 7   acceptable level of patient care in this case?
 8              MS. WIENEKE:  Form and foundation.
 9              THE WITNESS:  No.
10   BY MR. FATHI:
11        Q.    Do you believe -- do you agree with the statement
12   in the last sentence of that paragraph that, "Failing to
13   deliver psychotropic medication as prescribed is a
14   significant noncompliance issue"?
15        A.    Yes, I do.
16        Q.    Please turn now to page 6 of the attachments.
17   It's after the letter itself.
18              Do you have it, Doctor?
19        A.    Yes.
20        Q.    And in the upper left-hand corner, the box
21   labeled Kasson, the second box titled issues, there is a
22   reference to, "Psych inmates not being seen at regular
23   intervals."
24              Do you see that?
25        A.    Yes, I do.
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 54

 1      Q.    Is it correct that psych inmates are not being

 2    seen at regular intervals?

 3              MS. WIENEKE:  Foundation.

 4              You can answer.

 5              THE WITNESS:  Yes.

 6    BY MR. FATHI:

 7      Q.    Other than what we have discussed, are you aware

 8    of any other deficiencies with the provision of mental

 9    healthcare that ADC has brought to Wexford's attention?

10      A.    No.

11      Q.    Other than what we discussed, are you aware of

12    any other deficiencies with Wexford's provision of mental

13    healthcare that ADC is planning to bring to Wexford's

14    attention?

15      A.    No.

16      Q.    Let's go back to the newspaper article.  I

17    believe that is Exhibit 20.

18              On page 2 it refers to a letter from Wexford to

19    Director Ryan.

20              Do you see that reference?  It's in the fourth

21    paragraph.

22      A.    Yes, I do.

23      Q.    Have you seen that letter?

24      A.    No, I have not.

25      Q.    Other than what we discussed, have you heard any

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 60

1    BY MR. FATHI:

2        Q.    I'm sorry, Doctor.  Could I have you read the

3    Bates numbers on those two numbers?  I don't have them on

4    mine.

5        A.    One is ADC015761.  The second is ADC015762.

6        Q.    Thank you.

7              This is Exhibit 22 as identified by you by the

8    Bates numbers.  It is pages 838 and 839 of the Wexford

9    contract labeled "Staffing Roll-up Total for ADC

10   Contract."

11             Do you see that, Doctor?

12       A.    Yes, I do.

13       Q.    Have you seen this document before?

14       A.    Yes, I have.

15       Q.    My understanding is that this is the staffing

16   that Wexford is supposed to provide under the contract;

17   correct?

18       A.    This is the staffing they proposed under the

19   contract that was accepted, yes.

20       Q.    Okay.  I would like you to go through each of the

21   mental health positions here and ask you for each, how

22   many of the positions are actually filled as of today.

23   Okay?

24       A.    I'm sure I won't be able to tell you accurately.

25       Q.    Well, we're going to try.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 61

1      A.   Okay.

2      Q.   Let's start with clinical coordinator.  There is

3   supposed to be one FTE.

4           Is that position currently filled?

5      A.   Yes.

6      Q.   And who is that individual?

7      A.   That would be Dr. Jason Newell at Phoenix.

8      Q.   And that is filled on a full-time basis?

9      A.   Yes, it is.

10     Q.   And is he permanent or locum tenens?

11     A.   Okay.  Let me take that back.

12          No, that is not filled.

13     Q.   I'm sorry.  It's not filled at all?

14     A.   No, not to my knowledge.

15     Q.   Okay.  Next is clinical director.

16     A.   Clinical director is Dr. Jason Newell.

17     Q.   And he is full-time?

18     A.   He is full-time.

19     Q.   And is he a Wexford employee or locum tenens?

20     A.   He's a Wexford employee.

21     Q.   Okay.  Just so the record is clear, to your

22   knowledge, clinical coordinator is not filled?

23     A.   To my knowledge, clinical coordinator is not

24   filled.

25     Q.   Okay.  Let's move on to discharge psychologist,

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 62

```
1    three FTE.
2              How many of those are currently filled?
3    A.    To my knowledge, one.
4    Q.    And is that a permanent or a locum tenens?
5    A.    That is a Wexford employee.
6    Q.    Thank you.
7              Let's move down to MH physician.
8              First of all, what is that position?
9    A.    I assume that's a psychiatrist, but I don't know
10   what they're specifying there.
11   Q.    Okay.  Do you know if that position is full?
12   A.    I do not know.
13   Q.    Okay.  Next is MH therapist.
14             First, can you describe what that position is?
15   A.    That would be a mental health therapist, and
16   that's a person who has master's level and some additional
17   training in delivery of mental healthcare.
18   Q.    Okay.  And there is supposed to be two FTE.
19             How many of those are currently filled?
20   A.    To my knowledge, one.
21   Q.    Permanent or locum tenens?
22   A.    Permanent, if I'm correct.
23   Q.    Okay.  Occupational therapist, one FTE, is that
24   currently filled?
25   A.    No.
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 63

1          MS. WIENEKE:  Foundation.

2          THE WITNESS:  I'm sorry.  No.

3     BY MR. FATHI:

4          Q.    Psych associate, three FTE, how many of those are

5     currently filled?

6          A.    Well, if you notice, we have psych associate and

7     then down three from the bottom we have another psych

8     associate position.  So it's really hard for me to know

9     how to address that.

10         Q.    Okay.  Let's total them all up.

11               There is psych associate three FTE, and next line

12    is psych associate e-v-e, which I assume is evening?

13         A.    Yeah.

14         Q.    That is one, and that makes four.

15         A.    And then above that you have psych associate, 19.

16         Q.    No.  I'm sorry, I'm -- I count a total of 33 FTE

17    psych associates.

18               Is that what you count?

19         A.    19, yes.

20         Q.    Okay.  33 total FTE; correct?

21         A.    33 total.

22         Q.    Of those 33 FTE, how many of them are currently

23    filled?

24         A.    Can I estimate this?

25         Q.    Please.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 64

```
 1       A.   I would estimate 20.
 2       Q.   Okay.  Psych NP/PA, I assume that means nurse
 3   practitioner, physician's assistant; is that correct?
 4       A.   Yes.
 5       Q.   Two FTE, how many of those are currently filled?
 6       A.   As Wexford employees, I don't believe any of
 7   those are filled.
 8       Q.   Are they filled with locum tenens?
 9       A.   I don't know.
10       Q.   Next three are psych nurse positions, a total of
11   35.
12            Would you agree with me that those add up to 35?
13       A.   Yes.
14       Q.   Of the 35 FTE psych nurse positions, how many are
15   currently filled?
16       A.   I would estimate 22.
17       Q.   Next is psych nursing coordinator, 2 FTEs.
18            How many of those are currently filled?
19       A.   Those are both filled.
20       Q.   Permanent or locum tenens?
21       A.   Permanent.
22       Q.   Next is psych supervisor psychiatrist, five FTEs.
23            How many of those are currently filled?
24       A.   As Wexford employees, to my knowledge, none.
25       Q.   None?
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 65

1    A.    Wait.  I take that back.  One.

2    Q.    One out of the five?

3    A.    One.

4    Q.    One out of the five, and your answer is?

5    A.    My answer is one out of five is a Wexford

6  employee.

7    Q.    Okay.  Thank you.

8          Are the other four filled with locum tenens?

9    A.    I don't know.

10   Q.    Who would know the answer to that?

11   A.    The mental health supervisors for Wexford would

12  have the most accurate data.

13   Q.    Who in ADC would know the answer to that?

14   A.    I don't know.  The unit monitors for the specific

15  unit would know the answer to that.

16   Q.    Psych tech, the next four lines is a total of 33

17  FTE.

18         Do you agree with me, it's 33?

19   A.    Yes.

20   Q.    And of those 33 FTE, how many are currently

21  filled?

22   A.    I would estimate between 15 and 20.

23   Q.    Next is psychiatrist, three FTE.

24         How many of those are currently filled?

25   A.    To my knowledge, .5.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 66

1     Q.   Next, psychologist, if we add the two lines, 30

2  FTE; is that correct?

3     A.   Yes.

4     Q.   How many of those 30 FTE are currently filled?

5     A.   Again, an estimate, between 20 and 25.

6     Q.   Okay.  Let's move on to the next page, recreation

7  therapist, two FTE.

8          How many of those are currently filled?

9     A.   Those are both open.

10    Q.   So the answer is?

11    A.   None.

12    Q.   Neither are filled?

13    A.   Neither of those are currently filled.

14    Q.   Thank you.

15         State chief psychiatrist .5 FTE, is that position

16 currently filled?

17    A.   Not to my knowledge.

18    Q.   And finally, state mental health director, one

19 FTE, is that position currently filled?

20    A.   That actually has been changed.  As we discussed

21 earlier, we have two mental health region directors, and

22 those are both currently filled.

23    Q.   And are those both full-time positions?

24    A.   Yes, they are.

25    Q.   Okay.  Thank you.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 67

1            Will you please look over these two pages and
2      tell me if there is any mental health staff that we have
3      not yet talked about.
4            A.    I think we caught them all.
5            Q.    Okay.
6                  THE WITNESS:  Can we take a short break?
7                  MR. FATHI:  Sure.
8                  (A recess was taken from 10:32 a.m. until
9      10:51 a.m.)
10     BY MR. FATHI:
11           Q.    Doctor, during the break did you talk to anyone
12     except your counsel?
13           A.    No.
14           Q.    Did you review any documents?
15           A.    No.
16           Q.    Okay.  Let's go back to your August 13th memo,
17     which is Exhibit 19.  Please let me know when you have
18     that.
19                 Who is Joe Profiri?
20           A.    Joe Profiri is the acting division director for
21     health service contract monitors.
22           Q.    I notice that he is not on the Contract Monitor
23     Bureau Org Chart.
24           A.    His assignment is relatively new.
25           Q.    Okay.  If we were doing this chart today --

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 76

1    clear understanding of that.

2         Q.    Of the function of pool positions?

3         A.    The function of pool positions within ADC, I

4    don't know.  Again, that would be a Wexford internal kind

5    of policy, and I don't know who in the department would

6    actually be dealing directly with them.

7         Q.    But in any event, you don't know what it means

8    for Wexford to designate someone --

9         A.    No.

10        Q.    -- as --

11        A.    No.

12        Q.    -- something a pool position?

13        A.    No.  No, I don't know.

14        Q.    Okay.  Will you please turn to page 16151.

15        A.    51?

16        Q.    16151.

17        A.    Okay.  I have it.

18        Q.    And towards the middle of the page there are a

19   number of positions designated FLO Mental HLTH.

20              Do you see that?

21        A.    Yes.

22        Q.    Now, if we assume that means Florence mental

23   health, as I read that, as of the date of this document,

24   August 8th, there was no psychiatrist at Florence.

25              Was that, in fact, the case?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 77

1      A.   I believe that to be true.

2      Q.   Okay.  Will you turn to the next page, please.

3           Similarly here there are a number of positions

4    towards the bottom of the page designated EYM Mental HLTH.

5           Again, on the assumption that that means Eyman

6    mental health, this seems to indicate that as of the date

7    of this document there was no psychiatrist at Eyman.

8           Was that, in fact, the case?

9           MS. WIENEKE:  Form.

10          THE WITNESS:  As a Wexford employee, yes, I

11   believe that is the case.

12   BY MR. FATHI:

13     Q.   Do you believe that there was some other kind of

14   psychiatrist at Eyman on August 8th?

15     A.   Yes, I do.

16     Q.   And what kind of psychiatrist was that?

17     A.   I believe they had an actual registry

18   psychologist at Eyman at that time.

19     Q.   I'm asking about psychiatrists.

20     A.   This individual is a psychiatrist.

21     Q.   I'm sorry.  You said psychologist.

22     A.   Oh, did I?  I'm sorry.

23     Q.   So if we count registry psychiatrists on

24   August 8th, how many FTE psychiatrists were on site at

25   Eyman?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 78

1    A.   At Eyman, to my knowledge, one.

2    Q.   One FTE?

3    A.   As a psychiatrist, yes.

4    Q.   Okay.  Would you turn to page 16162, please.

5         Assuming that LEW means Lewis mental health, this

6  appears to indicate that as of August 8th there was no

7  psychiatrists on-site at Lewis complex.

8         Is that consistent with your recollection?

9         MS. WIENEKE:   Form.

10        THE WITNESS:   As a Wexford employee, that is

11 consistent with my recollection.

12 BY MR. FATHI:

13   Q.   Was there some other kind of psychiatrist on-site

14 at Lewis on August 8th?

15   A.   I believe that Lewis was using both -- was using

16 two telemedicine psychiatrists.

17   Q.   Okay.  Again my -- let me make sure --

18   A.   Oh, on-site.

19   Q.   Let me make sure my question was clear.

20        My question was:  Was there any kind of

21 psychiatrist on-site at Lewis as of August 8th?

22   A.   Not to my knowledge.

23   Q.   Okay.  Finally, 16154, please.

24        Assuming that PV means Perryville, this indicates

25 that as of August 8th there was one psychiatrist at

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 83

1          THE WITNESS:  Can I take a second?

2          (Discussion off the record.)

3          (Exhibit 24 was marked for identification.)

4   BY MR. FATHI:

5      Q.   Are you ready, Doctor?

6      A.   Yes, I am.

7      Q.   All right.  I'm showing you what has been marked

8   Exhibit 24, Bates Nos. 14034 through 14051, a document

9   titled, at least on the first page, "Arizona Department of

10  Corrections, Health Services Division, Central Office,

11  June 20th, 2012."

12          Doctor, have you seen this document before?

13     A.   Not that I recall.

14     Q.   Have you seen a different iteration of this

15  document perhaps from a different --

16     A.   I have seen similar documents in the past, yes.

17     Q.   Okay.

18          MR. FATHI:  Did you get that?

19  BY MR. FATHI:

20     Q.   Let me ask it again to make the record clear.

21          Doctor, have you seen a different iteration of

22  this form in the past, perhaps covering different time

23  periods?

24     A.   I have seen similar documents in the past.

25     Q.   Okay.  Thank you.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 84

1           So based on that, could you describe what this
2    is?
3        A.    This appears to be a supervision structure for
4    the health services division as it existed prior to
5    July 1st of 2012.
6        Q.    Okay.  Thank you.  And thank you for mentioning
7    that.  I'm now shifting gears, and we will talk now about
8    before July 1st.  Okay?
9        A.    Okay.
10        Q.    Would you please turn to page 14037, and this
11    page is labeled "Mental Health ASPC Eyman."  Again, it's
12    dated June 20th.
13           Doctor, it appears from this chart that as of
14    June 20th all three of the psychiatrist positions at Eyman
15    were vacant.
16           Was that the case?
17        A.    June 20th?  No, that is not my recollection.
18        Q.    What is your recollection?
19        A.    My recollection is that we had a psychiatrist on
20    staff there, Dr. Bishop.
21        Q.    At the Eyman complex?
22        A.    At the Eyman complex.
23        Q.    On-site as of June 20th?
24        A.    That's my recollection, yes.
25        Q.    And in which of these boxes would Dr. Bishop fit?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 85

1      A.   He would go in this box marked "Psychiatrist

2    Grade 01."

3      Q.   Okay.  So is it your recollection that as of

4    June 20th there was one FTE psychiatrist on-site at Eyman?

5      A.   That is my recollection.

6      Q.   And out of three positions; correct?

7      A.   If you count the psychiatrist sup- -- wait.

8           No.  My recollection is that there would be one

9    vacant, because the psychiatrist supervisor would be out

10   of the Tucson facility.

11     Q.   I see.

12          And, to your recollection, was that position

13   vacant on June 20th?

14     A.   The psychiatrist supervisor?

15     Q.   Yes.

16     A.   Yes.

17     Q.   Okay.  Would you turn to 14039, please.

18          I'm sorry.  I have one more question on Eyman.

19          Approximately how long, as of June 20th, had that

20   psychiatrist supervisor position been vacant?

21     A.   That had been vacant for -- and again, please let

22   me try to recall here.

23          That had been filled by Dr. Michael Breslow who

24   had left about a year prior to that, and then somewhere

25   around this time it was filled by Dr. Worthen at Lewis.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 86

```
 1          So it was vacant for a considerable period of
 2   time, and then Dr. Worthen assumed those duties, and I
 3   don't remember the specific date when that occurred.
 4       Q.   Okay.  But assuming that --
 5            MS. WIENEKE:  Were you finished?
 6            THE WITNESS:  I was finished.
 7   BY MR. FATHI:
 8       Q.   Okay.  So it is your recollection that this
 9   psychiatrist supervisor position was vacant for about a
10   year; is that correct?
11       A.   That is my recollection.
12       Q.   Okay.  And the one psychiatrist grade 1 position
13   at Eyman that you recall being vacant as of June 20th,
14   approximately how long had that been vacant?
15       A.   I don't recall.
16       Q.   Okay.  Now, please turn to 14039.  And this is
17   entitled "Mental Health ASPC Florence."  It appears from
18   this chart that as of June 20th the only psychiatrist
19   position at Florence was vacant.
20            Was that the case, Doctor?
21       A.   That is my recollection, yes.
22       Q.   And approximately how long had that position been
23   vacant?
24       A.   I don't recall.
25       Q.   Was it more than six months?
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 87

1      A.   I don't recall.  There were a number of staff

2   changes in Florence.  I don't recall the exact dates.

3      Q.   Okay.  It also appears from this chart that as of

4   June 20th the only nurse practitioner position was vacant.

5           Was that the case, Doctor?

6           MS. WIENEKE:  Object to the form, beyond the

7   scope.

8           THE WITNESS:  I think as a Department of

9   Corrections employee that was correct.

10  BY MR. FATHI:

11     Q.   And how long had that position been vacant?

12          MS. WIENEKE:  Same objection.

13          THE WITNESS:  Again, I don't recall specifically

14  but not very long.  The nurse practitioners who had filled

15  those positions had left very shortly before this.

16  BY MR. FATHI:

17     Q.   Okay.  And it also appears that the only

18  mid-level care provider position was vacant.

19          Is that consistent with your recollection,

20  Doctor?

21          MS. WIENEKE:  Same objections.

22          THE WITNESS:  Yes.

23  BY MR. FATHI:

24     Q.   And how long had that position been vacant?

25     A.   Again, that had been vacant for a short period of

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 88

1    time.

2        Q.    Okay.  And it also appears that two out of four

3    psychologist positions were vacant as of June 20th.

4              Was that the case?

5        A.    Yes, I believe it was.

6        Q.    And how long had those positions been vacant?

7        A.    One had been vacant for some time, and one had

8    been vacant a short period.

9        Q.    When you say for some time, would that be over a

10   year?

11       A.    I don't recall, but that would be possible.

12       Q.    Okay.  If you'd turn to 14041, please.  This page

13   is titled "Mental Health ASPC Lewis," and it appears as of

14   June 20th the only psychiatrist position at Lewis was

15   vacant.

16             Was that the case, Doctor?

17       A.    No, I don't believe so.

18       Q.    What is your recollection?

19       A.    My recollection is that Dr. Worthen was in that

20   position at that time.

21       Q.    As an ADC employee?

22       A.    As an ADC employee.

23       Q.    As a full-time on-site psychiatrist --

24       A.    As a full --

25       Q.    Excuse me, Doctor.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 89

1           As a full-time on-site psychiatrist at ASPC

2    Lewis?

3        A.   As a full-time on-site psychiatrist at Lewis.

4        Q.   So how long had he been in that position?

5        A.   He had been in that position, I would say, a

6    year.

7        Q.   Okay.  It also appears from this chart that as of

8    June 20th both of the nurse practitioner positions were

9    vacant.

10           Was that the case, Doctor?

11       A.   That was the case.

12       Q.   And how long had those positions been vacant?

13       A.   I don't recall, but six months.

14       Q.   Both?

15       A.   Both.

16       Q.   Okay.  And it also appears that as of June 20th,

17   two out of the five psychologist positions were vacant.

18           Was that the case, Doctor?

19       A.   Let me say that I believe those positions were

20   vacant but they were being filled by the psychology

21   assistant positions we had discussed earlier.

22           The psychology assistant in the underfill for the

23   psychiatry positions.  So when you have one of those

24   persons on staff, the psychology position shows as vacant.

25       Q.   Okay.  So those two positions -- it's your

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 90

1    recollection that those two positions were not filled by
2    licensed psychologists?
3        A.    It is my recollection that they were not filled
4    by licensed psychologists.
5        Q.    They were filled by unlicensed psychology
6    assistants?
7        A.    They were filled by unlicensed psychology
8    assistants that were practicing under Dr. Fulks' license.
9        Q.    And both of them were filled on a full-time
10   basis?
11       A.    That is my recollection.
12       Q.    Okay.  Would you turn to page 43, please.  This
13   is labeled "ASPC Perryville Mental Health," again
14   June 20th, 2012.  This chart indicates that as of
15   June 20th one of the two psychiatrist positions was
16   vacant.
17            Was that the case, Doctor?
18       A.    As of June 20th?  I don't think so.  I believe
19   that was filled.
20       Q.    Is it your recollection that Dr. Crews was there
21   as of June 20th?
22       A.    It is my recollection that Dr. Crews was there as
23   of June 20th.
24       Q.    And it's your recollection that the position that
25   that is indicated here as vacant on June 20th was, in

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

1   fact, full as of that date?

2       A.   Was, in fact, full as of that date.

3       Q.   And who filled -- filled by whom?

4       A.   Jesus, I can't remember the guy's name.

5       Q.   It was a man?

6       A.   It was a man.

7       Q.   It also appears from this document that as of

8   June 20th the only nurse practitioner position at

9   Perryville was vacant.

10           Was that, in fact, the case?

11      A.   No, that's not the case.  There was an additional

12  nurse practitioner at the time, Mr. Blair.  That is what I

13  remember.  I --

14      Q.   And your recollection is that he was a full-time

15  ADC employee working as a nurse practitioner at Perryville

16  as of June 20th?

17      A.   Yes.  That's right.

18      Q.   Doctor, do you have any understanding why these

19  records appear not to be consistent with your

20  recollection?

21      A.   You know, I don't.  But I -- I clearly remember

22  because these two people were in place when Wexford came

23  on board and were offered jobs and went to other

24  positions.  So, I mean, I'm sure my recollection is

25  correct, that these positions were filled at this time.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 92

1    Q.    Okay.  So you're confident that, at least in

2  respects we have discussed, this report is not accurate?

3    A.    That's right.

4    Q.    Okay.  It also appears from this document that as

5  of June 20th at Perryville the only recreational therapist

6  position was vacant.

7        Was that the case?

8    A.    That was the case.

9    Q.    And how long had that position been vacant?

10   A.    If I remember this correctly, that position had

11  been vacated for some time by a person on long-term

12  medical leave but no one had been in that position for

13  approximately a year.

14   Q.    Okay.  And finally, it appears that two of the

15  six psychologist positions were vacant.

16        Was that the case?

17   A.    Are we looking at the Psychologist Grade II

18  position?

19   Q.    I'm looking at the box labeled Psychologist II

20  that contains four positions, the box above that, DC

21  Psychologist III, and the box two over, Psychologist II

22  currently filled by Kay Mansfield-Blair.

23   A.    Right.  All right.  The position marked DC

24  Psychologist III is incorrect.  Dr. John St. Clair is in

25  that position and has been for some time.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 93

1    Q.   So your recollection is that position DC

2  Psychologist III, that is indicated on this chart as being

3  vacant as of June 20th, was, in fact, on that date filled?

4    A.   Yes.

5    Q.   And what about the Psychologist II position that

6  is shown as being vacant?

7    A.   My recollection is that that was vacant.

8    Q.   And how long had that position been vacant?

9    A.   I don't recall.  Several months.

10   Q.   Okay.  Would you please turn to page 45.  This

11  page is labeled ASPC Phoenix, and it appears from this

12  chart that on June 20th the clinical director position was

13  vacant.

14        Was that the case, Doctor?

15   A.   That's correct.

16   Q.   And how long had that position been vacant?

17   A.   11 months.

18   Q.   And what did the clinical director at Phoenix do?

19   A.   The clinical director in Phoenix is responsible

20  for maintaining the level of services to the degree that

21  the Department of Health Licensing Board, which licenses

22  that facility, are complied with.

23        That person will assign staff.  That person will

24  monitor programs.  That person will attend staffings to

25  monitor the level of patient care.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 94

1     Q.    Okay.  Thank you.

2           It also appears from this chart that on June 20th

3    the psychiatrist supervisor position was vacant.

4           Was that the case?

5     A.    That was the case.

6     Q.    And how long had that position been vacant?

7     A.    More than six months.

8     Q.    Okay.  It also appears that one of the two psych

9    nurse coordinator positions was vacant.

10          Was that, in fact, the case?

11    A.    That was the case.  That had actually been a very

12   recent vacancy, probably within the last --

13    Q.    Prior to the June 20th?

14    A.    Prior to the June 20th.

15    Q.    Okay.  In several of these boxes there is the

16   notation "Pool" with a further notation "Positions expire

17   9/30/2011."

18          Can you explain what that means?

19    A.    The pool positions are approved for a certain

20   period and then they have to go through a reapproval

21   process.

22          So on 9/30/11 that would have had to be

23   recertified for the pool to continue.

24    Q.    What I don't understand is that this chart --

25   this chart is dated June 20th, 2012.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 95

1      A.    Right.

2      Q.    So is it your understanding that these positions

3    no longer existed as of June 20th, 2012?

4      A.    No.

5            MS. WIENEKE:  Form, foundation.

6            THE WITNESS:  No.  It's my recollection that

7    these positions continued to exist.

8            Well, let me look at them more closely.

9            Okay.  Then my recollection is that those did not

10   exist at that point.

11   BY MR. FATHI:

12     Q.    So there weren't people filling those positions

13   as of June 20th, 2012?

14     A.    There were not people filling those positions.

15     Q.    Okay.

16     A.    And, in fact, those positions did not exist to be

17   filled at that point in time.

18     Q.    Because they had expired the previous year?

19     A.    That's right.

20     Q.    Okay.  Thank you.

21           Would you turn to page 49, please.  This page is

22   labeled "Mental Health ASPC Tucson," again dated

23   June 20th, and it appears that as of that date all four

24   psychiatrist positions at Tucson were vacant.

25           Was that, in fact, the case?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 96

1    A.   I'm sorry.  What was the page number, please?

2    Q.   Oh, I'm sorry.  49.  It's the last two digits.

3    A.   48.

4    Q.   Try turning it the other way.

5    A.   48, 49.

6    Q.   Okay.  Do you have it now?

7    A.   Yes, I do.

8    Q.   Okay.  Let me ask the question again.

9         It appears from this document that as of

10   June 20th all four psychiatrist positions at Tucson were

11   vacant.

12        Was that, in fact, the case?

13   A.   I don't believe that we had any staff

14   psychiatrists at Tucson at that time.

15   Q.   Of those four psychiatrist positions, how many of

16   them were filled with non-staff psychiatrists?

17   A.   I believe we had three locums at that time.

18   Q.   As of June 20th?

19   A.   As of June 20th.

20   Q.   Those were three FTEs?

21   A.   Three FTEs.

22   Q.   How long had those four psychiatrist positions

23   been vacant?

24   A.   I don't remember.

25   Q.   With regard to any of them?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 97

1    A.   The only one I recall is the chief psychiatrist,
2  and that would be Dr. Breslow.  That had been vacant about
3  a year.
4    Q.   Now, it's my understanding that the department
5  has been concentrating higher-acuity prisoners at Tucson;
6  correct?
7         MS. WIENEKE:  Object to the form.
8         THE WITNESS:  That was true at the time, yes.
9  BY MR. FATHI:
10    Q.   And that was true with regard to both medical and
11  mental health needs; correct?
12    A.   Yes.
13    Q.   Now, you said that was true at the time,
14  referring to June 20th.
15         Has that been reversed since then?
16    A.   No, not to my knowledge.  I think that is still
17  Wexford's plans.
18    Q.   Do you know?
19    A.   I have heard nothing to indicate that they have
20  changed that.
21    Q.   Okay.  Doctor, you said you have seen documents
22  similar to this one; correct?
23    A.   Yes.  That's correct.
24    Q.   Are documents similar to this generated, or
25  before July 1st were they generated on some sort of

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 102

1      A.    Yes, I did.

2      Q.    Dr. Crews says in the second line that she was

3    informed that she was as of this date one of 2.5

4    psychiatrists with ADC.

5            Was that, in fact, the case?

6      A.    As ADC employees, that is probably the case.

7      Q.    That would have been out of how many

8    psychiatrists positions systemwide?

9      A.    So are you talking about psychiatrists or

10   psychiatry providers, which would include nurse

11   practitioners?

12     Q.    Well, let's answer both, if you can.

13     A.    Approximately 14.

14     Q.    Okay.  So as of February of 2011, 2.5 out of 14

15   psychiatrists positions --

16     A.    Were filled by state employees.

17     Q.    -- were filled by state employees?

18           How many were filled by a psychiatrist of any

19   description?

20     A.    My recollection is 11.

21     Q.    11 out of 14.

22           Has it ever happened when you have either a pool

23   or locum employee, you then ask that employee not to come

24   back?

25           Let me ask it a different way.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 104

1      Q.    Just for the record, what is an HNR?

2      A.    HNR is a health needs request.

3      Q.    And what function does that serve?

4      A.    That functions if an inmate has a service need or

5      they want to be seen by a specific kind of medical

6      specialist, that allows them to communicate with the

7      medical department saying, I need this service.

8      Q.    Okay.  Would it be fair to say that's the primary

9      way that prisoners access healthcare?

10     A.    That's the primary way that they access

11     healthcare that is not routine, that's right.

12     Q.    Assuming the statement is true, in your view, is

13     it an acceptable situation to be backed up three to

14     four months with HNRs?

15            MS. WIENEKE:  Object to the form and foundation.

16            THE WITNESS:  It's certainly not an optimal

17     situation.  HNRs are triaged by nursing staff.  So if

18     there is some acute or emergent need, that person goes to

19     the head of the line.  So there's a sense -- so there's a

20     mechanism for addressing emergency situations.

21            So, no, I don't think that is -- not what we

22     would hope for.

23     BY MR. FATHI:

24     Q.    Could it create a risk for patient health and

25     safety?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 107

1      A.    To my knowledge, that's correct.

2      Q.    Okay.  A little further down, maybe eight lines

3    down, Dr. Crews writes, "I have to renew meds for dozens

4    of people per week without getting to see them because

5    there is not enough time."

6            Is it consistent with ADC policy for a

7    psychiatrist to renew meds for a patient without seeing

8    the patient?

9            MS. WIENEKE:  Form and foundation.

10           THE WITNESS:  It is not ADC policy, but is the

11   practice to do if the medication is expiring and the

12   person can't be seen face-to-face prior the expiration.

13   BY MR. FATHI:

14     Q.    Okay.  So if Dr. Crews, in fact, renewed meds for

15   patients without seeing them, that was not consistent with

16   ADC policy; correct?

17     A.    No.  Our policy is that they would be seen

18   face-to-face.

19     Q.    Okay.  Was Dr. Crews disciplined for renewing

20   meds without seeing patients face-to-face?

21     A.    No.

22     Q.    Why not?

23     A.    Because the alternative would be for the

24   medications to expire, and that would be a less acceptable

25   solution.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

1      Q.    And why would it be less acceptable?

2      A.    Because -- what do you call -- termination of

3   care without any kind of clinical reason would be a really

4   bad practice.

5      Q.    Because it creates a risk to patient health and

6   safety?

7            MS. WIENEKE:  Form and foundation.

8            THE WITNESS:  It could.  It's possible.

9   BY MR. FATHI:

10     Q.    Okay.  In the following sentence Dr. Crews

11  writes, some of these people -- excuse me -- "Some of

12  these people have not been seen for six months or longer."

13           Do you see that, Doctor?

14     A.    I do.

15     Q.    Is it consistent with ADC policy for a person who

16  is on psychotropic medication not to be seen for

17  six months or longer?

18     A.    The standard at that time was six months or less,

19  not six months or longer.

20     Q.    So if it was, in fact, true that patients on

21  psychotropic medications had not been seen for longer than

22  six months, that was inconsistent with ADC policy?

23     A.    That would be inconsistent with ADC policy.

24     Q.    Okay.  You mentioned that you believe Dr. Crews

25  is not currently employed -- she's not currently employed

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 115

1    asked by nursing staff at Florence to prescribe

2    medications for patients who she has never met or treated.

3          Do you see that?

4    A.    Yes.

5    Q.    Is it consistent with ADC policy for a

6    psychiatrist to prescribe medications for patients she has

7    never met or treated?

8    A.    As we discussed before, only on an emergency

9    basis to prevent care from being terminated.

10   Q.    Okay.  So is your testimony that under some

11   circumstances it is permitted under policy to prescribe

12   medications for patients one has never met or treated?

13   A.    To prevent expiration of medication for a short

14   term, yes.

15   Q.    So if Dr. Crews renewed medications for someone

16   that she has never -- excuse me.

17         If Dr. Crews prescribed medications for a patient

18   she has never met or treated, that did not violate ADC

19   policy?

20         MS. WIENEKE:  Form, foundation, asked and

21   answered.

22         THE WITNESS:  If the medications were medications

23   that had been prescribed by a licensed provider previously

24   and it was a continuation of that order, that would have

25   been acceptable.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 116

1    BY MR. FATHI:

2        Q.    Without ever meeting the patient?

3        A.    Without ever meeting the patient.  It would not

4    have been acceptable to start a medication with a person

5    who has not been evaluated prior to that.

6        Q.    Did you respond to this e-mail?

7        A.    Yes, I believe I did.

8        Q.    And in what form?

9        A.    I believe I e-mailed Dr. Crews and indicated that

10   we had located some locum providers and they would be

11   starting in Florence, to let her --

12            THE COURT REPORTER:  I cannot hear you.

13            THE WITNESS:  That we had located some locum

14   providers for Florence and that her fears for Florence

15   were not going to come to pass.

16            MR. FATHI:  We would like to request that that

17   e-mail be provided.

18            MS. WIENEKE:  Dr. Shaw, can you scoot closer to

19   the court reporter.

20   BY MR. FATHI:

21       Q.    Did you respond in any other way in addition to

22   the e-mail you just described?

23       A.    Not that I remember.

24       Q.    You were concerned by the situation that

25   Dr. Crews described in this e-mail?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 125

1    BY MR. FATHI:

2        Q.   I'm talking about risk.

3        A.   Risk --

4             MS. WIENEKE:  Same objection.

5             THE WITNESS:  A smaller staffing ratio creates a

6    greater risk.

7    BY MR. FATHI:

8        Q.   Okay.  And with that, we can -- I am ready to

9    move to a new topic, so we can either take a lunch break

10   or we can soldier on.  It's up to -- why don't we take

11   lunch.

12            (A recess was taken from 12:11 p.m. until

13   1:04 p.m.)

14   BY MR. FATHI:

15       Q.   You are still under oath.

16       A.   I am.

17       Q.   Doctor, are you aware of a situation at Eyman

18   last Sunday where a number of nurses did not come to work?

19       A.   No, I'm not aware.

20       Q.   Haven't heard anything about that?

21       A.   I haven't.

22       Q.   Okay.  Nurses line passes both medical and mental

23   health drugs; right?

24       A.   That's right.

25       Q.   The issues that we have been discussing with

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 126

1    Wexford, are those isolated to one or two facilities, or
2    are they more systemic?
3              MS. WIENEKE:  Object to the form.
4              THE WITNESS:  Which issues were you referring to?
5    BY MR. FATHI:
6        Q.   Well, let's say the shortage in psychiatric
7    staffing.
8              MS. WIENEKE:  Object to the form.
9              THE WITNESS:  Yes, those are isolated to a couple
10   of units for the most part.
11   BY MR. FATHI:
12       Q.   Those are isolated?
13       A.   Well, like we said, Lewis has a bigger problem
14   than Perryville, let's say.
15       Q.   Okay.  Well, let me find your --
16             Here we go.  Okay.  Let's look at your
17   August 13th memo.
18             MS. WIENEKE:  Exhibit 19?
19   BY MR. FATHI:
20       Q.   Exhibit 19.  Let me know when you have it.
21       A.   There we go.
22       Q.   So as of August 19th, Perryville, Lewis, Eyman,
23   Florence, and Tucson complex all had less than 50 percent
24   of their psychiatric provider FTEs filled; correct?
25             MS. WIENEKE:  Object to the form.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 127

1            THE WITNESS:  Yes.

2    BY MR. FATHI:

3        Q.    And what proportion of the non -- putting aside

4    private prisons -- what percentage of the ADC population

5    would you say is at those five complexes?

6        A.    What proportion of the ADC or the mental health

7    component?

8        Q.    Okay.  Let's take the mental health component.

9        A.    Mental health component is going to be 90,

10   95 percent are going to be at those units.

11       Q.    Okay.  So all of those units are under 50 percent

12   psychiatric provider staffing, wouldn't you agree with me

13   that that is a systemic problem?

14           MS. WIENEKE:  Object to the form.

15           THE WITNESS:  I think at this point that was

16   going to be a problem for these units; although, as we

17   said, this has changed in the last month or so.

18   BY MR. FATHI:

19       Q.    I understand that.  I'm asking you as of this

20   point, when units that collectively house, according to

21   your testimony, about 90 percent of the population on

22   psychotropic medications, are all under 50 percent

23   staffing on psychiatric providers, your testimony is you

24   don't think that is a systemic problem?

25           MS. WIENEKE:  Object to the form, misstates.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 130

```
 1    beyond the scope of the 30(b)(6) designation.
 2              THE WITNESS:  If it's necessary to protect them,
 3    yes.
 4    BY MR. FATHI:
 5         Q.    I'm sorry.  Yes, it permits the use?
 6              MS. WIENEKE:  Same objections.
 7              THE WITNESS:  If it's necessary to protect them,
 8    yes.
 9              MR. FATHI:  Kathy, your repetitive objections are
10    going to make the transcript very difficult to read.  I
11    will certainly give you a continuing objection to this
12    entire line of questioning as beyond the scope of the
13    30(b)(6)?
14              MS. WIENEKE:  I appreciate that.  Thank you.
15              I will accept the offer for the continuing
16    objection on the entire line of questioning related to the
17    use of chemical agent, which is beyond the scope of the
18    30(b)(6) designation.
19    BY MR. FATHI:
20         Q.    Let me ask the question again so we have a clear
21    record.
22              Does ADC policy permit using chemical agents on a
23    prisoner who is attempting suicide?
24         A.    Yes.
25         Q.    Does ADC policy permit the use of chemical agents
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 131

1   on a prisoner who is engaging in self-harm?

2       A.   Yes.

3       Q.   Does ADC policy permit the use of chemical agents

4   on a prisoner who is on suicide watch?

5            MS. WIENEKE:   Form.

6            THE WITNESS:   Yes.

7   BY MR. FATHI:

8       Q.   Does ADC policy permit the use of chemical agents

9   on a prisoner who is on mental health watch?

10      A.   Yes.

11      Q.   Okay.  Moving on to a different topic, does ADC

12  classify some prisoners as seriously mentally ill?

13      A.   Yes.

14      Q.   What is the process for classifying prisoners as

15  seriously mentally ill?

16      A.   There is a form, a document, that is filled out

17  documenting a number of issues that are actually sort of

18  statutory issues in terms of finding a person as seriously

19  mentally ill.  Those would be a diagnosis of a certain

20  type, some type of serious impairment.  There are a number

21  of key areas of functioning.

22      Q.   What kind of diagnoses in combination with other

23  factors can qualify someone as seriously mentally ill?

24      A.   Mostly schizophrenic diagnosis, major mood

25  disorders.  Those are the main ones.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 135

1    Q.   Okay.  Okay.  I'm going to be using in this line

2    of questioning the term isolation.  I would like you to

3    listen carefully to the definition.  All right?

4         Isolation means confinement in a cell for 22 or

5    more hours each day, confinement in Eyman-SMU-1,

6    Eyman-Browning Unit, Florence-Central Unit,

7    Florence-Kasson Unit, or Perryville-Lumley Special

8    Management Area, or confinement in a complex detention

9    unit.  And I will give it to you to have in front of you

10   just to -- if you need to refer to it.

11        Okay?  Do you understand the definition?

12   A.   Let me clarify.  Does this mean both these

13   categories are the same or either?

14   Q.   It's disjunctive.  It's either.

15   A.   Okay.

16   Q.   So in other words --

17   A.   Okay.  So if you are in these units, you would be

18   considered to be in isolation by this deposition?

19   Q.   Correct.  Correct.

20   A.   Okay.  I do understand that.

21   Q.   Okay.  And my question is:  Does ADC have any

22   written policy that prevents the placement of the prisoner

23   classified as seriously mentally ill in isolation?

24   A.   No.

25        MS. WIENEKE:  I'm sorry.  I need to interject.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 136

1           Objection to that term insofar as it has some

2    significance, significance within ADC.  We are using the

3    plaintiff's definition, which is not necessarily ADC's

4    definition for purposes of this questioning.

5           Thank you.

6           THE WITNESS:  If we follow this definition, then,

7    no, there is no policy in place for that.

8    BY MR. FATHI:

9        Q.   Okay.  And as we sit here today, there are

10   prisoners who are classified as seriously mentally ill who

11   are housed in isolation; correct?

12       A.   I would expect that to be true, yes.

13       Q.   There are seriously mentally ill prisoners in

14   SMU-1?

15       A.   Yes.

16       Q.   There are seriously mentally ill prisoners in

17   Browning Unit?

18       A.   Yes.

19       Q.   There are seriously mentally ill prisoners in

20   Florence-Central?

21       A.   Yes.

22       Q.   There are seriously mentally ill prisoners in

23   Florence-Kasson Unit?

24       A.   Yes.

25       Q.   There are seriously mentally-ill prisoners in the

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 137

```
 1   Perryville Special Management Unit?

 2       A.   Yes.

 3       Q.   Does ADC have any written policy that if a

 4   seriously mentally ill prisoner is placed in isolation, he

 5   or she has to have a cellmate?

 6       A.   Could you repeat that?

 7       Q.   Sure.  Does ADC have any written policy that

 8   requires that if a seriously mentally ill prisoner is

 9   placed in isolation, he or she has to have a cellmate?

10       A.   No.  There is no such policy, to my knowledge.

11       Q.   Okay.  Does ADC have any written policy that

12   prohibits the housing of a prisoner classified as MH-4 in

13   isolation?

14       A.   No.

15            (Exhibit 27 was marked for identification.)

16   BY MR. FATHI:

17       Q.   Dr. Shaw, these are responses prepared by the

18   state's counsel to our request for admissions in this

19   lawsuit.

20       A.   Yes.

21       Q.   Have you seen this document before?

22       A.   Yes, I have.

23       Q.   Did you have any role in preparing these

24   responses?

25       A.   Yes, I did prepare some of them.
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

1      Q.   Okay.  And while some of them are double celled,

2   some are also single celled; correct?

3      A.   That's correct.

4      Q.   All right.  Is it ADC policy that SMI inmates in

5   maximum custody are to be evaluated at least every

6   30 days?

7      A.   Yes.

8      Q.   Where is that written down?

9      A.   In the technical manual.

10      Q.   How long has that been ADC policy?

11      A.   I don't know.  Several years.

12      Q.   And who is the evaluation done by?

13      A.   That's typically done by one of the psychology

14   providers.

15      Q.   Okay.  But I'm -- I'm sorry.  I didn't ask a

16   clear question.

17           Does policy require the evaluation be done by a

18   certain level of staff?

19      A.   I don't recall policy specifying what level of

20   staff.  It indicates it has to be a mental health

21   professional.

22      Q.   It says mental health professional?

23      A.   I believe that's correct.

24      Q.   Okay.  And what does that include?

25      A.   It includes psychologists, psych associates,

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 140

```
 1    psych assistants, psychiatrists, psych nurses, psych nurse
 2    practitioners.
 3        Q.   What are the minimum qualifications for the psych
 4    associate?
 5        A.   Psych associate, they have to have a master's
 6    degree in a behavioral health-related field, and they have
 7    to have a license from the Board of Behavioral Health
 8    Examiners.
 9        Q.   So you said this evaluation could be done by an
10    RN?
11        A.   By a psychiatric RN.
12        Q.   Okay.  And you believe that this provision, that
13    it must be done by a mental health professional, is
14    written down in the Mental Health Technical Manual.
15        A.   I believe that it is.
16        Q.   All right.  Does policy require that this
17    evaluation have any minimum duration?
18        A.   No.
19        Q.   Does the policy require that the evaluation be
20    performed in any particular place?
21        A.   No.
22        Q.   Does policy require that the evaluation involve
23    face-to-face contact?
24        A.   Yes.
25        Q.   And where is that written down?
```

Parsons v. Ryan
Shaw, Ph. D., Ben - 10/3/2012

Page 141

1      A.    I believe it's also in the technical manual.

2      Q.    Would a two-minute cell-side conversation by a

3  psychiatric RN be consistent with policy?

4            MS. WIENEKE:   Foundation.

5            THE WITNESS:   Policy requires that the person

6  have an evaluation.   It does not specify length of time.

7  BY MR. FATHI:

8      Q.    So your testimony is that it could be done at

9  cell side?

10     A.    It could be done at cell side.

11     Q.    And a two-minute cell-side evaluation would be

12  consistent with policy?

13     A.    Would meet the policy standard.

14     Q.    Okay.  We won't make this an exhibit just yet,

15  but is this the current edition of the Mental Health

16  Technical Manual?

17     A.    Yeah, it looks like it.

18     Q.    Okay.  Can you please show me in there where it

19  says that this evaluation must be done by a mental health

20  professional and must be done face to face.

21           Maybe I can help you.  Look at page 19.  Tell me

22  if that's what you are thinking of.

23           I'm looking at 1.1.2.8.

24     A.    1.1.2.8, yes.

25     Q.    Okay.  But if you look over on page 18, this is

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 142

1    not talking about prisoners with serious mental illness.

2    It's talking about prisoners that are classified Mental

3    Health 3; correct?

4        A.    Where are we?

5        Q.    Look at page 18.

6        A.    And where are you reading?

7        Q.    I'm reading in the heading about halfway down the

8    page that says, "Mental Health 3."

9              So my point is that the provision is not about

10   SMI, it's about prisoners who are Mental Health 3; is that

11   correct?

12       A.    Yes.

13       Q.    Now, can you show me where this requires that the

14   evaluation every 30 days be done by a mental health

15   professional?

16       A.    Let's see.  This page is numbered as 20.  Please

17   see the bottom of the page there, where they have the

18   cross.

19       Q.    Uh-huh.

20       A.    If transferred to segregation housing, will be

21   seen by mental health clinician within 24 hours next

22   business day and a minimum every 30 days or more often as

23   clinically indicated.

24       Q.    Okay.  But that is about MH-3 inmates; correct?

25       A.    That's correct.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 143

1     Q.    Not about SMI inmates?

2     A.    SMI would be Mental Health 3 inmates.

3     Q.    All SMI inmates would be Mental Health 3 inmates?

4     A.    Yes.

5     Q.    By definition?

6     A.    By definition.

7     Q.    Now, if you go back to page 19, it says, "If

8  adequate staffing resources are not available to meet this

9  standard, mental health staff shall triage cases based on

10 clinical need of the population?"

11         Do you see that?

12    A.    I do see that.

13    Q.    So the policy contemplates that these 30-day

14 reviews may not happen in all cases; correct?

15    A.    That's right.

16    Q.    And that would still be consistent with policy?

17    A.    Yes.

18    Q.    Okay.  Can I have that back, please?

19    A.    You can.

20    Q.    Thank you.

21         Under ADC policy is there any limit to how long

22 an SMI prisoner in isolation can go without being seen

23 face to face by a psychiatrist?

24    A.    Yes -- wait.  Wait.  Let me clarify.

25         Are you talking about an SMI inmate who is

Page 148

1    know, I'm hearing voices again.  Well, then you need to be
2    in inpatient.
3        Q.   Let me ask it yet a different way.
4             Is there any policy that -- written policy that
5    explicitly discusses what happens with a serious mentally
6    ill prisoner in isolation if that prisoner get worse?
7             MS. WIENEKE:  Form.
8             THE WITNESS:  If the person doesn't need
9    inpatient care, no.
10   BY MR. FATHI:
11       Q.   Okay.
12       A.   However, I think it's hard to define getting
13   worse without using that criteria.
14       Q.   Well, you and I will have to disagree about that.
15            Is the decision to transfer someone to an
16   inpatient facility a custody or a mental health decision?
17       A.   Mental health decision.
18       Q.   Can custody overrule mental health on that?
19       A.   No.
20       Q.   So custody has no power -- if mental health
21   determines that someone needs to be transferred to an
22   inpatient facility, custody has no power to overrule that?
23       A.   No.
24       Q.   Okay.  Let's go back to the requests for
25   admission.  At the top of page 3 it says, "Most at

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 157

1    proposals and other documents that led to their

2    establishment.

3             (Exhibit 28 was marked for identification.)

4    BY MR. FATHI:

5        Q.    I'm sorry?

6        A.    1103.

7        Q.    Yes.

8             Exhibit 28 is Department Order 1103 titled

9    "Inmate Mental Healthcare Treatment and Programs."

10            Doctor, what is this?

11       A.    This is the general policies that direct mental

12   healthcare in the department.

13       Q.    Okay.  And just a related question, I think you

14   said earlier that the mental health technical manual, all

15   units have to comply with that; correct?

16       A.    That's correct.

17       Q.    So that is a policy of statewide application?

18       A.    That's right.

19       Q.    And the DOs are also policy for statewide

20   application?

21       A.    The DOs, director's instructions, all have

22   similar weight in terms of compliance.

23       Q.    And so Wexford has to comply with all of those?

24       A.    Wexford has to comply.

25       Q.    Okay.  Just for the record, this copy of DO 1103

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 164

1    phases of people reading it to make sure they know it's

2    been changed.

3        Q.   Okay.  But I want to make sure your testimony is

4    clear.

5             You are confident that this document, the new

6    version of 1103, is the one that's currently in effect?

7        A.   That is certainly my understanding.

8        Q.   And the version produced by your counsel dated

9    1997 is no longer in effect; correct?

10       A.   That's what I believe.

11       Q.   Okay.  Now, prisoners are sometimes put on watch

12   because they are believed to be at risk of suicide;

13   correct?

14       A.   That's correct.

15       Q.   And does ADC policy require that a prisoner who

16   is placed on watch because he or she is believed to be

17   suicidal be evaluated face to face by a psychiatrist?

18       A.   Not by a psychiatrist, no.

19       Q.   Does ADC policy require that the prisoner who is

20   on watch because he or she is believed to be suicidal be

21   evaluated face by face by any licensed mental health

22   staff?

23       A.   Yes.

24       Q.   And what kind of staff can do that?

25       A.   A psychiatrist could do that.  It's not required.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 168

1    even though we may not have any health staff there.

2        Q.    And are they corridor units?

3        A.    Corridor units are:  Phoenix, Perryville, Lewis,

4    Florence, Eyman, Tucson, Yuma.

5        Q.    Is there any policy, written policy, providing

6    that an MH-5 cannot be housed in isolation?

7        A.    No, not that I'm aware of.

8        Q.    Okay.  What is the relationship between a

9    classification as serious mentally ill and classification

10   of the 1 through 5 system?

11       A.    They are independent classifications.

12       Q.    Okay.  So someone who is SMI could be an MH-5 or

13   an MH-1?

14       A.    No.  Someone who is an SMI could be an MH-3,

15   could be an MH-4, could be an MH-5.  Could not be an MH-2

16   or 1.

17       Q.    Okay.  So they are related to that extent?

18       A.    They are related to that extent.

19       Q.    So this classification system is still used by

20   the department?

21       A.    Still used by the classification department.

22       Q.    Okay.  Is it still used by mental health staff?

23       A.    It's been revised in the technical manual.

24       Q.    And under that system everyone is either a zero

25   or a 3; correct?

Page 216

1      A.    No.   Baker Ward is only men.

2      Q.    Is Flamenco the only unit for women?

3      A.    Flamenco is the only inpatient facility for

4  women.

5      Q.    Do women ever go to Quiet Ward?

6      A.    No.   There are two suicide observation cells on

7  George Ward, which is the women's ward, where they can be

8  observed.

9      Q.    Okay.  So the maximum number of beds available

10  for women are 23; correct?

11      A.    That's correct.

12      Q.    Okay.  And which, if any, of those facilities are

13  licensed by the Arizona Department of Health Services?

14      A.    Baker Ward is licensed by the Arizona Department

15  of Health Services, and all three of the units -- no, I'm

16  sorry.  All three of the men's unit and the women's unit

17  at Flamenco are also licensed areas.

18      Q.    And so the Men's Treatment Unit is not?

19      A.    Men's Treatment Unit is not.

20      Q.    And Quiet Ward is not?

21      A.    Quiet Ward is not.

22      Q.    Okay.  And who -- what sort of population goes to

23  the Men's Treatment Unit?

24      A.    Men's Treatment Unit is for inmates who are

25  generally symptom free but who have additional issues that

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 234

1    Q.   And 35?

2    A.   Both Perryville.

3    Q.   Okay.  We better make this an exhibit after all.

4         (Exhibit 33 was marked for identification.)

5    BY MR. FATHI:

6    Q.   Doctor, will you find DO 1103, please.  I think

7    it's here, and will you turn to 11431, please.

8    A.   11431, okay.

9    Q.   And will you look at paragraph 1.9.4, please.

10        Do you have it?

11   A.   Yes, I do.

12   Q.   According to this paragraph, an unlicensed mental

13   health staff in consultation with a licensed mental health

14   staff can remove a prisoner from suicide or mental health

15   watch; correct?

16   A.   According to this policy, yes, although that

17   policy has also been revised.

18   Q.   What is the new policy?

19   A.   Well, the new policy is that we don't really have

20   unlicensed mental health staff except for the psych

21   assistants.  So I would guess it's possible that the psych

22   assistants could that.

23        But this policy was written back when our psych

24   associates were not licensed, prior to the master's level

25   licensing law that passed about, you know, 2002, 2003.  So

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 235

1   the number of unlicensed staff is pretty much zero at this
2   point.
3       Q.   Well, except for the psych assistants?
4       A.   Except for the psych assistants.
5       Q.   And how many psych assistants are there
6   systemwide?
7       A.   Well, there used to be maybe six or eight.
8       Q.   When you say there used to be, why do you put it
9   that way?
10      A.   Because, as of July 1st, I don't know what the
11  current makeup is.
12      Q.   Okay.  I understand you are saying it may not
13  happen often, but is it still the policy that someone can
14  be removed from the suicide or mental health watch by an
15  unlicensed mental health staff?
16      A.   It's still policy.
17      Q.   And is that policy unchanged in the new version
18  of DO 1103?
19      A.   I believe that policy is changed.
20      Q.   And what does the new policy say?
21      A.   I believe the new policy -- you know, I don't
22  want to speculate.  I would have to look.  I think it's
23  changed, but I don't know for certain.
24      Q.   Okay.  Is it consistent with ADC policy to give a
25  prisoner a disciplinary ticket for acts of self-harm?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 284

1    programs; correct?

2        A.    Correct.

3        Q.    And you also discussed in the deposition today

4    with counsel the enhanced treatment programs at the

5    various facilities.

6              And what I want to know is, when did this concept

7    first take flight in terms of the planning process?  You

8    talked about when it was implemented, but when did it

9    first begin to ruminate within the halls of ADC?

10       A.    That would have been probably in February after

11   the two suicides at Florence when it became clear to us

12   that our processes of monitoring mental health inmates

13   wasn't adequate for purposes that we had intended it to

14   be, that we needed to find a way of allowing our

15   clinicians to have more private time, more access to the

16   inmates.

17             After discussion with the folks in operations,

18   with the directors, we decided the best way to do that was

19   by establishing areas where these inmates would be housed

20   in near configurations.  Once we made that decision, we

21   began to think, okay, if we are going to have a near

22   configuration, what can we do to make it a more

23   therapeutic environment.

24       Q.    Was the development of the enhanced treatment

25   programs a result of the lawsuit that was filed in this

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Ben Shaw, Ph. D. - 10/3/2012

Page 285

1    case?

2        A.    No.   It was a result of our attempts to address a

3    serious gap in our ability to provide suicide prevention.

4        Q.    The GAR reports that you refer to, are these --

5    once generated, are these in -- once generated, are these

6    in paper form, or are they sent electronically?  How do

7    they --

8        A.    They are sent electronically.

9        Q.    Is this a form that you fill in various fields?

10       A.    Yes.   It's on a form that contains a series of

11   issues.   Then there's a field that has the various colors,

12   and then there's a section to write a discussion on why

13   these particular colors were assigned to this area, a

14   supporting documentation area.

15           MS. WIENEKE:   Those are all the questions I have.

16   Thank you.

17           MR. FATHI:   I have nothing further.

18           MS. WIENEKE:   We will read and sign.

19           (The deposition concluded at 5:38 p.m.)

20

21

22

23

24

25

# EXHIBIT U

**Portions of this document are subject to Protective Order**

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn ) | No.: |
| Jensen; Stephen Swartz; ) | CV12-00601-PHX-NVW |
| Dustin Brislan; Sonia ) | (MEA) |
| Rodriguez; Christina ) | |
| Verduzco; Jackie Thomas; ) | |
| Jeremy Smith; Robert Gamez; ) | |
| Maryanne Chisholm; Desiree ) | |
| Licci; Joseph Hefner; Joshua ) | |
| Polson; and Charlotte Wells, ) | |
| on behalf of themselves and ) | |
| all others similarly ) | |
| situated; and Arizona Center ) | |
| for Disability Law, ) | |
|       Plaintiffs, ) | |
|    v. ) | |
| Charles Ryan, Director, ) | |
| Arizona Department of ) | |
| Corrections; and Richard ) | |
| Pratt, Interim Division ) | |
| Director, Division of Health ) | |
| Services, Arizona Department ) | |
| of Corrections, in their ) | |
| official capacities, ) | |
|       Defendants. ) | |
| ) | |

30(b)(6) ARIZONA DEPARTMENT OF CORRECTIONS
(RICHARD PRATT)
DOCUMENT 76, TOPIC NOS. 3 THROUGH 6;
DOCUMENT 80, TOPIC NO. 4; DOCUMENT 82, TOPIC NO. 4

October 4, 2012
8:59 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 7

```
 1     A    Understood.
 2     Q    Okay.  And you understand you are under oath
 3  and penalty of perjury here today.  Yes?
 4     A    Yes.
 5     Q    Okay.  And if you don't understand a question
 6  I'm asking, please ask me to clarify, and I will do my
 7  best to restate it until you do understand.
 8     A    Understood.
 9     Q    Okay.  And if at any time you want to take a
10  break, just let me know; we'd be happy to do so, just
11  don't do it when there's a question pending.
12     A    Okay.
13     Q    All right.  Thank you.
14            Are you under any medication that could
15  affect your ability to testify today?
16     A    No.
17     Q    Okay.  And is there any other reason why you
18  couldn't testify truthfully today?
19     A    No.
20     Q    What is your current position with the
21  Department?
22     A    Interim Health Services division director.
23     Q    And how long have you held that position?
24     A    February of this year.
25     Q    Okay.  When did you start working at the
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 9

1      A      I obtained another position with an outside

2  company.

3      Q      What company was that?

4      A      Correctional Medical Services.

5      Q      Okay.  And what is your post-high school

6  educational background?

7      A      I obtained a BS in health care management from

8  Bellevue College in Omaha, Nebraska in 1995.  I

9  obtained a master's degree as a physician assistant

10  from the University of Nebraska Medical Center in 1997.

11      Q      And do you have any licensing?  You said you

12  are a physician's assistant.  You are licensed as a

13  physician assistant?

14      A      No, ma'am, not currently.

15      Q      Okay.  What are the duties of your job as the

16  interim Health Services director currently?

17      A      To oversee the entire Health Services

18  division.  And now you indicate currently?

19      Q      Uh-huh.

20      A      My position is in charge of the -- I'm the

21  interim assistant director over the Health Services

22  Monitoring Bureau.

23      Q      So you currently hold both titles

24  simultaneously?

25      A      Correct.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 15

1      A      To the best of my ability, yes.

2      Q      And again, did you gather any documents in

3      response to this topic?

4      A      No.

5      Q      Okay.  Thank you.

6              If you were asked to gather documents

7      responsive to these topics, would you know where to

8      look or where to get them?

9      A      I would do some research to find out.

10     Q      Have you been given a written litigation hold

11     in this case?

12     A      Yes.

13     Q      And when did you get it?

14     A      Last week.

15     Q      What did it say?

16             MS. WIENEKE:  No, he's not answering

17     that question.

18     Q      BY MS. KENDRICK:  Have you been saving your

19     e-mails and documents since you received this

20     litigation hold?

21     A      Yes.

22     Q      How do you save them?

23     A      I don't delete them.

24     Q      Okay.  What steps have you taken to make sure

25     that the individuals you supervise comply with this

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 16

1    litigation hold?

2              MS. WIENEKE:  Object to the form.

3              THE WITNESS:  I have provided the

4    information on the form that was given to me.  I'm not

5    aware of the forms that have been given to everyone

6    else.

7     Q    BY MS. KENDRICK:  Okay.  So you didn't pass it

8    on to your subordinates, the litigation hold?

9     A    No.

10    Q    Okay.  Prior to receiving the litigation hold,

11   were you regularly deleting e-mails and documents?

12    A    No.

13    Q    Okay.  And you understand your testimony today

14   is binding on the Department for these topics?

15    A    Yes.

16    Q    All right.  I'm going to show you -- do you

17   have Exhibit 10?  I'm showing you what's been marked as

18   Exhibit 10 in a previous deposition.  Do you recognize

19   this document?

20    A    Yes.

21    Q    Okay.  And I'm going to refer to this document

22   as the RFP, short for request for proposals.  Is that

23   okay?

24    A    Yes.

25    Q    Have you read this entire document?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 19

1     Q     Okay.  When did you guys start having these

2     weekly meetings?

3     A     With Wexford?

4     Q     Yeah.

5     A     It was either late April or early May --

6     Q     Okay.

7     A     -- of this year.

8     Q     And were minutes kept from those meetings?

9     A     No.

10    Q     And did the transition team within ADC, the

11    group of people that you referred to, did you guys meet

12    internally amongst yourselves on a regular basis?

13    A     Not on a regular basis, no.

14    Q     How frequently would you say you guys met?

15    A     There were impromptu meetings, discussions

16    that could have occurred daily.

17    Q     Okay.  It was more ad hoc and not formal?

18    A     Correct.

19    Q     And did each prison institution have its own

20    transition team, as well, at the various facilities?

21    A     No.

22    Q     So it was all with headquarters and Wexford;

23    it wasn't teams at each prison?

24    A     Correct.

25    Q     And when did the implementation period begin?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 22

```
 1              THE WITNESS:  Fully staffed?
 2      Q    BY MS. KENDRICK:  Fully staffed --
 3      A    Can you --
 4      Q    -- each facility has a certain number of
 5   health care positions -- medical, mental health,
 6   dental -- that are allocated to it.  Were all of those
 7   filled at all the institutions during the
 8   implementation period?
 9              MS. WIENEKE:  Form.
10              THE WITNESS:  To my knowledge, the FTE,
11   the number of positions were not complete at each
12   facility.
13      Q    BY MS. KENDRICK:  Okay.
14      A    Not completely filled.
15      Q    Okay.  All right.  And during the
16   implementation and transition period, did the
17   Department take any additional steps to ensure
18   prisoners' health needs requests were reviewed,
19   answered in a timely manner?
20              MS. WIENEKE:  Form.
21              THE WITNESS:  Nothing beyond the current
22   procedures that were supposed to be taking place.
23      Q    BY MS. KENDRICK:  Okay.  And likewise, the
24   same thing in ensuring that prisoners were receiving
25   all their necessary medication, you guys were just
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 27

1           THE WITNESS:  I don't know what's going

2    through the other parts of the Bureau.  For instance,

3    Mr. Taylor is a program evaluation administrator on the

4    contract compliance side.  There is also communications

5    that go through him.  There is communications that go

6    through all members of this Bureau, so I can't speak to

7    the others.

8        Q    BY MS. KENDRICK:  Okay.  How -- looking at

9    this organizational chart, it appears that you and

10   Mr. Taylor are at the same level.  How have you guys

11   divided up substantively the various areas that you are

12   monitoring or responsible for?  Are you responsible for

13   medical care?

14           MS. WIENEKE:  Form.

15           THE WITNESS:  I'm responsible for the

16   quality and the clinical care in the field.

17       Q    BY MS. KENDRICK:  And he is responsible for

18   the nonclinical components of the contract?

19       A    His responsibilities are mainly with the

20   contract compliance.

21       Q    Okay.  On page 2 of this letter, the first

22   full sentence at the top says,

23

24

25                                       Were you

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 29

1      Q     And what were Wexford's concerns?

2                  MS. WIENEKE:   Form.

3                  THE WITNESS:   They were varied.  I mean,

4      they were -- I don't know what specifics to be able to

5      provide there.

6      Q     BY MS. KENDRICK:  Were they concerned about

7      hiring enough staff and the staffing levels that were

8      in place?

9      A     I don't recall that as being a verbalized as a

10     concern, but it was an understood.

11     Q     Were they concerned about the length of time

12     it took for prisoners to receive health care?

13                 MS. WIENEKE:   Foundation.

14                 THE WITNESS:   I don't know what their

15     concerns were.  I know what my concerns are.

16     Q     BY MS. KENDRICK:  Well, let's talk about you.

17     What were your concerns?

18     A     My concerns?

19     Q     Yeah.

20     A     As far as what?

21     Q     Well, you said there were several occasions

22     where you would meet with the Wexford team; they would

23     express concerns about the health care system, and you

24     had your own concerns, so I'm just trying to figure out

25     a little more specificity what you were concerned about

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 36

1   adjusted to meet the needs of medical monitoring.  It

2   is still an active process with changes going on.

3       Q    So as you guys are using it in the field, you

4   are making refinements to it?

5       A    Correct.

6       Q    And if you can turn to page 3 of that letter.

7   The first full paragraph that begins with,

8

9

10

11

12

13

14                 Do you disagree with their assertion

15   here?

16       A    If that's their opinion, I disagree.

17       Q    Do you think that the health care system has

18   deteriorated since July 1st?

19                 MS. WIENEKE:  Form.

20                 THE WITNESS:  In general, no.

21       Q    BY MS. KENDRICK:  And any specific areas come

22   to your mind, though?

23                 MS. WIENEKE:  Form.

24                 THE WITNESS:  Yes.

25       Q    BY MS. KENDRICK:  What areas are those?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 37

```
 1      A    Delivery of medication.
 2      Q    Okay.  How about staffing?
 3                 MS. WIENEKE:  Form.
 4                 THE WITNESS:  It's a work in progress.
 5      Q    BY MS. KENDRICK:  Are the timeliness of
 6   referrals to outside providers the same as they were
 7   before July 1st?
 8                 MS. WIENEKE:  Form.
 9                 THE WITNESS:  I don't have the specifics
10   on all of those issues.
11      Q    BY MS. KENDRICK:  Okay.
12      A    Again, this is a transition period, so we are
13   still obtaining a lot of information right now.
14      Q    Back to this organizational chart, Exhibit 16,
15   on the right-hand side underneath your name, the
16   position of medical program monitor is listed as
17   vacant.  Has it been filled since this org chart was
18   created?
19      A    Yes, it has.
20      Q    Who is that individual now?
21      A    Dr. Robertson.
22      Q    Okay.  And a little bit further down, the
23   bottom far right box it says psychiatrist senior
24   vacant.  Do you know if that position has been filled?
25      A    Yes, it has.
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 40

1    about their experiences with the health care system?

2        A    They can.

3        Q    Have they done that yet?

4        A    I don't know specifically.

5        Q    And these contract monitors, they are located

6    physically at the institutions they are monitoring?

7        A    We have monitors in the central office that

8    are deployed to the field.  We also have monitors that

9    are in each facility, yes.

10       Q    Okay.  So, for example, on the left-hand side,

11   it lists Terry Allred as the Compliance Monitor II for

12   Lewis, so would Terry Allred be out at Lewis?

13       A    Yes.

14       Q    Is that the case for all of these individuals

15   in the two left-hand columns where it appears they are

16   assigned to different facilities?

17       A    Yes, with the exception of the bottom two,

18   Ignacio and Sears, they are assigned to five different

19   private prisons.

20       Q    Okay.  And does the -- do the monitors do any

21   sort of random audits of medical files as part of their

22   monitoring?

23       A    Yes, they do.

24       Q    What process do they use to randomly audit the

25   prisoners' medical files?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 51

```
 1       A     This reads $10,000 per occurrence.
 2       Q     And did ADC impose a $10,000 fine against
 3   Wexford for the Lewis incident?
 4       A     We recommended a $10,000 fine, yes.
 5       Q     Do you know who made the decision to impose
 6   that $10,000 fine against Wexford?
 7       A     I do not.
 8       Q     Was it solely for the hep C incident at Lewis,
 9   or was it also for other shortfallings in the contract?
10                   MS. WIENEKE:  Form and foundation.
11                   THE WITNESS:  I don't know.
12       Q     BY MS. KENDRICK:  This September 21st letter,
13   in addition to the hep C incident, it also describes
14   some other problems beginning on page 2, including a
15   problem with distributing medication at the Lumley yard
16   at Perryville and reviews of medication that's
17   expiring.  Were these also reasons for the $10,000
18   fine?
19                   MS. WIENEKE:  Foundation.
20                   THE WITNESS:  I don't know.
21       Q     BY MS. KENDRICK:  And you testified earlier
22   that medication was one area that you thought had
23   declined since July 1st.  Are the incidents that are
24   described in this letter the reason why you feel that
25   way?
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 52

```
 1      A    Yes.
 2      Q    Are there other incidents besides those that
 3  are detailed in this letter involving medication
 4  delivery that has caused you to make that assessment?
 5      A    No.
 6      Q    Do you know if ADC could have imposed a
 7  $10,000 fine for each one of these separate incidents?
 8      A    I don't know.
 9      Q    Okay.  I'm handing you a document that has
10  been marked as Exhibit 35.  It's Bates stamp ADCO27877
11  through 027885 and,
12
13
14      A    I don't know if I've seen this specific
15  document.
16      Q    Take your time looking at it.
17      A    I don't recall seeing this specific document.
18  It's possible, but there were a lot of reviews of a lot
19  of documents during that time.
20      Q    Okay.  I just have a quick question about one
21  thing that's on the second page of this document.
22
23
24
25
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 55

1   diabetics were.

2       Q    The source being an individual or the

3   documents they were trying to review?

4               MS. WIENEKE:  Form.

5               THE WITNESS:  They didn't have a

6   document that told them who all the insulin dependents

7   were.

8       Q    BY MS. KENDRICK:  Okay.  So how did they

9   determine who was insulin dependent?

10              MS. WIENEKE:  Foundation.

11              THE WITNESS:  That was one of their

12  objectives.  I'm sure they had several game plans in

13  place to do that, but I don't know what all they did.

14      Q    BY MS. KENDRICK:  Were they ultimately able to

15  determine even who was insulin dependent?

16      A    My understanding is that they did, yes.

17      Q    How many days did it take them to figure that

18  out?

19      A    I don't know when the final determination was

20  made, exact date, but I know it took probably three or

21  four days.

22      Q    Okay.  If you can turn back to number 35,

23

24

25

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 57

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 60

1       A    I do not.

2       Q    Okay.  And are you familiar with this report

3    that it's referencing, the medication expiration report

4    for July 1st to August 11th, 2012?

5       A    Yes.

6       Q    And what did it describe?

7       A    It was a list that showed a prescription and

8    an expiration date, and it was just a list, again, of

9    8,358 prescriptions that needed to be reviewed to

10    determine if those prescriptions were actually renewed

11    or not.

12       Q    Okay.  And in the next paragraph, it describes

13    a meeting on August 22nd between Monitoring Bureau

14    leadership and Wexford regional and corporate

15    personnel.  Were you at this meeting?

16       A    Yes.

17       Q    And the letter states that Denise Mervis, the

18    corporate pharmacist for Wexford, was aware of the

19    expired medication issue but had not taken adequate, if

20    any, actions to correct it.  What actions had she taken

21    to correct the problem?

22       A    I don't know.

23       Q    Did she describe the actions she had taken at

24    this meeting?

25       A    I don't recall that.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 63

1    A    Possibly human error.

2    Q    Would that be by the pharmacy staff or the

3    clinical staff?

4    A    Both.

5    Q    And was that due to lack of communication

6    between the clinicians and the pharmacists?

7    A    I don't know.

8    Q    What other causes did the Monitoring Bureau

9    find for this problem?

10   A    That's basically it.

11   Q    IT and human error?

12   A    Yes.

13   Q    And did the Monitoring Bureau propose some

14   sort of remedial plan or action to take to ensure that

15   this doesn't happen again and that the problem is

16   fixed?

17            MS. WIENEKE:   Form.

18            THE WITNESS:   The monitoring team's

19   function is to bring this to the attention to Wexford,

20   to have Wexford figure this out and fix it.

21   Q    BY MS. KENDRICK:   Have they figured it out and

22   fixed it?

23            MS. WIENEKE:   Form.

24            THE WITNESS:   (No oral response.)

25   Q    BY MS. KENDRICK:   You shook your head no.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1       A    I'm shaking my head because the question is so
2   vague, I'm having trouble answering it.  Have they
3   figured it out?
4       Q    Have they identified the IT issues and human
5   error that was the cause of this problem?
6                   MS. WIENEKE:  Form.
7                   THE WITNESS:  I don't know if they have
8   identified all the issues or not.
9       Q    BY MS. KENDRICK:  Okay.  And you don't know if
10  they have taken any action to fix it?
11      A    I don't know what specific actions they have
12  taken, but I know they have been looking into this and
13  working on this issue for quite some time.
14      Q    And are they providing the Monitoring Bureau
15  with any sort of regular update as to the actions they
16  are taking and the improvements that they've seen?
17                  MS. WIENEKE:  Form.
18                  THE WITNESS:  I have not gotten anything
19  directly from them, but the monitoring team is working
20  with the people in the field on a daily basis to follow
21  the progress.
22      Q    BY MS. KENDRICK:  So who would these updates
23  be going to, if not you?
24      A    The monitors in the field.
25      Q    So the monitors in the field don't report back

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 65

1    to you or Mr. Taylor or anybody else about whether they

2    are improving medication delivery?

3                    MS. WIENEKE:  Object to the form.

4                    THE WITNESS:  Yes.

5        Q    BY MS. KENDRICK:  How frequently?

6        A    We get a monthly update.

7        Q    So what was the last monthly update that you

8    received about this medication issue?  When did you

9    receive it?

10       A    At the end of August.

11       Q    You've not received one for the end of

12   September yet?

13       A    Not yet.

14       Q    And the end of August report, did it show any

15   sign that the delivery was improving?

16       A    That varies facility by facility.

17       Q    Which facilities were improving?

18       A    I don't recall.

19       Q    Were there any facilities that it concerned

20   you that it wasn't improving or it was getting worse?

21                   MS. WIENEKE:  Form.

22                   THE WITNESS:  My concern is for all the

23   facilities.

24       Q    BY MS. KENDRICK:  But were there any

25   institutions where you read the review and you said to

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 83

1            THE WITNESS:  I don't know.

2       Q    BY MS. KENDRICK:  Did you ever work as a

3  physician assistant in any of the prisons?

4       A    Yes.

5       Q    As a medical professional, in your judgment,

6  would it be better if the person with a chronic

7  condition has a continual supply of his or her

8  medications to treat that condition?

9            MS. WIENEKE:  Form.

10           THE WITNESS:  Yes.

11      Q    BY MS. KENDRICK:  And the fifth bullet point

12 says in bold underlined, if you lose the bar code, then

13 your refill process will be delayed.  Does it concern

14 you that if a prisoner loses a bar code on his

15 medication, that his supply of medication is delayed?

16           MS. WIENEKE:  Form and foundation.

17           THE WITNESS:  I can't even respond to

18 that because I'm not aware of what this process is.

19      Q    BY MS. KENDRICK:  If Wexford decided to make a

20 change such as requiring prisoners to file an HNR every

21 time they needed to refill their medication to treat

22 HIV/AIDS, is that something that they would need to get

23 approval from the Contract Monitoring Bureau?

24      A    No.

25      Q    They could make that kind of change?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 105

 1      Q     BY MS. KENDRICK:  And why would that be a

 2   concern to you?

 3      A     If it had a bearing on the inmates' care at

 4   that facility, if it was secondary to a lack of care, I

 5   would have a huge concern.

 6      Q     Okay.  And Wexford has provided you guys with

 7   these transport reports?

 8      A     Yes.

 9      Q     And Wexford also has been providing you with

10   monthly staffing reports?

11      A     Yes.

12      Q     Regarding each facility?

13      A     Yes.

14      Q     And have you made any observations in the

15   staffing patterns and the vacancy rates for July and

16   August?

17                  MS. WIENEKE:  Form.

18      Q     BY MS. KENDRICK:  Has the staffing -- the

19   vacancy rate gone down?

20                  MS. WIENEKE:  Form.

21                  THE WITNESS:  I'm seeing improvement,

22   yes.

23      Q     BY MS. KENDRICK:  Okay.  And the contract

24   requires that Wexford follow all of ADC policies and

25   procedures regarding health care services.  Correct?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 106

```
 1              MS. WIENEKE:  Object to form.
 2              THE WITNESS:  It's required in the
 3   contract, yes.
 4      Q    BY MS. KENDRICK:  Okay.  And as part of the
 5   monitoring, they have to notify you when they want to
 6   make a change to the policies and procedures.  Correct?
 7              MS. WIENEKE:  Form.
 8              THE WITNESS:  Correct.
 9      Q    BY MS. KENDRICK:  Okay.  Have they asked to
10   change any of the policies or procedures yet?
11              MS. WIENEKE:  Form.
12              THE WITNESS:  Not that I'm aware of.
13      Q    BY MS. KENDRICK:  But as the monitor, you
14   would have to approve that?
15      A    The Department would have to approve that,
16   yes.
17      Q    Okay.  And another report that's required is a
18   quarterly utilization review report on the number of
19   utilization reviews of referral for additional care.
20   What is a utilization review?
21      A    That's monitoring the patients in the
22   hospital.
23      Q    Is that a term of art that was used by ADC in
24   the health care system in monitoring?
25      A    That's a general term that's, to my knowledge,
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 113

1   next page, on 13, on health care and pharmaceutical
2   supplies, it also requires that an inventory of all the
3   medication and pharmaceuticals supplies that are on
4   hand at each facility be taken prior to implementation
5   of the contract on July 1st.  Was this inventory done?
6        A    Yes.
7                    MS. WIENEKE:  Same objections.
8                    THE WITNESS:  Yes.
9                    MS. KENDRICK:  It's responsive to topic
10  three about the implementation.
11       Q    BY MS. KENDRICK:  And 2.6.17 is continuity of
12  care plan in case of emergencies, and the RFP required
13  that this be developed within 30 days of the contract
14  being awarded.  Was that plan provided?
15                    MS. WIENEKE:  Same objections.
16                    THE WITNESS:  Yes.
17       Q    BY MS. KENDRICK:  Okay.  And are you familiar
18  with something that's called QMP, quality management
19  program?  It's a Wexford phrase.
20       A    No.
21       Q    Okay.  So I believe the Department calls it
22  continuous quality improvement, CQI, and are these
23  improvement studies that are requested in the RFP
24  something that Wexford is providing to you all?
25       A    I have not seen them.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 114

1    Q    Okay.  So I'm showing you in the version with

2    the response, because I believe ADC and Wexford use

3    different acronyms for it, but it's section 2.8.12.1,

4    and it calls for a description and plan for continuous

5    quality improvement.  And I have to confess that's a

6    little jargony to me, and so do you understand what

7    this report is that the Department is receiving from

8    ADC?

9    A    No.  As I said, I haven't received any reports

10   related to this at this point.

11              MS. KENDRICK:  Off the record.

12              (The deposition was at lunch recess from

13   12:23 p.m. to 1:17 p.m.)

14   Q    BY MS. KENDRICK:  So I think I only have a few

15   more questions to wind things up with me on these

16   topics, and these large binders will go away.

17              (Deposition Exhibit No. 38 was marked

18   for identification.)

19   Q    BY MS. KENDRICK:  I'm handing you Exhibit 38

20   which is Bates stamped as ADC028092.  And on the

21   caption line, when it says to Joe Profiri through

22   Richard Pratt, what does the through mean?  You review

23   these before they go to Mr. Profiri?

24   A    Should be, yes.

25   Q    I had never seen that on a memo before, so I

# EXHIBIT V

**Portions of this document are subject to Protective Order**

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, Plaintiffs, v. Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, Defendants. | No.: CV12-00601-PHX-NVW (MEA) |

DEPOSITION OF TRACY CREWS, M.D.

October 3, 2012
1:10 p.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 18

1    privatization?

2         A    There were many concerns.  It went on for many

3    years.  It's hard to tell you all of my concerns with

4    that.  There were so many.

5         Q    Well, why don't we start with staffing.  Did

6    you have concerns about staffing?

7         A    Yes.

8         Q    What were they?

9              MR. STRUCK:  Form.

10             THE WITNESS:  I was concerned that we

11   had a great exodus of staff, both from the mental

12   health and the medical areas that weren't being filled.

13   I was concerned that -- I was concerned about Wexford's

14   reputation of what things that people had pulled off of

15   the Internet and had shown me.

16        Q    BY MS. KENDRICK:  And do you know from

17   speaking with your former colleagues what the reason

18   was for the exodus of employees?

19             MR. STRUCK:  Form, foundation.

20             THE WITNESS:  I know some of the

21   reasons.  I know that some people wanted to stay with

22   the State.  I know that some people were concerned

23   about -- about their licenses; about how, you know, it

24   would affect them to have this company that had had a

25   poor reputation come in.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 23

1                    MR. STRUCK:  Oh, there's no number on

2      the very top right corner?

3                    THE WITNESS:  18.

4                    MR. STRUCK:  Thank you.

5                    MS. KENDRICK:  Oh, 18, yes.

6         Q    BY MS. KENDRICK:  So the document that was

7      labeled as Exhibit 54, which is Bates number ADC011256,

8      it's the same section of the Mental Health Technical

9      Manual.  Is that correct?

10        A    I'm sorry?

11        Q    This document (indicating).

12        A    No, this one says mental health 3.  This one

13     says mental health 5.

14        Q    Which categories did you use with prisoners?

15     One says 2009 and the other says 2011.  At the time you

16     left, were you still --

17        A    We were still using MH-5 for the ones with the

18     most need, but wait, this -- when I left, I think we

19     were still using this one (indicating).

20        Q    And you are pointing to exhibit?

21        A    The 2009 one.

22        Q    Okay, Exhibit 54.  Okay.  Do you know why the

23     classification system was changed in the manual in

24     2011?

25        A    It changed every few years with new -- anytime

Page 24

1    we had a new person in charge, it changed.

2        Q    Okay.  But you said you guys still followed

3    the 2009 classification?

4        A    There was a lot of confusion when this one

5    came out because there was some requirements in this

6    one that couldn't be met, and also there was some

7    difficulty with the categories that they used in this

8    one, and I think that was more of the problem with this

9    one, is that we couldn't put the categories -- or

10   psychology couldn't put the categories into the

11   computer system.  And so I believe when I left, they

12   were still using the old one, which identified them

13   with S if they were -- had higher needs as an MH-3.

14       Q    And you stated that the 2011 version of the

15   policy the requirements couldn't be met.  What

16   requirements were those?

17       A    Well, the amount of time that we had to see

18   patients we didn't have the staffing to do it.

19       Q    Did the 2011 requirements increase the amount

20   of time you were supposed to see patients?

21       A    Yes.  It made all patients on any medications

22   MH-3, and they had to be seen every 90 days by

23   psychiatry.  Now, I'm talking only on the psychiatry

24   side.  Psychology is a separate entity.

25       Q    Right.  And I only want to talk about

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

1      A    They are conducted wherever -- usually in

2    offices or sometimes at their rooms if it was, you

3    know, somebody in max security.  There's been times

4    where I've done it in the break room.  There's been

5    times I've done it in medical records.

6      Q    Okay.  And you said with the max security MH-4

7    prisoners it was at their rooms.  By rooms, do you mean

8    cell?

9      A    I personally demanded that they would bring

10   them to me.  I fought with security many times about

11   that.  I know that other people would see them at their

12   cells.  The nurses would see them at their cells.

13   Other psychiatry staff would see them at their cells on

14   occasion.

15     Q    As the psych supervisor, did you ever try to

16   create a policy that all psych contacts should be in

17   the offices?

18              MR. STRUCK:  Form.

19              THE WITNESS:  I wrote several e-mails to

20   the -- the deputy warden of Lumley, which is where

21   those folks are housed.  I wrote e-mails to our

22   facility health administrator asking for assistance.

23   What typically would happen would be I would get a

24   response back saying, no, you can see them at the door.

25   And I would write back and say, I'm not psychology.  We

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 36

1   didn't tend to have the space available for them to do

2   those kind of things.

3       Q    And the psych nurses, are they RNs?

4       A    They are.

5       Q    Okay.  Do LVNs work as mental health staff?

6       A    No.

7       Q    All right.

8            (Deposition Exhibit No. 57 was marked

9   for identification.)

10      Q    BY MS. KENDRICK:  So I'm showing you what has

11  been marked as Exhibit 57.  It's stamped with Bates

12  number PLTF-PARSONS-001649 and 1650.  Do you recognize

13  this e-mail?

14      A    I do.

15      Q    Did you write it?

16      A    I did.

17      Q    At the time you wrote it, what were the

18  positions of the people to whom you addressed it?

19      A    Dr. Linder was the mental health program

20  manager.  Dr. Valenzuela was the assistant FHA.  John

21  Kinton was the facility health administrator.  John

22  St. Claire was the Psych III.  He was my supervisor.

23  Helena Valenzuela, I think her official title was ASO

24  II or III.

25      Q    That's okay.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 37

1     A     Okay.

2     Q     And in this letter, you state in your third

3     sentence, "I know that you are aware that Ms. Bankson

4     has put in her resignation and will be leaving us this

5     month."  Who was Ms. Bankson?

6     A     She was a nurse practitioner.

7     Q     Was she a psych?

8     A     Psych nurse practitioner, yes.

9     Q     Okay.  Was her position replaced?

10    A     Yes, eventually.

11    Q     You say eventually, when?  Do you know

12    roughly?

13    A     I knew you were going to ask that.

14    Mr. Mitchell came on board, my best estimate is around

15    March of 2012.  Wait, wait, wait, March of 2011.

16    Q     Okay.  And did Nurse Bankson leave in

17    August of 2010?

18    A     Yes.

19    Q     At the end of the month; do you remember?

20    A     I don't remember the exact date.

21    Q     Okay.  So from August 2010 to March 2011,

22    there was no psychiatrist RN?

23              MR. STRUCK:  Form.

24              THE WITNESS:  Correct.

25    Q     BY MS. KENDRICK:  Okay.  And if we go through

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 38

1    this message, you state, "We currently have over 1200

2    inmates on psych meds (1246 according to the

3    database)."  And you refer here to the new MH technical

4    manual.  Is that the...

5        A    Like I said, they changed it.  It seemed to me

6    like every time somebody new was in charge, they

7    changed the technical manual, so I didn't really keep

8    up with that too much.

9        Q    Okay.  But since this was written in 2010, it

10   couldn't --

11       A    Yes -- well, it could, because that -- I know

12   they worked on one for a really long time and kept

13   going back and forth with it before they actually

14   signed it off.  And at that point, they were expecting

15   us to work under it even though it wasn't signed off.

16   And again, a lot of confusion as to what exactly the

17   requirements were at that point.

18       Q    And did you express your confusion to

19   Dr. St. Claire?

20       A    Yes, and he expressed his confusion back to

21   me.

22       Q    And so what did he instruct you to do given

23   the confusion?

24       A    Use the previous -- the way that we were doing

25   it already until he would get back to us.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 39

1       Q     Okay.  And so by that, do you mean 2009 --

2       A     I'm assuming, yeah, 2009.

3       Q     -- guideline?  Okay.  And in this e-mail, you

4    say, "If I saw 20 per day every day, no vacation, no

5    furlough, no sick leave and only saw the follow-ups, I

6    would still only be able to cover 960 inmates."  Do you

7    know how you got to that number, 960?

8       A     I worked four days a week.  I don't remember

9    exactly, but I assume I just multiplied it out.

10      Q     And when you say if I saw 20 per day every

11   day, do you remember what length of time you were

12   assuming for those visits with the prisoners?

13      A     For follow-up, usually about 20 to 30 minutes.

14      Q     Okay.  Do you feel it's reasonable for a

15   psychiatrist to see 20 patients day after day?

16               MR. STRUCK:  Form and foundation.

17               THE WITNESS:  In the community, maybe.

18   In a prison like that there tends to be difficulties

19   with getting patients up.  There is difficulties, you

20   know, anytime there is a -- you know, somebody falls

21   out on the yard or there is a fight or anything like

22   that, they close down the yard, you don't get people

23   up.  Security always comes first.

24               So there were times -- there were a lot

25   of times that there were downtimes.  Also, they'd have

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 40

1    count twice a day in which they wouldn't bring patients

2    up.  Sometimes they would; sometimes they wouldn't

3    during those times.

4        Q    BY MS. KENDRICK:  Okay.  You also go on to

5    state that you have to see new intakes, HNRs and

6    medical refusals.  And you say that Perryville gets

7    approximately eight to ten new inmates per day, and

8    that each one takes 45 minutes.  I assume that means to

9    do an intake assessment?

10       A    Correct.

11       Q    And who is --

12       A    Not -- let me not confuse you.  The intake

13   assessment that is done when they walk in the door is

14   done by psychology.  That's a different thing than what

15   I'm talking about here.  I'm talking about a psychiatry

16   intake.  So it could be three months down the road that

17   we get to see them for the first time.  So they've been

18   seen by mental health, but I'm talking about the person

19   who is prescribing the medication doing an intake.

20       Q    So for these, would you call them an

21   evaluation?

22       A    Evaluation.

23       Q    Okay.  For these intake evaluations, who is

24   authorized to complete them?

25                MR. STRUCK:  Foundation.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 54

1    But for the majority of the time, it was either

2    psychiatry or psychology that were assigned to that

3    unit.

4                    On San Carlos, we had plenty of office

5    space, one for each of us.  On Santa Maria we started

6    with one office, but years ago they went to two offices

7    there.  Have I missed any?

8    Q    So if you had a certain number of patients you

9    were going to see and say three of them were housed at

10   Lumley and three were housed at Santa Cruz, would you

11   be the one who moved from Lumley to Santa Cruz?

12   A    Right.

13   Q    They wouldn't transport a prisoner?

14   A    No.

15   Q    Okay.  All right.  This e-mail that is subject

16   line "Office space at Lumley," you refer to office

17   space at BLU.  What is that?

18   A    Brent-Lumley unit.

19   Q    Okay.  And you state that there is only one

20   office at BLU which the psychiatrist, PRN II, Psych

21   Associate II, release planner and whoever else needs to

22   see anyone at BLU for any mental health reason.

23   A    Correct.  We would even have -- like if

24   somebody from outside, a psychologist or somebody

25   needed to do an evaluation from outside, they would use

Page 55

1    our office space.  So that's, you know, what I was

2    mostly talking about for anybody else.

3        Q    Okay.  And so when you say one office, what

4    was the size of this office?

5        A    At Lumley, my best guess would be about 12 by

6    12, maybe; 12 feet by 12 feet.

7        Q    How many desks were in there?

8        A    Two desks.

9        Q    And how many chairs?

10       A    Four chairs.

11       Q    Did everybody have their own computer or did

12   you share a computer?

13       A    No, we shared a computer.

14       Q    One computer?

15       A    One computer.

16       Q    How did you all fit in there?

17            MR. STRUCK:  Form.

18            THE WITNESS:  We would be in there at

19   different times.

20       Q    BY MS. KENDRICK:  Was somebody in charge of

21   keeping a master schedule so you knew who was in there

22   when?

23       A    I think I referred to it in here that we just

24   worked it out amongst ourselves.

25       Q    So you would just kind of send out an e-mail

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 76

1    was something that was taken very seriously.  Typically

2    after they had the training, we would see an increase

3    in mental health referrals to the point where they were

4    referring people that, you know, didn't need to be seen

5    emergently.  If a nurse got a -- an HNR that was

6    concerning, even if it was a medical nurse, they would

7    have that patient evaluated immediately.  At the very

8    least, they would be put on a mental health watch until

9    mental health could see them.

10       Q    Okay.  And would that mental health staff be

11   you or --

12       A    It could be me.  It would more likely be a

13   psychology or a psych -- psychologist or a psych

14   associate.

15       Q    Okay.

16       A    But anybody could put them on a mental health

17   watch, even security.

18       Q    Okay.  If a prisoner's prescription for her

19   psych meds were coming up to expire, does she have to

20   file an HNR saying, I need my Prozac prescription

21   renewed or something like that?

22       A    No.

23       Q    It's automatic?

24       A    It is.  I have some -- I had some good nurses

25   that would keep track of that.  They would run

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 77

1    prescription expiration reports every month, and if
2    anybody was coming up to expire, typically they would
3    try to get them seen.  And if not, there were periods
4    of time where I would -- you know, each month the nurse
5    would lay down, you know, a stack of scripts for me,
6    and I would fill them until the patient could be seen.
7        Q    Okay.  If a prisoner wasn't raising something
8    that was urgent in terms of mental health symptoms, so
9    maybe she didn't say, I'm going to kill myself, but I'm
10   feeling sad or I'm depressed, were there any guidelines
11   or protocols from ADC about how soon she needed to be
12   seen by mental health staff?
13               MR. STRUCK:  Form.
14               THE WITNESS:  I believe there were.
15   There were guidelines as far as who -- as far as how
16   soon psychology needed to see them, and I'm not sure
17   what those guidelines were.  It was supposed to be that
18   psychology would see them first and then would refer
19   them on to psychiatry if needed.  But what we found was
20   that if a patient wrote on there, I'd like meds for
21   depression, and a psychologist saw her first, she would
22   typically get aggravated with not being able to get the
23   medication.
24               So in order to kind of streamline that a
25   little bit, I agreed early on in my tenure there to, if

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 78

1    it said meds, just go ahead and give them to the psych

2    nurse and have them scheduled with me.  Because

3    otherwise, they could wait so much time to see the

4    psychologist and then have to wait an additional amount

5    of time to see the psychiatrist.

6         Q    BY MS. KENDRICK:  And in the last year you

7    were working there, how long were they waiting to see

8    the psychologist for the non-urgent mental health

9    needs?

10                  MR. STRUCK:  Form.

11                  THE WITNESS:  I would think it would

12   vary on each yard, and I couldn't even hazard a guess.

13   I didn't keep track of their...

14        Q    BY MS. KENDRICK:  Okay.  And in your

15   August 2010 e-mail, you stated that psychiatry was

16   getting 40 or more HNRs per day, and that didn't

17   include the HNRs managed by psychology.  Was that -- I

18   mean, from that point until when you left, is 40 about

19   how many you would get a day in psychiatry?

20                  MR. STRUCK:  Form.

21                  THE WITNESS:  To my best recollection,

22   yes.  And those are the ones that would say, I need my

23   meds changed; I don't want to take this med anymore, or

24   I'm having a side effect, or I need meds for

25   depression.  So they are specifically medication

Page 79

1    related.

2        Q    BY MS. KENDRICK:   Okay.   Do you remember

3    what's the most -- the largest number of HNRs you ever

4    got in a day in the past couple of years?

5        A    I don't have any idea.

6        Q    Okay.   Were the HNRs that were going to the

7    psychiatry department getting backlogged in the past

8    year or two?

9                MR. STRUCK:   Form.

10               THE WITNESS:   They were -- after Kathie

11   Bankson left, they got more -- we were already

12   backlogged at that point, as you can see.   They got

13   more backlogged after that.   When I was by myself, and

14   then when we got Mr. Mitchell and then Dr. Ogesen on

15   board, we started getting caught up to the point where

16   I was feeling pretty comfortable with what we were

17   doing at that point.

18       Q    BY MS. KENDRICK:   How far behind were you

19   before Dr. -- I mean Mr. Mitchell was hired?

20       A    Over six months for some people for the more

21   routine follow-ups.   For the ones that were more high

22   profile, I don't know how you want to say it, more

23   acute -- had more acute problems, they would be seen

24   more frequently --

25       Q    Okay.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 81

1    Q    BY MS. KENDRICK:  This was marked -- we are

2    doing continuing numbering, Mr. Struck -- and this was

3    marked as No. 25 in a deposition this morning.  And

4    this is Bates stamped PLTF-PARSONS-001652 through 1653.

5    And it's an e-mail dated February 3rd, 2011, and it

6    says it's from Tracy Crews to Ben Shaw and John

7    St. Claire titled, "Please help."  Did you write this?

8    A    Yes, I did.

9    Q    And in it you say, we are backed up three to

10   four months with the HNRs.

11   A    Yes.

12   Q    Was this -- was this written before

13   Mr. Mitchell was hired?

14   A    That's correct.  It was when we were in the

15   process of trying to hire him.

16   Q    And in your e-mail in that same sentence, you

17   say, and longer for regular follow-ups.  What do you

18   mean by regular follow-ups?

19   A    That means that people who aren't asking for

20   their own meds and they are quiet, they are not asking

21   for any assistance or telling us that they are having

22   any problems.

23   Q    So did that include the people who would just

24   need a medication check?

25   A    Correct.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 82

```
1      Q    If you weren't able to see the person for the

2   medication check-up, would their prescription just be

3   automatically rewritten without seeing them?

4      A    I -- I would extend them without seeing them,

5   yes, as opposed to letting the medication just run out

6   or expire.

7      Q    Okay.  What's the problem with letting the

8   medication expire or run out?

9                MR. STRUCK:  Form and foundation.

10               THE WITNESS:  Well, depending on what

11  kind of medication it is and what it's being used to

12  treat.  For instance, if they are getting an

13  antidepressant to treat depression, the problem with

14  letting it run out is they are likely to get depressed

15  again.  And with bipolar disorder they can become

16  manic.  With the psychotic disorders they could start

17  hallucinating or having delusional thoughts.

18               Any of those can cause problems for the

19  patient, problems for the facility.  In addition, with

20  some disorders like some of the psychotic -- well, most

21  of the psychotic disorders and bipolar disorder there's

22  a kindling effect.  So the more times they go off

23  medications and have symptoms, the harder it is to get

24  control of those symptoms and to treat them.

25     Q    BY MS. KENDRICK:  Okay.  And in this e-mail
```

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 83

1    you refer to an abysmal staffing situation, and you

2    say, "Currently there is one provider for Perryville."

3    What do you mean by one provider?  One --

4        A    Psychiatry provider, yes.

5        Q    Would the word provider refer to a nurse

6    practitioner?

7        A    Yes.

8        Q    Or I mean an RN?

9        A    No, not an RN like a psych nurse, but a nurse

10   practitioner it could.  A provider also technically

11   could refer to a medical provider, but that wasn't my

12   intention here.

13       Q    Okay.  And how many psychiatry positions were

14   allocated to Perryville at that time; do you remember?

15       A    Two psychiatrists and one psych nurse

16   practitioner.

17       Q    And I believe you had testified earlier that

18   August 2010 was when the nurse practitioner had left?

19       A    Correct.

20       Q    So at the time you wrote this in February, it

21   had been just you since August?

22       A    Correct.

23       Q    And in your opinion, you said that there were

24   two psychiatrists' positions.  Would that have been

25   enough to address the needs of the Perryville

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 84

1    prisoners, or did you feel that there should have been

2    more positions?

3                    MR. STRUCK:   Form and foundation.

4                    THE WITNESS:   Well, there is two

5    psychiatrists' positions and the psych nurse

6    practitioner.   That would have been adequate to cover

7    the facility.   To give great service, probably one

8    more, but that would have been enough to cover it.

9        Q    BY MS. KENDRICK:   Okay.   And we looked earlier

10   at the -- at the chart with the mental health

11   prisoners, and from 2011.   I think that's 2012, this

12   one here.   And it listed 1,305 prisoners as MH-3 and 77

13   as MH-4, and that's a total of 1,382.

14       A    Wait, I may be on a different --

15       Q    Next page there.

16       A    Okay.

17       Q    So given that there were that many prisoners

18   with this level of mental health needs, did you -- do

19   you think that having a psychiatrist with a caseload

20   this high meets the acceptable standard of care?

21                    MR. STRUCK:   Form and foundation.

22                    THE WITNESS:   No.

23       Q    BY MS. KENDRICK:   Okay.   And you also state in

24   that e-mail that you were informed that you were one of

25   2.5 psychiatrists with ADOC.   Do you remember who told

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

1    they would let me know if there were problems.  I

2    didn't feel comfortable with three nurses that I didn't

3    know continuing medications for an extended period of

4    time with no end in sight.

5            There had been times in the past where I

6    had prescribed them for a few days, you know,

7    especially on like an urgent response-type situation,

8    you know, somebody comes in on a Saturday or something

9    and needs medications until they can be seen Monday,

10   but I did not feel comfortable prescribing for people

11   that I was never going to see, weren't going to be my

12   patients, and I was just trying to relay that in this

13   message.

14   Q    BY MS. KENDRICK:  And you testified earlier

15   that on occasion at Perryville the nurses might call

16   you and say, you know, so-and-so's Prozac dosage might

17   need to be increased.  Were the nurses at Florence

18   calling you and asking for similar sorts of things,

19   like increase the dosage of a prisoner's medicine?

20           MR. STRUCK:  Form.

21           THE WITNESS:  I don't remember them

22   asking me to increase doses.  They asked me to

23   prescribe for new intakes.  They asked me to extend

24   medications that were about to run out, to stop

25   medications that were being refused by the patient.

Page 93

1    Again, there was no end in sight, you know.  If they

2    had said our new provider is coming on next week, you

3    know, can you do this until next week, sure, I will do

4    that.  Because the first thing is patient care, you

5    know.  But I wasn't -- I wasn't willing to do it

6    indefinitely.

7        Q    BY MS. KENDRICK:  So for how long did you

8    write the prescriptions?

9        A    For three days I think at that point.

10                  MR. STRUCK:  Form.

11                  THE WITNESS:  And then I told them I

12   wasn't doing it beyond that, that they needed to get

13   somebody.

14       Q    BY MS. KENDRICK:  So do you know who started

15   writing the prescriptions?

16                  MR. STRUCK:  Form and foundation.

17                  THE WITNESS:  I have no idea.

18       Q    BY MS. KENDRICK:  To your knowledge, if there

19   was no psychiatric provider at an institution, would

20   medical doctors or medical nurse practitioners not

21   trained in psychiatry prescribe the psychiatric

22   medication?

23                  MR. STRUCK:  Form and foundation.

24                  THE WITNESS:  I don't know if that

25   actually happened.  At one point I suggested that they

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 100

1      A    Yes.

2      Q    And did Perryville keep a master list of

3   prisoners on psychotropic medication to give to

4   security staff so that they wouldn't be housed in hot

5   temperatures?

6      A    No.

7      Q    How would security staff know that a prisoner

8   was sensitive to the heat or to the sun?

9              MR. STRUCK:  Foundation, form.

10             THE WITNESS:  I don't guess they would

11   at all unless the prisoner made them aware of it.

12     Q    BY MS. KENDRICK:  And in the technical manual

13   that we've previously stamped as 55, chapter 5, section

14   7.0, which is page 64, if you can turn to that.  And

15   it's called management of photosensitivity reactions to

16   medications.  Are you familiar with this guideline?

17     A    Yes.

18     Q    Okay.  And the policy says that if a prisoner

19   has a reaction -- a photosensitivity reaction, that the

20   psychiatrist will order SPF 30 sunblock, one bottle per

21   month?

22     A    Uh-huh.

23     Q    Was that all that you could do for them?

24     A    Yes, or change their medication.  There is

25   alternates to most of these medications that offer some

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 103

1                    THE WITNESS:  I didn't have that occur.

2     To the best of my recollection, I would assume that we

3     would change to a different medication if that

4     occurred.

5          Q    BY MS. KENDRICK:  Are you familiar with any

6     prisoners on psychotropic medications experiencing

7     heatstroke?

8          A    Yes.

9          Q    What happened?

10         A    She died.

11         Q    Was she the only one?

12         A    She's the only one that I am aware of.

13         Q    Did other prisoners experience other adverse

14    effects short of death?

15                    MR. STRUCK:  Form and foundation.

16                    THE WITNESS:  I'm not aware of any other

17    prisoners that had a heat -- a severe heat reaction

18    with the medications.

19         Q    BY MS. KENDRICK:  What was the name of the

20    prisoner who died?

21                    Let's take a break.

22         A    Oh, I'm all right.  I'm trying to think of her

23    name and I'm just blanking.

24                    MR. STRUCK:  You all know who she is,

25    don't you, Corene?

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 104

1      Q      BY MS. KENDRICK:   If you don't remember her

2    name, that's fine.

3      A      Marcia Powell.   Marcia Powell.

4      Q      Okay.   So I'd like to ask you a little bit

5    more about the prisoners who were placed on suicide

6    watch.

7      A      Okay.

8      Q      I believe you said earlier that they are all

9    placed in the SMA at Lumley.   Is that correct?

10     A      Almost all of them.   Sometimes on rare

11   occasions now at the central detention unit.

12   Previously they were housed at the central detention

13   unit.

14     Q      When was the shift made, to the best of your

15   recollection?

16     A      My best guess was about three years ago, four

17   years ago.

18     Q      Is the SMA the unit where the women on death

19   row are also housed?

20     A      Yes.

21     Q      And the women who are on close custody, max

22   custody?

23     A      Yes.   Max custody, yes.

24     Q      Do you know why the suicide watch unit was

25   moved to that same unit?

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 114

1    Tasers and things like that.  So -- or, you know,

2    holding them down and having the possibility of

3    breaking bones and things like that.  So I don't know

4    how to answer that.

5        Q    BY MS. KENDRICK:  Is there a policy that

6    forbids the use of pepper spray on seriously mentally

7    ill prisoners?

8        A    Not that I'm aware of.

9        Q    What about if a prisoner is playing in her own

10   feces or smearing it on the walls; do you think pepper

11   spray is the appropriate response?

12               MR. STRUCK:  Form and foundation.

13               THE WITNESS:  I can't answer that.

14   Playing in your own feces is not a mental health

15   symptom; it is a behavioral symptom that I don't know

16   how to answer that.

17       Q    BY MS. KENDRICK:  Are you familiar with an

18   incident in September 2011 where correctional staff

19   used pepper spray on a woman who was smearing feces at

20   SMA?

21       A    No.

22       Q    Okay.  Are you familiar with an incident in

23   August of 2011 in a suicide watch where a mentally ill

24   woman was pepper sprayed so much that the entire pod

25   had to be evacuated?

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 117

1       Q       BY MS. KENDRICK:  And are there any sort of

2   policies or guidelines as to if a prisoner is just

3   actively self-harming, at a certain point, is she

4   transferred to a different mental hospital, to the

5   Phoenix facility?

6                       MR. STRUCK:  Form.

7                       THE WITNESS:  We try to transfer people

8   there if they are not responding to the treatments that

9   we gave them at Perryville.

10      Q       BY MS. KENDRICK:  How soon does that process

11  take?  How long does that process take?

12      A       I've seen it happen on the same day.  I've

13  seen it take weeks.

14      Q       On average, in the last year you were working

15  there, how long was it taking to transfer prisoners

16  over?

17                      MR. STRUCK:  Form, foundation.

18                      THE WITNESS:  A couple of weeks.

19      Q       BY MS. KENDRICK:  So what would you guys do in

20  the meanwhile?

21                      MR. STRUCK:  Form.

22                      THE WITNESS:  They were usually housed

23  at SMA in the -- usually in the watch cells, not

24  necessarily on a suicide watch.  They could also be

25  housed there on a 30-minute watch where they have their

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 127

1                    MR. STRUCK:  Form.

2                    THE WITNESS:  No.

3      Q    BY MS. KENDRICK:  Okay.  Are you aware of any

4  mental illnesses that could worsen or be exacerbated by

5  long periods of isolation?

6                    MR. STRUCK:  Form, foundation.

7                    THE WITNESS:  Almost all of them.  A

8  person who doesn't have mental illness being isolated

9  for long periods could develop mental illness or mental

10  illness symptoms from being isolated.

11      Q    BY MS. KENDRICK:  And people who already have

12  a diagnosis?

13                    MR. STRUCK:  Form, foundation.

14                    THE WITNESS:  Can be made worse.

15      Q    BY MS. KENDRICK:  Okay.  And are you aware of

16  any physical effects on individuals from being isolated

17  for long periods of time besides psychological?

18                    MR. STRUCK:  Form, foundation.

19                    THE WITNESS:  Well, of course, with the

20  lack of exercise, there's the problems associated with

21  that.  There is -- I mean, as human beings we need

22  interactions with other human beings.  These are mental

23  again.  But physical, okay, so I guess if you are not

24  in the sun, you could end up with a vitamin D

25  deficiency.  Again, if you are not exercising, your

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 136

1    Q    And she's had multiple stays in the suicide

2   watch at Lumley; is that correct?

3    A    That's correct.

4    Q    Was she on suicide watch when you left Lumley?

5    A    I am not sure.

6          (Deposition Exhibit No. 60 was marked

7   for identification.)

8    Q    BY MS. KENDRICK:   Okay.   So what I'm handing

9   you is a document that's Exhibit 60, and it's stamped

10  at the bottom PLTF-PARSONS-001642 through 1643.   And

11  it's an e-mail from Michael Gottfried to Don Specter,

12  and Mr. Struck is copied on it and other individuals.

13  And it discusses Inmate          in it, among other

14  prisoners.   This was written in August after you left.

15  Correct?

16   A    Correct, it was August, yes.   Yes, definitely.

17   Q    So I take it that means you did not write this

18  summary description?

19   A    I did not.

20   Q    Okay.   Before you left, had any effort been

21  made to transfer Ms.         to Phoenix-Flamenco?

22   A    Yes.

23   Q    What happened?

24   A    She's a level five, and they can't take level

25  five's out there.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 137

1    Q    So level five, you mean security?

2    A    Right.  In order to take a level five, they

3    would have to override it and have her reduced to a

4    level four in order to go out there.

5    Q    So does that mean that any prisoner who is a

6    level-five security automatically cannot go to Phoenix?

7    A    That was my understanding.

8    Q    What sort of mental health treatment is she

9    not eligible for because of her custody level?

10             MR. STRUCK:  Form and foundation.

11             THE WITNESS:  The treatment that's

12   provided at Flamenco, which is a level-one facility.

13   It's an inpatient treatment program.  I'm not sure

14   exactly what they provide out there.

15   Q    BY MS. KENDRICK:  But it's a more intensive

16   level --

17   A    It's supposed to be, yes.

18   Q    And more contact with mental health staff?

19   A    It's supposed to be, yes.

20   Q    So to your memory prior to you leaving, had

21   she ever been transferred to Phoenix at all?

22             MR. STRUCK:  Foundation.

23             THE WITNESS:  I can't say for sure.  It

24   seems like she had been out there earlier, like years

25   earlier, but I can't say for sure.

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 138

1     Q     BY MS. KENDRICK:  But not in the past year?

2     A     No, not in the past year, that I can recall.

3     Q     Okay.  Are you aware of other custody --

4     A     This says she was, though.

5     Q     Yes, it does.

6     A     Okay.  Well, she may have been.  I just may

7  not recall.

8     Q     Well, this also says she was transferred on

9  June 11th, which would have been right about when you

10 left.

11    A     Right.

12    Q     Okay.

13    A     So they must have overrode her.  I know that

14 we were trying to get her out there for the last month

15 or so that I was there, so they must have overrode her.

16    Q     Okay.  What sort of behaviors or problems was

17 she having that made you guys want to send her to

18 Phoenix and get an override?

19    A     Ms.          , in my opinion, she had the

20 schizophrenia disorder or the spectrum disorder

21 diagnosed.  My opinion, most of her issues were related

22 to her severe borderline personality disorder.  And her

23 behaviors were what -- what I saw mostly related to

24 that, which is this kind of pseudopsychosis,

25 rapid-cycling mood swings, impulsivity, self-harm

Parsons v. Ryan
Tracy Crews, M.D. - 10/3/2012

Page 141

1    believe it was offered out on the individual yards.  I

2    do believe that Dr. Mansfield-Blair did some DBT-type

3    treatments with patients, like not the full program,

4    but, you know, kind of a here and there kind of thing

5    and tried to work with her with that.

6        Q    BY MS. KENDRICK:  Do they offer dialectical

7    behavior therapy at Phoenix?

8        A    I would doubt it.  I don't know, though.

9        Q    And you said that she was never stable enough

10   to go to the WTU.  What does that mean, that she wasn't

11   stable enough?

12       A    The women's treatment unit, it was good for

13   what it was.  It was a -- they typically took people

14   who had abuse histories who were stable enough to

15   engage in therapy, intensive therapy.  They did not

16   have the facilities for somebody who was causing chaos

17   on a regular basis.

18       Q    Do you see that as a catch-22, that she is so

19   mentally ill that she can't get well enough to get the

20   treatment that actually would help her?

21                 MR. STRUCK:  Form and foundation.

22                 THE WITNESS:  Absolutely.  Absolutely.

23       Q    BY MS. KENDRICK:  Do you see any way of

24   getting out of that catch-22?

25       A    Absolutely.

# EXHIBIT W

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;        )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;      )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco; )
Jackie Thomas; Jeremy Smith; Robert  )
Gamez; Maryanne Chisholm; Desiree    )
Licci; Joseph Hefner; Joshua Polson; )
and Charlotte Wells, on behalf of    )
themselves and all others similarly  )
situated; and Arizona Center for     )
Disability Law,                      )
                                     )
          Plaintiffs,                )
     vs.                             )
                                     )
Charles Ryan, Director, Arizona      )
Department of Corrections; and       )
Richard Pratt, Interim Division      )
Director, Division of Health         )
Services, Arizona Department of      )
Corrections, in their official       )
capacities,                          )
                                     )
          Defendants.                )
                                     )


DEPOSITION OF JEFFREY ALAN SHARP, MD

October 9, 2012
9:09 a.m.
Phoenix, Arizona


Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 36

1        Q.    Are you aware of instances where the medical

2     staff is not able to respond to Health Needs Request

3     forms in a timely manner?

4                 MS. WIENEKE:   Form.

5                 THE WITNESS:   Can you be more specific.

6        Q.    BY MR. WILKES:   Are you aware of any backlogs

7     with the medical staff in being able to review and triage

8     them?

9                 MS. WIENEKE:   Form.

10                THE WITNESS:   Yes.

11       Q.    BY MR. WILKES:   And based on your experience,

12    what's your understanding of why there's a backlog with

13    the HNRs?

14                MS. WIENEKE:   Form and foundation.

15                THE WITNESS:   Manpower.   Manpower to deal

16    with it versus volume of HNRs.

17       Q.    BY MR. WILKES:   And so is it fair to say that

18    there's a staffing issue or concern that would prohibit

19    all of the HNRs to be able to be reviewed in a timely

20    manner?

21                MS. WIENEKE:   Form and foundation.

22                MR. HOCHULI:   Form.   Join.

23                THE WITNESS:   Yes.

24       Q.    BY MR. WILKES:   How long is it supposed to take

25    from receipt of an HNR to the time it's reviewed and

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

```
 1   triaged?

 2              MS. WIENEKE:  Form.

 3              THE WITNESS:  I honestly don't know the

 4   exact policy.

 5       Q.    BY MR. WILKES:  What's your understanding?

 6       A.    I believe I've heard 72 hours, but I don't know

 7   that I've currently or am aware of the black and white

 8   policy.

 9       Q.    And are you aware of any changes with regard to

10   that process now under Wexford as compared to under the

11   ADOC?

12       A.    Not aware of any changes.

13       Q.    Is it fair to say that you still have the same

14   issues of backlogs that we just discussed?

15              MS. WIENEKE:  Form and foundation.

16              THE WITNESS:  Yes.

17       Q.    BY MR. WILKES:  Now, there are some cases where

18   a prisoner may raise an urgent or emergency issue on an

19   HNR; is that right?

20       A.    Yes, sir.

21       Q.    And in that circumstance, can you describe for

22   me generally what's supposed to happen?

23              MS. WIENEKE:  Form.

24              THE WITNESS:  Well, what's supposed to

25   happen is the nurse was supposed to read every HNR and
```

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 47

1           THE WITNESS:  I would say they probably
2   center around two issues, maybe three:  one would be
3   staffing; two would be access to tertiary care,
4   consultation; and three would be access to medication.
5       Q.   BY MR. WILKES:  With regard to your concern
6   over staffing, when is the first time that you recall
7   having that concern?
8           MS. WIENEKE:  Form.
9           THE WITNESS:  During my time in Winslow.
10      Q.   BY MR. WILKES:  And have you had that concern
11  the entire time that you worked with the ADC?
12          MS. WIENEKE:  Form.
13          THE WITNESS:  Yes.
14      Q.   BY MR. WILKES:  And do you still have that
15  concern today?
16          MS. WIENEKE:  Form.
17          THE WITNESS:  Yes.
18      Q.   BY MR. WILKES:  And with regard to the access
19  to tertiary or consultant care, how long have you had
20  that concern?
21          MS. WIENEKE:  Form.
22          THE WITNESS:  That's difficult to answer
23  that with a number.  It's something that has loomed
24  larger with time.
25      Q.   BY MR. WILKES:  And do you still have that

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 48

1   concern today?

2       A.    Yes.

3       Q.    The last one you mentioned was access to

4   medication.   Is that a concern that you still have today?

5                 MS. WIENEKE:   Form.

6                 THE WITNESS:   Yes.

7       Q.    BY MR. WILKES:   And how long have you had that

8   concern?

9                 MS. WIENEKE:   Form.

10                THE WITNESS:   I want to consult with my

11   attorney.

12                MR. HOCHULI:   Take a break.

13                MR. WILKES:   That's fine.   Now is probably a

14   good time for a break.

15                (A recess was taken from 10:08 a.m. to

16                10:27 a.m.)

17       Q.    BY MR. WILKES:   Dr. Sharp, before we went off

18   the record, we were discussing concerns that you had over

19   the adequacy of health care provided to the prisoners.

20   And the specific question that was pending was:   How long

21   you've had the concern regarding access to medication?

22       A.    What's become apparent to me is we need to

23   define the word "concern."

24       Q.    How do you understand the word "concern"?

25       A.    I think in some of the previous questionings, I

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 50

```
 1              MS. WIENEKE:  Form and foundation.
 2              THE WITNESS:  Well, I'm going to remember
 3    that there's a -- I'll probably clarify what kind of
 4    concern it is.
 5       Q.    BY MR. WILKES:  That's great.  That would be
 6    perfect.  I appreciate that.
 7              So with regard to the question that we've
 8    been discussing, though, how long you had the concern
 9    regarding access to medication, how long have you had
10    that concern?
11              MS. WIENEKE:  Form.
12              THE WITNESS:  Well, to some degree, I was
13    worried about access to appropriate medication during my
14    tenure with ADOC, and I think that escalated to some
15    degree over time.  I would say my concern being worry
16    about adequacy has escalated with -- under Wexford.
17       Q.    BY MR. WILKES:  Let's discuss your medical
18    staffing concern in a little more detail.
19       A.    Okay.
20       Q.    In your view, are there currently enough
21    medical staff to provide adequate care to prisoners?
22              MS. WIENEKE:  Form and foundation.
23              THE WITNESS:  Currently?
24       Q.    BY MR. WILKES:  Currently.
25       A.    Today?  All I can talk about is where I work.
```

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 51

1    And I would say no, it's not adequate.

2        Q.    And are all the medical staff positions filled

3    where you work?

4                  MS. WIENEKE:  Form.

5                  THE WITNESS:  No.

6        Q.    BY MR. WILKES:  Do you know what positions are

7    not filled?

8        A.    Not exactly.

9        Q.    And within the past five years at the

10   facilities that you've worked at -- which would have been

11   Eyman and Florence, correct?

12       A.    Right.

13       Q.    Did you have this same concern over medical

14   staffing?

15                 MS. WIENEKE:  Form.

16                 THE WITNESS:  Yes.  At times in my tenure

17   with ADOC, it's been much worse than it is now.

18       Q.    BY MR. WILKES:  And by much worse, you mean

19   having even less positions filled than are currently

20   filled?

21       A.    Right.

22                 MS. WIENEKE:  Hold on.  Form and foundation.

23                 THE WITNESS:  Excuse me.

24       Q.    BY MR. WILKES:  And what kind of problems does

25   not having proper staffing create?

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 53

```
 1      Q.    BY MR. WILKES:  And is it fair to say that that
 2   can create a delay in the medical care that's received by
 3   the prisoners?
 4              MS. WIENEKE:  Foundation.
 5              THE WITNESS:  Well, yes.
 6      Q.    BY MR. WILKES:  And that delay can create a
 7   serious medical risk in some instances?
 8              MS. WIENEKE:  Foundation.
 9              THE WITNESS:  Yes.
10      Q.    BY MR. WILKES:  Do you know how long the delay
11   is for a prisoner patient to see a doctor currently?
12      A.    No.
13      Q.    But it's fair to say there's a backlog in
14   getting patients in to see a doctor?
15              MR. HOCHULI:  Where?
16              MS. WIENEKE:  Form and foundation.
17      Q.    BY MR. WILKES:  At your facility.
18              MS. WIENEKE:  Same objection.
19              THE WITNESS:  I think it depends on what the
20   complaint is.
21      Q.    BY MR. WILKES:  Are there backlogs in certain
22   type of -- I'm not sure I understand --
23      A.    The nurse can triage the HNRs.  So if somebody
24   wants a new special needs order for a lower bunk and
25   another inmate is telling that they're having chest
```

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 54

1    pains, well, the one that's having chest pains is going

2    to get scheduled to be seen before the one that wants the

3    chrono for the lower bunk, I hope.  But again, I'm not in

4    charge of that.  But that would be common sense for a

5    nurse.

6       Q.    Have you seen backlogs in seeing patients with

7    chronic care issues?

8       A.    Yes.

9       Q.    And how long are those backlogs?

10             MS. WIENEKE:  Foundation.

11             MR. HOCHULI:  Again, are we talking about

12   now at his facility?

13             MR. WILKES:  Yes.

14             MR. HOCHULI:  Thank you.

15             THE WITNESS:  There are backlogs presently,

16   and there have been backlogs during my tenure with ADOC.

17      Q.    BY MR. WILKES:  And how long are those backlogs

18   currently?

19             MS. WIENEKE:  Form.

20             THE WITNESS:  I really don't know.

21      Q.    BY MR. WILKES:  Have you ever had backlogs when

22   you tried to order an x-ray and you're waiting for the

23   radiologist to review that x-ray?

24      A.    Yes.

25      Q.    And how long in your experience have you had to

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 55

1   wait to get radiologist's report?

2                MS. WIENEKE:  Form.

3                THE WITNESS:  Depends upon the time frame

4   you're talking about.

5        Q.    BY MR. WILKES:  Let's start with currently.

6        A.    Currently I would say until you get an official

7   radiology report on an x-ray -- from the time it's done

8   or from the time I order it?

9        Q.    From the time you order it.

10       A.    I would say two to four weeks.

11       Q.    Does that impair your ability to provide

12   treatment to the prisoner in the interim?

13               MS. WIENEKE:  Form.

14               THE WITNESS:  Depends on the case.

15       Q.    BY MR. WILKES:  Can it?

16       A.    It can --

17               MS. WIENEKE:  Form.

18               THE WITNESS:  Yes.

19       Q.    BY MR. WILKES:  And what kind of risks can that

20   impose -- what kind of risks can that pose to the

21   prisoners for those types of delays?

22               MS. WIENEKE:  Form and foundation,

23   speculation.

24               THE WITNESS:  Depends on the case.

25       Q.    BY MR. WILKES:  Based on your experience, have

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 56

1     there been instances where that's posed a serious risk to

2     a particular prisoner inmate, the delay in receiving the

3     x-ray and radiology report?

4              MS. WIENEKE:  Form.

5              THE WITNESS:  Yes.

6        Q.   BY MR. WILKES:  Can you describe that incident

7     for me.

8        A.   Well, the one that popped into my mind was an

9     x-ray that someone had a cavitary lesion in one of the

10    upper lobes of the lung.  And I was seeing the x-ray

11    report probably two months after the x-ray was done.

12       Q.   Any other incidents similar to that that you

13    recall?

14       A.   Nothing pops into my head.

15       Q.   Are you aware of delays in prisoners being able

16    to see doctors based upon the fact that an escort is not

17    available to them at your current facility?

18       A.   Not currently.

19       Q.   Was that a problem under the ADC?

20              MS. WIENEKE:  Form.

21              THE WITNESS:  Occasionally.

22       Q.   BY MR. WILKES:  Are you aware of any delays due

23    to an inmate transferring to a new facility and providing

24    their charts to a new facility or anything like that?

25              MS. WIENEKE:  Form.

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 79

```
 1      Q.    BY MR. WILKES:  For medical health, is there
 2   typically one individual that's in charge of the medical
 3   health for a particular facility?
 4      A.    Right.  Among the providers at Perryville,
 5   there would be one that would be designated as a medical
 6   director or medical supervisor.  As I've told you
 7   previously, she's on sick leave, so Dr. Bell is filling
 8   in.  He worked at Lewis.
 9      Q.    We started all this with talking about concerns
10   that you had with regard to health care provided to the
11   prisoners.  And the three things that you gave that we
12   discussed were prisoners' access to health care because
13   of staffing shortages, correct?
14                MS. WIENEKE:  Form.
15                THE WITNESS:  Yes.
16      Q.    BY MR. WILKES:  And we discussed prisoners'
17   access to consulting care and your concerns about that,
18   correct?
19                MS. WIENEKE:  Form.
20                THE WITNESS:  Yes.
21      Q.    BY MR. WILKES:  And we discussed prisoners'
22   access to medications and your concerns about that,
23   correct?
24                MS. WIENEKE:  Form.
25                THE WITNESS:  Yes.
```

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 80

1        Q.    BY MR. WILKES:  And those would be things that
2    would be common to all prisoners who needed health care,
3    correct?
4                  MS. WIENEKE:  Form and foundation.
5                  THE WITNESS:  Well, it would be common in
6    all of our society.
7        Q.    BY MR. WILKES:  So everyone would run into
8    those same problems?
9        A.    Sure.
10       Q.    And those problems, if they weren't addressed,
11   pose a seriour health risk to a prisoner, correct?
12                  MS. WIENEKE:  Lack of foundation, calls for
13   speculation.
14                  THE WITNESS:  There again, I would just say
15   in the population in general.
16       Q.    BY MR. WILKES:  That poses a serious health
17   risk, correct?
18       A.    Sure.
19                  MS. WIENEKE:  Same objection.
20                  THE WITNESS:  If you don't take care of your
21   health needs, you suffer.
22       Q.    BY MR. WILKES:  And if you aren't allowed
23   adequate health care and access to it, you suffer,
24   correct?
25                  MS. WIENEKE:  Objection; lack of foundation,

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 81

1   speculation.

2                  THE WITNESS:  In some cases.

3        Q.    BY MR. WILKES:  Do you ever communicate any of

4   the concerns that we've talked about today over inmate

5   health care to others at the Arizona Department of

6   Corrections?

7        A.    Yes.

8        Q.    And who did you communicate those to?

9        A.    My immediate supervisor, the medical program

10  manager.  I don't know what he's called.  The chief over

11  health services.  The director himself.  The attorney

12  general.  Some of my state senators.

13       Q.    Do you ever raise any of the concerns that

14  we've talked about today with anyone at Wexford?

15                  MS. WIENEKE:  Form.

16                  THE WITNESS:  Formally in writing?

17       Q.    BY MR. WILKES:  We can start with that.

18       A.    I'd say no.

19       Q.    Informally and not in writing?

20       A.    Thursday mornings.

21       Q.    So at the meetings on Thursday mornings, you

22  have informed people at Wexford about the concerns that

23  we've talked about here today over the adequacy of health

24  care being provided to inmates?

25                  MS. WIENEKE:  Object to the form.

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 84

1    people are just names.  I mean, so a human relations, I

2    think, or whoever's in charge of -- what do you call

3    that.  Personnel, something like that.

4        Q.    So other than that additional concern with

5    regard to the physical facility at the Lumley Unit, as

6    you sit here today, any other concerns pop into your mind

7    related to the inadequate health care provided to

8    prisoners?

9                MS. WIENEKE:  Form.

10               THE WITNESS:  There is a problem with

11   psychiatric medication.

12       Q.    BY MR. WILKES:  What's the problem with

13   psychiatric medication?

14               MS. WIENEKE:  Form.

15               THE WITNESS:  It's been a long-term policy

16   of the Department of Corrections that there's a strict

17   separation between mental health and medical.  And

18   primary physicians such as myself were not allowed or

19   expected to prescribe psychotropic medication.

20       Q.    BY MR. WILKES:  And what kind of problems has

21   that created for you?

22               MS. WIENEKE:  Object to the form.

23               THE WITNESS:  Well, that created a problem

24   for patients sometimes because I knew they had a need,

25   and I needed to refer them to a mental health or

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 85

1    psychiatry, which may or may not have happened.  I guess

2    what I'm getting to is that now under Wexford, I'm

3    expected to refill those prescriptions, and I'm not

4    comfortable doing so.

5        Q.    BY MR. WILKES:  So under Wexford, you have to

6    refill --

7        A.    I don't have to.  I've refused to do it.  But

8    it's been made clear to me that that's the expectation

9    that they have of me.  And I know others in similar

10   positions as may have done it.

11       Q.    And if you don't refill that medication, is

12   there anyone at your unit who is --

13       A.    Yes, it has to go --

14             MS. WIENEKE:  Hold on.  Let him finish the

15   question and then allow me to object, please.

16             THE WITNESS:  I'm sorry.

17       Q.    BY MR. WILKES:  Let me do it this way:  So if I

18   understand correctly, currently under Wexford, you are

19   expected to prescribe psychiatric drugs; is that correct?

20             MS. WIENEKE:  Form.

21             THE WITNESS:  I'm given a list of expiring

22   medications, most of which are psychotropic medications.

23       Q.    BY MR. WILKES:  And when they provide -- what's

24   your understanding of why you're provided that list?

25       A.    I'm not to let the medication run out.  I'm to

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 86

```
 1   keep the prescription current.
 2       Q.    And are you able to see all of the patients on
 3   that --
 4       A.    No.
 5             MS. WIENEKE:  Hold on.
 6       Q.    BY MR. WILKES:  Are you able to see all of the
 7   patients on that list before the medications expire?
 8       A.    No.
 9             MS. WIENEKE:  Form.
10       Q.    BY MR. WILKES:  Do you feel comfortable
11   prescribing medications for prisoners that you have not
12   seen?
13             MS. WIENEKE:  Object to the form.
14   Misstates.  I believe he said renewing, not prescribing.
15   There's a big difference.
16             MR. WILKES:  Object to the speaking
17   objection.
18       Q.    BY MR. WILKES:  Are you comfortable renewing
19   the medicines for the psychiatric drugs that are expiring
20   for patients that you have not seen?
21             MS. WIENEKE:  Form.
22             THE WITNESS:  No.
23       Q.    BY MR. WILKES:  Why are you not comfortable
24   with that?
25       A.    In many cases, I have never seen the patient,
```

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 87

1    period.  And in most cases, what psychiatrists do

2    nowadays is prescribe multiple psychotropic medications,

3    and that is a practice that I'm just not familiar with at

4    all and don't feel competent in.

5        Q.    But it's your understanding that Wexford

6    expects you to renew those psychiatric medicines?

7        A.    I don't know that it's in writing anywhere, but

8    I've made it known that I'm not going to do it, and I've

9    encouraged my colleagues not to.

10       Q.    But whether or not it's in writing, is it your

11   understanding that that's Wexford's expectation with

12   providing you that list, that you will in fact renew the

13   psychiatric medicines?

14       A.    Yes.

15       Q.    So other than the psychiatric medicine that

16   we've just talked about and the additional issues with

17   the physical facility at Lumley and the three prior

18   concerns that we discussed, are there any other concerns

19   as you sit here today that you have about the inadequate

20   care being provided to inmates?

21            MS. WIENEKE:  Object to the form.

22   Misstates.

23            THE WITNESS:  None comes to mind.

24       Q.    BY MR. WILKES:  So based on your 20-plus-year

25   experience with the ADC, let's just focus on the ADC for

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 147

1    you.

2              Do you see that?

3    A.    Yes.

4    Q.    Are you aware of any response to this email?

5    A.    No.

6    Q.    This is another example of the type of delays

7    that we've been discussing, correct?

8              MS. WIENEKE:  Form.

9              THE WITNESS:  Yes.

10   Q.    BY MR. WILKES:  And a delay in seeing malignant

11   melanoma can have serious consequences, correct?

12   A.    Yes.

13             MS. WIENEKE:  Form and foundation,

14   speculation.

15   Q.    BY MR. WILKES:  And, in fact, that can result

16   in death?

17             MS. WIENEKE:  Same objections.

18             THE WITNESS:  Yes.

19   Q.    BY MR. WILKES:  Who's Steve Grabowski?

20   A.    He's a scheduler, a clinical coordinator.  He

21   and Jen Fontaine.  At that time in -- at the Eyman

22   Florence.

23   Q.    Just generally speaking, what would a scheduler

24   do at that time period?

25             MS. WIENEKE:  Foundation.

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 152

```
 1              MS. WIENEKE:  Object to the form.
 2              THE WITNESS:  I can only tell you what I've
 3    heard.  I've just -- I've heard monitors sounding off
 4    inappropriately among the medical staff.
 5        Q.    BY MR. WILKES:  And what did the monitor say?
 6    What's your understanding of what the monitor said?
 7        A.    Well, this goes back probably just to the first
 8    month or two with Wexford, but things were chaotic at
 9    best.
10        Q.    What was your understanding of why they were
11    chaotic?
12        A.    Transition.
13        Q.    And how was that chaotic transition impacting
14    the health care provided to prisoners?
15              MS. WIENEKE:  Form and foundation.
16        Q.    BY MR. WILKES:  Based on your experience.
17              MR. HOCHULI:  That you're aware of.
18              THE WITNESS:  There were innumerable
19    problems with medications.
20        Q.    BY MR. WILKES:  What were those problems?
21              MR. HOCHULI:  Again, we're talking about --
22        Q.    BY MR. WILKES:  Talking about your experience.
23        A.    Yeah.  Things that I directly observed.
24        Q.    Correct.
25        A.    Inmates not getting medications.  Medications
```

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 153

1    not getting refilled.  Delays in getting medication.
2    Nurses coming to me with huge piles of medications that
3    were labeled to be administered "watch swallow" when the
4    inmate could keep them on person, so I had to change all
5    the prescriptions or change all the cards that the
6    medications were on.  Again, this is a transition time in
7    the first month or two.  These are better at this point
8    in time, but there was a significant impact at
9    transition.
10         Q.    I'm going to show you what we're going to mark
11   as plaintiffs' -- actually, can we go off the record for
12   just a second.
13                (Discussion off the record.)
14                (Exhibit 70 was marked.)
15                MR. WILKES:  I handed the witness what's
16   going to be marked plaintiffs' Exhibit 70.  It was
17   previously marked as Exhibit 21.  This copy has a Bates
18   number at the bottom that starts with ADC027854 and
19   continues through 869.
20         Q.    BY MR. WILKES:  This is a letter on Arizona
21   Department of Corrections letterhead dated September
22   21st, 2012.  And it's to Karen Mullenix, Director,
23   Wexford Health Services.
24                Dr. Sharp, I'm just going to ask you to turn
25   with me to page 5.  First, let me ask, have you ever seen

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 175

1      A.     Yes.

2      Q.     That was a case in which you were named as a

3  defendant?

4      A.     Yes.

5      Q.     Do you know the outcome of that case as it

6  relates to you?

7      A.     You told me yesterday.

8      Q.     You don't have to talk about what we

9  discussed.  Independent of any --

10     A.     Well, you asked me.

11     Q.     Okay.  And I appreciate that.  That's fine.

12     A.     Sorry, you get what you ask for.

13     Q.     You're absolutely right.

14            Independent of our discussion, which is

15  privileged, do you have any information from any other

16  source as to the result of that litigation?

17     A.     Nope.  I haven't found in state service that

18  you get much feedback as to outcomes.

19     Q.     Several times today, Dr. Sharp, you were asked

20  the hypothetical question of whether delay can create a

21  serious risk to a patient.

22            MR. WILKES:  Objection; form.

23            THE WITNESS:  Right.

24     Q.     BY MS. WIENEKE:  Do you have any specific

25  knowledge as to any specific patient that you have

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

```
 1    treated that as a result of a delay in care that that
 2    specific patient suffered a serious risk --
 3                MR. WILKES:  Objection; form.
 4        Q.    BY MS. WIENEKE:  -- of --
 5                MR. WILKES:  I'm sorry.
 6        Q.    BY MS. WIENEKE:  -- to their health that you
 7    can give us?
 8                MR. WILKES:  Same objection.
 9                THE WITNESS:  I can't cite names and inmate
10    numbers, but I know I had several cases when I worked at
11    Florence South of people who had their chemotherapy
12    interrupted, people who had their radiation therapy
13    interrupted, Dr. Wohler's case with the guy who had the
14    cancer on his lip.
15        Q.    BY MS. WIENEKE:  A patient who has his
16    chemotherapy interrupted, what I'm asking you, do you
17    know as a result of that interruption of chemotherapy
18    that the inmate suffered a serious risk to his health?
19        A.    Yes.  If I had my chemotherapy interrupted, I
20    would say that would be a risk to my health if I hadn't
21    followed my oncologist's plan.
22        Q.    So are you just speaking in terms of generality
23    that it's not a good idea to interrupt chemotherapy?
24        A.    Sure.
25                MR. WILKES:  Object to the form.
```

Parsons v. Ryan
Sharp, M.D., Jeffrey - 10/9/2012

Page 177

1      Q.     BY MS. WIENEKE:  So, for example, you can't
2   tell us if that interruption in that patient's
3   chemotherapy resulted in a faster progression of cancer
4   than if they had not had that interruption in
5   chemotherapy?
6                MR. WILKES:  Objection; form.
7                THE WITNESS:  Yeah, nor could anybody else.
8      Q.     BY MS. WIENEKE:  You mentioned earlier in your
9   deposition a situation about an x-ray in which a lesion
10  was found on the lung.  You had a term for it.  And I
11  wrote it down, but I don't know how to pronounce it.
12  Could you help me there?
13     A.     Cavitary.
14     Q.     Thank you.  Do you know whether the -- what the
15  outcome was of the patient as a result of that x-ray
16  being read?
17     A.     There again, I wave a flag about a problem.  No
18  idea what the outcome was.  I admitted the patient
19  immediately to the hospital with TB precautions.  I let
20  everybody know that this patient had been on the yard,
21  that all the employees and inmates were exposed to them.
22  And no feedback, period.  None.
23     Q.     So as far as --
24     A.     I don't even know what happened to the patient.
25     Q.     Just to be clear, then, you don't know what

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 178

1    happened to the patient, correct?

2        A.    Don't know if they had active TB, don't know if

3    anybody else was tested.

4        Q.    And don't know if there was an outbreak of TB

5    in his area?

6        A.    Don't even know if he had TB.

7        Q.    You were also asked questions about a

8    particular type of --

9        A.    And I asked for that feedback in our Thursday

10   morning meeting.  I said, what happened to this guy?  No

11   answers.

12       Q.    And what was the approximate time of this

13   incident with the x-ray?

14       A.    I remember the x-ray was done in June.  And I

15   got -- and I saw the report I'm pretty certain it was in

16   September, and I made people aware in September.

17       Q.    Do you recall the year?

18       A.    Yeah, this year.

19       Q.    Oh, 2012.

20             So this was a situation where you would have

21   seen the patient on intake?

22       A.    No.  I was reviewing, like I do every week, a

23   stack of x-ray reports and lab reports to find out if

24   there's anything pertinent on them or they're just all

25   normal.  And I come across one that says cavitary lesion

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 179

```
 1    in the left upper lobe or whatever lobe it was.  Right or

 2    left, it doesn't matter.  But, duh, it just kind of

 3    shocked me.  There it is.  And what could this have

 4    resulted in.  Because the x-ray was two months old.

 5         Q.    And I'm sorry, I may not be understanding what

 6    you're saying.  What you were doing in June would have

 7    been --

 8         A.    No.  What I was doing at the time that I

 9    discovered the x-ray report that no one else had

10    evidently seen.

11         Q.    All right.  And that was in September?

12         A.    August or September.  We're splitting hairs

13    kind of.  I mean, whatever.  Weeks had passed that this

14    guy was having this open lesion.

15         Q.    I'm just trying to find out where --

16         A.    Lady in that case, excuse me.

17         Q.    I'm just trying to find out where you would

18    have been, whether this was while you were at ADC at

19    Alhambra or you were at Perryville.

20         A.    This was while I was working at Perryville and

21    specifically at the Lumley Unit.

22         Q.    You also mentioned that there was a certain

23    type of insulin at ADC that was not on the formulary.  Do

24    you recall that?

25         A.    Correct.
```

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 181

1    respect to the conditions at ADC at the present time are

2    limited to your knowledge of the conditions at

3    Perryville, the facility that you serve?

4              MR. WILKES:  Objection; form.

5              THE WITNESS:  Not that you've shown me this

6    September 21 thing.  The September 21 document.  That

7    pretty much tells me it's systemwide.  That would be

8    interesting if somebody would have shared that with

9    medical staff.  Maybe we could have been on the same

10   team.

11       Q.   BY MS. WIENEKE:  Would it be fair to say,

12   Dr. Sharp, that with respect to the medication issues

13   that you have personal knowledge of, those are the

14   medication issues that you know about that happened at

15   Perryville?

16              MR. WILKES:  Objection; form.

17              THE WITNESS:  I'm still hot over this.  I'm

18   sorry, you're going to have to repeat that.

19              MR. HOCHULI:  Let's take a break, please.

20              (A recess was taken from 2:18 p.m. to

21              2:22 p.m.)

22              (The previous question was read by the court

23              reporter.)

24              MR. WILKES:  Objection; form.  Or same

25   objection.

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

Page 189

1           MR. WILKES:  Objection; form.
2           THE WITNESS:  I can't compare them.  I'm in
3    a totally different environment.
4       Q.   BY MS. WIENEKE:  And it's a totally different
5    environment because --
6       A.   I work at Perryville.
7       Q.   Because that's a female facility or --
8       A.   No, because I don't know how things are at
9    Florence South right now.  I don't know how things are at
10   SMU 2 right now.  I worked there, and I don't work there
11   now.  I don't know how things were at Perryville in 2008
12   and 2009.  I work there now.
13      Q.   Are inmates -- at least from your experience
14   from July 1 till now, are inmates at Perryville who have
15   chronic conditions being seen at regular intervals?
16          MR. WILKES:  Objection; form.
17          THE WITNESS:  If you're referring to all
18   inmates with chronic conditions, I would say no.
19      Q.   BY MS. WIENEKE:  Well, I'm asking you about the
20   inmates that you've seen at Perryville.
21      A.   If I see an inmate with a chronic condition, I
22   do a chronic care evaluation, and I schedule them for
23   follow-up.  So as much as it's in my control, I see that
24   it happens.
25      Q.   And have you been at Perryville long enough to

Parsons v. Ryan
Jeffrey Alan Sharp, M.D. - 10/9/2012

1    see a pattern to know whether those chronic condition

2    patients are coming back for their routine appointments?

3                    MR. WILKES:  Objection; form.

4                    THE WITNESS:  The way I get feedback on that

5    is from the nurse who schedules the chronic care

6    appointments, and it's kind of the same story as I used

7    to hear at Florence South or at SMU 2.  You know, chronic

8    cares are way backlogged.

9        Q.    BY MS. WIENEKE:  And this is information you

10   got from whom?

11       A.    The nurse who schedules them on my unit.

12       Q.    Do you know how many chronic condition patients

13   there are at Perryville?

14       A.    No, I don't.

15       Q.    And do you have a way of quantifying the

16   backlog?  Do you have any idea in terms of time?

17       A.    I could ask one of the nurses.

18       Q.    So that would be the way you'd have to know,

19   you'd just have to ask someone?

20                   MR. WILKES:  Objection; form.

21                   THE WITNESS:  Yeah, that would -- I don't

22   know of any other way you could do it.

23                   MS. WIENEKE:  All right.  Thank you.  Those

24   are the questions I have.  Thank you so much.

25                   MR. HOCHULI:  I've got nothing.

# EXHIBIT X

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No.: CV12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

30(b)(6) ARIZONA DEPARTMENT OF CORRECTIONS
(KAREN INGRAM)
TOPIC NO. 2

September 13, 2012
10:11 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

```
 1      Q    BY MS. KENDRICK:  Did the evaluation committee
 2   look at what they were offering to provide, say, in
 3   some area of healthcare services?
 4                MR. BOJANOWSKI:  Form.
 5                Go ahead.
 6                THE WITNESS:  Yes.  It was all taken
 7   into consideration based on the requirements of the
 8   RFP.
 9      Q    BY MS. KENDRICK:  But I believe you said
10   earlier that if a bidder said they would meet the
11   minimum requirements of the RFP, they would not get
12   extra points if they offered something more?
13      A    That is correct.  However, it would be noted
14   as a strength within that evaluation tool.
15      Q    But you don't get preference points for
16   strengths?
17      A    No.
18      Q    Okay.
19                (The deposition was at lunch recess from
20   12:29 p.m. to 1:02 p.m.)
21      Q    BY MS. KENDRICK:  So I want to move on to
22   talking a little bit more about the evaluation of the
23   bids, and specifically if you turn to page 37 of the
24   RFP, the section that's 2.3.12 Performance, first, on
25   the breakdown of the points that were allocated, would
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

1  this be a section that got 100 points?

2      A     2.3 as a whole, not 2.3.12.

3      Q     Okay.  Were the points broken down more by

4  subsections?

5      A     No.

6      Q     Was this another section where if you met all

7  the minimum requirements, you would automatically get

8  the 100 points for section 2.3?

9      A     This would be the section where we sent out

10  references.

11      Q     Right.  So it's --

12      A     So the answer to your question is no.

13      Q     Okay.  Do you know how many points Wexford got

14  on this section?

15      A     I don't recall.

16      Q     How about the other bidders?

17      A     I don't recall.

18      Q     Okay.  And I just want to clarify, so the last

19  complete sentence on 2.3.12.1 says, "The Department the

20  right to contact all current and past customers."

21  Should it say the Department reserves the right?

22      A     I would think so, yes.

23      Q     Okay.  I just wanted to make sure.

24      A     Nice catch.

25      Q     And then on -- excuse me, on page 38, the

Page 69

```
 1   section that's labeled 2.3.12.2, which is, "The
 2   Department shall consider an Offeror's performance
 3   history based upon current and prior performance and
 4   information obtained from the Offeror, from the
 5   Contract/Customer Organizations, and from public
 6   records."
 7                  So I have a few questions about this.
 8   You just said a minute ago that this was the section
 9   where you sent out recommendations?
10        A     References.
11        Q     References.  So how did the evaluation
12   committee send out references?  What did you do?
13        A     By letter.
14        Q     Did you send it to every entity that was
15   listed?
16        A     Yes.
17        Q     Did you send the letter to all current and
18   former contractors?
19                  MR. BOJANOWSKI:  Form.
20                  Go ahead.
21                  THE WITNESS:  Based on the information
22   that was provided from me to offeror, yes.
23        Q     BY MS. KENDRICK:  And what did the letter that
24   was sent to the references ask?
25        A     We used the criteria in 2.3.12.1 in those
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 70

1   subsections to prepare that letter.

2       Q    So what did the letter say?

3                MR. BOJANOWSKI:  Form.

4                THE WITNESS:  I don't recall word for

5   word.

6       Q    BY MS. KENDRICK:  The gist of the letter, what

7   were you requesting of the references?

8       A    Contract term, type of contract, number

9   of -- the number of individuals served, how it was paid

10  and the performance of that contract.

11      Q    Did you guys receive responses from the -- all

12  the references that you contacted?

13      A    No.

14      Q    If you hadn't received a response, was there

15  follow-up?

16      A    Yes.

17      Q    Do you know how many references you got for

18  Wexford responses?

19      A    I don't recall.

20      Q    Did you obtain any information from the

21  bidders' subcontractors, their proposed subcontractors?

22      A    No.  Can you reword that?

23      Q    Sure.  I mean, we can even go specifics if we

24  want to go to the Wexford contract.  It's page 161 and

25  162.  It says list of subcontractors.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 71

1           MR. BOJANOWSKI:  We are at Bates 14901,
2     and we are going to go --
3           MS. KENDRICK:  Through page 163.
4           MR. BOJANOWSKI:  -- 14903.  All right.
5           THE WITNESS:  Are we done with the
6     amendments?
7       Q    BY MS. KENDRICK:  Maybe not.  Keep them close.
8       A    Okay.
9       Q    So what is Bates number 14901 is Wexford's
10    proposed list of subcontractors.  And so what I was
11    trying to ask you was whether the request for the
12    references, did that also occur with the
13    subcontractors?  For example, did you ask for
14    references for Diamond Pharmacy Service?
15      A    No.
16      Q    Or LabCorp?
17      A    No.
18      Q    Did the evaluation committee request any
19    information about the subcontractors beyond what
20    Wexford provided?
21      A    I don't recall.
22      Q    If you did, would it -- if you had requested
23    additional information, would it have come from Wexford
24    in that revision statement that we looked at earlier?
25      A    Yes.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 72

1      Q     The document with the smiley face.

2      A     Oh, not necessarily.

3      Q     Where else?

4      A     It could be in their clarification response.

5      Q     So if there is no supplemental information in

6   those two documents, then there was nothing else

7   provided?

8      A     Yes.

9      Q     Okay.  So the RFP at section 2.3.12.2 says

10   that the Department will -- will base the consideration

11   upon current and prior performance and information

12   obtained from the offeror, from the contract

13   organizations and from public records, and so I just

14   kind of want to break that down a little bit.

15              And what information was obtained from

16   public records in evaluating the bids?

17      A     I'm not sure that there was any additional

18   public records obtained.

19      Q     And in terms of obtaining information from the

20   offeror, was the information gathered either from the

21   bid or from these -- the follow-up discussion meeting

22   you described and any final documents they sent you,

23   sent the committee?

24      A     Say that one more time.

25      Q     I'm just trying to get a sense of the universe

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 73

```
 1    of information that each offeror or bidder provided to
 2    you guys.  And is it based upon what they offered in
 3    the bid and then the discussions with the evaluation
 4    committee that you described those meetings and then
 5    subsequent documentation?  Was there anything else that
 6    the committee asked for from the bidders?
 7                   MR. BOJANOWSKI:  Form.
 8                   Go ahead.
 9                   THE WITNESS:  As well as the references.
10       Q    BY MS. KENDRICK:  Okay.  So I just want to be
11    very clear.  So it's the RFP, what they told you about
12    in the meetings with the individual bidders, the
13    supplemental response they may have given you and the
14    references?
15                   MR. BOJANOWSKI:  Form.
16                   THE WITNESS:  Yes.
17       Q    BY MS. KENDRICK:  Did the evaluation committee
18    obtain any information about the bidders through the
19    Private Corrections Working Group?
20       A    I'm not familiar with that group.
21       Q    Can you flip to page 174 on the bid.
22                   MR. BOJANOWSKI:  This one?
23                   MS. KENDRICK:  Yes.
24                   MR. BOJANOWSKI:  That would be Bates
25    14924.  Are you going to go through like a bunch of
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 74

1   these?

2                   MS. KENDRICK:  Yeah.  I mean, I want to

3   ask her some questions about that chart as a whole.  It

4   goes for about seven pages.

5                   MR. BOJANOWSKI:  I think it goes to

6   14930.

7                   MS. KENDRICK:  Preceding page, also.

8                   MR. BOJANOWSKI:  What?

9                   MS. KENDRICK:  No, she is also looking

10  at the preceding page.

11                  MR. BOJANOWSKI:  Okay.

12       Q    BY MS. KENDRICK:  It's a customer list is what

13  was called for under...

14       A    Yes, that's what I was checking --

15       Q    Okay.

16       A    -- to see where we were at.

17       Q    So when you said that you guys sent out

18  letters to references, would that -- are you referring

19  to all of the entities that are listed in the chart

20  that begins at Bates number 14924?

21       A    Yes.

22       Q    And I apologize if I've already asked this

23  question, but do you remember how many responses you

24  received from Wexford's references?

25       A    No, I don't recall.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 75

1      Q     Okay.  Can you turn to page 176.  It's the
2  third page of the chart.  And next to the bottom line,
3  Clark County Sheriff's Office, Vancouver, Washington,
4  and did ADC contact Clark County, Washington?
5      A     Through the reference letters, yes.
6      Q     Did you receive a response?
7      A     I don't recall.
8      Q     You see in the fourth cell on that row, it
9  states that, "Wexford Health advised the client we
10  would not be renewing the contract"?
11      A     I see that.
12      Q     Did ADC ask the Clark County office about
13  whether that statement is accurate?
14                  MR. BOJANOWSKI:  Form.
15                  Go ahead.
16                  THE WITNESS:  I -- I don't recall.
17      Q     BY MS. KENDRICK:  So you are unable to testify
18  that they did ask about that?
19                  MR. BOJANOWSKI:  Form.
20                  THE WITNESS:  Yes.
21      Q     BY MS. KENDRICK:  Okay.  Did the evaluation
22  committee independently consult any sources of public
23  information like news articles about Wexford's Clark
24  County contract?
25      A     Not that I'm aware of, no.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 76

1      Q      Did the committee Google the words Wexford

2    Health in Clark County, Washington?

3      A      Not that I'm aware of.

4      Q      If you flip a few pages ahead to page 181.

5      A      That's some more documents there.  It's that

6    one.  That's 181, or it should be.

7      Q      What's the Bates number on that?

8             MR. BOJANOWSKI:  14931.

9      Q      BY MS. KENDRICK:  Okay.  The second bullet

10   point refers to Clark County, Washington Sheriff's

11   Office, and it states that an independent audit was

12   conducted by the institute for law and policy planning.

13   Did the evaluation committee review this audit?

14             MR. BOJANOWSKI:  Form.

15             Go ahead.

16             THE WITNESS:  Not that I'm aware of.  It

17   wasn't part of this proposal.

18      Q      BY MS. KENDRICK:  So your testimony is as part

19   of the ADC evaluation, they did not read this report?

20             MR. BOJANOWSKI:  Form.

21             Go ahead.

22             THE WITNESS:  Not to my knowledge.

23      Q      BY MS. KENDRICK:  Did the evaluation committee

24   take into account Wexford's performance in Clark County

25   when awarding points for this section of the contract?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 77

```
 1              MR. BOJANOWSKI:  Form.

 2              Go ahead.

 3              THE WITNESS:  It was all taken into

 4   consideration, so yes.

 5      Q    BY MS. KENDRICK:  And if you can just flip

 6   back to the chart, page 177, I believe is Bates number

 7   14927.  Is that correct?

 8      A    (No oral response.)

 9      Q    Okay.  The top -- top row, New Mexico

10   Corrections Department, and then the second row, New

11   Mexico Children, Youth and Family's Department, did ADC

12   contact New Mexico Department of Corrections or the

13   Department of Children, Youth and Families about

14   Wexford?

15      A    Through the references, they were contacted.

16      Q    And did ADC ask the State of New Mexico about

17   whether it is accurate what Wexford says in the fourth

18   column, that they lost the contract through normal

19   rebid process?

20      A    That specific question --

21              MR. BOJANOWSKI:  Form.

22              Go ahead.

23              THE WITNESS:  -- no.

24      Q    BY MS. KENDRICK:  And to clarify, that applied

25   to both the Children, Youth and Families, and the
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 78

1    separate corrections department?

2       A    Yes.

3              MR. BOJANOWSKI:  Same objection.

4       Q    BY MS. KENDRICK:  And did ADC consult any

5    sources of public information such as news articles

6    regarding Wexford's New Mexico contracts?

7              MR. BOJANOWSKI:  Form.

8              THE WITNESS:  Not to my knowledge.

9       Q    BY MS. KENDRICK:  Did the evaluation committee

10   Google the words Wexford Health in New Mexico?

11             MR. BOJANOWSKI:  Same objection.

12             THE WITNESS:  Not to my knowledge.

13      Q    BY MS. KENDRICK:  Was the evaluation committee

14   aware that the former director of New Mexico's

15   Department of Corrections was put on leave by the

16   governor for having an improper relationship with a

17   Wexford Health lobbyist?

18             MR. BOJANOWSKI:  Form.

19             THE WITNESS:  Not to my knowledge.

20      Q    BY MS. KENDRICK:  Was the evaluation committee

21   aware that the former governor, Bill Richardson,

22   returned a $10,000 campaign donation from Wexford after

23   he came under fire for receiving it?

24             MR. BOJANOWSKI:  Form.

25             THE WITNESS:  Not to my knowledge.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 79

1      Q     BY MS. KENDRICK:  And back on page 182, which
2    is Bates number 14932.  Correct?
3      A     Yes.
4      Q     Okay.  The top bullet point, New Mexico
5    correctional department, it also refers to -- strike
6    that.
7                  Did the fact of this fine go to
8    consideration as to how many points to award Wexford --
9                  MR. BOJANOWSKI:  Form.
10     Q     BY MS. KENDRICK:  -- on this section of the
11   contract?
12                 MR. BOJANOWSKI:  Form.
13                 Go ahead.
14                 THE WITNESS:  Say it one more time.
15     Q     BY MS. KENDRICK:  I'll rephrase that.  I'm
16   sorry.
17                 Earlier you had spoke about how when
18   doing the scoring certain things got weakness -- were
19   scored as weaknesses or strengths.  Would something
20   like this fine be considered a weakness?
21                 MR. BOJANOWSKI:  Form.
22                 Go ahead.
23                 THE WITNESS:  Yes.
24     Q     BY MS. KENDRICK:  In the evaluation of
25   Wexford, was this a weakness?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 80

1      A    I don't recall, but I believe it was.

2      Q    And your testimony, I believe, was it was a 10

3   percent deduction --

4      A    Yes.

5      Q    -- for a weakness?  So that would have been 10

6   percent off of the 100 points for the entire section?

7      A    Yes.

8      Q    So there are four separate fines listed here

9   in this section besides New Mexico:  City of

10  Chesapeake, Florida Department of Corrections and

11  Broward, Florida Sheriff's Office.  Would each one of

12  these fines be a separate 10 percent deduction?

13                MR. BOJANOWSKI:  Form.

14                THE WITNESS:  No.

15     Q    BY MS. KENDRICK:  So it was just one 10

16  percent deduction for all of the fines?

17     A    Yes.

18     Q    Flipping back to the chart, the very first

19  page of it, so listed at the bottom of the chart is

20  Illinois Department of Corrections; did the evaluation

21  committee get a response from the Illinois Department

22  of Corrections about Wexford?

23     A    I don't recall.

24     Q    And did ADC review any outside sources of

25  public information such as news articles about

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

```
 1   Wexford's Illinois contracts?
 2                   MR. BOJANOWSKI:  Form.
 3                   THE WITNESS:  I don't recall.
 4       Q    BY MS. KENDRICK:  Did the evaluation committee
 5   Google the words Wexford Health Illinois?
 6                   MR. BOJANOWSKI:  Form.
 7                   THE WITNESS:  I don't recall.  Not to my
 8   knowledge.  I'm sorry.
 9       Q    BY MS. KENDRICK:  Okay.  You said I don't
10   recall about consulting like news articles.  Is that
11   more of a, not to my knowledge?
12                   MR. BOJANOWSKI:  Same objection.
13                   THE WITNESS:  Yes.
14       Q    BY MS. KENDRICK:  Okay.  Was the evaluation
15   committee aware that the former director of the
16   Illinois Department of Corrections was sent to federal
17   prison for two years for taking a $30,000 bribe from
18   Wexford Health?
19                   MR. BOJANOWSKI:  Form.
20                   THE WITNESS:  Not to my knowledge.
21       Q    BY MS. KENDRICK:  Was the evaluation committee
22   aware that on October 24th, 2011, a class action
23   lawsuit was filed in federal court in Illinois alleging
24   widespread mistreatment of prisoners and inadequate
25   medical treatment?
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 82

```
 1                MR. BOJANOWSKI:  Form.

 2                THE WITNESS:  Not to my knowledge.

 3       Q    BY MS. KENDRICK:  Did anyone on the evaluation

 4   committee read the complaint in the case?

 5                MR. BOJANOWSKI:  Form.

 6                THE WITNESS:  We asked for the

 7   complaints in the proposal, and the committee reviewed

 8   them, yes.

 9       Q    BY MS. KENDRICK:  You asked for the

10   complaints?

11       A    Uh-huh.  Yes.

12       Q    Are you referring to the request for the list

13   of pending legal matters?

14       A    Yes.

15       Q    I believe that starts at page 184, and then

16   it --

17                MR. BOJANOWSKI:  How far are you going?

18                MS. KENDRICK:  To that page or maybe one

19   more page.  They didn't put numbers on it.  Yeah.

20                MR. BOJANOWSKI:  These two?

21                MS. KENDRICK:  Yeah.

22                MR. BOJANOWSKI:  Okay.  She's referring

23   to Bates range 14934 through 14950.

24       Q    BY MS. KENDRICK:  Is this what you were

25   referring to when you said you asked the bidders for
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 83

1    copies of the complaints?

2                    MR. BOJANOWSKI:  Form.

3                    Go ahead.

4                    THE WITNESS:  Yes.  I believe there was

5    a subsequent question to provide that information.

6        Q    BY MS. KENDRICK:  Did Wexford provide that

7    information?

8        A    I don't remember.

9        Q    If they had, would it have been within what

10   we've marked and are using as Exhibit 11?

11       A    Yes.

12       Q    Okay.  And the name of this case that was

13   filed in Illinois is Lippert, L-i-p-p-e-r-t, versus

14   Godinez, G-o-d-i-n-e-z.  And when the committee

15   reviewed this list of pending litigation, how did you

16   identify cases?  Are there names given of the cases?

17       A    I don't recall how that was.

18       Q    Was a specific individual on the evaluation

19   committee assigned to reviewing this section of the

20   bid?

21       A    Yes.

22       Q    Who was that?

23       A    That was, I believe, the consultant.  We do

24   have a member on the committee from the -- from

25   Mercer's team.  Linda is her first name.  I don't

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 84

1   remember her last name, and the other committee member

2   was Denise Stravia.

3       Q    How do you spell Denise's last name?

4       A    S-t-r-a-v-i-a.

5       Q    And what was her title?  Is she at ADC or was

6   she at the consultant?

7       A    She was at ADC, special projects planner, same

8   as Donna Markley.

9       Q    And this consultant from Mercer Group, Linda,

10  last name unknown, was she an attorney?

11      A    I don't think so.

12      Q    Without telling me the substance of any

13  conversation, was anybody from ADC's legal department

14  on the evaluation committee?

15      A    No.

16      Q    Did anyone from ADC's legal department review

17  the bids?

18      A    No.

19      Q    Did anyone from ADC legal's -- legal

20  department review the drafts or the final RFP?

21      A    Not to my knowledge.

22      Q    Okay.  Just going back to our chart of the

23  clients, page 175 -- it's the second page of the

24  chart -- the first full row is Mississippi Department

25  of Corrections.  Did the evaluation committee receive a

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 85

1   response to the letter to the Mississippi Department of

2   Corrections?

3       A    I don't recall.

4       Q    And did ADC consult any outside sources of

5   public information such as news articles or reports

6   regarding the Mississippi contract?

7                   MR. BOJANOWSKI:  Form.

8                   THE WITNESS:  Not to my knowledge.

9       Q    BY MS. KENDRICK:  How about anybody Googling

10  the words Wexford Health Mississippi?

11                  MR. BOJANOWSKI:  Same objection.

12                  THE WITNESS:  Not to my knowledge.

13      Q    BY MS. KENDRICK:  Did the evaluators know that

14  Wexford's delivery of healthcare was an issue in a

15  federal lawsuit filed by the ACLU against the State of

16  Mississippi?

17                  MR. BOJANOWSKI:  Form.

18                  THE WITNESS:  Not to my knowledge.

19      Q    BY MS. KENDRICK:  Did anyone on the committee

20  read the complaint in that case?

21                  MR. BOJANOWSKI:  Same objection.

22                  THE WITNESS:  If it were included in

23  their proposal, then it was read.

24      Q    BY MS. KENDRICK:  Did anyone on the committee

25  read the court monitor's reports describing Wexford's

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 86

1   healthcare services?

2                MR. BOJANOWSKI:  Same objection.

3                THE WITNESS:  If it were in the

4   proposal, it was reviewed.

5      Q    BY MS. KENDRICK:  And if it were not?

6      A    And then if it were not, they would not have

7   knowledge of that.

8                MR. BOJANOWSKI:  Same objections.

9      Q    BY MS. KENDRICK:  And if you flip to page 181,

10  the last bullet point is a 2007 Mississippi Department

11  of Corrections report conducted by the Mississippi

12  Legislature's Joint Committee on performance evaluation

13  and expenditure review.  Did the evaluators request or

14  review this report?

15               MR. BOJANOWSKI:  Form.

16               THE WITNESS:  I can't be sure, but I

17  think that is the one that we did receive, and they did

18  review it.

19     Q    BY MS. KENDRICK:  So again, if it was

20  received, it would be somewhere in this Exhibit 11?

21     A    Yes.

22               MR. BOJANOWSKI:  Form.

23               Go ahead.

24     Q    BY MS. KENDRICK:  Okay.  And with regard to

25  the chart that begins at Bates number 14934, the

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 87

1    pending legal matters, to the -- I don't want to put

2    words in your mouth.  Did the group review any of the

3    complaints, or if they were reviewed, was it only upon

4    if they were later provided?

5              MR. BOJANOWSKI:  Form.

6              THE WITNESS:  Only if they were later

7    provided.

8        Q    BY MS. KENDRICK:  Okay.  So going back to the

9    RFP, can you turn to page 97.  Okay.  This is from

10   section 2.17, Staffing.  Was 2.17 assigned 100 points?

11       A    Yes.

12       Q    And was this one of those sections where if

13   they met the minimum requirements, they would get all

14   100 points?

15       A    Yes.

16       Q    Did Wexford get 100 points?

17       A    I don't recall.

18       Q    How many points did ADC give the other bidders

19   on this section?

20       A    I don't recall.

21       Q    And on the bottom of page 97, it's in

22   subsection 2.17.2, it states that individuals in

23   positions that require credentials -- and it lists

24   physicians, nurse practitioners, psychologists,

25   psychological specialists, registered nurses, licensed

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 88

1    practical nurses and dentists -- shall be subject to a

2    credential review by the Department.

3              Did the evaluation committee do this

4    credential review?

5              MR. BOJANOWSKI:  Form.

6              Go ahead.

7              THE WITNESS:  No.  This is after award

8    where you see contractor and not offeror.

9    Q    BY MS. KENDRICK:  Okay.  Who would be

10   responsible for this review within the department?

11   A    They have a monitoring team.

12             MR. BOJANOWSKI:  I think she's asking

13   you for the name of a person who would look for

14   licensure and certification.

15   Q    BY MS. KENDRICK:  Well, either the department

16   or the name of the individuals, if you know the names.

17             MR. BOJANOWSKI:  If you don't know the

18   names but you know the department, then go ahead and

19   give her the department.

20             THE WITNESS:  It's the health

21   monitoring.  They changed it from health services to

22   health monitoring.  It's a core group of people, but I

23   don't know the individuals' names.

24   Q    BY MS. KENDRICK:  Okay.  Can you turn to what

25   is page 150 of the Wexford --

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 89

1           MR. BOJANOWSKI:  There we go.

2       Q   BY MS. KENDRICK:  Okay.  The top of page 150

3   lists an individual, Dr. Malcolm Wilkinson, as their

4   proposed statewide chief medical officer, or CMO.  Is

5   he currently serving in this role?

6           MR. BOJANOWSKI:  Form.

7           If you know.

8           THE WITNESS:  I don't know.

9       Q   BY MS. KENDRICK:  Okay.  And did the bid

10  evaluators research the proposed staff people that are

11  listed beginning at page 180 and then going on for four

12  more pages?

13      A   I don't know what you mean by research.

14      Q   Did you do any sort of background inquiry into

15  the individuals beyond what Wexford had provided with

16  the resumes and the summaries?

17          MR. BOJANOWSKI:  Form.

18          Go ahead.

19          THE WITNESS:  No.

20      Q   BY MS. KENDRICK:  Okay.  Did anyone from the

21  evaluation committee check with the Arizona Medical

22  Board to see if Dr. Wilkinson has full and unrestricted

23  licensure in good standing?

24          MR. BOJANOWSKI:  Form.

25          Go ahead.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 90

1          THE WITNESS:  I think that was part of
2    the requirement.  I don't recall.
3      Q   BY MS. KENDRICK:  When you say it's part of
4    the requirement, requirement that the bidder --
5      A    That it be provided.
6      Q    Be provided by the bidder but not that the
7    Department go and independently do the research?
8               MR. BOJANOWSKI:  Form.
9               Go ahead.
10              THE WITNESS:  Meaning independently
11   provided within that proposal making it not necessary
12   for the Department to perform additional -- the
13   certification is there.
14     Q   BY MS. KENDRICK:  You relied upon what Wexford
15   told you guys?
16              MR. BOJANOWSKI:  Form.
17              Go ahead.
18              THE WITNESS:  We relied on what Wexford
19   provided.
20     Q   BY MS. KENDRICK:  Did the evaluation committee
21   know that in June 2007, the Arizona Medical Board
22   placed Dr. Wilkinson on probation for 15 years?
23     A    Not to my knowledge.
24     Q    Did the committee know that Dr. Wilkinson's
25   license to practice medicine was restricted by the

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 91

1    medical board?

2                    MR. BOJANOWSKI:  Same.

3                    Go ahead.

4                    THE WITNESS:  Not to my knowledge.

5        Q    BY MS. KENDRICK:  Okay.  Did the evaluation

6    committee know that the Medical Board of Arizona issued

7    him a letter of reprimand and restriction on

8    conduct -- for conduct that is or might be harmful or

9    dangerous to the patient or public?

10                   MR. BOJANOWSKI:  Same objection.

11                   THE WITNESS:  Not to my knowledge.

12       Q    BY MS. KENDRICK:  Did the evaluation committee

13   know that the Arizona Medical Board has suspended him

14   from practicing general surgery for 15 years and until

15   he applies to the board and receives permission to

16   practice surgery again?

17                   MR. BOJANOWSKI:  Same objection.

18                   THE WITNESS:  Not to my knowledge.

19       Q    BY MS. KENDRICK:  Okay.  If you just look a

20   little bit further down, on page 150, section 2.3.9.3,

21   pharmacy director coordinator.  Who does Wexford

22   propose as their coordinator?

23                   MR. BOJANOWSKI:  Form.

24                   Go ahead.

25                   THE WITNESS:  I don't -- I don't know.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 92

```
 1      Q    BY MS. KENDRICK:  Does it say TBD?

 2      A    Yes.

 3      Q    Does TBD stand for to be determined?

 4      A    I presume so.

 5      Q    Was this considered a weakness in scoring the

 6  bid?

 7      A    I don't recall.

 8      Q    Does Wexford currently have a statewide

 9  pharmacy director?

10                MR. BOJANOWSKI:  Form.

11                Go ahead.

12                THE WITNESS:  I hope so.  I don't know.

13      Q    BY MS. KENDRICK:  Okay.  And if you can

14  continue on to page 151 here, what's the Bates number

15  on that?

16                MR. BOJANOWSKI:  It is 14872.

17                MS. KENDRICK:  Thank you.

18      Q    BY MS. KENDRICK:  If you go to the bottom of

19  151 and then up to the top of page 152 here, who is

20  Wexford proposing as their dental director coordinator?

21      A    It chose TBD.

22      Q    And again, would this have been scored as a

23  weakness?

24                MR. BOJANOWSKI:  Form.

25      Q    BY MS. KENDRICK:  Was this scored as a
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 93

```
 1   weakness?
 2                MR. BOJANOWSKI:  Same objection.
 3                THE WITNESS:  I don't recall.
 4       Q    BY MS. KENDRICK:  Does Wexford have a
 5   statewide dental director --
 6                MR. BOJANOWSKI:  Form.
 7       Q    BY MS. KENDRICK:  -- at this time?
 8                MR. BOJANOWSKI:  Same objection.
 9                THE WITNESS:  Not to my knowledge, but I
10   would presume that they do.
11       Q    BY MS. KENDRICK:  But you can't testify that
12   they do?
13                MR. BOJANOWSKI:  Form.
14                THE WITNESS:  It's not my role.
15       Q    BY MS. KENDRICK:  Well, I'm just trying to
16   clarify, because not to my knowledge and presume that
17   they do are two different things.
18                MR. BOJANOWSKI:  Form.  That's beyond
19   the scope of her knowledge as she's indicated, so she
20   doesn't know.
21       Q    BY MS. KENDRICK:  Okay.  And again, the inmate
22   grievance representative further down on page 152 also
23   listed as TBD.  Was this scored as a weakness?
24                MR. BOJANOWSKI:  Same objection.
25                THE WITNESS:  I don't recall.
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Karen Ingram - 9/13/2012

Page 94

```
 1      Q    BY MS. KENDRICK:  Is there a statewide inmate
 2   grievance representative at this time?
 3                  MR. BOJANOWSKI:  Same objection.
 4                  THE WITNESS:  I don't have knowledge of
 5   that.
 6      Q    BY MS. KENDRICK:  Did any of the other bidders
 7   file a protest over the awarding of the contract to
 8   Wexford?
 9                  MR. BOJANOWSKI:  Form.
10                  THE WITNESS:  Yes.
11      Q    BY MS. KENDRICK:  Who?
12                  MR. BOJANOWSKI:  Same objection.
13                  MS. KENDRICK:  What is the objection to
14   the --
15                  MR. BOJANOWSKI:  It's not relevant
16   whether there was a protest.
17                  MS. KENDRICK:  She evaluated the bids.
18                  MR. BOJANOWSKI:  I understand.  A
19   protest would come in after the contract award, so it's
20   not relevant.  So go ahead and ask your questions, but
21   I'm going to continue to object it's not relevant.
22                  MS. KENDRICK:  Well, is your objection
23   to the relevance of the question or to the form of the
24   question?
25                  MR. BOJANOWSKI:  Well, form is
```

# EXHIBIT Y

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No.: <br> CV12-00601-PHX-NVW <br> (MEA) |

30(b)(6) ARIZONA DEPARTMENT OF CORRECTIONS
(RICHARD H. ROWE, M.D.)
TOPIC NOS. 1, 2, 5, 6, 7, 8, 9, 10, 12, 13, 15, 17

September 19, 2012
9:49 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 51

1    have -- he's a -- my understanding of how that works is

2    that he's a consultant.

3        Q     When you say "he"?

4        A     Mr. Profiri is a consultant.  Mr. Pratt is the

5    division director for Health Services, and Mr. Profiri

6    is a consultant regarding the contract monitoring

7    because he's done that in the past.

8        Q     Okay.  So if I wanted to find out from the

9    best source to your knowledge who had the most

10   information about how Wexford was performing under the

11   contract, who would I talk to?

12       A     I would think it would be Mr. Joe Profiri.

13       Q     Okay.  There are -- your lawyer, Ms. Wieneke,

14   provided me with these manuals, inmate access to health

15   care.  Do you know which ones I'm talking about?

16       A     Yes, I'm familiar with these.

17       Q     Okay.  What -- are these the guidelines and

18   protocols for how health care is to be administered

19   within the Department of Corrections?

20       A     They would seem to indicate that they are

21   guidelines as to how health care should be provided,

22   correct.

23       Q     And is it -- to your knowledge, are clinicians

24   required to follow those guidelines?

25       A     There are guidelines, yes, and it is a guide

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 52

1    as to how health care should be delivered.

2        Q     So, for example, for intake, when a prisoner

3    arrives at an institution -- I mean is received by the

4    Department of Corrections from the county jail, what is

5    supposed to happen from a medical standpoint?

6        A     The intake process -- for the male it's at

7    Alhambra in Phoenix.  For the female, it's Perryville.

8    The inmate is seen -- after going through security for

9    clothing and identification, is seen immediately by

10   nursing staff where a history is done.  A history is

11   done in addition to other processes such as TB tests

12   that is required.

13            The nurses then will note any acute

14   problems that the inmate may have, or if they are in a

15   condition that will warrant immediate visit by the

16   practitioner, those are identified.  And then in that

17   process, the nurses screen the inmates for any medical

18   problems.  Then they see the practitioner, usually that

19   same day as a general rule.

20            After the practitioner does a physical,

21   writes the orders and so forth, the inmate sees mental

22   health, and then from there, they are either directed

23   for either further medical care or to the officer back

24   for their housing.

25       Q     Are there any time lines in which those steps

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 86

1    have a concern about a patient, a lot of that is

2    usually done either through telephone or someone pick

3    up an issue that has that.  There is a practice of

4    that, but I can't quote the process, except I recall

5    that someone may have a concern about something, and

6    they will pick up the phone and call regarding that

7    particular situation, whatever it might be.

8        Q    Right.  So, you know, in the community like in

9    hospitals and stuff, that they have a policy where if

10   some sentinel event occurs, that it's automatically

11   reviewed.  You are aware of that, right?

12       A    I'm aware of that, yes.

13       Q    So there's no equivalent policy in ADC that

14   you are aware of?

15       A    There might be.  I would have to look at the

16   policy for sure, because I've not committed everything

17   to memory.

18       Q    As you sit here today, you don't know?

19       A    Well, I don't know.

20       Q    Okay.  And so let's say in the last six

21   months, how many calls have you had from physicians who

22   have been concerned about sentinel events?

23       A    Oh, I'm trying to think, and this is a rough

24   guess.  Maybe five or six.

25       Q    Okay.  And what were those about?  You don't

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 87

1    have to disclose the identity of the patient, just tell

2    me what the problems were.

3        A    And those would have been primarily consults

4    that the practitioner needs attention, needs to be seen

5    by outside consultation.

6        Q    Right.  And what was the particular problems

7    that the physician was having?

8        A    Perhaps they couldn't get a specialist to see

9    a particular inmate.  I don't have the specifics in

10   front of me, but those are the type of calls I would

11   have gotten as it relates to patient care.

12       Q    So when a practitioner is having problems

13   getting care for the patient, they call you?

14       A    They have that option.

15       Q    And what other options are there?

16       A    They can call the division director.

17       Q    Mr. Pratt?

18       A    Mr. Pratt.

19       Q    Is it more common for him to get these calls

20   or for you, or do you know?

21       A    Typically me, if it's of a clinical nature.

22   Understand that I do not control the purse string, and

23   the cost of care outside is based on state law.  And if

24   it is an issue to where the particular inmate patient

25   needs to be seen, then there is some special provision

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 88

1    needs to be made, then he needs to get involved.

2         Q    Mr. Pratt?

3         A    Yes.

4         Q    So are there cases where the care can't be

5    provided because of the state law regulation on cost?

6         A    House Bill 2010, which is now law, states that

7    all inmate patient care has to be at AHCCCS rates.

8    Specialists out in the community, some of them refuse

9    to take that.  We have made a lot of effort to try to

10   get care for these patients that needed it.

11        Q    What is AHCCCS?

12        A    AHCCCS is the state Medicaid.

13        Q    I see.

14        A    And basically, the law was passed that the

15   same rates that doctors charged a Medicaid patient has

16   to relate to the inmate patients.

17        Q    So if I understand your answer correctly,

18   you've had trouble getting patients to be seen by

19   outside providers because of the low rates.  Is that

20   right?

21        A    It's been challenging, yes.  I have had that.

22        Q    And can you give me some examples of that?

23        A    Neurosurgical consult is a big one.

24   Subspecialty such as rheumatology where there are only

25   a few to start out with, so they can basically name

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 119

1   Right?

2       A    Yes.   I think a reasonable time that a patient

3   needs to be seen would be reasonable to have that, yes.

4       Q    And that would -- and a lot -- every patient

5   is different, right?  They all react to -- many of them

6   react to medication differently.  You have to have an

7   individualized assessment of the patient, as well.

8   Correct?

9       A    That's correct.

10      Q    But even though that's true, it's still

11  important to have policies and procedures that guide

12  the staff.  Correct?

13      A    Yes.   Guides are important in terms of

14  monitoring and in the statewide system to be sure that

15  the patients have the appropriate care.

16      Q    Right.  Okay.  Do you know whether the

17  Department, in your experience, has enough infirmary

18  beds for -- in-house infirmary beds for prisoners?

19      A    Overall, we have -- just to clarify where the

20  infirmary beds are, they are at three complexes.  And

21  my experience has been, yes, there have been enough

22  infirmary beds at times.  And that changes depending on

23  acuity, how many patients are coming in and so forth.

24  So there are times there may be one; other times it may

25  be full.  So yes, it varies.  But generally they have

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 129

1    chronic care conditions, end quote.  And these are

2    given regular recall as a monitoring process.

3        Q    So that would be hypertension, diabetes, HIV.

4    You name the others.

5        A    Well, we've got diabetes, HIV, asthma,

6    hypertension, seizures, things -- cancer.  Hepatitis C

7    has been added, HIV.  And I may have missed one or two,

8    but to monitor a condition, I think, is listed

9    elsewhere.

10       Q    And it's important for those conditions to be

11   monitored, because unless the patient's condition was

12   controlled from medication or other means, they could

13   have serious adverse effects.  Correct?

14       A    It is important to monitor to avoid serious

15   adverse effects.  Not every one of those is going to

16   have serious adverse effects.

17       Q    Right.  But if you don't monitor and stabilize

18   a patient with diabetes, that's a problem.  Right?

19       A    It could be.  The idea is to help the patient,

20   and the physician, per se, cannot control anybody's

21   disease.  They can work with the patient to outline a

22   care, but yes, it needs to be monitored.

23       Q    Right.  And so that the -- with the patient's

24   cooperation, of course, the disease is controlled.

25   Correct?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard M. Rowe, M.D. - 9/19/2012

Page 165

1    review process.

2        Q    I see.  Okay.  So as I understand the way the

3    health care system works here, it's pretty much a

4    centralized process in the sense that the staffing gets

5    set by either headquarters directly or through Wexford

6    into local institutions.  Is that right?

7        A    That is -- that is generally true.  It is

8    central staffing pattern as such.

9        Q    And the policies -- statewide policies are

10   promulgated in the central office, and they are sent to

11   the prisons to be followed.  Right?

12       A    That is the procedure, correct.

13       Q    And the funding is centralized, as well.

14   Correct?

15       A    The cost of care?

16       Q    Well, the amount of money that various

17   institutions have to provide care, they have a budget?

18       A    Right.  I have no idea about funding.  That's

19   related to other people that handles the budget.

20       Q    And whatever the local policies the

21   institutions may develop, they have to be consistent

22   with the departmental policies.  Correct?

23       A    Correct.

24       Q    Do local institutions develop local policies,

25   or do you not --

# EXHIBIT Z

Parsons v. Ryan
Carmelo Echeverria, M.D. - 10/5/2012

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;        )    No. CV12-00601-
Stephen Swartz; Dustin Brislan;      )    PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco; )
Jackie Thomas; Jeremy Smith; Robert  )
Gamez; Maryanne Chisholm; Desiree    )
Licci; Joseph Hefner; Joshua Polson; )
and Charlotte Wells, on behalf of    )
themselves and all others similarly  )
situated; and Arizona Center for     )
Disability Law,                      )
                                     )
          Plaintiffs,                )
     vs.                             )
                                     )
Charles Ryan, Director, Arizona      )
Department of Corrections; and       )
Richard Pratt, Interim Division      )
Director, Division of Health         )
Services, Arizona Department of      )
Corrections, in their official       )
capacities,                          )
                                     )
          Defendants.                )
                                     )

CARMELO ECHEVERRIA, MD
October 5, 2012
9:02 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons v. Ryan
Carmelo Echeverria, M.D. - 10/5/2012

Page 48

```
 1              MR. YURK:  Form.  You answered.
 2              THE WITNESS:  No.  None of my providers has
 3   come to me saying that they have fatigue.
 4       Q.    BY MR. LYALL:  None of them have expressed
 5   concern about staffing levels to you?
 6              MR. YURK:  Form.
 7              THE WITNESS:  That's none of their
 8   business.  That's my business.
 9       Q.    BY MR. LYALL:  The question is, has anybody
10   expressed to you concern about the staffing levels at
11   Lewis?
12              MR. YURK:  Form.
13              THE WITNESS:  No.
14              MR. YURK:  And by anyone, I assume you mean
15   his providers.  Not like the prisoners or inmates?
16              MR. LYALL:  I'll get to that.
17       Q.    BY MR. LYALL:  Providers.
18       A.    Providers, no, they haven't.
19       Q.    Has anybody else expressed concern to you about
20   staffing levels at Lewis?
21              MR. STRUCK:  Form.
22              MR. YURK:  Form.  When he says anybody, he's
23   talking about your mom, inmates, he's talking about your
24   supervisor, anybody.
25              THE WITNESS:  I can answer that.  Look.  In
```

Parsons v. Ryan
Carmelo Echeverria, M.D. - 10/5/2012

Page 54

1    emergency.

2        Q.    Who does track nurse staffing issues?

3        A.    A staffing issue, I don't know.  Who is in

4    charge of supervising the nurses is my head nurse.  That

5    I know.  But who is supposed to staff on that, I don't

6    know.

7        Q.    And the head nurse is?

8        A.    Her name?

9        Q.    Yes.

10       A.    Nicole Armenta.

11       Q.    But you don't know if she's responsible for

12   monitoring staffing levels?

13       A.    No, I'm not.

14       Q.    When did you begin as the medical director at

15   Lewis?  What was your start date?

16       A.    July 8th.

17       Q.    And were you given information about the

18   transition from ADC Healthcare to Wexford Healthcare?

19                MR. YURK:  Form.

20                THE WITNESS:  No.

21       Q.    BY MR. LYALL:  Were you given any information

22   about how the transition from ADC to Wexford would be

23   implemented?

24                MR. YURK:  Form.

25                THE WITNESS:  No.

Parsons v. Ryan
Carmelo Echeverria, M.D. - 10/5/2012

Page 55

1    Q.    BY MR. LYALL:  Nobody sent you any information

2  about how new policies or procedures would be implemented

3  when Wexford took over?

4              MR. YURK:  Form, foundation.

5              Go ahead.

6              THE WITNESS:  What I can tell you is what I

7  received from Wexford the first day I work into prison

8  was the way we were going to do patient care.  Yes, I

9  received that in four binders like this.

10   Q.    BY MR. LYALL:  On July 8?

11   A.    Yes.

12   Q.    And what was in those binders?

13   A.    I don't know left to right, but I can tell you

14  chronic care of patients, how to take care of hepatitis

15  C.  I can tell you about my job as a medical director.

16  My providers.  Things like that.

17   Q.    Policies and procedures?

18   A.    As far as what?

19   Q.    As far as health care.

20   A.    Well, you talk about chronic care, you talk

21  about hepatitis C, you talk about infectious diseases.

22  Yeah, they all read policies how to do it.

23   Q.    And have you reviewed all the documents in that

24  folder?

25   A.    From left to right, no.  But because let me

Parsons v. Ryan
Carmelo Echeverria, M.D. - 10/5/2012

Page 56

1    tell you something.  I've been practicing medicine about

2    17 years.  I really believe that most of the policies, I

3    know them by heart as far as health care.

4        Q.    But you haven't reviewed all of those

5    documents?

6        A.    Not all of them, no.

7        Q.    How would you describe the transition from ADC

8    Healthcare to Wexford Healthcare?

9                MR. YURK:  Form.

10               MR. STRUCK:   Form.

11               THE WITNESS:  I don't know what you're

12   asking.

13       Q.    BY MR. LYALL:  Well, the Department of

14   Corrections health care system was privatized; is that

15   right?

16       A.    Yes, that I know.

17       Q.    And Wexford is the company that now administers

18   health care in the Department of Corrections?

19       A.    That, I know, yes.

20       Q.    So there was a transition from Department of

21   Corrections providing health care to Wexford providing

22   health care; is that correct?

23       A.    Yes.

24       Q.    As the medical director at Lewis, how would you

25   assess that transition?

Parsons v. Ryan
Carmelo Echeverria, M.D. - 10/5/2012

Page 58

```
 1              MR. YURK:  Form.
 2              MR. STRUCK:  Join.
 3              THE WITNESS:  I wouldn't know that.
 4     Q.    BY MR. LYALL:  You don't know if there was any
 5   change when you were working for Department of
 6   Corrections on July 1 and following the change on July 1?
 7              MR. YURK:  Form.
 8              MR. STRUCK:  Join.
 9              THE WITNESS:  Because between July 1st and
10   now, yeah, there have been changes.  We got providers.
11   Dr. Bell got a new position.
12     Q.    BY MR. LYALL:  So changes in staffing?
13     A.    Changes on the regiment of staffing.  And
14   people that had resigned, the people that had gone, I
15   don't pay attention to that.  I just put my attention on
16   my providers.
17     Q.    Have there been any changes in policies?
18     A.    I wouldn't know because I don't know the ADC
19   policies.  I wouldn't pay attention to the ADC policy
20   when I was working there as a primary care.  So the
21   changes, I don't know.
22     Q.    When you were working as a subcontractor for
23   ADC, you weren't aware of their policies?
24     A.    No, I wasn't.  I don't have to.  I only have to
25   do patient care.  My job was to take care of inmates on a
```

Parsons v. Ryan
Carmelo Echeverria, M.D. - 10/5/2012

Page 59

1   daily basis, and that's exactly what I did.

2       Q.    Were there any policies that you had to conform

3   to when you were a subcontractor for ADC?

4       A.    No.  As far as what?

5       Q.    As far as providing health care.

6       A.    Yes.  I provided health care.  I don't need no

7   policy.  I'm a physician for 17 years.  So you say, go

8   take care of patient, I go take care of patient.  See how

9   many patients you can see, work ten hours, I just to

10  that.

11      Q.    And now as medical director, you're responsible

12  for Wexford's policies, implementing Wexford's policies?

13      A.    Of course.

14      Q.    And you've reviewed some of the policies that

15  were in that binder that they gave you on July 8th?

16      A.    Yes.  For health care, chronic care, like I

17  told you.  Every day I review and review.

18      Q.    Can you say more about which policy

19  specifically you read?  You said some you read, and some

20  you didn't?

21              MR. YURK:  Form, foundation.

22              MR. STRUCK:  Join.

23              THE WITNESS:  I wouldn't know which one it

24  is because, again, as I said, most of the policies about

25  health care, I don't have to read anything.  I know them

# EXHIBIT AA

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br>　　　　　Plaintiffs,<br>　　v.<br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br>　　　　　Defendants. | No.:<br>CV12-00601-PHX-NVW<br>(MEA) |

30(b)(6) ARIZONA DEPARTMENT OF CORRECTIONS
(MICHAEL ADU-TUTU, D.D.S.)

TOPIC NOS. 1 THROUGH 16 UP TO 2/21/12

October 1, 2012
10:09 a.m.
Phoenix, Arizona

**Prepared by:**
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

**Prepared for:**

(Copy)

1   improve his morale; it will improve this, I have waived

2   that also, and I have provided dentures.  Or somebody

3   is working in the customer service area and has all her

4   top front teeth missing, you know, or they are leaving

5   and going into a customer service area, even though

6   they have every tooth present which will make it

7   easier -- possible for them to eat their food, I have

8   waived the policy for them to get a partial denture to

9   help them.  So we have done that, and I did that.

10      Q    For inmates who fall into the first category,

11   which is they have no teeth or they don't have enough

12   teeth to like chew their food, is that situation

13   considered routine or urgent, slash, emergent?

14      A    Routine.  They will be given diet -- soft diet

15   and that kind of thing.  But all those things are

16   considered routine care, even on the street.  My

17   patients who don't have dentures are not considered an

18   emergency that I have to send them to somewhere else or

19   to emergency room.  That's how we determine what is

20   routine and urgent.  If they don't have a denture, if

21   they have been able to eat their food for some reason

22   but we need to give them the denture just to help,

23   that's considered a routine need.

24      Q    And approximately how long does it usually

25   take an inmate who falls into that -- the category we

1    just discussed to get dentures?

2        A    Let me describe the steps that goes through.

3    There are about four or five steps at least, and assume

4    that everything is all right.  The same steps that you

5    go through on the street but in the prison, you know,

6    that appointment's restricted.  You can't put Jane and

7    Joe -- Jane and Janet together because they have a

8    fight.  So all those things go into scheduling

9    patients.

10                But on the average, it should fall less

11   than six months to get the process.  All impressions go

12   back to the lab.  We have outside contract lab.  So

13   when I take the initial impression and pour the

14   impression at the institution, it goes to the lab for

15   them to do the bite rims.  I don't know whether you've

16   seen what I'm talking about.  It's rims that are made

17   to approximate your jaw how they come together.

18                Then the next step is registering your

19   teeth, how your jaw come together.  So assume that

20   everything, the impression, the bite rim that came was

21   okay.  Then they measure that with you selecting the

22   color of teeth you want.

23                Then it goes to the lab for the lab to

24   do, set it up with the teeth.  You come back.  Then the

25   dentist measure.  Your teeth come together.  You feel