# EXHIBIT CC

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE, & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-NVW **PLAINTIFF DUSTIN BRISLAN'S FIRST SET OF REQUESTS FOR ADMISSION (NOS. 1-78) AND FIRST SET OF INTERROGATORIES (NOS. 1-2) TO DEFENDANT CHARLES RYAN** |
| Plaintiffs, | |
| v. | *AND DEFENDANT CHARLES RYAN'S ANSWERS THERETO* |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

1      Defendant Charles Ryan, pursuant to FED. R. CIV. P. 33 and 36, submits the

2 following responses to Plaintiff Dustin Brislan's First Set of Requests for Admission

3 (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2).

4                 **OBJECTIONS TO PLAINTIFFS" DEFINITIONS**

5      Defendant objects to Plaintiffs' definition of "isolation," which includes several

6 different housing assignments, each with its own criteria for assignment.  Inmates may be

7 housed in a detention unit in disciplinary isolation, investigative detention, mental health

8 observation, or pending placement into a maximum security unit.  Moreover, the term

9 "isolation" implies solitary confinement; however, inmates housed in the housing units

10 listed in Plaintiffs' definition of "isolation" may or may not have cellmates.

11                     **REQUESTS FOR ADMISSION**

12 **REQUEST FOR ADMISSION NO. 1:** Admit that no written ADC POLICY prohibits

13 housing PRISONERS whom ADC has classified as "seriously mentally ill" or "severely

14 mentally ill" in ISOLATION.

. 15 *Response:*

16      **Defendant objects to Plaintiffs' definition of "isolation," which includes**

17 **several different housing assignments, each with its own criteria for assignment.**

18 **Inmates may be housed in a detention unit in disciplinary isolation, investigative**

19 **detention, mental health observation, or pending placement into a maximum security**

20 **unit. Moreover, the term "isolation" implies solitary confinement; however, inmates**

21 **housed in the housing units listed in Plaintiffs' definition of "isolation" may or may**

22 **not have cellmates. Defendant further objects that this Request is an incomplete and**

23 **one-sided statement of the circumstances and is, therefore, vague, ambiguous, and**

24 **misleading.**

25      **Without waiving these objections, Defendant admits in part that placement of**

26 **inmates in maximum custody and detention is determined by ADC's classification**

27 **policy and by inmate behavior.  However, mental health monitoring of seriously**

28 **mentally ill (SMI) inmates is, by policy, enhanced.  SMI inmates in maximum**

1  custody are to be evaluated at least every 30 days.  Most at Florence and Eyman are

2  housed in Enhanced Mental Health Treatment areas, where individual, group, and

3  televised treatment options are available, as well as phased group outdoor

4  recreation.

5  **REQUEST FOR ADMISSION NO. 2:**   Admit that PRISONERS whom ADC has

6  classified as "seriously mentally ill" or "severely mentally ill" are housed in ISOLATION.

7  *Response:*

8       Defendant objects to Plaintiffs' definition of "isolation," which includes

9  several different housing assignments, each with its own criteria for assignment.

10  Inmates may be housed in a detention unit in disciplinary isolation, investigative

11  detention, mental health observation, or pending placement into a maximum security

12  unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates

13  housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

14  not have cellmates.  Defendant further objects that this Request is an incomplete and

15  one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

16  misleading.

17       Without waiving these objections, admit in part within parameters of request

18  for admission #1.

19  **REQUEST FOR ADMISSION NO. 3:** Admit that no written ADC POLICY prohibits

20  housing PRISONERS under the age of 18 in ISOLATION.

21  *Response:*

22       Defendant objects to the relevance of this Request, as Plaintiffs' Complaint

23  does not raise claims relating to minors.  Defendant additionally to Plaintiffs'

24  definition of "isolation," which includes several different housing assignments, each

25  with its own criteria for assignment.  Inmates may be housed in a detention unit in

26  disciplinary isolation, investigative detention, mental health observation, or pending

27  placement into a maximum security unit.  Moreover, the term "isolation" implies

28  solitary confinement; however, inmates housed in the housing units listed in

1  Plaintiffs' definition of "isolation" may or may not have cellmates. Defendant

2  further objects that this Request is an incomplete and one-sided statement of the

3  circumstances and is, therefore, vague, ambiguous, and misleading.

4     Without waiving these objections, Defendant admits in part that there is no

5  written policy that prohibits housing inmates under the age of 18 in detention or

6  maximum custody. However, Defendant denies the request because inmates under

7  the age of 18 are not housed in any of the adult housing units identified in Plaintiff's

8  definition of "isolation" (Browning Unit, SMU I, Kasson Unit, Central Unit, or

9  Lumley – SMA).

10 **REQUEST FOR ADMISSION NO. 4:** Admit that PRISONERS under the age of 18 are

11 housed in ISOLATION.

12 *Response:*

13    Defendant objects to the relevance of this Request, as Plaintiffs' Complaint

14 does not raise claims relating to minors. Defendant additionally objects to Plaintiffs'

15 definition of "isolation," which includes several different housing assignments, each

16 with its own criteria for assignment. Inmates may be housed in a detention unit in

17 disciplinary isolation, investigative detention, mental health observation, or pending

18 placement into a maximum security unit. Moreover, the term "isolation" implies

19 solitary confinement; however, inmates housed in the housing units listed in

20 Plaintiffs' definition of "isolation" may or may not have cellmates. Defendant

21 further objects that this Request is an incomplete and one-sided statement of the

22 circumstances and is, therefore, vague, ambiguous, and misleading.

23    Without waiving these objections, Defendant admits in part that inmates

24 under the age of 18 are housed in detention and maximum custody, but are not

25 housed in any of the adult housing units referred to in Plaintiffs' definition of

26 "isolation."

27 **REQUEST FOR ADMISSION NO. 5:** Admit that no written ADC POLICY prohibits

28 housing PRISONERS over the age of 55 in ISOLATION.

1   *Response:*

2       Defendant objects to the relevance of this Request, as Plaintiffs' Complaint

3   does not raise claims relating to the age of any inmates.  Defendant additionally

4   objects to Plaintiffs' definition of "isolation," which includes several different

5   housing assignments, each with its own criteria for assignment.  Inmates may be

6   housed in a detention unit in disciplinary isolation, investigative detention, mental

7   health observation, or pending placement into a maximum security unit.  Moreover,

8   the term "isolation" implies solitary confinement; however, inmates housed in the

9   housing units listed in Plaintiffs' definition of "isolation" may or may not have

10  cellmates.  Defendant further objects that this Request is an incomplete and one-

11  sided statement of the circumstances and is, therefore, vague, ambiguous, and

12  misleading.

13      Without waiving these objections, Defendant admits in part that inmates over

14  the age of 55 are eligible for housing in maximum custody and detention and are not

15  specifically excluded by ADC policy.

16  **REQUEST FOR ADMISSION NO. 6:** Admit that PRISONERS over the age of 55 are

17  housed in ISOLATION.

18  *Response:*

19      Defendant objects to the relevance of this Request, as Plaintiffs' Complaint

20  does not raise claims relating to the age of any inmates.  Defendant additionally

21  objects to Plaintiffs' definition of "isolation," which includes several different

22  housing assignments, each with its own criteria for assignment.  Inmates may be

23  housed in a detention unit in disciplinary isolation, investigative detention, mental

24  health observation, or pending placement into a maximum security unit.  Moreover,

25  the term "isolation" implies solitary confinement; however, inmates housed in the

26  housing units listed in Plaintiffs' definition of "isolation" may or may not have

27  cellmates.  Defendant further objects that this Request is an incomplete and one-

28  sided statement of the circumstances and is, therefore, vague, ambiguous, and

1  misleading.

2        Without waiving these objections, Defendants admits in part that inmates over

3  the age of 55 are likely housed in the units identified in Plaintiffs' definition of

4  "isolation."

5  **REQUEST FOR ADMISSION NO. 7:** Admit that ADC has no written POLICY

6  requiring a face-to-face mental health evaluation of a PRISONER before he or she is

7  housed in ISOLATION.

8  *Response:*

9        Defendant objects that this Request is vague and ambiguous as to the meaning

10  of "mental health evaluation."   Defendant additionally objects to Plaintiffs'

11  definition of "isolation," which includes several different housing assignments, each

12  with its own criteria for assignment.  Inmates may be housed in a detention unit in

13  disciplinary isolation, investigative detention, mental health observation, or pending

14  placement into a maximum security unit.  Moreover, the term "isolation" implies

15  solitary confinement; however, inmates housed in the housing units listed in

16  Plaintiffs' definition of "isolation" may or may not have cellmates.  Defendant

17  further objects that this Request is an incomplete and one-sided statement of the

18  circumstances and is, therefore, vague, ambiguous, and misleading.

19        Without waiving these objections, Defendant is unable to admit or deny this

20  Request as written after a reasonable inquiry.  For operational and security reasons,

21  ADC written policy does not require a face-to-face mental health evaluation of an

22  inmate before the inmate is placed in segregation housing; however, security staff

23  conduct an observational assessment of the inmate's condition prior to placement in

24  segregation housing.  If the inmate is injured, appears ill, or appears mentally or

25  behaviorally unstable, medical staff will conduct an immediate face-to-face

26  assessment.  Alternate housing or treatment may occur as a result of this assessment.

27  Health services staff must be notified within one hour of inmate placement in

28  segregation housing.  Nursing staff perform an immediate chart review to ascertain

1   if any medical, dental, or mental health issues exist which contraindicate this
2   placement or require accommodation to the inmate's lockdown status.   See ADC
3   Health Services Technical Manual, Chapter 7, Section 6.0.

4        In addition to this process, mental health staff is notified when inmates are
5   placed in detention/segregation for protective segregation review.   A face-to-face
6   meeting with these inmates in held within 24 to 72 hours of their placement in
7   detention/segregation housing to assess their mental health and behavioral stability.

8   **REQUEST FOR ADMISSION NO. 8:** Admit that WEXFORD has no written POLICY
9   requiring a face-to-face mental health evaluation of a PRISONER before he or she is
10   housed in ISOLATION.

11   *Response:*

12        Defendant objects that this Request seeks an admission regarding the policies
13   of a non-party to this litigation.   Defendant additionally objects that this Request is
14   vague and ambiguous as to the meaning of "mental health evaluation."   Defendant
15   additionally objects to Plaintiffs' definition of "isolation," which includes several
16   different housing assignments, each with its own criteria for assignment.   Inmates
17   may be housed in a detention unit in disciplinary isolation, investigative detention,
18   mental health observation, or pending placement into a maximum security unit.
19   Moreover, the term "isolation" implies solitary confinement; however, inmates
20   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may
21   not have cellmates. Defendant further objects that this Request is an incomplete and
22   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and
23   misleading.

24        Without waiving these objections, Defendant admits in part that Wexford is
25   contractually obligated to adhere to existing ADC policies and procedures.

26   **REQUEST FOR ADMISSION NO. 9:**   Admit that ADC has no written POLICY
27   requiring a mental health evaluation of a PRISONER before he or she is housed in
28   ISOLATION.

1   *Response:*

2         **Defendant objects that this Request is vague and ambiguous as to the meaning**

3   **of "mental health evaluation." Defendant additionally objects to Plaintiffs'**

4   **definition of "isolation," which includes several different housing assignments, each**

5   **with its own criteria for assignment. Inmates may be housed in a detention unit in**

6   **disciplinary isolation, investigative detention, mental health observation, or pending**

7   **placement into a maximum security unit. Moreover, the term "isolation" implies**

8   **solitary confinement; however, inmates housed in the housing units listed in**

9   **Plaintiffs' definition of "isolation" may or may not have cellmates. Defendant**

10  **further objects that this Request is an incomplete and one-sided statement of the**

11  **circumstances and is, therefore, vague, ambiguous, and misleading.**

12        **Without waiving these objections, see #7, which answer is incorporated herein.**

13  <u>**REQUEST FOR ADMISSION NO. 10:**</u>   Admit that WEXFORD has no written

14  POLICY requiring a mental health evaluation of a PRISONER before he or she is housed

15  in ISOLATION.

16  *Response:*

17        **Defendant objects that this Request seeks an admission regarding the policies**

18  **of a non-party to this litigation. Defendant further objects that this Request is vague**

19  **and ambiguous as to the meaning of "mental health evaluation." Defendant**

20  **additionally objects to Plaintiffs' definition of "isolation," which includes several**

21  **different housing assignments, each with its own criteria for assignment. Inmates**

22  **may be housed in a detention unit in disciplinary isolation, investigative detention,**

23  **mental health observation, or pending placement into a maximum security unit.**

24  **Moreover, the term "isolation" implies solitary confinement; however, inmates**

25  **housed in the housing units listed in Plaintiffs' definition of "isolation" may or may**

26  **not have cellmates. Defendant further objects that this Request is an incomplete and**

27  **one-sided statement of the circumstances and is, therefore, vague, ambiguous, and**

28  **misleading.**

1        **Without waiving these objections, Defendant admits in part that Wexford is**

2    **contractually obligated to adhere to existing ADC policies and procedures.**

3    **REQUEST FOR ADMISSION NO. 11:**   Admit that PRISONERS in ISOLATION are

4    offered less than five hours per week of out-of-cell exercise.

5    *Response:*

6        **Defendant objects to Plaintiffs' definition of "isolation," which includes**

7    **several different housing assignments, each with its own criteria for assignment.**

8    **Inmates may be housed in a detention unit in disciplinary isolation, investigative**

9    **detention, mental health observation, or pending placement into a maximum security**

10   **unit. Moreover, the term "isolation" implies solitary confinement; however, inmates**

11   **housed in the housing units listed in Plaintiffs' definition of "isolation" may or may**

12   **not have cellmates.**

13       **Without waiving these objections, Defendant denies this Request.  Pursuant to**

14   **DO 804.01 at 1.2.6.5 and DO 704.10 at 1.1, inmates in detention and maximum**

15   **custody are offered six hours per week of out-of-cell exercise.**

16   **REQUEST FOR ADMISSION NO. 12:**   Admit that ADC written POLICY allows

17   PRISONERS in ISOLATION to be offered less than five hours per week of out-of-cell

18   exercise.

19   *Response:*

20       **Defendant objects to Plaintiffs' definition of "isolation," which includes**

21   **several different housing assignments, each with its own criteria for assignment.**

22   **Inmates may be housed in a detention unit in disciplinary isolation, investigative**

23   **detention, mental health observation, or pending placement into a maximum security**

24   **unit. Moreover, the term "isolation" implies solitary confinement; however, inmates**

25   **housed in the housing units listed in Plaintiffs' definition of "isolation" may or may**

26   **not have cellmates.**

27       **Without waiving these objections, Defendant denies this Request.  Pursuant to**

28   **DO 906.01 at 1.3.1; DO 804.01 at 1.2.6.5; and DO 704.01 at 1.1, inmates in detention**

1    and maximum custody are offered six hours per week of out-of-cell exercise.

2    **REQUEST FOR ADMISSION NO. 13:**  Admit that for PRISONERS in ISOLATION

3    the only out-of-cell exercise offered occurs in a windowless enclosure.

4    *Response:*

5    Defendant objects to Plaintiffs' definition of "isolation," which includes

6    several different housing assignments, each with its own criteria for assignment.

7    Inmates may be housed in a detention unit in disciplinary isolation, investigative

8    detention, mental health observation, or pending placement into a maximum security

9    unit. Moreover, the term "isolation" implies solitary confinement; however, inmates

10   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

11   not have cellmates. Defendant further objects that this Request is an incomplete and

12   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

13   misleading.

14   Without waiving these objections, Defendant is unable to admit or deny this

15   Request as written after reasonable inquiry. The exercise enclosures used by most of

16   the inmates housed in detention or in the maximum custody housing units are

17   constructed of chain link fencing with a cloth shade screen roof. These enclosures

18   provide the inmates with access to fresh air and sunshine, and allow for

19   communication between inmates in adjoining enclosures. The exercise enclosures at

20   SMU I and Browning consist of concrete walls with a steel mesh ceiling that is open

21   to sky. There is a vision window in the door leading into the exercise enclosure.

22   **REQUEST FOR ADMISSION NO. 14:**  Admit that for PRISONERS in ISOLATION

23   the only out-of-cell exercise offered occurs in a windowless enclosure with no exercise

24   equipment.

25   *Response:*

26   Defendant objects to Plaintiffs' definition of "isolation," which includes

27   several different housing assignments, each with its own criteria for assignment.

28   Inmates may be housed in a detention unit in disciplinary isolation, investigative

1    detention, mental health observation, or pending placement into a maximum security

2    unit. Moreover, the term "isolation" implies solitary confinement; however, inmates

3    housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

4    not have cellmates. Defendant further objects that this Request is an incomplete and

5    one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

6    misleading. Defendant additionally objects that this Request is compound and,

7    therefore, unanswerable as written.

8        Without waiving these objections, Defendant is unable to admit or deny this

9    Request as written. As to the design of the exercise enclosures, see Defendant's

10    response to #13, which answer is incorporated herein. Inmates using the recreation

11    enclosures at SMU I, Browning, Kasson, Central, Lumley, and the detention units

12    may request a handball to use during recreation.

13    **REQUEST FOR ADMISSION NO. 15:** Admit that ADC has no written POLICY

14    requiring OUTDOOR EXERCISE for PRISONERS held in ISOLATION.

15    *Response:*

16        Defendant objects to Plaintiffs' definition of "isolation," which includes

17    several different housing assignments, each with its own criteria for assignment.

18    Inmates may be housed in a detention unit in disciplinary isolation, investigative

19    detention, mental health observation, or pending placement into a maximum security

20    unit. Moreover, the term "isolation" implies solitary confinement; however, inmates

21    housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

22    not have cellmates. Defendant further objects that this Request is an incomplete and

23    one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

24    misleading.

25        Without waiving these objections, Defendant is unable to admit or deny this

26    Request as written. ADC policy requires "out of cell exercise." See DO 906.01 at

27    1.3.1; DO 804.01 at 1.2.6.5; and DO 704.10 at 1.1. As explained in Defendant's

28    response to #13, ADC exercise enclosures are open to the outdoors either through

1    chain link fencing material or steel mesh.

2    **REQUEST FOR ADMISSION NO. 16:**   Admit that ADC has no written POLICY

3    requiring that PRISONERS in ISOLATION be given access to exercise equipment.

4    *Response:*

5         Defendant objects to Plaintiffs' definition of "isolation," which includes

6    several different housing assignments, each with its own criteria for assignment.

7    Inmates may be housed in a detention unit in disciplinary isolation, investigative

8    detention, mental health observation, or pending placement into a maximum security

9    unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates

10   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

11   not have cellmates.  Defendant further objects that this Request is an incomplete and

12   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

13   misleading.

14        Without waiving these objections, Defendant admits in part that for security

15   purposes, exercise is limited to the use of a handball and calisthenics, with an

16   emphasis on large muscle exercise, including walking, jogging in place, and

17   isometrics.  See DO 906.01 at 1.3.

18   **REQUEST FOR ADMISSION NO. 17:**  Admit that when scheduled out-of-cell exercise

19   for PRISONERS in ISOLATION is canceled, ADC written POLICY does not require

20   staff to schedule additional exercise time to compensate for the cancellation.

21   *Response:*

22        Defendant objects to Plaintiffs' definition of "isolation," which includes

23   several different housing assignments, each with its own criteria for assignment.

24   Inmates may be housed in a detention unit in disciplinary isolation, investigative

25   detention, mental health observation, or pending placement into a maximum security

26   unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates

27   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

28   not have cellmates.  Defendant further objects that this Request is an incomplete and

1   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

2   misleading.

3         Without waiving these objections, Defendant admits in part that ADC written

4   policy does not specifically require rescheduling of exercise time to compensate for a

5   cancellation of exercise time; however, ADC written policy requires that inmates

6   receive a minimum of six hours per week of exercise time per week unless prohibited

7   by a legitimate security need.  See DO 906.01 at 1.3.1.

8   **REQUEST FOR ADMISSION NO. 18:**  Admit that PRISONERS in ISOLATION have

9   been denied scheduled out-of-cell exercise due to their alleged noncompliance with

10  grooming rules.

11  *Response:*

12        Defendant objects to Plaintiffs' definition of "isolation," which includes

13  several different housing assignments, each with its own criteria for assignment.

14  Inmates may be housed in a detention unit in disciplinary isolation, investigative

15  detention, mental health observation, or pending placement into a maximum security

16  unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates

17  housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

18  not have cellmates.  Defendant further objects that this Request is an incomplete and

19  one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

20  misleading.

21        Without waiving these objections, Defendant denies this Request.  See DO

22  804.01 at 1.3.1.

23  **REQUEST FOR ADMISSION NO. 19:**  Admit that ADC written POLICY allows

24  PRISONERS in ISOLATION to be denied scheduled out-of-cell exercise due to

25  noncompliance with grooming rules.

26  *Response:*

27        Defendant objects to Plaintiffs' definition of "isolation," which includes

28  several different housing assignments, each with its own criteria for assignment.

13

1   Inmates may be housed in a detention unit in disciplinary isolation, investigative

2   detention, mental health observation, or pending placement into a maximum security

3   unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates

4   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

5   not have cellmates.  Defendant further objects that this Request is an incomplete and

6   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

7   misleading.

8        Without waiving these objections, Defendant denies this Request.   See DO

9   804.01 at 1.3.1.

10   **REQUEST FOR ADMISSION NO. 20:**  Admit that PRISONERS in ISOLATION are

11   held in cells with no window to the outside.

12   *Response:*

13        Defendant objects to Plaintiffs' definition of "isolation," which includes

14   several different housing assignments, each with its own criteria for assignment.

15   Inmates may be housed in a detention unit in disciplinary isolation, investigative

16   detention, mental health observation, or pending placement into a maximum security

17   unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates

18   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may

19   not have cellmates.  Defendant further objects that this Request is an incomplete and

20   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and

21   misleading.

22        Without waiving these objections, Defendant denies this Request.   Most

23   contains a number of clusters.  Each cluster contains a number of pods.  Each pod

24   consists of a number of cells on two levels.  There are skylights in the ceiling of each

25   cluster, which brings indirect daylight into the buildings.

26   **REQUEST FOR ADMISSION NO. 21:**  Admit that PRISONERS in ISOLATION are

27   held in cells that are illuminated 24 hours a day.

28   *Response:*

1   Defendant objects to Plaintiffs' definition of "isolation," which includes
2   several different housing assignments, each with its own criteria for assignment.
3   Inmates may be housed in a detention unit in disciplinary isolation, investigative
4   detention, mental health observation, or pending placement into a maximum security
5   unit. Moreover, the term "isolation" implies solitary confinement; however, inmates
6   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may
7   not have cellmates. Defendant further objects that this Request is an incomplete and
8   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and
9   misleading.

10   Without waiving these objections, Defendant is unable to admit or deny this
11   Request as written after reasonable inquiry. Defendant admits in part that in
12   Browning, as well as in detention units, cells are lit by a 7-watt bulb (similar in
13   brightness to a night light) from 10 p.m. to 4 .a.m on weekdays and from 12:00 – 4:00
14   a.m. on weekends. Defendant denies that SMU I employs 24-hour cell illumination.

15   **REQUEST FOR ADMISSION NO. 22:** Admit that ADC written POLICY allows
16   PRISONERS to be housed in ISOLATION without either a television or a radio.

17   *Response:*

18   Defendant objects to Plaintiffs' definition of "isolation," which includes
19   several different housing assignments, each with its own criteria for assignment.
20   Inmates may be housed in a detention unit in disciplinary isolation, investigative
21   detention, mental health observation, or pending placement into a maximum security
22   unit. Moreover, the term "isolation" implies solitary confinement; however, inmates
23   housed in the housing units listed in Plaintiffs' definition of "isolation" may or may
24   not have cellmates. Defendant further objects that this Request is an incomplete and
25   one-sided statement of the circumstances and is, therefore, vague, ambiguous, and
26   misleading.

27   Without waiving these objections, Defendant admits in part that inmates in
28   housed in detention cells may be denied the possession of their radio or television as

a disciplinary sanction.  Otherwise, inmates housed in detention cells or in maximum custody cells are permitted to possess a radio or television if they have the funds to purchase them.

**REQUEST FOR ADMISSION NO. 23:**   Admit that ADC written POLICY allows PRISONERS to be housed in ISOLATION without regard to whether they are functionally illiterate.

*Response:*

Defendant objects to Plaintiffs' definition of "isolation," which includes several different housing assignments, each with its own criteria for assignment. Inmates may be housed in a detention unit in disciplinary isolation, investigative detention, mental health observation, or pending placement into a maximum security unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates housed in the housing units listed in Plaintiffs' definition of "isolation" may or may not have cellmates.  Defendant further objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, Defendant admits in part that ADC written policy allows for inmates to be housed in detention and maximum custody without regard to whether they are functionally illiterate.   A.R.S. § 31-229.02(B) exempts level 5 inmates from the mandatory literacy requirement.

**REQUEST FOR ADMISSION NO. 24:**   Admit that ADC written POLICY allows PRISONERS to be housed in ISOLATION solely for their own protection.

*Response:*

Defendant objects to the relevance of this Request, as Plaintiffs' Complaint does not raise claims relating to housing inmates in isolation solely for their own protection.  Defendant additionally objects to Plaintiffs' definition of "isolation," which includes several different housing assignments, each with its own criteria for assignment.  Inmates may be housed in a detention unit in disciplinary isolation,

16

1  investigative detention, mental health observation, or pending placement into a
2  maximum security unit.   Moreover, the term "isolation" implies solitary
3  confinement; however, inmates housed in the housing units listed in Plaintiffs'
4  definition of "isolation" may or may not have cellmates. Defendant further objects
5  that this Request is an incomplete and one-sided statement of the circumstances and
6  is, therefore, vague, ambiguous, and misleading.

7       Without waiving these objections, Defendant admits in part that DO 805
8  permits an inmate to make a verbal or written request to be housed in protective
9  segregation.   ADC policies provide staff with the necessary flexibility to house an
10 inmate in SMU I, Browning Unit, Kasson Unit, Central Unit, Lumley – SMA, or in a
11 detention unit if necessary to keep the inmate safe.   Defendant denies that ADC
12 written policy authorizes the immediate and permanent assignment to any of these
13 housing units without first conducting the review process outlined in DO 805.
14 Pursuant to DO 805.06, any inmate may request removal from protective
15 segregation.

16 **REQUEST FOR ADMISSION NO. 25:**   Admit that ADC written POLICY allows
17 PRISONERS to be housed in ISOLATION solely because they are under sentence of
18 death.

19 *Response:*

20      Defendant objects to the relevance of this Request, as Plaintiffs' Complaint
21 does not raise claims relating to housing inmates in isolation solely because they are
22 under sentence of death.   Defendant additionally objects to Plaintiffs' definition of
23 "isolation," which includes several different housing assignments, each with its own
24 criteria for assignment.   Inmates may be housed in a detention unit in disciplinary
25 isolation, investigative detention, mental health observation, or pending placement
26 into a maximum security unit.   Moreover, the term "isolation" implies solitary
27 confinement; however, inmates housed in the housing units listed in Plaintiffs'
28 definition of "isolation" may or may not have cellmates.   Defendant further objects

that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, Defendant admits in part that pursuant to DO 801, inmates sentenced to death are automatically placed in maximum custody.

**REQUEST FOR ADMISSION NO. 26:**   Admit that ADC written POLICY allows PRISONERS to be housed in ISOLATION solely because they are serving a sentence of life imprisonment.

*Response:*

Defendant objects to the relevance of this Request, as Plaintiffs' Complaint does not raise claims relating to housing inmates in isolation solely because they are serving a sentence of life imprisonment.  Defendant additionally objects to Plaintiffs' definition of "isolation," which includes several different housing assignments, each with its own criteria for assignment.  Inmates may be housed in a detention unit in disciplinary isolation, investigative detention, mental health observation, or pending placement into a maximum security unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates housed in the housing units listed in Plaintiffs' definition of "isolation" may or may not have cellmates.  Defendant further objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, Defendant admits in part that pursuant to DO 801, inmates sentenced to life serve a minimum of two years in maximum custody, three years in close custody, and then may reduce to medium custody. Inmates sentenced to life cannot reduce below medium custody.

**REQUEST FOR ADMISSION NO. 27:**   Admit that ADC written POLICY allows PRISONERS to be housed in ISOLATION solely because of the unavailability of space in a non-ISOLATION facility.

*Response:*

Defendant objects to the relevance of this Request, as Plaintiffs' Complaint

1   does not raise claims relating to housing inmates in isolation solely because of the
2   unavailability of space in a non-isolation facility.  Defendant additionally objects to
3   Plaintiffs' definition of "isolation," which includes several different housing
4   assignments, each with its own criteria for assignment.  Inmates may be housed in a
5   detention unit in disciplinary isolation, investigative detention, mental health
6   observation, or pending placement into a maximum security unit.  Moreover, the
7   term "isolation" implies solitary confinement; however, inmates housed in the
8   housing units listed in Plaintiffs' definition of "isolation" may or may not have
9   cellmates.  Defendant further objects that this Request is an incomplete and one-
10  sided statement of the circumstances and is, therefore, vague, ambiguous, and
11  misleading.

12          Without waiving these objections, Defendant denies this Request.  ADC does
13  not have a policy that allows detention beds or maximum custody beds to be filled
14  based on a lack of bed space.

15  **REQUEST FOR ADMISSION NO. 28:**  Admit that PRISONERS housed in a Special
16  Management Unit (SMU) are ineligible to participate in educational programs.

17  *Response:*

18          Defendant objects that this Request is vague as to the meaning of "educational
19  programs."  Defendant further objects to the relevance of this Request, as Plaintiffs'
20  Complaint does not allege that any Plaintiffs have been denied participation in
21  "educational programs" as a result of being in a Special Management Unit.
22  Defendant further objects that this Request is an incomplete and one-sided statement
23  of the circumstances and is, therefore, vague, ambiguous, and misleading.

24          Without waiving these objections, Defendant admits in part that A.R.S. § 31-
25  240(B) precludes the director from expending the education services budget monies
26  for education programs dedicated to inmates incarcerated in a special management
27  unit or prisoners sentenced to death.

28  **REQUEST FOR ADMISSION NO. 29:**   Admit that PRISONERS classified as

1  maximum custody are ineligible because of their custody classification for certain forms
2  of mental health treatment available to other PRISONERS.

3  *Response:*

4        **Defendant objects that this Request is an incomplete and one-sided statement**
5  **of the circumstances and is, therefore, vague, ambiguous, and misleading.**
6  **Defendant further objects that this Request is vague as to the meaning of the phrase**
7  **"certain forms of mental health treatment."**

8        **Without waiving these objections, Defendant denies this Request, as inmates**
9  **may receive individual mental health treatment, psychiatric treatment, and be**
10 **referred to and treated at in-patient programs.**

11 **REQUEST FOR ADMISSION NO. 30:** Admit that group mental health therapy is not
12 available in ASPC Florence - Central Unit.

13 *Response:*

14       **Defendant objects that this Request is an incomplete and one-sided statement**
15 **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

16       **Without waiving these objections, Defendant denies this Request. As a part of**
17 **the treatment available at the Central Unit Enhanced Mental Health Treatment**
18 **Area, inmates may be afforded the opportunity to be escorted unrestrained to an**
19 **educational classroom to participate in group therapy sessions. Inmates in this**
20 **Enhanced Treatment Area may also access psycho educational group instruction**
21 **through television programs on the CCTV series.**

22 **REQUEST FOR ADMISSION NO. 31:** Admit that PRISONERS in ISOLATION
23 receive only two MEALS per day.

24 *Response:*

25       **Defendant objects to Plaintiffs' definition of "isolation," which includes**
26 **several different housing assignments, each with its own criteria for assignment.**
27 **Inmates may be housed in a detention unit in disciplinary isolation, investigative**
28 **detention, mental health observation, or pending placement into a maximum security**

unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates housed in the housing units listed in Plaintiffs' definition of "isolation" may or may not have cellmates.

Without waiving these objections, Defendant is unable to admit or deny this Request as written after reasonable inquiry.  Inmates in maximum custody settings, including detention, are subject to a twice-a-day food delivery schedule under which inmates receive an amount of food equal to three meals.  In the morning, the inmates receive a "mega snack," which provides food for both breakfast and lunch.  In the evening, inmates receive a hot dinner.  Male inmates in restricted movement housing areas, including maximum custody and detention, are provided with a diet that averages 2600 calories per day.  Male inmates in non-restricted areas receive 2900 calories per day.  The twice-a-day feeding schedule for restricted movement inmates provides the same number of total calories that were provided in the previous three-times-a-day feeding schedule.

**REQUEST FOR ADMISSION NO. 32:**  Admit that ADC written POLICY authorizes the provision of only two MEALS per day to PRISONERS in ISOLATION.

*Response:*

Defendant objects to Plaintiffs' definition of "isolation," which includes several different housing assignments, each with its own criteria for assignment.  Inmates may be housed in a detention unit in disciplinary isolation, investigative detention, mental health observation, or pending placement into a maximum security unit.  Moreover, the term "isolation" implies solitary confinement; however, inmates housed in the housing units listed in Plaintiffs' definition of "isolation" may or may not have cellmates.

Without waiving these objections, Defendant is unable to admit or deny this Request as written after reasonable inquiry.  ADC policy provides for a twice-a-day food delivery schedule under which inmates receive an amount of food equal to three meals.

21

**REQUEST FOR ADMISSION NO. 33:** Admit that ADC has no written POLICY requiring PRISONERS who are taking psychotropic medications to be housed in areas where the temperature does not exceed 85 degrees Fahrenheit.

*Response:*

Defendant objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, Defendant admits in part that while ADC has a written policy regarding activities in direct sunlight for inmates taking psychotropic medications, ADC has seen no medical reason to specify temperature limits for areas housing these inmates.

**REQUEST FOR ADMISSION NO. 34:** Admit that WEXFORD has no written POLICY requiring PRISONERS who are taking psychotropic medications to be housed in areas where the temperature does not exceed 85 degrees Fahrenheit.

*Response:*

Defendant objects that this Request seeks an admission regarding the policies of a non-party to this litigation. Defendant further objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, Defendant admits in part that Wexford is contractually obligated to adhere to existing ADC policies and procedures.

**REQUEST FOR ADMISSION NO. 35:** Admit that ADC written POLICY does not prevent PRISONERS who are taking psychotropic medications from being housed in areas where the temperature exceeds 85 degrees Fahrenheit.

*Response:*

Defendant objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, see #33, which answer is incorporated herein.

22

1   **REQUEST FOR ADMISSION NO. 36:**  Admit that WEXFORD written POLICY does

2   not prevent PRISONERS who are taking psychotropic medications from being housed in

3   areas where the temperature exceeds 85 degrees Fahrenheit.

4   *Response:*

5        **Defendant objects that this Request seeks an admission regarding the policies**

6   **of a non-party to this litigation.  Defendant further objects that this Request is an**

7   **incomplete and one-sided statement of the circumstances and is, therefore, vague,**

8   **ambiguous, and misleading.**

9        **Without waiving these objections, Defendant admits in part that Wexford is**

10   **contractually obligated to adhere to existing ADC policies and procedures.**

11   **REQUEST FOR ADMISSION NO. 37:**  Admit that ADC PRISONERS who are taking

12   psychotropic medications are housed in areas where the temperature exceeds 85 degrees

13   Fahrenheit.

14   *Response:*

15        **Defendant objects that this Request is an incomplete and one-sided statement**

16   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

17        **Without waiving these objections, and after making a reasonable inquiry,**

18   **Defendant is unaware of any inmates, including inmates who are taking**

19   **psychotropic medications, being housed in areas where the temperature exceeds 85**

20   **degrees.  Defendant therefore denies this request.**

21   **REQUEST FOR ADMISSION NO. 38:**   Admit that ADC has no written POLICY

22   restricting the use of CHEMICAL AGENTS on PRISONERS who are mentally ill.

23   *Response:*

24        **Defendant objects that this Request is an incomplete and one-sided statement**

25   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

26        **Without waiving these objections, Defendant admits in part that ADC policy**

27   **regarding the use of force is directed toward maintaining staff and inmate safety**

28   **while utilizing the minimum force necessary to ensure their safety.   There is no**

1   exception in the policy for mentally ill inmates.  ADC written policy is consistent

2   with A.R.S. § 13-403(2), which authorizes correctional officers to use physical force

3   for the preservation of the peace, to maintain order or discipline, or to prevent the

4   commission of a felony or misdemeanor.

5   **REQUEST FOR ADMISSION NO. 39:**  Admit that CHEMICAL AGENTS have been

6   used on PRISONERS who are mentally ill.

7   *Response:*

8         Defendant objects that this Request is an incomplete and one-sided statement

9   of the circumstances and is, therefore, vague, ambiguous, and misleading.

10         Without waiving these objections, Defendant admits in part that within the

11   limits set by ADC's policy on use of force, chemical agents have been used in

12   situations involving inmates who are mentally ill.

13   **REQUEST FOR ADMISSION NO. 40:**  Admit that ADC has no written POLICY

14   restricting the use of CHEMICAL AGENTS on PRISONERS whom ADC has classified

15   as "seriously mentally ill" or "severely mentally ill."

16   *Response:*

17         Defendant objects that this Request is an incomplete and one-sided statement

18   of the circumstances and is, therefore, vague, ambiguous, and misleading.

19         Without waiving these objections, see #38, which answer is incorporated

20   herein.

21   **REQUEST FOR ADMISSION NO. 41:**  Admit that CHEMICAL AGENTS have been

22   used on PRISONERS whom ADC has classified as "seriously mentally ill" or "severely

23   mentally ill."

24   *Response:*

25         Defendant objects that this Request is an incomplete and one-sided statement

26   of the circumstances and is, therefore, vague, ambiguous, and misleading.

27         Without waiving these objections, see #39, which answer is incorporated

28   herein.

**REQUEST FOR ADMISSION NO. 42:**   Admit that ADC has no written POLICY restricting the use of CHEMICAL AGENTS on PRISONERS who are taking psychotropic medications.

*Response:*

Defendant objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, Defendant admits in part that ADC policy regarding the use of force is directed toward maintaining staff and inmate safety while utilizing the minimum force necessary to ensure their safety.  There is no exception in the policy for inmates who are taking psychotropic medications.

**REQUEST FOR ADMISSION NO. 43:**   Admit that CHEMICAL AGENTS have been used on PRISONERS who are taking psychotropic medications.

*Response:*

Defendant objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving these objections, Defendant admits in part that within the limits set by ADC's use of force policy, chemical agents have been used in situations involving inmates who are taking psychotropic medications.

**REQUEST FOR ADMISSION NO. 44:**   Admit that ADC has no written POLICY requiring PRISONERS who are taking psychotropic medications to be seen face-to-face by a psychiatrist.

*Response:*

Defendant objects that this Request is an incomplete and one-sided statement of the circumstances and is, therefore, vague, ambiguous, and misleading.

Without waiving this objection, Defendant denies this Request.  Current ADC policy requires that inmates who are prescribed psychotropic medication be evaluated by psychiatric staff, to include either a psychiatric provider or a mental health professional in consultation with a psychiatric provider, every 90 days.

1   **REQUEST FOR ADMISSION NO. 45:**   Admit that WEXFORD has no written
2   POLICY requiring PRISONERS who are taking psychotropic medications to be seen
3   face-to-face by a psychiatrist.
4   *Response:*

5       **Defendant objects that this Request seeks an admission regarding the policies**
6   **of a non-party to this litigation.**

7       **Without waiving this objection, Defendant admits in part that Wexford is**
8   **contractually obligated to adhere to existing ADC policies and procedures.   In**
9   **addition, this practice is a specific requirement in Wexford's contract.**

10  **REQUEST FOR ADMISSION NO. 46:**   Admit that ADC written POLICY allows
11  PRISONERS to be prescribed psychotropic medications without being seen face-to-face
12  by a psychiatrist.
13  *Response:*

14      **Defendant objects that this Request is an incomplete and one-sided statement**
15  **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

16      **Without waiving this objection, Defendant admits in part that medication may**
17  **be continued at the Intake process without a face-to-face contact with psychiatric**
18  **staff, to include either a psychiatric provider or a mental health professional in**
19  **consultation with a psychiatric provider.   Otherwise, this can only be done in**
20  **emergency situations.**

21  **REQUEST FOR ADMISSION NO. 47:**   Admit that WEXFORD written POLICY
22  allows PRISONERS to be prescribed psychotropic medications without being seen face-
23  to-face by a psychiatrist.
24  *Response:*

25      **Defendant objects that this Request seeks an admission regarding the policies**
26  **of a non-party to this litigation.**

27      **Without waiving this objection, Defendant admits in part that Wexford is**
28  **contractually obligated to adhere to existing ADC policies and procedures.**

1  **REQUEST FOR ADMISSION NO. 48:**   Admit that PRISONERS are prescribed
2  psychotropic medications without being seen face-to-face by a psychiatrist.
3  *Response:*

4      **Defendant objects that this Request is an incomplete and one-sided statement**
5  **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

6      **Without waiving this objection, Defendant admits in part that, in accordance**
7  **with ADC policy, inmates have been prescribed psychotropic medications by a**
8  **psychiatric nurse in consultation with a psychiatric provider.**

9  **REQUEST FOR ADMISSION NO. 49:**   Admit that ADC written POLICY allows
10  PRISONERS who are prescribed psychotropic medications to have those medications
11  renewed without being seen face-to-face by a psychiatrist.
12  *Response:*

13      **Defendant objects that this Request is an incomplete and one-sided statement**
14  **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

15      **Without waiving this objection, Defendant admits in part that ADC policy**
16  **requires a face-to-face contact with psychiatric staff, to include either a psychiatric**
17  **provider or a mental health professional in consultation with a psychiatric provider,**
18  **to renew psychotropic medication in all but emergency circumstances.**

19  **REQUEST FOR ADMISSION NO. 50:**   Admit that WEXFORD written POLICY
20  allows PRISONERS who are prescribed psychotropic medications to have those
21  medications renewed without being seen face-to-face by a psychiatrist.
22  *Response:*

23      **Defendant objects that this Request seeks an admission regarding the policies**
24  **of a non-party to this litigation.**

25      **Without waiving this objection, Defendant admits in part that Wexford is**
26  **contractually obligated to adhere to existing ADC policies and procedures.**

27  **REQUEST FOR ADMISSION NO. 51:**   Admit that PRISONERS who are prescribed
28  psychotropic medications have those medications renewed without being seen face-to-

1    face by a psychiatrist.

2    *Response:*

3        **Defendant objects that this Request is an incomplete and one-sided statement**

4    **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

5        **Without waiving this objection, Defendant admits in part that, in accordance**

6    **with ADC policy, psychotropic medications have been renewed by a psychiatric**

7    **nurse in consultation with a psychiatric provider.   This might occur when an**

8    **inmate's medications are due to expire, and the inmate cannot be seen by a**

9    **psychiatrist before the expiration date.   In such a case, the psychiatric nurse may**

10   **contact a psychiatric provider and have the medications renewed until a face-to-face**

11   **contact with a psychiatric provider can be scheduled.   Such a practice is used to**

12   **prevent a sudden stop in treatment, not in lieu of in-person assessments.**

13   **REQUEST FOR ADMISSION NO. 52:**   Admit that ADC written POLICY allows

14   PRISONERS who are prescribed psychotropic medications to have those medications

15   changed without being seen face-to-face by a psychiatrist.

16   *Response:*

17       **Defendant objects that this Request is an incomplete and one-sided statement**

18   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

19       **Without waiving this objection, Defendant admits in part that ADC policy**

20   **requires that any medication changes require a face-to-face contact with psychiatric**

21   **staff, to include either a psychiatric provider or a mental health professional in**

22   **consultation with a psychiatric provider.**

23   **REQUEST FOR ADMISSION NO. 53:**   Admit that WEXFORD written POLICY

24   allows PRISONERS who are prescribed psychotropic medications to have those

25   medications changed without being seen face-to-face by a psychiatrist.

26   *Response:*

27       **Defendant objects that this Request seeks an admission regarding the policies**

28   **of a non-party to this litigation.**

1    **Without waiving this objection, Defendant admits in part that Wexford is**

2    **contractually obligated to adhere to existing ADC policies and procedures.**

3    **REQUEST FOR ADMISSION NO. 54:**  Admit that PRISONERS who are prescribed

4    psychotropic medications have those medications changed without being seen face-to-

5    face by a psychiatrist.

6    *Response:*

7    **Defendant objects that this Request is an incomplete and one-sided statement**

8    **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

9    **Without waiving this objection, Defendant admits in part that, in accordance**

10   **with ADC policy, psychotropic medications have been changed by a psychiatric**

11   **nurse in consultation with a psychiatric provider.  This might occur when an inmate**

12   **reports significant medication problems to a psychiatric nurse, such as severe side**

13   **effects, and the inmate cannot be immediately seen by a psychiatrist.  In such a case,**

14   **the psychiatric nurse may contact a psychiatrist and have the medications changed**

15   **until a face-to-face contact with a psychiatrist can be scheduled.**

16   **REQUEST FOR ADMISSION NO. 55:**  Admit that ADC written POLICY allows

17   PRISONERS who are prescribed psychotropic medications to have those

18   medications discontinued without being seen face-to-face by a psychiatrist.

19   *Response:*

20   **Defendant objects that this Request is an incomplete and one-sided statement**

21   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

22   **Without waiving this objection, Defendant admits in part that DO 1103 1.9**

23   **requires a face-to-face consult with a psychiatrist or a mental health professional in**

24   **consultation with a psychiatrist before medications can be discontinued.**

25   **REQUEST FOR ADMISSION NO. 56:**  Admit that WEXFORD written POLICY

26   allows PRISONERS who are prescribed psychotropic medications to have those

27   medications discontinued without being seen face-to-face by a psychiatrist.

28   *Response:*

1   **Defendant objects that this Request seeks an admission regarding the policies**
2   **of a non-party to this litigation.**

3   **Without waiving this objection, Defendant admits in part that Wexford is**
4   **contractually obligated to adhere to ADC policies and procedures.**

5   **REQUEST FOR ADMISSION NO. 57:**   Admit that PRISONERS who are prescribed
6   psychotropic medications have those medications discontinued without being seen
7   face-to-face by a psychiatrist.

8   *Response:*

9   **Defendant objects that this Request is an incomplete and one-sided statement**
10  **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

11  **Without waiving this objection, Defendant admits in part that, in accordance**
12  **with ADC policy, psychotropic medications have been discontinued by a psychiatric**
13  **nurse in consultation with a psychiatrist.  This might occur when an inmate reports**
14  **significant medication problems to a psychiatric nurse, such as severe side effects,**
15  **and the inmate cannot be immediately seen by a psychiatrist.  In such a case, the**
16  **psychiatric nurse may contact a psychiatrist and have the medications discontinued**
17  **until a face-to-face contact with a psychiatrist can be scheduled.**

18  **REQUEST FOR ADMISSION NO. 58:**   Admit that, except for notations in the
19  HEALTH CARE RECORDS of individual PRISONERS, ADC does not maintain records
20  of the number of PRISONERS who meet with a psychiatric provider for medication
21  treatment of mental health conditions.

22  *Response:*

23  **Defendant objects that this Request is vague, ambiguous, and**
24  **incomprehensible as to "medication treatment of mental health conditions" and is**
25  **therefore unanswerable as written.**

26  **Without waiving these objections, Defendant denies this Request.   Data**
27  **concerning medication is kept by Pharmacy Program databases.**

28  **REQUEST FOR ADMISSION NO. 59:**   Admit that, except for notations in the

1   HEALTH CARE RECORDS of individual PRISONERS, WEXFORD does not maintain

2   records of the number of PRISONERS who meet with a psychiatric provider for

3   medication treatment of mental health conditions.

4   *Response:*

5         **Defendant objects that this Request seeks an admission regarding the**

6   **practices of a non-party to this litigation.   Defendant further objects that this**

7   **Request is vague, ambiguous, and incomprehensible as to "medication treatment of**

8   **mental health conditions" and is therefore unanswerable as written.**

9         **Without waiving these objections, see #58, which answer is incorporated**

10  **herein.**

11  **REQUEST FOR ADMISSION NO. 60:**   Admit that, except for notations in the

12  HEALTH CARE RECORDS of individual PRISONERS, ADC does not maintain records

13  of the number of PRISONERS who are prescribed psychotropic medication.

14  *Response:*

15        **Defendant objects that this Request is vague as to the meaning of "records."**

16        **Without waiving this objection, see #58, which answer is incorporated herein.**

17  **REQUEST FOR ADMISSION NO. 61:**   Admit that, except for notations in the

18  HEALTH CARE RECORDS of individual PRISONERS, WEXFORD does not maintain

19  records of the number of PRISONERS who are prescribed psychotropic medication.

20  *Response:*

21        **Defendant objects that this Request seeks an admission regarding the**

22  **practices of a non-party to this litigation.   Defendant further objects that this**

23  **Request is vague as to the meaning of "records."**

24        **Without waiving this objection, see #58, which answer is incorporated herein.**

25  **REQUEST FOR ADMISSION NO. 62:**   Admit that, except for notations in the

26  HEALTH CARE RECORDS of individual PRISONERS, ADC does not maintain records

27  of the number of PRISONERS who are placed in mental health restraints.

28  *Response:*

1   **Defendant objects that this Request is an incomplete and one-sided statement**

2   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

3   **Defendant further objects that this Request is vague as to the meaning of "records."**

4   **Without waiving these objections, Defendant denies this Request.   All**

5   **instances of the use of restraints are recorded on video equipment, and a**

6   **computerized use of force video recording log is kept.   A post maximum control**

7   **evaluation is conducted within three days after the restraints are removed by a**

8   **review committee, and results of this committee's findings are kept on record.**

9   **REQUEST FOR ADMISSION NO. 63:**   Admit that, except for notations in the

10   HEALTH CARE RECORDS of individual PRISONERS, WEXFORD does not maintain

11   records of the number of PRISONERS who are placed in mental health restraints.

12   *Response:*

13   **Defendant objects that this Request seeks an admission regarding the**

14   **practices of a non-party to this litigation.   Defendant further objects that this**

15   **Request is vague as to the meaning of "records."**

16   **Without waiving these objections, Defendant admits in part that Wexford is**

17   **contractually obligated to adhere to existing ADC policies and procedures.**

18   **REQUEST FOR ADMISSION NO. 64:**   Admit that, except for notations in the

19   HEALTH CARE RECORDS of individual PRISONERS, ADC does not maintain records

20   of the number of PRISONERS who are placed in a restraint chair.

21   *Response:*

22   **Defendant objects that this Request is vague as to the meaning of "records."**

23   **Without waiving these objections, Defendant denies this Request.   The**

24   **restraint chair is considered maximum behavioral control, and the process described**

25   **in #62 must be followed.**

26   **REQUEST FOR ADMISSION NO. 65:**   Admit that, except for notations in the

27   HEALTH CARE RECORDS of individual PRISONERS, WEXFORD does not maintain

28   records of the number of PRISONERS who are placed in a restraint chair.

1   *Response:*

2       **Defendant objects that this Request seeks an admission regarding the**

3   **practices of a non-party to this litigation.   Defendant further objects that this**

4   **Request is vague as to the meaning of "records."**

5       **Without waiving these objections, Defendant admits in part that Wexford is**

6   **contractually obligated to adhere to existing ADC policies and procedures.**

7   **REQUEST FOR ADMISSION NO. 66:**  Admit that ADC does not maintain records of

8   the mean or median length of stay of PRISONERS in inpatient mental health facilities.

9   *Response:*

10       **Defendant objects that this Request is vague as to the meaning of "records."**

11       **Without waiving this objection, Defendant admits in part that ADC does not**

12   **maintain records of the mean or median length of stay of inmates in inpatient mental**

13   **health facilities because hospital stay is dictated by the patient's clinical condition,**

14   **and there is considerable variability in the length of stay required to deliver needed**

15   **treatment.**

16   **REQUEST FOR ADMISSION NO. 67:**  Admit that WEXFORD does not maintain

17   records of the mean or median length of stay of PRISONERS in inpatient mental health

18   facilities.

19   *Response:*

20       **Defendant objects that this Request seeks an admission regarding the**

21   **practices of a non-party to this litigation.**

22       **Without waiving this objection, see #66, which answer is incorporated herein.**

23   **REQUEST FOR ADMISSION NO. 68:**  Admit that ADC has offered PRISONERS

24   presenting with dental problems extraction as the only treatment option.

25   *Response:*

26       **Defendant objects that this Request is vague and ambiguous as to the meaning**

27   **of "dental problems."**

28       **Without waiving these objections, Defendant admits in part there may be**

1    times that a tooth is beyond repair, and extraction is the only treatment option.

2    **REQUEST FOR ADMISSION NO. 69:**   Admit that WEXFORD has offered

3    PRISONERS presenting with dental problems extraction as the only treatment option.

4    *Response:*

5           Defendant objects that this Request seeks an admission regarding the

6    practices of a non-party to this litigation.   Defendant further objects that this

7    Request is vague and ambiguous as to the meaning of "dental problems."

8           Without waiving these objections, and after conducting a reasonable inquiry,

9    this answering Defendant is unable to admit or deny this Request, because to do so

10   would require Defendant to request from Wexford and read through the individual

11   medical records of more than 40,000 ADC inmates since July 1, 2012 to see whether

12   Wexford has offered tooth extraction as the only treatment option to any inmate.

13   **REQUEST FOR ADMISSION NO. 70:**   Admit that ADC has offered PRISONERS

14   presenting with dental problems extraction as the only treatment option, even when other

15   treatments might result in saving the tooth.

16   *Response:*

17          Defendant objects that this Request is vague and ambiguous as to the meaning

18   of "dental problems."   Defendant further objects to this Request as prematurely

19   seeking medical opinion more properly the subject of expert testimony.

20          Without waiving these objections, and after conducting a reasonable inquiry,

21   Defendant is unaware of any inmates who have presented with "dental problems"

22   being offered extraction as the only treatment option when other treatments might

23   result in saving the tooth.  Defendant therefore denies this Request.

24   **REQUEST FOR ADMISSION NO. 71:**   Admit that WEXFORD has offered

25   PRISONERS presenting with dental problems extraction as the only treatment option,

26   even when other treatments might result in saving the tooth.

27   *Response:*

28          Defendant objects that this Request seeks an admission regarding the

1  practices of a non-party to this litigation.   Defendant further objects that this
2  Request is vague and ambiguous as to the meaning of "dental problems."  Defendant
3  additionally objects to this Request as prematurely seeking medical opinion more
4  properly the subject of expert testimony.

5       Without waiving these objections, see #69, which answer is incorporated
6  herein.

7  **REQUEST FOR ADMISSION NO. 72:**  Admit that there are dental problems for which
8  treatments other than extraction might result in saving the tooth.

9  *Response:*

10       Defendant objects that this Request is vague and ambiguous as to the meaning
11  of "dental problems."   Defendant further objects to this Request as prematurely
12  seeking medical opinion more properly the subject of expert testimony.

13       Without waiving these objections, Defendant admits in part that there are
14  dental problems from which treatments other than extraction might result in saving
15  the tooth.

16  **REQUEST FOR ADMISSION NO. 73:**  Admit that WEXFORD provides ADC with a
17  report on WEXFORD'S provision of HEALTH CARE no less frequently than once every
18  week.

19  *Response:*

20       Defendant objects that this Request is vague and ambiguous as written.

21       Without waiving this objection, Defendant denies this Request.

22  **REQUEST FOR ADMISSION NO. 74:**  Admit that WEXFORD provides ADC with a
23  report on WEXFORD'S provision of HEALTH CARE no less frequently than once every
24  month.

25  *Response:*

26       Defendant objects that this Request is vague and ambiguous as written.

27       Without waiving this objection, Defendant admits in part that Wexford
28  submits monthly reports to ADC.

1    **REQUEST FOR ADMISSION NO. 75:**  Admit that WEXFORD provides ADC with a

2    report on WEXFORD'S provision of HEALTH CARE no less frequently than once every

3    three months.

4    *Response:*

5            **Defendant objects that this Request is vague and ambiguous as written.**

6            **Without waiving this objection, Defendant admits in part that Wexford**

7    **submits monthly and quarterly reports to ADC.**

8    **REQUEST FOR ADMISSION NO. 76:**  Admit that ADC has the right to terminate its

9    contract with WEXFORD upon ten days' notice.

10   *Response:*

11           **Defendant objects that this Request is an incomplete and one-sided statement**

12   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

13           **Without waiving these objections, Defendant admits in part that there are**

14   **provisions to cancel the contract, including for failure to perform after giving ten**

15   **days written notice of concern.**

16   **REQUEST FOR ADMISSION NO. 77:**  Admit that ADC has access to DOCUMENTS

17   related to the provision of HEALTH CARE by WEXFORD.

18   *Response:*

19           **Defendant objects that this Request is an incomplete and one-sided statement**

20   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

21           **Without waiving these objections, Defendant admits this Request.**

22   **REQUEST FOR ADMISSION NO. 78:**   Admit that ADC has access to WEXFORD

23   written POLICIES related to the provision of HEALTH CARE to ADC PRISONERS.

24   *Response:*

25           **Defendant objects that this Request is an incomplete and one-sided statement**

26   **of the circumstances and is, therefore, vague, ambiguous, and misleading.**

27           **Without waiving these objections, Defendant admits this Request.**

28                                         **INTERROGATORIES**

**INTERROGATORY NO. 1:**   For each of YOUR responses to the Requests for Admission set forth above that is other than an unqualified admission, specify each fact YOU rely upon to deny the request or to qualify your response.

*Response:*

      **See Defendant's responses above to the individual Requests for Admission.**

**INTERROGATORY NO. 2:**   For each of the Requests for Admission set forth above to which YOU have responded by stating that YOU do not have sufficient knowledge or INFORMATION to admit or deny the Request, describe the reasonable inquiry YOU made to enable YOU to respond to that Request.

*Response:*

      **See Defendant's responses above to the individual Requests for Admission.**

DATED this 24th day of September, 2012

                    STRUCK WIENEKE, & LOVE, P.L.C.

                    By  *Anne M. Orcutt*
                    Daniel P. Struck
                    Kathleen L. Wieneke
                    Rachel Love
                    Timothy J. Bojanowski
                    Nicholas D. Acedo
                    Courtney R. Cloman
                    Ashlee B. Fletcher
                    Anne M. Orcutt
                    STRUCK WIENEKE, & LOVE, P.L.C.
                    3100 West Ray Road, Suite 300
                    Chandler, Arizona  85226

                    Arizona Attorney General Thomas C. Horne
                    Office of the Attorney General
                    Michael E. Gottfried
                    Assistant Attorney General
                    1275 W. Washington Street
                    Phoenix, Arizona 85007-2926

                    *Attorneys for Defendants*

/ / /

/ / /

/ / /

1

COPIES of the foregoing e-mailed to
all counsel of record per the attached list
this 21st day of September, 2012.

2

3

By:    /s/Kim Penny

4            2682449.1

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| | | |
|---|---|---|
| 1 | Alison Hardy: | ahardy@prisonlaw.com |
| 2 | Amy Fettig: | afettig@npp-aclu.org |
| 3 | Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| 4 | | |
| | Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| 5 | | |
| | Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| 6 | | |
| 7 | Daniel Joseph Pochoda: | dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org |
| 8 | | |
| | David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| 9 | | |
| 10 | Donald Specter: | dspecter@prisonlaw.com |
| 11 | James Anthony Ahlers: | jahlers@perkinscoie.com; docketphx@perkinscoie.com; jroe@perkinscoie.com |
| 12 | | |
| | James Duff Lyall: | jlyall@acluaz.org; gtorres@acluaz.org |
| 13 | | |
| | Jennifer Ann Alewelt: | jalewelt@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| 14 | | |
| 15 | Jill Louise Ripke: | jripke@perkinscoie.com; jgable@perkinscoie.com |
| 16 | John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| 17 | Kelly Joyce Flood: | kflood@acluaz.org; gtorres@acluaz.org |
| 18 | Kirstin T. Eidenbach: | keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com |
| 19 | | |
| 20 | Matthew Benjamin de Mee: | mdumee@perkinscoie.com; cwendt@perkinscoie.com |
| | Michael Evan Gottfried: | Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov |
| 21 | | |
| 22 | Sara Norman: | snorman@prisonlaw.com |
| 23 | Sophia Calderon: | scalderon@jonesday.com; lwong@jonesday.com |
| 24 | Thomas Dean Ryerson: | tryerson@perkinscoie.com; docketphx@perkinscoie.com; rboen@perkinscoie.com |
| 25 | | |
| 26 | Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| 27 | | |
| | Sarah Rauh: | srauh@jonesday.com; treyes@jonesday.com |
| 28 | | |
| | David C. Kiernan: | dkiernan@jonesday.com; lwong@jonesday.com |

| | | |
|---|---|---|
| 1 | R. Scott Medsker: | rsmedsker@JonesDay.com |
| 2 | John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| 3 | Kamilla Mamedova: | kmamedova@jonesday.com |
| 4 | Jennifer K Messina: | jkmessina@jonesday.com |

**VERIFICATION**

I, CHARLES L. RYAN, hereby state upon my oath the following:

1.      I am a Defendant in *Parsons, et al. v. Charles L. Ryan, et al.,* U.S. District Court Case No. 1:12-cv-00601-NVW.

2.      I have read "Plaintiff Dustin Brislan's First Set of Requests for Admission and First Set of Interrogatories to Defendant Charles Ryan and Defendant Charles Ryan's Answers Thereto" and I believe based upon information provided by the Arizona Department of Corrections' staff that the content is complete and correct as of this date.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

DATED this 24th day of September, 2012.

CHARLES L. RYAN

2381506.1

# EXHIBIT DD

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

————————

| | |
|---|---|
| **Victor Antonio Parsons**, et al., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. **CV 12-601 PHX-NVW** |
| ) | |
| **Charles L. Ryan**, et al., ) | Phoenix, Arizona |
| ) | July 20, 2012 |
| ) | 10:20 a.m. |
| Defendants. ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Scheduling Conference)

BEFORE THE HONORABLE NEIL V. WAKE

Court Reporter:          Merilyn A. Sanchez, CRR
                         Sandra Day O'Connor U.S. Courthouse
                         401 W. Washington Street SPC-37
                         Phoenix, Arizona  85003-2118
                         (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

```
1            MR. SPECTER:  Yes, Your Honor, we are prepared to move

2    it up.  We can file it in the late fall or, you know --

3            THE COURT:  Let me -- now, again, in the most

4    important sense, Ms. Wieneke, I know I can't hold anybody to

5    anything absolutely certain, but what do you think you are

6    going to fight over on class certification?

7            MS. WIENEKE:  Commonality and typicality, Your Honor.

8            THE COURT:  Can you elaborate on that?

9            MS. WIENEKE:  Well, Your Honor, plaintiffs have

10   alleged through 14 plaintiffs inadequate medical care for many

11   of them.  But when you go to the doctor, you present certain

12   symptoms.  They all have a variety of different symptoms and

13   there's different plans to treat those symptoms.  So they all

14   have their individual claims.  And that's what we are concerned

15   about, is whether they are adequate representatives of the

16   class and whether they present common questions.

17           What we propose is limited class discovery for a short

18   period of time so that the issue of class certification can be

19   presented to the Court, and then open it up, after that issue

20   is resolved, to the entire case.

21           THE COURT:  Let me step back and just looking at this

22   case, my very general sense, that's all it is, is that the

23   plaintiffs are not going to be challenging so much this -- they

24   kind of have to challenge the specifics of their medical care

25   and treatment, but that they are -- also have to prove much
```

C E R T I F I C A T E

I, MERILYN A. SANCHEZ, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 25th day of July, 2012.

S/Merilyn A. Sanchez

MERILYN A. SANCHEZ, CRR

# EXHIBIT EE





# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov

JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR

<u>Hand Delivered, Electronic Mail, and</u>
<u>Certified Mail – Return Receipt Requested</u>

September 21, 2012

Karen Mullenix, Director
Wexford Health Sources
1850 N. Central Avenue, Suite 1050
Phoenix, Arizona 85004

Re:   Written Cure Notification - Contract No. 120075DC

Dear Ms. Mullenix:

The purpose of this letter is notify you of details of non-compliance, required corrective actions, and timeline for action to the above referenced contract between Wexford Health Sources ("Wexford") and the Arizona Department of Corrections ("ADC").

The action is being made in accordance with the contract's Special Terms and Conditions, Section 2.19 Contract Monitoring General Requirements, paragraph 2.19.5, which states:

> If non-compliance issues, other than those identified in Subsection 2.19.6, are identified during a quarterly audit required under Section 2.20, or any other monitoring activity, the Department Monitoring Staff shall provide a written cure notice to the Contractor's Arizona CEO and Area Manager regarding the details of the non-compliance, the required corrective action, and the period of time allowed to bring performance back into compliance with Contract requirements.

> If, at the end of the specified time period, the Contractor has complied with the cure notice requirements, the Department shall take no further action. (2.19.5.1)

> If, however, the Contractor has not complied with the cure notice requirements, the Department Contract Monitor shall notify the Contractor's Arizona CEO and Area Manager in writing that the matter shall be referred to the Chief Procurement Officer to take action against the Contractor, including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the Contract. (2.19.5.2)

- 1 -

Confidential Information - Subject to Protective Order

Several events detailing significant issues of non-compliance are described below:

### 1.   August 17, 2012, ASPC-Perryville/Lumley Unit

On August 17, 2012, Wexford nursing personnel were distributing medication on Lumley Unit - Yard 24 to include "watch swallow" medications.   In accordance with "watch swallow" protocols, certain medications in powder form require administration to be completed via "floating" the medication in a small cup of water, which the patient drinks.   During this distribution of medication, Wexford nurses depleted their stock of cups prior to completing medication distribution to the inmate population.   Wexford nurses failed to stop the medication line and retrieve additional plastic cups, as would have been appropriate.   Rather than refilling the supply of cups, a Wexford nurse placed the powdered "watch swallow" medication in an inmate's hand, directing the inmate to lick the powdered medication from her own hand.

This improper administration of medication instigated disorderly behavior by the affected inmate, requiring a security response.   The nurses' disregard for proper protocol in administering this inmate's medication and their disrespect for the inmate are significant non-compliance issues that require corrective action.

### 2.   August 22, 2012, Medication Expiration Report (Statewide)

During the month of August 2012, ADC conducted random reviews of prescriptions, utilizing the Medication Expiration Report published by Wexford for July 1 -- August 11, 2012.   In completing this review, ADC learned that a significant number of inmates may not have been receiving their medications as prescribed due to expired prescription(s) and inappropriate renewals or refills.   Approximately 8,358 prescriptions required review and potential renewal to ensure inmates received their required medications.

Wexford's lack of communication to its field supervisors regarding the necessary process for reviewing the Medication Expiration Report for renewal of medication, together with Wexford's delayed response and lack of urgency to correct the identified problem, contributed to this significant non-compliance issue.   Specifically, during a meeting on August 22, 2012, between ADC's Monitoring Bureau leadership and Wexford Regional and Corporate personnel, it was apparent, based on statements from Wexford's Corporate Pharmacist, Denise Mervis, Pharm.D., that Wexford was aware of the expired medication issue, but had not taken adequate, if any, action to correct it.   In this meeting, Dr. Mervis referred to the expired medication renewals as a critical issue.

When asked on August 22, 2012 what actions Wexford had undertaken to correct this problem, Wexford leadership advised that they intended to conduct an initial review of the July 1, 2012 -- August 11, 2012 Medication Expiration Report beginning August 27, 2012.   Wexford's decision to wait five days to begin reviewing the Medication Expiration Report was an inadequate response to a significant issue of grave concern to ADC.   As a result of Wexford's delayed response, ADC deployed State resources on August 23, 2012 to ADC prison complexes statewide to review various data sources in an effort to identify inmates in need of medication renewal and to ensure that renewal actually occurred.   Multiple ADC prison complexes also enhanced security vigilance by increasing the rate of security checks to 30-minute intervals on all inmates to ensure the well-being of the inmate population.

-2-

### 3. August 23, 2012, ASPC-Florence/Central Unit

On August 23, 2012, an inmate was found hanging from a sheet in his housing location. ADC staff removed the sheet, placed the inmate on a gurney, and arranged for air transport to an outside hospital. The inmate (MH-3) was last seen by an ADC psychiatrist provider on May 1, 2012. At that time, the provider prescribed lithium carbonate, a "watch swallow" medication used as a mood stabilizer, for 180 days. Medication Administration Records (MARs) showed this inmate received his medication in May, June, and July. On July 18, 2012, during a psychiatric follow-up, the inmate reported that the lithium carbonate had been helpful in stabilizing his mood. During ADC's investigation of this incident, ADC determined that this inmate had not received his psychotropic medication for the first 23 days of August 2012, as evidenced by the fact that no MAR had been generated. Failing to deliver psychotropic medication as prescribed is a significant, non-compliance issue.

### 4. August 27, 2012, ASPC-Lewis/Morey Unit

On August 27, 2012, between approximately 0600 and 0630 hours, while conducting diabetic insulin line in the medical unit at ASPC – Lewis – Morey Unit, Licensed Practical Nurse (LPN) N. Nwaohia contaminated a vial of insulin being used on the line. This contamination occurred when LPN Nwaohia drew insulin with a syringe for a Hepatitis-C positive inmate from a vial of "Regular" insulin and injected this insulin into the inmate. Utilizing the same syringe, she then drew a second dose of insulin from a vial of "Lantus" insulin and injected the secondary dose into the same inmate. LPN Nwaohia's actions contaminated the multi-dose "Lantus" vial. This vial was then utilized to provide insulin to other insulin dependent inmates.

Despite Wexford's Nurse Lindsay Stephen becoming aware of this information on August 27, 2012, Ms. Stephen did not file an Incident Report on the event, in accordance with ADC policy, until September 4, 2012. Rather, on August 27, 2012, she disposed of the insulin vials thought to have been involved in the contamination event and failed to notify Wexford management or appropriate ADC staff of the contamination event or her actions in destroying the insulin vials.

Wexford Site Manager Sumi Erno reported contacting Wexford Regional Manager Linda Maschner on August 28, 2012, to report the incident to her. Ms. Erno reported being directed by Ms. Maschner to begin identifying Insulin Dependent Diabetes Mellitus (IDDM) inmates so that baseline testing for Hepatitis-C could commence. As a precaution, baseline testing was also conducted for HIV. (The index inmate, although known to be positive for Hepatitis-C, was subsequently tested for both Hepatitis-C and HIV.) Pending receipt of those test results, plans were implemented to test all inmates potentially exposed through this event for both Hepatitis-C and HIV. Test results for the index inmate later confirmed him as positive for Hepatitis-C and negative for HIV.

Also, on August 28, 2012, upon direction of Wexford Management, Wexford RN Supervisor Sienkiewicz contacted AB Staffing, the subcontracted employer of LPN Nwaohia. Ms. Sienkiewicz reportedly advised AB Staffing that LPN Nwaohia would be prohibited from performing nursing services in support of Wexford contracts in the state. Wexford requested that AB Staffing file a complaint with the Arizona State Board of Nursing regarding LPN Nwaohia's actions. One week later, on September 4, 2012, while following up at ADC's request, Wexford learned that no complaint regarding LPN Nwaohia had been received by the Board. Wexford Regional Manager Maschner then formally submitted the complaint on the afternoon of September 4, 2012.

- 3 -

Confidential Information - Subject to Protective Order002   ADC027856

In identifying IDDM inmates, Ms. Erno initially reported on August 28, 2012, as having 105 inmates at Lewis that receive insulin. This number later changed to 103, following review of a spreadsheet created by Wexford medical personnel at the Lewis Complex listing inmates receiving insulin at Lewis. In review of this list, duplication of some inmates was noted, thus the 103 number derived from this list was determined questionable.

Additionally, the Department received a report from Wexford generated from the online reporting system of their subcontracted Pharmacy (Diamond Pharmacy Service) on September 5, 2012, which reflected 91 inmates receiving insulin at Lewis. In an email coinciding with the provision of this report, Wexford Director Karen Mullenix, stipulated that the report was generated by Wexford's Site Manager at Lewis (Sumi Erno) and that she (Mullenix) had concerns with the validity of the information Ms. Erno had provided thus far.

On September 5, 2012, during a meeting with inmates at ASPC-Lewis, an additional 9 inmates not previously identified by Wexford were added to the list of those potentially exposed.

Due to the continued fluctuation of information from Wexford and the lack of systems in place to readily identify insulin dependent/chronic care inmates, ADC deployed additional compliance monitoring staff to ASPC-Lewis on September 5, 6, & 7. Wexford did not deploy additional resources to the site until September 6, 2012. It was not until Friday, September 7, 2012, that the total population of insulin dependent inmates and the subset of potentially exposed inmates were identified with certainty. Further, baseline testing of this population was not completed until September 10, 2012, despite Wexford's earlier reporting that this had been completed on September 4, 2012.

The failure to follow established nursing protocols, poor record keeping, mismanagement of documentation, inadequate and inaccurate communication, lack of timely managerial or administrative support, and failure to ensure that corrective action had been completed represent serious issues of non-compliance.

### 5. September 13, 2012, ASPC-Perryville/Santa Rosa Unit

On September 13, 2012, at approximately 1715 hours, Wexford Director Karen Mullenix notified ADC of a possible case of pertussis (whooping cough) at ASPC-Perryville. Wexford management did not know the name(s) or number(s) of inmate(s) affected, or the unit(s) identified with the reported case. Wexford's notification of the reported pertussis case was inadequate and inconsistent. Further, without sufficient factual detail of the incident, Wexford reported no action plan to address the situation.

Ms. Mullenix further reported that Wexford's Dr. Palmer spoke to both the County and State Health Departments about the case. She also reported that Dr. Bell (Regional Medical Manager) was called about this issue two days prior, September 11, 2012, and although he was aware of the potential diagnosis, that information had not been communicated to either Ms. Mullenix or the ADC Site Monitors. ADC Audit Nurse Mendoza contacted Wexford facility personnel and determined that an inmate tested positive for pertussis on August 13, 2012, approximately 30 days prior to Wexford's notification to ADC. ADC Audit Nurse Mendoza also confirmed the inmate's name, number and location.

Confidential Information - Subject to Protective Order003                                                                                                                                ADC027857

In a phone conversation later that evening with Site Manager Deb Cherry and Richard Pratt, ADC Interim Assistant Director, Health Services Monitoring Bureau, it was reported that Dr. Palmer had seen the inmate who tested positive for pertussis approximately 10 days prior to Wexford's notification to ADC. Ms. Cherry also advised she was aware of this issue up to 10 days prior and failed to advise either Ms. Mullenix or ADC Site Monitors at that time. During ADC's investigation, Ms. Cherry speculated that the patient may have unknowingly contracted the disease through inmate visitation in the past few weeks, as the inmate was later contacted by her visitor to advise she or her child had been diagnosed with pertussis. Ms. Cherry also reported that Dr. Palmer contacted the County Health Department regarding the case and that she ordered 25 test kits from the Maricopa County Health Department to test any additional suspected cases of pertussis. That, in fact, was not the case. Ms. Cherry sent an "undeliverable" e-mail to the County's website, requesting the test kits.

A known case of a reportable infectious disease went unreported to ADC staff and Wexford State Level Management for 30 days, indicating a lack of urgency, a lack of awareness of the situation's potential seriousness, a breakdown of communication between field personnel and management, or all of the above. Further, Wexford's failure to independently engage in developing a plan by which to identify/confirm current and future suspected cases of pertussis is a significant non-compliance issue.

**Required CURE actions**

The aforementioned significant events have necessitated ADC to substantially supplement Wexford with personnel resources, operational modifications, and specific direction that should not be expected and are not required under this contract. ADC expects Wexford to effect sustained, systemic operational improvements in the management and delivery of health care services to ADC inmates. ADC is not contractually obligated to deploy its resources to manage Wexford's day-to-day, as well as crisis operations.

The following non-compliance issues, as identified here and/or in previously provided monitoring reports, require corrective action:

STAFFING:  Inadequate staffing levels in multiple program areas at multiple locations

1.  Inadequate support from corporate staff to field staff during normal and crisis operations

2.  Staffing levels creating inappropriate scheduling gaps in on-site medical coverage, including In-Patient Component

3.  Staffing levels forcing existing staff to work excessive hours, creating fatigue risks

MEDICATION/DOCUMENTATION:  Incorrect, incomplete, inconsistent medication administration or documentation of care provided

4.  Quantitative decrease in routine institutional care: backlog of prescription medication expiration review

5.  Incorrect or incomplete pharmacy prescriptions (medication not matching chart order, wrong dosage)

- 5 -

Confidential Information - Subject to Protective Order004                                        ADC027858

6. Inappropriate discontinuation/change of medication

7. Inconsistent non-formulary medication approval process

8. Inconsistent or contradictory medication refill and/or return procedures

9. Inadequate pharmacy reports

10. Inconsistent documentation of Medication Administration Records (MARs)

11. Inconsistent provision of release, transfer, and/or renewal medications

12. Inability to readily identify specific groups of inmates or chronic conditions based upon medications prescribed (e.g., diabetics)

SENSE OF URGENCY RESPONSE, and COMMUNICATION: ADC deployment of resources to intervene in healthcare operations as a result of corporate inaction

13. Inadequate/untimely communication between field staff, corporate staff, and ADC

14. Lack of responsiveness and/or lack of awareness of incident urgency and reporting requirements

15. Quantitative decrease in routine institutional care: backlog of chart reviews

16. Quantitative decrease in routine institutional care: backlog of provider line appointments

17. Quantitative decrease in routine institutional care: untimely handling of Health Needs Requests

18. Quantitative decrease in routine institutional care: backlog/cancellation of outside specialty consultations

19. Unresponsive approach to ADC inquiries on patient information

20. Unresponsive approach to inmate grievance process

ADC expects Wexford to provide a proposed corrective action plan for all of the identified deficiencies by October 1, 2012. Although Wexford is afforded 7, 30, 60, or 90 days to complete corrective action, it is ADC's expectation that Wexford will begin corrective action on all identified deficiencies immediately. Corrective action must be ongoing throughout the 90-day cure period, and Wexford must regularly demonstrate to ADC Contract Monitors that corrective action is ongoing and being completed throughout the 90-day cure period.

This letter shall also serve as a demand for Right to Assurance in accordance with section 8.1 of the Uniform Terms and Conditions, that it is Wexford's intent to perform and comply with all provisions of the contract. Accordingly, Wexford has ten (10) calendar days from the date of this letter to respond to the demand for assurance.

Confidential Information - Subject to Protective Order005 ADC027859

In accordance with the contract's Special Terms and Conditions, Section 2.19 Contract Monitoring General Requirements, paragraph 2.19.7, Wexford has ten (10) calendar days from the date of this letter to submit a written appeal of this Cure Notice.

Wexford's failure to provide written assurance of its intent to perform and comply with all contractual provisions within ten (10) calendar days, or its failure to cure all deficiencies noted herein within ninety (90) calendar days from the date of this letter may, at the State's option, be the basis for terminating the contract under the Uniform Terms and Conditions or other rights and remedies available by law or provided by the contract.

Sincerely,

Joe Profiri
Contract Beds Operations Director
Arizona Department of Corrections

Enclosures:   Cure Matrix Monitoring Report
              Cure Matrix Monitoring Summary Report

c:   Charles L. Ryan, Director - ADC
     Jeff Hood, Deputy Director - ADC
     Dawn Northup, General Counsel - ADC
     Michael Kearns, Division Director, Administrative Services - ADC
     Richard Pratt, Interim Assistant Director, Health Services - ADC
     Leon George, Chief Procurement Officer - ADC
     Mark W. Hale, President and Chief Executive Officer - Wexford
     Daniel L. Conn, Executive Vice President and COO - Wexford
     John Froehlich, Vice President of Finance - Wexford

Confidential Information - Subject to Protective Order006                                      ADC027860

**ADC HEALTH SERVICES CONTRACT MONITORING BUREAU**
**WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE**

Report Date:

| # | ITEM | Douglas | Eyman | Florence | Lewis | Perryville | Phoenix | Safford | Tucson | Winslow | Yuma |
|---|------|---------|-------|----------|-------|------------|---------|---------|--------|---------|------|
| 1 | Inadequate support from corporate staff to field staff during normal and crisis operations | | | | | | | | | | |
| 2 | Staffing levels creating inappropriate scheduling gaps in on-site medical coverage, including In-Patient Component | | | | | | | | | | |
| 3 | Staffing levels forcing existing staff to work excessive hours, creating fatigue risks | | | | | | | | | | |
| 4 | Quantitative decrease in routine institutional care: backlog of prescription medication expiration review | | | | | | | | | | |
| 5 | Incorrect or incomplete pharmacy prescriptions (medication not matching chart order, wrong dosage) | | | | | | | | | | |
| 6 | Inappropriate discontinuation/change of medication | | | | | | | | | | |
| 7 | Inconsistent non-formulary medication approval process | | | | | | | | | | |
| 8 | Inconsistent or contradictory medication refill and/or return procedures | | | | | | | | | | |
| 9 | Inadequate pharmacy reports | | | | | | | | | | |
| 10 | Inconsistent documentation of Medication Administration Records (MARs) | | | | | | | | | | |

Page 1 of 2

Confidential Information - Subject to Protective Order007

ADC027861

## ADC HEALTH SERVICES CONTRACT MONITORING BUREAU
## WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE

Report Date:

| # | ITEM | Douglas | Eyman | Florence | Lewis | Perryville | Phoenix | Safford | Tucson | Winslow | Yuma |
|---|------|---------|-------|----------|-------|------------|---------|---------|--------|---------|------|
| 11 | Inconsistent provision of release, transfer, and/or renewal medications | | | | | | | | | | |
| 12 | Inability to readily identify specific groups of inmates or chronic conditions based upon medications prescribed (e.g., diabetics) | | | | | | | | | | |
| 13 | Inadequate/untimely communication between field staff, corporate staff, and ADC | | | | | | | | | | |
| 14 | Lack of responsiveness and/or lack of awareness of incident urgency and reporting requirements | | | | | | | | | | |
| 15 | Quantitative decrease in routine institutional care: backlog of chart reviews | | | | | | | | | | |
| 16 | Quantitative decrease in routine institutional care: backlog of provider line appointments | | | | | | | | | | |
| 17 | Quantitative decrease in routine institutional care: untimely handling of Health Needs Requests | | | | | | | | | | |
| 18 | Quantitative decrease in routine institutional care: backlog/ cancellation of outside specialty consultations | | | | | | | | | | |
| 19 | Unresponsive approach to ADC inquiries on patient information | | | | | | | | | | |
| 20 | Unresponsive approach to inmate grievance process | | | | | | | | | | |

Page 2 of 2

Confidential Information - Subject to Protective Order008                    ADC027862

ADC — September 20, 2012

## ADC HEALTH SERVICES CONTRACT MONITORING BUREAU
## WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE

ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION

| # | ITEM | ISSUES | LOCATION | ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION | G/A/R? |
|---|------|--------|----------|-----------------------------------------------------------|--------|
| 1 | Inadequate support from corporate staff to field staff during normal and crisis operations. Due to be cured within: 7 calendar days | No visible evidence of additional Wexford corporate staff support in the field during crisis operations. No immediate plan of action provided in the event of unexpected events. Lack of guidance from corporate staff to local staff in the field. Written directives are unclear, inconsistent, or in conflict with verbal directions. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 2 | Staffing levels creating inappropriate scheduling gaps in on-site medical coverage, including In-Patient Component. Due to be cured within: 90 calendar days | Staffing patterns are not in compliance with contract requirements. On-site coverage not fully maintained between shifts, with total lack of coverage for some shifts. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 3 | Staffing levels forcing existing staff to work excessive hours, creating fatigue risks. Due to be cured within: 30 calendar days | Due to existing staffing levels not held to appropriate standards, some nursing staff is working excessive hours. Back-to-back shifts creating high potential for fatigue and less-than-satisfactory patient care. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |

Confidential Information - Subject to Protective Order009

ADC027863

**ADC HEALTH SERVICES CONTRACT MONITORING BUREAU**
**WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE**

| # | ITEM | ISSUES | LOCATION | ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION | G/A/R? |
|---|------|--------|----------|-----------------------------------------------------------|--------|
| 4 | Quantitative decrease in routine institutional care: backlog of prescription medication expiration review<br><br>Due to be cured within:<br>30 calendar days | Expiring Medication Review report not being reviewed for medication expiration. Results may lead to inmates going without prescribed meds. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 5 | Incorrect or incomplete pharmacy prescriptions (medication not matching chart order, wrong dosage)<br><br>Due to be cured within:<br>30 calendar days | Prescriptions written for the wrong dosage. Prescriptions written for medications that do not match the order in the medical chart. Illegible documentation. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 6 | Inappropriate discontinuation/ change of medication<br><br>Due to be cured within:<br>30 calendar days | Changes made in inmate meds without treatment plan, appointment log or SOAPE notes. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |

ADC – September 20, 2012

Confidential Information - Subject to Protective Order010

ADC027864

**ADC HEALTH SERVICES CONTRACT MONITORING BUREAU**
**WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE**

| # | ITEM | ISSUES | LOCATION | ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION | G/A/R? |
|---|------|--------|----------|------|--------|
| 7 | Inconsistent non-formulary medication approval process<br><br>Due to be cured within:<br>30 calendar days | Non-Formulary Drug Requests are not being made, or incorrectly requested, resulting in delay of medication to the inmate. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 8 | Inconsistent or contradictory medication refill and/or return procedures<br><br>Due to be cured within:<br>30 calendar days | Medication refill procedures and return procedures have been modified repeatedly and are unclear, leading to gaps in medications for inmates. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 9 | Inadequate pharmacy reports<br><br>Due to be cured within:<br>60 calendar days | A review of inmates without medication requires examining both Expiring Medication Report and On-Line Reporting data; subcontractor (Diamond) software system is very slow to access. Inability to obtain desired reports from Wexford in a timely manner. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |

ADC – September 20, 2012

Confidential Information - Subject to Protective Order011

ADC027865

**ADC HEALTH SERVICES CONTRACT MONITORING BUREAU**
**WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE**

| # | ITEM | ISSUES | LOCATION | ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION | G/A/R? |
|---|------|--------|----------|-----------------------------------------------------------|--------|
| 10 | Inconsistent documentation of Medication Administration Records (MARs)<br><br>Due to be cured within:<br>30 calendar days | Failure to provide a current MAR for patients on medication. Medication orders or refusals in chart do not match MAR. MARs completed prior to medication delivery. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 11 | Inconsistent provision of release, transfer, and/or renewal medications<br><br>Due to be cured within:<br>30 calendar days | Inmates are discharged/released/transferred without medications. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 12 | Inability to readily identify specific groups of inmates or chronic conditions based upon medications prescribed (e.g., diabetics)<br><br>Due to be cured within:<br>30 calendar days | No reliable data source to identify exact number of chronic care inmates. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |

ADC – September 20, 2012

Confidential Information - Subject to Protective Order 012

ADC027866

ADC—September 20, 2012

**ADC HEALTH SERVICES CONTRACT MONITORING BUREAU**
**WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE**

| # | ITEM | ISSUES | LOCATION | ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION | G/A/R? |
|---|------|--------|----------|-----------------------------------------------------------|--------|
| 13 | Inadequate/ untimely communication between field staff, corporate staff, and ADC<br><br>Due to be cured within:<br>7 calendar days | Wexford field staff failed to notify ADC or Wexford corporate on a significant medical event. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 14 | Lack of responsiveness and/or lack of awareness of incident urgency and reporting requirements<br><br>Due to be cured within:<br>7 calendar days | Reviewing records for expiring medications not responded to by Wexford with the urgency the situation warranted. Wexford field staff failed to make public health notifications on a potential infectious outbreak and may have delayed ADC notification by up to 30 days | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 15 | Quantitative decrease in routine medical care: institutional care: backlog of chart reviews<br><br>Due to be cured within:<br>60 calendar days | Excessive inmate medical records are pending provider review and medication renewals, lacking signatures. New arrivals and transfers are not receiving timely chart reviews. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |

Page 5 of 7

**ADC HEALTH SERVICES CONTRACT MONITORING BUREAU**
**WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE**

| # | ITEM | ISSUES | LOCATION | ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION | G/A/R? |
|---|------|--------|----------|-----------------------------------------------------------|--------|
| 16 | Quantitative decrease in routine institutional care: backlog of provider line appointments<br><br>Due to be cured within:<br>60 calendar days | Chronic care inmates not being seen on regular intervals. Psych Inmates not being seen at regular intervals. New arrivals not being seen as required. Appointment wait times are excessive. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 17 | Quantitative decrease in routine institutional care: untimely handling of Health Needs Requests<br><br>Due to be cured within:<br>7 calendar days | HNRs are not triaged within 24 hours. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 18 | Quantitative decrease in routine institutional care: backlog/ cancellation of outside specialty consultations<br><br>Due to be cured within:<br>60 calendar days | Inmates previously (under ADC) approved for outside specialty consults inappropriately canceled by Wexford. Wexford approval process proves to be excessively delayed, or responded to in a manner which does not provide adequate and continuing care for the inmate. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |

ADC – September 20, 2012

Page 6 of 7

Confidential Information - Subject to Protective Order014

ADC027868

## ADC HEALTH SERVICES CONTRACT MONITORING BUREAU
## WEXFORD HEALTH SOURCES COMPLIANCE DEFICIENCY CURE NOTICE

| # | ITEM | ISSUES | LOCATION | ONGOING FINDINGS AND ASSOCIATED CURE ACTIONS, BY LOCATION | G/A/R? |
|---|------|--------|----------|-----------------------------------------------------------|--------|
| 19 | Unresponsive approach to ADC inquiries on patient information<br><br>Due to be cured within:<br>7 calendar days | Wexford staff demonstrating reluctance to release information to ADC staff, including Health Services Monitoring Bureau and Constituent Services, either through intervention with the patient, or response to inmate family, friends, or advocates. Wexford current hospitalization report is not current/complete, information does not correlate with known in-patient inmate population. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |
| 20 | Unresponsive approach to inmate grievance process<br><br>Due to be cured within:<br>30 calendar days | Wexford not processing grievances within timeframes. | 1. ASPC-DOUGLAS<br>2. ASPC-EYMAN<br>3. ASPC-FLORENCE<br>4. ASPC-LEWIS<br>5. ASPC-PERRYVILLE<br>6. ASPC-PHOENIX<br>7. ASPC-SAFFORD<br>8. ASPC-TUCSON<br>9. ASPC-WINSLOW<br>10. ASPC-YUMA | | 1)<br>2)<br>3)<br>4)<br>5)<br>6)<br>7)<br>8)<br>9)<br>10) |

ADC – September 20, 2012

Confidential Information - Subject to Protective Order 015

ADC027869

# EXHIBIT FF

# Subject to Protective Order

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3

4

5

6   Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina                (MEA)
7   Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
8   Hefner; Joshua Polson; and Charlotte Wells, on          **EXHIBIT FF**
    behalf of themselves and all others similarly
9   situated; and Arizona Center for Disability Law,

10                   Plaintiffs,

11       v.

12  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
13  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
14  capacities,

                         Defendants.

15

16       **This document is subject to a protective order issued by the Court (Dkt. 140)
17       and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT GG

# Subject to Protective Order

1        UNITED STATES DISTRICT COURT

2              DISTRICT OF ARIZONA

3

4

5

6    Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
     Dustin Brislan; Sonia Rodriguez; Christina                (MEA)
7    Verduzco; Jackie Thomas; Jeremy Smith; Robert
     Gamez; Maryanne Chisholm; Desiree Licci; Joseph
8    Hefner; Joshua Polson; and Charlotte Wells, on          **EXHIBIT GG**
     behalf of themselves and all others similarly
9    situated; and Arizona Center for Disability Law,

          Plaintiffs,
10
          v.
11
     Charles Ryan, Director, Arizona Department of
12   Corrections; and Richard Pratt, Interim Division
     Director, Division of Health Services, Arizona
13   Department of Corrections, in their official
     capacities,

          Defendants.
14

15

16      **This document is subject to a protective order issued by the Court (Dkt. 140)**
        **and shall not be copied or examined except in compliance with that order.**
17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT HH

## JOHN ST. CLAIR

**From:**      TRACY CREWS
**Sent:**      Thursday, February 03, 2011 8:31 AM
**To:**        BEN SHAW
**Cc:**        JOHN ST. CLAIR
**Subject:**   Please help

Dr. Shaw,

I wanted to take a moment inform you of the abysmal staffing situation at Perryville.  Currently there is one provider for Perryville.  I attempted to have a PMRB scheduled this week and was informed that I am now one of 2.5 psychiatrists with ADOC.  There are nearly 4000 inmates at Perryville and approximately one third are currently on medications (more if you consider the ones that go on and off, on and off.)  We are an intake facility and the intakes alone present enough work to keep a provider busy full time.  In addition, we have a higher percentage of HNRs compared to the male prisons.  Currently, on most yards here, we are backed up 3-4 months with the HNRs and longer for regular follow-ups.  I have several nurses staffing their nursing lines with me everyday and they are bordering on practicing medicine just to help get us by.  I have to renew meds for dozens of people per week without getting to see them because there is not enough time.  Some of these people have not been seen for 6 months or longer.  Additionally, I am sometimes directed by central office to move inmates up on the list due to family complaints - pushing those that have been waiting months out further.  This tends, not to be based on clinical reasoning, but some other unknown factor (maybe fear of lawsuits?)  Time has been wasted by both psychiatry and psychology staff in interviewing and completing hiring packets only to have these sit on someone's desk in central office for months until the applicant gets a new position.  We do have one part-time provider, NP James Mitchell who has been waiting months to start.  Again, because of the feet dragging, he had to sign a contract and so will not be available now until March.  I find this interesting when Central office was able to get me approved to come on prior to even finishing my hiring packet and I was working within a few weeks of interviewing.  We were nowhere near the awful staffing levels then that we see now.  When Mr. Mitchell does come on it will help but not nearly enough to keep us from circling the drain.  I stay on my pager for emergencies here and to order intake meds, discharge meds, etc on my days off, whether they be my RDO, sick days, or annual leave.  I frequently stay late to finish lines or deal with emergencies.  Another words, I'm doing the best I can but it is still not enough.  I do not want to leave my position here as I feel that I do some good for the women here and society in general but I am stretched very thin.  Please advise.

Thank you for your time.  I look forward to your response.


Tracy Crews, M.D.
Psychiatrist Supervisor
Perryville

PLTF-PARSONS-000007

# EXHIBIT II

# Subject to Protective Order

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF ARIZONA

3

4

5

6    Victor Parsons; Shawn Jensen; Stephen Swartz;
     Dustin Brislan; Sonia Rodriguez; Christina
     Verduzco; Jackie Thomas; Jeremy Smith; Robert

7    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
     Hefner; Joshua Polson; and Charlotte Wells, on

8    behalf of themselves and all others similarly
     situated; and Arizona Center for Disability Law,

9                                      Plaintiffs,

10         v.

11   Charles Ryan, Director, Arizona Department of
     Corrections; and Richard Pratt, Interim Division

12   Director, Division of Health Services, Arizona
     Department of Corrections, in their official

13   capacities,

                                       Defendants.
14

15

No. CV 12-00601-PHX-NVW
   (MEA)


**EXHIBIT II**

16        **This document is subject to a protective order issued by the Court (Dkt. 140)**

17        **and shall not be copied or examined except in compliance with that order.**

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT JJ

# EXHIBIT KK

# ARIZONA DEPARTMENT OF CORRECTIONS
## HEALTH SERVICES CONTRACT MONITORING BUREAU
## MEMORANDUM

**TO:**      Joe Profiri, Contract Beds Operations Director

**THROUGH:** Richard Pratt, Interim Division Director, Health Services Contract Monitoring Bureau

**FROM:**   Ben Shaw, Mental Health Contract Monitor, Health Services Contract Monitoring Bureau

**DATE:**    August 13, 2012

**SUBJECT:**  Wexford Psychiatric Provider Coverage

Contract citation:

2.20.2.10 Mental Health

<u>Performance Outcome 6:</u> Mentally ill inmates receiving psychotropic medications shall be assessed in a face to face encounter with a Psychiatrist or Psychiatry Certified Nurse Practitioner every three (3) months to assess mental health status.

Wexford's current level of psychiatry staffing is grossly insufficient to meet this contractual requirement. Further, this staffing level is so limited that patient safety and orderly operation of ADOC facilities may be significantly compromised. Psychiatry staffing as of 8/10/2012 are as follows:

| <u>Unit</u> | <u>Psychiatry FTE Locations</u> | <u>Psychiatry FTE Filled</u> | <u>Psychiatry FTE Vacant</u> |
|---|---|---|---|
| Perryville | 2  (80 hrs per week) | 1  (40 hrs per week) | 1  (60 hrs per week) |
| Lewis | 1.5 (60 hrs per week) | 0 | 1.5 (60 hrs per week) |
| Eyman | 3  (130 hrs per week) | 0.5 (20 hrs per week) | 2.5 (100 hrs week) |
| Florence | 2  (80 hrs per week) | 0.75 (32 hrs per week) | 1.25 (40 hrs per week) |
| Tucson | 4  (160 hrs per week) | 1.4 (56 hrs per week) | 2.6 (104 hrs per week) |

Wexford currently has 14.85 psychiatry FTE's allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications. Wexford now employs a total of 5.95 FTE psychiatry providers (approximately 33% of their allocation) which 8.9 FTE's are vacant (leaving a vacancy rate of 66%).

Audit findings that support the position that Wexford's psychiatry staffing is insufficient to provide a safe level of services are as follows:

1)    Audit at Perryville on 8/1/2012 found that
       a) 54 patients medications had expired in July
       b) 75 women were committed at Perryville who had been prescribed and stabilized on psychotropic

ADC027770

medications at County Jail facilities. None (0%) of these women's medications were prescribed and continued, as ADOC policy in this area directs.

c) At the Perryville-Lumley Unit 123 HNR's were found requesting to be seen by a psychiatry provider. These patients were waiting to be seen for up to 60 days. None of the patients had been seen or scheduled to be seen at that point in time.

2) Audit at Lewis on 8/5/2012 found that of the 10 charts evaluated, none (0%) had been seen by psychiatry provider in the past 30 days.

3) Audit at Eyman on 8/6/2012 found that of the 20 charts evaluated, none (0%) had been seen by psychiatry provider in the past 30 days.

ADC027771



# Arizona Department of Corrections

1601 WEST JEFFERSON
PHOENIX, ARIZONA 85007
(602) 542-5497
www.azcorrections.gov



JANICE K. BREWER
GOVERNOR

CHARLES L. RYAN
DIRECTOR



**TO:**       Lewis Complex Inmates

**FROM:**   Lewis Medical/Wexford Health Services

**DATE:**    06/26/2011

**SUBJECT:**   Medication Changes


This memo is to address medication changes that will take place with the State transition to Wexford Health Services.

- All Gabapentin will be changed to watch swallow with the powder of the capsule placed in water.
- Effective 7/1/2012, Keep on Person (KOP) medications will be ordered through Wexford Health Services. You will continue to utilize the current Health Needs Request (HNR) form to request refills.
- Your KOP medications will be delivered in blister cards that are 6" wide and 9" high. You will no longer receive small Ziploc bags for your KOPs. Please remember that if your medications are not stored appropriately, then they are considered contraband and will be confiscated.
- The blister cards will have a barcode sticker on the top left hand corner that will be needed to request refills. These barcodes will replace the stickers that you currently use to request refills. Please allow a minimum of 7 business days (not including weekends).
- **If you lose the barcode then your refill process will be delayed**. You will need to submit a hand written HNR and indicate each medication that you need refilled. **Medications will not be refilled without an HNR**.
- The blister cards will be placed in brown or white paper bags for distribution to ensure inmate medical privacy.
- For July, August, and September only, your medications will automatically be refilled. After September, your medications will only be refilled if you submit an HNR with the barcode label located at the top left hand corner of your bubble pack. **Chronic care medications will no longer be refilled automatically.**

# EXHIBIT LL

# ARIZONA DEPARTMENT OF CORRECTIONS
## HEALTH SERVICES CONTRACT MONITORING BUREAU
## MEMORANDUM

**TO:**         Joe Profiri, ADC Monitoring Team Leader

**THROUGH:** Richard Pratt, Interim Health Services Division Director

**FROM:**     Paulette Boothby, ADC Pharmacy Monitor

**DATE:**      August 17, 2012

**SUBJECT:**  Medication Issues Report

07/13/12
**07/24/12 Update**
**07/31/12 Update**
**08/01/12 Update**
**08/03/12 Update**
**08/07/12 Update**
**08/09/12 Update – onsite visit to Alhambra**
**08/10/12 Update – onsite visit to Perryville**
**08/14/12 Update – onsite visit to Lewis – <u>updated information in this report is bolded and underlined for quick review</u>**
**08/16/12 Update – onsite visit to Eyman – <u>updated information in this report is bolded and underlined for quick review</u>**

Review of Reported Issues from the Field by Jeff DiGiorgio, Diamond Pharmacy & Paulette Boothby, ADC Pharmacy Monitor 07/23/12
Onsite findings by Paulette Boothby, ADC Pharmacy Monitor – Alhambra and Perryville 08/09/12 and 08/10/12

## FINDINGS:
### Item 1 – Expired Medications
     Various field issues reviewed contained prescriptions that have
       expired.
### Possible Solution:
### Item 1 – Expiration Report by Diamond
     Per Jeff, Diamond (Josh in IT) can prepare an Expiration Report for

1

ADC027794

ADC by complex and unit for prescriptions expiring in the next 14 days. This report can be generated weekly on Sunday and would be distributed to the onsite FHA each Monday morning. The onsite FHA/DON would provide the report to prescribers by unit on Monday morning so charts can be pulled and Continuity of Care prescriptions can be written to provide prescription coverage until the next scheduled appointment. Adequate prescribers to review and write prescriptions is essential for this process.

**UPDATE 07/31/12**
E-mail to Dr. Garcia, Dr. Smith, Dr. Mervis with copies to Diamond Pharmacy. E-mail was sent by Dr. Rowe, Dr. Robertson, Dr. Shaw and Paulette Boothby, RPh. Requiring Urgent Attention to provide Continuity of Care to inmates and requesting immediate action for renewal process. **(Additional staffing from Wexford Corporate and new hires is needed to support this process – Approximately 8358 prescriptions need to be reviewed to provide continuity of care- their staffing levels on site are a big concern) – Response Pending**

**UDATE 08/03/12**
E-mail to Wexford Staff (Denise Mervis) from P. Boothby expressing concern about staffing levels to support Expiring Medications and Renewals. Inquired if Wexford plans to provide extra prescriptive support to accomplish task. See response on 08/09/12 Wexford Pharmacy Teleconference.

**UPDATE 08/03/12** – Expiration Report of Psych Medication from 07/01/2012 through 08/11/12 provided by Denise. **(2488 prescriptions are identified for review)**

Expiration Report of Medical Medication from 07/01/2012 through 07/31/12 provided by Denise on 08/03/12. **(approximately 3700 prescriptions are identified for review)**

**UPDATE 08/09/12**
Expiration Report of Medical Medication from 08/01/12 through 08/11/12 provided by Denise **(approximately 2170 prescriptions are identified for review)**

2

**UPDATE 08/09/12 Wexford Pharmacy Teleconference**
Regarding: 08/03/12 E-mail to Wexford Staff from P. Boothby
expressing concern about staffing levels to support Expiring
Medications and Renewals. Inquired if Wexford plans to provide
extra prescriptive support to accomplish task. – Denise stated that a
staffing teleconference is scheduled for Friday, August 10, 2012.
Richard Pratt states that this teleconference has been rescheduled.
TBD

**UPDATE 08/10/12 Onsite visit to Perryville**
Tim Johnson, PA, stated that he had not received the Medical Expiration Reports that
were reportedly send to each site earlier in the week. I spoke to Deb Cherrie and she
didn't know. We went to her office and printed off a copy of Psych Expiration Reports
and she stated she would provide the report to the Psych provider. She did not have a
copy of the Medical Expiration Reports so I returned to the office that afternoon
scanned the report and sent a copy to her, Donna Mendoza, ADC Contract Monitor and
Tim Johnson, PA. Tim also reported that he had not received the Weekly Medical
Expiration Report that was generated and sent by Diamond on 08/05/12 for the
medications expiring 08/12/12 – 08/18/12. I spoke with Denise Mervis today
(08/13/12) 1400 notifying her of the situation and she is calling Deb Cherrie.

**UPDATE 08/14/12 Onsite visit to Lewis**
Sumi Erno, Wexford Site Manager and Nicole Armenta, Wexford DON, reports that
Expiration Report review and renewals are approximately 50% complete with staff
working to finish all retrospective reports and keep current status on all prospective
reports. Medical providers are helping by writing Psych prescription renewals. HNR
responses are up to date.

**UPDATE 08/16/12 Onsite visit to Florence**
Nicole Taylor, Psychologist, Florence states Diamond's Psych expiration reports are not
useful because of the number of transferred inmates between 07/01/2012 and
08/11/2012. Review and renewals utilizing this report are very time intensive and there
are not enough staff to accomplish this task. She also notes from profile reviews that
ADC prescriptions that rolled into the system with future expiration dates are not
current in Diamond's system. (One medical example identifies a cardiac patient who
went without his Plavix, ASA, Metoprolol and Gemfibrozil from 8/8/12 to 08/16/12 –
we alerted the provider on site and they were able to obtain the medication from an
outside pharmacy. Nicole is sending a listing of mental health examples and issues for
further review with Wexford pharmacy staff. **She states than many inmates
have gone without Psych meds for 30 days or more.**

3

ADC027796

This is an issue not only for the retrospective reports but also for the prospective weekly expiration reports.  Eyman and Florence complexes share 1 FTE Psych provider to evaluate patients and provide renewals from the expiration reports.  More staff is needed immediately to provide continuity of care.

NOTE:  Effective review of expiring medications requires that the facility obtain transfer reports from inmate records for incoming and outgoing inmates at each facility.  This would include all transfers between 07/01/12 and 08/11/12 for retrospective and 08/12/12 to present day for all prospective reviews.  Check to see if there are inmates who have transferred in or out who are not on the retrospective and prospective reports supplied by Diamond.  If they are not listed on the report a query would be needed to see if the identified inmates have medication.  If so, their profile would need to be printed and reviewed.

The lack of AIMS interface with Diamond's CIPS program in movement and transfer of inmates and medications is and will continue to be problematic.

The Diamond ORP System is very slow in retrieving profile information.  We tried to contact several of our Wexford and Diamond contacts to address this issue yesterday, but were not able to speak to anyone. (08/17/12 update with Diamond this morning. They are working with their IT department to increase capability of their system to handle the high volume of users currently accessing the system.  They do realize there is a significant problem with the ORP System).

Chart Review of 18 patients at HU8 and IPC previously identified as not receiving medications as of 08/08/12 was conducted.  Out of the 18 patients reviewed, 9 patients still had not received their medications.  Copy of findings sent to Wexford – Denise Mervis, Martin Winland, Jeanne Chastain.

FINDINGS:
Item 2 – Non-Formulary Drug Requests for MSER and MSIR
Previously in ADC both MSER and MSIR were formulary.  Various field issues reviewed contained prescriptions for Morphine Sulfate Extended Release and Morphine Sulfate Immediate Release and were not filled by Diamond.  A NFDR was needed and the original prescription is required (not the faxed copy).

4

ADC027797

**Possible Solution:**
**Item 2 - Non-Formulary Drug Requests for MSER and MSIR.**
Previously a memo regarding NFDR for Methadone was sent to
provide continuity of care Methadone prescriptions through
09/15/2012. Perhaps same procedure could be implemented for
MSER and MSIR to provide continuity of care.

**UPDATE – 08/01/12 Memo from Denise – all current Methadone,
MSER and MSIR orders will not need a non-formulary submitted
for at least one year. New orders will require a NFDR.**
Perhaps the DEA will allow Diamond to consider the faxed
prescription as the original similar to the Nursing Home Regulatory
processes. We have an upcoming meeting with the
DEA/SBOP. We could discuss this option at that time.

**UPDATE – 08/16/12 Onsite visit to Florence**
Chart review on 2 Cancer Patients show they went without MSER/MSIR for 5-6 days.
Copy of information sent to Wexford for review and explanation.

**FINDINGS:**
**Item 3 – Non-Formulary Drug Request Process**
No clear communication to the field. Wexford receives NF and
responds 24-48 hours and provides response to Diamond.
  1) Notification that NFDR is needed is sent to the prescriber?
  2) Notification that NFDR is approved/disapproved sent to the prescriber?
  3) 0 in the patient profile on the Diamond ORP signifies that medication is
     profiled and not sent. How does the site know the status and what should be
     done to solve the issue?

**UPDATE 08/09/12 Wexford Pharmacy Teleconference**
**NFDR sent to Wexford for review and provide decision to Diamond and the
provider – exception is nutritional supplements NFDR – review and sent
through medical supply chain rather than Diamond**

**Possible Solution:**
**Item 3 - Non-Formulary Drug Request process.**
Requesting direction on how this can solved. It was mentioned that

5

ADC027798

NFDR for anything 28 days be changed to 30 days because the blister package holds 30 day supplies and most providers are thinking in 30 days supplies. -- **Response pending -**

ADC Policy

| Non-Formulary Drug Requests | | OPR:<br>Pharmacy Program Manager<br>Auth: pb |
|---|---|---|
| Health Services Technical Manual | HSTM<br>Chapter 4<br>Section 1.6. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**PROCEDURES:**

1.0. A Non-formulary Drug Request Form (NFDR) will be submitted and approved before the procurement of any drug, medication, or other medical item that is managed under the ADC Formulary Process. This includes compounded medications prepared for dispensing; and items may also be requested for ADC Formulary addition via this form and checking "Request for Formulary Addition". Supporting information must accompany the request.

1.1. Provider will provide formulary medication for continuity of care, if needed, while the NFDR is being processed. If a non-formulary medication is an urgent request the Medical Program Manager, ADC Clinical Pharmacist or the Pharmacy Program Manager should be called.

**UPDATE 08/01/12** – Memo from Denise – the non-formulary process has been communicated repeatedly to the field and we will continue to communicate the message.

1. The provider is notified that a NF is required via the exception report.

2. Every site has the toll free number they can call to check on the NF request. A sign was distributed to all units to hang that discusses the process and the number to call with questions.

**UPDATE 08/16/12**

Rick, Wexford Site Manager states that removing Lantus, once daily insulin from the formulary impacts all insulin diabetic inmates who are on work crews. These inmates may no longer be able to work.

6

ADC027799

**FINDINGS:**
**Item 4 – Discharge Medication**

    Various field issues reviewed revealed a number of discharge
prescriptions were not being filled in time for discharge of patient.

Per Health Services Technical Manual Chap. 4.1.1

      15.0 Pending Discharge Medication orders must be sent to the pharmacy by nursing services at
least one week prior (but no sooner than two weeks prior) to discharge for the medication to be filled by the
Regional Pharmacy. An alternate procedure that meets the spirit of this requirement may be developed by the
Pharmacist in Charge and approved by the Pharmacy Program Manager.

15.1. Late notification for discharge medications will require a facility procedure using outside contracted
pharmacy services to provide discharge medication. Assistance in acquiring these contracts will be provided
through HSB

**Possible Solution:**

    **Item 4 – Discharge Medication**

    Need to identify a process with a 7-14 day lead time so that
medications can be written, filled, received onsite. Need to identify
process for patient to pick-up medication as they leave the facility.
This will require Operations assistance and involvement. Part of the
current process involves utilizing back-up pharmacies and courier
services for late notification discharges. These back pharmacies may
deliver medications after hours and Operations would need to
sign for medications and deliver to the Major's Office (or designee)
for delivery to the patient as they leave the facility (or alternate plan
would need to be implemented).

**UPDATE 07/13/12**

Memo from P. Boothby to Denise and Rebecca

Onsite pharmacy services were providing assistance and safety net to
assure discharge medication was provided at the time of discharge.
Possible solution proposed – Possibly the onsite medical records
could obtain the Diamond CIPS Reader function to see if patient has
chronic care medications that need to be provided. They would only
check to see if the inmate had current medications and would send the
chart to the provider for review and decision of what meds to write.
Depending on how efficient the system was, it could be done 14 days
out or 7 days out to assure timely filling and delivery. The release
information is provided by onsite inmate records at each facility.

BIG CONCERN – timely receipt of discharge medications due to loss
of oversite by onsite pharmacy.

7

ADC027800

**UPDATE 08/01/12**

Memo response from Denise.

We are working a proposal for the ADC where we would give discharging patients a hard copy script to take to a named retail pharmacy. They can have the order filled at no charge. This would also eliminate the waste involved for the many inmates who refuse or discard release meds currently provided. This also works well for inmates being discharged without notice. We can put the process in place and I believe it is still in compliance with the contract but we would need ADC approval.

**Update 08/09/12 – 5 inmates left Perryville without their Psych discharge medication – 1 insulin diabetic inmate left Yuma without his discharge medication.**

**UPDATE 08/09/12– per Director – all discharge medication will be given to the inmate before discharge from the institution. Medication will no longer be sent by mail or Fed Ex the next day unless directed by Richard Pratt. If medication is not received at the institution before discharge, Wexford will make arrangements to deliver the discharge medication to the inmate – the same day.**

Wexford's previous back up plan was to have medication technicians mail or Fed/Ex all undelivered discharge meds to patient after discharge.

**UPDATE 08/14/12 – Lewis Onsite**
**Per Sumi Erno, Wexford Onsite and Ashley Swindle, Wexford Med Tech –**
No issues reported with Discharge Medication

**UPDATE 08/16/12 – Florence Onsite**
No issues reported with Discharge Medication – advised site that per Director that all discharge medication is to be given to the inmate before discharge from the institution.

8

ADC027801

## FINDINGS:
## Item 5 – Hospital Discharge Medication

Various field issues reviewed revealed patients discharging from the hospital without chart review at facility and follow up on discharge medications with comparisons of current med lists. Each hospital discharge requires a provider review of orders, either in person or by nursing contact with on call provider.

Per Health Services Technical Manual Chap 5.6.0

1.1. Medication for inmates who are out to court or in the hospital shall be maintained at the unit pending the inmate's return to the facility unless the order has expired. Exception will be when the mediation is delivered to the inmate by security. Security will return any medication undeliverable to the pharmacy immediately.

Upon the inmate's return from the hospital the unit nurse will provide the discharge summary and hospital notes to the provider for review for medication formulary compliance or consideration of changing the medications. If there is no provider scheduled for that unit upon return of the inmate, the unit nurse will contact another facility provider or the on call provider to obtain orders based on the hospital discharge summary for the inmate and current medications provided by the ADC facility. All discontinued medications will be returned to the pharmacy.

## Possible Solution:
### Item 5 – Hospital Discharge Medication

Perhaps we can start monitoring the hospital discharges on the Diamond ORP on a regular basis to determine if the continuity of care is improving.

## UPDATE
## 08/01/12 Memo from Denise
Wexford Utilization Management and Regional Administrators to manage

## FINDINGS:
## Item 6 – Intake Medications

The majority of inmates rarely come with meds from county and oddly enough the ones that actually do – there is conflicting versions on what to do with them. There are a number of medications that come with the inmate – but for some reason – the county they come from – removes the label so those meds can not be given at all. The intake nurse states that they give them to the inmates, when the provider instructs them to do so.

If there is a transfer summary (occurs only approx 50%) there will be a RX written and as long as it is faxed before 1400, the inmate "should" receive it in 48 hours. If there is no transfer summary, the provider will write an order for the inmate to be seen on the yard – to

9

address their medication issues. With the lines being so far out, not sure how long that would take. Theoretically, the longest wait for anyone to wait for their RX (KOP &/or WS) would be if faxed after 1400 on a Friday – they "should" receive it by the following Wednesday. (reported from Perryville)

**Possible Solution:**
**Item 6 – Intake Medications**

> The back-up for this process is already in place. Medication is either given from the RDSA or is ordered from the back up pharmacy. Perhaps more tracking of this issue is warranted. Let's touch base with Lin Maschner to see if she has any information. – **Response pending** –
> If an order is faxed on Friday the site should receive it Monday or Tuesday at the latest.

> **UPDATE 08/09/12 Wexford Teleconference Call**
> Perryville and Alhambra had lost capability to receive Maricopa County Intake Medication Transfer Sheets – discussion with Jon Previte, Diamond stated issue was resolved. Denise asked Jon to contact both sites and provide training for this procedure.


**FINDINGS:**
**Item 7 – Inmates transferring from one location to another without their medications.** 08/01/2012 – Memo from Paulette

> The inmate's KOP medication in his/her possession should travel with the inmate (on person) when transporting to another unit or complex. Operations has been made aware of this, but sometimes it doesn't happen. Also, the WS medication remaining at the nurse's station is supposed to be packed up in the inmate's chart and sent to the new location, per policy.

**Possible Solution:**
Item 7 – 08/03/2012 Official Directive – Inmate Transfers and Medications by Denise needs correction.

Inmate Transfers and Medication –
1. Denise your KOP (Keep on Person) Medications Directive states KOP medications should move with the inmate's personal items. It should state KOP medications should remain with the inmate during transport.

10

ADC027803

I'm scanning and e-mailing copies of the 2- Director's Orders (705.06 and 909.05) and 1- Health Service Technical Manual Reference (Chapter 5.6.1) which states inmates shall be allowed to carry prescribed medications and medical devices or appliances, identified by Health Services staff as necessary, on their person. If needed, staff shall provide a see-through plastic bag for multiple prescriptions. Health Services staff shall approve any exceptions. DO 705.06 -1.1.3.2.  Also see DO 909.05 - 1.14 thru 1.14.3   and HSTM Chapter 5 Section 6.1 – 1.0

**FINDINGS:**
**ITEM 8 - New Finding 08/09/12 at Alhambra C Area nursing station  – Floor Stock for oral medication being sent by Diamond Pharmacy.  Non-patient specific with cards being utilized by several patients with single doses given.  Cards being sent do not have instructions for use on them.   No documentation is occurring.**

> **Solution:   Per 08/09/12 Wexford Pharmacy Teleconference – Paulette shared photo copies of samples.  Denise directed Diamond to stop this practice.  No more non-specific stock cards without directions printed on the label will be issued or allowed.**

**FINDINGS:**
**Item 9 – UPDATE 08/10/12 Perryville Onsite Visit KOP/DOT coding still problem on medications.  Asking Tim Johnson, PA, Perryville to send examples.**

**UPDATE 08/14/12 Lewis Onsite**
Per Ashley Swindle, Wexford Med Tech, issues with KOP/DOT coding are still occurring on a much less frequent basis.  She will send examples as they occur.

11

ADC027804