# EXHIBIT C

1 | Daniel Pochoda (Bar No. 021979)
2 | Kelly J. Flood (Bar No. 019772)
    James Duff Lyall (Bar No. 330045)*
3 | **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4 | Telephone:  (602) 650-1854
    Email: dpochoda@acluaz.org
5 |         kflood@acluaz.org
            jlyall@acluaz.org
6 |

7 | *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

8 | *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
   | *Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
9 | *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
   | *Robert Gamez, Maryanne Chisholm, Desiree Licci,*
   | *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
10 | *behalf of themselves and all others similarly situated*

11 | **[ADDITIONAL COUNSEL LISTED BELOW]**

12 |

13 | UNITED STATES DISTRICT COURT

14 | DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | **DECLARATION OF ROBERT L. COHEN** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

1    I, Robert L. Cohen, declare,

2         1.     I am a medical doctor and expert in the field of Correctional Medicine, with

3    30 years of experience in the field.  My Curriculum Vitae is attached.  I have been

4    appointed by federal courts to serve as a monitor in cases challenging the provision of

5    medical care to prisoners, including in Michigan, New York State and Florida.  I have also

6    been a member of the New York City Board of Corrections since 2009, served as a

7    representative on the National Commission on Correctional Health care for 17 years,

8    provided primary care to jail inmates at Rikers Island, and published extensively on health

9    care for the incarcerated.

10        **Expert Opinion**[1]

11        2.     I have been retained by plaintiffs' counsel in the *Parsons* case as an expert

12   in correctional health care.  I have been asked to render my opinion with respect to

13   whether the current widespread deficiencies in the medical care provided by the Arizona

14   Department of Corrections health care delivery system are systemic and whether the

15   deficiencies are amenable to a common remedy that will resolve the litigation.

16        3.     The opinions set forth in this declaration are based on my extensive

17   experience studying and researching correctional systems, my service in the field, and my

18   experience as an expert and monitor in prison conditions cases.  They are also based on

19   my review of the following documents:

20        Deposition of Tracy Crews, M.D., October 3, 2012

21        Deposition of Carmelo Echeverria, M.D., October 5, 2012

22        Deposition of Karen Ingram, September 13, 2012

23        Deposition of Richard Pratt, P.A., October 4, 2012

24        Deposition of Richard Rowe, M.D., September 19, 2012

25        Deposition of Jeffrey Alan Sharp, M.D., October 9, 2012

26

27        [1] All excerpts of deposition transcripts, plaintiff declarations and documents
     referenced herein are attached as exhibits to the Declaration of D. Fathi to which this
28   declaration is also attached.

1      Deposition of Ben Shaw, Ph.D., October 3, 2012

2      Summary Judgment Order, *Arenberg v. Ryan*, Case No. 2:10-cv00228-JWS (D.

3      Ariz. October 9, 2012)

4      ADC Notice of Request for Proposal for Privatization of Health Care and Wexford

5      Health Inc.'s Bid, (ADC014103 – ADC016042)

6      Death Investigation, Inmate Rhodes, July 19, 2012 (ADC02949 – ADC024982)

7      Death Investigation, Inmate Sexton, July 19, 2012 (ADC025110 – ADC025138)

8      Death Investigation, Inmate Todd, May 16, 2011 (ADC024171 – ADC024221)

9      Death investigation, Inmate Phothong, May 14, 2012 (ADC026930 – ADC026955)

10      Death Investigation, Inmate Venegas, (ADC025140 – ADC025171)

11      Letter from Joe Profiri to Karen Mullenix, September 21, 2012 (ADC027854 -

12      ADC027869)

13      Letter from Karen Mullenix to Joe Profiri, October 1, 2012 (ADC027941 –

14      ADC027943)

15      Memo from Jim Taylor to Joe Profiri, August 13, 2012 (ADC028112 –

16      ADC028114)

17      Spreadsheet: Arizona Vacancies and FTE Fill Percentages, August 8, 2012

18      (ADC028019)

19      Wexford Health Sources Inmate Wait Times, Arizona, August 1-31, 2012

20      (ADC028020 – ADC028022)

21      Memo from Dennis Kendall to Joe Profiri, August 13, 2012 (ADC028123 –

22      ADC028126)

23      Memo from Kathy Campbell to Joe Profiri, August 20, 2012 (ADC028128 –

24      ADC028129)

25      Weekly Non-Compliance Report, ASPC-Perryville, August 13, 2012 (ADC028131

26      – ADC028133)

27      Memo from Helena Valenzuela to Joe Profiri, August 13, 2012 (ADC028140 –

28      ADC028142)

1    Memo from Kathy Campbell to Joe Profiri, August 13, 2012 (ADC028143)

2    Memo from Vanessa Headstream to Joe Profiri, August 17, 2012 (ADC028144 –

3    ADC028146

4    Memo from Karyn Christie to Joe Profiri, August 13, 2012 (ADC028148 –

5    ADC028149)

6    Memo from Kathy Campbell to Joe Profiri, August 20, 2012 (ADC028159 –

7    ADC028161)

8    Memo from John Mitchell to Joe Profiri, August 10, 2012 (ADC028163)

9    Memo from John Mitchell to Joe Profiri, August 13, 2012 (ADC028164 –

10   ADC028165)

11   Memo from Dennis Chenail to Joe Profiri, August 13, 2012 (ADC028167)

12   Memo from Vanessa Headstream to Joe Profiri, August 17, 2012 (ADC028168 –

13   ADC028170)

14   Memo from John Mitchell to Joe Profiri, August 17, 2012 (ADC028171 –

15   ADC028172)

16   Medical Records for and Declarations of the Following Named Plaintiffs

17        Maryanne Chisholm

18        Joseph Hefner

19        Shawn Jensen

20        Desiree Licci

21        Joshua Polson

22        Stephen Swartz

23        Charlotte Wells

24

25   **Centralized Organization**

26   4.      Defendant Richard Pratt, an unlicensed physician's assistant and the current

27   Interim Health Services Division Director, is charged with "oversee[ing] the entire Health

28   Services Division."  (Ex. U, at 7:20-22; 9:15-18; 27:15-16 ("I'm responsible for the

quality and the clinical care in the field.))  Under Mr. Pratt's direction, defendants operate a top-down centralized health care system.  The staffing patterns, the medical policies and the guidelines for treatment are developed in the ADC's central office and must be followed at each prison.  (Ex. Y, at 51:13-52:1; 165:2-12.)  Any local policies developed at the prison level must be consistent with departmental policies.  (*Id*. at 165:20-23.)  The contract to privatize health care for state prisoners requires Wexford Health Sources to follow these policies and guidelines.  (Ex. U, at 105:23-106:3.)

5.     Based on the materials I have reviewed, I have concluded that defendants directing this centralized system, Pratt and Ryan, have neglected the serious medical needs of the Arizona state prisoners by failing to manage, support, supervise and administer medical care to prisoners in the ten state facilities.  Because of this neglect, these prisoners are at serious risk of harm, and in some cases, death.

6.     The defendants' contracting process demonstrates their failure to properly manage the system.  When contracting with an agent to perform health care in a large system like Arizona, it is critical that the state carefully investigate the track record and capacity of the bidders.  Defendants, however, failed to adequately investigate the capacity of Wexford to administer a system of ADC's size and complexity.  (*See* Ex. X, at 67:21-94:5.)  For example, defendants were apparently unaware that the Arizona Medical Board had placed Wexford's proposed Chief Medical Officer, Dr. Malcolm Wilkinson, on probation for 15 years, had issued him a letter of reprimand for conduct that might be harmful to patients, and suspended him from practicing general surgery for 15 years.  (Ex. X, at 89:2-91:16.)  Defendants also apparently failed to review publicly available news articles regarding Washington State's decision against renewing their Wexford contract, and Wexford's loss of their New Mexico contract after the New Mexico Director of Corrections was placed on leave for having an improper relationship with a Wexford lobbyist.  (Ex. X, at 75:1-78:19.)

7.     Once a contract of this size and complexity is awarded, it is essential that the state work with the contractor during the transition period to ensure success of the new

1    program.  Instead of cooperating with their new agent, the defendants sabotaged

2    Wexford's efforts to set up an experienced management team.  Defendants hired most first

3    and second level site management personnel from each prison complex to form its

4    contract management team, barring Wexford from making counter-offers to those

5    managers.  According to Wexford, "[t]he ADC's actions not only added thirty-four

6    unforeseen management vacancies to the already larger-than-indicated list of positions

7    Wexford needed to fill; but also sent a negative signal to other incumbent site personnel,

8    as they learned that no experienced management personnel would be left in place after

9    contract transition.  (Ex. FF, at ADC027941 –43).

10        8.     As the Wexford director explains, "the ADC created an institutional

11   leadership and knowledge void." ( *Id.*)  The ADC also "created an innately adversarial

12   relationship for the employees hired by Wexford from the state to continue to work at the

13   ADC facilities."  (*Id.*)  The former managers have no experience as contract monitors, and

14   many "are ignoring the established chain of command and giving instructions directly to

15   Wexford line personnel.  This frequent and ongoing interference by the former site leaders

16   . . . undermines the authority of the new Complex Managers; results in confusion and/or

17   conflicted loyalties among line staff; negatively affects staff productivity on multiple

18   levels; and increases the time and resources required to solve identified issues." (Ex. FF,

19   at ADC027942-943).  I share the opinion that the ADC's actions have critically

20   undermined Wexford's ability to deliver adequate care.

21        9.     Wexford's Director of Operations recognized the system's long history of

22   dysfunction in the October, 1, 2012 letter to an ADC administrator, describing the

23   problems as "embedded into ADC health care policy and philosophy, and [] exist[ing]

24   well before Wexford Health Services assumed responsibility for the program on July 1,

25   2012." (Ex. FF, at ADC027941-943).

26        10.    This letter from Wexford to the ADC followed a letter from the ADC to

27   Wexford, citing a laundry list of areas in which the ADC reports Wexford has failed to

28   comply with their new contract and demanding corrective actions.  (Ex. EE, at

-5-

ADC027854 –69).  This list included shocking examples of appalling care at several

prisons, including at ASPC-Perryville, where a Wexford nurse directed a patient to lick

powdered medications from her own hand, at ASPC-Lewis where more than 100

prisoners were exposed to Hepatitis C after a subcontracted nurse reused a syringe and at

ASPC-Florence, where a prisoner who was found hanging in his cell had not received his

psychotropic medication for 23 days.  (Ex. EE, at ADC027855-56).  The letter also

identified systemic problems found during Wexford's first few months in the prisons,

including the failure to properly review and renew over 8000 prescriptions, inadequate

staffing creating scheduling gaps, including for inpatients, and backlogs in provider line

appointments, chart reviews, sick call requests and delayed and cancelled outside

specialty consults.  (Ex. EE, at ADC027855-59).

**Statewide Health Care System is Highly Dysfunctional**

11.     A sound health care delivery system for a large prison system like

Arizona's must include at least the following nine elements: (1) a centralized

organizational and management structure; (2) written policies and procedures that are

implemented and followed consistently; (3) qualified medical staffing; (4) intake

screening; (5) timely access to medical care; (6) adequate clinical facilities; (7) medication

distribution system; (8) a functioning medical records system; and (9) quality assurance.

Based on my review of materials, it is my opinion that these elements are critically

deficient in Arizona's prison system.

**Centralized Management Structure**

12.     As I have explained above, the management structure for the ADC is

centralized, but is highly dysfunctional, with ultimate responsibility for delivering care in

the hands of defendants, who are now quarrelling with the agent that they have recently

hired to provide care.

13.     Reports prepared by ADC's monitoring teams indicate that the medical

management model that Wexford has implemented during the last three months is utterly

ineffectual.  Medical staff complain that they have no guidance and that their calls and

emails to Wexford corporate leaders regarding policy matters go unanswered.  Ex. RR, at ADC028163 (doctor expresses frustration that questions re formulary's lack of appropriate medications are unanswered)); (Ex. TT, at ADC028167 ("staff feel like they have been abandoned")).

**Written Procedures**

14.     A constitutionally adequate correctional medical care delivery system for a prison system with 33,000 prisoners must have and consistently follow comprehensive written policies and procedures.  My review of documents, including the correspondence between ADC and Wexford, establishes that there is a system-wide practice of not following the policies and procedures because, among other things, defendants have failed to provide adequate staffing, supervision and resources to promote compliance.

15.     The written policies are inappropriately countermanded by verbal directives.  One ADC monitor found that "[w]hen attempting to get answers as to how something is to be handled under Wexford's system, a different answer is obtained depending upon who you speak with.  Local Wexford staff often operate under verbal directives that are different from what was initially put in writing."  (Ex. UU, at ADC028126).

16.     Written policies and procedures are often viewed by providers and their supervisors as setting unrealistic requirements, and therefore are ignored.  (Ex. V, at 24:2-13; 38:11-40:3).  As of June 2012, mental health providers at ASPC-Perryville were still not using the updated 2011 Mental Health Technical Manual, but instead, were following the requirements of the 2009 manual.  (Ex. V, at 23:17-21).  Wexford's Medical Director for ASPC-Lewis reported he was given four binders of Wexford policy, but he had not read them.  (Ex. Z, at 54:9; 55:23-56:6).  The Lewis Medical Director testified that he "wouldn't pay attention to the ADC policy" when he was a subcontracted provider prior to privatization. (Ex. Z, at 58:18-21).  "I provided health care. I don't need no policy." (Ex. Z, at 59:6-7).

**Qualified Staffing**

17.     Defendants Pratt and Ryan and their agent Wexford have pursued a policy and practice of not providing adequate medical professional staffing in headquarters and at the individual prisons, as demonstrated by staffing data throughout the system.  As of August 8, 2012, the system had a 65.4% fill rate, meaning that it was operating on less than two thirds of the staff it was budgeted to employ.  (Ex. III, at ADC016148). The Florence facility had fewer than half the contracted staff positions filled, as did the Regional Office.  (*Id.*); (*See also* Ex. TT, at ADC028167 (at the Yuma complex, as of August 17 there is only one provider for 4,252 prisoners); Ex. JJJ, at ADC028133 (at the Perryville complex, "[p]roposed staffing patterns have not been met, with nursing and provider shortages occurring on almost a daily basis"); Ex. NN, at ADC028140, (noting "Medical and Psychiatric nurse shortage on various shifts" at the Phoenix complex)).

18.     ADC found "[i]nadequate staffing levels in multiple program areas at multiple locations", which created "inappropriate scheduling gaps" and forced existing staff to work excessive hours, "creating fatigue risks."  (Ex. EE, at ADC027858).  There has been a "[q]uantitative decrease in routine institutional care," prescriptions that provide the wrong dosage or do not match the physician orders, inappropriate discontinuation of medication, and a contradictory process for the approval of non-formulary medication. (*Id.* at ADC027858-59).  The result has been a crisis in delayed care from a backlog of appointments to see a clinician, untimely processing of prisoners requests for care, delay in specialty consultations, and not surprisingly, an unresponsive approach to prisoner grievances. ( *Id.* at ADC027859).

19.     Institutions were not fully staffed by ADC during the April 2-July 1, 2012 transition period.  (Ex. U, at 22:10-12).  One doctor characterized that time as a period of "a great exodus of staff, both from the mental health and medical areas that weren't being filled."  (Ex. V, at 18:11-12).

20.     Staffing continues to be a problem under Wexford.  "It was an understood" that staffing levels at the institutions was one of Wexford's concerns prior to taking over

1    delivery of health care.  (Ex. U, at 29:6-10).  "A smaller staffing ratio creates a greater

2    risk." (Ex. T, at 125:5-6)

3         21.    There currently is not enough medical staff at ASPC-Perryville to provide

4    adequate care to prisoners.  (Ex. W, at 50:20-51:1).  Lack of staff has been a concern for

5    Dr. Jeffrey Sharp, currently a primary care provider at ASCP-Perryville, since he worked

6    at ASPC-Winslow [1991-2003], at Eyman and Florence [2004-2012] and continues today.

7    (Ex. W, at 47:5-17).

8         22.    Staffing problems create delays in providing medical care which can create

9    a serious medical risk in some instances. (Ex. W, at 53:1-9).  "I know I had several cases

10   when I worked at Florence South of people who had their chemotherapy interrupted,

11   people who had their radiation therapy interrupted, Dr. Wohler's case with the guy who

12   had the cancer on his lip." (Ex. W, at. 175:24-176:14); (*See also* Ex. PP, at ADC028148,

13   (no nurses after 8 p.m. at the Safford Fort Grant Unit, so "inmates needing immediate

14   medical attention must be transported . . . 47 miles"); Ex. UU, at ADC028123 (at the

15   Florence complex, only three out of six provider positions are filled, with consequent

16   excessive wait times for routine care and delays in reviews of lab, x-ray, and specialty

17   care reports and medication renewal); *id.* at ADC028123 – 24 (the use of registry nurses

18   to fill staffing gaps "has resulted in numerous problems with documentation, delayed

19   mediation passes and incorrect sharps and tool counts" as well as "performance

20   deficiencies" such as failure to follow up medication no-shows, week-long nurse line

21   waiting lists, and provider orders "not being noted for up to one week"); Ex. RR, at

22   ADC028163 (at the Winslow complex, "[l]ack of staffing continues to be the major issue

23   and has an adverse effect on numerous other areas," including inevitable mistakes from

24   exhausted nurses working excessive overtime and "delay in care")).

25        23.    Chronic staffing shortages have resulted in frequent use of temporary

26   registry staff.  However, as ADC monitors recognize, "[t]he use of registry will never

27   provide the high level of care that a dedicated full time would.  Problems of poor

28   communication and lack of training are only increased when registry is used."  (Ex. SS, at

1   ADC028164).  I concur that the use of registry clinical staff, while useful on a short-term

2   basis, cannot be used as a permanent fix for chronic staffing shortages or as a substitute

3   for hiring permanent medical providers.

4        **Intake Screening**

5        24.     Prompt intake screening is essential in a correctional setting to ensure,

6   among other things, that patients receive timely medications for serious medical

7   conditions, are screened for communicable diseases and are identified as requiring

8   ongoing attention from specialty consultants.  Defendants have a practice of not

9   complying with their own requirement that health care records be reviewed within 12

10   hours of an inmate's arrival goes widely unmet.  (Ex. JJJ, at ADC028131 (at the Perryville

11   complex, "there does not appear to be an effort to meet" the requirement); Ex. MM, at,

12   ADC028113 (reviews not performed in a timely manner in the Lewis complex); Ex. QQ,

13   at ADC028171, (intake records review delays of one week at the Winslow complex, with

14   consequent disruption to the continuity of care)).

15        **Timely Access to Medical Care**

16        25.     Prisons must have a system for prisoners to make their health care needs

17   known, and for those needs to be addressed in a timely manner.  Prisoners with more

18   acute health care needs must be housed in facilities that offer access to a higher level of

19   care.  The ADC has pursued a practice and unwritten policy of delaying and/or denying

20   prisoners access to necessary care for serious medical needs.  (*See generally* Ex. MM, at

21   ADC 028113 (staff shortages in the Lewis complex "has led to extended delays in care on

22   the units as well as delay in inmates being seen upon return from the hospital"); Ex. JJJ, at

23   ADC028131 (patients are not scheduled for appointments on their return from hospital

24   stays at the Perryville complex)).  There are backlogs in the review of HNRs due to lack

25   of staff under both ADC and Wexford.  (Ex. W, at 36:11-37:16.)  These serious delays

26   pose a threat of significant harm to the prisoner patients.

27        **Sick Call**

28        26.     Defendants' contract monitors have found that prisoners wait more than 18

days for medical RN line and nearly seven weeks for medical appointments in the Lewis

Complex.  (Ex. KKK, at ADC028020-21).  Prisoners wait five to six months for routine

dental care in the Safford Complex; five months at Yuma, and four months at the Lewis

Complex.  (*Id.*)  In Perryville, sick call referrals to providers are not seen within seven

days as required by policy; instead, "[p]rovider lines have been canceled and have a very

long wait list."  (Ex. JJJ, at ADC028132).

27.     The monitors' reports describe visible signs of delayed care throughout the

state, with unreviewed medical records literally piling up: at the Winslow complex,

medical records "are sitting on a cart for three to four weeks prior to being noted by a

provider," resulting in medication delays.  (Ex. QQ, at ADC028171).  At the Tucson

complex, "approximately 80 charts [are] on [the] Provider rack awaiting chart review for

renewal of medications, new arrivals, Physician line, etc."  (Ex. VV, at ADC028159).  At

the West Medical unit in Tucson, "at least 130 charts [are] pending Provider review" for

doctor's line, medication renewals, etc.  (*Id.*)

**Emergency Care**

28.     Defendants have pursued a practice and unwritten policy of not providing

sufficient, trained staff to competently respond to emergencies.  At the Safford Complex's

Fort Grant unit, there are not enough nurses to provide 24-hour coverage, so after 8 p.m.,

"inmates needing immediate medical attention must be transported . . . 47 miles" to

another prison.  (Ex. PP, at ADC028148).  One prisoner who submitted an HNR for a

painful tooth abscess at the Tucson complex was not seen for over a month, at which time

he was given antibiotics.  (Ex. VV, at ADC028159).  At the Perryville complex, three

inmates who overdosed or were suspected of doing so "were not sent out to a hospital in a

timely manner."  (Ex. JJJ, at ADC028133).

29.     The lack of an adequate emergency response system may have contributed

to patient deaths.  For example, when a 57 year old man with asthma at ASPC-Eyman

complained of difficulty breathing and was en route to the medical clinic after hours, the

RN responsible for that clinic refused to respond and advised the custody officers to

1    transport him elsewhere.  When told the inmate was very unstable, she told the custody

2    officers to arrange for her transportation because she "did not want to burn her own gas."

3    (Ex. BBB, at ADC025117).  The officers then called 911, but the prisoner died within the

4    hour.  (*Id.*)  The Warden of that prison concluded that staff had not been negligent in this

5    incident.  (*Id.* at ADC025111).

6         30.    Defendants' practice and unwritten policy of not adequately staffing their

7    facilities with custody officers makes it impossible for the prisons to timely respond to

8    emergencies.  Although prisoners are supposed to have health and security checks every

9    30 – 60 minutes while in their cells, at least three prisoners had rigor mortis when

10   discovered, indicating that they had died hours earlier.  (Ex. OO, at, ADC026937; Ex.

11   CCC, at ADC024200; Ex. DDD, at, ADC024973). One death review involving a woman

12   who was dead at least several hours before staff noticed her, documents that, although the

13   rules require finding another officer to cover a post when the on-duty officer is called

14   away, it does not always happen and is "a constant battle."  (Ex. CCC, at ADC024180).

15        **Chronic Care**

16        31.    Defendants acknowledge that it is important to monitor chronic conditions

17   to avoid serious adverse effects.  (Ex. Y, at 129:14-15).  However, Dr. Sharp

18   acknowledges that chronic care patients are not always timely seen because of lack of

19   staffing.  (Ex. W, at 54:16-20).  This is the case currently at Perryville, (Ex. W, at 189:13-

20   18), and was the way at Florence and Eyman – chronic cases are "way backlogged." (Ex.

21   W, at 190:4-8)

22        **Specialty Care**

23        32.    Defendants have pursued a policy and practice of reimbursing specialty care

24   providers at low rates and this has made it challenging to find specialists who will provide

25   treatment to prisoners.  (Ex. Y, at 88:17-21).  This Court concluded in a  summary

26   judgment order in *Arenberg v. Ryan*, Case No. 2:10-cv-02228-JWS (D. Ariz. October 9,

27   2012), page 18, lines 14-15 that  "The evidence shows that ADC did not enter into new

28   contracts for inpatient and outpatient medical services until late 2010 – a year after the

2009 cancellations." (citations omitted).  Dr. Sharp's concerns about tertiary care and the consultation process have "loomed larger with time" and continue today.  (Ex. W, at 47:18-48:2).

33.     It currently takes about two to four weeks from the time a doctor orders an x-ray to the time he gets a radiology report, and that this delay can and has posed a serious risk to prison inmates.  (Ex. W, at 54:21-56:5).  In one instance, the x-ray report of a prisoner with a cavitary lesion in her lung was delivered around two months after the x-ray was done.  (*Id.* at 56:6-11).  The x-ray was done June of 2012, and he believes the report came back in August or September. (*Id.* at 178:12-179:14). Because this cavitary lesion carries a high risk for tuberculosis, he was "shocked" at "what [this could] have resulted in." (*Id.* at 179:2-4).  I agree that this delay is shocking as it put the prisoner, as well as all prisoners and staff she came in contact with, at risk for contracting a deadly disease.

34.     Delays in a specialist seeing a malignant melanoma (such as the one described in Ex. AAAA, at PLTF-PARSONS-000030) can have serious consequences, including death. (Ex. W, at 147:6-18).  Defendant Pratt, who is responsible for monitoring all clinical care provided by Wexford testified that he does not know if the timeliness of referrals to outside providers has changed under Wexford.  (Ex. U, at 37:5-10).

35.     Dr. Rowe, ADC Medical Program Manager, has had 5 or 6 calls from prison physicians in the past six months reporting problems with getting a consultation with an outside specialist.  (Ex. Y, at 86:20-87:11).

**Appropriate Medical Housing**

36.     Prisoners with serious medical conditions may be too fragile to house with healthy prisoners in the general population, and some will require housing in a staffed infirmary or hospital setting.  I was alarmed to review several death reviews that showed prisoners with very serious conditions dying in their cells, rather than a medical setting. Among them were Mr. Venegas, a 29 year old man who died of pneumonia either in his cell or on the way to the hospital, and was discovered after death to have pus around his

1    heart and lungs, which is a terribly painful condition (Ex. EEE, at ADC025144 – 63), and

2    Mr. Rhodes, a 64 year old man who died of lung cancer.  (Ex. DDD, at ADC024972-973).

3    **Adequate Clinical Facilities**

4        37.    Prisoners must be able to receive medical treatment in properly outfitted

5    clinic rooms that afford confidentiality.  Defendants have a practice and unwritten policy

6    of conducting exams in non-confidential settings.  The lack of space for mental health

7    staff at ASPC-Perryville resulted in examinations and interviews occurring in staff break

8    rooms and where medical records are stored. (Ex. V, at 27:1-5).  Multiple psychiatry and

9    psychology staff shared one 12 foot by 12 foot office in Perryville's Lumley Unit, which

10   houses the most seriously mentally ill female prisoners. (Ex. V, at 54:15-55:15).  At the

11   Phoenix complex, clinical space is inadequate to allow confidential examinations.  (Ex.

12   NN, at ADC028141).

13   **Medication Distribution Systems**

14       38.    Prisoners must be able to receive necessary medications for their serious

15   medical needs.  Defendants' practice and unwritten policy of failing to supervise, manage

16   and support medication distribution has created a system that is profoundly dysfunctional

17   resulting in serious risk of harm to patients throughout the state.  (*See, e.g.,* Ex. VV, at

18   ADC028160, (prisoner with MRSA discharged from hospital with orders for intravenous

19   antibiotic was not provided medication for at least four days); Ex. MM, at ADC028112-

20   ADC028113 (despite multiple attempts to solve medication delivery problems, the Lewis

21   complex "continue[s] to lag[] in what would be considered acceptable performance

22   delivery levels" including failure to follow up no-shows, use of expired medications,

23   medication orders without start or stop dates, falsified documentation of medication

24   delivery, and "missed or delayed insulin lines and other medication delivery failures), Ex.

25   PP, at ADC028149 (medications at Safford "are not arriving on time or are inaccurate

26   when delivered").

27       39.    Defendant Pratt testified that the delivery of medication to prisoners by the

28   health care system has deteriorated since July 1, 2012.  (Ex. U, at 36:17-37:1; 51:12-52:1).

Dr. Sharp testified that things were "chaotic at best" during the first couple months of the transition, which created "innumerable problems with medications" including prisoners not getting medications, medications not being refilled, and medications being incorrectly labeled as "watch swallow" when the prisoner could keep them on person.  (Ex. W, at 152:7-153:9).  ADC informed Wexford of the problems with medication distribution in a September 21, 2012 letter, and previously met with Wexford administration about the problems in August 2012.  (Ex. U, at 60:12-16).

40.     Under ADC, there was a separation between mental health and medical, so primary physicians were not allowed or expected to prescribe psychotropic medication.  (Ex. W, at 84:10-19).  However, under Wexford, primary physicians are expected to refill and renew those prescriptions, and do so in some cases without even seeing the patient first.  (*Id.* at 84:20-85:10; 86:18-87:4; Ex. T, at 115:15-116:3).  In most cases, providers should see their patients before renewing medications for serious medical conditions, and it is below the standard of care in the community for a physician to renew medications for a patient he or she is not familiar with.  Additionally, some general practitioners may, justifiably, consider themselves not qualified to prescribe psychiatric medications.  Requiring those physicians to prescribe mental health medications could put patients at risk of harm.

41.     The monitoring bureau director testified he does not know whether Wexford has fixed the problems with medication delivery, and he has not received any sort of regular update from Wexford about how they are fixing the problem with medication delivery.  (Ex. U, at 63:21-65:13).  Doctor Sharp's concerns about access to appropriate medication started when ADC ran medical care, have escalated over time, and have escalated under Wexford.  (Ex. W, at 50:7-16).

**Medical Records**

42.     An accurate, organized and up-to-date medical record is an essential tool for delivering adequate health care.  According to defendants' Monitoring Bureau, Wexford has pursued a practice of keeping chaotic, inaccurate, and disorganized records throughout

the state.  (Ex. NN, at, ADC028141 (at the Phoenix complex, "Inmate Medical Records are disorganized and incorrectly completed"); Ex. XX, at ADC028143; Ex. YY, at ADC028144; Ex. JJJ, at ADC028132 (at the Perryville complex, medication no-shows and refusals are not appropriately documented); Ex. ZZ, at ADC028169- 70 (numerous record-keeping failures found in medical records in the Yuma complex)).

43.    Some medical record-keeping is excessively back-logged.  (Ex. WW, at ADC028128 ("2 book cases with loose filing," some dated more than three months earlier, discovered at the Lewis complex); Ex. ZZ, at ADC028169, ("current MARs [medication administration records] found laying on one of the shelves" in the Yuma complex)).

44.    Medical charts do not always accompany the patients on transfer. According to a nurse in the Lewis complex, it is no longer the practice to transfer patients' full medical records with them when they move to a higher level of care; multiple charts for transferred patients were piled in the nurses' station.  (Ex. WW, at ADC028128).

45.    There was no written document listing all of the insulin dependent prisoners at Lewis so that staff could identify all prisoners who were exposed to Hep C.  It took "probably three or four days" for staff to identify and track down the prisoners on insulin. (Ex. U, at 55:5-21).  Pratt does not know if all exposed prisoners have been tested for HCV or HIV as of the date of the deposition.  (*Id.* at 57:13-14).  In my opinion, it is impossible to ensure patient safety in a system that cannot timely identify which of its patients require life-sustaining medications.

**Quality Assurance**

46.    Health care delivery systems, including prison medical systems, must have a system for evaluating the delivery of services and quality of care for patients.  The contract with Wexford required the company to submit a "Quality Management Program Description encompassing the Continuous Quality Improvement Program structure" within sixty days of the award of the contract. (Ex. HHH, at, ADC015178).  Although he testified that he is responsible for quality of medical care, defendant Pratt indicated that he

1    was not familiar with Wexford's quality management program, and had not received any

2    of their quality improvement reports.  (Ex. U, at 27:15-16, 113:17-114:10.)  In the absence

3    of a structured program to examine health care quality, life-threatening practitioner errors

4    and systemic problems may be overlooked or ignored, creating a potentially dangerous

5    situation for patients.

6    **Typicality of Named Plaintiffs' Claims**

7    47.    I reviewed the medical records and declarations for the named plaintiffs who

8    have raised medical care claims.  In these records, I found a pattern of patient care delays

9    affecting, among other things, the review of HNR's, access to nurse triage and primary

10    care providers, access to medically necessary specialty care, and the prescription and

11    delivery of necessary medications.  It is my opinion that these types of delays are typical

12    of those I would expect to find in a system with the serious deficiencies that currently

13    exist in the ADC.

14    **Conclusion**

15    48.    Based upon the information summarized above, it is my opinion that

16    medical care delivery system in the Arizona Department of Corrections poses a substantial

17    risk of serious harm to prisoners who require medical care.  The extensive problems I

18    have described are systemic, and are similar to problems I have encountered in other

19    prison class action lawsuits where I have been an expert.  In those actions, the federal

20    courts have successfully enjoined the defendants to develop systemic solutions to remedy

21    the ongoing harm to the prisoner class.

22

23

24

25

26

27

28

1    I declare under penalty of perjury that the foregoing is true and correct.

2

3    Executed on the 7th day of November 2012 in New York City, New

4    York.

5

6    _____

7    ROBERT L. COHEN

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-18-

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
    kflood@acluaz.org
    jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
    ahardy@prisonlaw.com
    snorman@prisonlaw.com
    ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
    afettig@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

1   Daniel C. Barr (Bar No. 010149)
    Jill L. Ripke (Bar No. 024837)
2   James A. Ahlers (Bar No. 026660)
    Kirstin T. Eidenbach (Bar No. 027341)
3   John H. Gray (Bar No. 028107)
    Thomas D. Ryerson (Bar No. 028073)
4   Matthew B. du Mée (Bar No. 028468)
    **PERKINS COIE LLP**
5   2901 N. Central Avenue, Suite 2000
    Phoenix, Arizona 85012
6   Telephone:  (602) 351-8000
    Email:     dbarr@perkinscoie.com
7              rjipke@perkinscoie.com
               jahlers@perkinscoie.com
8              keidenbach@perkinscoie.com
               jhgray@perkinscoie.com
9              tryerson@perkinscoie.com
               mdumee@perkinscoie.com
10
    Caroline Mitchell (Cal. 143124)*
11  David C. Kiernan (Cal. 215335)*
    Sophia Calderón (Cal. 278315)*
12  Sarah Rauh (Cal. 283742)*
    **JONES DAY**
13  555 California Street, 26th Floor
    San Francisco, California 94104
14  Telephone:  (415) 875-5712
    Email:     cnmitchell@jonesday.com
15             dkiernan@jonesday.com
               scalderon@jonesday.com
16             srauh@jonesday.com

17  *Admitted *pro hac vice*

18  R. Scott Medsker (D.C. 976405)*
    **JONES DAY**
19  51 Louisiana Avenue, NW
    Washington, D.C. 20001-2113
20  Telephone:  (202) 879-3837
    Email:     rsmedsker@jonesday.com
21
22  *Admitted *pro hac vice*

23  John Laurens Wilkes (Tex. 24053548)*
    Kate A. Suh (Tex. 24075132)*
    **JONES DAY**
24  717 Texas Street
    Houston, Texas 77002
25  Telephone:  (832) 239-3939
    Email:     jlwilkes@jonesday.com
26             ksuh@jonesday.com

27  *Admitted *pro hac vice*

28

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
           jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

# EXHIBIT 1

Robert L. Cohen, MD

130 Barrow Street, Apt. 102     (H) 212-242-5062
New York, NY  10014

314 West 14th Street             (W) 212-620-0144
New York, NY  10014               (F) 212-691-8588

BobbyCohen@aol.com

**EDUCATION**

A.B., Princeton University, 1970
M.D., Rush Medical College, 1975

**POSTGRADUATE TRAINING**

Residency, Medicine, Cook County Hospital, 1978
Chief Residency, Cook County Hospital, 1979
Board Certification, Internal Medicine - 1978

**PROFESSIONAL EMPLOYMENT**

Clinical Practice in General Internal Medicine
New York City
1988 –

Medical Director
Cicatelli Associates
New York, NY
2007 --

Attending Physician
Department of Medicine
Langone Medical Center
New York University School of Medicine
2010 –

Attending Physician
St. Vincent's Hospital and Medical Center
1988-2010

Medical Director
AIDS Center
St. Vincent's Hospital and Medical Center, NYC
January 1989 - October 1990.

Vice President for Medical Operations
New York City Health and Hospitals Corporation
1986-1988

Director
Montefiore Medical Center
Rikers Island Health Services
1982 - 1986

Associate Medical Director
Montefiore Medical Center
Rikers Island Health Services
1981 - 1982

Attending Physician
Department of Medicine
Cook County Hospital
1979 - 1981

**FACULTY APPOINTMENT**

Clinical Assistant Professor
Department of Social Medicine and Clinical Epidemiology
Albert Einstein College of Medicine
1985 – 2008

Clinical Instructor
Department of Medicine
New York University School of Medicine
2010 --

**FACULTY COMMITTEES**

Vice Chairman
Institutional Review Board
Montefiore Medical Center
1984 - 1986

Member
Institutional Review Board
Hunter College, City University of New York
2000 – present

Robert L. Cohen, MD
Page #3

**MEDICAL EXPERT -- PRISON HEALTH**

**Federal Court Appointed Monitoring of Health Care in Prisons and Jails**

Michigan, *Hadix v. Johnson*, 2003 -- present
Court Appointed monitor for oversight of medical care of 4 prisons in Michigan

Ohio, *Austin v. Wilkinson*, 2002 -- 2005
Member of two person Medical Monitoring Team to monitor compliance with settlement agreement regarding medical care in Ohio State Penitentiary

Connecticut, *Doe v. Meachum*, 1990 -- present
Medical expert at trial and court appointed monitor of compliance with settlement agreement covering care of all HIV infected prisoners in Connecticut.

New York State, *Milburn v. Coughlin*, 1989 -- present
Continuing review of compliance with health care consent agreement

Washington, D.C.  1986 - 2000
Court appointed medical expert involved in monitoring compliance with several consent agreements regarding medical care at the DC Jail as well as DC prisons at Lorton (VA)

Florida, *Costello v. Wainwright*, 1983 through 1988
Review of compliance with settlement agreement in all Florida Prisons

**State Court Appointed Monitor**

Philadelphia, PA, *Jackson v. Hendricks*, 1991 -- 1999
Review of compliance with consent agreement on medical care within Philadelphia jails

**Department of Justice Appointed Medical Expert**

Cook County Jail, 1982 (Chicago, IL)

Essex County Youth House, 1995 – 1999

Robert L. Cohen, MD
Page #4

**RECENT PRESENTATIONS**

Mass Incarceration and Correctional Medicine: The Dialectics of Caring for
Prisoners,
Albert Einstein College of Medicine Social Medicine Lecture Series
February 16, 2010

Strategies for assuring the civil rights of detained persons: U.S. and International
Perspectives;
American Public Health Association
November 8, 2010, Denver, CO

Why the United States Should Adopt the Optional Protocol to the Convention
Against Torture;
International Conference on Prison Health Care/WHO Health in Prison Project
Madrid, Spain, November, 2009

What is the Physician's Responsibility in an era of Mass Incarceration,
Offender Health Research Network, Manchester, England, May 2009
(http://www.ohrn.nhs.uk/conferences/past/14May2009MassIncarceration.pdf)

Health Care for Immigration Detainees: What Should Be The Standard?
Panel of the ABA Council on Immigration
American Bar Association
February 13, 2009, Boston, MA

Medical Consequences of Mass Incarceration
2ème Université d'Eté de Médecine en Milieu Pénitentiaire
Association of French Correctional Medicine Physicians
Perpignan France, May 21, 2008

American Exceptionalism: The Health Consequences of Mass Incarceration
2nd Annual Conference of the International Journal of Prison Health Care
Varna, Bulgaria, October 21, 2007

HIV/AIDS in Custody:  Advocacy for Prevention, Care and Treatment In
Correctional Settings and on Reentry, New York City Bar Association, Committee
on AIDS, Committee on Corrections, and the Committee on Mental Health Law
Wednesday, January 10, 2007
(http://abcny.org/PressRoom/PressRelease/2007_0110.htm)

Robert L. Cohen, MD
Page #5

_____

Prison Health Care – Does Court Intervention Improve Quality of Care?
New York University Law School, Health Law Forum
February 15, 2006
http://its.law.nyu.edu/cal/Views/EventView.cfm?EventId=10756

The Commission on Safety and Abuse in America's Prisons
Expert Testimony on the Quality of Medical Care – July 20, 2005
http://www.prisoncommission.org/statements/cohen_robert.pdf

Lessons Learned from Human Rights Based Approaches to Health
Emory University Conference Center, Atlanta, Georgia, USA - April 16, 2005
Prison health in US controlled prisons: Uplifting prisoners' rights to preserve
human rights  http://cesr.org/node/view/698

**BOARD AND COMMITTEE MEMBERSHIPS**

New York City Board of Correction
Appointed by New York City Council
2009 – present

International Journal of Prison Health Care
Editorial Board
2009 - present

Housing Works
Board Member
AIDS Day Treatment Centers and Housing Programs
1994 - present

National Commission on Correctional Health Care
Representative, American Public Health Association
1994 – 2011

World Health Organization – European Region
Health in Prison Project
APHA Invited Observer 2003 – present

**PUBLICATIONS**.

Allen-S, Wakeman-S, Cohen-R, Rich-J, Doctors in US Prisons in the Era of Mass
Incarceration, International Journal of Prisoner Health, 6(3):99–106, 2010

Cohen-R., "Health and Public Health Advocacy for Prisoners" in Puisis-M, et.al,
*Clinical Practice in Correctional Medicine*, Elsevier, 2006.

Robert L. Cohen, MD
Page #6

deLone-M, Cohen-R, et.al, <u>Standards for Health Services in Correctional Institutions</u>, 3rd edition, American Public Heatlh Association  2003

Cohen-R., The Medical Intake Examination, in Puisis-M, Cohen-R, et al, *Textbook of Correctional Medicine, Mosby, St. Louis, 1998.*

Frickhofen-N, Abkowitz-JL, Safford-M, Berry-M, Antunez-De-Mayolo-J., Astrow-A, Cohen-RL, King-LN,et.al., <u>Persistent B19 Parvovirus Infection in Patients Infected with HIV-1: A treatable cause of anemia in AIDS</u>., Annals of Internal Medicine, Vol. 113, No. 12,   926-933, Dec. 15, 1990.

Laudicina, S., Goldfield, N., Cohen, R., <u>Financing  for AIDS Care</u>, The Journal of Ambulatory Care Management,Vol. II, No. 2, 55-66, May 1988.

Selwyn, Peter A., Feiner, Cheryl, Cox, Charles P., Lipshutz, Carl & Cohen, Robert L., <u>Knowledge about AIDS  and High-Risk Behavior Among Intravenous Drug Users in   New York City</u>, AIDS, Vol. 1, No. 4, 247-254, 1987.

Cohen, Robert L.<u>, Case Studies: A Prisoner in Need of a Bone Marrow Transplant</u>, Hastings Center Report, Vol. 17, No. 5, 26-27, 1987.

Bayer, Ronald, Carol Levine, Susan M. Wolf et. al. <u>HIV Anti-body Screening: An Ethical Framework for Evaluating Proposed Programs</u>. JAMA  Vol. 256, No. 3: 1768-1774, 1986.

Cohen, Robert L., Oliver Dennis, Pollard-Sigwanz, Cathy, <u>Leukopenia and Anergy as Predictors of AIDS</u>, JAMA, Vol. 255, No. 10, 1289, 1986.

Whitman S, King L, and Cohen R, <u> Epilepsy and Violence: A Scientific and Social Analysis.</u>  In: Whitman S, and Hermann B, ed. The Social Dimensions of Psycho pathology.  Oxford University Press, 1986.

Cohen, R., <u>AIDS: The Impending Quarantine</u>, Bulletin of    the Health Policy Advisory Committee, Vol. 17, No. 3,   9-14, 1985.

Whitman S, Coleman T, Patron C, 6.0
Desi B, Cohen R, King L, <u>Epilepsy in Prison: Elevated Prevalence and No Relationship to Violence</u>. Neurology, Vol. 34, No. 6,   June, 1984.

Cohen, Robert L., <u>Imprisoned Plasma Donors: A Medical-Ethical Case and Comment</u>, Journal of Prison & Jail Health, Vol. 2, No. 1, 41-46, 1982.