# EXHIBIT U

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br>             Plaintiffs,<br>    v.<br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br>            Defendants. | No.:<br>CV12-00601-PHX-NVW<br>(MEA) |

30(b)(6) ARIZONA DEPARTMENT OF CORRECTIONS
(RICHARD PRATT)
DOCUMENT 76, TOPIC NOS. 3 THROUGH 6;
DOCUMENT 80, TOPIC NO. 4; DOCUMENT 82, TOPIC NO. 4

October 4, 2012
8:59 a.m.
Phoenix, Arizona
Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1      A      Understood.

2      Q      Okay.  And you understand you are under oath

3   and penalty of perjury here today.  Yes?

4      A      Yes.

5      Q      Okay.  And if you don't understand a question

6   I'm asking, please ask me to clarify, and I will do my

7   best to restate it until you do understand.

8      A      Understood.

9      Q      Okay.  And if at any time you want to take a

10   break, just let me know; we'd be happy to do so, just

11   don't do it when there's a question pending.

12      A      Okay.

13      Q      All right.  Thank you.

14             Are you under any medication that could

15   affect your ability to testify today?

16      A      No.

17      Q      Okay.  And is there any other reason why you

18   couldn't testify truthfully today?

19      A      No.

20      Q      What is your current position with the

21   Department?

22      A      Interim Health Services division director.

23      Q      And how long have you held that position?

24      A      February of this year.

25      Q      Okay.  When did you start working at the

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1      A     I obtained another position with an outside

2    company.

3      Q     What company was that?

4      A     Correctional Medical Services.

5      Q     Okay.  And what is your post-high school

6    educational background?

7      A     I obtained a BS in health care management from

8    Bellevue College in Omaha, Nebraska in 1995.  I

9    obtained a master's degree as a physician assistant

10   from the University of Nebraska Medical Center in 1997.

11     Q     And do you have any licensing?  You said you

12   are a physician's assistant.  You are licensed as a

13   physician assistant?

14     A     No, ma'am, not currently.

15     Q     Okay.  What are the duties of your job as the

16   interim Health Services director currently?

17     A     To oversee the entire Health Services

18   division.  And now you indicate currently?

19     Q     Uh-huh.

20     A     My position is in charge of the -- I'm the

21   interim assistant director over the Health Services

22   Monitoring Bureau.

23     Q     So you currently hold both titles

24   simultaneously?

25     A     Correct.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1      A     To the best of my ability, yes.

2      Q     And again, did you gather any documents in

3   response to this topic?

4      A     No.

5      Q     Okay.  Thank you.

6            If you were asked to gather documents

7   responsive to these topics, would you know where to

8   look or where to get them?

9      A     I would do some research to find out.

10     Q     Have you been given a written litigation hold

11  in this case?

12     A     Yes.

13     Q     And when did you get it?

14     A     Last week.

15     Q     What did it say?

16           MS. WIENEKE:  No, he's not answering

17  that question.

18     Q     BY MS. KENDRICK:  Have you been saving your

19  e-mails and documents since you received this

20  litigation hold?

21     A     Yes.

22     Q     How do you save them?

23     A     I don't delete them.

24     Q     Okay.  What steps have you taken to make sure

25  that the individuals you supervise comply with this

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1    litigation hold?

2              MS. WIENEKE:  Object to the form.

3              THE WITNESS:  I have provided the

4    information on the form that was given to me.  I'm not

5    aware of the forms that have been given to everyone

6    else.

7         Q    BY MS. KENDRICK:  Okay.  So you didn't pass it

8    on to your subordinates, the litigation hold?

9         A    No.

10        Q    Okay.  Prior to receiving the litigation hold,

11   were you regularly deleting e-mails and documents?

12        A    No.

13        Q    Okay.  And you understand your testimony today

14   is binding on the Department for these topics?

15        A    Yes.

16        Q    All right.  I'm going to show you -- do you

17   have Exhibit 10?  I'm showing you what's been marked as

18   Exhibit 10 in a previous deposition.  Do you recognize

19   this document?

20        A    Yes.

21        Q    Okay.  And I'm going to refer to this document

22   as the RFP, short for request for proposals.  Is that

23   okay?

24        A    Yes.

25        Q    Have you read this entire document?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 19

1      Q      Okay.  When did you guys start having these

2   weekly meetings?

3      A      With Wexford?

4      Q      Yeah.

5      A      It was either late April or early May --

6      Q      Okay.

7      A      -- of this year.

8      Q      And were minutes kept from those meetings?

9      A      No.

10      Q      And did the transition team within ADC, the

11   group of people that you referred to, did you guys meet

12   internally amongst yourselves on a regular basis?

13      A      Not on a regular basis, no.

14      Q      How frequently would you say you guys met?

15      A      There were impromptu meetings, discussions

16   that could have occurred daily.

17      Q      Okay.  It was more ad hoc and not formal?

18      A      Correct.

19      Q      And did each prison institution have its own

20   transition team, as well, at the various facilities?

21      A      No.

22      Q      So it was all with headquarters and Wexford;

23   it wasn't teams at each prison?

24      A      Correct.

25      Q      And when did the implementation period begin?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 22

```
 1              THE WITNESS:  Fully staffed?

 2      Q    BY MS. KENDRICK:  Fully staffed --

 3      A    Can you --

 4      Q    -- each facility has a certain number of

 5   health care positions -- medical, mental health,

 6   dental -- that are allocated to it.  Were all of those

 7   filled at all the institutions during the

 8   implementation period?

 9              MS. WIENEKE:  Form.

10              THE WITNESS:  To my knowledge, the FTE,

11   the number of positions were not complete at each

12   facility.

13      Q    BY MS. KENDRICK:  Okay.

14      A    Not completely filled.

15      Q    Okay.  All right.  And during the

16   implementation and transition period, did the

17   Department take any additional steps to ensure

18   prisoners' health needs requests were reviewed,

19   answered in a timely manner?

20              MS. WIENEKE:  Form.

21              THE WITNESS:  Nothing beyond the current

22   procedures that were supposed to be taking place.

23      Q    BY MS. KENDRICK:  Okay.  And likewise, the

24   same thing in ensuring that prisoners were receiving

25   all their necessary medication, you guys were just
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1          THE WITNESS:  I don't know what's going

2    through the other parts of the Bureau.  For instance,

3    Mr. Taylor is a program evaluation administrator on the

4    contract compliance side.  There is also communications

5    that go through him.  There is communications that go

6    through all members of this Bureau, so I can't speak to

7    the others.

8        Q    BY MS. KENDRICK:  Okay.  How -- looking at

9    this organizational chart, it appears that you and

10   Mr. Taylor are at the same level.  How have you guys

11   divided up substantively the various areas that you are

12   monitoring or responsible for?  Are you responsible for

13   medical care?

14          MS. WIENEKE:  Form.

15          THE WITNESS:  I'm responsible for the

16   quality and the clinical care in the field.

17       Q    BY MS. KENDRICK:  And he is responsible for

18   the nonclinical components of the contract?

19       A    His responsibilities are mainly with the

20   contract compliance.

21       Q    Okay.  On page 2 of this letter, the first

22   full sentence at the top says, "On several occasions

23   before our receipt of your demand for assurance, we

24   discussed with the ADC our assessment of the extremely

25   poor condition of its health care system."  Were you

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 29

```
 1      Q     And what were Wexford's concerns?
 2                   MS. WIENEKE:  Form.
 3                   THE WITNESS:  They were varied.  I mean,
 4      they were -- I don't know what specifics to be able to
 5      provide there.
 6      Q     BY MS. KENDRICK:  Were they concerned about
 7      hiring enough staff and the staffing levels that were
 8      in place?
 9      A     I don't recall that as being a verbalized as a
10      concern, but it was an understood.
11      Q     Were they concerned about the length of time
12      it took for prisoners to receive health care?
13                   MS. WIENEKE:  Foundation.
14                   THE WITNESS:  I don't know what their
15      concerns were.  I know what my concerns are.
16      Q     BY MS. KENDRICK:  Well, let's talk about you.
17      What were your concerns?
18      A     My concerns?
19      Q     Yeah.
20      A     As far as what?
21      Q     Well, you said there were several occasions
22      where you would meet with the Wexford team; they would
23      express concerns about the health care system, and you
24      had your own concerns, so I'm just trying to figure out
25      a little more specificity what you were concerned about
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 36

1   adjusted to meet the needs of medical monitoring.  It
2   is still an active process with changes going on.
3       Q    So as you guys are using it in the field, you
4   are making refinements to it?
5       A    Correct.
6       Q    And if you can turn to page 3 of that letter.
7   The first full paragraph that begins with, "Based on
8   its experience," the last sentence says,
9   "Unfortunately, because the individuals now empowered
10  to point out deficiencies are the very same individuals
11  who allowed the system to deteriorate in the first
12  place, the ADC has formed nothing but a negative,
13  counterproductive, and even destructive environment."
14              Do you disagree with their assertion
15  here?
16      A    If that's their opinion, I disagree.
17      Q    Do you think that the health care system has
18  deteriorated since July 1st?
19              MS. WIENEKE:  Form.
20              THE WITNESS:  In general, no.
21      Q    BY MS. KENDRICK:  And any specific areas come
22  to your mind, though?
23              MS. WIENEKE:  Form.
24              THE WITNESS:  Yes.
25      Q    BY MS. KENDRICK:  What areas are those?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 37

1      A      Delivery of medication.

2      Q      Okay.  How about staffing?

3                    MS. WIENEKE:  Form.

4                    THE WITNESS:  It's a work in progress.

5      Q      BY MS. KENDRICK:  Are the timeliness of

6      referrals to outside providers the same as they were

7      before July 1st?

8                    MS. WIENEKE:  Form.

9                    THE WITNESS:  I don't have the specifics

10     on all of those issues.

11     Q      BY MS. KENDRICK:  Okay.

12     A      Again, this is a transition period, so we are

13     still obtaining a lot of information right now.

14     Q      Back to this organizational chart, Exhibit 16,

15     on the right-hand side underneath your name, the

16     position of medical program monitor is listed as

17     vacant.  Has it been filled since this org chart was

18     created?

19     A      Yes, it has.

20     Q      Who is that individual now?

21     A      Dr. Robertson.

22     Q      Okay.  And a little bit further down, the

23     bottom far right box it says psychiatrist senior

24     vacant.  Do you know if that position has been filled?

25     A      Yes, it has.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1   about their experiences with the health care system?

2      A    They can.

3      Q    Have they done that yet?

4      A    I don't know specifically.

5      Q    And these contract monitors, they are located

6   physically at the institutions they are monitoring?

7      A    We have monitors in the central office that

8   are deployed to the field.  We also have monitors that

9   are in each facility, yes.

10      Q    Okay.  So, for example, on the left-hand side,

11   it lists Terry Allred as the Compliance Monitor II for

12   Lewis, so would Terry Allred be out at Lewis?

13      A    Yes.

14      Q    Is that the case for all of these individuals

15   in the two left-hand columns where it appears they are

16   assigned to different facilities?

17      A    Yes, with the exception of the bottom two,

18   Ignacio and Sears, they are assigned to five different

19   private prisons.

20      Q    Okay.  And does the -- do the monitors do any

21   sort of random audits of medical files as part of their

22   monitoring?

23      A    Yes, they do.

24      Q    What process do they use to randomly audit the

25   prisoners' medical files?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1    A    This reads $10,000 per occurrence.

2    Q    And did ADC impose a $10,000 fine against

3  Wexford for the Lewis incident?

4    A    We recommended a $10,000 fine, yes.

5    Q    Do you know who made the decision to impose

6  that $10,000 fine against Wexford?

7    A    I do not.

8    Q    Was it solely for the hep C incident at Lewis,

9  or was it also for other shortfallings in the contract?

10          MS. WIENEKE:  Form and foundation.

11          THE WITNESS:  I don't know.

12    Q   BY MS. KENDRICK:  This September 21st letter,

13  in addition to the hep C incident, it also describes

14  some other problems beginning on page 2, including a

15  problem with distributing medication at the Lumley yard

16  at Perryville and reviews of medication that's

17  expiring.  Were these also reasons for the $10,000

18  fine?

19          MS. WIENEKE:  Foundation.

20          THE WITNESS:  I don't know.

21    Q   BY MS. KENDRICK:  And you testified earlier

22  that medication was one area that you thought had

23  declined since July 1st.  Are the incidents that are

24  described in this letter the reason why you feel that

25  way?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 52

1       A    Yes.

2       Q    Are there other incidents besides those that

3    are detailed in this letter involving medication

4    delivery that has caused you to make that assessment?

5       A    No.

6       Q    Do you know if ADC could have imposed a

7    $10,000 fine for each one of these separate incidents?

8       A    I don't know.

9       Q    Okay.  I'm handing you a document that has

10   been marked as Exhibit 35.  It's Bates stamp ADCO27877

11   through 027885 and, it's the timeline for the

12   ASPC-Lewis medication incident.  Have you seen this

13   document before?

14      A    I don't know if I've seen this specific

15   document.

16      Q    Take your time looking at it.

17      A    I don't recall seeing this specific document.

18   It's possible, but there were a lot of reviews of a lot

19   of documents during that time.

20      Q    Okay.  I just have a quick question about one

21   thing that's on the second page of this document.  At

22   the time entry of 1400 hours Eastern time, it refers to

23   contacting statewide medical director Dr. Bell.

24      A    Yes.

25      Q    This Dr. Bell is a Wexford employee and not an

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1   diabetics were.

2      Q    The source being an individual or the

3   documents they were trying to review?

4                MS. WIENEKE:  Form.

5                THE WITNESS:  They didn't have a

6   document that told them who all the insulin dependents

7   were.

8      Q    BY MS. KENDRICK:  Okay.  So how did they

9   determine who was insulin dependent?

10               MS. WIENEKE:  Foundation.

11               THE WITNESS:  That was one of their

12  objectives.  I'm sure they had several game plans in

13  place to do that, but I don't know what all they did.

14     Q    BY MS. KENDRICK:  Were they ultimately able to

15  determine even who was insulin dependent?

16     A    My understanding is that they did, yes.

17     Q    How many days did it take them to figure that

18  out?

19     A    I don't know when the final determination was

20  made, exact date, but I know it took probably three or

21  four days.

22     Q    Okay.  If you can turn back to number 35, the

23  timeline document, on page 3 of that document, under

24  30th -- Thursday, August 30th, it states that 40 IDDM

25  inmates -- does IDDM stand for insulin dependent?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1    all of them.

2        Q     Then on page 8, under Thursday, the 6th, it

3    indicates ten more of the IDDM inmates were tested for

4    HCV and seven for HIV.  And then Friday, September 7th,

5    30 of the remaining IDDM inmates are tested.  Does that

6    comport with your -- it says 30 of the remaining.  Does

7    that comport with your knowledge, that by Friday,

8    September 7th, everybody had been identified and

9    tested?

10       A     Again, I don't know the date that it was

11   determined -- or it was determined that they had all

12   been tested.

13       Q     Have they all been tested by today?

14       A     I don't know.

15       Q     Okay.  And if you look at the timeline between

16   page 3, it has Friday, August 31st, and then page 4 it

17   has Tuesday, September 4th.  Do you know if any

18   activity took place investigating this incident between

19   August 31st and September 4th?

20       A     I don't.

21       Q     Could it be that it was because it was Labor

22   Day weekend?

23                    MS. WIENEKE:  Foundation.

24                    THE WITNESS:  It could be, yes.

25       Q     BY MS. KENDRICK:  Okay.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1      A    I do not.

2      Q    Okay.  And are you familiar with this report

3   that it's referencing, the medication expiration report

4   for July 1st to August 11th, 2012?

5      A    Yes.

6      Q    And what did it describe?

7      A    It was a list that showed a prescription and

8   an expiration date, and it was just a list, again, of

9   8,358 prescriptions that needed to be reviewed to

10   determine if those prescriptions were actually renewed

11   or not.

12      Q    Okay.  And in the next paragraph, it describes

13   a meeting on August 22nd between Monitoring Bureau

14   leadership and Wexford regional and corporate

15   personnel.  Were you at this meeting?

16      A    Yes.

17      Q    And the letter states that Denise Mervis, the

18   corporate pharmacist for Wexford, was aware of the

19   expired medication issue but had not taken adequate, if

20   any, actions to correct it.  What actions had she taken

21   to correct the problem?

22      A    I don't know.

23      Q    Did she describe the actions she had taken at

24   this meeting?

25      A    I don't recall that.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 63

1      A     Possibly human error.

2      Q     Would that be by the pharmacy staff or the

3   clinical staff?

4      A     Both.

5      Q     And was that due to lack of communication

6   between the clinicians and the pharmacists?

7      A     I don't know.

8      Q     What other causes did the Monitoring Bureau

9   find for this problem?

10     A     That's basically it.

11     Q     IT and human error?

12     A     Yes.

13     Q     And did the Monitoring Bureau propose some

14  sort of remedial plan or action to take to ensure that

15  this doesn't happen again and that the problem is

16  fixed?

17              MS. WIENEKE:  Form.

18              THE WITNESS:  The monitoring team's

19  function is to bring this to the attention to Wexford,

20  to have Wexford figure this out and fix it.

21     Q     BY MS. KENDRICK:  Have they figured it out and

22  fixed it?

23              MS. WIENEKE:  Form.

24              THE WITNESS:  (No oral response.)

25     Q     BY MS. KENDRICK:  You shook your head no.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 64

1    A    I'm shaking my head because the question is so
2    vague, I'm having trouble answering it.  Have they
3    figured it out?
4    Q    Have they identified the IT issues and human
5    error that was the cause of this problem?
6                   MS. WIENEKE:  Form.
7                   THE WITNESS:  I don't know if they have
8    identified all the issues or not.
9    Q    BY MS. KENDRICK:  Okay.  And you don't know if
10   they have taken any action to fix it?
11   A    I don't know what specific actions they have
12   taken, but I know they have been looking into this and
13   working on this issue for quite some time.
14   Q    And are they providing the Monitoring Bureau
15   with any sort of regular update as to the actions they
16   are taking and the improvements that they've seen?
17                   MS. WIENEKE:  Form.
18                   THE WITNESS:  I have not gotten anything
19   directly from them, but the monitoring team is working
20   with the people in the field on a daily basis to follow
21   the progress.
22   Q    BY MS. KENDRICK:  So who would these updates
23   be going to, if not you?
24   A    The monitors in the field.
25   Q    So the monitors in the field don't report back

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

```
 1    to you or Mr. Taylor or anybody else about whether they

 2    are improving medication delivery?

 3                    MS. WIENEKE:  Object to the form.

 4                    THE WITNESS:  Yes.

 5        Q    BY MS. KENDRICK:  How frequently?

 6        A    We get a monthly update.

 7        Q    So what was the last monthly update that you

 8    received about this medication issue?  When did you

 9    receive it?

10        A    At the end of August.

11        Q    You've not received one for the end of

12    September yet?

13        A    Not yet.

14        Q    And the end of August report, did it show any

15    sign that the delivery was improving?

16        A    That varies facility by facility.

17        Q    Which facilities were improving?

18        A    I don't recall.

19        Q    Were there any facilities that it concerned

20    you that it wasn't improving or it was getting worse?

21                    MS. WIENEKE:  Form.

22                    THE WITNESS:  My concern is for all the

23    facilities.

24        Q    BY MS. KENDRICK:  But were there any

25    institutions where you read the review and you said to
```

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 83

1              THE WITNESS:  I don't know.

2      Q     BY MS. KENDRICK:  Did you ever work as a

3  physician assistant in any of the prisons?

4      A     Yes.

5      Q     As a medical professional, in your judgment,

6  would it be better if the person with a chronic

7  condition has a continual supply of his or her

8  medications to treat that condition?

9              MS. WIENEKE:  Form.

10             THE WITNESS:  Yes.

11     Q     BY MS. KENDRICK:  And the fifth bullet point

12 says in bold underlined, if you lose the bar code, then

13 your refill process will be delayed.  Does it concern

14 you that if a prisoner loses a bar code on his

15 medication, that his supply of medication is delayed?

16             MS. WIENEKE:  Form and foundation.

17             THE WITNESS:  I can't even respond to

18 that because I'm not aware of what this process is.

19     Q     BY MS. KENDRICK:  If Wexford decided to make a

20 change such as requiring prisoners to file an HNR every

21 time they needed to refill their medication to treat

22 HIV/AIDS, is that something that they would need to get

23 approval from the Contract Monitoring Bureau?

24     A     No.

25     Q     They could make that kind of change?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1    Q    BY MS. KENDRICK:  And why would that be a

2  concern to you?

3    A    If it had a bearing on the inmates' care at

4  that facility, if it was secondary to a lack of care, I

5  would have a huge concern.

6    Q    Okay.  And Wexford has provided you guys with

7  these transport reports?

8    A    Yes.

9    Q    And Wexford also has been providing you with

10  monthly staffing reports?

11    A    Yes.

12    Q    Regarding each facility?

13    A    Yes.

14    Q    And have you made any observations in the

15  staffing patterns and the vacancy rates for July and

16  August?

17          MS. WIENEKE:  Form.

18    Q    BY MS. KENDRICK:  Has the staffing -- the

19  vacancy rate gone down?

20          MS. WIENEKE:  Form.

21          THE WITNESS:  I'm seeing improvement,

22  yes.

23    Q    BY MS. KENDRICK:  Okay.  And the contract

24  requires that Wexford follow all of ADC policies and

25  procedures regarding health care services.  Correct?

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

1              MS. WIENEKE:  Object to form.

2              THE WITNESS:  It's required in the

3    contract, yes.

4    Q    BY MS. KENDRICK:  Okay.  And as part of the

5    monitoring, they have to notify you when they want to

6    make a change to the policies and procedures.  Correct?

7              MS. WIENEKE:  Form.

8              THE WITNESS:  Correct.

9    Q    BY MS. KENDRICK:  Okay.  Have they asked to

10   change any of the policies or procedures yet?

11             MS. WIENEKE:  Form.

12             THE WITNESS:  Not that I'm aware of.

13   Q    BY MS. KENDRICK:  But as the monitor, you

14   would have to approve that?

15   A    The Department would have to approve that,

16   yes.

17   Q    Okay.  And another report that's required is a

18   quarterly utilization review report on the number of

19   utilization reviews of referral for additional care.

20   What is a utilization review?

21   A    That's monitoring the patients in the

22   hospital.

23   Q    Is that a term of art that was used by ADC in

24   the health care system in monitoring?

25   A    That's a general term that's, to my knowledge,

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 113

1    next page, on 13, on health care and pharmaceutical

2    supplies, it also requires that an inventory of all the

3    medication and pharmaceuticals supplies that are on

4    hand at each facility be taken prior to implementation

5    of the contract on July 1st.  Was this inventory done?

6        A    Yes.

7                 MS. WIENEKE:  Same objections.

8                 THE WITNESS:  Yes.

9                 MS. KENDRICK:  It's responsive to topic

10   three about the implementation.

11       Q    BY MS. KENDRICK:  And 2.6.17 is continuity of

12   care plan in case of emergencies, and the RFP required

13   that this be developed within 30 days of the contract

14   being awarded.  Was that plan provided?

15                MS. WIENEKE:  Same objections.

16                THE WITNESS:  Yes.

17       Q    BY MS. KENDRICK:  Okay.  And are you familiar

18   with something that's called QMP, quality management

19   program?  It's a Wexford phrase.

20       A    No.

21       Q    Okay.  So I believe the Department calls it

22   continuous quality improvement, CQI, and are these

23   improvement studies that are requested in the RFP

24   something that Wexford is providing to you all?

25       A    I have not seen them.

Parsons v. Ryan
AZ Dept of Corrections 30(b)(6) - Richard Pratt - 10/4/2012

Page 114

1    Q    Okay.  So I'm showing you in the version with

2    the response, because I believe ADC and Wexford use

3    different acronyms for it, but it's section 2.8.12.1,

4    and it calls for a description and plan for continuous

5    quality improvement.  And I have to confess that's a

6    little jargony to me, and so do you understand what

7    this report is that the Department is receiving from

8    ADC?

9    A    No.  As I said, I haven't received any reports

10   related to this at this point.

11               MS. KENDRICK:  Off the record.

12               (The deposition was at lunch recess from

13   12:23 p.m. to 1:17 p.m.)

14   Q    BY MS. KENDRICK:  So I think I only have a few

15   more questions to wind things up with me on these

16   topics, and these large binders will go away.

17               (Deposition Exhibit No. 38 was marked

18   for identification.)

19   Q    BY MS. KENDRICK:  I'm handing you Exhibit 38

20   which is Bates stamped as ADC028092.  And on the

21   caption line, when it says to Joe Profiri through

22   Richard Pratt, what does the through mean?  You review

23   these before they go to Mr. Profiri?

24   A    Should be, yes.

25   Q    I had never seen that on a memo before, so I