# EXHIBIT FF



October 1, 2012

Mr. Joe Profiri
Contract Beds Operations Director
Arizona Department of Corrections
1601 West Jefferson
Phoenix, Arizona 85007

**Subject: Wexford Health Sources written assurance of intent to perform**

Dear Mr. Profiri:

This letter is Wexford Health Sources' response to that portion of your September 21, 2012 letter regarding Written Cure Notification - Contract No. 120075DC that requested written assurance from Wexford of our intent to perform under the Contract. We hereby assure the Arizona Department of Corrections (ADC) that Wexford intends to perform and comply with all contractual provisions.

Pursuant to Section 8.1 of the Uniform Terms and Conditions of the contract, Wexford's agreement with the State includes a Right to Assurance clause. That clause provides as follows:

> 8.1. *Right to Assurance. If the State in good faith has reason to believe that the Contractor does not intend to, or is unable to perform or continue performing under this Contract, the Procurement Officer may demand in writing that the Contractor give a written assurance of intent to perform. Failure by the Contractor to provide written assurance within the number of Days specified in the demand may, at the State's option, be the basis for terminating the Contract under the Uniform Terms and Conditions or other rights and remedies available by law or provided by the contract.*

With regard to the letter's request that we "cure all deficiencies noted herein within ninety (90) calendar days from the date of this letter," we note that the 90-day timeframe is not reasonable for certain of the identified problems, but assure the ADC that we do intend to cure the deficiencies within reasonable and appropriate timeframes. As indicated in previous communications with the ADC, we are willing to discuss and agree upon reasonable and appropriate timeframes for these "cures" and suggest we continue our meetings in this regard at your earliest opportunity[1].

Your request for an assurance from Wexford came combined with a written cure notification. Please note that our current correspondence addresses only the ADC's request for the written assurance; and that as authorized in the ADC's September 28 letter to Karen Mullenix, we will respond separately to the Cure Notice, by no later than October 22.

Under the circumstances outlined below, Wexford does not believe ADC has a good faith reason to believe Wexford does not intend to perform under our contract. As indicated in our September 26 e-mail to Director Ryan, the majority of the problems Wexford now faces are long-standing issues, embedded into ADC health care policy and philosophy, and which existed well before Wexford Health

---

[1] As we discuss in more detail below and will discuss in greater detail in the response to the Cure Letter, we assure ADC that we intend to cure the deficiencies listed in the Cure Letter. However, Section 8.1 of the Uniform Terms and Conditions sets no deadlines, and we commit to reasonable and appropriate timeframes.

425 HOLIDAY DRIVE | FOSTER PLAZA TWO | PITTSBURGH, PA 15220 | P: 412-937-8590 | F: 412-937-8599 | WWW.WEXFORDHEALTH.COM

Confidential Information - Subject to Protective Order                                           ADC027941

Joe Profiri, Contract Beds Operations Director, Arizona Department of Corrections
Subject: Wexford Health Sources written assurance of intent to perform

October 1, 2012
Page 2 of 3

assumed responsibility for the program on July 1, 2012. Indeed, on several occasions before our receipt of your demand for assurance, we discussed with the ADC our assessment of the extremely poor condition of its health care system.

Importantly, the severity of these inadequacies, which was (or should have been) well known to ADC, was not communicated to Wexford (or any of the bidders) during the procurement process. The ADC failed to accurately disclose to bidders the dysfunctional condition of its inmate health care system. Based on the limited information available through site visits and responses to submitted questions, no bidder could have anticipated the degree of problems within the ADC inmate health care system.

For example, while the Request for Proposal (RFP) data included the number of actual non-filled positions, the information did not indicate that in addition, the ADC was also using an extraordinarily high volume of agency and PRN pool personnel in order to be able to provide required health care services. The number of vacancies also increased dramatically between the time the ADC provided data through the RFP process (October 2011) and Wexford beginning its contract eight months later on July 1, 2012. Without accurate, up-to-date information, Wexford did not have, and could not have had, an appropriate understanding of the large number of positions it would have to fill with permanent personnel upon assuming responsibility for the system.

The ADC compounded the staff vacancy issue by announcing its intention to hire both the first and second levels of site management personnel from each prison complex to form its contract monitoring team; by prohibiting Wexford from extending job offers to incumbent site managers until the make-up of the contract monitoring team had been confirmed; and by not allowing Wexford to make counteroffers to attempt to retain incumbent site management staff. The ADC's actions not only added thirty-four unforeseen management vacancies to the already larger-than-indicated list of positions Wexford needed to fill; but also sent a negative signal to other incumbent site personnel, as they learned that no experienced management personnel would be left in place after contract transition.

Section 2.17.4.1 of the RFP required the Contractor to "give Department employees displaced by this Contract first consideration for employment in comparable positions to those they currently hold." Given this statement, Wexford reasonably expected that we would be able to hire the majority of the incumbent Complex Managers (or their immediate subordinates) to continue their site management roles under Wexford. In addition to the RFP language, both industry standards and Wexford's prior experience in successfully assuming responsibility for statewide inmate health programs led us to believe that we would be able to employ the incumbent complex managers. In our experience in many systems around the country, the ADC's actions in this regard are extraordinary.

By retaining existing health care management staff, the ADC caused at least two material differences and problems for Wexford. First, the ADC created an institutional leadership and knowledge void for Wexford. Second, the ADC deprived Wexford of a resource that was and is crucial to Wexford's immediate success under the contract. This issue is so important that if the ADC had disclosed during the RFP process its intent to retain these individuals and not permit them to remain as the Complex Managers, Wexford would have bid the contract in a completely different manner, and may have chosen not to submit a bid.

In addition, by retaining former health care management staff to become "watchdogs" over their replacements, the ADC created an innately adversarial relationship for the employees hired by Wexford from the State to continue to work at the ADC facilities. These former site leaders are experienced Complex Managers used to performing as such, and they have no experience in performing as Contract Monitors. Wexford is finding that many of the Contract Monitors are ignoring the established chain of command and giving instructions directly to Wexford line personnel (which

WEXFORD HEALTH SOURCES, INC. | 425 HOLIDAY DRIVE | FOSTER PLAZA TWO | PITTSBURGH, PA 15220 | P: 412-937-8590 | F: 412-937-8599 | WWW.WEXFORDHEALTH.COM

Joe Profiri, Contract Beds Operations Director, Arizona Department of Corrections
Subject: Wexford Health Sources written assurance of intent to perform

October 1, 2012
Page 3 of 3

instructions often conflict with the instructions from Wexford personnel). This frequent and ongoing interference by the former site leaders is not contemplated or permitted by our contract; undermines the authority of the new Complex Managers; results in confusion and/or conflicted loyalties among line staff; negatively affects staff productivity on multiple levels; and increases the time and resources required to solve identified issues.

Based on its experience in this sector of the health care delivery market, Wexford relied upon the availability of first- and second-level site management personnel to continue to work as our Complex Managers. Wexford planned to merge their knowledge of the ADC system with our clinical programs and implementation expertise to form a powerful tool that could have had immediate positive impact on the existing ADC health care system. Unfortunately, because the individuals now empowered to point out deficiencies are the very same individuals who allowed the system to deteriorate in the first place, the ADC has formed nothing but a negative, counterproductive, and even destructive environment.

The issues described in the preceding paragraphs are examples, and account for many of the problems Wexford is having, but admittedly not all of the problems. However, the State brought Wexford in to act as an agent of change and improvement. Wexford absolutely has the financial capacity, resources, and experience to perform that function, and will bring these resources to bear to address the issues raised in the cure letter. However, the ADC (through all levels of its staff, including the Contract Monitors) must allow us to do the job we were contracted to do. If the ADC affords Wexford the time and opportunity to implement a solid foundation of Arizona-specific staff, policies, and programs, we can partner with the State to make Arizona's program one of the nation's leading correctional health care programs.

This is what is necessary in order to "cure" the ADC health care system. Given the sub-standard condition and documented deficiencies already existent in the ADC health care delivery system — and for which the State has already been sued on numerous occasions, including the recent class action suits filed by the American Civil Liberties Union, Prison Law Office, et al — curing many of these issues will take longer than ninety days. The ADC is well aware that Wexford is already working diligently to address these issues. As noted above, under all of these circumstances, the ADC does not have a good faith reason to believe that Wexford does not intend to perform under our contract.

Please let me know if you have any questions about this letter. Wexford looks forward to continuing to work with the Department on the delivery of health care services to ADC inmates.

Sincerely,

*Karen Mullenix*

Karen Mullenix
Director of Operations
Office: 480-696-7541
Email: kmullenix@wexfordhealth.com

WEXFORD HEALTH SOURCES, INC. | 425 HOLIDAY DRIVE | FOSTER PLAZA TWO | PITTSBURGH, PA 15220 | P: 412-937-8590 | F: 412-937-8599 | WWW.WEXFORDHEALTH.COM

Confidential Information - Subject to Protective Order002        ADC027943