Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Katherine E. Watanabe, Bar No. 027458
Lucy M. Rand, Bar No. 026919
Ashley B. Zuerlein, Bar No. 029541
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov
Ashley.Zuerlein@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-NVW |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

1

## <u>**TABLE OF CONTENTS**</u>

2

<u>Page</u>

3

4

I. FACTUAL BACKGROUND ...............................................................................1

A. The Arizona Department of Corrections ...........................................1
    1. Health Care ...............................................................................1
    2. Mental Health Classifications ..................................................2
    3. Suicide Watch Cells .................................................................2
    4. Maximum Custody Cells ..........................................................3

B. ADC Policies ......................................................................................4
    1. Medical Care .............................................................................4
        a. Intake Screening ............................................................4
        b. Access to Medical Care .................................................5
        c. Sick Call ........................................................................5
        d. Emergency Care .............................................................6
        e. Chronic Care ..................................................................6
        f. Specialty Care ................................................................6
        g. Medical Housing ............................................................7
        h. Clinical Facilities ..........................................................7
        i. Medication Distribution Systems ..................................8
        j. Medical Records .............................................................9
        k. Quality Assurance .........................................................9
    2. Dental Care .............................................................................10
        a. Triage Process ..............................................................10
        b. Pain Treatment .............................................................11
        c. De Facto Extraction Policy .........................................11
        d. Chewing Difficulty Treatment ....................................11
    3. Mental Health .........................................................................12
        a. Medication Management and Continuity of
            Coverage .....................................................................12
        b. Mental Health Treatment .............................................13
        c. Confinement .................................................................16
        d. Suicide Prevention .......................................................17
        e. Chemical Agents ..........................................................17
        f. Prisoners on Psychotropic Medications Subjected
            to Heat ..........................................................................18
    4. Conditions of Confinement in Maximum Custody Cells .......19
        a. Exercise .......................................................................19
        b. Educational Programming ............................................19
        c. Security Lighting ..........................................................20

i

## TABLE OF CONTENTS (cont.)

**Page**

    d.    Property .......................................................... 20
    e.    Meals ............................................................. 20

II.    THIS LAWSUIT SHOULD NOT BE CERTIFIED AS A CLASS
ACTION .................................................................................. 21

    A.    Commonality is Lacking ................................................ 21

        1.    Health Care Claims ............................................ 22
        2.    Maximum Custody Claims .................................. 28

    B.    Typicality is Lacking .................................................... 29

    C.    Rule 23(B)(2) Cannot be Satisfied ................................ 31

    D.    Plaintiff Parsons Should be Dismissed .......................... 33

CONCLUSION ................................................................................. 33

CERTIFICATE OF SERVICE ......................................................... 35

ii

1  Defendants Charles Ryan and Richard Pratt oppose Plaintiffs' Motion for

2  Class Certification.  The nature and reach of Plaintiffs' claims preclude any finding of

3  commonality or typicality, and their broad, abstract request for relief goes well beyond

4  what Rule 23 permits.  This lawsuit should not be certified as a class action.

5  **I.    FACTUAL BACKGROUND**

6      **A.    The Arizona Department of Corrections**

7  The Arizona Department of Corrections ("ADC") currently incarcerates

8  33,726 inmates in ten facilities statewide.  (Ex. 2, ¶¶ 3, 5.)  Each facility has a different

9  inmate population and different staffing levels.  (Ex. 2, ¶¶ 4, 42; Ex. 2-U.)  Although

10  ADC policies governing health care and conditions of confinement apply to all facilities

11  and inmates, the implementation of those policies can vary and/or lead to different results

12  depending on the specific facts and circumstances of a given case.  *See Florence v. Bd. of*

13  *Chosen Freeholders of County of Burlington*, 132 S. Ct. 1510, 1515 (2012) ("The

14  difficulties of operating a detention center must not be underestimated by the courts. ...

15  Maintaining safety and order at these institutions requires the expertise of correctional

16  officials, who must have substantial discretion to devise reasonable solutions to the

17  problems they face.").  Prison is not a static setting.

18      1.    Health Care

19  On July 1, 2012, Wexford Health Services, a private entity, took over the

20  provision of ADC health care pursuant to a legislative mandate requiring privatization.

21  (Ex. 2, ¶ 8.)  The ADC-Wexford contract imposes upon Wexford a duty to provide certain

22  care, including standards for staffing, access to health care, treatment screening,

23  emergency responses, medication and supplies, chronic care, environmental conditions,

24  and mental health treatment. (Id.) Wexford's compliance with these standards is

25  constantly monitored by ADC. (Id.) Under the ADC-Wexford contract, Wexford is

26  required to follow ADC policies. (Id., ¶ 43.) After the Governor signed the legislation

27  requiring privatization, many health care staff left for other jobs with the State of Arizona

28  so that they did not lose their retirement benefits and pensions, resulting in staffing

1

vacancies.  (Ex. 1, ¶ 9; Ex. 2, ¶ 42.)  This led to increased wait times in care at certain facilities in the first few months of the transition until the positions could be re-filled. (Id.)  Plaintiffs rely largely on this time period to support their claims.  Staffing has since improved significantly in all three health care fields.  (Ex. 2, ¶ 42; Ex. 2-U.)

### 2. Mental Health Classifications

There are five mental health classifications in ADC: MH-1 (no mental health needs), MH-2 (no current mental health needs but history of treatment), MH-3 (mental health needs and require outpatient treatment), MH-4 (mental health needs and admitted to a specialized mental health program outside of inpatient treatment areas), and MH-5 (mental health needs and admitted to an inpatient psychiatric treatment program). (Ex. 1, ¶ 18.)

(Id., ¶ 19.)  None of the Plaintiffs are MH-4 or MH-5. (Id.)  An inmate can also be designated as seriously mentally ill ("SMI").  (Id., ¶ 20.)  An inmate is designated SMI if he or she has an MH score of 3, 4, or 5, and possesses a qualifying mental health diagnosis and severe functional impairment. (Id.)

(Id., ¶ 21.)

### 3. Suicide Watch Cells

Inmates who demonstrate signs or symptoms of significant mental disorder and who are acting in a manner indicating high suicide risk are placed on suicide watch. (Ex. 1, ¶ 49.)  Each facility has specifically designated suicide watch cells, which are typically located in the facility's detention unit, which are modified so that the inmate cannot harm themselves. (Id. ¶ 55.) There are three levels of suicide watch: continuous watch; ten-minute watch; and thirty-minute watch (also referred to as mental health watch).  (Id., ¶¶ 56-59.)   Security officers conduct these visual welfare checks.   (Id.) Mental health staff visit the inmate every 24 hours and document the inmate's status in a progress note. (Id., ¶¶ 51, 61.) Inmates will be downgraded to lower watch levels and ultimately removed based on the clinical assessment of a licensed mental health staff, and usually after consultation with the entire mental health team.  (Id., ¶¶ 52–54.)

### 4.    Maximum Custody Cells

ADC does not recognize or use the term "isolation cell."  (Ex. 4, ¶ 4.)  The word "isolation" implies that an inmate has no ability to communicate, interact, or socialize with others, and that is simply not true of any inmate in the ADC system.  (Id.) Some inmates are required to remain in their cells for 22 hours per day.  (Id.)  This applies only to certain inmates that are classified as maximum custody[1] and certain inmates who are on detention status.[2]  (Id.)  These cells are known as "maximum custody cells."  (Id.) Not all inmates classified as maximum custody are required to be in their cell for at least 22 hours.  For instance, inmates in ADC's Max Phase Program, a program for male maximum custody inmates who have demonstrated positive institutional behavior and are prepared for transition to a lower custody unit or release to the community, are allowed more time out of their cell, they can be assigned to the Work Incentive Pay Program, they participate in group recreation on the recreation field, they are allowed contact visitation with their family and friends, and they eat their evening meal in group setting in the chow hall.  (Id., ¶ 7.)  Similarly, male maximum custody inmates with mental health issues who are housed in certain units are eligible to participate in various activities consistent with mental health programming that allows them out of cell time in group activities, and

_____

[1] An inmate can be classified as "maximum custody" if they committed a serious underlying offense (e.g.., first degree murder), if they committed violent, disruptive, or riotous acts while incarcerated, if they escaped or attempted to escape, or if they pose a serious threat to the security of the institution or themselves. (Ex. 4, ¶ 5.) An inmate is not classified as maximum custody indefinitely (except death row inmates); their classification is reviewed 180 days after initial approval and annually thereafter. (Id.) Eyman-SMU 1 Unit, Eyman-Browning Unit, and Florence-Central Unit house all of the male-general population inmates that are classified as maximum custody. (Id., ¶ 6.) Perryville-Lumley Special Management Unit houses all of the female-general population inmates that are classified as maximum custody. (Id.)

[2] Inmates are placed in "detention" as necessary to ensure the safe, secure and orderly operation of the facility, to ensure the integrity and pending completion of an ongoing investigation, while determining eligibility for protective segregation, for observation status to identify, minimize and intervene in the possibility of self-destructive behaviors, pending institutional review and classification placement, pending revocation of parole, work furlough, home arrest, or temporary, mandatory or provisional release, and to fulfill disciplinary sanctions. (Ex. 4, ¶ 8.) Not all inmates who receive a disciplinary sanction are required to be moved to a maximum custody cell; instead, they may be allowed to stay in their existing cell with limited privileges. (Id.)

1  participate in group recreation enclosures or a recreation field.  (Ex. 4, ¶ 7; Ex. 6 at 150-

2  152.) All of the maximum custody cells have sufficient ventilation, and either a perforated

3  cell front, a vision panel in the door or cell wall, a sky light, and/or a window looking

4  outside, and many of them have double-beds and house two inmates.   (Ex. 4, ¶ 9.)

5  Inmates are permitted to leave their cell to shower (three times per week), to participate in

6  recreation, to go to medical if necessary, or to meet with program staff or security

7  supervisors.  (Id.)  In that sense alone, Plaintiffs' use of the term "isolation" is inaccurate.

8        **B.**   **ADC Policies**

9        Plaintiffs allege two general claims in their Motion:  inadequate health care

10  and unconstitutional conditions of confinement in maximum custody cells. They further

11  allege that these claims are supported by "system-wide policies" that have produced

12  "systemic failures." But when you put aside these broad, abstract generalizations and

13  focus on the underlying allegations, there is nothing "system-wide" or "systemic" about

14  them.  Plaintiffs allege a conglomeration of specific *practices*, most of which are based on

15  isolated instances and which did not result in any injury or harm to themselves.

16        1.   Medical Care

17        a.   Intake Screening

18        Plaintiffs contend that ADC has "a practice of not complying with their own

19  requirement that health care records be reviewed within 12 hours of an inmate's arrival."

20  (Pls. Ex. C, ¶ 24.)  This is not an ADC policy or practice.  An inmate's chart is screened

21  by nursing staff within 12 hours of the inmate's transfer to a unit, and the inmate is

22  physically examined within 24 hours of his arrival. (Ex. 2, ¶ 10.) To support their

23  contention, Plaintiffs rely on a weekly non-compliance report and contract monitoring

24  memorandum for the week of August 13, 2012, and a contract monitoring memorandum

25  dated August 17, 2012, which merely identify a delay at three facilities — Perryville,

26  Lewis, and Winslow – during a one-week period only. (Pls. Ex. MM, QQ, JJJ.)  None of

27  the Plaintiffs identify a harm resulting from this alleged policy.

28

b.      Access to Medical Care

Plaintiffs contend that "ADC has pursued a practice and unwritten policy of delaying and/or denying prisoners access to necessary care for serious medical needs." (Pls. Ex. C, ¶ 25.)  This is not an ADC policy or practice.  It is ADC's practice and policy to provide all inmates with timely and effective health care.  (Ex. 2, ¶ 12.)  Inmates have access to Health Needs Request ("HNR") forms that they can submit, and which are retrieved and triaged daily.  (Id.) Plaintiffs again support their contention with the August 13, 2012 weekly non-compliance report and contract monitoring memorandum, which documented a delay in a one-week period of time and at only two facilities. (Pls. Ex. MM, JJJ.)   They also cite to Dr. Jeffrey Sharp's deposition testimony, a current Wexford employee. (Id., W at 36-37.) His testimony, however, was limited to staffing at the facility he was working at. (Ex. 7 at 16, 36, 50-51, 53-54.)

(Pls. Ex. F, ¶ 5; Ex. H, ¶ 4; Ex. P, ¶ 8; Ex. P, ¶ 9; Ex. Q, ¶¶ 3-4; Ex. R, ¶ 19.)  The alleged delays range from days to weeks and even months (and some non-specific), and the reason for the treatment is different for each and some do not even identify the condition.  (Id.)

c.      Sick Call

Plaintiffs contend that inmates wait more than 18 days for medical RN line and nearly seven weeks for medical appointments at Lewis, that the wait times for routine care is five to six months at Safford, five months at Yuma, and four months at Lewis, and that sick call referrals at Perryville are not seen within seven days. (Pls. Ex. C, ¶¶ 26–27.)  Under ADC policy, sick call referrals are seen by a physician within 7 days. (Ex. 2, ¶ 13.) Plaintiffs' allegation is limited to wait times at four facilities.  Furthermore, the document they use to support their claim regarding Lewis actually states the *average* wait time for the *month of August 2012* only. (Pls. Ex. KKK, JJJ.) That same document reported an average wait time of 2.65 weeks in 7 units at Lewis, and no wait times in 3 units; a 7-10 wait time at Perryville for medical care; wait times as low as 1.5 days for nursing at Safford; a 2-day wait period for mental health at Douglas; and 1-3 day wait

1    time for mental and medical care at Phoenix. (Id.) It is unclear from their declarations

2    whether any of the Plaintiffs allege a harm resulting from a delayed sick call request.

3                              d.    Emergency Care

4            Plaintiffs contend that ADC has "a practice and unwritten policy of not

5    providing sufficient, trained staff to competently respond to emergencies." (Pls. Ex. C,

6    ¶ 28.)  This is not an ADC policy or practice.  ADC policy requires emergency training

7    and accountability. (Ex. 2, ¶ 15.) Plaintiffs cite factually distinct incidents, none of which

8    can be tied specifically to a lack of training and some that are not even emergency

9    situations.  (Pls. Ex. C, ¶¶ 28-29.)  One is a general assertion that inmates at the Safford-

10   Ft. Grant Unit who are in need of emergency care after 8:00 pm. must be transferred to

11   another unit, which is 47 miles away.  At the time that August 2012 contract monitoring

12   memorandum was written, however, the Ft. Grant Unit – a satellite facility remotely

13   separate from the Safford complex – did not have 24-hour medical staffing. (Ex. 2, ¶ 16.)

14   That facility now has 24-hour medical staffing available.  (Id.) None of the Plaintiffs

15   allege a harm resulting from this alleged policy.

16                              e.    Chronic Care

17           Plaintiffs contend that "chronic care patients are not always timely seen

18   because of lack of staffing."  (Pls. Ex. C, ¶ 31.)  This is not an ADC policy or practice.

19   Inmates with chronic conditions are scheduled to be examined and/or treated at least every

20   six months by a medical provider, and medications and treatments are required to be

21   ordered in a timely manner. (Ex. 2, ¶ 19.)  Plaintiffs refer to Dr. Sharp's testimony, but he

22   never testified that any delay could be attributed to lack of staffing.  (Pls. Ex. W at 54,

23   189-190.)  His testimony was also limited to just three facilities (two in the past). (Id.)

24   Nonetheless, the staffing issues have greatly improved since the Wexford transition.

25   None of the Plaintiffs clearly allege a harm resulting from this alleged policy.

26                              f.    Specialty Care

27           Plaintiffs contend that ADC has a "policy and practice of reimbursing

28   specialty care providers at low rates," making "it challenging to find specialists who will

provide treatment to prisoners," and that it "currently takes about two to four weeks from the time a doctor orders an x-ray to the time he gets a radiology report." (Pls. Ex. C, ¶¶ 32-33.) The rates that ADC can pay outside specialists are fixed by statute. *See* A.R.S. § 41–1608. With respect to x-rays, when an x-ray is taken at a facility, a "wet read" is done by medical staff. (Ex. 2, ¶ 23.) If something is visible based on that "wet read" treatment is immediately provided. (Id.) The x-ray is then sent off-site for a contract radiologist to review, and then returned to medical staff for review and any further action if necessary. (Id.) Time frames are set forth in the contractor's agreement. (Id.) Urgent and emergent interpretations are requested if needed. (Id.) Plaintiffs rely on Dr. Sharp's testimony to support their two-to-four week time frame, however, Dr. Sharp only testified that this was his experience in the past, that he was "not aware of any changes" since Wexford's transition, and that whether any delay actually impaired an inmate's care depended on the case. (Pls. Ex. W at 47-48.) They also cite only one instance of a delayed X-ray. (Pls. Ex. C, ¶ 33.) None of the Plaintiffs allege harm resulting from a delayed x-ray.

(Pls. Ex. H, ¶ 17), and

(Pls. Ex. L., ¶¶ 4, 9.)

g.     Medical Housing

Plaintiffs contend that "prisoners with very serious conditions [are] dying in their cells, rather than a medical setting." (Pls. Ex. C, ¶ 36.) This is not an ADC policy or practice. (Ex. 2, ¶ 24.) If an inmate is in need of care, they are placed in an infirmary setting or taken to the hospital. (Id.) There are also policies addressing treatment for terminally ill and hospice care patients. (Id., ¶¶ 25-26.) To support their contention, Plaintiffs cite to only one instance in which an inmate died in his cell. (Pls. Ex. C, ¶ 36.) No Plaintiff alleges that they are dying in their cell or need to be placed in higher care.

h.     Clinical Facilities

Plaintiffs contend that ADC has a "practice and unwritten policy of

7

conducting examines [sic] in non-confidential setting." (Pls. Ex. C, ¶ 37.)  This is not ADC policy or practice. (Ex. 2, ¶¶ 27-28.) ADC policy requires that clinical encounters be conducted in private, without being observed or overheard by security personnel, and if triage is required to be conducted at the inmate's cell, staff will take precautions to promote private communication. (Id.) Plaintiffs rely on the deposition testimony of Dr. Tracy Crews, who testified that there were occasions when a "psych" visit was conducted in a break room or in medical records.  She did not testify which facility this took place at or how often it took place.  (Pls. Ex. V at 27, 54-55.)  They also rely on Dr. Crew's testimony that psychology staff at Perryville-Lumley Unit share one 12 x 12 foot office, and the August 13 contract monitoring memorandum, which stated that inmate confidentiality was being compromised at the Phoenix facility because the monitor witnessed four inmates with nurses separated by partitions (complaints involving only two facilities). (Id.; Pls. Ex. NN.) At Perryville, the medical area has five offices, one of which is always available to mental health staff for assessments and counseling. (Ex. 1, ¶ 35.) In addition, there is a mental health clinician's office in the Special Management Area, which allows more inmates to be seen without full restraints and shutting down the rest of the yard during transport. (Id.) The Phoenix Complex has private offices for individual assessment and counseling, as well as team treatment rooms, which permit teams of clinicians to work collectively with an inmate. (Id., ¶¶ 31-32.) None of the Plaintiffs allege that they have been examined in a break room or allege harm resulting from the location of an examination.

i.      Medication Distribution Systems

Plaintiffs contend that ADC has a "practice and unwritten policy of failing to supervise, manage and support medication distribution," and that physicians refill or renew prescriptions "without even seeing the patient." (Pls. Ex. C, ¶¶ 38, 40.)  These are not ADC policies or practices.  (Ex. 2, ¶ 29.)  ADC's policy on medication management and distribution provides for a consistent and uniform system of delivery of prescription medications to the inmate population to ensure that medications are delivered on a daily

basis. (Id., ¶ 30.)   Prescription medications are administered to inmates only upon the order of a physician, dentist, psychiatrist, or other legally authorized individual. (Id., ¶ 31.) All prescriptions are tracked by the pharmacy. (Id., ¶ 33.) Prescriptions for chronic care conditions are automatically refilled. (Id.) Inmates who request a renewal of a prescription must be evaluated by a licensed practitioner who has the capability of prescribing medication. (Id., ¶ 34.)  If an inmate simply needs a refill of a prescription that is still current, it is not necessary for that inmate to be seen by a medical provider.  (Id.) Plaintiffs' base their contention on three weekly contract monitoring memorandums that found delays in three facilities, and a September 21 letter to Wexford and testimony regarding the problems immediately following the Wexford transition. (Pls. Ex. MM, PP, VV.)

(Pls. Ex. H, ¶¶ 16, 18; Ex. P, ¶¶ 5, 7.)

j.   Medical Records

Plaintiffs contend that "Wexford has pursued a practice of keeping chaotic, inaccurate, and disorganized records throughout the state."  (Pls. Ex. C, ¶ 42.)  This is not ADC policy or practice.  ADC policy sets forth a very thorough and detailed policy for the maintenance and organization of medical records.  (Ex. 2, ¶¶ 36-37.) To support their contention, Plaintiffs point to contract monitoring memorandums in August 2012 citing disorganized or un-filed records at Phoenix, Perryville, Yuma, and Lewis.  (Pls. Ex. NN, XX, WW, YY.)  No Plaintiff alleges harm resulting from un-filed medical records.

k.   Quality Assurance

Plaintiffs contend that there is no structured system for evaluating Wexford's delivery of services.  (Pls. Ex. C, ¶ 46.)  This is not true. There are numerous provisions in place to provide quality assurance and monitoring of the Wexford contract. (Ex. 2, ¶ 40.)   For example, there are contract compliance monitors assigned to each ADC facility.  (Id.) These monitors review Wexford's compliance with the contract.  (Id.) There are also "quality care monitors," who are assigned multiple facilities.  (Id.) The purpose of the quality care monitor is to ensure that the care being provided to ADC inmates is

9

acceptable. (Id.) There are quarterly contract performance audits conducted by ADC regarding Wexford's performance under the contract. (Id.) There is also a litany of quality assurance checks, reviews, reports, and audits that are required under the contract to be prepared by Wexford and submitted to ADC to ensure that Wexford is complying with the provisions of the contract. (Id.) Plaintiffs cite to many of these quality assurance measures (contract monitoring memorandums and non-compliance reports) themselves.

### 2. Dental Care

#### a. Triage Process

Plaintiffs contend that "ADC has a policy or practice of allowing dental assistants, who are not licensed providers, too much discretion in determining when and if treatment will take place based on HNRs, and they have too large a role in examining patients." (Pls. Ex. D, ¶¶ 5, 45-48.)  This is not an ADC policy or practice.  Upon receipt of an HNR, a dental assistant will evaluate the request; if it requests routine treatment (e.g., a cleaning or filling), the assistant will place the inmate on the routine care list.  (Ex. 3, ¶¶ 3-9.)  If the HNR states that the inmate is suffering pain or is in discomfort, it is forwarded to a dentist for review.  (Id.) No Plaintiff alleges harm from this alleged policy.

Plaintiffs also contend that ADC policy on urgent care "provides no timelines as to how soon a patient identified as having an urgent care problem must be treated," and that there are no "timelines for routine treatment."  (Pls. Ex. D, ¶ 42.) Although ADC policy does not set specific timelines, the guideline for treatment of conditions classified as urgent is within three working days of receipt of an HNR, and the guideline for routine care is 90 days. (Ex. 3, ¶ 12.)  These timelines are also included in the Wexford contract. (Id.) Plaintiffs rely on the August 13 contract monitoring memorandum, which estimated wait times of between five and seven months at Douglas and four to five months at Safford. (Pls. Ex. TTT.) The same report estimated urgent care appointment wait times at Safford at 5.5 to 6.5 days.  (Id.) Plaintiffs do not cite evidence from any other facility. The Florence and Eyman dental clinics both average fewer than three working days for treatment of urgent care requests; the current waiting time on the

Florence dental clinic routine care list is less than 60 days; and the current waiting time on the Eyman dental clinic routine care list is approximately 60 days. (Ex. 3, ¶ 13.)  Plaintiffs

(Pls. Ex. H, ¶¶ 19, 22-25; Ex. I, ¶¶ 6, 8-9, 11-17, 20-25 ; Ex. Q, ¶ 18; Ex. R, ¶ 7.)

### b.      Pain Treatment

Plaintiffs contend that "[n]either ADC's policies, nor actual practices … adequately address patients' pain or the likelihood of increased pain and decay over time." (Pls. Ex. D, ¶¶ 6, 50–56.)  This is not ADC policy or practice. ADC's number one concern in treating inmates is addressing pain.  (Ex. 3, ¶¶ 15-19.) If an inmate submits an HNR describing pain, the HNR is reviewed within 24 hours by a dentist. (Id.) Generally, the inmate is scheduled for an appointment the same day, however, there are times when it is apparent from the HNR that a complaint of pain is not related to an urgent condition. (Id.)


### c.      De Facto Extraction Policy

Plaintiffs contend that "ADC dentists encourage inmates to allow the dentists to extract teeth that could be filled."  (Pls. Ex. D, ¶¶ 7, 61-64.)  This is not an ADC policy or practice.  If a dentist is able to fix a tooth, he will.  (Ex. 3, ¶¶ 22-27.) However, there are times when a tooth cannot be saved.  (Id.) In that instance – i.e., there is no other possible way to save the tooth – it will be pulled with the inmate's consent. (Id.) Whether a tooth can be filled depends upon the extent of the decay and the remaining structure of the tooth.  (Id.) If a tooth cannot be saved, the inmate is not given the option of a filling.  (Id.) The inmate may choose to have the tooth pulled, or the inmate may choose to refuse treatment.  (Id.) It is much easier to fill a tooth than to extract a tooth. (Id.)

(Pls. Ex. H, ¶¶ 21–22; Pls. Ex. K, ¶ 14; Pls. Ex. Q, ¶¶ 13-14.)

### d.      Chewing Difficulty Treatment

Plaintiffs contend that "ADC policy does not address timing or monitoring

11

of patients waiting to receive dental devices." (Pls. Ex. D, ¶¶ 8, 68-69, 71.)  Inmates who qualify for a dental device are closely monitored until their device arrives.  (Ex. 3, ¶¶ 29-35.)  If an inmate qualifies for and requests dentures, the inmate will be placed on the routine care list. (Id.) During this time, the inmate will be provided a soft diet. (Id.) When the inmate reaches the front of the queue, the inmate will then be called into the dental clinic automatically every four to six weeks until the device is ready. (Id.) The time required for a particular inmate to receive a dental device is difficult to estimate and will vary considerably from inmate to inmate. (Id.) The timing varies depending upon the dental needs of a particular inmate, the processing time required for the outside provider making the device, and various scheduling factors. (Id.) There are multiple steps involved in making dental devices, each of which takes approximately four to six weeks due to the necessity of taking impressions, mailing materials to an outside lab, the processing time for the outside lab, mailing materials back to the prison facility, making adjustments, and so forth. (Id.) The process of providing a dental device generally takes an average of six months.  (Id.) Plaintiffs' base this contention on one alleged incident:

                                                          No other Plaintiff alleges a similar delay.

      3.    <u>Mental Health</u>

          a.    Medication Management and Continuity of Care

Plaintiffs contend that psychotropic medications are not being delivered and that some medications are expiring.  (Pls. Ex. B, ¶¶ 14-17.)  Plaintiffs base this allegation on a letter ADC sent to Wexford on September 21, 2012, which outlined several areas of non-compliance with the contract between ADC and Wexford requiring corrective action, and an August 2012 contract monitoring memorandum for Perryville.  (Ex. 1, ¶ 2; Pls. Ex. EE.)  One of the areas of non-compliance was a backlog of more than 8,000 prescriptions requiring review and potential renewal in August 2012. (Id.) Prior to Wexford assuming control over the provision of healthcare in ADC facilities, ADC employed a prescription database with the capability to run advance prescription expiration reports to alert clinicians to the need to review inmate charts and schedule inmates for prescription

renewals. (Id., ¶ 3.) At the transition, Wexford instituted a different prescription management system with an off-site pharmacy that did not initially have the capability to generate advance prescription expiration reports like the ADC database. (Id., ¶ 4.) As a result, prescriptions expiring had to be manually reviewed, causing a backlog of prescriptions requiring review and potential renewal. (Id.) Wexford, however, now has the capability to generate advance prescription expiration reports, and there is no current backlog of prescription renewals at any ADC facility. (Id., ¶ 5.)

(Pls. Ex. F, ¶¶ 3, 6; Ex. G, ¶¶ 3-5, 7-8, 11; Ex H, ¶¶ 4-6; Ex. I, ¶ 27; Ex. J, ¶¶ 5-6; Ex. K, ¶¶ 7, 10-12; Ex. M, ¶ 4; Ex. N, ¶ 30;  Ex. R, ¶ 15.)

### b.   Mental Health Treatment

Plaintiff contends that "ADC does not have a reliable means for prisoners to make their mental health needs known in a timely matter to qualified staff." (Pls. Ex. B, ¶ 22).  This is not true.  HNRs are available in all ADC facilities and remain the primary way for inmates to request non-routine mental healthcare. (Ex. 1, ¶ 8.)  Although there had been a back log of HNRs following the Wexford transition due to the staffing issues, since September 2012, Wexford has hired 15 additional psychiatrists. (Id., ¶¶ 9-10.) Plaintiffs cite to the August 2012 contract monitoring memorandum, which stated that 123 HNRs had not been responded to at the Perryville-Lumley Unit. (Pls. Ex. KK.) But Perryville has since greatly improved staffing and significantly decreased wait times for psychiatric services. (Ex. 1, ¶ 11.)  Perryville has implemented an HNR tracking database to improve the timeliness of service, and now averages a two-week waiting time for HNRs requesting psychiatry services. (Id., ¶¶ 11-12.) The system-wide average wait time is approximately three weeks, which is less than the average wait times in the local community.  (Id., ¶¶ 12-13.)

Plaintiffs next contend that "ADC appears to lack a reliable system to ensure that prisoners taking psychotropic medications and those with mental illness are

13

meaningfully evaluated on a regular basis by qualified mental health staff." (Pls. Ex. B, ¶ 24.) ADC policy requires that inmates taking psychotropic medications must be evaluated face-to-face by a psychiatrist or psychiatric nurse every 90 days. (Ex. 1, ¶ 15.) This is also a requirement in the Wexford contract. (Id.) In addition, ADC policy requires that inmates with a mental health score of 4 or 5 must be seen face-to-face by mental health or psychiatry staff every 30 days, and inmates with a mental health score of 3 must be seen face-to-face by mental health or psychiatry staff every 30 or 90 days, depending upon their subcode. (Id.) If an inmate's prescription for a psychotropic medication is about to expire, and the inmate cannot be seen face-to-face by the psychiatrist prior to the expiration, the psychiatrist may renew the prescription, and the inmate will be seen by the psychiatrist at the next available appointment. (Id., ¶ 16.) This is done to ensure that inmates do not experience a sudden stop in treatment, but is considered the exception rather than the rule. (Id.) Inmates experiencing problems with their psychotropic medications may submit an HNR at any time. (Id., ¶ 17.) Plaintiffs cite to the August 13, 2012 contract monitoring memorandum that informed Wexford that its then "current level" of psychiatry staffing was insufficient to meet these contractual requirements. As noted above, staffing has greatly improved since that time. (Ex. 2-U.)

Plaintiffs next contend that "it appears that ADC lacks a reliable system to ensure that prisoners needing a higher level of mental health care are transferred in a timely fashion to appropriate facilities." (Pls. Ex. B, ¶ 26.) Plaintiffs support their contention only with Dr. Crews' testimony that inpatient referrals from Perryville (one facility) to the inpatient facility at Phoenix occur on the same day and other times it takes week. (Id.) The timing for transferring an inmate to inpatient treatment varies, depending upon bed availability at the Phoenix Complex and the severity of an inmate's symptoms. (Ex. 1, ¶ 23.) The transfer process typically takes a week, however inmates will be transferred the same day in an emergency. (Id., ¶ 24.) Female inmates may also be transferred to the Arizona State Hospital for inpatient mental health treatment. (Id., ¶ 25.)

Plaintiffs next contend that "ADC policy bars prisoners classified as security

14

level  five,                                        , from being placed at Phoenix's

Flamenco Unit, an inpatient facility with more intensive treatment."  (Pls. Ex. B, ¶ 26.)

Plaintiffs' argument is based on Dr. Crews' testimony that it was her "understanding" that

a level five inmate could not be sent to Flamenco unless her classification level was

overridden. (Pls. Ex. V at 137.) This is incorrect.  ADC policy does not prohibit placement

of security level five inmates at Flamenco; all security levels are eligible.  (Ex. 1, ¶ 27.)

       Finally, Plaintiffs contend that "there is a serious question whether the

Phoenix facilities are currently able to provide appropriate inpatient care." (Pls. Ex. B,

¶ 27.) Plaintiffs base their assertion on a few isolated issues noted by the Phoenix

Complex contract monitor in an August 2012 contract monitoring memorandum,

including an observation that inmates were watching television, which was described as

group mental health programming.  (Id.)  The inpatient mental health treatment facilities

at the Phoenix Complex consist of Baker Ward (for male inmates) and Flamenco (for

female inmates).  (Ex. 1, ¶ 30.)  Both units are licensed by the State as psychiatric

hospitals. (Id.) Inmates attend individual and group counseling sessions that are delivered

in person, not through the television. (Id., ¶ 31.)  The Phoenix Complex has private offices

for individual assessment and counseling, as well as team treatment rooms, which permit

teams of clinicians to work collectively with an inmate.  (Id., ¶¶ 32-33.)

       Several Plaintiffs make claims that generally fall under the category of

mental health treatment.

                                        (Pls. Ex. F, ¶ 6; Ex. G,

¶¶ 6, 19; Ex. H, ¶¶ 3, 8-9; Ex. J, ¶ 7; Ex. R, ¶ 17; Ex. S, ¶ 14);


                                        (Pls. Ex. F, ¶¶ 6, 9-10; Ex. G, ¶ 6; Ex. J, ¶ 8; Ex. K, ¶¶ 6, 14;

Ex. M, ¶ 8; Ex. R, ¶ 17; Ex. S, ¶ 12);


                                        (Pls. Ex. G, ¶¶ 10, 13-18; Ex. I, ¶¶ 30-31, 34-38, Ex. K, ¶¶ 6, 14; Ex. L, ¶¶ 10,

13; Ex. M, ¶ 5; Ex. R, ¶ 16; Ex. S, ¶ 15.)

c.      Confinement

Plaintiffs contend that there is no ADC policy barring the housing of prisoners with serious mental illness in maximum custody cells.  (Pls. Ex. B, ¶ 28.)  This is true; there is no policy that prohibits an SMI inmate's placement in a maximum custody cell.[3]  (Ex. 1, ¶ 37.)  Inmates in these units, however, may be double or tripled celled and in some cases may be placed in dormitory-style housing.  (Id., ¶ 39.)  Plaintiffs further contend that "there is apparently no written policy requiring that a face-to-face mental health evaluation be conducted before placing a prisoner in" maximum custody cells. (Pls. Ex. E, ¶ 47.)  There is no requirement that an inmate receive a face-to-face mental health evaluation prior to being placed in a particular unit. (Ex. 1, ¶ 42.) However, prior to placement in maximum custody, security staff conducts an observational assessment of an inmate's condition. (Id.) If an inmate is injured, appears ill, or appears mentally or behaviorally unstable, medical staff will conduct an immediate face-to-face assessment. (Id.) Health services staff are notified within one hour of an inmate's placement in maximum custody, and nursing staff perform an immediate chart review to ascertain if any medical, dental, or mental health issues exist which contraindicate this placement or require a change or accommodation to the inmate's housing status. (Id.)

Plaintiffs next contend that "there is apparently no written ADC policy that provides for ADC mental health staff to take action when the mental health of a severely mentally ill—or any—prisoner deteriorates in isolation unless inpatient care is determined necessary." (Pls. Ex. E, ¶ 47.)  Plaintiffs mischaracterize Dr. Benjamin Shaw's testimony to support this claim.  Dr. Shaw was asked whether there is a written policy that "explicitly discusses what happens with a serious mentally ill prisoner in isolation if that prisoner get[s] worse." (Pls. Ex. T at 148.) Obviously a policy cannot explicitly address

---

[3] Contrary to Plaintiffs' repeated assertions, *Casey v. Lewis*, 834 F.Supp. 1477 (D. Ariz. 1993) did not hold that "allowing prisoners suffering from serious mental illness to be housed in isolation" violates the Eighth Amendment. (Motion at 11:18-21.) The court held that "lockdown as an *alternative* to mental health care for inmates with serious mental illnesses clearly rises to the level of deliberate indifference. *Id*. at 1549 (emphasis added). There is not even an allegation, much less any evidence, in this case.

1    every possible hypothetical need; instead it provides guidance and allows for flexibility.

2    Inmates who demonstrate acute signs or symptoms of significant mental health disorder

3    will be placed on mental health watch.  (Ex. 1, ¶¶ 44-49.)  The shift commander or health

4    care staff may order that an inmate be placed on watch if they observe or receive a report

5    from other staff that an inmate's mental health is deteriorating.  (Id., ¶ 50.)  An inmate can

6    also submit an HNR requesting treatment or medication changes.  (Id., ¶ 47.)

7                            d.    Suicide Prevention

8                Plaintiffs contend that "ADC policy does not require that a prisoner on

9    suicide watch be evaluated face-to-face by a psychiatrist," and that "ADC policy allows a

10   prisoner to be taken off suicide watch by an unlicensed mental health staff member."  (Pls.

11   Ex. B, ¶ 31.)  Inmates on suicide watch are evaluated face-to-face by licensed mental

12   health staff every 24 hours. (Ex. 1, ¶ 61.) This evaluation may be performed by a

13   psychiatrist, a psychologist, a psychiatric nurse, or a licensed psychology associate. (Id.)

14   Furthermore, only a licensed mental health provider is authorized to remove an inmate

15   from suicide watch. (Id., ¶ 64.) None of the Plaintiffs allege a specific harm or injury

16   resulting from these policies.

17                            e.    Chemical Agents

18               Plaintiffs next contend that "ADC policy permits the use of chemical agents

19   (such as pepper spray) on prisoners while they are on suicide watch or other mental health

20   watch, or when they are engaging in self-harm," and that "ADC policy also permits the

21   use of chemical agents on prisoners who are seriously mentally ill and those who are

22   taking psychotropic medications."  (Pls. Ex. B, ¶ 32.)  ADC policy regarding the use of

23   force permits the use of chemical agents in only a narrow range of circumstances. (Ex. 1,

24   ¶ 66.)  The same use of force continuum applies to inmates who are seriously mentally ill,

25   taking psychotropic medications, or on suicide watch as to all other inmates. (Id.) ADC

26   policy permits the use of chemical agents and physical restraints if a person is actively

27   hurting himself and fails to respond to verbal directives. (Id., ¶ 67.) In such a

28   circumstance, use of force may be necessary to prevent serious harm to the inmate.  (Id.)

17

The use of force continuum outlined in ADC policy recognizes that the use of chemical agents on an inmate actively self-harming is safer than employing physical restraints. (Id.)

(Pls. Ex. F, ¶ 8; Ex. J, ¶ 11; Ex. M, ¶ 10; Ex. S, ¶ 9.)

               f.      Prisoners on Psychotropic Medications Subjected to Heat

Plaintiffs contend that ADC policy does not provide adequate protection against heat injury for those who are on psychotropic medications.  (Pls. Ex. B, ¶ 34.) Plaintiffs base this allegation on testimony from Dr. Crews regarding an ADC inmate who died from heat stroke in 2009 after being held in an outdoor holding pen for several hours without shade or access to water.  (Pls. Ex. V at 103:5-104:3.)  Following that inmate's death, and years before this lawsuit was filed, ADC stopped using uncovered outdoor enclosures as holding cells. (Ex. 1, ¶ 70.) These enclosures are now used as exercise enclosures and have been modified to include shade, misters, and access to water.  (Id., ¶¶ 70-71.) If an inmate reports heat intolerance, and the psychiatrist or psychiatric nurse determines that the inmate's psychotropic medication is contributing to their heat intolerance, the provider must discuss treatment alternatives with the inmate, including changing medications. (Id., ¶ 72.) If the inmate and psychiatric provider agree that changing medications is not in the inmate's best interest, the psychiatric provider must consult with the medical provider regarding a duty status to minimize heat exposure.  (Id.)

Plaintiffs further allege that "ADC has no policy specifying temperature limits for areas housing prisoners taking psychotropic medications."  (Pls. Ex. B, ¶ 36.) ADC physical plant standards regarding maximum indoor temperatures apply to all housing areas for all inmates, regardless of whether they are taking psychotropic medications. (Ex. 1, ¶ 74.) The physical plant standards require a maximum indoor temperature of 78°F-80°F.  (Id., ¶ 75.)

(Pls. Ex. H, ¶ 10.)

4.     Conditions of Confinement in Maximum Custody Cells[4]

a.     Exercise

Plaintiffs contend that ADC "[p]olicy allows for only 6 hours of exercise a week in three two hour blocks which means that prisoners are essentially confined to their cells for 23-24 hours per day." (Pls. Ex. E., ¶ 43.) Inmates in maximum custody cells are afforded 6 hours of outdoor exercise per week, in two hour blocks, three times weekly. (Ex. 4, ¶ 10.) Unless they are in the Max Phase Program or mental health programming, who can recreate in groups in the recreation field, they exercise in enclosures that are constructed of chain link fencing or steel mesh with a cloth shade screen roof and misting systems. (Id., ¶¶ 7-10.) These enclosures provide the inmates with access to fresh air and sunshine, and allow for communication between inmates in adjoining enclosures. (Id.) The exercise enclosures at SMU I and Browning consist of concrete walls with a steel mesh ceiling that is open to sky, and there is a vision window in the door leading into the exercise enclosure. (Id.) ADC has recently added 10 additional exercise enclosures for mental health inmates at each of those units. (Id.) Only Plaintiffs Brislan, Thomas, and allege the denial of 6 hours per week of exercise, and the extent of each alleged deprivation is different. (Pls. Ex. F, ¶ 11; Ex. M, ¶ 6; Ex. R, ¶ 18.)

b.     Educational Programming

Plaintiffs contend that "[p]risoners who are housed in the Special Management Unit (SMU) and those who are sentenced to death (which automatically results in their isolated confinement) are denied access to the prison's education programming." (Pls. Ex. E, ¶ 44.) This restriction is mandated by statute, which exempts inmates younger than 21. *See* A.R.S. § 31-240(B). (Ex. 4, ¶¶ 11-12.) None of the Plaintiffs specifically allege a harm resulting from the denial of educational programming.

---

[4] Courts have repeatedly upheld the constitutionality of the conditions in ADC's maximum custody cells (and specifically exercise, 24-hour lighting, food, and social interaction). *See, e.g., Baptisto v. Ryan*, 2006 WL 798879, at ** 27-28, 33 (D. Ariz. 2006); *Hampton v. Ryan*, 2006 WL 3497780, at **11-15 (D. Ariz. 2006), *aff'd*, 288 F.App'x 404 (9th Cir. 2008); *Walker v. Schriro*, 2006 WL 2772845, at **7-9 (D. Ariz. 2006).

1

c.      Security Lighting

2        Plaintiffs contend that "ADC's policies … allow for 24 hour illumination in

3  some isolation cells."  (Pls. Ex. E, ¶ 44.)  All suicide and mental health watch cells have

4  security lights in the cell that automatically turn on during evening hours. (Ex. 4, ¶ 14.)

5  They are in the cells so that officers conducting security checks can see the inmate and

6  verify his or her safety. (Id.) Some maximum custody cells have security lights in the cells

7  that remain on, and some non-watch maximum custody cells have security lights in the

8  cells that can be controlled by the inmate or by staff. (Id.) And yet other maximum

9  custody cells have no security lights.  (Id.)  Brislan is the only Plaintiff who alleges a

10  harm resulting from these security lights.  (Pls. Ex. F, ¶ 11.)

11

d.      Property

12        Plaintiffs contend that "ADC's policies … allow for … limited property,

13  including lack of access to TVs or radios." (Pls. Ex. E, ¶ 44.)  This is not correct.  Inmates

14  in maximum custody cells are permitted to have televisions or radios in their cells unless

15  the privilege has been taken away as a disciplinary sanction.  (Ex. 4, ¶ 15.)  None of the

16  Plaintiffs allege a harm resulting from the denial of property.

17

e.      Meals

18        Plaintiffs contend that "ADC's policies … allow for … infrequent, reduced

19  calorie meals."  (Pls. Ex. E, ¶ 44.)  Inmates in maximum custody cells receive twice-a-day

20  food delivery, which is an amount of food equal to three meals: in the morning, the

21  inmates receive a "mega snack," which provides food for both breakfast and lunch, and in

22  the evening, inmates receive a hot dinner. (Ex. 4, ¶ 13.)  This diet averages 2600 calories

23  per day. (Id.) The twice-a-day feeding schedule provides the same number of total calories

24  that were provided in the previous three-times a-day feeding schedule. (Id.) It is 300

25  calories less than that afforded to inmates in non-maximum custody cells due to the

26  inmates' restricted movement in maximum custody cells. (Id.) Only two Plaintiffs –

27  Brislan and Thomas – allege a harm (weight loss) resulting from this food-delivery

28  system.  (Pls. Ex. F, ¶ 14; Pls. Ex. M, ¶ 11.)

20

## II.      THIS LAWSUIT SHOULD NOT BE CERTIFIED AS A CLASS ACTION

Plaintiffs bear the burden of establishing the requirements of both Rule 23(a) and Rule 23(b)(2).  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  In doing so, they "must provide facts … ; simply repeating the language of the rules is insufficient." *In re Paxil Litigation*, 212 F.R.D. 539, 543 (C.D. Cal. 2003); *see also Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc."). The decision to certify a class is entirely discretionary. *Estate of Felts v. Genworth Life Ins. Co.*, 250 F.R.D. 512, 515 (W.D. Wash. 2008).

### A.      Commonality is Lacking

The purpose in requiring commonality is to "save[] the resources of both the courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982). Thus, class certification is appropriate only when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." *Id*. (citation omitted).  Recently presented with "one of the most expansive class actions ever," the Supreme Court further refined the necessary showing. *Wal-Mart*, 131 S. Ct. at 2546. The Court held that, although "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury,'" it is no longer sufficient to allege that the class members have all suffered a violation of the same provision of law. *Id*. at 2551. *Id*. Nor does commonality turn on the mere existence of common questions, "even in droves." *Id*. Rather, what matters is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id*. Thus, the common question must be capable of producing a common answer "in one stroke." *Id*. at 2552.  In determining whether a common question will generate a common answer, a court must consider any

dissimilarities between class members. *Id.* at 2551, 2556. This is because dissimilarities within the proposed class can "impede the generation of common answers." *Id.*

### 1.   Health Care Claims

Plaintiffs proffer common class *characteristics* and common *legal theories*, but do not – and cannot – provide a single common *question of law or fact* that can produce a common answer "in one stroke." That Plaintiffs and the purported class are all ADC inmates and ADC "policies, procedures, and practices are applicable to all ADC prisons and employees" are merely facts shared by the class; they are not questions of fact. (Motion at 2:22-24.) Moreover, the question, "whether Defendants Ryan and Pratt are deliberately indifferent to Class members' health and safety" (id. at 11:1-2) is precisely the type of question that the Supreme Court held to be insufficient. *See Wal-Mart*, 131 S. Ct. at 2551 ("[Rule 23(a)(2)] is easy to misread, since any competently crafted class complaint literally raises common questions. For example: … Is that an unlawful practice? … Reciting these questions is not sufficient to obtain class certification."). Plaintiffs' list of "system-wide policies and practices" fairs no better, as they are just their own legal conclusions. (Motion at 12:5-17:18.) *See Falcon*, 457 U.S. at 157 (allegation that racial discrimination has occurred "neither determines whether a class action may be maintained … nor defines the class that may be certified"); *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280, 1289 (10th Cir. 1999) ("We refuse to read an allegation of systematic failures as a moniker for meeting the class action requirements. Rule 23(a) requires a common question of law or fact.").

Plaintiffs' purported class is doomed because of the nature and breadth of the claims they are trying to make. To prove an Eighth Amendment claim for denial of adequate health care, an inmate must demonstrate a "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). "A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (internal quotations omitted). A prison official is deliberately

indifferent if he or she knows of and disregards a serious medical condition, or when an official is aware of facts from which the inference could be drawn that a substantial risk of harm exists, and actually draws such an inference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). In determining deliberate indifference, a court must "scrutinize the particular facts and look for substantial indifference in the individual case, indicating more than mere negligence or isolated occurrences of neglect." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990). If a claim alleges a delay in treatment, the prisoner must also show that the delay caused "substantial harm." *Id.* at 1335.

Thus, by their very nature, claims of inadequate health care turn on fact-specific inquiries.[5] For each inmate's claim, the court must decide: (1) whether the inmate's alleged medical need was "serious"; (2) whether medical staff was aware of the inmate's medical need; (3) whether and to what extent the inmate received treatment; and (4) the extent of any harm or injury sustained. For those claims that involve delayed treatment (which is the majority of Plaintiffs' claims), the court must also decide: (5) whether the delay in treatment caused the inmate "substantial harm." Thus, the facts and circumstances of each inmate's medical claim will dictate whether there was a constitutional violation. They cannot all be resolved "in one stroke" with one answer.[6]

---

[5] *See Kress v. CCA of Tennessee*, 694 F.3d 890, 893 (7th Cir. 2012) ("[C]laims of inadequate medical care by their nature require individual determinations, as the level of medical care required to comport with constitutional and statutory standards will vary depending on each inmate's circumstances, such as preexisting medical conditions."); *Stevens v. Harper*, 213 F.R.D. 358, 381-82 (E.D. Cal. 2002) ("Cases involving personal injury and inadequate medical care are particularly fact specific.").

[6] *Compare McGuckin v. Smith,* 974 F.2d 1050, 1062 (9th Cir. 1992) (7-month delay in providing inmate medical care for medical condition that forced him to endure "unnecessary pain" sufficient to present colorable § 1983 claim); *Hunt v. Dental Dep't,* 865 F.2d 198, 201 (9th Cir. 1989) (finding a three-month delay of inmate's treatment for broken teeth and bleeding and infected gums to be deliberately indifferent); *Shapley v. Nevada Bd. of State Prison Com'rs,* 766 F.2d 404, 407 (9th Cir. 1985) (one-year delay in providing knee surgery to inmate, resulting in serious aggravation of injury and permanent impairment, may be actionable); *with Amarir v. Hill*, 243 F.App'x 353, 354 (9th Cir. 2007) (no Eight Amendment violation where inmate received treatment for dental needs on nine separate occasions over a thirteen month span); *Wood,* 900 F.2d at 1335 (11–day delay in treatment for broken orthopedic pin in inmate's shoulder did not cause sufficient harm); *Mayfield v. Craven,* 433 F.2d 873, 874 (9th Cir. 1970) (11–day delay in treating inmate's "serious facial bone fractures" did not violate Eighth Amendment); *Thompson v. Shutt,* 2011 WL 674049, at **3–5 (E.D. Cal. 2011) (22-day delay between a recommendation

23

1    Commonality is particularly lacking in this case on several levels.  First, the

2    allegations include medical care, dental care, and mental health care.  For example,

3                                                                      (Pls. Ex.

4    N, ¶¶ 6-29);

5                              (Pls. Ex. K, ¶ 14);  and

6

7        (Pls. Ex. F, ¶ 3).  Second, there are different categories within each sub-category.

8    For example, within medical care,

9                                              (Pls. Ex. H, ¶ 4), and

10                                             (Pls. Ex. P,

11   ¶ 5).  Third, the claims falling within each (sub) sub-category are so markedly different in

12   substance that a determination of whether there was a constitutional violation depends on

13   a close evaluation of the specific facts of each one. For example, under Medical

14   Care/Access to Treatment,

15                            (Pls. Ex. R, ¶ 19);

16                            (Pls. Ex. Q, ¶ 3);

17

18       (Pls. Ex. P, ¶ 9.)  Under Dental Care/Triage Process,

19                            (Pls. Ex. I, ¶ 23);

20                        (Pls. Ex. Q, ¶ 18); and

21                            (Pls. Ex. H, ¶¶ 22-25).  Under

22

---

23   for surgery and an appointment with the surgeon for a broken finger did not constitute
     deliberate indifference); *Moore v. Thomas*, 653 F.Supp.2d 984, 1002 (N.D. Cal. 2009)

24   (30-day delay in treatment for inmate's fractured jaw did not constitute Eighth
     Amendment violation where record showed that "the delay did not cause substantial harm

25   in light of the fact that the type of jaw fracture and additional injuries he sustained are
     ones that would heal normally over a relatively short period of time"); *Smrz v. Corr. Med.*

26   *Serv., Inc.*, 2009 WL 2591678, at *5 (D. Idaho 2009) (3-month delay in scheduling
     surgery did not establish deliberate indifference); *Clement v. California Dept. of Corr.*,

27   220 F.Supp.2d 1098, 1106 (N.D. Cal. 2002) (3-month delay in performing colonoscopy,
     which led to discovery of colon cancer, did not violate Eighth Amendment where inmate

28   failed to show resulting harm).

Mental Health Care/Medication Management,

(Pls. Ex. I,

¶ 27);

(Pls. Ex. J, ¶ 5); and

(Pls. Ex. M, ¶ 4).   Under Mental Health Care/Treatment,

(Pls. Ex. I, ¶ 31,

34-38);

(Pls. Ex. F, ¶ 6); and

(Pls. Ex. G, ¶ 10). Whether any of these allegations amounted to a constitutional violation — and Defendants dispute their underlying allegations — cannot be answered in one stroke.

Citing *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001), Plaintiffs argue that commonality is satisfied because they are challenging system-wide policies and practices that affect all class members.   *Armstrong* was a class action lawsuit challenging California's policies regarding parole revocation hearings.   *Id*. at 854.   The plaintiffs — inmates with various disabilities — alleged that the policies discriminated against them on the basis of disability in violation of the ADA and Rehabilitation Act. *Id*. The defendants did not challenge the fact that the class members' disabilities qualified as a disability under the Acts, but did challenge the district court's finding of commonality based on their differing disabilities. *Id*. at 854. Specifically, the defendants argued that separate representative lawsuits (subclasses) should have been filed for each category of disability. *Id*. at 868. The Court "reject[ed] this approach to class-action litigation," noting that it had held in a previous civil-rights lawsuit, *LaDuke v. Nelson*, 762 F.2d 1318, 1332 (9th Cir. 1985), "that commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Id*. at 868.   In those circumstances, "individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality." *Id*.  Thus, the differing disabilities

did "not justify requiring groups of persons with different disabilities" to prosecute separate actions because they had all suffered similar harm – the written policies and practices deprived them of "meaningful access" to a fair hearing.  *Id*. at 861–864, 868.

*Armstrong* does not relieve Plaintiffs of their failure to demonstrate a common question of law or fact *in this case* simply because they allege they are challenging system-wide policies and practices. The differences in disabilities in *Armstrong* did not defeat commonality because the differing disabilities did not dictate whether there was an underlying statutory violation; they all qualified as disabilities under the Acts.  *LaDuke*, the case *Armstrong* relied upon, recognized this key distinction:  "Of course, if material variations exist as to the law or facts involved with individual class member injuries, then the commonality requirement would not be met." 762 F.2d at 1332. In this case, the differing health conditions, treatment, and alleged delay/harm *are* "material variations" that dictate whether there was a constitutional violation.   These dissimilarities cannot be ignored because they "impede the generation of common answers." *Wal-Mart*, 131 S. Ct. at 2551, 2556.[7]

Plaintiffs have also failed to show that there is a system-wide policy or practice of inadequate health care, a necessary prerequisite to any reliance on *Armstrong*. A challenge to a system-wide policy or practice requires "significant proof" that the alleged policy or practice is in fact system-wide.  *Wal-Mart Stores*, 131 S. Ct. at 2553; *Mathis v. GEO Group, Inc.*, 2012 WL 600865, at * 6 (E.D.N.C. 2012).  To build their case, Plaintiffs point to alleged ADC "practices" and/or "unwritten policies." As

---

[7] Plaintiffs' reliance on *Rodriguez v. Hayes*, 591 F.3d 1105, 1122-23 (9th Cir. 2010) fails for the same reason.  In *Rodriguez*, a class of detainees challenged an ICE policy that required they be detained for more than six months without a bond hearing while engaged in immigration proceedings.  *Id*. at 1111.  The defendants disputed commonality, arguing that the class members were placed in detention "for different reasons and under the authority of different statutes."  *Id*. at 1122.  The court rejected this argument because, as in *Armstrong*, these differences were not material to the issue "at the heart of each class member's claim," i.e., whether "an individual [may] be detained for over six months without a bond hearing under a statute that does not explicitly authorize detention for longer than that time without generating serious constitutional concerns?"  *Id*. at 1123. Any other reading of *Armstrong* and *Rodriguez* would be in direct conflict of the Supreme Court's subsequent holding in *Wal-Mart*.

demonstrated above in Section I(B), however, these alleged practices and/or unwritten practices are based either on general, non-specific assertions or on isolated occurrences involving a handful of inmates or reports from a few facilities reflecting a one-week period several months ago.  Plaintiffs provide no statistical evidence, and speak only in terms of generalities.  This is not "significant proof" of a system-wide policy.

The remaining cases cited by Plaintiffs certified class actions that challenged discrete policies and/or did not involve questions that turned on material individual circumstances. (Motion at 13:20-14:15.) And, notably, none of the cases certified a class of inmates challenging medical care, dental care, or mental health care.[8] Courts that have squarely addressed commonality arguments in inmate-health care cases have refused to certify the class.[9]  This Court should refuse to do so here.

_____

[8] *Brown v. Plata*, 131 S. Ct. 1910 (2011) and *Casey v. Lewis*, 834 F.Supp. 1477 (D. Ariz. 1993) involved inmate claims of inadequate medical/mental health care, but neither of those opinions addressed the propriety of class certification.

[9] *See, e.g.*, *Mathis*, 2012 WL 600865, at **3, 6 (denying motion to certify class of inmates challenging prison's medical, dental, and mental health care on commonality grounds because complaint merely challenged "a constellation of unspecified 'organizations, systems, policies, procedures, practices, acts, and omissions' that allegedly have led to unconstitutional individual deprivations of medical attention"); *Schilling v. Kenton County, Ky.*, 2011 WL 293759, at **1, 9 (E.D. Ky. Jan. 27, 2011) (denying motion to certify class of inmates challenging prison's provision of medical care on commonality grounds because in order to resolve whether inmates suffered an unconstitutional deprivation of medical care required – plaintiffs' purported common question of law – would require the court to "delve into the specific facts of each inmate's incarceration and the medical needs relative to that inmate" and thus the "different circumstances relative to each inmate, which may dictate different outcomes and different damages, militates against use of the class action"); *Smith v. Sheriff of Cook County*, 2008 WL 1995059, at **1–2 (N.D. Ill. 2008) (denying motion to certify class of inmates challenging jail's provision of dental care on commonality and typicality grounds because "[e]ach plaintiff's case would necessarily be different," including showing of harm and causation); *Stevens*, 213 F.R.D. at 381–82 (denying motion to certify class of wards challenging mental health care due to staffing shortages, inadequate facilities, and poor screening on commonality grounds because "[i]nstead of identifying a specific policy or practice that affects all class members … plaintiffs have simply pointed to a general area, the provision of mental health services, where the CYA may need improvement" and "class members with different mental illnesses may have specialized needs"); *see also Snead v. Mohr*, 2012 WL 5988774, at **1–2 (S.D. Ohio 2012) (denying motion to certify class of inmates challenging prisons' provision of medical care on commonality grounds because "each suffer from different diseases, have different medical needs, and assert distinct legal claims, many against defendants who are not common to both").

2.      Maximum Custody Claims

Like inadequate health care claims, prisoner conditions of confinement claims are inherently case specific.  *See DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("An inquiry into conditions of confinement by necessity relies on the particular facts of each situation."); *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) ("No static 'test' can exist by which courts determine whether conditions of confinement are cruel and unusual.").  Whether a prisoner's exposure to a particular condition amounts to a constitutional violation depends largely on the duration of that exposure.  *See Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000) ("The circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred."); *see also Hutto v. Finley*, 437 U.S. 678, 686–87 (1978) ("[T]he length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards.").

Plaintiffs challenge a constellation of conditions in ADC's maximum custody cells, including exercise, educational programming, 24-hour lighting, property, and meals.  They further argue that these conditions are exacerbated for inmates who are SMI.  Like their health care claims, class resolution is not suitable because determining whether the alleged conditions amount to a constitutional violation will require an individualized determination for each class member. Each claim must be addressed individually in light of the facts and circumstances surrounding the prisoner's exposure to the condition, including its duration. As discussed above, inmates in maximum custody cells are not exposed to the exact same conditions, nor are they exposed to the same conditions for the same amount of time.  *See Hoptowit v. Ray*, 682 F.2d 1237, 1246–47 (9th Cir. 1982) (although a court may not find an Eighth Amendment violation based on the "totality of conditions," "the court must consider the effect of each condition in the context of the prison environment, especially when the ill-effects of particular conditions are exacerbated by other related conditions").  It is the actual exposure and duration that will determine whether a class member endured unconstitutional conditions.

Plaintiffs' own claims demonstrates this point.  For example, <u>Brislan</u> claims that exercise is "often canceled" (Pls. Ex. F, ¶ 11); <u>Thomas</u> claims that he gets "no meaningful" exercise (Pls. Ex. M, ¶ 6); and <u>Polson</u> claims that he was "unable to go to rec except for maybe once a week" and that "sometimes" his recreation was "cut" (Pls. Ex. R, ¶ 18).  Furthermore, not all maximum custody cells are equipped with 24-hour lighting; not all inmates in maximum custody cells are deprived of a television or radio; not all inmates in maximum custody cells are SMI; and not all inmates in maximum custody cells are housed for the same amount of time.  Whether a constitutional violation has occurred can be resolved only by assessing each individual class member's exposure to the alleged conditions, and then determining whether those conditions violated that individual's constitutional rights.  This cannot be done on a class-wide basis.[10]

### B.    <u>Typicality is Lacking</u>

Like commonality, the typicality requirement serves as a "guidepost[] for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13. "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Id.* at 156 (quotation omitted). Although their claims need not be identical, they must be "reasonably coextensive with those of absent class members." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). "[W]hen 'proof of a violation requires individualized

---

[10] <u>*Compare*</u> *Foster v. Runnels*, 554 F.3d 807, 812–13 (9th Cir. 2009) (denial of 16 meals in 23 days was sufficiently serious deprivation); *Lopez v. Smith*, 203 F.3d 1122, 1133 (9th Cir. 2000) (deprivation of outdoor exercise for 45 days constituted cruel and unusual punishment); <u>*with*</u> *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (no Eighth Amendment claim for 3-week deprivation of outdoor exercise where prisoner able to exercise in cell and leave cell for shower); *Branham v. Meachum*, 77 F.3d 626, 630–31 (2nd Cir. 1996) (keeping inmate on lockdown and "full restraint" status without outdoor exercise for a period of approximately 22 days did not violate Eighth Amendment); *Abrams v. Church*, 2008 WL 426501, at *7 (E.D. Wash. 2008) (no Eighth Amendment violation for diet of peanut butter sandwiches for 2 days without consequences to prisoner's health); *Jorden v. Arnold*, 408 F.Supp. 869, 876–77 (M.D. Pa. 1976) (Eighth Amendment not violated when inmates only allowed 2 hours of exercise per week).

1    inquiry,' a common legal theory may not be enough to establish typicality." *Martinez v.*

2    *Brown*, 2011 WL 1130458, at *10 (S.D. Cal. 2011) (quotation omitted).

3              Plaintiffs' boldly assert that "the injuries suffered by the named Plaintiffs

4    are similarly typical of the Class as a whole," and relegate to a footnote block citations to

5    the Plaintiffs' declarations. The purported injury is that they were all "subject to an

6    unreasonable risk of harm."  This is far too abstract to show typicality.  This was likely

7    done to cover the obvious:  the Plaintiffs' injuries are not "reasonably coextensive."  First,

8    not all of the Plaintiffs allege medical, dental, and mental health injuries or injuries

9    resulting from conditions of confinement in maximum custody cells. Plaintiffs Brislan,

10   Gamez, Rodriguez, and Verduzco have no medical or dental claims; Plaintiffs Licci,

11   Jensen, and Hefner have no dental or mental health claims; Plaintiff Parsons has no

12   medical claims; Plaintiffs Smith and Thomas have no dental claims; Plaintiff Wells has no

13   mental health claims; and Plaintiffs Chisholm, Parsons, Rodriguez, Swartz, Licci, Jensen,

14   Hefner, Wells, and Verduzco have no maximum custody cell claims.  Moreover, Plaintiffs

15   do not allege any harm resulting from several alleged practices (e.g. intake screening).

16   Plaintiffs elected to pursue just one class, and it is not this Court's burden to construct

17   subclasses for them. *U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 408 (1980).

18             Even those Plaintiffs that allege medical, dental, or mental health claims do

19   not raise similar injuries.  In fact, many of them do not allege a resulting harm or injury at

20   all.   And when they do allege a specific harm, they are different. For example,

21                                                             (Pls. Ex. P, ¶¶ 6-8);

22                                                                               (Pls. Ex.

23   N, ¶ 4);                                                    (Pls. Ex. Q, ¶¶ 3–5);

24

25             (Pls. Ex. L, ¶ 9);

26                                              (Pls. Ex. J, ¶ 5); and

27                                              (Pls. Ex. K, ¶¶ 10-12). These varying injuries destroy

28

30

1  typicality.[11]

2          **C.      Rule 23(B)(2) Cannot be Satisfied**

3          A class can only be certified if "the party opposing the class has acted or

4  refused to act on grounds that apply generally to the class so that final injunctive relief or

5  corresponding declaratory relief is appropriate respecting the class as a whole." "The

6  requirement that a proposed class be amenable to group remedies implies a requisite

7  cohesion within the class such that a class-wide injunction would satisfy Federal Rule of

8  Civil Procedure 65(d) and would not require tailoring to individual class members."

9  *Martinez*, 2011 WL 1130458, at *13.  Thus, the Court "cannot certify a Rule 23(b)(2)

10  class if it finds that: (1) a putative class' proposed injunction is too general to pass Rule

11  65(d) muster or (2) the allegedly wrongful conduct … cannot be corrected without

12  specific tailoring of the injunction to individual members."  *Id*.  Rule 65(d)(1) requires

13  that an injunction "state its terms specifically" and "describe in reasonable detail–and not

14  by referring to the complaint or other document–the act or acts restrained or required."

15          Plaintiffs' proposed injunction exceeds Rule 23(b)(2)'s boundaries.[12]

16          [11] *See Schilling v. Kenton County, Ky.*, 2011 WL 293759, at *10 (E.D. Ky. Jan. 27,
17  2011) (denying motion to certify class of inmates challenging prison's provision of
    medical care on typicality grounds because the "facts relative to each Plaintiff present
18  varying degrees of deprivation, sufficiently distinct that they cannot be said to be typical"
    and the medical injuries among the named plaintiffs varied); *Kress v. CCA of Tennessee,*
19  *LLC*, 272 F.R.D. 222, 229 (S.D. Ind. 2010), *aff'd by*, 694 F.3d 890 (7th Cir. 2012)
    (denying motion to certify class of inmates challenging medical care on typicality grounds
20  because "[c]laims of inadequate medical care by their nature require individual
    determinations, as the level of medical care required to comport with constitutional and
21  statutory standards will vary depending on each inmate's circumstances, such as
    preexisting medical conditions"); *Bogle v. Raines*, 2010 WL 3890863, at *3 (W.D. Mich.
22  2010) (denying motion to certify class of inmates challenging jail's "no narcotics" policy
    on typicality grounds because evidence did not support existence of such a policy and
23  instead showed that plaintiffs were "simply dissatisfied with the medical care" they
    received and therefore "each potential class member's claims are subject to an
24  individualized medical assessment"); *Smith*, 2008 WL 1995059, at **1–2 (denying
    motion to certify class of inmates challenging jail's provision of dental care on
25  commonality and typicality grounds because "[e]ach plaintiff's case would necessarily be
    different," including showing of harm and causation).

26          [12] Although, as Plaintiffs point out, Rule 23(b)(2) was adopted to accommodate
    civil rights actions, "[t]he mere fact that a complaint alleges violation of a civil right does
27  not in itself ensure that Rule 23's requirements are satisfied." *Shook v. Bd. of County*
    *Commissioners of County of El Paso*, 543 F.3d 597, 610 (10th Cir. 2008) (quoting *East*
28  *Texas Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977)).

1    Despite the highly individualized nature of their claims — which varies from Plaintiff to

2    Plaintiff and facility to facility — they seek relief "at a stratospheric level of abstraction."

3    *Shook*, 543 F.3d at 604.  They seek an order requiring "sufficient" staffing levels, "timely"

4    access to care, "reliabl[e]" screening, "[t]imely and competent" responses to emergencies,

5    "[t]imely" medication prescription and distribution and medical supplies "necessary" for

6    "adequate" care, "[t]imely" access to "competent" care for chronic diseases, "[b]asic"

7    sanitary conditions, "[t]imely" access to "necessary" mental health treatment, a "regular"

8    assessment of health care, and prohibition of conditions that puts inmates at "substantial

9    risk of serious physical and mental harm."  (Dkt. # 1 at 73–74.)  Such an injunction would

10   violate Rule 65(d)'s specificity requirement.[13]  And because Defendants did not act on

11   grounds that applied to the class generally, this Court would be forced to correct any

12   individual violations by crafting an injunction that is specifically tailored to each class

13   member.  Courts that have addressed similar health care claims have reached the same

14   conclusion.[14]  This Court should not endeavor on such an ambitious request.  *See Miller*

15

16          [13] *See Martinez*, 2011 WL 1130458, at *15 (a proposed injunction that "attempts to
     build flexibility into its terms" violates Rule 65(d)'s specificity requirement; "Individual
17   wardens at CDCR facilities would ostensibly be placed under the contempt power of the
     Court and exposed to sanctions for violating an Injunction whose terms, at worst, are
18   unfixed and, at best, vary according to the institution. The Court would be required to
     determine, for each facility (or subdivision therein), what constitutes a "reasonable"
19   restriction in light of the needs of an inmate group. Where the relief sought by a putative
     class needs to be tailored to unenumerated subgroups, a class action is not appropriate.");
20   *Doe v. Unified Sch. Dist. 259*, 240 F.R.D. 673, 681–82 (D. Kan. 2007) ("Plaintiffs do not
     meet the requirements for Rule 23(b)(2) because the requested injunctive relief is vague
21   and generalized, *i.e.,* to train staff and administrators, to enforce its policies, and to redraft
     policies." … [P]laintiffs ask the court not only to enjoin defendant from engaging in
22   unlawful practices, but to enforce all policies regarding sexual harassment. This
     generalized request is essentially a statement of policy which does not address the
23   problem and cannot be fashioned in a manner which will satisfy the requirements of the
     federal rules.").

24          [14] *See, e.g., Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009) (in lawsuit
     by inmates challenging mental health care, class-wide injunctive relief did not satisfy Rule
25   23(b)(2) where inmates sought "to enjoin a 'wide range of behavior' against the 'broad
     class framed in the complaint'" but "eschew[ed] any effort to give content" to the relief
26   requested, and could not demonstrate that "'injunctive relief-relative to the class-is
     conceivable and manageable without embroiling' the district court 'in disputes over
27   individualized situations and constantly shifting class contours'"); *Shook*, 543 F.3d at 600,
     605, 608 (denying motion to certify class of mentally ill inmates challenge to mental
28   health care, insufficient protections against self-inflicted injuries, inadequate methods of

                                           32

*ex rel S.M. v. Bd. of Educ. of Albuquerque Pub. Sch.*, 455 F.Supp.2d 1286, 1297 (D.N.M. 2006) ("[C]lass certification under Fed.R.Civ.P. 23 is not a broad license for federal courts to usurp the policy-making roles of other branches of state or local government.").

### D.    Plaintiff Parsons Should be Dismissed

Plaintiff Parsons should be dismissed from this case. He is no longer in ADC's custody (Ex. 2, ¶ 7), and, because there are 13 other class representatives available to pursue this lawsuit, the "capable of evading review" exception to the mootness doctrine should not be invoked. Furthermore, he is not an adequate representative. A class representative must be able to "prosecute the action vigorously on behalf of the class." *Hanlon*, 150 F.3d at 1020. In determining adequacy, a court must consider the "zeal and competence" of the class representative. *Fendler v. Westgate-California Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975). After this case was filed, Parsons made several comments that put in question his ability to continue as a class representative. In phone calls to friends/relatives on July 25 and July 26 2012, Parsons stated: he had a "fall out with the attorneys"; he "really" does not "care" about other allegations in the complaint; he wanted his attorney to "amend [him] out"; he "can't in all … honesty… pursue issues" that are not his own; he is "compromising" his "morals" by proceeding; it is "not in [his] best interest" to continue; he does not "want to be a part of it"; he is "not comfortable with" a lot of things; "I'm not going to do it. I'm not going to do it"; "just take me out"; he is "not gonna compromise" his "principals"; he is "not sincere" in proceeding with the dental and mental health issues; and he would "deal with" his own claims once he gets out. (Ex. 5, ¶¶ 6-7; Ex. 5-A, File 10.61.0.21, at :30-8:30, 10:00-13:30 & File 10.62.0.21, at 6:06-8:24.)

### CONCLUSION

For these reasons, the Motion for Class Certification should be denied.

---

distributing medication, and screening mental health issues, under Rule 23(b)(2), because proposed injunction ordered a "wide range of behavior conformed to an essentially contentless standard, bounded only by reference to ambiguous terms like "reasonable" behavior or "adequate" treatment). With the exception of *Rodriguez*, none of the cases cited by Plaintiffs involved a Rule 23(b)(2) analysis. (Motion at 18:19-19:5.)

1     DATED this 8th day of January 2013.

2         STRUCK WIENEKE & LOVE, P.L.C.

3

4       By /s/ *Nicholas D. Acedo*

5         Daniel P. Struck
         Kathleen L. Wieneke

6         Rachel Love
         Timothy J. Bojanowski

7         Nicholas D. Acedo
         Courtney R. Cloman

8         Ashlee B. Fletcher
         Anne M. Orcutt

9         STRUCK WIENEKE & LOVE, P.L.C.
         3100 West Ray Road, Suite 300

10        Chandler, Arizona  85226

11        Arizona Attorney General Thomas C. Horne
         Office of the Attorney General

12        Michael E. Gottfried
         Katherine E. Watanabe

13        Lucy M. Rand
         Ashley B. Zuerlein

14        Assistant Attorney General
         1275 W. Washington Street

15        Phoenix, Arizona 85007-2926

16        *Attorneys for Defendants*

17  2720562.1

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on January 8, 2013, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:          ahardy@prisonlaw.com

Amy Fettig:            afettig@npp-aclu.org

Caroline N. Mitchell:  cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:    ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:   DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

Daniel Joseph Pochoda: dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

David Cyrus Fathi:     dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:        dspecter@prisonlaw.com

James Duff Lyall:      jlyall@acluaz.org; gtorres@acluaz.org

Jennifer Ann Alewelt:  jalewelt@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

John Howard Gray:      jhgray@perkinscoie.com; slawson@perkinscoie.com

Kelly Joyce Flood:     kflood@acluaz.org; gtorres@acluaz.org

Kirstin T. Eidenbach:  keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com

Matthew Benjamin de Mee: mdumee@perkinscoie.com; cwendt@perkinscoie.com

Michael Evan Gottfried:Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov

Sara Norman:           snorman@prisonlaw.com

Sophia Calderon:       scalderon@jonesday.com; lwong@jonesday.com

Asim Varma:            avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

Sarah Rauh:            srauh@jonesday.com; treyes@jonesday.com

David C. Kiernan:      dkiernan@jonesday.com; lwong@jonesday.com

| | |
|---|---|
| R. Scott Medsker: | rsmedsker@JonesDay.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| Kamilla Mamedova: | kmamedova@jonesday.com |
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org, mlauritzen@azdisabilitylaw.org |
| Eun Ae Suh: | ksuh@jonesday.com |
| Katherine E. Watanabe: | Katherine.Watanabe@azag.gov, susan.oquinn@azag.gov |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, pdrew@perkinscoie.com |
| Lucy Marie Rand: | Lucy.Rand@azag.gov, Geneva.Johnson-Joksch@azag.gov |
| Ashley Brook Zuerlein: | Ashley.Zuerlein@azag.gov, Geneva.Johnson-Joksch@azag.gov |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/   *Nicholas D. Acedo*

36