# EXHIBIT 1

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Katherine E. Watanabe, Bar No. 027458
Lucy M. Rand, Bar No. 026919
Ashley B. Zuerlein, Bar No. 029541
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov
Ashley.Zuerlein@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | NO. 2:12-cv-00601-NVW |
| Plaintiffs, | |
| v. | **DECLARATION OF BENJAMIN SHAW** |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

2717636.1

I, **BENJAMIN SHAW**, make the following Declaration:

1.    I am a psychologist employed by the Arizona Department of Corrections (ADC). I served as a Psychologist II at Arizona State Prison Complex (ASPC) Perryville from 1989 to 1997.  I was a Psychologist Supervisor at ASPC Lewis from 1997 to 2003.  I was the Clinical Director at ASPC Phoenix from 2005 to November 2010. From November 2010 to June 30, 2012, I was the ADC Mental Health Program Manager. Since July 1, 2012, I have served as the Mental Health Services Monitor.  I am familiar with the allegations made in Plaintiffs' Complaint, as well as the allegations made in Plaintiffs' Motion for Class Certification.  I am intimately familiar with, and have personal knowledge of, ADC's policies and practices regarding mental health treatment for ADC inmates, including the policies and practices outlined in this Declaration.

## Medication Management

2.    Plaintiffs contend that ADC lacks a reliable system for ensuring the delivery of prescribed medications.  Plaintiffs base this allegation on a letter ADC sent to Wexford on September 21, 2012 ("the cure letter") which outlined several areas of significant non-compliance with the contract between ADC and Wexford requiring corrective action.  One of these areas of non-compliance was a backlog of more than 8,000 prescriptions requiring review and potential renewal in August 2012.

3.    Prior to Wexford assuming control over the provision of healthcare in ADC facilities, ADC employed a prescription database with the capability to run advance prescription expiration reports to alert clinicians to the need to review inmate charts and schedule inmates for prescription renewals.

4.    Wexford instituted a different prescription management system with an off-site pharmacy that did not initially have the capability to generate advance prescription expiration reports like the ADC database.  As a result, prescriptions expiring had to be manually reviewed, causing a backlog of prescriptions requiring review and potential renewal.

2717636.1

2

5.     Wexford now has the capability to generate advance prescription expiration reports.   There is no current backlog of prescription renewals at any ADC facilities.

### Provision of Mental Health Treatment

6.     Plaintiffs contend that "ADC does not have a reliable means for prisoners to make their mental health needs known in a timely matter to qualified staff."

7.     This is not an ADC policy or practice.   Plaintiffs base this assertion on my testimony on October 3, 2012 that Health Needs Requests (HNRs) are the primary way for inmates to access non-routine healthcare and that HNRs had been backed up by three to four months.   Plaintiffs also reference a contract monitoring memorandum I wrote in August 2012, which states that at the Perryville-Lumley Unit, 123 HNRs were found requesting to be seen by a psychiatric provider.

8.     HNRs are available in all ADC facilities and remain the primary way for inmates to request non-routine mental healthcare.

9.     The back log in HNRs requesting psychiatry services was a result of numerous ADC psychiatrists and other mental health staff leaving ADC when health care transitioned to Wexford for other jobs with the State of Arizona so that they did not lose their retirement benefits and pensions.   This caused a lot of the staffing issues following the Wexford transition.

10.     Since September 2012, Wexford has hired 15 additional psychiatrists.

11.     Perryville, Lewis, and Florence facilities have greatly improved staffing and significantly decreased wait times for psychiatric services.   Perryville has implemented an HNR tracking database to further improve timeliness of service.

12.     Perryville now averages a two-week waiting time for HNRs requesting psychiatry services, while the system-wide average wait time is approximately three weeks.   If an HNR states that an inmate feels like hurting himself or herself, that inmate will be seen on an expedited basis.

2717636.1                                    3

13.   The average wait times in ADC facilities are less than the average wait times in the local community.   At Magellan, the behavioral health provider with whom the State of Arizona contracts, the average wait time is approximately one month.

14.   Plaintiffs additionally contend that "ADC appears to lack a reliable system to ensure that prisoners taking psychotropic medications and those with mental illness are meaningfully evaluated on a regular basis by qualified mental health staff."

15.   ADC policy requires that inmates taking psychotropic medications must be evaluated face-to-face by a psychiatrist or psychiatric nurse every 90 days.  (Ex. 1-A.)   This is also a requirement in the Wexford contract.   In addition, ADC policy requires that inmates with a mental health score of 4 or 5 must be seen face-to-face by mental health or psychiatry staff every 30 days.  (Ex. 1-A.)  Inmates with a mental health score of 3 must be seen face-to-face by mental health or psychiatry staff every 30 or 90 days, depending upon their subcode.  (Ex. 1-A.)

16.   If an inmate's prescription for a psychotropic medication is about to expire, and the inmate cannot be seen face-to-face by the psychiatrist prior to the expiration, the psychiatrist may renew the prescription.  The inmate will be seen by the psychiatrist at the next available appointment.  This is done to ensure that inmates do not experience a sudden stop in treatment, but is considered the exception rather than the rule.

17.   Inmates experiencing problems with their psychotropic medications may submit an HNR at any time.

**Mental Health Classifications**

18.   There are five mental health classifications in ADC: MH-1 (inmates who do not have mental health needs), MH-2 (inmates who do not currently have mental health needs but have had treatment in the past), MH-3 (inmates with mental health needs who require outpatient treatment), MH-4 (inmates with mental health needs who are admitted to a specialized mental health program outside of inpatient treatment areas), and MH-5 (inmates with mental health needs who are admitted to an inpatient program).

19.

20.     An inmate can also be designated as seriously mentally ill ("SMI") if: (1) he or she has a MH score of 3, 4, or 5; (2) possesses a qualifying mental health diagnosis as indicated on the SMI Determination Form; and (3) has a severe functional impairment as indicated on the SMI Determination Form. (Ex. 1-B.)

21.

## Inpatient and Enhanced Mental Health Treatment

22.     Plaintiffs contend that "it appears that ADC lacks a reliable system to ensure that prisoners needing a higher level of mental health care are transferred in a timely fashion to appropriate facilities."

23.     The timing for transferring an inmate to inpatient treatment varies, depending upon bed availability at the Phoenix Complex and the severity of an inmate's symptoms.

24.     The transfer process typically takes a week, however inmates will be transferred the same day in an emergency.

25.     Female inmates may also be transferred to the Arizona State Hospital for inpatient mental health treatment.

26.

27.     This is incorrect.   ADC policy does not prohibit placement of security level five inmates at Flamenco.   Female inmates of all security classification levels may be placed at Flamenco.

28.     Plaintiffs contend that "there is a serious question whether the Phoenix facilities are currently able to provide appropriate inpatient care."

2717636.1                                    5

29.     Plaintiffs base this assertion on a few isolated issues noted by the Phoenix Complex contract monitor in an August 2012 contract monitoring memorandum, including an observation that inmates were watching television, which was described as group mental health programming.

30.     The inpatient mental health treatment facilities at the Phoenix Complex consist of Baker Ward, the inpatient facility for male inmates, and Flamenco, the inpatient facility for female inmates.  Both Baker Ward and Flamenco are licensed by the State of Arizona as psychiatric hospitals.

31.     At the Phoenix Complex, inmates attend individual and group counseling sessions.  These sessions are delivered in person, not through the television. Inmates also attend group anger management classes and socialization groups.  The socialization groups may at times include a video component.

32.     The Phoenix Complex has private offices for individual assessment and counseling, as well as team treatment rooms, which permit teams of clinicians to work collectively with an inmate.

33.     In addition to the Phoenix Complex, Florence and Eyman both have enhanced mental health treatment options.  These facilities have private interview rooms, group recreation rooms, and offer a variety of group programming designed to minimize the effects of confinement.

34.     The Women's Treatment Unit (WTU) at Perryville also offers enhanced mental health treatment options.  Inmates in the WTU day program receive four to six hours of programming per day, including group counseling, anger management classes, parenting skills classes, and art therapy.

35.     At Perryville, the medical area has five offices, one of which is always available to mental health staff for assessments and counseling.  In addition, there is a mental health clinician's office in the Special Management Area (SMA), which allows more SMA inmates to be seen without full restraints and shutting down the rest of the yard during transport.

2717636.1                                                     6

## Conditions of Confinement

36.     Plaintiffs assert that "there is no ADC policy barring the housing of prisoners with serious mental illness in isolated confinement, and that such prisoners are currently housed in SMU 1, Browning, Florence-Central, Florence-Kasson, and Perryville-SMA."

37.     There is no ADC policy barring the placement of inmates with serious mental illness in SMU 1, Browning, Florence-Central, Florence-Kasson, and Perryville-SMA, and inmates with serious mental illness can be incarcerated in these units.

38.     However, these units are not what would typically be considered "isolated confinement."

39.     Inmates in these units may be double or tripled celled and in some cases may be placed in dormitory-style housing.

40.     As noted above, inmates with mental illness at Florence, Eyman, and Perryville are offered enhanced mental health treatment and programming, including group counseling sessions, group recreation, group classes, and socialization groups to minimize the effects of confinement.

41.     Plaintiffs allege that "there is apparently no written policy requiring that a face-to-face mental health evaluation be conducted before placing a prisoner in" units "which are traditionally referred to as solitary confinement or supermax-type units."

42.     There is no requirement that an inmate receive a face-to-face mental health evaluation prior to being placed in a particular unit.  However, inmates on watch status are evaluated face-to-face by mental health staff every 24 hours.  Prior to placement in maximum custody, security staff conducts an observational assessment of an inmate's condition.  If an inmate is injured, appears ill, or appears mentally or behaviorally unstable, medical staff will conduct an immediate face-to-face assessment,  (Ex. 1-C, Health Services Technical Manual (HSTM) Chapter 7, Section 6.0 at 2.2.)  Health

2717636.1                                             7

1   services staff are notified within one hour of an inmate's placement in maximum custody,

2   and nursing staff perform an immediate chart review to ascertain if any medical, dental, or

3   mental health issues exist which contraindicate this placement or require accommodation

4   to the inmate's lockdown status.  (Ex. 1-C, HSTM Chapter 7, Section 6.0 at 2.1.)  An

5   inmate's placement may be changed based upon this assessment.  Any suicidal ideation is

6   brought to the attention of mental health staff.  (Ex. 1-C, HSTM Chapter 7, Section 6.0 at

7   2.4.)

8         43.    Plaintiffs assert that "there is apparently no written ADC policy that

9   provides for ADC mental health staff to take action when the mental health of a severely

10  mentally ill—or any—prisoner deteriorates in isolation unless inpatient care is determined

11  necessary."

12        44.    Plaintiffs mischaracterize ADC mental health policies.  If an inmate,

13  whether designated as SMI or not, is determined to need a higher level of treatment than

14  can be provided by outpatient mental health services, pursuant to ADC Department Order

15  (DO) 1103.04, the inmate is referred to inpatient services.  (Ex. 1-D.)

16        45.    As noted above, ADC policy dictates that inmates who are designated

17  as MH-4 or MH-5 are seen by a mental health provider or psychiatry staff every 30 days

18  without the need to submit an HNR.  (Ex. 1-A.)  Inmates designated as MH-3 are seen

19  every 30 or 90 days, depending upon their subcode.  (Ex. 1-A.)  At these visits, the mental

20  health provider re-evaluates the inmate's classification and mental health functioning and

21  makes any necessary adjustments.

22        46.    ADC   policy   requires   that   inmates   prescribed   psychotropic

23  medications are seen every 90 days without the need to submit an HNR.  (Ex. 1-A.)  At

24  these visits, the clinician may make adjustments to the inmate's psychotropic medications

25  if the inmate reports medication problems or changes in his or her mental health

26  symptoms.

27        47.    If an inmate experiences a deterioration of his or her mental health or

28  experiences medication problems between the regularly scheduled visits outlined above,

1  the inmate may submit an HNR requesting treatment or medication changes.

2        48.    In accordance with DO 807.05, inmates who demonstrate acute signs

3  or symptoms of significant mental health disorder will be placed on mental health watch.

4  (Ex. 1-E, DO 807.05 at 1.2.1.)

5        49.    Inmates who demonstrate significant signs or symptoms of

6  significant mental disorder and are acting in a manner indicating high suicide risk will be

7  placed on suicide watch.  (Ex. 1-E DO 807.05 at 1.3.1.)

8        50.    Pursuant to ADC policy, the shift commander or health care staff

9  may order that an inmate be placed on watch if they observe or receive a report from other

10  staff that an inmate's mental health is deteriorating.  (Ex. 1-E, DO 807.05 at 1.2.3, 1.3.2,

11  and 1.4.2.)   Security staff conducting suicide watch or mental health watch must

12  immediately notify mental health staff through the shift commander of any significant

13  changes in an inmate's behavior while on watch.  (Ex. 1-E, DO 807.05 at 1.5.)

14        51.    In the first progress note after an inmate is placed on watch, mental

15  staff must document the circumstances that necessitated the watch and an assessment of

16  the inmate's current status.  (Ex. 1-E, DO 807.05 at 1.9.1.)  Mental health staff visit the

17  inmate every 24 hours while he or she is on watch and document the inmate's status in a

18  progress note.

19        52.    Inmates may be downgraded to a lower watch level or discontinued

20  from watch by licensed mental health staff when clinically indicated based upon an

21  assessment of the inmate, a thorough review of the inmate's medical and mental health

22  records, and conferring with security staff about the inmate's behavior while on watch.

23  (Ex. 1-E, DO 807.05 at 1.10.)

24        53.    Removal from watch status depends on a number of factors, all of

25  which are a part of a clinical assessment process: 1) the inmate states that he no longer

26  wants to hurt himself; 2) the inmate appears psychiatrically stable enough to give such

27  assurances; and 3) the inmate has shown appropriate behavior and stable mood while on

28  watch status.

54.     Removal or reduction in watch status is an important clinical decision that is often made by a consensus of the entire unit mental health team. The inmate's history is also a critical factor--if he has numerous self-harm attempts or recent suicidal behavior, then he may be maintained on watch somewhat longer until the treating clinician is confident that the patient is behaviorally stable. There is no set time limit for having an inmate in watch status, but the clinician must document in the medical record each day the reasons why the inmate must be kept on watch. Suicide watch is an extreme clinical measure that is a matter of life and death, and we take this responsibility VERY seriously.

## Suicide Watch Cells

55.     If an inmate is identified as at significant risk for suicide, the inmate is immediately referred to mental health staff for further assessment, treatment, and/or placement on suicide watch. Each facility has specifically designated suicide watch cells, which are typically located in the facility's detention unit. They are modified so that the inmate cannot harm themselves.

56.     There are three levels of suicide watch.

57.     Continuous watch: when an inmate has demonstrated signs or symptoms of significant mental disorder and is acting in a manner indicating imminent suicide risk or risk to others due to a mental illness, security staff observes the inmate on a direct, uninterrupted basis with a clear, unobstructed view of the inmate.

58.     Ten-minute watch: when an inmate has demonstrated significant signs or symptoms of significant mental disorder and is acting in a manner indicating high suicide risk and/or risk to other due to a mental illness, security staff shall conducts visual welfare checks of the inmate at staggered intervals not to exceed every 10 minutes.

59.     Thirty-minute watch: when an inmate has demonstrated acute signs or symptoms of significant mental disorder, but is not acting in a manner indicating significant suicide risk or risk to others due to a mental illness,  security staff conducts

visual welfare checks of the inmate at staggered intervals not to exceed every 30 minutes.  This level is also referred to as mental health watch.

### Suicide Prevention

60.     Plaintiffs assert that "ADC policy does not require that a prisoner on suicide watch be evaluated face-to-face by a psychiatrist."

61.     In practice, inmates on suicide watch are evaluated face-to-face by licensed mental health staff every 24 hours.  This evaluation may be performed by a psychiatrist, a psychologist, a psychiatric nurse, or a licensed psychology associate.

62.     In addition, inmates on suicide watch are monitored either continuously or at ten-minute intervals by security staff.

63.     Plaintiffs allege that "ADC policy allows a prisoner to be taken off suicide watch by an unlicensed mental health staff member."

64.     This is incorrect.  ADC DO 807.05 at 1.14.1 states that "discontinuation of watch status shall occur only after an in-person evaluation of the inmate on watch performed by a licensed mental health staff member."  (Ex. 1-E.)  Similarly, ADC DO 804.01 at 1.12.1.3 provides that "only a licensed mental health provider is authorized to cancel or remove a suicide watch."  (Ex. 1-F.)

65.     Plaintiffs assert that "ADC policy permits the use of chemical agents (such as pepper spray) on prisoners while they are on suicide watch or other mental health watch, or when they are engaging in self-harm" and that "ADC policy also permits the use of chemical agents on prisoners who are seriously mentally ill and those who are taking psychotropic medications."

66.     ADC policy regarding the use of force permits the use of chemical agents in only a narrow range of circumstances.  The same use of force continuum applies to inmates who are seriously mentally ill, taking psychotropic medications, or on suicide watch as to all other inmates.

67.     ADC policy permits the use of chemical agents and physical

restraints if a person is actively hurting himself or herself and fails to respond to verbal directives.  In such a circumstance, the use of force may be necessary to prevent serious harm to the inmate.  The use of force continuum outlined in ADC policy recognizes that the use of chemical agents on an inmate actively self-harming is safer than employing physical restraints.

## Psychotropic Medications and Heat

68.     Plaintiffs allege that ADC fails to "provide adequate protection against heat injury" for inmates on psychotropic medications.

69.     Plaintiffs base these allegations on testimony from Dr. Tracy Crews regarding an ADC inmate who died from heat stroke in 2009 after being held in an outdoor holding pen for several hours without shade or access to water. (Plaintiffs' Ex. V at 103:5-104:3.)

70.     Following the inmate's death, ADC stopped using uncovered outdoor enclosures as holding cells.  These enclosures are now used as exercise enclosures and have been modified to include shade, misters, and access to water.

71.     ADC DO 704.09 at 1.8 now provides that outdoor holding enclosures must be covered to provide shade, have a cooling or mister system, and a continuous water source.  (Ex. 1-G.)  Prior to approving the use of a temporary holding enclosure, the Unit Deputy Warden or On-Call Duty Officer must consider any medication prescribed to the inmate, paying particular attention to any psychotropic medications.  (Ex. 1-G, DO 704.09 at 1.5.1.4.)  ADC DO 704.10 at 1.5 through 1.6 requires that outdoor exercise enclosures be covered to provide shade and have either a mister system or evaporative cooler system.  (Ex. 1-G.)

72.     In addition, the ADC Mental Health Technical Manual (MHTM) at Chapter 5, section 19.0 states that if an inmate reports heat intolerance, and the psychiatrist or psychiatric nurse practitioner determines that the inmate's psychotropic medication is contributing to their heat intolerance, the provider must discuss treatment

alternatives with the inmate, including changing medications. (Plaintiffs' Ex. LLL at 84.) If the inmate and psychiatric provider agree that changing medications is not in the inmate's best interest, the psychiatric provider must consult with the medical provider regarding a duty status to minimize heat exposure. (Id.)

73. Plaintiffs further allege that "ADC has no policy specifying temperature limits for areas housing prisoners taking psychotropic medications."

74. ADC physical plant standards regarding maximum indoor temperatures apply to all housing areas for all inmates, regardless of whether they are taking psychotropic medications.

75. The physical plant standards outlined in ADC DO 401 state that "Mechanical cooling shall be provided to maintain a maximum indoor temperature of 78°F within the ASHRAE summer comfort zone." (Ex. 1-H, DO 401T at 1.5.1.3.2.1.) DO 401 further requires that "Inmate spaces in the Minimum and Medium Custody facilities shall be designed for air conditioning to maintain a maximum indoor temperature of 80°F within the ASHRAE summer comfort zone." (Ex. 1-H, DO 401T at 1.5.1.3.2.2.)

76. In practice, the indoor air temperature in ADC facilities varies depending on outdoor temperature and humidity levels. At the beginning of the summer, indoor temperatures are generally in the low 70s, while the temperature may reach 80°F in August.

77. The documents attached to this Declaration are true and accurate copies of what they purport to be.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _Decemba  21_____, 2012.


_____
Benjamin Shaw

# EXHIBIT 1-A

| | Determination and Management of Seriously Mentally Ill [SMI] Inmates | OPR: Health Services Division Director |
|---|---|---|
| **Arizona Department of Corrections** | | |
| Mental Health Technical Manual | MHTM Chapter 4 Section 5.0 | Supersedes: Procedural Instruction TR0002 Effective Date: 8/15/11 |

**Reference**:  MHTM 2-1.0
                MHTM 2-5.0

**Purpose**: To provide a standardized system of identifying inmate's who do or do not possess SMI needs while incarcerated in ADC.

**Responsibility**: It is the responsibility of each licensed mental health professional to administer the SMI Determination Form when clinically indicated in accordance with this policy.

1.0    Definition
    1.1    Seriously Mentally Ill inmates are those who:
        1.1.1    According to a licensed mental health professional possess:
            1.1.1.1 A qualifying mental health diagnosis as indicated on the SMI Determination Form.
            1.1.1.2 A severe functional impairment directly relating to their mental illness as indicated on the SMI Determination Form.
            1.1.1.3 A Mental Health score of 3.
2.0    SMI Status Conditions
    2.1    An inmate will be denied the SMI in ADC designation if he/she fails to satisfy all the criteria identified in Section 1.1 through 1.1.1.3, but shall receive an additional SMI screening as clinically indicated.
    2.2    Inmates previously determined to be SMI in the community mental health system shall have a new SMI Determination Form completed, as to ensure that the inmate meets the criteria specified in Section 1.1 through 1.1.1.3.
        2.2.1    The inmate will not be assigned a SMI in ADC qualifier based solely on his/her SMI status in the community.
    2.3    Minimum mental health service delivery levels for SMI inmates will be determined by the inmate's mental health score and subcode in accordance with MHTM 2-1.0.
        2.3.1    Mental health need levels are independent of an inmate's designation as SMI, as SMI inmates can be considered to be stable in treatment or not.
3.0    SMI Identification
    3.1    The inmate's medical file shall be brown-tagged to identify the inmate as SMI.

ADC032011

ADC Mental Health Technical Manual - Revised 08/15/11                    22
Appendix G of the Health Service Technical Manual

| MH score | Treatment Plan | Records Reviews | MH score and Sub-code changes | Face-to-Face meetings |
|---|---|---|---|---|
| 5 | Developed: Upon Diagnosis<br><br>Reviewed: As the condition warrants | Initial: When referred to MH<br><br>Follow up review: As Clinically Indicated | Evaluated: As clinically indicated.<br><br>Changed: As clinically indicated | MH or Psychiatry staff: Every 30 days |
| 4 | Developed: Upon Diagnosis<br><br>Reviewed: As the condition warrants | Initial: When referred to MH<br><br>Follow up review: As Clinically Indicated | Evaluated: As clinically indicated.<br><br>Changed: As clinically indicated | MH or Psychiatry staff: Every 30 days |
| 3 (See subcodes below) | Developed: Upon Diagnosis<br><br>Reviewed: As the condition warrants | Initial: When referred to MH<br><br>Follow up review: As Clinically Indicated | Evaluated: As clinically indicated.<br><br>Changed: As clinically indicated | MH or Psychiatry staff: See below |
| | **Subcodes are used like GAF scores.**<br>**Subcodes can change at each interaction with the inmate as their condition warrants.** | | | |
| Subcode A | Inmates in acute distress who may require substantial intervention in order to remain stable. These inmates may need inpatient settings or specialized mental health programs to address their unique needs. (Example: A floridly psychotic or delusional inmate with current or frequent suicidal ideation, or currently under a PMRB.) | | | MH or Psychiatry staff: Every 30 Days |
| Subcode B | Inmates who may need regular intervention but are generally stable and participate with psychiatric and/or psychological interventions. (Example: An inmate with a major depressive or other affective disorder who benefits from routine contact with both psychiatry and psychology staff.) | | | MH or Psychiatry staff: Every 90 days |
| Subcode C | Inmates who need infrequent intervention and have adequate coping skills to manage their mental illness effectively and independently. (Example: An inmate with a general mood or anxiety disorder who has learned to manage his symptoms effectively through the use of medication and infrequent contact with mental health staff.) | | | MH or Psychiatry staff: Every 90 days |
| 2 | Developed only when the inmate is reclassified to MH-3 | Initial: Once referred to MH<br><br>Follow up review: As Clinically Indicated | Evaluated: As clinically indicated<br><br>Changed: As clinically indicated | Unnecessary unless reclassified to MH-3 |
| 1 | Developed only when the inmate is reclassified to MH-3 | Initial: Once referred to MH<br><br>Follow up review: As Clinically Indicated | Evaluated: As clinically indicated<br><br>Changed: As clinically indicated | Unnecessary unless reclassified to MH-3 |

Attachment 2-1.0A

**Inmates on psychotropic medication will be seen by either the psychiatric registered nurse II or the psychiatrist or psychiatric nurse practitioner no less frequently than every 90 days.

†All MH-3, 4 or 5 inmates, if transferred to segregated housing (see definition above), will be seen by mental health clinician within 7 days and a minimum of once every (30) days or more often as clinically indicated thereafter.

ADC031980

# EXHIBIT 1-B

**ARIZONA DEPARTMENT OF CORRECTIONS**

**Mental Health Serious Mental Illness (SMI) Determination**

Inmates with a Mental Health Score of 3 or greater will be assessed as clinically indicated to determine if the criteria for SMI is met. To be considered SMI in ADC the inmate must have a qualifying diagnosis [as indicated below] and present with at least one identified level of the severe functional impairment as the result of the mental illness [Reference MHTM 4-5.0].

☐  **Anxiety Disorders**
300.00 Anxiety Disorder NOS; 300.01 Panic Disorder without Agoraphobia; 300.02 Generalized Anxiety Disorder; 300.14 Dissociative Identity Disorder; 300.21 Panic Disorder with Agoraphobia, and 300.22 Agoraphobia without History of Panic Disorder, 300.03 Obsessive Compulsive Disorder; and 309.81 Post -Traumatic Stress Disorder.

☐  **Bipolar Disorder**
296.0x Bipolar 1 Single Manic Episode, 296.4x Bipolar I Most Recent Episode Manic, 296.5x Bipolar I Most Recent Episode Depressed, 296.6x Bipolar I Most Recent Episode Mixed, 296.7 Bipolar I Most Recent Episode Unspecified, 296.80 Bipolar Disorder NOS, and 296.89 Bipolar II Disorder.

☐  **Depressive Disorders**
296.2x Major Depressive Disorder, Single Episode; 296.3x Major Depressive Disorder, Recurrent; 296.90 Mood Disorder NOS; 300.4 Dys

☐  **Psychotic Disorders**
295.10, Schizophrenia Disorganized Type, 295.20 Schizophrenia Catatonic Type, 295.30 Schizophrenia Paranoid Type, 295.60 Schizophrenia Residual Type, 295.90 Schizophrenia Undifferentiated, 295.70 Schizoaffective Disorder, 297.1 Delusional Disorder, and 298.9 Psychotic Disorder NOS.

☐  **Personality Disorders**
301.0 Paranoid Personality Disorder, 302.20 Schizoid Personality Disorder, 301.22 Schizotypal Personality Disorder, 301.4 Obsessive-Compulsive Disorder, 301.50 Histrionic Personality Disorder, 301.6 Dependent Personality Disorder, 301.81 Narcissistic Personality Disorder; 301.82 Avoidant Personality Disorder; 301.83 Borderline Personality Disorder; and 301.9 Personality Disorder NOS.

| The inmate does not meet any criteria listed above.  The inmate is not eligible for SMI status. |
|---|

The inmate posses a severe functional impairment as evidenced by [check as appropriate]:

☐  A serious and persistent inability to perform developmentally appropriate occupational or school functioning.
☐  Inability to live in General Population without supervision (self-care-basic needs): Impairment in the inmate's ability to function independently including the capacity to provide or arrange for needs such as food, personal hygiene, clothing, medical, dental and mental health care.
☐  Risk of harm to self or others.
☐  Risk of Deterioration:  The individual does not currently meet any of the above functional criteria, 1 through 3, but may be expected to deteriorate to such a level without treatment.  If the reviewer concurs with this statement, please document the reason below.

○  Diagnostic Category I diagnosis with probable chronic, relapsing and remitting course
○  Co-morbidities (like mental retardation, substance dependence, personality disorder)
○  Persistent or chronic factors such as social isolation, poverty, extreme chronic stressors (life-threatening or debilitating medical illnesses, victimization).
○  Other (past psychiatric history; gains in functioning have not solidified or are a result of current compliance only; court-committed; care is complicated; care is complicated and requires multiple providers.

| Inmate does not meet any of the criteria for functional impairment.  The inmate is not eligible for SMI status. |
|---|

| Inmate meets the SMI diagnostic and functional impairment criteria above.  The inmate is SMI in ADC. |
|---|

_____        _____                    _____
Mental Health Staff Name/Stamp         Mental Health Staff Signature                     Date

| Inmate Name  (Last, First M.I.) | | ADC Number |
|---|---|---|
| Date of Birth | Facility/Unit | |

1103-13
10/1/08

# EXHIBIT 1-C

| | Segregation (Lockdown status) | OPR:<br>Medical Program Manger /<br>Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: gg/eb |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 6.0. | Supercedes:<br>HSTM 7.6.0. June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCE:**      DIRECTORS INSTRUCTION 006
DIRECTORS INSTRUCTION 067
DIRECTORS INSTRUCTION 125
DIRECTORS INSTRUCTION 175
DEPARTMENT ORDER 804
DEPARTMENT ORDER 1103
NCCHC STANDARD P-E-09
NCCHC STANDARD P-E-10

**PURPOSE:**  To provide continuity of care for all inmates who may be transferred into a housing area that has been designated for isolation and/or segregation of inmates.  To ensure that the inmate's medical record is reviewed upon placement/transfer to the special area.  To assess an inmate's medical issues and needs relative to any complications arising from a new housing area and to assure that the inmate has continuing access to health care.

**RESPONSIBILITY:**  It is the responsibility of the Correctional Registered Nurse Supervisor to assure that inmates are not transferred to alternative housing areas where their medical needs cannot be accommodated or met.

**PROCEDURES:**
1.0.     Special housing may be referred to as Protective Segregation (PS), DI67, Detention, Central Detention Unit (CDU), Administrative Detention, Lockdown Status, Special Management Areas, Special Management Units or similar terms.  The term "Segregation" will be used to refer to all of these areas and functions.  This policy does not apply to short term holding cells used by security, nor to suicide or mental health watches, nor to hunger strikes which are addressed elsewhere.
1.1.     Detention Rounds must be conducted by Health Services staff a minimum of 3 days per week on non-consecutive days.
1.2.     In accordance with the guidance contained in HSTM Chapter 5 Section 3.1. security will support Health Services by assure appropriate portable collection boxes are available for inmates on a daily basis.  In the lockdowns areas the collection of HNRs will be done in such a manner as to assure medical confidentiality for the inmate.

307

ADC010954

1.3.    Inmates in a "Lock-down/lockup" status, will be instructed on local health care access procedures.  Facility/complex post orders will include the following minimum elements of direction to staff
          - specifying how the HNR forms are made available to inmates
          - specifying how the forms are collected by Health Service Staff.  Health Staff will gather those HNRs that Security has collected in the lockdown units.
          - specifying that Correctional Officer (non-health services staff) are not authorized to directly handle the HNRs.

2.0.    Security will notify Health Services of placement of an inmate in Segregation within one hour after an inmate is placed in detention. (Department Order 804).
2.1.    Upon notification of an inmate's transfer a nursing staff shall perform an immediate chart review to ascertain if any medical, dental or mental health issues exist that would contraindicate the placement or require accommodation to the inmate's lockdown status, document findings including the date and time of the "lock down" in the Progress Notes of the inmate's medical record.
2.2.    When the notification includes information that the inmate is injured or appears to be ill, nursing staff shall conduct an immediate hands-on assessment (for which there is no health care fee).
2.3.    During the first visit, nursing shall complete an initial assessment to include vital signs and weight, any physical abnormalities, including bruises or abrasions
2.4.    Any suicide ideation is to be brought to the attention of the Mental Health Staff or the Provider immediately with documentation in the Mental Health Progress Notes.
2.5.    Keep On Person (KOP) medications will be allowed to continue to be in the possession of the inmate providing there is no indication of anticipated abuse.  Watch/swallow medications will be retained by nursing and administered by nursing service, as prescribed.

3.0.    Ongoing Medical Care
3.1.    Inmates will have access to sick call, based upon a schedule established by the facility throughout their segregation.
3.2.    The HNR system will be monitored by the FHA to ensure that inmates have access to care in accordance with the basic requirements:  routine, urgent, and emergent care is available to the inmates; and inmate patient (condition and records) confidentiality is respected.
3.3.    Appointment times are scheduled and held a minimum of three times per week.  Inmates who require immediate care must have access to health care seven days per week.
3.4.    Inmates with serious mental disorders who are placed in segregation will be given consideration to being seen at the beginning, middle, and end of the week to avoid the likelihood of problems during weekend hours.
3.5.    When an inmate's housing or custody status precludes physically reporting to the Health Unit, a health services staff member will visit the housing area a minimum of three times per week to observe the segregated inmates' health status and coordinate any treatment required. There will be no health care fee for these observation visits as the visit was initiated by the health services staff.
3.6.    Should an extreme shortage of staff or a disturbance, preclude nursing staff from making a required visit, security staff shall provide the escort and supervision necessary to ensure access to health care.

ADC010955

# EXHIBIT 1-D

| CORRECTIONS ADC  ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER: 1100  INMATE HEALTH SERVICES | OPR:  HS |
|---|---|---|
| DEPARTMENT ORDER MANUAL | DEPARTMENT ORDER: 1103  *INMATE MENTAL HEALTH CARE, TREATMENT AND PROGRAMS* | SUPERSEDES:  DO 1103 (8/22/97) DI 298 (11/30/10) |
| | | EFFECTIVE DATE:  DECEMBER 19, 2012 |
| | | REPLACEMENT PAGE EFFECTIVE DATE:  N/A |

# TABLE OF CONTENTS

PURPOSE

APPLICABILITY

PROCEDURES  PAGE

1103.01  MEN'S TREATMENT UNIT/WOMEN'S TREATMENT UNIT...........................................1

1103.02  CONTINUITY OF CARE FOR SERIOUSLY MENTALLY ILL OFFENDERS......................5

1103.03  STAFF REPRESENTATION – CLEMENCY HEARING................................................7

1103.04  MENTALLY DISTURBED INMATES PENDING RELEASE.........................................8

1103.05  MANAGEMENT OF LICENSED MENTAL HEALTH FACILITIES................................11

1103.07  SERVICES FOR DEVELOPMENTALLY DISABLED/RETARDED INMATES....................17

1103.08  SERIOUSLY MENTALLY ILL INMATES - INDIVIDUALIZED TREATMENT PLANS..........18

IMPLEMENTATION............................................................................................19

DEFINITIONS.................................................................................................19

AUTHORITY..................................................................................................23

ADC048574

**1103.04**  **REFERRAL/HOSPITALIZATION OF MENTALLY DISTURBED INMATES PENDING RELEASE**

1.1 Security and other staff, as appropriate, shall notify a Site Mental Health Professional when an inmate displays behavior or makes verbal statements suggesting the inmate might require or benefit from Mental Health Services.

1.2 Upon notification as outlined in 1.1 above, the health care professional or Site Mental Health Professional shall arrange for an evaluation of the inmate by mental health staff.

1.2.1 If mental health staff evaluating the inmate determines the inmate may be mentally disturbed and psychiatric hospitalization may be in order, they shall request a further evaluation by a psychiatrist. If no psychiatrist is available, the evaluation shall be by a physician in consultation with a Site Mental Health Professional.

1.3 Upon determining the need for psychiatric hospitalization of the inmate, the psychiatrist/physician shall further determine if the inmate is willing to be hospitalized voluntarily.

1.3.1 If the inmate is willing to be hospitalized voluntarily and indicates so by signing the Conditions to Admission, Form 1103-53, the psychiatrist shall proceed as outlined in 1.6 through 1.6.5 of this section.

1.3.2 If the inmate is not willing to be hospitalized voluntarily, the psychiatrist/physician shall proceed as outlined in 1.7 through 1.8.3.2 of this section.

1.4 Upon determining the need for a course of mental health treatment other than psychiatric hospitalization, the psychiatrist/physician shall proceed accordingly in concert with other members of the mental health team and document the proposed course of action in the inmate's Medical Record.

1.5 Disturbed Community Supervision Offenders

1.5.1 Community Supervision offenders (offenders) who exhibit symptoms of a mental disorder shall be referred by their assigned Community Corrections Officer to a psychiatrist, physician, hospital or mental health facility for psychiatric evaluation.

1.5.2 When an offender refuses the referral, the assigned Community Corrections Officer may request a warrant for the revocation of parole or Administrative Release be issued by the Community Corrections Bureau Operations Director. If the request is approved, the warrant shall be issued.

1.5.3 If the psychiatrist/physician determines the offender needs inpatient psychiatric treatment, the offenders may be voluntarily admitted or involuntarily committed.

1.5.4 The assigned Community Corrections Officer shall notify the ABOEC of the action taken.

1.6 Voluntary Admissions - Any inmate committed to a Department prison or Community Corrections Center may be voluntarily admitted to the appropriate mental health facility, upon referral by a psychiatrist or physician. The psychiatrist/physician shall:

ADC048582

1.6.1   Determine the inmate's need for treatment and request the inmate sign a Conditions to Admission form.

1.6.2   Contact the appropriate mental health facility admitting psychiatrist and provide a briefing of the case.

1.6.3   Contact the admissions officer of the appropriate mental health facility to arrange for the transfer/admission of the inmate/offender.

1.6.4   Forward, in the case of all male and female inmates being transferred to ASPC – Phoenix - Flamenco Unit, the inmate's Medical Record to the Treatment Unit Admitting Officer.

   1.6.4.1   The Medical Record shall include a written summary documenting the inmate's condition and behavior and a copy of the completed Conditions of Admission.

1.6.5   Forward, in the case of minor inmates being considered for transfer to the Arizona State Hospital, a written summary documenting the inmate's condition and behavior and a copy of the completed Conditions of Admission to the treatment unit's Admitting Officer, upon first securing authorization from the Chief Medical Officer of the Arizona State Hospital as a result of a committing court order.

1.7   Involuntary Hospitalization (Involuntary Non-Emergency Admissions)

1.7.1   When an inmate is found to have a mental disorder, but not a current danger to himself or others, by a psychiatrist/physician, and is unwilling to commit himself voluntarily to a mental health facility, the following procedure shall be followed:

   1.7.1.1   A psychiatrist, or a physician when no psychiatrist is immediately available, shall examine the inmate/offender and submit an Application for Involuntary Treatment ARS 31-226, Form 1103-20, to the Director, or designee, describing the inmate's condition, including a recommendation for the involuntary hospitalization of the inmate.

   1.7.1.2   Upon receipt of the Application for Involuntary Treatment ARS 31-226 form, the Director, or designee, shall review the Application for Involuntary Treatment ARS 31-226 form and, if approved, send a copy to the Department's Attorney General Liaison for filing with the appropriate court, and notify the petitioning psychiatrist of the approval.

1.7.2   At least ten days prior to the court Hearing on the Application for Involuntary Treatment, the Office of the Attorney General shall provide the inmate the following:

   1.7.2.1   A copy of the Application for Involuntary Treatment ARS 31-226 form.

   1.7.2.2   A written notice of the hearing.

ADC048583

CHAPTER: 1100 - INMATE HEALTH SERVICES
DEPARTMENT ORDER: 1103 - INMATE MENTAL HEALTH CARE, TREATMENT AND PROGRAMS

1.7.2.3    A copy of the inmate's rights at the hearing.

1.7.3    When the court orders the inmate be committed involuntarily, security staff assigned to transport the inmate to court shall obtain a copy of the court order from the court and transport the inmate and a copy of the court order to the hospital or the mental health facility designated by the court.

1.7.4    When the court does not order the inmate committed involuntarily, security staff assigned to transport the inmate shall return the inmate to the sending facility and notify the Contract Health Site Manager of the inmate's return, who shall notify the appropriate mental health staff to assure continuity of care.

1.8    Involuntary Emergency Transfer to a Mental Health Facility

1.8.1    When an inmate is found by a psychiatrist/physician to have a mental disorder, pose a current danger to themself or others, and is unwilling to commit him/herself voluntarily to a mental health facility, the psychiatrist/physician shall:

1.8.1.1    Contact the appropriate mental health facility admitting psychiatrist and provide a briefing of the case.

1.8.1.2    Contact the Admissions Officer of the appropriate mental health facility to arrange for the emergency transfer/admission of the inmate/offender.

1.8.1.3    Ensure, when a male or female inmate is transferred to a mental health facility, the inmate's Medical Record and Institutional File, including all relevant documentation, is sent to the receiving facility with the inmate.

1.8.1.4    Forward, in the case of minor inmates, a written summary documenting the inmate's condition and behavior to the Arizona State Hospital's Treatment Unit Admitting Officer.

1.8.1.4.1    The minor inmate's Medical Record shall be retained at the sending facility.

1.8.1.5    Notify the appropriate Regional Mental Health Director an emergency transfer has occurred.

1.8.1.6    Be available to the Department's Attorney General Liaison, as necessary, to testify in court as to his/her findings.

1.8.2    The receiving/admitting psychiatrist shall:

1.8.2.1    Examine and admit the inmate on an emergency or voluntary basis.

1.8.2.2    Complete, if the inmate is not willing to be admitted on a voluntary basis and continues to appear mentally disordered and dangerous to self or others, an Application for Involuntary Treatment ARS 31-226 form and provide it forthwith to the Department's Attorney General Liaison for filing with the appropriate court.

ADC048584

1.8.2.2.1    The Application for Involuntary Treatment ARS 31-226 form shall be completed within 48 hours of admission (excluding weekends and holidays).

1.8.2.3    Notify the appropriate Regional Mental Health Director an emergency admission has occurred, and provide a copy of the Application for Involuntary Treatment ARS 31-226 form.

1.8.3    The Clinical Director of the admitting facility shall:

1.8.3.1    Provide the court and the appropriate Regional Mental Health Director or designee, as long as the court order for involuntary hospitalization is in effect, with quarterly reports detailing the inmate's mental health status and proposed plan of treatment for the next 90 days.

1.8.3.2    Notify the State Attorney General and the appropriate Regional Mental Health Director when the inmate's involuntary hospitalization is terminated by discharge from the hospital.

1.9    Release or Commitment of SMI Inmates

1.9.1    Inmates determined by a psychiatrist or clinical psychologist to be SMI shall not be released from the custody of the Department without every effort being made to assure continuity of care and a smooth transition to Mental Health Services in the community.

1.9.2    Prior to the expiration of sentence, if the inmate is determined to pose a threat to themself or others by reason of a mental disorder, an involuntary commitment shall be sought in accordance with Civil Commitment Procedures.

1103.05    MANAGEMENT OF LICENSED MENTAL HEALTH FACILITIES

1.1    The Contractor for Health Services, the ASPC-Phoenix Warden and the Alhambra/Flamenco Deputy Warden shall ensure the licensed mental health facilities are provided with security, food service, maintenance and all other systems and services needed for the operation of a prison.

1.2    The Statewide Chief Executive Officer and the ASPC-Phoenix Contract Health Site Manager shall ensure the licensed mental health facilities are provided with comprehensive treatment programs, clinical services and personnel and administrative support.

1.3    The Clinical Director for the licensed mental health facilities shall:

1.3.1    Consider an inmate's custody and internal risk level and violence potential when developing the inmate's transition/release plan.

1.3.2    Incorporate or recommend appropriate safeguards, including separation of inmates more potentially violent from those less potentially violent, consistent with institutional and public safety.

ADC048585

# EXHIBIT 1-E

| | | |
|---|---|---|
| **CORRECTIONS** **ADC** | ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER:  800 INMATE MANAGEMENT | OPR: OPS SS HS |
| DEPARTMENT ORDER MANUAL | | DEPARTMENT ORDER:  807 ***INMATE SUICIDE PREVENTION, PRECAUTIONARY WATCHES, AND MAXIMUM BEHAVIORAL CONTROL RESTRAINTS*** | SUPERSEDES: DO 807 (07/19/06) DI 237 (11/30/05) EFFECTIVE DATE: SEPTEMBER 16, 2009 REPLACEMENT PAGE REVISION DATE: APRIL 30, 2011 |

# TABLE OF CONTENTS

PURPOSE

APPLICABILITY

PROCEDURES ... PAGE

807.01 TRAINING .......................................................................................................... 1

807.02 SCREENING, ASSESSMENT, AND CLASSIFICATION ........................................ 4

807.03 COMMUNICATION ............................................................................................... 6

807.04 HOUSING ............................................................................................................. 8

807.05 LEVELS OF OBSERVATION ................................................................................ 10

807.06 MAXIMUM BEHAVIORAL CONTROL RESTRAINTS FOR SELF-INJURIOUS BEHAVIOR ........... 15

807.07 MENTAL HEALTH FOLLOW-UP AFTER WATCH ................................................. 20

807.08 INTERVENTION ................................................................................................... 20

807.09 REPORTING/NOTIFICATION ............................................................................... 22

807.10 POST-SUICIDE DEBRIEFING AND MULTIDISCIPLINARY REVIEW ....................... 22

DEFINITIONS ................................................................................................................ 22

ATTACHMENT

INMATE SUICIDE PREVENTION, PRECAUTIONARY
WATCHES, AND MAXIMUM BEHAVIORAL CONTROL RESTRAINTS          SEPTEMBER 16, 2009          807 – PAGE i

ADC048613

1.5.1.1.9   Personal hygiene items (i.e., soap, tooth paste, tooth brush).

1.5.1.2   Razors and razor blades shall not be approved for Thirty Minute Watches.

1.5.2   Unless contraindicated by mental health staff, each inmate on Thirty Minute Watch shall be afforded showers, telephone privileges, recreation, and visitation in accordance with his/her custody level.

1.6   Inmates shall never be placed on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch, Ten Minute Watch, or Thirty Minute Watch as a disciplinary sanction or as a means to address problematic inmate behavior unrelated to mental health issues.

1.7   Any deviations from the above Continuous Watch, One Officer to Multiple Inmate Continuous Watch, Ten Minute Watch, or Thirty Minute Watch conditions require prior approval from the Mental Health Program Manager in consultation with Offender Operations.

**807.05   LEVELS OF OBSERVATION**

1.1   Closed-circuit television monitoring or use of suicide prevention aides shall never substitute or replace in-person visual checks by security staff, although they may be used to supplement observation.

1.2   Thirty Minute Watch

1.2.1   Mental health staff shall order a Thirty Minute Watch when an inmate has demonstrated acute signs or symptoms of significant mental disorder, but is not acting in a manner indicating significant suicide risk or risk to others due to a mental illness.

1.2.1.1   This watch provides a closer and more structured observation for inmates whose mental status could deteriorate or who could become suicidal.

1.2.2   Mental health staff shall:

1.2.2.1   Complete an assessment whenever an inmate is placed on a Thirty Minute Watch. If an inmate is placed on this watch during non-business hours including nights or holidays, mental health staff shall complete a mental health assessment no later than the next working day.

1.2.2.2   Evaluate the inmates at least once per day while this watch is in effect.

1.2.3   The shift commander, mental health or medical health care staff may order this watch when an inmate is considered a possible risk to engage in self-destructive or suicidal behavior.  Only the mental health or medical health care staff are authorized to cancel this watch.

ADC048623

1.2.4    During non-business hours, including nights or holidays, medical staff shall complete a health and welfare check on the inmate who is on this watch at least once each day and contact the Mental Health Urgent Responder if needed in accordance with the Mental Health Technical Manual.

1.2.5    When pre-approved by both security and mental health staff, inmates on all levels of watch may be double-bunked, in accordance with the Health Services Technical Manual.

1.2.6    Security staff shall conduct visual welfare checks of inmates at staggered intervals not to exceed every 30 minutes.

　　1.2.6.1    Visual checks shall occur at random times within each 30-minute interval but no longer than 30 minutes shall pass between each random check. The intent is to make visual checks unpredictable.

　　1.2.6.2    Breathing and signs of life shall be clearly observed.

　　1.2.6.3    Security staff shall observe whether items in the inmate's possession match those authorized by mental health staff on the Mental Health Disposition form.

　　1.2.6.4    Visual checks shall be documented on the Observation Record.

1.3    Ten Minute Watch

1.3.1    Mental health staff shall order a Ten Minute Watch when an inmate has demonstrated significant signs or symptoms of significant mental disorder and is acting in a manner indicating high suicide risk and/or risk to others due to a mental illness.

　　1.3.1.1    This watch provides a closer and more structured observation for inmates whose mental status could deteriorate or who could become suicidal.

1.3.2    The shift commander or health care staff may order this watch when an inmate is considered a possible risk to engage in self-destructive or suicidal behavior. Only the mental health care staff are authorized to cancel this watch.

1.3.3    During nights, weekends, and holidays the Urgent Responder may initiate this watch and shall be contacted in accordance with Mental Health Technical Manual.

1.3.4    Security staff shall conduct visual welfare checks of inmates at staggered intervals not to exceed every ten minutes.

　　1.3.4.1    Visual checks shall occur at random times within each ten minute interval but no longer than ten minutes shall pass between each random check. The intent is to make visual checks unpredictable.

　　1.3.4.2    Breathing and signs of life shall be clearly observed.

INMATE SUICIDE PREVENTION, PRECAUTIONARY
WATCHES, AND MAXIMUM BEHAVIORAL CONTROL RESTRAINT          SEPTEMBER 16, 2009          807 - PAGE 11

ADC048624

1.3.4.3   Security staff shall observe whether items in the inmate's possession match those authorized by mental health staff on the Mental Health Disposition form.

1.3.4.4   Visual checks shall be documented on the Observation Record.

1.3.5   Mental health staff shall complete a suicide risk assessment before the end of the Ten Minute Watch as defined in section 807.02 of this Department Order. If an inmate is placed on this watch during non-business hours including nights and holidays, mental health staff shall complete an assessment no later than the next working day.

1.3.6   Mental Health staff shall evaluate the inmate once per day while this watch is in effect. During non-business hours including nights and holidays, health staff shall evaluate the inmate once per day.

1.4   <u>One Officer to Multiple Inmate Continuous Watch</u>

1.4.1   Mental health staff shall order a One Officer to Multiple Inmate Continuous Watch when an inmate has demonstrated signs or symptoms of significant mental disorder and is acting in a manner indicating imminent suicide risk or risk to others due to a mental illness.

1.4.1.1   This watch is for inmates whose mental status has deteriorated and are considered actively suicidal or a risk to others due to a mental illness.

1.4.2   The shift commander or health care staff may order this watch when an inmate is considered to be actively engaged in self-harm or considered by mental health staff to be at high imminent risk for suicide or self-harm and is presenting with significant suicide risk factors and signs of suicidal intent.

1.4.2.1   During weekends, the Urgent Responder shall be contacted in accordance with the Mental Health Technical Manual.

1.4.3   One Officer to Multiple Inmate Continuous Watch is also indicated when:

1.4.3.1   The suicidal or mental health inmate cannot be immediately placed in a designated watch cell, e.g., the inmate is placed in a standard cell, holding cell or enclosed area not routinely used for watch purposes.

1.4.3.2   The placement area contains protrusions or tie-off points that could be used in a suicide attempt.

1.4.3.3   The inmate by necessity retains objects or items that could be used in a suicide attempt e.g., medical items/appliances, sanitary pads, additional clothing, etc.

1.4.3.4   The inmate is returning from the hospital after medical treatment for self-harm.

1.4.4   Security staff shall:

ADC048625

1.4.4.1 Observe inmates on a direct, uninterrupted basis and shall have a clear, unobstructed view of the inmate.

1.4.4.2 Note "One Officer to Multiple Inmate Continuous visual observation" for One Officer to Multiple Continuous Watch on the Observation Record.

1.4.5 Mental health staff shall complete an assessment before the cancellation of the One Officer to Multiple Inmate Continuous Watch as defined in section 807.02 of this Department Order. If an inmate is placed on this watch during non-business hours including nights and holidays, mental health staff shall complete an assessment no later than the next working day.

1.4.6 Mental Health staff shall evaluate the inmate once per day while this watch is in effect. During non-business hours including nights and holidays, health staff shall evaluate the inmate once per day.

1.5 Security staff conducting Continuous Watch, One Officer to Multiple Inmate Continuous Watch, Ten Minute Watch and Thirty Minute Watch shall notify mental health staff immediately through the shift commander of any significant changes in an inmate's behavior while on watch.

1.5.1 During non-business hours including nights and holidays, security staff shall immediately contact the Mental Health Urgent Responder through Control.

1.6 The shift commander shall tour the watch cell area once every four hours to ensure that Observation Records are complete, accurate, and posted along with Mental Health Disposition forms and those visual checks are being performed in staggered, random manner.

1.7 Security staff shall ensure that an inmate on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch, Ten Minute Watch and Thirty Minute Watch is provided the following health care necessities:

1.7.1 Toilet use, upon request.

1.7.2 Fluid intake (minimum eight ounces), at least once per hour, while awake.

1.7.3 Regularly scheduled meals, including special medical and religious diets, of the same quantity and nutritional quality as meals served to the general population.

1.7.4 Paper sack lunches or food served on paper or shatter-resistant trays not requiring eating utensils may be provided to inmates on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch, and Ten Minute Watch if necessary, but should be of the same quantity and nutritional quality as meals served to the general population.

1.7.4.1 Food served should be free of items that can be used for self-harm e.g., bones.

1.7.4.2 Paper trays, paper sacks, napkins, and all other extraneous items shall be removed after the inmate completes eating.

ADC048626

1.7.4.3    Cellophane shall be removed from food prior to serving the food to the inmate.

1.7.5    Prescribed medication, in unit dosage and by watch swallow.

1.8    When evaluating inmates on watch during normal waking hours, mental health and health care staff shall interact with and not just observe inmates.

1.9    Mental health and medical health care staff shall document their evaluations of inmates on watch as progress notes in the mental health section of the medical record.

1.9.1    In the first progress note after an inmate is placed on a watch, mental health staff shall document the circumstances that necessitated the watch and an assessment of the inmate's current status.

1.10    Inmates on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch, Ten Minute Watch and Thirty Minute Watch shall not have their watch status downgraded or discontinued until Mental health staff has:

1.10.1    Assessed the inmate.

1.10.2    Thoroughly reviewed the inmate's medical and mental health record, any other relevant documentation.

1.10.3    Conferred with security staff about the inmate's observed behavior on watch.

1.11    Upon an in-person evaluation by the licensed mental health staff, inmates on watch may be downgraded as clinically indicated.

1.11.1.    Mental health inmates who are not suicidal and who have been placed on a One Officer to Multiple Inmate Continuous Watch because they cannot be placed in a designated watch cell may be directly and completely discontinued from watch.

1.12    Each change in watch status i.e., Continuous Watch, One Officer to Multiple Inmate Continuous Watch, Ten Minute Watch or Thirty Minute Watch and/or conditions of watch, e.g., allowed items on watch, shall be documented on a new Mental Health Disposition form, with both copies of the previous Mental Health Disposition being lined out and signed, stamped, dated and timed by the mental health staff making the change.

1.12.1    Mental health staff shall document the rationale for the change in watch status or watch conditions in the mental health record as a SOAP progress note.

1.12.2    Mental health and the shift commander shall ensure that, when needed, a new Observation Record is initiated if there is a change in watch status.

1.13    When watch status is discontinued altogether, the current Mental Health Disposition form shall be modified as above with "Cancelled" noted on the form.

1.14    Only a psychiatrist, psychologist, other licensed mental health staff or a non-licensed mental health staff member in consultation with a Licensed Psychologist may modify watch status, discontinue watch status, or make changes in the conditions of watch.

ADC048627

1.14.1 Watch status or discontinuation of watch status shall occur only after an in-person evaluation of the inmate on watch performed by a licensed mental health staff member.

1.15 Upon complete discontinuation of watch status, mental health staff shall prepare a discharge summary as a note-to-file documenting the following:

1.15.1 Initial reason for the watch.

1.15.2 Observed behavior during the period of watch.

1.15.3 Any evaluation, staffing, or consultation regarding the inmate on watch.

1.15.4 Therapeutic or other interventions.

1.15.5 Rationale for discontinuation of watch.

1.15.6 Specific communication with mental health and security staff on the unit receiving the inmate from watch, i.e., who was contacted, with a brief synopsis of the communication.

## 807.06    MAXIMUM BEHAVIORAL CONTROL RESTRAINTS FOR SELF-INJURIOUS BEHAVIOR

1.1 Guiding Principles

1.1.1 Maximum behavioral control restraints may be authorized when an inmate exhibits serious self-injurious behavior as a result of a mental disorder. Serious self-injurious behavior is defined as behavior that endangers the inmate's life or significantly affects the inmate's physical health and wellbeing.

1.1.2 Maximum behavioral control restraints are a therapeutic intervention authorized by licensed mental health staff to safely limit a mentally disordered inmate's mobility and to protect the physical wellbeing of the inmate.

1.1.3 Maximum behavioral control restraints shall only be used when all other less restrictive measures have proven ineffective, the inmate continues to actively engage in self-injurious behavior and has failed to respond to directives or procedures intended to stop the behavior.

1.1.4 Maximum behavioral control restraints shall never be used as a form of punishment.

1.1.5 Maximum behavioral control restraints shall be employed for the shortest time necessary.

1.1.6 Maximum behavioral control four-point non-ambulatory restraints shall be employed only in designated suicide-resistant watch cells equipped with authorized restraint beds or chairs.

1.1.6.1 If there is a need to place the restrained inmate in an area other than a designated watch cell (e.g., a medical unit), the inmate shall be restrained in an authorized restraint chair.

ADC048628

# EXHIBIT 1-F



| | | |
|---|---|---|
| **ARIZONA DEPARTMENT OF CORRECTIONS** | **CHAPTER: 800**<br><br>**INMATE MANAGEMENT** | **OPR:**<br><br>SS<br>OPS |
| **DEPARTMENT ORDER MANUAL** | **DEPARTMENT ORDER: 804**<br><br>**INMATE BEHAVIOR CONTROL** | **SUPERSEDES:**<br><br>DO 804 (08/28/09) |
| | | **EFFECTIVE DATE:**<br><br>JUNE 7, 2012 |
| | | **REPLACEMENT PAGE EFFECTIVE DATE:**<br><br>N/A |

## TABLE OF CONTENTS

PURPOSE

APPLICABILITY

PROCEDURES                                                                                      PAGE

804.01     INMATE DETENTION - OBSERVATION ................................................................ 1

804.02     USE OF HOLDING ENCLOSURES ..................................................................... 9

804.03     DEVIATIONS FROM INSTRUCTIONS ................................................................. 9

           IMPLEMENTATION ............................................................................... 10

           DEFINITIONS .................................................................................... 10

           AUTHORITY ...................................................................................... 11


*RESTRICTED*


804.04     *USE OF FORCE* ................................................................................ 12

804.05     *PLANNED USE OF FORCE* ....................................................................... 17

804.06     *FIREARMS AND OTHER WEAPONS* ............................................................... 21

804.07     *USE OF FIREARMS - REVIEW AND INVESTIGATION* .............................................. 22

           *DEFINITIONS - RESTRICTED* ................................................................... 23

*ATTACHMENTS*

ADC013911

1.9     <u>Sanitation Inspections</u> - Correctional Officers shall conduct a general sanitation inspection of all areas in the unit during each shift.

    1.9.1     Inspections shall be documented in the Correctional Service Journal and shall include any deficiencies observed and corrective action(s) taken.

    1.9.2     Sanitation deficiencies shall be corrected as quickly as possible.

1.10    <u>Inmate Welfare Checks</u> - Correctional Officers shall:

    1.10.1     Conduct random, periodic inmate welfare checks, in addition to checks at specifically timed intervals.

    1.10.2     Document and report conditions or abnormal/unusual behavior adversely affecting an inmate's welfare in an incident report, correctional journal and detention log, and immediately report observations through their chain of command.

1.11    <u>Access to Key Personnel</u>

    1.11.1     The detention unit COIII or COIV and the Lieutenant or Captain shall conduct a daily walk-through inspection of the unit to ensure inmates have access to supervisory personnel.

    1.11.2     Inmates may contact the Warden/Deputy Warden and other personnel by using the Inmate Letter.

1.12    <u>Inmate Observation Record</u> - When an inmate is placed on a watch, the staff member conducting the timed watch shall initiate an Observation Record, Form 1101-16.  Any staff member may recommend starting, continuing or canceling a watch. The recommendation shall be submitted through the chain-of-command.

    1.12.1     Types of watches include:

        1.12.1.1     Medical Watch - Health care staff may order this watch when clinically indicated for physical health reasons.

        1.12.1.2     Security Watch - The shift commander may order this watch when they have reason to believe the inmate may attempt to harm themselves but the inmate is not currently exhibiting any self-destructive behaviors. For example, an inmate has suffered a family tragedy. The inmate shall remain on this watch until mental health or health care staff have evaluated the inmate and begun a treatment plan.

        1.12.1.3     Suicide Watch - When an inmate is considered a possible risk self-destructive or suicidal behavior, the shift commander, mental health care staff, or Health Services may order this watch, as outlined in Department Order #807, <u>Inmate Suicide Prevention, Precautionary Watches, and Maximum Behavioral Control Restraints</u>. Only a licensed mental health provider is authorized to cancel or remove a suicide watch.

ADC013918

# EXHIBIT 1-G

| | | |
|---|---|---|
| **ARIZONA DEPARTMENT OF CORRECTIONS** | CHAPTER: 700<br><br>OPERATIONAL SECURITY | OPR:<br><br>OPS |
| **DEPARTMENT ORDER MANUAL** | DEPARTMENT ORDER: 704<br><br>**INMATE REGULATIONS** | SUPERSEDES:<br><br>DO 704 (11/18/09) |
| | | EFFECTIVE DATE:<br><br>MARCH 1, 2010 |
| | | REPLACEMENT PAGE REVISION DATE:<br><br>APRIL 15, 2010 |

## TABLE OF CONTENTS

PURPOSE

RESPONSIBILITY

PROCEDURES                                                                                    PAGE

704.01    INMATE HAIR STYLES AND HEAD GEAR................................................................. 2

704.02    FACIAL HAIR ............................................................................................... 3

704.03    INMATE IDENTIFICATION CARDS....................................................................... 3

704.04    REPLACEMENT OF INMATE IDENTIFICATION CARDS ............................................ 4

704.05    INMATE DRESS AND CLOTHING REQUIREMENTS .................................................. 5

704.06    HOUSING UNIT REGULATIONS .......................................................................... 5

704.07    HOUSING UNIT INSPECTIONS ........................................................................... 9

704.08    INMATE HOUSING ASSIGNMENTS ...................................................................... 9

704.09    TEMPORARY HOLDING ENCLOSURES................................................................ 11

704.10    INMATE EXERCISE ENCLOSURES (MAXIMUM CUSTODY / DETENTION UNITS)............... 13

704.11    INMATE DELEGATION / CONTROL ..................................................................... 14

704.12    DISCRIMINATORY ACTS .................................................................................. 14

704.13    SPECIFIC RESPONSIBILITIES............................................................................ 14

704.14    INTERPRETERS ............................................................................................. 15

704.15    ORIENTATION................................................................................................ 15

          IMPLEMENTATION.......................................................................................... 15

          DEFINITIONS ................................................................................................ 15

          AUTHORITY .................................................................................................. 16

1.3.2.1    Do Not House With (DNHW). (DI 37)

1.3.2.2    Detention Placement/Reason. (Investigation 2A, disciplinary, voluntary /non-voluntary Protective Segregation, Maximum Custody, Return to Custody (RTC), Detainer, medical and mental health concerns.)

1.3.2.3    Prison disciplinary history within the last two years, including violent and non-violent charges. (DI 31)

1.3.2.4    Inmate's committing offense(s). (DI 26)

1.3.2.5    History of institutional violence and predatory behavior within the last two years. (DI 31)

1.3.2.6    Security Threat Group or related information. (DI 81)

1.3.2.7    Physical and mental conditions or limitations and ADA considerations. (DT 08/04, AIMS screens, DI 85 and DI 35))

1.4    Exceptions

1.4.1    Housing unit assignments in the following areas are exempt from review by the housing unit committee due to length of stay and/or special needs.

1.4.1.1    Designated Transitory Units up to a maximum of 48 hours.

1.4.1.2    Medical Housing Facilities.

1.4.2    The unit CO IV shall review the placements the following business day as outlined in sections 1.4.1.1 through 1.4.1.2 above.

1.4.3    A change in custody does not necessarily require a change in housing. For example: when two close custody inmates are being housed together and one of the inmate's custody is reduced or increased; the inmates may continue to be housed together.

1.4.3.1    Inmates classified as maximum custody housed in detention units may be housed with close custody classified detention inmates as long as their housing assignments as outlined in this section.

1.4.4    Exceptions to the housing criteria may be considered. The unit Deputy Warden may authorize an exception to the housing criteria by documenting the reason on both inmates' AIMS files in the DT08 ADC#18 comment screen.

## 704.09    TEMPORARY HOLDING ENCLOSURES

1.1    Temporary holding enclosures shall:

1.1.1    Only be occupied by inmates of the same custody level following the processes outlined in 704.08, 1.2.1 through 1.2.7 of this Department Order.

1.1.2    Be used as a control measure to confine and restrict inmate movement on a temporary/short term basis and for no more than one hour.

      1.1.2.1     Any extension beyond one hour requires Deputy Warden or On-call Duty Officer (Associate Deputy Warden and above) approval.

1.1.3    Be in direct view of staff.

1.1.4    Be inside (Mental Health Observation) or outside (Recreation, Central Intake Processing, Medical Waiting Area, Ingress/Egress or Movement) a building.

1.2    Routine usage of a holding enclosure would include:

1.2.1    Awaiting a scheduled medical appointment.

1.2.2    Turn out for assigned work, education or treatment program.

1.3    Placement of inmates in holding enclosures shall not be for disciplinary reasons.

1.4    Inmates shall not be placed in outdoor enclosures pending transfer to mental health watch, detention assignment or awaiting transfer to another unit/institution.

1.4.1    They may be held at **inside enclosures with environmental temperature controls**; however; placement may not exceed the one hour limit without the Warden's approval.

1.5    The Unit Deputy Warden or in his absence the On-call Duty Officer must approve the placement of an inmate in a holding enclosure, outside of routine usage.

1.5.1    The Unit Deputy Warden or in his absence the On-call Duty Officer shall consider the following prior to approving the use of the temporary holding enclosure:

      1.5.1.1    The availability of staff to provide the prescribed watch.

      1.5.1.2    The medical condition of the inmate.

      1.5.1.3    Any mental heath status to include mental health score.

      1.5.1.4    Any medication prescribed to the inmate, particular attention to any psychotropic medications.

1.5.2    The shift commander shall ensure that an Observation Record, Form 1101-16, is initiated and that staff document observation as prescribed in Department Order #807, Inmate Suicide Prevention, Precautionary Watches and Clinically Ordered Restraints, section 807.05 and the time between observations shall not exceed 30 minutes.

      1.5.2.1    Each time a staff member completes the observation of the inmate and logs the results they shall notify the Unit Control room to log their observation.

1.5.3    The Observation Record shall be on a clip board strategically placed at the holding enclosure available to any command staff for review.

1.5.4    A supervisor shall review the Observation Record form and observe the inmate every half hour, verifying health and safety of the inmate.

CHAPTER: 700 – OPERATIONAL SECURITY
DEPARTMENT ORDER: 704 – INMATE REGULATIONS

1.5.4.1    At shift change, the on-coming shift commander will review all holding enclosures to review for occupancy, observe any inmate in the enclosures, check to verify the time the inmate has been in the enclosure and sign the Observation Record form.

1.5.5    Exigent circumstances must apply for any placement in the enclosure without the Deputy Warden approval.

1.5.5.1    These circumstances would include the immediate need to separate combatants or requests for Protective Segregation review.

1.5.5.2    Within 30 minutes of placing an inmate in the holding enclosure for exigent reasons, the Unit Deputy Warden or On-call Duty Officer must review and approve.

1.5.5.2.1    An inmate may not be assigned to holding enclosure for more than one hour and the shift commander will initiate sections 1.5.2 through 1.5.4.

1.5.6    Extension of the one hour limit shall require authorization by the Warden or after hours, the On-call Duty Officer.

1.5.6.1    Extension of time shall be logged on the Observation Record form to include time of extension approval, which staff approved extension and purpose of the extension.

1.5.6.2    Extensions may be approved for up to <u>one hour only (maximum two hours)</u>.

1.5.7    Water shall be continuously available to inmates in the enclosure.

1.6    Inmates requiring use of bathroom facilities will be accommodated.

1.7    Benches are available for the inmate to sit.

1.8    Outdoor Holding Enclosures:

1.8.1    Shall be covered to provide shade.

1.8.2    Shall provide a cooling or mister system.

1.8.3    Shall provide continuous water source.

## 704.10    INMATE EXERCISE ENCLOSURES (MAXIMUM CUSTODY/DETENTION/MENTAL HEALTH UNITS)

1.1    Inmates, with exception of those listed in 1.7 of this section, shall be afforded six hours of outdoor exercise weekly. Exercise periods shall be afforded to the inmate in two hour blocks, three times weekly.

1.2    Movement of maximum custody inmates to and from exercise enclosures shall be logged in the unit control room Correctional Journal.

1.2.1    Correctional staff shall make a visual check (health & welfare) on the inmates in the enclosures a minimum of every 30 minutes and ensure the check is logged in the Correctional Journal.

CHAPTER: 700 – OPERATIONAL SECURITY
DEPARTMENT ORDER: 704 – INMATE REGULATIONS

1.3     When a detention inmate goes to an exercise period, the movement shall be recorded on the Individual Inmate Detention Record, Form 804-3.

1.4     Water shall be available during the exercise period.

1.5     Outdoor exercise enclosures shall be covered to provide shade.

1.6     Outdoor exercise enclosures shall have either a mister system or evaporative cooler system for temperatures that exceed 100 degrees.

1.7     Mental health inmates, who are housed in a designated mental health unit/cell block, shall be afforded the same number of hours for exercise weekly as general population inmates. Exercise periods for these inmates shall be one hour in duration only, six days per week.

    1.7.1     Access to exercise areas shall be defined by mental health staff in three phases that increase the inmate's ability to access greater space and freedom of movement for exercise purposes.

1.8     Inmates participating in exercise periods shall be under constant staff supervision.

**704.11   INMATE DELEGATION / CONTROL** Wardens, Deputy Wardens and Administrators shall:

1.1     Ensure that inmates are not placed in a position of formal control or authority over other inmates.

1.2     Ensure staff report violations of this nature using an Information Report, Form 105-2, as outlined in Department Order #105, Information Reporting.

1.3     Designate a staff member to receive Information Reports concerning violations of this type.

**704.12   DISCRIMINATORY ACTS**

1.1     Employees shall report any known or alleged acts of discrimination against inmates by:

    1.1.1     Completing an Information Report, Form 105-2.

    1.1.2     Submitting the report to their first-line or any other appropriate supervisor.

1.2     Supervisors shall investigate reports of discrimination and take appropriate action to prevent and/or correct discriminatory acts against inmates.

**704.13   SPECIFIC RESPONSIBILITIES** - Wardens, Deputy Wardens and Administrators shall:

1.1     Make reasonable modifications in job and program requirements, and/or minor site changes (e.g., wheelchair ramps, lowering shelves) to facilitate participation by disabled inmates. (See Department Order #108, Americans with Disabilities Act (ADA) Compliance.)

1.2     Ensure inmate work assignments are based on the inmate's experience and skill level in accordance with the inmate's individual corrections plan, the applicable facility priority ranking report(s), and applicable vacancies in work and/or program areas.

1.3     Afford inmates the right to practice their religion in accordance with Department Order #904, Inmate Religious Activities/Marriage Requests, and Department Order #909, Inmate Property.

# EXHIBIT 1-H

DEPARTMENT ORDER 401-PRISON CONSTRUCTION
CHAPTER:  401T-PPS ADC Administrative Services, Physical Plant Standards
Rev. 02/23/12

| INDIVIDUAL VALIDATION | | | |
|---|---|---|---|
| | **ARIZONA DEPARTMENT OF CORRECTIONS** | CHAPTER:  400<br><br>PHYSICAL PLANT/FACILITIES | OPR:<br><br>Division Director, Administrative Services |
| **401-T-PPS TECHNICAL MANUAL PHYSICAL PLANT STANDARDS** | | DEPARTMENT ORDER:  401<br><br>PRISON CONSTRUCTION | SUPERSEDES: N/A<br><br>EFFECTIVE      DATE: 10/1/00<br>**Rev. 07/01/02**<br>**Rev. 08/02/06**<br>**Rev. 11/01/09**<br>**Rev. 04/09/10**<br>**Rev. 05/17/10**<br>**Rev. 01/27/12**<br>**Rev. 02/23/12** |

## FEBRUARY 23, 2012 REVISION SUMMARY

**The Arizona Department of Corrections _401-T-PPS Technical Manual Physical Plant Standards_ was revised on February 23, 2012. Changes are identified in red below:**

### 3.2.1 Medium Custody Housing Requirements

Medium Custody inmates may be housed in dormitory or cell style buildings. Optimal number of beds per pod/housing unit will be based on sound correctional practice, which ensures the safety of staff and inmates as well as effective security.  The housing unit shall have a control room per section 1.6.19.1.3, centrally located, capable of directly observing no more than 6 pods within a maximum of a 180 degree field of view. Pod size shall be limited to a maximum of 50 inmates per pod in dormitory style buildings. No more than 200 inmates shall be monitored by each control room officer for dormitory style buildings. Buildings shall be constructed to meet an I-3 condition 2 occupancy requirement. Exit and entry doors into the Pod areas shall be lockable. Movement between pods shall be restricted by an electronically and manually operated door or gate. Building may be constructed of masonry, concrete (pre-cast or cast-in-place), pre-engineered metal building or other materials that meet the above and code requirements.

**1.5.1.2.5**    The areas and buildings requiring these security bars are those in Close, maximum and all detention housing units (including control rooms), inmate canteen, receiving, and release, armory, locksmith, visiting, central control, complex control and pharmacy.

**1.5.1.2.6**   Any equipment that is accessible to inmates from the yard shall have a 10 foot high chain link fencing enclosure constructed around it of with 1—36" wide gate and 1 coil of 30" 5 point detainer hook and barb concertina razor ribbon around the top of the enclosure.

## 1.5.1.3   HVAC DESIGN CONDITIONS

### 1.5.1.3.1    Outdoor Conditions:

**1.5.1.3.1.1**    The outdoor design conditions shall be determined from the Climatic Data for Region X Arizona, California and Nevada issued by ASHRAE.

**1.5.1.3.1.2**    The summer design dry bulb and design wet bulb shall be taken from the 0.5 percent columns.  The winter dry bulb shall be taken from the 0.2 percent column.

### 1.5.1.3.2    Indoor Environmental Requirements:

**1.5.1.3.2.1**    Mechanical cooling shall be provided to maintain a maximum indoor temperature of 78°F within the ASHRAE summer comfort zone. Unless contradicted by security considerations or site and design conditions, equipment shall be ground-set.  Ground-set equipment shall be located in areas not accessible to inmates or secured by fencing.  Equipment selected shall be of the highest EER/SEER rating available.

**1.5.1.3.2.2**    Evaporative cooling may be provided for warehouse or industrial buildings.  12" Glasdek media shall be used as a minimum media thickness and be comprised of 4" thick and 8" thick media to allow replacement of the 4" media during regular maintenance.

Inmate spaces in the Minimum and Medium Custody facilities shall be designed for air conditioning to maintain a maximum indoor temperature of 80°F within the ASHRAE summer comfort zone.

**1.5.1.3.2.3**    Heating shall be provided for inmate, mixed use, and staff only spaces to maintain a minimum indoor temperature of 68°F within the ASHRAE winter comfort zone.

**1.5.1.3.2.4**    The following areas have special requirements:

**1.5.1.3.2.4.1**   Within Close and Maximum level custody facilities the housing unit control room, central control and complex control

8