# EXHIBIT 2

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Katherine E. Watanabe, Bar No. 027458
Lucy M. Rand, Bar No. 026919
Ashley B. Zuerlein, Bar No. 029541
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov
Ashley.Zuerlein@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-NVW <br><br> **DECLARATION OF RICHARD PRATT** |

2717803.1

I, **RICHARD PRATT**, make the following Declaration:

1.      I have been working with the Arizona Department of Corrections (ADC) since July of 2000, not including from October 2009 to July 2011 when I was employed elsewhere.  Currently, I am employed with ADC as the Interim Health Services Division Director.  I have held this position since February 2012.

2.      I am a named Defendant in this lawsuit and am familiar with the claims Plaintiffs make in their Complaint and Motion for Class Certification. I am also familiar with, and have personal knowledge of, ADC's policies and practices regarding medical treatment for ADC inmates, including the policies and practices outlined in this Declaration, ADC staffing, and ADC facility/inmate information.

3.      ADC has ten different facilities: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.

4.      The current inmate population at each facility is as follows:

- ASPC-Douglas: 2,095
- ASPC-Eyman: 5,151
- ASPC-Florence: 3,913
- ASPC-Lewis: 5,549
- ASPC-Perryville: 3,641
- ASPC-Phoenix: 587
- ASPC-Safford/Ft. Grant: 1,582
- ASPC-Tucson: 5,152
- ASPC-Winslow: 1,667
- ASPC-Yuma: 4,389

5.      The total ADC inmate population is:  33,726.

6.      Currently, the named Plaintiffs are housed in the following facilities-units:

- Dustin Brislan – Eyman-SMU I
- Maryanne Chisholm – Perryville-Santa Cruz
- Robert Gamez – Eyman-Browning

2717803.1                                         2

1          •      Joseph Hefner – Lewis-Barchey

2          •      Shawn Jensen – Tucson-Manzanita

3          •      Desiree Licci – Perryville-San Carlos

4          •      Joshua Polson – Lewis-Rast

5          •      Sonia Rodriguez – Perryville-Lumley

6          •      Jeremy Smith – Lewis-Rast

7          •      Stephen Swartz – Lewis-Rast

8          •      Jackie Thomas – Eyman-SMU I

9          •      Christina Verduzco – Perryville-Lumley

10         •      Charlotte Wells – Perryville-Santa Rosa

11     7.     Inmate Victor Parsons is no longer incarcerated at ADC; he was released on

12  parole in November 2012.

13     8.     Effective July 1, 2012, health care at all ADC facilities (including medical,

14  dental, and mental health care) is now provided by Wexford Health Services, a private

15  entity.  The ADC-Wexford contract imposes upon Wexford a duty to provide certain care,

16  including standards for staffing, access to health care, treatment screening, emergency

17  responses, medication and supplies, chronic care, environmental conditions, and mental

18  health treatment.  Wexford's compliance with these standards is constantly monitored by

19  ADC.

20  **Intake Screening**

21     9.     Plaintiffs contend that Defendants have a practice of not complying with

22  their own requirement that health care records be reviewed within 12 hours of an inmate's

23  arrival.  It is unclear whether this allegation relates to the review of medical records upon

24  intake at ADC, or upon an inmate's arrival at another unit or facility – two separate and

25  distinct issues.

26     10.     The Health Services Technical Manual, Chapter 5, Section 5.0 requires

27  nursing staff to perform a chart review of an inmate within 12 hours of his arrival from

28  another facility or unit, and to physically assess the inmate within 24 hours of his or her

2717803.1                              3

1   arrival. (Ex. 2-A.)  This is different than an inmate's initial intake at ADC.  Upon intake

2   at ADC, an inmate is physically examined within seven days of the inmate's arrival at the

3   intake facility.   (Ex. 2-B, Health Services Technical Manual, Chapter 5, Section 2.0,

4   Paragraph 4.0.)

5       **Access to Medical Care**

6       11.    Plaintiffs contend that ADC has pursued a practice and unwritten policy of

7   delaying and/or denying prisoners access to necessary care for serious medical needs."

8       12.    This is not ADC policy or practice.  It is ADC practice and policy to provide

9   all inmates with timely and effective health care.  Health Services Technical Manual,

10  Chapter 5, Section 3.1, sets forth ADC's policy for inmate access to necessary health care.

11  (Ex. 2-C.)  All inmates access non-emergency health care by making an appointment.  An

12  appointment is made by completing a non-emergency Health Needs Request (HNR).  The

13  completed HNR is deposited in a labeled box and picked up daily by health staff.  Nursing

14  staff triage the HNR and schedule the inmate for an appointment.  Triaging of HNRs is

15  performed to sort and classify the inmates' health requests to determine priority of need

16  and the proper place for inmate care to be rendered.  HNRs that indicate the inmate may

17  have or be suffering from a condition that requires immediate attention will be scheduled

18  to be seen the same day that the HNR is received.  If the triaging nurse cannot determine

19  what the inmate needs or cannot provide what the inmate requests, the inmate should be

20  seen within 24 hours.

21      **Sick Call**

22      13.    Under § 2.20.2.2 of the Wexford Contract, referrals from sick call to a

23  physician or midlevel provider must be seen within seven days of the referral.  (Ex. 2-D.)

24  HNRs are retrieved daily from each unit and triaged.   Inmates are scheduled for

25  appointments as indicated by the specific discipline providing the required service or

26  exam.  (Ex. 2-A at Paragraph 1.1.)  Delays in scheduling of medical appointments can be

27  a result of unrelated, uncontrollable situations, such as prison lockdowns.

28

**Emergency Care**

14.     Plaintiffs contend that Defendants have pursued a practice and unwritten policy of not providing sufficient, trained staff to competently respond to emergencies.

15.     This is not an ADC practice or policy.  ADC Policy, as laid out in Health Services Technical Manual, Chapter 5, Section 1.5, states that it is the responsibility of the CRNS II to ensure that all licensed nurses are trained in providing emergency nursing care to the patient in need of those services.  (Ex. 2-E.)  Paragraph 3.1 of Section 1.5 states that demonstration of skills and knowledge in regards to the Nursing Assessment/Procedures, Emergency Response Orders will be performed annually. (Id.)  Additionally, annual documentation is required to demonstrate that the licensed nurse can perform the skills expected.

16.     The Safford-Fort Grant Unit is a satellite unit located approximately 47 miles away from the Safford complex, in a mountainous area.  In August 2012, that Unit only had medical staff 16 hours per day because of its population and remote location. Currently, however, Fort Grant has 24-hour medical staffing available, thus eliminating the need to transport prisoners off-site.

17.     ADC does not have a policy requiring inmates to be sent to an outside facility when they have been suspected of overdosing.

**Chronic Care**

18.     Plaintiffs contend that "chronic care patients are not always timely seen because of lack of staffing."  This is not ADC policy or practice.

19.     The ADC Health Services Manual, Chapter 5, Section 5.1, Paragraph 3.1 provides: "The senior nursing staff member on each unit will ensure that inmates with chronic conditions are scheduled to be examined and/or treated at least every six months by a medical provider."  (Ex. 2-F.)  ADC Department Order 1101 – Inmate Access to Health Care, further provides: "Physicians, Physician's Assistants, Director of Nursing and Nurses shall … re-order medications and treatments for inmates with chronic

1   conditions in a timely manner so the inmates receive the necessary treatment for their

2   chronic conditions without interruption or delay."  (Ex. 2-G.)

3       20.   The Eyman facility formerly known as SMU 2 Unit is now called Browning

4   Unit.

5   **Specialty Care**

6       21.   Plaintiffs contend that "Defendants have pursued a policy and practice of

7   reimbursing specialty care providers at low rates and this has made it challenging to find

8   specialists who will provide treatment to prisoners," and that "[i]t currently takes about

9   two to four weeks from the time a doctor orders an x-ray to the time he gets a radiology

10  report."

11      22.   The rates that ADC can pay outside providers is set by statute.   Some

12  providers to refuse to accept the statutory rate, but this is not something that ADC can

13  control.

14      23.   Health Services Technical Manual Chapter 4, Section 3.0, Paragraph 8.1,

15  sets forth ADC's policy regarding X-rays. (Ex. 2-H.)  All X-rays are reviewed by medical

16  staff at the facility upon taking them; this is known as a "wet read."  If something is

17  visible based on that "wet read," treatment is immediately provided.  The X-ray is then

18  packaged and sent off site to a contract radiologist to interpret the X-ray.  The contract

19  radiologist reviews the X-ray, issues a written report, and then returns the X-ray and

20  report to medical staff for review and any further action if necessary.  If an emergent

21  interpretation is needed, the X-ray is taken to the outside radiologist or hospital.  If an

22  urgent interpretation is needed, medical staff will call the outside radiologist and request

23  an expedited interpretation. Chapter 5, Section 7.0, Paragraph 6.0, of the Health Services

24  Technical Manual requires medical staff to "maintain a tracking log of x-rays sent to the

25  radiologist contractor" and to "follow up with the contractor if reports are not received

26  within the amount of time specified in the contract." (Ex. 2-I.)

27

28

2717803.1                                    6

**Medical Housing**

24.     Plaintiffs contend that "prisoners with very serious conditions are dying in their cells, rather than a medical setting." This is not an ADC policy or practice. If an inmate is in need of care, they are placed in an infirmary setting or taken to the hospital.

25.     Health Services Technical Manual Chapter 7, Section 7.0, Paragraph 3.0, lays out the general ADC policy regarding hospice type services. (Ex. 2-J.) It states as follows: "Terminally Ill/Hospice care will be provided for inmates who are in the last stages of a diagnosed terminal illness. Hospice care focuses on the achievements the patient is able to make in face of physical deterioration. The Department has embarked on a process that will lead to a hospice program. In the interim, terminally ill patients will be provided support in a manner that is consistent with the basic medical doctrines of comfort support for the dying." (Id.)

26.     Health Services Technical Manual Chapter 7, Section 7.0, Paragraph 2.0 states: "All patients diagnosed terminally ill will have a care plan. Physical measures, such as ice packs, heat, position changes and air mattresses will be used as needed to enhance the comfort of the inmate. Medications will be given as ordered by the Health Care Provider to achieve maximum comfort for the inmate. Food and fluids will be provided as tolerated by the inmate." (Ex. 2-K.)

**Clinical Facilities**

27.     Plaintiffs contend that Defendants have a "practice and unwritten policy of conducting examines in non-confidential setting." This is not ADC policy or practice.

28.     Health Services Technical Manual Chapter 1, Section 7.0, Paragraph 3.1 states, "Clinical encounters are conducted in private, without being observed or overheard by security personnel. When triage is required to be conducted at the inmate's cell, health services staff will take extra precautions to promote private communication between health staff and the patient." (Ex. 2-L.) Paragraph 3.2 states "when safety is a concern and full visual privacy cannot be afforded, alternative strategies for partial privacy, such

1   as a privacy screen, will be utilized.  Security personnel are present only if the patient

2   poses a probable risk to the safety of the health care provider or others." (Id.)

3   **Medication Distribution Systems**

4   29.    Plaintiffs contend that "Defendants' practice and unwritten policy of failing

5   to supervise, manage and support medication distribution," and that "primary physicians

6   are expected to refill and renew those prescriptions, and do so in some cases without even

7   seeing the patient." This is not an ADC policy or practice.

8   30.    ADC's policy on medication management and distribution provides for a

9   consistent and uniform system of delivery of prescription medications to the inmate

10  population.  Health Services Technical Manual Chapter 5, Section 6.0, sets forth the

11  policy to ensure that medications are delivered on a daily basis in a uniform and consistent

12  manner throughout the Department, and that accountability is maintained in all phases of

13  the delivery process.   (Ex. 2-M.)

14  31.    Health Services Technical Manual Chapter 5, Section 6.4, Paragraph 1.0,

15  states: "Prescription medications are administered to individuals only upon the order of a

16  physician, dentist, psychiatrist, or other legally authorized individual." (Ex. 2-N.)

17  32.    The Wexford contract, Provision 2.13.10.4 Psychiatric Provider Services,

18  states "Psychotropic medications or other forms of pharmacotherapy will be prescribed

19  only by a psychiatrist, and only after the provider has conducted a thorough

20  examination…" (Ex. 2-O.)  The Mental Health Technical Manual, Chapter 5, Section

21  10.0, Paragraph 1.3, states that the health care professional responsible for administering

22  psychotropic medication shall only dispense psychotropic medication that has been

23  ordered by a psychiatrist or psychiatric nurse practitioner. (Ex. 2-P.) The Health Services

24  Technical Manual, Chapter 4, Section 1.1, Paragraph 1.1, states that only ADC employees

25  legally licensed by the State of Arizona to prescribe medications shall be authorized to

26  prescribe medications for inmates. (Ex. 2-Q.)

27  33.    All prescriptions are tracked by the pharmacy.  Prescriptions for chronic

28  care conditions are automatically refilled. If an inmate is prescribed a medication for

1   which there is no refill, a sticker is included with his prescription. That sticker can be

2   submitted with an HNR request if that inmate feels he needs a refill of his prescription.

3        34.    It is ADC practice that inmates who request a renewal of a prescription must

4   be evaluated by a licensed practitioner who has the capability of prescribing medication. If

5   an inmate simply needs a refill of a prescription that is still current, it is not necessary for

6   that inmate to be seen by a medical provider.

7       **Medical Records**

8        35.    Plaintiffs contend that "Wexford has pursued a practice of keeping chaotic,

9   inaccurate, and disorganized records throughout the state," and that "it is no longer the

10   practice to transfer patients' full medical records with them when they move to a higher

11   level of care."

12        36.    Health Services Technical Manual Chapter 5, Section 5.3 sets forth a very

13   thorough and detailed policy for the maintenance and organization of medical records.

14   (Ex. 2-R.)

15        37.    Health Services Technical Manual Chapter 5, Section 5.0 sets forth the

16   policy for transferring an inmate's medical record file when they are transferred to another

17   facility.  (Ex. 2-S.)  Medical staff shall, beginning at 1000 hours and continually

18   throughout the day, check AIMS for a listing of inmates scheduled to depart the sending

19   facility for another ADC facility the following day. Medical records staff must complete

20   the inmate identifying information on a Transfer Summary/Continuity of Care form and

21   affix it to the front of the medical record jacket, then give the medical record to the

22   designated nursing staff for completion of the Transfer Summary/Continuity of Care form

23   and return it to medical record staff. When the medical record is received from nursing

24   staff, medical record staff shall obtain all required documentation for inclusion in the

25   medical record and designate the medical records as those pending transfer and keep them

26   separate from other medical records. After 1500 hours, medical record staff shall package

27   all volumes of medical records of inmates and deliver packaged medical records to the

28

1    designated location where Security and/or transportation staff shall pick up the medical

2    records of transferred inmates.

3         38.    Hundreds of pages of paperwork are generated each day regarding medical

4    care and inmates are constantly submitting HNR requests.  It is not reasonable to assume

5    that all paperwork from each day will be filed on that day.

6         39.    More specifically, the Lewis facility maintains a centralized medical

7    records area which holds records for the entire complex, unlike other complexes, where

8    the records are maintained at each individual yard. As a result of this arrangement, it is

9    expected that the amount of loose filing in this location would be increased, as it is a

10   combination of all yards on that complex.

11   **Quality Assurance**

12        40.    Plaintiffs contend there is no structured system for evaluating Wexford's

13   delivery of services.  This is not true.  There are numerous provisions in place to provide

14   quality assurance and monitoring of the Wexford contract.  (Ex. 2-T.)  For example, there

15   are contract compliance monitors assigned to each ADC facility.  These monitors review

16   Wexford's compliance with the contract.  There are also "quality care monitors."  Each

17   quality care monitor may be assigned multiple facilities.  The purpose of the quality care

18   monitor is to ensure that the actual care being provided to ADC inmates is acceptable.

19   There are quarterly contract performance audits conducted by ADC regarding Wexford's

20   performance under the contract.  There is also a litany of quality assurance checks,

21   reviews, reports, and audits that are required under the contract to be prepared by Wexford

22   and submitted to ADC to ensure that Wexford is complying with the provisions of the

23   contract.

24        41.    ADC has received the Quality Management Description from Wexford.

25   **Staffing**

26        42.    Attached as Exhibit 2-U is a table outlining current staffing numbers at

27   ADC facilities.  These staffing numbers have improved significantly since the Wexford

28   transition. The staffing numbers Plaintiffs cite to represent the staffing levels immediately

1   after health care transitioned to Wexford. After the Governor signed the legislation which

2   mandated the privatization of health care into law, medical staff started leaving their

3   positions with ADC for other jobs with the State of Arizona so that they did not lose their

4   retirement benefits and pensions.

5       43.    Under the ADC-Wexford contract, Wexford is required to follow ADC

6   policies.

7       44.    The documents attached to this Declaration are true and accurate copies of

8   what they purport to be.

9       I declare under penalty of perjury that the foregoing is true and correct.

10   Executed on    DECEMBER 24           , 2012.

11

12

13                                   Richard Pratt

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2717803.1                              12

# EXHIBIT 2-A

| | Continuity of Care - Upon Transfer | OPR:<br>Medical Program Manager &<br>Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: dc/cp |
| Health Services Technical Manual | HSTM<br>Chapter 5<br>Section 5.0. | Supercedes:<br>HSTM 5.5.0. June  15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**          NCCHC STANDARD P-E-02
                         NCCHC STANDARD P-E-03
                         NCCHC STANDARD P-E-12

**PURPOSE:**  To provide guidance for ensuring the continuity of care upon transfer to another facility within the Arizona Department of Corrections or upon transfer to a non-ADC Facility, Unit or Jail.  This also provides guidance in the Reception of the Inmate.  The ensuring of continuity is directed through review of arriving inmate medical records by a qualified health staff member prior to transfer to another state ADC facility, contract facility, or out to court.  To ensure that the inmate medical records are reviewed upon arrival at the receiving facility and the inmate is interviewed by a receiving health services staff member.

**RESPONSIBILITY:**  It is the responsibility of the Correctional Registered Nurse Supervisor II to monitor that a correctional nurse completes a Continuity of Care Form prior to an inmate transfer; that the medical record is reviewed by a correctional nurse upon the inmate's arrival at the receiving facility; and the inmate is interviewed concerning the state of his/her health care and all related needs.

**GENERAL PROCEDURES:**  All inmates shall have their needs communicated from the sending facility to the receiving facility by the Continuity of Care Form and verbally at the time of transfer.

1.0.     **MEDICAL RECORDS TRANSFER PROCESS**.  Medical record staff or in their absence, other designated HSB staff shall, beginning at 1000 hours and continually throughout the day, check AIMS (DI-71) for listing of inmates scheduled to depart the facility for another ADC facility the following day.  Review the current medical record and the AIMS DT-08 for Medical Holds or Restrictions.

1.1.     If a Medical Hold or Restriction is in place, advise local Classification Office that a Medical Hold or Restriction exists and the inmate may not be transferred except as listed on DT 08.

188

1.2.     If no Hold or Restrictions exist, Medical Records staff must complete the inmate identifying information on a Transfer Summary/Continuity of Care form and affix it to the front of the medical record jacket. Then give the medical record to the designated nursing staff for completion of the Transfer Summary/Continuity of Care form and return to medical record staff. If nursing staff has identified an impediment to the pending transfer, nursing staff shall notify of the impediment, medical record staff shall then notify facility Classification staff as soon as possible.

1.3.     When medical record (with completed Transfer Summary /Continuity of Care form) is received from nursing staff, medical record staff shall obtain all required documentation for inclusion in the medical record and place in the medical record jacket in the proper location as per Organization of ADC Medical Record. The staff shall then place the Transfer Summary/Continuity of Care form in the required location of the medical record jacket.  Then the staff shall designate the medical records as those pending transfer and keep them separate from other medical records in the medical record office or area.

1.4.     Sometime after 1500 hours medical record staff shall be advised by Classification staff that the transfer list is complete; at this time, medical record staff shall; Complete columns 4, 5, and 6 of the Inmate Chronological Movement Record on top of Section IV of the medical record jacket; Enter pertinent information for each transferring inmate (as listed below) in a Departure Log (NOTE: This may be either a manual or an electronic log).Transfer Date, ADC No., Inmate Name, Receiving Facility, M.R.Sent Today (Y/N), Date M.R. Sent (if after Transfer Date); Package all **volumes** of medical records of inmates who are to be transferred to the same facility in a sealed container clearly addressed to the receiving facility. For those facilities with more than one unit, each medical record shall be marked with a removable label indicating the unit inmate is to be transferred to; Deliver packaged medical records to designated location where Security and/or Transportation staff shall pick up the medical records of transferred inmates.

2.0.     The MRL II and FHA of each complex will develop a post order that describes methodology for regular health staff receipt and review of the Movement list.   These lists are reviewed to serve as a trigger and double check of departing inmates to ensure that all necessary clinical preparations are made to support continuity of care when an inmate transfers.  The post order will also ensure that incoming inmates (from other complexes or jails) are reviewed ensure that all necessary clinical responses are provided to support continuity of care when an inmate is received – specifically to ensure that ongoing care is continued and necessary care is initiated.

2.1.     No later than 0800 hours (Monday through Friday), obtain a copy of the Daily Movement Sheet supplied by the facility Inmate Record Office , which lists all inmates who were transferred from the facility within the past 24, hours. On Mondays or following legal holidays, this time period may be expanded from 24 to 72 hours.

2.2.     Check the names of the inmates listed on the Daily Movement Sheet against those listed on the Departure Log to ascertain that **all of the volumes** of the medical records for all transferred inmates were sent to the receiving facilities.

2.3.     If lists/log comparison demonstrates that medical record(s) were not sent, notify receiving facility.

3.0     **Sending Facility (Departing Inmates)**.   The MRL II will review the Movement list to ensure that all necessary clinical preparations are made to support continuity of care when an inmate transfers.

189

3.1.     The sending facility <u>nursing staff</u> are responsible to immediately, upon notification of an inmate's impending transfer, review the inmate's medical record; and complete the necessary information elements on the Continuity of Care Form prior to transfer. The report must identify any existing chronic illness/disease; and/or medication ordered which must be continued during transportation and after intake at the new facility. They are also responsible to provide a copy of the inmate's Corrections Institution Pharmacy Software (CIPS) medication profile when transferring to a non-ADC facility. The nursing staff shall also contact the Clinical Coordinator for referral appointment information to an off-facility medical or dental provider, or to a clinic/hospital for evaluation; a follow-up appointment needed by an onsite medical or dental provider; any special requirements which are to be documented under "Comments".

3.2.     If the inmate is being transferred to another unit and a diagnostic report has been received in the medical record but has not been reviewed and signed by the ordering provider:  The report is to be placed on top of the SOAP divider so the transferring unit can route the chart and report to the provider assigned to that unit so treatment can be rendered if necessary.

3.3.     Sending facility <u>medical records staff</u> are responsible to: place the Continuity of Care Form in Section 2 of the health record to remain as a permanent part of the record.

3.4.     The Medical Record Scheduled Appointment Form discussed in the "Outside Specialty Care Clinics" section and "Routine Appointments (Recording) section must be verified and provided to the receiving complex. Review of the form will allow nursing staff to advise a need to cancel the movement or to inform the receiving complex of any pending care/treatment.

3.5.     The Facility Health Administrator (with the advice and assistance of the Medical Records Librarian, the Pharmacy Liaison, and the CRNS II) will develop complex post orders or policies to ensure that the appropriate staff also verify that all medical records and x-rays on file will accompany the inmate at the time of transfer and verify that all medication sheets and observed therapy (watch swallow) medications will accompany the inmate at the time of transfer. This policy must ensure that any non-administered Keep on Person medications should accompany the inmate at time of transfer. Note that a one week supply of prescription medications should accompany all inmates transferred to non-ADC private prisons.

3.6.     Medical record or in their absence, other designated IHSD staff shall beginning at 1000 hours and continually throughout the day, check AIMS (DI-71) for listing of inmates scheduled to depart the facility for another ADC facility the following day <u>and</u> review the current medical record and the AIMS DT-08 for Medical Holds or Restrictions.

-       If medical Hold or Restriction is in place, advise local Classification Office that a medical Hold or Restriction exists and the inmate may not be transferred except as listed on DT 08.

-       If no Hold or Restriction exists; complete the inmate identifying information on a Transfer Summary/Continuity of Care form and affix it to the front of the medical record jacket.

-       Give the medical record to the designated nursing staff for completion of the Transfer Summary/Continuity of Care form and return to medical record staff. If nursing staff has identified an impediment to the pending transfer, nursing staff shall notify of the impediment, medical record staff shall then notify facility Classification staff as soon as possible.

3.7.     When medical record with completed Transfer Summary /Continuity of Care form is received from nursing staff, medical record staff shall:

-       Obtain all required documentation for inclusion in the medical record and place in the medical record jacket in the proper location as per Organization of ADC Medical Record as outlined in Chapter 2 of this Technical Manual. Chronic Health Problem Card(From designated

Chronic Condition Tickler file box)Medication Sheets(From Medication books Nursing/Pharmacy)Laboratory, x-ray, Consultation and/or other reports

- Place Transfer Summary/Continuity of Care form on top of Section II of the medical record jacket affixed in prongs

- Designate the medical records as those pending transfer and keep them separate from other medical records in the medical record office or area.

3.8. After 1500 hours medical record staff shall be advised by Classification staff that the transfer list is complete, so far. (NOTE: Despite this notification, inmates subsequently may be added to the list by Classification.) At this time, medical record staff shall:

Complete columns 4, 5, and 6 of the Inmate Chronological Movement Record on top of Section IV of the medical record jacket. **(Date Transferred:, Transferred To:, Medical Records Cleared By: )**

- Enter pertinent information for each transferring inmate (as listed below) in a Departure Log (NOTE: This may be either a manual or an electronic log).Transfer Date, ADC No., Inmate Name, Receiving Facility, M.R. Sent Today (Y/N), Date M.R. Sent (if after Transfer Date)

- Package all volumes of medical records of inmates who are to be transferred to the same facility in a sealed container clearly addressed to the receiving facility. For those facilities with more than one unit, each medical record shall be marked with a removable label indicating the unit inmate is to be transferred to.

- Deliver packaged medical records to designated location where Security and/or Transportation staff shall pick up the medical records of transferred inmates.

4.6. No later than 0800 hours (Monday through Friday), obtain a copy of the Daily Movement Sheet supplied by the facility Inmate Record Office , which lists all inmates who were transferred from the facility within the past 24, hours. On Mondays or following legal holidays, this time period may be expanded from 24 to 72 hours.

- Check the names of the inmates listed on the Daily Movement Sheet against those listed on the Departure Log to ascertain that all of the volumes of the medical records for all transferred inmates were sent to the receiving facilities. If lists/log comparison demonstrates that medical record(s) were not sent, notify receiving facility and proceed as described above.


4.0. **Receiving Facility. (Arriving Inmates)** As above, the review of the Movement list will be performed to ensure that incoming inmates (from other complexes or jails) receive all necessary clinical responses to support continuity of care when an inmate.

4.1. Receiving facility <u>nursing staff</u> are responsible to perform a chart review within 12 hours upon arrival. They must physically assess an inmate within twenty-four hours of his/her arrival at a permanently assigned facility. The nursing staff will complete and sign the Initial Inter-facility Assessment Form and refer the inmate for appropriate emergency or routine health care service as determined by the chart review and assessment. The nursing staff shall also complete a Medical Work-Up Form, including date and signature and verify that the inmate has all required medical equipment, medication and supplies.

4.2. The Medical Record Scheduled Appointment Form discussed in the "Outside Specialty Care Clinics" section and "Routine Appointments (Recording) section, must be reviewed to allow nursing staff to plan for any patient needs regarding pending care/treatment.


5.0. <u>Current Medical/Dental Orders</u>

5.1.    Receiving nursing services may continue an inmate's medication order up to ten working days in order to ensure continuity of care.

5.2.    A provider must renew required prescriptions within a ten working day period.  This interim provision in no way diminishes the obligation of the receiving institution to do intake assessments in a timely manner.

5.3.    Inmates who are received at a facility with a current provider order that has not been complete shall have that order completed at the soonest opportunity.

5.4.    Nursing staff at the receiving facility are authorized to accomplish testing properly ordered by an ASPC-Phoenix physician, nurse practitioner, or PA.

6.0.    Transfer Errors

6.1.    All errors relating to an inter-facility transfer must be communicated to the FHA at the time the error (inappropriate placement, inability for receiving complex to provide adequate care of the inmate's needs, etc.) has been identified.

6.2.    The FHA shall assume the responsibility for taking appropriate action as required by the specific event.

7.0.    Transfers under Immigration and Naturalization Service (INS) agreements.  Inmates are often being transferred from Douglas, Safford and Fort Grant to Tucson for release to INS. Inmates housed at Kingman and Winslow are often transferred to Lewis for release to INS.

7.1.    The medical record will not be transferred to the new unit.  However, a Continuity of Care form must be done in order for nursing at the new unit to have medical information in case of an emergency.  The original Continuity of Care form must stay in the chart.  A copy is to be sent in an envelope marked 'Medical Information:  inmate #, date of move, Tucson or Lewis transitory for INS release."  This C of C will be accompanied by the Discharge Medication. These items will be turned over to the Immigration and Customs Enforcement Officers.

7.2.    In most cases, the inmate is released to INS the next day or within 2 days.  AIMS will need to be checked to ensure the release date is written on the Inmate Chronological Movement Record form.

7.3.    The record will then be processed with the other releases from your unit.

8.0.    Transfers to County custody.  Inmates are often being transferred to the various Arizona counties for court appointments or other legal actions.  Their absence may be as short as one day and as long as several years.  There is always a potential that these inmates may or may not return to ADC custody.  The continuity of care for these inmates places a special burden on the sending complex.

8.1.    FHAs will, under the guidance of the appropriate HSROD, remain in communication with the local county medical contact.  The goals include ensuring that Continuity of Care forms are received and utilized by receiving county staff; ensuring that ADC has accurate contact numbers, addresses, and fax numbers.

8.2.    FHAs shall create local post orders that describe:

- the method of communication with local OIU re: pending transfer to county and
- the method of reducing or eliminating missed appointments by communicating needed and pending ADC scheduled specialty appointments and
- describes the method of communication of a patient needs to a receiving county agency and

192

- describes the local method of monitoring returned inmates to reduce/eliminate the potential of missing necessary continuity of care requirements upon return from county custody.

# EXHIBIT 2-B

| | Receiving Screening and Delineation of Duties During Intake/Return to Custody | OPR: Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: ds/dc |
| Health Services Technical Manual | HSTM Chapter 5 Section 2.0. | Supercedes: HSTM 5.2.0. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:**        NCCHC STANDARD P-E-01
                       NCCHC STANDARD P-E-02
                       NCCHC STANDARD P-E-05
                       NCCHC STANDARD P-E-06
                       NCCHC STANDARD P-G-06

**PURPOSE:**   To establish the requirements for receiving screening of all incoming inmates immediately upon their arrival in the Reception Center and upon return to custody at other facilities.

**RESPONSIBILITY:**   It is the responsibility of the Facility Health Administrator and Key Contact Staff, to guarantee compliance with this Procedure.  Designated nursing staff from the psychiatric units shall complete the receiving screening after normal business hours.

**NEW INTAKE PROCEDURE:**
1.0.    Receiving screening takes place immediately upon arrival for all inmates.  Designated nursing staff from the psychiatric units shall complete the receiving screening after normal business hours.
1.1.    Inmates who present with a possible life-threatening condition are immediately referred for care.  After normal business hours, the nurse shall contact the provider on the Urgent Notification List for orders to send the inmate to the emergency room per existing post order procedures.
1.2.    Medical Records staff shall assure that a medical record is established for each reception inmate (including Parole Violators); Clear inmates for movement as all processes are completed;
1.3.    The following exceptions are allowed to transfer inmates prior to the completion of all reception processes: DI67; Death Row or Life Imprisonment Sentences; and Security Threat Group (STG) inmates.

2.0.    Facility Health administrator and Key Contact staff will ensure that the complex establishes a method for distributing information about the availability of, and access to, health care services to inmates upon their arrival at the facility.

170

ADC010817

2.1.    The primary elements include signs regarding how to access health care are posted in the intake/processing area of each facility, within 12 hours of their arrival, inmates are given written information (written information may be in the form of a facility handbook either by health services staff or operations staff a handout or postings in inmate housing areas) about how to access emergency and routine medical, mental health and dental services including instruction to the inmate regarding the purpose, use and preparation and "Drop Box" for the HNR form; the fee for service program; the grievance process for health-related complaints; special procedures, such as interpreters, are available to ensure that inmates who have difficulty communicating understand how to access health services; instructions are to be available in written form in English and Spanish, and provided verbally for all inmates during intake; and video presentations may support an initial and follow-up to the Orientation Program.

3.0.    Nursing staff shall review the intake record within 12 hours of the arrival of the inmate on the complex.  This is required so that professional nursing staff can focus on making sure that medications and emergent/urgent needs are met in a timely manner.

3.1.    Reception Center Screening form including observations of the inmate's appearance (e.g., sweating, tremors, anxious, disheveled) and the inmate's behavior (e.g., disorderly, appropriately, insensible).  This includes a mental status assessment of altered orientation potentially due to ingestion of drugs and/or alcohol.  The form requires observation of state of consciousness (e.g., alert, responsive, lethargic), ease of movement (e.g., body deformities, gait), breathing (e.g., persistent cough, hyperventilation); and skin (including lesions, jaundice, rashes, infestations, bruises, scars, tattoos, and needle marks or other indications of drug abuse).  It also includes the requirement for an assessment for communicable conditions including scalp for head lice and skin for scabies.

3.2.    Perform a nursing dental screening (visual inspection of the mouth) and referral to a dentist as appropriate.

3.3.    Complete a Medical History questionnaire.

3.4.    Perform a nursing physical Exam (top part of form including Blood pressure, pulse, respiration and temperature), Snellen eye exam, and urinalysis (complete urine dipstick);

3.5.    Completion of TB Symptomatology Checklist (Administration of PPD skin test to be read at 48 to 72 hours);

3.6.    Notice of Right to Request Limitation of Extraordinary Life Support; wherein the inmate will acknowledge receipt of this orientation by signing at the bottom of the printed material (Form 1101-2P).  Inmates will be advised that they may, at any time, implement a Do Not Resuscitate declaration by submitting an inmate letter to their Correctional Officer III or the FHA.  They will further be advised that if they wish to make such a declaration, they will meet with the physician and, if deemed necessary, will meet with a psychiatrist.

3.7.    Insure that information on access to health care is provided to the inmate and documented on the screening form.

3.8.    Transfer Summary/Continuity of Care

3.9.    When clinically indicated, there is an immediate referral to an appropriate health care service with the referral being noted on the receiving screening form.  Immediate health needs are identified and addressed, and potentially infectious inmates are isolated.  Inmates with "special needs" will be identified upon intake and individually oriented regarding access to non-emergency health care services.

171

ADC010818

3.10. The disposition of the inmate (e.g., immediate referral to a hospital, placed in general population) is indicated on the receiving screening form.

3.11. Receiving screening forms are dated and timed immediately upon completion and include the signature and title of the person completing the form.

4.0. The Medical Provider shall complete a physical examination of the inmate by day seven of the inmate's arrival at the intake facility, write orders for routine labs, and others as appropriate and order chest, or other, x-rays as necessary.

4.1. All arriving inmates must receive the PPD-Mantoux test at the reception center. The dispensed PPD skin test must be read between 48 to 72 hours following administration. Note that at Perryville intake, PPDs are administered to all inmates unless the JMS database verifies that a PPD was administered and the results were read along w/ the measurements of the reaction site. If the administered PPD test is inconclusive upon reading, order a repeat PPD in 7 to 12 days. If indicated, the inmate may be transferred prior to the completion of the repeat PPD and the Transfer Summary should note that a repeat PPD is required.

4.2. Continue documented transitional medications for 28 days (or up to 42 days for MH transitional medications);

4.3. Enter a medical score on the Physical Exam form, the Reception Center Checklist and the Problem List.

4.4. The disposition of the inmate (e.g., immediate referral to a hospital, placed in general population) is indicated on the receiving screening form. Receiving screening forms are dated and timed immediately upon completion and include the signature and title of the person completing the form.

5.0. Dental staff shall complete a Panorex x-ray of all inmates if not completed within the past year; provide instruction on oral hygiene and document this in the health record; and complete an initial dental exam for any inmate remaining at the Reception Center for over 20 days.

6.0. Lab staff shall immediately collect routine labs and document the collection on the Medical Work Up form for all reception inmates (including parole violators); and, if designated by local policy, collect buccal swab DNA specimens on all inmates on the Daily DNA batch List and enter collection date in AIMS.

7.0. Mental Health staff have been directed to complete the 14-Day Mental Health Assessment and refer inmates to providers in accordance with current Counseling and Treatment Services policy. Health Services Division Staff will provide any necessary medical or dental health assistance to support the patient's physical health needs.

**RETURN TO CUSTODY/NON-INTAKE LOCATION PROCEDURE:**

8.0. All receiving screening directed in paragraphs 1.0. through 7.0 above shall be completed with the following modifications or additional guidance:

8.1. Parole Violators must also be screened by nursing staff, especially if they arrive after normal business hours. Note that at non-reception complexes, psychiatric personnel will be informed to conduct the mental health screening the following business day as designated by local post order.

172

8.2.    Facility Health administrator and Key Contact staff will ensure that the complex distributes complex specific information about the availability of, and access to, health care services to inmates upon their arrival at the facility; including all elements in 2.1. above.

8.3.    All laboratory or diagnostic testing shall be provided in accordance with paragraph 4.0 above, with the following additional guidance:

-        PPD is not required for those inmates who are returning to custody and are <u>documented</u> to have had, within 10 months, a PPD administered and the results were read along with the measurements of the reaction site.

-        PAP is not required for those inmates who are returning to custody and are <u>documented</u> to have had, within one year, a PAP administered and the results were negative.

-        Routine intake labs are not required for those inmates who are returning to custody and are documented to have been in ADC custody within 90 days of the return to custody.

173

ADC010820

# EXHIBIT 2-C

| | Routine Appointments (Request) | OPR: Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: gg |
| Health Services Technical Manual | HSTM Chapter 5 Section 3.1. | Supercedes: HSTM 5.3.1. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES**:     DEPARTMENT ORDER 1101
NCCHC STANDARD P-E-07

**PURPOSE:**  To assure that all inmates have the opportunity to request health care services on a daily basis and to be seen in an appropriate timeframe by the most appropriate qualified health care professional consistent with the inmate's identified medical needs.

**RESPONSIBILITY:** It is the responsibility of the Facility Health Administrator through the Key Contact Nurse to maintain the system and flow of Health Needs Requests by inmates. This includes the provision for collecting, triaging, distributing and making appointments for the inmate, and to document the disposition of each request.

1.0 General Policy
1.1. All inmates will access non-emergency health care by making an appointment.
1.2.     An appointment is made by completing a non-emergency Health Needs Request (HNR) Form 1101-10P. The completed HNR is deposited in the appropriately labeled box. Health staff will pick up HNRs daily from the appropriately labeled box. Nursing will administratively triage the HNRs and schedule the inmate for an appointment.

2.0. Initiating Request for Non-emergency service
2.1. The Health Needs Request (HNR form # 1101-10p and 1101-10ps) is the primary written document for an inmate to request non-emergency medical services. The form is designed to enable the inmate to complete the form with little or no additional supervision or assistance.
2.2. Security is responsible for maintaining a supply of these forms and assuring that every inmate on all yards and housing areas, including lockdowns, will have access to the forms.
2.3. Inmates will complete the HNR form, remove and retain the goldenrod copy, and place the original (white), pink, and canary copies in the "Drop Box". Any Health Services staff may collect the HNRs in accordance with local post orders. Staff will collect the HNRS by 2400 of each day. Waivers to collection time may be granted by the Division Administrator and must be filed in the FHA's files.

179

ADC010826

2.4.  The form should be handled as a confidential correspondence between health services staff and the patient.  Security staff are not authorized to access or read completed HNRs.  The only exception is a properly designated Health Services Liaison Officer.

2.5.  Security, in consultation with Health Services, will assure that appropriate weather proof collection boxes are available for inmate's daily use either on the yards or in the housing areas of the open yards.  In the lockdowns areas, the collection of HNRs will be done in such a manner as to assure medical confidentiality for the inmate. There shall be coordination with complex Warden, to ensure that an HNR "Drop Box" is available.

2.6.  On a daily basis, seven days per week Health Services staff (or authorized Liaison Officers) will pick up the HNRs from the collection boxes on the open yards

2.7.  Inmates in a "Lock-down/lockup" status will be especially monitored to ensure that access to healthcare is not obstructed.

3.0   Triaging of HNRs by nursing professionals is performed to sort and classify the inmates' health requests to determine priority of need and the proper place for inmate care to be rendered.

3.1  Qualified health professionals with the most experience should be assigned to triage inmate requests.  Nursing staff will review each HNR within four hours following the time stamped as the receipt of the HNR. The date and time of collection by nursing will be indicated on the top right corner of the form.  HNRs must be picked up between 8 p.m. and 4 a.m. and must be triaged no later then 8 a.m.  Alternative schedules due to staffing or organizational requirements must be documented as an approved waiver for the complex.  HSTM Chapter 1 Section 4.0. provides direction on requesting a waiver of this type.

3.2. Following collection of all of the HNRs Nursing will sort them into disciplines, such as dental, mental health, nursing lines and provider lines.

3.3. HNRs that document or indicate the inmate may have or be suffering from a condition that requires immediate attention will be scheduled to be seen the same day that the HNR is received. If the situation requires that the inmate be seen by another discipline, the triaging nurse will initiate a telephone referral to the appropriate area.  The HNRs of other disciplines will be distributed on the same day for their action, as clinically appropriate.

3.3. HNRs requesting only information may be returned to the inmate with the appropriate response without the need for making an appointment.

3.4.  If HNR is unclear or lacks sufficient information to formulate a response, clearly state the reason for return in Section III and return the HNR form to the inmate via the inmate mail system.

4.0.     Scheduling: Following the guidance in 3.0. above, if the triaging nurse is able to acquire/provide/schedule an immediate response to the inmates needs (e.g., medications update, blanket, diet comment, review of lab/x-ray report, or creating an inmate communiqué), he/she should do so.  If the triaging nurse cannot either determine what the inmate needs or cannot provide what the inmate requests, the inmate should be seen within 24 hours.  If a weekend or holiday immediately follows the submission or receipt of the HNR, and it is clinically reasonable to do so, the appointment may be delayed up to 72 hours.

5.0.     At the discretion of the health services staff, and with consideration of time constraints and other inmates, at a given scheduled appointment more than one medical issue or complaint may be addressed or attended to.  Irrespective of the number of issues addressed only one co-pay

180

ADC010827

charge will be made for the single visit.

ADC010828

# EXHIBIT 2-D



### 2.20.2 Performance Outcomes and Measures

**Required Performance Outcomes and Measures: (RFP §2.20.2)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: Required Performance Outcomes and Measures:

#### 2.20.2.1 Intake

**Intake: (RFP §2.20.2.1)**

**Performance Outcome 1:** A physical examination is completed by a Medical Provider by day two (2) of an inmate's arrival at facility.

**Measure:** New Inmates identified from Intake Report reflect completion of physical examination documented in the medical record by Medical Provider by day two (2) of an inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

**Performance Outcome 2:** A mental health assessment is completed by a mental health practitioner by day two (2) of inmate's arrival at the intake facility.

**Measure:** New Inmates identified from Intake Report reflect completion of mental health assessment documented in the medical record by mental health practitioner by day two (2) of inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative; Intake: (RFP §2.20.2.1)

**Performance Outcome 1:** A physical examination is completed by a Medical Provider by day two (2) of an inmate's arrival at facility.

**Measure:** New Inmates identified from Intake Report reflect completion of physical examination documented in the medical record by Medical Provider by day two (2) of an inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

**Performance Outcome 2:** A mental health assessment is completed by a mental health practitioner by day two (2) of inmate's arrival at the intake facility.

**Measure:** New Inmates identified from Intake Report reflect completion of mental health assessment documented in the medical record by mental health practitioner by day two (2) of inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

#### 2.20.2.2 Sick Call

ADC015843



Sick Call: (RFP §2.20.2.2)

**Performance Outcome 1:** Sick call shall be held five days a week, Monday through Friday (excluding Holidays), for all inmates.

**Measure:** Reports reflect sick call held Monday through Friday every week.

**Performance Outcome 2:** All sick call inmates shall be triaged within 24 hours with emergent health need requests triaged immediately

**Measure:** Inmates identified from HNR Appointment Report show that triage is performed within 24 hours (or immediately for emergent needs) of request form date and time. (Minimum sample of 25 cases per quarter per site selected from the HNR Appointment Report database/log).

**Performance Outcome 3:** Every inmate's vital signs shall be checked and documented each time they attend sick call on the appropriate assessment form.

**Measure:** Medical record reflects vital signs for each sick call inmate. The percentage of inmates in HNR Appointment Report sample with documented vital signs on the assessment form/record (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

**Performance Outcome 4:** All Sick call entries are documented in the medical record utilizing the "Subjective – Objective – Assessment – Plan - Education" (SOAPE) format.

**Measure:** The medical record shall have a SOAP entry for each sick call inmate (minimum sample of 25 cases per quarter per site selected from the quarter reporting period HNR Appointment Report database/log).

**Performance Outcome 5:** Referrals from sick call to a Physician or Midlevel provider are seen within seven (7) days.

**Measure:** Date of referral to physician or Midlevel provider compared to date of sick call (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Sick Call: (RFP §2.20.2.2)

**Performance Outcome 1:** Sick call shall be held five days a week, Monday through Friday (excluding Holidays), for all inmates.

**Measure:** Reports reflect sick call held Monday through Friday every week.

**Performance Outcome 2:** All sick call inmates shall be triaged within 24 hours with emergent health need requests triaged immediately

ADC015844



Measure: Inmates identified from HNR Appointment Report show that triage is performed within 24 hours (or immediately for emergent needs) of request form date and time. (Minimum sample of 25 cases per quarter per site selected from the HNR Appointment Report database/log).

Performance Outcome 3: Every inmate's vital signs shall be checked and documented each time they attend sick call on the appropriate assessment form.

Measure: Medical record reflects vital signs for each sick call inmate. The percentage of inmates in HNR Appointment Report sample with documented vital signs on the assessment form/record (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

Performance Outcome 4: All Sick call entries are documented in the medical record utilizing the "Subjective – Objective – Assessment – Plan - Education" (SOAPE) format.

Measure: The medical record shall have a SOAP entry for each sick call inmate (minimum sample of 25 cases per quarter per site selected from the quarter reporting period HNR Appointment Report database/log).

Performance Outcome 5: Referrals from sick call to a Physician or Midlevel provider are seen within seven (7) days.

Measure: Date of referral to physician or Midlevel provider compared to date of sick call (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

2.20.2.3 Medical Specialty Consultations

Medical Specialty Consultations: (RFP §2.20.2.3)

Performance Outcome 1: Urgent consultations are scheduled within thirty (30) days of the date the request is initiated.

Measure: Date of consultation in medical record as compared to the date request is initiated. The percentage of inmates from the sample with a documented consultation in the Medical Record within thirty (30) days of request for an urgent consult. (sample of a minimum of 25 cases per quarter per site identified from the Medical Transport Report database/log during the reporting quarter).

Performance Outcome 2: Consultation reports are followed-up within seven days of receiving the report.

Measure: Date of follow-up as compared to date of receipt of report. The percentage of inmates from the sample with a completed consultation, receipt of a consultation report and documentation by clinical staff of review and action on recommendations from the report in the Medical Record within seven (7) days of receipt of the report. (sample of a

ADC015845

# EXHIBIT 2-E

| Arizona Department of Corrections | Nursing Assessment/Procedure Emergency Response Orders/Protocols | OPR: Nursing Program Manager/ Medical Program Manager<br><br>Auth: sr/jac |
|---|---|---|
| Health Services Technical Manual | HSTM Chapter 5 Section 1.5. | Supercedes: HSTM 5.1.5. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES**      NCCHC STANDARD P-E-11

**PURPOSE:** The purpose of the nursing assessment protocols is to provide nursing with standardize nursing practices based on nursing statutes and regulations to deliver quality nursing care to the inmate population.

**RESPONSIBILITY**: It is the responsibility of the CRNSII to ensure that all licensed nurses are trained in providing emergency nursing care, health maintenance and prevention to the patient who is in need of these services. The FHAs is responsible to ensure compliance occurs within their facility.

**1.0.     Nursing assessment/procedure/EROs protocol:**   The nursing assessment protocol is broken down into three parts and is contained in Appendix E to this technical manual:
- The first part is the set of nursing emergency response orders (EROs) are for life-threatening emergencies only.
- The second part is the set of nursing assessment/procedure protocols that provide guidelines in the health maintenance of the individual.
- The third part is the set of protocols for the prevention of illness.

1.1.    **Emergency Response Orders:**  The Emergency Response Orders (EROs) are step-by-step written instructions from the provider on providing emergency acute care to a patient during life-threatening event.  The ERO assist the licensed nurse either by nursing assessment or triage to stabilize or maintain the patient until Emergency Medical Services (i.e., EMTs, Ambulance, or PMTs) have responded and/or the provider is contacted to provide further instructions.

1.2.    **Nursing assessment protocol**:  The nursing assessment protocol is divided into triage and assessment because a licensed practical nurse can only perform triage tasks and report the findings to a registered nurse or provider per the nursing scope of practice.  The nursing assessment provides step-by -step guidelines in the management of the patient. The protocol provides the guidance to the nurse in advising the patient what over the counter medication the inmate can utilize in the maintenance of basic illness/injury.

168

ADC010815

1.3.    **Illness prevention protocols:**   Illness prevention protocols for preventive health care maintenance by the licensed nurse. Prevention would be immunizations, allergies, heartburn and so forth.

2.0.    **Nursing Assessment/Procedures protocol, including ERO annual compliance and maintenance:**

2.1.    The areas of the Nursing Assessment/Procedure/EROs Protocol will be reviewed and signed annually by the Medical Program Manager, Nursing Program Manager, Division Administrator, Lead Physician, FHAs, and CRNSII at the assigned facilities.

2.2.    Annual training in regards to the protocol will occur with all licensed nurses.  The CRNSII and FHAs are responsible for ensuring training occurs annually.

2.3.    All health units will have the Nursing Assessment/Procedure manual available to them. Original manual will be kept in the FHAs office.

2.4.    Yearly renewal of signatures annotating review of the documents will be the responsibility of Central Office and the FHAs. The updated signature sheet will be kept in original manual.

**3.0.    Training requirements of Nursing Assessment protocol:**

3.1.    Return demonstration of skills and knowledge in regards to the Nursing Assessment/Procedures, Emergency Response Orders will be performed annually. The FHAs and CRNSII are responsible for ensuring this occurs in each facility.

3.2.    Annual documentation is required to demonstrate the licensed nurse can perform the skills expected. A copy of the documentation must be sent to the Nurse Program Manager.

3.3.    When new or revised assessments/ procedures/ERO are introduced it is the CRNSII responsibility to introduce them during the nurses meeting.

169

ADC010816

# EXHIBIT 2-F

| | Chronic Condition Care | OPR: Medical Records Program Manager & Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM Chapter 5 Section 5.1. | Supercedes: HSTM 5.5.1. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES**:      ARIZONA REVISED STATUTES 31-201
                          DEPARTMENT ORDER 1101
                          NCCHC STANDARD P-G-02

**PURPOSE**:   To provide consistent criteria for providing care to special needs inmate-patients who are identified as having a chronic disease.

**RESPONSIBILITY:** It is the responsibility of the Arizona Department of Corrections Director to comply with the guidance of statute. The Director has established certain conditions as Chronic Conditions. These have been identified for legal and financial requirements and are not designed nor intended to serve as an exhaustive clinical listing of what may be considered clinically chronic.

**PROCEDURES:**
1.0    Chronic conditions require regular examinations and/or treatment.
1.1    Arizona Department of Corrections health care providers shall determine whether regular examinations and/or treatment are directly related to a qualifying disability. There is no health care fee for these conditions.
1.2.    The Medical Director and Medical Program Manager have established ADC chronic condition clinical practice guidelines that are consistent with selected national clinical practice guidelines that have been published by subject matter experts.   These are enclosed in Appendix E to this manual.   All providers are responsible to ensure that their diagnostic and treatment efforts remain in compliance with the clinical principles set forth in the guidelines.

ADC010844

2.0.    Chronic conditions are identified in Department Order 1101 as:
ADA Qualified Inmates Requiring Regular Examinations and/or Treatment
Allergies
Cancer (monitored)
Developmentally Disabled
Diabetes (monitored)
Heart Disease (monitored)
Hepatitis C
Hypertension (monitored)
Mental Illness.
Mentally Impaired
Latent Tuberculosis Infection (LTBI) (identified by a positive Purified Protein Derivative Test-PPD)
Respiratory Disease (monitored)
Seizure Disorder (monitored)
Seriously Mentally Ill (SMI)
Tuberculosis
HIV (monitored)

3.0.    Chronic Condition Examinations
3.1.    The senior nursing staff member on each unit will ensure that inmates with chronic conditions are scheduled to be examined and/or treated at least every six months by a medical provider.
3.2.    Those inmates with identified chronic conditions shall receive an annual physical at their scheduled appointment with the medical provider.
3.3.    Currently scheduled encounters for inmates with Monitored or Chronic Conditions are documented in a progress note and a note on the Chronic Conditions Flow Sheet in section 1 of the medical record.

4.0.    The conditions identified above will be monitored in accordance with A.R.S. 36-201.01 (G), and Department Order 1101 via a centralized chronic diseases electronic tickler system.
4.1.    The Monitored Condition Database was converted from paper in 2004. The procedures are described in HSTM Appendix E. The monitored Condition Database provides the following capabilities: Identification of inmates with Chronic Conditions; A mechanism for patient follow–up; and assists with re-ordering medications for inmates in a timely manner to treat their chronic conditions minimizing interruption or unnecessary delay.
4.3.    The process ensures that inmates receive medical attention on a regular basis. Reports are entered into a Centralized Database at Central Office Phoenix and reports are generated for monthly appointments.
4.4.    The goal with Health Services as we expand is to have each facility do their own input.
4.5.    Guidance will be provided by the Medical Records Program Manager for those clinics without database access and/or should there be an emergent need to replace the electronic system w/ a non-electric based form.

5.0    The Facility Health Administrator will ensure the existence and use of a chronic condition tracking system by which inmates who have been identified as having a chronic condition (identified above and Department Order 1101) can be scheduled regularly for various

ADC010845

examinations, evaluations and follow-up care.

6.0.     Private/contracted facilities and complexes are encouraged to discuss their administration and recording of the treatment of chronic conditions with the appropriate Health Services Regional Operations Director.   The ADC Director has defined the conditions listed in 2.0 above as Chronic Conditions as a response to the guidance contained in A.R.S. 31-201.01.(12) which states that "Inmates who are undergoing follow-up medical treatment for chronic diseases…." are exempt from the charging of health services fees.

ADC010846

# EXHIBIT 2-G

| ![CORRECTIONS ADC logo] ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER:  1100<br><br>INMATE HEALTH SERVICES | OPR:<br><br>HS |
|---|---|---|
| **DEPARTMENT ORDER MANUAL** | DEPARTMENT ORDER:  1101<br><br>*INMATE ACCESS TO HEALTH CARE* | SUPERSEDES:<br><br>DO 1101 (08/22/97)<br>DI 261 (06/18/08)<br>DI 296 (10/20/10)<br>DI 307 (04/19/12) |
| | | EFFECTIVE DATE:<br><br>DECEMBER 19, 2012 |
| | | REPLACEMENT PAGE REVISION DATE:<br><br>N/A |

# TABLE OF CONTENTS

PURPOSE
RESPONSIBILITY
APPLICABILITY
PROCEDURES               PAGE

| | | |
|---|---|---|
| 1101.01 | GUIDELINES | 1 |
| 1101.02 | CHARGING | 2 |
| 1101.03 | APPOINTMENTS | 2 |
| 1101.04 | OUTSIDE SPECIALITY CARE CLINICAL APPOINTMENTS | 5 |
| 1101.05 | DETENTION | 6 |
| 1101.06 | EMERGENCIES | 7 |
| 1101.07 | CHRONIC ILLNESSES | 8 |
| 1101.08 | EXTRAORDINARY LIFE SUPPORT MEASURES | 9 |
| 1101.09 | TERMINAL ILLNESSES | 12 |
| 1101.10 | DENTAL SERVICES | 12 |
| 1101.11 | VETERANS ADMINISTRATION | 16 |
| 1101.12 | REFUSAL OF TREATMENT | 17 |
| 1101.13 | INMATE HUNGER STRIKES (JULY 10, 2000) | 18 |
| 1101.14 | PRESCRIPTIONS | 20 |
| 1101.15 | TRANSGENDER INMATES | 21 |
| | IMPLEMENTATION | 22 |
| | DEFINITIONS | 22 |
| | AUTHORITY | 26 |
| | ATTACHMENTS | |

ADC048543

1.2     Wardens, Deputy Wardens and Administrators shall ensure:

    1.2.1   Security and/or transportation staff exerts every reasonable effort to transport inmates for emergency and scheduled health treatment.

    1.2.2   Appropriate security escort is provided if an inmate is in need of emergency treatment and is transported by an ambulance.

## 1101.07     CHRONIC ILLNESSES

1.1     Physicians, Physician's Assistants, Director of Nursing and nurses shall:

    1.1.1   Ensure the Chief of Security and the shift commander are given brief written instructions about the appropriate intervention for each medical emergency which may arise from a chronic condition existing in the institution.

    1.1.2   Ensure allergic substances, including medications, are recorded - in red ink - within the Medical Record file, i.e., on the problem list, medical history form, the outside front cover of the Medical Record jacket and the chronic condition card.

    1.1.3   Inmates with a chronic condition(s) must be entered into the Inmate Health System Monitored Condition Data base, or similar tracking system, to ensure inmates with a chronic condition(s) is seen on a regularly scheduled basis, as ordered by the health care provider.

    1.1.4   Re-order medications and treatments for inmates with chronic conditions in a timely manner so the inmates receive the necessary treatment for their chronic conditions without interruption or unnecessary delay.

    1.1.5   Notify the Contract Health Site Manager when a movement is required in order to provide a special assignment or special housing to accommodate an inmate's chronic condition.

1.2     The Contract Health Site Manager shall:

    1.2.1   When notified of a movement requirement:

        1.2.1.1     Arrange for an intra-facility movement, when appropriate.

        1.2.1.2     The Contract Health Site Manager shall coordinate with their chain of command and Offender Services Bureau to initiate inmate movement for medical reasons.

        1.2.1.3     Notify the Deputy Warden or Administrator.

    1.2.2   Ensure special arrangements are made for treatment or delivery of medications immediately after being notified of such a need by the supervising Physician or Director of Nursing.

    1.2.3   Chronic Condition Reporting shall be in accordance with the Contract Reporting Requirements.

ADC048551

# EXHIBIT 2-H

| | Radiologic Imaging Procedures | OPR:<br>Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: dc |
| Health Services Technical Manual | HSTM<br>Chapter 4<br>Section 3.0. | Supercedes: HSTM 4.3.0.<br>June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**          NCCHC STANDARD P-D-04

**PURPOSE:** To provide radiographic services to inmates utilizing either on-site equipment or off-site contracted vendors for assessing, diagnosing, or monitoring of an inmate's state of health.

**RESPONSIBILITY:** Facility Health Administrator shall ensure that only authorized personnel order and produce radiological studies within the confines of the facility. All pertinent policies and procedures must be followed to ensure the highest quality diagnostic care.

**PROCEDURES:**
1.0.    Personnel and Equipment Certifications:
1.1.    Radiographic procedures may only be ordered by a medical care provider or dental care provider. The provider shall complete the portion of the request regarding history and note the clinical findings.
1.2.    The Radiologist interpreting and issuing reports must have a current license issued by the State of Arizona, Board of Medical Examiners or the Arizona Board of Osteopathic Examiners in Medicine and Surgery.
1.3.    Radiologic Technologists shall maintain a current certification issued by the Arizona Medical Radiologic Technology Board of Examiners and be posted in the work area.
1.4.    An X-ray unit registration certification, issued by the Arizona Radiation Regulatory Agency (ARRA), must be posted for each machine on the complex.

2.0.    Overview:  Safety principals shall be adhered to at all times including environmental and personal safety.  Environmental safety principles that shall be upheld include but are not limited to:
-  A material safety data sheet (MSDS) specific to the processing fluids shall be available in the radiology department.
-  The door to the x-ray room must be closed during radiographic procedures to avoid inadvertent entry and radiation exposure
-  A sign stating "Caution Radiation Area" with the three blade radiation symbol shall be posted at all entrances to the radiology room.

149

ADC010796

3.0.     Personal safety.   Universal precautions shall be followed.  For information, contact the Occupational Health staff and refer to OSHA Standards on Occupational Exposure to Blood borne Pathogens.

3.1.     The technologist and dental staff shall wear radiation badges at all times to monitor x-ray exposure.  The film badges are collected from all personnel by the Radiologic Technologist III or designee.  All film badges are then forwarded to the contract vendor for processing and analysis. A written report is returned from the contractor and results are made available for viewing by the Radiology Department.

3.2.     Any abnormal results are reported immediately to the individual, the individual's supervisor and the Facility Health Administrator.  The individual shall not be allowed to work in areas of possible radiation exposure until specifically authorized by the Facility Health Administrator.   The Division Administrator of Health Services, Dental Program Manager, and/or Medical Program Manager are then notified by the Facility Health Administrator. Any additional required action will then be directed by the Division Administrator of Health Services.

3.3.     During the x-ray procedure, the radiologic technologist shall be protected from radiation by standing in the protective designated area or wear appropriate lead protection.

3.4.     Reasonable precautions shall be taken to protect the inmate in the radiology room. Pregnancy status must be determined prior to performing any radiographic procedure. A pregnant inmate may not receive routine x-rays unless the health care provider determines the existence of medical necessity.

3.5.     Lead shielding that is available and used when appropriate include the following: Lead Aprons; Gonad Shield (used on all inmates (male and female) of child bearing age); Lead Gloves; and Thyroid shield.

4.0.     Requisition Processing:  A requisition for a medical radiographic study must be signed by a medical provider and sent to the radiologic technologist.  Radiographic examinations are scheduled by the radiologic technologist.  Urgent or emergent requests shall be coordinated by the radiologic technologist.

5.0.     The following routine diagnostic radiographs are performed at each prison complex: Lower extremities; Hips; Upper extremities; Shoulders; Bony Thorax, Pelvis; and All head work (i.e. sinuses, orbits, facial, mandible, mastoid, skull, TMJs)

6.0.     Examinations done at designated facilities and performed by a radiologist include the following studies:
-  Esophagus - Barium swallow;
-  Stomach - Upper Gastrointestinal Series – Nothing by mouth after midnight the day before the scheduled exam;
-  Small bowel follow-through - Nothing by mouth after midnight the day before the scheduled exam;
-  Colon - Barium Enema. - Bowel preparation is required prior to this procedure.  The day before the medical procedure, the inmate will be given instructions on the proper use of the prep kit.  Barium enemas performed outside of the facility shall be prepared according to the attending radiologist or hospital protocols.

ADC010797

- Intravenous pyelograms (IVP) (Other Contrast Studies) may be performed.

6.1.    Require the inmate sign an informed consent prior to the procedure.

6.2.    History regarding allergies to shellfish, iodine or a previous reaction to contrast medium "x-ray dye" must be brought to the attention of the health care provider prior to the IVP examination.

6.3.    The health care provider must be present in the immediate area during the procedure. The contrast medium is injected intravenously by the HCP or designee.  Emergency medications and equipment must be present during an IVP, including, but not limited to:

- Solu-Cortef (4) 250 mg. Mix-a-Vials.
- "Man Down Bag"
- Benadryl


5.0     Other Radiographic Procedures.   Specific radiographic studies beyond facility capabilities shall be provided by an outside contracted vendor. This includes angiography, special x-ray procedures, CT, MRI, ultrasound, mammography, nuclear medicine scans and radiation therapy.

5.1.    All procedures require personal history and consultation generated by the provider.


6.0.    Equipment Maintenance:

6.1.    X-ray units are calibrated and maintained regularly by a contracted vendor.  X-ray unit calibration is verified by the Arizona Radiation Regulatory Agency (ARRA) and posted within the x-ray department.

6.2.    Processors maintenance is performed regularly by a contracted vendor. This shall include:

- Equipment cleaning and inspection
- Changing of processing fluids
- Disposal of processing fluids
- Repairs as needed


8.0 .   Radiograph Interpretation and Reporting

8.1.    Routine radiograph interpretation.  The Medical Provider shall review all radiographs prior to the submission for Radiologist interpretation and make an appropriate entry of the preliminary findings on the X-ray Request Form in the findings section. Radiographs are prepared and packaged by the radiologic technologist and sent to a contract radiologist via courier, mail, or UPS.  The radiologist reviews the films and issues a written report on each radiographic study submitted.  The radiographs and report are returned to the facility via courier, mail, or UPS.  The radiographs are filed in the radiology department based upon the inmate ADC identification number.  The report is given to the medical provider for review.  The Medical Records Librarian then files the report in the inmate's medical record.

8.2.    Emergent (STAT) Interpretation:  The radiographs are taken to the Contract Radiologist or the closest hospital staffed with a Radiologist for interpretation. Coordination of report is facilitated by the radiologic technologist.

8.3.    Urgent:  The radiologic technologist places a call to the contract Radiologist requesting the interpretation be expedited and followed by a written preliminary report sent via electronic transmission (facsimile or e-mail). These reports are given to the medical provider for review.

ADC010798

9.0     Radiograph Transfers and Storage.  Active inmate radiograph files are stored at the facility complex where the inmate resides.

9.1.    <u>Facility Transfers</u>: The radiologic technologist is notified when an inmate is transferred to another facility. The radiographs are packaged and given to the Medical Records Librarian to accompany the inmate along with the medical record.

9.2.    <u>Consultations</u>: If radiographs are necessary for a consultation (on-site or off-site)  with a specialist, the clinical coordinator advises the radiologic technologist who then facilitates the delivery of the films for consultant review.

9.3.    <u>Release</u>:  The radiologic technologist is notified of release from custody of an inmate. Within 30 days following the release, all radiographs are sent to the Central Unit at ASPC-Florence for maintenance and storage for 10 years; after which the films are destroyed per policy.

10.0    Duplication of X-rays:

        Duplication of x-rays shall be performed by the use of an x-ray copying machine which may be available at some complexes or utilizing a contracted hospital's radiology department.

152

ADC010799

# EXHIBIT 2-I

| | Clinical Follow Up Requirements | OPR:<br>Medical Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth:  cp |
| Health Services Technical Manual | HSTM<br>Chapter 5<br>Section 7.0. | Supercedes:<br>HSTM 5.7.0 June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**      NCCHC STANDARD P-E-12

**PURPOSE:**  To establish procedures for health staff to us when following pending health care issues.

**RESPONSIBILITY:**  It is the responsibility of the Facility Health Administrator and Key Contact Staff to assure that staff complies with this procedure.  Responding to and informing patients of outcome of clinical activity (especially abnormal results) remains the primary responsibility of the attending physician, nurse practitioner, or physician's assistant.

**PROCEDURE:**

1.0 <u>All Clinical Provider Staff</u> are responsible to track important diagnostic reports and consultation requests for their patients. Medical Providers shall write orders for important diagnostic tests and consultation requests as necessary and track these by maintaining a log or by ordering appropriate and timely follow-up visits so that they can follow up to assure they receive results. (Important diagnostic tests include, pulmonary function tests, electroencephalograms , imaging reports (scans, ultrasounds, MRI's, etc.), mammography reports, audiometry tests, and any other important reports ordered as part of the treatment plan of their assigned patient.) Routine reports which do not need to be tracked include laboratory reports, x-rays, electrocardiogram (EKG), and urinalysis results. A sample format is provided below.
2.0.      Diagnostic reports must be reviewed by provider, signed, stamped and dated prior to filing into the medical record.
2.1      If the inmate is being transferred to another unit, and the report <u>has not been</u> reviewed and signed, the report is to be placed on top of the SOAP divider so the transferring unit can route the chart.  The information/chart transferred should be adequately available to prompt and support the provider assigned to that unit to render treatment if indicated.
2.2.      Dental Providers staff shall track any Consultation Report that the dentist submits to assure that the referral to the outside consultant occurs in a timely manner.

239

ADC010886

3.0    Lab staff shall collect specimens and send them to the laboratory contractor; follow-up on pending lab results with the laboratory contractor; forward lab results to the appropriate provider for review; and notify the provider immediately of any critical results.

4.0.    The Clinical Coordinator will follow up with Central Office on any outstanding Consultation Reports pending approval after five business days and inform the FHA and Key Contact Provider of these pending reports. Refer to HSTM 7.2.0. for specific guidance in Clinical Coordination of outside consultations. The Clinical Coordinator shall, in accordance with HSTM 7.2.0, place a medical hold on inmates who have a scheduled appointment with an outside consultant. They shall also follow up and remove these holds after the inmate's appointment with the consultant.

5.0    Nursing staff shall note orders from the providers and follow through to assure that the order is completed as ordered by the provider; follow up with the provider, Clinical Coordinator, or other responsible staff to ascertain the status of a pending order (e.g., status of medical shoes ordered for an inmate); track and place inmates with chronic conditions on the provider line to assure that they are seen every six months, or as ordered by the provider; plan PPD testing as appropriate and read the PPD skin test at 48-72 hours (this includes assuring that an annual PPD test or follow-up is completed for each inmate on the unit).
5.1.    Responsibility to notify a patient regarding abnormal laboratory/testing findings may not be delegated by the provider to nursing staff.

6.0    Radiology Technologist shall maintain a tracking log of x-rays sent to the radiologist contractor that, at a minimum, notes inmate name, ADC number, date x-ray sent to contractor and date report is received from radiologist contractor. The Radiologist Technologist shall follow up with the contractor if reports are not received within the amount of time specified in the contract. Notify the FHA and Key Contact Provider if any delays in receiving reports.

7.0    Medical Records staff shall place a medical hold on inmates who have a scheduled appointment with an outside consultant. They shall also follow up and remove these holds after the inmate's appointment with the consultant.

**SAMPLE A**

| Inmate Name | Inmate Number | Test ordered | Date ordered | Results Expected On/about | Results received |
|---|---|---|---|---|---|
| Sample, Jr | 066659 | EEG | 6/13 | 6/21 | |
| Manygoats, B | 012345 | PFT | 6/13 | 6/19 | 6/20 |
| | | | | | |
| | | | | | |

240

ADC010887

# EXHIBIT 2-J

| | Management of Terminal Illness | OPR:<br>Clinical Facility Health Administrator/<br>Medical Program Manager/<br>Nursing Program Manager<br><br>Auth: st/cp/jac |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM<br>Chapter 7<br>Section 7.0. | Supercedes:<br>HSTM 7.7.0. June 15, 2008<br>Effective Date:<br>January 1, 2010 |

**REFERENCES**:  ARIZONA REVISED STATUTE § 36-3231
DEPARTMENT ORDER 1101
NCCHC STANDARD P-A-08
NCCHC STANDARD P-D-05
NCCHC STANDARD P-G-01
NCCHC STANDARD P-G-03
NCCHC STANDARD P-G-12
NCCHC STANDARD P-I-04

**PURPOSE:** To establish guidelines that ensures consistent management practices in providing end- of-life care for inmates with terminal illnesses.

**RESPONSIBILITY:** ·It is the responsibility of all Health Care staff assigned to provide care to the terminally ill to provide a supportive environment which preserves dignity and provides pain control measures to the terminally ill inmate. Inmates are informed of their rights to access to · care as well as their right to limit life support measures at intake.

**PROCEDURES:**
1.0.    Limitation of Life Support Efforts/Do Not Resuscitate (DNR).  Should an inmate develop a desire to limit life support efforts and/or to enter into a DNR agreement in future emergent situations, they must document their directive to the Health Staff.  At intake orientation, as described in HSTM 5.2.0. Inmates are informed of their right to implement a declaration via Form 1101-2P.
1.1.    The inmate must express this desire by documenting the request on an Inmate Letter (Form 70501168-A) to the Facility Health Administrator.  This letter may be written by the inmate; or dictated to an ADC employee if signed by the inmate; or verbalized to an ADC employee (and one witness), who will document the request on an IM letter form. An HNR may be accepted in lieu of an inmate letter.
1.2.    The attending physician will review the declaration with the inmate and sign the declaration as one of the two required witnesses. If the inmate is not deemed oriented to three spheres, arrange for a psychiatrist evaluation.  The physician shall discuss the inmate's illness, alternative treatment plans, and expected outcomes with the patient.

310

ADC010957

1.9.     A person who makes a good faith medical decision is immune from liability as prescribed in A.R.S. 36-3205.  A surrogate who is not the inmate's agent or guardian shall not make a decision to withdraw the artificial administration of food or fluid.

2.0.     <u>Pain Control</u>.  All patients diagnosed terminally ill will have a care plan. Physical measures, such as ice packs, heat, position changes and air mattresses will be used as needed to enhance the comfort of the inmate. Medications will be given as ordered by the Health Care Provider to achieve maximum comfort for the inmate. Food and fluids will be provided as tolerated by the inmate.

3.0.     <u>General policies for hospice type services</u>.  Terminally Ill/Hospice care will be provided for inmates who are in the last stages of a diagnosed terminal illness. Hospice care focuses on the achievements the patient is able to make in face of physical deterioration.  The Department has embarked on a process that will lead to a hospice program.  In the interim, terminally ill patients will be provided support in a manner that is consistent with the basic medical doctrines of comfort support for the dying.

4.0.     Responsibilities of certain health care providers during terminally ill care:
4.1.     Medical:  The Key Contact Physician or designee will complete a symptom or system specific examination and develop a plan of clinical care detailing treatment, pain control and resuscitation status for consideration within 48 hours of admission.  The provider will have regular contact with and make complete progress notes on all terminally ill patients. He/she will note all changes in plans of care in the progress note. Physician orders will be written as indicated.
4.2.     The Facility Health Administrator or designee will coordinate with security for special visits when appropriate, remain administratively responsible for ensuring that all aspects of supportive care are carried out.  The FHA will arrange for the utilization of a private room for the terminally ill patient when appropriate.
4.3.     Consistent with state regulations, the FHA will facilitate the early release of terminally ill inmates in a timely manner when appropriate.
4.4.     After each patient's death, the FHA will arrange for health services staff involved in the patient's care to access Employee Assistance and Support services through the CISD team.

5.0.     Inpatient Component Nurses are responsible for ensuring that the physician/provider orders are processed and carried through; completing a daily nursing assessment, take vital signs every shift and make an entry on the patient's progress note at least every shift or as ordered by the practitioner; notifying the Key Contact Physician or treating practitioner of any significant changes in the patient's condition; ensuring that treatment orders, medications, etc. are administered as prescribed and documented and that activities of daily living are met; providing at the end of each shift, a report to be given to the oncoming infirmary nurse; and reporting all patient deaths per Department Orders and this manual.

6.0.     Monitoring and Review:  Terminally ill admissions and assignments to the infirmary shall be monitored by the Key Contact Physician and Facility Health Administrator for clinical appropriateness, quality of care and pain management.

313

ADC010960

# EXHIBIT 2-K

| | Management of Terminal Illness | OPR: Clinical Facility Health Administrator/ Medical Program Manager/ Nursing Program Manager  Auth: st/cp/jac |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM Chapter 7 Section 7.0. | Supercedes: HSTM 7.7.0. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:**        ARIZONA REVISED STATUTE § 36-3231
DEPARTMENT ORDER 1101
NCCHC STANDARD P-A-08
NCCHC STANDARD P-D-05
NCCHC STANDARD P-G-01
NCCHC STANDARD P-G-03
NCCHC STANDARD P-G-12
NCCHC STANDARD P-I-04

**PURPOSE:** To establish guidelines that ensures consistent management practices in providing end- of-life care for inmates with terminal illnesses.

**RESPONSIBILITY:** It is the responsibility of all Health Care staff assigned to provide care to the terminally ill to provide a supportive environment which preserves dignity and provides pain control measures to the terminally ill inmate. Inmates are informed of their rights to access to care as well as their right to limit life support measures at intake.

**PROCEDURES:**
1.0.    Limitation of Life Support Efforts/Do Not Resuscitate (DNR). Should an inmate develop a desire to limit life support efforts and/or to enter into a DNR agreement in future emergent situations, they must document their directive to the Health Staff. At intake orientation, as described in HSTM 5.2.0. Inmates are informed of their right to implement a declaration via Form 1101-2P.
1.1.    The inmate must express this desire by documenting the request on an Inmate Letter (Form 70501168-A) to the Facility Health Administrator. This letter may be written by the inmate; or dictated to an ADC employee if signed by the inmate; or verbalized to an ADC employee (and one witness), who will document the request on an IM letter form. An HNR may be accepted in lieu of an inmate letter.
1.2.    The attending physician will review the declaration with the inmate and sign the declaration as one of the two required witnesses. If the inmate is not deemed oriented to three spheres, arrange for a psychiatrist evaluation. The physician shall discuss the inmate's illness, alternative treatment plans, and expected outcomes with the patient.

310

ADC010957

1.9.    A person who makes a good faith medical decision is immune from liability as prescribed in A.R.S. 36-3205.  A surrogate who is not the inmate's agent or guardian shall not make a decision to withdraw the artificial administration of food or fluid.

2.0.    <u>Pain Control</u>.  All patients diagnosed terminally ill will have a care plan. Physical measures, such as ice packs, heat, position changes and air mattresses will be used as needed to enhance the comfort of the inmate. Medications will be given as ordered by the Health Care Provider to achieve maximum comfort for the inmate. Food and fluids will be provided as tolerated by the inmate.

3.0.    <u>General policies for hospice type services</u>.  Terminally Ill/Hospice care will be provided for inmates who are in the last stages of a diagnosed terminal illness. Hospice care focuses on the achievements the patient is able to make in face of physical deterioration. The Department has embarked on a process that will lead to a hospice program.  In the interim, terminally ill patients will be provided support in a manner that is consistent with the basic medical doctrines of comfort support for the dying.

4.0.    Responsibilities of certain health care providers during terminally ill care:
4.1.    Medical: The Key Contact Physician or designee will complete a symptom or system specific examination and develop a plan of clinical care detailing treatment, pain control and resuscitation status for consideration within 48 hours of admission.  The provider will have regular contact with and make complete progress notes on all terminally ill patients. He/she will note all changes in plans of care in the progress note. Physician orders will be written as indicated.
4.2.    The Facility Health Administrator or designee will coordinate with security for special visits when appropriate, remain administratively responsible for ensuring that all aspects of supportive care are carried out.  The FHA will arrange for the utilization of a private room for the terminally ill patient when appropriate.
4.3.    Consistent with state regulations, the FHA will facilitate the early release of terminally ill inmates in a timely manner when appropriate.
4.4.    After each patient's death, the FHA will arrange for health services staff involved in the patient's care to access Employee Assistance and Support services through the CISD team.

5.0.    Inpatient Component Nurses are responsible for ensuring that the physician/provider orders are processed and carried through; completing a daily nursing assessment, take vital signs every shift and make an entry on the patient's progress note at least every shift or as ordered by the practitioner; notifying the Key Contact Physician or treating practitioner of any significant changes in the patient's condition; ensuring that treatment orders, medications, etc. are administered as prescribed and documented and that activities of daily living are met; providing at the end of each shift, a report to be given to the oncoming infirmary nurse; and reporting all patient deaths per Department Orders and this manual.

6.0.    Monitoring and Review:  Terminally ill admissions and assignments to the infirmary shall be monitored by the Key Contact Physician and Facility Health Administrator for clinical appropriateness, quality of care and pain management.

313

ADC010960

# EXHIBIT 2-L

| | Confidentiality | OPR:<br>Medical Records Program<br>Manager |
| --- | --- | --- |
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM<br>Chapter 1<br>Section 7.0. | Supercedes:<br>Effective Date:<br>January 1, 2010 |

**REFERENCES:**     DEPARTMENT ORDER 201
NCCHC STANDARD P-A-09
NCCHC STANDARD P-H-02

**PURPOSE:** To educate the HSD staff regarding the importance of confidentiality.   To provide an environment where there is an assurance on behalf of the patient that health care encounters remain private and that the patient's dignity is protected.  By doing so, the fostering of necessary and candid dialog between the patient and the provider occurs.

**RESPONSIBILITY:** It is the responsibility of the FHA to ensure that all clinical encounters are conducted in private and carried out in a manner designed to encourage the patient's subsequent use of health services. The HSD staff at each facility faces challenges to this obligation to keep all information between provider and the inmate private.  Dental staff, nursing, laboratory, radiology, health records, and support staff is required to respect the patient's privacy by restricting access of others to that information.

**REQUIREMENTS:**
1.0.     Unless otherwise directed by Arizona law, all medical records, and the information contained in the health records, are privileged and confidential.  A health care provider may only disclose part or all of a patient's health records as authorized by Arizona State or federal law. The provider may disclose information upon receipt of a written authorization signed by the patient.

2.0.     The Arizona Department of Corrections is a non-covered entity and not subject to the privacy requirement of HIPAA.
2.1.     Specifically, HIPAA addresses correctional institutions and other law enforcement custodial situations.  It allows Permitted Disclosures.
2.2.     A covered entity may disclose to a correctional institution having lawful custody of an inmate, protected health information (PHI) about such inmate, if the correctional institution represents that such health information is necessary for the provision of care.

47

ADC010694

3.0.   Privacy:

3.1.   Clinical encounters are conducted in private, without being observed or overheard by security personnel.  Privacy is made more difficult when triaging health complaints at the inmate's cell, in segregated housing, or in a lockdown setting.  When triage is required to be conducted at the inmate's cell, health services staff will take extra precautions to promote private communication between health staff and the patient.

3.2.   When safety is a concern and full visual privacy cannot be afforded, alternative strategies for partial privacy, such as a privacy screen, will be utilized.   Security personnel are present only if the patient poses a probable risk to the safety of the health care provider or others.

3.3.   Medical staff will provide timely instruction to security staff who observe or hear health encounters regarding maintaining confidentiality.

ADC010695

# EXHIBIT 2-M

| | Medication Delivery - (Keep On Person) | OPR: Nursing Program Manager/ Pharmacy Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: pb/sr |
| Health Services Technical Manual | HSTM Chapter 5 Section 6.0. | Supercedes: HSTM 5.6.0. June 15, 2008 Effective; January 1, 2010 |

**REFERENCES:**    Arizona Administrative Code R4-23-658
Arizona Administrative Code R4-23-672
Arizona Revised Statutes 32-1901 to 36-2515.A.2
Arizona Revised Statutes 32-1901 to 32-1996
Arizona Revised Statutes 36-2511 to 36-2552
Arizona Revised Statutes 36-2512.A.1 to 36-2515.A.1
DEPARTMENT ORDER 702
NCCHC STANDARD P-C-05
NCCHC STANDARD P-D-01
NCCHC STANDARD P-D-02

**PURPOSE**:   To provide a consistent and uniform system of delivery of Keep On Person prescription medications to the inmate/patient population. To ensure that medications are delivered on a daily basis in a uniform and consistent manner throughout the Department, and that accountability is maintained in all phases of the delivery process.

**RESPONSIBILITIES:** It is the joint responsibility of the Nursing Staff and Operations Staff to deliver prescription medications to the inmate population. Keep on Person medication may be delivered to the inmate by medical staff. However, every effort must be made to develop local procedures to allow security staff to deliver Keep on Person medication. When medication is delivered by security staff it must be in HIPAA compliant packaging.

**PROCEDURES:**
1.0.    The complete audit trail for all medications issued by a pharmacy must be maintained for subsequent inspection by Health Services staff, as well as Federal and State enforcement, investigative and licensing agencies.
1.1.    Medication for inmates who are out to court or in the hospital shall be maintained at the unit pending the inmate's return to the facility unless the order has expired.   Exception will be when the mediation is delivered to the inmate by security.  Security will return any medication undeliverable to the pharmacy immediately.

219

ADC010866

Upon the inmate's return from the hospital the unit nurse will provide the discharge summary and hospital notes to the provider for review for medication formulary compliance or consideration of changing the medications. If there is no provider scheduled for that unit upon return of the inmate, the unit nurse will contact another facility provider or the on call provider to obtain orders based on the hospital discharge summary for the inmate and current medications provided by the ADC facility.   All discontinued medications will be returned to the pharmacy.

2.0.     Keep-on-Person (KOP) maximum quantities dispensed may not exceed a 28 day supply, except for unit of use medications (e.g., eye drops, creams, lotions, etc.) which expire when gone.

2.1.     Inmates shall pick up KOP Medications from nursing staff or correctional staff at designated dates and times in accordance with local post orders. Documentation is to be accomplished in accordance with Pharmacy direction and medical records guidance to ensure that a complete record of treatment is maintained.

2.2.     The correctional officer shall document the delivery of the medication by inmate signature and that documentation returned to the pharmacy.   Security officers will be trained by pharmacy services in all aspects of the distribution of medication to the inmate.

2.3     Medication will be placed in opaque bags to protect the identity of the medications delivered to the inmate by security staff.

3.0.     Medication Delivery:

3.1.     <u>Quantity:</u>

Normally when initially filling a prescription, the supporting pharmacy shall prepare and issue a quantity (up to a 34 day supply) sufficient to last until the scheduled pick-up day. The remainder of the order shall be prepared (in quantities of 28 days supply) and sent on scheduled pick-up days until the order has expired. Each Complex will develop post-orders to establish and delineate procedures for each inmate housing unit to pick up their medications to include procedures of notifying inmates that they may have non-weekly medications to pick up.

Certain medications recommended by the Pharmacy and Therapeutics Committee, and approved by the Health Services Division Administrator, may be dispensed and delivered to an inmate in more than a one month supply.  These medications include topical preparations, inhalers, or other unit of use medications.

Antibiotic medications may be dispensed in the total amount of up to 28 days to complete therapy if the amount is considered safe.

Keep-on-Person (KOP) Preparation:

KOP medications will be prepared for officer delivery to the inmate by the pharmacy, medication liaison, or designee, under the supervision of the Facility Health Administrator.  Unit Dose medications will be prepared for distribution to nursing services by the medication liaison or designee, under the supervision of the Facility Health Administrator.

Bar Coded systems and scanners may be utilized by the medication liaison or designee, to assure that the bar-coded prescription is placed in the correct bar-coded opaque bag for delivery to the inmate by correctional officer staff.

3.2.     <u>Pick-up days to synchronize medication pick-up.</u>

KOP medications are delivered directly from the pharmacy to the appropriate Operations staff on a daily basis. Documentation of receipt of the medication by the inmate is returned to the

220

ADC010867

pharmacy.  Certain KOP medications may be delivered to an inmate in a supply to cover multiple days (up to thirty).

KOP medications are assigned for pick-up on a specific day, based upon the last digit of the inmate's number as follows:  The last digit of an inmate's ADC number designates their PICK-UP DAY as follows:

| | |
|---|---|
| 0 or 1 | Monday |
| 2 or 3 | Tuesday |
| 4 or 5 | Wednesday |
| 6 or 7 | Thursday |
| 8 or 9 | Friday |

3.3.     Delivery of medications shall be documented at every stage of the delivery system.
-        The correctional officer and nursing staff receiving medications from the medication liaison shall complete the "sign-off" sheets acknowledging receipt and count.  -   Inmates shall acknowledge the receipt of medications from Correctional Staff by signature and the document will be kept on file at the facility as defined in administrative policy and procedures.
-        During the regionalization process, documentation of receipt of medications by signature will be kept for 7 years by the pharmacy as long as there is a pharmacy on site.

4.0.     All discontinued/undelivered prescription medication  shall be returned to the pharmacy, but not sooner than three days and no later than seven days after the last expected delivery date EXCEPT when delivered by security.  Non-delivered medication from security will be immediately returned to pharmacy/nursing staff in accordance with locally developed post orders to research why the medication was undelivered.
4.1.     Undelivered Unit dosed medications will be retained in the custody and control of Nursing staff until determination is made regarding continuation of the prescription by the prescribing Provider.  Documentation of non-receipt will be maintained in the Medical Record.
4.2.     Confirmation of whether or not a medication is still active for an inmate will be determined by accessing the CIPS Reader computer.  If the prescription is in fact still active, and the inmate has changed locations, the nurse or medication liaison will provide transfer of the medication within the facility.
4.3.     If the inmate has moved to another facility the medication will be returned to the regional pharmacy for redistribution. · The pharmacy receives daily download reports of transfers identifying relocation of inmates and processes prescription replacement as needed.
4.4.     Transmittal/signature documents showing the non-delivery of Medication shall be returned to the pharmacy with the medications.
4.5.     If the undelivered medications never left the control of the pharmacy, correctional staff, nursing staff or medication liaison staff, they shall be returned to stock.
4.6.     Notation shall be made on the prescription file in the pharmacy computer to show the medication return.  An inventory adjustment shall be made using the "returned to stock" function of the pharmacy inventory control portion of the software.
4.7.     Returned medications which cannot be "returned to stock" must be destroyed.  Pharmacy staff shall document medication destruction or disposal through an approved contract vendor. Destruction shall comply with applicable Environmental Protection Agency and Occupational Safety and Health Agency (OSHA) directives.  Records shall be maintained for three years.

221

ADC010868

5.0.    Medications delivered to Inpatient Beds (IPC and Wards) will be delivered by coordinated schedules established by the FHA, CNRS II, and Key Contact Pharmacist. These medications are to be administered by Correctional Nursing Staff and will not be KOP medications. Post Orders must be written to delineate procedures.

6.0.    All psychotropic medications provided to patients in the Men's Treatment Unit will be Keep on Person unless ordered "unit dose" by a Psychiatrist.

7.0.    Pre-placement of medications that are to be delivered by nursing staff must be carefully managed to ensure security and patient safety. Complex CRNS II and unit CRNS Is are responsible to ensure that pre-pouring of medications is performed only in accordance with the HSTM 4.1.7. guidance and to ensure that all delivery activities are performed within the guidelines of the Nursing Practice Act. Preparation of medications to be delivered by nursing staff can only be prepoured or staged within the same shift as the delivery. The nursing staff who prepares the medication for delivery is the person who is responsible for the delivery process of the unit dose medications.

8.0.    The following are recommended and authorized elements of complex post order that guides staff in delivery of keep on person medications.
8.1.    General Responsibilities: All prescriptions will be legible and contain the diagnosis and all known allergies. The prescriptions must meet all regulations set by both State and Federal agencies. The bags will be placed into a plastic bin for transport. The bin must be sealed with combination locks. The prescription bags must be stamped in English and Spanish with Division approved information about the delivery process. The bags will include the inmate's name, ADC number and housing location on the outside of the sealed bag. The bags will be placed in housing unit bundles by specifically assigned personnel. The medications will be placed in a health unit area for pick up by assigned delivery staff.
8.2.    Pharmacy professional's Responsibilities: All Keep On Person prescriptions will be placed in a bag and sealed by Pharmacy Technicians and Pharmacists. Assigned personnel shall audit sign off sheets to ensure all medications are received, i.e. missing inmate signature requires investigation. Unclaimed medication must be returned to the pharmacy for entry in the Pharmacy computer as "returned to stock."
8.3.    Officer/Delivering staff's Responsibilities: Sign off sheets and must be returned to health unit in accordance with local schedules. The assigned personnel (correctional officers) will hand the medication bag to the inmates after the inmate has signed their name on the sign-off sheet provided. Sign off sheets and unclaimed medication must be returned to the health unit in accordance with local policy. Completed sign-off sheet and unclaimed medication should be placed in the empty bins. All paper, unclaimed prescriptions, and new prescriptions must be returned to the Pharmacy within the emptied bins. In the event that an inmate reports that medications were missing, the officer must be directed immediately inform Health Staff and to write an Information Report for documentation purposes. When returning the sign off sheets to the health unit, the officer should immediately notify Health staff of any missing medications.

ADC010869

# EXHIBIT 2-N

| | Medication Administration | OPR: Pharmacy Program Manager & Nursing Program Manager <br><br> Auth: pb/sr/jb |
|---|---|---|
| Arizona Department of Corrections | | |
| Health Services Technical Manual | HSTM Chapter 5 Section 6.4. | Supercedes: HSTM 5.6.4 June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:**     DEPARTMENT ORDER 702
NCCHC STANDARD P-D-02
NCCHC STANDARD P-C-05
NCCHC STANDARD P-I-06

**PURPOSE**:    To establish a procedure for the general administration of medications to inmates, including unit dose and insulin medications.

**RESPONSIBILITIES:** It is the responsibility of the Key Contact Staff and Supervisors to assure compliance with this procedure.   Complex CRNS II and unit CRNS Is are responsible to ensure that pre-pouring of medications is performed only in accordance with this policy and that all administration activities are performed within the guidelines of the Nursing Practice Act. CRNS IIs are responsible to ensure that all nursing staff follows this policy.

**PROCEDURES:**
1.0.     General Procedures:  Prescription medications are administered to inmates only upon the order of a physician, dentist, psychiatrist or other legally authorized individual.  Medications are prescribed only when clinically indicated.  A quick reference is provided in the table below this policy.
1.1.     All Controlled Substances and Tricyclic antidepressants will be Unit Dose (formerly called Watched Swallow) only.
1.2.     Psychotropic medications and controlled substances shall be administered by Unit Dose with the following <u>exceptions</u>:
- Valproic Acid, sodium divalproate, carbamazepine, SSRIs, and Psychiatric adjunct medications (such as benztropine, benadryl, hydroxyzine, colace, metamucil, etc.) <u>will be KOP weekly dosed</u> except in Baker, Flamenco.
- Psychiatrists can restrict use to Unit Dose as necessary in individual patients.
-   In addition, patients housed in CDUs under Mental Health Watch or Suicide Watch will have all their medication administered by Unit Dose with no exceptions.
- Diflucan: When Diflucan is ordered for pulmonary or disseminated coccidiomycosis, the prescription must be annotated as a required "Unit Dose."

230

ADC010877

# EXHIBIT 2-O

 **Wexford Health**
SOURCES INCORPORATED

### 2.13.10.4 Psychiatric Provider Services

**Psychiatric provider services and psychotropic medications. (RFP §2.13.10.4)**

Wexford Health has read, understands, and will comply with RFP Subsection 2.13.10.4 regarding psychiatric provider services and psychotropic medications.

A Wexford Health psychiatrist will provide consultation via face-to-face or telemedical interview for any inmate in need of psychiatric evaluation (i.e., exhibiting unusual or bizarre behavior), to establish a diagnosis and to plan for the individual's care and treatment. In most cases, the psychiatrist will conduct a Mental Status Examination as part of the assessment process, focusing on the domains of appearance, attitude, behavior, speech, mood and affect, thought process and content, perception, cognition, insight, and judgment. From this assessment, the psychiatrist will generate a treatment plan with charted diagnoses on all five DSM-IV TR dimensions relating to different aspects of disorder or disability, and including recommendations for follow-up services.

Wexford Health will also ensure a sufficient number of appropriately licensed psychiatrists and psychiatric mid-level practitioners to provide a full range of evidence-based, culturally sensitive, and gender-specific psychiatric services, as outlined below. In the absence of a psychiatrist, the site physician will assume responsibility for the provision of these services (within the scope of his or her practitioner's license). We will also ensure the appropriate referral of offenders for psychiatric evaluation.

- Oversight of individualized treatment planning, as described in the preceding section
- Prescribing and management of psychotropic and mental health related medications in accordance with evidence-based, best practice standards
- Participation in developing, and implementing suicide prevention strategies
- Development of initiatives to reduce the use of seclusion, segregation, and restraint
- Participation in involuntary medication proceedings
- Participation in the identification of inmates who are seriously functionally impaired
- Participation in discharge planning
- Participation in the identification, and treatment of inmates who are seriously functionally impaired
- Working collaboratively with ADC and ASPC personnel to develop support plans as required for the provision of services to SMI inmates
- Direct involvement in admission, and discharge decisions to the Arizona State Hospital or other licensed mental health inpatient treatment facilities

ADC015580



*Psychotropic Medications*

Wexford Health is a strong advocate for the prudent use of psychotropic medications in correctional settings. Psychotropic medications or other forms of pharmacotherapy will be prescribed only by a psychiatrist, and only after the provider has conducted a thorough examination, evaluated the patient (including, in the case of females, possible pregnancy), and determined that psychotropic medication is appropriate.

Prior to the prescription of psychotropic medication, Wexford Health's psychiatric staff will ensure that the inmate (a) has a basic understanding that he or she has a mental health problem, (b) understands that medication is being offered to produce relief from that problem, and (c) is able to give consent to treatment. We also inform the inmate about the risks of taking such medication, about alternative treatments, the appropriate length of care, and the fact that he or she may withdraw consent at any time without compromising access to other health care. We obtain informed consent from the inmate each time Wexford Health psychiatric staff prescribes a new psychotropic medication. Wexford Health will ensure that the consent for psychotropic medication is signed by the inmate, and witnessed by two persons.

To maximize the effectiveness of pharmacotherapy and to reduce the toxicity and side effects of medication, Wexford Health ensures that psychotropic medications are appropriately managed through the following measures:

- The psychiatrist will review the inmate's medical record to determine which medications the patient has been receiving prior to prescription of psychotropic medication

- The psychiatrist will evaluate all inmates placed on psychotropic medication within 72 hours

- The psychiatrist will reassess inmates classified as in need of psychotropic medications once a month for follow-up, even if the inmate is non-compliant with the treatment plan or refuses services.

- All inmates prescribed psychotropic medications will receive counseling, and education from Wexford Health's nursing staff regarding potential risks, and side effects

- Each inmate's individualized treatment plan will include a schedule for ongoing assessment of psychotropic medications for inmates, with routine monitoring during individual counseling sessions, and formal evaluations

- Wexford Health's proposed pharmacy contractor uses state-of-the-art software to maintain real-time patient medication profiles. Prior to dispensing, each order is audited at a minimum for potential drug-drug interactions, drug-disease interactions, duplicate therapy, allergies, excessive, or sub-therapeutic dosages

Wexford Health's drug utilization review (DUR) and management program helps ensure that inmates receive appropriate and medically necessary prescription drug therapy through ongoing analysis, and evaluation as part of our QMP program.

ADC015581



As part of our mental health evaluation process, Wexford Health utilizes a differential decision-tree to identify inmates who will most readily benefit from cognitive-behavioral therapy, and case management services, as opposed to those who would benefit more from psychopharmacological intervention, and those whose needs encompass both.

For appropriate patients, the above-described modalities are effective and successful alternatives to costly pharmacotherapy. Wexford Health also employs the following specific measures to positively impact the use of psychotropics:

- Close collaboration between mental health, and pharmacy staff promotes comprehensive patient assessments, and ensures that psychotropic intervention is clinically indicated and appropriate

- Regular, ongoing multidisciplinary treatment team meetings ensure that a patient's psychotropic therapy is consistently monitored, and modified as warranted

- Ongoing education and in-service training assists clinicians in staying current with new, and alternate treatment strategies

- Wexford Health's Pharmacy and Therapeutics Committee continually monitors its formulary, and updates the formulary as necessary to reflect new advances in drug protocols, and current practices of our physicians

Through these prudent measures, we are able to contain the use of psychotropics to minimum appropriate percentages of the populations at our contracted facilities.

Wexford Health believes that good charting is not something done primarily for retrospective review of patient care. Inmate medical records contain vital information that providers use every day. Requiring the staff at our contracted facilities to maintain proper documentation is proactive, not defensive. As a practice, we have found that this approach reduces the potential for litigation, and ensures that inmates receive quality care.

Complete and accurate documentation leads to many positive outcomes, including improved communication among health team members, effective risk management, and the availability of data for statistical purposes. As such, Wexford Health's maintenance and management of medical records will conform to AMA, NCCHC, and ACA standards as well as State of Arizona laws, and Health Insurance Portability and Accountability Act (HIPAA) regulations.

Wexford Health employs the Problem Oriented Medical Records (POMR) method at all of our contracted sites. This assures that the medical record is a valuable source of information, and a guide for treatment management, as well as a legal record of the services provided. Wexford Health requires that documentation in the medical record follow the SOAPE (Subjective, Objective, Assessment, Plan and Education) format.

For the ADC contract, we will provide, and uniformly use, standardized Department approved forms to maintain a complete, standardized, problem-oriented medical record for

ADC015582

# EXHIBIT 2-P

| CORRECTIONS ADC Arizona Department of Corrections | Procedures for Voluntary, Involuntary, and Emergency Use of Psychiatric Medications | OPR: Health Services Division Director |
|---|---|---|
| Mental Health Technical Manual | MHTM Chapter 5 Section 10.0 | Supersedes: Procedural Instructions P0022A, P0022B Effective Date: 8/15/11 |

**Purpose**: To provide guidance to psychiatric providers [or other providers when necessary] in situations where voluntary, involuntary, and emergency dispensing of psychiatric medications to incarcerated individuals is clinically indicated as a means of treating a mental disorder or reducing an inmate's risk of serious self injury and/or the potential for injury to others as the result of a mental disorder.

**Responsibility**: The psychiatric prescriber is responsible for assessing, and if necessary, ordering the use of psychiatric medication in accordance with the protocols of this section.

1.0 Voluntary Use of Psychiatric Medications
    1.1 When voluntarily administering psychotropic medication, the psychiatrist or psychiatric nurse practitioner shall:
        1.1.1  Complete the appropriate Informed Consent for Psychotropic Medication Form (1103-12P).
            1.1.1.1 In the event the inmate refuses to sign the form, the attending staff shall write "refused to sign" on the inmate signature line.
            1.1.1.2 If an approved medication consent form specific for the proposed medication is available, it should be utilized in place of Form 1103-12P.
        1.1.2  Document, on the Mental Health Progress Notes the reason for prescribing psychotropic medication, and the dosage and duration of the medication.
            1.1.2.1 Prepare a prescription to dispense psychotropic medication.
            1.1.2.2 Ensure, in conjunction with Pharmacy and Nursing staff, that the inmate receives the psychotropic medication within a medically appropriate time frame.
    1.2 Psychiatrists and psychiatric nurse practitioners may prescribe psychotropic medication and administer it voluntarily to inmates who are inpatients at the Alhambra Behavioral Treatment Facility if, in their opinion, the medication is necessary for the treatment of a mental disorder.

ADC032027

1.3 When voluntarily or involuntarily administering psychotropic medication, the health care professionals responsible for administering the psychotropic medication and documenting compliance with the psychiatrist's or psychiatric nurse practitioner's prescription for psychotropic medication shall:

    1.3.1   Only dispense psychotropic medication that has been ordered in a current prescription by a psychiatrist or psychiatric nurse practitioner and is labeled.

    1.3.2   Copy each medication order onto the Medication Administration Record (MAR).

    1.3.3   Complete a laboratory requisition, if indicated.

    1.3.4   Bracket, after transcribing the orders, all orders in RED and write "noted," followed by the date, time, the health care professional's legal name and professional title.

    1.3.5   Document, on the medication sheet, all psychotropic medication that is administered.

    1.3.6   Inform the psychiatrist or psychiatric nurse practitioner of any adverse reactions to the psychotropic medication, and document the information in the mental health progress notes and on the medication sheet.

    1.3.7   Keep all psychotropic medication in containers bearing the pharmacist's original label and store it in a securely locked medicine cabinet where the institution's prescription medications are stored and dispensed.

    1.3.8   Administer psychotropic medication to inmates by one of the following methods, as determined by reviewing the prescription:

        1.3.8.1 By unit dose.

        1.3.8.2 By daily dose.

        1.3.8.3 By watch swallow.

            1.3.8.3.1   Any health care professional may place an inmate on watch swallow if he or she suspects that the inmate may not take the medication as prescribed.

            1.3.8.3.2   Watch swallow can only be discontinued with written orders from the psychiatrist or psychiatric nurse practitioner.

        1.3.8.4 By keep on person.

        1.3.8.5 By intra-muscular injection.

2.0 Involuntary Emergency Use of Psychiatric Medications

    2.1 A psychiatrist or psychiatric nurse practitioner [or another attending physician/physician assistant/or nurse practitioner if a psychiatrist or psychiatric nurse practitioner are unavailable] may order emergency psychotropic medication for and administer it involuntarily to an inmate with a mental disorder if, after evaluating the severity of the inmate's symptoms and the likely effects of the particular drug to be used, the psychiatrist or psychiatric nurse practitioner determines that:

        2.1.1   An emergency exists in which the inmate's conduct presents a likelihood of imminent serious bodily harm to self or others.

        2.1.2   Alternative methods of confinement or restraint are inadequate.

        2.1.3   Forced medication is required, as a last resort, to address the emergency.

3.0 Involuntary Non-Emergency Use of Psychiatric Medications

ADC032028

# EXHIBIT 2-Q

| | Pharmaceutical Dispensing Procedures | OPR: Pharmacy Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: pb |
| Health Services Technical Manual | HSTM Chapter 4 Section 1.1. | Supercedes: HSTM 4.1.1. June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCES:**     Code of Federal Regulations, 21 CFR 1306.04(a)
Arizona Revised Statutes 32-1901(66)
Arizona Administrative Code R4-23-672
NCCHC STANDARD P-D-01
NCCHC STANDARD P-D-02

**PURPOSE:**   To provide details of prescription limits, release medication, define authorized prescribers, identify required prescription information, set limits of prescription quantities and refills, contract provider prescriptions, emergency and after hours prescriptions for narcotics and psychotropic medications, investigational drugs, clinical trial medications and protocols, provider DEA numbers, hormones for transsexual supplementation, occupational health, supplies and institutional medications.

**RESPONSIBILITIES:**   It is the responsibility of the Pharmacy Program Manager to oversee the dispensing functions of ADC pharmacies. It is the responsibility of the Key Contact Pharmacist to oversee the dispensing functions of the individual ADC pharmacies. It is the responsibility of the pharmacy staff, provider staff, nursing staff, administrative staff and mental health staff to maintain the integrity of dispensing procedures to ensure that all prescriptions are dispensed in a timely manner so as not to contribute to morbidity or mortality and so that the inmate population receive excellent pharmaceutical care while under the supervision of ADC health services.

**PROCEDURES:**
1.0.   **Authorized Prescribers:**
1.1.   Only Arizona Department of Corrections employees legally licensed by the State of Arizona to prescribe medications shall be authorized to prescribe medications for inmates. Prescription orders written by consultants shall be considered "treatment plan recommendations" to the ADC provider. The following ADC practitioners are required to have an ADC assigned DEA number:

100

ADC010747

# EXHIBIT 2-R

| | Organization of the Medical Record | OPR: Medical Records Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: cp |
| Health Services Technical Manual | HSTM Chapter 5 Section 5.3. | Supercedes: HSTM June 15, 2008 Effective Date: January 1, 2010 |

**REFERENCE**:        NCCHC STANDARD P-H-01

**PURPOSE:**
To provide a uniform document in which a record of an inmate's health status, diagnosis(es), examination(s), evaluation(s), treatment(s) and response(s) to treatment(s) can be recorded and maintained.

**RESPONSIBILITY**: The uniformity of the Medical Record is the responsibility of the Medical Record staff.  The maintenance of that uniformity is the responsibility of all Health Staff accessing the Medical Record.

PROCEDURES:

1.0 ESTABLISHMENT OF THE ADC HEALTH RECORD
**1.1 Origination of Health Records: Upon arrival at any of the designated Reception Centers medical record staff shall originate the document which becomes the inmates' medical record.**
-        **Alhambra Reception & Treatment Center (ASPC-Phoenix-ARTC): Adult male inmates**

-        **Lumley Reception & Assessment (ASPC-Perryville): All female inmates and female minor inmates**

-        **Browning (ASPC-Eyman): Death Row male inmates**

205

ADC010852

- Rincon Minors Unit (ASPC-Tucson): Minor male inmates adjudicated by the court as adults.

**1.2.**   **Organization of All ADC Medical Records Shall be:**

- Filed in 4-part classification-type binders, **in standard letter size (81/2" X 11").**

- **Only forms which have been approved as stipulated in Directors Instruction 14,** Forms Control, **may be used in the health record.**

- **Contents of the health record must be organized as per the specified approved format.**

- **The Medical Record Program Manager may change, or revise this organization as may be required by statute, regulation, Department Order or procedural changes.**

**1.3.**   **Inmate Identification Information:**   **The health record jacket shall contain the following information:**

- In the upper right hand corner of the file jacket:

  - **Inmate's full name (last name, first name)**

  - **ADC Number (which becomes the health record file number),**

  - **Information regarding any allergies the inmate may have (annotated in red on the Front of the file jacket).**

  - **list "AKAs" to the left of the name label.**

**1.4.**   **The ADC Number adhered to the bottom edge of the back cover of the jacket. Inmate Numbers shall be in the specified color-coded bands**

ADC INMATE COLOR-CODED NUMERICAL BANDS

206

ADC010853

| 1- LT BLUE | 2-RED | 3- LT GREEN | 4-GRAY | 5-GOLD |
|---|---|---|---|---|
| 6-DK GREEN | 7-BLUE | 8-ORANGE | 9- BLACK | 0- YELLOW |

**1.5.**   Color-coded tabs indicating any specified Chronic Conditions which the inmate has been diagnosed as having. Color Code(s) for HIV+/AIDS shall be affixed to the inside front cover of the jacket, upper left hand corner

**2.0.**   All forms contained in the health record must contain the following identifying information, and be filed in chronological order, with most current on top:

Inmate's full name, ADC Number,

Inmate's current location (Prison, Unit).

3.0.   ORGANIZATION OF ADC MEDICAL RECORDS
*SECTION I*

- Problem List (Problem list MUST be maintained and kept current with the medical providers making any additions, corrections, or deletions.  File the most current on top.  Health Provider: MD, DO, NP, PA, Dentist, Psychiatrist, Psychologist, Nursing may document on Problem List)
- Health Education HIV Tracking Form
- Health Education Diabetes Tracking Form
- Hepatitis B/C Contraindications Table
- Hepatitis B/C Screening Table
- Checklist for Hepatitis C treatment

207

ADC010854

- **HCV Therapy Monitoring Log**
- **Currently does not qualify for Hepatitis C**
- **SMI Check list**
- **ADA Checklist (Functional Assessment)**
- **Chronic Condition Flow Sheets (Various Conditions)**
- **14-day Mental Health Assessment**

Index Tab Divider: Intake Data

- **Initial/Inter-Facility Assessment**
- **Physical Examination(s)**
- **Nursing Staff Assessment**
- **Reception Center Screening**
- **Medical History**

Index Tab Divider:  Health Education

- **Continuous Progress Notes**

Index Tab Divider: Pr(ior) Rec(ords)/Rel(ease) of Info(rmation)*

- **\*NOTE: Documents in this section are NOT part of the medical record !!**
- Previous MH records are removed from the medical record during offender review of the medical record and are never copied and released as part of the Medical Record unless the inmate specifically authorizes the release of Previous Records on "Authorization to Disclose Copies or Provide Information from Medical Records (form 1104-2).
- Inmates are allowed to review Previous Medical records and may release Previous Records.
- **Any medical documents obtained from medical facilities for health care received prior to ADC incarceration**
- **Authorizations to Obtain Copies of Medical Records from medical facilities (requests for records  etc.**
- **Transfer Summary/Continuity of Care (from County Jails)**

*SECTION II*

- **NOTE: Items listed shall appear only in cases involving death of an offender.**
- **Central Office Mortality Review Documents**
- **Autopsy Report/Medical Examiner's Report**
- **Facility Mortality Review Documents**
- **Significant Incident/Information Reports Related to Final Episode**

Index Tab Divider: Progress Notes

- **Appointment Log**
- **Continuous Progress Notes**
- **CIPS Profile**
- **Wound Documentation Flow Sheet**

208

ADC010855

- **Continuous Progress Record – Pharmacy**
- **Transfer Summary/Continuity of Care (for Inter-facility Transfers, Court Transfers) (Located within the Progress Notes in chronological order as they occur)**

Index Tab Divider: Consults/Flow Sheets

- **In-House Consultation Reports**
- **Consultation Reports**
- **IPC records (Florence & Tucson):**
  - o **Request for In-House Consultation (Mental Health)**
  - o **Emergency Room Records &/Or Inpatient Medical Records for Admission During incarceration**
- **NPO Instruction Sheets for Procedures (Barium Enema, UGI, Colonoscopy Prep, Thyroid scans, EGD, Outpatient surgery, dental)**
- **Optometry Patient Record/ Eye Glass Order**
- **Flow Sheets (Various Types)**
- **Observation Records (CDU)**
- **Vital Signs**

Index Tab Divider: Dental

- **Dental Chart**
- **Dental Chart - Continuation Sheet**
- **Dental Communique**
- **Dental Instructions**

*POCKET BETWEEN SECTIONS II & III*

**Dental Panoramic and bite-wing X-rays**

*SECTION III*

- **Medical Work-up/Follow-up (Pink Sheet)**
- **Immunization Record (Yellow)**

Index Tab Divider: Lab/x-ray/EKGs

- **Laboratory Report (Various)**

- **X-ray Request and Report**

- **Mammograms**

209

ADC010856

- **Other Imaging Reports (Scans, Ultrasounds, MRIs, etc.)**

- **Audiometric tests**

- **Pulmonary Function Testing**

- **EKG Reports**

- **Urinalysis Forms**

- **PPD Forms**

Index Tab Divider: Consents/Refusals

- **Refusal of Treatment Forms (for In-house &/or Outside Appointments) (must be witnessed x 2)**
- **Consent/Refusal for Substance Abuse Treatment**
- **Post HIV Counseling Checklist**
- **Consent to Test for HIV**
- **Education/Consent for Possible Treatment of Hepatitis C**
- **Vaccine Consents (MMR, Influenza, etc.)**
- **Minor Surgery Consent**
- **PPD Conversion Counseling**
- **Informed Consent for Oral Surgery**

Index Tab Divider: Medication Sheets/Miscellaneous

- **Medical Delivery/OTC Flow Sheets**
- **Medication Distribution Log**
- **INH Administration Record**
- **Non-formulary Request**
- **Psychiatry Non-formulary Request (1103-25)**
- **Duty/Special Needs Orders**
- **Patient Disposition**
- **Shaving Waivers**
- **Restricted Diet Orders**

*SECTION IV*

- **Inmate Chronological Movement Record**
- **Notice of Destroyed Medical Record (if applicable)**
- **Notice from Library & Archives if chart cannot be located**

Index Tab Divider: Health Needs Request

210

ADC010857

- **Health Needs Request Forms (English/Spanish)**
- **Health Needs Request (For Emergency Requests)**

Index Tab Divider: Mental Health

- **Documents in this section are removed from the medical record during offender review of the medical record.**

- **MH Data Sheet (Yellow cardstock) (1103-26)**

- **Psychotropic Related Testing (Yellow cardstock) (1103-29)**

**(The above two forms will always be the first 2 forms filed under the MH tab.)**

- **Mental Health Continuous Progress Notes**
  - **Group Progress**
  - **SMA Assessment**
- **Psychiatric Follow-up Note (1103-37)**
- **Psychiatric Evaluation – MH (yellow paper/3 page document) (1103-32)**
- **Suicide Risk Screening Form**
- **Medical Nursing Watch (1103-A40)**
- **Mental Health Disposition (suicide/mental health watch)**
- **Any correspondence/letters from the inmate to MH staff**
- **Mental Health Treatment Plan**
- **WTU - Diagnostic Page**
  - **Problem list**
  - **Problem Plan(s)**
  - **Signature Page**
  - **Treatment Plan Reviews**
- **Informed Consent**
  - **Mental Health and WTU**

(Divider)

- **ADC inpatient progress notes (Flamenco) (for records that are not 6 part charts)**
- **Psychological Assessments**
- **Consent for Psychotropic Medications**
- **Cell front Checklist**

Index Tab Divider: Legal/Administrative*

211

ADC010858

**\*NOTE: Documents in this section are NOT part of the medical record.  They are removed from the medical record during offender review of the medical record (Medical and Mental Health) and are never copied and released as part of the Medical Record.**

- **Requests for Copies of Medical Records (outside requesters -- Not on ADC Forms)**

- **Authorization(s) to Release Copies of ADC Medical Records**

- **Documentation regarding specific medical documents released**

- **Currently Does not Qualify for Hep C Treatment**

- **Outside Request Review Sheet (MRC Approval/Denial Form)**

- **HEP C Committee Follow Up Information Request.**

- **Medical INCR Form**

- **Mental Health INCR Form**

- **Correspondence**

- **Court Documents**

- **DNA and/or Paternity Court Order and Test Confirmation**

- **Guidelines - Inmate Medical Record Reviews**

- **Right to Request Limitation of Extraordinary Life Support Measures**

- **Consent to Release Medical Information/Medical Record (This is the verbal consent - signed at intake)**

*PLASTIC POCKET, INSIDE BACK OF MEDICAL RECORD JACKET*

212

ADC010859

\-      VA Benefits Information  Chronic Health Problem Card  (During transport, and until needed for use in Chronic Condition System).  Chronic Condition Cards are pulled and maintained by the Nursing staff when a condition is identified.  Card Must be pulled by Nursing staff when inmate is transferred or released and placed in pocket located in back of chart.

MMC Identification Card (If applicable) (Not ADC Form)

\-      DOCUMENT PLACEMENT:  DOCUMENTS ARE PLACED IN THE VARIOUS SECTIONS IN REVERSE CHRONOLOGICAL ORDER (Newest or most current on top)

Unless otherwise noted, in sections where more than one type of the same form/document is included in the section, group all like documents together, file in reverse chronological order. (Example: all PPD slips, all x-rays, all EKGs, all Scans, all MRIs, etc.)

4.0. *BAKER/FLAMENCO SECTIONS 5 AND 6  CHART ORDER:*

\-      CHART ORGANIZATION FOR ALHAMBRA BEHAVIORAL HEALTH TREATMENT FACILITY (ABHTF) NOTE: NOTHING IS TO BE REMOVED FROM SECTIONS 5 AND 6 UNTIL ADMITTED TO BAKER/FLAMENCO UNIT.

*SECTION I*: Same as green medical record

*SECTION II*: Same as green medical record

*BROWN POCKET/TAB*: Dental X-rays

*SECTION III*: Same as green medical record

213

ADC010860

*SECTION IV*: **Same as green medical record (QUIET unit admission records are under the Mental Health Tab in this section until admitted to the unit.  QUIET unit is not part of the licensed units)**

*BROWN POCKET/TAB*:

-       **Chronic Card**
-       **Face Sheets**
-       **Extra Labels**

*SECTION V*: **INPATIENT PSYCH.  "MEDICAL": used for Baker and Flamenco units only.  DO NOT REMOVE ANYTHING FROM THIS SECTION.**

TAB 1: **MEDICAL PROGRESS NOTES**

-       **All progress notes (medical)**
-       **Medical Physical**
-       **Medical History**

TAB 2: **ALL DIAGNOSTICS**

-       **Lab reports**

-       **PPD**

-       **x-ray reports**

-       **EKG's**

TAB 3: **MEDICATION SHEETS/MISCELLANEOUS**

-       **MAR'S**

-       **Special needs status**

-       **Limited duty status**

-       **Diet Restrictions**

214

ADC010861

<u>SECTION VI</u>: **INPATIENT MENTAL HEALTH:**

**Documents in this section are removed from the medical record during offender review of the medical record.  DO NOT REMOVE ANYTHING FROM THIS SECTION.**

- **Discharge Summary**

<u>TAB 1</u>: **MENTAL HEALTH PROGRESS NOTES**

- **All progress notes charted**
- **Group Notes**
- **Cell front checklists**
- **Mental Health Disposition forms**

<u>TAB 2</u>: **CONSENTS/ORIENTATION**

- **Inmate Patient Orientation**

- **Conditions to Admission**

- **Mental Health Treatment Consent**

- **Grievance Policy**

- **Informed consent for Psychiatric medications**

<u>TAB 3</u>: **ADMISSION/ASSESSMENT**

- **Admission and Interim Treatment Plan**

- **Treatment Plan**

- **Psychological Report**

- **Clinical Assessment Packet**

- **Test Data**

- **Occupational Therapy Assessment**

215

ADC010862

<u>TAB 4</u>: **LEGAL**

- **Court-ordered Treatment**
- **Court-ordered Evaluation**
- **Psychiatric**
- **Release of Information**
- **Outside Medical Records**
- **Mental Health INCR's**

*Notes*:

- **SMI CHECK LISTS go in SECTION 1 UNDER "PROBLEM LIST"**
- **All FLOW SHEETS go in SECTION 2 UNDER TAB "FLOW SHEETS"**
- **All REFUSAL OF TREATMENT'S go in SECTION 3 UNDER TAB "REFUSAL OF TREATMENT FORMS"**
- **All HNR's go in SECTION 4 UNDER TAB "HNR"**

**5.0.**    THINNING A CHART

**Steps to creating a new volume:**

- **Label volume**

- **Name/# label**

- **ADC # stickers**

- **CC color stickers**

- **Allergy**

- **Mark old volume (STOP-DO NOT USE: SEE VOLUME # _____)**

- **Mark new volume #**

- **Mark "Medical Record" on front of chart**

- **Move appropriate documents to new volume (see below)**

216

ADC010863

- **Documents to be carried forward to new volume:**

| | |
|---|---|
| SECTION 1 | **Problem List – current**<br><br>**Functional Assessment – current**<br><br>**Mental Health Assessment – currrent**<br><br>**CC- tracking forms – current** |
| **Intake (tab)** | **Inter-facility Assessment – current**<br><br>**Physical – current**<br><br>**History – current** |
| **Previous Records (tab)** | 0 |
| SECTION 2 | **PROGRESS notes - 1 to 6 months**<br><br>**(depends on thickness)** |
| **Consults/Flow sheets (tab)** | **Consultation – 1 to 6 months (depends**<br><br>**on thickness)**<br><br>**Ophthalmology Report w/Eyeglass Rx –**<br><br>**current**<br><br>**Flow sheets – current** |
| **Dental (tab)** | **All if possible** |
| Section 3 | **Medical Work-up – current** |
| **Lab/X-ray/EKG** | **Lab/PPD- current** |

217

ADC010864

| | X-ray – current<br><br>EKG- current<br><br>Mammogram – current<br><br>PAP – current |
|---|---|
| **Consents/Refusals (tab)** | 0 |
| **Miscellaneous (tab)** | MAR sheets – 1 month<br><br>Duty status – current<br><br>Diet – current<br><br>Shaving waiver – current |
| Section 4 | Chrono movement – entire |
| **Legal/Administrative (tab)** | INCR – current<br><br>Right to Limit… - current |
| **HNR (tab)** | HNR – max 1 month worth |
| **Mental Health (tab)** | MH PROGRESS notes – 1 to 6 months<br><br>SMI Treatment Plan – current |
| | |

218

ADC010865

# EXHIBIT 2-S

| | Continuity of Care - Upon Transfer | OPR: Medical Program Manager & Nursing Program Manager |
|---|---|---|
| Arizona Department of Corrections | | Auth: dc/cp |
| Health Services Technical Manual | HSTM Chapter 5 Section 5.0. | Supercedes: Nursing Technical Manual, 1999, Dr. Robert Jones memo dated 02/15/2002 Effective Date: January 1, 2010 |

**REFERENCES:**          NCCHC STANDARD P-E-02
                        NCCHC STANDARD P-E-03
                        NCCHC STANDARD P-E-12

**PURPOSE:** To provide guidance for ensuring the continuity of care upon transfer to another facility within the Arizona Department of Corrections or upon transfer to a non-ADC Facility, Unit or Jail. This also provides guidance in the Reception of the Inmate. The ensuring of continuity is directed through review of arriving inmate medical records by a qualified health staff member prior to transfer to another state ADC facility, contract facility, or out to court. To ensure that the inmate medical records are reviewed upon arrival at the receiving facility and the inmate is interviewed by a receiving health services staff member.

**RESPONSIBILITY:** It is the responsibility of the Correctional Registered Nurse Supervisor II to monitor that a correctional nurse completes a Continuity of Care Form prior to an inmate transfer; that the medical record is reviewed by a correctional nurse upon the inmate's arrival at the receiving facility; and the inmate is interviewed concerning the state of his/her health care and all related needs.

**GENERAL PROCEDURES:** All inmates shall have their needs communicated from the sending facility to the receiving facility by the Continuity of Care Form and verbally at the time of transfer.

1.0      **Sending Facility**.
1.1.      The sending facility nursing staff are responsible to immediately, upon notification of an inmate's impending transfer, review the inmate's medical record; and complete the following information on the Continuity of Care Form prior to transfer. The form must identify any existing chronic illness/disease; and/or any medication ordered which must be continued during transportation and after intake at the new facility. They are also responsible to provide a copy of

194

ADC010841

the inmate's Corrections Institution Pharmacy Software (CIPS) medication profile when transferring to a non-ADC facility. The nursing staff shall also contact the Clinical Coordinator for referral appointment information to an off-facility medical or dental provider, or to a clinic/hospital for evaluation; a follow-up appointment needed by an onsite medical or dental provider; any special requirements which are to be documented under "Comments".

If the inmate is being transferred to another unit and a diagnostic report has been received in the medical record but has not been reviewed and signed by the ordering provider: The report is to be placed on top of the SOAP divider so the transferring unit can route the chart and report to the provider assigned to that unit so treatment can be rendered if necessary.

1.2.    Sending facility medical records staff are responsible to: place the Continuity of Care Form in Section 2 of the health record to remain as a permanent part of the record.

1.3.    The Medical Record Scheduled Appointment Form discussed in the "Outside Specialty Care Clinics" section and "Routine Appointments (Recording) section, must be verified and provided to the receiving complex. Review of the form will allow nursing staff to advise a need to cancel the movement or to inform the receiving complex of any pending care/treatment.

1.4.    The Facility Health Administrator (with the advice and assistance of the Medical Records Librarian, the Pharmacy Liaison, and the CRNS II) will develop complex post orders or policies to ensure that the appropriate staff also verify that all medical records and x-rays on file will accompany the inmate at the time of transfer and verify that all medication sheets and observed therapy (watch swallow) medications will accompany the inmate at the time of transfer. This policy must ensure that any non-administered Keep on Person medications should accompany the inmate at time of transfer. Note that a one week supply of prescription medications should accompany all inmates transferred to non-ADC private prisons.

2.0    **Receiving Facility**
2.1    . Receiving facility nursing staff are responsible to perform a chart review upon arrival. They must assess an inmate within twenty-four hours of his/her arrival at a permanently assigned facility. The nursing staff will complete and sign the Initial Inter-facility Assessment Form and refer the inmate for appropriate emergency or routine health care service as determined by the chart review and assessment. The nursing staff shall also complete a Medical Work-Up Form, including date and signature and verify that the inmate has all required medical equipment, medication and supplies.
2.2.    The Medical Record Scheduled Appointment Form discussed in the "Outside Specialty Care Clinics" section and "Routine Appointments (Recording), section, must be reviewed to allow nursing staff to plan for any patient needs regarding pending care/treatment.

3.0.    Current Medical/Dental Orders
3.1.    Receiving nursing services may continue an inmate's medication order up to ten working days in order to ensure continuity of care.
3.2.    A provider must renew required prescriptions within a ten working day period. This interim provision in no way diminishes the obligation of the receiving institution to do intake assessments in a timely manner.

195

ADC010842

3.3.    Inmates who are received at a facility with a current provider order that has not been complete shall have that order completed at the soonest opportunity.

3.4.    Nursing staff at the receiving facility are authorized to accomplish testing properly ordered by an ASPC-Phoenix physician, nurse practitioner, or PA.

3.0    Transfer Errors

3.1    All errors relating to an inter-facility transfer must be communicated to the FHA at the time the error (inappropriate placement, inability for receiving complex to provide adequate care of the inmate's needs, etc.) has been identified.

3.2.    The FHA shall assume the responsibility for taking appropriate action as required by the specific event.

196

ADC010843

# EXHIBIT 2-T



## 2.19 Contract Monitoring General Requirements

### 2.19.1 Contract Monitor

**The Department shall assign a Department Contract Monitor who shall be responsible for Contract compliance and Contractor performance. (RFP §2.19.1)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: The Department shall assign a Department Contract Monitor who shall be responsible for Contract compliance and Contractor performance.

### 2.19.2 Department Monitoring Staff

**The Department shall assign Department Monitoring Staff who shall monitor Contract compliance and performance and coordinate all necessary activities relative to the Contractor, the Contractor's Arizona CEO or other Arizona Corporate Staff, the Contractor's Area Manager and the Department. Department Monitoring Staff shall report to the Department Contract Monitor. (RFP §2.19.2)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: The Department shall assign Department Monitoring Staff who shall monitor Contract compliance and performance and coordinate all necessary activities relative to the Contractor, the Contractor's Arizona CEO or other Arizona Corporate Staff, the Contractor's Area Manager and the Department. Department Monitoring Staff shall report to the Department Contract Monitor.

#### 2.19.2.1 Ensuring Compliance

**Department Monitoring Staff shall review inmate access to care, compliance with NCCHC Standards, and adherence to required Department policies, procedures and regulatory directives to assure that correctional health service needs of the inmate population are adequately met. (RFP §2.19.2.1)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: Department Monitoring Staff shall review inmate access to care, compliance with NCCHC Standards, and adherence to required Department policies, procedures and regulatory directives to assure that correctional health service needs of the inmate population are adequately met.

#### 2.19.2.2 Review Terms of Contract

**Department Monitoring Staff shall review general compliance with the requirements and terms of the Contract to assure that the needs of the Department and the State of Arizona are adequately met. (RFP §2.19.2.2)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: Department Monitoring Staff shall review general compliance with

ADC015838



the requirements and terms of the Contract to assure that the needs of the Department and the State of Arizona are adequately met.

### 2.19.2.3 Monitoring Activities

**Compliance monitoring activities shall be conducted on a random and routine basis and shall include quarterly audits required under Section 2.20. (RFP §2.19.2.3)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: Compliance monitoring activities shall be conducted on a random and routine basis and shall include quarterly audits required under Section 2.20.

### 2.19.2.4 Meetings with Department Monitoring Staff

**The Contractor's Arizona Corporate Staff and the Area Manager shall meet with Department Monitoring Staff as requested and at locations designated by the Department Monitoring Staff as necessary to conduct the compliance monitoring activities. (RFP §2.19.2.4)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: The Contractor's Arizona Corporate Staff and the Area Manager shall meet with Department Monitoring Staff as requested and at locations designated by the Department Monitoring Staff as necessary to conduct the compliance monitoring activities.

### 2.19.3 Free Access

**The Department and the Department Monitoring Staff shall have free access to all Contract areas at any time and shall be given free access to staff and work products, and to any correspondence, records, reports, or other written and/or electronic materials dealing with this Contract. The Department requires written assurance from the Contractor that such access shall be provided. (RFP §2.19.3)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: The Department and the Department Monitoring Staff shall have free access to all Contract areas at any time and shall be given free access to staff and work products, and to any correspondence, records, reports, or other written and/or electronic materials dealing with this Contract. The Department requires written assurance from the Contractor that such access shall be provided.

### 2.19.4 Monitoring Activities

**The results of compliance monitoring activities conducted by the Department, including identification of non-compliance, shall be provided to the Contractor in writing by Department Monitoring Staff. (RFP §2.19.4)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: The results of compliance monitoring activities conducted by the

ADC015839



Department, including identification of non-compliance, shall be provided to the Contractor in writing by Department Monitoring Staff.

## 2.19.5 Non-Compliance Issues

**If non-compliance issues, other than those identified in Subsection 2.19.6, are identified during a quarterly audit required under Section 2.20, or any other monitoring activity, the Department Monitoring Staff shall provide a written cure notice to the Contractor's Arizona CEO and Area Manager regarding the details of the non-compliance, the required corrective action, and the period of time allowed to bring performance back into compliance with Contract requirements. (RFP §2.19.5)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  If non-compliance issues, other than those identified in Subsection 2.19.6, are identified during a quarterly audit required under Section 2.20, or any other monitoring activity, the Department Monitoring Staff shall provide a written cure notice to the Contractor's Arizona CEO and Area Manager regarding the details of the non-compliance, the required corrective action, and the period of time allowed to bring performance back into compliance with Contract requirements.

### 2.19.5.1 Remedying Non-Compliance Issues

**If, at the end of the specified time period, the Contractor has complied with the cure notice requirements, the Department shall take no further action. (RFP §2.19.5.1)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  If, at the end of the specified time period, the Contractor has complied with the cure notice requirements, the Department shall take no further action.

### 2.19.5.2 Continued Non-Compliance

**If, however, the Contractor has not complied with the cure notice requirements, the Department Contract Monitor shall notify the Contractor's Arizona CEO and Area Manager in writing that the matter shall be referred to the Chief Procurement Officer to take action against the Contractor, including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the Contract. (RFP §2.19.5.2)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  If, however, the Contractor has not complied with the cure notice requirements, the Department Contract Monitor shall notify the Contractor's Arizona CEO and Area Manager in writing that the matter shall be referred to the Chief Procurement Officer to take action against the Contractor, including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the Contract.

ADC015840



### 2.19.6 Notification of Non-Compliance

If non-compliance issues are identified or discovered, during a quarterly audit required under Section 2.20 or any other monitoring activity, whose gravity or severity can not be mitigated by the Contractor's ability to bring its performance back into compliance at a future date, the Department Contract Monitor shall notify the Contractor's Arizona CEO and Area Manager in writing that the matter shall be referred to the Chief Procurement Officer to take action against the Contractor, including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the Contract. (RFP §2.19.6)

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  If non-compliance issues are identified or discovered, during a quarterly audit required under Section 2.20 or any other monitoring activity, whose gravity or severity can not be mitigated by the Contractor's ability to bring its performance back into compliance at a future date, the Department Contract Monitor shall notify the Contractor's Arizona CEO and Area Manager in writing that the matter shall be referred to the Chief Procurement Officer to take action against the Contractor, including but not limited to monetary sanctions, suspension, refusal to renew, or termination of the Contract.

### 2.19.7 Appeal

The Contractor shall have ten (10) calendar days to appeal in writing disputing a finding of non-compliance that results in either a cure notice or a decision to refer the matter to the Chief Procurement Officer for action. (RFP §2.19.7)

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  The Contractor shall have ten (10) calendar days to appeal in writing disputing a finding of non-compliance that results in either a cure notice or a decision to refer the matter to the Chief Procurement Officer for action.

### 2.19.8 Final Decision

The Department Contract Monitor shall have ten (10) calendar days to make a final determination regarding the disposition of the cure notice or the decision to refer the matter to the Chief Procurement Officer for action and to provide written notice to the Contractor of the final determination. (RFP §2.19.8)

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  The Department Contract Monitor shall have ten (10) calendar days to make a final determination regarding the disposition of the cure notice or the decision to refer the matter to the Chief Procurement Officer for action and to provide written notice to the Contractor of the final determination.

ADC015841



## 2.20 Contract Performance Quarterly Audits

### 2.20.1 Quarterly Performance Outcomes

The Contractor shall be responsible, as applicable to a Contract awarded as a result of this Request for Proposal, for meeting specified quarterly performance outcomes and measures, by discipline, deemed crucial in measuring compliance with Department expectations of service delivery as identified in Subsection 2.20.2. Performance Outcome Measures and measurement sources may be added, revised or updated by the Department to reflect current priorities of the Department in delivering health care services to inmates and to accommodate automated reporting available after an Electronic Health Record system is implemented, (RFP §2.20.1)

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  The Contractor shall be responsible, as applicable to a Contract awarded as a result of this Request for Proposal, for meeting specified quarterly performance outcomes and measures, by discipline, deemed crucial in measuring compliance with Department expectations of service delivery as identified in Subsection 2.20.2. Performance Outcome Measures and measurement sources may be added, revised or updated by the Department to reflect current priorities of the Department in delivering health care services to inmates and to accommodate automated reporting available after an Electronic Health Record system is implemented

#### 2.20.1.1 Stated Performance Outcome

The Contractor shall ensure that each stated performance outcome, as applicable to a Contract awarded as a result of this Request for Proposal, is met one hundred percent (100%). (RFP §2.20.1.1)

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  The Contractor shall ensure that each stated performance outcome, as applicable to a Contract awarded as a result of this Request for Proposal, is met one hundred percent (100%).

#### 2.20.1.2 Quarterly Audits

Department Monitoring Staff shall conduct quarterly audits of each Arizona State Prison Complex. The Contractor's performance shall be measured quarterly for the preceding quarter at each Arizona State Prison Complex, beginning the second quarter after service has been implemented. (RFP §2.20.1.2)

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Department Monitoring Staff shall conduct quarterly audits of each Arizona State Prison Complex. The Contractor's performance shall be measured quarterly for the preceding quarter at each Arizona State Prison Complex, beginning the second quarter after service has been implemented.

ADC015842



### 2.20.2 Performance Outcomes and Measures

**Required Performance Outcomes and Measures: (RFP §2.20.2)**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Required Performance Outcomes and Measures:

#### 2.20.2.1 Intake

**Intake: (RFP §2.20.2.1)**

**Performance Outcome 1:** A physical examination is completed by a Medical Provider by day two (2) of an inmate's arrival at facility.

**Measure:** New Inmates identified from Intake Report reflect completion of physical examination documented in the medical record by Medical Provider by day two (2) of an inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

**Performance Outcome 2:** A mental health assessment is completed by a mental health practitioner by day two (2) of inmate's arrival at the intake facility.

**Measure:** New Inmates identified from Intake Report reflect completion of mental health assessment documented in the medical record by mental health practitioner by day two (2) of inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Intake: (RFP §2.20.2.1)

**Performance Outcome 1:** A physical examination is completed by a Medical Provider by day two (2) of an inmate's arrival at facility.

**Measure:** New Inmates identified from Intake Report reflect completion of physical examination documented in the medical record by Medical Provider by day two (2) of an inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

**Performance Outcome 2:** A mental health assessment is completed by a mental health practitioner by day two (2) of inmate's arrival at the intake facility.

**Measure:** New Inmates identified from Intake Report reflect completion of mental health assessment documented in the medical record by mental health practitioner by day two (2) of inmate's arrival to the facility (minimum sample of 25 new inmate cases opened per quarter per site selected from the reporting quarter).

#### 2.20.2.2 Sick Call

ADC015843



Sick Call: (RFP §2.20.2.2)

**Performance Outcome 1:** Sick call shall be held five days a week, Monday through Friday (excluding Holidays), for all inmates.

**Measure:** Reports reflect sick call held Monday through Friday every week.

**Performance Outcome 2:** All sick call inmates shall be triaged within 24 hours with emergent health need requests triaged immediately

**Measure:** Inmates identified from HNR Appointment Report show that triage is performed within 24 hours (or immediately for emergent needs) of request form date and time. (Minimum sample of 25 cases per quarter per site selected from the HNR Appointment Report database/log).

**Performance Outcome 3:** Every inmate's vital signs shall be checked and documented each time they attend sick call on the appropriate assessment form.

**Measure:** Medical record reflects vital signs for each sick call inmate. The percentage of inmates in HNR Appointment Report sample with documented vital signs on the assessment form/record (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

**Performance Outcome 4:** All Sick call entries are documented in the medical record utilizing the "Subjective – Objective – Assessment – Plan - Education" (SOAPE) format.

**Measure:** The medical record shall have a SOAP entry for each sick call inmate (minimum sample of 25 cases per quarter per site selected from the quarter reporting period HNR Appointment Report database/log).

**Performance Outcome 5:** Referrals from sick call to a Physician or Midlevel provider are seen within seven (7) days.

**Measure:** Date of referral to physician or Midlevel provider compared to date of sick call (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Sick Call: (RFP §2.20.2.2)

**Performance Outcome 1:** Sick call shall be held five days a week, Monday through Friday (excluding Holidays), for all inmates.

**Measure:** Reports reflect sick call held Monday through Friday every week.

**Performance Outcome 2:** All sick call inmates shall be triaged within 24 hours with emergent health need requests triaged immediately

ADC015844



Measure: Inmates identified from HNR Appointment Report show that triage is performed within 24 hours (or immediately for emergent needs) of request form date and time. (Minimum sample of 25 cases per quarter per site selected from the HNR Appointment Report database/log).

Performance Outcome 3: Every inmate's vital signs shall be checked and documented each time they attend sick call on the appropriate assessment form.

Measure: Medical record reflects vital signs for each sick call inmate. The percentage of inmates in HNR Appointment Report sample with documented vital signs on the assessment form/record (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

Performance Outcome 4: All Sick call entries are documented in the medical record utilizing the "Subjective – Objective – Assessment – Plan - Education" (SOAPE) format.

Measure: The medical record shall have a SOAP entry for each sick call inmate (minimum sample of 25 cases per quarter per site selected from the quarter reporting period HNR Appointment Report database/log).

Performance Outcome 5: Referrals from sick call to a Physician or Midlevel provider are seen within seven (7) days.

Measure: Date of referral to physician or Midlevel provider compared to date of sick call (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log).

2.20.2.3 Medical Specialty Consultations

**Medical Specialty Consultations: (RFP §2.20.2.3)**

**Performance Outcome 1:** Urgent consultations are scheduled within thirty (30) days of the date the request is initiated.

**Measure:** Date of consultation in medical record as compared to the date request is initiated. The percentage of inmates from the sample with a documented consultation in the Medical Record within thirty (30) days of request for an urgent consult. (sample of a minimum of 25 cases per quarter per site identified from the Medical Transport Report database/log during the reporting quarter).

**Performance Outcome 2:** Consultation reports are followed-up within seven days of receiving the report.

**Measure:** Date of follow-up as compared to date of receipt of report. The percentage of inmates from the sample with a completed consultation, receipt of a consultation report and documentation by clinical staff of review and action on recommendations from the report in the Medical Record within seven (7) days of receipt of the report. (sample of a

ADC015845



minimum of 25 cases per quarter per site identified from the Medical Transport Report database/log during the reporting quarter).

**Performance Outcome 3:** Appropriate utilization of off-site services to meet medical, dental and mental health needs of inmates

**Measure:** Audit review of off-site services to evaluate rationale for off-site services and recommendation for changes to processes and/or resources to offer services and provide care on-site when possible (minimum sample of 25 cases identified from the Medical Transport Report during the reporting quarter. Contractor to submit audit report quarterly to ADC and documentation of follow-up on recommendations).

**Performance Outcome 4:** Appropriate and timely transfer for emergency services to meet the emergent medical needs of the inmate population

**Measure:** Audit review of all Emergency room transfers and admissions to review processes, clinical nature leading to emergency, transfer timeliness and recommendations based on findings to reduce potentially avoidable emergency room admissions. Contractor to submit audit report quarterly to ADC and documentation of follow-up on recommendations. (

**Performance Outcome 5:** All Inpatient Admissions will have documented utilization review of admission and continued stay, meeting medical necessity review criteria and evidence of discharge planning.

**Measure:** Audit review of all Inpatient hospital admissions to assure documentation of admission and concurrent utilization review with approval based on meeting medical necessity criteria and documentation of discharge planning for return to infirmary or on-site services when clinically indicated. Contractor to submit audit report quarterly to ADC and documentation of follow-up on recommendations.

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Medical Specialty Consultations: (RFP §2.20.2.3)

**Performance Outcome 1:** Urgent consultations are scheduled within thirty (30) days of the date the request is initiated.

**Measure:** Date of consultation in medical record as compared to the date request is initiated. The percentage of inmates from the sample with a documented consultation in the Medical Record within thirty (30) days of request for an urgent consult. (sample of a minimum of 25 cases per quarter per site identified from the Medical Transport Report database/log during the reporting quarter).

**Performance Outcome 2:** Consultation reports are followed-up within seven days of receiving the report.

ADC015846



Measure: Date of follow-up as compared to date of receipt of report, The percentage of inmates from the sample with a completed consultation, receipt of a consultation report and documentation by clinical staff of review and action on recommendations from the report in the Medical Record within seven (7) days of receipt of the report. (sample of a minimum of 25 cases per quarter per site identified from the Medical Transport Report database/log during the reporting quarter).

Performance Outcome 3: Appropriate utilization of off-site services to meet medical, dental and mental health needs of inmates

Measure: Audit review of off-site services to evaluate rationale for off-site services and recommendation for changes to processes and/or resources to offer services and provide care on-site when possible (minimum sample of 25 cases identified from the Medical Transport Report during the reporting quarter. Contractor to submit audit report quarterly to ADC and documentation of follow-up on recommendations).

Performance Outcome 4: Appropriate and timely transfer for emergency services to meet the emergent medical needs of the inmate population

Measure: Audit review of all Emergency room transfers and admissions to review processes, clinical nature leading to emergency, transfer timeliness and recommendations based on findings to reduce potentially avoidable emergency room admissions. Contractor to submit audit report quarterly to ADC and documentation of follow-up on recommendations. (

Performance Outcome 5: All Inpatient Admissions will have documented utilization review of admission and continued stay, meeting medical necessity review criteria and evidence of discharge planning.

Measure: Audit review of all Inpatient hospital admissions to assure documentation of admission and concurrent utilization review with approval based on meeting medical necessity criteria and documentation of discharge planning for return to infirmary or on-site services when clinically indicated. Contractor to submit audit report quarterly to ADC and documentation of follow-up on recommendations.

2.20.2.4 Chronic Condition and Disease Management Programs

**Chronic Condition and Disease Management Programs: (RFP §2.20.2.4)**

Performance Outcome 1: Inmates in the CC/DM Programs have a treatment plan developed by a Provider, representing the appropriate clinical discipline, within thirty (30) days of identification.

Measure: The percentage of inmates from the CC/DM Active Inmate Roster sample with a documented treatment plan in the Medical Record, relevant to chronic condition/diseases, within thirty (30) days of identification (minimum sample of 25 cases

ADC015847



per quarter per site selected from CC/DM Active Inmate Roster during the reporting quarter).

**Performance Outcome 2:** CC/DM inmates are seen by a Provider (representing the appropriate clinical discipline) every three (3) to six (6) or as specified in the inmate's treatment plan and based on stability and individual need with documentation of the CC/DM assessment and intervention in inmate's medical record.

**Measure:** The percentage of inmates from the CC/DM Active Inmate Roster sample with a documented Provider visit, relevant to inmate's chronic condition/diseases, consistent with frequency of visits specified in the inmate's treatment plan (minimum sample of 25 cases per quarter per site selected from CC/DM Active Inmate Roster during the reporting quarter).

**Performance Outcome 3:** CC/DM inmates are provided coaching and education about their conditions/diseases as specified in the inmate's treatment plan in individual or group settings with documentation of CC/DM activity in inmate's medical record.

**Measure:** The percentage of inmates from the CC/DM Active Inmate Roster sample with documented coaching/education consistent with frequency of coaching/education activity as specified in the inmate's treatment plan (minimum sample of 25 cases per quarter per site selected from CC/DM Active Inmate Roster during the reporting quarter).

**Performance Outcome 4:** Disease Management Guidelines shall be developed and implemented for Chronic Condition Disease Management or other conditions not classified as Chronic Conditions as deemed necessary by the Department. These guidelines shall be used in conjunction with the treatment of Chronic Conditions or other identified conditions. Review of medical records shall be conducted quarterly with quarterly and yearly summaries presented to the Department.

**Measure:** Not less than 3 four (4) Disease Management Guidelines shall be developed and submitted for approval by ADC annually with audit methodology. Audit of medical records against DM guidelines implemented per quarter until the Department's need for additional guidelines is met or additional guidelines are requested. Contractor's submission of CC/DM Guidelines and audit methodology annually and submission of Guideline Audit results quarterly on the 15th day following and end of the reporting quarter.

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Chronic Condition and Disease Management Programs: (RFP §2.20.2.4)

**Performance Outcome 1:** Inmates in the CC/DM Programs have a treatment plan developed by a Provider, representing the appropriate clinical discipline, within thirty (30) days of identification.

ADC015848



Solicitation #ADOC12-00001105
Privatization for All Correctional Health Services
Arizona Department of Corrections

Measure: The percentage of inmates from the CC/DM Active Inmate Roster sample with a documented treatment plan in the Medical Record, relevant to chronic condition/diseases, within thirty (30) days of identification (minimum sample of 25 cases per quarter per site selected from CC/DM Active Inmate Roster during the reporting quarter).

Performance Outcome 2: CC/DM inmates are seen by a Provider (representing the appropriate clinical discipline) every three (3) to six (6) or as specified in the inmate's treatment plan and based on stability and individual need with documentation of the CC/DM assessment and intervention in inmate's medical record.

Measure: The percentage of inmates from the CC/DM Active Inmate Roster sample with a documented Provider visit, relevant to inmate's chronic condition/diseases, consistent with frequency of visits specified in the inmate's treatment plan (minimum sample of 25 cases per quarter per site selected from CC/DM Active Inmate Roster during the reporting quarter).

Performance Outcome 3: CC/DM inmates are provided coaching and education about their conditions/diseases as specified in the inmate's treatment plan in individual or group settings with documentation of CC/DM activity in inmate's medical record.

Measure: The percentage of inmates from the CC/DM Active Inmate Roster sample with documented coaching/education consistent with frequency of coaching/education activity as specified in the inmate's treatment plan (minimum sample of 25 cases per quarter per site selected from CC/DM Active Inmate Roster during the reporting quarter).

Performance Outcome 4: Disease Management Guidelines shall be developed and implemented for Chronic Condition Disease Management or other conditions not classified as Chronic Conditions as deemed necessary by the Department. These guidelines shall be used in conjunction with the treatment of Chronic Conditions or other identified conditions. Review of medical records shall be conducted quarterly with quarterly and yearly summaries presented to the Department.

Measure: Not less than 3 four (4) Disease Management Guidelines shall be developed and submitted for approval by ADC annually with audit methodology. Audit of medical records against DM guidelines implemented per quarter until the Department's need for additional guidelines is met or additional guidelines are requested. Contractor's submission of CC/DM Guidelines and audit methodology annually and submission of Guideline Audit results quarterly on the 15th day following and end of the reporting quarter.

2.20.2.5 Medical Records

**Medical Records: (RFP §2.20.2.5)**

**Performance Outcome 1: Medical Records are current, accurate, and chronologically maintained with all documents filed in the designated location.**

ADC015849



**Measure:** Medical record shall demonstrate that filing is chronological, properly located and current (minimum sample of 25 cases per quarter per site).

**Performance Outcome 2:** Physician's Orders in the medical record are taken off daily, annotated with time, date and name of the person taking them off.

**Measure:** Comparison of dates/times of Physician's orders with dates/times they were taken off. The percentage of inmates in Medical Record audit sample with current and chronologically maintained documents filed in designated location (minimum sample of 25 cases per quarter per site).

**Performance Outcome 3:** The Medication Administration Record (MAR) is filed in the chart and reflects dose, route, frequency, start date and nurse's signature.

**Measure:** The percentage of inmates in the Medical Record Audit sample with MAR reflecting documentation of dose, route, frequency, start date and nurse's signature. (minimum sample of 25 cases per quarter per site).

**Performance Outcome 4:** Medical record entries shall be legible, complete and the date, time, name stamp and signature shall attest to the entry.

**Measure:** Medical Records shall reflect appropriate entries. The percentage of inmates in the Medical Record Audit sample with medical records reflecting documentation that legible, complete and the date, time, name stamp and signature attesting to the entry (minimum sample of 25 cases per quarter per site).

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Medical Records: (RFP §2.20.2.5)

Performance Outcome 1: Medical Records are current, accurate, and chronologically maintained with all documents filed in the designated location.

Measure: Medical record shall demonstrate that filing is chronological, properly located and current (minimum sample of 25 cases per quarter per site).

Performance Outcome 2: Physician's Orders in the medical record are taken off daily, annotated with time, date and name of the person taking them off.

Measure: Comparison of dates/times of Physician's orders with dates/times they were taken off. The percentage of inmates in Medical Record audit sample with current and chronologically maintained documents filed in designated location (minimum sample of 25 cases per quarter per site).

Performance Outcome 3: The Medication Administration Record (MAR) is filed in the chart and reflects dose, route, frequency, start date and nurse's signature.

ADC015850



Measure: The percentage of inmates in the Medical Record Audit sample with MAR reflecting documentation of dose, route, frequency, start date and nurse's signature. (minimum sample of 25 cases per quarter per site).

Performance Outcome 4: Medical record entries shall be legible, complete and the date, time, name stamp and signature shall attest to the entry.

Measure: Medical Records shall reflect appropriate entries. The percentage of inmates in the Medical Record Audit sample with medical records reflecting documentation that legible, complete and the date, time, name stamp and signature attesting to the entry (minimum sample of 25 cases per quarter per site).

2.20.2.6 Prescribing Practices and Pharmacy

Prescribing Practices and Pharmacy: (RFP §2.20.2.6)

Performance Outcome 1: Recommendations made by the Pharmacy and Therapeutics Committee shall be appropriately acted upon on a timely basis and reported back in writing at the next quarterly meeting.

Measure: Review of Pharmacy and Therapeutics Committee meeting reports and minutes shall demonstrate that recommendations were appropriately enacted.

Performance Outcome 2: To ensure compliance by the Contractor with all medication-related requirements provided in this document and by the NCCHC standards, Pharmaceutical Operations and Medication Services.

Measure: Monitoring and reviewing all medication-related policies, procedures, forms (including non-formulary requests), protocols and documentation employed by the Contractor.

Performance Outcome 3: All medications shall be prescribed in therapeutic dosage ranges as determined by the most current editions of Drug Facts and Comparisons or the package insert.

Measure: Review of prescriptions for compliance with therapeutic ranges or if not within ranges, an approved NFR and clinical rational document shall be in inmate's medical record (minimum of 25 records selected from log of inmates receiving prescriptions).

Performance Outcome 4: Dosages of medication shall not be changed, increased or decreased contrary to time frames stated in appropriate clinical compendia, such as Drug Facts and Comparisons and/or the package insert, unless the need is clinically documented in the chart and a non-formulary request is approved.

Measure: Clinical compendia resources shall be used to compared to the dosage being administered for clinical appropriateness. If a change (increase or decrease) in medication dosage is demonstrated, an approved non-formulary request and/or clinical

ADC015851



rational document shall be in the inmate's medical record. (Minimum of 25 records selected from log of inmates receiving prescriptions).

**Performance Outcome 5:** When a medication error occurs, nursing staff must complete a medication incident report form, document per policy and notify the Nursing Supervisor and Health Facility Administrator, who will notify all other Program Managers and ADC On-site Monitor.

**Measure:** Medical record shall contain documentation of medication error form and report to appropriate staff per policy (minimum of 25 records representing medical errors,).

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Prescribing Practices and Pharmacy: (RFP §2.20.2.6)

Performance Outcome 1: Recommendations made by the Pharmacy and Therapeutics Committee shall be appropriately acted upon on a timely basis and reported back in writing at the next quarterly meeting.

Measure: Review of Pharmacy and Therapeutics Committee meeting reports and minutes shall demonstrate that recommendations were appropriately enacted.

Performance Outcome 2: To ensure compliance by the Contractor with all medication-related requirements provided in this document and by the NCCHC standards, Pharmaceutical Operations and Medication Services.

Measure: Monitoring and reviewing all medication-related policies, procedures, forms (including non-formulary requests), protocols and documentation employed by the Contractor.

Performance Outcome 3: All medications shall be prescribed in therapeutic dosage ranges as determined by the most current editions of Drug Facts and Comparisons or the package insert.

Measure: Review of prescriptions for compliance with therapeutic ranges or if not within ranges, an approved NFR and clinical rational document shall be in inmate's medical record (minimum of 25 records selected from log of inmates receiving prescriptions).

Performance Outcome 4: Dosages of medication shall not be changed, increased or decreased contrary to time frames stated in appropriate clinical compendia, such as Drug Facts and Comparisons and/or the package insert, unless the need is clinically documented in the chart and a non-formulary request is approved.

Measure: Clinical compendia resources shall be used to compared to the dosage being administered for clinical appropriateness. If a change (increase or decrease) in medication dosage is demonstrated, an approved non-formulary request and/or clinical rational document shall be in the inmate's medical record. (Minimum of 25 records selected from log of inmates receiving prescriptions).

ADC015852



Performance Outcome 5: When a medication error occurs, nursing staff must complete a medication incident report form, document per policy and notify the Nursing Supervisor and Health Facility Administrator, who will notify all other Program Managers and ADC On-site Monitor.

Measure: Medical record shall contain documentation of medication error form and report to appropriate staff per policy (minimum of 25 records representing medical errors,).

2.20.2.7 Reporting (AIMS)

**Reporting (AIMS): (RFP §2.20.2.7)**

**Performance Outcome 1: Required AIMS entries are made timely, completely and accurately and no greater than 3 work days from the entry in the medical record.**

**Measure: AIMS entries shall be compared with same entries in the medical record (minimum sample of 25 cases per quarter per site selected from AIMS database during the reporting quarter).**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Reporting (AIMS): (RFP §2.20.2.7)

Performance Outcome 1: Required AIMS entries are made timely, completely and accurately and no greater than 3 work days from the entry in the medical record.

Measure: AIMS entries shall be compared with same entries in the medical record (minimum sample of 25 cases per quarter per site selected from AIMS database during the reporting quarter).

2.20.2.8 Grievances

**Grievances: (RFP §2.20.2.8)**

**Performance Outcome 1: Responses to grievances shall be made within required time frames described in Department Order 802 Inmate Grievance Procedure and shall be completed within fifteen (15) calendar days of receipt of the grievance; the Health Facility Administrator shall investigate the complaint and prepare a written response.**

**Measure: Date of grievance response shall be within fifteen (15) calendar days of receipt of grievance as indicated on grievance log. Review of monthly Grievance report submitted to ADC with documentation of response within fifteen (15) days of receipt.**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Grievances: (RFP §2.20.2.8)

Performance Outcome 1: Responses to grievances shall be made within required time frames described in Department Order 802 Inmate Grievance Procedure and shall be completed

ADC015853



Solicitation #ADOC12-00001105
Privatization for All Correctional Health Services
Arizona Department of Corrections

within fifteen (15) calendar days of receipt of the grievance; the Health Facility Administrator shall investigate the complaint and prepare a written response.

Measure: Date of grievance response shall be within fifteen (15) calendar days of receipt of grievance as indicated on grievance log. Review of monthly Grievance report submitted to ADC with documentation of response within fifteen (15) days of receipt.

2.20.2.9 No Shows

No Shows: (RFP §2.20.2.9)

**Performance Outcome 1: When an inmate "no shows" for appointments, clinic visits, misses a medication dose or other medical, dental or mental health service, nursing staff must document per policy, Department Order 1101, and notify the Health Facility Administrator and Shift Commander.**

**Measure: Medical record shall contain documentation of "no-show" along with forms citing notification of appropriate staff per policy (minimum of 25 records selected from "no-show" log).**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  No Shows: (RFP §2.20.2.9)

Performance Outcome 1: When an inmate "no shows" for appointments, clinic visits, misses a medication dose or other medical, dental or mental health service, nursing staff must document per policy, Department Order 1101, and notify the Health Facility Administrator and Shift Commander.

Measure: Medical record shall contain documentation of "no-show" along with forms citing notification of appropriate staff per policy (minimum of 25 records selected from "no-show" log).

2.20.2.10 Mental Health

Mental Health: (RFP §2.20.2.10)

**Performance Outcome 1. All Mental Health, Health Needs Requests (HNR) when received by mental health personnel, shall be triaged within twenty four (24) hours by a qualified mental health professional.**

**Measure: Sick call log/HNR shall document that HNRs are triaged within twenty four (24) hours. The percentage of inmates in HNR Appointment Report – mental health need sample of those receiving triage within twenty four (24) hours of the health need request (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log with documented mental health need).**

ADC015854



**Performance Outcome 2:** Referrals to the psychiatric provider for routine requests must occur within seven (7) days of Mental Health receipt of the HNR or sick call visit where a referral need is identified.

**Measure:** The date of visit to the psychiatric provider compared to the date of HNR receipt or sick call encounter. The percentage of inmates in the HNR Appointment Report – mental health need sample of those receiving triage and documentation of need for referral to psychiatrists that are seen by the psychiatric provider within seven (7) days of the sick call request (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log with documented mental health need).

**Performance Outcome 3.** Inmates diagnosed as being Seriously Mentally Ill (SMI) shall have an update to their ongoing mental health treatment plan every thirty (30) days.

**Measure:** Review of SMI medical records to review treatment plan and supplemental progress notes. The percentage of inmates from SMI sample with updated treatment plan every thirty (30) days (minimum sample of 25 medical records for inmates with SMI diagnoses per quarter per site selected from the reporting quarter).

**Performance Outcome 4.** Mentally Ill inmates receiving psychotropic medications shall be assessed in a face to face encounter with a psychiatric registered nurse every thirty (30) days to update mental health status.

**Measure:** Review of selected inmate medical records to validate documentation showing contact on a thirty (30) day basis. The percentage of inmates from Psychotropic med user sample with a documented face to face encounter with a psychiatric nurse every thirty (30) days (minimum sample of 25 medical records for inmates with receiving psychotropic drugs per quarter per site selected from the reporting quarter).

**Performance Outcome 5.** Mentally Ill inmates receiving psychotropic medications shall be assessed in a face to face encounter with a psychiatric registered nurse every thirty (30) days to update mental health status. If the inmate is not assessed to be stable on his/her current medications, he or she will be referred to and evaluated by a Psychiatrist or Psychiatry Certified Nurse Practitioner within ten (10) working days.

**Measure:** Review of selected inmate medical records to validate documentation showing contact on a six (6) month basis. The percentage of inmates from Psychotropic med user sample with a documented face to face assessment with a psychiatrist or psychiatric CNP every six (6) months (minimum sample of 25 medical records per site for inmates with receiving psychotropic drugs during reporting quarter and prior reporting quarter).

**Performance Outcome 6.** Mentally Ill inmates receiving psychotropic medications shall be assessed in a face to face encounter with a Psychiatrist or Psychiatry Certified Nurse Practitioner every three (3) months to assess mental health status.

ADC015855



Solicitation #ADOC12-00001105
Privatization for All Correctional Health Services
Arizona Department of Corrections

**Measure:** Review of selected inmate medical records to validate documentation showing contact on a three (3) month basis. The percentage of inmates from Psychotropic med user sample with a documented face to face assessment with a psychiatrist or psychiatric CNP every three (3) months (minimum sample of 25 medical records per site for inmates with receiving psychotropic drugs during reporting quarter and prior reporting quarter).

**Performance Outcome 7:** The Contractor shall develop a reentry plan for follow up of mental health services and psychotropic medication management (if on medication) for inmates with mental disorders within thirty (30) days prior to release.

**Measure:** Maintenance of "Reentry/Discharge Plan log identifying inmates within 90, 60 and 30 days of discharge and relevant recommendations for follow-up and referrals.

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Mental Health: (RFP §2.20.2.10)

**Performance Outcome 1.** All Mental Health, Health Needs Requests (HNR) when received by mental health personnel, shall be triaged within twenty four (24) hours by a qualified mental health professional.

**Measure:** Sick call log/HNR shall document that HNRs are triaged within twenty four (24) hours. The percentage of inmates in HNR Appointment Report – mental health need sample of those receiving triage within twenty four (24) hours of the health need request (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log with documented mental health need).

**Performance Outcome 2:** Referrals to the psychiatric provider for routine requests must occur within seven (7) days of Mental Health receipt of the HNR or sick call visit where a referral need is identified.

**Measure:** The date of visit to the psychiatric provider compared to the date of HNR receipt or sick call encounter. The percentage of inmates in the HNR Appointment Report – mental health need sample of those receiving triage and documentation of need for referral to psychiatrists that are seen by the psychiatric provider within seven (7) days of the sick call request (minimum sample of 25 cases per quarter per site selected from the reporting quarter HNR Appointment Report database/log with documented mental health need).

**Performance Outcome 3.** Inmates diagnosed as being Seriously Mentally Ill (SMI) shall have an update to their ongoing mental health treatment plan every thirty (30) days.

**Measure:** Review of SMI medical records to review treatment plan and supplemental progress notes. The percentage of inmates from SMI sample with updated treatment plan every thirty (30) days (minimum sample of 25 medical records for inmates with SMI diagnoses per quarter per site selected from the reporting quarter).

ADC015856



Performance Outcome 4. Mentally Ill inmates receiving psychotropic medications shall be assessed in a face to face encounter with a psychiatric registered nurse every thirty (30) days to update mental health status.

Measure: Review of selected inmate medical records to validate documentation showing contact on a thirty (30) day basis. The percentage of inmates from Psychotropic med user sample with a documented face to face encounter with a psychiatric nurse every thirty (30) days (minimum sample of 25 medical records for inmates with receiving psychotropic drugs per quarter per site selected from the reporting quarter).

Performance Outcome 5. Mentally Ill inmates receiving psychotropic medications shall be assessed in a face to face encounter with a psychiatric registered nurse every thirty (30) days to update mental health status. If the inmate is not assessed to be stable on his/her current medications, he or she will be referred to and evaluated by a Psychiatrist or Psychiatry Certified Nurse Practitioner within ten (10) working days.

Measure: Review of selected inmate medical records to validate documentation showing contact on a six (6) month basis. The percentage of inmates from Psychotropic med user sample with a documented face to face assessment with a psychiatrist or psychiatric CNP every six (6) months (minimum sample of 25 medical records per site for inmates with receiving psychotropic drugs during reporting quarter and prior reporting quarter).

Performance Outcome 6. Mentally Ill inmates receiving psychotropic medications shall be assessed in a face to face encounter with a Psychiatrist or Psychiatry Certified Nurse Practitioner every three (3) months to assess mental health status.

Measure: Review of selected inmate medical records to validate documentation showing contact on a three (3) month basis. The percentage of inmates from Psychotropic med user sample with a documented face to face assessment with a psychiatrist or psychiatric CNP every three (3) months (minimum sample of 25 medical records per site for inmates with receiving psychotropic drugs during reporting quarter and prior reporting quarter).

Performance Outcome 7: The Contractor shall develop a reentry plan for follow up of mental health services and psychotropic medication management (if on medication) for inmates with mental disorders within thirty (30) days prior to release.

Measure: Maintenance of "Reentry/Discharge Plan log identifying inmates within 90, 60 and 30 days of discharge and relevant recommendations for follow-up and referrals.

2.20.2.11 Claims Payment and Provider Appeals

**Claims Payment and Provider Appeals (RFP §2.20.2.11)**

Performance Outcome 1: All clean claims as defined in A.R.S. § 36-2904(G)(1) shall be processed within thirty (30) days of receipt with 90% of clean claims paid within thirty (30) days and 99% of clean claims paid within sixty (60) days.

ADC015857



Measure: Date of claim receipt as compared to date of claim payment as demonstrated in claim data and records, including the Third Party Administrator Report on Processed Claims (sample of 100% of claims paid within the reporting period from claims payment system report).

Performance Outcome 2: Contractor shall provide a Notice of Decision mailed no later than 30 days after a provider files a claim dispute with the Contractor, unless the provider and Contractor agree to a longer period.

Measure: Date of claim receipt of claims dispute as compared to mailing date of Notice of Decision letter as documented in claim data and records (sample of 100% of claims paid within the reporting period from claims payment system report).

Performance Outcome 3: The Contractor's UM physician will conduct an appeal by reviewing the case record and/or discussion with the direct care clinician and render a decision based on the clinical information provided within seventy two hours for inpatient service requests and fourteen calendar days for standard outpatient service requests

Measure: Audit of cases identified from appeals log comparing date of appeal request with documentation of Notice of Decision communicated to provider within seventy two (72) hours for inpatient service requests and fourteen (14) calendar days for standard outpatient service requests (minimum sample of twenty five (25) cases from the appeals log occurring fourteen (14) days before the end of the reporting period)

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative: Claims Payment and Provider Appeals (RFP §2.20.2.11)

Performance Outcome 1: All clean claims as defined in A.R.S. § 36-2904(G)(1) shall be processed within thirty (30) days of receipt with 90% of clean claims paid within thirty (30) days and 99% of clean claims paid within sixty (60) days.

Measure: Date of claim receipt as compared to date of claim payment as demonstrated in claim data and records, including the Third Party Administrator Report on Processed Claims (sample of 100% of claims paid within the reporting period from claims payment system report).

Performance Outcome 2: Contractor shall provide a Notice of Decision mailed no later than 30 days after a provider files a claim dispute with the Contractor, unless the provider and Contractor agree to a longer period.

Measure: Date of claim receipt of claims dispute as compared to mailing date of Notice of Decision letter as documented in claim data and records (sample of 100% of claims paid within the reporting period from claims payment system report).

ADC015858



Performance Outcome 3: The Contractor's UM physician will conduct an appeal by reviewing the case record and/or discussion with the direct care clinician and render a decision based on the clinical information provided within seventy two hours for inpatient service requests and fourteen calendar days for standard outpatient service requests

Measure: Audit of cases identified from appeals log comparing date of appeal request with documentation of Notice of Decision communicated to provider within seventy two (72) hours for inpatient service requests and fourteen (14) calendar days for standard outpatient service requests (minimum sample of twenty five (25) cases from the appeals log occurring fourteen (14) days before the end of the reporting period)

2.20.2.12 Quality and Peer Review

**Quality and Peer Review (RFP §2.20.2.12)**

**Performance Outcome 1:** Contractor will conduct chart reviews that focus on the clinical aspects of the health care delivery system. The Contractor will develop and submit an annual Audit Plan to ADC for review and approval, describing criteria, form and sample/volume of charts to be reviewed on a monthly basis for each performance outcomes and reporting measure as specified by ADC or proposed by Contractor.

Measure: Review of audit methodology and sample, monitoring criteria and results of the monthly and quarterly chart audits.

**Performance Outcome 2:** Contractor will ensure the establishment of the CQI Committee by the Contractor that meets on a monthly basis. This committee will have representation from all disciplines practicing on the complex. The Contractor will ensure the committee conducts at least two (2) process quality improvement studies and two (2) outcome quality studies per year.

Measure: Review of the CQI monthly minutes and review of the annual process and outcome studies, including topics, methodology, findings, plans for improvement based on evidence and outcomes following quarterly monitoring schedules.

**Performance Outcome 3:** Recommendations made by the Quality Committee shall be appropriately acted upon on a timely basis and reported back in writing at the next monthly meeting.

Measure: Review of Quality Improvement Committee meeting reports and minutes shall demonstrate that recommendations were appropriately enacted.

**Performance Outcome 4:** As part of the Contractor's continuous quality improvement program the Contractor shall annually conduct scheduled provider peer review of all Physicians, Nurse Practitioners, Physician Assistants, Dentists, Psychiatrists, Psychiatric Nurse Practitioners and PhD level Psychologists in compliance with NCCHC Standard P-C-02, Clinical Performance Enhancement.

ADC015859



Solicitation #ADOC12-0000105
Privatization for All Correctional Health Services
Arizona Department of Corrections

**Measure:** Documentation that a medical, dental and mental health provider peer review was conducted for each provider within the prior 12 months.

**Performance Outcome 5.** As part of the Contractor's continuous quality improvement program, the Contractor shall quarterly conduct scheduled on-site audits at each Arizona State Prison Complex to measure compliance with requirements identified in Subsection 2.12.5.

**Measure:** Documentation that an audit was conducted at each Arizona State Prison within the prior three months and that all identified deficiencies were addressed and appropriate corrective action was taken.

**The Offeror shall submit as part of the response to this Request for Proposal Information describing how the Offeror shall ensure that each stated performance outcome, as applicable to a Contract awarded as a result of this request for proposal, is met one hundred percent (100%).**

Wexford Health has read, understands, accepts, and will or has complied with the following RFP requirement/narrative:  Quality and Peer Review (RFP §2.20.2.12)

**Performance Outcome 1:** Contractor will conduct chart reviews that focus on the clinical aspects of the health care delivery system. The Contractor will develop and submit an annual Audit Plan to ADC for review and approval, describing criteria, form and sample/volume of charts to be reviewed on a monthly basis for each performance outcomes and reporting measure as specified by ADC or proposed by Contractor.

**Measure:** Review of audit methodology and sample, monitoring criteria and results of the monthly and quarterly chart audits.

**Performance Outcome 2:** Contractor will ensure the establishment of the CQI Committee by the Contractor that meets on a monthly basis. This committee will have representation from all disciplines practicing on the complex. The Contractor will ensure the committee conducts at least two (2) process quality improvement studies and two (2) outcome quality studies per year.

**Measure:** Review of the CQI monthly minutes and review of the annual process and outcome studies, including topics, methodology, findings, plans for improvement based on evidence and outcomes following quarterly monitoring schedules.

**Performance Outcome 3:** Recommendations made by the Quality Committee shall be appropriately acted upon on a timely basis and reported back in writing at the next monthly meeting.

**Measure:** Review of Quality Improvement Committee meeting reports and minutes shall demonstrate that recommendations were appropriately enacted.

ADC015860



Performance Outcome 4: As part of the Contractor's continuous quality improvement program the Contractor shall annually conduct scheduled provider peer review of all Physicians, Nurse Practitioners, Physician Assistants, Dentists, Psychiatrists, Psychiatric Nurse Practitioners and PhD. level Psychologists in compliance with NCCHC Standard P-C-02, Clinical Performance Enhancement.

Measure: Documentation that a medical, dental and mental health provider peer review was conducted for each provider within the prior 12 months.

Performance Outcome 5. As part of the Contractor's continuous quality improvement program, the Contractor shall quarterly conduct scheduled on-site audits at each Arizona State Prison Complex to measure compliance with requirements identified in Subsection 2.12.5.

Measure: Documentation that an audit was conducted at each Arizona State Prison within the prior three months and that all identified deficiencies were addressed and appropriate corrective action was taken.

The Offeror shall submit as part of the response to this Request for Proposal information describing how the Offeror shall ensure that each stated performance outcome, as applicable to a Contract awarded as a result of this request for proposal, is met one hundred percent (100%).

ADC015861

# EXHIBIT 2-U

## Psychiatric Staffing Chart

| Facility | Position | # Positions Budgeted | Sept Fill Rate | Oct Fill Rate | Nov Fill Rate | December Fill Rate |
|---|---|---|---|---|---|---|
| ASPC Eyman | Psych Nurse | 3 | 100% | 100% | 100% | 100% |
| | Psych PA/NP | 1.5 | 0% | 0% | 0% | 0% |
| | Psychiatrist Technician | 6 | 50% | 50% | 50% | 67% |
| | Psychiatrist | 0.5 | 0% | 200% | 300% | 350% |
| | Psychiatrist Supervisor | 1 | 0% | 0% | 0% | 0% |
| | Total Psych | 12 | 50% | 58% | 63% | 73% |
| ASPC Florence | Psych Nurse | 3 | 67% | 100% | 100% | 100% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Psychiatrist Technician | 5 | 0% | 60% | 80% | 100% |
| | Psychiatrist | 1 | 100% | 0% | 0% | 0% |
| | Total Psych | 10 | 30% | 60% | 70% | 80% |
| ASPC Lewis | Psych Nurse | 3 | 100% | 100% | 100% | 100% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Psychiatrist Technician | 5 | 20% | 20% | 40% | 40% |
| | Psychiatrist Supervisor | 1 | 0% | 0% | 0% | 0% |
| | Total Psych | 10 | 40% | 40% | 50% | 50% |
| ASPC Perryville | Psych Nurse | 4 | 75% | 75% | 75% | 100% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Psychiatrist Technician | 1.8 | 56% | 56% | 100% | 100% |
| | Psychiatrist Supervisor | 1 | 0% | 0% | 0% | 0% |
| | Total Psych | 7.8 | 51% | 51% | 62% | 74% |
| ASPC Phoenix | Psych Nurse | 25 | 66% | 62% | 62% | 62% |
| | Psych Nurse Coordinator | 2 | 100% | 50% | 50% | 50% |
| | Psychiatrist Technician | 6 | 83% | 67% | 67% | 67% |
| | Psychiatrist | 1 | 50% | 50% | 50% | 50% |
| | Psychiatrist Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Total Psych | 35 | 71% | 63% | 63% | 63% |
| ASPC Tucson | Psych Nurse | 4 | 75% | 75% | 100% | 75% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Psychiatrist Technician | 3 | 0% | 33% | 67% | 100% |
| | Psychiatrist | 1.5 | 0% | 0% | 100% | 83% |
| | Psychiatrist Supervisor | 1 | 0% | 0% | 0% | 0% |
| | Total Psych | 10.5 | 29% | 38% | 71% | 69% |
| ASPC Yuma | Psych Nurse | 1 | 100% | 100% | 100% | 100% |
| | Psychiatrist | 1 | 0% | 0% | 0% | 0% |
| | Total Psych | 2 | 50% | 50% | 50% | 50% |

## Dental Staffing Chart

| Facility | Position | # Positions Budgeted | September Fill Rate | October Fill Rate | November Fill Rate | December Fill Rate |
|---|---|---|---|---|---|---|
| ASPC Douglas | Dentist | 2 | 38% | 0% | 45% | 45% |
| | Dental Assistant | 2 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 4 | 69% | 50% | 73% | 73% |
| ASPC Eyman | Dentist | 4 | 50% | 100% | 100% | 100% |
| | Dental Assistant | 5 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 9 | 78% | 100% | 100% | 100% |
| ASPC Florence | Dentist | 2.5 | 0% | 0% | 0% | 0% |
| | Dental Assistant | 5 | 100% | 100% | 100% | 100% |
| | Dentist Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 8.5 | 71% | 71% | 71% | 71% |
| ASPC Lewis | Dentist | 3 | 33% | 33% | 33% | 33% |
| | Dental Assistant | 5 | 100% | 100% | 100% | 100% |
| | Dentist Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 9 | 78% | 78% | 78% | 78% |
| ASPC Perryville | Dentist | 3 | 33% | 33% | 33% | 50% |
| | Dental Assistant | 4 | 100% | 100% | 100% | 100% |
| | Dentist Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 8 | 75% | 75% | 75% | 81% |
| ASPC Phoenix | Dentist Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Dental Assistant | 2 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 3 | 100% | 100% | 100% | 133% |
| ASPC Safford | Dentist | 0.5 | 0% | 0% | 0% | 0% |
| | Dental Assistant | 2 | 50% | 100% | 100% | 100% |
| | Dentist Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 3.5 | 57% | 86% | 86% | 86% |
| ASPC Tucson | Dentist | 4 | 69% | 69% | 69% | 69% |
| | Dental Assistant | 5 | 100% | 100% | 100% | 100% |
| | Dentist Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Total Dental Staff | 10 | 88% | 88% | 88% | 88% |
| ASPC Winslow | Dentist | 2 | 38% | 38% | 38% | 75% |
| | Dental Assistant | 2.5 | 80% | 80% | 80% | 80% |
| | Total Dental Staff | 4.5 | 61% | 61% | 61% | 78% |
| ASPC Yuma | Dentist | 2.5 | 0% | 0% | 0% | 40% |
| | Dental Assistant | 3.5 | 129% | 129% | 129% | 129% |
| | Total Dental Staff | 6 | 75% | 75% | 75% | 92% |

Nursing Staffing Chart

| Facility | Position | # Positions Budgeted | Sept Fill Rate | Oct Fill Rate | Nov Fill Rate | December Fill Rate |
|---|---|---|---|---|---|---|
| ASPC Douglas | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 3 | 67% | 100% | 100% | 100% |
| | PA/NP | 2 | 100% | 100% | 100% | 100% |
| | Registered Nurse | 7.6 | 79% | 79% | 87% | 92% |
| | RN Supervisor | 2 | 100% | 100% | 100% | 100% |
| | Total Nursing | 13.6 | 96% | 103% | 107% | 110% |
| ASPC Eyman | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 18 | 56% | 50% | 50% | 50% |
| | PA/NP | 3.5 | 29% | 29% | 29% | 29% |
| | Registered Nurse | 10.15 | 108% | 99% | 99% | 99% |
| | RN Supervisor | 4 | 50% | 50% | 50% | 50% |
| | Psych Nurse | 3 | 100% | 100% | 1% | 100% |
| | Psych PA/NP | 1.5 | 0% | 0% | 0% | 0% |
| | Total Nursing | 41.15 | 68% | 63% | 56% | 63% |
| ASPC Florence | Director of Nursing | 1 | 100% | 100% | 100% | 0% |
| | Licensed Practical Nurse | 18 | 61% | 72% | 78% | 78% |
| | PA/NP | 4 | 25% | 25% | 25% | 25% |
| | Registered Nurse | 13.2 | 38% | 45% | 76% | 76% |
| | RN Supervisor | 3 | 67% | 67% | 33% | 33% |
| | Psych Nurse | 3 | 67% | 100% | 100% | 100% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Total Nursing | 43.2 | 51% | 60% | 69% | 67% |
| ASPC Lewis | Director of Nursing | 1 | 100% | 100% | 100% | 0% |
| | Licensed Practical Nurse | 19 | 42% | 58% | 58% | 63% |
| | PA/NP | 3 | 33% | 33% | 33% | 33% |
| | Registered Nurse | 16.6 | 66% | 72% | 66% | 78% |
| | RN Supervisor | 4 | 75% | 75% | 100% | 100% |
| | Psych Nurse | 3 | 100% | 100% | 100% | 100% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Total Nursing | 47.6 | 57% | 65% | 65% | 69% |
| ASPC Perryville | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 18.9 | 63% | 74% | 89% | 95% |
| | PA/NP | 5 | 75% | 95% | 95% | 95% |
| | Registered Nurse | 21 | 43% | 67% | 71% | 86% |
| | RN Supervisor | 3 | 100% | 100% | 100% | 100% |
| | Psych Nurse | 4 | 75% | 75% | 75% | 100% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Total Nursing | 53.9 | 59% | 74% | 81% | 90% |
| ASPC Phoenix | Director of Nursing | 1 | 100% | 100% | 0% | 0% |
| | Licensed Practical Nurse | 6 | 50% | 67% | 67% | 67% |

## Nursing Staffing Chart

| Facility | Position | # Positions Budgeted | Sept Fill Rate | Oct Fill Rate | Nov Fill Rate | December Fill Rate |
|---|---|---|---|---|---|---|
| | PA/NP | 4.9 | 41% | 41% | 41% | 41% |
| | Registered Nurse | 9.4 | 64% | 74% | 74% | 74% |
| | RN Supervisor | 1 | 100% | 100% | 0% | 0% |
| | Psych Nurse | 25 | 66% | 62% | 62% | 62% |
| | Psych Nurse Coordinator | 2 | 100% | 50% | 50% | 50% |
| | Total Nursing | 49.3 | 64% | 64% | 60% | 60% |
| ASPC Safford/Ft. Gra | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 1 | 100% | 100% | 100% | 100% |
| | PA/NP | 1 | 100% | 100% | 100% | 100% |
| | Registered Nurse | 11.8 | 85% | 85% | 76% | 76% |
| | RN Supervisor | 2 | 100% | 100% | 100% | 100% |
| | Total Nursing | 16.8 | 89% | 89% | 83% | 83% |
| ASPC Tucson | Director of Nursing | 1 | 0% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 17.15 | 82% | 82% | 93% | 93% |
| | PA/NP | 2 | 50% | 50% | 50% | 50% |
| | Registered Nurse | 23.28 | 69% | 73% | 90% | 90% |
| | RN Supervisor | 8 | 75% | 63% | 63% | 63% |
| | Psych Nurse | 4 | 75% | 75% | 100% | 75% |
| | Psych PA/NP | 1 | 0% | 0% | 0% | 100% |
| | Total Nursing | 56.43 | 71% | 73% | 85% | 85% |
| ASPC Winslow | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 1 | 0% | 0% | 0% | 0% |
| | PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Registered Nurse | 10 | 70% | 70% | 80% | 90% |
| | RN Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Total Nursing | 14 | 64% | 64% | 71% | 79% |
| ASPC Yuma | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 10 | 50% | 80% | 80% | 90% |
| | PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Registered Nurse | 12.4 | 24% | 24% | 40% | 65% |
| | RN Supervisor | 2 | 50% | 50% | 50% | 50% |
| | Psych Nurse | 1 | 100% | 100% | 100% | 100% |
| | Total Nursing | 27.4 | 40% | 51% | 58% | 73% |

Medical Staffing Chart

| Facility | Position | # Positions Budgeted | September Fill Rate | October Fill Rate | November Fill Rate | December Fill Rate |
|---|---|---|---|---|---|---|
| ASPC Douglas | Medical Director | 1 | 0% | 0% | 0% | 0% |
| | Patient Care Tech | 2 | 50% | 50% | 100% | 100% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 3 | 67% | 100% | 100% | 100% |
| | PA/NP | 2 | 50% | 100% | 100% | 100% |
| | Registered Nurse | 7.6 | 79% | 79% | 87% | 92% |
| | RN Supervisor | 2 | 100% | 100% | 100% | 100% |
| | Lab Tech | 1 | 100% | 100% | 100% | 100% |
| | Total Medical Staff | 19.6 | 71% | 82% | 90% | 92% |
| ASPC Eyman | Medical Director | 1 | 0% | 0% | 0% | 0% |
| | Health Plan Coordinator | 1 | 0% | 0% | 0% | 100% |
| | Patient Care Tech | 4 | 150% | 125% | 100% | 100% |
| | Physician | 2 | 0% | 0% | 0% | 50% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 18 | 56% | 50% | 50% | 50% |
| | PA/NP | 3.5 | 29% | 29% | 29% | 29% |
| | Registered Nurse | 10.15 | 108% | 99% | 99% | 99% |
| | RN Supervisor | 4 | 50% | 50% | 50% | 50% |
| | Lab Tech | 1 | 100% | 100% | 100% | 100% |
| | Radiology Tech | 1 | 200% | 200% | 200% | 200% |
| | Total Medical Staff | 46.65 | 73% | 66% | 66% | 69% |
| ASPC Florence | Medical Director | 1 | 100% | 100% | 100% | 100% |
| | Health Plan Coordinator | 1 | 100% | 100% | 100% | 100% |
| | Patient Care Tech | 8.5 | 59% | 47% | 59% | 59% |
| | Physician | 1.2 | 0% | 0% | 0% | 0% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 0% |
| | Licensed Practical Nurse | 18 | 61% | 72% | 78% | 78% |
| | PA/NP | 4 | 25% | 25% | 25% | 25% |
| | Registered Nurse | 13.2 | 38% | 45% | 76% | 76% |
| | RN Supervisor | 3 | 67% | 67% | 33% | 33% |
| | Lab Tech | 2 | 50% | 50% | 100% | 100% |
| | Radiology Tech | 1 | 0% | 0% | 0% | 0% |
| | Total Medical Staff | 53.9 | 52% | 56% | 67% | 65% |
| ASPC Lewis | Medical Director | 1 | 100% | 100% | 100% | 100% |
| | Health Plan Coordinator | 1 | 0% | 0% | 0% | 0% |
| | Patient Care Tech | 5.4 | 56% | 93% | 102% | 102% |
| | Physician | 2 | 50% | 50% | 50% | 50% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 0% |
| | Licensed Practical Nurse | 19 | 42% | 58% | 58% | 63% |
| | PA/NP | 3 | 33% | 33% | 33% | 33% |

Medical Staffing Chart

| Facility | Position | # Positions Budgeted | September Fill Rate | October Fill Rate | November Fill Rate | December Fill Rate |
|---|---|---|---|---|---|---|
| | Registered Nurse | 16.6 | 66% | 72% | 66% | 78% |
| | RN Supervisor | 4 | 75% | 75% | 100% | 100% |
| | Lab Tech | 1 | 100% | 100% | 100% | 100% |
| | Radiology Tech | 1 | 0% | 0% | 100% | 100% |
| | Total Medical Staff | 55 | 55% | 65% | 68% | 74% |
| ASPC Perryville | Medical Director | 1 | 100% | 100% | 100% | 100% |
| | Patient Care Tech | 8.4 | 83% | 95% | 101% | 101% |
| | Physician | 1 | 175% | 175% | 175% | 175% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 18.9 | 63% | 74% | 89% | 95% |
| | PA/NP | 5 | 75% | 95% | 95% | 95% |
| | Registered Nurse | 21 | 43% | 67% | 71% | 86% |
| | RN Supervisor | 3 | 100% | 100% | 100% | 100% |
| | Lab Tech | 2 | 50% | 50% | 50% | 50% |
| | Radiology Tech | 1 | 0% | 100% | 100% | 100% |
| | Total Medical Staff | 62.3 | 63% | 79% | 87% | 93% |
| ASPC Phoenix | Medical Director | 1 | 100% | 100% | 100% | 100% |
| | Patient Care Tech | 2 | 100% | 100% | 100% | 150% |
| | Physician | 2.5 | 80% | 80% | 80% | 80% |
| | Director of Nursing | 1 | 100% | 100% | 0% | 0% |
| | Licensed Practical Nurse | 6 | 50% | 67% | 67% | 67% |
| | PA/NP | 4.9 | 41% | 41% | 41% | 41% |
| | Registered Nurse | 9.4 | 64% | 74% | 74% | 74% |
| | RN Supervisor | 1 | 100% | 100% | 0% | 0% |
| | Lab Tech | 2.2 | 91% | 45% | 91% | 91% |
| | Radiology Tech | 1 | 100% | 100% | 100% | 100% |
| | Total Medical Staff | 31 | 68% | 71% | 68% | 71% |
| ASPC Safford | Medical Director | 1 | 75% | 75% | 75% | 75% |
| Ft. Grant | Patient Care Tech | 3 | 67% | 67% | 67% | 100% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 1 | 100% | 100% | 100% | 100% |
| | PA/NP | 1 | 100% | 100% | 100% | 100% |
| | Registered Nurse | 11.8 | 85% | 85% | 76% | 76% |
| | RN Supervisor | 2 | 100% | 100% | 100% | 100% |
| | Lab Tech | 1 | 100% | 100% | 100% | 100% |
| | Total Medical Staff | 21.8 | 86% | 86% | 81% | 86% |
| ASPC Tucson | Medical Director | 1 | 0% | 100% | 100% | 100% |
| | Health Plan Coordinator | 2 | 50% | 100% | 100% | 100% |
| | Patient Care Tech | 6.3 | 100% | 100% | 100% | 100% |
| | Physician | 4 | 100% | 100% | 100% | 75% |

Medical Staffing Chart

| Facility | Position | # Positions Budgeted | September Fill Rate | October Fill Rate | November Fill Rate | December Fill Rate |
|---|---|---|---|---|---|---|
| | Director of Nursing | 1 | 0% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 17.15 | 82% | 82% | 93% | 93% |
| | PA/NP | 2 | 50% | 50% | 50% | 50% |
| | Registered Nurse | 23.28 | 69% | 73% | 90% | 90% |
| | RN Supervisor | 8 | 75% | 63% | 63% | 63% |
| | Lab Tech | 1 | 100% | 100% | 100% | 100% |
| | Radiology Tech | 1 | 100% | 100% | 100% | 100% |
| | Total Medical Staff | 66.73 | 75% | 80% | 89% | 87% |
| ASPC Winslow | Medical Director | 1 | 0% | 0% | 0% | 0% |
| | Patient Care Tech | 4 | 75% | 100% | 100% | 100% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 1 | 0% | 0% | 0% | 0% |
| | PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Registered Nurse | 10 | 70% | 70% | 80% | 90% |
| | RN Supervisor | 1 | 100% | 100% | 100% | 100% |
| | Lab Tech | 1 | 100% | 100% | 100% | 100% |
| | Radiology Tech | 1 | 0% | 0% | 0% | 100% |
| | Total Medical Staff | 21 | 62% | 67% | 71% | 81% |
| ASPC Yuma | Medical Director | 1 | 100% | 100% | 100% | 100% |
| | Patient Care Tech | 8 | 100% | 100% | 88% | 88% |
| | Physician | 1.75 | 0% | 0% | 0% | 0% |
| | Director of Nursing | 1 | 100% | 100% | 100% | 100% |
| | Licensed Practical Nurse | 10 | 50% | 80% | 80% | 90% |
| | PA/NP | 1 | 0% | 0% | 0% | 0% |
| | Registered Nurse | 12.4 | 24% | 24% | 40% | 65% |
| | RN Supervisor | 2 | 50% | 50% | 50% | 50% |
| | Lab Tech | 1 | 200% | 200% | 200% | 200% |
| | Radiology Tech | 1 | 100% | 100% | 100% | 100% |
| | Total Medical Staff | 39.15 | 56% | 64% | 66% | 77% |

# EXHIBIT 3

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Katherine E. Watanabe, Bar No. 027458
Lucy M. Rand, Bar No. 026919
Ashley B. Zuerlein, Bar No. 029541
Assistant Attorney General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov
Ashley.Zuerlein@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                    Plaintiffs,<br><br>              v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                    Defendants. | NO. 2:12-cv-00601-NVW<br><br>**DECLARATION OF CARLOS WEEKLY** |

I, **CARLOS WEEKLY**, make the following Declaration:

1.     I am a dentist employed by Wexford Health Services, and hold a doctorate of dental medicine. I was the Supervising Dentist at Florence from 2007 through 2011. I was the Dental Program Manager for the Arizona Department of Corrections (ADC) from July 2011 to November 2011. I served as the Interim Dental Program Manager from February 2012 to June 30, 2012. I have been employed in my current position with Wexford since July 1, 2012. I am familiar with the allegations in the Plaintiffs' Complaint and their Motion for Class Certification, and have personal knowledge of ADC's policies and practices regarding dental care for ADC inmates, including the policies and practices outlined in this Declaration.

### Dental Triage Process

2.     Plaintiffs allege that "ADC has a policy or practice of allowing dental assistants, who are not licensed providers, too much discretion in determining when and if treatment will take place based on HNRs, and they have too large a role in examining patients."

3.     ADC Dental Service Procedure 787 provides the procedures for review of dental Health Needs Requests (HNRs). (Ex. 3-A, Dental Service Procedure 787.)

4.     Upon receipt of an HNR, the staff dental assistant evaluates the request using the Dental Classification System outlined in Dental Service Procedure 770.2, which assigns a priority level to a dental complaint.

5.     Priority 1 complaints are considered emergencies and include postoperative uncontrolled bleeding, facial swelling of a life-threatening nature, fracture of the mandible, maxilla, or zygomatic arch, and intraoral lacerations that require suturing. (Ex. 3-A, Dental Procedure 770.2 at 3.1.1.) Because these conditions require immediate assessment and/or treatment, inmates falling into Priority One do not submit HNRs. These inmates are usually brought directly to dental by security staff after an assault or workplace accident or sent to an emergency room.

6.      Priority 2 complaints are considered urgent care and include fractured dentition with pulp exposure, acute dental abscess, and severe pain.  (Ex. 3-A, Dental Procedure 770.2 at 3.1.2.)

7.      HNRs containing complaints of pain or discomfort are forwarded to a dentist and reviewed by the dentist within 24 hours to determine whether the condition should be characterized as a Priority 2 or 3.  If the dentist determines that the inmate's condition falls under Priority 2, the inmate is scheduled to be seen by the dentist on an urgent basis.  Typically these appointments take place the same day.  If the dentist is not available that day, the appointment must be scheduled within 72 hours.

8.      Priority 3 complaints are considered routine care and include cavities, chronic periodontal conditions, non-restorable teeth, temporary fillings, broken or ill-fitting dental appliances, TMJ disorders, and teeth cleaning.  (Ex. 3-A, Dental Procedure 770.2 at 3.1.3.)  HNRs containing complaints categorized by the dental assistant as Priority 3 are responded to by the dental assistant and placed on the routine care list.

9.      Priority 4 conditions are not treated or provided at ADC.  (Ex. 3-A, Dental Procedure 770.2 at 3.1.4.)  These include fixed prosthodontics, orthodontics, removal of asymptomatic third molars without pathology, and treatment of discolorations or cosmetic defects.  (Id.)

10.     ADC dental assistants all hold certificates in radiology.  In my experience, most ADC dental assistants have more training than dental assistants in private practice.

11.     Plaintiffs assert that "ADC Dental Procedure 770.2, which defines urgent care, provides no timelines as to how soon a patient identified as having an urgent care problem must be treated although the HNR must be reviewed by a dental assistant 'and an appropriate dentist's acknowledgment within one business day (24 hours),'" and that there are no timelines for routine treatment.

12.     The guideline in ADC for treatment of conditions classified as urgent is within three working days of receipt of an HNR.  The guideline for routine care is 90 days.  These timelines are also included in the Wexford contract.

2717643.1                                      3

13.     I supervise the Florence and Eyman dental clinics, both of which average fewer than three working days for treatment of urgent care requests. The current waiting time on the Florence dental clinic routine care list is less than 60 days. The current waiting time on the Eyman dental clinic routine care list is approximately 60 days.

**Pain Treatment**

14.     Plaintiffs allege that "Neither ADC's policies, nor actual practices … adequately address patients' pain or the likelihood of increased pain and decay over time."

15.     This is not correct. Our number one concern in treating inmates is addressing pain.

16.     Inmates experiencing pain submit HNRs requesting treatment.

17.     HNRs containing complaints of pain are reviewed by a dentist within 24 hours of receipt from medical to determine whether the inmate's condition should be classified as a Priority 2 or 3.

18.     Most complaints of pain are classified as a Priority 2, and the inmate will be seen by the dentist on an expedited basis. Generally, the inmate is scheduled for an appointment the same day. Often the inmate will be seen by the dentist before he receives a response to his HNR.

19.     However, there are times when it is apparent from the HNR that a complaint of pain is not related to an urgent condition. If, for example, an inmate states in an HNR that he experiences pain or sensitivity when eating cold foods, that request is not considered urgent. The inmate will be classified as a Priority 3 and placed on the routine care list.

20.     If the dentist is unable to determine from the HNR whether the request should be classified as a Priority 2 or 3, the inmate will be seen on an expedited basis by the dentist.

**De Facto Extraction Policy**

21.     Plaintiffs allege that "ADC dentists encourage inmates to allow the dentists to extract teeth that could be filled."

2717643.1

4

22.   This is simply not true, and it certainly is not ADC policy.   In my experience, it is much easier to fill a tooth than to pull it.

23.   If a dentist is able to fix a tooth, he will.   However, there are times when a tooth cannot be saved.   In that instance – i.e., there is no other possible way to save the tooth – it will be pulled with the inmate's consent.

24.   In my experience, many inmates believe that all teeth can be filled, regardless of the extent of the decay.   This is not true.

25.   Often, inmates enter ADC facilities with extensive dental decay caused by decades of dental neglect.   This may be compounded by drug use.

26.   Whether a tooth can be filled depends upon the extent of the decay and the remaining structure of the tooth.   Without examining a tooth with extensive decay, it is difficult to determine whether the tooth can be saved.

27.   If, in my clinical judgment, a tooth cannot be saved, I inform the inmate that I recommend extraction.   I do not inform the inmate that a filling is an available alternative treatment option if I have determined that the tooth cannot be saved. The inmate may choose to have the tooth pulled, or the inmate may choose to refuse treatment.

**Treatment of Chewing Difficulty**

28.   Plaintiffs contend that "ADC policy does not address timing or monitoring of patients waiting to receive dental devices."

29.   The process of providing a dental device generally takes an average of six months.   However, the timing varies considerably depending upon the dental needs of a particular inmate, the processing time required for the outside provider making the device, and various scheduling factors.

30.   If an inmate has other dental needs, such as requiring fillings or scaling, those needs must be addressed before the process of providing the dental device begins.

2717643.1

5

31.     First, an inmate receives an exam and is informed regarding what dental services he qualifies for. An inmate must have at least six months remaining on his sentence to provide dentures. (Ex. 3-A, Dental Procedure 771.5 at 4.7.)

32.     If an inmate qualifies for and requests dentures, the inmate will be placed on the routine care list. During this time, the inmate will be provided a soft diet.

33.     When the inmate reaches the front of the queue, the dentist will again make sure that the inmate has at least six months remaining on his sentence. The inmate will then be called into the dental clinic automatically every four to six weeks until the device is ready without needing to submit an additional HNR. (Ex. 3-A, Dental Procedure 770.5 at 3.3.2.)

34.     There are multiple steps involved in making dental devices, each of which takes approximately four to six weeks due to the necessity of taking impressions, mailing materials to an outside lab, the processing time for the outside lab, mailing materials back to the prison facility, making adjustments, and so forth.

35.     As a result, the time required for a particular inmate to receive a dental device is difficult to estimate and will vary considerably from inmate to inmate.

36.     The documents attached to this Declaration are true and accurate copies of what they purport to be.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _Dec 24, 2012_, 2012.


_Carlos Weekly_
Carlos Weekly

2717643.1                                        6

# EXHIBIT 3-A

# DENTAL SERVICES
# TECHNICAL MANUAL

# HEALTH SERVICES

Dr. Michael Adu-Tutu, Interim Division Director

ARIZONA DEPARTMENT OF CORRECTIONS
January 1, 2010

ADC010554

## DENTAL PROCEDURE  770.2

### DENTAL CLASSIFICATION SYSTEM

1.0 <u>PURPOSE</u>:        To provide a standard classification system for the prioritization of dental treatment provided to inmates.

2.0 <u>RESPONSIBILITY</u>:        The Dental Program Manager and Dentist Supervisor at each facility will be responsible for compliance with the requirements of this procedure.

3.0 <u>DEFINITIONS</u>:

3.1        *Dental Classification System* - A system that establishes priories of dental treatment based on dental conditions diagnosed by institutional dentists and established as a total dental treatment plan.

3.1.1   *Priority 1 -*  **(EMERGENCY CARE)**

Requiring immediate assessment and/or treatment such as:

1. Postoperative uncontrolled bleeding;
2. Facial swelling that is of a life threatening
       nature or is causing facial deformity;
3. Fracture of the mandible, maxilla, or zygomatic arch;
4. Avulsed dentition;
5. An extremely painful condition that is non-responsive to the implementation of dental treatment guidelines
6. Intraoral lacerations that require suturing to include the vermilion border of the lips.

3.1.2   *Priority 2 -*  **(URGENT CARE )** - Treatment necessary subsequent to the implementation of dental treatment guidelines such as:

1.        Fractured dentition with pulp exposure;
2.        Acute dental abscess;
3.        Oral pathological condition that may severely compromise the general health of the inmate.
4.        Acute Necrotizing Ulcerative Gingivitis.

3.1.3   Priority 3 - **(ROUTINE CARE )**

Conditions that require treatment to restore the form and function of an inmate's oral tissues and are not solely elective nor cosmetic in nature such as:

1. Caries;
2. Chronic periodontal conditions;
3. Non-restorable teeth;

ADC010584

4. Edentulous and partially edentulous patients requiring replacement (See Dental Service Procedure 771.5 );
5. Presence of temporary, sedative, or intermediate restorations;
6. Broken or non functional prosthetic appliance, if patient qualifies (See 771.5)Broken or ill fitting dentures or partials.
7. TMJ disorders
8. Periodic examination
9. Gingival recession or root sensitivity
10. Routine dental prophylaxis

### 3.1.4 - Priority 4 – (EXEMPT CONDITIONS)

Those conditions that do not fall in the above categories and **ARE NOT** provided by ADC

1. Fixed prosthodontics (crown and bridge).
2. Orthodontics
3. Removal of asymptomatic third molars or impactions without pathology;
4. Treatment of discolorations, stains, cosmetic defects.
5. Ridge augmentations, vestibular extensions/implants

## 4.0 PROCEDURES:

4.1 Upon initial examination, all inmates will be classified according to the dental classification system,

Priority 1 (EMERGENCY CARE)
Priority 2 (URGENT CARE)
Priority 3 (ROUTINE CARE)
Priority 4 (EXEMPT CONDITIONS)

4.2 The priority classification should be re-evaluated and updated, if necessary, at each dental visit.

4.3 The scheduling of dental appointments for inmates will be based on the current relative priority of the inmate's dental condition within the dental classification system.

ADC010585

## DENTAL SERVICE PROCEDURE  770.5

**SCHEDULING APPOINTMENTS**

1.0   PURPOSE:  To provide a standard procedure for the scheduling of inmate dental appointments as a supplement to ADC Health Needs Request System/Procedure.

2.0   RESPONSIBILITY: The Dental Program Manager and Dentist Supervisor at each facility will be responsible for compliance with the requirements of this procedure.

3.0   PROCEDURES:

    3.1   Emergency dental care

        3.1.1   Inmates in need of emergency dental care should notify health services staff or security staff.

        3.1.2   After hours the nurse is responsible for the triage of the emergency dental complaints directed to him/her by the health services or security staff through the security shift commander.

        3.1.3   The nurse should contact the dentist on site or on the Urgent Notification List for directions/orders.

    3.2   Routine Care

        3.2.1   Inmates requesting dental treatment of a non emergent nature, may request a dental appointment by submitting a Health Needs Request Form to the health staff.

    3.3   Follow-up care

        3.3.1   For inmates who have been treatment planned and need continuing care, the following procedure is recommended:

        3.3.2   For those undergoing continuation of treatment such as root canal therapy, prosthetics or serial extractions, the dentist should re-appoint the inmate.

        3.3.3   For those requiring routine dental work, such as fillings, they will be required to submit a Health Needs Request Form for each visit, if they wish to continue treatment.

4.0   IMPLEMENTATION: This procedure will be implemented without change effective immediately.

ADC010593

| DENTAL PROCEDURE 771.5 |
|:---:|

## DENTAL PROSTHESES

1.0   <u>PURPOSE</u>:      To establish criteria that will be used to determine the eligibility of an inmate for replacement of missing teeth, and priorities by which they will be provided by ADC.

2.0   <u>RESPONSIBILITY</u>:      The Dental Program Manager and Dentist Supervisor at each facility will be responsible for compliance with the requirements of this procedure.

3.0   <u>DEFINITIONS</u>:

    3.1.   *Adequate Masticatory Function*: defined as an occlusion score of 16 points or more.

    3.2   *Occlusion Score*:  defined as the total of occlusion points scored as follows:

        3.2.1   Occluding incisors and canines or canines = 1 Point, (i.e., #7 with #26 = 1 Pt.)

        3.2.2   Occluding Bicuspids = 2 Points, (i.e., #4 with #29 = 2 Pts., #6 with #27 = 2 Pts.)

        3.2.3   Functional 1st or 2nd Molars = 3 Points. (i.e., #3 with #30 = 3 Pts.)  Note: 3rd Molars drifted to 2nd Molar position shall be recognized as functional occlusion and included when counting the occlusal score.

        3.2.4   Wisdom teeth = 0 Pts.

4.0   <u>PROCEDURES</u>:

    4.1   Full denture prostheses shall be constructed in accordance with the following:

        4.1.1   First priority will be given to medically compromised patients who, as a result of missing teeth, are exhibiting a significant medical condition that can be ameliorated by return to adequate masticatory function.

        4.1.2   Second priority will be given to those patients needing full upper or lower dentures, or both, as a result of extractions performed as part of an ongoing treatment plan, or who have lost teeth while in ADC.

        4.1.3   Third priority will be given to those who entered ADC with missing teeth.Edentulous upper and/or lower).

    4.2   Partial denture prosthesis shall only be provided if the Occlusion Score is 15 or less and the patient does not have  <u>active caries</u>, <u>moderate or severe periodontal disease</u>, <u>mobility of abutments</u> or <u>inadequate oral hygiene,</u> as evidenced by the presence of plaque, materia alba, stain, tartar, red bleeding gingiva.  Consideration should be given if there is an opposing full denture, to which a partial denture would

ADC010603

aid in stability.   Partial dentures will be constructed in accordance with the following:

4.2.1   First priority will be given to medically compromised patients who, as a result of missing teeth, are exhibiting a significant medical condition that can be ameliorated by return to adequate masticatory function.

4.2.2   Second priority will be those who qualify as a result of extractions performed as part of an on-going treatment plan, or who have lost teeth while in ADC.

4.2.3   Third priority will be given to those who entered ADC with missing teeth.

4.2.4   Patients will be restored to adequate masticatory function with one partial if possible (i.e., upper or lower, whichever increases the occlusion score to 16 or above).

4.3 Exception to the Occlusion Score can be granted by the Dental Program Manager if the teeth were lost as a result of assault or altercation which is supported by the appropriate documentation or there is a significant psychological need which is documented by a staff psychiatrist and psychologist and sent to the attention of the Dental Program Manager.

4.4 Fixed bridges, cast crowns or implants will not be provided.

4.5 Laboratory repairs of existing fixed prosthetics must have the approval of the Dental Program Manager.

4.6 Inmates will be provided prostheses based on priority.

4.7 No prosthetic replacements, other than first priority or where the teeth were extracted by ADC as part of a treatment plan that included replacement, will be started if the inmate has less than six months remaining in ADC.

4.8 Ridge augmentation or vestibular extension for improved retention of full dentures will only be considered if the patient is medically compromised, as stated in Sec.  .1. Approval for outside consultation and/or performance of these procedures must be obtained from the Dental Program Manager.

4.9 A complete dental scaling will be performed before impressions are taken for construction of a partial denture(s).

4.10  Laboratory prescriptions shall only be signed by a dentist.

ADC010604

## DENTAL SERVICE PROCEDURE 787

**Evaluation and Triage of Dental Health Needs Request**

1.0   <u>PURPOSE</u>:  To provide a dental evaluation and review for all inmates who submit an HNR with a dental complaint, including dental pain.

2.0   <u>RESPONSIBILITY</u>:     The Dental Program Manager and Dentist Supervisor at each facility will be responsible for compliance with the requirements of this procedure.

3.0   DEFINITIONS:   **HNR:** Health Need Request Form

**Dental Classification System:** Dental Procedure 770.2

**Dental Assistant Evaluation:** Collecting and recording by a staff dental assistant for a specific dental complaint of pain, oral bleeding or facial swelling (extra / intra oral).

**Standing Medical Order:** Toothache/Dental Abscess

4.0   EXCLUSIONS:

4.1  ASPC- Globe

4.2  SACRC

4.3  Papago Unit

4.4  Picacho Unit

5.0   PROCEDURES:

5.1   Upon receipt of an HNR, the staff dental assistant will evaluate the request using the Dental classification system (Dental Procedure 770.2). Any inmate whose request is considered priority one or two will be scheduled for clinical evaluation by the dental assistant that day or next clinical day.

5.2   The dental assistant's clinical evaluation will only address the complaint as defined under Dental Assistant Evaluation. The dental assistant will review the inmate health history perform an oral evaluation, and take dental radiographs, to assist in determining the severity of the dental condition.

5.3   The dental records and x-rays of those inmates who received a dental assistant evaluation will be reviewed and an appropriate dentist's acknowledgment within one business day (24 hours).  In the event of the unit dentist being unavailable for consultation the dental assistant shall ensure that another complex dentist reviews the evaluations, within one business day.  If no other dentist is available (onsite or on call), the dental assistant shall call the Dental Program Manager for a telephone

ADC010634

review.  In the event the Dental Program Manager is not available the dental assistant shall discuss the inmate with an attending complex physician.

5.4   The primary treatment that may be rendered at this visit is treatment that will alleviate pain and/or infection per Standing Dental Order (toothache/dental abscess).

5.5   The inmate should be rescheduled for treatment by the reviewing provider based on the priority level of the inmate's dental condition within the dental classification system.  If the reviewing provider has any question as to the significance of the dental assistant's evaluation, the dentist is to see the inmate within the next 24 hours or sooner.

5.6   The inmate should not be charged for the follow-up visit at in order to establish a definitive treatment for the condition reported in the HNR referred in Sec. 5.1.

5.7   The staff dental assistant evaluation SOAP notes and dental X-rays (if taken) shall be recorded in the dental section of the Inmate Health Record.

ADC010635

# EXHIBIT 4

1   Arizona Attorney General Thomas C. Horne
    Office of the Attorney General
2   Michael E. Gottfried, Bar No. 010623
    Katherine E. Watanabe, Bar No. 027458
3   Lucy M. Rand, Bar No. 026919
    Ashley B. Zuerlein, Bar No. 029541
4   Assistant Attorney General
    1275 W. Washington Street
5   Phoenix, Arizona 85007-2926
    Telephone: (602) 542-4951
6   Fax: (602) 542-7670
    Michael.Gottfried@azag.gov
7   Katherine.Watanabe@azag.gov
    Lucy.Rand@azag.gov
8   Ashley.Zuerlein@azag.gov

9   Daniel P. Struck, Bar No. 012377
    Kathleen L. Wieneke, Bar No. 011139
10  Rachel Love, Bar No. 019881
    Timothy J. Bojanowski, Bar No. 22126
11  Nicholas D. Acedo, Bar No. 021644
    Courtney R. Cloman, Bar No. 023155
12  Ashlee B. Fletcher, Bar No. 028874
    Anne M. Orcutt, Bar No. 029387
13  STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
14  Chandler, Arizona 85226
    Telephone: (480) 420-1600
15  Fax: (480) 420-1696
    dstruck@swlfirm.com
16  kwieneke@swlfirm.com
    rlove@swlfirm.com
17  tbojanowski@swlfirm.com
    nacedo@swlfirm.com
18  ccloman@swlfirm.com
    afletcher@swlfirm.com
19  aorcutt@swlfirm.com
    *Attorneys for Defendants*

20              UNITED STATES DISTRICT COURT
21                  DISTRICT OF ARIZONA

22  Victor Parsons, *et al.*, on behalf of themselves    NO. 2:12-cv-00601-NVW
    and all others similarly situated; and Arizona
23  Center for Disability Law,
                                    Plaintiffs,
24              v.                                         **DECLARATION OF GREG FIZER**

25  Charles Ryan, Director, Arizona Department
    of Corrections; and Richard Pratt, Interim
26  Division Director, Division of Health Services,
    Arizona Department of Corrections, in their
27  official capacities,
                                    Defendants.
28

2717802.1

I, **GREG FIZER**, make the following Declaration:

1.     I have been employed with the Arizona Department of Corrections since 1981, not including the two years I served with the Bureau of prisons from 1993-1994. I have served as Deputy Warden at Florence-Central since July, 2012, and currently hold that position.

2.     As Deputy Warden, I am responsible for the day-to-day operations with custody control. Day-to-day operations include feeding, recreation, showers, and appointments. I am also responsible for the security staff as well as correctional officers who provide case work and programming.

3.     I am familiar with the allegations made in Plaintiffs' Complaint, as well as the allegations made in Plaintiffs' Motion for Class Certification. I am familiar with, and have personal knowledge of, ADC's policies and practices regarding conditions of confinement for ADC inmates, including the policies and practices outlined in this Declaration.

**Maximum Custody Cells**

4.     ADC does not recognize or use the term isolation. The word isolation implies that an inmate has no ability to communicate, interact, or socialize with others, and that is simply not true of any inmate in the ADC system. Some inmates are required to remain in their cells for 22 hours per day. This applies only to certain inmates that are classified as maximum custody and certain inmates who are on detention status. The appropriate nomenclature to define these cells is "maximum custody cells."

5.     An inmate can be classified as "maximum custody" if they committed a serious underlying offense (e.g., first degree murder), if they committed violent, disruptive, or riotous acts while incarcerated, if they escaped or attempted to escape, or if they pose a serious threat to the security of the institution or themselves. An inmate is not classified as maximum custody indefinitely (except death row inmates); their classification is reviewed 180 days after initial approval and annually thereafter.

6.      Eyman/SMU 1 Unit, Eyman/Browning Unit, and Florence/Central Unit house all of the male-general population inmates that are classified as maximum custody. Perryville/Lumley Special Management Unit houses all of the female general population inmates that are classified as maximum custody.  Several other units are used to house exclusively non-general population inmates classified as maximum custody (e.g., protective custody, sexual offenders, and mental health inmates), including Eyman/Rynning Unit, Phoenix/Baker Ward, Phoenix/Flamenco King Ward, and Lewis/Rast Unit.

7.      ADC's Max Phase Program is a program for male maximum custody inmates who have demonstrated positive institutional behavior and are prepared for transition to a lower custody unit or release to the community. These inmates are housed in cell block 2 at Florence/Central Unit.  As part of the program they are allowed to participate in group recreation on the recreation field, have contact visitation with their family and friends, eat their evening meal in group settings in the chow hall, and be assigned to the Work Incentive Pay Program. Similarly, male maximum custody inmates with mental health issues who are housed at Phoenix-Flamenco King, ASPC-Florence/Central Unit, and ASPC-Eyman/Browning Unit are eligible to participate in various activities consistent with mental health programming that allows them out of cell time in group activities.

8.      Inmates are placed in "detention" as necessary to ensure the safe, secure and orderly operation of the facility, to ensure the integrity and pending completion of an ongoing investigation, while determining eligibility for protective segregation, for observation status to identify, minimize and intervene in the possibility of self-destructive behaviors, pending institutional review and classification placement, pending revocation of parole, work furlough, home arrest, or temporary, mandatory or provisional release, and to fulfill disciplinary sanctions. Not all inmates who receive a disciplinary sanction are required to be moved to a maximum custody cell; instead, they may be allowed to stay in their existing cell with limited privileges.

9.      Many of the "maximum custody" cells have double-beds and house two inmates. All of them have sufficient ventilation, and either a perforated cell front, a vision panel in the door or cell wall, a sky light, and/or a window looking outside.  Inmate are permitted to leave

1    their cells to shower(three times per week), to participate in  recreation, to go to medical if

2    necessary, and to meet with program staff, or security supervisors.

3    **Exercise**

4       10.    All inmates in maximum custody cells are afforded 6 hours of outdoor exercise per

5    week, in two hour blocks, three times weekly.  Unless they are in the Max Phase Program or

6    mental health programming, they exercise in enclosures that are constructed of chain link fencing

7    or steel mesh with a cloth shade screen roof and misting systems. Maximum custody inmates at

8    ASPC-Phoenix, ASPC-Florence, and ASPC-Eyman that are involved in mental health

9    programming are allowed to participate in group recreation enclosures or a recreation field. These

10   enclosures provide the inmates with access to fresh air and sunshine, and allow for

11   communication between inmates in adjoining enclosures. The exercise enclosures at SMU I and

12   Browning consist of concrete walls with a steel mesh ceiling that is open to sky. ADC has

13   recently added 10 additional exercise enclosures for mental health inmates at each of those units.

14   There is a vision window in the door leading into the exercise enclosure. Inmates using the

15   recreation enclosures at some units may request a handball to use during recreation.

16   **Educational Programming for Special Management Units/Death Row Inmates**

17      11.    ADC is prohibited by A.R.S. 31-240 from expending the education services

18   budget monies for education programs dedicated to maximum custody or death row inmates. The

19   exception to this statute are those inmates who meet criteria for special education services.

20      12.    Inmates younger than 21, and who meet special education requirements are

21   permitted to attend education classes regardless of their custody level.

22   **Meals**

23      13.    Inmates in maximum custody cells receive twice-a-day food delivery, which is an

24   amount of food equal to three meals. In the morning, the inmates receive a "mega snack," which

25   provides food for both breakfast and lunch. In the evening, inmates receive a hot dinner.  This

26   diet averages 2600 calories per day, which is the same amount of calories provided in the

27   previous three-times a day food schedule. The twice-a-day feeding schedule provides the same

28   number of total calories that were provided in the previous three-times a-day feeding schedule. It

2717802.1                                                    4

1    is 300 calories less than that afforded to inmates in non-maximum custody cells due to the

2    inmates' restricted movement in maximum custody cells.

3    **24-Hour Lighting**

4        14.    Suicide/mental health watch cells require 24-hour lighting to ensure adequate

5    illumination to obtain a good visual of the inmate on the watch.  This is strictly for the safety of

6    the inmate.  Some maximum custody cells have security lights in the cells that remain on, and

7    some maximum custody cells have security lights in the cells that can be controlled by the inmate

8    or by staff.  These lights are sometimes used to verify the health and welfare of the inmate and are

9    turned on only long enough to obtain a good visual. Older physical plant units do not have

10   security lights that can be controlled by staff in the maximum custody cells.

11   **Property**

12       15.    Inmates in maximum custody cells are permitted to have televisions or radios in

13   their cells unless the privilege has been taken away as a disciplinary sanction.

14

15   I declare under penalty of perjury that the foregoing is true and correct.

16   Executed on _December 24_, 2012.

17

18

19   Greg Fizer

20

21

22

23

24

25

26

27

28

# EXHIBIT 5

1  Arizona Attorney General Thomas C. Horne
   Office of the Attorney General
2  Michael E. Gottfried, Bar No. 010623
   Katherine E. Watanabe, Bar No. 027458
3  Lucy M. Rand, Bar No. 026919
   Ashley B. Zuerlein, Bar No. 029541
4  Assistant Attorney General
   1275 W. Washington Street
5  Phoenix, Arizona 85007-2926
   Telephone: (602) 542-4951
6  Fax: (602) 542-7670
   Michael.Gottfried@azag.gov
7  Katherine.Watanabe@azag.gov
   Lucy.Rand@azag.gov
8  Ashley.Zuerlein@azag.gov

9  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
10 Rachel Love, Bar No. 019881
   Timothy J. Bojanowski, Bar No. 22126
11 Nicholas D. Acedo, Bar No. 021644
   Courtney R. Cloman, Bar No. 023155
12 Ashlee B. Fletcher, Bar No. 028874
   Anne M. Orcutt, Bar No. 029387
13 STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
14 Chandler, Arizona 85226
   Telephone: (480) 420-1600
15 Fax: (480) 420-1696
   dstruck@swlfirm.com
16 kwieneke@swlfirm.com
   rlove@swlfirm.com
17 tbojanowski@swlfirm.com
   nacedo@swlfirm.com
18 ccloman@swlfirm.com
   afletcher@swlfirm.com
19 aorcutt@swlfirm.com
   *Attorneys for Defendants*

20                  UNITED STATES DISTRICT COURT
21                        DISTRICT OF ARIZONA

22 Victor Parsons, *et al.*, on behalf of themselves   NO. 2:12-cv-00601-NVW
   and all others similarly situated; and Arizona
23 Center for Disability Law,
                                 Plaintiffs,
24            v.                                          **DECLARATION OF JEFFERY**
                                                         **STEWART**
25 Charles Ryan, Director, Arizona Department
   of Corrections; and Richard Pratt, Interim
26 Division Director, Division of Health Services,
   Arizona Department of Corrections, in their
27 official capacities,
                                 Defendants.
28

2717636.1

I, **JEFFERY STEWART**, make the following Declaration:

1.　　I am employed by the Arizona Department of Corrections ("ADC") as a Information Technology Specialist. My current position is Network Services Manager, and my responsibilities include Computer Support, Network Support, overseeing technical support for the inmate phone system and other duties as assigned.

2.　　In conjunction with the *Parsons v. Ryan* lawsuit, I was asked to retrieve the recorded non-legal telephone calls made by Inmate Victor Antonio Parsons, ADC# 123589, between April 2008 and November 2012.

3.　　ADC utilizes the Securus Secure Call Platform to capture non-legal telephone calls made by ADC inmates.

4.　　I logged into the Securus Secure system using my unique log in identification number, entered Inmate Parsons' Inmate Pin Number, and performed a search of calls deriving from his telephone account for the requested time period. This search generated a list of calls, which I selected and saved on the Securus Secure Call Platform system.  Once the calls were saved onto the system, I created an ISO image which allowed the files to be copied in a format which was downloadable to my computer so a CD could be produced.  Attached as Exhibit 5-A, is a true and accurate copy of portions of that CD.

5.　　The announcement name at the beginning of each telephone call is "Tony Gabriel." An announcement name is a name an inmate uses to identify himself to the called party.  The Securus Secure Call Platform uses voice biometrics and a PIN system to ensure that only that specific inmate makes calls on that account.

6.　　The Securus Secure system identified the person who placed the telephone calls recorded on Exhibit 5-A as Inmate Parsons.  At the time he made those calls, his announcement name was Tony Gabriel.

7.　　The telephone calls on Exhibit 5-A are dated July 25 and July 26, 2012.

///

///

2717636.1                                                    2

1    I declare under penalty of perjury that the foregoing is true and correct.

2    Executed on _____12-21_____, 2012.

3

4

5                                    Jeffery Stewart

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2717636.1                                    3

# EXHIBIT 5-A

**Exhibit 5-A filed non-electronically**


**[Dkt. ## 314, 315]**

# EXHIBIT 6

Parsons v. Ryan
Shaw, Ben - 10/3/2012

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;    )
Stephen Swartz; Dustin Brislan;  )
Sonia Rodriguez; Christina       )
Verduzco; Jackie Thomas; Jeremy  )
Smith; Robert Gamez; Maryanne    )
Chisholm; Desiree Licci; Joseph  )
Hefner; Joshua Polson; and       )
Charlotte Wells, on behalf of    )
themselves and all others        )
similarly situated; and Arizona  )
Center for Disability Law,       )
                                 )
            Plaintiffs,          )
                                 ) NO.:
v.                               ) CV 12-00601-PHX-NVW(MEA)
                                 )
Charles Ryan, Director, Arizona  )
Department of Corrections; and   )
Richard Pratt, Interim Division  )
Director, Division of Health     )
Services, Arizona Department of  )
Corrections, in their official   )
capacities,                      )
                                 )
            Defendants.          )
                                 )

30(b)(6) DEPOSITION OF BEN L. SHAW, Ph.D.

Phoenix, Arizona
October 3, 2012
9:08 a.m.

Prepared by:
Kate E. Roundy, RPR
Arizona Certified
Reporter Number 50582

Parsons v. Ryan
Shaw, Ben - 10/3/2012

Page 150

1    Special Management Area housed in an enhanced mental

2    health treatment area?

3         A.   No.  They are housed in the regular area.

4         Q.   What is an enhanced mental health treatment area?

5         A.   Well, enhanced mental health area are areas that

6    have been established for inmates which require a couple

7    of additional things from the mental health staff.  One is

8    that inmates in the mental health enhanced area have to be

9    seen outside of their cell.  They cannot be seen cell

10   side.  We established special interview areas so that

11   inmates are given some privacy for that interaction.

12        They are given increased opportunity for

13   socialization and recreation.  In other words, if you

14   recreate and are generally stable, you will recreate with

15   someone else.  If the two of you are generally stable,

16   then you will recreate with two more guys.  So you have an

17   increased level of socialization/recreation depending on

18   the inmate's level of stability.

19        So at the end of that time you are recreating in

20   a group of maybe six or seven.  They can play basketball

21   and do something besides --

22        The recreation areas have been -- have been

23   altered so that they can see the sky.  The caged areas

24   have been sort of taken away so you have more open area

25   for the person to move around in.

Parsons v. Ryan
Shaw, Ben - 10/3/2012

Page 151

1        They have specialized group activities from

2  elected staff.  They have access to a general television

3  where educational programming and some kinds of treatment

4  programs can be shown on the TV so that the inmates in

5  that area can participate while still being in the cell.

6        The Kasson Unit is a unit where there are small

7  areas where inmates are kept usually around six to a cell

8  so that you can begin to utilize that small area as kind

9  of a socialization group.

10       Central are where the less acute inmates are, and

11  those inmates have much more opportunity to come out, to

12  socialize in larger groups.

13       The area at Eyman is beginning to function;

14  although, it's a little bit behind the Florence area.

15  There are a couple of opportunities for inmates who are in

16  that classification to get out of traditional settings.

17  One is we have established an area at Flamenco where

18  inmates who are level 5 can now be treated as an

19  intermediate psychiatric patient.  So they come there.

20  They can come out.  They can watch TV.  They can recreate.

21  They can get group therapy there.

22       Secondly, if they are stable, they can be

23  considered for the -- the term is a walking Ey-Fi

24  (phonetic).  That's not really what it's called, but it's

25  what everybody calls it.  It's really an area where

Parsons v. Ryan
Shaw, Ben - 10/3/2012

Page 152

1   inmates come out, they rec together, they eat together,

2   less time alone.  So that is what the enhancement is.

3       Q.   And at what units do enhanced mental health

4   treatment areas exist?

5       A.   Florence-Kasson, Florence-Central, Browning,

6   SMU-1.

7       Q.   Again, not at Perryville?

8       A.   Not Perryville.

9       Q.   Okay.  What is the total capacity of all the

10  enhanced mental health treatment areas?

11      A.   Around 400.

12      Q.   And what is their current population?

13      A.   Around 400.

14      Q.   And when were they established?

15      A.   We started on those in April of this year.

16      Q.   And what was the impetus to establish the

17  enhanced mental health treatment areas?

18      A.   Well, let me give you a long answer.

19      Q.   Let me ask a different question.

20           Did it have anything to do with this lawsuit?

21      A.   Yes, it does.

22      Q.   Okay.  Now, give me your long answer.

23      A.   Okay.  For the last year and a half the

24  Department of Corrections has made very careful studies of

25  all completed suicides.  FY 11 was a bad year by anybody's

# EXHIBIT 7

Parsons v. Ryan
Sharp, Jeffrey - 10/9/2012

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;          )    No. CV12-00601-
Stephen Swartz; Dustin Brislan;        )    PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree      )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of      )
themselves and all others similarly )
situated; and Arizona Center for       )
Disability Law,                        )
                                       )
          Plaintiffs,                  )
     vs.                               )
                                       )
Charles Ryan, Director, Arizona        )
Department of Corrections; and         )
Richard Pratt, Interim Division        )
Director, Division of Health           )
Services, Arizona Department of        )
Corrections, in their official         )
capacities,                            )
                                       )
          Defendants.                  )
                                       )

DEPOSITION OF JEFFREY ALAN SHARP, MD

October 9, 2012
9:09 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons v. Ryan
Sharp, Jeffrey - 10/9/2012

1      Q.     BY MR. WILKES:  Quickly I just want to go over

2   your background, Dr. Sharp.

3      A.     Sure.

4      Q.     How long have you been a doctor?

5      A.     I graduated from medical school in 1972.

6      Q.     And can you just briefly describe your medical

7   training for me.

8      A.     Sure.  Undergraduate at San Diego State.

9   Marquette University, Medical College of Wisconsin.

10  University of Utah, family practice residency.  All of

11  that through 1975.

12     Q.     And can you just give me a thumbnail sketch of

13  your job history after medical school, your medical job

14  history?

15     A.     Sure.  Residency is a job.  They don't pay you

16  much, but that's a job.  So '72 to '75, I was a family

17  practice resident at the University of Utah.

18            And then from '75 to '91, I was a family

19  practice physician in a small town called Page, Arizona.

20            And then from 1991 to 2003, I was a

21  physician for the Department of Corrections at the site

22  located in Winslow, Arizona.

23            And 2004 through February of 2012, I worked

24  at the Eyman and Florence Complexes in Florence, Arizona,

25  as a prison physician.

Parsons v. Ryan
Sharp, Jeffrey - 10/9/2012

1      Q.    Are you aware of instances where the medical

2   staff is not able to respond to Health Needs Request

3   forms in a timely manner?

4              MS. WIENEKE:  Form.

5              THE WITNESS:  Can you be more specific.

6      Q.    BY MR. WILKES:  Are you aware of any backlogs

7   with the medical staff in being able to review and triage

8   them?

9              MS. WIENEKE:  Form.

10             THE WITNESS:  Yes.

11     Q.    BY MR. WILKES:  And based on your experience,

12  what's your understanding of why there's a backlog with

13  the HNRs?

14             MS. WIENEKE:  Form and foundation.

15             THE WITNESS:  Manpower.  Manpower to deal

16  with it versus volume of HNRs.

17     Q.    BY MR. WILKES:  And so is it fair to say that

18  there's a staffing issue or concern that would prohibit

19  all of the HNRs to be able to be reviewed in a timely

20  manner?

21             MS. WIENEKE:  Form and foundation.

22             MR. HOCHULI:  Form.  Join.

23             THE WITNESS:  Yes.

24     Q.    BY MR. WILKES:  How long is it supposed to take

25  from receipt of an HNR to the time it's reviewed and

Parsons v. Ryan
Sharp, Jeffrey - 10/9/2012

Page 50

1              MS. WIENEKE:  Form and foundation.

2              THE WITNESS:  Well, I'm going to remember

3      that there's a -- I'll probably clarify what kind of

4      concern it is.

5        Q.    BY MR. WILKES:  That's great.  That would be

6      perfect.  I appreciate that.

7              So with regard to the question that we've

8      been discussing, though, how long you had the concern

9      regarding access to medication, how long have you had

10     that concern?

11             MS. WIENEKE:  Form.

12             THE WITNESS:  Well, to some degree, I was

13     worried about access to appropriate medication during my

14     tenure with ADOC, and I think that escalated to some

15     degree over time.  I would say my concern being worry

16     about adequacy has escalated with -- under Wexford.

17       Q.    BY MR. WILKES:  Let's discuss your medical

18     staffing concern in a little more detail.

19       A.    Okay.

20       Q.    In your view, are there currently enough

21     medical staff to provide adequate care to prisoners?

22             MS. WIENEKE:  Form and foundation.

23             THE WITNESS:  Currently?

24       Q.    BY MR. WILKES:  Currently.

25       A.    Today?  All I can talk about is where I work.

Parsons v. Ryan
Sharp, Jeffrey - 10/9/2012

Page 51

1    And I would say no, it's not adequate.

2         Q.    And are all the medical staff positions filled

3    where you work?

4                   MS. WIENEKE:  Form.

5                   THE WITNESS:  No.

6         Q.    BY MR. WILKES:  Do you know what positions are

7    not filled?

8         A.    Not exactly.

9         Q.    And within the past five years at the

10   facilities that you've worked at -- which would have been

11   Eyman and Florence, correct?

12        A.    Right.

13        Q.    Did you have this same concern over medical

14   staffing?

15                  MS. WIENEKE:  Form.

16                  THE WITNESS:  Yes.  At times in my tenure

17   with ADOC, it's been much worse than it is now.

18        Q.    BY MR. WILKES:  And by much worse, you mean

19   having even less positions filled than are currently

20   filled?

21        A.    Right.

22                  MS. WIENEKE:  Hold on.  Form and foundation.

23                  THE WITNESS:  Excuse me.

24        Q.    BY MR. WILKES:  And what kind of problems does

25   not having proper staffing create?

Parsons v. Ryan
Sharp, Jeffrey - 10/9/2012

Page 53

1       Q.      BY MR. WILKES:  And is it fair to say that that

2    can create a delay in the medical care that's received by

3    the prisoners?

4                       MS. WIENEKE:  Foundation.

5                       THE WITNESS:  Well, yes.

6       Q.      BY MR. WILKES:  And that delay can create a

7    serious medical risk in some instances?

8                       MS. WIENEKE:  Foundation.

9                       THE WITNESS:  Yes.

10      Q.      BY MR. WILKES:  Do you know how long the delay

11   is for a prisoner patient to see a doctor currently?

12      A.      No.

13      Q.      But it's fair to say there's a backlog in

14   getting patients in to see a doctor?

15                      MR. HOCHULI:  Where?

16                      MS. WIENEKE:  Form and foundation.

17      Q.      BY MR. WILKES:  At your facility.

18                      MS. WIENEKE:  Same objection.

19                      THE WITNESS:  I think it depends on what the

20   complaint is.

21      Q.      BY MR. WILKES:  Are there backlogs in certain

22   type of -- I'm not sure I understand --

23      A.      The nurse can triage the HNRs.  So if somebody

24   wants a new special needs order for a lower bunk and

25   another inmate is telling that they're having chest

Parsons v. Ryan
Sharp, Jeffrey - 10/9/2012

Page 54

1    pains, well, the one that's having chest pains is going

2    to get scheduled to be seen before the one that wants the

3    chrono for the lower bunk, I hope.  But again, I'm not in

4    charge of that.  But that would be common sense for a

5    nurse.

6         Q.    Have you seen backlogs in seeing patients with

7    chronic care issues?

8         A.    Yes.

9         Q.    And how long are those backlogs?

10              MS. WIENEKE:  Foundation.

11              MR. HOCHULI:  Again, are we talking about

12   now at his facility?

13              MR. WILKES:  Yes.

14              MR. HOCHULI:  Thank you.

15              THE WITNESS:  There are backlogs presently,

16   and there have been backlogs during my tenure with ADOC.

17        Q.    BY MR. WILKES:  And how long are those backlogs

18   currently?

19              MS. WIENEKE:  Form.

20              THE WITNESS:  I really don't know.

21        Q.    BY MR. WILKES:  Have you ever had backlogs when

22   you tried to order an x-ray and you're waiting for the

23   radiologist to review that x-ray?

24        A.    Yes.

25        Q.    And how long in your experience have you had to