**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> vs. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | ) ) ) No.  **CV 12-00601-PHX-NVW** ) ) ) **Phoenix, Arizona** ) **November 30, 2012** )      **2:00 p.m.** ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

_____

BEFORE:  **THE HONORABLE NEIL V. WAKE**
UNITED STATES DISTRICT JUDGE

(_**Scheduling Conference**_)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

APPEARANCES:

For the Plaintiffs:

       ACLU - Washington DC
       By:  **David Cyrus Fathi, Esq.**
       915 15th Street NW
       7th Floor
       Washington, DC 20005

       PRISON LAW OFFICE
       By:  **Donald Specter, Esq.**
       1917 5th Street
       Berkeley, CA 94710

       ARIZONA CENTER FOR DISABILITY LAW - PHOENIX
       By:  **Jennifer A. Alewelt, Esq.**
       5025 E. Washington Street
       Suite 202
       Phoenix, AZ 85034

For the Defendants:

       STRUCK WIENEKE & LOVE, PLLC
       By:  **Daniel P. Struck, Esq.**
       By:  **Timothy J. Bojanowski, Esq.**
       3100 W. Ray Road
       Suite 300
       Chandler, AZ 85226

       OFFICE OF THE ARIZONA ATTORNEY GENERAL
       By:  **Michael E. Gottfried, Esq.**
       1275 W. Washington Street
       Phoenix, AZ 85007-2926

1              P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Civil Case 2012-601, Victor

3   Antonio Parsons, et al., versus Charles L. Ryan, et al.  This

4   is the time set for discovery management conference.

5              Counsel, please announce for the record.

6              MR. FATHI:  David Fathi of the ACLU National Prison

7   Project for the prisoner plaintiffs.

8              MR. SPECTER:  Donald Specter for Prison Law Office for

9   the prisoner plaintiffs.

10             MS. ALEWELT:  Jennifer Alewelt for the Arizona Center

11   for Disability Law.

12             MR. STRUCK:  Daniel Struck, from Struck, Wieneke &

13   Love for the defendants.

14             MR. GOTTFRIED:  Michael Gottfried from the Attorney

15   General's Office.

16             MR. BOJANOWSKI:  Tim Bojanowski for the defendants.

17             THE COURT:  Good afternoon, counsel.

18             I first wanted to address this discovery dispute about

19   the privilege logs, and then I want to address the two matters

20   I also have set for today of the question of imposition of

21   sanctions on defendants on that matter and on the Hamm

22   subpoena.

23             Then I want to address more broadly the status of

24   problems in discovery in this case.  And I have received the

25   plaintiffs' memorandum filed today and some possible courses of

November 30, 2012 - Discovery Management Conference

1    action to bring those problems to an immediate end.

2            First, with respect to the -- this is Docket Number

3    252, the discovery dispute concerning the privilege log, I have

4    looked at the materials.  I don't know that I need discussion,

5    but if there's anything either counsel would like to say on the

6    merits of that, you may proceed.

7            MR. STRUCK:  Thank you, Your Honor.

8            With respect to the privilege log, the primary issue

9    is this:  There are several third party organizations out

10   there, American Friends Service Committee, Middle Ground.

11   These organizations are sending correspondence to plaintiffs

12   and correspondence is going back.  We don't know from the

13   privilege log how many -- how much correspondence we're even

14   talking about.  We don't know if there's just a little bit or a

15   lot.

16           We also don't know -- don't have enough information

17   with respect to the privilege log that was provided, the

18   general privilege log, as to whether or not there truly is a

19   work product privilege that is at play here.

20           So the purpose behind the dispute, or the one-pager

21   that we had sent you, was to try and get the plaintiffs to

22   articulate more clearly, specifically with those third party

23   entities, again, plaintiffs have never said that there's too

24   many -- too much correspondence with respect to those entities.

25   They only have cited to issues with respect to the problems in

1    figuring out how many letters family members had sent in,

2    because apparently, they had filed them with the putative

3    plaintiffs' file so we would have to go through and look for

4    it.  But they have never said anything with respect to --

5          THE COURT:  Tell me what it is you are trying to get

6    and what's the anticipated practical value of it.

7          MR. STRUCK:  Well, one of the things we're trying to

8    get is information with respect to the underlying claims that

9    the plaintiffs are making.  For example, in this case there

10   have been, I think, 13 or 14 depositions have been taken.

11   Despite the fact that we sent requests for production asking

12   for this type of information, information will pop up in the

13   deposition that we had never seen before, for example.

14         THE COURT:  Well, I don't want -- I want to hear what

15   you have to say.

16         MR. STRUCK:  Sure.

17         THE COURT:  I'd like you to connect this to categories

18   of documents about which the privilege logs are inadequate, and

19   I want to know where the beef is.  What is the practical

20   benefit you are anticipating and just abstract answers do not

21   help me.

22         MR. STRUCK:  I'm sorry, Your Honor.  I'm trying not to

23   give you an abstract answer.

24         The benefit would be, Your Honor, that we think there

25   are -- there's documentation that has been sent by these groups

1    to the plaintiffs.

2              THE COURT:  What groups?

3              MR. STRUCK:  Middle ground, American Friends Service

4    Committee, Amnesty International, there were a couple more that

5    were identified generally.

6              We think that there is information that we would be

7    able to obtain --

8              THE COURT:  This is communication from these groups to

9    whom?

10             MR. STRUCK:  To the plaintiffs' counsel.

11             THE COURT:  All right.  Go ahead.

12             MR. STRUCK:  Which we don't think is covered under the

13   work product privilege.

14             THE COURT:  How does it come within the basic criteria

15   of the rules of discovery that is reasonably calculated to lead

16   to the discovery of admissible evidence?

17             MR. STRUCK:  Because this is information that the

18   plaintiffs have identified with respect to communications they

19   have received regarding the health care or allegations of

20   inadequate health care within the Arizona Department of

21   Corrections.

22             And an example I can give you is a document that came

23   up in a couple of depositions.  It was a document that had

24   actually been prepared by Wexford, the third party contract

25   medical provider.  We hadn't had an opportunity to see it

_November 30, 2012 - Discovery Management Conference_

1    before.  But it was a document in which there were Wexford was

2    alerting inmates with respect to how they intended medications

3    to be distributed.  On the document was a Middle Ground stamp.

4    So clearly, the plaintiffs obtained that document from Middle

5    Ground.

6         We believe that a lot of information that some of the

7    allegations the plaintiffs are making are being funneled to

8    them through these groups.  And we would like an opportunity --

9    we're having a difficult time with respect to learning exactly

10   what the plaintiffs -- the factual basis for the plaintiffs

11   claims are in this case.  And that would be one way in which we

12   could -- it could help us obtain information by getting -- by

13   finding out, first of all, what is even there, because we can't

14   tell from that general privilege log.  But if it was laid out

15   that, yes, we received these communications transmitting this

16   information from Middle Ground or from Amnesty International or

17   from American Friends Service Committee, then we could say we

18   don't believe there's a work product privilege here.  Please

19   provide us with those documents.

20        That's the purpose behind the privilege log.  We don't

21   think that at this point, because we don't even know, frankly,

22   we would assume that these people have sent correspondence to

23   them, but based on the general nature of the privilege log that

24   was provided, we don't even know if it was just letters that

25   plaintiffs' counsel sent or if it was letters that were sent

November 30, 2012 - Discovery Management Conference

1    from Middle Ground.  We think that it was based upon --

2            THE COURT:  Is that all you are seeking?

3            MR. STRUCK:  That's it, Your Honor.

4            THE COURT:  And what about communications from family

5    and communications from counsel to class members and

6    plaintiffs?

7            MR. STRUCK:  We are not seeking information with

8    respect to communications from counsel to potential putative

9    class members.  We're not seeking that.  We're trying to make

10   that clear, or communications from the putative class members

11   to the attorneys.  We were trying to seek the information with

12   respect to family members, because we don't believe that

13   there's privilege, the attorney/client privilege.

14           THE COURT:  So what information again --

15           MR. STRUCK:  So but we understand the plaintiffs'

16   argument with respect to the difficulties in weeding out that

17   information, so we're willing to restrict our inquiry with

18   respect to those third party entities.

19           THE COURT:  Well, Mr. Struck, they are suing you.

20   They have to tell you what they are suing you for.  If they

21   don't tell you what they are suing you for, they are out.  So

22   why do you have to get discovery about wide ranging inquiries

23   presented to, I guess, ACLU as a public office law firm and

24   other firms doing some kind of -- why do they have to disclose

25   public complaints received by them as part of the mission they

1  have undertaken for themselves as opposed to them telling you

2  what they are suing you for and then that defines the playing

3  ground?

4          MR. STRUCK:  Your Honor, and I agree.  But the problem

5  that we're having is having them actually tell us -- we can

6  read the complaint, and much of the discovery responses we're

7  getting back from them is, "see complaint."  But we're entitled

8  to know, Your Honor, what the underlying factual basis for the

9  allegations are so we can counter it.

10          THE COURT:  Sounds like what you are asking for is a

11  wide range of complaints they have received from which you

12  would like to infer what you are being sued for.  It doesn't

13  seem to me like they can get away without telling you what they

14  are suing you for nor do you have a right to troll through all

15  kinds of public communications they get from which they pick

16  and choose the lawsuits they want to file.

17          MR. STRUCK:  Well, some of the things that we

18  believe -- some of what we believe is happening is that

19  information in addition to just complaints, but documentation

20  is also being transmitted from these groups to the plaintiffs

21  and we don't believe that's protected by work product.  And we

22  would like to see that documentation, Your Honor.  We would

23  like to know what we're facing with respect to this.

24          And I agree they should be telling us but I'm just

25  telling the Court we're having a hard time getting the factual

1    basis behind the allegations in the complaint, a very difficult

2    time.

3            THE COURT:  All right.  Who wants to respond to that?

4            MR. FATHI:  Your Honor, the Court asked how this even

5    meets the threshold requirement for discoverable information,

6    and the Court is correct.  This is not attempt to discover

7    facts that are relevant to this case.  This is an attempt to

8    discover our work product and to force us to spend time and

9    money logging hundreds if not thousands of privilege and work

10   product communications.

11           There is generally no obligation to prepare a

12   privilege log at all for communications and work product that

13   were generated or received after the filing of the case.

14   Nevertheless, we have provided them with a detailed privilege

15   log with regard to third party organizations like Middle

16   Ground, like Amnesty International, identifies not only the

17   organization but the specific individuals with whom those

18   communications took place and describes them.  For example,

19   this is American Friends Service Committee:  "Correspondence

20   prepared in anticipation of litigation and for trial regarding

21   investigation of conditions of confinement in ADC isolation

22   units and reflecting mental impressions, legal theories, and

23   conclusions of plaintiffs' counsel."

24           Now, that is more than enough for them to challenge

25   the applicability of the work product protection if they choose

—— November 30, 2012 - Discovery Management Conference ——

1    to do so.  They have not chosen to do so.  We have explained

2    that the burden of logging individual communications would

3    simply be overwhelming in light of the volume, and there is no

4    requirement that an item by item privilege log be maintained.

5    And the advisory committee note to the rule itself says that an

6    item by item log may be necessary if only a few items are at

7    stake.  But otherwise, a categorical privilege log is

8    acceptable.

9           With response to the Wexford document that was

10   allegedly received from Donna Hamm, that document was on ADC

11   letterhead.  Defendants should not have been surprised to see

12   that document.  And documents of that nature, if it's simply a

13   document that's been transmitted, that's not something that we

14   are asserting any kind of protection over.  We have produced

15   those documents.  But if it is relaying a specific

16   communication from a family member, from a putative class

17   member, from one of these advocacy organizations made to us

18   with the expectation that it will remain confidential, that is

19   what we are claiming the privilege and the work product

20   protection for.

21          And again, under the government law, a categorical

22   privilege log that we provided is more than adequate.

23          THE COURT:  Any last word, Mr. Struck?

24          MR. STRUCK:  Yes, Your Honor.  We still don't know how

25   many -- how much correspondence we're talking about here.  The

November 30, 2012 - Discovery Management Conference

1    plaintiffs in their papers never said how much correspondence

2    between these third party groups and they are in existence.  So

3    we don't know if it's overly burdensome.  Clearly under Rule

4    26, we are entitled to a privilege log in the cases we cited.

5    The cases the plaintiff cited talk about -- one of them was a

6    situation involving millions of documents and 20 law firms.

7    Another one was a situation involving communications between --

8    a multitude of communications between the client and the

9    attorney.  We're not talking about that.  There's no case that

10   they can cite to that says we're not entitled to a privilege

11   log with respect to this type of information.

12        And we still don't know how many letters were sent by

13   these groups to the plaintiffs which clearly isn't protected by

14   work product.  We're not interested in their mental impressions

15   or work product.  We're interested in the flow of information

16   the other direction.

17        THE COURT:  All right.  As to Discovery Dispute,

18   Number 252, the Court is satisfied that the privilege log that

19   has been given is more than sufficient.  And therefore treating

20   it as a Motion to Compel Discovery by the plaintiffs, Document

21   Number 252 is denied.

22        Frankly, this whole enterprise strikes me as very

23   attenuated that, as I suggested before, is the burden of the

24   plaintiffs to identify the basis of their lawsuit.  And if they

25   don't, the consequences will fall on them.  But this general

1  discovery about wide ranging communications that may or may not

2  bear in this lawsuit is a perfect example of the highly

3  attenuated burden of discovery that the Court is charged with

4  balancing against the burden on the parties, the importance to

5  the case, and which counsel and the parties are charged with

6  taking account of as well in managing discovery.

7         Now, the Court is disposed to assess attorney's fees

8  against defendants for this matter on the grounds of the

9  position that the defendant has taken is not substantially

10 justified under the rules.

11        You have a chance to respond.  So Mr. Struck, your

12 response.

13        MR. STRUCK:  Your Honor, we do believe our position

14 was substantially justified, primarily in light of the fact

15 that we still don't even know how much correspondence we're

16 talking about.  We do think that that information contains

17 relevant information with respect to the plaintiffs' claims.

18 We do believe that much of what the plaintiffs are alleging in

19 this lawsuit comes from the information that they are getting

20 from these third party groups.

21        We're having an extremely difficult time obtaining the

22 information from the plaintiffs with our own requests for

23 production and interrogatories.  In fact, we just sent -- we

24 just received responses from the plaintiffs two weeks ago to, I

25 believe, 122 requests for production with no documents attached

1    at all.

2         It's like pulling teeth trying to get any information

3    from plaintiffs.  And so we believe that we were substantially

4    justified in asking for that documentation so we could

5    establish whether or not there truly was a privilege and seek

6    that information.

7         THE COURT:  All right.  Mr. Fathi.  I will hear you as

8    to the adequacy of your privilege log.

9         MR. FATHI:  Thank you, Your Honor.

10        The defendant's position was not substantially

11   justified.  As I pointed out earlier, the advisory committee

12   note itself says, and I quote, "A document-by-document log may

13   be, quote, 'appropriate' if only a few items are withheld but

14   may be unduly burdensome when voluminous documents are claimed

15   to be privileged or protected, particularly if items can be

16   described by categories," end of quote.

17        And there's an aggravating factor here, Your Honor, in

18   the course of submitting the discovery disputes, defendants

19   sent us their half of the one-pager.  We sent them theirs.

20   They then changed their half and filed the one-pager with the

21   Court without notifying us.

22        When we saw this change, we asked the defendants to

23   please withdraw the one-pager.  They refused.  We eventually

24   received -- we sought and received the Court's permission to

25   file a supplemental statement to address the modifications that

1    had been withheld from us.  And this has certainly contributed

2    to the amount of time and expense incurred by the plaintiffs in

3    this matter.

4         Thank you.

5         THE COURT:  All right.  The Court finds that the

6    defendants' position is not substantially justified as to the

7    privilege log and will assess the defendants' attorney's fees

8    incurred in the matter.

9         Before I get to the mechanics of dealing with that I

10   would also like to address the issue about the Hamm subpoena.

11   Is Ms. Hamm here or anyone here on her behalf?

12        Oh.  Mr. Hamm.

13        MR. HAMM:  Yes, Your Honor.  I'm here on behalf of

14   Middle Ground and on behalf of my wife.  My wife is visiting in

15   the prison and is unavailable right now.

16        THE COURT:  Mr. Hamm, I don't want to be indelicate,

17   but I don't think it's a good idea for you to be speaking in

18   court.  I'm going to take a risk and ask you a simple question:

19   Does she intend to seek any real concrete, provable expenses on

20   this subpoena?

21        MR. HAMM:  No, Your Honor.  We believe what we have

22   already filed demonstrates the burden we have had to go through

23   but we're not asking for any financial compensation.

24        THE COURT:  Very well then.  If no financial

25   compensation is being sought on that, that moots the point.

1    Therefore, the Court's order, Document Number 268, setting this

2    for hearing as to whether sanctions should be awarded for the

3    defendant pursuant to that subpoena is denied as moot.

4            Now, with respect to the award I have just made,

5    counsel, I'm going to direct you -- I want the plaintiff to

6    substantiate and communicate to the other side the amount they

7    are claiming promptly with a fair chance for them to respond,

8    and then I want you all to dialogue promptly as to whether you

9    can agree on the amount.  And if not, then I want the fee

10   request submitted with the defendant's objection at the same

11   time.  So I'm, in effect, requiring prompt action and requiring

12   some dialogue.  And if you have a disagreement, present it to

13   me.

14           So with that, Mr. Fathi, how much time -- and I don't

15   think this should take much time at all, because I'm not

16   anticipating this would be much attorney's fees.  How much time

17   do you think you need?

18           MR. FATHI:  Would one week be acceptable, Your Honor?

19           THE COURT:  That would be fine with me.  So Mr.

20   Struck, how much time to continue that process that I have

21   outlined?

22           MR. STRUCK:  Your Honor, we would like it -- if it's

23   next Friday, we would like an additional week to dialogue with

24   the plaintiff.

25           THE COURT:  All right.  It is ordered that the

1  plaintiffs submit their proof and quantification of attorney's

2  fees on the matter awarded by December 6th, and that the -- if

3  the parties are not able to agree upon a quantification of

4  payment they are to submit both the plaintiffs' quantification

5  and the defendants' objection by December 13.

6          Now, counsel, I'm not sure where to start.  I have

7  been observing in this case a breakdown of both the culture of

8  this district and of the spirit of the discovery rules and I

9  have ruled promptly in all of your disputes.  And the plaintiff

10  has burdened me with disputes that did not merit my attention

11  as well that should have been worked out.  And I had hoped that

12  after a little shake me out time everyone would calm down and

13  begin to process this case in the manner that the rules require

14  and that the culture of this court requires, but it has not

15  happened.

16          So I will tell you, I'm thinking about a number of

17  things.  As you know, this is a prisoner case which under the

18  practice of our court, the district court almost always refers

19  them to processing by a magistrate judge with the opportunity,

20  of course, to take all the rulings back to a district judge.

21          I have not done this in this case because of the

22  magnitude of the case, and because the Court is going to

23  conclude this case within the three years that Congress has set

24  out under the Civil Justice Reform Act for the conclusion of

25  civil cases.  And I thought that I could do this more speedily

1    than a magistrate judge.

2         I see the plaintiff has suggested that the Court order

3    some regular scheduled mandatory meetings for counsel to

4    address their, what is feared to be, similar extensive

5    recurring discovery disputes.  And in a minute, I will ask you

6    all what you think of that.

7         I have had another thought.  When the parties and the

8    lawyers cannot communicate and cannot get along with discovery,

9    another device available to the Court is that I would appoint a

10   discovery master, requiring you both to pay one-half of the

11   cost of the discovery master.  And the discovery master can

12   have meetings as often as the master thinks appropriate.  It

13   might be once a week, twice a month, whatever.  And the

14   discovery master can do a few things:  Help you to communicate

15   when you cannot communicate with each other; can provide some

16   perspective of reasonableness; and then can make rulings all

17   subject to immediately bringing them back to this Court for me

18   to review directly and promptly.

19        And, of course, if it comes to that the discovery

20   master would be entrusted to make judgments about the

21   reasonableness of positions taken on both sides and to shift

22   accordingly the cost of disputes.

23        That -- I have never done that.  I have the authority

24   to do that.  I have never had to do that in a case.  I'm ready

25   to do it in this case unless something better is devised right

 1  now.  Of course, if I have to do that both sides are going to

 2  have to come up promptly with the substantial monies to pay a

 3  discovery master who will be attending to your matters

 4  immediately and addressing them immediately.

 5       And the last part of my preliminary comment is the

 6  discovery rules and the responsibility of the Court require

 7  reasonableness and practicality from all sides.  That's a

 8  matter of judgment and context, and if you all are not able to

 9  accomplish that then we will impose it on you in a more costly

10  way than through your own judgment and cooperation.

11       And if it results in recurring costly disputes, my

12  objective will be to allow no delay and to allow no cost to be

13  imposed on the other side for unreasonable disputes.  So I will

14  be looking for full compensation to whoever takes an

15  unreasonable position in discovery disputes.

16       And the final thought, which you all know, is that

17  these discovery disputes are not as difficult as sometimes

18  people would like to think.  And it's real simple, because you

19  just look at your side of this dispute, and then you put on the

20  other side's hat.  And you know 99 percent of the time what is

21  an appropriate, necessary, and reasonable discovery demand.  It

22  is not hard to sit in the other chair.  I sit in both chairs

23  and most of these are not hard for me.  And if you cannot

24  figure it out, I will.  But I have not had this problem with

25  this magnitude in other cases.

1          Counsel, I have about 210 pending civil cases at any

2     point in time.  I get about 380 a year.  And your lawsuit has

3     imposed more discovery disputes on me than the other 200

4     combined in the last six months.  So we need to bring this to

5     an end.  You all need to discover a different way of dealing

6     with this and processing it.

7          Now, I thank you for your patience in listening to my

8     speech.  I want to address the two things that I -- one the

9     table that the plaintiffs put on the table this idea of me

10    requiring regular scheduled management meetings from counsel.

11    I put on the table the appointment of special master, and I

12    suppose there could be a third possibility.  So I invite you

13    all to comment on the first, second, or some other third

14    possibility that you may think is a better way to change the

15    culture in which this discovery has been handled.

16          Mr. Fathi, you may.

17          MR. SPECTER:  Your Honor, as you know, we're not from

18    Arizona.  Would you mind giving us two minutes to consult with

19    our local counsel?

20          THE COURT:  I have got a better idea.  I'm going to

21    take a break to give you an opportunity to do that without

22    hyperventilating because I'm watching you talk.

23          I have another matter at 3:30, so I would like to have

24    this resolved by 3:30.  Let's take a 10-minute recess so you

25    all can confer.

November 30, 2012 - Discovery Management Conference

1          (Recess from 2:38 p.m. until 2:52 p.m.)

2          THE COURT:  Mr. Fathi.

3          MR. FATHI:  I will defer to Mr. Specter, Your Honor.

4          THE COURT:  All right.

5          MR. SPECTER:  Thank you, Your Honor.

6          THE COURT:  And speak into microphone.

7          MR. SPECTER:  Can you hear me now?

8          THE COURT:  Yes.

9          MR. SPECTER:  Thank you.

10          First of all, I would like to say we understand the

11  message that you are sending today and that we will try our

12  best to act accordingly.  In terms of your suggestions, we have

13  the following recommendation, which is that the party -- it's

14  similar to the one in our brief with an addition:  The parties

15  be ordered to meet and confer every -- or schedule a

16  meet-and-confer every two weeks.  The parties would be ordered

17  to have somebody with authority to make decisions at those

18  meet-and-confers.  If the conference is not necessary because

19  there are no agenda items then it can always be cancelled.

20          And the second part of our recommendation is that the

21  court schedule a status conference similar to the one that

22  we're having right now quarterly, because I think the

23  scheduling of the conference itself has a way of narrowing

24  disputes, if you know what I mean.

25          THE COURT:  So your proposal is willing to leave it

1  unstated in who the person or officer needs to be with

2  authority?

3          MR. SPECTER:  Yes.  It just has to be somebody who the

4  defendants designates to be able to make decisions at that time

5  about these discovery disputes.

6          THE COURT:  And the discovery disputes, there has to

7  have been explicit notice ahead of time so they know what they

8  are coming to talk about and what --

9          MR. SPECTER:  Right.  We have talked about a 48-hour

10  notice requirement.

11          THE COURT:  All right.

12          MR. SPECTER:  And in terms of the other two proposals

13  that the Court made, do you want to hear our reasoning?

14          THE COURT:  Go ahead.

15          MR. SPECTER:  In terms of the discovery referee, the

16  main concern is cost.  As you know, it's a pro bono case for

17  all of us and contingent as well, so we're -- from what I

18  understand from my colleagues, it can really run into a fair

19  amount of money.  And we thought the magistrate idea, we

20  rejected that because it adds another layer onto an already

21  complex process that would interfere with getting the case

22  moving in the time frame that you have talked about in the

23  past.

24          THE COURT:  All right.  Mr. Struck.

25          MR. STRUCK:  Thank you, Your Honor.

1        First of all, I wanted to apologize to the Court.  I

2   never had to be taken to the woodshed in 25 years of practice.

3   I practice all over the country.  I have never had a case with

4   these kind of problems.  And we are embarrassed, and we do not

5   want this to continue but we want to be able to defend our

6   client.  And we are -- have been frustrated by issues that have

7   brought us to where we are today.

8        One thing that is clear, this hearing has done more

9   for us being able to get information and get agreement than

10  anything else in the last 12 hours.  We have been asking for

11  releases for months.  We finally, I think, we're going to be

12  able to get releases for the named plaintiffs.

13       And we have been asking for a limitation on some of

14  the requests for production which we believed were burdensome.

15  Last night about an hour before that pleading was filed, we got

16  a letter where they were withdrawing some of that.  So -- and I

17  understand that there's blame that goes around to both sides.

18  But we are concerned about being able to effectively defend our

19  client going on with things the way they are.

20       We would recommend that the Court appoint a magistrate

21  judge to be a -- somebody who can deal with discovery disputes

22  so we don't have to bother Your Honor with them.

23       THE COURT:  You know, Mr. Struck, I'm sorry, I don't

24  want you to lose anything you want to say.

25       It is accepting failure to find someone to deal with

1    an unreasonable number of discovery disputes.  The objective is

2    for counsel.  And I understand this isn't just counsel.  This

3    is the parties as well -- need to change some attitudes.  So

4    just having all of the -- this volume of disputes of

5    significant number which have not been justified go to someone

6    else is not success.  It's failure.

7          MR. STRUCK:  And I understand the Court's position on

8    that.  And the only reason why I even suggested it is because

9    it is something that's done in Arizona as in jurisdictions

10   throughout the country.  I think that the parties would,

11   knowing full well that the magistrate judge has just as much

12   ability to sanction the parties for a frivolous stand on an

13   issue than you do, that that would be an incentive for the

14   parties to work together to prevent us from having to go to the

15   magistrate judge.  But I believe that most of these issues a

16   magistrate judge can deal with telephonically within a matter

17   of minutes.  If the magistrate judge believes that one side is

18   being frivolous --

19         THE COURT:  You know, Mr. Struck, what I'm seeing in

20   this case is both sides playing hardball.  I don't want any

21   more hardball.  I want reasonableness.  Nobody has to cave in.

22   If there are, you know, borderline disputes where there's fair

23   things to be said on both sides, that's what we're here for.

24   But I am seeing hardball being played on both sides, and I want

25   the hardball brought to an end, and I want to you all to

1   process this case the way regular lawsuits are processed.

2        MR. STRUCK:  Well, Your Honor, I agree with you.

3   Hardball, to the extent the Court thinks is going on, should

4   stop.  And we have no intention of being anything other than

5   reasonable throughout the discovery on this case.

6        We believe that -- I think the current practice, Your

7   Honor, is that we have agreed within two days to have a

8   meet-and-confer, which we have had, I believe, seven of them

9   over the last two and-a-half months.  And so I don't believe

10  that scheduling one every other week is really necessary,

11  because I think that that's something we have been able to

12  accomplish without having to do that.

13       Personally, I think --

14       THE COURT:  Who, in fact, has been coming to these

15  meet-and-confers?  Who are the people with authority who

16  historically have been showing up?

17       MR. STRUCK:  Well --

18       THE COURT:  The reason I'm asking is I want to have a

19  sense of the level of authority of who is coming to them.

20       MR. STRUCK:  I have been to two meet-and-confers.  I

21  have been, for the better part of the last two months, in one

22  trial or another.  But if I'm not there, then Kathleen Wieneke

23  is there or Tim Bojanowski is there, all of them having

24  authority.

25       THE COURT:  How many client representatives?

1      MR. STRUCK:  And we do -- I believe that our -- the

2  ADC general counsel has, I believe, been at -- she's been at a

3  couple of them.

4      But if we can get sufficient notice ahead of time in

5  sufficient detail, then perhaps that's something we can address

6  with our clients before we have the meet-and-confer.

7      So I think we can continue having meet-and-confers.  I

8  think having a scheduled meet-and-confer is a failure.  We can

9  all get along and agree to schedule one within 48 hours of an

10  issue arising, as we have been doing, with the knowledge of the

11  fact that if we can't agree on something I don't think either

12  side wants to come to you with a discovery dispute unless it's

13  a really good one.

14      So my preference, Your Honor, would be to continue

15  with both sides trying to work reasonably with each other to

16  resolve any of these discovery disputes and then let's see

17  where it goes.  We're not interested in having a special

18  master.  That isn't something I think is necessary.  The cost

19  of defending this case is already extremely high.  So we would,

20  definitely knowing that there's the specter of a discovery

21  master out there, will, I think, give everybody an incentive to

22  be reasonable with these kinds of disputes.  So we would prefer

23  that we just go along with dealing with --

24      THE COURT:  So what's the practice -- what has been

25  the practice so far with respect to how quickly you actually

───── **November 30, 2012 - Discovery Management Conference** ─────

```
1    get a meet and confer schedule from the time someone requests
2    it?
3              MR. STRUCK:  Initially, I think it was a little bit
4    longer and then we agreed to do them within 48 hours.  There
5    have been at least one occasion where we declined to have a
6    meet and confer on something we had met and conferred on two
7    times before.  We didn't see the utility of, again, talking for
8    an hour and not agreeing on something.  But for the most part
9    we have, within 48 hours or thereabouts, depending on the
10   schedules of the attorneys, have been able to get these
11   meet-and-confers scheduled.  Like I said, we have had seven of
12   them.
13             THE COURT:  All right.  Thank you.  You can respond if
14   you want.
15             MR. SPECTER:  I just wanted to say Mr. Struck's and
16   our perception of the ease with which these things have been
17   able to be scheduled is very different.  So we would
18   appreciate -- it doesn't seem like it costs anything to
19   schedule them regularly.
20             THE COURT:  So Mr. Specter, are you in Berkeley?
21   Where are you, Mr. Fathi?
22             MR. FATHI:  It's "Fathi" Your Honor.  And I'm in
23   Washington DC.
24             THE COURT:  I'm sorry.  How do you pronounce your name
25   again?
```

1          MR. FATHI:  "Fathi," Your Honor.

2          THE COURT:  Fathi.  I charge everyone with correcting

3     me immediately any time I mispronounce anyone's name, whether

4     or not it's your name.  I'm embarrassed to do so.

5          MR. FATHI:  Your Honor, it's quite all right.

6          Is that part of the problem that you all are out of

7     town?

8          MR. FATHI:  I don't think it's a problem, Your Honor.

9     I believe that either Mr. Specter or I have been present

10    telephonically at all of the meet-and-confers and if there was

11    one where we were not then our co-counsel, Caroline Mitchell,

12    who is in San Francisco, was present.  So the scheduling

13    difficulties, I don't think, have been on our end.  We have

14    always had someone with authority at these.

15         THE COURT:  And so for now, whatever has happened in

16    the past, are you telling me that an expectation of scheduling

17    within 24 hours is not feasible for the future?

18         MR. SPECTER:  If they will agree to schedule -- if you

19    are going to order the conference to be scheduled within 24

20    hours of a request, that's feasible.  We have had difficulty

21    getting them to the table at some point, so that would take

22    care of the problem as well if that's what you are thinking.

23         THE COURT:  There may be a benefit to having someone

24    else there, and that is, again, I know there's a lot I don't

25    know, but -- and you all have to allow me to say this from a

1    distance.  It looks like both sides are having some

2    unreasonable expectations of demands and that part of what is

3    needed here is some buckets of cold water that comes more

4    easily when delivered by a third person.  And that's what a

5    discovery master can do.  And if I'm called on to decide

6    disputes, which I am, there's a limit to how much of that I

7    could do.

8         I think for now, I am going to approach this in an

9    incremental way that is based on optimism.  And there will be

10   plenty of opportunities later to deal with increasing failure.

11   So I think rather than what I -- what the plaintiffs have

12   suggested of scheduling a mandatory pre-scheduled meeting, I'm

13   going to go with what the defendants are suggesting, which is

14   that I accept your mutual avowals that you will communicate and

15   set up meet-and-confers with a 24- to 48-hour notice.  I'm not

16   going to bring the magistrate judge in yet.

17        The disadvantage of that is that it slows it down and

18   also, although it improves the quality of my life, it

19   diminishes the quality of my information.  So if this is going

20   to happen, there is some benefit to me having a sense of what

21   is going on and what isn't going on.  I can always do that

22   later.

23        And the same about a discovery master.  I can -- yes,

24   there is a large cost, but on the other hand, if it gets to the

25   point where there's just a breakdown in communication,

1   unrealistic -- recurring, unrealistic expectations on both

2   sides, then the collateral benefit of a discovery master is to

3   have the benefit of that much more extensive dialogue with

4   someone who is neutral and independent and experienced and can

5   just get more sober perspectives on both sides.

6           So I think at this time, I don't need to really enter

7   an order as such.  I will leave you with the directive that I'm

8   accepting your mutual agreement to schedule a meet-and-confer

9   within 48 hours upon request.  And if things don't improve, we

10  can come back and deal with a next step.

11          Again, Mr. Struck is right.  The defendants are

12  entitled to know what they are being sued for.  And they are

13  entitled to not just the minimal pleadings but the disclosures

14  required by Rule 26 and appropriate contention interrogatories

15  to -- they are entitled to that.  They don't have to take

16  depositions to find out that.  With proper requests, the

17  plaintiffs have to tell them before they take the depositions.

18          So I'm expecting all of this to be processed in the

19  ways that are efficient for everyone where the plaintiffs do

20  their part so the defendants don't have unnecessary and

21  unreasonable burdens and where the plaintiffs can fairly get

22  discovery that is related to their focused contentions.  And I

23  don't see this as a fishing expedition on either side.  No one

24  should have to do that.

25          All right.  Now, Mr. Fathi, there were some things in

1  your memorandum that you anticipated as either -- I don't know

2  if they were imminent or approaching disputes.  Frankly, I

3  don't remember all the details.  Where do we stand on those?

4  And I am hoping perhaps that you all can have a new dialogue

5  very promptly about those things.  And if they can't promptly

6  be resolved, they can be presented under my discovery dispute

7  process.

8              What do you think about that, Mr. Fathi?

9              MR. FATHI:  That's fine, Your Honor.  I would like to

10  just mention a couple of them if that's acceptable.

11             THE COURT:  Go ahead.

12             MR. FATHI:  Perhaps the most pressing, if we are to

13  meet the deadlines the Court has set and we all want and expect

14  to meet, is a resolution to the defendants' position that they

15  will not produce records relating to prisoners other than the

16  named plaintiffs without individual releases.

17             As we discussed in our memorandum, the HIPAA

18  regulations are absolutely clear that protected health

19  information can be disclosed without an individual release in

20  response to a discovery request as long as a qualified

21  protective order is in place.  And the defendants have

22  previously agreed that the protective order you entered in this

23  case is a HIPAA-qualified protective order.  So there is, in

24  our view, no reason for the defendants to refuse to disclose

25  that information.

1          THE COURT:  Now, is this discovery aimed at the class

2  certification phase or discovery aimed generally at the case?

3          MR. FATHI:  It's both.

4          THE COURT:  I'm talking about discovery about the

5  medical records of people who are not named parties.

6          MR. FATHI:  I think it's primarily aimed at the

7  general phase of the case.  And as my co-counsel has just

8  reminded me, discovery closes in May, and at this point, again,

9  with the exceptions of the death records, which we have

10  received, all -- they have only produced discovery relating to

11  our 14 named plaintiffs.  And now that a HIPAA-compliant

12  protective order is in place --

13          THE COURT:  Where are we -- I mean, I haven't looked.

14  We're not fully briefed on the motion for class certification

15  yet, are we?

16          MR. FATHI:  No, Your Honor.  You recently granted a

17  slight modification of the schedule such that our reply brief

18  will be filed on July -- excuse me -- January 11th.  And if I

19  can anticipate where the Court is going, it's certainly true

20  that a prompt ruling on that motion may -- would be very

21  helpful.

22          THE COURT:  Have you filed your response yet?

23          MR. STRUCK:  Your Honor, it's due on December 19 --

24  yeah.  19th.

25          With respect to that, I believe this issue actually

November 30, 2012 - Discovery Management Conference

1   came up in the scheduling conference.  And it's our position

2   that, yes, this is a HIPAA-compliant protective order but it's

3   not relevant and it's unduly burdensome for us to be -- I mean,

4   we have already produced not just -- I think they said 40,000,

5   over 75,000 pages of documentation.  So we don't think until

6   this thing, if and when it is certified as a class, we should

7   have to go to the expense of copying all of those.

8        THE COURT:  Mr. Fathi, what are the disputed medical

9   records, subject matter and quantity of them?

10       MR. FATHI:  For example, Your Honor, we have asked for

11  lists of all prisoners who have HIV disease, all prisoners who

12  have hypertension, all prisoners who have diabetes and other

13  chronic conditions, all prisoners who have been classified by

14  the Department as seriously mentally ill.

15       And this is an issue not only in terms of paper

16  discovery, but this is something that is going to be essential

17  for our experts to conduct their inspections.  And again, to

18  meet the May discovery cutoff, we are trying to schedule those

19  inspections now for early in the new year, and so we really do

20  need to have these materials very soon.

21       THE COURT:  This doesn't sound like the production of

22  existing documents.  This sounds like ordering them to create

23  documents.

24       MR. FATHI:  It's both, Your Honor.  And any prison

25  medical information system by literally pressing a button, you

1  can generate a list of the kinds I have just mentioned.  It's

2  both, Your Honor.  There are interrogatories that do call for

3  information about non-named plaintiffs but also requests for

4  existing documents.

5          THE COURT:  And Mr. Struck are your records

6  computerized the way they say?

7          MR. STRUCK:  No.  In fact, I was just conferring with

8  ADC's general counsel saying that's not the case.  It's not the

9  simple press of a button.  If there are these types of lists

10  that we can readily obtain, we will provide them under the

11  protective order.  But I need to confer with my client to find

12  out what exactly we can do without in a burdensome review and

13  compilation.  I thought that the request was primarily towards

14  actual records of these folks.

15          MR. FATHI:  It is both, Your Honor.  And again, if the

16  defendants assert that they cannot identify all HIV positive

17  prisoners or all diabetic prisoners --

18          THE COURT:  Listen, I mean, this is a class action.

19  You are seeking injunctive relief, right?

20          MR. FATHI:  Correct.

21          THE COURT:  Only injunctive relief?

22          MR. FATHI:  Correct, Your Honor.

23          THE COURT:  Why do you need the name of every prisoner

24  of every health condition?

25          MR. FATHI:  It's not every health condition, Your

1    Honor.  But one of the most important elements of a prison -- a

2    constitutional prison health care system is its ability to deal

3    with people who have serious chronic illnesses and with regard

4    to mental health prisoners who are seriously mentally ill who

5    are on psychotropic medications.  So our experts need to, in

6    order to be able to make an assessment of that, they do need

7    this information.  And this is the kind of thing that is

8    routinely produced in prison --

9           THE COURT:  Sounds like what you are looking for is

10   basically information at the level of general data, that you

11   don't need each and every prisoner with this condition and

12   their name on that list.

13          MR. FATHI:  Well, Your Honor, it may be possible if we

14   had a random sampling, that might be accurate.  But our experts

15   need to look at the medical records of, for example, 10

16   prisoners with HIV disease.

17          THE COURT:  Great.  You don't need the list of every

18   prisoner for that.

19          MR. FATHI:  Well, that's true, Your Honor.  But we

20   need to generate that sublist in some way that -- in which

21   there's no sampling bias.  And again, I will simply represent

22   to the Court that this is the kind of discovery that we obtain

23   routinely and then the expert, for example, picks every 10th

24   name or has some sort of sampling.

25          THE COURT:  I am concerned with the burden of this, so

1    I'm going to take that very seriously.  And it doesn't really

2    much matter to me what other judges do.  I have the

3    responsibility to exercise judgment.  If others do it the same

4    as me, that's great.  If they do it less thoroughly than me, it

5    doesn't matter to me, that I'm going to do the job well, at

6    least to my mind.

7          I am concerned about the burden.  Well, I had all the

8    same stuff go on with the Maricopa County Jail case that I

9    inherited after 35 years of pendency.  And I got that case

10   prepared and tried in six months, so six months from the day I

11   got it.

12         MR. FATHI:  Obviously, Your Honor -- and, by the way,

13   my office is on that case as I'm sure you know.  So we're

14   familiar with the admirable speed with which that was

15   processed.

16         You are correct, Your Honor.  If there were some -- if

17   it were possible to agree on a sampling methodology then

18   perhaps we would not need a complete list.  But the important

19   thing, of course, is that there's a way for us and our experts

20   to get a representative sample.

21         THE COURT:  Yes, but what I'm remembering about that

22   case is that this -- and what I'm troubled about this case --

23   is here it looks like there are broad expansive requests for

24   data that requires creation of documents, not just pulling

25   something out of a folder and copying it.  And in that case, my

1    recollection, there was, yes, there were some difficulties at

2    first.  But after it shaked out, the lawyers dialogued about

3    what it is the experts actually needed and how that can be

4    generated in an economical way mand that's how it got done.

5         So I am not disposed to order sweeping, burdensome

6    discovery production from the defendant.  But I am disposed to

7    understand what the experts really need, the most

8    cost-effective ways to get something they can use.  And, in

9    fact, in the end, I didn't have to police that.  Once the

10   lawyers understood that, they accomplished it themselves.

11        So I suppose in general, Mr. Fathi, I'm not disposed

12   at all to make them create documents for you as a document

13   production now, but certainly not before we have class

14   certification resolved.

15        MR. FATHI:  Thank you, Your Honor.  We're certainly

16   willing and we will work with the defendants on a way of

17   reducing the burden.  But until today, it has been their

18   position that they will not produce any of that information

19   without individual releases.

20        THE COURT:  Actually, that's a different issue.  And

21   my general sense on that is, I thought I had resolved that with

22   a protective order I entered earlier so that I would have to

23   totally rethink that to come to a conclusion that individual

24   releases are necessary.  I'm actually concerned not about that

25   issue, but about the unreasonable burden.

1          And so I think what I am hoping to leave with you is,

2    Mr. Fathi, you can deal with them about what your experts --

3    how they operate, how they are going to do it.  And if they

4    think your experts are nonsensical and they can make a good

5    case that I shouldn't require them to incur great expense to

6    give stuff to you that your experts are not going to meet

7    minimum standards of scientific reliability, they can fight out

8    that.  But more likely you are not going to fight over that.

9    Once you give them an understanding of what your experts need

10   to do, whether you call it sampling or analysis they want, that

11   that can be obtained in a way far less costly to them than just

12   the, you know, blanket demand for names and data and records.

13         So I think that's what I am expecting you all to do

14   before you bring me a dispute.  And if you bring me a dispute,

15   show me that you have done that and given me enough information

16   that I can understand what your experts are going to do, why

17   they need the data they are seeking and why the data you are

18   asking for is the most cost effective and reasonable way to get

19   the data.  And you have to show otherwise.  So we won't have

20   this dispute at a high level of generality that does not move

21   the case forward.

22         That's not a ruling.  But that's some direction as to

23   what you really need to do before you bring that to me.  And I

24   don't see why you can't dialogue and get that resolved very

25   quickly as to what you are going to do.  It may take a little

1    time for defendants to put it all together.

2            Are there any other issues you want to talk about now?

3            MR. FATHI:  I believe there may be one, Your Honor.

4    But just on this issue, if we are all agreed that individual

5    releases are not required, then I believe --

6            THE COURT:  Is that something, Mr. Struck, is that

7    something you still want to fight about?

8            MR. STRUCK:  No, Your Honor.  I think that -- I think

9    what our position is, is that once, I mean, if and when this

10   case is certified as a class, then I think the protective order

11   suffices.  But I think right now, the requests that are

12   currently pending would require, as the Court noted, an

13   incredible burden for us.

14           THE COURT:  Actually, no, I didn't understand that.

15   Why -- tell me what the incredible burden is.  I'm not

16   quarrelling, I just want to understand it.

17           MR. STRUCK:  Well, the requests are for not only these

18   lists I would have to generate but also for the lists of

19   records for these people.

20           THE COURT:  I think my intent in discussion tried to

21   pass over that by suggesting that their experts are not going

22   to need that, and once you dialogue with them about what their

23   experts really need, that issue is going to fall by the

24   wayside.

25           And there is -- this still remains in my mind, the

─────── **November 30, 2012 - Discovery Management Conference** ───────

1   issue of whether you actually need this before class

2   certification because I don't want to prejudge it.  Are you

3   going to fight over a class certification?

4           MR. STRUCK:  Yeah.  We are responding to the motion

5   for class certification.

6           THE COURT:  Can you just bullet point for me the

7   grounds on which you are going to do battle?

8           MR. STRUCK:  Commonality and typicality, Your Honor.

9           THE COURT:  Is that just a matter of how we define the

10  classes and subclasses?

11          MR. STRUCK:  Well, there's a problem with that as well

12  because right now the class definition is extremely broad.  But

13  it will be a commonality/typicality argument with respect to

14  the wildly different issues that the named plaintiffs have and

15  whether they are common and typical for -- and certainly

16  whether there's a systemic issue with respect to these issues.

17          THE COURT:  So that could be related to the question

18  of these categories of records or information they are seeking.

19          So we'll have that briefed by mid-December --

20  mid-January.

21          MR. STRUCK:  I think our response brief is due on

22  December 19th and then the plaintiff's reply is January 11th on

23  the class cert.

24          THE COURT:  I don't want to prejudge the question of

25  whether this is even needed before class certification.  And

 1    Mr. Fathi, I'm hearing you say -- well, let me back up.

 2            Tell me how you need this for class certification as

 3    opposed to after class certification.

 4            MR. FATHI:  Your Honor, we mostly need it after.  We

 5    need it after class certification.  The difficulty is the --

 6    I'm confident the Court will rule quickly, but nevertheless,

 7    then we get to a relatively -- a very short time until the

 8    discovery cutoff.  As the Court said, it will take the

 9    defendant some time to generate the information we need.  So we

10    believe it is important to start getting this information and

11    getting it to our experts now.

12            I thought I heard the Court say that individual

13    releases are not required now that a qualified protective order

14    is in place, but Mr. Struck, I believe, is taking an opposite

15    position.  Again, we believe the HIPAA regulations are

16    absolutely clear they address specifically the situation when a

17    qualified protective order is in place, individual releases are

18    not required.

19            MR. STRUCK:  I'm sorry, Your Honor.  I think I said

20    the opposite, that we didn't think releases were going to be

21    required but we just didn't want the burden of producing what

22    they have asked for.  And it is my understanding from the

23    Court's direction that we are going to work with the plaintiffs

24    and they are going to talk with their experts about what they

25    actually need so if and when this case is certified, we can

1    provide that information to them.

2           MR. FATHI:  Well, there's the rub, Your Honor.

3    Apparently, they are not willing to produce this until after

4    the class is certified which may be two months from now.

5           THE COURT:  I guess what I want you to do now is move

6    forward diligently and in good faith.  And it may not matter.

7    By the time you get this focused and communicated -- I think

8    they are entitled, and I have done this in other cases, they

9    are entitled to understand what your experts are going to try

10   to do.  And because they think it's not going to pass

11   scientific muster, that's a good reason not for them to be

12   burdened and they can present to me a dispute.

13          Now, the chances of that happening seem very remote.

14   I mean, if your experts have done this before and they know

15   what they are doing and they are qualified, they may or may not

16   be persuasive but the chance is pretty remote that they won't

17   have a methodology that will pass scientific muster.

18          But they are entitled to know that so they can also

19   think independently about the degree of burden.  Because a lot

20   of times you ask for stuff, you all litigate this so you know a

21   lot about prisons, but a lot of people, they ask for stuff and

22   they don't understand the burden on the other side.

23          So I expect you all, both, to dialogue and to work

24   together to minimize the burden on both sides.  So that's what

25   I'm saying, and --

1          MR. FATHI:  Absolutely, Your Honor.  But we are very

2     concerned by Mr. Struck's position that until and unless the

3     class is certified individual releases are required.

4          THE COURT:  He has just retrenched from that.

5          MR. FATHI:  I believe his position was that individual

6     releases are not required only after the class is certified.

7          THE COURT:  I'm sorry.  Is that what you said, Mr.

8     Struck?

9          MR. STRUCK:  Your Honor, I didn't say that.  What I

10     said was the requests, as they are today, are overbroad, unduly

11     burdensome for us to produce them prior to the class

12     certification.  So that's -- we will endeavor to work with the

13     plaintiffs to figure out exactly what it is they want, because

14     right now their requests are extremely broad what their experts

15     need and try and come up with what it is, come up with a

16     methodology for obtaining that information so if and when the

17     class is certified we can obtain that information for them.

18     Because if the class isn't certified, I don't believe they are

19     entitled to all that information.

20          THE COURT:  I am concerned about that, too.  Until the

21     class is certified, you have got, what, 15 named plaintiffs?

22          MR. FATHI:  14, Your Honor.

23          THE COURT:  And that's what this lawsuit is about.

24     And we have all agreed that this other discovery is not really

25     pertinent or necessary to the class certification.  However, I

November 30, 2012 - Discovery Management Conference

1    think what I want you all -- I want you all --  you know, I

2    want you all to dialogue and explore this because I want to

3    have it ready to go.  And it may be that it just doesn't matter

4    whether they can get this all done or not, that by the time you

5    all understand this we'll be close to or have a ruling on the

6    class certification.

7            And I'm more concerned about -- I'm really not worried

8    about the individual consents.  I am worried about not

9    burdening the defendants with a lot of production that is just

10   grossly related rather than finely related to what their

11   experts' methodologies and plans are going to be.

12           MR. SPECTER:  We understand that, Your Honor, and we

13   will work with the defendants.

14           Could -- are you going to set a hearing for the

15   argument on the class certification motion?

16           THE COURT:  You know, I will.  I just -- I will have

17   to look at my calendar.  I think I have got a lot of trials at

18   that time.  We'll e-mail with you and pick a time that you all

19   can do, but it will almost certainly be on a Friday because

20   that's when I have my civil motions.

21           MR. SPECTER:  So as Mr. Fathi said, that's -- the

22   scheduling of that is important to the rest of the case, as

23   know, as you just identified.

24           THE COURT:  Well, Nick, pull up the calendar.  And how

25   are we on Friday, January 18?

UNITED STATES DISTRICT COURT

1          THE COURTROOM DEPUTY:  How much time do you need?

2          THE COURT:  How much time do you want?

3          MR. SPECTER:  Doesn't have to be long.  Most of our

4     argument is in the brief, Your Honor.

5          THE COURT:  How about if I set an hour?

6          MR. SPECTER:  That's fine.

7          THE COURT:  And, I mean, we may not need anything

8     close to that.  But do we have an hour on January 18?  Do we

9     have a trial that week?

10          THE COURTROOM DEPUTY:  No.

11          THE COURT:  All right.  That's great.

12          THE COURTROOM DEPUTY:  We don't have anything on the

13     17th, which is Thursday.

14          THE COURT:  How much do we have on the 18th?

15          THE COURTROOM DEPUTY:  You have got some Rule 16s and

16     oral argument on Breg/McConnell.

17          THE COURT:  That's going to be huge.  How about

18     January 17th, Thursday.  I would be looking at the morning.

19          MR. STRUCK:  Fine for defendants, Your Honor.

20          THE COURT:  10:00.

21          MR. FATHI:  Your Honor, we have -- at least I have a

22     conflict on the 17th.  The 18th would be preferable.

23          THE COURT:  Actually, I'm too busy on the 18th.

24          MR. FATHI:  I'm sorry.  The 18th is the Friday?

25          THE COURT:  It is, but unfortunately I have too much

1    on that day.

2             THE COURTROOM DEPUTY:  We can do Friday the 25th in

3    the afternoon.

4             THE COURT:  Friday the 25th.  How about 2:00 on

5    Friday, January 25th?

6             MR. STRUCK:  Fine for defendants, Your Honor.

7             MR. SPECTER:  Yes, Your Honor.  That works.

8             THE COURT:  Very well.  It is ordered setting oral

9    argument on plaintiffs' motion for class certification for

10   January 25th at 2:00.

11            All right.  Is there anything else, counsel?

12            MR. STRUCK:  No, Your Honor.

13            THE COURT:  Actually, was there more on your list of

14   things right now?

15            MR. SPECTER:  There was one more thing, Your Honor,

16   which I hope is a simple legal issue.

17            As you know, or as you may remember, we deposed

18   various people under Rule 30(b)(6) and you ruled that we could

19   only depose them once.  The three people, three of the people

20   that we deposed before your ruling are central to the

21   administration of the health care system at ADC.  And we have

22   asked the defendants for permission to depose them in their

23   individual capacity.

24            THE COURT:  What is the difference?  What's their role

25   in that case?  They are not -- they are here as public

1    officials, right?

2          MR. SPECTER:  They are here as -- of course they are

3    public officials.

4          THE COURT:  Anything that they can do wrong that gives

5    your client a lawsuit is in their capacity as public officials.

6          MR. SPECTER:  Yes, Your Honor.  We deposed them as

7    30(b)(6) deponents because of their -- they were representing

8    the entity.  So we asked them different questions than about

9    what we would do if they were --

10         THE COURT:  But how is their knowledge and their

11   brains different whether they are a public official or just a

12   guy?

13         MR. SPECTER:  Well, the topics are different, Your

14   Honor, that we discussed, and timing is different.  We didn't

15   want to depose them as individuals that far away from the close

16   of discovery in the case as well.

17         THE COURT:  Well, in general, I am not disposed to let

18   you depose people twice.  And I don't see any practical sense

19   to the idea.  And if the other judges have done it, then that's

20   their responsibility.  But I don't see any practical sense to

21   the idea that what you know in your head and you testify to is

22   different in your capacity as a public official and your

23   capacity as a human being.

24         So --

25         MR. SPECTER:  I understand that, Your Honor, but the

1    timing is different than in an injunctive relief case.  And

2    things have changed, so we wanted to get a more accurate

3    picture of what was going on before the close of discovery.

4         THE COURT:  Well, I don't have briefing on this.  You

5    have presented the issue briefly.  In general, one must show

6    justification for deposing a witness a second time.  Sometimes

7    it happens.  And I guess I'm disposed to view this the same way

8    so that I'm not disposed to accept your idea that you have this

9    right to depose them twice.  But if circumstances happen in

10   this case as they might happen in any case where there's

11   justification for deposing witness again because of later

12   events you can always seek that.

13        MR. SPECTER:  Thank you, Your Honor.

14        THE COURT:  And, of course, I would expect the other

15   side to agree to that.

16        MR. STRUCK:  Your Honor, actually, that's exactly what

17   I wrote in an e-mail to Mr. Specter two days ago, that if, for

18   example, Dr. Rowe refused to testify with respect to some of

19   the death records, we're allowing them to re-depose Dr. Rowe

20   with respect to those records because they were entitled to ask

21   him that.  We did advise them prior to all these depositions

22   this was a one-shot deal.  In fact, if you read the depositions

23   they asked the questions that they would ask them as an

24   individual or in an official capacity.

25        What we also said was if you can show good cause we

1   will consider allowing a limited re-deposition of these

2   individuals.

3           THE COURT:  Well, that's the criterion I am

4   articulating.  And, of course, I expect you to apply it so if

5   they do have good cause, I expect you to agree to it.  If not,

6   I think that would be down the road a bit but you can present

7   it to me and I will resolve it.

8           I'm a little bit late for the next matter, so I'm

9   going to take a five-minute recess before the next matter.

10          (Proceeding concluded at 3:40 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 15th day of January,

16  2013.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25