JWB

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Antonio Parsons, et al., | No. CV12-0601-PHX-NVW |
| Plaintiffs, | |
| vs. | **ORDER** |
| Charles L. Ryan, et al., | |
| Defendants. | |

Plaintiffs are fourteen inmates housed in various Arizona Department of Corrections (ADC) complexes.  Defendants are ADC Director Charles Ryan and ADC Division of Health Services Interim Director Richard Pratt.  Before the Court is Plaintiffs' Motion for Class Certification (Docs. 245, 248).[1]  The Court heard oral argument on Plaintiffs' motion on January 25, 2013.  For the reasons stated below, Plaintiffs' motion will be granted.

## I.    Background

ADC currently incarcerates approximately 33,000 inmates in ten complexes statewide: Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma (Doc. 321, Ex. 2, Decl. of Def. Richard Pratt ¶¶ 3-5).  Plaintiffs filed this action in March 2012, presenting five claims for relief stemming from Defendants' alleged deliberate indifference in the provision of overall health, medical, dental, and mental health care and to unconstitutional conditions of confinement in the ADC's

---

[1] Plaintiffs filed redacted and unredacted versions of their motion.

isolation units[2] (Doc. 1 at ¶¶ 140-149).  Plaintiffs seek declaratory and injunctive relief, including an Order compelling Defendants to develop a plan to provide Plaintiffs and the proposed class and subclass with constitutionally adequate health care and protection from unconstitutional conditions of confinement in ADC's isolation units.

Plaintiffs seek class certification for one Class and one Subclass.  The proposed Class definition is "all prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC" (Doc. 248 at 6).  The proposed Class representatives are Plaintiffs Parsons, Jensen, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Gamez, Chisholm, Licci, Hefner, Polson, and Wells.  The proposed Subclass definition is "all prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area" (*id.*).  The proposed Subclass members are Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, and Polson.

## II.    Governing Standard

The Court's authority to certify a class action is found in Federal Rule of Civil Procedure 23.  Plaintiffs first bear the burden of establishing the four requirements articulated in Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.  Additionally, Plaintiffs must also establish one of the requirements found in Rule

---

[2] Defendants take issue with the term "isolation" cell or unit as they argue it implies a total inability to communicate with others (Doc. 326 at 6).  For consistency, the Court will use the terminology supplied by Plaintiffs, but such use does not amount to an opinion about the substance of Plaintiffs' isolation claims.

23(b).  In this case, Plaintiffs allege that class certification in this case is appropriate pursuant to Rule 23(b)(2), which requires a demonstration that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2).

When analyzing whether class certification is appropriate, the Court must conduct "a rigorous analysis" to ensure that "the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011) (citing *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  As discussed below, the Court finds that certification of the Class and the Subclass is appropriate.

## III.    Rule 23(a) Analysis

### A.    Numerosity

Defendants do not dispute that the numerosity requirement is satisfied by ADC's overall inmate population of more than 33,000 and isolation population of approximately 3,000.  Indeed, there is no doubt that joinder of all members of the potential Class and Subclass would be impracticable, if not impossible.  *See Sepulveda v. Wal-Mart Stores, Inc.*, 237 F.R.D. 229, 242 (C.D. Cal. 2006) (acknowledging that joinder will be impracticable for very large classes).  The numerosity requirement is satisfied.

### B.    Commonality

#### 1.    Governing Standard

To establish commonality, Plaintiffs must demonstrate that there are "questions of law or fact common to the class."  FED. R. CIV. P. 23(a)(2).  Plaintiffs need not demonstrate that all questions are common to the class; rather, class claims must "depend upon a common contention . . . [that is] capable of classwide resolution." *Wal-Mart*, 131 S. Ct. at 2551.  "Even a single [common] question" will suffice to satisfy Rule 23(a). *Id.* at 2556 (citation omitted).  In the civil rights context, commonality is satisfied "where the

lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).

In assessing commonality, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen'l. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") (quotation omitted).  That said, although the Court must consider the underlying merits of Plaintiffs' claims to ascertain whether commonality exists, it is not the Court's function at this juncture to "go so far . . . as to judge the validity of these claims." *USW v. ConocoPhillips Co.*, 593 F.3d 802, 808-09 (9th Cir. 2010) (quoting *Staton v. Boeing Co.*, 327 F.3d 938, 954 (9th Cir. 2003)).  Thus, Plaintiffs' motion for class certification is not an opportunity to hold "a dress rehearsal for the trial on the merits." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012). The prohibition on requiring Plaintiffs to establish their claims at the class certification stage was recently reinforced by the Supreme Court in *Amgen Inc. v. Connecticut Retirement Plans and Trust Funds*, ___ U.S. ___, 2013 WL 691001, No. 11-1085 (Feb. 27, 2013), at *7 ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.")

Plaintiffs maintain that the common question to all Class and Subclass members is whether Defendants are deliberately indifferent to their health and safety in violation of the Eighth Amendment.  Thus stated, the common question is too broad.  As detailed below, the Court construes the common question as it relates to the practices Plaintiffs identified in their Complaint.

To support their motion, Plaintiffs rely on the factual allegations in their Complaint (Doc. 1 at ¶¶ 26-100), voluminous evidence obtained thus far during discovery, declarations of four experts (Doc. 240, Exs. B-E), and declarations of the named Plaintiffs (Doc. 249, Exs. F-S).  Plaintiffs argue that the facts derived from this

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

evidence soundly establish the existence of a "system-wide practice or policy that affects all of the putative class members" for both the Class and Subclass.  *See Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) (quoting *Armstrong*, 275 F.3d at 868).   More specifically, Plaintiffs contend that as to the Class systemic deficiencies exist in the provision of medical, dental, and mental health care that expose all inmates to a substantial risk of serious harm.  With respect to the Subclass, Plaintiffs maintain that the conditions of confinement in ADC's isolation units place inmates—and particularly mentally ill inmates—at a substantial risk of serious harm.

**2.    Facts**

*i.    Medical Care*

Wexford Health Sources was the private entity providing health care services to ADC inmates pursuant to the Arizona legislature's mandate from July 1, 2012 through March 3, 2013 (Doc. 321, Ex. 2, Decl. of Def. Richard Pratt ¶ 8).  Effective March 4, 2013, Corizon, Inc. took over for Wexford as ADC's health care provider.  While private contractors are responsible for the delivery of health care, the Court noted in its October 10, 2012 Order denying Defendants' Motion to Dismiss that Defendant Ryan "has a continuing duty to ensure that those to whom he delegated functions or duties performed those duties appropriately" (Doc. 175 at 10).  Plaintiffs' medical care expert, Dr. Robert Cohen, opines that prior to and since privatization, Defendants "have neglected the serious medical needs of the Arizona state prisoners by failing to manage, support, supervise and administer medical care to prisoners in the ten state complexes.  Because of this neglect, these prisoners are at serious risk of harm, and in some cases, death." (Doc. 240, Ex. C, Decl. of Robert L. Cohen, M.D. ¶ 5).  Included in Dr. Cohen's review was ADC's September 21, 2012 "Written Cure Notification" to Wexford's Director (Doc. 240, Ex. EE at ADC027858-ADC027859).   The Cure Notification detailed twenty significant areas of non-compliance and required corrective action within 90 days pursuant to the contract between ADC and Wexford.  The deficiencies included:

1

2    • Inadequate staffing levels in multiple program areas at multiple locations;

3
     • Staffing levels creating inappropriate scheduling gaps in on-site medical coverage;
4

5    • Staffing levels forcing existing staff to work excessive hours, creating fatigue risks;

6    • Quantitative decrease in routine institutional care: backlog of prescription medication
7      expiration review;

8    • Incorrect or incomplete pharmacy prescriptions;

9
     • Inappropriate discontinuation/change of medication;
10

11   • Inconsistent non-formulary medication approval process;

12   • Inconsistent or contradictory medication refill and/or return procedures;

13   • Inadequate pharmacy reports;

14
     • Inconsistent documentation of Medication Administration Records;
15

16   • Inconsistent provision of release, transfer, and/or renewal medications;

17   • Inability to readily identify specific groups of inmates or chronic conditions based
18     upon medications prescribed (e.g., diabetes);

19   • Inadequate/untimely communication between field staff, corporate staff, and ADC;

20
     • Lack of responsiveness and/or lack of awareness of incident urgency and reporting
21     requirements;

22   • Quantitative decrease in routine institutional care: backlog of chart reviews;

23
     • Quantitative decrease in routine institutional care: backlog of provider line
24     appointments;

25
     • Quantitative decrease in routine institutional care: untimely handling of Health Needs
26     Requests;

27

28

- Quantitative decrease in routine institutional care: backlog/cancellation of outside specialty consultations;

- Unresponsive approach to ADC inquiries on patient information; and

- Unresponsive approach to inmate grievance process (*id.*).

All twenty deficiencies were identified at all ten ADC complexes (*id.* at ADC027863-ADC027869).  Further underscoring this evidence is Wexford's response to the Cure Notification, which argued that ADC's expectation that all deficiencies would be cured within 90 days was unreasonable.  Wexford explained that "the majority of the problems Wexford now faces are long-standing issues, embedded into ADC health care policy and philosophy, and which existed well before Wexford Health assumed responsibility for the program" (*id.*, Ex. FF at ADC027941-ADC027942).  The Cure Notification relied on much of the same evidence Plaintiffs submit in support of their motion, which obviates the need to repeat it here.

Additionally, six named Plaintiffs present specific allegations related to his or her own medical treatment and the delays experienced in receiving medical care.

- Plaintiff Swartz suffered extensive injuries after being attacked by other inmates and experienced significant delays in seeing an ophthalmologist, never saw a plastic surgeon to whom he was referred, was not prescribed adequate pain medication for months, experienced months long delays in receiving prescription refills, and suffers permanent facial paralysis and is unable to completely close his left eye (Doc. 249, Ex. L, Decl. of Pl. Stephen Swartz ¶¶ 4-9).

- Plaintiff Desiree Licci was treated at ADC for cancer in 2001 and began experiencing troubling symptoms in fall 2010 (Doc. 249, Ex. N, Decl. of Pl. Desiree Licci ¶¶ 3-4). Despite several referrals to an oncologist, Plaintiff Licci waited for over one year to see a specialist and has not received a biopsy to rule out cancer despite numerous masses evident on CT scans (*id.* ¶¶ 5-26).

- Plaintiff Shawn Jensen had six years of highly elevated PSA tests but was not diagnosed with prostate cancer until October 2009 when it had progressed to Stage 2 (Doc. 249, Ex. O, Decl. of Pl. Shawn Jensen ¶¶ 5-7).  Plaintiff Jensen experienced

delays in receiving GnrH antagonist therapy (to lower testosterone levels) and did not receive surgery until July 2010 (*id.* ¶¶ 8-9).  Thereafter, Plaintiff Jensen experienced extreme difficulty with his catheter and was leaking urine (*id.* ¶¶ 14-15).  On August 1, 2010, Assistant Cordova could not ascertain what was causing the leakage and attempted to push the catheter further into Plaintiff Jensen's urethra.  This incident resulted in permanent catastrophic damage to Plaintiff Jensen's urethra and bladder, requiring six additional surgeries (*id.* ¶¶ 16-43, 45).

- Plaintiff Joseph Hefner experienced a negative reaction to expired eye medication, causing acute glaucoma (Doc. 249, Ex. P, Decl. of Pl. Joseph Hefner ¶¶ 5-6). Plaintiff Hefner experienced delays in receiving prescriptions and in seeing a physician after being assaulted by inmates (*id.* ¶¶ 7-9).

- Plaintiff Charlotte Wells had a history of heart problems and chronic chest pain but she did not see a heart specialist until she was sent to the hospital (Doc. 249, Ex. Q, Decl. of Pl. Charlotte Wells ¶ 3).  Tests conducted revealed an 80% blockage in her artery, and a stent was implanted (*id.* ¶ 4).  Plaintiff Wells continues to suffer from an irregular heartbeat, a leaky valve, problems with blood pressure, and chest pain (*id.* ¶ 11).

- Plaintiff Joshua Polson developed multiple ear infections during incarceration (Doc. 249, Ex. R, Decl. of Pl. Joshua Polson ¶ 19).  From 2009 on, he filed multiple health needs requests describing the pain in his ears but it takes days or weeks to see a provider (*id.*).  He has tested positive for MRSA (methicillin-resistant staph aureus) and the antibiotics provided do not eradicate the ear infections (*id.*).  At one point, Plaintiff Polson experienced pain and blood running from his left ear but the nurse said the bleeding was caused by a scratch (*id.* ¶ 20).  Plaintiff had a hearing test in March 2010 that found he was deaf in his right ear (*id.* ¶ 19).

### ii.    *Dental Care*

Plaintiffs' dental care expert, Dr. Jay Shulman, similarly attests that systemic deficiencies in the provision of dental care "place all inmates at risk of preventable pain, but also of teeth decay and unnecessary loss of teeth" (Doc. 240, Ex. D, Decl. of Jay D. Shulman ¶ 3).  Dr. Shulman opines that systemic deficiencies in the provision of dental care include:

- Insufficient dental staffing;

- Inadequate process for triaging inmates requiring dental treatment'

- Inappropriate treatment of pain;

- De facto extraction only policy;

- Inadequate treatment of chewing difficulty; and

- Inadequacy of national commission for correctional health care dental program evaluation (*id.*, Shulman Decl. ¶¶ 4-9).

Further, Dr. Shulman's review of the named Plaintiffs' dental records revealed that Plaintiffs Wells, Parsons, and Polson waited between 85 and 516 days to receive treatment for their identified dental needs (*id.* at 22, Table 1).  Plaintiff Chisholm declared that she has not had a teeth cleaning in six-and-a-half years (Doc. 243, Ex. H, Chisholm Decl. ¶ 19).  She also stated that when she requested treatment for a lost filling, the only option presented to her was tooth extraction (id. ¶¶ 21-22).

### iii.   Mental Health Care

Plaintiffs introduce the declaration of Pablo Stewart, who opines that "the shortage of mental health staff, delays in providing or outright failure to provide mental health treatment, and the gross inadequacies in the provision of psychiatric medications are statewide systemic problems, and prisoners who need mental health care have already experienced, or will experience, a serious risk of injury to their health if these problems are not addressed (Doc. 240, Ex. B, Decl. of Pablo Stewart ¶ 6).  Stewart identified deficiencies including:

- Inadequate staffing;

- Failure to manage medication; and

- Delays or failure to provide mental health treatment (*id.* ¶¶ 7-27).

These issues were articulated in an August 13, 2012 memo from ADC's Mental

Health Contract Monitor Ben Shaw to ADC Contract Beds Operations Director Joe Profiri.  Dr. Shaw reported:

> Wexford's current level of psychiatry staffing is grossly insufficient to meet [its] contractual requirement.  Further, this staffing level is so limited that patient safety and orderly operation of ADOC facilities may be significantly compromised . . . .  Wexford currently has 14.85 psychiatry FTE's [sic] allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications. Wexford now employs a total of 5.95 FTE psychiatry providers (approximately 33% of their allocation) [leaving] 8.9 FTE's [sic] vacant (leaving a vacancy rate of 66%) (Doc. 240, Ex. KK, at ADC027770).

Mental health staffing and prescription issues were also detailed in ADC's September 21, 2012 Cure Notification to Wexford (Doc. 240, Ex. EE at ADC027858-ADC027859).  Specifically, ADC informed Wexford that "a significant number of inmates may not have been receiving their medications as prescribed due to expired prescription(s) and inappropriate renewals or refills" (*id.* at ADC027855).  The Cure Notification also describes a prisoner in the Florence-Central Unit who was found hanging from a sheet on August 23, 2012.  This prisoner had been prescribed a mood stabilizer, but did not receive his medication for the first 23 days of August (*id.*).

### iv.    *Subclass -- Conditions of Confinement in Isolation Units*

With respect to the effects of the conditions of confinement in ADC's isolation units, Plaintiffs submit the declaration of Dr. Craig Haney (Doc. 240, Ex. E, Decl. of Craig Haney).  He opines:

> Contrary to sound correctional practice and the weight of psychological and psychiatric opinion, ADC currently houses seriously mentally ill prisoners in its isolation units.  ADC's failure to have and implement policy that excludes these prisoners from these units places these prisoners at an

- 10 -

unreasonable risk of harm . . . [C]onditions of extreme isolation can create enormous harm in even previously healthy individuals. ADC's apparent failure to put in place careful mental health monitoring policies for all prisoners subject to the extremely isolated conditions in their maximum security/isolation units, places all prisoners subject to such conditions at an unreasonable risk of harm (*id.* ¶ 54).

Plaintiffs argue that the conditions in ADC's isolation units that pose a substantial risk of serious harm to inmates are:

- Lack of exercise;

- Lack of educational programming;

- Constant cell illumination;

- Limited access to property; and

- Infrequent and reduced calorie meals (*id.* ¶ 44).

### 3.    Analysis

Based upon the above evidence, the question common to all members of the Class and the Subclass is whether Defendants' practices are deliberately indifferent to inmates' health and safety in violation of the Eighth Amendment and subjection to unconstitutional conditions of confinement in isolation units. *See Farmer v. Brennan*, 511 U.S. 825, 828 (1994). Further, the answer to that question is "apt to drive the resolution of the litigation" and would form the basis for whether an injunction directing Defendants to remedy any unconstitutional conditions is appropriate. *Wal-Mart*, 131 S. Ct. at 2551 (citation omitted).

To maintain an Eighth Amendment medical-care claim, Plaintiffs must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective

standard.  First, a prisoner must show a "serious medical need."  *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'"  *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  The state of mind required for deliberate indifference is subjective recklessness; however, "the standard is 'less stringent in cases involving a prisoner's medical needs . . . because the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'"  *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012) (quoting *McGuckin*, 974 F.2d at 1060).  The deliberate-indifference prong is met if the prisoner demonstrates (1) a purposeful act or failure to respond to a prisoner's medical need and (2) harm caused by the indifference.  *Id.*  Further, prison officials are deliberately indifferent to a prisoner's serious medical needs if they deny, delay, or intentionally interfere with medical treatment.  *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

### i.    Health Care Class

Defendants' response raises three main contentions against commonality: (1) Plaintiffs' allegations are nothing more than "a conglomeration of specific practices . . . based on isolated instances" that deviate from ADC's established and constitutional policies (Doc. 326 at 7); (2) Plaintiffs' claims necessarily turn on fact-specific inquiries which precludes a commonality finding (*id.* at 26-27); and (3) many of the Plaintiffs failed to allege any harm resulting from an alleged constitutional violation, which is facially insufficient to establish deliberate indifference (*id.*).

All three of these arguments, however, miss the mark in a class action seeking only injunctive and declaratory relief.  First, Defendants' oft-repeated contention that

Plaintiffs' allegations are inconsistent with ADC policies misunderstands the substance of Plaintiffs' claims.   Plaintiffs' claim is that *despite* ADC stated policies, the actual provision of health care in its prison complexes suffers from systemic deficiencies that rise to the level of deliberate indifference.

Similarly, Defendants erroneously focus on Plaintiffs' perceived failure to allege actual harm.  But Defendants rely on cases in which plaintiffs sought monetary damages. When seeking only injunctive relief, a plaintiff need not wait until he suffers an actual injury because the constitutional injury *is* the exposure to the risk of harm.   *Brown v. Plata*, 131 S. Ct. 1910, 1926 n.3 (citing *Farmer*, 511 U.S. 834).

For the same reason, assessing commonality does not require a fact-specific inquiry into each Plaintiff's allegations.  It matters not that each inmate may suffer from different ailments or require individualized treatment because commonality may be met where "the claims of every class member are based on a common legal theory, even though the factual circumstances differ for each member."  *Walsh v. Ford Motor Co.*, 130 F.R.D. 260, 268 (D. D.C. 1990) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998)).

Nor does the Supreme Court's decision in *Wal-Mart* defeat commonality.   *Wal-Mart's* analysis on commonality arose in a legally and factually inapposite context. Commonality in *Wal-Mart* was defeated because the putative class members—female Wal-Mart employees—alleged that they had been improperly denied promotions pursuant to a discriminatory corporate practice but, in fact, promotion decisions were discretionary and were handled independently by the numerous Wal-Mart managers. *Wal-Mart*, 131 S. Ct. at 2547-48.  This practice vitiated the conclusion that Wal-Mart acted pursuant to a centralized policy.  *Id.* at 2554.  That lack of commonality contrasts with this case, where all inmates are subjected to Defendants' actions or lack thereof, because they have the sole responsibility for health care policy.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Despite the distractions presented by Defendants that do not defeat commonality, the crucial question is whether there is sufficient evidence of systemic issues in the provision of health care or whether Plaintiffs' allegations are simply many examples of isolated instances of deliberate indifference.  A policy, practice, or custom may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant officials are not reprimanded.  *Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (citing  *Nadell v. Las Vegas Metro. Police Dep't.*, 268 F.3d 924, 929 (9th Cir. 2001)).  When examining liability for an improper custom or practice, courts should look at whether the practice at issue is one of sufficient duration, frequency, and consistency such that the alleged conduct may be the "traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 991, 918 (9th Cir. 1996).

In answering this narrow question, the Court finds that ADC's September 21, 2012 Cure Notification to Wexford and Wexford's response thereto is probative evidence that tips the balance in favor of concluding that the problems identified in the provision of health care are not merely isolated instances but, rather, examples of systemic deficiencies that expose all inmates to a substantial risk of serious harm (Doc. 240, Ex. EE; Doc. 243, Ex. FF).  This is particularly true in view of ADC's contention in the Cure Notification that twenty critical failures existed at all ten ADC complexes.  This evidence is what sets this case apart from Defendants' citations to other cases where class certification was denied.  In those cases, there was simply insufficient evidence propelling the plaintiffs' isolated allegations of mistreatment into a plausible claim of systemic deficiencies in those facilities.  In contrast, the evidence here suggests that the root cause of the injuries and threats of injuries suffered by Plaintiffs is the systemic failures in the provision of health care generally.

Further, the Court finds that Plaintiffs' expert declarations, largely unrebutted at this juncture, are sufficient to establish that ADC's practices or customs in the provision of health care rise to the level of deliberate indifference that places inmates at a

substantial risk of serious harm.  The Court reiterates that its conclusion is not an opinion that Plaintiffs will ultimately succeed on the merits of their claim.  Rather, it is a finding that their initial evidence is sufficient to establish that a common question exists as to all putative Class members.  *See Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) ("[C]lass members can assert such a single common complaint even if they have not all suffered actual injury; demonstrating that all class members are *subject* to the same harm will suffice.") (emphasis in original).  Put another way, the Court finds that the allegations of systemic deficiencies in ADC's provision of health care are sufficient to establish "a system-wide practice or policy that affects all of the putative class members." *Armstrong*, 275 F.3d at 868.

The evidence cited above is the "significant proof" that ADC is operating under a policy of providing deficient health care.  *See Wang v. Chinese Daily News*, ___ F.3d ___, No. 08-55483, Slip Op. at 8-9, 15 (9th Cir. March 4, 2013).  The Court also finds that litigating the adequacy of ADC's health care to all inmates "depend[s] on a common contention . . . of such a nature that it is capable of classwide resolution --- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 10 (citing *Wal-Mart*, 131 S. Ct. at 2551).

Defendants' limited disputes about the substance of Plaintiffs' allegations "amount to an attempt to hold 'a mini-trial on the merits' prior to certification, which is simply impermissible."  *Connor B. ex rel. Vigurs v. Patrick*, 272 F.R.D. 288, 296 (D. Mass 2011) (citing *In re PolyMedica Corp. Sec. Litig.*, 432 F.3d 1, 16 (1st Cir. 2005)).

Based on Plaintiff's showing of systemic deficiencies at all ten ADC facilities, the Court finds that commonality exists with respect to the allegations in Plaintiff's Complaint that the following practices constitute deliberate indifference to all inmates. Those practices, with citations to the named Plaintiffs' declarations detailing their exposure to them, are as follows:

1. Failure to provide timely access to health care (Chisholm Decl. ¶¶ 17-18; Swartz Decl. ¶¶ 4-9; Licci Decl. ¶¶ 3-29; Jensen Decl. ¶¶ 5-45; Hefner Decl. ¶¶ 5-9; Wells Decl. ¶¶ 3-5, 11; Polson Decl. ¶¶ 19-21).

2. Failure to provide timely emergency treatment (Jensen Decl. ¶ 15; Hefner Decl. ¶ 6; Wells Decl. ¶¶ 3-5).

3. Failure to provide necessary medication and medical devices (Gamez Decl. ¶ 20; Chisholm Decl. ¶¶ 17-18; Swartz Decl. ¶¶ 7; Smith Decl. ¶¶ 7-13; Licci Decl. ¶¶ 3-29; Jensen Decl. ¶¶ 5-45; Hefner Decl. ¶¶ 5-9; Wells Decl. ¶¶ 3-5, 11; Polson Decl. ¶¶ 19-21).

4. Insufficient health care staffing (i.e. physicians, psychiatrists, dentists, physicians' assistants, registered nurses, and other qualified clinicians) (Rodriguez Decl. ¶ 7; Smith Decl. ¶ 6; Polson Decl. ¶ 17; Verduzco ¶ 14).

5. Failure to provide care for chronic diseases and protection from infectious disease (Chisholm Decl. ¶¶ 17-18; Licci Decl. ¶¶ 3-29; Jensen Decl. ¶¶ 5-45; Wells ¶¶ 3-5, 11;  Polson Decl. ¶¶ 19-21).

6. Failure to provide timely access to medically necessary specialty care (Swartz Decl. ¶¶ 4-9; Licci Decl. ¶¶ 3-29; Jensen Decl. ¶¶ 5-45; Hefner Decl. ¶¶ 5-9; Wells ¶¶ 3-5, 11; Polson Decl. ¶¶ 19-21).

7. Failure to provide timely access to basic dental treatment (Chisholm Decl. ¶¶ 19--25; Swartz Decl. ¶ 14; Wells Decl. ¶¶ 13-20; Polson Decl. ¶¶ 7-12).

8. Practice of extracting teeth that could be saved by less intrusive means (Chisholm Decl. ¶¶ 22, 25; Swartz Decl. ¶ 14; Wells Decl. ¶¶ 13-20).

9. Failure to provide mentally ill prisoners medically necessary mental health treatment (i.e. psychotropic medication, therapy, and inpatient treatment) (Brislan Decl. ¶¶ 4-10; Gamez Decl. ¶¶ 3-23; Chisholm ¶¶ 3-9; Rodriguez ¶¶ 7-8; Swartz ¶¶ 10-13; Thomas Decl. ¶¶ 4-9; Polson Decl. ¶¶ 14-16; Verduzco ¶¶ 12-16).

10. Failure to provide suicidal and self-harming prisoners basic mental health care (Brislan Decl. ¶¶ 4-10; Swartz ¶¶ 10-13; Thomas Decl. ¶¶ 4-9; Verduzco ¶¶ 12-16).

### ii.    *Subclass*

Plaintiffs also allege that the conditions of confinement in ADC's isolation units pose a substantial risk of serious harm to all inmates and particularly to mentally ill inmates.  Further, it is undisputed that ADC does not require a face-to-face mental health evaluation prior to placing an inmate in isolation.  In opposition, Defendants reiterate their argument that to determine whether these conditions pose an unconstitutional risk of harm, the Court must assess each individual class member's exposure to the alleged conditions.   The Court disagrees, however, for the same reasons outlined above, particularly when considering the effects of these conditions in the aggregate instead of each condition on its own.  This is true even though all Subclass members may not be mentally ill because the risk of harm stemming from the allegedly unconstitutional conditions is the same for all inmates, even though the conditions may, in fact, impact the mentally ill in a more significant way.  *See Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2009); *Baby Neal*, 43 F.3d at 56.

Thus, the Court finds that commonality exists as to the following allegedly unconstitutional conditions in ADC's isolation units:

1. Inadequate psychiatric monitoring because of chronic understaffing (Brislan Decl. ¶ 8; Gamez Decl. ¶¶ 6, 22; Rodriguez Decl. ¶ 7; Swartz Decl. ¶ 10; Smith Decl. ¶ 6; Thomas Decl. ¶ 5; Polson Decl. ¶ 17).

2. Use of chemical agents against inmates on psychotropic medications (Brislan Decl. ¶ 8; Verduzco Decl. ¶ 9).

3. Lack of recreation (Brislan Decl. ¶ 11; Rodriguez Decl. ¶ 13; Thomas Decl. ¶ 6; Polson Decl. ¶ 18).

4. Extreme social isolation (Brislan Decl. ¶ 11; Gamez Decl. ¶ 24; Rodriguez Decl. ¶ 14; Smith Decl. ¶ 15; Thomas Decl. ¶ 6).

5. Constant cell illumination (Brislan Decl. ¶ 11; Rodriguez Decl. ¶ 12).

6. Limited property (Rodriguez Decl. ¶ 14).

7. Insufficient nutrition (Gamez Decl. ¶ 24; Rodriguez Decl. ¶ 13; Thomas Decl. ¶ 11).

### C.    Typicality

"The commonality and typicality requirements of Rule 23(a) tend to merge." *Wal-Mart*, 131 S. Ct. at 2551 n. 5 (quoting *Falcon*, 457 U.S. at 158-59).  In *Armstrong*, the Ninth Circuit explained that "named plaintiffs' injuries [need not] be identical with those of the other class members, only that the unnamed class members have injuries similar to those of the named plaintiffs, and that the injuries result from the same, injurious course of conduct." *Armstrong*, 275 F.3d at 869.

Defendants point out that not all of the named Plaintiffs have similar injuries. While true, the relevant inquiry is whether the named Plaintiffs have injuries typical to the class and not to each other.  Nor is Defendants' reliance on *Schilling v. Kenton County, Ky.*, CV No. 10-143-DLB, 2011 WL 293759, at *10 (E.D. Ky. Jan. 27, 2011), helpful because certification of this class does not require a merits-based inquiry to determine membership.  Rather, as explained above, it is ADC's practices that determine whether inmates are exposed to a substantial risk of serious harm, irrespective of what their individual health care needs or circumstances may be.  The Court finds the typicality factor is satisfied.

### D.    Adequacy of Representation

Finally, Rule 23(a)(4) requires that class representatives fairly and adequately represent the interests of the entire class.  "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel."  *Wal-Mart*, 603 F.3d at 614.

Defendants only challenge the adequacy of Plaintiff Parsons, pointing out that he was released on parole (Doc. 326 at 36).  The Court agrees that Parsons' release undermines his adequacy as a Class representative and he will be dismissed.

## IV.    Rule 23(b)(2)

Plaintiffs are also charged with satisfying one of the requirements in Rule 23(b) which applies when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  FED. R. CIV. P. 23(b)(2).  In this case, Plaintiffs allege that Rule 23(b)(2) is met because Defendants are obligated to provide constitutionally adequate health care and are aware of the systemic deficiencies in ADC's health care but have not taken corrective action.

1
2
3
4

Defendants focus again on the alleged factual differences among the class members and insist that these differences defeat certification under Rule 23(b)(2).  But as the Ninth Circuit explained in *Walters v. Reno*:

5
6
7
8
9

> [a]lthough common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2).  It is sufficient if class members complain of a pattern or practice that is generally applicable to the class as a whole.  Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.

10
11
12

145 F.3d 1032, 1047 (9th Cir. 1998) (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1775 (2d ed. 1986)).

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

Plaintiffs' claims for injunctive relief stemming from allegedly unconstitutional conditions of confinement are the quintessential type of claims that Rule 23(b)(2) was meant to address.  As discussed above, the claims of systemic deficiencies in ADC's health care system and unconstitutional conditions of confinement in isolation units apply to all proposed class members.  And while the Court is certainly cognizant that any proposed injunction must also meet Rule 65(d)'s specificity requirement, the Court does not find that any proposed injunction here would be crafted "at a stratospheric level of abstraction."  *Shook v. Bd. of County Comm'rs*, 543 F.3d 597, 604 (10th Cir. 2008).  Even *Shook* recognized that plaintiffs are not "required to come forward with an injunction that satisfied Rule 65(d) with exacting precision at the class certification stage."  *Id.* at 606.  Further undermining Defendants' argument is their failure to introduce any authority supporting the notion that the proposed injunction in this case violates Rule 65(d).  Indeed, the Ninth Circuit explained in *Rodriguez* that Rule 23(b)(2) certification is appropriate when "all class members seek the exact same relief as a matter of . . . constitutional right."  *Rodriguez*, 591 F.3d at 1126.

28

This conclusion is bolstered when considering the effects of a potential injunction. The remedy in this case would not lie in providing specific care to specific inmates. Rather, the level of care and resources would be raised for all inmates.  Thus, if successful, a proposed injunction addressing those practices would therefore prescribe "a standard of conduct applicable to all class members." *Shook*, 543 F.3d at 605.  This case is "a paradigm of the type of class suitable for certification under Rule 23(b)(2)" because injunctive relief for some inmates would necessarily result in injunctive relief for all inmates. *Colon v. Passaic County*, 2009 WL 1560156, at *5 (D. N. J. May 27, 2009) (certifying a class of prisoners seeking injunctive and declaratory relief for allegedly unconstitutional conditions of confinement) (citations omitted).

The boundaries outlined in this Order and Plaintiff's preliminary outline of injunctive relief presented in their Complaint are sufficient at this stage to meet Rule 23(b)(2)'s requirements.

## V.    Appointment of Class Counsel

In determining that Plaintiffs have successfully established Rule 23's requirements for class certification, the Court must also appoint class counsel pursuant to Rule 23(g). Plaintiffs' counsel have introduced uncontroverted evidence establishing extensive experience in complex prisoner civil rights litigation.  Consequently, the Court appoints the American Civil Liberties Union—National Prison Project, the American Civil Liberties Union—Arizona, the Prison Law Office, and the law firms of Perkins Coie LLP and Jones Day as Class Counsel.

## VI.    Miscellaneous Motion

Finally, former ADC Curt McDonnell has filed a motion to intervene seeking copies of documents.  The motion will be denied because McDonnell is not a named Plaintiff, his request for documents is improper, and he is no longer an ADC inmate.

**IT IS THEREFORE ORDERED that**:

(1) Plaintiffs' Motion for Class Certification (Docs. 245, 248) is **granted**.

(2) The following Class and Subclass are certified under Rule 23(b)(2) and the classes are defined as:

(a) Class—All prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC.  The Class is certified as to the following alleged practices:

 i. Failure to provide timely access to health care;

 ii. Failure to provide timely emergency treatment;

 iii. Failure to provide necessary medication and medical devices;

 iv. Insufficient health care staffing;

 v. Failure to provide care for chronic diseases and protection from infectious disease;

 vi. Failure to provide timely access to medically necessary specialty care;

 vii. Failure to provide timely access to basic dental treatment;

 viii. Practice of extracting teeth that could be saved by less intrusive means;

 ix. Failure to provide mentally ill prisoners medically necessary mental health treatment (i.e. psychotropic medication, therapy, and inpatient treatment); and

 x. Failure to provide suicidal and self-harming prisoners basic mental health care.

(b) Subclass—All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area.  The Subclass is certified as to the following alleged practices:

      i.     Inadequate psychiatric monitoring because of chronic understaffing;

      ii.    Use of chemical agents against inmates on psychotropic medications;

      iii.   Lack of recreation;

      iv.   Extreme social isolation;

      v.    Constant cell illumination;

      vi.   Limited property; and

      vii.  Insufficient nutrition.

(3) Plaintiff Parsons is **dismissed**.

(4) Named Plaintiffs Jensen, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Gamez, Chisholm, Licci, Hefner, Polson, and Wells are appointed as Class representatives.   Named Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, and Polson are appointed as Subclass representatives.

(5) The American Civil Liberties Union—National Prison Project, the American Civil Liberties Union—Arizona, the Prison Law Office, and the law firms of Perkins Coie LLP and Jones Day are appointed as counsel to the class and subclass defined above pursuant to Federal Rule of Civil Procedure 23(g).

(6) Curt McDonnell's Motion to Intervene (Doc. 360) is **denied**.

Dated this 5th day of March, 2013.

Neil V. Wake
United States District Judge