**Parsons v. Ryan**

**CV 12-00601-PHX-NVW (MEA)**

**Index of Defendants' Exhibits**

A.   December 18, 2012 letter from Ashlee Fletcher to Plaintiffs' counsel

B.   November 29, 2012 letter from Ashlee Fletcher to Plaintiffs' counsel

C.   March 26, 2013 letter from Ashley Zuerlein to Caroline Mitchell

D.   Draft of Guidance Software's contract for Department of Corrections work

E.   April 4, 2013 email from Marianne Claassen to Lucy Rand

F.   April 2, 2013 letter from Ashley Zuerlein to Laurens Wilkes

# EXHIBIT A



STRUCK WIENEKE & LOVE    3100 West Ray Road, Suite 300   Chandler, Arizona 85226   **480.420.1600**   swlfirm.com

December 18, 2012

Daniel P. Struck
PARTNER

Kathleen L. Wieneke
PARTNER

Rachel Love
PARTNER

Timothy J. Bojanowski
PARTNER

Christina Retts
SENIOR ASSOCIATE

Jamie D. Guzman
ASSOCIATE

Nicholas D. Acedo
ASSOCIATE

Tara B. Zoellner
ASSOCIATE

Amy L. Nguyen
ASSOCIATE

Ashlee B. Fletcher
ASSOCIATE

Courtney R. Cloman
ASSOCIATE

Anne M. Orcutt
ASSOCIATE

Jennifer Holsman Tetreault
OF COUNSEL

David C. Lewis
OF COUNSEL

**<u>VIA EMAIL ONLY</u>**

Jennifer Alewelt:  jalewelt@azdisabilitylaw.org
Caroline N. Mitchell:  cnmitchell@jonesday.com
Donald Specter:  dspecter@prisonlaw.com
David C. Fathi:  dfathi@npp-aclu.org
Laurens Wilkes:  jwilkes@jonesday.com

    Re: Parsons, et al. v. Ryan and Pratt
       U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

   This letter responds to Scott Medsker's November 30, 2012 letter regarding collection and production of email.

   Thank you for agreeing to remove Curt Czartsy, Sharon Bohn, Laurie Berg, and Sharon Malcolm from the custodian list.  As requested, we will continue to preserve e-mails for these individuals.  Defendants also agree to Plaintiffs' proposed prioritization of production and will produce emails in the order described by Plaintiffs in Scott Medsker's letter.  Defendants further agree to omit search terms 56 through 58 (Richard w/2 pratt; Charles w/2 ryan; Adututu or adututu or "adu tutu").  With regard to the term "health," Defendants will agree to produce all documents containing the term "health" from the custodian email accounts.  As requested, Defendants will alert Plaintiffs if it appears that a significant number of documents being retrieved in response to the term "health" are not related to the administration of health care, or if it becomes unduly burdensome.[1]  Defendants will also agree to search Mr. Ryan and Mr. Pratt's email accounts from January 1, 2011, as requested by Plaintiffs; however, we still believe there may be a significant cost burden on Defendants to gather, review, redact and produce relevant documents – even in light of the agreements discussed throughout this letter.

   Plaintiffs stated they would agree to limit the search of Contract Monitor email accounts to July 1, 2012 though the present, provided that the Contract Monitor did not have a prior role with ADC "that would have made him or her a custodian of similar relevant information."  Defendants have pulled the prior job titles of each Contract Monitor and have attached the list to this correspondence.  After reviewing that list, Defendants believe the following Contract Monitors may have been in a previous position with ADC that made him or her a custodian of similar relevant information:

---

   [1] This may be the case, as it is our understanding that some of the custodians include their title in every email, including irrelevant emails such as ones regarding burrito sales.

Counsel of Record
December 18, 2012
Page 2

       Jason Reese - Quality Assurance Manager
       Juliet Respicio-Moriarty - Health Services Coordinator
       Carol Pearson - Health Program Manager
       Jim Taylor - Regional Facility Health Administrator
       Dennis Chenail - Facility Health Care Manager II
       Karyn Christie - Correctional Registered Nurse Supervisor II
       Helena Valenzuela - Facility Health Care Manager II
       Sam Tardibuono - Facility Health Care Manager I
       John Mitchell -  Correctional Registered Nurse Supervisor I
       Dennis Kendall - Facility Health Care Manager II
       Matthew Musson - Facility Health Care Manager I
       Terry Allred - Facility Health Care Manager II
       Terri Ignacio  - Psychology Nurse II
       Jen Mielke-Fontaine - Utilization Review Nurse
       Donna Mendoza - Correctional Registered Nurse Supervisor I
       Trudy Dumkrieger Correctional Registered Nurse Supervisor II
       Kathy Campbell - Nursing Program Manager
       Patricia Arroyo - Correctional Registered Nurse Supervisor II
       Vanessa Headstream - Correctional Registered Nurse Supervisor I
       Paulette Boothby - Pharmacy Program Manager
       David Robertson - Physician Supervisor
       Ben Shaw - Mental Health Program Administrator
       Steven Bender - Correctional Psychotherapy Program Representative
       John Lee - Psychiatrist

As such, Defendants will search the email accounts of the above individuals from January 1, 2011 and propose limiting the search of the email accounts of Mark Haldane, Marlena Bedoya, Karen Chu and Kristan Sears to July 1, 2012 – as they were not in previous roles with ADC where they would have obtained relevant information.  Please inform us if you are agreeable to such.

Defendants submitted Dr. Sharp as a custodian; however, his name was inadvertently left off the list.  We apologize.  Dr. Sharp's emails will be searched and produced.  Plaintiffs allege Mark Haldane was also omitted from Defendants' custodian list.  That is incorrect.  Mark Haldane's email account is present on the list included in my November 30, 2012 letter, and his email account has been pulled.  Additionally, Plaintiffs inquired into whether Mark Haldane is the Contract Monitor for Perryville and requested his email account be prioritized.  Mark Haldane is the Contract Monitor for Perryville.  Please inform Defendants as to how high of a priority the production of Mr. Haldane's email account is, in accordance with the "priority list" provided by Plaintiffs in Scott Medsker's November 30, 2012 letter.

With regard to the cost associated with storage and retrieval of the emails, Defendants determined it would be more expensive to "rent" space on a per GB basis, as suggested by Plaintiffs, because Defendants would be

Counsel of Record
December 18, 2012
Page 3

responsible for a recurring monthly fee.  Because Defendants are unsure if the
case will be certified as a class, or how long the case will go for, it will be most
cost efficient to purchase space at a one-time fee.  Further, ADC has already
received training and purchased software and storage space.  The remaining
costs associated with the review of the documents is an estimate – one that may
be significantly reduced given the agreements discussed above and any
subsequent agreement to limit the amount of emails requested by Plaintiffs and
burden placed on Defendants.

        If Plaintiffs are agreeable to the above terms, Defendants will re-run the
search terms and time limits on the agreed-upon custodians to determine if an
undue burden still exists.  If Plaintiffs have any questions, suggestions, or
concerns, please do not hesitate to contact me.  We look forward to resolving this
issue in a timely manner.

                            Sincerely,

                            Ashlee B. Fletcher
                            For the Firm

ABF/slw
Attachment
2713814.1

cc:    Michael E. Gottfried
       Dawn Northup
       Katherine Watanabe
       Kelly Dudley

Jason Reese - Quality Assurance Manager
Juliet Respicio-Moriarty - Health Services Coordinator
Carol Pearson - Health Program Manager
Jim Taylor - Regional Facility Health Administrator
Dennis Chenail - Facility Health Care Manager II
Karyn Christie - Correctional Registered Nurse Supervisor II
Helena Valenzuela - Facility Health Care Manager II
Sam Tardibuono - Facility Health Care Manager I
John Mitchell -  Correctional Registered Nurse Supervisor I
Kristan Sears - Administrative Services Officer II
Dennis Kendall - Facility Health Care Manager II
Matthew Musson - Facility Health Care Manager I
Terry Allred - Facility Health Care Manager II
Mark Haldane – No prior title
Marlena Bedoya – no prior title
Terri Ignacio  - Psychology Nurse II
Jen Mielke-Fontaine - Utilization Review Nurse
Donna Mendoza - Correctional Registered Nurse Supervisor I
Trudy Dumkrieger Correctional Registered Nurse Supervisor II
Kathy Campbell - Nursing Program Manager
Patricia Arroyo - Correctional Registered Nurse Supervisor II
Vanessa Headstream - Correctional Registered Nurse Supervisor I
Karen Chu – no prior title
Paulette Boothby - Pharmacy Program Manager
David Robertson - Physician Supervisor
Ben Shaw - Mental Health Program Administrator
Steven Bender - Correctional Psychotherapy Program Representative
John Lee - Psychiatrist

# EXHIBIT

# B



STRUCK WIENEKE & LOVE    [ 3100 West Ray Road, Suite 300   Chandler, Arizona 85226   480.420.1600   swlfirm.com ]

November 29, 2012

Daniel P. Struck
PARTNER

Kathleen L. Wieneke
PARTNER

Rachel Love
PARTNER

Timothy J. Bojanowski
PARTNER

Christina Retts
SENIOR ASSOCIATE

Jamie D. Guzman
ASSOCIATE

Nicholas D. Acedo
ASSOCIATE

Tara B. Zoellner
ASSOCIATE

Amy L. Nguyen
ASSOCIATE

Ashlee B. Fletcher
ASSOCIATE

Courtney R. Cloman
ASSOCIATE

Anne M. Orcutt
ASSOCIATE

Jennifer Holsman Tetreault
OF COUNSEL

David C. Lewis
OF COUNSEL

**VIA EMAIL ONLY**

Jennifer Alewelt:  jalewelt@azdisabilitylaw.org
Caroline N. Mitchell:  cnmitchell@jonesday.com
Donald Specter:  dspecter@prisonlaw.com
David C. Fathi:  dfathi@npp-aclu.org

   Re: Parsons, et al. v. Ryan and Pratt
     U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

  As promised at yesterday's meet-and-confer, below and attached is a summary of the volume and costs associated with the production of email accounts requested by Plaintiffs. As mentioned yesterday, we believe we can work together to accomplish production of the relevant documents you seek; however, will need to narrow the amount of emails by refining the search terms, time frame, and custodians.

  Plaintiffs requested Curt Czarsty, ADC's IT Specialist, be one of the custodians. His email account, however, is not factored into the numbers and data discussed below, and Defendants propose he be removed as a custodian for several reasons. First, the vender will be required to redo all collection efforts that ADC has already accomplished in order to pull Curt's emails because the collector, Curt Czarsty, cannot be the same person as the custodian. To accomplish this, ADC will be required to incur an additional cost of $37,440 because the collection of emails will need to be done by the vender. This cost will be completely eliminated if Curt is removed as a custodian because it will allow him to conduct the collection himself using the tools he has acquired – the EnCase software ADC has purchased and the extensive training he has been provided to run the search and collection. Defendants believe it is most efficient to remove Curt as a custodian as it would save ADC almost $40,000 and, as an IT specialist, it is unlikely his email account will yield many, if any, emails regarding the administration of health care and/or conditions of confinement at ADC facilities. Additionally, as outlined below, adding Curt Czarsty will dramatically increase an already staggering amount of emails.

  Below is the amount of data contained in each custodian's email account. The date range for all email accounts pulled was January 1, 2011 through present.

Counsel of Record
November 29, 2012
Page 2

- madututu             1.2 GB
- cryan                7.9 GB
- rpratt               4.6 GB
- jlee                 51.2 MB
- kchu                 19.5 MB
- jmitchell            221 MB
- dchenail             523 MB
- lgeorge              641 MB
- drobertson           499.8 MB
- bshaw                251.2 MB
- kchristie            646.3 MB
- mhaldan              147.2 MB
- sbohm                802.4 MB
- stardibu             658.8 MB
- parroyo              548.4 MB
- tdinardo             810 MB
- kingram              580.7 MB
- tignacio             186.7 MB
- tdrumkrieger         523.2 MB
- hvalenzuela          956 MB
- mbedoya              382.3 MB
- ksears               1.1 GB
- tallred              838.3 MB
- smalcolm             553.1 MB
- dmendoza             488.1 MB
- sbender              194 MB
- gfizer               746.9 MB
- rlee                 675.8 MB
- jreese               1.4 GB
- vheadstream          602.2 MB
- mkearns              709.7 MB
- cpearson             1.7 GB
- dkendall             1.0 GB
- mmusson              2.2 GB
- lboothby             2.5 GB
- jtaylor              2.5 GB
- jmielke-fontaine     2.9 GB
- jrespocoo-moriarty   3.5 GB
- jprofiri             4.8 GB
- jhood                4.6 GB
- lberg                1.8 GB
- kcampbell            2.7 GB

Counsel of Record
November 29, 2012
Page 3

The total number of collected emails is 2,098,953.  After the emails have been de-duped, the total number of potentially relevant non-privileged emails is 734,856.  The total number of potential privileged emails is 17,364.

Moreover, ADC would be required to purchase additional space to store and process these emails.  That added space will cost $68,798.  The estimated cost to ADC for the Attorney General's office to review these emails for privilege and prepare them for production is $786,700 for every 40,000 emails.  The total cost ADC has invested in preparation for ESI collection in this case to date is $27,816.

Additionally, many of the search terms are simply too broad.  For example, the term "health" alone retrieved 357,004 emails – many of which are not likely to be related to Plaintiffs' claims or to the information you are seeking.  Further, and as discussed below, searching for terms such as Richard w/2 Pratt yields essentially every email of Richard Pratt – most of which do not contain relevant information.

As we touched upon yesterday, we believe that reducing the amount of emails can be accomplished through the following:

- Contract Monitor's email accounts be limited to the date range of July 1, 2012(the date they assumed the contract monitor role as a result of Wexford's takeover)-present.

- Named Defendants' email accounts be limited to March 22, 2012 (date Complaint was filed).

- Removal of all secretaries from the custodians list (Sharon Bohm, Laurie Berg, Sharon Malcolm)

- Tailor search terms and phrases of individual names.  For example, the search was conducted with search terms similar to "Richard w/2 Pratt."  Creating more specific search phrases such as "John w/2 Pratt AND health w/20 "health care" or "medical" will narrow the number of hits and dramatically reduce the number of emails.

Please provide Defendants with revised search terms, custodians, and timeframes and advise if you are amenable to the suggestions outlined above.  If you have any questions regarding the size of emails, costs to ADC or any other issues related to e-discovery, please do not hesitate to contact us.  We look forward to resolving this issue as soon as possible.

Counsel of Record
November 29, 2012
Page 4

Sincerely,

Ashlee B. Fletcher
For the Firm

ABF/slw
2712165.1

cc:     Michael E. Gottfried
        Dawn Northup
        Katherine Watanabe
        Kelly Dudley

| ROW | TEXT | TOTAL ITEMS |
|---|---|---|
| 1 | Health* | 357004 |
| 2 | Prognos* | 3756 |
| 3 | Dental | 33412 |
| 4 | Dentist* | 12902 |
| 5 | Tooth | 3868 |
| 6 | Teeth | 3796 |
| 7 | Denture* | 2424 |
| 8 | Extract* | 5004 |
| 9 | Wait w/2 time | 2570 |
| 10 | Temp w/2 filling* | 142 |
| 11 | Prosthe* | 3776 |
| 12 | Oral | 16328 |
| 13 | Medical* | 289714 |
| 14 | Doctor* | 28028 |
| 15 | Dr | 171392 |
| 16 | md or md | 15588 |
| 17 | rn or rn | 110298 |
| 18 | lpn or lpn | 16414 |
| 19 | Clinician* | 4922 |
| 20 | Nurse* | 95214 |
| 21 | Physician* | 49282 |
| 22 | Mental* | 79088 |
| 23 | HNR* | 24596 |
| 24 | Health and Needs Request* | 27920 |
| 25 | Continuous and Progress and Summary | 1730 |
| 26 | Health w/2 care | 38048 |
| 27 | Sick w/2 call | 3922 |
| 28 | Cell and Front and Visit | 2900 |
| 29 | Suicide and watch | 6830 |
| 30 | Psych* | 56356 |
| 31 | SMI | 9370 |
| 32 | Symptom* | 16722 |
| 33 | Medication* | 73618 |
| 34 | Formular* | 7090 |
| 35 | Prescription* | 21832 |
| 36 | Prescrib* | 20858 |
| 37 | Diagnos* | 34454 |
| 38 | Delay* | 29162 |
| 39 | Refer* | 76456 |
| 40 | Pharmac* | 60346 |
| 41 | Injur* | 43860 |
| 42 | Medical w/2 procedure* | 4314 |
| 43 | Dental w/2 procedure* | 684 |
| 44 | Surger* | 37764 |
| 45 | Specialist* | 40746 |

| 46 | Chronic* | 23686 |
|----|----------|-------|
| 47 | Disorder* | 14906 |
| 48 | Self w/2 *harm | 18816 |
| 49 | Suicid* | 22676 |
| 50 | Therap* | 20534 |
| 51 | Treatment* | 71702 |
| 52 | Dosage | 5074 |
| 53 | Dose* | 13846 |
| 54 | Safety w/2 check | 0 |
| 55 | Security w/2 walk | 68 |
| 56 | Richard w/2 pratt | 139934 |
| 57 | Charles w/2 ryan | 92822 |
| 58 | Adu-tutu or adututuor or "adu tutu" | 80458 |
| 59 | (Victor w/2 parsons) or 123589* or *123598 | 1306 |
| 60 | (Desiree w/2 licci) or 150051* or *150051 | 1076 |
| 61 | (Joshua w/2 polson) or 187716* or *187716 | 1162 |
| 62 | (Shawn w/2 jensen) or 32465* or *32465 | 2174 |
| 63 | (Jackie w/2 thomas) or 211267* or *211267 | 2198 |
| 64 | (Sonia w/2 rodriguez) or 103830* or *103830 | 1568 |
| 65 | (Charlotte w/2 wells) or 247188* or *247188 | 1308 |
| 66 | (Maryanne w/2 chisholm) or 200825* or *200825 | 1376 |
| 67 | (Dustin w/2 brislan) or 164993* or *164993 | 1894 |
| 68 | (Robert w/2 gamez) or 131401* or *131401 | 1598 |
| 69 | (Joseph w/2 hefner) or 203653* or *203653 | 1396 |
| 70 | (Stephen w/2 swartz) or 102486* or *102486 | 1958 |
| 71 | (Jeremy w/2 smith) or 129438* or *129438 | 1080 |
| 72 | Isolation | 7874 |
| 73 | Confinement | 3516 |
| 74 | Health w/2 screen* | 2042 |
| 75 | Wexford | 101546 |
| 76 | Deliberat* w/2 indifferen* | 1014 |
| 77 | Medical w/2 grievance* | 7874 |
| 78 | Disease* | 24880 |

| 79  | Hepatitis | 9150 |
|-----|-----------|------|
| 80  | Hep | 10954 |
| 81  | Virus* | 7030 |
| 82  | Sick* | 18496 |
| 83  | Overdos* | 13776 |
| 84  | Death* | 40540 |
| 85  | Deceased | 7542 |
| 86  | Hospital* | 143602 |
| 87  | Diet* | 17010 |
| 88  | Nutrition* | 4980 |
| 89  | Physical w/20 exam* | 6204 |
| 90  | Patient* | 60136 |
| 91  | Infirmar* | 11158 |
| 92  | Emergen* | 66216 |
| 93  | First and aid | 7972 |
| 94  | Cardiopulmonary | 1128 |
| 95  | Clinic* | 73720 |
| 96  | Autops* | 3596 |
| 97  | Medical w/2 examiner | 1688 |
| 98  | Continuity w/2 care | 6846 |
| 99  | Standard w/2 care | 2770 |
| 100 | Quality w/2 care | 2924 |
| 101 | Assessment | 29152 |
| 102 | Side and effect* | 6184 |
| 103 | "Maximum Security" | 1726 |
| 104 | "Maximum Custody" | 5460 |
| 105 | SMU | 32042 |
| 106 | Browning | 29368 |
| 107 | "Special Management Unit" | 382 |
| 108 | "Florence Central" | 11930 |
| 109 | "Central Unit" | 22610 |
| 110 | Kasson | 11918 |
| 111 | Lumley | 20570 |
| 112 | "Special Management Area" | 388 |
| 113 | SMA | 2638 |
| 114 | Segregation | 11074 |
| 115 | Enhanced | 2692 |
| 116 | Detention | 31026 |
| 117 | CDU | 17394 |
| 118 | SHU | 3058 |
| 119 | Aspen | 9646 |
| 120 | Baker | 21712 |
| 121 | Ward | 19508 |
| 122 | Flamenco | 10990 |
| 123 | "Behavioral Management Unit" | 326 |
| 124 | BMU | 3224 |

| 125 | Women* and Treatment and Unit | 1610 |
|-----|-------------------------------|------|
| 126 | WTU | 2490 |
| 127 | "Step-down program" or "stepdown program" or "step down program" | 482 |
| 128 | "Special Management Treatment Unit" | 138 |
| 129 | "Special Management Treatment Area" | 96 |
| 130 | "Behavioral control" | 946 |
| 131 | "Security Threat Group" | 1970 |
| 132 | STG | 6100 |
| 133 | Mh-4 or mh4 | 1364 |
| 134 | Mh-5 or mh5 | 532 |
| 135 | Outdoor* | 2990 |
| 136 | Exercise* | 13250 |
| 137 | Cell | 120290 |
| 138 | Recreation* | 17396 |
| 139 | Reduced and calorie* | 360 |
| 140 | Cure | 5096 |

# EXHIBIT C



**OFFICE OF THE ATTORNEY GENERAL**
**STATE OF ARIZONA**
LIABILITY MANAGEMENT SECTION

**TOM HORNE**
ATTORNEY GENERAL

**ASHLEY B. ZUERLEIN**
ASSISTANT ATTORNEY GENERAL
(602) 542-7620
ASHLEY.ZUERLEIN@AZAG.GOV

March 26, 2013

Caroline Mitchell
Jones Day
555 California St., 26th Floor
San Francisco, CA 94104
cmitchell@jonesday.com

  Re: *Parsons, et al. v. Ryan, et al.*
    USDC CV 12-00601-PHX-NVW (MEA)

Dear Ms. Mitchell:

   This letter is to follow-up regarding the production of email data.

**I. Search Terms**

   As previously discussed, Plaintiffs' request for production of emails for the identified custodians creates an undue burden upon Defendants. See list of identified ADC employees, i.e. custodians, attached as Exhibit A. The searches are too broad, the custodians too numerous, and the results too large.

   The EnCase database created by the ADC, currently contains emails for the majority of Plaintiffs' identified custodians from January 1, 2011,[1] through late November 2012. We have used the search terms confirmed by Ashlee Fletcher's November 29, 2012, correspondence to identify responsive emails. Defendants estimate that there are approximately 640,000 responsive emails (117.2 GB of data) after applying Plaintiffs' search terms and a privilege filter.[2] The top 14 "priority" custodians identified in your December 19, 2012 letter, are estimated to have approximately 157,000 emails (28.5 GB of data).

---

[1] Bedoya, Haldane, Chu, and Sears have been collected from July 1, 2012, through approximately November 2012, according to Plaintiffs' agreement.
[2] This estimate does not include de-duplication of emails between custodians, and does not include emails from late November 2012, to the present.

*Parsons, et al. v. Ryan, et al.*
March 26, 2013
Page 2 of 4

While we appreciate Plaintiffs' offer to possibly remove search terms in the future, doing so is not a viable option and will only increase Defendants' costs. Simply, each search requires a reconfiguration of the system. As a result, please review the list of search terms attached one final time and confirm your agreement to the terms attached as Exhibit B. Once Plaintiffs confirm these search terms, no further changes will be made.

We would like to again note that several of Plaintiffs' requested terms are extremely broad, resulting in a significant number of irrelevant results. For example, "health" results in 32,297 results, "medical" results in 24,886 results, and "dr" results in 16,220 results.[3] These types of terms are likely to be included in an employee's signature line and thus, are not narrowly tailored to lead to the discovery of admissible evidence. We would recommend you reconsider your proposed search terms.

Finally, it is our understanding that the attached search terms were to be applied uniformly to all 48 custodians. Please confirm.

## II. EnCase Email Process

In order to efficiently process Plaintiffs' email requests, the ADC has been utilizing EnCase software, which is capable of removing duplicate emails in one of two ways. The first option is "within custodian." This means that any email that occurs twice *within the same employee's account* will only be produced once. For example, if Director Ryan sent an email to Employee X, who then replied, only the final email chain would appear in Ryan's account. Employee X's emails would be unaffected by the de-duplication of Ryan's email account. Therefore, ultimately, there would be two duplicate emails to review: one in Ryan's email account and one in Employee X's email account.

The second option is de-duplication "across custodians." This means that any email that occurs twice within the identified employees will only appear in one employee's email account depending upon who was the last to respond in the email chain. For example, if Director Ryan sent an email to Employee X, who then responded, the final email chain will appear in Employee X's email account, but not Director Ryan's email account. The benefit to this option is that only one copy of the email would be reviewed, redacted, converted and produced. This option can save both parties time and money.

Based on the above descriptions, please clarify the type of de-duplication that Plaintiffs intended. Due to the EnCase programming required, once a method is confirmed, the ADC cannot change the type of de-duplication used without significant expense and delay.

---

[3] These figures are based upon EnCase data after applying privilege and search term filters.

### III.    Discovery Schedule

On March 20, 2013, Plaintiffs' relayed their position that it was Defendants' choice to select more costly email production options and they would not engage in cost-sharing. Plaintiffs have repeatedly suggested that Defendants rely upon the claw-back provision of the protective order and send Plaintiffs all emails without any review or redaction.[4]  This is not a viable option.  The ADC is responsible for the safe and orderly operation of state prisons and cannot compromise its duty.  The ADC's emails regularly contain highly sensitive information that cannot be disclosed.  Any disclosure of its security procedures would be extremely detrimental to the ADC, its employees, inmates and the public in general.  The claw-back procedure is meant as a safety net of last resort, not the primary method of preventing confidential, privileged and security information from being disclosed.

As you know, production of these emails is a two-step process.  First, the emails of each of your identified individuals are collected and the search terms run to narrow the scope of potentially relevant documents.  Once collected, the emails have to be produced to you.  As noted above, all of the emails must be reviewed for security and privilege.  Given the quantity of emails your searches are producing, this will require tremendous amounts of dedicated time and resources.

Accordingly, Defendants are left with two options with respect to the production of emails.  Option one involves the manual conversion of emails extracted from the EnCase system into a PDF format for review, redaction and bates numbering.  While it is the most economical for Plaintiffs, it is a very time consuming, burdensome process for Defendants. Based on the amount of emails requested, Defendants cannot produce all emails by the discovery deadline of September 27, 2013.  We note that during this same time frame, Defendants must also respond to numerous other requests for production of documents sought by Plaintiffs.  Because of the scope of your requests, this manual review (which is all the rules require) is unduly burdensome.

Option two, previously discussed, involves sending the extracted email data to a third-party for electronic conversion.  Defendants have located a third-party capable of converting the EnCase data to a TIFF format at a cost of $625 per gigabyte of data.  This format allows for computerized review, redaction and production of data.  Plaintiffs' full

---

[4] The cases you have forwarded do not support your position. *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 290 (S.D.N.Y. 2003), merely notes that parties *may* enter into a "claw-back" agreement to "return *inadvertently* produced privileged documents."  (Emphasis added.)  Here, the requested documents are *known* to contain security sensitive information.  It would be irresponsible for ADC to knowingly turn over these highly privileged and confidential documents to Plaintiffs.  A claw-back agreement is intended for *inadvertent* disclosure, not *intentional* disregard.

*Parsons, et al. v. Ryan, et al.*
March 26, 2013
Page 4 of 4

request is estimated to cost $38,438 (61.5 GB).  Conversion of the 14 "priority" custodians is estimated at $17,813 (28.5 GB).  When limited to Ryan, Pratt and Adu-tutu costs are estimated at $8,563 (13.69 GB).   If Plaintiffs are willing to share in the cost of electronic conversion, Defendants anticipate completion of email production in approximately six months.  However, this is an estimate that may change based upon the actual data to be processed.

In short, production of these emails is going to be extremely costly and time-intensive unless the number of emails you are seeking is reduced substantially.  As the request currently stands, it is unduly burdensome due to the resources needed if reviewed manually and the costs if reviewed in a more efficient electronic form.  If you continue to insist on these overly broad and burdensome requests, we will have no choice but to revise our previous one-page position and seek court intervention.

Please let me know if you believe that a meet and confer is necessary.

Sincerely,



Ashley B. Zuerlein
Assistant Attorney General

CC:    Tim Bojanowski
       Dan Struck
       Kathy Wieneke
       Dawn Northup

#3191627

# ATTACHMENT A

## E-MAIL PRODUCTION CUSTODIANS
### *PARSONS v. RYAN, USDC CV12-0601-PHX-NVW*

| # | E-mail Account Custodian | Date To Begin Collection | Job Title(s) Before and After July 1, 2012 |
|---|---|---|---|
| 1. | Adu-Tutu, Michael | 1/1/2011 | Administrator of HS / (Private Employer) |
| 2. | Allred, Terry | 1/1/2011 | Lewis Facility HC Mgr. I (FHA) / Lewis Compliance Monitor |
| 3. | Arroyo, Patricia | 1/1/2011 | Crrl RN Supervisor II / Audit Nurse |
| 4. | Bedoya, Marlena | **7/1/2012** | None / Tucson Compliance Monitor |
| 5. | Bender, Steven | 1/1/2011 | Crrl. Psychotherapy Prog. Rep. / MH Auditor |
| 6. | Berg, Laurie | 1/1/2011 | Executive Staff Assistant / same |
| 7. | Bohm, Sharon | 1/1/2011 | Executive Staff Assistant / same |
| 8. | Boothby, Paulette "Leslie" | 1/1/2011 | Pharmacy Program Manager / Pharmacy Monitor |
| 9. | Campbell, Kathy | 1/1/2011 | Nursing Program Manager / Health Services Coordinator |
| 10. | Chenail, Dennis | 1/1/2011 | Yuma Facility HC Mgr. II (FHA) / Yuma Compliance Monitor |
| 11. | Christie, Karyn | 1/1/2011 | Crrl RN Supervisor II / Safford & Ft. Grant Compliance Monitor |
| 12. | Chu, Karen | **7/1/2012** | None / Dental Program Monitor |
| 13. | Czarsty, Curtz | 1/1/2011 | IT / same |
| 14. | Dinardo, Terry | 1/1/2011 | HS Business Office Manager / same |
| 15. | Dumkrieger, Trudy | 1/1/2011 | Crrl RN Supervisor II / Tucson Audit Nurse |
| 16. | Fizer, Greg | 1/1/2011 | DW Florence-Central Unit / same |
| 17. | George, Leon | 1/1/2011 | Chief Procurement Officer / same |
| 18. | Haldane, Mark | **7/1/2012** | None / Perryville Compliance Monitor |
| 19. | Headstream, Vanessa | 1/1/2011 | Crrl RN Supervisor I / Audit Nurse |
| 20. | Hood, Jeff | 1/1/2011 | Deputy Director, Director's Office / same |
| 21. | Ignacio, Terri | 1/1/2011 | Psychology Nurse II / Compliance Monitor, Contract Beds |
| 22. | Ingram, Karen | 1/1/2011 | ADC Senior Procurement Specialist / same |
| 23. | Kearns, Michael P. | 1/1/2011 | Div. Director, Administrative Services Division / same |
| 24. | Kendall, Dennis | 1/1/2011 | Florence Facility HC Mgr. II (FHA) / Florence Compliance Monitor |
| 25. | Lee, John | 1/1/2011 | Psychiatrist / Psychiatrist |
| 26. | Lee, Ronda | 1/1/2011 | ADC Policy Unit Manager / same |
| 27. | Malcolm, Sharon | 1/1/2011 | Executive Staff Assistant / same |
| 28. | Mendoza, Donna | 1/1/2011 | Crrl RN Supervisor I / Lewis/Perryville Audit Nurse |
| 29. | Mielke-Fontaine, Jen | 1/1/2011 | Utilization Review Nurse / Eyman & Florence Audit Nurse |
| 30. | Mitchell, John | 1/1/2011 | Crrl RN Supervisor I / Winslow Compliance Monitor |
| 31. | Musson, Matthew | 1/1/2011 | Eyman Facility HC Mgr. I (FHA) / Eyman Compliance Monitor |

# ATTACHMENT A

## E-MAIL PRODUCTION CUSTODIANS
### *PARSONS v. RYAN, USDC CV12-0601-PHX-NVW*

| # | E-mail Account Custodian | Date To Begin Collection | Job Title(s) Before and After July 1, 2012 |
|---|---|---|---|
| 32. | Nicoletti, Joseph | 1/1/2011 | IT / same |
| 33. | Pearson, Carol | 1/1/2011 | Health Program Mgr II / Medical Records Monitor |
| 34. | Pratt, Richard | 1/1/2011 | Southern Regional FHA / Quality / Clinical Prog. Eval. Admr. (Div. Dir.) |
| 35. | Profiri, Joe | 1/1/2011 | Contract Beds Administrator (Operations Director) / same |
| 36. | Reese, Jason | 1/1/2011 | Quality Assurance Mgr / Executive Consultant II |
| 37. | Respicio-Moriarity, Juliet | 1/1/2011 | Health Services Coordinator / IM Griev. Appl. Investigator |
| 38. | Robertson, David | 1/1/2011 | Physician Supervisor / Medical Program Administrator |
| 39. | Rowe, Richard | 1/1/2011 | Medical Program Manager / Medical Service Administrator |
| 40. | Ryan, Charles | 1/1/2011 | Director / same |
| 41. | Sears, Kristan | **7/1/2012** | Admv. Svcs. Officer II / Compliance Monitor, Contract Beds |
| 42. | Sharp, Jeffrey | 1/1/2011 | ADC Physician / Wexford Physician |
| 43. | Shaw, Ben | 1/1/2011 | MH Program Manager / Mental Health Monitor |
| 44. | Tardibuono, Sam | 1/1/2011 | Douglas, Safford & Ft. Grant Facility HC Mgr. I (FHA) / Douglas Compliance Monitor |
| 45. | Taylor, Jim | 1/1/2011 | Northern Regional FHA / Program Eval. Administrator |
| 46. | Valenzuela, Helena | 1/1/2011 | Tucson Facility HC Mgr. II (FHA) / Phoenix Compliance Monitor |
| 47. | Weekly, Carlos | 1/1/2011 | ADC Florence Supervising Dentist / Wexford, Florence Supervising Dentist |

## Search Terms

health*
OR prognos*
OR dental
OR dentist*
OR tooth
OR teeth
OR denture*
OR extract*
OR (wait w/2 time)
OR (temp* w/2 filling*)
OR prosthe*
OR oral
OR medical*
OR doctor*
OR dr
OR md
OR rn
OR lpn
OR clinician*
OR nurse*
OR physician*
OR mental*
OR hnr*
OR "health needs request*"
OR "continuous progress summary"
OR (health w/2 care)
OR (sick w/2 call)
OR "cell front visit"
OR "suicide watch"
OR psych*
OR smi
OR symptom*
OR medication*
OR formular*
OR prescription*
OR prescrib*
OR diagnos*
OR delay*
OR refer*
OR pharmac*
OR injur*

OR (medical w/2 procedure*)
OR (dental w/2 procedure*)
OR surger*
OR specialist*
OR chronic*
OR disorder*
OR (self w/2 harm)
OR suicid*
OR therap*
OR treatment*
OR dosage
OR dose*
OR (safety w/2 check)
OR (security w/2 walk)
OR (victor w/2 parsons OR *123589*)
OR (desiree w/2 licci OR *150051*)
OR (joshua w/2 polson OR *187716*)
OR (shawn w/2 jensen OR *32465*)
OR (jackie w/2 thomas OR *211267*)
OR (sonia w/2 rodriguez OR *103830*)
OR (charlotte w/2 wells OR *247188*)
OR (maryanne w/2 chisholm OR *200825*)
OR (dustin w/2 brislan OR *164993*)
OR (robert w/2 gamez OR *131401*)
OR (joseph w/2 hefner OR *203653*)
OR (stephen w/2 swartz OR *102486*)
OR (jeremy w/2 smith OR *129438*)
OR isolation
OR confinement
OR (health w/2 screen*)
OR wexford
OR (deliberat* w/2 indifferen*)
OR (medical w/2 grievance*)
OR disease*
OR hepatitis
OR hep
OR virus*
OR sick*
OR overdos*
OR death*
OR deceased
OR hospital*
OR diet*

OR nutrition*
OR (physical w/20 exam*)
OR patient*
OR infirmar*
OR emergen*
OR "first aid"
OR cardiopulmonary
OR clinic*
OR autops*
OR (medical w/2 examiner)
OR (continuity w/2 care)
OR (standard w/2 care)
OR (quality w/2 care)
OR assessment
OR side effect*
OR "maximum security"
OR "maximum custody"
OR smu
OR browning
OR "special management unit"
OR "florence central"
OR "central unit"
OR kasson
OR lumley
OR "special management area"
OR sma
OR segregation
OR enhanced
OR detention
OR cdu
OR shu
OR aspen
OR baker
OR ward
OR flamenco
OR "behavioral management unit"
OR bmu
OR "women* treatment unit"
OR wtu
OR "step*down program"
OR "special management treatment unit"
OR "special management treatment area"
OR "behavior control"

OR "security threat group"
OR stg
OR mh*4
OR mh*5
OR outdoor*
OR exercise*
OR "out of cell"
OR recreation*
OR "reduced calorie*"
OR cure

# EXHIBIT D



Professional Services

**Statement of Work**

This Statement of Work (this "**SOW**"), dated the Effective Date (as defined on the signature page below), is by and between Guidance Software, Inc. ("**GSI**") and the client identified on the signature page hereto ("**Client**") along with any End User (as defined below), if applicable.  This SOW, once executed, shall be incorporated into and become a part of the Professional Services Agreement (or "**PSA**"), dated the PSA Effective Date (as defined on **Schedule A** hereto), between Client and GSI. If there is a conflict between the terms of this SOW and the PSA, this SOW will govern over the PSA to the extent of the conflict.  All Schedules attached hereto are made a part hereof and incorporated herein as if set forth in this SOW.  This SOW defines the professional services ("**Services**") to be delivered by GSI to Client, which are described in more detail on **Schedule A**, and the fees to be paid by Client to GSI in exchange for the Services, which are set forth in detail on **Schedule B**.  **References to "Client" hereunder also include any End User if an End User is receiving the Services hereunder with a law firm or other service provider entering into this SOW on such End User's behalf.**

The scope ("**Scope**") of the Services is limited to assisting Client with the tasks described on **Schedule A**.

**ASSUMPTIONS**

Client agrees that GSI relied upon the following assumptions in developing the (i) "**Fees and Expenses - Estimate**", (ii) "**Scope**", (iii) "**Deliverables**" and (iv) "**Performance Schedule**" sections set forth in this SOW.  Client agrees that any deviation from these assumptions may require GSI to change the Fees and Expenses - Estimate, Scope, Deliverables and Performance Schedule hereunder.

**General Assumptions:**

1.      Services will not be scheduled or performed prior to GSI's receipt of a fully executed PSA and SOW.

2.      If Services are connected with any current or potential litigation, Client will provide GSI with names of all involved parties for a conflict check prior to commencement of Services.

3.      GSI may use EnCase software to provide Services.  No rights to such software are granted to Client hereunder.

4.      For hourly billable services, a work day is normally eight (8) hours between 9AM-6PM (which includes a one hour lunch), Monday-Friday, excluding GSI recognized holidays.

5.      All time spent at the Client site or traveling from one Client site to another will be billed at the hourly rates set forth herein.

6.      Any tasks requested by Client not identified in this SOW will be billed pursuant to the PSA or as otherwise agreed in writing.

7.      Client will provide GSI with a list of authorized users with access to Client's computer network ("**Network**") and appropriate access to the Network and files/data stored thereon. Network access will include access to a centrally located Network switch(es). The location designated will have ample power and work space for the indicated number of GSI personnel.

8.      GSI personnel will have Client's full cooperation in connection with performing the Services hereunder.

9.      GSI reserves the right to assign additional personnel to perform the Services in the time frame indicated under "Performance Schedule" below.  All time estimates provided hereunder are based on our standard protocols for processing data and reporting.  Any requests for interim reports, data extraction or copies for the acquisition or restoration prior to the final report are billable in addition to these estimates.

10.     GSI may modify existing EnScripts, or utilize enhanced EnScripts developed by GSI, to automate Services at the indicated cost, however, Client does not own or have any rights to the EnScripts created or customized by GSI in performance of the Services. Client is being billed for the time to create or customize EnScripts used to enhance the Services being provided.

11.     The dress code for onsite work is business casual unless otherwise agreed to in writing.

**Scope Specific Assumptions:**

Additional assumptions specific to the Scope of Services to be performed under this SOW are set forth on **Schedule C**.

**PERFORMANCE SCHEDULE; ALLOCATED GSI RESOURCES**

Unless otherwise agreed in writing between GSI and Client, GSI will begin performing the Services on, and estimates that performance will be completed by, the dates set forth on **Schedule A**.  GSI estimates that each Scope item will be performed on the date(s) and/or in the timeframe(s) described on **Schedule A**.  GSI normally requires confirmation of this Performance Schedule at least 48 hours prior to onsite deployment of GSI consultants within the continental United States and at least 72 hours prior confirmation for international onsite deployment.  If Client confirms the start date set forth on **Schedule A**, but re-schedules or cancels such start date within ten (10) calendar days of such start date, GSI reserves the right to invoice Client (and Client agrees to pay such invoice) for (a) GSI's

SOW – General Engagement (Attached to PSA)



actual costs incurred as a result of such re-scheduling or cancellation, and (b) fifty percent (50%) of the aggregate engagement fee if GSI, after making commercially reasonable efforts to do so, is unable to re-allocate the scheduled consultant(s) to another engagement during the scheduled dates.  GSI estimates* that the number of consultants set forth on **Schedule A** can complete the Services within the Performance Schedule.

### DELIVERABLES

GSI will deliver to Client the Deliverables, if any, set forth on **Schedule A** either as described in the Performance Schedule, at the completion of the Services or as otherwise agreed in writing between Client and GSI.

**Testimony Upon Request**.  If requested in writing by Client, GSI will provide testimony regarding the Deliverables or with respect to the Services at the hourly rates set forth in the PSA or as otherwise agreed in writing between Client and GSI.

### FEES AND EXPENSES - ESTIMATE

In exchange for the Services, Client agrees to (i) pay GSI the fees, at the hourly rates and/or fixed amounts, as set forth on **Schedule B**; and (ii) reimburse GSI for GSI's Service-related expenses set forth on **Schedule B**.  If Client is a law firm or service provider and the Services are to be performed by GSI for an end user of the Services that is Client's client (an "**End User**"), End User must also execute this SOW and agree to be jointly and severally liable with Client to perform hereunder and pay all amounts due GSI hereunder.

### DISPOSITION OF EVIDENTIARY MATERIALS

If required per the Scope, GSI will create forensic copies of collected Electronically Stored Information (ESI) and store these copies as EnCase Evidence Files in a secure GSI storage facility until the Services are completed.  Upon completion of the Services, all stored ESI shall be returned to Client either to the contact address set forth on **Schedule A** or as Client otherwise instructs GSI in writing.  Unless otherwise agreed in writing, Client shall bear all costs for the return/delivery of the ESI.  Client may also provide written authorization to GSI directing GSI to wipe and/or physically destroy any media containing the ESI at GSI's then current fee for such service.

### BILLING INSTRUCTIONS; CLIENT INFORMATION AND PROJECT LEADS

Invoices for Services and other correspondence under this SOW will be directed to Client and End User (if applicable) as set forth on **Schedule A**. Client's and GSI's respective project coordinators for this engagement are set forth on **Schedule A**.

### MISCELLANEOUS TERMS AND CONDITIONS

1. **Expiration**. This SOW expires if not signed and returned to GSI within 30 days from the date signed by GSI below.  This SOW will also become void if GSI's performance does not commence within 30 days from such date unless otherwise agreed in writing.

2. **Effectiveness**.  Upon execution by both parties, this SOW shall be a non-cancelable, non-refundable order by Client. The purchased Services shall expire one (1) year from the Effective Date.  If Client fails to schedule the Services within this time period, any balance paid for such Services shall be forfeited and will not be refunded or rolled over.

3. **Payment Obligation**. Client and End User each agree to pay the fees and expenses charged by GSI under this SOW. Invoices are due on receipt and are overdue if not paid in full within thirty (30) days of the invoice date. Client will pay interest on all overdue amounts at the rate of one and one-half percent (1 1/2%) per month. In the event an amount is not paid in full within forty-five (45) days of the invoice date GSI, without waiver of any other rights or remedies, has the right to suspend work until Client pays all fees, expenses and interest due and payable to GSI. Prices do not include taxes. Client shall be responsible for paying any applicable taxes, except taxes on GSI income.

4. **\*Estimates Set Forth Herein**. All estimates set forth herein have been developed by GSI in reliance upon (i) information provided by Client or End User to GSI, and (ii) the assumptions set forth herein under "**Assumptions**".  Client and End User each represent and warrant to GSI that all information provided to GSI in connection with this SOW is complete and accurate as of the time it is provided to GSI.  If such information is ever no longer complete and/or accurate, Client and End User each agree to promptly inform GSI of any appropriate revisions and/or updates.

**[ Signature Page Follows ]**

### EXECUTION

By signing below, each of GSI and Client (and End User if applicable) agree to the terms and conditions, and to perform each of their respective obligations, set forth in this SOW.

SOW – General Engagement (Attached to PSA)



| GUIDANCE SOFTWARE, INC.: | CLIENT: Arizona Department of Corrections |
|---|---|
| | |
| By: _____ | By: _____ |
| Name/Title: | Name/Title: |
| Date: | "**Effective Date**": |
| | |
| | **END USER (if applicable):** |
| | By: _____ |
| | Name/Title: |
| | Date: |

| -- GSI INTERNAL USE ONLY -- |
|---|
| REF: |

**[ Signature Page to Statement of Work ]**



## Schedule A to SOW
### Engagement Specific Information

"**PSA Effective Date**", if applicable: June 15, 2012

### SCOPE OF SERVICES; DELIVERABLES

The Services shall generally consist of the following:

| | |
|---|---|
| 1. | **eDiscovery Collections, Processing and Delivery** |
| 2. | |
| 3. | |
| 4. | |

The specific Scope of the Services shall be limited to assisting Client with the following:

| | |
|---|---|
| 1. | **Supplemental Collections of Tier 1 Custodians** |
| 2. | **Collection of Tier 2 Custodians** |
| 3. | **Date Range Filtering, Global Deduplication, Index Based Key Terms of Tier 1 Custodians** |
| 4. | **Date Range Filtering, Global Deduplication, Index Based Key Terms of Tier 2 Custodians** |
| 5. | **Potential Privilege Split of Tier 1 custodians** |
| 6. | **Potential Privilege Split of Tier 2 custodians** |
| 7. | **MSG and Concordance (Native) delivery of Named Custodians.  Data will be delivered per custodian.** |
| 8. | **MSG and Concordance (Native) delivery of Tier 1 Custodians.  Data will be delivered per custodian.** |
| 9. | **MSG and Concordance (Native) delivery of Tier 2 Custodians.  Data will be delivered per custodian.** |
| 10. | **Mentoring Client personnel on how to locate and print-out evidence trail.** |
| 11. | **As directed, mentoring Client personnel on additional EnCase functionality.** |

GSI will deliver to Client the following deliverables ("**Deliverables**") either pursuant to the Performance Schedule, if expressly set forth therein, or otherwise at the completion of the Services:

| | |
|---|---|
| 1. | **Native file exports** |
| 2. | **MSGs and Concordance load files** |
| 3. | |
| 4. | |

### PERFORMANCE SCHEDULE; ALLOCATED GSI RESOURCES

GSI estimates**\*** that 1 consultant will be required to complete the Services within the following Performance Schedule:

| Start Date: | TBD | | Estimated Completion Date: | TBD |
|---|---|---|---|---|

| Work Day / Date | Scope Item / Service Performed |
|---|---|
| Day(s) __ __ | |
| Day(s) __ __ | |
| Day(s) __ __ | |
| Day(s) __ __ | |

### BILLING INSTRUCTIONS; CLIENT/END USER INFORMATION AND PROJECT LEADS

Invoices for Services and other correspondence hereunder, including delivery of ESI, will be directed to Client/End User as follows:

| CLIENT: | Arizona Department of Corrections | END USER: | Arizona Department of Corrections |
|---|---|---|---|
| Address: | 1601 W Jefferson<br>Phoenix, AZ 85007 | Address: | 1601 W Jefferson<br>Phoenix, AZ 85007 |
| Phone: | 602-542-2323 | Phone: | 602-542-2323 |
| Attn: | Dawn Northup | Attn: | Dawn Northup |
| Email: | dnorthup@azcorrections.gov | Email: | dnorthup@azcorrections.gov |

### CLIENT/END USER PROJECT LEAD:      GSI PROJECT LEAD:

| Contact: | Dawn Northup | Contact: | Kerry McIlhaney |
|---|---|---|---|
| Phone: | 602-542-2323 | Phone: | 704-819-6543 |

SOW – General Engagement (Attached to PSA)



| Email: | dnorthup@azcorrections.gov | Email: | Kerry.mcilhaney@encase.com |
|--------|-----------------------------|--------|----------------------------|





Professional Services

<u>Schedule B to SOW</u>
**Fees and Expenses Estimate***

**Client and End User (if applicable) each agree to pay GSI the following fees, at the hourly rates or fixed amounts, set forth below and to reimburse GSI for the Service-related expenses set forth below:**

| Item | Code | Description | Rate | Qty. | Total |
|---|---|---|---|---|---|
| **Hourly Based Services** | | | | | |
| 1 | 259 | eDiscovery Services – Senior Consultant | $265/hr | 120 | $31,800.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Fees & Charges** | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| **Expenses**** | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | **TOTAL:** | $31,800.00 |
| | | | | **RETAINER:** | $0 |

**All subsequent modifications to the fees and expenses Estimate above, as agreed in writing between Client, End User and GSI, shall be incorporated into this SOW as if fully set forth herein.  Please note that billable hours are for actual time spent on the examination, set-up, and reporting and do not include computer processing time (acquiring and searching).  Any modifications requested by Client or End User, not initially addressed by Client and End User upon receipt and execution of this SOW, will be charged according to the PSA.**

*This is only an estimate of GSI's fees and expenses. Client and End User will be billed for actual Services provided until the completion of the Services. If the actual Services provided are expected by GSI to exceed the Scope or this Estimate, GSI will advise Client and End User before performing the additional Services. The parties must confirm all modifications to this Estimate and the SOW generally by mutually executing a Change Request form, in form and substance satisfactory to GSI.

**Client will be billed for GSI's actual costs for media provided to Client and shipping charges necessary to complete the Services.

SOW – General Engagement (Attached to PSA)



**Schedule C to SOW**
**Scope Specific Assumptions**

SCOPE SPECIFIC ASSUMPTIONS

In addition to the general assumptions set forth in the SOW, GSI is also relying upon the following Scope specific assumptions in performing the Services under this SOW:

Professional Services

## PROFESSIONAL SERVICES AGREEMENT

"**Effective Date**":

This Professional Services Agreement (this "**Agreement**"), effective as of the Effective Date set forth above, is between the client named on the signature page hereto ("**Client**") and Guidance Software, Inc. ("**GSI**"), and sets forth the terms and conditions pursuant to which GSI shall provide digital investigations services ("**Services**") for Client.  If GSI performs Services at the direction of Client prior to the Effective Date, the Effective Date will then be the date GSI first performed Services for Client, unless a prior, mutually executed and written professional services agreement governed such prior Services, in which case this Agreement supersedes such prior agreement with respect to Services performed subsequent to the Effective Date set forth above.

1.      **Scope of Services; Changes to Scope.**

   **A.   Scope; SOWs.**  Client hereby engages GSI to provide the Services in accordance with the terms of this Agreement within the scope set forth in any Statement of Work(s) ("**SOW**") attached hereto and executed by both Client and GSI.  Client may engage GSI to provide additional scope items and/or Services under this Agreement through the execution of additional agreed upon SOWs.  Such additional SOWs shall be attached to this Agreement as successively numbered (and/or dated) SOWs.

   **B.   Changes.**  Any changes to a SOW shall be documented and agreed to in writing (each a "**Change Order**").  Each Change Order will identify the relevant SOW and set forth any changes to such SOW, including changes to scope of Services, associated deliverables, timelines and any increases or decreases in the compensation.

2.      **Fees and Expenses.**  Unless otherwise set forth in a SOW, Services shall be provided on a time and materials ("**T&M**") basis at GSI's rates in effect at the time Services are performed. On a T&M engagement, if an estimated total amount is stated in a SOW, that amount is solely a good faith estimate for Client's budgeting and GSI's resource scheduling purposes and not a guarantee by GSI that Services will be completed for that amount.  The actual amount to be paid by Client may be higher or lower. If the estimated amount is expended, GSI will continue to provide Services on a T&M basis under the same rates and terms. Client agrees to pay expenses reasonably incurred by GSI in connection with Services, including without limitation, messenger fees, travel expenses, non-routine photocopying in excess of 50 pages, and disk or tape duplication.

3.      **Payment and Taxes.**  GSI shall invoice Client not more than twice a month for all fees and expenses incurred by GSI in connection with GSI's performance of the Services. All outstanding balances invoiced to Client are due on receipt and are overdue if not paid within 30 days of the invoice date. Any invoice rendered to Client by GSI shall be conclusive as to the correctness of all items therein set forth and shall constitute an account stated unless Client objects to such invoice, in writing, within 5 days from the rendering thereof. Client will pay interest on all overdue amounts at the rate of one percent (1%) per month, or the maximum amount allowed by law, whichever is less, until all amounts due are paid in full. If Client fails to comply with the payment terms of this Section 3, GSI may suspend performing Services until Client pays all fees, expenses and interest due and payable to GSI. Notwithstanding anything to the contrary herein, if Client fails to timely pay invoices from GSI, the parties acknowledge and agree that GSI shall have the right to send any billing and payment information obtained from Client or as a result of the Services, whether otherwise considered confidential or proprietary, to its attorneys, advisors, or collection agencies in order to pursue the collection of any unpaid invoice. All fees shall be exclusive of any sales, use, value-added or similar taxes, duties, imposts, customs, levies or other withholding, except for taxes based on GSI's income ("**Tax**"). Any such Tax shall be paid by the Client in addition to the fees for Services. In the event of local tax withholding on Client payments to GSI, such payments shall be grossed-up to provide GSI the same amount after such withholding as it would have received without the imposition of such withholding, together with tax receipts or similar evidence of any withholding made by Client.

4.      **Retention of Evidence; Intellectual Property Ownership.**  All work products, other than GSI Technology (as defined below), developed by GSI specifically for Client in connection with GSI's performance of the Services, including all original copies of electronic data evidence, including EnCase® evidence files, shall be deemed to be the property of Client and shall be promptly delivered to Client at Client's request.  Client acknowledges and agrees that GSI shall retain all ownership and title in any intellectual property and GSI Technology developed prior to or in the course of providing Services to Client.  For purposes of this Agreement, "**GSI Technology**" shall be defined as including but not limited to computer programs, source codes, ideas, trade secrets, processes, including any specified processes for the handling of electronic evidence, "hash value" libraries and/or any other concept, compilation or process eligible for federal copyright or patent protection.

5.      **Confidentiality.**  Client and GSI each agree to retain in confidence the non-public terms in this Agreement and all other non-public information and know-how disclosed or that becomes known as a result of activities pursuant to this Agreement, which is either designated as proprietary or confidential, or by the nature of the circumstances surrounding disclosure, should reasonably be understood to be confidential ("**Confidential Information**"). Each party agrees to: (a) preserve and protect the confidentiality of the other party's Confidential Information; (b) refrain from using the other party's Confidential Information except as contemplated herein; and (c) not disclose such Confidential Information to any third party except to employees and contractors as is reasonably required under this Agreement.  Notwithstanding the foregoing, either party may disclose Confidential Information of the other party which is: (i) already publicly known; (ii) discovered or created by the receiving party without reference to the Confidential Information of the



disclosing party, as shown in records of receiving party; (iii) otherwise known to the receiving party through no wrongful conduct of the receiving party, or (iv) required to be disclosed by law, court order, or, in the opinion of GSI, may constitute child pornography. However, either party hereto may disclose any Confidential Information hereunder to such party's agents, attorneys and other representatives or any court of competent jurisdiction or any other party empowered hereunder as reasonably required to resolve any dispute between the parties hereto.

**6.     Legal Work Product.**  For any Services performed in the course of or in the anticipation of any legal action, Client agrees that at Client's request GSI shall take instructions with regard to the Services from Client's attorney and shall work through such attorney in performing all Services. In the event that Client is a law firm or attorney and has engaged GSI to perform Services on behalf of a third party Client, GSI shall take instructions with regard to the Services from Client and shall work through Client in performing all such Services.  For avoidance of doubt, Client retains final decision-making authority in regard to the Services. Subject to Section 5 of this Agreement, all work product resulting from such Services as directed by Client's legal counsel, including reports, EnCase evidence files and other data compilations shall be considered the attorney work product of Client and Client's counsel.

**7.     Warranty; Remedies.**  GSI warrants that it will perform the Services with professional thoroughness and competence.  No other warranty or representation, whether express or implied, is created by this Agreement or in connection with the Services.  Client represents and warrants that all actions by GSI undertaken upon the instructions of Client, either as set forth in a SOW or as subsequently communicated to GSI (including, without limitation, the Services), are and will be in compliance with applicable law, and do not and shall not constitute tortious actions. Client acknowledges that GSI assumes no responsibility or liability in connection with compliance with the European Directive on the protection of individuals with regard to the processing of personal information and on the free movement of such data (Directive 95/46/EC), and any implementing laws of EU member nations, or, any equivalent and applicable laws, regulations or decrees conferring privacy obligations of the same or a substantially similar nature (collectively "**Data Protection Regulations**"); in connection with the foregoing, Client, on behalf of itself, its heirs, executors, administrators, successors and assigns, hereby releases and forever discharges GSI, its agents, servants, employees, officers, directors, shareholders, heirs, successors and assigns and any and all other named and unnamed parties or associations, of and from any and all Claims (as defined below) now sustained or sustained in the future, arising out of or relating to the Data Protection Regulations, and agrees to indemnify, defend and hold GSI harmless against any and all Claims to which GSI may become subject to arising in any manner out of the Data Protection Regulations.

**8.     LIMITATION OF LIABILITIES.**  IN NO EVENT SHALL GSI BE LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, OR SPECIAL DAMAGES WHATSOEVER (INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF BUSINESS PROFITS, BUSINESS INTERRUPTION, SPOLIATION OF EVIDENCE, AND/OR LOSS OF BUSINESS INFORMATION) ARISING OUT OF THE SERVICES PROVIDED OR OTHERWISE IN CONNECTION WITH THIS AGREEMENT EVEN IF GSI HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES.  GSI'S ENTIRE LIABILITY TO CLIENT OR ANY THIRD PARTY, WHETHER IN TORT, CONTRACT, NEGLIGENCE, OR OTHERWISE, SHALL NOT EXCEED THE AMOUNT OF FEES PAID BY CLIENT TO GSI DURING THE ONE (1) YEAR IMMEDIATELY PRECEDING THE CLAIM. GSI ASSUMES NO LIABILITY IN CONNECTION WITH CLIENT'S USE OF THE WORK PRODUCT. GSI ASSUMES NO LIABILITY FOR FAILURE OF ELECTRONIC DEVICES OR COMPUTERS CONTAINING CLIENT DATA PROVIDED GSI HAS UTILIZED COMMERCIALLY-AVAILABLE HARDWARE COMMONLY UTILIZED FOR DATA COLLECTION AND STORAGE.

**9.     Indemnification.**  Client will defend, indemnify and hold GSI (and its officers, directors, agents and employees) harmless from any and all losses, liabilities, suits, damages, claims, demands, and expenses (including, without limitation, reasonable attorneys' fees)(collectively, "**Claims**"), whether based on contract, tort (including strict liability) or crimes, resulting from a claim by a third party (for clarity, the term "third party" includes but is not limited to a government entity, as well as Client employees and agents) based on actions by GSI undertaken upon the instructions of Client, either as set forth in an SOW or as subsequently communicated to GSI. GSI agrees to (i) promptly notify Client in writing of any indemnifiable Claim and (ii) give Client the opportunity to defend or negotiate a settlement of any such Claim and cooperate fully with Client, at Client's expense, in defending or settling such Claim.  Notwithstanding the foregoing, GSI may, at its own expense, assist in such defense if it so chooses, provided that Client will control such defense and all negotiations relative to the settlement of any such Claim.

**10.     Term and Termination.**

**A.**  The term of this Agreement begins on the Effective Date and expires one (1) year from the Effective Date, unless terminated earlier as provided herein. This Agreement automatically renews for additional one (1) year periods, unless either party gives the other party written notice that it will not renew at least ninety (90) days prior to the expiration date of the then current term.

**B.**  Either party may terminate this Agreement if the other party materially breaches its obligations under this Agreement and does not cure such breach within thirty (30) days of receipt of written notice of such breach.

**C.**  Client agrees that GSI shall have a right to notify law enforcement and terminate this Agreement if, during the performance of the Services, GSI (a) observes information that, in the opinion of GSI, may constitute child pornography, (b) believes in its opinion that continued performance of the Services will commit or aid and abet any crime, or (c) discovers evidence of the planning of a future

PSA – General Engagement (Stand Alone - No LCP)



crime, GSI shall immediately notify Client of such evidence and have a right to discontinue performance of Services and immediately terminate this Agreement, without liability or penalty.

**D.**   When the Services under a SOW have been completed by GSI, or in the event this Agreement is terminated, GSI will (a) return Client's legal evidence and other Confidential Information to Client, at which time Client shall be solely responsible for the retention of any such evidence as required by law, (b) irretrievably destroy all such legal evidence or Confidential Information stored on GSI's computers if Client provides a written instruction to destroy; or (c) continue to store the legal evidence and Client Confidential Information for so long as Client remains current on its payment of applicable storage fees. GSI's actions under this Section are subject to GSI's obligation to maintain Client's records pursuant to a court order or by law.

**11.   General.**

**A.   No Joint Venture or Agency; Subcontractors.**   Nothing in this Agreement shall constitute or create a joint venture, partnership, or any other similar arrangement between GSI and Client.  Neither party is authorized to act as agent or bind the other party except as expressly stated in this Agreement. GSI reserves the right to engage subcontractor(s) to support its provision of Services. In so doing, GSI shall enter into confidentiality agreements with GSI's subcontractors containing terms no less restrictive than those set forth herein.

**B.   Controlling Law; Venue; Arbitration.**   This Agreement shall be governed by and construed in accordance with the laws of the State of California. Any controversy or claim arising out of or relating to this Agreement shall be settled by arbitration using a single arbitrator in Los Angeles County, California and in accordance with the American Arbitration Association's rules of commercial arbitration. Judgment upon any award rendered in such arbitration may be entered in any court having jurisdiction thereof.  In the event legal action or arbitration is commenced by either party in connection with this Agreement, the prevailing party shall be entitled to recover from the other reasonable attorneys' fees and costs, including without limitation expert witness' costs, expended by the prevailing party in connection with such action.

**C.   Non-Solicitation.**   During the term of a SOW and for one year afterward, to the extent permitted by applicable law, Client shall not directly or indirectly solicit any GSI employee for hire by Client; however, public advertisements of open positions shall not be considered a solicitation under this Section.

**D.   Notices.**   Any notice required or permitted under this Agreement shall be given in writing to the address, email address or facsimile number provided for a party below, on any fully executed SOW, or such other address or number as any party may provide to the other in writing in the manner contemplated hereby.   **If to GSI:**   Guidance Software, Inc., 215 North Marengo Avenue, Suite 250, Pasadena, California 91101, Attn: Legal Department, Facsimile: +1 626.229.9199.  **If to Client:   as set forth on the signature page hereto or any attached SOW.**

**E.   Force Majeure.**  Either party's failure to perform its obligations hereunder shall not be deemed a breach of this Agreement if such failure is due to fire, strike, war, civil unrest, terrorist action, government regulations, acts of nature, or other causes beyond the reasonable control of the party claiming force majeure.  This provision shall not apply to Client's obligation to pay any sums that are due prior to the force majeure event under this Agreement, which shall continue unabated.

**F.   Amendment; Successors; Severability; Waiver.**   This Agreement shall not be revised except by a written agreement executed by both Client and GSI, including without limitation, a SOW.  This Agreement shall be binding upon Client's heirs, executors, administrators, other legal representatives, successors, and assigns.  If any provision of this Agreement is voided, deemed unenforceable or deemed illegal, the remainder of this Agreement and the remainder of such provision will remain in full force and effect.  In the event of an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if jointly drafted by the parties and no presumption, inference or burden of proof will arise favoring or disfavoring a party by virtue of authorship of any or all of the Agreement provisions.  Failure of either party to insist upon the strict performance of any provision herein or to exercise any option, right, remedy, or power contained in this Agreement will not constitute a waiver or relinquishment thereof for the future.

**G.   Legal Counsel**.  GSI is neither a legal practice nor a law firm, and Client acknowledges that GSI's Services are not legal advice. Client utilizes the Services at its own risk and is advised to seek legal counsel before acting on any information gained from the Services.

**H.   Third Party Beneficiaries.**  The terms and conditions of this Agreement, express or implied, exist only for the benefit of the parties to this Agreement. No other person or entity will be deemed to be a third party beneficiary of this Agreement.

**I.   Entire Agreement**.  This Agreement, including any SOWs and/or Change Orders entered into pursuant hereto, constitutes the entire agreement of the parties with respect to its subject matter and supersedes all prior or contemporaneous representations, proposals, discussions and communications, whether oral or in writing.  In the event of a conflict between the terms and provisions of any executed SOW, Change Order, or the main body of this Agreement, the terms and provisions of an executed SOW/Change Order will prevail. Any Client terms of trade stated or referenced in a Client purchase order, or any terms to which GSI has not specifically agreed in writing (except for names, quantities and addresses), shall not be binding on GSI.

**[ Signature Page Follows ]**

PSA – General Engagement (Stand Alone - No LCP)



**EXECUTION**

By signing below, each of GSI and Client agree to the terms and conditions, and to perform each of their respective obligations, set forth in this Agreement.

| **GUIDANCE SOFTWARE, INC.:** | **CLIENT:** |
|---|---|
|  |  |
| By: _____ | By: _____ |
| Name/Title: | Name/Title: |
| Date: | "**Effective Date**": |
|  |  |
|  | **Address:** |
|  | **Attn:** |
|  | **Email:** |
|  | **Telephone:** |

| -- GSI INTERNAL USE ONLY -- |
|---|
| REF: |

**[ Signature Page to Professional Services Agreement ]**

# EXHIBIT E

**Rand, Lucy**

---

| | |
|---|---|
| **From:** | Claassen, Marianne [MClaassen@epiqsystems.com] |
| **Sent:** | Thursday, April 04, 2013 12:23 PM |
| **To:** | Rand, Lucy |
| **Cc:** | Martin, Dennis |
| **Subject:** | Cost for Processing data |

Hi Lucy,

The cost to process uncompressed data (per GB) into searchable single- page Tiff files is $625.00 per GB.

Thank you,
Marianne

**Marianne Claassen**
Sales Administrator
Epiq Systems
eDiscovery Solutions
3255 E. Elwood Street, Suite 110
Phoenix, Arizona 85034
Mobile:  602-315-1617
Fax: 602-258-6466
mclaassen@epiqsystems.com
www.epiqsystems.com

Managed technology for the global legal profession

  

# EXHIBIT

# F



**TOM HORNE**
**ATTORNEY GENERAL**

**OFFICE OF THE ATTORNEY GENERAL**
**STATE OF ARIZONA**
**LIABILITY MANAGEMENT SECTION**

**ASHLEY B. ZUERLEIN**
**ASSISTANT ATTORNEY GENERAL**
**(602) 542-7620**
**Ashley.Zuerlein@azag.gov**

April 2, 2013

Lauren Wilkes
Jones Day
717 Texas Street, Suite 3300
Houston, TX 77002-2745
jlwilkes@jonesday.com

     Re:    *Parsons, et al. v. Ryan, et al.*
            USDC CV 12-00601-PHX-NVW (MEA)

Dear Mr. Wilkes:

     In response to your March 29, 2013 correspondence, I would like to clarify several matters.

     As an initial matter, Defendants cannot agree to the addition of "Corizon" to the search term list. The inclusion of "Corizon" would result in the production of every single email sent by a Corizon employee regardless of relevance. This is the same issue Defendants are having with the inclusion of "Wexford" on the search term list. The signature line of each employee includes his or her employer. It is the equivalent of searching Jones Day's email for "Jones Day."

     The removal of search terms after the requested emails are processed by Encase is not a viable option due to Plaintiffs' decision not to contribute to the costs of converting the resulting data into a TIFF format. As discussed in Defendants' March 26, 2013 correspondence, the Encase system produces emails in a MSG or PST native format. These formats cannot be electronically redacted or bates stamped. As such, Defendants must manually convert them into a PDF format for redaction, bates stamping and production using Adobe Acrobat.[1] While Defendants originally considered your request to refine search terms at a later date, MSG and PST files are not fully compatible with Concordance. Thus, it cannot be utilized as a "review tool."

---

[1]     Adobe Acrobat does not have the capability of searching emails for key terms on this scope of a project.

Similarly, Defendants have determined that your recommendation for a "seed set" imposes excessive, unnecessary costs upon Defendants. The Encase database was purchased by ADC before the lawsuit was filed. This is the first case in which it has been utilized. ADC is not currently able to perform the programming tasks required to refine and extract multiple sets of data. Each time ADC is required to refine and extract the data contained in the EnCase system, it has to hire a consultant to perform the tasks. ADC estimates that it will expend $10,000 to $15,000 in programming fees to update the data stored in the system, deduplicate, conduct a final key term search and extract the relevant data. Performing these functions multiple times, or for the review of a "seed set," will cost ADC several thousands of dollars in unnecessary expenses. As such, Plaintiffs' recommendation does not provide a workable alternative.

Encase personnel have confirmed that selection of the deduplication "across custodian" option will not alter the parties ability to see each of the individuals cc'd or bcc'd on an email. For example, if Ryan sent an email to Employee X, and bcc'd Employee Y, then Employee X responded to Director Ryan, there will be 4 emails: (1) Ryan sending the email to X and Y (bcc); (2) X receiving the email; (3) Y receiving the email; and (4) X replying to Ryan.

For further clarification, a classic example of deduplication occurs when Ryan sends an email to X, Y, Z and C. There would be two emails: (1) Ryan sending the email to X, Y, Z and C; and (2) X receiving the email from Ryan. In this example, the emails received by Y, Z, and C are duplicates of X and are not produced. Instead, the system generates a "log of duplicates."

With respect to the "claw-back" provision, *Fleischer v. Phoenix Life Ins.,* No. 1:11-cv-08405-cm-jcf, 2012 BL 340929 (S.D. N.Y. Dec. 27, 2012), is both distinguishable and inapplicable within the Ninth Circuit. In *Fleischer*, the emails at issue were potentially subject to an attorney-client privilege or work-product privilege. Federal Rule of Evidence 502, addresses the inadvertent disclosure and waiver of these privileges. It does not deal with the disclosure of the confidential and security-sensitive information at issue in this case.

ADC has a statutory duty to provide for the safe and orderly operation of the state prison system. This includes the protection of ADC inmates, staff and the public.[2]

---

[2]      The courts have repeatedly acknowledged the severe security concerns associated with prison administration. "Prison administrators are responsible for maintaining internal order and discipline for securing their institutions against unauthorized access or escape, and for rehabilitating … the inmates placed in their custody. The Herculean obstacles to effective discharge of these duties are too apparent to warrant explication. Suffice it to say

Plaintiffs have requested emails *and document attachments* sent to and reviewed by top ADC officials referencing individual psychological conditions/treatment, detention, segregation, maximum security, and Security Threat Groups ("STG").  Production of these documents without review or redaction would create a severe security risk.  In addition, the production of mental health information would currently violate the Protective Order as Plaintiffs have yet to provide releases.

In effect, your proposal does nothing to alleviate the tremendous expense and burden presented by the immense number of emails you have requested.  While relying on the claw-back agreement enables you to view the emails faster, we are still burdened by the need to commit significant time and resources to review the ocean of emails to identify which need to be "clawed back."  Further, you are at least implying that after some unidentified period of time the claw-back documents need to be identified.  Thus, your proposal not only fails to make Plaintiffs' request less burdensome, it increases the burden upon Defendants, by requiring the review to be done in an arbitrary, truncated time period.

I am troubled by Plaintiffs' assertion that after a period of time the documents produced to Plaintiffs, "would no longer be treated as Attorneys' Eye Only."  It is our understanding that, except in very limited circumstances, confidential documents are *only* to be shown to attorneys and their agents.  The Protective Order entered in this case states:

> Confidential information shall not be used or shown, disseminated, copied, or in any way communicated, orally, in writing, or otherwise, by the parties, their counsel, or any of the representatives, agents, expert witnesses, or consultants, except for the preparation and trial of this action and as otherwise limited by this Order.

(Dkt. 140, ¶ 5(a).)  Your claw-back "offer" implies that Plaintiffs are not appropriately maintaining ADC's confidential and security sensitive documentation.

The circumstances under which Plaintiffs may view ADC's confidential information is limited to (i) "material contained in the respective Plaintiff's medical records and is written by the respective Plaintiff, or written by a non-inmate and does not contain any

---

that the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree.  Most require expertise, comprehensive planning, and the commitment of resources… For all of those reasons, courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform.  Judicial recognition of that fact reflects no more than a healthy sense of realism."  *Procunier v. Martinez*, 416 U.S. 396, 404-405 (1974), overruled on other grounds, *Thornburgh v. Abbott*, 490 U.S. 401 (1989).

written or verbal statements made by or concerning any other inmate" and (ii) where the inmate Plaintiff is originator of the Confidential Information.  (Dkt. 140, ¶5 (d).)

Due to concerns that confidential information is not being appropriately maintained, in accordance with Paragraph 7 of the Protective Order, Defendants request that Plaintiffs provide a list of all qualified persons to whom they have provided confidential information.

Lastly, I would like to clarify that Defendants are not refusing to produce *all* emails. Defendants are disputing the time period in which Plaintiffs are demanding the completion of email production because the scope of the search terms, number of custodians and cost associated with production is unduly burdensome.

In addition, Defendants dispute the production of emails for all 47 identified custodians as it creates an undue burden upon Defendants.  Based upon the current data available to Defendants, the production of all 47 custodians is approximately 117.2 GB or 640,262 emails.  After deduplication, Defendants estimate a reduction in the quantity of data to 61.5 GB or 375,000 emails with a large quantity of attachments.  Defendants anticipate that the attachments to many of these emails will require extensive redaction as they include security threat and physical plant information.

Plaintiffs have only named Charles Ryan and Richard Pratt as Defendants in this matter.  Any information in their possession would have been emailed directly to them and should be contained within their email accounts.  The email accounts of the following ADC employees are unlikely to produce information relevant to this litigation and create an undue burden given the quantity and costs of production.

- Curt Czarsty, IT
- Joseph Nicoletti, IT
- Laurie Berg, Executive Staff Assistant (187,201 emails)[3]
- Sharon Bohm, Executive Staff Assistant (44,839 emails)
- Sharon Malcolm, Executive Staff Assistant (43,110 emails)
- Carol Pearson, Medical Record Monitor (108,021 emails)
- Leon George, Chief Procurement Officer (20,076 emails)
- John Lee, Psychiatrist/Psychiatrist (2,748 emails)
- Joe Profiri, Contract Bed Administrator until July 2012 (158,498 emails)
- Ronda Lee, ADC Policy Unit Manager (does not deal with substantive policy issues) (35,142 emails)

---

[3]   Email estimates are based upon the data currently contained in the EnCase system. Defendants are unable to estimate the quantity of emails that will be impacted by the decision to deduplicate "across custodian."

Please reconsider your inclusion of these individuals within your request for production.

In light of Plaintiffs' continued insistence for complete production of all emails within 90 days, Defendants will be amending their one-pager later this week for court resolution.

Sincerely,



Ashley B. Zuerlein
Assistant Attorney General

CC:   Tim Bojanowski
      Dan Struck
      Kathy Wieneke
      Dawn Northup

#3213710