UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIV 12-0601-PHX-NVW |
| vs. | ) ) | Phoenix, Arizona April 26, 2013 |
| Charles Ryan and Richard Pratt, in their official capacities, | ) ) ) ) | 2:14 p.m. |
| Defendants. | ) ) | |
| _____ | ) | |

BEFORE:  THE HONORABLE NEIL V. WAKE, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

ORAL ARGUMENT


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                      A P P E A R A N C E S

2

3    For the Plaintiffs:

4              Jones Day – Washington, DC
               By:  R. SCOTT MEDSKER, ESQ.
5              51 Louisiana Avenue NW
               Washington, DC  20001
6
               Jones Day – San Francisco, CA
7              By:  CAROLINE N. MITCHELL, ESQ.
               555 California Street, 26th Floor
8              San Francisco, CA  94104

9    For the Plaintiff Arizona Center for Disability Law:

10             Arizona Center for Disability Law – Phoenix, AZ
               By:  JENNIFER ANN ALEWELT, ESQ.
11             5025 East Washington Street, Suite 202
               Phoenix, AZ  85034
12
     For the Defendants:
13
               Office of the Attorney General – Phoenix
14             By: ASHLEY BROOK ZUERLEIN, ESQ.
                   LUCY MARIE RAND, ESQ.
15                 MICHAEL EVAN GOTTFRIED, ESQ.
               1275 West Washington Street
16             Phoenix, AZ  85007

17

18

19

20

21

22

23

24

25

1          THE CLERK:  This is civil case 2012-601, Victor

2     Antonio Parsons, et al., versus Charles L. Ryan, et al.  This

3     is the time set for an oral argument.  Counsel, please announce

4     for the record.

5          MR. MEDSKER:  Scott Medsker with Jones Day on behalf

6     of the plaintiffs.

7          MS. MITCHELL:  Caroline Mitchell with Jones Day on

8     behalf of the plaintiffs.

9          MS. ALEWELT:  Jennifer Alewelt with the Arizona Center

10    for Disability Law on behalf of plaintiff --

11         THE COURT:  I'm sorry.  Your name again?  Speak into

12    the microphone please.

13         MS. ALEWELT:  Jennifer Alewelt, Arizona Center for

14    Disability Law, for plaintiff Arizona Center for Disability

15    Law.

16         MS. ZUERLEIN:  Ashley Zuerlein with the Arizona

17    Department --

18         THE COURT:  Again speak into the microphone.

19         MS. ZUERLEIN:  Ashley Zuerlein with the Arizona

20    Attorney General's Office for defendants.

21         MS. RAND:  Lucy Rand with the Attorney General's

22    Office for defendants.

23         MR. GOTTFRIED:  And Michael Gottfried from the

24    Attorney General's Office for the defendants.

25         THE COURT:  All right.  I understand that defendant

1    has agreed to some of this discovery.  Could someone explain to

2    me what is not -- what is agreed, and then we'll go to the

3    range of dispute.

4            MS. ZUERLEIN:  Yes, Your Honor.  The defendants have

5    already agreed to produce documents for what we've been

6    referring to as the top three individuals, which is --

7            THE COURT:  Could you come up to the podium please.

8            MS. ZUERLEIN:  Of course.

9            We've agreed to produce documents for the top three

10   individuals, Charles Ryan, Michael Adu-Tutu, and Richard Pratt.

11           THE COURT:  And have you agreed on the search terms

12   and the time frame?

13           MS. ZUERLEIN:  Plaintiffs have given us a list of

14   search terms.  Defendants have objected to some of them based

15   on an overly -- unduly burdensome result.

16           And the time frame is still in dispute.  The

17   plaintiffs would like the documents produced I believe it was

18   within 60 days.

19           THE COURT:  I'm sorry.  I'm having a hard time hearing

20   you.

21           MS. ZUERLEIN:  I'm sorry.  I believe that the

22   plaintiffs had requested that a good chunk of those be produced

23   within 60 days.  And I believe we've objected to that as far as

24   the time frame due to the scope of e-mails that are included.

25           THE COURT:  So you really haven't agreed on anything?

UNITED STATES DISTRICT COURT

1          MS. ZUERLEIN:  We have agreed that we will produce the

2    e-mails for the three individuals that we've named.

3          THE COURT:  You've agreed on the three people but not

4    search terms --

5          MS. ZUERLEIN:  Which time frame.

6          THE COURT:  -- or the time frame?

7          MS. ZUERLEIN:  Yes.

8          THE COURT:  All right.  Let me hear from the

9    plaintiffs as to -- Now I understand you have significantly

10   retrenched your demand, so if you can explain that to me.

11         MR. MEDSKER:  Thank you, Your Honor.  Plaintiffs have

12   significantly retrenched their demands repeatedly.

13         THE COURT:  Your name again?

14         MR. MEDSKER:  My name is Scott Medsker.

15         THE COURT:  Medsker.  All right.

16         MR. MEDSKER:  Yes, Your Honor.  Plaintiffs have

17   repeatedly retrenched their demands with regard to the number

18   of custodians and the amount of time we're asking for e-mails

19   to be produced over the course of the last five months since

20   November, Your Honor.

21         We initially had agreement that the custodians to be

22   produced would include the named defendants as opposing counsel

23   just referenced, 34 employees who were contract monitors with

24   the ADC and monitored the relationship with Wexford, and then

25   ADC employees who had been deposed in litigation.

1          After we reached that agreement, we began discussing

2     search terms.  That agreement was reached on October 29th of

3     2012.

4          THE COURT:  But they tell me you've not agreed on the

5     search terms.

6          MR. MEDSKER:  We think there is at least one key

7     search term that's still in dispute, the term health.  That is

8     a term that we've discussed again since November.  We've

9     offered ways to limit the documents that are responsive to the

10    term health.  In their brief I see that they've listed a number

11    of other terms, including medical, dental, Wexford.  Those were

12    terms that were initially proposed by the defendants.

13         The proposal we came up with on search terms to the

14    ADC and the proposal they agreed to was that if they ran a

15    search for a term such as health and found that it was

16    producing a series of hits, all of which were categorically

17    non-responsive, for instance, a daily e-mail from somebody not

18    related to the case from a company that had the word health in

19    there, if they would show us a sample of those documents, we

20    could review them and then work with them to further revise the

21    search terms to make sure that those documents did not hit.

22         And they have not to date given us samples of

23    documents that do that.

24         In November we focused on 14 individuals that we asked

25    for their e-mails to be prioritized.  That was after striking

1    four custodians that defendants agreed to strike, Mr. Czarsty

2    and the three assistants for Dr. Adu-Tutu, Mr. Ryan, and

3    Mr. Pratt.

4            We reached agreement on that again, and as of December

5    19th, our understanding was that production would be

6    forthcoming based upon agreed-upon search terms subject to the

7    agreement that if there were categorically nonresponsive

8    documents, we would revise them.

9            And we got nothing until January 14th when we followed

10   up again.  There were a series of conversations.  As of that

11   date we were told that the process was in the works.  We would

12   see e-mails along with production of other documents,

13   non-e-mail documents, that we asked for within the next few

14   weeks.

15           We followed up on February 27th after we had received

16   nothing, noted that we believed there was a discovery dispute,

17   asked for a meet and confer.  The next day we were told that in

18   defendant's view there was no discovery dispute and that they

19   would not meet and confer.

20           We eventually did meet and confer in early March, and

21   that is when we decided to submit this seventh joint discovery

22   dispute to you for your assistance.

23           On March 14th we bid against ourselves yet again and

24   came up with what is called the seed set proposal where we

25   asked for production from ten custodians, all of whom have key

1    roles in this litigation.

2              And we severely limited the scope of time we were

3    asking for e-mails from those individuals.  We're not asking

4    for more than four months of e-mails for any single individual.

5    For some individuals we're only asking for two months of

6    e-mails.

7              That comes to a total of approximately 36 months of

8    e-mails in the aggregate from all ten custodians that we're

9    asking for.  So those are the, as I think you referred to them,

10   the narrowings that we've done since our October 29th agreement

11   on the scope of custodians.

12             THE COURT:  All right.  Let me -- And, Ms. Zuerlein,

13   can you explain to me the cost of what Mr. Medsker has narrowed

14   it too, because a lot of your brief talks about the costs of

15   what they originally asked for.  We're not talking about that

16   now.  So what about what they're talking about now?

17             MS. ZUERLEIN:  Assuming we are looking at the costs

18   for just those 14 people that they've prioritized now, we're

19   still looking at, what we have to date for November, 2012, or

20   up to that point, is still around 95 -- well, I'm sorry; that's

21   wrong -- 156,000 e-mails, which is probably going to take about

22   a year to go through.

23             That for the cost --

24             THE COURT:  You mean going through them manually for

25   privilege and security?

1    MS. ZUERLEIN:  That would be assuming that we have

2    them converted by someone else, that we have five people

3    working on it straight through the year.

4        And the cost of that is -- I'm sorry I don't have the

5    exact figure.  It's about $17,000 to $18,000 for just the

6    conversion, if that's what you're referring to.

7        THE COURT:  That's the conversion to what?  In the

8    different computer format that it can be read, searched?

9        MS. ZUERLEIN:  It's a conversion from the format that

10   comes out of the system we have into a TIFF, which is just a

11   format that can be Bates stamped, redacted, searched, processed

12   as plaintiffs would like.

13       THE COURT:  And how many -- You say one year to get it

14   done.  How many labor hours is that?  Let's call 2000 hours one

15   man year or woman year.  How many -- How do you get to a year?

16       MS. ZUERLEIN:  I was looking at it.  Assuming that

17   we're looking at e-mails that don't have attachments, which I

18   know is incorrect, but you can't always factor in the time to

19   do those, we're assuming that one person could get through

20   about 150 to 160 e-mails a day with an 8-hour day working 40

21   hours a week throughout the year and with 5 people doing it.

22       THE COURT:  And that's premised on having to do a

23   manual review of the entire production?

24       MS. ZUERLEIN:  No.  I'm premising that on just having

25   someone else convert it.

1      THE COURT:  No.  But the conversion is $17,000.

2  You're talking about the time.  Does it -- Is it going to --

3  We're talking about a human being looking at 150 e-mails a day,

4  so that's a different process than the computer conversion.

5      MS. ZUERLEIN:  It is.  If we had someone manually

6  convert that in addition --

7      THE COURT:  You said for $17,000 you can have it,

8  quote, converted.

9      MS. ZUERLEIN:  Yes.

10      THE COURT:  You're telling me about human beings have

11  to look at this stuff for a year.  That's what I'm asking you

12  to explain.

13      MS. ZUERLEIN:  Yes.  The $17,000 is just to have it

14  converted.  And then to have someone actually go through it,

15  read it, review and redact it, Bates stamp it, to produce it,

16  that's the year part or what we estimate to be approximately a

17  year.

18      THE COURT:  Of course if you had 12 people doing it,

19  it would be done in a month, wouldn't it?

20      MS. ZUERLEIN:  I don't know that that would be the

21  case.  I think it would take significantly more people than

22  that.

23      Your Honor, also responding to what plaintiffs have

24  noted before, we actually didn't have an agreement to produce

25  all of these e-mails.  The agreement was that we would do a

1   search and see if it was something that was unduly burdensome.

2   And if it was unduly burdensome, we would address it with them

3   again.  After running the searches, we found out the extent of

4   how many e-mails were included and what we were looking at and

5   determined that when we pulled these and tried to manually

6   convert them in January after we finally nailed down terms in

7   December, we found out it was going to be too time -- it was

8   not an effective or cost efficient means, which is when

9   discussions arose again.

10           THE COURT:  What about this proposal of the three

11   people, the two defendants and Dr. Adu-Tutu, and you search a

12   couple months of e-mails of each?  What about that?  How would

13   that play out?

14           MS. ZUERLEIN:  For the top three individuals, which I

15   think is the most relevant -- it's what gets to whether or not

16   something is deliberately indifferent -- we're looking at about

17   60,000 e-mails.  And I think that it's possible we could finish

18   that by your discovery cutoff, which I believe is September.

19           And that was what we had been talking to plaintiffs

20   about, that at the time we have not been able to get an

21   agreement to limit it to those top three individuals.  And,

22   again, these numbers are based on through November of 2012, so

23   it is going to expand further up to date.

24           THE COURT:  All right.  Mr. Medsker, come on back.

25   I'm having a hard time understanding why we need any of this at

1   all.  This is a lawsuit about the inadequacy of the level of

2   medical care.  That's going to require apprehending the actual

3   facts of what levels of care are provided.

4          You're going to need an expert and so are they about

5   what is such a low level that it falls below the constitutional

6   minimums.  I'm at a loss as to why you or anybody needs to

7   troll through tens of thousands or hundreds of thousands of

8   e-mails from anybody.  Go ahead.

9          MR. MEDSKER:  Certainly, Your Honor.  The thing that

10  we have to show is systemwide deliberate indifference.  And the

11  e-mails of not only these three individuals but also the

12  individuals who were responsible for healthcare at each of the

13  facilities and those individuals who were responsible for the

14  relationship with Wexford, which provided the healthcare, those

15  e-mails are the best contemporaneous evidence.

16         THE COURT:  Why?  I mean, you've got a huge volume of

17  business in corrections in a large statewide prison system.

18  You're going to have zillions of e-mails.  What are you looking

19  for?  The e-mails to say I sure hope we never get sued for this

20  because what we're doing is unconstitutional?

21         And for that you want to spend months and months and

22  months and huge amounts of labor and money?

23         MR. MEDSKER:  Well, Judge Wake, we know those

24  e-mails --

25         THE COURT:  When I was in law school, they told a

1    story about -- perhaps an urban myth -- of the memo that said

2    destroy this memo before the Justice Department sees it.

3              MR. MEDSKER:  Right.

4              THE COURT:  I doubt that ever happened.  But it sounds

5    like that's what you're looking for.

6              MR. MEDSKER:  But the thing is, Judge Wake, we know it

7    exists.  We know it exists.

8              THE COURT:  No, we don't.

9              MR. MEDSKER:  We referenced it in our complaint, Judge

10   Wake.  We referenced it in our complaint, and it's referenced

11   in document 415 on the document -- on the docket, the

12   Declaration of Don Specter, which notices allegations in the

13   complaint referencing e-mails putting Mr. Ryan on notice of the

14   level of healthcare that was being provided.

15             We know there are e-mails from other doctors that

16   we've found in other pieces of litigation regarding the

17   deficient level of medical care, the e-mail from Dr. Sharp,

18   which is in the docket at document 414-10, Exhibit J.  So this

19   is not a fishing expedition where we're going out hoping to

20   find that document.

21             We know --

22             THE COURT:  Actually what it is, you want them to pay

23   to search the haystack for your needle.  And the Court has to

24   manage this litigation in a way that's proportionate and

25   reasonable.  And, I mean, if you wanted to pay for all of it,

| | |
|---|---|
| 1 | including their time, I suspect their attitude would be very |
| 2 | different, but you're not volunteering to do that. |
| 3 | MR. MEDSKER:  So let me address the issue of costs, |
| 4 | because that's something I wanted to -- |
| 5 | THE COURT:  Well, costs, value -- |
| 6 | MR. MEDSKER:  Absolutely. |
| 7 | THE COURT:  -- and going back to what the lawsuit's |
| 8 | about. |
| 9 | MR. MEDSKER:  Absolutely. |
| 10 | THE COURT:  And if you have particular providers or |
| 11 | physicians that you already know about, that should be easy to |
| 12 | find their e-mails.  So go ahead.  As I said, this seems like |
| 13 | a -- The analytical structure of this lawsuit is very |
| 14 | straightforward.  These guys are professionals in this area. |
| 15 | There's things that people ought to know.  There's a level of |
| 16 | resources being devoted.  If it's within reason, even though |
| 17 | not optimal, you're going to lose the lawsuit.  If it's below |
| 18 | that, you're going to win the lawsuit. |
| 19 | So why do we need to spend all this time trolling |
| 20 | through, with issues of security and privilege, trolling |
| 21 | through -- This is not an antitrust case being litigated out of |
| 22 | Wall Street. |
| 23 | MR. MEDSKER:  No.  I understand that.  I understand |
| 24 | that, Judge Wake. |
| 25 | And on the issue of cost, I just want to make sure |

1      that you understand the $17,000 to $18,000 for conversion is

2      not based upon our seed set proposal of ten custodians.  That's

3      based on our broader proposal for the full period of time for

4      the three defendants.  And the five man years that were

5      referenced to do this individual document-by-document manual

6      review is based on that broader scope too.  And to alleviate

7      those costs and those burdens, we've tried to be innovative and

8      come up with this seed set proposal.

9              THE COURT:  Well, I'll tell you in the grand scheme of

10     things, $17,000 did not seem to be excessive.  But all the

11     time, the labor, trolling through what is obviously going to be

12     mostly completely irrelevant, so that you might find your

13     needle in their haystack.

14             MR. MEDSKER:  Sure.  So on time and labor, Judge Wake,

15     we first got a quote from the defendants in November of last

16     year indicating that they estimated it would take $786,700 to

17     go through 40,000 e-mails.

18             Now, if you extrapolate that out to the number of

19     e-mails they thought existed then, that would have been $14.4

20     million.  That seemed to us to be just not possibly right.

21             So we wrote them a letter indicating that this is

22     something we do often, based on our experience that was high,

23     and we were more than willing to discuss with them how to find

24     a lower cost method.

25             That November 29th letter also included a number of

1    other concessions about the number of custodians, the search

2    terms, et cetera.  We received a response on December 18th

3    thanking us for our agreements and indicating that the burden

4    might be less and that if we wanted to further lower the

5    burden, we should just ask for less.

6            So in November we attempted to work with them and use

7    our expertise to help come up with a better process.

8            In March and April we started having discussions about

9    what their process actually was.  And I will tell you honestly

10   it shocks me that somebody who gets sued on a daily basis

11   decides that the most efficient way to run a document review is

12   to do document-by-document manual review.  When we first

13   discussed the method of search methodology in a meet and confer

14   on September 24th, defendant suggested keyword terms.  We noted

15   that there might be more efficient ways, but we could be

16   amenable to how we were going to do it if they were going to

17   search keywords.

18           THE COURT:  And I'm by no means on top of this, but I

19   understand that there are computerized ways of sorting and

20   examining that are much more efficient than manual examination.

21           But they are themselves very costly.  And I keep

22   coming back to so what?  What are you going to get?  You're

23   going to review all this stuff hoping for a few e-mails that

24   somebody complains.  And suppose you get one of the physicians

25   are complaining.  That's not going to make the case.

1    MS. MITCHELL:  Your Honor, could I just address that

2    point for one minute?

3        THE COURT:  Well, no.  We'll hear from Mr. Medsker in

4    turn.

5        Well, anyway, I want to hear this, but just to tell me

6    there are cheaper ways to do this doesn't answer my question.

7    What are we doing it at all?

8        MR. MEDSKER:  We're doing it at all because as

9    plaintiffs, as prisoner plaintiffs, we're entitled to evidence,

10   and we're entitled to discovery that is reasonably likely to

11   lead to evidence.  And it's our burden here to prove systemwide

12   deliberate indifference that's currently going on and to show

13   that the prison was on notice of that.  And there are

14   e-mails --

15       THE COURT:  But, you know, look, I know a lot more

16   than I ever wanted to know about corrections healthcare.

17       MR. MEDSKER:  Understood.

18       THE COURT:  And whatever else you think, the people

19   who do this know a lot about it, and they usually know when

20   they're in trouble.  And when the level of care is simply

21   resulting in not providing care, long delays, and things that

22   you can establish on a gross level of data, that's all you need

23   to win.

24       And so I'm just wondering what is the value of

25   trolling through all of this to find some well-meaning and

1    perhaps correct physician in the system who said we're not

2    getting enough here.

3            Let's suppose we had that.  Is it worth spending all

4    this time and labor to find that when what will really matter

5    is the systemic data itself as to what resources are being put

6    in rather than looking for the embarrassing e-mail?

7            I can tell you that's what I'm going to care about,

8    about the systemic data.  And I will be aided by expert

9    witnesses who are -- at least whichever ones are believable to

10   me.  That's what's going to matter.

11           So it seems to me that's what ought to be examined

12   rather than -- Well, I am talking freely to help you understand

13   my concerns and to respond to them.

14           MR. MEDSKER:  Of course, Judge Wake.  We are not doing

15   this to harass or embarrass.  We're doing it in our right to

16   find the best evidence of notice.  And we know that it exists

17   because we've seen some of it.

18           THE COURT:  Why not do rifle shot discovery at those

19   people?  You say you already know some of them.  If you have

20   some and you've got great complaining memos that are specific,

21   you've got that.  Why do we have to spend all this time to get

22   a few more?

23           MR. MEDSKER:  Your Honor, this is not rifle shot

24   discovery, respectfully.  We've worked time and time again to

25   narrow this to approximately 36 months of e-mail.  And the

```
 1   reason that it's not working and that it's resulting in so much

 2   time and cost is the system they're employing, they can't even

 3   modify search terms.  Once they've run the searches, that's

 4   what you get.  So even if there was a way for us to narrow it

 5   down, the way they're doing it doesn't allow us to find the

 6   evidence that these prisoners have a right to to prove their

 7   case.

 8            THE COURT:  Go ahead.

 9            MR. MEDSKER:  Your Honor, what we need today and what

10   the prisoners are entitled to is a way to get forward to a

11   productive path for discovery.  As we cited in our brief,

12   e-mails have been used in prison cases before.  They're

13   contemporaneous.  There's no deposition now that we can take

14   that would get evidence that is as good as e-mails about the

15   level of healthcare at the time.

16            THE COURT:  That makes no sense to me at all.  The

17   evidence that matters about the level of healthcare is going to

18   be the gross evidence about budgeting, staffing, number of

19   people being served.  There are probably data out there that

20   relate to delays or wait times.  Maybe there aren't.  But

21   that's what's going to matter.  And when you get that, if

22   you're right, you'll prove your case.

23            MR. MEDSKER:  And we believe that the e-mails will

24   show that the defendants were on notice that those gross levels

25   existed.
```

1      THE COURT:  I'm telling you that I find it

2  inconceivable that the managers of the State Department of

3  Corrections do not have knowledge of the gross levels of care.

4  If you have the facts, they will know of it in general.

5      So, I mean, there's obviously two dimensions.  One is

6  the substantive level, inadequate level of care, and the other

7  is that it fell to the level of reckless indifference or

8  conscious disregard.

9      And what I'm telling you is I will have to be

10  persuaded that the defendants are ignorant of what goes on in

11  their prisons.  That is an unlikely sell.

12      So if you have the facts, I'm just highly dubious that

13  we need to burden the defendant with all this money that you

14  want them to spend -- you don't want to spend it -- to come up

15  with e-mails with people who tell them of what will otherwise

16  be readily known and proved from the gross facts that you come

17  up with.

18      Anyway, I'm repeating myself, and I apologize for

19  that.

20      MR. MEDSKER:  I understand.  And these time periods

21  are around the cure letter period and the discussions about the

22  level of care that Wexford was giving and known deficiencies in

23  those systems and contract monitors across the system that were

24  identifying problems with the level of care.  The e-mails are

25  evidence.

1    THE COURT:  But there should be focused ways -- The

2    issue of the Wexford contract, which obviously they're unhappy

3    about how that went, that ought to be obtainable in a focused

4    way.  That's a specific contract, specific set of

5    communications.  They themselves concluded it was inadequate,

6    and you want to blame them for concluding that.  They want

7    credit for concluding that.

8          But right now we're just talking about what happened.

9    And that ought to be discoverable without doing all of --

10         MR. MEDSKER:  The e-mails themselves, Your Honor, are

11    not only notice; they're evidence of the existence of the

12    conditions.

13         They themselves, the complaints and the communications

14    are evidence of the gross conditions that we have to prove.

15    And that's why we're entitled to them.

16         THE COURT:  All right.  Thank you.  Counsel, you

17    wanted to add something?

18         MS. MITCHELL:  Your Honor, we understand what you're

19    saying.

20         THE COURT:  Please state your name when you speak.

21         MS. MITCHELL:  Caroline Mitchell.  We understand what

22    you're saying, and I actually agree with you if what comes out

23    of today is that they're ordered to produce e-mails that are

24    focused on the communications with Wexford about the disputes

25    relating to the conditions identified in the cure letter and if

1    they have to produce the e-mails with the contract monitors

2    about what the conditions are they're seeing and what Wexford

3    is saying to them and what they're saying to Wexford about the

4    cause of those, that would be a big step forward to us.  And if

5    you direct it to be narrowed to that, that's okay.  We've been

6    trying to find a way to narrow it.

7            They have a search tool, but they don't really have a

8    search tool that lets them get down to a narrow set of

9    documents.  But even if they produce those by going and finding

10   those and printing them out the old-fashioned way, that would

11   be okay.  We're not trying to be unreasonable.  We're trying to

12   get to these core discovery issues.  And the cure letter was

13   the heart of the class certification motion.  So I agree that's

14   the important thing, and getting to the e-mail about that's

15   what's key.

16           So if the Court would order that, I think it would be

17   a big step forward in terms of moving the e-discovery process

18   ahead.

19           THE COURT:  All right.

20           MR. GOTTFRIED:  Your Honor, Michael Gottfried for the

21   defendants.  This is -- We've been talking continuously about

22   this huge e-mail request, and this is the first time we've

23   heard that it's just these Wexford e-mails that they've wanted.

24   And, frankly, I'm pretty sure -- this is all coming to us

25   differently -- we've given them all that stuff or they've got

1   it from public records requests.  We're in the process of

2   giving them all the Wexford e-mails and all the Wexford

3   documentation and what happened with Wexford.

4           That has nothing to do with what we've been talking

5   about from these discovery disputes.  So I'm not sure exactly

6   what's going on here, but we've never even argued about giving

7   just targeted Wexford information in e-mails.

8           So I don't think we have a problem doing that, and I

9   think we've been doing that.  But that's not this dispute that

10   we're here today about with all the search terms and all the

11   man hours that have to go into this.  I'm not sure what else to

12   say about that.

13           THE COURT:  Let me offer some general comments.  To

14   some extent this may be like lots of big lawsuits that go on

15   now that become driven by the expense of electronic discovery.

16   I'm of the view the electronic discovery is a tool, not a goal,

17   and that the Court must manage discovery in a way that's

18   proportionate to the value, to the issues, the amount in

19   controversy, and the likely value.  And the Court is charged

20   with that, and I make judgments all the time about what level

21   of discovery is sufficiently likely to have value to warrant

22   the expense on both sides.

23           There is no right to just whatever discovery might be

24   theoretically -- might yield something, and it's especially

25   true for this kind of highly burdensome gross review of

UNITED STATES DISTRICT COURT

1    extensive business records.  There's no right to that.

2         What there is is a need to have a focused judgment

3    about what is likely to matter and what is likely to be cost

4    beneficial.  This is heightened by the fact that the entire

5    cost of this is sought to be imposed on the opposing party.

6         Now, that takes me back to this lawsuit.  What's this

7    lawsuit about?

8         We have a group of named plaintiffs who have their own

9    cases who have conditions about which they are concerned, most

10   of them, about the possibility of future inadequate care rather

11   than past inadequate care.  And by inadequate I mean within the

12   constitutional standard, which is much lower than just what we

13   would think of under ordinary civil liability.

14        And I granted the class certification in this case, as

15   I said in my order, not because I made any specific judgment

16   about the merits of this case but because the allegations,

17   liberally read, seek a remedy -- well, they claim inadequacy of

18   care in that constitutional sense and a remedy that go to the

19   level of care.  So that's why I concluded that the relief that

20   plaintiffs were seeking for themselves would in fact, if

21   granted, result in the same level of relief systemically for

22   many, many other people, and therefore it was appropriate to

23   process this case with a conscious eye to the interests of

24   others, of absentees, so that their interests are consciously

25   attended to and that the process itself took account of that

1    rather than just leaving all that up to the complete choice and

2    discretion of the named plaintiffs.

3            But this is still not a lawsuit about everyone else's

4    medical care.  It's about the level of care.

5            Mr. Gottfried, what do the defendants propose as being

6    appropriate and reasonable and doable?  And I guess really this

7    comment is for both sides.  I do not intend to have a lawsuit

8    that goes on forever.  We're going to conclude this lawsuit

9    like every other one.  So --

10           MR. GOTTFRIED:  Your Honor, I think, to start with, we

11   have to limit the people that the e-mails are coming from, the

12   so-called custodians.  And it seems to me that if we're talking

13   about -- And, as the Court said, they can't argue they don't

14   know about what's going on in their own system.  But even if

15   that was something we were talking about, it's got to be the

16   three people or the four people, the policymakers in the prison

17   system itself.

18           Why?

19           If we were just looking at the e-mails for the

20   director, for the medical coordinator, which is Dr. Adu-Tutu

21   and Richard Pratt, who is another medical coordinator, if there

22   was a doctor complaining about something, it would get up to

23   one of those people.  And if it didn't get up to one of those

24   people, then I guess there's an argument that they didn't know

25   about it, and the system as a whole, the policymaker of the

1    system as a whole didn't know about it.

2          THE COURT:  Then they would be recklessly indifferent

3    to the self-imposed ignorance, and so you're going to lose on

4    that anyway.

5          MR. GOTTFRIED:  Right.  So to say we have to comb

6    through the e-mails of 47 or 44 or 14 people with all these

7    enormous search terms just makes nor theoretical sense even,

8    because if you get the e-mail that goes from Dr. Jones to

9    Director Ryan or to the medical people, it's going to all be

10   caught up with the people up at the top.

11          So to look at all these other e-mails makes absolutely

12   no sense to me.

13          Then the other problem we have is the search terms

14   themselves.  They're just so incredibly over-inclusive.  You

15   have the word health in a --

16          THE COURT:  I've looked at them, and that's

17   completely clear to me.

18          MR. GOTTFRIED:  So those have to be narrowed to a

19   certain extent.  And we're just getting no cooperation in

20   trying to narrow those down.

21          THE COURT:  It just hit me you only need one search

22   term that will bring up everything that matters.  Just put in

23   the word lawyer.

24          MR. GOTTFRIED:  Causes other problems maybe along the

25   way.

1      THE COURT:  Just kidding.

2      MR. GOTTFRIED:  Then on top of it all, this suggestion

3  about, you know, taking a seed set and taking a small amount to

4  see if the search terms are too inclusive, we've gone over this

5  over and over again that it costs us money to do that, and then

6  there's no promise in the future that it's going to even be

7  reduced --

8      THE COURT:  Hold on.  Let me stop you right there.  It

9  doesn't bother me that it costs you money.  What I'm concerned

10  about is the amount and the likely value we get from it.  And

11  I'm not worried about they'll ask for more later, because I

12  know how to say no.  So let's talk about the merits of this

13  proposal.

14      MR. GOTTFRIED:  If we could somehow narrow the search

15  term dramatically, if we narrowed it down to the three or four

16  people at the top, because the monitors, if the monitors are

17  seeing horrible things but not telling the people on top, well,

18  I don't know -- I don't know if that's ever going to happen.

19  That's the monitor's job, is to tell the people on top.

20      All of those e-mails are going to be captured with the

21  people on top, or at least a great number of them are going to

22  be captured with the people on top.

23      The problem is I don't know how to narrow these search

24  terms they're so broad right now.  And I think what Ashley was

25  trying to -- Ms. Zuerlein was trying to tell you before was

1    we're trying to figure out even on the smaller amount of

2    e-mails that are out there.  And five people working full time,

3    it would take a year or two to even deal with the smaller

4    amount of 14, I think they were talking about, custodians and

5    the amount of e-mails those search terms generate.

6          And we just -- I don't know how to reduce it to a

7    manageable number given the incredible expanse of the search

8    terms.  I think it's easier to reduce the custodians, but

9    that's only half the problem, because the search terms are

10    still so wide and so broad.

11          THE COURT:  Mr. Medsker, what's this two- to

12    four-month time frame that you had offered as a sample?

13          MR. MEDSKER:  Thank you, Your Honor.  The two- to

14    four-month time frame was proposed to do exactly what

15    Mr. Gottfried suggests, narrowing custodians and narrowing

16    search terms.  We made that proposal on the assumption that, as

17    you noted, e-discovery is a tool, but it's only a tool if you

18    actually use it properly.  And we made that proposal on the

19    assumption that defendants had the capability to run these

20    searches and run iterative versions of those searches to figure

21    out which terms were good and which terms were bad and which

22    terms led to needlessly duplicative or cumulative amounts of

23    documents.

24          So that's why we made the seed set proposal.  And we

25    are more than willing to work with defendants to try to find a

1    way to reach that common goal, because we're doing this pro

2    bono.  We don't want a huge document dump either because we

3    have to do the same thing where we sit there and read through

4    them.

5         So everybody wants the focused type of discovery that

6    provides just the relevant information.  And if we had, as you

7    noted, a proper tool that would let us get there, we do this

8    all the time.  There are ways that we can work together to do

9    that.

10        But these suggestions that we can't be trusted with a

11   promise to do things later or that we've been unreasonable or

12   we've been unresponsive -- Your Honor has the exhibits, and he

13   has the correspondence, and that's not borne out by the

14   correspondence.

15        But we're willing to do that, and that's why we

16   started with a limited two- to four-month range, because we

17   thought that was an adequate test period.  And like we asked

18   for samples with search terms, that we could do that review,

19   and then we could work on reviewing this, because we don't want

20   a document dump either.  So that was the purpose for the two-

21   to four-month range.

22        THE COURT:  It seems to me that the people that matter

23   are the defendants and the -- or at least the three people that

24   you have preliminarily narrowed it to.

25        MR. MEDSKER:  Your Honor, I would also suggest to the

1    extent that Mr. Gottfried referenced that there are contract

2    monitors who could funnel these things up to the top, Joe

3    Profiri is a fourth individual who is responsible for

4    overseeing the relationship with Wexford.

5        THE COURT:  Well, but let's digress for a minute about

6    the substance of Wexford.  Everybody agrees that they failed to

7    do the job the way the Department wanted it.  That makes your

8    case.  So what?  They failed to do the job.  I mean, I don't

9    mean so what.  It is very significant that that happened.  But

10   it doesn't seem to be a matter that is in great dispute, that

11   they failed to do the job that resulted in complaints there

12   will be no difficulty in getting.  You already have them from

13   the Department.  And that's part of the story here, but there's

14   more to it.

15        And so Wexford's inadequacies just don't strike me as

16   a part of this that warrants exorbitant expense to confirm what

17   is obvious and undisputed that they failed to do this job

18   adequately.

19        MR. MEDSKER:  My point, Judge Wake, was just to -- And

20   I understand that, and I agree with that.  To the extent we're

21   trying to identify receptacles for complaints, I think Joe

22   Profiri is one as well.  That was beyond just the three

23   individuals.  I think he is --

24        MS. MITCHELL:  And, Your Honor, if I could just

25   address that one point that you made?

1      THE COURT:  All right.

2      MS. MITCHELL:  I'm sorry.  Caroline Mitchell.  It

3  actually isn't beyond dispute that Wexford failed.  Wexford's

4  position is that they were put in an untenable position because

5  of systemic failures within the ADC that it wasn't possible for

6  them to address during their contract.

7      So what we're looking -- It's interesting to see what

8  Wexford did wrong.  What's much more interesting to us in that

9  e-mail is the candid communications between Wexford and the ADC

10  about the systemic problems that exist in the system that

11  they're now saying Corizon is going to be able to address.

12      And we want to see kind of the inside baseball on that

13  so that we can apply that as we analyze what --

14      THE COURT:  But is there any dispute about getting the

15  communications between the Department and Wexford?  Were we

16  talking about that at all?

17      MR. GOTTFRIED:  Your Honor -- and, Ms. Mitchell,

18  correct me if I'm wrong -- my understanding is we've given them

19  22 volumes -- or 10 volumes of e-mails between Wexford and the

20  Department during this time period of more than 10,000 pages

21  already.  And that's everything we have.  That's from our whole

22  dispute.  I mean, it's all wrapped up in the discussions that

23  were going on to get rid of Wexford that we've already handed

24  all of that stuff over.

25      THE COURT:  Go ahead, Ms. Mitchell.

1          MS. MITCHELL:  Well, that's just not the case, because

2     we didn't even know about the termination of Wexford.  And our

3     understanding is -- the determination, when it was happening.

4     And we don't have the documents from October and November when

5     they were negotiating about the break-up.

6          THE COURT:  Did you talk to them about that?

7          MR. GOTTFRIED:  Again, Your Honor, this is the first

8     time we've heard that it's the Wexford e-mails that they're

9     concentrating on.  But the fact is we've given them the whole

10    file that has to do with Wexford, and all the e-mails are in

11    there.

12         THE COURT:  Go ahead, Ms. Mitchell.

13         MS. MITCHELL:  Well, Your Honor, if that's the case,

14    if they'll agree, to the extent that they haven't, that they'll

15    produce all of the e-mail -- Because we haven't gotten

16    production of any of their electronic e-mail yet.

17         So if they're going to agree that they'll produce all

18    of those -- I think Dr. Adu-Tutu is not as relevant because he

19    left before the time period that we're focused on.  But

20    Mr. Profiri is important.

21         If they'll agree to produce all of those, if we can

22    get a sampling of the contract monitor documents, so we can

23    come back to you and say either these are really important,

24    here's why, or these aren't important, then maybe we can reach

25    agreement today.

1          But I don't think it's accurate to say they've

2     produced all of the electronic e-mails on those.

3          THE COURT:  Well, this seventh joint discovery dispute

4     is a very high level abstraction and a claim of entitlement and

5     objection to expansive electronic discovery.  That's not what

6     you just said here.

7          I'm going to think out loud for a minute.  I'm not

8     disposed to grant the broad electronic discovery that you

9     claim.  Even as you've narrowed it, it appears to me to be

10    burdensome and overbroad, and there are likely to be better and

11    more focused ways to get it than requiring expansive searches

12    of e-mails involving -- that obviously are going to involve

13    people who are dealing with the entire administration of the

14    Department of Corrections.  So I'm not disposed to grant that.

15         And I am, again, I see this case -- and I will repeat

16    myself hopefully briefly, only briefly -- I see this case as

17    not turning on some smoking gun e-mail where somebody admits

18    something or complains about something.

19         I see this case turning on the gross data about the

20    level of care and how that relates to the population being

21    served, the demands being made.

22         Of course it's going -- You're going to have to prove

23    up the case with respect to your named plaintiffs about their

24    conditions, their needs, levels of care that relate to them,

25    and how those levels of care follow below the constitutional

1  minimums for them in a way that's probable.

2         And if in fact the gross data show a poor level of

3  care but not one falling to the depth of an Eighth Amendment

4  violation, it's not going to matter that anybody complained and

5  anybody sent angry e-mails telling them that were so.  That's

6  just not going to matter.

7         And if you do prove that, you're not going to need

8  that to prove your case either.

9         So I'm disposed to not impose great burdens on the

10 defendants on this e-mail search and to leave you to mining the

11 vein of gold that is there, their level of actual care, and

12 getting what you hope will be credible, persuasive expert

13 witnesses the data that they need to offer their opinions.

14        Now, with that said, obviously this Wexford contract

15 is particularly significant.  I'm hearing the defendants say

16 they've already given you all of that.  By the way, when we're

17 dealing with large amounts of data production, it doesn't have

18 to be perfect.  It cannot be perfect.  But if you've done

19 diligent effort, a large volume, and you've got most of the

20 stuff, that's all that life requires.  The Rules of Civil

21 Procedure don't require any more than life.

22        Now, you know, there are issues about the key decision

23 makers.  If there's some focused way to get at that without

24 this gross review of all the business they've done for whatever

25 period of months, I'm open to you all exploring that in a

focused way.  But, again, part of what I want to communicate to you both is I'm seeing the discovery in this case as being quite a different paradigm from what lots of lawyers think the way lots of cases go.  I don't see this as that kind of a massive electronic communications.

There may be a lot of significant and even costly and burdensome data that goes directly to the levels of care, and I'm not diminishing any of that discovery.  We're not talking about that.

But I don't see this as coming from the paradigm that unfortunately is all too prevalent in our litigation of we're in a big lawsuit, and I want everything, especially what costs you money to produce rather than me.  I'm not in that paradigm. I would be in that paradigm in a case where that approach has real cost-benefit value.  And I don't see it in this case.

So I guess -- I'm not disposed to craft a particular order here but rather to send you back and to have you explore what you can, in a very different focused way, that could get to things that are likely to be high value and not excessively costly.

And also, Ms. Mitchell and Mr. Medsker, part of the reason I come to this conclusion is what I said before.  I think you win your lawsuit if you establish the level of care substantively as being below that minimum.  And I'm not going to care much what Mr. Ryan says about it, about his subjective

1    thoughts, if that's what's going on in his Department.  I mean,

2    I'll care about what everybody says.  But it's intrinsically

3    not very persuasive for someone -- I'm not saying he would say

4    this -- but if he got up and said, "You know, I just work here.

5    I don't know what goes on," that's going to be very

6    unpersuasive.

7         So I don't think the plaintiffs -- Well, every

8    plaintiff wants that memo that we all heard about in law school

9    in the antitrust case, but that's not how you win most cases.

10        So I apologize for the sort of stream of consciousness

11   character of my comments, but I want to give you a sense of

12   what to focus on and to keep in focus the real value on both

13   sides' case.  And I invite you all to continue dialog in a much

14   more focused way.

15        And, Mr. Gottfried, if there's something that you can,

16   with reasonable effort and discovery, you left a batch out of

17   the documents on the Wexford deal, then I expect you to make

18   that effort.

19        MR. GOTTFRIED:  Absolutely, Your Honor.

20        THE COURT:  So I'll say one other thing for you all.

21        This reading your papers -- and your discussion here

22   is very helpful to me -- I do have a very substantial concern

23   here that coming at this case that way, the way that I'm

24   rejecting, will simply guarantee this goes on indefinitely.

25   There isn't the time much less the -- Well, there just isn't

1   the time to approach it that way.  It has to be approached in a

2   much more direct and productive way.

3            So now I don't want my comments to get off -- I'm not

4   telling the defense you guys are going to lose this case.  I'm

5   just telling you what I think they need to prove and how they

6   can get at it.

7            That's probably, if I say much more, I'll probably

8   defuse the direction I've been trying to give.

9            MS. MITCHELL:  Your Honor, we appreciate the

10  direction.  We do think that having access to the Wexford

11  documents about what they said, about the way the care was

12  working, and any inadequacies in the system is critical.  It

13  sounds like defendants are agreeing to give us any documents

14  they have of those type that they can find from a reasonable

15  search of these individuals.  So that's good.  We would still

16  like to have some of the contract monitoring e-mails so we can

17  see what kind of systematic problems there were when Wexford

18  was approaching trying to remedy them.  So that that's what we

19  can test when we go out and have our experts look at the

20  system, because then the experts can say:  Okay.  We know these

21  problems existed.  Have they been addressed by Corizon or

22  haven't they?

23           And if they haven't, then the question will be for you

24  do they rise to the level of being unconstitutional or not?

25           And those are the kind of documents we want to get to.

1   And I don't think that that's unreasonable.  We understand this

2   is a different kind of case.  We litigate big antitrust cases,

3   and, believe me, we understand the difference here and the

4   difference of your approach.

5          THE COURT:  Of course there is no antitrust law

6   anymore anyway, is there?

7          MS. MITCHELL:  Well, some of our clients wish not, but

8   it seems to still happen occasionally.

9          But so we're trying to be reasonable.  I think if you

10  just leave this as the parties talk, we're going to continue to

11  have these issues, and we're going to get closer and closer to

12  the discovery cutoff.  And it would be most helpful for us to

13  have these documents, so when our experts go out, they know

14  about it.  Whether you want to refer us to a magistrate to just

15  try and come up with a really focused plan, that's fine with

16  plaintiffs.

17         THE COURT:  Well, I've had some discussion with you

18  all about that, and my only -- my main -- I've talked about

19  having a discovery master and having both of you pay half of

20  it.  But I haven't gotten to that point yet, because so far, by

21  maintaining my familiarity with your disputes, I maintain my

22  ability to give you very prompt action.  So I might have to get

23  that but not yet.

24         And you know, if the evidence shows that the

25  Department had serious systemic deficiencies before the Wexford

1    contract, the idea that we'll fix the deficiencies by saving

2    money on paying less to an outside contractor, well, that will

3    just help your case, not hurt it.

4            MS. MITCHELL:  But we still have to find the evidence

5    of the actual deficiencies and bring that to you.  The cure

6    letter isn't going to win the case for us, and we understand

7    that, and we want to find that evidence and have access to it.

8            THE COURT:  Here's what I'm disposed to do now is,

9    with the benefit of these remarks, simply -- I don't know if

10   I'm denying or affirming -- but terminating this discovery

11   dispute to direct you all to continue to address this in light

12   of the comments that I've given you.

13           And I think you'll have an idea of if you continue to

14   reach an impasse on something much more specific, you can both

15   have an idea of the way I'm likely to see it.

16           And so that will empower you to reach much more

17   focused resolutions that you can both live with on the theory

18   that you think you'll probably lose if you take it any further.

19           But if you can't, then bring it back, and I'll give

20   you my more focused decisions.

21           Do either of you wish to say anything further about

22   this before I get to that deferral resolution?

23           MS. MITCHELL:  No, Your Honor.

24           MR. GOTTFRIED:  No, Your Honor.

25           THE COURT:  All right.  Then with respect to the

1    seventh joint notice of discovery dispute, document number 403,

2    it's ordered that, treating it as motions on both sides

3    concerning discovery, the motion is denied without prejudice

4    with direction to counsel and the parties to continue to

5    explore the matters in light of the direction the Court has

6    given in open court.

7            I do want you to move promptly on this because if

8    there's going to be problems, I'll need to figure it out.  And

9    I want to do it in time that we do not delay this case.

10           You know, this is totally unrelated.  I could look

11   this up, but I just haven't.  What's the status of the appeal

12   in the class certification order?  Didn't the defendants file a

13   petition to appeal that?

14           MR. GOTTFRIED:  Your Honor, I think it's been fully

15   briefed in the Ninth Circuit, and we're just waiting to see

16   if -- It's been fully briefed in the Ninth Circuit.  We're just

17   waiting to see if they're going to accept the appeal or not.

18           THE COURT:  Okay.  All right.  And of course nobody

19   has any idea when that will be.

20           Of course if they reverse that order, my job here

21   would be really a lot easier.  Okay.  All right.  I've got

22   something else I've got to do, so we'll be in recess until

23   3:30.

24       (Proceedings recessed at 3:15 p.m.)

25

1                         <u>C E R T I F I C A T E</u>

2

3          I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6          I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11         DATED at Phoenix, Arizona, this 7th day of May, 2013.

12

13                         s/Linda Schroeder
                           Linda Schroeder, RDR, CRR
14

15

16

17

18

19

20

21

22

23

24

25

**UNITED  STATES  DISTRICT  COURT**