Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,
Dustin Brislan, Sonia Rodriguez, Christina Verduzco,
Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne
Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson,
and Charlotte Wells, on behalf of themselves and all
others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON
SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) |

**LODGED PROPOSED:**

**EIGHTH JOINT NOTICE OF DISCOVERY DISPUTE**

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone: (602) 650-1854
    Email: dpochoda@acluaz.org
5            kflood@acluaz.org
             jlyall@acluaz.org
6
    *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)
7
    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
8   *Dustin Brislan, Sonia Rodriguez, Christina Verduzco,*
    *Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne*
9   *Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson,*
    *and Charlotte Wells, on behalf of themselves and all*
10  *others similarly situated*

11  **[ADDITIONAL COUNSEL LISTED ON**
    **SIGNATURE PAGE]**
12
                    UNITED STATES DISTRICT COURT
13
                          DISTRICT OF ARIZONA
14

15  Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina          (MEA)
16  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph      **EIGHTH JOINT NOTICE OF**
17  Hefner; Joshua Polson; and Charlotte Wells, on      **DISCOVERY DISPUTE**
    behalf of themselves and all others similarly
18  situated; and Arizona Center for Disability Law,

19                   Plaintiffs,

20  v.

21  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
22  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
23  capacities,

                     Defendants.

24

25

26

27

28

**Disputed Issues**

I.   Plaintiffs' experts are experienced in correctional health care and conditions of confinement in isolation, and have developed methodologies for prison tours designed to allow them to efficiently, comprehensively, and accurately evaluate the state of a prison's health care and isolation units.   Must Plaintiffs' experts agree in advance of their prison tours to limit their tours to the scope approved by Defendants, including the areas the experts will be permitted to inspect, who they will be able to talk to, and the records they may inspect?

II.   Defendants' counsel are accompanying Plaintiffs' experts on their prison tours.   Must Defendants provide notice of their experts' tours of ADC prisons and permit Plaintiffs' counsel to observe these tours?

**Plaintiffs' Position**

**I.   Plaintiffs' Expert Tours**

**A.   Introduction**

This Court has made clear that systemic data and expert witness testimony are critical and "what's going to matter" for Plaintiffs to meet their burden of proof in this case.  Reporter's Transcript, April 26, 2013, at 18:7-10.  Plaintiffs "[are] going to need an expert and so are [Defendants] about what is such a low level that it falls below the constitutional minimums." *Id*. at 12:4-6.  The Court also stated that rather than review documents such as Defendants' emails, Plaintiffs should be focused on "getting what you hope will be credible, persuasive expert witnesses the data that they need to offer their opinions." *Id*. at 34:9-13.

Plaintiffs have tried for nearly a year to get the data they need for their expert witnesses, but these efforts have yielded no meaningful results.  Pursuant to the Court's admonition to use written discovery instead of 30(b)(6) depositions, Plaintiffs endeavored to obtain systemic data and information through written discovery, but Defendants

objected and refused to provide responsive information about health care or conditions of isolation pertaining to any prisoner other than the 14 original named plaintiffs because a class was not certified.[1]  Declaration of Donald Specter ("Specter Decl.") ¶ 2.  It was not until May 24, 2013, almost three months after this Court certified the case as a class action, that Defendants stopped objecting to Plaintiffs' discovery requests on the grounds that a class has not been certified.  *Id*.

The Court, as quoted above, made clear at the April 26, 2013 hearing that system-wide information and expert witness testimony will be decisive in this case.  Plaintiffs agree that expert testimony is critical, and are attempting to ensure that the expert tours are productive, accurate, reliable, and efficient.  Yet at every turn Defendants continue to engage in obstructionist behavior, by attempting to dictate and pre-clear every aspect of the methodology used by Plaintiffs' experts in their tours, and in refusing to produce documents and information needed by the experts to prepare for the tours and their reports.

In light of the September 27, 2013 cut-off deadline for fact discovery, time is of the essence.  Plaintiffs ask the Court to compel Defendants to produce the responsive documents sought in their Rule 34 requests for inspection, and issue an order directing Defendants to permit Plaintiffs' experts to tour the institutions without unreasonable restrictions.  This Court has issued such orders in a similar case.  *See Graves v. Arpaio*, Case No. CV-77-0479-PHX-NVW, Dkt. 1769 (D. Ariz. Jan. 28, 2009) (Specter Decl. Ex. 1) at 3-5 (finding that "[a]s a practical matter, Plaintiffs' counsel cannot give meaningful input to the independent experts without access to the Maricopa County Jails facilities and staff, their clients, and their clients' records" and ruling that "upon reasonable notice to the Defendants, Plaintiffs' counsel may tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, and review records on-site.").

---

[1]  Plaintiff Parsons was paroled in November 2012, and this Court dismissed him as a class representative on March 6, 2013.  Order, March 6, 2013, at 19, 23.

### B.    Plaintiffs' Efforts to Prepare for Expert Tours

The efforts made by Plaintiffs for more than six months to hammer out agreement regarding their experts' tours provide the Court with the context for the current dispute, illustrate Plaintiffs' need to seek the Court's assistance, and document that Plaintiffs have made sincere efforts as required by LRCiv. 7.2(j) to personally consult and resolve the disputed matters.

Plaintiffs first met with Defendants regarding the parameters of expert tours on November 28, 2012, and after another meeting in December, proposed a schedule of limited expert tours.  Specter Decl. ¶¶ 4-6, Exs. 2-5.  Plaintiffs served their first Request for Inspection on January 4, 2013, and it described in detail the process that would be used by the experts during tours in February and March 2013, including describing the areas that experts would need to inspect and the types of documents that should be produced.[2] *Id*. ¶ 7, Ex. 6.

Defendants requested that Plaintiffs change the dates for the expert tours, and on February 8, 2013, counsel for Plaintiffs provided a proposed revised schedule with dates in April and May, designed to conclude before the close of discovery on May 31, 2013. *Id*. ¶ 8, Ex. 7.  Defendants did not respond for two weeks, so Plaintiffs served a modified Request for Inspection on February 21, 2013 reflecting the new dates.  *Id*. ¶ 9, Ex. 8. Plaintiffs again contacted Defendants regarding the revised schedule on February 26, and counsel for Defendants stated that the new dates were acceptable, but the occurrence of any tours was "contingent upon an order granting class certification, as well as the parties [sic] agreement regarding the parameters of these tours, including but not limited to what

---

[2] The notice stated that "inspect" meant to physically walk through and observe ADC prison facilities, such as clinical spaces, medication lines, isolation and segregation housing units, infirmaries, or intake areas.  As different experts are evaluating different subjects, not all of them would go to all of these locations.  The notice stated that experts would want to confer with and interview staff, and confidentially meet with prisoners. Finally, the notice stated that among the documents that experts would potentially want to review was a sampling of health needs requests, grievances, isolation unit incident reports, and the medical files of prisoners with various medical or mental health conditions.  Ex. 6 at 1-3.

1   the experts can view, whom they can ask questions and how that can be accomplished.…"

2   *Id*. ¶ 10, Ex. 9.

3       This Court certified this matter as a class action on March 6, 2013 and one week

4   later modified the trial schedule to extend discovery for four months.  Dkt. Nos. 372, 388,

5   and 389.  The parties met and conferred on March 13, 2013 regarding Plaintiffs' expert

6   inspections and made some progress.   They agreed that Plaintiffs' expert tours would

7   occur during the summer instead of April and May, and reached agreement on some

8   issues regarding the presence of counsel for the parties during the tours, the institutions

9   that the experts would tour, and the types of documents that would be produced to assist

10  the inspections.   Specter Decl. ¶ 11.   Plaintiffs explained that their experts were very

11  experienced in correctional health care and prison operations, had conducted numerous

12  inspections in the past, and would work cooperatively with Defendants to minimize any

13  operational burden.  *Id*.  Furthermore, Plaintiffs explained that the experts will only be at

14  an institution for a brief time, and it is in their interest to be as efficient as possible during

15  the tour.  *Id*.  At Defendants' request, Plaintiffs provided additional information regarding

16  the parameters of the tours on April 15, 2013, and the types of information or reports that

17  the experts would need to properly prepare for the tour.  *Id*. ¶ 12, Exs. 10-11.

18      On April 24, 2013, Defendants informed Plaintiffs that they would not allow

19  Plaintiffs' experts to choose which areas to tour during the inspections, they were

20  "consulting with their clients" about what documents could be provided in advance of the

21  tour, but they would provide lists of certain categories of health care staff for the experts

22  to review.  *Id*. ¶ 13, Ex. 12 at 1-2. The parties conferred yet again on April 29, 2013, and

23  Defendants requested additional information regarding the experts' planned methodology.

24  *Id*. ¶ 14.

25      On May 3, 2013, Counsel for Plaintiffs expressed their concern with how the

26  negotiations had been drawn out excessively and requested the parties "agree on general

27  parameters, such as the date of the inspections, the areas of the inspections (such as

28  housing units, clinics, etc.), the fact that the experts will speak to staff during the tour and

1   review relevant documents...."[3]  *Id*., Ex. 13.   On May 6, 2013, Plaintiffs served their

2   amended request for inspection by their experts with tours proposed to begin on July 8,

3   2013.  *Id*. ¶ 15, Ex. 14.  As of May 28, 2013, Defendants have not provided any of the

4   promised information to assist the experts in preparing for the tours, and have not moved

5   from their position that they will pre-select and pre-clear all locations visited by the

6   experts within the prison and all individuals with whom the experts may speak.  *Id*. ¶ 16.[4]

7                  **C.    Argument**

8            The heart of this case is the level of health care and conditions of isolation

9   provided by Defendants to prisoners in their custody, which the Court noted will be

10  presented through expert testimony.   Reporter's Transcript, April 26, 2013, at 18:7-10,

11  33:19-21, 34:11-13.  Plaintiffs allege that Defendants' practice of providing inadequate

12  health care—including deficient medical, dental, and mental health care—and

13  unconstitutional conditions of confinement in isolation, combined with Defendants'

14  deliberate indifference to such conditions, is endangering the health and lives of prisoners

15  in the custody of ADC.  Complaint, Dkt. No. 1, ¶¶ 39, 40, 59, 66, 82 and 100.  Plaintiffs

16  must carry the burden of showing the systemic and unconstitutional levels of health care

17  and use of isolation.

18          Defendants' continued insistence on negotiating the minutiae of the experts' tours

19  is preventing the parties from agreeing that the tours can go forward, in turn jeopardizing

20  the Court's ability to make findings as to actual conditions of health care and isolation.

21  *See Graves v. Arpaio*, 2008 WL 4699770, *3 (D. Ariz. Oct. 22, 2008) (describing how in

22  order to decide a motion to terminate a consent decree, the Court needed to have joint

23  discovery regarding "current and ongoing conditions" in the Maricopa County Jail and "to

24  _____

25          [3] Defendants' position that the parties had reached agreements on the disputed
    issues is not true.  After Plaintiffs' counsel realized that Defendants' increasingly specific
26  demands would leave the experts with a sanitized view of the prisons and the health care
    operations, Plaintiffs proposed a more general approach that Defendants rejected.
27          [4] Plaintiffs have already agreed that Defendants' counsel will be present when
    Plaintiffs' experts speak with ADC staff, and that statements made by ADC staff are not
28  admissions.  Specter Decl. ¶ 4.

facilitate providing information to the expert witnesses before their tours and inspections of jail facilities").  Their obstinacy also flies in the face of the central purpose of the Federal Rules of Civil Procedure: to "secure the just, speedy, and inexpensive determination of every action".  Fed. R. Civ. P. 1.

This Court and others have routinely issued orders allowing expert discovery such as prison tours.  *See Graves v. Arpaio*, 2011 WL 1843026 at *5, *10 (D. Ariz. May 16, 2011) (granting Plaintiffs' "discovery request for counsel and their medical expert to tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, and review records on-site, upon reasonable notice to Defendants"); *Graves*, Dkt. No. 1769, (Specter Decl., Ex. 1) at 3-5; *Coleman v. Schwarzenegger*, 2007 WL 3231706, *4 (E.D./N.D. Cal. Oct. 30, 2007) (as part of their Rule 34 inspection of operations on property, plaintiffs' experts may speak to prison staff of the expert's choice so long as the staff are reasonably available); *United States v. Erie*, 2010 WL 986505 at *3 (W.D.N.Y. Mar. 17, 2010) (plaintiffs' consultants allowed access to jail staff on tours "as necessary" to their investigation).

Requests for inspection under Rule 34 must be reasonably specific (Fed. R. Civ. P. 34(b)(1)(A)), but the rule is meant to be liberally construed to allow broad access. *Martin v. Reynolds Metals Corp.*, 297 F.2d 49, 56 (9th Cir. 1961); *see also New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 960-61 (2nd Cir. 1983) (in a case involving conditions in a developmental center, the trial court did not abuse its discretion in permitting plaintiffs' counsel to inspect the facilities, take photographs, make observations, take notes, and interview any class member, staff member or employee outside the presence of defendants); *Morales v. Turman*, 59 F.R.D. 157, 158-59 (E.D. Tex. 1972) (finding in a case involving the conditions of juvenile correctional facilities that "[w]hen important civil rights are in issue in complex litigation of widespread concern, a court must make every effort to enhance the fact-finding process").  Plaintiffs' request for inspection by their experts is reasonably specific, and narrowly tailored to take into account the needs of prison staff to run a secure institution.

1    Experts must have access to the information that they need, in order to provide
2    "credible, persuasive" guidance to the Court.   Reporter's Transcript, April 26, 2013, at
3    34:9-13.    Much of that information will come through prison tours, including
4    observations, staff and prisoner interviews, and document reviews on those tours.   The
5    experts must be able to decide whom to interview, where to go, and what files and
6    documents to review, based on their expertise and experience in such investigations.

7    There are compelling reasons why the experts need such flexibility during tours.

8    First, the experts often do not discover problems or issues until they are physically
9    present at the institution, and when they do discover the problems, they will need to dig
10   deeper on the spot, by speaking with knowledgeable individuals, or by traveling to certain
11   locations in the prison they had perhaps not previously anticipated visiting.   Experts
12   conducting an inspection cannot predict or anticipate in advance all of the problems they
13   will find.  For example, in October 2012, Defendants' own staff monitoring the provision
14   of health care at the Lewis prison complex ran across

15   
16           multiple stacks of loose filing in the medical records area that
             date back to approximately May, 2012.  This equals
             approximately 12-15 feet of loose filing not contained in
17           patient medical records or readily available to medical staff.
             …on the Barchey unit[,] an assessment of 15-20 inches of
18           stacked documents would be accurate… approximately 15-20
             inches of loose filing exists which directly affects inmate care
19           on the Bachman unit. …there are approximately 15-20 inches
             of loose filing directly related to patient care on the Buckley
20           Unit. …approximately 15-20 inches of loose filing for the
             Morey Unit. …for the Rast unit is in excess of 15 inches.
21           …there is in excess of 15-20 inches of loose filing directly
             related to the Stiner unit inmates.

22   Specter Decl. ¶ 17, Ex. 15 at ADC036726-36727.  An expert conducting inspection tours
23   would not be able to predict that she or he would encounter a problem of such magnitude,
24   and would necessarily want to be able to immediately speak to staff about the situation.
25   Defendants' position that experts could only talk to a pre-approved list of people would
26   preclude the expert from conducting the necessary follow up.

27   Second, in order to provide the most accurate information to the Court, the experts
28   need to see the prisons as they truly exist and operate, and not a sanitized, pre-approved

Potemkin village.  In this case, Defendants have a documented history of trying to present a scrubbed-up illusion of a functioning health care system to outsiders. ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ Plaintiffs' experts must have meaningful access to ADC prisons, staff, and documents to accurately assess if these serious deficiencies documented by Wexford a few months ago continue to exist.

Similarly, Plaintiffs have repeatedly requested to review a range of documents on the tours, (Specter Decl. ¶¶ 4, 7, 9, 11, 12, 14, 15, Exs. 2, 6, 8, 10, 11, 13, 14), and asked for samples of the documents ahead of time in order to limit, if possible, their on-site reviews.  Specter Decl. ¶ 4, 11, Ex. 2.  In order to identify prisoners to interview or a random sample of medical records to review, the experts need to have logs or reports listing prisoners who have required certain levels of care or who have certain conditions (*e.g.*, prisoners sent to outside hospitals in the past year, insulin-dependent diabetics, Hepatitis C or HIV positive prisoners,[5] prisoners on psychiatric medications, etc.).  Defendants have not produced these sample documents or logs.  Specter Decl. ¶ 16.

---

[5] ██████████████████████████████████████████████████

## II.   Defendants' Expert Tours

Defendants' counsel have asserted their right to be present for Plaintiffs' experts' tours of ADC prisons. Plaintiffs' counsel have no objection, and have requested to likewise be present for Defendants' expert tours, if any.  Defendants do not agree to this request.  Permitting Plaintiffs' counsel to observe Defendants' experts' tours promotes efficiency and fairness, will save time and money, and will reduce the time needed to establish basic facts about each expert's tour at deposition and during trial.

For example, if Plaintiffs' counsel can observe which units experts enter, whether and to what extent they talk with staff or examine documents or log books, or how long they review each prison and each unit, it will help establish a "common factual baseline." *Coleman,* 2007 WL 3231706, *2 (permitting counsel for all parties to be present at experts' prison site inspections in order to create a "common factual baseline," in the interests of efficient discovery); *see also Plata v. Brown*, 2013 WL 654996, *2-3 (N.D. Cal. Feb. 21, 2013) (same).

The presence of Plaintiffs' counsel during the tours will not invade privileged communication or attorney work product, because Plaintiffs' counsel simply wish to observe the tours.  Plaintiffs would not be present during the private conversations Defendants' attorneys seek to have with their experts before or after the tours.  In the order recently issued in *Plata v. Brown*, the court rejected the argument that the presence of plaintiffs' counsel on defendants' expert tours would invade privilege or work-product protection, noting that "Defendants' own position regarding their right to accompany Plaintiffs' counsel on any prison visits demonstrates that Defendants do not themselves believe that observation of a consultant's prison tours by opposing counsel violates any privilege. Defendants' counsel insist that they must be present for all prison tours by Plaintiffs' consultants or experts—which would be barred by Rule 26 if the Court were to accept Defendants' position in opposition to the instant motion."  2013 WL 654996 at *2.

Defendants also contend that it would be a waste of time and money for Plaintiffs' counsel to observe Defendants' expert tours, because counsel for Defendants are going to

1   wait to until after they review the expert consultants' opinions to decide whether to

2   designate them as experts at trial.  If Defendants decide to not use their expert consultants'

3   opinions at trial, then any waste of time and money will fall solely on Plaintiffs, and not

4   Defendants.  However, if Defendants do decide to use their experts' opinions, then there

5   will be a savings of time and money because Plaintiffs will have already been present to

6   observe what actually happened during the inspection, and will not have to engage in

7   protracted discovery as to what occurred during the tours.

8        Attendance by all counsel at expert inspections will create a level playing field and

9   reduce the likelihood of factual disputes about what did or did not happen, thereby

10  allowing the parties and the Court to focus on substantive issues such as the experts'

11  opinions and the strengths or weaknesses of their methodologies.  It furthers the central

12  purpose of the Federal Rules of Civil Procedure: to "secure the just, speedy, and

13  inexpensive determination of every action".  Fed. R. Civ. P. 1.

14

15  **DEFENDANTS' POSITION**[6]

16       Defendants agree that this Court made clear that expert witness data will be

17  important to this case and that Plaintiffs need focus their efforts on obtaining such data,

18  rather than engaging in unnecessary, irrelevant, and costly discovery tactics.  As a result,

19  Defendants have bent over backwards to accommodate Plaintiffs' demands with respect to

20  these tours.  Indeed, the parameters for these tours was agreed upon for the most part,

21  until Plaintiff inexplicably changed their minds and decided there should be no parameters

22  to these tours, at all, other than providing Defendants with the dates that their experts

23

24

_____

25       [6] Plaintiffs' position statement is filled with inflammatory content, is unreasonably
    long, and unnecessarily combines two disputed issues.  Despite Defendants' objections to
26  the deficiencies, Plaintiffs refused to amend their portion of this pleading.  *See*
    Defendants' ("D") Ex. 1 (Various Correspondence regarding this discovery dispute).
27  Defendants will not waste the Court's time responding to each misrepresentation
    contained in Plaintiffs' position, but will address the relevant issues as concisely as
28  possible.

intended to enter Defendants' facilities.[7]  Prior to withdrawing their agreement, the parties had agreed to the following:

1.     One lawyer from each side will accompany each expert on his or her inspection.  ACDL may also have a lawyer present for the inspections.

2.     Photographs will be taken by ADC staff at the experts' direction and Defendants will provide Plaintiffs with a memory card of the requested photographs.

3.     Plaintiffs would limit their tours to a representative sample of general housing units.  Additionally, Plaintiffs will inspect Eyman-SMU I, Eyman-Browning, Florence-Central, Florence-Kasson, and Perryville-Lumley SMA.

4.     Plaintiffs agreed that statements made by ADC staff to Plaintiffs' experts will not constitute admissions under 801(d)(2).

5.     Plaintiffs would provide Defendants with "categories" of individuals their experts wished to speak to and Defendants would generate a list of individuals knowledgeable on those topics for Plaintiffs' experts to ask general questions of during the tours.

6.     Plaintiffs would provide Defendants with a list of documents Plaintiffs' experts would like to review and Defendants would inquire as to whether those documents could be made available prior to or during the tours.

7.     Defendants agreed to provide Plaintiffs with each of their requested "lists", to the extent the lists existed.[8]

Despite Plaintiffs' protests to the contrary, Defendants have responded to an extraordinary amount of written discovery.  Additionally, Plaintiffs have conducted, as

---

[7] Currently, Plaintiffs have scheduled tours by seven experts (including three medical experts and both a psychologist and a psychiatrist), at eleven facilities to be conducted nearly every day for six weeks during July and August.  Defendants have objected to Plaintiffs use of duplicative experts as their testimony at trial will result in cumulative evidence. *See* Plaintiffs' ("P") Ex. 12

[8] In footnote 3, Plaintiffs claim the parties did not reach an agreement on disputed issues.  A review of the correspondence between counsel, however, evidences that the parties had reached an agreement on nearly every aspect of the expert tours before Plaintiffs' counsel, without providing any legitimate reason, decided to renege on the agreements that had been reached. *See* P Ex. 10-12.

1  this Court noted, an "extreme" number of 30(b)(6) depositions as well as numerous other

2  depositions.  To date, Defendants have produced nearly 100,000 pages of documents to

3  Plaintiffs.

4       Moreover, this Court previously noted its disapproval of "sweeping, burdensome

5  discovery", yet Plaintiffs again request the Court order such discovery.  *See* D Ex. 2

6  (Excerpts from November 30, 2012 discovery hearing transcript).  The Court has also

7  noted that it intends to "understand what the experts really need, the most cost-effective

8  ways to get something they can use."  *Id.*  After withdrawing from their agreements as to

9  the scope of the expert tours, Defendants are left with a request so broad and vague that it

10  essentially allows Plaintiffs unfettered access to Defendants' facilities, staff, and

11  documents.  Moreover, Plaintiffs themselves seem to be unclear on what documents their

12  experts will need.  For example, at the November 30, 2012 hearing, David Fathi stated

13  Plaintiffs' experts will need to review a "random sampling" such as "every tenth" person

14  with HIV.  *Id.*  Once the parties began discussing the tours in detail, however, Plaintiffs

15  rejected Defendants' proposal that Plaintiffs' experts review a random sampling such as

16  every tenth or hundredth medical record.  Instead, Plaintiffs now wish to have their

17  experts "cherry pick" records and have expressed to Defendants they only need to review

18  records of the "really sick people."

19       Plaintiffs misrepresent the time the parties spent discussing the expert tours issue.

20  Although Plaintiffs first raised their desire to conduct expert tours in late November,

21  2012, the parties agreed to postpone expert tours until after the Court ruled on class

22  certification.  *See* P Ex. 7.  It is misleading to suggest that this issue has been ongoing for

23  months, when in fact, the parties had just about agreed to the parameters of the tours in

24  two phone calls until Plaintiffs decided they wanted to back out of the agreement.

25       Defendants served timely objections to both of Plaintiffs' Requests, highlighting

26  their overly broad and vague nature.  *See* D Ex. 3 (Defendants' Objections to Plaintiffs'

27  Inspection Requests).  Once the Court granted Plaintiffs' Motion for Class Certification,

28  Defendants promptly engaged in discussions regarding the expert tours.  On March 13,

2013, less than a week after the Court granted Plaintiffs' Class Certification motion, the parties held their first telephonic meet-and-confer on the issue. *See* P Ex. 10.   The parties exchanged correspondence in an effort to narrow the disputed issues.  *See* P Ex. 10–12. On April 29, 2013, the parties participated in a second telephonic meet-and-confer.  *See* P Ex. 13.   At this time, the parties reached an agreement on nearly every issue of contention. Plaintiffs provided Defendants with categories of staff members to whom they would like their experts to speak and Defendants agreed to make available individuals who were knowledgeable on those topics.  *See* P Ex. 11-12.   Defendants also agreed to provide Plaintiffs with a representative sample of housing units, and Plaintiffs agreed to limit their tours to those representative areas.  *See* P Ex. 10, 12.

On May 3, 2013, Plaintiffs unexpectedly reneged on the parties' agreement and for the first time, requested Plaintiffs' counsel be present during Defendants' experts' tours. *See* P Ex. 13.   Defendants inquired as to why Plaintiffs were withdrawing the prior agreement and requested authority for their position that Plaintiffs' Counsel should be permitted to accompany Defendants' own experts on tours of Defendants' own facilities. *See* D Ex. 4 (May 3, 2013 correspondence from Struck to Fathi).   Further, Defendants reassured Plaintiffs that the remaining details of the tours could easily be worked out prior to the tours taking place.  *Id.*   A telephone conference was set up to discuss Plaintiffs' withdrawal of their prior agreements.   Plaintiffs refused to compromise, insisting they be given unfettered access to Defendants' facilities and staff.   On May 21, 2013, Plaintiffs served another amended request, adding more tour dates and a yet another medical expert. *See* D Ex. 5 (Plaintiffs' May 21, 2013 Request to Enter Defendants' Property).

Plaintiffs' assertion that Defendants' continued insistence of "negotiating the minutiae of the expert tours" has "jeopardized the Court's ability to make findings as to actual conditions of health care and isolation" makes little sense.  Plaintiffs' requests were vague and overbroad.  It was essential for the parties to engage in discussions regarding the details and scope of the tours in order to avoid troubling the Court with disputes that might arise during the tours.  Indeed, the discussions were productive, but Plaintiffs have

now dramatically shifted their position and filed the instant discovery dispute.  Plaintiffs' assertion that Defendants have, in any way, delayed this process is without merit.[9]

**Plaintiffs' Expert Tours**

Rule 34 does not allow Plaintiffs' experts to speak with Defendants' staff members.  In the spirit of compromise, however, Defendants agreed to make knowledgeable staff members available to Plaintiffs' experts, based on categories provided by Plaintiffs.  *See* P Ex. 11-12.  Plaintiffs agreed to this proposal, and provided categories, but have now changed their minds.  *Id.*

Plaintiffs' new position is that their experts are entitled to enter the facilities, without guidelines or parameters, conduct informal interviews of both Corizon and ADC staff and intrude into any area, without prior notice.  Plaintiffs' newfound sense of entitlement is puzzling.  Defendants repeatedly explained the burden and intrusion this would place on facility operations, but Plaintiffs were not receptive, reasoning their experience in prison litigation enables them to conduct tours in the least intrusive manner.

Allowing Plaintiffs to conduct informal interviews of ADC and Corizon staff would result in roving depositions, lead to unreliable evidence and would result in a blatant circumvention of Rule 34.  Plaintiffs are not entitled to the unfettered flexibility they request and Plaintiffs' rationale for requesting such access is unpersuasive.

First, to the extent Plaintiffs need to "dig deeper" when they discover unexpected "things" on the tours, they can utilize other discovery avenues provided under the Federal Rules, such as submitting written discovery or noticing depositions.  Even better, Plaintiffs could speak to knowledgeable staff members, which Defendants have agreed to make available based on categories Plaintiffs themselves provided.

---

[9]  Additionally, Plaintiffs' statement that an agreement regarding whether the tours can go forward has been hampered by the parties' discussions is incorrect.  Defendants have never taken the position that Plaintiffs' experts cannot tour the facilities, rather, Defendants have consistently maintained that guidelines need to be established to ensure the safety and security of the facilities as these tours present a tremendous burden on facility operation.

Second, Plaintiff's assertion that the experts will not be able to see the prisons as they "actually exist" is inaccurate.  Plaintiffs seek to have seven experts conduct over six weeks of tours at eleven facilities.  How Plaintiffs will be prevented from obtaining an accurate representation of the facilities, with that much exposure, is unknown.

Courts have expressly rejected similar requests, holding that Rule 34 does not require defendants to allow plaintiffs to interview prison staff.  *See U.S. v. Territory of the Virgin Islands,* 280 F.R.D. 232 (D. Virgin Islands 2012); *Curry v. Goodman*, 2003 WL 22305161 (D. Conn. 2003); D Ex. 6 (*Mitchell v. Cate*, No. 2:08-CV-01196 JAM EFB (E.D. Cal.), Oct. 17, 2012 Order re: Discovery Dispute).  Additionally, informal interviews conducted under Rule 34 do not provide for the formal protections afforded by Rule 30, including the defendants' right to designate witnesses to testify on its behalf under Rule 30(b)(6).  *Virgin Islands,* 280 F.R.D at 237.  Accordingly, the *Virgin Islands* court denied plaintiff's requests for informal interviews in light of the potential lack of reliability resulting from the plaintiff's proposed informal and broad-sweeping questioning.  *Id.* at 236-238.  Similarly, the Court in *Curry* noted that "interrogation of employees, conducted informally could amount to a roving deposition, taken without notice, throughout the facilities, of persons who were not sworn and whose testimony was not recorded, and without any right by the defendant to make any objection to the questions asked."  *Id.*  Identical concerns are present here and Plaintiffs should not be afforded such authority.

In *Belcher v. Bassett Furniture Industries, Inc.*, 588 F.2d 904 (4th Cir. 1978), the Court of Appeals reversed and remanded the district court's granting of the plaintiffs' inspection of the defendants' premises, noting plaintiffs assumed their expert would have the right to roam through the facilities, to stop when he chooses, and to make inquiries as he deemed appropriate of any supervisors or employees in the facility.  *Id.* at 906.  The court concluded there was no reason why the plaintiffs could not engage in normal methods of deposing witnesses prior to the sweeping relief they requested.  *Id. at 910.*

Here, Plaintiffs seek to have their experts gain limitless access to Defendants' facilities and staff – thereby providing them with the opportunity to conduct the sweeping and roving depositions which have been expressly rejected under similar circumstances. Despite their contention to the contrary, Plaintiffs' request is far from narrow and is deficiently broad and vague, as Defendants have repeatedly outlined in their objections to Plaintiffs' requests. *See* D Ex. 3. The ambiguity in Plaintiffs' request is intentional – "issue an order directing Defendants to permit Plaintiffs' experts to tour the institutions without unreasonable restrictions." Keeping the request vague allows their experts to roam through the facilities and interview staff at random, without guidelines. It is unfair to subject Defendants to such "broad and all-encompassing" questioning without Rule 30's procedural safeguards. *See Virgin Islands*, 280 F.R.D. at 237.

Although Plaintiffs cite, generally, to *Graves v. Arpaio*, 2011 WL 1843026 (D. Ariz. 2011), as well as to a specific order from that case, *Graves v. Arpaio*, Case No. CV-77-0479-PHX-NVW, Dkt. 1769 (D. Ariz. Jan. 28, 2009), to support their position, *Graves* is distinguishable for many reasons. Plaintiff's cite to the January 28, 2009 Order, reasoning, "This Court has issued such orders in a similar case." First, the experts referenced in the *Graves* order were *post-judgment,* court-appointed, consulting experts. Plaintiffs next cite to the *Graves* decision, generally, to conclude "This Court and other have routinely issued orders allowing expert discovery such as prison tours." Coincidently, the citation relied on by Plaintiffs is a direct reference to the January 28, 2009 order described above. Plaintiff's reliance on this Order provides no support for their position. The procedural posture and status of the experts makes *Graves*, which was a consent decree case, and the vast majority of the other cases relied on by Plaintiffs, completely distinguishable. Here, the case is in the pre-trial stage and Plaintiffs' experts are not court appointed. Moreover, Plaintiffs' experts are looking for constitutional violations rather than ensuring compliance with an injunction issued by a court that already determined constitutional violations exist.

1    In *Mitchell*, a case in the same procedural posture, the Court denied identical

2    requests by plaintiffs based on the same arguments Defendants make here. Plaintiffs'

3    Counsel, Don Specter, sought tours as counsel of record in the *Mitchell* case. The Court

4    denied Plaintiffs' counsels' request, noting:

5         "Plaintiffs' proposed informal questioning of prison staff would
          amount to a roving deposition taken without notice, and could lead to
6         Plaintiffs' experts relying on inaccurate or unreliable information.
          Additionally, such informal questioning would deprive Defendants of the
7         protections and safeguards prescribed by Rule 30 of the Federal Rules of
          Civil Procedure for oral depositions, such as advance notice to the deponent,
8         a formal record of the deposition to ensure accuracy, and an oath or
9         affirmation to ensure the veracity and reliability of the testimony. Fed. R.
          Civ. P. 30(b). Accordingly, Plaintiffs' request to informally question staff at
10        the prisons (Dckt. No. 124 is denied."
11

12   *See* D Ex. 6.

13   The extent of Plaintiffs' expert tours should be limited to observations and should

14   not be used as a hybrid visit/deposition. If Plaintiffs' experts want to question ADC or

15   Corizon staff, questions can be presented through formal discovery mechanisms. *See*

16   *Curry,* 2003 WL 22305161 *1. Moreover, as Defendants have repeatedly informed

17   Plaintiffs, informal depositions could lead to inaccurate and/or unreliable information.

18   For example, Plaintiffs' experts could interview newly hired staff, relief employees, or

19   other employees would provide inaccurate information. Randomly questioned staff may

20   not understand the context of the questions and would be afforded no opportunity for

21   clarification. And, if Plaintiffs' request were granted, Defendants would have no

22   opportunity to make a record of their objections to the questioning and no assurance that

23   the responses were truthful and accurate. Yet, Plaintiffs' experts would then be permitted

24   to base their reports and opinions on the unreliable, inaccurate, and misleading

25   information obtained through such informal questioning. Consequently, randomly

26   selected staff should not be relied on to give an accurate picture of ADC's operations and

27   it would be improper for Plaintiffs' experts to rely on such information in forming their

28   opinions. *See Bailey v. Viacom*, 235 Fed. Appx. 85, 91 (3d Cir.2011) (stating that the

1     testimony of a witness who was not designated to testify under Rule 30(b)(6) does not

2     establish a "company-wide practice.").

3         Plaintiffs opine that Defendants can point out Plaintiffs' experts' inaccuracies in

4     their expert analysis or rebuttal reports and through cross-examination.  This position is

5     without merit.  Without a formal record of the interrogation (such as a deposition

6     transcript), it will be impossible for Defendants to object to the evidence or cross-examine

7     the experts.  Presenting rebuttal witnesses or evidence to counter inaccurate information

8     would be a waste of the Court's time.  Further, if Plaintiffs' experts do not know that the

9     information they are relying on is inaccurate, their reports will be unreliable, and

10    additional rebuttal reports will be have to be prepared and addressed in expert depositions.

11    This is precisely what the rules of discovery seek to avoid.  *See Curry*, 2003 WL

12    22305161 *1; *see also Virgin Islands*, 280 F.R.D. at 237; *Belcher*, 588 F.2d at 909.

13         In *New York Assoc. for Retarded Children v. Carey (Willowbrook),* 706 F.2d 956,

14    961 (2d Cir.1983), a case cited by Plaintiffs, the Court noted, "such an inspection may be

15    denied as unduly burdensome if "the degree to which the proposed inspection will aid in

16    the search for truth" is outweighed by "the burdens and dangers created by the

17    inspection."  Here, the parameter of the tours sought by Plaintiffs does not outweigh the

18    burden and dangers created by their proposed tours.  The sheer volume and length of the

19    tours, alone, is extremely intrusive on the Defendants.  What Plaintiffs seek is not only

20    impracticable, but runs afoul of the Federal Rules of Civil Procedure.  The Court should

21    deny Plaintiffs' request.

22         **Defendants' Expert Tours**

23         Rule 34 does not provide Plaintiffs with the right to "shadow" Defendants' experts

24    when touring their own facilities.  The cases cited by Plaintiffs were in a completely

25    different procedural posture.  Specifically, in those cases, a determination of systemic

26    constitutional violations had already been made, and the matters had been in a remedial

27    stage for many years before the issue arose.  *See generally Brown v. Plata,* 131 S. Ct.

28    1910, 179 L. Ed. 2d 969 (2011).  A "common factual baseline" was needed so that the

1    court could fashion an appropriate remedy, but here there has been no determination on

2    liability.

3           Second, Defendants' experts will not be speaking with any inmate class members

4    during their tours, which was the primary concern expressed in the cases cited.

5    Defendants have promised to give Plaintiffs ample notice should any of their experts

6    desire to speak with inmates, in order to allow them to be present during any discussions.

7           Third, Plaintiffs' desire to shadow defense experts as they tour the facilities is an

8    unwarranted invasion into privileged communications and violates the work-product

9    privilege between Defendants, their counsel, and their experts.  *See* D Ex. 6 (denying an

10   identical request by plaintiffs' counsel, to accompany defendants' experts on prison visits

11   because it would constitute an impermissible invasion into privileged communications and

12   would violate the work-product privilege between defendants, their counsel, and their

13   expert consultants).  This is particularly true as at the time defense experts will be touring

14   the facilities, they will be consulting experts for the Defendants.  It will not be until after

15   the tours take place and the experts have an opportunity to review the voluminous

16   documentation in this case, that a decision will be made as to whether they will be

17   designated as trial experts.  Moreover, any concerns Plaintiffs have with respect to the

18   bases for any designated trial expert reports, will be extinguished by the fact that

19   Defendants must comply with Rule 26(a)(2)(B), and Plaintiffs will have an opportunity to

20   conduct additional discovery with respect to their opinions.

21          Plaintiffs' request will result in nothing more than an unnecessary accumulation of

22   attorneys' fees.  Plaintiffs will not be prejudiced by a denial of this request.

23   . . .

24   . . .

25   . . .

26   . . .

27   . . .

28   . . .

1    Dated:  June 7, 2013

2    **PRISON LAW OFFICE**                    **STRUCK WIENEKE, & LOVE,**
                                             **P.L.C.**
3
     By:  _s/ Donald Specter_
4        Donald Specter (Cal. 83925)*        By:  _s/ Ashlee B. Fletcher_
         Alison Hardy (Cal. 135966)*             Daniel P. Struck
5        Sara Norman (Cal. 189536)*              Kathleen L. Wieneke
         Corene Kendrick (Cal. 226642)*          Timothy J. Bojanowski
6        1917 Fifth Street                       Rachel Love
         Berkeley, California 94710              Nicholas D. Acedo
7        Telephone:  (510) 280-2621             Courtney R. Cloman
         Email:    dspecter@prisonlaw.com        Ashlee B. Fletcher
8                  ahardy@prisonlaw.com          Anne Orcutt
                   snorman@prisonlaw.com         3100 West Ray Road, Suite 300
9                  ckendrick@prisonlaw.com       Chandler, Arizona 85226

10       *Admitted *pro hac vice*

11       Daniel Pochoda (Bar No. 021979)        Arizona Attorney General Thomas C.
         Kelly J. Flood (Bar No. 019772)        Home
12       James Duff Lyall (Bar No. 330045)*     Office of the Attorney General
         **ACLU FOUNDATION OF**                     Michael E. Gottfried
13       **ARIZONA**                                Assistant Attorney General
         3707 North 7th Street, Suite 235           1275 W. Washington Street
14       Phoenix, Arizona 85013                     Phoenix, Arizona 85007-2926
         Telephone:  (602) 650-1854
15       Email:    dpochoda@acluaz.org
                   kflood@acluaz.org          *Attorneys for Defendants*
16                 jlyall@acluaz.org

17       *Admitted pursuant to Ariz. Sup. Ct.
         R. 38(f)
18
         David C. Fathi (Wash. 24893)*
19       Amy Fettig (D.C. 484883)**
         **ACLU NATIONAL PRISON**
20       **PROJECT**
         915 15th Street N.W., 7th Floor
21       Washington, D.C. 20005
         Telephone:  (202) 548-6603
22       Email:    dfathi@npp-aclu.org
                   afettig@npp-aclu.org
23
         *Admitted *pro hac vice*.  Not admitted
24        in DC; practice limited to federal
          courts.
25       **Admitted *pro hac vice*

26

27

28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          keidenbach@perkinscoie.com
          jhgray@perkinscoie.com
          mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com
          tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
            jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

**CERTIFICATION OF ATTEMPT TO RESOLVE THE DISCOVERY DISPUTE**

**<u>Plaintiffs' Position:</u>**

Plaintiffs certify that we have made sincere efforts as required by LRCiv. 7.2(j) to personally consult and resolve the disputed matter described herein.   The parties have discussed the issue numerous times by telephone, email, and written correspondence.   The parties have reached an impasse.

**<u>Defendants' Position:</u>**

*s/ Donald Specter*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on June 7, 2013, I electronically transmitted the above

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Ashley B. Zuerlein
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov
Ashley.Zuerlein@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Timothy J. Bojanowski
Rachel Love
Nicholas D. Acedo
Courtney R. Cloman
Ashlee B. Fletcher
Anne M. Orcutt
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
rlove@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

Jennifer Alewelt
Asim Varma
Sarah Kader
ARIZONA CENTER FOR DISABILITY LAW
jalewelt@azdisabilitylaw.org
avarma@azdisabilitylaw.org
skader@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

*s/ Delana Freouf*