Index of Exhibits to Declaration of Donald Specter in Support of

Prisoner Plaintiffs' Joint Notice of Discovery Dispute

Exhibit 1        Order issued in *Graves v. Arpaio*, Case No. CV-77-0479-PHX-NVW, Dkt. 1769 (D. Ariz. Jan. 28, 2009)

Exhibit 2:       Email dated November 28, 2012  from Don Specter to Dan Struck

Exhibit 3:       Email dated December 13, 2012 from Dan Struck to Don Specter

Exhibit 4:       Email dated December 14, 2012 from Don Specter to Dan Struck

Exhibit 5:       Letter dated January 2, 2013 from Corene Kendrick to Dan Struck

Exhibit 6:       Plaintiffs Rule 34 Notice for Plaintiffs' Expert Inspections dated January 4, 2013

Exhibit 7:       Email dated February 8, 2013 from David Fathi to Dan Struck

Exhibit 8:       Plaintiffs Amended Rule 34 Notice dated February 21, 2013

Exhibit 9:       Emails dated February 26, 2013 and February 27, 2013 from Dan Struck to David Fathi

Exhibit 10:      Letter dated April 4, 2013 from David Fathi to Dan Struck and Michael Gottfried

Exhibit 11:      Letter dated April 15, 2013 from David Fathi to Dan Struck and Michael Gottfried

Exhibit 12:      Letter dated April 24, 2013 from Ashlee Fletcher to Counsel

Exhibit 13:      Email dated May 3, 2013 from David Fathi to Counsel

Exhibit 14:      Plaintiffs Amended Rule 34 Notice dated May 6, 2013

Exhibit 15:      Excerpt of Defendants' October 2012 monitoring report for Arizona State Prison Complex ("ASPC") – Lewis, which Defendants Bates stamped as ADC 036726-36727.

Exhibit 16:      **[FILED UNDER SEAL]** Powerpoint presentation used in a November 7, 2012 meeting at ADC between Defendants and Wexford Health Sources, and an agenda for a November 8, 2012 meeting of Defendants, Wexford, and Governor's office staff.  Wexford Bates stamped these documents as WEXFORD-000001-0000131.

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Fred Graves, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the Maricopa County Jails, )<br><br>Plaintiffs, )<br><br>vs. )<br><br>Joseph Arpaio, Sheriff of Maricopa County; Fulton Brock, Don Stapley, Andrew Kunasek, Max W. Wilson, and Mary Rose Wilcox, Maricopa County Supervisors; )<br><br>Defendants. ) | No. CV-77-0479-PHX-NVW<br><br>**ORDER** |

Plaintiffs and Defendants Fulton Brock, Don Stapley, Andrew Kunasek, Max Wilson, and Mary Rose Wilcox (collectively "Board Defendants") ask the Court to appoint a medical expert and a mental health expert jointly selected by the parties. (Doc. ##1767, 1768.) They have reached agreement on the selection of two experts to evaluate the delivery of medical and mental health care at the Maricopa County Jails, assist in the development of a plan demonstrating compliance with the Second Amended Judgment, and report on the implementation of a plan. (*Id.*) They have reached agreement on five related issues and have been unable to resolve two issues.

First, the parties have not reached agreement on whether, upon reasonable notice, Plaintiffs' counsel may tour Maricopa County Jails facilities, speak with detainees and

staff, and review records on-site. The Board Defendants contend permitting Plaintiffs' counsel such access "serves no purpose but to enable fishing expeditions to locate individual claims," "undermines the authority of the experts," and "duplicates the work that will be performed." (Doc. #1768 at 3.) The Board Defendants further contend such access is unnecessary because the experts will have full access to Plaintiffs' clients and their records, Plaintiffs' counsel may speak with the experts ex parte and may ask the experts to review certain records or speak with certain detainees or staff if the need arises, and Plaintiffs' counsel may communicate by mail with their clients. (*Id.*)

Second, the parties have not reached agreement on whether, upon reasonable request, CHS will provide copies of records to Plaintiffs' counsel for off-site review. The Board Defendants contend it is unnecessary for Plaintiffs' counsel to review records because Plaintiffs' counsel will be able to suggest to the experts identified charts to review, and the experts are hired to review the charts, not Plaintiffs' counsel. The Board Defendants acknowledge, however, that "there may be some occasions where it may be necessary to provide limited records to Plaintiffs' counsel, but it is anticipated that those occasions will be few and far between." (Doc. #1768 at 4.)

On October 22, 2008, the Court found current and ongoing violations of constitutional right and of the Amended Judgment as originally written or as narrowed by the Second Amended Judgment and that Defendants are in breach of the Amended Judgment and as it is restated and narrowed by the Second Amended Judgment. (Doc. #1634 at 79, ¶ 475.) The Court expressly stated:

> As in any case closed by entry of a permanent injunction, enforcement for non-compliance with the permanent injunction may be sought by an aggrieved Plaintiff. Such enforcement may be in the form of further specific orders to implement the permanent injunction and/or contempt remedies to give incentive to cease the violations of the permanent injunction.

(*Id.* at ¶ 476.) Thus far, the parties have avoided more costly and time-consuming enforcement proceedings by negotiating and agreeing upon a process for bringing the Maricopa County Jails into compliance with the Second Amended Judgment. This

1   process includes bringing in independent experts to evaluate Defendants' compliance

2   with the medical and mental health provisions of the Second Amended Judgment and to

3   assist Defendants in achieving compliance where necessary.  The independent experts do

4   not, however, represent the Plaintiffs' interests, and Plaintiffs require representation for

5   their interests in Defendants' compliance with the Second Amended Judgment until

6   compliance is achieved and the judgment is terminated.  *See Duran v. Carruthers*, 885

7   F.2d 1492, 1495 (10th Cir. 1989) (appointment of special master did not render inmate

8   plaintiffs' monitoring of compliance with consent decree unnecessary or duplicative;

9   plaintiffs' counsel had "a continuing duty and responsibility to make sure that the

10  defendants comply, and continue to comply with the decree"); *Keith v. Volpe*, 833 F.2d

11  850, 857 (9th Cir. 1987) (district court was entitled to believe that relief under a consent

12  decree would occur more speedily and reliably if plaintiffs' counsel monitored post-

13  judgment activities; therefore, post-judgment monitoring by plaintiffs' counsel was

14  necessary); *Ginest v. Bd. of County Comm'rs*, 423 F. Supp. 2d 1237, 1240 (D. Wyo.

15  2006) (post-judgment activities of plaintiffs' counsel were necessary and did not

16  duplicate those of court-appointed compliance monitor).   It is far more efficient to permit

17  Plaintiffs to have meaningful representation during this remedial phase than to permit the

18  Board Defendants to invest substantial time and money in unilateral efforts that may not

19  avoid enforcement litigation.

20          As a practical matter, Plaintiffs' counsel cannot give meaningful input to the

21  independent experts without access to the Maricopa County Jails facilities and staff, their

22  clients, and their clients' records.  The Plaintiff class of all pretrial detainees in the

23  Maricopa County Jails is by definition constantly changing, Defendants already have

24  taken some steps toward compliance, and information to which Plaintiffs' counsel had

25  access in the summer of 2008 likely is no longer accurate or complete.  With thousands of

26  pretrial detainees requiring medical and mental health care, it would be extremely

27  inefficient for Plaintiffs' counsel to ask the independent experts to speak to certain

28  detainees or staff or to review certain records when Plaintiffs' counsel have had little or

no access to current information.  Moreover, for the independent experts to remain truly neutral, they cannot serve as Plaintiffs' investigators.

At the January 9, 2009, status conference, the Board Defendants raised their concern that Plaintiffs' counsel sought to engage in "fishing expeditions" to locate individual claims, rather than to focus on systemic issues relevant to compliance with the Second Amended Judgment.  Plaintiffs' counsel assured the Court their intent was to represent the Plaintiff class and avowed they would not use their access to the Maricopa County Jails during this remedial phase to further the efforts of individual detainees in any individual actions for damages.  If Plaintiffs' counsel misuse or abuse their access to the Maricopa County Jails facilities, staff, records, or detainees, the Board Defendants may ask the Court to impose limitations as warranted by the circumstances.

IT IS THEREFORE ORDERED, upon stipulation of the parties, that medical expert Dr. Lambert King and mental health expert Dr. Kathryn Burns are appointed to serve as independent evaluators of the Defendants' compliance with the medical and mental health provisions of the Second Amended Judgment and to be compensated by Defendants for their services.

IT IS FURTHER ORDERED, upon stipulation of the parties, that:

1.  The experts will evaluate the delivery of medical and mental health care at Maricopa County Jails, identify deficiencies, assist Correctional Health Services ("CHS") in developing a corrective action plan, if needed, to achieve compliance with the Second Amended Judgment, and submit reports on compliance to the Court at 120-day intervals.

2.  CHS will provide the experts with clerical and administrative support as they may reasonably need, with the costs to be borne by Maricopa County.  After on-site evaluation, the experts will notify the Court of their need, if any, to retain additional professional support.

3.  The experts will have access to Defendants' staff, facilities, and records for purposes of evaluating compliance and may interview detainees in a private

1   setting. Upon reasonable request, CHS will provide copies of records to the

2   experts for off-site review.

3       4.   All parties are free to communicate with the experts ex parte or otherwise.

4       5.   CHS will compensate each of the experts at an hourly rate of $300. The

5   experts will submit invoices for their fees and costs to CHS on a monthly

6   basis. The invoices will show the number of hours worked and the services

7   performed by date. Costs will be substantiated by customary itemization. The

8   experts' services will be limited to such as are reasonably necessary to

9   monitor, facilitate, and report on CHS's compliance with the Second

10  Amended Judgment.

11      IT IS FURTHER ORDERED that, upon reasonable notice to the Defendants,

12  Plaintiffs' counsel may tour the Maricopa County Jails facilities, speak with pretrial

13  detainees and staff, and review records on-site.

14      IT IS FURTHER ORDERED that, upon reasonable request, CHS will provide

15  copies of records to Plaintiffs' counsel for off-site review.

16      IT IS FURTHER ORDERED that the hearing set for February 3, 2009, at 9:30

17  a.m. is vacated.

18      DATED this 28th day of January, 2009.

19

20

21

22

23  _____

24  Neil V. Wake
    United States District Judge

25

26

27

28

- 5 -

# Exhibit 2



**Corene Kendrick <ckendrick@prisonlaw.com>**

## RE: Proposed Stipulation on Documents
1 message

**Don Specter** <dspecter@prisonlaw.com>                                    Wed, Nov 28, 2012 at 3:00 PM
To: dstruck@swlfirm.com
Cc: Parsons Team <ParsonsTeam@swlfirm.com>, Michael.gottfried@azag.gov, "Watanabe, Katherine"
<Katherine.Watanabe@azag.gov>, "Fathi, David" <dfathi@npp-aclu.org>, cnmitchell@jonesday.com, Corene Kendrick
<ckendrick@prisonlaw.com>

Dan,

You asked for more specific information about the prison inspection by experts.  As I mentioned
during our conference call this afternoon, each of our experts will need to tour the prisons, but
each expert will not inspect every prison.  At this point, we do not have a proposed schedule.  If
it would be more convenient for your clients, we would be happy to schedule tours so that more
than one expert tours the same prison and the same time, but of course that may not be
possible due to scheduling conflicts.  Let us know your preference.

We believe that the inspections of each facility can be accomplished in one-to-two days,
depending on the size of the facility and the number of charts to be reviewed.

We propose that the expert be accompanied by one attorney from each side.

We would like to take pictures during the tours.  Please let us know whether we should bring our
own equipment or if the prison would prefer to supply that.

We propose that the experts be allowed to interview employees and prisoners privately without
any lawyer present.

The attached sheet provides information about the documents that the experts would like to
review at the facility and the areas proposed for inspection.  It is difficult at this time to pinpoint
how many prisoner medical and general files of each type will be reviewed at the facility since
much of that depends on how many of each type of case is available, the ease with which the
files can be obtained, etc.

Let me know if you have any questions.   Please let us know by noon tomorrow whether the

above is acceptable.


Don

---

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 2:03 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'
**Subject:** RE: Proposed Stipulation on Documents


Dan,


There's one other issue that was on the agenda that we didn't get to before you had to leave. That is whether Defendants are going to object to another deposition of witnesses who were deposed under Rule 30(b)(6), but not as individuals, before the Court's October 4 ruling stating that Rule 30(b)(6) witnesses could be deposed only once. We are particularly interested in deposing Pratt, Rowe and Shaw before the end of discovery.


Please let us know if you are going to object to these further depositions by the close of business today as well.


Thanks


Don

---

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 1:23 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'
**Subject:** Proposed Stipulation on Documents


Dear Dan,

As we noted in today's meet-and-confer, many of your requests simply ask us to admit that a document indicates or states what it states. As Caroline explained, we are willing to stipulate

that documents state what they state (and the documents will evidence what they say).  Beyond that, we are also willing to enter a mutual stipulation where each party agrees that the documents that it or its agent created that are produced in the litigation are authentic.  Finally, we are willing to reach agreement that certain documents created by Defendants or their agents are business records within the meaning of  FRE 803(6), provided that (1) we reserve the right to make any other evidentiary objections to a specific document including but not limited to, objections based on multiple hearsay, (2) defendants represent that the records meet the requirements of Rule 803(6), (3) you describe in more detail which records you wish to be covered by the stipulation and (4) you provide more detail about which discovery requests you are going to withdraw in light of the stipulation.

We assume that our proposed stipulation addresses your need for much of the discovery you have propounded and that you will withdraw the requests seeking us to confirm that documents state or indicate what they state or indicate, if that is incorrect, please let us know.  Please advise which of your requests you are willing to withdraw or narrow in light of the proposed stipulation.


We hope that this approach will resolve some of the issues we discussed at length earlier today.  Please let me know your response by the close of business today so that we may proceed accordingly.


Don



**12 11 28 Expert Tours Info Needed.docx**
31K

Information/ Documents

- For each facility, a list of all ADC prisoners who fit the below criteria, and a subset of these prisoners' records will be selected for review:

  o Prisoners who currently are chronic care patients, including persons with diabetes, hypertension, congestive heart failure, lung cancer, Hep C, asthma, HIV/AIDS, and pregnant patients;
  o Prisoners who currently are prescribed psychotropic medications, including for each prisoner the mental health diagnoses and the medications and dosages;
  o Prisoners who currently are on the mental health caseload, including for each prisoner the mental health diagnoses;
  o Prisoners in isolation who have mental health diagnoses;
  o Prisoners who had serious suicide attempts in last two years;
  o Prisoners who were admitted to outside hospitals and emergency rooms in last two years;
  o Prisoners who were referred to outside clinics and reason for referral in the past year;
  o Prisoners who have had dental extractions in the last two years;
  o Prisoners who have had medications prescribed for them by dentists in the past two years;
  o Prisoners who received after hours care for dental problems;
  o Prisoners who have been in ADC custody for more than five years;
  o Documents listing the duration of isolation for prisoners;

- At intake facilities recently completed medical records
- A sampling of health needs requests received
- All spore test logs
- The average daily population at the facility
- The clinical staffing at the facility
- The number of provider encounters per period of time

Inspections

- Tour the clinical space available for medical, dental, and mental health care
- Tour the range of housing available in the isolation and segregation units (all segregation units: medical, admission, administrative, punitive, protective)
- Kitchen
- Intake Unit (if present)
- Infirmary (if present)
- Facilities where prisoners with chronic diseases or disabilities are cohorted (if present)
- Entrance to a sample of the general population and isolation cells – not just viewing from the outside

- Tour of all areas where prisoners in isolation are taken or have access:

  o Exercise enclosures
  o Visiting areas
  o Law library
  o Suicide watch areas/cells

Interviews

- Interview a sample of known and unknown prisoners so that some interviewees are suggested by plaintiffs' attorneys and some will be randomly selected at the site.

# Exhibit 3



**Corene Kendrick <ckendrick@prisonlaw.com>**

## RE: Proposed Stipulation on Documents
1 message

**Dan Struck** <DStruck@swlfirm.com>                                     Thu, Dec 13, 2012 at 10:41 AM
To: Don Specter <dspecter@prisonlaw.com>
Cc: Parsons Team <ParsonsTeam@swlfirm.com>, "Michael E. . Gottfried" <Michael.Gottfried@azag.gov>, Katherine Watanabe <Katherine.Watanabe@azag.gov>, "Fathi, David" <dfathi@npp-aclu.org>, "cnmitchell@jonesday.com" <cnmitchell@jonesday.com>, Corene Kendrick <ckendrick@prisonlaw.com>

Don,


I apologize for not getting back to you until today, but just got back from an out of town funeral.


We certainly don't oppose your proposing dates when your experts are available and advising us of the same,  but it is premature to be scheduling these tours before a ruling on the class certification.   We are confident that  we will be able to arrange these in short order if necessary.


We also don't have a problem discussing the parameters of the tours ahead of time.   We are certainly agreeable to having your experts  tour clinical spaces and review certain documents, such as a predetermined random sample of medical records.   We are checking with our clients with respect to some of your other requests, such as touring segregation units and areas where segregation inmates have access.   We do wish to be present any time an expert wants to engage either ADC or Wexford employees in conversation.    We will also agree to provide photographs of areas that the expert requests be photographed.   We can discuss the logistics of how we will accomplish this so we can satisfy both sides.


As far as the "lists" that you have requested go, many if not all do not exist in the format you have requested.   We are in the process of determining what lists do exist either at the facility level or at Central Office which tracks some of this information, and will get back to you as soon as possible.   Moreover, some of this information would be maintained by Wexford, assuming it keeps track of this information in the format you have suggested.


We understand that the parties have stipulated that the medical records are authentic and are business records pursuant to 803(6).   We still have not heard from you folks as to whether you will also stipulate to their admissibility pursuant to 803(4).


As for the releases, it is our understanding that you will be providing them for the named plaintiffs.  We need them to be operative until the date of trial, as we do not have access to all of their records for outside consults or,  for example, hospital stays while they are incarcerated.   We will, of course, let you know when we are requesting the records, and will provide you with whatever we receive.


Finally, please let us know if you plan on dismissing Mr. Parsons as a named plaintiff in this matter due to his release from custody.


Please feel free to give me a call if you have any questions or would like to discuss further.


Dan Struck



## Daniel P. Struck

Direct: (480) 420-1620

dstruck@swlfirm.com

www.swlfirm.com

---

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, December 12, 2012 2:37 PM
**To:** Dan Struck
**Cc:** Parsons Team; Michael.gottfried@azag.gov; Watanabe, Katherine; Fathi, David; cnmitchell@jonesday.com; Corene Kendrick
**Subject:** RE: Proposed Stipulation on Documents


Dan,


Now that the Court has set a hearing date for the class certification motion, we would like to make arrangements for expert tours to begin in February.  I'm assuming for purposes of this discussion that the Court grants our motion.  In the unlikely event, the Court denies the motion, we can revisit whatever agreements we reach.


I set forth in my email below on November 28 the requirements we believe are necessary for these tours.  We have spoken to Brandi Blair, one of Wexford's attorneys, and my understanding is that she would prefer that all the arrangements be made through ADC with notice to her about the dates for the inspections.  She did insist on having an attorney present when the experts speak with Wexford's employees and so we suggest one attorney from ADC, plaintiffs and Wexford be present for those discussions.


Please let me have your thoughts on this proposal so we can resolve this issue and start scheduling the inspections.


Don

---

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 3:01 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'; 'Fathi, David'; 'cnmitchell@jonesday.com'; Corene Kendrick
**Subject:** RE: Proposed Stipulation on Documents

Dan,

You asked for more specific information about the prison inspection by experts.  As I mentioned during our conference call this afternoon, each of our experts will need to tour the prisons, but each expert will not inspect every prison.  At this point, we do not have a proposed schedule.  If it would be more convenient for your clients, we would be happy to schedule tours so that more than one expert tours the same prison and the same time, but of course that may not be possible due to scheduling conflicts.  Let us know your preference.

We believe that the inspections of each facility can be accomplished in one-to-two days, depending on the size of the facility and the number of charts to be reviewed.

We propose that the expert be accompanied by one attorney from each side.

We would like to take pictures during the tours.  Please let us know whether we should bring our own equipment or if the prison would prefer to supply that.

We propose that the experts be allowed to interview employees and prisoners privately without any lawyer present.

The attached sheet provides information about the documents that the experts would like to review at the facility and the areas proposed for inspection.  It is difficult at this time to pinpoint how many prisoner medical and general files of each type will be reviewed at the facility since much of that depends on how many of each type of case is available, the ease with which the files can be obtained, etc.

Let me know if you have any questions.   Please let us know by noon tomorrow whether the above is acceptable.

Don

_____

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 2:03 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'
**Subject:** RE: Proposed Stipulation on Documents

Dan,

There's one other issue that was on the agenda that we didn't get to before you had to leave.  That is whether Defendants are going to object to another deposition of witnesses who were deposed under Rule 30(b)(6), but not as individuals, before the Court's October 4 ruling stating that Rule 30(b)(6) witnesses could be deposed only once.  We are particularly interested in deposing Pratt, Rowe and Shaw before the end of discovery.

Please let us know if you are going to object to these further depositions by the close of business today as well.


Thanks


Don

---

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 1:23 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'
**Subject:** Proposed Stipulation on Documents


Dear Dan,

As we noted in today's meet-and-confer, many of your requests simply ask us to admit that a document indicates or states what it states. As Caroline explained, we are willing to stipulate that documents state what they state (and the documents will evidence what they say). Beyond that, we are also willing to enter a mutual stipulation where each party agrees that the documents that it or its agent created that are produced in the litigation are authentic. Finally, we are willing to reach agreement that certain documents created by Defendants or their agents are business records within the meaning of FRE 803(6), provided that (1) we reserve the right to make any other evidentiary objections to a specific document including but not limited to, objections based on multiple hearsay, (2) defendants represent that the records meet the requirements of Rule 803(6), (3) you describe in more detail which records you wish to be covered by the stipulation and (4) you provide more detail about which discovery requests you are going to withdraw in light of the stipulation.

We assume that our proposed stipulation addresses your need for much of the discovery you have propounded and that you will withdraw the requests seeking us to confirm that documents state or indicate what they state or indicate, if that is incorrect, please let us know. Please advise which of your requests you are willing to withdraw or narrow in light of the proposed stipulation.


We hope that this approach will resolve some of the issues we discussed at length earlier today. Please let me know your response by the close of business today so that we may proceed accordingly.


Don

This electronic mail transmission contains information from the law firm Struck Wieneke & Love, P.L.C. that
may be confidential or privileged. Such information is solely for the intended recipient, and use by any other
party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying,
distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception
of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be
free of any virus or other defect that might affect any computer system into which it is received and opened,
it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by
the sender for any loss or damage arising in any way from its use. If you have received this message in error,
please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform
you that any U.S. federal tax advice contained in this communication (including any attachments), unless
otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of

(1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

**Exhibit 4**



To:
Cc:
Bcc:
Subject:   Proposed Stipulation on Documents

| | |
|---|---|
| From: | Don Specter <dspecter@prisonlaw.com> |
| To: | Dan Struck <DStruck@swlfirm.com> |
| Cc: | Parsons Team <ParsonsTeam@swlfirm.com>, "Fathi, David" <dfathi@npp-aclu.org>, cnmitchell@jonesday.com, Corene Kendrick <ckendrick@prisonlaw.com> |
| Date: | 12/14/2012 03:15 PM |
| Subject: | RE: Proposed Stipulation on Documents |
| Sent by: | parsonsdiscovery@prisonlaw.com |

Dan,

I'm writing to confirm our conversation yesterday about the points set forth in your December 13 email.

We agreed that Plaintiffs will provide you with proposed dates for the expert inspections, which we hope to begin in February.  By then the Court will have heard argument on the motion for class certification.  As I mentioned, it is not feasible to wait until after a ruling on the motion to arrange dates for the tours since the experts have only limited availability and need as much notice as possible.  I suggest that at the argument on the motion and in their papers, both parties request a ruling as soon as possible so that we can plan accordingly.

You are still checking with your clients about whether they will permit tours of certain facilities, such as segregation units.  Please let us know by next week whether your clients object so we have time to have the matter resolved by the Court, if necessary.

We agree experts may engage ADC and Wexford employees in conversation during the inspections and that attorneys for the parties and Wexford can be present whenever that occurs.

We agreed that more than one expert tour may occur in a day as long as it is at different institutions.  You expressed a preference for having only one expert tour a particular facility at one time, but you will let me know if your clients can tolerate multiple experts at a single institution at the same time.

Thank you for agreeing to allow photographs to be taken.  Please let us know how you would like that to be accomplished.

You also agreed to get back to us about which "lists" and other documents that we requested are available.  We request that you provide us that information by January 4.

With respect to releases from the named plaintiffs, we agreed that Plaintiffs would provide releases that are effective until the close of discovery.  If Plaintiffs intend to present testimony about health care that is provided by an outside facility after the close of discovery, we will provide you either with the relevant records or a release for those records.  Similarly, you agreed to provide Plaintiffs notice and supplemental discovery on evidence you intend to present to the court that occurs after the close of discovery.

Although we came close, we did not reach agreement on the admissibility of the medical records since we continue to disagree about the appropriateness of requests for admissions that have been served on plaintiffs that relate to the information in the medical records.  As I understand it, Plaintiffs have now responded to all such requests and if we can agree that discovery of this sort is complete, then we can quickly reach a resolution of the admissibility of the medical records.

Finally, you asked whether we would be dismissing Parsons.  At this time, we do not intend to dismiss Parsons as a named plaintiff.

Please let me know if you disagree with any of the above, and as always feel free to call if that would be easier.

Don

**From:** Dan Struck [mailto:DStruck@swlfirm.com]
**Sent:** Thursday, December 13, 2012 10:42 AM
**To:** 'Don Specter'
**Cc:** Parsons Team; Michael E. . Gottfried; Katherine Watanabe; Fathi, David; cnmitchell@jonesday.com; Corene Kendrick
**Subject:** RE: Proposed Stipulation on Documents

Don,

I apologize for not getting back to you until today, but just got back from an out of town funeral.

We certainly don't oppose your proposing dates when your experts are available and advising us of the same,  but it is premature to be scheduling these tours before a ruling on the class certification.   We are confident that  we will be able to arrange these in short order if necessary.

We also don't have a problem discussing the parameters of the tours ahead of time.   We are certainly agreeable to having your experts  tour clinical spaces and review certain documents, such as a predetermined random sample of medical records.   We are checking with our clients with respect to some of your other requests, such as touring segregation units and areas where segregation inmates have access.   We do wish to be present any time an expert wants to engage either ADC or Wexford employees in conversation.    We will also agree to provide photographs of areas that the expert requests be photographed.  We can discuss the logistics of how we will accomplish this so we can satisfy both sides.

As far as the "lists" that you have requested go, many if not all do not exist in the format you have requested.   We are in the process of determining what lists do exist either at the facility level or at Central Office which tracks some of this information, and will get back to you as soon as possible. Moreover, some of this information would be maintained by Wexford, assuming it keeps track of this information in the format you have suggested.

We understand that the parties have stipulated that the medical records are authentic and are business records pursuant to 803(6).   We still have not heard from you folks as to whether you will also stipulate to their admissibility pursuant to 803(4).

As for the releases, it is our understanding that you will be providing them for the named plaintiffs.  We need them to be operative until the date of trial, as we do not have access to all of their records for outside consults or,  for example, hospital stays while they are incarcerated.   We will, of course, let you know when we are requesting the records, and will provide you with whatever we receive.

Finally, please let us know if you plan on dismissing Mr. Parsons as a named plaintiff in this matter due to his release from custody.

Please feel free to give me a call if you have any questions or would like to discuss further.

Dan Struck



**Daniel P. Struck**
Direct: (480) 420-1620
dstruck@swlfirm.com
www.swlfirm.com

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, December 12, 2012 2:37 PM
**To:** Dan Struck
**Cc:** Parsons Team; Michael.gottfried@azag.gov; Watanabe, Katherine; Fathi, David; cnmitchell@jonesday.com; Corene Kendrick
**Subject:** RE: Proposed Stipulation on Documents

Dan,

Now that the Court has set a hearing date for the class certification motion, we would like to

make arrangements for expert tours to begin in February.  I'm assuming for purposes of this discussion that the Court grants our motion.  In the unlikely event, the Court denies the motion, we can revisit whatever agreements we reach.

I set forth in my email below on November 28 the requirements we believe are necessary for these tours.  We have spoken to Brandi Blair, one of Wexford's attorneys, and my understanding is that she would prefer that all the arrangements be made through ADC with notice to her about the dates for the inspections.  She did insist on having an attorney present when the experts speak with Wexford's employees and so we suggest one attorney from ADC, plaintiffs and Wexford be present for those discussions.

Please let me have your thoughts on this proposal so we can resolve this issue and start scheduling the inspections.

Don

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 3:01 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'; 'Fathi, David'; 'cnmitchell@jonesday.com'; Corene Kendrick
**Subject:** RE: Proposed Stipulation on Documents

Dan,

You asked for more specific information about the prison inspection by experts.  As I mentioned during our conference call this afternoon, each of our experts will need to tour the prisons, but each expert will not inspect every prison.  At this point, we do not have a proposed schedule.  If it would be more convenient for your clients, we would be happy to schedule tours so that more than one expert tours the same prison and the same time, but of course that may not be possible due to scheduling conflicts.  Let us know your preference.

We believe that the inspections of each facility can be accomplished in one-to-two days, depending on the size of the facility and the number of charts to be reviewed.

We propose that the expert be accompanied by one attorney from each side.

We would like to take pictures during the tours.  Please let us know whether we should bring our own equipment or if the prison would prefer to supply that.

We propose that the experts be allowed to interview employees and prisoners privately without any lawyer present.

The attached sheet provides information about the documents that the experts would like to review at the facility and the areas proposed for inspection.  It is difficult at this time to pinpoint how many prisoner medical and general files of each type will be reviewed at the

facility since much of that depends on how many of each type of case is available, the ease with which the files can be obtained, etc.

Let me know if you have any questions.   Please let us know by noon tomorrow whether the above is acceptable.

Don

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 2:03 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'
**Subject:** RE: Proposed Stipulation on Documents

Dan,

There's one other issue that was on the agenda that we didn't get to before you had to leave. That is whether Defendants are going to object to another deposition of witnesses who were deposed under Rule 30(b)(6), but not as individuals, before the Court's October 4 ruling stating that Rule 30(b)(6) witnesses could be deposed only once.  We are particularly interested in deposing Pratt, Rowe and Shaw before the end of discovery.

Please let us know if you are going to object to these further depositions by the close of business today as well.

Thanks

Don

**From:** Don Specter [mailto:dspecter@prisonlaw.com]
**Sent:** Wednesday, November 28, 2012 1:23 PM
**To:** dstruck@swlfirm.com
**Cc:** 'Parsons Team'; 'Michael.gottfried@azag.gov'; 'Watanabe, Katherine'
**Subject:** Proposed Stipulation on Documents

Dear Dan,

As we noted in today's meet-and-confer, many of your requests simply ask us to admit that a document indicates or states what it states.  As Caroline explained, we are willing to stipulate that documents state what they state (and the documents will evidence what they say). Beyond that, we are also willing to enter a mutual stipulation where each party agrees that the documents that it or its agent created that are produced in the litigation are authentic.  Finally, we are willing to reach agreement that certain documents created by Defendants or their agents are business records within the meaning of  FRE 803(6), provided that (1) we reserve the right to make any other evidentiary objections to a specific document including but not limited to, objections based on multiple hearsay, (2) defendants represent that the records meet the

requirements of Rule 803(6), (3) you describe in more detail which records you wish to be covered by the stipulation and (4) you provide more detail about which discovery requests you are going to withdraw in light of the stipulation.

We assume that our proposed stipulation addresses your need for much of the discovery you have propounded and that you will withdraw the requests seeking us to confirm that documents state or indicate what they state or indicate, if that is incorrect, please let us know. Please advise which of your requests you are willing to withdraw or narrow in light of the proposed stipulation.

We hope that this approach will resolve some of the issues we discussed at length earlier today. Please let me know your response by the close of business today so that we may proceed accordingly.

Don

This electronic mail transmission contains information from the law firm
Struck Wieneke & Love, P.L.C. that may be confidential or privileged. Such
information is solely for the intended recipient, and use by any other party
is not authorized. If you are not the intended recipient, be aware that any
disclosure, copying, distribution or use of this message, its contents or any
attachments is prohibited. Any wrongful interception of this message is
punishable as a Federal Crime. Although this e-mail and any attachments are
believed to be free of any virus or other defect that might affect any
computer system into which it is received and opened, it is the responsibility
of the recipient to ensure that it is virus free and no responsibility is
accepted by the sender for any loss or damage arising in any way from its use.
If you have received this message in error, please notify the sender
immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the
IRS under Circular 230, we inform you that any U.S. federal tax advice
contained in this communication (including any attachments), unless otherwise
specifically stated, was not intended or written to be used, and cannot be
used, for the purpose of (1) avoiding penalties under the Internal Revenue
Code or (2) promoting, marketing or recommending to another party any matters
addressed herein.

# Exhibit 5



**PRISON LAW OFFICE**

General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

**VIA EMAIL ONLY**

January 2, 2013

Mr. Dan Struck
Struck Wieneke & Love
3100 W. Ray Rd., Ste. 300
Chandler, AZ 85226

RE:   *Parsons, et al. v. Ryan, et al.*
       Plaintiffs' Proposed Expert Inspection Schedule

Dear Dan,

I write to follow up on the email exchanges between you and Don Specter regarding Plaintiffs' expert inspections of certain facilities. Based upon the experts' availability, we propose the attached schedule of tours. We attempted to consolidate some of the experts' tours so they are at the same institution on the same day. If your client prefers to have only one expert at an institution on a given day, please let me know and we can adjust which facilities are requested for that day.

In his December 12 email, Don asked that you let us know by Friday January 4 whether Defendants maintain the information and lists the experts need to conduct their reviews.

We will be serving a formal request for inspection to memorialize these dates.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick

cc:   Michael Gottfried and Katherine Watanabe
      Co-Counsel

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Felecia Gaston • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

*Parsons v. Ryan* Expert Calendar
Bobby Cohen, Medical
Jay Shulman, Dental
Pablo Stewart, Mental Health
Craig Haney, Isolation
Eldon Vail, Conditions

# February 2013

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|--------|--------|---------|-----------|----------|--------|----------|
| | | | | | 1 | 2 |
| 3 | 4 | 5 <br> Shulman – Yuma | 6 <br> Shulman – Yuma and/or travel day | 7 <br> Shulman – Phx | 8 <br> Shulman – Phx | 9 |
| 10 | 11 <br> Cohen – Tucson | 12 <br> Cohen –Tucson | 13 <br> Cohen –Tucson and/or travel day | 14 <br> Cohen – Yuma | 15 <br> Cohen –Yuma | 16 |
| 17 | 18 <br> Holiday | 19 | 20 <br> Shulman – Pville | 21 <br> Shulman – Pville | 22 <br> Shulman - Lewis | 23 |
| 24 | 25 <br> Cohen - Florence <br> Stewart – Florence | 26 <br> Cohen - Florence <br> Stewart – Eyman | 27 <br> Cohen –Eyman | 28 <br> Cohen –Eyman | | |

*Parsons v. Ryan* Expert Calendar
Bobby Cohen, Medical
Jay Shulman, Dental
Pablo Stewart, Mental Health
Craig Haney, Isolation
Eldon Vail, Conditions

# March 2013

| SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|
| | | | | | 1<br>Cohen – Eyman | 2 |
| 3 | 4<br>Stewart – Tucson | 5<br>Stewart – Tucson<br>Shulman – Florence | 6<br>Shulman – Florence | 7<br>Shulman - Eyman | 8<br>Shulman - Eyman | 9 |
| 10 | 11<br>Stewart – Phx | 12 | 13 | 14 | 15 | 16 |
| 17 | 18<br>Cohen – Lewis | 19<br>Cohen –Lewis | 20<br>Cohen – Pville<br>Haney – Florence<br>Vail – Florence | 21<br>Cohen - Pville<br>Haney – Florence<br>Vail – Florence | 22<br>Cohen – Phoenix<br>Haney – Florence | 23 |
| 24 | 25<br>Stewart – Pville<br>Haney – Pville | 26<br>Stewart – Lewis<br>Haney – Pville<br>Vail – Pville | 27<br>Haney – Eyman<br>Vail – Eyman | 28<br>Haney – Eyman<br>Vail – Eyman | 29<br>Haney – Eyman | 30 |
| 31 | | | | | | |

# Exhibit 6

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
       kflood@acluaz.org
       jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
*Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
*Christina Verduzco, Jackie Thomas, Jeremy Smith,*
*Robert Gamez, Maryanne Chisholm, Desiree Licci,*
*Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
*behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **PLAINTIFFS' REQUEST TO ENTER DEFENDANTS' PROPERTY FOR THE PURPOSE OF EXPERT INSPECTIONS** |

| | |
|---|---|
| PROPOUNDING PARTIES: | Plaintiffs |
| RESPONDING PARTIES: | Defendants |
| REQUEST NUMBER: | One |

1

2 **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3      PLEASE TAKE NOTICE THAT, pursuant to Federal Rules of Civil Procedure 26

4 and 34(a)(2), Named Plaintiffs Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin

5 Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert

6 Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte

7 Wells (**"Plaintiffs"**) request that Defendants allow PLAINTIFFS' COUNSEL and

8 Plaintiffs' experts to INSPECT certain ADC prisons and confer with staff and prisoners.

9      Plaintiffs' experts are as follows:

10      a.  Robert Cohen, M.D.

11      b.  Craig Haney, Ph.D., J.D.

12      c.  Jay Shulman, D.D.S.

13      d.  Pablo Stewart, M.D.

14      e.  Eldon Vail

15      For purposes of this request, "INSPECT" means to physically walk through,

16 observe, and photograph ADC prison facilities, INCLUDING: clinical space available for

17 medical, dental and mental health care; medication lines; housing available in the

18 ISOLATION and segregation units; kitchen facilities; intake or screening areas;

19 infirmaries and other inpatient facilities; a sample of general population and ISOLATION

20 cells; cells in which PRISONERS are housed during suicide and mental health watches;

21 and all areas to which PRISONERS in ISOLATION are taken or have access,

22 INCLUDING exercise enclosures, counseling/programming areas or offices, visiting

23 areas, law libraries, and suicide watch areas.  The term "INSPECT" also means to confer

24 with and interview HEALTH CARE STAFF and CORRECTIONAL STAFF, as well as to

25 confidentially meet with PRISONERS, to discover information regarding the provision of

26 HEALTH CARE to prisoners and conditions of confinement in ISOLATION.

27      The term "INSPECT" further means to review documents or records,

28 INCLUDING: a sample of health needs requests received; a sample of grievances

received related to the provision of health care or the conditions of confinement in ISOLATION; a sample of incident reports; and logbooks relating to PRISONERS' movement and activities within ISOLATION units; and for each facility, a list of all ADC PRISONERS who fit the below criteria, and a subset of these PRISONERS' records will be selected for review:

    a. PRISONERS who currently are chronic care patients, INCLUDING persons with diabetes, hypertension, congestive heart failure, cancer, Hepatitis, asthma, HIV/AIDS, kidney failure/dialysis, and pregnant patients;

    b. PRISONERS who currently are prescribed psychotropic medications, INCLUDING for each prisoner the mental health diagnoses and the medications and dosages;

    c. PRISONERS who currently are on the mental health caseload, INCLUDING for each prisoner the mental health diagnoses;

    d. PRISONERS in ISOLATION who have mental health diagnoses, INCLUDING for each prisoner the mental health diagnoses;

    e. PRISONERS who had serious suicide attempts in last two years;

    f. PRISONERS who were placed on suicide watch or any kind of mental health watch in the last year;

    g. PRISONERS who were admitted to outside hospitals and emergency rooms in last two years;

    h. PRISONERS who were admitted to any inpatient mental health facility in the last two years;

    i. PRISONERS who were referred to outside clinics and reason for referral in the past year;

    j. PRISONERS who have had dental extractions in the last two years;

    k. PRISONERS who have had medications prescribed for them by dentists in the past two years;

    l. PRISONERS who received after hours care for dental problems in the past

1    year;

2    m. PRISONERS who have been in ADC custody for more than five years;

3    n. Documents listing the duration of ISOLATION for PRISONERS.

4    Other records of selected prisoners will also be inspected.

5

6    Therefore, Plaintiffs request that subject to the above and following definitions,

7    Defendants allow PLAINTIFFS' COUNSEL and Plaintiffs' experts to INSPECT the

8    following ADC prisons and confer with prison staff and prisoners on the following dates:

9    a. Arizona State Prison Complex ("ASPC") - Eyman, in Florence, Arizona on

10       February 26-March 1, March 7-8, and March 27-29, 2013, from 8 a.m. to 5 p.m.

11          i.   February 26 – Stewart

12          ii.  February 27-March 1 – Cohen

13          iii. March 7-8 – Shulman

14          iv.  March 27-28 – Haney and Vail

15          v.   March 29 – Haney

16    b. ASPC-Florence, in Florence, Arizona, on February 25-26, March 5-6, and

17       March 20-22, 2013, from 8 a.m. to 5 p.m.

18          i.   February 25 – Cohen and Stewart

19          ii.  February 26 – Cohen

20          iii. March 5-6 – Shulman

21          iv.  March 20-21 – Haney and Vail

22          v.   March 22 – Haney

23    c. ASPC-Lewis, in Buckeye, Arizona, on February 22, March 18-19, and March

24       26, 2013, from 8 a.m. to 5 p.m.

25          i.   February 22 – Shulman

26          ii.  March 18-19 – Cohen

27          iii. March 26 – Stewart

28

1        d.  ASPC-Perryville, in Goodyear, Arizona, on February 20-21, March 20-21 and

2            March 25-26, 2013, from 8 a.m. to 5 p.m.

3               i.  February 20-21 – Shulman

4              ii.  March 20-21 – Cohen

5             iii.  March 25 – Haney and Stewart

6             iv.  March 26 – Haney and Vail

7        e.  ASPC-Phoenix, in Phoenix, Arizona, on February 7, March 11 and 22, 2013,

8            from 8 a.m. to 5 p.m.

9               i.  February 7 – Shulman

10             ii.  March 11 – Stewart

11           iii.  March 22 – Cohen

12        f.  ASPC-Tucson, in Tucson, Arizona, on February 8, 11-13, and March 4-5, 2013,

13            from 8 a.m. to 5 p.m.

14              i.  February 8 – Shulman

15            ii.  February 11-13 – Cohen

16          iii.  March 4-5 – Stewart

17        g.  ASPC-Yuma, in San Luis, Arizona, on February 5-6, and 14-15, 2013, from 8

18            a.m. to 5 p.m.

19               i.  February 5-6 – Shulman

20            ii.  February 14-15 – Cohen

21

22  **<u>DEFINITIONS</u>**

23      1.    "ADC" means the Arizona Department of Corrections, INCLUDING all its

24  subdivisions, agents, employees, contractors, and attorneys.

25      2.    "CORRECTIONAL STAFF" means custody staff employed or paid by the

26  ADC to serve in a security or operational capacity.

27

28

3.     "DEFENDANTS" means Defendants Charles Ryan and Richard Pratt, and their predecessors, successors, employees, subordinates, contractors, agents, and attorneys.

4.     "HEALTH CARE" means the provision of care, INCLUDING adequate diet, to address the mental health, medical, or dental needs of a PRISONER, whether those needs arise as a result of injury, illness, disease, or other trauma, or care provided for diagnostic or preventive purposes.

5.     "HEALTH CARE STAFF" means all staff employed or paid by the ADC, WEXFORD, or HEALTH CARE SUBCONTRACTORS (other than CORRECTIONAL STAFF) who are responsible for providing HEALTH CARE to ADC PRISONERS.

6.     "HEALTH CARE SUBCONTRACTOR" means any person or entity contracting with the ADC or WEXFORD to provide HEALTH CARE to PRISONERS.

7.     "INCLUDING" means including but not limited to.

8.     "INSPECT" is defined at pages 2-4 of this Request.

9.     "ISOLATION" means confinement in a cell for 22 hours or more each day; confinement in Eyman-Special Management Unit ("SMU") 1, Eyman-Browning Unit, Florence-Central Unit, Florence-Kasson Unit, or Perryville-Lumley Special Management Area ("SMA"); or confinement in a Complex Detention Unit ("CDU").

10.    "PLAINTIFFS' COUNSEL" means legal counsel and retained experts for PLAINTIFFS and agents acting on their behalf.

11.    "PRISONER" means a person incarcerated by the ADC.

12.    "WEXFORD" means Wexford Health Sources, Incorporated.

1   DATED: January 4, 2013                    By:   ___/s/ Corene Kendrick___

2                                             Donald Specter (Cal. 83925)*
                                              Alison Hardy (Cal. 135966)*
3                                             Sara Norman (Cal. 189536)*
                                              Corene Kendrick (Cal. 226642)*
4                                             **PRISON LAW OFFICE**
                                              1917 Fifth Street
5                                             Berkeley, California 94710
                                              Telephone:  (510) 280-2621
6                                             Email:    dspecter@prisonlaw.com
                                                        ahardy@prisonlaw.com
7                                                       snorman@prisonlaw.com
                                                        ckendrick@prisonlaw.com
8
                                              *Admitted *pro hac vice*
9                                             Daniel Pochoda (Bar No. 021979)
                                              Kelly J. Flood (Bar No. 019772)
10                                            James Duff Lyall (Bar No. 330045)*
                                              **ACLU FOUNDATION OF ARIZONA**
11                                            3707 North 7th Street, Suite 235
                                              Phoenix, Arizona 85013
12                                            Telephone:  (602) 650-1854
                                              Email:    dpochoda@acluaz.org
13                                                      kflood@acluaz.org
                                                        jlyall@acluaz.org
14
                                              *Admitted pursuant to Ariz. Sup. Ct. R.
15                                            38(f)

16                                            David C. Fathi (Wash. 24893)*
                                              Amy Fettig (D.C. 484883)**
17                                            **ACLU NATIONAL PRISON PROJECT**
                                              915 15th Street N.W., 7th Floor
18                                            Washington, D.C. 20005
                                              Telephone:  (202) 548-6603
19                                            Email:    dfathi@npp-aclu.org
                                                        afettig@npp-aclu.org
20
                                              *Admitted *pro hac vice*.  Not admitted in DC;
21                                            practice limited to federal courts.
                                              **Admitted *pro hac vice*
22

23

24

25

26

27

28

Daniel C. Barr (Bar No. 010149)
Jill L. Ripke (Bar No. 024837)
James A. Ahlers (Bar No. 026660)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Thomas D. Ryerson (Bar No. 028073)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:      dbarr@perkinscoie.com
            rjipke@perkinscoie.com
            jahlers@perkinscoie.com
            keidenbach@perkinscoie.com
            jhgray@perkinscoie.com
            tryerson@perkinscoie.com
            mdumee@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:      cnmitchell@jonesday.com
            dkiernan@jonesday.com
            scalderon@jonesday.com
            srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Kate A. Suh (Tex. 24075132)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com
           ksuh@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
              jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

1

## **CERTIFICATE OF SERVICE**

2      I hereby certify that on January 4, 2013, I served the foregoing document by

3  electronic mail on the following counsel of record:

4

5                          Michael E. Gottfried
                          Katherine Watanabe
6                          Lucy Rand
                          Ashley Zuerlein
                          Assistant Arizona Attorney General
7                          Michael.Gottfried@azag.gov
                          Katherine.Watanabe@azag.gov
8                          Lucy.Rand@azag.gov
                          Ashley.Zuerlein@azag.gov
9
                          Daniel P. Struck
10                         Kathleen L. Wieneke
                          Timothy J. Bojanowski
11                         Rachel Love
                          Nicholas D. Acedo
12                         Courtney R. Cloman
                          Ashlee B. Fletcher
13                         Anne M. Orcutt
                          STRUCK WIENEKE, & LOVE, P.L.C.
14                         dstruck@swlfirm.com
                          kwieneke@swlfirm.com
15                         tbojanowski@swlfirm.com
                          rlove@swlfirm.com
16                         nacedo@swlfirm.com
                          ccloman@swlfirm.com
17                         afletcher@swlfirm.com
                          aorcutt@swlfirm.com
18                         *Attorneys for Defendants*

19                         Jennifer Alewelt
                          Asim Varma
20                         Sarah Kader
                          ARIZONA CENTER FOR DISABILITY LAW
21                         jalewelt@azdisabilitylaw.org
                          avarma@azdisabilitylaw.org
22                         skader@azdisabilitylaw.org
                          *Attorneys for Arizona Center for Disability Law*
23

24

25                                    */s/ Corene Kendrick*
                                     Corene Kendrick
26

27

28

# Exhibit 7

**Fathi, David**

| | |
|---|---|
| **From:** | Fathi, David |
| **Sent:** | Friday, February 08, 2013 12:00 PM |
| **To:** | dstruck@swlfirm.com; tbojanowski@swlfirm.com |
| **Cc:** | 'NORTHUP, DAWN' (DNORTHUP@azcorrections.gov); 'Gottfried, Michael' (Michael.Gottfried@azag.gov) |
| **Subject:** | Plaintiffs' expert inspections |
| **Attachments:** | 13 02 06 Expert Tour Calendar (2).docx; 13.02.06 req for inspect by experts.doc |

Dear Dan,

Attached please find a revised proposed schedule for plaintiffs' expert inspections and a revised Rule 34 notice.  As you requested, we have moved these inspections to April and May.

We understand that it is your position that you will not allow expert inspections until and unless the class is certified.  However, in light of the June 28 deadline for plaintiffs' expert disclosures, we would like to confirm dates for these inspections in the event the Court does grant the class certification motion.

I will call you early next week to discuss this (please let me know if there are times that are particularly good or bad for you).  I would also like to discuss whether defendants are interested in stipulating to an extension of the fact discovery cutoff, which is currently May 31.

Thanks very much.

David

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@npp-aclu.org

*Not admitted in DC; practice limited to federal courts

1

# Exhibit 8

1 Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
2 James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3 3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
4 Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
5         kflood@acluaz.org
         jlyall@acluaz.org
6 *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

7 *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
*Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
8 *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
*Robert Gamez, Maryanne Chisholm, Desiree Licci,*
9 *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
*behalf of themselves and all others similarly situated*
10
**[ADDITIONAL COUNSEL LISTED ON**
11 **SIGNATURE PAGE]**

12                UNITED STATES DISTRICT COURT

13                    DISTRICT OF ARIZONA

14 Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
Dustin Brislan; Sonia Rodriguez; Christina             (MEA)
15 Verduzco; Jackie Thomas; Jeremy Smith; Robert
Gamez; Maryanne Chisholm; Desiree Licci; Joseph
16 Hefner; Joshua Polson; and Charlotte Wells, on        **PRISONER PLAINTIFFS'**
behalf of themselves and all others similarly          **REQUEST TO ENTER**
17 situated; and Arizona Center for Disability Law,      **DEFENDANTS' PROPERTY**
                                                       **FOR THE PURPOSE OF**
18                Plaintiffs,                            **EXPERT INSPECTIONS**
                                                       **(MODIFIED)**
19      v.

20 Charles Ryan, Director, Arizona Department of
Corrections; and Richard Pratt, Interim Division
21 Director, Division of Health Services, Arizona
Department of Corrections, in their official
22 capacities,

23                Defendants.

24

25 PROPOUNDING PARTIES:        Prisoner Plaintiffs

26 RESPONDING PARTIES:         Defendants

27 REQUEST NUMBER:             One (Modified)

28

78204-0001/LEGAL25878834.1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT, pursuant to Federal Rules of Civil Procedure 26 and 34(a)(2), Prisoner Plaintiffs Victor Parsons, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells ("Prisoner Plaintiffs") request that Defendants allow PRISONER PLAINTIFFS' COUNSEL and Prisoner Plaintiffs' experts to INSPECT certain ADC prisons and confer with staff and prisoners.  The dates below have been modified at Defendants' request.

Prisoner Plaintiffs' experts are as follows:

1.     Robert Cohen, M.D.;

2.     Craig Haney, Ph.D., J.D.;

3.     Jay Shulman, D.D.S.;

4.     Pablo Stewart, M.D.;

5.     Eldon Vail; and

6.     Todd Wilcox, M.D.

For purposes of this request, "INSPECT" means to physically walk through, observe, and photograph ADC prison facilities, INCLUDING: clinical space available for medical, dental, and mental health care; medication lines; housing available in the ISOLATION and segregation units; kitchen facilities; intake or screening areas; infirmaries and other inpatient facilities; a sample of general population and ISOLATION cells; cells in which PRISONERS are housed during suicide and mental health watches; and all areas to which PRISONERS in ISOLATION are taken or have access, INCLUDING exercise enclosures, counseling/programming areas or offices, visiting areas, law libraries, and suicide watch areas.  The term "INSPECT" also means to confer with and interview HEALTH CARE STAFF and CORRECTIONAL STAFF, as well as to confidentially meet with PRISONERS, to discover information regarding the provision of HEALTH CARE to prisoners and conditions of confinement in ISOLATION.

The term "INSPECT" further means to review documents or records, INCLUDING:  a sample of health needs requests received; a sample of grievances received related to the provision of health care or the conditions of confinement in ISOLATION; a sample of incident reports; and logbooks relating to PRISONERS' movement and activities within ISOLATION units; and for each facility, a list of all ADC PRISONERS who fit the below criteria, and a subset of these PRISONERS' records will be selected for review:

a.   PRISONERS who currently are chronic care patients, INCLUDING persons with diabetes, hypertension, congestive heart failure, cancer, Hepatitis, asthma, HIV/AIDS, kidney failure/dialysis, and pregnant patients;

b.   PRISONERS who currently are prescribed psychotropic medications, INCLUDING for each prisoner the mental health diagnoses and the medications and dosages;

c.   PRISONERS who currently are on the mental health caseload, INCLUDING for each prisoner the mental health diagnoses;

d.   PRISONERS in ISOLATION who have mental health diagnoses, INCLUDING for each prisoner the mental health diagnoses;

e.   PRISONERS who had serious suicide attempts in last two years;

f.   PRISONERS who were placed on suicide watch or any kind of mental health watch in the last year;

g.   PRISONERS who were admitted to outside hospitals and emergency rooms in last two years;

h.   PRISONERS who were admitted to any inpatient mental health facility in the last two years;

i.   PRISONERS who were referred to outside clinics and reason for referral in the past year;

j.   PRISONERS who have had dental extractions in the last two years;

1      k.      PRISONERS who have had medications prescribed for them by dentists in
2                   the past two years;

3      l.      PRISONERS who received after hours care for dental problems in the past
4                   year;

5      m.      PRISONERS who have been in ADC custody for more than five years;

6      n.      Documents listing the duration of ISOLATION for PRISONERS.

7      Other records of selected prisoners will also be inspected.

8      Therefore, Prisoner Plaintiffs request that subject to the above and following
9 definitions, Defendants allow PRISONER PLAINTIFFS' COUNSEL and Prisoner
10 Plaintiffs' experts to INSPECT the following ADC prisons and confer with prison staff
11 and prisoners on the following dates:

12      a.      Arizona State Prison Complex ("ASPC") – Douglas, in Douglas, Arizona on
13                   April 2 and May 20, 2013, from 8 a.m. to 5 p.m.

14          i.      April 2 – Shulman

15          ii.      May 20 – Cohen

16      b.      ASPC – Eyman, in Florence, Arizona on April 8-9 and May 1-2, 7, 22-23,
17                   2013, from 8 a.m. to 5 p.m.

18          i.      April 8-9 – Cohen

19          ii.      May 1-2 – Shulman

20          iii.      May 7 – Stewart

21          iv.      May 22-23 – Vail and Haney

22      c.      ASPC – Florence, in Florence, Arizona, on April 10-11 and May 2-3, 6, 20-
23                   21, 2013, from 8 a.m. to 5 p.m.

24          i.      April 10-11 – Cohen

25          ii.      May 2-3 – Shulman

26          iii.      May 6 – Stewart

27          iv.      May 20-21 – Vail and Haney

28

1  d. ASPC – Lewis, in Buckeye, Arizona, on April 15-17, 22 from 8 a.m. to 5

2   p.m.

3    i. April 15-16 – Shulman

4    ii. April 16-17 – Wilcox

5    iii. April 22 – Stewart

6  e. ASPC – Perryville, in Goodyear, Arizona, on April 8-9, 17-18, 24, and

7   May 24, 2013, from 8 a.m. to 5 p.m.

8    i. April 8-9 – Wilcox

9    ii. April 17-18 – Shulman

10    iii. April 24 – Stewart

11    iv. May 24 – Vail and Haney

12  f. ASPC – Phoenix, in Phoenix, Arizona, on April 19, 23 and May 17, 2013,

13   from 8 a.m. to 5 p.m.

14    i. April 19 – Shulman

15    ii. April 23 – Stewart

16    iii. May 17 – Wilcox

17  g. ASPC – Safford, in Safford, Arizona, on April 3 and May 21, 2013 from

18   8 a.m. to 5 p.m.

19    i. April 3 – Shulman

20    ii. May 21 - Cohen

21  h. ASPC – Tucson, in Tucson, Arizona, on April 4, 8-9 and May 22-23, 2013,

22   from 8 a.m. to 5 p.m.

23    i. April 4 – Shulman

24    ii. April 8-9 – Stewart

25    iii. May 22-23 – Cohen

26  i. ASPC – Winslow, in Winslow, Arizona, on May 23-24, 2013, from 8 a.m.

27   to 5 p.m.

28    i. May 23-24 – Wilcox

j.     ASPC – Yuma, in San Luis, Arizona, on April 29-30 and May 15-16, 2013, from 8 a.m. to 5 p.m.

    i.     April 29-30 – Shulman

    ii.     May 15-16 – Wilcox

## DEFINITIONS

1.     "ADC" means the Arizona Department of Corrections, INCLUDING all its subdivisions, agents, employees, contractors, and attorneys.

2.     "CORRECTIONAL STAFF" means custody staff employed or paid by the ADC to serve in a security or operational capacity.

3.     "DEFENDANTS" means Defendants Charles Ryan and Richard Pratt, and their predecessors, successors, employees, subordinates, contractors, agents, and attorneys.

4.     "HEALTH CARE" means the provision of care, INCLUDING adequate diet, to address the mental health, medical, or dental needs of a PRISONER, whether those needs arise as a result of injury, illness, disease, or other trauma, or care provided for diagnostic or preventive purposes.

5.     "HEALTH CARE STAFF" means all staff employed or paid by the ADC, WEXFORD, or HEALTH CARE SUBCONTRACTORS (other than CORRECTIONAL STAFF) who are responsible for providing HEALTH CARE to ADC PRISONERS.

6.     "HEALTH CARE SUBCONTRACTOR" means any person or entity contracting with the ADC or WEXFORD to provide HEALTH CARE to PRISONERS.

7.     "INCLUDING" means including but not limited to.

8.     "INSPECT" is defined at pages 2-4 of this Request.

9.     "ISOLATION" means confinement in a cell for 22 hours or more each day; confinement in Eyman-Special Management Unit ("SMU") 1, Eyman-Browning Unit, Florence-Central Unit, Florence-Kasson Unit, or Perryville-Lumley Special Management Area ("SMA"); or confinement in a Complex Detention Unit ("CDU").

1        10.    "PRISONER PLAINTIFFS' COUNSEL" means legal counsel and retained

2  experts for PRISONER PLAINTIFFS and agents acting on their behalf.

3        11.    "PRISONER" means a person incarcerated by the ADC.

4        12.    "WEXFORD" means Wexford Health Sources, Incorporated.

5  Dated:  February 21, 2013          **PERKINS COIE LLP**

6

7                        By:   s/ Amelia M. Gerlicher
                                Daniel C. Barr (Bar No. 010149)

8                                Amelia M. Gerlicher (Bar No. 023966)
                                Kirstin T. Eidenbach (Bar No. 027341)

9                                John H. Gray (Bar No. 028107)
                                Matthew B. du Mée (Bar No. 028468)

10                                2901 N. Central Avenue, Suite 2000
                                Phoenix, Arizona 85012

11                                Telephone:  (602) 351-8000
                                Email:    dbarr@perkinscoie.com

12                                            agerlicher@perkinscoie.com
                                          keidenbach@perkinscoie.com

13                                          jhgray@perkinscoie.com
                                          mdumee@perkinscoie.com

14                                Daniel Pochoda (Bar No. 021979)

15                                Kelly J. Flood (Bar No. 019772)
                                James Duff Lyall (Bar No. 330045)*

16                                **ACLU FOUNDATION OF**
                                **ARIZONA**

17                                3707 North 7th Street, Suite 235
                                Phoenix, Arizona 85013

18                                Telephone:  (602) 650-1854
                                Email:    dpochoda@acluaz.org

19                                          kflood@acluaz.org
                                        jlyall@acluaz.org

20                                *Admitted pursuant to Ariz. Sup. Ct.

21                                R. 38(f)

22

23

24

25

26

27

28

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@npp-aclu.org
           afettig@npp-aclu.org
           aquereshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
           dkiernan@jonesday.com
           scalderon@jonesday.com
           srauh@jonesday.com

*Admitted *pro hac vice*

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
                jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Victor Parsons;
Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina
Verduzco; Jackie Thomas; Jeremy Smith;
Robert Gamez; Maryanne Chisholm;
Desiree Licci; Joseph Hefner; Joshua
Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated*

1

## **CERTIFICATE OF SERVICE**

2    I hereby certify that on February 21, 2013, I e-mailed a copy of the attached

3    document to the following parties:

4

5    Michael E. Gottfried
     Katherine E. Watanabe
     Lucy M. Rand
6    Ashley B. Zuerlein
     Assistant Arizona Attorneys General
7    Michael.Gottfried@azag.gov
     Katherine.Watanabe@azag.gov
8    Lucy.Rand@azag.gov
     Ashley.Zuerlein@azag.gov
9
     Daniel P. Struck
10   Kathleen L. Wieneke
     Timothy J. Bojanowski
11   Rachel Love
     Nicholas D. Acedo
12   Courtney R. Cloman
     Ashlee B. Fletcher
13   Anne M. Orcutt
     STRUCK WIENEKE, & LOVE, P.L.C.
14   dstruck@swlfirm.com
     kwieneke@swlfirm.com
15   tbojanowski@swlfirm.com
     rlove@swlfirm.com
16   nacedo@swlfirm.com
     ccloman@swlfirm.com
17   afletcher@swlfirm.com
     aorcutt@swlfirm.com
18
19   *Attorneys for Defendants*

20
     Jennifer Alewelt
21   Asim Varma
     Sarah Kader
22   ARIZONA CENTER FOR DISABILITY LAW
     jalewelt@azdisabilitylaw.org
23   avarma@azdisabilitylaw.org
     skader@azdisabilitylaw.org
24
     *Attorneys for Arizona Center for Disability Law*
25

26                                      s/ Delana Freouf

27

28

# Exhibit 9



To:
Cc:
Bcc:
Subject:  Plaintiffs' expert inspections

**From:** Dan Struck [mailto:DStruck@swlfirm.com]
**Sent:** Wednesday, February 27, 2013 6:45 PM
**To:** Fathi, David
**Subject:** RE: Plaintiffs' expert inspections

David,

For scheduling purposes, we can accommodate the dates.  As previously stated, though,  it is contingent upon an order granting class certification, as well as the parties agreement regarding the parameters of these tours, including but not limited to what the experts can view, whom they can ask questions and how that can be accomplished yet still preserve the defendants' ability to fairly cross examine these experts at trial.   As we previously stated, for example, we will also not agree to the extensive schedule proposed by plaintiffs for Craig Haney.   He will need to pare down his plan to spend multiple days touring one prison.    We will need to hammer out an agreement on these details prior to any of these tours taking place.

Dan



**Daniel P. Struck**
Direct: (480) 420-1620
dstruck@swlfirm.com
www.swlfirm.com

**From:** Fathi, David [mailto:dfathi@npp-aclu.org]
**Sent:** Tuesday, February 26, 2013 4:22 PM
**To:** Dan Struck; Tim Bojanowski
**Cc:** Dawn Northup; Michael E. Gottfried
**Subject:** FW: Plaintiffs' expert inspections

Dear Dan,

We still haven't received a response to my Feb. 8 email proposing a schedule for plaintiffs' expert inspections (see below and attached).  When we spoke by phone on Feb. 12 you told me you would propose these dates to your clients, but we've heard nothing further in the intervening two weeks.  As I'm sure you can appreciate, our experts have been holding these dates for some time now, and we need to get these inspections scheduled.  We'd appreciate a response very soon.

Thanks very much,

David

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@npp-aclu.org

*Not admitted in DC; practice limited to federal courts


**From:** Fathi, David
**Sent:** Friday, February 08, 2013 12:00 PM
**To:** dstruck@swlfirm.com; tbojanowski@swlfirm.com
**Cc:** 'NORTHUP, DAWN' (DNORTHUP@azcorrections.gov); 'Gottfried, Michael' (
Michael.Gottfried@azag.gov)
**Subject:** Plaintiffs' expert inspections

Dear Dan,

Attached please find a revised proposed schedule for plaintiffs' expert inspections and a revised Rule 34
notice.  As you requested, we have moved these inspections to April and May.

We understand that it is your position that you will not allow expert inspections until and unless the
class is certified.  However, in light of the June 28 deadline for plaintiffs' expert disclosures, we would
like to confirm dates for these inspections in the event the Court does grant the class certification
motion.

I will call you early next week to discuss this (please let me know if there are times that are particularly
good or bad for you).  I would also like to discuss whether defendants are interested in stipulating to an
extension of the fact discovery cutoff, which is currently May 31.

Thanks very much.

David

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@npp-aclu.org

*Not admitted in DC; practice limited to federal courts*

This electronic mail transmission contains information from the law firm Struck Wieneke & Love, P.L.C. that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.

# Exhibit 10

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**AMERICAN CIVIL LIBERTIES UNION**

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH  FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*


*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

**BY EMAIL TRANSMISSION ONLY**

April 4, 2013

Daniel P. Struck
Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

Michael Gottfried
Lucy Rand
Office of the Attorney General
1275 W. Washington St.
Phoenix, AZ 85007

      **Re:**    **Parsons v. Ryan, et al.**

Dear Counsel:

I am writing to memorialize our March 13, 2013 meet and confer regarding plaintiffs' expert inspections.

**We have agreed to the following:**

In light of the March 6, 2013 order certifying the plaintiff class, defendants will no longer assert that information and documents regarding non-named class members are irrelevant to this litigation. Defendants may continue to assert objections based on burden.

Only one lawyer for the plaintiff class will accompany each expert on his or her inspection. ACDL reserves the right to have a lawyer present for these inspections.

Photographs will be taken by ADC staff at the experts' direction.

The experts will do some record review on-site during their inspections.

Only current logbooks need be available for inspection during the experts' tours; if earlier logbooks are needed, plaintiffs will request them through a Rule 34 request for production.

Plaintiffs' experts do not need to inspect every general population housing unit, and will limit their inspection to a housing unit that is representative or typical sample of general population housing units. Plaintiffs would like that housing unit to be chosen by the expert during the inspection. This agreement does not apply to the isolation units (Eyman-SMU 1, Eyman- Browning, Florence-Central, Florence-Kasson, and Perryville-Lumley SMA).

Defendants asked that plaintiffs agree that statements by ADC staff to plaintiffs' experts are not admissions. Plaintiffs agree to this limitation.

Defendants will produce the following lists requested in plaintiffs' Request to Enter Defendants' Property for the Purpose of Expert Inspections, dated February 6, 2013:

> PRISONERS who currently are chronic care patients, INCLUDING persons with diabetes, hypertension, congestive heart failure, cancer, hepatitis, asthma, HIV/AIDS, kidney failure/dialysis, and pregnant patients.

> PRISONERS who currently are on the mental health caseload, INCLUDING for each prisoner the mental health diagnoses.

> PRISONERS who were referred to outside clinics and [the] reason for referral in the past year.

> PRISONERS who have had medications prescribed for them by dentists in the past two years.

> PRISONERS who have been in ADC custody for more than five years.

Defendants' counsel will accept service of subpoenas for current ADC employees.

**We have not reached agreement on the following:**

Defendants asked that plaintiffs identify in advance, by category, staff that plaintiffs' experts will need to speak with. Plaintiffs agreed to attempt to generate such a list, but it is impossible to provide an exhaustive list in advance.

Defendants have not agreed that plaintiffs' experts may conduct confidential interviews with plaintiff class members.

Defendants asked approximately how many incident reports, grievances, and HNRs plaintiffs' experts will need to review during their inspections. Plaintiffs agreed to consult with their experts and attempt to provide an estimate.

Defendants asked that plaintiffs' experts agree in advance to a specific methodology for sampling medical records and other documents. Plaintiffs agreed to consult with their experts and determine if this is possible. However, plaintiffs will not agree to limitations on their experts' ability to review records that do not apply equally to defendants' experts.

Defendants have declined to provide the following lists requested in plaintiffs' Request to Enter Defendants' Property for the Purpose of Expert Inspections, dated February 6, 2013:

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

PRISONERS who currently are prescribed psychotropic medications, INCLUDING for each prisoner the mental health diagnoses and the medications and dosages.

PRISONERS in ISOLATION who have mental health diagnoses, INCLUDING for each prisoner the mental health diagnoses.

PRISONERS who had serious suicide attempts in [the] last two years.

PRISONERS who were placed on suicide watch or any kind of mental health watch in the last year.

PRISONERS who were admitted to outside hospitals and emergency rooms in [the] last two years.

PRISONERS who have had dental extractions in the last two years.

PRISONERS who received after hours care for dental problems in the past year.

Documents listing the duration of ISOLATION for PRISONERS.

Defendants have not yet decided whether to provide the following list requested in plaintiffs' Request to Enter Defendants' Property for the Purpose of Expert Inspections, dated February 6, 2013:

PRISONERS who were admitted to any inpatient mental health facility in the last two years.

\* \* \*

If I have inadvertently omitted or misstated any part of our discussion, please notify me in writing as soon as possible.  We will provide you with the information from our experts referenced above by April 15, and would like to schedule a call with you that week to attempt to reach final agreement on the outstanding issues regarding expert inspections.

Finally, I enclose for your information two orders by Judge Wake regarding expert inspections in *Graves v. Arpaio*.

Very truly yours,

David C. Fathi

Enclosures

Cc:    All counsel of record

1

2

3

4

5

6                IN THE UNITED STATES DISTRICT COURT

7                     FOR THE DISTRICT OF ARIZONA

8

9   Fred Graves, Isaac Popoca, on their own )   No. CV-77-0479-PHX-NVW
    behalf and on behalf of a class of all )
10  pretrial detainees in the Maricopa County )  **ORDER**
    Jails,                                    )
11                                            )
                  Plaintiffs,                 )
12                                            )
    vs.                                       )
13                                            )
                                              )
14  Joseph Arpaio, Sheriff of Maricopa )
    County; Fulton Brock, Don Stapley, )
15  Andrew Kunasek, Max W. Wilson, and )
    Mary Rose Wilcox, Maricopa County )
16  Supervisors;                              )
                                              )
17                Defendants.                 )
                                              )
18  _____ )

19         Plaintiffs and Defendants Fulton Brock, Don Stapley, Andrew Kunasek, Max

20  Wilson, and Mary Rose Wilcox (collectively "Board Defendants") ask the Court to

21  appoint a medical expert and a mental health expert jointly selected by the parties.  (Doc.

22  ##1767, 1768.)  They have reached agreement on the selection of two experts to evaluate

23  the delivery of medical and mental health care at the Maricopa County Jails, assist in the

24  development of a plan demonstrating compliance with the Second Amended Judgment,

25  and report on the implementation of a plan.  (*Id.*)  They have reached agreement on five

26  related issues and have been unable to resolve two issues.

27         First, the parties have not reached agreement on whether, upon reasonable notice,

28  Plaintiffs' counsel may tour Maricopa County Jails facilities, speak with detainees and

1   staff, and review records on-site.  The Board Defendants contend permitting Plaintiffs'

2   counsel such access "serves no purpose but to enable fishing expeditions to locate

3   individual claims," "undermines the authority of the experts," and "duplicates the work

4   that will be performed."  (Doc. #1768 at 3.)  The Board Defendants further contend such

5   access is unnecessary because the experts will have full access to Plaintiffs' clients and

6   their records, Plaintiffs' counsel may speak with the experts ex parte and may ask the

7   experts to review certain records or speak with certain detainees or staff if the need arises,

8   and Plaintiffs' counsel may communicate by mail with their clients.  (*Id.*)

9   Second, the parties have not reached agreement on whether, upon reasonable

10  request, CHS will provide copies of records to Plaintiffs' counsel for off-site review.  The

11  Board Defendants contend it is unnecessary for Plaintiffs' counsel to review records

12  because Plaintiffs' counsel will be able to suggest to the experts identified charts to

13  review, and the experts are hired to review the charts, not Plaintiffs' counsel.  The Board

14  Defendants acknowledge, however, that "there may be some occasions where it may be

15  necessary to provide limited records to Plaintiffs' counsel, but it is anticipated that those

16  occasions will be few and far between."  (Doc. #1768 at 4.)

17  On October 22, 2008, the Court found current and ongoing violations of

18  constitutional right and of the Amended Judgment as originally written or as narrowed by

19  the Second Amended Judgment and that Defendants are in breach of the Amended

20  Judgment and as it is restated and narrowed by the Second Amended Judgment.  (Doc.

21  #1634 at 79, ¶ 475.)  The Court expressly stated:

22      As in any case closed by entry of a permanent injunction, enforcement for
        non-compliance with the permanent injunction may be sought by an
23      aggrieved Plaintiff.  Such enforcement may be in the form of further
        specific orders to implement the permanent injunction and/or contempt
24      remedies to give incentive to cease the violations of the permanent
        injunction.
25
    (*Id.* at ¶ 476.)  Thus far, the parties have avoided more costly and time-consuming
26
    enforcement proceedings by negotiating and agreeing upon a process for bringing the
27
    Maricopa County Jails into compliance with the Second Amended Judgment.  This
28

1   process includes bringing in independent experts to evaluate Defendants' compliance

2   with the medical and mental health provisions of the Second Amended Judgment and to

3   assist Defendants in achieving compliance where necessary.  The independent experts do

4   not, however, represent the Plaintiffs' interests, and Plaintiffs require representation for

5   their interests in Defendants' compliance with the Second Amended Judgment until

6   compliance is achieved and the judgment is terminated.  *See Duran v. Carruthers*, 885

7   F.2d 1492, 1495 (10th Cir. 1989) (appointment of special master did not render inmate

8   plaintiffs' monitoring of compliance with consent decree unnecessary or duplicative;

9   plaintiffs' counsel had "a continuing duty and responsibility to make sure that the

10  defendants comply, and continue to comply with the decree"); *Keith v. Volpe*, 833 F.2d

11  850, 857 (9th Cir. 1987) (district court was entitled to believe that relief under a consent

12  decree would occur more speedily and reliably if plaintiffs' counsel monitored post-

13  judgment activities; therefore, post-judgment monitoring by plaintiffs' counsel was

14  necessary); *Ginest v. Bd. of County Comm'rs*, 423 F. Supp. 2d 1237, 1240 (D. Wyo.

15  2006) (post-judgment activities of plaintiffs' counsel were necessary and did not

16  duplicate those of court-appointed compliance monitor).   It is far more efficient to permit

17  Plaintiffs to have meaningful representation during this remedial phase than to permit the

18  Board Defendants to invest substantial time and money in unilateral efforts that may not

19  avoid enforcement litigation.

20          As a practical matter, Plaintiffs' counsel cannot give meaningful input to the

21  independent experts without access to the Maricopa County Jails facilities and staff, their

22  clients, and their clients' records.  The Plaintiff class of all pretrial detainees in the

23  Maricopa County Jails is by definition constantly changing, Defendants already have

24  taken some steps toward compliance, and information to which Plaintiffs' counsel had

25  access in the summer of 2008 likely is no longer accurate or complete.  With thousands of

26  pretrial detainees requiring medical and mental health care, it would be extremely

27  inefficient for Plaintiffs' counsel to ask the independent experts to speak to certain

28  detainees or staff or to review certain records when Plaintiffs' counsel have had little or

1 no access to current information. Moreover, for the independent experts to remain truly

2 neutral, they cannot serve as Plaintiffs' investigators.

3       At the January 9, 2009, status conference, the Board Defendants raised their

4 concern that Plaintiffs' counsel sought to engage in "fishing expeditions" to locate

5 individual claims, rather than to focus on systemic issues relevant to compliance with the

6 Second Amended Judgment. Plaintiffs' counsel assured the Court their intent was to

7 represent the Plaintiff class and avowed they would not use their access to the Maricopa

8 County Jails during this remedial phase to further the efforts of individual detainees in

9 any individual actions for damages. If Plaintiffs' counsel misuse or abuse their access to

10 the Maricopa County Jails facilities, staff, records, or detainees, the Board Defendants

11 may ask the Court to impose limitations as warranted by the circumstances.

12       IT IS THEREFORE ORDERED, upon stipulation of the parties, that medical

13 expert Dr. Lambert King and mental health expert Dr. Kathryn Burns are appointed to

14 serve as independent evaluators of the Defendants' compliance with the medical and

15 mental health provisions of the Second Amended Judgment and to be compensated by

16 Defendants for their services.

17       IT IS FURTHER ORDERED, upon stipulation of the parties, that:

18     1.   The experts will evaluate the delivery of medical and mental health care at

19         Maricopa County Jails, identify deficiencies, assist Correctional Health

20         Services ("CHS") in developing a corrective action plan, if needed, to achieve

21         compliance with the Second Amended Judgment, and submit reports on

22         compliance to the Court at 120-day intervals.

23     2.   CHS will provide the experts with clerical and administrative support as they

24         may reasonably need, with the costs to be borne by Maricopa County. After

25         on-site evaluation, the experts will notify the Court of their need, if any, to

26         retain additional professional support.

27     3.   The experts will have access to Defendants' staff, facilities, and records for

28         purposes of evaluating compliance and may interview detainees in a private

1   setting.  Upon reasonable request, CHS will provide copies of records to the
2   experts for off-site review.
3       4.   All parties are free to communicate with the experts ex parte or otherwise.
4       5.   CHS will compensate each of the experts at an hourly rate of $300.  The
5   experts will submit invoices for their fees and costs to CHS on a monthly
6   basis.  The invoices will show the number of hours worked and the services
7   performed by date.  Costs will be substantiated by customary itemization.  The
8   experts' services will be limited to such as are reasonably necessary to
9   monitor, facilitate, and report on CHS's compliance with the Second
10  Amended Judgment.
11      IT IS FURTHER ORDERED that, upon reasonable notice to the Defendants,
12  Plaintiffs' counsel may tour the Maricopa County Jails facilities, speak with pretrial
13  detainees and staff, and review records on-site.
14      IT IS FURTHER ORDERED that, upon reasonable request, CHS will provide
15  copies of records to Plaintiffs' counsel for off-site review.
16      IT IS FURTHER ORDERED that the hearing set for February 3, 2009, at 9:30
17  a.m. is vacated.
18      DATED this 28th day of January, 2009.

23  _____
         Neil V. Wake
24      United States District Judge

2011 WL 1843026
Only the Westlaw citation is currently available.
United States District Court,
D. Arizona.

Fred GRAVES, Isaac Popoca, on their own behalf and on behalf of a class of all pretrial detainees in the
Maricopa County Jails, Plaintiffs,
v.
Joseph ARPAIO, Sheriff of Maricopa County; Fulton Brock, Don Stapley, Andrew Kunasek, Max W. Wilson, and
Mary Rose Wilcox, Maricopa County Supervisors, Defendants.

No. CV–77–00479–PHX–NVW. | May 16, 2011.

Opinion

ORDER

NEIL V. WAKE, District Judge.

**\*1** Before the Court are Defendant Arpaio's Motion Regarding Detention Staff Training Relating to Mental Health Issues, Defendant Maricopa County Board of Supervisors' Motion to Vacate June 14, 2011 Evidentiary Hearing, Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts, and a discovery dispute. (Docs.1949, 1953, 1954, 1959, 1963.) No one has requested oral argument on any of the pending motions pursuant to LRCiv 7.2(f) although oral argument and/or evidentiary hearing on these issues has been suggested as an alternative to a decision on the briefs in a few of the numerous documents filed. In the final reply on these motions, filed May 12, 2011, CHS Defendants join Plaintiffs in requesting an expedited ruling on Defendants' Motion to Vacate June 14, 2011 hearing, which the Court hereby grants.

## I. Background

### A. The Second Amended Judgment

This class action, alleging that the civil rights of pretrial detainees held in the Maricopa County Jails had been violated, was brought against the Maricopa County Sheriff and the Maricopa County Board of Supervisors in 1977. In 1981, the parties entered into a consent decree, which was superseded in 1995 by the stipulated Amended Judgment. The Amended Judgment expressly did not represent a judicial determination of any constitutionally mandated standards applicable to jails.

In 1998, Defendants moved to terminate the Amended Judgment pursuant to the Prison Litigation Reform Act ("PLRA"), U.S.C. § 3626 and U.S.C. § 1997e. Their motion was denied based on Ninth Circuit law holding the decree termination provisions of the PLRA unconstitutional. In 2000, the Ninth Circuit held the PLRA decree termination provision constitutional in another case and subsequently reversed and remanded this case in January 2001. In September 2001 and November 2003, Defendants renewed their motion to terminate the Amended Judgment. In April 2008, this case was reassigned to the undersigned judge.

In August and September 2008, a thirteen-day evidentiary hearing was held. During that process, Plaintiffs agreed not to contest termination of certain paragraphs of the Amended Judgment. On October 22, 2008, Defendants' Renewed Motion to Terminate the Amended Judgment pursuant to the PLRA was granted in part and denied in part, and the provisions of the Amended Judgment remaining in effect were restated in the Second Amended Judgment entered the same day. (Docs.1634,

1635.) The Second Amended Judgment consists of those provisions of the Amended Judgment for which "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right," "is narrowly drawn," and is "the least intrusive means to correct the violation." *See* 18 U.S.C. § 3626(b)(3).

On November 21, 2008, Defendants filed a notice of appeal with the Court of Appeals for the Ninth Circuit. On October 13, 2010, the Court of Appeals affirmed the Second Amended Judgment. On November 2, 2010, Defendant Arpaio filed a petition for rehearing en banc, which was denied on March 25, 2011. On April 4, 2011, the Court of Appeals mandate issued revesting jurisdiction in this Court.


## B. Terminating the Second Amended Judgment

**\*2** Congress enacted the PLRA to prevent federal courts from micromanaging prisons by mere consent decrees and to return control of the prison system from courts to "the elected officials accountable to the taxpayer." *Gilmore v. California,* 220 F.3d 987, 996 (9th Cir.2000). "[N]o longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Id.* at 999. The PLRA requires that prospective relief regarding prison conditions "extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1).

The PLRA also provides that any order for prospective relief regarding prison conditions is terminable upon the motion of any party or intervener two years after a district court has granted or approved the prospective relief, one year after the district court has entered an order denying termination of prospective relief under the PLRA, or two years after the enactment of the PLRA for orders issued before the PLRA's enactment. 18 U.S.C. § 3626(b)(1). The party seeking to terminate the prospective relief bears the burden of proving prospective relief no longer is necessary to correct a current and ongoing constitutional violation. *Gilmore,* 220 F.3d at 1007.

Under § 3626(b)(3), a "district court cannot terminate or refuse to grant prospective relief necessary to correct a current and ongoing violation, so long as the relief is tailored to the constitutional minimum." *Id.* at 1007–08. Before ruling on a motion to terminate, the district court must inquire into current prison conditions unless plaintiffs do not contest defendants' showing that there is no current and ongoing violation. *Id.* at 1008. If prospective relief remains necessary to correct a current and ongoing violation, the district court's authority to modify the existing prospective relief includes authority to expand or diminish the existing relief. *See Pierce v. Orange County,* 526 F.3d 1190, 1204 n. 13 (9th Cir.2008). Determining whether such relief meets § 3626(b)(3)'s need-narrowness-intrusiveness criteria "will obviously rest upon case-specific factors-namely, the extent of the current and ongoing constitutional violations." *Id.* at 1206.


## C. Enforcing the Second Amended Judgment

After the Second Amended Judgment was issued October 22, 2008, the parties began efforts to achieve compliance. On January 28, 2009, upon stipulation of the parties, the Court appointed medical expert Dr. Lambert King and mental health expert Dr. Kathryn Burns as independent evaluators of Defendants' compliance with the medical and mental health provisions of the Second Amended Judgment. The Court greatly appreciates the assistance Dr. King and Dr. Burns have provided to the Court and the parties in identifying areas of need, documenting progress, and recommending strategies for achieving full compliance with the Second Amended Judgment.

**\*3** On April 7, 2010, the Court ordered the parties "to meet and confer to develop a proposed procedure for achieving and demonstrating Defendants' complete compliance with the Second Amended Judgment, including a procedure for Plaintiffs to submit fee applications at appropriate intervals to be paid promptly by Defendants." (Doc. 1880 at 4.) The order explained, "The Court's purpose is to set a procedure by which full compliance with the Second Amended Judgment is either confirmed or specific implementing remedies are ordered and complied with by the end of this year." (*Id.*)

On June 18, 2010, the parties filed a joint report regarding nonmedical provisions of the Second Amended Judgment, in which Defendant Arpaio asserted that the Maricopa County Jails are in complete compliance with the nonmedical provisions

of the Second Amended Judgment. Plaintiffs disputed that assertion with respect to portions of those provisions. On July 30, 2010, the parties filed a Supplemental Joint Report Regarding Nonmedical Provisions of the Second Amended Judgment, which addressed food provided to pretrial detainees in the Maricopa County Jails. Plaintiffs did not dispute that the menu provided by Defendant Arpaio satisfied the Second Amended Judgment's food requirements, but contended that inmates' food journals indicated that they were not receiving the amount of vegetables stated in the menu and were still consistently receiving inedible moldy bread and oranges. Defendants explained that inmate journals likely did not include vegetables incorporated in the stew and that production records document actual weights of vegetables added to the stew in addition to the side vegetables served. Defendants further explained procedures followed to prevent moldy bread or oranges from being served and to provide replacement meals should any moldy bread or oranges be included in the meals served.

Also on July 30, 2010, the parties filed a Joint Report Re: Medical/Mental Health Provisions of the Second Amended Judgment. The parties recommended that the Court-appointed medical and mental health care experts file compliance reports offering their assessments of the areas contemplated by the Second Amended Judgment that they perceive as resolved and those that they believe remain unresolved, together with their remedial proposals for each unresolved area of inmate medical and mental health care. The experts' compliance reports were filed on August 25, 2010. Plaintiffs subsequently filed a notice that they had no objections to the experts' proposed remedies.

On August 27, 2010, the Court held a status hearing regarding the parties' proposed timeline for discovery and the remaining proceedings in this case. Defendants' proposal included the following paragraph:

> 4. By September 9, 2010, the parties will notify the Court, the parties and the consultants/experts, whether they accept or object to any of the consultant's/expert's findings and remedial recommendations. If neither party objects to a consultant's/expert's findings and remedial recommendations, the Court will adopt those findings and that remedy as an order of the Court.

**\*4** (Doc. 1895 at 16.) During the status hearing, referring to the paragraph quoted above, the Court stated:

> Your proposal had suggested that if you are able to agree on a course of action, that it would be automatically adopted by the Court. Now, if you are able to agree and the experts agree, it is highly likely that I will agree. But I cannot give that authority away in advance. I have to be persuaded.

> So that part, this last sentence on Paragraph 4, I'm going to have to change that so that whatever you agree on still needs to be presented to the Court. Now, as I said, it's very unlikely I will disagree. But I will need to make a judgment that the course of action is appropriate.

(Doc.1908 at 35–36.)

After the Court of Appeals affirmed the Second Amended Judgment, Defendant Arpaio filed a motion to terminate paragraphs 2–5 and 9–16 of the Second Amended Judgment on October 28, 2010, but filed a petition for rehearing en banc on November 2, 2011. On November 17, 2010, the Court denied Defendant Arpaio's motion to terminate for lack of jurisdiction without prejudice to refiling it after the Court of Appeals' mandate issued and jurisdiction was revested in this Court.

On January 20, 2011, the parties filed a Joint Case Management Plan Regarding Health Care, which stated that Defendants had resolved most of their disagreements with the medical and mental health experts' proposed remedies and identified two issues on which Defendants continued to disagree with the recommendations. Defendant Maricopa County Board of Supervisors indicated that it had made a voluntary choice not to oppose the experts' remaining recommendations and to pursue all of the other remedies proposed by the experts even though not all were contemplated by, or appropriate under, the Second Amended Judgment. During a status conference on January 21, 2011, the Court set an evidentiary hearing regarding "physician staffing" issues for June 14, 2011, ordered briefing on "detention staff training" issues, and stated that these orders did not preclude resolution of other enforcement issues should any arise. The Court subsequently set a schedule, as jointly proposed by the parties, for discovery related to "physician staffing" issues in preparation for the anticipated June 14, 2011 evidentiary hearing.

During the January 21, 2011 status conference, Plaintiffs stated they did not believe that Defendants were in full compliance with the nonmedical provisions of the Second Amended Judgment, but that additional remedies were unnecessary. Plaintiffs indicated they would communicate with Defendants regarding any outstanding issues and attempt to resolve them before the appellate mandate issued and Defendant Arpaio would be able to renew his motion to terminate the nonmedical provisions of the Second Amended Judgment.

On March 9 and 10, 2011, the parties filed separate statements regarding a discovery dispute, which they subsequently supplemented with further briefing. Plaintiffs had retained Dr. Todd Wilcox as their medical expert, and they wished to tour the Maricopa County Jails with Dr. Wilcox March 21–25, 2011, and to conduct specific discovery. Defendant Maricopa County Board of Supervisors objected to the request because it believed the purpose of the discovery was to obtain evidence for the June 14, 2011 hearing on "physician staffing," the issue had been resolved, and there now was no need for the hearing or related discovery. Defendant Arpaio also opposed Plaintiffs' use of Dr. Wilcox because of alleged bias. On March 18, 2011, Defendant Maricopa County Board of Supervisors moved to vacate the June 14, 2011 evidentiary hearing because it believed the "physician staffing" issues were resolved. On April 4, 2011, in addition to responding to the motion to vacate the hearing, Plaintiffs filed a Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts.

## II. Discovery Dispute Filed March 9 and 10, 2011 (Docs.1953, 1954, 1955)

**\*5** Defendants denied Plaintiffs' request to schedule a **tour** of the Maricopa County **Jails** on March 21–25, 2011, with a medical **expert** of their choice, to review medical charts of class members on-site, to speak with class members in a manner that provides audio privacy, and to speak with medical clinical and administrative staff. Plaintiffs presented the request for the purpose of monitoring Defendants' compliance with the Second Amended Judgment and not limited to "physician staffing" issues for the June 14 evidentiary hearing. The Court has previously ordered that "upon reasonable notice to the Defendants, Plaintiffs' counsel may tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, and review records on-site." (Doc. 1769.) Whether Dr. Wilcox's testimony will be permitted at a possible evidentiary hearing in the future does not affect Plaintiffs' present right to retain an expert to assist them in monitoring Defendants' compliance with the Second Amended Judgment. Therefore, Plaintiffs' Statement Regarding Discovery Dispute (Doc.1953) will be deemed a motion to compel discovery and will be granted.

## III. Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts (Doc.1963)

Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts includes "a proposed Order incorporating the recommendations of the Court's experts," which includes Dr. Burns' recommendations verbatim. (Doc.1963 at 2 n. 1.) Dr. Burns' recommendations generally address modifying medical and mental health policies, procedures, records management, and forms.

Because "Dr. King's recommended remedies are intermixed with discussion and explication," Plaintiffs have attempted to "extract his actual recommendations from the remaining text and to set forth only the recommended remedies in the proposed Order." (*Id.*) However, the Corrective Action Plan included in Dr. King's April 6, 2011 report does not purport to be final and definitive. Dr. King expressly states that "further adaptations within this Corrective Action Plan may well be necessary and appropriate going forward over the next 12 to 18 months." (Doc.1966 at 37.)

Further, Plaintiffs' proposed Order converts some of Dr. King's "discussion and explication" into orders for which compliance is not currently possible and may not ever be possible. For example, with regard to evaluation and treatment of patients at risk for alcohol and opiate withdrawal symptoms, the proposed Order states in part:

> 2. Patients participating in legal methadone treatment programs **will continue to receive methadone maintenance** after [*sic.*] during their pre-trial detention. **Methadone will be available within the MCJ** for use in an opiate withdrawal treatment protocol for patients who are heroin dependent. Two other drugs—Suboxone and Subutex—are also acceptable alternatives.

3. Between July 1, 2001 and December 1, 2011, CHS will work diligently to secure the approvals and community partnerships necessary to provide methadone maintenance after jail entry and use of methadone or other drugs for treatment of opiate withdrawal, including approvals from state and federal agencies including the U.S. Drug Enforcement Administration.

**\*6** (Doc.1963–2 at 21, emphasis added.) In contrast, Dr. King's report states:

[P]atients participating in legal methadone treatment programs should continue to receive methadone maintenance after [sic.] during their pre-trial detention. In addition, since methadone is medically preferable to clonidine in most respects, methadone needs to be available within the MCJ for use in an opiate withdrawal treatment protocol for patients who are heroin dependent. Two other drugs—Suboxone and Subutex—are also acceptable alternatives.

Dr. Alvarez and I are having ongoing discussions about his diligent efforts to secure the approvals and community partnerships necessary to provide methadone maintenance after jail entry and use of methadone or other drugs for treatment of opiate withdrawal. **Multiple regulatory, legal, licensure and training issues remain to be resolved.** There appear to be three main options, which are not necessarily mutually exclusive. These options are the following:

• A licensed and community-base[d] drug addiction treatment network **might be** engaged to come into MCJ facilities to evaluate, counsel and treat patients receiving methadone maintenance or at risk for opiate withdrawal and addiction treatment.

• CHS **may be able to** obtain Opiate Treatment Program (OTP) certification by the Substance Abuse and Mental Health Services Administration (SAMHSA) linked to OTP accreditation through the National Commission on Correctional Health Care....

• Individual physicians employed by CHS **might** complete the additional training needed to obtain a SAMHSA DATA (Drug Addiction Treamtne Act of 2000) Waiver for use of Suboxone (buprenorphine) and Subutex (buprenorphine plus naloxone hydrochloride) in treatment of opiate addiction.

All of these options involve approvals from state and federal agencies including the U.S. Drug Enforcement Administration. **I estimate that another three months (July 1, 2011) will be needed to establish a feasible plan,** implementation of which can hopefully be completed by December 1, 2011. This projected date reflects the substantial time required to complete any of the three options outlined above.

(Doc.1966 at 48–49, emphasis added.)

Moreover, some provisions of the proposed Order cannot be fully complied with presently. For example, quoting from Dr. King's recommendations, the proposed Order states, "CHS will track and monitor of [*sic.*] individual medication profiles and medication administration records," followed by the statement, "Fully adequate attention to this action remains dependent on initiation of the electronic medical Order entry and medication administration record systems currently being developed jointly by CHS and Diamond Pharmacy Services." (Doc.1963–2 at 23.) Other provisions only set forth general plans, *e.g.:*

Regarding the development of the Electronic Health Record System, a Request for Proposals (RFP) document has been approved by the Maricopa County Materials Management Department. Selection of a Vendor/System and the HER Contract Award is slated to occur in July 2011. This will be followed by a series of steps including hardware installation; Net deployment; building work flow; content design; testing; and training. Full activation of the system is projected for June 2013. As part of this Corrective Action Plan, the foregoing milestones will be incorporated and monitored.

**\*7** (*Id.*)

The Court can and will enforce the Second Amended Judgment and will issue orders regarding ancillary matters as needed to give effect to the Second Amended Judgment. But the PLRA does not permit the Court to order prospective relief that extends further than necessary to correct a current and ongoing constitutional violation. Moreover, the Court will not order

general aspirational statements that cannot be specifically enforced. Therefore, Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts (Doc.1963) will be denied.

### IV. Defendant Maricopa County Board of Supervisors' Motion to Vacate June 14, 2011 Evidentiary Hearing (Doc.1959)

Defendant Maricopa County Board of Supervisors seeks to vacate the June 14, 2011 evidentiary hearing that was set to decide "physician staffing" issues, which Defendant believes have been resolved. On April 6, 2011, the sixth reports of Dr. King and Dr. Burns were filed and include some revisions to previous recommendations. In response to Defendant's motion to vacate the evidentiary hearing, Plaintiffs state they believe that "the revised recommendations will help Defendants achieve full compliance with the Second Amended Judgment so long as these remedies are adopted as a court order to implement the Second Amended Judgment." (Doc.1964 at 2.) Plaintiffs further state they would agree with Defendant that the June 14, 2011 evidentiary hearing is unnecessary if the Court should decide to grant Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts without requiring testimony on the matter. However, for the reasons stated above, the Court will deny Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts and will not hear testimony on the matter. Therefore, the condition for Plaintiff's agreement to vacate the June 14 hearing is not satisfied.

At this point, it is unclear whether the parties agree that the medical and mental health experts' revised proposed remedies regarding "physician staffing" provide a plan for Defendants to achieve full compliance with the medical and mental health provisions of the Second Amended Judgment. On March 18, 2011, Plaintiffs said:

> From Plaintiffs' perspective, Dr. King's and CHS's new plan (attached as Exhibit A to CHS's Statement Re Discovery Dispute), which was provided to Plaintiffs on March 11, departs significantly from Dr. King's original, more stringent recommendations regarding intake staffing—and it considerably dilutes his earlier recommendations, which he had strongly defended as necessary as recently as his January 2011 report. Plaintiffs have the right, after reviewing Dr. King's upcoming compliance report, and after conducting discovery at MCJ with their own medical expert, to reach their own conclusions as to whether this new plan is adequate to bring the Defendants into full compliance with the Second Amended Judgment on the issue of physician staffing.

**\*8** (Doc.1957 at 5.) On April 4, 2011, Plaintiffs said that "the revised recommendations will help Defendants achieve full compliance" if adopted as a court order. (Doc.1964 at 2.)

Thus, the Court cannot determine whether there is need for an evidentiary hearing on "physician staffing." Moreover, the Court cannot determine from the parties' submissions whether a "nursing issue" exists and whether it should be addressed in conjunction with any remaining "physician staffing" issue. It appears, however, that if an evidentiary hearing is required to resolve any remaining disputes regarding the nursing and/or physician staffing components of a compliance plan, holding the evidentiary hearing on June 14, 2011, would not permit adequate time for discovery and preparation.

Therefore, the evidentiary hearing set for June 14, 2011, will be vacated, and a status/case management conference will be set in its place.

### V. Defendant Arpaio's Motion Regarding Detention Staff Training Relating to Mental Health Issues (Doc.1949)

### A. Dr. Burns' Recommendations Are Limited to Determining Whether Additional or Revised Detention Staff Training Is Needed and Do Not Purport to Be Based on Evidence of a Systemic Constitutional Violation.

In her report filed August 25, 2010, Dr. Burns had not found evidence of a need for additional training for detention officers and said she hesitated to adopt Plaintiffs' recommendations (*see* Docs.1900 at 37–38, 1897–2 at 14) as part of a remedial plan. Instead, she recommended that Defendants' Continuous Quality Improvement program determine whether additional training is needed and whether the current curriculum should be revised or supplemented:

I believe that Segregation/Discipline and Training of Correctional Staff are topics that can and do impact access to care within correctional facilities nearly universally. However, in this particular case, the severity of mental health staffing shortages and the lack of treatment programming options has precluded my ability to truly assess the degree to which Segregation/ Discipline and Correctional Staff Training have independently impacted access to care. I believe it is premature therefore to offer a detailed remedial plan for these areas because the effects of the additional mental health staff, treatment interventions to segregated inmates and modification of the MHU to house high custody inmates and actually provide confidential individual and group treatment have not been measured. On general principle, I do not disagree with any of the [Plaintiffs'] recommendations but hesitate to adopt them as part of a remedial plan without further evidence of need. However, because the issues are so ubiquitous in correctional settings, I do offer the following recommendations for the Continuous Quality Improvement program:

....

1. Analyze the number, appropriateness and timeliness of security staff referrals to mental health to determine whether additional training is needed for all custody staff;

**\*9** 2. Charter a small committee of supervisory mental health and custody staff to review the mental health training curriculum for officers to revise or supplement as necessary for those officers assigned to posts dealing with inmates most at risk and a highest risk of serious mental health problems, namely, the booking/receiving area, the MHU and all segregation housing areas; ....

(Doc.1905–1 at 21.)

In her report filed January 4, 2011, Dr. Burns noted Defendant Arpaio's objection to her recommendations regarding detention staff training, but did not change those recommendations. Again, she stated her recommendation that the training curriculum be reviewed to determine whether there was need to revise or supplement it. She mentioned three incidents of physical mistreatment by detention staff of restrained inmates in the MHU as examples of events that possibly could be prevented by additional training. Defendant Arpaio, however, asserts that all three mentioned incidents involved the same detention officer, he was not assigned to the MHU, he has been charged with aggravated assault, and no amount of training likely could have prevented his actions.

In her report filed April 6, 2011, Dr. Burns stated that for reasons stated in her previous report, she continues to believe that her "modest quality improvement recommendation ... remains relevant and appropriate." Dr. Burns' recommendations regarding detention staff training are not remedies to cure noncompliance with the Second Amended Judgment. She merely suggests that the Continuous Quality Improvement program include detention staff training in its assessment and improvement cycle.

**B. Although the Second Amended Judgment Does Not Expressly Require the Assessment and Improvement of Detention Staff Training, the Court May Order Additional or Revised Detention Staff Training If It Is Needed for Defendants to Comply with the Second Amended Judgment.**
As discussed above, the Second Amended Judgment consists of only those provisions of the Amended Judgment for which "prospective relief remains necessary to correct a current and ongoing violation of the Federal right, extends no further than necessary to correct the violation of the Federal right," "is narrowly drawn," and is "the least intrusive means to correct the violation." *See* 18 U.S.C. § 3626(b)(3). Plaintiffs expressly did not contest termination of paragraphs 106 and 107 of the Amended Judgment, which stated:

106. Defendants shall ensure that all new detention officers receive a basic training course consisting of not less than forty hours prior to being assigned to any detention-related duty.

107. Defendants shall ensure that ongoing training be provided continuously during employment of all detention officers to sharpen their skills, reinforce their knowledge and understanding of the fundamentals of their jobs, and familiarize them with new developments in the field and new policies and procedures of the institution, in a reasonable manner. Said training shall include, but not be limited to the following: ... (m) recognition of the signs and symptoms of mental illness

and mental retardation; ....

**\*10** (Docs. 166, 1635 at 17.) Thus, detention staff training is not directly required by the Second Amended Judgment.

However, that does not mean that Defendants need not assess whether additional or revised detention staff training is required to satisfy the Second Amended Judgment. Paragraph 7 of the Second Amended Judgment provides: "All pretrial detainees confined in the jails shall have ready access to care to meet their serious medical and mental health needs." In order to terminate the Second Amended Judgment, Defendants must prove there is no current and ongoing constitutional violation regarding paragraph 7, *i.e.,* all pretrial detainees in the Maricopa County Jails actually do have ready access to care to meet their serious medical and mental health needs. Ready access to medical and mental health care involves both medical and detention staff:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

*Estelle v. Gamble,* 429 U.S. 97, 104–05 (1976) (internal quotations, citations, and footnotes omitted). Defendant Arpaio is not relieved of all obligations under paragraphs 6, 7, and 8 merely because they fall primarily within the purview of Correctional Health Services. Until the Second Amended Judgment is terminated, all of the Defendants will be subject to enforcement of each of its provisions.

Defendant Arpaio's motion "requests that Plaintiffs be precluded from re-litigating the issue of detention staff training as it pertains to mental health issues." Dr. Burns' recommendations do not attempt to revive terminated provisions; she merely suggests that Defendants assess whether additional or different detention staff training should be provided. If Defendants are unable to prove that all pretrial detainees have ready access to care to meet their serious medical and mental health needs, both Defendant Arpaio and Defendant Maricopa County Board of Supervisors are obligated to find and remove any barriers to access, which may include inadequate mental health training for detention staff. But that issue is not presently before the Court.

IT IS THEREFORE ORDERED that Defendant Arpaio's Motion Regarding Detention Staff Training Relating to Mental Health Issues (Doc.1949) is denied, Defendant Maricopa County Board of Supervisors' Motion to Vacate June 14, 2011 Evidentiary Hearing (Doc.1959) is granted without prejudice, and Plaintiffs' Motion for an Order Adopting the Unopposed Recommended Remedies of the Court's Experts (Doc.1963) is denied.

IT IS FURTHER ORDERED granting Plaintiffs' discovery request for counsel and their medical expert to tour the Maricopa County Jails facilities, speak with pretrial detainees and staff, and review records on-site, upon reasonable notice to Defendants (Doc.1953).

**\*11** IT IS FURTHER ORDERED vacating the evidentiary hearing set for June 14, 2011.

IT IS FURTHER ORDERED setting a status conference for **9:30 a.m., June 14, 2011.** By **June 7, 2011,** the parties shall file a joint case management report stating (1) whether there is need for an evidentiary hearing regarding nursing and/or physician staffing and (2) whether there is need for an evidentiary hearing on any other matter at this time.

**End of Document**                                                   © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 11



**LEGAL DEPARTMENT**
**NATIONAL PRISON**
**PROJECT**

**BY EMAIL TRANSMISSION ONLY**

April 15, 2013

Daniel P. Struck
Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

Michael Gottfried
Lucy Rand
Office of the Attorney General
1275 W. Washington St.
Phoenix, AZ 85007

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*


*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

      **Re:**    **Parsons v. Ryan, et al.**

Dear Counsel:

I write to follow up on the outstanding issues set forth in my letter of April 4, 2013:

1. Defendants asked that plaintiffs identify in advance, by category, staff that plaintiffs' experts will need to speak with. Plaintiffs agreed to attempt to generate such a list, but it is impossible to provide an exhaustive list in advance.

2. Defendants asked approximately how many incident reports, grievances, and HNRs plaintiffs' experts will need to review during their inspections. Plaintiffs agreed to consult with their experts and attempt to provide an estimate.

3. Defendants asked that plaintiffs' experts agree in advance to a specific methodology for sampling medical records and other documents. Plaintiffs agreed to consult with their experts and determine if this is possible. However, plaintiffs will not agree to limitations on their experts' ability to review records that do not apply equally to defendants' experts.

April 4, 2013 letter from Fathi to Struck, *et al.*, at 2. We have consulted with our experts and provide the following information in a good faith attempt to collaborate with defendants in planning plaintiffs' expert inspections. However, given that discovery and our investigation are ongoing, information may come

1

to our attention before or during the inspections that requires modification of these responses.

## 1. Categories of staff for experts to speak with:

<u>Shulman</u>

-Dental staff

<u>Vail</u>

-Officials who do the classification into and out of the isolation units
-Custody staff who work in the isolation units
-Mental health staff who work in the isolation units
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)
-Caseworkers or counselors who work with prisoners in the isolation units

<u>Haney</u>

-Medical and mental health staff
-Custody staff who work in the isolation units
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

<u>Stewart</u>

-Medical and mental health treatment staff
-Custody staff responsible for the day-to-day operation of the isolation units and the mental health units
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

<u>Wilcox</u>

-Health Services Director/Administrator
-Director of Nursing and nursing staff
-Physicians, including psychiatrists
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

<u>Cohen</u>

-Health Services Director/Administrator
-Director of Nursing and nursing staff
-Physicians, including psychiatrists
-Nurse Practitioners and Physician Assistants

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

-Pharmacists
-Health Records Administrator
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

### 2. On-site review of incident reports[1], grievances[2], and HNRs during inspections:

All experts would strongly prefer to review these documents in advance of their inspections to the extent possible. This would make the experts' on-site time more productive and reduce the burden on ADC staff. Therefore, it is essential that defendants fully respond to Requests No. 55 and 56 of Plaintiff Victor Parsons' First Set of Requests for Production of Documents, and Requests No. 26 and 28 of Plaintiff Joshua Polson's First Set of Requests for Production of Documents.

Shulman

-At each facility he visits, Dr. Shulman will need to review dental HNRs and dental grievances filed at that facility since Jan. 1, 2012.

Vail

-Mr. Vail will need to review current unit logs, incident reports for the previous six months, infraction/disciplinary records for the previous six months, and grievances for the previous year.

Haney

-Dr. Haney's on-site document review is driven by prisoner interviews, so he will need to consult grievances, incident reports, and HNRs on an as-needed basis.

Stewart

-Dr. Stewart's on-site document review will consist mainly of medical records. He may review some HNRs, grievances, and incident reports on an as-needed basis.

Wilcox

-Dr. Wilcox will need to review the previous three months of incident reports, HNRs, and grievances.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

---

[1] "Incident reports" means any written report documenting unusual events, including but not limited to information reports and significant incident reports.
[2] "Grievances" includes appeals, as well as responses to grievances and appeals.

Cohen

-Dr. Cohen will need to review the previous three months of incident reports, HNRs, and grievances.  He will also need to review, for the previous six months, the requests for consultation services and the utilization management responses.

### 3.  Selection of medical records and other documents for review:

Shulman

-Dr. Shulman will select records based on review of dental grievances and HNRs.  In addition, he would like to select a random sample of records from a list of prisoners at each facility who have been in custody for at least five years.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Vail

-Mr. Vail will select records based on pre-inspection document review and on cellfront prisoner interviews during the inspection.

Haney

-Dr. Haney's sampling methodology of records to review is based on three factors:
  -prisoners identified in advance of the inspection through document review;
  -prisoners identified during the inspection through cellfront interviews;
  -prisoners selected randomly by using isolation unit rosters and a random number table (this is a typical social science sampling methodology).  Dr. Haney will both interview these prisoners and review their records; accordingly, his preference is to identify these prisoners in advance of the tour so that letters can be sent to them and so that custody will know who to pull out for interviews.

Stewart

-Dr. Stewart will select records for review using a combination of methodologies:
  -reviewing the list of prisoners on the mental health caseload and psychotropic medications;
  -asking custody staff to identify prisoners who have been on segregation units for a long time, those who do not go out to recreation, or those who have difficulties on the unit;
  -prisoners identified in pre-inspection document review;
  -prisoners identified through cellfront interviews
He will also sample from different housing units to get a representative sample from a given facility.

4

<u>Wilcox</u>

-Dr. Wilcox will review records based on the following criteria:
    -on-site deaths, critical incidents, and hospitalizations
    -random sample from chronic care lists, including but not limited to hypertension, diabetes, asthma, HIV, pregnancy, and schizophrenia
    -random sample of records of other patients

<u>Cohen</u>

-Dr. Cohen will review records based on the following criteria:
    -on-site deaths, critical incidents, and hospitalizations
    -random sample from chronic care lists, including but not limited to hypertension, diabetes, asthma, HIV, pregnancy, and schizophrenia
    -random sample of records of other patients

He will also review emergency logs, and any protocols for managing chronic diseases, emergency response and specialty referral that have been implemented since Corizon took over medical management.

* * *

Please let us know when defendants' counsel are available this week to meet and confer on these issues, so that we can reach agreement where possible, and promptly present the remaining issues to the Court for resolution.

Very truly yours,

David C. Fathi

Cc:    All counsel of record

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**Exhibit 12**



STRUCK WIENEKE & LOVE

3100 West Ray Road, Suite 300   Chandler, Arizona 85226   **480.420.1600**   swlfirm.com

April 24, 2013

Daniel P. Struck
PARTNER

Kathleen L. Wieneke
PARTNER

Rachel Love
PARTNER

Timothy J. Bojanowski
PARTNER

Christina Retts
PARTNER

Jamie D. Guzman
ASSOCIATE

Nicholas D. Acedo
ASSOCIATE

Tara B. Zoellner
ASSOCIATE

Amy L. Nguyen
ASSOCIATE

Ashlee B. Fletcher
ASSOCIATE

Courtney R. Cloman
ASSOCIATE

Anne M. Orcutt
ASSOCIATE

Kevin L. Nguyen
ASSOCIATE

David C. Lewis
OF COUNSEL

**<u>VIA EMAIL ONLY</u>**

Jennifer Alewelt:  jalewelt@azdisabilitylaw.org
Caroline N. Mitchell:  cnmitchell@jonesday.com
Donald Specter:  dspecter@prisonlaw.com
David C. Fathi:  dfathi@npp-aclu.org

Re:    Parsons, et al. v. Ryan and Pratt
       U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

This letter responds to David Fathi's April 4 and April 15, 2013 letters regarding the parties' meet-and-confer regarding expert tours.  While the April 4, 2013 letter correctly memorializes most of what the parties discussed, we write to point out some of the inconsistencies.

Defendants never agreed to no longer assert that information regarding non-named class members is irrelevant to this litigation.  Instead, Defendants agreed to revisit their relevance objections in light of the Court's Order granting class certification, and to amend their responses where necessary.

With regard to tours of duplicative housing units, you allege Plaintiffs would like the housing unit to be chosen by the expert during the inspection.  That is not what was agreed to.  Instead, Defendants offered to meet with ADC and come up with a "representative sample" of both general population and segregation units.  Defendants then agreed to provide these lists to Plaintiffs. Plaintiffs agreed to review the lists to determine if they adequately cover the type of units the experts want to inspect.

In your April 15, 2013 letter, you state that "all experts would strongly prefer to review these documents in advance of their inspections to the extent possible."  Defendants agree this would reduce the burden on ADC staff and make the experts' on-site time most productive.  In your letter, however, you state that in order to accomplish this, Defendants need to "fully respond" to Requests No. 55 and 56 of Parsons' First Set of Requests for Production of Documents and Requests No. 26 and 28 of Polson's First Set of Requests for Production of

All Counsel of Record
April 24, 2013
Page 2

documents.  These requests, however, are overly broad and unduly burdensome as set forth more fully in Defendants' objections.  Moreover, Defendants have produced documents responsive to No. 55 and 56 of Parsons' First Set of Requests for Production.  If Plaintiffs narrow these requests and alleviate the undue burden, Defendants will re-assess whether they can produce responsive documents.

With regard to the particular documents your experts will need to review on-site, Defendants are currently consulting with their clients and will be prepared to discuss whether the facilities can accomplish such review during next week's meet-and-confer regarding expert tours.

Thank you for providing categories of staff that your experts would like to speak to.  Defendants will generate a list of individuals based on these categories for your review.

Additionally, at the March 13, 2013 meet-and-confer, the parties also discussed Plaintiff Chisholm's responses to Defendant Ryan's First Request for Production of Documents.  In particular, the parties discussed Request No. 6 which requests "All documents relied upon in drafting or supporting any allegations contained in the Complaint."  Up until March 11, 2013, Plaintiffs' response to this Request included a generic list of 220 inmates' medical records without any indication what sections or portions of the records Plaintiffs relied on. After requesting Plaintiffs supplement to include these details, Plaintiffs eventually removed the list in its entirety.  During the meet-and-confer, Defendants inquired into whether the current response to Request No. 6 was an exhaustive and comprehensive list of evidence Plaintiffs will rely on to support the allegations in their Complaint.  Plaintiffs were unsure and stated they would get back to Defendants with an answer.  We have not yet heard from you. Defendants request an exhaustive list so that Defendants are not blind-sided by new information at trial.  Please be prepared to inform Defendants of your position by next week's meet-and-confer.

Finally, Plaintiffs have retained six experts – including two medical experts and both a psychologist and a psychiatrist.  To the extent Plaintiffs present duplicative and/or redundant testimony from these experts, Defendants will file a motion to exclude expert testimony pursuant to Fed. R. Evid. 403 and 611(a). Limiting the number of witnesses is essential under Fed. R. Evid. 611(a) to avoid needless consumption of time.  The Court is obliged under Fed. R. Evid. 403 to exclude evidence which will waste time, cause undue delay or will be cumulative. *See In re Welding Fume Products Liab. Litig.*, 1:03-CV-17000, 2010 WL 7699456, at *80 (N.D. Ohio June 4, 2010) (Duplicative trial testimony can be limited through sustaining objections, giving sua sponte cautions to counsel, or terminating counsel's questioning under Fed. R. Evid. 611(a)); *Ruud v. United*

All Counsel of Record
April 24, 2013
Page 3

*States,* 256 F.2d 460 (9th Cir.), cert. denied, 358 U.S. 817 (1958) (the Court's inherent power to limit the number of experts at trial has long been recognized); *United States v. Alisal Water Corp.,* 431 F.3d 643, 659–60 (9th Cir. 2005), *cert denied,* 547 U.S. 1113, (2006) (The Court retains discretion to exclude cumulative expert testimony). Plaintiffs' recent addition of Dr. Wilcox is unnecessarily increasing the costs of litigation, particularly when Plaintiffs previously identified Dr. Cohen as a medical expert. Defendants object to this duplicative expert witness and would like to know how Plaintiffs expect to introduce his testimony regarding this matter that will not already be obtained from Dr. Cohen. Notwithstanding Dr. Wilcox's unfamiliarity with prison health care delivery systems, it appears Plaintiffs are "piling on" with respect to expert testimony from medical doctors.

With the above clarifications, Plaintiffs' April 4, 2013 correspondence accurately reflects the parties' discussions at the March 13, 2013 meet-and-confer regarding expert tours.

Sincerely,

Ashlee B. Fletcher
For the Firm

ABF/ab
2747398.1

cc:    Michael E. Gottfried
       Dawn Northup
       Kelly Dudley
       Ashley Zuerlein
       Lucy Rand

**Exhibit 13**

**Corene Kendrick**

| | |
|---|---|
| **From:** | Fathi, David |
| **Sent:** | Friday, May 03, 2013 7:55 AM |
| **To:** | Rand, Lucy; Gottfried, Michael; Watanabe, Katherine; Zuerlein, Ashley; jalewelt@azdisabilitylaw.org; skader@azdisabilitylaw.org; avarma@azdisabilitylaw.org; Fettig, Amy; kflood@acluaz.org; jlyall@acluaz.org; danpoc@cox.net; dpochoda@acluaz.org; Quereshi, Ajmel; scalderon@jonesday.com; dkiernan@jonesday.com; kmamedova@jonesday.com; rsmedsker@jonesday.com; jkmessina@jonesday.com; cnmitchell@jonesday.com; srauh@jonesday.com; jlwilkes@jonesday.com; dbarr@perkinscoie.com; mdumee@perkinscoie.com; keidenbach@perkinscoie.com; agerlicher@perkinscoie.com; jhgray@perkinscoie.com; ahardy@prisonlaw.com; ckendrick@prisonlaw.com; snorman@prisonlaw.com; dspecter@prisonlaw.com; nacedo@swlfirm.com; tbojanowski@swlfirm.com; ccloman@swlfirm.com; afletcher@swlfirm.com; rlove@swlfirm.com; aorcutt@swlfirm.com; dstruck@swlfirm.com; kwieneke@swlfirm.com |
| **Cc:** | abender@swlfirm.com; tmayo@swlfirm.com; kshadoan@swlfirm.com; cwebb@swlfirm.com; swolford@swlfirm.com; mlauritzen@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org; ACLU AZ 1; Stamm, Alex; Krase, Hilary; nbreen@jonesday.com; dkkerr@jonesday.com; mlandsborough@jonesday.com; treyes@jonesday.com; lwong@jonesday.com; dfreouf@perkinscoie.com; slawson@perkinscoie.com; sneilson@perkinscoie.com; docketphx@perkinscoie.com; cwendt@perkinscoie.com; edegraff@prisonlaw.com |
| **Subject:** | Plaintiffs' expert inspections |

Dan,

I write to follow up on our April 29 conversation about expert tours.  We are in the process of obtaining the information we promised and will provide that soon.  We also look forward to getting the information you promised to provide as soon as possible.

We are concerned that the process for negotiating the expert tours is becoming excessively burdensome and time consuming.  In fact, neither Don nor I have ever spent so much time negotiating prison expert inspections.  All of our experts have taken numerous prison tours, and they will all act reasonably so as not to overburden the prison staff.  Therefore, we don't believe it is necessary for the parties to choreograph each step of the process.  There is only a certain amount of time to do the inspections, and if we both approach the tours in a cooperative manner there shouldn't be any problems.   Thus, I propose that we agree on general parameters, such as the date of the inspections, the areas of the inspections (such as housing units, clinics, etc.) the fact that the experts will speak to staff during the tour and review relevant documents, and leave it at that.

In addition, we request that you inform us when your experts are going to be inspecting the prisons and that your clients arrange for gate clearances so that plaintiffs' counsel can accompany them on the inspections.  We believe that it is necessary to accompany your experts so we can have accurate and reliable first-hand knowledge of the information that your experts rely on for their opinions, just as defendants will be able to do when they accompany our experts.  Please let me know whether this is acceptable to your clients.

Also, while we do not agree with your position that your clients may interfere with  the methodology our experts use to select records (besides the issue of burden), if the Court agrees with your position, we will insist that we approve the methodology that your experts use for this task as well.

Thanks, and I look forward to hearing from you.

David

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
dfathi@npp-aclu.org

*Not admitted in DC; practice limited to federal courts

**Exhibit 14**



PRISON LAW OFFICE

General Delivery, San Quentin CA. 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

May 6, 2013

Mr. Dan Struck
Struck Wieneke & Love
3100 W. Ray Rd., Ste. 300
Chandler, AZ 85226

RE:   *Parsons, et al. v. Ryan, et al.*
      Plaintiffs' Amended Expert Inspection Schedule

Dear Dan,

Enclosed with this letter is Plaintiffs' amended request for inspection by expert witnesses.  As you can see, the request is organized by institution.  This includes the dates for all experts except the expert regarding the physical health effects of isolation. David Fathi told you on the April 29, 2013 meet-and-confer telephone call that this individual will be identified and dates provided as soon as possible.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick, Staff Attorney

cc:    All counsel of record

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President • Marshall Krause, Treasurer
Felecia Gaston • Christiane Hipps • Margaret Johns • Cesar Lagleva
Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

1  Daniel Pochoda (Bar No. 021979)
   Kelly J. Flood (Bar No. 019772)
2  James Duff Lyall (Bar No. 330045)*
   **ACLU FOUNDATION OF ARIZONA**
3  3707 North 7th Street, Suite 235
   Phoenix, Arizona 85013
4  Telephone: (602) 650-1854
   Email: dpochoda@acluaz.org
5          kflood@acluaz.org
           jlyall@acluaz.org
6  *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

7  *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
   *Dustin Brislan, Sonia Rodriguez, Christina Verduzco,*
8  *Jackie Thomas, Jeremy Smith, Robert Gamez,*
   *Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
9  *Joshua Polson, and Charlotte Wells, on behalf of*
   *themselves and all others similarly situated*
10
   **[ADDITIONAL COUNSEL LISTED ON**
11   **SIGNATURE PAGE]**

12              UNITED STATES DISTRICT COURT

13                  DISTRICT OF ARIZONA

14  Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina             (MEA)
15  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
16  Hefner; Joshua Polson; and Charlotte Wells, on         **PLAINTIFFS' REQUEST TO**
    behalf of themselves and all others similarly          **ENTER DEFENDANTS'**
17  situated; and Arizona Center for Disability Law,        **PROPERTY FOR THE**
                                                           **PURPOSE OF EXPERT**
18                   Plaintiffs,                            **INSPECTIONS**
                                                           **[AMENDED]**
19         v.

20  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
21  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
    capacities,
22                   Defendants.

23

24

25

26

27

28

78204-0001/LEGAL26635670.1

| | PROPOUNDING PARTIES: | Plaintiffs |
|---|---|---|
| | RESPONDING PARTIES: | Defendants |
| | REQUEST NUMBER: | One |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT, pursuant to Federal Rules of Civil Procedure 26 and 34(a)(2), Named Plaintiffs Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells ("Plaintiffs") request that Defendants allow PLAINTIFFS' COUNSEL and Plaintiffs' experts to INSPECT certain ADC prisons and confer with staff and prisoners.

Plaintiffs' experts are as follows:

a.    Robert Cohen, M.D.

b.    Craig Haney, Ph.D., J.D.

c.    Jay Shulman, D.D.S.

d.    Pablo Stewart, M.D.

e.    Eldon Vail

f.    Todd Wilcox, M.D.

g.    An expert regarding the physical health effects of isolation, to be identified.

For purposes of this request, "INSPECT" means to physically walk through, observe, and photograph ADC prison facilities, INCLUDING: clinical space available for medical, dental and mental health care; medication lines; housing available in the ISOLATION and segregation units; kitchen facilities; intake or screening areas; infirmaries and other inpatient facilities; a sample of general population and ISOLATION cells; cells in which PRISONERS are housed during suicide and mental health watches; and all areas to which PRISONERS in ISOLATION are taken or have access, INCLUDING exercise enclosures, counseling/programming areas or offices, visiting areas, law libraries, and suicide watch areas.  The term "INSPECT" also means to confer with and interview HEALTH CARE STAFF and CORRECTIONAL STAFF, as well as to

confidentially meet with PRISONERS, to discover information regarding the provision of HEALTH CARE to prisoners and conditions of confinement in ISOLATION.

The term "INSPECT" further means to review documents or records, INCLUDING: a sample of health needs requests received; a sample of grievances received related to the provision of health care or the conditions of confinement in ISOLATION; a sample of incident reports; and logbooks relating to PRISONERS' movement and activities within ISOLATION units; and for each facility, a list of all ADC PRISONERS who fit the below criteria, and a subset of these PRISONERS' records will be selected for review:

a.   PRISONERS who currently are chronic care patients, INCLUDING persons with diabetes, hypertension, congestive heart failure, cancer, Hepatitis, asthma, HIV/AIDS, kidney failure/dialysis, and pregnant patients;

b.   PRISONERS who currently are prescribed psychotropic medications, INCLUDING for each prisoner the mental health diagnoses and the medications and dosages;

c.   PRISONERS who currently are on the mental health caseload, INCLUDING for each prisoner the mental health diagnoses;

d.   PRISONERS in ISOLATION who have mental health diagnoses, INCLUDING for each prisoner the mental health diagnoses;

e.   PRISONERS who had serious suicide attempts in last two years;

f.   PRISONERS who were placed on suicide watch or any kind of mental health watch in the last year;

g.   PRISONERS who were admitted to outside hospitals and emergency rooms in last two years;

h.   PRISONERS who were admitted to any inpatient mental health facility in the last two years;

i.   PRISONERS who were referred to outside clinics and reason for referral in the past year;

1    j.    PRISONERS who have had dental extractions in the last two years;

2    k.    PRISONERS who have had medications prescribed for them by dentists in

3         the past two years;

4    l.    PRISONERS who received after hours care for dental problems in the past

5         year;

6    m.    PRISONERS who have been in ADC custody for more than five years;

7    n.    Documents listing the duration of ISOLATION for PRISONERS.

8         Other records of selected prisoners will also be inspected.

9         Therefore, Plaintiffs request that subject to the above and following definitions,

10   Defendants allow PLAINTIFFS' COUNSEL and Plaintiffs' experts to INSPECT the

11   following ADC prisons and confer with prison staff and prisoners on the following dates:

12   a.    Arizona State Prison Complex ("ASPC") – Douglas, in Douglas, Arizona on

13        August 6 and September 6, 2013, from 8 a.m. to 5 p.m.

14        i.    August 6 – Shulman

15        ii.   September 6 – Cohen

16   b.    ASPC - Eyman, in Florence, Arizona on July 16-18, 22-25and August 1-2,

17        2013, from 8 a.m. to 5 p.m.

18        i.    July 16 – Stewart

19        ii.   July 17-18 – Cohen

20        iii.  July 22-23 - Shulman

21        iv.   July 23-25 – Haney

22        v.    August 1-2 – Vail

23   c.    ASPC-Florence, in Florence, Arizona, on July 15, 19, 22, 24-25, 30-31, and

24        August 12-13, 2013, from 8 a.m. to 5 p.m.

25        i.    July 15 – Stewart

26        ii.   July 19, 22 – Haney

27        iii.  July 24-25 - Shulman

28

1            iv.     July 30-31 – Vail

2            v.      Aug. 12-13 – Wilcox

3     d.     ASPC-Lewis, in Buckeye, Arizona, on July 9, 2013 from 1 p.m. to 5 p.m.

4         and July 10, 15-16, 22, 2013 from 8 a.m. to 5 p.m.

5            i.      July 9 (afternoon) - 10 – Shulman

6            ii.     July 15-16 – Cohen

7            iii.    July 22 – Stewart

8     e.     ASPC-Perryville, in Goodyear, Arizona, on July 8-9, 18, 29-31, 2013, from

9         8 a.m. to 5 p.m.

10            i.      July 8-July 9 (morning) – Shulman

11            ii.     July 18 – Stewart and Haney

12            iii.    July 29 – Vail

13            iv.     July 30-31 – Wilcox

14     f.      ASPC-Phoenix, in Phoenix, Arizona, on July 19, 26, 29, 2013, from 8 a.m.

15         to 5 p.m.

16            i.      July 19 – Stewart

17            ii.     July 26 – Shulman

18            iii.    July 29 – Wilcox

19     g.     ASPC-Safford, in Safford, Arizona, on August 5 and September 3, 2013

20         from 8 a.m. to 5 p.m.

21            i.      August 5 – Shulman

22            ii.     September 3 – Cohen

23     h.     ASPC-Tucson, in Tucson, Arizona, on July 8-9, August 7-8, and

24         September 4-5, 2013, from 8 a.m. to 5 p.m.

25            i.      July 8-9 – Stewart

26            ii.     August 7-8 – Shulman

27            iii.    September 4-5 – Cohen

28

1         i.      ASPC-Winslow, in Winslow, Arizona, on August 14, 2013, from 8 a.m. to

2         5 p.m.

3             i.     Aug. 14 – Wilcox

4        j.      ASPC-Yuma, in San Luis, Arizona, on August 1-2, 2013, from 8 a.m. to

5         5 p.m.

6             i.     August 1-2 – Wilcox

7             ii.

8                   **DEFINITIONS**

9      1.     "ADC" means the Arizona Department of Corrections, INCLUDING all its

10 subdivisions, agents, employees, contractors, and attorneys.

11      2.     "CORIZON" means Corizon, Inc.

12      3.     "CORRECTIONAL STAFF" means custody staff employed or paid by the

13 ADC to serve in a security or operational capacity.

14      4.     "DEFENDANTS" means Defendants Charles Ryan and Richard Pratt, and

15 their predecessors, successors, employees, subordinates, contractors, agents, and

16 attorneys.

17      5.     "HEALTH CARE" means the provision of care, INCLUDING adequate

18 diet, to address the mental health, medical, or dental needs of a PRISONER, whether

19 those needs arise as a result of injury, illness, disease, or other trauma, or care provided

20 for diagnostic or preventive purposes.

21      6.     "HEALTH CARE STAFF" means all staff employed or paid by the ADC,

22 WEXFORD, or HEALTH CARE SUBCONTRACTORS (other than CORRECTIONAL

23 STAFF) who are responsible for providing HEALTH CARE to ADC PRISONERS.

24      7.     "HEALTH CARE SUBCONTRACTOR" means any person or entity

25 contracting with the ADC or WEXFORD to provide HEALTH CARE to PRISONERS.

26      8.     "INCLUDING" means including but not limited to.

27      9.     "INSPECT" is defined at pages 2-4 of this Request.

28

1      10.   "ISOLATION" means confinement in a cell for 22 hours or more each day;

2  confinement in Eyman-Special Management Unit ("SMU") 1, Eyman-Browning Unit,

3  Florence-Central Unit, Florence-Kasson Unit, or Perryville-Lumley Special Management

4  Area ("SMA"); or confinement in a Complex Detention Unit ("CDU").

5      11.   "PLAINTIFFS' COUNSEL" means legal counsel and retained experts for

6  PLAINTIFFS and agents acting on their behalf.

7      12.   "PRISONER" means a person incarcerated by the ADC.

8      13.   "WEXFORD" means Wexford Health Sources, Incorporated.

Dated:  May 6, 2013             **PRISON LAW OFFICE**

By:   s/ Corene Kendrick
Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
           agerlicher@perkinscoie.com
           keidenbach@perkinscoie.com
           jhgray@perkinscoie.com
           mdumee@perkinscoie.com

1                        Daniel Pochoda (Bar No. 021979)

Kelly J. Flood (Bar No. 019772)

2                        James Duff Lyall (Bar No. 330045)*

**ACLU FOUNDATION OF**

3                        **ARIZONA**

3707 North 7th Street, Suite 235

4                        Phoenix, Arizona 85013

Telephone:  (602) 650-1854

5                        Email:    dpochoda@acluaz.org

                                  kflood@acluaz.org

6                                  jlyall@acluaz.org

7                        *Admitted pursuant to Ariz. Sup. Ct.

R. 38(f)

8

9                        David C. Fathi (Wash. 24893)*

Amy Fettig (D.C. 484883)**

10                     Ajmel Quereshi (Md. 28882)*

**ACLU NATIONAL PRISON**

**PROJECT**

11                     915 15th Street N.W., 7th Floor

Washington, D.C. 20005

12                     Telephone:  (202) 548-6603

Email:    dfathi@npp-aclu.org

13                              afettig@npp-aclu.org

                                aquereshi@npp-aclu.org

14

15                        *Admitted *pro hac vice*.  Not admitted

in DC; practice limited to federal

courts.

16                     **Admitted *pro hac vice*

17                     Caroline Mitchell (Cal. 143124)*

David C. Kiernan (Cal. 215335)*

18                     Sophia Calderón (Cal. 278315)*

Sarah Rauh (Cal. 283742)*

19                     **JONES DAY**

555 California Street, 26th Floor

20                     San Francisco, California 94104

Telephone:  (415) 875-5712

21                     Email:    cnmitchell@jonesday.com

                                  dkiernan@jonesday.com

22                                scalderon@jonesday.com

                                srauh@jonesday.com

23

24                     *Admitted *pro hac vice*

25

26

27

28

R. Scott Medsker (D.C. 976405)*
**JONES DAY**
51 Louisiana Avenue, NW
Washington, D.C. 20001-2113
Telephone:  (202) 879-3837
Email:    rsmedsker@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2013, I e-mailed a copy of the attached document to the following parties:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Ashley B. Zuerlein
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov
Ashley.Zuerlein@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Timothy J. Bojanowski
Rachel Love
Nicholas D. Acedo
Courtney R. Cloman
Ashlee B. Fletcher
Anne M. Orcutt
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
rlove@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

Jennifer Alewelt
Asim Varma
Sarah Kader
**ARIZONA CENTER FOR DISABILITY LAW**
jalewelt@azdisabilitylaw.org
avarma@azdisabilitylaw.org
skader@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

s/ Delana Freouf

**Exhibit 15**

**LEWIS**
**From OCTOBER 2012 To OCTOBER 2012**
**Red Only Findings**



| | **LEWIS BARCHEY** Medical Records (Q)) | | | | | |
|---|---|---|---|---|---|---|
| | Performance Measure (Description) | Grn | Amb | Red | Notifications | Level |
| 1 | Are medical records current, accurate and chronologically maintained with all documents filed in the designated location? | | | | Performance measure is not met. With the current state of "loose filing" in the medical records area, it is an accurate to state that loose filing goes back to approximately May, 2012 and is several inches thick relative to stack heights. Secondly, when auditing the return to custody charts, it was noted that at least 2 charts: ████████ and ████ #████ were located in the return to custody section, but in the case of inmate ████████ there was an active medical record no longer associated with the RTC files that was missing the vital return to custody documentation. These files were presented to the medical records supervisor to be merged. | 1 |
| | | | | | Performance measure is not met. Currently there are multiple stacks of loose filing in the medical records area that date back to approximately May, 2012. This equals approximately 12-15 feet of loose filing not contained in patient medical records or readily available to medical staff. While investigating the Return to Custody performance measures for the Lewis complex, it was discovered that there were 43 inmate files in this section. Of those 43, only 10 were currently incarcerated in the ADC. Of those 10, only 6 were on the Lewis complex. The remaining 4 are located at other institutions throughout the state. Further investigation revealed that medical charts from the Return to Custody section had not been merged to those medical records that were in active use in units on the complex and they included: ████████ #████ and ████████ | |
| | | | | | Performance measure is not met. Within complex medical records, there are several stacks of "loose filing", some of which pertains to those patients on the Barchey unit. An assessment of 15-20 inches of stacked documents would be accurate. Additionally, while gathering data relative to the return to custody performance measure, my investigation discovered a Return to Custody file and a medical file for inmate ████████ Upon discovery, both files were given to the complex medical records supervisor to be merged. | |
| | | | | | Performance measure is not met. In auditing the loose filing within the complex medical records, it was determined that approximately 15-20 inches of loose filing exists which directly affects inmate care on the Bachman unit. The following inmate medical records contained documents which were appropriate for the medical record, but were not in their assigned location. ████████ #████ and ████████ | |

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC036726

**LEWIS**
**From OCTOBER 2012 To OCTOBER 2012**
**Red Only Findings**



Performance measure is not met. An audit of the current loose filing in complex medical records finds that there are approximately 15-20 inches of loose filing directly related to patient care on the Buckley unit.

Performance measure is not met. An audit of complex medical records loose filing found approximately 15-20 inches of loose filing documentation for the Morey unit.

Performance measure is not met. Loose filing in complex medical records for the Rast unit is in excess of 15 inches.

Performance measure is not met. An audit of complex medical records indicates that there is in excess of 15-20 inches of loose filing directly related to the Stiner unit inmates.

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC036727

**Exhibit 16**

**FILED UNDER SEAL**