**EXHIBIT 1**

**EXHIBIT 1**

No. 13-80078

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

VICTOR PARSONS, et al.,

*Plaintiffs/Respondents,*

v.

CHARLES RYAN, et al.,

*Defendants/Petitioners.*

ON RULE 23(F) PETITION FROM THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
NO. CV 12-00601-NVW-PHX

## PLAINTIFFS-RESPONDENTS' ANSWER TO PETITION FOR PERMISSION TO APPEAL FROM ORDER GRANTING CLASS CERTIFICATION

Daniel C. Barr
Amelia M. Gerlicher
Kirstin T. Eidenbach
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 351-8000

Daniel Pochoda
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
(602) 650-1854

Donald Specter
Alison Hardy
Sara Norman
Corene Kendrick
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
(510) 280-2621

Caroline Mitchell
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
(415) 875-5712

David C. Fathi
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
(202) 548-6603

*Attorneys for Prisoner Plaintiffs/Respondents*

# TABLE OF CONTENTS

**Page**

Introduction ....................................................................................1

Statement of Facts ..........................................................................3

Question Presented..........................................................................8

Argument.........................................................................................8

    I.     THE PETITION DOES NOT MEET THE TEST FOR RULE 23(F)
           REVIEW .........................................................................8

          A.     The Class Certification Order Involves Routine Issues of
               Law Unlikely to Evade Review after Final Judgment...............9

          B.     The District Court's Order is Not Manifestly Erroneous ........11

               1.     Commonality .................................................12

               2.     Typicality .....................................................17

               3.     Rule 23(b)(2) .................................................17

               4.     System-wide practices ....................................19

Conclusion ....................................................................................20

# TABLE OF AUTHORITIES

**Page**

<u>CASES</u>

*Agne v. Papa John's Int'l, Inc.,*
   286 F.R.D. 559 (W.D. Wash. 2012) ....................................................................3

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001) ...............................................................passim

*Brown v. Plata,*
   131 S. Ct. 1910 (2011)..........................................................................passim

*Butler v. Suffolk Cnty.,*
   --- F.R.D. ---, 2013 WL 1136547 (E.D.N.Y. Mar. 19, 2013)............................16

*Chamberlan v. Ford Motor Co.,*
   402 F.3d 952 (9th Cir. 2005) ................................................................1, 8, 11

*Chief Goes Out v. Missoula Cnty.,*
   2013 WL 139938 (D. Mont. Jan. 10, 2013) .......................................................16

*Comcast v. Behrend,*
   569 U.S. ___, No. 11-864 (Mar. 27, 2013).........................................................16

*Estelle v. Gamble,*
   429 U.S. 97 (1976)..............................................................................14

*Farmer v. Brennan,*
   511 U.S. 825 (1994)............................................................................12

*Floyd v. City of New York,*
   283 F.R.D. 153 (S.D.N.Y. 2012) .......................................................................3

*Hawkins v. Comparet-Cassani,*
   251 F.3d 1230 (9th Cir. 2001) .........................................................................10

*Hevesi v. Citigroup Inc.,*
   366 F.3d 70 (2d Cir. 2004) ................................................................................10

*Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r,*
   2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) ................................................16

# TABLE OF AUTHORITIES
### (continued)

Page

CASES (CONT.)

*Mathis v. GEO Grp., Inc.,*
    2012 WL 600865 (E.D.N.C. Feb. 23, 2012) ....................................16

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.,*
    422 F.3d 782 (9th Cir. 2005) .........................................................20

*Ortega-Melendres v. Arpaio,*
    836 F. Supp. 2d 959 (D. Ariz. 2011) *aff'd sub nom. Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) .............................................................3

*Pierce v. Cnty. of Orange,*
    526 F.3d 1190 (9th Cir. 2008) ....................................................9, 10

*Rodriguez v. Hayes,*
    591 F.3d 1105 (9th Cir. 2009) ........................................................18

*Rosas v. Baca,*
    2012 WL 2061694 (C.D. Cal. June 7, 2012).....................................16

*Russell v. United States,*
    2012 WL 2343369 (N.D. Cal. June 20, 2012).....................................3

*Schilling v. Kenton Cnty., Ky.,*
    2011 WL 293759 (E.D. Ky. Jan. 27, 2011).......................................16

*Shook v. Board of County Commissioners,*
    543 F.3d 597 (10th Cir. 2008) ...................................................18, 19

*Smith v. Sheriff of Cook County,*
    2008 WL 4866071 (N.D. Ill. July 16, 2008) ....................................16

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) .........................................................17

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.,*
    262 F.3d 134 (2d Cir. 2001) ...........................................................11

## TABLE OF AUTHORITIES
### (continued)

Page

CASES (CONT.)

*Theriot v. Parish of Jefferson,*
  185 F.3d 477 (5th Cir. 1999) ..............................................................19

*Wal-Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541 (2011)...............................................................passim

*Walters v. Reno,*
  145 F.3d 1032 (9th Cir. 1998) ...........................................................15


OTHER AUTHORITIES

Federal Rule of Civil Procedure 23 ................................................passim

## Introduction

Defendants' Petition for Permission to Appeal from the district court's class certification order does not meet any of the factors for interlocutory review under Fed. R. Civ. P. ("Rule") 23(f).  Because the district court ruled correctly, and nothing will be gained by hearing an appeal at this juncture, this Court should deny the Petition.

Defendants argue that their Petition should be granted because the decision presents an unsettled issue of class action law that is likely to evade later review and because the decision is "manifestly erroneous."  *See Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005).  Defendants are wrong on all counts.

First, Defendants' claim that the law is unsettled with regard to a class action under the Eighth Amendment fails to take into account this Court's decision in *Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001), which analyzed commonality and typicality in a class action where prisoners challenged system-wide prison conditions.  Nor does the Supreme Court's decision in *Wal-Mart v. Dukes* require interpretation by this Court in the Eighth Amendment context.  As the district court explained in detail, *Dukes* presented a very different factual setting which is inapplicable to the facts here.

Second, Defendants contend that the district court's decision is manifestly erroneous because *Dukes* compels a different result on the issue of commonality.

But the relevant authority is not *Dukes*, but *Armstrong*, in which this Court addressed system-wide deficiencies in prison conditions.  The Court held that "where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members . . . individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality."  275 F.3d at 868 (internal citations omitted).  The same analysis applies here because Plaintiffs are challenging system-wide policies and practices that put all class members at risk of harm.  *See also Brown v. Plata*, 131 S. Ct. 1910, 1926 n.3 (2011) (recognizing that individual differences are immaterial when prisoners challenge system-wide deficiencies).

Finally, Defendants attack the district court's analysis on several minor issues, misstating applicable law and asking this Court to reweigh the evidence that the district court carefully considered.  Even a cursory review of the opinion below establishes that each finding is supported by substantial evidence.  Under these circumstances, the district court's decision cannot be manifestly erroneous.

Critically, defendants' Petition reveals no reason for this Court to hear this appeal now.  Defendants at no point suggest that they plan to do anything other than pursue this case to a final, appealable decision on the merits.  Thus, an interlocutory appeal would only add expense and uncertainty, as compared to

permitting the parties to proceed to the established trial date, and, if necessary, an appeal after final judgment.

### Statement of Facts

The district court ably summarized the facts presented in support of class certification in its Order. (*See* Order at 1-2, 5-10). The facts necessary to understand the issues on appeal are repeated here.

The named plaintiffs in this action are prisoners housed in various Arizona Department of Corrections ("ADC") prison complexes. Following class certification, they represent roughly 33,000 prisoners within ADC.[1] Defendants are ADC Director Charles Ryan and ADC Division of Health Services Interim Director Richard Pratt.[2] Plaintiffs filed this action in March 2012 challenging the health care provided by ADC (including medical, dental and mental health care)

---

[1] The class size is not "extraordinary," contrary to defendants' unsupported assertion. Pet. at 1. *See, e.g., Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 992 (D. Ariz. 2011) *aff'd sub nom. Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) (certifying, in a county with over a million Latinos, a class of all Latinos who had been stopped by the sheriff during the preceding 5 years and into the future); *Agne v. Papa John's Int'l, Inc.*, 286 F.R.D. 559, 566-72 (W.D. Wash. 2012) (certifying a national class alleging improper text messages sent to more than 68,000 phone numbers)*; Russell v. United States*, 2012 WL 2343369, at *6-9 (N.D. Cal. June 20, 2012) (certifying a nationwide class of 60,557 soldiers and veterans); *Floyd v. City of New York*, 283 F.R.D. 153, 172 (S.D.N.Y. 2012) (certifying class "likely to be well over one hundred thousand").

[2] Health care within ADC has been outsourced to private contractors, first to Wexford Health Services in July 2012, and then, on March 4, 2013, to Corizon, Inc. However, Defendant Ryan "has a continuing duty to ensure that those to whom he delegated functions or duties performed those duties appropriately." (Doc. 175 (Oct. 10, 2012 Order denying Defendants' Motion to Dismiss) at 10).

- 3 -

and unconstitutional conditions of confinement in ADC's isolation units.  The suit

seeks only prospective declaratory and injunctive relief, and not damages.

Plaintiffs sued under the Eighth Amendment because the system-wide health

care provided by ADC and the conditions of confinement in ADC's isolation units

place prisoners at a substantial risk of serious harm.  Defendants concede both

health care and conditions of confinement are governed by written policies applied

system-wide.  (*See* Doc. 321 (Def. Class Cert. Resp.) at 1 ("ADC policies

governing health care and conditions of confinement apply to all facilities and

inmates")).  Moreover, following privatization of the delivery of health care, ADC

monitored medical and mental health care system-wide, and, on September 21,

2012, issued a written "Cure Notification" to its contractor, Wexford.  (Order at 5,

citing Doc. 240, Ex. EE).  The Cure Notification identified numerous systemic

deficiencies throughout the ADC system and stated, "ADC expects Wexford to

effect sustained, systemic operational improvements in the management and

delivery of health care services."  (Doc. 240, Ex. EE, at ADC027858).  ADC

demanded correction of the listed deficiencies within 90 days.  Wexford objected

because the problems were overwhelmingly systemic, explaining that the

deficiencies stemmed from "long-standing issues, embedded into ADC health care

policy and philosophy."  (*Id.* at 7, citing Doc. 240, Ex. FF).  Its response also

called the ADC healthcare system "extremely poor," "sub-standard," and "dysfunctional." (Doc. 240, Ex. FF, at ADC027942-43).

Plaintiffs moved for class certification in November 2012. In addition to the Cure Notification correspondence, plaintiffs supported the motion with hundreds of pages of ADC's monitoring reports and internal documents, testimony by ADC health care staff, and declarations from all fourteen named plaintiffs and from experts on prisoner medical care, mental health care, dental care, and isolation conditions. These experts reviewed the policies and procedures of ADC, as well as prisoner medical records, and concluded that systemic deficiencies in ADC care create a substantial risk of serious harm to all prisoners. (Doc. 240, Exs. B-E).

For example, Plaintiffs' medical care expert, Dr. Robert Cohen, opined that prior to and since privatization, Defendants "have neglected the serious medical needs of the Arizona state prisoners by failing to manage, support, supervise and administer medical care to prisoners in the ten state complexes. Because of this neglect, these prisoners are at serious risk of harm, and in some cases, death." (Order at 5 (citing Doc. 240, Ex. C, ¶ 5)). Defendants' own documents detailed serious systemic problems in the health care system. ADC found "[i]nadequate staffing levels in multiple program areas at multiple locations," "forcing existing staff to work excessive hours, creating fatigue risks." (Doc. 240, Ex. EE at ADC027858). ADC has responded to its nursing staff shortage with a statewide

practice of hiring temporary nurses from registries, but ADC acknowledges "[p]roblems of poor communication and lack of training are only increased when registry is used." (*Id.*, Ex. SS, at ADC028164; *see also* Ex. AAA, at ADC027890-96; Ex. II, at ADC027911 (registry nurse already under investigation from the State Board of Nursing put more than 100 prisoners at risk of Hepatitis C infection by using a contaminated needle in insulin later injected into other prisoners)).

Plaintiffs' dental care expert, Dr. Jay Shulman, described systemic deficiencies in ADC dental care that "place all inmates at risk of preventable pain, but also of teeth decay and unnecessary loss of teeth." (Order at 8 (citing Doc. 240, Ex. D, ¶ 3)). He noted ADC does not employ enough dentists statewide to meet the needs of the class, and, to compound matters, unlicensed dental assistants have too much discretion and too large a role in examining patients. (Doc. 240, Ex. D, ¶ 5).

Regarding mental health care, Dr. Pablo Stewart opined that "the shortage of mental health staff, delays in providing or outright failure to provide mental health treatment, and the gross inadequacies in the provision of psychiatric medications are statewide systemic problems." (Order at 9 (citing Doc. 240, Ex. B, ¶ 6)). ADC's Mental Health Contract Monitor wrote that psychiatry staffing is "grossly insufficient … [and] so limited that patient safety and orderly operation of [ADC] facilities may be significantly compromised." (Doc. 240, Ex. KK, at

ADC027770).   ADC doctors testified to the dangerous policy of expecting non-psychiatrist physicians to refill prescriptions for patients they had never seen and for psychiatric medications with which they are unfamiliar.  (*Id.*, Ex. W, at 84:10-87:14; Ex. MM, at ADC028113; Ex. C, ¶ 40).  No ADC policy requires that those on suicide watch be evaluated face-to-face by a psychiatrist, and unlicensed mental health staff may terminate suicide watch.  (*Id.*, Ex. T at 164:15-18; 234:12-235:16).

Dr. Craig Haney opined that ADC's failure to "have and implement policy" preventing seriously mentally ill prisoners from being placed in isolation units was "[c]ontrary to sound correctional practice and the weight of psychological and psychiatric opinion."  (Order at 10–11 (citing Doc. 240, Ex. E, ¶ 54)).  Plaintiffs also provided evidence that the ADC's policy of subjecting mentally ill prisoners—even those on psychotropic medications—to the use of chemical agents in isolation units poses a substantial risk of harm.  (Doc. 240, Ex. E, ¶ 48).

The district court certified the class on March 6, 2013.  In its order, the court noted the evidence excerpted above and found that "Plaintiffs' expert declarations, largely unrebutted at this juncture, are sufficient to establish that ADC's practices or customs in the provision of health care rise to the level of deliberate indifference that places inmates at a substantial risk of serious harm."  (Order at 14–15).  Fact discovery is currently underway, and trial is set for October 20, 2014.  (Doc. 389).

## Question Presented

The district court certified a class of prisoner plaintiffs seeking injunctive relief regarding defendants' system-wide practices and policies. Is this a rare case where the legal issues are so unsettled and the lower court decision so manifestly erroneous that this Court should grant interlocutory review?

## Argument

### I.    THE PETITION DOES NOT MEET THE TEST FOR RULE 23(F) REVIEW

This Court "begin(s) with the premise that Rule 23(f) review should be a rare occurrence" because class certification decisions "'present familiar and almost routine issues that are no more worthy of immediate appeal than many other interlocutory rulings.'" *Chamberlan,* 402 F.3d at 955, 959 (quoting Rule 23 advisory committee's notes). "Interlocutory appeals are generally disfavored because they are 'disruptive, time-consuming, and expensive.'" *Id.* at 959 (explaining that such appeals "add to the heavy workload of the appellate courts, require consideration of issues that may become moot, and undermine the district court's ability to manage the class action") (citations omitted).

Rule 23(f) review is ordinarily limited to three situations: (1) when the class certification decision is both "questionable" and effectively ends the litigation for reasons independent of the merits (i.e., a "death knell" situation); (2) when the decision presents an unsettled issue of class action law that is likely to evade later

review; or (3) when the decision is "manifestly erroneous." *Id.* Defendants argue that the second and third criteria apply here, but their mere disagreement with the district court, and with the concept of civil rights litigation generally, does not make this a rare case that merits extraordinary interlocutory review.

**A.    The Class Certification Order Involves Routine Issues of Law Unlikely to Evade Review after Final Judgment.**

Rule 23(f) can be invoked if the class certification decision presents "an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally," *and* the issue of law is "likely to evade end-of-the-case review." *Id.* Defendants overplay the first prong of this requirement, and ignore the second.

Despite defendants' claims that district courts are left adrift on Eighth Amendment class certification issues, the district court here did not lack applicable precedent. *Armstrong*, cited multiple times by the district court, also addressed class certification of prisoners' claims related to their conditions of confinement. (*E.g.*, Order at 4, 18). Although the claims in *Armstrong* were brought under the Fourteenth Amendment and Americans with Disabilities Act rather than the Eighth Amendment, the applicable class action analysis is the same. *See also Pierce v. Cnty. of Orange,* 526 F.3d 1190, 1199–1200 (9th Cir. 2008) (addressing propriety of class certification in Fourteenth Amendment challenge to jail conditions). The court below also relied on Supreme Court precedent, as well as Ninth Circuit cases

on both Eighth Amendment claims and class certification. (*See* Order at 3–4, 11–14, 18 (discussing governing standards for commonality and typicality analysis)). Thus Defendants' assertion that this Court has never addressed "the propriety of certifying an Eighth Amendment Claim" is both inaccurate and irrelevant.[3]

Defendants' real complaint is that the district court did not find *Wal-Mart Stores, Inc. v. Dukes* dispositive of certification of this class.   131 S. Ct. 2541 (2011).  As explained below, the district court correctly reasoned that *Dukes* offers limited guidance in this case.  Accordingly, this Court's general guidance on the application of *Dukes* is not a critical issue of law directly related to this case, and an appeal at this juncture is unnecessary.  *See Hevesi v. Citigroup Inc.*, 366 F.3d 70, 84–85 (2d Cir. 2004) (rejecting 23(f) appeal because the issue was only remotely related to the actual district court certification decision).

Critically, defendants do not argue that class certification will evade review after the underlying merits are addressed.  Nor could they, as this Court can and does review class certification in prisoner cases after final judgment.   *See Armstrong*, 275 F.3d at 867–70.  They do not claim crippling liability, or that they will be forced into settlement.  Even if defendants had succeeded in showing an

---

[3] In addition to addressing certification of similar claims in *Armstrong* and *Pierce,* this Court has addressed Eighth Amendment class certification in *Hawkins v. Comparet-Cassani,* 251 F.3d 1230 (9th Cir. 2001) (addressing class certification of prisoners who challenged usage of stun belts under the Eighth Amendment, and reversing class certification based on standing).

- 10 -

unsettled question of law, their failure to show that the decision will evade review "alone[] establishes an adequate basis to deny the petition." *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 142 (2d Cir. 2001).[4]

### B.    The District Court's Order is Not Manifestly Erroneous.

This Court grants Rule 23(f) petitions for "manifest error" only in extremely limited circumstances of significant error by the district court. "Any error must be truly 'manifest,' meaning easily ascertainable from the petition itself. If it is not, then consideration of the petition will devolve into a time consuming consideration of the merits, and that delay could detract from planning for the trial in the district court." *Chamberlan*, 402 F.3d at 959. Class certification decisions "rarely" give rise to such legal errors, however, "because class actions typically involve complex facts that are unlikely to be on all fours with existing precedent." *Id. at* 962 (citation omitted).

Defendants' arguments on this standard merely rehash their arguments before the district court regarding the meaning of *Dukes* and the standard of proof for Eighth Amendment claims. As they did below, defendants fail to apprehend

---

[4] Defendants devote most of their argument on this issue to decrying the "trend" of expensive prisoner class actions. (Pet. at 7–9 (citing, *e.g.*, *Plata*)). But the lengthy judicial oversight and legal costs incurred in California result not from the lack of class certification guidance, but rather from that state's persistent failures to comply with court orders. *See Plata*, 131 S. Ct. at 1922–28 ("This case arises from serious constitutional violations in California's prison system. The violations have persisted for years. They remain uncorrected.").

the constitutional injury claimed by plaintiffs: that defendants' system-wide policies and practices subject plaintiffs to a substantial risk of serious future harm, entitling them to injunctive relief. Accordingly, defendants' arguments—based almost entirely upon cases seeking damages for past injuries—miss the mark. That these meritless arguments were rejected by the district court does not make the district court's opinion erroneous, let alone manifestly erroneous on its face.

### 1.    Commonality

Plaintiffs seek injunctive relief under the Eighth Amendment. That Amendment is violated when prison officials, acting with deliberate indifference, subject prisoners to "a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). In other words, "the constitutional injury *is* the exposure to the risk of harm." (Order at 13 (citing *Brown v. Plata*, 131 S. Ct. 1910, 1926 n.3)). Plaintiffs have identified system-wide ADC policies and practices—regarding both health care and conditions in isolation—that have caused them, and many other Arizona prisoners, serious physical or psychiatric injury, and in some cases death. Those policies and practices apply to all Arizona prisoners and thus place the plaintiffs and other class members at continuing risk of harm. As the Supreme Court recognized in *Plata* (a state-wide prisoner health care class action), "all prisoners in [the state] are at risk so long as the State continues to provide inadequate care." 131 S. Ct. at 1940. Because plaintiffs and other class members

are subject to a substantial risk of harm from defendants' policies and practices, the commonality requirement is easily met.

This is the "common legal theory" discussed by the district court—that all of the plaintiffs complain of the same risk caused by the same conduct—not, as defendants derisively claim, that all of the plaintiffs merely have Eighth Amendment claims. (Pet. at 1, 9–10). Because both the cause of injury (Defendants' system-wide practices) and the injury (the substantial risk of serious harm) are the same, the district court could find that "litigating the adequacy of ADC's health care to all inmates 'depend[s] on a common contention . . . of such a nature that it is capable of classwide resolution.'" (Order at 15 (quoting *Wang v. Chinese Daily News*, ____ F.3d ____, 2013 WL 781715, at *4 (9th Cir. Mar. 4, 2013))). The court further defined the question by certifying particular practices for which commonality exists—analysis ignored by defendants. (Order at 16–18). Moreover, as the court put it, "the answer to that question is 'apt to drive the resolution of the litigation' and would form the basis for whether an injunction directing Defendants to remedy any unconstitutional conditions is appropriate." (Order at 11 (citing *Dukes*, 131 S. Ct. at 2551)). Thus, contrary to defendants' claims, the district court did consider whether the common questions raised are capable of generating a common answer in a class proceeding. It then proceeded

to discuss in detail plaintiffs' evidence showing that the constitutional deficiencies occur system-wide. (*See* Order at 12–18).

Defendants also take issue with the district court's discussion of differences between the individual named plaintiffs. As they did below, they claim that the specific differences in the individual plaintiffs' experiences with the health care system and placement in isolation should defeat class certification. They now claim that the district court's failure to accept their argument was clear error. (Pet. at 13–16).

Defendants' position relies on the mistaken premise that plaintiffs' claims are merely a collection of 33,000 individual damages claims. Rather, the district court correctly recognized that the class claims allege that all prisoners are at a risk of injury from system-wide deficiencies, and that the risk alone—not the physical or psychological consequences of that risk coming to pass—is the injury common to the class. No individualized evaluation is required when prisoners mount an injunctive challenge to system-wide deficiencies, as the Supreme Court confirmed in *Plata*, which is materially indistinguishable on this point:

> Because plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay— or any other particular deficiency in medical care complained of by the plaintiffs—would violate the Constitution under *Estelle v. Gamble*, 429 U.S. 97, 104– 105 (1976), if considered in isolation. Plaintiffs rely on system-wide deficiencies in the provision of medical and

- 14 -

> mental health care that, taken as a whole, subject sick and
> mentally ill prisoners in California to "substantial risk of
> serious harm."

131 S. Ct. at 1926 n.3 (citation omitted).[5]

The district court's conclusion on this point is amply supported by Circuit

precedent.[6]  Defendants' reliance on *Dukes* to argue otherwise is, as it was below,

misplaced.  Individual differences defeated commonality in *Dukes* because Wal-

Mart did not centrally control employment decisions, and without centralized

control of the decisions alleged to give rise to plaintiffs' Title VII injury, there was

no "common answer" to be found.  131 S. Ct. at 2552.  As the district court stated,

"[t]hat lack of commonality contrasts with this case, where all inmates are

subjected to Defendants' actions or lack thereof, because they have the sole

responsibility for health care policy." (Order at 13).

*Dukes'* applicability is also limited because the plaintiffs in this case seek

only injunctive relief.  Cases seeking monetary relief for class members involve

detailed inquiries into individual damages that complicate a court's task of

identifying common questions that have common answers.  *See, e.g., Dukes*, 131 S.

_____

[5] Justice Scalia articulated Defendants' argument that certification in a statewide class action regarding prisoner health care is improper, but garnered support of only one other Justice.  *Plata*, 131 S. Ct. at 1952 (Scalia, J., dissenting).

[6] *See, e.g., Armstrong*, 275 F.3d at 868 (class members' differing disabilities, and thus needs for different accommodations, did not defeat commonality in ADA challenge); *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998) (commonality not defeated by class members' differing experiences with INS agents and offices).

- 15 -

Ct. at 2557 (holding that Rule 23(b)(2) prohibits certification "when each class member would be entitled to an individualized award of monetary damages"); *see also Comcast v. Behrend*, 569 U.S. ___, No. 11-864, slip. op. at 6–7 (Mar. 27, 2013) (reversing class certification because the lack of a class-wide damages model meant damage calculations would swamp individual issues, in violation of Rule 23(b)(3)). *Dukes*' instruction regarding individual differences is thus inapplicable to an Eighth Amendment claim seeking only injunctive relief.

The district court's analysis is reasoned and detailed, and not clearly erroneous. (*See* Order at 13). Accordingly, its findings on commonality do not provide grounds for a Rule 23(f) appeal.[7]

---

[7] Defendants' assertion that the "majority" of courts agree that individual differences defeat commonality is groundless. (*See* Pet. at 14–15 n. 6). It is misleading to limit comparable cases to "Eighth Amendment health care cases" when many cases seeking class certification for unconstitutional conditions of confinement are brought under the Fifth or Fourteenth Amendment. And of the five cases defendants cite, only three substantively discuss commonality and all are distinguishable here: in *Mathis v. GEO Grp., Inc.*, 2012 WL 600865 (E.D.N.C. Feb. 23, 2012), the court denied class certification because the plaintiff did not present any evidence of the practices referenced in the complaint; and in both *Schilling v. Kenton Cnty., Ky.*, 2011 WL 293759 (E.D. Ky. Jan. 27, 2011) and *Smith v. Sheriff of Cook County*, 2008 WL 4866071 (N.D. Ill. July 16, 2008) the court denied certification in part because individual damages calculations would be unworkable. Cases granting class certification on Eighth Amendment claims, using analysis consistent with that of the district court, continue to be common after *Dukes*. *See Chief Goes Out v. Missoula Cnty.*, 2013 WL 139938 (D. Mont. Jan. 10, 2013); *Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r*, 2012 WL 6738517 (S.D. Ind. Dec. 31, 2012); *Rosas v. Baca*, 2012 WL 2061694 (C.D. Cal. June 7, 2012); *Butler v. Suffolk Cnty.*, --- F.R.D. ---, 2013 WL 1136547 (E.D.N.Y. Mar. 19, 2013).

### 2.    Typicality

Defendants fault the district court for a "perfunctory" discussion of typicality, but, as the district court explained, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." (Order at 18 (citing *Dukes*, 131 S. Ct. at 2551 n.5)). Defendants further misstate the law by claiming that variations between named plaintiffs destroy typicality, when the relevant inquiry is whether named plaintiffs' injuries are similar to those of unnamed plaintiffs and occur as a result of the "same, injurious course of conduct." (Order at 18 (*citing Armstrong*, 275 F.3d at 869)). Here, all class members are at the same risk from defendants' system-wide policies and practices; that the named plaintiffs have suffered varying physical injuries as a result is irrelevant. Far from defeating typicality, such variation among named plaintiffs ensures that the composition of the class is better reflected by the named plaintiffs. *See Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (typicality satisfied where "[t]he named plaintiffs . . . include a very broadly selected cross-section of the different categories of Boeing employees"). Accordingly, the court's finding on typicality is not manifest error.

### 3.    Rule 23(b)(2)

Defendants repeat their arguments below regarding the district court's ability to craft an injunction that would satisfy Rule 23(b)(2). When this case represents, as the district court said, the "quintessential type of claims that Rule 23(b)(2) was

- 17 -

meant to address," it is hardly manifest error to refuse to base a class certification decision on hypothetical difficulties in crafting a future injunction. *See Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2009) (Rule 23(b)(2) is satisfied when "class members seek uniform relief from a practice applicable to all of them").

Defendants rely on *Shook v. Board of County Commissioners*, 543 F.3d 597 (10th Cir. 2008). Not only is *Shook* not the law of this Circuit, but the court there strongly suggested that, while the lower court did not abuse its discretion in denying class certification, certifying the class would have been the better decision. 543 F.3d at 600. *Shook* also reaffirmed that (b)(2) certification is appropriate where, as here, class members' injuries are "sufficiently similar that they can be addressed in an single injunction that need not differentiate between class members." *Id.* at 604.

Further, as the district court correctly explained, *Shook* does not require class plaintiffs "'to come forward with an injunction that satisfied Rule 65(d) with exacting precision at the class certification stage'" as long as "'all class members seek the exact same relief as a matter of . . . constitutional right.'" (Order at 20 (citing *Shook*, 543 F.3d at 606, and *Rodriguez*, 591 F.3d at 1126)). The district court correctly found that an injunction in this case would comply with *Shook* because the "remedy in this case would not lie in providing specific care to specific

inmates" but rather "the level of care and resources would be raised for all inmates." (Order at 21 (citing *Shook*, 543 F.3d at 605)).[8]

### 4.    System-wide practices

Defendants' argument regarding system-wide practices repeats the argument made in their motion for reconsideration to the district court: that the court erroneously interpreted the Cure Notification as documenting deficiencies at all ADC complexes.[9] Within 48 hours of the filing of that motion, the district court denied it, rebuking defendants for taking its statements out of context and highlighting the other significant evidence supporting class certification that it had discussed in the Order. (*See* Defendants' Amended Petition, Attachment 1).

Defendants also appear to argue that the evidence presented by plaintiffs is insufficient to demonstrate system-wide practices. But this argument ignores the district court's finding that "[t]he Cure Notification relied on much of the same evidence Plaintiffs submit in support of their motion" (Order at 7), and the court's reliance on plaintiffs' "largely unrebutted" expert declarations. (Order at 14).

---

[8] Defendants also assert that the certification order violates the Prison Litigation Reform Act. (Pet. at 19). But "any reference at the class certification stage to the PLRA's limitations on the district court's ability to grant relief [is] error." *Shook*, 543 F.3d at 613.

[9] Defendants attached their Motion for Reconsideration to their Petition. (Pet., Attachment 2). The Motion includes a declaration presenting evidence not provided to the district court during briefing on class certification, which the Court should not consider because it is "new evidence furnished for the first time on appeal." *See Theriot v. Parish of Jefferson*, 185 F.3d 477, 491 n.26 (5th Cir. 1999).

Defendants' argument is simply an improper request that this Court weigh the evidence differently than did the district court. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 798 (9th Cir. 2005) ("[I]t is not [this Court's] task to weigh the evidence presented to the district court").

## Conclusion

The district court's class certification decision was well reasoned and well supported. It is not manifestly erroneous on its face, nor does it address issues that will evade later review. Plaintiffs respectfully request that this Court deny Defendants' Petition to Appeal.

Respectfully submitted on this 4th day of April, 2013.

PERKINS COIE LLP

By: /s/ Amelia M. Gerlicher
   Daniel C. Barr
   Amelia M. Gerlicher
   Kirstin T. Eidenbach
   2901 North Central Avenue
   Suite 2000
   Phoenix, AZ 85012-2788

*Attorneys for Prisoner Plaintiffs-Respondents*

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system as follows:

Daniel P. Struck
Nicholas D. Acedo
STRUCK, WIENEKE &LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona 85226

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed ONE copy of the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

Michael E. Gottfried
OFFICE OF THE ATTORNEY GENERAL
1275 W. Washington Street
Phoenix, Arizona 85007-2926


  /s/ Amelia M. Gerlicher
Amelia M. Gerlicher

**EXHIBIT 2**

**EXHIBIT 2**

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**BY EMAIL TRANSMISSION ONLY**

April 15, 2013

Daniel P. Struck
Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

Michael Gottfried
Lucy Rand
Office of the Attorney General
1275 W. Washington St.
Phoenix, AZ 85007

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Re:   **Parsons v. Ryan, et al.**

Dear Counsel:

I write to follow up on the outstanding issues set forth in my letter of April 4, 2013:

1. Defendants asked that plaintiffs identify in advance, by category, staff that plaintiffs' experts will need to speak with. Plaintiffs agreed to attempt to generate such a list, but it is impossible to provide an exhaustive list in advance.

2. Defendants asked approximately how many incident reports, grievances, and HNRs plaintiffs' experts will need to review during their inspections. Plaintiffs agreed to consult with their experts and attempt to provide an estimate.

3. Defendants asked that plaintiffs' experts agree in advance to a specific methodology for sampling medical records and other documents. Plaintiffs agreed to consult with their experts and determine if this is possible. However, plaintiffs will not agree to limitations on their experts' ability to review records that do not apply equally to defendants' experts.

April 4, 2013 letter from Fathi to Struck, *et al.*, at 2. We have consulted with our experts and provide the following information in a good faith attempt to collaborate with defendants in planning plaintiffs' expert inspections. However, given that discovery and our investigation are ongoing, information may come

to our attention before or during the inspections that requires modification of these responses.

1. **Categories of staff for experts to speak with:**

Shulman

-Dental staff

Vail

-Officials who do the classification into and out of the isolation units
-Custody staff who work in the isolation units
-Mental health staff who work in the isolation units
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)
-Caseworkers or counselors who work with prisoners in the isolation units

Haney

-Medical and mental health staff
-Custody staff who work in the isolation units
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

Stewart

-Medical and mental health treatment staff
-Custody staff responsible for the day-to-day operation of the isolation units and the mental health units
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

Wilcox

-Health Services Director/Administrator
-Director of Nursing and nursing staff
-Physicians, including psychiatrists
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

Cohen

-Health Services Director/Administrator
-Director of Nursing and nursing staff
-Physicians, including psychiatrists
-Nurse Practitioners and Physician Assistants

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2

-Pharmacists
-Health Records Administrator
-Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

## 2. On-site review of incident reports[1], grievances[2], and HNRs during inspections:

All experts would strongly prefer to review these documents in advance of their inspections to the extent possible. This would make the experts' on-site time more productive and reduce the burden on ADC staff. Therefore, it is essential that defendants fully respond to Requests No. 55 and 56 of Plaintiff Victor Parsons' First Set of Requests for Production of Documents, and Requests No. 26 and 28 of Plaintiff Joshua Polson's First Set of Requests for Production of Documents.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Shulman

-At each facility he visits, Dr. Shulman will need to review dental HNRs and dental grievances filed at that facility since Jan. 1, 2012.

Vail

-Mr. Vail will need to review current unit logs, incident reports for the previous six months, infraction/disciplinary records for the previous six months, and grievances for the previous year.

Haney

-Dr. Haney's on-site document review is driven by prisoner interviews, so he will need to consult grievances, incident reports, and HNRs on an as-needed basis.

Stewart

-Dr. Stewart's on-site document review will consist mainly of medical records. He may review some HNRs, grievances, and incident reports on an as-needed basis.

Wilcox

-Dr. Wilcox will need to review the previous three months of incident reports, HNRs, and grievances.

---

[1] "Incident reports" means any written report documenting unusual events, including but not limited to information reports and significant incident reports.
[2] "Grievances" includes appeals, as well as responses to grievances and appeals.

Cohen

-Dr. Cohen will need to review the previous three months of incident reports, HNRs, and grievances.  He will also need to review, for the previous six months, the requests for consultation services and the utilization management responses.

### 3. Selection of medical records and other documents for review:

Shulman

-Dr. Shulman will select records based on review of dental grievances and HNRs.  In addition, he would like to select a random sample of records from a list of prisoners at each facility who have been in custody for at least five years.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Vail

-Mr. Vail will select records based on pre-inspection document review and on cellfront prisoner interviews during the inspection.

Haney

-Dr. Haney's sampling methodology of records to review is based on three factors:
   -prisoners identified in advance of the inspection through document review;
   -prisoners identified during the inspection through cellfront interviews;
   -prisoners selected randomly by using isolation unit rosters and a random number table (this is a typical social science sampling methodology).  Dr. Haney will both interview these prisoners and review their records; accordingly, his preference is to identify these prisoners in advance of the tour so that letters can be sent to them and so that custody will know who to pull out for interviews.

Stewart

-Dr. Stewart will select records for review using a combination of methodologies:
   -reviewing the list of prisoners on the mental health caseload and psychotropic medications;
   -asking custody staff to identify prisoners who have been on segregation units for a long time, those who do not go out to recreation, or those who have difficulties on the unit;
   -prisoners identified in pre-inspection document review;
   -prisoners identified through cellfront interviews
He will also sample from different housing units to get a representative sample from a given facility.

4

Wilcox

-Dr. Wilcox will review records based on the following criteria:
    -on-site deaths, critical incidents, and hospitalizations
    -random sample from chronic care lists, including but not limited to
    hypertension, diabetes, asthma, HIV, pregnancy, and schizophrenia
    -random sample of records of other patients

Cohen

-Dr. Cohen will review records based on the following criteria:
    -on-site deaths, critical incidents, and hospitalizations
    -random sample from chronic care lists, including but not limited to
    hypertension, diabetes, asthma, HIV, pregnancy, and schizophrenia
    -random sample of records of other patients

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

He will also review emergency logs, and any protocols for managing chronic diseases, emergency response and specialty referral that have been implemented since Corizon took over medical management.

\* \* \*

Please let us know when defendants' counsel are available this week to meet and confer on these issues, so that we can reach agreement where possible, and promptly present the remaining issues to the Court for resolution.

Very truly yours,

David C. Fathi

Cc:    All counsel of record

5

**EXHIBIT 3**

**EXHIBIT 3**



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

July 11, 2013

Ms. Ashlee Fletcher, Esq.
Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
afletcher@swlfirm.com

RE: *Parsons v. Ryan*
Expert tours of Dr. Bobby Cohen, July 15-18, 2013
ASPC-Lewis and ASPC-Eyman

Dear Ms. Fletcher and Counsel,

I write regarding Dr. Cohen's expert tours next week. He and I will be touring the Lewis and Perryville prisons July 15-16 and July 17-18, respectively. Both tours will last from 8:00 am to 5 p.m. We will report to the administrative/warden's office each morning. Don Specter's June 19, 2013 letter offered an overview of what Dr. Cohen hopes to do on his tours, below more specific detail is outlined below as to how he plans to spend each day.

On the first day at both complexes, Dr. Cohen would like to begin by speaking with the Facility Health Administrator or Medical Director to get an overview of the complex and its various clinical/medical areas. He would like to tour the medical clinic spaces on each unit, the central medical unit, and the pharmacy. He will want to speak to designated clinical staff and someone from the pharmacy. We have previously agreed that a designee from each category of health care staff be available to answer questions. *See* April 15, 2013 letter from David Fathi (setting forth categories); July 2, 2013 letter from Ashlee Fletcher ("Defendants will designate individuals pursuant to the categories provided in David Fathi's April 15, 2013 letter").

On the first day, while touring, he also wants to have a brief confidential meeting with the named plaintiffs who are housed at the prison. It is acceptable to have these meetings in a confidential room at the plaintiffs' living units, as he wants to see each named plaintiffs' housing unit as well. These interviews with our clients will take no more than ten minutes each.

According to our records and a review of the ADC website, there are three named plaintiffs currently housed at ASPC-Lewis, who he will want to visit and speak to on July 15:

- ████████████████████████
- ████████████████████████
- ████████████████████████

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

According to our records and a review of the ADC website, there are four named plaintiffs currently housed at ASPC-Eyman, who he will want to visit and speak to on July 17:

- ████████████████████████████████
- ████████████████████████████████
- ████████████████████████████████
- ████████████████████████████████

After his walking tour on the first day at each prison, Dr. Cohen would like to review the medical charts of the named plaintiffs, prisoners who have died in the past 12 months, and the charts of the prisoners listed below. He asks that all charts be available for him on the first day of the tour. Based upon the things found in the record review, he *may* want to speak to 5 or 10 prisoners on the second day. He would pick those prisoners – if any – on the first day of the tour based upon initial chart review, and give those names to staff.

He will spend the majority of the second day of his tours reviewing files, and may have follow up questions regarding individual cases for the medical director, nursing director, or pharmacy director, depending upon what he finds in the prisoners' files.

Lewis Medical Charts to Review July 15-16
Named Plaintiffs

████████████████████████
████████████████████████
████████████████████████

Prisoners Who Have Died in the Past 12 Months

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████

Class Members

████████████████████████████
████████████████████████████
████████████████████████████

Ms. Ashlee Fletcher
July 11, 2013
Page 3





<u>Eyman Medical Charts to Review July 17-18</u>
Named Plaintiffs



Prisoners Who Have Died in the Past 12 Months



Class Members



Ms. Ashlee Fletcher
July 11, 2013
Page 5



Ms. Ashlee Fletcher
July 11, 2013
Page 6



Please let us know immediately if you object to any aspect of the inspections outlined above.

Sincerely yours,

/s/ Corene Kendrick

Corene Kendrick

cc:    Counsel of Record
       Dr. Cohen

6

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**ACLU**
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

## BY EMAIL TRANSMISSION ONLY

July 11, 2013

Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

Re:   Parsons v. Ryan
      **Dr. Stewart's tours of Florence and Eyman**

Dear Counsel:

I write regarding Dr. Stewart's expert inspection tours of ASPC-Florence (July 15) and ASPC-Eyman (July 16). In response to Ms. Fletcher's query, both tours will last from 8 a.m. to 5 p.m.

Dr. Stewart will need to visit the following units:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

## Florence

-Central Unit, including CB 1, 2, 3, and 4
-Kasson Unit, including Mental Health and Detention
-HU 8, Health Unit, and IPC
-Any other areas where prisoners are housed on mental health or suicide watch, or for any other mental health purposes

## Eyman

-SMU I, including East, Detention, Protective Custody, and Mental Health Watch
-Browning BMU and Mental Health
-Meadows CDU
-Housing units where named plaintiffs are housed (Dustin Brislan, 164993; Robert Gamez, 131401; Jackie Thomas, 211267; Jeremy Smith, 129438).
-Any other areas where prisoners are housed on mental health or suicide watch, or for any other mental health purposes

At each complex, Dr. Stewart will need to follow the path of a hypothetical arriving prisoner with mental health needs, through screening, evaluation, referral for medications, follow up care and facilities for "inpatient" level care.

In all of the units he visits, Dr. Stewart will need to talk with prisoners at cellfront, and then conduct additional interviews with some of them in a setting that provides confidentiality. He will need to review the records of the prisoners with whom he speaks.

1

Dr. Stewart will also need to speak with staff from the categories upon which we have agreed:

> Medical and mental health treatment staff
> Custody staff responsible for the day-to-day operation of the isolation units and the mental health units
> Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

*See* April 15, 2013 letter from David Fathi (setting forth categories); July 2, 2013 letter from Ashlee Fletcher ("Defendants will designate individuals pursuant to the categories provided in David Fathi's April 15, 2013 letter").

Dr. Stewart will need to observe the mental health treatment programs described in Defendants' Response to Plaintiff Wells' First Set of Interrogatories. He will need to observe a medication pass in each complex. He may also review HNRs, grievances, and incident reports on an as-needed basis.

Finally, in addition to random cellfront interviews, Dr. Stewart will need to speak with the following prisoners. Except where indicated, he will begin with a cellfront interview, but may then need to speak with the prisoner in a confidential setting.

**Florence**



AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

<u>Eyman</u>

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

It is acceptable to hold the interviews with the named plaintiffs in a confidential room at the plaintiffs' living units, as Dr. Stewart needs to see each plaintiff's housing unit as well.

Please let us know immediately if you object to any aspect of the inspections outlined above.

Very truly yours,

David C. Fathi

Cc:    All counsel of record

3

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**BY EMAIL TRANSMISSION ONLY**

July 15, 2013

Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

      Re:     **Parsons v. Ryan**
             **Dr. Craig Haney's tours of Florence, Eyman & Perryville**

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*


*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Dear Counsel:

I write regarding Dr. Craig Haney's expert inspection tours of ASPC-Perryville
(July 18); ASPC-Florence (July 19 & 22) and ASPC-Eyman (July 23-25). In
response to Ms. Fletcher's query, all tours will last from 8 a.m. to 5 p.m.

Dr. Haney would like to visit the following units:

**Perryville**

- Lumley Special Management Area
- Lumley Mental Health
- Complex Detention (CDU)
- Any other areas where prisoners are housed on mental health or
  suicide/mental health watch, or for any other mental health purposes
- Some cells on the units as available
- All recreation areas and program and/or mental health areas on or used
  by these units

**Florence**

- Central Unit, including CB 1, 2, 3, 4, 5 and 7
- Kasson Unit, including Mental Health and Detention
- Any other areas where prisoners are housed on mental health or
  suicide/mental health watch, or for any other mental health purposes
- Some cells on the units as available
- All recreation areas and program and/or mental health areas on or used
  by these units

1

<u>Eyman</u>

- SMU I, including East, Detention, Protective Custody, and Mental Health Watch
- Browning, Browning BMU and Browning Mental Health
- Any other areas where prisoners are housed on mental health or suicide/mental health watch, or for any other mental health purposes
- Some cells on the units as available
- All recreation areas and program and/or mental health areas on or used by these units

At each complex, he would like to begin the tour with a brief overview/meeting with prison administrative staff.

At each complex, Dr. Haney may ask for particular photographs to be taken by staff. Dr. Haney will also need to speak with staff from the categories upon which we have agreed:

> Medical and mental health treatment staff
> Custody staff who work in the isolation units
> Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

*See* April 15, 2013 letter from David Fathi (setting forth categories); July 2, 2013 letter from Ashlee Fletcher ("Defendants will designate individuals pursuant to the categories provided in David Fathi's April 15, 2013 letter").

Dr. Haney will need to review the health records of the named isolation plaintiffs and interview each named plaintiff in a confidential setting (those individuals are indicated in the appropriate unit below). He may also review other medical records, HNRs, grievances, and incident reports on an as-needed basis.

In all of the units he visits, Dr. Haney will need to talk with prisoners at cell-front, for a few of these individuals, he may ask to conduct additional confidential interviews with them. If this is the case, the Warden will be consulted.

Finally, in addition to random cell-front interviews, Dr. Haney will need to speak with the following prisoners, including the indicated named plaintiffs. These are longer interviews which usually take about 45 minutes to an hour. Aside from the Named Plaintiffs, who must be interviewed, the following list is over-inclusive for some units in order to accommodate fluctuation in population and any security needs raised by the Warden.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## CONFIDENTIAL INTERVIEW LIST

### Perryville



### Florence

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION



### Eyman

### *SMU I*

### *Browning*

Please let us know immediately if you object to any aspect of the inspections outlined above.

Very truly yours,

Amy Fettig

Cc:     All counsel of record

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

4



Amelia M. Gerlicher
PHONE:   (602) 351-8308
FAX:     (602) 648-7156
EMAIL:   AGerlicher@perkinscoie.com

2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
PHONE: 602.351.8000
FAX: 602.648.7000
www.perkinscoie.com

July 16, 2013

**VIA E-MAIL**

Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

Re:   **Parsons v. Ryan: Jay Shulman's tours of Florence, Eyman, and Phoenix**

Dear Counsel:

I write regarding Jay Shulman's expert inspection tours of Eyman (July 22-23), Florence (July 24-25) and Phoenix (July 26). Each day will last from 8 a.m. to 5 p.m.

Dr. Shulman plans to proceed largely as he did last week during the tours of Perryville, Lewis, and Yuma. He will spend the bulk of his time reviewing medical records. The lists of prisoners whose charts he would like to view is enclosed with this letter. Depending on his pace and availability of additional information, we may also request additional medical records while on site. Dr. Shulman will also want to speak briefly with dental staff working at each facility, and tour a dental clinic in the area where he will review records.

At each of the facilities Dr. Shulman toured last week, prison staff provided us the current routine care list. We agreed with counsel that Defendants would produce each of these documents with Bates stamps for the future convenience of all parties.

During the tours last week, Defendants prevented Dr. Shulman from asking questions about staffing, on the grounds that that information had been provided. Information on dental staffing and scheduling was requested in Swartz' Request for Production No. 6. Defendants' June 17, 2013 response to that RFP cites previous RFP responses that have not been updated beyond December 31, 2012, and a list of dental staff from May 9, 2013 that has no indication of schedule or full-time status (ADC091983-84). If Defendants have produced additional responsive documents, we request that you identify those documents by Bates number. If documents addressing current dental staffing have not been produced, then Dr. Shulman should be permitted

LEGAL27285475.1

Struck, Wienke, & Love
July 16, 2013
Page 2

to ask about that topic.  Indeed, allowing him to learn information through a brief discussion with current staff could reduce some of the document production that would otherwise be required.

Please let us know immediately if you object to any aspect of the tours outlined above.

Sincerely,

Amelia M. Gerlicher

AMG/kdl

Parsons v. Ryan – Record review list for Dr. Jay Shulman – July 22-26

## Phoenix

| | | | |
|---|---|---|---|
| ███████ | ███████████ | ██████████ | PHOENIX |
| ████████ | ██████████ | █████████ | PHOENIX |
| ████████ | ████████████ | ████████ | PHOENIX |
| ██████████ | ███████████ | ███████ | PHOENIX |
| █████████ | ███████████ | █████████ | PHOENIX |
| █████████ | █████████ | ███████████ | PHOENIX |
| █████████ | ██████████ | █████████████ | PHOENIX |
| █████████ | █████████ | █████████ | PHOENIX |
| █████████ | ██████████ | ████████ | PHOENIX |
| █████████ | █████████ | █████████ | PHOENIX |
| ██████████ | █████████ | █████████ | PHOENIX |
| █████████ | ████████████ | █████████ | PHOENIX |
| █████████ | ██████████ | ███████ | PHOENIX |
| ██████████ | ███████████ | ██████████ | PHOENIX |
| █████████ | ██████████ | █████████ | PHOENIX |
| █████████ | ██████████ | █████████ | PHOENIX |
| █████████ | ███████████ | ██████████ | PHOENIX |
| █████████ | ██████████ | ██████████ | PHOENIX |
| ██████████ | █████████ | █████████ | PHOENIX |
| | | | |

Parsons v. Ryan – Record review list for Dr. Jay Shulman – July 22-26

| Florence | | | |
|---|---|---|---|
| ███████ | ████████████ | ███████████ | FLORENCE |
| ███████ | █████████ | ████████ | FLORENCE |
| ██████ | ██████████ | ██████████ | FLORENCE |
| ██████ | ████████████ | █████████ | FLORENCE |
| ██████ | ██████████ | █████████ | FLORENCE |
| ██████ | ██████████ | █████████ | FLORENCE |
| █████ | ██████████ | █████████ | FLORENCE |
| ██████ | █████████ | █████████ | FLORENCE |
| ██████ | ████████ | █████████ | FLORENCE |
| █████ | █████████ | ███████████ | FLORENCE |
| ██████ | █████████ | █████████ | FLORENCE |
| ██████ | █████████ | █████████ | FLORENCE |
| ██████ | █████████ | ████████ | FLORENCE |
| ██████ | ██████████ | █████████ | FLORENCE |
| █████ | █████████ | █████████ | FLORENCE |
| ██████ | █████████ | █████████ | FLORENCE |
| ██████ | █████████ | ██████████ | FLORENCE |
| ██████ | █████████ | █████████ | FLORENCE |
| ██████ | █████████ | █████████ | FLORENCE |
| ██████ | ████████████ | █████████ | FLORENCE |

LEGAL27273876.2

Parsons v. Ryan – Record review list for Dr. Jay Shulman – July 22-26

| | | | |
|---|---|---|---|
| ███████ | ███████████ | █████████ | FLORENCE |
| ███████ | ████████ | ████████ | FLORENCE |
| ██████ | ███████████ | ████████████ | FLORENCE |
| ████████ | ██████████ | ████████ | FLORENCE |
| ███████ | █████████ | █████████ | FLORENCE |
| ███████ | █████████ | █████████ | FLORENCE |
| ███████ | █████████ | █████████ | FLORENCE |
| ████████ | █████████ | █████████ | FLORENCE |
| ████████ | █████████ | ████████ | FLORENCE |
| ████████ | ████████ | ████████ | FLORENCE |
| ███████ | ████████████ | █████████ | Florence – South |
| ████████ | ██████████ | ███████████ | FLORENCE Central |
| ████████ | █████████ | ████████ | FLORENCE Central |
| ████████ | █████████ | █████████ | FLORENCE East |
| ████████ | █████████ | █████████ | FLORENCE South |

LEGAL27273876.2

Parsons v. Ryan – Record review list for Dr. Jay Shulman – July 22-26

## Eyman



| | EYMAN | COOK UNIT |
| --- | --- | --- |
| | EYMAN | COOK UNIT |
| | EYMAN | COOK UNIT |
| | EYMAN | COOK UNIT |
| | EYMAN | COOK UNIT |
| | EYMAN | BROWNING UNIT |
| | EYMAN | COOK UNIT |
| | EYMAN | COOK UNIT |
| | EYMAN | COOK UNIT |
| | EYMAN | SMU EAST |
| | EYMAN | SMU EAST |
| | EYMAN | COOK UNIT |
| | EYMAN | COOK UNIT |
| | EYMAN | SMU EAST |
| | EYMAN | COOK UNIT |
| | EYMAN | SMU I |
| | EYMAN | MEADOWS |
| | EYMAN | MEADOWS MED |
| | EYMAN | SMU EAST |
| | EYMAN | COOK UNIT |

Parsons v. Ryan – Record review list for Dr. Jay Shulman – July 22-26

| | | | | |
|---|---|---|---|---|
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | MEADOWS CDU |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK UNIT |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | SMU I |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK UNIT |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | BROWNING UNIT |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | SMU EAST |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | SMU I |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK UNIT |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | SMU I |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK UNIT |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | SMU |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | COOK |
| ▬▬▬ | ▬▬▬ | ▬▬▬ | EYMAN | SMU |

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**BY EMAIL TRANSMISSION ONLY**

July 16, 2013

Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ  85226

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH  FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*


*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

> Re:   **Parsons v. Ryan**
>        **Eldon Vail's tours of Florence, Eyman & Perryville**

Dear Counsel:

I write regarding Eldon Vail's expert inspection tours of ASPC-Perryville (July 29); ASPC-Florence (July 30-31) and ASPC-Eyman (August 1-2).  In response to Ms. Fletcher's query, all tours will last from 8 a.m. to 5 p.m.

Mr. Vail would like to visit the following units:

**Perryville**

- Lumley Special Management Area
- Lumley Mental Health
- Complex Detention (CDU)
- Any other areas where prisoners are housed on mental health or suicide/mental health watch, or for any other mental health purposes
- Some cells on the units as available
- All recreation areas and program and/or mental health areas on or used by these units

**Florence**

- Central Unit, including CB 1, 2, 3, 4, 5 and 7
- Kasson Unit, including Mental Health and Detention
- Any other areas where prisoners are housed on mental health or suicide/mental health watch, or for any other mental health purposes
- Some cells on the units as available
- All recreation areas and program and/or mental health areas on or used by these units

**Eyman**

- SMU I, including East, Detention, Protective Custody, and Mental Health Watch

1

- Browning, Browning BMU and Browning Mental Health
- Any other areas where prisoners are housed on mental health or suicide/mental health watch, or for any other mental health purposes
- Some cells on the units as available
- All recreation areas and program and/or mental health areas on or used by these units

At each complex, he would like to begin the tour with a brief overview/meeting with prison administrative staff.

At each complex, Mr. Vail may ask for particular photographs to be taken by staff. Mr. Vail will also need to speak with staff from the categories upon which we have agreed:

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

- Officials who do the classification into and out of the isolation units
- Custody staff who work in the isolation units
- Mental health staff who work in the isolation units
- Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)
- Caseworkers or counselors who work with prisoners in the isolation units

*See* April 15, 2013 letter from David Fathi (setting forth categories); July 2, 2013 letter from Ashlee Fletcher ("Defendants will designate individuals pursuant to the categories provided in David Fathi's April 15, 2013 letter"). In particular, once he is at a housing unit, Mr. Vail will need to speak with the Sergeant or lead officer of each unit for a brief overview of about 10-15 minutes. He may also wish to speak with other custody and mental health staff and caseworkers/counselors.

Mr. Vail will need to review unit logs in each of the housing units. He may also review
grievances and incident reports and restraint/use of force documentation, and individual case files on an as-needed basis.

During his tours of each housing unit he will walk the tiers and conduct brief, cell-front interviews, for a few of these individuals, he may ask to conduct additional confidential interviews with them. If this is the case, the Warden will be consulted.

Finally, in addition to random cell-front interviews, Mr. Vail will need to speak with about 6-10 prisoners from each housing unit in a confidential setting. These interviews generally take about 15-20 minutes from start to finish, although the logistics of moving prisoners back and forth in these units does

take some time.  Mr. Vail will include in these interviews, any Named Plaintiffs who live on the units.

Aside from the Named Plaintiffs, who must be interviewed, the following list is over-inclusive in order to accommodate fluctuation in population and any security needs raised by the Warden.  Please note that we have identified housing unit based on the most recent rosters we received in discovery but these are necessarily some weeks old.

## CONFIDENTIAL INTERVIEW LIST

### Perryville



AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### Florence



### Eyman

*SMU I*

3



*Browning*

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION



Please let us know immediately if you object to any aspect of the inspections outlined above.

Very truly yours,

Amy Fettig

Cc:      All counsel of record

4

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



## BY EMAIL TRANSMISSION ONLY

July 16, 2013

Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ 85226

<div style="margin-left:2em">

Re:    Parsons v. Ryan
       Dr. Stewart's tours of Perryville and Phoenix

</div>

Dear Counsel:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

I write regarding Dr. Stewart's expert inspection tours of ASPC-Perryville (July 18) and ASPC-Phoenix (July 19). In response to Ms. Fletcher's query, both tours will last from 8 a.m. to 5 p.m.

Dr. Stewart will need to visit the following units:

### Perryville

-Women's Treatment Unit
-Lumley Unit, including Special Management Area
-CDU
-Lumley Mental Health/Watch
-Reception and Assessment
-Minors
-Santa Maria Medical
-Housing units where named plaintiffs are housed (Maryanne Chisholm, 200825; Sonia Rodriguez, 103830; Christina Verduzco, 205576)
-Exercise areas
-Any other areas where prisoners are housed on mental health or suicide watch, or for any other mental health purposes

### Phoenix

-All units and areas

At each complex, Dr. Stewart will need to follow the path of a hypothetical arriving prisoner with mental health needs, through screening, evaluation, referral for medications, follow up care and facilities for "inpatient" level care.

In all of the units he visits, Dr. Stewart will need to talk with prisoners at cellfront, and then conduct additional interviews with some of them in a setting

1

that provides confidentiality. He will need to review the records of the prisoners with whom he speaks, in an area that provides auditory privacy.

Dr. Stewart will also need to speak with staff from the categories upon which we have agreed:

> Medical and mental health treatment staff
> Custody staff responsible for the day-to-day operation of the isolation units and the mental health units
> Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

*See* April 15, 2013 letter from David Fathi (setting forth categories); July 2, 2013 letter from Ashlee Fletcher ("Defendants will designate individuals pursuant to the categories provided in David Fathi's April 15, 2013 letter").

Dr. Stewart will need to observe the mental health treatment programs described in Defendants' Response to Plaintiff Wells' First Set of Interrogatories. He will need to observe a medication pass in each complex. He will need to observe a telemedicine psychiatry session at these facilities, and all other facilities that use telemedicine for psychiatry. He may also review HNRs, grievances, and incident reports on an as-needed basis.

Finally, in addition to cellfront interviews, Dr. Stewart will need to speak with the following prisoners. Except where indicated, he will begin with a cellfront interview, but may then need to speak with the prisoner in a confidential setting.

**Perryville**



AMERICAN CIVIL LIBERTIES
UNION FOUNDATION



It is acceptable to hold the interviews with the named plaintiffs in a confidential room at the plaintiffs' living units, as Dr. Stewart needs to see each plaintiff's housing unit as well.

**Phoenix**



AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Please let us know immediately if you object to any aspect of the inspections outlined above.

Very truly yours,

David C. Fathi

Cc:     All counsel of record

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



## BY EMAIL TRANSMISSION ONLY

July 18, 2013

Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, AZ  85226

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

**Re:**   **Parsons v. Ryan**
**Dr. Stewart's tours of Lewis and Yuma**

Dear Counsel:

I write regarding Dr. Stewart's expert inspection tours of ASPC-Lewis (July 22) and ASPC-Yuma (July 23).  In response to Ms. Fletcher's query, both tours will last from 8 a.m. to 5 p.m.

Dr. Stewart will need to visit the following units:

## Lewis

-Rast Max
-Rast Close
-Health Unit
-Stiner, Morey, and Bachman Detention
-Housing units where named plaintiffs are housed (Joshua Polson, 187716, and Stephen Swartz, 102486)
-Exercise areas
-Any other areas where prisoners are housed on mental health or suicide watch, or for any other mental health purposes

## Yuma

-Dakota Close
-Dakota Detention
-Yuma CDU
-Exercise areas
-Any other areas where prisoners are housed on mental health or suicide watch, or for any other mental health purposes

At each complex, Dr. Stewart will need to follow the path of a hypothetical arriving prisoner with mental health needs, through screening, evaluation, referral for medications, follow up care and facilities for "inpatient" level care.

1

In all of the units he visits, Dr. Stewart will need to talk with prisoners at cellfront, and then conduct additional interviews with some of them in a setting that provides confidentiality. He will need to review the records of the prisoners with whom he speaks. He will need to do this in an area that provides auditory privacy – that is, an area in which his conversation with plaintiffs' counsel cannot be overheard by others in the room.

Dr. Stewart will also need to speak with staff from the categories upon which we have agreed:

> Medical and mental health treatment staff
> Custody staff responsible for the day-to-day operation of the isolation units and the mental health units
> Administrators (e.g., Warden, Deputy Warden, Major, Captain, shift commander)

*See* April 15, 2013 letter from David Fathi (setting forth categories); July 2, 2013 letter from Ashlee Fletcher ("Defendants will designate individuals pursuant to the categories provided in David Fathi's April 15, 2013 letter").

Dr. Stewart will need to observe the mental health treatment programs described in Defendants' Response to Plaintiff Wells' First Set of Interrogatories. He will need to observe a medication pass in each complex. He will need to observe a telemedicine psychiatry session at these facilities, and all other facilities that use telemedicine for psychiatry. He may also review HNRs, grievances, and incident reports on an as-needed basis.

Finally, in addition to cellfront interviews, Dr. Stewart will need to speak with the following prisoners. Except where indicated, he will begin with a cellfront interview, but may then need to speak with the prisoner in a confidential setting.

### Lewis



AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

2



AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

It is acceptable to hold the interviews with the named plaintiffs in a confidential room at the plaintiffs' living units, as Dr. Stewart needs to see each plaintiff's housing unit as well.

**Yuma**

3



Please let us know immediately if you object to any aspect of the inspections outlined above.

Very truly yours,

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

David C. Fathi

Cc:     All counsel of record

4



**PRISON LAW OFFICE**

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

July 20, 2013

Ms. Ashlee Fletcher, Esq.
Struck, Wieneke & Love
3100 West Ray Road, Suite 300
Chandler, Arizona 85226
afletcher@swlfirm.com

RE:   *Parsons v. Ryan*
      Expert tours of Dr. Todd Wilcox, July 29-Aug. 2, 2013
      ASPC-Phoenix, ASPC-Perryville, ASPC-Yuma

Dear Ms. Fletcher and Counsel,

I write regarding Dr. Wilcox's upcoming expert tours. He and attorney Sara Norman will be touring the Phoenix, Perryville, and Yuma prisons July 29, July 30-31, and Aug. 1-2, respectively. All tours will last from 8:00 am to 5 p.m. Ms. Norman and Dr. Wilcox will report to the administrative/ warden's office each morning. Don Specter's June 19, 2013 letter offered an overview of what the medical experts planned to do on his tours, below more specific detail is outlined below as to how he plans to spend each day. These tours will follow a similar structure as those of Dr. Cohen at Lewis and Eyman prisons last week, except at Phoenix it will be compressed into one day.

Dr. Wilcox would like to begin by speaking with the Facility Health Administrator or Medical Director to get an overview of the complex and its various clinical/medical areas. He would like to tour the medical clinic spaces on each unit, the central medical unit and infirmary, and the pharmacy. He will want to speak to designated clinical staff and someone from the pharmacy. We have previously agreed that a designee from each category of health care staff be available to answer questions. *See* April 15, 2013 letter from David Fathi (setting forth categories); July 2, 2013 letter from Ashlee Fletcher ("Defendants will designate individuals pursuant to the categories provided in David Fathi's April 15, 2013 letter").

Dr. Wilcox will also want to see housing units while touring all prison facilities, and be able to speak confidentially cell-front to random prisoners. He also wants to have a brief confidential meeting with any named plaintiffs. It is acceptable to have these meetings in a confidential room at the plaintiffs' living units, as he wants to see each named plaintiffs' housing unit as well. These interviews with our clients will take no more than ten minutes each.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Ms. Ashlee Fletcher
July 11, 2013
Page 2

There is one named plaintiff currently housed at ASPC-Phoenix, who he will want to visit and speak to on July 29:

- ███████████████████████████████████

There are five named plaintiffs currently housed at ASPC-Perryville, who he will want to visit and speak to on July 30:

- ████████████████████████████████████████
- ████████████████████████████████████████
- ████████████████████████████████████████
- ████████████████████████████████████████
- ████████████████████████████████████████

After his walking tour on the first day at each prison, Dr. Wilcox would like to review the medical charts of the prisoners listed below. He asks that all charts be available for him on the first day of the tour. Similar to Dr. Cohen's tour, he may request that he be provided the charts of some of the individuals he speaks to while touring the living units in the morning.

When he is at Perryville, Dr. Wilcox would like to review the medical files of all pregnant prisoners. **However, we were unable to identify these prisoners by name because the Monitored Conditions Report dated 3/12/13 produced to Plaintiffs (ADC095053-95081) lists no pregnant prisoners. We request that he be provided the names and medical files of all pregnant women.**

Based upon the things found in the record review at Perryville and Yuma, he *may* want to speak to a few prisoners on the second day. He would pick those prisoners – if any – on the first day of the tour based upon initial chart review, and give those names to staff. He will spend the majority of the second day of his tours at Perryville and Yuma reviewing files and visiting any areas where he was unable to go on the first day, and may have follow up questions regarding individual cases for the medical director, nursing director, or pharmacy director, depending upon what he finds in the prisoners' files.

Phoenix Medical Charts to Review July 29
Named Plaintiffs

- ███████████████████████████

Prisoners Who Have Died in the Past 12 Months

- ███████████████████████████
- ███████████████████████████
- ███████████████████████████

Class Members

- ███████████████████████████
- ███████████████████████████
- ███████████████████████████
- ███████████████████████████



<u>Perryville Medical Charts to Review July 30-31</u>
Named Plaintiffs



Prisoners Who Have Died in the Past 12 Months



Class Members
    All pregnant prisoners (see page 2) and



Ms. Ashlee Fletcher
July 11, 2013
Page 4



<u>Yuma Medical Charts to Review August 1-2</u>
Prisoners Who Have Died in the Past 12 Months

Ms. Ashlee Fletcher
July 11, 2013
Page 5

Class Members



Ms. Ashlee Fletcher
July 11, 2013
Page 6

Please let Sara Norman know immediately if you object to any aspect of the inspections outlined above.

Sincerely yours,

/s/ Corene Kendrick

Corene Kendrick, Staff Attorney

cc:    Counsel of Record
       Dr. Wilcox

**EXHIBIT 4**

**EXHIBIT 4**

███████████

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

- - - - -

VICTOR PARSONS; SHAWN      )
JENSEN; STEPHEN SWARTZ;    )
DUSTIN BRISLAN; SONIA      )
RODRIGUEZ; CHRISTINA       )
VERDUZCO; JACKIE THOMAS;   )
JEREMY SMITH; ROBERT       )
GAMEZ; MARYANNE CHISHOLM;  )
DESIREE LICCI; JOSEPH      )
HEFNER; JOSHUA POLSON;     )
and CHARLOTTE WELLS, on    )
behalf of themselves and   )
all others similarly       )
situated; and ARIZONA      )
CENTER FOR DISABILITY      )
LAW,                       )
                           )
          Plaintiffs,      )
                           )
     vs.                   ) No. CV 12-00601-PHX-NVW
                           ) (MEA)
CHARLES RYAN, DIRECTOR,    )
ARIZONA DEPARTMENT OF      )
CORRECTIONS; and RICHARD   )
PRATT, INTERIM DIVISION    )
DIRECTOR, DIVISION OF      )
HEALTH SERVICES, ARIZONA   )
DEPARTMENT OF              )
CORRECTIONS, in their      )
official capacities,       )
                           )
          Defendants.      )

- - - - -

DEPOSITION OF ████████████
May 21, 2013
Pittsburgh, PA

Reported By: Michelle Hall

Job No: 61602

1      ████████████

2          A.     I'm the project operations director

3      in Illinois.

4          Q.     And how long have you held that

5      position?

6          A.     I have held that position since the

7      end of April, approximately.

8          Q.     Of this --

9          A.     2013.

10         Q.     And what are your duties in that

11     position?

12         A.     I have various duties.  I assist the

13     vice president of operations in Illinois with

14     special projects and tasks.

15         Q.     And what was your position with

16     Wexford before the current one?

17         A.     I was the director of operations for

18     the State of Arizona.

19         Q.     And what dates did you hold that

20     position?

21         A.     I held that position from June 4,

22     2012, until, as I stated, recently, April 2013.

23         Q.     And what were your duties in that

24     position?

25         A.     I was responsible for overseeing all

1    ████████████

2    of the operational aspects of our business in

3    the State of Arizona.

4         Q.    So you oversaw the contract with the

5    Arizona Department of Corrections?

6         A.    Yes.

7         Q.    Did you also oversee the contract

8    with Yavapai County?

9         A.    No.

10        Q.    So only the ADC contract?

11        A.    Correct.

12        Q.    Before the Arizona position, have

13   you held any other positions with Wexford?

14        A.    Yes.

15        Q.    Can you describe those, please.

16        A.    Sure.  I was a regional

17   administrator beginning in October of 2007 in

18   the State of Illinois for the Department of

19   Corrections contract.  I held that position

20   until I was promoted to the director of

21   operations for Arizona in June of 2012.

22        Q.    And did you have any positions with

23   Wexford before the Illinois position that you

24   took in 2007?

25        A.    No.

1   ███████████████

2   order to investigate in the future if a med had

3   been administered.

4       Q.    Now, the issue you mentioned of KOP

5   meds not being tracked on the MAR, was that at

6   selected facilities or was that systemwide?

7       A.    It was a systemic issue.

8               MR. BOJANOWSKI:  Same

9   objection.

10              THE WITNESS:  I'm sorry.

11              MS. BLAIR:  That's okay.

12      Q.    And was that problem fixed by the

13  time Wexford -- the contract ended?

14              MR. BOJANOWSKI:  Same

15  objection.

16      A.    I believe that it was almost 100

17  percent fixed.  We had placed KOP medications

18  on the MARs through our pharmacy, Diamond

19  Pharmacy.

20      Q.    So as of March 3 of 2013, the

21  problem was -- I don't want to put words in

22  your mouth.  What did you say?

23      A.    What I will say is that it was

24  almost 100 percent fixed.  If a prescription

25  was written towards the end of the month after

1          ██████████████

2     at which -- let me begin again.

3               Was this a systemwide problem or

4     only at a few facilities?

5               MR. BOJANOWSKI:  Form.

6     Foundation.

7          A.   Again, seven of the ten facilities

8     did not utilize the IHAS system.

9          Q.   And was this problem fixed by the

10    end of the contract in March 2013?

11              MR. BOJANOWSKI:  Same

12    objection.

13         A.   Not all ten facilities were

14    utilizing the IHAS system.  Approximately nine

15    of the ten facilities were utilizing IHAS when

16    Wexford exited the contract.

17         Q.   Which was the one that was not?

18         A.   Lewis.

19         Q.   Any particular reason?

20              MR. BOJANOWSKI:  Form.

21    Foundation.

22         A.   In my opinion, there was resistance

23    from the staff at that particular facility, and

24    there was a lack of leadership on -- in the

25    site manager position.

1       █████████████

2       Q.      Was the site manager a Wexford

3  employee or an ADC employee?

4       A.      He was a Wexford employee that we

5  consequently placed on suspension prior to the

6  end of the contract and did not bring back.

7       Q.      And what was that person's name?

8       A.      His name was ████████████.

9       Q.      Same name as the facility?

10      A.      Yes.

11      Q.      And then you mentioned there was

12 staff resistance.  Can you tell me a little bit

13 more about that.

14                      MR. BOJANOWSKI:  Form.

15 Foundation.

16      A.      When our staff went out to train on

17 the IHAS system, many of the nurses complained

18 that they simply didn't have the time to do the

19 entry into the IHAS system.

20      Q.      Now, the next issue you mentioned

21 was at the Lewis facility, there was looseleaf

22 filing and full charts that had not been filed

23 for one to two years; is that correct?

24      A.      Yes.

25      Q.      And this is at the time that Wexford

1
2    took over July 1, 2012; correct?

3         A.    Yes.

4         Q.    Can you tell me a little bit more

5    about that.

6         A.    I can only tell you that it was an

7    immense amount of paperwork, both looseleaf and

8    old charts that should have been sent to the

9    archive.  We brought on additional staff in

10   order to clean up the problem, and we did have

11   it corrected before we exited the contract in

12   March.

13        Q.    And why is unfiled filing and charts

14   significant from an operational perspective?

15                    MR. BOJANOWSKI:   Form.

16   Foundation.

17        A.    From a perspective of looseleaf

18   filing for current charts, it could be a lab

19   result that would be essential for a provider

20   to make a health care decision.  If it's an

21   archive chart, it could come to a problem with

22   an attorney's office or the disability

23   department asking for copies of records in

24   order for a case or to establish disability

25   eligibility.  And if the chart is sitting there

1          ███████████

2    approval of the consult.  So they were in

3    various states.

4         Q.    And was this a situation at one or

5    two facilities, or was this systemwide?

6                   MR. BOJANOWSKI:  Form.

7    Foundation.

8         A.    I would have to defer to Dr. ██████

9    for that information.  I think that he would be

10   better able to give you the specific

11   information you're looking for.  I'm unsure of

12   the answer.

13        Q.    Okay.  That's fine.

14              And was this problem fixed by the

15   end of the Wexford contract?

16                   MR. BOJANOWSKI:  Same

17   objection.

18        A.    The backlog of consults that existed

19   on July 1, 2012, were all caught up, yes.

20        Q.    Did there remain other backlog

21   consults at the time of the end of the Wexford

22   contract?

23                   MR. BOJANOWSKI:  Same

24   objection.

25                   MS. BLAIR:  Join.

1 ████████████████

2     A.     I don't believe that it was all ten

3 facilities, to my recollection, but I -- but I

4 don't recall the exact number.  It was a

5 majority of the facilities, I would say.

6     Q.     And why is this situation

7 significant from an operational perspective?

8               MR. BOJANOWSKI:  Same

9 objection.

10     A.     It can be significant for several

11 reasons.  Grievances are written for a plethora

12 of reasons.  It could be that they're upset

13 with the health care that they were provided;

14 it could be that they put in a health needs

15 request and they haven't yet been seen; it

16 could be that they're having trouble with a

17 particular staff member, and sometimes that may

18 be health care, sometimes it's security.  But

19 it's information that's vital in making health

20 care decisions for that patient's well-being.

21     Q.     And had this been fixed by the end

22 of the Wexford contract?

23               MR. BOJANOWSKI:  Form.

24 Foundation.

25     A.     We did not have -- Wexford did not

1         ███████████

2    have a backlog of grievances when we left the

3    contract.

4         Q.    How about inmate letters?

5         A.    Not to my knowledge, we did not.

6         Q.    The next issue you mentioned was,

7    and please correct me if I state this

8    incorrectly, that there were supposed to be 50

9    infirmary beds at Tucson, and the actual number

10   was less than half of that; is that correct?

11        A.    I think I said approximately 50 beds

12   were supposed to be available for our

13   utilization.

14        Q.    And when you say approximately 50

15   beds were supposed to be available, how had

16   that been conveyed to Wexford?

17        A.    That was information that was

18   contained in the RFP that later became the

19   contract.

20        Q.    And by the time the Wexford contract

21   ended, how many infirmary beds were there at

22   Tucson?

23        A.    Less than 30.  I don't recall the

24   exact number.

25        Q.    And why is that significant from an

1 ███████████

2 at all.

3    Q.    And why is this sort of thing

4 significant from an operational standpoint?

5              MR. BOJANOWSKI:  Form.

6 Foundation.

7    A.    Well, obviously, our folks were

8 there for either auditing purposes or training

9 purposes.  If you can't get in, obviously, you

10 can't provide the service.

11    Q.    Had this problem been fixed by the

12 end of the contract?

13              MR. BOJANOWSKI:  Form.

14 Foundation.

15    A.    I would say yes.

16    Q.    I think I skipped one.  You

17 mentioned employee adherence to time and

18 attendance was, I guess, not ideal.  Could you

19 tell me about that.

20    A.    My understanding of the time and

21 attendance prior to Wexford's taking over the

22 contract July 1 was that they were almost on I

23 would liken it to an honor system.  They filled

24 out a paper time sheet and had a supervisor

25 sign off on it.

1       ████████████

2               We placed them on a biometric clock

3       where they had to use their thumbprint in order

4       to log in and log out of the facility.

5       Apparently, ADC allowed staff to flex time.

6       Wexford, that's not our policy; we don't allow

7       for flex time.

8               There was just a different general

9       view from the staff of how to adhere to time

10      and attendance when Wexford took over.  It was

11      very difficult to maintain time and attendance

12      and enforce our rules because they had had such

13      a different view of it with ADC.

14          Q.   And how did your learn what the

15      situation had been at ADC before Wexford took

16      over?

17          A.    We gained most of that information

18      from site managers that we hired who had been

19      in other capacities with ADC, or directly from

20      staff themselves.  Many of them were very

21      disgruntled when we told them that we were

22      going to put the biometric clock in.

23          Q.   Once Wexford took over and went to

24      the biometric clock, were there problems with

25      time and attendance?

Page 57

1          ████████████████

2                    MR. BOJANOWSKI:   Form.

3     Foundation.

4          A.    I think any large company

5     experiences problems.  I think you're always

6     going to have those few individuals, and I will

7     say that we experienced some instances of

8     employees that, you know, we dealt with either

9     through our discipline process or coaching and

10    counseling.

11         Q.    But what I'm wondering is perhaps,

12    especially in the first period after the system

13    changed, were there problems with time and

14    attendance of employees?

15                    MR. BOJANOWSKI:   Form.

16    Foundation.

17         A.    I recall that there were some

18    employees that we did have to work aggressively

19    with because of time and attendance issues in

20    the first two to three months of the contract.

21         Q.    And were those employees all

22    clustered at one or two facilities, or were

23    they sprinkled throughout the system?

24                    MR. BOJANOWSKI:   Same

25    objection.

1　　　　　　　　███████████████

2　are from 0 to 5, and it indicates their acuity

3　of care level.  So an MH3 is typically a

4　patient who is on a direct observe psychotropic

5　medication.

6　　　　Q.　　Did you -- thank you.  Did you

7　discuss constitutional requirements at all?

8　　　　　　　　　MR. BOJANOWSKI:  Form.

9　Foundation.

10　　　　　　　　　MS. BLAIR:  Form.

11　　　　A.　　When I look at that term, that was a

12　term that we came up with as a group, and I

13　looked at it more from an industry standard

14　perspective versus from a legal constitutional

15　requirement because, obviously, I'm not a legal

16　expert, I can't give legal definition of those

17　words.  But for me, it was more from a

18　consistent with what we see across our book of

19　business, what we know to be the standards.

20　　　　Q.　　Okay.  And I'm just asking as an

21　historical matter, did you say anything about

22　constitutional requirements while this slide

23　was being shown?

24　　　　A.　　I think other than just reading the

25　words off the slide, no.

1              ████████████

2   to the Freedom of Information Act, and so they

3   respond, and whereas I pointed out that Wexford

4   was not regulated by the Freedom of Information

5   Act, and to that reason, we had differing

6   philosophies of how to respond to requests for

7   information from the media.

8       Q.    Anything else on this slide?

9       A.    No.

10      Q.    Okay.  Would you turn to Page

11   Wexford 129, please, or actually Wexford 130.

12   This slide is titled "In summary, the current

13   class action lawsuits are accurate.  Now, what

14   are we going to do about it?"  What did you say

15   about this slide?

16            MR. BOJANOWSKI:  Form.

17   Foundation.

18      A.    That's exactly what I said was

19   exactly the verbiage that was on there.  This

20   statement was made by Dr. █████ during his --

21   Dr. █████ and Dr. █████ -- during their

22   presentation.  I summarized our entire

23   presentation with this statement.  And then

24   this is where we were to go into our planning

25   session.  So that was all that was said on the

1            ███████████████

2 slide was exactly what this slide reads.

3     Q.    And when you say the current class

4 action lawsuits, which are you referring to?

5               MR. BOJANOWSKI:  Form.

6 Foundation.

7               MS. BLAIR:  Join.

8     A.    I believe that Dr. █████ was

9 referring to the ACLU lawsuit.

10     Q.    This lawsuit in which we're taking

11 your deposition?

12     A.    Yes.  That's correct.

13     Q.    Okay.  Wexford 131 is a slide titled

14 "Proposed solutions."  Well, let me back up a

15 step.  Immediately after you presented the

16 slide on Wexford 130, did the meeting continue,

17 or was that the end of the meeting?

18     A.    No, the meeting did continue.

19     Q.    Okay.  So what happened after that?

20     A.    I don't recall if that's the point

21 at which █████ and █████ and Director

22 █████ and █████ took a brief intermission

23 and met and then we came back and did the

24 proposed solutions, or if we did that

25 immediately following this particular -- the

**EXHIBIT 5 (part 1)**

**EXHIBIT 5 (part 1)**

**April 2013 DOUGLAS COMPLEX**

| | Intake  (Q) | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Is a physical examination completed by a medical provider by day two (Business Day)(2) of the intake process? Alhambra, Perryville, Tucson Minors only | X | | | 4/8/2013 10:43 AM Entered By: ▇ <br><br>Not an intake facility <br><br>4/8/2013 10:42 AM Entered By: ▇ <br><br>Not an intake facility. | 2 |
| 2 | Is a mental health assessment completed by a mental health practitioner by day two (Business Day) (2) of the intake process? Alhambra, Perryville, Tucson Minors only | X | | | 4/8/2013 10:43 AM Entered By: ▇ <br><br>Not an intake facility | 2 |

## April 2013 DOUGLAS COMPLEX

| Sick Call (Q) | | | | | | |
|---|---|---|---|---|---|---|
| | Performance Measure (Description) | Grn | Amb | Red | Notifications | Level |
| 1 | Is sick call being conducted five days a week Monday through Friday (excluding holidays)? | X | | | 4/15/2013 10:12 AM Entered By: ▮▮ | 1 |
| 2 | Are sick call inmates being seen within 24 hours of the HNR being triaged (or immediately if inmate is identified with emergent medical needs)? | X | | | 4/15/2013 10:12 AM Entered By: ▮▮ | 1 |
| 3 | Are vitals signs, to include weight, being checked and documented each time an inmate is seen during sick call? | X | | | 4/15/2013 10:12 AM Entered By: ▮▮ | 1 |
| 4 | Is the SOAPE format being utilized in the inmate medical record for encounters? | X | | | 4/15/2013 10:13 AM Entered By: ▮▮ New provider, PA, neens to be instructed to include E (education) in the SOAPE notes. | 1 |
| 5 | Are referrals to providers from sick call being seen within seven (7) days? | X | | | 4/15/2013 10:14 AM Entered By: ▮▮ | 1 |
| 6 | Are nursing protocols in place and utilized by the nurses for sick call? | X | | | 4/15/2013 10:14 AM Entered By: ▮▮ | 1 |

## April 2013 DOUGLAS COMPLEX

| | Medical Specialty Consultations (Q) | | | | | |
|---|---|---|---|---|---|---|
| | Performance Measure (Description) | Grn | Amb | Red | Notifications | Level |
| 1 | Are urgent consultations being scheduled to be seen within thirty (30) days of the consultation being initiated? | X | | | 4/30/2013 6:46 PM Entered By: ▇▇▇ | 2 |
| 2 | Are consultation reports being reviewed by the provider within seven (7) days of receipt? | X | | | 4/30/2013 6:46 PM Entered By: ▇▇▇ | 2 |
| 3 | Is the utilization and availability of off-site services appropriate to meet medical, dental and mental health needs? | X | | | 4/30/2013 6:46 PM Entered By: ▇▇▇ | 3 |
| 4 | Are the emergent medical needs of the inmates appropriate and emergent transports ordered in a timely manner? | X | | | 4/30/2013 6:46 PM Entered By: ▇▇▇ | 2 |
| 5 | Do all inpatient admissions have documented utilization review of admission and evidence of discharge planning? | X | | | 4/30/2013 6:46 PM Entered By: ▇▇▇ | 2 |

**April 2013 DOUGLAS COMPLEX**



| | Chronic Condition and Disease Management (Q) | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Are treatment plans developed and documented in the medical record by a provider within thirty (30) days of identification that the inmate has a CC? | X | | | 4/26/2013 4:43 PM Entered By: ▓▓▓ <br><br> 4/5/2013 1:15 PM Entered By: ▓▓▓ <br><br> Treatment plans are developed in the medical reocrd by a provider within time frame indicated | 1 |
| 2 | Are CC inmates being seen by the provider (every three (3) to six (6) months) as specified in the inmate's treatment plan? | | X | | 4/26/2013 4:48 PM Entered By: ▓▓▓ <br><br> Eggers Unit: ▓▓▓ HTN Seen6/12, due 8/12 past due <br> Papago Unit: ▓▓▓ Asthma seen 11/12, due 3/13 past due <br> ▓▓▓ HTN seen 9/12, due 3/13 <br> ▓▓▓ DM type 2 seen 10/12, due date not indicated <br> ▓▓▓ HTN, seen 12/12, due date not indicated <br><br> 4/5/2013 1:20 PM Entered By: ▓▓▓ <br><br> Mohave Unit: <br> ▓▓▓ - Asthma, due 1/13, past due <br> ▓▓▓ - Seizures, due 10/12, past due <br> ▓▓▓ - HTN, due 2/13, past due <br> Gila Unit: <br> ▓▓▓ Asthma, due 2/13, past due <br> ▓▓▓ - Seizures, due 11/12, past due <br> ▓▓▓ - HTN, due 9/12, past due | 2 |
| 3 | Are CC/DM inmates being provided coaching and education about their condition / disease and is it documented in the medical record? | | X | | 4/26/2013 4:51 PM Entered By: ▓▓▓ <br><br> Eggers Unit: <br> ▓▓▓ education is not documented <br> ▓▓▓ education is not documented <br> Papago Unit: <br> ▓▓▓ Education is not documented <br> ▓▓▓ education is not documented <br> ▓▓▓ education is not documented <br> ▓▓▓ education is not documented <br><br> 4/5/2013 1:23 PM Entered By: ▓▓▓ <br><br> Mohave Unit: <br> ▓▓▓ Education is not documented <br> ▓▓▓ Education is not | 1 |

## April 2013 DOUGLAS COMPLEX



| | | | | | |
|---|---|---|---|---|---|
| | | | | documented  ____ Education is not documented  Gila Unit:  ____ Education is not documented  ____ Education is not documented | |
| 4 | Have disease management guidelines been developed and implemented for Chronic Disease or other conditions not classified as CC? | X | | 4/5/2013 1:24 PM Entered By: ____  Disease management guidelines have been developed and imlemented for Chronic Dsease and other disease processes.  4/30/2013 6:47 PM Entered By: ____ | 2 |
| 5 | Has the contractor submitted his/her quarterly guideline audit results by the 15th day following the end of the reporting quarter? | | X | 4/26/2013 4:53 PM Entered By: ____  This should be green, report is not due at this time.  4/5/2013 1:36 PM Entered By: ____  Report is due this Month | 2 |



### Corrective Action Plans for PerformanceMeasure: Chronic Condition and Disease Management (Q)

**2  Are CC inmates being seen by the provider (every three (3) to six (6) months) as specified in the inmate's treatment plan?**
Level 2 Amber User: ____          Date: 4/26/2013 4:48:09 PM

**3  Are CC/DM inmates being provided coaching and education about their condition / disease and is it documented in the medical record?**
Level 1 Amber User: ____          Date: 4/26/2013 4:51:11 PM

**5  Has the contractor submitted his/her quarterly guideline audit results by the 15th day following the end of the reporting quarter?**
Level 2 Amber User: ____          Date: 4/26/2013 4:53:19 PM

## April 2013 DOUGLAS COMPLEX

| | **Medical Records (Q))** | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Are medical records current, accurate and chronologically maintained with all documents filed in the designated location? | X | | | 4/15/2013 10:08 AM Entered By: ▮ | 1 |
| 2 | Are provider (physician, mid-levels) orders taken off (noted) daily annotated with time, date and name of person taking the orders off? | X | | | 4/15/2013 10:08 AM Entered By: ▮ | 1 |
| 3 | Does the Medication Administration Record (MAR) in the medical chart reflect dose, route, frequency, start date and nurse's signature? | X | | | 4/15/2013 10:08 AM Entered By: ▮ | 1 |
| 4 | Are medical record entries legible, complete with time, name stamp and signature present? | X | | | 4/15/2013 10:10 AM Entered By: ▮ The new provider (PA) needs a name stamp or needs to print name along with signature. | 1 |
| 5 | Are arrival logs maintained and kept current with name of inmate, ADC #, date of arrival, # of volumes? | X | | | 4/10/2013 3:50 PM Entered By: ▮ | 1 |
| 6 | Are departure logs maintained and kept current with name of the inmate, ADC #, unit being transferred to, date of departure, # of volumes? | X | | | 4/10/2013 3:50 PM Entered By: ▮ | 1 |
| 7 | Are previous volumes (old volumes) filed in a separate location (not with active files) and are easily accessible to obtain as needed? | X | | | 4/10/2013 3:50 PM Entered By: ▮ | 1 |
| 8 | Are medical records for released inmates pulled from the active file area? | X | | | 4/10/2013 3:50 PM Entered By: ▮ | 1 |
| 9 | Are requested medical records received from archives upon an inmates return to ADC being merged with newly established medical records since inmates return to ADC? | X | | | 4/10/2013 3:50 PM Entered By: ▮ | 1 |
| 10 | Is a Release of Information log that reflects the Medical Records Requests for copies of the inmate's medical records from 3rd parties (attorney and family requests only)? | X | | | 4/10/2013 3:50 PM Entered By: ▮ | 1 |

## April 2013 DOUGLAS COMPLEX

| | Prescribing Practices and Pharmacy (Q) | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Are recommendations made by the Pharmacy and Therapeutics Committee appropriately enacted? | X | | | 4/26/2013 10:30 AM Entered By: ▮▮ | 2 |
| 2 | Are pharmacy polices, procedures forms, (including non-formulary requests) being followed? | | X | | 4/26/2013 10:12 AM Entered By: ▮▮  HSTM 4.1.6  1. Amber – will remain amber until a written corrective action plan is received and implemented at each Complex Site by Corizon Health.  A) HSTM 4.1.6 Non-Formulary Drug Requests: A written Action Plan is required from ▮▮, Regional Director of Nursing, Corizon, to ensure that requests for necessary non-formulary medications at each Complex Site, are received by inmate patients in a timely manner. Providers will need to provide formulary medication, if needed, to provide continuity of care while the NFDR is being processed. This Action Plan requires documented follow-up from Corizon staff that identified medications have been approved or denied and if denied, an appropriate therapy is instituted so that patient will not go without medication during the approval/denial process.  a. April 2013 NFDR Stop Date Reports indicates:  i. 1583 Non-formulary drugs expiring for 1270 patients  B) HSTM 4.1.1 Pharmaceutical Dispensing Procedures: A written Action Plan is required from ▮▮, Regional Director of Nursing, Corizon, to ensure that all prescriptions are dispensed in a timely manner so as not to contribute to morbidity or mortality and so that the inmate population receive continuity of care. This Action Plan requires documented follow-up from Corizon staff assuring expiring medications at each Complex Site are renewed before expiration date.  a. April 2013 Discontinued (Expired) Medication Report indicates:  i. 2766 Expired medications expiring for 1721 patients | 2 |
| 3 | Are all medications being prescribed in the therapeutic ranges as determined by the most current editions of the "Drug Facts and Comparisons" or the packet insert? | X | | | 4/26/2013 10:12 AM Entered By: ▮▮ | 1 |

**April 2013 DOUGLAS COMPLEX**

**Corrective Action Plans for PerformanceMeasure: Prescribing Practices and Pharmacy (Q)**

**2  Are pharmacy polices, procedures forms, (including non-formulary requests) being followed?**

**Level 2 Amber User:** ▇▇▇▇▇▇▇▇  **Date: 4/26/2013 10:12:30 AM**

**April 2013 DOUGLAS COMPLEX**

| Reporting (AIMS) (Medical Records)(Q) | | | | | | |
|---|---|---|---|---|---|---|
| | Performance Measure (Description) | Grn | Amb | Red | Notifications | Level |
| 1 | Are medical AIMS entries being made timely, completely, accurately and no greater than 3 work days from the entry in the medical record? | X | | | 4/15/2013 10:11 AM Entered By: ▮▮ | 1 |

## April 2013 DOUGLAS COMPLEX

| | Grievances (Q) | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Are grievances being responded to within fifteen (15) working days of receipt per Department Order 802? | X | | | 4/4/2013 1:20 PM Entered By: ███ <br><br> I reviewed 10 grievances at Mohave, 9 at Gila,2 at Eggers No grievances at Papago. All were within policy time frames. | 2 |

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC088805

**April 2013 DOUGLAS COMPLEX**

| | No Shows (Q) | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Are medical, dental and mental health line "no-shows" being reported and documented per policy, Department Order 1101? | X | | | 4/8/2013 10:44 AM Entered By: ▮ | 1 |

## April 2013 DOUGLAS COMPLEX

| | Mental Health (Q) | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Are all Health Needs Requests (HNR), for mental health services, being triaged within 24 hours (24) of receipt by a qualified mental health professional? | X | | | 4/30/2013 8:38 AM Entered By: ▓ | 1 |
| 2 | Are inmates referred to a psychiatric provider, from a sick call visit or other encounter, for routine services occurring within seven days of referral request? | X | | | 4/30/2013 8:38 AM Entered By: ▓ | 1 |
| 3 | Are mental health treatment plans being reviewed, at a minimum of 90 days, by the mental health treatment team for Seriously Mentally Ill (SMI) inmates? D.O. 1103, 1103.08 1.5 dtd 1/11/2013 | X | | | 4/30/2013 8:38 AM Entered By: ▓ <br> No SMI's housed at this facility. | 2 |
| 4 | Are inmates prescribed psychotropic medication seen face to face by a nurse every thirty days? | X | | | 4/30/2013 8:39 AM Entered By: ▓ <br> No SMI's housed at this facility. | 1 |
| 5 | Are inmates that are seen every thirty (30) days by the psychiatric nurse and are assessed to be unstable on their current medication referred to and evaluated by a psychiatrist or psychiatry certified nurse practitioner? | X | | | 4/30/2013 8:39 AM Entered By: ▓ <br> No SMI's housed at this facility. | 1 |
| 6 | Are inmates being prescribed psychotropic medication being seen by a psychiatrist or psychiatry certified nurse practitioner every three (3) months? | X | | | 4/30/2013 8:39 AM Entered By: ▓ <br> No SMI's housed at this facility. | 1 |
| 7 | Are discharge plans being established for SMI inmates within 90, 60 and 30 days of release from prison? | X | | | 4/30/2013 8:39 AM Entered By: ▓ <br> No SMI's housed at this facility. | 2 |
| 8 | Is the primary counselor establishing a mental health treatment plan within 72 hours of the SMI inmate arrival to the facility? D.O. 1103 - 1103.08, 1.1.1. dtd 1/11/2013 | X | | | 4/30/2013 8:40 AM Entered By: ▓ <br> No SMI's housed at this facility. | 2 |
| 9 | Are master mental health treatment plans being developed by the mental health treatment team within 30 days of an inmate being assessed as SMI? D.O. 1103, 1103.08 1.2.1 dtd 1/11/2013 | X | | | 4/30/2013 8:40 AM Entered By: ▓ <br> No SMI's housed at this facility. | 2 |

**April 2013 DOUGLAS COMPLEX**

| | Quality and PEER Review (Q) | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Is the contractor physician conducting monthly and quarterly chart reviews? | | X | | 4/10/2013 3:05 PM Entered By: ▇▇<br><br>As a Medical Director is not yet hired, this performance measure has not been completed. | 1 |
| 2 | Is contractor conducting monthly CQI committee meetings and meeting NCCHC standard? | | X | | 4/10/2013 3:07 PM Entered By: ▇▇<br><br>According to the FHA, direction from Corizon has not been provided on the format for CQI, therefore this performance measure has not been met. | 1 |
| 3 | Are CQI committee improvement recommendations acted on timely and progress reported back to committee in the next monthly meeting? | | X | | 4/10/2013 3:08 PM Entered By: ▇▇<br><br>This performance measure cannot be accomplished as the is currently no CQI process arrived at. | 1 |
| 4 | Is the contractor conducting annual PEER reviews for physicians, nurse practitioners, physician assistants, dentists, psychiatrists, psychiatric nurse practitioners and Phd. level psychologists? | X | | | 4/10/2013 3:09 PM Entered By: ▇▇<br><br>This performance measure is not due at this time. | 1 |
| 5 | Did the contractor conduct a quarterly on-site review of the site CQI program? | X | | | 4/10/2013 3:09 PM Entered By: ▇▇<br><br>This performance measure is not due at this time. | 1 |

| Corrective Action Plans for PerformanceMeasure: Quality and PEER Review (Q) |
|---|
| **1 Is the contractor physician conducting monthly and quarterly chart reviews?**<br>Level 1 Amber User: ▇▇▇▇   Date: 4/10/2013 3:05:53 PM |
| **2 Is contractor conducting monthly CQI committee meetings and meeting NCCHC standard?**<br>Level 1 Amber User: ▇▇▇▇   Date: 4/10/2013 3:07:24 PM |
| **3 Are CQI committee improvement recommendations acted on timely and progress reported back to committee in the next monthly meeting?**<br>Level 1 Amber User: ▇▇▇▇   Date: 4/10/2013 3:08:44 PM |

### April 2013 DOUGLAS COMPLEX

| | Medication Administration | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Is there a formal medication administration program? | X | | | 4/26/2013 5:00 PM Entered By: ▮ | 1 |
| 2 | Is the documentation of completed training and testing kept on file for staff who administer or deliver medications? | X | | | 4/30/2013 6:47 PM Entered By: ▮ | 1 |
| 3 | Is there a tracking system for KOP medications to determine if medications have been received by the inmate? | X | | | 4/26/2013 5:01 PM Entered By: ▮ <br><br> There is a process study in place for tracking of the KOP medication. | 1 |
| 4 | Are the Medciation Administration Records (MAR) being completed in accordance with standard nursing practices? | X | | | 4/26/2013 5:04 PM Entered By: ▮ <br><br> Papago Unit: ▮ , There is no Diagnosis on the MAR <br><br> 4/30/2013 6:47 PM Entered By: ▮ | 1 |
| 5 | Are medication errors forwarded to the FHA to review corrective action plan? | X | | | 4/30/2013 6:47 PM Entered By: ▮ | 2 |
| 6 | Are there any unreasonable delays in inmate receiving prescribed medications? | | X | | 4/26/2013 5:09 PM Entered By: ▮ <br><br> At the beginning of April month KOP medication was an issue. Pharmacy staff has developed a process to ensure this does not happen. | 2 |
| 7 | Are inmates being required to show ID prior to being administered their medications? | X | | | 4/26/2013 5:09 PM Entered By: ▮ | 2 |
| 8 | Are chronic condition medication expiration dates being reviewed prior to expiration to ensure continuity of care? | X | | | 4/30/2013 6:47 PM Entered By: ▮ | 2 |
| 9 | Are non-formulary requests being reviewed for approval or disapproval within 24 to 48 hours? | X | | | 4/26/2013 5:18 PM Entered By: ▮ <br><br> There is was not a process in place To track this process. A sheet was developed on 4/24/13. The pharmacy techs are discussin a procedure with Pharm-a-core to | 2 |

## April 2013 DOUGLAS COMPLEX



| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | populate a report to track the non-formulary medications, due dates etc.<br><br>4/30/2013 6:47 PM Entered By: ▉ | |
| 10 | Are providers being notified of non-formulary decssions within 24 to 48 hours? | X | | | 4/30/2013 6:47 PM Entered By: ▉<br>▉ | 2 |
| 11 | Are medication error reports being completed and medication errors documented? | X | | | 4/30/2013 6:48 PM Entered By: ▉<br>▉ | 2 |

**Corrective Action Plans for PerformanceMeasure: Medication Administration**

**6  Are there any unreasonable delays in inmate receiving prescribed medications?**
**Level 2 Amber User:** ▉          **Date: 4/26/2013 5:09:28 PM**

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER          ADC088810

### April 2013 DOUGLAS COMPLEX

| | Staffing | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Is there an approved staffing pattern available to the Site Manager (FHA)? | X | | | 4/10/2013 2:00 PM Entered By: ▉ | 1 |
| 2 | Are the adequacy and effectiveness of the staffing  assessed by the facility's sufficient to meet the needs of the inmate population? | X | | | 4/10/2013 1:39 PM Entered By: ▉ | 3 |
| 3 | Are all positions filled per contractor staffing pattern? | | X | | 4/10/2013 3:16 PM Entered By: ▉ <br><br> MEDICAL: <br> Since the inception of the contract, the Medical Director position has gone unfilled. According to the FHA, Dr. ▉ has been interviewed to fill this position and has just been cleared background investigation.  I am awaiting word from the FHA as to a start date. <br><br> DENTAL: <br> The second dentist position is being recruited by Corizon. | 2 |
| 4 | Is the Site Manager (FHA) kept infomed of recruiting efforts being taken to fill vacant positions by the corporate office? | X | | | 4/10/2013 3:16 PM Entered By: ▉ | 2 |



**Corrective Action Plans for PerformanceMeasure: Staffing**

**3  Are all positions filled per contractor staffing pattern?**
Level 2 Amber User: ▉         Date: 4/10/2013 3:16:09 PM

### April 2013 DOUGLAS COMPLEX

| | Infirmary Care | | | | | |
|---|---|---|---|---|---|---|
| | **Performance Measure (Description)** | **Grn** | **Amb** | **Red** | **Notifications** | **Level** |
| 1 | Does policy or post order define the specific scope of medical, psychiatric, and nursing care provided in the infirmary setting? | X | | | 4/4/2013 1:51 PM Entered By: ▇▇▇▇ <br><br>There is no infirmary at this Complex <br><br> 4/28/2013 1:58 PM Entered By: ▇▇▇▇ <br><br> N/A | 1 |
| 2 | Are patients always within sight or hearing of a qualified health care professional (do inmates have a method of calling the nurse?) | X | | | 4/4/2013 1:51 PM Entered By: ▇▇▇▇ <br><br>There is no infirmary at this Complex <br><br> 4/28/2013 1:58 PM Entered By: ▇▇▇▇ <br><br> N/A | 1 |
| 3 | Is the number of appropriate and sufficient qualified health professionals in the infirmary determined by the number of patients, severity of illnesses and level of care required? | X | | | 4/4/2013 1:52 PM Entered By: ▇▇▇▇ <br><br>There is no infirmary at this Complex <br><br> 4/28/2013 1:58 PM Entered By: ▇▇▇▇ <br><br> N/A | 1 |
| 4 | Is a supervising registered nurse in the IPC 24 hours a day? | X | | | 4/4/2013 1:52 PM Entered By: ▇▇▇▇ <br><br>There is no infimary at this Complex <br><br> 4/28/2013 1:58 PM Entered By: ▇▇▇▇ <br><br> N/A | 1 |
| 5 | Is the manual of nursing care procedures consistent with the state's nurse practice act and licensing requirements? | X | | | 4/4/2013 1:52 PM Entered By: ▇▇▇▇ <br><br>There is no infirmary at this Complex <br><br> 4/28/2013 1:58 PM Entered By: ▇▇▇▇ <br><br> N/A | 1 |
| 6 | Does admission to or discharge from infirmary care occur only on the order of physician or other provider where permitted by virtue of credentials and scope of practice? | X | | | 4/4/2013 1:53 PM Entered By: ▇▇▇▇ <br><br>There is no infirmary at this Complex <br><br> 4/28/2013 2:00 PM Entered By: ▇▇▇▇ | 1 |

CONFIDENTIAL INFORMATION - SUBJECT TO PROTECTIVE ORDER

**April 2013 DOUGLAS COMPLEX**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | N/A. No infirmary at this site. | |
| 7 | Is the frequency of physician and nursing rounds in the infirmary specified based on categories of care provided? | X | | | 4/4/2013 1:53 PM Entered By: ▉▉▉<br><br>There is no infirmary at this Complex<br><br>4/30/2013 6:50 PM Entered By: ▉▉▉<br><br>4/28/2013 2:00 PM Entered By: ▉▉▉<br><br>N/A. No infirmary at this site. | 1 |
| 8 | Is a complete inmate health record kept and include:<br>-Admitted order (admitting diagnosis, medications, diet, activity restrictions, required diagnostic tests, frequency of monitoring and follow-up<br>-Complete document of care and treatment given<br>-Medication administration record<br>-Discharge plan and discharge notes | X | | | 4/4/2013 1:54 PM Entered By: ▉▉▉<br><br>There is no infimary at this Complex<br><br>4/28/2013 2:00 PM Entered By: ▉▉▉<br><br>4/28/2013 2:00 PM Entered By: ▉▉▉<br><br>N/A. No infirmary at this site. | 1 |
| 9 | If inpatient record is different than outpatient record, is a copy of the discharge summary from the infirmary care placed in the patient's outpatient chart? | X | | | 4/5/2013 1:34 PM Entered By: ▉▉▉<br><br>There is no infirmary at this Complex | 1 |
| 10 | If an observation patient is placed by a qualified health care professional for longer than 24 hours, is this order being done only by a physician? | X | | | 4/5/2013 1:34 PM Entered By: ▉▉▉<br><br>There is no infirmary at this Complex | 1 |
| 11 | Are vital signs done daily when required? | X | | | 4/5/2013 1:34 PM Entered By: ▉▉▉<br><br>There is no infirmary at this Complex | 1 |
| 12 | Are there nursing care plans that are reviewed weekly and are signed and dated? | X | | | 4/5/2013 1:35 PM Entered By: ▉▉▉<br><br>There is no infirmary at this Complex | 1 |
| 13 | Are medications and supplies checked regularly, and who is assigned to do it? | X | | | 4/5/2013 1:35 PM Entered By: ▉▉▉<br><br>4/5/2013 1:35 PM Entered By: ▉▉▉<br><br>4/5/2013 1:35 PM Entered By: ▉▉▉<br><br>There is no infirmary at this Complex | 1 |