UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **Victor Parsons**, et al., on )<br>behalf of themselves and all )<br>others similarly situated; )<br>and **Arizona Center for** )<br>**Disability Law**, )<br> )<br> )<br> Plaintiffs, )<br>vs. )<br> )<br>**Charles Ryan**, Director, )<br>Arizona Department of )<br>Corrections; and **Richard** )<br>**Pratt,** Interim Division )<br>Director, Division of Health )<br>Services, Arizona Department )<br>of Corrections, in their )<br>official capacities, )<br> )<br> Defendants. )<br>_____) | No.  **CV 12-00601-PHX-NVW**<br><br>       **Phoenix, Arizona**<br>       **August 7, 2013**<br>        **10:00 a.m.** |

BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**

(*Motion Hearing*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1   For the Plaintiffs:

 2           PERKINS COIE LLP
             By:  Amelia M. Gerlicher, Esq.
 3           By:  John H. Gray, Esq.
             2901 N. Central Ave.
 4           Suite 2000
             Phoenix, AZ 85012
 5
             ARIZONA CENTER FOR DISABILITY LAW - PHOENIX, AZ
 6           By:  Jennifer A. Alewelt, Esq.
             5025 E. Washington St.
 7           Suite 202
             Phoenix, AZ 85034
 8
     For the Defendants:
 9
             STRUCK WIENEKE & LOVE, P.L.C.
10           By:  Nicholas D. Acedo, Esq.
             By:  Ashlee B. Fletcher, Esq.
11           By:  Timothy J. Bojanowski, Esq.
             By:  Kathleen Wieneke, Esq.
12           3100 W. Ray Road
             Suite 300
13           Chandler, AZ 85226

14           OFFICE OF THE ATTORNEY GENERAL - PHOENIX
             By:  Lucy M. Rand, Esq.
15           1275 W. Washington St.
             Phoenix, AZ 85007-2926
16

17

18

19

20

21

22

23

24

25
```

—August 7, 2013 - Motion Hearing—

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  This is Civil Case 2012-601,

3      Victor Antonio Parsons, et al., versus Charles L. Ryan, et al.

4              This is the time set for oral argument.

5              Counsel, please announce for the record.              10:01:08

6              MS. GERLICHER:  Amelia Gerlicher, Perkins Coie.

7              THE COURT:  Speak into the microphone, please.

8              MS. GERLICHER:  Amelia Gerlicher.

9              THE COURT:  Can't hear you.

10             MS. GERLICHER:  Amelia Gerlicher, Perkins Coie, for     10:01:18

11     the plaintiffs.

12             THE COURT:  What's your last name again?

13             MS. GERLICHER:  Gerlicher.

14             MR. GRAY:  John Gray, Perkins Coie, for the

15     plaintiffs.                                                    10:01:32

16             MS. ALEWELT:  Jennifer Alewelt for plaintiff Arizona

17     Center For Disability Law.

18             MR. ACEDO:  Nicholas Acedo, Ashlee Fletcher, Tim

19     Bojanowski, and Kathleen Wieneke from the law firm of Struck

20     Wieneke and Love; and Lucy Rand from the Attorney General's    10:01:47

21     Office on behalf of the defendants.

22             THE COURT:  All right.  Good morning, counsel.

23             I'm sorry, ma'am.  I don't see your name on my list.

24     What's your name again?

25             MS. GERLICHER:  Amelia Gerlicher.  I signed the        10:02:07

August 7, 2013 - Motion Hearing

```
 1   schedule that was submitted yesterday, Your Honor.

 2            THE COURT:  How do you spell your name?

 3            MS. GERLICHER:  G-E-R-L-I-C-H-E-R.

 4            THE COURT:  All right.  Fine.  I do not have you on my

 5   list.                                                            10:02:23

 6            Okay.  All right.  This is the time set for hearing on

 7   the Motion For Stay Pending the Appeal of a Class

 8   Certification.  And I also directed you all to be prepared to

 9   discuss the status of discovery.

10            Maybe it would make the discussion easier if I just    10:02:42

11   tell you what my preliminary thoughts are so that you can focus

12   your comments on them.

13            My preliminary thoughts are that the discovery should

14   not be stayed pending the appeal, and the discovery should be

15   concluded quickly with very little more to do.  Staying the     10:03:08

16   discovery would have the cost of rendering it very likely to

17   have been wasted; that if it's stayed for however long it takes

18   for the Court of Appeals to rule on the class certification

19   appeal, that discovery is likely to be out of date and have to

20   be done over again.                                             10:03:35

21            And a great amount of discovery has been done, and I

22   will tell you frankly, I need to hear from counsel about this.

23   But my preliminary sense from your summary is that much of the

24   discovery is likely to have been of little value.  And if the

25   case is such that the parties, or the plaintiff, can expend     10:03:57
```

─────August 7, 2013 - Motion Hearing─────

1    great resources on discovery of little value then we're

2    probably done.  There's very little more that needs to be done

3    if discovery of little value can be done at great expense.  So

4    we could wrap it up quickly.

5         We would then have the discovery done, and we would          10:04:16

6    proceed with the rest of the schedule.  And I have accepted the

7    amended schedule you had proposed some months ago, and that

8    would proceed next to expert witness matters and then summary

9    judgment and trial.

10        Under that approach, it wouldn't matter much what the        10:04:33

11   Court of Appeals does on the class certification.  We'll have

12   our case discovery done for the named plaintiffs.  We'll be

13   ready for trial for the named plaintiffs.  And the relief that

14   is sought, one the principal reasons I certified the class here

15   is the relief that's sought in its nature is systemic and would  10:04:55

16   affect other prisoners.

17        Therefore, if we grant relief in terms of ordering

18   systemic remedies, it's pretty much the same whether you

19   certify a class or not, or let's say it's similar.  And if in

20   the meantime the class certification is reversed, we're still    10:05:21

21   prepared or may have already gone to trial.

22        So that's my initial thought.  In summary, I'm not

23   seeing the benefit of staying discovery.  I'm not seeing the

24   need for any substantial additional discovery.  And let me add

25   one other thought, and that is, it's impossible for the judge    10:05:42

—August 7, 2013 - Motion Hearing—

1   to micromanage discovery, that the process is dependent on the

2   priorities and the judgment of counsel and the litigants.  And

3   we set a time schedule which was extended, and my view is that

4   the litigants prioritize for themselves.  They pursue what is

5   important, and they gather if they don't.  But if the litigants       10:06:14

6   pursue unimportant matters and run out of time, and they have

7   exhausted the burden that's fair to impose on the other side

8   they are out of time and they are out of discovery and it's

9   over.

10          So I rely on that self-prioritizing, and it does            10:06:35

11   appear there is extensive discovery here.  May not have been of

12   much value, but it looks like it ought to be just about done.

13          Now, there are some specific things here about e-mails

14   and whatnot that I'm not sure about, that there probably needs

15   to be some further disclosure on e-mails.  There's some things      10:07:00

16   here I read here about the defendants' discovery that they say

17   has not been responded to, just been objected to.  That needs

18   to be addressed.

19          So those are my initial thoughts, and I will hear

20   whatever anyone wants to say.  Actually, this is the                10:07:15

21   defendants' motion, so I will hear from the defendant first.

22          MR. ACEDO:  Good morning, Your Honor.

23          I will put the discovery aside for a second.  The

24   Court of Appeals decision to grant our 23(f) petition

25   complicates other things in addition to discovery.  It             10:07:39

—August 7, 2013 - Motion Hearing—

1   complicates our dispositive motion.  It complicates the trial

2   evidence.  It also complicates the relief that this Court can

3   grant.

4            Now, I'm not going to stand up here and tell you that

5   I know what the Court of Appeals is going to do.  I don't.          10:07:55

6   That's uncertain.

7            THE COURT:  Let me interrupt you and say that from my

8   own view, it makes perfect sense for the Court of Appeals to

9   grant an interlocutory appeal in a matter like this.  It

10  doesn't do much good to review that class certification at the       10:08:09

11  back end.  Now, to me, that doesn't necessarily mean that they

12  are probably going to reverse or probably going to affirm, but

13  it does, to me, it does make sense to review something like

14  that early on.  But it also leaves me without any sense of what

15  the likely outcome will be.  I just need to proceed however.         10:08:30

16           MR. ACEDO:  I understand that.  I would just add that

17  under *Chamberlan* the Ninth Circuit made very clear that it will

18  only take Rule 23(f) appeals under rare occurrences and rare

19  circumstances, and that there are pros and cons to granting

20  relief.  And that typically, you should only grant relief in        10:08:50

21  three circumstances, and we urged two of them.  We don't know

22  which one they grasped, but at the end of the day they did

23  grant it.

24           But as I started off, the grant of the petition

25  complicates not only discovery but our dispositive motion and       10:09:12

─────August 7, 2013 - Motion Hearing─────

1   the trial evidence and the relief this Court can afford.

2           There are a couple things that are certain.  We have

3   no idea when the Court of Appeals is going to make their

4   determination and whatever -- assuming that they would affirm

5   the class certification order, defendants will pursue further          10:09:24

6   appeals.  We will either seek rehearing en banc or writ of

7   certiorari.

8           So we're talking possibly about a lot of time before

9   that is resolved.  The chances of it getting resolved before we

10  have to file our dispositive motion in April are slim to none,          10:09:44

11  I think.

12          And here's why that's the problem:  Right now the

13  class is still certified, and if the Court doesn't grant a

14  stay, we will have to address this lawsuit from a class action

15  standpoint, the class allegations.  That is going to take --            10:09:58

16  that's going to be extraordinary.

17          THE COURT:  But you need to be concrete about that.

18  How is that going to be much different from the -- how is it

19  going to be much different?

20          MR. ACEDO:  Well, let's say that the class was not              10:10:16

21  certified.  We've got 13 cases brought by 13 plaintiffs.

22  Plaintiff Jensen complains about how a catheter was inserted.

23  Plaintiff Wells complains about some delay in some dental

24  treatment.  If those were the claims, we would go after those

25  specific claims and show that it wasn't -- a one-month delay in         10:10:34

1    getting a tooth cleaning was not deliberate indifference.

2         THE COURT:  But you would go after them no matter

3    what, right?

4         MR. ACEDO:  Well, plaintiffs' burden from a class

5    standpoint is much more than that.  As you made very clear,       10:10:48

6    they have to show systemic deficiencies based on gross data.

7    And that's what the parties have been engaging in from a

8    discovery standpoint thus far.  That's why the discovery is so

9    burdensome as you have recognized, is they are trying to

10   accumulate gross data to show systemic deficiencies.             10:11:06

11        If this class were not certified, our Motion for

12   Summary Judgment would be very simple.  We just deposed one of

13   the plaintiffs yesterday, and he didn't recall anything.

14   Showed him his declaration in support of his class

15   certification motion.  I don't remember.  We think that that     10:11:22

16   would be a very easy case, at least from a summary judgment

17   standpoint.

18        Now, if there is no stay we've got to attack that

19   completely different from a certification standpoint.  Again,

20   we have to show that these deficiencies not only do not fall to  10:11:36

21   an unconstitutional level but they are not system-wide.  Those

22   same problems carry right over to trial and the evidence, the

23   plaintiffs' case that they have to present a trial and our

24   defense.  Are we defending against plaintiff Chisholm's claims?

25   Plaintiff Wells' claims?                                         10:11:58

─────── August 7, 2013 - Motion Hearing ───────

1          THE COURT:  You are defending against them.  What if

2     you defeat all of them, the individual plaintiffs?

3          MR. ACEDO:  And the class is still certified?

4          THE COURT:  Right.

5          MR. ACEDO:  Well, we would certainly argue that --          10:12:07

6     well, I think this Court has made clear that the case wouldn't

7     go away.  And we have been operating under that assumption that

8     even if we pick off each of the 13 and they don't have any

9     individual claims, they still can remain as class

10    representatives on behalf of the other 30,000 inmates.          10:12:26

11         THE COURT:  That's hard for me to think through on

12    concrete terms, because a class representative has to have a

13    meritorious claim that is typical of others.  If all of these

14    class representatives fail, that seems to me to mean that there

15    will not have been a systemic failure of medical care.          10:12:53

16         MR. ACEDO:  Your Honor, we completely agree with that.

17    That was the argument that we raised in our Motion to Dismiss,

18    and that was a basis for our opposition of class certification

19    that if you look at the individual plaintiffs' harm to them,

20    just look at those 13 claims of harm, those don't rise to a     10:13:11

21    constitutional injury.  So how can their claims be typical of a

22    class?

23         THE COURT:  Well, on the other hand, if those

24    plaintiffs do prevail, if they do prove meritorious claims that

25    implicate -- that are part of a systemic failure to provide     10:13:27

—August 7, 2013 - Motion Hearing—

1   medical care, then they get their relief and the relief would

2   be class-wide as well.

3          I'm just -- I'm trying to think through in a concrete

4   empirical way the distinction you are articulating.  And I'm

5   finding it hard to grasp, because if you defeat all of these        10:13:53

6   plaintiffs' claims, you will have necessarily defeated their

7   contention that there is a systemic failure of medical care

8   and you win those cases.  How would a class -- how would all

9   the class plaintiffs representatives fail and yet the class

10  claim prevail?  It's just hard for me to visualize that.           10:14:21

11         MR. ACEDO:  We agree with your internal struggle.

12  We're going through the same thing.  We believe that if those

13  13 are knocked off the class can proceed.  But we have to

14  assume that they are.  We can't just prepare a defense based on

15  those 13 claims.  We have to prepare a defense also against       10:14:39

16  plaintiffs' class claims of systemic deficiencies.  So we can't

17  go MSJ or into trial just hoping that we pick off the 13

18  plaintiffs.  We've got to take a much more global approach.

19         On the flip side, if the 13 plaintiffs do have

20  meritorious claims, it's our position that that doesn't           10:15:01

21  necessarily mean that there are systemic deficiencies.  That's

22  13 constitutional violations out of 33,000.

23         THE COURT:  They have to prove that and more.

24         MR. ACEDO:  Absolutely.

25         THE COURT:  They could win -- but their allegation is      10:15:16

─────August 7, 2013 - Motion Hearing─────

1   that the reason they aren't being provided care is the systemic

2   deficiencies.  That's what they allege and that's what I take.

3   So you had said when you first came to the podium, well, if you

4   had to try this case or summary judgment it would be very

5   different whether it's the class or the individuals.  I'm not      10:15:40

6   telling you you are wrong.  I'm just not understanding it, and

7   I'm suggesting that we get a lot more concrete and specific.

8         MR. ACEDO:  Let me give you a blueprint of how we

9   envision this MSJ, if it were just against the 13 plaintiffs.

10  We would have headings for each individual plaintiff.  We would   10:15:59

11  specify the precise allegations in their complaint, not

12  inadequate health care, inadequate mental health care, the

13  precise allegations.  For instance, Plaintiff Wells alleges

14  that she was a few -- a month or two delayed in her cleaning.

15  We would address each of those allegations and show that ADC      10:16:21

16  was not deliberately indifferent to that care, and/or they did

17  not sustain a constitutional injury.  And we would do that for

18  each of the 13.

19        If the class were certified and we have to file our

20  MSJ, we certainly would include all of those arguments, but it    10:16:39

21  would be much broader than that.  We would have -- we would

22  talk about not only the care that they received but the care

23  that is provided across the board.

24        And I understand that that's a hard concept to grasp.

25  I understand that.  And that's part of the reason why we          10:17:00

─────August 7, 2013 - Motion Hearing─────

1    believe that there should be a stay, because there is

2    uncertainty.  If there's a stay now, and we wait until the

3    Court of Appeals tells us if this is certified or not, we can

4    go forward with a clear approach on how --

5              THE COURT:  I'm sorry.  I saw that earlier.  What's          10:17:18

6    their briefing schedule?

7              MR. ACEDO:  I'm sorry?

8              THE COURT:  What's the Court of Appeals briefing

9    schedule?

10             MR. ACEDO:  Our opening brief is August 21st.  I            10:17:24

11   believe the answering brief is approximately 30, 30 days after

12   that.

13             THE COURT:  Have they set an oral argument yet?

14             MR. ACEDO:  They have not.

15             THE COURT:  They wait until the briefs are in?            10:17:34

16             MR. ACEDO:  That's correct.  The order did say it

17   would put it on the first oral argument section it could.  But

18   I have been an appellate lawyer in Arizona, particularly in the

19   Ninth Circuit for 10 years.  One thing I have learned is never

20   anticipate a quick ruling from them with their caseload.  I'm          10:17:49

21   sure you are aware.  Again, that's the uncertainty.  It could

22   be months.  It could be years.  That's just the first level.

23             Then we're talking about rehearing en banc, and then

24   we're talking a petition for writ of certiorari.  Who knows how

25   long this thing could go.  And we are just proceeding in the           10:18:09

———August 7, 2013 - Motion Hearing———

1    hopes that if a stay isn't granted that they affirm.

2            THE COURT:  Let me tell you, as a practical matter, I

3    know theoretically it's not supposed to work this way, as a

4    practical matter, I would be delighted to have the Court of

5    Appeals send me a telegram on this about whether to stay this.      10:18:27

6    If they think that would be -- and part of the problem is you

7    don't have a merits panel.  You had a motions panel grant the

8    appeal, so you don't know what judges you are going to have on

9    the merits panel.  So there is nobody who could send me a

10   telegram.  If they had a sense of, yes, you may want to --         10:18:50

11   we're probably going to reverse this, or for whatever reason

12   they thought this should be stayed, that would be fine with me.

13   In the meantime, I have to make a decision that's based on the

14   assumption that we don't know what's going to happen.

15           MR. ACEDO:  We don't.                                      10:19:09

16           THE COURT:  And as I said, to me, it made perfect

17   sense for them to grant an appeal because it's not a very

18   effective remedy at the back end to review the class

19   certification.

20           MR. ACEDO:  You are right.  And I will go back to          10:19:19

21   *Chamberlan*.  The Court said we only will take these in rare

22   circumstances.  We had argued in our petition that it was a

23   novel issue, never been addressed, and/or that ruling was

24   manifestly erroneous.  Of the three situations in which the

25   Court said, yeah, we should take these, one of them was not       10:19:40

─────August 7, 2013 - Motion Hearing─────

 1   only a novel issue but one that is likely to evade a review.

 2   We didn't argue that.  We simply argued that it was a novel

 3   issue.

 4          So if we want to get into the guessing game and we're

 5   trying to read between the lines here, that was -- we didn't          10:19:57

 6   squarely fit within that box.  Our primary argument, our

 7   primary focus was that the ruling was manifestly erroneous.  In

 8   *Chamberlan* it talked about, well, what does that mean?  Well,

 9   we look at the petition and on its face we see some serious

10   problems.  So if we want to try to get into the guessing game,          10:20:16

11   that's where I would go.

12          Also add that it was a motions panel, but it wasn't a

13   typical two-judge panel.  It was a three-judge panel.  That's

14   unusual to me.  The only other time I have seen that was in the

15   *Chamberlan* case.  And one of those three justices was Chief          10:20:32

16   Judge Kozinski, for whatever that's worth.

17          THE COURT:  He only has one vote.

18          MR. ACEDO:  An important one, yes.

19          But I agree.  It's hard to know what they are going to

20   do.  That's uncertain.  So I think what we have to do is take a          10:20:50

21   step back and look at what factors outweigh the other factors.

22          THE COURT:  Yeah, but what about, you know, it looks

23   to me like this discovery is almost over.  I mean, maybe the

24   plaintiff didn't see it that way, but I'm seeing it that way.

25   If the discovery is almost over, why not just wrap it up and          10:21:08

─────August 7, 2013 - Motion Hearing─────

1    have this ready to go?

2              MR. ACEDO:  Well, we are on the tail end.  I would

3    estimate we're probably two-thirds of the way through.  This

4    last third is the home stretch.  We have got a lot of

5    depositions, a lot of depositions to take.  If we take them          10:21:25

6    now --

7              THE COURT:  I'm not sure I bought into the 50 or 75

8    depositions.

9              MR. ACEDO:  We don't either.  Again, I'm playing a

10   guessing game.  But even if it was eight more --                      10:21:36

11             THE COURT:  By the way, I apologize for being

12   disorganized in my comment, but you are going to have to submit

13   to more than two hours of deposition for Mr. Ryan and Mr. -- is

14   it Mr. Pratt, or -- but the federal rule presumptively says

15   seven hours, but that's really a minor issue.  This really          10:21:59

16   bleeds over into discovery management.

17             MR. ACEDO:  And if I could just finish with the

18   discovery, we are at the tail end.  But there are still 12

19   expert tours, one going on right now.  Those don't need to take

20   place.                                                               10:22:20

21             THE COURT:  I don't understand these expert tours.

22   They look to me like they are being done in lieu of

23   interrogatories, walking around the prison asking people

24   questions.  That's what interrogatories are for.

25             MR. ACEDO:  And that has been our position from the        10:22:32

—August 7, 2013 - Motion Hearing—

1    get-go.  But we heeded this Court's advise to act reasonably.

2    We did not want to have to fight that in front of you.

3         THE COURT:  I fear that I may have intimidated you all

4    earlier, and I regret that.

5         MR. ACEDO:  Well, we're 41 tours into it.  And that's    10:22:48

6    the past.  But the fact of the matter is there's 12 left.  And

7    none of them are mental health tours.  I believe eight of the

8    12, none of the plaintiffs are there.  Two of the three experts

9    that are touring have already conducted tours at other

10   facilities.  There's no reason for those to happen, none.  As    10:23:06

11   far as the depositions, even if you cut it off at 25, they

12   still have some left.

13         From our view --

14         THE COURT:  What do these depositions -- this issue of

15   the systemic and class challenge here, I have always understood    10:23:28

16   to be aimed at the gross level of provision of services that

17   seem to me to be easily ascertainable from gross data and

18   applying them to industry standards about providing medical

19   care to -- in correction settings.  I have not envisioned that

20   that meant walking through all the prisons asking lots of    10:23:54

21   people questions.

22         I will give you a -- I apologize if this comparison is

23   not fair.  But if you want to know how many people are riding

24   on a bus system you can look at the data at the central

25   management of the bus system, or you can interview lots and    10:24:16

———August 7, 2013 - Motion Hearing———

1    lots of people at the bus stations.  Looks to me like they are

2    interviewing people at the bus stations.  And so I have got

3    serious concerns about how this whole thing is going.

4           MR. ACEDO:  As do we.  As do we, Your Honor.  And

5    that's why we have focused on the tours so much.  And it's          10:24:34

6    baffling in plaintiffs' discovery proposal, they spend most of

7    it complaining that they weren't even broader than they wanted.

8    That's unbelievable.  They essentially provided a list of

9    deposition questions that they didn't get to ask, that we were

10   protecting individuals because -- protecting ourselves because    10:24:54

11   there were no -- this is a Rule 34 deposition.  We had no

12   protection.  They were roving depositions.

13          But that's besides the point.  We agree these expert

14   tours are outrageous, excessive, unduly burdensome.  There's 12

15   left and those can stop.  Those can stop today, right now.          10:25:12

16          THE COURT:  Well, I have come back to the fact that a

17   lot of them have already been done, and I am very reluctant to

18   waste what's been done, even if it was excessive.  I am much

19   more inclined to bring this to closure so that we do not run

20   the risk of a year or two from now having to do this all over      10:25:29

21   again if the Court of Appeals certifies the class

22   certification.  That would be a waste that would be

23   intolerable.

24          So I'm really looking for a way to bring to an end

25   what I fear may be inappropriate discovery so that we have          10:25:49

1    closure and we can proceed on the named plaintiffs.

2           MR. ACEDO:  Well, Your Honor --

3           THE COURT:  Go ahead.

4           MR. ACEDO:  We don't think that this discovery would

5    go to waste.  I mean, the facilities aren't changing.  They          10:26:07

6    don't need to take additional tours.  The facilities are

7    staying the same.  The depositions, not that many depositions

8    have been taken so far.  Would they need to retake those

9    depositions?  Well, let's assume that they did.  And we're not

10   agreeing to that, but let's assume that they did.  They would       10:26:26

11   be very limited.  What has happened since the case was stayed?

12   These wouldn't be seven-hour depositions.  These would be one-

13   or two-hour depositions.  And some of them wouldn't even need

14   to be taken again.  Contract monitors, for example, individuals

15   that don't have any relevant information with respect to the        10:26:44

16   individual plaintiffs' claims.  A lot of these depositions were

17   just were more broad, systemic that went towards the class

18   claims.

19           So there weren't that many that have been taken.

20   There's far more that are yet to be taken that we can stop.  I       10:27:00

21   don't think --

22           THE COURT:  Tell me the character of these untaken

23   depositions.

24           MR. ACEDO:  I believe --

25           THE COURT:  I mean, if this is a matter of the              10:27:11

— August 7, 2013 - Motion Hearing —

1  character of what I'm seeing reading this, of asking a whole

2  bunch of people on the retail level of the prison health care

3  services depositions, I don't see that as appropriate and

4  justified.  That's interviewing people at the bus stations to

5  find out how many people ride on a bus system.                    10:27:34

6         MR. ACEDO:  Of the 22 depositions that they have

7  noticed that are going to be happening in the next 30 days, 11

8  of them are contract monitors from the different facilities.

9         THE COURT:  And what are they, again, their

10 depositions, what do you think they are about?                     10:27:49

11        MR. ACEDO:  Well, I think they are going to be

12 relatively duplicative.  I mean, these contract monitors are in

13 there to make sure ADC is complying with -- Corizon is

14 complying with the contract with ADC.  And we don't understand

15 how it's going to be different from one facility to another.       10:28:07

16 So for them to parade eight or nine contract monitors just from

17 different facilities, we think that that's not useful.  But

18 that's 11 of the upcoming 22.

19        THE COURT:  Are those one-hour depositions each or

20 what?                                                              10:28:24

21        MR. ACEDO:  They have all been slated for seven hours,

22 I believe.

23        THE COURT:  Seven hours each?

24        MS. GERLICHER:  They have been noticed to start at 9

25 a.m., Your Honor.  Some of them are half day.                      10:28:33

—August 7, 2013 - Motion Hearing—

1      MR. ACEDO:  But that's 11 of the 22.  Those are

2  depositions that we can stop now.

3      THE COURT:  Do you know what the others are?  Do you

4  remember.

5      MR. ACEDO:  They are all in our table that we                    10:28:43

6  submitted through our discovery proposal.  One of them is

7  Director Ryan, Mr. Pratt -- I'm sorry, Mr. Gross who is the

8  Director of Health Services.  There's nursing monitors.

9  There's some deputy wardens.  That's the garden variety.  But

10  11 of 22 are these contract monitors.  We have listed them out.  10:29:04

11      So we can stop that now.  The depositions that have

12  been taken --

13      THE COURT:  What about the named plaintiffs, though?

14  Should they have to wait for two years for their cases to

15  proceed?                                                         10:29:22

16      MR. ACEDO:  Well, they elected to join this lawsuit

17  and agreed to have it be certified.  And they moved for a class

18  certification.  These 13 wanted to convert their complaint into

19  a class action lawsuit.  And when you do that, you have -- one

20  of the -- something that goes with that is if it's certified we  10:29:43

21  can appeal.  So they willingly made that choice.  If they would

22  like to decertify the class sua sponte on their own, we'll

23  accept that and we'll move forward just on their claims and we

24  can have a trial in October.

25      But again, the discovery that we have already taken,          10:30:00

───August 7, 2013 - Motion Hearing───

1   that's not going to be wasted.  Things aren't going to change.

2          THE COURT:  You know, whether it's a year or two years

3   from now, whatever is done now is going to be out of date then.

4   How could I go to trial three years from now on data that's two

5   years old?                                                          10:30:22

6          MR. ACEDO:  One thing we could do, it's the defendants

7   that are going to have to supplement -- that would have to

8   supplement their written discovery responses if that happened.

9   So we would be bearing that burden.  We're asking for the stay

10  now.  We're taking the risk now that this is decertified.  If     10:30:36

11  it's stayed and it's not decertified and it continues as a

12  class action lawsuit, that would be something that would be on

13  our shoulders.  We're not asking -- the plaintiffs are not

14  going to have to come to the table with a lot of discovery.  It

15  largely falls on our shoulders, and it's something we            10:30:54

16  understand.

17         But I think that is something that certainly the

18  parties and the Court can work out if and when that time comes.

19  I don't think it needs to be outrageous.  If we need to

20  re-depose a handful of individuals for one or two hours, we can  10:31:08

21  do that.  We can do it relatively quickly.

22         THE COURT:  By the way, this interlocutory appeal of

23  class certifications is relatively new.  Are there any cases on

24  this about staying this?

25         MR. ACEDO:  No.  I didn't find any, Your Honor.  But      10:31:22

─────August 7, 2013 - Motion Hearing─────

1   again, I read the *Chamberlan* opinion again last night.  If you

2   read it closely, it contemplates that things should stop

3   because of the uncertainty, because if they reverse that order

4   it drastically changes the face of the lawsuit.

5           THE COURT:  But does it drastically change it?          10:31:43

6           MR. ACEDO:  We think it does.  We think it does.  And

7   we know that's a hard concept to grapple with.  But a perfect

8   example are these contract monitors from multiple facilities

9   that they want to depose.  Why would they need to depose all

10  those contract monitors if it were just one plaintiff's claim?  10:32:02

11  Why would they tour a facility where none of the plaintiffs are

12  housed?  Those are concrete examples.

13          Why would we have to answer interrogatories that ask,

14  provide us the list of names of all prisoners who have this

15  chronic condition?  Well, it's unnecessary.                    10:32:19

16          THE COURT:  Well, yeah.  Well, I need to hear from the

17  other side.  But it does appear to me that the scope of the

18  discovery that's been sought greatly exceeded what I had

19  contemplated.

20          MR. ACEDO:  And what's set up now, if there is no       10:32:43

21  stay, that will continue for the next three or four months.

22          Thank you.

23          THE COURT:  All right.  Ms. Gerlicher.

24          MS. GERLICHER:  Yes, Your Honor.

25          THE COURT:  Ms. Gerlicher, are you with -- what firm    10:33:12

—August 7, 2013 - Motion Hearing—

```
 1   are you with?

 2           MS. GERLICHER:  Perkins Coie.

 3           THE COURT:  Which office?

 4           MS. GERLICHER:  Phoenix.

 5           THE COURT:  Good.  Go ahead.                    10:33:18

 6           MS. GERLICHER:  Your Honor, I'd like to begin by

 7   discussing this question of the nature of the relief that

 8   plaintiffs seek.  We seek injunctive prospective systemic

 9   relief in order to help the named plaintiffs even if the class

10   is decertified.  Accordingly, we would need evidence on        10:33:32

11   system-wide policies and practices.  We would need evidence on

12   facility-wide practices that are not actually written down.

13           So as you thought as you came in today, there is

14   actually not very much of a difference between the case they

15   would have to try if the class were certified or if it was not. 10:33:50

16   We still have to prove that there are practices and policies

17   that are --

18           THE COURT:  Well, the difference would be that the

19   named plaintiffs would be either suffering injury or a

20   sufficient proximate threat of injury caused by the failure,    10:34:09

21   the systemic failure to provide services.  But you would have

22   to connect it with each of those named plaintiffs.

23           MS. GERLICHER:  Yes.  But we would still be

24   entitled --

25           THE COURT:  I thought that's what your lawsuit was.     10:34:23
```

1   That's what I thought when I granted the motion to certify the

2   class.

3           MS. GERLICHER:  Well, we are showing, Your Honor, that

4   there are systemic policies and practices and there are

5   facility-wide practices that cause a substantial risk of          10:34:34

6   serious harm to both the named plaintiffs and to the class as a

7   whole.  They are very similar inquiries.

8           THE COURT:  But if you don't prove it as to the named

9   plaintiffs it unravels the basis for class certification, that

10  is, their typicality and representativeness.  So frankly, that    10:34:51

11  was central to my thinking, that that's the case you are trying

12  to prove.  You are going to be proving that anyway, and I

13  didn't envision this case going forward if the class

14  representatives all unraveled that they either had no injuries

15  or no sufficient threat or didn't have a threat based on          10:35:15

16  systemic inadequacy of health care.

17          MS. GERLICHER:  And, Your Honor, I believe --

18          THE COURT:  Let me restate that.  I did not

19  contemplate having trial about other people if all the class

20  representatives were shown not to have been injured or            10:35:30

21  threatened with injury or their injury or threats were not

22  traceable to systemic inadequacy.

23          MS. GERLICHER:  Well, yes.  I mean, we picked the

24  named plaintiffs, Your Honor, so that they could represent the

25  class.  There is law on what happens if the class claims of the   10:35:46

UNITED STATES DISTRICT COURT

―August 7, 2013 - Motion Hearing―

1    particular named plaintiffs fail.  And they can fail and have

2    the class action go forward.  But I don't have that law in

3    front of me here.  We would want to brief that more extensively

4    if that's going to be important to your thinking.

5           We -- the defendants discussed a lot, kind of what          10:36:01

6    this uncertainty might happen and what might happen with the

7    Ninth Circuit.  But they ignored the other half of the inquiry

8    on the stay, which is the equities between the two parties.

9    And they are arguing primarily just this uncertainty and how

10   they are going to plan their case, which is what we just         10:36:19

11   discussed, the differences are minor.

12          And there are discovery costs which I will address in

13   a minute.  But that's weighed against the harms to our

14   plaintiffs.  And, you know, Your Honor has expressed some doubt

15   as to what's going on in those expert tours.  But I will tell    10:36:35

16   you that just in the last week, we have seen patients with

17   full-blown AIDS who weren't being treated; an out-of-control

18   diabetic with abnormal test results that hasn't been seen; a

19   woman whose C-section wound was left untreated for weeks and is

20   currently being packed with sugar from sugar packets used for    10:36:53

21   coffee; and a man who complained about chest pains for a year

22   before being told by a hospital recently that he has advanced

23   lung cancer that's likely to be deadly.

24          The amount of discovery that has gone on in these

25   tours is really substantially and was actually very efficient    10:37:08

─────August 7, 2013 - Motion Hearing─────

1  and I will deal with that in a minute.  But the general point

2  defendant's pooh-poohed in their response was that these harms

3  are ongoing, and if you do issue a stay that not only just the

4  named plaintiffs but all of the class members will continue to

5  suffer under this system of care, those who have chronic          10:37:25

6  conditions and regularly see medical providers.

7            THE COURT:  Slow down five miles an hour.  The court

8  reporter can't type that fast, and I can't think that fast.

9            MS. GERLICHER:  Fair enough, Your Honor.

10           There are prisoners throughout the system who have      10:37:39

11 chronic conditions that need to be seen regularly by this

12 medical system.  All prisoners are subject to the possibility

13 of injury and need emergency treatment, and there are thousands

14 of prisoners currently in isolation who are daily subjected to

15 the unconstitutional conditions in ADC.                           10:37:56

16           And so these harms are significant and cannot outweigh

17 those that the defendants have proposed.  And the Ninth Circuit

18 has said that faced with a conflict between financial concerns

19 and preventable human suffering, the Court has little

20 difficulty concluding that the balance of hardships tips in      10:38:14

21 plaintiffs' favor.  It does not tip sharply in defendants'

22 favor, which is their burden.

23           THE COURT:  You know, the court, we have a huge volume

24 of prisoner civil rights cases concerning conditions of

25 confinement; a lot from the Department of Corrections, a lot     10:38:30

─August 7, 2013 - Motion Hearing─

1    from the counties' sheriff's offices.  But we're seeing in

2    recent cases that the Department of Corrections has decided to

3    remove physicians from the hospitals.  Are you familiar with

4    that?

5            MS. GERLICHER:  From the hospitals inside facilities?    10:38:47

6            THE COURT:  I mean from the prisons, that they are

7    having nurse practitioners instead of physicians.

8            MS. GERLICHER:  You mean treat prisoners in the

9    prison?  Yes.  We have seen that as well.

10            THE COURT:  Yes.                                        10:38:59

11            MS. GERLICHER:  There's a chronic difficulty

12    particularly in mental health with prisoners getting access to

13    practitioners that are not kind of nurse practitioners or

14    assistants.

15            THE COURT:  All right.                                 10:39:10

16            MS. GERLICHER:  Your Honor, I'd like to address the

17    discovery issues that were raised.

18            THE COURT:  Yes.

19            MS. GERLICHER:  You mentioned this bus analogy that

20    you would like to -- you envisioned us going after the gross   10:39:22

21    data.  And this is a case where all of that data is in the

22    hands of defendants, and they refused to give us virtually any

23    of it before the class was certified, or at least a small

24    amount of it.  So that's one of the reasons we're kind of in

25    the thick of it right now.                                     10:39:39

1          And we have asked for a lot of documents.  They have

2     listed the requests in their papers.  They have not responded

3     to a good number of those requests.  And that's one of the

4     reasons why our deposition list is so long.

5          THE COURT:  A lot of it is how it is requested.                    10:39:51

6     Looking through a lot of this, it looks like you have been

7     asking for -- well, the data that would seem to be significant

8     ought to be available on a management level and easily

9     produced.

10         MS. GERLICHER:  You would think so, Your Honor.  But          10:40:11

11    we have asked for it in different ways, and we either don't get

12    it or it doesn't exist.  So we asked for different types of

13    documents.  And remember, we don't know, particularly when this

14    case started, how the records are kept and how exactly to ask

15    for them.  And I have even had situations where I used words          10:40:27

16    the deponent used in the deposition to ask for documents and it

17    comes back, we don't have a form by that name.  So it's been a

18    continuing experience.

19         And that's why when in the Spring, when we had not

20    gotten virtually any document discovery, we had to come up with     10:40:42

21    a list of people we --

22         THE COURT:  I remember they didn't give discovery

23    until after my ruling on the class certification and then did.

24    So discovery should be forthcoming.

25         MS. GERLICHER:  It has been.  And in the last 60 days          10:40:55

─────August 7, 2013 - Motion Hearing─────

1  they have produced something like 30,000 pages of records, so

2  it is moving along.  But in the meantime, we had to do the

3  expert tours and start planning for depositions because

4  discovery was going to close at the end of September.

5       So we formulated a list of people that we thought          10:41:12

6  would have this information that we have been unable to get

7  through written discovery requests, and we based that list in

8  part on their disclosure statement of witnesses, which at the

9  time had 800 people on it.

10       THE COURT:  Slow down.                                     10:41:25

11       MS. GERLICHER:  And we looked at what we might need to

12  prove across 10 facilities in four different areas and the 17

13  questions that Your Honor had put in the class certification

14  order and came up with a list that includes both people we

15  thought they would call at trial, people that we thought would  10:41:39

16  have the system-wide information or could at least tell us if

17  it existed, and people that were more familiar with the

18  facilities and the treatment on the ground that is perhaps not

19  written down in the actual policies.

20       We noticed some of those depositions in June so that       10:41:54

21  we could plan for them and have them in August and September.

22  Defendants -- we also will need to depose some people who work

23  for Corizon and Smallwood, and defendants objected to the ADC

24  depositions.  And so we started discussing with them, you know,

25  what did you have in mind, what are you -- how do you propose    10:42:14

1   this could work, could you reduce your Disclosure Statement so

2   we would have a more focused list to work from, and none of

3   that went anywhere.  And then we had the stay briefing and this

4   emergency briefing.

5           And so we're into August now, and that's why, in part,          10:42:30

6   we need -- we think an extension would make this more efficient

7   because we could then go back and look at the many documents

8   and the information we have gleaned from the expert tours and

9   make that list substantially smaller.  But at the time we made

10  it, in order to plan to meet your discovery cutoff, we had to          10:42:48

11  make it a longer list.

12          Regarding the expert tours, Your Honor, so the

13  experts, there are two doctors who are dealing with the medical

14  claim.  There's a dentist, a psychiatrist dealing --

15          THE COURT:  Tell me what they are doing.                        10:43:10

16          MS. GERLICHER:  Which one, Your Honor?

17          THE COURT:  Well, any of them.

18          MS. GERLICHER:  I have not -- I have been on the

19  dental tours, so I can tell you that Dr. Shulman looks at -- he

20  visits the dental clinic briefly, but what he really would like        10:43:22

21  to use his time doing is looking at the records.  And so he

22  reviews 30 records or so a day, very quickly.  They don't have

23  to copy those records.  They don't have to produce the vast

24  majority of them.  But he's using them to formulate his opinion

25  regarding how treatment is done for those -- for patients in           10:43:40

───── August 7, 2013 - Motion Hearing ─────

1   that facility.

2         THE COURT:  What is he producing in terms of the paper

3   product?

4         MS. GERLICHER:  What is he producing, Dr. Shulman?  He

5   will produce a report.                                      10:43:49

6         THE COURT:  I mean, is he bringing this down to data

7   or just reading a bunch of stuff and going to give a subjective

8   assessment?

9         MS. GERLICHER:  He'll have data to back up his report.

10  We have been unable to get, for the most part, any gross data  10:44:03

11  regarding dental with the exception of some reports that we

12  don't understand how they are created yet.  And so he is

13  basically creating his own gross data.

14        But Your Honor was concerned if this is perhaps, you

15  know, much more burdensome, but if you imagine that they had to  10:44:23

16  produce something like 200 medical records, that -- through

17  written discovery -- that would be much more lengthy and much

18  more work than him just getting it done in 10 days or 12 days

19  that he's touring.

20        And that's the case throughout these tours.  We have  10:44:38

21  learned a tremendous amount from these tours, to actually being

22  in the facility, real time, to see how these people live, to

23  ask them, numerous people, numerous inmates generally during

24  the course of a day how treatment works and then to go into the

25  medical facilities.                                          10:44:56

─────────── August 7, 2013 - Motion Hearing ───────────

1        THE COURT:  And you are willing to limit those to,

2    what, three more?

3        MS. GERLICHER:  If the defendants, sounds like they

4    might be open to this, are willing to stipulate that the

5    medical facilities at the five remaining complexes are the same    10:45:05

6    as the ones that have been done, then we would be willing not

7    to do those tours.  We have asked them to do that in the past

8    and they have refused.  And the remaining three-day tours are

9    for an expert who has not yet toured.  She is looking at the

10   physical effects of isolation confinement.                          10:45:22

11        Regarding written discovery, Your Honor, and the

12   parties have done a lot of it, you are right.  The plaintiffs

13   actually, despite -- or the defendants, despite the fact that

14   they have most of the documents and do not have the burden of

15   proof, have issued even more requests to us than we have issued    10:45:39

16   to them.  And you are right, some of our requests are broad for

17   the reasons we have discussed previously.  We just don't know

18   how they keep the records, so it's been kind of an ongoing

19   negotiating process.

20        But that process has been ongoing.  We have talked to        10:45:53

21   defendants about various request and we have formulated them

22   and agreed to take lists that are slightly different than what

23   we asked for.  And that's been an important part of the ongoing

24   production over the last 60 days in particular.

25        And, in fact, some of the requests will probably be          10:46:09

─────── August 7, 2013 - Motion Hearing ───────

1  either withdrawn or put on hold now that the expert tours have

2  taken place.  For example, in the stay moving papers,

3  defendants mentioned the list of all patients on the mental

4  health caseload.  Well, it's important that we know who the

5  patients are in the mental caseload so the mental health expert   10:46:25

6  knows who to talk to and pick records from.  But now that he's

7  toured, assuming that there's no material changes on how health

8  care is done and we don't delay things significantly for a

9  stay, then we don't need that to be ongoing, supplemented on an

10  ongoing basis at the rate we requested originally.  So similar   10:46:43

11  requests like that do not need to continue.

12      THE COURT:  Now, Mr. Acedo says that if I grant this

13  stay, it will have a significant reduction of the short term

14  discovery that otherwise would take place to bring this to

15  completion.  Is that right?   10:47:11

16      MS. GERLICHER:  I didn't quite understand.

17      THE COURT:  He's saying that if I grant the stay that

18  he requests, that it will forestall a large amount of discovery

19  that otherwise would be taking -- have to take place to bring

20  this to completion.   10:47:28

21      MS. GERLICHER:  Well, I think by definition a stay is

22  going to forestall discovery.

23      THE COURT:  Another way of saying, what's left to be

24  done?

25      MS. GERLICHER:  What's left to be done.  There are a   10:47:36

1   very small number of written requests based on what we learned

2   or did not get at the expert tours; the issue of e-mail; the

3   expert tours that remain to be conducted that we discussed; and

4   depositions.

5         THE COURT:  About how many depositions?                    10:47:52

6         MS. GERLICHER:  Well, if we have to go forward under

7   the current deadline and the information we need know today

8   then we need the ones we have noticed plus the one from Corizon

9   and Smallwood employees.  If we could get an extension, which

10  we don't think we would extend any other deadlines, just       10:48:07

11  extension of fact discovery, then we believe we can lower that

12  list.

13        THE COURT:  But he says there's -- you want to

14  interview 11 of the monitors and what other depositions do you

15  need?                                                           10:48:23

16        MS. GERLICHER:  Well, the current depositions that

17  have been noticed were for all ADC employees.  That was the

18  first wave of them.  So they do include the ADC monitors and

19  the system-wide people who work for ADC.

20        THE COURT:  Why do you have to depose 11 of them?         10:48:35

21        MS. GERLICHER:  Because we assume that at least some

22  of them will be trial witnesses, and we haven't been told

23  otherwise.  These are people who have been inside each facility

24  on a regular basis, so we think they are one of the best

25  sources for information about practices as opposed to written   10:48:50

─────August 7, 2013 - Motion Hearing─────

1   policies.  And defendants have refused to stipulate that one --

2   that care is the same at one facility as the other, and we

3   anticipate that they will hold us to our burden of proof to

4   show system-wide issues.  And we have attempted 30(b)(6)

5   depositions in the Fall, but we generally were given what they          10:49:08

6   knew based on the job description and had not been prepared to

7   speak on the full scope of the topics we issued.

8        But it is also true that if we had a chance to look at

9   more documents, and that we were able to evaluate what we

10   learned by actually visiting these facilities, and/or we had          10:49:27

11   additional information on defendants, trial witnesses, that we

12   could reduce that list.

13        THE COURT:  All right.  And what about your answers to

14   their discovery requests?  They say you have not responded to

15   their discovery requests.                                             10:49:55

16        MS. GERLICHER:  There are requests on both sides that

17   have been objected to.  The requests that they say we haven't

18   responded to, I think they are referring to a letter they sent

19   us yesterday morning that lists a lot of interrogatories.  I

20   didn't have time to look at that in detail, but I did look at          10:50:08

21   the first set for Chisholm, for example, and this was the

22   difficulty kind of going through this entire process, Your

23   Honor.

24        They would -- some of those requests were for things

25   like all impeachment evidence that we plan to use at trial; all       10:50:26

—August 7, 2013 - Motion Hearing—

1    deposition testimony and reports that have been generated by

2    people that we might use to -- for people who might be used to

3    cross-examine any witness at trial.  They are background

4    information on a complaint in the paragraph that is not about

5    the witness that the request is directed to.  And these are          10:50:44

6    just the requests they objected to specifically as not being

7    responded to in October when we certainly didn't have very much

8    information.

9          So to the extent that those are proper requests and we

10   now have the information, we will, of course, supplement them.       10:51:01

11   But many of them are just not proper requests or information

12   that's not knowable at this time.

13         THE COURT:  Anything else?

14         MS. GERLICHER:  Your Honor, as we raised in our papers

15   we would request not only an extension of the discovery that's       10:51:12

16   going forward, or fact discovery into the Fall, but to not move

17   any of the other deadlines.  We would actually request that the

18   trial be moved up.

19         THE COURT:  Look, I set the schedule on your

20   stipulation.                                                         10:51:32

21         MS. GERLICHER:  Yes, Your Honor.

22         THE COURT:  To accommodate your experts.  So if you

23   all want to move up your expert schedule, that's fine would me.

24         MS. GERLICHER:  We don't need to move up the expert

25   schedule.  We would just move trial up.                             10:51:41

—August 7, 2013 - Motion Hearing—

1        THE COURT:  We can't move up the trial without having

2    the experts resolved.  The trial is set after the time for

3    expert disclosures and discovery.  We can't move up the trial.

4        MS. GERLICHER:  Yes.  We would not move it farther

5    than that, Your Honor.  And alternatively, we would request        10:51:55

6    that there be a way to take some additional fact discovery in

7    the interim so that you are not hearing at trial only about

8    evidence that is at least a year old.

9        THE COURT:  Well, you know, I'm fine with moving that

10   trial up but you all have to come up with a tighter schedule      10:52:12

11   for the experts.

12        MS. GERLICHER:  I will take that under advisement,

13   Your Honor.

14        And then I just also wanted to make the point that I

15   understand from your perspective some of this looks like          10:52:26

16   there's been too much, and you may not feel it is necessary.

17   But we feel we need to make a record, not just for you, but for

18   the other judges who may see this going forward.  And

19   defendants have made it clear that they intend to appeal

20   whatever happens here so we want it to be very, very clear on      10:52:41

21   the record.

22        THE COURT:  All we're talking about is that discovery

23   has to be reasonable and proportionate.  And a lot of the

24   discovery requests looks like it is -- could be done literally,

25   on the other hand, I don't know exactly what's been going on in    10:53:10

——August 7, 2013 - Motion Hearing——

 1    terms of the other side's responses.

 2         So it seems like the data, the gross data that would

 3    go to a lot of this should be in the command of the -- in the

 4    control of the defendants and they could -- they ought to have

 5    it.  It would be amazing if they don't have -- this is basic          10:53:34

 6    management data.

 7         MS. GERLICHER:  I agree, Your Honor.

 8         THE COURT:  If they don't have the management data

 9    that itself would be probative of management failure.

10         MS. GERLICHER:  I agree, Your Honor.                             10:53:43

11         THE COURT:  If they do have the management data it

12    should be not burdensome to produce it.

13         MS. GERLICHER:  I agree.  But as I said, we have asked

14    repeatedly for the information that our experts need and it has

15    been denied.  And so we have looked for other ways in order to       10:53:59

16    get the information that we need to prove our case.

17         THE COURT:  All right.

18         Mr. Acedo, why can't you all agree to representative

19    discovery instead of deposing 11 people at a number of

20    facilities?  I mean, to some extent is this a self-inflicted         10:54:40

21    wound of making them do discovery if you won't agree that the

22    discovery is representative?

23         MR. ACEDO:  I believe so, if I understand your

24    question correctly.  They haven't reached out to us to narrow

25    -- they served us with notices and we presented it to the            10:55:05

1    Court.

2         Your Honor, I just heard two different things up here.

3    On the one hand when they were arguing against our request for

4    a stay, they were arguing that there's not much left to be

5    done.  We can get this done and we can move forward.  But then          10:55:20

6    when it switched over to the discovery disputes, they just gave

7    a list of reasons why they need more time to conduct discovery.

8    They have asked you -- they want at least 90 more days, and up

9    to as many as six months before trial.  And I think their

10   discovery proposal even requests to do depositions and tours up         10:55:40

11   until trial.  It's confusing.

12         THE COURT:  Let me say, it is impossible for the Court

13   to micromanage discovery, as I said before.  And one of the

14   gross tools available to the Court to incentivize the litigants

15   to prioritize their discovery to what's important is just to            10:56:04

16   set a time limit.  You set a time limit.  You have only got so

17   much time.  Then you better do what's valuable because you are

18   going to run out of time.

19         That's the -- that's a gross tool that's available to

20   me.  We have a time limit.  And so I'm not going to be giving           10:56:21

21   them -- I will think about this.  But if I give any extension,

22   and I may not give any, it won't be much.

23         MR. ACEDO:  And we agree, Your Honor.  The deadlines

24   are a great tool.  They are in place and we have been following

25   them and we can comply.  We will comply with them as the                10:56:44

─August 7, 2013 - Motion Hearing─

```
 1    discovery schedule is already set.

 2         I need to address a few things she said about the

 3    discovery process thus far.  Particularly, her vague assertions

 4    that we have been withholding evidence and not responding and

 5    objecting to everything.  We didn't produce 130,000 blank       10:57:00

 6    pages.  We didn't produce ROGs or FRA answers with nothing

 7    filled out.  We have laid it out for you, Your Honor.  We can

 8    submit it to you.  We can show you what we have given them.

 9    What they are talking about with these witness testimony

10    description, they gave us a ROG three weeks ago.  Why didn't we  10:57:20

11    get that last year?

12         Instead of providing that earlier, they were trying to

13    finagle an agreement where we give them our list, they give

14    them our list of witness and we can't veer from the list.  And

15    if we try to veer from the list we be precluded from -- that's   10:57:38

16    ridiculous.  That's their tactic.  We have asked for contention

17    interrogatory responses starting back, I believe, last October

18    or November.  What is the basis for your claims?  I believe it

19    was the November hearing, you told them, they have a right to

20    know what they are being sued for.  We have served them.  We     10:57:57

21    have brought this issue repeatedly.  They have still not given

22    that information to us.

23         So for them to come up here and say, well, we have

24    been delaying.  We have been holding back.  That's just not

25    true.  We're a little bit over a month outside the discovery,    10:58:13
```

UNITED STATES DISTRICT COURT

─August 7, 2013 - Motion Hearing─

1    the discovery deadline.  You can see what we've provided.  It's

2    been extraordinary.  It's been burdensome.  There's no

3    discovery disputes in front of you.  If all of this were an

4    issue, it would have reached your desk and there's nothing on

5    schedule right now.                                    10:58:34

6         The expert tours, let me tell you what Dr. Shulman's

7    been doing on his tour.  Mr. Bojanowski, he was on his tour

8    yesterday.  He looks in the dental room, looks around for about

9    two minutes, and goes in the other room and looks at records

10   for the rest of the day.                               10:58:52

11        THE COURT:  Slow down five miles an hour.

12        MR. ACEDO:  He walks in the dental room, he looks

13   around for two minutes, and then goes in a room and reviews the

14   records all day.  Why couldn't they have gotten those records

15   through other means?  Instead we had to arrange with a facility 10:59:03

16   to have the warden or deputy warden present, to have staff

17   designees pulled from their responsibilities sitting there

18   waiting for him, to have the people that need to review those,

19   pull those records, pay them overtime to stay after they are

20   supposed to leave so they can be available.            10:59:21

21        Having four attorneys, or three attorneys sitting in a

22   room literally doing nothing, no electronics are allowed.

23   Imagine that, a lawyer without a phone.  We are literally

24   twiddling our thumbs.  This is Dr. Shulman's fifth or sixth

25   tour.  He's doing one today.                           10:59:39

─────── August 7, 2013 - Motion Hearing ───────

1    I just want to end by switching back to the stay,

2  because, I mean, that's why we're here initially.  And I think

3  the Court raised some legitimate concerns about, well, to what

4  extent will this discovery be wasted.  We don't think it will

5  be.  If anything, at most, we can supplement.  We can do that     10:59:59

6  efficiently.  By ordering a stay, we can stop these 22 plus six

7  depositions of six different dentists.

8        THE COURT:  Well, let's go back.  22 depositions of --

9  11 depositions of monitors because you won't agree that a few

10 depositions are representative of different facilities?           11:00:22

11       MR. ACEDO:  I don't recall a proposal of that -- the

12 only proposal I have seen, which I saw last night for the first

13 time in their discovery proposal, was we'll agree to not tour

14 the remaining facilities if you agree that the conditions at

15 those facilities are identical.  I read that yesterday morning   11:00:39

16 for the first time.  I don't know about any proposals to say,

17 well, look, one contract monitor's testimony will be

18 representative of the rest of them.

19       THE COURT:  And maybe that just came recently so you

20 haven't had a chance to consider it.                             11:00:56

21       MR. ACEDO:  But we can stop the 12 remaining tours.

22 We can stop the depositions.  We can wait and come back and

23 reconvene after the appeal is final.

24       THE COURT:  But you, yourself, told me I have got to

25 wait for en banc, certiorari, and the whole bit.  We're talking  11:01:11

─August 7, 2013 - Motion Hearing─

1    two years or more.  Even if we get a prompt decision from the

2    panel in the six or nine or 12 months, which would be pretty

3    darn fast for them.

4            MR. ACEDO:  That would be fast.  And nothing would

5    prevent you from lifting the stay.  That's something, certainly        11:01:30

6    something we can consider down the road.  But it's just the

7    nature of the beast.  It's a 23(f) appeal.  We're entitled to

8    it.  The Court of Appeals is interested in it.  And we have a

9    right to pursue that now.  And the ramifications of that order,

10   if it's decertified, far outweigh any discovery that needs to         11:01:51

11   be redone, which we don't think is -- is minimal, if any.  And

12   of the any, that burden is on us, not on them.

13           THE COURT:  Actually, the burden is on them to prove

14   their case.

15           MR. ACEDO:  Well, the burden is on us to supplement or        11:02:07

16   produce.  But all this is a moot point if the Ninth Circuit

17   comes down and decertifies.  I can't imagine what discovery

18   would be left.  That's a very real possibility.  Again, we

19   argue manifest error, and that was one of the three

20   circumstances the Court would take these type of cases.              11:02:27

21           THE COURT:  Is one of the key issues there that if

22   these recent Supreme Court cases that are tightening up the

23   commonality requirements for (b)(3) classes, whether that's

24   going to apply to a (b)(2) class?  Isn't that one of the key

25   issues?                                                              11:02:43

—— August 7, 2013 - Motion Hearing ——

1        MR. ACEDO:  Here's the difference.  There's been quite

2   a few US Supreme Court class certifications in the last five

3   years.

4        THE COURT:  They are all (b)(3) cases.

5        MR. ACEDO:  Well, the ones that have talked about                11:02:50

6   commonality, it's 23(a).  That's a 23(a) factor and it applies

7   equally to (b)(2) or (b)(3).  One of the more recent cases --

8        THE COURT:  Yeah, but the commonality in those cases

9   typically had to do with the damage aspect, which is only

10  pertinent to a (b)(3) class.                                          11:03:09

11       MR. ACEDO:  Commonality applies to (b)(2) injunctive

12  classes as well, Your Honor.

13       THE COURT:  I know, but the -- the verbal formula

14  does, but the practical application, the commonality for

15  damages simply has no relevance to it.  I'm not quarrelling          11:03:21

16  with it, I just see it as a pretty significant issue if they

17  are going to cut back on (b)(2) classes on that same, more

18  tighter analysis for damages, which is (b)(3), that's a very

19  significant -- that would be a significant change.

20       MR. ACEDO:  It is.  And the trend that I have seen in           11:03:41

21  the last five years is that the Ninth Circuit and the Supreme

22  Court are tightening up those standards.  They are decertifying

23  classes and that's the trend.  And you are right.  Whether to

24  the extent Wal-Mart applies in this (b)(2) injunctive case,

25  that's a hot issue.  That could be why they took it.                 11:03:57

1        THE COURT:  Of course that was a damage case.

2        MR. ACEDO:  Right.  And we argued this in our

3   response, and I apologize for repeating it.  The analysis that

4   we're relying on, the commonality portion, applies equally to

5   both (b)(2) and (b)(3).                                    11:04:12

6        THE COURT:  And, you know, I'm digressing, but I have

7   already said that I was influenced by the discussion in the

8   Newberg treatise about class actions where the relief is

9   essentially similar anyway.  That makes sense for the Court to

10  certify, which is different in order to protect the interests   11:04:29

11  of people who would be affected anyway, which just doesn't

12  impact on damages the same way.  But they might reach that

13  conclusion, so we'll see.

14       MR. ACEDO:  I think the bottom line, Your Honor, is

15  there is uncertainty.  And the ramifications of an order        11:04:50

16  decertifying the class, I mean, that would be tremendous.  It

17  would change the landscape of this case.

18       THE COURT:  That's the point.  Would it?  I mean, if

19  you have got to go to trial anyway, and your theory is what I

20  thought, or their theory is that the reason these people are    11:05:09

21  injured or threatened with injury is because of the systemic

22  lack of care, they would be proving that on their own case.

23       And if they fail to prove that on their own cases,

24  that would necessarily mean that there would be no class injury

25  either.  So there's that whole line of cases, old cases, that   11:05:36

UNITED STATES DISTRICT COURT

─────August 7, 2013 - Motion Hearing─────

1   say, well, you know, we don't really need to certify a class in

2   a (b)(2) situation because if the plaintiffs win they will

3   effectively get the same relief as if you certified the class.

4   And there are plenty of cases that bought into that.  I must

5   admit when I was a young lawyer, I once successfully made that          11:05:56

6   argument and I persuaded a judge to deny a class certification.

7   I now realize the error of my ways.

8            And a lot of courts had done that, but that's wrong,

9   because that theory would result in never certifying any (b)(2)

10  class where the named plaintiffs -- if relief for the named          11:06:17

11  plaintiffs effectively provided relief for the class, it will

12  almost always appeal.  And other cases have noted that, and I

13  think the better cases have rejected that.

14           MR. ACEDO:  Well, the other side of the --

15           THE COURT:  But this brings us back to the                   11:06:39

16  practicality if we go forward.  We go forward with the named

17  plaintiffs.  If some of them haven't been injured yet, their

18  claim is that they are in serious threat and the threat exists

19  because of their health situations that could create a need and

20  there is a systemic failure of services.  That's what they             11:07:06

21  allege.  If they don't prove a systemic failure of services,

22  they are going to lose their individual claims, which is the

23  same thing as not proving what would be necessary for class

24  relief.

25           So I'm thinking this through, and I'm trying to figure        11:07:22

1   whether it makes much difference if we do or do not have the

2   class certification.  And part of what I'm saying is rehearsing

3   this line of cases that you all can find if you want to.  This

4   is the flip side of that line of cases that I think some of

5   them erroneously held you should -- you can't deny class          11:07:48

6   certification for an injunction class because the plaintiffs'

7   relief will -- you don't really need a class certification

8   because the plaintiffs' relief will be to grant that relief.

9        Well, the other side of that coin now is that if my

10  class certification order is reversed it doesn't really matter   11:08:07

11  much.  It doesn't matter for the named plaintiffs who are here,

12  and doesn't matter for the discovery, the preparation and what

13  we have to do.

14        MR. ACEDO:  Well, Your Honor, Ms. Gerlicher was just

15  up here and told you that even if their individual claims fail   11:08:27

16  at trial, they will still -- they believe they still can pursue

17  the class claims.

18        THE COURT:  Well, you know, we'll see.

19        MR. ACEDO:  Yeah.  We will see.

20        THE COURT:  I understand doctrinally, a class action       11:08:40

21  can proceed even if the named plaintiffs' claim has become moot

22  or whatnot.  I'm not talking about that.  I'm talking about if

23  you look at the actual interplay of the substantive claims,

24  individually and class-wise, if, I think, if the named

25  plaintiffs lose, it will have meant that there was no systemic   11:09:06

1    deficiency in medical care, which means the plaintiff class

2    loses too.  It's hard for me to see how the individual

3    plaintiffs could lose, but the absentee class members can win.

4    In the practical context of this case, it's hard for me to see

5    how that could happen.                                          11:09:31

6           MR. ACEDO:  It's hard for us to see as well, Your

7    Honor.  But we have to prepare between now and then for -- we

8    have to defend against the class claims.  We just can't bank

9    on, well, let's just focus on the individuals and then we'll

10   win.  We can't do that.  And between now and then, everyone has 11:09:46

11   to, if there's no stay, has to proceed on the assumption that

12   class discovery is fair game.  And I think with every request

13   for production, RFA, ROG, every deposition question asked,

14   every tour that goes forward, we can get up there and say, wait

15   a minute.  Hold on.  We object to that, because it's not going  11:10:06

16   to go beyond the individual claim.

17          So I don't want to look at it in a vacuum at what's

18   going to happen at trial, what the result might be, because

19   this has ramifications between now and trial with the

20   discovery.  And if it's hard for you and I to grapple with it   11:10:27

21   and to really fine that line now, that just raises problems

22   with every discovery dispute that may arise between now and

23   then.  And it just makes more sense just to stop it now and

24   then see what happens.  Because it all could be a moot point.

25          THE COURT:  Well, let me -- I do want to have a          11:10:49

—August 7, 2013 - Motion Hearing—

1    comment about discovery.  But before we do that, let me say

2    this.

3            I will -- I'm thinking about effective efficient

4    processing of this case, and I really do not want to waste all

5    the expenditures that both sides have made so far.  So that          11:11:03

6    weighs heavily in my mind.

7            If I end up denying your motion for stay pending

8    appeal, it will not hurt my feelings in the slightest if the

9    Court of Appeals reverses that.  I would welcome their

10   guidance.  If they think it should be stayed, that would be          11:11:24

11   fine with me.  I'm going to make my best call.  But -- because

12   they are in a position to say what I can't, which is what their

13   prospect is of reversing that order.  So if I deny this motion,

14   I believe you could take it up.

15           And I'm not inviting a reversal of a ruling, I'm just        11:11:41

16   telling you that I'm going to give it my best call.  But I

17   don't have a personal stake in it and it wouldn't bother me if

18   they had a different view.

19           Now, with respect to the balance of discovery, I don't

20   know.                                                                11:12:13

21           MS. GERLICHER:  Your Honor, I don't wish to interrupt,

22   but if you were going to say something substantive about your

23   decisions I believe the ACDL would like to be heard before you

24   do.

25           THE COURT:  I didn't know that.  Where are they?            11:12:24

UNITED STATES DISTRICT COURT

─────────── August 7, 2013 - Motion Hearing ───────────

1          Let's yield the microphone.  I didn't realize you

2     wanted to speak.

3          MR. ACEDO:  Can I have one last point before we switch

4     gears?

5          THE COURT:  You can respond to her, too.                    11:12:32

6          MR. ACEDO:  Your concern about the practicality of an

7     injunction benefitting all, we cited the *Zepeda* case in our

8     pleadings and we think that is the most current applicable law

9     and that case holds.  Even if an injunction may have the

10    practicable benefit of benefitting other individuals that       11:12:47

11    shouldn't drive a decision to issue an injunction.  Unless the

12    class is certified, it has to be narrowly tailored.  I just

13    direct your attention to that case.

14         THE COURT:  I don't quarrel with that in the abstract.

15    The benefit of the class is incidental to granting relief to    11:13:03

16    the named plaintiffs when you don't have a class certification.

17    I understand.

18         All right.

19         MS. ALEWELT:  Good morning, Your Honor.

20         I just briefly wanted to mention --                        11:13:18

21         THE COURT:  I'm sorry.  Would you state your name

22    again, please?

23         MS. ALEWELT:  Jennifer Alewelt for the Center for

24    Plaintiff -- for the plaintiff, Arizona Center for Disability

25    Law.                                                            11:13:28

UNITED STATES DISTRICT COURT

1        THE COURT:  Okay.

2        MS. ALEWELT:  We actually have no stake in the outcome

3    of this whatsoever, so to the extent that defendants' arguments

4    don't -- are unrelated to us, they are unrelated to us.  So the

5    outcome of this motion has no determination at all as to the          11:13:43

6    progression of the mental health and isolation claims.  I have

7    attended the expert tours of Pablo Stewart, Craig Haney, and

8    Eldon Vail, not all of those tours, but with each of those

9    experts.  And those claims should move forward regardless of

10   the outcome of this anyway.                                           11:14:07

11        Insofar as what you were mentioning about injunctive

12   relief, our office actually has a case in the Ninth Circuit

13   Court of Appeals that we originally filed as a class action and

14   opted not to certify because the relief was the same with a lot

15   less cost.  So that's not uncommon.  So we certainly agree with      11:14:24

16   your standpoint that these claims would still need to be

17   litigated regardless.  But at least as it relates to the mental

18   health and isolation claims, those ought to moved forward.

19        That being said, the plaintiffs, named plaintiffs,

20   have already agreed to bear the cost of that burden because it        11:14:40

21   would -- that discovery would continue anyway so defendants

22   would regardless bear that cost, and then that shifts the

23   burden to the named plaintiffs.  And they have agreed to

24   continue to participate in that discovery.

25        So to the extent that those specific claims would move          11:14:54

─────August 7, 2013 - Motion Hearing─────

1   forward, they will, regardless of the Ninth Circuit's decision.

2        That's it.

3        THE COURT:  All right.  Mr. Acedo, you get the last

4   say if there's anything you want to say in response to that.

5        MR. ACEDO:  Ms. Alewelt bought up a good point about                11:15:10

6   the practicality.  Why is this -- why do they need this case

7   certified then if they can just raise it not as a class?

8   That's a very good question.  Why does it have to be certified?

9   It doesn't have to be.  But because it is certified they are

10  using that as their sword to conduct all this discovery.  It             11:15:28

11  justifies them having 44 lawyers on this case.  If this were

12  just a case with 13 inmates you have got to ask yourself would

13  they have 44 lawyers working day and night on this?  Would we

14  be getting e-mails and letters two or three times a day every

15  day?  I don't think so.                                                  11:15:47

16       So from a practicality concern, something else to

17  consider, Your Honor, is the attorney's fees that are just

18  racking up on this case solely because it is a class action and

19  they are proceeding on that basis.

20       THE COURT:  That's a legitimate concern.                           11:16:01

21       It does appear to me that the plaintiffs are seeking

22  and giving discovery information that goes beyond even the

23  rather long list of classes, subclasses that I certified.  They

24  are just looking for anything they can find, some of which may

25  well be legitimate.                                                      11:16:40

1          I read the stuff about overheating.  That's not in any

2   of my -- that may fall below constitutional minimums but it's

3   not what I certified.

4          MS. GERLICHER:  It goes to the conditions of

5   isolation, Your Honor.                                    11:16:57

6          THE COURT:  Well, perhaps.  Was that where -- was that

7   in some of the isolation units?

8          MS. GERLICHER:  I believe it may have been discovered

9   on Pablo Stewart's tour, which would have been a mental health

10  tour.  And I know it's an issue with mental health medications  11:17:16

11  as well.

12         THE COURT:  I didn't think that was within what we

13  certified, that is, the mental health medications may be

14  broadly viewed.

15         MS. ALEWELT:  Your Honor, it does relate to           11:17:31

16  medications because it's all protocols of appropriate

17  conditions for someone on such medications.  So it's part of

18  the scope of that.  I think it's been a warm summer as usual,

19  and the heat was overwhelming.  And that was something that

20  certainly the clinician identified as an issue as part of the  11:17:47

21  medication component is ensuring those individuals on those

22  certain medications have additional protections or information

23  about the dangers of certain heat conditions in relationship to

24  taking that medication.

25         THE COURT:  I know.  I granted relief on that basis in  11:18:05

————August 7, 2013 - Motion Hearing————

1    a different case.

2            MR. ACEDO:  Your Honor, another example on these

3    tours, they have requested all the records of pregnant women.

4    None of the plaintiffs are pregnant.  There's no allegation in

5    the complaint, but they assert it's a class action and some          11:18:22

6    class members are pregnant, therefore, we want all the records

7    of any pregnant woman.  We have to go out, get those records,

8    gather them, and they sit in the room for a day and review

9    them.

10           MS. GERLICHER:  Your Honor, one of the --                     11:18:35

11           THE COURT:  I must tell you, that is not what I

12   contemplated when I certified this class.

13           MS. GERLICHER:  Your Honor, one of the plaintiffs was

14   pregnant and I believe there were allegations about her

15   pregnancy care, although if I'm wrong about that I apologize.        11:18:45

16   But again, this is about systemic issues affecting --

17           THE COURT:  You know, I had -- I went through a list

18   that was pretty generous.  But there's a list.  It isn't

19   anything you couldn't think of.

20           MS. GERLICHER:  Your Honor, they produced that to us         11:19:01

21   without objection, apparently.  At least they did produce it

22   and there isn't a discovery dispute before you about it, which

23   goes to the general issue that over time, they are -- things

24   are proceeding and they are producing documents and they

25   produced a lot in recent days.  I do give them credit for that.     11:19:18

UNITED STATES DISTRICT COURT

────── August 7, 2013 - Motion Hearing ──────

1    But that's one of the reasons why an extension of just fact

2    discovery would actually be more efficient because we would

3    have time to evaluate and digest those documents before we

4    would have to go out depose people.

5         MR. ACEDO:  Your Honor, one of the reasons why we          11:19:34

6    didn't object to those and other overbroad and burdensome

7    discovery is because of the -- I think there's been eight

8    discovery disputes.

9         THE COURT:  Right.

10        MR. ACEDO:  And on six of them, we won.  On two of          11:19:44

11   them we lost, and we got hit with fees on one of them.  That

12   did put the fear of God in us.  We really took your admonition

13   to heart.  We came in here in November and you assessed fees

14   against us on that one issue, and we have been very careful

15   since that time.  Plaintiffs haven't.  They have raised and     11:20:05

16   they have lost.  It almost --

17        THE COURT:  I remember the reason I did that.  I

18   wasn't picking on anybody.  I don't remember the details, but I

19   remember thinking at that time that one was particularly

20   unjustified.  But I don't remember the details of it.           11:20:20

21        As I said earlier, I do fear that I have intimidated

22   one or both sides.  The discovery process really -- it depends

23   on both diligence and good faith on both sides.  And I don't

24   want people to -- there are times when you get discovery

25   requests where it's more than you really need to produce.  But  11:20:52

1    it's not a problem to do it.  It's just easier to give it than

2    to fight over it.  There's plenty of times like that.

3         There are times when things are requested that are

4    burdensome and costly and they are sufficiently clear that they

5    are beyond the range that it's worth a fight.  And under the        11:21:11

6    rules, the Court isn't supposed to assess fees unless the

7    position of the losing party lacks substantial justification.

8    So if it's a fair fight, I don't intend to assess fees against

9    people.

10        I can't remember if I said this to you all, but I have    11:21:27

11   got a simple litmus test about discovery that works a lot of

12   the time, not all of the time.  And that when I'm the recipient

13   of discovery requests, I will give the other side what I think

14   they are entitled to.  I won't fight with them -- well, I say

15   in the present tense but this was when I was a lawyer.  I           11:21:59

16   didn't fight with people if they didn't craft it exactly right.

17   Most of the time you know what they should get.  Give it to

18   them.

19        And my usual practice was to say, I think this is what

20   you are entitled to.  If you think you are entitled to more,       11:22:15

21   tell me and we'll talk about it.  Otherwise, I'm happy telling

22   the judge that I gave you this and this is all you deserve.

23   And that worked about 98 percent of the time for me.  And

24   that's what I asked other lawyers to do.

25        I know this is a difficult case in a lot of ways,            11:22:34

─────August 7, 2013 - Motion Hearing─────

1    because the defendants are public officials, represent a large

2    institutional client.  And I understand that raises

3    complications about how you handle a case like this.

4         I think I have tried to describe to you my sense of

5    what matters in this case for purposes of the class issues,        11:23:05

6    which is the systemic relief.  And that is, it's the gross

7    data.  I did not understand that I was licensing the plaintiffs

8    to do investigation about anything to sue for anything.  I give

9    a specific list of things that was basically your list.  I have

10   eliminated some things.                                            11:23:36

11        And if that's what class certification meant, then

12   that's not what I intended to do.  And there may be things that

13   the Department is doing, Ms. Gerlicher, that are wrong.  But if

14   they are not in this lawsuit you have to file a different

15   lawsuit to get to them.  And you don't have this lawsuit as a      11:24:08

16   general inquiry to things to sue them for.  It's not true of

17   any lawsuit.

18        So where do I go with this?

19        MR. ACEDO:  Your Honor, those are pretty strong words,

20   and I think it further supports a stay because, I mean, with       11:24:27

21   that admonition, plaintiffs really need to refocus their case.

22   It's been out of control, and with what you just said and what

23   I believe you are repeating, they are proceeding down this

24   path.  And with a stay, the parties, not just plaintiffs, the

25   parties can take a deep breath, can refocus, can consider what     11:24:47

1    you are telling us today.  And I think by taking the time to

2    process that, any discovery that may need to be done in the

3    event that it's a firm two years from now should be minimal and

4    can be efficiently done.

5         MS. GERLICHER:  Your Honor, in this hearing is the          11:25:06

6    first time they have claimed that some of the discovery was

7    irrelevant.  They have claimed it was burdensome and we were

8    asking for a lot but they haven't claimed it was outside the

9    four corners of your order.

10        If that's going to be the basis of a decision then we       11:25:20

11   need to have a lot more information about what it is that has

12   been claimed.  And I do not have all the discovery requests in

13   my head, so I cannot tell you how they line up with your

14   requests.

15        But even if the parties need to take a deep breath,         11:25:32

16   that is not a reason to grant a stay.  That is not a reason

17   that the equities tip against our clients who are suffering

18   under this system every day.

19        So it's just not a reason to grant a stay.  We do

20   think that things could be more efficient if there were more     11:25:46

21   time for fact discovery.  But if the deadline stays the way it

22   is we could still accomplish our deadline.  And we do take

23   seriously your comments about making sure they line up with

24   your class certification order, and we will be doubly sure of

25   that going forward.  But that is not a reason to grant a stay.   11:26:02

─────── August 7, 2013 - Motion Hearing ───────

 1          THE COURT:  All right.  I'm going to take this under

 2    advisement.  I will try to issue something quickly.

 3          I do --

 4          MS. GERLICHER:  There is actually one more issue, Your

 5    Honor.                                                              11:26:16

 6          THE COURT:  Go ahead.

 7          MS. GERLICHER:  You said at the beginning they you did

 8    believe they need to produce an e-mail.  They refused to

 9    produce an e-mail on Monday.  We need your guidance on that.

10          THE COURT:  Let's talk briefly about that.  In just       11:26:26

11    reading your papers, it appeared to me that from what -- and I

12    don't have a command of the details, that some conservative

13    amount of e-mail can be produced without significant outside

14    costs.

15          MS. GERLICHER:  We believe that is true.                   11:26:41

16          THE COURT:  If that's the case, I'm disposed to

17    require that.

18          I know the defendants, no doubt, were encouraged by my

19    remarks the last time we were here about my perceived

20    perception of the great overbreadth of the e-mail discovery.     11:26:53

21    And if it can be produced with -- if you are talking about a

22    couple thousand dollars in outside costs --

23          MR. ACEDO:  Your Honor, I think a good starting point

24    is where we left off at the last hearing.  We left off with

25    they want three custodial records for a date range, which is     11:27:24

—August 7, 2013 - Motion Hearing—

1    just one for Wexford in the search that would generate 16,000

2    plus e-mails.  And you said flat out that was burdensome.

3          MS. GERLICHER:  I don't believe that was what that

4    remark was for.  It was directed to the total request.

5          MR. ACEDO:  I have got the transcript here.  I can          11:27:41

6    certainly submit it.

7          THE COURT:  It doesn't matter because 16,000 looks

8    burdensome to me.  But what's the --

9          MS. GERLICHER:  Your Honor, just to clarify -- I'm

10   sorry.  I did not mean to interrupt.  I just wanted to clarify   11:27:50

11   that 16,000 does sound like a lot, but with the current

12   document review software, that can be done.  I mean, I did

13   3,000 e-mails in my spare time last week.  It is not as

14   burdensome as it sounds.

15         THE COURT:  And is that the one that had a few hundred      11:28:05

16   dollars of costs, outside costs?

17         MS. GERLICHER:  Right.

18         THE COURT:  Is that right, Mr. Acedo?  Is that just

19   ready to deliver just but for paying the vendor for that cost?

20         MR. ACEDO:  Your Honor, first of all, we left off at       11:28:18

21   three custodians at 16,000.  Since that time they want a

22   fourth.  They are going up, not down.  That's more burdensome,

23   not less.

24         MS. GERLICHER:  That's -- sorry.

25         THE COURT:  One at a time.  I'm asking -- I got the        11:28:29

─────August 7, 2013 - Motion Hearing─────

1   impression that the outside cost was only a few hundred

2   dollars, under a thousand.  Is that correct?

3           MR. ACEDO:  Ms. Rand can speak a little further on

4   this.  But whatever the cost of the conversion is, that pales

5   in comparison to what the cost will be in us having to review          11:28:45

6   those documents before we turn them over.

7           THE COURT:  You mean for privilege issues?

8           MS. RAND:  Yes, Your Honor.  It's going to be

9   approximately $1,500 to convert the e-mails at the number of

10  16,000 plus and as well as attachments.  Plaintiffs have          11:29:02

11  insisted that we reduce that cost, even though they are not

12  willing to share in the cost, and they insist that we use their

13  vendor.  I have also asked them whether this last request for

14  the expansion of the e-mails to include a fourth custodian,

15  Tara Diaz, and to include an additional term, Corizon, with an          11:29:25

16  additional date term is their final revision and they refuse to

17  say, yes, that's our final revision.  They just basically say,

18  start producing it.  We'll talk about it later.

19          THE COURT:  This goes back to the discussion we had

20  before.  I'm having a hard time seeing this general trolling          11:29:43

21  through all the communications of a huge operation like this,

22  what is this likely to yield?

23          MS. GERLICHER:  They are not capable of running a very

24  fine-tuned search, so our original vision several months ago

25  was that we would get a kind of basic set of e-mails and revise          11:30:01

—August 7, 2013 - Motion Hearing—

1    them further.  And we're to the point where we have agreed to

2    get this set and these are the e-mails that discuss Wexford and

3    Corizon.

4         THE COURT:  My question is, what do you expect to

5    find?  Wexford was a disaster.  Everybody knows that.  What do      11:30:17

6    we need to troll through 16,000 e-mails for?

7         MS. GERLICHER:  Well, because it's a contemporaneous

8    record of what was going on, what was fixed, what was not, why

9    it was going wrong, the role of ADC, in --

10        THE COURT:  I thought they already produced all the         11:30:36

11   Wexford communications.  Is that right?

12        MS. GERLICHER:  No.  They produced communications that

13   were in the Wexford procurement file which were about the

14   procurement process, it appears to us.

15        THE COURT:  So if this were not particularly             11:30:50

16   burdensome, I would have it produced just because it's not a

17   big deal.  Would there be attorney/client communications in

18   these e-mails?

19        MS. RAND:  Yes, Your Honor, there would.  And we would

20   have to review them and redact them as well as the attachments.   11:31:05

21        THE COURT:  Can't you just filter them out for any of

22   the names of attorneys?

23        MS. RAND:  That is also filtering.  After we filter

24   them out then we still have to review for privileged.

25        THE COURT:  Why not just filter them out, everything       11:31:21

1   with attorneys is out?  Why not just do that?  That's a

2   software issue.

3           MS. GERLICHER:  We would be fine with that.  We would

4   also be find with a clawback agreement.

5           MS. RAND:  We also have security issues as we're          11:31:33

6   talking about a correctional facility, not just attorney/client

7   privilege issues.

8           Also, with the expansion of the e-mails we're not

9   talking about 16,000 anymore.  We're talking about 21,000 plus.

10          THE COURT:  Tell me what was the expansion again?         11:31:50

11          MS. RAND:  They included a fourth custodian, Tara

12  Diaz.  They included an additional search term, Corizon, and

13  they expanded the dates from -- the original search was going

14  to be from April 2nd, 2012, to March 3rd, 2013.  It's now been

15  expanded to July 18th, 2013, which was the date that we ran the   11:32:10

16  reports.

17          THE COURT:  And Corizon is the current vendor?

18          MS. RAND:  Yes, sir.

19          Your Honor, one other point I'd like to make about the

20  e-mail issue is that after the April 26th oral argument, we       11:32:32

21  approached plaintiffs with a proposal and they did not get back

22  to us until close to the middle of July to start discussing

23  issues.  And we almost believe it was a --

24          THE COURT:  Yeah.  Yeah.

25          MS. RAND:  Well, they have waited quite a long time to     11:32:50

1    bring up the issue.  And knowing that discovery closes at the

2    end of September and that we would have to review these

3    e-mails, it seems as if they did not really think about it.  It

4    wasn't on their radar and suddenly now with the hearings they

5    are starting to bring these issues back up, and --                     11:33:12

6            THE COURT:  Now, again, Ms. Gerlicher, what do you

7    expect to get, what do you hope to get from this other than

8    feeling comfortable because you reviewed all the communications

9    that went on between them?

10           MS. GERLICHER:  Well, these are -- they are requests        11:33:25

11   that deal with -- they are from Mr. Ryan and Mr. Pratt so they

12   go to their knowledge of the healthcare system.  They also are

13   contemporaneous, informal, to some degree, reports of what is

14   going on in the system.  E-mail contains, you know, some gold

15   mines.  I was reviewing some last week we got from Smallwood       11:33:46

16   that talk specifically about how the staff is improperly

17   dealing with dentists at one of the facilities.

18           So it's a type of evidence we do not yet have for the

19   most part, and we have narrowed it down as much as we -- to a

20   set that we think is most likely to get us --                          11:34:04

21           THE COURT:  I'm going to give you a pragmatic

22   resolution to this.  Start with this set that's requested, and

23   I will authorize and require the production, but filtering out

24   everything with attorneys.  If there's attorneys involved, it's

25   out, plus a clawback provision.  If any attorney stuff gets          11:34:23

───── August 7, 2013 - Motion Hearing ─────

1   through it will be given back and counsel will be charged with

2   that.

3           Now, I remain dubious about the value of this, but

4   with the cost being insignificant and with these terms, I'm

5   satisfied it will provide something.                    11:34:43

6           When this is all over, Ms. Gerlicher, I want you to

7   tell me whether you found anything interesting on this, all

8   right?

9           MS. GERLICHER:  Yes, Your Honor.

10          Are you ordering production of the 22,000, the -- both   11:34:52

11  time periods, Wexford and Corizon?

12          THE COURT:  I am, but I'm doing this on the belief

13  that it's under a $1,000 or $2,000 of cost to do that.  And

14  there would be no manual reviewing required because we're going

15  to filter out everything involving attorneys.          11:35:07

16          MR. ACEDO:  Your Honor, I don't know if there's any

17  way we can guarantee -- if we're just excluding words like

18  "attorney," we would literally have to put in every conceivable

19  attorney's name that's mentioned.  There is going to be some

20  manual redaction on these.  And I will add that these are the   11:35:24

21  exact same arguments they gave you in April, the exact same

22  ones, and you had the exact same concerns.

23          THE COURT:  Actually, I don't remember this about

24  redacting, filtering out by attorneys.

25          MS. GERLICHER:  Your Honor, we do reviews all the time   11:35:35

UNITED STATES DISTRICT COURT

—August 7, 2013 - Motion Hearing—

1    where we have 50 attorneys that are filtered out.

2             THE COURT:  And is that doable?

3             MS. GERLICHER:  Yes.  I mean, these are e-mails of

4    three different people, so I don't imagine they themselves are

5    dealing with all that many attorneys.  But it certainly should        11:36:01

6    be doable using the type of software that we have pointed them

7    to.  Actually, I don't know exactly what we pointed them to.

8    But I have used software that is perfectly capable of doing

9    that.

10            THE COURT:  They've got to be dealing with a limited       11:36:19

11   number of attorneys, so their names should work.  And with the

12   clawback, you are charged with anything you come across.

13            MS. GERLICHER:  Absolutely, Your Honor.

14            THE COURT:  Of sending it back.

15            Now, I'm reaching this conclusion thinking we're           11:36:37

16   talking about less than $2,000, maybe less than 1,000 in costs

17   and without manual review, unless you want to.  But I don't

18   think you have to with the filtering out of the attorneys.  All

19   you have to do is give them attorney's names, attorneys that

20   work -- that the department deals with.                             11:36:56

21            MS. RAND:  Your Honor, we object because there's

22   security issues.  We have reports that are attached to e-mails

23   that are security reports that report things such as --

24            THE COURT:  How about filtering out for those?  Is

25   there a way to filter out for those?                               11:37:11

─────────── August 7, 2013 - Motion Hearing ───────────

 1          MS. RAND:  No, Your Honor.  Not at this time.  We can

 2     look at it, but I don't think there is without manual

 3     intervention.

 4          MR. ACEDO:  Every document is going to have to be

 5     manually reviewed.  We can't rely on a system to exclude a          11:37:23

 6     privileged document.  There may be an attorney that we forgot

 7     and all of a sudden we have waived the privilege?

 8          THE COURT:  No, you have the clawback.  I'm more

 9     concerned about the security.  I think we have some protections

10     for attorney/client.                                               11:37:36

11          MS. RAND:  Often times the inmate health issues may be

12     related to housing, may be related to another inmate's issue.

13     We have got to be able to redact out things like that.  We've

14     got to be able to redact out the morning reports if something

15     like that is attached.  Security issues of the entire prison,     11:37:53

16     those kind of reports occur regularly.  We have seen them in

17     the e-mails we have reviewed prior.

18          THE COURT:  What's your answer to that, Ms. Gerlicher?

19          MS. GERLICHER:  Housing and other inmates' health

20     issues are not security issues.                                    11:38:08

21          THE COURT:  I know, but what about the other things

22     she mentions?

23          MS. GERLICHER:  I'm not sure what those are.  Sounds

24     like that is a specific report that could be searched for an

25     removed.  We could also have a clawback for security issues.       11:38:18

UNITED STATES DISTRICT COURT

─────── August 7, 2013 - Motion Hearing ───────

1  And all these documents are generally attorney's eyes only.

2  THE COURT:  Here's what I'm going to do.  I'm

3  persuaded that I'm not quite confident about the security

4  issues, so I'm going to direct you all to continue to dialogue

5  about this.  If you don't reach an agreement you can submit        11:38:34

6  that to me with your statements of your positions of what can

7  or cannot be done to protect security.

8  But I am determining that the attorney/client issues

9  are adequately dealt with by filtering and the clawback.

10  MS. GERLICHER:  Okay, Your Honor.                                 11:38:52

11  THE COURT:  All right.  As I said, I'm going to take

12  this under advisement.  And if we do go forward, I'm going to

13  expect you all to -- I may set limits on what can go forward,

14  and beyond any limits that I set, I'm going to direct you to

15  confer about further limitation in light of the direction I      11:39:37

16  have given in this hearing.

17  MR. ACEDO:  Your Honor, we would ask in the

18  alternative if you deny our stay that at least the expert

19  tours, these ones that are coming up this week, next week, be

20  cancelled.  We have laid out in our papers that there's no       11:40:08

21  reason to do them and they are unduly burdensome, just as an

22  alternative request.

23  MS. GERLICHER:  One of those experts has not yet

24  toured, Your Honor.  As we have pointed out, we're willing to

25  cancel the others subject to stipulation.  And the expert who    11:40:23

─ August 7, 2013 - Motion Hearing ─

```
 1    has not yet toured is looking at issues different than any

 2    other expert.

 3              THE COURT:  Which one is she?

 4              MS. GERLICHER:  Dr. Bree Williams.

 5              THE COURT:  What is her area?                      11:40:34

 6              MS. GERLICHER:  Looking at the physical effects of

 7    isolation, Your Honor.

 8              MR. ACEDO:  She's essentially conditions of

 9    confinement expert, and they have two others --

10              THE COURT:  I'm sorry.  Can't hear you.           11:40:42

11              MR. ACEDO:  She's essentially a conditions of

12    confinement expert, and they have two other experts that have

13    done a lot of tours.  It's in our papers exactly how many they

14    have done.

15              MS. GERLICHER:  But one of those is a psychiatrist, 11:40:51

16    Your Honor, and the other was a corrections expert.

17              THE COURT:  What's her name again?

18              MS. GERLICHER:  Dr. Haney was dealing with mental

19    health in the isolation units.

20              THE COURT:  What's her field?                     11:41:01

21              MS. GERLICHER:  Craig Haney, I think he's --

22              MS. ALEWELT:  He's a psychologist.

23              MS. GERLICHER:  And Mr. Vail is a correctional --

24              THE COURT:  How many days tours does he want to do?

25              MS. GERLICHER:  Ms. Williams wants to do three one-day 11:41:15
```

1    tours of each of the isolation units, or a one-day tour of each

2    isolation unit.

3          THE COURT:  Well, Mr. Acedo, that's stuff that I

4    specifically did certify those subgroups.  So what's wrong with

5    those tours?                                                            11:41:34

6          MR. ACEDO:  Well, she is scheduled to tour Florence,

7    Eyman, and Perryville.  Their other experts, Haney and Vail,

8    have already toured Perryville, two days; Florence, four days;

9    Eyman, five days.  There's been nearly 10 tours of these

10   facilities on the issue of confinement.  They are trying to      11:41:54

11   carve out niches that they specialize in certain things.

12         But, I mean, I think this goes back to our broader

13   objection, something you pointed out earlier, that why can't

14   this be done through interrogatories.  Why are they going to

15   facilities where these inmates aren't housed at?                 11:42:11

16         MS. ALEWELT:  That's part of the claim.  In order to

17   be able to prove the claim the conditions of confinement aren't

18   appropriate, we need to see the conditions of confinement, and

19   the experts to have an opportunity to opine.  And there are two

20   different thresholds, or rather three, and we have selected      11:42:26

21   three different experts to speak to those issues:  The first

22   being Dr. Haney, who is the psychologist who is going to opine

23   as to the mental impact of long-term isolation.  Eldon Vail is

24   a former corrections warden, I believe, and he is going to

25   opine about the appropriateness of the physical conditions.      11:42:46

1   For example, on a tour with him we saw several rodents and

2   insects, and that's a different opinion than a clinician would

3   provide who is an expert in psychology or psychiatry.  The

4   third expert Amelia was discussing is going to talk about the

5   medical impact of long-term isolation.                        11:43:08

6          So while each of these individuals may cross over the

7   facilities they see, it's only to ensure that we provide the

8   complete girth of information that's available to show the

9   Court all of the places ADC is failing in that regard.

10          THE COURT:  All right.  I will consider that.          11:43:24

11          Counsel, is there anything else before we adjourn?

12          All right.  Thank you.  The matters are taken under

13   advisement.

14          (Proceeding concluded at 11:43 a.m.)

1

2

3

4

5                    C E R T I F I C A T E

6

7        I, LAURIE A. ADAMS, do hereby certify that I am duly

8   appointed and qualified to act as Official Court Reporter for

9   the United States District Court for the District of Arizona.

10       I FURTHER CERTIFY that the foregoing pages constitute

11  a full, true, and accurate transcript of all of that portion of

12  the proceedings contained herein, had in the above-entitled

13  cause on the date specified therein, and that said transcript

14  was prepared under my direction and control.

15       DATED at Phoenix, Arizona, this 8th day of August,

16  2013.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25