**EXHIBIT 9**

**EXHIBIT 9**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn Jensen; | ) | No. CV12-00601- |
| Stephen Swartz; Dustin Brislan; | ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco; | ) | |
| Jackie Thomas; Jeremy Smith; Robert | ) | |
| Gamez; Maryanne Chisholm; Desiree | ) | |
| Licci; Joseph Hefner; Joshua Polson; | ) | |
| and Charlotte Wells, on behalf of | ) | |
| themselves and all others similarly | ) | |
| situated; and Arizona Center for | ) | |
| Disability Law, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| vs. | ) | |
| | ) | |
| Charles Ryan, Director, Arizona | ) | |
| Department of Corrections; and | ) | |
| Richard Pratt, Interim Division | ) | |
| Director, Division of Health | ) | |
| Services, Arizona Department of | ) | |
| Corrections, in their official | ) | |
| capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

HELENA VALENZUELA, Ph.D.

August 23, 2012
9:06 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Page 2

```
 1                    I N D E X
 2   WITNESS                          PAGE
 3   HELENA VALENZUELA, Ph.D.
 4       Examination by Mr. Brantley       6
 5
 6
 7
 8
 9       All exhibits are designated CONFIDENTIAL
         INFORMATION - SUBJECT TO PROTECTIVE ORDER
10       with the exception of Exhibit No. 157
11
12                 INDEX TO EXHIBITS
13   No.  Description          Bates No.      Page
```

```
14   137  Email chain starting with   PLTF-PARSONS-     41
          10/18/10 email from Helena   003652-3653
15        Valenzuela to Rhonda
          Jensen
16
17   138  Email chain starting with   PLTF-PARSONS-     45
          10/25/10 email from Helena   003655-3656
18        Valenzuela to Rhonda
          Jensen
19   139  Email chain starting with   PLTF-PARSONS-     49
          2/8/11 email from Rhonda     003652-3653
20        Jensen to Helena Valenzuela
21   140  Email chain starting with   PLTF-PARSONS-     58
          8/9/11 email from Helena     003872
22        Valenzuela to Rhonda
          Jensen, Richard Rowe,
23        David Robertson
24   141  8/25/11 email from Helena    PLTF-PARSONS-     59
          Valenzuela to Rhonda Jensen  003884
25
```

Page 4

```
 1               INDEX TO EXHIBITS (Cont.)
 2   No.  Description          Bates No.      Page
```

```
 3   153  April 2013 Phoenix        ADC088976        178
          Complex, Staffing
 4
     154  January 2013 Phoenix      ADC070566        186
 5        Complex, Staffing
 6   155  November 2012 Phoenix     ADC052872-52873  188
          Alhambra/Flamenco,
 7        Staffing
 8   156  9/27/12 email from Karen  ADC034754        211
          Chu to Jim Taylor,
 9        Richard Pratt, Helena
          Valenzuela
10
     157  Meeting with the Arizona  WEXFORD          218
11        Department of Corrections,  000004-131
          November 7, 2012
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              INDEX TO EXHIBITS (Cont.)
 2   No.  Description          Bates No.      Page
```

```
 3   142  November 2012 Phoenix    ADC052840        103
          Complex, Intake
 4
     143  January 2013 Phoenix     ADC070547        105
 5        Complex, Intake
 6   144  June 2013 Phoenix        ADC118026        107
          Complex, Intake
 7
     145  Phoenix From October 2012  ADC036927-36928  136
 8        To October 2012, Amber
          Only Findings
 9
     146  December 2012 Phoenix    ADC069629-69631  137
10        Complex, Sick Call
11   147  May 2013 Phoenix Complex,  ADC117766-117769  139
          Sick Call
12
     148  ADOC Health Services     ADC034823-34825  150
13        Contract Monitoring Bureau
          Memorandum
14        To Joe Profiri through
          Jim Taylor from Helena
15        Valenzuela, 8/24/12
          Subject: Phoenix Complex:
16        Wexford Health Services
          Compliance-Findings
17
     149  January 2013 Phoenix     ADC070515-70516  152
18        Alhambra/Flamenco, Medical
          Records
19
     150  December 2012 Phoenix    ADC069642-69643  161
20        Complex, Medication
          Administration
21
     151  November 2012 Phoenix    ADC052851-52852  165
22        Complex, Medication
          Administration
23
     152  November 2012 Phoenix    ADC052858        168
24        Complex, Medication Room
25
```

Page 5

```
 1      DEPOSITION OF HELENA VALENZUELA, Ph.D.
 2
 3         The deposition of HELENA VALENZUELA, Ph.D.,
 4   was taken on August 23, 2012, commencing at 9:06 a.m., at
 5   the law office of PERKINS COIE LLP, 2901 North Central
 6   Avenue, Suite 2000, Phoenix, Arizona, before CAROLYN T.
 7   SULLIVAN, a Certified Reporter, Certificate No. 50528,
 8   for the State of Arizona.
 9
10   APPEARANCES:
11   For all Plaintiffs except Arizona Center for Disability
     Law:
12
        JONES DAY
13      Kevin C. Brantley, Esq.
        3161 Michelson Drive
14      Suite 800
        Irvine, California 92612
15
16   For Plaintiff Arizona Center for Disability Law:
17      ARIZONA CENTER FOR DISABILITY LAW
        Sarah E. Kader, Esq.
18      Staff Attorney
        5025 East Washington Street
19      Suite 202
        Phoenix, Arizona 85034
20
21   For Defendants:
22      STRUCK WIENEKE & LOVE, P.L.C.
        Ashlee B. Fletcher, Esq.
23      3100 West Ray Road
        Suite 300
24      Chandler, Arizona 85226
25
```

1    HELENA VALENZUELA, Ph.D.,
2 called as a witness herein, having been first duly sworn
3 by the Certified Reporter to speak the whole truth and
4 nothing but the truth, was examined and testified as
5 follows:
6
7        EXAMINATION
8 BY MR. BRANTLEY:
9    Q.   Good morning, Dr. Valenzuela.
10    A.   Good morning.
11    Q.   My name is Kevin Brantley.  I work for the law
12 firm of Jones Day, and I represent the prisoner
13 plaintiffs in the Parsons v. Ryan case.
14        Can you please state your first and last
15 name for me.
16    A.   Helena Valenzuela.
17    Q.   And can you spell your last name for me,
18 please.
19    A.   V-a-l-e-n-z-u-e-l-a.
20    Q.   Thank you.  And what's your current title?
21    A.   The health services compliance monitor at the
22 Phoenix Alhambra Complex.
23    Q.   And what's the address at the Phoenix Alhambra
24 Complex?
25    A.   I believe it's 2400 North Van Buren.  No, East

1 Van Buren, I'm sorry.  2400 East Van Buren, Phoenix,
2 Arizona.  And I don't know the zip code.
3    Q.   And what's your business email address?
4    A.   The business email address would be the same.
5 Oh, email. ▓▓▓▓▓▓▓▓▓▓▓▓
6    Q.   What's your home address?
7    A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓Caroline is
8 C-a-r-o-l-i-n-e.
9    Q.   And what city is that?
10    A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓
11    Q.   And just to go over a few ground rules for the
12 deposition.  A lot of these are to assist the court
13 reporter.
14        First off, I need all of your answers to be
15 verbal answers.  She can't take down a head nod, a wave
16 of the arms, a shake of the head, anything like that, so
17 I need all of your answers to my questions to be verbal.
18    A.   Understood.
19    Q.   Also, if you're answering yes or no, please
20 answer yes or no, not uh-huh, yeah, nah.  Please
21 verbalize the yes or no.
22    A.   Understood.
23    Q.   When I'm asking a question, if you could wait
24 until I've finished asking the question completely, I
25 would appreciate that, and I will do the same for you.

1 I'll wait until you've completed answering the question
2 until I say anything else.. Are you able to do that with
3 me?
4    A.   Understood, yes.
5    Q.   If I ask a question that you're unclear about,
6 would you please ask me to clarify it?
7    A.   Yes, I will.
8    Q.   Because if you answer a question, I'm assuming
9 that you understood it.  Do you understand that?
10    A.   Yes, I do.
11    Q.   Even if an attorney objects to a question
12 during the deposition, you still need to answer that
13 question unless your attorney instructs you otherwise.
14 Do you understand that?
15    A.   Yes, I do.
16    Q.   If you need to take a break at any time, please
17 let me know.  But if there's any question that's
18 outstanding at the time, you need to answer that question
19 before taking a break.  Do you understand that?
20    A.   Yes, I do.
21    Q.   I don't want you to guess or speculate about
22 anything, but I am entitled to your best recollection and
23 best estimates.  Do you understand that?
24    A.   Yes, I do.
25    Q.   And you were -- you took the oath, and

1 everything you say today is under penalty of perjury as
2 if you were testifying at trial.  Do you understand that?
3    A.   Yes, I do.
4    Q.   Is there anything as you sit here today that
5 would prevent you from being able to testify fully and
6 truthfully?
7    A.   No.
8    Q.   Have you ever been deposed before?
9    A.   Yes, I have.
10    Q.   How many times?
11    A.   Once.
12    Q.   And in what case was that?
13    A.   This was in a divorce case.
14    Q.   So in your time at the Arizona Department of
15 Corrections, you've never been involved in a deposition
16 before?
17    A.   No.
18    Q.   Did you meet with anyone in preparation for
19 this deposition?
20    A.   I met with the attorney.
21    Q.   And which attorney was that?
22    A.   With Ashlee.
23    Q.   And that's Ashlee Fletcher?
24    A.   Yes.
25    Q.   And how many times did you meet with Ashlee?

Page 10

```
 1      A.   One time.
 2      Q.   And for how long did you meet?
 3      A.   Approximately -- I believe an hour or so.
 4      Q.   And were you just discussing the process of the
 5 deposition and what was going to take place today?
 6           MS. FLETCHER:  Form.
 7           Don't answer that.  It goes into privileged
 8 communications.
 9      Q.   BY MR. BRANTLEY:  Have you had any discussions
10 relating to the case with attorneys outside of preparing
11 for this deposition?
12      A.   No.
13      Q.   So you haven't spoken to any other attorneys
14 about this case outside of your preparation for this
15 deposition?
16      A.   Right.  And I've not spoken with other
17 attorneys besides the attorneys with Ashlee.
18      Q.   And where did you go to college?
19      A.   I went to Arizona State University for the
20 Ph.D.  And for the second -- the first Master's, went to
21 Arizona State University.  And the second Master's was at
22 Long Beach -- California State Long Beach.
23      Q.   And where did you do your undergrad?
24      A.   Arizona State University.
25      Q.   So you did undergrad at ASU?
```

Page 11

```
 1      A.   Right.
 2      Q.   And then you received a couple of Master's, one
 3 of them from Long Beach State --
 4      A.   Yes, Cal State Long Beach.  A Master's in
 5 biomedical art.  And a Master's from Arizona State
 6 University in learning disabilities and emotional
 7 disturbance.  Actually, special education.  It was a
 8 double major on that one.
 9      Q.   And when did you originally get your degree in
10 biomedical art?
11      A.   Oh, I think that was in the 1980s.
12      Q.   And how long after that was it that you went
13 and got your first -- your next Master's in learning
14 disabilities?
15      A.   Actually, the learning disabilities was first.
16      Q.   Okay.
17      A.   It's called special education.  I just had the
18 double major in that.  I should have clarified that.  So
19 it would be a Master's in special education with a double
20 major.
21      Q.   And when did you get that degree?
22      A.   That degree was probably in the 1970s.  And I'm
23 just not sure of the exact date at this point.  I moved
24 forward.
25      Q.   So you've got two Master's, one in biomedical
```

Page 12

```
 1 art and a double major in learning disabilities and
 2 special education?
 3      A.   Correct.  No, I have special education, double
 4 major learning disabilities and emotional disturbance.
 5      Q.   Okay.  And then subsequently you obtained a
 6 Ph.D.; is that correct?
 7      A.   That is correct.
 8      Q.   And what's that Ph.D. in?
 9      A.   It would be in justice studies with a criminal
10 justice aspect.
11      Q.   And you obtained that at Arizona State as well?
12      A.   Yes, I did.
13      Q.   And what year did you obtain that degree?
14      A.   Oh, I better remember that one.  That was 2007.
15      Q.   Prior to starting your work with the Arizona
16 Department of Corrections, can you walk through what
17 positions you held in all your different employment from
18 the time you got your first undergrad degree until the
19 time you started working for the Arizona Department of
20 Corrections.
21      A.   I've been a special education teacher, been an
22 educational director of a private school.  I have --
23 let's see.  Taught at Arizona State University at the
24 Justice Studies Department as a professor.  And I've been
25 at the Department of Corrections for the last six years
```

Page 13

```
 1 in positions of an admin assistant to the facility health
 2 administrator, and then I was the facility health
 3 administrator at Tucson.  And additionally, I do family
 4 mediations and educational consultations within the
 5 community.  And on the other hand, I've also -- see, I
 6 have two.  I am also medical illustrator, so I do
 7 freelance medical illustrations and murals.
 8      Q.   And you continue to do that today?
 9      A.   Yes.
10      Q.   Since you obtained your degree around 1980,
11 you've been doing this biomedical art ever since then?
12      A.   Yes.
13      Q.   And so you worked in the education field for
14 roughly 25 years, 30 years?
15      A.   Yeah, long time.  I've kept going.
16      Q.   And how long were you a special education
17 teacher versus the time you spent as a director at a
18 private school?
19      A.   I would say I was already teaching probably six
20 years at that point, I believe, maybe even longer.
21      Q.   And then at some point you decided you wanted
22 to go back and get a degree in criminal justice?
23      A.   No.  I had -- I decided at that point I wanted
24 to be a biomedical artist because -- in other words, I
25 didn't go right away for my Ph.D.  And I wanted to do the
```

## Page 14

1    biomedical art, and I did that, and then I went for the
2    Ph.D. later, after children. I should mention I was a
3    mother at that point. There was time taken to mother two
4    children that are adults now.
5        Q.   And so your only educational background in the
6    medical field is the biomedical art degree, correct?
7        A.   Correct.
8        Q.   And after you had been working in the education
9    field and the biomedical art field for several decades,
10   you then decided to go back and obtain your Ph.D.?
11       A.   Right.
12       Q.   And what year was it that you decided to go
13   back and get your Ph.D. in criminal justice?
14       A.   I think it was about -- I think it was about
15   2002. Around that decision time.
16       Q.   And why did you decide to go back and get your
17   Ph.D. at that time?
18       A.   I have a -- it ties into the research that I
19   did with special education about coping skills and
20   resilience. And I was very interested in prison because
21   during the time that I was going back for preliminaries,
22   I went to go for a Ph.D., I was debating between
23   education and criminal justice and decided to go that
24   route because of the mental health aspects and the
25   background of being interested in how people learn. In

## Page 15

1    special education, that's necessary within the justice
2    system as well.
3        Q.   At the time that you went and got your Ph.D.,
4    did you have any inclination that you were going to start
5    working for the Arizona Department of Corrections or did
6    you not know exactly where the degree was going to take
7    you?
8        A.   I did not know exactly where I was going to go
9    because I was concentrating on studying. But during the
10   time, then I did decide that the Department of
11   Corrections would be a wonderful place to continue my
12   thoughts and my values of doing community service in a
13   certain sense.
14       Q.   And you indicated that you started working for
15   the Department of Corrections in 2007?
16       A.   No. I would from today count back six years.
17   Yeah, I think it was maybe around that time.
18       Q.   And your first position at the ADC, you said
19   that was an assistant?
20       A.   They call it -- let's see. It's -- you're
21   assistant to the facility health administrator. And that
22   was at Perryville.
23       Q.   What did your job tasks entail as the assistant
24   to the FHA at Perryville?
25       A.   Assisting the facility health administrator in

## Page 16

1    the health operations of the prison facility.
2        Q.   And can you give me a further explanation?
3    Like were you -- like a lot of emails or making sure that
4    medications were being distributed or making sure
5    everything that was being done in a timely fashion? What
6    exactly were you responsible for as the assistant?
7        MS. FLETCHER:   Form.
8        Q.   BY MR. BRANTLEY:   What were your
9    responsibilities as the assistant to the FHA at
10   Perryville?
11       A.   Basically what he or she would like me to
12   follow up on, complete, administrative duties. Making
13   sure that the delivery of health care was continuing.
14       Q.   And how long were you the assistant at
15   Perryville?
16       A.   I was there approximately three years.
17       Q.   And then following your time as the assistant
18   FHA at Perryville, you became the FHA at Tucson?
19       A.   Correct.
20       Q.   And that was in 2010?
21       A.   Yes.
22       Q.   Do you remember what month in 2010 you became
23   the FHA?
24       A.   I believe it was in October. In the fall.
25       Q.   And what were your job duties as the FHA at

## Page 17

1    Tucson?
2        A.   At that point it was the responsibilities of
3    assuring that the inmates were receiving health care.
4        Q.   Were you monitoring the time it took for things
5    to take place? Were you walking around the prison
6    facility and visually checking on things? Can you give
7    me a better description of -- like I understand that your
8    job was to ensure that health care was delivered to the
9    prisoners, but what exactly did that entail?
10       MS. FLETCHER:   Form.
11       THE WITNESS:   What question would you like
12   me to answer?
13       Q.   BY MR. BRANTLEY:   In more description, what
14   were your tasks? What did you do on a day-to-day basis
15   as the FHA at Tucson?
16       A.   Day-to-day basis would be working with security
17   to make sure that inmates were going to their
18   appointments, making sure that the operations
19   administratively would be functioning, that the providers
20   would be meeting and delivering health care, working with
21   the nursing supervisors meetings. Basically making sure
22   by administratively particularly that operations
23   continued on a daily basis and people were receiving
24   their health care.
25       Q.   And as the FHA, were you at the prison every

Page 18

1    day you were working?
2        A.   Yes, I was there every day unless there was a
3    meeting that I needed to go to like at Central Office or
4    some such.
5        Q.   What percentage of the day would you say
6    were in your office versus walking around the prison
7    complex?
8        A.   Can you -- what percentage of the day?
9        Q.   Like on a given day, did you spend most of your
10   day in your office working at a computer or making phone
11   calls or were you out walking around the prison complex?
12       A.   I was around the prison complex.
13       Q.   Would you say like 90 percent of your day you
14   were walking around the prison complex and 10 percent of
15   the day you were in your office?
16       A.   It would depend on what was going on.  So that
17   would be difficult to specifically say on a day-to-day
18   basis.  If there would be meetings with the warden or if
19   there would be an emergency of some sort that I would
20   have to attend to, I would not be walking around.  But I
21   would say probably 40 percent would be walking and
22   sometimes 50.  It would be variable more than a
23   consistent.
24       Q.   So roughly half your day you spent out in the
25   prison complex and half your day either in meetings or in

Page 19

1    your office taking care of other administrative tasks?
2        MS. FLETCHER:  Form.
3        THE WITNESS:  One question, please.
4        Q.   BY MR. BRANTLEY:  In a given day, you spent
5    roughly 50 percent of your time out in the prison
6    complex, correct?
7        A.   I would say that it would be variable, and I
8    wouldn't want to commit to 50 percent consistently.
9        Q.   But you did spend a good deal of your time in
10   your day-to-day activities as the FHA out in the prison
11   complex?  You saw what was going on on a day-to-day
12   basis, correct?
13       MS. FLETCHER:  Form.
14       Q.   BY MR. BRANTLEY:  Did you see what was going on
15   on a day-to-day basis in the prison complex?
16       A.   I would need -- what do you mean by "see"?
17       Q.   You were walking around.  You were seeing what
18   took place during the delivery of medications, correct?
19       MS. FLETCHER:  Form.
20       Q.   BY MR. BRANTLEY:  When you were walking around
21   the prison complex, what was it that you were doing?
22       A.   It would be that I could possibly be speaking
23   with staff.  It would be possibly if they -- what were
24   the operations taking place because there were different
25   yards.  It wasn't just on one yard.  So on a day-to-day

Page 20

1    basis to say that I did rounds would be incorrect.  I
2    would go and do if I could go, if my schedule permitted.
3    If not, I didn't go.  I would have other responsibilities
4    to attend to.  So I would not have a percentage.
5        Q.   But you did see the delivery of medical care
6    taking place while you were the FHA at Tucson?
7        A.   Is that a question?
8        Q.   Yes.  Did you see the delivery of medical care
9    taking place while you were the FHA in Tucson?
10       A.   Not on -- I did when I would go out.  I would
11   observe what was occurring.
12       Q.   Was it part of your job to observe what was
13   occurring?
14       A.   I would say that would be part of my job, yes.
15       Q.   So part of your job was to monitor the delivery
16   of medical care?
17       MS. FLETCHER:  Form.
18       THE WITNESS:  Please rephrase.
19       Q.   BY MR. BRANTLEY:  Do you understand the word
20   "monitor"?
21       A.   The word "monitor," yes.
22       Q.   And do you use it in conversations ever?
23       A.   I do use that in conversations.
24       Q.   In your tasks as the FHA, would you say that
25   you monitored the delivery of medical care?

Page 21

1        A.   If you could define how you use the word
2    "monitor," that would assist me.
3        Q.   Were you responsible for seeing the delivery of
4    medical care and evaluating it while you were the FHA?
5        MS. FLETCHER:  Form.
6        THE WITNESS:  Please rephrase.
7        Q.   BY MR. BRANTLEY:  Were you responsible in any
8    aspect for evaluating the delivery of medical services
9    while you were the FHA?
10       A.   Yes.
11       Q.   And to whom did you report when you were the
12   FHA?
13       A.   At one point I reported to Jim Taylor.
14       Q.   And who is Jim Taylor?
15       A.   He was the regional administrator.
16       Q.   And you indicated at one point it was Jim
17   Taylor.
18       A.   I think Richard Pratt when -- at one point when
19   I think he was out ill, it was more of a substitute, but
20   it was mainly Jim Taylor.
21       Q.   And who did you supervise as the FHA?
22       MS. FLETCHER:  Form.
23       THE WITNESS:  Who did I -- could you
24   rephrase, please.
25       Q.   BY MR. BRANTLEY:  Were you in charge of anyone

Page 22

1  as the FHA?
2     A.  Yes.
3     Q.  Who were you in charge of?
4     A.  I was in charge of the mental health staff,
5  medical staff, dental staff.
6     Q.  Anyone else?
7     A.  Administrative staff.
8     Q.  Anyone else?
9     A.  The dialysis.
10    Q.  What do you mean by the dialysis?
11    A.  They were the -- that's what I was thinking.
12  They were a vendor, a contractual vendor.
13    Q.  How many units are there at the Tucson complex?
14    A.  At that time there were ten.
15    Q.  Can you tell me the type of inmates that were
16  housed in each of those units?
17       MS. FLETCHER:  Form.
18       THE WITNESS:  Can you rephrase that.
19    Q.  BY MR. BRANTLEY:  What was the purpose of each
20  of the ten units?
21    A.  That would be a security issue.  I would not be
22  able to answer that.
23    Q.  What would be a security issue?
24    A.  You're saying -- reask the question.  It was
25  about what inmates there were or the purpose?  I was not

Page 23

1  responsible for housing.
2     Q.  You said there's ten units at Tucson?
3     A.  Yes, they are different.
4     Q.  Were there different types of inmates housed in
5  the different units?
6     A.  Yes.
7     Q.  And what types of inmates were there in each of
8  the units?
9       MS. FLETCHER:  Form.
10    Q.  BY MR. BRANTLEY:  Let's take unit 1.  What was
11  unit 1's name?
12       MS. FLETCHER:  Form.
13    Q.  BY MR. BRANTLEY:  Can you name the ten units?
14    A.  I don't know if I can name them right offhand.
15  It's been a while.  But I can name -- I can give you a
16  start.  Manzanita, Whetstone.  Let's see.  I'm just
17  not -- I'm drawing a blank at this point because I'm
18  seeing Perryville units come into my mind as well.  They
19  will come to me probably later.  Can we revisit that.
20    Q.  Were there any isolation units at Tucson?
21       MS. FLETCHER:  Form.
22       THE WITNESS:  Rephrase, please.
23    Q.  BY MR. BRANTLEY:  Are you aware what an
24  isolation unit is?
25       MS. FLETCHER:  Form.

Page 24

1       THE WITNESS:  Define.
2     Q.  BY MR. BRANTLEY:  Were there any maximum
3  security units at the Tucson facility?
4     A.  Yes, there were.
5     Q.  Were there any medical units at the Tucson
6  facility, specifically for housing ill patients?
7     A.  Yes.
8     Q.  What type of ill patients?  Mentally ill?  Were
9  there mentally ill patients?  Was there a specific unit
10  for housing mentally ill patients at Tucson?
11    A.  Rephrase.  You've asked me several questions.
12    Q.  Was there a specific unit at Tucson that housed
13  mentally ill patients?
14    A.  Not specifically.
15    Q.  Is there an infirmary at Tucson?
16    A.  Yes.
17    Q.  Do you recall whether there's air conditioning
18  in the infirmary?
19       MS. FLETCHER:  Form.
20       THE WITNESS:  Rephrase, please.
21    Q.  BY MR. BRANTLEY:  Was there air conditioning in
22  the infirmary when you worked at Tucson?
23       MS. FLETCHER:  Form.
24       THE WITNESS:  There was a cooling system.
25  But as far as I'm not able to define if it was air

Page 25

1  conditioning or the type of cooling system.
2     Q.  BY MR. BRANTLEY:  So there was some mechanical
3  operation in place for cooling --
4     A.  Yes.
5     Q.  -- the infirmary at Tucson?
6        Do you think it's important to have some
7  sort of cooling system in an infirmary?
8        MS. FLETCHER:  Form.
9        THE WITNESS:  Can you rephrase.
10    Q.  BY MR. BRANTLEY:  Do you think the temperature
11  of an infirmary matters?
12       MS. FLETCHER:  Form.
13       THE WITNESS:  I would think -- in relation
14  to what?
15    Q.  BY MR. BRANTLEY:  Are there situations where
16  it's imperative in giving medical care to have a
17  temperature-controlled environment?
18       MS. FLETCHER:  Form.
19       THE WITNESS:  Could you be specific on what
20  you're requesting.
21    Q.  BY MR. BRANTLEY:  Do you know of any situations
22  that can occur if the infirmary gets too hot with patient
23  care?
24       MS. FLETCHER:  Form.
25       THE WITNESS:  I would need more of a

Page 26

1    detailed specific -- what you're exactly asking.
2        Q.   BY MR. BRANTLEY:  Do you know whether any
3    medications have adverse effects if the temperature is
4    hotter than normal or temperature is too hot?
5        A.   Medication is refrigerated, if necessary,
6    within the IPC, Inpatient Care Unit.  It requires to be
7    monitored and kept at a certain temperature.
8        Q.   I'm not referring to the medication itself but
9    a patient on a type of medication.  If you hand somebody
10   medication, are you concerned that they might go
11   someplace where it's too hot?
12       MS. FLETCHER:  Form.
13       THE WITNESS:  That's beyond my -- that's a
14   clinical question.
15       Q.   BY MR. BRANTLEY:  Is the Tucson Prison Complex
16   where inmates with serious medical conditions are sent?
17       MS. FLETCHER:  Form.
18       THE WITNESS:  Repeat in a different way.
19       Q.   BY MR. BRANTLEY:  In the Arizona Department of
20   Corrections, is the Tucson Prison Complex the location
21   where seriously ill patients are sent?
22       MS. FLETCHER:  Form.
23       THE WITNESS:  That is -- again, that's a
24   broad question.  You'd have to really tailor that down
25   for me.

Page 27

1        Q.   BY MR. BRANTLEY:  Is Tucson considered the
2    medical yard?
3        MS. FLETCHER:  Form.
4        THE WITNESS:  Is Tucson -- what do you mean
5    by medical yard?
6        Q.   BY MR. BRANTLEY:  If there's a seriously ill
7    patient at Perryville, would they be sent to Tucson for
8    care?
9        MS. FLETCHER:  Form.
10       THE WITNESS:  Probably not.  Perryville is a
11   female prison but Tucson's a male prison, so they don't
12   mix.
13       Q.   BY MR. BRANTLEY:  Is there a special unit at
14   the Tucson complex that houses seriously ill patients?
15       A.   Yes.
16       Q.   What's the name of that unit?
17       A.   The IPC, Inpatient Care Unit.
18       Q.   What's the criteria for identifying an inmate
19   that should be housed at the IPC?
20       MS. FLETCHER:  Form.
21       THE WITNESS:  That would not be my
22   responsibility.  That would be medical.
23       Q.   BY MR. BRANTLEY:  You have no idea how an
24   inmate gets transferred to the IPC at Tucson from another
25   complex?

Page 28

1        MS. FLETCHER:  Form.
2        MS. FLETCHER:  Please rephrase.
3        Q.   BY MR. BRANTLEY:  Are you involved in any
4    method in the transferring of prisoners for the purposes
5    of medical care?
6        MS. FLETCHER:  Form.
7        THE WITNESS:  Repeat, please.
8        Q.   BY MR. BRANTLEY:  As the FHA at Tucson, were
9    you involved in the transfer of seriously ill inmates to
10   the Tucson facility?
11       A.   What do you mean by "involved"?
12       Q.   Did your job, any aspect of your job, have
13   anything to do with the intake of seriously ill prisoners
14   to the IPC at Tucson?
15       A.   Any aspect of my job.  I was not involved in
16   transferring the inmates to Tucson.
17       Q.   Who would make a decision as to whether or not
18   an inmate that was seriously ill should be transferred to
19   the IPC at Tucson?
20       MS. FLETCHER:  Form.
21       THE WITNESS:  There were procedures involved
22   with that, and I'm not -- that's beyond -- that involves
23   other complexes as well.
24       Q.   BY MR. BRANTLEY:  What is building 9 of the
25   Rincon Unit used for?

Page 29

1        MS. FLETCHER:  Form, foundation.
2        THE WITNESS:  At this point, I'm not sure.
3        Q.   BY MR. BRANTLEY:  When you were the FHA at
4    Tucson, was there a Rincon Unit?
5        A.   Yes, there was.
6        Q.   Do you recall building 9, Rincon Unit?
7        A.   I recall the Rincon Unit.
8        Q.   You don't recall any specific section of the
9    Rincon Unit?
10       MS. FLETCHER:  Form.
11       THE WITNESS:  I recall Rincon as a unit.
12       Q.   BY MR. BRANTLEY:  Have you ever heard of Rincon
13   being referred to as the death house?
14       A.   No.
15       Q.   Who's housed in Rincon Unit?
16       MS. FLETCHER:  Form.
17       THE WITNESS:  Repeat or rephrase.
18       Q.   BY MR. BRANTLEY:  When you were the FHA at
19   Tucson, who was housed in the Rincon Unit?
20       MS. FLETCHER:  Form.
21       THE WITNESS:  That would not be -- again,
22   that's a medical decision on who should be housed in the
23   Rincon.
24       Q.   BY MR. BRANTLEY:  Were they seriously ill
25   patients?

Page 30

1     MS. FLETCHER: Form.
2     THE WITNESS: That would be a medical
3  person. Medical staff decides that.
4     Q.   BY MR. BRANTLEY: I understand the medical
5  staff decides who goes there and who fits the criteria.
6  How would you describe yourself the people that were
7  housed in the Rincon Unit?
8     A.   How would I describe myself?
9     Q.   You yourself, when you were walking around a
10  good part of your day as the FHA going through the Tucson
11  facility, you've been to the Rincon Unit.  Were the
12  inmates at the Rincon Unit seriously ill inmates?
13     MS. FLETCHER: You would have to define
14     THE WITNESS: You would have to define
15  "seriously ill."
16     Q.   BY MR. BRANTLEY: Were they critically ill
17  inmates?
18     MS. FLETCHER: Form.
19     THE WITNESS: Please define "critically
20  ill."
21     Q.   BY MR. BRANTLEY: Was any hospice care
22  delivered at Rincon?
23     A.   No, not to my knowledge.
24     Q.   So as the FHA of a complex, you're not aware of
25  what prisoners and what type of conditions they have and

Page 31

1  what particular housing needs they have?
2     MS. FLETCHER: Form.
3     THE WITNESS: A multitude of questions.  Can
4  you be specific, please.
5     Q.   BY MR. BRANTLEY: As the FHA, part of your task
6  was to walk around the complex, correct?
7     A.   Part of my task?
8     Q.   Part of your job entailed walking around the
9  Tucson complex?
10     A.   That was not defined as my task or
11  responsibility.  It was my choice to do that.
12     Q.   Your previous testimony indicated that roughly
13  half of your day was spent walking around the complex.
14     MS. FLETCHER: Form.
15     Q.   BY MR. BRANTLEY: Correct?
16     A.   What is the question?
17     Q.   When you're walking around the complex, do you
18  look at the prisoners?
19     A.   Do I look at them?
20     Q.   Yes.
21     A.   I see the prisoners, they're there, yes.
22     Q.   Did you see that some prisoners had medical
23  conditions that required medical care?
24     MS. FLETCHER: Form.
25     THE WITNESS: Yes.

Page 32

1     Q.   BY MR. BRANTLEY: And were there certain
2  patients that had to be housed in a medical unit that
3  were sick and could not get up and participate in
4  everyday life?
5     MS. FLETCHER: Form.
6     THE WITNESS: What is the question?
7     Q.   BY MR. BRANTLEY: So as the FHA, you don't know
8  what prisoners are housed at your complex?
9     MS. FLETCHER: Form.
10     THE WITNESS: Please rephrase that question.
11     Q.   BY MR. BRANTLEY: Do you know what inmates were
12  housed at the Tucson complex when you were the FHA?
13     MS. FLETCHER: Form.
14     THE WITNESS: I need a clarification on what
15  you mean.  What inmates were housed there?  What do you
16  mean?
17     Q.   BY MR. BRANTLEY: I think the question is
18  fairly clear.  Did you know while you were in charge of
19  the prison who was being housed at your prison?
20     MS. FLETCHER: Form.
21     THE WITNESS: I knew the inmates were there,
22  but who and where, I don't know exactly -- I can't answer
23  exactly.
24     Q.   BY MR. BRANTLEY: Did you know which particular
25  inmates had specific medical conditions?

Page 33

1     A.   Did I know which specific inmates had medical
2  conditions?  I knew they had medical conditions.  I was
3  the administrative more than medical.  Medical staff
4  would be able to address their medical conditions.
5     Could we have a break for a minute or five
6  minutes?
7     MS. FLETCHER: Whenever you want a break,
8  you can have a break.  But if he has a question
9  pending --
10     THE WITNESS: Can we make a break in a
11  minute or two?
12     MR. BRANTLEY: If you want a break, we can
13  take a break.
14     MS. FLETCHER: We can take a break right
15  now.  That would be fine.
16     (A recess was taken from 9:46 a.m. to
17     9:51 a.m.)
18     Q.   BY MR. BRANTLEY: Dr. Valenzuela, were you
19  aware while you were the FHA at Tucson of any critically
20  ill patients being housed at your complex?
21     MS. FLETCHER: Form.
22     THE WITNESS: I was aware there are
23  critically ill patients at the Tucson complex.
24     Q.   BY MR. BRANTLEY: Okay.  And so now you do
25  understand what a critically ill person is?

Page 34

1      A.   I believe in the way that you're presenting it,
2   I believe I do understand that it is someone who would
3   not be able to function on a regular yard; is that
4   correct?
5      Q.   Yes.
6          MS. FLETCHER:  You don't get to ask him
7   questions.
8      Q.   BY MR. BRANTLEY:  Was there a specific unit
9   that those critically ill patients were housed in?
10     A.   The Inpatient Care Unit.
11     Q.   And that's the IPC?
12     A.   Correct.
13     Q.   And as the FHA at Tucson, were you aware of the
14  range of medical conditions that the inmates within your
15  complex had?
16     A.   Please repeat.
17     Q.   As the FHA of Tucson, were you aware of the
18  range of medical conditions that the inmates housed at
19  Tucson had?
20     A.   The range of -- please define what you mean
21  what is within that range.
22     Q.   Were you aware that there may have been inmates
23  that were completely healthy?
24     A.   Yes.
25     Q.   And you're aware that there were some inmates,

Page 35

1   as we've discussed, that may have been critically ill?
2      A.   Yes.
3      Q.   Along that range, from people that are healthy
4   to people that are critically ill, as the FHA at Tucson,
5   were you aware of the medical conditions that existed
6   within that range?
7          MS. FLETCHER:  Form.
8          THE WITNESS:  I was aware that there were
9   various medical conditions.  I was not aware of the
10  specifics.  Again, I'm the administrator, not the medical
11  staff.
12     Q.   BY MR. BRANTLEY:  Are you aware of whether
13  there are any new facilities or quarters being built at
14  Tucson right now?
15     A.   I'm not aware of what's happening at Tucson
16  now.  I'm not at Tucson.
17     Q.   As the FHA at Tucson, were you frequently
18  contacted by relatives or friends of inmates regarding
19  inmate health concerns?
20         MS. FLETCHER:  Form.
21         THE WITNESS:  Define "frequently."
22     Q.   BY MR. BRANTLEY:  As part of your task as the
23  FHA at Tucson, were you responsible for responding to
24  friends and family members of inmates of your facility
25  when those friends or families had expressed concerns

Page 36

1   about medical care?
2      A.   I was responsible to speak with people who --
3   for the family or the people that the inmate had approved
4   could speak with me regarding their condition.  Not
5   anyone, not all.
6      Q.   Would you say that you were contacted by
7   friends or relatives on a regular basis?
8          MS. FLETCHER:  Form?
9          THE WITNESS:  Regular?  Define.
10     Q.   BY MR. BRANTLEY:  Would you be contacted on a
11  daily basis?
12         MS. FLETCHER:  Form, foundation.
13         THE WITNESS:  I would be contacted -- I
14  would be contacted, but I don't know if it would be on a
15  daily basis.  Sometimes there would be more than
16  another.  Yeah, I would say I would be contacted, but I
17  can't say exactly daily.
18     Q.   BY MR. BRANTLEY:  Do you recall an inmate by
19  the name of Shawn Jensen being under your care?
20         MS. FLETCHER:  Form.
21         THE WITNESS:  Yes.
22     Q.   BY MR. BRANTLEY:  What do you recall about
23  Mr. Jensen's situation?
24         MS. FLETCHER:  Form.
25         THE WITNESS:  I believe that he had a

Page 37

1   medical condition that was being addressed by the medical
2   staff.
3      Q.   BY MR. BRANTLEY:  Do you remember anything
4   else?
5      A.   I recall that his wife was very involved in his
6   health care.
7      Q.   Do you recall any issues being expressed by
8   Mr. Jensen's wife about the health care Shawn Jensen was
9   receiving?
10     A.   Yes.
11     Q.   Do you recall any specifics about the issues
12  she was raising?
13     A.   She was concerned about catheters.  Just
14  basically his medical condition.
15     Q.   But you don't recall what that medical
16  condition was?
17     A.   I couldn't recall exactly due to it is medical,
18  and I wouldn't want to make some diagnosis statement.  I
19  don't make diagnoses.
20     Q.   Now, given that your only educational
21  background relating to the medical field is in biomedical
22  art, was there any specific person that you spoke to
23  regarding provisions of medical care?
24         MS. FLETCHER:  Form.
25         THE WITNESS:  Spoke to -- what do you mean

Page 38

1   by provisions?
2       Q.   BY MR. BRANTLEY:  Given that you don't really
3   have a medical background aside from the illustration
4   career, was there someone that you would rely on to
5   provide insight into the medical care being provided to
6   the inmates?
7           MS. FLETCHER:  Form.
8           THE WITNESS:  The medical care was being
9   provided by medical staff, by the doctors and the
10  nurses.  I was not involved in providing the medical
11  care.
12      Q.   BY MR. BRANTLEY:  But it was your job to ensure
13  that the medical care was being provided?
14          MS. FLETCHER:  Form, foundation.
15          THE WITNESS:  Rephrase that.
16      Q.   BY MR. BRANTLEY:  Was part of your job task as
17  the FHA ensuring that prisoners were receiving proper
18  medical care?
19      A.   Administratively, yes.
20      Q.   What do you mean by that?
21      A.   That the operations were running to the point
22  where the medical health care could be delivered
23  properly.
24      Q.   Was it your job to oversee the delivery of
25  medical care?

Page 39

1       A.   Administratively, yes.
2       Q.   And given that you don't have a medical
3   background, how do you assess that?
4       A.   How did I assess what?
5           MS. FLETCHER:  Form.
6       Q.   BY MR. BRANTLEY:  How do you assess whether
7   prisoners are receiving adequate medical care?
8       A.   I do not assess if the inmate is receiving the
9   adequate medical care.  The provider does that, the
10  doctor or the nurse.  And that's not me.  I make sure
11  that they're able to administratively.
12      Q.   Were you aware of any issues with Shawn Jensen
13  obtaining his provider-prescribed medications on a timely
14  basis?
15          MS. FLETCHER:  Form.
16          THE WITNESS:  I was aware at one point about
17  the medications.  However, as I recall, he was receiving
18  them.
19      Q.   BY MR. BRANTLEY:  So you do recall Mrs. Jensen
20  contacting you about an issue with Mr. Jensen receiving
21  his medication?
22          MS. FLETCHER:  Form.
23          THE WITNESS:  I recall Mrs. Jensen
24  contacting me, but specifically I'm not recalling one
25  particular incident as such.

Page 40

1       Q.   BY MR. BRANTLEY:  With a prescription that is
2   filled by a provider, how long should that take to be
3   filled?
4           MS. FLETCHER:  Form, foundation.
5           THE WITNESS:  That's depending on the
6   prescription.
7       Q.   BY MR. BRANTLEY:  Administratively as the FHA,
8   were you responsible for ensuring that medications were
9   being filled on a timely basis?
10      A.   Repeat that again, please.
11      Q.   From an administrative standpoint as the FHA,
12  were you responsible for ensuring that medications were
13  being delivered on a timely basis to the inmates?
14      A.   From an administrative standpoint, yes.
15      Q.   And was there any policy or regulation
16  regarding how long from the time a provider signed a
17  prescription it should take before the inmate received
18  the prescription?
19          MS. FLETCHER:  Form.
20          THE WITNESS:  That would be more with the
21  pharmacy.  That would be a pharmaceutical answer.
22      Q.   BY MR. BRANTLEY:  So you're not aware of any
23  policy or procedure relating to the time frame for
24  delivery of medication?
25          MS. FLETCHER:  Form.

Page 41

1           THE WITNESS:  That would be again a
2   pharmaceutical question to answer.
3           (Exhibit 137 was marked.)
4           MR. BRANTLEY:  I'd like to introduce this as
5   Exhibit 137.
6           THE WITNESS:  Is this for me to read?
7       Q.   BY MR. BRANTLEY:  Yes, Dr. Valenzuela.  This is
8   an email communication from October of 2010.  Can you
9   take a moment to familiarize yourself with the
10  communication.
11      A.   Okay.  I read it.
12      Q.   And does this appear to be a true and accurate
13  copy of the email communication you had with Mrs. Jensen?
14          MS. FLETCHER:  Form.
15          THE WITNESS:  This does appear to me as an
16  email.
17      Q.   BY MR. BRANTLEY:  And the topmost email on
18  Exhibit 137, which is Bates labeled Plaintiff Parsons
19  003652, do you recognize that this is an email you sent?
20  It begins:  Dear Ms. Jensen.
21      A.   I thought you meant back here.
22           Yes, I did -- yes, this would be me.
23      Q.   Okay.  So on October 18th, 2010, you responded
24  to a concern raised by Shawn Jensen's wife regarding
25  delivery of medication?

Page 42

1    A.  Correct.

2    Q.  And in your response, you indicated that you

3  are now the new facility health administrator for Tucson,

4  correct?

5    A.  Correct.

6    Q.  So that corresponds with you taking over in the

7  fall of 2010?

8    A.  Yes.

9    Q.  And so on Monday, October 18th, 2010, you

10  became aware of an issue with Mr. Jensen receiving his

11  medication?

12    MS. FLETCHER: Form.

13    THE WITNESS: Through her, I became aware of

14  this email of what she's saying. But it is not

15  necessarily accurate that he was not receiving his

16  medication.

17    Q.  BY MR. BRANTLEY: Do you recall doing anything

18  in response to this email?

19    A.  I don't recall what occurred after this, what I

20  did, but I'm sure that I probably did something.

21    Q.  What would be your typical response to an email

22  like this?

23    MS. FLETCHER: Form.

24    THE WITNESS: I would probably investigate

25  it and respond.

Page 43

1    Q.  BY MR. BRANTLEY: Would you have gone and

2  checked the medical records to see if any prescription

3  had been written by a provider?

4    MS. FLETCHER: Form, foundation.

5    THE WITNESS: Particularly because I was

6  new, I would have probably contacted the nursing

7  supervisor.

8    Q.  BY MR. BRANTLEY: Would it concern you that a

9  patient went in and was seen on a Thursday, October 14th,

10  and still had not received his prescription that was

11  prescribed to him four days later?

12    MS. FLETCHER: Form.

13    THE WITNESS: That's very general. I'm not

14  sure what you're asking.

15    Q.  BY MR. BRANTLEY: When a doctor prescribes a

16  medication, do you think that the patient should receive

17  it?

18    MS. FLETCHER: Form, foundation.

19    THE WITNESS: I would believe if a doctor

20  prescribes the medication, then I would believe that

21  medication -- the inmate should take the medication the

22  doctor prescribes.

23    Q.  BY MR. BRANTLEY: And if you went to the doctor

24  on a Thursday and he provided you a prescription and you

25  delivered it to the pharmacy and you still hadn't

Page 44

1  received it four days later, would you be concerned that

2  you hadn't received the medication?

3    MS. FLETCHER: Form, foundation.

4    THE WITNESS: You're asking a question about

5  my health? I'm not getting this.

6    Q.  BY MR. BRANTLEY: Yes.

7    A.  My health is not the issue here.

8    Q.  Because you are indicating you're unaware of

9  any policy or procedure regarding the time frame for the

10  delivery of medication, I'm trying to obtain information

11  from you about what's going on in your mind when you

12  received this email. If you're not aware of any sort of

13  policy or procedure, I want to know if this shocked you

14  that someone hadn't received his medication and it had

15  been four days.

16    MS. FLETCHER: Form. If that's a question.

17    Q.  BY MR. BRANTLEY: Was it surprising to you that

18  someone was prescribed something on a Thursday and still

19  had not received the medication by Monday?

20    MS. FLETCHER: Form, foundation.

21    THE WITNESS: Specifically, that is an

22  assumption that somebody did not receive it. I'm not

23  going to answer. It's on an assumption.

24    MR. BRANTLEY: I'd like to introduce Exhibit

25  138. It's an email beginning with Bates label Plaintiff

Page 45

1  Parsons 003655.

2    (Exhibit 138 was marked.)

3    Q.  BY MR. BRANTLEY: Can you please familiarize

4  yourself with this email.

5    A.  Yes. I'm familiar now that I've read it.

6    Q.  I want to focus on the most recent

7  communication at the top of Exhibit 138, which is Bates

8  labeled Parsons 3655. And does this appear to be a true

9  and accurate --

10    A.  Yes.

11    Q.  -- copy of the email chain that you --

12    A.  It appears to be, yes.

13    MS. FLETCHER: Let him finish his question

14  before you answer.

15    THE WITNESS: Okay.

16    Q.  BY MR. BRANTLEY: And on Monday, October 25th

17  of 2010, you emailed Shawn Jensen's wife, correct?

18    A.  Yes, I emailed this.

19    Q.  And on Monday, October 25th, you indicated that

20  he was in the process of receiving the Cipro, correct?

21    A.  This was the information given to me by nursing

22  supervisor.

23    Q.  So on the 25th, you communicated to Mrs. Jensen

24  that her husband was in the process of receiving the

25  Cipro?

Page 46

1    A.  I communicated that.
2    Q.  And that's the same Cipro that was prescribed
3  on October 14th?
4         MS. FLETCHER: Form, foundation.
5         THE WITNESS: I'm unsure about that. I
6  would not know that.
7    Q.  BY MR. BRANTLEY: Would it seem unusual that a
8  prescription that was signed by a provider on the 14th of
9  a month still has not been filled or is still in the
10  process of being filled 11 days later?
11         MS. FLETCHER: Form.
12         THE WITNESS: I do not recall the specifics
13  on this besides the email.  But what the occurrence is
14  between that time, I do not know.
15    Q.  BY MR. BRANTLEY: Would you consider that to be
16  a timely delivery of medication?
17         MS. FLETCHER: Form, foundation.
18         THE WITNESS: I can only answer here that
19  what I wrote here was based on the information given to
20  me by the nursing supervisor.
21    Q.  BY MR. BRANTLEY: So as the FHA, you have no
22  criteria by which to evaluate whether or not medication
23  is being delivered on a timely basis?
24         MS. FLETCHER: Form, foundation.
25         THE WITNESS: Repeat that. Rephrase that.

Page 47

1    Q.  BY MR. BRANTLEY: As the FHA of Tucson, you had
2  no criteria by which to evaluate whether medication was
3  being delivered on a timely basis?
4         MS. FLETCHER: Form, foundation.
5         THE WITNESS: To whom?
6    Q.  BY MR. BRANTLEY: The inmates.
7         MS. FLETCHER: Form.
8         THE WITNESS: The inmates received their
9  medication based on what the doctor, nurse -- what the
10  doctor's prescription was.
11    Q.  BY MR. BRANTLEY: Except in a situation like
12  this when the doctor prescribes something on the 14th of
13  a month, and the inmate still hasn't received it 11 days
14  later?
15         MS. FLETCHER: That's not a question.
16    Q.  BY MR. BRANTLEY: Do you believe it's
17  reasonable to wait 11 days to receive medication?
18         MS. FLETCHER: Form, foundation.
19         She's answered this question several times.
20         Go ahead.
21         THE WITNESS: Do I believe it -- repeat
22  that, please, now.
23    Q.  BY MR. BRANTLEY: Do you believe it's
24  reasonable to wait 11 days to receive medication that was
25  prescribed to you?

Page 48

1         MS. FLETCHER: Form, foundation.
2         THE WITNESS: Again, I am not the issue
3  here.  So that's why I get -- it's not me -- it's not
4  about my health here.  Medications prescribed to me after
5  11 days? I don't understand that.
6    Q.  BY MR. BRANTLEY: Just as a way to get at
7  whether or not this seems to shock you, would it surprise
8  you that it takes 11 days to receive medication?
9         MS. FLETCHER: Form, foundation.
10         THE WITNESS: I cannot answer when a --
11  specifically when the information here is not upon
12  specific recollection that it is correct.
13    Q.  BY MR. BRANTLEY: Was timely provision of
14  medication a frequent problem?
15         MS. FLETCHER: Form, foundation.
16         THE WITNESS: Timely delivery of medication
17  specifically?  What do you mean?  I mean, medication --
18  when are you talking about?
19    Q.  BY MR. BRANTLEY: Let me ask a different
20  question.  Did you receive complaints from other
21  relatives and family members aside from Mrs. Jensen that
22  their relative or family member inmate wasn't receiving
23  medication on a timely basis?
24         MS. FLETCHER: Form.
25         THE WITNESS: I received many -- different

Page 49

1  phone calls.  I don't specifically recall this being an
2  issue of timely medication of other family members.
3         And I'd like a -- I think I need a break.
4         MS. FLETCHER: Do you want a break?
5         THE WITNESS: Yeah.  Real quick.  Just a
6  minute or two.
7         (A recess was taken from 10:18 a.m. to
8         10:25 a.m.)
9         MR. BRANTLEY: I'd like to introduce Exhibit
10  139, which is another email chain beginning Plaintiff
11  Parsons 003693.
12         (Exhibit 139 was marked.)
13    Q.  BY MR. BRANTLEY: I'd like to focus your
14  attention to the second email in the chain, the one dated
15  Tuesday, February 8th, 2011, at 3:29 p.m.
16    A.  Down here?
17    Q.  The second email.  Please familiarize yourself.
18    A.  Okay.  I did familiarize myself.
19    Q.  And does this appear to be a true and accurate
20  copy of an email chain that you were involved with?
21    A.  Yes.
22    Q.  And in this particular communication, you
23  indicate: I am personally taking over his medication
24  today.  Correct?
25    A.  Yes.

Page 50

1    Q.   And what did you mean by "taking over"?
2    A.   From an administrative standpoint, making sure
3  that the providers, that the nurses were going to be
4  addressing the situation.
5    Q.   And this was the first time that you decided to
6  administratively get involved, was this day?
7       MS. FLETCHER:  Form.
8       THE WITNESS:  What was the question?
9    Q.   BY MR. BRANTLEY:  You indicate:  I am
10 personally taking over his medication today.
11      Was this the first time that you personally
12 took over the administration of his medication, Shawn
13 Jensen's medication?
14      MS. FLETCHER:  Form.
15      THE WITNESS:  Taking over does not mean that
16 I'm administering it.  Administratively is I am giving
17 attention to this to see that her concerns are addressed.
18      Many times, as I recall, her information
19 that she would send was incorrect.  I didn't want to
20 debate it with her.  My way of working was trying to
21 cooperate with her and assist her in also being able to
22 continually communicate with him, however, not argue that
23 some of the information that she was giving was
24 inaccurate.
25      So I wanted to validate, I've got your

Page 51

1  information, we're having the providers look at that, and
2  the medical team will decide, because they have the
3  ultimate say, on what should be the proper medical care
4  that Mr. Jensen should receive.
5    Q.   BY MR. BRANTLEY:  So on February 8th, you
6  decided that you needed to actually get involved in this
7  now?
8       MS. FLETCHER:  Form.
9       THE WITNESS:  No.  This was validating to
10 her that my attention as administrative is also involved.
11   Q.   BY MR. BRANTLEY:  Did that attention start on
12 February 8th?
13      MS. FLETCHER:  Form.
14      THE WITNESS:  I do not recall exactly when
15 the dates of involvement besides what is here in the
16 email.
17   Q.   BY MR. BRANTLEY:  So you originally became
18 aware of Mr. Jensen's circumstances on October 18th.  And
19 on February 8th, you sent an email saying you're taking
20 over his medication today, correct?
21      MS. FLETCHER:  Form.
22      THE WITNESS:  I'm sorry, say that again.
23 Repeat the question or rephrase it.
24   Q.   BY MR. BRANTLEY:  You originally became aware
25 of Mr. Jensen's medical needs on October 18th when

Page 52

1  Mrs. Jensen emailed you, correct?
2       MS. FLETCHER:  Form.
3       THE WITNESS:  I received the email at that
4  time.  And what I wrote in there is what I wrote in
5  there.  That I'm new, and I became aware of what she was
6  explaining to me in her email.  Giving her my email was a
7  courtesy to assist her.
8    Q.   BY MR. BRANTLEY:  I didn't ask any questions.
9  Thank you.
10      In this same email, you indicate -- and,
11 again, this is Plaintiff Parsons 3693, which is Exhibit
12 139:  Whatever the doctors write on the outside
13 consultations is not automatically given here.  The
14 providers here decide if the medication is appropriate
15 and then have to rewrite the prescription.
16      Is that a policy?
17   A.   Yes.  There are medications that are
18 permitted -- that are not permitted in the prison
19 system.  There are non-formulary and formulary.  And even
20 if another provider or specialist in the community has
21 written a prescription or prescribed something, the
22 doctors on site have the final say because of the
23 regulations.
24   Q.   So this was a medication policy and procedure
25 that you were aware of?

Page 53

1       MS. FLETCHER:  Form.
2       THE WITNESS:  Yes, I'm aware of the
3  non-formulary and formulary and there are some
4  medications that are permitted and some that are not.
5  Instead of that, you would give that in the prison.
6    Q.   BY MR. BRANTLEY:  And because of that situation
7  and that policy, there could be a delay in the delivery
8  of medication as the approval process takes place?
9       MS. FLETCHER:  Form, foundation.
10      THE WITNESS:  That would not be in my area
11 of expertise.
12   Q.   BY MR. BRANTLEY:  But you're aware of a policy
13 that says that if an outside consultation writes a
14 prescription that isn't an approved medication for
15 distribution within the ADC that they have to rewrite
16 prescription for something that is approved, correct?
17   A.   Repeat, please.
18   Q.   You described a policy and procedure by which
19 if an outside doctor prescribed something that wasn't on
20 the approved formulary for the ADC, that prescription
21 would have to be rewritten for a medication that was
22 approved by the ADC, correct?
23   A.   Yes.
24   Q.   And so there is some sort of delay from the
25 time a medication prescription is received from an

Page 54

1    outside consultant or outside doctor if it's not a
2    formulary approved by the ADC?
3          MS. FLETCHER: Form, foundation.
4          THE WITNESS: The medical doctor would have
5    to deal with that. The medical doctor deals with what he
6    writes, what's the formulary, how to adjust that. That's
7    beyond my expertise.
8      Q.   BY MR. BRANTLEY: But you're aware of a policy
9    that says if a prescription gets written by an outside
10   consultant and it's for a non-ADC approved medication,
11   the prescription has to be rewritten?
12         MS. FLETCHER: Form.
13         THE WITNESS: I am aware that there is a
14   non-formulary and a formulary that the provider has to
15   abide by. As far as how the approval and the process of
16   that, that is between the doctor, and he could be working
17   with the -- even the outside physician.
18     Q.   BY MR. BRANTLEY: I'm aware that you're not
19   aware of any policy and procedure regarding the time
20   frame for delivery of medication from the time that it's
21   received on a prescription till the inmate receives it.
22         MS. FLETCHER: Form.
23     Q.   BY MR. BRANTLEY: You're unaware of any policy
24   and procedure regarding the time frame for delivery of
25   medication, correct?

Page 55

1          MS. FLETCHER: Form.
2          THE WITNESS: There are various
3    communications and various situations that the medical
4    doctor, pharmacy, nursing attend to that. I'm aware that
5    they do that.
6      Q.   BY MR. BRANTLEY: So after seeing a few of
7    these emails, did it refresh your recollection of
8    Mr. Jensen's medical circumstances at all?
9      A.   Well, I believe it did refresh that it had to
10   do with his genitals. And I do recall that part. And I
11   recall that Mrs. Jensen was consistently upset about
12   something. And often what she was upset about was
13   misinformation either that she had accumulated in her
14   head or that Mr. Jensen had conveyed to her.
15     Q.   Now, I understand that you're saying what
16   Mrs. Jensen was conveying to you was misinformation. But
17   these emails do in fact substantiate that there was a
18   delay from the time that Mr. Jensen got a prescription to
19   the time he received the medication?
20         MS. FLETCHER: Form.
21         THE WITNESS: These emails verified --
22   answered something. That does not verify what you just
23   said.
24     Q.   BY MR. BRANTLEY: But you say in one of your
25   emails that he should be receiving the Cipro soon. Or

Page 56

1    let me read the exact -- he's in the process of receiving
2    the Cipro.
3          MS. FLETCHER: Form.
4          THE WITNESS: I'm trying to figure out what
5    the question was.
6          MR. BRANTLEY: Can you read back my
7    question, please.
8          (The requested portion of the record was
9          read by the reporter.)
10     Q.   BY MR. BRANTLEY: So at that time when he's in
11   the process of receiving the Cipro, you were aware that
12   he still is trying to receive a medication that had been
13   prescribed 11 days previously?
14         MS. FLETCHER: Form, foundation.
15         THE WITNESS: That was 2010. It's very
16   difficult to recall the details exactly. And that is
17   again in the medical staff, is their focus. I get
18   information from the medical staff.
19     Q.   BY MR. BRANTLEY: You don't recall anything
20   else about Mr. Jensen's circumstances?
21         MS. FLETCHER: Form.
22         THE WITNESS: Be specific. What are you
23   speaking about?
24     Q.   BY MR. BRANTLEY: Do you recall that he had a
25   repetitive pattern of the same medical condition

Page 57

1    repeating multiple times throughout a year?
2          MS. FLETCHER: Form, foundation.
3          THE WITNESS: Repeat, please.
4      Q.   BY MR. BRANTLEY: From your recollection of
5    Mr. Jensen's circumstances, did you notice a pattern in
6    his medical needs?
7      A.   That is a medically based more and I'm not
8    clinical to answer that.
9      Q.   With regard to communications you were
10   receiving from his wife --
11     A.   Correct.
12     Q.   -- did it seem that the same issues kept
13   reoccurring?
14         MS. FLETCHER: Form, foundation.
15         THE WITNESS: Say that again. Please repeat
16   that.
17         MR. BRANTLEY: Will you read back my
18   question, please.
19         (The requested portion of the record was
20         read by the reporter.)
21         MS. FLETCHER: Form, foundation.
22         THE WITNESS: What issues? Oh, I can't
23   ask -- I'm not clear what you were asking.
24     Q.   BY MR. BRANTLEY: Do you recall that Mr. Jensen
25   kept having the same medical situation reoccur?

Page 58

1      MS. FLETCHER: Form, foundation.
2      THE WITNESS: His medical conditions,
3  anything with that needs to be answered by a doctor, a
4  medical doctor. That's beyond my information. Also, I
5  respond to email as she gets them. I didn't group it and
6  evaluate. That's been a while now. 2010.
7      MR. BRANTLEY: I'd like to introduce this as
8  Exhibit 140. This is an email communication Bates
9  labeled Plaintiff Parsons 003872.
10     (Exhibit 140 was marked.)
11     Q. BY MR. BRANTLEY: I'd like you just to focus on
12 the topmost email on the chain, please.
13     A. Okay. Go ahead.
14     Q. And does this appear to be a true and accurate
15 copy of an email that you sent on Tuesday, August 9th,
16 2011?
17     A. Yes.
18     Q. And in this email, you indicate that Mr. Jensen
19 is scheduled for a consultation with Dr. Chord very soon,
20 correct?
21     A. Yes.
22     Q. And that, again, was on August 9th, correct?
23     A. What was on August 9th?
24     Q. This communication that said he's scheduled for
25 his consultation very soon.

Page 59

1      A. Correct.
2      MR. BRANTLEY: I'd like to have this marked
3  as Exhibit 141. It's an email communication with the
4  Bates label Plaintiff Parsons 003884.
5      (Exhibit 141 was marked.)
6      THE WITNESS: Okay. Now I'm familiar with
7  this.
8      Q. BY MR. BRANTLEY: And does this appear to be a
9  true and correct copy of an email that you sent on
10 Thursday, August 25th, 2011?
11     A. Yes, it is.
12     Q. And at the end of the first paragraph, do you
13 see where it says: he was last seen by the provider this
14 past Monday, 8/22/11.
15     A. Is that the third paragraph?
16     Q. First paragraph.
17     A. Oh, I see. Okay.
18     Q. So on Tuesday, August 9th, you emailed
19 Ms. Jensen and indicated that Mr. Jensen would be seen
20 very soon, correct?
21     MS. FLETCHER: Where are you?
22     Q. BY MR. BRANTLEY: On Exhibit 140, which is
23 Bates labeled Plaintiff Parsons 3872. Do you recall
24 indicating that Mr. Jensen was scheduled for a
25 consultation with Dr. Chord very soon?

Page 60

1      A. Do I recall this email?
2      Q. Yes.
3      A. Yes.
4      Q. And that you said on August 9th, he was
5  scheduled very soon?
6      A. Yes, that's what the email says.
7      Q. And then on Exhibit 141, which is Bates labeled
8  Plaintiff Parsons 3884, you indicate that he was finally
9  seen on August 22nd.
10     A. Well, he was seen by -- I believe that that's
11 the provider on site. I'm not sure -- any current
12 medical issues he's experiencing since he was just seen
13 by the provider this past Monday.
14     That could have been the provider on site.
15 That might have been the consulting provider, who is off
16 site.
17     The other problem that would occur is
18 Ms. Jensen had access, and she would be calling
19 Dr. Chord's office, and she --
20     Q. I didn't ask you any questions.
21     MS. FLETCHER: You can finish your answer.
22     THE WITNESS: That has to do with this.
23 That she would be calling the office of Dr. Chord. And
24 when she called, that would compromise security, and then
25 we could not transfer him on that appointment date

Page 61

1  because family was not to know when they're to be
2  transported, and she would find out. So we would have to
3  reschedule. The actual urology office would have to
4  reschedule that.
5      So I don't know if that's what happened
6  here, but that happened several times in the course of
7  working with Ms. Jensen and trying to get him to his
8  appointments. There was an interference that was
9  occurring. So that could have been also here, but I
10 don't know which provider this is indicating he saw. I
11 believe it's the onsite provider.
12     MR. BRANTLEY: I'd like to move to strike
13 that answer as non-responsive.
14     Q. BY MR. BRANTLEY: So in your time as FHA at
15 Tucson, do you recall there being any recurring issues
16 with delivery of medications?
17     MS. FLETCHER: Form, foundation.
18     THE WITNESS: I believe I've answered the
19 question already.
20     Q. BY MR. BRANTLEY: Other than issues with
21 delivery of medication, were there any other reoccurring
22 issues with the delivery of medical services that arose
23 while you were the FHA at Tucson?
24     MS. FLETCHER: Form.
25     THE WITNESS: Please rephrase it.

Page 62

1    Q.  BY MR. BRANTLEY:  Were you receiving complaints
2  about the medical care being received by inmates aside
3  from complaints dealing with the delivery of medication?
4        MS. FLETCHER:  Form.
5        THE WITNESS:  Receiving complaints -- what
6  kind of complaints specifically?
7    Q.  BY MR. BRANTLEY:  Let me ask a different
8  question.
9        While you were the FHA at Tucson, do you
10  believe there were any issues with the delivery of
11  medical care to the inmates at the Tucson complex?
12        MS. FLETCHER:  Form, foundation.
13        You can answer.
14        THE WITNESS:  I can answer?
15        MS. FLETCHER:  If you can.
16        THE WITNESS:  That would be not me to
17  evaluate that.  If you're asking for an evaluative
18  question, that's not for me to evaluate.  That would
19  probably be the regional.
20    Q.  BY MR. BRANTLEY:  Please describe for me one
21  last time what your role was as FHA at Tucson.
22        MS. FLETCHER:  Form.
23        THE WITNESS:  My role was administratively
24  to oversee the operations of health care delivery to the
25  inmates.

Page 63

1    Q.  BY MR. BRANTLEY:  But you don't have any more
2  specifics about what exactly that entailed?
3        MS. FLETCHER:  Form, foundation.
4        THE WITNESS:  Is that a question?
5    Q.  BY MR. BRANTLEY:  Yes.
6    A.  What was the question?
7    Q.  But you don't have any more specifics about
8  what exactly that entailed?
9        MS. FLETCHER:  Form, foundation.
10        THE WITNESS:  That's a statement.
11    Q.  BY MR. BRANTLEY:  Can you describe to me in any
12  further detail what you did as the FHA?
13    A.  The duties were administratively communications
14  making sure that the administrative operations, the
15  meetings, sending emails, working with families, those
16  kinds of issues I did address.  Right here like an email
17  to Mrs. Jensen.  But this is administratively, not
18  medically.
19    Q.  Do you recall there being any staffing issues
20  with the medical department at Tucson while you were the
21  FHA?
22        MS. FLETCHER:  Form, foundation.
23        THE WITNESS:  That is -- I mean, it's
24  difficult to recall that at this point because it's -- at
25  the time I imagine it went up and down with staffing.

Page 64

1  Staffing comes and goes in any operations.
2    Q.  BY MR. BRANTLEY:  Were you ever concerned about
3  being understaffed while you were the FHA at Tucson?
4        MS. FLETCHER:  Form, foundation.
5        THE WITNESS:  Please rephrase.
6    Q.  BY MR. BRANTLEY:  Were you ever concerned --
7        MR. BRANTLEY:  Can you just please repeat
8  the question.
9        (The requested portion of the record was
10        read by the reporter.)
11        MS. FLETCHER:  Form, foundation.
12        THE WITNESS:  Staffing patterns were not my
13  decision.  That was upper management.
14    Q.  BY MR. BRANTLEY:  Did you ever feel like you
15  needed more people to carry out the medical care tasks at
16  Tucson?
17        MS. FLETCHER:  Form, foundation.  Form,
18  foundation.
19        THE WITNESS:  That's beyond what I could
20  answer.  I don't answer on feeling.
21    Q.  BY MR. BRANTLEY:  Did any of your subordinates
22  ever raise concerns with staffing at Tucson while you
23  were the FHA?
24        MS. FLETCHER:  Form, foundation.
25        THE WITNESS:  I'm not sure of what my

Page 65

1  staffing were thinking at that point in time.  I can't
2  answer for them.
3    Q.  BY MR. BRANTLEY:  Let's move forward to your
4  time as contract compliance monitor.  When did you take
5  over that position?
6        MS. FLETCHER:  Form.
7        THE WITNESS:  Take over the position?
8    Q.  BY MR. BRANTLEY:  When did you become the
9  contract compliance monitor at the Phoenix complex?
10    A.  I believe in June 2012.
11    Q.  And why did you become the compliance monitor
12  at Phoenix?
13        MS. FLETCHER:  Form.
14        THE WITNESS:  Please rephrase.
15    Q.  BY MR. BRANTLEY:  What caused you to move from
16  being the FHA at Tucson to become the contract compliance
17  monitor at Phoenix?
18    A.  The medical services or health services became
19  privatized as a result of legislation.  So a private
20  company decided to take over the contract when they were
21  chosen to be the contract people to do the health
22  services.
23    Q.  And the first private company to take over the
24  medical services was Wexford?
25    A.  Correct.

Page 66

1      Q.   When you became the contract monitor at
2   Phoenix, did someone from Wexford take over your job
3   responsibilities at Tucson?
4           MS. FLETCHER: Form, foundation.
5           THE WITNESS:  When I left, I'm not sure what
6   Wexford decided to do.
7      Q.   BY MR. BRANTLEY:  Is there currently a position
8   within Wexford -- or was there a position within Wexford
9   equatable to what you did as an FHA at Tucson?
10          MS. FLETCHER: Form, foundation.
11          THE WITNESS:  I was not a Wexford employee.
12  I would not know that information.
13     Q.   BY MR. BRANTLEY:  So once medical care became
14  privatized, you're uncertain whether there was still a
15  facility health administrator at each of the locations?
16          MS. FLETCHER: Form.
17          THE WITNESS:  I would not know that
18  information. I was not an employee of Wexford. I was a
19  DOC employee.
20     Q.   BY MR. BRANTLEY:  Can you please describe your
21  job duties as the contract compliance monitor.
22     A.   I am to evaluate and monitor the contractual
23  obligations for providing health services to inmates at
24  the Phoenix complex.
25     Q.   And what do you do to evaluate and monitor?

Page 67

1      A.   We use the tool known as the MGAR to monitor.
2   It is based on contractual performance measures.
3      Q.   You said you use the tool called MGAR.
4      A.   Right.
5      Q.   Do you know what MGAR stands for?
6      A.   Yes.  It stands for medical is the M, G is the
7   green, A is the amber, and R is the red.
8      Q.   So in your role as contract compliance monitor,
9   your primary responsibility was completing the MGARs?
10          MS. FLETCHER: Form.
11          THE WITNESS:  Rephrase, please. Say that
12  again. What was the question?
13     Q.   BY MR. BRANTLEY:  As the contract compliance
14  monitor, your primary role is to complete the MGAR forms?
15          MS. FLETCHER: Form.
16          THE WITNESS:  My primary role? Please
17  clarify "primary role."
18     Q.   BY MR. BRANTLEY:  What do you do during the
19  day?
20          MS. FLETCHER: Form.
21          THE WITNESS:  What do I do during the day?
22     Q.   BY MR. BRANTLEY:  When I asked you what being
23  the contract compliance monitor entailed, you said: We
24  monitor the contract and complete the MGAR form.
25          I'm trying to find out, is that all you do?

Page 68

1   Do you only complete MGAR forms as the compliance
2   contract monitor?  Is that your only job task?
3           MS. FLETCHER: Form.
4           THE WITNESS:  My job tasks involve other
5   duties, but that's the main part of evaluation of that.
6   That is what our evaluation is based upon.
7      Q.   BY MR. BRANTLEY:  What are these other duties?
8      A.   We have meetings with the warden, meetings with
9   Central Office, communications with the private company.
10     Q.   And were the MGAR reports issued on a monthly
11  basis?
12     A.   Yes.
13     Q.   To whom do you report?
14          MS. FLETCHER: Form.
15          THE WITNESS:  My supervisor is Kathy
16  Campbell.
17     Q.   BY MR. BRANTLEY:  And what's her title?
18     A.   She would be the program manager -- or
19  administrative program manager, sorry.
20     Q.   And she's an ADC employee?
21     A.   Yes.
22     Q.   Is there any ongoing training that you undergo
23  as the contract compliance monitor?
24     A.   We have meetings with our supervisors and
25  continue on to assure that we're doing the best job we

Page 69

1   can.
2      Q.   But besides these meetings, there's no other
3   training?
4           MS. FLETCHER: Form.
5           THE WITNESS:  Those are part of the
6   training. Those meetings become training meetings.
7      Q.   BY MR. BRANTLEY:  Is there any other type of
8   training?
9      A.   We went through an extensive training before we
10  began the entire MGAR process.
11     Q.   And how many units are at the Phoenix complex?
12     A.   They have the intake, F area, Flamenco. And
13  within Flamenco we have Ida Ward, George, and Baker. And
14  John King Quiet. And then there's also Aspen.
15     Q.   And so let's take these one at a time. The
16  intake, that's where new inmates that are entering the
17  ADC prison system get processed?
18     A.   Yes.
19     Q.   What kind of inmates are housed in F area?
20          MS. FLETCHER: Form.
21          THE WITNESS:  The housing has to do with
22  security.  So security operations decides who's housed
23  there.
24     Q.   BY MR. BRANTLEY:  But you don't know who's
25  housed there?

Page 70

1         MS. FLETCHER: Form.
2         THE WITNESS: Is that a question?
3     Q.   BY MR. BRANTLEY: Do you know who's housed
4  there?
5         MS. FLETCHER: Form.
6         THE WITNESS: Inmates are housed there.
7     Q.   BY MR. BRANTLEY: But you don't know what type
8  of inmates?
9     A.   The security operations classification makes
10  the decision on who's housed there.
11    Q.   How about Flamenco, is that a particular type
12  of inmate housing ward?
13        MS. FLETCHER: Form.
14        THE WITNESS: That is the mental health
15  ward. Mental health inmates are housed there.
16    Q.   BY MR. BRANTLEY: So you know who's in
17  Flamenco, but you're not sure who's in the F area?
18        MS. FLETCHER: Form.
19        THE WITNESS: The Flamenco is a hospital
20  section. So they're mentally ill inmates. Who gets
21  housed there, I don't know. Who chooses, the
22  classification of how they get there, no.
23    Q.   BY MR. BRANTLEY: But to answer my question,
24  you know what type of inmates are in some of the units
25  but not what type of inmates are in other units?

Page 71

1         MS. FLETCHER: Form.
2         THE WITNESS: Please rephrase that question.
3     Q.   BY MR. BRANTLEY: You're aware that Flamenco
4  houses mentally ill inmates, correct?
5     A.   Yes.
6     Q.   But for other units such as F area, you're
7  unaware of what type of inmates are housed there?
8         MS. FLETCHER: Form.
9         THE WITNESS: I'm unaware because that's not
10  the mental health hospital.
11    Q.   BY MR. BRANTLEY: Are any medical services
12  provided to F area?
13    A.   Yes.
14    Q.   As contract compliance monitor, are you
15  responsible for monitoring the medical services provided
16  to F area?
17    A.   I am responsible for monitoring Corizon and if
18  they're providing the medical services based on the
19  contract.
20    Q.   And that would include within the F area?
21    A.   Yes. F area is located at Phoenix complex.
22    Q.   Do you know who's housed in John King Quad?
23        MS. FLETCHER: Form.
24        THE WITNESS: I do not know. I know it's a
25  mental health hospital. And it's John King Quiet.

Page 72

1     Q.   BY MR. BRANTLEY: And that's part of Flamenco?
2     A.   That's part of Flamenco, yes. I gave the
3  details of that.
4     Q.   And are you aware of who's housed in Aspen?
5         MS. FLETCHER: Form.
6         THE WITNESS: I am aware that inmates are
7  housed there, but I'm not aware of who gets housed there.
8     Q.   BY MR. BRANTLEY: There's no particular medical
9  concern about those patients?
10        MS. FLETCHER: Form, foundation.
11        THE WITNESS: Rephrase that, please.
12    Q.   BY MR. BRANTLEY: Flamenco has inmates with a
13  particular medical need. They have mental health
14  issues. Aspen is not a unit that specifically houses one
15  particular type of inmate, correct?
16        MS. FLETCHER: Form, foundation.
17        THE WITNESS: I do not classify nor choose
18  who gets housed there.
19    Q.   BY MR. BRANTLEY: But medical services are
20  rendered?
21    A.   Medical services are rendered to Aspen as they
22  are to the entire complex.
23    Q.   And you ensure compliance with all aspects of
24  medical care, dental care, mental health care under the
25  contract with Corizon?

Page 73

1         MS. FLETCHER: Form.
2         THE WITNESS: I don't ensure, I evaluate
3  according to the contractual obligations.
4     Q.   BY MR. BRANTLEY: Does anyone assist you in
5  assessing the contractual compliance?
6         MS. FLETCHER: Form.
7         THE WITNESS: Does anyone assist me as --
8  I'm not sure what you mean by that.
9     Q.   BY MR. BRANTLEY: Are you the only person in
10  charge of monitoring contract compliance at Phoenix?
11    A.   I am the contract monitor at Phoenix complex.
12  There are other contract monitors in nursing that are
13  contractual monitors as well that go with clinical. I'm
14  more administrative.
15    Q.   Do those contract monitors in nursing report to
16  you?
17    A.   No.
18    Q.   Do they provide you any information to be
19  included in an MGAR report?
20    A.   No.
21    Q.   As the contract compliance monitor, has your
22  job changed at all since Wexford stopped being the
23  provider and Corizon took over?
24        MS. FLETCHER: Form.
25        THE WITNESS: I'm not sure. Would you

Page 74

1    please clarify specifically.
2        Q.   BY MR. BRANTLEY: Are your job duties the exact
3    same as they were under Wexford now under Corizon?
4        A.   By me, yes, I remained the complex monitor.
5        Q.   So nothing changed for you when Wexford left
6    and Corizon took over?
7            MS. FLETCHER: Form.
8            THE WITNESS: Nothing changed? What do you
9    mean by that?
10       Q.   BY MR. BRANTLEY: Within your job description,
11   nothing changed when Wexford left and Corizon took over?
12       A.   Within my job description, no, it's the same.
13       Q.   And the MGAR reports, that's how you refer to
14   them internally?
15       A.   Yes.
16       Q.   And you indicated that these reports are
17   supposed to be completed monthly?
18       A.   Monthly.
19       Q.   And all the information within an MGAR report,
20   is that input by you?
21       A.   My report, yes.
22       Q.   Is this using like a computer system?
23       A.   Yes.
24       Q.   Is there a particular day of the month that the
25   MGAR report is supposed to be issued for the prior month?

Page 75

1        A.   Usually the end of the month.
2        Q.   And when you say the end of the month, does
3    that report cover the current month or the prior month?
4        A.   The current month. In other words, July would
5    be covered at the end of the month of July. Then they
6    received it.
7        Q.   And do you have any regularly scheduled
8    meetings around completing the MGAR reports?
9            MS. FLETCHER: Form.
10           THE WITNESS: I'm not sure what you mean by
11   that.
12       Q.   BY MR. BRANTLEY: Are there any meetings that
13   specifically relate to the MGAR reports?
14           MS. FLETCHER: Form, foundation.
15           THE WITNESS: Meeting -- please clarify.
16   Meetings relating to MGAR form?
17       Q.   BY MR. BRANTLEY: Do you talk to anyone about
18   what gets put into the MGAR report before you complete
19   the MGAR report?
20       A.   I would talk possibly with my supervisor.
21       Q.   Are there any normal email communications
22   relating to the MGAR reports?
23           MS. FLETCHER: Form, foundation.
24           THE WITNESS: Emails from whom?
25           MS. FLETCHER: Just ask him to clarify.

Page 76

1            THE WITNESS: Oh, please clarify.
2        Q.   BY MR. BRANTLEY: In the process of completing
3    the MGAR reports, do you typically communicate with
4    anyone by email for purposes of completing the MGAR
5    reports?
6        A.   I complete the MGAR reports on my own. I might
7    ask for clarification of time or something, but it's not
8    about how or -- how to do that.
9        Q.   Do the MGAR reports generated by the nursing
10   contract compliance monitors get incorporated into your
11   MGAR report?
12           MS. FLETCHER: Form, foundation.
13           THE WITNESS: I can't speak what the nursing
14   monitors do with their MGAR.
15       Q.   BY MR. BRANTLEY: So the nursing monitors
16   create a completely independent MGAR from your MGAR?
17       A.   Yes.
18       Q.   You're never involved in inputting information
19   into the same report?
20           MS. FLETCHER: Form, foundation.
21           THE WITNESS: The report -- I do my part.
22   Nursing does their part.
23       Q.   BY MR. BRANTLEY: And combined, they may be
24   generated into one overall report?
25           MS. FLETCHER: Form, foundation.

Page 77

1            THE WITNESS: I'm not sure how nursing does
2    that. That's a whole different area. They could be.
3    I'm not sure how that is. I know my report is
4    submitted. How it's put in the system is not what I
5    decide. That's technical or upper management.
6        Q.   BY MR. BRANTLEY: But you've seen a completed
7    MGAR report?
8        A.   I've seen my completed MGAR report.
9        Q.   And it doesn't have anything to do with
10   compliance within the nursing wards?
11           MS. FLETCHER: Form, foundation.
12           THE WITNESS: Nursing does their separate --
13   they do a separate MGAR than I do.
14       Q.   BY MR. BRANTLEY: So if there's an MGAR that
15   indicates information was input by a nursing contract
16   compliance monitor, you would not have seen that
17   information prior to it getting put in the MGAR report?
18           MS. FLETCHER: Form, foundation.
19           THE WITNESS: Correct. I don't deal with
20   the nursing MGAR.
21       Q.   BY MR. BRANTLEY: So you're responsible for the
22   accuracy of the information within your MGAR reports?
23       A.   Right.
24       Q.   But you have nothing at all do with any MGAR
25   report generated by a nurse?

Page 78

1      A.   That's true, I don't.
2      Q.   Can you please explain to me the different
3   categories, green, amber, and red, and what they
4   represent.
5      A.   Green would be that the compliance is met, that
6   the completion of the performance measure is being
7   completed.
8           Amber is that there have been areas that
9   need improvement.
10          And red is that it's been brought to the
11  attention and/or really we need to get this taken care of
12  right now. More of an alert.
13     Q.   Are there any guidelines that dictate whether
14  something gets elevated from green to amber or amber to
15  red?
16     A.   Amber would be if it's not being completed.
17  Green is being completed and it's in compliance according
18  to the contract, NCCH standards, policies. The amber is
19  where there are findings that not all of it is, and this
20  area needs attention to improve. Red becomes this needs
21  more immediate attention than even the amber.
22          And this is -- we're in transition at this
23  time. Corizon is taking over. So this is a transition
24  time of improvement and learning. So it's a tool for
25  them as well as to be learning and improving.

Page 79

1      Q.   Is it your judgment when to elevate something
2   from amber to red?
3      A.   Yes.
4      Q.   And you said typically it's something that
5   needs immediate attention or something that's been raised
6   before but hasn't been taken care of?
7           MS. FLETCHER: Form.
8           THE WITNESS: Repeat it, please.
9      Q.   BY MR. BRANTLEY: To qualify for red, it has to
10  be something that needs immediate attention or something
11  that's been brought to Corizon's attention and has not
12  been rectified, correct?
13          MS. FLETCHER: Form.
14          THE WITNESS: Not totally correct. It is to
15  bring to the attention, but it might have been improved
16  and then it slipped again. Let's look at this, make sure
17  it keeps going. It's more because of the transition
18  right now, let's pay attention to this. Really go
19  forward and more so than just the amber.
20     Q.   BY MR. BRANTLEY: Are there any guidelines for
21  how much detail gets put into the Notifications section
22  of the report?
23     A.   Can you please clarify.
24     Q.   Are there any guidelines, policies, procedures,
25  rules that you follow that dictate how much detail you

Page 80

1   need to place within your reporting on the MGAR?
2      A.   The details have to do mainly with the
3   number -- what it is. The number of the medical record
4   or the inmate and what is occurring. So it's basically
5   to -- it goes along with what the performance measure is
6   to give more information so that they -- enough
7   information that they can go in and correct that and show
8   that it's not one time or one person.
9      Q.   So the goal as far as the detail within the
10  Notifications section was to put them on notice that this
11  was an issue. The goal is not to give them every detail
12  about a particular circumstance, correct?
13          MS. FLETCHER: Form.
14          THE WITNESS: I feel like there's two
15  questions here. Say it again.
16     Q.   BY MR. BRANTLEY: So when you complete the
17  Notifications section of the MGAR, you're only putting in
18  enough information to put them on notice, correct?
19          MS. FLETCHER: Form.
20          THE WITNESS: I don't know what you mean by
21  notice.
22     Q.   BY MR. BRANTLEY: You indicated that you put
23  enough detail in to put Corizon on notice of the --
24  whatever the monitoring circumstance is that created an
25  amber or a red alert.

Page 81

1      A.   Right. Correct.
2      Q.   So you only put in as much detail as is
3   necessary?
4           MS. FLETCHER: Form.
5           THE WITNESS: I got confused. Necessary to
6   what?
7      Q.   BY MR. BRANTLEY: For them to understand the
8   problem. For Corizon to understand the problem.
9      A.   Of why it is marked as a yellow, right.
10     Q.   And besides the green, amber, red reports, is
11  there any other type of reporting you do, whether it be
12  email or memos, regarding the compliance of Corizon?
13          MS. FLETCHER: Form.
14          THE WITNESS: If you could clarify that
15  again.
16     Q.   BY MR. BRANTLEY: Other than the MGAR reports,
17  do you provide any other reports by email or memo to
18  anyone else?
19          MS. FLETCHER: Form.
20          THE WITNESS: If there is an issue, I could
21  email. I mean, there is a possibility I could do that,
22  yes. It's not within the scope of not doing that.
23     Q.   BY MR. BRANTLEY: Do you ever create any memos
24  to your superiors regarding what you've seen during your
25  contract compliance monitoring?

Page 82

1    A.   Yes.
2    Q.   So that would be another type of reporting you
3    do, is creating memos?
4         MS. FLETCHER:  Form.
5         THE WITNESS:  Please rephrase that question.
6    Q.   BY MR. BRANTLEY:  Well, I've asked you if you
7    create any other sort of reports about the contract
8    compliance beyond the MGAR.  And you indicated, no, you
9    occasionally might send an email.  And then I asked
10   whether or not you also create memos.  And you indicated
11   that there are some circumstances when you would create a
12   memo, correct?
13   A.   Correct.
14   Q.   So there is further reporting that you do
15   beyond the MGAR report itself?
16        MS. FLETCHER:  Form.
17        THE WITNESS:  Well, the word "reporting"
18   confused me that you were using.  I inform by memo, if
19   necessary, but the MGAR is what we use as reporting.
20   Q.   BY MR. BRANTLEY:  Right.  Okay.  So just to
21   clarify, the MGAR is what would go to Corizon but also to
22   your superiors to say, hey, this is how the contract
23   compliance monitoring is going.  And that's the only
24   thing that you would ever give to Corizon, is the MGAR?
25        MS. FLETCHER:  Form.

Page 83

1         THE WITNESS:  Rephrase.  Rephrase that
2    question.
3    Q.   BY MR. BRANTLEY:  Do you have any other
4    communications regarding contract compliance with Corizon
5    outside of the MGAR reports?
6    A.   I converse with Corizon.  Conversing.  The
7    report, though, is the MGAR.
8    Q.   And occasionally you might draft or create a
9    memo to your superiors regarding some of the information
10   contained within an MGAR report just to make them aware
11   of what's taking place?
12        MS. FLETCHER:  Form.
13        THE WITNESS:  Yes.  I could do a memo.
14   Q.   BY MR. BRANTLEY:  And if Wexford or Corizon was
15   not complying with the contract, besides being issued
16   like an amber or a red alert within the MGAR report, did
17   you do anything else to try to rectify the situation?
18        MS. FLETCHER:  Form, foundation.
19        THE WITNESS:  My job is to report through
20   the MGAR and to give the information through there.  As
21   far as the other things, that's not my area.  That would
22   be my superiors.
23   Q.   BY MR. BRANTLEY:  What's a corrective action
24   plan?
25   A.   Corrective action plan is a -- CAP is the

Page 84

1    initials.  And that would be what the vendor or Corizon
2    would give back to the monitor as saying, this is what we
3    are doing to improve that situation, to correct the
4    situation.  That's why it's called corrective action
5    plan.  It's an action plan for correction.
6    Q.   So you issue an MGAR that may have an amber or
7    a red notification in it?
8    A.   Correct.
9    Q.   And in response, Wexford or Corizon would issue
10   a corrective action plan back to you?
11   A.   Correct.
12   Q.   What did you do with the corrective action
13   plans?
14        MS. FLETCHER:  Form.
15        THE WITNESS:  I read the corrective action
16   plan.
17   Q.   BY MR. BRANTLEY:  Do you do anything else?
18        MS. FLETCHER:  Form.
19        THE WITNESS:  I read it and evaluate and
20   decide the approval.
21   Q.   BY MR. BRANTLEY:  Do you monitor whether or not
22   the contractor complies with the corrective action plan?
23   A.   Monitoring is my duty, yes.
24   Q.   So within the monitoring, you also monitor
25   whether the contractor is fulfilling a corrective action

Page 85

1    plan?
2    A.   Well, the corrective action plan is part of the
3    MGAR, it's part of the entire monitoring system.
4    Q.   So once Wexford or Corizon issues you the
5    corrective action plan, you don't do anything to verify
6    that what they said they would do, they're doing beyond
7    reporting in the MGAR report?
8         MS. FLETCHER:  Form.
9         THE WITNESS:  This confuses me.  And you
10   continuously say Wexford.  That confuses me.
11   Q.   BY MR. BRANTLEY:  I'm trying to say Wexford or
12   Corizon because you were the contract --
13        MS. FLETCHER:  Let's specify Wexford and
14   specify Corizon.  Maybe that will help.  I don't think
15   you've asked her whether her people were required to do
16   that.  Maybe that will help too.
17        MR. BRANTLEY:  I previously questioned
18   whether or not her job duties changed between Wexford or
19   Corizon, and she indicated they did not.  So I based my
20   question on the fact that she indicated her job did not
21   change at all.
22        MS. FLETCHER:  Her job, correct.
23   Q.   BY MR. BRANTLEY:  Do you ever look back at a
24   corrective action plan to see whether or not the
25   provider, whether it be Wexford or Corizon, corrected the

Page 86

1    problem?
2        MS. FLETCHER:  Form.
3        THE WITNESS:  I read the corrective action
4    plan and follow up.
5        Q.   BY MR. BRANTLEY:  What does the following up
6    entail?
7        A.   I go and see, are they following their
8    corrective action plan.
9        Q.   And are they under obligation under the
10   contract to follow the corrective action plan?
11       MS. FLETCHER:  Form.
12       THE WITNESS:  They are to complete
13   corrective action plans.
14       Q.   BY MR. BRANTLEY:  Is there any consequences for
15   repeated non-compliance with the contract?
16       MS. FLETCHER:  Form, foundation.
17       THE WITNESS:  I'm not contractually -- I do
18   not deal with writing or completing the contract and
19   dealing with that.  That's upper management.
20       Q.   BY MR. BRANTLEY:  Once Corizon issues you a
21   CAP, a corrective action plan, do they create any
22   additional reports to you regarding that particular
23   issue?
24       MS. FLETCHER:  Form, foundation.
25       THE WITNESS:  Please repeat.

Page 87

1        Q.   BY MR. BRANTLEY:  So you issue an MGAR report.
2        A.   Correct.
3        Q.   Corizon responds with a CAP.  Do they have any
4    obligation once they've responded with a CAP to create
5    any other reporting to you regarding that particular
6    issue?
7        MS. FLETCHER:  Form, foundation.
8        THE WITNESS:  I do not know what they're
9    contractually obligated to be reporting to me or to
10   others.  That's how I'm perceiving this question.  So I
11   don't -- that is not my area on what they are
12   contractually obligated to do.  They give me the CAP, I
13   approve it, disapprove it, and they're to follow that
14   CAP, and I follow up.
15       Q.   BY MR. BRANTLEY:  You follow up via the MGAR
16   report?
17       A.   I follow up, yes, to see if they're complying
18   to do that part, if it's been corrected.  It's a tool
19   to -- for improvement.
20       Q.   You mentioned that at the Phoenix complex, one
21   of the units is the intake unit, correct?
22       A.   Yes.
23       Q.   Is that Alhambra?
24       A.   Yes.  Alhambra intake.
25       Q.   Can you describe the health screening

Page 88

1    requirements that are supposed to take place when an
2    inmate arrives at intake?
3        MS. FLETCHER:  Form, foundation.
4        THE WITNESS:  That is the medical --
5    Corizon's medical requirements.  So I do not monitor the
6    exact -- I monitor if they have complied with completing
7    all of the forms.
8        Q.   BY MR. BRANTLEY:  So as the contract compliance
9    monitor, you're only monitoring essentially paperwork and
10   forms, not the actual medical care being provided?
11       MS. FLETCHER:  Form.
12       THE WITNESS:  You have to rephrase that.
13   Specifically what are you asking?
14       Q.   BY MR. BRANTLEY:  You indicated that you do not
15   monitor the exact activity.  That you monitor the forms.
16       MS. FLETCHER:  Form.
17       Q.   BY MR. BRANTLEY:  And monitor to make sure that
18   the forms have been completed completely, correct?
19       MS. FLETCHER:  Form.
20       THE WITNESS:  Not necessarily correct.
21   Please clarify what you're asking me.
22       Q.   BY MR. BRANTLEY:  When you're performing your
23   duties as contract compliance monitor --
24       A.   Right.
25       Q.   -- and obtaining information to input the

Page 89

1    MGAR reports --
2        A.   Right.
3        Q.   -- is the information put in the MGAR report
4    obtained from a review of paperwork or is it obtained
5    from seeing what's taking place --
6        MS. FLETCHER:  Form.
7        Q.   BY MR. BRANTLEY:  -- during the medical
8    procedures?
9        MS. FLETCHER:  Form.
10       THE WITNESS:  You're asking two things.
11       Q.   BY MR. BRANTLEY:  I'm a little confused.  I
12   asked you whether -- to describe to me what the
13   requirements are for a health screening upon intake.  And
14   you indicated that that's medical, Corizon's
15   requirements, not yours, correct?
16       A.   Correct.  Medical, clinically what they're to
17   be doing, their medical screening, if the inmate is ill,
18   that's not my area.  They are to be doing the medical
19   portion of that.  It's a clinical issue.  Intake is
20   clinical.  That's what I'm assuming you're referring to.
21       Q.   You monitor contract compliance with regard to
22   intake within your MGAR report, correct?
23       A.   Correct.
24       Q.   If you're indicating that you do not know what
25   the requirements are for an intake health screening and

Page 90

1  that only the medical personnel like Corizon know what
2  the requirements are, how do you ensure that they're
3  complying with the contract?
4      MS. FLETCHER: Form.
5      THE WITNESS: I am going by the MGAR what is
6  asked of me based on what is in there contractually. So
7  I'm interpreting your question previously has to do with
8  clinical. They deliver the health care services in the
9  clinical services. I'm not clinically evaluating them.
10 I observe. I don't -- it's not just paperwork, if that's
11 what you're asking, no. It's not just paperwork that I'm
12 observing. But clinically I'm not doing, oh, are they
13 doing a correct -- you know, is he doing correct medical
14 care. That is not my area. I'm not a clinical.
15     Q.  BY MR. BRANTLEY: But are you responsible for
16 monitoring whether or not, for instance, an intake
17 screening took place within a certain amount of time from
18 the time the inmate arrived at the prison?
19     A.  Yes.
20     Q.  And what are the requirements time framewise
21 for an inmate that arrives at Alhambra to receive a
22 screening?
23     MS. FLETCHER: Form.
24     THE WITNESS: What are the requirements?
25 Please clarify.

Page 91

1      Q.  BY MR. BRANTLEY: I asked you if you knew --
2      A.  Right.
3      Q.  -- what the requirements were for when someone
4  arrives at the prison how soon they have to have their
5  health screening. And you said --
6      A.  Their health screening --
7      MS. FLETCHER: Form.
8      Go ahead and answer.
9      THE WITNESS: The health screening is within
10 this medical intake. I'm not sure what you mean by
11 health screening. Specifically what is health screening
12 that you're asking for?
13     Q.  BY MR. BRANTLEY: The only aspect of the intake
14 procedure that you're responsible for monitoring contract
15 compliance of is whether or not the inmate received the
16 intake screening within the allotted time frame?
17     MS. FLETCHER: Form.
18     THE WITNESS: That is one of the monitoring,
19 their allotted time frame. But there are other MGAR
20 issues or MGAR performance measures. So I do that one,
21 yes. Did they get it in the certain amount of time that
22 is contractually set. I am confused by what you're
23 saying is the health screening. I'm not sure what you
24 are meaning by that.
25     Q.  BY MR. BRANTLEY: What takes place during the

Page 92

1  intake procedures as pertaining to medical care?
2      MS. FLETCHER: Form, foundation.
3      THE WITNESS: Medical care, that is again
4  Corizon decides upon the medical care of an inmate that
5  is incoming.
6      Q.  BY MR. BRANTLEY: When you are completing the
7  MGAR report --
8      A.  Right.
9      Q.  -- for intake contract compliance, what do you
10 look at to see whether or not they have complied with the
11 contract as far as intake requirements are concerned?
12     A.  The MGAR changes monthly. I don't make the
13 decisions on what should be in there. That is from upper
14 management. So whatever is on the MGAR, that is what I
15 would be looking if it is being completed. So every
16 month it could be different or it could be the same,
17 different ones. That changes. And I am not aware of
18 what will be in that MGAR.
19     Q.  Can you describe to me what Corizon is supposed
20 to do when a prisoner arrives at intake Alhambra in
21 Phoenix?
22     MS. FLETCHER: Form, foundation.
23     THE WITNESS: Corizon makes their decision
24 on what they do. That is not my decision.
25     Q.  BY MR. BRANTLEY: So what exactly are you

Page 93

1  monitoring?
2      MS. FLETCHER: Form.
3      THE WITNESS: Whatever is sent to me on the
4  MGAR on a monthly basis. I'll get -- August will come at
5  the beginning of August, and then I know what I need to
6  monitor. It's not the same every time.
7      MR. BRANTLEY: Is now a good time to break
8  for lunch?
9      MS. FLETCHER: You guys only noticed this
10 deposition till 1:00. So if you want to take time for
11 lunch --
12     MR. BRANTLEY: Let me take a five-minute
13 break.
14     MS. FLETCHER: Okay.
15     (A recess was taken from 11:37 a.m. to
16     11:45 a.m.)
17     MR. BRANTLEY: Why don't we reconvene at
18 12:15.
19     (A recess was taken from 11:45 a.m. to
20     12:20 p.m.)
21     Q.  BY MR. BRANTLEY: Dr. Valenzuela, as the
22 contract compliance monitor at Phoenix, your only
23 knowledge about what to measure in the MGAR report is
24 based on what's given to you by your superiors to
25 monitor, correct?

Page 94

1   MS. FLETCHER: Form.
2   THE WITNESS: Sorry, I didn't quite hear the
3   last part.
4   Q.   BY MR. BRANTLEY: In your job as the contract
5   compliance monitor, you indicated previously you're not
6   really aware of any outside policies or procedures
7   regarding time frames on that. So your knowledge of how
8   to monitor and what to measure them on comes from what
9   your supervisors provide within the MGAR report?
10   MS. FLETCHER: Form.
11   THE WITNESS: I -- in addition -- there must
12   be a confusion. Because I measure -- that is our tool,
13   but I also have the observations. If there are other
14   blatant areas that are not on the MGAR, then I would
15   probably bring that also to the attention of the facility
16   health administrator. We work together as making sure
17   hopefully the care is provided and improved upon. So the
18   MGAR is the main tool.
19   Q.   BY MR. BRANTLEY: Real quick, you just
20   indicated that you work with the facility FHA, correct?
21   A.   Well, she gets the -- or whoever is the
22   facility health administrator gets the MGAR.
23   Q.   Because previously I thought you indicated you
24   weren't aware if there were FHAs still.
25   MS. FLETCHER: Form. That was not what was

Page 95

1   said.
2   THE WITNESS: At my facility.
3   Q.   BY MR. BRANTLEY: So as the contract compliance
4   monitor, you measure based on what the supervisors
5   provided, and then you also observe. And if there's
6   something that you observe that needs to be reported even
7   though your supervisors may not have asked you to look
8   for it, you'll include that in the MGAR report?
9   MS. FLETCHER: Form.
10   THE WITNESS: I'm so confused by the
11   question. Please simplify or rephrase that.
12   Q.   BY MR. BRANTLEY: You indicated that in
13   measuring compliance, you'll use the MGAR tool and look
14   at what your supervisor indicated you should measure
15   contract compliance for, correct?
16   MS. FLETCHER: Form.
17   THE WITNESS: Yes.
18   Q.   BY MR. BRANTLEY: And then also you indicated
19   that sometimes you'll make observations about things that
20   also need to be corrected that may not have been asked by
21   your supervisor.
22   MS. FLETCHER: Form.
23   THE WITNESS: Can you put that in question
24   form, please.
25   Q.   BY MR. BRANTLEY: Aside from what your

Page 96

1   supervisors ask you to monitor based on their questions
2   in the MGAR report, does anything else get included in
3   the MGAR report?
4   MS. FLETCHER: Form.
5   THE WITNESS: The MGAR is -- the answers in
6   the MGAR are very specific based on what is in the MGAR
7   form.
8   Q.   BY MR. BRANTLEY: Okay.
9   A.   There is the performance measure, there would
10   be the compliance notations.
11   Q.   But you indicated that you also do make
12   notations based on observations?
13   A.   Yes. In other words, it's in the contract.
14   MGAR comes from the contract. That's why it changes
15   monthly. But there are other observations. If there are
16   other things that are within the contract that need to be
17   noted and that are not being completed, that would be
18   brought also to the attention so they can be improved
19   upon.
20   Q.   And do you reference the contract when
21   completing the MGAR report?
22   A.   Not necessarily. It's being revised, and it
23   will be referencing -- sometimes we'll put that in so
24   that they can know where to go. But generally it's word
25   for word. But now we'll be putting -- the MGAR will

Page 97

1   automatically have that coming up soon. They're revising
2   that part of the MGAR so that the reference point will be
3   right there and they wouldn't have to be confused where
4   it's at.
5   Q.   But beyond the MGAR, you indicated that
6   sometimes you'll indicate observations based on things
7   that you saw that weren't in compliance with the
8   contract?
9   MS. FLETCHER: Form.
10   THE WITNESS: Weren't in -- yes, that might
11   not be on the MGAR but on there.
12   Q.   BY MR. BRANTLEY: And you observe that, and you
13   know it might not be in compliance because you know
14   what's compliant with the contract in your head or are
15   you using some sort of document that refreshes your
16   recollection as to what the standards of the contract
17   are?
18   A.   That's a double question. Can you please give
19   me one.
20   Q.   Are you basing what you write in the MGAR about
21   your observations on your knowledge of the contract or --
22   are you basing it on your knowledge of the contract?
23   MS. FLETCHER: Form.
24   THE WITNESS: Yes.
25   Q.   BY MR. BRANTLEY: So are you referencing any

Page 98

1  sort of document to see what the contract terms are when
2  you're completing the MGAR report?
3       MS. FLETCHER: Form.
4       THE WITNESS: What are you specifically --
5       Q.  BY MR. BRANTLEY: Do you have the contract
6  memorized?
7       A.  No.
8       Q.  So you don't have in your head every single
9  term that if they might not be in compliance with, you
10  would know right off the bat, oh, that's not in
11  compliance, that's got to go in the MGAR report?
12       MS. FLETCHER: Form.
13       THE WITNESS: Because the MGAR rotates and
14  because that might have been on the last month's MGAR and
15  maybe because I'm continuously monitoring for the CAP,
16  then it might be I reference back, oh, you might check on
17  that. In that sense. That's where the interwoven
18  monthly information is delivered, too.
19       Q.  BY MR. BRANTLEY: So outside potentially a
20  previous MGAR where you noted a situation, that may not
21  be one of the reporting requirements that your supervisor
22  included on the particular months, you're not referencing
23  any sort of outside documents to confirm that they're
24  complying with the contract?
25       A.  I don't know what other outside documents

Page 99

1  you're referring to.
2       Q.  I don't know what other outside documents
3  either. Do you have any manual that says, these are the
4  performance metrics for the entire contract?
5       A.  We do not have a document that says, these are
6  the performance metrics for the document.
7       Q.  Do you have any sort of document, whether it be
8  a manual, an email, a memo, that gives guidance as to
9  whether or not something is compliant or non-compliant
10  with the contract?
11       MS. FLETCHER: Form.
12       THE WITNESS: I don't quite understand that
13  because the MGAR is the point of which to look at because
14  it's in direct reference from the contract and the NCCH
15  standards and not just the contract and ADOC policy.
16       Q.  BY MR. BRANTLEY: So your only knowledge about
17  what to measure compliance against is what's included
18  within the MGAR tool?
19       MS. FLETCHER: Form.
20       THE WITNESS: My only knowledge. No. I
21  have more. It's knowledge, not just the MGAR.
22       Q.  BY MR. BRANTLEY: And what is that knowledge?
23       A.  I would say the knowledge from the training,
24  from the NCCH standards, and the ADOC policy.
25       Q.  So you're using knowledge outside of what's

Page 100

1  contained in the MGAR report when you're doing your
2  compliance monitoring?
3       MS. FLETCHER: Form.
4       THE WITNESS: No. Because the MGAR is based
5  on all of those items. It's just based on those.
6  They're within that scope.
7       Q.  BY MR. BRANTLEY: Let me try to ask this one
8  last time. So when you sit down to do the MGAR, all
9  you're doing is looking at what your supervisors put for
10  the performance measure and whether or not Corizon is
11  complying with that performance measure?
12       MS. FLETCHER: Form.
13       THE WITNESS: I don't understand that
14  question.
15       Q.  BY MR. BRANTLEY: What part of the question
16  don't you understand?
17       A.  The part about "you're only looking at." I'm
18  not sure what you mean. I'm only looking at the MGAR and
19  putting that down?
20       Q.  When you go to do your contract compliance and
21  you're inputting stuff into the MGAR tool --
22       A.  Uh-huh.
23       Q.  -- you're basing all of your notifications off
24  of standards within the performance measure of the MGAR
25  tool?

Page 101

1       MS. FLETCHER: Form.
2       THE WITNESS: I am basing that -- the notes
3  are based on what was in that particular MGAR number or
4  whatever.
5       Q.  BY MR. BRANTLEY: And so you're measuring based
6  on what your supervisors asked you to measure?
7       MS. FLETCHER: Form.
8       THE WITNESS: I'm basing it on the MGAR that
9  was given to me as the monitor.
10       Q.  BY MR. BRANTLEY: And your supervisors create
11  what performance measures --
12       A.  I don't know who creates what performance
13  measures specifically.
14       Q.  You just get them when they come up on the MGAR
15  report?
16       A.  Right.
17       Q.  And it's your understanding that they're based
18  off of terms of the contract plus other underlying
19  policies and procedures?
20       MS. FLETCHER: Form, foundation.
21       Q.  BY MR. BRANTLEY: That you mentioned that you
22  have other external knowledge about. Like from your
23  training and --
24       A.  Specifics. If you can specify the question, I
25  would be able to answer that.

Page 102

1    Q.   We'll move on.
2         Are you aware of how quickly an intake is
3    supposed to take place at the Phoenix location?
4         MS. FLETCHER:  Form.
5         THE WITNESS:  How quickly?  I'm not sure.
6    Q.   BY MR. BRANTLEY:  What the time frame is for an
7    intake to occur?
8         MS. FLETCHER:  Form.
9         THE WITNESS:  Yes.
10   Q.   BY MR. BRANTLEY:  What is that time frame?
11   A.   The time frame is two days.
12   Q.   And where does that time frame come from?
13        MS. FLETCHER:  Form.
14        THE WITNESS:  The time frame is given to
15   me.  I'm not sure where that is coming from as far as I
16   did not do that.  I don't put the MGAR together.
17   Q.   BY MR. BRANTLEY:  But your knowledge of what
18   the time frame is is based off of the questions that are
19   posed to you in the MGAR report?
20   A.   Right.  And basically it's two business days.
21   I didn't include that.
22   Q.   And as the contract compliance monitor at
23   Phoenix, do you observe Corizon taking longer than two
24   business days to conduct the intake?
25        MS. FLETCHER:  Form.

Page 103

1         THE WITNESS:  Do I observe?  It has
2    fluctuated.  At this point in time they are.  So it's an
3    improvement.  I mean, so I'm saying, when are you saying
4    this observing?
5    Q.   BY MR. BRANTLEY:  Sometime during your time as
6    the contract compliant monitor, there were times it was
7    taking longer than two days for an intake to take place?
8    A.   Right.
9         MR. BRANTLEY:  I'm going to introduce
10   Exhibit 142, which is Bates ADC052840.
11        (Exhibit 142 was marked.)
12   Q.   BY MR. BRANTLEY:  Does this appear to be a true
13   and correct copy of an intake MGAR report that you
14   completed?
15   A.   Yes.
16   Q.   And is this document a compilation of acts,
17   events, or opinions that were made at or near the time
18   that they took place?
19        MS. FLETCHER:  Form.
20        THE WITNESS:  Restate.
21   Q.   BY MR. BRANTLEY:  You created this form,
22   correct?
23   A.   I didn't create the form.
24   Q.   You input the information into this particular
25   report?

Page 104

1    A.   Yes.
2    Q.   And the information you input, was it near in
3    time to when you observed it?  Were you observing the
4    information as you were inputting it?
5         MS. FLETCHER:  Form.
6         THE WITNESS:  Was I -- the inputting was
7    during that month.  This is November.
8    Q.   BY MR. BRANTLEY:  So you were inputting the
9    information near in time to when you were obtaining the
10   information?
11        MS. FLETCHER:  Form.
12        THE WITNESS:  That would be -- I would say
13   that the information was put in.  I'm not sure at this
14   time when, but during that month.  And toward the end.
15   And usually -- now I think the MGARs are getting dated,
16   so it's hard.  Well, here you go.  It says right there
17   what date I put it in.
18   Q.   BY MR. BRANTLEY:  So you input information on
19   November 16th and November 30th for this particular MGAR
20   report?
21   A.   Right.  That's when the date is that was put
22   in, and the computer did that.  That was automatic.
23   Q.   And these MGAR reports are -- they're created
24   in the normal course of your job duties as the contract
25   compliance monitor?

Page 105

1         MS. FLETCHER:  Form.
2         THE WITNESS:  They're created?
3    Q.   BY MR. BRANTLEY:  You complete this as part of
4    your normal job duty?
5    A.   Yes.
6    Q.   And in the top box under Notifications, you
7    indicated that there were a couple of inmates whose
8    intake took longer than the two business days that are
9    required by the metric, correct?
10   A.   Correct.
11   Q.   And that's why on this particular instance, an
12   amber was marked?
13   A.   Correct.
14        MR. BRANTLEY:  Exhibit 143.
15        (Exhibit 143 was marked.)
16        THE WITNESS:  I was waiting.  Sorry.
17   Q.   BY MR. BRANTLEY:  And this was -- this document
18   Bates labeled ADC070547, this is another example of an
19   MGAR report?
20   A.   Correct.
21   Q.   And this is for January 2013?
22   A.   Correct.
23   Q.   And this appears to be a true and correct copy
24   of that MGAR report?
25   A.   Yes.

Page 106

1     Q.   And this particular report indicates that you
2  created the amber note on January 17th, correct?
3     A.   Yes.
4     Q.   And once again, this was just part of your
5  normal job tasks creating the information in the
6  Notification column for the MGAR report?
7     A.   Yes.
8     Q.   And you notice that in the second box down
9  within the notifications on this document, it indicates
10 that certain inmates did not receive a physical
11 examination within 24 hours?
12    A.   Correct.
13    Q.   Where did that 24-hour metric come from?
14    A.   Let's see.  I believe there was -- in the
15 beginning when we were still putting the MGAR together,
16 there were errors in when you inputted things, and I
17 believe this was one that needed a correction and was
18 corrected via email.  Once you input the information, as
19 the monitor, you can't retrieve it and correct it.  You
20 have to go through a series of things.  In other words, I
21 have to -- oh, brother, I put it there.  So what happens
22 was at that time information was being put in that, oh,
23 my goodness, that needed to be in the HR area.  This was
24 supposed to be in a different area.
25         So I'm not sure what happened with this one,

Page 107

1  but I remember there was a revision that had to be made
2  because of this.  If you notice:  In C area, a review of
3  twelve medical records indicate compliance.  That should
4  have been in green.  Why was it in yellow.  This was in
5  error, and it was revised.  So I'm not sure if you ever
6  got that revision.
7     Q.   My question was the 24 hours.  The performance
8  measure says two business days.
9     A.   Right.  That's how come this was probably going
10 to the HNR.  This is a different --
11    Q.   It belonged on a separate MGAR report?
12    A.   It belongs somewhere else.  And somehow they
13 got interchanged, and I could not correct it, so I
14 immediately informed the -- they had to go through IT,
15 and she was having a hard time getting it out.  Because
16 this was new.  This MGAR was a whole new format being
17 used within our IT system, too.
18    Q.   Okay.
19         MR. BRANTLEY:  Introduce Exhibit 144.
20         (Exhibit 144 was marked.)
21    Q.   BY MR. BRANTLEY:  It's Bates labeled
22 ADC118026.
23    A.   Yes.
24    Q.   And once again, this is a true and correct copy
25 of the MGAR report that you created for June 2013?

Page 108

1     A.   Yes.
2     Q.   And it says that you input the information on
3  June 27th, 2013.
4     A.   Yes.
5     Q.   And this is an intake MGAR report, correct?
6     A.   Yes.
7     Q.   And in the first box under Notifications,
8  there's a paragraph.  And towards the bottom, it
9  indicates:  It seems there exists an attitude of ignoring
10 the ineffective current medical intake process combined
11 with a non urgency to maintain timely intake medical
12 inmate processing.  Correct?
13    A.   Correct.
14    Q.   So you were identifying that there was an issue
15 with Corizon's intake compliance?
16    A.   Correct.
17    Q.   And you also indicate that they previously and
18 currently have been made aware of this on several
19 occasions, correct?
20    A.   I've made it -- right there, it says they have
21 been made aware of this on several occasions, correct.
22    Q.   Was there any consequence for Corizon not
23 improving their intake compliance?
24         MS. FLETCHER:  Form, foundation.
25         THE WITNESS:  That is not in my area of the

Page 109

1  consequences.  Mine is to report the findings.  It is
2  important to remember, though, they were in transition
3  period at this time.  And this MGAR is also a learning
4  tool for the improvement so that they can improve.  They
5  were a new company.  So to alert is to be straight on and
6  let's get this taken care of is the whole purpose of
7  that.  And they're on a path of improvement.
8     Q.   BY MR. BRANTLEY:  They're on a path to
9  improvement?
10    A.   They are on a path of improvement.
11    Q.   It appears that it says:  They have shown a
12 momentary attention to address the problems with the
13 intake process; however, it is temporary with limited to
14 no follow up.
15         MS. FLETCHER:  Is that a question?
16    Q.   BY MR. BRANTLEY:  You did state that in your
17 notes?
18    A.   It is stated in here, yes.
19    Q.   So are they improving or are they momentarily
20 improving and then not really doing anything about it?
21         MS. FLETCHER:  Form.
22         THE WITNESS:  When are you referring?  When
23 are you making reference here?
24    Q.   BY MR. BRANTLEY:  You said to me that this was
25 a time during transition and that they were improving

Page 110

1   their intake process.  And that their intake process is
2   improving.  That's what you previously stated, correct?
3       A.   I stated they are on a path to improvement,
4   yes.
5       Q.   And is this statement consistent with them
6   being on a path to improvement?
7           MS. FLETCHER:  Form.
8           THE WITNESS:  This statement is giving
9   information on the performance measure for them to
10  improve upon.  This was in June.  It's now August.
11      Q.   BY MR. BRANTLEY:  Do you believe prisoners
12  should be given their medications immediately upon
13  intake?
14          MS. FLETCHER:  Form, foundation.
15          THE WITNESS:  My belief system is not what
16  my job duties are.
17      Q.   BY MR. BRANTLEY:  Under your job duties in
18  contractual compliance, how quickly is a prisoner
19  supposed to get his medication upon arriving at Phoenix?
20          MS. FLETCHER:  Form, foundation.
21          THE WITNESS:  Which inmates are you speaking
22  about?  It's an intake, and it's also a receiving area.
23  Who are you talking about?
24      Q.   BY MR. BRANTLEY:  With regard to intake,
25  because that's what we're talking about.  When a prisoner

Page 111

1   comes through intake, is there a guideline for which -- a
2   time frame is set up that they're supposed to be given
3   their medication?
4           MS. FLETCHER:  Form, foundation.
5           THE WITNESS:  That would be in the nursing
6   area.  That would be a medication delivery has been
7   transferred to the nursing section.
8       Q.   BY MR. BRANTLEY:  So you're not responsible for
9   monitoring compliance with deliver of medication?
10      A.   At this point, the nursing are monitoring
11  medications and medication administration delivery.
12      Q.   And they complete their own MGAR report
13  monitoring?
14      A.   Yes.
15      Q.   Do you know whether county jails are required
16  to send a transfer summary or continuity of care form
17  with a prisoner?
18          MS. FLETCHER:  Form, foundation.
19          THE WITNESS:  The county, I'm not sure of
20  their requirements.
21      Q.   BY MR. BRANTLEY:  Do you know what a continuity
22  of care form is?
23      A.   Yes, I do.
24      Q.   Can you describe to me what a continuity of
25  care form is?

Page 112

1           MS. FLETCHER:  Form.
2           THE WITNESS:  I can describe that.
3       Q.   BY MR. BRANTLEY:  Will you?
4       A.   Are you asking me to?
5       Q.   I believe so.
6       A.   Okay.  A continuity of care form is a form that
7   indicates what care the inmate should have to continue
8   receiving medical care.  It's informational and also
9   possible psychological, medications.
10      Q.   And who generates those continuity of care
11  forms?
12          MS. FLETCHER:  Form, foundation.
13          THE WITNESS:  That would be a question I
14  would not be able to know.  I don't know.
15      Q.   BY MR. BRANTLEY:  In what context have you seen
16  a continuity of care form?
17          MS. FLETCHER:  Form.
18          THE WITNESS:  I've seen them in the medical
19  file, medical record.
20      Q.   BY MR. BRANTLEY:  Was that while you were a
21  contract compliance monitor or while you were an FHA?
22          MS. FLETCHER:  Form.
23          THE WITNESS:  That's two questions.  Can you
24  rephrase.
25      Q.   BY MR. BRANTLEY:  You indicated that you had

Page 113

1   seen a continuity of care form, correct?
2       A.   Yes.
3       Q.   Did you see that continuity of care form while
4   you were an FHA?
5       A.   Yes.
6       Q.   Did you also see continuity of care forms while
7   you are a contractual compliance monitor?
8       A.   Yes.
9       Q.   Have you also seen them in those job duties?
10      A.   What job duties?
11      Q.   As the compliance contract monitor, have you
12  seen continuity of care forms?
13      A.   Yes.  I thought I answered it.
14      Q.   Do you have any idea what percentage of inmates
15  arrive to Phoenix with a continuity of care form?
16          MS. FLETCHER:  Form, foundation.
17          THE WITNESS:  No, I do not.
18      Q.   BY MR. BRANTLEY:  Are you aware of any laws or
19  regulations requiring inmates to arrive with a continuity
20  of care form?
21          MS. FLETCHER:  Form, foundation.
22          THE WITNESS:  I'm not aware.
23      Q.   BY MR. BRANTLEY:  Do you know what an intake
24  treatment plan is?
25          MS. FLETCHER:  Form.

## Page 114

1       THE WITNESS:  That, I don't know.  I'm not
2  sure what you're referring to.
3     Q.  BY MR. BRANTLEY:  You've never heard of an
4  intake treatment plan?
5     A.  I've heard in different context.  I'm not
6  sure.  You'd have to clarify.
7     Q.  What context have you heard it in?
8     A.  I've heard the words treatment plan and intake,
9  and I'm not sure what you're referring to.
10     Q.  When a prisoner arrives at Phoenix Alhambra and
11  goes through the intake process, do the medical providers
12  create a treatment plan for that particular inmate?
13       MS. FLETCHER:  Form, foundation.
14       THE WITNESS:  I'm not -- the medical
15  providers are under Corizon, and so they would be doing
16  what Corizon lets them know to do.  And I don't know
17  exactly what that is at this time.
18     Q.  BY MR. BRANTLEY:  When you were the FHA at
19  Tucson, were intake treatment plans devised at all by
20  your medical providers?
21       MS. FLETCHER:  Form, foundation.
22       THE WITNESS:  It was not an intake facility.
23     Q.  BY MR. BRANTLEY:  Do you know if prisoners
24  receive a health screening when they're transferred from
25  one prison to another?

## Page 115

1       MS. FLETCHER:  Form, foundation.
2       THE WITNESS:  I'd need more specifics on
3  that.
4     Q.  BY MR. BRANTLEY:  When a prisoner, for
5  instance, goes from one prison to another for whatever
6  the reason --
7     A.  Uh-huh.
8     Q.  -- when that prisoner arrives, are they
9  required to undergo some kind of medical screening when
10  they arrive at the new prison?
11       MS. FLETCHER:  Form, foundation.
12       THE WITNESS:  I'm not sure what happens at
13  another prison because I'm only at the one facility.
14     Q.  BY MR. BRANTLEY:  When you receive an inmate
15  that was transferred from another facility to your
16  facility, do they receive a health screening?
17       MS. FLETCHER:  Form, foundation.
18       THE WITNESS:  They go through the intake
19  process.
20     Q.  BY MR. BRANTLEY:  And that's specific to
21  Phoenix because it's an intake facility?
22     A.  Yes.
23     Q.  When you were the FHA at Tucson, if a prisoner
24  was transferred from another complex to your facility at
25  Tucson, when they arrived did they undergo a health

## Page 116

1  screening?
2       MS. FLETCHER:  Form, foundation.
3       THE WITNESS:  Not an intake health screening
4  because they're not -- Tucson was not an intake facility.
5     Q.  BY MR. BRANTLEY:  I understand it's not an
6  intake facility.  I am now moving beyond intake
7  screening.  I'm trying to ask you about transfer
8  screening.
9       When a prisoner is transferred, do they
10  undergo any kind of health screening when they arrive at
11  your facility?
12       MS. FLETCHER:  Form, foundation.
13       THE WITNESS:  The medical provider and the
14  nursing will address that.  They go and they get an
15  evaluation.
16     Q.  BY MR. BRANTLEY:  So when you were the FHA at
17  Tucson and a prisoner was transferred to Tucson, the
18  medical providers would evaluate --
19     A.  It would be --
20       MS. FLETCHER:  Form, foundation.
21       Let me object first before you answer.
22       Form, foundation.
23       THE WITNESS:  When an inmate would arrive,
24  then the nursing would be the first to triage and
25  determine what is to be happening.

## Page 117

1     Q.  BY MR. BRANTLEY:  And why do they do this?
2       MS. FLETCHER:  Form, foundation.
3       THE WITNESS:  That would be a medical
4  decision.  I don't answer that.
5     Q.  BY MR. BRANTLEY:  Do you have any idea what
6  occurs during a health screening during the transfer
7  process?
8     A.  That would be again determined by nursing
9  and/or a provider would decide.
10     Q.  So only the provider or a nurse would know the
11  answer to what takes place during the health screening?
12       MS. FLETCHER:  Form.
13       THE WITNESS:  Well, yes.
14     Q.  BY MR. BRANTLEY:  Do prisoners ever arrive at
15  Phoenix from another facility that aren't intake
16  prisoners?
17     A.  Yes.
18     Q.  And, for instance, are those mental health
19  inmates?
20       MS. FLETCHER:  Form, foundation.
21       THE WITNESS:  I am not -- I don't really
22  know all of the prisoners that arrive and why they're
23  arriving.  It's not classification.
24     Q.  BY MR. BRANTLEY:  But there are people that are
25  transferred into Phoenix, correct?

Page 118

1     A.   Correct.
2     Q.   It's not just an intake facility, correct?
3     A.   Correct.
4     Q.   Does anyone at Phoenix monitor what takes place
5  during a transfer screening?
6          MS. FLETCHER:  Form, foundation.
7          THE WITNESS:  That is Corizon's
8  responsibility because they are the health care provider.
9     Q.   BY MR. BRANTLEY:  So the ADC does not monitor
10  what Corizon does during transfer screenings?
11         MS. FLETCHER:  Form, foundation.
12         THE WITNESS:  Please restate that.
13    Q.   BY MR. BRANTLEY:  You indicated that Corizon is
14  responsible for performing the transfer screenings,
15  correct?
16    A.   Yes.
17    Q.   And they would be the ones who would know what
18  takes place during a transfer screening, correct?
19    A.   Correct.
20    Q.   Do transfer screenings get monitored through
21  the MGAR report process?
22         MS. FLETCHER:  Form.
23         THE WITNESS:  Again, the MGAR changes.  And
24  that's a nursing and clinical area.  So possibly because
25  of the various months, and it might be on there, transfer

Page 119

1  screenings, if that's part of the contract, it would
2  probably be eventually or has been on there.
3     Q.   BY MR. BRANTLEY:  Do you ever see or review the
4  nursing monitor's MGAR reports?
5          MS. FLETCHER:  Form.  She answered that.
6          Go ahead.
7          THE WITNESS:  I don't review nursing forms,
8  no, MGARs.
9     Q.   BY MR. BRANTLEY:  What does continuity of care
10  mean to you?
11         MS. FLETCHER:  Form.
12         THE WITNESS:  Are you phrasing that in the
13  medical sense?  In what context are you asking me that?
14  Oh, I can't ask a question.  Please clarify.
15    Q.   BY MR. BRANTLEY:  In your job as an FHA, did
16  you ever hear the term continuity of care?
17    A.   Yes.
18    Q.   And in what context did you hear that term?
19    A.   Basically if the medical providers and the
20  nursing were talking about that.
21    Q.   So you overheard other people talking about
22  continuity of care?
23    A.   Uh-huh.
24         MS. FLETCHER:  Answer yes or no.
25         THE WITNESS:  Yes.

Page 120

1     Q.   BY MR. BRANTLEY:  At Phoenix as the contract
2  compliance monitor, had you ever heard the term
3  continuity of care mentioned?
4          MS. FLETCHER:  Form.
5          THE WITNESS:  The continuity of care, I have
6  heard, yes.
7     Q.   BY MR. BRANTLEY:  And what did you think it
8  meant?
9          MS. FLETCHER:  Form, foundation.
10         THE WITNESS:  Please give me -- be more
11  specific.
12    Q.   BY MR. BRANTLEY:  You overhear people talking
13  about continuity of care.  What did you think continuity
14  of care meant?
15         MS. FLETCHER:  Form, foundation.
16         THE WITNESS:  I don't -- in other words, I
17  don't really assume or think that.  That is more asking
18  me an opinion and assumption and speculation.  I don't
19  assume or --
20    Q.   BY MR. BRANTLEY:  I just want to know what the
21  term "continuity of care" means to you.
22    A.   The term "continuity of care" means to me a
23  continued care of an inmate.  I would imagine that would
24  be clearly stated continuity of care, continued care.
25    Q.   And do you think continuity of care is

Page 121

1  important?
2          MS. FLETCHER:  Form, foundation.
3          THE WITNESS:  It's an opinion.
4     Q.   BY MR. BRANTLEY:  In your opinion is it
5  important?
6          MS. FLETCHER:  Form, foundation.
7          THE WITNESS:  Continuity of care is part of
8  what is with inmates in their medical, and so it is one
9  of the factors that should be in their medical record.
10    Q.   BY MR. BRANTLEY:  Do you have any idea how
11  continuity of care is accomplished?
12         MS. FLETCHER:  Form, foundation.
13         THE WITNESS:  That would be in the medical
14  realm with the medical providers, nursing.
15    Q.   BY MR. BRANTLEY:  How do you monitor the
16  timeliness of responding and triaging HNRs?
17    A.   How do I monitor the -- say that again.
18    Q.   How do you monitor the timeliness of responding
19  or triaging HNRs?
20         MS. FLETCHER:  Form.
21         THE WITNESS:  I review HNRs.
22    Q.   BY MR. BRANTLEY:  To determine whether or not
23  they were addressed timely?
24    A.   Yes.  Probably medical records.
25    Q.   And do you know what the time frame is for

Page 122

1    reviewing an HNR?
2         MS. FLETCHER: Form.
3         THE WITNESS: I'm not sure what you mean by
4    that.
5     Q.   BY MR. BRANTLEY: You said it's your job to
6    review whether or not the HNR has been responded to
7    timely. Do you know what the time frame is --
8         MS. FLETCHER: Form.
9     Q.   BY MR. BRANTLEY: -- that they had to be
10   responded to within?
11    A.   Say that again. Say the question again,
12   please.
13    Q.   You said you monitor the timeliness of
14   responses to HNR forms. What's the time frame that an
15   HNR needs to be addressed within?
16    A.   There are parts that within 24 hours, the HNR
17   needs to be triaged by nursing.
18    Q.   Do you think it's important to monitor the
19   timeliness of response to HNRs?
20        MS. FLETCHER: Form, foundation.
21        THE WITNESS: It is my job duty to monitor
22   that when it is on the MGAR.
23    Q.   BY MR. BRANTLEY: So you review and complete
24   the MGAR report with regard to HNRs, correct?
25        MS. FLETCHER: Form.

Page 123

1         THE WITNESS: Say it again, please.
2     Q.   BY MR. BRANTLEY: Are you the person that
3    monitors contract compliance with responding to HNRs?
4     A.   If it is on my MGAR, that is what is given to
5    me. If it changes and given to someone else, no, I
6    wouldn't be doing it. At this point, I did. In the
7    past, I have.
8     Q.   So there are circumstances where for some time
9    you may have been in charge of monitoring a particular
10   performance index, and then at a time that got
11   transferred to somebody else to monitor?
12    A.   I don't know that. I only know what I get to
13   monitor that is given to me on the MGAR.
14    Q.   Have you ever completed an MGAR report
15   regarding timeliness of responding to HNR requests?
16    A.   Yes.
17    Q.   Do you know if any of the nurse compliance
18   monitors also review for timeliness of response to HNRs?
19        MS. FLETCHER: Form, foundation.
20        THE WITNESS: I don't know that.
21    Q.   BY MR. BRANTLEY: Prior to the ADC privatizing
22   its medical care with Wexford or Corizon, when you were
23   the FHA, were you monitoring response to HNRs?
24        MS. FLETCHER: Form.
25        THE WITNESS: What do you mean "monitoring

Page 124

1    response"?
2     Q.   BY MR. BRANTLEY: Was one of your duties as the
3    FHA to make sure that HNRs were being responded to in a
4    timely fashion?
5     A.   I oversaw nursing. Nursing was to respond.
6     Q.   If an inmate complained that an HNR hadn't been
7    responded to in a timely fashion, was it your job as the
8    FHA at Tucson to go to the nurses and make sure that
9    something changed?
10        MS. FLETCHER: Form.
11        THE WITNESS: Please rephrase that. I don't
12   get it.
13    Q.   BY MR. BRANTLEY: The nurses were in charge of
14   triaging and responding to HNRs.
15    A.   Uh-huh.
16    Q.   You oversaw the nurses, correct?
17    A.   Correct.
18    Q.   Was part of your job duty to monitor that they
19   were triaging and responding to HNRs within the 24-hour
20   period?
21        MS. FLETCHER: Form.
22        THE WITNESS: Again, it was nursing
23   supervisors. My responsibility was administratively to
24   work with nursing. But nursing supervisors were working
25   with also helping the response time on that.

Page 125

1     Q.   BY MR. BRANTLEY: But as the FHA, it didn't
2    fall under your responsibilities to make sure that the
3    HNRs were being responded to timely?
4     A.   I would say yes, I would be administratively
5    responsible to make sure that they were responded to in a
6    timely basis, make sure the supervisors are doing their
7    job in making sure that the nursing is responding to them
8    and continuing the triage properly.
9     Q.   Can you describe what an HNR form is.
10    A.   An HNR form, that is the initials of Health
11   Needs Request. And it is where an inmate is requesting
12   an appointment or stating what their symptoms are to be
13   addressed by medical or mental health or dental, one of
14   the health providers.
15    Q.   And do those forms come in triplicate; is that
16   correct?
17        MS. FLETCHER: Form.
18        THE WITNESS: Yes.
19    Q.   BY MR. BRANTLEY: And in your experience both
20   as the FHA -- let's start with that. As the FHA at
21   Tucson, did you ever experience a time when there was a
22   shortage of HNR forms?
23        MS. FLETCHER: Form.
24        THE WITNESS: That is not the -- that's not
25   my realm. The HNR forms are distributed by security.

Page 126

1    Q.   BY MR. BRANTLEY: As the FHA at Tucson, did you
2    ever hear anything about complaints with regard to
3    prisoners' access to HNR forms?
4        A.   I don't recall that as being an issue.
5        Q.   Do you know how the prisoner is supposed to get
6    a copy of the HNR form?
7            MS. FLETCHER: Form, foundation.
8            THE WITNESS: Where? Never mind. Please
9    clarify.
10       Q.   BY MR. BRANTLEY: If a prisoner wanted to
11   complete an HNR form, where would they find it?
12           MS. FLETCHER: Form.
13           THE WITNESS: In which place?
14       Q.   BY MR. BRANTLEY: In Tucson when you were the
15   FHA.
16           MS. FLETCHER: Form.
17           THE WITNESS: Say that again.
18       Q.   BY MR. BRANTLEY: When you were the FHA at
19   Tucson --
20       A.   Right.
21       Q.   -- if a prisoner needed to complete an HNR,
22   where would they find the form?
23           MS. FLETCHER: Form.
24           THE WITNESS: That would be each yard has a
25   different area where they would find that.

Page 127

1        Q.   BY MR. BRANTLEY: Do you know what would happen
2    if a prisoner didn't use an original HNR form but instead
3    used a photocopy?
4            MS. FLETCHER: Form and foundation.
5            THE WITNESS: I do not know.
6        Q.   BY MR. BRANTLEY: Does a prisoner fill out the
7    HNR form?
8            MS. FLETCHER: Form, foundation.
9            THE WITNESS: I can't speak for the
10   prisoner, but the normal procedure would be that a
11   prisoner or inmate would be filling out the form.
12       Q.   BY MR. BRANTLEY: Do you know what happens if
13   the inmate was unable to fill out the form?
14           MS. FLETCHER: Form, foundation.
15           THE WITNESS: That, I am not clear on.
16       Q.   BY MR. BRANTLEY: Do you know if anyone's
17   allowed to help them fill out the forms?
18       A.   That, again, I'm not clear on.
19       Q.   Do you know who would know that?
20       A.   Probably the nursing.
21       Q.   How do they submit HNR forms?
22           MS. FLETCHER: Form, foundation.
23           THE WITNESS: It varies. Probably yard per
24   yard, and I'm not sure when you're referring to.
25       Q.   BY MR. BRANTLEY: Let's start with Tucson.

Page 128

1    When you were at Tucson, how would somebody submit an HNR
2    form?
3            MS. FLETCHER: Form, foundation.
4            THE WITNESS: I am not sure what they would
5    do because it's an inmate, and I can't predict how they
6    would submit any kind of a form.
7        Q.   BY MR. BRANTLEY: You don't know if there was
8    any policy for how a prisoner was supposed to submit HNR
9    forms when you were at Tucson?
10       A.   I know that there's a policy, but I don't
11   believe that I can say that inmates followed it, so I
12   couldn't assure that.
13       Q.   So you know there was a policy, but you don't
14   know what the policy was?
15           MS. FLETCHER: Form. That's not what she
16   said.
17           THE WITNESS: That's not what I said.
18       Q.   BY MR. BRANTLEY: Actually, I believe you did
19   say that you did not know what the policy was, correct?
20           MS. FLETCHER: Form. No, that's not what
21   she said.
22       Q.   BY MR. BRANTLEY: And that the nurses would
23   know what the policy was.
24           MS. FLETCHER: Form.
25           THE WITNESS: I don't recall that. Maybe

Page 129

1    you could read it back to me, but I didn't mean to say it
2    like that.
3        Q.   BY MR. BRANTLEY: Do you know how the HNRs get
4    from the living units to medical staff?
5            MS. FLETCHER: Form, foundation.
6        Q.   BY MR. BRANTLEY: At Tucson?
7            MS. FLETCHER: Form, foundation.
8            THE WITNESS: I don't know that because that
9    would be nursing.
10       Q.   BY MR. BRANTLEY: Do you have any knowledge of
11   the HNR process at Phoenix?
12       A.   Yes.
13       Q.   And what do you know about the HNR process at
14   Phoenix?
15       A.   The inmates are to submit an HNR if they need
16   dental, medical, or mental health care.
17       Q.   And, again, this is the triplicate form, the
18   same form that it would have been at Tucson?
19           MS. FLETCHER: Form.
20           THE WITNESS: The same form is used, yes.
21       Q.   BY MR. BRANTLEY: And at Phoenix, you're not
22   aware if they can fill out a photocopy HNR?
23           MS. FLETCHER: Form.
24           THE WITNESS: I'm not aware of that.
25       Q.   BY MR. BRANTLEY: Do you know what happens once

Page 130

1　the nursing staff reviews the HNR?
2　　　　MS. FLETCHER: Form, foundation.
3　　　　THE WITNESS: That would be unclear to me
4　since it is the Corizon staff that does that.
5　　Q.　BY MR. BRANTLEY: At Phoenix are there any
6　written requirements for how soon the HNR has to be
7　reviewed and responded to?
8　　　　MS. FLETCHER: Form, foundation.
9　　　　THE WITNESS: Please rephrase.
10　　Q.　BY MR. BRANTLEY: At Phoenix where you're the
11　compliance contract monitor, do you know of any written
12　requirement regarding how soon an HNR needs to be
13　addressed by a nurse?
14　　　　MS. FLETCHER: Form, foundation.
15　　　　THE WITNESS: The HNR needs to be triaged
16　within 24 hours.
17　　Q.　BY MR. BRANTLEY: And you know that because of
18　completing the MGAR reports?
19　　　　MS. FLETCHER: Form, foundation.
20　　　　THE WITNESS: That's a question?
21　　Q.　BY MR. BRANTLEY: How do you know the 24-hour
22　time frame policy?
23　　A.　From the MGAR as stated.
24　　Q.　Do you know whether the ADC or any other
25　medical staff tracks whether or not a prisoner files an

Page 131

1　HNR for the same issue multiple times?
2　　A.　Say that again, please.
3　　Q.　Is there any sort of tracking system for
4　whether a prisoner, inmate, submits an HNR for the same
5　exact problem repeatedly?
6　　　　MS. FLETCHER: Form, foundation.
7　　　　THE WITNESS: That would be a Corizon
8　procedure.
9　　Q.　BY MR. BRANTLEY: Do you know whether or not
10　there is a procedure?
11　　A.　I am not aware what Corizon -- their inner
12　workings.
13　　Q.　Do you know what happens after a prisoner
14　receives a response to an HNR?
15　　　　MS. FLETCHER: Form, foundation.
16　　　　THE WITNESS: That, again, is by Corizon.
17　And how they are going to process that and what they're
18　going to do, I couldn't speak for every nurse or what
19　happens to every HNR.
20　　Q.　BY MR. BRANTLEY: When you were the FHA at
21　Tucson, did you ever respond to an HNR?
22　　A.　Very rarely.
23　　Q.　Why would you have responded to an HNR?
24　　A.　The inmate may have directed it to me.
25　　Q.　But one of your day-to-day tasks as the FHA was

Page 132

1　not responding to HNR requests, correct?
2　　A.　No, I was not a daily task of responding to
3　HNRs. That would be nursing.
4　　Q.　Are prisoners ever told to file another HNR?
5　　　　MS. FLETCHER: Form, foundation.
6　　　　THE WITNESS: I am not clear or sure what
7　prisoners are told by whom.
8　　Q.　BY MR. BRANTLEY: As the FHA at Tucson, in one
9　of the circumstances that you did respond to an HNR form,
10　did you ever tell an inmate that they needed to file a
11　new HNR form?
12　　　　MS. FLETCHER: Form.
13　　　　THE WITNESS: Please clarify that.
14　　Q.　BY MR. BRANTLEY: You indicated that when you
15　were the FHA at Tucson, there were occasions that you
16　responded to HNR requests, correct?
17　　A.　Maybe two. Very rare.
18　　　　MS. FLETCHER: Can we take a break.
19　　　　MR. BRANTLEY: Sure. Five minutes.
20　　　　(A recess was taken from 1:15 p.m. to
21　　　　1:22 p.m.)
22　　Q.　BY MR. BRANTLEY: What is the sick call
23　process?
24　　　　MS. FLETCHER: Form, foundation.
25　　　　THE WITNESS: The sick call process in

Page 133

1　reference to what?
2　　Q.　BY MR. BRANTLEY: To the Phoenix facility.
3　　　　MS. FLETCHER: Form, foundation.
4　　　　THE WITNESS: Are you talking about --
5　please clarify.
6　　Q.　BY MR. BRANTLEY: Have you ever completed an
7　MGAR report relating to sick calls?
8　　A.　Yes.
9　　Q.　What is the sick call?
10　　A.　The sick call is the medical line that inmates
11　are to be seen by the medical provider or I should say
12　medical nursing or the provider.
13　　Q.　Is it literally like a phone call or --
14　　A.　No. The word is just sick call. It's
15　basically an appointment line, requesting appointments.
16　It is an appointment line. Instead of calling it an
17　appointment line, they call it a sick call.
18　　Q.　How does it differ from the HNR process?
19　　A.　The HNR is the request from the inmate to have
20　an appointment or to be seen by medical and/or dental or
21　mental health.
22　　Q.　And the sick call is different?
23　　　　MS. FLETCHER: Form.
24　　　　THE WITNESS: The sick call is different.
25　　Q.　BY MR. BRANTLEY: Can someone seek medical

Page 134

1    attention at sick call without completing an HNR?
2         MS. FLETCHER: Form, foundation.
3         THE WITNESS: That would be a Corizon
4    decision.
5         Q.  BY MR. BRANTLEY: Are sick call and HNR
6    intertwined in some way?
7         MS. FLETCHER: Form.
8         Q.  BY MR. BRANTLEY: Let me rephrase this.  So an
9    inmate can request medical care through the HNR process?
10        A.  Yes.
11        Q.  Can they also request medical care through the
12   sick call process?
13        MS. FLETCHER: Form.
14        THE WITNESS: That would be a Corizon
15   decision.
16        Q.  BY MR. BRANTLEY: So is it your understanding
17   that an inmate completes an HNR and then is placed in the
18   sick call line?
19        MS. FLETCHER: Form, foundation.
20        THE WITNESS: It would be dependent upon
21   what Corizon is doing.  Corizon is responsible for the
22   processing of HNRs and sick call.
23        Q.  BY MR. BRANTLEY: Did you have sick call when
24   you were at Tucson as the FHA?
25        A.  Yes.

Page 135

1         Q.  And when you were the FHA at Tucson, were the
2    inmates required to complete an HNR before they could
3    participate in sick call?
4         MS. FLETCHER: Form.
5         THE WITNESS: The process was HNR, but no,
6    inmates would come for medication.  They were able to
7    tell the nurse, I'm not feeling well.  It was a series.
8    They would come up for medication call.  They could even
9    tell their security officer, I don't feel well.  There
10   was a multitude of ways.  They would say, I'm not feeling
11   well, whatever.  So there's a triaging that goes on
12   regarding when somebody's expressing that they're having
13   a problem medically or psychologically.
14        Q.  BY MR. BRANTLEY: But you're unsure, because
15   Corizon's in charge of it at Phoenix, whether or not sick
16   call is operated in the same way in Phoenix as it was in
17   Tucson when you were the FHA?
18        A.  They are a company that they are doing -- yes,
19   they do it their way, and I don't know exactly how
20   they're doing it.
21        Q.  And you monitor them based on the performance
22   measures provided by your superiors with regard to sick
23   calls, correct?
24        A.  Correct.
25        Q.  Do you recall there being issues when you were

Page 136

1    at Phoenix with Wexford conducting sick calls?
2         MS. FLETCHER: Form, foundation.
3         THE WITNESS: If I have it on the MGAR,
4    that's where it would be.
5         Q.  BY MR. BRANTLEY: But do you recall there being
6    issues with the sick call process?
7         MS. FLETCHER: Form, foundation.
8         THE WITNESS: I can't specifically be 100
9    percent accurate, but if it's on my MGAR, then there
10   would be.  It would be indicated on the MGAR.
11        Q.  BY MR. BRANTLEY: And the same goes for
12   Corizon?
13        A.  Correct.
14        MR. BRANTLEY: Let's introduce Exhibit 145.
15        (Exhibit 145 was marked.)
16        Q.  BY MR. BRANTLEY: This is Bates labeled
17   ADC036927.  I'm only focused on performance measure
18   No. 1.  That's all I need you to look at for right now.
19        A.  Okay.  Does this indicate that I wrote this
20   MGAR?
21        Q.  There is no indication on this particular MGAR.
22        A.  Then I'm not sure if I wrote this.
23        Q.  Aside from who wrote this particular MGAR, does
24   this appear to be a true and accurate copy of an MGAR?
25        MS. FLETCHER: Form, foundation.

Page 137

1         THE WITNESS: I can't answer that.  I'm not
2    aware of who wrote it.
3         Q.  BY MR. BRANTLEY: Let's move to the next
4    exhibit.  It's going to be 146.
5         (Exhibit 146 was marked.)
6         Q.  BY MR. BRANTLEY: It begins with Bates label
7    ADC069629.
8         A.  Yes.
9         Q.  And does this appear to be a true and accurate
10   copy of an MGAR report that you completed?
11        A.  Yes.
12        Q.  And this is reference to a sick call compliance
13   monitoring?
14        MS. FLETCHER: Form.
15        THE WITNESS: Say that -- please repeat.
16        Q.  BY MR. BRANTLEY: This report relates to sick
17   call monitoring?
18        A.  This report relates to the sick call.
19        Q.  That's a yes?
20        A.  Yes.
21        Q.  And with regard to performance measure No. 1,
22   you can see that you inputted some information both on
23   December 14th and on December 20th.
24        A.  Where are you looking?
25        Q.  Where it has your name and the date with regard

Page 138

1  to performance index No. 1.
2      A.  Okay.  Just a second here.  Okay, I got it.
3      Q.  So you did complete this MGAR with reference to
4  performance measure No. 1 on December 14th and December
5  20th?
6      A.  It appears -- what I was hesitating on and I'm
7  noticing someone else is on the MGAR here, another
8  person.
9      Q.  Correct.
10     A.  Right.
11     Q.  Previously you indicated that you would never
12 complete an MGAR report that somebody else also put
13 information into.
14         MS. FLETCHER:  Form.
15         THE WITNESS:  I didn't say that.
16     Q.  BY MR. BRANTLEY:  1 previously questioned
17 whether or not you ever completed an MGAR form that also
18 contained information from other compliance monitors, and
19 you indicated no.
20         MS. FLETCHER:  Form.
21         THE WITNESS:  There are different -- the
22 MGAR is in the computer.  Where it puts things is beyond
23 my control.  If somebody's inputting something, it could
24 switch to that.  And this was in the -- the MGAR is still
25 being developed.  It's a new tool within the IT.  So it's

Page 139

1  not like -- it's not without its problems, let's say.  So
2  that's why I'm looking to make sure I give you the
3  correct information on who did that part.  And recalling
4  back, it was 2012.
5      Q.  BY MR. BRANTLEY:  But you can see in box I
6  where you can see sick call appointments are not
7  occurring per policy?
8      A.  Yes.
9      Q.  And the policy you're basing that off of is
10 whether or not it's being conducted five days a week
11 Monday through Friday per the performance measure?
12         MS. FLETCHER:  Form.
13         THE WITNESS:  Yes.
14     Q.  BY MR. BRANTLEY:  Take a look at one more sick
15 call MGAR here.  This is Exhibit 147.  It begins with
16 ADC117766.
17         (Exhibit 147 was marked.)
18     Q.  BY MR. BRANTLEY:  Does this appear to be a true
19 and accurate copy of an MGAR form that you completed for
20 May 2013?
21     A.  Yes.
22     Q.  And this MGAR report also relates to sick call
23 compliance, correct?
24     A.  Yes.
25     Q.  Do you notice that this MGAR, Exhibit 147, has

Page 140

1  much more detail in the Notification column than your
2  previous MGARs?
3         MS. FLETCHER:  Form.
4         THE WITNESS:  The question is what?
5      Q.  BY MR. BRANTLEY:  Do you notice that this
6  particular MGAR starting in May 2013 seems to have more
7  detail in it than previous MGARs?
8         MS. FLETCHER:  Same objection.
9         THE WITNESS:  I don't have all of the other
10 MGARs for the comparison at this point in time.
11     Q.  BY MR. BRANTLEY:  For instance, the exhibits
12 that we've previously marked here that are MGAR
13 reports --
14     A.  Uh-huh.
15     Q.  -- does it appear that there's more text in
16 the Notification column on this particular --
17     A.  Yes.
18     Q.  -- MGAR than on previous MGARs?
19         MS. FLETCHER:  Form.
20         THE WITNESS:  Than the previous -- in
21 comparison to -- are you referring -- please clarify.
22     Q.  BY MR. BRANTLEY:  Does it look like there's a
23 lot more detail in this particular MGAR than there was in
24 the last MGAR we just looked at?
25     A.  In the December MGAR?

Page 141

1      Q.  Correct.
2         MS. FLETCHER:  Form.
3         THE WITNESS:  Which one?
4      Q.  BY MS. FLETCHER:  147 is the May 2013.  146 is
5  December 2012.  145 is October 2012.  So December 2012
6  sick call.
7         MS. FLETCHER:  What's the question?
8         MR. BRANTLEY:  There is no question.
9      Q.  BY MR. BRANTLEY:  Does it appear to you that
10 there's more detail in this MGAR than in previous MGARs?
11         MS. FLETCHER:  Form.
12         THE WITNESS:  Please clarify and be
13 specific.
14     Q.  BY MR. BRANTLEY:  Is there anything that
15 occurred in that time frame of May 2013 that would have
16 resulted in more detailed MGAR reports?
17         MS. FLETCHER:  Form.
18         THE WITNESS:  The recollection is difficult
19 about what occurred because of not knowing about the
20 specifics.
21         MS. FLETCHER:  I can tell you what exhibit
22 number is specific to each one.  I've written them down
23 if you want.  I know you don't have those on your page.
24         MR. BRANTLEY:  What did we have Bates label
25 ADC 36927?  It's the October to October.

Page 142

1    MS. FLETCHER:  That's Exhibit 145, October
2  2012.
3    Q.   BY MR. BRANTLEY:  When you look at Exhibit 145,
4  which is Bates labeled ADC 36927, and in the
5  notifications you put in column 1 --
6    A.   Is this the one you're referring to?
7    MS. FLETCHER:  He's referring to Exhibit
8  145.
9    THE WITNESS:  145 is the exhibit that I
10  don't know who wrote that.  There's no name indicating
11  who did that.
12    Q.   BY MR. BRANTLEY:  Let's move on.
13    Do you know what types of documents would be
14  generated at the medical appointment?
15    MS. FLETCHER:  Form, foundation.
16    THE WITNESS:  I do not know that.  That's
17  Corizon.
18    Q.   BY MR. BRANTLEY:  Who at Corizon would know?
19    MS. FLETCHER:  Form, foundation.
20    THE WITNESS:  I would not know that.
21  That's -- that would be a Corizon staff.
22    Q.   BY MR. BRANTLEY:  You're not aware if any
23  examination notes get created?
24    MS. FLETCHER:  Form, foundation.
25    THE WITNESS:  I am not privy to that

Page 143

1  information.
2    Q.   BY MR. BRANTLEY:  Do you do any compliance
3  monitoring on your MGAR reports with regard to medical
4  records management?
5    MS. FLETCHER:  Form.
6    THE WITNESS:  It depends on if it is on the
7  MGAR.
8    Q.   BY MR. BRANTLEY:  So you're really unaware of
9  anything that takes place with regard to what would be in
10  the medical record?
11    MS. FLETCHER:  Form, foundation.
12    THE WITNESS:  Please rephrase that.
13    Q.   BY MR. BRANTLEY:  As the contract compliance
14  monitor, do you review medical records to determine
15  whether or not they're in compliance with the contract?
16    A.   I review medical records, yes.
17    Q.   To determine whether or not what's documented
18  in the medical record is compliant with the contract?
19    MS. FLETCHER:  Form, foundation.
20    THE WITNESS:  I review medical records if
21  it's in regard to what is on the MGAR.
22    Q.   BY MR. BRANTLEY:  And when you review medical
23  records, do you ever see examination notes?
24    A.   Please clarify "examination notes."  What does
25  that mean?

Page 144

1    Q.   Are there any handwritten notes or any note of
2  examinations?
3    A.   There are handwritten notes.
4    Q.   Do you know if any part of the form or file is
5  completed prior to the doctor or nurse meeting with the
6  prisoner?
7    MS. FLETCHER:  Form, foundation.
8    THE WITNESS:  That, I'm not clear on.
9    Q.   BY MR. BRANTLEY:  If a prisoner is scheduled
10  for an appointment, will somebody prefill out sections of
11  the examination notes so there's less for the health care
12  staff to write in?
13    MS. FLETCHER:  Form, foundation.
14    THE WITNESS:  Can you rephrase, please.
15    Q.   BY MR. BRANTLEY:  If a prisoner is going to a
16  medical appointment and there's a form that the provider
17  is required to fill out --
18    A.   Okay, form.  What --
19    MS. FLETCHER:  Let him finish the question.
20    Q.   BY MR. BRANTLEY:  Would any part of that form
21  have been prefilled out by some other staff member prior
22  to the medical appointment?
23    MS. FLETCHER:  Form, foundation.
24    THE WITNESS:  I am unclear on what form.  I
25  would not be able to answer that.

Page 145

1    Q.   BY MR. BRANTLEY:  Are prescriptions written on
2  paper?
3    MS. FLETCHER:  Form, foundation.
4    THE WITNESS:  I am unclear on the specifics
5  on that.  You would have to be specific.
6    Q.   BY MR. BRANTLEY:  You're not aware of how
7  prescriptions are given to inmates?
8    MS. FLETCHER:  Form, foundation.
9    THE WITNESS:  It is a Corizon duty and
10  procedure.  To answer accurately, that would have to be
11  directed to Corizon.
12    Q.   BY MR. BRANTLEY:  When you were the FHA at
13  Tucson, did your inmates receive prescriptions on paper?
14    MS. FLETCHER:  Form.
15    THE WITNESS:  Please specific and clarify
16  the question.
17    Q.   BY MR. BRANTLEY:  You're unaware of whether or
18  not a prescription comes to the inmate on paper versus
19  being submitted through a computer program?
20    MS. FLETCHER:  Form, foundation.
21    THE WITNESS:  The question is confusing.
22  However, I will answer that the procedure of
23  prescriptions is again medical with the medical doctor
24  and the medical staff and pharmacy.
25    Q.   BY MR. BRANTLEY:  When you were in charge at

Page 146

1    Tucson as the FHA, you're unaware of whether or not the
2    medical staff were writing prescriptions on paper versus
3    inputting them into a computer system?
4         MS. FLETCHER: Form.
5         THE WITNESS: That's -- please restate.
6     Q.   BY MR. BRANTLEY: You're unaware of how
7    prescriptions are handled?
8         MS. FLETCHER: Form.
9         THE WITNESS: Is that a question?
10    Q.   BY MR. BRANTLEY: Have you ever seen a
11   prescription in an inmate's file?
12        MS. FLETCHER: Form.
13        THE WITNESS: Prescriptions are not
14   necessarily in inmates' files.
15    Q.   BY MR. BRANTLEY: If I was an inmate at Tucson
16   while you were the FHA and I saw one of the providers at
17   the facility, if the provider indicated I need a
18   prescription, would that be handed and filled out on a
19   piece of paper?
20        MS. FLETCHER: Form, foundation.
21        THE WITNESS: That would be on the unit, and
22   the provider, if it's a provider-driven unit, it depends
23   on how they're going to decide how to organize that, the
24   process to be most efficient.
25    Q.   BY MR. BRANTLEY: Do you know if inmates are

Page 147

1    given any instructions with regard to using prescription
2    medications?
3         MS. FLETCHER: Form, foundation.
4         THE WITNESS: That would be -- I would not
5    know that.
6     Q.   BY MR. BRANTLEY: Do you know if physician
7    orders are supposed to be taken off the medical record
8    daily?
9         MS. FLETCHER: Form, foundation.
10        THE WITNESS: I'm unclear. Please clarify
11   that.
12    Q.   BY MR. BRANTLEY: Do you know what a
13   physician's order is?
14    A.   Yes.
15    Q.   Is there any requirement that they be taken off
16   the medical record daily?
17        MS. FLETCHER: Form, foundation.
18        THE WITNESS: That would be a
19   nursing/medical informational answer.
20    Q.   BY MR. BRANTLEY: We previously spoke about
21   formulary and non-formulary medication. Is there a
22   specific form that needs to be filled out for
23   non-formulary medication?
24        MS. FLETCHER: Form, foundation.
25        THE WITNESS: That would be medical

Page 148

1    provider. I would not know that specific answer.
2     Q.   BY MR. BRANTLEY: Do you know what a medication
3    administration report is?
4     A.   Yes.
5     Q.   What is a medication administration report?
6     A.   A medication administration report is about a
7    medication to be administered.
8     Q.   Can you give me any more detail besides just
9    repeating the same three words?
10    A.   That's what it is. It's the documentation.
11    Q.   Of what?
12    A.   Of the medication administration.
13    Q.   So is it like a chart that lists this
14   medication was supposed to be distributed on this
15   particular day at this particular time and then there's a
16   mark or a signature of some sort that indicates that that
17   took place?
18        MS. FLETCHER: Form.
19        THE WITNESS: There were many variables that
20   you included in that. Can you please clear it and
21   specific.
22    Q.   BY MR. BRANTLEY: What is on a medication
23   administration report?
24    A.   I know what a report is. I'm not a nurse, so
25   specifically I don't know -- can't answer specifically

Page 149

1    what exactly is on the report.
2     Q.   So you've never seen a medication
3    administration report?
4         MS. FLETCHER: Form.
5         THE WITNESS: I have seen a medication
6    report.
7     Q.   BY MR. BRANTLEY: And when you saw the
8    medication administration report, what was on it?
9         MS. FLETCHER: Form.
10        THE WITNESS: When I saw the medication
11   report, I saw the front of the medication report, and it
12   said Medication Report. I believe it said a date,
13   nursing signature. That is to my recollection. And
14   there must be more information, but I cannot recall
15   specifically what is on there.
16    Q.   BY MR. BRANTLEY: Do you know if they're
17   supposed to be initialed at the time medication is given
18   to a prisoner?
19        MS. FLETCHER: Form, foundation.
20        THE WITNESS: That would be a nursing
21   response.
22    Q.   BY MR. BRANTLEY: As part of your duties as the
23   Phoenix contract compliance monitor, do you ever review
24   medication administration reports?
25    A.   I believe I did at one time. I think there was

1    a -- wondering if nursing or -- when we were beginning.
2    I can't remember the exact time. I might have been asked
3    to help out and do that.
4       Q.  But you're not aware of what the requirements
5    are for completing the medication administration report?
6       MS. FLETCHER: Form.
7       THE WITNESS: I'm aware of what would be the
8    requirements in regard to what would be specified on the
9    MGAR as a performance compliance measure.
10       MR. BRANTLEY: I'll introduce Exhibit 148.
11   This is Bates labeled ADC034823.
12       (Exhibit 148 was marked.)
13       MS. FLETCHER: Do you want her to read the
14   whole thing or is there a specific section?
15       Q.  BY MR. BRANTLEY: Just familiarize yourself
16   with this memo that you drafted.
17       A.  Okay. I have familiarized myself.
18       Q.  And does this appear to be a true and accurate
19   copy of a memo that you drafted on August 24th of 2012?
20       A.  Yes.
21       Q.  And this was addressed to Joe Profiri?
22       A.  Correct.
23       Q.  And who's Joe?
24       A.  At that time he was the monitoring team leader.
25       Q.  Is he no longer the monitoring team leader?

1       A.  He is no longer that.
2       Q.  Who is?
3       A.  Well, I believe it's -- we don't really have a
4   monitoring team leader. It's been changed where I report
5   to Kathy Campbell, who is the administrator.
6       Q.  And on this particular memo, that would be what
7   Jim Taylor was, Kathy Campbell's position is the same
8   thing that Jim Taylor --
9       A.  Yes, that's correct.
10       Q.  And the third finding down on Exhibit 148,
11   which is Bates labeled ADC034823, beginning Finding: MAR
12   is not being initialed at the time of medication
13   administration.
14       A.  Correct.
15       Q.  It says: Medication nurse returned did not
16   take MAR with her when delivering medication to Delta and
17   Echo. Nurse explained to me she initials on return.
18       A.  Correct.
19       Q.  So it was part of your monitoring to make sure
20   that medication administration reports were being signed
21   and initialed by nurses?
22       MS. FLETCHER: Form.
23       THE WITNESS: Form. At that point in time, if
24   you notice the date, this was the beginning. This was
25   when we were -- again, this was all about learning

1    improving. And I believe I was helping out at that
2    time. That the nursing wasn't -- the nursing monitor
3    wasn't there, coming down. And so when I would go at
4    different times to monitor, I would go and even walk with
5    the nursing. And what I observed, I reported. This is
6    not on an MGAR in the sense this is more of an
7    improvement and letting them know what I am seeing and
8    finding. All toward improvement.
9       Q.  BY MR. BRANTLEY: In your time as the
10   compliance monitor at Phoenix, have you experienced any
11   issues with Corizon's completion of medical records?
12       MS. FLETCHER: Form, foundation.
13       THE WITNESS: Please be specific.
14       Q.  BY MR. BRANTLEY: Were there times when you had
15   to create amber and red notifications to Corizon with
16   regard to medical records issues?
17       MS. FLETCHER: Form.
18       THE WITNESS: Specific, please.
19       Q.  BY MR. BRANTLEY: You don't recall whether or
20   not you've ever had any issues with medical records?
21       MS. FLETCHER: Form.
22       THE WITNESS: The specifics, please.
23       MR. BRANTLEY: Mark this 149.
24       (Exhibit 149 was marked.)
25       Q.  BY MR. BRANTLEY: It begins with Bates label

1    ADC070515.
2       MS. FLETCHER: Do you want her to review a
3   specific portion?
4       Q.  BY MR. BRANTLEY: Have you reviewed any of it?
5       A.  I've been looking, but is there something I
6   need to look at?
7       Q.  We're going to focus on performance measure 1.
8       A.  All right.
9       Q.  And does this appear to be a true and accurate
10   copy of an MGAR report that you completed for January
11   2013 with regard to medical records?
12       A.  Yes.
13       Q.  And you completed the information within
14   section 1 on January 9th and January 10th?
15       A.  Yes.
16       Q.  And you note that you -- you noted documents
17   falling out, loose filing.
18       A.  Yes.
19       Q.  And HNRs not in chronological order?
20       A.  Correct.
21       Q.  Do you recall any other issues with the way
22   medical records were maintained?
23       MS. FLETCHER: Form.
24       THE WITNESS: Please clarify or be specific.
25       Q.  BY MR. BRANTLEY: During your time as the

Page 154

1    Phoenix contract compliance monitor, do you recall any
2    other instances where medical records were not compliant
3    with the contract?
4        A.   If it's not -- I mean, anything that would be
5    documented within the MGAR.
6        Q.   Do issues such as loose filing and items not in
7    chronological order pose larger problems when dispensing
8    medical care?
9            MS. FLETCHER: Form, foundation.
10           THE WITNESS: I don't know.
11       Q.   BY MR. BRANTLEY: Do you think it's easy to
12   administer care when things weren't in order and papers
13   were falling out?
14           MS. FLETCHER: Form, foundation. She's not
15   a doctor.
16           THE WITNESS: Yeah, that would be a medical
17   question.
18       Q.   BY MR. BRANTLEY: Do you think there's a reason
19   you're supposed to be monitoring whether or not the
20   medical records are kept appropriately?
21           MS. FLETCHER: Form, foundation.
22           THE WITNESS: I monitor what is given me to
23   monitor within the MGAR.
24       Q.   BY MR. BRANTLEY: Do you think how medical
25   record are kept is important?

Page 155

1            MS. FLETCHER: Form, foundation.
2            THE WITNESS: My thinking is based on my job
3    duties. My job duties are to monitor and complete the
4    MGAR in regard to the performance measures.
5        Q.   BY MR. BRANTLEY: Do you look at anything else
6    in a given month beyond what you're supposed to be
7    reporting in the MGAR?
8            MS. FLETCHER: Form.
9            THE WITNESS: Specifics, please.
10       Q.   BY MR. BRANTLEY: Do you make any other
11   observations beyond what your superiors request you to
12   observe?
13           MS. FLETCHER: Form.
14           THE WITNESS: I would need specifics.
15       Q.   BY MR. BRANTLEY: Are medical staff trained on
16   handling emergencies?
17           MS. FLETCHER: Form, foundation.
18           THE WITNESS: I'm not qualified to answer
19   that. That's Corizon, who's the medical provider.
20       Q.   BY MR. BRANTLEY: When you were the FHA at
21   Tucson, were you aware whether or not the medical staff
22   was trained to handle emergencies?
23           MS. FLETCHER: Form, foundation.
24           THE WITNESS: Medical staff receives
25   training. To what degree you're speaking of emergencies

Page 156

1    is unclear to me.
2        Q.   BY MR. BRANTLEY: So you're not aware of any
3    type of hands-on training with regard to handling
4    emergencies that may have occurred?
5            MS. FLETCHER: Form, foundation.
6            THE WITNESS: I am unclear on what you mean
7    by the training. Basically medical is medical and also
8    receives medical training in compliance with their
9    licensure and all of the other items that go along with
10   being a provider and a nurse and a dentist, mental
11   health.
12       Q.   BY MR. BRANTLEY: When you were the FHA at
13   Tucson, did they ever run mock emergency drills?
14           MS. FLETCHER: Form, foundation.
15           THE WITNESS: You know, I don't really
16   remember right now.
17       Q.   BY MR. BRANTLEY: Do you know what guidelines
18   are given to health care and custody staff as to when
19   they can invoke an emergency response?
20           MS. FLETCHER: Form, foundation.
21           THE WITNESS: I'm unclear what you mean.
22       Q.   BY MR. BRANTLEY: When you were the FHA at
23   Tucson, were there any guidelines that your staff had
24   dictating when they could invoke an emergency response,
25   i.e., calling 911 to have paramedics come to the site?

Page 157

1            MS. FLETCHER: Form, foundation.
2            THE WITNESS: Medical would have to answer
3    that question.
4        Q.   BY MR. BRANTLEY: So when you were the FHA, you
5    really didn't know what the guidelines were, medically
6    what the guidelines were, correct?
7            MS. FLETCHER: Form.
8            THE WITNESS: Please rephrase.
9        Q.   BY MR. BRANTLEY: Any guidelines that may have
10   existed when you were at Tucson as the FHA with regard to
11   contacting or invoking emergency response, you wouldn't
12   have any knowledge about that?
13           MS. FLETCHER: Form.
14           THE WITNESS: Please be specific on what
15   guidelines you're speaking.
16       Q.   BY MR. BRANTLEY: You indicated that the health
17   care staff would be responsible for knowing when it was
18   okay to invoke an emergency response, like calling 911.
19   Were you not aware of when it was okay to contact 911?
20           MS. FLETCHER: Form.
21           THE WITNESS: The awareness, I'm aware of
22   them calling 911.
23       Q.   BY MR. BRANTLEY: But you're not aware of
24   whether or not there were any guidelines under which they
25   did call 911?

Page 158

1     MS. FLETCHER: Form, foundation.
2     THE WITNESS: That, again, is a medical and
3  nursing procedure.
4     Q.  BY MR. BRANTLEY: But when you were the Tucson
5  FHA, weren't you in charge of medical and nursing?
6     MS. FLETCHER: Form.
7     THE WITNESS: Please be specific. In
8  charge. I was administrator.
9     Q.  BY MR. BRANTLEY: So you were the administrator
10  for all medical care services conducted at Tucson while
11  you were the FHA?
12     MS. FLETCHER: Form.
13     THE WITNESS: I was in charge of
14  administering guidelines. Medical was part of medical.
15  There were medical teams, medical director. All of those
16  were more in the medical area.
17     Q.  BY MR. BRANTLEY: When you were at Tucson as
18  the FHA, do you know if the institution used life flight
19  or any similar emergency response evacuation by air?
20     MS. FLETCHER: Form.
21     THE WITNESS: Is that two questions?
22     Q.  BY MR. BRANTLEY: No. When you --
23     A.  I'm not sure what life flight is. Is that a
24  company?
25     Q.  It's like a helicopter paramedic. An ambulance

Page 159

1  by helicopter. It's life flights, a generic term. Did
2  your institution, did Tucson, ever have a helicopter show
3  up to transport a patient away?
4     MS. FLETCHER: Form, foundation.
5     THE WITNESS: I am not sure.
6     Q.  BY MR. BRANTLEY: At Phoenix have you ever had
7  a helicopter come in to transport a patient away?
8     MS. FLETCHER: Form, foundation.
9     THE WITNESS: At this point I'm not sure
10  about that either.
11     Q.  BY MR. BRANTLEY: Are you in charge of
12  monitoring whether medications or medical devices are
13  being distributed in a timely manner?
14     A.  I'm not in charge of -- are you asking me --
15  I'm not in charge of medical administration.
16     Q.  In your job as contract compliance monitor at
17  the Phoenix facility, do you ever monitor whether
18  medications or medical devices are being distributed to
19  inmates in a timely manner? Is that ever part of any of
20  your MGAR reports?
21     MS. FLETCHER: Form.
22     THE WITNESS: Is that two questions?
23     Q.  BY MR. BRANTLEY: Do you ever complete an MGAR
24  report that contains information regarding whether
25  medication or medical devices were distributed in a

Page 160

1  timely manner?
2     A.  There might have been an MGAR report on that.
3  If it was given to me as an MGAR report, then I would
4  have completed that.
5     Q.  But you're not aware of the policy relating to,
6  medication distribution, that's all handled by Corizon,
7  correct?
8     MS. FLETCHER: Form.
9     Q.  BY MR. BRANTLEY: Are you aware of the policies
10  relating to distributing medication?
11     A.  Whose policy? Please clarify.
12     Q.  Are you aware of the policies at the Phoenix
13  facility for distributing medication to inmates?
14     MS. FLETCHER: Form.
15     THE WITNESS: Corizon distributes the
16  medication. That's my response.
17     Q.  BY MR. BRANTLEY: So you're unaware of whether
18  or not your job as the contract compliance monitor ever
19  monitored whether or not medications were being
20  distributed?
21     MS. FLETCHER: Form.
22     THE WITNESS: If it's on the MGAR, then I
23  would be monitoring that or it was requested of me by my
24  supervisors.
25     MR. BRANTLEY: I'd like to introduce Exhibit

Page 161

1  150. It begins with Bates label ADC069642.
2     (Exhibit 150 was marked.)
3     Q.  BY MR. BRANTLEY: Just by way of background,
4  this is another MGAR that has more than one person who's
5  reporting on it. And what I would like to focus the
6  attention to is performance measure No. 6.
7     A.  No. 6. Okay. All right. I'm looking at
8  No. 6.
9     Q.  And does this appear to be a true and correct
10  copy of an MGAR report from December 2012 regarding
11  medication administration?
12     A.  Yes.
13     Q.  And when the MGAR report is completed, as you
14  can see for No. 6, two people have input information for
15  this notification, correct?
16     A.  Yes.
17     Q.  And that is both yourself and Vanessa
18  Headstream?
19     A.  Yes.
20     Q.  And do you have any idea of whether or not the
21  form gets populated by when something is input in time?
22  So if Ms. Headstream input her note second, would it be
23  the second one in line?
24     A.  That's what I was just trying to figure out.
25  Oh, I'm not sure. I'm trying to determine that at this

Page 162

1  point. The monitors do not have control of the MGAR. We
2  input, and whoever has designed that program, it's in
3  there. So I'm trying to determine who wrote what.
4      Q.   Let me read you some of the information, and
5  maybe it will refresh your recollection. It says: I
6  asked the nurse to explain and the nurse said those were
7  inmates that were gone. Verification revealed the
8  inmates were on site and keep on persons had not been
9  delivered yet. Nurse said they would be delivered
10  immediately.
11          And this is in regard to seeing in the
12  medication room approximately 20 past due medication
13  packets stuffed in a plastic wash basin.
14      A.   They hold them in there. I'm not sure,
15  though --
16          MS. FLETCHER: Wait. There's not a question
17  pending.
18      Q.   BY MR. BRANTLEY: But you don't recall a
19  situation where you may have seen a bunch of medication
20  in a wash basin and asked a nurse about it?
21          MS. FLETCHER: Form.
22          THE WITNESS: Do I recall -- please repeat
23  it.
24      Q.   BY MR. BRANTLEY: Would you have remembered if
25  you had walked by the medication room and seen 20

Page 163

1  medications stuffed in a wash basin and asked the nurse
2  about it? Would you recall if that situation took place?
3          MS. FLETCHER: Form.
4          THE WITNESS: It's difficult for me to
5  recall this since both are very similar.
6      Q.   BY MR. BRANTLEY: Regardless, somebody created
7  an MGAR report indicating that there were issues with the
8  administration of medication, correct?
9          MS. FLETCHER: Form, foundation.
10      Q.   BY MR. BRANTLEY: Either you or Vanessa
11  Headstream put this note in here indicating that 20
12  medications were found in a sink, that the nurse told
13  them that those inmates were no longer at the complex.
14  But then upon verification, the inmates actually were
15  there. And then the nurse decided, okay, I'll go ahead
16  and hand out the medication.
17          MS. FLETCHER: Form.
18          THE WITNESS: It sounds like there's more
19  questions that I'm not sure which one to answer.
20      Q.   BY MR. BRANTLEY: One of the two of you put
21  this note into this MGAR, correct?
22      A.   Yes.
23      Q.   And you only would have put this note in the
24  MGAR if you had actually observed that take place,
25  correct?

Page 164

1          MS. FLETCHER: Form.
2          THE WITNESS: I put in what I observe, but I
3  don't know if I observed this. And it's not -- I know
4  with the wash basin, it's not a sink, they have the
5  little plastic like a bin. So it's not a sink, like a
6  typical sink. So what's why I'm not clear of writing
7  this. It's like a plastic little basin thing.
8      Q.   BY MR. BRANTLEY: But Vanessa Headstream
9  wouldn't have made this note if she hadn't have made this
10  observation, correct?
11          MS. FLETCHER: Form, foundation.
12          THE WITNESS: I would not be able to speak
13  to what she observed or wrote or decided to do.
14      Q.   BY MR. BRANTLEY: Would you have made a note
15  like this if you hadn't have observed that take place?
16          MS. FLETCHER: Form.
17          THE WITNESS: Repeat.
18      Q.   BY MR. BRANTLEY: Would you have made a note
19  within the MGAR indicating that a bunch of medication was
20  stuffed into a wash basin instead of being handed out to
21  the inmates if you didn't see that take place?
22          MS. FLETCHER: Form.
23          THE WITNESS: If I don't see something take
24  place, I'm not going to make a notation.
25      Q.   BY MR. BRANTLEY: Okay. Do you recall any

Page 165

1  other issues with medication distribution while you were
2  the contract compliance monitor in Phoenix?
3          MS. FLETCHER: Form.
4          THE WITNESS: I need some specifics. If
5  it's in the MGAR, then -- and my name's on it.
6          MR. BRANTLEY: We're going to label this
7  Exhibit 151. And it begins with Bates label ADC052851.
8          (Exhibit 151 was marked.)
9      Q.   BY MR. BRANTLEY: And I'd like to focus your
10  attention to performance measure No. 5.
11      A.   No. 5. Okay.
12      Q.   And does this appear to be a true and accurate
13  copy of the November 2012 MGAR report relating to
14  medication administration?
15      A.   Yes.
16      Q.   And you completed notification No. 5 on
17  November 30th, 2012; is that correct?
18      A.   Was I supposed to be looking at 6 or 5?
19      Q.   No. 5.
20      A.   Oh, sorry. Say that again.
21      Q.   You completed the notification within
22  performance measure No. 5 on November 30th, 2012?
23      A.   No. 5. November 30th. Yes.
24      Q.   And the notification indicates that you
25  witnessed a nurse drop some medication on the floor, pick

## Page 166

1    it back up, and then administer it to an inmate; is that
2    correct?
3        A.   Right.
4        Q.   And that is outside of protocol, correct?
5        A.   Correct.
6        Q.   If the medication drops on the floor, it
7    shouldn't be administered to a patient?
8        A.   No. That's been corrected.
9            MS. FLETCHER: Mr. Brantley, I don't know
10   how effective it is to show her documents and essentially
11   ask her to confirm that a piece of paper says what a
12   piece of paper says. The document speaks for itself.
13   And I just want to go on the record that plaintiffs have
14   all these documents. They can review the documents
15   themselves and look and see what the document says. And
16   it's not really necessary to waste a witness's time
17   asking a witness to confirm that a piece of paper says
18   what a piece of paper says.
19           MR. BRANTLEY: Actually, I need to
20   authenticate the documents and verify with the witness
21   that she did in fact create that entire report, which is
22   why I'm going through and authenticating the different
23   MGAR reports.
24           MS. FLETCHER: Are you going to go through
25   and authenticate every single MGAR report she's ever

## Page 167

1    authored?
2            MR. BRANTLEY: No. I don't have an entire
3    trash can full of MGAR reports here.
4            MS. FLETCHER: And it is true just for the
5    record that her name is contained at the end of every one
6    of these reports with the dates on which she entered this
7    information into the computer system. But continue on.
8            MR. BRANTLEY: No, not all MGARs have that.
9    Within your production, there are numerous MGARs that do
10   not have any indication as to who input the information.
11   So that's why we're going through this process. But
12   thank you for your concern, Ashlee.
13           MS. FLETCHER: You're welcome. We've gone
14   through several exhibits that clearly state that
15   Ms. Valenzuela authored the document and input the
16   information, and Mr. Brantley has wasted a considerable
17   amount of time asking her to confirm that a piece of
18   paper says what a piece of paper says. Continue on.
19       Q.   BY MR. BRANTLEY: Do you ever recall the
20   medication room being left unattended?
21           MS. FLETCHER: Form, foundation.
22           THE WITNESS: If it is on my MGAR, I would
23   say it is. If it's not, it's not.
24       Q.   BY MR. BRANTLEY: So it wouldn't surprise you
25   if you had a couple of MGARs reporting that the

## Page 168

1    medication room door was left open, and the room was
2    unattended?
3        A.   The question is what?
4        Q.   It wouldn't surprise you that you had a couple
5    of MGAR reports that notated that the medication room
6    door was left open and all the medications unattended?
7            MS. FLETCHER: Form.
8            THE WITNESS: The word "surprise" is
9    confusing to me. Clarify.
10       Q.   BY MR. BRANTLEY: You understand what the word
11   "surprise" means, correct?
12       A.   I'd like to hear how you define "surprise."
13           MR. BRANTLEY: So we can walk through each
14   of the MGAR reports and I can show it to her, and she can
15   confirm or she can say, I don't really recall. And if I
16   signed it, it is.
17           MS. FLETCHER: It's your deposition,
18   Mr. Brantley. You can conduct it in whatever fashion you
19   would like.
20           MR. BRANTLEY: I'd like to introduce Exhibit
21   152. This is Bates labeled ADC052858.
22           (Exhibit 152 was marked.)
23           THE WITNESS: Am I looking at a certain
24   document or number?
25       Q.   BY MR. BRANTLEY: Performance measure No. 1.

## Page 169

1        A.   Okay.
2        Q.   Is this a true and accurate copy of an MGAR
3    report from November 2012 regarding medication room?
4        A.   Yes.
5        Q.   And with regard to performance measure No. 1 on
6    November 25th and November 30th, you input information
7    with regard to that measure?
8        A.   Yes.
9        Q.   And you can see that you noted on your
10   observance of November 29th that when you went by the
11   medication room that the door was wide open twice?
12       A.   Yes.
13       Q.   Is it normal for the door to be left wide open?
14           MS. FLETCHER: Form, foundation.
15           THE WITNESS: This is reporting my
16   observation, not what is normal.
17       Q.   BY MR. BRANTLEY: In the normal course of
18   business, would Corizon leave the medication room door
19   open?
20           MS. FLETCHER: Form, foundation.
21           THE WITNESS: In the normal course of
22   business, I'm unsure what Corizon does on every minute of
23   their days being there 24/7.
24       Q.   BY MR. BRANTLEY: But the door is supposed to
25   be locked and closed?

Page 170

1  A.  The door is to be closed and locked.
2  Q.  And you notice on November 24th, another time
3  that the door was open and no staff was inside, correct?
4  A.  That's what it says, correct.  It also says
5  several checks during the week indicated compliance.
6  Q.  What's the risk of leaving the door open to the
7  medication room?
8      MS. FLETCHER: Form, foundation.
9      THE WITNESS: It's not in my realm to answer
10 what the risks are.
11 Q.  BY MR. BRANTLEY: Why is it part of the
12 compliance measures to check to make sure the medication
13 room door is locked?
14     MS. FLETCHER: Form, foundation.
15     THE WITNESS: Contractual and it is on the
16 MGAR.
17 Q.  BY MR. BRANTLEY: But you don't know of any
18 reason why you would want to keep the medication door
19 locked?
20     MS. FLETCHER: Form, foundation.
21     THE WITNESS: It is not my job to know
22 reasons.  It is my job to observe and to report what I've
23 been asked to report as a monitor.
24 Q.  BY MR. BRANTLEY: When you were the FHA at
25 Tucson, were there ever any instances when a medication

Page 171

1  room door was left open?
2      MS. FLETCHER: Form, foundation.
3      THE WITNESS: I cannot recall the specifics
4  on that.
5  Q.  BY MR. BRANTLEY: But it must be important to
6  keep the medication room door closed if you're required
7  to monitor that that's taking place, correct?
8      MS. FLETCHER: Form, foundation.
9      THE WITNESS: Please rephrase it.  Restate.
10 Q.  BY MR. BRANTLEY: The measure of whether or not
11 the door is closed was important to the Arizona
12 Department of Corrections when they signed this contract,
13 so they created a compliance system by which you were
14 supposed to monitor whether or not the door was closed?
15     MS. FLETCHER: Form, foundation.
16     THE WITNESS: I don't speak for the Arizona
17 Department of Corrections.
18 Q.  BY MR. BRANTLEY: Are clinical staff supposed
19 to be scheduled to be on duty 24 hours a day?
20     MS. FLETCHER: Form, foundation.
21     THE WITNESS: The specifics?  The very large
22 state.
23 Q.  BY MR. BRANTLEY: When you were the FHA at
24 Tucson, were there supposed to be clinical staff on duty
25 24 hours a day?

Page 172

1      MS. FLETCHER: Form, foundation.
2      THE WITNESS: Specifically what clinical
3  staff?  What do you mean?
4  Q.  BY MR. BRANTLEY: Were there medical personnel
5  on staff 24 hours a day on location when you were the FHA
6  at Tucson?
7      MS. FLETCHER: Form, foundation.
8      THE WITNESS: I don't recall.
9  Q.  BY MR. BRANTLEY: During your time at Phoenix
10 as the contract compliance monitor, are you supposed to
11 monitor whether or not medical staff is on schedule 24
12 hours a day?
13     MS. FLETCHER: Form.
14     THE WITNESS: I need specifics on that.
15 Q.  BY MR. BRANTLEY: How many health care
16 personnel are supposed to be on duty at any particular
17 time?
18     MS. FLETCHER: Form, foundation.
19     THE WITNESS: That is a Corizon decision.
20 Q.  BY MR. BRANTLEY: So you're not aware of how
21 many staff are supposed to be on the grounds 24 hours a
22 day?
23     MS. FLETCHER: Form.
24     THE WITNESS: Please rephrase the question
25 with specifics.

Page 173

1  Q.  BY MR. BRANTLEY: You're not aware whether or
2  not there's some sort of requirement that there be
3  medical staff on duty 24 hours a day?
4      MS. FLETCHER: Form.
5      THE WITNESS: That's not a question.  Is
6  that a question?
7  Q.  BY MR. BRANTLEY: Are you aware?
8      MS. FLETCHER: Form.
9      THE WITNESS: Am I aware of what?
10 Q.  BY MR. BRANTLEY: Whether or not medical staff
11 is supposed to be on duty 24 hours a day at Phoenix.
12     MS. FLETCHER: Form.
13     THE WITNESS: I am aware that medical staff
14 should be there.  As far as their staffing pattern, I am
15 not aware of where you're specifically talking about.
16 Q.  BY MR. BRANTLEY: Let's take the intake unit at
17 Phoenix.  There are supposed to be medical staff there 24
18 hours a day?
19     MS. FLETCHER: Form, foundation.
20     THE WITNESS: The medical -- there is
21 medical staff there.
22 Q.  BY MR. BRANTLEY: 24 hours a day?
23     MS. FLETCHER: Form.
24     THE WITNESS: Yes.
25 Q.  BY MR. BRANTLEY: What about at Aspen?

Page 174

1      MS. FLETCHER: Form.
2      THE WITNESS: What about what? I mean,
3 please be specific.
4      Q.  BY MR. BRANTLEY: At Aspen, is there medical
5 staff on duty 24 hours a day?
6      MS. FLETCHER: Form.
7      THE WITNESS: No.
8      Q.  BY MR. BRANTLEY: Why is there not staff on
9 duty 24 hours a day?
10     MS. FLETCHER: Form, foundation.
11     THE WITNESS: That is not my area to answer.
12     Q.  BY MR. BRANTLEY: What's the Aspen Unit used
13 for?
14     MS. FLETCHER: Form, foundation.
15     THE WITNESS: Please clarify that.
16     Q.  BY MR. BRANTLEY: What type of inmates are
17 housed at the Aspen Unit?
18     MS. FLETCHER: Form, foundation.
19     THE WITNESS: That is not -- I do not do
20 classification.
21     Q.  BY MR. BRANTLEY: So you're unaware of what
22 type of medical needs the inmates at Aspen might need?
23     MS. FLETCHER: Form, foundation.
24     THE WITNESS: Please restate.
25     Q.  BY MR. BRANTLEY: You're unaware of the medical

Page 175

1 requirements for the inmates housed at Aspen?
2      MS. FLETCHER: Form.
3      THE WITNESS: I would appreciate a question,
4 not a statement.
5      Q.  BY MR. BRANTLEY: Are you unaware --
6      MR. BRANTLEY: Do you want to repeat the
7 question from above, please.
8      (The requested portion of the record was
9      read by the reporter.)
10     MS. FLETCHER: Same objection.
11     Q.  BY MR. BRANTLEY: Are you aware of the medical
12 requirements for the inmates housed at Aspen?
13     MS. FLETCHER: Form.
14     THE WITNESS: Specifics? It's too general
15 of a question for me to answer.
16     Q.  BY MR. BRANTLEY: Did Corizon order the FHAs to
17 stop using temporary agency staff?
18     MS. FLETCHER: Form, foundation.
19     THE WITNESS: I am not aware of Corizon's
20 operations or upper management decisions.
21     Q.  BY MR. BRANTLEY: So you're unaware of whether
22 or not Corizon was ordered to stop paying overtime to
23 permanent health care staff?
24     MS. FLETCHER: Form, foundation.
25     THE WITNESS: Was that a question?

Page 176

1      Q.  BY MR. BRANTLEY: Yes. So you're unaware of
2 whether or not Corizon was ordered to stop paying
3 overtime to permanent health care staff?
4      MS. FLETCHER: Form, foundation.
5      THE WITNESS: I feel like I'm getting
6 statements instead of questions. So now I'm getting
7 confused. If you --
8      Q.  BY MR. BRANTLEY: Are you aware of whether or
9 not Corizon was ordered to stop paying overtime to
10 permanent health care staff?
11     MS. FLETCHER: Form, foundation.
12     THE WITNESS: I had heard about that.
13     Q.  BY MR. BRANTLEY: And what did you hear?
14     A.  That Corizon was to be -- see, I can't even
15 remember exactly. It was in passing about that -- how
16 was that. I think it was -- I can't even remember. It
17 was one nurse that said she wasn't getting -- that they
18 couldn't do overtime or something to that effect.
19     Q.  Has this affected the Phoenix complex at all in
20 regards to staffing?
21     MS. FLETCHER: Form, foundation.
22     THE WITNESS: Has it affected -- please be
23 specific.
24     Q.  BY MR. BRANTLEY: Since you heard that Corizon
25 may stop paying overtime, have you seen any changes in

Page 177

1 the staffing levels at the Phoenix complex?
2      MS. FLETCHER: Form, foundation.
3      THE WITNESS: First of all, that's not the
4 case. They are paying overtime, No. 1.
5      No. 2, I'm not -- now I'm not sure what the
6 question is still. Maybe I need a break after this
7 question.
8      MS. FLETCHER: There's not a question
9 pending if you'd like a break right now.
10     THE WITNESS: Okay.
11     MS. FLETCHER: We'll take a break.
12     (A recess was taken from 2:32 p.m. to
13     2:39 p.m.)
14     Q.  BY MR. BRANTLEY: So before we took a break,
15 you indicated that Corizon staff is being paid overtime,
16 correct?
17     MS. FLETCHER: Form, foundation.
18     THE WITNESS: At this point, it is my
19 understanding. I'm not sure because I'm not Corizon, but
20 it is my understanding.
21     Q.  BY MR. BRANTLEY: Are you aware of any point in
22 time when they weren't paying for overtime?
23     MS. FLETCHER: Form, foundation.
24     THE WITNESS: I'm not specifically aware.
25 It was only that I had heard that.

Page 178

1      Q.   BY MR. BRANTLEY:  Had you heard anything about
2   medical staff being forced to work beyond their scheduled
3   hours?
4           MS. FLETCHER:  Form, foundation.
5           THE WITNESS:  I believe I recall, and it
6   might have been during my MGAR time, that with the
7   staffing and low staffing, they were really working hard
8   to try to meet the needs and possibly that was
9   occurring.  I might have even included that in an MGAR.
10          MR. BRANTLEY:  I'd like to introduce Exhibit
11   153, which is Bates labeled ADC088976.
12          (Exhibit 153 was marked.)
13      Q.   BY MR. BRANTLEY:  I'm going to have you focus
14   just on the Notification column 2.
15      A.   No. 2.  All right.
16      Q.   And this appears to be a true and accurate copy
17   of an MGAR you created for April 2013 regarding staffing?
18      A.   That's what it says.
19      Q.   And you input the information for section 2 on
20   April 28th, 2013?
21      A.   That is what it said.
22      Q.   And do you see where it says:  Monitors have
23   been informed by Corizon supervisors overtime and the use
24   of agency is not permitted by upper management.  Do you
25   see that?

Page 179

1      A.   What is the question?
2      Q.   Do you see where it says:  Monitors have been
3   informed by Corizon supervisors overtime and the use of
4   agency is not permitted by upper management?
5      A.   That is what is written, yes.
6      Q.   So beyond hearing a rumor that someone may not
7   have been receiving overtime, you were actually notified
8   by Corizon supervisors that they weren't supposed to be
9   paying overtime?
10          MS. FLETCHER:  Form.
11          THE WITNESS:  No, incorrect.  It says
12   "informed."  And they were nursing.  Just like I had
13   said, it had been talked about.  My writing in the MGAR
14   is more formal.
15      Q.   BY MR. BRANTLEY:  But you were actually aware
16   that Corizon had communicated to you that they were going
17   to stop paying overtime?
18          MS. FLETCHER:  Form.
19          THE WITNESS:  Rephrase, please.
20      Q.   BY MR. BRANTLEY:  Is what you see in the MGAR
21   report correct?
22      A.   If I'm writing an MGAR here, it is correct.
23      Q.   So you were in fact told by Corizon supervisors
24   that they were no longer going to be paying overtime?
25          MS. FLETCHER:  Form.

Page 180

1           THE WITNESS:  I just have a difficult time
2   if it's not a question.  It sounds to me like a statement
3   into a question, and I get confused.
4      Q.   BY MR. BRANTLEY:  Were you in fact told by
5   Corizon supervisors that there were no longer going to be
6   paying overtime?
7      A.   I was informed that they were not being
8   permitted to.  Informed by a discussion -- there was not
9   a -- I'm reporting it because I wanted to report that to
10   see how accurate that information was in the certain
11   sense.  I don't have any documentation that that was the
12   case, but it needed to be reported.
13      Q.   But it says:  informed by Corizon supervisors.
14          MS. FLETCHER:  Read the whole sentence,
15   please.  There's more to that sentence.
16      Q.   BY MR. BRANTLEY:  The sentence reads to me that
17   the monitors have been informed by Corizon supervisors.
18          MS. FLETCHER:  Correct.  It says the
19   monitors, it doesn't say Helena Valenzuela.
20      Q.   BY MR. BRANTLEY:  Where did you get the
21   information that the monitors had been informed that
22   Corizon supervisors weren't going to be paying overtime?
23      A.   As I said, I had heard that from nursing,
24   nursing supervisor.  And it was at -- if you notice the
25   date of when -- this is at this time.  So this MGAR is to

Page 181

1   be used as a tool for correcting and awareness and as a
2   transition.  So this isn't, oh, a punitive, let's look at
3   this.  They were adjusting, they were new.  This is
4   transition.  This is what's happening.  This is what's
5   being said at this time.  It's a valuable way of getting
6   out and correcting specifics.
7      Q.   The next portion of that sentence reads:
8   however, an extremely high back load number intakes not
9   being timely medically processed resulted in medical and
10   medical records staff working until midnight last night.
11      A.   That is correct.
12          MS. FLETCHER:  That's not what it says.
13   Please read it again.
14      Q.   BY MR. BRANTLEY:  An extremely high back load
15   number intakes not being timely medically processed
16   resulted in medical and medical records staff working
17   until midnight last week.  Correct?
18      A.   That's what it says.
19      Q.   So you were actually aware that there were
20   staff being forced to work beyond their scheduled hours?
21          MS. FLETCHER:  Form.
22          THE WITNESS:  I don't know if they were
23   being forced or requested to work, and it was Corizon's
24   way of addressing the issue to make sure there are
25   timely -- the intakes and to make sure the process

Page 182

```
1    continue on.  These are ways of they're trying to improve
2    on what they are doing.
3        Q.   BY MR. BRANTLEY:  At the Phoenix facility where
4    you're the contract compliance monitor --
5        A.   Right.
6        Q.   -- how many health care staff have quit in the
7    last four months?
8            MS. FLETCHER:  Form, foundation.
9            THE WITNESS:  I can't be specific on that.
10   I don't know.
11       Q.   BY MR. BRANTLEY:  Do you know if anyone's quit?
12           MS. FLETCHER:  Form, foundation.
13           THE WITNESS:  I do know that they are no
14   longer there.  Whether they've quit or been released, I'm
15   not sure.  Again, sometimes people say something, and
16   they could be with -- it's true and it could be not
17   true.  I believe I know -- I can't recall specifically,
18   but I think I do know -- was it -- someone had quit, but
19   I don't remember the specifics on that.
20       Q.   BY MR. BRANTLEY:  But maybe one person quit,
21   not much more than that?  You haven't seen an influx in
22   people quitting, correct?
23           MS. FLETCHER:  Form.
24           THE WITNESS:  Please repeat that or rephrase
25   that.
```

Page 183

```
1        Q.   BY MR. BRANTLEY:  Since your MGAR report where
2    you indicated that there had been information about
3    Corizon not paying overtime, have you noticed a reduction
4    in staff at your location?
5            MS. FLETCHER:  Form, foundation.
6            THE WITNESS:  That would be -- I could not
7    answer that with complete accuracy.
8        Q.   BY MR. BRANTLEY:  Are you in charge of
9    monitoring the staffing levels at Phoenix?
10           MS. FLETCHER:  Form.
11           THE WITNESS:  I am -- again, if it's on the
12   MGAR, I'm replying to the MGAR as far as giving the
13   information in the process of correcting.
14       Q.   BY MR. BRANTLEY:  And are you aware of any
15   issues with the staffing that create gaps in providing
16   medical care at the Phoenix facility?
17           MS. FLETCHER:  Form, foundation.
18           THE WITNESS:  Repeat, please.
19       Q.   BY MR. BRANTLEY:  Are you aware of any issues
20   with the staffing that creates gaps in providing medical
21   care at the Phoenix facility?
22           MS. FLETCHER:  Same objection.
23           THE WITNESS:  If it is on the MGAR, I would
24   indicate it on the MGAR if it is in relation to one of
25   the performance measures.
```

Page 184

```
1        Q.   BY MR. BRANTLEY:  Are you aware that there's
2    any positions that still need to be filled at the Phoenix
3    facility?
4            MS. FLETCHER:  Form, foundation.
5            THE WITNESS:  I am aware that there are
6    positions, yes, that need -- I believe it fluctuates at
7    this point.  I don't know exactly today.  I'm not there.
8        Q.   BY MR. BRANTLEY:  But there is need for some
9    additional staff, correct?
10           MS. FLETCHER:  Form, foundation.
11           THE WITNESS:  As of today, I don't know
12   because I'm not there.
13       Q.   BY MR. BRANTLEY:  How far is the Alhambra Unit
14   from the Aspen Unit?
15       A.   It is probably -- gosh, I have never measured
16   it, but several blocks, maybe.  I think it's less than --
17   it's a couple blocks.  You turn the corner, go, and it's
18   the first opening.
19       Q.   So if you were at the Alhambra Unit and you
20   needed to get to Aspen, would you drive?
21           MS. FLETCHER:  Form.
22           THE WITNESS:  Can you rephrase.
23       Q.   BY MR. BRANTLEY:  If you were at the Alhambra
24   Unit and you needed to get to Aspen, how would you get
25   there?
```

Page 185

```
1        A.   I would say I could walk, I could drive.
2        Q.   What do you typically do?
3        A.   I typically drive.
4        Q.   So do you recall any issues with having not
5    enough staff at the Phoenix location?
6            MS. FLETCHER:  Form, foundation.
7            THE WITNESS:  Probably specifically -- I
8    would need a specific on that.  Again, if it's in the
9    MGAR, it's there.  It's already written in there,
10   documented.
11       Q.   BY MR. BRANTLEY:  And if there was an issue
12   with staffing, you would document it within the MGAR as
13   you've just stated, correct?
14           MS. FLETCHER:  Form.
15           THE WITNESS:  Could you repeat the question.
16       Q.   BY MR. BRANTLEY:  If there were issues with
17   staffing and you were responsible that month for
18   monitoring the staffing within your MGAR report, you
19   would have made a notation within the MGAR report?
20       A.   Yes.
21       Q.   Do you recall ever issuing a corrective action
22   plan with regard to staffing needs?
23       A.   I do not do the corrective action plans.  That
24   would be Corizon.
25       Q.   Are you aware of a corrective action plan being
```

Page 186

1    instituted with regard to staffing needs?
2         MS. FLETCHER: Form.
3         THE WITNESS: I need the specifics on --
4    regarding, you know, what, where. Maybe I could help you
5    out. It's in the MGAR if there is.
6         MR. BRANTLEY: I'm going to introduce this
7    as Exhibit 154. It's Bates labeled ADC070566.
8         (Exhibit 154 was marked.)
9    Q.   BY MR. BRANTLEY: I want you to focus just on
10   the last sentence of the big paragraph within the
11   notifications.
12   A.   What number?
13   Q.   No. 2.
14   A.   Okay. Okay, I focused on it.
15   Q.   And this again appears to be a true and
16   accurate copy of the MGAR report for staffing for January
17   2013?
18   A.   Yes.
19   Q.   And with regard to notification No. 2, you
20   input that information on January 22nd, 2013?
21   A.   Yes.
22   Q.   Can you read the last sentence of notification
23   No. 2 for me, please.
24   A.   Although non compliance of this finding has
25   been previously reported, non compliance persists without

Page 187

1    any corrective action plan being submitted or discussed.
2    Q.   Is there any requirement that a corrective
3    action plan be created by Corizon with regard to a red
4    notification?
5         MS. FLETCHER: Form, foundation.
6         THE WITNESS: Requirements are made by upper
7    management, but the expectation is to have the corrective
8    action plan.
9    Q.   BY MR. BRANTLEY: What happens if they never
10   file a corrective action plan?
11        MS. FLETCHER: Form, foundation.
12        THE WITNESS: They file it. At that point
13   that is not my responsibility for what happens. My
14   responsibility is to report.
15   Q.   BY MR. BRANTLEY: But you're also supposed to
16   monitor the corrective action plans, correct?
17        MS. FLETCHER: Form.
18        THE WITNESS: Correct.
19   Q.   BY MR. BRANTLEY: And if you institute an MGAR
20   that requires a corrective action plan but Corizon never
21   provides a corrective action plan, what do you do?
22   A.   I would notify the -- just as I have here, that
23   it has not been submitted. which will -- they will
24   submit. And if not, then the upper management would be
25   able to -- they would be taking that under consideration

Page 188

1    and do whatever they're doing.
2    Q.   And have you ever had during your time at
3    Phoenix any circumstances where you felt staffing levels
4    were causing medical needs to be put in jeopardy?
5         MS. FLETCHER: Form.
6         THE WITNESS: I report on the MGAR. If it's
7    on the MGAR as a performance measure requiring
8    monitoring, then it would be -- the information is on the
9    MGAR.
10        MR. BRANTLEY: I'd like to introduce Exhibit
11   155, Bates labeled ADC052872.
12        (Exhibit 155 was marked.)
13   Q.   BY MR. BRANTLEY: And we're going to be
14   focusing on notification No. 2.
15   A.   No. 2. Okay.
16        Do you want me to --
17   Q.   Have you reviewed it?
18   A.   Yes, I have.
19   Q.   And does this appear to be a true and accurate
20   copy of the MGAR report you created for November 2012
21   with regard to staffing?
22   A.   Yes, it is.
23   Q.   And you notate in here on your notation dated
24   November 16th, 2012, that: As a result of low staffing,
25   MTU's current mental health program goals are in

Page 189

1    jeopardy. Is that correct?
2    A.   Yes, that is what it states.
3    Q.   How did you form that opinion?
4    A.   The amount -- let's see. Due to the staffing
5    levels, that is how I formed that opinion.
6    Q.   And you felt that the staffing levels put the
7    mental health program goals in jeopardy?
8         MS. FLETCHER: Form, foundation.
9         THE WITNESS: Please rephrase again to a
10   question.
11   Q.   BY MR. BRANTLEY: You felt that the staffing
12   levels put the mental health program goals in jeopardy?
13   A.   That's not a question.
14        MS. FLETCHER: Same objections.
15   Q.   BY MR. BRANTLEY: Did you feel the staffing
16   levels put the mental health program goals in jeopardy?
17        MS. FLETCHER: Form, foundation.
18        THE WITNESS: If I have written that here,
19   that is what -- at that point and since then they have
20   corrected this. Was there at that point in time on
21   November 2012.
22        Also I would appreciate if you did not make
23   eyebrows up high and keep asking me with impatience.
24   Q.   BY MR. BRANTLEY: You also see within this
25   notation the notation that says: After 6 PM, there is no

Page 190

1   night nurse on site at Aspen. If there is a medical or
2   mental health emergency at Aspen, a night nurse from the
3   Alhambra units is to respond by taking the man down bag,
4   going through security, and driving in his or her
5   personal vehicle to Aspen, again going through security.
6   Correct?
7       A.   This is what I wrote, yes.
8       Q.   So this is the situation where if you were over
9   at Alhambra and you needed to get to Aspen, you would
10  have to drive your car, correct?
11          MS. FLETCHER:  Form, foundation.
12          THE WITNESS:  That would be a decision on
13  the Corizon staff. This is my observation. But how they
14  do that is up to them.
15      Q.   BY MR. BRANTLEY:  How long would it take to
16  walk from Alhambra to Aspen?
17          MS. FLETCHER:  Form, foundation.
18          THE WITNESS:  I have never researched that
19  nor have I -- when I have walked it, it depends on how
20  fast you walk. It could be ten minutes.
21      Q.   BY MR. BRANTLEY:  The last portion of this
22  sentence or notification says: If there is short
23  staffing at Alhambra, coverage is compromised for the
24  entire complex. Correct?
25      A.   That is what it says. This is when Wexford was

Page 191

1   in charge, not Corizon.
2       Q.   And did you feel that that was a staffing issue
3   that needed to be addressed?
4           MS. FLETCHER:  Form.
5           THE WITNESS:  Restate, please.
6       Q.   BY MR. BRANTLEY:  Do you believe not having a
7   night nurse on site at Aspen is in compliance with the
8   contract?
9       A.   What I believe is what I wrote in here.
10      Q.   Do you know if there's any tracking system for
11  patients with chronic diseases?
12          MS. FLETCHER:  Form, foundation.
13          THE WITNESS:  That is a Corizon operational
14  issue.
15      Q.   BY MR. BRANTLEY:  When you were the FHA at
16  Tucson, was there any sort of tracking system for
17  patients with chronic diseases?
18          MS. FLETCHER:  Form, foundation.
19          THE WITNESS:  That, again, would be with
20  nursing and medical staff would have developed and
21  completed that.
22      Q.   BY MR. BRANTLEY:  And from the administrative
23  standpoint as the FHA, you're not really aware of whether
24  or not there was a tracking system?
25          MS. FLETCHER:  Form.

Page 192

1           THE WITNESS:  Restate, please.
2       Q.   BY MR. BRANTLEY:  As the FHA who's in charge of
3   the administration of the health care at Tucson --
4       A.   Uh-huh.
5       Q.   -- were you aware of not of a chronic disease
6   tracking system?
7       A.   I'm not sure what you mean by a chronic disease
8   tracking system. The chronic care was taken care of by
9   nursing and medical. How they tracked it, I'm not sure
10  if you're being specific with some list of something
11  or -- so it was being taken care of by medical.
12      Q.   Are you aware of any special procedures for
13  prisoners with chronic diseases?
14          MS. FLETCHER:  Form, foundation.
15          THE WITNESS:  That would be within the
16  medical realm of answering.
17      Q.   BY MR. BRANTLEY:  Who would be the best person
18  to ask regarding tracking systems for chronic disease?
19          MS. FLETCHER:  Form, foundation.
20          THE WITNESS:  I'm really not sure, besides
21  someone in medical.
22      Q.   BY MR. BRANTLEY:  Meaning at this point
23  Corizon, correct?
24      A.   At this point, Corizon, yes.
25      Q.   But you're not aware of how often a prisoner

Page 193

1   with a chronic disease is supposed to be seen by a doctor
2   or nurse or some other medical practitioner?
3           MS. FLETCHER:  Form, foundation.
4           THE WITNESS:  That would be nursing
5   responding to that.
6       Q.   BY MR. BRANTLEY:  Do you feel there's enough
7   medical staff to see the prisoners within the time
8   guidelines set forth under the contract?
9           MS. FLETCHER:  Form, foundation.
10          THE WITNESS:  My job responsibilities are
11  not to feel. My responsibilities are to report what is
12  listed on the MGAR.
13      Q.   BY MR. BRANTLEY:  Is there enough staff to see
14  prisoners within the guidelines?
15          MS. FLETCHER:  Form, foundation.
16          THE WITNESS:  Again, I am here today. I'm
17  not on site. The staffing is hired. I don't know the
18  update at this point in time because I haven't been there
19  the other two days as well.
20      Q.   BY MR. BRANTLEY:  Since you became the contract
21  compliance monitor at Phoenix in the fall of 2012,
22  correct, or was it --
23      A.   '12 to '13. Phoenix -- when was the contract.
24  Yeah, June, July of '12. Because I'm almost there a
25  year.

Page 194

1    Q.   Do you recall whether there's been issues with
2  chronic care patients being seen?
3         MS. FLETCHER: Form, foundation.
4         THE WITNESS: I believe there was -- there
5  were issues. I can't be specific on that because of the
6  changes between Wexford and Corizon. I know that -- I
7  couldn't be specific on that, but I believe they were.
8    Q.   BY MR. BRANTLEY: Are you familiar with the
9  process by which a prison doctor refers a prisoner to an
10 outside specialist?
11        MS. FLETCHER: Form, foundation.
12        THE WITNESS: That is a Corizon process.
13   Q.   BY MR. BRANTLEY: When you were the FHA at
14 Tucson, were you aware of any process by which a prison
15 doctor refers prisoners to outside specialists?
16   A.   Yes.
17   Q.   What was that process?
18   A.   Well, the process was that the medical provider
19 would submit a consultation. And as far as if necessary
20 quickly, he would even be calling the other specialist.
21 It would depend. Generally I can tell you the process,
22 but specifically each provider as a doctor would decide
23 on how do that as well.
24   Q.   Was there a specific form they needed to fill
25 out to obtain specialty care?

Page 195

1         MS. FLETCHER: Form, foundation.
2         THE WITNESS: There was documentation that
3  had to be completed. But as far as which specific form,
4  you would have to ask or show me if that was it.
5    Q.   BY MR. BRANTLEY: As the contract compliance
6  monitor in Phoenix, how do you monitor the timeliness of
7  referrals?
8         MS. FLETCHER: Form, foundation.
9         THE WITNESS: That would be more so in the
10 nursing section.
11   Q.   BY MR. BRANTLEY: So that would be Nurse
12 Headstream?
13   A.   I believe so.
14   Q.   Do you know if there's any onsite specialty
15 care provided at the Phoenix facility?
16        MS. FLETCHER: Please be specific on that.
17        THE WITNESS: Please be specific on that.
18   Q.   BY MR. BRANTLEY: Is there any specialty care
19 provided at Phoenix?
20        MS. FLETCHER: Form, foundation.
21        THE WITNESS: I'm unsure what you mean by
22 that. Corizon is in charge of any of the medical,
23 providing the medical care. That would probably be more
24 in their area of responding.
25   Q.   BY MR. BRANTLEY: Is the Flamenco Unit

Page 196

1  considered a specialty care unit?
2         MS. FLETCHER: Form.
3         THE WITNESS: I'm not sure what you mean by
4  specialty care.
5    Q.   BY MR. BRANTLEY: Care beyond the normal care
6  provided by Corizon. The blood pressure, things like
7  that. Is there any sort of like dialysis or higher
8  specialty type care that takes place at Phoenix, or are
9  those prisoners sent off site?
10        MS. FLETCHER: Form, foundation.
11        THE WITNESS: You would have to maybe break
12 those questions up, please.
13   Q.   BY MR. BRANTLEY: Is there any sort of dialysis
14 or anything else like that that takes place at the
15 Phoenix location?
16        MS. FLETCHER: Form, foundation.
17        THE WITNESS: Anything other than that, I'm
18 not sure what that means, what you mean by anything other
19 than that.
20   Q.   BY MR. BRANTLEY: Well, you're in the medical
21 care field, correct?
22   A.   Right.
23   Q.   What does the medical care field describe
24 specialty care as?
25        MS. FLETCHER: Form, foundation.

Page 197

1         THE WITNESS: If you're asking if there's
2  dialysis, there's not dialysis at the Phoenix complex.
3  That does not work at -- it's an intake facility mainly.
4    Q.   BY MR. BRANTLEY: Do you recall any issues with
5  the dress of Wexford or Corizon employees at the Phoenix
6  location?
7         MS. FLETCHER: Form.
8         THE WITNESS: The dress?
9    Q.   BY MR. BRANTLEY: What they were wearing.
10        MS. FLETCHER: Form, foundation.
11        THE WITNESS: You mean if it -- yes, I do
12 recall.
13   Q.   BY MR. BRANTLEY: And what was the issue that
14 you recall?
15   A.   Of dress? I mean, I'm not sure. Are we
16 talking about dress --
17   Q.   Not dressing appropriately for the job at
18 Phoenix.
19   A.   Yes, initially there was not -- it was not
20 dress by the DOC policy. That's clothing, right? You're
21 meaning clothing?
22   Q.   Yes.
23   A.   Okay. The clothing, right.
24   Q.   My question was, were they wearing clothing
25 that wasn't in compliance with the contract?

Page 198

1    MS. FLETCHER: Form.
2    THE WITNESS: It would depend on when you go
3    "they." "They" encompasses to me all or many. I need
4    specifically.
5    Q.   BY MR. BRANTLEY: Were there any individuals at
6    all who were wearing clothing that was not in compliance
7    with the contract?
8    MS. FLETCHER: Form.
9    THE WITNESS: Yes. Not in compliance with
10   DOC dress code.
11   Q.   BY MR. BRANTLEY: Have you ever heard of
12   telemedicine?
13   A.   Yes.
14   Q.   Does telemedicine take place at the Phoenix
15   complex?
16   A.   No.
17   Q.   Are there policies or guidelines with regard to
18   what types of documents that are created when a prisoner
19   dies in custody?
20   MS. FLETCHER: Form, foundation.
21   THE WITNESS: Are there what? Please
22   repeat.
23   Q.   BY MR. BRANTLEY: Policies or guidelines on
24   what types of documents are created when a prisoner dies
25   in custody.

Page 199

1    A.   There is a policy, ADOC policy.
2    Q.   Do you know what that is?
3    A.   You would have to be specific on what you
4    mean. I mean, this involves security operations,
5    involves many more than just medical.
6    Q.   From a medical standpoint, when a prisoner dies
7    while in custody, are there specific documents that need
8    to be created?
9    MS. FLETCHER: Form, foundation.
10   THE WITNESS: That's confusing to me.
11   Q.   BY MR. BRANTLEY: You're unaware from a medical
12   standpoint when a prisoner dies in custody whether or not
13   there's some sort of form that needs to be completed?
14   MS. FLETCHER: Form.
15   THE WITNESS: That's so general of a
16   question that it is difficult for me to answer that
17   accurately.
18   Q.   BY MR. BRANTLEY: Do you know how many inmates
19   have died at the Phoenix location since you became the
20   contract compliance monitor?
21   MS. FLETCHER: Form.
22   THE WITNESS: I would need more of a -- what
23   do you mean by that? Please repeat.
24   Q.   BY MR. BRANTLEY: How many inmates died at
25   Phoenix since you became the contract compliant monitor?

Page 200

1    MS. FLETCHER: Form, foundation.
2    THE WITNESS: Again, that is not -- that is
3    too general to answer.
4    Q.   BY MR. BRANTLEY: What part of it is too
5    general?
6    A.   At the Phoenix complex. If somebody's there,
7    they might die in the hospital. They might die on the
8    way to the hospital. I don't have the exact number nor
9    am I knowing that at this point in time. But you go "at
10   the Phoenix complex."
11   Q.   So the issue is whether or not they may have
12   died while at the complex versus enroute to a hospital or
13   at a hospital?
14   A.   Yeah.
15   Q.   In total, encompassing all of that, those
16   people that may have died in custody, those people that
17   may have died in an ambulance on the way to the hospital,
18   somebody that may have died at a hospital, do you know
19   how many deaths have occurred at your complex since
20   becoming --
21   A.   I do not know exactly to answer that
22   accurately.
23   Q.   Would you be able to give me an estimate?
24   A.   It would be clearly an estimate. I believe --
25   I believe two, but I'm not sure.

Page 201

1    Q.   Do you know if a mortality review is created or
2    generated and placed in the prisoner's file upon their
3    death?
4    MS. FLETCHER: Form, foundation.
5    THE WITNESS: I am not sure if that is
6    completed.
7    Q.   BY MR. BRANTLEY: Do any of your duties as the
8    compliance contract monitor at Phoenix revolve around
9    documentation on the deaths of prisoners?
10   MS. FLETCHER: Form.
11   THE WITNESS: On the MGAR, if there is
12   mortality review, if there's a question on that, then
13   that would be where I would look into that to see if
14   that's in compliance.
15   Q.   BY MR. BRANTLEY: So like with the other
16   aspects, like sick call and intake --
17   A.   Right, exactly.
18   Q.   -- all the policies and procedures are being
19   garnered from the MGAR when you complete it?
20   MS. FLETCHER: Form.
21   Q.   BY MR. BRANTLEY: You're seeing what the
22   policies and procedures are within the performance
23   measure in the MGAR?
24   MS. FLETCHER: Form.
25   THE WITNESS: The question, please?

Page 202

1    Q.   BY MR. BRANTLEY:  You may or may not have
2  completed an MGAR with regard to documentation upon
3  prisoner death, correct?
4        MS. FLETCHER:  Form.
5        THE WITNESS:  I may or may not have --
6    Q.   BY MR. BRANTLEY:  You indicate that you might
7  have completed an MGAR that monitored death notification
8  information?
9    A.   I might have.  If there is a -- if there is --
10 if it is about mortality review or something to that
11 effect, I probably would have if it's on the MGAR.  I
12 don't specifically recall at this moment was that an area
13 that I did.
14   Q.   So the only information you would have about it
15 would be garnered from the MGAR, correct?
16       MS. FLETCHER:  Form.
17       THE WITNESS:  I'm unclear on your question.
18   Q.   BY MR. BRANTLEY:  The only policies or
19 guidelines as they relate to documentation regarding
20 prisoner deaths that you're aware of would be contained
21 on the MGAR form?
22       MS. FLETCHER:  Form.
23       THE WITNESS:  On the MGAR form.  My job is
24 when I read that on the MGAR form, what I've been given.
25 Then I would research what is on that and report on the

Page 203

1  notifications within the MGAR.
2    Q.   BY MR. BRANTLEY:  So there's no outside policy
3  or guideline relating to paperwork created upon prisoner
4  death?
5        MS. FLETCHER:  Form.
6    Q.   BY MR. BRANTLEY:  That you're aware of?
7    A.   There is definitely documentation.  But I'm
8  saying there's security, there is medical, psychological,
9  the autopsy report.  There is numerous documentation that
10 is created.
11   Q.   And all of that is supposed to be put in the
12 prisoner's file?
13       MS. FLETCHER:  Form, foundation.
14       THE WITNESS:  That is -- I'm unsure about
15 what specifically at this point in time goes in the file
16 regarding that.  Because remember there is a medical file
17 and then there's also the institutional file.
18   Q.   BY MR. BRANTLEY:  Are you aware of whether or
19 not a psychological autopsy gets conducted by prisoner
20 mental health staff in cases of suicide?
21       MS. FLETCHER:  Form, foundation.
22       THE WITNESS:  At this point, that would be a
23 Corizon operation.  I'm unaware of that.
24   Q.   BY MR. BRANTLEY:  So you're not aware of what
25 the time frame is for mortality review?

Page 204

1        MS. FLETCHER:  Form.
2        THE WITNESS:  So I'm not -- rephrase that
3  question, please.  In other words, you just said, "so
4  you're not aware."
5    Q.   BY MR. BRANTLEY:  Are you aware of any time
6  frame in which mortality review is supposed to take
7  place?
8        MS. FLETCHER:  Form.
9        THE WITNESS:  Yes, there is time frames.
10   Q.   BY MR. BRANTLEY:  And what is that time frame?
11       MS. FLETCHER:  Form.
12       THE WITNESS:  That would be more in the
13 direction of medical records might have changed.  I'm not
14 exactly clear on that at this point in time.
15   Q.   BY MR. BRANTLEY:  I'd like to direct you back
16 to Exhibit 148, please.
17   A.   148.  Okay.
18   Q.   And on the --
19   A.   Yes.
20   Q.   And on page 2, which is Bates labeled
21 ADC034824.
22   A.   Okay.  No. 2, which one?
23   Q.   Right up at the top you indicate:  Finding:
24 Mortality Review on Inmate is not completed and missed
25 the 72 hour compliance time.  Correct?

Page 205

1    A.   That's what it says.
2    Q.   And how are you aware of there being a 72-hour
3  compliance time?
4        MS. FLETCHER:  Form.
5        THE WITNESS:  How am I aware?
6    Q.   BY MR. BRANTLEY:  Where did that 72-hour
7  compliance time come from?
8        MS. FLETCHER:  Form, foundation.
9        THE WITNESS:  Usually these are upper
10 management decisions of these policies coming into play
11 here.  And at that time, this was 2012.  So it could have
12 been that I received a call from somebody in nursing or
13 in medical that said, can you check on that mortality
14 review or check on this and see if it was done in the
15 72-hour compliance.  So it might have been that I was
16 asked that way, and I was answering.
17   Q.   BY MR. BRANTLEY:  Do you know whether there's
18 been any delays in basic dental care while you've been
19 the compliance monitor at Phoenix?
20       MS. FLETCHER:  Form, foundation.
21       THE WITNESS:  So we're not on this now?  I
22 should put this away?
23   Q.   BY MR. BRANTLEY:  Yeah, we're done with the
24 question regarding mortality.
25   A.   Again, please.

Page 206

1    Q.   Were you aware of any issues with delays in
2  basic dental care while you've been the contract
3  compliance monitor at Phoenix?
4        MS. FLETCHER: Form, foundation.
5        THE WITNESS: If it was on the MGAR as
6  something that I needed to research, then I would have
7  probably documented that on the MGAR.
8    Q.   BY MR. BRANTLEY: Are you aware whether or not
9  oral care has always been documented on the MGAR reports
10 since you've been contract compliant monitor?
11       MS. FLETCHER: Form, foundation.
12       THE WITNESS: I'm unclear of that question.
13   Q.   BY MR. BRANTLEY: Has oral care always been a
14 component of the MGAR report?
15   A.   Oral care, I am not sure if it's been -- I
16 don't recall it being every single time because they
17 rotate. So I cannot answer that specifically. I don't
18 have all the MGARs in front of me.
19   Q.   Do you ever recall a time when oral care
20 standards were added to the MGAR report?
21       MS. FLETCHER: Form.
22       THE WITNESS: I can't specifically answer if
23 there are a time when they're added, if they're added.
24 I'm unclear of the time they're added. Again, the MGAR
25 switches every month and things add and things are taken

Page 207

1  off that are from the contract. So I'm not sure if
2  they're there every single time or when they were
3  switched or if that was the case.
4    Q.   BY MR. BRANTLEY: Do you know where the
5  standards come from within the oral care standards MGAR
6  reporting?
7        MS. FLETCHER: Form, foundation.
8        THE WITNESS: I am not clear on exactly
9  where dental standards come from besides the dental.
10   Q.   BY MR. BRANTLEY: Do you ever recall evaluating
11 oral care standards?
12   A.   If it was on the MGAR, I was probably
13 evaluating that.
14   Q.   In general when you're doing any MGAR reporting
15 for any sort of topic, for each particular topic, how
16 many charts or inmate files are you reviewing when you're
17 doing your reporting?
18       MS. FLETCHER: Form.
19   Q.   BY MR. BRANTLEY: Let me rephrase that.
20   A.   That would be helpful.
21   Q.   When you're going to do a compliance review,
22 let's say for intake procedures, how many charts would
23 you look at in order to make your determination whether
24 or not Corizon or Wexford was in compliance?
25       MS. FLETCHER: Form.

Page 208

1        THE WITNESS: It would depend on the
2  record. Sometimes you're not even looking at the medical
3  record. You might be looking at the HNR. Generally
4  maybe ten, maybe five. If would depend. No less than
5  five or ten or more.
6    Q.   BY MR. BRANTLEY: And it might vary depending
7  on what category you're reviewing compliance for?
8    A.   Probably.
9    Q.   Do you know whether or not any intake oral exam
10 takes place at the Phoenix location?
11       MS. FLETCHER: Form, foundation.
12       THE WITNESS: Can you define an oral exam.
13   Q.   BY MR. BRANTLEY: When a prisoner arrives at an
14 ADC facility, how soon should they be seen by a dentist?
15       MS. FLETCHER: Form, foundation.
16       THE WITNESS: When an inmate arrives, it
17 depends on what's happening with them first of all. So
18 when you're saying how soon should he be seen by the
19 dentist, it depends. I'm not sure what you're really
20 asking.
21   Q.   BY MR. BRANTLEY: Is there a baseline dental
22 report created for each inmate when they come into the
23 ADC system?
24       MS. FLETCHER: Form, foundation.
25       THE WITNESS: The dental would be answering

Page 209

1  that as far as what -- I can tell you that they do get
2  panoramic x-ray when they arrive. But because these
3  intakes, many of them leave quickly, normally they're, as
4  you call it, oral exam. I'm assuming it's checking the
5  mouth, right, as a dentist? A dental oral exam?
6    Q.   BY MR. BRANTLEY: Yes.
7    A.   They would possibly do that when they're at
8  another area because they leave quickly. Usually the
9  longest stay is five days. Some stay longer.
10   Q.   BY MR. BRANTLEY: But do you believe that all
11 inmates in the intake process are supposed to have a pano
12 x-ray taken?
13       MS. FLETCHER: Form.
14       THE WITNESS: It is not my belief. It is
15 what I would -- that would be one of the items I believe
16 that is part of the dental intake. They're doing a
17 fantastic job about that.
18   Q.   BY MR. BRANTLEY: Do you know what an MSDS is?
19   A.   I don't think -- please define it. No.
20   Q.   That's all my question was, is if you knew what
21 it was.
22       What contact, if any, do you have with
23 Dr. Karen Chu?
24   A.   Karen Chu is the dental supervisor over the
25 state. And if I have a question or she has a concern,

## Page 210

1  then that would be our contact. By telephone, email.
2  Usually telephone.
3      Q.  So she's the person in charge of monitoring
4  dental care within ADC?
5          MS. FLETCHER: Form, foundation.
6          THE WITNESS: I believe that -- I understand
7  her to be the dental supervisor. As far as that is her
8  primary, I'm not sure being not privy to the upper
9  management, how they are doing things in upper
10  management.
11     Q.  BY MR. BRANTLEY: Do you know if the dental
12  triage process at Phoenix differs from any other
13  complexes?
14     A.  I wouldn't be able to answer because that's a
15  comparison of the other complexes.
16     Q.  Do you know how the determination is made
17  whether someone needs urgent versus routine care?
18         MS. FLETCHER: Form, foundation.
19         THE WITNESS: I believe the nursing and the
20  intake makes that decision.
21     Q.  BY MR. BRANTLEY: Do you think it's difficult
22  to administer a quick and accurate dental triage system?
23         MS. FLETCHER: Form, foundation.
24         THE WITNESS: My thinking is not relevant.
25  I go back to my job duties and responsibilities of the

## Page 211

1  MGAR evaluation based on the performance measure
2  compliance.
3      Q.  BY MR. BRANTLEY: Do you ever recall expressing
4  concerns over dental care?
5          MS. FLETCHER: Form.
6          THE WITNESS: If it is in the MGAR, I was
7  probably evaluating it as a performance measure, and it
8  was probably listed in the MGAR.
9          MR. BRANTLEY: I introduce Exhibit 156,
10  Bates labeled ADC034754.
11         (Exhibit 156 was marked.)
12     Q.  BY MR. BRANTLEY: Can you please familiarize
13  yourself with this email.
14     A.  Yes, I'm familiar.
15     Q.  And does this appear to be a true and accurate
16  copy of an email communication from Karen Chu to
17  yourself, Jim Taylor, and Richard Pratt on September
18  27th, 2012?
19     A.  Yes.
20     Q.  And the bottom portion of this email where it
21  starts with Helena comma: As far as the current Oral
22  Care section of the MGAR. Do you see that section?
23     A.  Yes, I do.
24     Q.  The bolded questions that are 1, 2, and 3. were
25  those questions you were asking Dr. Chu?

## Page 212

1          MS. FLETCHER: Form.
2          THE WITNESS: I'm not sure because this
3  is -- this email is from her, and it's in a September 27,
4  2012, at 9:09 p.m. even.
5      Q.  BY MR. BRANTLEY: So you're unaware if these
6  three questions were questions you posed to Dr. Chu?
7      A.  I'm not sure.
8      Q.  And you previously indicated that Phoenix has a
9  special unit for mental health patients, correct?
10         MS. FLETCHER: Form.
11     Q.  BY MR. BRANTLEY: That was the Flamenco Unit,
12  correct?
13     A.  Well, you'd have to define "special unit" to
14  me, what you mean by that, before I would answer.
15     Q.  Does Phoenix have a particular unit where
16  mental health patients are housed?
17     A.  Yes.
18     Q.  And as you previously mentioned, that's the
19  Flamenco Unit, correct?
20     A.  The Flamenco Unit.
21     Q.  Do you know whether there is air conditioning
22  or any other cooling system within the Flamenco Unit?
23         MS. FLETCHER: Form, foundation.
24         THE WITNESS: It's cool there. I'm not sure
25  about -- I'm not -- I'm not adept in answering what type

## Page 213

1  of system is there.
2      Q.  BY MR. BRANTLEY: But when you've been in the
3  Flamenco Unit, it's always been cool, you haven't had any
4  circumstances where it's been hot?
5      A.  Yeah, I've been cool. I mean, it's adequate.
6      Q.  Do you know the process by which inmates are
7  transferred to the Flamenco Unit?
8          MS. FLETCHER: Form, foundation.
9          THE WITNESS: I do not know that exact
10  process, no.
11     Q.  BY MR. BRANTLEY: Do you know if there's a
12  waiting list?
13         MS. FLETCHER: Form, foundation.
14         THE WITNESS: I do not know.
15     Q.  BY MR. BRANTLEY: In the Alhambra Unit, do you
16  know who does the mental health screening for arriving
17  prisoners?
18     A.  I do not know who does that. That's Corizon.
19  I mean, I know Corizon does that, but who they staff can
20  change.
21     Q.  And do you have any idea what that mental
22  health screening involves?
23         MS. FLETCHER: Form, foundation.
24         THE WITNESS: I am not exactly sure on all
25  that involves.

Page 214

1    Q.   BY MR. BRANTLEY: Are you aware of anything
2  that it involves?
3          MS. FLETCHER: Form, foundation.
4          THE WITNESS: Again, I want to be very
5  specific and clear on my answers and accurate. I am not
6  at this point in time knowing exactly what they are doing
7  and what it is involving.
8    Q.   BY MR. BRANTLEY: Do you know whether
9  telepsychiatry is used at Phoenix?
10   A.   I do not believe it is used. I have not seen
11 that, but I can't say 100 percent it is not being used.
12   Q.   Do you know whether or not any of the
13 psychiatrists at Phoenix are Corizon employees?
14         MS. FLETCHER: Form, foundation.
15         THE WITNESS: I do not know if they're
16 Corizon full time or if they're -- that, I don't know how
17 that is. It's a Corizon issue.
18   Q.   BY MR. BRANTLEY: And do you handle the
19 monitoring of mental health compliance?
20         MS. FLETCHER: Form, foundation.
21         THE WITNESS: Do I -- I need specifics. Do
22 I handle it?
23   Q.   BY MR. BRANTLEY: Are you in charge of
24 monitoring mental health care compliance at the Phoenix
25 facility?

Page 215

1    A.   No.
2    Q.   Who is?
3    A.   At this point in time I believe it is
4  Dr. Taylor.
5    Q.   As the contract compliance monitor, do you
6  monitor the distribution of mental health medications?
7          MS. FLETCHER: Form.
8          THE WITNESS: Do I monitor distribution --
9  no, I'm not monitoring -- medication -- can you please
10 clarify it, be more specific with that, please.
11   Q.   BY MR. BRANTLEY: Does any aspect of your job
12 as compliance monitor entail reviewing whether or not
13 mental health medications are being distributed
14 correctly?
15         MS. FLETCHER: Form.
16         THE WITNESS: I would probably defer to
17 nursing -- or yes, to nursing.
18   Q.   BY MR. BRANTLEY: And would that be nursing
19 monitor Headstream or would that be nurses at Corizon?
20         MS. FLETCHER: Form, foundation.
21         THE WITNESS: I'm not sure -- if it's
22 regarding monitoring, it's nursing of DOC.
23   Q.   We're getting to the end
24 here, which I'm sure you're pleased about.
25         So you've mentioned that you served as the

Page 216

1  FHA at Tucson, correct?
2    A.   Correct.
3    Q.   And that was between 2010 and 2012, correct?
4    A.   Yes.
5    Q.   And as the FHA, you were in charge
6  administratively for the medical care at the Tucson
7  facility?
8          MS. FLETCHER: Form.
9          THE WITNESS: I believe I've answered the
10 question.
11   Q.   BY MR. BRANTLEY: Do you feel the medical care
12 standards have changed between when you were the FHA and
13 now that medical care has been privatized?
14         MS. FLETCHER: Form, foundation.
15         (Cellphone rings.)
16         MS. FLETCHER: Go ahead and answer his
17 question, and then we'll take a break.
18         THE WITNESS: I am so sorry about that
19 interruption.
20   Q.   BY MR. BRANTLEY: Do you feel the medical care
21 standards have changed between when you were the FHA at
22 Tucson and now that medical care has been privatized?
23         MS. FLETCHER: Form, foundation.
24         THE WITNESS: I do not base my reviews on
25 feelings. I base it on doing my job as being a

Page 217

1  compliance monitor and reporting what I see and working
2  with whoever is there for improvement and moving forward.
3    Q.   BY MR. BRANTLEY: Do you feel the standard of
4  care has changed at all in the last three years?
5          MS. FLETCHER: Form, foundation.
6          THE WITNESS: You would have to -- that, I
7  would need definition for.
8    Q.   BY MR. BRANTLEY: Do you feel medical care has
9  gotten better since it was privatized?
10         MS. FLETCHER: Form, foundation.
11         THE WITNESS: I would need to know the
12 evaluation tool that you are wanting me to refer to to
13 make that kind of a judgment. I'm not really qualified
14 to make that judgment.
15   Q.   BY MR. BRANTLEY: So as the person in charge of
16 administering health care at Tucson and later the
17 contract compliance monitor, you're not really able to
18 make an assessment as whether or not you feel the
19 medical care has improved?
20         MS. FLETCHER: Form. She did not say she
21 administered health care at Tucson. Can you please
22 rephrase that.
23         MR. BRANTLEY: She was in charge of the
24 administration of health care at Tucson.
25         THE WITNESS: Your question is broad. I am

Page 218

1  trying to answer your questions with accuracy. And my
2  thinking is that that is a general question that if the
3  data that I have -- I based my -- I believe I need to
4  base my answers on data and information. I don't have
5  all of the data to make that kind of an assessment.
6          MR. BRANTLEY: Mark this as Exhibit 157.
7  And it's Bates labeled Wexford 000004 through 000131.
8          (Exhibit 157 was marked.)
9          MR. BRANTLEY: Let's go ahead and take the
10 break.
11         (A recess was taken from 3:46 p.m. to
12         3:54 p.m.)
13    Q.  BY MR. BRANTLEY: You have Exhibit 157 in front
14 of you, correct?
15    A.  Yes.
16    Q.
17
18
19
20
21    A.  I have not seen this document previously.
22
23
24         MS. FLETCHER: Form.
25         THE WITNESS:



Page 219

1
2    Q.  BY MR. BRANTLEY:
3
4
5         MS. FLETCHER: Form.
6         THE WITNESS:
7
8    Q.  BY MR. BRANTLEY:
9
10   A.
11   Q.
12
13
14         Do you agree with that statement?
15         MS. FLETCHER: Form, foundation.
16         THE WITNESS: I have not seen this. I'm not
17 going to -- again, this is not something that I can
18 answer.
19    Q.  BY MR. BRANTLEY: In your personal opinion,
20 when you were the FHA at Tucson, did you feel that the
21 medical care being provided at Tucson met constitutional
22 standards?
23         MS. FLETCHER: Form, foundation.
24         THE WITNESS: The question again is
25 requesting certain amount of data and exposure to

Page 220

1  standards and constitutional requirements. I cannot
2  answer that.
3     Q.  BY MR. BRANTLEY: Do you think staffing was
4  better prior to privatization?
5          MS. FLETCHER: Form, foundation.
6          THE WITNESS: I don't have all of the
7  staffing patterns for the comparison. I cannot answer
8  that.
9     Q.  BY MR. BRANTLEY: When you were the FHA at
10 Tucson, do you recall ever being understaffed?
11         MS. FLETCHER: Form, foundation.
12         THE WITNESS: "Understaffing" would need to
13 be defined in regard to operations.
14    Q.  BY MR. BRANTLEY: When you were the FHA at
15 Tucson, do you feel there was enough medical care staff
16 to provide medical care to the prisoners?
17         MS. FLETCHER: Form, foundation.
18         THE WITNESS: As the FHA, I was to operate
19 within the guidelines of what staffing was permitted and
20 given to me from the upper management.
21    Q.  BY MR. BRANTLEY: And do you know whether or
22 not those staffing guidelines have changed after
23 privatization?
24         MS. FLETCHER: Form, foundation.
25         THE WITNESS: I'm not sure. Don't know.

Page 221

1     Q.  BY MR. BRANTLEY: Anyone ever warn you that you
2  were overstepping your bounds as the contract monitor in
3  interfering with the operations of a contractor?
4          MS. FLETCHER: Form.
5          THE WITNESS: You would have to expand on
6  that question, please, clarify.
7     Q.  BY MR. BRANTLEY: Do you ever recall anyone
8  telling you that you were involving yourself in matters
9  that were beyond your job duties while you were the
10 contract compliance monitor at Phoenix?
11    A.  Unclear on "anyone," and it's a vague question
12 to me. Is this Corizon staff? Is this -- oh, sorry.
13    Q.  When you're completing your MGAR reports, do
14 you feel constrained in any way in the types of
15 information you put in the report?
16         MS. FLETCHER: Form.
17         THE WITNESS: Constrained? Please be
18 specific on the meaning of "constrained."
19    Q.  BY MR. BRANTLEY: Do you hold back? Is there
20 information that maybe should go in the MGAR report but
21 you don't put in the MGAR report?
22         MS. FLETCHER: Form.
23         THE WITNESS: I wouldn't know the specifics
24 on information.
25         And you're doing that face again when you

Page 222

```
 1    crinkle your nose.
 2        Q.   BY MR. BRANTLEY:  So you indicated earlier that
 3    the only time you've talked to any lawyers regarding this
 4    lawsuit was in your preparation for this deposition,
 5    correct?
 6        A.   Yes.
 7        Q.   You haven't contacted any lawyers for any other
 8    reason regarding this situation?
 9        MS. FLETCHER:  Form.
10        THE WITNESS:  I'm not sure what situation.
11        Q.   BY MR. BRANTLEY:  This lawsuit.
12        A.   No, I have not contacted lawyers.  I've been
13    only with Ashlee as far as meeting -- or the Struck
14    company.  Is that right?
15        MS. FLETCHER:  Struck Wieneke.
16        THE WITNESS:  Obviously I haven't been
17    meeting enough.
18        Q.   BY MR. BRANTLEY:  Is there anything regarding
19    your observations as the contract compliance monitor at
20    Phoenix that's not contained in the MGAR reports?
21        MS. FLETCHER:  Form.
22        THE WITNESS:  Repeat it, please.
23        Q.   BY MR. BRANTLEY:  Is there anything regarding
24    your observations as the contract compliance monitor at
25    Phoenix that's not contained in the MGAR reports?
```

Page 223

```
 1        MS. FLETCHER:  Form.
 2        THE WITNESS:  Could you be specific on what
 3    observations I'm making on regarding?
 4        Q.   BY MR. BRANTLEY:  No, I'm just asking you
 5    whether or not aside from the MGAR report if there are
 6    any sorts of documents or emails or communications
 7    regarding your observations as the contract compliance
 8    monitor.
 9        A.   Let's say that the MGAR is specific but that
10    the improvements will be -- this is a transition time.
11    I'm not sure if that's what you're meaning.  But the
12    improvements are there and coming.  And what you've given
13    here are some past MGARs as we're going forward, they are
14    on a path of improvement, and I would like that to be
15    noted.  So I don't know if that's come through in the
16    MGARs.
17        Q.   So you believe that the medical care being
18    provided by the private companies has been improving?
19        MS. FLETCHER:  Form, foundation.
20        THE WITNESS:  I'm saying that the -- you
21    asked me previously about what isn't -- what I'm not
22    noting.  I'm saying they're on a path to improvement and
23    improving.
24        Q.   BY MR. BRANTLEY:  Has the administration of
25    medical care changed at all since medical care was
```

Page 224

```
 1    privatized?
 2        MS. FLETCHER:  Form, foundation.
 3        THE WITNESS:  That would be again something
 4    of a comparison question that I would not have enough
 5    data to answer.
 6        Q.   BY MR. BRANTLEY:  So you don't have enough data
 7    to make a judgment as to whether or not you think care
 8    has improved since privatization?
 9        MS. FLETCHER:  Form, foundation.
10        THE WITNESS:  I am not, again, hired for
11    making judgments.  If it's to do with the MGAR, then I
12    report, but I am not making a judgment.
13        Q.   BY MR. BRANTLEY:  Do you think that the medical
14    care should be privatized at the ADC facilities?
15        MS. FLETCHER:  Form, foundation.
16        THE WITNESS:  That is again not within my
17    realm to respond.
18        Q.   BY MR. BRANTLEY:  You don't have any thoughts
19    on it?
20        MS. FLETCHER:  Form, foundation.
21        Q.   BY MR. BRANTLEY:  No personal opinions?
22        MS. FLETCHER:  She hasn't even answered your
23    first question, so wait till she answers, and then you
24    can ask the second question.
25        THE WITNESS:  Both of them were not
```

Page 225

```
 1    questions, they were accusations.
 2        Q.   BY MR. BRANTLEY:  Do you have any personal
 3    opinions as to the quality of health care since the
 4    transition to privatization?
 5        MS. FLETCHER:  Form, foundation.
 6        THE WITNESS:  My personal opinions are not
 7    relevant in doing my job responsibilities.
 8        MR. BRANTLEY:  I have nothing further.
 9        MS. FLETCHER:  Can we take a quick break,
10    and then I'll decide if I have any follow-ups.
11        (A recess was taken from 4:06 p.m. to
12        4:11 p.m.)
13        MS. FLETCHER:  I don't have any follow-ups,
14    so we'll just take our standing order etran.
15        MR. BRANTLEY:  Okay.
16        (The deposition concluded at 4:11 p.m.)
17
18
19
20
21
22
23
24
25
```

Page 226

```
1              SIGNATURE PAGE
2         I, HELENA VALENZUELA, Ph.D., a deponent
   exercising my right to read and sign my deposition taken
3  on August 23, 2013, place my signature hereon and make
   the following changes on this        day of        ,
4  2013.
5         (IF THERE ARE NO CHANGES, WRITE "NONE.")
6
7              HELENA VALENZUELA, Ph.D.
8  PAGE LINE   READS      CHANGE TO      REASON
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 227

```
1  STATE OF ARIZONA  )
                      )
2  COUNTY OF MARICOPA )
3
4         I, CAROLYN T. SULLIVAN, a Certified
5  Reporter, Certificate No. 50528, in the State of Arizona,
6  do hereby certify that the foregoing witness was duly
7  sworn to tell the whole truth; that the foregoing pages
8  constitute a full, true, and accurate transcript of all
9  proceedings had in the foregoing matter, all done to the
10 best of my skill and ability.  Pursuant to request,
11 notification was provided that the deposition is
12 available for review and signature.
13
14         I FURTHER CERTIFY that I am not related to
15 nor employed by any of the parties hereto, and have no
16 interest in the outcome.
17
18         WITNESS my hand this 24th day of August,
19 2013.
20
21
22         Carolyn T. Sullivan, RPR
           Arizona Certified
           Reporter No. 50528
23
24
25
```