**EXHIBIT 11**

**EXHIBIT 11**

 **STRUCK WIENEKE & LOVE**          [ 3100 West Ray Road, Suite 300  Chandler, Arizona 85226   480.420.1600   swlfirm.com ]

Daniel P. Struck
PARTNER

Kathleen L. Wieneke
PARTNER

Rachel Love
PARTNER

Timothy J. Bojanowski
PARTNER

Christina Retts
SENIOR ASSOCIATE

Jamie D. Guzman
ASSOCIATE

Nicholas D. Acedo
ASSOCIATE

Tara R. Zoellner
ASSOCIATE

Amy L. Nguyen
ASSOCIATE

Ashlee B. Fletcher
ASSOCIATE

Courtney R. Cloman
ASSOCIATE

Anne M. Orcutt
OF COUNSEL

Jennifer Holsman Tehrani
OF COUNSEL

David C. Lewis
OF COUNSEL

October 1, 2012

**VIA EMAIL ONLY**

To: All Counsel of Record

Re:     Parsons, et al. v. Ryan and Pratt
        U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

      This letter responds to David Fathi's correspondence of October 1, 2012 regarding 30(b)(6) depositions of the Arizona Department of Corrections.

      Jen Mielke Fontaine will testify on October 10, 2012 regarding Doc. No. 76, Topic 1.  Shaka Okougbo is available to testify on October 18 regarding Doc. No. 80, Topic 2.  Greg Fizer will testify regarding Doc. No. 81, Topics 1, 3-9, 11, 13-14, and 16.  We are checking on Mr. Fizer's availability on October 18. Please confirm whether you intend to depose two witnesses that day.

Sincerely,

*Anne M. Orcutt*

Anne M. Orcutt

AMO/slw
2694286.1
cc:     Dawn Northup, Esq.
        Kelly Dudley

All Counsel of Record
October 1, 2012
Page 2


**Counsel of Record:**

**PERKINS COIE, LLP**
Daniel Clayton Barr:          DBarr@perkinscoie.com
James Anthony Ahlers:         jahlers@perkinscoie.com
Jill Louise Ripke:            jripke@perkinscoie.com
John Howard Gray:             jhgray@perkinscoie.com
Kirstin T. Eidenbach:         keidenbach@perkinscoie.com
Matthew Benjamin du Mee:      mdumee@perkinscoie.com
Thomas Dean Ryerson:          tryerson@perkinscoie.com

**JONES DAY**
Caroline N. Mitchell:         cnmitchell@jonesday.com
Sophia Calderon:              scalderon@jonesday.com
Sarah Rauh:                   srauh@jonesday.com
David C. Kiernan:             dkiernan@jonesday.com
R. Scott Medsker:             rsmedsker@JonesDay.com
John Laurens Wilkes:          jlwilkes@JonesDay.com
Kamilla Mamedova:             kmamedova@jonesday.com
Jennifer K. Messina:          jkmessina@jonesday.com

**Prison Law Office**
Donald Specter:               dspecter@prisonlaw.com
Alison Hardy:                 ahardy@prisonlaw.com
Corene Kendrick:              ckendrick@prisonlaw.com
Sara Norman:                  snorman@prisonlaw.com

**ACLU National Prison Project**
David C. Fathi:               dfathi@npp-aclu.org
Amy Fettig:                   afettig@npp-aclu.org

**ACLU Foundation of Arizona**
Daniel J. Pochoda:            dpochoda@acluaz.org
Kelly J. Flood:               kflood@acluaz.org
James Duff Lyall:             jlyall@acluaz.org

**ACDL**
Jennifer Alewelt:             jalewelt@azdisabilitylaw.org
Asim Varma:                   avarma@azdisabilitylaw.org
Sarah Kader:                  skader@azdisabilitylaw.org

**Office of the Attorney General**
Michael E. Gottfried:         Michael.gottfried@azag.gov

Parsons v. Ryan
Fizer, Greg - 10/29/2012

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;       )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;     )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of   )
themselves and all others similarly )
situated; and Arizona Center for    )
Disability Law,                     )
                                    )
          Plaintiffs,               )
     vs.                            )
                                    )
Charles Ryan, Director, Arizona     )
Department of Corrections; and      )
Richard Pratt, Interim Division     )
Director, Division of Health        )
Services, Arizona Department of     )
Corrections, in their official      )
capacities,                         )
                                    )
          Defendants.               )
                                    )

DEPOSITION OF GREG FIZER

October 29, 2012
9:18 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Page 2

INDEX

WITNESS                                   PAGE
GREG FIZER
  Examination by Ms. Fettig              6
  Examination by Ms. Alewelt             206
  Further Examination by Ms. Fettig      218

REQUESTED DOCUMENTS          PAGE  LINE
By Ms. Fettig                 22    16

INDEX TO EXHIBITS
No.  Description          Bates No.        Page
73  Subpoena served upon      (No Bates)     16
    Greg Fizer

74  Department Order Manual   ADC013837-859  21
    Chapter: 800
    Inmate Management
    Department Order: 801
    Inmate Classification

75  Department Order Manual   ADC013875-910  22
    Chapter: 800
    Inmate Management
    Department Order: 803
    Inmate Disciplinary
    Procedure
76  Department Order Manual   ADC013923-940  23
    Chapter: 800
    Inmate Management
    Department Order: 805
    Protective Segregation
77  Department Order Manual   ADC013911-922  24
    Chapter: 800
    Inmate Management
    Department Order: 804
    Inmate Behavior Control

Page 4

INDEX TO EXHIBITS (Cont.)
No.  Description          Bates No.        Page
86  Department Order Manual   ADC013137-141  137
    Chapter: 900
    Inmate Programs and
    Services
    Department Order: 912
    Food Service

87  Department Order Manual   ADC013967-993  150
    Chapter: 800
    Inmate Management
    Department Order: 807
    Inmate Suicide Prevention,
    Precautionary Watches,
    and Minimum Behavioral
    Control Restraints
88  Department Order Manual   ADC012120-146  183
    Chapter: 500
    Personnel/Human Services
    Department Order: 509
    Employee Training and
    Education

89  ADC Administrative        ADC026924-956  194
    Investigations Unit,
    Administrative
    Investigation Report,
    Case No. 2012-0377
    CONFIDENTIAL INFORMATION -
    SUBJECT TO PROTECTIVE
    ORDER

Page 3

INDEX TO EXHIBITS (Cont.)
No.  Description          Bates No.        Page
78  Department Order Manual   ADC013941-966  25
    Chapter: 800
    Inmate Management
    Department Order: 806
    Security Threat Groups
    (STGs)

79  Department Order Manal    ADC012680-696  26
    Chapter: 700
    Operational Security
    Department Order: 704
    Inmate Regulations

80  ASPC-Florence/Central     ADC018014      63
    Unit, Grievance of
    Robert C. Gamez
    CONFIDENTIAL INFORMATION -
    SUBJECT TO PROTECTIVE
    ORDER
81  Department Order Manual   ADC013994-4005 88
    Chapter: 800
    Inmate Management
    Department Order: 809
    Earned Incentive Program
82  ASPC-Florence, Central    ADC027724-758  94
    Unit & Kasson Mental/
    Behavioral Health Programs
83  Inmate Letter Response to  (No Bates)    96
    Eddie Cano from CO III
    S. Smith, 2/24/2009
84  Department Order Manual   ADC013018-028  97
    Chapter: 900
    Inmate Programs and
    Services
    Department Order: 906
    Inmate Recreation/Arts &
    Crafts
85  Inmate Letter Response to  (No Bates)    116
    Robert Gamez from CO III
    Pittario, 7/13/2011

Page 5

DEPOSITION OF GREG FIZER

The deposition of GREG FIZER was taken on October 29, 2012, commencing at 9:18 a.m., at the law office of PERKINS COIE LLP, 2901 North Central Avenue, Suite 2000, Phoenix, Arizona, before CAROLYN T. SULLIVAN, a Certified Reporter, Certificate No. 50528, for the State of Arizona.

APPEARANCES:

For all Plaintiffs except Arizona Center for Disability Law:

    AMERICAN CIVIL LIBERTIES
    UNION FOUNDATION
    Amy Fettig, Esq.
    915 15th Street, NW
    7th Floor
    Washington, DC 20005-2112

For Arizona Center for Disability Law:

    ARIZONA CENTER FOR DISABILITY LAW
    Jennifer Alewelt, Esq.
    5025 East Washington Street
    Suite 202
    Phoenix, Arizona 85034

For Defendants:
    OFFICE OF THE ATTORNEY GENERAL
    STATE OF ARIZONA
    Katherine E. Watanabe, Esq.
    Michael E. Gottfried, Esq.
    Assistant Attorneys General
    1275 West Washington
    Phoenix, Arizona 85007

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 6

1          GREG FIZER,
2  called as a witness herein, having been first duly sworn
3  by the Certified Reporter to speak the whole truth and
4  nothing but the truth, was examined and testified as
5  follows:
6
7          EXAMINATION
8  BY MS. FETTIG:
9      Q.   Good morning. Thank you for coming today. My
10  name is Amy Fettig, and I'm one of the attorneys
11  representing the plaintiffs in the action Parsons v.
12  Ryan.
13          Would you state your name, please.
14     A.   Greg Fizer.
15     Q.   And what's your employer and title?
16     A.   My employer is Arizona Department of
17  Corrections. My title is deputy warden.
18     Q.   And what's your business address?
19     A.   It's 1305 East Butte Avenue, Florence, Arizona.
20     Q.   Have you ever given a deposition before?
21     A.   Yes.
22     Q.   What case?
23     A.   A Schwartz case and Aguirre case.
24     Q.   Are those the names of the cases?
25     A.   Those are the names v. Department of

Page 7

1  Corrections, correct.
2      Q.   And when was that at?
3      A.   Probably within the last year and a half, both.
4      Q.   And are those the only times that you've ever
5  given a deposition?
6      A.   That I recall.
7      Q.   Have you ever been convicted of a felony or
8  misdemeanor?
9      A.   No.
10     Q.   And you know because you've done depositions
11  before that you're under oath and required to tell the
12  truth today?
13     A.   Yes.
14     Q.   And although you've been in depositions before,
15  first of all, please answer audibly. The court reporter
16  can't record "uh-huhs" or nods of the head.
17          And you need to answer every question unless
18  your attorney instructs you not to. Your attorneys may
19  and probably will object at some points during the
20  deposition. You should still answer anyway unless they
21  instruct you not to.
22          If you're confused by a question or if you
23  think I'm not being clear, just ask me for
24  clarification. Will you agree to let me know if you
25  don't understand me?

Page 8

1      A.   Yes.
2      Q.   And please remember that I'm really just asking
3  you what you know. I'm not asking you to speculate or
4  guess. But keep in mind that I am entitled to your best
5  recollection and best estimates.
6          Also, if during the course of this
7  deposition you remember something that you didn't say on
8  the record and need to supplement your answer, just let
9  me know, and we'll do that. Will you agree to let me
10  know if you have additional information that you recall?
11     A.   Yes.
12     Q.   Also, and this is perhaps the most important
13  thing to keep the court reporter happy, and that's our
14  goal today. Let's not talk over each other today. I
15  have a tendency to do that, and many of us do. So keep
16  that in mind.
17          And finally, is there any reason why your
18  memory might be impaired today?
19     A.   No.
20     Q.   Medications or anything like that?
21     A.   No.
22     Q.   Is there any reason why you can't answer fully
23  and truthfully?
24     A.   No.
25     Q.   Can you tell me how long you've held your

Page 9

1  current position as deputy warden.
2      A.   The assignment at Central Unit or deputy warden
3  title?
4      Q.   How about let's start with the assignment at
5  Central.
6      A.   July of 2009.
7      Q.   And where were you at before that?
8      A.   I've been at five different complexes. Besides
9  Florence, it's Tucson, Safford, Douglas, Yuma.
10     Q.   And what were your positions at those units?
11     A.   Correctional administrator.
12     Q.   Does that mean deputy warden or --
13     A.   That's the formal titles are correctional
14  administrator I, II, III, IV, etc. And I'm currently a
15  correctional administrator IV.
16     Q.   And are deputy wardens all correctional
17  administrators IV?
18     A.   Yes.
19     Q.   So what would be a correctional administrator
20  IV, III, II, I?
21     A.   The informal terms are associate deputy wardens
22  and deputy wardens. And grade 21s are the associate
23  deputy wardens. There are deputy warden levels at 22,
24  23, and 24.
25     Q.   And how long have you been working with the

3 (Pages 6 to 9)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 10

1    Arizona Department of Corrections?
2        A.   I started in 1981, and I've had a break in
3    service for about two years when I was with the Bureau of
4    Prisons.
5        Q.   And when was that?
6        A.   That was from '93 to mid '94.
7        Q.   But other than that period of time with BOP,
8    you've been with Arizona Department of Corrections?
9        A.   Correct.
10       Q.   Since 1981?
11       A.   '81.
12       Q.   What about your work history before working
13   with the Arizona Department of Corrections?
14       A.   I was in the United States Air Force.  And upon
15   my service with the Air Force, I started at college and
16   completed my Bachelor's degree.  Bachelor of Science in
17   criminal justice with a dual major in psychology.
18       Q.   And where was that?
19       A.   Ball State University.  That's where I ended up
20   getting a degree.  I started at Purdue in forestry,
21   actually, and transferred over to criminal justice.
22       Q.   Do you have any other training or certification
23   other than the BS?
24       A.   I went through the academy with the Arizona
25   Department of Corrections.  I went through an academy

Page 11

1    with the United States Air Force.  I went through an
2    academy with the Bureau of Prisons.
3        Q.   Have you ever had any professional license
4    revoked at all?
5        A.   No.
6        Q.   Suspended?
7        A.   No.
8        Q.   Limited in any way?
9        A.   No.
10       Q.   Can you tell me a little bit about your job
11   duties in your current position as deputy warden at
12   Florence-Central.
13       A.   Yes.  As a deputy warden of the unit, you're
14   responsible for all operational security, custody control
15   issues.
16       Q.   And what exactly -- can you explain that in
17   layman's terms what that means.
18       A.   You are responsible for the day-to-day
19   operations with the custody control issues of feeding,
20   recreation, showers, appointments.  You have support
21   service staff that provide auxiliary services.  However,
22   they don't fall under my chain of command.  So I am
23   responsible for the security staff as well as
24   correctional officers who provide case work and
25   programming.  Tasked with those duties and

Page 12

1    responsibilities.
2        Q.   In your capacity as a deputy warden, do you
3    receive grievances at all?
4        A.   Yes.
5        Q.   And at what level?
6        A.   On appeal.
7        Q.   So who does it go to first?  Who is the prior
8    level of review to you?
9        A.   It is the CO IV.  There's an informal process
10   where the inmate will file an inmate letter with the
11   CO III.  The CO III attempts to provide an answer, and
12   then it ultimately then goes to the CO IV.
13       Q.   Do you review HNRs at all?
14       A.   No.
15       Q.   To whom do you directly report?
16       A.   To the warden.
17       Q.   And who do you supervise?
18       A.   The associate deputy warden, the CO IV, which
19   is the Correctional Officer IV position, program
20   supervisor, and two captains.  And then all their
21   subordinate staff.
22       Q.   Okay.  And in your -- in your role as deputy
23   warden, do you have any reporting requirements, like
24   monthly or weekly, daily reports that you have to either
25   approve or write?

Page 13

1        A.   Monthly reports that I send to the warden.
2        Q.   And what do those reports cover?
3        A.   It's an overview of the operations for the past
4    30 days.  Any issues to note in regard to exceptions
5    outside the normal operational procedures, highlights,
6    things that are noteworthy would be brought forth.
7        Q.   What sort of categories would you routinely
8    include in those monthly reports?
9        A.   There is a template that you follow, and it has
10   a variety of issues regarding security, custody, control
11   issues.
12       Q.   And what would be an example of unusual things
13   you would report?
14       A.   A spike in, say, for example, issues regarding
15   staff assaults, inmate assaults, inmate grievances in a
16   particular area, those kind of things.
17       Q.   What are these reports called in the
18   Department?
19       A.   These are the 703 inspection reports.  It's
20   referencing Department Order 703.
21       Q.   And you said it's a template that you fill out?
22       A.   Yes.
23       Q.   Do you have any regularly scheduled meetings
24   during the month?
25       A.   With my supervisor?

GLENNIE REPORTING SERVICES
(602) 266-6535    www.glennie-reporting.com

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 14

1   Q.  Uh-huh.
2   A.  Yes, there are weekly executive staff meetings
3   with the warden where the executive level staff, that
4   being the other deputy wardens and then all the other
5   support service administrators or managers, meet weekly.
6   Q.  And do you have any regularly scheduled
7   meetings that you convene for your subordinates?
8   A.  Yes.  Following the executive staff meeting, I
9   have my own unit management meeting with my management
10  team.
11  Q.  Who's the management team at the Florence Unit?
12  A.  At Central Unit?
13  Q.  Yes, excuse me, Central.
14  A.  That would be myself and those that I supervise
15  that I just mentioned, the CO IV, the two captains.  Also
16  the administrative lieutenant, shift supervisors, day
17  shift and swing shift.  My AA III, which is the
18  administrative associate III position.
19  Q.  What's the purpose of these meetings?
20  A.  To convey information that we've obtained from
21  the executive level staff and any unit issues that we
22  have going on.
23  Q.  And that's a weekly -- on a weekly basis?
24  A.  Yes.
25  Q.  Are there any other regular meetings that you

Page 15

1   convene or that you attend?
2   A.
3   
4   
5   
6   Q.  In your duties as deputy warden, do you have
7   any ongoing training requirements?
8   A.  Yes, I do.
9   Q.  What are they?
10  A.  Every year you have an annual training
11  requirement to meet in those very -- basically year to
12  year.  But it essentially ends up being 40 hours or close
13  to 40 hours of training a year.
14  Q.  And what type of training is this?
15  A.  A variety of subject manners, to include sexual
16  harassment, to include communication, to include CARE, to
17  include use of force, to include firearms training, those
18  type of things.
19  Q.  In your weekly meetings with your staff, do you
20  document these meetings?  Is there any memorandum
21  produced as a result?
22  A.  Meeting minutes are produced.
23  Q.  And in your meeting with the warden, do you
24  also have meeting minutes?
25  A.  Yes.

Page 16

1   Q.  And how about the Friday meetings?
2   A.
3   
4   
5   
6   Q.  Are you familiar at all with the Parsons
7   lawsuit?
8   A.  Yes.
9   Q.  What do you know about it?
10  A.  I was involved in a teleconference when there
11  was a meeting regarding some of the issues regarding
12  Parsons v. Ryan, and then I've read the suits.
13  Q.  You read the complaint?
14  A.  Yes.
15  Q.  And you know today we're here because of the
16  Parsons lawsuit?
17  A.  Yes.
18  Q.  I'm going to hand you what I believe will be
19  marked Exhibit 73.
20       (Exhibit 73 was marked.)
21  Q.  BY MS. FETTIG:  So this is the subpoena for
22  your attendance here today, correct?
23  A.  Yes.
24  Q.  Did you review any documents in preparation for
25  your testimony today?

Page 17

1   A.  Yes, I did.  Department orders.
2   Q.  What were they specifically?
3   A.  804, 801.
4   Q.  Anything else?
5   A.  No.
6   Q.  Did you speak to anyone in preparation for the
7   deposition today?
8   A.  I spoke with Mike.
9   Q.  Anyone besides your attorneys?
10  A.  No.
11  Q.  Did you do anything else to prepare for today's
12  deposition?
13  A.  No.
14  Q.  So if you'll turn just to page 5 of this
15  attachment, it's labeled 5 at the bottom.  Paragraph 21.
16  It's a definition of isolation.  And I would just ask you
17  to review that.
18       So that definition of isolation refers to
19  confinement in a cell for 22 hours or more in a day or
20  confinement in the Eyman-Special Management Unit 1,
21  Eyman-Browning Unit, Florence-Central Unit,
22  Florence-Kasson Unit, or Perryville-Lumley Special
23  Management Area or confinement in a Complex Detention
24  Unit, CDU.  And that's the definition we're using in this
25  lawsuit to encompass all of these units and confinement

5 (Pages 14 to 17)

Parsons v. Ryan
Fizer, Greg – 10/29/2012

Page 18

1  in isolation, and so that's the shorthand for the
2  definition in the subpoena. Is that clear?
3      A.  It's clear. It's just a term that we haven't
4  used for a number of years.
5      Q.  Is it -- go ahead.
6      A.  And there really are two different issues
7  here. You're noting a custody level issue as well as a
8  temporary placement for detention reasons, and you're
9  combining the two.
10     Q.  Are you referring to the complex detention
11  unit?
12     A.  Yes.
13     Q.  And so during the course of this deposition,
14  when there's something special about CDUs versus the
15  other units, we'll try to cover that.
16     A.  Okay.
17     Q.  And if you want to flag it, please do.
18         So in your role as the deputy warden at the
19  Florence Unit, are you aware of any policies and
20  procedures that govern the detention or release of
21  prisoners from isolation?
22     A.  Release from detention, there is a couple
23  policies that cover release from detention. Detention is
24  an area where we house inmates temporarily for a variety
25  of reasons. It may be that we need to remove inmates

Page 19

1  from general population for their own protection while we
2  review their concerns for safety. That's covered under
3  Department Order 805. So we'll take those inmates,
4  remove them immediately, conduct an interview, and then
5  the system begins the process.
6         Following completion of that process,
7  there's a review out of Central Office to make a
8  determination of appropriate status of the inmate. The
9  inmate may appeal that status. Once that's completed,
10  then the final decision is made, and the inmate then is
11  referred to Central Classification that then places the
12  inmate based on the decisions of the Protective
13  Segregation Unit. That's how the inmate is entered into
14  detention and released from detention under that process.
15         Then we have inmates that enter detention
16  for disciplinary reasons. Assaults, for example. If an
17  inmate assaults another inmate and he's determined to be
18  a safety security risk to the unit, he's removed from
19  general population and placed in detention, much like a
20  jail concept. He's removed then, and the process begins
21  with discipline. And there's so many steps involved in
22  the discipline, and the inmate is afforded those due
23  process notices.
24         Once that's completed, the decision is made
25  by the disciplining hearing officer, again, the inmate

Page 20

1  may appeal. Following that, the decision is finalized,
2  and then that's referred to classification. The decision
3  is made again on the placement of the inmate.
4         There's a separate policy for discipline
5  with that. And it also involves classification, which is
6  a separate policy.
7         Then there's the assignment to detention
8  based on any possible criminal offenses. And this is
9  then where the inmate is removed from general population
10  he's served a notice that he's under investigation for
11  possible criminal charges, and he's placed in detention
12  for up to 30 days while our Criminal Investigation Unit
13  begins their investigation. At the conclusion of that,
14  the inmate is either released from detention or his due
15  process is afforded him for court hearings and/or an
16  inmate disciplinary process is invoked, and a decision is
17  based then on placement, and he's released from
18  detention.
19         Those cover detention. If you're talking
20  about the custody level of maximum custody, the release
21  from maximum custody is all covered under the
22  classification policy.
23     Q.  Let's take a look at some policies so that I
24  make sure I understand the system.
25         So I'm going to hand you what should be 74,

Page 21

1  and it's Department Order 801, Inmate Classification.
2         (Exhibit 74 was marked.)
3     Q.  BY MS. FETTIG: So, Deputy Warden Fizer, is
4  this the inmate classification policy and procedure you
5  were referring to?
6     A.  Yes.
7     Q.  And this -- who does this govern in terms of
8  where folks are classified?
9     A.  This covers all inmates in the Department of
10  Corrections. All inmates are classified, and their
11  custody level is determined by the classification
12  process.
13     Q.  Would this policy cover prisoners at your unit?
14     A.  Yes.
15     Q.  And how about the other maximum security units?
16     A.  Yes.
17     Q.  Can I ask you to turn to page 21. And this is
18  also ADC01358. And at the very bottom in the section
19  you'll see it says Implementation.
20     A.  Yes.
21     Q.  It mentions the Inmate Classification Technical
22  Manual.
23     A.  Yes.
24     Q.  Is that a document that guides placement?
25         MS. WATANABE: Can you wait a second while

6 (Pages 18 to 21)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

| Page 22 |
|---|

1  pull it up online.
2        (Discussion off the record.)
3    Q.   BY MS. FETTIG: Deputy Warden, down at the
4  bottom of page 21 under the paragraph Implementation,
5  there's a reference to Inmate Classification Technical
6  Manual.
7    A.   Yes.
8    Q.   Is this manual used in order to determine an
9  inmate's entry into an isolation unit?
10   A.   Yes.
11   Q.   This paragraph also mentions the inmate custody
12 manual. Is this referencing the same classification
13 manual or is this a different document?
14   A.   It's the same.
15   Q.   All right.
16       MS. FETTIG: And I don't believe that that
17 classification manual has been produced to us. We would
18 ask for that to be produced.
19       MS. WATANABE: I'll go through the
20 production requests.
21   Q.   BY MS. FETTIG: Now I'm going to hand you
22 another policy and procedure, and I want you to let me
23 know -- let's mark this as Exhibit 75.
24       (Exhibit 75 was marked.)
25       MS. WATANABE: Which policy is it?

| Page 23 |
|---|

1        MS. FETTIG: And it's DO 803, Inmate
2  Disciplinary Procedure.
3    Q.   BY MS. FETTIG: Deputy warden, is this a policy
4  that you were referring to in your discussions of inmates
5  being detained in detention?
6    A.   Yes.
7    Q.   And would this -- first of all, is this policy
8  current?
9    A.   Yes.
10   Q.   And would this policy be used to classify
11 individuals into and out of detention?
12   A.   Yes.
13   Q.   So this is going to be marked 76, and it's DO
14 805, Protective Segregation.
15       (Exhibit 76 was marked.)
16   Q.   BY MS. FETTIG: Deputy Warden, you referred to
17 protecting the safety of inmates in detention, especially
18 vulnerable inmates. Is this the policy you're referring
19 to, DO 805?
20   A.   Yes.
21   Q.   Does this policy cover their placement into
22 protective segregation?
23   A.   Yes.
24   Q.   Are there any other policies that are used to
25 determine whether or not a prisoner needs protective

| Page 24 |
|---|

1  segregation?
2    A.   No.
3    Q.   And just to double check that this 805 is
4  actually the current 805?
5    A.   Yes.
6    Q.   To your knowledge?
7    A.   Yes.
8    Q.   Almost done. I'm just trying to get all these
9  in.
10       77. This is DO 805, Inmate Behavior
11 Control. It's going to be marked Exhibit 77.
12       (Exhibit 77 was marked.)
13   Q.   BY MS. FETTIG: Deputy Warden, would you take a
14 look at this Department Order 804. And let me know
15 whether or not this order bears any weight on whether or
16 not prisoners are classified to an isolation unit or a
17 detention unit?
18   A.   Yes.
19   Q.   Which unit?
20   A.   It concerns the coverage of detention. It
21 concerns the operation and required services of inmates
22 in detention.
23   Q.   And is this the current policy?
24   A.   Yes.
25   Q.   I'm going to hand you another policy. And it's

| Page 25 |
|---|

1  DO 806, Security Threat Groups. And that will be 78.
2        (Exhibit 78 was marked.)
3    Q.   BY MS. FETTIG: Can you tell me if this policy
4  is used to either determine classification to an
5  isolation unit, admittance, retention, or release?
6    A.   It covers the security threat groups and the
7  appropriate placement of those inmates just pending
8  validation hearings and the subsequent validation
9  hearings, yes.
10   Q.   Subsequent to validation hearings, would
11 prisoners be held in isolation units?
12   A.   Yes. In terms of a discipline unit -- excuse
13 me, not discipline, but a detention unit and then
14 appropriately placed, once the validation appeal process
15 is ended, it will go back to classification.
16       Q.   Are all inmates who are validated as a security
18 threat group member placed
19   A.
20   Q.   So you never have those individuals, for
21 example
22   A.   There is one exception.
23
24
25                                              That's

7 (Pages 22 to 25)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 26

1  the only exception I'm aware of.
2      Q.   And is that policy current as far as you know,
3  the one that's been marked as Exhibit 78?
4      A.   Yes, it is.
5      Q.   Finally, I'm going to give you what will be
6  marked 79.  And that's DO 704, Inmate Regulations.
7          (Exhibit 79 was marked.)
8      Q.   BY MS. FETTIG: Deputy Warden, could you review
9  this policy and let me know if it's the current version
10 of DO 74.
11     A.   Yes, it is.
12     Q.   And would this policy play any role in the
13 placement, retention, or release of prisoners in the
14 Arizona Department of Corrections from an isolation or
15 into an isolation unit?
16     A.   It's designed not so much for that.  It's
17 designed to cover the operational issues of inmates
18 really at any custody level, their housing, in terms of
19 what's required in grooming and dress and the standards
20 of our housing area and some of the operational
21 activities and events that occur in the various custody
22 levels.
23     Q.   Were you involved at all in the development of
24 these policies?
25     A.   No.

Page 27

1      Q.   Can you tell me what prisoners who are placed
2  in protective segregation, what units they are placed
3  into?
4      A.   ████████████████████████████████████████
5  ██████████████████████████████████████████████████
6  ██████████████████████████████████████████████
7      Q.   And do their privileges and programming
8  opportunities reflect their custody level or their
9  housing?
10     A.   Their custody level.
11     Q.   Would the policies that we've just discussed,
12 perhaps with the exception of DO 704, govern
13 classification to isolation units as we've defined them
14 here statewide?
15     A.   Yes.
16     Q.   Can you tell me how a prisoner comes to be
17 classified into your unit Florence-Central?
18     A.   Inmates that enter the system with a heinous
19 cream, such as capital offense, is classified as maximum
20 custody for the first two years of their placement, and
21 they're housed in either Eyman or Florence.  And there
22 they will remain for a minimum of two years.
23         Inmates at the lower custody levels, who,
24 through disciplinary process have elevated their custody
25 status with classification discipline, will end up in

Page 28

1  maximum custody.
2      Q.   And is the procedure you've just described to
3  me, is that fairly consistent across maximum security
4  units?
5      A.   Yes.
6      Q.   Can you tell me what custody overrides are
7  under ADC policy?
8      A.   That's designed to keep them to a minimum
9  because we operate an objective classification system.
10 But the design is to allow certain exceptions to the
11 objective standards for inmates that we feel need to have
12 a higher security level.
13         In the event of that, what is usually
14 required is that we have the special security unit, the
15 SSU units, provide us documentation of the predatory
16 behaviors of the inmate, the assaultive behavior of the
17 inmate, behavior that's a risk to the safety and security
18 of the unit.  Any corroborating information, reports that
19 we have with that.
20         They're then classified, and a
21 recommendation is made by the deputy warden and warden,
22 and it's sent to Central Classification to make the final
23 disposition.  There's also overrides from a higher
24 custody level down before the minimum requirements are
25 met.  Classification is all based on points.  There's a

Page 29

1  number of questions that are answered on a matrix.  And
2  based on the final tally of points determines what
3  custody level the inmate goes to.
4          At the higher custody levels, if the inmate
5  doesn't meet the threshold for reducing down to close
6  custody, which is the next level below max, sometimes
7  exceptions are requested based on the performance of the
8  inmate or his involvement in treatment programs or
9  special programs.  And that, too, follows the same
10 process.  The deputy warden must recommend it, the warden
11 recommends it, and then it goes to Central
12 Classification.
13     Q.   Are these custody overrides tracked anywhere?
14     A.   Yes.  It's all recorded in our automated inmate
15 management system, AIMS.
16     Q.   So is there any oversight of these custody
17 overrides on a regular basis?  Sort of annual review?
18     A.   Every six months.  Overrides are reviewed every
19 six months.  It's a trigger that is set up in the
20 software program where these inmates that are overrides
21 will pop up on a screen, the DI 95 screen, and alert the
22 program staff, the CO IIIs, CO IVs that this inmate needs
23 to be classified.
24     Q.   Can you tell me just how often -- in your
25 professional experience how often do custody overrides

8 (Pages 26 to 29)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 30

1  occur that would place someone into an isolation unit
2  from a lower custody setting?
3      A.  To a maximum custody level from close custody
4  or medium, the overrides aren't that often.  They do
5  occur -- I don't have a percentage to offer you, but it's
6  less frequent that the objective scoring system because
7  our main goal was to obtain the necessary documentation
8  through the regular process to validate that he needs to
9  be at higher custody.  But there are an occasional
10  situations for whatever reasons that we weren't able to
11  invoke disciplinary process or weren't successful in
12  disciplinary process, and we've had to use what we call
13  intell information to elevate their custody.
14      Q.  So are there circumstances where an individual
15  would have internal risk score lower than 5 and a
16  discretionary override would be used to elevate their
17  custody on an isolation unit?
18      A.  To a maximum custody unit, yes.
19      Q.  And can you give me an example of when that
20  might happen?
21      A.  Inmates that may present predatory behavior in
22  lower custody units, that's the most frequent override
23  request.  That's when we have inmates who threaten other
24  inmates, who will basically chase other inmates into 805
25  process.  For whatever reason, an inmate may appear on a

Page 31

1  unit that their past history or their committing offense
2  or even past offenses are intolerable to the general
3  population.  So that group of inmates, the race, it's it's
4  driven by race in terms of who needs to correct this
5  inmates's placement in terms of the inmate concept of
6  what's acceptable or not.
7          So if a white inmate appears and he has a
8  tainted history, another white inmate will be asked to
9  chase him off the unit.  Most times, then those inmates
10  will set up a history or pattern of chasing other inmates
11  off.  And through the 805 process where we interview
12  these inmates who requested protection, we'll determine a
13  common name.  And once that's established that there's a
14  repetitiveness to this same name and same type of
15  behaviors and same type of maneuver by the inmate, then
16  we will have SSU focus on them and try to provide as much
17  information about their activities, behaviors,
18  associations, and such with the predatory behavior.  And
19  then we'll classify them.
20      Q.  In custody overrides, is the mental health
21  status of the prisoner ever considered a factor?
22      A.  It is considered a factor, but it's not the
23  driving force.  In other words, inmates of higher needs,
24  such as the mental health scores of 3, and the range is 1
25  through 5, may be placed at any custody level.  Those

Page 32

1  with classification need scores of 4 or higher are
2  separated out to strictly mental health unit.
3      Q.  Would there be a circumstance or are you aware
4  of a circumstance in which an inmate who had an MH 4 or
5  MH 5 would be subjected to a custody override increasing
6  his or her custody level?
7      A.  I'm not familiar with that.  I have not dealt
8  with that.
9      Q.  Prior to placement in isolation units, are
10  mental health staff consulted?
11      A.  Mental health staff are consulted when
12  classifications are done.  That's at the annual reviews
13  or a six-month review for the overrides.  Well, they are
14  consulted for the appropriate score.
15      Q.  And what do you mean by appropriate score?
16      A.  A referral was done that this inmate has come
17  up with his annual review, and we're looking for the
18  mental health's assessment of where this inmate's current
19  mental health needs score is at.
20      Q.  So you ask whether or not they're an MH 3 or MH
21  4, 5, etc.?
22      A.  We ask for an assessment.
23      Q.  And do you know what the nature of that
24  assessment is?
25      A.  I don't.

Page 33

1      Q.  Okay.  Prior to an inmate being classified to
2  an isolation unit, for example, at Florence-Central,
3  before they end up there, are mental health staff
4  consulted in any way?  Are they part of -- I guess I'm
5  asking, are they part of the classification process?
6      A.  No.  It's more of a referral process, like I
7  just spoke of.  But in terms of the decision making,
8  again, it's all based on objective matrix that's
9  completed, and then reviews are done through the
10  operations staff.  It's not a driving force unless, of
11  course, we have an inmate who has a mental health score
12  of 4 or higher, then that would require special attention
13  and involve classification as well as mental health and
14  medical decision involved.  If it's 3 or lower, they are
15  not involved other than providing the assessment of their
16  current score.
17      Q.  So if you have a prisoner who's an MH 4 and
18  they've been recommended for classification to an
19  isolation unit, then you bring in mental health staff or
20  reach out to --
21      A.  I don't have any inmates 4s at Central Unit.
22  Those individuals generally go to the designated mental
23  health units.
24      Q.  Have you ever had any MH 4s at Central?
25      A.  I don't recall having an MH 4.  I can tell you

9 (Pages 30 to 33)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 34

1  if we did, we would immediately contact our mental health
2  staff about the appropriate placement of that individual.
3      Q.   If someone showed up at your unit and you
4  noticed they had an MH 4, you would reach out to your
5  mental health staff?
6      A.   That's not done.  That would really be very
7  improbable because there's such a review process about
8  movement, and decisions are made and reviewed and
9  rereviewed before placements are made.
10     Q.   And what policy governs that involvement of
11 mental health staff if you've got an MH 4 prisoner?
12     A.   Again, I've not had that experience, but
13 typically, mental health staff I would think would be
14 immediately involved in pulling the inmate in and doing
15 an assessment if he in fact does warrant a mental health
16 placement of 4.  And then I imagine immediate contact
17 would be made with the mental health staff at the
18 respective mental health units that house those custody
19 levels, and he would be moved.
20     Q.   Do you know if that policy or procedure is in
21 writing anywhere?
22     A.   I don't for sure.  There are Department Orders
23 that cover mental health, and I would imagine it's in
24 there, but I don't know that for sure.
25     Q.   When you are evaluating someone at their

Page 35

1  six-month annual review -- or I guess it's a yearly
2  review.
3      A.   Six-month for overrides and one year for the
4  normal classification.
5      Q.   When those reviews come up to decide whether or
6  not you're going to retain someone in an isolation unit,
7  are mental health staff consulted then?
8      A.   That's where we do the referral to see if they
9  still warranted the mental health score of 3.
10     Q.   So as part of your review, whether it's
11 six-month or annual, you reach out to mental health staff
12 to find out what their score is?
13     A.   Yes.
14     Q.   And is that part of a departmental order or
15 policy that you're aware of it?
16     A.   Used to be.  I don't know for sure if it's in
17 this current policy.
18     Q.   But that's your practice at Central?
19     A.   Yes.
20     Q.   Do you know if it's the policy at the other
21 isolation units?
22     A.   I think so.  I don't know for sure.
23     Q.   Can you tell me what criteria you use to retain
24 a prisoner in an isolation unit?
25          MS. WATANABE:  Objection.  That's kind of

Page 36

1  vague what you mean by retain.
2          BY MS. FETTIG:  To keep them classified to the
3  isolation unit as opposed to moving them to a lower
4  custody.
5      A.   Inmates won't leave maximum custody until their
6  scores are lowered sufficiently to meet that threshold to
7  reduce down to close custody.
8      Q.   And how do they accomplish that?
9      A.   They do that through a period of time
10 primarily.  Once they're classified to maximum custody,
11 it takes a period of time to reduce the points low enough
12 to obtain the threshold necessary for close custody and
13 not be involved in disciplinary violations.  In other
14 words, show positive institutional adjustment during that
15 period of time.
16     Q.   And what's the policy that governs that
17 evaluation?
18     A.   801.
19     Q.   Can you take a look at actually DO 704, which
20 is 78, I believe.  Page 10.
21          I think I have the wrong reference, but I
22 wanted to ask you, does Central Unit have a phase
23 program?
24     A.   We do.
25     Q.   And can you tell me about it.

Page 37

1      A.   The phase program started in -- just about the
2  time I got to Central Unit.  It was already under way in
3  terms of development.  I ended up implementing it.  It
4  started in the latter part of July of 2009.  The idea was
5  to start as a pilot project where we allowed select
6  inmates, based on select criteria, to participate in a
7  program in Cell Block 2 where they would be allowed group
8  recreation on the recreation field of no more than 52
9  inmates.  The number 52 comes from allowing two tiers of
10 26 inmates each to be turned out for recreation.
11          Allow secondly inmates who would be involved
12 in supervised work activities, unrestrained on the
13 Central Unit, to allow inmates in maximum custody on this
14 program to have contact visits on the weekends, and to
15 allow these inmates to turn out to the kitchen for their
16 evening meal unrestrained.  Again, no more than 52
17 inmates at the time.
18          That has evolved to -- it was started as a
19 90-day pilot and has continued to provide us with a
20 transition of inmates from maximum custody to close
21 custody.  It has also helped prepare these inmates for
22 release.  And it allows these inmates to begin
23 resocializing in a more open type of environment than
24 normally maximum custody does.
25     Q.   So I found the reference.  Page 10, 1.2.7.  And

10 (Pages 34 to 37)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 38

1 can you tell me, is that still consistent with the
2 definition -- the criteria, is that still consistent with
3 the phase program as it now exists?
4     MS. WATANABE: 1.2.7?
5     MS. FETTIG: Yes. It starts: Maximum
6 Custody inmates being considered for the Central Unit's
7 Phase Program shall meet the following criteria.
8     THE WITNESS: I have two page 10s.
9  Q. BY MS. FETTIG: I'm sorry. It's ADC012689.
10     A. It is correct, with the exception of the last
11 one, 1.2.7.6. It's Cell Block 2 instead of Cell Block 7.
12     Q. And can you tell me, when did this program
13 start?
14     A. July 2009.
15     Q. And how many prisoners at a time are in the
16 program?
17     A. Up to 152.
18     Q. Is that all prisoners at Florence-Central?
19     A. We also take inmates that we screen that are in
20 maximum custody at the Browning Unit and also the SMU.
21     Q. Do those other units have a phase program like
22 you have at Florence-Central?
23     A. They do not.
24     Q. So is this the only phrase program of its kind?
25     A. It is Central Unit.

Page 39

1     Q. In your experience at Florence-Central and
2 throughout your career with the Arizona Department of
3 Corrections, have you found that isolation or placement
4 in an isolation like Florence-Central has a negative
5 impact on some prisoners?
6     A. Maximum custody, by its very design, takes
7 inmates and separates them to ensure the safety of
8 themselves and other inmates. Some inmates respond
9 differently than other inmates to those type of
10 situations. We're pretty fortunate at Central Unit and
11 that the majority of the cell blocks are an open concept
12 and that allows a lot of socialization. So we don't
13 observe the deterioration issue that may exist at the
14 other maximum custody units.
15     Q. And when you say that the cell blocks are open,
16 what exactly do you mean?
17     A. It's the old physical plant design with the
18 open cell fronts rather than bars. We have four cell
19 blocks like that, and then we have two other cell blocks
20 that are closed cell fronts. We also have the Kasson
21 cell block that used to be its own entity, but now it's
22 part of a cell block that's on the Central Unit that also
23 has more of a closed cell front but has windows, large
24 windows, to allow ample amount of visibility. Those are
25 the cell block designs that typically are used to

Page 40

1 restrain inmates at that level and provide more
2 socialization than the new concept of the SMUs.
3     Q. You mentioned that individuals who are at
4 maximum custody due to custody overrides are reviewed
5 every six months and others are reviewed annually. Is
6 there any circumstance in which individuals would be
7 reviewed more or less?
8     A. No. Those are two driving time periods or time
9 frames when reviews are normally done. If, for example,
10 we had an inmate involved in some sort of disciplinary
11 process and ended up with a major violation and such, if
12 we end up with the inmate in the 805 process and he's
13 finalized that and/or the criminal investigation process
14 and that's been finalized, those three processes would
15 also involve classification.
16     Q. And who does these reviews?
17     A. It starts with the CO III, the Correctional
18 Officer III. And they will meet with the inmate, and
19 they and the CO IVs then will make a determination on the
20 placement. They then will process the paperwork and send
21 it to the deputy warden. And then the deputy warden
22 sends it to the warden. Both are recommendations. And
23 then that's sent to Central Office for final disposition.
24     Q. So is it the case that Central Office gives the
25 final sign-off on these decisions?

Page 41

1     A. Yes.
2     Q. And where are these reviews documented?
3     A. There's classification forms that are completed
4 for all max custody hearings.
5     Q. Are there any reports that are generated that
6 review decisions to retain prisoners in isolation units
7 at all?
8     A. I'm not sure what...
9     Q. Are there any -- at the administrative level,
10 there are any reports that take a look at decisions to
11 either retain an individual in isolation or to place them
12 in a lower custody setting?
13     A. Each review produces a maximum custody packet
14 of documents, and that goes to the unit deputy warden and
15 the complex warden. That's the review process for each
16 and every inmate. There's also AIMS screens, the
17 Automated Inmate Management System, that provides
18 documentation in terms of what the classification levels
19 were, what the points were assigned. There's also the
20 needs score. There's a variety of basically screens that
21 indicate the various aspects of the classification.
22     There's also, as I referred to earlier, a
23 screen that produces a review time frame for inmates
24 coming up for classification that month that need to be
25 seen. You can also go back on prior histories and

11 (Pages 38 to 41)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 42

1  produce that. If you want to know how many inmates in
2  your unit, for example, are already reduced to close
3  custody and awaiting transportation and bed space
4  availability in close custody, there's a screen that you
5  can access that will produce that.
6        MR. GOTTFRIED: Go off the record for a
7  minute.
8        (Discussion off the record.)
9    Q. BY MS. FETTIG: Can you tell me if there are
10  any reports generated in the aggregate that demonstrate
11  the length of stay in an isolation unit?
12   A. I don't believe there is.
13   Q. So as the deputy warden at Florence-Central,
14  you can't pull up a roster that tells you how long each
15  prisoner at that has been at your unit?
16   A. Individually, but not in aggregate.
17   Q. The length of stay at your unit or at any
18  isolation utility, is that ever a consideration in the
19  decision to retain someone?
20   A. No.
21   Q. Under ADC policy, is there any maximum amount
22  of time a prisoner may spend in an isolation unit?
23   A. No.
24   Q. How about minimum? Is there a minimum amount
25  of time?

Page 43

1    A. For the lifers, they must spend two years.
2    Q. And how about individuals who are on a custody
3  override?
4    A. Six months.
5    Q. Any other policy that covers how long someone
6  minimally has to stay in isolation?
7    A. No.
8    Q. Can we take a look at DO 801 again. And I
9  believe that should be Exhibit 74. Paragraph 1.9. It
10  says: After 180 days from Maximum Custody approval, the
11  inmate shall be reviewed annually unless an event occurs
12  that will result in a reduction in custody.
13   A. What page are you on?
14   Q. ADC013853.
15       MS. WATANABE: What's the regular page
16  number?
17       MR. FETTIG: The regular page number is 16.
18       THE WITNESS: And which line are you on?
19   Q. BY MS. FETTIG: 1.9.
20   A. Okay.
21   Q. Can you tell me what -- it says: The inmate
22  shall be reviewed annually unless an event occurs that
23  results in a reduction in custody.
24       Can you give me an example of when that
25  might happen?

Page 44

1    A. I've not had that happen. I don't know what
2  that would be.
3    Q. Okay.
4    A. I'm sorry. If we end up with an inmate going
5  back to court and his committing offense that drove him
6  to that level is reduced, that will change his points.
7  So he'll come back from court and be reclassified based
8  on the new charges for the committing offense.
9    Q. So upward or downwards?
10   A. Downwards if it's less than.
11   Q. So in terms of aggregate reporting of prisoners
12  in the isolation units, what type of reports, if any, are
13  generated to let prison administrators know who is up for
14  review?
15   A. The AIMS screen.
16   Q. So it's just by individual --
17   A. No.
18   Q. -- or 30 days? I'm sorry.
19   A. Yes. It's the aggregate screen you pull up,
20  and it indicates who needs to be seen for the next 30
21  days. I do believe it goes longer than 30 days, but 30
22  days is what we typically look at.
23   Q. At Florence-Central Unit, do you know what the
24  average length of stay for prisoners is?
25   A. I don't.

Page 45

1    Q. Any idea what the median length of stay might
2  be?
3    A. I don't.
4    Q. So length of stay -- is it the case that length
5  of stay is not something you as a prison administrator at
6  Florence-Central generally track?
7    A. No, I don't.
8    Q. Can a prisoner be released directly from an
9  isolation unit to the community?
10   A. Yes.
11   Q. How often does that happen, do you know?
12   A. I don't have a frequency.
13   Q. You talked a little bit about the architecture
14  of Florence-Central Unit. I want to go back to that.
15  Can you tell me what the average size of a cell is at
16  Florence-Central?
17   A. The cell blocks were built at different dates.
18  The oldest one is Cell Block 2. It was activated in
19  1930. It has the smallest cell space. I don't know
20  exactly the square footage in it. Just roughly guess,
21  and this is strictly a guess, it's probably 6 feet by 7
22  feet. Very small. Then we had three other cell blocks
23  built after that then in the '50s and '60s, they were a
24  little bit larger. I don't have the size of those. And
25  then 5 and 7 were built in the latter part of the '70s.

12  (Pages 42 to 45)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 46

1  It seems like there's a little more room in there.
2  Again, I don't have the cell sizes on those. All of the
3  inmates in Central Unit are single cell versus double
4  cell. And then the Kasson Unit was built in the late
5  '70s and early '80. And the size of the
6  cells are similar to what 5 and 7 are, and I don't have
7  the size.
8      Q.  Do you have any idea what the size of the cells
9  at the SMU or Browning Unit are?
10     A.  I toured Browning one time, and the cells there
11 seem to be much larger than the cells at Central Unit.
12     Q.  And how about the SMU?
13     A.  I haven't toured the SMU.
14     Q.  Have you been to the Perryville-Lumley Special
15 Management Area?
16     A.  I have not.
17     Q.  And how about in the complex detention units,
18 what are the size of those cells, do you know?
19     A.  The complex detention unit for Florence is
20 housed at Kasson cell block, and the cells are the same
21 size as the general population cells at Kasson cell
22 block.
23     Q.  At Florence-Central, can you tell me, do any of
24 the cells have windows to the outside?
25     A.  They all do.

Page 47

1      Q.  And so can you -- do prisoners have access to
2  sunlight?
3      A.  Oh, yes. Yes.
4      Q.  Do you know how large the windows are?
5      A.  No, I don't.
6      Q.  We talked a little earlier about the nature of
7  the doors and the fronts of the cells. Are there any
8  units or pods at Florence-Central Kasson Unit where the
9  door is solid?
10     A.  Yes. We still have -- we still have doors in
11 Wing 2 and 3 that have the solid doors. Now, the door is
12 solid, but the cell front has the windows in it. Long,
13 linear windows.
14     Q.  So are they floor to ceiling or what are the
15 size of these windows?
16     A.  It's floor to -- it's the cell front, door to
17 ceiling.
18     Q.  So can you see into the entire cell through
19 those windows?
20     A.  Yes.
21     Q.  At Florence-Central, are prisoners able to
22 control the lighting in their cells?
23     A.  Yes.
24     Q.  Night and day?
25     A.  We have a security light that is in the cell

Page 48

1  blocks that we keep on, and it's not the same
2  illumination as during the day. The securities lights
3  are by design to provide less illumination but are
4  adequate to get a good visual of the inmate to make sure
5  he's okay. And so from 10 until 6 in the morning, we end
6  up with the security lights versus the normal
7  illumination of cell blocks.
8      Q.  In the cells of Florence-Central, what kind of
9  furniture are in them?
10     A.  Some have metal stools and metal tables. Other
11 ones have concrete stools and tables and beds.
12     Q.  And are there any shelves or places to put
13 things?
14     A.  There are metal shelves and concrete shelves,
15 yes.
16     Q.  How about the other -- cells at the SMU or
17 Browning, do you know what those look like at all?
18     A.  I have toured there, and I know they have
19 tables. I believe -- I don't really know if it's
20 concrete. I'm really not that familiar with it to be
21 able to adequately and accurately state.
22     Q.  Do you know if there are policies and
23 procedures that govern the cleaning of cells --
24     A.  Yes.
25     Q.  -- at Florence-Central?

Page 49

1      A.  Yes.
2      Q.  And at the isolation units generally?
3      A.  Yes.
4      Q.  What are those policies and procedures?
5      A.  They're found in 704. The inmate needs to keep
6  his cell clean. He also needs to make his bed, and he
7  needs to have his -- a number of boxes are allowed, four
8  boxes maximum, and they're to be lined up. And basically
9  the cell is to be maintained in a clean, neat appearance.
10     Q.  Are these policies and procedures for isolation
11 units different than the general population prisons?
12     A.  No.
13     Q.  So they're the same?
14     A.  Same.
15     Q.  At Florence-Central, are there any post orders
16 that govern the cleaning and cleanliness of the cells in
17 the units?
18     A.  Yes.
19     Q.  What are they?
20     A.  The post orders that cover the floor officer
21 positions and the cell block positions all have the
22 description of that in them.
23     Q.  And is there any documentation of cleanliness
24 in each prisoner's cell or on the unit generally?
25     A.  There is documentation that's done in the

13 (Pages 46 to 49)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 50

1  journal if we end up with inmates that don't meet the
2  standards of sanitation for their cells. Also
3  information reports will be done, and our disciplinary
4  violations will be done.
5     Q.   And what is the journal?
6     A.   It's a correctional journal. It's maintained
7  at the desk in each cell block.
8     Q.   And who mains that?
9     A.   The desk officer.
10    Q.   To your knowledge is this a consistent practice
11 across the isolation units in the Arizona Department of
12 Corrections?
13    A.   I don't know if it is at Browning, SMU, and
14 SMA.
15    Q.   When prisoners are taken out of their cell at
16 Central Unit, can you tell me what the restraint policy
17 is.
18    A.   They first are strip searched, and then they
19 are restrained with handcuffs behind their back.
20    Q.   And does --
21    A.   And then escorted by an officer.
22    Q.   By one officer?
23    A.   Yes.
24    Q.   So this procedure applies to anytime the
25 prisoner leaves his cell?

Page 51

1     A.   With the exception of our inmates in Cell Block
2  2 and the inmates in Cell Block 1, who are also part of a
3  special program.
4     Q.   And is this the phase program that we discussed
5  earlier?
6     A.   Cell block 2 is the phase program.
7     Q.   And Cell Block 1 --
8     A.   It's a program that has enhanced mental health
9  access.
10    Q.   And what's the policy for those units?
11    A.   The 704 is listed here concerning the criteria
12 to get into Cell Block 2. And the exceptions for the
13 escort are provided by a memorandum to the director, who
14 has signed off on the exceptions.
15    Q.   And what are the exceptions?
16    A.   They were the -- I already described four
17 liberties that were allowed in the Cell Block 2 program:
18 to allow them to go to recreation, to allow them to work,
19 to go to contact visits, and to have evening meal in the
20 chow hall. Those are the four exceptions.
21        In Cell Block 1, they were allowed to go to
22 an unrestrained classroom to participate in groups. They
23 also are allowed to go to the rec field and contact
24 visits and the chow hall.
25    Q.   So for Cell Block 1 and 2, when would they

Page 52

1  actually be restrained and subject to strip searches?
2     A.   At times whenever they were making movement
3  other than those four times.
4     Q.   And the strip search policy that applies to
5  everybody who's not in Cell Block 1 and Cell Block 2,
6  where is that written?
7     A.   It's in the post orders.
8     Q.   Is there a post order number or do you know any
9  details on that?
10    A.   I don't know the number.
11    Q.   And to your knowledge, the strip search policy
12 that generally applies to prisoners at Central, is that
13 consistent across the other isolation units?
14    A.   It should be.
15    Q.   And would that be contained in their post
16 orders?
17    A.   Yes.
18    Q.   Can you tell me how prisoners at Florence and
19 potentially at the other isolation units, how are they
20 able to communicate with staff?
21    A.   They can communicate with them when the staff
22 are in the cell blocks. They can interact face to face
23 at that point. Staff make movement in those cell
24 blocks. This would be program staff, medical staff. The
25 security staff minimally check on them every 30 minutes

Page 53

1  Supervisors, management team tours. Religious service
2  personnel. Even our teachers and librarians will go into
3  the cell blocks and interact with staff. They also can
4  write an inmate letter to any staff member and
5  communicate in writing.
6     Q.   Is the inmate letter a special form?
7     A.   Yes.
8     Q.   And how do they get access to that?
9     A.   Through either the officer or the CO III.
10    Q.   And when would they be able to speak with the
11 officer or the CO III?
12    A.   You mean by asking for communication from the
13 inmate letter, or are we talking about just
14 walk-throughs?
15    Q.   Let's talk about the walk-throughs. When does
16 that happen?
17    A.   Every 30 minutes, the officer who works the
18 floor and the cell block must make a check on the
19 inmate. It's a concept called continuous motion. And
20 the idea is to keep moving through the cell blocks. But
21 minimally they need to make contact and walk in front of
22 every cell and check on the inmate every 30 minutes.
23    Q.   And where is that documented?
24    A.   In the journals.
25    Q.   And what does the contact involve?

14 (Pages 50 to 53)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 54

1    A.   They may walk by, they may talk with the
2  individual inmates, or they may just walk by and be
3  solicited by the inmate for any requests or any issues.
4  They look in at the inmates each cell as they pass by.
5    Q.   And do you know if this constant movement, the
6  30-minute checks, is this consistent across all of the
7  isolation units?
8    A.   It should be.
9    Q.   And is that governed by a policy?
10    A.   Yes.
11    Q.   What policy is that?
12    A.   I think it's in 704.
13    Q.   Do we want to take a look at 704 and see if we
14  can find it.
15        Now, I see that there is a -- on page 9,
16  12688, and that's the ADC number, there's the housing
17  unit inspection, 704.07. But I don't see the 30-minute
18  checks that you mentioned.
19    A.   No, I don't either. It must not be in this
20  policy.
21    Q.   But it's your belief that the continuous
22  movement 30-minute checks is consistent to ADC policy?
23    A.   Yes, it is. It's in one of the policies. I
24  thought it was this one.
25    Q.   Would it be in a post order as well?

Page 55

1    A.   It would be in a post order.
2    Q.   And what oversight is in place to ensure that
3  these 30-minute checks happen?
4    A.   The journals are reviewed by the shift
5  commander, by the captain, the associate deputy warden,
6  and myself.
7    Q.   And how often does that occur?
8    A.   Daily.
9    Q.   If there's an emergency situation, how can a
10  prisoner in an isolation unit communicate with staff?
11    A.   They can talk to the staff member when they
12  walk by. They could yell for assistance or help.
13    Q.   Are these 30-minute checks consistent across
14  all shifts on all days?
15    A.   Yes.
16    Q.   You mentioned supervisory personnel on the
17  units. How often does policy require that an
18  administrator might be on an isolation unit?
19    A.   I'm not sure what you're -- you're asking if
20  there's a policy that talks of tours or what?
21    Q.   Let me rephrase that. How would a prisoner in
22  an isolation unit access supervisory personnel?
23    A.   He could either talk to them when they're
24  walking through on a tour or he could write an inmate
25  letter.

Page 56

1    Q.   And how often would they walk through the unit
2  on a tour?
3    A.   That varies.
4    Q.   Is there no policy that requires a specific
5  amount of time or period on each day or each week or each
6  month where supervisory personnel have to be on an
7  isolation unit?
8    A.   Department Order 703 does talk about
9  institutional tours by chief security, CO IV's, ADWs, and
10  deputy wardens.
11    Q.   And what does that require?
12    A.   It requires two tours for every shift per
13  month.
14    Q.   And where is that recorded?
15    A.   In the 703 reports.
16    Q.   And that's the report that you do on a monthly
17  basis?
18    A.   Correct.
19    Q.   So in order to affirm that, you would look at
20  the unit logs or how would you record that?
21    A.   To affirm that others have done that? They
22  send the reports to me. And then collectively, I take
23  their reports and mine and send it to the warden.
24    Q.   Okay. At Central, are prisoners awoken during
25  night shifts if, when staff are doing their rounds, they

Page 57

1  can't see their face or their hands?
2    A.   If they can't see their face during a formal
3  count, they ask them to take the sheet or blanket down,
4  whatever it is covering their face, so they can see their
5  face.
6    Q.   And what policy is that part of?
7    A.   There's a policy for counts. I think it's
8  701. It covers the formal counts and making sure you're
9  doing a positive photo ID to face check.
10    Q.   So for supervisor personnel, you mentioned that
11  they have to be on the unit every -- twice a month; is
12  that correct?
13    A.   No. I'm talking about the captains, the CO IV,
14  the ADW. It speaks of that in 703. The shift
15  commanders, the lieutenants and the sergeants are coming
16  out in those cell blocks daily throughout their shifts.
17    Q.   So is there a policy that requires a daily
18  walk-through by supervisory staff?
19    A.   Their post orders require them to walk through
20  the cell blocks.
21    Q.   But to your knowledge there's no ADC policy?
22    A.   Policy, no.
23    Q.   So in addition to these 30-minute checks, are
24  there any other rounding requirements for correctional
25  staff?

15 (Pages 54 to 57)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 58

1    A.  No, that's it.
2    Q.  Is there any policy that requires a minimum
3  amount of human interaction with prisoners on isolation
4  units?
5    A.  No.
6    Q.  Is there any requirement that correctional
7  officers, when they do their rounds, speak to the
8  prisoners?
9    A.  A requirement that they do?
10    Q.  Uh-huh.
11    A.  If they're training that they do, I don't --
12  there isn't a policy that says you have to talk to the
13  inmates when you're walking around. It's just -- it's
14  common practice. Training emphasizes the need to
15  communicate with the inmates. It's the best way to be
16  able to gain respect from both ways and cooperation. The
17  officers all know that, that the best management approach
18  with inmates is through effective communication. The way
19  to establish that is you establish communication line
20  with each and every inmate in the cell block so that you
21  can have this line of respect, courtesy, and dignity in
22  communication efforts and cooperation with the inmates.
23    Q.  Based on your experience as an administrator at
24  Central Unit, do you have any estimates on the amount of
25  interaction a prisoner in your unit might have with a

Page 59

1  staff member on any given day?
2    A.  How many minutes? That depends on the
3  inmates. It varies widely.
4    Q.  What would cause it to vary?
5    A.  Just personalities.
6    Q.  When your staff are doing their rounds, do they
7  wear any kind of protective gear?
8    A.  Yes, they do.
9    Q.  What do they wear?
10    A.  They wear a stab-proof vest, and they also wear
11  eye goggles.
12    Q.  And to your knowledge do mental health staff
13  wear the same kind of protective gear?
14    A.  When they're on the units.
15    Q.  And you said eye goggles. What do they look
16  like?
17    A.  They're clear lens glasses.
18    Q.  So not like a shield --
19    A.  Not a face shield.
20    Q.  And do they carry a plastic shield at all or --
21    A.  No. Plastic face shields are available at the
22  Kasson cell block, but staff usually choose not to wear
23  those. They prefer the eye goggles.
24    Q.  Are you aware of any policies that govern the
25  access to programming for prisoners in isolation?

Page 60

1    A.  The maximum custody inmates are allowed to
2  participate in special education programs, the SPED
3  programs. Other than that, state law doesn't allow them
4  to participate in education classes. There are
5  programming opportunities through closed circuit TV, and
6  that includes self-improvement classes as well as
7  education classes. Those education classes being along
8  those lines of mandatory literacy and preparation for
9  GEDs.
10    If an inmate wants to obtain his GED while
11  in maximum custody and he's not special education, he can
12  take the CCTV coursework, prepare for the GED, request to
13  be able to take the GED exam. If he has the funds to pay
14  for that, there will be a pre-GED test administered by
15  our education staff. If he passes it, then he'll be
16  allowed to submit a fund disbursement for the payment of
17  the exam, and then he will be allowed to take the exam.
18    The self-improvement classes they can watch
19  on CCTV, and they can fill out a program packet
20  information that supplements the viewing of the program
21  information.
22    Q.  For CCTV program, is that only available to
23  prisoners who have television?
24    A.  With the exception of inmates in Cell Block 1
25  . There is CCTV programming in Cell Block 1 for the

Page 61

1  inmates along those lines of whatever group counseling
2  topic is in session. We've just finished up the anger
3  management. We've moved to substance abuse. Those
4  modules are both on CCTV. To be able to allow all
5  inmates access to that CCTV information, we have done a
6  request for an exception of policy to allow loaner
7  televisions to be provided to inmates in CB 1. So mostly
8  the inmates have to purchase their own televisions.
9  However, if they are in a special program like CB 1,
10  exceptions are granted.
11    Q.  And do you know if the CCTV programming access,
12  is that consistent across isolation units in ADC?
13    A.  CCTV is available at Florence and Eyman both.
14    Q.  And is it only available to prisoners who have
15  a television in those units?
16    A.  Yes.
17    Q.  Do prisoners in the isolation units have any
18  access to work opportunities?
19    A.  The inmates in the phase program and also the
20  inmates in CB 1 have opportunities to work. We also have
21  an enhanced behavioral health program at the Kasson Unit
22  in Wing 1, and there are a few inmates who are involved
23  in work programs there as well.
24    Q.  And how many prisoners are in the Kasson Unit?
25    A.  Total is 200.

16 (Pages 58 to 61)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 62

1    Q.   Are they all in the enhanced program?
2    A.   No. 64. Wing 1 houses the special program.
3    Q.   And do they have any additional education
4  access?
5    A.   No.
6    Q.   How about addiction services?  Is that
7  available to anybody in isolation units?
8    A.   As I was speaking of, the inmates that take the
9  CCTV coursework for substance abuse, they can complete
10 the paperwork manuals that facilitate the CCTV
11 programming information.  And then in CB 1, those inmates
12 are currently going through groups that are facilitated
13 with the topic being substance abuse.
14   Q.   And how about the other prisoners at
15 Florence-Central?
16   A.   Just through CCTV.
17   Q.   How about for all prisoners at Florence, who
18 has access to mental health groups or counseling?
19   A.   I can only speak of the Central Unit, and that
20 would be the inmates in the Wing 1 at Kasson and the CB 1
21 program at the main yard.
22        MS. ALEWELT:  Can we take a break.
23        (A recess was taken from 10:50 a.m. to
24        10:59 a.m.)
25        (Exhibit 80 was marked.)

Page 63

1    Q.   BY MS. FETTIG:  I hand you what's been marked
2  as plaintiffs' Exhibit 80.  And it appears to be a
3  prisoner grievance.  Does that look like the form that
4  you would be -- that would be used at the
5  Florence-Central Unit?
6    A.   Yes.
7    Q.   And the prisoner's name is Robert Gamez?
8    A.   Yes.
9    Q.   And under the signature, it says G. Fizer,
10 Deputy Warden.  Is that your signature?
11   A.   Yes.
12   Q.   The date is 12/2 I believe '09?
13   A.   '09, yes.
14   Q.   The third paragraph, it says:  Dr. Holly also
15 states there are no mental health groups available at
16 Central Unit but you can request to be seen individually
17 by mental health staff.
18   A.   Yes.
19   Q.   Is that consistent with ADC policy to not have
20 mental health groups available?
21   A.   Yes.  It's not really a policy not to have
22 groups.  I mean, there isn't a policy that says you have
23 to exclude them at maximum custody.  But by the very
24 nature of maximum custody, the inmates are restrained.
25 And trying to facilitate a group with inmates that are

Page 64

1  restrained like that is challenging.  However, just
2  recently with the movement of the mental health
3  programming at Central Unit both in CB 1 and Wing 1, we
4  have developed the group counseling programs.  And that
5  started in July.
6    Q.   Of this year?
7    A.   For CB 1 and probably I'm thinking August for
8  Kasson.
9    Q.   And that's August of 2012?
10   A.   Yes.
11   Q.   But other than the prisoners who are in Wing 1
12 and CB 1 at the Central Unit --
13   A.   We've been doing groups with the CB 2 inmates
14 since the beginning of the program.
15   Q.   And that's -- is this the phase program you're
16 referring to?
17   A.   Yes.  Now, those groups are the
18 self-improvement groups.  We don't necessarily have
19 mental health staff attending those, but there are groups
20 for reasons of self-improvement.
21   Q.   Who runs the self-improvement groups?
22   A.   The CO IIIs.
23   Q.   And so let me just get this straight.  And I
24 apologize for my confusion.  CB 2 is the phase program?
25   A.   Yes.

Page 65

1    Q.   And is it correct that that's been in place
2  since 2009?
3    A.   July 2009, yes.
4    Q.   And did you initiate that program?
5    A.   It had started prior to my getting there.  A
6  lot of the -- a lot of the planning and the written kind
7  of structure, formatting of the way the operations would
8  be run was in place.  And once I got there, I was
9  introduced to it and then implemented it.
10   Q.   And for CB 2, that's -- how many folks are in
11 that again?
12   A.   152.
13   Q.   For Cell Block 1 and Wing 1, these are the new
14 programs?
15   A.   Newer programs.
16   Q.   And these folks are there because of their
17 mental health issues primarily?
18   A.   Correct.
19   Q.   But for CB 2, is mental health not a factor?
20   A.   It doesn't exclude them from participation in
21 that program, but that wasn't the design of the program.
22   Q.   Just because my memory is so poor, Cell Block
23 1, how many folks are in there?
24   A.   There's 120 beds.
25   Q.   And Wing 1?

17 (Pages 62 to 65)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 66

1    A.  64.
2    Q.  So is it accurate to say other than the folks
3 in Cell Block 1, Wing 1, and CB 2, they fall under the
4 general policy of no mental health groups as reflected in
5 Exhibit 80?
6    A.  Correct.
7    Q.  And do you know, is that -- is that policy
8 consistent across the other isolation units?
9    A.  I don't know. I do know that there has been an
10 interest in having enhanced mental health programming
11 available at all the maximum custody units, but I don't
12 know where they're at with that.
13    Q.  And to your knowledge, is there any other
14 program at the other isolation units like the CB 2
15 program?
16    A.  CB 2 is unique. It's the one and only. Now,
17 we -- as I was saying, we will screen inmates from
18 Browning and SMU to participate in that program. We take
19 inmates from all male custody facilities into that
20 program.
21    Q.  For all of the prisoners at Central Unit, are
22 there any other rehabilitation services available that we
23 haven't discussed so far?
24    A.  Well, it depends on what you mean by
25 rehabilitation. There's a variety of concepts for

Page 67

1 rehabilitation.
2    Q.  Any program that we haven't discussed?
3    A.  Any structured program with objective goals and
4 such, there is the transition program synonymous with
5 prerelease programming. We do facilitate that program at
6 Central Unit, and that's done by the CO IIIs. And what
7 we do is our CO IIIs will meet with our inmates who are
8 near release, six months to release, and they'll provide
9 them with the documents, the self-paced self-study
10 documents to read through and make their entries on and
11 process and then assist them with any questions that they
12 have on that.
13    Q.  So this is an individual program, it's not a
14 group program?
15    A.  It's not a group.
16    Q.  And is this transition program available for
17 all prisoners?
18    A.  At Central Unit.
19    Q.  At Central Unit?
20    A.  That are near release.
21    Q.  And do you know if that transition programming
22 piece is consistent across all the isolation units?
23    A.  I don't.
24    Q.  And the transition program, would that be
25 synonymous with what some people call discharge planning?

Page 68

1    A.  Well, prerelease, yeah, it's synonymous with
2 that.
3    Q.  For prisoners who weren't in Cell Block 1 or
4 Wing 1 or CB 2, are there any opportunities for
5 congregant activity with other prisoners?
6    A.  The recreation facilities that are set up have
7 adjoining recreation enclosures. And whenever the
8 inmates turn out for recreation in those enclosures, it's
9 loud. They're communicating with each other. That's
10 part of the -- I'm sure they see that as part of the
11 benefit, going out there and being able to communicate
12 with each other.
13    Q.  So let's talk about the recreation policies.
14 For recreation availability of exercise, what are the
15 policies that govern that for prisoners who are in
16 isolation units, do you know?
17    A.  906 covers recreation. And the inmates, other
18 than those in those programs at Central Unit, go to a
19 recreation enclosure which is outside. To protect them
20 from the sun, we have sunscreen, and we have a misting
21 system. They're also provided two water jugs. I'm going
22 to approximate I believe it's a quart size each. And we
23 also have carts out there with water jugs on them, and we
24 will -- every 30 minutes during a check that they need to
25 have water replenished, we do that. But in those

Page 69

1 enclosures, they'll have calisthenics, run in place, and
2 they'll do isometrics.
3    Q.  So you mentioned Department Order 906. Do you
4 know what the title of that is?
5    A.  I don't.
6    Q.  I'm going to show you some policies that we
7 were given in the discovery process. Actually, I want
8 you to take a look at DO 704, which I believe has been
9 entered as 79.
10    And if you would turn to page 13. At
11 704.10, that's near the bottom. It says: Inmate
12 Exercise Enclosures (Maximum Custody/Detention/Mental
13 Health Units).
14    A.  Uh-huh.
15    Q.  Would this apply to your unit at Florence, this
16 section?
17    A.  Yes.
18    Q.  And at 1.1, it says: Inmates, with the
19 exception of those listed in 1.7 of this section, shall
20 be afforded six hours of outdoor exercise weekly.
21    To your knowledge is that the policy that
22 you use?
23    A.  Yes.
24    Q.  And are these exercise opportunities given in
25 two-hour blocks three times weekly?

18 (Pages 66 to 69)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

| Page 70 |
|---|

1    A.   Yes.
2    Q.   As it's practiced at your unit, is exercise
3  always outside?
4    A.   Yes.
5    Q.   Do you have any indoor enclosures?
6    A.   We do not.  Well, we have holding enclosures
7  indoors.  We don't have recreation enclosures indoors.
8  The inmates choose to recreate in their cells, though.
9  You'll frequently see that during the day when you tour.
10  The same type of exercises, running in place,
11  calisthenics.
12    Q.   Any exercise equipment available?
13    A.   No.
14    Q.   For any of the inmates?
15    A.   In CB -- for the inmates in the Kasson mental
16  health program, for those that are allowed to go out to
17  the group enclosures, at this point there's four, there
18  is a basketball goal out there.  And those inmates can
19  participate in basketball.  That's the only inmates at
20  Central Unit.
21    Q.   How large are the outdoor enclosures?
22    A.   The individual enclosures?
23    Q.   Uh-huh.
24    A.   I believe they're 10x10.  I don't have exact
25  measurements, but I believe they're 10x10.

| Page 71 |
|---|

1    Q.   And do they have any shade?
2    A.   Yes, the sunscreen.
3    Q.   So what does that look like?
4    A.   You'll see it in patios of restaurants and
5  various things.  It's a sunscreen that filters out -- it
6  depends on what type you buy.  You can purchase various
7  types of screen, a percentage of the sun rays.  But it
8  will allow sunlight but so there's natural illumination,
9  but it blocks most of the harmful rays from coming in and
10  overheating the inmates in those enclosures.
11    Q.   And the enclosures themselves, are they -- what
12  material are they made of?
13    A.   Expanded metal.
14    Q.   What is that?
15    A.   It's a metal steel mesh type of material.  It's
16  the diamond-shaped materials.
17    Q.   So you can see out of it?
18    A.   Oh, yes.  In and out.
19    Q.   And are all of the outdoor enclosures at
20  Central Unit designed the same?
21    A.   Yes.
22    Q.   Are you aware of what the outdoor enclosures
23  look like at the other isolation?
24    A.   I'm aware of what they look like at Browning.
25    Q.   And who do they look like?

| Page 72 |
|---|

1    A.   They're concrete-walled enclosures with an open
2  roof other than a steel mesh over the top of the concrete
3  enclosure.
4    Q.   Is there any shade in those units?
5    A.   I don't know if they put sunscreen on top of
6  that.  I don't remember sunscreen being on there.  But I
7  know that 704 requires that anytime an inmate has to be
8  outside in an enclosure, there has to be some type of
9  water supply and misting as well as the sunscreen.
10    Q.   So who -- so it's your understanding that 704
11  governs outdoor exercise for all prisoners in isolation
12  units?
13    A.   The type of facility they're in and what
14  cooling systems are in place and hydration systems.
15    Q.   Does it govern the amount of time that they are
16  allotted for exercise on a weekly basis?
17    A.   That and 804.  804 speaks of it as well.
18    Q.   Let's take a look at 804.  And that is Exhibit
19  77, I believe.  If you would turn to page 3.
20    A.   Here it is.
21    Q.   So about halfway down the page, there's
22  1.2.6.5, opportunity for exercise outside the cell.
23    A.   Uh-huh.
24    Q.   Which prisoners does this policy govern
25  exercise access for?

| Page 73 |
|---|

1    A.   The detention inmates.
2    Q.   And this policy says:  The opportunity to
3  exercise outside the cell for a minimum of two hours on
4  three different days of each week.
5    A.   Yes.
6    Q.   Whereas, 704 says:  Be afforded six hours of
7  outdoor exercise weekly.
8    A.   Yes.
9    Q.   Does that mean for detained prisoners, they
10  don't have access to outdoor exercise under 704 -- or 804?
11    A.   I don't believe there's -- let me just say
12  this:  Of the five complexes I was at assigned to, they
13  all had outdoor recreation enclosures for detention.  I
14  don't believe there's any complex detention unit that
15  doesn't have an outdoor recreation facility.
16    Q.   So is it your understanding of exercise policy
17  for prisoners who are in isolation units, whether it's
18  maximum security or detention units, that they all have
19  six hours of exercise outdoors?
20    A.   Yes.
21    Q.   That's the minimum?
22    A.   Yes.
23    Q.   Other than 906 which you mentioned and 704 and
24  804 Department Order, are there any other policies that
25  govern access to exercise for prisoners in the isolation

19 (Pages 70 to 73)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 74

1  units?
2      A.  I don't believe so.
3      Q.  And in all of these units, is it your
4  understanding that prisoners are given two-hour blocks
5  are exercise on three different days?
6      A.  Yes.
7      Q.  That's true across the system?
8      A.  Right.
9      Q.  How do you record that this exercise is
10  actually occurring or the opportunity is given?
11      A.  On the security journals in the cell blocks.
12      Q.  And is this the correctional journal that you
13  mentioned earlier?
14      A.  Yes.
15      Q.  And who reviews the incidence of exercise or
16  the availability of exercise on each unit?
17      A.  Let me back up a minute.  For detention units,
18  each inmate has an individual detention record.  And it's
19  a seven-day recording of all activities and of services
20  provided the inmates in detention.  That's a statewide
21  policy.  It's in 804.  It covers all the activities from
22  medical to CO IIIs to cell cleanings to showers,
23  exercise, everything.  Inmates in maximum custody, the
24  showers and recreation are documented in the correctional
25  journals.  Those journals are reviewed during the daily

Page 75

1  briefing Monday through Friday that is conducted by the
2  management team.  And they review the journals.
3      Q.  So on a daily basis, you review whether or not
4  exercise is being offered to prisoners; is that correct?
5      A.  Right.
6      Q.  So based on your personal review of these
7  records, what's your sense of how often prisoners are
8  getting access to exercise?  Are they following the
9  policy, your staff?
10      A.  Oh, yes, daily.  You would certainly know if
11  you weren't allowing inmates out to exercise in maximum
12  custody.
13      Q.  How would you know?
14      A.  Things like mail, food, exercise, and showers
15  are things of premier importance to these inmates.  And
16  you would know.  There would be problematic issues.
17  Beyond that, I require the shift commanders communicate
18  with me via email and give me a summary of what their
19  staffing is like at the beginning of shift.  And I know
20  how many rec team members I have and that the rec turns
21  are being conducted at the beginning of the shift.  And
22  then at the conclusion of the shift, I require them to
23  submit a summary of the day's activities, to include
24  recreation, showers, cell cleanings, etc.
25      Q.  So these are your personal requirements?

Page 76

1      A.  Yes.
2      Q.  Do you know if that kind of requirement is
3  mandated in other isolation units?
4      A.  I don't know.
5      Q.  Do you know if exercise equipment is available
6  at any of the other isolation units?
7      A.  I don't know.
8      Q.  You mentioned that water is available at the
9  Florence-Central Unit in the outdoor enclosures.
10      A.  Yes.
11      Q.  Do you know if that's a consistent practice or
12  policy in other isolation units?
13      A.  It is a policy.
14      Q.  So water is required?
15      A.  A continuous water supply is required.
16      Q.  And you also mentioned the mister system.  And
17  I believe -- let's take a look at 704, which is Exhibit
18  79.  Page 14.  1.6.  Outdoor exercise enclosures shall
19  have either a mister system or evaporative cooler system
20  for temperatures that exceed 100 degrees.
21      A.  Yes.
22      Q.  So this is something you got at
23  Florence-Central?
24      A.  Yes.
25      Q.  To your knowledge is that consistent policy

Page 77

1  across ADC?
2      A.  Yes.
3      Q.  Every isolation unit has a mister system?
4      A.  Any outdoor enclosure has a misting system.
5      Q.  To your knowledge what policies or procedures
6  ensure that these cooling systems are working and being
7  operated?
8      A.  What policies?  Just the fact that it's
9  required in 704.
10      Q.  And is there any oversight of these systems to
11  ensure that they operate?
12      A.  Oh, yes.
13      Q.  What would that be?
14      A.  That's the shift commanders ensure that they
15  are working.  Once it reaches the required level or the
16  temperature level, then the misting systems are turned
17  on, and then that's recorded.  And then during the
18  30-minute checks, it's continually documented.
19      Q.  So it's documented in the 30-minute checks, and
20  then it's recorded.  Where would it be recorded?
21      A.  In the correctional journal.  At Central Unit,
22  it's with tower 13.
23      Q.  And that's a particular post?
24      A.  It's the main tower in the middle of the main
25  yard.

20 (Pages 74 to 77)

（空白）

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 78

1    Q.   Other than the misting systems and the
2  availability of water, are there any other precautions
3  that are taken to prevent heat exposure or heat-related
4  illness for prisoners during recreation?
5    A.   The sunscreen, the misting system, and
6  replenishing of the water for hydration. That's it.
7    Q.   Do you know if sunscreen is available for
8  prisoners to buy at the commissary?
9    A.   I believe it is. I believe it is. I know at
10 lower custodies, in fact, it is.
11   Q.   But for isolation units like Florence-Central?
12   A.   I believe it is. I just don't know of any
13 inmates that use that. They're not exposed to the direct
14 sun in those enclosures. We have the sunscreen over the
15 top. I don't recall if it is permitted.
16   Q.   Do you know if there are any special
17 precautions taken for severely mentally ill individuals
18 who are in these isolation units when they go outside?
19   A.   If there's a special needs order for them not
20 to be exposed to heat or the sun, then they're given
21 those provisions in a special needs order. And those
22 special needs orders are accommodated.
23   Q.   And the special needs order would come from the
24 Mental Health Department?
25   A.   Mental health through medical, yes.

Page 79

1    Q.   And how would they be accommodated?
2    A.   Depending on what the order is.
3    Q.   For heat, are you aware of the accommodations
4  made for --
5    A.   There is none at Central Unit.
6    Q.   Can you tell me if there's any circumstance in
7  which a prisoner in an isolation unit wouldn't be allowed
8  to engage in outdoor exercise?
9    A.   No.
10   Q.   When a prisoner is in outdoor exercise, what
11 kind of supervision is there?
12   A.   There are the checks that are done, the
13 30-minute checks.
14   Q.   Of the outdoor enclosures?
15   A.   And the inmates.
16   Q.   So when they're in the outdoor enclosure, part
17 of the 30-minute check is to go outside or to view the
18 enclosure?
19   A.   The enclosures are walked around by the
20 security staff member, and he checks on each and every
21 inmate. And then that's reported back to tower 13 via
22 radio, and that's recorded.
23   Q.   Are staff instructed to observe whether
24 prisoners might be suffering from some sort of heat
25 exposure during the two hours?

Page 80

1    A.   Oh, yes, absolutely.
2    Q.   Is this written someplace?
3    A.   It's part of the health and welfare. It's
4  termed health and welfare check on inmates. And the
5  concept of health and welfare is to make sure that we
6  don't have any medical conditions that would warrant the
7  attention of medical staff.
8    Q.   So the health and welfare, is that a different
9  check than the 30-minute check, or is it subsumed by it?
10   A.   It's all part of it.
11   Q.   So is there a specific post order that --
12   A.   It's in the post order.
13   Q.   That they need to check on individuals
14 potentially suffering heat-related illness or just
15 general health and welfare?
16   A.   General medical condition of the inmates. Any
17 security concerns that we may have.
18   Q.   And during these health and welfare checks, are
19 correctional officers instructed to ensure that there's
20 water available?
21   A.   Yes.
22   Q.   So they have the primary responsibility for
23 that?
24   A.   Yes.
25   Q.   And would that be recorded in the correctional

Page 81

1  journal?
2    A.   Yes.
3    Q.   Under what circumstances would outdoor exercise
4  be cancelled?
5    A.   If our staffing levels aren't sufficient to
6  provide safe and secure escorts of these inmates, it
7  would be cancelled.
8    Q.   And is that part of your policy?
9    A.   It is. It's termed under the security, the
10 safety/security aspect of the operation.
11   Q.   And in your own experience at Florence-Central,
12 how often do staffing shortages lead to the cancellation
13 of outdoor recreation?
14   A.
15
16
17
18
19
20
21
22
23
24
25

21 (Pages 78 to 81)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 82



1
2    Q.   Can you estimate how often that happens on a
3    weekly basis?
4    A.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23    Q.   When recreation is cancelled, what effort is
24   made to make up that outdoor rec?
25    A.   It's just not probable at Central Unit.  You

Page 83

1    have 1,161 inmates at Central Unit.  Each one has to be
2    allowed to recreate six hours three different times a
3    week.  And we run recreation seven days a week from 6 in
4    the morning to roughly 1600 hours, 1700 hours in the
5    evening.  And that's seven days a week.  You just
6    couldn't possibly make it up.
7    Q.   So is it consistent with ADC policy not to make
8    up missed recreation?
9    A.   At Central Unit I know it is.
10   Q.   How about the other units?
11   A.   I don't know.
12   Q.   Is there any minimum -- when recreation is
13   cancelled, is there any policy that requires a minimum
14   amount per week that a prisoner be given recreation time?
15   A.   It's the six hours of recreation.  And if,
16   because of the staffing levels, we can't safely conduct
17   recreation, then it isn't conducted.
18   Q.   So you don't make the minimum?
19   A.   On those days, we do not make the minimum.
20   Q.   Are there any -- is there any review or
21   oversight on a unit basis that looks at the number of
22   times recreation might be missed in a month?
23   A.   It's normally recorded -- an information report
24   has to be done by the shift commander in addition to the
25   advisement to myself of the staffing.  Then an

Page 84

1    information report is made out.  And then provides the
2    documentation.  At the end of the month, as part of the
3    703 process and report, we'll take a look at how many
4    times recreation was cancelled.
5    Q.   And in your experience, has a supervisor of
6    yours or someone up the chain of command ever come to you
7    and said, look, it seems like recreation is being
8    cancelled too many times?
9    A.   No.
10   Q.   Do you know of this ever occurring at any time?
11   A.   No.
12   Q.   So it's fairly consistent that under ADC
13   policy, you're not required to make up for a cancelled
14   recreation?
15   A.   We couldn't make it up at Central Unit.  We've
16   not been required to make it up.
17   Q.   Because it's just physically staffingwise not
18   possible?
19   A.   It's not possible.  Not just staffingwise, the
20   numbers -- the number of inmates that you're recreating,
21   our low days are around 320 inmates.  When you talk about
22   having -- everything is at the cell front with these
23   inmates.  When you're talking about coming in with 51
24   staff at day shift, you're talking about stripping these
25   inmates, applying restraints, running a recreation line

Page 85

1    where you have officers strategically placed at various
2    points in the cell block and along the continuum of
3    escort line to the recreation enclosures and allow these
4    inmates to be released from the cell with about a 40 to
5    60 foot spacing between them and walk to their enclosure,
6    secure them there.
7         When you're talking about feeding the
8    inmates -- and this is cell front.  When we're talking
9    about bring the inmates back, and that's via the pat
10   search and then back in and putting them back in the
11   cells, that's opposite of the turnout.  And then
12   stripping them, escorting them to the showers, the
13   officers are constantly moving.  You couldn't begin to
14   catch that up.  Heavy days are near 370 inmates.  So try
15   to do those numbers and duplicate them, you wouldn't be
16   able to do it.
17   Q.   How many outdoor exercise enclosures do you
18   have on Central Unit?
19   A.   In the main yard, 117.
20   Q.   And how did you come to have that number?  Is
21   it estimated based on your population or...
22   A.   It was -- gosh, this is going back quite a
23   number of years.  I don't have the exact year that was
24   started.  But once the rec field group exercises were
25   discontinued and we went to the enclosures, then they

22  (Pages 82 to 85)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 86

1   created these enclosures, and they put enclosures in all
2   the available locations in Central Unit that they could.
3   And the number ended up being 117.
4       Q.   So it wasn't based on your population?
5       A.   In part, yes.
6       Q.   Was there any calculation made whether or not
7   that would be -- the 117 would be sufficient?
8       A.   It is sufficient.
9       Q.   But you're telling me it's difficult to
10  actually do all the recreation that you need to do?
11      A.   We get recreation done if we have the
12  staffing.
13
14
15
16
17  Even to keep recreation going, we will collapse support
18  service staff. Clothing, some visitation staff, tour
19  room, lock and key, property. We'll take CO IIIs and
20  pull them off CO III duties and run them as desk
21  officers. We'll take supervisors and run them on the --
22  we do everything possible to keep recreation going.
23          MR. GOTTFRIED:  Wait one second.
24          MS. FETTIG:  Do you want to go off the
25  record?

Page 87

1           MR. GOTTFRIED:  Yeah.
2           (Discussion off the record.)
3       Q.   BY MS. FETTIG:  So, Deputy Warden, your
4   attorney was just clarifying some issue about policy --
5           MR. GOTTFRIED:  Not necessarily.
6       Q.   BY MS. FETTIG:  Potentially about what we've
7   just been talking about, which is recreation. Is there
8   anything you'd like to clarify?
9       A.   The numbers. In terms of the recreation
10  turnout, it's rotating which cell block, which particular
11  cell block recreates on a particular day. And just those
12  inmates that would be due to be turned out for recreation
13  would be impacted at that time. So not all the inmates
14  would be missing recreation, say, if we had to shut it
15  down on Tuesday. Just those numbers that were to turn
16  out for that day.
17      Q.   Right. So it's whoever is on cycle basically?
18      A.   Right.
19      Q.   Because they're only recreating three days a
20  week?
21      A.   Right.
22      Q.   You mentioned that the recreation enclosures
23  are adjacent to one another. So you're recreating more
24  than one person at a time; is that correct?
25      A.   Yes.

Page 88

1       Q.   And people can speak to one another at one
2   time?
3       A.   Yes.
4       Q.   But is it the case that they're each in
5   separate enclosures?
6       A.   Yes, they are.
7       Q.   So are you having 117 people recreating at the
8   same time?
9       A.   Yes.
10      Q.   And are they right next to each other? What's
11  the physical layout?
12      A.   We have blocks or clusters of recreation
13  enclosures. And those that are clusters are next to each
14  other.
15          (Exhibit 81 was marked.)
16      Q.   BY MS. FETTIG:  I'm going to be handing you
17  Department Order 809, the Earned Incentive Program. I
18  want you to turn to the very last page, ADC014004.
19          This attachment seems to set forth
20  recreation activities for maximum security prisoners.
21  Are you familiar with this policy?
22      A.   Yes.
23      Q.   And if you'll look on this page, it's divided
24  into Phase I, Phase II, and Phase III. And under each,
25  it says 6 hours per week and then outdoor exercise. Can

Page 89

1   you tell me, just to clarify, under this policy, are they
2   talking about six hours per week recreation on top of
3   outdoor exercise, or is this the same thing?
4       A.   Same thing.
5       Q.   And for Phase I, Phase II, Phase III, my
6   understanding is that Central Unit is the only maximum
7   security unit with the phase program. So does this only
8   apply to Central Unit or is it universally applied?
9       A.   Universally applied. Every inmate in the
10  system, every inmate, regardless of custody level, is set
11  up in a phase.
12      Q.   So is there a formal phase program in every
13  unit?
14      A.   In terms of their phase level, yes.
15      Q.   For maximum security units, this phase system,
16  how does it impact their stay in maximum security?
17      A.   The privileges that are afforded differently
18  for the phases are in regard to visitation and the hobby
19  craft that you see here. Inmates in Phase I are not
20  allowed hobby craft in maximum custody.
21      Q.   And you're referring to Attachment C,
22  ADC014003.
23      A.   Yes. Where you saw all the recreation and then
24  the outside, underneath that it talks after hobby craft.
25      Q.   And there's none for Phase I?

23 (Pages 86 to 89)

Parsons v. Ryan
Fizer, Greg – 10/29/2012

Page 90

1    A.   Right.
2    Q.   Okay.  But in Phase II, you have -- and Phase
3  II and Phase III, there's access to origami and pencil
4  drawing for hobby craft?
5    A.   Yes.
6    Q.   And that's consistent with ADC, those are the
7  only available hobby crafts?
8    A.   Yes.
9    Q.   So under the earned incentive program in 809,
10  regardless of behavior or what phase you're in, your
11  access to outdoor exercise is going to be the same?
12    A.   Yes.
13    Q.   Can you take a look at 704, which is 79.  Look
14  at page 14.  Paragraph 1.7.
15    A.   Uh-huh.
16    Q.   And this deals with mental health inmates.  Are
17  you familiar with this provision?
18    A.   Yes.
19    Q.   And it says that exercise periods for these
20  inmates shall be one hour in duration only six days per
21  week.
22    A.   Yes.
23    Q.   Is this consistent policy across ADC?
24    A.   I believe so.
25    Q.   And why is the exercise for mental health

Page 91

1  inmates different than for other inmates?
2    A.   I don't have a Department perspective on why
3  they chose that.  I know there was some discussion at
4  some levels that there was a need to afford inmates that
5  are in designated mental health units an opportunity to
6  go outside and recreate six days a week versus every
7  other day kind of thing.
8    Q.   The next paragraph is 1.7.1, and that mentions
9  that access to exercise is going to be governed by three
10  phases that increase.
11    A.   Yes.
12    Q.   Do you know anything about this?  Are you
13  familiar with this at all?
14    A.   Yes, a little bit.
15    Q.   Can you tell me how it works.
16    A.   Yes.  The concept was to increase
17  socialization.  Mental health inmates tend to withdraw
18  from socialization and isolate and restrict themselves.
19  The idea was to improve their social skills and through
20  both individual and group therapy, work on that.  And to
21  demonstrate the ability and to practice what they've
22  learned, the idea was to set them up in individual
23  enclosures initially, allow them to communicate with
24  inmates in adjoining recreation enclosures.
25      If that went well over a period of time,

Page 92

1  then to allow two of them that agreed to recreate in the
2  same enclosure the opportunity to recreate.  The same
3  concept.  If that went well, then they progressed to up
4  to four inmates in a much larger enclosure to facilitate
5  the group type of recreating and improve the skills.  The
6  idea being to eventually move these inmates progressively
7  from an isolated single enclosure recreation period where
8  you could communicate with others but through an
9  enclosure to one of being in a group area with multiple
10  inmates.
11    Q.   And do you know how mental health inmates are
12  defined for this policy?
13    A.   I don't.  I know that a factor is any prior
14  history with mental health and medication is an issue.
15  But I don't know what their continuum is.
16    Q.   Do you know at Florence-Central, at your unit,
17  who does this policy apply to?
18    A.   We don't have a mental health program per se.
19  What we do is have areas where we have mental health
20  enhanced access, and that being in the Cell Block 1 and
21  at the Kasson Wing 1.
22    Q.   So does that exercise policy apply to them to
23  your knowledge?
24    A.   No.  We do six days a week -- I mean, six hours
25  a week, but we don't do six days a week.

Page 93

1    Q.   Do you know who this policy would apply to in
2  the maximum security units, if anyone?
3    A.   I don't.  I know that ASPC-Phoenix has a mental
4  health unit, a couple mental health units, and my guess
5  would be that they would practice that there.
6    Q.   So to your knowledge, this part of the policy
7  is not generally applied to prisoners who are in maximum
8  security or detention?
9    A.   No.  Central Unit is a unit that's considered
10  general population, but we have enhanced areas of access
11  for mental health, and we have the enhanced phase program
12  for transition either to lower custody or to the streets.
13    Q.   And when you say general population, do you
14  mean general population in maximum custody?
15    A.   Yes.  There's -- general population is a
16  designation for inmates that can be around other
17  inmates.  There's no special qualities or characteristics
18  to those inmates.  They're not PS inmates, protective
19  segregation inmates.  They are not inmates that have
20  scored 4 or greater that require a residential type of
21  mental health setting.  They're not -- they're not
22  segregated as a sex offender unit.  These are inmates
23  that generally can get along with other inmates, and
24  there's nothing special about their characteristics.
25    Q.   So at Central Unit, you don't generally have

24  (Pages 90 to 93)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 94

1   maximum security prisoners?
2     A.  We do. That's their custody level. That's
3   general population custody. Maximum custody general
4   population. We have maximum custody PS, we have maximum
5   custody mental health, we have maximum custody sex
6   offenders.
7     Q.  In that unit?
8     A.  No, in the Department.
9     Q.  I see.
10      (Exhibit 82 was marked.)
11     Q.  BY MS. FETTIG: The court reporter has just
12  handed you Exhibit 82, which is a document that your
13  lawyers produced to us during the discovery in this case.
14     A.  I'm sorry, who produced?
15     Q.  Your lawyers. Have you ever seen this document?
16     A.  I have not.
17     Q.  It appears to be a PowerPoint presentation.
18  And the first page says ASPC-Florence, Central Unit &
19  Kasson, Mental/Behavioral Health Programs.
20     A.  We produced a PowerPoint presentation at the
21  request of the division, and this looks a lot like it.
22     Q.  So were you involved in the production of this
23  PowerPoint?
24     A.  Yes. I'm not sure if this is it, though. It
25  looks like it is. Florence.

Page 95

1     Q.  Can you turn to page 25. It's ADC027748.
2     A.  Got it.
3     Q.  And this says: Browning Unit Mental Health
4  Program. So it might not be your unit --
5     A.  It is not.
6     Q.  -- but I wanted to ask you some general
7  questions if you know about them at all.
8      Under incentives about halfway down the
9  slide, it says Phase 1 inmates receive outdoor recreation
10  1 time monthly. And in Phase 2, two times monthly.
11  Phase 3, three times monthly.
12      Are these incentives for outdoor recreation
13  consistent with ADC policy for recreation as you
14  understand it for maximum security inmates?
15     A.  I believe. I'm not familiar with their
16  program, but I believe they have it worded as such
17  because they're probably considering the recreation
18  enclosures at the end of each of the pods as part of the
19  pod construction or physical plant and maybe not term
20  them as outdoor, although it clearly is outdoor since you
21  have an open space at the top. I do know that they had
22  constructed additional enclosures beyond the pod setting
23  that was truly separate from the physical plant. And
24  that's probably what they're referring to, is escorting
25  these inmates to these through enclosures that are

Page 96

1   separate from the physical plant and are set up
2   outdoors. I don't know what material it's made from. I
3   don't know if it's block or steel mesh or what. But I
4   would imagine that that's what they're referring to, and
5   that's why they have it worded as such. I don't know,
6   though.
7     Q.  So you think it's a different structure than
8  previously existed?
9     A.  I know for a fact that they were tasked with
10  creating larger enclosures to be able to facilitate more
11  inmates than just one in the enclosures. And they were
12  under construction for quite a while. That's probably
13  what this is, and that's why they have it worded as such
14  because everyone knows that you have inmates recreate
15  without outside access.
16     Q.  Are there any isolation units in the ADC system
17  that have indoor recreation spaces?
18     A.  No, I don't think so. I have experience at
19  five complexes, and none of the five had them. I'm not
20  aware of any.
21      (Exhibit 83 was marked.)
22     Q.  BY MS. FETTIG: So I'm handing you an inmate
23  letter response. The inmate's name is ▮▮▮▮▮▮▮▮ And
24  he's at ASPC-Tucson Rincon Unit. I recognize that's not
25  your current unit, but I'm wondering if you can clarify

Page 97

1   something for me. About halfway down in this paragraph,
2   it says: You do receive 1 hour of recreation three times
3   per week which is minimal allowed to Phase I inmates.
4      Is this consistent with ADC recreation
5   policy?
6     A.  No.
7     Q.  And are you familiar at all with this Phase I
8  restrictions for -- on recreation?
9     A.  No.
10     Q.  Is there any unit in the ADC system where one
11  hour of recreation three times a week would be
12  appropriate under ADC policy?
13     A.  No.
14     MR. GOTTFRIED: Could we go off the record
15  for a second.
16      (Discussion off the record.)
17      (Exhibit 84 was marked.)
18     Q.  BY MS. FETTIG: I've just -- the court reporter
19  has just handed you what's been marked as plaintiffs'
20  Exhibit 84. That's DO 906, Inmate Recreation Arts &
21  Crafts. I'm just hoping you can clarify a question for
22  me on page 2, which is ADC013020.
23     A.  Yes.
24     Q.  The top of the page, paragraph 1.3.1, it
25  mentions that: Inmates in detention or medical isolation

25 (Pages 94 to 97)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 98

1  will also receive a minimal outdoor recreation period of
2  not less than six hours a week unless a legitimate
3  security need prohibits otherwise.
4        Can you tell me who are the prisoners in
5  medical isolation? What does that mean?
6    A.  I'm sorry. Where are you?
7    Q.  I'm at the very top of the page. And it's page
8  2 at 1.3.1.
9    A.  Okay. And your question is who are the inmates
10  in medical isolation?
11    Q.  Yes.
12    A.  These are inmates that are assigned to medical
13  units.
14    Q.  So they're not inmates in detention or maximum
15  security?
16    A.  I'm -- this is a strange terminology. It's
17  atypical of the Department verbiage for this. We have
18  medical units in maximum custody, but the medical units
19  typically house a whole variety of custody levels. There
20  is a medical unit in Central Unit, and I have minimals
21  all the way through maxes. So it's not a true
22  designation. What drives their placement in medical unit
23  is, of course, their medical needs. So I would assume
24  this is implying that any inmate assigned to the medical
25  units, we minimally need to make sure they have six hours

Page 99

1  of recreation a week.
2    Q.  For prisoners in Florence-Central Unit, how
3  much time are they generally spending in their cell a
4  day?
5    A.  If they're not out for recreation, if they're
6  not out for the shower, then they potentially could be
7  escorted to an appointment or visitation. We do
8  visitation seven days a week, and that would be contact
9  visits for the most part. They are also pulled out of
10  their cells for program one on one interviews. They're
11  also pulled out sometimes for classification, for
12  discipline, for a variety of process services. So it
13  varies how long they're in their cells on an average.
14  Other than those events, they are in their cells.
15    Q.  When they're pulled out for recreation for
16  those two-hour blocks, are showers included in those
17  two-hour blocks?
18    A.  No, that's separate.
19    Q.  Are you aware of any policies or practices that
20  determine the privileges available to inmates in
21  isolation?
22    A.  The privileges available?
23    Q.  Uh-huh. Increasing privileges. What policies
24  would those be?
25    A.  The 809 covers the phase privileges.

Page 100

1    Q.  Okay. Let's turn to 809, which I believe is
2  Exhibit 80. Or 81.
3        Other than the policy 809, are there any
4  policies that govern privileges for prisoners in --
5    A.  Maximum custody?
6    Q.  -- maximum custody?
7    A.  There is a separate visitation policy, 911. It
8  covers all custody levels.
9    Q.  Anything else?
10    A.  It really depends on what your term is
11  privileges. For example, inmates are allowed to write to
12  other inmates if they're related to them. That is
13  considered a privilege in that they must meet the
14  criteria for that in terms of their adherence to rules
15  and regulations. Those that adhere to rules and
16  regulations are allowed the privilege to communicate with
17  their relatives. That's a separate policy under mail.
18  They're also allowed interrelation phone calls for the
19  same type of criteria, although it's more strict. That's
20  a separate policy as well. Those are two privileges
21  under 809 and visitation.
22    Q.  So let's look at 809 in Attachment B, which
23  starts at ADC 14001.
24    A.  I'm sorry, again?
25    Q.  It's ADC 14001. Incentive Matrix - Store,

Page 101

1  Phone and Visitation.
2    A.  All right.
3    Q.  For prisoners in maximum security or I guess
4  the death row as well, for visitation, are these visits
5  going to be contact or non-contact first?
6    A.  The inmates generally are only allowed
7  non-contact visits. Those in those special programs do
8  have contact visits.
9    Q.  Is there any limitation on who can visit them?
10    A.  Yes, there is. And 911 covers that.
11  Essentially it's they need to request -- they provide us
12  a list of up to 20 individuals. If a person elects to
13  visit the inmate, then they submit an application. They
14  can do that either through the mail or online. We take
15  their information, and we run a background check, ACIC
16  and NCIC. If they clear their background check and pay a
17  $25 initial fee, we will allow them to visit. The other
18  factor that is involved is whether or not they're a
19  victim of the crime, particularly if they're a child.
20    Q.  You mentioned that some prisoners now have
21  contact visits. Can you tell me a little bit more about
22  that.
23    A.  It's the inmates in the phase program and the
24  enhanced mental health programs.
25    Q.  So we're talking about Kasson 1, CB 1, and

26 (Pages 98 to 101)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 102

1  CB 2?
2      A.   Yes.
3      Q.   And they have contact visits?
4      A.   Yes.
5      Q.   For the individuals who have non-contact visits
6  in the isolation units, what does this visitation
7  involve? Are they on the phone, is it --
8      A.   Yes. It's in a glass -- they sit in a booth.
9  They're escorted over, same process, stripped,
10 restrained, escorted over, placed in a booth. The
11 visitors ahead of time will call and make an appointment
12 because there's only so many booths available. We'll
13 schedule a time for them. The visitors will appear.
14 We'll take them into the visitation area. They'll sit at
15 the front of the booth. The inmate will come in, be
16 placed in the booth on the other side, and then be
17 secured in there. There are the hand phones that are
18 used, and the visitor and the inmate then can communicate
19 with each other through the phone. And there is a
20 security glass in between. They can see each other.
21     Q.   And the non-contact visits that you've just
22 described to me, do you know if that physical setting is
23 the same in the other isolation units?
24     A.   It would be the same type of setup,
25 non-contact.

Page 103

1      Q.   With phones and security glass?
2      A.   I don't know for sure. There's different type
3  of non-contact booths. Some non-contact booths have a
4  perforated type of material where you talk through this
5  material rather than use a phone. Some have a small
6  opening, although not usually in most correctional
7  facilities do we allow those openings. But there are
8  some, and they're allowed communication that way. Most,
9  however, have phones.
10     Q.   Do you know which units have that, that sort of
11 mesh screening that you described?
12     A.   We did initially at Central Unit have that
13 perforation, and they had to talk through that.
14     Q.   But now are all of them --
15     A.   Yeah, we went back and installed phones on
16 them. I've seen them in other locations as well, but I
17 can't remember where those are at.
18     Q.   And does this non-contact visit -- the nature
19 of these non-contact visits, is that in any policy at
20 all, written policy?
21     A.   It's in 911.
22     Q.   For 809, Attachment B, under C it says regular
23 visitation for maximum security prisoners in Phase I,
24 Phase II, and Phase III. And for each phase, it's one
25 per week non-contact and the amount of time is two

Page 104

1  hours. And it never changes across the phases. Is that
2  consistent with ADC policy as you understand it?
3      A.   Yes.
4      Q.   And the exceptions you mentioned were for the
5  mental health units, Kasson 1, CB 1, and then CB 2?
6      A.   Yes.
7      Q.   Do you know if there are any other exceptions
8  in the other isolation units?
9      A.   No, there is none.
10     Q.   So those are the only exceptions in the system?
11     A.   Those are the only exceptions.
12     Q.   Can you describe for me what legal visits would
13 be like. Are they also non-contact for isolation
14 prisoners?
15     A.   They're normally non-contact with the exception
16 if the attorney requests to have a contact visit so that
17 the inmate can handle the material and/or sign the
18 documents, we will allow that. However, the inmate is
19 still placed in what we call travel restraints. It
20 allows them a little more movement in the front to
21 facilitate their writing.
22     Q.   Taking a look at Attachment B under A, Store.
23 Is this the same as a commissary policy?
24     A.   Yes.
25     Q.   Can you explain what this means to me.

Page 105

1      A.   Yes, that's what that is exactly.
2      Q.   So for maximum security inmates, what is the
3  commissary policy?
4      A.   They receive a menu once a week, and they're
5  allowed to order off that menu. They submit menu order,
6  and then our vendor, who is Keefe presently, will fulfill
7  that request based on if they have sufficient funding and
8  then provide them the items within a week's time.
9      Q.   Are items restricted for maximum security
10 inmates as opposed to minimum or closed?
11     A.   Yes.
12     Q.   In what way?
13     A.   They're not allowed to have the items that have
14 metal in them. They're also not allowed to have the
15 items that are normally heated. Those kind of things.
16     Q.   Any other restrictions?
17     A.   They can't have CD players, cassette players.
18 No, they have cassette players. They can't have CD
19 players, excuse me.
20     Q.   Going down to B, Phone on Attachment B. It
21 looks like for maximum security prisoners, there's one
22 phone call a week for 15 minutes regardless of what phase
23 they're in.
24     A.   Uh-huh.
25     Q.   Is that consistent with ADC policy?

27 (Pages 102 to 105)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 106

1    A.   Yes.
2    Q.   And is that the policy that's practiced at your
3  unit, Florence Central?
4    A.   Yes.
5    Q.   Is that true across the board for all of your
6  prisoners?
7    A.   There is -- has been a request to allow the
8  inmates in those special programs two phone calls a week,
9  but that hasn't been done yet.
10   Q.   So the current practice is one phone call?
11   A.   Uh-huh.
12   Q.   Is there a limitation on who prisoners in
13  isolation units can call?
14   A.   Just those on their approved 20 list.
15   Q.   And the approved 20, would that include family
16  members, friends?  Are there any limitations on there?
17   A.   No.  Again, they're all screened, though.  So
18  in terms -- there is a limitation.  We do exclude some
19  people from contact with the inmate.
20   Q.   And wouldn't that be based on the background
21  check?
22   A.   Yes.  And/or victim.
23   Q.   What about access to religious services for
24  prisoners in isolation units?  What policy governs that?
25   A.   There is a policy for religious services.  I'm

Page 107

1  sorry, I don't know the number of it.
2    Q.   Do you remember the nature of that policy?
3    A.   Yes.
4    Q.   Can you describe it.
5    A.   Inmates may request to have contact with the
6  unit chaplain and/or request specific documents regarding
7  the nature of their religious practices.  The unit
8  chaplain will meet with those individuals.  He will tour
9  the cell block and meet with them.  He also, if they
10  order any kind of religious items that is consistent with
11  their type of religion, he needs to review it and ensure
12  it meets policy requirements.  And then once approved,
13  it's allowed to go forth, and they receive it.
14   Q.   You mentioned that the chaplain meets with the
15  prisoners.  Is this at cell front?
16   A.   Yes.  Or he has -- depends on the nature of the
17  visit.  Some that don't mind it, having cell front visit,
18  that will be facilitated.  Those that request to have
19  individual contact, they are escorted then to his office
20  area and put in an enclosure, and he interviews them
21  there.
22   Q.   Is there any circumstance for prisoners in
23  isolation units in which they would be allowed congregant
24  religious activities?
25   A.   No.

Page 108

1    Q.   What policies or procedures govern prisoner
2  property in the isolation units?
3    A.   It's DO 909.
4    Q.   And do you remember what this policy requires
5  or allows?
6    A.   It's an extensive policy.  Generally, yes, but
7  not for each specific area.
8    Q.   For the prisoners on your unit, what does it
9  allow?
10   A.   It's a lot.  Basically it's any item that's not
11  going to compromise security.  What's generally not
12  allowed for all inmates is any local maps.  Anything that
13  comes in needs to come through an approved vendor, such
14  as Keefe.  They are allowed to order books or magazines
15  through an approved vendor as well.  But they can't have
16  items sent in from home.
17        For example, family members can't go out to
18  a bookstore, purchase a book, and have it mailed in to
19  the inmate.  It just wouldn't be accepted.  They could
20  order those books through such as Amazon.com and have
21  those books sent in.  But the idea is not to have
22  significant others or family friends insert contraband
23  into the books and send them in or magazines.  Anything
24  that may cause a risk to security and the safe and
25  orderly operation of the prison isn't allowed.

Page 109

1        Pornographic material and stuff like that is
2  not allowed in.  There's a review process for that.  The
3  Central Office pretty much makes determination on the
4  general pornography in terms of the magazines and stuff
5  like that.  And that may include propaganda magazines,
6  racist magazines or publications, antigovernment type of
7  publications.  Survivalist type of information.  Any
8  things about weapons or bombs, stuff like that is always
9  prevented from coming in.
10   Q.   How do the property -- how does the property
11  policy differ for prisoners in maximum custody or the
12  isolation units as opposed to minimum or medium?
13   A.   It's more restrictive.  The idea is not to
14  provide them any means of making a weapon or possessing a
15  weapon, making whatever is usually a benign material into
16  a weapon.
17   Q.   But they'd be allowed books in their cells?
18   A.   Absolutely.
19   Q.   Is there any limitation on --
20   A.   Not hardback books, excuse me.
21   Q.   Only softback books?
22   A.   Correct.
23   Q.   Is there any limitation on the number of books
24  a prisoner can have in their cell at any particular time?
25   A.   Yes, there is.

28 (Pages 106 to 109)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 110

1    Q.   What's that number?
2    A.   I don't have that number offhand.  It is a
3  limitation.
4    Q.   Is there any circumstance in which a prisoner
5  in isolation unit wouldn't be allowed a television?
6    A.   No.
7    Q.   How about a radio?
8    A.   No.
9    Q.   So the only limitation would be their ability
10  to actually purchase it perhaps?
11    A.   Correct.
12    Q.   How about family pictures?  Is there any
13  limitation on the number of pictures?
14    A.   There's not a limitation on that, no.
15    Q.   How about letters?
16    A.   They just need to keep them -- they can get
17  those in.  They can't be pornographic in nature, though.
18    Q.   How about the number of letter a prisoner might
19  be allowed in their cell?
20    A.   No.  Well, let me qualify that.  If it goes
21  beyond -- they're allowed up to four boxes.  If it goes
22  beyond that, they're not allowed to have those.  That
23  excludes the inmates that came in before 909 who have
24  multiple boxes, some of them, and will keep those until
25  they leave the prison system one way or the other.

Page 111

1    Q.   Are the boxes in their cells?
2    A.   No.  We keep them in a storage area.
3    Q.   So they can write an inmate letter asking for
4  them?
5    A.   And rotate the boxes.
6    Q.   So how many boxes are they allowed to have in
7  their cell at any given time?
8    A.   Four.
9    Q.   And how large are these boxes?
10    A.   Legal size boxes.  In other words, the width is
11  up to legal size.  I don't remember the length.
12        MR. GOTTFRIED:  It's bankers boxes.
13        THE WITNESS:  Bankers boxes is exactly what
14  it is.
15    Q.   BY MS. FETTIG:  And should those four boxes
16  include all of their property or just written materials?
17    A.   Their legal and written materials.
18    Q.   What kind of food items are prisoners in
19  isolation units allowed to have in their cells?
20    A.   Again, anything that they can get in through
21  the commissary that's approved for them, which normally
22  exclude anything that you have to heat.
23    Q.   And is that only for prisoners in isolation
24  units?
25    A.   In maximum custody.

Page 112

1    Q.   Are there any limitations for prisoners in the
2  isolation units in terms of sending and receiving mail?
3    A.   No.  Not unique in that population.
4    Q.   It's the same?
5    A.   Yes.
6    Q.   How about access to the law library?  What are
7  the policies that govern prisoners' access to the law
8  library in isolation units?
9    A.   They're allowed access to copies of legal
10  materials.  And so they'll send in an inmate letter
11  requesting specific legal materials.  And the librarian
12  has a time frame in which to meet those, and then he'll
13  provide them the necessary copies.
14    Q.   So under that policy, they don't go to a law
15  library?
16    A.   They do not.
17    Q.   And do they have access to any catalogs or
18  books that would let them know what legal materials they
19  might want to order?
20    A.   Our librarian, unit librarian, has an order
21  form.  And in there, in addition to legal materials,
22  which he'll list, they also will break down the types of
23  books that they have.  Novels, autobiographies, and stuff
24  like that, educational material, religious material.
25    Q.   So that's regular library services?

Page 113

1    A.   Uh-huh.
2    Q.   Is that a consistent practice across the other
3  isolation units?
4    A.   That they request those materials and copies
5  are brought, yes.
6    Q.   When a prisoner is in isolation, how often are
7  they allowed to shower every week?
8    A.   Three times a week.  They shower on days they
9  rec.
10    Q.   So it's always the same day when they rec?
11    A.   Yes.  And as I was talking, if we have to
12  cancel recreation, they still are allowed to shower.
13  They're always allowed three showers a week.
14    Q.   And what policy governs that?
15    A.   I would imagine it's in 804.  It may even be in
16  704.
17    Q.   Is the shower policy for isolation prisoners
18  different than for other prisoners in the ADC system?
19    A.   It is.  The lower custodies normally shower
20  more frequently than three times a week.
21    Q.   For these three showers, are those recorded in
22  the unit journal?  Where would they be recorded?
23    A.   They are in the general population maximum
24  custody units.  For those assigned to detention, it's
25  documented in that weekly detention order, individual

29 (Pages 110 to 113)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 114

1 detention record.
2    Q.   And how would -- what kind of oversight takes
3 place of this documentation?
4    A.   The weekly documentation is provided where it's
5 collected on Sunday nights, and then it's brought into
6 briefing, and we review randomly those documents and/or
7 during tours we'll review those.  Supervisors are
8 responsible on each shift to make sure the documentation
9 is done.
10    Q.   So would a prisoner generally be given a shower
11 after his recreation period?
12    A.   Yes.
13    Q.   Is that in written policy at all?
14    A.   A shower -- I don't think it's worded that way,
15 but it's done that way.  Inmates who refuse recreation
16 are still allowed to shower.  And we do those normally at
17 the same time that we've turned out cell block for
18 recreation.  There will be a select number of inmates who
19 have refused to turn out and will go ahead and shower
20 there.
21    Q.   I see.  So before -- or at the same time you're
22 running recreation, you're also running showers?
23    A.   For the refusals.
24    Q.   And are the refusals to recreate documented?
25    A.   In the journals, security journals, yes.  The

Page 115

1 reason why we want to make sure we get back into those
2 cells, if the inmate has refused for a week to go out to
3 recreation, we want to make sure we go in and assess that
4 inmate, take a look at him, talk to him, ▓▓▓▓▓▓▓▓▓▓▓▓▓
5 ▓▓▓▓▓▓▓▓▓▓
6    Q.   Is that practice a written policy?
7    A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8 ▓▓▓▓▓ I don't know if it's in 704 or not.  I know that
9 we were mandated in writing via email and directives from
10 our division director to make sure that we had done a
11 ▓▓▓▓▓▓▓▓▓▓▓▓ And I think that is spoke of in
12 704.  And we minimally need to do that every week.
13    Q.   Is that -- where would that be documented?
14    A.   That again is in the correctional journal.
15    Q.   And it's called a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓
16    A.   Uh-huh.
17    Q.   So walk me through this. ▓▓▓▓▓▓▓▓▓▓
18 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
21 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
22    A.   ▓▓▓▓▓▓▓▓
23    Q.   And that's part of written policy or post
24 order?
25    A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ - and I -- if it's

Page 116

1 not in 704, it's certainly in the general post orders
2 that that be done.
3    Q.   And what's involved in ▓▓▓▓▓▓▓▓▓▓▓
4    A.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
5 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
6 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
7 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
8 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
9 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
11 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
12    Q.   If a prisoner refuses to go to recreation for a
13 certain period of time, do you ever contact mental health
14 staff?
15    A.   If he -- not for the refusals for one week or
16 so.  If he continually -- or if he shows other signs and
17 symptoms of regressing socially, hygiene is poor, seems
18 to be incoherent, not responding as he normally does,
19 yes, we do.
20         (Exhibit 85 was marked.)
21    Q.   BY MS. FETTIG:  And this is an inmate letter
22 response from Robert Gamez.  That's the name of the
23 inmate.  It's dated 7/13/2011.  And there's a staff
24 signature.  Do you recognize that signature?
25    A.   It's not legible.  It says it's from Pittario,

Page 117

1 but I can't attest to that.
2    Q.   By it's at Florence-Central Unit?
3    A.   Yes.
4    Q.   In the second paragraph, it seems to be a
5 response to a shower complaint.  And it's quoting, I
6 believe, Lt. Stoner, who was asked why showers were
7 conducted at 0400 hours.  And he confirms that they were
8 in fact running as late as 0400 hours.  Is this a regular
9 occurrence?
10    A.   No.  There were times when, for whatever
11 reason -- there could have been what we call an ICS, an
12 incident that would have stopped all activities on the
13 unit for a period of -- this would have had to have been
14 a number of hours.  And then once resolved, we continued
15 with the recreation and showers.  And we would have then
16 provided inmates that wanted showers on graveyard that
17 chance to shower.  Normally they're all finished before
18 graveyard ever comes on.
19    Q.   And when does graveyard start?
20    A.   10.
21    Q.   Now, it goes on to say, if you see the third
22 sentence:  we have been running showers as late as 0400
23 hours in CB4.  This has been the norm for some time now.
24 I would gladly stop given the number of staff have that I
25 have to complete the task, but that would mean that a

30 (Pages 114 to 117)

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Fizer, Greg - 10/29/2012



Page 118

1 large number of inmates would not get their showers.
2     A.   I don't know who that would have been. I don't
3 recall this at all. It was atypical for us to run
4 showers on graveyard.
5     Q.   If showers are being run on graveyard, does
6 that also mean that recreation was being run on graveyard?
7     A.   No.
8     Q.   You don't have any recollection of this
9 incident?
10     A.   No. I don't know why that would have been
11 done. I don't know why that would have been done. I
12 can't imagine. As I was saying, I require the shift
13 commanders to give me a report at the end of their
14 shifts. And recreation normally finishes around 4:00,
15 sometimes 5, and then showers usually finish just before
16 9:00, sometimes as late as 9:30. But graveyard very,
17 very seldom has showers to do.
18     Q.   When is recreation and showers usually started
19 in the day?
20     A.   6 in the morning.
21     Q.   And it runs until --
22     A.   All day.
23     Q.   But before graveyard shift starts?
24     A.   Yes.
25     Q.   You mentioned that a delay in showers might

Page 119

1 normally be caused by I think you said an ICS?
2     A.   ICS, yes.
3     Q.   And what did that stand for again?
4     A.   It's an incident command structure.
5     Q.   Incident command structure. Is that just
6 shorthand for a report or --
7     A.   No. An incident. For example, if we would
8 have had some sort of situation. It could be driven by
9 inmate assault, it could be driven by some physical plant
10 issue where we had to shut down the unit operations for a
11 period of time. If the lethal fence went down, if the
12 lighting or camera went down. Some sort of incident that
13 stopped activities on the unit, that would have backed it
14 up a number of hours. But for a week, I just don't even
15 recall that. That's not normal.
16     Q.   If an incident occurs like showers at 4 a.m.,
17 what kind of corrective action would be taken to return
18 things to the normal policy and practice?
19     A.   To resolve whatever the issue is and quickly
20 get back to that.
21     Q.   And would those 4 a.m. showers, would they show
22 up in the correctional journal?
23     A.   We would all know about that, yes.
24     Q.   Because your staff would let you know?
25     A.   The staff would let us know, yeah. We have

Page 120

1 reduced staffing on graveyard. Besides the fact you
2 don't want to be doing activities with inmates at night
3 for disruptive reasons, interrupt sleep patterns,
4
5
6
7
8                                       . I just
9 don't remember that event.
10     Q.   Let's talk about staffing since you mentioned
11 your staffing schedules, and I don't really have a sense
12 of what's required. Is it true that you have three
13 shifts?
14     A.   Yes.
15     Q.   What are those?
16     A.   They're termed day shift, swing shift, and
17 graveyard. It's 6 to 2, 2 to 10, and then 10 to 6.
18     Q.   And what's your staffing on each of those
19 shifts?
20     A.
21
22     Q.   Is this governed by an ADC policy?
23     A.   It's a -- yes. 525 covers the staffing
24 patterns for all units. But you're not going to find
25 those numbers in that policy. What you're going to find

Page 121

1 is the allocation of full-time employee positions, FTEs,
2 for various custody levels in different physical plant
3 designs.
4          We have post charts that are approved at the
5 division level for each and every unit. And that's for
6 security staffing on day, swing, and graves, as well as
7 support service staff. Support service staff could be
8 either seven-day posts or five-day posts. Security
9 staffing requires a relief factor of .8. You also have
10 the support service staff that if it's seven days, it has
11 a relief factor as well. Those staffing numbers are
12 driven by the physical plant and the custody level.
13          The intention is to equalize as much as
14 possible staffing in every single unit so that it's
15 comparable among custody levels with like physical plant
16 designs. And FTEs then are allocated on those post
17 charts.
18
19
20
21
22
23
24
25

31 (Pages 118 to 121)

Page 126

1 
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17        But that's a post on each shift. There's
18 desk and a key officer. And then you have floor officers
19 who are in charge of any activities on the floors. And
20 especially the continuous motion to the cell blocks.
21    Q.   How many floor officers would you have per
22 shift?
23    A.   Depends on the size of the cell block and
24 what's going on in the cell block. CB 5 has an area
25 where we house inmates out of Alhambra that are awaiting

Page 127

1 decisions on 805. It's an auxiliary unit for placement
2 of those inmates. So they'll end up with additional
3 floor officers. So they're running CB 5 with an
4 additional desk officer.
5
6
7    Q.   Is the floor officer or officers responsible
8 for the showers?
9    A.   Yes.
10    Q.   So you have, for example, the 208 prisoners,
11 and there are two floor officers?
12    A.   Uh-huh.
13    Q.   And those floor officers are responsible for
14 all the showers, all the recreation?
15    A.   Yeah. We divide CB 4 in half for recreation
16 days because it is so big. But, say, if the whole
17 building can rec that day, you would have those two
18 officers and the keys running the showers. Now, we do
19 have yard officers assigned, and that's our rec team,
20 what we call rec team.
21
22
23        What we do, we take those, since we're not
24 running recreation at that point, and we'll divide those
25 up into cell blocks that are running the showers. And

Page 128

1 we'll supplement them to run showers then.
2    Q.   So the yard officers -- tell me if I'm
3 understanding this correctly. The yard officers
4 supplement the floor officers in activities?
5    A.   When we don't have recreation, yes. Swing
6 shift will finish recreation, and then they'll divide
7 up -- the team will divide up and go to the cell blocks
8 who are running showers and help those floor officers get
9 showers done.
10    Q.   Are the floor officers the officers who are
11 responsible for the 30-minute checks?
12    A.   Yes.
13    Q.   And what is the rule of thumb or do you have a
14 rule of thumb in terms of how many prisoners per floor
15 officer?
16    A.   It really isn't by that. It's by the physical
17 plant of how much area they have to cover.
18 
19
20
21
22
23
24
25    Q.   Are your staffing plans generally what would be

Page 129

1 used in other isolation units?
2    A.   Yes. Well, the physical plant is much
3 different at SMUs. They have clusters and pods. And I
4 don't know how they --
5    Q.   Are you aware of how they staff those clusters
6 and pods?
7 
8
9
10
11
12    Q.   Are pod duties equivalent to the floor officer?
13    A.   Yes.
14    Q.   And how does your staffing pattern change in
15 the graveyard shift? First of all, is it the same for
16 the first two shifts or no?
17
18
19
20
21
22
23
24
25

Page 130

1

2

3

4

5

6

7

8

9

10

11

12

13

14    Q.  In the isolation units, what's the role of a

15 correctional staff member in the provision of health care?

16    A.  Well, one is the escort over to medical

17 appointments. Two is helping escort the nurse for

18 medication and/or insulin shots. And three is noting any

19 issues that they may find where the inmate is in duress

20 or medical need and then advising medical staff.

21    Q.  Do they distribute "keep on person" medications

22 at all?

23    A.  No.

24    Q.  Not at Central?

25    A.  No.

Page 131

1    Q.  Are you aware that they do that in any of the

2 other --

3    A.  Yes.

4    Q.  They do?

5    A.  Yes, I believe they do.

6    Q.  Where?

7    A.  I think all the other custody levels do KOPs.

8 As far as maxes, I don't know if they do at Browning and

9 the SMU.

10    Q.  Correctional officers distributing KOPs? What

11 do you mean?

12    A.  At other custody levels.

13    Q.  But they don't at Central Unit --

14    A.  No.

15    Q.  -- is that what you're saying?

16    What is the role in mental health monitoring

17 of the correctional staff?

18    A.  The same as with the medical. That is,

19 escorting to appointments, facilitating the nurse or

20 mental health staff if they need to pull an inmate out to

21 see them one on one. And also to advise mental health

22 staff if the inmate is under duress or deteriorating

23 visibly for some reason. Incoherent, non-responsive.

24    Q.  That role in advising mental health care staff,

25 is that in their post order?

Page 132

1    A.  Yes.

2    Q.  Do you remember what the name of that --

3    A.  It's the general post order. There's a general

4 post order that's put out by division, and it has a lot

5 of what we've been talking about today. And then each

6 unit has specific post orders that accompany that general

7 post order.

8    Q.  Okay. So what you're saying is there's a

9 general post order that applies across the system?

10    A.  Yes.

11    Q.  And then your unit would have something

12 specific?

13    A.  Yes.

14    Q.  What's the role of your correctional staff in

15 an emergency medical situation?

16    A.  To isolate and contain the area. To get

17 medical staff there as quickly as possible. To provide

18 any backboard or gurney or whatever is required. And

19 then many times they've been involved in beginning CPR

20 whenever we've had an inmate that's needed that.

21    Q.  And are these roles also embodied in the post

22 orders?

23    A.  I don't know what the verbiage is as far as --

24 that's the understanding of the requirement. It probably

25 is in the general post orders someplace that they do

Page 133

1 medical care, but I don't know that it's specifically

2 described.

3    Q.  In the general post orders, would that be the

4 general post order for the floor officer? How are these

5 titled?

6    A.  There is a general post order that's put out by

7 division, and it covers all posts and all units. And

8 it's just general information for the corrections

9 officer. Then there's generalities to each floor officer

10 position across the state, to each desk officer across

11 the state, to each yard officer across the state. And

12 then unit specifics that are added to those based on the

13 unit physical plant and/or operation.

14    Q.  Are the post orders --

15    MS. WATANABE: We're getting close to 1:00.

16 Do we want to go ahead and break for lunch soon?

17    MS. FETTIG: Yes. Why don't I sort of

18 finish this column of questions, and then we'll break for

19 lunch. Thank you for reminding me. I'm very bad with

20 remembering to eat.

21    Q.  BY MS. FETTIG: So just helping me clarify

22 exactly how these post orders are organized, they

23 general across the system and then functional to the

24 actual post?

25    A.  Yes.

34 (Pages 130 to 133)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 134

1    Q.   And then the layer below that would be the
2  actual unit post?
3    A.   Yes. For example, you open a binder. You go
4  to a post at Central Unit, and you go to main control.
5  You're going to open a binder, and then the very first
6  post order you're going to see, it's going to be titled
7  General Post Orders. And it's going to have just the
8  essential information that's required for all corrections
9  officers dealing with inmates in a unit. It's going to
10 have things in there about 805, about the need to do ICS
11 situations, just general information for the officers.
12         Then you're going to come to the control
13 room post order. The first part of that post order is
14 going to be a general post order for all control rooms,
15 what they need to do. And then you're going to come to a
16 section that's called Unit Specific Information and
17 Responsibilities. And that will be anything unique to
18 Central Unit, such as our lethal fence system. That's
19 how it will be set up.
20    Q.   Thank you. That's very helpful to clarify.
21         We'll finish this up and then go eat.
22         So what's the role of the correctional staff
23 in the prison grievance system? Do they pick up the
24 grievances?
25    A.   Yes. They do pick up the grievances, and

Page 135

1  they'll provide them to the CO IIIs.
2    Q.   Do they answer the grievances at all?
3    A.   No.
4    Q.   Do they pass out grievance forms?
5    A.   They certainly can. There's nothing preventing
6  them from passing them out. Usually we have CO IIIs pass
7  out the grievance forms. Inmates will sometimes try to
8  circumvent the informal process, and all they end up
9  doing is delaying the process because they have to do the
10 informal process first. So most of the times, it's the
11 CO IIIs that provide the grievance document to them.
12    Q.   And which officer would be responsible for
13 handling visits? Is that a floor officer duty?
14    A.   Escorting the visits or supervising visits?
15    Q.   Both.
16    A.   Supervising visits, there is a core group of
17 staff that that is their post. They're part of the
18 support service structure. Mail property staff, that's
19 their duty. Key control, that's their duty. Tool
20 control. The sanitation crews, the visitation staff.
21 Those are -- the SSU staff. Those are all special
22 support duty functions. And those staff are dedicated to
23 just those responsibilities.
24    Q.   And what about phone calls? Is that a floor
25 officer duty?

Page 136

1    A.   Yes. They pass out the inmate phone.
2    Q.   And does that happen on a daily basis?
3    A.   Yes.
4    Q.   And how about food? Who's responsible for
5  passing out food?
6    A.   The floor officer.
7    Q.   Are there any other interactions that we
8  haven't discussed that you can think of that correctional
9  officers have with prisoners on a daily basis at Central
10 Unit?
11    A.   They pass out the mail.
12    Q.   And is that floor officers too?
13    A.   Yes.
14    Q.   Anything else?
15    A.   No.
16         MS. FETTIG: All right. Let's go off the
17 record and go get something to eat.
18         (A recess was taken from 12:56 p.m. to
19         1:53 p.m.)
20    Q.   BY MS. FETTIG: Deputy Warden, can you tell me
21 what are the policies or procedures that govern the
22 provision of food to prisoners in isolation units.
23    A.   The amount of food that they receive, the
24 calories, the times?
25    Q.   All of the above.

Page 137

1    A.   All of the above. 804 probably covers the
2  detention unit. Meals, it refers to that they will have
3  the same meals as general population. There is a
4  separate food service policy. I don't have the number of
5  that policy. But the number of meals they receive in
6  maximum custody is two. The first meal is a megasack,
7  the contents of which make up a breakfast and a lunch
8  together. And then they're provided a warm meal in the
9  evening. Their calories are slightly reduced from the
10 other custody levels based on they're allowed less
11 activities and movement than the other custody levels.
12    Q.   Do you know about those calories are?
13    A.   It's 2,600 calories they're allowed versus
14 2,900.
15         (Exhibit 86 was marked.)
16    Q.   BY MS. FETTIG: The court reporter is handing
17 you the DO 912. Is this the policy you just mentioned?
18    A.   Yes.
19    Q.   And if you could look at the first page, that's
20 ADC 13138. Under Procedures, paragraph 1.1, it mentions
21 a Food Service Technical Manual.
22    A.   Uh-huh.
23    Q.   Do you know what that is?
24    A.   Yes.
25    Q.   And what does that manual encompass?

35 (Pages 134 to 137)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 138

1        A.   It's detailed information regarding food
2   service beyond what the Department Order provides.
3        Q.   So times?  Nutrition?  What else does it have?
4        A.   Those kind of things.  Percentage of protein
5   versus fats and carbohydrates.  We're on a healthy diet
6   now, which a lot of our breads are the whole wheat type.
7   A lot of chicken, lower fat foods are served.
8        Q.   So would the Food Service Technical Manual also
9   apply to what's given to the maximum custody inmates?
10       A.   As well as the general population.
11       Q.   If you could also turn to page 4, which is the
12  very last page.  At the very bottom, second to last
13  paragraph, it says:  The Division Director for Offender
14  Operations, in coordination with Health Services staff
15  shall maintain a "Diet Guidelines" Manual.
16            Do you know what this is?
17       A.   Yes, I believe so.  There is a -- there is
18  different diets afforded to the inmate population based
19  on medical and/or religious needs.  And this manual would
20  provide the menus for those diets.
21       Q.   For the special diets?
22       A.   Yes.
23       Q.   And then following that, in the next paragraph,
24  it says:  Warden shall maintain an Institution Order to
25  implement or supplement this Department Order and the

Page 139

1   processes indicated in the Technical Manual.
2            Do you have an institutional order at
3   Florence-Central that --
4        A.   This would come from the complex warden.  The
5   institutional orders come from the complex warden and be
6   applicable to all the units at Florence.  Yes, I'm sure
7   we do.
8        Q.   Do you know what it requires?
9        A.   It basically talks about the application of
10  food service for the particular units that isn't
11  described in more detail in this Department Order.
12       Q.   And could you take a look at 804, which has
13  already been introduced as I believe Exhibit 78.  And
14  page 2.
15            Now, this Exhibit 84, you mentioned it
16  earlier as governing food service for detention units; is
17  that correct?
18       A.   Yes.
19       Q.   And under paragraph -- and this again is on
20  page 2.  Paragraph 1.2.3.  It mentions that meals at the
21  standard meal hours and in the same quality as served to
22  the general population, including special medical or
23  religious diets.
24       A.   Uh-huh.
25       Q.   So for prisoners in the detention units, do

Page 140

1   they receive meals three times a day?
2        A.   It's the two meals, the megasack and the
3   evening meal.
4        Q.   Like the isolation prisoners?
5        A.   Like the max custody inmates.
6        Q.   And in the general population, what is the
7   regular schedule for meal delivery?
8        A.   The close custody, medium custody, and minimum
9   all receive three separate meals a day.
10       Q.   So it's only the maximum custody prisoners and
11  the detention unit prisoners that have two meals a day?
12       A.   That's delivered -- the meals are delivered
13  twice a day.  It is three meals, but they're only
14  delivered twice a day.
15       Q.   I see.  The megasack is two meals in one?
16       A.   Two meals.
17       Q.   And turning again to 804.  And 1.2.3.4 says:
18  When security precautions dictate, sack meals may be
19  served.  Do you see where that is?  On page 2.
20       A.   Yes.
21       Q.   So sack meals are delivered, you're telling me,
22  on isolation units or maximum custody every day?
23       A.   Yes.
24       Q.   And in detention units, every day?
25       A.   Yes.

Page 141

1        Q.   So is there a security precautions reason for
2   doing the sack lunches or why?
3        A.   The sack meals are served -- it's -- it
4   contains the necessary calories, the necessary balance of
5   carbohydrates, proteins, etc.  It has helped us provide
6   services to the inmates in a much more quicker manner.
7   Trying to serve three hot meals a day was incredibly
8   challenging and doing the recreation and showers and
9   other types of activities required during the day's event
10  with the number of inmates that we have.
11            By providing a sack meal that has two meals
12  combined, we're able to free up more time with the
13  officers and get a lot more of the other activities done
14  in a timely manner.  So it's been a tremendous help to us
15  in terms of time saving and resources.
16       Q.   So would you say it's motivated by staffing
17  issues?
18       A.   Not so much staffing, it's just -- it wouldn't
19  matter how many staff you had.  It's just everything
20  that's required in -- it's very challenging to make
21  movement of inmates in maximum custody.  Because of the
22  strip searches that require time, the restraint
23  application, and then the movement out of the cell block,
24  a lot of that takes a lot more time than just a simple
25  turnout would.  It wouldn't matter if you had three

36 (Pages 138 to 141)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 142

1    officers or five officers in front of the cell. It still
2    takes time. And by providing us -- being alleviated from
3    serving one additional meal, which is very time consuming
4    to do, we're able to take that time that would devote to
5    the meal and provide more timely service of the
6    recreation and showers and everything else.
7        Q.   How is the provision of food to prisoners in
8    the isolation units documented?
9        A.   In the detention units, again, it's on that
10   weekly individual record that's kept. And in the general
11   population, maximum custody units, it's recorded in the
12   security journal. There's also meal counts that are
13   done. There's a variety of documents we have a food
14   service provided to us by an outside contractor. They
15   count the number of meals that are served, the number of
16   diets that are served. We do our own count. We have to
17   reconcile those for everything single meal. Those are
18   reviewed, and those are signed off by the approving
19   authorities, and then billing is done.
20       Q.   Where are those counts recorded?
21       A.   The counts of the meals are recorded on the
22   food document forms.
23       Q.   Okay. And do you count the number of meals
24   that you order versus those that are served?
25       A.   Uh-huh, yes.

Page 143

1        Q.   And where would that be? How would that be
2    recorded?
3        A.   It's all in those food service documents.
4        Q.   Do you know the title of these food service
5    documents?
6        A.   No.
7        Q.   Let's just take a quick look at 912 again,
8    Exhibit 86, page 2.
9        A.   Which policy?
10       Q.   912, the food service policy. Page 2, and
11   that's paragraph 912.03, 1.1. The last sentence here
12   says: The system shall use the Meals Ordered and Actual
13   Served documents outlined in the Technical Manual.
14       A.   I'm still trying to find the policy.
15       Q.   We just entered it. Do you have it?
16       A.   Yes.
17       Q.   Take a look at page 2. So about a third of the
18   way down, paragraph 912.03, 1.1. It references a Meals
19   Ordered and Actual Served documents. Are those the
20   documents you were referring to?
21       A.   Yes, uh-huh.
22       Q.   And who creates these documents?
23       A.   Keefe, as well as we do. We make entry on our
24   counts and they make counts on theirs.
25       Q.   And Keefe --

Page 144

1        A.   I'm sorry, Canteen. Trinity. Canteen now has
2    evolved into Trinity.
3        Q.   And that's the service food contractor?
4        A.   Correct.
5        Q.   And so they give you an initial count --
6        A.   And we fill in the actual count.
7        Q.   And who's responsible for that?
8        A.   Each shift commander that serves meals. And
9    then it's brought to me, and then I sign it.
10       Q.   Are there any other documents involved in the
11   production and delivery of meals that we haven't covered?
12       A.   No.
13       Q.   What happens if these documents reveal that
14   certain meals aren't being delivered?
15       A.   To the inmates?
16       Q.   Yes. Is there --
17       A.   It just doesn't happen. You serve -- you'd
18   have quite a situation. But if there's a food shortage
19   where they have to go back and prepare more meals, then
20   information reports are made. And those are created, and
21   then those are staffed later with the vendor on why did
22   they run out of food. This very seldom happens. But
23   inmates are always fed their meals.
24       Q.   And that's based on your review of the records,
25   that's your testimony?

Page 145

1        A.   Yes.
2        Q.   What happens when a prisoner refuses a meal?
3        A.   Initial refusal is documented in an information
4    report. If they refuse three consecutive meals, then
5    we'll elevate that, and we'll have medical staff review
6    them, an SIR is generated, and then an evaluation by
7    medical and even mental health is done.
8        Q.   You mentioned the prisoners in the isolation
9    units are subject to reduced calorie meals.
10       A.   Yes.
11       Q.   What policy dictates that?
12       A.   It should be in this one. If not, it would be
13   in the tech manual. It says: Vision director shall
14   maintain tech manual. Will cover portion control
15   restrict diets. I would think it would be in there.
16       Q.   In the food service technical manual?
17       A.   I would think so.
18       Q.   And in that manual, 2,600 calories are
19   required?
20       A.   Yes.
21       Q.   And is every prisoner in an isolation unit
22   subject to this reduced calorie meal?
23       A.   Yes.
24       Q.   Across the board?
25       A.   Yes.

37  (Pages 142 to 145)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 146

1    Q.   How is the nutritional adequacy of the reduced
2  calorie diet determined?
3    A.   There's a nutritionist with the contract
4  vendor, and she makes out the menus based on nutritional
5  needs.
6    Q.   Do you know this person's qualifications?
7    A.   Other than she's a nutritionist, I don't.
8    Q.   And do you know how often the nutritional
9  adequacy is reviewed?
10    A.   The menu cycles are six weeks.  The reviews
11  with the contract issues are yearly.  So I don't know.  I
12  don't know for sure.
13    Q.   Is such a review required by ADC policy?
14    A.   I don't know.
15    Q.   Have you ever seen nutritional analysis for
16  these reduced calorie meals?
17    A.   I did when they first came out when we went to
18  the heart healthy diet, yes.
19    Q.   Do you know if prisoners who are subject to
20  this reduced calorie meal are monitored at all for health
21  impacts of the reduced calorie meals?
22    A.   No, they're not monitored.
23    Q.   To your knowledge have prisoners in the
24  detention units lost weight or suffered any medical
25  consequences as a result of these reduced calorie meals?

Page 147

1    A.   Not suffered medical consequences.  Depending
2  on the size they came in at, reduction to 2,600 if they
3  were on 4,500, of course, is just simple math.  Inmates
4  that come from the lower custodies have the higher
5  calorie content, the 2,900.  And then they'll supplement
6  with food items from the commissary.  So they may eat a
7  multitude of calories above 2,900 and have been employed
8  through a WIPP program because of work opportunities that
9  were available in lower custody.  But once they worked
10  their way to maximum custody no longer have a WIPP
11  assignment, they're not had that funding from outside
12  sources coming in.  And if they can't supplement through
13  the commissary, they're left with strictly the 2,600.  So
14  if they're used to a higher calorie content, they will
15  end up losing weight probably.
16    Q.   If a prisoner is on a special medical diet or
17  religious diet in an isolation unit, how is that
18  accommodated through the reduced calorie diet program?
19    A.   Again, the nutritionist takes in consideration
20  the specific medical need or religious need and select
21  foods are provided then.  The menus are rotated
22  considerably so they're not getting the same foods over
23  and over again.  They are rotated.  And then the meals
24  are made up separately from the other meals.  Those meals
25  are reviewed because they're small in number.  And once

Page 148

1  the meal is made, it's packaged up with cellophane, and
2  the inmate's name and number is written on it.  And the
3  officer who works that cell block then knows which inmate
4  is on the diet and will provide that meal to them.
5    Q.   When did --
6    A.   Let me qualify that a little more.  CB 1 and
7  CB 2 inmates report to the chow hall.  If there's any in
8  those cell blocks, they will actually sign for their
9  meals we receive.
10    Q.   Everyone in those cell blocks signs for the
11  meals they receive?
12    A.   If they received a special diet.
13    Q.   So a medical diet or a religious diet?
14    A.   Yes.
15    Q.   Do the prisoners in CB 1 and CB 2 also receive
16  reduced calorie meals?
17    A.   Yes.
18    Q.   When did the Department start the reduced
19  calorie meal program?
20    A.   I don't have an exact date.  It's been several
21  years.
22    Q.   And what was the impetus for it?
23    A.   The reduced activity level.
24    Q.   So is all the nutritional analysis of meals
25  passed out to isolation prisoners done by your

Page 149

1  contractor?
2    A.   Yes.
3    Q.   And is there any ADC official who actually
4  oversees that these are adequate?
5    A.   There is a contract monitor at each complex,
6  and they inspect the kitchen and they review menus, and
7  they deal with any issues that may arise regarding food
8  service.
9    Q.   And to your knowledge, has the contract monitor
10  ever found problems with food service at your particular
11  institution?
12    A.   No.  We -- as I was saying before, there's a
13  few things at our custody level that's of premier
14  importance to get right.  And that's mail, food.  You
15  want to make sure they get their recreation and showers
16  and stuff.  Those things are very important, and you
17  don't want to compromise those.  You want to make sure
18  they have those the best that you can.
19    Q.   Is food ever used as punishment in the Arizona
20  Department of Corrections?
21    A.   No.
22    Q.   Do you know what policies and procedures govern
23  the management of suicide watch and prevention in the
24  Arizona Department of Corrections?
25    A.   Yes.  I believe it's 807.

38  (Pages 146 to 149)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 150

1    Q.   Anything else?
2    A.   Medical and mental health have their own
3    series, but I think it's that policy, 807, that covers
4    the watches.
5         (Exhibit 87 was marked.)
6    Q.   BY MS. FETTIG: So the court reporter is
7    handing you policy 807, Inmate Suicide Prevention, marked
8    as Exhibit 87. Could you take a look at this and tell me
9    if it's the current version to your knowledge.
10   A.   Yes, it is.
11   Q.   Other than 807, do you know of any post orders
12   that pertain to suicide prevention for your staff?
13   A.   The general post orders talk of suicide
14   precautions and signs, symptoms of depression, possible
15   suicide.
16   Q.   Are there any special precautions that are
17   taken for suicide watch on the isolation units in
18   particular?
19   A.   I'm sorry? Is there what?
20   Q.   Are there any special precautions taken under
21   policy or practice for suicide watch issues on the
22   isolation units above and beyond what would be in a
23   general order?
24   A.   Absolutely.
25   Q.   What are they?

Page 151

1    A.   There's a multitude of issues. It's found in
2    the policies, but their cell first of all is designated
3    as a watch cell. Those cells have been reviewed for any
4    type of tie-off areas, sharp edges, anything like that.
5    Those cells are typically located in higher profile areas
6    where you have quick access. They also have illumination
7    and cell fronts to facilitate the constant supervision of
8    the inmates if needed. The mattress itself is usually a
9    suicide prevention-type mattress so he can't tear the
10   edges off or use any material to tie off.
11   Q.   Excuse me. Are you talking about every cell in
12   an isolation unit or just particularly designated suicide
13   watch cells?
14   A.   Suicide watch cells.
15   Q.   And you have those, for example, at Central
16   Unit?
17   A.   Yes.
18   Q.   I'm sorry, I wasn't clear.
19   A.   And then they're provided special clothing to
20   include a smock and suicide prevention blankets. And the
21   food that's delivered to them, utensils, all that in
22   terms of what they can have in their cell beyond the
23   mattress is dictated by the mental health staff to
24   include a smock, to include a blanket. That's all
25   determined by the mental health staff. If they are

Page 152

1    allowed to have eating utensils, it's up to the mental
2    health staff. Any other type of materials, hygiene items
3    or anything like that is all determined by the mental
4    health staff.
5         And we have three types of mental health
6    watches. We have the continuous watch, the ten-minute
7    watch, and the 30-minute watches.
8    Q.   And above and beyond the general suicide
9    precaution policies within ADC, is there anything
10   particular to the isolation units that's different than
11   the general policy regarding suicide prevention and
12   watches?
13   A.   Just what I talked about. Tie-off areas and
14   sharp edges and stuff like that.
15   Q.   So that only exists in the isolation unit, or
16   are you talking about general suicide watch cells?
17   A.   Your watch areas are typically located where
18   your detention areas are at. In Central Unit, the watch
19   area for suicides are all located at Kasson at the very
20   front of Wing 2.
21   Q.   I see. So what you're saying is that in
22   general, the watch cells for suicide watches are going to
23   be located in the detention centers or higher security
24   units?
25   A.   Yes.

Page 153

1    Q.   Regardless of what custody level the prisoner
2    is at?
3    A.   Right.
4    Q.   I understand what you're talking about finally.
5    Forgive me for being so slow.
6         What is the role of correctional staff in
7    suicide watches?
8    A.   The role -- the obvious role is to make sure
9    that they don't engage in self-harm. And so they're
10   responsible for whatever the period of time --
11   intermittent period of time is for the observations,
12   whether that be continuous, 10, or 30. They're to make
13   sure if it is a 10 or 30 that those are random times, not
14   set times. Not like at 2:00, 10 after 2, etc. It has to
15   be a variance in terms of the time increment. They have
16   to make sure that they are closely monitoring, including
17   view of the hands, face, feet, etc. So he's not
18   manipulating something beneath the blanket, whether it be
19   fingernails or whatever and make sure the inmate is
20   healthy and not engaged in any type of self-harm.
21        They're also required to do their necessary
22   documentation, which is an observation form that they
23   have to fill out. And in there, it states the time and
24   also what activity the inmate was involved with when they
25   made the notation and observation.

39 (Pages 150 to 153)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 154

1      They are also required to have a journal.
2   Q.   So the correctional journal?
3   A.   Yes.
4   Q.   In addition to the observation record?
5   A.   Yes. They're also required to make sure that
6   the post order -- or the watch order is the most current
7   watch order that's posted on the cell front.
8   Q.   And who would review the observation records?
9   A.   On shift, it's the supervisor. They have to
10  review every -- within every four hours, they have to do
11  a review of every inmate on watch and note that on the
12  observation log in chronological order.
13  Q.   Is there any special training given to
14  correctional officers on suicide watch and prevention?
15  A.   All officers receive eight hours of training
16  when they go through COTA for suicide watch and suicide
17  prevention. And then every year they are given another
18  two hours of training. Those on post for the watch have
19  a post order specific to the watch site for them to read
20  over and understand.
21  Q.   So when a watch is ordered, there's a post
22  order that directs individual officers on what they're
23  supposed to do?
24  A.   Yes.
25  Q.   What happens after a completed suicide?

Page 155

1   A.   A completed suicide? CIU is notified, which is
2   the Criminal Investigation Unit. The area is sealed off
3   as a crime scene. An officer is posted on the scene. A
4   journal is started. The body, if it's still in the cell,
5   remains in the cell until the medical examiner arrives on
6   site. Then we start the notification processes.
7   Q.   And what are the notification processes?
8   A.   The emergency contact for the inmate that's
9   listed will be notified. The chain of command is
10  notified, to include the duty officer and administrators,
11  warden.
12  Q.   What kind of review do prison administrators do
13  when a suicide is completed on their unit?
14  A.   There's an after action report that has to be
15  done. It details all the activities that occur in or
16  around that time period, what the staffing was, what the
17  history of the inmate was, mental health, reviews the
18  care and treatment that was provided the inmate.
19      Then later there is a review that's done by
20  medical staff, mental health, as well as the unit
21  administrator for a full review of the suicide and
22  whether or not there's anything that we could capture
23  from that to assist us in the prevention of other
24  suicides.
25  Q.   Is it true that prisoners who attempt suicide

Page 156

1   or engage in self-harm activities might be subject to
2   disciplinary action?
3   A.   If an inmate engages in some sort of self-harm
4   and is transported to a hospital, the costs of that then
5   are assessed against the inmate through the disciplinary
6   process, yes.
7   Q.   But would they be given a disciplinary charge?
8   A.   Yes.
9   Q.   Could that impact their custody level?
10  A.   Yes, as a major violation, yes.
11  Q.   So if you -- if a prisoner is charged with a
12  major violation of engaging in self-harm, could they end
13  up in an isolation unit as a result?
14  A.   In a detention unit? They're immediately
15  placed in a watch. Whenever an inmate commits self-harm
16  they end up in a watch, and then, no, they're not placed
17  in detention.
18  Q.   As a result of disciplinary?
19  A.   No. We don't place -- in maximum custody, we
20  don't typically place our inmates that are written up on
21  major violations in the detention unit. They remain in
22  the general population housing, and they're served with a
23  disciplinary report, violation report, but they don't go
24  to detention.
25  Q.   They would just be given a major violation and

Page 157

1   remain in --
2   A.   Their current housing. Unless there's an open
3   cell front and they've committed some sort of assault,
4   and then we'll move them to the closed cell front
5   setting. But other than that, they're not placed in
6   detention.
7   Q.   And by open cell front, you mean open bars?
8   A.   Yes.
9   Q.   And are the open bars, pods, if you want to
10  call them, that they're reserved for lower risk
11  prisoners? Is that true?
12  A.   No. It's not really lower risk. Any inmates
13  that have engaged in any type of assaultive behavior,
14  whether that be throwing on, punching, attempting to
15  punch another inmate, grabbing, stabbing, etc. Those
16  inmates are moved from the open cell fronts because of
17  security concerns to a closed cell front for a period of
18  time. And they'll remain there until an informal type
19  review is done. And if they request to move back to an
20  open cell front, then they're evaluated to determine
21  whether they're appropriate to move back or not.
22  Q.   For a prisoner who attempts suicide and -- at
23  Florence-Central, would that prisoner be maintained at
24  Florence-Central or sent to a mental health unit?
25  A.   That's really up to the mental health staff.

40 (Pages 154 to 157)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 158

1    There are a few that are moved out to the Flamenco or
2    Baker Ward.  That's a call by mental health staff,
3    though.
4         Q.   If a prisoner is disciplined for engaging in a
5    self-harm activity at Florence-Central or any isolation
6    unit, you mentioned that could be a major disciplinary
7    violation.  Would that extend their stay in the isolation
8    unit?
9         A.   It could increase their points, and so, yeah,
10   it would impact length of stay.
11        Q.   Do you know if there are any reports generated
12   on annual suicide statistics in ADC?
13        A.   I don't.
14        Q.   Do you know if there are any reports generated
15   on suicide statistics at Central Unit?
16        A.   No, there's none.
17        Q.   So you don't review annual numbers or follow
18   that?
19        A.   No.
20        Q.   Do you know if the mental health staff does?
21        A.   No, I don't.
22        Q.   Is suicide or self-harm activity a special
23   concern for isolation units?
24        A.   It's a special concern for the Department wide,
25   not just for Central Unit or for maximum custody units.

Page 159

1         Q.   Is there any enhanced concern for those units?
2         A.   The requirement to do a continuous movement is
3    especially important in maximum custody because there's
4    not the freedom of movement.  Inmates can't come to you.
5    We must go to them.  And so the requirement to make sure
6    you are circulating and observing inmates is very
7    important in the maximum custody units, and that's
8    emphasized with the staff.  The lower custody units, the
9    staff are required to make movement, but inmates in those
10   units typically will be pulled out for various reasons
11   and make movement on the yard, and so their movement is
12   less restricted, and there's less of a requirement and
13   emphasis on the officers to do a check on each and every
14   inmate during each of their tours.
15        Q.   So would you consider these 30-minute checks as
16   part of the suicide prevention?
17        A.   Yes.
18        Q.   At Central Unit, do you know whether or not any
19   of the prisoners in your units have an MH 3 diagnosis?
20        A.   Yes, they do.
21        Q.   And you know if any of those within the MH 3s
22   have a designation of serious mental illness?
23        A.   No, I don't.
24        Q.   Do you have any idea how many MH 3s you have?
25        A.   I don't.  When we started the enhanced programs

Page 160

1    at CB 1 and CB Kasson, there was roughly 280 some inmate
2    that had inmate scores of 3, but that number fluctuates.
3         Q.   Are all of the MH 3s at Central Unit in either
4    CB 1 or Kasson?
5         A.   No.
6         Q.   Do you have a rough idea of how many are not?
7         A.   No, I don't know the total number.
8         Q.   Do you know within any of the isolation units
9    if there are prisoners with an MH 4 and MH 5 designation?
10        A.   In the maximum custody units?
11        Q.   Uh-huh.
12        A.   I don't know about Browning and SMU.  At
13   Central there's not.
14        Q.   And how about Perryville, do you have any idea
15   about that?
16        A.   I don't know.
17        Q.   When a prisoner is determined to be actively
18   suicidal on Central Unit, are they immediately moved out
19   of their current housing situation or do they remain
20   there?
21        A.   The mental health staff do an evaluation.  If
22   they feel they warrant placement in a watch cell based on
23   their level of depression or suicidal ideation or
24   tendencies, then they will move them.  Again, that
25   decision is strictly by medical and mental health.

Page 161

1         Q.   Are there any prisoners at Central Unit or any
2    of the other isolation units who are diagnosed with
3    mental retardation?
4         A.   I'm not aware of any.
5         Q.   Is there any policy that prevents them being
6    housed in those units?
7         A.   No.
8         Q.   Do you know if it's true that prisoners who are
9    transferred from an inpatient mental health facility
10   might be housed in either Florence-Central or one of the
11   other isolation units?
12        A.   That make movement from an in-house mental
13   health --
14        Q.   An inpatient mental health facility.
15        A.   I'm not aware of that, no.
16        Q.   If a prisoner is classified to Central Unit,
17   are you aware whether or not his mental health treatment
18   plan is still followed upon being classified to
19   Central --
20        A.   No.
21        Q.   -- from lower custody?
22        A.   No.
23        Q.   No, you're not aware?
24        A.   No, I'm not aware.  We don't have access to
25   their files.

41 (Pages 158 to 161)

Parsons v. Ryan
Fizer, Greg – 10/29/2012

Page 162

1    Q.  Are there any criteria that preclude a prisoner
2  from being classified to an isolation unit?
3    A.  Any policies that preclude them?
4    Q.  Uh-huh.
5    A.  Not that I'm aware of.
6    Q.  Under policy, do your correctional staff play
7  any role in monitoring the effects of isolation on
8  prisoners at Central?
9    A.  They are required to, during their movement,
10  note if any inmates appear to be incoherent, depressed.
11  There are signs and symptoms.  And beyond being taught
12  those signs and symptoms, they're required to carry a
13  card with them that lists what those signs and symptoms
14  are.  So it's frequently addressed and talked about and
15  up front in the minds of the officers.
16    They know the purpose of walking around in
17  those cell blocks and observing inmates to determine if
18  we have any inmates that are showing these signs and
19  symptoms and alert medical staff and mental health staff
20  when they see that.  And they do frequently.  If they
21  have any medical concerns, they'll make sure that they're
22  notified.  If an inmate appears to be incoherent or not
23  responsive to direction or conversation or otherwise,
24  they'll alert mental health staff.
25    Q.  And is this required under their post order?

Page 163

1    A.  Yes.
2    Q.  So who in mental health would they notify?
3    A.  Whosever available.  That may be the psych
4  nurse, it may be a psych associate or psychiatrist,
5  psychologist.
6    Q.  Do they have any time frames in which they need
7  to notify staff?
8    A.  They need to notify them immediately, and they
9  do so.
10    Q.  And that's required by their post order?
11    A.  Yes.
12    Q.  Let's take another look at Exhibit 83, which is
13  the PowerPoint presentation.
14    The first few pages appear to be about
15  Central Unit and Kasson.  Page 3 in particular says: On
16  April 27th, 2012, Division Director Patton, NROD
17  McWilliams, blah, blah, blah, Central Unit Administration
18  staff met regarding increasing programs available at
19  Central Unit for inmates identified to have an increased
20  need due to mental health/behavioral issues.
21    Were you part of that meeting on April 27th?
22    A.  No. I was out for medical reasons.
23    Q.  Do you know if this meeting and the development
24  of these programs were at all motivated by this lawsuit?
25    A.  No.

Page 164

1    Q.  No, you don't know --
2    A.  No, I don't know.
3    Q.  If you could turn to page 4.  Several points
4  down, it says 1 on 1 counseling with mental health
5  professionals is one of the objectives of the Kasson Wing
6  1 and Cell Block 1programs.
7    Do you know if this counseling occurs at
8  cell front, this one-on-one counseling?
9    A.  No.  This actually occurs in an office.
10    Q.  On the unit or --
11    A.  Yes.  On the wing itself.
12    Q.  So actually page 5 says Cell Block Kasson is
13  the title of the slide.  The last bullet says: These
14  inmates are in need are more frequent meetings with
15  mental health professionals in an office type one-on-one
16  setting.
17    Is that the counseling that they're
18  referring to?
19    A.  Yes.
20    Q.  Does that -- now, this is for cell block
21  Kasson.  Does this one-on-one office type setting also
22  apply to the inmates on Cell Block 1?
23    A.  Yes.
24    Q.  And do you know how often that type of
25  counseling occurs in these programs?

Page 165

1    A.  Yes.  With the inmates in Kasson, the goal is
2  to do this every couple weeks.  With the inmates in Cell
3  Block 1, it's at least every 30 days.
4    Q.  Going to page 6.  There's a bullet that says:
5  Kasson movement May 2012.
6    Second point down:  Seven inmates were
7  identified, screened and selected to go to Baker
8  Ward/Flamenco from the original group due to the severity
9  of their mental health disorders.
10    Baker Ward/Flamenco, is that a mental health
11  program, an inpatient program?
12    A.  It's a mental health program.
13    Q.  Is that still an isolation unit?
14    A.  I believe all custodies are there.  The whole
15  mission is mental health, inmates that are severe mental
16  health issues, and it is a mental health unit.  So I
17  believe all custodies are there.
18    Q.  So page 7, the title of the slide is
19  Modifications to Kasson Wing 1.  And it talks about
20  windows being retrofitted.  Can you tell me a little bit
21  about these modifications for Wing 1.
22    A.  Yes.  The large window was part of the mental
23  health enhancement for Kasson.  They did have the closed
24  cell fronts with the exception of the long linear window
25  that was in front.  And to have better visibility of the

42  (Pages 162 to 165)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 166

1   inmates and for them to be able to see out and facilitate
2   any socialization that may result from that, then we
3   started with one large window in every cell and now going
4   back and installing a second window. So as you see in
5   the pictures --
6       Q.   Where are you, what page?
7       A.   You can go to page 8 or 9. It shows cells with
8   the two windows, upper and lower.
9       Q.   So some have upper and lower and some,
10  apparently on Baker Pod on page 9, only has a window in
11  the door, it looks like?
12      A.   It's a retrofit, so we started with one and
13  went all the way around. Once we completed all 64 cell
14  fronts, we started back around working on the second.
15      Q.   So these windows, they're not in the door,
16  they're beside the door?
17      A.   Yes.
18      Q.   And on page 7, it mentions that televisions
19  have been installed in the pods in order to begin viewing
20  program materials.
21      A.   Yes.
22      Q.   Where are these televisions installed?
23      A.   They're large flat screen televisions. If you
24  turn to page 9, you can see a photograph of the flat
25  screen mounted on the wall.

Page 167

1       Q.   And that's what the prisoners are looking at
2   for group programming?
3       A.   Right. You see two TVs in the Able Pod
4   picture. One points to the left side, one points to the
5   right side. All inmates have a view then.
6       Q.   Yes, I do see that. And from their place in
7   their cells, can they hear what's being broadcast?
8       A.   Yes.
9       Q.   And what type of group programming material
10  would they watch on these pod televisions?
11      A.   They started with Commitment to Change is the
12  title of it. And it was selected by the mental health
13  staff themselves from a menu of topics. And the
14  Commitment to Change was one that was selected as the
15  starting point for these inmates.
16      Q.   So is that the group counseling?
17      A.   Yes. They will view -- the Commitment to
18  Change is shown at two set time periods, and inmates are
19  then encouraged to watch the material that's broadcast on
20  the CCTV station. And then following that, they are
21  pulled out for group interaction and group sessions eight
22  at a time.
23      Q.   And when you say pulled out, where do they go?
24      A.   To the recreation enclosures, which are octagon
25  shaped. And the mental health staff, the psych associate

Page 168

1   or the psychologist, stand out there with a CO III that's
2   assigned to Wing 1, and they're the ones then to
3   facilitate the group discussion.
4       Q.   I see. So actually, turning to page 10,
5   there's a picture on -- the printing is not great, but
6   there's a picture on the lower left side. Is this the
7   group meeting you're referring to?
8       A.   Yes.
9       Q.   It looks like there's a person in the middle of
10  a bunch of cages.
11      A.   That's one of the psych associates, yes.
12      Q.   And there are eight people in these cages at a
13  time?
14      A.   Yes. They're not cages.
15      Q.   Enclosures.
16      A.   Thank you.
17      Q.   And those are actually the outdoor recreation
18  spaces?
19      A.   Yes.
20      Q.   So actually turning to page 11, there's
21  pictures of offices with again some barred enclosures. I
22  won't call them cages.
23      A.   Thank you.
24      Q.   Is this a depiction of the one-on-one
25  counseling that you --

Page 169

1       A.   This is the primary office. It's located on
2   the wing itself.
3       Q.   Are you pointing to the picture on the lower
4   left corner of page 11?
5       A.   Yes. This one. That's the primary office.
6   And the mental health staff sit at the desk. And they'll
7   engage in the one-on-one counseling with the inmate who's
8   placed in the enclosure. There is a trap door where
9   materials can be passed through to the inmate if need be.
10      Q.   Yes, I see where that is. It looks like sort
11  of a food slot.
12      A.   We call it a cuff board. And then there is
13  another office at the very -- on the left side. This is
14  at the very front of the wing. That's in case we are
15  doing simultaneous one-on-one meetings.
16      Q.   And would there be a correctional officer in
17  this room --
18      A.   No.
19      Q.   -- or outside the room?
20      A.   No. They are -- the inmates are escorted up to
21  the enclosure, placed in the enclosure, and then the
22  officer leaves.
23      Q.   Do you have any idea how long these one-on-one
24  sessions are scheduled to last or if there's any
25  requirement?

43 (Pages 166 to 169)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

## Page 170

1   A.  I don't know what the requirement is. I know
2   they typically meet with them for 30 to 40 minutes.
3   Q.  And is this everyone in the program or --
4   A.  Yes.
5   Q.  -- just folks --
6   A.  Yes.
7   Q.  Everyone?
8   A.  Yes.
9   Q.  Turning to page 12, this is a slide entitled
10  Cell Block 1. And it discusses the physical layout of
11  Cell Block 1 as a horseshoe shape that provides the
12  ability to see outdoors. Can you describe that a little
13  more. I'm having a hard time envisioning.
14  A.  It was a design from the '60s, and it was a
15  unique architecture shape. Never seen a cell block like
16  it. If you can envision a V with long extensions at the
17  top of the V on both sides. The V is the horseshoe. The
18. sides then are the east and the west side of the cell
19  block. There's three tiers in the cell block. So you go
20  out like this. All of that faces open windows all across
21  the front. Those windows are long, linear windows the
22  entire length of the face of the cell block. It looks
23  like a rib structure of concrete down through these
24  windows. But it avails itself to lots of visibility and
25  light from the outside. They can clearly see people

## Page 171

1   walking around outside.
2   Q.  Does it get hot?
3   A.  Hot? Not any hotter than any other -- because
4   it faces the north.
5   Q.  Okay. It says here the last point on 12: The
6   east and west sides provides for the ability to see
7   outdoors. Is that the same rib structure you're talking
8   about?
9   A.  Yes.
10  Q.  So these cells on Cell Block 1, they don't have
11  their own windows to the outside, but the front of them
12  faces windows? Is that accurate?
13  A.  They each have -- in the back of the cell, they
14  each have a window. The access is to the outside. And
15  then in the front, particularly those on the east and
16  west side, have very clear visibility. But those in the
17  V itself also see illumination from the V area.
18  Q.  I see. So page 14, which is a continuation of
19  the cell block program. And the paragraph on the left,
20  it says: Inmates can see each other while socializing.
21  Are these the folks in the V of the horseshoe?
22  A.  Yes.
23  Q.  And they have windows in their cell fronts?
24  A.  In the back. And the front is the open bars.
25  In the back are the windows in the back of the cell

## Page 172

1   blocks. Those are bars. You see the light coming in?
2   Those are doors.
3   Q.  The picture on the left?
4   A.  There's a door for each tier. And they exit
5   out those doors to report to chow or report to the
6   recreation enclosures.
7   Q.  And the picture on the right, is that the rib
8   structure you were referring to?
9   A.  Yes.
10  Q.  I see.
11  And for Cell Block 1, in this program, are
12  the folks in Cell Block 1, what would be their mental
13  health status?
14  A.  They're a little higher functioning. They're
15  all inmates IIIs. They all either had a prior history or
16  are currently on medication for mental health issues.
17  And they've been selected by the mental health staff to
18  participate in the program. They're not as severe as the
19  inmates are at the Kasson Unit. They're much more able
20  to socialize effectively with others.
21  Q.  And on page 15, there's a slide entitled
22  Program Incentives for Cell Block 1. It goes through a
23  list of incentives.
24  A.  Uh-huh.
25  Q.  And, for example, No. 1 says: They are

## Page 173

1   afforded the opportunity to participate in WIPP job
2   positions (currently 16 inmates assigned).
3   Is that 16 out of 120?
4   A.  Yes.
5   Q.  So these individuals who are like the 16 doing
6   job opportunity, is this part of a phased incentive
7   program or how is a determination made of who get a job
8   or who gets contact visitation, etc.?
9   A.  It's a review that's done that starts with the
10  CO III that's assign to the building. The sergeant also
11  that's assigned to the building may recommend select
12  inmates. We review their history in terms of discipline,
13  in terms of their participation in the program, and then
14  any work history that they've had, any special skills
15  that they may have and stuff. And then a decision is
16  made with the CO IV as well as myself to assign them to
17  the work program.
18  The reason that we only have 16 is because
19  their opportunities are in the cell block only. Unlike
20  the inmates assigned to CB 2, who work outside the cell
21  block where we have 81 positions for them, there's only
22  16 jobs for these guys to do inside the cell block.
23  Q.  I see. And for the Cell Block 1 as well as the
24  Kasson Unit, other than the one-on-one counseling and the
25  group sessions that we discussed, are there any other

44 (Pages 170 to 173)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 174

1 mental health programs that these prisoners are able to
2 participate in?
3     A.   The material is broadcast on the CCTV.  They do
4 the one-on-ones, and they do the groups.  Beyond that,
5 there isn't anything.
6     Q.   And for the prisoners who aren't in these
7 specialized programs at Central Unit, they are afforded
8 the CCTV if they have a television --
9     A.   Yes.
10     Q.   -- is that true?
11     A.   Yes.  The mental health staff also do see
12 inmates that have mental health needs in other cell
13 blocks.  And they do that every 30 days.  They will make
14 sure they make contact with those inmates as well.
15     Q.   Do you know if those contacts are at cell
16 front?
17     A.   Some of those are at cell front, but others are
18 required to come to the medical unit, and they'll meet
19 with the psych associate there or else the psychologist
20 or psychiatric nurse.
21     Q.   Do you know which are required?  Is that part
22 of their treatment plan?
23     A.   The medication renewals, medication updates,
24 those kind of things are all face to face done at the
25 medical unit.  If they just want to touch base with the

Page 175

1 inmate and see how they're doing, they'll go to the cell
2 block.  If the inmate requests to have a one-on-one, then
3 they're placed on the appointment list and seen.
4     Q.   So looking at page 16 of the PowerPoint
5 presentation and page 17, are these slides evaluating the
6 success of the Kasson and Cell Block 1 programs?
7     A.   This is just providing some information that
8 was requested in regard to self-harm and discipline.
9 There isn't -- this isn't set up as a measure of success
10 one way or another.  But if we were asked to provide
11 information regarding a -- like I said, discipline and
12 self-harm.
13     Q.   So on 17, it looks like you went from three
14 incidents of self-harm in June to one in July.
15     A.   None.
16     Q.   And none in August.
17     A.   None in August.
18     Q.   Is that -- was June before the program went
19 online fully?
20     A.   Yes.
21     Q.   And was it fully implemented by July?
22     A.   Yes.
23     Q.   And so far, for September, are your numbers for
24 both incidents of self-harm but also assaults on staff
25 and other inmates, major or minor violations, are they

Page 176

1 consistent with what was reflected in the data for July
2 and August, do you know?
3     A.   It looks like Kasson, we had an increase in
4 August to seven.  I believe that number is down for
5 Kasson.  Three for August in Cell Block 1.  I don't know
6 that we had any assaults in Cell Block 1 during that time
7 period.
8         Self-harm, there was -- there were one or
9 more incidents of self-harm at Kasson since August.
10     Q.   On page 18, it talks about training for all
11 staff that work with inmates in these programs.  And it
12 says: Dr. Taylor reports she will have a training
13 program established within the next 30 days.
14         Do you know if this training program has
15 been established?
16     A.   It has not.
17     Q.   And do you know anything about the nature of
18 this training program?
19     A.   What she wants to put together is a program to
20 take our officers beyond just the training that's
21 provided by the Department and put together a curriculum
22 that will help facilitate our officers in communication
23 with these inmates, understanding the nature of these
24 inmates, the patience that's required with these inmates,
25 the redundancy with which they may pose questions to you

Page 177

1 and just basically may want attention.  And just help
2 facilitate a better service delivery from us to the
3 inmates through learning some techniques of just
4 interaction with these inmates.  That's her goal.
5     Q.   So that type of training is not currently
6 available?
7     A.   No.
8     Q.   The next slide on this exhibit is 19, and it
9 indicates that it's talking about a Phoenix unit, and in
10 particular, Aspen Unit, Baker Ward, and Flamenco Unit.
11 Do you have any knowledge whatsoever of that program?
12     A.   I don't.  I know that we send our severe mental
13 health inmates up there, but I don't otherwise.
14     Q.   So you're not familiar with any changes that
15 have recently taken place with these programs?
16     A.   No.  I've never seen this.
17     Q.   How about let's go to 27747, which is page 24.
18 This looks to be the beginning of a mental health
19 behavior health program for Browning Unit and SMU 1 at
20 Eyman.  Are you familiar at all with any recent changes
21 in programming at these units?
22     A.   No.  I know they've been encouraged to, like I
23 say, create the recreation enclosures for multiple
24 inmates.  And they've also been encouraged to provide the
25 enhanced programming opportunities and contacts, but I'm

45 (Pages 174 to 177)

Parsons v. Ryan
Fizer, Greg – 10/29/2012

Page 178

1  not sure where they are with that.
2      Q.   And would the encouragement of these aspects of
3  programming, would that be to model after what you've
4  been doing at Kasson 1 and CB 1?
5      A.   The essence of it, yes. And the one-on-ones,
6  the frequency of which those are done and also at some
7  point to begin the groups and to begin the increased
8  socialization contacts with the recreation opportunities,
9  yes.
10     Q.   And just going back to the one-on-ones that are
11  part of the program at Kasson and CB 1, who conducts
12  those one-on-ones?
13     A.   Psych associates or psychologists.
14     Q.   Okay. And they happen for each prisoner, am I
15  remembering correctly, on a weekly basis?
16     A.   Every other week at Kasson and every -- at
17  least every 30 days in CB 1.
18     Q.   So the group programs, those are happening on a
19  weekly basis?
20     A.   Yes.
21     Q.   I just can't keep it all...
22     A.   That's all right.
23     Q.   So just so we can finish off this document.
24  Page 30. ASPC-Perryville the slide is titled. Subtitle
25  is the Santa Cruz Unit Mental/Behavioral Health

Page 179

1  Programs. Are you aware of any changes to the
2  programming at Perryville?
3      A.   I am not.
4      Q.   Are you aware of any other mental health
5  programs for the isolation unit populations other than
6  the ones we've talked about today?
7      A.   No.
8      Q.   So as far as you know, we've covered the gamut?
9      A.   Yes.
10     Q.   At Florence-Central Unit, if a prisoner is in a
11  Kasson Unit or CB 1, if they're removed from those
12  programs, are they returned to the regular units at
13  Central? Where would they go?
14     A.   Yes. One of the general population cell
15  blocks.
16     Q.   And since they've been identified as a prisoner
17  with mental health needs but they're no longer in the
18  mental health program, do you have any knowledge of how
19  those mental health needs are accommodated in the general
20  population unit?
21     A.   We still continue the 30-day one-on-one
22  contacts.
23     Q.   And that's the general policy as far as you
24  know?
25     A.   Yes.

Page 180

1      Q.   We talked about staffing levels at Central Unit
2  before lunch. Just going back to that briefly, if you
3  have a prisoner who's been placed on a suicide watch,
4  does that change the staffing pattern or staffing level
5  on the unit?
6  [redacted]
7  [redacted]
8  [redacted]
9  [redacted]
10 [redacted]
11 [redacted]
12 [redacted]
13 [redacted]
14 [redacted]
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19     Q.   You mentioned you have a watch officer. Is
20  that someone who's just designated on every shift to be
21  the watch officer?
22     A.   Yes.
23     Q.   If there's not a watch currently in place, what
24  does that officer do?
25     A.   That's never happened. That's never happened.

Page 181

1      Q.   So on a daily basis, for each shift, you're
2  going to have a position that's designated as a watch
3  officer?
4      A.   Yes.
5      Q.   And do they go to the different units? Are
6  they only in one unit?
7      A.   The only watches for Florence are in front of
8  Wing 2 at Kasson, and the officer is posted there. They
9  can't leave that area. There's four inmates on one side
10  of the run and four on the other side and a desk in
11  between. And he makes his movement -- he or she makes
12  his movement back and forth.
13     Q.   If there's a medical emergency on a unit, would
14  that change the staffing pattern on that unit?
15 [redacted]
16 [redacted]
17 [redacted]
18 [redacted]
19 [redacted]
20 [redacted]
21 [redacted]
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

46 (Pages 178 to 181)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

**Page 182**

3  Q.  In general when staff are responding to a
4  medical situation on the unit, which are the posts that
5  would do the response?

15  Q.  And who's making those decisions?
16  A.  It's already determined.  You do that ahead of
17  time.  It's that prioritized post chart I was referring
18  to.
19  Q.  And the prioritized post chart, just to make
20  sure that I understand this correctly, that applies to
21  each unit across the system?
22  A.  Yes.
23  Q.  So each unit has it's own tailored prioritized
24  post chart?
25  A.  Every unit.

**Page 183**

1  Q.  What are the policies and procedures that
2  govern the training of correctional staff in ADC?
3  A.  I don't know the Department Order number.
4  Q.  I'm going to pull one and show it to you.  You
5  can tell me if this is what you use.
6  (Exhibit 88 was marked.)
7  Q.  BY MS. FETTIG:  So the court reporter just
8  handed you DO 509, Employee Training and Education, as
9  plaintiffs' Exhibit 88.  Are you familiar with this
10  policy?
11  A.  Yes.
12  Q.  And would this be the policy that governs the
13  training of your correctional officers?
14  A.  Yes.
15  Q.  Just so we have a better idea of the documents
16  out there, if you would turn to page 1 down at paragraph
17  1.3.  It mentions the Correctional Officer Training
18  Academy.  And I think you referred to it earlier, COTA.
19  A.  Yes.
20  Q.  1.3.2 cites a COTA Technical Manual.  What
21  would that be?
22  A.  I have never seen it.  It apparently covers the
23  specific issues regarding curriculum, the various
24  classes, regarding the essential training objectives.  It
25  probably also has post standards in there as well.

**Page 184**

1  Q.  But you're saying that you yourself don't use
2  it?
3  A.  I have not seen it, no.
4  Q.  Going to page 6.  Paragraph 509.04.  General
5  In-Service Training Plan.  Are you familiar with that?
6  A.  Yes.
7  Q.  What is that?
8  A.  Every year they come up with a training plan,
9  and they put it out to the staff.  And it's the decisions
10  that are made about what this year's training will
11  encompass as refresher training for staff, the annuals.
12  And it affects all staff, administrators, support staff,
13  correctional series staff.  Decisions are usually made
14  by -- are made based on whatever a focus has become with
15  the Department, what we feel weaknesses are that we need
16  to work on.
17  So the plan is changed every year in terms
18  of what we want to refresh our staff with.  But core to
19  that is the CARE training, weapons qualification
20  training.  There's always some element on
21  communications.  There's always some element of equal
22  opportunity issues.
23  Q.  Do you remember for this year's general
24  inservice training plan what were some of the focuses of
25  the training?

**Page 185**

1  A.  All those that I've just covered.  I don't
2  remember, no.
3  Q.  That's okay.  Now, going down the page 6, the
4  paragraph 1.2, it mentions satellite training programs.
5  Are you aware whether or not either your complex or your
6  unit has a satellite training program?
7  A.  No, it does not.
8  Q.  So turning to page 7, paragraph 509.05 says
9  Special Training.  And under that, it's Orientation
10  Training.  And specifically the Arizona Department of
11  Corrections Orientation Manual (ADCOM).  Are you familiar
12  with that?
13  A.  I knew that we had that for new employees, yes.
14  Q.  So that applies to your officers who are new,
15  recently hired?
16  A.  No.  This is more for people other than
17  correctional series.  As it describes here, these are the
18  intermittent/seasonal and all volunteers, contractors,
19  etc.
20  Q.  In the following paragraph?
21  A.  Yeah.  These are contractors and stuff that --
22  that's part of the orientation training that they're
23  given.
24  Q.  So this orientation training is not for
25  correctional officers per se?

47  (Pages 182 to 185)

Page 186

1      A.   I don't believe so, no.
2      Q.   Okay. Going down to the following paragraph,
3   1.3, it's the very bottom of the page. Still in the
4   orientation training section. That section is entitled
5   Correctional Analysis and Response for Emergencies (CARE)
6   Training. Does this apply to your correctional staff?
7      A.   The CARE. We have to do the CARE training,
8   yes.
9      Q.   And is this a core training?
10     A.   This is part of the -- the core training. It's
11  done every year now, not every two years but every year.
12     Q.   And would this CARE training be part of the
13  general inservice training plan?
14     A.   Yes.
15     Q.   Is any training for corrections staff working
16  in isolation units like the Central Unit different than
17  the training that's given to correctional staff who work
18  in medium custody, minimum custody, etc.?
19     A.   No.
20     Q.   So it's all the same?
21     A.   Yes.
22     Q.   Going through a list of what training is
23  required for correctional staff, let's take a look at
24  page 3 in 509. Actually, I misspoke. It starts at page
25  2, 509.02. Pre-Service Training/Correctional Officer

Page 187

1   Training Academy Operations.
2            There's a list of training subjects. Is
3   this part of the -- is this list also part of the annual
4   training that everyone receives or is this a one-time?
5      A.   The curriculums for the COTA classes are
6   usually a little bit different than the annual
7   trainings. They may not be as comprehensive as the
8   training that's given at COTA. For example, the suicide
9   prevention and mental health training is an eight-hour
10  class at COTA and a two-hour class during the annual
11  refresher.
12           But, yeah, some of this stuff,
13  professionalism and ethics, we typically have that.
14  Inmate management, interpersonal communication skills.
15  All those you'll typically see in annual refresher
16  training.
17     Q.   And this annual refresher training is now
18  happening on a yearly basis?
19     A.   Yes.
20     Q.   And what kind of record keeping do you have of
21  each individual officer's training?
22     A.   It's all computerized. A lot of it is online
23  anymore. The classes that must be done instructionally
24  are done at the complex, and it minimizes the amount of
25  time that you have to take people away from the unit and

Page 188

1   send them out to a complex. Shift schedules aren't
2   having to be adjusted.
3            For example, graveyard staff don't have to
4   have a day off and attend training and then have a day
5   off and come back. A lot of classes are loaded online on
6   software programs, and they go through the software
7   program, read about the objectives for the class, do the
8   online instruction for the class, and take an exam. If
9   they pass the exam, then they're given credit for that
10  course.
11           It really provides for a lot of facilitation
12  to keeping our staff where they need to be on post and
13  still meet the requirements of renewing their training.
14  The things like CARE, use of force, weapons. Any kinds
15  of things with -- like it was referring to here, the
16  special curriculum classes, which was, for example, EOL
17  training for supervisors and stuff, are all usually done
18  at the complex out there. We have instructions and then
19  some dialogue with the participants.
20     Q.   So what percentage of the annual training is
21  done online?
22     A.   Percentage? At least 50 percent, if not more.
23     Q.   And that's basically self-paced?
24     A.   Yes.
25     Q.   And do you as a deputy warden, do you ensure

Page 189

1   that your staff are actually completing the training?
2      A.   Weekly we monitor the training progress for
3   staff.
4      Q.   Through the computer records?
5      A.   Yes.
6      Q.   And what happens if you find that a staff
7   member is not engaging in the required training?
8      A.   We address that with the supervisors for the
9   shift.
10     Q.   And are they given a set period of time in
11  which they have to get a certain amount of training done,
12  or is it just by the end of the year?
13     A.   No. With the numbers of officers and
14  supervisors -- well, the staff at Central Unit, you have
15  to make sure that percentage is met every month, order,
16  etc. So we break it out by shift and make sure that
17  they're progressing as they need to be so that you don't
18  have a jam at the end of the year.
19     Q.   And is this something that you report to your
20  supervisors?
21     A.   The report can be viewed by anyone in the chain
22  of command. And so yes, the warden does look at that.
23     Q.   Do you generate it, the report, or --
24     A.   The training officer does.
25     Q.   And is the training officer an administrator or

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 190

1  what kind of position is that?
2      A.   They're in another division. It's a support
3  division. There's one per complex. And they generate
4  the reports and help set up the curriculums and stuff,
5  facilitate the training classrooms, make sure the
6  instructors are there, facilitate the training.
7      Q.   I see.
8           What are the policies and procedures that
9  govern the use of restraints for prisoners in isolation
10  units?
11      A.   804 covers use of force.
12      Q.   And what does that require?
13      A.   It's a continuum that's used on use of force.
14  And the continuum is emphasized in training. The use of
15  force continuum requires that we start at the lowest
16  level and maintain that lowest level of application of
17  force to be able to satisfy the need at hand, whatever it
18  is.
19      Q.   And are the use of force policies paired with
20  the restraint policy?
21      A.   There's a separate policy for maximum
22  restraint. The use of the chair, the use of the bed,
23  maximum control. It's a different policy.
24      Q.   And are either of these policies, either use of
25  force or restraint, do they apply systemwide or --

Page 191

1      A.   Yes.
2      Q.   Okay. How would a use of force incident be
3  documented at your unit?
4      A.   There's an incident report that's made out.
5  There is a use of force document itself that's created.
6  There's a significant incident report made out. Each
7  participant in the use of force has to fill out a
8  supplement report that goes along with the use of force
9  report. And also the video that's made during the use of
10  force is reviewed and stored electronically for a minimum
11  of two years.
12      Q.   And is there a video made for every use of
13  force incident?
14      A.   Unless it's spontaneous.
15      Q.   And under policy, how do you define
16  spontaneous?
17      A.   If you're escorting an inmate and he spins on
18  you and kicks you, and you need to take him down, that's
19  spontaneous.
20      Q.   So is it determined on a case-by-case basis?
21      A.   Yes.
22      Q.   For a use of restraints, how would that be
23  documented?
24      A.   Use of restrains is -- are you talking about
25  the application of handcuffs and travel restraints, or

Page 192

1  are we talking about the use of restraints for
2  controlling the inmate in self-harm events?
3      Q.   The latter.
4      A.   Decision has to be made by the mental health
5  provider that there is a need to have that done. That
6  request is communicated through the supervisor, shift
7  supervisor, to my level. There is a written order for it
8  that's filled out. The inmate -- there's a whole policy,
9  and it's very specific and detailed line by line. But
10  essentially medical staff is involved, mental health
11  staff is involved, operations staff is involved. There's
12  an observation record that's kept. So an SIR is done, a
13  operation record is done, and an incident report is done.
14      Q.   And the use of restraint policy, where -- is
15  that a Departmental Order?
16      A.   Yes.
17      Q.   Do you recall which number?
18      A.   No, I don't.
19      Q.   Other than the Departmental Order, are there
20  any other policies that govern use of restraints?
21      A.   Not other than the ones I just mentioned.
22      Q.   Do you know under the use of --
23      A.   This is it. Excuse me. It's 807.
24      Q.   The suicide prevention?
25      A.   For the maximum restraints. It's in here.

Page 193

1  Progressive and maximum, 807.
2      Q.   To your knowledge on the -- at Central Unit
3  when use of force or restraint is used with a prisoner
4  who either is designated severely mentally ill or has
5  some other MH level, 3, 4, 5, are there any special
6  precautions that are taken or required?
7      A.   As I referred to, medical staff is involved.
8  They evaluate the inmate. Once the inmate is restrained
9  on the bed or the chair, they evaluate the restraints.
10  His medical history is reviewed prior to placement, and
11  that is in consultation with the mental health provider
12  then. So both interact when this is done in terms of any
13  special issues with that. Those are extremely rare, by
14  the way. The three and a half years I was at Central
15  Unit, we've maybe used it twice. It's very, very rare
16  that we use those.
17      Q.   How about the use of chemical agents? How
18  often does that occur and under what circumstances?
19      A.   Almost daily.
20      Q.   And when would they be used?
21      A.   It varies. It could be used to stop an inmate
22  from self-harm. It could be used to prevent the inmate
23  to gain control of an inmate. To stop an inmate from
24  assaulting another inmate or assaulting staff. Well,
25  those are the reasons.

49 (Pages 190 to 193)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 194

1    Q.   And what is the policy that governs the use of
2 chemical agents?
3    A.   804.
4    Q.   In a situation where you have somebody who's
5 designated as severely mentally ill, do you know if there
6 are any special precautions taken when chemical agents
7 are being used or prospectively thought to be used?
8    A.   No.
9    Q.   No, you don't know; or no --
10    A.   No, there isn't any special precautions.
11         (Exhibit 89 was marked.)
12         MS. FETTIG:  Let's go off the record and
13 take a quick break.
14         (A recess was taken from 3:30 p.m. to
15         3:40 p.m.)
16         BY MS. FETTIG:  Deputy Warden, you've just been
17 handed what's been marked as plaintiffs' Exhibit 89. And
18 it is an Administrative Investigative Report.  And I'd
19 ask you just to take a look at this and let me know if
20 you recognize it.
21    A.   Yes.
22    Q.   It lists you as originator, I believe,
23 G. Fizer.
24    A.   Yes.
25    Q.   And what does that mean, actually, to be the

Page 195

1 originator?
2    A.   Basically I'm the administrator of the unit
3 where this event occurred.  And so with these kind of
4 events, we always do an AIU investigation.
5    Q.   What is an AIU investigation?
6    A.   Administrative investigation.
7    Q.   And did you write this report?
8    A.   No.  This is -- I was looking to see if the AAR
9 was on here.  It's not.  It's not on here.  This is all
10 policy and CIUs.  No, this is the administrative
11 investigation.  This is the AIU report right here.  It
12 looks like the administrative inquiry, which is the 601,
13 and the AIU.
14    Q.   So this -- the document that I've just handed
15 you as plaintiffs' Exhibit 89, you would characterize
16 that as an AIU?
17    A.   Yes.  Administrative investigation.
18    Q.   The administrative investigation.
19    A.   Yes.
20    Q.   And you mentioned an administrative report.
21 Would that be separate from the administrative
22 investigation?
23    A.   This is the administrative inquiry, the form
24 601.
25    Q.   And what ADC number on you are you on?

Page 196

1    A.   The back page.
2    Q.   The administrative inquiry?
3    A.   Huh-uh.
4    Q.   And does the administrative inquiry trigger
5 this report?
6    A.   In part, it does trigger the report in that
7 it's an allegation that's served to the respective
8 employee for them to know what's being alleged against
9 them and for them to be able to provide a response,
10 written response.
11    Q.   I see.  And would you have been the person who
12 issued this administrative inquiry?
13    A.   It depends.  Let's see.  I think I had just
14 stepped out.  I had a total knee replacement.  I left the
15 latter part of March and didn't return until almost the
16 beginning of June, so I think -- yeah, the event had
17 occurred in January, I'm reading.  I recall this event.
18 But as far as this inquiry, this was done after I left.
19    Q.   It seems to be dated April 2nd, 2012.
20    A.   Yeah, that was after.  I mean, the 601 was
21 dated -- date of inquiry, 4/2, I was gone on medical
22 leave.
23    Q.   But it says the date of occurrence is January
24 30, 2012.
25    A.   Yes.

Page 197

1    Q.   So recall this incident?
2    A.   Yes.
3    Q.   What do you recall about it?
4    A.   The inmate having successfully committed
5 suicide.  He hung himself.
6    Q.   Do you recall anything else about this
7 incident?
8    A.   The specifics of the incident.  How the officer
9 had reported that he had been doing his checks and found
10 the inmate hanging in his cell.  We later --
11         MR. GOTTFRIED:  What inmate is this?  You're
12 not giving us the document, so this is really hard to do.
13         THE WITNESS:  ████████████
14         MS. FETTIG:  ██████████████████
15         MR. GOTTFRIED:  It is more helpful if you
16 have a copy for us when we're doing this.  We don't need
17 the DOs, but -- it's kind of hard to follow what's going
18 on.
19         MS. FETTIG:  I'll give a chance to take a
20 look at it.
21    Q.   BY MS. FETTIG:  This is a document that
22 actually you produced to us.
23         MR. GOTTFRIED:  Sure, we produced a million
24 documents to you.  We're not bring them all with us to
25 deposition.  We're not saying we don't know what it is,

50 (Pages 194 to 197)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 198

1  we're just saying it's hard to follow.
2      Q.  BY MS. FETTIG:  For this type of administrative
3  investigation, would the deputy warden generally be the
4  originator?
5      A.  Yes.
6      Q.  And on the first page, it indicates that
7  Lt. McDonald failed to post another officer when the
8  assigned floor officer was escorting the inmate to the
9  health care unit.  And in the comments section underneath
10  the synopsis, it indicates that she was demoted to
11  sergeant effective May 16th, 2012.
12          In this incident and an incident like it,
13  would any additional training be required when staff
14  malfeasance or incorrect action has been found?
15      A.  The idea behind the review on these things, the
16  after action report, and then I talked about the
17  subsequent suicide review, those are times that we look
18  at any enhancements that we need to do, any specialized
19  training, any briefing topics, anything else that we need
20  to do operationally to train our staff.
21      Q.  So this type of administrative investigation,
22  is it a routine investigation or unusual in this
23  circumstance?
24      A.  For suicides, this is routine.
25      Q.  And what do these investigations -- do you

Page 199

1  always look at the conduct of your officers?
2      A.  We look at everyone's conduct.  What they did
3  at the time.  Whether it met the written instructions
4  that are provided for their tasked duties and
5  responsibilities.
6      Q.  Take a look at page 26927.  And that's ADC
7  26927.  Section IV about halfway down, Past Punitive.
8  This seems to be a record of disciplines for
9  Lt. McDonald.  Is that accurate?
10      A.  Yes.
11      Q.  In these circumstances when you're evaluating
12  after action suicides, do you always look at the
13  disciplinary history of the officers involved?
14      A.  Only if we are making an allegation of
15  misconduct with the employee.
16      Q.  Just a few clarifying questions.
17          On the next page, ADC 26928, about I would
18  say three-quarters of the way down, there's a paragraph
19  that starts:  Per the Post Orders for the security floor
20  officers.  Do you see where that is?
21      A.  Yes.
22      Q.  And there it mentions that security/health and
23  welfare checks were to be conducted ▓▓▓▓▓▓▓▓▓▓
24  ▓▓▓▓▓▓▓▓▓▓
25      A.  Yes.

Page 200

1      Q.  And is that different than ▓▓▓▓▓▓▓▓▓
2  intervals that you told me about?
3      A.  Yes.
4      Q.  In what way?
5      A.  ▓▓▓▓▓▓▓▓▓ At one time we were required
6  to only do the ▓▓▓▓▓▓▓▓▓ Following suicides that
7  we had had, and I believe it was this one, there was a
8  decision to go to the continuous movement throughout the
9  cell block and adjust the time from ▓▓▓▓▓▓▓▓▓
10  ▓▓▓▓▓▓▓▓▓
11      Q.  So back in January of 2012, you were at
12  ▓▓▓▓▓▓▓▓▓ is that correct?
13      A.  Yes.
14      Q.  And now the new ▓▓▓▓▓▓▓▓▓ that is
15  not -- it's not in Departmental Order but it's in post
16  orders; is that accurate?
17      A.  It's in the general post order, yes.
18      Q.  Is that the only place it's located?
19      A.  I think it's in policy somewhere.  On I can't
20  recall -- I think I saw it recently in policy, but I
21  can't tell you which one it is.  I thought it was 704,
22  but it isn't.
23      Q.  So it may not have been updated yet?
24      A.  No, it's in policy.  I just saw it recently.
25      Q.  And the next sentence says:  Informal counts

Page 201

1  are conducted ▓▓▓▓▓▓▓▓▓
2          What are informal counts?
3      A.  All through graveyard, the Department does --
4  they essentially do a count ▓▓▓▓▓▓▓▓▓ And they have
5  formal counts and informal counts.  The formal count is
6  you have to do a face-to-ID count and verify that is in
7  fact the inmate that's supposed to be in that cell.  And
8  that is him, and you verify that with the ID card and the
9  visible sighting of his facial features.  And then you
10  record the count.
11      Q.  And that's the formal count?
12      A.  That's the formal county.
13          You do informal counts ▓▓▓▓▓▓▓▓▓
14  ▓▓▓▓▓▓▓ verifying that you in fact have an inmate
15  in that cell and you see living, breathing flesh in that
16  cell.
17      Q.  And where would the informal counts be
18  recorded?
19      A.  On the count sheets.
20      Q.  Okay.  And that's the same place the formal
21  counts are recorded?
22      A.  Right.  They're just noted as informals.
23      Q.  And there is in fact a different procedure to
24  formal versus informal?
25      A.  You don't have to do the face to ID.

51 (Pages 198 to 201)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 202

1    Q.   Turning to page 26934.  This is a movement
2  printout for inmate Phothong.  And about three-quarters
3  of the way down, it says April 1st, 2011, transferred to
4  ASPC-E/SMU M/H W.  What unit is that?
5    A.   That's the SMU 1 mental health watch area.
6    Q.   I see.  And then --
7    A.   The ASPC-E is Arizona State Prison
8  Complex-Eyman.  Then you go to the slash mark, and after
9  that is the unit designator.  And then following unit
10  designator is any special housing, which is mental
11  health.
12    Q.   And then W is watch?
13    A.   Watch.
14    Q.   So anytime we see a watch, and it looks like
15  there are three more occurrences on this page, that means
16  he was on a mental health watch?
17    A.   Correct.
18    Q.   Turning to page 37.  That's 26937.  The bottom
19  paragraph.  It says:  I asked Lt. McDonald to tell me why
20  inmate ████████ cell light appeared to be turned off.
21    A.   I'm sorry.  Where do you see that?
22    Q.   That is at the very bottom paragraph after the
23  italicized writing.
24    A.   Okay.
25    Q.   And the very last thing it says:  Investigation

Page 203

1  revealed the security lights in CB-7 Able run were always
2  turned on.
3       Can you tell me what -- first of all, what's
4  going on here?  The security lights exist in each cell
5  or --
6    A.   No.  The security lights, there are three
7  security lights for each tier in that cell block, and
8  they're in the common area.  To peer into the inmate's
9  cell, they typically use the flashlights.  And they'll
10  illuminate either the ceiling or the floor so they can
11  see the inmate with the flashlight.
12    Q.   Okay.  So they don't turn the lights on?
13    A.   In the cell itself?  Not typically, no.
14    Q.   So when they're making their health and welfare
15  checks on the graveyard shift, they're just generally
16  flashing the flashlight on the prisoner's face?
17    A.   They'll flash it at the floor or ceiling, and
18  that provides enough illumination that you can see the
19  inmate.
20    Q.   And higher up on that same page, second
21  paragraph, it says -- let's go to the first paragraph
22  first, in that it says the officers told the lieutenant
23  that the inmate was stiff when they cut him down.
24    A.   I'm sorry.  Where do you see that?
25    Q.   The very top paragraph.

Page 204

1    A.   Is this the next page?
2    Q.   No, it's still 37.
3    A.   Okay.
4    Q.   So these -- in the graveyard shift, how often
5  are these checks happening?  And I realize this is back
6  in January of 2012.
7    A.   This officer failed to make the checks.  That's
8  what happened.  It went through about a three-hour period
9  where he had failed to make any checks.  They had
10  falsified the record in the journal, and those staff were
11  both redressed on that as was the lieutenant.
12    Q.   And how did you discover that they falsified
13  the record?
14    A.   Through the administrative investigation.  They
15  ended up admitting to it.
16    Q.   Let's turn to 26939.  The first paragraph
17  again.  It says that:  Lt. McDonald stated the 0300 hour
18  informal count was not conducted and she failed to post
19  another office in the absence of CO II Manos and stated
20  she would have normally posted another officer to cover
21  but they were shorthanded.
22       What should she have done if she was
23  shorthanded?
24    A.   If in fact she didn't have enough officers on
25  unit to cover that, then she should have got ahold of the

Page 205

1  complex supervisor and had a staff member cross leveled
2  over there.
3    Q.   Did your investigation reveal that she failed
4  to do that?
5    A.   Yes.
6    Q.   Can you tell me any policies or procedures that
7  are in place to ensure that correctional officers don't
8  falsify records or logs, account logs in particular?
9    A.   There is a policy Department Order 601, and it
10  has a list of various misconduct behaviors.  And it's
11  listed there.  Otherwise, we assume that they will follow
12  direction as noted in the post orders.  But if they fail
13  and they falsify documents, that's a dismissible offense.
14    Q.   And in this case, both officers were
15  disciplined?
16    A.   I know that the Officer Manos was on original
17  probation, and he was terminated.  The other one was
18  terminated as well, and I believe he was original
19  probation as well.  But yes, both were terminated.
20    Q.   I'm just reviewing.  Give me a moment.
21       MS. FETTIG:  I don't have any further
22  questions at this time.
23       MS. ALEWELT:  I do.  I have a few questions.
24
25

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 206

EXAMINATION
BY MS. ALEWELT:
1    Q.   My name is Jennifer, and I represent the
Arizona Center for Disability Law.  And we are involved
in this lawsuit representing the rights of individuals
with mental illness.  So I just have a couple of
questions.  I'm going to jump around a little bit, but
you did such a good job that I'm not concerned that
you'll be able to answer these questions.  If you need
more context, let me know.
11         You had mentioned that you had some mental
health 3 folks in Central.  Do you remember that?
13    A.   Yes.
14    Q.   Do they ever come to you with mental health
treatment plans as far as counseling requirements or
medication requirements?  Are there ever existing mental
health I guess mandates?
18    A.   They have their own treatment protocol, and
those records, the files, access to those are
restricted.  And I don't have access to those.  If I have
a mental health staff member that needs escorts done for
his mental health line, then we facilitate that.  But
otherwise, treatment plans to facilitate any kind of
ongoing treatment for mental health isn't really
discussed other than the ones for CB 1 and Kasson.

Page 207

1    Q.   So it's possible that you may not be aware that
someone is on medication at all other than possibly the
MH 3 classification which may or may not indicate that?
4    A.   That's correct.
5    Q.   And whose job is it then to make sure that
those treatment plans continue to remain in effect
wherever the person may be?
8    A.   The psychologist III is the top administrator
at each complex to ensure that mental health programming
treatment is facilitated.  They report to a -- what we
use the term the facility health administrator, which is
now the top executive officer to Wexford at each complex.
13    Q.   So say I'm a psych III, and I have somebody who
maybe is exhibiting some behaviors that I see may require
them to relocate to your area.  Is there -- am I just
then sort of responsible for tracking them to your house
or how would that work?
18    A.   This would be for an inmate on watch?
19    Q.   Well, or any inmate if they're receiving some
sort of -- say inmate X is receiving some sort of psych
medications elsewhere outside Central Unit but may for
other reasons result in requiring a maximum custody.  You
talked about that score.  How is that person tracked over
to Central if they came from somewhere else with an
existing mental health need?  For example, I probably am

Page 208

1    not going to have my psych meds as "keep on person."  How
do I make sure if I prescribed them here that they're
still going to get them?
4    A.   Yes.  The file goes with the inmate.
5    Q.   So there would just be someone on the mental
health side that picks up on Central to make sure that
those medications are administered?
8    A.   All received in inmates are processed through
the medical unit first.
10    Q.   And that's where you'll identify their mental
needs, through the medical intake?
12    A.   Yes.
13    Q.   You said you have the privilege of reviewing
grievances at some levels.
15    A.   Yes.
16    Q.   Have you ever seen any where someone is
complaining about the impacts of isolation on their
mental health?
19    A.   No.
20    Q.   Would that be better suited for another type of
complaint?
22    A.   They typically would fill out an HNR requesting
contact with the mental health staff.
24    Q.   If, for example, somebody -- if someone is
maybe exhibiting mental health symptoms and they go the

Page 209

1    wrong route through a grievance, would they be redirected
to an HNR process?
3    A.   Yes.
4    Q.   Could that result in a delay in getting care to
them in addressing those concerns?
6    A.   No.  Anything with mental health issues,
particularly if it's related to depression or possible
suicide or deterioration, individual sends out red flags
for all of us in maximum custody, but really anybody in
the Department of Corrections.  So if they were to
receive -- the CO IIIs were to receive an inmate letter,
which is the first step in a grievance, that says, I feel
like I have mental health, I feel like I'm deteriorating,
those CO IIIs, I'm confident regardless of what unit,
would immediately notice health.  And they weren't
available, then medical staff and alert them to the
inmate letter.
18    Q.   So the response wouldn't be to the inmate, you
need to file an HNR request?
20    A.   They would get that back as a response because
we're required to respond to all inmate informals.  But
they, in addition, would contact mental health or medical
staff.
24    Q.   And that would just be something that would be
recorded in the inmate's file?  And where?

53 (Pages 206 to 209)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

## Page 210

1  A.  Yes.  That phone call, that referral would be
2  recorded in their medical or mental health file.
3  Q.  Okay.  You mentioned earlier that if you arrive
4  and you have a heinous crime, you've got at least a
5  two-year stay in Central.  But you also had said that if
6  you are there pursuant to an override that you would be
7  there at least six months.  And you sort of explained it
8  as if there weren't exceptions, so I'm sort of wondering
9  if there are.
10  So say, for example, this individual who I
11  was talking about over here who hypothetically is
12  exhibiting worse symptoms that ultimately lands them in
13  Central maximum custody.  If, for example, a mental
14  health clinician said, this person can't be here anymore,
15  could they override the override, if that makes sense?
16  If someone's there pursuant to an override, can mental
17  health staff say, this person's custody has to change as
18  a result of mental health needs, or is that something
19  that's ultimately a custody decision?
20  A.  The custody is left to the operations staff.
21  If there's a mental health need, then where they feel
22  like maximum custody placement may impact them and their
23  well being, they'll approach it through a treatment
24  approach with mental health, not a custody reduction.
25  Q.  That sort of brings me to another question.

## Page 211

1  You said you don't have any people with the SMI
2  designation in Central Unit?
3  A.  No.  There are SMI.
4  Q.  Sorry, let me clarify.
5  A.  There are some inmates that are supposedly SMI,
6  but they're not at a mental health rating of a 4 or
7  higher.
8  Q.  So they may have the SMI label --
9  A.  Right.
10  Q.  -- and maybe an MH 3?
11  A.  Right.
12  Q.  So you do have some people in Central with the
13  SMI designation?
14  A.  I'm sure we do.
15  Q.  Are you aware of what that means in ADOC
16  context or what's your understanding of people who have
17  the SMI designation because -- in the ADOC context
18  because it also exists in other land as well.  So I'm
19  meaning there.
20  A.  They're in significant need of mental health
21  treatment.
22  Q.  Any other indicators?  Any other things you
23  know about that population from an ADC perspective?
24  A.  Other -- no.
25  Q.  Are people with the SMI designation, they're at

## Page 212

1  least recognized as people with significant mental health
2  issues.  Do you identify them as having any other needs
3  as far as maybe help filling out grievances or HNRs?  Are
4  they identified that way at all?
5  A.  Those inmates are right now -- should all be on
6  Wing 1 at Kasson.  The CO III that's there has
7  volunteered to work that wing and works closely with the
8  mental health staff, psych associates, namely.  And she
9  understands the level functioning these inmates are at.
10  And so yes, she does provide assistance and helping them
11  understand information that's given to them, processing
12  the information and stuff like that.
13  Q.  Okay.  You had mentioned that you have a few
14  groups of folks who are exempted from your traditional
15  restraint rules.  Your Cell Block 1, and then you also
16  had your Cell Block 2.  Does that also apply to the
17  Kasson Wing 1?  I said you said it was a Department Order
18  in around July or August of 2012 that changed the
19  restraints for certain activities.
20  A.  The inmates at Kasson are still restrained
21  during movement.  There are -- the porters that work over
22  at Kasson Wing 1, there's four of them, and they're
23  allowed to work out on the wings and in the pods
24  unrestrained.
25  Q.  The porters are then prisoners?

## Page 213

1  A.  They're inmates assigned to Wing 1 that provide
2  janitorial services.  And they're unrestrained.
3  Q.  I have a porter.  It's just not a prisoner.  I
4  just wanted to clarify.
5  A.  And all the other movement is restrained.
6  Q.  And you said that the change was around July or
7  August of this year; is that correct?
8  A.  That's when the enhanced mental health access
9  for these inmates began.
10  Q.  It's been a busy time for you over there.
11  A.  Yes.
12  Q.  Let's see.  Now, you had mentioned earlier that
13  if someone is a security threat or had gang activity that
14  they're all at Browning.  Was that the right --
15  A.  It's a process -- a system process where they
16  are evaluated, and then if they are validated through
17  then evaluation or assessment and declared to be a
18  security -- member of a security threat group, then they
19  are housed at the Browning Unit by policy.
20  Q.  So those folks who are in the Browning
21  threat -- who are in Browning that are a security threat,
22  they wouldn't have the ability to move to, say, Cell
23  Block 2 or Cell Block 1 if they --
24  A.  No.
25  Q.  So once you go to Browning, that's where you

54 (Pages 210 to 213)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 214

1  hang out?
2      A.   This is the STGs, the acronym STGs.  The
3  security threat groups.  The only way that you get out of
4  the STG placement at Browning is to step down out of the
5  STG.
6      Q.   Denounce or debrief, or is that --
7      A.   Exactly.
8      Q.   Is that the correct term?
9      A.   Exactly.  Debrief.
10         MR. GOTTFRIED:  There's two separate
11  processes.
12         MS. ALEWELT:  So in order for someone to
13  move, they would have to do either/or?
14         MR. GOTTFRIED:  Renounce and debrief or go
15  into the step-down program process.  There are two
16  separate ways out of Browning if you are an STG member, a
17  gang member.
18      Q.   BY MS. ALEWELT:  What happens if there's a
19  mental health emergency on the unit?  Is there on
20  staff -- I mean, I would call 911 in case of emergency.
21  What if there was somebody who was actively psychotic or
22  had self-harmed?  Is there a call line or how would COs
23  who are a first line, how would they get the support
24  staff they need to address the issue if it's sort of
25  beyond their level?

Page 215

1      A.   They would initiate an ICS, an incident command
2  structure, via radio.  They're going to communicate to
3  the control room that I have an -- I'm initiating ICS.  I
4  have inmate so-and-so, and then they describe where
5  they're at and what the behavior is.  And I need a task
6  force and a supervisor, camera, gurney, whatever else
7  they need brought over.  So they're the ones through the
8  radio.
9      Q.   So they can identify, I need a mental health
10  professional of some sort?
11      A.   Normally what we do is ███████████████████
12  █████████████████████████.  Medical staff will be called
13  for the ICS.  ████████████████.  If their issue
14  appears to be mental health-related, then the mental
15  health staff in the medical unit will evaluate it.
16      Q.   And is there someone available from somewhere
17  that you can call into 24 hours a day?
18      A.   There's an on-call if it's after hours for the
19  mental health staff.  Mental staff is there 24/7.
20      Q.   And is mental health after hours after
21  traditional business hours and weekends or what is --
22      A.   Yes.
23      Q.   You had mentioned earlier that the inmate can
24  give you a list of who visits.  So does that mean that
25  the inmate can then say, I don't want this person

Page 216

1  visiting?
2      A.   Yes.
3      Q.   Do you ever have your mental health staff
4  review the inmate's visitor list to see if there are any
5  clinical contraindications with that inmate's visitor
6  list?
7      A.   No.
8      Q.   In order to be assigned as watch officer, are
9  there any extra training to get that duty assignment or
10  is that just --
11      A.   No.
12      Q.   I think you had mentioned earlier that all
13  inmates with mental health issues are seen every 30 days
14  everywhere in ADOC.  Was that correct?
15      A.   The inmates that are in the programs are seen
16  at least every 30 days.  The ones at Kasson, they try to
17  do it every two weeks.  Any inmate that leaves the
18  program from either one of those programs is seen at
19  least every 30 days.
20      Q.   So that was your Kasson or your Cell Block 1?
21      A.   Yes.
22      Q.   So they're seen every 30 days, and then every
23  30 days after they've been involved in that program?
24      A.   Yes.
25      Q.   You've got a lot of stuff new going on at

Page 217

1  Central Unit.  How is that going?
2      A.   It's going very well, actually.  The inmates
3  have really bought into the system.  The mental health
4  program is a little bit cyclic.  We've done that a few
5  times in the past.  Had some very, very good programs in
6  the past.  And we began again.  And we have a very
7  dynamic psychologist III.  And she recruited a couple --
8  well, three really good psych associates.  I'm really
9  impressed with the mental health staff.  They're just
10  really engaged and want the program to succeed.  And I
11  have a really good management team.
12         The inmates are really invested in the
13  program.  They cooperate.  They like the program.  Some
14  had put in to go to the phase program at CB 2 and have
15  since then got themselves involved in the mental health
16  program and requested not to be considered for the CB 2
17  program because they like the program.
18         It's to the point that they -- for inmates
19  at maximum custody, there's a different machoism about
20  them.  It's all about being a man and not admitting to
21  weaknesses.  These inmates, in touring the cell block and
22  visiting them on the rec field, they'll come up freely
23  and tell you that they know they have a problem, and they
24  appreciate the mental health staff they're working with.
25      Q.   That's exciting.

55 (Pages 214 to 217)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

### Page 218

1  A.  So it's a big success. I think it's wonderful
2 what we're doing with them.
3  Q.  And I'm hearing a lot of positive about it, so
4 that's exciting from our perspective certainly. Really
5 the main difference between the CB 1 and CB 2 is what you
6 had mentioned or at least partially is the availability
7 or type of programming. Is that fair?
8  A.  The type of programming and the mental health
9 staffing that's available, yes.
10  MS. ALEWELT:  I think that's all the
11 questions I have.
12  MR. GOTTFRIED:  We have no questions.
13  MS. FETTIG:  I have one additional question
14 for follow up on what Jennifer said.
15
16  FURTHER EXAMINATION
17 BY MS. FETTIG:
18  Q.  What is the mental health staffing on CB 1 and
19 the Kasson Unit?
20  A.  We have the psychologist III, we have right now
21 three psych associates, and we have one psych tech. We
22 have a psychiatrist and a half, a full and a part-time
23 position, and we have a psychiatric nurse.
24  Q.  And is that staffing to cover both those units?
25  A.  Yes.

### Page 219

1  Q.  Just those units or --
2  A.  Yes.
3  Q.  Okay. And then for everyone else who's not in
4 CB 1 or Kasson Wing 1, what is your mental health
5 staffing?
6  A.  I'm sorry. Those psych associates will also
7 see other inmates in Central Unit.
8  Q.  What about the psychiatrist and the
9 psychologist?
10  A.  The psychologist, the psych III, is in charge
11 of all mental health services for Florence, and the
12 psychiatrist sees all inmates at Florence that are on
13 medications.
14  Q.  Are there any psych staff that you're aware of
15 who work only with the CB 1 and Kasson 1 prisoners, or do
16 they all overlap with the whole unit?
17  A.  Because there are some vacancies in positions,
18 there is one psych associate and one tech that work
19 primarily with CB 1. There is one psych associate that
20 works primarily with the Kasson program, but another
21 psych associate and the psychologist III spend a
22 considerable amount of time with the Kasson inmates.
23  Q.  But they also work with the prisoners in all of
24 Central Unit; is that correct?
25  A.  Yes.

### Page 220

1  MS. FETTIG:  No further questions.
2  MR. GOTTFRIED:  We're done.
3  (The deposition concluded at 4:21 p.m.)

### Page 221

1  SIGNATURE PAGE
2  I, GREG FIZER, a deponent exercising my right to
read and sign my deposition taken on October 29, 2012,
3 place my signature hereon and make the following changes
on this      day of      , 2012.
4
5  (IF THERE ARE NO CHANGES, WRITE "NONE.")
6
7  GREG FIZER
8
PAGE LINE  READS    CHANGE TO    REASON

56 (Pages 218 to 221)

Parsons v. Ryan
Fizer, Greg - 10/29/2012

Page 222

1    STATE OF ARIZONA )
                       )
2    COUNTY OF MARICOPA )
3
4         I, CAROLYN T. SULLIVAN, a Certified
5    Reporter, Certificate No. 50528, in the State of Arizona,
6    do hereby certify that the foregoing witness was duly
7    sworn to tell the whole truth; that the foregoing pages
8    constitute a full, true, and accurate transcript of all
9    proceedings had in the foregoing matter, all done to the
10   best of my skill and ability.  Pursuant to request,
11   notification was provided that the deposition is
12   available for review and signature.
13
14        I FURTHER CERTIFY that I am not related to
15   nor employed by any of the parties hereto, and have no
16   interest in the outcome.
17
18        WITNESS my hand this 31st day of October,
19   2012.
20
21
          Carolyn T. Sullivan, RPR
22        Arizona Certified
          Reporter No. 50528
23
24
25

57 (Page 222)