**EXHIBIT 12**

**EXHIBIT 12**

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;    )
Stephen Swartz; Dustin Brislan;)
Sonia Rodriguez; Christina       )
Verduzco; Jackie Thomas; Jeremy)
Smith; Robert Gamez; Maryanne  )
Chisholm; Desiree Licci; Joseph)
Hefner; Joshua Polson; and       )
Charlotte Wells, on behalf of  )
themselves and all others        )
similarly situated; and Arizona)
Center for Disability Law,       )
                                 )
            Plaintiffs,           )
                                 )  NO.:
v.                               )  CV 12-00601-PHX-NVW(MEA)
                                 )
Charles Ryan, Director, Arizona)
Department of Corrections; and )
Richard Pratt, Interim Division)
Director, Division of Health   )
Services, Arizona Department of)
Corrections, in their official )
capacities,                      )
                                 )
            Defendants.           )
                                 )

30(b)(6) DEPOSITION OF BEN L. SHAW, Ph.D.

Phoenix, Arizona
October 3, 2012
9:08 a.m.

Prepared by:

Kate E. Roundy, RPR

Arizona Certified

Reporter Number 50582

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 2

1                I N D E X
2   WITNESS                    PAGE
3   BEN L. SHAW, Ph.D.
4      Examination By Mr. Fathi        6
5      Examination By Ms. Alewelt      241
6      Examination By Ms. Wieneke      283
7
8
9
10
11
12
13
14               INDEX TO EXHIBITS
15  No.    Description            Page
16  16     Health Services Contract      16
           Monitoring Bureau Organizational
17         Chart
18  17     Notice of 30(b)(6) Deposition  19
           Duces Tecum, Document 82
19
20  18     Notice of 30(b)(6) Deposition  23
           Duces Tecum, Document 81
21  19     Psychiatry/Medication      32
22  20     Arizona Republic article    48
23  21     September 21, 2012 correspondence  49
           to Ms. Mullenix from Joe Profiri,
24         Re: Written Cure Notification
25

Page 3

1                INDEX TO EXHIBITS
2   No.     Description            Page
3   22     Wexford Health Sources, Inc.,    59
           Privatization for all correctional
4          health services
5   23     Arizona Vacancies and FTE Fill   70
           Percentages - Compared to
6          Contracted Staff Plan (External)
7   24     Arizona Department of Corrections  83
           Health Services Division, Central
8          Office, June 20, 2012, current
           graph
9
10  25     February 3, 2011 e-mail from    101
           Dr. Crews to Dr. Shaw, Subject:
11         Please help
12  26     June 16, 2011 e-mail from Dr. Crews, 111
           Subject: Please help Florence
13  27     Plaintiff Dustin Brislan's First  137
           Set of Requests for Admission
14         (Nos. 1-78) and First Set of
           Interrogatories (Nos. 1-2) to
15         Defendant Charles Ryan
16  28     D.O. 1103 effective date      157
           August 22, 1997
17
18  29     Technical manual revised      162
           August 15, 2011
19  30     March 18, 2011 letter by Dr. Shaw  189
           to SMI Commission Members regarding
20         ADC's mental health services
21  31     SMU-1 Mental Health Program and an  210
           August 15, 2012 memo to inmates
22
23  32     MH Levels Statistical Summary as of  221
           7/23/2012
24
25  33     ASPC Florence-Central Unit and   234
           Kasson PowerPoint presentation

Page 4

1        30(b)(6) DEPOSITION OF BEN L. SHAW, Ph.D.,
2   was taken on October 3, 2012, commencing at 9:08 a.m., at
3   PERKINS COIE, 2901 North Central Avenue, 20th Floor,
4   Phoenix, Arizona, before KATE E. ROUNDY, RPR, a Certified
5   Court Reporter, Certificate No. 50582, for the State of
6   Arizona.
7
8   APPEARANCES:
9
10  For Plaintiffs: Victor Parsons, Shawn Jensen, Stephen
    Swartz, Dustin Brislan, Sonia Rodriguez, Christina
11  Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez,
    Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua
12  Polson, and Charlotte Wells, on behalf of themselves and
    all others similarly situated:
13
14     AMERICAN CIVIL LIBERTIES UNION FOUNDATION
       David C. Fathi, Esq.
15     915 15th Street, NW
       7th Floor
16     Washington, DC 20005
       (202) 548-6603
17     dfathi@npp-aclu.org
18
    For Plaintiff Arizona Center for Disability Law:
19
       ARIZONA CENTER FOR DISABILITY LAW
20     Jennifer Alewelt, Esq.
       5025 East Washington Street, Suite 202
21     Phoenix, Arizona 85034
       (602) 274-6287
22     jalewelt@azdisabilitylaw.org
23
24
25

Page 5

1   APPEARANCES CONTINUED:
2
3   For Defendants Charles Ryan, Director, Arizona Department
    of Corrections; and Richard Pratt, Interim Division
4   Director, Division of Health Services, Arizona Department
    of Corrections, in their official capacities:
5
6      STRUCK WIENEKE & LOVE
       Kathleen L. Wieneke, Esq.
7      3100 West Ray Road, Suite 300
       Chandler, Arizona 85226
8      (480) 420-1602
       kwieneke@swlfirm.com
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 to 5)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 6

1     BEN L. SHAW, Ph.D.,
2   called as a witness herein, having been first duly sworn
3   by the Certified Court Reporter to tell the whole truth
4   and nothing but the truth, was examined and testified as
5   follows:
6
7              EXAMINATION
8   BY MR. FATHI:
9     Q. Good morning, Dr. Shaw.
10    A. Good morning.
11    Q. My name is David Fathi, and I represent the
12  prisoner plaintiffs in this case.
13       Also with me is Jennifer Alewelt, who represents
14  the Arizona Center For Disability Law.
15       Would you please state your full name?
16    A. My name is Ben L. Shaw.
17    MS. WIENEKE: And could I just state for the
18  record that we are producing Dr. Shaw on the 30(b)(6)
19  document No. 80, topics No. 7; on document No. 81, topics
20  10, 12, 15; Document 82, topics 1, 2, 3, and 5 through 24
21  and without waiving any of the objections that we
22  previously submitted on the 30(b)(6) issues.
23       Thank you very much.
24    MR. FATHI: Thank you, Kathy.
25       Did you say 80, No. 7 also?

Page 7

1     MS. ALEWELT: Yes. That was the first one I got.
2     MS. WIENEKE: Let me just check.
3     Yes.
4     MR. FATHI: Okay. I don't know that he was
5   designated on that previously, but we can figure that out
6   at a break.
7   BY MR. FATHI:
8     Q. Dr. Shaw, who is your employer?
9     A. I work for the Arizona Department of Corrections.
10    Q. And your title?
11    A. I'm the mental health services monitor.
12    Q. Has your title changed recently?
13    A. Yes. It changed as of July 1st.
14    Q. And prior --
15    A. I'm sorry.
16       Prior to that I was the mental health program
17  manager.
18    Q. Thank you.
19       What is your business address?
20    A. My business address is 1601 Jefferson Avenue.
21    Q. In Phoenix?
22    A. In Phoenix.
23    MR. FATHI: Kathy, if you will agree to accept
24  service for Dr. Shaw in the event he is no longer employed
25  by the department, then we don't need his home address.

Page 8

1     MS. WIENEKE: We can discuss that. As of now
2   service for his business address is fine. In the event
3   that he is no longer employed by the department, then we
4   can discuss that at that time.
5     MR. FATHI: Well, unless you are willing to agree
6   on the record to accept service, then I will need
7   Dr. Shaw's home address, please.
8     MS. WIENEKE: Well, I think --
9   BY MR. FATHI:
10    Q. What is your home address?
11    MS. WIENEKE: I think under state law, given his
12  job description, his home address is not considered a
13  public record under Title 39.
14    MR. FATHI: It doesn't need to be a public
15  record.
16  BY MR. FATHI:
17    Q. Dr. Shaw, would you state your home address,
18  please?
19    A. ████████████████████
20    Q. Okay. Thank you very much.
21    MS. WIENEKE: And we would ask that that
22  information be subject to the protective order.
23  BY MR. FATHI:
24    Q. Dr. Shaw, I understand that you have been deposed
25  previously?

Page 9

1     A. I have. That's correct.
2     Q. In fact, you were deposed in March in
3   April Hullaby versus State of Arizona?
4     A. That's correct.
5     Q. And that involved the suicide of Jerry Kulp?
6     A. That's right.
7     Q. Have you ever been deposed in any cases since
8   then?
9     A. I have not.
10    Q. I gather you're somewhat familiar with the
11  process, but I do want to remind you that you are under
12  oath, sworn to tell the truth just as if you were
13  testifying in court.
14       Do you understand that?
15    A. Yes, I understand that.
16    Q. Good. Just a few guidelines to refresh
17  everyone's recollection. Please do answer verbally and
18  audibly. The reporter can't take down nods of the head or
19  shakes of the head.
20       You must answer every question unless your
21  counsel instructs you not to.
22       Your counsel may make objections. Again, those
23  are just for the record, and you need to answer unless she
24  instructs you not to.
25       I try to ask clear questions, but I don't always

3 (Pages 6 to 9)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 10 | Page 11 |
|---|---|
| 1 succeed. So if I ask you a question and you don't | 1 Q. And is that a full-time position? |
| 2 understand it, please ask me to rephrase. I don't want | 2 A. Yes, it is. |
| 3 you answering a question that you don't understand. | 3 Q. When did you start working at ADC? |
| 4 A. Okay. | 4 A. September 6th, 1989. |
| 5 Q. I am asking only for what you know. I don't want | 5 Q. And what was your position then? |
| 6 you to guess. But if it's a question where you can make | 6 A. I was a Psychologist II. |
| 7 an estimate, then I'm entitled to your estimate. Okay? | 7 Q. At a particular facility? |
| 8 A. I understand. | 8 A. I was at the Perryville facility, which is the |
| 9 Q. If you later think of additional information, | 9 men's facility at that point in time. |
| 10 such that one of your answers was either incorrect or | 10 Q. Can you just briefly walk me through your career |
| 11 incomplete, please just let me know, and you can | 11 with the department up until the present time? |
| 12 supplement or change your answer. Okay? | 12 A. I began at Perryville in 1989. We established a |
| 13 A. Okay. | 13 therapeutic community there. I was there for |
| 14 Q. Finally, and perhaps most importantly, let's try | 14 approximately seven years. |
| 15 not to talk over each other for the sake of the court | 15 I then accepted a position as a supervisor |
| 16 reporter and for a clear record. Okay? | 16 psychologist at the Lewis unit when it opened. |
| 17 A. I will certainly try. | 17 Q. And what year was that? |
| 18 Q. Is there any reason why you are not able to fully | 18 A. That was 1980 -- no, 1997, I believe. I was |
| 19 and truthfully answer questions here today? | 19 there for six years. |
| 20 A. No, there is no reason. | 20 I then accepted a position at Juvenile Services, |
| 21 Q. Okay. You testified that your current position | 21 and I was a psychologist at the juvenile correctional |
| 22 is mental health contract monitor; is that right? | 22 facility at Black Canyon for two years. |
| 23 A. That's correct. | 23 Q. Excuse me. Is that a separate state agency from |
| 24 Q. Since July 1st of this year? | 24 ADC? |
| 25 A. Since July 1st of this year. | 25 A. That is a separate state agency. |

| Page 12 | Page 13 |
|---|---|
| 1 Q. What is it called? | 1 Missouri State University. And I received a bachelor |
| 2 A. That is the Department of Juvenile Corrections. | 2 degree in 1969. |
| 3 Q. Okay. | 3 Q. In what subject? |
| 4 A. I was there for two years. | 4 A. In psychology. |
| 5 I then returned to the Arizona Department of | 5 Q. Your 1983 Ph.D. is in counseling psychology? |
| 6 Corrections as the clinical director at the Phoenix | 6 A. That's correct. |
| 7 licensed psychiatrist facility. | 7 Q. Have you ever held any professional licenses? |
| 8 Q. And what year was that? | 8 A. I have a license as a professional psychologist |
| 9 A. 2005. | 9 in Arizona currently. I have been licensed in the state |
| 10 Q. Okay. | 10 of Texas and in the state of Missouri also as a |
| 11 A. I was there until November of 2010, at which time | 11 professional psychologist. |
| 12 I took the position as mental health program manager and | 12 Q. And are the Texas and Missouri licenses current? |
| 13 kept that position until July of this year. | 13 A. No, they are not current. |
| 14 Q. Okay. Thank you. | 14 Q. But your Arizona license is? |
| 15 Let's go through your educational background post | 15 A. My Arizona license is current. |
| 16 high school. | 16 Q. Have you ever had a professional license revoked, |
| 17 A. Okay. I attended Southwest Missouri State | 17 suspended, or limited in any way? |
| 18 College from 1965 through 1969. I then worked for | 18 A. No, I have not. |
| 19 approximately seven years and returned to the University | 19 Q. And have you ever been convicted of or pleaded |
| 20 of Missouri. I attended the University of Missouri from | 20 guilty to a misdemeanor or a felony? |
| 21 1977 to 1983, at which time I received a Ph.D. in | 21 A. No, I have not. |
| 22 counseling psychology. | 22 Q. Let's talk about your job responsibilities. I |
| 23 Q. And I'm sorry. Was there a bachelor's degree in | 23 would like to ask about both pre-July and since July 1st. |
| 24 there? | 24 A. Yes. |
| 25 A. The bachelor's degree was from the Southwest | 25 Q. So before July 1st, you were the mental health |

4 (Pages 10 to 13)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

## Page 14

1  program manager?
2  A.  That's correct.
3  Q.  What were the duties of that position?
4  A.  As a mental health program manager I was
5  responsible for the overall mental health program and
6  treatment services in the Department of Corrections. I
7  supervised the chief psychologist at each of the ADC
8  units. I was responsible for developing and implementing
9  inmate treatment programs and basically monitoring to make
10  certain that adequate services were given at the unit
11  level.
12  Q.  And who was your -- who did you directly report
13  to in that job?
14  A.  At the time I directly reported to
15  Michael Adu-Tutu.
16  Q.  And what was his position?
17  A.  He was the division director for health services.
18  Q.  And at some point did someone else assume that
19  position?
20  A.  Richard Pratt assumed that position, and that
21  would have been, what, seven months ago.
22  Q.  Okay.  And once Mr. Pratt assumed that position,
23  then you reported to him?
24  A.  Then I reported directly to him.  That is
25  correct.

## Page 15

1  MS. WIENEKE:  Couple things.  You need to slow
2  down and wait for David to finish, and you need to speak
3  just a little louder and more clearly so the court
4  reporter can understand you.
5  MR. FATHI:  Thank you, Kathy.
6  THE WITNESS:  Thank you.
7  BY MR. FATHI:
8  Q.  And as mental health program manager you
9  mentioned that you supervised the chief psychologists at
10  all the institutions?
11  A.  That's right.
12  Q.  Did anyone else report directly to you besides
13  the chief psychologists?
14  A.  Not directly.  The -- let's turn this off.
15  The staff at the unit levels would report to the
16  chief psychologists, and then they would report to me.
17  Q.  Okay.  So in terms of people reporting directly
18  to you, it was just the chief psychologists --
19  A.  Right, just a pyramid.
20  Q.  And again, you need to try not to talk over me,
21  just for the court reporter.  Thanks.
22  Okay.  Post July 1st, you are the mental health
23  contract monitor; correct?
24  A.  That's correct.
25  Q.  And who do you report to in that position?

## Page 16

1  A.  I report to Richard Pratt.
2  Q.  And what is Mr. Pratt's position?
3  A.  Mr. Pratt is the acting division director for
4  health services monitoring.
5  Q.  Okay.  And who, if anyone, reports to you in your
6  position?
7  A.  Directly reporting to me is Steve Bender, who is
8  a licensed -- who is a master-level psychologist.
9  MR. FATHI:  Okay.  Let's make this the next in
10  order.
11  (Exhibit 16 was marked for identification.)
12  BY MR. FATHI:
13  Q.  Dr. Shaw, I'm showing you a document titled
14  Health Services Contract Monitoring Bureau marked as
15  Exhibit 16.
16  Have you seen this document before?
17  A.  Yes, I have.
18  Q.  And can you describe what it is?
19  A.  This is the structure of our current monitoring
20  bureau.
21  Q.  And does it accurately describe that structure as
22  of today?
23  A.  Yes, it appears to.
24  Q.  So you mentioned Mr. Bender as someone who you
25  directly supervise, and he is on the chart; correct?

## Page 17

1  A.  That's right.
2  Q.  According to this chart, it looks likes you also
3  supervise a psychiatrist senior but that position is
4  vacant; is that correct?
5  A.  Well, that has recently been filled by
6  Dr. John Lee.
7  Q.  And Dr. Lee is a psychiatrist?
8  A.  Dr. Lee is a psychiatrist.
9  Q.  And is that a full-time position?
10  A.  No.  Dr. Lee is in a quarter-time position.
11  Q.  And when was that position filled?
12  A.  Approximately two months ago.
13  Q.  And is Mr. Bender full-time?
14  A.  Mr. Bender is full-time.
15  Q.  Okay.  And what is Mr. Bender's professional
16  background or training?
17  A.  Mr. Bender is a master-level psychologist.  He
18  has been an employee of the Department of Corrections for
19  approximately 20 years and has worked in a number of
20  different mental health positions in the Department of
21  Corrections.
22  Q.  Okay.  So as I take it that you are responsible
23  for monitoring Wexford's performance on the mental health
24  portion of the contract; is that correct?
25  A.  That's correct.

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 18

1    Q.  And how do you divide that work with the two
2  people who report to you, Mr. Bender and Dr. Lee?
3    A.  Dr. Lee does specialized evaluations directly
4  related to psychiatry.  Mr. Bender does routine
5  evaluations of documented level of care at each unit.  I
6  do monitoring of specialized programs that I feel are
7  critical to service delivery.
8    Q.  And what would be an example of such a program?
9    A.  Such a program would be the licensed mental
10 health program at the Phoenix unit.
11   Q.  Okay.  Dr. Shaw, are you at all familiar with the
12 Parsons versus Ryan lawsuit?
13   A.  Yes, I am familiar with it.
14   Q.  Have you read the complaint that was filed in
15 this case?
16   A.  Yes, I have.
17   Q.  And you understand that this deposition today is
18 taking place as part of that lawsuit; correct?
19   A.  Yes, it is my understanding.
20   Q.  And you understand that you have been designated
21 by ADC to testify on its behalf on a number of topics;
22 correct?
23   A.  That is my understanding.
24   Q.  And you understand that, and this may be a little
25 bit different from other depositions, but today you are

Page 19

1  testifying not on your own behalf, but on behalf of the
2  Arizona Department of Corrections?
3    A.  Yes, I understand that.
4    MS. WIENEKE:  Form.  Object to the form.
5  BY MR. FATHI:
6    Q.  And you are required to testify to information
7  that is known or reasonably available to ADC; correct?
8    MS. WIENEKE:  Object to the form.
9    THE WITNESS:  Yes, I understand that.
10   MR. FATHI:  All right.  This will be Exhibit
11 No. 17.
12   (Exhibit 17 was marked for identification.)
13 BY MR. FATHI:
14   Q.  I'm showing you Exhibit 17, which is document
15 No. 82 filed in this case titled "Notice of 30(b)(6)
16 Deposition Duces Tecum."
17   Dr. Shaw, have you seen this document before?
18   A.  Yes, I have.
19   Q.  When did you first see it?
20   A.  Approximately three weeks ago.
21   Q.  Now, would you turn to page 6?  And I'm using the
22 page numbers at the top of the page, page 6.
23   And towards the bottom of page 6 you see a
24 heading "Topics"; correct?
25   A.  Yes, I see it.

Page 20

1    Q.  And then over the next few pages there are topics
2  labeled 1 through 24.
3    Do you see that?
4    A.  Yes, I do.
5    Q.  Now, you have been designated to testify today on
6  behalf of ADC on all of those topics except No. 4.
7    Do you understand that?
8    A.  Yes, I do understand that.
9    Q.  And are you able to testify to information known
10 or reasonably available to ADC on all of those topics?
11   A.  I believe that I am.
12   Q.  To your knowledge, is there anyone within the
13 department who is more knowledgeable than you on any of
14 those topics?
15   MS. WIENEKE:  Foundation.
16   THE WITNESS:  I don't believe so.
17 BY MR. FATHI:
18   Q.  Staying with that document for the moment, please
19 go to page 13, again, using the numbers at the top of the
20 page.
21   A.  Okay.
22   Q.  And there you see towards the bottom of the page
23 a topic or heading saying "Documents requested."
24   Do you see that?
25   A.  Yes, I do.

Page 21

1    Q.  And over the next couple of pages, nine different
2  categories of documents.
3    Do you see that?
4    A.  Yes, I do.
5    Q.  Were you asked to gather all the documents listed
6  on those pages?
7    MS. WIENEKE:  Object to the form, calls for
8  attorney/client privileged information.
9    Don't answer the question.
10 BY MR. FATHI:
11   Q.  Did you gather the documents listed on those
12 pages?
13   MS. WIENEKE:  For the record, defendants prior to
14 today's deposition produced documents responsive to the
15 document request and were provided to plaintiffs.
16   MR. FATHI:  I disagree with that
17 characterization, but let's let the witness answer the
18 pending question.
19   THE WITNESS:  Yes, I did.  I did gather these
20 documents.
21 BY MR. FATHI:
22   Q.  You gathered all nine of those categories of
23 documents?
24   A.  Yes, I did.
25   Q.  And what did you do with them?

6 (Pages 18 to 21)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 22

1    A.  I gave them to Mr. Pratt, who was gathering
2  documents in the general fashion for these proceedings.
3    Q.  Okay.  And where did you search for documents
4  that were responsive to those categories?
5    A.  Those were found in a number of different areas.
6  Some were in our department policies.  Some were in our
7  technical manual.  Some were in director's instructions.
8    Q.  Did you search for e-mails that were responsive
9  to these categories?
10   A.  No, I did not.
11   Q.  Why not?
12   A.  I believe that the answers or the information
13  asked in these issues were contained in our policies and
14  procedures and the technical manual.
15   Q.  Did you read the definition of documents set
16  forth on page 2?
17   A.  Yes, I did.
18   Q.  And you see that includes electronic mail;
19  correct?
20   A.  Yes.
21   Q.  But you did not search for e-mails that were
22  responsive to these requests?
23   A.  I did not.
24     MS. WIENEKE:  Object to the form.
25     THE WITNESS:  I did not.

Page 23

1  BY MR. FATHI:
2    Q.  Did you search for memoranda or notes that were
3  responsive to these document categories?
4    A.  Yes, I did.
5    Q.  And did you find any?
6    A.  Yes, I did.
7    Q.  And I assume you gave those to Mr. Pratt.
8    A.  Yes, I did.
9    Q.  Okay.  Have you ever sent or received e-mails
10  that were pertaining to any of those nine topics?
11     MS. WIENEKE:  Object to the form.
12     THE WITNESS:  Not that I directly recall.
13  BY MR. FATHI:
14   Q.  So, for example, directing your attention to
15  item 9, you have never sent any e-mails regarding policies
16  and procedures regarding management of ADC prisoners who
17  are prescribed psychotropic medications?
18     MS. WIENEKE:  Form.
19     THE WITNESS:  Not that I recall.
20     MR. FATHI:  Okay.  Okay.  This will be
21  Exhibit 18.
22       (Exhibit 18 was marked for identification.)
23  BY MR. FATHI:
24   Q.  Dr. Shaw, please turn to page 7 of Exhibit 18,
25  which is document No. 81 filed in this case.

Page 24

1    Are you there?
2    A.  I'm here.
3    Q.  Now, you have also been designated to testify on
4  behalf of ADC on topics No. 10, 12, and 15.
5    You are aware of that?
6    A.  Yes, I'm aware of that.
7    Q.  And are you able to testify today to information
8  known or reasonably available to ADC on those three
9  topics?
10   A.  Yes, I am.
11   Q.  Okay.  Would you now please turn to page 14.  And
12  there you see a heading stating "Documents requested";
13  right?
14   A.  Yes, I do see that.
15   Q.  And there are ten categories of documents listed;
16  correct?
17   A.  Yes.
18   Q.  Did you search for documents in these ten
19  categories?
20   A.  Yes, I did.
21   Q.  And did you find any?
22   A.  Yes, I did.
23   Q.  And did you give those to Mr. Pratt also?
24   A.  Yes, I did.
25   Q.  Did you search for e-mails in those categories?

Page 25

1    A.  No, I did not.
2    Q.  And why is that?
3    A.  Again, I did not recall any e-mails that were
4  directly related to these topics that I had received or
5  sent.
6    Q.  So, for example, you have never sent or received
7  any e-mails pertaining to No. 4, all policies and
8  procedures regarding the provision of healthcare to
9  prisoners classified as seriously mentally ill, severely
10  mentally ill, MH-1 through MH-5, or any other mental
11  health classification employed by the ADC while housed in
12  isolation; is that correct?
13     MS. WIENEKE:  Object to the form.
14     THE WITNESS:  Not that I recall.
15  BY MR. FATHI:
16   Q.  Okay.  So let me just be clear on -- that I
17  understand your testimony.
18     Your testimony is that you don't recall sending
19  or receiving any e-mails on --
20   A.  On these specific topics, I don't recall that.  I
21  mean, I send hundreds of e-mails.  I don't recall a
22  specific one of these topics.
23   Q.  Okay.  Did you search through your e-mails to
24  verify that, in fact, you had not sent or received any
25  e-mails on those topics?

7 (Pages 22 to 25)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 26 | Page 27 |
|---|---|

Page 26

1    A.  I searched through the last 90 days, which is as
2  far back as my e-mail would go.
3    Q.  Okay.  Let's talk about that.
4       Why does your e-mail only go back 90 days?
5    A.  That's how our e-mail service is currently
6  configured.
7    Q.  And then what happens to your e-mails after
8  90 days?
9       MS. WIENEKE:  Foundation.
10       THE WITNESS:  Well, I'm no expert in that, but
11  they go wherever e-mails go, where you can't find them
12  anymore.
13  BY MR. FATHI:
14    Q.  Is it your understanding that they are still
15  retrievable in some way, or is it your understanding that
16  they are irretrievably lost?
17       MS. WIENEKE:  Foundation.
18       THE WITNESS:  I -- I -- it is not my
19  understanding that I know where they go.
20  BY MR. FATHI:
21    Q.  You don't know?
22    A.  I don't know.
23    Q.  Okay.  Has -- putting aside your counsel, has
24  anyone instructed you to save e-mails that might be
25  relevant to this case?

Page 27

1    A.  We were instructed to save e-mails relevant to
2  this case.  I believe that might have been four months
3  ago.
4    Q.  And were you instructed to save other documents
5  that might be related to this case?
6    A.  Yes.
7    Q.  And that was at the same time?
8    A.  That was at the same time.
9    Q.  And again, unless it was your counsel, who was it
10  that instructed you to do that?
11    A.  That would have been Mr. Pratt in discussing
12  preparation for this lawsuit.
13    Q.  Okay.  Other than what we have already talked
14  about, what did you do to prepare for your deposition
15  today?
16    A.  I reviewed the technical manual.  I reviewed the
17  department orders and policies that related to the topics
18  that were in these documents.  I looked through some
19  clinical records that I thought were relevant.  And I
20  reviewed some of our recent plans and changes in terms of
21  how we manage inmates in various kinds of facilities.
22    Q.  Any other documents that you reviewed in
23  preparation for today?
24    A.  No.
25       MR. FATHI:  Kathy, we would request all documents

| Page 28 | Page 29 |
|---|---|

Page 28

1  that he reviewed in preparation for today.
2       MS. WIENEKE:  They have been produced.
3       MR. FATHI:  It's your -- you're representing that
4  every document that Dr. Shaw reviewed in preparation for
5  today has already been produced?
6       MS. WIENEKE:  The technical manual has been
7  produced.  The policies and the plans -- the policies and
8  the orders have been produced.  The clinical records of
9  the 14 plaintiffs you have.  Those have been produced.
10  And the documents that we produced yesterday you have.
11  Those are the documents that he reviewed.
12  BY MR. FATHI:
13    Q.  Dr. Shaw, did you review any clinical records
14  other than those of the 14 named plaintiffs?
15    A.  To prepare for this?
16    Q.  Yes.
17    A.  No.
18    Q.  And what were the documents you said regarding
19  plans and changes?  What were those?
20    A.  Plans and changes, we have a recent, not
21  proposal, a recent plan on housing and treatment of
22  inmates in maximum custody.  I reviewed that.
23    Q.  Was that a single document?
24    A.  It's contained in a single document currently.
25    Q.  Describe for me the document that you reviewed.

Page 29

1    A.  I reviewed a plan that I had proposed to the
2  director and that he had accepted.  I also reviewed some
3  recent documents from the maximum custody units.
4    Q.  What documents were those?
5    A.  Those would be pictures of some of the changes
6  that have been made, some written discussion of inmate
7  response to the changes.
8    Q.  And the plan that you provided to the director,
9  what form was that in?
10    A.  That was in a decision memorandum.
11       MR. FATHI:  Kathy, that has not been produced.
12  And we'd ask that that and all of the documents that Dr.
13  Shaw reviewed that have not been produced, be produced.
14  BY MR. FATHI:
15    Q.  Any other documents you reviewed in preparation
16  for the deposition besides what we discussed?
17    A.  No.
18    Q.  Okay.  I see you brought some notes with you.
19       What are those?
20    A.  Actually, that was directions on how to get here.
21    Q.  Okay.  Can I see that?
22       Thank you.
23       MS. WIENEKE:  Wait.  No, let me look at that
24  first, David.  Can I have that back, please?  Seriously,
25  can I have it back before you read it?

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 30 | Page 31 |
|---|---|
| 1     MR. FATHI: If he reviewed it in preparation for | 1  at a document after I say give it back to me. That is not |
| 2  the deposition -- | 2  professional. |
| 3     MS. WIENEKE: He hasn't even established that | 3     The information in this e-mail is attorney/client |
| 4  foundation. | 4  privilege information. I will not allow you to look at |
| 5     And, please, do not ask to look at a document | 5  it. It's an e-mail from my office to Dr. Shaw. |
| 6  when I asked you to give it back to me. That is | 6     The record will reflect that after it was handed |
| 7  unprofessional. | 7  to you and after I asked you to give it back to me, you |
| 8     MR. FATHI: I will not sit here and be accused of | 8  continued to look at the document. |
| 9  unprofessionalism. The doctor brought notes with him to | 9     MR. FATHI: No. That is not an accurate |
| 10  the deposition. I'm entitled to see them. | 10  statement of what happened. |
| 11     MS. WIENEKE: No, you are not entitled to see his | 11     Let's move on. |
| 12  notes. You are not entitled to see anything without my | 12  BY MR. FATHI: |
| 13  okay. | 13    Q. Doctor, whom did you speak with, if anybody, in |
| 14     MR. FATHI: That's not a correct statement of the | 14  preparation for your deposition today? |
| 15  law. | 15    A. I spoke with my attorney. |
| 16     MS. WIENEKE: The rule does not allow you to see | 16    Q. Is that Ms. Wieneke? |
| 17  anything under refreshing recollection until you establish | 17    A. That is Ms. Wieneke. |
| 18  the foundation that he needed the information to refresh | 18    Q. And when did you speak with her? |
| 19  his recollection and to assist him in testifying. | 19    A. That would have been a week ago Monday, whenever |
| 20     Is that not the law? | 20  it was. |
| 21     MR. FATHI: No, that is not the law. | 21    Q. It was just on one occasion? |
| 22     MS. WIENEKE: That is the law. | 22    A. One occasion. |
| 23     MR. FATHI: Why don't you review the document and | 23    Q. And for approximately how long? |
| 24  then show it to me. | 24    A. I would say approximately three hours. |
| 25     MS. WIENEKE: I'm not going to allow you to look | 25    Q. Did you speak with anyone else about this |

| Page 32 | Page 33 |
|---|---|
| 1  deposition? | 1    A. Yes, I have seen it. |
| 2    A. No, I have not. | 2    Q. This is Exhibit 19, Bates No. ADC27769 through |
| 3    Q. You didn't speak with Mr. Pratt? | 3  27809. |
| 4    A. I informed Mr. Pratt that we were going to be | 4    Doctor, will you please look at pages 2770 and |
| 5  conducting this deposition, but I would not discuss the | 5  71? |
| 6  content. | 6     MS. WIENEKE: Could I ask for the record, you |
| 7    Q. And you didn't speak with either of the people | 7  said you were asking about the current staffing under |
| 8  you supervise in the Contract Monitoring Bureau? | 8  Wexford. |
| 9    A. Not about this particular deposition, no. | 9     Can you direct me to the topic and document |
| 10    Q. And you didn't speak with anyone else in the | 10  number for that you are asking Dr. Shaw? |
| 11  department about this deposition? | 11     MR. FATHI: I will do that later. |
| 12    A. Directly about this deposition, no. | 12     MS. WIENEKE: I'm asking you to do it now, so I |
| 13    Q. Anything else you did to prepare for today's | 13  can direct under which topic you are inquiring. |
| 14  deposition? | 14     MR. FATHI: We will discuss that later. |
| 15    A. Not that I recall. | 15  BY MR. FATHI: |
| 16    Q. Okay. Let's talk about the current mental health | 16    Q. Doctor, would you -- |
| 17  staffing that exists under the Wexford contract. | 17     MS. WIENEKE: Are you refusing to do it now when |
| 18    What's the date that Wexford took over | 18  you are asking the witness? Later is not helpful to me. |
| 19  responsibility for providing mental healthcare to ADC | 19     MR. FATHI: Yes, I'm refusing to do it now. We |
| 20  prisoners? | 20  will talk about it later. |
| 21    A. July 1st, 2012. | 21     MS. WIENEKE: Then my objection is beyond the |
| 22     MR. FATHI: Exhibit 19. | 22  scope of the topic in the 30(b)(6) notices, since you will |
| 23     (Exhibit 19 was marked for identification.) | 23  not direct me to the topic at this time. |
| 24  BY MR. FATHI: | 24     MR. FATHI: Is this your position that this is |
| 25    Q. Doctor, have you seen this document before? | 25  not within the scope of the 30(b)(6) notices? |

9 (Pages 30 to 33)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 34 | Page 35 |
|---|---|
| 1   MS. WIENEKE: That is my position, unless you can<br>2 direct me to a topic which I can review.<br>3   MR. FATHI: Okay. I think you are capable of<br>4 reading the notice on your own.<br>5   MS. WIENEKE: As a matter of professional<br>6 courtesy, I'm asking you to direct me. And you have over<br>7 20 topics for which this witness has been directed.<br>8   Are you telling me that you will not direct me at<br>9 this time?<br>10   MR. FATHI: Yes, I'm telling you we will do that<br>11 later.<br>12   MS. WIENEKE: But you are asking him now.<br>13 BY MR. FATHI:<br>14   Q. Dr. Shaw --<br>15   MS. WIENEKE: Then I would ask for a break so<br>16 that I can read the numerous topics and find the one that<br>17 you are asking him under.<br>18   MR. FATHI: All right.<br>19   MS. WIENEKE: Will you accumulate my break?<br>20   MR. FATHI: How long a break do you need?<br>21   MS. WIENEKE: As long as it takes me to read<br>22 through all the topics to see which one you are directing<br>23 this under.<br>24   MR. FATHI: Okay. Let's take a break.<br>25   MS. WIENEKE: Okay. Thanks. | 1   (A recess was taken from 9:44 a.m. until<br>2 9:45 a.m.)<br>3   MR. FATHI: During the break I stated that the<br>4 questions I'm about to ask Dr. Shaw are pursuant to item<br>5 No. 2 in document No. 82. They are -- they may well be<br>6 covered under other designated topics as well.<br>7   MS. WIENEKE: For the record, item No. 2 is the<br>8 availability of mental healthcare other than medications<br>9 within the ADC system. The questions pertaining to<br>10 staffing Counsel believes that those are covered within<br>11 that category.<br>12 BY MR. FATHI:<br>13   Q. Dr. Shaw, is mental health staffing relevant to<br>14 the ability to provide mental healthcare?<br>15   A. Yes, mental health staffing is relevant.<br>16   Q. Thank you.<br>17   Will you look at 27770 and 27771?<br>18   A. Yes.<br>19   Q. This is a memo apparently written by you and<br>20 dated August 13th of 2011; is that correct?<br>21   A. That is correct.<br>22   Q. And you wrote this memo; correct?<br>23   A. I did write this memo.<br>24   Q. And why did you write this memo?<br>25   A. I wrote this memo to bring to Wexford's attention |

| Page 36 | Page 37 |
|---|---|
| 1 some staffing issues that I felt were important at that<br>2 time.<br>3   Q. And in this memo you set forth the level of<br>4 psychiatric staffing provided by Wexford as of<br>5 August 10th, 2012; is that right?<br>6   MS. WIENEKE: Object to the form.<br>7   THE WITNESS: Yes, as of that date.<br>8 BY MR. FATHI:<br>9   Q. And when you say psychiatric staffing, does that<br>10 include only psychiatrists, or does that include other<br>11 staff as well?<br>12   A. That would include psychiatrists or<br>13 psychiatry-certified nurse practitioner, anyone who could<br>14 prescribe psychotropic medications.<br>15   Q. So when you talk in this memo about psychiatry<br>16 staffing, you are referring to those two categories?<br>17   A. That's right.<br>18   Q. What is the staffing level of psychiatric<br>19 staffing as of today?<br>20   A. I don't know precisely. I know they have added a<br>21 number of staff; however, many of those staff are locum<br>22 tenens staff. So they serve at a certain time frame. So<br>23 I'm not sure if some of them have left their time frame<br>24 recently or not.<br>25   THE COURT REPORTER: Left their time? | 1   THE WITNESS: Yeah, if their service that they<br>2 are committed to the department has lapsed and they have<br>3 left.<br>4 BY MR. FATHI:<br>5   Q. When you say their service they committed to the<br>6 department, what do you mean by that?<br>7   A. Well, locum tenens are basically psychiatrists<br>8 who work for an agency, and they will commit to a certain<br>9 period of time, a month, six months, a year, whatever<br>10 their contract with the department specifies. So that may<br>11 be a person who serves for 30 days or a person who serves<br>12 360 days.<br>13   Q. Now, in this August 13th memo when you give the<br>14 numbers of psychiatric staff, these are people whom are<br>15 employed by Wexford; correct?<br>16   A. No. This would include the locum tenens<br>17 psychiatrists as well.<br>18   Q. Okay. And are those people, do they contract<br>19 with Wexford? Do they contract with --<br>20   A. These people contract with Wexford.<br>21   Q. Okay. Again. you just need me to finish my<br>22 question.<br>23   A. I'm sorry.<br>24   Q. So in the numbers in this memo, you are including<br>25 both psychiatrists and psychiatric staff employed by |

10  (Pages 34 to 37)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 38

1    Wexford and locum tenens contractors; correct?
2        A.  That's correct, anyone who is currently able to
3    prescribe psychotropic medications.
4        Q.  Okay.  And I believe your testimony was, you
5    don't know what the current levels of psychiatry --
6        A.  As of today, I do not know.
7        Q.  I will just ask it again.
8        A.  Okay.
9        Q.  You don't know what the current levels of
10   psychiatry staffing are; correct?
11       A.  That's correct.
12       Q.  Does it remain your belief today that Wexford's
13   current level of psychiatry staffing is grossly
14   insufficient to meet this contractual requirement?
15       A.  I believe that Wexford's staffing level has
16   improved.  I believe that it is not at the level that they
17   had initially planned to have.  It is, however, improved
18   from the date when this document was written.
19       Q.  And what is your basis for saying that?
20       A.  I have received reports from several of the units
21   which had very limited psychiatric coverage, indicating
22   that providers have now been put in place to provide
23   services.
24       Q.  I'm sorry.  I thought you just said you don't
25   know what the current level of staffing is.

Page 39

1        A.  Well, let me say that I received those -- that
2    information within the last month.
3        Q.  And in what form did you receive that
4    information?
5        A.  I received that information from -- I was
6    informed by Mr. Bender and also from personal contacts
7    with the supervisors of mental health currently employed
8    by Wexford.
9        Q.  And how was that information conveyed to you, in
10   what form?
11       A.  Telephonically.
12       Q.  None of it was conveyed by e-mail?
13       A.  No, none of it was conveyed in e-mail.
14       Q.  None of it was conveyed in any written form?
15       A.  No.
16       Q.  So you don't know what the current level of
17   psychiatry staffing is today; correct?
18       A.  As of this minute today, no, I do not.  I don't
19   know that.
20       Q.  So my question is:  Does it remain your belief
21   today, as you stated in this memo, that Wexford's current
22   level of psychiatry staffing is grossly insufficient to
23   meet this contractual requirement?
24       MS. WIENEKE:  Objection; asked and answered.
25

Page 40

1    BY MR. FATHI:
2        Q.  That is a yes or no question.
3        MS. WIENEKE:  You are not limited to yes or no.
4    You can answer in any way you want, again.
5        THE WITNESS:  I think that Wexford's capacity to
6    provide psychiatry services has improved.  I believe that
7    it is -- continues to have deficits and needs to improve
8    further but has improved very significantly over levels
9    discussed in this memo.
10   BY MR. FATHI:
11       Q.  How significantly?
12       A.  I think units that had very limited coverage now
13   have several providers available to them.  Wexford has
14   begun to use telepsychiatry more extensively so that
15   inmates are able to be served in that capacity.
16       Q.  But you can't give me numbers?
17       A.  I can't give you numbers as of today, no.
18       Q.  Can you give me numbers as of any date subsequent
19   to August 13th?
20       A.  No.
21       Q.  Okay.  I'm going to ask this question again.  I'm
22   entitled to a yes or no answer.  You can then explain your
23   answer, but I will ask you to answer this yes or no.
24       Does it remain your belief today that Wexford's
25   current level of psychiatry staffing is grossly

Page 41

1    insufficient to meet this contractual requirement?
2        MS. WIENEKE:  Object to the form, asked and
3    answered.
4    BY MR. FATHI:
5        Q.  Please answer the question, Doctor.
6        A.  No, I don't believe it's grossly insignificant --
7    grossly insufficient.
8        Q.  Okay.  At what point between August 13th and
9    today did it cease to be grossly insufficient?
10       A.  I believe after Wexford was able to obtain
11   contracts with several psychiatry registries, at the point
12   where Wexford was able to establish telemedicine services
13   to several of its units the service became significantly
14   better.
15       Q.  And what point did Wexford establish those
16   contracts with the registries?
17       A.  I can't tell you specific dates.  I know that it
18   was in late August.
19       Q.  Okay.  And which registries was that?
20       A.  I cannot give you a specific registry.
21       Q.  At which units are you testifying that psychiatry
22   staffing has improved since August 13th of 2012?
23       A.  The Florence unit has improved.  The Perryville
24   unit has improved.
25       Q.  Has the Lewis unit improved?

11 (Pages 38 to 41)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 42

1     A.  The Lewis unit now has increased telemedicine
2  capacity.
3     Q.  Has on-site psychiatry staffing at the Lewis unit
4  improved?
5     A.  As of today, I don't think so.
6     Q.  Has on-site psychiatry staffing at the Eyman unit
7  improved?
8     A.  I don't know.
9     Q.  Has on-site psychiatry staffing at the Tucson
10  unit improved?
11     A.  I don't know.
12     Q.  Who would know the answers to these questions?
13     A.  The answer to those questions would be known by
14  the Wexford mental health supervision staff.
15     Q.  It's not part of your function as mental health
16  contract monitor to know those answers?
17        MS. WIENEKE:  Form.
18        THE WITNESS:  It's part of our responsibility to
19  monitor level of services.
20  BY MR. FATHI:
21     Q.  And monitoring the level of services doesn't
22  require you to monitor the level of staffing?
23     A.  Not necessarily.  It depends on whether the
24  services are adequate.
25     Q.  So is it your testimony that no one in the

Page 43

1  Arizona Department of Corrections could tell me what the
2  current level of on-site psychiatry staffing is?
3        MS. WIENEKE:  Object to the form, misstates.
4        THE WITNESS:  I don't know.
5  BY MR. FATHI:
6     Q.  Does it remain your belief today that Wexford's
7  psychiatry staffing level is so limited that patient
8  safety and orderly operation of ADC facilities may be
9  significantly compromised?
10     A.  No, I don't believe that is true.  I believe that
11  they have improved to the extent that that is probably not
12  correct at this point.
13     Q.  And at what point did that cease to be correct?
14     A.  I think the point where they increased their
15  level of registry coverage and increased their use of
16  telemedicine.
17     Q.  Does it remain your belief today that Wexford's
18  psychiatry staffing is insufficient to provide a safe
19  level of services?
20     A.  No, I don't think that is true.
21     Q.  And when did that cease to be your belief?
22     A.  When they increased their level of registry
23  coverage and began utilizing telemedicine to increase
24  their service delivery level.
25        MS. WIENEKE:  Increase the level.

Page 44

1  BY MR. FATHI:
2     Q.  Do you believe that Wexford today is providing
3  adequate services to ADC prisoners?
4     A.  Let me answer that in this way.
5        The expectation for psychiatric services by
6  Wexford is set at a pretty high bar.  That bar was set
7  there purposefully.
8        Are they meeting the bar that we have set, I
9  don't believe so.  Are they at a level where services are
10  safe, yes, I believe that is true.
11     Q.  Do you believe that Wexford is currently
12  providing an adequate level of psychiatrist services to
13  ADC prisoners?
14        MS. WIENEKE:  Form.
15        THE WITNESS:  Adequate in terms of a safe level,
16  yes.  Adequate in terms of good clinical practice, I think
17  that is less certain.
18  BY MR. FATHI:
19     Q.  At the bottom of page 27770 and going on to the
20  next page, it reports a number of audits.
21        Do you see that?
22     A.  Yes, I do.
23     Q.  Audits at Perryville, Lewis, and Eyman; correct?
24     A.  That's correct.
25     Q.  Have any similar audits been done at any

Page 45

1  facilities since these audits?
2     A.  Yes.  Audits were performed at the end of
3  September.
4     Q.  And what were the results of those audits?
5     A.  The results of the audits found that the service
6  level had improved but still had not reached the level
7  where they were consistent with the expectation of the
8  contract.
9     Q.  And where would the written results of those
10  audits be found?
11     A.  Those audits are contained in a general audit of
12  Wexford services, which is known as a GAR, green, amber,
13  red report, which is compiled by the unit monitors at each
14  of our units.
15        So the results of the mental health audit were
16  communicated to the local monitors, and they included them
17  in this more general report of Wexford services.
18        MR. FATHI:  Kathy, we would like to request all
19  audits that Wexford performed as they are relevant to
20  provision of mental healthcare.
21        MS. WIENEKE:  Is that the same thing as MGAR?
22        THE WITNESS:  MGAR, that's right.
23  BY MR. FATHI:
24     Q.  Dr. Shaw, have you written any other memos about
25  Wexford's performance in providing mental healthcare?

12  (Pages 42 to 45)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 46

1    A.  No.
2    Q.  This is the one and only memo you have written
3  regarding Wexford's performance in mental health?
4    A.  That's right.
5    Q.  Have you written any other documents -- and I'm
6  including e-mails -- regarding Wexford's performance in
7  providing mental healthcare?
8    A.  Any written documents that relate to the general
9  provision of medication renewals and delivery.
10   Q.  By Wexford?
11   A.  By Wexford.
12   Q.  And describe those documents for me.
13   A.  Those documents are a compilation of findings
14  from our pharmacy program monitor as well as our medical
15  staff in terms of the general level of medication renewals
16  by Wexford offer the past 90 days.
17   Q.  And did those documents reveal any deficiencies
18  in Wexford's performance?
19   A.  The initial documents it revealed some
20  significant deficits in their renewal services.
21      Recent documents continue to show some deficits,
22  but again, a very significant improvement in that area.
23      MR. FATHI:  Okay.  Kathy, we would request those
24  documents as well.
25  BY MR. FATHI:

Page 47

1    Q.  Doctor, other than what we already discussed,
2  have you written any other documents -- again, I'm
3  including e-mails -- regarding Wexford's performance in
4  providing mental health services?
5      MS. WIENEKE:  Is this the medications you are
6  talking about?
7      THE WITNESS:  Oh, if you look here, there are
8  several decision reports by Ms. Boothbey.  I believe that
9  we have two letters that Ms. Boothbey, myself, and
10  Dr. Rowe wrote.
11      MS. WIENEKE:  I was just asking for
12  clarification, if this is the --
13      MR. FATHI:  Excuse me.  Is this for the record,
14  or is this a private conversation?
15      MS. WIENEKE:  Just off the record.
16      (Discussion off the record.)
17  BY MR. FATHI:
18   Q.  Okay.  Doctor, I believe there was a question
19  pending.
20      Besides what we have discussed already, have you
21  written any other documents, including e-mails, regarding
22  Wexford's performance in providing mental healthcare?
23   A.  I wrote an e-mail about a specific inmate who was
24  transferred to the Baker unit in mid August concerning his
25  service needs and Wexford's difficulties at the specific

Page 48

1  unit.  That's the only one I recall.
2    Q.  So, to the best of your recollection, you have
3  written in the three months that you have been mental
4  health contract monitor exactly one e-mail regarding
5  Wexford's performance in providing mental health services?
6    A.  That is the only one I can recall that was
7  specifically directed at a topic that Wexford had
8  addressed.
9    Q.  That wasn't my question.  My question pertains to
10  any e-mails pertaining to Wexford's provision of mental
11  healthcare services.
12   A.  I don't remember any.
13      MR. FATHI:  Okay.  Kathy, we would request that
14  one e-mail and any others that are responsive to my
15  question.
16      (Exhibit 20 was marked for identification.)
17  BY MR. FATHI:
18   Q.  Doctor, showing you Exhibit 20, a September 28,
19  2012 article from the Arizona Republic titled "Arizona
20  fines provider at prison healthcare," have you read this
21  article?
22   A.  Yes, I have read this article.
23   Q.  The article mentions a seven-page letter sent by
24  ADC to Wexford on September 21st.
25      Have you seen that letter?

Page 49

1    A.  No, I have not.
2    Q.  Did you have any role in drafting the letter?
3    A.  No, I did not.
4      (Exhibit 21 was marked for identification.)
5  BY MR. FATHI:
6    Q.  Doctor, showing you Exhibit 21, which is a
7  seven-page letter to Karen Mullenix at Wexford Health
8  Services from Joe Profiri, a seven-page letter with a
9  number of attachments dated September 21st.
10      Have you seen this document before?
11   A.  No, I have not.
12   Q.  Would you look, please, at the second page of the
13  letter.
14      The first paragraph under heading No. 2, it says,
15  "ADC learned that a significant number of inmates may not
16  have been receiving their medications as prescribed due to
17  expired prescriptions and inappropriate renewals or
18  refills."
19      Do you see that language?
20   A.  Actually, I don't.  That is on page 2?
21   Q.  Page 2, it's in the first paragraph under heading
22  No. 2.
23   A.  Okay.  Yes, I do see it now.
24   Q.  All right.  Do you know anything about the
25  situation referenced here?

13 (Pages 46 to 49)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 50

1    A. Yes, I do know something about that situation.
2    Q. Did the medications that were not received
3  include psychotropic medications?
4    A. Yes, they did.
5    Q. And when it says "a significant number of
6  inmates," how many prisoners are we talking about here?
7    MS. WIENEKE: Foundation.
8    THE WITNESS: Are you asking overall or
9  psychotropic medications?
10  BY MR. FATHI:
11    Q. I think I'm asking both.
12    A. Okay. My rough estimate was that the number of
13  psychotropic medications was in the area of 1500.
14  Overall, again, a very rough estimate, would have been
15  5,000.
16    Q. And for how long did these prisoners not receive
17  their medications?
18    MS. WIENEKE: Foundation.
19    THE WITNESS: I believe that would have
20  depended -- it would have gone anywhere from a few days to
21  up to a month.
22  BY MR. FATHI:
23    Q. Okay. Does not receiving medications as
24  prescribed create a risk to patient health or safety?
25    MS. WIENEKE: Objection; form and foundation.

Page 51

1    THE WITNESS: Yes, it does.
2  BY MR. FATHI:
3    Q. I'm sorry. Your answer?
4    A. Yes, it does.
5    Q. What did ADC do in response to this situation?
6    A. ADC dispatched many of our monitors to review
7  medication renewals. The pharmacy monitor and myself had
8  requested some special reports from the pharmacy that
9  services Wexford. Utilizing those reports, both ADC and
10  Wexford staff reviewed the names of inmates who had
11  apparently had expired medications and those were renewed
12  in a process of identifying and renewing.
13    Q. And how long did that process take?
14    A. After the initial identification, about
15  two weeks.
16    Q. So is it your testimony that all the prisoners
17  who are identified as not receiving their medications
18  subsequently did receive their medications?
19    A. Can I say all, no. I think -- I think the vast
20  majority did. I don't know of any exceptions, but I would
21  be reticent to say yes, every one of them.
22    Q. Okay. Please look at the next page of the
23  letter, and I'm going to ask you about the first paragraph
24  on page 3.
25    That paragraph refers to a prisoner in

Page 52

1  Florence-Central Unit who was found hanging from a sheet
2  on August 23rd. It says that the prisoner was prescribed
3  a mood stabilizer but didn't receive it for the first 23
4  days of August.
5    Doctor, are you familiar with this situation?
6    A. Yes, I am.
7    Q. I know it happened in Florence-Central Unit.
8    Do you know more specifically where it happened?
9    A. No. Florence-Central Unit.
10    Q. Did the prisoner survive?
11    A. Yes.
12    Q. What were the nature of his injuries?
13    A. He had some edema to the neck but no permanent
14  injuries were sustained.
15    Q. What is the name of this prison?
16    MS. WIENEKE: No. He is not going to provide
17  that information for privacy reasons.
18    MR. FATHI: We are entitled to this information
19  pursuant to the protective order in this case.
20    MS. WIENEKE: I don't agree.
21    MR. FATHI: Are you instructing him not to
22  answer?
23    MS. WIENEKE: Yes.
24  BY MR. FATHI:
25    Q. Where is this prisoner now?

Page 53

1    A. I believe this prisoner is currently at the
2  Phoenix Mental Health Program Unit.
3    Q. And why is he no longer at the Central Unit?
4    A. Following the hanging attempt, he was moved there
5  for a higher level of observation treatment.
6    Q. Do you believe that Wexford provided an
7  acceptable level of patient care in this case?
8    MS. WIENEKE: Form and foundation.
9    THE WITNESS: No.
10  BY MR. FATHI:
11    Q. Do you believe -- do you agree with the statement
12  in the last sentence of that paragraph that, "Failing to
13  deliver psychotropic medication as prescribed is a
14  significant noncompliance issue"?
15    A. Yes, I do.
16    Q. Please turn now to page 6 of the attachments.
17  It's after the letter itself.
18    Do you have it, Doctor?
19    A. Yes.
20    Q. And in the upper left-hand corner, the box
21  labeled Kasson, the second box titled issues, there is a
22  reference to, "Psych inmates not being seen at regular
23  intervals."
24    Do you see that?
25    A. Yes, I do.

14 (Pages 50 to 53)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) -- 10/3/2012

Page 54

1    Q.  Is it correct that psych inmates are not being
2  seen at regular intervals?
3        MS. WIENEKE:  Foundation.
4        You can answer.
5        THE WITNESS:  Yes.
6  BY MR. FATHI:
7    Q.  Other than what we have discussed, are you aware
8  of any other deficiencies with the provision of mental
9  healthcare that ADC has brought to Wexford's attention?
10   A.  No.
11   Q.  Other than what we discussed, are you aware of
12 any other deficiencies with Wexford's provision of mental
13 healthcare that ADC is planning to bring to Wexford's
14 attention?
15   A.  No.
16   Q.  Let's go back to the newspaper article.  I
17 believe that is Exhibit 20.
18       On page 2 it refers to a letter from Wexford to
19 Director Ryan.
20       Do you see that reference?  It's in the fourth
21 paragraph.
22   A.  Yes, I do.
23   Q.  Have you seen that letter?
24   A.  No, I have not.
25   Q.  Other than what we discussed, have you heard any

Page 55

1  ADC employees or contractors express concern about the
2  quality of the mental healthcare provided by Wexford?
3    A.  Well, let me ask, are you referring to
4  conversations?  Are you referring to discussions?  Are you
5  referring to written documents?
6    Q.  All of the above.
7    A.  Yes, there have been discussions about the
8  difficulties with some of Wexford's provision of services
9  from other monitors.
10   Q.  Like who?
11   A.  Dr. Johnston, who is our medical program monitor.
12   Q.  And who else?
13   A.  Dr. Valenzuela in Phoenix.
14       And actually I can't recall specific names of
15 other monitors.
16   Q.  Would it be safe to say that a number of ADC
17 employees or contractors have expressed concern about the
18 quality of mental healthcare provided by Wexford?
19   A.  Are you saying mental health?
20       MS. WIENEKE:  Object to the form.
21 BY MR. FATHI:
22   Q.  Let's start with mental health.
23   A.  Well, that narrows it quite a lot.
24       Dr. Valenzuela has brought an issue forth.  And
25 there have been several other monitors whose names I can't

Page 56

1  currently recall who have brought some issues forward.
2    Q.  And what is the issue that Dr. Valenzuela brought
3  forth?
4    A.  Dr. Valenzuela was concerned about a forced
5  medication issue.  She was also concerned about the
6  treatment of an inmate who was transferred to Baker Ward.
7    Q.  And what were those concerns?
8    A.  Those concerns were that at the Lewis unit that
9  he was not receiving medication that would have been
10 helpful to him, and he would have needed a specialized
11 kind of hearing in order to prescribe this medication, and
12 that was not done.
13   Q.  What was the name of that prisoner?
14       MS. WIENEKE:  Object to the form.  Not going to
15 reveal the name of the inmate.
16       MR. FATHI:  Are you instructing him not answer?
17       MS. WIENEKE:  Yes.
18 BY MR. FATHI:
19   Q.  What other concerns, if any, did Dr. Valenzuela
20 express about the quality of Wexford's mental healthcare?
21   A.  Those are the only issues that I recall her
22 directly expressing to me.
23   Q.  Have you heard Mr. Pratt express any concerns
24 about the quality of healthcare provided by Wexford?
25   A.  Well, I think Mr. Pratt is concerned, as you can

Page 57

1  see from these documents, about some of the healthcare
2  being delivered by Wexford.
3    Q.  Have you ever heard Mr. Pratt express concern
4  about the quality of healthcare delivered by Wexford?
5    A.  Yes.  I have heard him say that there were
6  problems that needed to be addressed by Wexford, yes.
7    Q.  Have you heard Mr. Pratt express to you that the
8  current level of healthcare provided by Wexford is
9  unacceptable?
10   A.  I have not heard him say that.
11   Q.  Inappropriate?
12   A.  No, I have not heard him say that.
13   Q.  Inadequate?
14   A.  In a specific case I have heard him say that.
15   Q.  Have you ever heard Director Ryan express any
16 concern about the quality of healthcare provided by
17 Wexford?
18   A.  I have not personally heard him say that, no.
19   Q.  Do you have much interaction with Director Ryan?
20   A.  Not too much these days.
21   Q.  Let's go back to the monitoring chart.
22       Doctor, I would like you to tell me which of the
23 individuals on this chart have expressed concern either
24 orally or in writing about the quality of care provided by
25 Wexford.

15  (Pages 54 to 57)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

## Page 58

1    A.  Helena Valenzuela, Matthew Musson, Kristan Sears.
2    Q.  Any others?
3    A.  Those are the only ones I can recall.
4    Q.  Okay.  Thank you.
5        Other than what we have discussed, are you aware
6   of any documents, in either written or electronic form --
7   and again, I'm including e-mails -- in which any ADC staff
8   or contractors expressed concern about the quality of
9   mental healthcare being provided by Wexford?
10   A.  No.  The information I have was transmitted
11  orally.  I'm unaware of a written document.  It may exist,
12  but I have not seen it.
13   Q.  No e-mails?
14   A.  Not to me.
15   Q.  Any e-mails that you have seen that were
16  addressed to others that you were copied on, for example?
17   A.  Ms. Sears wrote an e-mail to Mr. Bender
18  expressing some concerns about -- actually one of our
19  other contractors, not Wexford.  That is the only written
20  communication I recall.
21   Q.  So no e-mail about Wexford?
22   A.  No, not that I recall.
23       Could I clarify?
24   Q.  Please.
25   A.  The mental health directors for Wexford are two

## Page 59

1   individuals who I know well and supervised for some time,
2   so there is a considerable amount of verbal interaction,
3   telephone and face-to-face, between them and myself.
4   E-mails, not so much.
5    Q.  Okay.  And who are those two individuals?
6    A.  It would be Dr. Tom Fulks and Dr. Nicole Taylor.
7    Q.  And in what capacity did you supervise them?
8    A.  They were both chief psychologists at different
9   units when I was the mental health program manager.
10   Q.  How long have you known them?
11   A.  In excess of five years.
12   Q.  Would you say you are friends with them?
13   A.  Well, I used to be.
14   Q.  Can you explain that answer?
15   A.  Well, as a monitor you have a different kind of
16  relationship.  I guess we still have mutual respect, but,
17  you know, there is a limit to the social activities that
18  you can have at this point.
19   Q.  And what are their titles with Wexford, if you
20  know?
21   A.  Dr. Fulks is the northern mental health director
22  and Dr. Taylor is the southern region mental health
23  director.
24   Q.  Okay.  Thank you.
25       (Exhibit 22 was marked for identification.)

## Page 60

1   BY MR. FATHI:
2    Q.  I'm sorry, Doctor.  Could I have you read the
3   Bates numbers on those two numbers?  I don't have them on
4   mine.
5    A.  One is ADC015761.  The second is ADC015762.
6    Q.  Thank you.
7        This is Exhibit 22 as identified by you by the
8   Bates numbers.  It is pages 838 and 839 of the Wexford
9   contract labeled "Staffing Roll-up Total for ADC
10  Contract."
11       Do you see that, Doctor?
12   A.  Yes, I do.
13   Q.  Have you seen this document before?
14   A.  Yes, I have.
15   Q.  My understanding is that this is the staffing
16  that Wexford is supposed to provide under the contract;
17  correct?
18   A.  This is the staffing they proposed under the
19  contract that was accepted, yes.
20   Q.  Okay.  I would like you to go through each of the
21  mental health positions here and ask you for each, how
22  many of the positions are actually filled as of today.
23  Okay?
24   A.  I'm sure I won't be able to tell you accurately.
25   Q.  Well, we're going to try.

## Page 61

1    A.  Okay.
2    Q.  Let's start with clinical coordinator.  There is
3   supposed to be one FTE.
4        Is that position currently filled?
5    A.  Yes.
6    Q.  And who is that individual?
7    A.  That would be Dr. Jason Newell at Phoenix.
8    Q.  And that is filled on a full-time basis?
9    A.  Yes, it is.
10   Q.  And is he permanent or locum tenens?
11   A.  Okay.  Let me take that back.
12       No, that is not filled.
13   Q.  I'm sorry.  It's not filled at all?
14   A.  No, not to my knowledge.
15   Q.  Okay.  Next is clinical director.
16   A.  Clinical director is Dr. Jason Newell.
17   Q.  And he is full-time?
18   A.  He is full-time.
19   Q.  And is he a Wexford employee or locum tenens?
20   A.  He's a Wexford employee.
21   Q.  Okay.  Just so the record is clear, to your
22  knowledge, clinical coordinator is not filled?
23   A.  To my knowledge, clinical coordinator is not
24  filled.
25   Q.  Okay.  Let's move on to discharge psychologist.

16  (Pages 58 to 61)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 62 |
|---|

1   three FTE.
2       How many of those are currently filled?
3   A.  To my knowledge, one.
4   Q.  And is that a permanent or a locum tenens?
5   A.  That is a Wexford employee.
6   Q.  Thank you.
7       Let's move down to MH physician.
8       First of all, what is that position?
9   A.  I assume that's a psychiatrist, but I don't know
10  what they're specifying there.
11  Q.  Okay.  Do you know if that position is full?
12  A.  I do not know.
13  Q.  Okay.  Next is MH therapist.
14      First, can you describe what that position is?
15  A.  That would be a mental health therapist, and
16  that's a person who has master's level and some additional
17  training in delivery of mental healthcare.
18  Q.  Okay.  And there is supposed to be two FTE.
19      How many of those are currently filled?
20  A.  To my knowledge, one.
21  Q.  Permanent or locum tenens?
22  A.  Permanent, if I'm correct.
23  Q.  Okay.  Occupational therapist, one FTE, is that
24  currently filled?
25  A.  No.

| Page 63 |
|---|

1      MS. WIENEKE:  Foundation.
2      THE WITNESS:  I'm sorry.  No.
3  BY MR. FATHI:
4   Q.  Psych associate, three FTE, how many of those are
5  currently filled?
6   A.  Well, if you notice, we have psych associate and
7  then down three from the bottom we have another psych
8  associate position.  So it's really hard for me to know
9  how to address that.
10  Q.  Okay.  Let's total them all up.
11      There is psych associate three FTE, and next line
12  is psych associate e-v-e, which I assume is evening?
13  A.  Yeah.
14  Q.  That is one, and that makes four.
15  A.  And then above that you have psych associate, 19.
16  Q.  No.  I'm sorry, I'm -- I count a total of 33 FTE
17  psych associates.
18      Is that what you count?
19  A.  19, yes.
20  Q.  Okay.  33 total FTE; correct?
21  A.  33 total.
22  Q.  Of those 33 FTE, how many of them are currently
23  filled?
24  A.  Can I estimate this?
25  Q.  Please.

| Page 64 |
|---|

1   A.  I would estimate 20.
2   Q.  Okay.  Psych NP/PA, I assume that means nurse
3  practitioner, physician's assistant; is that correct?
4   A.  Yes.
5   Q.  Two FTE, how many of those are currently filled?
6   A.  As Wexford employees, I don't believe any of
7  those are filled.
8   Q.  Are they filled with locum tenens?
9   A.  I don't know.
10  Q.  Next three are psych nurse positions, a total of
11  35.
12      Would you agree with me that those add up to 35?
13  A.  Yes.
14  Q.  Of the 35 FTE psych nurse positions, how many are
15  currently filled?
16  A.  I would estimate 22.
17  Q.  Next is psych nursing coordinator, 2 FTEs.
18      How many of those are currently filled?
19  A.  Those are both filled.
20  Q.  Permanent or locum tenens?
21  A.  Permanent.
22  Q.  Next is psych supervisor psychiatrist, five FTEs.
23      How many of those are currently filled?
24  A.  As Wexford employees, to my knowledge, none.
25  Q.  None?

| Page 65 |
|---|

1   A.  Wait.  I take that back.  One.
2   Q.  One out of the five?
3   A.  One.
4   Q.  One out of the five, and your answer is?
5   A.  My answer is one out of five is a Wexford
6  employee.
7   Q.  Okay.  Thank you.
8      Are the other four filled with locum tenens?
9   A.  I don't know.
10  Q.  Who would know the answer to that?
11  A.  The mental health supervisors for Wexford would
12  have the most accurate data.
13  Q.  Who in ADC would know the answer to that?
14  A.  I don't know.  The unit monitors for the specific
15  unit would know the answer to that.
16  Q.  Psych tech, the next four lines is a total of 33
17  FTE.
18      Do you agree with me, it's 33?
19  A.  Yes.
20  Q.  And of those 33 FTE, how many are currently
21  filled?
22  A.  I would estimate between 15 and 20.
23  Q.  Next is psychiatrist, three FTE.
24      How many of those are currently filled?
25  A.  To my knowledge, .5.

17 (Pages 62 to 65)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 66 | Page 67 |
|---|---|

Page 66

1    Q.  Next, psychologist, if we add the two lines, 30
2  FTE; is that correct?
3    A.  Yes.
4    Q.  How many of those 30 FTE are currently filled?
5    A.  Again, an estimate, between 20 and 25.
6    Q.  Okay.  Let's move on to the next page, recreation
7  therapist, two FTE.
8      How many of those are currently filled?
9    A.  Those are both open.
10    Q.  So the answer is?
11    A.  None.
12    Q.  Neither are filled?
13    A.  Neither of those are currently filled.
14    Q.  Thank you.
15      State chief psychiatrist .5 FTE, is that position
16  currently filled?
17    A.  Not to my knowledge.
18    Q.  And finally, state mental health director, one
19  FTE, is that position currently filled?
20    A.  That actually has been changed.  As we discussed
21  earlier, we have two mental health region directors, and
22  those are both currently filled.
23    Q.  And are those both full-time positions?
24    A.  Yes, they are.
25    Q.  Okay.  Thank you.

Page 67

1      Will you please look over these two pages and
2  tell me if there is any mental health staff that we have
3  not yet talked about.
4    A.  I think we caught them all.
5    Q.  Okay.
6      THE WITNESS:  Can we take a short break?
7      MR. FATHI:  Sure.
8      (A recess was taken from 10:32 a.m. until
9  10:51 a.m.)
10  BY MR. FATHI:
11    Q.  Doctor, during the break did you talk to anyone
12  except your counsel?
13    A.  No.
14    Q.  Did you review any documents?
15    A.  No.
16    Q.  Okay.  Let's go back to your August 13th memo,
17  which is Exhibit 19.  Please let me know when you have
18  that.
19      Who is Joe Profiri?
20    A.  Joe Profiri is the acting division director for
21  health service contract monitors.
22    Q.  I notice that he is not on the Contract Monitor
23  Bureau Org Chart.
24    A.  His assignment is relatively new.
25    Q.  Okay.  If we were doing this chart today --

| Page 68 | Page 69 |
|---|---|

Page 68

1    A.  If we were doing this chart today --
2    Q.  -- would he -- his name be at the very top here
3  where it says assistant director?
4    A.  Yes.  Where it says vacant, that would be acting
5  Assistant Director Joe Profiri.
6    Q.  Okay.  Thanks very much.
7      Lower down on that same page where you list the
8  psychiatry staffing, I just want to make sure I understand
9  the testimony you gave earlier.
10      Is it your testimony that the on-site psychiatry
11  staffing has increased since you wrote this memo?
12    A.  Yes, it is my testimony.
13    Q.  Is it your testimony that the on-site
14  psychiatrist staffing has increased since your wrote this
15  memo?
16      MS. WIENEKE:  Form.
17  BY MR. FATHI:
18    Q.  I'm asking specifically about the psychiatrists.
19    A.  Psychiatrists, I don't know.  I'm really -- I had
20  really looked at psychiatry providers which included
21  psychiatric nurse practitioners.  When I was looking at
22  this issue, I was really looking at who could prescribe
23  medication and how many people were there to fill how many
24  prescriptions.  So I didn't really differentiate between
25  psychiatrists and psychiatric nurse practitioners since

Page 69

1  they can both write prescriptions.
2    Q.  So the answer to your question is that you don't
3  know?
4      MS. WIENEKE:  Form.
5      THE WITNESS:  Yes.
6  BY MR. FATHI:
7    Q.  Let me ask it again so we have a clear record.
8    A.  Let's me listen closely.
9    Q.  Is it your testimony that since you wrote this
10  memo on August 13th the number of on-site psychiatrists
11  has increased?
12    A.  I don't know.
13    Q.  Okay.  Thank you.
14      To be a psychiatrist providing services in the
15  Arizona Department of Corrections, do you need to be board
16  certified?
17    A.  I don't know.
18    Q.  Do you need to have completed a residency in
19  psychiatry?
20    A.  Yes.
21    Q.  To be a psychologist in the Arizona Department of
22  Corrections, do you need to have a doctoral-level degree?
23    A.  Yes.
24    Q.  So everybody on this staffing document,
25  Exhibit 22, who is designated as a psychologist has a

18  (Pages 66 to 69)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 70

1   doctoral-level degree?
2        MS. WIENEKE: Form.
3        THE WITNESS: Who is designated as a
4   psychologist?
5   BY MR. FATHI:
6        Q.  Yes.
7        A.  Yes.
8        Q.  Okay.  Does -- in order to be a psychologist with
9   ADC, do you need to be licensed in the state of Arizona?
10       A.  Yes.
11       Q.  Has that changed recently?
12       A.  We have established a position called a
13  psychology assistant, which is a person who has completed
14  a doctoral-level training but has not received a license.
15  But those people would not be considered a psychologist.
16       Q.  What is their job title?
17       A.  Psychology assistant.
18       Q.  Okay.  So everybody whose job title is
19  psychologist must be a licensed in the state of Arizona?
20       A.  Yes.  By statute you can't refer to yourself as
21  psychologist unless you have a license.
22       Q.  And again, Doctor, please just be sure to wait
23  for me to finish so the record is clear.
24       Okay.  Thank you.
25       (Exhibit 23 was marked for identification.)

Page 71

1   BY MR. FATHI:
2        Q.  I am showing you now Exhibit 23.  This is Bates
3   No. ADC16148 through 16176, a document titled "Arizona
4   Vacancies and FTE Fill Percentages -- Compared to
5   Contracted Staff Plan (External), dated August 8th, 2012.
6        Doctor, have you seen this document before?
7        A.  No, I have not.
8        Q.  Do you know what it is?
9        A.  No, I do not.
10       Q.  It appears to be a document showing what
11  percentage of healthcare staff positions are filled.
12       Would you agree with that characterization?
13       MS. WIENEKE: Foundation.
14       THE WITNESS: If I am interpreting it correctly,
15  yes.
16  BY MR. FATHI:
17       Q.  And assuming that that is what it is, it shows
18  that systemwide just under two-thirds of the positions are
19  filled; correct?
20       MS. WIENEKE: Foundation.
21  BY MR. FATHI:
22       Q.  I'm looking at the lower right-hand corner.
23       A.  That is what this document would say, yes.
24       Q.  Do you have any reason to doubt that that was the
25  case as of August 8th?

Page 72

1        MS. WIENEKE: Foundation.
2        THE WITNESS: I don't know.
3   BY MR. FATHI:
4        Q.  But my question is:  Do you have any reason to
5   doubt that that was the case?
6        MS. WIENEKE: Foundation.
7        THE WITNESS: I don't have any reason to doubt
8   it, assuming this is an accurate statement.
9   BY MR. FATHI:
10       Q.  Do you have any reason to doubt that it's an
11  accurate statement?
12       MS. WIENEKE: Objection; asked and answered,
13  foundation.
14       THE WITNESS: I have no --
15       MS. WIENEKE: You can answer.
16       THE WITNESS: I can answer.  I have no reason to
17  doubt it.
18  BY MR. FATHI:
19       Q.  Have you seen other versions of this same
20  document from different time periods?
21       A.  No, I have not.
22       Q.  Okay.  Would you turn to page 16167, please.  You
23  will see there is a column indicating for every position
24  on this page VA.
25       What does that mean?

Page 73

1        MS. WIENEKE: Foundation.
2        THE WITNESS: I would infer that means vacant.
3   BY MR. FATHI:
4        Q.  Okay.  Where it says on the same page, budget,
5   150 frozen positions, what does that mean?
6        MS. WIENEKE: Foundation.
7        THE WITNESS: I don't know.
8   BY MR. FATHI:
9        Q.  Are you aware of 150 frozen positions in the
10  department?
11       A.  No.
12       Q.  Okay.  If you turn to page 16168, please, towards
13  the middle of the page there are some positions that are
14  designated "Mental HLTH."
15       Do you see that?
16       A.  Yes, I do.
17       Q.  Do you think we can safely assume that means
18  mental health?
19       MS. WIENEKE: Foundation.
20       THE WITNESS: Yes, I think we can safely assume
21  that means mental health positions.
22  BY MR. FATHI:
23       Q.  All right.  Can you turn to page 16172, please.
24       Are you there, Doctor?
25       A.  I am.

19  (Pages 70 to 73)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 74 | Page 75 |
|---|---|
| 1   Q.  Towards the bottom of the same page some | 1   Are there certain positions that are designated |
| 2 positions are designated temporary double-fill FT. | 2 as pool positions? |
| 3    What does that mean? | 3   MS. WIENEKE:  Foundation. |
| 4   MS. WIENEKE:  Foundation. | 4   THE WITNESS:  There are certain positions that |
| 5   THE WITNESS:  I don't know. | 5 are eligible to be filled by pool workers. |
| 6 BY MR. FATHI: | 6 BY MR. FATHI: |
| 7   Q.  Okay.  Would you turn to page 16175, please. | 7   Q.  And others that are not? |
| 8   Do you see where it says, "Temporary seasonal | 8   A.  And others that are not. |
| 9 FT"? | 9   Q.  And what is the difference -- is there some |
| 10   A.  Yes, I do. | 10 principle according to which some are eligible to be |
| 11   Q.  And what does that mean? | 11 filled with pool employees and some are not? |
| 12   MS. WIENEKE:  Foundation. | 12   A.  I can answer that from the perspective of the |
| 13   THE WITNESS:  I believe that means pool | 13 Department of Corrections prior to July 1st.  At that time |
| 14 positions, but again, I don't know for a fact. | 14 positions were designated in terms of number of vacancies |
| 15 BY MR. FATHI: | 15 or difficulty in attracting permanent staff.  And then we |
| 16   Q.  Okay.  And what are pool positions? | 16 use pool positions to fill those vacancies. |
| 17   A.  Pool positions are persons who work not as ADC | 17   Q.  So before July 1st when the department had |
| 18 employees but as private contracts, much like the | 18 difficulty filling positions, some of those would be |
| 19 agencies.  Except they don't work for agencies; they work | 19 designated as pool positions? |
| 20 for themselves. | 20   A.  That's correct. |
| 21   Q.  They contract directly with Wexford to work at | 21   Q.  What about after July 1st? |
| 22 ADC? | 22   A.  I don't know what Wexford's position in that |
| 23   A.  That's right. | 23 matter is. |
| 24   Q.  And what is the difference between a permanent | 24   Q.  Okay.  Who in ADC would know that? |
| 25 employee and a -- let me start again. | 25   A.  I would guess that the unit monitors would have a |

| Page 76 | Page 77 |
|---|---|
| 1 clear understanding of that. | 1   A.  I believe that to be true. |
| 2   Q.  Of the function of pool positions? | 2   Q.  Okay.  Will you turn to the next page, please. |
| 3   A.  The function of pool positions within ADC, I | 3   Similarly here there are a number of positions |
| 4 don't know.  Again, that would be a Wexford internal kind | 4 towards the bottom of the page designated EYM Mental HLTH. |
| 5 of policy, and I don't know who in the department would | 5   Again, on the assumption that means Eyman |
| 6 actually be dealing directly with them. | 6 mental health, this seems to indicate that as of the date |
| 7   Q.  But in any event, you don't know what it means | 7 of this document there was no psychiatrist at Eyman. |
| 8 for Wexford to designate someone -- | 8   Was that, in fact, the case? |
| 9   A.  No. | 9   MS. WIENEKE:  Form. |
| 10   Q.  -- as -- | 10   THE WITNESS:  As a Wexford employee, yes, I |
| 11   A.  No. | 11 believe that is the case. |
| 12   Q.  -- something a pool position? | 12 BY MR. FATHI: |
| 13   A.  No.  No, I don't know. | 13   Q.  Do you believe that there was some other kind of |
| 14   Q.  Okay.  Will you please turn to page 16151. | 14 psychiatrist at Eyman on August 8th? |
| 15   A.  51? | 15   A.  Yes, I do. |
| 16   Q.  16151. | 16   Q.  And what kind of psychiatrist was that? |
| 17   A.  Okay.  I have it. | 17   A.  I believe they had an actual registry |
| 18   Q.  And towards the middle of the page there are a | 18 psychologist at Eyman at that time. |
| 19 number of positions designated FLO Mental HLTH. | 19   Q.  I'm asking about psychiatrists. |
| 20   Do you see that? | 20   A.  This individual is a psychiatrist. |
| 21   A.  Yes. | 21   Q.  I'm sorry.  You said psychologist. |
| 22   Q.  Now, if we assume that means Florence mental | 22   A.  Oh, did I?  I'm sorry. |
| 23 health, as I read that, as of the date of this document, | 23   Q.  So if we count registry psychiatrists on |
| 24 August 8th, there was no psychiatrist at Florence. | 24 August 8th, how many FTE psychiatrists were on site at |
| 25   Was that, in fact, the case? | 25 Eyman? |

20  (Pages 74 to 77)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 78

1    A. At Eyman, to my knowledge, one.
2    Q. One FTE?
3    A. As a psychiatrist, yes.
4    Q. Okay. Would you turn to page 16162, please.
5        Assuming that LEW means Lewis mental health, this
6    appears to indicate that as of August 8th there was no
7    psychiatrist on-site at Lewis complex.
8        Is that consistent with your recollection?
9        MS. WIENEKE: Form.
10       THE WITNESS: As a Wexford employee, that is
11   consistent with my recollection.
12   BY MR. FATHI:
13   Q. Was there some other kind of psychiatrist on-site
14   at Lewis on August 8th?
15   A. I believe that Lewis was using both -- was using
16   two telemedicine psychiatrists.
17   Q. Okay. Again my -- let me make sure --
18   A. Oh, on-site.
19   Q. Let me make sure my question was clear.
20       My question was: Was there any kind of
21   psychiatrist on-site at Lewis as of August 8th?
22   A. Not to my knowledge.
23   Q. Okay. Finally, 16154, please.
24       Assuming that PV means Perryville, this indicates
25   that as of August 8th there was one psychiatrist at

Page 79

1    Perryville, Dr. Tracy Crews.
2        Is that consistent with your recollection?
3        MS. WIENEKE: Form.
4        THE WITNESS: I'm sorry. Could you repeat the
5    date, please?
6    BY MR. FATHI:
7    Q. The page number is 16154.
8    A. Yes.
9    Q. The date of this document is August 8th of 2012.
10   A. I don't believe Dr. Crews was with the department
11   at that time.
12   Q. Okay. But you do see her name on this?
13   A. I do see her name here.
14   Q. So is it your understanding or does it seem to
15   you that this document is incorrect?
16       MS. WIENEKE: Object to the form and foundation.
17       THE WITNESS: My recollection is that Dr. Crews
18   had left as of July 1st. That was my -- that is my
19   recollection.
20   BY MR. FATHI:
21   Q. Okay. So, to the best of your recollection, as
22   of August 8th, how many FTE psychiatrists were on-site at
23   Perryville?
24       MS. WIENEKE: Form.
25       THE WITNESS: One.

Page 80

1    BY MR. FATHI:
2    Q. And who was that person?
3    A. That was Dr. Mansfield, a locum psychiatrist.
4    Q. Do you believe there is any difference in the
5    quality of care between -- provided by permanent employees
6    versus locum mental health staff?
7        MS. WIENEKE: Foundation.
8        THE WITNESS: Not in and of itself. Many of the
9    locum psychiatrists are experienced and highly competent
10   professionals.
11   BY MR. FATHI:
12   Q. I'm asking more generally about mental health
13   staff.
14       Would you -- do you believe there is any
15   difference in the quality of care provided by permanent
16   staff versus locum mental health staff?
17       MS. WIENEKE: Same objection, asked and answered.
18       THE WITNESS: I think the only difference that I
19   would see is that permanent staff may be able to provide a
20   longer period of care with a single provider. To the
21   extent that that is important, perhaps it's a benefit.
22   But in terms of individual treatment, I don't see any
23   significant difference between the two.
24   BY MR. FATHI:
25   Q. Is it important in mental health treatment to

Page 81

1    establish a therapeutic relationship between the therapist
2    and patient?
3        MS. WIENEKE: Object to the form, beyond the
4    scope.
5        THE WITNESS: Yeah, it's important.
6    BY MR. FATHI:
7    Q. And all else being equal, is it easier to do that
8    if it's the same therapist over a period of time versus
9    several different ones?
10       MS. WIENEKE: Form and foundation.
11       THE WITNESS: Well, depends on the therapist and
12   it also depends on the type of relationship that needs to
13   be established.
14   BY MR. FATHI:
15   Q. Is it your testimony that there would be no
16   difference in terms of therapeutic relationship between,
17   on the one hand, having the same therapist for one year
18   versus having six different therapists over a one-year
19   period?
20       MS. WIENEKE: Foundation, beyond the scope.
21       THE WITNESS: Well, if I might be able to answer
22   that in a little more of an expanded form.
23       In the Department of Corrections, you don't pick
24   your therapist. So you may have a therapist for a year
25   that you don't really like very much, and you don't have

21 (Pages 78 to 81)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 82

1  much of a relationship with, but he is your therapist.
2       On the other hand, if the purpose of that
3  relationship is to monitor symptoms of a psychiatric
4  disorder and to treat those symptoms, then having multiple
5  therapists may not be a very significant hindrance.
6       If the purpose was to do psychodynamic therapy,
7  if the purpose was to do ongoing more reconstructive
8  therapy, then yes, that would be more of a problem.
9  BY MR. FATHI:
10      Q.  I'm sorry.  What would be more of a problem?
11      A.  If you were involved in some kind of long-term
12  psychodynamic talk therapy, that would be a problem.
13      If your therapy was more involved in medication
14  management, if your therapy was more in terms of
15  monitoring your symptoms and addressing them with
16  medications, it would be less of a problem.
17      Q.  Sure.  But it sounds like you agree in some
18  cases, at least, it's better to have the same therapist
19  over time than a bunch of different ones?
20      MS. WIENEKE:  Form and foundation, beyond the
21  scope.
22      THE WITNESS:  In some cases I'm sure that is
23  true.
24  BY MR. FATHI:
25      Q.  Okay.  Thank you.

Page 83

1       THE WITNESS:  Can I take a second?
2       (Discussion off the record.)
3       (Exhibit 24 was marked for identification.)
4  BY MR. FATHI:
5       Q.  Are you ready, Doctor?
6       A.  Yes, I am.
7       Q.  All right.  I'm showing you what has been marked
8  Exhibit 24, Bates Nos. 14034 through 14051, a document
9  titled, at least on the first page, "Arizona Department of
10  Corrections, Health Services Division, Central Office,
11  June 20th, 2012."
12      Doctor, have you seen this document before?
13      A.  Not that I recall.
14      Q.  Have you seen a different iteration of this
15  document perhaps from a different --
16      A.  I have seen similar documents in the past, yes.
17      Q.  Okay.
18      MR. FATHI:  Did you get that?
19  BY MR. FATHI:
20      Q.  Let me ask it again to make the record clear.
21      Doctor, have you seen a different iteration of
22  this form in the past, perhaps covering different time
23  periods?
24      A.  I have seen similar documents in the past.
25      Q.  Okay.  Thank you.

Page 84

1       So based on that, could you describe what this
2  is?
3       A.  This appears to be a supervision structure for
4  the health services division as it existed prior to
5  July 1st of 2012.
6       Q.  Okay.  Thank you.  And thank you for mentioning
7  that.  I'm now shifting gears, and we will talk now about
8  before July 1st.  Okay?
9       A.  Okay.
10      Q.  Would you please turn to page 14037, and this
11  page is labeled "Mental Health ASPC Eyman."  Again, it's
12  dated June 20th.
13      Doctor, it appears from this chart that as of
14  June 20th all three of the psychiatrist positions at Eyman
15  were vacant.
16      Was that the case?
17      A.  June 20th?  No, that is not my recollection.
18      Q.  What is your recollection?
19      A.  My recollection is that we had a psychiatrist on
20  staff there, Dr. Bishop.
21      Q.  At the Eyman complex?
22      A.  At the Eyman complex.
23      Q.  On-site as of June 20th?
24      A.  That's my recollection, yes.
25      Q.  And in which of these boxes would Dr. Bishop fit?

Page 85

1       A.  He would go in this box marked "Psychiatrist
2  Grade 01."
3       Q.  Okay.  So is it your recollection that as of
4  June 20th there was one FTE psychiatrist on-site at Eyman?
5       A.  That is my recollection.
6       Q.  And out of three positions; correct?
7       A.  If you count the psychiatrist sup- -- wait.
8       No.  My recollection is that there would be one
9  vacant, because the psychiatrist supervisor would be out
10  of the Tucson facility.
11      Q.  I see.
12      And, to your recollection, was that position
13  vacant on June 20th?
14      A.  The psychiatrist supervisor?
15      Q.  Yes.
16      A.  Yes.
17      Q.  Okay.  Would you turn to 14039, please.
18      I'm sorry.  I have one more question on Eyman.
19      Approximately how long, as of June 20th, had that
20  psychiatrist supervisor position been vacant?
21      A.  That had been vacant for -- and again, please let
22  me try to recall here.
23      That had been filled by Dr. Michael Breslow who
24  had left about a year prior to that, and then somewhere
25  around this time it was filled by Dr. Worthen at Lewis.

22  (Pages 82 to 85)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 86

1    So it was vacant for a considerable period of
2    time, and then Dr. Worthen assumed those duties, and I
3    don't remember the specific date when that occurred.
4    Q.  Okay.  But assuming that --
5    MS. WIENEKE:  Were you finished?
6    THE WITNESS:  I was finished.
7    BY MR. FATHI:
8    Q.  Okay.  So it is your recollection that this
9    psychiatrist supervisor position was vacant for about a
10   year; is that correct?
11   A.  That is my recollection.
12   Q.  Okay.  And the one psychiatrist grade 1 position
13   at Eyman that you recall being vacant as of June 20th,
14   approximately how long had that been vacant?
15   A.  I don't recall.
16   Q.  Okay.  Now, please turn to 14039.  And this is
17   entitled "Mental Health ASPC Florence."  It appears from
18   this chart that as of June 20th the only psychiatrist
19   position at Florence was vacant.
20   Was that the case, Doctor?
21   A.  That is my recollection, yes.
22   Q.  And approximately how long had that position been
23   vacant?
24   A.  I don't recall.
25   Q.  Was it more than six months?

Page 87

1    A.  I don't recall.  There were a number of staff
2    changes in Florence.  I don't recall the exact dates.
3    Q.  Okay.  It also appears from this chart that as of
4    June 20th the only nurse practitioner position was vacant.
5    Was that the case, Doctor?
6    MS. WIENEKE:  Object to the form, beyond the
7    scope.
8    THE WITNESS:  I think as a Department of
9    Corrections employee that was correct.
10   BY MR. FATHI:
11   Q.  And how long had that position been vacant?
12   MS. WIENEKE:  Same objection.
13   THE WITNESS:  Again, I don't recall specifically
14   but not very long.  The nurse practitioners who had filled
15   those positions had left very shortly before this.
16   BY MR. FATHI:
17   Q.  Okay.  And it also appears that the only
18   mid-level care provider position was vacant.
19   Is that consistent with your recollection,
20   Doctor?
21   MS. WIENEKE:  Same objections.
22   THE WITNESS:  Yes.
23   BY MR. FATHI:
24   Q.  And how long had that position been vacant?
25   A.  Again, that had been vacant for a short period of

Page 88

1    time.
2    Q.  Okay.  And it also appears that two out of four
3    psychologist positions were vacant as of June 20th.
4    Was that the case?
5    A.  Yes, I believe it was.
6    Q.  And how long had those positions been vacant?
7    A.  One had been vacant for some time, and one had
8    been vacant a short period.
9    Q.  When you say for some time, would that be over a
10   year?
11   A.  I don't recall, but that would be possible.
12   Q.  Okay.  If you'd turn to 14041, please.  This page
13   is titled "Mental Health ASPC Lewis," and it appears as of
14   June 20th the only psychiatrist position at Lewis was
15   vacant.
16   Was that the case, Doctor?
17   A.  No, I don't believe so.
18   Q.  What is your recollection?
19   A.  My recollection is that Dr. Worthen was in that
20   position at that time.
21   Q.  As an ADC employee?
22   A.  As an ADC employee.
23   Q.  As a full-time on-site psychiatrist --
24   A.  As a full --
25   Q.  Excuse me, Doctor.

Page 89

1    As a full-time on-site psychiatrist at ASPC
2    Lewis?
3    A.  As a full-time on-site psychiatrist at Lewis.
4    Q.  So how long had he been in that position?
5    A.  He had been in that position, I would say, a
6    year.
7    Q.  Okay.  It also appears from this chart that as of
8    June 20th both of the nurse practitioner positions were
9    vacant.
10   Was that the case, Doctor?
11   A.  That was the case.
12   Q.  And how long had those positions been vacant?
13   A.  I don't recall, but six months.
14   Q.  Both?
15   A.  Both.
16   Q.  Okay.  And it also appears that as of June 20th,
17   two out of the five psychologist positions were vacant.
18   Was that the case, Doctor?
19   A.  Let me say that I believe those positions were
20   vacant but they were being filled by the psychology
21   assistant positions we had discussed earlier.
22   The psychology assistant in the underfill for the
23   psychiatry positions.  So when you have one of those
24   persons on staff, the psychology position shows as vacant.
25   Q.  Okay.  So those two positions -- it's your

23  (Pages 86 to 89)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 90

1  recollection that those two positions were not filled by
2  licensed psychologists?
3      A.  It is my recollection that they were not filled
4  by licensed psychologists.
5      Q.  They were filled by unlicensed psychology
6  assistants?
7      A.  They were filled by unlicensed psychology
8  assistants that were practicing under Dr. Fulks' license.
9      Q.  And both of them were filled on a full-time
10  basis?
11      A.  That is my recollection.
12      Q.  Okay.  Would you turn to page 43, please.  This
13  is labeled "ASPC Perryville Mental Health," again
14  June 20th, 2012.  This chart indicates that as of
15  June 20th one of the two psychiatrist positions was
16  vacant.
17          Was that the case, Doctor?
18      A.  As of June 20th?  I don't think so.  I believe
19  that was filled.
20      Q.  Is it your recollection that Dr. Crews was there
21  as of June 20th?
22      A.  It is my recollection that Dr. Crews was there as
23  of June 20th.
24      Q.  And it's your recollection that the position that
25  that is indicated here as vacant on June 20th was, in

Page 91

1  fact, full as of that date?
2      A.  Was, in fact, full as of that date.
3      Q.  And who filled -- filled by whom?
4      A.  Jesus, I can't remember the guy's name.
5      Q.  It was a man?
6      A.  It was a man.
7      Q.  It also appears from this document that as of
8  June 20th the only nurse practitioner position at
9  Perryville was vacant.
10          Was that, in fact, the case?
11      A.  No, that's not the case.  There was an additional
12  nurse practitioner at the time, Mr. Blair.  That is what I
13  remember.  I --
14      Q.  And your recollection is that he was a full-time
15  ADC employee working as a nurse practitioner at Perryville
16  as of June 20th?
17      A.  Yes.  That's right.
18      Q.  Doctor, do you have any understanding why these
19  records appear not to be consistent with your
20  recollection?
21      A.  You know, I don't.  But I -- I clearly remember
22  because these two people were in place when Wexford came
23  on board and were offered jobs and went to other
24  positions.  So, I mean, I'm sure my recollection is
25  correct, that these positions were filled at this time.

Page 92

1      Q.  Okay.  So you're confident that, at least in
2  respects we have discussed, this report is not accurate?
3      A.  That's right.
4      Q.  Okay.  It also appears from this document that as
5  of June 20th at Perryville the only recreational therapist
6  position was vacant.
7          Was that the case?
8      A.  That was the case.
9      Q.  And how long had that position been vacant?
10      A.  If I remember this correctly, that position had
11  been vacated for some time by a person on long-term
12  medical leave but no one had been in that position for
13  approximately a year.
14      Q.  Okay.  And finally, it appears that two of the
15  six psychologist positions were vacant.
16          Was that the case?
17      A.  Are we looking at the Psychologist Grade II
18  position?
19      Q.  I'm looking at the box labeled Psychologist II
20  that contains four positions, the box above that, DC
21  Psychologist III, and the box two over, Psychologist II
22  currently filled by Kay Mansfield-Blair.
23      A.  Right.  All right.  The position marked DC
24  Psychologist III is incorrect.  Dr. John St. Clair is in
25  that position and has been for some time.

Page 93

1      Q.  So your recollection is that position DC
2  Psychologist III, that is indicated on this chart as being
3  vacant as of June 20th, was, in fact, on that date filled?
4      A.  Yes.
5      Q.  And what about the Psychologist II position that
6  is shown as being vacant?
7      A.  My recollection is that was vacant.
8      Q.  And how long had that position been vacant?
9      A.  I don't recall.  Several months.
10      Q.  Okay.  Would you please turn to page 45.  This
11  page is labeled ASPC Phoenix, and it appears from this
12  chart that on June 20th the clinical director position was
13  vacant.
14          Was that the case, Doctor?
15      A.  That's correct.
16      Q.  And how long had that position been vacant?
17      A.  11 months.
18      Q.  And what did the clinical director at Phoenix do?
19      A.  The clinical director in Phoenix is responsible
20  for maintaining the level of services to the degree that
21  the Department of Health Licensing Board, which licenses
22  that facility, are complied with.
23          That person will assign staff.  That person will
24  monitor programs.  That person will attend staffings to
25  monitor the level of patient care.

24  (Pages 90 to 93)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 94

1    Q.  Okay.  Thank you.
2        It also appears from this chart that on June 20th
3    the psychiatrist supervisor position was vacant.
4        Was that the case?
5    A.  That was the case.
6    Q.  And how long had that position been vacant?
7    A.  More than six months.
8    Q.  Okay.  It also appears that one of the two psych
9    nurse coordinator positions was vacant.
10       Was that, in fact, the case?
11   A.  That was the case.  That had actually been a very
12   recent vacancy, probably within the last --
13   Q.  Prior to the June 20th?
14   A.  Prior to the June 20th.
15   Q.  Okay.  In several of these boxes there is the
16   notation "Pool" with a further notation "Positions expire
17   9/30/2011."
18       Can you explain what that means?
19   A.  The pool positions are approved for a certain
20   period and then they have to go through a reapproval
21   process.
22       So on 9/30/11 that would have had to be
23   recertified for the pool to continue.
24   Q.  What I don't understand is that this chart --
25   this chart is dated June 20th, 2012.

Page 95

1    A.  Right.
2    Q.  So is it your understanding that these positions
3    no longer existed as of June 20th, 2012?
4    A.  No.
5        MS. WIENEKE:  Form, foundation.
6        THE WITNESS:  No.  It's my recollection that
7    these positions continued to exist.
8        Well, let me look at them more closely.
9        Okay.  Then my recollection is that those did not
10   exist at that point.
11   BY MR. FATHI:
12   Q.  So there weren't people filling those positions
13   as of June 20th, 2012?
14   A.  There were not people filling those positions.
15   Q.  Okay.
16   A.  And, in fact, those positions did not exist to be
17   filled at that point in time.
18   Q.  Because they had expired the previous year?
19   A.  That's right.
20   Q.  Okay.  Thank you.
21       Would you turn to page 49, please.  This page is
22   labeled "Mental Health ASPC Tucson," again dated
23   June 20th, and it appears that as of that date all four
24   psychiatrist positions at Tucson were vacant.
25       Was that, in fact, the case?

Page 96

1    A.  I'm sorry.  What was the page number, please?
2    Q.  Oh, I'm sorry.  49.  It's the last two digits.
3    A.  48.
4    Q.  Try turning it the other way.
5    A.  48, 49.
6    Q.  Okay.  Do you have it now?
7    A.  Yes, I do.
8    Q.  Okay.  Let me ask the question again.
9        It appears from this document that as of
10   June 20th all four psychiatrist positions at Tucson were
11   vacant.
12       Was that, in fact, the case?
13   A.  I don't believe that we had any staff
14   psychiatrists at Tucson at that time.
15   Q.  Of those four psychiatrist positions, how many of
16   them were filled with non-staff psychiatrists?
17   A.  I believe we had three locums at that time.
18   Q.  As of June 20th?
19   A.  As of June 20th.
20   Q.  Those were three FTEs?
21   A.  Three FTEs.
22   Q.  How long had those four psychiatrist positions
23   been vacant?
24   A.  I don't remember.
25   Q.  With regard to any of them?

Page 97

1    A.  The only one I recall is the chief psychiatrist,
2    and that would be Dr. Breslow.  That had been vacant about
3    a year.
4    Q.  Now, it's my understanding that the department
5    has been concentrating higher-acuity prisoners at Tucson;
6    correct?
7        MS. WIENEKE:  Object to the form.
8        THE WITNESS:  That was true at the time, yes.
9    BY MR. FATHI:
10   Q.  And that was true with regard to both medical and
11   mental health needs; correct?
12   A.  Yes.
13   Q.  Now, you said that was true at the time,
14   referring to June 20th.
15       Has that been reversed since then?
16   A.  No, not to my knowledge.  I think that is still
17   Wexford's plans.
18   Q.  Do you know?
19   A.  I have heard nothing to indicate that they have
20   changed that.
21   Q.  Okay.  Doctor, you said you have seen documents
22   similar to this one; correct?
23   A.  Yes.  That's correct.
24   Q.  Are documents similar to this generated, or
25   before July 1st were they generated on some sort of

25  (Pages 94 to 97)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 98 | Page 99 |
|---|---|
| 1  regular basis? | 1  BY MR. FATHI: |
| 2      A.  Yes.  Yes.  Yes, they were. | 2      Q.  Doctor, did it ever happen, to your knowledge -- |
| 3      Q.  On what sort of period? | 3  and again, I'm talking about before July 1st -- that |
| 4      A.  I don't know specifically.  I would say within | 4  mental health staff were furloughed from ADC? |
| 5  every 90 days we would try to update these. | 5          MS. WIENEKE:  Beyond the scope, form. |
| 6          The actual list of staff at each unit was updated | 6  BY MR. FATHI: |
| 7  monthly, but it was done on a listing rather than a | 7      Q.  You can answer. |
| 8  graphic form like this. | 8      A.  Yes.  There was a period -- I believe that was |
| 9          MR. FATHI:  Those have not been produced, and we | 9  2010 -- where all State employees, including mental health |
| 10  would like to request that they be produced going back to | 10  staff, at the Department of Corrections had a furlough |
| 11  January 1 of 2011, please. | 11  program. |
| 12          MS. WIENEKE:  In what RFP are those in response | 12      Q.  And what form did that take, at least for mental |
| 13  to? | 13  health? |
| 14          MR. FATHI:  They are responsive to the subpoena | 14          MS. WIENEKE:  Show a continuing objection to |
| 15  duces tecum issued today -- issued for today, I should | 15  the -- show a continuing objection, beyond the scope of |
| 16  say. | 16  the 30(b)(6) topic to this line of questioning regarding |
| 17          MS. WIENEKE:  Which document request? | 17  furlough. |
| 18          MR. FATHI:  We will discuss that later.  If it's | 18          Thank you. |
| 19  truly your position that we haven't requested these | 19          THE WITNESS:  That took the form of a day, as I |
| 20  documents, we can discuss that later. | 20  recall, a month when employees did not work and were not |
| 21          MS. WIENEKE:  I'm just saying that if you have | 21  paid. |
| 22  requested a document, you direct me to the document | 22  BY MR. FATHI: |
| 23  request or the RFP or subpoena duces tecum which you | 23      Q.  And you said a day, a month. |
| 24  requested it. | 24          For how many months did that continue? |
| 25          MR. FATHI:  Okay.  We will do that. | 25      A.  Boy, I don't remember clearly.  As I recall, it |

| Page 100 | Page 101 |
|---|---|
| 1  was about five months. | 1          MS. WIENEKE:  Form and foundation. |
| 2      Q.  And is it your testimony that during the year | 2          THE WITNESS:  My understanding was that uniform |
| 3  2010 is the only time during your employment with the | 3  staff were not furloughed because they needed -- for |
| 4  department that you recall that happening? | 4  safety and security reasons, they needed full staff at all |
| 5      A.  That's the only time I recall it happening. | 5  times. |
| 6      Q.  And you said it was department-wide throughout | 6          Nursing staff were not furloughed for the same |
| 7  ADC? | 7  reason, that they were seen as essential day-to-day staff |
| 8      A.  It was statewide throughout the -- all State | 8  and it seemed unwise to have a shortage even for a day. |
| 9  employees, but throughout ADC. | 9  BY MR. FATHI: |
| 10          Let me take that back. | 10      Q.  But psychiatrists were furloughed? |
| 11          I believe that uniform staff were not furloughed. | 11      A.  Psychiatrists were furloughed. |
| 12      Q.  Within ADC? | 12      Q.  And all mental health staff except for nurses |
| 13      A.  Within ADC. | 13  were furloughed? |
| 14      Q.  So uniform staff were not furloughed but | 14      A.  That's my recollection, yes. |
| 15  healthcare staff were? | 15          MR. FATHI:  This is Exhibit 25. |
| 16      A.  And, as I recall, there was dispensation for | 16          (Exhibit 25 was marked for identification.) |
| 17  nursing staff as well.  They were not furloughed. | 17  BY MR. FATHI: |
| 18      Q.  Okay.  So let me see if I understand your | 18      Q.  Doctor, this is Exhibit 25, an e-mail sent on |
| 19  testimony. | 19  February 3rd, 2011 from Tracy Crews to you. |
| 20          Uniform staff were not furloughed.  Healthcare | 20      A.  Uh-huh. |
| 21  staff were furloughed except for nursing staff? | 21      Q.  Titled, "Please help." |
| 22      A.  That's my recollection. | 22          I take it that you have seen this document |
| 23      Q.  Okay.  Thank you. | 23  before? |
| 24          And what is your understanding of why that was | 24      A.  Yes, I have. |
| 25  done? | 25      Q.  You received this e-mail? |

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 102

1    A. Yes, I did.
2    Q. Dr. Crews says in the second line that she was
3  informed that she was as of this date one of 2.5
4  psychiatrists with ADC.
5        Was that, in fact, the case?
6    A. As ADC employees, that is probably the case.
7    Q. That would have been out of how many
8  psychiatrists positions systemwide?
9    A. So are you talking about psychiatrists or
10  psychiatry providers, which would include nurse
11  practitioners?
12    Q. Well, let's answer both, if you can.
13    A. Approximately 14.
14    Q. Okay. So as of February of 2011, 2.5 out of 14
15  psychiatrists positions --
16    A. Were filled by state employees.
17    Q. -- were filled by state employees?
18        How many were filled by a psychiatrist of any
19  description?
20    A. My recollection is 11.
21    Q. 11 out of 14.
22        Has it ever happened when you have either a pool
23  or locum employee, you then ask that employee not to come
24  back?
25        Let me ask it a different way.

Page 103

1        When you filled mental health positions, as you
2  testified has occurred, with non-state employees, does it
3  ever occur that you find them unsatisfactory and you ask
4  either that person, or the agency, that that person not
5  return?
6    A. That has happened on some rare occasions.
7    Q. You say on rare occasions?
8    A. I can only recall once.
9    Q. And what kind of provider was that, or what kind
10  of mental health staff was that?
11    A. That was a psychiatric nurse practitioner.
12    Q. Okay. And what was the problem with him or her?
13    A. It was believed that they were disrespectful to
14  their patients, and that was not therapeutic or acceptable
15  to the department.
16    Q. When you hire or contract with temporary
17  employees to provide mental health staff, some of them
18  haven't worked in prisons before?
19    A. That's correct.
20    Q. Back to Dr. Crews' e-mail, about six lines down
21  she writes, "Currently on most yards here we are backed up
22  three to four months with the HNRs and longer for regular
23  follow-ups."
24        Do you see that line?
25    A. Yes.

Page 104

1    Q. Just for the record, what is an HNR?
2    A. HNR is a health needs request.
3    Q. And what function does that serve?
4    A. That functions if an inmate has a service need or
5  they want to be seen by a specific kind of medical
6  specialist, that allows them to communicate with the
7  medical department saying, I need this service.
8    Q. Okay. Would it be fair to say that's the primary
9  way that prisoners access healthcare?
10    A. That's the primary way that they access
11  healthcare that is not routine, that's right.
12    Q. Assuming the statement is true, in your view, is
13  it an acceptable situation to be backed up three to
14  four months with HNRs?
15        MS. WIENEKE: Object to the form and foundation.
16        THE WITNESS: It's certainly not an optimal
17  situation. HNRs are triaged by nursing staff. So if
18  there is some acute or emergent need, that person goes to
19  the head of the line. So there's a sense -- so there's a
20  mechanism for addressing emergency situations.
21        So, no, I don't think that is -- not what we
22  would hope for.
23  BY MR. FATHI:
24    Q. Could it create a risk for patient health and
25  safety?

Page 105

1        MS. WIENEKE: Form and foundation, calls for
2  speculation.
3        THE WITNESS: It's possible. Again, we take
4  patients to triage so that that doesn't happen.
5  BY MR. FATHI:
6    Q. Who are they triaged by, what type of staff?
7    A. They are typically triaged by psych nurses, if
8  it's an MH HNR.
9    Q. And are they ever -- those are RNs?
10    A. They are RNs.
11    Q. Are they ever triaged by any other kind of staff?
12    A. They might possibly be triaged by medical nurses.
13    Q. Are they ever triaged by someone who is not an
14  RN?
15    A. No.
16    Q. They are not triaged by licensed practical nurses
17  or licensed vocational nurses?
18    A. If they are triaged by medical staff, that may be
19  possible.
20    Q. Okay. But in terms of mental health, to your
21  knowledge, they're never triaged by someone who is not at
22  least an RN?
23    A. If they are triaged by the mental health nurses,
24  no, they will not be triaged by an RN.
25    Q. Okay. Is it consistent with ADC policy at this

27 (Pages 102 to 105)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 106 | Page 107 |
|---|---|
| 1 time for mental health staff to be backed up three to | 1 A. To my knowledge, that's correct. |
| 2 four months with HNR? | 2 Q. Okay. A little further down, maybe eight lines |
| 3 MS. WIENEKE: Form, foundation. | 3 down, Dr. Crews writes, "I have to renew meds for dozens |
| 4 THE WITNESS: Well, the policy is that they will | 4 of people per week without getting to see them because |
| 5 be triaged within a short period of time. The standards | 5 there is not enough time." |
| 6 for delivery services are not set in policy. | 6 Is it consistent with ADC policy for a |
| 7 BY MR. FATHI: | 7 psychiatrist to renew meds for a patient without seeing |
| 8 Q. Okay. So the policy requires the HNR to be | 8 the patient? |
| 9 triaged within a certain particular time, but the policy | 9 MS. WIENEKE: Form and foundation. |
| 10 doesn't require that the patient be seen by a provider in | 10 THE WITNESS: It is not ADC policy, but is the |
| 11 any particular time; is that correct? | 11 practice to do if the medication is expiring and the |
| 12 A. That's the function of triage, and so the length | 12 person can't be seen face-to-face prior the expiration. |
| 13 of time that may be involved in the wait would be resulted | 13 BY MR. FATHI: |
| 14 with the triage -- results in the triage. | 14 Q. Okay. So if Dr. Crews, in fact, renewed meds for |
| 15 Q. Okay. But I just wanted to be clear for the | 15 patients without seeing them, that was not consistent with |
| 16 record, so there's no ADC policy or there was not -- | 16 ADC policy; correct? |
| 17 MS. WIENEKE: Hold on. | 17 A. No. Our policy is that they would be seen |
| 18 BY MR. FATHI: | 18 face-to-face. |
| 19 Q. There is no ADC policy that requires, once the | 19 Q. Okay. Was Dr. Crews disciplined for renewing |
| 20 HNR is triaged, the patient to be seen by a provider | 20 meds without seeing patients face-to-face? |
| 21 within any particular period of time? | 21 A. No. |
| 22 MS. WIENEKE: Form and foundation, beyond the | 22 Q. Why not? |
| 23 scope of the 30(b)(6). | 23 A. Because the alternative would be for the |
| 24 BY MR. FATHI: | 24 medications to expire, and that would be a less acceptable |
| 25 Q. Correct? | 25 solution. |

| Page 108 | Page 109 |
|---|---|
| 1 Q. And why would it be less acceptable? | 1 by ADC; is that correct? |
| 2 A. Because -- what do you call -- termination of | 2 A. That's correct. |
| 3 care without any kind of clinical reason would be a really | 3 Q. And it's your understanding that she's not |
| 4 bad practice. | 4 currently employed by Wexford? |
| 5 Q. Because it creates a risk to patient health and | 5 A. That's correct. |
| 6 safety? | 6 Q. Is she still, to your knowledge, providing |
| 7 MS. WIENEKE: Form and foundation. | 7 services to ADC prisoners? |
| 8 THE WITNESS: It could. It's possible. | 8 A. Not to my knowledge, no. |
| 9 BY MR. FATHI: | 9 Q. What were the circumstances of her departure from |
| 10 Q. Okay. In the following sentence Dr. Crews | 10 ADC? |
| 11 writes, some of these people -- excuse me -- "Some of | 11 A. The circumstances were that she found a position |
| 12 these people have not been seen for six months or longer." | 12 with the state hospital, which allowed her to continue |
| 13 Do you see that, Doctor? | 13 benefits that were important to her. So she accepted a |
| 14 A. I do. | 14 position there. |
| 15 Q. Is it consistent with ADC policy for a person who | 15 Q. And approximately when did that happen? |
| 16 is on psychotropic medication not to be seen for | 16 A. I think she left right around the time that |
| 17 six months or longer? | 17 Wexford came in, this July 1st. |
| 18 A. The standard at that time was six months or less, | 18 Q. Of this year? |
| 19 not six months or longer. | 19 A. Of this year. |
| 20 Q. So if it was, in fact, true that patients on | 20 Q. So would it be fair to say that her departure |
| 21 psychotropic medications had not been seen for longer than | 21 from ADC was voluntary? |
| 22 six months, that was inconsistent with ADC policy? | 22 A. It was absolutely voluntary. |
| 23 A. That would be inconsistent with ADC policy. | 23 Q. Did you respond to this e-mail? |
| 24 Q. Okay. You mentioned that you believe Dr. Crews | 24 A. Yes, I did. |
| 25 is not currently employed -- she's not currently employed | 25 Q. Did you respond with an e-mail? |

28  (Pages 106 to 109)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 110 | Page 111 |
|---|---|

### Page 110

1    A.  You know, I don't remember. I may have responded
2  to Dr. St. Clair, who was a cc.
3        As I recall, the discussion of Mr. Mitchell,
4  which is in the bottom part here, was a person who had
5  applied at Perryville and apparently had his application
6  still pending at the Department of Administration. So, as
7  I recall, I talked to the director, and he called
8  administration, and Mr. Mitchell was on within a couple of
9  days.
10    Q.  Okay.  And Mr. Mitchell was what kind of staff?
11    A.  He was a psychiatric nurse practitioner, so he
12  was an additional provider.
13    Q.  Okay.  Just so I understand, your testimony is
14  that, to the best of your recollection, you did not
15  respond to this via e-mail?
16    A.  I don't remember.  I don't remember responding to
17  it.
18    Q.  Did you have any communication in any medium with
19  Dr. Crews in response to this?
20    A.  I don't remember if I talked to Dr. Crews or if I
21  talked to Dr. St. Clair. I know Dr. St. Clair had, as I
22  recall, written an additional e-mail, and I may have
23  responded to that.
24    Q.  But you just don't recall if you responded
25  directly to Dr. Crews?

### Page 111

1    A.  I don't remember. I think I talked to Dr. Crews.
2  I don't recall if it was an e-mail or telephone call or
3  how it was communicated.
4    Q.  Were you concerned by the situation that
5  Dr. Crews described at Perryville?
6    A.  Yes, I was concerned. And I think the fact that
7  we had additional resources that were available made it
8  frustrating, and so we took steps to address that.
9    Q.  Okay.
10    A.  If I may, I think we actually had a face-to-face
11  meeting with Dr. Crews and Dr. St. Clair.
12    Q.  And what was said in that meeting?
13    A.  I think we went over -- we had discussed
14  Mr. Mitchell's imminent arrival and how to address --
15  where the -- where that resource needed to be applied in
16  order to assist and riveting some of the things Dr. Crews
17  had brought up here.
18    Q.  In what instance?
19    A.  I'm sorry.
20    Q.  I didn't catch the word.
21    A.  In riveting some of the issues that Dr. Crews had
22  raised.
23    Q.  Okay.  Thank you.
24        MR. FATHI:  26.
25        (Exhibit 26 was marked for identification.)

| Page 112 | Page 113 |
|---|---|

### Page 112

1  BY MR. FATHI:
2    Q.  Doctor, Exhibit 26 is a June 16, 2011, e-mail
3  from Dr. Crews to you and others titled "Please Assist
4  Florence."
5        Did you receive this e-mail?
6    A.  Yes, I did.
7    Q.  On the second line she wrote, "Today is the last
8  day that they have a psychiatric provider at Florence."
9        Is that correct?
10    A.  At that time I believe it was.
11    Q.  So there was a time in 2011 when there was no
12  psychiatric provider at Florence?
13    A.  For a brief period, I believe that is correct.
14    Q.  And how long did that last, to the best of your
15  recollection?
16    A.  I believe that lasted about a week.
17    Q.  And what happened after a week?
18    A.  We located two locum providers, and they were
19  assigned to Florence.
20    Q.  Were they both full-time?
21    A.  To my recollection, yes.
22    Q.  Were they both psychiatrists?
23    A.  I don't remember. I don't remember if they were
24  psychiatrists or nurse practitioners.
25    Q.  What is a psychiatric provider in ADC?

### Page 113

1    A.  A psychiatric provider is someone who is licensed
2  by the state to actually prescribe psychotropic
3  medications. So that really would be a psychiatrist or a
4  psychiatric nurse practitioner. Those are the two
5  specialities that could do that.
6    Q.  So if I see someone referred to as a psychiatric
7  provider, that person is either a psychiatrist or a
8  psychiatric nurse practitioner?
9    A.  That's right.
10    Q.  And under ADC policy are those two professions
11  interchangeable?
12    A.  There will typically be a -- how do I say this --
13  there will typically be a number of positions which are
14  specified for each one, but their actual work duties are
15  pretty much identical.
16    Q.  So under ADC policy a psychiatric nurse
17  practitioner can do anything that the psychiatrist can do?
18    A.  Yes.
19    Q.  Okay.  In the next sentence Dr. Crews writes, "We
20  are down to four full-time staff psychiatric providers."
21        Was that the case as of this date?
22    A.  As ADC employees, I believe that is probably
23  correct.
24    Q.  And that's systemwide; correct?
25    A.  That's systemwide.

29 (Pages 110 to 113)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) -- 10/3/2012

### Page 114

1  Q. And how long was that the case?
2  A. June 11th, I don't recall. I mean, we would have
3  used locums. We would have hired whatever psychiatric
4  providers we could find, but I don't recall the actual
5  time frames between ADC employees and locums.
6  Q. Okay. So you just don't recall how long it was
7  through that there were four --
8  A. Four.
9  Q. Excuse me.
10  -- four full-time psychiatric providers
11  systemwide?
12  A. No, I don't recall that.
13  Q. Okay. In the next sentence, or it's actually the
14  same sentence, she writes, "I have recently learned that
15  we are luckily to lose two of those in the new future."
16  Was there ever a time in 2011 or later where
17  there were -- in June 2011 or later when there was fewer
18  than four full-time psychiatric providers systemwide as
19  ADC employees?
20  A. Not that I recall.
21  Q. So your memory is that from June of 2011 forward
22  it never went lower than four systemwide?
23  A. I don't recall it going lower than that.
24  Q. Okay. Couple lines down from that Dr. Crews
25  asked -- excuse me -- Dr. Crews writes that she has been

### Page 115

1  asked by nursing staff at Florence to prescribe
2  medications for patients who she has never met or treated.
3  Do you see that?
4  A. Yes.
5  Q. Is it consistent with ADC policy for a
6  psychiatrist to prescribe medications for patients she has
7  never met or treated?
8  A. As we discussed before, only on an emergency
9  basis to prevent care from being terminated.
10  Q. Okay. So is your testimony that under some
11  circumstances it is permitted under policy to prescribe
12  medications for patients one has never met or treated?
13  A. To prevent expiration of medication for a short
14  term, yes.
15  Q. So if Dr. Crews renewed medications for someone
16  that she has never -- excuse me.
17  If Dr. Crews prescribed medications for a patient
18  she has never met or treated, that did not violate ADC
19  policy?
20  MS. WIENEKE: Form, foundation, asked and
21  answered.
22  THE WITNESS: If the medications were medications
23  that had been prescribed by a licensed provider previously
24  and it was a continuation of that order, that would have
25  been acceptable.

### Page 116

1  BY MR. FATHI:
2  Q. Without ever meeting the patient?
3  A. Without ever meeting the patient. It would not
4  have been acceptable to start a medication with a person
5  who has not been evaluated prior to that.
6  Q. Did you respond to this e-mail?
7  A. Yes, I believe I did.
8  Q. And in what form?
9  A. I believe I e-mailed Dr. Crews and indicated that
10  we had located some locum providers and they would be
11  starting in Florence, to let her --
12  THE COURT REPORTER: I cannot hear you.
13  THE WITNESS: That we had located some locum
14  providers for Florence and that her fears for Florence
15  were not going to come to pass.
16  MR. FATHI: We would like to request that that
17  e-mail be provided.
18  MS. WIENEKE: Dr. Shaw, can you scoot closer to
19  the court reporter.
20  BY MR. FATHI:
21  Q. Did you respond in any other way in addition to
22  the e-mail you just described?
23  A. Not that I remember.
24  Q. You were concerned by the situation that
25  Dr. Crews described in this e-mail?

### Page 117

1  A. I was concerned, although I knew that there were
2  solutions in the works. So, you know, I felt at least
3  that we would be able to remedy this situation in short
4  order. Although, certainly I wasn't happy that Dr. Crews
5  was being asked to renew medications.
6  Q. I'm sorry. You said there was a solution already
7  in the works when you received this e-mail?
8  A. We already had the locum providers located. They
9  just hadn't started yet.
10  Q. I see.
11  And your testimony is they started how long after
12  you received this e-mail?
13  A. I think within a week. I would have to check to
14  make sure, but pretty shortly.
15  Q. Okay. You have testified about a number of
16  vacancies that existed in mental health staff, and again,
17  I'm talking about before July 1st.
18  Would it be fair to say that ADC has struggled to
19  retain a full compliment of mental health physicians?
20  MS. WIENEKE: Form and foundation.
21  THE WITNESS: I think that would depend on the
22  position. Specifically psychiatrists, I think every
23  mental health provider has struggled. The veteran's
24  administration has struggled. Indian Health Services has
25  struggled. Psychiatrists have been in big demand for some

30 (Pages 114 to 117)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

## Page 118

1    period, and we do struggle to find staff psychiatrists.
2    BY MR. FATHI:
3    Q.  Have you struggled to find staff psychologists?
4    A.  To a lesser extent.  We have been generally
5    successful in finding psychologists.  We haven't filled
6    every position, but certainly we have a much better fill
7    rate as ADC employees than we do with psychiatry.
8    Q.  Have you struggled to maintain a full compliment
9    of psychiatric nurse practitioners?
10          MS. WIENEKE:  Form and foundation.
11          THE WITNESS:  Yes.  That would be really the same
12    as the psychiatrists.  They are in demand by many
13    agencies, so we do struggle.
14    BY MR. FATHI:
15    Q.  Any other mental health job classifications that
16    you have had difficulty filling?
17          MS. WIENEKE:  Same objections.
18          THE WITNESS:  Not too much.  We have openings
19    from time to time, but we typically are able to recruit
20    people.
21          Even from psychology, you know, we discussed the
22    psychology assistant position, and that gave us a
23    considerable amount of coverage.  It's really consistent
24    with the way medicine is practiced in general.  If I get
25    sick and go to the hospital, it's probably going to be an

## Page 119

1    intern that sees me first.
2          So the idea of having a non-licensed person
3    practice under another person's license is a pretty
4    well-established practice.
5    BY MR. FATHI:
6    Q.  And I believe that you testified that that is
7    consistent with ADC policy?
8    A.  We actually had written that policy about a year
9    ago.  So that is a new position.
10    Q.  And forgive me if you said this already.
11          Do the unlicensed psych assistants continue to
12    exist under the Wexford contract?
13    A.  I don't know that for a fact.  I believe that's
14    true, but I don't know that for a fact.
15    Q.  Okay.  Currently how many FTE psychiatrists are
16    devoted to sex offender treatment programs?
17          MS. WIENEKE:  Object to the form, beyond the
18    scope.
19          THE WITNESS:  I don't know that.  That really
20    falls under a different category in the Department of
21    Corrections.  They are in a division called counseling and
22    treatment services.
23    BY MR. FATHI:
24    Q.  Okay.  So if we look at Exhibit 22, which is the
25    Wexford staffing roster, is it your testimony that those

## Page 120

1    who provide -- psychiatrists or psychologists who provide
2    sex offender treatment are not included on this roster?
3    A.  That's my testimony.
4    Q.  Okay.  And I'm sorry.  They are in what division?
5    A.  They are in counseling and treatment services.
6    Q.  And that is separate from healthcare services?
7    A.  That is separate from healthcare services.
8    Q.  Okay.  Are you familiar with the American
9    Psychiatric Association?
10    A.  I have heard of them.
11    Q.  That will do.
12          Are you aware that the American Psychiatric
13    Association recommends one full-time psychiatrist or
14    equivalent for every 150 prisoners on psychotropic
15    medication?
16          MS. WIENEKE:  Form and foundation.
17          THE WITNESS:  No, I'm not aware of that.
18    BY MR. FATHI:
19    Q.  As we sit here today, does ADC have one full-time
20    psychiatrist or equivalent for every 150 prisoners on
21    psychotropic medicine?
22    A.  No.
23    Q.  What is the ratio approximately?
24          MS. WIENEKE:  Object to the form, beyond the
25    scope.

## Page 121

1          THE WITNESS:  Again, we would have to know what
2    Wexford's current staffing situation is.  We have between
3    8- and 9,000 inmates on medication.
4    BY MR. FATHI:
5    Q.  On psychotropic medication?
6    A.  On psychotropic medication.
7    Q.  Going back to before July 1st, besides Dr. Crews,
8    did you ever receive e-mails from any other ADC staff or
9    contractors expressing concern about the level of mental
10    health staffing?
11    A.  I did not.  I know Dr. Breslow had expressed some
12    concerns but that was really prior to my being directly
13    involved in the provision of psychiatric services.
14    Q.  When you say it was prior to your involvement,
15    would that mean before 2010?
16    A.  Yes.
17    Q.  And for the record, who was Dr. Breslow at that
18    time?
19    A.  Dr. Breslow was the chief psychiatrist for the
20    department at that time.
21    Q.  And as your understanding -- as you understand
22    it, what were the concerns he expressed?
23    A.  Well, I would have to say this is things that I
24    have heard, not things I was directly involved in it.
25          He was concerned that the staffing at, I believe,

31 (Pages 118 to 121)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

## Page 122

1   Florence needed to be increased.
2       Q.   The mental health staffing?
3       A.   The psychiatry staffing specifically.
4       Q.   And to whom did he express that?
5       A.   I believe that was to Dr. Adu-Tutu, who was the
6   division director at that time.
7       Q.   Any other ADC staff or contractors that you are
8   aware of expressing concern about the level of mental
9   health staffing?
10      A.   Not that I recall.
11      Q.   Really, Dr. Crews and Dr. Breslow are the only
12  ones?
13      A.   Are you talking about the psychiatry services?
14      Q.   Mental health staff.
15      A.   Mental health staff.  Geez, I mean, I'm sure they
16  have, but I can't specifically remember the incidence.
17          The only one I recall is shortly before Wexford
18  assumed control there was some discussion from some of the
19  psychology staff about impending vacancies and how to
20  address those, and that was done in e-mail form.
21      Q.   Were you copied on those e-mails?
22      A.   Yes.
23      Q.   Okay.  And you are saying this was in the first
24  half of 2012?
25      A.   This was -- this would have been shortly before

## Page 123

1   July 1st.
2           MR. FATHI:   Okay.  We would like to request those
3   e-mails.
4   BY MR. FATHI:
5       Q.   Have you yourself ever expressed a view to anyone
6   at all, except your counsel, that ADC has inadequate
7   mental health staffing?
8           MS. WIENEKE:   Object to the form, foundation.
9           THE WITNESS:   Well, let me think how to answer
10  that.
11          Sure.  I mean, the development of the psychology
12  assistant position was a response to what I saw as kind of
13  a chronic shortage in one area.
14          Increased program activities had been a response
15  to some staff utilization issues that I identified.  And
16  those are contained in several different places, I guess.
17  BY MR. FATHI:
18      Q.   And where would those be contained?
19      A.   There may be some e-mails.  There were some
20  e-mails about the psychology associate positions that I
21  sent to our personnel department.  There are some e-mails
22  from Dr. Fulks and myself about the development of that
23  position.
24          There is some -- there is a proposal for the
25  development of a behavioral management unit, and there's a

## Page 124

1   proposal for the development of some additional resources
2   for inmates in segregated housing, but really in the form
3   of proposals.
4       Q.   But those were written down; correct?
5       A.   Those were written down.
6           MR. FATHI:   Okay.  We would like to request all
7   of those documents.
8   BY MR. FATHI:
9       Q.   Well, certainly in your August 13th, 2012 memo,
10  you have expressed concerns about inadequate mental health
11  staffing at the department; correct?
12      A.   Yes.  I felt that psychiatry wasn't sufficient to
13  deliver a good level of services.  Yeah, that's right.
14      Q.   Would you agree with me that at some point
15  inadequate mental health staffing creates a risk to
16  patient health and safety?
17          MS. WIENEKE:   Form and foundation.
18          THE WITNESS:   It's certainly possible.
19  BY MR. FATHI:
20      Q.   At some point it does; correct?
21          MS. WIENEKE:   Form and foundation.
22          THE WITNESS:   Well, at some point it certainly
23  can.  You would have to say, does it happen today to me, I
24  don't know.  Will it happen, certainly possible.
25

## Page 125

1   BY MR. FATHI:
2       Q.   I'm talking about risk.
3       A.   Risk --
4           MS. WIENEKE:   Same objection.
5           THE WITNESS:   A smaller staffing ratio creates a
6   greater risk.
7   BY MR. FATHI:
8       Q.   Okay.  And with that, we can -- I am ready to
9   move to a new topic, so we can either take a lunch break
10  or we can soldier on.  It's up to -- why don't we take
11  lunch.
12          (A recess was taken from 12:11 p.m. until
13  1:04 p.m.)
14  BY MR. FATHI:
15      Q.   You are still under oath.
16      A.   I am.
17      Q.   Doctor, are you aware of a situation at Eyman
18  last Sunday where a number of nurses did not come to work?
19      A.   No, I'm not aware.
20      Q.   Haven't heard anything about that?
21      A.   I haven't.
22      Q.   Okay.  Nurses line passes both medical and mental
23  health drugs; right?
24      A.   That's right.
25      Q.   The issues that we have been discussing with

32  (Pages 122 to 125)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 126 | Page 127 |
|---|---|
| 1  Wexford, are those isolated to one or two facilities, or | 1        THE WITNESS: Yes. |
| 2  are they more systemic? | 2   BY MR. FATHI: |
| 3        MS. WIENEKE: Object to the form. | 3        Q. And what proportion of the non -- putting aside |
| 4        THE WITNESS: Which issues were you referring to? | 4   private prisons -- what percentage of the ADC population |
| 5   BY MR. FATHI: | 5   would you say is at those five complexes? |
| 6        Q. Well, let's say the shortage in psychiatric | 6        A. What proportion of the ADC or the mental health |
| 7   staffing. | 7   component? |
| 8        MS. WIENEKE: Object to the form. | 8        Q. Okay. Let's take the mental health component. |
| 9        THE WITNESS: Yes, those are isolated to a couple | 9        A. Mental health component is going to be 90, |
| 10  of units for the most part. | 10  95 percent are going to be at those units. |
| 11  BY MR. FATHI: | 11       Q. Okay. So all of those units are under 50 percent |
| 12       Q. Those are isolated? | 12  psychiatric staffing, wouldn't you agree with me |
| 13       A. Well, like we said, Lewis has a bigger problem | 13  that that is a systemic problem? |
| 14  than Perryville, let's say. | 14       MS. WIENEKE: Object to the form. |
| 15       Q. Okay. Well, let me find your -- | 15       THE WITNESS: I think at this point that was |
| 16       Here we go. Okay. Let's look at your | 16  going to be a problem for these units; although, as we |
| 17  August 13th memo. | 17  said, this has changed in the last month or so. |
| 18       MS. WIENEKE: Exhibit 19? | 18  BY MR. FATHI: |
| 19  BY MR. FATHI: | 19       Q. I understand that. I'm asking you as of this |
| 20       Q. Exhibit 19. Let me know when you have it. | 20  point, when units that collectively house, according to |
| 21       A. There we go. | 21  your testimony, about 90 percent of the population on |
| 22       Q. So as of August 19th, Perryville, Lewis, Eyman, | 22  psychotropic medications, are all under 50 percent |
| 23  Florence, and Tucson complex all had less than 50 percent | 23  staffing on psychiatric providers, your testimony is you |
| 24  of their psychiatric provider FTEs filled; correct? | 24  don't think that is a systemic problem? |
| 25       MS. WIENEKE: Object to the form. | 25       MS. WIENEKE: Object to the form, misstates. |

| Page 128 | Page 129 |
|---|---|
| 1        THE WITNESS: I think the problem that you are | 1   the most part. |
| 2   seeing here is a problem that, this is right after the | 2        Q. So pepper spray, for example? |
| 3   takeover by Wexford, and a very significant portion of the | 3        MS. WIENEKE: Objection, beyond the scope of the |
| 4   psychiatric staff had just left. So, you know, you catch | 4   30(b)(6). |
| 5   this at the low point. | 5   BY MR. FATHI: |
| 6   BY MR. FATHI: | 6        Q. You can answer. |
| 7        Q. Could you answer my question, Doctor? | 7        A. Pepper spray would be a chemical agent. |
| 8        MS. WIENEKE: He has answered the question. If | 8        Q. And what are some others that are used at ADC? |
| 9   you don't like the answer, that's your problem, but he has | 9        MS. WIENEKE: Same objections. |
| 10  answered question. | 10       THE WITNESS: I'm no expert in that, but there |
| 11       MR. FATHI: He hasn't answered the question. | 11  are a couple different kind of pepper-based sprays that |
| 12       MS. WIENEKE: That will be able for the Court to | 12  are used. |
| 13  determine. | 13  BY MR. FATHI: |
| 14       MR. FATHI: Can you read the question back, | 14       Q. And they are typically sprayed in the face; |
| 15  please? | 15  correct? |
| 16       (Requested portion of the record read.) | 16       MS. WIENEKE: Objection; lack of foundation, |
| 17       THE WITNESS: I don't think it would be fair to | 17  beyond the scope of the 30(b)(6) designation. |
| 18  characterize it as a systemic problem shortly after a | 18       THE WITNESS: It -- I am no expert in security |
| 19  takeover when a large number of staff had left without an | 19  practices. Obviously, I want to have the person's |
| 20  opportunity to attract more. | 20  behavior under control. So a spray in the face would not |
| 21  BY MR. FATHI: | 21  be contraindicated. |
| 22       Q. Doctor, what does the term "chemical agents" mean | 22  BY MR. FATHI: |
| 23  in ADC parlance? | 23       Q. Does ADC policy permit the use of chemical agents |
| 24       A. Chemical agents usually refer to some kind of | 24  on a prisoner who is attempting suicide? |
| 25  noxious chemicals that are used for behavior control for | 25       MS. WIENEKE: Object to the form, foundation. |

33 (Pages 126 to 129)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 130

1   beyond the scope of the 30(b)(6) designation.
2        THE WITNESS:  If it's necessary to protect them,
3   yes.
4   BY MR. FATHI:
5        Q.  I'm sorry.  Yes, it permits the use?
6        MS. WIENEKE:  Same objections.
7        THE WITNESS:  If it's necessary to protect them,
8   yes.
9        MR. FATHI:  Kathy, your repetitive objections are
10  going to make the transcript very difficult to read.  I
11  will certainly give you a continuing objection to this
12  entire line of questioning as beyond the scope of the
13  30(b)(6)?
14       MS. WIENEKE:  I appreciate that.  Thank you.
15  I will accept the offer for the continuing
16  objection on the entire line of questioning related to the
17  use of chemical agent, which is beyond the scope of the
18  30(b)(6) designation.
19  BY MR. FATHI:
20       Q.  Let me ask the question again so we have a clear
21  record.
22       Does ADC policy permit using chemical agents on a
23  prisoner who is attempting suicide?
24       A.  Yes.
25       Q.  Does ADC policy permit the use of chemical agents

Page 131

1   on a prisoner who is engaging in self-harm?
2        A.  Yes.
3        Q.  Does ADC policy permit the use of chemical agents
4   on a prisoner who is on suicide watch?
5        MS. WIENEKE:  Form.
6        THE WITNESS:  Yes.
7   BY MR. FATHI:
8        Q.  Does ADC policy permit the use of chemical agents
9   on a prisoner who is on mental health watch?
10       A.  Yes.
11       Q.  Okay.  Moving on to a different topic, does ADC
12  classify some prisoners as seriously mentally ill?
13       A.  Yes.
14       Q.  What is the process for classifying prisoners as
15  seriously mentally ill?
16       A.  There is a form, a document, that is filled out
17  documenting a number of issues that are actually sort of
18  statutory issues in terms of finding a person as seriously
19  mentally ill.  Those would be a diagnosis of a certain
20  type, some type of serious impairment.  There are a number
21  of key areas of functioning.
22       Q.  What kind of diagnoses in combination with other
23  factors can qualify someone as seriously mentally ill?
24       A.  Mostly schizophrenic diagnosis, major mood
25  disorders.  Those are the main ones.

Page 132

1        Q.  Okay.  If someone is classified as seriously
2   mentally ill, what consequences does that have for his or
3   her treatment or conditions of confinement in ADC?
4        A.  They will have enhanced monitoring and treatment
5   from the mental health staff.  Their treatment plan has to
6   be renewed on a much more frequent basis.  They will be
7   eligible for a far extended number of services upon
8   discharge from the department.
9        Q.  Okay.  If someone is seriously mentally ill, how
10  often does their treatment plan have to be renewed?
11       A.  Every 30 days.
12       Q.  And where is that written down?
13       A.  That's in the Mentally Ill Technical Manual.
14       Q.  About how many prisoners currently in ADC are
15  classified as seriously mentally ill?
16       A.  There are two types of prisoners who are
17  currently classified as seriously mentally ill.  One are
18  inmates who the Department of Corrections mental health
19  staff have determined to be seriously mentally ill.  The
20  second is inmates who have entered the system and have
21  been determined to be seriously mentally ill by one of the
22  RBHAs prior to coming to the department.  RBHA, Regional
23  Behavioral Health Authority.
24       MS. WIENEKE:  R-A-B-A, all capped.
25       MS. ALEWELT:  R-B-H-A.  Sorry.

Page 133

1   BY MR. FATHI:
2        Q.  Okay.  Have we exhausted that topic?
3        A.  I shouldn't have opened that up.
4        Q.  All right.  How many -- let's talk about both of
5   those categories.
6        How many of each approximately are there
7   currently in the Arizona Department of Corrections?
8        A.  It's generally an even split, and they run
9   between 6 to 700 in each category.
10       Q.  So 6 to 700 who have been classified as SMI in
11  ADC, and 6 to 700 who have been classified as SMI in the
12  community?
13       A.  That's right.
14       Q.  And are those two categories treated differently
15  in ADC?
16       A.  Yes.
17       Q.  Can you describe that for me?
18       A.  If the inmate has been determine to be SMI in the
19  community but does not meet the standard as far as the DOC
20  mental health staff is concerned, they will continue to be
21  classified as SMI in the community and when they leave the
22  department they will receive the after-care services but
23  they won't receive the same ongoing services as those who
24  have been determined to be SMI by the department's mental
25  health staff.

34  (Pages 130 to 133)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 134

1    Q.  But it's all time definition; right?
2        MS. WIENEKE:  Object to the form.
3        THE WITNESS:  Well --
4    BY MR. FATHI:
5    Q.  Let me ask a clearer question.
6        It's my understanding that the definition of
7    seriously mentally ill is set forth in the state statute,
8    and that's the definition that applies whether you are in
9    the community or whether you are in prison; is that
10   correct?
11   A.  That's correct.
12   Q.  So --
13   A.  However, SMI is a point in time category.  It's
14   not an extended category.
15       So if a person is SMI, that doesn't mean he will
16   be SMI from now on.  That may be true, or he may improve,
17   or his level of impairment may improve so that he no
18   longer meets that criteria.
19   Q.  Okay.  But it is all the same criteria?
20   A.  Yes, it's all the same criteria.
21   Q.  So your testimony, as I understand it, is if
22   someone has been classified as SMI in the community, they
23   will not necessarily be treated as SMI in ADC; is that
24   correct?
25   A.  Not necessarily.

Page 135

1    Q.  Okay.  Okay.  I'm going to be using in this line
2    of questioning the term isolation.  I would like you to
3    listen carefully to the definition.  All right?
4        Isolation means confinement in a cell for 22 or
5    more hours each day, confinement in Eyman-SMU-1,
6    Eyman-Browning Unit, Florence-Central Unit,
7    Florence-Kasson Unit, or Perryville-Lumley Special
8    Management Area, or confinement in a complex detention
9    unit.  And I will give it to you to have in front of you
10   just to -- if you need to refer to it.
11       Okay?  Do you understand the definition?
12   A.  Let me clarify.  Does this mean both these
13   categories are the same or either?
14   Q.  It's disjunctive.  It's either.
15   A.  Okay.
16   Q.  So in other words --
17   A.  Okay.  So if you are in these units, you would be
18   considered to be in isolation by this deposition?
19   Q.  Correct.  Correct.
20   A.  Okay.  I do understand that.
21   Q.  Okay.  And my question is:  Does ADC have any
22   written policy that prevents the placement of the prisoner
23   classified as seriously mentally ill in isolation?
24   A.  No.
25       MS. WIENEKE:  I'm sorry.  I need to interject.

Page 136

1        Objection to that term insofar as it has some
2    significance, significance within ADC.  We are using the
3    plaintiff's definition, which is not necessarily ADC's
4    definition for purposes of this questioning.
5        Thank you.
6        THE WITNESS:  If we follow this definition, then
7    no, there is no policy in place for that.
8    BY MR. FATHI:
9    Q.  Okay.  And as we sit here today, there are
10   prisoners who are classified as seriously ill who
11   are housed in isolation; correct?
12   A.  I would expect that to be true, yes.
13   Q.  There are seriously mentally ill prisoners in
14   SMU-1?
15   A.  Yes.
16   Q.  There are seriously mentally ill prisoners in
17   Browning Unit?
18   A.  Yes.
19   Q.  There are seriously mentally ill prisoners in
20   Florence-Central?
21   A.  Yes.
22   Q.  There are seriously mentally ill prisoners in
23   Florence-Kasson Unit?
24   A.  Yes.
25   Q.  There are seriously mentally-ill prisoners in the

Page 137

1    Perryville Special Management Unit?
2    A.  Yes.
3    Q.  Does ADC have any written policy that if a
4    seriously mentally ill prisoner is placed in isolation, he
5    or she has to have a cellmate?
6    A.  Could you repeat that?
7    Q.  Sure.  Does ADC have any written policy that
8    requires that if a seriously mentally ill prisoner is
9    placed in isolation, he or she has to have a cellmate?
10   A.  No.  There is no such policy, to my knowledge.
11   Q.  Okay.  Does ADC have any written policy that
12   prohibits the housing of a prisoner classified as MH-4 in
13   isolation?
14   A.  No.
15       (Exhibit 27 was marked for identification.)
16   BY MR. FATHI:
17   Q.  Dr. Shaw, these are responses prepared by the
18   state's counsel to our request for admissions in this
19   lawsuit.
20   A.  Yes.
21   Q.  Have you seen this document before?
22   A.  Yes, I have.
23   Q.  Did you have any role in preparing these
24   responses?
25   A.  Yes, I did prepare some of them.

35  (Pages 134 to 137)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 138

1    Q. Can you tell me which ones you prepared?
2    A. I prepared portions of: 1, 2, 3, 4, 7, 8, 9, 10,
3    30, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45,
4    46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59,
5    61, 62, 63, 64, 65, 66, 67.
6       That's it.
7    Q. Okay. Thank you, Doctor.
8       Will you turn to pages 2 and 3, please. At the
9    bottom of page 2 it says, "SMI inmates in maximum custody
10   are to be evaluated every 30 days."
11      Do you see that?
12   A. Yes.
13   Q. What does maximum custody mean?
14   A. Maximum custody?
15   Q. Yeah.
16   A. Maximum custody would be a level 5 inmate, which
17   would be the inmates who are housed in the unit specified
18   here.
19   Q. So SMU, Browning, Florence-Central?
20   A. Yes.
21   Q. Perryville-SMA?
22   A. Yes. These maximum custody units.
23   Q. Okay. And you're indicating our definition of
24   isolation; correct?
25   A. Yes.

Page 139

1    Q. Okay. And while some of them are double celled,
2    some are also single celled; correct?
3    A. That's correct.
4    Q. All right. Is it ADC policy that SMI inmates in
5    maximum custody are to be evaluated at least every
6    30 days?
7    A. Yes.
8    Q. Where is that written down?
9    A. In the technical manual.
10   Q. How long has that been ADC policy?
11   A. I don't know. Several years.
12   Q. And who is the evaluation done by?
13   A. That's typically done by one of the psychology
14   providers.
15   Q. Okay. But I'm -- I'm sorry. I didn't ask a
16   clear question.
17      Does policy require the evaluation be done by a
18   certain level of staff?
19   A. I don't recall policy specifying what level of
20   staff. It indicates it has to be a mental health
21   professional.
22   Q. It says mental health professional?
23   A. I believe that's correct.
24   Q. Okay. And what does that include?
25   A. It includes psychologists, psych associates,

Page 140

1    psych assistants, psychiatrists, psych nurses, psych nurse
2    practitioners.
3    Q. What are the minimum qualifications for the psych
4    associate?
5    A. Psych associate, they have to have a master's
6    degree in a behavioral health-related field, and they have
7    to have a license from the Board of Behavioral Health
8    Examiners.
9    Q. So you said this evaluation could be done by an
10   RN?
11   A. By a psychiatric RN.
12   Q. Okay. And you believe that this provision, that
13   it must be done by a mental health professional, is
14   written down in the Mental Health Technical Manual?
15   A. I believe that it is.
16   Q. All right. Does policy require that this
17   evaluation have any minimum duration?
18   A. No.
19   Q. Does the policy require that the evaluation be
20   performed in any particular place?
21   A. No.
22   Q. Does policy require that the evaluation involve
23   face-to-face contact?
24   A. Yes.
25   Q. And where is that written down?

Page 141

1    A. I believe it's also in the technical manual.
2    Q. Would a two-minute cell-side conversation by a
3    psychiatric RN be consistent with policy?
4       MS. WIENEKE: Foundation.
5       THE WITNESS: Policy requires that the person
6    have an evaluation. It does not specify length of time.
7    BY MR. FATHI:
8    Q. So your testimony is that it could be done at
9    cell side?
10   A. It could be done at cell side.
11   Q. And a two-minute cell-side evaluation would be
12   consistent with policy?
13   A. Would meet the policy standard.
14   Q. Okay. We won't make this an exhibit just yet,
15   but is this the current edition of the Mental Health
16   Technical Manual?
17   A. Yeah, it looks like it.
18   Q. Okay. Can you please show me in there where it
19   says that this evaluation must be done by a mental health
20   professional and must be done face to face.
21      Maybe I can help you. Look at page 19. Tell me
22   if that's what you are thinking of.
23      I'm looking at 1.1.2.8.
24   A. 1.1.2.8, yes.
25   Q. Okay. But if you look over on page 18, this is

36 (Pages 138 to 141)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 142

1   not talking about prisoners with serious mental illness.
2   It's talking about prisoners that are classified Mental
3   Health 3; correct?
4      A.   Where are we?
5      Q.   Look at page 18.
6      A.   And where are you reading?
7      Q.   I'm reading in the heading about halfway down the
8   page that says, "Mental Health 3."
9           So my point is that the provision is not about
10  SMI, it's about prisoners who are Mental Health 3; is that
11  correct?
12     A.   Yes.
13     Q.   Now, can you show me where this requires that the
14  evaluation every 30 days be done by a mental health
15  professional?
16     A.   Let's see.  This page is numbered as 20.  Please
17  see the bottom of the page there, where they have the
18  cross.
19     Q.   Uh-huh.
20     A.   If transferred to segregation housing, will be
21  seen by mental health clinician within 24 hours next
22  business day and a minimum every 30 days or more often as
23  clinically indicated.
24     Q.   Okay.  But that is about MH-3 inmates; correct?
25     A.   That's correct.

Page 143

1      Q.   Not about SMI inmates?
2      A.   SMI would be Mental Health 3 inmates.
3      Q.   All SMI inmates would be Mental Health 3 inmates?
4      A.   Yes.
5      Q.   By definition?
6      A.   By definition.
7      Q.   Now, if you go back to page 19, it says, "If
8   adequate staffing resources are not available to meet this
9   standard, mental health staff shall triage cases based on
10  clinical need of the population?"
11          Do you see that?
12     A.   I do see that.
13     Q.   So the policy contemplates that these 30-day
14  reviews may not happen in all cases; correct?
15     A.   That's right.
16     Q.   And that would still be consistent with policy?
17     A.   Yes.
18     Q.   Okay.  Can I have that back, please?
19     A.   You can.
20     Q.   Thank you.
21          Under ADC policy is there any limit to how long
22  an SMI prisoner in isolation can go without being seen
23  face to face by a psychiatrist?
24     A.   Yes -- wait.  Wait.  Let me clarify.
25          Are you talking about an SMI inmate who is

Page 144

1   receiving psychotropic medications?
2      Q.   No.  I'm talking about the entire -- if someone
3   is just an SMI inmate?
4      A.   Right.
5      Q.   By virtue of that fact, is there any limit under
6   ADC policy to how long that person can be in isolation
7   without being seen face to face by a psychiatrist?
8      A.   If the person is not on medication, no, there is
9   not a limit there.
10     Q.   Now, this 30-day evaluation we are discussing,
11  what's the purpose of that evaluation?
12     A.   The purpose of that evaluation is to make certain
13  that the inmate continues to be stable.  Since the inmates
14  in this maximum custody segments can't come forth and ask
15  for assistance, like a person who is in the regular jail
16  population can, we feel it's necessary to maintain a
17  higher level of contact with them.
18     Q.   I'm sorry.  Just one moment.
19          Is there any one written ADC policy providing for
20  the removal of an SMI prisoner from isolation if it's
21  determined that his or her mental condition is
22  deteriorating as a result?
23     A.   If a person's mental health is deteriorating as a
24  result of anything, the person would be referred to one of
25  the inpatient programs.  Yes, they would be taken out of

Page 145

1   there, and those issues would be addressed.
2      Q.   Is there any written policy that requires the
3   removal of an SMI prisoner from isolation if it's
4   determined that his or her mental health condition is
5   deteriorating as a result?
6      A.   Yes.  There is a policy that requires a higher
7   level of care for any inmate, including those in maximum
8   custody who shows signs of deterioration.
9      Q.   Okay.  And where is that policy written down?
10     A.   Well, let's see.  I think that's in the technical
11  manual also under referral to the inpatient facilities.
12     Q.   Okay.  Can you show that to me, please?
13     A.   Yeah.  Let's take a look.
14     Q.   Can you read the page number and item for the
15  record?
16     A.   That is page 11, and it's titled "Weekly Mental
17  Health Teleconference."
18     Q.   And what provision are you pointing to?
19     A.   To provide for ongoing, effective, and timely
20  communications with mental health staff at the Eyman
21  Behavioral Health Treatment Facility --
22          THE COURT REPORTER:  Slow down.
23          THE WITNESS:  Sorry.
24          -- to provide for ongoing, effective, and timely
25  communications between mental health staff at the Eyman

37 (Pages 142 to 145)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 146

1   Behavioral Health Treatment Facility and all other
2   complexes regarding inmates who may potentially require
3   intensive mental health treatment at the ABHTF.
4   BY MR. FATHI:
5       Q.   So it's your testimony that this is the written
6   policy that requires removal of an SMI prisoner from
7   isolation if it's determined that his mental health
8   condition is deteriorating?
9           MS. WIENEKE:  Form.
10          THE WITNESS:  He would be considered to be
11  requiring intensive mental health treatment, yes.
12  BY MR. FATHI:
13      Q.   That -- so it's your testimony that this
14  policy -- anytime an SMI prisoner in isolation is
15  determined to be deteriorating, this policy requires his
16  removal?
17          MS. WIENEKE:  Object to the form.
18          THE WITNESS:  If we define deteriorating as a
19  need of inpatient treatment, yes.
20  BY MR. FATHI:
21      Q.   How about if we define deteriorating as getting
22  worse?
23          MS. WIENEKE:  Form.
24          THE WITNESS:  Well, that's a hard differential to
25  make.

Page 147

1       Usually getting worse means we find that the
2   person is no longer able to be treated by the outpatient
3   services, so they are sent to inpatient services.
4   BY MR. FATHI:
5       Q.   Well, it's certainly possible to get worse but
6   not be at the point where you need inpatient services;
7   correct?
8           MS. WIENEKE:  Foundation.
9           THE WITNESS:  Well, it depends what you mean by
10  getting worse.
11  BY MR. FATHI:
12      Q.   Let me ask it a different way.
13          Is there any written ADC policy that, in terms,
14  explicitly provides for the removal of an SMI prisoner
15  from isolation if his condition is determined to be
16  getting worse?
17          Is there a written policy that says that?
18      A.   I don't think I have any policy that would define
19  getting worse without seeing the person as being in need
20  of a higher level treatment.  I mean, kind of by
21  definition, if you are getting worse, you need something
22  you are not getting.
23      Q.   But not necessarily inpatient treatment?
24      A.   Well, if you are not at that level, how do we
25  know you are getting worse?  I feel worse today.  You

Page 148

1   know, I'm hearing voices again.  Well, then you need to be
2   in inpatient.
3       Q.   Let me ask it yet a different way.
4           Is there any policy that -- written policy that
5   explicitly discusses what happens with a serious mentally
6   ill prisoner in isolation if that prisoner get worse?
7           MS. WIENEKE:  Form.
8           THE WITNESS:  If the person doesn't need
9   inpatient care, no.
10  BY MR. FATHI:
11      Q.   Okay.
12      A.   However, I think it's hard to define getting
13  worse without using that criteria.
14      Q.   Well, you and I will have to disagree about that.
15          Is the decision to transfer someone to an
16  inpatient facility a custody or a mental health decision?
17      A.   Mental health decision.
18      Q.   Can custody overrule mental health on that?
19      A.   No.
20      Q.   So custody has no power -- if mental health
21  determines that someone needs to be transferred to an
22  inpatient facility, custody has no power to overrule that?
23      A.   No.
24      Q.   Okay.  Let's go back to the requests for
25  admission.  At the top of page 3 it says, "Most at

Page 149

1   Florence and Eyman are housed in enhanced mental health
2   treatment areas."
3           Do you see that?
4       A.   Yes, I do.
5       Q.   All right.  I take it from the way this is
6   phrased that some SMI prisoners in maximum custody at
7   Florence and Eyman are not in enhanced mental health
8   treatment areas; correct?
9           MS. WIENEKE:  Form.
10          THE WITNESS:  I don't believe that's true.  No, I
11  think every SMI would be in the enhanced mental health
12  treatment area.
13  BY MR. FATHI:
14      Q.   Every single one?
15      A.   Every single one.
16      Q.   So if we go down to Florence and Eyman today, we
17  will not find one SMI prisoner in isolation who is not in
18  an enhanced mental health treatment area?
19          MS. WIENEKE:  Form, foundation.
20          THE WITNESS:  I don't believe so.  I think that
21  the vast majority of the inmate 3s are in the enhanced
22  mental health treatment areas.  I think all of the SMIs
23  are.
24  BY MR. FATHI:
25      Q.   Okay.  Are SMI prisoners housed in the Perryville

38 (Pages 146 to 149)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 150 | Page 151 |
|---|---|

**Page 150**

1  Special Management Area housed in an enhanced mental
2  health treatment area?
3      A.  No.  They are housed in the regular area.
4      Q.  What is an enhanced mental health treatment area?
5      A.  Well, enhanced mental health area are areas that
6  have been established for inmates which require a couple
7  of additional things from the mental health staff.  One is
8  that inmates in the mental health enhanced area have to be
9  seen outside of their cell.  They cannot be seen cell
10  side.  We established special interview areas so that
11  inmates are given some privacy for that interaction.
12      They are given increased opportunity for
13  socialization and recreation.  In other words, if you
14  recreate and are generally stable, you will recreate with
15  someone else.  If the two of you are generally stable,
16  then you will recreate with two more guys.  So you have an
17  increased level of socialization/recreation depending on
18  the inmate's level of stability.
19      So at the end of that time you are recreating in
20  a group of maybe six or seven.  They can play basketball
21  and do something besides --
22      The recreation areas have been -- have been
23  altered so that they can see the sky.  The caged areas
24  have been sort of taken away so you have open area
25  for the person to move around in.

**Page 151**

1      They have specialized group activities from
2  elected staff.  They have access to a general television
3  where educational programming and some kinds of treatment
4  programs can be shown on the TV so that the inmates in
5  that area can participate while still being in the cell.
6      The Kasson Unit is a unit where there are small
7  areas where inmates are kept usually around six to a cell
8  so that you can begin to utilize that small area as kind
9  of a socialization group.
10      Central are where the less acute inmates are, and
11  those inmates have much more opportunity to come out, to
12  socialize in larger groups.
13      The area at Eyman is beginning to function;
14  although, it's a little bit behind the Florence area.
15  There are a couple of opportunities for inmates who are in
16  that classification to get out of traditional settings.
17  One is we have established an area at Flamenco where
18  inmates who are level 5 can now be treated as an
19  intermediate psychiatric patient.  So they come there.
20  They can come out.  They can watch TV.  They can recreate.
21  They can get group therapy there.
22      Secondly, if they are stable, they can be
23  considered for the -- the term is a walking Ey-Fi
24  (phonetic).  That's not really what it's called, but it's
25  what everybody calls it.  It's really an area where

| Page 152 | Page 153 |
|---|---|

**Page 152**

1  inmates come out, they rec together, they eat together,
2  less time alone.  So that is what the enhancement is.
3      Q.  And at what units do enhanced mental health
4  treatment areas exist?
5      A.  Florence-Kasson, Florence-Central, Browning,
6  SMU-1.
7      Q.  Again, not at Perryville?
8      A.  Not Perryville.
9      Q.  Okay.  What is the total capacity of all the
10  enhanced mental health treatment areas?
11      A.  Around 400.
12      Q.  And what is their current population?
13      A.  Around 400.
14      Q.  And when were they established?
15      A.  We started on those in April of this year.
16      Q.  And what was the impetus to establish the
17  enhanced mental health treatment areas?
18      A.  Well, let me give you a long answer.
19      Q.  Let me ask a different question.
20      Did you have anything to do with this lawsuit?
21      A.  Yes, it does.
22      Q.  Okay.  Now, give me your long answer.
23      A.  Okay.  For the last year and a half the
24  Department of Corrections has made very careful studies of
25  all completed suicides.  FY 11 was a bad year by anybody's

**Page 153**

1  reckoning, and so we began to very carefully look at those
2  incidents to see what can we learn, what kind of things
3  might we change.
4      FY 12 we had a long good stretch, eight, nine
5  months with no suicide, and then we had a stretch where we
6  had four in a row.  Well, two of them were suicides that
7  we kind of understood what was happening.  Two were
8  suicides of guys who were at Florence who had been seen by
9  mental health staff, had said, hey, we are doing just
10  fine, and in fact they were not doing just fine.
11      So we began to look at what can we do to this
12  situation where inmates are more likely to express to us,
13  you know, feelings that are important for us to know.  And
14  it became clear we want to have more time for them to have
15  private sessions with our staff.
16      So after some discussions with the director and
17  after some discussions with operations staff, we came up
18  with the plan to make these enhanced areas where we can
19  have these services available.  Instead of having all
20  these guys spread all over everywhere, put them in areas
21  that are relatively isolated and then enhance their level
22  of treatment there.
23      As I said, Eyman and -- I mean, Florence-Central
24  and Kasson are up and running pretty much at 100 percent.
25  Our current data there looks very good.  Now custody

39 (Pages 150 to 153)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 154

1 thinks it's a great idea too, so...
2     It came as a response to a couple of suicides
3 that we thought, hey, we are missing something here that
4 we need to take a closer look at.
5     Q. And you said it also had something to do with
6 this lawsuit?
7     A. Well, I guess the level of care in these units, I
8 think, are kind of key to this lawsuit.
9     Q. I take it you were involved in the discussions
10 that led to the establishment of the enhanced mental
11 health treatment units?
12     A. Yes, I was.
13     Q. Would you say you were the principal mover behind
14 this plan?
15     A. Well, yes, I think I was.
16     Q. And during the discussions leading up to and
17 accompanying the establishment of these units, was there
18 discussion of this lawsuit?
19     A. I don't remember that. I think there was
20 discussion about suicides and how that impacted the
21 department in terms of its liability in general. But this
22 specific lawsuit, I don't recall that being discussed.
23     Q. So is it your testimony that the establishment of
24 these units was in no way a consequence of this lawsuit?
25     A. Well, I think the department was mindful of many

Page 155

1 kinds of liability they had. I think the department
2 wanted to make sure that they were giving the best level
3 of services they are capable of doing.
4     Certainly this lawsuit was something that we
5 wanted to make certain that we weren't -- we wanted to
6 make sure that we were giving a level of service that we
7 felt comfortable in defending, from this lawsuit or any
8 others that might arise.
9     Q. Okay. So when did actual construction begin?
10     A. Began late April.
11     Q. Of 2012?
12     A. 2012, yeah.
13     Q. And when did that become operational?
14     A. Florence became fully operational probably in
15 June, July. Eyman is still doing some construction in
16 terms of, I think, their outside rec. They are using
17 parts of the program but not all of it. As I said, they
18 are a little bit behind Florence, and Florence is working
19 pretty much as we designed.
20     Q. And why is this not being done at Perryville?
21     A. This sounds terrible. I just didn't think about
22 it. I forgot about it. You know, that just sounds
23 horrible. I didn't think about it.
24     Q. Now that you have been reminded, are there any
25 plans to do a similar thing at Perryville?

Page 156

1     A. There just may be. Yeah, there just may be.
2     Q. Okay. Where would I find the written policies
3 that govern the operation of enhanced mental health
4 treatment units?
5     A. You will -- there is a proposal that the director
6 had signed. There are some working papers. Those are the
7 ones that I know for certain exist. Wexford may have some
8 additional documentation.
9     Q. Are you saying that at least as far as ADC is
10 concerned, there is no -- there is no finalized policy
11 yet?
12     A. There's a policy in terms of the proposal of how
13 these areas should operate, which actually becomes sort of
14 a working policy.
15     There is a policy that dictates movement to the
16 special unit at Flamenco. Those are the policies I'm
17 aware of, plus the policies that related to it in the form
18 of the technical manual. We still have to apply with
19 these.
20     Q. Right, but there is nothing in the technical
21 manual about enhanced mental health treatment?
22     A. No. That's newer than the technical manual.
23     MR. FATHI: Okay. Kathy, we would like to
24 request all policies governing the operation of the
25 enhanced mental health treatment areas as well as all

Page 157

1 proposals and other documents that led to their
2 establishment.
3     (Exhibit 28 was marked for identification.)
4 BY MR. FATHI:
5     Q. I'm sorry?
6     A. 1103.
7     Q. Yes.
8     Exhibit 28 is Department Order 1103 titled
9 "Inmate Mental Healthcare Treatment and Programs."
10 Doctor, what is this?
11     A. This is the general policies that direct mental
12 healthcare in the department.
13     Q. Okay. And just a related question, I think you
14 said earlier that the mental health technical manual, all
15 units have to comply with that; correct?
16     A. That's correct.
17     Q. So that is a policy of statewide application?
18     A. That's right.
19     Q. And the DOs are also policy for statewide
20 application?
21     A. The DOs. director's instructions, all have
22 similar weight in terms of compliance.
23     Q. And so Wexford has to comply with all of those?
24     A. Wexford has to comply.
25     Q. Okay. Just for the record, this copy of DO 1103

40 (Pages 154 to 157)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 158 | Page 159 |
|---|---|

**Page 158**

1  is Bates Nos. 11410 to 11448.

2  Q. Doctor, this document bears an effective date of

3  August 22, 1997.

4  Do you see that?

5  A. Yes, I do.

6  Q. Has this version of the policy been in effect

7  continuously since that date?

8  A. It was updated about three months ago. There is

9  a new edition. This is the '97 version. There is another

10  edition.

11  Q. So this is not the current edition of DO 1103?

12  A. No.

13  Q. And you said this was updated about three months

14  ago?

15  A. Before Wexford took over the --

16  Q. I see. This is the copy of the version of 1103

17  that has been produced to us by your counsel.

18  Do you have any idea why counsel would produce an

19  obsolete version of an --

20  A. They may not be aware of the revised edition.

21  MR. FATHI: Kathy, can you explain why the

22  current edition of DO 1103 has not been produced?

23  MS. WIENEKE: I am not going to answer your

24  question about that. You can continue on with the

25  deposition of this witness.

**Page 159**

1  MR. FATHI: Kathy, we requested all policies, and

2  this is the version of 1103 that you produced. I would

3  appreciate an explanation why you produced a version of

4  the policy that is not longer in effect.

5  MS. WIENEKE: You can continue on questioning the

6  witness. I'm not going to answer your questions.

7  MR. FATHI: We are going to need to recall the

8  witness to question him on the current versions of the

9  policies which should have been produced, according to the

10  witness, three months ago.

11  MS. WIENEKE: Make whatever record you want.

12  BY MR. FATHI:

13  Q. Okay. So, Dr. Shaw, this policy is no longer in

14  effect; correct?

15  A. There is a revised policy. Many of these same

16  areas remain, but it is different.

17  Q. Okay.

18  A. And in fairness, it was written three months ago.

19  The policy for approving it may be even newer than that.

20  When you write a policy, it has to be approved by a chain

21  of command, and that may have only taken place a few weeks

22  ago.

23  Q. Okay. But you are confident that the new version

24  of DO 1103 is now in effect?

25  A. I'm confident of that, yeah.

| Page 160 | Page 161 |
|---|---|

**Page 160**

1  Q. So this is no longer the current version of

2  DO 1103?

3  A. As of -- yes, I'm confident there is a revised

4  version.

5  Q. Okay. Doctor, I apologize, but we are going to

6  need to recall you to question you about current policies

7  that should have been produced by your counsel.

8  Okay. Doctor, I'm showing you now the Arizona

9  Department of Corrections Mental Health Technical Manual

10  revised December 11, 2009.

11  Is this the current version of the mental health

12  technical manual?

13  A. No. This is the current version.

14  Q. Oh, so what is the date of the current version?

15  A. August 15th, 2011.

16  Q. Okay. The --

17  MS. WIENEKE: Can I see what you are referring to

18  when you say "this is"?

19  Can we have this document that you have pointed

20  to marked as an exhibit then, please?

21  BY MR. FATHI:

22  Q. Doctor, the version of the mental health

23  technical manual that your counsel has produced in this

24  litigation is the one dated December 11, 2009.

25  Is it your testimony that this document is no

**Page 161**

1  longer in effect?

2  A. No. The version that you have here, the revised

3  August 15th, is the current version.

4  Q. Okay. So for more than a year this December 2009

5  version has not been in effect; correct?

6  A. About a year.

7  Q. Can you think of any reason why counsel would

8  have produced an obsolete version of the mental health

9  technical manual?

10  MS. WIENEKE: Object to the form.

11  THE WITNESS: I don't know.

12  MR. FATHI: Kathy, can you explain why you

13  produced a version of the mental health technical manual

14  that has been obsolete for over a year?

15  MS. WIENEKE: Mr. Fathi, you just pointed to the

16  witness and gave the witness what you had in your

17  possession, the correct version of the technical manual.

18  In our request for production we asked you to

19  produce all copies of documents which you received

20  pursuant to the public records requests or any other

21  source. You gave us nothing. But yet you had this

22  document in your possession, which you showed to the

23  witness today. There is absolutely which you

24  have incurred today in questioning this witness.

25  I am asking the court reporter to mark the

41 (Pages 158 to 161)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 162

1  technical assistance manual as an exhibit to this
2  deposition so you can question Dr. Shaw instead of
3  engaging in these games of gotcha, which you find so
4  entertaining, but have nothing to do with the allegations
5  and are wasting this doctor's time.
6       So please proceed with the deposition after the
7  court reporter kindly marks the deposition exhibit.
8       MR. FATHI:  Pursuant to a discovery request, you
9  produced a manual that you knew or should have known had
10 been obsolete and no longer in effect for more than a
11 year.
12      Can you explain why you did that?
13      MS. WIENEKE:  Don't you dare tell me what I knew
14 or should have known after I have just pointed out to you
15 that you had this document in your possession and failed
16 to produce it in response to a request for production.
17      Now, let's stop wasting time on these stupid,
18 idiotic games and proceed with this gentleman's deposition
19 and stop wasting his time.
20      MR. FATHI:  I will handle this deposition as I
21 see fit, but I'm entitled to an answer as to why you
22 produced a document that has been obsolete and no longer
23 in effect for more than a year.
24      (Exhibit 29 was marked for identification.)
25      THE WITNESS:  So both of these are public

Page 163

1  documents.
2  BY MR. FATHI:
3       Q.  When counsel produced the document, we assumed
4  that it was the version that was actually in effect.
5            I would -- in response to your question, Doctor,
6  I would point out that the new version of DO 1103 is not
7  available on the Internet.
8       A.  It may not have made it to the Internet yet.  As
9  I say, it's very new.
10      Q.  I believe you said several -- it was approved
11 several weeks ago?
12      A.  Well, it was written -- how do I say this -- the
13 time between the writing and approval sometimes can be
14 several weeks to months.
15      MR. FATHI:  Kathy, we request that you produce
16 the current currently-in-effect version of DO 1103.
17 BY MR. FATHI:
18      Q.  Has it been communicated to ADC staff that the
19 version of DO 1103 that your counsel produced to us is no
20 longer in effect?
21      A.  I don't understand what you are asking.
22           Once the approval process is fully in place, it
23 will be placed on the Internet, and then it will be --
24 there -- it will be fully communicated by the time it
25 reaches the Internet, because it has to go through various

Page 164

1  phases of people reading it to make sure they know it's
2  been changed.
3       Q.  Okay.  But I want to make sure your testimony is
4  clear.
5            You are confident that this document, the new
6  version of 1103, is the one that's currently in effect?
7       A.  That is certainly my understanding.
8       Q.  And the version produced by your counsel dated
9  1997 is no longer in effect; correct?
10      A.  That's what I believe.
11      Q.  Okay.  Now, prisoners are sometimes put on watch
12 because they are believed to be at risk of suicide;
13 correct?
14      A.  That's correct.
15      Q.  And does ADC policy require that a prisoner who
16 is placed on watch because he or she is believed to be
17 suicidal be evaluated face to face by a psychiatrist?
18      A.  Not by a psychiatrist, no.
19      Q.  Does ADC policy require that the prisoner who is
20 on watch because he or she is believed to be suicidal be
21 evaluated face by face by any licensed mental health
22 staff?
23      A.  Yes.
24      Q.  And what kind of staff can do that?
25      A.  A psychiatrist could do that.  It's not required.

Page 165

1  A psychologist, a licensed psych associate could do that.
2       Q.  Any other category of staff?
3       A.  No.
4       Q.  And you're saying the policy requires
5  face-to-face evaluation?
6       A.  It does require face-to-face evaluation.
7       Q.  And where is that written down?
8       A.  It's in the DO 807.
9       Q.  And is it specifically a requirement, a
10 face-to-face evaluation?
11      A.  I believe so.
12      Q.  Doctor, I'm showing you DO 807 dated --
13 replacement date -- replacement page revision date May 21,
14 2012?
15      A.  Okay.
16      Q.  Is this the current version of DO 807?
17      A.  Yes, it is.
18      Q.  Okay.  That's good.
19           Can you please show me where it requires a
20 face-to-face evaluation of prisoners placed on suicide
21 watch?
22           Doctor, I take it that you have not been able to
23 find it yet.
24      A.  Actually, I have.  I'm looking at each one.
25           For instance, on the suicide watch, we can't use

42  (Pages 162 to 165)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 166

1  this, of course, but --
2      Q.  What policy are you quoting?
3      A.  1103.
4      Q.  Okay.  But again, you are looking at the version
5  of 1103 that is no longer in effect?
6      A.  Yes.
7      MS. WIENEKE:  For the record, that's the one
8  that's on the web site, the one that you are looking at?
9      THE WITNESS:  And that -- but you will notice
10  that, like, 1.7.6, mental health staff shall visit the
11  inmate every four hours.
12      And then I believe it says mental health staff
13  shall visit daily while on mental health watch.
14  BY MR. FATHI:
15      Q.  It says mental health staff; right?
16      A.  Yeah.
17      Q.  And that was different than licensed mental
18  health staff that we discussed earlier?
19      A.  Well --
20      Q.  But again, I really don't want to talk about the
21  obsolete policy.
22      Were you able to find it in DO 807?
23      A.  I am thinking DO 807 should.
24      Q.  Okay.  We need to move on, Doctor.
25      A.  All right.

Page 167

1      Q.  If you find it later, you can tell your counsel,
2  and she will let us know.
3      Okay.  Doctor, I'm showing you the expired
4  version of the mental health technical manual --
5      A.  Okay.
6      Q.  -- dated December 11, 2009, Bates No. 11232 to
7  11332.
8      A.  Okay.  Okay.
9      Q.  Can we look at page 11256, please.
10      A.  11256?
11      Q.  Yes.
12      A.  Okay.
13      Q.  Okay.  Now, this page, and the next few, describe
14  a system of classifying prisoners from MH-1 through MH-5
15  based on their mental health needs; correct?
16      A.  That's right.
17      Q.  And what consequences does a prisoner's
18  classification as an MH-1 or 5 in between have for his
19  or her treatment or conditions after confinement?
20      A.  All right.  MH-3, 4, and 5 have to be classified
21  to units where a full range of mental health services are
22  available, which would be at corridor units that we
23  discussed earlier.
24      Inmates with MH-1 or 2 scores can be at any unit.
25  They could be at Douglas or Safford, or Granite, anywhere,

Page 168

1  even though we may not have any health staff there.
2      Q.  And are they corridor units?
3      A.  Corridor units are:  Phoenix, Perryville, Lewis,
4  Florence, Eyman, Tucson, Yuma.
5      Q.  Is there any policy, written policy, providing
6  that an MH-5 cannot be housed in isolation?
7      A.  No, not that I'm aware of.
8      Q.  Okay.  What is the relationship between a
9  classification as serious mentally ill and classification
10  of the 1 through 5 system?
11      A.  They are independent classifications.
12      Q.  Okay.  So someone who is SMI could be an MH-5 or
13  an MH-1?
14      A.  No.  Someone who is an SMI could be an MH-3,
15  could be an MH-4, could be an MH-5.  Could not be an MH-2
16  or 1.
17      Q.  Okay.  So they are related to that extent?
18      A.  They are related to that extent.
19      Q.  So this classification system is still used by
20  the department?
21      A.  Still used by the classification department.
22      Q.  Okay.  Is it still used by mental health staff?
23      A.  It's been revised in the technical manual.
24      Q.  And under that system everyone is either a zero
25  or a 3; correct?

Page 169

1      A.  In the new system?
2      Q.  Yes.
3      A.  No.  No.
4      Q.  Do you have the 2011 version?
5      A.  The 0-3 system has been removed.  That is not in
6  the current manual.
7      Q.  Is the August 15, 2011 manual the current version
8  of the mental health technical manual?
9      A.  Yes, it is.
10      Q.  All right.  Would you turn to pages 18 and 19 of
11  the 2011 manual, please.
12      This describes a system where, as I read it,
13  everyone is classified as either a Mental Health 3 or a
14  Mental Health 0.
15      Do you see that?
16      A.  Yes, but this has been changed.  This is not the
17  policy.
18      Q.  I thought you just testified that this was a
19  current version of the mental health technical manual --
20      A.  No.
21      Q.  Let me finish.
22      I thought you just testified that this is the
23  current version of the mental health technical manual?
24      A.  I assumed from the -- from looking at the cover
25  that it was the correct version, but this is not.

43 (Pages 166 to 169)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

## Page 170

1     Q.  Okay.  So your testimony is that there is a later
2  version of the mental health technical manual?
3        MS. WIENEKE:  Form.
4        THE WITNESS:  There is a revised version of this.
5  This particular section was never adopted.  It was changed
6  before the revised August 15th was actually adopted in the
7  policy.
8  BY MR. FATHI:
9     Q.  Okay.  Let me back up, because I'm confused.
10        Which is the current version of the mental health
11  technical manual?
12     A.  Current version is revised August 15th, 2011, but
13  this is a draft copy, apparently.  This is not the -- this
14  section right there does not adopt the policy.
15     Q.  Well, this is the section -- this is the copy of
16  this manual that I downloaded from the ADC Web.  So
17  apparently downloading policies from the ADC web site is
18  not a foolproof manner of getting the current version.
19        MR. FATHI:  So this is why, Kathy, it was
20  important that counsel discharge their obligation to
21  produce policies that are currently in effect and up to
22  date.
23  BY MR. FATHI:
24     Q.  So, Doctor, your testimony is that this version
25  that I have given to you, of the August 15th, 2011 mental

## Page 171

1  health technical manual, is actually not up to date?
2     A.  This section is not up to date, no.
3        MS. WIENEKE:  This section being what?
4        THE WITNESS:  This section being the mental
5  health service delivery section.
6  BY MR. FATHI:
7     Q.  Okay.  Again, Doctor, I apologize.  We will need
8  to recall you once we have the policies that are currently
9  in effect so that we can question you about that.
10     A.  But in answer to your question, the MH-1 through
11  5 is still in effect.
12     Q.  As set forth in the 2009 version?
13     A.  The -- yes.  Yes.  That actually -- that section
14  still is in effect.
15     Q.  Okay.  So this 0 and 3 system?
16     A.  That was the proposed version, but it was going
17  to cause too much problems for classification, so this
18  section right here was taken out and the old section was
19  put back in.
20     Q.  Okay.  Let's look at page 20 of the 2011 version.
21        Do you see that?
22     A.  I do.
23     Q.  So that page is also not in effect?
24     A.  No, this page is not in effect, but the three
25  zero codes --

## Page 172

1     Q.  Okay.
2     A.  -- a portion of this is still in effect.
3     Q.  What portion is that?
4     A.  That's the sub codes A, B, and C portions.
5     Q.  I'm sorry.  How is that still in effect?
6     A.  If you are a Mental Health 3, you may be a Mental
7  Health 3A or Mental Health 3C.  So you will have an
8  additional sub-code on the mental health score to show
9  what level of service you need to have.
10     Q.  Okay.  In the 2009 mental health technical
11  manual, Mental Health 3s were sub-coded either R or S?
12        Is that system still in effect?
13     A.  No, that is gone.
14     Q.  Okay.  So when your counsel produces the current
15  version of the mental health technical manual, that will
16  include the current version of the MH-1 through 5 system?
17     A.  MH-1 through 5 system is in the current manual,
18  that's right.
19     Q.  And it's the same as it was in the 2009 manual
20  except that the sub-codes for MH-3s are different;
21  correct?
22     A.  That's right.
23     Q.  Okay.
24     A.  It's not a big change, but it is a change.
25     Q.  Okay.  Doctor, would you look at the 2009

## Page 173

1  version, please.
2     A.  Okay.
3     Q.  Would you turn to page 11261, please.
4     A.  Got it.
5     Q.  Now, this appears to be a matrix that shows the
6  various services that prisoners receive depending on their
7  MH score; is that correct?
8     A.  At the time, yes.
9     Q.  But this is no longer correct?
10     A.  That is no longer correct.
11     Q.  Okay.
12     A.  But it's replaced by the new sub-code system.
13     Q.  Okay.  And again, I will see that when I get the
14  current version of the mental health technical manual;
15  correct?
16     A.  You should, yes.
17     Q.  Okay.
18        (The deponent conferred with his counsel off
19  record.)
20        THE WITNESS:  So the sub-codes in the 2011 manual
21  are correct.  That's -- those are the sub-codes we are
22  currently using.
23  BY MR. FATHI:
24     Q.  Right, for the Mental Health-3s?
25     A.  That's right.

44  (Pages 170 to 173)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 174 | Page 175 |
|---|---|

### Page 174

1   Q.  Okay.
2   A.  Well, yes.
3   Q.  Okay.  But the 2011 manual isn't correct with
4   regard to the rest of the system?
5   A.  That's right.
6   Q.  Okay.  So about how many MH-3s are there in ADC?
7   A.  8500.
8   Q.  Have you gone through and recoded all of them
9   under the new system?
10   A.  Pretty much.
11   Q.  When was that accomplished?
12   A.  Oh, August -- probably last November, December,
13   after we worked the bugs out of the new manual or thought
14   we had.
15   Q.  So everyone who was now a Mental Health 3 should
16   have a code, a sub-code of A, B, or C; correct?
17   A.  That's correct.
18   Q.  So if I look at records, I should no longer see
19   in current entries 3Rs and 3Ss?
20   A.  No, you shouldn't.  No.
21   Q.  Okay.
22   A.  No.  The 3Rs and 3Ss were used for a number of
23   years, and their meaning changed several times so it
24   became very confusing.  Nobody knew exactly what they
25   meant.

### Page 175

1   Q.  Okay.  Doctor, I would like to go through the two
2   versions of the mental health technical manual and compare
3   a few things.
4   Okay.  In the 2009 version please go to page
5   11241.
6   A.  Okay.
7   Q.  And this is a chapter titled "New Employee
8   Orientation for Mental Health Staff."
9   A.  Yes.
10   Q.  And this chapter and section has been deleted in
11   the 2011 version; correct?
12   A.  Yes.
13   Q.  And why was that decision made?
14   A.  We have a more general training program for all
15   staff now that subsumes this portion.
16   Q.  And where is that written down?
17   A.  That's in -- probably in the policies on
18   training.
19   Q.  But that's not a mental health specific policy?
20   A.  It's not a mental health specific policy, but
21   mental health has to cooperate with it.
22   Q.  Okay.  Would you please look at page 11242 of the
23   2009 manual.  And then -- do you have it?
24   A.  I do.
25   Q.  And would you please turn to page 8 of the 2009

| Page 176 | Page 177 |
|---|---|

### Page 176

1   manual.
2   A.  Okay.
3   Q.  Section 1.1 of the 2009 manual provided for
4   quarterly psychology peer reviews.
5   Do you see that?
6   A.  Yes.
7   Q.  And in the 2011 manual those have been changed to
8   annual reviews.
9   Do you see that?
10   A.  Yes, I do.
11   Q.  And why was that change made?
12   A.  That was changed to reflect the current NCCHC
13   standards.
14   Q.  Wouldn't quarterly reviews also be consistent
15   with NCCHC standards?
16   A.  I suppose; although, we wrote it to meet the
17   standard.
18   Q.  Is it your position that you would have been out
19   of compliance with the NCCHC standards if you continued to
20   do quarterly reviews?
21   A.  We could have; although, you know, we wrote this
22   to address the standard as currently written.
23   Q.  My question was:  Is it your belief that you
24   would have been out of compliance with the NCCHC standards
25   if you continued to do quarterly reviews?

### Page 177

1   A.  If we rather not, we could have done monthlies, I
2   suppose.
3   Q.  And if you look at item 2.1, in the 2009 version
4   psychiatric peer reviews were done quarterly; correct?
5   A.  What page are you on in the old manual?
6   Q.  11243.
7   A.  Quarterly, yes.
8   Q.  And on page 9 of the new manual those two have
9   been reduced to annually; correct?
10   A.  That's right.
11   Q.  And what was the reason for that change?
12   A.  Same rationale to make the current NCCHC
13   standards.
14   Q.  Was there a belief that there was some
15   disadvantage to doing it quarterly?
16   A.  No.  I don't know if there was a disadvantage.
17   It simply -- you know, we wanted to meet the NCCHC
18   standards, and we also wanted to make sure we had time to
19   do the clinical work, so...
20   Q.  So it was a workload issue?
21   A.  Huh?
22   Q.  It was a workload issue?
23   A.  It was a workload issue.
24   Q.  Okay.  Okay.  Will you please look at 11245 in
25   the old manual.  Okay.  And page 10 in the new manual.

45 (Pages 174 to 177)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 178

1      A.  Okay.
2      Q.  Now, this chapter and section sets forth the
3  required review of medical records for inmate arriving on
4  the unit; correct?
5      A.  Uh-huh.
6      Q.  That a yes?
7      A.  That's a yes.
8      Q.  All right.  And there are a number of things that
9  are required to be reviewed in the 2009 policy that have
10 been deleted from the 2011 policy; correct?
11     A.  Yes.
12     Q.  So, for example, in the 2009 policy there are
13 four -- sorry -- five current items specified in the
14 mental health section, and in the 2011 policy there are
15 none; correct?
16     A.  I'm sorry.  Repeat what you are saying.
17     Q.  Section -- in the mental health section of the
18 old policy, 1.2.5, there are five specific things that are
19 to be included.
20        Do you see that?
21     A.  Yes.
22     Q.  And then in the new version, 1.2.3, there are
23 none.
24        Do you see that?
25     A.  Yes, I do.

Page 179

1      Q.  And why was that change made?
2      A.  That change was made primarily because these
3  issues are done simply at intake.  These issues are done
4  at the first staffing for the inmate after the staff sees
5  them.
6         This is done basically by one person looking at
7  the record.  The staffing is done by the staff who
8  actually has the inmate in the room with them.
9      Q.  I'm sorry.  Both of these are titled "Medical
10 Records Reviewed for Inmate Arriving at Unit"; correct?
11     A.  Yes.
12     Q.  Is it your testimony that these are actually --
13 these actually govern different things?  These actually
14 govern different things, the 2009 version?
15     A.  No.  No.  No.  The section under mental health
16 section simply isn't included in the new review.
17     Q.  But it was in the past?
18     A.  It was in the past.
19     Q.  And why was that change made?
20     A.  It was changed because it was thought that it's
21 better to review these issues with the treatment team when
22 the treatment plan was made rather than having a single
23 person do it at intake.
24     Q.  Well, but doing it at intake doesn't preclude
25 having the treatment team doing it later; correct?

Page 180

1      A.  No, it doesn't.  But it simply was helpful for
2  the team.  They had to redo the same issues.
3      Q.  So again the workload issues?
4      A.  The workload issues.
5         MS. WIENEKE:  Can I have a moment, please?
6         MR. FATHI:  Let's go off the record.
7         (A recess was taken from 2:27 p.m. until
8  2:30 p.m.)
9  BY MR. FATHI:
10     Q.  Okay.  Back on the record.
11        Doctor, in the 2009 manual will you please turn
12 to page 11272.
13     A.  11272.  Okay.
14     Q.  And in the 2011 manual, the version of it that we
15 have at least, could you please turn to page 30.
16        Okay.  Do you have it?
17     A.  I have it.
18     Q.  This is chapter 2, section 7, titled "Mental
19 Health Follow-Up after Discharge from Watch"; correct?
20     A.  That's right.
21     Q.  Now, the 2009 version had a requirement in
22 section 1.0 that all inmates who had been discharged after
23 a downgrade of continuous watch should be seen by a mental
24 health clinician within five business days of returning to
25 their unit and as clinical indicated thereafter."  I

Page 181

1  assume that should be clinically indicated.
2      A.  Clinically, yes.
3      Q.  Do you see that?
4      A.  I do see that.
5      Q.  And that's been deleted in the 2011 version;
6  correct?
7      A.  Yes, it has.
8      Q.  And why was that deleted?
9      A.  That was not seen as necessary since usually,
10 when they downgrade from a continuous watch, they go down
11 to a lower-level watch.
12     Q.  So it was seen that it was not necessary to have
13 them seen by a mental health clinician?
14     A.  Well, the person who was on a continuous watch
15 would then be put on a 10-minute mental health watch.  So
16 it would fall under the new policy.  It's very rare to
17 take somebody from a continuous watch to no watch.
18     Q.  Okay.  I'm sorry.  Let me ask it again.
19        The old policy had a requirement that prisoners
20 who had been discharged after a downgrade of continuous
21 watch would be seen by a mental health clinician within
22 five business days of return to the unit; correct?
23     A.  That's right.
24     Q.  And the new policy doesn't have that?
25     A.  That's right.

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 182

1    Q.  And the reason for that is what?
2    A.  Reason for that is, watches progress in a
3  specific way.  You don't usually, in fact, never take one
4  from a continuous watch to no watch.  You take them from a
5  continuous to a 10 to a 30 and then off.
6    Q.  So policy prohibits going from continuous watch
7  to no watch?
8       MS. WIENEKE:  Were you finished with your answer?
9       THE WITNESS:  Yes.
10      MS. WIENEKE:  Okay.  It sounded like you had more
11  to say and you were cut off.
12  BY MR. FATHI:
13    Q.  Policy prohibits going from a continuous watch to
14  no watch?
15    A.  No, it does not prohibit it.
16    Q.  So that could happen consistent with policy?
17    A.  That could happen consistent with policy, but you
18  have to look at why that would happen.
19    Q.  Was there seen -- was it believed there was some
20  problem to having these prisoners seen by a mental health
21  clinician?
22    A.  Well, what typically happens is the person gets
23  put on continuous watch and downgraded that day, so they
24  were put on continuous watch for some foolish reason.  If
25  the person had some significant mental problem, we would

Page 183

1  have followed the process of going from a continuous to a
2  10 to a 30.
3    Q.  I'm sorry.  I don't understand.
4       Was it perceived there was some problem with
5  having these prisoners seen by a mental health clinician
6  within five business days?
7    A.  It was just seen as being superfluous; it didn't
8  happen.
9    Q.  It didn't happen?
10    A.  It didn't happen.  It was virtually never in
11  effect.  So the 10- to 15-minute process is what was
12  followed as a rule.
13    Q.  I'm sorry.  You are saying that the -- this
14  requirement of the 2009 policy was not followed in
15  practice?
16    A.  It was not followed in practice because it almost
17  never occurred.
18    Q.  What never occurred?
19    A.  A person going from a continuous watch to no
20  watch.
21    Q.  But this says a prisoner who has been discharged
22  after a downgrade of continuous watch; correct?
23    A.  That's right.  Yeah.  It was not seen as
24  clinically necessary, no.
25       Again, the new policy provides for a clinical

Page 184

1  assessment of needs, and so that is seen as adequate.
2    Q.  Was there some problem with requiring the
3  prisoner to be seen within five business days?
4    A.  There was no problem.  The thought of the new
5  manual was that we would require the clinician to make
6  some judgments of how the person was to be seen.
7    Q.  So was this also a workload issue?  Was this also
8  a workload issue?
9    A.  Yes, to an extent, and also a clinical issue.
10    Q.  In the 2009 version, section 2.2 required that
11  the mental health clinician receiving an inmate after
12  watch discontinuance will conduct a face-to-face
13  assessment of the inmate and that, provision 2, has been
14  deleted in the new policy; correct?
15    A.  That's right.
16    Q.  And why was that deleted?
17    A.  Again, I think it follows the section where it
18  says the mental health -- the responsible chief
19  psychologist --
20       THE COURT REPORTER:  I need you to slow down.
21       THE WITNESS:  It is the responsibility of the
22  chief psychologist to ensure a mental health clinician
23  provide any necessary follow-up services mental health
24  personnel on receiving the unit -- on the receiving or
25  responsible for providing post-watch follow-up until it is

Page 185

1  determined that an ultimate follow-up schedule or
2  discontinuance is clinically indicated.
3       So that is a general rule.
4  BY MR. FATHI:
5    Q.  I can read the policy, but my question is, why
6  was this particular requirement discontinued?
7    A.  It was seen as a way of allowing a greater
8  clinical judgment to be put in place.
9    Q.  And it was also seen as a way of using less staff
10  time; correct?
11    A.  Well, depends on the clinical need.
12    Q.  Okay.  In the 2009 manual, will you turn to
13  11296, please.
14    A.  Okay.
15    Q.  And in the 2011 manual page 50, please.
16    A.  Okay.
17    Q.  Okay.  The 2009 version -- I'm sorry.  This is
18  chapter 4, section 4, outpatient mental health treatment
19  plans.
20    A.  Uh-huh.
21    Q.  The 2009 version provided timelines for mental
22  health treatment plans to be reviewed.
23       Do you see that in section 1.2.4?
24    A.  Yes.
25    Q.  And that has been deleted from the new version;

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 186 | Page 187 |
|---|---|
| 1  correct? | 1  that SMI prisoners have to have their treatment plans |
| 2  A.  Yes. | 2  reviewed every 30 days, does it? |
| 3  Q.  And why was that deleted? | 3  A.  No. |
| 4  A.  Again, it was to allow clinical judgment in terms | 4  Q.  Okay.  Thank you. |
| 5  of how often it needed to be done. | 5  MR. FATHI:  Let's take a short break. |
| 6  Q.  So there is no longer any requirement, any | 6  (A recess was taken from 2:42 p.m. until |
| 7  temporal requirement in terms of how often treatment plans | 7  2:53 p.m.) |
| 8  have to be reviewed; correct? | 8  THE WITNESS:  Let me correct the record. |
| 9  A.  Well, that is not necessarily true.  The | 9  BY MR. FATHI: |
| 10  inmate -- the SMIs have to be reviewed every 30 days. | 10  Q.  Please. |
| 11  Q.  You said that.  Can you show me where that is? | 11  A.  On SMI treatment plans, the initial treatment |
| 12  A.  Well, let me see if I can find that. | 12  plan has to be done within 30 days.  The reviews are every |
| 13  Well, that is for MH-3s. | 13  99 days. |
| 14  So you see at page 20 of the new manual, where it | 14  Q.  And where is that written down? |
| 15  says "MH-3," on the final indication of treatment plans -- | 15  A.  That is in 1103, page ACD011442. |
| 16  let's see -- | 16  MS. WIENEKE:  And also I would like to -- |
| 17  Q.  Okay.  Doctor, let me ask it a different way. | 17  MR. FATHI:  Excuse me.  Let me just finish up |
| 18  On page 50 of the new manual, titled "outpatient | 18  with this. |
| 19  medical treatment plans" -- | 19  BY MR. FATHI: |
| 20  A.  Okay. | 20  Q.  Page what? |
| 21  Q.  -- it doesn't say there that SMI prisoners have | 21  A.  ADC011442. |
| 22  to have the treatment plans reviewed every 30 days, does | 22  Q.  Okay.  And this, of course, is no longer in |
| 23  it? | 23  effect, as you have testified? |
| 24  A.  No, it doesn't say that in that section. | 24  A.  We may have to correct that, too. |
| 25  Q.  On page 20 of the new manual it also doesn't say | 25  Q.  Is it your testimony that that requirement is |

| Page 188 | Page 189 |
|---|---|
| 1  also written down in the current version of the DO 1103? | 1  A.  Yes. |
| 2  A.  Yes.  I'm certain of it. | 2  Q.  Okay.  Will you turn to page 11411, please -- |
| 3  Q.  Okay.  Well, what do you mean when you just said | 3  actually, it's the first full page of the policy. |
| 4  you may have to correct that, too? | 4  Are you there? |
| 5  A.  Well, we may have found out that the new version | 5  A.  I'm here. |
| 6  is still in the approval process.  So even though there | 6  Q.  This page refers to -- well, it says, "The |
| 7  has been changes, this is still the actual current policy. | 7  department operates a special program's unit to provide |
| 8  MS. WIENEKE:  This being 1103, which is exhibit | 8  mental health services and housing to male inmates and a |
| 9  number what? | 9  special programs area to female inmates." |
| 10  MR. FATHI:  28. | 10  Do you see that? |
| 11  MS. WIENEKE:  28.  So the 1997 version that | 11  A.  Yes, I do. |
| 12  defendants produced is in effect as of this date. | 12  Q.  Is that true as we stand here today? |
| 13  MR. FATHI:  Okay.  Let me get that -- some | 13  A.  That is true as we stand here today. |
| 14  testimony of the witness on that. | 14  Q.  Has that been true continuously since 1997? |
| 15  BY MR. FATHI: | 15  A.  Yes. |
| 16  Q.  Dr. Shaw, is it now your testimony that | 16  Q.  There has always been a Special Programs Unit? |
| 17  Exhibit 28, ADC11410 through 11448 dated August 22, 1997, | 17  A.  Always been a Special Programs Unit at least |
| 18  is the current version of DO 1103? | 18  since 1997, yes. |
| 19  A.  As we stand today, yes, that's the current | 19  Q.  In continuous operation? |
| 20  version. | 20  A.  Yes. |
| 21  Q.  Okay.  Thank you for clarifying that. | 21  Q.  Okay. |
| 22  In that case, let's talk about that. | 22  (Exhibit 30 was marked for identification.) |
| 23  Okay.  So I gather it is now your testimony, | 23  BY MR. FATHI: |
| 24  Doctor, that this version of DO 1103 has been in effect | 24  Q.  Dr. Shaw, Exhibit 30 is a letter dated March 18, |
| 25  continuously since August 22, 1997? | 25  2011? |

48 (Pages 186 to 189)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 190

1    A.  Yes.
2    Q.  Signed by you and Charles Flanagan; correct?
3    A.  That's correct.
4    Q.  Will you turn to page 3, please?
5        MS. WIENEKE:  Can I ask, did plaintiffs produce
6    this document in this lawsuit in response to defendants'
7    requests for production to plaintiffs?
8        MR. FATHI:  Yes, we did.
9        MS. WIENEKE:  Did you guys put a Bates number on
10   this document?
11       MR. FATHI:  Kathy, we can discuss that at the
12   break.  We have limited time here, and I would like to
13   examine the witness.
14       MS. WIENEKE:  There are no Bates numbers on
15   Exhibit No. 30.  In the future I would ask that if you are
16   going to mark documents that you say you have produced,
17   that you produce documents with Bates numbers so that we
18   can track and make sure that we can keep track of the
19   documents that you are saying you produced in response to
20   your request for production.
21   BY MR. FATHI:
22   Q.  Doctor, at the bottom of page 3 it refers to the
23   discontinuation of a Special Programs Unit.
24       Do you see that?
25   A.  Here we go.

Page 191

1    Q.  Do you see that?
2    A.  Yes, I do.
3    Q.  And on the top of page 4 on the third line you
4    write, "while it is correct that both of these programs
5    did stop operation for a period."
6        Do you see that?
7    A.  Yes.
8    Q.  So let me ask you again.
9        Has the special program unit been in continuous
10   operation since 1997?
11   A.  Well, let me -- let me say that if we had the
12   unapproved version of this policy, it would be much more
13   clear.
14       What used to be called the Special Programs Unit
15   is now called the Men's Treatment Unit.  And that has been
16   in effect, although has been under several names, Special
17   Programs Unit, Aspen Unit.
18       The Special Programs Unit we are talking about
19   here is a special unit for behaviorally disorderly
20   inmates.
21   Q.  Doctor, in Exhibit 30, on pages 3 and 4 you state
22   that a special program unit did stop operation for a
23   period.
24       Is that correct?  That is what the letter says.
25   A.  That is what the letter says.

Page 192

1    Q.  And is that correct?
2    A.  Yes, but it's not the Special Programs Unit that
3    you see in 1103.
4    Q.  How many different Special Programs Units does
5    the department operate?
6    A.  Well, they operate what we call a Men's Treatment
7    Unit, which is for general population guys, and it's been
8    a program that has been in operation for a long time under
9    various names.
10       The SPA unit is now called the Women's Treatment
11   Unit, which is clarified in the new policy.
12   Q.  Okay.  My question is, how many different
13   programs have been operated under the name Special
14   Programs Unit?
15   A.  I can only think of two.  One is what is now
16   called the Men's Unit -- Men's Treatment Unit.  The other
17   is a special behavioral unit that used to operate out of
18   the Eyman unit; however, it was called Special Programs
19   Unit after the name of the Men's Treatment Unit had been
20   changed.  I had nothing to do with that.  I know it's
21   confusing, but that's what happened.
22   Q.  Okay.  So in Exhibit 30, what Special Programs
23   Unit did stop operation for a period?
24   A.  The Special Programs Unit that did stop operation
25   was a special unit in maximum custody units which were for

Page 193

1    both mentally ill and severely behavioral disorderly
2    inmates.  It operated in a staff-intensive
3    behavior-modification fashion.
4    Q.  Okay.  So your testimony is that the Special
5    Programs Unit referred to on page 11411 has been
6    continuously in operation without interruption since 1997;
7    correct?
8    A.  Yes.
9    Q.  And is it your testimony that the Special
10   Programs Area for women described on page 11411 has been
11   continuously in operation since 1997 without interruption?
12   A.  Yes, although their names have been changed.
13   Q.  Would you turn to 11439, please.  And this refers
14   to a Special Management Treatment Unit.
15       Do you see that?  It's in the bold heading about
16   a third of the way down the page.
17   A.  Which page?
18   Q.  11439?
19   A.  Oh, 39.
20   Q.  Do you see the reference to the Special
21   Management Treatment Unit?
22   A.  Yes.
23   Q.  Is that program currently in operation?
24   A.  Let me be sure that --
25   Q.  I'm sorry.

49 (Pages 190 to 193)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

## Page 194

1     A.  Let me be sure that I'm going to give you
2  accurate information here.
3     Q.  This describes the Special Management Treatment
4  Unit in operation at Browning Unit.
5     A.  Okay.  Then this area exists now, but what -- it
6  did not exist for a period of time.  This was the area
7  that was referred to in the letter.
8     Q.  Okay.  So during what period of time did the
9  Special Management Treatment Unit not exist?
10    A.  That did not exist for about 2007 to 2010.
11    Q.  Okay.  And this version of the policy was in
12 effect during that period; correct?
13    A.  Yes, it was.
14    Q.  So the fact that a given program or treatment
15 area is mentioned in the current version of the policy
16 doesn't mean it necessarily exists?
17    A.  It suggests that the policy needs to be revised.
18    Q.  The fact that a given program or treatment area
19 is mentioned in the current version of an ADC policy
20 doesn't mean that the program actually exists; correct?
21    A.  I don't know how to answer.  It does exist now.
22 There was a period of time when it didn't exist.
23    Q.  Let me back up.
24    A.  Right.
25    Q.  It did not exist between 2007 and 2010; correct?

## Page 195

1     A.  That's correct.
2     Q.  Between 2007 and 2010, this version of DO 1103
3  was in effect; correct?
4     A.  That's correct.
5     Q.  So during that period DO 1103 described a program
6  that did not actually exist; correct?
7     A.  That's correct.
8     Q.  Okay.  Thank you.
9        This same page also refers to Special Management
10 Treatment Area for female prisoners.
11       Does that exist currently?
12    A.  Let me make sure -- yes, it still exists.
13    Q.  Has it existed continuously since 1997?
14    A.  My belief is that it has, but I cannot say that
15 for a fact.
16    Q.  And where is it currently located?
17    A.  Perryville.
18    Q.  Which unit?
19    A.  Lumley Unit.
20    Q.  Is it part of the Special Management Area, or is
21 it a different part of the Lumley Unit?
22    A.  There is a specific Special Management Area at
23 Lumley.
24    Q.  I'm sorry.  My question is, is the Special
25 Management Treatment Area part of the Special Management

## Page 196

1  Area?
2     A.  Yes.
3     Q.  Would you turn to page 11445, please.
4     A.  Got you.
5     Q.  And this is a part of the definition section of
6  the DO; correct?
7     A.  That's right.
8     Q.  And it defines a prescription as, "A
9  psychiatrist-specific written order following a
10 face-to-face encounter with an inmate patient."
11       Do you see that?
12    A.  Yes, I do.
13    Q.  Is it current ADC policy that psychotropic
14 medications can be prescribed only by a psychiatrist?
15    A.  No.  They may be prescribed by a
16 psychiatric-trained nurse practitioner.
17    Q.  At one point was it ADC policy that psychotropic
18 medication could be prescribed only by a psychiatrist?
19    A.  That may be true, but it hasn't been true for a
20 long, long time.
21    Q.  Can you think of any other reason why DO 1103
22 would define prescription as a psychiatrist-written order?
23    A.  I can only assume that they may have left out the
24 psychiatric nurse practitioner.
25    Q.  Why would they do that?

## Page 197

1     A.  I don't know.
2     Q.  Okay.  So -- just so your testimony is clear, you
3  don't know if at one point it was ADC policy that a
4  prescription for psychotropic medication can only be
5  written by a psychiatrist?
6     A.  No, I don't know that to be true.
7     Q.  You don't know one way or the other?
8     A.  I don't know one way or the other.
9     Q.  Okay.  Okay.  Let's go back to the 2011 version
10 of the Mental Health Technical Manual.  If you turn to
11 page 38, please.
12    A.  38?
13    Q.  Yes.
14    A.  Okay.
15    Q.  And this describes the Step-Down Program;
16 correct?
17    A.  That's right.
18    Q.  Is this program currently operational?
19    A.  Yes.
20    Q.  For how long has it been operational without
21 interruption?
22    A.  The Step-Down Program was in continuous operation
23 until fall of 2011, and then it was reconstituted in
24 February -- well, no, that's wrong.
25       2010 it was stopped and then reconstituted in

50  (Pages 194 to 197)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 198

1  February of 2011. So it was stopped for about five,
2  six months.
3      Q.  And why was it stopped and then restarted after
4  such a short time?
5      A.  It was stopped because the staff at Tucson
6  believed that the inmates who were in that program could
7  be served in an outpatient basis; however, I did a further
8  evaluation and felt it was necessary to have a step-down
9  program, so it was reinstituted.
10     Q.  And would you say that you made that decision?
11     A.  I did.
12     Q.  It appears from the section of the mental health
13  treatment manual that if a prisoner has even -- I'm sorry.
14        Let me ask first, the Step-Down Program is for
15  male prisoners only; is that correct?
16     A.  That's correct.
17     Q.  Is there a Step-Down Program for female
18  prisoners?
19     A.  No.
20     Q.  Why not?
21     A.  We haven't established one. We have never
22  established that kind of a unit there.
23     Q.  Is there a belief that female prisoners don't
24  need a step-down unit?
25     A.  I don't think that is a decision that we made. I

Page 199

1  think, again, it's just that we haven't thought it through
2  at the women's unit.
3      Q.  It appears that if a male prisoner has either a
4  public or institutional score of 5, he is not eligible for
5  the Step-down Program; correct? I'm looking at section
6  2.1.1.4.
7      A.  2 --
8      Q.  At the bottom of page 38.
9      A.  2.1 -- I'm sorry. What section?
10     Q.  The bottom of page 38, section 2.1.1.4. One of
11  the admission criteria is that the inmate has PI scores of
12  4, 4, or lower.
13        Do you see that?
14     A.  No, I don't.
15     Q.  Are you on page 38?
16        MS. WIENEKE: I think it is the wrong one. Yes.
17        MR. FATHI: The mystery solved.
18        THE WITNESS: 38.
19  BY MR. FATHI:
20     Q.  38.
21     A.  Okay. Now, 2.1.1.4.
22     Q.  So if a prisoner has either a public or
23  institutional risk score of 5, he is not eligible for the
24  Step-down Program; correct?
25     A.  He would not be eligible because you can't house

Page 200

1  a level 5 inmate at the Tucson complex.
2      Q.  Okay. But for whatever reason, he is not
3  eligible?
4      A.  No, he would not be eligible. He could not be
5  classified to that unit.
6      Q.  And similarly, he would not be eligible if he had
7  received a disciplinary ticket within the last
8  three months; correct?
9      A.  That's right.
10     Q.  Would you turn to page 41, please.
11        This describes the women's treatment unit;
12  correct?
13     A.  That's right.
14     Q.  I assume that's at Perryville?
15     A.  That's Perryville.
16     Q.  Does this unit exist today?
17     A.  It exists today.
18     Q.  How long has it existed continuously?
19     A.  It has existed continuously since 1997.
20     Q.  What is its capacity?
21     A.  Current capacity is -- current capacity is 30.
22     Q.  And what is the current population?
23     A.  I don't know for a fact.
24     Q.  Is it ever full?
25     A.  It's not been full recently.

Page 201

1      Q.  Has it ever been full?
2      A.  Not in the last two years.
3      Q.  Has it ever been full?
4      A.  Not to my knowledge.
5      Q.  Does it currently have a full compliment of
6  mental health staff?
7      A.  Yes.
8      Q.  So all the mental health staff positions that
9  service that program are currently filled?
10     A.  Except for the recreational therapist. That is
11  not full.
12     Q.  And if a woman has a public or institutional risk
13  score of 4 or higher, she is not eligible; correct?
14     A.  That's right.
15     Q.  Would you turn to page 43, please.
16        This describes the Behavioral Management Unit;
17  correct?
18     A.  That's correct.
19     Q.  And that is in Browning Unit?
20     A.  That's in Browning Unit.
21     Q.  What is the capacity of the BMU?
22     A.  BMU's capacity is 30.
23     Q.  And how many prisoners are there currently?
24     A.  Last time I checked, 16.
25     Q.  Why is it only half full?

51 (Pages 198 to 201)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 202

1   MS. WIENEKE: Foundation.
2   THE WITNESS: I'm sorry.
3   MS. WIENEKE: It's okay. I just objected.
4   THE WITNESS: It's only half full because that's
5   the number of inmates that have been referred to it. It
6   has 10 single cells and ten double cells, and the double
7   cells have really been difficult for us to utilize. So we
8   have only been recently using those as single cells.
9   BY MR. FATHI:
10   Q. Why have the double cells been difficult to
11   utilize?
12   A. Because it's a very difficult population. It's a
13   very highly needy and a highly disordered population.
14   It's been very difficult for us to move, within the year
15   we have been doing it, to have guys who have reached the
16   level where they are able to live with somebody.
17   Q. So if everyone is single celled, what is the
18   capacity?
19   A. If everyone is single cell, capacity is 20.
20   Q. And you said this program has been in existence
21   for about a year?
22   A. About a year.
23   Q. Looking at section 1.1.1.1, it says that if an
24   Axis 1 diagnosis is present, it must be well controlled
25   through the use of psychotropic medications.

Page 203

1   Do you see that?
2   A. I do see that.
3   Q. And that is one of the admission criteria;
4   correct?
5   A. That's right.
6   Q. So the people who are most severely mentally ill
7   with psychotic disorders or major mood disorders would not
8   be eligible; correct?
9   A. That's correct, they would not be, if they had
10   active symptoms.
11   Q. Does the Behavioral Health Unit at Tucson still
12   exist?
13   A. No, it does not.
14   Q. When did that cease to exist?
15   A. That ceased to exist early 2010.
16   Q. And why was that discontinued?
17   A. There became problems in housing, inmates who
18   were level 5, inmates in Tucson. There became quite a bit
19   of contention that prison inmates would become eligible
20   and housed at Tucson. Those inmates that needed the
21   treatment just became impossible to maintain there.
22   Q. So at that time level 5 inmates could be housed
23   at Tucson?
24   A. Could not, no. That was the reason why we had to
25   move them.

Page 204

1   Q. All right. I'm sorry.
2   So the problem was that you wanted to put Mental
3   Health 5 -- sorry -- level 5 inmates in the program, but
4   you couldn't as long as it was at Tucson?
5   A. That's right. And since many of the inmates who
6   would qualify for this program had -- were level 5
7   inmates, it just became a program that wasn't really
8   usable.
9   Q. So is there any difference between the Behavioral
10   Health Unit and the Behavioral Management Unit other than
11   location?
12   A. The programs are very similar, but we can put
13   level 5 inmates there.
14   Q. Okay. So the substance of the program --
15   A. The substance of the program is very similar.
16   Q. Okay. Would you turn to page 64 of the 2011.
17   This is titled "Management of Photosensitivity Reactions
18   to Medications"; correct?
19   A. That's correct.
20   Q. And it appears from this policy that before
21   anything can be done to manage photosensitivity reaction,
22   the prisoners must have an unequivocal diagnosis of
23   significant sunburn; correct?
24   A. That's correct.
25   Q. To include erythema at a minimum?

Page 205

1   A. That's correct.
2   Q. Erythema means reddening of the skin?
3   A. That's right.
4   Q. Why is it not possible to deal with this
5   prophylactically? Why is it necessary to wait until the
6   inmate has significant sunburn?
7   A. It's a relatively rare condition, and so there is
8   some sense that there needs to be some indication that's
9   going to occur before you begin to utilize the protocol.
10   Q. Your testimony is that photosensitivity reactions
11   to psychotropic medications are relatively rare?
12   A. Relatively rare.
13   Q. What percentage would you estimate?
14   A. You may be asking the wrong specialty.
15   I would anticipate maybe 10, 12 percent. And
16   only certain medications have that kind of side effect.
17   Q. In .4 it says, "Inmates will not be issued
18   special duty status, special clothing, or hats."
19   Do you see that?
20   A. I do.
21   Q. And why is that the case?
22   A. That didn't seem to be indicated or helpful for
23   these kind of conditions.
24   Q. Why not?
25   A. The sunscreen is generally effective.

52 (Pages 202 to 205)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 206 | Page 207 |
|---|---|

**Page 206**

1  The special clothing simply made things hotter.
2  Hats, inmates have hats. We -- we didn't think
3  special hats made much sense.
4  Special duty status, which is basically usually
5  having the inmate not work, and that really wasn't good
6  for the inmate for a number of reasons, and it wasn't good
7  for us financially.
8  Q.  Is it your testimony that there were no special
9  duty statuses in the department other than simply not
10  working at all?
11  MS. WIENEKE:  Object to the form, misstates his
12  testimony.
13  THE WITNESS:  I'm not an expert on special duty
14  status, but that's the most frequent.
15  BY MR. FATHI:
16  Q.  It just seems that one obvious way to manage a
17  photosensitivity reaction would be to allow the prisoner
18  to stay indoors or give him some sort of protective
19  covering.  And my question is, why are all of these things
20  prohibited under this policy?
21  MS. WIENEKE:  Form.
22  THE WITNESS:  Well, I guess it ties into the
23  first point you raised, in that if that was done
24  prophylactically, I think there was a sense that we might
25  have 9,000 guys wearing hats and shirts when, in fact --

**Page 207**

1  BY MR. FATHI:
2  Q.  I'm sorry, but that's not my question.
3  MS. WIENEKE:  He was not finished. Can you
4  please allow the witness to finish answering your question
5  before you interrupt him.
6  MR. FATHI:  Well, he wasn't actually answering my
7  question.
8  THE WITNESS:  Ask your question one more time.
9  BY MR. FATHI:
10  Q.  I'm not asking about prophylactics. I'm
11  accepting that the prisoner has to show significant
12  sunburn, including erythema, before he is eligible.
13  A.  Okay.
14  Q.  My question is, once that is established, why is
15  there a categoric prohibition on special duty status,
16  special clothing, or hats?
17  MS. WIENEKE:  Form.
18  THE WITNESS:  Those weren't found to be necessary
19  to manage the disorder. The topical creams seem to be
20  effective.
21  BY MR. FATHI:
22  Q.  Now, there is a copay for medical visit; correct?
23  MS. WIENEKE:  Form.
24  THE WITNESS:  Let me see how to answer that.
25  There is a copay for medical visits initiated by

| Page 208 | Page 209 |
|---|---|

**Page 208**

1  the inmates. If it's a contact initiated by the provider,
2  there is no copay. If the individual is in SMI, there is
3  never a copay.
4  BY MR. FATHI:
5  Q.  Is it your testimony that a prisoner would never
6  have a copay to get his sunscreen pursuant to this policy?
7  MS. WIENEKE:  Object to the form.
8  THE WITNESS:  I'm trying to think when that would
9  be necessary.
10  If the -- if the medication was prescribed by his
11  psychiatrist, the psychiatrist initiated the contact, no,
12  he wouldn't pay for it.
13  BY MR. FATHI:
14  Q.  Is it your testimony that the prisoner would
15  never be charged a copay to get sunscreen pursuant to this
16  policy?
17  MS. WIENEKE:  Object to the form, asked and
18  answered.
19  THE WITNESS:  I can't say it would never happen.
20  I can't think what the situation would be.
21  BY MR. FATHI:
22  Q.  Okay. Will you turn to page 84, please. This is
23  titled "Management of Heat and Tolerance Reaction to
24  Medications"; correct?
25  A.  That's correct.

**Page 209**

1  Q.  Some psychotropic medications make the patient
2  more sensitive to heat; correct?
3  A.  That's correct.
4  Q.  And that can have, in some cases, quite serious
5  health ramifications; correct?
6  A.  It could.
7  Q.  But it appears from this policy that no
8  protective steps will be taken unless the prisoner has an
9  unequivocal diagnosis of hyperthermia or orthostatic
10  hypotension; correct?
11  MS. WIENEKE:  Form.
12  THE WITNESS:  Yes. That's correct.
13  BY MR. FATHI:
14  Q.  Okay. And it appears also from this policy that
15  other than discontinuing the medication, the only
16  accomodation is a duty status to minimize heat exposure;
17  correct?
18  MS. WIENEKE:  Form.
19  THE WITNESS:  Yes.
20  BY MR. FATHI:
21  Q.  So why is duty status change permissible pursuant
22  to this policy but not permissible pursuant to the
23  photosensitivity policy?
24  MS. WIENEKE:  Form.
25  THE WITNESS:  The health ramifications of this

53 (Pages 206 to 209)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 210 | Page 211 |
|---|---|

**Page 210**

1  policy are far greater, so far more caution is taken.
2  With the photosensitivity, the belief is that
3  topical medications can be utilized in a general safe
4  fashion. With this population you have to be more
5  careful.
6  BY MR. FATHI:
7  Q. Are you familiar with the way that the Maricopa
8  County Jail manages heat sensitivity and psychotropic
9  medications?
10  A. No, I'm not.
11  (Exhibit 31 was marked for identification.)
12  BY MR. FATHI:
13  Q. Doctor, I'm showing you a document, Exhibit 31,
14  titled, "Mental Health Program SMI-1 Unit."
15  Do you see that?
16  A. Yes, I do.
17  Q. And have you seen this document before?
18  A. No.
19  Q. The effective date is blank, but if you turn to
20  the last page, you will see a memo dated August 15th,
21  2012.
22  Do you see that?
23  A. Uh-huh. I do.
24  Q. Have you seen this memo before?
25  A. No, I have not.

**Page 211**

1  Q. Do you know what this document is?
2  A. Well, the first section looks like some kind of
3  post or some sort of direction for the operation of the
4  old program that was discontinued some time back.
5  And this appears to be a letter sent out to
6  inmates who were participating in the enhanced treatment
7  area, kind of explaining what is going on and what the
8  rules are.
9  MS. WIENEKE: This, meaning the last page of
10  Exhibit 31?
11  THE WITNESS: Yeah, this being the last page. I
12  don't know why it's connected to the old policy.
13  BY MR. FATHI:
14  Q. I'm sorry. Your testimony is that the first four
15  pages are an old policy?
16  A. Well, I don't know. I haven't seen this policy,
17  so I'm not sure what it is.
18  Q. Okay. But based on the August 15th memo, you
19  believe this has something to do with the enhanced mental
20  health treatment?
21  A. I'm sure this does.
22  Q. This being the August 15th document?
23  A. This being the August 15th document.
24  Q. Who made the decision to initiate this program?
25  MS. WIENEKE: Object to the form.

| Page 212 | Page 213 |
|---|---|

**Page 212**

1  THE WITNESS: Who made the decision, the
2  director.
3  BY MR. FATHI:
4  Q. Director Ryan?
5  A. Yes.
6  Q. I assume you are -- by that you are referring to
7  the enhancement mental health treatment areas as a whole;
8  correct?
9  A. That's correct.
10  Q. I'm asking about this particular program referred
11  to in this memo.
12  MS. WIENEKE: Take your time and read it.
13  THE WITNESS: Now, repeat your question, please.
14  BY MR. FATHI:
15  Q. My question is, who decided to create the
16  particular program that's described in this memo?
17  MS. WIENEKE: Foundation.
18  THE WITNESS: I would guess this is an
19  explanation for the enhanced treatment program that
20  actually was perhaps from CO III Kraicinski.
21  BY MR. FATHI:
22  Q. But it doesn't use the term enhanced mental
23  health treatment?
24  A. No. No. He talks about the new program, which
25  is kind of how the inmates would see it.

**Page 213**

1  Q. But your understanding is when he said new
2  program, he is referring to the enhanced mental health
3  treatment area?
4  MS. WIENEKE: Foundation.
5  THE WITNESS: That's what he is referring to.
6  BY MR. FATHI:
7  Q. About a third of the way down the paragraph it
8  says, "You will not be moved from this area as long as
9  your inmate score is 3."
10  Why would that be?
11  A. One of the purposes of the program is to make
12  sure that we continue to monitor closely inmates MH-3. We
13  would hope --
14  THE COURT REPORTER: Inmates?
15  THE WITNESS: MH-3.
16  BY MR. FATHI:
17  Q. Inmates who are MH-3.
18  A. We would hope that we have positive incentives
19  for them to participate in the program, but they will
20  remain in the area so we can continue to monitor their
21  condition.
22  Q. So there is a deliberate effort to cluster higher
23  mental health score inmates in certain areas of the SMU?
24  A. Yes.
25  Q. And which areas are those?

54 (Pages 210 to 213)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 214

1    A.   Those are the enhanced treatment areas.
2    Q.   But how would -- what are the names of the units
3  or pods or the clusters or --
4    A.   At Eyman, I would have to look.
5    Q.   Well, this refers to 1 Baker/Charlie and 2
6  Able/Baker inmates.
7       Do you see that?
8    A.   That's right.
9    Q.   Would that be safe to assume that those are among
10  the areas that are part of the enhanced medical health
11  treatment area?
12    A.   Those are two of the treatment pods, yes.
13    Q.   Okay.  Could you go back to Exhibit 30, please,
14  that is your letter from 2011.
15    A.   Yes.
16    Q.   On page 3 in the second full paragraph, you say
17  that ADC "currently operates facilities with 310 inpatient
18  mental health treatment beds."
19       Is that still correct today?
20    A.   Yes, it is correct.
21    Q.   Okay.  Could you please break down those 310 beds
22  for me?
23    A.   Yes.  There are 48 beds at Baker Ward for acute
24  psychiatric treatment.
25       There are 23 beds at Flamenco for both acute and

Page 215

1  intermediate care treatment for women.
2       There are 82 beds at Flamenco for acute care
3  treatment for male inmates, one ward for level 5s, one
4  ward for public segregation, and one ward for general
5  population inmates.
6    Q.   That's all part of Flamenco?
7    A.   That's all part of Flamenco.
8    Q.   Okay.
9    A.   And then there are 150 some beds in the Men's
10  Treatment Unit.
11    Q.   I think we are still missing a few.
12    A.   Where are we now?
13    A.   We are at 303.
14    Q.   What did I say?
15    Q.   310.
16    A.   Oh, there are seven beds at Quiet Ward, which is
17  a high security suicide watch area in Flamenco.
18    Q.   And it's called Quiet?
19    A.   Yeah.  Every ward is named a letter.  And it was
20  Q, so now it's Quiet; although, it's not very quiet there.
21    Q.   Is Quiet Ward relatively new?
22    A.   Oh, no.  It's been there a long time.
23    Q.   I have never heard it is why I asked.
24       Okay.  Baker Unit, does that accept both men and
25  women?

Page 216

1    A.   No.  Baker Ward is only men.
2    Q.   Is Flamenco the only unit for women?
3    A.   Flamenco is the only inpatient facility for
4  women.
5    Q.   Do women ever go to Quiet Ward?
6    A.   No.  There are two suicide observation cells on
7  George Ward, which is the women's ward, where they can be
8  observed.
9    Q.   Okay.  So the maximum number of beds available
10  for women are 23; correct?
11    A.   That's correct.
12    Q.   Okay.  And which, if any, of those facilities are
13  licensed by the Arizona Department of Health Services?
14    A.   Baker Ward is licensed by the Arizona Department
15  of Health Services, and all three of the units -- no, I'm
16  sorry.  All three of the men's unit and the women's unit
17  at Flamenco are also licensed areas.
18    Q.   And so the Men's Treatment Unit is not?
19    A.   Men's Treatment Unit is not.
20    Q.   And Quiet Ward is not?
21    A.   Quiet Ward is not.
22    Q.   Okay.  And who -- what sort of population goes to
23  the Men's Treatment Unit?
24    A.   Men's Treatment Unit is for inmates who are
25  generally symptom free but who have additional issues that

Page 217

1  they want to work on in terms of parenting, in terms of
2  mood control, to substance abuse.
3       So psychiatrically they don't have a problem with
4  the symptoms, but they continue to have associated social
5  symptoms, and that is what the Men's Treatment Unit is to
6  address.
7    Q.   Let me back up a minute.
8       All of the units that you have described are part
9  of the Phoenix complex; is that correct?
10    A.   That's correct.
11    Q.   So they would be serviced by the Phoenix complex
12  staff that we discussed earlier today?
13    A.   That's correct.
14    Q.   Is Baker Unit ever full?
15    A.   Baker Unit has -- has not reached 40.  Baker Unit
16  usually runs about 27, 28.  A lot of that is because many
17  of the inmates on Baker on pretty disturbed, which is why
18  they are in Baker, which is difficult to double cell them.
19    Q.   I'm sorry.  You said it's never been full?
20    A.   I don't think it's ever reached capacity, as far
21  as 40 goes, not that I know of.
22    Q.   I'm sorry.  I thought the capacity was 48.
23    A.   48.  It has never reach 40 as far as I know.
24    Q.   I see.  Okay.
25       Has the Flamenco women's unit ever been full?

55 (Pages 214 to 217)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 218

1    A.  No.  Again, it's -- the capacity there is kind of
2  limited by the degree of symptomology that the inmates
3  there have.  You can double cell some, but you can't
4  double cell them all.
5    Q.  I see.  So the capacity of 23 assumes some double
6  cell?
7    A.  That's correct.
8    Q.  And similarly, for Baker Unit the capacity of 48
9  assumes some double cell?
10    A.  That's correct.
11    Q.  I see.
12      Is the Flamenco men's unit ever full?
13    A.  Depends on the ward.  Ida Ward, which is the unit
14  for general population men, runs full or couple bed empty,
15  but it's usually pretty full.
16      John, which is the protective segregation unit,
17  usually runs about 25, 26, which leaves four or five open
18  beds.
19      King, which is for the level 5 inmates, really is
20  still in the process.  It usually runs about 15 or 16
21  guys.  And we could theoretically put 30 up there, but we
22  really are still developing a program that will allow us
23  to do that.
24    Q.  Is the Men's Treatment Unit ever full?
25    A.  Men's Treatment Unit usually runs pretty close to

Page 219

1  full.  They usually run somewhere between 140, 145, so
2  they are pretty full.
3    Q.  Is there -- has there ever been a waiting list?
4    A.  For Men's Treatment Unit, yes, there has been.
5    Q.  What is the longest the waiting list has been
6  either in terms of number of people or in terms of wait
7  time to get in?
8    A.  Number of people has usually been under ten.
9  Wait time just depends on when they discharge somebody and
10  can bring somebody else in.
11    Q.  What is the longest wait time you have ever been
12  aware of?
13    A.  Longest wait time I have known personally has
14  been a month.
15    Q.  And is Quiet Ward ever full?
16    A.  Quiet Ward is almost always full.
17    Q.  What do you do -- I'm sorry.
18      Quiet Ward is suicide watch; correct?
19    A.  Right.
20    Q.  So what do you do if Quiet Ward is full and you
21  have someone else who needs to go on suicide watch?
22    A.  We put them on a non-suicide watch area, and then
23  they go on a continuous watch.  It can't be anything other
24  than that.
25    Q.  Physically where does that happen?

Page 220

1    A.  That happens in a section of Ida Ward that is a
2  non-licensed, non-treatment area.
3    Q.  And are the cells constructed specifically to be
4  suicide cells?
5    A.  Those cells are not constructed as suicide
6  cells --
7      THE COURT REPORTER:  Are not?
8      THE WITNESS:  Are not, which is why we do not
9  like to use them.
10  BY MR. FATHI:
11    Q.  But sometimes you have to do that if Quiet Ward
12  is full?
13    A.  Sometimes we have to if Quiet Ward is full.
14    Q.  Are the suicide cells in the Flamenco women's
15  unit ever full?
16    A.  I'm sure it's been true, although I can't recall
17  when.
18    Q.  Now, it's my understanding that female prisoners
19  and minors, including male minors, can go to the state
20  hospital; correct?
21    A.  That's correct.
22    Q.  But adult male prisoners cannot?
23    A.  That's correct.
24    Q.  So even if the ADC facilities for males were full
25  and you had a male prisoner who needed that kind of

Page 221

1  treatment, he could not go to the state hospital?
2    A.  He could not go to the state hospital, that's
3  correct.
4    Q.  Whereas a women prisoner in the same situation
5  could go to the state hospital?
6    A.  That's true.
7    Q.  There are a couple documents we received late
8  yesterday afternoon, so I haven't had a chance to look at
9  them comprehensively, but I want to ask you at least a few
10  questions about them.
11      This will be 32.
12      (Exhibit 32 was marked for identification.)
13  BY MR. FATHI:
14    Q.  Doctor, showing you Bates No. 27759 through 768,
15  a document titled "MH Level Statistical Summary as of
16  7/23/12."
17      Have you seen this document before?
18    A.  I have seen similar documents.  I don't know if I
19  have seen this particular one.
20    Q.  Is this document generated on a regular basis?
21    A.  This data is kept electronically.  The document
22  is generated when we want to generate it.
23    Q.  Why was this particular document for July 23rd of
24  this year generated?
25    A.  I don't know.

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 222

1    Q.  Now, on the first page towards the upper
2    left-hand corner it says, "Section I."  Then on page 765
3    it says "Section II DI85 Only."
4        Do you know what that means?
5    A.  DI85 is the beginning of the protective
6    segregation process.  And those inmates have a special --
7    there a special obligation in terms of mental health
8    management.
9    Q.  Well, as I look at the numbers, they seem to be
10   the same.
11       So what is the difference between these two
12   sections, if you know?
13   MS. WIENEKE:  Foundation.
14   BY MR. FATHI:
15   Q.  If you don't know, that's fine.
16   A.  I don't know.
17   Q.  Okay.  You said that Mental Health 3s and above
18   have to be at a corridor facility; is that correct?
19   A.  Yes.
20   Q.  And is Douglas a corridor facility?
21   A.  No.
22   Q.  But if you look at the first page of this
23   document, it appears that there are five MH-3s at Douglas.
24       Do you see that?
25   A.  I see that.

Page 223

1    Q.  Why would that be?
2    A.  Those guys are probably scheduled to be
3    transferred.
4    Q.  I'm sorry.  I thought you said that MH-3s were
5    not to be at Douglas; correct?
6    A.  Well, what typically will happen is a guy at
7    Douglas will have a problem, and he has made an MH-3.  So
8    he is an MH-3, but he will have to be transferred out.
9    Q.  Okay.  But you don't know that that's actually
10   the case here?
11   A.  No, but I would guess from five that that is
12   probably right.
13   Q.  You don't know how many of those five have
14   been --
15   A.  I don't know that.
16   Q.  Is Winslow a corridor facility?
17   A.  No, it's not.
18   Q.  And it looks like there are two MH-3s at Winslow.
19   I'm looking at page 5.
20       Do you see that?
21   A.  Yes, I do see that.
22   Q.  Okay.
23   A.  Actually, I know the reason for that.
24   Q.  And what is the reason for that?
25   A.  Both of these inmates are in DI85 process, so

Page 224

1    they can't be moved until the DI85 evaluation is complete.
2    Q.  And you say the DI85 is part of the protective
3    segregation process?
4    A.  Right.  So they will be declared protective
5    segregation, which means they will go to Lewis, or they'll
6    be denied, which means they would go to another corridor
7    unit.
8    Q.  And what is protective segregation?
9    A.  Protective segregation is a specialized housing
10   unit for inmates who have some kind of threat or danger in
11   the general population with the department.
12   Q.  So it's what might be popularly called protective
13   custody?
14   A.  That's exactly what it is.
15   Q.  So it has nothing to do with mental health;
16   correct?
17   A.  No, it doesn't.  It does not.
18   Q.  Okay.  All right.
19   A.  Only to the extent that there's a special policy
20   in terms of mental health monitoring for guys in that
21   process.
22   Q.  And what is that special policy?
23   A.  That's Director's Order 85, which means that once
24   they go in, they must be seen within 24 hours by mental
25   health and on a monthly thereafter.

Page 225

1    Q.  You said Director's Order 85?
2    A.  That's right.
3    Q.  Is it Director's Instruction 295?
4    A.  Director's Instruction 295, that's right.
5    MR. FATHI:  Okay.  Let's take a short break.
6    THE WITNESS:  Okay.
7    (A recess was taken from 3:48 p.m. until
8    3:56 p.m.)
9    BY MR. FATHI:
10   Q.  Okay.  We don't need to make this an exhibit, but
11   I would like to ask you about this very attractive, full
12   color presentation that we received late yesterday Bates
13   Nos. 27724 through 27758.
14       Doctor, have you seen this document before?
15   A.  Yes, I have.
16   Q.  And what is it?
17   A.  This is actually a description that the director
18   is using of the special programs that we have been
19   referring to as the enhanced program areas, plus some
20   other additional program areas in the Department of
21   Corrections.
22   Q.  And when you say the director, that's
23   Director Ryan?
24   A.  That's Director Ryan.
25   Q.  And he has been using this for what purpose?

57 (Pages 222 to 225)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 226

1    A.  Actually, I think he -- the director just likes
2  to have visual material at his disposal.  He has books of
3  it, and this is a section he wanted made on these areas.
4    Q.  There is no date on this document.
5      Do you know when it was created?
6    A.  Oh, within the last three or four weeks.  It's
7  not very old.
8      THE COURT REPORTER:  What?
9      THE WITNESS:  It's not very old.
10      I'm running out a steam here, but I'm --
11  BY MR. FATHI:
12    Q.  Okay.  Would you turn to page 726, please.
13    A.  726, that's page 3 at the bottom?
14    Q.  Oh, yes.
15    A.  Okay.
16    Q.  In the first three lines it refers to a few
17  different people who I'm not familiar with, so could you
18  please identify them for me?
19    A.  The division director, Patton, is the chief
20  administrator for all of the operations staff.  He's the
21  boss of all the security officers and the security
22  supervisors and the wardens.  He is like all their boss.
23      NROD McWilliams is a regional supervisor for, I
24  believe, the southern region, and he's the supervisor of
25  the wardens in that region.

Page 227

1    Warden Hetmer is the warden for the Florence
2  Unit.
3    Q.  So he's the warden of the entire Florence
4  complex?
5    A.  Yes, he is.
6    Q.  And is the Florence and Eyman complex part of the
7  northern or southern region?
8    A.  Boy, I hope I'm saying this right.  I believe
9  that's part of the southern region.  Mr. McWilliams is
10  their supervisor.  And forgive me if they're the northern
11  region, but I think they're the southern region.
12    Q.  Okay.  And it refers to Central Unit
13  administration.
14      Were you part of this meeting?
15    A.  Yes, I was.
16    Q.  And what was discussed at that meeting?
17    A.  This was the meeting where we initially looked at
18  the areas in the Florence unit to try to find out what
19  would be the best areas to house inmates for these special
20  program units.
21    Q.  And was this lawsuit discussed at the meeting at
22  all?
23    A.  No, it was not.
24    Q.  You sure about that?
25    A.  Yeah.  Two recent suicides at Florence were

Page 228

1  discussed.
2    Q.  Okay.  Would you turn to page 6, please.
3      I'm sorry, back to page 3, the date of that
4  meeting, April 27, 2012, is that consistent with your
5  memory?
6    A.  Yeah, that sounds about right.
7    Q.  Okay.  Page 6, where it says "Kasson Movement
8  May 2012," is the movement referred to that of the 42
9  inmates described in the next line?
10    A.  Let me read this.  42 inmates removed --
11      THE COURT REPORTER:  Read out loud or --
12      THE WITNESS:  I'll read silently.
13      Okay.  Now, please repeat the question.
14  BY MR. FATHI:
15    Q.  Is the movement -- when it says, "Kasson
16  movement," does that refer to the movement described in
17  the following two paragraphs?
18    A.  Yes, it does.
19    Q.  And that took place in May of 2012?
20    A.  Yes, it did.
21    Q.  Do you remember when?
22    A.  Not exactly.
23    Q.  Page 13, is this still referring to the Kasson
24  unit?
25    A.  No.  This is Central Cell Block 1.

Page 229

1    Q.  Central Unit Cell Block 1?
2    A.  Yes.
3    Q.  So on page 13 it refers to some movement taking
4  place in May of 2012.
5      Do you see that?
6    A.  Yes, I do.
7    Q.  Is that consistent with your memory?
8    A.  That is consistent.
9    Q.  Okay.  The first part of this document, pages 1
10  through 18, describes some changes that have been made or
11  being made at ASPC Florence; correct?
12    A.  Yes.  That's correct.
13    Q.  Page 19 begins a section on ASCP Phoenix, and my
14  question is, does this -- do pages 19 through 23 describe
15  changes being made at Phoenix or simply the current
16  situation?
17      Let me try to ask it a better way.  That wasn't
18  very --
19      Will you please look at pages 20 to 23 and tell
20  me which, if any, of these programs, activities, amenities
21  have begun since March of this year.
22    A.  Okay.  20 and 21 are programs that were
23  well-established.
24      22, you see an area that is marked John and King.
25  Those are new programs that were established approximately

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 230

1    at the same time as the programs at Florence were.
2        Q.   So in April and -- between April and June of this
3    year?
4        A.   That's right.
5        Q.   And anything else on 22 or 23 that is new within
6    the last six months?
7        A.   No.  Those two are the major changes there.
8        Q.   Okay.  Then on page 25 it describes some changes
9    taking place at the Eyman complex; correct?
10       A.   That's correct.
11       Q.   And are the timelines set forth on page 25 all
12   consistent with your memory?
13       A.   Yes, those are consistent with my recollection.
14       Q.   So where are we on -- it refers to construction
15   of outdoor recreation enclosures?
16       A.   Yes.
17       Q.   Do you see that?
18       A.   Yes.
19       Q.   Where are we in that process?
20       A.   I was there about two weeks ago, and they thought
21   it would be done probably in another 30 to 60 days, they
22   anticipated, for completion.
23       Q.   And are those -- are there going to be outdoor
24   recreation enclosures both at Browning and SMU-1?
25       A.   Yes.

Page 231

1        Q.   How many?
2        A.   One at Browning and I believe four at SMU-1.
3            SMU-1 has special populations that can't mix that
4    requires smaller areas with independent areas to support
5    them.
6        Q.   And can you describe what these outdoor
7    recreation areas are -- excuse me -- outdoor recreation
8    enclosures are going to look like?
9        A.   Some of them look like enclosures half the size
10   of this table, a row facing each other so you could
11   actually put guys into groups there.
12           Some look more like a basketball court with a
13   fence around it.  It depends on what kind of inmate or
14   what phase inmate will use them.
15       Q.   What will the enclosure be made out of?
16       A.   Enclosure is made out of expanded metal, kind of
17   a crisscross.
18       Q.   Will it be like a chain-link fence?
19       A.   It will be like a chain-link fence somebody
20   smashed flat.  It won't be round.
21       Q.   Will there be -- so it won't be solid; correct?
22       A.   It will not be solid, no.
23       Q.   Light and air will be able to penetrate?
24       A.   Absolutely.
25       Q.   And again, I'm talking about the side walls.

Page 232

1        A.   The side walls will all be the same material.
2        Q.   Because currently, as I'm sure you know, the
3    recreation takes place in a concrete enclosure; correct?
4        A.   That's right, but that's why we are changing
5    this.  I don't think that -- we think this will be a
6    better plan.
7        Q.   Good.
8            And on page 27 there are photos of what's
9    identified as Browning Unit mental health enclosure.
10           Do you see that?
11       A.   Yes, I do.
12       Q.   Are those the exercise enclosures, or is this
13   something else?
14       A.   Those are for exercise in group exclusion.  If
15   you see the full picture here, there may be seven of these
16   enclosures, and then on the another side there are another
17   seven.  So you can put 14 guys there, and if you wanted
18   to, you could have a guy, a mental health person in the
19   middle talking about why it's good to write your mother a
20   letter or why it's good to control your temper, or
21   whatever kind of group they want to run.
22       Q.   And are these all outdoors?
23       A.   These are all outdoors.
24       Q.   Okay.  And page 29, what is pictured there?
25       A.   That looks like one half of one of the

Page 233

1    enclosures, the back side of them.  You see they're kind
2    of in a row there.
3        Q.   Yeah.
4            Okay.  Page 30 and following is about ASPC
5    Perryville; is that correct?
6        A.   That's correct.
7        Q.   I would like to ask you to do the same thing you
8    did with Phoenix and go through and tell me which of these
9    programs and services are new within -- since March of
10   this year.
11       A.   These are all fairly well-established programs.
12   They have been running for some time.
13       Q.   All right.  So there is nothing new in the last
14   six months --
15       A.   Nothing --
16       Q.   Again, nothing new in the last six months listed
17   here at Perryville?
18       A.   No.
19       Q.   Okay.
20       A.   And I feel like we haven't really been, now that
21   you have pointed it out, thinking about the women as much
22   as I should.
23       Q.   Okay.  And just so it's clear, pages 34 and 35,
24   those both pertain to Perryville?
25       A.   33, 34, yes, those are both Perryville.

59 (Pages 230 to 233)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 234

1    Q.  And 35?
2    A.  Both Perryville.
3    Q.  Okay.  We better make this an exhibit after all.
4        (Exhibit 33 was marked for identification.)
5    BY MR. FATHI:
6    Q.  Doctor, will you find DO 1103, please.  I think
7    it's here, and will you turn to 11431, please.
8    A.  11431, okay.
9    Q.  And will you look at paragraph 1.9.4, please.
10       Do you have it?
11   A.  Yes, I do.
12   Q.  According to this paragraph, an unlicensed mental
13   health staff in consultation with a licensed mental health
14   staff can remove a prisoner from suicide or mental health
15   watch; correct?
16   A.  According to this policy, yes, although that
17   policy has also been revised.
18   Q.  What is the new policy?
19   A.  Well, the new policy is that we don't really have
20   unlicensed mental health staff except for the psych
21   assistants.  So I would guess it's possible that the psych
22   assistants could that.
23       But this policy was written back when our psych
24   associates were not licensed, prior to the master's level
25   licensing law that passed about, you know, 2002, 2003.  So

Page 235

1    the number of unlicensed staff is pretty much zero at this
2    point.
3    Q.  Well, except for the psych assistants?
4    A.  Except for the psych assistants.
5    Q.  And how many psych assistants are there
6    systemwide?
7    A.  Well, there used to be maybe six or eight.
8    Q.  When you say there used to be, why do you put it
9    that way?
10   A.  Because, as of July 1st, I don't know what the
11   current makeup is.
12   Q.  Okay.  I understand you are saying it may not
13   happen often, but is it still the policy that someone can
14   be removed from the suicide or mental health watch by an
15   unlicensed mental health staff?
16   A.  It's still policy.
17   Q.  And is that policy unchanged in the new version
18   of DO 1103?
19   A.  I believe that policy is changed.
20   Q.  And what does the new policy say?
21   A.  I believe the new policy -- you know, I don't
22   want to speculate.  I would have to look.  I think it's
23   changed, but I don't know for certain.
24   Q.  Okay.  Is it consistent with ADC policy to give a
25   prisoner a disciplinary ticket for acts of self-harm?

Page 236

1    MS. WIENEKE:  Form and foundation.
2    THE WITNESS:  That can be done.  It's within
3    policy.
4    BY MR. FATHI:
5    Q.  Okay.  We talked about the various programs that
6    are available at ASCP Phoenix.
7        Who is the gatekeeper for these programs?  Who
8    decides which prisoners go?
9    A.  There is a weekly teleconference between the
10   staff at the Phoenix programs and all of the outpatient
11   department heads.  And at that time the department heads
12   will refer inmates at their facility that they feel need
13   to be accepted for inpatient care, and then the staff at
14   Phoenix will accept them or they will ask for some
15   additional treatment and then for a revisiting of that
16   inmate.
17       So the gatekeeper would be the clinical staff in
18   Phoenix.
19   Q.  And is there one person in particular at Phoenix,
20   or is it a collective decision?
21   A.  The final decision would be the clinical
22   director's.
23   Q.  I'm sorry.  Is there just one clinical director
24   at Phoenix?
25   A.  There is only one clinical director at Phoenix.

Page 237

1    Q.  And I believe you testified that that position is
2    currently vacant?
3    A.  No.  That is currently filled.
4    Q.  And who is currently in that position?
5    A.  Dr. Jason Newell.
6    Q.  Okay.  So if push comes to shove, it's up to the
7    clinical director in Phoenix whether or not to accept a
8    given prisoner?
9    A.  If there's a -- that's right.
10   Q.  And is there ever any custody involved in that
11   decision?
12   A.  No.
13   Q.  So if Dr. Newell wants to accept a given patient,
14   custody has no veto over that decision?
15   A.  That's correct.
16   Q.  Okay.  It's my understanding that custody staff
17   can pass out meds under some circumstances.
18   A.  Well, let me think.
19       I believe custody staff passes out bags with
20   keep-on-person medication to some units.
21   Q.  And that's consistent with policy?
22   A.  That's consistent with policy.
23   Q.  And that could be psychotropic medication, too;
24   correct?
25   A.  It could be anything.  It's just a paper bag with

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 238 | Page 239 |
|---|---|
| 1   the inmate's name on it so the officer won't know what is | 1       MR. FATHI:  How have we clarified? |
| 2   in it. | 2       MS. WIENEKE:  The Mental Health Technical Manual |
| 3      Q.   So the identifying -- what medication it is is | 3   that we produced is the current version. |
| 4   not written on the bag? | 4       You also asked us to produce drafts, which we |
| 5      A.   No.  It's just like, Inmate Ben, here's your bag. | 5   also produced. |
| 6   They don't -- | 6       MR. FATHI:  No.  The version of the Mental Health |
| 7      Q.   Does policy permit custody staff to distribute | 7   Technical Manual that you produced is the December 2009 |
| 8   any other medication or only keep-on-person medication? | 8   version, which is not the current version. |
| 9      A.   Only keep-on-person meds. | 9       Correct? |
| 10       MR. FATHI:  Okay.  Okay, Doctor, as I said, we -- | 10       THE WITNESS:  No.  The 2009 version is not the |
| 11   because of failure to produce various documents and the | 11   current version. |
| 12   up-to-date versions of various documents, I need to | 12       MR. FATHI:  Okay.  That's the one you produced. |
| 13   reserve the right to call you back, but for now, I'm | 13       MS. WIENEKE:  But you had today for the |
| 14   finished, and I thank you very much. | 14   deposition the 2011 version, which you questioned the |
| 15       THE WITNESS:  You are quite welcome. | 15   witness on; correct? |
| 16       MS. WIENEKE:  What up-to-date versions of various | 16       MR. FATHI:  No.  He testified that is not the |
| 17   documents?  We clarified that the 1997 version was the | 17   current 2011 version. |
| 18   up-to-date version of the document.  So what specifically | 18       MS. WIENEKE:  No.  He testified that there is |
| 19   are you referring to? | 19   included in that a section which is a draft; correct? |
| 20       MR. FATHI:  Well, I am referring, the ones I know | 20       MR. FATHI:  No.  He testified that in the version |
| 21   about so far, are the Mental Health Technical Manual.  We | 21   I have there is a section that is different in the final |
| 22   would like the current version of that. | 22   version. |
| 23       MS. WIENEKE:  Which we clarified. | 23       Is that correct? |
| 24       MR. FATHI:  I'm sorry? | 24       THE WITNESS:  That's correct. |
| 25       MS. WIENEKE:  Which we clarified. | 25       MR. FATHI:  Okay.  So we need the final |

| Page 240 | Page 241 |
|---|---|
| 1   up-to-date version of the Medical Health Technical Manual. | 1       (A recess was taken from 4:19 p.m. until |
| 2       We also need the new version of DO 1103 when that | 2   4:33 p.m.) |
| 3   becomes final. | 3 |
| 4       MS. WIENEKE:  Which it's not final at this time. | 4         EXAMINATION |
| 5       MR. FATHI:  When it is, we need that. | 5   BY MS. ALEWELT: |
| 6       MS. WIENEKE:  Well, we are not going to produce | 6      Q.   We met earlier.  I'm Jennifer.  I am the attorney |
| 7   this witness just because an 1103 will not yet become final | 7   for the Arizona Center for Disability Law. |
| 8   as of the date that you chose to depose him, just to be | 8      A.   Yes. |
| 9   clear. | 9      Q.   And we are also a plaintiff in this action. |
| 10       MR. FATHI:  It's not just about the one document. | 10       Have you heard of us before? |
| 11   It's about the failure to produce other documents that | 11      A.   I have heard of you. |
| 12   have been clearly requested, such as e-mails.  It's about | 12      Q.   I will jump around a little bit because we |
| 13   producing documents at the last minute so there's no | 13   covered a lot of different topics, so pardon me for that. |
| 14   reasonable time to review them. | 14   And if there is anything you want me to clarify, let me |
| 15       For these reasons, Doctor, we need to reserve the | 15   know. |
| 16   right to call you back.  But as I said, for now I | 16      A.   Okay. |
| 17   finished, and I thank you very much for your time. | 17      Q.   When we first -- when you first started speaking |
| 18       MS. WIENEKE:  I have a few. | 18   with David you had talked about health and safety of the |
| 19       MR. FATHI:  Ms. Alewelt has some questions. | 19   inmates as it relates to the mental healthcare, and you |
| 20       MS. ALEWELT:  Do you need a break?  I don't have | 20   testified that you felt that it's safe from a health and |
| 21   a ton of questions for you, but I see it's been a long day | 21   safety perspective. |
| 22   and it's warm in here.  If you need a few minutes before | 22       Does that sound correct? |
| 23   we start again, that's fine. | 23       Was there -- |
| 24       MS. WIENEKE:  Can we just take five minutes? | 24       MR. FATHI:  Excuse me.  Was there an answer? |
| 25       MS. ALEWELT:  Yes. | 25 |

61  (Pages 238 to 241)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

| Page 242 | Page 243 |
|---|---|

**Page 242**

1  BY MS. ALEWELT:
2      Q.  I'm sorry.  You looked confused, so I was going
3  to give you more background about what I was specifically
4  referring to.
5          It was about the time that we were talking about
6  the memo that you wrote regarding deficiencies.
7      A.  Psychiatry?
8      Q.  Correct.  It's No. 19.  It's the Department of
9  Corrections memo regarding what you saw as current
10  deficiencies in psychiatry staffing.
11      A.  Yes.
12      Q.  And David had asked you if you thought that that
13  had been resolved, and you said that you felt it was no --
14  that it's safe, at a safe level; is that correct?
15      MS. WIENEKE:  Form.
16      THE WITNESS:  Let me answer that more fully.
17      There are two levels.
18  BY MS. ALEWELT:
19      Q.  Right.
20      A.  Okay.  One is the safe level, and one is the
21  contractual obligations that Wexford has obligated itself
22  to.
23      Q.  Okay.
24      A.  The level that they currently have can probably
25  be characterized as safe, but it doesn't meet the

**Page 243**

1  obligations that they took on with this contract, which we
2  wrote in a very specific way to provide very close
3  coverage.
4          So the safety needs are a low bar.  The needs
5  that Wexford has to address to fill this contract are a
6  high bar.
7      Q.  Okay.
8      A.  So we are still encouraging Wexford to move
9  forward into this next level.
10      Q.  Would you say that the low bar of safety
11  thresholds also aligns with the clinical thresholds of
12  what appropriate care would be?  Is that sort of how you
13  set that bar, or is that --
14      MS. WIENEKE:  Form and foundation.
15      THE WITNESS:  I think it sets with the bar of, is
16  there a minimal level of care available to the inmates
17  that allows them to maintain their mental health?  That is
18  a low bar, and I think that is being met.
19  BY MS. ALEWELT:
20      Q.  You mentioned that when you were drafting the
21  contractual requirements for staffing for Wexford you
22  wrote it in a specific way.
23      A.  That's correct.
24      Q.  How did you determine what the staffing needs for
25  the department were?

| Page 244 | Page 245 |
|---|---|

**Page 244**

1      A.  We had really never talked about the staffing
2  needs.  You know, our approach was functions that had to
3  be accomplished.
4          So Wexford is responsible for having sufficient
5  staff to meet the functions that we specified.  If they
6  can do that with one person, that's fine.  If it takes
7  five persons, then that is what they have to provide.
8      Q.  So there aren't specific requirements that there
9  be, say, ten folks who are clinical psychologists?
10      A.  Not from our department.  We have established
11  performance standards that they have to meet, and those
12  standards have to be met.  And whatever staff it takes to
13  meet those, Wexford has to provide.
14          Wexford has a proposed staffing which may or may
15  not be adequate to meet all of the standards -- or all the
16  performance standards that they are obligated to meet.
17      Q.  Do they have to submit the proposed staffing to
18  the contract monitors, or is that something --
19      A.  The post staffing was in what they call the RFP,
20  the requests for proposal, and there was a proposed
21  staffing there.
22          Once they received the contract the RFP became
23  the contract, the request for proposal.
24      Q.  So then, I guess, technically there is an ADOC
25  requirement as to what appropriate staffing would be; is

**Page 245**

1  that correct?
2      MS. WIENEKE:  Object to the form, foundation.
3      THE WITNESS:  No.  It really depends on whether
4  they can perform the functions that they are obligated to
5  do.
6  BY MS. ALEWELT:
7      Q.  Okay.
8      A.  They obviously believe that this number of staff
9  would be necessary to meet them.  They may or may not be
10  correct.
11      Q.  Okay.  And that would be something that you would
12  determine as part of your review obligations?
13      A.  That is something we determine as part of our
14  reviews.
15      Q.  Okay.  Let's go back to the concept of psychiatry
16  staffing before.  I understand there are different folks
17  who can prescribe meds, and that is certainly a part of
18  mental health.
19          But there are two different type of folks.  You
20  said there is the psychiatrist and then the nurse
21  practitioners?
22      A.  That's right.
23      Q.  Can you explain a little bit, there must be
24  something that a psychiatrist can do that a nurse
25  practitioner cannot.  What, if you could, perhaps explain

62 (Pages 242 to 245)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 246

1    the difference between the two.
2        A.  I'm sure there are legal distinctions in terms of
3    assessments for court purposes, assessments for
4    court-ordered treatment, which we do routinely, what we
5    call PMRB, psychiatric medication review boards, which is
6    basically a process for giving involuntary medication, all
7    of those require psychiatrists.
8        The functions that do not require psychiatrists
9    are the ongoing evaluations and prescription of
10   psychotropic medications.
11       Q.  Would you say the main function then of the
12   psychiatric nurse practitioner is to prescribe
13   psychotropic medications?
14       A.  Their main purpose is to do basic mental health
15   assessments and prescribe psychotropic medications to
16   address the symptoms that they observe.
17       Q.  Okay.  Let me skip to another topic.  Let's talk
18   more about the serious mentally ill designation.
19       You mentioned that folks sometimes come in
20   with -- from the community with the SMI designation, and
21   I'm pretty familiar with that.
22       A.  Yes.
23       Q.  I don't know if you are aware, but in the
24   community the SMI designation affords that person some
25   additional assistance in certain types of settings.

Page 247

1        Are you familiar with that?
2        A.  I'm very well aware of that, yes.
3        Q.  I understand that ADC does their own assessment
4    in determining whether or not someone meets the SMI
5    criteria from their perspective.
6        Do they provide any additional assistance by way
7    of help with grievance processes or filling out HNRs to
8    folks that have the SMI designation?
9        A.  They provide some -- for instance, representation
10   at release boards.  SMIs may receive that.
11       There is a series of evaluation points prior to
12   release which go back, oh, I think as far back as
13   six months, where they are beginning to prepare that
14   person for release.
15       As far as other kinds of specific things like
16   assisting with HNRs, that would not necessarily be in
17   policy.  That might be done on a case-by-case basis.
18       Q.  Would someone be encouraged to help an SMI inmate
19   in completing a Help Needs Request or grievance?
20       A.  If he was unable to do that, yes.
21       Q.  But there is no specific policy that permits
22   someone to assist or require someone to assist?
23       A.  No.  But the SMI will have to have a treatment
24   plan, and there may be specific functions in that
25   treatment plan that will actually act as a driving policy

Page 248

1    for that particular person.
2        Q.  Okay.  Sort of along the lines of the treatment
3    plan, and we were talking about the difficult levels of
4    mental health classification, how does an individual move
5    among levels?  How do you change a classification?  For
6    instance, someone who is SMI is supposed to be evaluated
7    every 30 days, so that may change the nature of their
8    classification.  But what about someone who might be a
9    Mental Health Level 2 and may worsen or fluctuate?  How do
10   they move within?
11       MS. WIENEKE:  Form.
12       THE WITNESS:  Well, what would happen is that it
13   would take some kind of clinical event for that to occur.
14       So if a person was a Mental Health 2, that would
15   mean that he had been stable for a long period of time.
16   Now something might happen, you know, his mother might
17   die, or who knows, and he might begin to have more
18   trouble.  At that point his mental health score would
19   change.  He would go from an MH-2 to very likely an MH-3.
20       Then if he was not at a corridor facility, they
21   would have to reclassify him and move him somewhere where
22   more services are available.
23   BY MS. ALEWELT:
24       Q.  Does everyone with a mental health classification
25   have a treatment plan?

Page 249

1        A.  Everyone with a mental health classification of 3
2    has a treatment plan.
3        Q.  3, 4, or 5?
4        A.  3, 4, or 5.  But if you look at statistics, 4 and
5    5 are very infrequently used now.
6        We went through a long and painful discussion
7    about how we tried to change that, and that was for the
8    very reason that the 4 and 5 are actually classifications
9    that were used a long time ago but aren't really used much
10   anymore.
11       So really functionally we have MH-1, 2, and 3.
12   You have MH-3s, who are SMIs.  You have MH-3s who are
13   adjustment disorders.  MH-3 simply means you need mental
14   healthcare, and the level of care is really specified by
15   your treatment plan.
16       Q.  Okay.  So along those same lines, in the
17   PowerPoint presentation -- I can't recall which exhibit it
18   was -- our most recent exhibit, I believe, at page 25.
19       A.  25?  Okay, I have it.
20       Q.  You see under incentives it talks about three
21   different phases inmates, it looks like, receive some
22   sort of incentive?
23       A.  That's right.
24       Q.  Can you explain how one might move from Phase I
25   to Phase II?

63 (Pages 246 to 249)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 250

1    A.  Again, that is really dependent upon the person's
2  behavior and the level of stability on Phase I.  So if
3  they are outdoors, they seem to be recreating without real
4  problems, then they would go to a Phase II, where they
5  would have an additional person out there.
6    Again, you know, we looked at the one local
7  policy that one of our CO IIIs had put out.  That is very
8  typical of what the inmate is going to see in terms of,
9  here is what you have to do to move from phase to phase.
10   Q.  So it's very clear to them?
11   A.  Yes.  Actually that was -- that was a good
12  document in that it very clearly specified why the person
13  was there and what they have to do to move to a different
14  phase.
15   Q.  Alternatively, what kind of conduct would have
16  someone moving back a phase?  For example, would an
17  incident of self-harm, such as swallowing items, be
18  something that could cause a move back?
19   A.  That could be.  I mean, you would see that as a
20  sign of decreased behavioral stability.  Aggression
21  towards the people who are in your rec group would be
22  probably a reason to move you back.
23   Anything that shows a lessening of your behavior
24  and control is going to require us to take a closer look
25  at that point.

Page 251

1    Q.  And with these new ideas or concepts and some of
2  them being existing in this PowerPoint presentation, were
3  clinicians involved at all levels in determining how this
4  would --
5    A.  This is actually about as -- about as close to a
6  mental health operations shared program as we have -- I
7  have ever seen.  I mean, we really had both components
8  working on how does this work for us, what do we have to
9  do to make it work.
10   Q.  Let's see, what else.
11   Oh, on page 16 of that same document, while we
12  are there, can you help me understand what this graph is?
13  It's page 16, and it's entitled "Statistical Information
14  and Future Plans/Activities, Disciplinary Self-harm."
15   What does that mean?
16   A.  Okay.  This really is just a graphic display
17  of -- let me make sure I'm reading this right.
18   This just shows how each of these particular
19  factors have been impacted over the last three months in
20  these specialized units.
21   Q.  What does disciplinary self-harm mean?
22   A.  Disciplinary self-harm -- where do you see that?
23   Q.  That's at the top.
24   A.  I think that be two different phases.  You
25  see where it has self-assault on staff, other major

Page 252

1  violations, minor violations, which are disciplinary types
2  of instances.
3    If you look at the next page, you see the
4  self-harm statistics.
5    Q.  So this -- you're saying this one graph is just
6  disciplinary?
7    A.  That's correct.
8    Q.  And this second page, 17 --
9    A.  Is self-harm.
10   Q.  Okay.  So it's just mis-marked?
11   A.  Yeah.  That really should be a slash or somehow
12  separate those so that you know it's not just one single
13  title.
14   Q.  Okay.
15   A.  Actually, you probably should have put self-harm
16  and put it on the next page.
17   Q.  Okay.  So this then first page on 16 reflects
18  just disciplinary actions over that time frame?
19   A.  Right.
20   Q.  And what does other major violations include, if
21  you know?
22   A.  Refusing orders -- well, I don't want to
23  speculate.
24   Q.  Sure.
25   A.  I mean, a number of different violations that

Page 253

1  they would consider a major violation.  It's really a
2  disciplinary term, and it can cover a lot of different
3  kinds of acts.
4    Q.  Okay.  Thank you for clarifying.  I was confused
5  about that.
6    Let's talk a little bit more about staffing.
7    So you had -- we have gone through in great
8  detail all of the vacancies that may or may not be
9  existing at this time.
10   What I want to know is, what do you do when there
11  are those absences, assuming that each of those positions
12  is somehow necessary to the provision of mental health
13  healthcare?  Are there on-call folks?  You mentioned locum
14  tenens sometimes an option.
15   MS. WIENEKE:  Object to the form and foundation.
16   THE WITNESS:  That certainly is true for the
17  psychiatrists and nurse practitioners.
18   For other kinds of things, like the psychology
19  and psych associate staff, if -- you have to decide what
20  kinds of work tasks you will perform, and you triage that
21  in terms of, do you do a group, or is it necessary to do
22  some additional individual counseling.  Can you do a
23  group?  You look to see what can you do to deliver
24  adequate mental health services knowing that you don't
25  have another person, in theory, like you would like to

64  (Pages 250 to 253)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 254

1  have.
2     Q.  You mentioned maybe switching a group option to
3  an individual counselor position or vice-versa.
4        Does that then sometimes obligate you to deviate
5  from that prisoner's treatment plan, if you are unable to
6  provide the services that are in the individual's
7  treatment plan?
8     MS. WIENEKE:  Object to the form.
9     THE WITNESS:  You'd have to look through the
10  plan.  That's probably one of the key issues in terms of
11  what you do do.  You know, what does the treatment plan
12  demand, and you want to meet those obligations.
13  BY MS. ALEWELT:
14     Q.  Okay.  Let's see.  If a person comes in with
15  existing mental health needs that you are aware of, how
16  soon is it before they have an existing treatment plan
17  with the DOC?
18     MS. WIENEKE:  Form.
19     THE WITNESS:  Well, let me -- let me go back a
20  little bit.
21        If a person comes in, he will have an initial
22  evaluation within the first two days.  It will document
23  history, observed functioning, lots of different kinds of
24  issues that might relate to his service needs, history of
25  suicide, history of severe illicit substance abuse,

Page 255

1  history of sexual molestation, a whole lot of things that
2  will help the treatment unit who reviews it to go, okay,
3  here's the guy we need to see right away, we need a
4  treatment plan.  It assists them in deciding how long that
5  takes.
6        If he is an SMI, it has to be done within the
7  first 30 days.  Non-SMI, it's going to have to be done
8  when the treatment team actually sees him, which is
9  usually within the first 90 days.
10     Q.  In that first evaluation you were talking about,
11  sounds sort of like an intake evaluation?
12     A.  It's an intake evaluation.
13     Q.  Who conducts that?
14     A.  That's done by psych associates at Phoenix Unit
15  as part of the initial intake process.
16     Q.  For all prisoners?
17     A.  For every single person that comes through.
18     Q.  I'm sorry.  I want to make sure I am clear on
19  that.
20        So if the psych associate does the evaluation and
21  says, I think this person needs mental health treatment,
22  if it's -- is that when the SMI -- I guess, let me think
23  about how to word this.
24        If the person did not enter DOC with existing
25  mental health issues, how often after a psych associate

Page 256

1  says this individual needs mental healthcare, is that
2  person seen?
3     A.  Okay.  Well, that person -- the purpose of the
4  initial evaluation is to assign the mental health score.
5  So if the psych associate sees the person has existing
6  needs and make them an MH-3, then the person will go to
7  the -- the unit will review that file, and then that
8  person will have to be seen either by psychiatry or by
9  psychology staff, depending on the needs addressed in
10  that.
11        Psychology staff, it's usually within the first
12  45 days.  If there's a mental health need for psychiatry
13  or psych associates, usually faster than that.
14        And the key thing that drives that is when does
15  the medication expire?  The person has to be seen prior to
16  that, and the longest it can be prescribed at the intake
17  unit is 45 days.  So they have to see them within that
18  time period.
19     Q.  Okay.  Does -- you had mentioned that DOC can do
20  their own SMI evaluation?
21     A.  Yes.
22     Q.  And give someone that designation?
23     A.  That's right.
24     Q.  Would that be something that would also be done
25  during this intake?

Page 257

1     A.  No.  The intake is really a point in time,
2  relatively brief assessment of what they need in terms of
3  mental health services.  So a more extensive evaluation,
4  like an SMI evaluation, would have to be done by the
5  treatment team at the unit.
6     Q.  And does the treatment team make the
7  recommendation that that needs to be done, or how does the
8  SMI evaluation work in DOC?
9     A.  The treatment team will assess the inmate.  If he
10  appears to have mental health problems and meet that
11  criteria, then they would do that SMI determination.  If
12  you met that criteria, they would become an SMI in DOC.
13     Q.  And can the inmate ask for an SMI evaluation?
14     A.  They can.
15     Q.  Do they automatically get one, or is that another
16  determination that is made?
17     A.  No, they would automatically get one.  I think it
18  would depend on the team's assessment of what this
19  person's motivation is or what kind of problems they
20  present in addition to that.
21     Q.  Do you ever reevaluate the SMI designation that
22  DOC gives, or as soon as it's given, is it something that
23  remains with the individual so long as they are there?
24     A.  No, it could be redone.
25     Q.  Okay.  I want to go back to, if we can, the

65 (Pages 254 to 257)

## Page 258

1    Exhibit 22, which is something we talked about earlier.
2       Did you find that one?
3       MR. FATHI: You have two different --
4       MS. ALEWELT: I'm sorry. This must be the wrong
5    one then. I had marked this 22. I guess not.
6       THE WITNESS: Is that the one you want to speak
7    about?
8       MS. ALEWELT: Yes, the September 21, 2012 letter.
9    My apologies.
10      Oh, you know what? This says 21. It's probably
11   22. Sorry, David. This is clearly marked 21.
12   BY MS. ALEWELT:
13     Q. Okay. We had talked about a couple things sort
14   of related to that. You had mentioned, after we spoke
15   about this, some concerns that Dr. Valenzuela had
16   regarding the delivery of mental healthcare. And you
17   mentioned one issue related to an off-formulary medication
18   that we talked about a little bit, sounded like an
19   off-formulary medication.
20     Dr. Valenzuela, you had indicated, was concerned
21   about someone at the Lewis unit who was -- does that --
22     A. She was concerned in that the inmate appeared to
23   be deteriorating relatively rapidly and there was no PMRB
24   or no steps taken at Lewis to begin treatment at that
25   time.

## Page 259

1      He was on a watch. He had been referred to the
2   treatment center, and I think Lewis staff was thinking,
3   oh, he will go any day, and it took about a week, maybe a
4   little bit longer, for him to go. I think Dr. Valenzuela
5   was saying, look, we need to address those kinds of things
6   at the unit while he is waiting.
7     Q. Okay. And that's then also what you were
8   referencing as it relates to the forced medication issue;
9   is that correct? You had mentioned the PMRB, which is --
10     A. PMRB is forced medication.
11     Q. Okay. I just wanted to make sure. You had
12   mentioned that there was an issue of forced medication,
13   and I just wanted to make sure that that wasn't something
14   separate and apart from what you were discussing earlier
15   to --
16     A. Her other issue was that we had a person there on
17   PMRB, and she was thinking we were doing a series of
18   emergency medication when, in fact, it was ongoing PMRB
19   treatment.
20     Q. Okay. And additionally we talked about some
21   specifics regarding a prisoner that was referenced who had
22   hung himself, and I would like to know the name of that
23   prisoner, if you know?
24     A. No.
25     MS. WIENEKE: No.

## Page 260

1      MS. ALEWELT: I guess I would like to know why we
2   can't know that.
3      MS. WIENEKE: We can -- we can discuss this at
4   another time. You can ask him about the details, and then
5   we can have a discussion about that. But knowing that
6   inmate's name at this time is not going to interfere with
7   your ability to get information about that, so you can
8   continue to question Dr. Shaw about that incident and take
9   advantage of the time you have remaining on this
10   deposition.
11     MS. ALEWELT: We will take a break, then. I'm
12   sorry. If you will, take a moment.
13     (A recess was taken from 5:00 p.m. until
14   5:03 p.m.)
15     MS. ALEWELT: Before we ask specific questions
16   about that, I just want to be clear about what the basis
17   of the objection is.
18     MS. WIENEKE: If you can show me in the
19   protective order how you are entitled to that information,
20   then I'm happy to look at it. But under -- in this
21   setting under this record I don't believe that you are
22   entitled to that information. I don't have a release from
23   the family. I don't have -- I mean, from the inmate since
24   he did survive, for that information.
25     You guys have claimed that you have 550 releases.

## Page 261

1   You haven't given us a single one of them, even though we
2   asked for them, so...
3     MS. ALEWELT: Our position is that we don't
4   require releases for what we are asking for. And I think
5   the protective order somewhat reflects that because it
6   infers that we will receive information that other folks
7   will not.
8     So I guess if we need to go to the court for
9   clarification on this, and you are now saying that we
10   require release forms, then that seems inconsistent with
11   the court's understanding of what we can get, because the
12   provision provides that we receive information and then
13   releases can be obtained before we release the information
14   to the counsel for other parties.
15     So I just want to be clear about --
16     MS. WIENEKE: The problem is, we are sitting here
17   in a deposition and in an open forum where the other
18   plaintiffs' counsel is sitting and would have complete
19   access to that information as you are questioning
20   Dr. Shaw. That's the problem. I don't believe that the
21   protective order contemplates that.
22     MS. ALEWELT: I don't think so either.
23     MS. WIENEKE: So that's why I'm suggesting that
24   you ask the questions, and if we can reach an arrangement
25   where we could provide you -- you know, we can have a

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 262

1  discussion outside of the other plaintiffs' counsel and we
2  can discuss that and how we can accommodate that, we can
3  have that discussion.
4      But there's nothing preventing you from asking
5  questions about the information that's in the letter
6  without identifying the name, and then we can have that
7  discussion later.
8      MS. ALEWELT:  Are you saying that then you're not
9  giving us -- you are not answering these questions now
10 because it's not related to the protective order?  I just
11 want to make sure I'm clear on what the objection is.
12     MS. WIENEKE:  No.  No.  The only thing I
13 prevented Dr. Shaw from answering is providing the
14 identity --
15     MS. ALEWELT:  Right.
16     MS. WIENEKE:  -- of the inmate in that letter,
17 but I'm not preventing anybody from asking any questions
18 about the incident.
19     MS. ALEWELT:  I guess -- I'm sorry.  Maybe I was
20 not as clear as I meant to be.  I just meant to say, what
21 is the basis for your objection and asking him not to
22 answer the question as it relates to the name?  Is it
23 because of privilege?  Is it because --
24     MS. WIENEKE:  Because of confidentiality and
25 because of the protective order, because while it may be

Page 263

1  possible that your client is entitled to the information,
2  Mr. Fathi's clients are not entitled to the information,
3  so I can't disclose it in this forum.  But it does not
4  foreclose you from asking all the questions you want
5  absent the identity of the person about the incident.
6      MS. ALEWELT:  Okay.
7      MR. FATHI:  If I leave the room, will you allow
8  her to ask the identity of the individual?
9      MS. WIENEKE:  No.  You are live streaming to all
10 those people who have access to this.  It's not going to
11 solve the problem.
12     MR. FATHI:  I don't know what you're talking
13 about, the live streaming.
14     MS. WIENEKE:  You are realtiming this court
15 reporter's record to whoever may have access to it.
16 That's not going to solve the problem.
17     MR. FATHI:  No.  We are not live streaming to
18 anyone.
19     MS. WIENEKE:  It's -- I misstated by saying live
20 streaming.  It's realtiming to whoever wants to plug in at
21 any time; right?
22     MR. FATHI:  No, we are not realtiming or live
23 streaming or anything.
24     I want to be clear.  If I leave the room, you
25 will nevertheless instruct the witness not to answer

Page 264

1  Ms. Alewelt's question?
2      MS. WIENEKE:  That's correct.
3      And for clarification, Kate, did you not tell
4  me --
5      THE COURT REPORTER:  Can I go off the record?
6      MS. WIENEKE:  No, I need this on the record.
7      Did you not tell me at the beginning of this
8  deposition that you were realtiming this record?
9      THE COURT REPORTER:  I cannot type and answer at
10 the same time, so let me answer.
11     (Off the record.)
12     MR. FATHI:  Is it still your position that even
13 if I leave the room, you will instruct the witness not to
14 answer Ms. Alewelt's question asked in her capacity as
15 counsel for the Arizona Center For Disability Law?
16     MS. WIENEKE:  Even if you leave the room, I will
17 instruct this witness not to provide the identity of the
18 inmate that is referenced in the letter, but any and all
19 questions can be asked about the circumstances in that
20 letter, the same option that was available to you
21 throughout the deposition and the same option that's
22 available to Jennifer in asking all the questions she
23 wants about that incident.
24 BY MS. ALEWELT:
25     Q.  Let's talk about this guy without talking about

Page 265

1  this guy.
2      A.  Okay.  Well, okay.
3      Q.  So I'm referencing the letter.  We found this;
4  right?
5      A.  The --
6      Q.  The September 21, 2012 Arizona Department of
7  Corrections letter?
8      A.  Yes.
9      Q.  There in that letter talks about an inmate who
10 was found hanging from a sheet.
11     Are you familiar with that individual case?
12     A.  Yes.
13     Q.  Okay.  It looks like from this letter this
14 individual hadn't received his psychotropic medication for
15 several days; is that correct?
16     A.  That is correct.
17     Q.  Is that something that happens regularly?
18     A.  No.
19     Q.  What kind of frequency does this delay occur, or
20 with what kind of frequency?
21     MS. WIENEKE:  Form and foundation.
22     THE WITNESS:  It's a rare occurrence.  I don't
23 know how often that occurs.
24     Again, this was during the period of time when
25 Wexford was kind of reestablishing their process for

67 (Pages 262 to 265)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 266

1    identifying inmates who need medication, and I think this
2    was one of the guys that got -- this is one of the
3    consequences of that.
4    BY MS. ALEWELT:
5        Q.   Were there other consequences to that change that
6    may not be itemized here?
7        A.   As we discussed earlier, there were inmates who
8    we know medications may have lapsed.  So there were not
9    dire consequences but certainly having the inmates not
10   having their medication was a situation that we didn't
11   want to continue.
12       Q.   If an inmate during that time period filled out
13   an HNR requesting medications, for example, would that
14   have been triaged as an expedited request?
15           MS. WIENEKE:  Form and foundation.
16           THE WITNESS:  It would not have been triaged.  I
17   don't know what the specific consequence of that would be,
18   whether he would be seen, whether his medication would
19   have been renewed.  That would have been one possible way
20   to communicate to say this was a problem.
21   BY MS. ALEWELT:
22       Q.   And do you know if this individual is now
23   receiving adequate --
24       A.   The individual -- if it's the individual I
25   believe, yes, he is receiving medication.

Page 267

1        Q.   Okay.  And to jump back to the individual that
2    Dr. Valenzuela was trying --
3            To be clear, was Dr. Valenzuela attempting to go
4    get a court order to medicate this individual?
5        A.   No.  Dr. Valenzuela is one of our unit monitors.
6    She is not a psychiatrist or psychologist.  She is one of
7    the department's monitors, and her function is to watch
8    cases and to watch other areas that may show problems or
9    if she believes might be problematic and raise those
10   issues.
11       Q.   So was her concern, related to the forced
12   medication piece, related to an isolated incident?
13       A.   It was related to a specific person.
14       Q.   Can you tell me more about what the facts were
15   with that particular individual?  Why -- I guess -- I
16   guess I'm sort of seeing this as an attempt to have
17   someone comply with medication, so I'm a bit confused
18   about that.
19       A.   I think Dr. Valenzuela saw several episodes where
20   the person was actually forced to take medications.  And
21   if it's an emergency, there's a specific policy or
22   procedure that has to be followed, both in the law and in
23   NCCHC standards.
24           What I don't think she realized at that time was
25   that the person had already undergone a PMRB, and that he

Page 268

1    could not at that point refuse medication.  Medication had
2    been found to be in his best interest, and he had to
3    comply.
4        Q.   Is he currently under court order?
5        A.   He -- the PMRB has the same force as a court
6    order.
7        Q.   And you know who he is?
8        A.   Yes, I know who he is.
9        Q.   Can you tell me his name?
10           MS. WIENEKE:  No.
11           MS. ALEWELT:  That's fine.
12           MR. FATHI:  Is there an instruction not to
13   answer?
14           MS. WIENEKE:  Yes.
15   BY MS. ALEWELT:
16       Q.   So you mentioned that one of the differences
17   between a psych nurse and a psychiatrist is the exciting
18   role of being able to complete the court-ordered
19   evaluation.
20           Is that all being done now by a Wexford
21   clinician, or are there ADOC folks still conducting those?
22       A.   No.  All medical services are being delivered by
23   Wexford staff.
24       Q.   Okay.  That means they also do the P -- is it
25   PSRB?

Page 269

1        A.   PMRB.
2        Q.   PMRB.
3        A.   Prescribed Medication Review Board.
4        Q.   Okay.
5        A.   Yes.  Those are all Wexford employees.
6        Q.   Okay.  Now, you mentioned that some of the -- I'm
7    sorry.  I'm jumping all over the place -- you mentioned
8    that some of the levels of mental health classifications
9    are somewhat extinct, mainly 5 and 4, but it looks like,
10   according to this blue and white document, that there are
11   still at least 200 people that are classified as mental
12   health level 4.
13           What does that mean, and why are they still in
14   that classification?
15       A.   That means probably at one point in time they
16   were in the treatment center or in some kind of inpatient
17   facility, and when they returned to the unit, the unit
18   failed to redo their score.  And it may have been
19   five years ago, six years ago.  We don't know.
20           But it's not routinely done anymore.  If the
21   person comes to the treatment center, his MH score will
22   not be raised.  He will remain a 3.
23       Q.   So 3 is your most acute person, but also --
24       A.   3 is a general category saying this person is
25   receiving mental health services.

68  (Pages 266 to 269)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 270

1    Q.  Okay.
2    A.  He may be in need of very acute services, or he
3  may be requiring relatively minor services, but he is
4  still an MH-3.
5    Q.  Okay.  So is there any requirement or plan to
6  move everyone out of those MH-4 categories?
7    A.  Well, you know, as we got caught in the problem
8  before, we attempted to do that with the new technical
9  manual, to make truncated scores so that we didn't have
10  these guys going across the board.  But since we also have
11  to dovetail with the classification services, it was
12  necessary to continue the five levels of mental health
13  scores even though they are not informative anymore.
14    Q.  Okay.  When the contract monitors are reviewing
15  whether or not Wexford has sufficient staffing to provide
16  the mental health services that it ought to provide or
17  needs to provide by contract, how do the contract monitors
18  evaluate it?  And let me give you some examples of sort of
19  what I'm thinking.
20    Are they looking at how many -- you mentioned
21  there are between 8 and 9,000 persons in ADOC with mental
22  health issues.
23    Is that something that comes into play?  How do
24  you figure out if their staffing needs are meeting the
25  contract requirements for service provision?

Page 271

1    MS. WIENEKE:  Object to the form.
2    THE WITNESS:  What is going to be done, and as a
3  rule, is we will review cases and see are they meeting the
4  standards in these cases.  And that will give us data to
5  know is the staff that currently is there sufficient, or
6  are there gaps in services, or are there indications that
7  the treatment level that is specified in the contract not
8  being met.
9    So if that's the case, then they receive a
10  negative feedback on the MGAR, M-G-A-R, that we talked
11  about earlier.
12    Q.  The one with colors in it?
13    A.  Yeah.  Green meaning everything is okay.  Yellow
14  means there is a problem.  Red means there is some big
15  problems.
16    So if the Wexford unit manager gets a report back
17  with a lot of red assessments, then they know there is
18  some serious problems in those areas.
19    Q.  How soon after they're notified are they required
20  to fix those deficiencies?
21    A.  They will be asked to do a plan of correction on
22  those areas.  That plan will be submitted to the ADC
23  monitor.  They will decide if that plan is adequate to
24  meet the deficits that they observed, and then that plan
25  will become part of the monitoring program, if it's

Page 272

1  accepted, when it's accepted.
2    Q.  And how frequently -- and you may have answered
3  this, and my apologies -- how frequently are the GARs
4  conducted?
5    A.  Monthly.
6    Q.  Okay.  So, for example, in the memo where you had
7  referred specifically to some deficiencies in psychiatry
8  staffing, was that something that was reflected in the GAR
9  for the month of August?
10    A.  The GAR for, let's say the month of September,
11  which was when we first began using it, would require us
12  to go through the chart.  For instance, one of the
13  requirements for Wexford is that the inmate be seen face
14  to face by the psychologist every 90 days.  Are the files
15  that we are looking at reflecting that?
16    It's also obligated to have the psych nurses see
17  the inmate every month.  Is that being done?
18    If that -- those things aren't being done, then
19  those issues become red areas in the GAR, and the units
20  that are involved have to find a way to address those or
21  have to provide a plan as to how they are going to address
22  those.
23    Q.  As contract monitor, do you have any capability
24  to go in yourself and provide any of those services?
25    A.  No.  We can't.  We cannot provide direct

Page 273

1  services.
2    Q.  Okay.
3    A.  It's tempting, but we cannot do that.
4    Q.  Sure.
5    We had talked earlier -- and I just want to make
6  sure I'm clear about it -- how people are seen after that
7  intake process.  We have sort of three categories of
8  people:  People that have an SMI designation when they
9  arrive at DOC, people that might have existing mental
10  health needs that you know of when they get there, and
11  then other folks who you may identify have mental health
12  needs later.
13    I'm just trying to figure out, if I were one of
14  those three people, how long would it be when I arrive
15  until I see someone?
16    A.  If you are an SMI or if the unit terms you as
17  SMI, the unit has 30 days to develop your treatment plan,
18  which means you will be seen within those 30 days and
19  really should participate in the treatment plan process
20  within 30 days.
21    If you are an MH-3 on medication, you are going
22  to be seen by the psychiatrist within 45 days, and at that
23  point the plan will be -- will be developed as a result of
24  that evaluation process.
25    Q.  So what if I'm just a regular Joe who comes in

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 274

1   who may have a boatload of mental health issues, none of
2   which have been diagnosed?  It sounds like that is
3   something that could be picked up in the intake.  How soon
4   will you see me?
5       A.  If you have a boatload of mental health problems
6   and we make you an MH-3, your chart will be reviewed by
7   the treatment team when you arrived at the facility, and
8   they will decide what schedule you will be put on.
9       Do you need to be scheduled to see a
10  psychiatrist?  Can you be seen by one of the psych
11  associates first?  What do you do initially?
12      Q.  Do you prescribe any -- or are there any
13  medications prescribed as a result of that intake process
14  for folks who did not previously have psychotropic
15  medications?
16      A.  It's possible to do, but that's usually done on
17  an emergency basis.  If an inmate comes in who's on
18  ongoing medication, those medications are continued.
19      If the inmate says, I was on Paxil two years ago,
20  probably they will have to wait until they see the
21  psychiatrist at the unit.
22      Because at the intake facility, time is short.
23  They move through very fast.  So to do a real psychiatric
24  evaluation is not very feasible, unless it's an emergency
25  situation and the guy's obviously got some acute problem.

Page 275

1   In that case they will be kept at the intake facility
2   until they decide what really does he need, does he need
3   to be referred to the inpatient program?  Can he be
4   stabilized and sent to the unit?
5       Q.  What about -- let me think about how I want to
6   word this.
7       If someone arrives and they are their own
8   historian and indicate that they are on a specific
9   medication, are -- strike that.
10      Are there specific medications that have to be
11  prescribed within ADOC, or are there specific medications
12  that are excluded from being provided at ADOC?
13      A.  There are specific medications that are not on
14  the formulary; however, at intake if a person comes in
15  from Maricopa County or Pima County on a specific
16  medication, that medication will be continued until they
17  are seen by their unit prescriber.
18      Q.  Even if it's off formulary?
19      A.  Even if it's off formulary.
20      Q.  That was the question that I was eventually going
21  to get out.  So thank you for knowing what I meant.
22      How long will the off-formulary medication be
23  continued?  Until they can be seen?
24      A.  That's right.
25      Q.  Okay.

Page 276

1       A.  And the prescriber has the option then of
2   requesting that medication continue, or then have the
3   option of trying them on a new medication.
4       Q.  Are there any policies regarding whether someone
5   has to attempt an on-formulary medication before they are
6   able to get an off-formulary alternative?
7       A.  You know, I can't answer that now because Wexford
8   has different rules than we have.  Wexford has a normal
9   formulary procedure, but I'm not certain exactly what
10  kinds of preliminary medications they have to take.
11      Q.  If you saw that their non-formulary procedure was
12  becoming problematic, are you authorized as contract
13  manager to tell them to modify it?
14      MS. WIENEKE:  Form.
15      THE WITNESS:  We have the option to raise that as
16  a GAR issue and make them -- make them show that their
17  process is good therapeutic practice.
18      We don't have -- well, in specific cases we still
19  maintain the option to direct service, not do direct
20  service, but state to them, no, you will do this.  But
21  again, we would have to have a very good reason to do
22  that.
23  BY MS. ALEWELT:
24      Q.  You mentioned that one of the results of the GAR
25  could be a corrective action plan.

Page 277

1       Is there anything else that you can do as
2   contract manager to encourage Wexford to adhere to their
3   requirements?
4       A.  Well, the corrective action plan is really the
5   vehicle of doing that.  I mean, we can encourage them,
6   but, you know, that really doesn't have the weight of a
7   written instruction to say this is the problem, we have
8   identified it, and we need you to tell us how you will
9   address it.
10      Q.  Okay.  So if a person requires an inpatient
11  setting, you can provide that?
12      A.  Yes, we can.
13      Q.  How is a person transferred between levels of
14  care?  For example, how -- I guess, how do you
15  ascertain -- we were talking about this a little bit
16  earlier, about someone who was on isolation and on suicide
17  watch, and how it's likely if they got worse they would
18  require inpatient care.
19      A.  That's right.
20      Q.  There are other things that might spawn inpatient
21  care also?
22      A.  Absolutely.
23      Q.  How do you identify those folks?
24      A.  Those are identified by the unit treatment teams.
25  So again, they will keep track of a person's level of

70  (Pages 274 to 277)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 278

1  functioning. If they become more symptomatic, if their
2  behavior becomes more stable, they begin hurting
3  themselves and they can't really stop that or they can't
4  find ways of addressing those things.
5      It's really much like in the community, if the
6  person's mental status deteriorates to the point where
7  they can't function in an open setting or in an -- any
8  kind of a non-inpatient setting, then they are transferred
9  to one of our units in Phoenix.
10  Q.  Okay.  When we were talking about the number of
11  inpatient beds that DOC has, you had mentioned there are
12  23 for the ladies.
13      And I was wondering, have there ever been
14  occasions where somewhere required an inpatient setting
15  but perhaps there was not that feasibility to move them
16  there due to the double-cell issue you had mentioned?
17  A.  Not usually.  Typically what will happen is, if a
18  referral comes in from Perryville, which that requires a
19  specific kind of case, the treatment team on George will
20  make some adjustments --
21      THE COURT REPORTER:  On?
22      THE WITNESS:  On George Ward, which is the
23  women's treatment ward, to accommodate that person's need.
24  So that woman might have to wait two or three or four days
25  before that housing situation be arranged, but it will be

Page 279

1  arranged, and she will be brought in.
2  BY MS. ALEWELT:
3  Q.  Is there some kind of bridge care that is
4  provided to her that is like the inpatient setting before
5  she moves there?
6  A.  Well, usually she will be on some kind of a watch
7  setting at the unit that she is in, so they will at least
8  provide for her safety needs.  She will be offered
9  medication, if that is appropriate.
10      So it will be a level of care that provides
11  safety, provides minimum level of treatment, but it may
12  not be consistent with an inpatient program.
13      MS. ALEWELT:  Okay.  I think that is about all
14  the questions I had, unless you want to stop for a second
15  and give us one more break.  I am almost done.  You are at
16  the end stretch here.
17      (A recess was taken from 5:28 p.m. until
18  5:29 p.m.)
19  BY MS. ALEWELT:
20  Q.  Just a couple more questions, and I'm all through
21  here.
22      So we talked about the different thresholds of if
23  I'm the guy that comes into the intake and how soon I'll
24  be seen.  I guess we talked about in practice how that
25  functions.

Page 280

1      Is that written down somewhere, where if you -- I
2  mean, I know we talked about if you are SMI, you are seen
3  within 30 days.  Is there something written somewhere that
4  indicates if you are on meds, you are seen within 45?  How
5  do we know how that functions?
6  A.  There is a policy that your medication has to be
7  renewed.  It has to be a face-to-face contact.  So within
8  the time frame between when that medication was prescribed
9  and when it ends, you have to be seen; otherwise, your
10  meds expire, and then we have to do some kind of emergency
11  thing, and then you still have to be seen.
12  Q.  So the policy that allows the folks who come in
13  who are not SMI designated, who are MH-3, we are saying
14  that the reason they are seen within 45 days is because of
15  the medication policy?
16  A.  Right.  They may be seen before that.
17  Q.  Sure.
18  A.  But they can't be seen after that.
19  Q.  So that's the --
20  A.  That's the window.
21  Q.  -- that where you're getting the threshold for.
22      Okay.  And if I'm the guy that comes in with no
23  history of mental health concerns but it's clear that I
24  have some, is there anything that says how soon I'm
25  evaluated for a treatment plan to address those needs?

Page 281

1  A.  If you come in -- how can I say this -- if you
2  come in and you have obvious mental health problems, even
3  saying you are fine, that's probably one of the people
4  that will be seen by the psychiatrist at the intake
5  facility.
6      You know, we talked about the Quiet Ward.  You
7  will probably be put on the Quiet Ward and seen by the
8  treatment team up there.
9      If they put you on medication, then you will go
10  on the 45-day schedule.
11  Q.  So there's nothing in writing that says when you
12  will see me.  It's just a matter of what my needs are
13  based on when I arrive?
14  A.  That's right.
15  Q.  Okay.  So my SMI folks are seen within 30 days by
16  policy.
17      My MH-3 folks are seen, if they are on
18  medication, 45 days.  If they are not on medication, how
19  soon is it before you see the MH-3 guys?
20  A.  That's going to be determined by the unit when
21  they do the mental health record review.
22  Q.  Okay.
23  A.  And it would -- it's so very rare that the person
24  has significant mental health problems but aren't being
25  treated by psychiatry.

71 (Pages 278 to 281)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 282

1    Q.  Right.
2    A.  It's possible, but it happens very infrequently.
3    Q.  You never know; right?
4    A.  Yeah.
5    Q.  Going back to the GARs quickly, you mentioned
6    that something -- that the August 13th memo you wrote that
7    that would be something that would likely be contained in
8    the September GAR.
9          When was the first time that you issued a GAR to
10   Wexford?
11   A.  Well, this month we'll be issuing a GAR.
12   Actually, it's a --
13   THE COURT REPORTER:  Sorry.  Actually?
14   THE WITNESS:  Actually, this month of September
15   was the first time we actually utilized a GAR.  We were
16   utilizing memos, such as that prior to this.
17   BY MS. ALEWELT:
18   Q.  Okay.  Was the GAR, that something that developed
19   after the contract was finalized, or was that --
20   A.  The GAR is based on an instrument that had been
21   used by the monitors for the private facilities for some
22   time.  And that type of instrument has been revamped so
23   that we are using it in health services.
24        So it's a new instrument, but kind of based on a
25   similar instrument that has been used in contract

Page 283

1    monitoring in the private facilities.
2    Q.  And you didn't use it in prior months just
3    because why?
4    A.  We just kind of -- it's new.  We just kind of
5    have been working it up.
6    Q.  Okay.
7    A.  So it's a work in progress.  We have been using
8    memos prior to that.  Now we're ready to use the GAR.
9    MS. ALEWELT:  Okay.  And, of course, we would
10   request those whenever they are completed.
11   BY MS. ALEWELT:
12   Q.  So that's now something that's going to become an
13   every-month thing, the GAR?
14   A.  An every-month thing.
15   MS. ALEWELT:  Okay.  Now I really do think that
16   concludes my questions.
17   THE WITNESS:  Okay.
18   MS. ALEWELT:  Thank you so much, Dr. Shaw.
19   MR. FATHI:  Can we get a time check before?
20   (Discussion off the record.)
21
22        EXAMINATION
23   BY MS. WIENEKE:
24   Q.  Dr. Shaw, Exhibit 33 is the PowerPoint
25   presentation which discusses the enhanced treatment

Page 284

1    programs; correct?
2    A.  Correct.
3    Q.  And you also discussed in the deposition today
4    with counsel the enhanced treatment programs at the
5    various facilities.
6          And what I want to know is, when did this concept
7    first take flight in terms of the planning process?  You
8    talked about when it was implemented, but when did it
9    first begin to ruminate within the halls of ADC?
10   A.  That would have been probably in February after
11   the two suicides at Florence when it became clear to us
12   that our processes of monitoring mental health inmates
13   wasn't adequate for purposes that we had intended it to
14   be, that we needed to find a way of allowing our
15   clinicians to have more private time, more access to the
16   inmates.
17        After discussion with the folks in operations,
18   with the directors, we decided the best way to do that was
19   by establishing areas where these inmates would be housed
20   in near configurations.  Once we made that decision, we
21   began to think, okay, if we are going to have a near
22   configuration, what can we do to make it a more
23   therapeutic environment.
24   Q.  Was the development of the enhanced treatment
25   programs a result of the lawsuit that was filed in this

Page 285

1    case?
2    A.  No.  It was a result of our attempts to address a
3    serious gap in our ability to provide suicide prevention.
4    Q.  The GAR reports that you refer to, are these --
5    once generated, are these in -- once generated, are these
6    in paper form, or are they sent electronically?  How do
7    they --
8    A.  They are sent electronically.
9    Q.  Is this a form that you fill in various fields?
10   A.  Yes.  It's on a form that contains a series of
11   issues.  Then there's a field that has the various colors,
12   and then there's a section to write a discussion on why
13   these particular colors were assigned to this area, a
14   supporting documentation area.
15   MS. WIENEKE:  Those are all the questions I have.
16   Thank you.
17   MR. FATHI:  I have nothing further.
18   MS. WIENEKE:  We will read and sign.
19   (The deposition concluded at 5:38 p.m.)
20
21
22
23
24
25

72 (Pages 282 to 285)

Parsons v. Ryan
Ben Shaw, Ph. D., AZ Dept of Corrections 30(b)(6) - - 10/3/2012

Page 286

1           SIGNATURE PAGE
2      I, BEN L. SHAW, Ph.D., a deponent exercising
   my right to read and sign my deposition taken on
3  September 30, 2012, place my signature hereon and make the
   following changes on this ___ day of _____, 2012.
4
5          (IF THERE ARE NO CHANGES, WRITE "NONE.")
6
          _____
7              BEN L. SHAW, Ph.D.
8  PAGE LINE  READS      CHANGE TO     REASON
9   ___ ___  _____  _____  _____
10  ___ ___  _____  _____  _____
11  ___ ___  _____  _____  _____
12  ___ ___  _____  _____  _____
13  ___ ___  _____  _____  _____
14  ___ ___  _____  _____  _____
15  ___ ___  _____  _____  _____
16  ___ ___  _____  _____  _____
17  ___ ___  _____  _____  _____
18  ___ ___  _____  _____  _____
19  ___ ___  _____  _____  _____
20  ___ ___  _____  _____  _____
21  ___ ___  _____  _____  _____
22  ___ ___  _____  _____  _____
23  ___ ___  _____  _____  _____
24  ___ ___  _____  _____  _____
25  ___ ___  _____  _____  _____

Page 287

1    STATE OF ARIZONA      )
                           ) SS.
2    COUNTY OF MARICOPA    )
3
4         I, KATE E. ROUNDY, a Certified Reporter,
5    Certificate No. 50582, in the State of Arizona, do hereby
6    certify that the foregoing witness was duly sworn to tell
7    the whole truth; that the foregoing pages constitute a
8    full, true, and accurate transcript of all proceedings had
9    in the foregoing matter, all done to the best of my skill
10   and ability.  Pursuant to request, notification was
11   provided that the deposition is available for review and
12   signature.
13
14        I FURTHER CERTIFY that I am not related to
15   nor employed by any of the parties hereto, and have no
16   interest in the outcome hereof.
17
18        WITNESS my hand this 10th day of October,
19   2012.
20
21        _____
          KATE E. ROUNDY, RPR
22        Arizona Certified
          Reporter No. 50582
23
24
25

73 (Pages 286 to 287)