# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn           )  No:
Jensen; Stephen Swartz;         )  CV12-00601-PHX-NVW
Dustin Brislan; Sonia           )  (MEA)
Rodriguez; Christina            )
Verduzco; Jackie Thomas;        )
Jeremy Smith; Robert Gamez;     )
Maryanne Chisholm; Desiree      )
Licci; Joseph Hefner; Joshua    )
Polson; and Charlotte Wells,    )
on behalf of themselves and     )
all others similarly            )
situated; and Arizona Center    )
for Disability Law,             )
            Plaintiffs,          )
    v.                          )
Charles Ryan, Director,         )
Arizona Department of           )
Corrections; and Richard        )
Pratt, Interim Division         )
Director, Division of Health    )
Services, Arizona Department    )
of Corrections, in their        )
official capacities,            )
            Defendants.          )
                                )

DEPOSITION OF MARLENA D. BEDOYA
September 10, 2013
9:59 a.m.
Tucson, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 145

1   ADC -- or with Wexford, rather?

2      A     He worked with ADC and Wexford.

3      Q     What was his position before Corizon hired him

4   as the FHA?

5      A     Assistant FHA.

6      Q     And it had been Gretchen who was the FHA --

7      A     Yes.

8      Q     -- before him?

9      A     Carrie Harris and then Gretchen.

10     Q     Do you know why Gretchen left at the time of

11  the transition?

12     A     I don't.

13            MR. BOJANOWSKI:  Form, foundation.

14            THE WITNESS:  I have no idea.

15     Q  BY MR. PODSIADLIK:  Was it disruptive to what

16  you had to do on your job to have to adjust to a new

17  person?

18            MR. BOJANOWSKI:  Form.

19            THE WITNESS:  Oh, no.

20     Q  BY MR. PODSIADLIK:  At the bottom here, it

21  says sick call and medical records, and you wrote,

22  "Please see the attached spreadsheets for trends across

23  the Tucson Complex.  The highlighted areas will show

24  you which yards and what items need to be retrained

25  with your team."

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 146

1    A    Okay.

2    Q    What spreadsheets were attached?

3    A    I don't recall.  They didn't -- I don't know.

4    Q    What spreadsheets could have been attached?  I

5  mean, what spreadsheets exist that you might have

6  attached to this?

7              MR. BOJANOWSKI:  Form.

8              THE WITNESS:  A spreadsheet that

9  highlighted the areas that showed which yards and what

10  items need to be retrained with your staff.  I -- I

11  don't -- I would have thought you'd have the

12  attachment.

13    Q    BY MR. PODSIADLIK:  Me, too, but I don't.

14    A    I'm sorry.

15    Q    No, that's not your fault.  Look at Tim.  It's

16  probably not Tim's fault, either.

17              Would these have been spreadsheets that

18  you made?

19    A    Yes.

20    Q    And would they still be on your computer in

21  your office?

22    A    I have no idea.

23    Q    But you have no recollection at all of what

24  these spreadsheets might refer to?

25    A    Well, if it's under sick call and medical

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 147

1    records --

2        Q    Uh-huh.

3        A    -- okay, and given -- given what those

4    questions are in here --

5        Q    Right.

6        A    -- okay, I'm assuming I set up a spreadsheet,

7    because this is what I'm thinking I would have done

8    with the questions to show the tracking and trending

9    for that month, which we were not -- we were letting

10   them do their transition, okay, versus putting it in

11   here.  I put it in a spreadsheet for him to visually

12   see.  That's what I'm thinking it is.

13       Q    I understand.

14       A    Some people are more visual than others.

15       Q    Absolutely.

16             Have you -- have you ever before made a

17   representation of trends across the Tucson Complex?

18       A    Not that I recall, because this was the only

19   month that we were asked to not input, because they

20   were -- with new staff, they were getting the accesses,

21   the networks joined with a different company, and they

22   wanted us, you know, to stay out of that to allow them

23   to do -- IT to be able to do their work.

24       Q    Do you recall if you and Matthew ever went

25   through the spreadsheet together?

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 150

1    went over that, and we did talk about the spreadsheets

2    more generally, and you said that the only kind of

3    documentation you had for each month is the MGAR?

4         A    Right.

5         Q    What are the Peer reviews that are mentioned

6    as number 4, annual P-E-E-R reviews?  "Is the

7    contractor conducting annual PEER reviews for

8    Physicians, Nurse Practitioners, PAs, Dentists,

9    Psychiatrists, Psychiatric Nurse Practitioners, and

10   Ph.D.-level psychologists?"

11        A    Peer reviews are -- okay.  Anybody with a

12   license, nurse, mid-level nurse practitioner,

13   physician, they are to have what's called a

14   peer review, meaning your mid-levels, which are your

15   nurse practitioners, they are seeing patients, writing

16   scrips, requesting labs.  They have somebody, usually a

17   physician, meaning the medical director for the

18   complex, who randomly audits some of their charts each

19   month.  And he goes down through and reviews, and he

20   makes sure that that nurse practitioner is, you know,

21   prescribing, seeing, ordering appropriate steps in a

22   person's care.  That's what a peer review is.

23        Q    Does Corizon do peer reviews?

24        A    They do.  The medical director for our site --

25   I can only speak of Tucson --

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 224

```
 1   STATE OF ARIZONA    )
                         )
 2   COUNTY OF MARICOPA  )

 3

 4             I, Marcella L. Daughtry, a Certified

 5   Reporter, Certificate No. 50623, in the State of

 6   Arizona, do hereby certify that the foregoing witness

 7   was duly sworn to tell the whole truth; that the

 8   foregoing pages constitute a full, true, and accurate

 9   transcript of all proceedings had in the foregoing

10   matter, all done to the best of my skill and ability.

11   Pursuant to request, notification was provided that the

12   deposition is available for review and signature.

13

14             I FURTHER CERTIFY that I am not related

15   to nor employed by any of the parties hereto, and have

16   no interest in the outcome.

17

18             WITNESS my hand this 23rd day of

19   September, 2013.

20

21                         _____

                           Marcella L. Daughtry
22                         Arizona Certified
                           Reporter No. 50623
23

24

25
```

GLENNIE REPORTING SERVICES
(602) 266-6535    www.glennie-reporting.com

Deposition of Troy Lawrence Evans

FILED UNDER SEAL

# Deposition of Arthur Gross

# FILED UNDER SEAL

# Deposition of Carson Anton McWilliams

# FILED UNDER SEAL

# Deposition of Juliet Respicio-Moriarty

# FILED UNDER SEAL

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br>　　　　　Plaintiffs,<br>　　v.<br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br>　　　　　Defendants. | No:<br>CV12-00601-PHX-NVW<br>(MEA) |

DEPOSITION OF NICOLE TAYLOR, J.D., Ph.D.

September 5, 2013
9:13 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Page 29

1  years ago.  I just recently joined the project.  They
2  had been working on -- they being a variety of people I
3  haven't met -- had been working on changing the
4  classification system and moving it towards a different
5  system, and so I joined in just recently.
6       Q    What's the name of this project?
7       A    That's a very good question.  I'm not sure.
8  It's a strategic plan initiative, and I'm not sure what
9  the title of it is.
10      Q    How do you refer to it when you are talking
11 about it?
12      A    Our strategic plan.
13      Q    When did you join the project?
14      A    I joined the project the end of June.
15      Q    Of 2013?
16      A    Correct.
17      Q    Who is in charge of the project?
18      A    Carson McWilliams.
19      Q    And you said this project was begun a couple
20 of years ago?
21      A    Correct.  They had started looking at what
22 they can do for the management of max enclosed inmates
23 on how to classify them in a better fashion to allow
24 more fluid movement, and so we just dovetailed that
25 with programming aspects.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 30

1    Q    But you just joined the project a couple of
2  months ago?

3    A    Correct.

4    Q    What is your role in the project?

5    A    My role is to work on the movement of the
6  mental health inmates through that system,
7  specifically, and ensuring that their movement through
8  makes sense with what services we have to offer and
9  what their needs might be in that arena.

10   Q    Have you created any documents as part of this
11 project?

12   A    I believe there is only a draft format that
13 has not been signed off on by anyone yet.

14   Q    When you say a draft format, what does that
15 mean?

16   A    It's a proposal, a proposition paper that
17 was -- that is created and presented to Director Ryan.

18   Q    And did you draft that document?

19   A    I assisted in drafting that document.

20   Q    Who else had a role in drafting that document?

21   A    Carson McWilliams, Amy Barnes who is an ADW at
22 Florence complex, Carol Pierce.

23   Q    Is it possibly Pearson?

24   A    No, no, she's the medical records individual.
25 Carol Ortiz, that is her name -- she is out at

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 31

1   Perryville -- participated in that, Ernie Trujillo who
2   is the northern regional director participated in that,
3   and I can't think of anyone else who participated in
4   the drafting of the document.
5        Q    Anyone else from the mental health side?
6        A    No.
7        Q    Any other documents that you have had a role
8   in creating as part of this project?
9        A    No.
10       Q    So it's simply referred to as the strategic
11  initiative?
12            MS. CLOMAN:  Form.
13            THE WITNESS:  Correct, the informal
14  referral to it would be that, yes.
15       Q    BY MR. FATHI:  Are there any other special
16  projects you are working on that are not reflected in
17  your resume?
18       A    No.
19       Q    Now, it says here that one of your duties is
20  to, quote, evaluate mental health services provided by
21  the contracted vendor and private prisons, end of
22  quote.  What percentage of your time do you spend on
23  the private prisons?
24       A    Do I spend going there or supervising the
25  results of what's found there?

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 68

1    Q    BY MR. FATHI:  Do you monitor whether prisoner
2  suicides were preventable?
3                MS. CLOMAN:  Form.
4                THE WITNESS:  I receive information
5  after a suicide to review, yes.
6    Q    BY MR. FATHI:  Do you monitor whether prisoner
7  suicides were preventible?
8                MS. CLOMAN:  Form.
9                THE WITNESS:  Yes.
10   Q    BY MR. FATHI:  And where is that reflected in
11  the MGAR?
12   A    That is not in the MGAR.
13   Q    Where is that reflected?
14   A    That would be in psychological autopsies that
15  we receive -- that I receive.
16   Q    And this is part of your duties as mental
17  health monitor?
18   A    Correct.
19   Q    Which of your duties as reflected on your
20  resume does this fall under?
21   A    The ensuring compliance with ADC policies and
22  procedures.
23   Q    Okay.  So tell me about your role in
24  monitoring whether prisoner suicides were preventable.
25   A    I will either go down to the complex where the

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 69

1    suicide occurred myself or I will ask an on-site

2    monitor to send me their record via electronically to

3    review if I can't get to the site.

4        Q    And how do you memorialize the findings of

5    your monitoring?

6        A    I wait for the psych autopsy to come from the

7    Corizon staff, and then I go and discuss that

8    information with Director Ryan and Deputy Director

9    Hood.

10       Q    So do you create anything in writing as a

11   result of your monitoring of prisoner suicides?

12       A    No, I do not.  I also do discuss it with

13   Dr. Shaw who is the current regional mental health

14   director of the findings.

15       Q    Okay.  So you monitor whether prisoner

16   suicides were preventible, but you don't write anything

17   down?

18       A    Correct.

19       Q    How many ADC prisoners have died by suicide so

20   far in 2013?

21              MS. CLOMAN:  Form.

22              THE WITNESS:  We actually -- our

23   information is prepared as fiscal year, and so fiscal

24   year 2013 was seven, which includes July 1st through

25   June 30th of 2013.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 170

1       A       Correct.

2       Q       And I believe you said you have not yet seen

3    any corrective action plans?

4       A       Yes, I have not seen any.

5       Q       Okay.   You just said you have weekly meetings

6    with Corizon?

7       A       Yes.

8       Q       And who typically attends those meetings?

9       A       Those same individuals that I listed.  Other

10   than Donna James, she was new to those meetings, it's

11   the same individuals every week.

12      Q       Okay.  So that's Ms. Bybee, you, Mr. Gross,

13   Kathy Campbell, Dr. Robertson, and Martin Winland?

14      A       And Richard Pratt.  I'm not sure if you said

15   his name or maybe you did.

16      Q       Oh, Mr. Pratt attends those meeting?

17      A       Correct.

18      Q       And how long do those meetings usually last?

19      A       They usually last around two hours.

20      Q       Are minutes ever kept of those meetings?

21      A       They have an agenda, and I think everybody

22   takes notes on the agenda.  I'm not aware of anybody

23   taking minutes of it, but I believe there is an agenda

24   created.

25      Q       So there is a written agenda?

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 211

1    to a different day because there was an issue that day,

2    they would just shift it.

3        Q    Okay.  So to your knowledge, neither of these

4    groups have ever been cancelled in Kasson unit because

5    of a security incident?

6                MS. CLOMAN:  Form.

7                THE WITNESS:  Canceled and not

8    rescheduled?

9        Q    BY MR. FATHI:  Canceled and not rescheduled

10   the same week.

11       A    That is not my understanding, no.

12       Q    Now, when a prisoner receives a one-on-one

13   counseling session, where is that recorded?

14               MS. CLOMAN:  Form.

15               THE WITNESS:  In the mental health

16   section of their medical chart.

17       Q    BY MR. FATHI:  Is it recorded anywhere else?

18       A    By recorded?

19       Q    Let me ask it a different way.  If I wanted to

20   know -- if I wanted to verify that every prisoner in

21   Kasson unit in wing one in fact got their individual

22   session this month, is there any way for me to do that

23   other than looking at each and every one of their

24   medical records?

25       A    Ms. Newman who is at Kasson, for example,

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 212

1   keeps a database that she updates with each time that

2   she does her session.  So she keeps track of when their

3   one-on-one's due, when their medications expire, when

4   they release.  All that information is on a database

5   that is being kept.

6       Q    And is she the only one that does the

7   one-on-ones?

8       A    Currently, I believe that she is the one on

9   wing one Kasson program.

10      Q    How many prisoners are on wing one of Kasson

11  approximately?

12      A    I believe they are running at about 50 right

13  now.

14      Q    And how long are these monthly one-on-one

15  sessions?

16      A    I -- I've seen the full range.  You know, it

17  just depends on what the inmate presents with, whether

18  they need five minutes.  There's some pretty

19  disorganized individuals up there that can't handle

20  more than five, but some of them get an hour if they

21  need an hour.

22      Q    So these monthly one-on-one sessions could

23  range anywhere from about five minutes to about an

24  hour?

25      A    Correct.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 213

1    Q    And the group -- group sessions, how long are

2    those?

3    A    The group sessions are set up to be an hour.

4    Q    And do they usually last the full hour?

5    A    Sometimes longer, but yeah.

6    Q    Ever shorter?

7    A    Not typically.  Well, I think she had to

8    cancel one because an individual was urinating in the

9    group and so the group was having a reaction to that.

10   But otherwise they -- they maintain them at an hour and

11   sometimes they go over a little.

12   Q    And when a prisoner takes part in one of these

13   groups, where is that recorded?

14             MS. CLOMAN:  Form.

15             THE WITNESS:  On a group note.

16   Q    BY MR. FATHI:  And where is the group note

17   recorded?

18   A    In their chart.

19   Q    Is it recorded anyplace else other than the

20   charts of the individual prisoners?

21   A    She would indicate that on her database that

22   there was a contact.

23   Q    And this is Ms. Newman?

24   A    Correct.  And this is just for Kasson.  Each

25   place has a different person.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 285

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA  )

3

4              I, Marcella L. Daughtry, a Certified

5    Reporter, Certificate No. 50623, in the State of

6    Arizona, do hereby certify that the foregoing witness

7    was duly sworn to tell the whole truth; that the

8    foregoing pages constitute a full, true, and accurate

9    transcript of all proceedings had in the foregoing

10   matter, all done to the best of my skill and ability.

11   Pursuant to request, notification was provided that the

12   deposition is available for review and signature.

13

14             I FURTHER CERTIFY that I am not related

15   to nor employed by any of the parties hereto, and have

16   no interest in the outcome.

17

18             WITNESS my hand this 16th day of

19   September, 2013.

20

21                       _____

                         Marcella L. Daughtry
22                       Arizona Certified
                         Reporter No. 50623

23

24

25