**EXHIBIT 1**

PARSONS v. RYAN

PLAINTIFFS' DISCOVERY TAKEN TO DATE

TABLE P-1

PLAINTIFFS' INTERROGATORIES

| Description | Date Served | Date Responded To | # of ROGs | # of Pages Produced |
|---|---|---|---|---|
| Parsons' 1st Set of ROGs | 06/15/2012 | 07/23/2012 | 15 | |
| Jensen's 1st Set of ROGs | 06/15/2012 | 07/23/2012 | 11 | |
| | 1st Supp | 08/28/2012 | | |
| Swartz's 1st Set of ROGs | 06/15/2012 | 07/23/2012 | 8 | |
| | 1st Supp | 12/12/2012 | | |
| ACDL's 1st Set of ROGs | 06/22/2012 | 07/26/2012 | 10 | |
| | 1st Supp | 07/03/2013 | | |
| Polson's 1st Set of ROGs | 01/08/2013 | 02/11/2013 | 10 | |
| | 1st Supp | 07/03/2013 | | |
| Wells' 1st Set of ROGs | 05/20/2013 | 06/26/2013 | 19 | 2,193 |
| | 1st Supp | 07/03/2013 | | 9 |
| Gamez's 1st Set of ROGs | 08/13/2013 | 09/16/2013 | 25 | 12 |
| Licci's 1st Set of ROGs | 08/13/2013 | 09/16/2013 | 20 | |
| Rodriguez's 1st Set of ROGs | 07/09/2013 | 08/12/2013 | 5 | |
| | 1st Supp | 10/11/2013 | 1 | 3,362 |
| | | | | |
| Total ROGs | | | | |
| | | | | |
| Prior to 08/09/2013 | | | 73 | 2,214 |
| Since 08/09/2013 | | | 51 | 3,362 |
| Grand Total | | | 124 | 5,576 Total Pages |

PARSONS v. RYAN

**TABLE P-2**

**PLAINTIFFS' REQUESTS FOR ADMISSION**

| Description | Date Served | Date Responded To | # of RFAs |
|---|---|---|---|
| Brislan's 1st Set of RFAs | 08/21/2012 | 09/24/2012 | 78 |
| | 1st Supp | 10/17/2012 | |
| Verduzco's 1st Set of RFAs | 04/29/2013 | 06/10/2013 | 285 |
| Gamez's 1st Set of RFAs | 08/13/2013 | 09/16/2013 | 75 |
| Licci's 1st Set of RFAs | 08/13/2013 | 09/16/2013 | 8 |
| **Total RFAs** | | | |
| **Prior to 08/09/2013** | | | 363 |
| **Since 08/09/2013** | | | 83 |
| **Grand Total** | | | 446 Total RFAs |

**TABLE P-3**

**PLAINTIFFS' REQUESTS FOR PRODUCTION BY ADC**

| Description | Date Served | Date Responded To | # of RFPs | # of Pages Produced |
|---|---|---|---|---|
| Parsons' 1st Set of RFPs | 06/15/2012 | 07/23/2012 | 63 | 0 |
| | 1st Supp | 09/11/2012 | | 1,519 |
| | 2nd Supp | 09/27/2012 | | 12,500 |
| | 3rd Supp | 09/28/2012 | | 9,512 |
| | 4th Supp | 10/16/2012 | | 3,054 |
| | 5th Supp | 11/06/2012 | | 2,635 |
| | 6th Supp | 11/15/2012 | | 3,173 |
| | 7th Supp | 12/11/2012 | | 19,532 |
| | 8th Supp | 12/21/2012 | | 1,484 |

PARSONS v. RYAN

| Document | Date | Date | | |
|---|---|---|---|---|
| 9th Supp | 01/04/2013 | | | 729 |
| 10th Supp | 01/25/2013 | | | 2,610 |
| 11th Supp | 02/19/2013 | | | 6,118 |
| 12th Supp | 02/22/2013 | | | 2,614 |
| 13th Supp | 03/08/2013 | | | 1,259 |
| 14th Supp | 03/29/2013 | | | 2,181 |
| 15th Supp | 05/01/2013 | | | 3,699 |
| 16th Supp | 05/17/2013 | | | 231 |
| 17th Supp | 07/25/2013 | | | 23,139 |
| 18th Supp | 07/31/2013 | | | 1,077 |
| ACDL's 1st Set of RFPs | 06/22/2012 | 07/26/2012 | 12 | 0 |
| 1st Supp | 12/13/2012 | | | 20 |
| 2nd Supp | 12/19/2012 | | | 918 |
| 3rd Supp | 01/22/2013 | | | 2 |
| Rule 30(b)(6) Notice and Subpoena to ADC (Doc. # 44) | 07/03/2012 | 08/06/2012 | 11 | 329 |
| Rule 30(b)(6) Notice and Subpoena to ADC (Doc. # 76) | 08/09/2012 | 08/27/2012 | 6 | 0 |
| 1st Supp | 10/03/2012 | | | 422 |
| 2nd Supp | 10/29/2012 | | | 1,412 |
| 3rd Supp | 11/14/2012 | | | 1,285 |
| 4th Supp | 12/21/2012 | | | 1,067 |
| 5th Supp | 02/19/2013 | | | 3,808 |
| 6th Supp | 05/01/2013 | | | 81 |
| 7th Supp | 05/17/2013 | | | 388 |
| 8th Supp | 07/17/2013 | | | 665 |
| Rule 30(b)(6) Notice and Subpoena to ADC (Doc. # 78) | 08/10/2012 | 09/06/2012 | 3 | 0 |
| Rule 30(b)(6) Notice and Subpoena to ADC (Doc. # 80) | 08/14/2012 | 09/20/2012 | 5 | 0 |
| 1st Supp | 09/25/2012 | | | 69 |
| 2nd Supp | 10/01/2012 | | | 617 |

| | | | | | |
|---|---|---|---|---|---|
| Rule 30(b)(6) Notice and Subpoena to ADC (Doc. # 81) | 08/15/2012 | | 09/20/2012 | 10 | 0 |
| | | 1st Supp | 09/26/2012 | | 92 |
| Rule 30(b)(6) Notice and Subpoena to ADC (Doc. # 82) | 08/15/2012 | | 09/20/2012 | 9 | 0 |
| | | 1st Supp | 09/25/2012 | | 38 |
| | | 2nd Supp | 10/02/2012 | | 52 |
| | | 3rd Supp | 10/02/2012 | | 41 |
| Rule 30(b)(6) Notice and Subpoena to ADC (Doc. #98) | 08/24/2012 | | 09/20/2012 | 3 | 0 |
| | | 1st Supp | 09/28/2012 | | 160 |
| Parsons' 2nd Set of RFPs | 10/12/2012 | | 12/07/2012 | 14 | 1,824 |
| | | 1st Supp | 12/21/2012 | | 73 |
| | | 2nd Supp | 05/01/2013 | | 8 |
| Polson's 1st Set of RFPs | 01/08/2013 | | 02/11/2013 | 38 | 0 |
| | | 1st Supp | 03/29/2013 | | 5,766 |
| | | 2nd Supp | 05/01/2013 | | 1,277 |
| | | 3rd Supp | 05/17/2013 | | 267 |
| | | 4th Supp | 05/24/2013 | | 157 |
| | | 5th Supp | 07/25/2013 | | 5,224 |
| Jensen's 1st Set of RFPs | 01/31/2013 | | 03/13/2013 | 9 | 108 |
| | | 1st Supp | 04/08/2013 | | 257 |
| | | 2nd Supp | 07/25/2013 | | 447 |
| Swartz' 1st Set of RFPs | 05/10/2013 | | 06/17/2013 | 20 | 161 |
| | | 1st Supp | 07/17/2013 | | 14,241 |
| | | 2nd Supp | 07/25/2013 | | 576 |
| | | 3rd Supp | 07/31/2013 | | 194 |
| Supplemental Production via e-mail | | | 8/8/2013 | | 99 |
| Licci's 1st Set of RFPs | 08/13/2013 | | 09/16/2013 | 52 | 0 |
| Supplemental Production via e-mail | | | 8/14/2013 | | 297 |
| Supplemental Production via e-mail | | | 8/15/2013 | | 37 |
| Supplemental Production via e-mail | | | 8/19/2013 | | 64 |
| Supplemental Production via e-mail | | | 8/21/2013 | | 77 |

PARSONS v. RYAN

| Description | Date | RFPs | Total Pages |
|---|---|---|---|
| Supplemental Production via e-mail | 8/28/2013 | | 356 |
| Supplemental Production via e-mail | 9/7/2013 | | 105 |
| Supplemental Production via e-mail | 9/9/2013 | | 1,200 |
| Supplemental Production via e-mail | 9/10/2013 | | 130 |
| Supplemental Production via e-mail | 9/17/2013 | | 43 |
| Supplemental Production via e-mail | 9/19/2013 | | 48 |
| Supplemental Production via e-mail | 9/20/2013 | | 7,330 |
| Supplemental Production via CD-ROM | 9/20/2013 | | 2042 |
| Supplemental Production via CD-ROM | 9/24/2013 | | 178 |
| Supplemental Production via e-mail | 10/12/2013 | | 9,888 |
| Supplemental Production via CD-ROM | 10/17/2013 | | 1,434 |
| Supplemental Production via CD-ROM | 10/25/2013 | | 102,704 |
| Production of E-mails | | | |
| **Total RFPs Prior to 08/09/2013** | | 156 | 139,211 pages produced to all requests |
| **Since 08/09/2013** | | 52 | 125,933 pages produced to all requests |
| **Grand Total** | | 208 | 265,144 Total Pages |

Note: Certain documents were produced via e-mail and copies were subsequently provided on disk. These calculations have been made to eliminate potential double-counting, by only identifying a single date of production for each document. Additionally, documents identified and produced by Defendants with their disclosure statements, which are also responsive to one of Plaintiffs' requests for production are omitted from these totals.

PARSONS v. RYAN

**TABLE P-4**

**PLAINTIFFS' THIRD PARTY DOCUMENT REQUESTS**

| Description | Date Served | Date Responded To | # of Requests | # of Pages Produced |
|---|---|---|---|---|
| Subpoena to Wexford Health Sources | 08/06/2012 | | 1 | 6,021 |
| | 2nd Response | 10/08/2012 | | 876 |
| | 3rd Response | 11/13/2012 | | 1,330 |
| | 4th Response | 11/19/2012 | | 1,419 |
| | 5th Response | 11/21/2012 | | 38 |
| | 6th Response | 12/21/2012 | | 511 |
| 30(b)(6) Notice and Subpoena to Wexford (Doc. # 381) | 3/8/2013 | | 8 | 955 |
| Rule 30(b)(6) Notice and Subpoena to Smallwood | 07/09/2013 | 07/25/2013 | 22 | 2,940 |
| **Total Third Party Document Requests** | | | | |
| Prior to 08/09/2013 | | | **31** | **14,090** |
| Since 08/09/2013 | | | **0** | **0** |
| **Grand Total** | | **Total Requests** | **31** | **14,090 Total Pages** |

**TABLE P-5**

**DEPOSITIONS TAKEN BY PLAINTIFFS**

| Deponent | Title | Date Taken | Hours | Transcript Pages |
|---|---|---|---|---|
| Curt Czarsty | IT Personnel – ADC 30(b)(6) designee in response to topics 1-6, 10-12, and 14-15 of Doc. # 44 (electronic storage of documents and emails). | 08/17/2012 | 3 | 137 |

PARSONS v. RYAN

| Name | Description | Date | | |
|---|---|---|---|---|
| Ronda Lee | Policy Unit Manager – ADC 30(b)(6) designee in response to topic 9 of Doc. # 44 (retention and destruction of paper documents) | 08/21/2012 | 1 | 57 |
| Carol Pearson | Medical Records Manager – ADC 30(b)(6) designee in response to topics 8, 10, and 13 of Doc. # 44 (transfer of documents to Wexford) | 08/21/2012 | 1 | 31 |
| Karen Ingram | Procurement Officer – ADC 30(b)(6) designee in response to topic 2 of Doc. # 76 (health care services proposal by Wexford) | 09/13/2012 | 3 | 106 |
| Richard Rowe | Medical Services Administrator – ADC 30(b)(6), designee in response to topics 1-2, 5-10, 12-13, 15 and 17 of Doc. # 78 (health care policies and practices) | 09/19/2012 | 5 | 176 |
| Joseph Nicoletti | IT Personnel – ADC 30(b)(6) designee in response to topic 8 of Doc. # (backup and archival of electronic documents and emails) | 09/21/2012 | 1 | 61 |
| Carol Pearson (continued) | Medical Records Manager – ADC 30(b)(6) designee in response to topics 8, 10, and 13 of Doc. #44 (medical records) | 09/21/2012 | 2 | 102 |
| Michael Adu-Tutu | Dental Program Manager – ADC 30(b)(6) designee in response to topics 1-16 of Doc. #98 (dental services provided to inmates prior to privatization) | 10/01/2012 | 6 | 199 |
| Tracy Crews Ben Shaw | Psychiatrist Mental Health Program Manager – ADC 30(b)(6) designee in response to topics 10, 12 and 15 of Doc. #81; and, topics 1-3 and 5-24 of Doc. #82 (mental health services provided to inmates) | 10/03/2012 10/03/2012 | 4 7 | 151 287 |
| Richard Pratt | Health Services Division Director – ADC 30(b)(6) designee in response to topics 3-6 of Doc. #76; topic 4 of Doc. #80; and, topic 4 of Doc. # 82 (privatization of health care and | 10/04/2012 | 5 | 176 |

PARSONS v. RYAN

| | delivery of health care to inmates) | | | |
|---|---|---|---|---|
| Carmelo Echeverria | Doctor | 10/05/2012 | 3 | 131 |
| Jeffrey Sharp | Doctor | 10/09/2012 | 6 | 193 |
| Carlos Weekly | Dental Director – | 10/23/2012 | 3 | 114 |
| Greg Fizer | Deputy Warden | 10/29/2012 | 6 | 222 |
| Jonathan Trethewey | Inmate – Preservation Deposition | 04/04/2013 | 6 | 250 |
| Karen Chu | Dental Program Manager | 05/15/2013 | 3 | 125 |
| Dan Conn | CEO at Wexford – Individually regarding Wexford's services under the contract with ADC | 05/20/2013 | 4 | 174 |
| Karen Mullenix | Operations Director at Wexford – Wexford 30(b)(6) designee in response to Doc. # 436 regarding Wexford's services under the contract with ADC, with the exception of utilization review | 05/21/2013 | 5 | 177 |
| William Smallwood | CEO — as Smallwood Prison Dental Services 30(b)(6) designee in response to Doc. # 490. | 08/20/2013 | 6 | 286 |
| Helena Valenzuela | Contract Compliance Monitor at ASPC Phoenix, ADC HS Contract Monitoring Bureau | 08/23/2013 | 6 | 226 |
| David Robertson | Doctor – Medical Program Administrator, ADC HS Contract Monitoring Bureau, Quality/Clinical | 08/26/2013 | 5 | 51 |
| Vanessa Headstream | Health Services Coordinator (Nursing Monitor), ADC HS Contract Monitoring Bureau, Quality/Clinical | 8/27/2013 | 5 | 185 |
| Nicole Taylor | Health Services Coordinator (Mental Health Monitor) and former Psychologist III at ASPC-Florence, ADC HS Contract Monitoring Bureau, Quality/Clinical | 9/5/2013 | 5 | 285 |
| Art Gross | Assistant Director, ADC HS Contract Monitoring Bureau | 9/9/2013 | 4 | 132 |
| Marlena Bedoya | Contract Compliance Monitor, ADC HS Contract Monitoring Bureau | 9/10/2013 | 5 | 224 |

PARSONS v. RYAN

| Name | Title | Date | | |
|---|---|---|---|---|
| Kathy Campbell | Program Evaluation Administrator, ADC HS Contract Monitoring Bureau | 9/11/2013 | 5 | 199 |
| Anthony Medel | Contract Compliance Monitor II at ASPC-Yuma ADC HS Contract Monitoring Bureau | 9/17/2013 | 6 | 272 |
| Troy Evans | Health Services Compliance Monitor, ADC-Safford | 9/17/2013 | 3 | 150 |
| Martin Winland | Pharmacy Monitor (Pharmacist), ADC HS Contract Monitoring Bureau, Quality/Clinical | 9/18/2013 | 4 | 164 |
| John Mitchell | Compliance Monitor I, ADC-Winslow | 9/18/2013 | 5 | 170 |
| Terry Allred | Contract Compliance Monitor II – ASPC Lewis, ADC HS Contract Monitoring Bureau | 9/18/2013 | 4 | 189 |
| Sam Tardibuono | Contract Compliance Monitor, ASPC-Douglas, AD C HS Contract Monitoring Bureau | 9/19/2013 | 5 | 194 |
| Mark Haldane | Contract Compliance Monitor, ASPC-Perryville, ADC HS Contract Monitoring Bureau | 9/19/2013 | 7 | 266 |
| Jen Mielke-Fontaine | Audit Nurse Contract Monitor, ASPC-Florence, ADC HS Contract Monitoring Bureau | 9/20/2013 | 6 | 320 |
| Yvonne Maese | Program Evaluation Specialist (Audit Nurse) and temporary Contract Compliance Monitor at ASPC-Eyman, ADC HS Contract Monitoring Bureau, Quality/Clinical | 9/20/2013 | 4 | 158 |
| Kathy Campbell | Program Evaluation Specialist HS Contract Monitoring Bureau — as ADC 30(b)(6) designee in response to topics 4, 11, 14, 16 and 18 of Doc. # 76 and 633. | 9/23/2013 | 2 | 68 |
| Juliet Respicio-Moriarity | Inmate Grievance Appeals Investigator, ADC HS Contract Monitoring Bureau — as ADC 30(b)(6) designee in response to topic 3 of Doc. # 76 and 633. | 9/23/2013 | 1 | 32 |

PARSONS v. RYAN

| | | | Hours | Pages |
|---|---|---|---|---|
| Carson McWilliams | Northern Director of Regional Operations — as ADC 30(b)(6) designee in response to topics 1-9, 11, 13-14 and 16 of Doc. # 81 and 635. | 9/27/2013 | 5 | 197 |
| Joseph Pastor | Corporate Psychiatrist, Corizon Health — as Corizon 30(b)(6) designee in response to mental health policy topics of Doc. # 680-1 | 10/4/2013 | 4 | 193 |
| Neil Fisher | Corporate Director for Utilization Management, Wexford — as Wexford 30(b)(6) designee in response topics 7-10 of Doc. # 436 | 10/8/2013 | 4 | 154 |
| Winfred Williams | Chief Medical Officer, Corizon Health — as 30(b)(6) designee of Corizon in response to topics 4 and 6 of Doc. # 680-1 | 10/10/2013 | 4 | 145 |
| Vickie Bybee | Vice President of Operations, Corizon Health — as 30(b)(6) designee of Corizon in response to topics 1-3 and 5-6 of Doc. # 680-1 | 10/10/2013 | 3 | 112 |
| **Total Depositions** | | | | |
| Prior to 8/9/2013 | 18 witnesses examined | | 74 hours | 2,869 pages |
| Since 8/9/2013 | 24 witnesses examined | | 108 hours | 4,372 pages |
| **Grand Total** | | | **182 hours** | **7,241 pages** |

Note: Witnesses examined on separate days in their individual capacity and as designees of an organizational entity are counted twice. If was witness was deposed in a single day in response to topics from multiple 30(b)(6) notices, for these purposes, the witness is counted only once.

PARSONS v. RYAN

## TABLE P-6

### DEPOSITIONS NOTICED BY PLAINTIFFS

| Deponent | Title | Date of Deposition |
|---|---|---|
| Richard Pratt | Interim Health Services Division Director | 11/7/2013 |
| Charles Ryan | Director | 11/8/2013 |
| Total Depositions | 2 | |

## TABLE P-7

### PLAINTIFFS' EXPERT INSPECTIONS

| Date | Expert | Facility | # of Hours | # of Corizon Staff |
|---|---|---|---|---|
| 07/08/2013 | Jay Shulman | ASPC-Perryville | 9 | 2 |
| 07/08/2013 | Pablo Stewart | ASPC-Tucson | 9 | 2 |
| 07/09/2013 | Jay Shulman | ASPC-Perryville | 4 | 2 |
| 07/09/2013 | Jay Shulman | ASPC-Lewis | 4 | 3 |
| 07/09/2013 | Pablo Stewart | ASPC-Tucson | 9 | 2 |
| 07/10/2013 | Jay Shulman | ASPC-Lewis | 9 | 3 |
| 07/11/2013 | Jay Shulman | ASPC-Yuma | 5 | 2 |
| 07/12/2013 | Jay Shulman | ASPC-Yuma | 9 | 2 |
| 07/15/2013 | Pablo Stewart | ASPC-Florence | 9 | 3 |
| 07/15/2013 | Robert Cohen | ASPC-Lewis | 9 | 3 |

PARSONS v. RYAN

| Date | Name | Facility | | |
|------|------|----------|---|---|
| 07/16/2013 | Pablo Stewart | ASPC-Eyman | 9 | 3 |
| 07/16/2013 | Robert Cohen | ASPC-Lewis | 9 | 3 |
| 07/17/2013 | Robert Cohen | ASPC-Eyman | 9 | 5 |
| 07/18/2013 | Robert Cohen | ASPC-Eyman | 9 | 5 |
| 07/18/2013 | Pablo Stewart | ASPC-Perryville | 9 | 3 |
| 07/18/2013 | Craig Haney | ASPC-Perryville | 9 | 3 |
| 07/19/2013 | Craig Haney | ASPC-Florence | 9 | 2 |
| 07/19/2013 | Pablo Stewart | ASPC-Phoenix | 9 | 2 |
| 07/22/2013 | Jay Shulman | ASPC-Eyman | 9 | 2 |
| 07/22/2013 | Craig Haney | ASPC-Florence | 9 | 2 |
| 07/22/2013 | Pablo Stewart | ASPC-Lewis | 9 | 3 |
| 07/23/2013 | Pablo Stewart | ASPC-Yuma | 9 | 2 |
| 07/23/2013 | Craig Haney | ASPC-Eyman | 9 | 3 |
| 07/23/2013 | Jay Shulman | ASPC-Eyman | 9 | 2 |
| 07/24/2013 | Jay Shulman | ASPC-Florence | 9 | 2 |
| 07/24/2013 | Craig Haney | ASPC-Eyman | 9 | 3 |
| 07/25/2013 | Jay Shulman | ASPC-Florence | 9 | 2 |
| 07/25/2013 | Craig Haney | ASPC-Eyman | 9 | 3 |
| 07/26/2013 | Jay Shulman | ASPC-Phoenix | 9 | 2 |
| 07/29/2013 | Eldon Vail | ASPC-Perryville | 9 | 3 |
| 07/29/2013 | Todd Wilcox | ASPC-Phoenix | 9 | 4 |
| 07/30/2013 | Eldon Vail | ASPC-Florence | 9 | 4 |

PARSONS v. RYAN

| Date | Name | Facility | | |
|---|---|---|---|---|
| 07/30/2013 | Todd Wilcox | ASPC-Perryville | 9 | 4 |
| 07/31/2013 | Eldon Vail | ASPC-Florence | 9 | 4 |
| 07/31/2013 | Todd Wilcox | ASPC-Perryville | 9 | 4 |
| 08/01/2013 | Eldon Vail | ASPC-Eyman | 9 | 5 |
| 08/01/2013 | Todd Wilcox | ASPC-Yuma | 9 | 4 |
| 08/02/2013 | Eldon Vail | ASPC-Eyman | 9 | 5 |
| 08/02/2013 | Todd Wilcox | ASPC-Yuma | 9 | 4 |
| 08/05/2013 | Jay Shulman | ASPC-Safford | 9 | 2 |
| 08/06/2013 | Jay Shulman | ASPC-Douglas | 9 | 2 |
| 08/07/2013 | Jay Shulman | ASPC-Tucson | 9 | 2 |
| 08/08/2013 | Jay Shulman | ASPC-Tucson | 9 | 2 |
| 08/14/2013 | Brie Williams | ASPC-Florence | 9 | 2 |
| 08/15/2013 | Brie Williams | ASPC-Eyman | 9 | 2 |
| 08/16/2013 | Brie Williams | ASPC-Perryville | 9 | 2 |
| 10/15/2013 | Todd Wilcox | ASPC-Florence | 9 | 3 |
| 10/16/2013 | Todd Wilcox | ASPC-Florence | 5 | 3 |
| 10/24/2013 | Todd Wilcox | ASPC-Tucson | 9 | 3 |
| 10/25/2013 | Todd Wilcox | ASPC-Tucson | 5 | 3 |

PARSONS v. RYAN

| Total Plaintiff Expert Inspections | | |
|---|---|---|
| Prior to 08/09/2013 | | 373 hours |
| Since 08/09/2013 | | 55 hours |
| Grand Total | | 428 Total Hours |

**EXHIBIT 2**

1  Thomas C. Horne Arizona Attorney General
   OFFICE OF THE ATTORNEY GENERAL
2  Michael E. Gottfried, Bar No. 010623
   Katherine E. Watanabe, Bar No. 027458
3  Lucy M. Rand, Bar No. 026919
   Ashley B. Zuerlein, Bar No. 029541
4  Assistant Attorneys General
   1275 W. Washington Street
5  Phoenix, Arizona 85007-2926
   Telephone: (602) 542-7695
6  Fax: (602) 542-7670
   Michael.Gottfried@azag.gov
7  Katherine.Watanabe@azag.gov
   Lucy.Rand@azag.gov
8  Ashley.Zuerlein@azag.gov

9  Daniel P. Struck, Bar No. 012377
   Kathleen L. Wieneke, Bar No. 011139
10 Rachel Love, Bar No. 019881
   Timothy J. Bojanowski, Bar No. 22126
11 Nicholas D. Acedo, Bar No. 021644
   Courtney R. Cloman, Bar No. 023155
12 Ashlee B. Fletcher, Bar No. 028874
   Anne M. Orcutt, Bar No. 029387
13 STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
14 Chandler, Arizona  85226
   Telephone:  (480) 420-1600
15 Fax:  (480) 420-1696
   dstruck@swlfirm.com
16 kwieneke@swlfirm.com
   rlove@swlfirm.com
17 tbojanowski@swlfirm.com
   nacedo@swlfirm.com
18 ccloman@swlfirm.com
   afletcher@swlfirm.com
19 aorcutt@swlfirm.com
   *Attorneys for Defendants*

20              UNITED STATES DISTRICT COURT

21                   DISTRICT OF ARIZONA

22 Victor Parsons; *et al.*, on behalf of themselves    NO. CV12-0601-PHX-NVW (MEA)
   and all others similarly situated; and Arizona
23 Center for Disability Law,                            **DECLARATION OF
                                                         LUCY RAND IN SUPPORT OF
24                         Plaintiffs,                   DEFENDANTS' RESPONSE TO
                                                         PLAINTIFFS' MOTION FOR
25              v.                                       RECONSIDERATION (DOC. 687)**

26 Charles Ryan and Richard Pratt, in their
   official capacities,
27
                          Defendants.
28

#3590119

1

2          I, **Lucy Rand**, declare under penalty of perjury that the following information is

3   true to the best of my information, knowledge, and belief:

4          1.      I am over 18 years of age, am competent to testify to the matters contained

5   herein, and make this Declaration upon my personal knowledge.

6   **A.      Calderon Declaration Paragraph 2:**

7          2.      On September 11, 2013, I responded to Amy Fettig's September 5, 2013,

8   letter that addressed previous discovery requests by "clarifying" and/or demanding

9   production of discovery to which Defendants had already objected.   (Attachment A.)

10   This letter addressed approximately 42 discovery requests and 8 interrogatory responses.

11   I advised Plaintiffs that their late requests to clarify discovery requests—which

12   essentially requested voluminous additional discovery—in conjunction with their

13   recently propounded request for production ("RFP") from Plaintiff Licci (containing 53

14   requests) did not permit Defendants time to process the requests prior to the close of

15   discovery—only 17 business days from the time Plaintiffs sent their letter.   I also

16   requested that Plaintiffs prioritize their discovery requests and offered to schedule a meet

17   and confer.

18          3.      On September 12, 2013, Amy Fettig responded to my letter by stating that

19   Plaintiffs would like to schedule a meet and confer.   Additionally, Ms. Fettig provided

20   for the first time 22 additional requests for specific documents and asked to discuss these

21   requests in the meet and confer.   (Attachment B.)   I responded by asking Plaintiffs to

22   provide a list correlating their 22 new requests for specific documents with their

23   document request to which Plaintiffs felt their new request fell under.

24          4.      On September 13, 2013, I participated in the parties' meet and confer.   I

25   began to go through the Fettig 9/5/2013 letter by request.   The Defendants expressed

26   their objections to Plaintiffs' "clarification"/"supplementation" letter and reiterated their

27   objections to previous sets of RFPs.   I advised Plaintiffs that Defendants were in the

28

1    process of attempting to obtain non-objected to documents.  At the end of the meet and

2    confer, Plaintiffs' counsel asked Defendants to state whether all of their requested

3    documents would be provided, when the documents would be provided, and whether

4    Defendants would be objecting to their requests.  Plaintiffs' request was unclear because

5    they did not specify whether they were referring to only the previous sets of RFPs,

6    documents requested pursuant to 30(b)(6) depositions, and/or new/"supplemental"

7    requests in the Fettig 9/5/2013 letter.  I advised Plaintiffs' counsel that we did not know

8    yet which documents we would be producing, as we had just received their new list of

9    specific documents and had not had sufficient time to review the requests.

10   **B.      Kendrick Declaration Paragraph 4:**

11     5. On October 11, 2013, I had a telephone conference with Ms. Corene

12   Kendrick and other counsel for Plaintiffs.  I stated that I had numerous Master Record

13   Files to review for redaction because of the security-sensitive information contained

14   within them.  Plaintiffs only requested the entire inmate record for 90 inmates on August

15   13, 2013, in Plaintiff Licci's First RFP.  Doc. #571.  I conveyed to Plaintiffs that I was

16   unable to complete all discovery at the same time.  I stated that at that moment, I was

17   reviewing the e-mails the Court had ordered Defendants to produce and, therefore, could

18   not review the Master Record Files, which consists of approximately 19,862 pages.

19   **C.      Mitchell Declaration:**

20     6. **Paragraph 2:** Although I am the sole attorney at the Attorney General's

21   Office managing the day-to-day responsibilities of reviewing, requesting, and producing

22   documents, I have the assistance of a full-time paralegal (since October 2012), as well as

23   the part-time assistance of two legal secretaries, and utilize the Attorney General's

24   Office copy room for scanning projects.  In addition, Struck Wieneke & Love employees

25   have consistently assisted in reviewing, requesting, and producing documents, even prior

26   to the departure of Ms. Ashley Zuerlein.  Struck Wieneke & Love employees defer to me

27   to assign bates label numbers and to bates label the documents.  Further, there would not

28

#3590119 – Decl. of Rand     3

1  have been an issue producing items had Plaintiffs not waited until the last minute to

2  request their "clarifications"/"supplementations."

3         7.     On September 12, 2013, I met with Michael Gottfried, Unit Chief for the

4  Department of Corrections Unit at the Attorney General's Office, to discuss the amount

5  of discovery being propounded by Plaintiffs and the upcoming discovery cut-off date. In

6  going through the discovery remaining, we determined that Parsons had been dismissed

7  and, therefore, was not entitled to supplementation of discovery. Immediately after this

8  discussion, I wrote an e-mail to Amy Fettig advising her that Defendants would not be

9  supplementing Parsons' discovery requests because he had been dismissed. I did not

10  time my non-supplementation announcement to Plaintiffs as a means to disadvantage

11  them. On the contrary, I only made this finding upon receiving Plaintiff Licci's First

12  RFP and Amy Fettig's 9/5/2013 "clarification"/"supplementation" letter and after

13  evaluation of the same.

14         8.     **Paragraph 5:** On October 11, 2013, Plaintiffs' counsel Alison Hardy sent

15  me an e-mail in which she detailed items—all from Licci's First RFP except for one

16  request for MGARs—that the parties had discussed Defendants would be producing

17  using words such as "all". (See Exhibit 11 to Mitchell Decl., Doc. #691.) In an effort

18  clarify the matter, I responded by to her e-mail by stating that as "noted in my previous

19  e-mail, production is subject to Defendants' objections. Therefore, we are attempting to

20  produce documents, but may not produce them as requested in your RFPs based on

21  Defendants' objections, e.g., unduly burdensome, overly broad, etc." Defendants'

22  objections of unduly burdensome and overly broad were made in reference to Plaintiffs'

23  First RFP from Licci, which was not served on Defendants on August 7, 2012, the date

24  of Ms. Mitchell's letter to Mr. Bojanowski. Licci's First RFP was served on August 13,

25  2013.

26         9.     **Paragraph 6:** I made two mistakes while bates labeling documents.

27  Plaintiffs claim that "critical attachments" are missing Defendants' production. No

28

4

1  "critical attachments" were not provided due to misnumbering of bates labels, nor did I

2  intentionally not produce any "critical attachments."   I produced the documents as

3  received.

4       10.   **Paragraph 7:** Plaintiffs complain that there are documents that have not

5  been produced from their expert tours; however, even though Defendants have

6  repeatedly requested Plaintiffs to specify all that is missing, Plaintiffs have not done so.

7  In fact, Plaintiffs have told me and Defendants that they do not know what is missing.

8       11.   **Paragraph 9:** On October 1, 2013, after the time to conduct discovery had

9  passed and the Court had issued its order denying the extension of discovery, Plaintiffs

10  contacted me to request a time to review the nineteen boxes of documents sitting at the

11  Attorney General's Office since June 2013.   I advised Plaintiffs on more than one

12  occasion that the documents were available for review and Plaintiffs promised me on

13  more than one occasion that they would contact me to set up a time to review the

14  documents.  Upon Sophia Calderon's October 1 call, I scheduled a time for Plaintiffs to

15  review the documents, but was reminded shortly thereafter that the deadline to perform

16  discovery had passed.  Upon this reminder, I immediately contacted Ms. Calderon and

17  advised her that the Court's time period to perform discovery had passed and advised her

18  that the review was no longer scheduled.  Plaintiffs never contacted me again to state that

19  they received the message, to object, or otherwise.

20  **Production:**

21       12.   Since the close of discovery on September 27, 2013, I have personally

22  produced 20,616 pages to Plaintiffs, which are the following documents:

23      • Master Record Files: 3,277 pages;

24      • Medical/Dental Records: 15,868 pages;

25      • Statistical Data: 213 pages;

26      • Expert Tours:  Documents (236 pages) and Photos (252 photos);

27      • MGARs/Compliance Rpts: 770 pages.

28

1     13.    Since the close of discovery, September 27, 2013, Defendants also

2  produced 3,362 pages of Temperature Reports.

3     14.    I have approximately 15,532 pages of Master Record Files still to review,

4  redact, and produce.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 28th day of October, 2013.

_Lucy Rand_

Lucy Rand

**ATTACHMENT A**



**TOM HORNE**
ATTORNEY GENERAL

OFFICE OF THE ARIZONA ATTORNEY GENERAL

CIVIL DIVISION / LIABILITY MANAGEMENT SECTION

**LUCY M. RAND**
DIRECT (602) 542-7683
LUCY.RAND@AZAG.GOV

September 11, 2013

**VIA E-MAIL ONLY**

Amy Fettig
ACLU National Prison Project
915 15th Street, NW, 7th Floor
Washington, DC 20005-2112

     Re:    <u>Supplemental Discovery Production</u>
               *PARSONS v. RYAN, USDC CV12-0601-PHX-NVW (MEA)*

Dear Amy:

    This letter responds your September 5, 2013, letter and only addresses discovery production. As Defendants have informed Plaintiffs in the past, Anne Orcutt is the point person for interrogatories and, therefore, she will separately address the portions of your letter regarding interrogatories.

    As you know, discovery has been ongoing for more than 14 months, yet Plaintiffs' letter requesting additional and supplemental discovery arrived only 17 business days before the close of discovery, and on the heels of service of Plaintiffs' large request for production from Plaintiff Licci containing 52 requests. Plaintiffs' late letter request does not permit time to process the requests, obtain items, review and redact the items (if necessary), and produce items prior to September 27, 2013, the close of discovery. Further, the documents requested are so voluminous that Defendants cannot conceivably complete the request even with an additional month to do so. Keeping in mind the time remaining to complete discovery, Defendants request that Plaintiffs immediately provide a written prioritization of their discovery requests.

    If Plaintiffs would like to schedule a meet and confer regarding this matter, I am available on Thursday or Friday of this week and I would be happy to check the availability of co-counsel.

                     Sincerely,

                     s/Lucy M. Rand
                     Lucy M. Rand,
                     Assistant Attorney General

LMR/hs
cc:    Anne Orcutt
       Michael Gottfried

**ATTACHMENT B**

**Rand, Lucy**

| | |
|---|---|
| **From:** | Fettig, Amy <afettig@npp-aclu.org> |
| **Sent:** | Thursday, September 12, 2013 11:04 AM |
| **To:** | Rand, Lucy |
| **Cc:** | Gottfried, Michael; ParsonsTeam@swlfirm.com; Corene Kendrick; cnmitchell@JonesDay.com; Fathi, David; Parsonsdiscovery@prisonlaw.com |
| **Subject:** | RE: Letter re: Discovery  - PARSONS v. RYAN |

Dear Lucy:

Thank you for your response to my discovery supplementation letter of last week, dated September 5, 2013.  We do think a meet and confer would be helpful in this matter and we are generally available on Friday after 10 am PST, please suggest times when you are free.  During the call we would also like to discuss problems we've identified with discovery production during several recent depositions.  In particular, in the deposition s of Dr. David Robertson, Dr. Nicole Taylor, Art Gross, Kathy Campbell, and Marlene Bedoya, all of these witnesses mentioned documents that have never been produced to us, despite the fact that they clearly fall within the ambit of our requests.  Below is an initial list of some of the documents that arose in connection with each witness' testimony.  These lists are not all-inclusive, as we do not have the benefit of the deposition transcript for any hearing other than Dr. Robertson's to identify documents described in the depositions.   In particular, the issue of Corrective Action Plans (CAPs) attached to the MGARs as well as statewide CAPs keeps arising in deposition after deposition.  It is unclear why these haven't been produced, how they are stored electronically, whether they would be attached to the MGAR or not when MGARs are printed.  During the depositions we have received conflicting information from witnesses and Counsel for Defendants as to all of these questions.

There appears to be ample confusion regarding the CAPs and there may be confusion regarding some of the other documents ADC's witnesses have cited in their deposition.  However, these omissions of production are quite serious.  In the interests of avoiding further confusion, we think it would be easiest to discuss the production of documents identified below with you over the phone on Friday during our meet and confer, with the understanding that others may be identified in upcoming depositions as well.

Thank you for your attention to this matter.

Amy

**Documents identified during the deposition of David Robertson:**
- Written reports and documents created by Dr. Robertson after he reviews and investigates specific prisoners' medical cases. *See* transcript at 81:16-82:3.

**Documents identified during the deposition of Kathy Campbell:**
- training materials used in the orientation/training for MGARs in June 2012

**Documents identified during the deposition of Nicole Taylor:**
- Strategic Plan Initiative (drafts and final – note that all of our requests for production include "drafts" within the definition of DOCUMENTS we request)
- Mental Health Technical manual (drafts and final update)
- Psych autopsies completed whenever there is an inmate suicide
- Dr. Taylor's emails to facilities with MGAR findings
- Full list of mgar indicators (both active and inactive)
- Corrective Action Plans (CAPS)

1

- Email from DW G. Fizer of Central to Dr. Taylor early last week re: programming resources
- Agendas for weekly meetings with Corizon
- Psych associate databases (ex: Newman in Kasson)
- MGAR findings (Oct, Nov, April, May, June, July)
·

**Documents identified during the deposition of Art Gross:**
- CAPS for each institution
- Statewide CAPS developed by Wexford and Corizon (drafts and final versions)
- Two-page summaries produced for each facility of each monthly MGAR report
- Quarterly MGAR reports (on Tuesday night you produced the quarterly reports for April/May/June 2013, but we do not have any quarterly reports created for Wexford or Corizon prior to this time period)
- Worksheets used by monitors when auditing prisons.  See ADC088752-755 as an example of worksheets that were attached to the March 2013 review of Florence, also see ADC088737-741 as an example from the March 2013 Eyman review

**Documents identified during the deposition of Marlena Bedoya:**
- Spreadsheets created by M. Bedoya in April 2013 that track trends across the Tucson complex and were attached to her April 5, 2013 memo (Ex. 227, ADC088785)
- CAPs for each institution
- Peer review documents/memos/reports
- February compliance documents (MGAR and compliance report)
- Corizon weekly staffing reports
- Training materials regarding MGARs

Amy Fettig
Senior Staff Counsel
ACLU National Prison Project
915 15th Street., NW 7th Floor
Washington, DC 20005
202-548-6608
afettig@npp-aclu.org

**From:** Rand, Lucy [mailto:Lucy.Rand@azag.gov]
**Sent:** Wednesday, September 11, 2013 9:04 PM
**To:** Fettig, Amy
**Cc:** Gottfried, Michael; SW&L Parsons Team (ParsonsTeam@swlfirm.com)
**Subject:** Letter re: Discovery - PARSONS v. RYAN

Amy,

See attached letter.

Sincerely,
Lucy

Lucy M. Rand,
Assistant Attorney General

**OFFICE OF THE ATTORNEY GENERAL**
Department of Corrections Unit
Liability Management Section
1275 West Washington Street
Phoenix, AZ 85007-2926
**(602) 542-7683 Direct**
(602) 542-7635 Secretary
(602) 542-7670 FAX
Lucy.Rand@azag.gov

The information contained in this e-mail message is privileged and confidential, intended only for the use of the specific individuals and/or entities to which it is addressed.  If you are not one of the intended recipients, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you received this communication in error, please immediately notify the sender by return e-mail or call (602) 542-7683.  Thank you.

**EXHIBIT 3**

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                              Defendants. | NO. 2:12-cv-00601-NVW<br><br><br>**DECLARATION OF<br>ANNE M. ORCUTT** |

I, ANNE M. ORCUTT, make the following Declaration:

1.     I am over the age of 18 years and am competent to testify to, and have personal knowledge of, the matters set forth in this Declaration.

2.     I am an attorney licensed to practice in the District Court, District of Arizona.  I am an attorney of record in *Parsons v. Ryan, et al*, 2:12-cv-00601-NVW.  If called as a witness, I could testify competently to the facts stated herein, all of which are within my personal knowledge.

3.     Many of the "critical" documents Plaintiffs claim have not been produced by Defendants do not even exist, but instead have been invented by Plaintiffs through tortured readings of the depositions of ADC employees.   Other documents, while in existence, are not responsive to the discovery requests Plaintiffs cite in their Motion for Reconsideration.

4.     Plaintiffs failed to address production of other documents until two days before the close of discovery and are now using their Motion for Reconsideration to distract the Court from their failure to timely engage in the meet-and-confer process required by the Court prior to filing any discovery disputes.

5.     Plaintiffs contend that Defendants have not produced "'snapshots' documenting problems at ADC facilities regarding the provision of pharmaceuticals." Quereshi Declaration, ¶5. But Plaintiffs mischaracterize the testimony of Martin Winland, the Pharmacy Contract Monitor, during his deposition regarding "snapshots" to mean that there are stand-alone documents entitled "snapshots" that have not been produced to Plaintiffs.   The "snapshots" referred to by Mr. Winland are not documents at all but instead are the observations of the auditors at the precise point in time they review the pharmacy records.   These "snapshots" are contained in the monthly monitoring ("MGAR") reports, which have been produced to Plaintiffs.

6.     Plaintiffs contend that Defendants have not produced "the 'Strategic Plan Initiative,' regarding prisoners in maximum custody."  Quereshi Declaration, ¶6.  But there is no such document.   Dr. Taylor testified during her deposition regarding an

2

1   ongoing project relating to changing the classification system at ADC, which she stated is

2   "a strategic plan initiative." *See* Taylor Dep. 29:6-9, attached hereto as Attachment A.

3   Dr. Taylor did not testify that there is a document referred to as "the Strategic Plan

4   Initiative." Indeed, she testified that the only document relating to the project is a position

5   paper that was presented to Director Ryan for review "that has not been signed off by

6   anyone yet." *See* Taylor Dep. 30:10-17, attached hereto as Attachment A.  This draft

7   document, which has not yet been approved or implemented, is not responsive to Plaintiff

8   Parsons' Request for Production No. 9 which seeks "ALL POLICIES AND

9   PROCEDURES REGARDING confinement of PRISONERS in ISOLATION, including

10  but not limited to placement in, retention in, or removal from ISOLATION,

11  CONDITIONS OF CONFINEMENT, diet, and OUTDOOR EXERCISE while in

12  ISOLATION." *See* Mitchell Declaration, Exhibit 9.

13          7.      Plaintiffs assert that Defendants have not produced "the 'evolving matrices'

14  ADC uses to determine when a prisoner is ready to be transitioned out of an isolation

15  cell." *See* Quereshi Declaration, ¶ 7.  No such document exists.  Plaintiffs do not cite any

16  authority for their assertion that there is an evolving matrix, nor have Plaintiffs raised this

17  issue with Defendants prior to filing their Motion for Reconsideration.  Defendants

18  presume Plaintiffs have created this "document" from the deposition of Carson

19  McWilliams. Mr. McWilliams did not testify that ADC has an "evolving matri[x]" that it

20  "uses to determine when a prisoner is ready to be transitioned out of an isolation cell."

21  Mr. McWilliams referred to a portion of a memo that outlines the privileges and

22  incentives available to maximum custody inmates participating in the "Walking 5"

23  program at CB-2 as a "step matrix." *See* McWilliams Dep. at 183:10-11, 184:11-14,

24  attached hereto as Attachment B.  Mr. McWilliams testified that this document is "CB 2's

25  program in a nutshell" and is not used at other units besides CB-1.  McWilliams Dep.

26  186:2-8.  He testified that other units have "something they give to the inmates to tell

27  them what the privilege options are." *See* McWilliams Dep. 186:23-188:14, attached

28  hereto as Attachment B.  The step matrix documents for CB-2 and CB-1 have already

3

1   been produced to Plaintiffs and were used as exhibits by Plaintiffs during Mr.

2   McWilliams' deposition. *See* ADC139522-139523. Production of additional documents

3   outlining the privileges available to inmates participating in similar programs at other

4   units has never been the subject of a meet-and-confer between the parties, and such

5   documents were not included in the Stipulation.

6         8.    Plaintiffs contend that Defendants should have produced "monthly inmate

7   grievance appeals reports" pursuant to Plaintiff Parsons' Request for Production No. 55.

8   *See* Quereshi Declaration, ¶ 8. This request seeks "ALL DOCUMENTS REGARDING

9   exhausted GRIEVANCES REGARDING HEALTH CARE or ISOLATION from January

10  1, 2010 through the RESPONSE DATE." *See* Mitchell Declaration, Exhibit 9.   As

11  Defendants explained to Plaintiffs during a meet-and-confer, producing all documents

12  regarding exhausted grievances as requested by Parsons' Request for Production No. 55

13  would be extremely burdensome.   But Defendants agreed to produce logs of inmate

14  grievances and grievance appeals, which contain the inmate's name and inmate number,

15  the date received, a statement of the issue(s) raised in the grievance, and the status of the

16  grievance.   And Defendants produced logs of all medical and non-medical grievances

17  submitted by ADC inmates for 2011, 2012, and 2013 to date.   *See* ADC074296-

18  ADC074366, ADC089380-ADC089442, attached hereto as Ex. D. Defendants also

19  produced the medical and non-medical grievance files of Plaintiffs.   *See*, *e.g.,*

20  ADC016217-018164 and ADC074261-074295. Defendants produced the grievance logs

21  on March 8, 2013 and May 17, 2013.   Thus, Plaintiffs had ample opportunity to bring a

22  discovery dispute to the Court for resolution prior to the close of discovery if they desired

23  to compel production of additional information regarding inmate grievances, but failed to

24  do so.

25        9.    Plaintiffs contend that Defendants have not produced "documents relating to

26  ADC's psychiatric associate database." *See* Quereshi Declaration, ¶11.   ADC does not

27  have a "psychiatric associate database."   Dr. Taylor testified during her deposition that

28  Ms. Newman, a mental health provider at Florence Kasson, has a database that contains

her one-on-one sessions with inmates, when their medications expire, and when the inmate is released. *See* Taylor Dep. 211:25-212:5, attached hereto as Attachment A.. Dr. Taylor did not testify regarding an ADC "psychiatric associate database," nor does such a database exist. Moreover, Dr. Taylor testified that determining which inmates attended group mental health programming in a particular week would require pulling and reviewing each individual inmate's medical records. *See* Taylor Dep. 215:15-216:1, attached hereto as Attachment A.

    10.    Plaintiffs contend that Defendants should produce "agendas from weekly meetings ADC has with Corizon" pursuant to pursuant to Request Nos. 4 and 5 from Plaintiffs' Notice of 30(b)(6) Deposition Duces Tecum, dated August 9, 2012 (Doc. 76). *See* Quereshi Declaration, ¶13. But agendas from weekly meetings are not responsive to either of these requests. Request No. 4 seeks "The plans for an actual evaluation of WEXFORD's compliance and performance, including whether WEXFORD[1] is meeting specific performance measures and outcomes, as defined in Sections 2.14, 2.19 and 2.20 of the HEALTH CARE PRIVATIZATION CONTRACT." *See* Quereshi Declaration, Exhibit 1. Request No. 5 seeks "The POLICIES AND PROCEDURES for requesting and evaluating the reports by WEXFORD to ADC as specified per the schedule identified in Exhibit 2, "Required Reporting," of the HEALTH CARE PRIVATIZATION CONTRACT and what has actually been done to date to request and evaluate such reports." *See* Quereshi Declaration, Exhibit 1. The monthly MGARs, which Defendants have produced to Plaintiffs, serve as the evaluation of Corizon's compliance and performance on specific performance measures and outcomes contained in the contract. These have been produced to Plaintiffs.

    11.    Plaintiffs contend that Defendants should produce "job descriptions for certain ADC employees related to this litigation, in particular monitoring staff" pursuant to Plaintiff Parsons' Request Nos. 21 and 61. *See* Quereshi Declaration, ¶ 14.   Job

---

[1]   Defendants agreed to substitute Corizon for Wexford in responding to Plaintiffs' document requests contained in this Notice.

descriptions for monitoring staff are not responsive to either of these requests.  Request No. 21 seeks "DOCUMENTS SUFFICIENT TO SHOW ADC'S HEALTH CARE STAFFING plan at each facility, including but not limited to DOCUMENTS REGARDING (a) the minimum qualifications (e.g., M.D., R.N., L.P.N., etc.) for each position, whether (i) HEALTH CARE STAFF, (ii) non-patient care-giving staff (such as medical file clerks), or (iii) CORRECTIONAL STAFF, required in the infirmary within the facility; (b) a general DESCRIPTION of the function of each position listed; (c) the training required of each position (e.g., pre-service or in-service trainings); (d) the number of hours required per week for each position; (e) any difference in coverage on holidays or weekends for any staff position; (f) whether each position is filled or vacant as of the RESPONSE DATE; and (g) the identity of the staff members currently filling each position, with provider number (if applicable), shift, duties and degrees for each staff member identified." *See* Mitchell Declaration, Exhibit 9.   Request No. 61 seeks DOCUMENTS SUFFICIENT TO SHOW the ORGANIZATIONAL STRUCTURE of the ADC for the time period from January I, 2011 through the RESPONSE DATE." *See* Mitchell Declaration, Exhibit 9.   Neither of these discovery requests includes job descriptions of monitoring staff.  Moreover, Plaintiffs have not requested a meet-and-confer regarding production of job descriptions of monitoring staff, and such documents were not included in the Stipulation.

12.    Plaintiffs contend that Defendants should produce peer reviews for licensed medical staff, citing the deposition of Marlena Bedoya, the contract monitor for ASPC-Tucson. *See* Quereshi Declaration, ¶ 15.  Ms. Bedoya testified during her deposition that Corizon has not yet finished the first cycle of annual peer reviews, and these documents are therefore not available.   See Bedoya Dep. at 150:3-151:6, attached hereto as Attachment C.   Ms. Bedoya also testified that Wexford retained the peer review documents it produced for its providers when the contract terminated.  Bedoya Dep. at 151:7-23, attached hereto as Attachment G.  Production of peer review documents has not

1    been the subject of a meet-and-confer between the parties, but Defendants agree to

2    produce annual peer reviews for Corizon staff after they are completed.

3          13.    Plaintiffs contend that Defendants should produce weekly wait times for

4    dental treatment by Smallwood Prison Dental Services pursuant to Request No. 5 from

5    Plaintiffs' Notice of 30(b)(6) Deposition Duces Tecum, dated August 9, 2012 (Doc. 76)

6    *See* Quereshi Declaration, ¶ 16.  Weekly dental wait times are not responsive to Request

7    No. 5, which seeks "The POLICIES AND PROCEDURES for requesting and evaluating

8    the reports by WEXFORD to ADC as specified per the schedule identified in Exhibit 2,

9    "Required Reporting," of the HEALTH CARE PRIVATIZATION CONTRACT and what

10    has actually been done to date to request and evaluate such reports."  *See* Quereshi

11    Declaration, Exhibit 1. Exhibit 2 of the Health Care Privatization Contract referenced in

12    Plaintiffs' discovery request requires a ***monthly*** report on the wait times for inmates to be

13    seen by dental.  Defendants have produced monthly dental wait time reports to Plaintiffs.

14    *See* ADC108129-ADC108130.  Weekly dental wait time reports are not responsive to

15    Plaintiffs' discovery request, have not been the subject of a meet-and-confer between the

16    parties, and were not included in the parties' Stipulation.

17          14.    Plaintiffs contend that Defendants should produce documents related to

18    annual audits by the Office of the Arizona Inspector General pursuant to Plaintiff Parsons'

19    Request for Production No. 6.  See Quereshi Declaration, ¶ 17. Inspector General audits

20    are not responsive to Request No. 6, which seeks "All POLICIES AND PROCEDURES

21    REGARDING QUALITY ASSURANCE of HEALTH CARE, including but not limited

22    to required reports, meetings, in-service trainings, audits, evaluations, or peer review

23    systems."  The Office of the Inspector General audits ADC to determine whether it is in

24    compliance with its policies and procedures, *see* McWilliams Dep. 38:5-10, attached

25    hereto as Attachment B, not to determine the quality of health care provided to inmates by

26    ADC's health care contractor.  Moreover, production of documents relating to Inspector

27    General audits of ADC has never been the subject of a meet-and-confer between the

28    parties and was not included in the parties' Stipulation.

15.     Plaintiffs contend that Defendants should have produced the psychiatric autopsies referred to during Dr. Taylor's deposition. (Doc. # 687, p. 2).   Psychiatric autopsies are produced at the direction of ADC's general counsel in anticipation of litigation and thus protected from disclosure.

16.     Plaintiffs state in their Motion that Marlena Bedoya "testified during her September 10, 2013 depositions [sic] about a memorandum she wrote summarizing troublesome trends regarding the administration of sick calls and the management of medical records." (Doc. # 687, p. 2).  Ms. Bedoya did not testify regarding "troublesome trends," nor does the memorandum she was shown during the deposition contain such language.  In fact, she testified that the memorandum, which is dated April 5, 2013, covers the first month of Corizon's performance under the contract.  Ms. Bedoya testified that the spreadsheet she attached to the memorandum "showed which yards and what items needed to be retrained with your staff" because "there were a lot of new hires." Defendants produced the memorandum, which references the spreadsheet, to Plaintiffs on May 17, 2013.  Plaintiffs had ample opportunity to request production of the spreadsheet prior to Ms. Bedoya's deposition on September 10, 2013, but failed to do so.

17.     Plaintiffs state in their Motion that "Carson McWilliams testified that updated statistics compiled by the ADC reveal a change in the suicide rate in ADC facilities." (Doc. # 687, p. 2).  This misstates Mr. McWilliams' testimony.  Carson McWilliams did not refer to suicide rates during his deposition, only numbers of suicides. Nonetheless, Defendants have produced statistics on suicides rates per 100,000 inmates with Defendants' Tenth Supplemental Disclosure Statement, served on September 27, 2013. *See* ADC140136.  And Defendants produced, on June 26, 2013, a chart of all ADC inmates whose deaths were classified as suicides from 2009 to 2013 in response to Plaintiff Wells' Interrogatory No. 1.  Additionally, ADC issues an Inmate Death Notification on the ADC web site for every inmate death in ADC custody.  Thus, the information was available to Plaintiffs.

18.     Plaintiffs state in their Motion that "Mr. McWilliams also testified that the ADC has generated a report listing all prisoners held in isolation units and the amount of time spent by each prisoner."   (Doc. # 687, p. 2).   Plaintiffs mischaracterize Mr. McWilliams' testimony.   When he was asked by Plaintiffs whether there are "any reports or documents generated in ADC that analyze or record the length of stays for prisoners in isolation," Mr. Williams responded, "I don't know of any reports that are just designed to look at length of stay." McWilliams Dep. 150:11-13, 150:15-16, attached hereto as Attachment B.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the ___28___ day of October 2013.


_anne m Orcutt_

_____
Anne M. Orcutt

2829370.1

9

**ATTACHMENT A**

Parsons v. Ryan
Deposition of Taylor, J.D., Ph.D., Nicole - 9/5/2013

Page 29

1    years ago.  I just recently joined the project.  They

2    had been working on -- they being a variety of people I

3    haven't met -- had been working on changing the

4    classification system and moving it towards a different

5    system, and so I joined in just recently.

6        Q     What's the name of this project?

7        A     That's a very good question.  I'm not sure.

8    It's a strategic plan initiative, and I'm not sure what

9    the title of it is.

10       Q     How do you refer to it when you are talking

11   about it?

12       A     Our strategic plan.

13       Q     When did you join the project?

14       A     I joined the project the end of June.

15       Q     Of 2013?

16       A     Correct.

17       Q     Who is in charge of the project?

18       A     Carson McWilliams.

19       Q     And you said this project was begun a couple

20   of years ago?

21       A     Correct.  They had started looking at what

22   they can do for the management of max enclosed inmates

23   on how to classify them in a better fashion to allow

24   more fluid movement, and so we just dovetailed that

25   with programming aspects.

Parsons v. Ryan
Deposition of Taylor, J.D., Ph.D., Nicole - 9/5/2013

Page 30

1      Q     But you just joined the project a couple of

2    months ago?

3      A     Correct.

4      Q     What is your role in the project?

5      A     My role is to work on the movement of the

6    mental health inmates through that system,

7    specifically, and ensuring that their movement through

8    makes sense with what services we have to offer and

9    what their needs might be in that arena.

10     Q     Have you created any documents as part of this

11   project?

12     A     I believe there is only a draft format that

13   has not been signed off on by anyone yet.

14     Q     When you say a draft format, what does that

15   mean?

16     A     It's a proposal, a proposition paper that

17   was -- that is created and presented to Director Ryan.

18     Q     And did you draft that document?

19     A     I assisted in drafting that document.

20     Q     Who else had a role in drafting that document?

21     A     Carson McWilliams, Amy Barnes who is an ADW at

22   Florence complex, Carol Pierce.

23     Q     Is it possibly Pearson?

24     A     No, no, she's the medical records individual.

25   Carol Ortiz, that is her name -- she is out at

Parsons v. Ryan
Deposition of Taylor, J.D., Ph.D., Nicole - 9/5/2013

Page 211

1    to a different day because there was an issue that day,

2    they would just shift it.

3        Q    Okay.  So to your knowledge, neither of these

4    groups have ever been cancelled in Kasson unit because

5    of a security incident?

6                    MS. CLOMAN:  Form.

7                    THE WITNESS:  Canceled and not

8    rescheduled?

9        Q    BY MR. FATHI:  Canceled and not rescheduled

10    the same week.

11        A    That is not my understanding, no.

12        Q    Now, when a prisoner receives a one-on-one

13    counseling session, where is that recorded?

14                    MS. CLOMAN:  Form.

15                    THE WITNESS:  In the mental health

16    section of their medical chart.

17        Q    BY MR. FATHI:  Is it recorded anywhere else?

18        A    By recorded?

19        Q    Let me ask it a different way.  If I wanted to

20    know -- if I wanted to verify that every prisoner in

21    Kasson unit in wing one in fact got their individual

22    session this month, is there any way for me to do that

23    other than looking at each and every one of their

24    medical records?

25        A    Ms. Newman who is at Kasson, for example,

Parsons v. Ryan
Deposition of Taylor, J.D., Ph.D., Nicole - 9/5/2013

Page 212

1    keeps a database that she updates with each time that
2    she does her session.  So she keeps track of when their
3    one-on-one's due, when their medications expire, when
4    they release.  All that information is on a database
5    that is being kept.
6        Q    And is she the only one that does the
7    one-on-ones?
8        A    Currently, I believe that she is the one on
9    wing one Kasson program.
10       Q    How many prisoners are on wing one of Kasson
11   approximately?
12       A    I believe they are running at about 50 right
13   now.
14       Q    And how long are these monthly one-on-one
15   sessions?
16       A    I -- I've seen the full range.  You know, it
17   just depends on what the inmate presents with, whether
18   they need five minutes.  There's some pretty
19   disorganized individuals up there that can't handle
20   more than five, but some of them get an hour if they
21   need an hour.
22       Q    So these monthly one-on-one sessions could
23   range anywhere from about five minutes to about an
24   hour?
25       A    Correct.

Parsons v. Ryan
Deposition of Taylor, J.D., Ph.D., Nicole - 9/5/2013

Page 215

1    wing one this week, how can I find that out?

2        A    They'd probably list all the inmates who are

3    in the program.  If you asked somebody who worked there

4    who attended, they are going to probably list the whole

5    group of people, all 50 of them.

6        Q    No, but I'm asking, so -- okay, so how big are

7    these groups?

8        A    They are eight, and so in one day, they run

9    them eight, eight, eight, eight, eight, all the

10   individuals through the same day, just at different

11   times.

12       Q    And is that true of both the psychoeducational

13   group and the mental health group?

14       A    Yes.

15       Q    So let's say I wanted not just a list of

16   everybody in the unit, I wanted to know who actually

17   went that week.  How could I find that out?

18       A    You would have to pull their charts to

19   determine probably specifically who attended those

20   groups.  And when we get an EMR, that will be an easy

21   push of the button, but until then it's a chart pull.

22       Q    So if I wanted to know for sure who actually

23   attended group that week, there's no other way for me

24   to find that out except to go through all the charts.

25   Correct?

Parsons v. Ryan
Deposition of Taylor, J.D., Ph.D., Nicole - 9/5/2013

Page 216

1      A    Correct.

2      Q    Okay.  Any other mental health programming at

3  Kasson unit that we haven't talked about?

4      A    No.

5      Q    Okay.  Let's move to CB-1.

6      A    Okay.  So CB-1 is a cellblock that has 120

7  beds, and those individuals have to be much higher

8  functioning because we let them out in groups that are

9  much larger, so they need to be doing fairly well

10 psychologically.

11           The expectation is that they attend one

12 to two groups a week, either run by the psych associate

13 or the psych tech at that location; that they attend a

14 one-on-one once a month and that they go out to rec in

15 groups of 70; that they go to chow unrestrained; that

16 they have contact visits, which is separate from the

17 rest of max custody, do not have contact visits.  And

18 that they go down and get -- pick up their store rather

19 than it being brought to them.  And they do that in a

20 group unrestrained.

21           And that's -- they work up and down the

22 phase levels based on their behavior, based on their

23 participation, and that's reviewed weekly in the

24 treatment team meetings that they have.

25     Q    So how many phases are there in CB-1?

**ATTACHMENT B**

Parsons vs Ryan
30(b)(6)   Deposition of Carson Anton McWilliams, AZ Dept of Corrections - 9/27/2013

Page 38

1    performs that?

2         A.    The Inspector General's Office, his staff.

3         Q.    Of the State of Arizona?

4         A.    Correct.

5         Q.    And I guess how do they perform this audit,

6    what do they do?

7              MS. LOVE:   Form and foundation.

8              THE WITNESS:   They look at documentation,

9    and they compare it to policy to be sure that policy is

10   being followed.

11        Q.    BY MS. EIDENBACH:   And one of the reports they

12   look at is the information report that we've been

13   discussing; is that right?

14        A.    Correct.

15        Q.    You said that those reports are kept for about

16   six months.  So an annual audit would only be looking at

17   about six months of reports; is that right?

18             MS. LOVE:   Form.

19             THE WITNESS:   They could require more if

20   they felt like they needed to, but generally speaking,

21   yes, that's all they would look at.

22        Q.    BY MS. EIDENBACH:   Do you know if the annual

23   audit produces a report?

24        A.    Yes, they do.

25        Q.    And do you know who prepares that report?

Parsons vs Ryan
30(b)(6)   Deposition of Carson Anton McWilliams, AZ Dept of Corrections - 9/27/2013

Page 150

1      Q.    Other than the programs we've just discussed,

2    are there any other programs in place at Perryville SMA

3    we haven't talked about?

4            MS. LOVE:  Form and foundation.

5            THE WITNESS:  Not to my knowledge.

6      Q.    BY MS. EIDENBACH:  We're going to go back to

7    Browning.

8            (Exhibit 422 was marked.)

9      Q.    BY MS. EIDENBACH:  While that's being marked,

10   there are any -- and my next couple questions aren't

11   going to be about that document.  Are there any reports

12   or documents generated in ADC that analyze or record the

13   length of stays for prisoners in isolation?

14           MS. LOVE:  Form and foundation.

15           THE WITNESS:  I don't know of any reports

16   that are just designed to look at length of stay.  I

17   mean, we obviously have documents that would tell you how

18   long someone's been there.  We know the duration of that

19   on the computer system.  You can tell that by looking at

20   locations and stuff.  So you could generate a report that

21   way.

22     Q.    BY MS. EIDENBACH:  Do you know if anybody does

23   generate a report?

24     A.    I don't know of a report that's generated just

25   to look at that, no.

Parsons vs Ryan
30(b)(6)  Deposition of Carson Anton McWilliams, AZ Dept of Corrections - 9/27/2013

Page 183

1    record, I'll just review my notes, and then we can finish

2    up.

3               MS. LOVE:  Okay, thank you.

4               (A recess was taken from 2:26 p.m. to

5               2:37 p.m.)

6               (Exhibit 425 was marked.)

7        Q.    BY MS. EIDENBACH:  I've handed you what's been

8    marked Exhibit 425.  And the beginning Bates number is

9    ADC139521.  Are you familiar with this document?

10       A.    Yeah, this is the expectation memo to the

11   inmates.  It looks like CB 2 step matrix here.  Yes, I've

12   seen documents -- I think some of these have changed from

13   time to time, but yes.

14       Q.    So the document mentions CB 2.  Does it apply

15   to any other units?

16       A.    This is just for CB 2 right here.  CB 1 has a

17   different set of things because it's a little bit

18   different with I think the actual TV programs, the things

19   they use.  The newsletter is different, I know that.

20   Some of the things would be the same, but some of them

21   would be different also.

22       Q.    But CB 1 has a similar --

23       A.    CB 1 has a similar one, yes.  But this is

24   CB 2's here.

25       Q.    Does CB 1 have a Memo of Expectations?

Parsons vs Ryan
30(b)(6)  Deposition of Carson Anton McWilliams, AZ Dept of Corrections - 9/27/2013

Page 184

1     A.     I don't believe they do the Memo of

2  Expectations.   I know 2 did because that was the original

3  one we developed for our max custody inmates to become

4  workers and to get out into the yard unrestrained.   And

5  that was a -- to be honest, a little bit more volatile

6  group because some of those guys were well-experienced

7  criminals.   Behaving, but well experienced.   Some of the

8  CB 1 inmates, their issues are more on the mental health

9  side of things.   These are the guys that are more like

10  the wolves type people.

11     Q.     Is there a name for the program that uses the

12  step matrix?

13     A.     Well, we have an informal name.   We call it the

14  Walking 5 Program.   And the only reason we call it that

15  because they're max custody inmates that they're walking

16  around without restraints.   But once we changed some

17  things -- I'm sure we're not going to use that

18  terminology going forward because we're going to open up

19  more cell blocks, and then it's going to become more of

20  this tiered system that we talked about earlier where

21  more of the stage 3 inmates are in Central.   The stage 2

22  inmates, outside of protective custody and the sex

23  offenders, are in SMU 1.   And more of the stage 1

24  inmates, including the condemned row and STG, which are

25  also separate, are in Browning.   So we can have some more

Parsons vs Ryan
30(b)(6)   Deposition of Carson Anton McWilliams, AZ Dept of Corrections - 9/27/2013

Page 186

1   to violence.  Things like that.

2       Q.   And the matrix contained in these documents

3   only applies to CB 2, it's not used in any other max

4   custody yard or program?

5       A.   No, just applies to CB 2.  Now, some of these

6   things do apply in other places, but not all of them.  So

7   this is just CB 2's program in a nutshell here with what

8   they're doing.

9       Q.   Do other units have a similar matrix that they

10  use?

11      A.   Yeah, in fact, we just developed a new one that

12  is a little bit more complex for the project we're doing

13  now.  It actually has more categories.  And we're trying

14  to actually automate this one so we can input everything

15  and let our computer system prioritize them for us.  But

16  it has about 20 categories that we're looking at in it.

17      Q.   So if you look at ADC139523.  It's the last

18  page.

19      A.   Yes.

20      Q.   It mentions CB 1 over in the far right column.

21      A.   Yes.  Let's see.  Far right.  Yeah.  In-Pod

22  Activities.

23      Q.   So is this page the matrix for CB 1?

24      A.   Actually, this one might be -- well, we do have

25  the loaner TV program in there and we've got recreation

Parsons vs Ryan
30(b)(6)   Deposition of Carson Anton McWilliams, AZ Dept of Corrections - 9/27/2013

Page 187

1    awards to include the ribbons.  Yeah, this one looks

2    like -- this looks like actually this is the CB 2 one,

3    and this is the CB 1 one.  Yes, it is.  They have their

4    own little newsletter.  I don't see it listed here,

5    but...

6        Q.    Does Kasson Unit have a similar matrix?

7        A.    It would.  It doesn't have -- I don't think

8    quite as elaborate as this, but it does have -- it's

9    something they give to the inmates to tell them what the

10   privilege options are.  And they do have a newsletter

11   also.  In fact, theirs is called The Kassonian.  And they

12   have art contests and poetry contests.  They do a lot of

13   the similar things.  It's just not quite as detailed as

14   CB 1 because the CB 1 inmates are a little bit

15   functioning.

16       Q.    What about SMU at Eyman, do they have a matrix?

17       A.    They have -- it's a little bit different than

18   this.  They have just recently, though, put out something

19   that does break down some of their privilege systems.

20   Because we had a meeting about a couple months ago and

21   basically told everybody to start following the Central

22   Unit model because the Central Unit was the most

23   organized of all of them because they've been around the

24   longest.  So we said, these guys have gone through the

25   growing pains and they have some of this stuff down, so

Parsons vs Ryan
30(b)(6)  Deposition of Carson Anton McWilliams, AZ Dept of Corrections - 9/27/2013

Page 188

1    follow what they're doing and everybody get on the same

2    page with that respect.

3              So that's when we told them we want all of

4    the CO IIIs to get involved in the counseling groups

5    because the only place that was doing back then was

6    Central Unit.  Now Browning Unit's doing it.  SMU 1 will

7    start soon.  So we're trying to get everybody involved in

8    the same type of things.  It might not be exactly the

9    same programs, but the overall idea will be the same.

10       Q.    What about Perryville, do they have a matrix

11   similar to this?

12       A.    Yes, they do.  I don't know the detail of it,

13   but I know they have something that they put out as

14   Phoenix Complex.

15       Q.    I was going to ask you, other than CB 1, CB 2,

16   Kasson, Phoenix, Eyman, and Perryville, are there any

17   other units that have a matrix?

18       A.    To my knowledge, with the addition of Phoenix,

19   no.  I think they might be developing something down in

20   Tucson, but I haven't seen that yet.

21       Q.    Looking back at 523, so the last page of the

22   exhibit, CB 1, do you know when this program was put into

23   place?

24       A.    Yes.  It was May of 2012, I believe.

25       Q.    And how many prisoners are in this program?

**ATTACHMENT C**

Parsons v. Ryan
Deposition of Bedoya, Marlena D. - 9/10/2013

Page 150

1    went over that, and we did talk about the spreadsheets

2    more generally, and you said that the only kind of

3    documentation you had for each month is the MGAR?

4          A    Right.

5          Q    What are the Peer reviews that are mentioned

6    as number 4, annual P-E-E-R reviews?  "Is the

7    contractor conducting annual PEER reviews for

8    Physicians, Nurse Practitioners, PAs, Dentists,

9    Psychiatrists, Psychiatric Nurse Practitioners, and

10   Ph.D.-level psychologists?"

11         A    Peer reviews are -- okay.  Anybody with a

12   license, nurse, mid-level nurse practitioner,

13   physician, they are to have what's called a

14   peer review, meaning your mid-levels, which are your

15   nurse practitioners, they are seeing patients, writing

16   scrips, requesting labs.  They have somebody, usually a

17   physician, meaning the medical director for the

18   complex, who randomly audits some of their charts each

19   month.  And he goes down through and reviews, and he

20   makes sure that that nurse practitioner is, you know,

21   prescribing, seeing, ordering appropriate steps in a

22   person's care.  That's what a peer review is.

23         Q    Does Corizon do peer reviews?

24         A    They do.  The medical director for our site --

25   I can only speak of Tucson --

Parsons v. Ryan
Deposition of Bedoya, Marlena D. - 9/10/2013

Page 151

1      Q     Of course.

2      A     -- okay, she has started doing the peer

3   reviews for the mid-levels out there.

4      Q     Do you know if they finished one single cycle

5   of review yet?

6      A     They had -- no.

7      Q     Did Wexford do peer reviews?

8                MR. BOJANOWSKI:  Form.

9                THE WITNESS:  Should have.

10     Q     BY MR. PODSIADLIK:  Did they?

11     A     Should have.

12                MR. BOJANOWSKI:  Form.

13     Q     BY MR. PODSIADLIK:  Do you -- do you know

14   whether they did?

15                MR. BOJANOWSKI:  Same objection.

16                Go ahead.

17                THE WITNESS:  Should have.

18     Q     BY MR. PODSIADLIK:  If you wanted to find out

19   if they've actually done that, what would you do?

20     A     They --

21                MR. BOJANOWSKI:  Same objection.

22                THE WITNESS:  -- took the paperwork back

23   with them.

24     Q     BY MR. PODSIADLIK:  I see.  So as far as you

25   know, if I asked them for peer-review documents, the

**EXHIBIT 4**

1 | Arizona Attorney General Thomas C. Horne
Office of the Attorney General
2 | Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
3 | Assistant Attorneys General
1275 W. Washington Street
4 | Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
5 | Fax: (602) 542-7670
Michael.Gottfried@azag.gov
6 | Lucy.Rand@azag.gov

7 | Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
8 | Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
9 | Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
10 | Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
11 | STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
12 | Chandler, Arizona  85226
Telephone:  (480) 420-1600
13 | Fax:  (480) 420-1696
dstruck@swlfirm.com
14 | kwieneke@swlfirm.com
rlove@swlfirm.com
15 | tbojanowski@swlfirm.com
nacedo@swlfirm.com
16 | ccloman@swlfirm.com
afletcher@swlfirm.com
17 | aorcutt@swlfirm.com
*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-NVW <br><br> **DECLARATION OF ASHLEE B. FLETCHER** |

I, **ASHLEE B. FLETCHER**, make the following Declaration:

1.    I am over the age of 18 years and am competent to testify to, and have personal knowledge of, the matters set forth in this Declaration.

2.    I am an attorney licensed to practice in the District Court, District of Arizona. I am an attorney of record in *Parsons v. Ryan, et al*, 2:12-cv-00601-NVW. If called as a witness, I could testify competently to the facts stated herein, all of which are within my personal knowledge.

3.    The below information references materials Plaintiffs assert there are ongoing disputes regarding as referenced in the Stipulation Regarding Discovery filed on September 27, 2013. *See* Doc. 674.

4.    Plaintiffs allege there are disputes regarding "materials flagged in the course of Plaintiffs' Expert tours, including specific documents from prisoner's medical charts, and photographs taken at the direction of the experts." Defendants have already produced the majority of these items and have informed Plaintiffs they will produce the remaining items once they are received from the facility. *See* Attachment A (Spreadsheet of Items produced on the tours). Indeed, in an October 21, 2013 correspondence from Plaintiffs' Counsel to Defendants, Alison Hardy acknowledges Defendants have already produced photographs and medical records requested during the tours. *See* Attachment B (October 21, 2013 Correspondence from Hardy). Moreover, Plaintiffs have admitted they are unsure what documents they tabbed and/or requested during the tours.

5.    Plaintiffs assert there are disputes with respect to Licci's Requests for Production Nos. 4, 5, and 50, but Defendants have already produced documents in response to these requests. Specifically, Request No. 4 was served on August 13, 2013. This RFP requested medical records for over 400 inmates. To date, Defendants have produced nineteen of the medical records and will have another eighteen produced shortly. Request No. 5 was served on August 13, 2013. This RFP requests "Master Files" of 90 inmates. To date, Defendants have produced 25 of those files – encompassing 3,068 pages. Defendants are diligently working on producing the remaining files – consisting of over 15,532 pages. Request No. 50 was served on August 13, 2013 – well

2

1   over a year after discovery started in this case.  This RFP requests dental HNRS of over

2   30 inmates.   To date, Defendants have produced over twenty inmates' dental HNRS.

3   Further, of the fifty records requested in RFP #5 and #50, Plaintiffs reviewed 48 of them

4   during their experts' tours.  Additionally, during the tours, Plaintiffs flagged individual

5   pages of medical records and Defendants have been producing these pages.

6       6.    Plaintiffs allege there is an ongoing dispute with respect to Licci's RFAs 1-

7   9; Licci's Interrogatories 2-4, 13, 20; Plaintiff Gamez RFA 29-49, 58-59, 64-71, 74-75.

8   No dispute exists.   During a meet-and-confer with Plaintiffs on September 27, 2013,

9   Defendants agreed to review our responses to Plaintiff Licci's Request for Admission

10  Nos. 1-8;[1] Plaintiff Licci's Interrogatory Nos. 2-4, 13, and 20; and Plaintiff Gamez's

11  Request for Admission Nos.   29-49, 58-59, 64-71, and 74-75 for supplementation.

12  Defendants have done so and will supplement our responses to these discovery requests.

13      7.    Plaintiffs allege that disputes remain concerning the types of documents that

14  Plaintiffs contend Defendants are required to supplement.  In the stipulation, Plaintiffs

15  baldly assert that there are disputes concerning the *types* of documents Defendants are

16  required to supplement.    It is not clear what Plaintiffs are referring to, however,

17  Defendants will supplement their responses as required under Rule 34 of the Federal

18  Rules of Civil Procedure.

19      8.    Plaintiffs allege that disputes remain concerning Defendants' privilege log.

20  Plaintiffs contend, without any detail or support, that disputes remain as to whether

21  Defendants are required to produce a privilege log to their production of documents other

22  than email.  Defense Counsel has informed Plaintiffs' Counsel on numerous occasions

23  that Defendants will not produce a privilege log for communications with our clients.

24  Plaintiffs have agreed to this.  Then, in Plaintiffs' September 25, 2013 letter, Plaintiffs

25  accuse Defendants of failing to produce a privilege log.  Plaintiffs fail to mention what

26  exactly they believe Defendants need to provide a privilege log for.  Moreover, the parties

27

28

---

[1]  Plaintiff Licci propounded only 8 Requests for Admission, not 9 as stated by Plaintiffs in the Stipulation.

3

1   attended a meet-and-confer just two days before Plaintiffs sent their letter, and Plaintiffs

2   failed to raise the privilege log issue at that time.   To the extent Plaintiffs assert

3   Defendants should have produced a privilege log, there is no reason Plaintiffs could not

4   have brought this to the Court's attention at an earlier juncture.

5          9.      Plaintiffs assert disputes remain regarding the production of documents

6   described by witnesses in depositions.  The majority of these items were not brought to

7   Defendants' attention until September 25, 2013 – two days before the close of discovery.

8   *See* Attachment H (September 25, 2013 Correspondence from Fathi to Rand).   These

9   individuals requests are outlined below:

10         10.     Plaintiffs request production of the "Strategic Plan Initiative Draft"

11  mentioned during the deposition of Nicole Taylor.  Although Taylor's deposition was on

12  September 5, 2013, Plaintiffs did not request this document until September 25, 2013.

13  Defendants are willing to produce this document, however, will not produce until it is in

14  final form.  Defendants see little value in producing drafts until the document is in its final

15  form.

16         11.     Plaintiffs request production of the Mental Health Technical Manual – in

17  draft form.   In Taylor's deposition on September 5, 2013, she testified ADC was in the

18  process of updating this manual.  *See* Attachment C (Deposition of N. Taylor at 55:18-

19  56:11). Plaintiffs did not request this document until September 25, 2013.   Regardless,

20  Defendants have already produced several versions of this document to Plaintiffs; one that

21  was in effect from December 11, 2009 – August 14, 2011 and another that went into effect

22  on August 15, 2013.  Because this document is in constant flux while being updated, it

23  makes little sense to provide drafts of this document.  Defendants will produce the next

24  version once it is in final form.  Moreover, as Defendants have explained to Plaintiffs

25  numerous times, these manuals are on the ADC website. Indeed, Plaintiffs are aware of

26  this as they pulled the most recent version from ADC's website, and marked it as Exhibit

27  29 to Dr. Shaw's deposition.

28

12. Plaintiffs request production of psych autopsies from all inmate suicides. They do not provide a date range for this overbroad request. Regardless, Psych Autopsies are generated in anticipation of litigation at the direction of ADC's general counsel. These documents are work product and not subject to production.

13. Plaintiffs request production of "Taylor's emails to facilities with MGAR findings pasted in." Defendants believe Plaintiffs are referring to Dr. Taylor's deposition where she testified that she sends the MGAR findings to site leads and Dr. Shaw. *See* Attachment C at 80:2-80:20. This information is duplicative of the information contained in the MGARS. As Dr. Taylor testified, "So those would be the same as the MGAR findings, they are just in an e-mail format rather than the MGAR format." *Id.* Defendants have already produced thousands of pages of MGARS and have informed Plaintiffs they will continue to produce them up until the time of trial. Additionally, Taylor's emails were not a part of email production. Defendants have produced all emails as ordered by the Court. Additionally, Plaintiffs waited until September 25, 2013 to request this information.

14. Plaintiffs request production of a "Full List of MGAR Indicators (both active and inactive)." Defendants believe Plaintiffs are requesting this because Taylor testified in her deposition that she received training on what the MGAR indicators are. *See* Attachment C at 33:2-33:10. Since June alone, Defendants have produced over 1760 pages of MGAR reports – including lists of MGAR indicators.

15. Plaintiffs request "Instruction materials regarding the MGAR audit tool." Defendants have produced over 200 pages of instructional materials regarding the MGAR.

16. Plaintiffs request "Corrective Action Plans for MGAR 'amber' and 'red' findings, including all the documents, drafts, worksheets, etc. generated by monitors when preparing their MGAR reports." Plaintiffs allegedly request this information because several monitors testified they use notes as the basis for their monthly MGAR reports. They assert that both the Corrective Action Plans and the notes are responsive to the following requests: Doc. 76 at 4: "The plans for and actual evaluation of Wexford's

1   compliance and performance, including whether Wexford is meeting specific performance

2   measures and outcomes, as defined in Sections 2.14, 2.19 and 2.20 of the Health Care

3   Privatization Contract"; and Doc. 76 at 5: "The Policies and procedures for requesting

4   and evaluating the reports by Wexford to ADC as specified per the schedule identified in

5   Exhibit 2, 'Required Reporting," of the Health Care Privatization Contract and what has

6   actually been done to date to request and evaluate such reports. This topic includes the

7   identity of all ADC staff or other employees, agents, or contractors who participated in

8   these activities and their roles." Defendants fail to see how these documents are

9   responsive to either of these requests. Moreover, Plaintiffs did not request these

10  documents until September 25, 2013. Additionally, Defendants have informed Plaintiffs

11  numerous times of the difficulties presented in obtaining Corrective Action Plans, but

12  informed Plaintiffs we will produce them to the extent it is possible and does not create an

13  undue burden. This is an ongoing process and Plaintiffs are aware of it. *See* Attachment

14  D (Declaration of K. Campbell).

15         17.    Plaintiffs request production of "E-versions of the CAPS as they appear on

16  the screen." During Mr. Evans' deposition, Plaintiffs' Counsel requested printouts of the

17  CAPS and "e-versions" of the CAPS. *See* Attachment E (Deposition of T. Evans) at

18  147:10-148:23.    Defense Counsel requested that Plaintiffs' Counsel advise which

19  discovery request they believed these items were responsive to. They failed to do so until

20  September 25, 2013. Plaintiffs allege this is responsive to the following requests; Doc. 76

21  at 4: "The plans for and actual evaluation of Wexford's compliance and performance,

22  including whether Wexford is meeting specific performance measures and outcomes, as

23  defined in Sections 2.14, 2.19 and 2.20 of the Health Care Privatization Contract"; and

24  Doc. 76 at 5: "The Policies and procedures for requesting and evaluating the reports by

25  Wexford to ADC as specified per the schedule identified in Exhibit 2, 'Required

26  Reporting," of the Health Care Privatization Contract and what has actually been done to

27  date to request and evaluate such reports. This topic includes the identity of all ADC staff

28  or other employees, agents, or contractors who participated in these activities and their

6

roles."  Defendants fail to see how "e-versions" are responsive to either of these requests.

Regardless, as described above, Defendants will produce CAPS to the extent they can and to the extent it does not create and undue burden.  *See* Attachment D.  To the extent the "e-version" is identical to the printed version, Defendants will only produce one version.

18.     Plaintiffs request an email from Greg Fizer to Taylor stating that programming doesn't have adequate resources.  In her deposition, Taylor testified she received an email from Fizer "last week" noting that he had concerns that the program at Florence Central Unit isn't being followed in the way that we had set it up a year ago.  *See* Attachment C at 160:17-160:25.  Plaintiffs' Counsel waited until September 25 to request this email.  Regardless, Defendants were not ordered to produce emails from Fizer or Taylor.  Defendants have produced all emails ordered by the Court.

19.     Plaintiffs request production of "Written Agendas and meeting minutes for weekly meetings with Corizon officials and ADC Monitoring Bureau."  Plaintiffs waited until September 25, 2013 to specifically request this information, although they contend these documents are responsive to the following requests: Doc. 76 at 4:  "The plans for and actual evaluation of Wexford's compliance and performance, including whether Wexford is meeting specific performance measures and outcomes, as defined in Sections 2.14, 2.19 and 2.20 of the Health Care Privatization Contract"; and Doc. 76 at 5:  "The Policies and procedures for requesting and evaluating the reports by Wexford to ADC as specified per the schedule identified in Exhibit 2, 'Required Reporting,' of the Health Care Privatization Contract and what has actually been done to date to request and evaluate such reports.  This topic includes the identity of all ADC staff or other employees, agents, or contractors who participated in these activities and their roles."  Plaintiffs' waited until September 18, 2013, during Marty Winland's deposition to request these items.    Regardless, Defendants fail to see how these documents are responsive to either of these requests.

20.     Plaintiffs request production of "written agendas and minutes for weekly ADC monitor meetings."  Plaintiffs waited until September 25, 2013 to specifically

1    request this information, although they contend these documents are responsive to the

2    following requests: Doc. 76 at 4:  "The plans for and actual evaluation of Wexford's

3    compliance and performance, including whether Wexford is meeting specific performance

4    measures and outcomes, as defined in Sections 2.14, 2.19 and 2.20 of the Health Care

5    Privatization Contract"; and Doc. 76 at 5:  "The Policies and procedures for requesting

6    and evaluating the reports by Wexford to ADC as specified per the schedule identified in

7    Exhibit 2, 'Required Reporting,' of the Health Care Privatization Contract and what has

8    actually been done to date to request and evaluate such reports.  This topic includes the

9    identity of all ADC staff or other employees, agents, or contractors who participated in

10   these activities and their roles.  Defendants fail to see how these documents are responsive

11   to either of these requests.

12        21.    Plaintiffs request "spreadsheets attached to the memorandum of M. Bedoya

13   to the FHA for ASPC-Tucson dated April 5, 2013 (ADC088785)."  During Bedoya's

14   deposition, she was shown a memorandum containing a note that stated, "Please see the

15   attached spreadsheets for trends across the Tucson Complex."  *See* Attachment F

16   (Deposition of M. Bedoya) at 145:20-147:15.  Bedoya testified that she didn't recall what

17   the spreadsheets were referring to, but stated she probably created them herself so that she

18   could visibility demonstrate the tracking and trends for that particular month. *Id.*  She

19   never testified this was a document created in the regular course of ADC business, rather

20   it was a document created one time by the witness to help her visualize that month's

21   trends. Plaintiffs waited until September 25, 2013 to specifically request this information,

22   although they contend these documents are responsive to the following requests:  Doc. 76

23   at 4:  "The plans for and actual evaluation of Wexford's compliance and performance,

24   including whether Wexford is meeting specific performance measures and outcomes, as

25   defined in Sections 2.14, 2.19 and 2.20 of the Health Care Privatization Contract"; and

26   Doc. 76 at 5:  "The Policies and procedures for requesting and evaluating the reports by

27   Wexford to ADC as specified per the schedule identified in Exhibit 2, 'Required

28   Reporting," of the Health Care Privatization Contract and what has actually been done to

1   date to request and evaluate such reports.  This topic includes the identity of all ADC staff

2   or other employees, agents, or contractors who participated in these activities and their

3   roles."   Defendants fail to see how this request would notify Defendants that Plaintiffs

4   were requesting a "cheat sheet" created by a contract monitor at one particular facility for

5   one particular month.  This document is not responsive to this request.  More importantly,

6   Defendants produced the memorandum to Plaintiffs on May 17, 2013, but Plaintiffs failed

7   to request the spreadsheets referenced in the document until September 25, 2013.

8        22.    Plaintiffs request "written job descriptions for Arthur Gross, Assistant

9   Director of ADC and leader of the Health Services Contract Monitoring Bureau." They

10  allege this document is responsive to Parsons RFP #21, " Documents sufficient to show

11  ADC"s health care staffing plan at each facility, including but not limited to documents

12  regarding (a) the minimum qualifications (e.g., M.D., R.N., L.P.N., for each position,

13  whether (i) health care staff, (ii)non-patient care-giving staff (such as medical file clerks),

14  or (iii) correctional staff, required in the infirmary within the facility; (b) a general

15  description of the function of each position listed; (c) the training required of each

16  position (e.g., pre-service of in-service trainings); (d) the number of hours required per

17  week for each position; (e) any difference in coverage on holidays or weekends for any

18  staff position; (f) whether each position is filled or vacant as of the response date; and (g)

19  the identity of the staff members currently filling each position, with provider number (if

20  applicable), shift, duties and degrees for each staff member identified; and Parsons RFP

21  #61, "Documents sufficient to show the organizational structure of the ADC for the time

22  period from January 1, 2011 through the response date."  Defendants fail to see how

23  Gross's job description is responsive to either of these requests.  Although Gross testified

24  during his deposition that a written job description exists for his current position, Plaintiffs

25  failed to ask for this information prior to his depo.  Moreover, Gross testified that his job

26  description states, "responsible for the oversight of a monitoring bureau or service bureau

27  with the Department of Corrections for contracted healthcare service provision in ten state

28  prison locations."  *See* Attachment G (Deposition of A. Gross) at 10:10-10:14.  Thus,

9

1    Plaintiffs already have this information.    Moreover, Plaintiffs waited until September 25

2    to specifically request this information.

3        23.    Plaintiffs also request "written job descriptions for the monitor positions in

4    the health services contract monitoring bureau." Plaintiffs allege this was brought to their

5    attention during Gross's deposition, but he never testified regarding the job descriptions of

6    other individuals. Plaintiffs assert these documents are responsive to Parsons RFPS #21,

7    61 (described above), but Defendants disagree. Regardless, as described above, there is

8    no reason Plaintiffs could not have asked for this information earlier. The first time

9    Defendants received this request was in Plaintiffs' September 25 letter.

10        24.    Plaintiffs request "peer reviews for all licensed medical staff at ASPC-

11    Tucson and potentially other facilities." First, the request itself is unclear as to which peer

12    review documents Plaintiffs are requesting. Regardless, Plaintiffs assert these documents

13    were first brought to their attention during Bedoya's deposition on September 10, 2013,

14    but Plaintiffs' Counsel waited until September 25, 2013 before requesting these

15    documents. Plaintiffs are being disingenuous. The document that refers to peer reviews,

16    that was marked as an exhibit during Bedoya's deposition, was produced to Plaintiffs on

17    May 17, 2013. Had Plaintiffs timely reviewed the production, they could have requested

18    production of peer reviews, and brought it to the Court's attention, prior to September 25,

19    2013.

20        25.    Plaintiffs request "weekly staffing reports regarding Corizon's staffing

21    levels." During Bedoya's deposition she testified that she receives a weekly staffing

22    report from ADC. *See* Attachment F at 171:22-172:13.    Plaintiffs did not request

23    production of these reports during Bedoya's deposition on September 10, 2013 and

24    instead waited until September 25, 2013, to request these reports. Regardless, Plaintiffs

25    are in possession of this information as Defendants have been consistently producing

26    Corizon's monthly staffing report.

27        26.    Plaintiffs request "Psych associates databases containing group program

28    records." Plaintiffs base this request off one comment in Taylor's deposition that, "Ms.

Newman who is at Kasson, for example, keeps a database that she updates with each time she does a session." *See* Attachment C at 211:19- 212:9. Plaintiffs have taken this testimony from Taylor and used it to claim, without support, that all psych associates maintain this "database." To the contrary, Taylor simply testified she was aware that one psych associate at one facility maintained this database. Moreover, Plaintiffs failed to request this "database" during the September 5, 2013 deposition and instead waited until September 25, 2013. Further, as acknowledged by Plaintiffs' Counsel during Taylor's deposition, whether an inmate was seen in a group or individual session will be documented in that individual's medical records. Plaintiffs already have this information.

27. Plaintiffs request "Drafts of statewide Actions Plans from Corizon in Pharmacy, Mental Health, Chronic Care, Sick Call, and Utilization Management, including "statement of need" and target date for addressing the need." Defendants are confused by this request and are unsure of what specific documents Plaintiffs are referring to. Plaintiffs assert this information was discovered during the Taylor and Gross depositions. In Taylor's deposition, she testified that the current plan is to have corrective action plans done across the board, statewide. *See* Attachment C at 168:17-24. Taylor did not testify this had been accomplished. In Gross's deposition, he testified that there are some statewide correction action plans that are in draft form. *See* Attachment G at 59:2-5. Although Plaintiffs' Counsel discussed the statewide CAPS with Defense Counsel during Gross's deposition, Plaintiffs did not ask for them until September 25. Defendants have informed Plaintiffs they will produce CAPS to the extent they can extract them from the MGAR program without undue burden. *See* Attachment D. As described above, Defendants will not produce drafts of these documents.

28. Plaintiffs request a "53 page boot camp manual" for ADC monitors. Defendants produced this document to Plaintiffs on September 24, 2013.

29. Plaintiffs request "Weekly reports from the Dental Coordinator." Defendants have produced dental wait time reports to Plaintiffs.

30.     Plaintiffs request "Monthly Inmate Grievance Appeal Reports." Defendants have already produced these documents to Plaintiffs.

31.     Plaintiffs also request production of "documents identified at the Winland deposition that have not been produced." Plaintiffs point to numerous items referenced within documents that were produced to Plaintiffs on September 9, 2013. To the extent Plaintiffs believed the items referenced in these documents should have been produced, Plaintiffs could have brought this to Defendants attention upon receipt of the production. Instead, Plaintiffs waited until September 25, 2013 to request production of these items.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on ⟨⟨Ⓞⓒⓣⓞⓑⓔⓡ 29⟩⟩, 2013.

Ashlee Fletcher

12

**ATTACHMENT A**

## Production Related to Expert Tours

| Attorney | Expertise | Expert | Facility | Tour Dates | Photos Requested | Med Recs Requested | Other Docs Requested |
|---|---|---|---|---|---|---|---|
| Cancelled | Medical | Cohen, Bobby | Douglas - Cancelled | 9/6/2013 | - | - | - |
| Fletcher | Medical | Cohen, Bobby | Eyman | 7/17/2013 | 8 | 2 | |
| Fletcher | Medical | Cohen, Bobby | Eyman | 7/18/2013 | 2 | 0 | |
| Fletcher | Medical | Cohen, Bobby | Lewis | 7/15/2013 | 0 | 0 | |
| Fletcher | Medical | Cohen, Bobby | Lewis | 7/16/2013 | 5 | 0 | |
| Cancelled | Medical | Cohen, Bobby | Safford - Cancelled | 9/3/2013 | - | - | - |
| Rescheduled | Medical | Cohen, Bobby | Tucson - Rescheduled | 9/4/2013 | - | - | - |
| Rescheduled | Medical | Cohen, Bobby | Tucson - Rescheduled | 9/5/2013 | - | - | - |
| Wieneke | Max Conditions (psych effects) | Haney, Craig | Eyman | 7/23/2013 | 37 | 0 | |
| Wieneke | Max Conditions (psych effects) | Haney, Craig | Eyman | 7/24/2013 | 21 | 0 | |
| Wieneke | Max Conditions (psych effects) | Haney, Craig | Eyman | 7/25/2013 | 0 | 0 | |
| Wieneke | Max Conditions (psych effects) | Haney, Craig | Florence | 7/19/2013 | 25 | 11 | 25 + 12? |
| Wieneke | Max Conditions (psych effects) | Haney, Craig | Florence | 7/22/2013 | 31 | 0 | |
| Bojanowski | Max Conditions (psych effects) | Haney, Craig | Perryville | 7/18/2013 | 10 | 0 | |
| Bojanowski | Dental | Shulman, Jay | Douglas | 8/6/2013 | 0 | 0 | |
| Orcutt | Dental | Shulman, Jay | Eyman | 7/22/2013 | 0 | 1 | Routine Dental Care Rpt |
| Orcutt | Dental | Shulman, Jay | Eyman | 7/23/2013 | 0 | 0 | |
| Orcutt | Dental | Shulman, Jay | Florence | 7/24/2013 | 0 | 0 | Routine Dental Care Rpt |
| Orcutt | Dental | Shulman, Jay | Florence | 7/25/2013 | 0 | 0 | |
| Orcutt | Dental | Shulman, Jay | Lewis | 7/9/2013 | 0 | 0 | Active Dental HNRs List |
| Orcutt | Dental | Shulman, Jay | Lewis | 7/10/2013 | 0 | 0 | |
| Wieneke | Dental | Shulman, Jay | Perryville | 7/8/2013 | 0 | 0 | Routine Dental Care Report; Smallwood Dental Rpt |
| Wieneke | Dental | Shulman, Jay | Perryville | 7/9/2013 | 0 | 0 | |
| Orcutt/Rand | Dental | Shulman, Jay | Phoenix | 7/26/2013 | 0 | 0 | Routine Dental Care Rpt (Alhambra, Aspen MTU) |
| Bojanowski | Dental | Shulman, Jay | Safford | 8/5/2013 | 0 | 0 | |
| Orcutt | Dental | Shulman, Jay | Tucson | 8/7/2013 | 0 | 0 | |
| Orcutt | Dental | Shulman, Jay | Tucson | 8/8/2013 | 0 | 0 | |
| Fletcher | Dental | Shulman, Jay | Yuma | 7/11/2013 | 0 | 0 | |
| Fletcher | Dental | Shulman, Jay | Yuma | 7/12/2013 | 0 | 0 | Routine Dental Care Rpt |
| Wieneke | Mental Health | Stewart, Pablo | Eyman | 7/16/2013 | 18 | 43 | |
| Wieneke | Mental Health | Stewart, Pablo | Florence | 7/15/2013 | 28 | 0 | |
| Cloman | Mental Health | Stewart, Pablo | Lewis | 7/22/2013 | 8 | 26 | Inmate MH By Location Rpt |
| Cloman | Mental Health | Stewart, Pablo | Perryville | 7/18/2013 | 14 | 20 | Inmate Outcount Sheet; Weekly Programming for WTU |
| Cloman | Mental Health | Stewart, Pablo | Phoenix | 7/19/2013 | 35 | 16 | |
| Cloman | Mental Health | Stewart, Pablo | Tucson | 7/8/2013 | 5 | None | |
| Cloman | Mental Health | Stewart, Pablo | Tucson | 7/9/2013 | 0 | None | |
| Fletcher | Mental Health | Stewart, Pablo | Yuma | 7/23/2013 | 13 | 17 | |
| Bojanowski | Max Conditions of Confinement | Vail, Eldon | Eyman | 8/1/2013 | 15 | | |
| Bojanowski | Max Conditions of Confinement | Vail, Eldon | Eyman | 8/2/2013 | 14 | | |
| Wieneke/Bojanowski | Max Conditions of Confinement | Vail, Eldon | Florence | 7/30/2013 | 0 | | |
| Wieneke/Bojanowski | Max Conditions of Confinement | Vail, Eldon | Florence | 7/31/2013 | 28 | | |
| Rand | Max Conditions of Confinement | Vail, Eldon | Perryville | 7/29/2013 | 16 | | |

## Production Related to Expert Tours

| Attorney | Expertise | Expert | Facility | Tour Dates | Photos Requested | Med Recs Requested | Other Docs Requested |
|---|---|---|---|---|---|---|---|
| TBD | Medical | Wilcox, Todd | Florence | 10/15/2013 | ? | 3 | |
| TBD | Medical | Wilcox, Todd | Florence | 10/16/2013 | ? | 0 | |
| Rescheduled | Medical | Wilcox, Todd | Florence - Rescheduled | 8/12/2013 | - | - | |
| Reschedules | Medical | Wilcox, Todd | Florence - Rescheduled | 8/13/2013 | - | - | - |
| Cloman | Medical | Wilcox, Todd | Perryville | 7/30/2013 | ? | - | Tabbed Recs - Courtney did not take pics with them. |
| Cloman | Medical | Wilcox, Todd | Perryville | 7/31/2013 | ? | - | |
| Fletcher | Medical | Wilcox, Todd | Phoenix | 7/29/2013 | ? | - | |
| TBD | Medical | Wilcox, Todd | Tucson | 10/24/2013 | N/A | N/A | |
| TBD | Medical | Wilcox, Todd | Tucson | 10/25/2013 | N/A | N/A | |
| Cancelled | Medical | Wilcox, Todd | Winslow - Cancelled | 8/14/2013 | - | - | - |
| Fletcher | Medical | Wilcox, Todd | Yuma | 8/1/2013 | 9 | | HNR Monitoring Form; Special Diets forms from Y-La Paz |
| Fletcher | Medical | Wilcox, Todd | Yuma | 8/2/2013 | 0 | | |
| Orcutt | Max Conditions (medical) | Williams, Brie | Eyman | 8/15/2013 | 14 | | |
| Fletcher | Max Conditions (medical) | Williams, Brie | Florence | 8/14/2013 | 14 | | |
| Rand | Max Conditions (medical) | Williams, Brie | Perryville | 8/16/2013 | () | 13 | Browning Activity Schedule (8/1/2013); F-Kasson MH Program; Max Custody Step Program; MH Note re Group Schedules (PV-SMA), Programming Schedule |
| | Unknown | | Unknown | Unknown | | | |

**ATTACHMENT B**

## Elaine Percevecz

| | |
|---|---|
| **From:** | Alison Hardy <ahardy@prisonlaw.com> |
| **Sent:** | Monday, October 21, 2013 3:10 PM |
| **To:** | Lucy Rand; Parsons Team; Alewelt, Jennifer; Dooley, Cathleen; Kader, Sarah; Rico, JJ; Varma, Asim; Amy Fettig; Fathi, David; Flood, Kelly; Lyall, James; Pochoda, Daniel; Pochoda, Daniel; Quereshi, Ajmel; Brantley, Kevin; Calderon, Sophia; Freeman, Taylor; Kiernan, David; Mamedova, Kamilla; Messina, Jennifer; Mitchell, Caroline; Wilkes, John; Barr, Daniel; du Mee, Matthew; Eidenbach, Kirstin; Gerlicher, Amelia; Gray, John; Corene Kendrick; Sara Norman; Don Specter |
| **Subject:** | RE: Production - PARSONS v. RYAN |
| | |
| **Importance:** | High |

Dear Lucy,

Thank you for the latest supplemental production.  We received the disk with the additional documents today.  Below are my questions about further production:

1.  **Photos from expert tours**:  On 10/11/13, you told me that you had the photos and would be sending them out shortly.   Last week, you sent the Eyman photos, and today, we received some photos for Florence, Lewis and Tucson.  We have no photos yet from the other prisons, including Yuma and Perryville, where Dr. Willcox requested photos.  Do you have more photos?  If not, have you asked the prisons to forward them to you?  If you do have more photos, when will we receive them?

2.  **Tagged records from Cohen's Lewis tour**:  you indicated you did not have any, and would call your clients to track them down.  Last week, you forwarded two medical records from Dr. Cohen's Lewis tours.  I understand Dr. Cohen tagged more records during his tour.  Do you have more records to send us from Lewis?

3.  **Tagged records from Stewart's Tucson tour**:  On 10/11/13, you indicated you did not have them, and would call your clients to track them down.  Do you have more records to send us from the Tucson tour?

4.  **Tagged records from Williams's Florence and Perryville tours**: on 10/11/13, you indicated you did not have them, and would call your clients to track them down.  You did say that you had been advised that the Perryville records had been located and would be forwarded to you.  What is the status of those records?  Do you have more records to send from Dr. Williams's tours?

5.  **143 Medical Records (Licci RFP #4, Exh. A.II)**:  you initially said on 10/11/13 that you had 25 records to send us, but later indicated it was 19.  You forwarded the 19 last week.  When will we receive the remainder of the production?

6.  **90 Master Files**:  you have so far forwarded 25 of those files.  You indicated on 10/11/13 that you had the remaining 65 files, and believed you needed to redact them.  I explained that, given the protective order, plaintiffs believe redaction is unnecessary, and that we want the files forwarded now.  You indicated you would talk to your clients about this.  Please update us.

I look forward to your prompt response.  Appreciate your help.

Thanks,
Alison

1

Alison Hardy
Staff Attorney
**Prison Law Office**
1917 Fifth Street
Berkeley, CA 94710
510.280.2638
ahardy@prisonlaw.com

---

**From:** Rand, Lucy [mailto:Lucy.Rand@azag.gov]
**Sent:** Thursday, October 17, 2013 11:54 PM
**To:** SW&L Parsons Team (ParsonsTeam@swlfirm.com); Alewelt, Jennifer (jalewelt@azdisabilitylaw.org); Dooley, Cathleen (cdooley@azdisabilitylaw.org); Kader, Sarah (skader@azdisabilitylaw.org); Rico, JJ (jrico@azdisabilitylaw.org); Varma, Asim (avarma@azdisabilitylaw.org); Amy Fettig (afettig@npp-aclu.org); Fathi, David (dfathi@npp-aclu.org); Flood, Kelly (kflood@acluaz.org); Lyall, James (jlyall@acluaz.org); Pochoda, Daniel (danpoc@cox.net); Pochoda, Daniel (dpochoda@acluaz.org); Quereshi, Ajmel (aquereshi@npp-aclu.org); Brantley, Kevin (kcbrantley@jonesday.com); Calderon, Sophia (scalderon@jonesday.com); Freeman, Taylor (tfreeman@jonesday.com); Kiernan, David (dkiernan@jonesday.com); Mamedova, Kamilla (kmamedova@jonesday.com); Messina, Jennifer (jkmessina@jonesday.com); Mitchell, Caroline (cnmitchell@jonesday.com); Wilkes, John (jlwilkes@jonesday.com); Barr, Daniel (dbarr@perkinscoie.com); du Mee, Matthew (mdumee@perkinscoie.com); Eidenbach, Kirstin (keidenbach@perkinscoie.com); Gerlicher, Amelia (agerlicher@perkinscoie.com); Gray, John (jhgray@perkinscoie.com); Hardy, Alison (ahardy@prisonlaw.com); Kendrick, Corene (ckendrick@prisonlaw.com); Norman, Sara (snorman@prisonlaw.com); Specter, Donald (dspecter@prisonlaw.com)
**Subject:** Production - PARSONS v. RYAN

Counsel,

Attached is a list of production that was sent out today.

Lucy

Lucy M. Rand,
Assistant Attorney General
**OFFICE OF THE ATTORNEY GENERAL**
Department of Corrections Unit
Liability Management Section
1275 West Washington Street
Phoenix, AZ 85007-2926
**(602) 542-7683 Direct**
(602) 542-7635 Secretary
(602) 542-7670 FAX
Lucy.Rand@azag.gov

The information contained in this e-mail message is privileged and confidential, intended only for the use of the specific individuals and/or entities to which it is addressed. If you are not one of the intended recipients, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you received this communication in error, please immediately notify the sender by return e-mail or call (602) 542-7683. Thank you.

**ATTACHMENT C**

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn            )   No:
Jensen; Stephen Swartz;          )   CV12-00601-PHX-NVW
Dustin Brislan; Sonia            )   (MEA)
Rodriguez; Christina             )
Verduzco; Jackie Thomas;         )
Jeremy Smith; Robert Gamez;      )
Maryanne Chisholm; Desiree       )
Licci; Joseph Hefner; Joshua     )
Polson; and Charlotte Wells,     )
on behalf of themselves and      )
all others similarly             )
situated; and Arizona Center     )
for Disability Law,              )
              Plaintiffs,         )
      v.                          )
Charles Ryan, Director,          )
Arizona Department of            )
Corrections; and Richard         )
Pratt, Interim Division          )
Director, Division of Health     )
Services, Arizona Department     )
of Corrections, in their         )
official capacities,             )
              Defendants.         )
                                  )

DEPOSITION OF NICOLE TAYLOR, J.D., Ph.D.

September 5, 2013
9:13 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 33

1    any questions, I asked them.

2       Q    Sure.  But my question is, did you receive any

3    training on how to be a mental health monitor when you

4    assumed that position?

5                MS. CLOMAN:  Form.

6                THE WITNESS:  I received instruction on

7    how to evaluate the services, on what the indicators

8    were for mental health, on how to utilize the online

9    system for MGAR, and I had Mr. Matt Musson with me when

10   I inputted the first set that I put in.

11      Q    BY MR. FATHI:  How long did that training

12   take?

13      A    It was over the course of about a month.

14      Q    Okay.  Was this sort of on-the-job training?

15      A    Correct.

16      Q    Let me try to ask a more precise question.

17   I'm asking if when you began your job as mental health

18   monitor there was a defined training period that you

19   received in how to do your job?

20      A    No, there was not.

21      Q    Did you receive any written instructions when

22   you began your job on how to perform your duties?

23      A    Written instructions to include here are the

24   things you are going to be monitoring was provided.

25   The pronounce of the MGARs, here's the indicators that

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 55

1      Q      Where in the MGAR is your monitoring of mental

2   health programming reflected?

3      A      Specifically number four touches on that

4   aspect of those programs because it asks whether those

5   inmates with the mental health three and above are seen

6   according to policy.  Policy is written to dictate how

7   often they need to be seen, and those programs that

8   were developed are supported by those policies, so I

9   ensure that those programs are continuing and supported

10   by those policies.

11      Q      So let's talk about that.  On the second page

12   of the May 2013 Phoenix MGAR, you write, quote, Inmates

13   need to be seen either every 30 days by an MH staff if

14   in lockdown or every 90 days if on an open yard, end of

15   quote.  Do you see that?

16      A      Correct.

17      Q      Where does that requirement come from?

18      A      That comes out of the Mental Health Technical

19   Manual.

20      Q      And that requirement is still in effect?

21      A      Correct.  We are currently in the process of

22   updating our Mental Health Technical Manual, as it is

23   supposed to be updated once a year, and so as it is

24   signed off on it will actually have different

25   requirements for the Phoenix complex that are a lot

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 56

1    more stringent than these.

2        Q    So there is currently a revision ongoing to

3    the Mental Health Technical Manual?

4        A    Correct.

5        Q    When will that be finalized?

6                 MS. CLOMAN:  Foundation.

7                 THE WITNESS:  I'm not sure.  I have most

8    of it completed, and I am -- I need to then send it up

9    the chain for signatures.

10       Q    BY MR. FATHI:  But you do have a draft?

11       A    I do have a draft, yes.

12       Q    And when it says inmates need to be seen, what

13   does "seen" mean?

14       A    Inmates need to be seen, and the technical

15   manual states that they need to have a contact by a

16   licensed mental health staff member every 30 days if in

17   lockdown or every 90 days if on an open yard.

18       Q    But what does seen mean?  Could that be a

19   cell-front contact?

20       A    If I'm doing a monitoring, I won't count a

21   cell-front contract.

22       Q    My question is, under the policy, could a

23   cell-front contact satisfy this policy?

24       A    Under the current policy, and that's part of

25   revisions that we've made, that those will not

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 80

1      A      Not that I can think of, no.

2      Q      You've never sent an e-mail regarding your

3   findings as mental health monitor?

4      A      As I shared with you earlier, I sent an e-mail

5   to the site lead, and I carbon copied Dr. Shaw so they

6   are aware of the findings that we have.  So those would

7   be the same as the MGAR findings, they are just in an

8   e-mail format rather than the MGAR format.

9      Q      It's word for word identical to what ends up

10  in the MGAR?

11     A      Yes, I cut and paste.  The MGAR findings do

12  not go to the site leads, lead psychologist, so this

13  way they get the information.  We want to make sure

14  that they have the information.

15     Q      But it's exactly the same words?

16     A      Correct.  I may add a few more.  You know, we

17  had spoken about this when I was on-site, things that

18  maybe I wouldn't write in there.  But there might be a

19  little bit more dialogue than bullet points that we do

20  in the MGAR.

21     Q      And those are conveyed by e-mail to the site

22  lead of the various facilities?

23     A      Correct.

24     Q      You mentioned verbal reports about suicides.

25  Have you ever prepared anything in writing about any

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 160

1    they met the threshold.  So I discussed those findings

2    with them that I had last month.

3         Q    So those were in the August --

4         A    Correct.

5         Q    -- MGAR?

6              And can you give me some examples?

7         A    The -- I believe there was a red finding at

8    Phoenix complex for treatment plans.  They had three

9    units that were doing great and three that were not,

10   and the three that were not pulled the entire

11   percentage down.

12             And so I discussed with both the staff

13   that are there, Dr. Fulks that's a Corizon staff member

14   and our staff, that I had concerns about the fact that

15   these treatment plans are not being updated within time

16   frames.

17        Q    Other examples?

18        A    I believe I have discussed -- I received an

19   e-mail from Mr. Fizer, who is the deputy warden at

20   Florence Central unit, and he had concerns that the

21   program that is running there is not being followed in

22   the way that we had set it up a year ago.  And so I

23   expressed those concerns up my chain about the program

24   not having the adequate resources allotted to it to

25   make it run.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 168

1    they are still on watch.

2        Q    Okay.  So through the morning reports, you

3    believe that you reliably find out about everybody that

4    has been on watch for a long time?

5        A    Oh, correct, yes.

6        Q    And then we also talked about the meeting that

7    occurred with Corizon last Tuesday on the issue of

8    corrective action plans.  Do you recall that

9    discussion?

10       A    Yes, I do.

11       Q    Do you know now who that other person from

12   Corizon was?

13       A    Yes.  That individual's name is Donna James,

14   and I spoke with Art Gross on the phone, and he was not

15   positive what her job title is other than he believes

16   her to be a utilization management nurse with Corizon.

17       Q    And what transpired at that meeting?

18       A    We meet every week to discuss any issues that

19   have come up throughout the week with Corizon.  We

20   update them on issues.  They update us on issues, but

21   CAPs were specifically discussed there, about the need

22   for the CAPs to be done.  We had a very long

23   conversation about Corizon's stance that those CAPs

24   should probably be completed by their administration so

25   that they can manage the sites and have consistency

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 211

1    to a different day because there was an issue that day,

2    they would just shift it.

3        Q    Okay.  So to your knowledge, neither of these

4    groups have ever been cancelled in Kasson unit because

5    of a security incident?

6                    MS. CLOMAN:  Form.

7                    THE WITNESS:  Canceled and not

8    rescheduled?

9        Q    BY MR. FATHI:  Canceled and not rescheduled

10   the same week.

11       A    That is not my understanding, no.

12       Q    Now, when a prisoner receives a one-on-one

13   counseling session, where is that recorded?

14                   MS. CLOMAN:  Form.

15                   THE WITNESS:  In the mental health

16   section of their medical chart.

17       Q    BY MR. FATHI:  Is it recorded anywhere else?

18       A    By recorded?

19       Q    Let me ask it a different way.  If I wanted to

20   know -- if I wanted to verify that every prisoner in

21   Kasson unit in wing one in fact got their individual

22   session this month, is there any way for me to do that

23   other than looking at each and every one of their

24   medical records?

25       A    Ms. Newman who is at Kasson, for example,

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 212

1    keeps a database that she updates with each time that

2    she does her session.  So she keeps track of when their

3    one-on-one's due, when their medications expire, when

4    they release.  All that information is on a database

5    that is being kept.

6        Q    And is she the only one that does the

7    one-on-ones?

8        A    Currently, I believe that she is the one on

9    wing one Kasson program.

10       Q    How many prisoners are on wing one of Kasson

11   approximately?

12       A    I believe they are running at about 50 right

13   now.

14       Q    And how long are these monthly one-on-one

15   sessions?

16       A    I -- I've seen the full range.  You know, it

17   just depends on what the inmate presents with, whether

18   they need five minutes.  There's some pretty

19   disorganized individuals up there that can't handle

20   more than five, but some of them get an hour if they

21   need an hour.

22       Q    So these monthly one-on-one sessions could

23   range anywhere from about five minutes to about an

24   hour?

25       A    Correct.

**ATTACHMENT D**

1    Arizona Attorney General Thomas C. Horne
     Office of the Attorney General
2    Michael E. Gottfried, Bar No. 010623
     Lucy M. Rand, Bar No. 026919
3    Assistant Attorneys General
     1275 W. Washington Street
4    Phoenix, Arizona 85007-2926
     Telephone: (602) 542-4951
5    Fax: (602) 542-7670
     Michael.Gottfried@azag.gov
6    Lucy.Rand@azag.gov

7    Daniel P. Struck, Bar No. 012377
     Kathleen L. Wieneke, Bar No. 011139
8    Rachel Love, Bar No. 019881
     Timothy J. Bojanowski, Bar No. 22126
9    Nicholas D. Acedo, Bar No. 021644
     Courtney R. Cloman, Bar No. 023155
10   Ashlee B. Fletcher, Bar No. 028874
     Anne M. Orcutt, Bar No. 029387
11   STRUCK WIENEKE & LOVE, P.L.C.
     3100 West Ray Road, Suite 300
12   Chandler, Arizona 85226
     Telephone: (480) 420-1600
13   Fax: (480) 420-1696
     dstruck@swlfirm.com
14   kwieneke@swlfirm.com
     rlove@swlfirm.com
15   tbojanowski@swlfirm.com
     nacedo@swlfirm.com
16   ccloman@swlfirm.com
     afletcher@swlfirm.com
17   aorcutt@swlfirm.com
     *Attorneys for Defendants*

18                  **UNITED STATES DISTRICT COURT**

19                        **DISTRICT OF ARIZONA**

20   Victor Parsons, *et al.*, on behalf of themselves    NO. 2:12-cv-00601-NVW
     and all others similarly situated; and Arizona
21   Center for Disability Law,
                                   Plaintiffs,            **DECLARATION OF KATHLEEN**
22                v.                                      **CAMPBELL**

23   Charles Ryan, Director, Arizona Department
     of Corrections; and Richard Pratt, Interim
24   Division Director, Division of Health Services,
     Arizona Department of Corrections, in their
25   official capacities,
                                   Defendants.

26

27              I, **KATHLEEN CAMPBELL**, make the following Declaration:

28

1.    I am over the age of 18 years and am competent to testify to, and have personal knowledge of, the matters set forth in this Declaration.

2.    I am an Arizona Department of Corrections ("ADC") employee, and currently the Program Evaluation Administrator (Contract Compliance) in the Health Services Contract Monitoring Bureau.

3.    There are approximately 34 ADC employees that work in the Health Services Contract Monitoring Bureau. The Bureau oversees many things, including grievance appeals, medical records, contract compliance, and quality/clinical care.  The contract compliance component is responsible for ensuring that private vendors are fulfilling their contractual obligations with ADC.  Each of the ten (10) Complexes have a contract monitor that is responsible for ensuring Corizon's compliance with its duties relating to health care under the ADC-Corizon contract.  My responsibilities include supervising the ten contract-compliance monitors with responsibility over ASPC-Douglas, ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Perryville, ASPC-Phoenix, ASPC-Safford, ASPC-Tucson, ASPC-Winslow and ASPC-Yuma.

4.    To facilitate monitoring and compliance of the contract, ADC developed the MGAR system.  The MGAR system is an internet-based database application that is integrated with the ADC e-mail system.  I am involved in selecting the available performance measures that will be monitored and reported in a particular month. (The monitored performance measures are changed from month to month so that the contractor is not aware of the specific focus of each monitoring visit and therefore cannot anticipate the focus of the monitor but rather must attempt to focus on all of the requirements of the contract.)  Both the facility contract-compliance monitor as well as the state-wide clinical monitors can enter their findings into the MGAR application on a monthly basis.  Based upon whether or not the contractor meets the performance measure, the compliance monitor or clinical monitor enters a finding of Green, Amber or Red.

5.    When an Amber or Red finding is entered the MGAR application sends a notification to certain ADC personnel as well as to the contractor's regional office

2

1   and the complex at issue to notify them that efforts must be made to improve performance

2   in this area.

3         6.    I am aware that when monitors have occasionally made mistakes in

4   data entry (for example, by typing their notifications under the wrong performance

5   measure), they have requested that IT personnel delete the single erroneous entry, so it

6   may be corrected.  I have no knowledge of any information pertaining to the MGAR

7   findings or CAPS being "purged" from the MGAR application.

8         7.    In addition to merely reporting their findings, the MGAR

9   automatically generates the need for a CAP to requesting that the contractor redress a

10   perceived problem in contract delivery.  These automatically generated requests are

11   entered into the MGAR system, and appear on the Monthly MGAR reports for each

12   Complex.  I understand that those reports have been provided to Plaintiffs in this

13   litigation.  When a CAP request is generated, the MGAR system automatically generates

14   an e-mail message that is sent to the Complex notifying them that a CAP is requested for a

15   specific performance measure.

16         8.    The contractor then has access to the MGAR system and may enter

17   their proposed Corrective Action Plan.  The monitor must then log back into the MGAR

18   application to check to see if a CAP was submitted, and if so, accept or reject it.  The

19   monitor may also enter notes or comments pertaining to the CAP.  Additionally, a

20   supervisor may also enter additional notes regarding the CAP in the system.

21         9.    Where monitors have noted that some issues appear to continue

22   across complexes, ADC may request the vendor to provide a state-wide Action Plan

23   addressing common issues.  In September 2013, ADC accepted Corizon's Statewide

24   Action Plans relating to Chronic Conditions, Pharmacy Program, Mental Health, Sick

25   Call, and Utilization Management.

26        10.    Because MGAR is a database application developed by ADC, every

27   feature required extensive programming.  Furthermore, the application is under constant

28   development to make it more user-friendly.

3

1         11.    Previously, there has been no easy way to obtain reports of the CAP

2    that have been submitted and their approval or rejection status.  Additionally, there is no

3    automatic notification made by the system to the CAP requestor that a CAP has been

4    submitted and is available for review.

5         12.    To obtain CAP information a user of the MGAR application must

6    search the MGAR database for a particular performance measure area, for a certain

7    complex for a certain month, to identify which CAPS were requested.  The user can then

8    click on a certain CAP and view the request, the CAP, the approval/rejection notes, and

9    other supervisor notes.  The on-screen view of the CAP and notes fields is limited to

10   approximately 25 lines of text, and the user must select within the box and scroll down if

11   an entry is lengthy.  The MGAR system currently does not include any written report

12   where CAP data can be organized and presented for review.  To obtain this information,

13   the only way is for the user to manually search for all CAPs and then individually print

14   the screen display for each and every CAP.  In the past year there have been hundreds of

15   CAP requests generated by the MGAR system and attempting to manually print each one

16   separately for this litigation would consume a significant amount of time of the Health

17   Services Contract Monitoring Bureau staff, taking away significant time necessary to

18   ensure contract compliance, address inmate grievances, and address constituent concerns.

19        13.    When the requests for CAPs became apparent in this litigation in

20   September 2013, ADC began to work with the IT personnel who is the chief programmer

21   of the MGAR system to create a report which will permit the output of all electronically

22   stored CAP data.  The programmer has been instructed that the programming and creation

23   of a report to organize and permit the output of this data is to be her top priority.  We

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

4

1  expect that this report will be completed in the next few weeks, if not sooner, and then

2  will be able to generate a report and output the historical CAP information.

3

4          I declare under penalty of perjury that the foregoing is true and correct.

5  Executed on October 28, 2013.

6

7

8                                            Kathleen Campbell

282914.1

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                    5

**ATTACHMENT E**

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;          )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;        )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;   )
Jackie Thomas; Jeremy Smith; Robert    )
Gamez; Maryanne Chisholm; Desiree      )
Licci; Joseph Hefner; Joshua Polson;   )
and Charlotte Wells, on behalf of      )
themselves and all others similarly    )
situated; and Arizona Center for       )
Disability Law,                        )
                                       )
          Plaintiffs,                  )
     vs.                               )
                                       )
Charles Ryan, Director, Arizona        )
Department of Corrections; and         )
Richard Pratt, Interim Division        )
Director, Division of Health           )
Services, Arizona Department of        )
Corrections, in their official         )
capacities,                            )
                                       )
          Defendants.                  )
                                       )


DEPOSITION OF TROY LAWRENCE EVANS, RN
September 17, 2013
9:14 a.m.
Phoenix, Arizona



Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

Page 147

1    regarding dental?

2       A.    I don't know.  Honestly, I threw that out

3    there.  I thought somebody had said something about there

4    being something on the April GAR about dental.

5               MS. MAMEDOVA:  So there are a few things

6    that we would like to request production of.  So the

7    53-page manual, the bootcamp manual that Mr. Evans

8    mentioned at the beginning that he was given when he

9    started working at the Safford facility.

10              We would like to request any printouts of

11   the CAPs that he has in his possession.

12              And we'd like to request E versions of the

13   CAPs the way that they appear on the computer.

14              MR. STRUCK:  Okay.  Was that two separate

15   things or was that one?

16              MS. MAMEDOVA:  Yes.  The printouts of the

17   CAPs that Mr. Evans has in his possession.  And E

18   versions of the CAPs.

19              MR. STRUCK:  They're the same.  Why do you

20   need both versions?

21              MS. MAMEDOVA:  If they're exactly the same,

22   we do not.  But if the E version is the same --

23              MR. STRUCK:  Do you mean different

24   information or the format looks different?

25              MS. MAMEDOVA:  Different information.  Do

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

Page 148

1    you remember we looked at the November --

2              MR. STRUCK:  Yeah.  I thought it was just a

3    different format that he's testified to.

4              MS. MAMEDOVA:  The November reports looked

5    like they had the CAPs and the actual plans under the

6    questions for the CAPs.  But the ones that we received

7    after that did not have any information other than the

8    fact that the CAP is requested.  So if it looks different

9    on the E version, we'd like to see that.  We'd like to

10   see what information there is.

11             And the weekly reports from the contractor

12   regarding the dental care that Mr. Evans received.

13             MR. STRUCK:  I think you all identified

14   where I thought you had asked us for CAPs before.  I

15   think I remember seeing that in some correspondence

16   recently.  But I'm not sure about the 53-page manual.

17   And honestly, I'm not sure about the weekly reports from

18   Smallwood on the dental care.  So if you wouldn't mind,

19   shoot me an email with the source of that request.  And

20   in the meantime, I'll start trying to get this.

21             MS. MAMEDOVA:  Sounds good.

22             So that's it for me.  Do you have any

23   questions for me?

24             MR. STRUCK:  No, we'll read and sign.

25             (The deposition concluded at 1:25 p.m.)

**ATTACHMENT F**

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn            )  No:
Jensen; Stephen Swartz;          )  CV12-00601-PHX-NVW
Dustin Brislan; Sonia            )  (MEA)
Rodriguez; Christina             )
Verduzco; Jackie Thomas;         )
Jeremy Smith; Robert Gamez;      )
Maryanne Chisholm; Desiree       )
Licci; Joseph Hefner; Joshua     )
Polson; and Charlotte Wells,     )
on behalf of themselves and      )
all others similarly             )
situated; and Arizona Center     )
for Disability Law,              )
                 Plaintiffs,     )
     v.                          )
Charles Ryan, Director,          )
Arizona Department of            )
Corrections; and Richard         )
Pratt, Interim Division          )
Director, Division of Health     )
Services, Arizona Department     )
of Corrections, in their         )
official capacities,             )
                 Defendants.     )
                                 )

DEPOSITION OF MARLENA D. BEDOYA
September 10, 2013
9:59 a.m.
Tucson, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 145

1    ADC -- or with Wexford, rather?

2        A     He worked with ADC and Wexford.

3        Q     What was his position before Corizon hired him

4    as the FHA?

5        A     Assistant FHA.

6        Q     And it had been Gretchen who was the FHA --

7        A     Yes.

8        Q     -- before him?

9        A     Carrie Harris and then Gretchen.

10       Q     Do you know why Gretchen left at the time of

11   the transition?

12       A     I don't.

13               MR. BOJANOWSKI:  Form, foundation.

14               THE WITNESS:  I have no idea.

15       Q     BY MR. PODSIADLIK:  Was it disruptive to what

16   you had to do on your job to have to adjust to a new

17   person?

18               MR. BOJANOWSKI:  Form.

19               THE WITNESS:  Oh, no.

20       Q     BY MR. PODSIADLIK:  At the bottom here, it

21   says sick call and medical records, and you wrote,

22   "Please see the attached spreadsheets for trends across

23   the Tucson Complex.  The highlighted areas will show

24   you which yards and what items need to be retrained

25   with your team."

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 146

1     A     Okay.

2     Q     What spreadsheets were attached?

3     A     I don't recall.  They didn't -- I don't know.

4     Q     What spreadsheets could have been attached?  I

5   mean, what spreadsheets exist that you might have

6   attached to this?

7               MR. BOJANOWSKI:  Form.

8               THE WITNESS:  A spreadsheet that

9   highlighted the areas that showed which yards and what

10   items need to be retrained with your staff.  I -- I

11   don't -- I would have thought you'd have the

12   attachment.

13     Q     BY MR. PODSIADLIK:  Me, too, but I don't.

14     A     I'm sorry.

15     Q     No, that's not your fault.  Look at Tim.  It's

16   probably not Tim's fault, either.

17               Would these have been spreadsheets that

18   you made?

19     A     Yes.

20     Q     And would they still be on your computer in

21   your office?

22     A     I have no idea.

23     Q     But you have no recollection at all of what

24   these spreadsheets might refer to?

25     A     Well, if it's under sick call and medical

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 147

1    records --

2        Q    Uh-huh.

3        A    -- okay, and given -- given what those

4    questions are in here --

5        Q    Right.

6        A    -- okay, I'm assuming I set up a spreadsheet,

7    because this is what I'm thinking I would have done

8    with the questions to show the tracking and trending

9    for that month, which we were not -- we were letting

10   them do their transition, okay, versus putting it in

11   here.  I put it in a spreadsheet for him to visually

12   see.  That's what I'm thinking it is.

13       Q    I understand.

14       A    Some people are more visual than others.

15       Q    Absolutely.

16                 Have you -- have you ever before made a

17   representation of trends across the Tucson Complex?

18       A    Not that I recall, because this was the only

19   month that we were asked to not input, because they

20   were -- with new staff, they were getting the accesses,

21   the networks joined with a different company, and they

22   wanted us, you know, to stay out of that to allow them

23   to do -- IT to be able to do their work.

24       Q    Do you recall if you and Matthew ever went

25   through the spreadsheet together?

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 171

1          MR. BOJANOWSKI:  -- in relation to --
2          THE WITNESS:  Okay.
3          MR. BOJANOWSKI:  And at that time,
4   that's what it is.
5          THE WITNESS:  That's what it -- yeah.
6          MR. BOJANOWSKI:  So go ahead and answer
7   his question.
8          THE WITNESS:  In January of 2013, I used
9   their staffing report that they gave central office and
10  central office sent out to us.
11     Q     BY MR. PODSIADLIK:  So Wexford gave
12  central office Wexford's staffing, and then
13  central office gave that information to you so you
14  could evaluate it for compliance?
15     A     Yes.
16     Q     Is that right?
17     A     Uh-huh.
18     Q     How often did -- let me rephrase that.
19          Is the only time you've looked at
20  staffing when it came up on the MGAR for that month?
21     A     Yes.
22     Q     Have you looked at staffing for Corizon?
23     A     Sure.
24     Q     When?
25     A     On a weekly basis I look at it.

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 172

1    Q    How are you able to track it?

2    A    Same thing, staffing report that I receive.

3    Q    You get a weekly staffing report?

4    A    Yes.

5    Q    Do you get that through your e-mail?

6    A    Yes.

7    Q    What does -- what does it look like?

8    A    A staffing report.

9    Q    Okay.  Does it list the total number of

10   full-time employment positions?

11   A    Yes.

12   Q    And that is sent to you by ADC?

13   A    Yes.

14   Q    When you read it every week, do you do

15   anything with that knowledge?

16              MR. BOJANOWSKI:  Form.

17              Go ahead.

18              THE WITNESS:  It's not really my

19   responsibility to do anything with that knowledge.

20   Q    BY MR. PODSIADLIK:  I understand.

21   A    Okay?  It's not.

22   Q    Do you see any correlation between staffing

23   and your other duties -- let me start again.

24              Have you observed any relationship

25   between the staffing as you find it in the report and

**ATTACHMENT G**

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn                )   No:
Jensen; Stephen Swartz;              )   CV12-00601-PHX-NVW
Dustin Brislan; Sonia                )   (MEA)
Rodriguez; Christina                 )
Verduzco; Jackie Thomas;             )
Jeremy Smith; Robert Gamez;          )
Maryanne Chisholm; Desiree           )
Licci; Joseph Hefner; Joshua         )
Polson; and Charlotte Wells,         )
on behalf of themselves and          )
all others similarly                 )
situated; and Arizona Center         )
for Disability Law,                  )
                Plaintiffs,           )
                                      )
        v.                            )
Charles Ryan, Director,              )
Arizona Department of                )
Corrections; and Richard             )
Pratt, Interim Division              )
Director, Division of Health         )
Services, Arizona Department         )
of Corrections, in their             )
official capacities,                 )
                Defendants.           )
                                      )

(SUBJECT TO PROTECTIVE ORDER)
DEPOSITION OF ARTHUR GROSS
September 9, 2013
9:22 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

Page 10

1    you in a consulting position or anything like that with

2    the Department of Corrections?

3        A    No.

4        Q    And do you have any training in clinical

5    medicine?

6        A    No.

7        Q    Okay.  Do you have a job description for your

8    position?

9        A    Yes.

10       Q    Okay.  What does the job description say?

11       A    Responsible for the oversight of a monitoring

12   bureau or service bureau with the Department of

13   Corrections for contracted healthcare service provision

14   in ten state prison locations.

15       Q    Okay.  Is this a written job description?

16       A    Printed, yes.

17       Q    Okay.  Are you in charge of monitoring the

18   healthcare services at the private prisons contracted

19   with the Department?

20       A    Yes.

21       Q    Let me mark something as a new exhibit.

22                 (Deposition Exhibit No. 205 was marked

23   for identification.)

24       Q    BY MS. KENDRICK:  So I'm showing you an

25   organizational chart that the attorneys for the State

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

1    A    I can't -- I can't answer that question.

2    Q    Are these specific to institutions or are they

3    statewide corrective action plans?

4    A    The latest ones in draft form are statewide

5    corrective action plans.

6    Q    And the latest ones that are statewide, are

7    they all involving staffing?

8    A    No.

9    Q    What other deficiencies are they addressing?

10    A    They are addressing mental health

11    deficiencies, medication management, chronic care, sick

12    call, utilization management, are the five areas that

13    we are discussing.

14    Q    So you've actually requested five corrective

15    action plans and have received four in draft form?

16    A    We requested -- we requested corrective action

17    plans.  Those are the five general categories that

18    Corizon has submitted to us, and of those five, four of

19    them have been received in draft form.

20    Q    Did you request a statewide corrective action

21    plan on staffing, increasing the number of staff?

22    A    I'm going to answer that specifically no.  I

23    talk about that subject every week, so it's an ongoing

24    discussion on staffing.

25    Q    So I want to go back through the list of five

**ATTACHMENT H**

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

### VIA EMAIL ONLY

September 25, 2013

Lucy M. Rand, AAG
Office of the Attorney General
Department of Corrections Unit
Liability Management Section
1275 West Washington Street
Phoenix, AZ 85007-2926

### Re: *Parsons v. Ryan Supplemental Discovery Production*

Dear Ms. Rand:

I am writing to memorialize our September 23, 2013 meet and confer, and to provide Defendants with the additional information requested during our meeting.

As a threshold matter, we agreed to a stipulation asking the Court to extend the September 27, 2013 deadline for submitting discovery disputes, to allow us additional time to resolve these issues prior to seeking Court intervention. Plaintiffs propose that the parties request an order that a motion seeking to compel a response on any of the discovery issues enumerated in this letter and any disputes arising from depositions taken this week may be filed no later than October 25, 2013. Additionally, we request that you provide a date certain when you will certify that your document production is complete. We intend to ask the Court for a week after that date to review the documents and move to compel on materials that have not been produced, unless you are willing to stipulate to that. Of course if there are additional discovery issues you would like to include in such an agreement, please let us know. In light of the current September 27 deadline, please let us know your response to this proposal tomorrow.

### PLAINTIFFS' DISCOVERY REQUESTS

#### Documents identified during depositions

Plaintiffs agreed to provide Defendants a list of documents identified during recent depositions that have not been produced. This list is attached as Appendix A and includes reference to the specific discovery requests to which these documents are responsive, and the deposition in which the document was

1

identified. Plaintiffs note that additional documents were produced last night that may include some of the documents identified in Appendix A.

**Objections based on class certification**

Plaintiffs also agreed to provide a list of the discovery requests to which Defendants objected on the ground that *"the Court did not certify this claim."* That list is attached as Appendix B.

**Documents identified during plaintiffs' expert tours**

Defendants indicated that the photographs taken for Plaintiffs' experts during their tours will likely be produced next week, and agreed to provide a firm date for that production later this week. As for the medical records tabbed for copying during the expert tours, Defendants agreed to provide a firm production date by September 24. We did not hear from you on September 24; we request a response as soon as possible.

**Plaintiff Licci's First Request for Production, Requests # 4-5**

These request class member medical records (#4) and institutional files (MRFs) (#5). Defendants indicated that the MRFs will be produced by the end of next week. The medical records are still in production, and Defendants agreed to inform us of the production date by September 24. We did not hear from you on September 24; we request a response as soon as possible.

In terms of Plaintiffs' request for medical records in RFP #4, the Section II requests remain unchanged. The Section I requests to inspect for Florence and Tucson also remain unchanged. Due to the cancellation of expert tours at Winslow, Safford and Douglas, Plaintiffs request production of those records listed in Section I, rather than inspection.

**Plaintiffs Licci's Interrogatories and Requests for Admissions; Plaintiff Gamez's Requests for Admissions**

We discussed Defendants' objections to these requests on the ground that they seek an admission from a third party, and Defendants' responses referring plaintiffs to the Smallwood deposition, even when the deposition does not address the particular discovery request. Defendants indicated that where ADC policy controls they will supplement their responses, but that in areas of dental process and practice they will not. Defendants also indicated that they will discuss this matter with Kathy Wieneke and provide further information to Plaintiffs.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**Other requests**

Defendants indicated that they will not provide supplemental responses to any discovery requests propounded by Victor Parsons. We believe you are estopped from taking this position. As late as August of this year, you were continuing to supplement the Parsons discovery. See Docket 569. To announce that you are now taking a different position, only when we cannot propound further discovery, is unreasonable and we intend to seek an order from the Court requiring you to continue this production.

Defendants have recently raised an objection to providing supplemental discovery to Deposition Duces Tecum [DKT. #76], but indicated they will confer as to the status of that objection.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Defendants indicated they will not produce the new MGAR instructions until they are finalized. We note that the final document may be among the documents produced last night.

Defendants agreed to confer among themselves regarding production of the Corrective Action Plans, and provide further information to plaintiffs.

Defendants indicated that their responses to Plaintiff Licci's First Set of Requests for Production with be supplemented in about a week.

As for plaintiffs' initial disclosures, we believe all our descriptions of proposed testimony provide the same level of detail as yours, to the extent we know what the witnesses will be able to testify to. You have not provided to us the level of detail you sought from us in the meet-and-confer. We are willing to work with you on this issue, but it needs to be a two way street. If there are specific entries that you think are not written to the same level of specificity as yours, please send us that list of names and we will review them and explain to you our view in more detail.

## ADDITIONAL DISCOVERY ISSUES

In the interest of completeness, we wish to raise additional discovery issues that were not discussed during our September 23 discussion. These issues must also be addressed in the stipulation. First, the discovery dispute regarding Plaintiffs' September 5, 2013 discovery supplementation letter remains ongoing, but Plaintiffs believe that further discussion may now be fruitful rather than seeking immediate Court intervention. In particular, the production of death records under Parsons RFP #40 needs to be addressed. Second, plaintiffs are reviewing the 30(b)(6) testimony taken to date and will provide a list by tomorrow morning of any material relating to those depositions that we intend to move to compel on. We believe some of those issues can be resolved if the parties work together, so would also be willing to

3

include those in the stipulation if you wish to do that.  Finally, Defendants have not yet produced a privilege log.  Please provide a date certain by when you will do so or agree in writing that you are withdrawing all of your privilege objections to all of Plaintiffs' document requests.  We are willing to consider extending the date for production of the log, as long as there is an extension of our time to move to compel.

We request a meet-and-confer for tomorrow afternoon to reach closure on all of these issues.  Please let me know when you are available for that.

If I have inadvertently omitted or misstated any portion of our discussion, please let me know.  We look forward to your response.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Very truly yours,

David C. Fathi

cc:  All counsel of record

Enc.

4

# APPENDIX A

## Unproduced Documents Identified During Recent Depositions

**The following previously unproduced documents were identified during depositions:**

- Strategic Plan Initiative draft (Taylor – new policies and procedures for max custody unit) (Parsons RFP 1 - #9)
- Mental Health Technical manual (currently being updated so we want to make sure we have drafts) (Taylor) (Parsons 1 - #1; ACDL RFP 1 - ##1-9)
- Psych autopsies completed whenever there is an inmate suicide (Taylor) (Parsons RFP 1 - #40)
- Taylor's emails to facilities with MGAR findings pasted in (Taylor) (Dkt #76 ##4, 5)
- Full list of MGAR indicators (both active and inactive) (Taylor) (Dkt #76 ##4, 5)
- Instruction materials regarding the MGAR audit tool (Campbell) (Dkt #76 ##4, 5)
- Corrective Action Plans for MGAR "amber" and "red" findings, including all the documents, drafts, worksheets, etc. generated by the monitors when preparing their MGAR reports (Taylor; Campbell; Bedoya; Robertson; Gross; Evans – note that several witnesses have testified that they use worksheets and notes as the basis for their monthly MGAR reports – Plaintiffs' definition of "document" includes drafts, notes, etc. and the request is for documents related to the monitoring of the contract)) (Dkt #76 ##4, 5)
- E-versions of the CAPs as they appear on the screen (Mr. Evans mentioned that the CAP appears on the screen differently than the way it appears when he prints it. We would like to see how the reports appear on the screen.) (Dkt #76 ##4, 5)
- Email from Greg Fizer (DW Florence Central) to Taylor re: programming doesn't have adequate resources (Aug/Sept 2013) (Taylor) (Parsons 1 - ##49,50)
- Written agendas and minutes for weekly meetings with Corizon officials and ADC Monitoring Bureau (Taylor; Campbell; Evans; Winland) (Dkt #76 ##4, 5)
- Written agendas and minutes for weekly ADC monitor meetings (Evans; Winland) (Dkt #76 ##4, 5)
- Spreadsheets attached to the memorandum of M. Bedoya to the FHA for ASPC-Tucson, dated April 5, 2013 (ADC088785) (Bedoya) (Dkt #76 ##4, 5)
- Written Job Descriptions for Arthur Gross, Assistant Director of ADC and leader of the Health Services Contract Monitoring Bureau (Gross) (Parsons RFP 1 - ##21, 61)
- Written job descriptions for the Monitor positions in the Health Services Contract Monitoring Bureau (Gross) (Parsons RFP 1 - ##21, 61)
- Peer reviews for all licensed medical staff at ASPC-Tucson and potentially other facilities (Bedoya) (Parsons RFP 1 - #6)
- Weekly staffing reports regarding Corizon's staffing levels (Bedoya) (Dkt #76 ##4, 5)
- Psych associate databases containing group program records (ex: Newman in Kasson has one) (Taylor) (Polson 1 - #21; Licci RFP 1 - #6))

- Drafts of statewide Action Plans from Corizon in Pharmacy, Mental Health, Chronic Care, Sick Call and Utilization Management, including "statement of need" and target date for addressing the need (Taylor; Gross) (Dkt #76 ##4, 5)
- "53 page boot camp manual" for ADC monitors (Evans) (Dkt #76 ##4, 5)
- Weekly reports from the Dental Coordinator (Evans)  (Dkt #76 ##4, 5)
- Monthly Inmate Grievance Appeal Report (reflects all grievance appeals; generated through the IHAS system) (Moriarty) (Parsons RFP 1 - #55)
- Documents identified at the Winland deposition that have not been produced (Dkt #76 ##4, 5)
  - From Deposition Ex. 319, the August 2013 Lewis Pharmacy Monitoring Report, the "snapshot" referred to in paragraph E, at ADC 137534;
  - From Dep. Ex. 327, the July 2013 Phoenix Pharmacy Monitoring Report, the photographs of boxes of medications referred to in paragraph 1 at ADC 137323;
  - From deposition Ex. 330, the August 2013 Yuma Pharmacy Monitoring Report, the "snapshot" referred to at ADC 137697;
  - From Dep. Ex. 323, the July 2013 Eyman Pharmacy Monitoring Report, the summary of investigation and corrective action plan submitted by Jim Taylor, Corizon referred to at ADC 137207;
  - From deposition ex. 324, the August 2013 Eyman Pharmacy Monitoring report, the snapshot referred to in paragraph E) at ADC 137476;
  - From deposition Exhibit 325, the July 2013 Perryville Pharmacy Monitoring Report, the email or other document that is the source of the information on ADC 137293 that begins with the following language: "There are several issues of concern with this facility . . .," as well as the pictures taken to support the statement quoted;
  - From deposition Exhibit 325, the July 2013 Perryville Pharmacy Monitoring Report, the email or other document that is the source of the information that begins on ADC 137294 with the following language: "Today, Monday, July 22, 2013, I accompanied Nurse McDonald on Lumley pill call" and concludes on page ADC 137295 with the following language: "Please ensure that nurses are compliant with proper medication administration processes. nts";
  - From deposition Ex. 326, the August 2013 Perryville Pharmacy Monitoring Report, the "snapshot" referred to at ADC 137560;
  - From deposition Ex. 326, the August 2013 Perryville Pharmacy Monitoring Report, the email or other document that is the source of the information that begins on ADC 137561 with the following language "On my brief visit to Lumley I encountered the following issues (8-5)" and concludes with the language "I continue to alert the facility on chronic medications needing filled/refilled";
  - From deposition Ex. 320, the July 2013 the Florence Pharmacy Monitoring Report, the email or other document that is the source of the information that begins on ADC 137240 with the language "This location must maintain the continuity of care by renewing medications in appropriate time frame and be more keenly aware of expiring meds" and concludes on the same page with the language "This must be done to maintain the continuity of care of our population and to reduce morbidity/mortality";

- From deposition Ex. 322, the August 2013 Florence Pharmacy Monitoring Report, the "snapshot" referred to on page ADC 137506;
- From deposition Ex. 322, the August 2013 Florence Pharmacy Monitoring Report, the email or other document that is the source of the language that begins on ADC 137506 with the language "Medications need to be ordered/reordered in a timely or manner" and concludes on ADC 137507 with the language "72 prescriptions expired, 21 prescriptions discontinued, 7 renewed or therapy changed";
- From deposition Ex. 331, the July 2013 Tucson Pharmacy Monitoring Report, the email or other document that is the source of the language begins on page ADC 137373 with the words "The facility must be aware of the necessity of renewing prescriptions in a timely manner as not to negatively impact the continuity of care" and concludes on page ADC 137374 with the language "Next, I asked nursing if after (3) no shows for medications, if they are notifying the physicians and they told me that they have been instructed to NOT do this regarding MH meds because MH is so short staffed that they won't get to them anyway";
- From deposition Ex. 332, the August 2013 Tucson Pharmacy Monitoring Report, the "snapshot" referred to at ADC 137645.

**The following documents were identified during depositions as having been updated since produced to Plaintiffs:**

- Pursuant to Dkt #76 - ##4-5 updates for ALL statewide reports that Corizon is providing to ADC (wait times, referrals to outside, etc.), including but not limited to (the most recent month of production is indicated in bold):
  - ADC122017-122017 – Corizon AZ IM Wait Times Rpt – 2013-05.pdf
    Inmate Wait Times for **May** 1-31, 2013
  - ADC122042-122045 – Corizon AZ Inpatient Log – 2013-06.pdf
    Inpatient Log Documenting Hospital Admissions for **June** 2013
  - ADC122046-122048 – Corizon AZ Medical HNR Rpt – 2013-05.pdf
    Health Needs Requests Appointments Report for **May** 2013
  - ADC122049-122056 – Corizon AZ Medical Transports By Complex – 2013-05.pdf
    Medical Transports Complex Report **May** 2013
  - ADC122057-122058 – Corizon AZ MH HNR Appt Rpt – 2013-05.pdf
    Health Needs Requests Appointments Report **May** 2013 (Mental Health HNR/Appointments)
  - ADC122060-122060 – Corizon AZ Intake Rpt – 2013-05.pdf
    AZDOC Inmate Intake By Complex **May** 1-31, 2013
  - ADC121167 June 2013 staffing in native format.xlsx
    Arizona Monthly Staffing Report Florence Region (**June** 2013)

## APPENDIX B

Defendants refused to respond to the following Interrogatories and Requests for Admission on the grounds that the Interrogatory or Request concerned matters beyond those certified in the Court's March 5, 2013 Order granting Plaintiffs' Motion for Class Certification. [Doc. 372]. Beneath each request and excerpted response, Plaintiffs have included a listing of those practices, certified by the court, to which the requests are relevant.

## DEFENDANTS RESPONSES TO LICCI'S 1ST SET OF INTERROGATORIES (INTERROGATORIES NOS.: 14-20)

### INTERROGATORY NO. 14:

Does ADC track or monitor the instances in which inmates are denied or refuse their RESTRICTED DIET, the reasons for the denials or refusals, and any action taken as a result of such denials or refusals? If so, explain how ADC tracks or monitors that INFORMATION.

### ANSWER TO INTERROGATORY NO. 14:

Defendant objects that this Interrogatory is compound, vague, and ambiguous. Defendant objects that this Interrogatory is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to restricted diets.

### RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care". [Doc. 372, p. 22].

### INTERROGATORY NO. 15:

Explain what factors determine whether an inmate receives a RESTRICTED DIET. YOUR response to this interrogatory should include, but not be limited to, an explanation of what is needed for a "provider [to] determine[] that the general population menu is inappropriate," what determines whether "a therapeutic or soft food diet [is] consistent with the therapeutic diets listed in the ADC Diet Manual," and what it means for a SOFT DIET or THERAPEUTIC DIET to be "supported in the inmate's progress notes with SOAP documentation by the prescribing practitioner." [See Ryan's Responses to Verduzco's 1st RFAs Nos. 223-24].

1

**ANSWER TO INTERROGATORY NO. 15:**
Defendant objects that this Interrogatory is overly broad, unduly burdensome, compound, vague, and ambiguous. Defendant objects that this Interrogatory is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to restricted diets.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care".** [Doc. 372, p. 22].

**INTERROGATORY NO. 16:**
Whom does ADC permit to determine whether inmates receive RESTRICTED DIET? In particular, YOUR response should include, but not be limited to, a statement of who is authorized to decide whether the "general population menu is inappropriate," whether "a therapeutic or soft food diet [is] consistent with the medical diets listed in the ADC Diet Manual," and whether a restricted diet is "supported in the inmate's progress notes with SOAP documentation by the prescribing practitioner." [See Ryan's Responses to Verduzco's 1st RFAs Nos. 223-24].

**ANSWER TO INTERROGATORY NO. 16:**
Defendant objects that this Interrogatory is overly broad, unduly burdensome, compound, vague, and ambiguous. Defendant objects that this Interrogatory is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to restricted diets.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care".** [Doc. 372, p. 22].

**INTERROGATORY NO. 17:**
Regardless of YOUR response to the previous interrogatory, which categories of personnel actually have decided, on any occasion, whether inmates may receive RESTRICTED DIETS?

**ANSWER TO INTERROGATORY NO. 17:**
Defendant objects that this Interrogatory is overly broad, unduly burdensome, vague, and ambiguous. Defendant objects that this Interrogatory is not likely to lead to the discovery

of admissible evidence, as the Court's Order certifying the class did not include claims relating to restricted diets.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care." [Doc. 372, p. 22].**

**INTERROGATORY NO. 18:**
State the number of jobs available to PRISONERS housed in each ISOLATION unit, the job title of each job, the eligibility for each job, the number of hours per week available to be worked for each job, and the names and ADC numbers of each PRISONER holding said jobs as of June 1, 2013.

**ANSWER TO INTERROGATORY NO. 18:**
Defendant objects that this Interrogatory is overly broad, unduly burdensome, compound, vague, and ambiguous. Defendant objects that this Interrogatory is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to jobs.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "iv. Extreme social isolation". [Doc. 372, p. 23].**

**INTERROGATORY NO. 19:**
State the name, ADC number, and current housing unit of each PRISONER in ISOLATION who is eligible for a lower custody housing placement but still housed in ISOLATION as of the RESPONSE DATE.

**ANSWER TO INTERROGATORY NO. 19:**
Defendant objects that this Interrogatory is overly broad, unduly burdensome, compound, vague, and ambiguous. Defendant objects that this Interrogatory is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to classification levels.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "iv. Extreme social isolation". [Doc. 372, p. 23].**

**INTERROGATORY NO. 20:**
What is ADC's policy on dental floss, flossers, floss loops, and other similar products intended to permit PRISONERS to clean between their teeth? If this policy varies by custody level, explain variations in your response.

**ANSWER TO INTERROGATORY NO. 20:**
Defendant objects that this Interrogatory is overly broad, compound, vague, and ambiguous. Defendant objects that this Interrogatory is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to dental floss or similar products.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "vii. Failure to provide timely access to basic dental treatment".** [Doc. 372, p. 22].

**DEFENDANTS RESPONSES TO GAMEZ'S 1ST SET OF REQUESTS FOR ADMISSION (REQUESTS FOR ADMISSION NOS.: 29-47, 49, 58-59, 64-75)**

**REQUEST FOR ADMISSION NO. 29:**
Admit that some ADC exercise enclosures have no misting system.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. The request fails to identify which ADC exercise enclosures are included in the request. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to exercise enclosures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "iii. Lack of recreation".** [Doc. 372, p. 23].

**REQUEST FOR ADMISSION NO. 30:**
Admit that some ADC exercise enclosures have no source of drinking water.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. The request fails to identify which ADC exercise enclosures are included in the request. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to exercise enclosures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "iii. Lack of recreation".** [Doc. 372, p. 23].

**REQUEST FOR ADMISSION NO. 31:**
Admit that ADC infirmaries are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 32:**
Admit that housing units at ASPC-Perryville are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 33:**
Admit that housing units at ASPC-Yuma are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 34:**
Admit that housing units at ASPC-Tucson are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 35:**
Admit that housing units at ASPC-Eyman are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 36:**
Admit that housing units at ASPC-Phoenix are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

6

**REQUEST FOR ADMISSION NO. 37:**
Admit that housing units at ASPC-Lewis are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 38:**
Admit that housing units at ASPC-Douglas are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 39:**
Admit that housing units at ASPC-Safford are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 40:**
Admit that housing units at ASPC-Florence are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 41:**
Admit that housing units at ASPC-Winslow are not air conditioned.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 42:**
Admit that temperatures exceeding 85 degrees Fahrenheit have been recorded in ADC housing units between June 1, 2013, and the RESPONSE DATE.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

8

**REQUEST FOR ADMISSION NO. 43:**
Admit that temperatures exceeding 90 degrees Fahrenheit have been recorded in ADC housing units between June 1, 2013, and the RESPONSE DATE.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 44:**
Admit that temperatures exceeding 95 degrees Fahrenheit have been recorded in ADC housing units between June 1, 2013, and the RESPONSE DATE.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . . and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 45:**
Admit that temperatures exceeding 100 degrees Fahrenheit have been recorded in ADC housing units between June 1, 2013, and the RESPONSE DATE.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to air conditioning or temperatures.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care; . . .**

and x. Failure to provide suicidal and self-harming prisoners basic mental health care." [Doc. 372, p. 22].


**REQUEST FOR ADMISSION NO. 46:**
Admit that ADC does not provide a RESTRICTED DIET specifically designed for PRISONERS with diabetes.

**RESPONSE:** Defendant objects that this Request is vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class does not include claims relating to restricted diets.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION:** "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care". [Doc. 372, p. 22].


**REQUEST FOR ADMISSION NO. 47:**
Admit that Corizon does not provide a RESTRICTED DIET specifically designed for PRISONERS with diabetes.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class does not include claims relating to restricted diets.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION:** "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care". [Doc. 372, p. 22].


**REQUEST FOR ADMISSION NO. 49:**
Admit that Corizon does not provide methadone maintenance.

**RESPONSE:** Defendant objects that this Request is overbroad, vague and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the

discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to methadone maintenance.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "iii. Failure to provide necessary medication and medical devices; [and] . . . v. Failure to provide care for chronic diseases and protection from infectious disease". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 58:**
Admit that ADC cannot produce reports showing how many PRISONERS have received the RESTRICTED DIETS described in the Diet Reference Manual (Bates Nos. 40574-40609).

**RESPONSE:** Defendant objects that this Request is vague and ambiguous. Defendant further objects that this Request is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to restricted diets.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 59:**
Admit that ADC's contracted food service provider cannot produce reports showing how many PRISONERS have received the RESTRICTED DIETS described in the Diet Reference Manual (Bates Nos. 40574-40609).

**RESPONSE:** Defendant objects that this Request is vague and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence, as the Court's Order certifying the class did not include claims relating to restricted diets.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 64:**
Admit that ADC POLICY does not require that women PRISONERS be offered a PAP smear at least every three years.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant objects because this request does not identity the "ADC POLICY" referred to in this request. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to PAP smears.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 65:**
Admit that Corizon POLICY does not require that women PRISONERS be offered a PAP smear at least every three years.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to PAP smears.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 66:**
Admit that ADC POLICY does not require that women PRISONERS over 50 years old be offered a mammogram at least every two years.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant objects because this request does not identity the "ADC POLICY" referred to in this request. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to inmates over 50 years old or mammograms.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 67:**
Admit that Corizon POLICY does not require that women PRISONERS over 50 years old be offered a mammogram at least every two years.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to inmates over 50 years old or mammograms.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 68:**
Admit that as of the RESPONSE DATE, ADC does not have an electronic health records system to track whether women PRISONERS have been offered a PAP smear in the last three years.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to PAP smears.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 69:**
Admit that as of the RESPONSE DATE, Corizon does not have an electronic health records system to track whether women PRISONERS have been offered a PAP smear in the last three years.

13

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to PAP smears.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 70:**
Admit that as of the RESPONSE DATE, ADC does not have an electronic health records system to track whether women PRISONERS over 50 years old have been offered a mammogram in the last two years.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to inmates over 50 years old or mammograms.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 71:**
Admit that as of the RESPONSE DATE, Corizon does not have an electronic health records system to track whether women PRISONERS over 50 years old have been offered a mammogram in the last two years.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to inmates over 50 years old or mammograms.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**

**REQUEST FOR ADMISSION NO. 72:**
Admit that ADC POLICY does not require that PRISONERS who are pregnant be offered periodic pre-natal appointments with an obstetrician/gynecologist.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant objects because this request does not identity the "ADC POLICY" referred to in this request. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to pregnant inmates.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease". [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 73:**
Admit that Corizon POLICY does not require that PRISONERS be offered who are pregnant be offered periodic pre-natal appointments with an obstetrician/gynecologist.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to pregnant inmates.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease". [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 74:**
Admit that as of the RESPONSE DATE, ADC does not have an electronic health records system to track PRISONERS with coccidioidomycosis.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to coccidioidomycosis.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care". [Doc. 372, p. 22].**


**REQUEST FOR ADMISSION NO. 75:**
Admit that as of the RESPONSE DATE, Corizon does not have an electronic health records system to track PRISONERS with coccidioidomycosis.

**RESPONSE:** Defendant objects that this Request is overbroad, vague, and ambiguous. Defendant further objects that this Request seeks an admission regarding a non-party to this litigation. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to coccidioidomycosis.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "v. Failure to provide care for chronic diseases and protection from infectious disease; [and] vi. Failure to provide timely access to medically necessary specialty care". [Doc. 372, p. 22].**


**DEFENDANTS' RESPONSES TO GAMEZ'S 1ST SET OF INTERROGATORIES (INTERROGATORIES NOS.: 15, 17)**

**INTERROGATORY NO. 15:**
DESCRIBE the restraints worn by PRISONERS in ISOLATION units when they are outside of their cells.

**ANSWER TO INTERROGATORY NO. 15:**
Defendant objects that this Interrogatory is overbroad, vague, and ambiguous. Defendant additionally objects to Plaintiff's definition and use of the term "ISOLATION." Plaintiffs' definition of "ISOLATION" includes several different types of housing assignments, each with its own criteria for assignment. Inmates may be housed in a detention unit in disciplinary segregation, investigative detention, mental health observation, or pending placement into a maximum security unit. Moreover, the term "ISOLATION" implies solitary confinement; however, inmates housed in the housing units listed in Plaintiffs' definition of "ISOLATION" may or may not have cellmates. Defendant additionally objects that this Request is not likely to lead to the discovery of

admissible evidence because the Court's Order certifying the class did not include claims relating to use of restraints when inmates are out of their cells.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "iv. Extreme social isolation".  [Doc. 372, p. 23].**

**INTERROGATORY NO. 17:**
State the minimum qualifications ADC requires of persons who act as interpreters for medical, mental health, or DENTAL encounters for PRISONERS who do not speak English.

**ANSWER TO INTERROGATORY NO. 17:**
Defendant objects that this Interrogatory is overbroad, vague, and ambiguous. Defendant additionally objects that this Request is not likely to lead to the discovery of admissible evidence because the Court's Order certifying the class did not include claims relating to interpreters.

**RELEVANT PRACTICES IDENTIFIED IN THE COURT'S ORDER GRANTING CLASS CERTIFICATION: "i. Failure to provide timely access to health care". [Doc. 372, p. 22].**

**EXHIBIT 5**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                    Plaintiffs,<br><br>vs.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official Capacities,<br><br>                    Defendants. | )<br>)<br>)  NO. 2:12-cv-00601-NVW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

VIDEOTAPED DEPOSITION OF JOSHUA W. POLSON

Florence, Arizona
August 23, 2013
9:16 a.m.

REPORTED BY:
CHRISTINE JOHNSON, RPR, RMR
Certified No. 50383

PREPARED FOR:

Joshua W. Polson - 8/23/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

---

Page 50

1  to do with dislike or liked.
2  BY MS. WIENEKE:
3     Q   Okay.  So if you had your preference, you would
4  prefer to be double-bunked; correct?
5     A   Not preferred.  It would be better for my
6  stability.
7     Q   Okay.  And who has made that medical
8  determination?
9     A   There's been a couple of doctors that have seen me
10 that said it might be good for me to have a single bunk.
11    Q   Okay.  Tell me the name of the medical provider
12 who has made the medical determination.
13    A   I don't remember their name.
14    Q   Okay.  Can you tell me the name of any medical
15 care provider who has made the medical determination that
16 medically you should be double-bunked?
17    A   No.
18    Q   Or you should not be?
19    A   I don't even remember your name.
20    Q   Okay.  Would I find that in any of your medical
21 records, that is, that medically you should be
22 single-bunked?
23    A   I don't know.  I don't have the medical records.
24 I couldn't tell you.  I can give you an idea, though, if you
25 look at my history of disciplinary, it might see that, you

---

Page 51

1  know, I've had quite a bit of conflict and that's due to my
2  bipolar and PTSD because if you have a person that's in that
3  state of mind, you tend to get into quite a bit of arguments
4  with people.  You know what I mean?  So, I mean, I'm not
5  missing my teeth because of drugs.
6     Q   You're missing your teeth because of fights?
7     A   Assaults, yeah.
8     Q   And assaults?
9     A   Yeah, specifically in one assault, but I've lost
10 other teeth during assaults or loosened them, so I have --
11 they've had to get pulled.
12    Q   Have you lost -- how many teeth have you lost?
13    A   Over half of mine.
14    Q   And have those all been the result of assaults?
15    A   Some have been loosened so they've had to have
16 been pulled.  I don't go around just telling, "Oh, yeah, a
17 dentist needs to pull this tooth because I was assaulted."
18 You know, still a little bit of a, quote, unquote, "code of
19 ethics" amongst inmates.  We just don't tell on people
20 saying, "Hey, I was assaulted, so I need this tooth pulled
21 because it's loose" so --
22    Q   Let me see if I understand what you're saying.
23 Are you saying that if I were to look in your dental charts
24 and your medical records, I would not see that the teeth
25 that you have lost or have had pulled would reflect that

---

Page 52

1  that was the result of assaults?
2     A   That's very possible.
3     Q   And that's because you have not been candid with
4  your care providers about the real reasons why you --
5     A   No, they never asked.
6     Q   Oh, they don't ask you why --
7     A   No.
8     Q   -- what happened?
9     A   No.
10    Q   Okay.  Have you ever had to have a tooth pulled or
11 cared for because of a basketball injury?
12    A   Maybe that's what I told them.  I don't know.  I
13 couldn't tell you.
14    Q   If you told them that, was that a lie?
15    A   No, I wouldn't say that.
16    Q   What would you say?  Was it the truth?
17    A   I don't know what to say.  Could have been.  Could
18 have been the truth.  I don't know if I told them that.  I
19 don't know if I told them that or not.  That's the thing.
20    Q   Well, let's talk about your recollection.
21    A   Maybe I was playing chess and I lost a tooth.  I
22 don't know.
23    Q   Have you lost a tooth playing chess?
24    A   I don't know.
25    Q   Tell me how that would happen.

---

Page 53

1     A   I don't know, maybe they threw a piece at me.
2     Q   Well, that would be an assault; right?
3     A   Could be, depends on who's looking at it.
4     Q   So to be clear, have you injured any of your teeth
5  playing basketball?
6     A   I don't know.
7     Q   I'm sorry?
8     A   I don't know.  I don't recollect it.
9     Q   Okay.
10    A   It's possible.  I don't know.  I haven't been on
11 the yard very much, so --
12        (Whereupon, the court reporter marked for
13 identification Exhibit No. 4.)
14 BY MS. WIENEKE:
15    Q   Showing you what's been marked as Exhibit No. 4 to
16 your deposition, Mr. Polson, these records are ADC
17 individual inmate detention records.  Do you see your name
18 at the top, Polson, 187716?
19    A   Yeah.
20    Q   And what I'd like you to look at are the top --
21    A   This is -- this -- this location isn't a
22 detention, though.
23    Q   Well, I'd like you to look at this category
24 heading that says "Date," "Shift," "Meals," "Shower Times,"
25 "Exercise Times," "Razor," "Haircut," "Medical," "Phone."

Joshua W. Polson - 8/23/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

---

Page 54

1  Do you see that?
2      A   Sure.
3      Q   Those are the headings?
4      A   Yeah.
5      Q   Okay.  I'd like you to look at the next page under
6  the bottom where it says "Legend."
7      A   Yeah.
8      Q   All right.
9      A   Are they saying I'm a legend?
10     Q   And then it says "Exercise.  Enter actual time
11 period both inside or out.  For refusal mark R."  Okay.  You
12 see that?
13     A   Yeah.
14     Q   All right.  And then on the left-hand side, you
15 see the dates -- days of the week and the dates?
16     A   Uh-huh.
17     Q   Okay.  So first one I want to take a look at is
18 Wednesday, May 29, 2013.  Are you with me?
19     A   Yeah.
20     Q   All right.  Then let's go all the way across under
21 "Exercise Times" for that date.  Do you see that?
22     A   Sure.
23     Q   And there's an "R" for in and an "R" for out.  Do
24 you see that?
25     A   So you're saying out of that whole week, I refused

---

Page 55

1  only once?
2      Q   According to the legend, that means you refused
3  exercise on Wednesday, May 29th, 2013; correct?
4      A   That's what it says, yeah.
5      Q   Right?
6      A   But I don't know what that's supposed to point
7  out.
8      Q   Do you have any reason to dispute that
9  information?
10     A   No.
11     Q   Okay.  Take a look at the third page of the
12 exhibit, Wednesday, May 22nd, 2013.  You refused to exercise
13 that day; right?
14         MR. du MEE:  Object to form.
15         THE WITNESS:  Why is it always Wednesday?
16 BY MS. WIENEKE:
17     Q   That's what the records show; correct?
18     A   Sure.
19     Q   Do you have any reason to dispute the information?
20     A   Apparently not.
21     Q   Let's take a look at Monday, May 6, 2013.  You
22 refused to exercise that day?
23         MR. du MEE:  Can you give him just a minute.
24 What's the date?
25         THE WITNESS:  What's the date?

---

Page 56

1  BY MS. WIENEKE:
2      Q   May 6th.
3      A   What does this mean?  I don't understand.
4          MR. du MEE:  Hey, Kathy, do you have a
5  Bates-stamped copy of these?
6          MS. WIENEKE:  I do not.
7          MR. du MEE:  Because I don't remember seeing these
8  before.
9          MS. WIENEKE:  These were e-mailed by Lucy.
10         THE WITNESS:  What does this mean?
11         MR. du MEE:  Well, I'm just going to put an
12 objection on the record here that we're using
13 nonBates-stamped copies that I don't believe have been sent
14 to us, and I think that violates the agreement between the
15 parties.
16         THE WITNESS:  Yeah, because nobody ever writes
17 stuff down over there.  All of a sudden they want to write
18 stuff down.
19 BY MS. WIENEKE:
20     Q   Do you have any reason to believe that you refused
21 rec on May 6th, 2013?
22     A   Well, I guess if you don't get to go to rec,
23 that's refusal, right?
24     Q   Actually, no, sir.
25     A   So I could just write down an "R" if somebody

---

Page 57

1  doesn't go to rec and that's saying they refused because I
2  don't believe that this is correct.
3      Q   Okay.  And what basis do you have to say that the
4  information on the log is correct?  Do you have a specific
5  memory of May 6th, 2013 that you did not go to rec that day
6  for some other reason?
7      A   No.  There's times I have not gone to rec because
8  they can't get everybody go to rec.  So if I was to wait
9  around until like half of 25 rooms go to rec, then I
10 wouldn't get rec because it would be too late at night, so I
11 just go to the shower.  So in other words, I'm not refusing
12 because I want to.  I'm refusing because I'm kind of forced
13 to.
14     Q   Well, I'm specifically asking you about May 6th,
15 2013 when you're in detention.
16     A   I don't know.  I wasn't in detention then.
17     Q   And whether you have specific recollection of the
18 specific reason why refusal is noted?
19     A   I don't know.  I wasn't in detention then.
20     Q   According to the record, you were housed in cell
21 1CO7 on May 6th, 2013.  Do you have any reason to believe
22 that you weren't in that cell location?
23     A   I was in that cell location.
24     Q   All right.
25     A   I don't know about that date, but I was in that

---

Joshua W. Polson - 8/23/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

---

Page 58

1  cell location.
2     Q   Okay. Taking a look at July 11th and July 12th,
3  2013, according to the record, you refused rec on both those
4  dates, Thursday and Friday.
5     A   According to the record.
6     Q   Do you have any reason to believe that the records
7  are inaccurate?
8        MR. du MEE: Josh, let me find it first. They're
9  not exactly in order here. July 11th you said? Okay. Here
10 we go.
11       THE WITNESS: What about it?
12 BY MS. WIENEKE:
13    Q   Do you have any reason to believe that the
14 information about your refusal for rec on July 11th and --
15    A   I couldn't tell you.
16    Q   Hold on -- and 12th is inaccurate?
17    A   I couldn't tell you.
18    Q   Okay. The next date is on the next page, two
19 pages over, July 1st, July 3rd and July 7th, according to
20 this record, you refused rec on those three days.
21       Do you have any reason to believe that the
22 information recorded therein is inaccurate?
23    A   I don't know. I couldn't tell you.
24    Q   Okay. Turning to June 24, June 26 and June 28,
25 the record indicates you refused rec on all three days.

---

Page 59

1        Do you have any reason to believe that the record
2  which reflects your refusal on June 24, June 26 and June 28
3  is inaccurate?
4        MR. du MEE: Object to foundation.
5        THE WITNESS: I don't know. I couldn't tell you.
6  BY MS. WIENEKE:
7     Q   Okay. The next record is June 19 and June 21st.
8  Do you have any reason to believe that the refusals as noted
9  for those two days are inaccurate?
10    A   I don't know, but that one's crossed out like --
11 like they made a mistake. I couldn't tell you.
12    Q   Okay. And for the record, the crossed out is on
13 June 17th, which is not a date I asked you about.
14    A   I'm just saying there's one crossed out, so, I
15 mean, anybody can make mistakes.
16    Q   Even you?
17    A   Sure.
18    Q   Okay.
19    A   I'm only human.
20    Q   So June 10th -- June 10th, 2013 indicates a
21 refusal. Do you have any reason to believe that information
22 is inaccurate?
23    A   I don't know. I don't recollect that stuff.
24    Q   Okay. June 3rd and June 7th, 2013 indicate
25 refusal for rec. Do you have any reason to believe that

---

Page 60

1  information is inaccurate?
2     A   I don't know. I don't recollect that date either.
3     Q   Okay. July 31st and August 2nd, this would have
4  been less than a month ago, those indicate refusal for rec.
5        Do you have any reason to believe that information
6  is inaccurate?
7     A   I don't know. I don't recollect that.
8     Q   All right. August 5th and August 7th indicate
9  refusal for rec. This would have been three weeks ago.
10       Do you have any reason to believe that information
11 is inaccurate?
12    A   I don't remember. I don't recollect it on the 7th
13 -- I mean, on the 5th, 6th, I think the 8th, I think those
14 were around the time I was on a watch. I'm not sure. I
15 don't know.
16    Q   On August 9th, it indicates that you received a
17 chopped fine mechanical soft mega sack, received.
18       Do you have any reason to believe that was
19 inaccurate?
20    A   Oh, there's no telling. How come it's only right
21 there, not on the rest of the pages, though?
22       MS. WIENEKE: Move to strike; nonresponsive.
23 BY MS. WIENEKE:
24    Q   On August 9th, it indicates that you received a
25 chopped fine mechanical soft mega sack. Do you have any

---

Page 61

1  reason to believe that was inaccurate?
2     A   I don't know.
3     Q   Okay. On July 15th, 2013 and July 17th and
4  July 19th, 2013, it indicates that you refused rec.
5        Do you have any reason to believe that is
6  inaccurate?
7     A   I don't recollect none of that.
8     Q   On the last page of Exhibit No. 4 on July 18th,
9  2013, it notes the words under quotations "hunger strike."
10 Were you participating in a hunger strike as of that date?
11    A   Well, if it only lasted one day, would that be a
12 legit hunger strike if it only lasted one day?
13       MS. WIENEKE: Move to strike; nonresponsive.
14       THE WITNESS: Doesn't a hunger strike have to be a
15 few days?
16       MR. du MEE: He's trying to clarify your question.
17 BY MS. WIENEKE:
18    Q   Respectfully, I'm happy to answer questions if you
19 don't understand --
20    A   I don't understand --
21    Q   -- but asking me if a one-day hunger strike is not
22 a clarification --
23    A   Well, can you clarify what a hunger strike is
24 then?
25    Q   I'm asking you if on July 18th, 2013 you

---

Joshua W. Polson - 8/23/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 62

1  participated in a hunger strike?
2      A   I don't recollect that.
3      Q   Okay.  Have you ever participated in a hunger
4  strike?
5      A   Maybe.  It's possible.  I don't know.  Or maybe I
6  haven't eaten because I was depressed and they assumed it
7  was a hunger strike.
8          (Pause.)
9      Q   You are currently housed at SMU.  Can you tell me
10  what run you're on or what pod?
11      A   3 Abel.
12      Q   Have you ever denied dental treatment that was
13  offered you by ADC?
14      MR. du MEE:  Object to form.
15      MS. WIENEKE:  What's wrong with the form?
16      MR. du MEE:  Vague and ambiguous as to dental
17  treatment.
18      THE WITNESS:  Can you restate the question in a
19  different form at least so I can better understand it?
20  BY MS. WIENEKE:
21      Q   Have you ever denied any type of dental treatment
22  that has been offered to you by ADC?
23      A   That's the same question in the same --
24      Q   What is it about the words "dental treatment" that
25  you don't --

Page 63

1      A   I don't know what you mean by denied.  It's kind
2  of a --
3      Q   Have you ever refused?
4      A   I might have.
5      Q   Okay.  And what would cause you to refuse dental
6  treatment?
7      A   I could have been depressed and sleeping and just
8  didn't want to go nowhere or could have been that -- I don't
9  know.  Maybe something was -- I don't know.  Something had
10  to have been wrong because I usually always go.  I mean, I'm
11  sure I probably refused or -- usually you just sign a
12  waiver.  You sign a refusal thing usually, and it would tell
13  you on that refusal why I refused, so I would say refer to
14  that.  I don't know for sure.
15      Q   Okay.
16          (Whereupon, the court reporter marked for
17  identification Exhibit No. 5.)
18  BY MS. WIENEKE:
19      Q   Exhibit No. 5, Mr. Polson, is a document entitled
20  "Refusal to Submit to Treatment."  In the box at the bottom
21  that says "Inmate's Signature," is that your signature?
22      A   Yeah.
23      Q   It's dated April 9th, 2009.  Do you see that?
24      A   Uh-huh.
25      Q   "Yes"?

Page 64

1      A   Yeah, I do, yes.
2      Q   This is a refusal for dental treatment.  Do you
3  see the box that's marked at the top right "Dental
4  Procedure" and then it's written "Dental Treatment."  Do you
5  see that?
6      A   Where at?
7      Q   Right here (indicating).  It's marked "Dental
8  Procedure" and it's written "Dental Treatment."
9      A   Dental treatment.  That doesn't explain nothing.
10  That's pretty vague.
11      Q   Okay.  It says at the bottom here "Reason for
12  Refusal."
13      A   Yeah.
14      Q   Is this your writing?
15      A   That's -- it looks like my writing, yeah.
16      Q   And it says, "I feel fine with my teeth right
17  now."  Do you see that?
18      A   Yeah.
19      Q   And that was true when you wrote it?
20      A   I guess if I wrote it.  I don't know.
21      Q   Well, you wouldn't have lied in this document when
22  you signed it, would you?
23      A   No, but that wouldn't have really been a lie.
24  That could have been just a -- right there if I feel fine
25  right now, if you're depressed and you say something like

Page 65

1  that, that's not a lie.  That's -- that's just you're
2  depressed.  You don't -- it's not considered a lie when
3  you're depressed, I don't think.
4      You can't judge somebody for being depressed,
5  could you, and them not wanting to get out of bed and go get
6  a tooth pulled or a tooth drilled on or whatever the
7  procedure was supposed to be because it doesn't say what the
8  procedure is.  It just says "dental treatment."  That's
9  pretty vague.
10      Q   Do you know whether you were depressed when you
11  signed that?
12      A   I don't know.  I couldn't tell you for sure.
13      Q   So that's speculation on your part?
14      A   It could be.
15      Q   Okay.  And you don't know what was the type of
16  treatment that was being proposed; correct?
17      A   Apparently not.  It doesn't say.  Can I say
18  something?
19      Q   There is no question pending.
20      A   Oh, all right.
21      Q   When were you first admitted into the Department
22  of Corrections?
23      A   On this time or previous times?
24      Q   Well, actually the first time.
25      A   My very first time in prison 2004, of like August,

**EXHIBIT 6**

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; ) | No. CV12-00601- |
| Stephen Swartz; Dustin Brislan; ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco;) | |
| Jackie Thomas; Jeremy Smith; Robert ) | |
| Gamez; Maryanne Chisholm; Desiree ) | |
| Licci; Joseph Hefner; Joshua Polson;) | |
| and Charlotte Wells, on behalf of ) | |
| themselves and all others similarly ) | |
| situated; and Arizona Center for ) | |
| Disability Law, ) | |
| ) | |
| Plaintiffs, ) | |
| vs. ) | |
| ) | |
| Charles Ryan, Director, Arizona ) | |
| Department of Corrections; and ) | |
| Richard Pratt, Interim Division ) | |
| Director, Division of Health ) | |
| Services, Arizona Department of ) | |
| Corrections, in their official ) | |
| capacities, ) | |
| ) | |
| Defendants. ) | |
| ) | |

DEPOSITION OF TROY LAWRENCE EVANS, RN

September 17, 2013
9:14 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

**Page 86**

1  a -- types in I guess a Corrective Action Plan, you can
2  see that when you're checking through your section of
3  Corrective Action Plans.  And then she submits it?
4      A.  Uh-huh.
5      Q.  To whom?
6      A.  To me.
7      Q.  She submits it to you.  And do you have to
8  approve it?
9      A.  Yes.
10     Q.  And how long does that process take
11 approximately?
12     A.  There's no time frame.
13     Q.  Is there any time in which it's reasonable for
14 you to approve a Corrective Action Plan?
15     A.  There's no time frame.
16     Q.  Okay.  So you can take a year if you wanted to?
17     A.  Theoretically, I guess you could.  It would
18 probably be unreasonable, but -- there's no time frame,
19 so...
20     Q.  How long do you usually take to approve a
21 Corrective Action Plan?
22     A.  She approves them as I submit them generally.
23     Q.  She approves them or you approve them?
24     A.  She submits them as I -- like when I submit an
25 amber, generally she's submitting something because

**Page 87**

1  usually we've already talked about what's going on.
2      Q.  Okay.
3      A.  I'm not the police.  I'm not trying to catch
4  her and surprise her.  I'm trying to help her make
5  changes for better health care that's given to the
6  inmates.  And she usually has a plan of action in place,
7  and she will submit it to me, and I'll accept it.  I
8  mean, there's times where she -- I think last month or
9  another time she submitted the wrong Corrective Action
10 Plan to me in the wrong spot, and I refused it, and I
11 told her, hey, you need to put the right plan.  I mean,
12 there's no time frame, so I don't know.
13     Q.  So do you usually discuss issues that you're
14 classifying as amber before submitting report with
15 Ms. Mullen?
16     A.  I do.
17     Q.  And once the -- so once the Corrective Action
18 Plan has been submitted to you and you approve it, is
19 there some kind of a time period in which it's supposed
20 to be complied with?
21         MR. STRUCK:  Form.
22         THE WITNESS:  I guess reask me the question
23 more specific.  I don't really know what you're asking.
24     Q.  BY MS. MAMEDOVA:  So let's say you submitted
25 this Corrective Action Plan for No. 2 on the sick call

**Page 88**

1  for August 2013.  Are sick call inmates being seen within
2  24 hours of the HNR being triaged.  And then Ms. Mullen,
3  presumably, we don't have it, but presumably she
4  submitted a Corrective Action Plan to you --
5      A.  Correct.
6      Q.  -- of how they are going to address it.  And do
7  you have a record of this Corrective Action Plan?
8      A.  With me?
9      Q.  Just -- no, not with you, but generally.
10     A.  No.  I have them printed out in my office.
11     Q.  And are they in the system or --
12     A.  Once they're approved, they're purged, so I'm
13 not sure -- I think once they're approved, then they're
14 purged.  Because like the whole point of my Corrective
15 Action Plan slot is to view any that aren't addressed.
16 So once they're addressed, then they're gone.
17     Q.  Okay.  So you can't see them in the system
18 anymore?
19     A.  I've already seen them, so I don't need to.
20     Q.  But if you went to the Corrective Action Plan
21 section, you can't look at reports --
22     A.  No.
23     Q.  -- that have already been addressed?
24     A.  No.
25     Q.  So how would you know for next month whether a

**Page 89**

1  Corrective Action Plan for the previous month has been --
2  or I guess whether or not the Corrective Action Plan is
3  being put into effect?
4      A.  Well, I know what the corrective action is.
5      Q.  But do you have some record of it or do you
6  just remember it?
7      A.  I print them off, but I know what --
8      Q.  You print them off.  So do you have --
9      A.  I submit this report, and I know what's
10 ambered.  So if it was ambered, it has to have a
11 Corrective Action Plan, period.  And it's not like
12 there's 50 ambers.  There's only a couple of them.  So we
13 know what has to be changed, and we know what's being
14 implemented to change it.
15     Q.  But do you print every Corrective Action Plan
16 that's submitted to you?
17     A.  I do not.
18     Q.  Do you print some of them?
19     A.  I do.
20     Q.  How do you determine which one you will print
21 and which one you won't?
22     A.  There's no way.
23     Q.  It's just if you need to at that particular
24 moment or...
25     A.  Yeah.

23 (Pages 86 to 89)

**EXHIBIT 7**

**From:** Halloran, Wendy [mailto:whalloran@kpnx.com]
**Sent:** Thursday, October 24, 2013 7:15 PM
**To:** LAMOREAUX, BILL; RYAN, CHARLES; NICK, DOUG
**Subject:** Media Request From Wendy Halloran at KPNX 12 News

Hello Director Ryan, Bill and Doug,

Pursuant to Arizona's Public Records Law, A.R.S. § 39-121 *et seq.*, 12 News/KPNX-TV of Phoenix, Arizona, ("12 News") more specifically, Investigative Reporter Wendy Halloran hereby requests the right to examine and copy, or to be furnished with copies, certain public records in the possession of the Arizona Department of Corrections (hereafter the "Department").

Arizona Public Records Law carries with it a presumption that all records are "open to the public for inspection as public records." *Carlson v. Pima County*, 141 Ariz. 487,490,687 P.2d 1242 (1984). If the request is denied in part or in whole, please justify any redactions by referencing the specific grounds on which the information is withheld under the Public Records Law. All severable portions of otherwise exempt material must be produced. 12 News reserves the right to appeal your decision to withhold any information.

These records are sought for the purpose of informing the public. 12 News is a news-gathering organization and this information will help the public understand the operations of the Department. Nevertheless, we agree to reimburse you for reasonable costs associated with producing the requested information. If that amount will exceed $75, please let us know what it will be before you incur the costs. If your agency does not maintain the records below, please advise who does and include the proper custodian's name and address when possible.

We seek the following records (including in written, electronic, audio, video, CD, or other format) in the custody of the Department:

a.  The quarterly and monthly monitoring memos and reports, known as MGAR reports (short for Monitoring Green-Amber-Red reports), that are prepared by staff in the Department's Health Services Contract Monitoring Bureau, for all Department facilities from March 1, 2013 through the present.

b.  All corrective action plans prepared by the Department's healthcare contractor, Corizon Health Inc. (hereafter "Corizon"), in response to the MGAR reports.

c.  All additional reports, records, memos or correspondence between Corizon and the Department about the provision of healthcare at the Department's facilities from March 1, 2013 through the present, including those that discuss healthcare staffing levels .

d.  All bills from Corizon to the Department and all records of payment from the Department to Corizon since Jan. 1, 2013.

2

e.   All bills related to the litigation *Parsons et al. v. Ryan et al.* from the law firm Struck Wieneke &
Love to the Department and all records of payment related to the litigation *Parsons et al. v.
Ryan et al.* from the Department to the law firm Struck Wieneke & Love .


Please comply with this request on or before November 10, 2013. *See* A.R.S. § 39-121(D)(1) and (E)
(public records must be furnished "promptly"). If there are ways we can narrow the request to expedite
processing, let us know. Otherwise, we may deem the request denied.

Thank you very much for your prompt attention. Should you have any questions, you may contact me by
phone at 602-526-0640 or by email at whalloran@12news.com

Best Regards,

Wendy Halloran

*Wendy Halloran*
Investigative Reporter          **12 NEWS/KPNX-TV**
P:  602 444-1357                **200 E. Van Buren Street**
C:  602 526-0640                **Phoenix, AZ 85004-2238**
whalloran@12news.com



**EXHIBIT 8**

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**VIA EMAIL ONLY**

September 5, 2013

Lucy M. Rand, AAG
Office of the Arizona Attorney General
Department of Corrections Unit
Liability Management Section
1275 West Washington Street
Phoenix, AZ 85007-2926

*Re: Parsons v. Ryan Supplemental Discovery Production*

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
*DIRECTOR*
*ATTORNEY AT LAW**

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS*

Dear Ms. Rand:

I am writing regarding Plaintiffs' discovery requests and the need for both
responses and supplementation of the same. Plaintiffs have reviewed
Defendants' discovery responses to the various pending requests in this matter
and have identified a narrowed list of requests that require response and
supplementation. Each request is identified and set forth below. Where
possible we have also narrowed the scope of these requests or specifically
waived further supplementation.

### PLAINTIFF JOSHUA POLSON'S FIRST SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST FOR PRODUCTION NO. 1**
All DOCUMENTS regarding CONDITIONS OF CONFINEMENT for
prisoners on SUICIDE WATCH.
- In response to this request, Defendants have produced Departmental
  Orders, the Mental Health Technical Manual, forms, a training
  document and POs from some units. However, POs from units, such as
  Eyman, Florence, and Perryville, have not been produced. Plaintiffs
  request supplementation of this RFP or Defendants' confirmation that
  no further responsive documents exist.

**REQUEST FOR PRODUCTION NO. 2**
All POLICIES AND PROCEDURES regarding MANAGEMENT OR
TREATMENT of prisoners on SUICIDE WATCH, including but not limited
to required frequency of contact with psychiatrists and other HEALTH CARE
STAFF and CORRECTIONAL STAFF.

- In response to this request Defendants have produced Departmental
  Orders, forms and POs for all prison complexes except for Perryville.

1

Plaintiffs request supplementation of this RFP to include the PO from Perryville and any other responsive documents or confirmation that no further responsive documents exist.

**REQUEST FOR PRODUCTION NO. 3**

All DOCUMENTS, including but not limited to POLICIES AND PROCEDURES, regarding USE OF FORCE or RESTRAINT by ADC staff on PRISONERS on SUICIDE WATCH and prisoners who are CLASSIFIED as "SERIOUSLY MENTALLY ILL," "SEVERELY MENTALLY ILL," MH-1 THROUGH MH-5, or any OTHER MENTAL HEALTH CLASSIFICATION employed by the ADC.

- Defendants have produced no documents in response to this request but have indicated that they "are still attempting to locate additional responsive documents and will supplement this response as they are located." Plaintiffs request documents responsive to this RFP.

**REQUEST FOR PRODUCTION NO. 10**

All POLICIES AND PROCEDURES regarding the PROVISION of HEALTH CARE to prisoners classified as "SERIOUSLY MENTALLY ILL," "SEVERELY MENTALLY ILL," MH-1 THROUGH MH-5, or any OTHER MENTAL HEALTH CLASSIFICATION employed by the ADC while housed in ISOLATION, including but not limited to required FREQUENCY OF CONTACT with PSYCHIATRISTS or other health care staff; MONITORING of prisoners for ADVERSE MENTAL HEALTH EFFECTS of ISOLATION; and the REMOVAL of prisoners SUFFERING ADVERSE HEALTH EFFECTS of ISOLATION.

- Defendants have failed to produce any policies or procedures in response to this request regarding specific mental health programs provided to prisoners at SMU I, Browning, Florence Central, Florence Kasson, or Perryville – Lumley SMA. Plaintiffs request supplementation. Plaintiffs note that some policy documents were produced by Unit staff during Plaintiffs' expert tours but have not yet been produced through discovery.
- Plaintiffs also note that a PO from Tucson is listed as responsive to this request but POs from units, such as Eyman, Florence, and Perryville, have not been produced. Plaintiffs request supplementation of this RFP or Defendants' confirmation that no further responsive documents exist.

AMERICAN CIVIL LIBERTIES UNION FOUNDATION

**REQUEST FOR PRODUCTION NO. 15**
All "703 INSPECTION REPORTS" or other monthly reports generated
pursuant to ADC Department Orders at the ISOLATION units since January 1,
2011.

- Defendants have only produced reports for Eyman, Lewis and Florence
  for April 2011 and Eyman and Florence for January of 2012. Plaintiffs
  request supplementation of this request to include reports from January
  1, 2013 to August 2013, or affirmation that no further responsive
  documentation exists.

**REQUEST FOR PRODUCTION NOs. 16 & 17**
All MEETING MINUTES produced for periodic STAFF MEETINGS and/or
UNIT MANAGEMENT MEETINGS at ISOLATION units since January 1,
2011.

All MEETING MINUTES produced for periodic meetings between
WARDENS at ISOLATION units and their EXECUTIVE STAFF since
January 1, 2011.

- Defendants produced some documents responsive to these requests and
  indicated that they are still attempting to locate additional responsive
  documents. Plaintiffs request supplementation for ASPC - Florence
  after February 2013; ASPC- Perryville after March 22, 2013; ASPC-
  Eyman, Browning Unit after December 28, 2012; and ASPC-Eyman,
  SMU I unit after January 27, 2012.

**REQUEST FOR PRODUCTION NO. 18**
Copies of CORRECTIONAL JOURNALS maintained by each ISOLATION
Unit for the last year.

- Plaintiffs agreed to limit this request to specific dates due to the volume
  of a full year of Correctional Journals. We request a single week of
  said journals from June 6-16, 2013 for Florence Central Unit;
  Perryville-Lumley SMA; Eyman Browning Unit; and Eyman SMU I.

**REQUEST FOR PRODUCTION NO. 19**
All DOCUMENTS DESCRIBING or DEPICTING the CELL SIZE, PLAN,
FURNITURE, FIXTURES, DOORS, and WINDOWS in the ISOLATION
units, including the variations, if any, in the cells in the particular ISOLATION
units.

- In response to this request Defendants have produced diagrams of
  Eyman SMU I, Eyman Browning, and Rynning. Defendants have also

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

3

referred to Interrogatory response No. 10 to Plaintiff Wells' First Set of Interrogatories.  Plaintiffs request supplementation of this RFP to include diagrams of Florence Central Unit and Perryville-Lumley SMA or confirmation that no further responsive documents exist.

**REQUEST FOR PROCUTION NO. 21:**  All DOCUMENTS, POLICIES & PROCEDURES regarding the OPERATION OF, CONDITIONS of CONFINEMENT in, and MENTAL HEALTH CARE PROGRAMS at, all of the units described in the memorandum to Charles Ryan from Robert Patton and Richard Pratt dated April 30, 2012, entitled "Increase of Mental Health for Max Custody"

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

- Defendants produced general Departmental Orders and the Mental Health Technical Manual in response to this request but have failed to produce any policies or procedures regarding the specific mental health programs set forth in in the 4/30/12 Ryan memo, including SMU I, Browning, Florence Central, Florence Kasson, or Perryville -- Lumley SMA .  Plaintiffs request supplementation of this RFP or Defendants' confirmation that no further responsive documents exist.

**REQUEST FOR PRODUCTION NO. 22**
All documents regarding the USE OF FORCE or RESTRAINTS in the ISOLATION units for the last two years.

- Plaintiffs have narrowed this request.  Using the Morning Reports produced by Defendants in response to this request and Swartz RFP No. 9, Plaintiffs have been able to narrow our request for Use of Force/Incident Management Reports (Form 804-2) and all underlying documents regarding use of force and restraints to particular use of force incidents at the Florence Central Unit, Lumley, Eyman Browning & SMU I units identified in the morning reports.  **Please see *Appendix A*** to this letter which includes tables for each unit that set forth the name and number of the prisoner involved in the use of force/restraint incident, the corresponding SIR report #, and the date of the incident/SIR report.

**REQUEST FOR PRODUCTION NO. 24**
All INSTITUTION ORDERS regarding FOOD SERVICE MAINTAINED or DEVELOPED by WARDENS or OTHER ADMINISTRATIVE STAFF at the ISOLATION units as referenced in Departmental Order 912, Food Service (effective date January 28, 2009) at p. 4 (ADC013141).

- Defendants have produced no documents in response to this request but have indicated that they "are still attempting to locate additional

4

responsive documents and will supplement this response as they are located." Plaintiffs request documents responsive to this RFP.

**REQUEST FOR PRODUCTION NO. 26**
All INFORMATION REPORTS or OTHER DOCUMENTS generated since January 1, 2011 that document MISSED MEALS on the ISOLATION units.

- Defendants have produced some Information Reports responsive to this request. Plaintiffs request supplementation of this RFP or Defendants' confirmation that no further responsive documents exist.

**REQUEST FOR PRODUCTION NO. 27**
All documents regarding any NUTRITIONAL ANALYSIS of the DIET served to prisoners in ISOLATION units.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

- Defendants have produced some documents responsive to this request including policies, requests for proposals, and contracts with food vendors but no documents specific to the ISOLATION UNITS. Plaintiffs request documents responsive to this RFP or Defendants' confirmation that no further responsive documents exist.

**REQUEST FOR PRODUCTION NO. 28**
All INFORMATION REPORTS and OTHER DOCUMENTS generated at ISOLATION units in the last two years regarding the CANCELLATION or TRUNCATION of OUTDOOR EXERCISE.

- Defendants have produced some reports in response to this request but have indicated that they "are still attempting to locate additional responsive documents and will supplement this response as necessary." Plaintiffs request documents responsive to this RFP.

**REQUEST FOR PRODUCTION NO. 30**
All ADC POST ORDERS, including general Post Orders that apply across ADC and facility-specific Post Orders, related to the provision of OUTDOOR EXERCISE to prisoners in ISOLATION.

- Defendants have produced no documents in response to this request but have indicated that they "are still attempting to locate additional responsive documents and will supplement this response as they are located." Plaintiffs request documents responsive to this RFP.

**REQUEST FOR PRODUCTION NO. 32**
All ADC POST ORDERS, including general Post Orders that apply across ADC and facility-specific Post Orders, regarding HEALTH AND WELFARE CHECKS and MENTAL HEALTH contacts on prisoners in ISOLATION.

- Defendants have produced no documents in response to this request but have indicated that they "are still attempting to locate additional responsive documents, if any, and will supplement this response as they are located." Plaintiffs request documents responsive to this RFP.

**REQUEST FOR PRODUCTION NO. 33**
All ADC POST ORDERS, including general Post Orders that apply across ADC and facility-specific Post Orders, for WATCH OFFICERS.

- Defendants have produced no documents in response to this request but have indicated that they "are still attempting to locate additional responsive documents, if any, and will supplement this response as they are located." Plaintiffs request documents responsive to this RFP.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**REQUEST FOR PRODUCTION NO. 35**
All ADC POST ORDERS, including general Post Orders that apply across ADC and facility-specific Post Orders, regarding STRIP SEARCHING of prisoners in ISOLATION.

- Defendants have produced one document in response to this request but have indicated that they "are still attempting to locate additional responsive documents, if any, and will supplement this response as they are located." Plaintiffs request documents responsive to this RFP.

**REQUEST FOR PRODUCTION NO. 36**
All documents regarding STAFFING and STAFFING VACANCIES in ISOLATION units, including but not limited to post charts, staffing charts, prioritized posting charts, and staffing rosters in each ISOLATION unit.

- The most recent documents Defendants have produced all date from 2012. Plaintiffs request Defendants supplement this request with responsive documents for 2013.

## PRISONER PLAINTIFFS' NOTICE OF 30(B)(6) DEPOSITION DUCES TECUM (DKT. 76)

**REQUEST FOR PRODUCTION NO. 4.**
All DOCUMENTS that evaluate WEXFORD's compliance and performance and whether WEXFORD is meeting specific performance measures and outcomes, as defined in Sections 2.19 and 2.20 of the HEALTH CARE PRIVATIZATION CONTRACT.

6

**REQUEST FOR PRODUCTION NO. 5.**
All reports created by WEXFORD for ADC as specified per the schedule identified in Exhibit 2, "Required Reporting," of the HEALTH CARE PRIVATIZATION CONTRACT.

- The parties stipulated that the word "Corizon" would replace all appearances of the word "Wexford" in discovery requests.
- Defendants have not produced any monitoring reports after the June 2013 reports. Furthermore, Defendants have not produced any Corrective Action Plans created by Corizon in response to shortcomings identified by ADC monitoring staff in their monthly reports.
- Defendants have produced a limited number of reports by Corizon, and the ones produced are from May 2013. For example, the May monitoring reports at ADC 117829-830 and 117863, refer to the Pharmacy Corrective Action Plan of May 13, 2013, and the Status Report of May 30, 2013 regarding the Corrective Action Plan. Neither of these documents – nor any other corrective action plans – have been produced by Defendants.
- Plaintiffs request that Defendants supplement this production and confirm in writing that these are all of the reports created by Corizon to comply with the requirements of the Health Care Privatization Contract.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## PLAINTIFF VICTOR PARSONS' FIRST SET OF REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION NO. 2**
All ADC POLICIES AND PROCEDURES in DRAFT FORM or that have not been approved or implemented regarding HEALTH CARE from January 1, 2011 through the response date.

- Defendants have not produced anything responsive to this request after December 2012. To the extent that there are any new policies and procedures, defendants must supplement. In particular, Plaintiffs note that a draft of a new mental health care program at Perryville Lumley – SMA was shown to Plaintiffs' expert, Eldon Vail, during his tour, but this document has never been produced. Plaintiffs request that this response be supplemented accordingly.

7

**REQUEST FOR PRODUCTION NO. 16**

All MINUTES from MEETINGS attended by ADC HEALTH CARE STAFF, and any other meetings at which the HEALTH CARE of PRISONERS, HEALTH CARE POLICIES AND PROCEDURES, HEALTH CARE STAFFING, or ANY ISSUE related to HEALTH CARE was discussed.

- Defendants produced a number of meeting minutes in response to this request. However, prisoner names were redacted in the copies produced. For example, minutes from the meetings at ASPC Phoenix (ADC55223-243) have blacked out prisoner-plaintiff names. Now that the class is certified, all prisoner names must be unredacted in documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 18.:**

All DOCUMENTS REGARDING HEALTH CARE statistics of any kind at the ADC, including but not limited to DOCUMENTS that track disease or condition prevalence, outcomes, delays in service, care provided, and costs.

- Defendants have produced dental summary reports and a dental utilization report for May 2013. Plaintiffs request dental utilization reports from January 1, 2012 to April 2013. In addition, this request includes reports provided by Smallwood Prison Dental Services to Corizon. Plaintiffs request continuing production of all wait time and utilization reports provided by Smallwood (directly or through Corizon). If ADC does not receive or maintain these reports, state so.

**REQUEST FOR PRODUCTION NO. 19**

DOCUMENTS SUFFICIENT TO SHOW the HOURS OF OPERATION, STAFFING SCHEDULES, and HEALTH CARE STAFFING levels for each facility operated by the ADC from January 1, 2011 through the RESPONSE DATE.

- Defendants have produced "staffing roll-ups" from May and June 2013. Plaintiffs request continuing supplementation of this request. In addition, Plaintiffs are not clear whether the produced documents satisfy this request for staffing levels. Please explain the column headings on the staffing roll-ups (i.e, what is the difference between "Corizon filled FTEs" and "Corizon Employee FTEs"), or identify a witness who can explain the document.
- Regarding staffing schedules for dental, see Swartz RFP No. 6.

**REQUEST FOR PRODUCTION NO. 25.:**

All DOCUMENTS REGARDING formal and informal HEALTH CARE training provided to HEALTH CARE STAFF and CORRECTIONAL STAFF, REGARDING (a) the provision of HEALTH CARE, (b) administrative responsibilities REGARDING the provision of HEALTH CARE, (c) the

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

8

processing of Health Needs Request ("HNR") forms and other PRISONER COMPLAINTS, and (d) the procedures to ensure that PRISONERS have access to HEALTH CARE.

- None of the documents provided are specific to dental clinics. Plaintiffs request supplementation of this response, or confirmation that no such responsive documents exist with respect to dental clinics.

**REQUEST FOR PRODUCTION NO. 40**
All Documents regarding DEATH RECORDS.

- No documents have been produced for anything after December 2012. Plaintiffs request supplementation of this response to the present date.
- **Plaintiffs can provide Defendants with what they believe is an up-to-date list of all prisoners who have died since January 1, 2011, and what, if any, documents have been produced to date.**

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**REQUEST FOR PRODUCTION NO. 54**
All documents regarding the PROVISION of OUTDOOR EXERCISE to prisoners in ISOLATION, including but not limited to POLICIES AND PROCEDURES; SCHEDULES for the provision of outdoor exercise; documents sufficient to show WHEN and FOR HOW LONG prisoners ACTUALLY RECEIVED outdoor exercise, including any documents regarding CANCELLATION or TRUNCATION of scheduled outdoor exercise; PLANS of the AREAS in which outdoor exercise is provided; and EXERCISE EQUIPMENT in the outdoor exercise areas.

- Defendants have produced Departmental Orders and Post Orders in response to this request as well as photographs of recreation enclosures and ADC Reports regarding missed meals.
- Defendants response indicates that they "will supplement this response as necessary." Plaintiffs request supplementation or affirmation that no further responsive documentation exists.

**REQUEST FOR PRODUCTION NO. 55**
All DOCUMENTS REGARDING exhausted GRIEVANCES REGARDING HEALTH CARE or ISOLATION from January 1, 2010 through the RESPONSE DATE.

- Defendants' response refers to grievances of named plaintiffs only, but information related to all of the class members is relevant to Plaintiffs' claims. To limit this request, Plaintiffs request that Defendants

9

supplement this response by producing the dental-related grievances listed in the document at ADC074296 - 327.

## REQUEST FOR PRODUCTION NO. 56
All documents regarding GRIEVANCES regarding CONDITIONS of CONFINEMENT in ISOLATION.

- Plaintiffs received the following logs for exhausted non-medical grievance appeals: 1) non-medical grievances (conditions of confinement only) from Jan. 1, 2011 to April 24, 2013 (ADC089380-391) and 2) non-medical grievances (all) from Jan. 1, 2011 to 12/21/12) (ADC089392-442). Based on the current non-medical logs produced we request only the following grievances for Parsons' RFP #56 related to exhausted grievances for the ISOLATION units, including documentation of all levels of appeals:

For ADC089380-391, Grievance Appeals Non-Medical – Conditions (1/1/11-4/24/13), grievances listed under the following log numbers:

- 6, 74, 75, 127, 187, 198, 199, 219, 256-264, 272, 273, 348-350, 378, 379, 495, 509, 532, 578, 582, 606, 657, 662, 663, 731
- Starting on ADC089385 the numbering in the list of Log numbers starts over: 51-53, 111, 184, 215, 294, 295, 423, 440, 529, 542 and 580.

For ADC089392-442, Grievance Appeals Non-Medical (1/1/11-12/21/12), grievances listed under the following log numbers:

- 1, 2, 10, 27, 28, 32, 36, 59, 74, 75, 87, 94-96, 101, 107, 116, 127, 129, 131, 152-154, 157, 166, 168, 182, 198, 199, 223, 238-240, 243, 256-264, 271-274, 287, 288, 297-299, 312, 313, 348, 351, 397, 400, 405, 446, 449, 462, 465, 468, 470, 508, 509, 514, 522, 532, 567, 582, 583, 619, 657, 659, 662, 663, 666, 720, 731, 747
- Starting on ADC089420 the numbering in the list of Log numbers starts over: 10, 50-54, 58, 62, 65, 101, 112, 121, 143, 144, 200, 210, 213, 215, 218, 219, 277 ,294, 295, 312, 373, 384, 412, 423, 433, 520, 521, 525, 536 and 542.

## REQUEST FOR PRODUCTION NO. 61
Documents sufficient to show the ORGANIZATIONAL STRUCTURE of the ADC for the time period from January 1, 2011 through the response date.

- Defendants have produced only organizational charts from July 2012 (prior to Corizon's provision of health services). Plaintiffs request Defendants supplement this response with updated information.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## PLAINTIFF VICTOR PARSONS' SECOND SET OF REQUESTS FOR PRODUCTION

**REQUEST TO PRODUCE NO. 13**
All documents, in particular but not exclusively including photographs and video recordings, REGARDING, DEPICTING, OR DOCUMENTING the PHYSICAL OR MENTAL CONDITION of Victor Parsons, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, or Charlotte Wells after any of these persons sustained an injury.

- Defendants have produced Significant Incident Reports in response to this request and responded that they will "seasonably supplement this response as necessary."
- Plaintiffs request supplementation of this response to include recordings of any telephone calls to or from Plaintiffs regarding factual circumstances at issue in this lawsuit.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

## PLAINTIFF SWARTZ'S FIRST REQUEST FOR PRODUCTION

*Plaintiffs agree to waive further production and supplementation for **Requests 1 and 7.***

**REQUEST FOR PRODUCTION NO. 2**
All GRIEVANCE DOCUMENTS for GRIEVANCES REGARDING DENTAL CARE that have not been exhausted from January 1, 2012 to the RESPONSE DATE.

- Defendants' response references grievance documents from Douglas, Perryville, Lewis, Tucson, and Yuma. Please confirm whether documents from Safford, Phoenix, Eyman, and Florence have been produced.

**REQUEST FOR PRODUCTION NO. 4**
All DISCIPLINARY REPORTS for all ADC PRISONERS in ISOLATION units for incidents that occurred on or after February 1, 2013.

- Plaintiffs have narrowed this request using the discipline report log Defendants produced under Swartz RFP #14 and request only the underlying disciplinary report documentation form the following incidents (note this list tracks the data as presented in the reports:  Case #; ADOC #; Name; Race; Violation; Date):

11