# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn          )   No:
Jensen; Stephen Swartz;        )   CV12-00601-PHX-NVW
Dustin Brislan; Sonia          )   (MEA)
Rodriguez; Christina           )
Verduzco; Jackie Thomas;       )
Jeremy Smith; Robert Gamez;    )
Maryanne Chisholm; Desiree     )
Licci; Joseph Hefner; Joshua   )
Polson; and Charlotte Wells,   )
on behalf of themselves and    )
all others similarly           )
situated; and Arizona Center   )
for Disability Law,            )
               Plaintiffs,     )
     v.                        )
Charles Ryan, Director,        )
Arizona Department of          )
Corrections; and Richard       )
Pratt, Interim Division        )
Director, Division of Health   )
Services, Arizona Department   )
of Corrections, in their       )
official capacities,           )
               Defendants.     )
                               )

DEPOSITION OF MARLENA D. BEDOYA
September 10, 2013
9:59 a.m.
Tucson, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 145

1  ADC -- or with Wexford, rather?

2      A    He worked with ADC and Wexford.

3      Q    What was his position before Corizon hired him

4  as the FHA?

5      A    Assistant FHA.

6      Q    And it had been Gretchen who was the FHA --

7      A    Yes.

8      Q    -- before him?

9      A    Carrie Harris and then Gretchen.

10     Q    Do you know why Gretchen left at the time of

11 the transition?

12     A    I don't.

13               MR. BOJANOWSKI:  Form, foundation.

14               THE WITNESS:  I have no idea.

15     Q    BY MR. PODSIADLIK:  Was it disruptive to what

16 you had to do on your job to have to adjust to a new

17 person?

18               MR. BOJANOWSKI:  Form.

19               THE WITNESS:  Oh, no.

20     Q    BY MR. PODSIADLIK:  At the bottom here, it

21 says sick call and medical records, and you wrote,

22 "Please see the attached spreadsheets for trends across

23 the Tucson Complex.  The highlighted areas will show

24 you which yards and what items need to be retrained

25 with your team."

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 146

 1     A     Okay.

 2     Q     What spreadsheets were attached?

 3     A     I don't recall.  They didn't -- I don't know.

 4     Q     What spreadsheets could have been attached?  I

 5  mean, what spreadsheets exist that you might have

 6  attached to this?

 7               MR. BOJANOWSKI:  Form.

 8               THE WITNESS:  A spreadsheet that

 9  highlighted the areas that showed which yards and what

10  items need to be retrained with your staff.  I -- I

11  don't -- I would have thought you'd have the

12  attachment.

13     Q     BY MR. PODSIADLIK:  Me, too, but I don't.

14     A     I'm sorry.

15     Q     No, that's not your fault.  Look at Tim.  It's

16  probably not Tim's fault, either.

17               Would these have been spreadsheets that

18  you made?

19     A     Yes.

20     Q     And would they still be on your computer in

21  your office?

22     A     I have no idea.

23     Q     But you have no recollection at all of what

24  these spreadsheets might refer to?

25     A     Well, if it's under sick call and medical

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 147

1    records --

2        Q       Uh-huh.

3        A       -- okay, and given -- given what those

4    questions are in here --

5        Q       Right.

6        A       -- okay, I'm assuming I set up a spreadsheet,

7    because this is what I'm thinking I would have done

8    with the questions to show the tracking and trending

9    for that month, which we were not -- we were letting

10   them do their transition, okay, versus putting it in

11   here.  I put it in a spreadsheet for him to visually

12   see.  That's what I'm thinking it is.

13       Q       I understand.

14       A       Some people are more visual than others.

15       Q       Absolutely.

16               Have you -- have you ever before made a

17   representation of trends across the Tucson Complex?

18       A       Not that I recall, because this was the only

19   month that we were asked to not input, because they

20   were -- with new staff, they were getting the accesses,

21   the networks joined with a different company, and they

22   wanted us, you know, to stay out of that to allow them

23   to do -- IT to be able to do their work.

24       Q       Do you recall if you and Matthew ever went

25   through the spreadsheet together?

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 150

 1   went over that, and we did talk about the spreadsheets

 2   more generally, and you said that the only kind of

 3   documentation you had for each month is the MGAR?

 4       A     Right.

 5       Q     What are the Peer reviews that are mentioned

 6   as number 4, annual P-E-E-R reviews?  "Is the

 7   contractor conducting annual PEER reviews for

 8   Physicians, Nurse Practitioners, PAs, Dentists,

 9   Psychiatrists, Psychiatric Nurse Practitioners, and

10   Ph.D.-level psychologists?"

11       A     Peer reviews are -- okay.  Anybody with a

12   license, nurse, mid-level nurse practitioner,

13   physician, they are to have what's called a

14   peer review, meaning your mid-levels, which are your

15   nurse practitioners, they are seeing patients, writing

16   scrips, requesting labs.  They have somebody, usually a

17   physician, meaning the medical director for the

18   complex, who randomly audits some of their charts each

19   month.  And he goes down through and reviews, and he

20   makes sure that that nurse practitioner is, you know,

21   prescribing, seeing, ordering appropriate steps in a

22   person's care.  That's what a peer review is.

23       Q     Does Corizon do peer reviews?

24       A     They do.  The medical director for our site --

25   I can only speak of Tucson --

Parsons v. Ryan
Deposition of Marlena D. Bedoya - 9/10/2013

Page 224

```
 1   STATE OF ARIZONA    )
                         )
 2   COUNTY OF MARICOPA  )

 3

 4               I, Marcella L. Daughtry, a Certified

 5   Reporter, Certificate No. 50623, in the State of

 6   Arizona, do hereby certify that the foregoing witness

 7   was duly sworn to tell the whole truth; that the

 8   foregoing pages constitute a full, true, and accurate

 9   transcript of all proceedings had in the foregoing

10   matter, all done to the best of my skill and ability.

11   Pursuant to request, notification was provided that the

12   deposition is available for review and signature.

13

14               I FURTHER CERTIFY that I am not related

15   to nor employed by any of the parties hereto, and have

16   no interest in the outcome.

17

18               WITNESS my hand this 23rd day of

19   September, 2013.

20

21                         _____
                           Marcella L. Daughtry
22                         Arizona Certified
                           Reporter No. 50623
23

24

25
```

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;        )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;      )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree    )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of    )
themselves and all others similarly )
situated; and Arizona Center for     )
Disability Law,                      )
                                     )
         Plaintiffs,                 )
    vs.                              )
                                     )
Charles Ryan, Director, Arizona      )
Department of Corrections; and       )
Richard Pratt, Interim Division      )
Director, Division of Health         )
Services, Arizona Department of      )
Corrections, in their official       )
capacities,                          )
                                     )
         Defendants.                 )
                                     )


DEPOSITION OF TROY LAWRENCE EVANS, RN

September 17, 2013
9:14 a.m.
Phoenix, Arizona


Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

Page 87

1    usually we've already talked about what's going on.

2         Q.    Okay.

3         A.    I'm not the police.  I'm not trying to catch

4    her and surprise her.  I'm trying to help her make

5    changes for better health care that's given to the

6    inmates.  And she usually has a plan of action in place,

7    and she will submit it to me, and I'll accept it.  I

8    mean, there's times where she -- I think last month or

9    another time she submitted the wrong Corrective Action

10   Plan to me in the wrong spot, and I refused it, and I

11   told her, hey, you need to put the right plan.  I mean,

12   there's no time frame, so I don't know.

13        Q.    So do you usually discuss issues that you're

14   classifying as amber before submitting report with

15   Ms. Mullen?

16        A.    I do.

17        Q.    And once the -- so once the Corrective Action

18   Plan has been submitted to you and you approve it, is

19   there some kind of a time period in which it's supposed

20   to be complied with?

21             MR. STRUCK:  Form.

22             THE WITNESS:  I guess reask me the question

23   more specific.  I don't really know what you're asking.

24        Q.    BY MS. MAMEDOVA:  So let's say you submitted

25   this Corrective Action Plan for No. 2 on the sick call

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

Page 88

1    for August 2013.  Are sick call inmates being seen within

2    24 hours of the HNR being triaged.  And then Ms. Mullen,

3    presumably, we don't have it, but presumably she

4    submitted a Corrective Action Plan to you --

5        A.    Correct.

6        Q.    -- of how they are going to address it.  And do

7    you have a record of this Corrective Action Plan?

8        A.    With me?

9        Q.    Just -- no, not with you, but generally.

10       A.    No.  I have them printed out in my office.

11       Q.    And are they in the system or --

12       A.    Once they're approved, they're purged, so I'm

13   not sure -- I think once they're approved, then they're

14   purged.  Because like the whole point of my Corrective

15   Action Plan slot is to view any that aren't addressed.

16   So once they're addressed, then they're gone.

17       Q.    Okay.  So you can't see them in the system

18   anymore?

19       A.    I've already seen them, so I don't need to.

20       Q.    But if you went to the Corrective Action Plan

21   section, you can't look at reports --

22       A.    No.

23       Q.    -- that have already been addressed?

24       A.    No.

25       Q.    So how would you know for next month whether a

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

 1  Corrective Action Plan for the previous month has been --
 2  or I guess whether or not the Corrective Action Plan is
 3  being put into effect?
 4       A.    Well, I know what the corrective action is.
 5       Q.    But do you have some record of it or do you
 6  just remember it?
 7       A.    I print them off, but I know what --
 8       Q.    You print them off.  So do you have --
 9       A.    I submit this report, and I know what's
10  ambered.  So if it was ambered, it has to have a
11  Corrective Action Plan, period.  And it's not like
12  there's 50 ambers.  There's only a couple of them.  So we
13  know what has to be changed, and we know what's being
14  implemented to change it.
15       Q.    But do you print every Corrective Action Plan
16  that's submitted to you?
17       A.    I do not.
18       Q.    Do you print some of them?
19       A.    I do.
20       Q.    How do you determine which one you will print
21  and which one you won't?
22       A.    There's no way.
23       Q.    It's just if you need to at that particular
24  moment or...
25       A.    Yeah.

Page 92

1  has ever seen a report printed in this fashion where the

2  actual plan would be under the Corrective Action Plan

3  question.

4              MR. STRUCK:  Printed?

5              MS. MAMEDOVA:  Right.

6      Q.    BY MS. MAMEDOVA:  So basically do you see how

7  there's a question up top and then there's a corrective

8  plan in the box at the bottom.  So it's submitted by

9  Rochelle Mullen.  I'm just curious if A, that's how it

10  comes up with the screen when you look at the screen when

11  the corrective plan is submitted.

12      A.    That's how it looks on the screen when the

13  Corrective Action Plan is submitted under the corrective

14  action portion.  But it doesn't print out when you print

15  out the GAR.  It's only available when it prints out the

16  CAP.  So this is generated automatically.  That's

17  generated automatically.  The Corrective Action Plan is

18  under the Corrective Action Plan tab in the MGAR, but it

19  doesn't come out -- I mean, it doesn't print out

20  automatically in the GAR at any time that I know of.  If

21  it does, then I'm unaware of it.

22      Q.    So you do see it the way that it's depicted in

23  the November 2012 on your screen, just when you print it

24  in hard copy, then the plan, even if Ms. Mullen already

25  has submitted it, doesn't come up in that box?

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

Page 94

1    print them or not print them?

2        A.    No.

3        Q.    Do you know of any practice regarding the

4    Corrective Action Plan that would require you to keep a

5    record of them?

6        A.    Well, I know about all the Corrective Action

7    Plans, so there's record of all of them.  But I guess the

8    answer is no.  Nobody comes at the end of the month and

9    says, do you have all your Corrective Action Plans

10   printed out.

11       Q.    So as far as you know, there's no practice to

12   keep a record of the Corrective Action Plans?

13       A.    But it's in my best interest to.

14       Q.    Why?

15       A.    To make sure they're implemented.

16       Q.    Okay.  I see.

17       A.    But I'm aware of them because I know each one

18   that she does for each amber.  So even if I don't have a

19   printed copy of it, I know what she submits as a plan for

20   each one.

21       Q.    So if you don't print them, you just keep them

22   in your memory for as many months as the corrective plan

23   hasn't been addressed?

24              MR. STRUCK:  Form.

25              THE WITNESS:  They're addressed immediately.

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

Page 146

1    generally regarding the dental care at Safford?

2         A.    How do I report my -- I don't record anything.

3         Q.    So when you say you monitor the dental care,

4    like what do you do?  Do you observe them?

5         A.    Anything that has to be done in dental.  I

6    installed two new x-ray processors in there, we got two

7    new x-ray processors for them.  I took one of their

8    Sharps containers off the wall because security wanted it

9    off the wall.  I changed the way they count Sharps

10   because that needs to be done.  I get a weekly report

11   from the contractor that tells me what the wait times are

12   so I don't have to generate that.  It's generated by the

13   contractor.

14        Q.    And these weekly reports from the contractor,

15   do you have them?

16        A.    I don't.

17        Q.    Do you keep them in your office or how do you

18   get them?

19        A.    Email them.

20        Q.    Do you have them in your email?

21        A.    I do.

22        Q.    Did you review the April 2013 report when you

23   started working as a monitor?

24        A.    No.

25        Q.    So how did you know there was something on that

Parsons vs Ryan
Deposition of Troy Lawrence Evans, R.N. - 9/17/2013

Page 150

1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA  )

3

4               I, CAROLYN T. SULLIVAN, a Certified

5   Reporter, Certificate No. 50528, in the State of Arizona,

6   do hereby certify that the foregoing witness was duly

7   sworn to tell the whole truth; that the foregoing pages

8   constitute a full, true, and accurate transcript of all

9   proceedings had in the foregoing matter, all done to the

10  best of my skill and ability.  Pursuant to request,

11  notification was provided that the deposition is

12  available for review and signature.

13

14              I FURTHER CERTIFY that I am not related to

15  nor employed by any of the parties hereto, and have no

16  interest in the outcome.

17

18              WITNESS my hand this 26th day of September,

19  2013.

20

21

                          Carolyn T. Sullivan, RPR
22                        Arizona Certified
                          Reporter No. 50528
23

24

25

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn | ) | No: |
| Jensen; Stephen Swartz; | ) | CV12-00601-PHX-NVW |
| Dustin Brislan; Sonia | ) | (MEA) |
| Rodriguez; Christina | ) | |
| Verduzco; Jackie Thomas; | ) | |
| Jeremy Smith; Robert Gamez; | ) | |
| Maryanne Chisholm; Desiree | ) | |
| Licci; Joseph Hefner; Joshua | ) | |
| Polson; and Charlotte Wells, | ) | |
| on behalf of themselves and | ) | |
| all others similarly | ) | |
| situated; and Arizona Center | ) | |
| for Disability Law, | ) | |
|         Plaintiffs, | ) | |
|     v. | ) | |
| Charles Ryan, Director, | ) | |
| Arizona Department of | ) | |
| Corrections; and Richard | ) | |
| Pratt, Interim Division | ) | |
| Director, Division of Health | ) | |
| Services, Arizona Department | ) | |
| of Corrections, in their | ) | |
| official capacities, | ) | |
|         Defendants. | ) | |
| | ) | |

(SUBJECT TO PROTECTIVE ORDER)
DEPOSITION OF ARTHUR GROSS
September 9, 2013
9:22 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

Page 128

1   that's what we stand by.

2             MS. KENDRICK:   Thank you for clarifying

3   that.

4             THE WITNESS:   Okay.

5             MS. KENDRICK:   But were you able to find

6   anything about the CAPs that you said should have been

7   produced?

8             MR. STRUCK:   Well, I think there was

9   just a misunderstanding.   The statewide corrective

10  action plan that he testified to, I think he just got

11  them yesterday.

12            MS. KENDRICK:   That's not what I'm

13  talking about.

14            MR. STRUCK:   I know.   The other ones

15  were simply -- well, what I was referring to -- what we

16  were referring to were the MGARs and the discussions at

17  the end of the MGAR's regarding CAP's.   So there

18  aren't -- as far as I know, there aren't any, but I

19  will double-check any additional other than the

20  statewide drafts that they just got yesterday.

21            MS. KENDRICK:   Okay.

22            MR. STRUCK:   And then I'm also checking

23  on the monthly reports that you all said you didn't

24  get.   I sent an e-mail to Lucy to have her look for

25  that.

Page 132

1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA )

3

4              I, Marcella L. Daughtry, a Certified

5   Reporter, Certificate No. 50623, in the State of

6   Arizona, do hereby certify that the foregoing witness

7   was duly sworn to tell the whole truth; that the

8   foregoing pages constitute a full, true, and accurate

9   transcript of all proceedings had in the foregoing

10  matter, all done to the best of my skill and ability.

11  Pursuant to request, notification was provided that the

12  deposition is available for review and signature.

13

14             I FURTHER CERTIFY that I am not related

15  to nor employed by any of the parties hereto, and have

16  no interest in the outcome.

17

18             WITNESS my hand this 23rd day of

19  September, 2013.

20

21             _____
                       Marcella L. Daughtry, RPR
22                     Reporter No. 50623

23

24

25

```
               UNITED sTATES DISTRICT COURT
                  DISTRICT OF ARIZONA
Victor Parsons; Shawn Jensen;      )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;    )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of   )
themselves and all others similarly )
situated; and Arizona Center for    )
Disability Law,                     )
                                    )
        Plaintiffs,                 )      SUBJECT TO
     vs.                            )   PROTECTIVE ORDER
                                    )
Charles Ryan, Director, Arizona     )
Department of Corrections; and      )
Richard Pratt, Interim Division     )  30(b)(6) DEPOSITION
Director, Division of Health        )        OF
Services, Arizona Department of     )  ARIZONA DEPARTMENT
Corrections, in their official      )    OF CORRECTIONS
capacities,                         )
                                    )   Continuation of
        Defendants.                 )    Docket No. 81
                                    )


              CARSON ANTON MCWILLIAMS

           (Topics 1-9, 11, 13, 14, 16)

                September 27, 2013
                   9:01 a.m.
                 Phoenix, Arizona


                    Prepared by:
                    Carolyn T. Sullivan, RPR
                    Arizona Certified
                    Reporter No. 50528
```

Page 37

1      Q.      And these take place every day?

2      A.      Monday through Friday.

3      Q.      And how do the people attending that meeting

4   learn of the notifications?  Are they provided a stack of

5   papers or does somebody --

6      A.      They all read the information reports from the

7   past 24 hours.  On Monday would be from the past 48

8   hours.

9      Q.      And are those reports computerized?

10     A.      They could be, but they don't have to be.

11     Q.      Are they handwritten?

12     A.      They could be, but they could be typed or

13  computer -- typed on a computer.

14     Q.      So there's no requirement for the form of the

15  notification report other than --

16     A.      Well, there's a form that you have to put it

17  on.  So yeah, there is a requirement for that.  That's a

18  form.  But how you write it, no.  You could print it, you

19  could hand write it.

20     Q.      Where are these kept once they've been filled

21  out?

22     A.      They're kept on file in the deputy warden's

23  office for probably about six months, maybe a little bit

24  longer, and then they're archived.

25     Q.      And you mentioned an annual audit.  Who

Parsons vs Ryan
30(b)(6)   Deposition of AZ Dept of Corrections Carson Anton McWilliams – 9/27/2013

Page 38

1    performs that?

2         A.    The Inspector General's Office, his staff.

3         Q.    Of the State of Arizona?

4         A.    Correct.

5         Q.    And I guess how do they perform this audit,

6    what do they do?

7              MS. LOVE:  Form and foundation.

8              THE WITNESS:  They look at documentation,

9    and they compare it to policy to be sure that policy is

10   being followed.

11        Q.    BY MS. EIDENBACH:  And one of the reports they

12   look at is the information report that we've been

13   discussing; is that right?

14        A.    Correct.

15        Q.    You said that those reports are kept for about

16   six months.  So an annual audit would only be looking at

17   about six months of reports; is that right?

18             MS. LOVE:  Form.

19             THE WITNESS:  They could require more if

20   they felt like they needed to, but generally speaking,

21   yes, that's all they would look at.

22        Q.    BY MS. EIDENBACH:  Do you know if the annual

23   audit produces a report?

24        A.    Yes, they do.

25        Q.    And do you know who prepares that report?

Parsons vs Ryan
30(b)(6)  Deposition of AZ Dept of Corrections Carson Anton McWilliams – 9/27/2013

Page 39

1       A.      The auditors that do the audit.

2       Q.      And who do they send it to?

3       A.      It goes to several people.  Of course, the

4    inspector general, who would be their supervisor.  It

5    goes to the division director of operations.  It goes to

6    the wardens of the complexes.  Myself, the region's

7    operations director.  And the director ultimately.

8       Q.      And have you ever seen one of these audits?

9       A.      Yes, I have.

10      Q.      When you receive them each year, what do you do

11   with them?

12      A.      We have a meeting with the warden of that

13   facility, and we discuss any -- the results.  We go over

14   those line by line.

15      Q.      And does this review result in any action,

16   changes in policy, new programs?

17              MS. LOVE:  Form.

18              THE WITNESS:  It could.

19      Q.      BY MS. EIDENBACH:  Has it ever?

20      A.      I can't think of an actual policy that it's

21   changed, but it's possible that it could.

22      Q.      If a prisoner is released from a maximum

23   custody unit, is that prisoner automatically returned to

24   maximum custody if they return to prison?

25      A.      Would you repeat that.

Parsons vs Ryan
30(b)(6)   Deposition of AZ Dept of Corrections Carson Anton McWilliams - 9/27/2013

1    put TVs up on the walls of the cell block, and then we

2    show a video.  Like at 7:00 in the morning, we say, watch

3    this video.  And at 9:00 you have a group, and you talk

4    about it.  Because in a cell block, it's hard to do

5    because they'd be spread out.  You couldn't do it.  You'd

6    have to have a TV in front of every cell.  This way, we

7    can do it.  So it gave us the ability to do different

8    types of programming and to get the message out to that

9    group of inmates in an easier format.  So I think it's

10   been beneficial in that respect, yes.

11        Q.    You mentioned that you got information about,

12   using your example, a mentally ill inmate housed between

13   two intimidating inmates.  How did you get that

14   information?  Was it reports from COs?  Was it reports

15   from mental health staff?

16        A.    It's kind of a combination of things.  It's

17   experience from what I've seen in the past to what --

18   just talking.  I know a lot of inmates for a long period

19   of time.  So talking to some inmates, too, and some of

20   them just say, you know, these guys are scary.  And they

21   are.

22        Q.    You also talked about the benefits you've seen.

23   Have you been monitoring these benefits in any sort of

24   statistical way?

25        A.    Well, we're keeping statistics on self-harm and

Parsons vs Ryan
30(b)(6)   Deposition of AZ Dept of Corrections Carson Anton McWilliams - 9/27/2013

Page 59

1    things along those lines.  And certainly the numbers have

2    reduced, and that went up when inmates were participating

3    in programs.  We now have inmates out working in max

4    custody that we didn't have, you know, in many years.  We

5    did a long time ago, but not in the past like 15 years.

6    So, yeah, we have numbers on those things.

7        Q.    Do you compile those statistics in a report?

8        A.    There's a running report that we do that just

9    talks about progress in opening up this program or doing

10   this, but I don't know if we have a report that lists all

11   those things.  It would be kind of like bits and pieces

12   that we pulled into one.  I don't think there's one

13   report that has all that in it.

14       Q.    Does anybody look at the statistics big

15   picturewise?

16       A.    Yes.

17       Q.    Who?

18       A.    I know I certainly do and my boss does and the

19   director does.  We talk about these things and talk about

20   that it's a positive, you know, approach and those things

21   seem to be working.

22       Q.    Do you talk about these statistics in your

23   monthly meetings with your supervisors?

24       A.    Yes.  I do this more individually.  I mean,

25   sometimes we get together and talk about it.  Usually

Parsons vs Ryan
30(b)(6)   Deposition of AZ Dept of Corrections Carson Anton McWilliams - 9/27/2013

Page 151

1    Q.    So it's your testimony that no reports or

2    documents are ever generated at ADC that analyze or

3    record the length of stays of a prisoner in isolation?

4              MS. LOVE:  Form and foundation.  Misstates.

5              THE WITNESS:  No, that wouldn't be my

6    statement because we just generated one a few weeks ago

7    because we are looking at all the max custody inmates.

8    We've done that kind of stuff before.  I wouldn't be the

9    first one to do that.

10   Q.    BY MS. EIDENBACH:  Why did you generate the one

11   a few weeks ago?

12   A.    Because we're in the process of looking at

13   every inmate in maximum custody to see where they can be

14   appropriately placed -- remember that pecking order I

15   described a while ago.  So that we can know where to

16   place people.

17   Q.    And who generated the report?

18   A.    It was generated through our classification

19   administrator.

20   Q.    And who received the report?

21   A.    A group of staff that I had put together to do

22   this project.

23   Q.    Who are the staff?

24   A.    There's some staff members that are

25   classification specialists that are looking at reviewing

GLENNIE REPORTING SERVICES
www.glennie-reporting.com - 602.266.6535

Parsons vs Ryan
30(b)(6)   Deposition of AZ Dept of Corrections Carson Anton McWilliams - 9/27/2013

Page 152

1    these inmates.

2       Q.    Can you give me their names?

3       A.    I can, I imagine.  I'm not sure if it -- yeah,

4    I can give them to you.  Macadorie, Espinoza, Cattrell,

5    Stacy Crabtree, myself.  That's the main group of it.

6    There might be one or two other people.  We've got a

7    couple CO IIIs that are doing part time working it, but

8    they rotate around.

9       Q.    Is a prisoner's length of stay in isolation

10   ever a consideration in the decision to retain or release

11   the prisoner from isolation?

12             MS. LOVE:  Form.

13             THE WITNESS:  Would you repeat that

14   question.

15      Q.    BY MS. EIDENBACH:  Sure.  Is the length of a

16   prisoner's stay in isolation ever a consideration in the

17   decision to keep him or her in isolation or to release

18   them to a general population or other max custody yard?

19             MS. LOVE:  Form and foundation.

20             THE WITNESS:  Generally speaking, no.

21      Q.    BY MS. EIDENBACH:  Why not?

22      A.    It's a point system, and you're scored out by

23   points.  And that's -- that's how it works.  So if your

24   points are always -- if your points stay at a high level,

25   then you would remain in maximum custody.

Parsons vs Ryan
30(b)(6)  Deposition of AZ Dept of Corrections Carson Anton McWilliams - 9/27/2013

Page 197

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA )

3

4            I, CAROLYN T. SULLIVAN, a Certified

5    Reporter, Certificate No. 50528, in the State of Arizona,

6    do hereby certify that the foregoing witness was duly

7    sworn to tell the whole truth; that the foregoing pages

8    constitute a full, true, and accurate transcript of all

9    proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14           I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18           WITNESS my hand this 14th day of October,

19   2013.

20

21

                         Carolyn T. Sullivan, RPR
22                       Arizona Certified
                         Reporter No. 50528
23

24

25

Parsons v. Ryan
30(b)(6)  Deposition of AZ Dept of Corrections Juliet Respicio-Moriarty - 9/23/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;      )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;    )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of   )
themselves and all others similarly )
situated; and Arizona Center for    )
Disability Law,                     )
                                    )
          Plaintiffs,               )
     vs.                            )
                                    )
Charles Ryan, Director, Arizona     )
Department of Corrections; and      )
Richard Pratt, Interim Division     ) 30(b)(6) DEPOSITION
Director, Division of Health        )       OF
Services, Arizona Department of     ) ARIZONA DEPARTMENT
Corrections, in their official      )   OF CORRECTIONS
capacities,                         )
                                    )  Continuation of
          Defendants.               )   Docket No. 78
                                    )


JULIET RESPICIO-MORIARTY

(Topic 3)

September 23, 2013
9:08 a.m.
Phoenix, Arizona


Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons v. Ryan
30(b)(6)  Deposition of AZ Dept of Corrections Juliet Respicio-Moriarty - 9/23/2013

Page 22

1                    (Exhibit 411 was marked.)

2        Q.    BY MS. KENDRICK:  Exhibit 411 doesn't have a

3    Bates number, but it was produced by defendants in its

4    native format as ADC055452.  Is this the type of

5    grievance report that you do?

6        A.    I don't, but, again, I give data to someone at

7    the office, and maybe they produce it like this.  But

8    this is again inmate grievance, so it looks like local

9    level.

10       Q.    So you do a separate report that's just

11   grievance appeals?

12       A.    Yes.

13             MS. KENDRICK:  Dan, that is a report that we

14   have never seen.

15             MR. STRUCK:  What's that?

16             MS. KENDRICK:  The grievance appeal report.

17   The three reports that are marked 409 through 411 are the

18   universe of grievance things that have been produced to

19   us.

20             (Exhibit 412 was marked.)

21       Q.    BY MS. KENDRICK:  Exhibit 412 is an email that

22   was produced to us with Bates number ADC116252 to 253.

23   Do you recognize the names Eric Hall or Julie Kellison?

24       A.    I see a lot of grievances every day.  Which

25   names?

Page 32

1    STATE OF ARIZONA    )
                          )
2    COUNTY OF MARICOPA )

3

4              I, CAROLYN T. SULLIVAN, a Certified

5    Reporter, Certificate No. 50528, in the State of Arizona,

6    do hereby certify that the foregoing witness was duly

7    sworn to tell the whole truth; that the foregoing pages

8    constitute a full, true, and accurate transcript of all

9    proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14             I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18             WITNESS my hand this 7th day of October,

19   2013.

20

21

22                        Carolyn T. Sullivan, RPR
                          Arizona Certified
                          Reporter No. 50528
23

24

25

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn            )   No:
Jensen; Stephen Swartz;          )   CV12-00601-PHX-NVW
Dustin Brislan; Sonia            )   (MEA)
Rodriguez; Christina             )
Verduzco; Jackie Thomas;         )
Jeremy Smith; Robert Gamez;      )
Maryanne Chisholm; Desiree       )
Licci; Joseph Hefner; Joshua     )
Polson; and Charlotte Wells,     )
on behalf of themselves and      )
all others similarly             )
situated; and Arizona Center     )
for Disability Law,              )
              Plaintiffs,        )
     v.                          )
Charles Ryan, Director,          )
Arizona Department of            )
Corrections; and Richard         )
Pratt, Interim Division          )
Director, Division of Health     )
Services, Arizona Department     )
of Corrections, in their         )
official capacities,             )
              Defendants.        )
                                 )

DEPOSITION OF NICOLE TAYLOR, J.D., Ph.D.

September 5, 2013
9:13 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

1    years ago.  I just recently joined the project.  They

2    had been working on -- they being a variety of people I

3    haven't met -- had been working on changing the

4    classification system and moving it towards a different

5    system, and so I joined in just recently.

6        Q    What's the name of this project?

7        A    That's a very good question.  I'm not sure.

8    It's a strategic plan initiative, and I'm not sure what

9    the title of it is.

10       Q    How do you refer to it when you are talking

11   about it?

12       A    Our strategic plan.

13       Q    When did you join the project?

14       A    I joined the project the end of June.

15       Q    Of 2013?

16       A    Correct.

17       Q    Who is in charge of the project?

18       A    Carson McWilliams.

19       Q    And you said this project was begun a couple

20   of years ago?

21       A    Correct.  They had started looking at what

22   they can do for the management of max enclosed inmates

23   on how to classify them in a better fashion to allow

24   more fluid movement, and so we just dovetailed that

25   with programming aspects.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 30

1     Q     But you just joined the project a couple of

2  months ago?

3     A     Correct.

4     Q     What is your role in the project?

5     A     My role is to work on the movement of the

6  mental health inmates through that system,

7  specifically, and ensuring that their movement through

8  makes sense with what services we have to offer and

9  what their needs might be in that arena.

10    Q     Have you created any documents as part of this

11 project?

12    A     I believe there is only a draft format that

13 has not been signed off on by anyone yet.

14    Q     When you say a draft format, what does that

15 mean?

16    A     It's a proposal, a proposition paper that

17 was -- that is created and presented to Director Ryan.

18    Q     And did you draft that document?

19    A     I assisted in drafting that document.

20    Q     Who else had a role in drafting that document?

21    A     Carson McWilliams, Amy Barnes who is an ADW at

22 Florence complex, Carol Pierce.

23    Q     Is it possibly Pearson?

24    A     No, no, she's the medical records individual.

25 Carol Ortiz, that is her name -- she is out at

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 31

1   Perryville -- participated in that, Ernie Trujillo who
2   is the northern regional director participated in that,
3   and I can't think of anyone else who participated in
4   the drafting of the document.
5       Q    Anyone else from the mental health side?
6       A    No.
7       Q    Any other documents that you have had a role
8   in creating as part of this project?
9       A    No.
10      Q    So it's simply referred to as the strategic
11  initiative?
12              MS. CLOMAN:  Form.
13              THE WITNESS:  Correct, the informal
14  referral to it would be that, yes.
15      Q    BY MR. FATHI:  Are there any other special
16  projects you are working on that are not reflected in
17  your resume?
18      A    No.
19      Q    Now, it says here that one of your duties is
20  to, quote, evaluate mental health services provided by
21  the contracted vendor and private prisons, end of
22  quote.  What percentage of your time do you spend on
23  the private prisons?
24      A    Do I spend going there or supervising the
25  results of what's found there?

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 68

```
 1    Q    BY MR. FATHI:  Do you monitor whether prisoner
 2  suicides were preventable?
 3                MS. CLOMAN:  Form.
 4                THE WITNESS:  I receive information
 5  after a suicide to review, yes.
 6    Q    BY MR. FATHI:  Do you monitor whether prisoner
 7  suicides were preventible?
 8                MS. CLOMAN:  Form.
 9                THE WITNESS:  Yes.
10    Q    BY MR. FATHI:  And where is that reflected in
11  the MGAR?
12    A    That is not in the MGAR.
13    Q    Where is that reflected?
14    A    That would be in psychological autopsies that
15  we receive -- that I receive.
16    Q    And this is part of your duties as mental
17  health monitor?
18    A    Correct.
19    Q    Which of your duties as reflected on your
20  resume does this fall under?
21    A    The ensuring compliance with ADC policies and
22  procedures.
23    Q    Okay.  So tell me about your role in
24  monitoring whether prisoner suicides were preventable.
25    A    I will either go down to the complex where the
```

Page 69

1   suicide occurred myself or I will ask an on-site

2   monitor to send me their record via electronically to

3   review if I can't get to the site.

4        Q    And how do you memorialize the findings of

5   your monitoring?

6        A    I wait for the psych autopsy to come from the

7   Corizon staff, and then I go and discuss that

8   information with Director Ryan and Deputy Director

9   Hood.

10       Q    So do you create anything in writing as a

11  result of your monitoring of prisoner suicides?

12       A    No, I do not.  I also do discuss it with

13  Dr. Shaw who is the current regional mental health

14  director of the findings.

15       Q    Okay.  So you monitor whether prisoner

16  suicides were preventible, but you don't write anything

17  down?

18       A    Correct.

19       Q    How many ADC prisoners have died by suicide so

20  far in 2013?

21                  MS. CLOMAN:  Form.

22                  THE WITNESS:  We actually -- our

23  information is prepared as fiscal year, and so fiscal

24  year 2013 was seven, which includes July 1st through

25  June 30th of 2013.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 170

1       A      Correct.

2       Q      And I believe you said you have not yet seen

3   any corrective action plans?

4       A      Yes, I have not seen any.

5       Q      Okay.  You just said you have weekly meetings

6   with Corizon?

7       A      Yes.

8       Q      And who typically attends those meetings?

9       A      Those same individuals that I listed.  Other

10  than Donna James, she was new to those meetings, it's

11  the same individuals every week.

12      Q      Okay.  So that's Ms. Bybee, you, Mr. Gross,

13  Kathy Campbell, Dr. Robertson, and Martin Winland?

14      A      And Richard Pratt.  I'm not sure if you said

15  his name or maybe you did.

16      Q      Oh, Mr. Pratt attends those meeting?

17      A      Correct.

18      Q      And how long do those meetings usually last?

19      A      They usually last around two hours.

20      Q      Are minutes ever kept of those meetings?

21      A      They have an agenda, and I think everybody

22  takes notes on the agenda.  I'm not aware of anybody

23  taking minutes of it, but I believe there is an agenda

24  created.

25      Q      So there is a written agenda?

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 211

 1   to a different day because there was an issue that day,

 2   they would just shift it.

 3       Q    Okay.  So to your knowledge, neither of these

 4   groups have ever been cancelled in Kasson unit because

 5   of a security incident?

 6                   MS. CLOMAN:  Form.

 7                   THE WITNESS:  Canceled and not

 8   rescheduled?

 9       Q    BY MR. FATHI:  Canceled and not rescheduled

10   the same week.

11       A    That is not my understanding, no.

12       Q    Now, when a prisoner receives a one-on-one

13   counseling session, where is that recorded?

14                   MS. CLOMAN:  Form.

15                   THE WITNESS:  In the mental health

16   section of their medical chart.

17       Q    BY MR. FATHI:  Is it recorded anywhere else?

18       A    By recorded?

19       Q    Let me ask it a different way.  If I wanted to

20   know -- if I wanted to verify that every prisoner in

21   Kasson unit in wing one in fact got their individual

22   session this month, is there any way for me to do that

23   other than looking at each and every one of their

24   medical records?

25       A    Ms. Newman who is at Kasson, for example,

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 212

1    keeps a database that she updates with each time that

2    she does her session.  So she keeps track of when their

3    one-on-one's due, when their medications expire, when

4    they release.  All that information is on a database

5    that is being kept.

6         Q    And is she the only one that does the

7    one-on-ones?

8         A    Currently, I believe that she is the one on

9    wing one Kasson program.

10         Q    How many prisoners are on wing one of Kasson

11    approximately?

12         A    I believe they are running at about 50 right

13    now.

14         Q    And how long are these monthly one-on-one

15    sessions?

16         A    I -- I've seen the full range.  You know, it

17    just depends on what the inmate presents with, whether

18    they need five minutes.  There's some pretty

19    disorganized individuals up there that can't handle

20    more than five, but some of them get an hour if they

21    need an hour.

22         Q    So these monthly one-on-one sessions could

23    range anywhere from about five minutes to about an

24    hour?

25         A    Correct.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 213

1     Q     And the group -- group sessions, how long are

2     those?

3     A     The group sessions are set up to be an hour.

4     Q     And do they usually last the full hour?

5     A     Sometimes longer, but yeah.

6     Q     Ever shorter?

7     A     Not typically.  Well, I think she had to

8     cancel one because an individual was urinating in the

9     group and so the group was having a reaction to that.

10    But otherwise they -- they maintain them at an hour and

11    sometimes they go over a little.

12    Q     And when a prisoner takes part in one of these

13    groups, where is that recorded?

14                   MS. CLOMAN:  Form.

15                   THE WITNESS:  On a group note.

16    Q     BY MR. FATHI:  And where is the group note

17    recorded?

18    A     In their chart.

19    Q     Is it recorded anyplace else other than the

20    charts of the individual prisoners?

21    A     She would indicate that on her database that

22    there was a contact.

23    Q     And this is Ms. Newman?

24    A     Correct.  And this is just for Kasson.  Each

25    place has a different person.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 285

1   STATE OF ARIZONA   )
                       )
2   COUNTY OF MARICOPA )

3

4                I, Marcella L. Daughtry, a Certified

5   Reporter, Certificate No. 50623, in the State of

6   Arizona, do hereby certify that the foregoing witness

7   was duly sworn to tell the whole truth; that the

8   foregoing pages constitute a full, true, and accurate

9   transcript of all proceedings had in the foregoing

10  matter, all done to the best of my skill and ability.

11  Pursuant to request, notification was provided that the

12  deposition is available for review and signature.

13

14               I FURTHER CERTIFY that I am not related

15  to nor employed by any of the parties hereto, and have

16  no interest in the outcome.

17

18               WITNESS my hand this 16th day of

19  September, 2013.

20

21                          _____
                            Marcella L. Daughtry
22                          Arizona Certified
                            Reporter No. 50623
23

24

25

GLENNIE REPORTING SERVICES
(602) 266-6535    www.glennie-reporting.com