Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
kflood@acluaz.org
jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Jennifer Alewelt (Bar No. 027366)
Asim Varma (Bar No. 027927)
Sarah Kader (Bar No. 027147)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: jalewelt@azdisabilitylaw.org
avarma@azdisabilitylaw.org
skader@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-NVW (MEA)

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION**

**(FILED UNDER SEAL)**

## I. INTRODUCTION.

Defendants' brief illustrates two things: First, key documents responsive to Plaintiffs' discovery remain to be produced, including the corrective action plans (CAPs) that Corizon sent to the ADC to respond to perceived problems in the provision of health care; prisoner medical records; tour documents; psych autopsies; and data on the duration of prisoners' stays in isolation; Second, Defendants continued to supplement the Parsons discovery long after Parsons was dismissed from the case and only refused to continue two weeks before the discovery deadline, when Plaintiffs could not cure that deficiency by propounding additional discovery.

Plaintiffs are trying to avoid trial by ambush and to ensure that the evidence necessary to reach a just result is presented to this Court. Defendants have access to all of the documents relevant to this case. If they are not required to produce the types of critical documents identified in Plaintiffs' Motion for Reconsideration in discovery, they will be free to make claims and cherry-pick evidence at trial and Plaintiffs will be denied the evidence necessary for cross-examination.

Allowing the parties to complete the meet-and-confer contemplated by the Joint Motion and to raise outstanding issues with the Court if that process breaks down is the most sure way to ensure a just trial and is warranted under the Federal Rules of Civil Procedure, especially when the Court considers the gravity of the Plaintiffs' allegations. If the Court is concerned about delay, the best option is to order a joint submission by a date certain that addresses any of these issues that cannot be resolved promptly.

As to the Parsons discovery, because Defendants have supplemented it long after Parsons' dismissal and engaged in a course of dealings on which Plaintiffs relied, the Court should order them to continue supplementation of those key documents until the time of trial.

## II. DEFENDANTS SHOULD NOT BE EXCUSED FROM COMPLETING THEIR PRODUCTIONS.

### A. Defendants' Discovery Statistics Support Plaintiffs' Position.

Defendants' claim that this is "scorched-earth" litigation, but the record does not support such hyperbole.[1] Defs' Resp. at 2. Defendants recite a list of discovery statistics that is by no means shocking for a case addressing systemic claims against a state institution. *Id.* More importantly, it is deceptive because it tells the Court nothing of the content of Defendants' discovery responses. Many of the responses and pages included in their tallies are replete with objections or refusals to answer. For example, Defendants refused to answer Desiree Licci's First Set of Requests for Admission in its entirety, but include those RFAs in their evidence of diligence. Compare Sophia Calderón Supp. Decl., Ex. 3 with Defs' Ex. 1, Table P-2 (Doc. 707-1). Looking across the interrogatory and request for admission responses they served in the last month of discovery, a time period that Defendants emphasize in their brief, Defendants refused to answer 49 percent—or almost half of that discovery. *See* Calderón Supp. Decl. ¶ 6. In the Joint Motion, Plaintiffs did not seek all of this, but rather focused on the most crucial refusals to respond and sought the ability to continue the meet-and-confer process, and Defendants agreed to do so. *See, e.g.*, Docket No. 673 at ¶¶ 3-4.

Similarly, Defendants tout the number of hours, 428, spent reviewing inmate medical records during prison tours. Defs' Resp., p. 3. Plaintiffs agree those were extremely valuable hours, but the problem comes if they are wasted because Defendants have not adequately tracked the documents Plaintiffs marked for production during those reviews. As noted below, those productions have been ongoing, but are not complete. Now, Defendants suggest that they view them as "duplicative." *Id.* at 7. As we explain

---

[1] Defendants have propounded a substantially greater number of written discovery requests than Plaintiffs. Compare Doc. 283, p. 2 with Defs' Resp., p. 2.

*infra* p. 9, that does not make sense and a failure to produce them would severely prejudice Plaintiffs.

Defendants also boast that 47% of their document production has happened in the last month. Defs' Resp., p. 3. But that only underscores the delay that has prejudiced Plaintiffs throughout this lawsuit. If the Court examines Defendants' discovery statistics closely, it will see that the Defendants produced much of their discovery from July on, with a substantial production, largely Court-ordered e-mail, after the close of discovery. Moreover, Defendants acknowledge that there are "thousands" of additional pages of documents that they have yet to produce. Defs' Resp., p. 3, fn. 2. Again, the Joint Motion would allow the parties to work to resolve the outstanding production to narrow any issues to be presented to the Court.[2]

**B. Documents Referenced in Depositions.**

Defendants' contentions about specific documents do not excuse their failure to produce, as detailed below. Instead, the Court should order further meet-and-confer as contemplated by the Joint Motion.

***Psych. Autopsies***

Defendants admit that they have failed to produce the "psych autopsies" Nicole Taylor testified to reviewing when she assesses whether a suicide within an ADC facility was preventable. Defendants now claim, for the first time, that such autopsies are protected work product. Defs' Resp., p. 4.

---

[2] To illustrate the difficulties that have attended discovery, Plaintiffs' motion pointed to one deposition where Defendants had relied on an unproduced document to question a named plaintiff based on Defendants' representation that the document had already been produced. Defendants' response claims this was a one-time event for which there was no prejudice. Defs' Resp., p. 3. Defendants are wrong on both counts. Defendants have refused to stipulate that they will not rely on the testimony elicited based on the unproduced document, so there is potential prejudice. Moreover, in the Rodriguez deposition, there was a similar incident where Defendants' counsel used a document and represented that Defendants would "produce [it] . . . after the deposition." Rodriguez Dep. 143:11-144:17. Taking Defendants at their word that these were mistakes, they still illustrate the difficulty both sides have had in determining just what has been produced. (Deposition testimony referenced in this reply is attached in alphabetical order as Mitchell Supp. Decl., Ex. 16.)

The record fails to support Defendants' claim. Dr. Taylor testified that she receives the psych autopsies as part of her "duties as mental health monitor," and that she reviews them as part of fulfilling her duty, listed on her resume, of "ensuring compliance with ADC policies and procedures." She made no mention of a separate work product project she was undertaking for counsel. Taylor Dep., 68:16-22. Dr. Taylor then explained the process she undertakes to discharge this aspect of her duties. *Id*. at 68:23-69:3. She explained she discusses her conclusions with Defendant Ryan, Deputy Directory Hood and Dr. Ben Shaw. *Id.* at 69:4-14. Nowhere does she claim these documents are privileged, nor does she reference any role by counsel in her use of them. Defendants' counsel never objected or instructed her on privilege grounds when she testified about them. Nor have these autopsies ever been listed on a privilege log. *See Burlington N. & Santa Fe Ry. Co. v. United States Dist. Court for the Dist. of Montana*, 408 F.3d 1142, 1149-50 (9th Cir. 2005) (affirming district court's finding of waiver where Defendants produced a privilege log in an untimely manner and with insufficient information regarding the documents for which privilege was asserted). Defendants carry the burden of establishing work product protection. *Weil v. Inv./Indicators, Research & Mgmt., Inc.*, 647 F.2d 18, 25 (9th Cir. 1981). The evidence above does not carry that burden. Nor does the summary assertion of privilege in Anne Orcutt's declaration (Defs' Resp., Ex. 3, ¶ 15), which is inadmissible hearsay, not based on any apparent personal knowledge.

***Corrective Action Plans***

As Plaintiffs noted in their Motion, the CAPs are critical documents because they go to the corrective action being taken by Corizon with respect to health care in response to Defendants' monitoring. They were not previously produced to Plaintiffs, and they were not included in the list of documents Defendants told Plaintiffs they would continue to produce. *See* Doc. No. 691, Mitchell Decl., Ex. 15. Now, Defendants have committed to their production, subject to a claim of "undue burden." *See* Defs' Ex. 4, ¶¶ 16-17.

Plaintiffs request that the Court memorialize that commitment in its order on the Motion of Reconsideration.[3]

***Marlene Bedoya's Memorandum***

Defendants do not dispute that, despite their relevancy and responsiveness, Defendants failed to produce the spreadsheets attached to Marlene Bedoya's memorandum regarding "trends across the Tucson complex." *See* Defs' Resp., p. 4. Defendants' main complaint, other than quibbling with Plaintiffs' language, is that Plaintiffs did not raise the issue sooner. It was not until the deposition that Plaintiffs identified and understood the deficiency.

***McWilliams Data***

Defendants selectively cite ADC's North Region Operations Director Carson McWilliams' deposition to claim that ADC does not maintain a report on prisoners' length of time in isolation. But what they omit is Mr. McWilliams' testimony that:

> we obviously have documents that would tell you how long someone has been there. We know the duration of that on the computer system. You can tell that by looking at locations and stuff. So you could generate a report that way.

McWilliams Dep., 150:15-21.[4] This directly contradicts Defendants' representations in discovery. *See* Mitchell Supp. Decl., Ex. 17, at 90 ("ADC does not track this information or have a way to readily compile it[.]").[5]

---

[3] If Defendants are now saying they are confident the CAPs were not destroyed and thus there will be no "undue burden" in reconstructing them, Plaintiffs welcome that news and look forward to their production. That is not the picture painted in Defendants' depositions or the meet-and confer, where the ability to produce them appeared much more tenuous. *See* Motion (Docket No. 687), p. 3, and evidence cited therein.

[4] *See* Fed. R. Civ. P. 34 advisory committee notes (1970 Amendment) ("The inclusive description of 'documents' . . . makes clear that Rule 34 applies to electronics data compilations from which information can be obtained only with the use of detection devices, and that when the data can as a practical matter be made usable by the discovering party only through respondent's devices, respondent may be required to use his devices to translate the data into usable form. In many instances, this means that respondent will have to supply a print-out of computer data.").

[5] Defendants claim to have produced the type of suicide data that Mr. McWilliams referenced on the last day of discovery. However, the documents Defendants have produced only provides general information regarding the number of suicides in all ADC

***Other Documents***

Defendants claim that Plaintiffs' Motion for Reconsideration seeks to "circumvent the meet-and-confer process and elicit a production order now" with respect to the documents identified in Ajmel Quereshi's Declaration. Defs' Resp., p. 6. But that gets Plaintiffs' intention exactly wrong. The whole point of the Joint Motion was to allow the parties to work together to resolve the issues about missing documents that came up in the depositions, before resorting to Court intervention.

Defendants' explanations in their attached attorney declarations do not resolve Plaintiffs' concerns, but Plaintiffs believe that the parties could make headway, if given time to complete the process in an orderly fashion. For example, Defendants deny that a "Strategic Plan Initiative" exists as a document, but admit that Dr. Taylor prepared a position paper as part of a "Strategic Plan Initiative," and offer no cognizable reason why that document has not been produced. *See* Defs' Exhibit 3, ¶ 6. Similarly, Defendants reject Plaintiffs' requests for the Inspector General's audits relating to ADC's health care, claiming it was not called for by Plaintiffs' discovery (*id.*, ¶ 14), but even the request they quote requires production of audits.[6] *Id.* These types of disagreements exist across the documents highlighted in Ajmel Quershi's Declaration. *See* Doc. 690. But if, as contemplated by the Joint Motion, the parties work jointly to address these issues, many of them may be resolved without prejudice to either party.

---

facilities this year. As Defendants revealed in their response to Plaintiff Charlotte Wells First Set of Interrogatories, they have information related to suicide differentiated by facility as well as unit. Such information is needed to accurately assess the conditions of confinement for and the provision of mental health care to persons in isolation units.

[6] Defendants do not deny that after this Court's order they reversed position on the production for review of 19 boxes of documents. *See* Mot. at 9 and evidence cited therein. Instead, they chastise Plaintiffs for not reviewing them earlier. Defs' Resp., p. 6. Plaintiffs wanted to review them when they had sufficient people familiar with the issues relevant to those documents available in Arizona to do so. Prior to the discovery cut-off, Defendants agreed to review on a date that was convenient for everyone. *See id*. Had Plaintiffs known Defendants would not abide by that agreement, Plaintiffs would have made arrangements to do it the last week of discovery. Defendants' bait-and-switch tactics should not be allowed to succeed.


## III. PLAINTIFFS WERE DILIGENT IN PURSING DISCOVERY.

Defendants' allegations of Plaintiffs' delay do not bear scrutiny. Defs' Resp., pp. 6-8. They essentially make two claims that warrant discussion:[7] (1) Plaintiffs should have raised the disputes sooner; and (2) Plaintiffs' requests are duplicative.

### A. Plaintiffs' Could Not Have Reasonably Raised the Disputes Sooner.

On the first point, Defendants acknowledge that "[m]uch of what Plaintiffs demand are documents that were mentioned during one of the twelve depositions Plaintiffs conducted in the last eleven days of discovery" and urge that the depositions should have been scheduled "months ago." Defs' Resp., p. 7. But that is wrong for two reasons. First, Defendants' own discovery charts show that the bulk of their document production occurred throughout July, August and early September of this year. Plaintiffs needed documents from those productions to take the depositions.[8] The real question is why

---

[7] Defendants make the additional point that "what Plaintiffs are hoping for [is] more discovery." Defs' Resp., p. 6. Plaintiffs do want more discovery, because critical documents have yet to be produced. Defendants complain that "each time a dispute arises and a ruling is issued[,] it results in yet more discovery and more disputes." What this really means is that when Plaintiffs have raised discovery disputes, the Court has sometimes found that Plaintiffs were entitled to the discovery. As to rulings spawning additional disputes, that is because Defendants afford each ruling the narrowest possible reading and Plaintiffs have often had to return to the Court to get the relief initially granted. *See*, *e.g.*, Doc. 577, Plaintiffs' Request for Clarification. Defendants also note that Channel 12 News has served a public records request, which is entirely irrelevant to this motion. Defs' Resp., p. 6, fn.5.

[8] Even though Plaintiffs waited until near the end of discovery to depose witnesses, Plaintiffs' counsel still did not have key documents that have since emerged. For example, a January 2013 email alleges that Terry Allred, Contracts Compliance Monitor II – ASPC Lewis, ADC HS Contract Monitoring Bureau, retaliated against a Wexford site manager who "reported the discovery of unprocessed grievances from Mr. Allred's tenure as FHA at ASPC-Lewis. Specifically, Allred is reported to have made statement [sic] regarding his ability to come down hard on the site manager for having made Allred look bad via reporting the discovery of unprocessed grievances." Mitchell Supp. Decl., Ex. 18. Allred was deposed on September 13, 2013, and this document was not produced until after the close of discovery. In another example, an email from the medical director at ASPC-Tucson explains the impact of Corizon's planned provider coverage reduction and says "Our skeleton just lost a foot and a tibia." He goes on to warn, "This could be the straw that breaks the camel's back for both Brown and Clayton . . . All providers are telling me they are mentally, emotionally and physically exhausted already and so am I." Mitchell Supp. Decl., Ex. 19. This February 2013 email was forwarded to Kathleen Campbell, Program Evaluation Specialist HS Contract Monitoring Bureau. Plaintiffs deposed Ms. Campbell in September 2013, but were unable to ask her about this email because it was not produced until October.

documents, like the Corizon corrective action plans, only came to Plaintiffs' attention during the depositions, rather than being produced by Defendants in advance.[9]

The second reason for the delay in scheduling of the depositions was the uncertainty as to how many depositions Plaintiffs could take. Defendants refused to budge beyond 25 and, even when the Court ordered the depositions of monitors, Defendants fought about the contours of those depositions. *See* Doc. Nos. 611, 618, 623. Sorting this out required repeated reference to the Court before Plaintiffs understood the number of depositions that would be allowed. *See id*. Until Plaintiffs had this number, they could not prioritize the discovery and determine whose depositions they could afford to take without forfeiting the right to take key depositions, such as Defendant Ryan's.

**B. The Requests at Issue are Not "Duplicative."**

Defendants claim that "[m]any of the documents referenced in the Stipulation have been provided to Plaintiffs through other means, making their renewed requests, duplicative." Defs' Resp., p. 7. Defendants' examples show this claim is meritless. Their first example is that "the majority of the medical records Plaintiffs now want produced, were reviewed by both Plaintiffs' Counsel and Plaintiffs' experts during their tours." *Id*. Apparently, Defendants are suggesting that having been given an opportunity to see them, it is "duplicative" for Plaintiffs to ask for their actual production. But it is absurd to suggest that Plaintiffs and their experts should be forced to rely on memory and their handwritten notes, while Defendants have full access to the documents and can impeach any error in their recollection.[10] In fact, even Defendants apparently recognize the merit

---

[9] Defendants also claim that the documents at issue were only requested on September 25, 2013, but that is simply not true. Defs' Resp., p. 7. They were requested as part of Plaintiffs' written discovery served in August and as far back as mid-2012. Plaintiffs initiated a meet-and-confer early in September about deficiencies in the production in response to selected requests. *See* Defs' Ex. 8. The parties continued that meet-and-confer on September 23, 2013, and also addressed issues that had arisen in the interim. The September 25, 2013 letter Defendants' attached memorialized the September 23 meet-and-confer and, as a courtesy, provided additional information Defendants had requested. *See* Defs' Resp. Ex. 4, Attach. H.

[10] This is especially true because at the time of the tours, the understanding between the parties was that the documents would be produced and Counsel for

of Plaintiffs' argument because, although slowly, they have been continuing to produce these files. Granting of the Joint Motion would allow this process to continue and would necessitate Court intervention only if the process breaks down.

Defendants' second example is Plaintiffs' request for the MGARs in "e-format," given that they have already been produced as .pdfs. Plaintiffs would be satisfied with the .pdfs if the two versions of the document were the same. However, deposition testimony suggested that Corizon's corrective action plans were "automated into" the MGAR system once the CAPs were created. These CAPs were not with the .pdf version produced to Plaintiffs, which is why Plaintiffs sought the "e-format." Campbell Dep., 85:14-86:8. Defendants understand this, which is why they have now agreed to produce the "e-format" when it does not match the previously produced .pdf. Defs' Ex. 4, ¶ 17.

## IV. DEFENDANTS SHOULD BE COMPELLED TO SUPPLEMENT THE PARSONS DISCOVERY.

Defendants do not dispute that they continued to supplement Parsons' discovery requests, even after he was dismissed from the case. Nor do they dispute that they announced their refusal to continue that practice when Plaintiffs could no longer propound discovery. But they do claim it was innocent. Plaintiffs take Ms. Rand at her word, but it does not eliminate the "sandbagging" effect of their actions. As discussed in Plaintiffs' Motion, Parsons' discovery requests seek key documents. If those are not supplemented by Defendants and Defendants use the updated information, it will be trial by ambush. *See* Mot. (Doc. 687), p. 7 and evidence cited therein. The most equitable resolution is to require Defendants to continue the practice of supplementing the discovery in the same manner they did prior to the cut-off for discovery.

Plaintiffs note for the Court that we learned this week that Mr. Parsons has been returned to prison and is now an absent class member. It is possible he will seek to intervene and restore his status as a class representative.

---

Defendants directed Counsel for Plaintiffs and their experts to flag and identify the documents for subsequent copying and production.

Dated: October 31, 2013

**JONES DAY**

By: s/ Caroline Mitchell

Caroline Mitchell (Cal. 143124)*
Sophia Calderón (Cal. 278315)*
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com
scalderon@jonesday.com
*Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email: dbarr@perkinscoie.com
agerlicher@perkinscoie.com
keidenbach@perkinscoie.com
jhgray@perkinscoie.com
mdumee@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
kflood@acluaz.org
jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Warren E. George (Cal. 53588)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:   dspecter@prisonlaw.com
         ahardy@prisonlaw.com
         snorman@prisonlaw.com
         ckendrick@prisonlaw.com
         wgeorge@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@npp-aclu.org
         afettig@npp-aclu.org
         aquereshi@npp-aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com
         tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email: kmamedova@jonesday.com
jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone: (949) 851-3939
Email: kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: s/ Jennifer Alewelt

Jennifer Alewelt (Bar No. 027366)
Asim Varma (Bar No. 027927)
Sarah Kader (Bar No. 027147)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: jalewelt@azdisabilitylaw.org
avarma@azdisabilitylaw.org
skader@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
Cathleen M. Dooley (Bar No. 022420)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email: jrico@azdisabilitylaw.org
cdooley@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2013, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Timothy J. Bojanowski
Rachel Love
Nicholas D. Acedo
Courtney R. Cloman
Ashlee B. Fletcher
Anne M. Orcutt
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
rlove@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

s/ Delana Freouf

78204-0001/LEGAL28253501.2