1          **UNITED STATES DISTRICT COURT**

2          **FOR THE DISTRICT OF ARIZONA**

3          _____

4

   Victor Parsons, et al., on      )
5  behalf of themselves and all    )
   others similarly situated;      ) No.  **CV 12-00601-PHX-NVW**
6  and Arizona Center for          )
   Disability Law,                 )
7                                  )        **Phoenix, Arizona**
                  Plaintiffs,      )        **November 1, 2013**
8  vs.                             )           **3:07 p.m.**
                                   )
9  Charles Ryan, Director,         )
   Arizona Department of           )
10 Corrections; and Richard        )
   Pratt, Interim Division         )
11 Director, Division of Health    )
   Services, Arizona Department    )
12 of Corrections, in their        )
   official capacities,            )
13                                 )
                  Defendants.      )
14 _____)

15

16          BEFORE:  **THE HONORABLE NEIL V. WAKE**
                 UNITED STATES DISTRICT JUDGE

17              (*Motion Hearing*)

18

19

20

21 Official Court Reporter:
   Laurie A. Adams, RMR, CRR
22 Sandra Day O'Connor U.S. Courthouse, Suite 312
   401 West Washington Street, SPC 43
23 Phoenix, Arizona 85003-2151
   (602) 322-7256
24
   Proceedings Reported by Stenographic Court Reporter
25 Transcript Prepared by Computer-Aided Transcription

```
1   For the Plaintiffs:
            PERKINS COIE LLP
2           By:  Daniel C. Barr, Esq.
            2901 N. Central Avenue
3           PO Box 400
            Phoenix, AZ 85001-0400
4
            PRISON LAW OFFICE
5           By:  Donald Specter, Esq.
            1917 5th Street
6           Berkeley, CA 94710

7           ARIZONA CENTER FOR DISABILITY LAW
            By:  Sarah E. Kader, Esq.
8           1242 E. Del Rio Drive
            Tempe, AZ 85282
9
    For the Defendants:
10
            STRUCK WIENEKE & LOVE, P.L.C.
11          By: Daniel P. Struck, Esq.
            By: Ashlee B. Fletcher, Esq.
12          3100 W. Ray Road
            Suite 300
13          Chandler, AZ 85226

14          OFFICE OF THE ATTORNEY GENERAL
            By:  Lucy M. Rand, Esq.
15          By:  Michael E. Gottfried, Esq.
            1275 W. Washington Street
16          Phoenix, AZ 85007

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1          P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  This is Civil Case 2012-601,

3     Victor Antonio Parsons versus Charles L. Ryan, et al.  This is

4     the time set for oral argument.

5          Counsel, please announce for the record.                    15:07:51

6          MR. SPECTER:  Donald Specter, Prisoner Law Office, for

7     the plaintiffs.  Along with me is Dan Barr from Perkins Coie

8     and Sarah Kader from ACDL.

9          MR. STRUCK:  Your Honor, Daniel Struck for defendants

10    with Lucy Rand.                                                   15:08:09

11         THE COURT:  All right.  Good afternoon, counsel.

12         I really don't propose an open-ended discussion today.

13    I have read your papers.  I will lay out a few things for you

14    and then we may have some more discussion.

15         The defendant's decision a couple weeks before the         15:08:49

16    close of discovery to stop giving production in response to

17    requests in the name of Mr. Parsons I find to be unreasonable

18    and unjustified.  And I'm disposed to require the defendants to

19    respond to that discovery.  The discovery was pertinent to all

20    plaintiffs not just the dismissed individual plaintiff.  And in  15:09:13

21    light of the history of production, I'm disposed that way.

22         With respect to the 13 boxes of documents that had

23    been waiting to be reviewed by the plaintiffs without the

24    plaintiffs having done so, I'm disposed to conclude that the

25    defendants' decision to bar that after my order was             15:09:35

─────── November 1, 2013 - Motion Hearing ───────

1   unreasonable and unjustified and to allow brief time for the

2   plaintiffs to review those documents.  I don't see that as

3   being burdensome at all on the defendant.

4        And I will hear from you all on this, but I just want

5   to outline this so we can focus our discussion.                    15:09:53

6        On this matter of the corrective action plans, first,

7   let me ask Mr. Struck, what's the quantity of documents we're

8   talking about there?

9        MR. STRUCK:  Your Honor, with respect to the

10  corrective action plans, we're talking about a couple different   15:10:17

11  things.  And it's primarily because of the kind of the evolving

12  nature of the monitoring process with the Department and

13  between the Department and Corizon.  The problematic documents

14  with respect to the production on the part of the defendants

15  are the early facility-based corrective action plans.  And the    15:10:37

16  reason why it's difficult for the defendants to produce that is

17  because they actually have to go to each screen shot and

18  manually print it because it's not a document that was prepared

19  --

20        THE COURT:  Well, actually --                               15:10:55

21        MR. STRUCK:  So we're talking thousands of pages of

22  those documents.

23        Now, there also are quarterly corrective action plans

24  which we have produced and will continue to produce.

25        THE COURT:  How far back do they go, the ones that          15:11:08

1    have been produced?

2         MR. STRUCK:  The quarterly action plan, I think, the

3    one came out in September, I believe, of this year.

4         THE COURT:  Last month.

5         MR. STRUCK:  Yes.                                    15:11:22

6         THE COURT:  So you have given them one.

7         MR. STRUCK:  That has been produced.  And I believe

8    that some of the corrective action plans have actually been

9    produced, but they would like all of them going back to when

10   Wexford started.  And that's where it becomes a problem for the   15:11:35

11   defendants, because just electronically there's no easy way to

12   do it that's not burdensome.

13        THE COURT:  As long as you are up here, Mr. Struck, on

14   these psychiatric autopsies, I'm really not persuaded that

15   that's attorney work product.  That strikes me as ordinary     15:12:00

16   course of business documentation that cannot be insulated from

17   discovery by having the lawyer tell the client that everything

18   you are doing you are doing for me in addition to discharging

19   your legal responsibilities.

20        However, how many are there?                          15:12:15

21        MR. STRUCK:  I will have to consult with Ms. Rand as

22   to how many psychiatric autopsies there are.  One thing I want

23   to note, Your Honor, is with respect to the actual production,

24   what the plaintiffs actually asked for were death records.

25   That was it.  They didn't specify anything other than that.   15:12:35

—— November 1, 2013 - Motion Hearing ——

1    And so this is a continuing theme with the way they have --

2         THE COURT:  So your principal -- one of your points

3    is, it didn't actually ask for these.

4         MR. STRUCK:  Exactly.  And with respect to the

5    psychiatric autopsies themselves, I mean, we haven't even had a          15:12:54

6    meet and confer on that particular issue yet.  And it certainly

7    hasn't been, other than in the course of this Motion to

8    Reconsider, something that's been briefed.

9         THE COURT:  Well, I don't intend to go beyond -- into

10   new things.  I intend to deal with things that may have been          15:13:13

11   fairly requested and should have been produced.

12        MR. STRUCK:  All right.

13        THE COURT:  And on this dispute about data regarding

14   suicide rates, this is not clear to me because it appears I do

15   have the understanding that data has already been supplied.  So          15:13:37

16   tell me what has been supplied and what is in dispute.

17        MR. STRUCK:  Your Honor, we have supplied data with

18   respect to the number of suicides, what the suicide rate is as

19   it compares to other states in the United States, other

20   corrections institutions.  What they want us to produce is a          15:13:53

21   document we don't have.  They want us to generate a document

22   and they believe that we can generate the average, the mean,

23   and the median of how long inmates are within the segregation

24   cells which we can't do without looking at each and every

25   inmate's file to determine how long -- we would have to          15:14:16

1    actually generate that document.  So that's what we were

2    objecting to.

3            THE COURT:  All right.  And when was that request

4    made?

5            And Mr. Specter, you will have a chance to answer all       15:14:28

6    this.

7            MR. STRUCK:  Your Honor, with respect to suicide

8    statistics, I'm hesitant to tell you exactly when that was.  It

9    wasn't -- they requested suicide statistics in conjunction with

10   their request for production of documents and interrogatories       15:14:46

11   within the appropriate time frame, but the issue actually

12   didn't come up, I believe, until Mr. McWilliams' deposition

13   which occurred just a week or so before the discovery cutoff.

14           But again, our position is we don't have that document

15   and I don't think the Rules of Civil Procedure require us to        15:15:08

16   produce documents, particularly when it's difficult to produce.

17           THE COURT:  That would not be a request for

18   production.

19           MR. STRUCK:  Right.

20           THE COURT:  Might be an interrogatory.                       15:15:17

21           MR. STRUCK:  It was an interrogatory.  I believe it

22   was in July when they sent that, or it might have been the

23   interrogatories that were sent just before the discovery was to

24   send end.

25           THE COURT:  And maybe this is related, but this             15:15:30

─── November 1, 2013 - Motion Hearing ───

1    request for list of prisoners held in isolation and the length

2    of stay, you say you don't have any such documents.  Is that

3    correct?

4            MR. STRUCK:  Well, that's right, not without having to

5    go through --                                                    15:15:53

6            THE COURT:  You would have to manually review it and

7    create it?

8            MR. STRUCK:  I think they can look at it on a computer

9    screen but they would have to go through and see how long each

10   inmate was in a particular housing unit and look at the history  15:16:01

11   of how they have been housed in order to make that

12   determination.

13           THE COURT:  And also, I have these two motions to

14   seal.  Frankly, from reading them, I don't see any

15   justification for sealing anything in those.  But I didn't have  15:16:14

16   a response and the time may have expired.  Anybody wants to

17   tell me why any of those documents should be sealed, tell me

18   now or I'm going to order them filed in the public record.

19           MR. STRUCK:  I believe you are -- I know you are

20   talking about those two -- I believe two e-mails that were       15:16:30

21   attached.  And in reviewing those e-mails I didn't see anything

22   that wouldn't -- that is cover by any kind of a privilege or

23   security related.

24           THE COURT:  All right.  Let me let Mr. Specter speak

25   because it's actually his motion.  And this is help to me.  I    15:16:46

─── **November 1, 2013 - Motion Hearing** ───

1    will -- Mr. Specter, I will hear what you -- anything you would

2    like to say on those.  And then I will -- well, let me hear

3    what you have to say.

4          MR. SPECTER:  On the CAPs, Your Honor, some of the

5    declarations filed by defendants' counsel indicate that they          15:17:08

6    are working on a program to produce those CAPs.  And we

7    understood --

8          THE COURT:  You know, that's not what I just heard.

9    So maybe he will have a chance to respond to that.

10         MR. SPECTER:  Yes.  I can -- the papers are quite          15:17:24

11   voluminous, but it's in one of the two associates of Mr. Struck

12   who said that.  I can find that for you in a few minutes.

13         On the psychiatric autopsies, Your Honor, we did ask

14   for review documents which would cover that.  And in fact, you

15   had previously ordered that mortality reviews on medical deaths          15:17:48

16   be produced.

17         THE COURT:  I didn't order the statistics be created.

18   I ordered those things to be produced.

19         MR. SPECTER:  No.  I'm not talking about the

20   statistics, Your Honor.  I'm talking about the psychological          15:18:01

21   autopsies.  Those are reviews by the psychologist about the

22   care the prisoner received before he committed -- he or she

23   committed suicide.  And they are not statistics.  They are

24   reviews.

25         THE COURT:  I'm sorry.  He just told me you didn't          15:18:27

──────── November 1, 2013 - Motion Hearing ────────

1   request this until this briefing.  You just told me you not

2   only requested it but I ordered it to be produced.

3            MR. SPECTER:  You ordered similar things to be

4   produced.

5            THE COURT:  I feel like I'm living in alternate          15:18:37

6   universes right now.  But if you are telling me I ordered

7   similar things to be produced, I didn't order that to be

8   produced.  So did you request it, and did I order it to be

9   produced?

10           MR. SPECTER:  We requested it.  We can show you -- I     15:18:50

11  would represent to the Court that we have requested documents

12  which psychological autopsies fall under that.  I don't have

13  the exact document, the exact request in my hands.  But I can

14  provide that to the Court on Monday.

15           And --                                                   15:19:13

16           THE COURT:  I intend to rule on all this today.

17           MR. SPECTER:  Okay.  Well, I'm telling you that we did

18  request those, Your Honor.

19           Now, the other thing is --

20           THE COURT:  Now, could you elaborate on that so Mr.      15:19:30

21  Struck can respond to it in a very focused way when we get up

22  to the podium.

23           MR. SPECTER:  Yes.  We requested the records of all

24  prisoners who have died, and we requested -- to give reviews of

25  those, any reviews of those or evaluations of those deaths by   15:19:53

1   the health care staff.

2        THE COURT:  And when was that requested?

3        MR. SPECTER:  I think it was probably requested in the

4   first set of requests by Mr. Parsons that you just talked about

5   at the beginning of the hearing.                              15:20:09

6        On the suicide -- on the segregation report, you have

7   in our reply papers the quotation from a deponent who works for

8   the ADC, who said that a report on length of stay for prisoners

9   in suicide can be easily created from their database.  That's

10  in our reply papers.  So I'm not sure why --                 15:20:39

11       THE COURT:  Tell me again when were you refused this?

12  Obviously, I have a serious problem with months went by,

13  massive requests were discovered, there was resistance from the

14  other side, nothing happened.  Time passed.  Then we got right

15  up to the end and then you started asking for things.  And that 15:21:06

16  put us in a position where after the expiration of discovery

17  you have your demands and disputes that could have been

18  presented earlier, could have been resolved, could have been

19  complied with that result in you all, in effect, forcing the

20  Court to abandon the discovery deadline to allow you to do    15:21:27

21  months later work that you had plenty of time to do and did not

22  do earlier.  And this is not anything unusual about this case.

23  That never works in my court.  Everybody has to proceed

24  diligently and in good faith.  And things you don't get done in

25  time, the train leaves the station.                          15:21:47

1    This case is particularly significant because of my

2  view that I have expressed before that discovery in this case

3  has been greatly excessive, and the truth is that trial judges

4  cannot calibrate discovery to make it right, fair, and

5  appropriate.  Trial judges only have very limited abilities at          15:22:09

6  the boundaries to limit some of that.  And one of the crude

7  instruments we do have is to set a time limit so that when

8  excessive discovery is being sought, the party has to decide

9  what's important enough to pursue and what is less important.

10 And when you run out of time, you got what was important enough   15:22:35

11 to you to pursue timely and bring your disputes to the Court.

12 And if you don't get it done in that time you have

13 prioritized -- I say "you."  I'm talking of all litigants in

14 this situation.

15    You have prioritized things yourself and the Court has          15:22:49

16 had at least this crude instrument of setting a time limit so

17 people prioritize things and you have to get it done.  So I'm

18 saying this because this is in response, Mr. Specter, to things

19 you said in your briefs that would suggest otherwise.  And I

20 reject the contrary assertions from you and other people who          15:23:08

21 have done the same thing, who come in at the end of discovery

22 and give me their disputes on things that could have been

23 pursued earlier.

24    Now, some of these things I am persuaded that you

25 could not have pursued them earlier.  I am going to give you          15:23:23

─── **November 1, 2013 - Motion Hearing** ───

1   relief on those.

2           MR. SPECTER:  Yes, Your Honor.

3           THE COURT:  Anyway, I apologize for my digression.  I

4   want this in the record so we have a clear record that I am

5   rejecting your general assertion that you can simply sit for      15:23:37

6   months, leave disputes on the table, bring them up at the last

7   minute and feel entitled to all the follow-up time to deal with

8   at the last minute what you could have gotten months earlier if

9   you had been diligent.

10          So anyway.                                                 15:24:01

11          MR. SPECTER:  Your Honor, I understand.  Respectfully,

12  we have a difference of opinion.  I understand your ruling so

13  I'm not going to argue with you.  We have set it all out in our

14  papers.

15          THE COURT:  Right.                                         15:24:12

16          MR. SPECTER:  So in terms of the segregation issue, in

17  our reply brief there's a statement by the deponent saying that

18  they have the capability to provide these reports.  My

19  suggestion is, well, if you are going to rule on these things

20  then that's our answer to that question.                          15:24:30

21          The data on the suicide rates --

22          THE COURT:  Go back.  That was the data on -- I'm

23  sorry.

24          MR. SPECTER:  Length of stay and segregation.

25          THE COURT:  Let's talk about it briefly.                  15:24:45

— November 1, 2013 - Motion Hearing —

1      We have a subclass here of people who are in

2  isolation, but the issue there has to do with the provision of

3  health care.

4      MR. SPECTER:  Not only that, Your Honor, it's also the

5  conditions of confinement in those units, we believe, are cruel    15:25:10

6  and unusual punishment.

7      THE COURT:  Well, yes.  But what are these -- how do

8  these statistics matter if you have got --

9      MR. SPECTER:  Sure.

10      THE COURT:  -- people who -- if the conditions of       15:25:24

11  isolation fall below constitutional minimums, how does it

12  matter how many people are being subjected to that?  They all

13  are entitled to protection, one or a thousand.

14      MR. SPECTER:  Right, but if a -- these are -- this

15  document dispute concerns length of stay in these units.  So if    15:25:46

16  a person stays there one day, it might be a little more

17  difficult to prove cruel and unusual punishment than if a

18  person is subject to those conditions for years on end.

19      THE COURT:  There are people who are subjected there

20  for years, maybe indefinitely.                      15:26:05

21      MR. SPECTER:  Yes.  And we're trying to get the exact

22  statistics for that.  Your Honor has indicated before that you

23  would like statistics as much as possible, so that's what we're

24  trying to accommodate through this request.

25      THE COURT:  All right.  Please continue.          15:26:30

─────── November 1, 2013 - Motion Hearing ───────

1    MR. SPECTER:  So on the suicide rate, I don't think

2  Mr. Struck answered that particular point.  I heard him move

3  off to the segregation issue.  It seems to me a fairly simple

4  method of calculation.  If they don't have a document which

5  explains suicide rate then they don't.  But if they do --          15:26:48

6    THE COURT:  That's what he just said.  He said they

7  don't -- those are not documents that exist that they can go

8  produce and give to you.

9    MR. SPECTER:  Yes, but he was talking about the issue

10  we just discussed, which was the length of stay and segregation   15:27:02

11  issue.  He wasn't talking about suicide rate.

12    THE COURT:  You are right.  You are right.

13    MR. SPECTER:  So I think those are the issues which

14  you have addressed.

15    THE COURT:  Now, go back to the -- they have given you    15:27:19

16  the statistics.  You have the general statistics about suicide

17  rates.

18    MR. SPECTER:  Well, we know from their website how

19  many people have committed suicide over time.  So we're just

20  trying to make sure we're both on the same page with what the     15:27:42

21  rate is.  Because to calculate the suicide rate you have to

22  figure in the average daily population, which is a little

23  difficult for us to do.  So that's why we asked for the rate.

24    THE COURT:  I'm sorry.  Tell me what it is you have

25  and what is it you do not have?                                    15:28:02

─────── November 1, 2013 - Motion Hearing ───────

1      MR. SPECTER:  We know, it's public information whether

2  prisoners have died.  Maybe they can -- is the reason for

3  suicide on the website, too?

4      MR. STRUCK:  Your Honor, we have produced not only the

5  numbers of folks who committed suicide but also information          15:28:19

6  with respect to the suicide rates we actually included in a

7  disclosure.  So I'm not sure why we're talking about that.

8      THE COURT:  I remember you saying that.  So Mr.

9  Specter, what is it that you don't have that you are demanding?

10     MR. SPECTER:  We have a difference of opinion about          15:28:34

11  whether they produced that.  So if you order it produced it

12  won't be of any harm to the defendants.

13     THE COURT:  I'm not sure I understand what you are

14  asking to be produced.

15     MR. SPECTER:  The suicide rate for the years 2012 and          15:28:47

16  2000 -- up to the present time.

17     THE COURT:  And he tells me he's given it to you.

18     MR. SPECTER:  Okay.

19     THE COURT:  He also tells me that you are asking for

20  some tailored statistics that they would have to create.          15:29:03

21     MR. SPECTER:  That was on the segregation issue.  Mr.

22  Struck believes --

23     THE COURT:  I thought he was talking about the suicide

24  too.

25     MR. SPECTER:  You asked him about the suicide but he          15:29:14

UNITED STATES DISTRICT COURT

─────────── **November 1, 2013 - Motion Hearing** ───────────

1   went into segregation.

2         THE COURT:  All right.  So back to the segregation --

3   all right.  I understand that.

4         MR. SPECTER:  So the CAPs, just to go back a little

5   bit, the caps, their declarations say they are working on those    15:29:29

6   now to get them to us.

7         THE COURT:  I didn't hear that from Mr. Struck.

8         MR. SPECTER:  No, but it's in their declarations.

9   It's in the record, Your Honor, they said that.  I don't think

10  Mr. Struck would deny that.    15:29:46

11        THE COURT:  Anything else?

12        MR. SPECTER:  No, Your Honor.  I think that's all.

13        THE COURT:  Mr. Struck, since -- I'd like -- what

14  about the corrective action plans?  Are you in the process of

15  producing them to them?    15:30:02

16        MR. STRUCK:  Your Honor, as we have told the

17  plaintiffs, because we have talked about this quite a bit on a

18  couple of meet-and-confers, we have been trying to work with

19  the IT people to come up with a program to be able to extract

20  that information more easily.  That has not been successful    15:30:22

21  yet.  That's what we're trying to do.

22        THE COURT:  Bottom line, I thought from what Mr.

23  Specter said it was basically done, and it's just a matter of

24  giving it to you.

25        MR. STRUCK:  No.  That's not what the declaration    15:30:36

—— November 1, 2013 - Motion Hearing ——

1   said.  It said we were working with the IT department to try

2   and accomplish that.  But right now there's no program that

3   allows us to do it.  They are actually crying to create

4   something in order to extract those caps that were inputted by

5   Corizon onto the MGARs.                                    15:30:53

6          THE COURT:  All right.

7          MR. STRUCK:  With respect to -- and I would like to

8   say just at the onset, I won't spend a lot of time because I

9   understand where the Court's coming from.  I don't believe we

10  were dragging our feet.  I was here last November and heard the  15:31:10

11  message loud and clear from the Court with respect to how they

12  wanted the parties to conduct this case.  And as a result we

13  ended up producing an awful lot of information I normally would

14  have objected to but we didn't because we didn't want to come

15  to you with another discovery dispute.                       15:31:27

16         And we have been producing documents by the thousands

17  to them throughout this case.  And to suggest we were somehow

18  dragging our feet or not giving them anything is just not true.

19         And we agree with the Court that the plaintiffs have

20  waited to the very end to bring up these discovery disputes.  15:31:49

21  We were here on August 9th, I believe, on a Motion to Stay

22  Discovery.  And we were told by the plaintiffs, the Court was

23  told, we were told, hey, discovery almost done.  Don't worry

24  about it.  Since that time, we have been inundated with notices

25  of depositions, tours, and written discovery from these people.  15:32:10

─── November 1, 2013 - Motion Hearing ───

1   And we have responded to that, Your Honor, in the best we can.

2           And that's all I will say about that.  And getting

3   back to some of these other issues, let me just respond to what

4   Mr. Specter said.  With respect to the psych autopsies, and

5   what I as referring you to, Your Honor, before with respect to          15:32:32

6   what their actual request was, it's in Request For Production

7   Document Number 40, Parsons.  The request is all documents

8   regarding death records.  That's all it says.  Doesn't say

9   anything about psych autopsies.  This wasn't an issue with

10  respect to the mortality reviews, which is what you ruled on          15:32:55

11  earlier in the case, which is a completely different animal.

12  They never asked for psych autopsies until less than a week

13  before the end of discovery.  And they asked for it informally

14  and said, hey, it complies with request Number 40.  How in the

15  world are we supposed to figure out exactly what they want.          15:33:16

16          THE COURT:  Actually, I'm just relying on what you

17  said.  And you used the phrase, "documents relating to death

18  records."

19          MR. STRUCK:  I have it right here.

20          THE COURT:  That doesn't sound like the psych          15:33:26

21  autopsies to me.

22          MR. STRUCK:  Right.  I agree.

23          So in any event, that's our position with respect to

24  the psych autopsies.

25          THE COURT:  By the way --          15:33:39

─────── November 1, 2013 - Motion Hearing ───────

1          MR. STRUCK:  Yes.

2          THE COURT:  I don't care what the particular time

3    frame is, but about how many suicides a year does the

4    Department have?

5          MR. STRUCK:  Just one second.                              15:33:50

6          THE COURT:  Yeah.  Please confer.

7          MR. STRUCK:  Your Honor, I just conferred with Dawn

8    Northup, counsel for the Department of Corrections.  She

9    believes in 2013 there have been seven suicides.

10         THE COURT:  So if we go back however many years, three   15:34:14

11   years would put us around 20.

12         MR. STRUCK:  It's probably, yeah, about maybe 10 to 15

13   a year.

14         THE COURT:  I'm trying to figure out the practical

15   value to the plaintiffs of having those records.  I'm putting  15:34:28

16   aside for the moment whether it was timely requested.

17         And how does your suicide rate compare to other

18   correctional institutions?

19         MR. STRUCK:  Actually very well.  That's one of the

20   reasons we included it in the disclosure.  I believe Arizona   15:34:50

21   ranks 27th with respect to all the other states' Department of

22   Corrections regarding suicide rates.  So we're somewhere right

23   in the middle.

24         THE COURT:  You are a little bit above the average but

25   you are probably in the bell curve.                            15:35:07

1    MR. STRUCK:  Right.

2    THE COURT:  Well, I'm still trying to think through

3 these -- all these anecdotal accounts of individuals could

4 matter if reduced to meaningful statistics.  Then we have the

5 gross statistics already.                                        15:35:33

6    All right.  Go ahead.

7    MR. STRUCK:  I did want to mention, and I understand

8 your ruling with respect to the boxes, but I would like to

9 mention, Your Honor, that the 19 -- actually 19 boxes of

10 documents have been sitting in Ms. Rand's office since last     15:35:48

11 June.

12    THE COURT:  I know.  But the problem is two weeks

13 before the close of discovery you refused to give it to them.

14    MR. STRUCK:  No, it was after the close of discovery,

15 Your Honor.  It was after -- I believe it was after the ruling  15:36:00

16 denying the --

17    THE COURT:  Stay.

18    MR. STRUCK:  -- the motion on the 10th discovery

19 dispute and the request for, I guess, a stay of some other

20 issues.                                                          15:36:13

21    THE COURT:  I'm sorry.  Obviously I'm remembering this

22 wrong.  But I thought they finally said, okay, we'll look at

23 it, but it wasn't after the end of discovery.

24    MR. STRUCK:  It was after the end of discovery, Your

25 Honor.  It was in October.  It was the day that you issued your  15:36:26

1  ruling denying the 10th discovery dispute and the stipulation.

2  It was within hours after that.

3  THE COURT:  I also want to say for the record, for

4  both of you, when the parties come in and stipulate to extend

5  the discovery dispute, that is in disregard of my scheduling          15:36:47

6  order that says this is the schedule.

7  Now, the truth is, I consider those one by one and

8  it's not at all uncommon for the Court to grant some relief.

9  But it's specific relief that's consistent with diligence and

10 good faith.  I rarely just allow stuff to go on because we            15:37:10

11 didn't get around to it.  Sometimes I have.  But it depends on

12 the circumstances.  In this case, with the history of excessive

13 discovery at great cost, extending that further because the

14 parties agreed to it lacked justification.  And -- but I am

15 here talking now and I am considering specifics.                      15:37:37

16 MR. STRUCK:  And, Your Honor, we appreciate that and I

17 would say again, part of the reason why we agreed to that was

18 because we didn't want to get you upset.

19 THE COURT:  Well, it's okay.  It's not -- nothing

20 wrong with making litigation decisions in anticipation of what        15:37:54

21 you think the Court will rule.

22 MR. STRUCK:  Right.

23 THE COURT:  But I am here, as I said, addressing

24 specifics here to things that may warrant the additional time.

25 MR. STRUCK:  I understand that.  And I appreciate                     15:38:12

1   that.

2         With respect to the issue regarding the length of stay

3   in the segregation cells, there is a passage that they attached

4   to their reply regarding Carson McWilliams' testimony.  And I

5   can read it to you.  The plaintiffs actually quoted on Page 5          15:38:35

6   of their reply brief, and they say -- or the quote is, "We

7   obviously have documents that would tell you how long someone

8   has been there," which we do, and we're not disputing that.

9   "We know the duration of that on the computer system," which we

10  can.  "You can tell that by looking at locations and stuff so          15:39:01

11  you could generate a report that way."

12        That would be -- you would have to look at each

13  individual's duration.  And that's what's unduly burdensome.

14  Is it possible to create that report?  Yes, it could be

15  created.  But it's not a report that exists and it's something        15:39:19

16  that would be unduly burdensome for us to create.  That's the

17  point the defendants are trying to make.

18        THE COURT:  By the way, going back to the 19 boxes

19  that have been sitting there for a long time, it does appear,

20  and you can correct me, that there would be not significant          15:39:33

21  burden on the defendant of having -- allowing plaintiffs'

22  counsel to look at those boxes.

23        MR. STRUCK:  Your Honor, I would agree with that

24  assessment.  It was primarily a decision that was made in light

25  of the order and the fact that discovery had ended.  And the          15:39:53

——— **November 1, 2013 - Motion Hearing** ———

1   time for them to be inspecting things had passed, and they had

2   shown no interests in those documents for several months.  So

3   that was the reason the request was denied.

4           I believe the boxes are still --

5           THE COURT:  Let me go back to these discovery requests    15:40:15

6   that were refused because they were made in the name of

7   plaintiff Parsons, which, as I have already told you, that

8   strikes me as unreasonable when you had a pattern, A, of giving

9   the discovery requests notwithstanding his dismissal; and B,

10  discovery requests plainly applied to all plaintiffs, not just    15:40:31

11  Parsons.

12          Now, in terms of -- I have less of an empirical handle

13  on what that covers.  And I do intend to require you to respond

14  to that in the same manner that you should have when you

15  changed your mind you weren't going to respond to them two       15:40:52

16  weeks before the close of discovery.

17          MR. STRUCK:  Just a little background on that, because

18  you wouldn't know about this.

19          That was the subject, the Parsons -- that was

20  supplementation they wanted, supplementation of discovery, not    15:41:04

21  a, hey, answer this discovery.  So there had been a continuing

22  supplementation of discovery on the Parsons Request for

23  Production throughout the course of this litigation.

24          THE COURT:  What do we mean by supplementation?  A new

25  discovery request being labeled supplementation, or is it what    15:41:20

1   I think of as supplementation, which is, you have given

2   discovery.  It's an accurate production.  There's new documents

3   and new events that need to be disclosed in order to make the

4   prior disclosure not misleading now in light of new events,

5   that continues without limit.  But which was this?                    15:41:37

6          MR. STRUCK:  This is a supplementation of those kind

7   of records that are continually being generated.

8          THE COURT:  Okay.  Now, with respect to that, there is

9   a broader issue that I never contemplated that document

10  production would be continuing forever, until a month before      15:41:59

11  trial, until the day before trial, into the first week of

12  trial.  We have to have a finite time so counsel can fairly

13  grapple with what they are putting into trial.

14         Now, on the other hand, there's other documents that

15  may be appropriate, and nothing has been presented to me that      15:42:22

16  would be a legitimate obligation to supplement.  And I don't

17  have a good handle on -- I am rejecting the rationale that is

18  put forward here that because this is the name of Parsons you

19  don't have to answer it.

20         So --                                                          15:42:42

21         MR. STRUCK:  And I understand that.  And we accept

22  that, Your Honor.  With respect to the specific Parsons

23  supplementation that they have requested in their papers, if

24  you look at -- there's an attachment.  It's a September 5

25  letter they sent where they actually narrowed the Parsons           15:42:59

1    supplementation.  They were requesting down to 11 requests for

2    production and even narrowed it even more.  So that's really

3    the universe of documentation that we're talking about.

4          THE COURT:  So this narrowed -- what is it?  Is it new

5    categories of documents or just updating of previously produced          15:43:19

6    documents?

7          MR. STRUCK:  Updating of previously produced

8    documents, supplementing documents that the plaintiffs say are,

9    you know, subject to a particular request for production within

10   that, the Parsons RFP.          15:43:37

11         THE COURT:  So if I require you to respond to that,

12   how quickly can that be done?  And here's where I don't have in

13   mind the empirical substance of those requests.

14         MR. STRUCK:  Well, with respect to responding to those

15   requests, I mean, it's probably going to take a couple weeks to          15:43:56

16   respond.  And some of them, I mean, like I said, there are

17   issues that have never been fully briefed with respect to

18   whether our objections are valid or not.

19         THE COURT:  Well, these are objections previously made

20   to the same categories of requests?          15:44:15

21         MR. STRUCK:  Yes.

22         THE COURT:  Or were they new objections not previously

23   asserted?

24         MR. STRUCK:  They were objections that were made at

25   the time of the original response.          15:44:23

1      THE COURT:  Okay.  Well, my sense of that is that I

2  know there were various objections made to which the plaintiffs

3  just let it go.  I don't intend to reopen discovery to make

4  practical the renewal, on the eve of the close of discovery,

5  objections that have been made before and not resolved and not          15:44:45

6  presented to the Court promptly.  I don't intend to do that.

7      But if there are -- at the same time I do intend to

8  reject the rationale you gave me.  And I do not intend to have

9  another round of discovery disputes.  I intend to resolve

10  whatever there is now.                                                   15:45:19

11      MR. STRUCK:  All right.

12      THE COURT:  So going back to those documents, I

13  realize you may not have this in hand, but --

14      MR. STRUCK:  I'm looking for the September 5 letter,

15  which outlines it very succinctly.  And plaintiffs attached it          15:45:39

16  as an exhibit, Your Honor, to their motion and it's -- I have

17  it as Exhibit A in my notebook.

18      THE COURT:  All right.  Let's put it this way.  Let me

19  tell you, there's an issue of -- I intend to set a time for

20  compliance with what I'm going to allow.  And I'll tell you           15:46:12

21  what I'm looking at, not because there's any magic to it, but

22  there's some practicality.  I'm looking at three weeks from

23  today which is November 22nd.  And there's a very concrete

24  reason why I wanted to have this done by then, because the

25  following week is Thanksgiving and I don't want to ruin               15:46:31

─── **November 1, 2013 - Motion Hearing** ───

1    anyone's Thanksgiving.

2         MR. STRUCK:  All right.

3         THE COURT:  So is there any reason why, well, this

4    can't be done in three weeks?  And again, that's also, the

5    plaintiffs, if you want to go look at those 19 boxes get it          15:46:49

6    done in the next three weeks.  And there's other things.  I

7    will get an order out.  Well, probably won't get it out by 5:00

8    today.  Certainly be out first thing Monday morning and maybe

9    Saturday a ruling on everything.

10        MR. STRUCK:  Your Honor, I think it's something that          15:47:08

11   we could probably accomplish by November 22.

12        THE COURT:  I mean, I don't want to micromanage the

13   lawyers' lives, but I just don't want to be responsible for

14   domestic discord.  And if I push it to the following week until

15   Tuesday, that's two days before Thanksgiving.  But if I'm not          15:47:44

16   helping my wife before then I'm guilty of whatever she accuses

17   me of.

18        So...

19        MR. STRUCK:  Just so I'm clear with respect to what

20   I'm saying, I'm talking about the way, how they have narrowed          15:48:00

21   this dispute in the September 5th letter.

22        THE COURT:  Tell you what.  Here's what I think I'm

23   going to do.  I will get an order out as quickly as I can.  I'm

24   going to be allowing some of this additional discovery.  And

25   Nick, what day is Thanksgiving again?          15:48:48

1    THE COURTROOM DEPUTY:  28th.

2    THE COURT:  Well, I think whatever I allow, I will

3  allow to Monday, November 25th, and I realize that I really

4  cannot -- I cannot preclude a future dispute about compliance

5  with what I'm ordering.  But I will tell you all that what I          15:49:35

6  allow I'm going to intend to be focused, not open-ended, and

7  should be able to be complied with.  And if anybody doesn't

8  comply with it, of course, I will hear whatever it is.

9    I give everyone immunity not to have to work from

10  November 27th until December 2nd.  So anything that you have to       15:50:08

11  do you can put off until the following week in terms of

12  additional disputes.

13    So...

14    MR. STRUCK:  Okay.

15    THE COURT:  Now, I have said that, but Mr. Specter,                15:50:22

16  it's your motion.  You have the right to have the last say.

17  I'm sorry.  I sort of got it inverted in my mind when I invited

18  Mr. Struck to speak first.

19    So go ahead.

20    MR. SPECTER:  Sure.  Well, due to the wonders of                  15:50:35

21  modern technology, Your Honor, I can read into the record for

22  you the definition of death records that we put in our first --

23    THE COURT:  Go ahead.

24    MR. SPECTER:  -- discovery request.

25    Death records means any document regarding the death             15:50:50

1    of a prisoner including audits, reviews, studies, interview

2    notes, videos, audio recordings, external investigations, or

3    internal investigations.

4            THE COURT:  All right.

5            MR. SPECTER:  So we think that covers the                    15:51:08

6    psychological autopsies.

7            THE COURT:  Okay.  And let me -- let's go back.  Mr.

8    Struck is telling me they don't have a program to get them.

9            MR. SPECTER:  Right.  They say they are working on it.

10   And if, through their IT department, they can, in good faith,      15:51:25

11   can develop a program to get the CAPs then they should produce

12   them.  If, with a reasonable effort, they can't get them

13   through their IT then they won't produce them and we understand

14   that.

15           THE COURT:  Let me go back.  It's the same question or      15:51:46

16   comment I made with Mr. Struck.

17           If we already have the general statistics here, what

18   is the anticipated value of -- oh.  Well, let me finish my

19   question.  What's the anticipated value of these specific

20   reviews that you are asking for, and also, what was the time       15:52:14

21   frame that you requested?

22           MR. SPECTER:  We would accept, Your Honor, from 2012

23   to the present.  That seems reasonable to me.

24           And the value -- would you like me to answer the

25   value?                                                             15:52:38

——— November 1, 2013 - Motion Hearing ———

1          THE COURT:  Yes, please.

2          MR. SPECTER:  It has two values.  It shows whether the

3    care that -- prisoners' mental health care that prisoners who

4    committed suicide were receiving was adequate.

5          THE COURT:  But how would it do that?  I mean, there's          15:52:50

6    going to be a normal rate of suicide, as tragic as it is, in

7    any population including prisoner population.

8          MR. SPECTER:  There are certain suicides you can't do

9    anything about, but there are a lot of times where the prisoner

10   has given indications where he's about to commit suicide and          15:53:09

11   nothing is done.

12         THE COURT:  You think you might find that in these

13   reviews?

14         MR. SPECTER:  Yes.  Exactly, Your Honor.  And if we

15   don't find that but we look at the underlying records and it          15:53:19

16   shows that there was inadequate care, then that's also relevant

17   to whether the system itself can identify and fix problems.

18         THE COURT:  All right.

19         MR. SPECTER:  The second point I'd like to make is a

20   little tangential, but you talked about it with Mr. Struck.          15:53:41

21   And that is the trial date.

22         THE COURT:  What about it?

23         MR. SPECTER:  Well, it's about a year from now, and

24   we're in an injunctive relief case, so it's not just a

25   retrospective look at what's happened.                              15:54:06

UNITED STATES DISTRICT COURT

1    THE COURT:  I understand that.  But my point is the

2  lawyers have to have a reasonable time for which they are doing

3  discovery or we never end the discovery.  It's like Zeno's

4  paradox.  You never get to the end.

5    MR. SPECTER:  I fully accept that, Your Honor.  The          15:54:22

6  problem is the discovery cutoff ended more than a year before

7  the trial date.  So we have a year's time in which we can't

8  conduct discovery but the defendants can use whatever

9  information they have about their system.  So when we get to

10  the trial of this matter, our evidence will be basically --    15:54:41

11    THE COURT:  I see that as impractical, improbable,

12  because in fact, A, the lawyers -- you are suing for systemic

13  violations.

14    MR. SPECTER:  Yes, Your Honor.

15    THE COURT:  And it's very improbable that a systemic        15:54:54

16  violation will arise in the few months before the trial.  If it

17  is systemic, it had to have been there for quite a while.  So a

18  reasonable time frame is entirely reasonable to limit the

19  endless discovery.

20    MR. SPECTER:  I agree.  And in the *Plata* case, for        15:55:09

21  example, the Supreme Court affirmed a district court order

22  saying three or four months before trial was reasonable.  Here

23  we're talking about 13 months.

24    THE COURT:  Well --

25    MR. SPECTER:  We don't want to get into the                 15:55:22

```
1    position --

2            THE COURT:  If they offer -- they are going to be

3    required to list their trial documents.  And if they try to

4    list a bunch of documents that you haven't had access to, do

5    you think they are going to get away with that?              15:55:35

6            MR. SPECTER:  I'm glad to hear they won't.

7            But the other problem is the fact they are going to

8    have witnesses testify about the current conditions and we

9    won't have deposed them.  And we won't know what documents they

10   are relying on, and it's -- they are going to come in and     15:55:48

11   say --

12           THE COURT:  I don't know if they are going to do that

13   but I intend to have a trial according to the outline we have

14   laid out that's fair to both sides.

15           MR. SPECTER:  Right, Your Honor.                      15:56:01

16           THE COURT:  That's based on systemic deficiencies.

17   And also, the reason we have to close the discovery because

18   there's other things you all wanted to do.  You wanted to have

19   an opportunity for summary judgment.  We can't be doing

20   discovery while we're doing summary judgment.  And I need a    15:56:19

21   little time to rule on these motions.

22           So the answer is, that was the schedule we set --

23   basically, I'm not remembering all the details, but I thought

24   it was a schedule you all agreed to.

25           MR. SPECTER:  No, we didn't agree.  You set it, Your  15:56:32
```

1   Honor, and we accepted it, of course.  But regardless, I'm not

2   quibbling with the schedule.  I'm just trying to resolve the

3   problem what do we do about the 13-month lag time between close

4   of discovery and the start of the trial.  How do we make that

5   fair to both sides, as you said?                                15:56:55

6          THE COURT:  You are just assuming they are going to do

7   unreasonable things and I'm going to blink at it.  We take --

8   trials are a practical process.  And I don't see how I should

9   have to worry about improbable hypotheticals.  We set a

10  reasonable trial schedule that allowed to fit in everything      15:57:16

11  people wanted to do before trial.  So other than hearing you

12  say in general you are unhappy about that, I'm not hearing

13  anything specific.

14         MR. SPECTER:  You are right.  It's a little

15  hypothetical, Your Honor.  So I guess our position will be if    15:57:34

16  they introduce evidence of conditions that occur past the close

17  of discovery we will object at the appropriate time, because we

18  will not have had the opportunity to test that evidence.

19         THE COURT:  I will take the motion under advisement.

20  I intend to get something out in writing.  I hoped to get it     15:58:03

21  done today, but -- oh.  Actually, there is one more thing.  Did

22  you have anything more to say?

23         MR. SPECTER:  Yes, Your Honor.

24         THE COURT:  I had a follow-up thing for Mr. Struck so

25  please continue.                                                 15:58:16

────── November 1, 2013 - Motion Hearing ──────

1      MR. SPECTER:  Part of the -- I think it's fair to say

2  from the defendants' submissions in response to this motion is

3  they still have outstanding documents that they have agreed to

4  produce that haven't been produced.

5      THE COURT:  Oh.                                          15:58:29

6      MR. SPECTER:  And is the November 22nd date going to

7  apply to that, too?

8      THE COURT:  Well, let me ask Mr. Struck, is there any

9  reason he cannot do that by November 22nd?

10      MR. SPECTER:  That would be good.                       15:58:40

11      MR. STRUCK:  No, Your Honor.  In fact, we produced a

12  whole bunch of things in the last two weeks.

13      MR. SPECTER:  We look forward that.  Could you put

14  that in your order, Your Honor?

15      MR. STRUCK:  Your Honor, we said we would produce it.   15:58:51

16  You don't need to order us to do so.

17      THE COURT:  Mr. Struck, with respect to those suicide

18  reviews, if we go back a little less than two years, we're

19  probably looking at a dozen or so.  Let's suppose even that

20  very, very small sample shows a recurring pattern of clear     15:59:16

21  warning and neglect to deal with it.  That would seem like it

22  would help their case.  And so I'm wondering what the burden

23  is, granted this is going to be manual review.  But if we're

24  going back 21 months, what would be the burden of that?

25      MR. STRUCK:  You are right.  It will be a manual          15:59:40

UNITED STATES DISTRICT COURT

 1   review.  I don't -- other than just in conjunction with the

 2   other things that we're going to be working on prior to

 3   November 22nd, it probably -- if on its own, standing alone, is

 4   probably not an excessive burden.  There is a concern with

 5   respect to -- there is a state law which I believe similar to          15:59:57

 6   the mortality review which you have already ruled on with

 7   respect to that that applies.  But it is -- it is our

 8   understanding it is done at the direction of counsel for the

 9   Department of Corrections in anticipation of litigation.

10           THE COURT:  No.  I will hear you on that.  I gave you          16:00:24

11   an initial reaction on that but I will hear you on that.

12           MR. STRUCK:  What I would --

13           THE COURT:  But it's -- from what I understood from

14   what you said is we always do it that way.  Instead of having

15   internal management reviews of suicides we just have the              16:00:39

16   lawyers tell us to do it all the time so every one we do is

17   attorney/client or work product protected.  That's what I

18   understood your argument to be.  Is that not correct?

19           MR. STRUCK:  With respect to these psych reviews,

20   those are done at the direction of counsel.  There's mortality        16:01:02

21   reviews that are not done at the direction of counsel that are

22   produced.

23           THE COURT:  Let's go back to fundamental work product

24   principles.

25           MR. STRUCK:  All right.                                       16:01:13

1       THE COURT:  Those reports are not going to contain any

2   counsel's observations or mental impressions.  What they are

3   going to be is fact gathering from people who will have

4   gathered information about those suicides that it seems rather

5   obvious could not be reproduced now.  Therefore, if you look at          16:01:29

6   Rule 26 under the work product exceptional circumstance

7   exception, it would be produceable notwithstanding an exception

8   to the work product.

9       MR. STRUCK:  I understand what you are saying with

10  respect to factual information.  But with respect to, you know,          16:01:46

11  there will be conclusions within that document.

12      THE COURT:  But these are not lawyers.  These are your

13  staff people preparing these evaluations.

14      MR. STRUCK:  For the lawyer, for subsequent

15  litigation.  And I think that this is -- I have dealt with this          16:02:01

16  issue before in after action reports with respect to incidents

17  that have occurred.  Their terms of the actual -- at least at a

18  minimum in terms of the conclusions with respect to that,

19  whether or not it is an attorney who is doing it or it is being

20  done at the direction of the attorney.                                   16:02:23

21      THE COURT:  None of these are being done by attorneys.

22  All these are being done by the mental health staff, right?

23      MR. STRUCK:  Yes, Your Honor.  That is true.  They are

24  being done.  But with respect to the conclusions that are being

25  provided to the attorney with respect to future litigation,             16:02:37

1   those conclusions should be protected under the work product.

2         THE COURT:  But they are not lawyer conclusions.  They

3   are not lawyer impressions.  I mean, we all deal with this on a

4   semi-regular basis so I'm familiar with it, too.  And as you

5   recall, there's the exceptional circumstances exception to the      16:02:55

6   work product doctrine that basically is the only way you can

7   get these facts anymore is to get them from the report that was

8   done at the request of the lawyer.  And it's produceable.  You

9   can protect against mental impressions of the lawyer but I'm

10  not hearing there's any of that.  There wouldn't be because       16:03:14

11  this doesn't come from lawyers.  So that could arise in

12  situations where the only source is the lawyers' restatement of

13  it.

14        But that's not what I'm hearing.  It appears to me

15  that this is just -- all this -- there might be -- work product    16:03:29

16  is plainly within the exception to work product because it's

17  the only way to get this information now after the passage of

18  time.

19        MR. STRUCK:  And again, I would agree with you with

20  respect to the facts.  But if we are required to produce these     16:03:49

21  we should at least be able to redact the conclusions.

22        THE COURT:  These are the conclusions not of lawyers

23  but of your mental health or other professionals about the

24  facts.  So I'm just not seeing a need or justification for -- I

25  mean, the conclusions will -- it seems they would be              16:04:12

1   inseparable from the recounting of the factual investigation.

2           MR. STRUCK:  Say hypothetically, for example, if the

3   conclusion was, well, in this case, if Officer X had been on,

4   you know, at his post during this period of time or had timely

5   done his safety and security check, this may have been                16:04:34

6   prevented.  I mean, that's not a fact.  That's a conclusion.

7           THE COURT:  Well, the -- this is only going to matter

8   if it tends to support a systemic failure to provide

9   constitutional minimums.  That's all it's going to matter for.

10  And, you know, who knows.  It might tend to support it.  It            16:05:00

11  might not.

12          All right.  Anything further on that?

13          MR. STRUCK:  No, Your Honor.

14          THE COURT:  All right.  Mr. Specter, you don't need to

15  argue this point because you just won it.                             16:05:11

16          MR. SPECTER:  I am not.  Believe me.  I understand

17  when to quit.

18          THE COURT:  If there's nothing else then I will get an

19  order out as soon as I can.

20          The motion is taken under advisement.                          16:05:26

21          (Proceeding concluded at 4:05 p.m.)

22

23

24

25

1

2

3

4                    C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 16th day of December,

15   2013.

16

17                              s/Laurie A. Adams

18                              _____

                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25