**Index of Exhibits to the Declaration of Corene Kendrick**

Exhibit 1:       Arizona Department of Corrections Department Order 902

Exhibit 2:       September 17, 2013 Statewide memorandum

Exhibit 3:       September 9, 2013 demand letter from Dianne Post to Charles Ryan

Exhibit 4:       September 25, 2013 letter from Corene Kendrick to Daniel Struck

Exhibit 5:       October 7, 2013 email attaching October 1, 2013 letter from Ashlee Fletcher to Corene Kendrick

Exhibit 6:       October 7, 2013 letter from Corene Kendrick to Ashlee Fletcher

Exhibit 7:       October 14, 2013 letter from Corene Kendrick to Ashlee Fletcher

Exhibit 8:       November 12, 2013 Abdullah Declaration

Exhibit 9:       November 14, 2013 Abdullah Declaration

Exhibit 10:     Copy of an envelope addressed to "Corene Kendrick, Esq. Attorney at Law" from Seymour Abdullah

Exhibit 11:     Photos of an envelope addressed to "Corene Kendrick, Esq." from Seymour Abdullah

Exhibit 12:     Copy of an envelope from Prison Law Office to Jose Fierro

Exhibit 13:     Copy of envelope from Jose Fierro to "Corene Kendrick Attorney at Law"

Exhibit 14:     Copy of a photo taken December 9, 2013 of an envelope from Shane Spalding to Prison Law Office

Exhibit 15:     Copy of envelope from Prison Law Office to Anthony Gosney

Exhibit 16:     Copies of two envelopes sent between the Prison Law Office and John Larsgard

Exhibit 17:     Two copies of envelopes sent between the Prison Law Office and Jody Sullivan, a prisoner housed at Tucson-Manzanita

Exhibit 18:     December 17, 2013 Declaration of Brein Mandeville

Exhibit 19:     November 4, 2013 Declaration of Stephen Reeves

Exhibit 20:     [Redacted] July 29, 2013 Declaration signed by Barry Patterson

Exhibit 21:     September 17, 2013 Supplemental Declaration signed by Barry Patterson

Exhibit 22:     [Redacted] May 25, 2012 letter from Donald Specter to Michael Gottfried

Exhibit 23:     [Redacted] August 2, 2012 letter from Donald Specter to Daniel Struck

Exhibit 24:      [Redacted] November 29, 2012 letter from James Duff Lyall to Michael Gottfried

Exhibit 25:      January 24, 2013 letter from Matthew du Mée to Michael Gottfried

Exhibit 26:      February 5, 2013 letter from Ashley Zuerlein to Matthew du Mée

Exhibit 27:      February 8, 2013 letter from Matthew du Mée to Ashley Zuerlein

Exhibit 28       February 12, 2013 letter from Ashley Zuerlein to Matthew du Mée

Exhibit 29:      February 13, 2013 letter from Matthew du Mée to Ashley Zuerlein

Exhibit 30:      February 14, 2013 email chain between counsel for the parties

Exhibit 31:      March 7, 2013 letter from Matthew du Mée to Ashley Zuerlein

Exhibit 32:      Email chain between counsel for the parties (regarding Mr. du Mée's March 7 letter)

Exhibit 33:      April 12, 2012 Dustin Brislan grievance

Exhibit 34:      October 22, 2013 Declaration signed by Dustin Brislan

Exhibit 35:      October 30, 2013 Dustin Brislan grievance.

Exhibit 36:      October 24, 2013 grievance response

Exhibit 37:      November 5, 2013 Declaration signed by Stephen Swartz [privileged attorney-client communication is redacted from Attachment 2 to his declaration]

Exhibit 38:      October 30, 2013 Stephen Swartz grievance and response

Exhibit 39:      Copy of envelope addressed to U.S. District Court from Stephen Swartz

Exhibit 40:      April 2, 2013 inmate letter from Jeremy Smith to ADC staff and response

Exhibit 41:      Print out from the State Bar of Arizona website showing that Mr. Brookman was admitted to the State Bar of Arizona on November 6, 2012

Exhibit 42:      September 6, 2013 grievance response by the SMU-I librarian

Exhibit 43:      January 7, 2014 Declaration of Robert Gamez

Exhibit 44:      December 29, 2013 Declaration of Jackie Thomas

Exhbiit 45:      November 27, 2013 email from Donald Specter to Dawn Northup

Exhibit 46:      Arizona Department of Corrections Department Order 914

78204-0001/LEGAL28738453.1

# EXHIBIT 1

| | | | |
|---|---|---|---|
| CORRECTIONS / ADC | ARIZONA DEPARTMENT OF CORRECTIONS | CHAPTER:   900<br><br>INMATE PROGRAMS AND SERVICES | OPR:<br><br>DIR |
| DEPARTMENT ORDER MANUAL | | DEPARTMENT ORDER:  902<br><br>***INMATE LEGAL ACCESS TO THE COURTS*** | SUPERSEDES:<br><br>DO 902 (02/04/11) |
| | | | EFFECTIVE DATE:<br><br>JULY 6, 2013 |
| | | | REPLACEMENT PAGE REVISION DATE:<br><br>N/A |

# TABLE OF CONTENTS

**PURPOSE**

**RESPONSIBILITY**

**PROCEDURES**                                                              **PAGE**

902.01         SYSTEM OVERVIEW ......................................................................... 1

902.02         LEGAL RESOURCES AND ACCOMMODATIONS ........................................... 2

902.03         GENERAL RESPONSIBILITY ................................................................ 3

902.04         PARALEGAL ASSISTANCE .................................................................. 6

902.05         QUALIFIED LEGAL CLAIMS COPYING ....................................................... 9

902.06         CHARGES - QUALIFIED LEGAL CLAIMS ....................................................11

902.07         NON-QUALIFIED LEGAL CLAIMS SERVICES................................................12

902.08         SPECIAL NEEDS INMATES ..................................................................13

902.09         LEGAL SUPPLIES ...........................................................................14

902.10         LEGAL PROPERTY...........................................................................14

902.11         LEGAL MAIL................................................................................15

902.12         LEGAL PHONE CALLS ......................................................................17

902.13         LEGAL VISITS ..............................................................................18

                IMPLEMENTATION ..........................................................................19

                DEFINITIONS................................................................................19

                AUTHORITY..................................................................................21

                ATTACHMENTS

# PURPOSE

The Department of Corrections ensures all inmates have direct access to the courts in all legal claims involving direct appeals from the conviction for which they are incarcerated, habeas petitions, civil rights actions, or conditions of confinement. The Department facilitates this access by making forms and specific legal assistance available to the inmate population. The system is designed to maximize inmates' opportunity to present legal claims pertaining to the aforementioned legal claims to the State or Federal court, in a quick, efficient manner, with no barriers. This Department Order establishes the process to be used by inmates for gaining access to the courts and also describes the role of all parties involved. This Department Order sets forth all affirmative steps the Department shall take to assist inmates in obtaining access to the courts. This process does not affect the inmates' ability to independently pursue actions on their own or to obtain outside counsel to represent them.

# RESPONSIBILITY

The Legal Access Monitor shall monitor this inmate legal access to the courts system in all facilities to ensure the assistance provided to inmates by Paralegals (See DEFINITIONS) conforms to all Department written instructions and contract provisions, and ensure staff are complying with the provisions of this Department Order.

# PROCEDURES

**902.01**      **SYSTEM OVERVIEW** - Inmates shall have direct access to the courts through the mail.

  1.1      Qualified Legal Claims (See DEFINITIONS) - Inmates who do not feel able to draft pleadings or to complete District Court/state forms without assistance may:

    1.1.1      Contact an attorney directly, at the inmate's expense.

    1.1.2      Request the court to appoint an attorney to represent them.

    1.1.3      Obtain active assistance through the Department from Paralegals. (See section 902.04 of this Department Order)

  1.2      Non-Qualified Legal Claims - The Department may not actively assist inmates in the filing of documents not involving civil rights, conditions of confinement, appeals from conviction or habeas petitions. Inmates who desire assistance filing pleadings or petitions in matters not related to civil rights or conditions of confinement, appeals from conviction or habeas petitions may seek assistance of counsel, the courts or other assistance outside the Department. The Department may provide passive assistance as noted below:

    1.2.1      Inmates may use legal texts and resource materials, as provided in section 902.02 of this Department Order and identified in Attachment A.

    1.2.2      Inmates may request from the Paralegal or designated staff the address of any Arizona Court above the level of Justice of the Peace courts and selected Federal Courts. (See Attachment C for Federal Courts. State Court material is in the Forms packet as identified in Attachment B.)

  1.3      Legal Research - No provision is made in this system for extensive, generalized legal research.

1.4     <u>Inmate Legal Assistants and Law Clerks</u> - There is no provision in this Department Order for an inmate legal assistance program. The Department shall take no affirmative steps to assist inmates helping other inmates with qualified legal claims. Inmates are prohibited from assisting other inmates with non-qualified legal claims.

1.5     <u>Right to Retain Counsel</u> - This system does not interfere with an inmate's right to retain counsel, to the extent the inmate can afford counsel and is willing to pay for the services of an attorney.

    1.5.1     Inmates may, of course, avail themselves of pro bono services of a court-appointed attorney.

    1.5.2     Nothing in this system suggests inmates may retain someone other than a licensed attorney for legal purposes.

1.6     <u>Access to Legal Resources</u> - All institutions shall provide access to the required legal resources. Smaller stand-alone units may transport inmates to an institution which has the required legal resources, or shall provide storage areas for legal resources and materials in addition to the required work space.

1.7     <u>Approved Department Forms and Other Documentation</u> - Staff and inmates shall only use the Department forms authorized by this Department Order to request services or report information about this legal access system. Any other forms are null and void. If additional forms are required, they shall be developed and approved only in accordance with Department Order #114, <u>Forms Management System</u>.

## 902.02     LEGAL RESOURCES AND ACCOMMODATIONS

1.1     The Legal Resources identified in Attachment A are presently available for inmate use.  Any additions or deletions to the legal texts and resource material identified in Attachment A shall be subject to the Director's approval.

1.2     All legal reference texts and manuals available for use by inmates shall be kept in the Reserve/Reference section of the unit Library, under the control of designated staff, and shall be used only in the unit Library, with the exception noted in 1.3.2 of this section.

    1.2.1     Legal Resource Centers shall provide no legal resource material except for such material set forth in this Department Order.

    1.2.2     The units are not required to possess and shall not possess older versions of the law. The centers do not provide archive services. Therefore, inmates requesting older versions of the law, for whatever reason, should be encouraged to contact the courts.

1.3     Inmates who visit the library may check out legal texts, manuals, and other legal reference material for a specified period of time within a given day, <u>for use only in the library.</u>

    1.3.1     Each book shall have a check out card, on which inmates shall write their name and ADC number.

        1.3.1.1     Inmates shall leave their identification card with designated staff, to be returned to them when they return the book.

1.3.2      Under special circumstances an inmate who is unable to visit the library may obtain legal texts and resources for use outside the library. Complex Detention Units (CDUs) and Protective Custody units shall maintain a legal resource library as prescribed in section 902.08, 1.3 and 1.3.1 of this Department Order.

1.4      The Legal Access Monitor shall provide designated staff with a supply of current court forms as identified in Attachment B. The inmate shall pay for copies of these court documents in accordance with section 902.06 of this Department Order.

1.4.1      Inmates may draft their own pleadings, motions and other legal documents.

1.4.2      Handwritten forms which are left incomplete shall not be considered qualified for copying.

1.5      The Department shall not supply inmates with forms, documents or any legal materials from other states. It shall be the duty of the inmate to contact the out-of-state court to request any forms, documents or legal materials from that state.

1.6      The Department shall ensure inmates have access to the name and address of the Arizona State Courts and Federal District/Appellate Courts. These addresses shall be made readily available to inmates, and shall be posted on library bulletin boards in each unit. One or more copies shall be kept in the Reserve/Reference section of the unit Library for referral by inmates. These copies are not to be taken from the Reserve/Reference desk; however, if an inmate requires a copy, it may be purchased in accordance with section 902.07 of this Department Order.

1.7      The unit Deputy Warden may set aside a private room for the use of the Paralegal.

1.7.1      If requested by the Paralegal, a telephone with a speaker may be provided for use in tele-conferencing.

1.7.2      In all instances, designated staff, together with security staff, shall ensure inmates who are meeting with Paralegals have space to prepare their legal actions.

1.8      The Department shall not make computers or typewriters available to inmates in the unit Library for the purpose of enabling inmates to do legal work. Only inmates who have a qualifying disability may be provided a personal typewriter pursuant to a court order.

**902.03**      **GENERAL RESPONSIBILITY** - This inmate legal access to the courts system relies on five specific groups of individuals, with general responsibility as follows:

1.1      <u>Designated Staff</u> - These staff members shall be responsible for:

1.1.1      Cataloging and maintaining legal resources in the Reserve/Reference section of the unit Library; signing out legal texts to inmates for use only in the library; keeping track of legal texts to prevent/minimize loss; making texts available for inmates who have limited access to the library; and maintaining records in accordance with Department Order #103, <u>Correspondence/Records Control.</u>

1.1.1.1      A monthly inventory of legal resources shall be completed and a copy sent via interoffice mail to the Legal Access Monitor during the first week of the following month.

1.1.2    Coordinating, with institution staff and the Paralegal, the scheduling of appointments for inmates to meet with Paralegals (See section 902.04, of this Department Order) and ensuring inmates are made aware of the date and time of their appointment.

1.1.2.1    Designated staff shall work closely with security/other staff to arrange for meetings between Paralegals and inmates. Paralegals shall be allowed to remain and work in the facilities in order to complete appointments.

1.1.3    Photocopying or supervising the photocopying of all qualified and non-qualified legal claims.

1.1.4    Processing inmate requests for services including: notary services, copies of the court forms identified in Attachment B and other chargeable services in accordance with section 902.06 and 902.07 of this Department Order.

1.1.5    Facilitating the delivery of notary services, copies or other chargeable services in accordance with section 902.06 and 902.07 of this Department Order.

1.1.6    Providing assistance to the inmate in properly completing Department forms, requesting assistance or having photocopies made.

1.1.7    Maintaining the Paralegals – Unit Sign-In Log, Form 902-4 at each unit for the ingress and egress of the Paralegals. Designated staff shall collect data regarding Paralegal visits and provide the information to the Legal Access Monitor on a monthly basis to use in verifying on-site hours worked by the Paralegal contractors. The Paralegals – Unit Sign-In Log form shall be maintained for a period of three years.

1.2    Paralegals - Although not required to do so by law, the Department provides inmates with an opportunity to obtain assistance from qualified Paralegals (see definition), to facilitate their access to the courts.

1.2.1    Paralegals shall be responsible for:

1.2.1.1    Assisting inmates who request assistance in the actual preparation of their initial pleadings or petitions for filing with the courts.

1.2.1.2    Providing bilingual services as required.

1.2.1.2.1    A tele-conference with a bilingual interpreter is permissible.

1.2.1.2.2    Certified interpretation is not required.

1.2.1.3    Providing notary services, paid for by the inmate, in accordance with section 902.06 of this Department Order, to the extent required by court rules.

1.2.1.3.1    Non-qualified legal materials shall be notarized by authorized staff.

1.2.1.4   Making the determination as to what legal documents require photocopying and the number of copies to be made in matters involving qualified legal claims where the inmate is indigent.  The Paralegal shall consult with the Legal Access Monitor if a question or problem arises. (See section 902.05, of this Department Order.)

1.2.1.5   Contacting the Legal Access Monitor if they have any questions themselves pertaining to the inmate access to the courts system.

1.2.1.6   Contacting the Warden or designee with questions concerning institutional activity, coordination, etc.

1.2.1.7   Providing inmates with copies of Court names and addresses at a cost of $.10 per printed side.

1.2.1.8   Complying with Department Orders and other Department written instructions, as identified in their contract, as well as the terms and conditions of their contract.

1.2.1.9   Recording their time in hours to the nearest tenth using the Paralegal Activity Log, Form 902-3, on a weekly basis, and forwarding a copy to the Legal Access Monitor on a bi-weekly basis.

1.2.1.10   Reviewing questionable outgoing legal mail to determine if it is actually legal mail. (Mail not addressed to an attorney, judge or court, but may be required by court order or statute.)

1.2.2   Paralegals shall not:

1.2.2.1   Practice law, give legal advice, conduct legal research, represent an inmate or make referrals.

1.2.2.2   Aid inmates in any matter, legal or non-legal which does not involve qualified legal claims. The Paralegal may direct inmates to where they may find information in the resource center.

1.2.2.3   Assist inmates in qualified legal claims beyond the initial filing of their pleadings with the courts.

1.3   Legal Access Monitor - The Legal Access Monitor shall be responsible for:

1.3.1   Providing system-wide monitoring and operational oversight of the inmate legal access to the courts system.

1.3.2   Ensuring the Paralegals are assisting inmates on matters involving qualified legal claims only and only at the initial pleading stage.

1.3.3   Resolving questions Paralegals and designated staff may have concerning the inmate legal access to the courts system.

1.3.4   Ensuring the Paralegals are adhering to all contract provisions and Department written instructions in assisting inmates.

1.3.5     Visiting selected prison facilities to monitor the activities of the Paralegals, overseeing the operations of the inmate access to courts system, and reviewing legal resource material to ensure it is up to date and complete.

1.3.6     Ensuring accommodations and arrangements are being made for special needs inmates. (See section 902.08, of this Department Order.)

1.3.7     Making recommendations to the Director to either purchase additional sets of legal resource materials or eliminate resource materials, as appropriate.

1.3.8     Reviewing Paralegal Activity Log forms and billings for accuracy and determining the proper amount to be paid for work completed.

1.3.9     Reordering legal texts, as necessary, to replace missing texts and ordering updates as they become available from the publisher.

1.3.10    Performing other duties, as assigned.

1.4   ADC Attorneys – The ADC Attorneys shall be responsible for overseeing the tasks of the Legal Access Monitor and providing the Legal Access Monitor with direction.

1.5   Inmates - Inmates may use the resources available through this inmate legal access to the courts system.

1.5.1     The Department shall not establish an inmate legal assistant/inmate law clerk program, nor shall the Department take any affirmative steps in assisting inmates in helping other inmates with qualified legal claims.

1.5.1.1     Inmates who have been found charging or bartering in exchange for services, or who have been found to be creating a security problem or assisting inmates with non-qualified legal claims shall be disciplined and shall be precluded from helping other inmates in the future. No inmate shall be allowed to assist another inmate if the Warden or Deputy Warden determines a potential or existing security problem has developed or may develop, or allowing such assistance may detrimentally impact institutional resources.

1.5.1.2     Inmates shall not possess or store other inmates' legal paperwork in their cell or housing area.

1.5.2     Inmates shall mail legal materials in accordance with section 902.11 of this Department Order.

1.5.3     Inmates shall attempt to resolve issues related to this inmate legal access to the courts system through designated staff before contacting the Legal Access Monitor.

**902.04     PARALEGAL ASSISTANCE** - Inmates may receive active assistance in the initial filing of pleadings involving qualified legal claims from Paralegals provided by the Department. (See Attachment D, Paralegal Assistance Request Process.)

1.1     Inmates desiring legal assistance from a Paralegal shall complete an Inmate Request for Paralegal Assistance, Form 902-1, available only from designated staff. The request shall include a plain, concise description of the qualified legal claim and the type of assistance requested. The Inmate Request for Paralegal Assistance form is not to be used to ask legal questions, only to request to meet with the Paralegal regarding their qualified issues.  The Inmate Request for Paralegal Assistance form shall also be available in Spanish. Illiterate inmates shall contact designated staff, who shall help them complete the form. Inmates serving sentences pursuant to Interstate Corrections Compact and concurrent custody agreements shall make the request in accordance with 1.11 of this section.

    1.1.1     If the issue involves Section1983 Civil Rights or Conditions of Confinement, the inmate shall have first attempted to resolve the issue through the inmate grievance process, in accordance with Department Order #802, <u>Inmate Grievance Procedure</u>. The inmate shall attach a copy of the final disposition of the grievance to the initial request for assistance. If the inmate has not attempted to resolve the issue through the inmate grievance process, the Paralegal shall advise the inmate the court will likely dismiss the inmate's suit if the inmate fails to exhaust the administrative remedies available through the inmate grievance system.

    1.1.2     If the issue involves Notice of Appeal from the Superior Court, a Rule 32 or habeas petition, the inmate shall include the appropriate legal documents/orders of the court out of the trial court record.

1.2     Once the inmate has completed his/her portion of the form, the form shall be given directly to designated staff or placed in a designated drop box or tray at the direction of designated staff.

1.3     Designated staff shall accept, sign and date the Inmate Request for Paralegal Assistance form, provide a copy to the inmate, and forward the request along with any attached documents to the Paralegal. Designated staff:

    1.3.1     May fax the request and attachments (if any) to the Paralegal, using the designated fax machine. Material to be faxed shall not exceed 20 pages. Staff may also scan the request and send an electronic copy to the Paralegal via e-mail.

    1.3.2     Shall charge the inmate the actual cost of faxing as determined by the institution. The charge shall be the actual cost of the telephone connection.

        1.3.2.1     The inmate shall prepare and submit an Inmate Request for Withdrawal, Form 905-1, to the designated staff prior to faxing. Inmates without the necessary funds shall be handled as specified in section 902.06, 1.1 of this Department Order.

    1.3.3     Shall not intercept or delay Inmate Requests for Assistance.

1.4     The Paralegal shall review each request and determine whether the matter described involves a qualified legal claim.

    1.4.1     If it is unclear whether the issue involves a qualified legal claim and/or the Paralegal determines a meeting is appropriate, the Paralegal shall request designated staff, in consultation with the Paralegal, schedule a meeting with the requesting inmate to resolve the issue(s).

    1.4.2    If the request does not involve a qualified legal claim, the Paralegal shall not provide assistance and shall return the request for assistance to the inmate through designated staff. If possible, the Paralegal shall direct the inmate to where assistance for a non-qualified claim exists.

1.5    The Paralegal shall keep a copy of the request.

1.6    Designated staff shall work with security staff and the Paralegal in scheduling days and hours when the Paralegal is scheduled to meet with inmates, based upon inmate population, the volume of requests, quick access, court deadlines and appropriate attention to security issues.

1.7    Designated staff shall schedule an appointment, in consultation with the Paralegal, and notify both the Paralegal and the inmate by completing the appointment section of the Inmate Request for Paralegal Assistance form and forwarding a notification copy to the inmate and to the Paralegal. Designated staff shall keep the file copy of the request and forward a copy to the Legal Access Monitor.

    1.7.1    Turn-outs for scheduled Paralegal meetings shall not be suspended except when a legitimate security concern exists to do so.

1.8    Paralegals shall meet with inmates to provide necessary assistance with preparation of the initial pleading for filing. However, for Arizona inmates in other states who are serving sentences pursuant to Interstate Corrections Compact or concurrent custody agreements and who, in accordance with 1.11 of this section, request assistance with the preparation of an initial pleading, the Paralegal shall ensure one copy of the appropriate sections of legal references; forms and instructions are mailed to the inmate. The mailings shall be made by Interstate Corrections Compact staff at the Offender Operations expense.

    1.8.1    Paralegals shall <u>not</u> provide assistance beyond the initial filing stage. (See section 902.03, 1.2 of this Department Order for details concerning assistance provided by Paralegals.)

    1.8.2    The Paralegal may authorize designated staff to copy documents in accordance with section 902.05 of this Department Order by completing the appropriate authorization requests.

    1.8.3    The Paralegal may request additional meetings, as necessary. If additional meetings are required, designated staff shall schedule the meeting using a Paralegal Meeting Notification, Form 902-8.

    1.8.4    The Paralegal shall be available on an as needed basis, based on number of requests, type of request and possible deadlines. The schedule shall be determined by the Paralegal and designated staff.

1.9    Staff shall not retaliate against an inmate for requesting assistance from a Paralegal or for exercising any other legal privilege pursuant to this Department Order nor shall they retaliate against an attorney, agent of an attorney or any other person for exercising any privilege pursuant to this Department Order.

1.10    Designated staff and/or Paralegals shall:

    1.10.1    Direct questions concerning this inmate access to the courts system to the Legal Access Monitor.

1.10.2    Immediately report suspected abuses of this inmate access to the courts system to the Warden or Deputy Warden for review and resolution, ensuring the Legal Access Monitor is also advised.

1.11    Arizona inmates in other states who are serving sentences pursuant to Interstate Corrections Compact and concurrent custody agreements may, upon written request addressed to the Offender Services Bureau Administrator, receive Paralegal assistance for a qualified claim. Upon receipt of the inmate's written request, the Administrator shall notify the Legal Access Monitor. The Legal Access Monitor shall forward the inmate's request to a Paralegal, who shall provide assistance, via the mail, for post-conviction relief claims and condition of confinement/civil rights claims which arose in Arizona. Any claim pertaining to conditions of confinement outside of Arizona shall be filed in the state where the inmate is confined. The mailings shall be made by Interstate Corrections Compact staff at the expense of Offender Operations.

902.05    **QUALIFIED LEGAL CLAIMS COPYING** - (See Attachment E, Qualified Legal Claims Copying Process.) All requests for copying involving qualified legal claims, except as provided in section 902.05, 1.10, shall be reviewed by the Paralegal prior to copying by using the following process:

1.1    To request photocopies, the inmate shall complete the appropriate section of a Request/Authorization for Qualified Legal Claim Copying, Form 902-2, and shall submit the request with the documents to be copied attached (including a copy of the pleading if the documents to be copied are intended as an attachment), in person, to designated staff. Failure to attach sufficient documentation to enable the Paralegal to determine if documents are qualified may result in a delay or return of the request to the inmate. The Paralegal shall deny a request which is vague or does not substantiate a qualified legal claim. It shall then be necessary for the inmate to submit another request with sufficient documentation.

1.1.1    In the event the inmate is obtaining active assistance from the Paralegal and has completed the pleading in the presence of the Paralegal, the Paralegal shall complete the Request/Authorization for Qualified Legal Claim Copying form and submit it with the pleading directly to designated staff for photocopying.

1.2    Designated staff shall sign and date the form and provide the inmate a copy of the request as a receipt.

1.3    Designated staff shall forward the packet to the Paralegal.

1.4    The Paralegal shall review the packet to determine which documents shall be copied and how many copies are to be made. Documents which violate prison rules (i.e., gang symbols, instructions regarding illegal activities, etc.) shall not be copied.

1.5    If Department Order compliance interpretation is needed then the Paralegal shall consult with the Legal Access Monitor.

1.6    The Paralegal shall complete the request and, within three work days of receipt, shall return the packet to designated staff.

1.7    Designated staff shall:

1.7.1     Make photocopies in accordance with the Paralegal's notation on the request form, ensuring the inmate has paid for the copies or the account has been placed on hold in accordance with section 902.06 of this Department Order. Photocopies shall be made, if possible, within three work days of designated staff receiving the request form back from the Paralegal. Extra time may be necessary for extensive copying requests.

     1.7.1.1     All legal documents, such as, but not limited to, pleadings, briefs, motions, affidavits, copies of case law, and licenses submitted for photocopying shall not be censored, but may be read to the extent required to establish the contents of the document do not contain contraband.

     1.7.1.2     All legal matters, other than legal documents, namely and especially letters to or from an inmate's attorney, to or from a judge, or to or from a court of law, which are submitted for photocopying, shall not be read or censored, but may be scanned to the extent necessary to establish the letters which do not contain contraband.

1.7.2     Refrain from photocopying any documents, if so instructed by the Paralegal.

1.7.3     Arrange for a meeting between the Paralegal and the inmate, if so instructed by the Paralegal.

1.8     Designated staff shall keep a copy of the request and:

1.8.1     Forward a copy of the Request/Authorization for Qualified Legal Claim Copying form, together with the photocopied material, to the inmate.

1.8.2     Return the material, above, to the inmate if the request was denied.

1.8.3     Forward the Inmate Request for Withdrawal, Form 905-1, to the Business Office in accordance with section 902.06 of this Department Order, if the material is to be photocopied.

1.8.4     Forward a copy of all requests for qualified legal claim copying to the Legal Access Monitor on a monthly basis.

1.9     The Paralegal's decision is final. Inmates may present concerns regarding qualified legal claim copying to the Legal Access Monitor through designated staff using the Inmate Letter, Form 916-1.

1.10     The inmate shall be responsible for payment for copies in accordance with section 902.06 of this Department Order, except the inmate may choose to pay for copies relating to qualified legal claims in accordance with section 902.07 of this Department Order. In this event, the documents do not require the Paralegal's review.

1.11     If the copies do not relate to a qualified legal claim, the inmate may request copies be made in accordance with section 902.07 of this Department Order as non-qualified legal documents or non-legal documents.

1.12    Telephonic review of qualified legal copying requests may be done when designated staff and the Paralegal determine it necessary based upon time frames (e.g., verified impending court deadlines, date of Paralegal's next visit to the unit, etc.)

1.13    There is no requirement for the Paralegal to meet in person with the inmate to review a qualified legal copy request.

1.14    Requests for copies of Exhibits/Attachments shall have a legitimate pleading to support the copying of those documents.  Exhibits/Attachments shall also relate to the pleading. The Paralegal may deny copying of documents if they do not relate to a pleading in an active court case.

**902.06       CHARGES - QUALIFIED LEGAL CLAIMS** - All inmates shall be responsible for payment for services related to qualified legal claims.

1.1     For issues relating to qualified legal claims, the service requested shall be provided in accordance with the Paralegal's notation on the request regardless of the inmate's ability to pay. However, if the inmate has funds available, the cost of the service shall be deducted from the inmate's account. If funds are not available, the inmate's account shall be placed on hold in accordance with Department Order #905, Inmate Trust Account/Money System, until such time as the debt is paid.

1.2     Chargeable services include, but are not limited to:

        1.2.1    Qualified legal claim photocopying, including required court forms, other attachments or other documentation.

        1.2.2    Notary services related to qualified legal claims, or as required by statute or court rules.

        1.2.3    Court forms listed on Attachment B. (There is no charge for the initial form requested, or for one subsequent request on the same pleading.)

1.3     An inmate who is requesting any service relating to qualified legal claims shall complete and deliver to designated staff an Inmate Request for Withdrawal form in the amount necessary to completely pay for the requested service at the time designated staff perform the service or arrange for delivery of the service. For photocopies, the Request/Authorization for Qualified Legal Claim Copying form shall be required.

1.4     Designated staff shall submit the Inmate Request for Withdrawal form to the Business Office when the service has been provided to the inmate. Designated staff shall indicate on the Inmate Request for Withdrawal the service is for qualified legal claims.

1.5     The Business Office shall:

        1.5.1    Upon receipt of the Inmate Request for Withdrawal form, ensure if funds are available the inmate's account is debited or the inmate's account is placed on hold.

        1.5.2    Ensure the Inmate Request for Withdrawal form serves as documentation for the hold or request for payment.

        1.5.3    Ensure funds collected are deposited in the appropriate account in accordance with Department Order #905, Inmate Trust Account/Money System.

1.6     The charge for any document is $.10 per printed side (excluding those provided at no charge as outlined in 1.2.3 of this section), including copies of court forms listed on Attachment B, a photocopy of a document or form, or any other form published by another agency or court (normally available and provided by the Department).

1.7     The charge for notary public services shall be $1.00 per notarized document, pursuant to A.R.S. 41-316. Notaries related to statute or court required purposes shall be treated the same as qualified legal claims. The Paralegal or Legal Access Monitor can assist in determining these types of notaries.

1.8     The price charged for individual services, forms or copies shall be subject to periodic review and adjustment by the Director.

**902.07     NON-QUALIFIED LEGAL CLAIMS SERVICES** - (See Attachment F, Non-Qualified Legal Claims Copying Process.) Inmates shall be charged for all non-qualified legal claim photocopies as well as other services provided for in this section. Non-legal copying shall be done in accordance with Department Order # 910, Inmate Education and Resource Center Services.

1.1     Inmates who do not have sufficient funds to pay for the copies/service at the time requested shall be denied the service or copies.

1.2     All documents submitted for copying shall be in compliance with Department Order #909, Inmate Property, and are not to violate any other written instructions.

1.3     Chargeable items include:

        1.3.1     Non-qualified legal claim photocopies.

        1.3.2     Qualified legal claims photocopies were not copied, in accordance with the Paralegal's notation on the request.

        1.3.3     Names and address lists for federal or state courts. (See Attachment C for federal courts. State courts are available in the Legal Resource Center.)

        1.3.4     Notary Services related to non-qualified claims.

1.4     An inmate who wishes to purchase non-qualified claim photocopies or other immediately chargeable services shall complete an Inmate Request for Withdrawal form and request the assigned Correctional Officer III verify funds are available.

1.5     The Correctional Officer III shall verify the availability of funds and sign and date the Inmate Request for Withdrawal form in accordance with Department Order #905, Inmate Trust Account/Money System.

1.6     The inmate shall deliver the Inmate Request for Withdrawal form to designated staff within two work days of verification by the Correctional Officer III, together with the material to be photocopied. An inmate who wishes to copy non-qualified legal material shall complete a Request for Non-Qualified/Non-Legal Copying, Form 902-7, as well as the Inmate Request for Withdrawal form, and deliver the Request for Non-Qualified/Non-Legal Copying form, the Inmate Request for Withdrawal form and the documents to be photocopied to designated staff.

1.7     Designated staff shall determine if the copies are authorized in accordance with Department Order #909, Inmate Property, or other written instructions. If there is any question about the suitability of the copies, designated staff may consult with:

        1.7.1     His/her supervisor, the unit Deputy Warden or the unit Chief of Security.

1.7.2   The Legal Access Monitor or the Paralegal if it appears the copying may be legal in nature.

1.8   Any attempt by the inmate to have contraband documents copied shall result in denial of the request for copies and shall subject the inmate to disciplinary action.

1.9   Designated staff shall arrange for delivery of the service, copies or forms and submit the Inmate Request for Withdrawal form to the institution Business Office where the appropriate deduction from the inmate's account shall be made. Designated staff shall ensure the Inmate Request for Withdrawal form indicates it is for payment of non-qualified services or photocopies.

1.10   If at any time an inmate requests and receives copies or other service for which payment is due and the inmate's account has insufficient funds to pay, the account shall be placed on hold in accordance with Department Order #905, Inmate Trust Account/Money System. The hold shall remain in place until such time as the inmate has satisfied the obligation.

1.11   At no time shall non-qualified legal claims copying or non-legal copying take precedence over copying of documents relating to qualified legal claims.

1.12   All non-qualified legal matter copies shall be sold at $.10 per printed side.

1.13   Any other form published by another agency relating to a non-qualified legal claim, or to be utilized by the inmate for non-qualified legal claim purposes, which the inmate may require and the Department normally provides, may be sold at a charge of $.10 per printed side.

1.14   Court name and address documents shall be copied at a charge of $.10 per printed side.

1.15   The Notice of Claim required for property claims in accordance with Department Order #909, Inmate Property, shall be sold to inmates at a cost of $.10 per copy. This form is not to be used for any other purpose than as outlined in Department Order #909, Inmate Property.

1.16   Inmates who request Notary Public Services for non-qualified/non-legal matters shall be charged $1.00 per notarized document.

## 902.08   SPECIAL NEEDS INMATES

1.1   Accommodations shall be made, as needed, to ensure access to the courts for inmates with special needs, to include inmates who are illiterate, non-English speaking, and disabled.

1.1.1   Accommodation may include providing a tele-conference with a bilingual interpreter and the Paralegal.

1.2   Arrangements shall be made for inmates who have limited access to the unit Library to meet with Paralegals, to review legal resource materials, or to obtain forms or photocopies.

1.3   CDUs and Protective Custody units shall establish and maintain, within the unit, a collection of the required legal resource materials as identified in Attachment A.

1.3.1   The Warden shall designate a staff member to be responsible for those functions identified in section 902.03, 1.1 through 1.1.6 of this Department Order.

**902.09**         **LEGAL SUPPLIES**

1.1       Inmate stores shall stock only those items authorized by Department Order #909, Inmate Property. There shall be no special order items.

1.2       Inmates shall be provided legal supplies regardless of their ability to pay. If the inmate does not have funds available, a hold shall be placed on the inmate's account.

1.3       Inmates shall be charged the current inmate store price for any item received.

1.4       The amount of legal supplies provided per month to inmates who request them and do not have the funds to pay shall be:

    1.4.1       Pens - 1

    1.4.2       Pencils – 2

    1.4.3       Legal pad/writing tablet (size 8 1/2" x 11") - 2

    1.4.4       Pre-stamped, regular envelopes – 5 (marked with 'LEGAL MAIL')

    1.4.5       Manila envelopes – 5 (marked with 'LEGAL MAIL')

1.5       Additional legal supplies may be provided after a showing is made by the inmate which additional supplies are necessary in order to present or support a qualified claim. These additional items shall be issued on an individual basis.

    1.5.1       The Paralegal shall verify the inmate is actually working on a qualified legal issue before additional legal supplies are provided.

1.6       Legal supplies are those supplies actually used for qualified and non-qualified legal claims. The Department is not required to provide supplies for personal/private use.

1.7       In order for indigent inmates to receive or continue to receive monthly legal supplies they must demonstrate the supplies they have received are actually being used for qualified legal purposes. The Paralegal can assist in verifying actual qualified use of legal supplies.

**902.10**         **LEGAL PROPERTY** - Inmates shall be permitted to maintain personal legal books and materials in their housing location.  Inmates shall be provided with legal boxes regardless of their ability to pay.  If the inmate does not have funds available, a hold shall be placed on the inmate's account.  Inmates shall only be provided with sufficient boxes to properly store specific legal documents. Refer to Department Order #704, Inmate Regulations for further information concerning storage boxes.

1.1       Inmates are authorized to keep no more than three boxes of legal materials in their living area.

    1.1.1       The dimensions of each box shall not exceed 17-1/2" in length x 10-1/4" in height x 11-1/2" in width.

    1.1.2       The weight of each box shall not exceed 20 pounds.

    1.1.3       Each box of legal material shall be numbered in sequential order.

    1.1.4       All boxes, to include those in storage, shall have the inmate owners name and ADC number clearly written on the top and side of each box.

1.2 Legal materials in excess of the three boxes shall be stored by the Department. In order to store excess legal materials, inmates shall, in the presence of staff:

   1.2.1 Seal legal materials in a box, after staff inspection for contraband.

   1.2.2 Ensure their name and ADC number are written on the top and side of the box.

   1.2.3 Ensure the box of legal material is numbered in the next sequential order.

1.3 Inmates shall store and possess only their own personal legal materials. If staff discovers an inmate is storing or possessing other inmate's legal materials, staff shall return the legal materials to the owner regardless of whether or not disciplinary action is taken.

   1.3.1 If it is determined an inmate has drafted legal documents on behalf of another inmate, and those documents are being stored or possessed by the inmate who drafted them, those documents shall be confiscated and not given to the inmate whose name may be listed on the documents.

1.4 When an inmate wishes to exchange one box of legal material for another, the inmate shall:

   1.4.1 Notify the Property Officer by Inmate Letter, Form 916-1.

   1.4.2 Clearly indicate by number the box(es) to exchange.

1.5 The Property Officer shall exchange the box(es) of legal materials within three work days from the date of receipt of the request, which shall be date stamped as received.

1.6 The legal materials to be exchanged shall be inspected for contraband by staff and sealed in the presence of staff prior to exchange.

   1.6.1 Only sealed boxes shall be exchanged.

   1.6.2 A Checklist for Storage of Inmate Legal Materials, Form 902-9, shall be used any time legal materials are stored or exchanged.

   1.6.3 Completed forms shall be placed in the Inmate Property File within five work days.

1.7 Possession of legal material and/or legal texts or books shall be subject to the quantity limitations in accordance with Department Order #909, Inmate Property.

1.8 Compact discs sent in from attorneys shall be considered as legal materials and barring any security concerns shall be stored in the inmate's legal boxes.

## 902.11    LEGAL MAIL

1.1 Inmates shall identify outgoing legal mail by writing "Legal Mail" on the lower left-hand corner of the envelope.  (See Definitions for guidance on what constitutes "Legal Mail".)

1.2 Outgoing mail not labeled as legal mail shall be processed as regular mail.

1.3 All legal mail, outgoing or incoming, shall be logged.

1.4 Staff who process incoming or outgoing inmate mail shall:

   1.4.1 Generally identify all legal mail and record it on a log by indicating the inmate's name and the sender's name.

1.4.2 Inspect such mail for contraband, stamp the envelope "LEGAL MAIL, ARIZONA DEPARTMENT OF CORRECTIONS" using a commercial stamp, and log it before it is placed in the envelope and sealed by the inmate.

    1.4.2.1 All incoming mail, letters, memoranda, and documents, from an inmate's attorney or from a judge or court, shall be opened for inspection purposes in the presence of the inmate. Such incoming mail may be scanned in the conducting of an inspection for contraband, but shall not be read or censored by staff.

    1.4.2.2 All outgoing letters to an inmate's attorney or to a judge or court shall be brought to the mail room by the inmate, where the letter shall not be read or censored but shall be inspected for contraband and sealed in the presence of the inmate. All outgoing legal documents to an inmate's attorney or to a judge or court (other than letters to an inmate's attorney or to a judge or court, such as pleadings, briefs and motions) shall not be censored, but staff are not prohibited from reading such documents to the extent necessary to establish the absence of contraband.

1.4.3 Send legal mail as first class mail regardless of the inmate's ability to pay the required postage.

1.4.4 Submit names of inmates claiming to have inadequate funds for postage to the Business Office, indicating postage due from the inmate. The Business Office shall either debit the inmate account or, if there are insufficient funds to pay the postage, place a hold on the inmate account.

1.4.5 Return the mail to the inmate if he/she requests mail to be sent as legal mail and it is not to an attorney, judge or court. The inmate may request to have the Paralegal review the mail to determine whether it may be approved as legal mail. The Paralegal may contact the Legal Access Monitor for direction.

1.5 Designated staff who process incoming mail shall attempt to make a determination, based on an inspection of the envelope, whether the contents constitute legal mail. The return address may be indicative of whether the contents of the envelope constitute legal mail. Designated staff shall not rely solely on the words "legal mail" having been stamped on the envelope. If there is any serious doubt as to whether the contents of the envelope contain legal mail, designated staff shall contact the Legal Access Monitor for direction.

1.6 Staff suspecting abuse of the legal mail designation shall advise the Warden or Deputy Warden who shall take appropriate action following consultation with the Department's General Counsel.  An inmate who intentionally sends personal mail to a private address and falsely claims it is legal mail shall be subject to disciplinary action in accordance with Department Order #803, Inmate Disciplinary Procedure.

1.7 When applicable, staff shall take the following steps to locate inmates to whom legal mail is addressed and to forward such mail to the inmate.

    1.7.1 Use the Adult Information Management System (AIMS) and inmate records to locate any addressee of legal correspondence who is not located at the institution which received the correspondence, and to locate any inmate who has received legal mail which does not have an ADC number as part of the address.

1.7.1.1    Staff shall have inmates verify they are the person to whom the legal mail is addressed utilizing the inmate's identification card.

1.7.2    Forward any legal correspondence to any inmate addressee who is under commitment to or supervised by the Department.

1.7.2.1    Inmates, releasees and parolees receiving forwarded legal correspondence shall notify the sender of their new address.

1.7.3    When legal mail is forwarded, in addition to the requirements outlined in 1.4.1 of this section, the inmate's forwarding address and the date forwarded shall be logged.

1.7.4    Return legal correspondence to the sender only if the addressee is no longer an inmate, releasee or parolee, in which case the sender shall be advised of this fact.

**902.12    LEGAL PHONE CALLS** - Inmates who have retained counsel may make legal phone calls in accordance with the following:

1.1    Inmates shall communicate legal matters through the mail whenever possible.

1.2    Legal phone calls may be approved when it is reasonable and necessary to do so. Staff shall approve court-ordered telephonic conferences and ensure the inmate is provided the opportunity to participate in the conference.

1.2.1    Legal phone calls should not exceed 30 minutes in length. Additional time is permitted at the discretion of the Deputy Warden. Time limits do not apply to court-ordered telephonic conferences.

1.3    The Department shall not pay, reimburse or be responsible for the placement of inmate legal calls. All outgoing legal calls shall be collect.

1.3.1    Court-ordered telephonic conferences shall be placed at the Department's expense, using the in-state long-distance telephone service when necessary.

1.4    Inmates shall request legal calls 24 hours in advance, by submitting a Legal/Emergency Telephone Call Request, Form 915-2, through staff designated by the Warden or Deputy Warden.

1.4.1    Upon approval, the call then shall be scheduled.

1.5    Legal phone calls shall only be denied or suspended due to security concerns, provided an effective method of legal communication remains available to the inmate.

1.5.1    Legal phone calls shall not be denied as a form of discipline.

1.6    Legal phone calls shall not be monitored or recorded.

1.7    Staff shall not listen to the conversation, but shall maintain visual contact of the inmate when the inmate is in an area where security or information may be compromised.

1.8     Inmates who are acting Pro Se are not entitled to make legal calls unless instructed by the courts.

1.9     If an attorney requests a legal phone call with an inmate, staff shall contact the inmate first to determine if the inmate wishes the call.  Staff shall have the inmate complete the Legal/Emergency Telephone Call Request form to accept or refuse a legal call from the requesting attorney.

## 902.13     LEGAL VISITS

1.1     Attorney/Agent of an Attorney Visits

1.1.1     Attorney or agent visits shall be held in a location within the institution designated by the Warden, Deputy Warden or Administrator of the institution.

1.1.2     Attorneys or their agents shall contact the Warden, Deputy Warden or Administrator at least 48 hours in advance of the requested visit and provide their name and date of birth. Attorneys shall also provide their Bar number.

1.1.3     Contact or non-contact visits by attorneys or their agents shall be allowed (consistent with the safe, secure and orderly operation of the institution) only when they are approved in advance by the Warden, Deputy Warden or Administrator.

1.1.4     In an emergency, the Warden, Deputy Warden or Administrator may waive the advance notice requirement.

1.1.4.1     In such cases, the attorney or agent shall provide, at the time of the visit, written justification for the emergency.

1.1.4.2     When a justified emergency exists, space for the visit shall be provided, consistent with the safe, secure and orderly operation of the institution.

1.1.5     Attorneys and agents shall be advised the inmate shall be questioned to determine if the inmate wishes to meet with the requesting attorney or agent.

1.1.6     If the inmate agrees to meet with the attorney or agent, the visit shall be approved and scheduled.

1.1.7     If the inmate does not wish to meet with the attorney or agent, the attorney or agent shall be contacted within the same 48 hour period of the initial request and informed the visit has been denied. The appropriate staff member shall ensure a Visitation Waiver, Form 911-2, is completed in accordance with Department Order #911, Inmate Visitation.

1.2     Agents of an Attorney Restrictions - The attorney shall understand he or she is ultimately responsible for the actions of his or her agent.

1.2.1     The Warden, Deputy Warden or Administrator may exercise his or her discretion in permitting an agent to meet with an inmate. Any denial shall be for good cause and the Warden, Deputy Warden or Administrator shall be prepared to provide a reason for the denial.

        1.3      <u>Visits Under Court Order</u> - Persons acting under a court order shall contact the appropriate unit staff to arrange a visit with an inmate. An original certified copy of the court order shall be provided by such person to the appropriate unit staff for inclusion in the inmate's Visitation, Institutional and Master File.

# IMPLEMENTATION

Wardens shall provide written direction which addresses the following, at a minimum:

- Identification of designated staff for carrying out responsibilities and processes required by this Department Order.

- Specific process for copying qualified, non-qualified, and non-legal materials.

- Specific process for submission of the Inmate Request for Paralegal Assistance and related documents to include charging for fax service.

- Process for legal resource and text check-out and monitoring, to include a specified period of time for check out.

- Allocation of space for Paralegal activities and/or storage of materials.

The assigned staff member at each institution shall notify the Legal Access Monitor of such directions, for final approval prior to implementation.

# DEFINITIONS

**ACCESS TO THE COURTS** - Inmates shall not be barred from the courts and the Department shall, when written requests are made, actively assist inmates in the preparation and initial filing of (1) direct appeals from the convictions for which they were incarcerated, (2) Habeas petitions, (3) '1983 Civil Rights actions, and (4) Conditions of Confinement actions.

- Active Assistance - Assistance provided to inmates by Paralegals.

- Passive Assistance - Assistance available to inmates through resource materials to which they are directed.

**AGENTS OF AN ATTORNEY** - Individuals who are authorized by a licensed attorney to act on behalf of, for or in place of the attorney, and who are directed to visit an inmate on behalf of, or in place of an attorney.

- To demonstrate a bonafide agency relationship with an attorney, pursuant to this Order, an individual shall have documented (written) authorization by the attorney to act on behalf of, for or in place of the attorney. The written authorization, signed and dated by the attorney shall:

  - Expressly set forth the specific nature of the duty or duties in accordance with which the agent purports to act on behalf of, for or in place of the attorney.

  - Outline the general nature of the visit.

  - Be notarized.

- Agents may include private investigators, licensed in accordance with A.R.S. section 32-2401; Paralegals; law students; secretarial staff and duly appointed process servers.

- Agents shall not include anyone who is on an inmate's visiting list.

**ATTORNEY** - An attorney-at-law licensed to practice in any state or federal jurisdiction.

- Who has entered into or may in the future enter into an attorney-client relationship with the inmate or has been appointed to represent the inmate, as evidenced by court record, court order or by the inmate's written authorization.

- Shall not include anyone who is on the inmate's visiting list.

**CIVIL RIGHTS** - Rights guaranteed by the United States Constitution.

**DEBIT** - An immediate withdrawal of funds from an inmate's account.

**DESIGNATED STAFF** - Any Department Employee(s) appointed by the Warden to be responsible for such duties as outlined in this Department Order.

**HABEAS CORPUS** - A writ by which a party attempts to obtain release from confinement.

**HOLD** - An obligation owed by an inmate which restricts inmate funds until the obligation is collected.

**INITIAL FILING** - The filing of a pleading or petition with a court of law to begin a legal action in court. An initial filing also includes the filing of all notices or other documents which may be required prior to the filing of the pleading or petition, including the initial filing of amended complaints or petitions.

**LEGAL ACCESS MONITOR** - A Department employee with Paralegal training, located in the Legal Services Unit at Central Office.

**LEGAL CALL** - Unmonitored telephone calls made by an inmate to the inmate's attorney or an agent of the attorney, for legal purposes, which have been scheduled according to Department Orders as legal calls. Court-ordered telephonic conferences with the court are also unmonitored calls and are made at the Department's expense on the state's long-distance service, when necessary.

**LEGAL MAIL** - Any letters to or from an inmate's attorney as defined above, or to or from a judge or to or from a court of law.

**NON-QUALIFIED LEGAL CLAIMS** - Any legal claims which do not fall under the definition of QUALIFIED LEGAL CLAIMS. These include divorce, child custody, paternity, name change, etc.

**PARALEGAL** - An independent contractor who has obtained a diploma/degree/certificate from an accredited Paralegal school who has met the American Bar Association (ABA) approval, or possesses three or more years verifiable full-time Paralegal experience. The Department shall contract in accordance with Department Order #302, Contracts and Procurement, to obtain the services of qualified Paralegals. Individuals who have graduated from law school but have never been licensed to practice law in any jurisdiction may serve as Paralegals.

**PETITION** - A written request the court exercise for its authority to redress a wrong.

**PLEADING** - For the purpose of this Department Order, a pleading refers to a Notice of Appeal pursuant to Ariz.R.Crim.P. 31.2; the initial filing of a Petition for Post-Conviction and related forms, pursuant to Ariz.R.Crim.P. 32; a Petition for Review pursuant to Ariz.R.Crim.P. 31.19; a Petition for Review pursuant to Ariz.R.Crim.P. 32.9(c); a Petition for Review pursuant to Ariz.R.Crim.P.31.19 and 32.9(g); a Petition for Writ of Habeas Corpus in state or federal court; and a Civil Rights complaint or Condition of Confinement complaint in state or federal court.

**POST-CONVICTION RELIEF (RULE 32, ARIZONA RULES OF CRIMINAL PROCEDURE)** - The process through which a party seeks relief from a sentence imposed on the party by a court of law.

**QUALIFIED LEGAL CLAIMS** - In the direct appeal, any claim of error; in the Post Conviction Relief proceeding, any non-precluded claim set forth in Ariz.R.Crim.P.32; and in federal court, any claim of error based on a violation of the federal constitution or law. Forms include the Notice of Appeal from the Superior Court (Ariz.R.Crim.P.31.2(a); Notice of Post-Conviction Relief, Request for Preparation of Post-Conviction Relief Record, and Petition for Post-conviction Relief (Ariz.R.Crim.P. 32);Petition for Review (Ariz.R.Crim.P. 32.9(c)); Petition for Review (Ariz.R.Crim.P. 31.19 and 32.9(g)); Petition for a Writ of Habeas Corpus in state or federal court; and a civil rights action or condition of confinement claim (42 U.S.C. ' 1983).

**WRIT** - A written judicial order to perform a specified act or giving authority to have a specified act done.


{Original Signature on File}


_____

Charles L. Ryan
Director


**FORMS LIST**
902-1, Inmate Request for Paralegal Assistance
902-1S, Solicitud De Preso Para Ayuda De Paralegal
902-2, Request/Authorization for Qualified Legal Claim Copying
902-3, Paralegal Activity Log
902-4, Contract Paralegals – Unit Sign-In Log
902-7, Request/Authorization for Non-Qualified/Non-Legal Copying
902-8, Paralegal Meeting Notification
902-9, Checklist for Storage of Inmate Legal Materials

**ATTACHMENTS**
Attachment A, Legal Texts and Resource Material
Attachment B, Court Forms Packets
Attachment C, Federal Appellate/District Courts and State Appellate Courts
Attachment D, Paralegal Assistance Request Process
Attachment E, Qualified Legal Claims Copying Process
Attachment F, Non-Qualified Legal Claims/Non-Legal Copying Process

# AUTHORITY
*Lewis v. Casey,* 116 S. Ct. 2174 (1996)

**ATTACHMENT A**
**DEPARTMENT ORDER 902**

**LEGAL TEXTS AND RESOURCE MATERIAL**

The following legal texts and legal resource material may remain for use by inmates and shall be placed in the Reserve/Reference section of the General Library of each unit:

1.      A complete set of Arizona Revised Statutes (non-annotated)
2.      Arizona Revised Statutes (annotated), Volumes 5, 5A, 5B and 5C
3.      Arizona Rules of Court - State
4.      Arizona Rules of the Court - Federal
5.      Federal Civil Judicial Procedure and Rules
6.      Federal Criminal Code and Rules
7.      A complete set of Department Orders or access to authorized computer-generated copies (General Access Department Orders only)
8.      The Classification Manual
9.      U.S. Code: 28 U.S.C. Section 2254
10.     U.S. Code: 42 U.S.C. Section 1981 through 42 U.S.C. Section 2000e-1
11.     Black's Law Dictionary
12.     Rights of Prisoners 4th
13.     The Law and Policy of Sentencing and Corrections 9th Ed.
14.     Post-Conviction Remedies (Means)
15.     U.S. Constitution (articles and amendments)
16.     Arizona Legal Forms Book - Criminal Procedure.
17.     Lewis v. Casey
18.     Prisoner's Handbook (Rule 32) (Petitions for Post-Conviction Relief)
19.     The Civil Rights of Institutionalized Persons Act (CRIPA) settlement agreement (Female units only)

Note: <u>Any deletions or additions to the above list will be subject to the approval of the Director of the Department of Corrections</u>.

**ATTACHMENT B**
**DEPARTMENT ORDER 902**

### COURT FORMS PACKETS

The following court documents and forms shall be available in Legal Resource Centers. The Legal Access Monitor will provide current copies to Designated Staff as needed.

1. Arizona State Courts - Self-Help Resources
2. Federal Section 1983 Forms Packet
3. Federal Petition for Wit of Habeas Corpus by a Person in State Custody Forms Packet
4. State Notice of Post-Conviction relief (Pursuant to Rule 32 of the Rules of Criminal Procedure)
5. State Notice of Appeal from Superior Court
6. State Petition for Post-Conviction Relief (Pursuant to Rule 32 of the Rules of Criminal Procedure)
7. State Request for Preparation of Post-Conviction Relief Record
8. State Court Complaint
9. Petition for Review, Arizona Rules of Criminal Procedure, Rule 31.19(a)
10. Petition for Review, Arizona Rules of Criminal Procedure, Rule 32.9(c)
11. Petition for Review, Arizona Rules of Criminal Procedure, Rule 31.19 & 32.9(g)
12. State and Federal Notice of Change of Address Forms
13. State Certificate of Compulsory Arbitration
14. State Deferral or Waiver of Court Fees and Costs (State) Forms
15. State Deferral or Waiver of Appellate Court Fees and Costs Forms
16. Mandatory Civil Cover Sheet (Maricopa County)

**ATTACHMENT C**
**DEPARTMENT ORDER 902**

**ARIZONA DEPARTMENT OF CORRECTIONS**
**Federal Appellate/District Courts and State Appellate Courts**

**UNITED STATES COURTS**

Supreme Court of the United States
1 First Street, N.E.
Washington, D.C. 20543

**Phoenix:**

United States Ninth Circuit Court of Appeals
401 W. Washington Street
Phoenix, AZ 85003-2118
                    OR

P.O. Box 193939
San Francisco, CA 94119-3939

United States Bankruptcy Court
401 W. Washington Street
Phoenix, AZ 85003-2118

District Court of Arizona
United States Courthouse
401 W. Washington Street
Phoenix, AZ 85003-2118

**Tucson:**

District Court of Arizona
United States Courthouse
405 W. Congress Blvd
Tucson, AZ 85701-1711

**STATE APPELLATE COURTS**

Supreme Court of Arizona
State Courts Building
1501 W. Washington
Phoenix, AZ 85007

**Phoenix:**

Court of Appeals Division 1
State Courts Building
1501 W. Washington, Second Floor
Phoenix, AZ 85007

**Tucson:**

Court of Appeals Division 2
State Office Building
400 W. Congress
Tucson, AZ 85701-1374

**ATTACHMENT D**
**DEPARTMENT ORDER 902**

### PARALEGAL ASSISTANCE REQUEST PROCESS



(1)   Qualified Legal Claim at the Initial filing stage.

(2)   If the Paralegal is unsure whether issue meets the criteria he/she will request a preliminary meeting with the inmate to discuss the issue prior to approving or denying the request.

(3)   See D0 902, section 902.07, Non-Qualified/Non-Legal Claims.

\* Copy of form to inmate.

\*\* Paralegal keeps copies of forms.

\*\*\* Copy of form to inmate, Paralegal, file, and Legal Access Monitor.

JULY 6, 2013

**ATTACHMENT E**
**DEPARMENT ORDER 902**

### QUALIFIED LEGAL CLAIMS COPING PROCESS



*         Return one copy of the form to the inmate.
**        Keep copy of the form.
***       Copy of the form to the inmate, copy to the Legal Access Monitor, copy to the file.

JULY 6, 2013

**ATTACHMENT F**
**DEPARTMENT ORDER 902**

### Non-Qualified Non-Legal Claim Copies



(1)  Item requested for copying does not violate any
requirements at prohibitions established in
Department Orders or other written instructions.

* Copy of form to inmate, copy for file.

JULY 6, 2013

# EXHIBIT 2

# ARIZONA DEPARTMENT OF CORRECTIONS
## LEGAL SERVICES OFFICE
### MEMORANDUM

TO:             Robert Patton, Offender Operation Division Director

FROM:           Julia Erwin, ADOC, Legal Access Monitor

THRU:           Dawn Northup, ADOC, General Counsel

DATE:           09/17/2013

SUBJECT:        Arizona State Prison Complex / Operations
                Legal Mail

It is recommended that per Departmental Order 902.11, specifically subsections 1.4.2.1 and 1.4.2.2, mail arriving from the following entities without an individual specific attorney as part of the return address is not considered Legal Mail for confidentiality purposes:

- NAACP
- Justice Project
- ACLU
- Arizona Center for Disability Law
- Prison Law Office

Definition for legal mail is defined as "All letters to/from an inmate's attorney, to/from a judge or to/from a court of law". A "Legal Mail" stamp placed on envelopes by/from the above entities without a specific attorney included in the address shall not be considered privileged Legal Mail. Mail from the above entities not meeting the above standard should be opened and inspected by Complex Mail Room staff, and processed as regular mail. Mail from these entities that identify a specific attorney in the return address should continue to be processed as Legal Mail. Inmates acting in Propria Persona (Pro Se) should continue to have their documented legal agent's written communications treated with confidentiality privileges.

PLTF-PARSONS-030526

# EXHIBIT 3

# NATIONAL ASSOCIATION for the ADVANCEMENT of COLORED PEOPLE



**MARICOPA COUNTY BRANCH**
P.O. Box 20883 * Phoenix, Arizona 85036-0883
Telephone: (602) 252-4064
Fax: (602) 252-2954

9 September 2013

Director Charles Ryan
Arizona Department of Corrections
1601 W Jefferson St
Phoenix, AZ 85007

  Re: Treatment of LGBTI prisoners

Dear Director Ryan,

We contact you today as civil rights organizations and persons who are concerned about the treatment of LGBTI prisoners in the Arizona Department of Corrections. We hope that we can resolve this issue with the Department through a consultative, community participation process that results in a win/win solution.

We have complaints from eighteen LGBTI prisoners. The complaints come from Lewis, Tucson, Florence, Yuma, and Eyman, and from several different yards within those prisons. Complainants report having been moved multiple times and encountering similar problems across the prison system. Thus the problem seems to be widespread and statewide.

The complainants are four Caucasians, five Mexican-Americans, five Native Americans, two Mexican Nationals, and two African-Americans. Eleven identify as gay and seven as transgender persons. Of the seven transgender prisoners, five identify as Native American, one as Mexican- American, and one as Caucasian. Because almost all of the transgender complainants are Native American, we think perhaps there may be ethnic discrimination occurring here as well as LGBTI discrimination.

Of those complainants, fourteen have made requests for protective segregation, and four were already approved for PC as of the time they contacted work group members. Of those fourteen who have requested PC, only six have been approved (two within the past two weeks who remain in detention cells awaiting placement). Most of those approvals for PC occurred only after numerous denials and aggressive intervention from the outside. Eight prisoners are still trying to get into safer housing. Eleven of the PC requesters report that they have already been victims of prison violence; the rest have at least been threatened with violence.

Eight of the PC requesters received at least one violation for Refusing to House when staff declined to process their refusal as an 805 request instead. Refusing to house is a major disciplinary violation, which increases prisoners' custody levels and has resulted in seven of the eighteen gay/trans prisoners being housed in maximum security settings, (six in the Supermax facility, and one in Florence Central). It's questionable how many of those maximum security placements are appropriate, especially since three gay/trans individuals so placed are scored as medium security prisoners.

Danger to LGBTI persons in correctional institutions.

It is undisputed that prison is a very dangerous place for the LGBTI population, and that they are extremely vulnerable inmates for whom the prison administration must take special care to protect. Jamie Fellner, a member of the national PREA commission, stated, " (T)hat pervasive sexual violence in prison happens because of poor management, bad policies, and a lack of commitment to preventing it."[1]   Two main concerns are initial placement for transgendered and intersex persons (male or female prisons) and placement in general or protective custody.  [2]  Obviously, ADOC is well aware that homosexuals are targeted for physical, sexual or verbal abuse in prison as this was your argument for your policy in *Whitmire v. Arizona*, 298 F.3d 1134 (9th Cir. 2002).

Some prisoners state that they do not want protective custody because it makes them more vulnerable to harassment and assault by correctional officers and it restrains their liberty and access to vocational and recreational programs.  *Doe v. Bell*, # 112508/02, Supreme Court of the State of NY, County of NY, January 7, 2003, ruled that it's not enough to provide one small place for LGBTI to go to, the institution must provide safety for all inmates in all places.

Every person who was interviewed in the study reported some form of harassment and/or assault during imprisonment including verbal harassment, physical and sexual assault, humiliation, prostitution and rape by guards and other employees as well as by prisoners often with the tacit permission of the guards.  Group showers were extremely dangerous for this population.

Forced sexual acts puts the LGBTI population at extremely high risk for sexually transmitted diseases, especially when condoms are prohibited, including HIV and hepatitis, both of which are widespread in U.S. correctional facilities.  Many LGBTI prisoners who were infected then complained of denial of basic care and discriminatory providers.  Untreated transsexual prisoners have a suicidality of 20-30%, which is reduced to 1-2% after treatment. [3]

Joseph Eldridge, # 14748 has filed a very similar complaint against AZ DOC on April 30, 2013, 2:13-cv-00888-DGC-AFM, alleging sexual victimization, physical assault and complicity by the guards.

In 2011-12, an estimated 4.0% of state and federal prison inmates and 3.2% of jail inmates reported experiencing one or more incidents of sexual victimization by another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months. Patterns of inmate-on-inmate sexual victimization in 2011-12 were consistent with patterns in past surveys. Rates reported by prison and jail inmates were higher among females than males, higher among whites than blacks, and higher among inmates with a college degree than those who had not completed high school. Among state and federal prison inmates, an estimated 6.3% of those identified with serious psychological distress reported that they were sexually victimized by another inmate. In comparison, among prisoners with no indication of mental illness, 0.7% reported being victimized by another inmate.[4]

---

[1] Stop Prison Rape Now, Jamie Fellner, The Daily Beast, Sept. 4, 2013.
[2] It's War in Here, A report on the treatment of transgender and intersex people in New York State Men's Prison, Silvia Rivera Project, 2006.
[3] Ibid. p. 26
[4] Sexual Victimization In Prisons And Jails Reported By Inmates, 2011-12, Allen Beck, Ph.D., BJS Statistician, Marcus Berzofsky, Dr.P.H., Rachel Caspar, Christopher Krebs, Ph.D., RTI International, May 16, 2013, NCJ 241399

Among heterosexual males, an estimated 3.5% reported being sexually victimized by another inmate. In comparison, among males who were bisexual, 34% reported being sexually victimized by another inmate. Among males who were homosexual or gay, 39% reported being victimized by another inmate.[5]

Female heterosexual inmates reported lower rates of inmate-on-inmate victimization (13%) and staff sexual misconduct (4%) than female bisexual inmates (18% and 8%, respectively).  Among female homosexual or lesbian inmates, the rate of inmate-on-inmate sexual victimization was similar to that for female heterosexual inmates (13%), while the rate of staff sexual victimization was at least double (8%) that for female heterosexual inmates (4%).

The rate of inmate-on-inmate sexual victimization for males was higher among non-Hispanic white inmates (5.9%) and inmates of two or more races (9.5%) than non- Hispanic black inmates (2.9%).  Among male former state prisoners, the rates of staff sexual misconduct were higher for those of two or more races (11.3%) and black non-Hispanics (6.5%) than for white non-Hispanics (4.5%) and Hispanics (4. 0%).

The rate of staff sexual misconduct was higher for male inmates ages 20 to 24 (7. 9%) than for male inmates ages 25 to 34 (5.2%), ages 35 to 44 (3.5%), and age 45 or older (2.0%).  Among female former state prisoners, rates of staff sexual misconduct were lower for those ages 35 to 44 (3.1%) and age 45 or older (1.6%), compared to those ages 20 to 24 (6.7%).

Most victims of staff sexual misconduct (87%) reported only perpetrators of the opposite sex. Among victims of staff sexual misconduct, 79% were males reporting sexual activity with female staff. An additional 5% were males reporting sexual activity with both female and male staff.  Among male former inmates, inmate-on-inmate and staff-on-inmate victimization rates were higher in facilities under a court order or consent decree, higher in facilities reporting a major disturbance in the twelve months prior to the most recent facility census, higher in facilities with medium or greater security levels, and higher in facilities with a primary function of housing general population than in facilities without these characteristics.  Among former inmates who had been tested for HIV (90%), those who had been sexually victimized by other inmates or by staff had significantly higher percentages for HIV positive (6.5% and 4.6%, respectively) than those who had not been victimized (2. 6%).

From this U.S. government data, it is clear that both men and women are at risk from both inmates and guards. White men are more at risk from inmates, men of color from guards.  The LGBTI population, both male and female, is at higher risk than the heterosexual population.

The Center for Evidence-Based Corrections at the University of California-Irvine examined violence in correctional centers finding in 2007 that 41 percent of transgender inmates face violence, compared to two percent among a random sample of inmates in the same California prisons. Nationwide, the Bureau of Justice Statistics said in a report recently that an estimated four percent of state and federal prison inmates were sexually victimized by prison staff between 2011 and 2012. The rate of sexual victimization among prisoners themselves was lower: 2.4 percent. [6]  Thus it is clear that inmates are more at risk from staff than from inmates. Yet, you do not report staff on inmate violence on your website assault reports.

[5] Sexual Victimization Reported by Former State Prisoners, 2008, U.S. Department of Justice , Office of Justice Programs, *Bureau of Justice Statistics,* Allen J. Beck, Ph.D., *BJS Statistician,* Candace Johnson, Ph.D. , *Principal Research Scientist, NORC ,* May 2012, NCJ 237363

[6] A Decade in the Making: Revamped Policy Evaluates Transgender Prisoners in Illinois Corrections Department policy addresses potential vulnerability or predatory risk By Alison Flowers The Medill Justice Project Published: May 29, 2013.

The Department of Justice released a report in 2009 [7] looking at ways to prevent staff sexual abuse of prisoners since it is a crime to engage in any sexual contact with or without "consent". Such action puts the employee at risk of criminal charges and administrative discipline. Such personnel have been found to have also engaged in other prohibited practices such as providing contraband, accepting bribes, and lying to investigators.

The Prison Rape Elimination Act of 2003 (PREA) makes it a top priority for prison officials to prevent sexual abuse. Yet at the Bureau of Prisons (BOP), allegations of misconduct doubled from 2001-2008, faster than the growth of prisoners or personnel. These allegations were at 92 of 93 BOP sites and against every occupational category except human resources. The occupational categories that had the highest rates of allegations were food services, recreation, and education and vocational training. They also found that the majority of allegations (65 percent) involved accusations of criminal sexual abuse rather than non-criminal sexual misconduct.

They pointed out that simply segregating and then transferring victims can have negative impacts on them and reduce their willingness to report abuse again and to cooperate with investigations. In effect, the institution was punishing the victim rather than the perpetrator. Many of our complainants have stated the same problem. When they refuse to house with a dangerous inmate, they are punished with an increase in their score, or sent to the special management units, resulting in inappropriate use of maximum security cells. Such use of maximum-security cells would violate *DOES v. Terry Stewart*, CIV 96-0486 PHX WFN 13 July 2000. *Does* was a class action of all protective segregation inmates and the DOC was permanently enjoined from transfer of protective segregation inmates to maximum security GP yards.

One part of the mandated plan included that "No inmate will ever be forced into general population." Many of complaints we have received are about being forced to remain in the general population after the inmate has reported an assault.[8] Nearly every one of these inmates was repeatedly assaulted while being denied 805 status.

The plan specifies that even if there is no verified information suggesting a need for protection, or the victim cannot identify the attacker the staff has to investigate, evaluate and protect the victim. That is not happening. (MR) Policy 805.1, 1.2.1.2 says that inability or unwillingness to identify the perpetrator cannot be the sole reason to exclude from protection. Thus, obviously it is being used as one criteria, which is not permitted under PREA standards.

According to the agreement, every inmate who requires protection receives it at once and for as long as it is needed, they must be immediately placed in secure segregated housing, staff are required to use specified criteria in their assessment, each decision must be documented, well-reasoned and reviewed. In the MR case, the refusal simply states "no evidence" but shows no indication that any specified criteria were used or what investigation had been done. That kind of blanket denial does not meet the requirement of a "well-reasoned" decision. In the MR case, apparently on appeal the committee said there were other options, but did not outline what those were.

The Department of Justice report made a series of recommendations including:
    Create an alternative to automatically isolating and transferring prisoners that allege abuse;
    Develop procedures to ensure that victims receive appropriate psychological and medical assessments;
    Trainings for staff be updated and strengthened;

---

[7] The Department of Justice's Efforts to Prevent Staff Sexual Abuse of Federal Inmates, September 2009, U.S. Department of Justice, Office of the Inspector General Evaluation and Inspections Division, Report Number I-2009-004.
[8] Communications on file for ten different prisoners.

Policies and procedures be revised to give specific guidance on protocol to respond to sexual abuse allegations and for victim services;

Regularly assess the implementation of the program.

Male prison society obviously puts transgender and gender-variant prisoners with feminine characteristics at great risk. [9] Prison staff and authorities must share the blame as well because they create the conditions of confinement that foster and perpetuate this violent prison society, and even go so far as to collude with perpetrators to victimize LGBTI prisoners and others for whom they have particular disdain.  In fact, the famous case of *Farmer v. Brennan*, 511 U.S. 825 (1994) that created the "deliberate indifference" standard was on behalf of a transgender victim of physical and sexual assault.

When officials do investigate allegations of sexual assault, they often disbelieve complaints reported by gay or bisexual prisoners, they often conclude no rape occurred if there are no wounds from a fight, they fail to provide medical care and counseling to the victim, and if they discipline the perpetrator, he often ends up back in the same housing area as the victim exposing the survivor to retaliation.

Human Rights Watch (HRW) also found that prison staff tends to single out the LGBTI community for harassment.[10]  Like BOP, HRW found that internal control procedures were lacking, victims were exposed to further harassment and retaliation, the process was riddled with conflict of interests and violations of confidentiality were rampant.  Clearly an outside panel is necessary to review procedures and audit results.

In addition to sexual assaults, LGBTI prisoners often receive homophobic and transphobic slurs and name calling, are forced to submit to demeaning and often public strip searches or nudity, receive disproportionate punishment for minor infractions of rules, are treated as sexual predators regardless of the underlying conviction and denied medical care.  In fact, prisoner AV at Lewis claims that he is harassed by officers and the deputy warden and is repeatedly subject to hostile remarks.

While administrative segregation (ad-seg) provides some protection from other prisoners, they tend to house prisoners in even harsher and more restrictive conditions. Stigma also attaches to prisoners housed in medical wards, compounding their marginalization among other prisoners and exposing them to further persecution from prison staff. Prisoners doing terms in ad-seg lose privileges they enjoyed in general population, endure harsher restrictions including reduced space in cells and in their exercise yards, and are isolated from direct contact with all other prisoners besides their cellmates, if they have one. Prisoners in isolation are also at risk from even more severe abuse by prison staff, because ad-seg prisoners are assumed to be more dangerous and because there are few others around to witness their misconduct.

Administrative segregation is therefore not an acceptable long-term solution to house LGBTI prisoners. Separate medical wards that do not additionally punish prisoners housed there can provide at least a temporary refuge for LGBTI prisoners but being housed in a medical ward still stigmatizes LGBTI prisoners as sick and diseased, a stereotype already widespread in this society. This can lead to further victimization by other prisoners and prison staff, since this society views stigmatized illnesses like HIV/AIDS (and supposed illnesses

---

9 Alexander L. Lee, Boalt Hall School of Law, Spring 2003, Nowhere to Go But Out: The Collision Between Transgender & Gender-Variant Prisoners and the Gender Binary in America's Prisons.

[10] Id.

like transgenderism) as worthy of moral condemnation and ostracization. [11]

One study of California prisoners found that 59 percent of transgender women housed in men's prisons had been sexually abused while incarcerated, as compared to four percent of non-transgender inmates in men's prisons.[12] Making matters worse, transgender inmates often face prejudice and discrimination in the aftermath of an assault.  The majority of transgender survivors are subjected to repeated sexual assaults (as many of our complainants allege). Yet many remain silent to avoid transfer to solitary confinement where they are locked in a tiny cell for 23 hours a day and cut off from vital services and programs.

The knowledge that the LGBTI population is at particularly high risk of sexual assault in prisons is longstanding, pervasive, well-documented and expressly noted by prison officials in the past.  In fact, in *DOES v. Terry Stewart*, CIV 96-0486 PHX WFN 13 July 2000, a class action for the protection of protective segregation inmates, the current AZ DOC director, Charles Ryan, was deputy director at the time and was personally involved in  the plan and procedures and promised the court that he would continue to take personal interest in Protective Segregation issues.  In fact, he conducted the policy and operation review project to update staff and conducted training on it.

Further, prisons officials across the state have received numerous administrative complaints about the sexual assaults and requests for 805 Protective Custody.  For example, Prisoner A was assaulted and states that it was documented in an incident report yet he was denied 805 status.  Prisoner B was raped and beaten at least three times, this was documented; yet he has been denied 805 status nine times.  Prisoner C was assaulted with attendant medical records; yet has been denied 805 several times.  Prisoner D was raped and assaulted and had to go to ER; yet has been denied 805 status twelve times.  Prisoner E was threatened, put in lockdown but denied 805 status numerous times.  Prisoner F received death threats and was put in lockdown but denied 805 status.  Prisoner G had to wait and re-apply for 805 after an assault.  Prisoner H petitioned for a year before he was granted 805 and was beaten several more times while waiting.  Prisoner I was denied 805 four times during which she was repeatedly assaulted.

Physical assault is a reason for 805 status (805.02, 1.5.1) as is threats (805.02, 1.5.2) and sexual assault and threats (805.02, 1.5.3).  Change of gender is a consideration (805.02, 1.5.9) but nowhere is LGBI mentioned in the considerations.  805.02, 1.5.8 does mention size, build and age which could be used for some, but not all, LGBI prisoners.  Given the well-known and documented threat to the LGBI prisoners, it is imperative that 805.02 be revised to include LGBI.

Recent events indicate LGBTI prisoners are not being protected in spite of knowledge of the danger.  In 2006, inmate DS filed a complaint with the FBI regarding repeated sexual harassment and assault. The FBI investigation revealed that the same guard she complained of had a history of complaints from other prisoners. DS_2 was murdered for his homosexual relationship and a lawsuit against DOC is pending.  TS committed suicide because of the violence he was subjected to.  ArizonaPrisonWatch has communicated with the

---

[11] Id
[12] Just Detention International, Rape is not part of the penalty, March 2013; Targets for Abuse: Transgender Inmates and Prisoner Rape , March 2013

department on this issue regularly for years.  Most recently, Joseph Eldridge, # 14748 filed such a complaint against AZ DOC on April 30, 2013, 2:13-cv-00888-DGC-AFM alleging sexual victimization, physical assault and complicity by the guards.


Many prisoners who report a sexual assault are subjected to insensitive questioning soon after the attack. Some staff responds to requests for help with indifference and jokes. Such inappropriate reactions can cause inmates to suffer so- called "second rape," with an emotional impact equal to that of the sexual assault.[13]

The lack of confidentiality means the prisoner is labeled a snitch risking further retaliation, and a reason for 805 status (805.02, 1.5.2). It is no wonder that prisoner rape is one of the nation's most seriously under-reported crimes.  Prisoners need confidential counseling, comprehensive testing and treatment for STDs and housing options that protect them but do not restrict their access to programmatic and rehabilitative services.  Only then will victims feel free to report the abuse they suffer.


"Sexual abuse of lesbian, gay, bisexual, transgender, and queer (LGBTQ) inmates constitutes one of the most rampant and ignored human rights violations in the U.S. today.   In a 2007 academic study, funded by the


California Department of Corrections and Rehabilitation and conducted at six California men's prisons, 67 percent of inmates who identified as LGBTQ reported having been sexually assaulted by another inmate during their incarceration, a rate that was 15 times higher than for the inmate population overall.  One study found that nearly 75 percent of prisoner rape survivors in men's facilities and 57 percent of survivors in women's facilities were sexually abused more than once, and 30 percent of all prisoner rape survivors endured six or more assaults. In the worst cases, gay and transgender prisoners become sex slaves, are treated like the perpetrators' property, and sold to others within the facility." [14]


"For LGBTQ survivors, the trauma is heightened by the institutional apathy and homophobia they regularly face. Corrections staff tend to confuse homosexuality and transgender status with consent to rape, and trivialize the problem. LGBTQ inmates frequently describe officials ignoring or even laughing at reports of sexual violence. To make matters worse, LGBTQ inmates who report abuse are often subjected to further attacks, humiliating strip searches, and punitive segregation." [15]


Prisoner rape victims are highly vulnerable to contracting HIV and other sexually transmitted diseases.  In 2004, the HIV prevalence rate inside U.S. prisons was more than four times higher than in society overall;  hepatitis C rates were 8 to 20 times higher; and chlamydia, gonorrhea, and syphilis rates are likewise significantly higher. Ninety-five percent of prisoners are released to carry these diseases into the public.  Harm reduction measures such as condom distribution, which some prisons have, would go far towards reducing the infection rates.

You cannot deny knowledge of the problem by simply refusing to verify the facts or pretending not to connect the dots.  Given the voluminous information you have had about this problem over the years and the

---

[13] Just Detention, Mental Health Consequences of Sexual Violence in Detention, February 2009.

[14] LGBTQ Detainees Chief Targets for Sexual Abuse in Detention February 2009

[15] ibid.

requirements of PREA, you clearly have both objective and subjective knowledge of the enormity of sexual violence occurring in Arizona prisons.


Standards for dealing with violence toward LGBTI prisoners.

In an overview of administrative segregation policies across the country, the researchers found that, "At the formal policy level, most permit placement in segregation based on a wide range of rationales. The elasticity suggests that administrative segregation may be used for goals other than incapacitation. In exchanges about our inquiry into administrative segregation, several commentators referred to the potential for its overuse based on what is colloquially known as being "mad" at a prisoner, as contrasted with being "scared" of that individual."
[16]   It also seems that being LGBTQI is another category of prisoners in which administrative segregation is used because officials don't "like" the prisoner.

Arizona is one of only twelve jurisdictions where an individual officer decides whether to place an inmate in administrative segregation.  A much better practice (thirty-one jurisdictions) a committee makes the decision and in two, a hearing officer makes a recommendation to a committee.  Arizona should consider changing its practice, to not have a committee review until after the deputy warden has made his suggestion, in conformity with the majority of states.

Arizona is only one of eight jurisdictions that do not specify that inmates can present evidence.  A much better practice is to follow the lead of the thirty jurisdictions that authorize inmates to present evidence by oral, written or documents and/or to call witnesses.  Arizona should revise its practice.


Arizona is one of twenty jurisdictions that do not specify if inmates can be represented at a hearing.  Again our policies lag behind those of other states and need to be updated.

The majority of jurisdictions (30) require an initial review of administrative segregation within seven days, six states in three or less.  Nine states require a review within thirty days, two states require sixty days, and six states ninety days.  Arizona seems to be completely out of step with the rest of the nation in only requiring a review in six months.

The National Prison Rape Elimination Commission (NPREC or Commission) has developed national standards that will help eliminate prison rape and other forms of sexual abuse in confinement because, "Sexual abuse of people in confinement violates their basic human rights, impedes the likelihood of their successful reentry into the community, and violates the Government's obligation to provide safe and humane conditions of confinement. No prison sentence, regardless of the crime, should ever include rape. A core priority of any confinement facility must be safety, which means protecting the safety of all—the public, the staff, and the inmate population."[17] The Prison Rape Elimination Act (PREA) of 2003 requires agencies to comply with the national standards proposed by the Commission and approved and promulgated by the Attorney General to eliminate sexual abuse in confinement or suffer a loss in funding. [18]

---

[16] Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies, Liman overview segregation June 28, 2013, June 2013, Hope Metcalf, Jamelia Morgan, Samuel Oliker- Friedland, Judith Resnik, Julia Spiegel, Haran Tae, Alyssa Work, and Brian Holbrook, A Project of the Liman Public Interest Program at Yale Law School.

[17] Standards for the Prevention, Detection, Response, and Monitoring of Sexual Abuse in Adult Prisons and Jails, The National Prison Rape Elimination Commission.

[18] Ibid

On May 17, 2012, the U.S. Department of Justice released national standards aimed at eliminating sexual abuse in prisons, jails, youth detention facilities, halfway houses, and police lock-ups as mandated by the Prison Rape Elimination Act (PREA) of 2003. They require that corrections facilities take concrete steps to protect inmates from sexual abuse – whether perpetrated by staff or by inmates. [19] The standards cover prevention and response planning, training, education and screening, detection and response including reporting, investigation, discipline, and medical care, monitoring including data collection and audits, and a number of supplemental standards and appendices dealing with responsibility of medical examiners, training, data collection, and needs assessment. The standards became applicable to the states in August 2013.

The standards recognize the importance of outside agencies in supporting efforts to reduce sexual abuse in prisons which is why PREA standards require that corrections agencies have to work with community groups. Institutions have to provide inmates with contact information, reasonable communication possibilities in as confidential a manner as possible and disclosure when the communication is not confidential.  The existing AZ DOC inmate brochure regarding PREA and Sexual Assault does not have such contact information.

Victims must be provided with timely access to medical treatment, crisis intervention services, and ongoing medical and mental care.  The standards require a coordinated response, a forensic exam by a qualified person, evidence collecting protocols that meet national standards, that the victim have access to emotional support, information and referrals, treatment for sexually transmitted infections and for women, emergency contraception.  These services are mandatory on state and local facilities whether or not the victim can or will name the perpetrator.  In 805.01, 1.2.1.2 it states that the inability or unwillingness to name the perpetrator may not be the sole reason to exclude the prisoner from protective custody; however, under the PREA standard, they must be given the full benefit of victims services.

Illinois spent ten years revising their policy toward transgender prisoners in order to avoid a costly lawsuit. [20] The new guidelines require a psychiatric assessment of how vulnerable or predatory a transgender inmate is when considering placement.  It also updates the role of the Gender Identity Disorder committee that addresses placement, security concerns and medical treatment.  During the assessment period (usually a month) the inmate is placed in a single cell without a roommate and showers alone.

In 2002, the National Lawyers Guild (NLG) and the city of San Francisco Human Rights Commission created a protocol for housing transgender inmates safely and humanely in correctional setting. [21]  Among other procedures, these protocols allow inmates to choose the gender of the person who searches them, respects objections of an inmate to pairing with a certain cellmate for fear of assault, allows complaints out of the chain of command so inmates don't have to file the complaint with the abuser, and includes outside independent monitoring.

[19] Just Detention, The Prison Rape Elimination Act Standards: An Overview for Community Service Providers, June 2013
[20] A Decade in the Making: Revamped Policy Evaluates Transgender Prisoners in Illinois Corrections department policy addresses potential vulnerability or predatory risk, By Alison Flowers The Medill Justice Project Published: May 29, 2013
[21] STILL IN DANGER: The Ongoing Threat of Sexual Violence against Transgender Prisoners, 2005, Stop Prisoner Rape, ACLU National Prison Project.

Prison Rape Elimination Act (PREA)

PREA requirements apply to all detention facilities, including federal and state prisons, jails, police lock-ups, private facilities, and immigration detention centers. PREA requires that facilities adopt a zero-tolerance approach to this form of abuse and states that sexual assault in detention can constitute a violation of the Eighth Amendment of the U.S. Constitution.

The institution must prevent sexual abuse by, among other things, maintaining a zero-tolerance policy toward sexual abuse, designating a PREA point person, screening inmates for risk, documenting adequate staffing, training employees including about the unique vulnerabilities of the LGBTI inmates, not hiring abusers, preventing juveniles from being housed with adults, banning cross-gender pat-downs and examinations solely to determine genital status, preventing improper viewing by opposite sex staff, restricting the use of solitary confinement as a means of protecting vulnerable inmates, and working with outside entities that adhere to these policies.

The standards require that inmates be screened for risk of being sexually abused or sexually abusive and that screening information be used to inform housing, bed, work, education, and program assignments. The goal is to keep inmates at high risk of victimization away from those at high risk of committing abuse. Upon learning of an allegation of abuse, staff must separate the alleged victim and abuser and take steps to preserve evidence. Nowhere in your 805 policy is the preservation of evidence noted.  However, facilities may not simply place victims in segregated housing against their will unless a determination has been made that there is no available alternative means of separation, and even then only under specified conditions and with periodic reassessment. The institution must detect abuse by making inmates aware of the policy, must facilitate multiple and third-party reporting options, must prevent retaliation, and must assist those with disabilities and limited English. In addition, transgender and intersex inmates must be given the opportunity to shower separately from other inmates.

The agency may not impose a time limit on when an inmate may submit a grievance regarding sexual abuse. According to PREA standards, a grievance system cannot be the only method and should not be the primary method for inmates to report abuse.  You must have multiple internal reporting mechanisms as well as an external reporting structure for such complaints.   The standards require that agencies provide at least two internal reporting avenues, and at least one way to report abuse to a public or private entity or office that is not part of the agency and that can allow inmates to remain anonymous upon request. An agency must also provide a way for third parties to report such abuse on behalf of an inmate.

The institution must respond to sexual abuse by timely and appropriate medical and mental health care, if possible access to victim advocates from rape crisis centers outside or if not, have a trained person inside, establish evidence protocol, investigate all allegations with a preponderance of the evidence standard, discipline staff with termination as presumptive sanction for staff who commit sexual abuse, discipline inmates only when they are the perpetrators of abuse, allow inmates opportunity to file grievances regarding sexual abuse, maintain records of incidents of abuse and use those records to inform future prevention planning.

The Policy Review and Developmental Guide has a very useful series of questions about each PREA standard and whether your policy complies.  It would be a very good place to start to revise your policies and operations to implement the requirements of PREA.

You have alleged that you do not keep records of sexual assault based on LGBTI status.  According to PREA, in collecting data on sexual incidents, the facility "shall consider whether the incident or allegation was motivated by ... gender identity; lesbian, gay, bisexual, transgender, or intersex identification, status, or perceived status ... or was motivated or otherwise caused by other group dynamics at the facility." Given this requirement, what is the Arizona DOCs plan for gathering such statistics to comply with PREA?

The standards require that each facility be audited every three years to assess compliance. Those that do not comply with the standards are subject to a five percent reduction in funds they would otherwise receive for prison purposes from the department unless the governor certifies that five percent of such funds will be used to enable compliance in future years. The first year of the PREA non-compliance penalty period is fiscal year 2014, which will commence on October 1, 2013, and end on September 30, 2014. The standard for prisons can be found at 28 C.F.R. §§ 115.11 – 115.93.

Because the PREA requires the Bureau of Justice Statistics to carry out a comprehensive statistical review and analysis of the incidence and effects of prison rape for every calendar year, BJS developed the National Prison Rape Statistics Program (NPRSP), a series designed to collect multiple measures on the incidence and prevalence of sexual assault. This would also be a program model for Arizona.

NPRSP includes four separate data collection efforts: the Survey on Sexual Violence (SSV), the National Inmate Survey (NIS), the National Survey of Youth in Custody (NSYC), and the National Former Prisoner Survey (NFPS). Each of these collections is an independent effort and, while not directly comparable, provide various measures of the prevalence and characteristics of sexual assault in correctional facilities. Incidents reported to or observed by correctional or medical officials collected in the SSV administrative records survey may be an under-representation of actual incidents. Allegations made anonymously by inmates and youth in the NIS, NSYC, and FPS may be an over-representation of actual incidents, although it is possible this over-reporting is offset by some victims who, despite the protocols enacted to assure confidentiality and encourage reporting, remain fearful of retribution or ridicule and fail to report sexual victimization. By using more than one method and measure, the data collections can together provide a deeper understanding of sexual victimization in correctional facilities. These would certainly be good tools for Arizona and would be compatible for use with the national statistics.

In order to comply with PREA, AZ DOC must realize that LGBTI people in detention are particularly at risk of sexual abuse as shown from government and academic studies and statistics from the Bureau of Justice Studies.

Transgender people are at especially high risk needing more protection in both male and female prisons (citations omitted). [22] What is required is individualized classifications, individualized medical determinations, and no protective segregation that constitutes a denial of the same privileges and programs as other prisoners. Staff must distinguish between sex abuse and consensual behavior. Consensual behavior can be prohibited but it cannot be punished like sexual abuse.

Use of Administrative Segregation

Since lesbian, gay, bisexual, transgender, and intersex (LGBTI) individuals—both adults and youth—under custodial supervision are one of the groups most at risk for abuse, [23] "corrections administrators need to do more to identify those who are vulnerable and protect them in ways that do not leave them isolated and without access to rehabilitative programming." Administrative segregation, and the ensuing isolation from the general population for purposes of "safety," often exacerbates mental health conditions such as depression or gender

---

[22] PREVENTING THE SEXUAL ABUSE OF LESBIAN, GAY, BISEXUAL, TRANSGENDER, AND INTERSEX PEOPLE IN CORRECTIONAL SETTINGS, Comments Submitted in Response to Docket No. OAG-131; AG Order No. 3143-2010, National Standards to Prevent, Detect, and Respond to Prison Rape.
[23] Policy Review and Development Guide: Lesbian, Gay, Bisexual, Transgender and Intersex Persons in Custodial Settings, Smith Consulting (Brenda Smith, Melissa Loomis, Jaime Yarussi, Jody Marksamer) in collaboration with The Project on Addressing Prison Rape, American University, Washington College of Law, August 2013.

dysphoria. In addition, isolation from the general population often means limited or no access to programming, regular visitation, or health care, all of which are necessary for LGBTI populations. Likewise, data suggest that special population units (such as those on Rikers Island and the San Francisco County Jail) have not kept inmates who identify as LGBTI any safer."[24]

Although it is permissible to place vulnerable inmates in administrative segregation in some circumstances, agency officials will not be able to rely on this measure as long-term protection for LGBTI inmates. Agency officials may, however, segregate LGBTI inmates as a temporary measure when there are specific circumstances, such as upon admission (while determining an appropriate long-term placement) or immediately following an assault and during a pending investigation.

The final PREA standards require adult prisons and jails to conduct an intake screening within 72 hours of an inmate's arrival to assess that inmate's risk for sexual victimization or abuse. Inmates may not be disciplined for refusing to answer questions and may not be placed in areas based solely on their identification or status except under legal order. The institution must decide on a case-by-case how best to protect the inmate and that includes taking into account the inmates views. Placements must be assessed at least twice a year.

<u>Legal Context</u>

*Farmer v. Brennan*, 511 U.S. 825, 829 (1994) established that rape is not part of the penalty of any prisoner. Farmer was a transgender prisoner placed in a male prison, the very kind of prisoner most at risk. While prisons are not mandated to be comfortable, they must be reasonably safe and the conditions under which prisoners live are subject to scrutiny under the Eighth Amendment. (p. 832) That prison officials have a duty to protect prisoners from violence at the hands of other prisoners and staff is well settled constitutional law.

*Farmer* established the "deliberate indifference" standard for inmate health and safety. (p. 836-7) To consciously disregard a substantial risk of serious harm meets that standard when a prison official acts or fails to act despite his knowledge of the substantial risk of serious harm. (p. 842) While the requisite knowledge of the substantial risk is a question of fact, inference can be made from circumstantial evidence, and a factfinder can conclude that a prison knew of a substantial risk from the very fact that the risk was obvious. When the risk is

longstanding, pervasive, well-documented or expressly noted by the prison officials in the past e.g. because of prior law suits, outside organization advocacy and a multitude of inmate grievances, then that official had actual knowledge. (p. 843) *Farmer* specifically mentions inmate rape as being so common and uncontrolled that it is obvious, and it does not matter if officials know precisely who will rape who. (p. 844) The right of prisoners to be free from assault is well established and qualified immunity will not apply under either the Eighth Amendment or 42 U.S.C. §1983. *Schwenk v. Hartford et al*, 204 F. 3d 1187 (9th Cir. 2000), *Powell v. Schriver*, 175 F.3d 107 (2d Cir. 1999).

Nor can a LGBTI prisoner be routinely placed in administrative segregation without procedural safeguards. *Enomoto v. Wright*, 434 U.S. 1052, 98 S. Ct. 1223, 55 L. Ed. 2d 756 (1978). Segregation of LGBTI inmates can be done for protection, under review and when the person is not denied access to all programs or services. *Estate of DiMarco* v. *Wyoming Dept. of Corr.,* 473 F.3d 1334, 1342–43 (10th Cir. 2007) Corrections officials must create an appropriate intake classification scheme to identify and house LGBTI inmates rather than segregating them. *Gay Inmates of Shelby County* v. *Barksdale,* 819 F.2d 289 (6th Cir. 1987) Such isolation violates Fourteenth Amendment due process. *RG v. Koller*, 415 F. Supp. 2d 1129 (D. Haw. 2006) and Eighth Amendment rights, *McCray v. Burrell,* 516 F.2d 357 (4th Cir. 1975). Long term segregation from the general population also violates due process rights. *DiMarco v. Wyoming Dep't of Corrections*, 300 F. Supp. 2d 1183 (D. Wyo. 2004) Blanket policies are not acceptable especially when they involve harsh conditions. *Tates v. Blanas*, 2003 U.S. Dist. LEXIS 26029 (E.D. Cal. Mar. 6, 2003) This policy is reinforced in the PREA standards.

---

[24] Ibid

At the same time, prison officials cannot remain indifferent to the special vulnerability of LGBTI inmates and the harm facing them.   *Taylor* v. *Michigan DOC,* 69 F.3d 76 (6th Cir. 1995) To do so opens the prison to damages especially when the prisoner is housed with a known predatory inmate, *Greene v. Bowles*, 361 F.3d 290 (6th Cir. 2004) as at least one prisoner has alleged. Deliberate indifference will be found when prison officials continue to house a gay person in the general population, where he was gang raped and sold as a sex slave for over 18 months. *Johnson* v. *Johnson,* 385 F.3d 503, 527 (5th Cir. 2004)

At least three prisoners have complained of repeated assaults as they applied and re-applied for 805 status. A prisoner still retains constitutional protections. *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974).  Ignoring the risks to transgender inmates by housing them with male inmates, after being advised to house with females, is a constitutional violation.  The safety or the prisoner outweighs other interests. *Crosby v. Reynolds*, 763 F. Supp. 666 (D. Me. 1991)

Conclusion

It is also well established that no one, including prisoners, may be discriminated against because of who they are rather than what they do.   *Robinson v. California*, 370 U.S. 660 (1962) Further, prisoners retain rights not inconsistent with their status as a prisoner.  *Turner v. Saffley*, 482 U.S. 78 (1986)  Treating LGBTI prisoners differently based on their status as LGBTI violates constitutional norms. See *Doe* v. *Sparks,* 733 F. Supp. 227 (W.D. Pa. 1990) regarding denying same-sex partners visitation rights.  Arizona has had its own challenge regarding the denial of same-sex kissing and hugging among nonfamily members during prison visits, *Whitmire* v. *Arizona,* 298 F.3d 1134 (9th Cir. 2002).  Blanket discriminatory policies applied to the LGBTI community will not withstand scrutiny.   As PREA requires, individualized assessment is mandated.

Because of our concerns we are asking to meet and discuss with you ways to move forward and ensure constitutional and real protection for all inmates, especially LGBTI.  We are concerned about PREA compliance including statistics and training, ensuring a multitude of complaint paths including outside the prison, modification of 805 language to include LGBTI as a factor, and moving to national standards with a committee making the first decision on 805 status, a more frequent review of PC placements and an outside

audit.  We would also like to explore harm reduction measures such as condom distribution for health protection.

We are also concerned that ADOC is no longer in compliance with *Does v. Stewart*.  We believe that an inquiry into compliance by the previously appointed prison expert for the *Does* case, Steve Martin, should be funded by ADOC including an audit of maximum-security cells and use of such cells for 805 prisoners who are LGBTI.

We appreciate hearing from you within two weeks.  Thank you for your consideration.

Sincerely,


Arizona Prisoner Justice Working Group
Dianne Post, Attorney, Legal Redress, Maricopa County Branch NAACP
Margaret Jean Plews, Arizona Prison Watch / Survivors of Prison Violence-AZ
Margie Diddams, ASU Doctoral Candidate / Prisoners Are People


Cc:  Larry Hammond, Attorney

Dan Pochoda, Legal Director, ACLU of Arizona
Plaintiff's counsel on *Does v. Stewart*

Calvin Lee, Staff Attorney, Navajo Nation Human Rights Commission
Varvara Phillips, Investigator, Navajo Nation Human Rights Commission

Antonia D'Orsay (This Is How)

# EXHIBIT 4



PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

September 25, 2013

Mr. Daniel Struck
Struck, Wieneke & Love
3100 W. Ray Road, Suite 300
Chandler, AZ 85226

RE:     *Parsons v. Ryan*, Legal Mail from Class Counsel

Dear Dan,

Enclosed is a copy of a memo sent by ASPC-Eyman Sgt. McClincy to all prisoners informing them that mail from certain organizations, including class counsel ACLU and Prison Law Office, as well as Plaintiffs ACDL, shall not be considered privileged Legal Mail unless a specific attorney is part of the return address, and that letters from our organizations will be opened if a specific attorney is not listed on the envelope.

This direction to open our mail if a "specific attorney" is not listed is inconsistent with ADC's own policies. They state "The return address may be indicative of whether the contents of the envelope constitute legal mail. Designated staff shall not rely solely on the words "legal mail" having been stamped on the envelope. If there is any serious doubt as to whether the contents of the envelope contain legal mail, designated staff shall contact the Legal Access Monitor for direction." (DO 902.11, 1.5).

We believe that any mail to or from our offices to the class we represent should presumptively be treated as privileged Legal Mail, and be processed according to the department's policies designed to ensure confidential communications. (See DO 902.11, 1.4.2.1 "all incoming mail…from an inmate's attorney…shall be opened for inspection purposes in the presence of the inmate. Such incoming mail may be scanned in the conducting of an inspection for contraband, but shall not be read or censored by staff.")

We request that this memo, and any similar ones issued at other prison complexes, be rescinded.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick

cc:     Counsel of Record

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

# *Memorandum*

## ARIZONA DEPARTMENT OF CORRECTIONS
### ARIZONA STATE PRISON COMPLEX - EYMAN / Operations

| | |
|---|---|
| **TO:** | All Inmates |
| **FROM:** | Sgt. D. McClincy, ASPC-E / Mailroom |
| **Through:** | J. Erwin, ADOC, Legal Access Monitor |
| **DATE:** | 09/12/2013 |
| **SUBJECT:** | Legal Mail |

Per Departmental Order 902 ss; 902.11.1.4.2.1; ss 902.11.1.4.2.2, and Definitions legal mail is defined as "All letters to/from an inmate's attorney, to/from a judge or to/from a court of law". Mail arriving from the following entities without an individual specific attorney as part of the return address will no longer warrant Legal Mail Confidentiality privileges:

- **NAACP**
- **Justice Project**
- **ACLU**
- **Arizona Center for Disability Law**
- **Prison Law Office**

A "Legal Mail" stamp placed on envelopes by/from the above entities without a specific attorney included in the address shall not be considered privileged Legal Mail. Mail from the above entities not meeting the above standard shall be opened and inspected by Complex Mail Room staff, and processed as regular mail. Mail from these entities with a specific attorney included in the address shall continue to be processed as Legal Mail. Inmates acting in Propria Persona (Pro Se) shall continue to have their documented legal agent's written communications treated with confidentiality privileges.

# EXHIBIT 5

**Corene Kendrick**

| | |
|---|---|
| **From:** | parsonsdiscovery@prisonlaw.com on behalf of Don Specter |
| **Sent:** | Monday, October 07, 2013 9:56 AM |
| **To:** | Parsons Discovery Comittee |
| **Subject:** | FW: Parsons, et al. v. Ryan, et al. - Correspondence |
| **Attachments:** | 20131007 LT Counsel re C. Kendrick 9-25-13 ltr re legal mail.pdf |

---

**From:** Amy Bender [mailto:ABender@swlfirm.com]
**Sent:** Monday, October 07, 2013 9:46 AM
**To:** jalewelt@azdisabilitylaw.org; cnmitchell@jonesday.com; dspecter@prisonlaw.com; dfathi@npp-aclu.org; agerlicher@perkinscoie.com
**Cc:** Michael E. Gottfried; Kelly Dudley; Lucy Rand; Parsons Team
**Subject:** Parsons, et al. v. Ryan, et al. - Correspondence

Counsel,

Please see the attached letter from Ashlee Fletcher.

Best regards,
Amy Bender



**Amy Bender**
Legal Assistant to Ashlee B. Fletcher
and Anne M. Orcutt
Direct: (480) 420-1638
abender@swlfirm.com
www.swlfirm.com

This electronic mail transmission contains information from the law firm Struck Wieneke & Love, P.L.C. that may be confidential or privileged. Such information is solely for the intended recipient, and use by any other party is not authorized. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this message, its contents or any attachments is prohibited. Any wrongful interception of this message is punishable as a Federal Crime. Although this e-mail and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by the sender for any loss or damage arising in any way from its use. If you have received this message in error, please notify the sender immediately by telephone (480) 420-1600. Thank you.

Tax Advice Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230, we inform you that any U.S. federal tax advice contained in this communication (including any attachments), unless otherwise specifically stated, was not

intended or written to be used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal Revenue Code or (2) promoting, marketing or recommending to another party any matters addressed herein.



**STRUCK WIENEKE & LOVE**   [ 3100 West Ray Road, Suite 300   Chandler, Arizona 85226   **480.420.1600**   swlfirm.com ]

October 1, 2013

Daniel P. Struck
PARTNER
Kathleen L. Wieneke
PARTNER
Rachel Love
PARTNER
Timothy J. Bojanowski
PARTNER
Christina Retts
PARTNER
Jamie D. Guzman
ASSOCIATE
Nicholas D. Acedo
ASSOCIATE
Tara B. Zoellner
ASSOCIATE
Amy L. Nguyen
ASSOCIATE
Ashlee B. Fletcher
ASSOCIATE
Courtney R. Cloman
ASSOCIATE
Anne M. Orcutt
ASSOCIATE
Kevin L. Nguyen
ASSOCIATE
David C. Lewis
OF COUNSEL

**VIA EMAIL ONLY**

Jennifer Alewelt:  jalewelt@azdisabilitylaw.org
Caroline N. Mitchell:  cnmitchell@jonesday.com
Donald Specter:  dspecter@prisonlaw.com
David C. Fathi:  dfathi@npp-aclu.org
Amelia Gerlicher:  agerlicher@perkinscoie.com

        Re:     Parsons, et al. v. Ryan and Pratt
                  U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

       This letter responds to Corene Kendrick's September 25, 2013 letter regarding legal mail.

       Facility mail rooms often receive mass mailings from organizations such as the ACLU and Prison Law Office.  Although both organizations are among the counsel of record in this matter, the mere mention of these organizations on an envelope directed to an ADC inmate, does not automatically qualify the mail as legal mail.

       As we have previously informed Plaintiffs' Counsel, ADC policy states that mail coming from "an attorney, a judge, or a court" will be treated as legal mail.  (February 5, 2013 Correspondence from Zuerlein to du Mee; February 12, 2012 Correspondence from Zuerlein to du Mee).  As such, we specifically advised Plaintiffs' Counsel to include a specific attorney's name on the return address of any mail directed to your clients so that it is clear to mailroom staff that it is in fact legal mail.

       Your failure to properly address your mailings as legal mail – including mass mailings – will result in the mail being treated as regular mail.  The mail will still be received by the inmate, but will not be treated as legal mail.

Counsel of Record
October 7, 2013
Page 2


       Therefore, simply because mail comes from ACLU or the Prison Law Office, does not automatically convert the mail into legal mail.  The September 17, 2013, and any similar memorandum, will remain in effect.


Sincerely,

Ashlee B. Fletcher
For the Firm


ABF/ab
2817630.1

cc:    Michael E. Gottfried
        Kelly Dudley
        Lucy Rand

# EXHIBIT 6



## PRISON LAW OFFICE

General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 7, 2013

Ms. Ashlee Fletcher
Struck, Wieneke & Love
3100 W. Ray Road, Suite 300
Chandler, AZ 85226

RE:     *Parsons v. Ryan*, Legal Mail from Class Counsel

Dear Ms. Fletcher,

I write in response to your letter of today regarding legal mail sent by class counsel to class members housed in ADC prisons.  In your letter, you state that you "specifically advised Plaintiffs' Counsel to include a specific attorney's name on the return address of any mail directed to your clients so it is clear to mailroom staff that it is in fact legal mail."  You go on to write that "Your failure to properly address your mailings as legal mail – including mass mailings – will result in the mail being treated as regular mail."

Enclosed are scans of the envelopes used by the ACLU and the Prison Law Office. You will note that each organization lists the name of an attorney on the envelope.  For the ACLU, it says "David C. Fathi, Attorney" and is clearly labeled as Legal Mail to be opened in the presence of the inmate.  For the Prison Law Office, it says "Donald Specter, Attorney at Law" and is clearly labeled as "Legal Mail". These are the envelopes used for every piece of mail sent to Arizona prisoners.  It is unclear what your repeated references to "mass mailings" is referring to, but both offices send every letter to prisoners addressed to the individual with their name and ADC number.  Due to the overwhelming volume of mail we are receiving from prisoners, we sometimes send a form thank you letter in response to acknowledge receipt of the prisoner's letter.

We reiterate our position that any mail to or from our offices to the class we represent should presumptively be treated as privileged Legal Mail, and be processed according to the department's policies designed to ensure confidential communications.  (See DO 902.11, 1.4.2.1 "all incoming mail…from an inmate's attorney…shall be opened for inspection purposes in the presence of the inmate. Such incoming mail may be scanned in the conducting of an inspection for contraband, but shall not be read or censored by staff.")  We further request that the memo referenced in my September 25 letter, and any similar ones issued at other prison complexes, be rescinded.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

DAVID C. FATHI
ATTORNEY*

**AMERICAN CIVIL LIBERTIES**
**UNION FOUNDATION**

NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS



LEGAL MAIL - OPEN IN PRESENCE OF INMATE



Legal Mail

**PRISON LAW OFFICE**
Director: Donald Specter, Attorney at Law
General Delivery
San Quentin, CA 94964-0001

# EXHIBIT 7



PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Megan Hagler
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

October 14, 2013

Ms. Ashlee Fletcher
Struck, Wieneke & Love
3100 W. Ray Road, Suite 300
Chandler, AZ 85226

RE:    *Parsons v. Ryan*, Legal Mail sent by Class Members to Class Counsel

Dear Ms. Fletcher,

I have previously written Counsel for Defendants on September 25 and October 7 regarding Legal Mail sent to and from class counsel and ADC prisoners, and the memos that have been circulated at Arizona state prison complexes informing mailroom staff that Legal Mail to and from the Prison Law Office, the ACLU, and the Arizona Center for Disability Law should not be treated as legal mail unless a specific attorney's name is listed on the envelope.  On October 7, I sent you scans of the envelopes used by the PLO and ACLU-NPP which clearly list the names of Don Specter and David Fathi, and identify each of them as attorneys.

It has come to our attention that an identical memo was issued to mailroom staff at ASPC-Tucson.  Additionally, at ASPC-Eyman, prison staff interpret the memo regarding Legal Mail to deny prisoners the ability to send out confidential legal mail addressed to the attorneys in our office.  Specifically, on October 2, 2013, a class member housed at Eyman-Meadows took a legal package addressed to Mr. Specter to the mailroom to be sent out as legal mail.  CO II Grech, a mailroom worker, refused to accept the package, telling the prisoner that the Prison Law Office was no longer considered legal mail.  He directed the prisoner to the memo we wrote you about on September 25 as the basis for the refusal.  The prisoner pointed out that the package was addressed specifically to Mr. Specter, an Attorney at Law.  Mr. Grech then contacted Betty Uliberri, the Eyman law library contract paralegal, who said that Mr. Specter is not admitted to practice law in Arizona, and therefore the package did not have to be treated as legal mail.

We request Defendants immediately clarify with mailroom and law library staff at Eyman and all other prison complexes that the attorneys appointed by the court to represent the class should not be treated differently based upon whether they are licensed in Arizona.  We reiterate our position that any mail to or from our offices to the class we represent should presumptively be

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

Ms. Ashlee Fletcher
October 14, 2013
RE: *Parsons v. Ryan*
Page 2

treated as privileged Legal Mail, and be processed according to the department's policies designed to ensure confidential communications. (See DO 902.11, 1.4.2.1 "all incoming mail…from an inmate's attorney…shall be opened for inspection purposes in the presence of the inmate. Such incoming mail may be scanned in the conducting of an inspection for contraband, but shall not be read or censored by staff.") We further request that the memo referenced in my September 25 letter, the one at ASPC-Tucson, and any similar ones issued at other prison complexes, be rescinded.

If we do not receive a timely response and proof that these corrections have been made within two weeks, we are prepared to go to the Court regarding ADC's refusal to follow its own policies regarding legal mail, and ADC staff's interference with class members' ability to send or receive legal mail from the attorneys of record in this case.

Sincerely yours,

*/s/ Corene Kendrick*

Corene Kendrick

cc:    Counsel of Record

2

# EXHIBIT 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | **DECLARATION OF SEYMOUR ABDULLAH** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

I, Seymour Abdullah, declare:

1.     I am a prisoner housed in the Arizona State Prison Complex – Eyman, Meadows Unit. My ADC number is 40697.

2.     Since this case was filed and certified as a class action, I have written back and forth with the attorneys at the ACLU of Arizona and the Prison Law Office regarding my health care treatment in Eyman. I always label the envelopes as "Legal Mail" and address them to an attorney by name. When the attorneys write me back, their envelopes are stamped "Legal Mail" and list an attorney's name on the return address.

3.     On October 2, 2013, I attempted to mail a package addressed to Donald Specter at the Prison Law Office. I went to the Meadows mailroom and asked that it be sent out as legal mail. Correctional Officer (CO) II Grech, a mailroom worker, refused to accept the package, and told me that any mail to or from the Prison Law Office was no longer considered legal mail. He pointed to a memo on the wall as the basis for his decision, but would not let me read the memo or make a copy of it.

4.     I told Mr. Grech that the package was addressed specifically to Mr. Specter, who is an Attorney at Law. Mr. Grech then contacted Betty Uliberri, the Eyman law library contract paralegal. She said that since Mr. Specter is not admitted to practice law in Arizona, the package did not have to be treated as legal mail.

5.     As a result, my letter and the documents that I sent with it to Mr. Specter were read by prison staff.

I declare under penalty of perjury that the foregoing is true and correct.

Signed the 12ᵗʰ of November, 2013, in Florence, Arizona.

Seymour J. Abdullah
Seymour Abdullah, ADC # 40697

# EXHIBIT 9

**ARIZONA DEPARTMENT OF CORRECTIONS**

Inmate Grievance - GF Supplement

| Inmate Name *(Last, First M.I.)* | ADC Number | Institution/Facility | Case Number |
|---|---|---|---|
| ABDULLAH, SEYMOUR | 4D697 | EYman-Meadows | 11/14/13 |

RE: Parson, et al., v. Ryan, et al., # CV 12-00601-PHX-NVW

## DECLARATION

ON the MORNING OF NOVEMBER 14, 2013, I, SEY-MOUR ABDULLAH #4D697, took two pieces OF "Legal mail" to the mail and property window to send out. It was addressed to:

1. Ms. Corene Hendrick
   Attorney At Law,
   Prison Legal office
   General Delivery
   San Quentin, CA 94864

2. Ms. Bridgette Amiri
   Attorney At Law
   and ACLU of Arizona
   P.O. Box 17148
   Phoenix, AZ. 85011-0148

CoII Grieb, mailroom Supervison at the Meadows Unit, gave me back the mail and said Neither of them were listed as attorneys. He said he checked the Arizona Bar list and they weren't listed. I asked him to put that on the envelopes so the people would know when I sent them out to them. He did so in red ink. (He had told me that his computer listed the names of Attorneys in each state. But I don't believe that. At any rate, he only checked the state Bar of Arizona.). This problem has happened before with mail to the ACLU, Prison Law office and the NAACP.

I do declare, under penalty of perjury, that the above are true and correct to the best of my knowledge, belief and understanding.

| Signature | Date |
|---|---|
| Seymour J. Abdullah | November 14, 2013 |

INITIAL DISTRIBUTION - Committee Recommendation - All copies to Grievance Advisory Committee
FINAL DISTRIBUTION - White and Pink - Inmate, Canary - Grievance File

INITIAL DISTRIBUTION - GF Supplement - White and Canary - Grievance Coordinator, Pink - Inmate
FINAL DISTRIBUTION - White - Inmate, Canary - Grievance File

802-7
7/13/09

# EXHIBIT 10

SEYMOUR J. ABDULLAH, #40692
(ASPC) EYMAN - meridius
P.O. BOX 3300, 10 · B · 33
Florence, Az.
85132

LEGAL MAIL

Corene Kendrick, esq.
Attorney at law
PRISON LAW OFFICE
General Delivery
San Quentin, California 94964-0001

US POSTAGE
PITNEY BOWES
$ 00.46⁰
02 1R
0002008493
MAILED FROM ZIP CODE 94901

emeid.med.listro,A
Arizona Bar