Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
    jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
    avarma@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' EXPERTS AND EXPERT REPORTS** |

1   Pursuant to the Court's Amended Scheduling Order setting a deadline of April 18,

2   2014 for motions challenging expert opinion testimony [Doc. 389 at 2], Plaintiffs move to

3   strike 14 of Defendants' 18 expert witnesses and portions of their four expert reports.  The

4   parties have met and conferred regarding these issues and have reached an impasse.

5   [Declaration of Donald Specter ("Specter Decl.") ¶ 8, Ex. 8][1]  This Motion is supported by

6   the facts and argument below, and the Declaration of Donald Specter and its exhibits.

7   **Introduction**

8   Defendants' expert reports and updated Disclosure Statement make plain that

9   Defendants want to avoid at all costs a trial based on the conditions in ADC's prisons as

10   revealed through eighteen months of painstaking and expensive fact discovery that ended

11   on September 27, 2013.  Defendants' strategy is two pronged.  First, they intend to use

12   their experts to challenge the opinions of Plaintiffs' experts by relying on information

13   which postdates the close of discovery and to which Plaintiffs never had access.  Second,

14   all of their 18 expert witnesses will testify effusively about recent and future alleged

15   changes by the ADC and Corizon up until the time of trial.  As part of this strategy

16   Defendants will cherry pick the evidence they want to use, selectively disclosing only

17   evidence that supports their position, and strip Plaintiffs of any meaningful ability to

18   cross-examine by withholding any contrary evidence.

19   Defendants also intend to support their strategy by having their fact witnesses

20   testify broadly to hearsay and opinions and attack Plaintiffs' experts.  Defendants have

21   implemented this strategy by, long after the close of discovery, deputizing 14 fact

22   witnesses as so-called "experts" without providing reports identifying the actual opinions

23   they will offer or the facts to which they will testify, and (with one exception) without

24   subjecting them to expert depositions.

25   More fundamentally, these non-report experts are largely "going beyond what

26   [they] saw and did and why [they] did it" in the course of their normal jobs; instead they

27

28   [1]  All Exhibits referred to herein are attached to the Specter Declaration.

are "giving an opinion formed because there is a lawsuit," which means they are "considered 'retained or employed' under Rule 26(a)(2)(B) and must file a written report." *Hermann v. Hartford Cas. Ins. Co,* 2012 WL 5569769 *3 (D. Colo. Nov. 15, 2012). For example, these experts include an ADC employee sociologist, Michael Dolny, who is doing a statistical analysis of Plaintiffs' experts' methodology and findings, and eight other witnesses who, according to Defendants, will rebut the opinions of Plaintiffs' experts. [*See* Ex. 1, Defendants' 11th Supplemental (Expert) Disclosure Statement at 6, 11, 16, 18, 36, 38, 42, 51-52] Many of them also are non-treating physicians who intend to offer unspecified opinions rebutting the individual cases of poor care relied on by Plaintiffs' health care experts. [*Id*. at 8, 13-16, 33-36, 44-50] This plainly thrusts them into the report writing realm. Defendants' failure to provide such reports on the Court's deadline of December 18, 2013 wreaks havoc with the rest of the Court's pre-trial schedule, and should be rejected.

At the November 1, 2013 hearing, this Court declared that the trial will be held "according to the outline we have laid out that's fair to both sides." [Hearing Tr., Nov. 1, 2013 at 33:13-14] If Defendants' plan succeeds, the parties will be trying two different cases: Plaintiffs' case will be limited to proof of conditions as they existed before the discovery cut-off in September 2013. Defendants' evidence will be about whatever evidence of conditions Defendants choose to disclose up to the day of trial, 13 months later. To avoid such an unfair result, Plaintiffs ask the Court to stop this strategy in its tracks by striking Defendants' testifying expert reports to the extent they purport to opine about time periods for which Plaintiffs have not been afforded full discovery and striking Defendants' non-report "experts" because (1) they should have written reports; (2) they failed to disclose the information required by Rule 26—the opinions they intend to offer and the facts on which they are based; (3) Defendants have refused to make these witnesses available for a deposition about their expert opinions, with one exception; and (4) their anticipated testimony is needlessly duplicative and cumulative.

**Background**

This Court's scheduling order required Defendants to disclose their experts on December 18, 2013.  [Doc. 389 at 2]  Defendants served four expert reports and disclosed 15 other non-report experts,[2] committing to allow depositions only of the four report experts and one other.  Despite Defendants' vigorous opposition to any ongoing document production after the discovery cut-off, their expert reports rely heavily on evidence from after that date.  These include October 2013 staffing reports, interviews with staff in November and December 2013, and staff trainings in mid-December.  Worse yet, the reports repeatedly promise that the expert witnesses will continue their work and testify at trial to information not even included in these reports.  For example, Defendants' expert Dr. Penn opines that the delivery of mental health care is constitutionally adequate because ADC has plans to change the substance and frequency of mental health programming for prisoners in isolation and train correctional officials on suicide prevention techniques [Ex. 4 at 76], and their expert Dr. Mendel points to Corizon's plans to recruit and hire more health care staff.  [Ex. 2 at 11]

As to the 14 "non report" experts, like the report experts, they too pledge to offer testimony regarding developments "up until the time of trial," with no countervailing discovery for Plaintiffs.  [*See, e.g.,* Ex. 1 at 3, 6, 11, 18, 34, 40, 44, and 49; Appendix 1 (attached hereto) at 4-7][3]  Tipping the playing field even further, Defendants unilaterally refuse to make all but one of these experts available for deposition, defying the mandate of Rule 26(b)(4)(A) that "[a] party may depose any person who has been identified as an expert whose opinions may be presented at trial."  Nor are Defendants' disclosures as to these experts adequate.  Instead, they identify in broad terms the topics on which they will opine, but default on providing a summary of the actual "facts and opinions to which the

---

[2] Defendants have since withdrawn one, Mark Jansen, so only 14 are at issue.
[3] Defendants' four expert reports are filed as Exhibits 2-5 of the Specter Declaration.  Appendix 1 is a complete listing of all sections of these reports that rely upon documents created and events that occurred after discovery closed, or that rely upon future developments.

witness is expected to testify," as required by Rule 26(b)(2)(C)(ii).   Defendants' disclosures as to these experts also show that their testimony would be needlessly duplicative and cumulative.

Plaintiffs forecast in November that Defendants would present a case that capitalized on the time period after discovery closed, noting the danger of a "a year's time in which we can't conduct discovery but the defendants can use whatever information they have about their system."   [Hearing Tr., Nov. 1, 2013 at 32:7-9]   The Court underscored Defendants' obligation "to list their trial documents" and responded to Plaintiffs' concerns by rhetorically asking "if they try to list a bunch of documents that you haven't had access to, do you think they are going to get away with that?"   [*Id*. at 33:3-5]   That is precisely what Defendants have done with the expert reports: tried to use information to which they denied Plaintiffs access to sandbag Plaintiffs and their experts. The question now is whether they will get away with it, or whether, as the Court asserted, it will have a trial that's "fair to both sides."   [*Id*. at 33:14]

Each of Defendants' report experts relies on post-discovery "evidence" to support his opinions.   For example, Dr. Seiter, offered as an expert on conditions of confinement in isolation, notes that ADC is currently reviewing "maximum custody inmates" to determine if some may be removed to "close custody" housing.   [Ex. 5, Seiter Report at 23]   He opines on the ADC's alleged progress, citing a reduction in the number of prisoners in "maximum custody" as of December 9, 2013–two and a half months after discovery closed.   [*Id*.]

Dr. Mendel, Defendants' medical care expert, similarly emphasizes alleged improvements since the close of discovery:

> As of November 2013, the average wait time at Lewis based on my random selection of records was 25 days, but more than half of the encounters were sent directly to providers by the nurses.  As of November 2013, the average wait time at Yuma based on my random selection of records was 8.33 days from the submission of an HNR.  The maximum wait time at Yuma during that time was twelve days.   This is a significant improvement from the 45 days reported by Corizon at the end of September.

[Ex. 2, Mendel Report at 11]  Dr. Mendel repeats his reliance on post-discovery evidence for many other opinions, including opinions on the adequacy of Defendants' monitoring of prisoners' health needs;[4] the provision of medication to prisoners;[5] the sufficiency of ADC's responses to prisoner grievances [*id*. at 4 (recounting his review of grievances from November 2013); the average wait time to see a provider for routine care (*id*. at 10); the number of health care staff ADC employs (*id*. at 20-22); and the timeliness of non-formulary medication approvals (*id*. at 19 (basing conclusion on conversations he had with staff during September and November visits to prisons)].

Dr. Penn, Defendants' mental health care expert, relied on an assessment conducted on December 6, 2013—more than two months after the close of discovery—to conclude that "Staff implemented appropriate objective baseline assessments . . . for patients on antipsychotic medications . . . ."  [Ex. 4, Penn Report at 40 and Ex. A, p. 4] Likewise, Dr. Penn's conclusions on the number of prisoners participating in mental health programs who had jobs [(*id*. at 51, 53); the training programs available to correctional officers who will supervise suicidal prisoners or those in isolation (*id*. at 76)]; the conditions of the cells for maximum custody prisoners;[6] and the number of prisoners currently situated at each step of ADC's maximum custody program depend on information from November or December of 2013.[7]

The conclusions of Defendants' dental expert, Dr. Dovgan, regarding the sufficiency of dental care for ADC prisoners are, in multiple instances, based on

---

[4] *See id*. at 22-23 ("Corizon and ADC worked extensively over the past few months with CareLog to create a comprehensive database of all chronic care needs.").

[5] *See id*. at 17 ("Although medication continuity was identified as an issue in the June NCCHC accreditation Report for Perryville, it had been corrected as of October 2013.").

[6] *Id*. at 75-76 ("For example, I identified that in September 2013 within the Florence Central Unit:  offenders had been pulled out of cell blocks 5 and 7 (long linear units) and placed into cell block 4 (which had shorter runs and open cell-fronts) therefore establishing shorter runs, more open cell fronts, improved visualization by correctional officers, and improved access for offenders to communicate with correctional and mental health staff.").

[7] *Id*. at 48, 56 ("The contact visit exception at Lumley was only approved in November 2013 and currently only one inmate has reached that level.").

information that post-dates September 27, including his conclusions regarding the average wait time for prisoners requesting routine care [(Ex. 3, Dovgan Report at 13-16); the number of fillings ADC staff have performed (*id.* at 21-22); the number of dentures ADC has provided (*id.* at 67); the number of cleanings ADC has performed (*id.* at 68); and the adequacy of care provided since September to prisoners identified by Plaintiffs' dental expert as receiving inadequate dental care (*id.* at 72)].

Where Defendants' experts cannot rely on developments that have occurred since the close of discovery, they go even further into the future, relying on promised improvements that have yet to occur.  *See* Appendix 1 at 4-7.  This includes:

- future hikes in the number of health care providers Corizon employs [Ex. 2 at 11];
- speeding the time for processing prisoners' health need requests (HNRs) [*id.* at 22-23];
- the future implementation of ADC's electronic medical record system [*id.* at 23];
- increasing the number of outdoor recreation areas servicing isolation units;[8]
- improving the substance and frequency of mental health programming for prisoners in isolation [Ex. 4. at 51, 54; Ex. 2 at 22];
- training correctional officials on suicide prevention techniques [Ex. 4 at 76];
- the review of a prisoner's medical record when placed in segregation [*id.* at 79];
- conducting mental health rounds on a sufficiently frequent basis for prisoners in segregation [*id.*];
- the placement of prisoners in isolation in conditions that appropriately correspond to their mental health status and security risk [Ex. 5 at 22];
- the training of correctional officers and line staff working in the mental health pods on how to interact with mentally ill prisoners [*id.*];improving the degree of movement allowed prisoners in isolation [*id.*]; and
- increasing the availability of jobs and programs to prisoners in isolation [*id.*].

---

[8] *See* Ex. 4, Penn Report at 45 ("Outdoor recreation enclosures are under construction at Browning between Wings 3 and 4 and tables are planned for installation … "); *id.* at 47 ("During my visit, I observed a second outside recreation/programming area under construction between Wings 3 and 4 and understand that, upon completion, inmates housed in those areas will be afforded outdoor opportunities in accordance with their Step level").

Currently, there is no avenue for Plaintiffs to take meaningful discovery on these vague, promised improvements.

Finally, Defendants refuse to produce numerous post-discovery documents specifically cited and relied upon by their experts.  For example, during his December 2013 inspection tours, Dr. Penn reviewed a number of prisoner medical files [Ex. 4 at 5-6], and relies on these files, among other documents, for his conclusion that there are "no significant problems or concerns" with ADC's mental health care system.  [*Id.* at 90] Plaintiffs have requested production of these documents [Ex. 9], but Defendants have refused, stating that "Defendants do not have an obligation to produce documents cited by their experts."  [Ex. 10 at 8]

**Argument**

**I.    THE COURT SHOULD STRIKE PORTIONS OF DEFENDANTS' FOUR EXPERT REPORTS THAT RELY UPON ON EVENTS THAT OCCURRED AFTER THE CLOSE OF DISCOVERY OR FUTURE EVENTS THAT MAY OCCUR UP UNTIL TRIAL.**

Defendants will severely prejudice Plaintiffs if they are allowed to introduce and rely on evidence that Plaintiffs have had no opportunity to probe with discovery.  *Harkabi v. SanDisk Corp.*, No. 08 Civ. 8203, 2012 WL 826892, at *8 (S.D.N.Y. Mar. 12, 2012) ("If evidence […] was permitted, SanDisk would be required to defend against a product for which little or no discovery was conducted.  That sort of prejudice is manifestly unfair.").  Were the Court to let Defendants present such evidence without reopening discovery, Defendants could claim that any previously identified deficiencies have been remediated since the discovery deadline, without exposing that contention to meaningful cross-examination because Plaintiffs would have no discovery to prove the contrary.

These fears are not hypothetical.  In contrast to Defendants' experts' cheerful characterizations, serious problems obviously remain.  For example, on January 8, 2014, the *Arizona Republic* reported that a nurse working for Corizon recently injected and exposed 24 diabetic prisoners at the Lewis prison to hepatitis B and C.  [Ex. 11]  The incident was similar to a 2012 incident at the same prison under Wexford's watch, in

1   which a nurse spurred a hepatitis C scare by contaminating the insulin supply.  [*Id*.]  The

2   incident directly contradicts Dr. Mendel's opinions regarding the improvements since

3   Corizon replaced Wexford but, because discovery is closed, Plaintiffs have no access to

4   the relevant documents.

5        Defendants even refuse to produce medical records and other post-discovery

6   documents specifically cited and relied upon by their experts.  The unfairness of this tactic

7   is patent.   Defendants have access to the complete medical records relied upon by

8   Plaintiffs' experts, and Defendants have stated that at trial their experts will rebut the

9   opinions of Plaintiffs' experts about the care these prisoners received.  [Ex. 1 at 11, 16,

10  18, 38]  At the same time, they deny Plaintiffs and their experts any access to the records

11  relied upon by Defendants' experts for their conclusions that health care and conditions in

12  ADC's isolation units meet constitutional standards.  Defendants' expert reports should be

13  stricken to the extent that they rely on documents Defendants refuse to produce.

14       Unless the Court acts, Defendants will continue to selectively introduce self-

15  serving evidence that post-dates the close of discovery.  Dr. Mendel states as much: "By

16  the time of the trial in this case, we can expect clear proof that the system is not broken

17  and that the key components of the healthcare delivery system are operating within the

18  standard of care."  [Ex. 2, Mendel Report at 44]  Accordingly, Plaintiffs ask that the Court

19  strike those portions of the reports citing or relying on such evidence, and order that the

20  trial of this case be based on conditions as they existed on September 27, 2013, the day

21  discovery closed.   *See Graves v. Arpaio,* No. CV-77-00479-PHX-NVW  (D. Ariz.

22  Sept. 10, 2013), Docket 2156 at 2 (ordering that the relevant conditions for the purposes

23  of determining whether constitutional violations existed in a jail system would be those

24  existing on August 9, 2013).

25       Alternatively, Plaintiffs respectfully request that the Court re-open discovery to

26  allow Plaintiffs to test Defendants' contentions and set a new cut-off that precludes

27  Defendants from introducing later created evidence.  The Supreme Court approved the

28  schedule set by a special three-judge panel in this Circuit, presiding over a statewide

1    prison conditions class action, that allowed the parties to conduct discover until three

2    months before trial.  *Brown v. Plata*, 563 U.S. __, 131 S. Ct. 1910, 1935 (2011); *see also*

3    *Graves*, Docket 2156 at 3 (setting discovery cutoff 35 days prior to the date of trial).  If

4    the Court chooses not to strike the portions of the reports and related conclusions based on

5    events occurring after the close of discovery, Plaintiffs ask that the schedule in this case

6    be similarly re-set so that discovery closes in July and that both parties be bound by that

7    cut off in their trial presentations.

8    **II.    DEFENDANTS' FOURTEEN ADDITIONAL EXPERTS SHOULD BE
         STRICKEN**

9

10           **A.    Fourteen of Defendants' Experts Should Be Stricken for Their Failure
              To Provide Reports When Their Testimony Will Offer Opinions
              Developed Specially for This Litigation.**

11

12           Defendants' disclosure statement identifies 14 fact witnesses, some never listed at

13   all before, who they now deputize as "experts" so they can testify to hearsay and their

14   opinions.   [Ex. 1 at 2-52]   To avoid submitting reports for the remaining experts,

15   Defendants designate them as Rule 26(a)(2)(C) witnesses.   Making matters worse,

16   Defendants preview the topics these so-called "experts" will testify to, but fail to provide

17   the required summary of the opinions and facts they will offer.  *See* Rule 26(a)(2)(C)(ii).

18   In further defiance of the rules, Defendants dismissed Plaintiffs' request for all but one of

19   these depositions, claiming "you aren't entitled to these depositions."  [Ex. 6]  Instead,

20   they insist on ambushing Plaintiffs at trial by calling these non-reporting experts without

21   giving Plaintiffs any reasonable opportunity to test, or even to understand, their expert

22   opinions ahead of time.[9]

23           In the Ninth Circuit, expert witnesses must submit reports if their opinions are

24   rendered specially for the litigation or are based on evidence the experts reviewed because

25   of the litigation, rather than solely on facts they would have reviewed in the normal course

26   of their non-expert job duties.  *See Goodman v. Staples The Office Superstore, LLC*, 644

27   _____

28           [9] Defendants agreed to allow Plaintiffs to depose only one expert, Mark Dolny.
     [Specter Decl. ¶ 8, Ex. 8]

F.3d 817, 826 (9th Cir. 2011) (giving example of treating physicians, who must complete reports if their opinions go "beyond the scope of the treatment rendered" or are based on "information . . . that [he or she] hadn't reviewed during the course of treatment"). The rule applies not only to treating physicians, but to all hybrid fact-and-opinion experts. *LaShip, LLC v. Hayward Baker*, Inc., ---F.R.D.---, CIV.A. 11-0546, 2013 WL 6017956, at *5-7 (E.D. La. Nov. 13, 2013) (citing *Goodman*, holding that expert should have submitted a report because he rendered his opinion not from his work at the site, but specifically for the litigation to support the plaintiff's damages claim). Although Fed. R. Civ. P. 26(a)(2) does not require reports from certain witnesses, Defendants cannot avoid the reporting requirement for their 14 non-reporting experts simply by citing Rule 26(a)(2).[10]

Rather, like the treating physician in *Goodman*, Defendants' 14 experts should have submitted reports because their opinions were rendered specially for this litigation and are based on facts that the witnesses would not have reviewed, but for this litigation. That Defendants' experts are employed by ADC, Corizon, or Smallwood means merely that they, like the treating physicians in *Goodman*, may have percipient knowledge related

---

[10] Under Rule 26(a)(2)(B), employees of a party testifying as experts must provide reports if their duties "regularly involve giving expert testimony." A Westlaw search shows that some of Defendants' non-reporting experts often give expert testimony. *See, e.g., Arenberg v. Ryan*, 2013 WL 5346305 (D. Ariz. Sept. 23, 2013) (Rowe expert trial testimony); *Worley v. Corr. Med. Servs.*, 2013 WL 4874456 (D. Ariz. Sept. 12, 2013), at *1 (Rowe declaration); *Maloney v. Ryan*, 2013 WL 3945921 (D. Ariz. July 31, 2013), at *5-6, 8 (Daniels declaration and Donnelly "Statement of Nutritional Adequacy," Dkt. 22-1 at 8); *Palmer v. Wexford Med.*, 2013 WL 3930559 (D. Ariz. July 22, 2013), at *6 (Rowe declaration); *Torres v. Ryan*, 2013 WL 1191266 (D. Ariz. March 22, 2013), at *5 (Rowe declaration); *Delacruz v. Ryan*, 2013 WL 1149547 (D. Ariz. March 19, 2013), at *1 (Rowe declaration); *West v. Brewer*, 2011 WL 6724628 (D. Ariz. Dec. 21, 2011), at *8, 16-17 (McWilliams expert testimony); *DeRoche v. Adu-Tutu*, 2011 WL 4947494 (D. Ariz. Oct. 18, 2011), at *1 (Rowe declaration); *Brinkman v. Schriro*, 2010 WL 2035594 (D. Ariz. May 20, 2010), at *3 (Rowe affidavit); *Hernandez v. Schriro*, 2008 WL 192343 (D. Ariz. Jan. 22, 2008) at *7-9 (McWilliams declaration); *Baptisto v. Ryan*, 2006 WL 798879 (D. Ariz. Mar. 28, 2006) at *5-6, 11-13, 19-20, 22-24, 34-35 (McWilliams expert testimony); *Hampton v. Ryan*, 2006 WL 3497780 (D. Ariz. Dec. 4, 2006) at *1, 13 (McWilliams declaration); *Walker v. Schriro*, 2006 WL 2772845 (D. Ariz. Sept. 23, 2006) at *1, 7-9 (McWilliams declaration). Obviously there may be many other such cases not reported on Westlaw. Accordingly, the Court should require each of these 14 witnesses to state the number of times they have given expert testimony if it contemplates allowing them to proceed without reports.

to the case *apart from* their expert opinions.  But their status as employees does not automatically excuse them from submitting reports when a report is necessary to understand the scope of opinions they intend to offer at trial.  *See Goodman*, 644 F.3d at 826; *Fouchia v. Carlota Copper Co.*, No. CV-11-00374-PHX-NVW, 2012 WL 2072673 (D. Ariz. June 8, 2012) at *5-6 (holding under *Goodman* that physician who did not produce report would be barred from testifying as to any matter he did not learn directly from examination of the plaintiff, including any testimony "based on scientific, technical, or other specialized knowledge"); *Hermann,* 2012 WL 5569769 at *3 (giving an opinion formed because there is a lawsuit means the individuals are "considered 'retained or employed' under Rule 26(a)(2)(B) and must file a written report); *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 735 (7th Cir. 2010) (reports required where treating physicians offered opinions on causation "specifically for the purpose of litigation" and where there was no evidence "suggesting that either doctor previously considered or determined the cause of . . . injuries during the course of treatment").

For example, Defendants specifically state that most of these experts will rebut Plaintiffs' experts' opinions.  [*See* Ex. 1 at 7 (McWilliams to rebut Mr. Vail and Dr. Haney and "allegations contained in Plaintiffs' expert reports"); *id.* at 11 (Rowe to testify about "Plaintiffs' experts"); *id.* at 16 (Robertson to testify about "Plaintiffs' experts"); *id.* at 18 (Taylor to rebut Dr. Stewart, Dr. Haney, and Mr. Vail); *id.* at 36 (Dolny to discuss Plaintiffs' experts' methodology and opinions); *id.* at 38 (Smallwood to rebut Dr. Shulman's methodology and opinions); *id.* at 42 (Trujillo to rebut Mr. Vail and Dr. Haney); *id.* at 51-52 (Williams to discuss "Plaintiffs' experts")]

Similarly, Defendants say that their experts will opine about issues the Plaintiffs raised in the litigation.  For example, Mark Dolny is preparing a statistical analysis of Plaintiffs' expert reports, but has not prepared a report of his opinions, requiring Plaintiffs to go blind into a deposition on scientific matters.  [*See also, e.g.*, *id.* at 7 (McWilliams to testify on "confinement issues raised by named Plaintiffs")]  Such testimony necessarily was developed specifically for this litigation.

Further, Defendants' experts intend to testify about treatment provided to the named plaintiffs and other prisoners. Even where Defendants' experts may have treated certain prisoners, their stated testimony goes beyond facts they learned in the course of treatment and requires a report for those additional facts. [*See, e.g.*, *id.* at 8-10 (Rowe to testify to review of medical records for 12 named plaintiffs); *id.* at 13-16 (Robertson will opine about review of records of several named plaintiffs, but only personally treated Jensen); *id.* at 16 (Taylor to testify to her review of records of the prisoner population and named plaintiffs, but only has personal knowledge of Brislan and Gamez);[11] *id.* at 33-34 (Fleming to testify to the mental health treatment provided to nine prisoners, but no indication he treated any of them); *id.* at 34-36 (Buenker to testify about psychiatric services rendered to the prisoner population at large and specific named plaintiffs, including prisoners whom Buenker did not personally examine); *id.* at 44-49 (Hanstad to testify about dental care provided to various prisoners, but only has personal knowledge for named plaintiffs Chisholm and Wells); *id.* at 49-52 (Williams to testify about review of records of various prisoners and named plaintiffs, but no indication he treated them)]

Additionally, Defendants' 14 non-report expert witnesses will testify about the overall propriety of ADC policies and practices and apparently intend to offer general opinions about correctional policy and health care, although they do not disclose what those specific opinions are. [*See generally id.* at 2-52] These opinions largely are not based on facts these experts learned in the course of treating patients or their other routine job duties; they are formulated specifically and solely to rebut Plaintiffs' claims in this litigation. They are precisely the kind of opinions that require an expert report. *See Goodman, supra*.

To exacerbate the prejudice, Defendants ignore Rule 26(a)(2)(C)'s requirement that the non-report experts summarize the opinions and facts to which they will testify. Instead, the disclosures are generally so vague and broad that they do not reasonably

---

[11] *See* Specter Decl. ¶ 13, Ex. 12 [Taylor Depo at 245:19-22].

allow Plaintiffs to prepare for trial. They often fail to even explain which portions of described testimony is percipient fact and which is expert opinion. Defendants' disclosure of Defendant Ryan is representative. [Ex. 1 at 2-3] Defendants note in the last sentence that Ryan will testify "pursuant to" Rule 26(a)(2)(C), without more. Others identify topics, but do not state their actual opinions or the facts to which they will testify. Without judicial relief, Plaintiffs will be forced to blindly cross-examine these witnesses at trial without the benefit of either a report, the required summary of opinions and facts, a deposition, or access to discovery of timely information.

Plaintiffs therefore request that the Court exercise its Rule 37 authority to preclude Defendants' 14 non-report writing experts from offering expert testimony at trial. *See* Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (Rule 37 provides a "self-executing" and "automatic" sanction of evidence exclusion to encourage timely disclosure); *Wong v. Regents of the Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005) ("Parties must understand that they will pay a price for failure to comply strictly with scheduling and other orders"). In truth, this is the only viable remedy. Even if Plaintiffs received 14 expert reports tomorrow, Plaintiffs would not have time to digest and depose those experts without extending the current deadlines for expert depositions, dispositive motions, and trial. And were Plaintiffs required to examine 14 expert reports and take 14 depositions within the current schedule, Plaintiffs would be severely prejudiced by the lack of opportunity to prepare. This dilemma is purely of Defendants' making, and the most equitable remedy is to exclude Defendants' experts from trial. *See Fouchia,* 2012 WL 2072673 at *5-6 (refusing to permit untimely expert reports and excluding portions of expert witness testimony); *Lampe Berger USA, Inc. v. Scentier, Inc.*, No. 04-354, 2008 WL 3386716, at *4 (M.D. La. Aug. 8, 2008) ("To allow [a party's] untimely, supplemental report into evidence would simply flout the deadlines this Court has been reluctant to extend on several occasions."); *cf. Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 684 (M.D. Fla. 2010) (excluding expert because defendant was left "without the chance to depose th[e] expert witness," and explaining

1    that, had plaintiffs timely disclosed the expert, the defendant "would have had the

2    opportunity to re-depose [the witness] in the context of his qualifications and specific

3    opinions to be rendered prior to the discovery deadline").

**B.    If Defendants' Experts Are Not Stricken, Defendants Must Be Ordered to Comply with Rule 26(a)(2)(B).**

6        Even if the Court were to permit Defendants' experts to testify at trial, Plaintiffs

7    should be allowed to depose these witnesses after receiving expert reports.  As noted

8    above, Rule 26 provides for the depositions of "*any* person who has been identified as an

9    expert whose opinions may be presented at trial."  Fed. R. Civ. P. 26(b)(4)(A) (emphasis

10   added).  The rule applies whether the expert submits a report or not.  *See, e.g.*, *Brown v.

11   Best Foods*, 169 F.R.D. 385, 387 (N.D. Ala. 1996) ("'Rule 26(b)(4) anticipates that not all

12   expert witnesses will prepare reports, *and allows the taking of depositions of non-

13   reporting experts.*'") (emphasis added) (quoting *Smith v. State Farm Fire & Cas. Co.*, 164

14   F.R.D. 49, 55 (S.D. W.Va. 1995)); Advisory Committee Notes to Fed. R. Civ. P. 26 ("A

15   treating physician, for example, can be deposed or called to testify at trial without any

16   requirement for a written report.").

17       Despite Rule 26, Defendants have refused to serve reports or make their 14 experts

18   available for expert depositions and asserted in a meet-and-confer that their non-reporting

19   experts were not experts for purposes of depositions, but were instead merely "ordinary

20   witnesses."  [Specter Decl. ¶ 8]  Defendants cannot have it both ways.

21       Moreover, Defendants consistently took the stance during fact depositions that

22   Plaintiffs could not ask questions calling for expert opinion, even though Defendants have

23   now designated some of those same witnesses as experts.  [*See, e.g.*, Ex. 13 (Smallwood

24   Tr.) at 186-87, 195, 198-99, 226-27, 263-64; Ex. 14 (Williams Tr.) at 75-77, 79; Ex. 15

25   (Robertson Tr.) at 70]  Even had Plaintiffs known they were intended experts, Plaintiffs

26   could not have tested the experts' opinions during fact discovery, and it is prejudicial to

27   prevent Plaintiffs from doing so now.

28

### C.    Defendants' Non-Report Writing Experts are Duplicative and Should Be Stricken

Additionally, to permit Defendants to present 18 expert witnesses on cumulative and duplicative topics is wasteful and burdensome.

Expert evidence may be excluded "if its probative value is substantially outweighed by a danger of … needlessly presenting cumulative evidence."  Fed. R. Evid. 403.   "There can be no doubt of the power of the trial court, in the exercise of a sound and reasonable judicial discretion, to limit the number of expert witnesses to the issue of value."  *Ruud v. United States*, 256 F.2d 460, 462, n.5 (9th Cir. 1958) (quoting *Chapman v. United States*, 169 F.2d 641, 642 (10th Cir. 1948)); *see United States v. Walker*, 910 F. Supp. 861, 863 (N.D.N.Y. 1995) ("This Court has never in the past allowed the government to make its case through the sheer weight of successive expert testimony by even two experts as to their identical conclusions on identical issues . . ."). If Defendants' duplicative experts are not limited by the Court, then "[t]he number of experts is limited only by the pool of available expertise and the size of the litigant's purse."  Kenneth W. Graham, 22A Fed. Prac. & Proc. Evid. § 5220 (2d ed. April 2013) at n.27.[12]

Four people were designated as experts on medical care topics:  Dr. Mendel, Dr. Robertson, Dr. Rowe, and Dr. Williams; but only Dr. Mendel submitted a written report and will be made available for an expert deposition.  [Ex. 1 at 8-11, 13-16, 49-52, 54]  Six people were designated as expert witnesses on topics related to mental health care:  Dr. Penn, Dr. Buenker, Dr. Fleming, Mr. McWilliams, Dr. Taylor, and Mr. Trujillo; but only Dr. Penn submitted a written report and is available for an expert deposition.  [*Id.* at 4-8, 16-18, 33-36, 41-44, 52]  Three people were designated as experts on topics related to dental care:  Dr. Dovgan, Dr. Smallwood, and Dr. Hanstad; but only Dr. Dovgan

---

[12] Indeed, not even this limit applies in this case, because Defendants are designating their own employees as expert witnesses.  Thus for Defendants, unlike for Plaintiffs, there is little or no cost to designating multiple and duplicative experts.

1   submitted a written report and will sit for an expert deposition.  [*Id.* at 37-41, 44-49, 52-

2   53]  Finally, six individuals were designated as experts on topics related to the conditions

3   of isolation:  Dr. Seiter, Mr. Daniels, Ms. Donnelly, Mr. McWilliams, Dr. Taylor, and Mr.

4   Trujillo; but only Dr. Seiter submitted a written report and will be available for an expert

5   deposition.  [*Id.* at 4-8, 16-18, 33, 37, 41-44, 53]

6       Plaintiffs move to strike (1) Drs. Rowe, Robertson, and Williams as needlessly

7   duplicative of Dr. Mendel; (2) Drs. Taylor, Fleming, and Buenker, and Messrs.

8   McWilliams and Trujillo as needlessly duplicative of Dr. Penn; (3) Drs. Smallwood and

9   Hanstad as needlessly duplicative of Dr. Dovgan; and (4) Dr. Taylor, Ms. Donnelly, and

10  Messrs. Daniels, McWilliams, and Trujillo as needlessly duplicative of Dr. Seiter.

11                              **Conclusion**

12      For the reasons stated above, the Court should strike Defendants' testifying expert

13  reports to the extent they purport to opine about time periods for which Plaintiffs have not

14  been afforded full discovery, or rely upon documents Defendants have refused to produce;

15  strike Defendants' non-report experts as improper and preclude any party from offering

16  evidence that post-dates the discovery cut-off. The requested sanctions are warranted, as

17  Defendants are unable to show that their egregious noncompliance with the requirements

18  of Rule 26 is "substantially justified" or "harmless."  Fed. R. Civ. P. 37(c)(1); *Hoffman v.*

19  *Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1178-79 (9th Cir. 2008) (citing *Yeti by*

20  *Molly Ltd.*, 259 F.3d at 1106).

21      Respectfully submitted,

22

23

24

25

26

27

28

Dated:  January 27, 2014

**PRISON LAW OFFICE**

By:   s/ Donald Specter
    Donald Specter (Cal. 83925)*
    Alison Hardy (Cal. 135966)*
    Sara Norman (Cal. 189536)*
    Corene Kendrick (Cal. 226642)*
    Warren E. George (Cal. 53588)*
    1917 Fifth Street
    Berkeley, California 94710
    Telephone:  (510) 280-2621
    Email:    dspecter@prisonlaw.com
             ahardy@prisonlaw.com
             snorman@prisonlaw.com
             ckendrick@prisonlaw.com
             wgeorge@prisonlaw.com

*Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
           agerlicher@perkinscoie.com
           keidenbach@perkinscoie.com
           jhgray@perkinscoie.com
           mdumee@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
           jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Qureshi (Md. 28882)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@npp-aclu.org
             afettig@npp-aclu.org
             aqureshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com
             dkiernan@jonesday.com
             scalderon@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com
             tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:   kmamedova@jonesday.com
             jkmessina@jonesday.com

*Admitted *pro hac vice*

1    Kevin Brantley (Cal. 251886)*
     **JONES DAY**
2    3161 Michelson Drive, Suite 800
     Irvine, California 92612
3    Telephone:  (949) 851-3939
     Email:    kcbrantley@jonesday.com
4
     *Admitted *pro hac vice*
5
     *Attorneys for Plaintiffs Shawn Jensen;*
6    *Stephen Swartz; Dustin Brislan; Sonia*
     *Rodriguez; Christina Verduzco; Jackie*
7    *Thomas; Jeremy Smith; Robert Gamez;*
     *Maryanne Chisholm; Desiree Licci; Joseph*
8    *Hefner; Joshua Polson; and Charlotte*
     *Wells, on behalf of themselves and all others*
9    *similarly situated*

10   **ARIZONA CENTER FOR DISABILITY**
     **LAW**
11

12   By:   s/ Asim Varma
          Sarah Kader (Bar No. 027147)
13        Asim Varma (Bar No. 027927)
          5025 East Washington Street, Suite 202
14        Phoenix, Arizona 85034
          Telephone:  (602) 274-6287
15        Email:    skader@azdisabilitylaw.org
                    avarma@azdisabilitylaw.org
16
          J.J. Rico (Bar No. 021292)
17        Cathleen M. Dooley (Bar No. 022420)
          **ARIZONA CENTER FOR**
18        **DISABILITY LAW**
          100 N. Stone Avenue, Suite 305
19        Tucson, Arizona 85701
          Telephone:  (520) 327-9547
20        Email:    jrico@azdisabilitylaw.org
                    cdooley@azdisabilitylaw.org
21
     *Attorneys for Arizona Center for Disability*
22   *Law*

23

24

25

26

27

28

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on January 27, 2014, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand

7

Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov

8

Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

9

Daniel P. Struck

10

Kathleen L. Wieneke
Timothy J. Bojanowski

11

Rachel Love
Nicholas D. Acedo

12

Courtney R. Cloman
Ashlee B. Fletcher

13

Anne M. Orcutt
STRUCK WIENEKE, & LOVE, P.L.C.

14

dstruck@swlfirm.com
kwieneke@swlfirm.com

15

tbojanowski@swlfirm.com
rlove@swlfirm.com

16

nacedo@swlfirm.com
ccloman@swlfirm.com

17

afletcher@swlfirm.com
aorcutt@swlfirm.com

18

19

*Attorneys for Defendants*

20

21

s/ Delana Freouf

22

23

24

25

26

27

28

78204-0001/LEGAL29140542.2                                    -20-