**Index of Exhibits to the Declaration of Donald Specter**

**in Support of Plaintiffs' Motion to Strike**

Exhibit 1:     Excerpts of Defendants' Eleventh Supplemental Expert Disclosure dated December 18, 2013

Exhibit 2:     [FILED UNDER SEAL] Expert Dr. Lawrence H. Mendel, D.O.'s Report

Exhibit 3:     [FILED UNDER SEAL] Expert Dr. John Dovgan, D.D.S.' Report

Exhibit 4:     [FILED UNDER SEAL] Expert Dr. Joseph V. Penn, M.D.'s Report

Exhibit 5:     [FILED UNDER SEAL] Expert Dr. Richard P. Seiter, Ph.D.'s Report

Exhibit 6:     January 8, 2014 Email exchange between David Fathi and Dan Struck

Exhibit 7:     January 13, 2014 Letter from Don Specter to Dan Struck

Exhibit 8:     January 17, 2014 Letter from Don Specter to Dan Struck

Exhibit 9:     January 23, 2014 Email from David Fathi to Courtney Cloman

Exhibit 10:    January 23, 1014 Letter from Courtney Cloman to Plaintiffs' counsel

Exhibit 11:    January 8, 2014 Article on the *Arizona Republic* website

Exhibit 12     Excerpt of the Deposition Transcript of Dr. Nicole Taylor taken on September 5, 2013

Exhibit 13:    Excerpts of the Deposition Transcript of Dr. William Smallwood taken on August 20, 2013

Exhibit 14:    Excerpts of the Deposition Transcript of Dr. Winfred Williams taken on October 10, 2013

Exhibit 15:    Excerpt of the Deposition Transcript of Dr. David Robertson taken on August 20, 2013

# EXHIBIT 1

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; *et al.*, and Arizona Center for Disability Law, | NO.  CV12-0601-PHX-NVW |
| Plaintiffs, | |
| v. | **DEFENDANTS' *ELEVENTH* SUPPLEMENTAL (*EXPERT*) DISCLOSURE STATEMENT** |
| Charles Ryan, Director; *et al.*, | |
| Defendants. | |

Defendants,   through   counsel   and   pursuant   to   Federal   Rule   of   Civil

Procedure 26(a)(1) *and (a)(2)*, submit their ***Eleventh*** Supplemental (***Expert***) Disclosure

2791530.1

Statement.   Defendants will supplement and/or amend this disclosure statement as information is discovered.   ***Supplemental and/or revised text is shown in bolded and italicized font***.

**I.    NAMES, ADDRESSES, AND TELEPHONE NUMBERS OF INDIVIDUALS LIKELY TO HAVE DISCOVERABLE INFORMATION**

A. INDIVIDUALS WHO WILL BE CALLED TO TESTIFY

1.    Charles Ryan, ADC Director, Defendant
      c/o Struck Wieneke & Love, P.L.C.[1]
      3100 West Ray Road, Suite 300
      Chandler, AZ 85226
      (480) 420-1600
          and
      Office of the Attorney General, State of Arizona
      1275 West Washington Street
      Phoenix, AZ 85007-2926
      (602) 542-1610

Charles Ryan is the Director of the ADC. Director Ryan will testify regarding his training and experience in corrections and his role in the development of policies, procedures, training programs, and ADC's strategic vision.  Director Ryan has more than 35 years of experience in the field of corrections.  He has served as Director of the Arizona Department of Corrections since 2009, and prior to that as Deputy Director of Prison Operations, as a prison warden and as a prison administrator.  He possesses in-depth, hands-on  institutional knowledge.  Director Ryan has extensive experience in the development of correctional institution policy including the formulation of the inmate classification system, the staffing, operation and activities of various prison complexes and the development of budgetary requirements.  Director Ryan will testify regarding the centralization of health and mental health care for certain inmate populations.  He  is likely to testify with regard to the maintenance and administration of ADC institutions and

---

[1] All parties listed as care of Struck Wieneke & Love, P.L.C. shall also be in care of the Attorney General's Office, State of Arizona, regardless of whether it is explicitly stated. Further, Struck Wieneke and Love's and the Attorney General's Office's contact information for all parties shall be the same as listed for Director Ryan, unless specifically stated otherwise.

programs; ADC policies, procedures, and practices, including those related to medical, dental and mental health care as well as the provision of adequate care to ADC inmates in compliance with constitutional requirements; the improvements in the delivery of health care to the ADC inmate population; the privatization of the entire health care delivery system, specifically, the taking over of the health care system by Wexford Health Sources ("Wexford") from July 1, 2012 through March 3, 2013, and by Corizon Health on March 4, 2013; ADC facilities' compliance with the National Commission on Correctional Health Care Standards ("NCCHC"), Wexford's compliance during its tenure, and Corizon's compliance after it took over on March 4, 2013; various budgetary issues surrounding the ADC and the overall operation of ADC; his recommendation of policies and programs to the Governor and Legislature for improving corrections programs including health care services; his establishment of employment qualifications for key personnel as well as relevant staffing policies, procedures, levels, and issues with regard to dental, medical, and mental health personnel as well as to any communications with said personnel; financial issues relative to the administration of specialty care to inmates at ADC as well as ***maximum custody and detention units*** and conditions of confinement issues in various ADC facilities; exhaustion of the grievance appeal process.  He will also discuss why changes in policies and procedures were made, and will rebut the suggestion that changes were made because of the filing of Plaintiffs' lawsuit.  ***Director Ryan will testify regarding these areas as they develop up until the time of trial.  Director Ryan will also testify regarding changes implemented throughout ADC regarding the provision of health care and conditions of confinement for those mentally ill inmates in maximum custody or detention units and the positive outcomes resulting from those changes.  Director Ryan will testify consistent with his deposition testimony.  Director Ryan will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).***

      2.     Richard Pratt, ADC Quality/Clinical Program Evaluation Administrator and former Interim Director, Health Services ("HS") Division, Defendant c/o Struck Wieneke & Love, P.L.C.

Richard Pratt is the Quality/Clinical Program Evaluation Administrator and the former Interim Division Director of Health Services at ADC.  Please see Exhibit Bates Numbered ADC123458-123461 for Mr. Pratt's credentials and qualifications.  Mr. Pratt was previously deposed and Defendants will rely on his deposition testimony. In addition to his deposition testimony, Mr. Pratt is likely to testify with regard to  policies, procedures, and practices, including those related to medical, dental, mental health care; his knowledge of Plaintiffs' medical, dental and mental health needs requests and Plaintiffs' institutional history as reflected in grievance appeals files; the privatization of the entire health care delivery system, specifically, the taking over of the entire health care system by Wexford; ADC policies and procedures including those related to medical, dental and mental health care as well as the provision of adequate care to ADC inmates in compliance with constitutional requirements; relevant staffing policies, procedures, levels; ADC facilities' compliance with the NCCHC standards; Wexford's compliance during its tenure; compliance with contract requirements by Corizon; and Corizon's  compliance after it took over on March 4, 2013; policies and procedures including those related to medical, dental and mental health care, statistics, reports and historical data relating to mental, medical and dental care,  as well as the provision of adequate care to ADC inmates in compliance with constitutional requirements.

3.     Carson McWilliams, ADC Northern Region Operations Director (NROD)
       c/o Struck Wieneke & Love, P.L.C.

Carson McWilliams is the Northern Region Operations Director of ADC. Please see Exhibit Bates Numbered ADC123449-123451 for his credentials and qualifications. Mr. McWilliams is likely to testify with regard to policies and procedures including those related to medical, dental and mental health care, classification, housing, security,  and operations of ADC Complexes in the Northern Region; a description of the complexes, pods, units and security classifications of each facility; fundraising opportunities and activities at Complexes; implementation of structural changes and

programming in ADC facilities; education opportunities and availability to ADC populations; CCTV programing;  implementation of mental health programming at ADC facilities, recreation, employment, and education activities provided to ADC inmates, and the conditions of confinement at ADC facilities, including all matters raised in the court's certification of the class and sub classes as it relates to conditions of confinement, which may include, lighting, food service, recreational activities, mail, food, watch, reading materials and the like; statistics, reports and historical data relating to mental, medical and dental care; and his knowledge of security operations and conditions in maximum custody.

*Mr. McWilliams will also testify regarding the changes implemented and anticipated for maximum custody inmates, specifically inmates who are in maximum custody and designated as Seriously Mentally Ill.  Mr. McWilliams will testify that mental health inmates in maximum custody have been clustered in various housing areas and ADC has identified office space for mental health staff in those housing areas.  ADC has built large recreation enclosures for use by multiple inmates at the same time and in some units, recreation fields will be used by 50-60 inmates at a time.  Inmates are working as porters, groundskeepers, maintenance works, kitchen workers and in other various capacities.  Mental health group programming as well as self-help television programs are being offered.  ADC is also starting to facilitate groups to include ADC programs staff with several new groups planned.  Some units include contact visitation.  A stage system is being implemented to allow the evaluation of inmates with the highest phase receiving the most out-of-cell activity.  This system is based on time, participation in programs and the inmate's general behavior.  Religious services are also available.  Plans are being made to expand the outdoor recreation in groups and on recreation fields.  Even more jobs are being identified and inmates will be screened and/or trained to work in those jobs.  Tables are being placed in pods and runs for increased group out-of-cell interaction.  Proposals are being reviewed for various new out-of-cell activities that will increase and encourage positive*

1   *socialization. Programs are being reviewed and staff is being trained to facilitate*
2   *groups with plans to implement those new programs in January 2014. Maximum*
3   *custody inmates have been reviewed for movement to lower custody levels and*
4   *placement in open cell blocks, such as CB1 and CB2 in ASPC-Florence's Central*
5   *Unit. Plans to open more blocks are scheduled to begin in 2014. ADC is also currently*
6   *reviewing housing areas to cluster inmates designated as Seriously Mentally Ill in a*
7   *more open living environment. Mr. McWilliams will also testify as to the*
8   *implementation and positive outcomes related to these changes once the changes have*
9   *been made.*

10   *Mr. McWilliams has reviewed the reports of Plaintiffs' experts Eldon Vail*
11   *and Craig Haney. Mr. McWilliams will testify regarding the conditions of confinement*
12   *as alleged by both Mr. Vail and Mr. Haney and as to the conditions of confinement for*
13   *those inmates in maximum custody or detention units that may change up until the time*
14   *of trial. Mr. McWilliams will testify regarding the classification system for mentally ill*
15   *inmates placed in maximum custody and detention units, specifically but not limited to*
16   *the fact that ADC's classification system has been reviewed and validated by expert Dr.*
17   *James Austin through the American Correctional Association and the National*
18   *Institute of Corrections. Further, every inmate receives an annual classification review,*
19   *which is an interactive process including the inmate.*

20   *Mr. McWilliams will also testify regarding the ability of inmates, with the*
21   *exception of those inmates on Death Row, to earn their way out of maximum custody or*
22   *detention units and the criteria for such movement. Mr. McWilliams will testify that*
23   *there are various groups of mental health inmates in maximum custody or detention*
24   *units, which each require special considerations in how ADC addresses their housing*
25   *and movement. Additionally, Mr. McWilliams will testify regarding the training that all*
26   *correctional staff receives and the training that staff assigned to mental health units are*
27   *undergoing, including ASIST Training and other specialized training regarding*
28   *inmates with mental illness. Officers are selected to work in those areas of maximum*

6

*custody housing mentally-ill inmates based on their experience level and demonstrated ability to address situations that may arise.  These officers serve 5 years at these posts before rotating in order to provide consistency in these housing areas.  Further, all sergeants and lieutenants will be trained in motivational interviewing as part of crisis intervention training.*

*Mr. McWilliams will also testify regarding the frequency with which inmates have contact with individual staff, whether it be correctional or medical staff.  Mr. McWilliams will testify regarding the opportunity for recreation within the maximum custody and detention units.  Further, maintenance issues throughout ADC are regularly addressed with those issues positing a security or safety concern given higher priority.  Mr. McWilliams will also testify about the maintenance and cleanliness of the complexes; however, there remains the potential for rodent or insect given that inmates are permitted to keep food in their cells and often attempt to keep animals such as ground squirrels and pigeons as pets.*

*Mr. McWilliams will further testify regarding the requirement that staff and visitors to maximum custody and detention units wear safety gear.  He will testify that staff safety is a priority and that the equipment in use today is the direct result of past incidents of violent inmate behavior.  Mr. McWilliams will testify regarding the health and welfare checks that are occurring through ADC for inmates in maximum custody and detention units, including the role of the roving officer whose sole job duty is to conduct such checks.  He will also testify regarding the policies and procedures regarding the use of chemical agents and the circumstances for such use.  He will testify regarding the emphasis ADC places on de-escalation techniques, barring emergency situations requiring immediate response.  Mr. McWilliams will also address conditions of confinement issues raised by named Plaintiffs.*

*Mr. McWilliams will testify as to the current status of all of these areas, the allegations contained in Plaintiffs' expert reports, and changes that may be implemented up until trial.  Mr. McWilliams will testify consistent with his deposition*

1     ***testimony.   Mr. McWilliams will testify pursuant to Federal Rule of Civil Procedure***

2     ***26(a)(2)(C).***

3          4.      Richard Rowe, M.D., former ADC Quality/Clinical, Medical Program
                   Administrator, HS Division

4                    c/o Struck Wieneke & Love, P.L.C.

5          Dr. Richard Rowe is the HS Division, Quality/Clinical Medical Program

6 Administrator. Please see Exhibit Bates Numbered ADC123462-123463 for his

7 credentials and qualifications.  Dr. Rowe was previously deposed and Defendants will rely

8 on his deposition testimony. In addition to his deposition testimony, Dr. Rowe ***will*** testify

9 ***pursuant to FRCP 26(a)(2)(C)*** with regard to recommendations made to him by doctors

10 at various ADC facilities and the procedure by which recommendations are made to him;

11 policies, practices, procedures, and processes of the administration of all health care

12 services to inmates housed at ADC; relevant staffing policies and procedures;

13 implementation of structural and programming improvements in ADC facilities; policies

14 and procedures including those related to medical health care as well as the provision of

15 adequate care to ADC inmates in compliance with constitutional requirements; his role in

16 authoring inmate mortality reviews; his involvement in working with outside providers as

17 a result of the ACCHS legislation and privatization legislation. ***Dr. Rowe will also testify***

18 ***regarding the mortality reviews he completed.***

19          ***Dr. Rowe will also testify regarding his review of Plaintiff Shawn Jensen's***

20 ***medical records and his opinions regarding the treatment rendered to Jensen.  He will***

21 ***further testify regarding specific allegations made by Mr. Jensen as it relates to his***

22 ***medical care in connection with his treatment for prostate cancer as well as his current***

23 ***prognosis.***

24          ***Dr. Rowe will testify regarding his review of Plaintiff Swartz's medical***

25 ***records and his opinions regarding the treatment rendered to Swartz after he was***

26 ***involved in two inmate assaults in 2010.  Specifically, he will testify regarding the***

27 ***follow-up care, medications, and subsequent facial reconstructive surgery.  He will also***

28

1   *testify regarding Plaintiff Swartz's allegations that staff screened him with a metal*

2   *detector after he swallowed metal, did not refer him for an endoscopy, and told him he*

3   *would have to pass the metal.*

4   *Dr. Rowe will testify regarding his review of Plaintiff Rodriguez's medical*

5   *records and his opinions regarding the treatment rendered to her.  He will further*

6   *testify regarding Plaintiff Rodriguez's allegation that she has experienced multiple*

7   *asthma attacks and breathing problems as a result of her exposure to pepper spray.*

8   *Dr. Rowe will testify regarding his review of Plaintiff Thomas's medical*

9   *records and his opinions regarding the treatment provided to him.  He will further*

10   *testify regarding Plaintiff Thomas's specific allegations that in November 2011, he*

11   *overdosed on Diclofenac and did not receive medical attention, that he has experienced*

12   *insomnia and weight loss while in SMU, and was not prescribed a sleep aid.*

13   *Dr. Rowe will testify regarding his review of Plaintiff Gamez's medical*

14   *records and his opinions regarding the treatment provided to him.  He will further*

15   *testify regarding Plaintiff Gamez's specific allegations that his care was managed by a*

16   *nurse practitioner, he did not receive follow-up tests to confirm that he has frontal lobe*

17   *dysfunction, and his medications have been denied or delayed.*

18   *Dr. Rowe will testify regarding his review of Plaintiff Chisholm's medical*

19   *records and his opinions regarding the treatment provided to her.  He will further testify*

20   *regarding Plaintiff Chisholm's specific allegations that she was not referred to a*

21   *cardiologist for eight months despite experiencing chest pains and shortness of breath*

22   *and did not receive adequate care or testing from outside specialists.*

23   *Dr. Rowe will testify regarding his review of Plaintiff Licci's medical*

24   *records and his opinions regarding the treatment provided to her.  He will further testify*

25   *regarding Plaintiff Licci's specific allegations that she has experienced delays in seeing*

26   *an oncologist and receiving testing regarding masses on her breasts, mouth, arms, and*

27   *ovaries, that she experiences extreme discomfort in her cervix that impacts her bowels*

28   *and results in constipation, and medical staff make false claims in replies to her*

9

1   *grievances.   Dr. Rowe will also testify regarding Plaintiff Licci's allegation that her*
2   *port-a-cath may not have been properly flushed.*

3   *Dr. Rowe will testify regarding his review of Plaintiff Hefner's medical*
4   *records and his opinions regarding the treatment provided to him.   He will further*
5   *testify regarding Plaintiff Hefner's specific allegations that his vision deteriorated after*
6   *a nurse gave him expired eye drops, he did not receive eye medication following eye*
7   *surgery in 2006 and 2008, has not seen an ophthalmologist, and experienced delay in*
8   *receiving a CT scan following an injury.   He will testify regarding Plaintiff Hefner's*
9   *allegation that he did not receive adequate treatment after an assault.   Dr. Rowe will*
10  *also testify regarding Plaintiff Hefner's claim that his requests for a medical diet have*
11  *been denied.*

12  *Dr. Rowe will testify regarding his review of Plaintiff Polson's medical*
13  *records and his opinions regarding the treatment provided to him.   He will further*
14  *testify regarding Plaintiff Polson's specific allegations that he experienced delays in*
15  *receiving appropriate care and medications for chronic ear pain.*

16  *Dr. Rowe will testify regarding his review of Plaintiff Wells' medical*
17  *records and his opinions regarding the treatment provided to her.   He will further testify*
18  *regarding Plaintiff Wells' specific allegations that she was not evaluated by a*
19  *cardiologist despite repeated complaints of chronic chest pain.*

20  *Dr. Rowe will testify regarding his review of Plaintiff Smith's medical*
21  *records and his opinions regarding the treatment provided to him.   He will further*
22  *testify regarding Plaintiff Smith's specific allegation that he was unable to write HNRs*
23  *due to a hand injury.*

24  *Dr. Rowe will testify regarding his review of Plaintiff Brislan's medical*
25  *records and his opinions regarding the treatment provided to him.   He will further*
26  *testify regarding Plaintiff Brislan's specific allegation that he has lost weight due to*
27  *insufficient meals.*

28  *In addition to testifying regarding the medical treatment of the named*

10

*Plaintiffs, Dr. Rowe will also testify regarding the health care provided to the individual inmates specifically referred to by Plaintiffs' experts and whether the care rendered was adequate, appropriate and meets the standard of care up until the time of trial.*

    5.    Ben Shaw, M.D. (former ADC HS Division, Quality/Clinical, Mental Health Monitor (Health Services Coordinator)) , current Mental Health Director at Corizon
c/o Corizon Health

Ben Shaw, M.D., is the former HS Division, Quality/Clinical, Mental Health Monitor (Health Services Coordinator) at ADC, and the current Mental Health Director at Corizon. Dr. Shaw was previously deposed and Defendants will rely on his deposition testimony.  In addition to his deposition testimony, Dr. Shaw will testify with regard to policies and procedures at the time of his employment with ADC, including those related to  mental health needs; the privatization of the entire health care delivery system, specifically, the transition of the entire health care system to Wexford; the transition of the entire health care system to Corizon; the provision of adequate care to ADC inmates in compliance with constitutional requirements, statistics, reports and historical data relating to mental, medical and dental care,  and his current job activities.  Dr. Shaw may also testify regarding his knowledge of the care and treatment of the named Plaintiffs, as well as class members whose care he is familiar with. Dr. Shaw has knowledge of the mental health group programing, the CCTV programing, the activities of the psych associates and other mental health staff, how the telemed program works,  medication distribution, the mental health phases at maximum security facilities, the incentive programs, and the loaner tv and radio programs.

    6.    Carol Pearson, ADC HS Contract Monitoring Bureau, Medical Records Monitor
c/o Struck Wieneke & Love, P.L.C

Carol Pearson is the current HS Contract Monitor Bureau Medical Records Monitor and former ADC Medical Records Program Manager at ADC.  Ms. Pearson was previously deposed and Defendants will rely on her deposition testimony.  Ms. Pearson is

likely to testify regarding her information with regard to ADC Polices, practices, and procedures, including those related to the organization, storage, maintenance, archiving, and eventual destruction of inmate medical records; and the privatization of the healthcare delivery system and its impact on medical records management.

       7.     Juliet Respicio-Moriarty, ADC HS Contract Monitoring Bureau, Inmate Grievance Appeals Investigator
              c/o Struck Wieneke & Love, P.L.C.

       Juliet Respicio-Moriarty is the current Inmate Grievance Appeals Investigator for ADC. Please see Exhibit Bates Numbered ADC123429-123433 for her credentials and qualifications. Ms. Respicio-Moriarty will testify regarding policies, practices, and procedures for provision of health care to ADC's inmate population; delivery of medication to inmates; delivery of mental health care and dental care; her activities in evaluation of mental health services provided by Corizon, reporting on those services with the monitoring MGAR reports; and monitoring and reviewing those services for patterns; compilation and analysis of statistical data; ensuring compliance with federal and state laws; clinical reviews for inmate grievance appeal responses and investigations; and her knowledge of Corizon's performance under the Contract with ADC.

       8.     Kathleen Campbell, ADC HS Contract Monitoring Bureau, Program Evaluation Administrator
              c/o Struck Wieneke & Love, P.L.C.

       Kathleen Campbell is the current Program Evaluation Administrator for ADC. Please see Exhibit Bates Numbered ADC123435-123438 for her credentials and qualifications. Ms. Campbell will testify regarding policies, practices, and procedures for provision of health care to ADC's inmate population; delivery of medication to inmates; delivery of oral and dental care; reporting on those services with the monitoring MGAR reports; and monitoring and reviewing those services for patterns; compilation and analysis of statistical data; ensuring compliance with federal and state laws; and her knowledge of Corizon's performance under the Contract with ADC.

9.     Sam Tardibuono, ADC HS Contract Monitoring Bureau, Contract Compliance Monitor, ASPC-Douglas
c/o Struck Wieneke & Love, P.L.C.

Sam Tardibuono is the current Contract Monitor at ASPC-Douglas. Please see Exhibit Bates Numbered ADC123464-123467 for his credentials and qualifications. Mr. Tardibuono will testify regarding his monitoring of policies, practices, and procedures for provision of health care to ADC's inmate population; delivery of medication to inmates; delivery of mental health care and dental care only as required for monitoring and reporting in the MGAR; his activities in evaluation of mental health services provided by Corizon, reporting on those services with the monitoring MGAR reports; and monitoring and reviewing those services for patterns; compilation and analysis of statistical data; ensuring compliance with federal and state laws; and his knowledge of Corizon's performance under the Contract with ADC.

10.     David Robertson, D.O., ADC HS Contract Monitoring Bureau, Quality/Clinical, Medical Program Administrator
c/o Struck Wieneke & Love, P.L.C.

Dr. David Robertson is the current HS Contract Monitoring Bureau, Quality/Clinical, Medical Program Administrator. Please see Exhibit Bates Numbered ADC123413-123418 for his credentials and qualifications. Dr. Robertson will testify *pursuant to FRCP 26(a)(2)(C). He will testify* regarding ADC policies, practices, and procedures including those related to medical care, review and investigation of medical grievances, inmate death investigations and mortality reviews, implementation by Corizon of electronic medical records, Corizon's telemedicine system; his knowledge of Plaintiffs' medical health needs and the continuous improvements in the delivery of health care to the ADC inmate population. *Dr. Robertson will also testify regarding the mortality reviews he completed.*

*Dr. Robertson will also testify regarding the medical care provided to Plaintiff Shawn Jensen and that the medical care was appropriate and within the applicable standard of care. He will further testify regarding specific allegations made*

13

1   *by Mr. Jensen as it relates to his medical care in connection with his treatment for*
2   *prostate cancer as well as his current prognosis.*

3            *Dr. Robertson will testify regarding his review of Plaintiff Swartz's*
4   *medical records and his opinions regarding the treatment rendered to Swartz after he*
5   *was involved in two inmate assaults in 2010.  Specifically, he will testify regarding the*
6   *follow-up care, medications, and subsequent facial reconstructive surgery.  He will also*
7   *testify regarding Plaintiff Swartz's allegations that staff screened him with a metal*
8   *detector after he swallowed metal, did not refer him for an endoscopy, and told him he*
9   *would have to pass the metal.*

10           *Dr. Robertson will testify regarding his review of Plaintiff Rodriguez's*
11  *medical records and his opinions regarding the treatment rendered to her.  He will*
12  *further testify regarding Plaintiff Rodriguez's allegation that she has experienced*
13  *multiple asthma attacks and breathing problems as a result of her exposure to pepper*
14  *spray.*

15           *Dr. Robertson will testify regarding his review of Plaintiff Thomas's*
16  *medical records and his opinions regarding the treatment provided to him.  He will*
17  *further testify regarding Plaintiff Thomas's specific allegations that in November 2011,*
18  *he overdosed on Diclofenac and did not receive medical attention, that he has*
19  *experienced insomnia and weight loss while in SMU, and was not prescribed a sleep*
20  *aid.*

21           *Dr. Robertson will testify regarding his review of Plaintiff Gamez's*
22  *medical records and his opinions regarding the treatment provided to him.  He will*
23  *further testify regarding Plaintiff Gamez's specific allegations that his care was*
24  *managed by a nurse practitioner, he did not receive follow-up tests to confirm that he*
25  *has frontal lobe dysfunction, and his medications have been denied or delayed.*

26           *Dr. Robertson will testify regarding his review of Plaintiff Chisholm's*
27  *medical records and his opinions regarding the treatment provided to her.  He will*
28  *further testify regarding Plaintiff Chisholm's specific allegations that she was not*

1    *referred to a cardiologist for eight months despite experiencing chest pains and*
2    *shortness of breath and did not receive adequate care or testing from outside specialists.*

3    *Dr. Robertson will testify regarding his review of Plaintiff Licci's medical*
4    *records and his opinions regarding the treatment provided to her.  He will further testify*
5    *regarding Plaintiff Licci's specific allegations that she has experienced delays in seeing*
6    *an oncologist and receiving testing regarding masses on her breasts, mouth, arms, and*
7    *ovaries, that she experiences extreme discomfort in her cervix that impacts her bowels*
8    *and results in constipation, and medical staff make false claims in replies to her*
9    *grievances.  Dr. Robertson will also testify regarding Plaintiff Licci's allegation that her*
10   *port-a-cath may not have been properly flushed.*

11   *Dr. Robertson will testify regarding his review of Plaintiff Hefner's*
12   *medical records and his opinions regarding the treatment provided to him.  He will*
13   *further testify regarding Plaintiff Hefner's specific allegations that his vision*
14   *deteriorated after a nurse gave him expired eye drops, he did not receive eye medication*
15   *following eye surgery in 2006 and 2008, has not seen an ophthalmologist, and*
16   *experienced delay in receiving a CT scan following an injury.  He will testify regarding*
17   *Plaintiff Hefner's allegation that he did not receive adequate treatment after an assault.*
18   *Dr. Robertson will also testify regarding Plaintiff Hefner's claim that his requests for a*
19   *medical diet have been denied.*

20   *Dr. Robertson will testify regarding his review of Plaintiff Polson's*
21   *medical records and his opinions regarding the treatment provided to him.  He will*
22   *further testify regarding Plaintiff Polson's specific allegations that he experienced*
23   *delays in receiving appropriate care and medications for chronic ear pain.*

24   *Dr. Robertson will testify regarding his review of Plaintiff Wells' medical*
25   *records and his opinions regarding the treatment provided to her.  He will further testify*
26   *regarding Plaintiff Wells' specific allegations that she was not evaluated by a*
27   *cardiologist despite repeated complaints of chronic chest pain.*

28   *Dr. Robertson will testify regarding his review of Plaintiff Smith's medical*

15

1   *records and his opinions regarding the treatment provided to him.  He will further*
2   *testify regarding Plaintiff Smith's specific allegation that he was unable to write HNRs*
3   *due to a hand injury.*

4   *Dr. Robertson will testify regarding his review of Plaintiff Brislan's*
5   *medical records and his opinions regarding the treatment provided to him.  He will*
6   *further testify regarding Plaintiff Brislan's specific allegation that he has lost weight*
7   *due to insufficient meals.*

8   *In addition to testifying regarding the medical treatment of the named*
9   *Plaintiffs, Dr. Robertson will also testify regarding the health care provided to the*
10  *individual inmates specifically referred to by Plaintiffs' experts and whether the care*
11  *rendered was adequate, appropriate and meets the standard of care.*

12   11. Nicole Taylor, Ph.D., ADC HS Contract Monitoring Bureau,
13     Quality/Clinical, Health Services Coordinator (Mental Health Monitor) and
   former Psychologist III at ASPC-Florence
14     c/o Struck Wieneke & Love, P.L.C.

15  Nicole Taylor, Ph.D. is the current HS Contract Monitoring Bureau,
16  Quality/Clinical, Health Services Coordinator (Mental Health Monitor). Please see
17  Exhibit Bates Numbered ADC123454-123457 for her credentials and qualifications. ***Dr.***
18  ***Taylor will testify based on her education, training, qualifications, and experience and***
19  ***review of records of the inmate population.*** Dr. Taylor will testify regarding ADC
20  policies, practices, and procedures including those related to mental health care and
21  conditions of confinement*,* including mental health programming offered to inmates
22  housed at ASPC-Eyman, Florence*, **Lewis, Phoenix, Perryville Tucson and Yuma*** and any
23  changes to programming that occurs up until trial; the Mental Health Technical Manual
24  and any changes to that Manual that occurs up until trial; her knowledge of Plaintiffs'
25  mental health care needs, specifically the mental health care needs and treatment of named
26  Plaintiffs Dustin Brislan and Robert Gamez; the subsequent transition to Corizon; the
27  provision of adequate care to ADC inmates in compliance with constitutional
28  requirements; relevant staffing policies, procedures, levels and issues with regard to

mental health personnel *and changes to those policies, procedures and levels up until trial.*

*Dr. Taylor will testify regarding the mental health care provided to and mental health condition of the named Plaintiffs Swartz, Brislan, Thomas, Smith, Gamez, Chisholm, Polson, Rodriguez and Verduzco.  She will testify regarding their allegations related to their mental health care.*

*Specifically, Dr. Taylor will testify regarding her review of Plaintiff Stephen Swartz's records relating to his allegations that despite multiple instances of self-harm, he has received inadequate mental health care while on suicide watch and while housed at SMU.  She will also testify regarding his allegation that he was able to access dangerous objects while on suicide watch.*

*Dr. Taylor will testify regarding her review of Plaintiff Brislan's records relating to his allegations that he has been placed on suicide watch for extended periods but has not received therapeutic treatment to address his self-harming behavior.  She will also testify regarding his allegation that he was able to access dangerous objects while on suicide watch.*

*Dr. Taylor will testify regarding her review of Plaintiff Thomas's records relating to his allegations that while he did not have suicidal ideation when he arrived at SMU, his mental condition has deteriorated and he has become suicidal and committed multiple acts of self-harm.  She will also testify regarding Plaintiff Thomas's allegations that he has received minimal mental health care.*

*Dr. Taylor will testify regarding her review of Plaintiff Smith's records relating to his allegations that his depression has been aggravated by interruptions in his mental health treatment and prolonged incarceration in SMU and that he was not seen by mental health despite reporting mental health problems.*

*Dr. Taylor will testify regarding her review of Plaintiff Gamez's records relating to his claim that he was not provided adequate mental health services to address his deteriorating mental health. Dr. Taylor will testify regarding her review of*

*Plaintiff Chisholm's records relating to her allegations that her mental health has been adversely impacted by custodial harassment.*

*Dr. Taylor will testify regarding Plaintiff Polson's records relating to his allegation that his mental health symptoms are caused or worsened by not receiving adequate mental health care and that his suicidal ideation has increased as a result of his housing.*

*Dr. Taylor will testify regarding her review of Plaintiff Rodriguez's records relating to her allegation that her mental health care primarily involves medication and not therapy. Dr. Taylor will testify regarding her review of Plaintiff Verduzco's records relating to her allegation that she does not receive regular therapy.*

*Dr. Taylor reviewed the expert reports of Dr. Pablo Stewart, Craig Haney and Eldon Vail.  She will testify regarding the mental health status, care and access to mental health care to the inmate population as referenced by Plaintiffs' experts, including any members of the population referenced through supplementation by Plaintiffs' experts and up until trial.  Dr. Taylor will testify concerning the treatment of the named plaintiffs up to the time of trial. Dr. Taylor will further testify consistent with her deposition testimony.  Dr. Taylor will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).*

12.   Ron Credio, Warden, ASPC-Eyman
c/o Struck Wieneke & Love, P.L.C.

Ron Credio is the Warden at ASPC-Eyman. He has been employed with the ADC for over 18 years, starting as a Correctional Officer at ASPC-Eyman/Rynning Unit. He was promoted to the position of Sergeant at ASPC-Florence/Central Unit, Lieutenant at ASPC-Eyman/Meadows Unit, Captain at ASPC-Florence/Picacho and North Unit, Associate Deputy Warden at ASPC-Florence/South Unit, Deputy Warden as ASPC-Phoenix/Globe and Alhambra, and Deputy Warden of Operations at ASPC-Florence. Warden Credio has a Bachelor of Science in Public Safety Administration, Associates Degree in Corrections, and Associates Degree in Management. He is likely to testify

18

regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Eyman, its cell blocks, the inmates housed at ASPC-Eyman, recreation and therapy and behavioral programming at ASPC-Eyman, access to healthcare and the delivery of healthcare to inmates. Warden Credio is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements;, lighting issues, conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Credio will also provide foundational testimony for institutional records.

> 13.    Gerald Thompson, DW, ASPC-EYMAN-SMU I
>        c/o Struck Wieneke & Love, P.L.C.

Deputy Warden Gerald Thompson is likely to testify regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Eyman, its cell blocks, the inmates housed at SMU-I, and recreation, therapy and behavioral programming at SMU-I, and access to healthcare and delivery of healthcare to the inmates. Deputy Warden Thompson is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial,

and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities;  food service, including nutrition requirements;, lighting issues, conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates.   Deputy Warden Thompson will also provide foundational testimony for institutional records.

14.    Assistant Deputy Warden Munoz, ASPC-Eyman
        c/o Struck Wieneke & Love, P.L.C.

Assistant Deputy Warden Munoz is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Eyman, its cell blocks, the inmates housed at ASPC-Eyman, recreation and therapy and behavioral programming at ASPC-Eyman, and access to healthcare and delivery of healthcare to the inmates. Assistant Deputy Warden Munoz is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including

20

1 nutrition requirements;, lighting issues,  conditions of confinement and management of

2 SMU units; inmates' access to programming, visitation, and recreation time; and

3 educational programming available to inmates.  Assistant Deputy Warden Munoz will

4 also provide foundational testimony for institutional records.

5        15.    Stephen Morris, DW, ASPC-Eyman-Browning Unit (and former DW,

6               ASPC-Florence-East)
              c/o Struck Wieneke & Love, P.L.C.

7

8        Deputy Warden Stephen Morris is assigned to the Browning Unit at ASPC-

9 Eyman, and is likely to testify regarding his knowledge of ADC's contemporary practices

10 and procedures in relation to security operations, including general information regarding

11 ASPC-Eyman, its cell blocks, the inmates housed in Browning Unit, recreation at

12 Browning Unit, therapy and behavioral programming at Browning Unit, and access to

13 healthcare and delivery of healthcare to the inmates. Deputy Warden Morris is

14 additionally likely to have discoverable information with regard to Plaintiffs' institutional

15 history and ADC's policies and procedures, and conditions of confinement with respect to

16 their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues;

17 practices and policies regarding inmates with gang affiliations as well as ADC's

18 management of gang affiliated inmates; any Plaintiff's protective custody or classification

19 status at any point during their incarceration at ADC as well as the policies and

20 procedures regarding the classification, housing, programming, recreation, morale and

21 welfare programs, and fundraisers; the management of health care at each respective

22 facility, the physical layout of each of their respective facilities; food service, including

23 nutrition requirements;, lighting issues,  alleged sanitation and extermination  issues at

24 their respective facilities; conditions of confinement and management of SMU units;

25 inmates' access to programming, visitation, and recreation time; and educational

26 programming available to inmates. Deputy Warden Munoz will also provide foundational

27 testimony for institutional records.

28

21

16.     Lance Hetmer, Warden, ASPC-Florence
        c/o Struck Wieneke & Love, P.L.C.

Lance Hetmer is the Warden at ASPC-Florence.  He is responsible for the oversight of a multi-custody facility of approximately 4,270 inmates and approximately 1,055 full time staff.  Warden Hetmer began his career with the ADC over 25 year ago as a Correctional Officer at the ASPC-Douglas facility.  He was promoted through the ranks, holding the positions of sergeant, lieutenant and captain.  With each promotion, he gained knowledge and experience in working with all custody levels at ASPC-Safford, Perryville, and Tucson.  For the last 13 years he has held management positions of Associate Deputy Warden, Deputy Warden, and Deputy Warden of Operations. Warden Hetmer is likely to testify regarding his knowledge of ADC's historical and contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Florence, its cell blocks, the inmates housed in each cell block, recreation for all security levels, therapy and behavioral programming for all security levels, and access to healthcare and delivery of healthcare to the inmates. Warden Hetmer is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues and extermination issues at their respective facilities; food service, including nutrition requirements;, lighting issues, conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Deputy Warden

1    Hetmer will also provide foundational testimony for institutional records.

2         17.    Amy Barnes, ADW, ASPC-Florence-Kasson Unit
3                c/o Struck Wieneke & Love, P.L.C.

4         Deputy Warden Amy Barnes is assigned to the Kasson Unit at ASPC-

5    Florence, and is likely to testify regarding her knowledge of ADC's contemporary

6    practices and procedures in relation to security operations, including general information

7    regarding ASPC-Florence, its cell blocks, the inmates housed in Kasson Unit, recreation

8    at Kasson Unit, therapy and behavioral programming at Kasson Unit, and access to

9    healthcare and delivery of healthcare to the inmates. Deputy Warden Barnes is

10   additionally likely to have discoverable information with regard to Plaintiffs' institutional

11   history and ADC's policies and procedures, and conditions of confinement with respect to

12   their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues;

13   practices and policies regarding inmates with gang affiliations as well as ADC's

14   management of gang affiliated inmates; any Plaintiff's protective custody or classification

15   status at any point during their incarceration at ADC as well as the policies and

16   procedures regarding the classification, housing, programming, recreation, morale and

17   welfare programs, and fundraisers; the management of health care at each respective

18   facility, the physical layout of each of their respective facilities; alleged sanitation issues

19   at their respective facilities; conditions of confinement and management of maximum

20   custody units; inmates' access to programming, visitation, and recreation time; and

21   educational programming available to inmates. Deputy Warden Barnes will also provide

22   foundational testimony for institutional records.

23        18.    R. Allen Bock, Warden, ASPC-Lewis (and former Warden of ASPC-Yuma)
24               c/o Struck Wieneke & Love, P.L.C.

25        Warden Allen Bock is likely to testify regarding his knowledge of ADC's

26   contemporary practices and procedures in relation to security operations, including

27   general information regarding ASPC-Lewis, its cell blocks, the inmates housed in each

28   Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and

access to healthcare and delivery of healthcare to the inmates. Warden Bock is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements, lighting issues; conditions of confinement and management of maximum custody units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Bock will also provide foundational testimony for institutional records.

> 19.   Alfred Ramos, Warden, ASPC-Phoenix
>        c/o Struck Wieneke & Love, P.L.C.

Warden Alfred Ramos is the Warden at ASPC-Phoenix. He began his career in corrections as a group worker at the Yakima County Juvenile Hall in Yakima, Washington.  He ultimately served as a Superintendent in the Washington Correctional system until his retirement in 2003.  In March 2004, Warden Ramos was hired by the ADC and assigned as an Associate Deputy Warden at ASPC-Lewis.  He was promoted in 2011 as Warden at ASPC-Phoenix.  He is likely to testify regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Phoenix, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to the inmates. Warden Ramos is additionally likely to have discoverable information with regard to Plaintiffs' institutional

history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements; lighting issues; conditions of confinement and management of maximum custody units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates.   Warden Ramos will also provide foundational testimony for institutional records.

      20.   Berry Larson, Warden, ASPC-Winslow
            c/o Struck Wieneke & Love, P.L.C.

Warden Berry Larson is the Warden at ASPC-Winslow. Warden Larson manages three correctional facilities with a population of 1,943 inmates and 514 staff, 1 close/medium custody unit, 2 minimum custody units, and 50 contract jail beds. She has been in the corrections field for 24 years, holding the positions of Correctional Officer I, Correctional Programs Officer I and II, Correctional Programs Supervisor, Associate Deputy Warden, and Deputy Warden.  She was the Deputy Warden of Programs at the Hutchinson Correctional Facility for the Kansas Department of Corrections for 3 years. In the field of corrections, Warden Larson has worked with male and female inmates, and juvenile offenders.  Additionally, she worked in correctional and probationary boot camps for adults and juveniles. She is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Winslow, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and

access to healthcare and delivery of healthcare to the inmates. Warden Larson is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements;, lighting issues; conditions of confinement and inmate management; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Larson will also provide foundational testimony for institutional records.

> 21.  Yolanda Elliott, Warden, ASPC-Douglas (and former DWOP of ASPC-Douglas)
>      c/o Struck Wieneke & Love, P.L.C.

Warden Yolanda Elliott is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Douglas, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to the inmates. Warden Elliott is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and

26

procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; conditions of confinement and inmate management; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Elliott will also provide foundational testimony for institutional records.

22.   Judy Frigo, Warden, ASPC-Perryville
      c/o Struck Wieneke & Love, P.L.C.

Warden Judy Frigo is the Warden at ASPC-Perryville.  Please see Exhibit Bates Numbered ADC123426-123428 for her credentials and experience. Warden Frigo is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Perryville, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to the inmates. Warden Frigo is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements;, lighting issues;   conditions of confinement and management of maximum units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Frigo will

27

also provide foundational testimony for institutional records.

   23. Lyle Broadhead, Warden, ASPC-Safford
     c/o Struck Wieneke & Love, P.L.C.

   Warden Lyle Broadhead is likely to testify regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Safford, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to inmates. Warden Broadhead is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; conditions of confinement and inmate management; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Broadhead will also provide foundational testimony for institutional records.

   24. Therese Schroeder, Warden, ASPC-Tucson
     c/o Struck Wieneke & Love, P.L.C.

   Warden Therese Schroeder is the Warden at ASPC-Tucson. She is responsible for approximately 1,300 staff and an inmate population of approximately 5,000 inmates. Warden Schroeder began her corrections career in October 1988. Her first assignment as a Correctional Officer was at the Echo Unit at ASPC-Tucson. In 1996 she was promoted to Correctional Officer III, promoted to Correctional Officer IV in 1998,

and promoted to Associate Deputy Warden at Tucson/Rincon in 2001.  Warden Schroeder was also the Deputy Warden of the Cimarron Unit and Deputy Warden of Operations at ASPC-Tucson.  In April 2006 she was appointed as the Warden of ASPC-Safford.  In 2008 she was appointed as the Warden at ASPC-Perryville.  She became the Warden of ASPC-Tucson in 2011.   Warden Schroeder has an Associate's Degree in Business Management and has earned ACA's Certified Corrections Executive Certificate.  She is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Tucson, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to the inmates. Warden Schroeder is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements; lighting issues; conditions of confinement and management of maximum custody units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Schroeder will also provide foundational testimony for institutional records.

   25. Laura Escapule, Warden, ASPC-Yuma (and former Warden of ASPC-Winslow)
     c/o Struck Wieneke & Love, P.L.C.

    Warden Laura Escapule is the Warden at ASPC-Yuma.  She began her

29

career with the ADC in 1996 as a Correctional Officer I at ASPC-Douglas.  In 1998 she was promoted to Correctional Officer III at ASPC-Yuma, followed by a promotion to Correctional Officer IV. In 2005 she was promoted to Deputy Warden at ASPC-Tucson, followed by a promotion to Deputy Warden of Operations in 2007 at ASPC-Yuma. Her current appointment entails supervision and management of a prison complex which employs 1,100 administrative, security and support staff, encompassing 2 minimum custody units, 2 medium custody units and 1 close custody unit.  Warden Escapule is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Florence, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to the inmates. Warden Escapule is additionally likely to have discoverable information with regard to ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; conditions of confinement and inmate management; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates.   Moreover, Warden Escapule will testify regarding the work incentive pay plan ("WIPP") at Yuma which allows inmates to utilize experience, training, and expertise in meaningful employment while support their needs. Warden Escapule will also provide foundational testimony for institutional records.

> 26.   Robert Parkinson, FHA at ASPC-Florence
>        c/o Corizon Health

Robert Parkinson is the former Facility Health Administrator for ASPC-Eyman, and current Facility Health Administrator for ASPC-Florence, and is likely to

30

testify regarding his knowledge of ADC's policies and procedures for delivery of health care to ADC's inmate population; and the day-to-day operation of health services at Florence including delivery of medications and delivery of mental health care and dental care, and the overall delivery of healthcare to the inmates.

27.     Ann Mullen, FHA at ASPC-Safford
        c/o Corizon Health

Ann Mullen is the Facility Health Administrator for ASPC-Safford, and is likely to testify regarding her knowledge of ADC's policies and procedures for delivery of health care to ADC's inmate population; and the day-to-day operation of health services at Safford including delivery of medications and delivery of mental health care and dental care, and the overall delivery of healthcare to the inmates.

28.     Masood Sirjani, Dental Director at ASPC-Phoenix
        c/o Corizon Health

Masood Sirjani is the Dental Director for ASPC-Phoenix and will testify regarding his knowledge of ADC's policies and procedures for delivery of dental care to ADC's inmate population, the dental intake process for all male ADC inmates at ASPC-Phoenix, triage of dental HNRs, wait times for routine and urgent dental care at ASPC-Phoenix, and the review and resolution of grievances related to dental care, and the overall delivery of healthcare to the inmates.

29.     Deborah Kinder, FHA at ASPC-Douglas
        c/o Corizon Health

Deborah Kinder is the Facility Health Administrator for ASPC-Douglas, and is likely to testify regarding her knowledge of ADC's policies and procedures for delivery of health care to ADC's inmate population; and the day-to-day operation of health services at Douglas including delivery of medications and delivery of mental health care and dental care, and the overall delivery of healthcare to the inmates.

30.     Von Marschik, FHA at ASPC-Eyman
        c/o Corizon Health

31

1    Von Marschik is the Facility Health Administrator for ASPC-Eyman, and is

2  likely to testify regarding his knowledge of ADC's policies and procedures for delivery of

3  health care to ADC's inmate population; and the day-to-day operation of health services at

4  Eyman including delivery of medications and delivery of mental health care and dental

5  care. Mr. Marschik has a lengthy tenure with Corizon Health Services and is also expected

6  to testify regarding his experience and expertise in privatizing health care in correctional

7  settings, and the overall delivery of healthcare to the inmates.

8       31.    Holly Massey, FHA at ASPC-Phoenix
               c/o Corizon Health
9

10   Holly Massey is the Facility Health Administrator for ASPC-Phoenix, and is

11  likely to testify regarding her knowledge of ADC's policies and procedures for delivery of

12  health care to ADC's inmate population; and the day-to-day operation of health services at

13  Phoenix including delivery of medications and delivery of mental health care and dental

14  care, and the overall delivery of healthcare to the inmates.

15      32.    Matthew Harvey, FHA at ASPC-Tucson
               c/o Corizon Health
16

17   Matthew Harvey is the Facility Health Administrator for ASPC-Tucson, and

18  is likely to testify regarding his knowledge of ADC's policies and procedures for delivery

19  of health care to ADC's inmate population; and the day-to-day operation of health

20  services at Tucson including delivery of medications and delivery of mental health care

21  and dental care, and the overall delivery of healthcare to the inmates.

22      33.    Elsie Stowell, FHA at ASPC-Winslow
               c/o Corizon Health
23

24   Elsie Stowell is the Facility Health Administrator for ASPC-Winslow, and

25  is likely to testify regarding her knowledge of ADC's policies and procedures for delivery

26  of health care to ADC's inmate population; and the day-to-day operation of health

27  services at Winslow including delivery of medications and delivery of mental health care

28  and dental care, and the overall delivery of healthcare to the inmates.

34.     Angelo Daniels, Deputy Warden of Security Operations
        c/o Struck Wieneke & Love P.L.C.

Angelo Daniels is the Deputy Warden of Security Operations at ADC, and is likely to testify regarding his knowledge of ADC's policies and procedures for oversight of inmate meal preparation and delivery, including accommodation of the religious standards in place for the various faiths to which inmates in ADC custody belong, and provisions of adequate nutritional needs for special diets. ***DW Daniels will also testify regarding his oversight of the Food Services Contract and collaborative relationship with Trinity Services Group in ensuring that adequate nutritional value is provided to inmates through all diets, including the mega sack meals provided to inmates in maximum custody. DW Daniels will testify regarding his oversight of the meals provided to ensure nutritional adequacy, caloric intake and appropriate rotation of food product in the meals. DW Daniels will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).***

35.     ***Mark Jansen, Interim Vice President Operations***
        ***c/o Corizon Health***

***Mark Jansen is the Interim Vice President of Operations for Corizon Health.   Please see Exhibit Bates Numbered ADC203360-ADC203362 for his credentials and qualifications.   He is likely to testify regarding his knowledge of the contract between Optimal Phone Interpreters ("OPI") and Corizon to provide language translation services to ADC for assistance in providing health care to Limited English speaking inmates; the availability and usage of that service; and the HIPAA compliance related to that service.   He is also expected to testify regarding Corizon's obligations under the Contract with ADC, Corizon's staffing, recruiting, policies, and the provision of medical, mental health and dental health care to ADC's inmate population.   Mr. Jansen will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).***

36.     ***Mark Fleming, PhD, LP, LPCMH, CRC, HSP, CCHP-MH***
        ***c/o Corizon Health, Regional Vice President for Behavioral Health***

1          *Dr. Fleming is the Regional Vice President for Behavioral Health for*

2   *Corizon Health.  Please see Exhibit Bates Numbered ADC203363-ADC203364 for his*

3   *credentials and qualifications.  Dr. Fleming is expected to testify regarding the mental*

4   *health care offered to ADC's inmate population.  He is expected to testify regarding*

5   *Corizon's obligations and performance under the Contract with ADC, Corizon's*

6   *staffing, recruiting, policies related to the provision of mental health programming to*

7   *ADC's inmate population and changes to these areas up until the time of trial.   He is*

8   *expected to testify regarding the systemic delivery of mental health programming,*

9   *individualized treatment, Corizon's systems in place for the delivery mental health care,*

10   *as well as any changes to that delivery and treatment that may occur up until trial.  He*

11   *will also testify regarding the operational oversight and clinical leadership and support*

12   *to Corizon staff, ADC and inmates.  He is expected to testify regarding the mental*

13   *health treatment programming offered to inmates throughout the ADC inmate*

14   *population and any changes to programming that may occur up until the time of trial.*

15   *Dr. Fleming will also testify regarding the individualized mental health treatment*

16   *regarding named Plaintiffs Swartz, Brislan, Thomas, Smith, Gamez, Chisholm, Polson,*

17   *Verduzco and Rodriguez.  Dr. Fleming will testify regarding pursuant to Federal Rule*

18   *of Civil Procedure 26(a)(2)(C).*

19         37.   *Thomas Buenker, M.D., Regional Psychiatry Director*

20               *c/o Corizon Health*

21          *Dr. Buenker is the Regional Psychiatry Director for Corizon Health.*

22   *Please see Exhibit Bates Numbered ADC203365-ADC203367 for his credentials and*

23   *qualifications.  Dr. Buenker is expected to testify regarding the psychiatric services*

24   *provided to the inmate population and the administration of psychotropic medications*

25   *and any changes to services and administration of psychotropic medications that occur*

26   *up until trial. He is expected to testify Corizon's staffing, recruiting, policies and*

27   *practices related to the provision of psychiatric services to ADC's inmate population*

28   *and changes to these areas that occur up until trial. He is expected to testify as to the*

1  *psychiatric services provided on a systemic basis as well as individualized treatment*

2  *provided to inmates, including any changes to that treatment that may occur up until*

3  *trial.*

4  *Dr. Buenker will also testify regarding the individualized mental health*

5  *treatment regarding named Plaintiffs Brislan, Rodriguez, Thomas, Smith, Gamez,*

6  *Chisholm, Polson, Swartz, and Verduzco.   Specifically, Dr Buenker will testify*

7  *regarding his review of Plaintiff Brislan's records relating to his claims that he has*

8  *received inadequate medication delivery and management, has not been regularly*

9  *monitored by a psychiatrist, and did not receive needed inpatient mental health care.*

10  *Dr. Buenker will testify regarding his review of Plaintiff Rodriguez's records relating to*

11  *her claim that she has experienced inadequate medication delivery and management,*

12  *inadequate monitoring, and did not receive needed inpatient mental health care. Dr.*

13  *Buenker will testify regarding his review of Plaintiff Thomas's records relating to his*

14  *allegations that he has experienced inadequate medication delivery and management,*

15  *lack of informed consent, long delays in follow-up and psychiatric evaluation, and was*

16  *not prescribed a sleep aid.  Dr. Buenker will testify regarding his review of Plaintiff*

17  *Smith's records relating to his allegations that he has experienced inadequate*

18  *medication delivery and management, inadequate monitoring, and was prescribed*

19  *medications not indicated for depression without being seen by a doctor or obtaining*

20  *informed consent.  Dr. Buenker will testify regarding his review of Plaintiff Gamez's*

21  *records relating to his allegations that he has experienced inadequate medication*

22  *delivery and management, as well as inadequate monitoring and follow-up.   Dr.*

23  *Buenker will also testifying regarding Plaintiff Gamez's claim that he was not seen by a*

24  *psychiatrist from 2007 to 2011.  Dr. Buenker will testify regarding his review of*

25  *Plaintiff Chisholm's records relating to her allegations that she has experienced*

26  *inadequate medication delivery and management, inadequate psychiatric care and*

27  *follow-up, and delay in being seen by psychiatry after she reported having a nervous*

28  *breakdown. Dr. Buenker will testify regarding his review of Plaintiff Polson's records*

35

*relating to his allegations that he has experienced inadequate medication delivery and management and sporadic monitoring of his medication levels.  Dr. Buenker will testify regarding his review of Plaintiff Swartz's records relating to his allegations that he experienced inadequate medication delivery and management, inadequate monitoring, was not seen by a psychiatrist despite multiple suicide attempts, and did not receive inpatient treatment.  Dr. Buenker will testify regarding his review of Plaintiff Verduzco's records relating to her allegations that she goes for months without seeing a psychiatrist despite displaying multiple symptoms of psychological distress and that she did not receive needed inpatient psychiatric care.*

*Dr. Buenker will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).*

38. *Michael Dolny, Ph.D, Administrative Services Officer V (Research Manager)*
*c/o Struck Wieneke & Love, P.L.C.*

*Dr. Dolny is an Administrative Services Officer V (Research Manager) for ADC.  Dr. Dolny reviewed the reports of Plaintiffs' expert witnesses in order to assess the sampling methodologies used by those expert witnesses.  Dr. Dolny will testify that there are few statistical claims made in the expert witness reports reviewed.  They contain no hypothesis tests, statistical tests for significance or inferential statistics used. Nothing in the reports indicates that the findings included are generalizable.  Plaintiffs' experts sampling methodology lacks statistical rigor in that the experts fail to provide what the sampling methodology actually was or how many cases were reviewed to identify the representative cases cited as examples.  There is no way to evaluate the statistical meaning of the representative cases chosen by Plaintiffs' experts.  Dr. Dolny will testify that despite Plaintiff's experts' attempts at outlining their methodologies, it is unclear from the actual data in the reports what the methodology is.   He will further testify that the sample sizes lack precision.  Small sample sizes, even if taken at random, create estimates in the population that also lack precision and lead to large standard*

*errors.  When sample sizes are increased, the standard error is reduced.  Dr. Dolny will also testify that the narrative findings contained in Plaintiffs' experts' reports cannot be generalized to the population.  Dr. Dolny will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).*

39.  ***Laura Donnelly***
***Trinity Services Group***
***c/o McCarter & English***
***Gregory Cote***
***265 Franklin Street***
***Boston, Massachusetts 02110***
***(617) 449-6500***

*Ms. Donnelly is a registered dietician who works for Trinity Services Group, the third-party vendor that supplies food services to ADC.  Ms. Donnelly is expected to testify regarding the nutritional adequacy and caloric requirements and provisions for those inmates in maximum custody and detention units, including but not limited to the adequacy of the mega sack meals provided to those inmates.  Ms. Donnelly will further testify about the collaborative relationship between ADC and Trinity Food Services as it relates to the planning and provision of meals to inmates in maximum custody and detention units up until the time of trial. Ms. Donnelly will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).*

40.  ***William Smallwood, D.D.S., CEO, Smallwood Prison Dental Servcies***
***c/o Smallwood Prison Dental Services***
***The Sack Law Firm***
***Jeffrey M. Mervis***
***8270 Greensboro Drive, Suite 810***
***McLean, Virginia 22102***
***(703) 883-0102***

*Dr. Smallwood is the owner of Smallwood Prison Dental Services (SPDS), which subcontracts with Corizon to provide dental services at ADC. A copy of his CV, which explains his education and experience, is attached.  Dr. Smallwood has experience in providing prison dental services at several correctional facilities across*

37

*the country.  He understands the challenges that treating inmates in a correctional setting presents and how the circumstances differ from a private practice setting.*

*Dr. Smallwood will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).*

*Dr. Smallwood reviewed the dental expert report submitted by Dr. Shulman.  In Dr. Smallwood's opinion, Dr. Shulman's stated method of selecting his sample, which included inmates "who had one or more scheduled appointments for issues related to pain and swelling" was biased and focused on selecting records of inmates with problems.  Dr. Smallwood will testify that in his opinion and based upon the theories of statistics, Dr. Shulman should have made a random selection of records.*

*Dr. Smallwood will testify that SPDS uses the proprietary Correctional Dental Software (CDS) program to manage dental requests and appointments, monitor wait times, and track dental statistics at ADC.  He will testify regarding the available reports and statistics, which include number of requests for dental treatment submitted, current wait times, number of procedures performed, and number of treatment refusals. Dr. Smallwood will testify regarding the current wait times and dental statistics at the time of trial.  Dr. Smallwood may also perform a live demonstration of the capabilities of the CDS program at trial.*

*Dr. Smallwood will testify that when SPDS took over the provision of dental care at ADC from Wexford in March 2013, there was a backlog of dental requests.  He will testify that by August 2013, nearly all of the backlog was cleared.  He will testify that as of December 2013, the longest average wait time for routine dental care statewide is 1.5 months, which is half the time required by the ADC contract.  He will also testify that as of December 2013, all dental intakes were completed within 30 days statewide.  This intake procedure is in compliance with ADC policy as stated in the DSTM at 770.1 and NCCHC standard P-E-06.*

*Dr. Smallwood will testify that in his opinion, relying on inmate to dentist staffing ratios would not yield the results necessary to effectively manage statewide*

*dental operations for a correctional system of nearly 36,000 inmates such as ADC.  He will testify that determining the appropriate staffing at a correctional dental clinic depends on numerous factors, including (1) whether the facility houses male or female inmates; (2) the security level of the facility; (3) whether the facility serves as a reception center for inmates; (4) the proximity of facilities; and (5) cost for staff types.  He will testify that the bottom line in determining staffing levels is the volume of work that needs to be completed and being able to effectively and timely manage the workload within the standard of care.*

*Dr. Smallwood will testify that CDS provides him an accurate and up-to-date view of the exact number of dental requests pending at any given time and wait times.  Dr. Smallwood will testify that in addition to CDS, he also relies on input from the regional dental directors at ADC to determine appropriate staffing levels at ADC complexes.  He will testify that he reviews dental staffing, HNR volumes, and wait time reports on a regular basis to review that staffing meets patient needs.  He will testify that he reallocates staffing resources as needed to see that timely service is provided at all ADC complexes.  To achieve this, he employs several dentists who split their time between multiple complexes.  He also moves dental staff on a temporary basis to other complexes if needed to manage wait times, and SPDS pays for their travel and lodging costs.  He will testify that in his opinion, this approach to staffing is the most efficient and cost-effective way to provide timely and appropriate dental care in a correctional system such as ADC.  He will also testify that in his opinion, dental staffing at ADC is sufficient to meet the needs of the ADC inmate population, as evidenced by low wait times for dental treatment at all complexes statewide.*

*Dr. Smallwood will testify that he recently hired two dental hygienists, one for the Northern region and one for the Southern region.  He will testify that the dental hygienists travel to the dental clinics within their respective regions based on inmate demand to provide cleanings. He will testify that wait times for routine treatment, which includes cleanings, are 1.5 months or less at all ADC complexes statewide as of*

*December 2013.  He will also testify regarding the current wait times for routine care treatment at the time of trial.*

*Dr. Smallwood will testify that ADC does not have an "extraction-only" policy.  He will testify that the dentists he employs perform fillings on teeth that can be restored, but that some teeth are non-restorable.  He will testify that in his experience, the incidence of "meth mouth" is high among inmates and that a high percentage of inmates have poor oral hygiene and have never seen a dentist.  He will testify that for an inmate with "meth mouth," extraction is often the only available treatment option. He will also testify that whether a tooth can be restored is a matter of clinical discretion based upon a review of current x-rays and a clinical examination.*

*Dr. Smallwood will testify that SPDS dentists are reviewed annually using a peer review process and that he also evaluates dentists based on their productivity to ensure that inmates are provided timely and appropriate dental care.  He will testify that CDS enables him to quickly and easily evaluate the productivity of all dentists he employs.*

*Dr. Smallwood will testify that dental assistants at ADC have all passed an examination and possess a certification that permits them to take dental x-rays.  Dr. Smallwood will testify that dental assistants do not perform dental procedures and that a dentist is always on-site at the clinic during clinic hours.  He will testify that dental assistants are evaluated by their supervising dentists.  Dr. Smallwood will testify that in his opinion, having dental assistants triage dental HNRs and take dental x-rays based on a standing order from their supervising dentist is appropriate and within the standard of care.*

*Dr. Smallwood will also testify that based on his decades of experience in providing correctional dentistry, the NCCHC is the governing industry standard for correctional dentistry.  Dr. Smallwood will testify that the dental classification system outlined in ADC's Dental Services Technical Manual meets NCCHC standard P-E-06, which requires that oral treatment is provided based on a system of established*

*priorities for care. He will also testify that ADC policies on access to care, intake screening, oral examination, dental sick call, x-rays, referral to specialists, supplies and equipment, infection control, and staffing levels are within NCCHC guidelines as outlined in P-E-06 and Appendix G of the NCCHC Standards for Health Services in Prisons. He will also testify that ADC policy 770.1, which requires dental intake screening within 7 days and a comprehensive oral examination within 30 days of admission complies with the requirements of NCCHC standard P-E-06. He will also testify that ADC policy as stated in the contract, which requires that urgent care requests be treated within 72 hours mirrors NCCHC guidelines as set forth in Appendix G of the standards.*

*Dr. Smallwood will testify that in his opinion, the correct measure of a correctional dental system is not whether it meets an arbitrary staffing ratio but whether it provides timely and appropriate dental care to inmates. He will testify that in his opinion, SPDS provides timely and appropriate care to ADC inmates.*

*All of the opinions expressed by Dr. Smallwood herein are to a reasonable degree of dental probability.*

    41.    Ernest Trujillo, ADC Southern Regions Operations Director (SROD)
                    c/o Struck Wieneke & Love, P.L.C.

Ernest Trujillo is the Southern Region Operations Director of ADC. Please see Exhibit Bates Numbered ADC123472-123477 for his credentials and experience. Mr. Trujillo is likely to testify with regard to the delivery of medical, dental and mental health care to the inmates; his activities in ensuring compliance with all Department Orders, Procedural Manuals, Post Orders, and Standard of Operations as they apply to security and operational practices, staff safety, the welfare of the inmate population; his supervision of ADC facilities, including policy and program development and implementation statewide with regard to security operations, inmate programming, and standardization of staffing; ensuring the implementation of the Department's Strategic

41

Plan and other agency initiatives, and standardization of processes and procedures in all facilities.

*Mr. Trujillo will also testify regarding the changes implemented for maximum custody inmates, specifically inmates who are in maximum custody and designated as Seriously Mentally Ill. He will also testify regarding the positive outcomes related to these changes once the changes have been made.*

*Mr. Trujillo has reviewed the reports of Plaintiffs' experts Eldon Vail and Craig Haney. Mr. Trujillo will testify regarding the conditions of confinement as alleged by both Mr. Vail and Mr. Haney and as to the conditions of confinement for those inmates in maximum custody or detention units that may change up until the time of trial. Mr. Trujillo will testify regarding the classification system for mentally ill inmates placed in maximum custody and detention units, specifically but not limited to the fact that ADC's classification system has been reviewed and validated by Dr. James Austin of the American Correctional Association and the National Institute of Corrections. Further, every inmate receives an annual classification review, which is an interactive process including the inmate. Mr. Trujillo will also testify regarding the ability of inmates, with the exception of those inmates on Death Row, to earn their way out of maximum custody or detention units and the criteria for such movement. Mr. Trujillo will testify that there are various groups of mental health inmates in maximum custody or detention units, which each require special considerations in how ADC addresses their housing and movement. Additionally, Mr. Trujillo will testify regarding the training that all correctional staff receives and the training that staff assigned to mental health units are undergoing , including ASIST Training and other specialized training regarding inmates with mental illness. Officers are selected to work in those areas of maximum custody housing mentally-ill inmates based on their experience level and demonstrated ability to address situations that may arise. These officers serve 5 years at these posts before rotating in order to provide consistency in these housing*

*areas.   Further,  all  sergeants  and  lieutenants  will  be  trained  in  motivational interviewing as part of crisis intervention training.*

*Mr. Trujillo will also testify regarding the frequency with which inmates have contact with individual staff, whether it be correctional or medical staff.  Mr. Trujillo  will  testify  regarding  the  opportunity  for  recreation  within  the  maximum custody  and  detention  units.   Further,  maintenance  issues  throughout  ADC  are regularly addressed with those issues positing a security or safety concern given higher priority.  Mr. Trujillo will testify as to the changes occurring at Perryville Complex – Lumley Unit that affects the programming access and conditions of confinement of mentally  ill  inmates  in  that  unit.   Mr. Trujillo  will  also  testify  regarding  the  issues related to mentally ill inmates in maximum custody or detention units that are unique to Perryville  as  the  only  complex  that  houses  female  inmates  with  exception  of  George Ward at the Phoenix Complex.*

*Mr. Trujillo will further testify regarding the requirement that staff and visitors to maximum custody and detention units wear safety gear.  He will testify that staff safety is a priority and that the equipment in use today is the direct result of past incidents of violent inmate behavior.  Mr. Trujillo will testify regarding the health and welfare checks that are occurring through ADC for inmates in maximum custody and detention units, including the role of the roving officer whose sole job duty is to conduct such checks.  He will also testify regarding the policies and procedures regarding the use of chemical agents and the circumstances for such use.  He will testify regarding the emphasis ADC places on de-escalation techniques, barring emergency situations requiring immediate response.  Mr. Trujillo will also address conditions of confinement issues raised by named Plaintiffs.  Particularly, Mr. Trujillo will testify regarding the allegations made by Plaintiff Verduzco relating to the length of the suicide smocks, cell lighting, being awoken by security staff for safety checks, minimal human contact, and being unable to go outside, brush her teeth, or bathe regularly.  He will also testify regarding her claim that after being pepper sprayed, she is stripped naked and hosed*

1   *down by security staff. Mr. Trujillo will testify regarding Plaintiff Rodriguez's*

2   *allegations that while on suicide watch she is only allowed to shower twice a week, is*

3   *not provided toothpaste and a toothbrush, cannot go to recreation, and is not allowed to*

4   *have reading materials. Mr. Trujillo will testify regarding Plaintiff Chisholm's claims*

5   *that she experienced custodial harassment.*

6   *Mr. Trujillo will testify as to the current status of all of these areas, the*

7   *allegations contained in Plaintiffs' expert reports, and changes that may be*

8   *implemented up until trial. Mr. Trujillo will testify pursuant to Federal Rule of Civil*

9   *Procedure 26(a)(2)(C).*

10      42.    Brian Hanstad, D.M.D., Northern Regional Dental Director and Dental

11              Supervisor ASPC-Perryville
              c/o Smallwood Prison Dental Services

12          *The Sack Law Firm*
          *Jeffrey M. Mervis*

13          *8270 Greensboro Drive, Suite 810*
          *McLean, Virginia 22102*

14          *(703) 883-0102*

15

16   *Dr. Hanstad is the Northern Region Dental Director and the Dental*

17   *Supervisor for ASPC-Perryville. Dr. Hanstad will testify pursuant to Federal Rule of*

18   *Civil Procedure 26(a)(2)(C).*

19   *Dr. Hanstad will testify regarding his knowledge of and interactions with*

20   *named Plaintiffs Maryanne Chisholm and Charlotte Wells related to their dental care.*

21   *He will testify that in his opinion, the dental treatment they received was appropriate*

22   *and within the standard of care. Dr. Hanstad will testify regarding his review of*

23   *Plaintiff Stephen Swartz's dental records and his opinions regarding the treatment*

24   *provided to Swartz relating to his allegations that he had a cracked molar for two years*

25   *and was told the only option was to extract the tooth. Dr. Hanstad will testify regarding*

26   *his review of Plaintiff Polson's dental records and his opinions regarding the treatment*

27   *provided to Polson relating to his allegations that he experienced long delays in*

28   *receiving partial dentures and treatment for broken teeth.*

44

1    *He may also testify regarding the dental care of other ADC inmates whom*
2    *he has treated or whose dental records he has reviewed, including whether their dental*
3    *care was appropriate and within the standard of care.*

4    *Dr. Hanstad will testify that upon intake, inmates are provided with dental*
5    *hygiene instruction.  Because of security concerns, special toothbrushes are issued.*
6    *Inmates are taught how to brush their teeth and how to practice good dental hygiene in*
7    *the corrections setting.  Inmates are also instructed on how to access dental care*
8    *through HNRs.*

9    *Dr. Hanstad will testify regarding ADC policies relating to timeliness of*
10   *dental intakes, routine care, and urgent care.  He will testify that per ADC policy,*
11   *inmates receive dental x-rays and a comprehensive oral evaluation within 30 days of*
12   *intake, unless it has been less than six months since the inmate was previously in ADC*
13   *custody.  Dr. Hanstad will testify that female inmates go through the dental intake*
14   *process at Perryville.  He will testify that male inmates have their dental intake x-rays*
15   *taken at Phoenix, but may receive their comprehensive oral examination at their*
16   *receiving units. Dr. Hanstad will testify that intake wait times are less than 30 days*
17   *statewide as of December 2013 and will also testify regarding current wait times at the*
18   *time of trial.*

19   *Dr. Hanstad will testify that ADC does not have an "extraction-only"*
20   *policy.  He will testify that dentists at ADC perform fillings on teeth that can be*
21   *restored, but many teeth are non-restorable and cannot be filled.  He will explain hat*
22   *many inmates come into the system with little or no dental care and poor dental hygiene*
23   *practices.  He will testify that the incidence of "meth mouth" is very high among*
24   *inmates in ADC custody, particularly among the female inmates.  He will testify that for*
25   *an inmate with "meth mouth," extraction is often the only viable treatment option.  He*
26   *will also testify that whether a tooth can be restored is a matter of clinical discretion*
27   *based upon a review of current x-rays and a clinical examination.*

28   *Dr. Hanstad will testify that inmates may refuse dental care or specific*

45

1    *dental treatment and that refusals are to be noted on the refusal form.  He will also*

2    *testify that ADC policy requires that dentists obtain informed consent from inmates for*

3    *oral surgery, including extractions.  He will testify that dentists explain the risks and*

4    *benefits of the procedure, as well as any available treatment alternatives, to the inmate,*

5    *and the inmate signs the informed consent form if he or she decides to have the*

6    *procedure performed.  Dr. Hanstad will testify that the informed consent form for oral*

7    *surgery does not include fillings as an option because many times a filling is not an*

8    *available treatment alternative if the dentist is recommending an extraction.*

9           *Dr. Hanstad will testify that in his opinion, inmate to dentist staffing ratios*

10   *are not the most appropriate method for determining dental staffing needs.  He will*

11   *testify that determining the appropriate staffing at a correctional dental clinic depends*

12   *on factors such as HNR volume and security issues.  He will testify that Perryville*

13   *receives the highest number of HNRs of any complex statewide, even though it ranks*

14   *sixth statewide in terms of inmate population. He will testify that dentists at Perryville*

15   *perform more dental procedures than any other dental clinic statewide.  In addition, Dr.*

16   *Hanstad will testify that female inmates do not have the same no-show rate as male*

17   *inmates.   As a result, Perryville's dental staffing needs are different than other*

18   *complexes.  Dr. Hanstad will also testify that dentists at complexes such as Winslow,*

19   *Safford, and Douglas, which have smaller, lower custody populations, can generally see*

20   *more patients per day than dentists treating higher custody populations at complexes*

21   *such as Lewis and Eyman.  He will testify that maximum custody inmates must be*

22   *transported by correctional staff to dental appointments in restraints, which lengthens*

23   *the time in between appointments.*

24          *Dr. Hanstad will testify that in his experience, ADC inmates sometimes*

25   *submit dental HNRs for reasons other than to obtain dental treatment.  He will testify*

26   *that some inmates in maximum custody submit HNRs to get out of their cells.  He will*

27   *testify that at Perryville, the dental department now has a portable dental chair which*

28   *can be taken to the maximum custody unit to provide dental care on-site.  This enables*

46

1  *a dentist to treat a maximum custody inmate without having to close down the entire*

2  *dental clinic due to the inmate's security level.  He will also testify that inmates submit*

3  *dental HNRs claiming they have pain in order to be seen sooner but deny having pain*

4  *when they are called into the clinic.*

5  *Dr. Hanstad will testify that in his opinion, dental staffing at ADC is*

6  *sufficient to meet the needs of the ADC inmate population, as evidenced by low wait*

7  *times for dental treatment at all complexes statewide.  He will testify that ADC policy*

8  *requires that urgent care requests be seen within 72 hours and routine care requests*

9  *within 90 days.  He will testify that intake examinations must be performed within 30*

10  *days.  Dr. Hanstad will testify regarding current dental wait times at the time of trial.*

11  *Dr. Hanstad will testify regarding reasons that an inmate may have an*

12  *extended wait time for dental care, such as being out to court, refusing treatment, or*

13  *experiencing certain health problems which require clearance from a physician prior to*

14  *undergoing dental treatment.*

15  *Dr. Hanstad will testify that dental assistants at ADC have all passed an*

16  *examination and possess a certification that permits them to take dental x-rays.  He will*

17  *testify that he has a standing order for his dental assistants to take x-rays to assist him*

18  *in his clinical evaluation.  Dr. Hanstad will testify that dental assistants review the*

19  *inmate's complaint, take a health history, and take x-rays if needed.  He will testify that*

20  *dental assistants do not perform dental procedures and that a dentist is always on-site at*

21  *the clinic during clinic hours.  Dr. Hanstad will testify regarding requirements for*

22  *dental training and supervision under Arizona state law.  Dr. Hanstad will testify that in*

23  *his opinion, having dental assistants triage dental HNRs and take dental x-rays based*

24  *on a standing order from their supervising dentist is within the standard of care.*

25  *Dr. Hanstad will testify regarding the dental priority classification system*

26  *in the Dental Services Technical Manual.  He will testify that dental assistants are*

27  *instructed to classify HNRs mentioning the words "pain" and/or "swelling" and any*

28  *synonyms as urgent care.  Dr. Hanstad will testify that per ADC policy, urgent care*

47

1    *requests must be seen within 72 hours.  He will testify that many urgent care requests*
2    *are seen the same day or within 24 hours.  He will testify that most dental clinics are*
3    *open Monday through Friday.  On weekends, nursing staff triage dental HNRs using*
4    *dental protocols, and inmates experiencing pain and swelling may be seen on sick call*
5    *outside of dental clinic hours.*

6    *Dr. Hanstad will testify that dental assistants receive on-the-job training*
7    *from the dentists they assist and are evaluated on their triaging skills on an on-going*
8    *basis.  Dr. Hanstad will testify that dentists are evaluated annually through the dental*
9    *peer review process, which includes chart reviews to assess appropriateness of care*
10   *provided.  He will testify that dentists are also evaluated on their productivity, which is*
11   *assessed using the CDS program.  He will testify that all dentists in ADC are licensed in*
12   *Arizona and must complete continuing education to maintain their licensure.*

13   *Dr. Hanstad will testify that dental emergencies are rare at ADC and*
14   *usually involve broken jaws.  He will testify that dental emergencies are generally*
15   *referred to outside providers and hospitals.*

16   *Dr. Hanstad will testify that SPDS has hired two dental hygienists, one for*
17   *each region.  The dental hygienists travel to the complexes within their regions*
18   *depending on inmate demand for cleanings. Dr. Hanstad will testify that wait times for*
19   *routine care, which includes cleanings, average 1.5 months or less at all ADC*
20   *complexes statewide as of December 2013.  He will also testify regarding current*
21   *routine care wait times at the time of trial.*

22   *Dr. Hanstad will also testify regarding the capabilities of the CDS*
23   *program.  He will testify that CDS provides a real-time snapshot of current dental*
24   *requests and wait times.  He will testify that inmates on the routine care list are listed in*
25   *order of longest to shortest waiting time.  If an inmate has been waiting for 90 days or*
26   *longer, the wait time for that inmate turns red to alert staff. He will testify that he can*
27   *run reports on the number of HNRs, the numbers of procedures performed, the number*
28   *of refusals, and average wait times. He will testify that CDS is linked to AIMS so that*

1   *dental staff has access to accurate information on an inmate's housing location.  If an*

2   *inmate on the routine care list is transferred to another complex, the inmate is*

3   *automatically transferred to the routine care list at the receiving complex based on the*

4   *date of the inmate's original HNR.  He will testify regarding current dental statistics at*

5   *the time of trial.*

6       *All of the opinions expressed by Dr. Hanstad herein are to a reasonable*

7   *degree of dental probability.*

8       43.   Winfred Williams, Chief Medical Officer , M.D.
9           c/o Corizon Health

10      Winfred Williams is Corizon's current Chief Medical Officer, and ***will***

11  testify ***pursuant to FRCP 26(a)(2)(C).  He will testify*** regarding his knowledge of ADC's

12  policies and procedures related to the delivery of medical care to ADC's inmate

13  population; and the implementation and use of  the Care Log software at Yuma. Dr.

14  Williams has a lengthy tenure with Corizon Health Services and will also testify regarding

15  his experience and expertise in privatization of health care in correctional settings ***and***

16  ***Corizon's outcomes measurements in the ADC system.***

17      *Dr. Williams will also testify regarding his review of Plaintiff Shawn*

18  *Jensen's medical records and his opinions regarding the treatment rendered to Jensen.*

19  *He will further testify regarding specific allegations made by Mr. Jensen as it relates to*

20  *his medical care in connection with his treatment for prostate cancer as well as his*

21  *current prognosis.*

22      *Dr. Williams will testify regarding his review of Plaintiff Swartz's medical*

23  *records and his opinions regarding the treatment rendered to Swartz after he was*

24  *involved in two inmate assaults in 2010.  Specifically, he will testify regarding the*

25  *follow-up care, medications, and subsequent facial reconstructive surgery.  He will also*

26  *testify regarding Plaintiff Swartz's allegations that staff screened him with a metal*

27  *detector after he swallowed metal, did not refer him for an endoscopy, and told him he*

28  *would have to pass the metal.*

49

1  　　　　*Dr. Williams will testify regarding his review of Plaintiff Rodriguez's*
2  *medical records and his opinions regarding the treatment rendered to her.  He will*
3  *further testify regarding Plaintiff Rodriguez's allegation that she has experienced*
4  *multiple asthma attacks and breathing problems as a result of her exposure to pepper*
5  *spray.*

6  　　　　*Dr. Williams will testify regarding his review of Plaintiff Thomas's*
7  *medical records and his opinions regarding the treatment provided to him.  He will*
8  *further testify regarding Plaintiff Thomas's specific allegations that in November 2011,*
9  *he overdosed on Diclofenac and did not receive medical attention, that he has*
10  *experienced insomnia and weight loss while in SMU, and was not prescribed a sleep*
11  *aid.*

12  　　　　*Dr. Williams will testify regarding his review of Plaintiff Gamez's medical*
13  *records and his opinions regarding the treatment provided to him.  He will further*
14  *testify regarding Plaintiff Gamez's specific allegations that his care was managed by a*
15  *nurse practitioner, he did not receive follow-up tests to confirm that he has frontal lobe*
16  *dysfunction, and his medications have been denied or delayed.*

17  　　　　*Dr. Williams will testify regarding his review of Plaintiff Chisholm's*
18  *medical records and his opinions regarding the treatment provided to her.  He will*
19  *further testify regarding Plaintiff Chisholm's specific allegations that she was not*
20  *referred to a cardiologist for eight months despite experiencing chest pains and*
21  *shortness of breath and did not receive adequate care or testing from outside specialists.*

22  　　　　*Dr. Williams will testify regarding his review of Plaintiff Licci's medical*
23  *records and his opinions regarding the treatment provided to her.  He will further testify*
24  *regarding Plaintiff Licci's specific allegations that she has experienced delays in seeing*
25  *an oncologist and receiving testing regarding masses on her breasts, mouth, arms, and*
26  *ovaries, that she experiences extreme discomfort in her cervix that impacts her bowels*
27  *and results in constipation, and medical staff make false claims in replies to her*
28  *grievances.  Dr. Williams will also testify regarding Plaintiff Licci's allegation that her*

1  *port-a-cath may not have been properly flushed.*

2  *Dr. Williams will testify regarding his review of Plaintiff Hefner's medical*
3  *records and his opinions regarding the treatment provided to him.  He will further*
4  *testify regarding Plaintiff Hefner's specific allegations that his vision deteriorated after*
5  *a nurse gave him expired eye drops, he did not receive eye medication following eye*
6  *surgery in 2006 and 2008, has not seen an ophthalmologist, and experienced delay in*
7  *receiving a CT scan following an injury.  He will testify regarding Plaintiff Hefner's*
8  *allegation that he did not receive adequate treatment after an assault.  Dr. Williams will*
9  *also testify regarding Plaintiff Hefner's claim that his requests for a medical diet have*
10 *been denied.*

11 *Dr. Williams will testify regarding his review of Plaintiff Polson's medical*
12 *records and his opinions regarding the treatment provided to him.  He will further*
13 *testify regarding Plaintiff Polson's specific allegations that he experienced delays in*
14 *receiving appropriate care and medications for chronic ear pain.*

15 *Dr. Williams will testify regarding his review of Plaintiff Wells' medical*
16 *records and his opinions regarding the treatment provided to her.  He will further testify*
17 *regarding Plaintiff Wells' specific allegations that she was not evaluated by a*
18 *cardiologist despite repeated complaints of chronic chest pain.*

19 *Dr. Williams will testify regarding his review of Plaintiff Smith's medical*
20 *records and his opinions regarding the treatment provided to him.  He will further*
21 *testify regarding Plaintiff Smith's specific allegation that he was unable to write HNRs*
22 *due to a hand injury.*

23 *Dr. Williams will testify regarding his review of Plaintiff Brislan's medical*
24 *records and his opinions regarding the treatment provided to him.  He will further*
25 *testify regarding Plaintiff Brislan's specific allegation that he has lost weight due to*
26 *insufficient meals.*

27 *In addition to testifying regarding the medical treatment of the named*
28 *Plaintiffs, Dr. Williams will also testify regarding the health care provided to the*

51

1   *individual inmates specifically referred to by Plaintiffs' experts and whether the care*

2   *rendered was adequate, appropriate and meets the standard of care.*

3        44.   **Joseph V. Penn, M.D., CCHP, F.A.P.A.**
              **UTMB Correctional Managed Care**
4             **200 River Pointe Drive, Suite 200**
              **Conroe, Texas 77304**
5             **(936) 494-4170**

6        *Dr. Penn is certified by the American Board of Psychiatry and Neurology*

7   *in psychiatry and holds a subspecialty certification in forensic psychiatry and has been*

8   *retained as an expert witness by Defendants Ryan and Pratt. Dr. Penn is a Certified*

9   *Correctional Health Care Professional (CCHP), a Clinical Associate Professor of*

10  *Psychiatry in the Department of Psychiatry and Behavioral Services at the University of*

11  *Texas Medical Branch, Medical School and is the Director of Mental Health Services,*

12  *University of Texas Medical Branch Correctional Managed Care.  Dr. Penn will testify*

13  *consistent with the information and opinions set forth in his CONFIDENTIAL expert*

14  *report, which is produced herewith as ADC203372 through ADC203515  A list of the*

15  *documents and things Dr. Penn considered in the preparation of his report is contained*

16  *therein at ADC203467 through ADC203479.  In addition, Dr. Penn's curricula vitae*

17  *(including his list of publications he has authored in the past ten years) is produced*

18  *herewith as ADC203481 through ADC203509.  A list of cases where Dr. Penn has*

19  *testified during the past four years is produced herewith as ADC203511 through*

20  *ADC203513.  Dr. Penn's fee schedule is produced herewith as ADC203515.*

21       45.   **John W. Dovgan, DDS**
              **3841 E. Thunderbird Road, Ste. 101**
22            **Phoenix, Arizona 85032**
              **(602) 867-1899**
23

24

25       *Dr. Dovgan is a dentist licensed to practice in the State of Arizona and has*

26  *been retained as an expert witness by Defendants Ryan and Pratt.  Dr. Dovgan will*

27  *testify consistent with the information and opinions set forth in his CONFIDENTIAL*

28  *expert report, which is produced herewith as ADC2203516through ADC203609.  A list*

52

1  *of the documents and things Dr. Dovgan considered in the preparation of his report is*
2  *contained therein at ADC203599 through ADC203609.  In addition, Dr. Dovgan's*
3  *curricula vitae (including his list of publications he has authored in the past ten years)*
4  *is produced herewith as ADC203594 through ADC203597.  A list of cases where Dr.*
5  *Dovgan has testified during the past four years is contained therein at ADC203596*
6  *through ADC203597.  Dr. Dovgan's fee schedule is also contained therein at*
7  *ADC203597.*

8       46.   *Richard P. Seiter, Ph.D.*
              *205 Topton Way*
9             *St. Louis, Missouri 63105*
              *(314) 330-0658*
10

11          *Dr. Seiter holds a Ph.D. in Public Administration from The Ohio State*
12  *University and has been retained as an expert witness by Defendants Ryan and Pratt.*
13  *He has served extensively with the Federal Bureau of Prisons, served six additional*
14  *years as the Director of the Ohio Department of Rehabilitation and Correction, was the*
15  *first Chief of the NIC National Academy of Corrections, a full professor and Director of*
16  *Criminal Justice at St. Louis University, and former Executive Vice President and*
17  *Chief Corrections Officer for Corrections Corporation of America.  Dr. Seiter is also a*
18  *past recipient of the E.R. Cass Award by the American Correctional Association (ACA)*
19  *and the Louie Wainwright Award from the Association of State Correctional*
20  *Administrators (ASCA).  Dr. Seiter will testify consistent with the information and*
21  *opinions set forth in his CONFIDENTIAL expert report, which is produced herewith as*
22  *ADC203610-ADC203762.  In addition, Dr. Seiter's biography and curricula vitae,*
23  *including a list of cases where Dr. Seiter has testified in the past four years and his fee*
24  *schedule is produced herewith as ADC203696-ADC203704.  A list of the documents*
25  *and things Dr. Seiter considered in the preparation of his report is set forth at*
26  *ADC203706-ADC203716.*

27

28

47. ***Lawrence H. Mendel, D.O., FSCP, CCHP***
***1255 N. Hamilton Road, #71***
***Columbus, Ohio 43230***
***(614) 471-8151***

*Dr. Mendel is a certified by the American Osteopathic Board of Family Practice and has been retained as an expert witness by Defendants Ryan and Pratt. Dr. Mendel is a Fellow of the Society of Correctional Physicians and a Certified Correctional Health Care Professional. Dr. Mendel has extensive practice as an emergency room physician as well as experience as both a provider and administrator in correctional healthcare settings. Dr. Mendel served for more than ten years as the Medical Director of the Ohio Department of Rehabilitation and Correction, and has written, presented, and consulted extensively for a variety of governmental and private entities on questions relating to correctional healthcare. Dr. Mendel also holds a faculty appointment with The Ohio State University as an Assistant Clinical Professor of Family Medicine. Dr. Mendel will testify consistent with the information and opinions set forth in his CONFIDENTIAL expert report, which is produced herewith as ADC203763-ADC203835. A list of the documents and things Dr. Mendel considered in the preparation of his report is contained therein at ADC203824-ADC203835. In addition, Dr. Mendel's curricula vitae, including his list of recent publications, is produced herewith as ADC203814–ADC203817. A list of cases where Dr. Mendel has testified in the past four years is produced herewith as ADC203819-ADC203822. Dr. Mendel's fee schedule is set forth within the text of his CONFIDENTIAL expert report at ADC203765.*

48. Any and all foundational witnesses, including custodians of records necessary to lay foundation for the admissibility of evidence at trial.

54

# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

# FILED UNDER SEAL

# EXHIBIT 4


# FILED UNDER SEAL

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

## David Fathi

| | |
|---|---|
| **From:** | Dan Struck <DStruck@swlfirm.com> |
| **Sent:** | Wednesday, January 08, 2014 4:48 PM |
| **To:** | David Fathi |
| **Cc:** | Parsons Team; AG Team; Don Specter (dspecter@prisonlaw.com); Corene Kendrick (ckendrick@prisonlaw.com); Caroline N Mitchell (cnmitchell@jonesday.com); keidenbach@perkinscoie.com |
| **Subject:** | Re: Expert Depositions |

Sorry David, but you aren't entitled to these depositions.

Sent from my iPhone

On Jan 8, 2014, at 2:19 PM, "David Fathi" <dfathi@aclu.org> wrote:

> Dan,
>
> In addition to Drs. Penn, Seiter, Mendel, and Dovgan, we will need deposition dates for the
> following expert witnesses identified in Defendants' Eleventh Supplemental (Expert) Disclosure
> Statement:
>
> Charles Ryan
> Carson McWilliams
> Ernest Trujillo
> Richard Rowe
> David Robertson
> Nicole Taylor
> Angelo Daniels
> Mark Dolny
> Mark Jansen
> Mark Fleming
> Thomas Buenker
> Winfred Williams
> Laura Donnelly
> Dr. Smallwood
> Dr. Hanstad
>
> Thanks very much.
>
> David
>
> David C. Fathi*
> Director, ACLU National Prison Project
> 915 15th St. N.W., 7th Floor
> Washington, DC  20005
> (202) 548-6603
> **Please note new email address:** dfathi@aclu.org

1

# EXHIBIT 7



**PRISON LAW OFFICE**
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

January 13, 2014

Mr. Daniel Struck
Struck, Wieneke & Love
3100 W. Ray Road, Suite 300
Chandler, AZ 85226

RE:  *Parsons v. Ryan*
     Defendants' Expert Reports and Materials Not Produced

Dear Dan,

As we discussed on the call today, Defendants' expert reports relied upon materials that were responsive to past discovery requests but not produced, as well as documents that were not produced with the expert reports. We list each of these categories of documents below.

Defendants' failure to produce these documents is prejudicial, and we request that they be produced to us no later than January 22, 2014, as our experts' supplemental reports are due 30 days after the completion of the production of the other documents you are producing to us. We reserve the right to seek relief from the Court on all of these matters if you do not reasonably address our concerns.

I.  <u>Documents Not Produced that were Responsive to Plaintiffs Requests</u>

First, the following documents were not produced although they are responsive to past discovery requests, an improper sandbagging of Plaintiffs, and in defiance of the Court's clear order that Defendants complete all discovery productions no later than November 25, 2013. (Doc. 717). Judge Wake told you to fully produce discovery responses, gave you a deadline by which to do it, and it is clear from your experts' use of the following documents that Defendants disregarded his order. We request that you strike all portions of your experts' opinions that rely upon these facts that were not previously produced to Plaintiffs. If you do not so agree, we will move to strike all sections of your experts' reports.

A.  Mendel (medical)

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

The following documents are responsive to Plaintiff Jensen's 1st RFP, Request 9 ("all draft or final policies and practices of Corizon regarding the provision of health care to prisoners"):

- Mendel p. 23 (Corizon has detailed clinical guidelines for treatment of chronic conditions)
- ADC_M000002-000039 Corizon Asthma Clinical Pathways
- ADC_M000040-000057 Corizon Warfarin Clinical Pathways
- ADC_M000058-000118 Corizon Diabetes Clinical Pathways
- ADC_M000119-000158 Corizon Hypertension Pathways
- ADC_M000159-000191 Corizon Seizures Clinical Pathways

The following documents are responsive to Parsons' 1st RFP, Request 55 ("All documents regarding exhausted grievances regarding health care or isolation"):

- Mendel pp. 4, 15 (prisoner grievances)
- Mendel Appendix, p. 5 (ADC203297 Corizon CAG FAQ PGMS FY13-June 2013)

The following documents are responsive to Parsons 1st RFP, Request 40 (all death records) and Request 18 (All documents regarding health care statistics of any kind at the ADC, including but not limited to documents that track disease or condition prevalence, outcomes, delays in service, care provided, and costs"):

- Mendel Appendix, p. 11: (ADC_S000292-297, IM Deaths by Reasons 2012; ADC_S000298-302, IM Deaths by Reasons 2013)

B.      Dovgan (dental)

The following documents are responsive to Parsons 1st RFP, Request 18 (All documents regarding health care statistics of any kind at the ADC, including but not limited to documents that track disease or condition prevalence, outcomes, delays in service, care provided, and costs") and Request 19 (cocuments sufficient to show the hours of operation, staffing schedules, and health care staffing levels for each facility operated by the ADC):

- Dovgan Ex. B, p. 9 (Smallwood Dental Services documents showing staffing, monthly reports, utilization summaries, wait times, and Power Point presentation)

C.      Penn (mental health)

The following documents are responsive to Parsons 1st RFP, Request 51 (all documents regarding internal investigations or external investigations regarding the delivery of health services to prisoners in isolation"):

- ADC_P888-901, NCCHC accreditation report Douglas, 6/28/13

Mr. Daniel Struck
RE: *Parsons v. Ryan*
Defendants' Expert Reports
Jan. 13, 2013
Page 3

- ADC_P902-915, NCCHC accreditation report Perryville, 6/28/13
- ADC_P920-933, NCCHC accreditation report Phoenix, 6/28/13
- ADC_P934-950, NCCHC accreditation report Tucson, 6/28/13
- ADC_P965-973, NCCHC accreditation report Yuma, 3/11/11

The following document is responsive to Licci's 1st RFP, Request 13 ("All documents regarding mental health group programs scheduled from June 1, 2012 to present"):
- ADC_S286-291, Mental Health Programs & Schedule (dated 8/16/13)

The following documents are responsive to Polson's 1st RFP, Request 2 ("all policies and procedures regarding management or treatment of prisoners on suicide watch") and Request 25 (all documents regarding health care training provided to health care and custody staff):
- ADC_S362-384, 9.7a COTA Signs & Symptoms of Mental Disorders lp (pre-service) (dated 5/29/07)
- ADC_S535-553, 9.7b Suicide Prevention LP (pre-service) (dated 9/25/12)

    D.    Seiter (isolation)

The following documents are responsive to Parsons 1st RFP, Request 51 (all documents regarding internal investigations or external investigations regarding the delivery of health services to prisoners in isolation"):
- Seiter p. 1, Patricia L. Hardyman, PH.D. "Validation of the Arizona Department of Corrections Objective Classification System:  Final Report", Criminal Justice Institute, 2013
- Seiter p. 7, Arizona Department of Corrections, Mental Health Initiatives and Suicide Prevention Strategies, May 2013

The following documents are responsive to Polson's 1st RFP, Request 2 ("all policies and procedures regarding management or treatment of prisoners on suicide watch") and Request 25 (all documents regarding health care training provided to health care and custody staff):
- ADC_S000317 Video of Signs & Symptoms of Mentally Ill Inmates (in-service) training materials
- ADC_S000318-000361 Signs & Symptoms of Mentally Ill Inmates (in-service) training Materials
- Arizona Department of Corrections COTA Curriculum Details, (September 24, 2013). (ADC S000362-384)

- ADC_S000362-000384 9.7a COTA Signs & Symptoms of Mental Disorders lp (pre-service) training materials
- ADC_S000385-000439 9.7a COTA Signs & Symptoms of Mental Disorders PPT (pre-service) training materials
- ADC_S000440-000444 COTA Signs & Symptoms of Mental Disorder workbook pages (preservice)training materials
- ADC_S000445 Video of 2014 Inmate Suicide Prevention (in-service) training Materials
- ADC_S000446-000515 Inmate Suicide Prevention (in-service) training materials
- ADC_S000516-000517 - 9.7 SP Risk Factor Cards PPT (pre-service) training materials
- ADC_S000518-000534  - 9.7b Suicide Prevention (pre-service) training materials
- ADC_S000535-000553 - 9.7b Suicide Prevention LP (pre-service) training materials
- ADC_S000554-000555 - SP Risk Factor Cards (pre-service) training materials

The following documents are responsive to Polson's 1st RFP, Request 32 (all post orders regarding health and welfare checks and mental health contacts on prisoners in isolation) and Request 33 (all post orders for watch officers):
- ADC_S000235- 000244 - Unit Specific Post Order – Browning Unit
- ADC_S000245- 000248 - Post Order Restricted Watch Security Officer 36 (5/15/13)
- ADC_S000249- 000260 - Post Order Restricted Watch Security Officer 36 (Florence)
- ADC_S000261 - Unit Specific Post Order – Perryville Lumley Unit
- ADC_S000557- 000561 - Restricted Post Order 37 re Max Custody Rovers

The following document is responsive to Licci's 1st RFP, Request 13 ("All documents regarding mental health group programs scheduled from June 1, 2012 to present"):
- Seiter p. 6 and ADC_S286-291, Mental Health Programs & Schedule (dated 8/16/13)

The following documents are responsive to Rodriguez's 1st Set of Interrogatories, Interrogatory 5 (indoor maximum temperature and humidity, and documents in support of the findings), and the Court's September 25, 2013 Order (Docket 665):
- ADC_S000221-223 PV Lumley Temperature Data – August 26, 2013
- ADC_S000224-226 PV Lumley Temperature Data – October 18, 2013
- ADC_S000227-229 PV Lumley Temperature Data – September 12, 2013
- ADC_S000230-232 PV Lumley Temperature Data – September 26-27, 2013

The following documents are responsive to Polson's 1st RFP, Request 11 ("documents sufficient to show the number and names of all prisoners at each ADC facility and unit classified as 'seriously mentally ill,' 'severely mentally ill,' MH-3 through MH-5…"):
- ADC_S000281-283 – ADC Maximum Custody Profile Males

- Mental Health Scores by Gender & Classification spreadsheet

The following documents are responsive to Parsons 1st RFP, Request 40 (all death records) and Request 18 (all documents regarding health care statistics of any kind at the ADC, including but not limited to documents that track disease or condition prevalence, outcomes, delays in service, care provided, and costs"):

- ADC_S000292-97 IM Deaths by Reason 2012
- ADC_S000298-302 IM Deaths by Reason 2013

II. <u>Documents Relied on By Experts that were not Produced with the Reports</u>

Second, the following documents were cited by your experts in their reports, but were not produced with the reports.  We have sorted the list of documents by expert and the page number of their report:

A.     Mendel (medical)

Mendel p. 3 (medical files of "other prisoners")
Mendel pp. 4, 15 (grievances from Lewis, Phoenix, Yuma)
Mendel p. 11 ("random selection of records" at Lewis and Yuma)
Mendel pp. 13-19 (all documents from named plaintiffs' medical files not previously produced)
Mendel pp. 22-23 (CareLog" database)
Mendel p. 23 (medical file of Patrick Nissely, 22702)
Mendel p. 26 (medical file of Michael Velasquez, 173685)
Mendel p. 27 (specialty referral logs)
Mendel p. 40 (medical file of Robert Devine, 138222)
Mendel Appendix, p. 9:
    Bureau of Justice Statistics Mortality Data;
    Bureau of Justice Statistics Mortality in Local Jails and State Prisons, 2000-2011 –
    Statistical Tables – August 2013;
    Bureau of Justice Statistics State Corrections Expenditures, FY 1982-2010 – Dec 2012
    (revised Oct 22, 2013);
    ADC Corrections at a Glance Brochures (January-October 2013)
Mendel Appendix, p. 10:
    ADC_M0000002-39, Corizon Asthma Clinical Pathways;
    ADC_M0000040-57, Corizon Warfarin Clinical Pathways;
    ADC_M0000058-118, Corizon Diabetes Clinical Pathways;
    ADC_M0000119-158, Corizon Hypertension Pathways;
    ADC_M0000159-191, Corizon Seizures Clinical Pathways.

Mendel Appendix, p. 11:
      ADC_S000292-297, IM Deaths by Reasons 2012;
      ADC_S000298-302, IM Deaths by Reasons 2013;
      ADC_M000192, IPC Beds Comparison Spreadsheet.
Mendel Appendix, p. 12:
      ADC_M000193, Memo from Joy Lloyd to Corizon Staff re Constituency Svcs;
      ADC_M000194, Arizona Staffing Variances.
      ADC200159-200168 Photographs taken at Yuma Complex by Dr. Mendel

      B.      Dovgan (dental)

Dovgan p. 7, 31, 35-38, 53-66 & Ex. B, pp. 4-8 (Inmate Dental Records for 155 inmates)
Dovgan Ex. B, p. 9 (SPDS patient reports for 21 inmates)
Dovgan Ex. B, pp. 8-9 (photographs taken by Dr. Dovgan)
Dovgan Ex. B, p. 11 (Out-to-court dates for various inmates)
Dovgan Ex. B, p. 11 (AIMS Movement Reports)
Dovgan Ex. B, p. 11 (Dental Instructional Video provided to inmates)

      C.      Penn (mental health)

Penn, p. 5 ("five randomly selected medical records of state prisoners identified with 'serious mental illness' from each of the Phoenix, Perryville, Eyman, and Florence facilities")
Penn, p. 32 ("several Arizona Department of Corrections state prisoner medical records")
Penn, p. 35 ("ten records received for state prisoners")
Penn, p. 41 ("Randomly selected medical records of state prisoners")
Penn, p. 68 ("inmate records")
Penn p. 72 (mental health watch individual logs)
Penn, p. 84 ("available records")

Penn Ex. A:
      ADC_S000292-297, IM Deaths by Reason 2012
      ADC_S000298-302, IM Deaths by Reason 2013
      ADC_P000564, Keefe Store OTCs
      ADC_P000565-579, Pharmacor Stock Sheets
      ADC_P000868-881, Eyman SMU I Mental Health Inmate List
      ADC_P000887, AZ Psych DOT KOP Drug List 12/11/13
      ADC_P000985-992, Phoenix Alhambra Application for Behavioral Health Service Agency License
      ADC_P000993, Phoenix Alhambra License of Level I Sub Acute Agency

PAR000611 – 613, Standards for & Evaluation of Medical & Health Related Facilities and Services Provided to Inmates who are Confined in a State Prison
PAR000619 – 622, Phoenix Alhambra & Aspen Units validation Survey Report conducted by AZ Department of Health Services – March 27, 2013

Medical Records Reviewed by Dr. Penn:
ASPC-Tucson:
Eric Clark, ADC 180165
David Fletcher, ADC 50457
Charles Gatliff, ADC 160559
Richard Gregg, ADC 229861
Xavier Hernandez, ADC 205654
Carlton Leader, ADC 73740
Vincent Powell, ADC 93198

ASPC-Lewis:
Joseph Aherns, ADC 275930
Justeen Coleman, ADC 253012
Michael Collins, ADC 86924
Mark Deaton, ADC 162533
Norman Flanigan, ADC 177442
Arthur Gaines, ADC 202177
Gary Hall, ADC 207113
Paul Lilly, ADC 92444
Danny Merritt, ADC 216352
Karl Schlobohn, ADC 203606

ASPC-Yuma:
ADC_P000445-000563, Daniel DeLeon, ADC 189733
ADC_P000001-000164, David Armijo, ADC 232734
ADC_P000165-000319, James Bennett, ADC 237279
ADC_P000320-000444, Victor Calzada-Gutierrez, ADC 254887

D.      Seiter (isolation)

Seiter p. 1 (Patricia L. Hardyman, PH.D. "Validation of the Arizona Department of Corrections Objective Classification System:  Final Report", Criminal Justice Institute, 2013)
Seiter p. 2 (Arizona Department of Corrections, Mental Health Initiatives and Suicide Prevention Strategies, May 2013)

Mr. Daniel Struck
RE: *Parsons v. Ryan*
Defendants' Expert Reports
Jan. 13, 2013
Page 8

Seiter p. 13 and Ex. 8 (Use of Force Packets (Form 2 in DO 804) Beginning with the list of all incidents between July 1, 2012 and February 5, 2013 (described in Exh. 8))
Seiter p. 13 and Ex. 8 (Videos that were used for the 15 incidents Dr. Seiter selected)

Seiter Ex. 2:

    ADC_S000001- 000009, Inmate Assault Data (2/11/13)
    ADC_S000010- 000013, Inmate Assault Data (3/31/13)
    ADC_S000014- 000017, Inmate Assault Data (6/30/13)
    ADC_S000018- 000021, Inmate Assault Data (FY 2014 as of 9/30/13)
    ADC_S000022- 000025, Inmate Assault Data (FY 2014 as of 10/31/13)
    ADC_S000026- 000029, SIR 12-13160 (Eyman)
    ADC_S000030- 000049, UOF Review 12-A08-6875 (Eyman)
    ADC_S000050- 000063, UoF Review 13-A08-0210 (Eyman)
    ADC_S000064- 000083, UoF Review on Inmate Pettit #181452 (Eyman)
    ADC_S000084- 000134, UoF Reviews 1 of 2 (Perryville)
    ADC_S000135- 000164, UoF Reviews 2 of 2 (Perryville)
    ADC_S000165- 000176, UoF Review #12-A01-6608 Mowry #159208 (Florence)
    ADC_S000177- 000188, UoF Review #12-A01-8879 Wright #188401 (Florence)
    ADC_S000189- 000200, UoF Review #12-A01-9261 Savala #169554 (Florence)
    ADC_S000201- 000210, UoF Review #13-A01-0214 Martinez #266305 (Florence)
    ADC_S000211- 000220, UoF Review #13-A01-0499 Kubiak #248182 (Florence)
    ADC_S000221- 000223, PV Lumley Temperature Data - Aug 26 2013
    ADC_S000224- 000226, PV Lumley Temperature Data - Oct 18 2013
    ADC_S000227- 000229, PV Lumley Temperature Data - Sep 12 2013
    ADC_S000230- 000232, PV Lumley Temperature Data - Sep 27 2013
    ADC_S000233, Florence Use of Force Video
    ADC_S000234, Gamez Use of Force Video 1/13/13 – 13-B02-0180, 13-00498
    ADC_S000235- 000244, Unit Specific Post Order – Browning Unit
    ADC_S000245- 000248, Post Order Restricted Watch Security Officer 36 (5/15/13)
    ADC_S000249- 000260, Post Order Restricted Watch Security Officer 36 (Florence)
    ADC_S000261, Unit Specific Post Order – Perryville Lumley Unit
    ADC_S000262- 000276, ADC Detention/PC Report (as of 11/29/13) PowerPoint re 805 (Protective Custody requests) and placements
    ADC_S000277, Assault Data monthly by complex FY11
    ADC_S000278, Assault Data Monthly by complex FY12
    ADC_S000279, Assault Data Monthly by complex FY13
    ADC_S000280, Assault Data Monthly by complex FY14
    ADC_S000281- 000283, ADC Maximum Custody Profile Males
    ADC_S000284- 000285, Adult Corrections Systems Statistics
    ADC_S000292- 000297, IM Deaths by Reason 2012

Mr. Daniel Struck
RE: *Parsons v. Ryan*
Defendants' Expert Reports
Jan. 13, 2013
Page 9

     ADC_S000298- 000302, IM Deaths by Reason 2013
     ADC_S000303- 000316, Eyman-Browning UoF SIR No. 201213036 9/25/12
     ADC_S000557- 000561, Restricted Post Order 37 re Max Custody Rovers
     ADC_S000556, Mental Health Scores by Gender & Classification spreadsheet
     ADC_S000562, Email from R. Patton to D. Northup re Rovers

     I look forward to your prompt response.

Sincerely yours,

*/s/ Don Specter*

Don Specter

cc:    Counsel of Record

# EXHIBIT 8



PRISON LAW OFFICE
General Delivery, San Quentin, CA 94964
Telephone (510) 280-2621 • Fax (510) 280-2704
www.prisonlaw.com

*Director:*
Donald Specter

*Managing Attorney:*
Sara Norman

*Staff Attorneys:*
Rana Anabtawi
Rebekah Evenson
Steven Fama
Warren George
Penny Godbold
Alison Hardy
Corene Kendrick
Kelly Knapp
Millard Murphy
Lynn Wu

VIA EMAIL ONLY

January 17, 2014

Mr. Daniel Struck
Struck, Wieneke & Love
3100 W. Ray Road, Suite 300
Chandler, AZ 85226

RE:   *Parsons v. Ryan*
      Defendants' Expert Reports and Materials Not Produced

Dear Dan,

I am writing to confirm many of the points discussed on our meet and confer on Monday.  If any of this does not comport with your memory, please let me know immediately.

**1.     Expert Reports From All Designated Experts**

Our position is that all 19 of the designated experts in your disclosure need to provide reports, because the summary descriptions are not sufficient.

You stated that you disagree that anyone other than the four experts who provided reports need to do so.  You further stated that Mr. Jansen would be withdrawn as an expert witness and will be designated solely as a fact witness.

We agreed that the parties are at an impasse on this issue.

**2.     Deposition and Document Discovery of All Designated Experts**

Our position is that all of the designated experts must be subject to deposition and document discovery.

You stated that you disagree, and that Defendants will only make available for deposition the four experts who wrote reports and Michael Dolny, the ADC statistician.

We agreed that the parties are at an impasse on this issue.

Board of Directors
Penelope Cooper, President • Michele WalkinHawk, Vice President
Marshall Krause, Treasurer • Christiane Hipps • Margaret Johns
Cesar Lagleva • Laura Magnani • Michael Marcum • Ruth Morgan • Dennis Roberts

### 3.      Missing Documents from Expert Reports

We informed you that there was a vast quantity of documents that were relied upon by your experts that were not produced with the reports, or were responsive to past document requests and not provided.

You asked that we send you a letter detailing the missing documents.  I sent you a 9 page letter on January 13, to which Ashlee Fletcher responded today stating Defendants would provide "1) all documents our office provided to Drs. Dovgan, Mendel, Penn and Seiter, as well as 2) documents they obtained from their independent research and have provided a copy to us."

Once we receive these disks and have an opportunity to review them, we can tell you which documents still need to produced.  We reserve the right to seek relief from the court given these documents are being produced to us 10 days before our rebuttal reports are due.

### 4.      Defendants' Reports Rely Upon Information After the Close of Discovery

Our position is that your expert reports are replete with information generated after the close of discovery (September 27, 2013), but Defendants refuse to provide us access to discovery to rebut these positions.  It is prejudicial to Plaintiffs for Defendants to cherry-pick and only provide the documents that support your positions.  Therefore we requested that you strike those opinions, or alternatively provide sufficient supplemental discovery to allow us to fully respond to their purported opinions.

You stated that Defendants would not be striking their opinions, and that you would only provide us the information that your experts relied upon.

We agreed the parties are at an impasse on this issue.

### 5.      Defendants' Reports Rely Upon Interviews With Staff

Your experts had extensive conversations and interviews with ADC, Corizon, and Smallwood staff.  We had requested that our experts be permitted to speak with staff during their tours, and you refused.  Defendants offered designated individuals who either did not know the answers to the questions or were repeatedly instructed by Defendants' attorneys to not answer the questions.  Therefore, we requested that you strike these opinions.

You stated that you would only strike these opinions if we agreed to strike Plaintiffs' experts' opinions that relied upon interviews with our clients. We noted that you never requested that your experts be allowed to interview our clients during their tours.

We agreed the parties are at an impasse on this issue.

### 6.     Defendants' Experts Rely Upon Future Developments

Your experts repeatedly and explicitly say they intend to rely upon future developments between now and the time of trial. However, Defendants refuse to produce any discovery from after September 27, 2013, except for the cherry-picked information that supports the experts' conclusions. Plaintiffs are prejudiced by Defendants chosing to disclose only the information that is advantageous to your position. Therefore, our position is that discovery will need to be reopened in some sort of limited basis closer to trial, or the parties need to agree to a cut-off date for the court's consideration.

You stated that "We're not going to try this case based upon the medical, dental, mental health system that was in place on September 27, 2013."

We agreed the parties are at an impasse on this issue.

### 7.     Requesting the Court's Assistance

Finally, you indicated that you believe this is a discovery dispute and therefore should be brought to the Court's attention in a one page statement. We disagree and will be filing a motion with the court.

If any of this does not comport with your memory, please let me know immediately.

Sincerely yours,

*/s/ Don Specter*

Don Specter

cc:     Counsel of Record

# EXHIBIT 9

**Corene Kendrick**

| | |
|---|---|
| **From:** | parsonsdiscovery@prisonlaw.com on behalf of David Fathi |
| **Sent:** | Thursday, January 23, 2014 3:46 PM |
| **To:** | ccloman@swlfirm.com |
| **Subject:** | FW: Parsons v. Ryan |

Courtney,

Thank you for your message.  You did not respond to the question in the second paragraph of my January 22 message below; I would be grateful for an answer.

We do not agree that you have fulfilled your obligations.  We have reviewed the four disks referenced in your January 17 letter, and the following documents, listed in Don Specter's January 13 letter, are missing:

**Mendel:**
p. 4, 15 (prisoner grievances)
p. 3 (medical files of "other prisoners")
p. 22-23 (CareLog database)
p. 23 (medical file of Patrick Nissely, 22702)
p. 26 (medical file of Michael Velasquez, 173685)
p. 27 (specialty referral logs)
p. 40 (medical file of Robert Devine, 138222)

**Dovgan:**
Ex. B, p. 11 (dental instructional video provided to inmates)
**Penn:**
p. 72 (mental health watch individual logs)
p. 5 ("five randomly selected medical records of state prisoners identified with 'serious mental illness' from each of the Phoenix, Perryville, Eyman, and Florence facilities")
p. 32 ("several Arizona Department of Corrections state prisoner medical records")
p. 35 ("ten records received for state prisoners")
p. 41 ("Randomly selected medical records of state prisoners")
p. 68 ("inmate records")
p. 84 ("available records")

*Tucson medical records:*
Eric Clark, ADC 180165
David Fletcher, ADC 50457
Charles Gatliff, ADC 160559
Richard Gregg, ADC 229861
Xavier Hernandez, ADC 205654
Carlton Leader, ADC 73740
Vincent Powell, ADC 93198

*Lewis medical records:*
Joseph Aherns, ADC 275930
Justeen Coleman, ADC 253012
Michael Collins, ADC 86924

Mark Deaton, ADC 162533
Norman Flanigan, ADC 177442
Arthur Gaines, ADC 202177
Gary Hall, ADC 207113
Paul Lilly, ADC 92444
Danny Merritt, ADC 216352
Karl Schlobohn, ADC 203606
Please let us know when defendants will produce these documents.

I must say I am puzzled by your accusations of delay by plaintiffs, when defendants have still not produced documents that should have been produced, at the latest, with defendants' expert reports on December 18 of last year.

Finally, with regard to defendants' experts, we will be filing a motion pursuant to the Scheduling Order (Doc. 389), which explicitly contemplates "Motions Challenging Expert Opinion Testimony." We will inform the Court that defendants decline to stipulate to an expedited briefing schedule.

David C. Fathi*
Director, ACLU National Prison Project
915 15th St. N.W., 7th Floor
Washington, DC  20005
(202) 548-6603
**Please note new email address**:  dfathi@aclu.org

*Not admitted in DC; practice limited to federal courts*

---

**From:** Courtney Cloman
**Sent:** Thursday, January 23, 2014 3:36 PM
**To:** David Fathi
**Cc:** Parsons Team
**Subject:** RE: Parsons v. Ryan

David,

Thank you for your email.  As we stated in our email on Friday, we intend to provide you with a substantive response to Don Specter's letter of January 13, 2014.  However, we were required to focus our attention on the voluminous document production that you have acknowledged you received.  Our response to Mr. Specter's letter will be provided later today.  We maintain that there is no need to file anything with the Court as we have fulfilled our obligations, even more so now following the large production.

Regarding your proposal in yesterday's email, we cannot agree to a briefing schedule that is so clearly prejudicial to Defendants.  A motion is the improper vehicle by which to raise a discovery dispute with the Court.  Judge Wake has established a procedure by which to raise these disputes and the parties have abided by that procedure throughout the pendency of this action.  There is no justification for bypassing this procedure and in doing so, we believe Plaintiffs are violating the Court's Order.   The parties are required to submit a one-pager.  We told Plaintiffs this during the meet-and-confer on January 13, 2014.  This is not a novel position. We expect Plaintiffs to abide by the Court's Order and

would appreciate receiving Plaintiff's portion of the one-pager as soon as possible so that we may add Defendants' portion.

If Plaintiffs insist on ignoring the Court's established procedures and on filing a motion, it is inappropriate for Plaintiffs to demand that Defendants respond to any motion within 5 days of service while Plaintiffs have been preparing for this motion for two weeks.  Mr. Specter said during the meet-and-confer that Plaintiffs were going to file a motion.  Yet now, after nearly two weeks, Plaintiffs want to require Defendants to respond in only 5 days.  We cannot agree to this.  Defendants are entitled to the same number of days since the meet-and-confer to respond that Plaintiffs have had in preparing their motion.  The only reason we are now facing the deadlines that we are is because Plaintiffs continue to fail to raise issues in a timely manner as evidenced by the fact that Plaintiffs have had the intention of filing a motion for nearly two weeks but have yet to do so.   Defendants should not be prejudiced by Plaintiffs delay and should be afforded the right to appropriately respond to any motion.

Please provide us with Plaintiffs' portion for the one-pager so that we can review and include our portion for your review, followed by a joint submission to the Court.

Thank you,

Courtney

---

**From:** David Fathi [mailto:dfathi@aclu.org]
**Sent:** Wednesday, January 22, 2014 5:03 PM
**To:** Courtney Cloman
**Subject:** Parsons v. Ryan

Courtney,

As of today, most of plaintiffs' counsel have received the four disks referenced in your January 17 letter.  We have not yet had the opportunity to compare these disks to Don Specter's January 13 letter itemizing the documents defendants failed to produce with their expert reports, and therefore do not concede that defendants' production is complete.

In light of your production of these documents nine days before the deadline for plaintiffs' rebuttal expert reports, we request that you stipulate that plaintiffs' experts may serve supplemental reports based on these documents at the same time they serve supplemental reports based on the death records defendants have agreed to produce by today.  See Doc. 733 at 4, lines 4-8.

With regard to our dispute over defendants' expert witnesses, plaintiffs will file a motion late this week or early next week.  Because of the urgency of this matter in light of upcoming deadlines established in the scheduling order, we will be asking the Court to expedite the briefing schedule.  Please let us know if defendants will stipulate to the following schedule:

Defendants' response filed on the fifth court day after electronic service of plaintiffs' motion
Plaintiffs' reply filed on the third court day after electronic service of defendants' response

Thank you very much.

David C. Fathi*
Director, ACLU National Prison Project
915 15th St.. N.W., 7th Floor

Washington, DC  20005
(202) 548-6603
**Please note new email address**: <u>dfathi@aclu.org</u>

*Not admitted in DC; practice limited to federal courts*

This electronic mail transmission contains information from the law firm Struck Wieneke &
Love, P.L.C. that may be confidential or privileged. Such information is solely for the
intended recipient, and use by any other party is not authorized. If you are not the
intended recipient, be aware that any disclosure, copying, distribution or use of this
message, its contents or any attachments is prohibited. Any wrongful interception of this
message is punishable as a Federal Crime. Although this e-mail and any attachments are
believed to be free of any virus or other defect that might affect any computer system
into which it is received and opened, it is the responsibility of the recipient to ensure
that it is virus free and no responsibility is accepted by the sender for any loss or
damage arising in any way from its use. If you have received this message in error,
please notify the sender immediately by telephone (480) 420-1600. Thank you. Tax Advice
Disclosure: To ensure compliance with requirements imposed by the IRS under Circular 230,
we inform you that any U.S. federal tax advice contained in this communication (including
any attachments), unless otherwise specifically stated, was not intended or written to be
used, and cannot be used, for the purpose of (1) avoiding penalties under the Internal
Revenue Code or (2) promoting, marketing or recommending to another party any matters
addressed herein.

# EXHIBIT 10



**STRUCK WIENEKE & LOVE**     3100 West Ray Road, Suite 300  Chandler, Arizona 85226  480.420.1600  swlfirm.com

January 23, 2014

Daniel P. Struck
PARTNER

Kathleen L. Wieneke
PARTNER

Rachel Love
PARTNER

Timothy J. Bojanowski
PARTNER

Christina Retts
PARTNER

Jamie D. Guzman
ASSOCIATE

Nicholas D. Acedo
ASSOCIATE

Tara B. Zoellner
ASSOCIATE

Amy L. Nguyen
ASSOCIATE

Ashlee B. Fletcher
ASSOCIATE

Courtney R. Cloman
ASSOCIATE

Anne M. Orcutt
ASSOCIATE

Kevin L. Nguyen
ASSOCIATE

David C. Lewis
OF COUNSEL

**VIA EMAIL ONLY**

Sarah Kader:  skader@azdisabilitylaw.org
Caroline N. Mitchell:  cnmitchell@jonesday.com
Donald Specter:  dspecter@prisonlaw.com
David C. Fathi:  dfathi@npp-aclu.org
Amelia Gerlicher: agerlicher@perkinscoie.com

Re:     Parsons, et al. v. Ryan and Pratt
        U.S. District Court of Arizona; 2:12-cv-00601

Dear Counsel:

This letter responds to Don Specter's of January 13, 2014 to Daniel Struck.  Initially, we note that Mr. Specter suggested that if the documents were provided prior to January 22nd, Plaintiffs would not be prejudiced as their experts would have sufficient time to review the documents prior to the expected completion and production of their supplemental reports by February 26th.  On January 17th, we mailed four DVD-Rs, containing not only the documents mentioned in Mr. Specters' letter, but all documents our office provided to Defendants' experts (excluding formal discovery responses, briefing, deposition transcripts and videos which we believe Plaintiffs already possess), as well as those documents obtained by Drs. Dovgan, Mendel, Penn and Seiter from other sources. Given the fact Plaintiffs' counsel waited until four-weeks after service of Drs. Dovgan, Mendel, Penn and Seiter's initial expert reports to express any concern related to these documents, any prejudice is the result of Plaintiffs' delay.

**I.   Documents provided to Drs. Dovgan, Mendel, Penn and Seiter are not responsive to Plaintiffs' discovery requests.**

We take umbrage with Mr. Specter's baseless assertion that we have disregarded any of Judge Wake's orders and the implication that Defendants sand-bagged Plaintiffs by failing to produce documents in response to properly propounded discovery requests, while permitting their retained experts access to the material, which they relied upon for their expert opinions. Further, to the extent that Plaintiffs believe Defendants did not completely respond during fact discovery to the specific requests propounded, Plaintiffs should not have waited three months after the close of fact discovery to raise those issues.  Defendants will not strike any portion of Drs. Dovgan, Mendel, Penn, or Seiters' expert

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 2

reports.  Finally, we note that approximately 40 documents listed by Mr. Specter (totaling less than 600 pages) constitute less than 0.2% of the more than 300,000 pages of documents previously produced by Defendants.

To eliminate unnecessary duplication, we will address each request identified by Mr. Specter in order.  We assume the documents and requests identified in Mr. Specter's letter constitute a complete and exhaustive list of items with which Plaintiffs take issue, and that Plaintiffs do not take issue with any document which was not identified nor contend that any documents are responsive to any formal discovery request not explicitly identified.

A. <u>Plaintiff Parsons' 1st Request for Production.</u>

Request 18 seeks "All DOCUMENTS REGARDING HEALTH CARE statistics of any kind at the ADC, including but not limited to DOCUMENTS that track disease or condition prevalence, outcomes, delays in service, care provided and costs.  Defendants objected in part that this request was "vague and ambiguous [and] seeks information that is publically available to Plaintiffs."

The documents numbered ADC_S000292 through ADC_S000302, which were listed by Drs. Mendel and Seiter, are merely computer print outs of inmates reported by ADC as having died while in custody, as a parolee on an active warrant, or on absconder status, with the reported manner of death contained in the ADC Press Releases which Defendants have produced.  While the first page of each report provides a total count of the number of names listed on the subsequent pages, Defendants do not believe that a mere count is a "statistic" as that term is used by ADC, and further note that Plaintiffs did not define the term "statistic."  Furthermore, to the extent Plaintiffs' circular definitions mean that Request 18 seeks production of statistical documents regarding "the provision of care, including adequate diet, to address the mental health, medical or dental needs of a PRISONER, whether those needs arise as a result of injury, illness, disease, or other trauma, or care provided for diagnostic or preventative purposes" a list of inmates, parolees, absconders who died and their date and preliminary manner of death is not a statistic regarding "HEALTH CARE".  (Because the response relating to Dr. Dovgan is the same as our response to Request No. 19, those documents will be addressed in the next paragraph.)

Request 19 seeks "DOCUMENTS SUFFICIENT TO SHOW the HOURS OF OPERATION, STAFFING SCHEDULES, and HEALTH CARE STAFFING LEVELS for each facility operated by ADC from January 1, 2011 through the RESPONSE DATE."  With respect to Dr. Dovgan, the Request is limited to DOCUMENTS which Plaintiffs defined as "every writing or record … that is or has been in the possession, custody, or control of DEFENDANTS and the ADC, to which they have access or to which they have knowledge, including, but not limited to newspaper articles," etc.  The documents obtained by Dr. Dovgan from

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 3

Smallwood Prison Dental Services, are not DOCUMENTS as Plaintiffs have defined the term.

Request 40 seeks "all DOCUMENTS REGARDING DEATH RECORDS." Plaintiff has defined DEATH RECORD as "any DOCUMENT REGARDING the death of a PRISONER, including audits, REVIEWS [defined as "examinations, assessments, evaluations, or investigations performed by or at the direction of ADC STAFF or officials"] studies, interview notes, videos, audio-recordings, EXTERNAL INVESTIGATIONS [defined as "investigations, REVIEWS [defined as above], audits, studies, whether formal or informal, conducted by a person who is not employed by ADC or an entity that is not the ADC"] or INTERNAL INVESTIGATIONS [defined as "an investigation, REVIEW, audit, study, interview notes, videos or audio recordings, whether formal or informal, conducted by the ADC."]" Defendants objected to this circular request as being "vague and ambiguous" and have consistently limited production of responsive documents to portions of the HS Technical Manual pertaining to deaths, select forms relating to inmate deaths, ADC Mortality Reviews, Inspector General's (Criminal Investigation Unit and Administrative Investigation Unit) investigation reports, medical records of deceased inmates, and (per court order) Psychological Autopsies. To the extent Plaintiffs believe that lists of deaths in custody or any other documents exists that are "DEATH RECORDS" and were not produced, Plaintiff should have clarified the definition during fact discovery. Additionally, Plaintiffs cannot assert the existence of any prejudice, since the lists of deaths bearing production numbers ADC_S00292 through ADC_S000302, are cumulative summary lists of the prisoner names, date of death, and preliminary manner of death which are contained in other documents produced in response to this Request, and which are also publically released in the Death Notifications published on the ADC Website.

Request 51 seeks "All DOCUMENTS REGARDING INTERNAL INVESTIGATIONS OR EXTERNAL INVESTIGATIONS REGARDING CONDITIONS OF CONFINEMENT for PRISONERS in ISOLATION from January 1, 2009 to the RESPONSE DATE." In his January 13th letter, Mr. Specter twice mischaracterizes this Request as seeking "all documents regarding internal or external investigations regarding the delivery of health services to prisoners in insolation", which is Request 52. Defendants objected to this request and responded that it does not maintain copies of external evaluations that may have been conducted. Dr. Seiter independently obtained Patricia L. Hardyman's "Validation of the Arizona Department of Corrections Objective Classification System: Final Report" during his own internet research, which we recently produced to you bearing production numbers ADC_S000747 through ADC_S000837. As it was publically obtained and was not in the possession, control or custody of Defendants or the ADC, it is not responsive to Request 51. Furthermore, as a study of the ADC Objective Classification System, we do not believe the report can be considered to be one regarding conditions of

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 4

confinement in maximum custody or detention units.  Furthermore, the referenced "Mental Health Initiatives and Suicide Prevention Strategies" was disclosed to Plaintiffs as ADC140132-ADC140148 with Defendants 10th Supplemental Disclosure Statement on September 27, 2013.

Request 52 seeks "All DOCUMENTS REGARDING INTERNAL INVESTIGATIONS OR EXTERNAL INVESTIGATIONS REGARDING THE DELIVERY OF HEALTH SERVICES to PRISONERS in ISOLATION from January 1, 2009 to the RESPONSE DATE."  Defendants objected to the Request. With respect to Dr. Seiter's reference by title to "Mental Health Initiatives and Suicide Prevention Strategies," it was previously disclosed as ADC140132-ADC140148.   With respect to Dr. Penn, the five referenced NCCHC Accreditation Reports were only located by ADC personnel on December 12th and supplemental copies were produced by Defendants on December 18th on the same DVD-R, which contained Dr. Penn's expert report.  Defendants believe their supplement of those documents to be timely, and will continue to supplement and produce additional NCCHC Reports that become available.  Furthermore, we note that of the five Complexes listed, Douglas, Tucson, and Yuma do not house maximum custody inmates, and the NCCHC reports focus on health services at the prison complex as a whole and is not limited to inmates in maximum custody or detention units or areas at any complex, including Perryville and Phoenix.

Request 55 seeks "All DOCUMENTS REGARDING exhausted GRIEVANCES REGARDING HEALTH CARE or ISOLATION from January 1, 2010 through the RESPONSE DATE."  Defendants objected to this Request as, *inter alia,* overbroad and unduly burdensome" and have consistently limited the responsive materials solely to the named Plaintiffs' medical grievances and grievance files relating to properly and fully exhausted grievances.  Plaintiffs have never previously taken issue with that interpretation or narrowing, despite ample opportunities and innumerable "one-pagers."   More importantly, however, Request 55, while unlimited in most respects given Plaintiffs extensive use of circular and broad definitions, contains the undefined limiting term "exhausted" which Defendants contend means proper exhaustion through all levels of the grievance process, including the Director's level.  The grievances Dr. Mendel obtained at Lewis and Yuma and classified and summarized in his report are not Director's level grievances, but rather initial grievances submitted regarding health care at those complexes.  (Dr. Mendel obtained those grievances directly from Corizon personnel and we have directed him to provide us copies so that they may be produced.)  Similarly the CAG FAG PBMS report does not report exhausted grievances, but rather the "[n]umber of formal inmate health grievances submitted by inmates at ADC prisons during the reporting month". *See* ADC203297 CONFIDENTIAL CAG FAQ PMBS FY13-June 2013.xlsx at the Definitions worksheet.  The documents listed simply are not responsive to this Request.  Finally, we note that CAG GAW PBMS data has been previously produced in this litigation, including on October 17th and 28th.  It was not until Dr.

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 5

Mendel requested the data in preparing his report, that we realized it had been inadvertently omitted from the prior productions, and it was produced with a supplemental production of other Corizon reports we similarly identified on December 18, 2013.

B.     Plaintiff Polson's 1st Request for Production.

Request 2 seeks production of "All POLICIES AND PROCEDURES REGARDING management or treatment of PRISONERS on SUICIDE WATCH, including but not limited to required frequency of contact with psychiatrists and other HEALTH CARE STAFF and CORRECTIONAL STAFF."   Defendants objected that this Request was "vague and ambiguous" and also raised general objections that the requests were overbroad and purported to require production of documents in multiple forms.   In response, Defendants produced Department Orders, forms relating to the Department Orders and Post Orders.  Plaintiff never took issue with this limitation nor suggested during fact discovery, or in response to any of the six supplemental responses to Plaintiff Polsons' 1st Request for Production, that the term POLICIES AND PROCEDURES would include any training materials.    The documents referenced, ADC_S000317 through ADC_S000345 are updated forms and accompaniment of materials previously produced by Defendants as ADC089433 and ADC049646.  Therefore Plaintiffs' counsel and experts had sufficient access to the underlying subject matter and content of the materials reviewed by Drs. Penn and Seiter.

Request 11 seeks production of "DOCUMENTS SUFFICIENT TO SHOW the number and names of all prisoners at each ADC facility and unit classified as 'seriously mentally ill', 'severely mentally ill', MH-3 through MH-5, or any other mental health classification employed by ADC to indicate the presence of mental illness, as of January 1, 2011 and the first day of every third month thereafter."   A cursory review of the documents referenced in Dr. Seiter's report is all that is necessary to readily determine that the documents are not responsive to this Request.    The "Mental Health Scores by Gender and Classification spreadsheet" refers to ADC13048, which was disclosed on September 27, 2013.  (And updated version of the original May 2013 data was provided to Dr. Seiter as ADC_S000556).    ADC_S000281 through ADC_S000283 – Maximum Custody Males refers to the objective classification scores by location code relating to most serious current offense, discipline and institutional risk.  Neither document is sufficient to show the number and names of inmates at each ADC facility and unit, based upon mental health scores or SMI designation.

Request 25 seeks "All documents referenced in the ADC Food Service Technical Manual (rev. 7/2/10) related to 'Department Food Specifications' and

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 6

the 'Standardized Cycle Menu.'".[1]  The lesson plans referenced ADC_S000362 through ADC_S000348 and ADC_S000535 through ADC_S000553, relate to Signs and Symptoms of Mental Illness and Suicide Prevention, and we are unaware of any reference to them in the ADC Food Service Technical Manual. Please direct us to any such reference.

Request 32 seeks "All ADC Post Orders, including general Post Orders that apply across ADC and facility specific Post Orders, REGARDING health and welfare checks and mental health contact on PRISONERS in ISOLATION."  In addition to their General Objections, Defendants specifically objected to this request as being overbroad, unduly burdensome and vague based upon the term "ISOLATION."  Defendants note that they produced a list of all general Post Orders with their Ninth Supplemental Response to Plaintiff Parsons' 1st Request for Production on January 4, 2013 as ADC055042 and that while Plaintiffs had the benefit of that list to request specific Post Orders in effect at specific locations on particular dates, Plaintiffs never clarified Request No. 32.  Notably, while Plaintiffs requests are generally unlimited in scope, this request is specifically limited to "health and welfare checks and mental health contact".  The Post Orders identified, Post Orders 36 and 37, relate not only to "health and welfare checks and mental health contact" but are for "mental health observation" and/or "security checks."  Furthermore, in response to Request 32, Defendants nevertheless responded that they "are still attempting to locate responsive documents and will supplement this response as they are located."  *See, e.g.,* Defs' Sixth Supp. Resp. to Polson's 1st RFP at 35.  To the extent you consider the documents identified as ADC_S000235 through ADC_S000261 and ADC_S000557 through ADC_S000561, responsive to Request 32, the production of them to you on January 17, 2014 should be considered supplementation of that response.

Request 33 seeks "All ADC Post Orders, including general Post Orders, that apply across ADC and facility-specific Post Orders, for Watch Officers."  In addition to their General Objections, Defendants specifically objected that this Request was vague and ambiguous, overly broad and unduly burdensome. Despite those objections, and prior to those Requests being propounded, Defendants produced a list of all general Post Orders by number, ADC055042 through which Plaintiffs could have, but failed to, timely clarify this request. Defendants note that ADC_S000557 through ADC_S000561 is the Post Order for the Maximum Custody Housing Unit Rover Officer who is to be in constant motion and therefore is not a "Watch Officer."  Furthermore, in response to Request 32, Defendants nevertheless responded that they "are still attempting to

---

[1] We have been unable to locate any request contained in Plaintiff Polson's 1st Request for Production that could be characterized as seeking production of "all documents regarding health care training provided to health care and custody staff".

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 7

locate responsive documents and will supplement this response as they are located." *See, e.g.,* Defs' Sixth Supp. Resp. to Polson's 1st RFP at 35. Defendants' production of ADC_S000235 through ADC_S000261 on January 17, 2014 and production of ADC_S000557 through ADC_S000561 is the supplemental production of responsive documents which were not located until Dr. Seiter specifically requested them.

C.      Plaintiff Jensen's 1st Request for Production.

Request 9 seeks "All draft or final POLICIES AND PRODCEDURES of CORIZON REGARDING the provision of HEALTH CARE to PRISONERS." The term "POLICIES AND PROCEDURES" as defined by Plaintiffs incorporates the term "DOCUMENTS" which Plaintiffs' definition, (and FED. R. CIV. P. 34), limits to documents and things "that is or has been in the possession, custody or control of DEFENDANTS and the ADC." In addition to their General Objections, Defendants Pratt and Ryan specifically objected that this Request "seeks to obtain Corizon documentation not in the possession of the ADC" and advised Plaintiff Jensen that if he wished to obtain such documents, his counsel "must issue a subpoena to Corizon." Defendants nevertheless produced those Corizon documents which were in ADC's possession, control, or custody. The "detailed clinical guidelines" to which Dr. Mendel refers on page 23 of his report are the Corizon proprietary Clinical Pathways documents (ADC_M000002 through ADC_M000191), which were provided by Corizon to Dr. Mendel upon his request, and to our knowledge are still not within ADC's possession, control or custody.

D. Plaintiff Rodriguez' 1st Set of Interrogatories.

Interrogatory No. 5 was propounded on July 9, 2013 and sought inside temperature data and identification of documents, for the period from "June 1, 2013 through August 31, 2012, and from June 1, 2013 through the date of your response, including July 2013." On August 12, 2013, Defendants responded and objected to this Request. Plaintiffs subsequently advised the Court that their report was limited to "the summer months of 2012 and 2013", which Plaintiffs specified as being June through August. *See* 9th Notice of Discovery Dispute at 1. The random dates for which Dr. Seiter requested and received (including days in September and October 2013) fall outside of the summer period contemplated by the requests. Following the Court's order, on October 11, 2013 Defendants provided a comprehensive response, accompanied by more than 2,500 pages of temperature logs from 2012 through August 8, 2013 for Perryville. To the extent Plaintiffs believe Defendants' response was insufficient because it did not include data beyond that which would have been provided had Defendants not objected on August 12, 2012 that issue should have been timely raised via a meet and confer and such objection at this point is waived.

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 8

     E.     <u>Plaintiff Licci's 1st Request for Production.</u>

Request 13 seeks "All DOCUMENTS REGARDING mental health group PROGRAMS scheduled from June 1, 2012 to the present." Plaintiffs' counsel defined PROGRAMS as meaning "a program made available to prisoners in the custody of ADC, including but not limited to rehabilitative, therapeutic, educational, vocational, substance abuse treatment, recreational, re-entry, and faith-based programs; furlough, temporary release, compassionate release, and early release programs; and prison job assignments whether or not for pay." In addition to their General Objections, on September 16, 2013 Defendants objected that this Request was duplication of Plaintiffs' prior subpoena duces tecum (dkt. 76), vague, ambiguous, overly broad and unduly burdensome. Specifically, Defendants directed Plaintiffs to the technical manuals and Post Orders produced in response to Plaintiff Parsons' 1st RFP. To the extent that Plaintiffs believe that Request 13 sought documents and things beyond those interpreted by Defendants, Plaintiffs' counsel should have raised the issue with Defendants prior to the close of fact discovery. Turning to the specific documents Dr. Seiter obtained during his inspection of ASPC-Florence, ADC_S000286 through ADC_S000291, these documents merely confirm information that Drs. Seiter and Mendel obtained from other sources and are substantively identical to documents previously produced bearing production numbers ADC084886 through ADC084903; and, ADC139521 through ADC139527, which include documents that Plaintiffs experts viewed and requested during their own tours at ASPC-Florence.

     **II. <u>Defendants do not have an obligation to produce documents cited by their experts.</u>**

Section II of your letter suggests that a party is obligated to produce any document referenced in a retained experts report, with service of that report. Rule 26(a)(2)(B)(ii) requires identification of the facts or data considered in forming the experts' opinion. If you contend otherwise, please provide us with that authority and supplement your expert reports to include all documents referenced or considered in preparing them, including notes of prisoner interviews along with notes of record reviews conducted at ADC facilities.

In general, the documents identified in your January 13, 2014 letter by production number were served upon Plaintiffs' counsel on January 17, 2014 and we do not believe there is any need to discuss them further. (We note that those records identified with a PAR prefix were produced or disclosed by your co-Plaintiff the Arizona Center for Disability Law.) In terms of those documents which are not produced, but are listed for the following experts, we provide the following response based upon our understanding, but suggest that during their deposition, you may wish to confirm this with the individual experts.

     A.     <u>Documents and things referenced by Dr. Mendel.</u>

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 9

Medical files of other prisoners (p.3).  Dr. Mendel is describing that, similar to Plaintiffs' experts, in preparation for writing his report, he conducted medical record reviews during his inspections of the ADC facilities, in addition to those records provided to him from production.  This is similar to the process Plaintiffs expects undertook during their tours last summer.  Just as Plaintiffs did not did not copy all of those records, but only identified selected pages of certain records, Dr. Mendel did not obtain a copy each chart, but rather made notes.  In response to your subpoena, Dr. Mendel will provide his notes from those reviews. Furthermore, a list of the specific inmates whose charts Dr. Mendel has reviewed at each location is attached, which includes those inmates mentioned in his report, such as Patrick Nissely (p23).

Grievances from Lewis, Phoenix, and Yuma (pp. 4, 15).  While Dr. Mendel reviewed grievances in general during his site visit, the only ones he obtained and discussed in detail were those from Lewis and Yuma.  Dr. Mendel will be producing them with his response to your subpoena.

Random selection of records at Lewis and Yuma (p.11).  We believe this is the list of records Dr. Mendel reviewed at these sites.  We suggest you inquire with him regarding his selection methodology.

Plaintiffs' recent medical records (pp.13-19).  All documents pertaining to the named Plaintiffs that had not been previously disclosed were included on the DVD-R produced with Dr. Mendel's report on December 18, 2013 as ADC_M000195 through ADC_M000206 and ADC203298 through ADC203347. While Dr. Mendel may have also reviewed those files during his site inspections, those records were not duplicated.  Pursuant to our prior representations to you and the Court, we are, in the process of obtaining updated records for the named Plaintiffs and will provide them in Defendants' next supplemental disclosure statement, and will periodically supplement those up to the time of trial pursuant to Rule 26(e).

"CareLog" Database (pp.22-23) Dr. Mendel was advised as to the existence and status of the CareLog database project, but did not personally view it or have access to it.  Nevertheless, at your request, we will inquire into its reporting capabilities respond accordingly.

Medical files of Michael Velasquez and Robert Devine (pp. 26 and 40). These documents were requested in Plaintiff Licci's Request for Production No. 4, and produced by Defendants as ADC160811 through ADC161109 (Velasquez) and ADC205898 through ADC206231 (Devine).

Specialty referral logs (p.27).  We believe these documents are logs maintained by Corizon personnel that Dr. Mendel reviewed during his site

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 10

inspections.  However, they may also refer to monthly data reports provided to Corizon such as the Medical Transports report (*see, e.g.* ADC155096). Additional aggregate data relating to this point is contained in the monthly CAG/FAQ/PMBS reports (*see, e.g.* ADC155097) which were also provided to Dr. Mendel.

ADC Corrections at a Glance Brochures (appendix p.9).  While these
documents are published monthly at www.azcorrections.gov, copies of them were
produced on January 17, 2014 as ADC_S000563 through ADC_S000582.

BJS Mortality Data and Reports (appendix p.9).  While the reports are
publically available from the BJS website, both they and the non-public ADC
submission were produced on January 17, 2014 as ADC_M000207 through
ADC_M000584.

    B.     Documents and things referenced by Dr. Dovgan.

Inmate Dental Records (various pages).  While Drs. Mendel and Penn
reviewed documents at the ADC sites, Dr. Dovgan requested that those be
duplicated and assembled for his review offsite.  Aside from documents
previously produced at Plaintiffs' request, any and all other records were
produced on January 17, 2014 as ADC_D000001 through ADC_D002491;
ADC_D002527 through ADC_D002636; and, ADC_D002641 through
ADC_D002656.

SPDS Patient Reports (Ex. B, p.9).  These documents were produced on
January 17, 2014 as ADC_D002497 through ADC_D002517.

Photographs (Ex. B, p.8-9).  These documents were produced on January
17, 2014 as ADC166216 through ADC166232.

Out-to-Court dates (Ex. B, p.11)  These documents were produced on
January 17, 2014 as ADC_D002637 through ADC_D002640.

AIMS Movement Reports (Ex. B, p.11).  These documents were produced
on January 17, 2014 as ADC_D002657 through ADC_D002832.

Dental Instructional Videos (Ex. B, p.11).  These videos were produced to
you on September 28, 2012 as ADC018322 through ADC018324.

    C.     Documents and things referenced by Dr. Penn.

Medical records of SMI inmates at Perryville, Phoenix, Eyman and
Florence (p.5).  Dr. Penn states "*I have requested the opportunity to review* file
randomly selected medical records…."  He does not identify them as materials

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 11

considered in forming the opinions in his December 18, 2013 report. Those records will be provided after they have been collected for Dr. Penn's review. Should he rely upon them for any supplemental report they will be produced.

Several ADC medical records (p.32) is a reference to Plaintiffs medical records, which have previously been produced to you and are identified in Exhibit A to Dr. Penn's report at 3-4, as well as those other charts reviewed by Dr. Penn during his site inspections which are specifically identified at pages 5-6 of his expert report.

"ten records received" (p.35) is a reference to those inmates at ASPC-Yuma which Dr. Stewart reviewed and cited as examples of an ineffective medication system. Upon review, we believe this may be a typo in Dr. Penn's report, as Pablo Stewart only identified nine inmates on pages 32-33 of his report relating to his opinions relating to the efficacy of medication administration. Dr. Penn was provided and reviewed six files that Pablo Stewart reviewed at ASPC-Yuma. Some of these were previously produced in response to Plaintiff Licci's Request for Production No. 4 as ADC159526 through ADC159756 and ADC165882 through ADC165968. The remaining files were previously produced on January 17, 2014 as ADC_P000001 through ADC_P000563.

"Randomly selected medical records" (p.41) is a reference to those charts reviewed by Dr. Penn during his site inspections which are specifically identified on pages 5-6 of his report.

"inmate records" (p.68) are collective references to Plaintiffs medical records, which have previously been produced to you and are identified in Exhibit A at 3-4; the other charts reviewed by Dr. Penn during his site inspections which are specifically identified at pages 5-6 of his expert report; and the suicide autopsy reports, mortality reviews, and investigations identified in Exhibit A to Dr. Penn's report at 8-9.

"mental health watch individual logs" (p.72) is a reference to the Observation Logs which Dr. Penn examined as they were being taken in the watch areas during his site inspections. We believe Plaintiffs experts had similar opportunities to look at those logs and did in fact review such logs while on their respective tours. Similar records have previously been produced as ADC114358 through ADC115859 and ADC136318 through ADC136419. Furthermore, an additional 19 boxes of these were made available for inspection by Plaintiffs' counsel from which only ADC170446 through ADC171284 were selected by Plaintiffs for duplication.

"available records" (p.84) is, we believe, a collective reference to all documents identified in Dr. Penn's report, including Exhibit A thereto.

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 12

    <u>Medical Records reviewed by Dr. Penn</u>.   As with Dr. Mendel, this is similar to the process Plaintiffs own expects undertook during their tours last summer.  Just as Plaintiffs did not did not copy all of those records, but only identified selected pages of certain records, Dr. Penn reviewed the charts on-site as of the date of his visit and did not obtain a copy each chart, but rather made notes.  In response to your subpoena, Dr. Penn will provide his notes from those reviews.

    D.    <u>Documents and things referenced by Dr. Seiter.</u>

    <u>Validation study</u> (p.1) is addressed *supra* at 4.  It was also produced on January 17, 2014 as ADC_S000747 through ADC_S000837.

    <u>ADC Mental Health Initiatives and Suicide Prevention Strategies</u> (p.2) is addressed *supra* at 4 and was previously disclosed by Defendants as ADC140132-ADC140148.

    <u>Use of Force Packets and Videos</u> (p. 13 and Ex. 8) are documents which are specifically identified in Exhibit 2 of Dr. Seiters report at 43-45.  Those pertaining to the named Plaintiffs were previously produced bearing ADC numbers.  Dr. Seiter's random selection was made from the Use of Force SIR summaries which were previously produced as ADC089116 through ADC089379.  The randomly selected materials for the incidents at Eyman, Florence and Perryville were assigned the ADC_S numbers identified on pages 43-45 of Dr. Seiter's report, and those materials were produced to you on January 17, 2014.

    Finally, as to your letter dated January 17, 2014, which contained Plaintiffs' attempt to memorialize the January 13, 2014 meet-and-confer, we see the need for clarification on several points.  We recognize that in your letter, you continually fail to distinguish between the two kinds of experts covered by Federal Rule of Civil Procedure 26(a)(2).  The distinction between these two types of experts is vital to any analysis concerning what is required of them.  During the meet and confer, we did not simply disagree that anyone other than the Drs. Penn, Mendel, Seiter and Dovgan need to provide a report.  Rather, we cited Rule 26(a)(2)(B) as the controlling authority of those experts who are required to provide a written report.  We explained that the remaining identified non-retained experts (with the exception of Mark Jansen who we agreed to de-designate) were designated as Rule 26(a)(2)(C) witnesses, as is noted in our 11th Disclosure Statement.  The Rule clearly states that these witnesses are not required to provide written reports.

Parsons, et al. v. Ryan, et al.
January 23, 2014
Page 13

We also explained that due to their designations as Rule 26(a)(2)(C) witnesses, they are to be treated as fact witnesses as to whether they are subject to deposition and document discovery. Plaintiffs exhausted their allotted fact-witness depositions and are not entitled to depose these individuals. You are correct we agreed to produce Dr. Dolny for deposition.

Regarding your request that we strike Defendants' experts' opinions where they relied on interviews with staff, we did not agree that we would strike these opinions if you agreed to strike Plaintiffs' experts' opinions that relied upon interviews with your clients. We simply asked, under your unreasonable premise, whether you would in fact strike your own experts' opinions for that reason. You refused to answer that question.

Finally, we still maintain that because this is a discovery dispute, a one-page dispute statement is required under the Court's Order. If you still believe Court intervention is appropriate, please provide us with Plaintiffs' position for the one-page statement so that we may include Defendants' portion and allow for a joint submission to the Court.

Sincerely,

Courtney R. Cloman
For the Firm

CRC/
2855604.1

cc:     Michael E. Gottfried
        Kelly Dudley
        Lucy Rand

# EXHIBIT 11



Shopping | Jobs | Cars | Real Estate | Rentals | Buy & Sell | LaVozArizona.com

SEASON FOR SHARING ✦ A LEGACY OF CARING FOR 20 YEARS



azcentral.com
ARIZONA'S HOME PAGE

SUBSCRIBE NOW
for $2.77 per week    SUBSCRIBE

☀ 56°
Phoenix

search: All azcentral.com    SEARCH

Log in | My account | Register | e-Newspaper | Help

| News | Sports | Money | Things to do | Politics | Opinion | Watchdog | Travel | Food & Home | Health | Traffic | Weather | Subscribers |

Today's Deal

Ahwatukee | Chandler | Gilbert | Glendale | Mesa | Peoria | Phoenix | Pinal | Scottsdale | Southwest Valley | Surprise | Tempe

Community  »  Southwest Valley  »  Article                    💬 Comments

# Official: Nurse exposed 24 Buckeye inmates to hepatitis B and C

SHARE URL    EMAIL    FONT: A A **A**

**By Craig Harris**
The Republic | azcentral.com
Wed Jan 8, 2014 9:40 PM

For the second time in 17 months, inmates at the State Prison Complex-Lewis near Buckeye have been exposed to a life-threatening disease by a private health-care provider.

The latest exposure involved improper procedures by an employee of a contractor that was brought in to replace the previous company after a similar incident.

A nurse working for Corizon Inc., the private health-care provider, improperly injected and exposed inmates to hepatitis B and C, said Clarisse Tsang, the Department of Health Services hepatitis-prevention coordinator. The nurse's identity was not revealed.

Tsang's disclosure to The Arizona Republic came after Corizon, which last year was awarded a three-year, $372 million contract to provide state inmate health care, refused to provide details of the incident, which occurred Sunday night.

The company sent out a news release Wednesday, saying approximately 24 inmates were exposed to "blood-borne pathogens" involving improper procedures for injections.

Some of those inmates were housed in close custody, meaning they represent a high risk to the public and staff because they have been sentenced for violent crimes, according to the Department of Corrections. Other prisoners were housed in minimum custody for low-risk inmates.

In a telephone interview Wednesday, Corizon spokeswoman Susan Morgenstern would not say if inmates were exposed to hepatitis or HIV. She also would not say why the company waited three days to notify the public. She said the company should have additional details to release today.

The Department of Corrections, which awarded the contract, also would not provide details about the potential public health risk despite knowing about the problem since Monday.

Doug Nick, a Corrections spokesman, referred questions to Corizon, saying it was the company's responsibility to alert the public.

"It's a medical issue," Nick said. "They are the doctors and nurses."

Tsang said the inmates were exposed because of an "improper use of an insulin injection from a vial" on a number of inmates.

Tsang said that up to 10 of those inmates had been exposed to hepatitis in August 2012 when a similar problem occurred with a different private health-care provider whose nurse contaminated the prison's insulin supply.

Laura Oxley, a Department of Health Services spokeswoman, said her agency is perplexed about how the same problem could have occurred again at the same prison to some of the same inmates.

"It didn't go without notice," said Oxley, whose agency is investigating the incident.

The inmates could become extremely ill. Symptoms of hepatitis B and C include nausea, fatigue and yellowing of the skin or eyes. Hepatitis also causes liver problems and can be deadly, Tsang said.

Tsang said it could take up to six months to develop symptoms, though some could occur in two to six weeks.

Corizon said company officials on Tuesday met with the 24 inmates who may have been affected to counsel them and offer the "appropriate preventative medications as a precautionary measure."

The company, in its news release, said it was developing a corrective-action plan.



THE VERY BEST OF REPUBLIC PHOTOGRAPHY
(just point, click and buy!)  ➜

Exclusive selections for our subscribers

Numbers don't back need for lethal force at border

Mesa Mayor Smith will quit to run for governor

Tucson Shooting: Those touched by tragedy unite in hope

Arizona State set to announce new Vice President for Athletics

'Nook,' 3.5 stars

Most Popular | Top Videos

Official: Nurse exposed 24 Buckeye inmates to hepatitis B and C

Cool independent businesses in the West Valley

Join the West Valley Life photo project

DOC officer accused of sex with inmate in state-prison van

Most recent top home sales in Southwest Valley

Lanes open EB I-10 in far west Valley

Recent mug shots in the West Valley

Southwest Valley cold cases

**GET AZCENTRAL ANYWHERE**

📱 Mobile

💬 SMS

✉ Email

🐦 Twitter

**f** Facebook

**azcentral.com mobile editions**

Get azcentral.com on your phones and tablets for the latest news, sports, video, photos and much more from azcentral, The Arizona Republic and 12 News.

**›** Get azcentral.com mobile!
**›** Android | iPad | iPhone
**›** iPhone Sports | AZ

From our sponsor
**Banner Children's Total Kid for iPad**
Download your free copy of Total Kid, an interactive digital parenting magazine filled with trending health topics, videos, tips and activities. Sponsored by Banner Health.

TOTAL KID

Caroline Isaacs, an activist and outspoken critic of privatizing prison health care, said she was "sadly not surprised" that inmates again were potentially exposed to hepatitis.

"It's just yet another piece of evidence that these kinds of problems are inevitable because they are inherent in the way these corporations do business," said Isaacs, American Friends Service Committee program director. "This will keep happening until the state of Arizona takes responsibility for medical care in its own facilities."

Isaacs said she was astounded that the Department of Corrections didn't inform the public about a possible hepatitis outbreak.

"Who is calling the shots?" Isaacs said. "Arizona ultimately is responsible for what this corporation does or does not do."

Corizon, in its news release, said it notified the Department of Corrections and Health Services about the problem on Monday.

The company, at the bottom of its news release, also included a statement from Corrections Director Charles Ryan that said: "Corizon responded to this incident immediately and has assured the department that it will conduct a full investigation of this matter to ensure any potentially affected inmates are treated."

The Department of Corrections, which routinely issues news releases on state letterhead, did not independently disclose information about the incident.

In the 2012 incident, a nurse for Wexford Health Sources Inc., the previous health-care provider, spurred a hepatitis C scare by contaminating the prison's insulin supply. That nurse, Nwadiuto Jane Nwaohia, voluntarily surrendered her nursing license in September.

Last year, Corrections hired Corizon after the state agreed to terminate Wexford's statewide contract.

That decision came amid accusations that Wexford improperly dispensed medicine to inmates, wasted state resources and didn't show a sense of urgency after the hepatitis scare.

Wexford has said its contract performance was hindered by state monitors and a lack of cooperation from Corrections.

To replace Wexford, the state agreed to a more expensive contract with Corizon of Brentwood, Tenn., to become the health-care provider at all Arizona-run prisons. Corizon, the country's largest provider of correctional medical care, took over March 4. The three-year deal with Corizon cost taxpayers at least $372 million, but Corizon has the option to seek additional funds in the final year. That contract is at least 6 percent higher than Wexford's $349 million, three-year deal.

The state hired private health-care providers, claiming it's less costly to taxpayers.

*Reach the reporter at craig.harris @arizonarepublic.com or 602-444-8478.*

**MORE FROM AZCENTRAL**

FROM AROUND THE WEB

Wife wants divorce, cites pea-eating incident
Dying woman robbed after crashing at Taco Bell
Worker stung by scorpion that was on bananas
Jane Seymour, 62, is proud of bikini body
Mark Wahlberg lost 'Fifty Shades' bid over cost

[?]

**YOU MAY LIKE**    by Taboola

**FROM AROUND THE WEB**    by Taboola



Teen Who Injected Krokodil In Genitals Was From U.S., Mexican Officials Say



Female Inmates Try to Escape Using Dozens of Bed Sheets



Baby born after mom dies of cancer



Heathy Dinner Options

# EXHIBIT 12

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn | ) No: |
| Jensen; Stephen Swartz; | ) CV12-00601-PHX-NVW |
| Dustin Brislan; Sonia | ) (MEA) |
| Rodriguez; Christina | ) |
| Verduzco; Jackie Thomas; | ) |
| Jeremy Smith; Robert Gamez; | ) |
| Maryanne Chisholm; Desiree | ) |
| Licci; Joseph Hefner; Joshua | ) |
| Polson; and Charlotte Wells, | ) |
| on behalf of themselves and | ) |
| all others similarly | ) |
| situated; and Arizona Center | ) |
| for Disability Law, | ) |
|              Plaintiffs, | ) |
|      v. | ) |
| Charles Ryan, Director, | ) |
| Arizona Department of | ) |
| Corrections; and Richard | ) |
| Pratt, Interim Division | ) |
| Director, Division of Health | ) |
| Services, Arizona Department | ) |
| of Corrections, in their | ) |
| official capacities, | ) |
|              Defendants. | ) |
| | ) |

DEPOSITION OF NICOLE TAYLOR, J.D., Ph.D.

September 5, 2013
9:13 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 245

1   which there is special mental health programming for

2   mental health prisoners?

3                MS. CLOMAN:  Form.

4                THE WITNESS:  We haven't covered the

5   lower custody programs, MTU and WTU.  I'm not sure if

6   you want to go into those or not.

7     Q    BY MR. FATHI:  Okay.  Let me rephrase my

8   question, and thank you for the clarification.

9                Have we covered all maximum custody

10  areas where there is special mental health programming

11  for mental health inmates?

12    A    Correct, yes.

13    Q    Okay.  Back to the disclosure statement.  So

14  the next topic on which you are -- we are told you are

15  going to testify is, quote, her knowledge of

16  Plaintiffs' mental health care needs, end quote.  What

17  will be your testimony on that subject?

18                MS. CLOMAN:  Form.

19                THE WITNESS:  I would testify as to my

20  knowledge on Inmate Brislan and Inmate Gamez.  I have

21  not, as far as I can tell, had any contact with any of

22  the other plaintiffs.

23    Q    BY MR. FATHI:  And what will be your testimony

24  about Mr. Brislan?

25                MS. CLOMAN:  Form.

Parsons v. Ryan
Deposition of Nicole Taylor, J.D., Ph.D. - 9/5/2013

Page 285

1   STATE OF ARIZONA   )
                       )
2   COUNTY OF MARICOPA )

3

4               I, Marcella L. Daughtry, a Certified

5   Reporter, Certificate No. 50623, in the State of

6   Arizona, do hereby certify that the foregoing witness

7   was duly sworn to tell the whole truth; that the

8   foregoing pages constitute a full, true, and accurate

9   transcript of all proceedings had in the foregoing

10  matter, all done to the best of my skill and ability.

11  Pursuant to request, notification was provided that the

12  deposition is available for review and signature.

13

14              I FURTHER CERTIFY that I am not related

15  to nor employed by any of the parties hereto, and have

16  no interest in the outcome.

17

18              WITNESS my hand this 16th day of

19  September, 2013.

20

21                        _____

22                        Marcella L. Daughtry
                          Arizona Certified
                          Reporter No. 50623

23

24

25

# EXHIBIT 13

Case 2:12-cv-00601-ROS   Document 754-1   Filed 01/27/14   Page 104 of 124

WILLIAM SMALLWOOD                          August 20, 2013
PARSONS vs. RYAN                                          1

```
 1              UNITED STATES DISTRICT COURT
                         for the
 2              Eastern District of Virginia
        ------------------------------:
 3   VICTOR PARSONS, et al.,          :
                                      :
 4                   Plaintiff,       :
            vs.                       :Civil Action No.:
 5                                    :CV 12-00601-PHX-NVW
     CHARLES RYAN and RICHARD PRATT,:(MEA)
 6                                    :
                     Defendant.       :
 7      ------------------------------:

 8                              McLean, Virginia
                         Thursday, August 20, 2013
 9

10   Deposition of:

11                   WILLIAM SMALLWOOD,

12   called for oral examination by counsel for

13   Plaintiff, pursuant to notice, at the office of The

14   Sack Law Firm, 8270 Greensboro Drive, Suite 810,

15   McLean, Virginia, before Michelle Taylor, of Esquire

16   Deposition Solutions, a Notary Public in and for the

17   Commonwealth of Virginia, beginning at 10:08 a.m.,

18   when were present on behalf of the respective parties:

19

20

21

22
```



WILLIAM SMALLWOOD                                   August 20, 2013
PARSONS vs. RYAN                                                186

1  These are the definitions that they would be using?

2      A    Yes.

3      Q    Under priority two urgent care, it lists

4  fracture dentition with pulp exposure.  Can you define

5  that for those non-dentists among us?

6      A    Were are you?

7      Q    Under 3.1.2, priority two, urgent care.

8      A    That is a cavity that the carries has gone

9  into the dentin.  The dentin is fractured, and the

10 nerve of the tooth is which is pulp exposure is

11 exposed.

12     Q    Okay.  And what is an acute dental abscess?

13     A    Acute dental abscess is a onset abscess of a

14 tooth usually visible through clinical diagnosis in

15 the vesicle.

16     Q    What would be an oral pathological condition

17 that makes it severe compromise the dental health of

18 the inmate?

19          MR. MERVIS:  I'm go to go stop here, Amelia,

20 and object.  Dr. Smallwood is not here as an expert.

21 All right.  He has already told you they apply the

22 technical services manuals in the performance of



Case 2:12-cv-00601-ROS   Document 754-1   Filed 01/27/14   Page 106 of 124

WILLIAM SMALLWOOD                                    August 20, 2013
PARSONS vs. RYAN                                                187

 1   their -- of his employees duties.  And so I don't

 2   think it's within the scope of this deposition to quiz

 3   Dr. Smallwood on his dental knowledge.

 4           MS. GERLICHER:  I'm not quizzing him on his

 5   dental knowledge.  I'm quizzing him on how his

 6   knowledge of the Dental Services Technical Manual

 7   which is one of the topics.  I don't know what these

 8   terms mean so I thought it would be helpful to define

 9   them.

10           MR. MERVIS:  Well, you need to talk to your

11   expert then.  He's here as a CEO of his company and

12   talking about policies and procedures, but that does

13   not go to the medical definitions of terms.

14           MS. GERLICHER:  Well, fair point, Counsel.

15   BY MS. GERLICHER:

16      Q    Sir, are inmates required to use the words

17   listed under urgent care to describe their problems?

18      A    I would not expect an inmate to write on a

19   request I have fractured dentition with pulp exposure,

20   no.

21      Q    So the dental assistants reviewing HNR would

22   need to kind of translate what the inmate says in



Case 2:12-cv-00601-ROS   Document 754-1   Filed 01/27/14   Page 107 of 124

WILLIAM SMALLWOOD                                    August 20, 2013
PARSONS vs. RYAN                                                  195

1            MR. MERVIS:  Join the objection.

2            THE WITNESS:  We will take care of the

3    emergent care and leave the patient on for routine

4    care with the same his or her day of request to insure

5    we're treating the patients.

6    BY MS. GERLICHER:

7       Q    I have to say that I was told something

8    differently.  Every time I visited a dental clinic.

9            So you're saying that a HNR -- if a patient

10   has HNR one complaining of routine care, and they come

11   into the dental clinic on some other issue, they stay

12   on the routine care list?

13           MS. WIENEKE:  Let me just object to the

14   editorial which is why we objected to the expert

15   (inaudible) process and specifically said these were

16   not walking depositions.  And plaintiffs agreed that

17   there were no A01D to admissions that were resulting

18   from the deposition -- I mean, I'm sorry the expert

19   (inaudible).

20           MS. GERLICHER:  That's why I'm talking pains

21   to be clear during this deposition.

22           MS. WIENEKE:  Well, I'm objecting to your



Case 2:12-cv-00601-ROS   Document 754-1   Filed 01/27/14   Page 108 of 124

WILLIAM SMALLWOOD                        August 20, 2013
PARSONS vs. RYAN                                      198

 1      A     It's a verbal policy.

 2      Q     It comes from who?

 3      A     Corporate office.

 4      Q     Your corporate office?

 5      A     Yes.

 6      Q     Can a lengthy delay in treatment result in

 7   teeth that are too far decayed to treat with the

 8   filling?

 9            MR. MERVIS:  Objection.  Calls for expert

10   testimony.

11            MS. WIENEKE:  Also, form and foundation.

12   Calls for speculation as to lengthy.  It's vague and

13   ambiguous.

14            MS. GERLICHER:  Form or foundation, counsel.

15            MS. WIENEKE:  Actually the rules do not limit

16   objections to form and foundation.  If you have such a

17   rule you can show me.

18   BY MS. GERLICHER:

19      Q     Will you answer the question, sir?

20            MR. MERVIS:  No, it calls for expert

21   testimony, Counsel.  He's not here as your expert --

22   or is for our expert.



```
 1              MS. GERLICHER:  He's a dentist.

 2              MR. MERVIS:  He's not here -- he's not here

 3   as a dentist.

 4              MS. WIENEKE:  And it's beyond the scope of

 5   the 30(b)(6) --

 6              MS. GERLICHER:  I understand that.

 7              MS. WIENEKE:  -- topics which do not ask this

 8   witness to provide expert opinions as to the types of

 9   problems somebody can have with, quote, lengthy delays

10   and treatment.

11   BY MS. GERLICHER:

12       Q    Does anyone monitor HNRs to insure teeth are

13   not decaying to far to treat with the filling?

14              MS. WIENEKE:  Object to the form.

15              MR. MERVIS:  I object to the form.

16              THE WITNESS:  Dentistry is a very vast

17   profession.  That question is very challenging to

18   answer without seeing a x-ray or radiograph and

19   letting me examine the tooth.

20   BY MS. GERLICHER:

21       Q    So in order to determine the teeth are

22   decaying too far, you need to look at the tooth and
```



1      Q    Can Corizon change that number?

2           MS. WIENEKE:  Foundation.

3           THE WITNESS:  You would have to ask Corizon.

4    BY MS. GERLICHER:

5      Q    You don't know whether Corizon can change the

6    number of FTE dentists that you have working at ADC?

7           MR. MERVIS:  As between Smallwood and Corizon

8    or between Corizon and ADC?  What's your question?

9           MS. GERLICHER:  I don't understand that

10   question.

11          MR. MERVIS:  We don't --

12   BY MS. GERLICHER:

13     Q    My question is whether Corizon can change the

14   number of FTE dentists that Smallwood has working at

15   ADC?

16     A    You would have to ask Corizon.

17          MR. MERVIS:  But if you're asking as a

18   contract matter, then the contract speaks for itself.

19   BY MS. GERLICHER:

20     Q    Are there facilities that currently do not

21   have as much staffing allocated as you feel they

22   should?



WILLIAM SMALLWOOD                                    August 20, 2013
PARSONS vs. RYAN                                                    227

1              MS. WIENEKE:  Form and foundation.  Calls for

2     inappropriate opinion testimony.  Going beyond the

3     scope of the 30(b)(6).

4              MR. MERVIS:  And I join the objection.

5              THE WITNESS:  Repeat the question.

6     BY MS. GERLICHER:

7        Q    Are there facilities that currently do not

8     have enough staff allocated?

9              MR. MERVIS:  Objection.  Same objection

10    stated previously.

11             MS. WIENEKE:  Join.

12             THE WITNESS:  We actively recruit for some

13    positions.

14    BY MS. GERLICHER:

15       Q    Which positions are you actively recruiting

16    for?

17       A    Off the top of my head, I believe, it is

18    Eyman and Douglas.

19       Q    Are those dentists or dental assistants?

20       A    I believe, dentists at both.

21       Q    What is staffing payback?

22             THE WITNESS:  I'm not talking about



Case 2:12-cv-00601-ROS   Document 754-1   Filed 01/27/14   Page 112 of 124

WILLIAM SMALLWOOD                                    August 20, 2013
PARSONS vs. RYAN                                                  263

1           MR. MERVIS:  Objection.  He is not here to

2    give opinion testimony.

3           MS. WIENEKE:  Join the objection.  And

4    question calls for a yes or no answer.

5           THE WITNESS:  Repeat the question.

6    BY MS. GERLICHER:

7       Q    Did you have occasion to form an opinion

8    regarding the level of dental care provided under

9    Wexford?

10      A    Yes.

11      Q    What was that opinion?

12          MR. MERVIS:  Objection.  He is not here to

13   provide opinion testimony, he's not an expert.  And

14   it's also outside the scope of the designation, the

15   subpoena.

16          MS. WIENEKE:  Join in all of those

17   objections.  In addition, lack of foundation.

18          THE WITNESS:  There was room for improvement.

19   BY MS. GERLICHER:

20      Q    Which specific areas were there room for

21   improvement?

22          MR. MERVIS:  Objection.  Foundation.  He's



Case 2:12-cv-00601-ROS   Document 754-1   Filed 01/27/14   Page 113 of 124

WILLIAM SMALLWOOD                                    August 20, 2013
PARSONS vs. RYAN                                                 264

 1  not here to give you expert opinion.  And it's outside

 2  the scope of the dep -- subpoena.

 3          MS. WIENEKE:  Join in all of the previously

 4  stated objections.

 5  BY MS. GERLICHER:

 6      Q    Sir, there is a question pending.

 7      A    In all facets of correctional dentistry.

 8      Q    Room to improve all facets of correctional

 9  dentistry, is that what you're saying?

10          MS. WIENEKE:  Objection.

11          MR. MERVIS:  Same objections.

12          THE WITNESS:  Room to improve on all facets

13  of -- all facets of all aspects of correctional

14  dentistry.

15  BY MS. GERLICHER:

16      Q    We have previously discussed the Dental

17  Services Technical Manual and established that did not

18  change after you took over dental services at ADC; is

19  that correct?

20          MR. MERVIS:  Objection.  Foundation.

21          THE WITNESS:  I did not say that.  I do not

22  know what it was like before took we took it over.  I



Case 2:12-cv-00601-ROS   Document 754-1   Filed 01/27/14   Page 114 of 124

WILLIAM SMALLWOOD                                    August 20, 2013
PARSONS vs. RYAN                                                283

1          CERTIFICATE OF NOTARY PUBLIC

2    I, Michelle Taylor, the officer before whom the

3    foregoing deposition was taken, do hereby certify that

4    the witness whose testimony appears in the foregoing

5    deposition was duly sworn by me; that the testimony of

6    said witness was taken by me in stenotype and

7    thereafter reduced to typewriting under my direction;

8    that the said deposition is a true record of the

9    testimony given by said witness; that I am neither

10   counsel for, related to, nor employed by any of the

11   parties to the action in which this deposition was

12   taken; and further, that I am not a relative or

13   employee of any counsel or attorney employed by the

14   parties hereto, nor financially or otherwise

15   interested in the outcome of this action.

16                           *Michelle Taylor*

17   _____

18                      Michelle Taylor
                        Notary Public in and for the
                        Commonwealth of Virginia

19

20   My commission expires:

21   August 31, 2016

22   Notary Registration No.: 7515446



# EXHIBIT 14

Parsons v. Ryan
30(b)(6)  Deposition of Winfred D. Williams, M.D. - 10/10/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;      )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;    )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree  )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of  )
themselves and all others similarly )
situated; and Arizona Center for   )
Disability Law,                    )
                                   )   CONFIDENTIAL
         Plaintiffs,               )   SUBJECT TO
     vs.                           )  PROTECTIVE ORDER
                                   )
Charles Ryan, Director, Arizona    )
Department of Corrections; and     )
Richard Pratt, Interim Division    )  30(b)(6) DEPOSITION
Director, Division of Health       )        OF
Services, Arizona Department of    )    CORIZON, INC.
Corrections, in their official     )
capacities,                        )
                                   )   Continuation of
         Defendants.               )   Docket No. 680
                                   )


WINFRED D. WILLIAMS, MD

(Topics 4 and 6)

October 10, 2013
8:59 a.m.
Phoenix, Arizona


Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

                            Prepared by:
602.266.6535                Carolyn T. Sullivan, RPR
www.glennie-reporting.com   Arizona CR No. 50528

Parsons v. Ryan
30(b)(6)  Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 75

1   making the assumption it wasn't up to the standard of

2   care in the first place.  And you're asking him if this

3   is going to be a situation where NCCHC standards are now

4   going to be put in place when they are already in place.

5   So that's outside the scope of this guy's depo.

6                 MS. KENDRICK:  I'm trying to find out if the

7   standard of care was adequate based on Corizon's

8   performance and --

9                 MR. BOJANOWSKI:  He was not noticed as an

10  expert witness to determine what the standard of care

11  existed prior to Corizon taking over the contract and

12  then making an analysis with regard to what it is now as

13  compared to that.  That's not within the scope of this

14  notice.

15                MR. CONLON:  That's true.

16      Q.    BY MS. KENDRICK:  Dr. Williams, you went to

17  medical school, correct?

18      A.    Correct.

19      Q.    And as part of that, you learned about

20  community guidelines for care?

21      A.    Correct.

22      Q.    And the Corizon standards and policies are

23  based upon the community guidelines of care for whatever

24  medical condition we're talking about?

25                MR. BOJANOWSKI:  Form.  Outside the scope.

Parsons v. Ryan
30(b)(6)  Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 76

1             MR. CONLON:  Here we go again.

2             MS. KENDRICK:  Okay.

3       Q.    BY MS. KENDRICK:  If you were running a

4    hospital in the community and 57 of the 87 chronic care

5    patients had not been seen as required by their treatment

6    plan, would that meet the community standard of medical

7    care for prisoners with chronic conditions?

8             MR. CONLON:  Form, foundation, outside the

9    scope.

10            Do not answer.

11            MS. KENDRICK:  Are you going to instruct him

12   not to answer?

13            MR. CONLON:  Yes, I am.

14            MS. KENDRICK:  I don't understand because it

15   says the provision of chronic care.  So part of the

16   provision of chronic care is providing chronic care that

17   is up to community standards.  And I'm asking him to tell

18   me if the chronic care system is up to community

19   standards.

20            MR. BOJANOWSKI:  That's an expert opinion

21   that you're asking him to render, not --

22            MS. KENDRICK:  He's a medical doctor who

23   learned about the community guidelines and standards of

24   care.

25            MR. BOJANOWSKI:  I understand, Corene, but

Parsons v. Ryan
30(b)(6)  Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 77

1    that's not the scope of this.  This is a factual

2    determination.

3                    MR. CONLON:  It's a 30(b)(6).

4                    MS. KENDRICK:  It's not a basis to instruct

5    him not to answer.  What's your basis?

6                    MR. CONLON:  Outside the scope.  He's a

7    30(b)(6) witness.  He's not an expert witness.

8                    MR. BOJANOWSKI:  You designated him in a

9    certain way to testify to a topic.  Now you're going --

10                   MS. KENDRICK:  We didn't designate how he

11   came up with the definitions.  And the definition was the

12   provision of chronic care.  And at issue in this case is

13   whether ADC prisoners are receiving adequate chronic care

14   up to the standards of care.

15                   MR. CONLON:  What you did was you noticed a

16   30(b)(6) deposition.  He's a designee, he's not an

17   expert.  And there's been no one who's been presented in

18   the guise of an expert for 30(b)(6).  That's not the

19   scope of his testimony.

20       Q.    BY MS. KENDRICK:  Are you familiar with Corizon

21   policies and standards?

22       A.    Yes.

23       Q.    Did the chronic care system that you

24   experienced when you came to work here, did it meet

25   Corizon's standards and policies?  It's a yes-or-no

Parsons v. Ryan
30(b)(6)  Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 145

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA  )

3

4              I, CAROLYN T. SULLIVAN, a Certified

5    Reporter, Certificate No. 50528, in the State of Arizona,

6    do hereby certify that the foregoing witness was duly

7    sworn to tell the whole truth; that the foregoing pages

8    constitute a full, true, and accurate transcript of all

9    proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14             I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18             WITNESS my hand this 25th day of October,

19   2013.

20

21

22                          Carolyn T. Sullivan, RPR
                            Arizona Certified
                            Reporter No. 50528
23

24

25

# EXHIBIT 15

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen;          )<br>Stephen Swartz; Dustin Brislan;        )<br>Sonia Rodriguez; Christina Verduzco;)<br>Jackie Thomas; Jeremy Smith; Robert )<br>Gamez; Maryanne Chisholm; Desiree   )<br>Licci; Joseph Hefner; Joshua Polson;)<br>and Charlotte Wells, on behalf of   )<br>themselves and all others similarly )<br>situated; and Arizona Center for     )<br>Disability Law,                      )<br>                                     )<br>         Plaintiffs,                 )<br>    vs.                              )<br>                                     )<br>Charles Ryan, Director, Arizona      )<br>Department of Corrections; and       )<br>Richard Pratt, Interim Division      )<br>Director, Division of Health         )<br>Services, Arizona Department of      )<br>Corrections, in their official       )<br>capacities,                          )<br>                                     )<br>         Defendants.                 )<br>                                     ) | No. CV12-00601-<br>PHX-NVW (MEA) |

DAVID W. ROBERTSON, DO

August 26, 2013
9:18 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

Page 70

1    four.  Would you agree these are necessary elements to

2    deliver --

3                 MR. BOJANOWSKI:  Form, foundation.  You're

4    asking him to render an expert opinion.  He's not

5    designated as an expert, and you're asking him questions

6    that --

7                 MS. KENDRICK:  Tim --

8                 MR. BOJANOWSKI:  -- clearly are out of the

9    bounds.

10                MS. KENDRICK:  Your co-counsel has

11   stipulated that all objections will be limited to form of

12   the question.

13                MR. BOJANOWSKI:  I understand.  Go ahead.

14                MS. KENDRICK:  And 57 objections in 30

15   minutes is getting absurd and sanctionable.

16                MR. BOJANOWSKI:  They have a good basis,

17   this is just one example of it, but go ahead and ask your

18   question.

19                MS. KENDRICK:  Would you object like that in

20   court in front of Judge Wake and I were cross-examining

21   your witness?

22                MR. BOJANOWSKI:  Go ahead and ask your

23   question.  You've got seven hours.

24      Q.    BY MS. KENDRICK:  Based on your experience

25   working in correctional health care and being a physician

DAVID W. ROBERTSON, DO - 8/26/13

```
 1   STATE OF ARIZONA    )
                         )
 2   COUNTY OF MARICOPA  )

 3

 4              I, CAROLYN T. SULLIVAN, a Certified

 5   Reporter, Certificate No. 50528, in the State of Arizona,

 6   do hereby certify that the foregoing witness was duly

 7   sworn to tell the whole truth; that the foregoing pages

 8   constitute a full, true, and accurate transcript of all

 9   proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14              I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18              WITNESS my hand this 5th day of September,

19   2013.

20

21                             _____

22                             Carolyn T. Sullivan, RPR
                               Arizona Certified
23                             Reporter No. 50528

24

25
```