Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>　　　　　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>　　　　　　　　　　　　　　　Defendants. | NO. 2:12-cv-00601-NVW<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' EXPERTS AND EXPERT REPORTS** |

Defendants Charles Ryan and Richard Pratt, through counsel, respond in opposition to Plaintiffs' Motion to Strike Defendants' Experts and Expert Reports (Doc. 753). Because this class action seeks injunctive relief and therefore requires up-to-date information pertaining to the quality of ADC inmate care to be considered at the time of trial, and because Defendants' expert reports and disclosures comply with both the letter and spirit of Rule 26(a)(2), Plaintiffs' Motion must be denied. This Response is supported by the following Memorandum of Points and Authorities and the attached Exhibits 1-10.

## **MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Are the representative Plaintiffs seriously unhappy that ADC is *improving* its inmate health care by hiring more providers, speeding the time for processing inmate requests, and continuing to implement quality improvement measures such as enhanced training and program participation and recreational opportunities for prisoners in isolation? Doc. 753 at 4-6.[1] Or do their lawyers sense an opportunity to freeze the evidence, circa 2011-13, despite this action seeking prospective injunctive relief that must necessarily examine the *current* conditions of confinement as they appear at the time of a comprehensive trial that will not take place any sooner than the end of 2014? Plaintiffs' insistence on preserving the *status quo* from 2011-13 is all the more remarkable when one considers that ADC's third-party provider, Corizon Health, took over health care management in March 2013—only six months before the September 27, 2013 discovery cut-off—and Corizon's steady and ADC-mandated improvements are continuing to

---

[1] This theme of discouraging or trying to conceal ADC health care improvements echoes a position Plaintiffs' counsel took before this case was even filed—refusing to reveal the identities of inmates whose lives were allegedly in peril because ADC's medical intervention for individual inmates might place counsel's litigation objectives (to get a class certified) in peril. Ex. 1 (11/10/11 e-mail) at 3 ("you [Mr. Specter] expressed a fear that if you provided names to me, it might mean that ADC would address the medical issues with individual inmates, which you believe might interfere with your ability to certify a class of inmates") and 4 (comment from Mr. Pochoda that it is "Good to … avoid turning over names with ADC having direct access and us still on outside.").

1  manifest themselves in the form of increased medical, dental, and mental health staffing,
2  reduced wait times, enhanced training and other improvements spelled out for Plaintiffs
3  on a monthly and periodic basis via produced monitoring reports, corrective action plans,
4  and statistical reports on wait times, utilization rates, chronic conditions, quality
5  improvement reviews, medical transports, medication administration, professional
6  licensure, and inmate grievances.

7  The change in third-party health care providers—initially from ADC to Wexford
8  on July 1, 2012, and from Wexford to Corizon on March 4, 2013—illustrates the changing
9  nature of care provided to ADC inmates that justifies <u>the Court</u> evaluating the
10 constitutionality of such care as it exists when it decides whether to order injunctive relief
11 (or grant summary judgment) in 2014.  This timing issue was a concern expressed by the
12 Court to Plaintiffs' counsel at the first scheduling conference on July 20, 2012 when the
13 Court asked if Plaintiffs had considered dismissing the case for six months to decide if
14 care was improving under the new provider,[2] and Plaintiffs' counsel declined, stating "we
15 are very concerned about the delay that would be occasioned by dismissing and refiling"
16 and suggesting the Defendants could raise the issue of mootness during the lawsuit.  Ex. 2
17 (7/20/12 Tr.) at 29-33.

18 Beyond their unwillingness to delay litigation in a case with a changing factual
19 landscape, Plaintiffs' counsel well understands that "we're in an injunctive relief case, so
20 it's not just a retrospective look at what's happened."  Ex. 3 (11/1/13 Tr.) at 31.  The
21 reality is that with Corizon's taking over on March 4, 2013, there have been extensive,
22 positive changes in the quality of health care delivered to ADC inmates, and Defendants
23 are constantly updating class counsel on such changes to enable them access to the exact

---

[2] The Court inquired of Plaintiffs' counsel "whether you might think it wise, simply to give them a better chance to, A, do better, and, which in turn gives you a better prospect when you come back in full force and have the new status quo that's easier to discover" and "it might make sense simply to defer this some number of months so that the effort they are going to spend will be more productive." Ex. 2 (7/20/12 Tr.) at 31, 33.

2

same evidence that defense counsel has.[3] Indeed, in response to concerns voiced by Plaintiffs' counsel over the 13-month gap between the discovery cut-off and trial, and Defendants' access to ADC documents, this Court assured the parties that exhibits offered at trial must be accessible to both sides. Ex. 3 (11/1/13 Tr.) at 33 ("If [Defendants] try to list a bunch of documents that you haven't had access to, do you think they are going to get away with that?"). Neither Defendants' four retained experts nor their Rule 26(a)(2)(C) experts will be offering any testimony at trial based on or referencing documents that have not been or will not be made available to Plaintiffs' counsel. Since the September 27, 2013 discovery cut-off, Defendants have produced or disclosed more than 200,000 pages of documents, and Defendants issued their 14th Supplemental Disclosure as recently as February 10, 2014, which includes more than 2,300 pages of updated reports on staffing, wait times, chronic conditions, medical transports, quality improvement reviews, and inmate grievances. *See* Ex 4.[4] And—as they have repeatedly assured Plaintiffs—Defendants will continue to provide Rule 26(e) supplemental

---

[3] For example, Dr. Mendel noted that since Corizon took over in March 2014, there has been a real and substantial decrease in inmate wait times for routine medical care, addressed medication continuity challenges, dramatic increases in the number of mid-level and upper-level providers at ADC complexes, efforts to improve chronic care through records monitoring and clinical pathways, and improvements in outside specialty care. *See* Mendel Rpt., SEALED Ex. 2 to Pltfs' Mot. (Doc 762) at ADC203772-774, ADC203780-781, ADC203783-784, ADC203785-787 and ADC203789-790. Similarly, Dr. Dovgan highlighted the use of the proprietary Correctional Dental Software to effectively manage dental care and reduce wait times below NCCHC standards. *See* Dovgan Rpt., SEALED Ex. 3 to Pltfs' Mot. at ADC203529-533. Drs. Seiter and Penn further noted further ongoing and independent efforts to change maximum custody management practices to align with the Association of State Correctional Administrators' recently issued principles on restrictive housing. *See* Seiter Rpt., SEALED Ex. 5 to Pltfs' Mot. at ADC 203632-636; Penn Rpt., SEALED Ex. 4 to Pltfs' Mot. at ADC203420 and ADC203426.

[4] Defendants note that while many documents are listed individually for the first time on the disclosure statement, a significant percentage were previously produced, or were produced in a different format previously. All documents listed in **bold typeface** on Ex. 4 with a production number less than ADC229808 were produced to Plaintiffs' counsel *prior* to being listed on the disclosure.

3

disclosures of monthly Medical Green-Amber-Red monitoring reports (MGARs), Corrective Action Plans (CAPs), which now appear on the printed MGAR reports, staffing reports, wait times and utilization reports, and other statistical reports generated by ADC or submitted to ADC by Corizon up until trial.[5] Defendants have also recently provided updated medical records and recorded phone calls for the named Plaintiffs and will continue to produce supplemental records for the named Plaintiffs up until trial. Contrary to Plaintiffs' fears, Defendants will not selectively produce only the portions of reports and records that are helpful to Defendants, but instead will continue to produce <u>all</u> of the monitoring and statistical reports and <u>all</u> of the updated medical records of the named Plaintiffs.

## II.  LEGAL ARGUMENT

### A.  THE EIGHTH AMENDMENT AND PLRA REQUIRE THE EVALUATION OF "CURRENT" CONDITIONS TO SUPPORT A CLAIM OF INJUNCTIVE RELIEF.

Plaintiffs first argue it is unfair to allow defense experts to rely on recent or anticipated improvements to ADC inmate care post-dating the September 27, 2013 discovery cut-off date because "Defendants could claim that any previously identified deficiencies have been remediated since the discovery deadline, without exposing that contention to meaningful cross-examination because Plaintiffs would have no discovery to prove the contrary."  Doc. 753 at 7.  This argument ignores several principles: (1) Defendants timely disclosed the written reports of their four specially retained experts by the Court deadline of December 18, 2013; (2) Plaintiffs will be deposing Defendants' retained experts in the Spring of 2014, giving them the opportunity to explore the efficacy of ADC's health care improvements (since Corizon took over from Wexford in 2013) that

---

[5] As the Court was made aware in preparation for the November 1, 2013 hearing, CAPs were submitted electronically, and the ADC reports did not contain the text of the Corrective Action Plans.  While such information was not easily accessible, ADC made good on its promise to revise those reports so that the CAPs would be included on the printed copy, and produced those reports to Plaintiffs on January 22, 2014, prior to Plaintiffs filing the instant motion.

4

Plaintiffs seem so eager to discourage or conceal; (3) Eighth Amendment law and the PLRA require that the constitutionality of conditions of confinement be evaluated at the time of trial; and (4) <u>Defendants will be supplementing their disclosures and discovery responses up until trial to include any evidence Defendants plan to introduce or reference at trial</u>. Fed.R.Civ.P. 26(e).

In a pre-PLRA civil rights challenge to the constitutional adequacy of medical and dental health care delivered to ADC inmates, *Casey v. Lewis*, 834 F. Supp. 1477 (D. Ariz. 1993), Judge Muecke evaluated the evidence according to the prison conditions that existed at the time of trial—not when the suit was filed or when formal discovery ended:

> The provision of care generally within the medical/dental care system ***at the time of trial*** did not rise to a level of deliberate indifference to the serious medical/dental needs of the inmates. However, at the time of the filing of this lawsuit, defendants were deliberately indifferent to the inmates' serious medical and dental care needs and the medical and dental care systems were unconstitutional…The majority of the components of the system that make the system constitutional are ***added staff, policy changes and pilot programs implemented since the filing of this action***.

834 F. Supp. at 1546-47 (emphasis added). Ninth Circuit precedent applying the PLRA similarly confirms that claims for injunctive relief must be evaluated in the context of "current" prison conditions, which necessarily includes improvements to institutional health care prior to or even after trial. *Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002) ("The text of § 3626(a)(1)(A) suggests that, in the absence of a 'current and ongoing' violation, there is no occasion to fashion prospective relief to cure the violation. In other words, if a violation no longer exists, the statute does not permit the court to order prospective relief.");[6] and *Gilmore v. California*, 220 F.3d 987, 1008 (9th Cir. 2000)

---

[6] The Ninth Circuit in *Hallett* further sustained the district court's denial of prospective relief by referencing subsequent evidence of improvements at the prison: "[E]vidence presented by Defendants shows that both inpatients and outpatients are subject to medication compliance monitoring, that Defendants have increased the number of staff hours dedicated to medication management, and that Defendants have made a number of reforms to their method for distributing medications." 296 F.3d at 749.

("Thus, unless plaintiffs do not contest defendants' showing that there is no current and ongoing violation under § 3626(b)(3), the court must inquire into current conditions at a prison before ruling on a motion to terminate.").

Plaintiffs' reliance on unpublished cases does not help them. *Harkabi v. SanDisk Corp.*, No. 08 Civ. 8203, 2012 WL 826892, at *8 (S.D.N.Y. Mar. 12, 2012) did not involve prisoner litigation under the PLRA, but business litigation (a contractual "earn-out" provision) in which two software developers disclosed a new damages theory based on an entirely new product (the Sony Memory Stick) three months after the close of discovery that had not appeared in their complaint (which focused instead on SanDisk's U3 device). *Id.*

As Plaintiffs' counsel is well aware, *Graves v. Arpaio,* No. CV-77-00479-PHX-NVW (D. Ariz. Sept. 10, 2013), involves an *ongoing* prisoner conditions case with a 35-year history, with a more recent 5-year history that completely undermines Plaintiffs' Motion. As outlined by the Ninth Circuit in *Graves v. Arpaio*, 623 F.3d 1043 (9th Cir. 2010), the most recent chapter stemmed from the consent decree in *Hart v. Maricopa County*, and the defendants' efforts to terminate the injunction in 2008, resulting in a 12-day evidentiary hearing before this Court in August-September 2008. The Ninth Circuit repeatedly referred to the PLRA's "current and ongoing" standard for terminating injunctive relief, including the statement that "the burden was on Sheriff Arpaio, not the plaintiffs, to prove current jail conditions." 623 F.3d at 1051, n.3. It was in response to defendants' efforts to lift the Third Amended Judgment (*Graves,* Doc. 2142) that this Court set a date certain for its determination on constitutionality pursuant to a termination motion akin to summary judgment briefing. And as this Court noted in its August 27, 2013 scheduling conference (*Graves,* Doc. 2151), the focus was on *conditions now*, not over the five years since the previous, 2008 evidentiary hearing. Ex. 5 (*Graves* 8/27/13 Tr.) at 9. But even though the practical necessity of summary judgment briefing requires some limits on the timeliness of evidence brought to the Court's attention, the Court allowed an expanded evidentiary hearing and noted at a recent Final Pretrial Conference

6

that 12 days before trial defendants must produce any underlying medical files about which defendants wish to cross-examine or otherwise challenge plaintiffs' witnesses (*Graves,* 01/30/2014 Minute Entry, Doc. 2209).

Plaintiffs also insist that "Defendants even refuse to produce medical records and other post-discovery documents specifically cited and relied upon by their experts." Doc. 753 at 7-8. But the only evidence for this assertion is a January 23, 2014 letter from defense counsel which included a heading ("Defendants do not have an obligation to produce documents cited by their experts") that Plaintiffs have taken out of context, as language under the heading simply pointed out that Defendants were unaware of any authority requiring the production of documents "*with service of that report*." Doc. 754-1, Ex. 10 at 8 (emphasis added). Plaintiffs' own experts did not generally produce the documents they reference in their expert reports simultaneous with the service of such reports which lead to Defendants seeking discovery of them pursuant to Fed. R. Civ. P. 45 (Doc. 749), and Defendants have never refused to produce the documents referenced by their experts.[7] In fact, Defendants' January 23, 2014 letter spells out when the specific documents from Defendants' expert reports were produced, disclosed, or otherwise became available to Plaintiffs. Notably, while Plaintiffs have presumed that they have demanded that Defendants produce "everything," they have never even bothered to

---

[7] Despite their accusations of ambushing, Plaintiffs have come up with only one example of documents they claim Defendants have refused to produce (Dr. Penn's review of prisoner medical files), Doc. 753 at 7. But, like Plaintiffs' experts, Dr. Penn reviewed many of those files in their original format at the ADC facilities, without having them duplicated. *See* Doc 754-1, Ex. 9 at 10-12 (pages 92-94 of 124). Furthermore, Plaintiffs have never replied to that letter or explicitly requested an opportunity to inspect those records. On January 17, 2014, Defendants sent out discs with more than 6,000 additional pages of documents provided to Defendants' experts for review, and on January 31, 2014, Defendants produced more than 1600 pages of documents in response to Plaintiffs' subpoenas to Defendants' experts, including those records which Dr. Penn did not review at the ADC facilities, but rather requested to be duplicated, which he received after January 17, 2014. Defendants further acknowledge the requirement to seasonably supplement production of documents subject to Plaintiffs' subpoenas to Defendants' retained experts, should they receive and rely upon any additional documents.

7

1  request that ADC duplicate these records or produce them for their inspection.

2  Plaintiffs also claim that Defendants will be in a position to selectively portray the evidence if defense experts can look at intervening developments beyond September 27, 2013.[8]  Doc. 753 at 1, 8.  Not only does this argument ignore Plaintiffs' ability to inquire into the basis for such opinions at the upcoming depositions of Defendants' four retained experts, but it mistakenly assumes Defendants have any discretion in the monthly MGARs, CAPs and staffing reports produced to Plaintiffs' counsel—all of which involve statistical data and process improvement reporting that is produced regardless of content, not for the purpose of this litigation but for the ongoing process of monitoring contract compliance.  Moreover, Defendants will continue to fulfill their duty to supplement discovery responses to the extent any new ADC information comes to light, and they expect Plaintiffs to do likewise for the information upon which they may rely.

Finally, Plaintiffs "request that the Court re-open discovery to allow Plaintiffs to test Defendants' contentions and set a new cut-off that precludes Defendants from introducing later created evidence."  Doc. 753 at 8.  In a case in which the Court has been critical of "excessive discovery," this latest request by Plaintiffs is abusive and wholly unnecessary.  As set forth above, Defendants will continue to supplement their discovery and disclosures with MGARs, CAPs, ADC's statistical reports (which are published on www.azcorrections.gov), Corizon statistical reports submitted to ADC, new ADC policies

---

[8] Plaintiffs are in no position to make such an assertion, as their sources of proof for an allegedly "systemic" Eighth Amendment violation have come from a skewed identification of extreme individual health cases—most of which Plaintiffs' counsel have funneled for their experts to address in their reports—while ignoring the vast majority of positive health care delivered to inmates throughout the ADC system.  Only a random sample approach is possible of sustaining Plaintiffs' charges of comprehensive, systemic problems at all ten ADC prison complexes, yet Plaintiffs continue to point to the aberrations and outliers as if they are a fair depiction of reality—particularly given their policy-based challenge to health care on a systemwide basis.  *Bull v. City and County of San Francisco*, 595 F.3d 964, 967 (9th Cir. 2010) (criticizing argument based on "unproven allegations to give a shocking and inflammatory account of mistreatment by jail officials" where plaintiffs only challenged "the blanket policy and practice").

1  and procedures, and updated records regarding the thirteen named Plaintiffs. This is not
2  "later created evidence" as cynically suggested by Plaintiffs, but simply ADC, Corizon
3  and Smallwood Prisons Dental Services officials and employees continuing to provide
4  health care to 36,000 inmates/patients in an ongoing effort to improve that care for the
5  benefit of all.

6  The MGARs, staffing reports, wait time/utilization reports, and other periodic
7  statistical reports which Defendants are continuing to produce are precisely the type of
8  system-wide data this Court has indicated that it will focus on at trial in this case. *See*,
9  *e.g.,* Ex. 6 (8/7/2013 Tr.) at 17-18, 22 and 58; Ex. 7 (4/26/2013 Tr.) at 17-19 and 33-34.
10 By contrast, it is clear from the one example of additional discovery that Plaintiffs offer in
11 support of their claimed need to reopen discovery – documents regarding an incident in
12 which a nurse at Lewis Complex failed to follow injection protocols – that their real
13 motivation for reopening discovery is so that they can continue searching for the elusive
14 needle in the haystack. This Court has repeatedly reminded Plaintiffs that to prove their
15 case they must present evidence of system-wide deficiencies in the provision of health
16 care, *id.*, yet they persist in seeking isolated incidences of harm and want this Court to
17 continue to indulge them in their irrelevant and fruitless quest.

18 Under *Casey*, *Hallett* and the PLRA, the Eighth Amendment inquiry under
19 Plaintiffs' claim for prospective, injunctive relief must necessarily evaluate the conditions
20 that exist at the time of trial.

**B. DEFENDANTS' 14 EMPLOYEE/AGENT EXPERTS DO NOT REQUIRE WRITTEN REPORTS AND WERE PROPERLY DISCLOSED UNDER RULE 26(a)(2)(C).**

23 Revealing a profound misunderstanding of Rule 26(a)(2)(C), the 2010 amendments
24 to this rule, and *Goodman v. Staples The Office Superstore*, 644 F.3d 817 (9th Cir. 2011),
25 Plaintiffs argue that Defendants are trying to "deputize" 14 non-report witnesses as
26 experts and "ambush" Plaintiffs at trial by mischaracterizing their respective work duties
27 and disclosed opinions. Plaintiffs contend that these 14 employees of ADC, Corizon or
28 Smallwood Prison Dental Services should be stricken or subject to the report requirement

9

(and/or deposed or re-deposed) "because their opinions were rendered specially for this litigation and are based on facts that the witnesses would not have reviewed, but for this litigation." Doc. 753 at 10. These contentions overlook the job duties of these 14 percipient witnesses whose opinion testimony is a well-recognized allowance under Rule 26(a)(2)(C).[9]

The 2010 Notes of the Advisory Committee specifically addressed the concern eluded by Plaintiffs' Motion:

> *Subdivision (a)(2)(C).* Rule 26(a)(2)(C) is added to mandate summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B) and of the facts supporting those opinions. *This disclosure is considerably less extensive than the report required by Rule 26(a)(2)(B). Courts must take care against requiring undue detail, keeping in mind that these witnesses have not been specially retained* and may not be as responsive to counsel as those who have.
>
> This amendment resolves a tension that has sometimes prompted courts to require reports under Rule 26(a)(2)(B) even from witnesses exempted from the report requirement. *An (a)(2)(B) report is required only from an expert described in (a)(2)(B).*
>
> A witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705. *Frequent examples include physicians or other health care professionals and employees of a party who do not regularly provide expert testimony.* Parties must identify such witnesses under Rule 26(a)(2)(A) and provide the disclosure required under Rule 26(a)(2)(C). The (a)(2)(C) disclosure obligation does not include facts unrelated to the expert opinions the witness will present.

2010 Advisory Committee Notes to Rule 26 (emphasis added). The 14 employees offering opinion testimony (together with their titles and deposition status) are:

---

[9] In truth, Plaintiffs' counsel appear most upset that they are unable to depose (or re-depose) these 14 witnesses in addition to the 36 depositions Plaintiffs have already taken and five expert depositions they will take, as their initial email correspondence with defense counsel did not complain of the adequacy of the summary disclosures or the lack of any written report, but simply sought deposition dates for the 14 ADC/Corizon/Smallwood employees. Doc. 754-1, Ex. 6.

1    Charles Ryan (ADC Director; **deposed 11/8/13**)
2    Carson McWilliams (ADC Northern Region Operations Director; **deposed 9/27/13**)
     Ernest Trujillo (ADC Southern Region Operations Director)
3    Richard Rowe (ADC Quality/Clinical, Med. Program Administrator; **deposed 9/19/13**)
4    David Robertson (ADC HS Contract Monitoring Bureau; **deposed 8/26/13**)
     Nicole Taylor (ADC Mental Health Monitor; **deposed 9/5/13**)
5    Angelo Daniels (Deputy Warden of Security Operations)
     Mark Dolny (Administrative Services Officer V, Research Manager)[10]
6    Mark Fleming (Corizon Health, Regional Vice President for Behavioral Health)
7    Thomas Buenker Corizon Health Regional Psychiatry Director)
     Winfred Williams (Chief Medical Officer, Corizon Health; **deposed 10/10/13**)
8    Laura Donnelly (Trinity Services Group)
     Dr. Smallwood (D.D.S., CEO, Smallwood Prison Dental Services; **deposed 8/20/13**)
9    Dr. Hanstad (Smallwood Northern Regional Dental Director and Supervisor ASPC-Perryville)

Doc. 754-1, Ex. 6, 1/8/14 Fathi email. As illustrated above, Plaintiffs have already deposed or will have the opportunity to depose 8 of the 14 ADC/Corizon/Smallwood employees.[11] Moreover, Defendants' Eleventh Supplemental Disclosure served

---

[10] Because Mark Dolny has reviewed Plaintiffs' expert reports and methodologies and prepared opinions to refute Plaintiffs' claims of systemic violations, Defendants have agreed to produce him for deposition at a mutually acceptable date. Contrary to Plaintiffs' assertion, Dr. Dolny did not and is incapable of "preparing a statistical analysis of Plaintiffs' expert report," Doc. 753 at 11, as Plaintiffs' sampling methodology (pulling the worst-case, extreme medical cases while ignoring everything else) does not allow for statistical analysis.

[11] Plaintiffs claim that Defendants' counsel prevented them from seeking expert opinion testimony during the depositions of Dr. Smallwood, Dr. Williams, and Dr. Robertson. *See* Specter Decl. at ¶¶ 14-16. But Plaintiffs misrepresent the nature of the objections during these depositions and include only selected pages of the deposition transcripts. For example, Dr. Smallwood was designated as a 30(b)(6) designee of Smallwood Prison Dental Services ("SPDS"), and SPDS' counsel, Jeffrey Mervis objected that the questions were outside the scope of the 30(b)(6) deposition notice, which Plaintiffs' counsel conceded at the deposition was a "fair point." Ex. 8 (Smallwood Dep.) at 187; s*ee also id.* at 199. At 195, Defendants' counsel objected to the foundation and editorial questioning based upon the expert tours, but not withstanding and consistent with each of the other listed objections, Dr. Smallwood responded to the question. Ex. 8 (Smallwood Dep.) at 194-196. Likewise, during the deposition of Dr. Williams, defense counsel's objections were that the 30(b)(6) deposition notices in response to which Dr. Williams was designated did not include the expert opinion questions by which Plaintiffs sought to bind Corizon. *See* Ex. 8 (Williams Dep.) at 73-81. Finally, Dr. Robertson had

11

1  December 18, 2013 included "summary descriptions" of the 14 ADC/Corizon/Smallwood
2  expert witnesses that include far greater detail than that required by Rule 26(a)(2)(C)—
3  outlining topics of anticipated testimony and areas of rebuttal. Doc. 754-01, Ex. 1.
4  Defendants have since served three additional supplemental disclosure statements which
5  provide even more detail regarding the testimony of these witnesses. *See, e.g.*,
6  Defendants' 14th Supplemental Disclosure Statement, attached as Ex 4, at 2-10, 13-18,
7  and 33-52.

8  Plaintiffs' reliance on *Goodman* is misplaced, as *Goodman* required a written
9  report of a plaintiff's treating physician who had "morph[ed] into a witness hired to render
10 expert opinions that go beyond the usual scope of a treating doctor's testimony[.]" 644
11 F.3d at 819-20. Not only did *Goodman* predate the 2010 amendments to Rule 26(a)(2)
12 clarifying this issue, but the excluded opinions were on causation, and the Ninth Circuit
13 noted that the plaintiff had "specifically retained a number of her treating physicians to
14 render expert testimony beyond the scope of the treatment rendered; indeed, to form their
15 opinions, these doctors reviewed information provided by Goodman's attorney that they
16 hadn't reviewed during the course of treatment." 644 F.3d at 826.

17 In contrast, here the employees of ADC, Corizon and Smallwood occupied
18 supervisory roles and functions that required them to oversee the quality of medical,
19 dental and mental health care rendered to ADC inmates. Some treat patients while others
20 supervise the care provided by others, or health care operations in general. Others
21 supervise multiple aspects of conditions of confinement for ADC inmates, including
22 programming, food services, and general prison operations. For example, Messrs.
23 McWilliams and Trujillo are ADC's Northern and Southern Region Operations Directors
24 and are logically tasked with implementing ADC's changes for maximum custody

---

26 not been designated at the time of his deposition, and was being asked for an expert
27 opinion agreeing with the content of the Wexford PowerPoint, a document which he
   testified he had never before seen. Ex. 10 (Robertson Dep.) at 69-72. Nevertheless, Dr.
28 Robertson responded to the questions which were subsequently asked. *Id.*

inmates, including those designated as mentally ill, which encompass large recreation enclosures, improvements to programming, job placement, behavior modification programs, training, and explaining ADC's classification system—all of which fall under their job functions as an Operations Director. To the extent any of Plaintiffs' criticisms of ADC inmate health care and conditions of confinement are germane to the operations overseen by Messrs. McWilliams and Trujillo, it is only natural to allow them to offer rebuttal testimony to such criticisms, which Defendants' Rule 26(a)(2)(C) disclosure clearly summarized.[12]

Plaintiffs further contend that some of the 14 employees may qualify as 26(a)(2)(B) experts if their duties "regularly involve giving expert testimony," and drop a footnote suggesting that a "Westlaw search shows that some of Defendants' non-reporting experts often give expert testimony." Doc. 753 at 10, n.10.  This comparison is groundless, as the cases cited primarily involve *pro se* prisoner suits in which the Attorney General's Office has logically supported its dispositive motions with affidavits from the named health care providers or knowledgeable witnesses—a far cry from establishing that any of the 14 ADC/Corizon/Smallwood employees are professional expert witnesses subject to Rule 26(a)(2)(B).  If such logic were taken to its absurd conclusion, Messrs. Specter and Fathi could likewise be classified as employed experts whose duties "regularly involve giving expert testimony" because of the frequency of their declarations filed in this case alone.

---

[12] Plaintiffs further take issue with Dr. Rowe, Dr. Taylor, Dr. Smallwood, and Mr. Trujillo testifying about Plaintiffs' expert reports or rebutting such experts' methodology and opinions. Doc. 753 at 11.  To the extent any of Defendants' 14 employees either treated ADC inmates or functioned as supervisory officials whose job performance is encompassed within Plaintiffs' claim of "systemic" violations of the Eighth Amendment, such employees are clearly within their right(s) to defend and explain their treatment and operational or supervisory performance—subject to the Court's inherent Rule 403 authority <u>at trial</u> to avoid cumulative evidence.  Moreover, Plaintiffs misstate the testimony of Dr. Taylor regarding her knowledge of the named Plaintiffs, incorrectly claiming that she is only familiar with Plaintiffs Brislan and Gamez. *See* Specter Decl. at ¶ 13.  In her role as Mental Health Monitor, Dr. Taylor reviews and is familiar with the mental health care and conditions of confinement of Plaintiffs Swartz, Brislan, Thomas, Smith, Gamez, Chisholm, Polson, Rodriguez and Verduzco.  *See* Ex. 4 at 16-17.

Doc. 754, 662, 647, 591, 560, 486, 440, 365, 292, 240, 239, 85, and 74.  While Plaintiffs point to a handful of cases, they do not and cannot establish that any of the ADC, Corizon, Smallwood or Trinity employees' "duties as the party's employee regularly involve giving expert testimony."  Furthermore, the Advisory Committee Note to the 1970 Amendments to 26(b)(4), explicitly clarifies that the rule does not extend "itself to the expert whose information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit.  ***Such an expert should be treated as an ordinary witness***." (Emphasis added).

Finally, Plaintiffs complain of certain ADC/Corizon/Smallwood employees testifying "about treatment provided to the named plaintiffs and other prisoners" based on their review of medical records.  Doc. 753 at 12.  This should not trouble Plaintiffs, as they have styled this certified class action as one involving systemic violations, and succeeded in convincing this Court that ADC inmates allegedly face a substantial risk of serious harm stemming from inadequate health care and that such a risk is pursuant to a pattern or practice of ADC.  (Doc 372).  Indeed, Plaintiffs relied heavily on the Cure Notification ADC previously sent to Wexford in obtaining class certification, and have acknowledged they will be examining many of these same ADC and third-party witnesses about alleged deficiencies in inmate health care, which can only be accomplished with the aid of reviewing medical records of inmates.  How can such an alleged risk be assessed or disproved without ADC and third-party medical personnel—who are presumably the alleged policymakers behind such practices—being allowed the ability to show that the care rendered to ADC inmates was within the standard of care, and certainly falls far short of a constitutional deficiency?  Of the 14 Rule 26(a)(2)(C) experts challenged by Plaintiffs, most have job duties that encompass the supervisory role of assuring adequate health care to inmates, which role cannot be discharged in the absence of medical records reviews of the named Plaintiffs and other prisoners.

## C. THE PROPOSED TESTIMONY OF THE 14 EMPLOYEE/AGENT EXPERTS IS NOT DUPLICATIVE OR CUMULATIVE UNDER RULE 403, AND PLAINTIFFS' MOTION IS PREMATURE IN SEEKING AN EVIDENTIARY RULING.

Plaintiffs' final argument is plainly premature, as it seeks a Rule 403 finding of duplicative or cumulative evidence that neither the parties nor the Court is equipped to make at this juncture. As any trial lawyer knows, how evidence comes out at trial and strategy decisions as to what type of evidence to emphasize or abandon is a fluid process. If any lawyer spends too much time rehashing the same testimony from the same or multiple sources, he or she will be given a "move along" admonition, and all parties will be motivated not to bore or antagonize the judge in whose hands rests the fact-finding fate of the case.

More importantly, Plaintiffs' Rule 403 objections are without merit, and are merely a different angle by which to achieve their objective of excluding most of the 14 medical and operational Rule 26(a)(2)(C) witnesses because Plaintiffs are uncomfortable with the idea of percipient fact witnesses also having and being able to express their opinions on issues within their job functions. But the 2010 amendments to Rule 26(a)(2)(C) expressly contemplate that "[a] witness who is not required to provide a report under Rule 26(a)(2)(B) may both testify as a fact witness and also provide expert testimony under Evidence Rule 702, 703, or 705."

Rule 403 was never intended to erect silos around the topics or issues of witness testimony, and medical and supervisory officials testifying at a trial seeking classwide relief relating to medical, dental, and mental health care and conditions of confinement must necessarily testify about conditions at various prison facilities throughout Arizona—a necessity given Plaintiffs' claim of pervasive and "systemic" violations allegedly occurring pursuant to a policy or pattern—and such testimony may occasionally overlap in a comprehensive case such as this.[13] But drawing the lines between cumulative and

---

[13] Designating 14 witnesses who may offer opinion testimony regarding 17 certified practices relating to medical, dental, and mental health care and conditions of

15

non-cumulative testimony is a formidable task best left for trial, should any portion of this case survive summary judgment.

### III. CONCLUSION

After taking no fewer than 36 depositions, with five more expert depositions on the horizon, Plaintiffs are disappointed that they have exceeded their limit and cannot re-depose 7 witnesses (and 6 others) who will offer properly and timely disclosed Rule 26(a)(2)(C) opinions. Plaintiffs are similarly dismayed that ADC health care is improving, and that increased hiring of providers, reduced wait times, and enhanced training are achieving positive results that will only continue well beyond the September 27, 2013 discovery cut-off as this case marches toward an October 2014 trial date. But given Defendants' continued production of the MGARs, CAPs, and statistical reports in their entirety and Defendants' supplementation of discovery with any exhibits they will use at trial, there exists no basis for Plaintiffs' Motion to Strike and it should be denied.

---

confinement at 10 ADC complexes statewide is hardly excessive. And as Defendants' 26(a)(2)(C) disclosures make clear, while there are some areas in which the witnesses' knowledge overlaps, each of the 14 witnesses will offer separate and distinct testimony relevant to the 17 certified practices.

16

DATED this 11th day of February 2014.

STRUCK WIENEKE & LOVE, P.L.C.


By /s/ Daniel P. Struck
   Daniel P. Struck
   Kathleen L. Wieneke
   Rachel Love
   Timothy J. Bojanowski
   Nicholas D. Acedo
   Ashlee B. Fletcher
   Anne M. Orcutt
   STRUCK WIENEKE & LOVE, P.L.C.
   3100 West Ray Road, Suite 300
   Chandler, Arizona 85226

   Arizona Attorney General Thomas C. Horne
   Office of the Attorney General
   Michael E. Gottfried
   Lucy M. Rand
   Assistant Attorneys General
   1275 W. Washington Street
   Phoenix, Arizona 85007-2926

*Attorneys for Defendants*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on February 11, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amy Fettig: | afettig@npp-aclu.org |
| Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| Daniel Joseph Pochoda: | dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org; hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| James Duff Lyall: | jlyall@acluaz.org; gtorres@acluaz.org |
| Cathleen M. Dooley: | cdooley@azdisabilitylaw.org |
| J.J. Rico: | jrico@azdisabilitylaw.org |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Kirstin T. Eidenbach: | keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com |
| Jerica L. Peters: | jpeters@perkinscoie.com |
| Matthew Benjamin de Mee: | mdumee@perkinscoie.com; cwendt@perkinscoie.com |
| Michael Evan Gottfried: | Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov |
| Sara Norman: | snorman@prisonlaw.com |
| Sophia Calderon: | scalderon@jonesday.com; lwong@jonesday.com |
| Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| David C. Kiernan: | dkiernan@jonesday.com; lwong@jonesday.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |

| | |
|---|---|
| Kamilla Mamedova: | kmamedova@jonesday.com |
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Taylor Freeman: | tfreeman@jonesday.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org, mlauritzen@azdisabilitylaw.org |
| Katherine E. Watanabe: | Katherine.Watanabe@azag.gov, susan.oquinn@azag.gov |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, pdrew@perkinscoie.com |
| Lucy Marie Rand: | Lucy.Rand@azag.gov, Geneva.Johnson-Joksch@azag.gov |
| Ajmel Quereshi: | aquereshi@npp-aclu.org |

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/ *Daniel P. Struck*