**EXHIBIT 5**

**EXHIBIT 5**

1           **UNITED STATES DISTRICT COURT**

2           **FOR THE DISTRICT OF ARIZONA**

3                 _____

4

    Fred Graves, et al.,     )

5                      )

              Plaintiffs,  )  No.  **CV 77-479-PHX-NVW**

6    vs.                 )

                      )

7    Joseph Arpaio, et al.,   )    **Phoenix, Arizona**

                      )    **August 27, 2013**

8             Defendants.  )      **1:33 p.m.**

9    _____)

10

11

12          BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**

                        **(Scheduling/Status Conference)**

13

14

15

16

17

18

19

20

21    Official Court Reporter:

    Laurie A. Adams, RMR, CRR

22    Sandra Day O'Connor U.S. Courthouse, Suite 312

    401 West Washington Street, SPC 43

23    Phoenix, Arizona 85003-2151

    (602) 322-7256

24

    Proceedings Reported by Stenographic Court Reporter

25    Transcript Prepared by Computer-Aided Transcription

```
                 August 27, 2013 - Scheduling/Status Conference

1              THE COURT:  Yes.

2              MS. IAFRATE:  Last time we had a finite period of time

3    for which we viewed the evidence.  Five years seems

4    overwhelming.

5              THE COURT:  No.  We're not going to have a trial over        13:41:38

6    five years.  We're going to have a trial over the present.  But

7    there's always some window of the past.

8              MS. IAFRATE:  Understood.

9              THE COURT:  When I said five years, I didn't mean to

10   scare anybody, I just meant that we have a history of openness.        13:41:52

11   I haven't had complaints about the information made available.

12   So anyway, I don't have to resolve that now.  But that why we

13   would have an evidentiary hearing, and one way to come at it is

14   to proceed on the assumption that it can be addressed in

15   writing and then I could, after having all that, conclude that        13:42:29

16   I do want to hear some live witnesses.

17             But now, as I told you, I had this on my own track to

18   bring this to completion in January or whenever it was when I

19   ordered you all -- maybe it was later -- to address the

20   recommendations of our consultants, monitors, maybe we don't          13:43:01

21   want to use that word, and to come up with a specific program

22   and timetables to achieve compliance.  So I was on track to do

23   that anyway.

24             So Ms. Iafrate, when you filed this motion, you

25   triggered some statutory time limits.                                 13:43:21
```

UNITED STATES DISTRICT COURT

C E R T I F I C A T E

I, LAURIE A. ADAMS, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 30th day of August, 2013.

s/Laurie A. Adams
Laurie A. Adams, RMR, CRR

UNITED STATES DISTRICT COURT

**EXHIBIT 6**

**EXHIBIT 6**

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

————————————————

| | |
|---|---|
| **Victor Parsons**, et al., on behalf of themselves and all others similarly situated; and **Arizona Center for Disability Law**, | ) ) ) No. **CV 12-00601-PHX-NVW** ) ) ) **Phoenix, Arizona** |
| Plaintiffs, vs. | ) **August 7, 2013** ) **10:00 a.m.** ) |
| **Charles Ryan**, Director, Arizona Department of Corrections; and **Richard Pratt**, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

————————————————

BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**

(*Motion Hearing*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

─────── August 7, 2013 - Motion Hearing ───────

1    get-go.  But we heeded this Court's advise to act reasonably.

2    We did not want to have to fight that in front of you.

3          THE COURT:  I fear that I may have intimidated you all

4    earlier, and I regret that.

5          MR. ACEDO:  Well, we're 41 tours into it.  And that's          10:22:48

6    the past.  But the fact of the matter is there's 12 left.  And

7    none of them are mental health tours.  I believe eight of the

8    12, none of the plaintiffs are there.  Two of the three experts

9    that are touring have already conducted tours at other

10   facilities.  There's no reason for those to happen, none.  As   10:23:06

11   far as the depositions, even if you cut it off at 25, they

12   still have some left.

13         From our view --

14         THE COURT:  What do these depositions -- this issue of

15   the systemic and class challenge here, I have always understood   10:23:28

16   to be aimed at the gross level of provision of services that

17   seem to me to be easily ascertainable from gross data and

18   applying them to industry standards about providing medical

19   care to -- in correction settings.  I have not envisioned that

20   that meant walking through all the prisons asking lots of   10:23:54

21   people questions.

22         I will give you a -- I apologize if this comparison is

23   not fair.  But if you want to know how many people are riding

24   on a bus system you can look at the data at the central

25   management of the bus system, or you can interview lots and   10:24:16

—————————— August 7, 2013 - Motion Hearing ——————————

1   lots of people at the bus stations.  Looks to me like they are

2   interviewing people at the bus stations.  And so I have got

3   serious concerns about how this whole thing is going.

4         MR. ACEDO:  As do we.  As do we, Your Honor.  And

5   that's why we have focused on the tours so much.  And it's      10:24:34

6   baffling in plaintiffs' discovery proposal, they spend most of

7   it complaining that they weren't even broader than they wanted.

8   That's unbelievable.  They essentially provided a list of

9   deposition questions that they didn't get to ask, that we were

10  protecting individuals because -- protecting ourselves because   10:24:54

11  there were no -- this is a Rule 34 deposition.  We had no

12  protection.  They were roving depositions.

13        But that's besides the point.  We agree these expert

14  tours are outrageous, excessive, unduly burdensome.  There's 12

15  left and those can stop.  Those can stop today, right now.      10:25:12

16        THE COURT:  Well, I have come back to the fact that a

17  lot of them have already been done, and I am very reluctant to

18  waste what's been done, even if it was excessive.  I am much

19  more inclined to bring this to closure so that we do not run

20  the risk of a year or two from now having to do this all over    10:25:29

21  again if the Court of Appeals certifies the class

22  certification.  That would be a waste that would be

23  intolerable.

24        So I'm really looking for a way to bring to an end

25  what I fear may be inappropriate discovery so that we have      10:25:49

UNITED STATES DISTRICT COURT

───── August 7, 2013 - Motion Hearing ─────

1    that's not going to be wasted.  Things aren't going to change.

2         THE COURT:  You know, whether it's a year or two years

3    from now, whatever is done now is going to be out of date then.

4    How could I go to trial three years from now on data that's two

5    years old?                                                    10:30:22

6         MR. ACEDO:  One thing we could do, it's the defendants

7    that are going to have to supplement -- that would have to

8    supplement their written discovery responses if that happened.

9    So we would be bearing that burden.  We're asking for the stay

10   now.  We're taking the risk now that this is decertified.  If   10:30:36

11   it's stayed and it's not decertified and it continues as a

12   class action lawsuit, that would be something that would be on

13   our shoulders.  We're not asking -- the plaintiffs are not

14   going to have to come to the table with a lot of discovery.  It

15   largely falls on our shoulders, and it's something we          10:30:54

16   understand.

17        But I think that is something that certainly the

18   parties and the Court can work out if and when that time comes.

19   I don't think it needs to be outrageous.  If we need to

20   re-depose a handful of individuals for one or two hours, we can 10:31:08

21   do that.  We can do it relatively quickly.

22        THE COURT:  By the way, this interlocutory appeal of

23   class certifications is relatively new.  Are there any cases on

24   this about staying this?

25        MR. ACEDO:  No.  I didn't find any, Your Honor.  But   10:31:22

UNITED STATES DISTRICT COURT

August 7, 2013 - Motion Hearing

1  because the defendants are public officials, represent a large

2  institutional client.  And I understand that raises

3  complications about how you handle a case like this.

4      I think I have tried to describe to you my sense of

5  what matters in this case for purposes of the class issues,          11:23:05

6  which is the systemic relief.  And that is, it's the gross

7  data.  I did not understand that I was licensing the plaintiffs

8  to do investigation about anything to sue for anything.  I give

9  a specific list of things that was basically your list.  I have

10  eliminated some things.          11:23:36

11      And if that's what class certification meant, then

12  that's not what I intended to do.  And there may be things that

13  the Department is doing, Ms. Gerlicher, that are wrong.  But if

14  they are not in this lawsuit you have to file a different

15  lawsuit to get to them.  And you don't have this lawsuit as a          11:24:08

16  general inquiry to things to sue them for.  It's not true of

17  any lawsuit.

18      So where do I go with this?

19      MR. ACEDO:  Your Honor, those are pretty strong words,

20  and I think it further supports a stay because, I mean, with          11:24:27

21  that admonition, plaintiffs really need to refocus their case.

22  It's been out of control, and with what you just said and what

23  I believe you are repeating, they are proceeding down this

24  path.  And with a stay, the parties, not just plaintiffs, the

25  parties can take a deep breath, can refocus, can consider what          11:24:47

1

2

3

4

5                    C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 8th day of August,

16   2013.

17

18                         s/Laurie A. Adams

19                         _____
                           Laurie A. Adams, RMR, CRR

20

21

22

23

24

25

**EXHIBIT 7**

**EXHIBIT 7**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

――――――――――

Victor Parsons, et al., on       )
behalf of themselves and all     )
others similarly situated;       )
and Arizona Center for           )
Disability Law,                  )
                                 )
            Plaintiffs,          )     CIV 12-0601-PHX-NVW
                                 )
      vs.                        )     Phoenix, Arizona
                                 )     April 26, 2013
Charles Ryan and Richard         )        2:14 p.m.
Pratt, in their official         )
capacities,                      )
                                 )
            Defendants.          )
                                 )
―――――――――――――――――――――――――――――)


BEFORE:   THE HONORABLE NEIL V. WAKE, JUDGE


REPORTER'S TRANSCRIPT OF PROCEEDINGS

ORAL ARGUMENT


Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1    MS. MITCHELL:  Your Honor, could I just address that
2  point for one minute?
3    THE COURT:  Well, no.  We'll hear from Mr. Medsker in
4  turn.
5    Well, anyway, I want to hear this, but just to tell me
6  there are cheaper ways to do this doesn't answer my question.
7  What are we doing it at all?
8    MR. MEDSKER:  We're doing it at all because as
9  plaintiffs, as prisoner plaintiffs, we're entitled to evidence,
10  and we're entitled to discovery that is reasonably likely to
11  lead to evidence.  And it's our burden here to prove systemwide
12  deliberate indifference that's currently going on and to show
13  that the prison was on notice of that.  And there are
14  e-mails --
15    THE COURT:  But, you know, look, I know a lot more
16  than I ever wanted to know about corrections healthcare.
17    MR. MEDSKER:  Understood.
18    THE COURT:  And whatever else you think, the people
19  who do this know a lot about it, and they usually know when
20  they're in trouble.  And when the level of care is simply
21  resulting in not providing care, long delays, and things that
22  you can establish on a gross level of data, that's all you need
23  to win.
24    And so I'm just wondering what is the value of
25  trolling through all of this to find some well-meaning and

1    perhaps correct physician in the system who said we're not

2    getting enough here.

3            Let's suppose we had that.  Is it worth spending all

4    this time and labor to find that when what will really matter

5    is the systemic data itself as to what resources are being put

6    in rather than looking for the embarrassing e-mail?

7            I can tell you that's what I'm going to care about,

8    about the systemic data.  And I will be aided by expert

9    witnesses who are -- at least whichever ones are believable to

10   me.  That's what's going to matter.

11           So it seems to me that's what ought to be examined

12   rather than -- Well, I am talking freely to help you understand

13   my concerns and to respond to them.

14           MR. MEDSKER:  Of course, Judge Wake.  We are not doing

15   this to harass or embarrass.  We're doing it in our right to

16   find the best evidence of notice.  And we know that it exists

17   because we've seen some of it.

18           THE COURT:  Why not do rifle shot discovery at those

19   people?  You say you already know some of them.  If you have

20   some and you've got great complaining memos that are specific,

21   you've got that.  Why do we have to spend all this time to get

22   a few more?

23           MR. MEDSKER:  Your Honor, this is not rifle shot

24   discovery, respectfully.  We've worked time and time again to

25   narrow this to approximately 36 months of e-mail.  And the

1    reason that it's not working and that it's resulting in so much

2    time and cost is the system they're employing, they can't even

3    modify search terms.  Once they've run the searches, that's

4    what you get.  So even if there was a way for us to narrow it

5    down, the way they're doing it doesn't allow us to find the

6    evidence that these prisoners have a right to to prove their

7    case.

8              THE COURT:  Go ahead.

9              MR. MEDSKER:  Your Honor, what we need today and what

10    the prisoners are entitled to is a way to get forward to a

11    productive path for discovery.  As we cited in our brief,

12    e-mails have been used in prison cases before.  They're

13    contemporaneous.  There's no deposition now that we can take

14    that would get evidence that is as good as e-mails about the

15    level of healthcare at the time.

16              THE COURT:  That makes no sense to me at all.  The

17    evidence that matters about the level of healthcare is going to

18    be the gross evidence about budgeting, staffing, number of

19    people being served.  There are probably data out there that

20    relate to delays or wait times.  Maybe there aren't.  But

21    that's what's going to matter.  And when you get that, if

22    you're right, you'll prove your case.

23              MR. MEDSKER:  And we believe that the e-mails will

24    show that the defendants were on notice that those gross levels

25    existed.

1      But I don't think it's accurate to say they've

2  produced all of the electronic e-mails on those.

3      THE COURT:  Well, this seventh joint discovery dispute

4  is a very high level abstraction and a claim of entitlement and

5  objection to expansive electronic discovery.  That's not what

6  you just said here.

7      I'm going to think out loud for a minute.  I'm not

8  disposed to grant the broad electronic discovery that you

9  claim.  Even as you've narrowed it, it appears to me to be

10  burdensome and overbroad, and there are likely to be better and

11  more focused ways to get it than requiring expansive searches

12  of e-mails involving -- that obviously are going to involve

13  people who are dealing with the entire administration of the

14  Department of Corrections.  So I'm not disposed to grant that.

15      And I am, again, I see this case -- and I will repeat

16  myself hopefully briefly, only briefly -- I see this case as

17  not turning on some smoking gun e-mail where somebody admits

18  something or complains about something.

19      I see this case turning on the gross data about the

20  level of care and how that relates to the population being

21  served, the demands being made.

22      Of course it's going -- You're going to have to prove

23  up the case with respect to your named plaintiffs about their

24  conditions, their needs, levels of care that relate to them,

25  and how those levels of care follow below the constitutional

1    minimums for them in a way that's probable.

2            And if in fact the gross data show a poor level of

3    care but not one falling to the depth of an Eighth Amendment

4    violation, it's not going to matter that anybody complained and

5    anybody sent angry e-mails telling them that were so.  That's

6    just not going to matter.

7            And if you do prove that, you're not going to need

8    that to prove your case either.

9            So I'm disposed to not impose great burdens on the

10   defendants on this e-mail search and to leave you to mining the

11   vein of gold that is there, their level of actual care, and

12   getting what you hope will be credible, persuasive expert

13   witnesses the data that they need to offer their opinions.

14           Now, with that said, obviously this Wexford contract

15   is particularly significant.  I'm hearing the defendants say

16   they've already given you all of that.  By the way, when we're

17   dealing with large amounts of data production, it doesn't have

18   to be perfect.  It cannot be perfect.  But if you've done

19   diligent effort, a large volume, and you've got most of the

20   stuff, that's all that life requires.  The Rules of Civil

21   Procedure don't require any more than life.

22           Now, you know, there are issues about the key decision

23   makers.  If there's some focused way to get at that without

24   this gross review of all the business they've done for whatever

25   period of months, I'm open to you all exploring that in a

41

C E R T I F I C A T E

I, LINDA SCHROEDER, do hereby certify that I am duly appointed and qualified to act as Official Court Reporter for the United States District Court for the District of Arizona.

I FURTHER CERTIFY that the foregoing pages constitute a full, true, and accurate transcript of all of that portion of the proceedings contained herein, had in the above-entitled cause on the date specified therein, and that said transcript was prepared under my direction and control.

DATED at Phoenix, Arizona, this 7th day of May, 2013.


s/Linda Schroeder
Linda Schroeder, RDR, CRR

UNITED STATES DISTRICT COURT

**EXHIBIT 8**

**EXHIBIT 8**

**In the Matter Of:**

PARSONS vs. RYAN

CV 12-00601-PHX-NVW

**WILLIAM SMALLWOOD**

*August 20, 2013*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1              UNITED STATES DISTRICT COURT
                        for the
 2              Eastern District of Virginia
       ------------------------------:
 3     VICTOR PARSONS, et al.,        :
                                      :
 4                    Plaintiff,      :
            vs.                       :Civil Action No.:
 5                                    :CV 12-00601-PHX-NVW
       CHARLES RYAN and RICHARD PRATT,:(MEA)
 6                                    :
                      Defendant.      :
 7     ------------------------------:

 8                                  McLean, Virginia
                            Thursday, August 20, 2013

 9

10     Deposition of:

11                  WILLIAM SMALLWOOD,

12     called for oral examination by counsel for

13     Plaintiff, pursuant to notice, at the office of The

14     Sack Law Firm, 8270 Greensboro Drive, Suite 810,

15     McLean, Virginia, before Michelle Taylor, of Esquire

16     Deposition Solutions, a Notary Public in and for the

17     Commonwealth of Virginia, beginning at 10:08 a.m.,

18     when were present on behalf of the respective parties:

19

20

21

22
```



1    regularly communicate with Smallwood employees in

2    Arizona?

3        A    Our director of operations Rhonda Jessop

4    and/or director of administration Cathy Ellington.

5        Q    Why does Ms. Jessop communicate with

6    Smallwood employees in Arizona?

7            MR. MERVIS:  I'm going to object, Amelia.

8    And your questions, again are so broad.  Which topic

9    is this relating to under the subpoena?

10           MS. GERLICHER:  This is a 30(b)(6) deposition

11   and I need to know who he is, and what he does, and

12   what his employees do so that I can understand his

13   testimony.

14           MR. MERVIS:  No, I disagree.  Its a 30(b)(6)

15   deposition limited to the topics that are designated

16   under the amended subpoena.  And I'm asking which

17   topic this pertains to.

18           MS. GERLICHER:  The relationship with Corizon

19   and the relationship with ADC.

20           MR. MERVIS:  And you just asked him about his

21   employees talking to each other.

22           MS. GERLICHER:  No, I asked, them talking to



1          MR. MERVIS:  You mean extractions that don't

2     need to be made, can they do them then?  I don't

3     understand the question.  Really I don't understand

4     the line of questioning.

5          MS. GERLICHER:  If the witness doesn't

6     understand he can ask me to clarify.

7          MR. MERVIS:  Well, I mean is this part of the

8     case that someone is not doing extractions when they

9     come in for urgent care?

10         MS. GERLICHER:  If the witness doesn't

11    understand the question, he can ask me to clarify.

12         THE WITNESS:  The patient comes in needs

13    urgent care, needs an extraction we'll take that tooth

14    out.  If there's time available and any other teeth

15    need taken out we'll try to address that at that time

16    as well.  If not they'll send out a HNR.

17    BY MS. GERLICHER:

18    Q    Thank you.  If an inmate has a HNR in the

19    system for routine care and they're brought in for

20    urgent care, what happens to the routine care HNR?

21         MS. WIENEKE:  Object to the form.

22    Foundation.  Calls for speculation.



1          MR. MERVIS:  Join the objection.

2          THE WITNESS:  We will take care of the

3    emergent care and leave the patient on for routine

4    care with the same his or her day of request to insure

5    we're treating the patients.

6    BY MS. GERLICHER:

7    Q    I have to say that I was told something

8    differently.  Every time I visited a dental clinic.

9          So you're saying that a HNR -- if a patient

10   has HNR one complaining of routine care, and they come

11   into the dental clinic on some other issue, they stay

12   on the routine care list?

13         MS. WIENEKE:  Let me just object to the

14   editorial which is why we objected to the expert

15   (inaudible) process and specifically said these were

16   not walking depositions.  And plaintiffs agreed that

17   there were no A01D to admissions that were resulting

18   from the deposition -- I mean, I'm sorry the expert

19   (inaudible).

20         MS. GERLICHER:  That's why I'm talking pains

21   to be clear during this deposition.

22         MS. WIENEKE:  Well, I'm objecting to your



```
 1   editorial process in the way that you asked the

 2   question.  The witness has answered the question.

 3          THE WITNESS:  Let me recap.  Routine policy

 4   is to take them off.

 5   BY MS. GERLICHER:

 6      Q   Okay.

 7      A   We try to emphasize to staff.  If our wait

 8   time is under control, we're under three months, let's

 9   go the extra effort and leave the patient on the list.

10   The clinician has the right to take him off that list.

11      Q   Okay.  So you're saying your routine policy

12   is to take them off?

13      A   And they will resubmit another request.

14      Q   And is that up to the dentist's discretion

15   whether or not to do that?

16      A   Yes, and the majority of dentists will leave

17   them on the list.

18      Q   And do you track whether that is being done

19   or not?

20      A   No.

21      Q   And how do you know that's being done?

22      A   Communications with staff.
```



WILLIAM SMALLWOOD                                    August 20, 2013
PARSONS vs. RYAN                                              283

1              CERTIFICATE OF NOTARY PUBLIC

2     I, Michelle Taylor, the officer before whom the

3     foregoing deposition was taken, do hereby certify that

4     the witness whose testimony appears in the foregoing

5     deposition was duly sworn by me; that the testimony of

6     said witness was taken by me in stenotype and

7     thereafter reduced to typewriting under my direction;

8     that the said deposition is a true record of the

9     testimony given by said witness; that I am neither

10    counsel for, related to, nor employed by any of the

11    parties to the action in which this deposition was

12    taken; and further, that I am not a relative or

13    employee of any counsel or attorney employed by the

14    parties hereto, nor financially or otherwise

15    interested in the outcome of this action.

16
                                *Michelle Taylor*
17                   _____

18                        Michelle Taylor
                     Notary Public in and for the
                        Commonwealth of Virginia
19

20    My commission expires:

21    August 31, 2016

22    Notary Registration No.: 7515446



800.211.DEPO (3376)
EsquireSolutions.com

1    A C K N O W L E D G E M E N T   O F   D E P O N E N T

2

3

4    I, WILLIAM SMALLWOOD, do hereby acknowledge I

5    have read and examined the foregoing pages of

6    testimony, and the same is a true, correct and

7    complete transcription of the testimony given by me,

8    and any changes or corrections, if any, appear in

9    the attached errata sheet signed by me.

10

11

12

13

14

15

16

17

18

19

20   _____          _____
     DATE                      WILLIAM SMALLWOOD

21

22



EXHIBIT 9

EXHIBIT 9

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV12-00601-PHX-NVW (MEA) |
| Plaintiffs, | CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER |
| vs. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | 30(b)(6) DEPOSITION OF CORIZON, INC. |
| Defendants. | Continuation of Docket No. 680 |

WINFRED D. WILLIAMS, MD

(Topics 4 and 6)

October 10, 2013
8:59 a.m.
Phoenix, Arizona


Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

Prepared by:
602.266.6535                    Carolyn T. Sullivan, RPR
www.glennie-reporting.com       Arizona CR No. 50528

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 73

1    4th, 2013, was that adequate chronic care system?

2              MR. CONLON:  Form, foundation.

3              MR. BOJANOWSKI:  Join.

4              THE WITNESS:  I can't say.  I can't say.

5         Q.    BY MS. KENDRICK:  But Corizon and you have

6    decided to make all these improvements to the chronic

7    care system?

8         A.    We want to know what's out there, yes.  And

9    that's what we're doing, is trying to identify what's out

10   there so we can manage these patients.

11        Q.    But would you put all these improvements in

12   place if it was a 100 percent functioning system?

13             MR. CONLON:  Form, foundation.

14             MR. BOJANOWSKI:  Form, foundation.

15             THE WITNESS:  We're implementing a Corizon

16   system, which this state doesn't have a Corizon system.

17        Q.    BY MS. KENDRICK:  And the Corizon system and

18   policies that are in place, are they designed to bring

19   correctional health care systems into compliance with

20   standards and guidelines from groups such as NCCHC?

21             MR. BOJANOWSKI:  Form.

22             THE WITNESS:  Yes.

23        Q.    BY MS. KENDRICK:  So you're currently in the

24   process of bringing Arizona up to the NCCHC standards?

25             MR. BOJANOWSKI:  Form.

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 74

1              MR. CONLON:  Form, foundation.

2      Q.    BY MS. KENDRICK:  In the Corizon system?

3              MR. BOJANOWSKI:  Same objection.

4              MR. CONLON:  Join.

5      Q.    BY MS. KENDRICK:  You can answer.

6      A.    It is our expectation that we meet NCCHC

7   standards across the board with Corizon.

8      Q.    Corizon meets the standards.  I'm talking about

9   the Arizona system that you've been hired to run and in

10  some cases fix, improve, what have you.  Is putting the

11  Corizon system in place in Arizona part of bringing up

12  the standard of care?

13             MR. BOJANOWSKI:  Well, form.  This is

14  outside the scope of the notice.

15             MR. CONLON:  So your question goes to

16  whether Corizon's services are intended to upgrade

17  service?  That's what you're saying?

18             MS. KENDRICK:  He's been talking for going

19  on two hours about Corizon's standards, Corizon programs,

20  Corizon databases, all these things that they're

21  implementing, putting in place.  And so I'm trying to

22  find out if, as part of putting in the Corizon system, in

23  this case as applied to chronic care, if that's bringing

24  the system up to the standard of care.

25             MR. BOJANOWSKI:  Well, the problem is you're

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 75

1    making the assumption it wasn't up to the standard of

2    care in the first place.  And you're asking him if this

3    is going to be a situation where NCCHC standards are now

4    going to be put in place when they are already in place.

5    So that's outside the scope of this guy's depo.

6              MS. KENDRICK:  I'm trying to find out if the

7    standard of care was adequate based on Corizon's

8    performance and --

9              MR. BOJANOWSKI:  He was not noticed as an

10   expert witness to determine what the standard of care

11   existed prior to Corizon taking over the contract and

12   then making an analysis with regard to what it is now as

13   compared to that.  That's not within the scope of this

14   notice.

15             MR. CONLON:  That's true.

16   Q.    BY MS. KENDRICK:  Dr. Williams, you went to

17   medical school, correct?

18   A.    Correct.

19   Q.    And as part of that, you learned about

20   community guidelines for care?

21   A.    Correct.

22   Q.    And the Corizon standards and policies are

23   based upon the community guidelines of care for whatever

24   medical condition we're talking about?

25             MR. BOJANOWSKI:  Form.  Outside the scope.

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 76

1           MR. CONLON:  Here we go again.

2           MS. KENDRICK:  Okay.

3      Q.    BY MS. KENDRICK:  If you were running a

4   hospital in the community and 57 of the 87 chronic care

5   patients had not been seen as required by their treatment

6   plan, would that meet the community standard of medical

7   care for prisoners with chronic conditions?

8           MR. CONLON:  Form, foundation, outside the

9   scope.

10          Do not answer.

11          MS. KENDRICK:  Are you going to instruct him

12  not to answer?

13          MR. CONLON:  Yes, I am.

14          MS. KENDRICK:  I don't understand because it

15  says the provision of chronic care.  So part of the

16  provision of chronic care is providing chronic care that

17  is up to community standards.  And I'm asking him to tell

18  me if the chronic care system is up to community

19  standards.

20          MR. BOJANOWSKI:  That's an expert opinion

21  that you're asking him to render, not --

22          MS. KENDRICK:  He's a medical doctor who

23  learned about the community guidelines and standards of

24  care.

25          MR. BOJANOWSKI:  I understand, Corene, but

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 77

1    that's not the scope of this.  This is a factual

2    determination.

3               MR. CONLON:  It's a 30(b)(6).

4               MS. KENDRICK:  It's not a basis to instruct

5    him not to answer.  What's your basis?

6               MR. CONLON:  Outside the scope.  He's a

7    30(b)(6) witness.  He's not an expert witness.

8               MR. BOJANOWSKI:  You designated him in a

9    certain way to testify to a topic.  Now you're going --

10              MS. KENDRICK:  We didn't designate how he

11   came up with the definitions.  And the definition was the

12   provision of chronic care.  And at issue in this case is

13   whether ADC prisoners are receiving adequate chronic care

14   up to the standards of care.

15              MR. CONLON:  What you did was you noticed a

16   30(b)(6) deposition.  He's a designee, he's not an

17   expert.  And there's been no one who's been presented in

18   the guise of an expert for 30(b)(6).  That's not the

19   scope of his testimony.

20       Q.    BY MS. KENDRICK:  Are you familiar with Corizon

21   policies and standards?

22       A.    Yes.

23       Q.    Did the chronic care system that you

24   experienced when you came to work here, did it meet

25   Corizon's standards and policies?  It's a yes-or-no

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 78

1    question.

2                 MR. BOJANOWSKI:  Same objection.

3                 MR. CONLON:  Form, foundation.

4                 MS. KENDRICK:  He said he was trained by

5    Corizon.  He's a medical doctor.  He knows the Corizon

6    systems.  He's overseeing the implementation of Corizon

7    systems.  I'm just trying to ask him yes or no whether

8    the system that he walked into on March 4th, 2013, met

9    Corizon's standards.

10                MR. CONLON:  Here is No. 4 again on the

11   subpoena:  The provision of specialty care, chronic care,

12   and emergency care, health care services to prisoners.

13   His topic is limited to those areas of care.

14                Let's see.  Let's go down.  This topic

15   includes the scope of care that Corizon is able to

16   provide and the areas.

17                There's nothing here that talks about making

18   a comparative analysis of what happened when he showed up

19   versus what he's going.

20                MS. KENDRICK:  Scope of care includes

21   whether or not the care is adequate.

22                MR. CONLON:  But that wasn't your question.

23   That's not been your question.

24                MS. KENDRICK:  What are you saying that's

25   not been my question.  That's been my question the whole

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 79

```
 1    time.
 2                MR. CONLON:  You've been asking about what
 3    was it like when you got here.
 4                MR. BOJANOWSKI:  Your question is, did the
 5    care that he walked into meet the standard of care either
 6    that he expected from a community basis or the standard
 7    of care that is set forth in Corizon policies and
 8    procedures.
 9                MS. KENDRICK:  How is that question out of
10    the scope?
11                MR. BOJANOWSKI:  That is nowhere within the
12    scope of this.  That's asking him to sit there and say,
13    I'm going to make an expert judgment based upon what I
14    saw --
15                MS. KENDRICK:  I'm not asking him to make an
16    expert judgment.  He was designated by Corizon as the
17    person most knowledgeable to speak on Corizon's
18    procedures, including about these topics.  So I'm asking
19    him a very simple question.  He knows the policies.  He's
20    been trained on them.  He's worked for Corizon for years.
21    He is qualified I think in the eyes of Corizon because
22    Corizon said he is qualified to answer questions.  I am
23    asking him a very simple question.  Did the system meet
24    the standard of Corizon's policies when he came in.
25                MR. BOJANOWSKI:  There's nowhere in this
```

Parsons v. Ryan
30(b)(6)  Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 80

1   notice that tells him that he's to testify as to Corizon

2   policies and anybody meeting those policies.

3          MS. KENDRICK:  And the other thing is, you

4   need to flip the page to No. 6 that says the quality

5   assurance relating to any of the above-listed topics and

6   Corizon's implementation of any policies and procedures

7   related to any of the above-listed topics.

8          I may need to defer to Mr. Gray here because

9   he did all the negotiations over the definitions.  But my

10  understanding from reading the emails was that we could

11  ask questions related to topic 6 of both Dr. Williams and

12  Ms. Bybee.

13         MR. BOJANOWSKI:  And you're asking him a

14  question outside of what quality assurance is for the

15  provision of health care that he's facing.

16         MS. KENDRICK:  What's your basis for saying

17  that's outside of the quality assurance?

18         MR. BOJANOWSKI:  Because you're asking him

19  to analyze the quality of care that was provided by

20  somebody who he's not employed with, he never worked

21  with, he never analyzed.  There's no foundation that he

22  has looked at documents with regard to what Wexford

23  provided.  And you're asking him now --

24         MS. KENDRICK:  So I'll rephrase the

25  question, Tim.

Parsons v. Ryan
30(b)(6)   Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 81

1      Q.     BY MS. KENDRICK:  Does the current as of today
2   standard of care chronic care provided at the ADC
3   prisons, does it meet Corizon's standards currently
4   today?
5      A.     The patients that we're seeing, we're
6   treating --
7             MR. BOJANOWSKI:  Same objection.  Except I'm
8   not making the scope objection.
9      Q.     BY MS. KENDRICK:  You can answer.
10     A.     The patients that we're seeing, we're treating
11  to Corizon's expectations.
12     Q.     But the -- so you're saying yes, what we're
13  seeing today meets all of Corizon's standards of care?
14             MR. BOJANOWSKI:  Same objection.
15             Go ahead.
16             MR. CONLON:  Join.  Go ahead.
17             THE WITNESS:  What are you referring to
18  specifically when you say yes, am I saying yes?
19     Q.     BY MS. KENDRICK:  So I've just shown you
20  several examples of your client and your client's
21  monitors pointing out areas where they feel that
22  Corizon's performance in delivering chronic care is
23  deficient.  And so given these deficiencies and others,
24  do you think that the delivery of chronic care is meeting
25  Corizon's standards?

Parsons v. Ryan
30(b)(6)  Deposition of Winfred D. Williams, M.D. - 10/10/2013

Page 144

1                    SIGNATURE PAGE

2          I, WINFRED D. WILLIAMS, MD, a deponent
exercising my right to read and sign my deposition taken
3   on October 10, 2013, place my signature hereon and make
the following changes on this          day of          ,
4   2013.

5          (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

7                              WINFRED D. WILLIAMS, MD

8   PAGE  LINE   READS        CHANGE TO         REASON

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz;
Dustin Brislan; Sonia Rodriguez; Christina Verduzco;
Jackie Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph Hefner;
Joshua Polson; and Charlotte Wells, on behalf of
themselves and all others similarly situated; and
Arizona Center for Disability Law,

No.:
CV12-00601-PHX-NVW (MEA)

Plaintiffs,

AFFIDAVIT OF NONSIGNATURE

vs.

Charles Ryan, Director, Arizona Department of
Corrections; and Richard Pratt, Interim Division
Director, Division of Health Services, Arizona
Department of Corrections, in their official capacities,

Defendants.

     **Carolyn T. Sullivan, RPR,** Certified Court Reporter No. 50528, being first duly sworn upon her oath deposes and says as follows:

     1.  That the foregoing deposition of **Confidential Subject to Protective Order 30(b)(6) Arizona Department of Corizon, Inc. Continuation of Docket No. 680 Winfred D. Williams, MD (Topics 4 and 6)** was taken before me on October 10, 2013;

     2.  That the signature of the deponent was not waived;

     3.  That on October 28, 2013 I sent the original signature page and a copy of the deposition transcript to J. Scott Conlon, Attorney at Law, so that the deposition could be read, corrections made, and the signature page signed and returned to me for attachment to the original transcript;

     4.  Signature page and corrections sheet were due on December 10, 2013;

     5.  That as of close of business on December 10, 2013, I had not received the signature page nor a list of desired changes to the deposition; and

     6.  That I sign said deposition and make this affidavit.

     DATED at Phoenix, Arizona, this 10 day of December , 2013.

Court Reporter

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
30(b)(6) CORIZON (Winfred D. Williams, MD) - 10/10/13

1    STATE OF ARIZONA    )
                          )
2    COUNTY OF MARICOPA )

3

4              I, CAROLYN T. SULLIVAN, a Certified

5    Reporter, Certificate No. 50528, in the State of Arizona,

6    do hereby certify that the foregoing witness was duly

7    sworn to tell the whole truth; that the foregoing pages

8    constitute a full, true, and accurate transcript of all

9    proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14              I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18              WITNESS my hand this 25th day of October,

19   2013.

20

21                        Carolyn T. Sullivan, RPR

22                        Arizona Certified
                          Reporter No. 50528

23

24

25

**EXHIBIT 10**

**EXHIBIT 10**

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;      )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;    )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of   )
themselves and all others similarly )
situated; and Arizona Center for    )
Disability Law,                     )
                                    )
         Plaintiffs,                )
     vs.                            )
                                    )
Charles Ryan, Director, Arizona     )
Department of Corrections; and      )
Richard Pratt, Interim Division     )
Director, Division of Health        )
Services, Arizona Department of     )
Corrections, in their official      )
capacities,                         )
                                    )
         Defendants.                )
                                    )

DAVID W. ROBERTSON, DO
August 26, 2013
9:18 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

Page 69

1              MR. BOJANOWSKI:  Form, foundation.

2              THE WITNESS:  Repeat the question.

3       Q.     BY MS. KENDRICK:  Were you ever told by anybody

4   else that the Monitoring Bureau needed to focus on

5   bringing down Wexford?

6              MR. BOJANOWSKI:  Same objection.

7              THE WITNESS:  No.

8              (Exhibit 167 was marked.)

9       Q.     BY MS. KENDRICK:  I'm handing you Exhibit 167.

10  It's a PowerPoint from Wexford Health Sources, Inc.  On

11  page 1, it refers to a meeting with the Arizona

12  Governor's Office on November 8th, 2012.  Were you at

13  that meeting?

14      A.     No.

15      Q.     On page 4, it's Wexford 004, it says:  Meeting

16  with the Arizona Department of Corrections, November 7th,

17  2012.  Were you at that meeting?

18      A.     No.

19      Q.     Have you ever seen this PowerPoint before?

20      A.     No.

21      Q.     Can you please turn to Wexford 21.

22      A.     I have it.

23      Q.     Okay.  And it says:  The delivery of

24  constitutionally mandated correctional health care

25  requires several basic concepts.  And it goes on to list

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

Page 70

1    four.  Would you agree these are necessary elements to

2    deliver --

3                MR. BOJANOWSKI:  Form, foundation.  You're

4    asking him to render an expert opinion.  He's not

5    designated as an expert, and you're asking him questions

6    that --

7                MS. KENDRICK:  Tim --

8                MR. BOJANOWSKI:  -- clearly are out of the

9    bounds.

10               MS. KENDRICK:  Your co-counsel has

11   stipulated that all objections will be limited to form of

12   the question.

13               MR. BOJANOWSKI:  I understand.  Go ahead.

14               MS. KENDRICK:  And 57 objections in 30

15   minutes is getting absurd and sanctionable.

16               MR. BOJANOWSKI:  They have a good basis,

17   this is just one example of it, but go ahead and ask your

18   question.

19               MS. KENDRICK:  Would you object like that in

20   court in front of Judge Wake and I were cross-examining

21   your witness?

22               MR. BOJANOWSKI:  Go ahead and ask your

23   question.  You've got seven hours.

24        Q.    BY MS. KENDRICK:  Based on your experience

25   working in correctional health care and being a physician

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

Page 71

1  supervisor and monitoring the clinical practice of

2  medical care, do you think these elements are important

3  to provide quality, adequate medical care to prisoners?

4         MR. BOJANOWSKI:  Form, foundation.

5         THE WITNESS:  Yes.

6     Q.    BY MS. KENDRICK:  Their next bullet point

7  says:  The ADC system had none of these components

8  functioning correctly prior to privatization.  Do you

9  agree with that?

10         MR. BOJANOWSKI:  Form, foundation.

11         THE WITNESS:  No.

12     Q.    BY MS. KENDRICK:  Which parts do you disagree

13  with?

14         MR. BOJANOWSKI:  Same objection.

15         THE WITNESS:  Which -- I'm sorry.

16     Q.    BY MS. KENDRICK:  They say the system had none

17  of these.  You say you disagree with that conclusion that

18  they made.  Do you think the Department had all four of

19  these elements working?

20         MR. BOJANOWSKI:  Form, foundation.

21     Q.    BY MS. KENDRICK:  Two, three?

22     A.    I disagree with that statement that the ADC had

23  none of them in place.  That's so absolute.  We did have

24  sound clinical practices.  We did have workflows.  We did

25  cooperate.  We had understanding.  I disagree with the

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

Page 72

1    statement.

2         Q.    Okay.  You think they were all functioning

3    correctly?

4              MR. BOJANOWSKI:  Form, foundation.

5              THE WITNESS:  They were functioning.

6              (Exhibit 168 was marked.)

7         Q.    BY MS. KENDRICK:  So the document that I gave

8    you is from Corizon.  It's their Supplemental Proposal

9    for the Provision of Inmate Correctional Health Services

10   dated December 21, 2012, Bates stamped ADC-PROC-10933.

11             Have you ever seen this document before?

12        A.    No.

13        Q.    And the first page inside it refers to a

14   meeting between Corizon and ADC officials to discuss

15   medical care on December 6.  Were you at that meeting?

16        A.    No.

17        Q.    Did you attend any meetings with Corizon staff

18   about them taking over in December?

19        A.    No.

20        Q.    How about in January?

21        A.    When did they take over?

22        Q.    They took over for Wexford.

23        A.    No.  Not prior.

24        Q.    So not until -- they started on March 4th,

25   right?

DAVID W. ROBERTSON, DO - 8/26/13

1                    SIGNATURE PAGE

2          I, DAVID W. ROBERTSON, DO, a deponent exercising
my right to read and sign my deposition taken on August
3  26, 2013, place my signature hereon and make the
following changes on this _10th_ day of _OCTOBER_,
4  2013.

5      (IF THERE ARE NO CHANGES, WRITE "NONE.")

6

7    _NONE_                         David W. Robertson D.O.
                                    DAVID W. ROBERTSON, DO

8  PAGE   LINE     READS        CHANGE TO           REASON

9  ___   ___    _____    _____    _____

10 ___   ___    _____    _____    _____

11 ___   ___    _____    _____    _____

12 ___   ___    _____    _____    _____

13 ___   ___    _____    _____    _____

14 ___   ___    _____    _____    _____

15 ___   ___    _____    _____    _____

16 ___   ___    _____    _____    _____

17 ___   ___    _____    _____    _____

18 ___   ___    _____    _____    _____

19 ___   ___    _____    _____    _____

20 ___   ___    _____    _____    _____

21 ___   ___    _____    _____    _____

22 ___   ___    _____    _____    _____

23 ___   ___    _____    _____    _____

24 ___   ___    _____    _____    _____

25 ___   ___    _____    _____    _____

198

DAVID W. ROBERTSON, DO - 8/26/13

```
 1    STATE OF ARIZONA    )
                          )
 2    COUNTY OF MARICOPA )

 3

 4             I, CAROLYN T. SULLIVAN, a Certified

 5    Reporter, Certificate No. 50528, in the State of Arizona,

 6    do hereby certify that the foregoing witness was duly

 7    sworn to tell the whole truth; that the foregoing pages

 8    constitute a full, true, and accurate transcript of all

 9    proceedings had in the foregoing matter, all done to the

10    best of my skill and ability.  Pursuant to request,

11    notification was provided that the deposition is

12    available for review and signature.

13

14             I FURTHER CERTIFY that I am not related to

15    nor employed by any of the parties hereto, and have no

16    interest in the outcome.

17

18             WITNESS my hand this 5th day of September,

19    2013.

20

21                        Carolyn T. Sullivan, RPR
22                        Arizona Certified
                          Reporter No. 50528
23

24

25
```