Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
         jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
         avarma@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO STRIKE DEFENDANTS' EXPERTS AND EXPERT REPORTS** |

78204-0001/LEGAL29411988.1

## Introduction

Equal access to the evidence on which this case will be tried is a cornerstone of due process and fundamental fairness. *See Ferguson v. DeStefano*, 2010 WL 4810825, at *1 (S.D. Fla. Sept. 2, 2010) (In ruling on summary judgment motion, "the court must seriously consider whether the parties have had equal access to evidence relevant to the motion"). But Defendants, disregarding the discovery cutoff of September 27, 2013 established by the Court, are relying on evidence well past this date and boldly proclaim their intent to try this case on the conditions that will exist more than a year past the cutoff date, while denying Plaintiffs access to documents and institutions to rebut that evidence. They have also disclosed 14 expert witnesses while refusing to provide the required expert reports or (with one exception) produce the experts for deposition. These tactics, coupled with Defendants' virtual monopoly on the relevant evidence, have created an intolerable asymmetry that, unless remedied by the Court, will make a fair trial impossible.

Defendants trumpet the volume of documents they have produced, but the number of pages is utterly beside the point. The fundamental problem is that Defendants are selectively producing *only what they choose to produce,* while Plaintiffs have no access to other probative documents, prison staff, or medical records. [*See* Def. Br. (Doc. 794) at 5 ("Defendants will be supplementing their disclosures and discovery responses up until trial to include any evidence *Defendants plan to introduce or reference at trial*") (emphasis added)]

If Defendants elect not to produce documents on a given issue, Plaintiffs—and the Court—are left entirely in the dark. Thus, for example, while Defendants' expert confidently proclaims that ADC's suicide prevention practices "are within generally accepted standards," relying on information that post-dates the September 27, 2013 discovery cutoff [Specter Decl., Jan. 27, 2014 (Doc. 754-1), Ex. 4 at 68-75], Plaintiffs have no access to any information about the three suicides of class members that have

occurred since that date beyond the press releases on ADC's website. [*See* Declaration of David Fathi ("Fathi Decl.") filed herewith, Exs. 1-3][1]

## I. THE COURT HAS THE POWER TO ESTABLISH A CUT-OFF DATE FOR EVIDENCE AT TRIAL.

As a remedy for this radical imbalance in access to evidence, Plaintiffs asked that the Court order that the trial of this case be based on conditions as they existed on September 27, 2013. [Pl. Br. (Doc. 753) at 8] Defendants object, wrongly asserting that the Prison Litigation Reform Act (PLRA) requires evidence of a "current and ongoing"

---

[1] In their opposition brief, Defendants do not dispute that they have refused to produce medical records reviewed and relied upon by Dr. Penn. [*See* Def. Br. at 7 n.7; Specter Decl., Jan. 27, 2014 (Doc. 754-1), Ex. 4 at 5-6 (listing records)] Defendants' statement that Plaintiffs have never requested these records is false. [*See* Specter Decl. (Doc. 754-1), Ex. 7 at 1 ("we request that [these documents] be produced to us no later than January 22, 2014"), *id.* at 7 (listing medical records reviewed by Dr. Penn); Ex. 9 at 2 ("please let us know when Defendants will produce these documents")] Thus, while Dr. Penn is able to examine the records reviewed by Plaintiffs' expert Dr. Stewart and dispute his conclusions [*see* Specter Decl. (Doc. 754-1), Ex. 4 at 35], Plaintiffs are deprived of an equivalent opportunity. Defendants also assert that "Plaintiffs have come up with only one example of documents they claim Defendants have refused to produce." [Def. Br. at 7 n.7], while ignoring the numerous examples detailed at pages 4-6 and Appendix 1 (Doc. 753-1) of Plaintiffs' Motion.

Today Defendants informed Plaintiffs' counsel that they would produce all of the medical files reviewed by Drs. Penn and Mendel [Fathi Decl. ¶ 8]; however, this belated offer, coming two months after such production is due, will not negate the prejudice to Plaintiffs since it is unlikely that the records will be produced in a manner that will make them useful for the depositions of Drs. Penn and Mendel.

Finally, Defendants allege that "Plaintiffs' own experts did not generally produce the documents they reference in their expert reports simultaneous with the service of such reports which lead [sic] to Defendants seeking discovery of them pursuant to Fed. R. Civ. P. 45 (Doc. 749)." [Def. Br. at 7] This is yet another example of the asymmetrical access to information in this case. Almost without exception, Plaintiffs' experts relied upon documents in ADC's custody prisoners' medical files that Plaintiffs' experts reviewed on site with Defendants' counsel sitting at the same table documenting which files were reviewed; deposition transcripts; or documents that were previously produced by the Defendants. Plaintiffs' expert reports list the Bates numbers of the previously-produced documents, and the names of all prisoners whose medical files were reviewed, both in the text of their reports and in the appendices. It would be inefficient and wasteful for Plaintiffs to produce back to Defendants documents in ADC's possession. The previously unproduced documents from Plaintiffs' experts are things such as billing records, transcripts of past testimony or copies of past expert reports, and academic studies. On the other hand, the documents relied upon by Defendants' experts—the vast majority of which post-date September 27, 2013—are in the possession of Defendants. Moreover, Defendants' counsel did not identify the names of all prisoners whose medical records were reviewed by their medical expert, Dr. Mendel, until January 23, 2014. [Specter Decl. (Doc. 754-1), Ex. 10 at 9]

violation in order to support injunctive relief. That language appears in 18 U.S.C. § 3626(b)(3), which governs motions to terminate existing injunctive relief. There is no such language in § 3626(a)(1)(A), which governs the initial grant of injunctive relief, and the omission is presumed to represent a deliberate choice by Congress. *See Barnhart v. Sigmon Coal Co.,* 534 U.S. 438, 452 (2002) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (internal quotation marks omitted); *Thomas v. Bryant*, 614 F.3d 1288, 1320 (11th Cir. 2010) ("current and ongoing violation" requirement does not apply to initial grant of injunctive relief); *Austin v. Wilkinson,* 372 F.3d 346, 360 (6th Cir. 2004) (same), *aff'd in part and rev'd in part on other grounds*, 545 U.S. 209 (2005). The cases cited by Defendants,[2] *Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002), and *Gilmore v. California*, 220 F.3d 987 (9th Cir. 2000), involved termination motions to which the "current and ongoing violation" requirement applied; this case does not.[3]

In *Brown v. Plata*, the Supreme Court rejected the State of California's argument that a three judge panel "did not allow it to present evidence of current prison conditions"

---

[2] On February 12, 2014, the day after the deadline for Defendants' opposition brief, they filed a Notice of Supplemental Authority (Doc. 795) because "they inadvertently failed to include" two legal citations in their brief. Normally, notices of supplemental authority are reserved for "pertinent and significant authorities [that] come to a party's attention after the party's brief has been filed," [Fed. R. App. P. 28(j)], and "[t]here are obvious dangers in sending the court a letter citing authorities that were in existence but that counsel failed to include in the brief . . . often 'it is simply tardy research that is responsible for these late citations. Submitting cases at the last minute that should have been in the brief is a sign of sloppy lawyering.'" 16AA Fed. Prac. & Proc. Juris. § 3974.6, n.11 (4th ed. April 2013) (*quoting* Aldisert, WINNING ON APPEAL: BETTER BRIEFS & ORAL ARGUMENT, 2D ED. 2003 at 331).

In any event, the two cases cited, *Snow v. McDaniel*, 681 F.3d 978 (9th Cir. 2012), and *Farmer v. Brennan*, 511 U.S. 825 (1994), were both predicated on the proposition that if any supplemental information closer to the time of trial were to be used as evidence, it would be made equally available to both parties.

[3] The *Hallett* court commented in *dicta* that "[t]he quoted standard for termination does not differ materially from the standard to be applied in deciding whether prospective relief is proper." 296 F.3d at 743. *See Thomas*, 614 F.3d at 1320 ("We are not persuaded that the Ninth Circuit's comment [in *Hallett*] is apposite to this case; that comment was made in the different context of the court's review of a grant of a motion to terminate injunctive relief.")

because it established a discovery cut-off "a few months before trial." *Brown v. Plata*, 131 S. Ct. 1910, 1935 (2011). And in *Graves v. Arpaio,* No. CV-77-00479-PHX-NVW (D. Ariz.), although it involves a termination motion subject to the PLRA's "current and ongoing violation" requirement, this Court has ordered that the trial, currently scheduled to begin February 25, 2014, must address jail conditions as they existed on August 9, 2013. [*Id.*, Doc. No. 2156 (Sept. 10, 2013), at 2] Nothing prevents the Court from entering a similar order in this case, to which the "current and ongoing violation" requirement does not apply.

## II. IF THE COURT ALLOWS DEFENDANTS TO USE RECENT EVIDENCE, PLAINTIFFS MUST BE ALLOWED TO CONDUCT DISCOVERY AS TO THAT EVIDENCE.

Plaintiffs have moved to strike Defendants' expert reports to the extent that they rely upon evidence that post-dates the close of discovery on September 27, 2013, or anticipated future developments that have yet to occur. If Defendants prefer to try this case based on evidence postdating September 2013, Plaintiffs have no objection, provided that Plaintiffs and Defendants have equal access to that evidence, and that can only be accomplished by allowing Plaintiffs to conduct discovery.

Defendants' brief repeatedly asserts that conditions in ADC have changed fundamentally in recent months.[4] If this is true—which Plaintiffs do not concede—then the discovery Plaintiffs took before the September 2013 cutoff is stale and outdated, and Plaintiffs must be allowed to take discovery as to these allegedly changed conditions.[5] Defendants cannot have it both ways; they cannot emphasize "the changing nature of care provided to ADC inmates" and argue that information prior to September 27, 2013 is all

---

[4] *See, e.g.,* Def. Br. at 1 ("Corizon's steady and ADC-mandated improvements"); *id.* at 2 ("extensive, positive changes in the quality of health care delivered to ADC inmates"); *id.* at 3 n.3 ("a real and substantial decrease in inmate wait times" and "dramatic increases in the number of mid-level and upper-level providers").

[5] Defendants themselves clearly believe that pre-September 2013 discovery is insufficient, as they continue to send medical records and other documents to their own experts for review. [*See* Fathi Decl., Exs. 4-5 (January 23, 2014 and January 31, 2014 letters from Defendants' counsel to their expert, enclosing medical records and other materials "for your ongoing review")]

but irrelevant [Def. Br. at 2], but then deny Plaintiffs relevant information about those changes except what Defendants unilaterally decide to disclose. By the same token, they cannot urge that the trial of this case "requires up-to-date information" and "must necessarily examine the *current* conditions of confinement as they appear at the time of … trial" [Def. Br. at 1 (emphasis in original)], while denying Plaintiffs that up-to-date information. If the alleged improvements in ADC health care and conditions of confinement are remotely as impressive as Defendants claim, they have nothing to lose and everything to gain if Plaintiffs are allowed to conduct discovery. *See Matter of Hawaii Corp.*, 88 F.R.D. 518, 524 (D. Haw. 1980) (one purpose of discovery is to promote settlement).

Accordingly, if the Court elects to allow presentation of post-September 2013 evidence at trial, it should reopen discovery, establish a discovery cutoff date of August 1, 2014, and order that trial will be based on conditions as they existed on that date. In the interim, the parties should be permitted to conduct depositions, paper discovery, and expert inspections, so that both sides have equal access to evidence of the "extensive, positive changes" [Def. Br. at 2] alleged in Defendants' brief.

It is particularly important that Plaintiffs' experts be permitted to re-inspect ADC facilities to assess Defendants' claims of sweeping changes in recent months. Plaintiffs' experts conducted their inspection tours in the summer of 2013, and for their expert reports served on November 8, 2013, necessarily relied almost exclusively on evidence pre-dating the September 27 discovery cutoff. Defendants' experts, by contrast, conducted their inspections many months later, and are planning additional tours in the future.[6]

As the Court has recognized, this is a case in which expert testimony will be critically important. Plaintiffs' experts must be given a full and fair opportunity to assess

---

[6] *See, e.g.*, Specter Decl. (Doc. 754-1), Ex. 4 at 5 (Dr. Penn plans to inspect ASPC-Yuma "in January or February of 2014").

78204-0001/LEGAL29411988.1         -5-

1  the fundamental changes that defendants claim have recently occurred. These tours offer
2  independent evidence and an ability to test the accuracy of Defendants' evidence and
3  reports. If Plaintiffs' experts are denied this opportunity, the Court will be faced at trial
4  with a one-sided presentation by Defendants without any meaningful adversarial testing,
5  and will be deprived of the evidence necessary to decide this case.

### III. FOURTEEN OF DEFENDANTS' EXPERTS SHOULD BE STRICKEN FOR THEIR FAILURE TO PROVIDE REPORTS WHEN THEIR TESTIMONY WILL OFFER OPINIONS DEVELOPED SPECIALLY FOR THIS LITIGATION.

Defendants argue that although 14 of their experts will be offering opinions developed specially for this litigation and based on facts the witnesses reviewed only because of the litigation, the experts had no obligation to produce expert reports. This flies in the face of Ninth Circuit precedent, the federal rules, and common sense.

Defendants admit that in *Goodman*, the Ninth Circuit found that physicians were required to produce reports even though they had actually treated the plaintiff. [Def. Br. at 12] Because the physicians had also reviewed information "that they hadn't reviewed during the course of treatment" to form their opinions, they were considered "retained or specially employed" as experts under the rule and were required to produce expert reports. *Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 826 (9th Cir. 2011)

Although Defendants claim that their witnesses fall under a "well-recognized allowance" to the reporting requirements, they cite no case law. [Def. Br. at 10] Seeking to distinguish *Goodman*, Defendants assert that that case "predates" the 2010 Amendments to the federal rules, [*id*. at 12], even though *Goodman* was decided May 3, 2011, over five months after the 2010 Amendments had taken effect. In any event, the provision interpreted by *Goodman* is Rule 26(a)(2)(B), which dictates when an expert must file a report and which was unaltered by the 2010 Amendments. Defendants' own quotations to the Advisory Committee Notes make clear that subparagraph (C) was "added to mandate summary disclosures of the opinions to be offered by expert witnesses who are not required to provide reports under Rule 26(a)(2)(B)." [*Id*. at 10] The

1  amendment did not alter the established 26(a)(2)(B) calculus, nor did it somehow trump
2  *Goodman*'s interpretation of that calculus five months later. *See Kondragunta v. Ace*
3  *Doran Hauling & Rigging Co.*, 2013 WL 1189493, at *2 (N.D. Ga. Mar. 21, 2013)
4  (finding *Goodman* persuasive and noting that "[w]hile the amended rule may have created
5  a new type of disclosure for experts who were not required to file a written report, it did
6  not alter the criterion for identifying those experts who do have to submit a report").

7  Here, Defendants' experts will be offering opinions that are specially designed for
8  this litigation and based on facts they reviewed only because of the litigation. Thus,
9  *Goodman* requires that those experts produce reports. *Kondragunta, supra*, 2013 WL
10  1189493, at *10; *see also Funai Elec. Co. v. Daewoo Elec. Corp.*, 2007 WL 1089702 at
11  *5 (N.D. Cal. Apr. 11, 2007) ("Courts impose the report requirement on employees who
12  testify regarding matters outside the scope of their employment, who provide technical
13  evaluations of evidence reviewed solely in preparation for trial, who provide opinion
14  testimony on the merits of the case, or who have no direct and personal knowledge of the
15  facts to which they are testifying.")

16  Defendants rely heavily on the fact that their newly disclosed experts are employed
17  by ADC, Corizon, Trinity, or Smallwood.[7]  [Def. Br. at 11-14]  But being an employee
18  does not automatically exclude an expert from the reporting requirement. *See* Plfs.' Mot.
19  at 10-11 (collecting cases); *Hardin v. Wal-Mart Stores, Inc.,* 2010 WL 3341897, at *4
20  (E.D. Cal. Aug. 25, 2010) ("Where employees have no connection to specific events
21  involved in an action, or the employees have reviewed information or documents in

---

[7] Defendants describe these witnesses as "Defendants'14 employees" [Def. Br. at 13 n.12] and cite the 2010 Advisory Committee Note referring to "employees of a party." [*Id*. at 10]  But half of these witnesses are not employees of a party; they are employees of Corizon, Smallwood, or Trinity, which are not parties to this litigation. [*See* Fathi Decl., Ex. 6 (Privatization of medical services request for proposal, "The Contractor is an independent Contractor, and will not, under any circumstance, be considered an employee, servant or agent of the Department, nor will the employees, servants or agents of the Contractor be considered employees of the Department.")]  These witnesses are therefore indistinguishable from any other retained expert; Defendants have not disclosed whether these witnesses or the corporations that employ them are receiving any compensation for their expert witness services.

1  preparation of litigation, expert reports must be produced.") (citing *Prieto v. Malgor*, 361
2  F.3d 1313, 1318-19 (11th Cir. 2004).]

3  In addition, the mere fact that Defendants' experts may have some knowledge
4  relevant to their opinions from their normal job duties does not automatically avoid the
5  reporting requirement. The Ninth Circuit made clear in *Goodman* that physicians who are
6  offering opinions "beyond the scope of the treatment rendered" or based on information
7  not "reviewed during the course of treatment" must produce a report. *Goodman,* 644 F.3d
8  at 826. The question is not whether the proposed expert has any personal knowledge
9  relevant to the case, but rather is whether the expert appears to offer opinions generated
10 specially for the litigation or based on evidence reviewed only because of the litigation.
11 For example, a treating physician might offer an opinion without a report on the extent of
12 a person's injuries because the physician reached that opinion in the course of treating the
13 person. The treating physician, however, must write a report to opine on the cause of the
14 injuries if the physician did not independently reach an opinion about causation outside of
15 the litigation. If the physician reviewed other files (such as the patient's entire medical
16 history), spoke with other witnesses or attorneys, etc., that also could be a basis for
17 requiring a report.

18 Here, Defendants' witnesses will be offering opinions that are specially designed
19 for this litigation and based on facts they reviewed only because of the litigation.
20 Defendants never deny this fact. Instead, they rely on vague statements about the
21 witnesses having "supervisory roles and functions." [*See* Def. Br. at 12] The closest
22 Defendants come to a denial is the statement that "most" of their newly disclosed experts
23 have "supervisory role[s] of assuring adequate health care to inmates, which role cannot
24 be discharged in the absence of medical records reviews of the named Plaintiffs and the
25 other prisoners." [*Id*. at 14] Surely Defendants cannot be suggesting that these experts
26 just *happened* to review the named Plaintiffs' files, independent of this litigation.

27 Ultimately, Defendants' own disclosure statements reveal that these newly
28 disclosed experts are offering opinions that are specially designed for this litigation and

1 based on facts they reviewed only because of the litigation. As Plaintiffs pointed out in their original motion, Defendants explicitly state that most of the 14 experts will be offering expert opinions that respond to "Plaintiffs' experts" or "Plaintiffs' experts' opinions." [*See* Plfs.' Mot. at 11 (listing eight newly disclosed experts who will offer such testimony] And other experts will be testifying regarding their review of medical records for named plaintiffs whom they have never treated. [*See id.* at 12 (listing seven newly disclosed experts who will be offering such testimony)]

In addition to Defendants' experts being "retained or specially employed" under the expert-report rule, it appears that at least some of Defendants' experts also have job duties that "regularly involve giving expert testimony." Plaintiffs listed numerous cases found on Westlaw in which Defendants' experts have repeatedly offered expert opinions. [Plfs.' Mot. at 10, n.10] [8]

In response to Plaintiffs' list of regularly-given expert testimony, Defendants completely ignore Plaintiffs' cited examples of expert trial testimony offered by Dr. Rowe and Mr. McWilliams. Instead, Defendants try to brush off the examples of their experts regularly issuing affidavits by claiming that these affidavits occurred in *pro se* prisoner suits "in which the Attorney General's Office has logically supported its dispositive motions with affidavits **from the named health care providers or knowledgeable witnesses**." [*See* Def. Br. at 13 (emphasis added)] This is demonstrably false. Dr. Rowe was not a "named health care provider" or a "knowledgeable witness" in any of the five cases listed where he provided affidavits or declarations. Instead, Dr. Rowe was called upon in every case listed to analyze the plaintiffs' medical file and opine as to their treatment, solely for the purposes of litigation. Dr. Rowe's duties plainly involve regularly giving expert testimony.

---

[8] Defendants decline Plaintiffs' invitation to list the number of times their experts have given expert testimony, but it is doubtless true that Plaintiffs' list of cases found on Westlaw that happen to cite Defendants' experts by name significantly understates the number of times that these experts have given expert testimony.

78204-0001/LEGAL29411988.1               -9-

To compound their error, Defendants cite to a 1970 Advisory Committee Note that states that Rule 26(b)(4) does not apply to an expert who was "an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit," suggesting again that the cited testimony by Dr. Rowe and others came in that capacity. [Def. Br. at 14] This supports the point made in Goodman—there is a distinction between a witness who is a contemporaneous "actor or viewer" of events at issue, and a witness who has been asked to review those events retrospectively and opine about them for the purpose of litigation. Defendants' experts fall into the latter category, as demonstrated by Dr. Rowe's testimony above, and they were required to produce reports.

Given Defendants' failure to issue reports for these expert opinions, the only appropriate remedy is not to allow these witnesses to testify as experts. Defendants complain that if the expert opinions of these witnesses are struck, the witnesses cannot "defend and explain their treatment and operational or supervisory performance" and will not "be[] allowed the ability to show that the care rendered to ADC inmates was within the standard of care." [*See* Def. Br. at 13 n.12, 14] This is a false dichotomy. What Plaintiffs object to is Defendants designating some of those witnesses as experts offering new opinions after the fact witness deposition deadline, refusing to produce mandatory reports from those experts, denying any attempt to depose those experts about their newfound expert opinions,[9] and deploying those expert opinions at trial.[10]

---

[9] Defendants stress that Dr. Smallwood and Dr. Williams were 30(b)(6) designees and that questions about their expert opinions were outside the scope of that deposition. [Def. Br. at 11 n.11] But this makes Plaintiffs' point – Plaintiffs had no idea that these witnesses would later be designated as experts and were not permitted to ask questions about their expert opinions during their depositions. Incredibly, Defendants matter-of-factly assert that they were justified in objecting to questions asking Dr. Robertson for his expert opinion, because he had "not been designated [as an expert] at the time of his deposition." [*Id*. at 11-12 n. 11] In other words, Defendants' counsel fought any and all attempts to ask their non-expert witnesses for expert opinions, waited until after the fact witness deposition deadline to designate those witnesses as experts, and now shamelessly argues that Plaintiffs should not be able to review those experts' reports or depose those same witnesses about their expert opinions. Defendants make no attempt to explain how Plaintiffs could have possibly avoided this Catch-22.

[10] To counter Plaintiffs' argument that Defendants' 18 expert witnesses are duplicative and cumulative, Defendants assert the number is "hardly excessive." [Def. Br.

**Conclusion**

For the reasons stated above and in Plaintiffs' Motion (Doc. 753), the Court should strike Defendants' testifying expert reports to the extent they purport to opine about time periods for which Plaintiffs have not been afforded full discovery, or rely upon documents Defendants have refused to produce; strike Defendants' non-report experts as improper; and preclude any party from offering evidence that post-dates the discovery cut-off.

In the alternative, the Court should strike Defendants' testifying expert reports to the extent they purport to opine about time periods for which Plaintiffs have not been afforded full discovery, or rely upon documents Defendants have refused to produce; strike Defendants' non-report experts as improper; reopen discovery and establish a discovery cutoff date of August 1, 2014, and modify the pre-trial schedule accordingly.

Dated: February 13, 2014     **PRISON LAW OFFICE**

By: *s/ Corene Kendrick*
   Donald Specter (Cal. 83925)*
   Alison Hardy (Cal. 135966)*
   Sara Norman (Cal. 189536)*
   Corene Kendrick (Cal. 226642)*
   1917 Fifth Street
   Berkeley, California 94710
   Telephone: (510) 280-2621
   Email:  dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

---

at 15-16 n.13]  However, Defendants ignore that they previously argued Plaintiffs' seven expert witnesses were "duplicative" and "cumulative." (Doc. 485 at 11 n.7)  Courts have the authority to manage the length of their cases and trials, and cut the number of witnesses proposed by a party or strike their opinions. *See MCI Communications Corp. v. American Telephone & Telegraph Co.*, 85 F.R.D. 28, 29-30 (N.D. Ill. 1979) (finding defendants' proposed evidence cumulative when defendant announced plans to call 183 witnesses and put on a defense lasting 8 months, and instead cutting defendants' trial time to match Plaintiffs' estimate).  Defendants argue Plaintiffs' request to strike some of the non-reporting experts "is premature in seeking an evidentiary ruling," [Def. Br. at 15], but Plaintiffs do not raise an evidentiary objection; "[t]he request for discretionary exclusion should be distinguished from an objection to the admission of evidence; the objection asserts a right of the party whereas the request invokes a power of the judge."  22A Fed. Prac. & Proc. Evid. § 5224 (2d ed. April 2013).

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE, LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone: (602) 351-8000
Email:   dbarr@perkinscoie.com
         agerlicher@perkinscoie.com
         keidenbach@perkinscoie.com
         jhgray@perkinscoie.com
         mdumee@perkinscoie.com
         jpeters@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:   dpochoda@acluaz.org
         jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:   dfathi@npp-aclu.org
         afettig@npp-aclu.org
         aquereshi@npp-aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

|   |   |
|---|---|
| 1 | Caroline Mitchell (Cal. 143124)* |
|   | David C. Kiernan (Cal. 215335)* |
| 2 | Sophia Calderón (Cal. 278135)* |
|   | **JONES DAY** |
| 3 | 555 California Street, 26th Floor |
|   | San Francisco, California 94104 |
| 4 | Telephone:  (415) 875-5712 |
|   | Email:     cnmitchell@jonesday.com |
| 5 |            dkiernan@jonesday.com |
|   |            scalderon@jonesday.com |

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com
           tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
           jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone:  (949) 851-3939
Email:     kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By: *s/ Sarah Kader*
Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:   skader@azdisabilitylaw.org
            avarma@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email:   jrico@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 13, 2014, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Timothy J. Bojanowski
Rachel Love
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
rlove@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

　　　　　　　　　　　　　　　　　　S. Neilson