Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                              Plaintiffs,<br><br>           v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                              Defendants. | NO. 2:12-cv-00601-NVW<br><br>**DEFENDANTS' MOTION FOR RECONSIDERATION OF ORDER GRANTING IN PART PLAINTIFFS' MOTION TO STRIKE DEFENDANTS' EXPERTS AND EXPERT REPORTS** |

1    The Court's decision now to refuse evidence as to the state of ADC's

2    healthcare after September 27, 2013, is not only inconsistent with Plaintiffs' claims, the

3    PLRA, Eighth Amendment jurisprudence, and the framework by which both parties and

4    the Court have proceeded since the inception of this lawsuit, but it is also severely

5    detrimental and prejudicial to Defendants' case.  It is also clear to Defendants that the

6    decision was strongly influenced by the Court's apparent belief that Defendants had

7    requested and urged an October 2014 trial date so that they could surreptitiously collect

8    evidence up until trial, and then unsuspectingly spring that evidence on Plaintiffs without

9    prior disclosure.  Nothing could be further from the truth, and, if nothing else, that belief

10   must be dispelled.

11    The Court has repeatedly stressed that its objective is a fair trial for <u>both</u>

12   sides.  This ruling makes it very one-sided.  Defendants respectfully request that the Court

13   reconsider its February 26, 2014 Order granting, in part, Plaintiffs' Motion to Strike

14   Defendants' Experts and Expert Reports.  There are less-drastic options readily available,

15   with no prejudice to Plaintiffs, that will level the playing field.

16   **I.      <u>DEFENDANTS DID NOT REQUEST AN OCTOBER 2014 TRIAL DATE</u>**

17    At the February 24, 2014 hearing, the Court recounted that it set a trial date

18   in October 2014 "at [Defendants'] request" and over Plaintiffs' objection, and that "by

19   accommodating [Defendants'] request" it "put [Plaintiffs] in an unfair position." (Ex. 1 at

20   16.)  The Court then insinuated that Defendants' counsel duped it into setting the October

21   2014 trial date, and that it would hold Defendants accountable for that perceived

22   deception:

23       And oh, with respect to the trial date, well, I don't see how I
         can do that.  I think I have to live with the mistake I made and
24       I will not lose track of the fact that I made that mistake at Mr.
         Struck's request of setting the late trial date. So I'm going to
25       try to minimize any unfair effect to the plaintiffs for me setting
         that trial later than I now wish I had.
26

27   (Id. at 42–43.)  The Court's belief is wrong.  Defendants did not request an October 2014

28   trial date; the Court set that trial date on its own.

1

The parties submitted a Joint Proposed Discovery Plan on July 7, 2012. (Doc. 46.)  That discovery plan did not propose a trial date by either party.  (Id.)  At the July 20, 2012 Scheduling Conference, shortly after counsel announced appearances and before Defendants' counsel even uttered a word, the Court stated:

> [L]et me spoil some of the suspense for all of you. Congress has provided that civil cases should be concluded within three years of filing. Other than some cases I had when I came to the court that already couldn't meet that, I have never had a case that violated that deadline of the Civil Justice Reform Act. I don't intend to break my record for you or any other case. So we are going to have this case, if necessary, through trial and final judgment within three years of filing. And that's March of 2015.
>
> So we can all just count backwards and figure out what time there is to do things. And I'm not optimistic that there will be any slack anywhere because we are going to have this case to final judgment by March 2015, no matter what.
>
> So if you just think backwards, if we want to have this -- just let's assume a worst-case scenario, that we go the distance on everything, *we need to start a trial no later than late 2014 to make sure it's concluded by March of 2015.*

(Ex. 2 at 6–7, emphasis added.)   Plaintiffs' counsel later asked the Court when it envisioned setting a trial date.  The Court responded:

> [A]s I said at the beginning of our discussion, I would start this no later than January 2015, which is two months before the time it has to be done. However, I – *it would be much better if we would do it in the fall of 2014.* Part of this just – this is going to be a big trial to fit in on my calendar. And there needs to be a little time for things to go wrong.
>
> So if we have – realistically, you know, *I would be shooting for some time in the fall of 2014.*

(Id. at 49, emphasis added.)

The Initial Scheduling Order did not include a trial date.  (Doc. 52.)  But in March 2013, Plaintiffs requested a six-month extension of the fact and expert discovery deadlines.  (Doc. 364.)  The Court granted Plaintiffs' request, and in that order it set the October 20, 2014 trial date. (Doc. 389.) Thus, the trial date was <u>driven by Plaintiffs'</u> discovery extension request and <u>set by the Court</u>.  Defendants had nothing to do with it.

**II.     BOTH PARTIES AND THE COURT HAVE BEEN OPERATING ON THE ASSUMPTION THAT ONGOING EVIDENCE OF ADC CARE AND CONDITIONS WOULD BE ADMISSIBLE AT TRIAL FOR PURPOSES OF LIABILITY**

At the February 24, 2014 hearing, the Court insinuated that Defendants concealed their intent to rely on current ADC conditions at trial until they disclosed their expert reports, which relied on evidence post-dating the September 27, 2013 fact discovery deadline:

> [W]hen I went with you instead of them on this schedule, you didn't tell me that my fact cutoff, my discovery deadlines were really fictional. If you had told me that back then, it's likely I would have said something like, oh, I will move your trial up earlier.

(Ex. 1 at 30.)  Although the Court's Scheduling Orders set deadlines for fact discovery and expert disclosures, they do not inform the parties that the Court would only consider fact evidence – and expert evidence that relies on that fact evidence – that was produced prior to September 27, 2013. And as discussed below, there is authority supporting ongoing supplementation of gross data in prison litigation challenging inmate healthcare and seeking injunctive prospective relief.

Defendants operated accordingly. And Plaintiffs knew that Defendants intended to continue to supplement their disclosures with current ADC data, and to rely on that data at trial.  (See, e.g., Ex. 3 at 32: "The problem is the discovery cutoff ended more than a year before the trial date. So we have a year's time in which we can't conduct discovery *but the defendants can use whatever information they have about their system*.") (Emphasis added).  The Court seemingly acknowledged the need to provide the most up-to-date information when it denied Defendants' request to stay discovery pending the appeal in August 2013.  The Court's primary concern was that the discovery taken up to that point would be "wasted" and "out of date" once the stay was lifted.  (Ex. 4 at 4, 18, 22.)  At oral argument, Defendants' counsel reiterated that this would not be a concern because Defendants would continue to supplement their disclosures with current evidence.  (Id. at 22, 43–44.)  In its corresponding order denying a stay, the Court stated that "it

3

1   would not issue an injunction based on years-old data" and that a stay would effectively

2   render the data "obsolete."   (Doc. 567 at 3.)   This signaled to Defendants, if not both

3   parties, that the Court would accept – and even require – current evidence of ADC

4   conditions at trial.

5          Even at the February 24, 2014 hearing on Plaintiffs' Motion to Strike, the

6   Court made it very clear that it had expected to hear evidence of current ADC conditions

7   at trial. (Ex. 1 at 17–18: "I expected you all, and I appreciate you are giving ongoing data.

8   . . . If you just want to have updated data, I expected that anyway so there may not be

9   unfairness in the updated data . . .").   Thus, Defendants' intent to admit evidence of

10  current ADC conditions at trial was well known and expected by the parties and the Court.

11  And Defendants have disclosed everything it intends to use at trial.

12  **III.   DEFENDANTS REQUEST THAT THE CUT-OFF DATE BE EXTENDED**

13         With these influential misperceptions dispelled, Defendants ask the Court to

14  reconsider its September 27, 2013 cut-off date in light of the following.

15       **A.   Evidence of Current Conditions and Care is Necessary to Defend**
            **Against a Claim for Prospective Injunctive Relief.**

16

17         Plaintiffs seek prospective injunctive relief to prevent alleged "ongoing"

18  constitutional violations and future risk of harm.   (Doc. 1, 242, 331; Ex. 2 at 32: "And this

19  is a case of ongoing violation of fundamental constitutional rights."; Ex. 5 at 17: "And it's

20  our burden here to prove systemwide deliberate indifference that's currently going on.").)

21  The framework for analyzing such claims is set forth in *Farmer v. Brennan*, 511 U.S. 825

22  (1994), and *Helling v. McKinney*, 509 U.S. 25 (1993). *Farmer* discusses the relevant

23  evidence that is necessary to prove and disprove these types of claims, and makes clear

24  that current evidence of prison conditions is probative, if not necessary, to establish a lack

25  of deliberate indifference:

26         In a suit such as petitioner's, insofar as it seeks injunctive
           relief to prevent a substantial risk of serious injury from
           ripening into actual harm, "the subjective factor, deliberate
27         indifference, should be determined in light of the prison
           authorities' current attitudes and conduct," *Helling, supra*, 509
28         U.S. at 36: their attitudes and conduct at the time suit is

4

brought and persisting thereafter. An inmate seeking an injunction on the ground that there is "a contemporary violation of a nature likely to continue," must adequately plead such a violation; to survive summary judgment, he must come forward with evidence from which it can be inferred that the defendant-officials were at the time suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm, and that they will continue to do so; and finally to establish eligibility for an injunction, the inmate must demonstrate the continuance of that disregard during the remainder of the litigation and into the future. In so doing, the inmate may rely, in the district court's discretion, on developments that postdate the pleadings and pretrial motions, as the defendants may rely on such developments to establish that the inmate is not entitled to an injunction. If the court finds the Eighth Amendment's subjective and objective requirements satisfied, it may grant appropriate injunctive relief.

511 U.S. at 845–46 (internal citations omitted). This holding is consistent with longstanding precedent that injunctive relief is only proper if there is a "continuing violation of federal law." *Green v. Mansour*, 474 U.S. 64, 73 (1985); *Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991) ("When there is no continuing violation of federal law, injunctive relief is not part of a federal court's remedial powers.").

Therefore, because the essence of Plaintiffs' claims call on whether the current conditions and care at ADC meet constitutional minimums, evidence of current conditions is critical. *See Farmer*, 511 U.S. at 845; *see also Kress v. CCA of Tennessee, LLC*, 694 F.3d 890, 893 (7th Cir. 2012) (affirming district court's grant of summary judgment in favor of private prison facility because inmates failed to present evidence of any current and ongoing constitutional violations); *Lovell v. Brennan*, 728 F.2d 560, 562–63 (1st Cir. 1984) (affirming district court's dismissal of class claims challenging conditions of confinement based on current conditions, not conditions at time of or pre-dating suit); *Arenberg v. Ryan*, CV 10-2228-PHX-MHM, 2011 WL 53060, at *4 (D. Ariz. Jan. 7, 2011) ("In attempting to establish either eligibility for an injunction or that a party is not entitled to injunctive relief, the parties may rely on developments that postdate the pleadings and pretrial motions."); *Casey v. Lewis*, 834 F.Supp. 1477, 1546–47 (D. Ariz. 1993) (district court considered evidence of prison conditions at time of trial).

In its order, this Court concluded that evidence of "current conditions" is relevant only to determine whether an existing injunction should be terminated pursuant to 18 U.S.C. § 3626(b)(3), which is where that phrase is found, but is not relevant to establish the propriety of an initial injunction under 18 U.S.C. § 3626(a)(1)(A), which does not include the phrase "current conditions."  But the Ninth Circuit has rejected this reasoning:

> The quoted standard for termination does not differ materially from the standard to be applied in deciding whether prospective relief is proper. To prevail on their motion to extend jurisdiction, Plaintiffs must establish that the prospective relief "extend[s] no further than necessary to correct the *violation* of" their Eighth Amendment rights. 18 U.S.C. § 3626(a)(1)(A) (emphasis added). This standard, too, requires the existence of a constitutional "violation" in need of correction. The text of § 3626(a)(1)(A) suggests that, in the absence of a "current and ongoing" violation, there is no occasion to fashion prospective relief to cure the violation. In other words, if a violation no longer exists, the statute does not permit the court to order prospective relief.

*Hallett v. Morgan*, 296 F.3d 732, 743 (9th Cir. 2002); *see also Gilmore v. People of the State of California*, 220 F.3d 987, 1006 (9th Cir. 2000). Thus, evidence of current conditions is necessary not only to comply with Eighth Amendment jurisprudence, but also to comply with the PLRA.

The Court also discounted the relevance of current conditions, citing the voluntary cessation doctrine:

> Defendants' changes at the prison since the filing of this lawsuit also do not preclude an injunction. A "defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice."

(Doc. 815 at 2–3, quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982).)  Voluntary cessation, however, is an exception to the mootness doctrine, and it applies only if the changes arose "*because of* the litigation." *Sze v. I.N.S.*, 153 F.3d 1005, 1008 (9th Cir. 1998); *Pub. Utilities Comm'n of State of Cal. v. F.E.R.C.*, 100 F.3d 1451, 1460 (9th Cir. 1996); *Nome Eskimo Cmty. v. Babbitt*, 67 F.3d 813, 816 (9th Cir. 1995)). The changes, modifications, and improvements in ADC healthcare that are reflected in the

current evidence are not "because of" Plaintiffs' lawsuit, but because of circumstances outside this litigation, namely:  the statutory privatization of healthcare in July 2012 and the contractual provisions requiring certain levels of care.  In other words, any modifications and/or improvements in healthcare at ADC are because of Corizon's compliance with its contractual obligation to the State, or other non-lawsuit reasons.[1]  *See Sze*, 153 F.3d at 1008 (rejecting voluntary cessation argument that action occurred because plaintiffs "drew particular attention" to the case because it "demonstrated no more than correlation" and not causation); *see also Smith v. Univ. of Washington, Law Sch.*, 233 F.3d 1188, 1194–95 (9th Cir. 2000) ("In fact, it is generally fair to say that when a change of position is wrought by a statutory provision, the change is neither voluntary nor likely to be resiled from at any time in the foreseeable future.").  Section C.2, supra, provides a few examples.  Although the burden of establishing mootness is a "heavy one," "[t]hat does not mean that the burden cannot be borne."  *Smith*, 233 F.3d at 1194 (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  Defendants should not be deprived of the opportunity to meet that burden here by introducing evidence of current conditions and care, and if they do, then the case is moot and there is "no case or controversy for the court[] to adjudicate."[2]  *Id*. at 1193.

---

[1] The decision to privatize healthcare was made long before Plaintiffs filed their lawsuit. The Governor signed H.B. 2010 in September 2009, and the Request for Proposal, which outlined the contractual requirements for the provision of healthcare, was issued prior to October 2009. *See* Criminal Justice Budget Reconciliation, 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6, § 21, Sec. 26 (H.B. 2010). Plaintiffs filed their lawsuit in March 2012.

[2] Even Plaintiffs agree that Defendants have a right to prove that the claims are moot. (See Ex. 2 at 32: "Obviously the defendants have made a mootness argument, they certainly have the right to come forward with evidence and meet what the Supreme Court has characterized as a heavy burden of showing that the violations have been cured and cannot be expected to recur. But we believe that should occur in the context of this lawsuit, Your Honor.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.**     **Evidence of ADC Healthcare and Conditions After September 2013 is Particularly Relevant to Plaintiffs' Claims.**

The Court has repeatedly stated that this case will rise or fall based on the gross data either supporting or refuting systemic deficiencies.  (Doc. 567 at 3; Ex. 4 at 17; Ex. 5 at 11-12, 17–19, 33.) There are at least four categories of data that are directly relevant to Plaintiffs' healthcare claims.  They include:

- The monthly and quarterly Corizon statistical reports. These are aggregate data summaries generated by Corizon and are required under the ADC contract. These reports document staffing levels, healthcare wait times, utilization statistics, medication/prescription report lists, clinical data regarding chronic conditions and infectious diseases, outside medical transports for specialty and emergency care, medical grievance reports, and litigation/medical board activity.

- The monthly Medical Green Amber Red Reports ("MGAR"): monthly reports generated by the Health Services Monitoring Bureau for each ADC complex regarding levels of compliance with contract criteria and relating to contract performance, timeliness of care, and adherence to ADC policies. These monthly reports also include Corrective Action Plans ("CAP") proposed/implemented by Corizon in response to reported contract compliance issues.

- Updated medical and institutional records for the named Plaintiffs.

- The National Commission on Correctional Health Care's ("NCCHC") accreditation report for the Tucson and Florence facilities, which are expected to be released in March or April 2014.[3] The NCCHC is committed to improving the quality of health care in prisons, and provides standards for the provision of health services based on external peer review. *See* http://www.ncchc.org/about. Accreditation surveys and reports are done for each individual corrections facility. These accreditation reports will reflect whether these facilities have consistent and significant compliance with 68 recommended requirements for the proper management of a correctional health services delivery system.

This is the type of current evidence that Defendants seek to admit at trial to establish not only a lack of deliberate indifference, but also to show that there are not systemic deficiencies in the provision of healthcare at ADC.

---

[3] The NCCHC is surveying the Yuma facility in May or June 2014, and the Lewis facility sometime after June 2014.

8

**C.**     **Precluding More Current Evidence is Severely Prejudicial to Defendants.**

Notwithstanding the vital importance of demonstrating current conditions and care at ADC, Defendants understand that there must be a cut-off date. But the September 27, 2013 cut-off date set by the Court – after that date already passed – is severely prejudicial to Defendants.  That cut-off date should be extended.

1.     ADC's privatization of care in July 2012 and change in healthcare providers in March 2013 temporarily disrupted healthcare.

The evidence the Court will be considering at trial is very limited, and not a complete and accurate picture of the current conditions and care at ADC.  As the Court is aware, the Legislature privatized ADC healthcare effective July 1, 2012.  Wexford Health Services was the first private provider, and rendered services until March 3, 2013.  Corizon Inc. took over on March 4, 2013, and continues to provide healthcare to ADC inmates today.  Plaintiffs filed their lawsuit on March 22, 2012.  Thus, during the 18-month period from the date the lawsuit was filed until the close of fact discovery, ADC provided healthcare services for three months, Wexford provided services for eight months, and Corizon provided services for only seven months.

As one can imagine, taking over the provision of healthcare for 34,000 inmates is something that cannot happen overnight.  There is a transition period, and it can take several months to reach compliance with ADC's contract.  Plaintiffs relied on this very fact themselves when they sought a six-month extension of discovery once Corizon first took over.  (Doc. 364 at 3–4: requesting extension based on "the fact that when the current deadline for fact discovery expires, Corizon will have recently assumed control and will have been providing health care services for less than three months [and] the likelihood that Defendants will assert as a defense that Corizon will need time to come up to speed in providing health care services to prisoners [and] the time it will take for Defendants to compile and provide evidence related to ADC's monitoring of Corizon's performance").

Wexford's eight-month tenure is not an accurate or complete picture of current healthcare at ADC, as they were the first private entity to provide ADC healthcare. There were performance issues, and they were transitioned out in March 2013.  Wexford's short tenure is not an accurate measuring stick of the care that ADC provided prior to July 2012 or that Corizon has provided since March 2013.  Even Plaintiffs agree that this evidence is not sufficient.  (See Doc. 559 at 2: "First, Defendants have changed health care providers twice during the pendency of this case. Responsibility for providing health care passed from state employees to Wexford Health Sources on July 1, 2012, and from Wexford to Corizon, Inc. on March 4, 2013. Thus, virtually all the discovery Plaintiffs conducted regarding Wexford–its policies, procedures, staffing matrices, drug formulary, dental and pharmacy subcontractors, and all other aspects of its operation–must be repeated with regard to Corizon."; Ex. 5 at 39: "The cure letter isn't going to win the case for us, and we understand that.")

Corizon's subsequent seven-month tenure (until the September 2013 cut-off) is similarly not an adequate amount of time to yield a body of work from which the Court can accurately and fully judge the provision of ADC healthcare, particularly when Plaintiffs are seeking an injunction to overhaul nearly every aspect of healthcare at ADC. The Court needs more data in order to make an informed decision as to the adequacy of care and whether there are systemwide deficiencies.[4]  Plaintiffs should also not benefit

---

[4] The Court has stated its view of Wexford's performance under the contract – "Wexford was a disaster. Everybody knows that." (Ex. 4 at 63) – and it has hinted several times that it believes the State privatized healthcare to save money and at the expense of adequate care. (See Ex. 2 at 18–19: "I do remember reading in the newspaper about the new vendor and don't worry about this, because I don't know what the truth is, but I remember reading that the idea was to spend less money and build in a profit component for the vendor, which seemed like a bit of a challenge for also improving service."; Ex. 5 at 38-39: "And you know, if the evidence shows that the Department had serious systemic deficiencies before the Wexford contract, the idea that we'll fix the deficiencies by saving money on paying less to an outside contractor, well, that will just help your case, not hurt it."; Ex. 1 at 13: "well, if there were deficiencies, constitutional deficiencies, why should we assume that they just arose under Wexford as opposed to having been there before when the State of Arizona decided to save money by spending less on prisons.") Evidence of Corizon's care over an extended period of time and after it has had an adequate opportunity to establish itself will help refute these perceptions.

from timing the filing of their lawsuit when they knew ADC healthcare was in a state of transition and vulnerable.   The Court must consider more current evidence, and not evidence that is 13-months old.

 2.   Some modifications/improvements in conditions and care will not take effect until after the September 2013 cut-off, but are directly relevant to the issue of liability.

As discussed above, evidence of current conditions and care is directly relevant to deliberate indifference and mootness. The Court cannot adequately assess ADC's healthcare without considering any evidence of care in the year prior to trial.  In addition to the monthly statistics and updated evidence already mentioned, other evidence of improvements exist and is highly relevant to these issues.  The following are examples of improvements that were either conceived prior to the lawsuit, or after the lawsuit but not because of it, and which were not or will not be implemented until after the September 2013 cut-off date.

- Crisis intervention/suicide prevention. In response to several suicides that occurred prior to June 2011, ADC developed new suicide and crisis intervention training to be utilized by ADC employees. Specifically, the new training consisted of combining crisis intervention with suicide training.  Over 235 employees were trained to conduct the training and over 7,000 employees completed the training. This training was administered from June to November 2011. Since that time, ADC continues to revise and revamp this training and ADC employees continue to receive updated courses in crisis intervention and suicide prevention.  Many of these training courses occurred in fiscal years 2013 and 2014 – after September 27, 2013. Moreover, ADC has added several security "rovers" (beginning on September 4, 2013) to be in constant motion to provide additional security checks at unexpected times in order to reduce the opportunity for inmate self-harm. They are being implemented on a rolling basis at each facility, and many will not be in place until after September 27, 2013.

- Electronic health records ("EHR"). The State's Request for Proposal, and specifically the October 21, 2011 Solicitation, required the winning bidder to implement an EHR system.  Vendors were required to include conversion of EHR in their proposals. Implementation of the EHR is a long and tedious process as, among

other things, it requires all paper medical records to be scanned and coded into the EMR system. As such, the EHR system will not be in place until April 2014 at Perryville, and until June or July at Florence and Eyman. EHR roll-outs are expected to be done at 1-2 complexes at a time thereafter.

- Capital improvements to maximum custody cells. The genesis for these improvements (including water, shade, misters, and limited outside recreation during the summer) began in the summer of 2009, following the death of inmate Marcia Powell in an outside recreation enclosure. ADC also modified some of the maximum custody cell doors in the Lumley Unit (5 of 12 doors were modified as of 9/7/2010) to allow for better monitoring of mental health inmates. Over the following 24 months, the cell doors of Yard 35 were also modified to allow the officers to have better visibility when conducting constant watches. The concept was then considered for the male maximum custody cells at Florence in approximately Fall/Summer 2011, and was implemented throughout 2011, 2012 and 2013, and is still ongoing.

- Modification to cell enclosures for group programming. ADC is currently in the process of implementing group programming "desks" for maximum custody inmates. Director Ryan initially got the idea to use these desks after they were showcased at an ASCA Western Directors Conference in July 2010 and after he met with the Director for the Washington State Department of Corrections. Currently, group programming for maximum custody inmates is conducted with the inmates inside individual enclosures. With implementation of the new desks, inmates will be able to participate in programming as a group and without an enclosure, while still ensuring they are properly restrained.

   3.   The Court imposed the September 2013 cut-off after Defendants' experts already relied on evidence after that date.

   Defendants' experts relied on evidence in October, November, and December 2013 in formulating their opinions. This included expert tours by three of Defendants' experts (Drs. Dovgan, Mendel, and Penn), who conducted their tours in November/December 2013, and gross data during these months once they became available. The evidence is already built into their opinions. As discussed above, Defendants relied on legal authority allowing evidence of ongoing conditions in

1    prospective injunctive relief cases such as this one when they scheduled the expert tours
2    and facilitated their experts' reports.  The Court's Scheduling Orders did not inform the
3    parties that such evidence would be rejected, Plaintiffs acknowledged Defendants would
4    rely on such evidence, and the Court anticipated the evidence as well.  Had Defendants
5    known that such evidence would not be allowed, they would have ensured that the expert
6    reports focused solely on pre-September 2013 data.  They would have also scheduled their
7    expert tours before that date.[5]

8           It is apparent now that Plaintiffs waited until after the close of fact discovery
9    and after Defendants' experts' disclosures to raise this issue with the Court, leaving
10   Defendants no opportunity to cure it. The Court's order after these deadlines expired
11   sealed Defendants' fate.  This is a harsh and unfair ruling and rewards Plaintiffs'
12   scorched-earth litigation and gotcha tactics, particularly when Plaintiffs still have an
13   opportunity to depose Defendants' experts regarding their reports and the evidence they
14   relied on.

15                **D.    Extending the Cut-Off Date is Feasible and Fair to Both Parties.**

16          Given the importance of current evidence on the issue of liability and the
17   extreme prejudice to Defendants if the September 2013 cut-off date stands, Defendants
18   respectfully request the Court to extend that date.  This can be accomplished by re-setting
19   the evidence cut-off, and allowing both parties to conduct additional discovery, all without
20   upsetting the October 2014 trial date and still allowing plenty of time for dispositive
21   motions.  Defendants propose extending the cut-off date to **July 1, 2014**.  Defendants may
22   supplement their disclosures with gross data and other relevant evidence, Plaintiffs may
23   conduct additional, specific discovery to "test" that evidence, and both parties may
24   concurrently conduct fact and expert discovery, up until that time.  This is precisely what
25   Plaintiffs have proposed in the past.  (See Doc. 559 at 10: "Plaintiffs request that limited

26   _____
27   [5] Defendants scheduled their expert tours when they did to accommodate their
     experts' schedules and because Defendants were inundated with Plaintiffs' discovery
     demands in July, August, and September 2013, which included 20 depositions between
28   August 20, 2013 and September 27, 2013, and 46 expert tours in July and August 2013.

fact discovery be permitted until six months before trial (i.e., contemporaneously with expert discovery and depositions) so that evidence produced at trial is more current."; Id. at 8 n.11: "Plaintiffs propose that fact discovery be continued concurrently with expert discovery."; Doc. 753 at 10: "Plaintiffs respectfully request that the Court re-open discovery to allow Plaintiffs to test Defendants' contentions and set a new cut-off that precludes Defendants from introducing later created evidence. . . . Plaintiffs ask that the schedule in this case be similarly re-set so that discovery closes in July and that both parties be bound by that cut off in their trial presentations.").

A July 1 cut-off date would preserve the parties' abilities to file dispositive motions (e.g., motions due on July 15, 2014, responses due on August 15, 2014, and replies due on September 1, 2014), and further preserve the Joint Proposed Pretrial Order (September 26, 2014), Pretrial Conference (October 6, 2014), and Trial (October 20, 2014) dates already in place. (Doc. 389.)  Although the Court has stated that it will "move fast" in ruling on the dispositive motions (Ex. 1 at 25), if more time is needed the cut-off date can be moved up to June 1, 2014.  Given the amount of time before trial, this proposed cut-off date is flexible, and Defendants are amenable to modifications.  Any extension will shorten the 13-month gap between the current cut-off date and the date of trial (something Plaintiffs have wanted all along), and alleviate the unfair prejudice that Defendants currently face.

**E.**      **Plaintiffs Will Not Be Prejudiced By an Extension of the Cut-Off Date**

As discussed above, Plaintiffs expected Defendants to introduce evidence of current conditions.  And they have made several requests in the past (even in their Motion to Strike) to extend discovery.  (Doc. 753 at 9; Doc. 559 at 8-9.)  Defendants' proposal allows them to do just that.  Plaintiffs also represented to the Court at the July 20, 2012 Scheduling Conference that there was no need to continue litigating this case if they had evidence that the private healthcare provider was providing constitutionally adequate care. (Ex. 2 at 30-31.)  Finally, Defendants – not Plaintiffs – are the ones who will be burdened by any additional discovery. As the Court has recognized, Plaintiffs have pursued

excessive and overbroad discovery in this case.  But their discovery abuse should not be a reason to deny <u>Defendants'</u> request to extend the cut-off date.  Defendants are willing to engage in additional discovery to avoid the severe prejudice that will occur if the cut-off date is not extended.  In a sense, denying Defendants' request because of Plaintiffs' prior discovery abuses (and the headache it has caused the Court) would be rewarding that abuse.  (See Ex. 1 at 5, 29: "There has been excessive discovery in this case. . . . The sooner we do it [discovery cut-off] the less I have to deal with that.").

## IV. DEFENDANTS REQUEST LEAVE TO SUPPLEMENT THE DISCLOSURES OF THREE RULE 26(A)(2)(C) WITNESSES

Defendants have served Plaintiffs today with their Fifteenth Supplemental Disclosure Statement. (Ex. 6.)  In compliance with Fed.R.Civ.P. 26(a)(2)(C), that Disclosure Statement exhaustively supplements the expected testimony regarding: (1) Dr. Taylor's own treatment of Plaintiffs Thomas and Gamez; (2) Dr. Robertson's own treatment of Plaintiff Jensen; and (3) Dr. Hanstad's own treatment of Plaintiffs Chisholm and Wells.  It also supplements the expected testimony regarding: (4) Dr. Taylor's review of certain treatment provided to Plaintiffs Verduzco and Polson by other healthcare staff. The Disclosure Statements provide a summary of the facts and an opinion to which these witnesses are expected to testify.

Supplements (1), (2), and (3) fall squarely under the purview of Rule 26(a)(2)(C) because they pertain to their own treatment of the named Plaintiffs.  *See Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 819 (9th Cir. 2011) (noting that "treating physicians" are excused from Rule 26(a)(2)(B)'s expert-report requirement); *see generally* Fed.R.Civ.P. 26(a)(2)(B) (expert report only required if "witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony").  As for supplement (4) – Dr. Taylor's review of certain treatment provided to Plaintiffs Verduzco and Polson – Dr. Taylor did <u>not</u> review those records "to provide expert testimony in th[is] case."  At the time she reviewed their medical treatment, Dr. Taylor

15

was the Mental Health Contract Compliance Monitor. (Ex. 6; Ex. 7 at 37.)    Her responsibilities as a Compliance Monitor include randomly reviewing medical files and MGAR findings at various facilities.  (Id.) Dr. Taylor reviewed the treatment of Plaintiffs Verduzco and Polson in the course of her responsibilities as Contract Compliance Monitor and specifically during one of those random audits.  (Id.)  Thus, her testimony is not subject to Rule 26(a)(2)(B).

Defendants ask this Court to reconsider its ruling prohibiting these witnesses from testifying as to the aforementioned treatment/review of treatment.  Striking their testimony is the harshest of sanctions, and particularly harsh where the deficiency was harmless.  *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010) ("Among the factors that may properly guide a district court in determining whether a violation of a discovery deadline is justified or harmless are: (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of the trial; and (4) bad faith or willfulness involved in not timely disclosing the evidence.").

First, the original disclosures of Drs. Taylor, Robertson, and Hanstad did provide notice that they would be testifying regarding their treatment or review of treatment of the named Plaintiffs and provide an opinion as to that treatment.  During Dr. Taylor's prior deposition, she testified that she treated Gamez. (Ex. 7 at 245–246, 248.) And Plaintiffs' own disclosure statement listed Drs. Robertson, Taylor, and Hanstad as potential Plaintiff witnesses. (Ex. 8.) And most importantly, Defendants provided Plaintiffs with all of the corresponding medical records underlying their treatment prior to the fact discovery deadline.  Second, the deadline to depose expert witnesses has not yet expired and does not expire until April 11, 2014.  (Doc. 780.)  There is still ample time to depose these three witnesses and explore their testimony/opinions.  In fact, Plaintiffs have noticed the deposition of Dr. Hanstad for April 2, 2014.  The Court does not need to reopen discovery, and taking their depositions by the April 11 deadline will not disrupt the current dispositive motion deadline (April 18, 2014).  And third, trial is more than seven

16

months away.  It will not be disrupted.  *See Carrillo v. B & J Andrews Enterprises*, LLC, 2:11-CV-01450-RCJ, 2013 WL 394207, at *7 (D. Nev. Jan. 29, 2013) (disclosure violation harmless where party had sufficient time to review the documents and conduct discovery); *Davis v. GEO Grp.*, No. 10-CV-02229-WJM-KMT, 2012 WL 882405, at *3 (D. Colo. Mar. 15, 2012) (disclosure violation harmless in light of time remaining before trial); *In re Denture Cream Products Liab. Litig.*, 09-2051-MD, 2012 WL 5199597, at *6 (S.D. Fla. Oct. 22, 2012) (disclosure violation harmless where discovery was still open and depositions could cure any prejudice).  Because Plaintiffs will not be prejudiced by their expert disclosures, their expert testimony should not be stricken.

## CONCLUSION

For these reasons, Defendants respectfully request this Court to reconsider its February 26, 2014 order, extend the discovery cut-off date to July 1, 2014, and allow Drs. Taylor, Robertson, and Hanstad to provide Rule 26(a)(2)(C) expert testimony as to their treatment/review of treatment of the named Plaintiffs as described herein.

17

DATED this  12th  day of March 2014.

STRUCK WIENEKE & LOVE, P.L.C.


By /s/ Nicholas D. Acedo
    Daniel P. Struck
    Kathleen L. Wieneke
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    Ashlee B. Fletcher
    Anne M. Orcutt
    STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
    Chandler, Arizona  85226

    Arizona Attorney General Thomas C. Horne
    Office of the Attorney General
    Michael E. Gottfried
    Lucy M. Rand
    Assistant Attorneys General
    1275 W. Washington Street
    Phoenix, Arizona 85007-2926

    *Attorneys for Defendants*

2871529.1

18

**CERTIFICATE OF SERVICE**

I hereby certify that on March 12, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:               ahardy@prisonlaw.com

Amy Fettig:                 afettig@npp-aclu.org

Caroline N. Mitchell:       cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:         ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:        DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

Daniel Joseph Pochoda: dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

David Cyrus Fathi:          dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:             dspecter@prisonlaw.com

James Duff Lyall:           jlyall@acluaz.org; gtorres@acluaz.org

Cathleen M. Dooley:         cdooley@azdisabilitylaw.org

J.J. Rico:                  jrico@azdisabilitylaw.org

John Howard Gray:           jhgray@perkinscoie.com; slawson@perkinscoie.com

Kirstin T. Eidenbach:       keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com

Jerica L. Peters:           jpeters@perkinscoie.com

Matthew Benjamin de Mee: mdumee@perkinscoie.com; cwendt@perkinscoie.com

Michael Evan Gottfried:Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov

Sara Norman:                snorman@prisonlaw.com

Asim Varma:                 avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

David C. Kiernan:           dkiernan@jonesday.com; lwong@jonesday.com

John Laurens Wilkes:        jlwilkes@jonesday.com, dkkerr@jonesday.com

Kamilla Mamedova:           kmamedova@jonesday.com

19

Jennifer K. Messina:      jkmessina@jonesday.com

Taylor Freeman:      tfreeman@jonesday.com

Sarah Eve Kader:      skader@azdisabilitylaw.org, mlauritzen@azdisabilitylaw.org

Katherine E. Watanabe: Katherine.Watanabe@azag.gov, susan.oquinn@azag.gov

Amelia M. Gerlicher:      agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, pdrew@perkinscoie.com

Lucy Marie Rand:      Lucy.Rand@azag.gov, Geneva.Johnson-Joksch@azag.gov

Ajmel Quereshi:      aquereshi@npp-aclu.org

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/  *Nicholas D. Acedo*