EXHIBIT 1

EXHIBIT 1

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

———————————

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | )<br>)<br>)<br>)<br>) No. **CV 12-00601-PHX-NVW**<br>)<br>) |
| Plaintiffs, | ) **Phoenix, Arizona**<br>) **February 24, 2014**<br>)   **3:07 p.m.** |
| vs. | ) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

———————————————

BEFORE:   **THE HONORABLE NEIL V. WAKE, JUDGE**

(*Motion Hearing*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

5

1    defeat plaintiffs' case.  They do not.

2           Now, in this case, we set a fact cutoff and a

3    discovery cutoff closely related to it that actually is more

4    generous to the defendant because it's way past the time the

5    complaint was filed, and that the defendant's theory that          16:06:27

6    everything can be proved up to the last minute would make the

7    entire idea of a case management schedule a joke.  There would

8    be no limit to anything.

9           So the practical need to focus the factual inquiry and

10   to have a meaningful trial and not have perpetual discovery       16:06:55

11   expense makes it necessary to do what we did.  But in any

12   event, the law of injunctions allows -- tracks it in a

13   parallel.

14          So the fact deadline stands.  The discovery deadline

15   stands.  Now, the plaintiffs' suggestion that, well, if you let   16:07:14

16   them get away with this we want to have discovery for another

17   four or five months, the answer is that is not good enough

18   because what that would mean is any time anybody just blows off

19   the case management schedule, they blow off the discovery

20   limit.  So one gets rewarded for violating the Court's orders,    16:07:38

21   and that's not required, nor is it sensible.

22          So I gave you all plenty of time.  There has been

23   excessive discovery in this case.  And this case proves that it

24   is not possible for district judges to calibrate lawsuits

25   exactly the way they should be.  There's plenty of room for       16:08:02

1    care provider, Corizon, who is doing a very good job, has been

2    in place since March of 2013.  So that gives them roughly five

3    months of evidence with respect to what Corizon is doing

4    regarding the health care, and that is simply unfair and

5    it's -- in order to -- for you to determine that there is a          16:24:07

6    systemic deficiency, you can't really do that in five months.

7        THE COURT:  Well, but the situation, whatever it is,

8    there's no reason to doubt that, well, if there were

9    deficiencies, constitutional deficiencies, why should we assume

10   that they just arose under Wexford as opposed to having been        16:24:40

11   there before when the State of Arizona decided to save money by

12   spending less on prisons.

13       MR. STRUCK:  And, Your Honor, I'm not suggesting there

14   are systemic deficiencies because we don't think there are.

15       THE COURT:  I know.                                              16:24:58

16       MR. STRUCK:  But the argument that we're making is, if

17   there is a systemic deficiency that's caused by the

18   circumstances with respect to a one- or two-month period of

19   time, I don't know to what extent the Court is going to be

20   looking at that very small window of time to determine --           16:25:16

21       THE COURT:  Well, I don't know what I'm going to see.

22   I know there's been an astounding amount of discovery here, but

23   I'm assuming that I'm going to get evidence that describes a

24   broader range of levels of policy and care and expenditure and

25   whatnot, not just a small window of a few months or five months     16:25:38

UNITED STATES DISTRICT COURT

1   boundary ever, not even on the first day of trial.  On the last

2   day of trial you can tell me what happened the day before.

3          MR. STRUCK:  Your Honor, that's not what I felt it

4   meant, but I did -- I have said consistently, and we have

5   argued this point before you on more than one occasion, that          16:29:17

6   what is happening at the time of trial is relevant and it's

7   relevant not just to if you find that there is a constitutional

8   violation --

9          THE COURT:  You know, maybe I shouldn't jump ahead of

10  my own discussion.  I could be wrong about this, but my                16:29:34

11  recollection is that I set that longer schedule at your

12  request, that the plaintiffs wanted an earlier trial date.

13         MR. STRUCK:  Plaintiffs have wanted an earlier trial

14  date.  That is true.

15         THE COURT:  So it is appearing to me now that by                16:29:47

16  accommodating your request, I have put them in an unfair

17  position.  That's one reason I pulled up my calendar and I

18  said, where do I have some time?  As turns out it may be just

19  luck, but it turns out I can create some time in June.

20         MR. STRUCK:  Well, and I will get to that in a second          16:30:08

21  but I would like to address some of the other things that the

22  Court raised.  And I understand what you are saying.  And I

23  can't recall whether it was done at our request or whether you

24  set those dates.  I really can't.  I'd have to go back and

25  look.                                                                  16:30:24

UNITED STATES DISTRICT COURT

1          But we're not prejudicing the plaintiffs because they

2     will be provided with the information.  We're not going to be

3     introducing any information that they didn't have.  And simply

4     because they won the race to trial, they got it here earlier

5     and they knew -- that's one of the reasons why they didn't stay          16:30:41

6     the case when you suggested they stay the case back at the

7     scheduling conference back in July of 2012.  They didn't want

8     to stay it, because they knew that there would be issues with

9     respect to getting a private operator up to speed regarding the

10    health care system.          16:31:04

11         THE COURT:  One of the key reasons I didn't think I

12    should do that is they are alleging a violation of

13    constitutional rights now, and seemed like they have a right to

14    try to prove that.  And so I -- that was a significant reason

15    for me not just pushing this all off.          16:31:20

16         Anyway, go ahead, Ms. Struck.  I keep interrupting

17    you.

18         MR. STRUCK:  That's fine.  I understand.

19         But anyway, with respect to the evidence that we would

20    like to present at trial, it's not going to be in the form of          16:31:37

21    anything other than statistics.  I mean, it's going to be, here

22    is how long it takes to get a chronic consult.  We keep

23    statistics on that on a monthly basis.  It's not rocket

24    science.

25         THE COURT:  I thought you were going to offer not just          16:31:58

1  statistics but opinions based on those statistics, you know.

2  If it's just the statistics, I see your perspective on that.

3  But, you know, if you are saying, well, we are giving all this

4  stuff and we want to offer opinions, they don't take anything

5  on faith from you and a trial is not a faith based exercise.    16:32:22

6  So that's the unfairness.  I expected you all, and I appreciate

7  you are giving ongoing data.

8          MR. STRUCK:  And, Your Honor, I think what I

9  understood your preliminary ruling on the witnesses is that

10  you're not going to allow anything that wasn't properly         16:32:41

11  disclosed vis-a-vis the case management conference or the Rule

12  26.  And so it doesn't seem to me that we're going to be able

13  to provide any testimony from either our 26(a)(2)(B) experts or

14  our employees with respect to whether or not, you know,

15  treating a diabetic within this frame of time was within the    16:33:03

16  standard of care.  So --

17          THE COURT:  Well, I am primarily concerned with the

18  unfairness about offering opinions.  They have --

19          MR. STRUCK:  I'd like to -- I'm sorry I interrupted

20  you.                                                            16:33:24

21          THE COURT:  But what I'm saying is I have got to think

22  this through.  If you just want to have updated data, I

23  expected that anyway so there may not be unfairness in the

24  updated data although there might.  I think there would be

25  unfairness of letting people offer opinions if the other side   16:33:36

1   It's not even actually --

2          THE COURT:  I will move fast on that.

3          MR. STRUCK:  It's going to be a big one.  We're going

4   to move on the whole thing and we think we've got a good shot

5   at it.  We certainly have an opportunity to cut out a lot of          16:42:47

6   claims in this case and shorten this trial, make it cheaper for

7   plaintiffs, make it cheaper for us, and promote judicial

8   economy.

9          So we would like an opportunity to fully brief this as

10  the order set forth, and I think June 13th is when you ordered      16:43:04

11  our reply.  And I think it's going to -- I understand you do

12  move quickly.  I have had you in other cases.  This is a big

13  one, though, and it may take some careful time and thought.

14         That's probably --

15         THE COURT:  I guess you are going to ask me to let you      16:43:22

16  go beyond the 17-page limit.

17         MR. STRUCK:  Yes, Your Honor, we are.  It's a big case

18  right now.  We don't know what the Ninth Circuit -- and that's

19  another issue.  We're still -- we haven't gotten an opinion.

20         THE COURT:  It would be nice if they are going to --      16:43:41

21  whatever they are going to do would just do it.

22         MR. STRUCK:  I agree.  I agree.  And there were -- I

23  don't know what they are going to do.  There were questions

24  with respect to the scope of the claims that were certified and

25  the manner in which it was certified that could have just been      16:43:56

1        THE COURT:  What it would do, it would undercut, not

2   totally, but in large part what you are telling me about now

3   you want to have rolling discovery that -- rolling proof that

4   never ends.  The sooner we do it the less I have to deal with

5   that.                                                              16:48:35

6        MR. STRUCK:  Well, I think you told me you are not

7   going to be dealing with that unless it's something you really

8   want to hear in which case --

9        THE COURT:  The truth is I told you what my

10  disposition was, but you will get my ruling when you get it.      16:48:47

11       MR. STRUCK:  And I understand what you are saying

12  about folks' schedules.  But it is important, you know, we've

13  got -- Kathleen Wieneke's son is getting married the first week

14  in June in Austin, Texas.  She's going to be out.  I was

15  actually going to go to the wedding because it's the same boy     16:49:03

16  she was pregnant with when she and I tried *Casey versus Lewis*

17  20 years ago.

18       THE COURT:  What a better remembrance than to try this

19  case.

20       MR. STRUCK:  Yeah.  She's not going to miss that.  And       16:49:15

21  we have experts who are -- they are a bear to schedule and not

22  only will we want them to testify but we may very well want

23  them to sit in when the plaintiffs' experts testify.  And their

24  June and July is booked.  So, you know, those aren't -- and

25  they have, you know, they have other cases and other things       16:49:40

1    going on.

2         It's just -- I mean, we have a, with all of our main

3    witnesses, we have all sorts of scheduling nightmares.  And

4    it's just -- it would be prejudicial to the defendants to gear

5    up to get this thing ready to go for trial on June 3rd between                16:49:58

6    now and then.  Honestly, Judge, I just don't think it could be

7    done.

8         THE COURT:  It doesn't surprise me, but on the other

9    hand, when I went with you instead of them on this schedule,

10   you didn't tell me that my fact cutoff, my discovery deadlines                16:50:16

11   were really fictional.  If you had told me that back then, it's

12   likely I would have said something like, oh, I will move your

13   trial up earlier.

14        MR. STRUCK:  And, Your Honor, I don't think -- that's

15   not exactly what we are anticipating here.  But I thought that                16:50:35

16   we have been very open and honest, not only with you, but I

17   know Don Specter and I have had many conversations about that.

18   In fact, I know that he agreed with me at one time that what

19   was happening at the time of trial in terms of health care was

20   very important to the Court.  So we're not trying to pull a                   16:50:53

21   fast one on anybody.  And we never intended to do that and

22   don't intend to do it.  And it sounds like you wouldn't let us

23   do it anyway even if we wanted to.

24        But with respect to a June 3rd trial date, it would

25   prejudice defendants to get ready to go that quickly.  We                     16:51:11

UNITED STATES DISTRICT COURT

1    what I'm going to have to do here is what I do in virtually

2    every civil trial.  The criminal trials I don't have to do it

3    because they are short.  And that is, figure out, as best I

4    can, what an amount of time is and give it to you and then I

5    leave it to you to use that time well.  Unfortunately, I found       17:07:49

6    that the civil lawyers routinely ask for a multiple of the

7    amount of time they really need and then when I set them to a

8    time budget, guess what.  I get efficient trials.  Whereas if I

9    just give you what you want I have three trials a year.

10          MR. SPECTER:  Okay.                                            17:08:08

11          THE COURT:  So that is what I almost always do on

12   civil trials.  But to do that, I want to have as good an

13   understanding as I can about the issues and witnesses so I'm

14   coming up with an amount of time that gives you what you should

15   have but still forces you to be efficient.                           17:08:22

16          MR. SPECTER:  Sounds like a good balance.  We're

17   perfectly willing to work on that.

18          THE COURT:  Anything else?  I do have another matter

19   that's backed up.

20          MR. SPECTER:  No, Your Honor.  I think that's enough.         17:08:32

21   Thanks.

22          THE COURT:  I will take the motion under advisement.

23   I will try to get an order out as soon as possible, maybe even

24   tomorrow.

25          And oh, with respect to the trial date, well, I don't        17:08:41

UNITED STATES DISTRICT COURT

43

1  see how I can do that.  I think I have to live with the mistake

2  I made and I will not lose track of the fact that I made that

3  mistake at Mr. Struck's request of setting the late trial date.

4  So I'm going to try to minimize any unfair effect to the

5  plaintiffs for me setting that trial later than I now wish I          17:09:15

6  had.

7          All right.  Very well.  You are all dismissed and the

8  clerk will call the next case.

9          (Proceeding concluded at 5:09 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

44

1

2

3

4

5

6

7

8                         C E R T I F I C A T E

9

10        I, LAURIE A. ADAMS, do hereby certify that I am duly

11   appointed and qualified to act as Official Court Reporter for

12   the United States District Court for the District of Arizona.

13        I FURTHER CERTIFY that the foregoing pages constitute

14   a full, true, and accurate transcript of all of that portion of

15   the proceedings contained herein, had in the above-entitled

16   cause on the date specified therein, and that said transcript

17   was prepared under my direction and control.

18        DATED at Phoenix, Arizona, this 5th day of March,

19   2014.

20

21                         s/Laurie A. Adams

22                         Laurie A. Adams, RMR, CRR

23

24

25

**EXHIBIT 2**

**EXHIBIT 2**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

———————————

| | |
|---|---|
| Victor Antonio Parsons, et al., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. **CV 12-601 PHX-NVW** |
| ) | |
| Charles L. Ryan, et al., ) | Phoenix, Arizona |
| ) | July 20, 2012 |
| ) | 10:20 a.m. |
| Defendants. ) | |
| ) | |

REPORTER'S TRANSCRIPT OF PROCEEDINGS

(Scheduling Conference)

BEFORE THE HONORABLE NEIL V. WAKE

Court Reporter:          Merilyn A. Sanchez, CRR
                         Sandra Day O'Connor U.S. Courthouse
                         401 W. Washington Street SPC-37
                         Phoenix, Arizona  85003-2118
                         (602) 322-7250

Proceedings taken by stenographic court reporter
Transcript prepared by computer-aided transcription

1          MR. SPECTER:  No, Your Honor.

2          THE COURT:  This is just a straight injunction class.

3          MR. SPECTER:  Just a straight injunction class, right.

4          THE COURT:  And for that we have issues of typicality,

5     adequacy of representation.  The adequacy of representation

6     would seem to be not all that difficult.  Typicality would

7     require some discovery, but it doesn't seem like the discovery

8     on class certification should be -- should take all that much

9     time if it's just an injunction class.

10          MR. SPECTER:  Right, Your Honor.  Under -- under the

11    Court's understanding of -- of what that class certification

12    motion requires, we agree with you.  We are prepared to move

13    that time up.  We will need to take some discovery and one of

14    the ways we think we can do that efficiently for class

15    certification is through some of the 30(b)(6) depositions that

16    we intend to notice.

17          THE COURT:  Let me -- let me spoil some of the

18    suspense for all of you.  Congress has provided that civil

19    cases should be concluded within three years of filing.  Other

20    than some cases I had when I came to the court that already

21    couldn't meet that, I have never had a case that violated that

22    deadline of the Civil Justice Reform Act.  I don't intend to

23    break my record for you or any other case.

24          So we are going to have this case, if necessary,

25    through trial and final judgment within three years of filing.

1    And that's March of 2015.  So we can all just count backwards

2    and figure out what time there is to do things.  And I'm not

3    optimistic that there will be any slack anywhere because we are

4    going to have this case to final judgment by March 2015, no

5    matter what.  So we will get everything done that we can get

6    done.  But as I said, I don't expect that there is going to be

7    any slack in the schedule.

8              So if you just think backwards, if we want to have

9    this -- just let's assume a worst-case scenario, that we go the

10   distance on everything, we need to start a trial no later than

11   late 2014 to make sure it's concluded by March of 2015.  Giving

12   account for possibility of scheduling -- little things going

13   wrong.  That means we need to have summary judgments ready to

14   file, briefed and -- because of the magnitude of the case,

15   there could be a lot to do for counsel and for the Court.

16             So just roughly, we need to start the process of final

17   summary judgment briefing in early 2014 to give us eight, ten

18   months to get briefs argued and whatnot and a decision.  Which

19   means that we have, for everything else, about a year and a

20   half.

21             So, when I look at a year and a half, Mr. Specter, I'm

22   just queasy to give you six months for a class certification,

23   because it needs to be briefed and ruled on.  So you would be

24   burning off the better part of a year just to get to class

25   certification.

1    keeps coming up.  And this -- this -- actually this folds into

2    your motion -- are you asking for a stay in that motion?

3            MS. WIENEKE:  Yes, Your Honor.

4            THE COURT:  Because you say here in your report that

5    you were going to do that.  Well, the immediate answer is

6    there's no stay until there's a stay.  So things are going

7    unless I stop them.

8            And I guess we will see what the other side has to

9    say.  I'll just tell you preliminarily, this again, studying

10   the case and your case management report, it seems like a bit

11   of a stretch for the State to say:  Well, we are being sued for

12   something, but we don't want to deal with it because -- in

13   court because we might want to deal with it on our own.

14   Generally you don't stop a lawsuit on that ground.

15           You can stop a lawsuit by coming and proving that you

16   have changed whatever is the basis of the actual conduct.  But

17   not on the basis that what you said.

18           So, you know, my sense for now, and I'll tell you

19   briefly from this and we will have a lot to talk about is for

20   purposes of scheduling this case, I'm not disposed to delay

21   anything on that basis, but I'll hear your motion and see what

22   the other side says in response and might rethink that.

23           But, you know, I do remember reading in the newspaper

24   about the new vendor and don't worry about this, because I

25   don't know what the truth is, but I remember reading that the

1 idea was to spend less money and build in a profit component

2 for the vendor, which seemed like a bit of a challenge for also

3 improving service. But I also saw that it is actually costing

4 more money, so I don't know.

5      So for now, we will go forward and we will consider

6 your motion when it's ready, whether I should stay these

7 proceedings.

8      Now, oh, with respect to amendments, it would not be

9 at all surprising that perhaps in a case like this if some

10 plaintiffs drop out and some others get added in except that we

11 are not going to delay the case. That may happen in due

12 course, but we are not going delay the case for it. So if

13 anybody wants to make any motions, do it quickly. And I think

14 that can probably happen, but it won't have to delay the case.

15      Now, if there are -- do you have a problem,

16 Mr. Specter, about this Wexford company coming in? Is that

17 something you need to amend to name them?

18      MR. SPECTER: Well, my co-counsel, Mr. Fathi, will

19 address that.

20      THE COURT: All right, Mr. Fathi.

21      MR. FATHI: Thank you, Your Honor. I'm David Fathi

22 with the ACLU National Prison Project.

23      The whole Wexford issue really is kind of a red

24 herring. The department has a nondelegable duty under the

25 Eighth Amendment to provide constitutional conditions in

1   fact, now I remember there was something in your report about

2   on July 6, you said you were going to think about something.

3   Was it this?

4          MR. SPECTER:  Yes, Your Honor, it was.

5          THE COURT:  Speak into the microphone.

6          MR. SPECTER:  Sorry, everybody -- my voice is soft and

7   I get called on that quite a bit.

8          Yes, we have.  The defendants, or Mr. Struck, who is

9   not here, and I, and Mr. Fathi had a telephone conversation

10  where we talked about this issue.  And in his proposed status

11  report, he had said, you know, we will give you the discovery

12  you need to effectively evaluate whether Wexford is doing a

13  good job.

14         And so we said, okay, if you really mean that, and we

15  can determine whether or not Wexford is doing a good job,

16  because as you said, if they are providing constitutional care,

17  we are happy because our clients will be happy, and we don't

18  want to spend a fortune litigating a case which we are not

19  going to win.

20         So we proposed a stipulation which would give us the

21  discovery we thought we would need and also firm up the -- the

22  conditions under which we would be operating during this little

23  period.  And I got a letter back from the defense counsel

24  yesterday or the day before basically rejecting many of those

25  points.

1        So I don't really think that we can come to any

2  effective agreement.  And more importantly, Your Honor, we've

3  continued to gather information.  We've been visiting prisoners

4  recently.  And our opinion is that the care is not getting

5  better based on the limited information we've been able to

6  gather.

7        So we are not really inclined to stop anything at the

8  moment.  I think if in fact there is a point where our opinion

9  changes, we will certainly let you know.  But as of this point,

10  we are where we think we need to move forward with the trial

11  schedule that you've outlined.

12        THE COURT:  And I'll do that unless everybody agrees

13  to something else.  But my comment was more not so much a

14  matter of whether you think in the 20 days they have changed

15  things, but whether you might think it wise, simply to give

16  them a better chance to, A, do better, and, which in turn gives

17  you a better prospect when you come back in full force and have

18  the new status quo that's easier to discover.

19        So I wasn't thinking that you would just accept where

20  they are, but I was thinking you might want to give them the

21  chance to either improve things or give you a better record

22  than you can make if you would go full bore the next four to

23  six months.

24        And, you know, the reality is for a structural

25  injunction case, even though I will get this done in three

 1    years, that the time that would be passing would not be

 2    significant in terms of you achieving the ultimate objections

 3    you want to achieve at the back end.

 4         Now, that's really -- it's whether you have to think

 5    that Wexford is taking this lawsuit seriously.  If you just

 6    think that six months from now they are going to be doing

 7    nothing different than they are now, there's no reason to wait.

 8         MR. FATHI:  That's right, Your Honor.  If I may, to

 9    just to add to Mr. Specter's comments, we are very concerned

10    about further delay.  Just to put this in context, there have

11    been, since the first of the year, at least four suicides in

12    the prison system, at least 36 other deaths, including people

13    as young as their 20s.  And this is a case of ongoing violation

14    of fundamental constitutional rights.  So we are very concerned

15    about the delay that would be occasioned by dismissing and

16    refiling.

17         Obviously the defendants have made a mootness

18    argument, they certainly have the right to come forward with

19    evidence and meet what the Supreme Court has characterized as a

20    heavy burden of showing that the violations have been cured and

21    cannot be expected to recur.  But we believe that should occur

22    in the context of this lawsuit, Your Honor.

23         THE COURT:  All right.  Well, that's -- as I view it,

24    you all would have to agree to a course of action like that;

25    otherwise, we are going forward with the lawsuit.

1    to talk about trial scheduling and how long it would take.

2              MR. SPECTER:  Can I --

3              THE COURT:  Yes.

4              MR. SPECTER:  Sorry, can I ask when you envision

5    generally trying the case?

6              THE COURT:  Yeah.  I am -- as I said at the beginning

7    of our discussion, I would start this no later than January

8    2015, which is two months before the time it has to be done.

9    However, I -- it would be much better if we would do it in the

10   fall of 2014.  Part of this just -- this is going to be a big

11   trial to fit in on my calendar.  And there needs to be a little

12   time for things to go wrong.

13             So if we have -- realistically, you know, I would be

14   shooting for sometime in the fall of 2014.

15             I might even shoot for the summer, but it's hard to

16   set a trial this length in the summer.  There just -- lawyers

17   and witnesses and experts are just -- you can't fit a time in.

18   So the fall is the realistic time to expect it.

19             So -- and all right, I think -- I think that's

20   everything on your list.

21             Let me ask counsel if there's anything either of you

22   would like to bring up that would assist us processing the

23   case.  Mr. Specter?

24             MR. SPECTER:  Well, I just want to go over what I

25   understand, not including the days because your clerk will send

1                          C E R T I F I C A T E

2

3

4

5

6          I, MERILYN A. SANCHEZ, do hereby certify that I am

7   duly appointed and qualified to act as Official Court Reporter

8   for the United States District Court for the District of

9   Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15

16

17          DATED at Phoenix, Arizona, this 25th day of July,

18   2012.

19

20

21                          S/Merilyn A. Sanchez

22                          MERILYN A. SANCHEZ, CRR

23

24

25

**EXHIBIT 3**

**EXHIBIT 3**

1             **UNITED STATES DISTRICT COURT**

2             **FOR THE DISTRICT OF ARIZONA**

3             _____

4

5   Victor Parsons, et al., on        )
    behalf of themselves and all      )
    others similarly situated;        )  No.  **CV 12-00601-PHX-NVW**
6   and Arizona Center for            )
    Disability Law,                   )
7                                     )      **Phoenix, Arizona**
                    Plaintiffs,       )      **November 1, 2013**
8   vs.                               )        **3:07 p.m.**
                                      )
9   Charles Ryan, Director,           )
    Arizona Department of             )
10  Corrections; and Richard          )
    Pratt, Interim Division           )
11  Director, Division of Health      )
    Services, Arizona Department      )
12  of Corrections, in their          )
    official capacities,              )
13                                    )
                    Defendants.       )
14  _____  )

15

16          BEFORE:  **THE HONORABLE NEIL V. WAKE**
              UNITED STATES DISTRICT JUDGE

17                   (*Motion Hearing*)

18

19

20

21  Official Court Reporter:
    Laurie A. Adams, RMR, CRR
22  Sandra Day O'Connor U.S. Courthouse, Suite 312
    401 West Washington Street, SPC 43
23  Phoenix, Arizona 85003-2151
    (602) 322-7256

24
    Proceedings Reported by Stenographic Court Reporter
25  Transcript Prepared by Computer-Aided Transcription

---

November 1, 2013 - Motion Hearing

```
 1          THE COURT:  I understand that.  But my point is the
 2     lawyers have to have a reasonable time for which they are doing
 3     discovery or we never end the discovery.  It's like Zeno's
 4     paradox.  You never get to the end.
 5          MR. SPECTER:  I fully accept that, Your Honor.  The        15:54:22
 6     problem is the discovery cutoff ended more than a year before
 7     the trial date.  So we have a year's time in which we can't
 8     conduct discovery but the defendants can use whatever
 9     information they have about their system.  So when we get to
10     the trial of this matter, our evidence will be basically --     15:54:41
11          THE COURT:  I see that as impractical, improbable,
12     because in fact, A, the lawyers -- you are suing for systemic
13     violations.
14          MR. SPECTER:  Yes, Your Honor.
15          THE COURT:  And it's very improbable that a systemic       15:54:54
16     violation will arise in the few months before the trial.  If it
17     is systemic, it had to have been there for quite a while.  So a
18     reasonable time frame is entirely reasonable to limit the
19     endless discovery.
20          MR. SPECTER:  I agree.  And in the *Plata* case, for       15:55:09
21     example, the Supreme Court affirmed a district court order
22     saying three or four months before trial was reasonable.  Here
23     we're talking about 13 months.
24          THE COURT:  Well --
25          MR. SPECTER:  We don't want to get into the                15:55:22
```

40

1

2

3

4                     C E R T I F I C A T E

5

6          I, LAURIE A. ADAMS, do hereby certify that I am duly

7    appointed and qualified to act as Official Court Reporter for

8    the United States District Court for the District of Arizona.

9          I FURTHER CERTIFY that the foregoing pages constitute

10   a full, true, and accurate transcript of all of that portion of

11   the proceedings contained herein, had in the above-entitled

12   cause on the date specified therein, and that said transcript

13   was prepared under my direction and control.

14         DATED at Phoenix, Arizona, this 16th day of December,

15   2013.

16

17                              s/Laurie A. Adams

18                              _____
                                Laurie A. Adams, RMR, CRR

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

EXHIBIT 4

EXHIBIT 4

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

────────────────────

| | |
|---|---|
| **Victor Parsons**, et al., on behalf of themselves and all others similarly situated; and **Arizona Center for Disability Law**, | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) ) |
| **Charles Ryan**, Director, Arizona Department of Corrections; and **Richard Pratt**, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

No.  **CV 12-00601-PHX-NVW**


**Phoenix, Arizona
August 7, 2013
10:00 a.m.**

────────────────────


BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**


(*Motion Hearing*)


Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

4

─────────────── August 7, 2013 - Motion Hearing ───────────────

 1  schedule that was submitted yesterday, Your Honor.

 2          THE COURT:  How do you spell your name?

 3          MS. GERLICHER:  G-E-R-L-I-C-H-E-R.

 4          THE COURT:  All right.  Fine.  I do not have you on my

 5  list.                                                          10:02:23

 6          Okay.  All right.  This is the time set for hearing on

 7  the Motion For Stay Pending the Appeal of a Class

 8  Certification.  And I also directed you all to be prepared to

 9  discuss the status of discovery.

10          Maybe it would make the discussion easier if I just    10:02:42

11  tell you what my preliminary thoughts are so that you can focus

12  your comments on them.

13          My preliminary thoughts are that the discovery should

14  not be stayed pending the appeal, and the discovery should be

15  concluded quickly with very little more to do.  Staying the    10:03:08

16  discovery would have the cost of rendering it very likely to

17  have been wasted; that if it's stayed for however long it takes

18  for the Court of Appeals to rule on the class certification

19  appeal, that discovery is likely to be out of date and have to

20  be done over again.                                            10:03:35

21          And a great amount of discovery has been done, and I

22  will tell you frankly, I need to hear from counsel about this.

23  But my preliminary sense from your summary is that much of the

24  discovery is likely to have been of little value.  And if the

25  case is such that the parties, or the plaintiff, can expend     10:03:57

UNITED STATES DISTRICT COURT

17

─── August 7, 2013 - Motion Hearing ───

1    get-go.  But we heeded this Court's advise to act reasonably.

2    We did not want to have to fight that in front of you.

3         THE COURT:  I fear that I may have intimidated you all

4    earlier, and I regret that.

5         MR. ACEDO:  Well, we're 41 tours into it.  And that's        10:22:48

6    the past.  But the fact of the matter is there's 12 left.  And

7    none of them are mental health tours.  I believe eight of the

8    12, none of the plaintiffs are there.  Two of the three experts

9    that are touring have already conducted tours at other

10   facilities.  There's no reason for those to happen, none.  As    10:23:06

11   far as the depositions, even if you cut it off at 25, they

12   still have some left.

13        From our view --

14        THE COURT:  What do these depositions -- this issue of

15   the systemic and class challenge here, I have always understood  10:23:28

16   to be aimed at the gross level of provision of services that

17   seem to me to be easily ascertainable from gross data and

18   applying them to industry standards about providing medical

19   care to -- in correction settings.  I have not envisioned that

20   that meant walking through all the prisons asking lots of        10:23:54

21   people questions.

22        I will give you a -- I apologize if this comparison is

23   not fair.  But if you want to know how many people are riding

24   on a bus system you can look at the data at the central

25   management of the bus system, or you can interview lots and      10:24:16

UNITED STATES DISTRICT COURT

─── August 7, 2013 - Motion Hearing ───

1  lots of people at the bus stations.  Looks to me like they are

2  interviewing people at the bus stations.  And so I have got

3  serious concerns about how this whole thing is going.

4       MR. ACEDO:  As do we.  As do we, Your Honor.  And

5  that's why we have focused on the tours so much.  And it's        10:24:34

6  baffling in plaintiffs' discovery proposal, they spend most of

7  it complaining that they weren't even broader than they wanted.

8  That's unbelievable.  They essentially provided a list of

9  deposition questions that they didn't get to ask, that we were

10 protecting individuals because -- protecting ourselves because    10:24:54

11 there were no -- this is a Rule 34 deposition.  We had no

12 protection.  They were roving depositions.

13       But that's besides the point.  We agree these expert

14 tours are outrageous, excessive, unduly burdensome.  There's 12

15 left and those can stop.  Those can stop today, right now.        10:25:12

16       THE COURT:  Well, I have come back to the fact that a

17 lot of them have already been done, and I am very reluctant to

18 waste what's been done, even if it was excessive.  I am much

19 more inclined to bring this to closure so that we do not run

20 the risk of a year or two from now having to do this all over     10:25:29

21 again if the Court of Appeals certifies the class

22 certification.  That would be a waste that would be

23 intolerable.

24       So I'm really looking for a way to bring to an end

25 what I fear may be inappropriate discovery so that we have        10:25:49

─────August 7, 2013 - Motion Hearing─────

1    that's not going to be wasted.  Things aren't going to change.

2         THE COURT:  You know, whether it's a year or two years

3    from now, whatever is done now is going to be out of date then.

4    How could I go to trial three years from now on data that's two

5    years old?                                                         10:30:22

6         MR. ACEDO:  One thing we could do, it's the defendants

7    that are going to have to supplement -- that would have to

8    supplement their written discovery responses if that happened.

9    So we would be bearing that burden.  We're asking for the stay

10   now.  We're taking the risk now that this is decertified.  If    10:30:36

11   it's stayed and it's not decertified and it continues as a

12   class action lawsuit, that would be something that would be on

13   our shoulders.  We're not asking -- the plaintiffs are not

14   going to have to come to the table with a lot of discovery.  It

15   largely falls on our shoulders, and it's something we           10:30:54

16   understand.

17        But I think that is something that certainly the

18   parties and the Court can work out if and when that time comes.

19   I don't think it needs to be outrageous.  If we need to

20   re-depose a handful of individuals for one or two hours, we can  10:31:08

21   do that.  We can do it relatively quickly.

22        THE COURT:  By the way, this interlocutory appeal of

23   class certifications is relatively new.  Are there any cases on

24   this about staying this?

25        MR. ACEDO:  No.  I didn't find any, Your Honor.  But        10:31:22

43

─────── August 7, 2013 - Motion Hearing ───────

1        I just want to end by switching back to the stay,

2   because, I mean, that's why we're here initially.  And I think

3   the Court raised some legitimate concerns about, well, to what

4   extent will this discovery be wasted.  We don't think it will

5   be.  If anything, at most, we can supplement.  We can do that                    10:59:59

6   efficiently.  By ordering a stay, we can stop these 22 plus six

7   depositions of six different dentists.

8        THE COURT:  Well, let's go back.  22 depositions of --

9   11 depositions of monitors because you won't agree that a few

10  depositions are representative of different facilities?                          11:00:22

11        MR. ACEDO:  I don't recall a proposal of that -- the

12  only proposal I have seen, which I saw last night for the first

13  time in their discovery proposal, was we'll agree to not tour

14  the remaining facilities if you agree that the conditions at

15  those facilities are identical.  I read that yesterday morning                   11:00:39

16  for the first time.  I don't know about any proposals to say,

17  well, look, one contract monitor's testimony will be

18  representative of the rest of them.

19        THE COURT:  And maybe that just came recently so you

20  haven't had a chance to consider it.                                            11:00:56

21        MR. ACEDO:  But we can stop the 12 remaining tours.

22  We can stop the depositions.  We can wait and come back and

23  reconvene after the appeal is final.

24        THE COURT:  But you, yourself, told me I have got to

25  wait for en banc, certiorari, and the whole bit.  We're talking                 11:01:11

UNITED STATES DISTRICT COURT

─────August 7, 2013 - Motion Hearing─────

1   two years or more.  Even if we get a prompt decision from the

2   panel in the six or nine or 12 months, which would be pretty

3   darn fast for them.

4        MR. ACEDO:  That would be fast.  And nothing would

5   prevent you from lifting the stay.  That's something, certainly    11:01:30

6   something we can consider down the road.  But it's just the

7   nature of the beast.  It's a 23(f) appeal.  We're entitled to

8   it.  The Court of Appeals is interested in it.  And we have a

9   right to pursue that now.  And the ramifications of that order,

10  if it's decertified, far outweigh any discovery that needs to    11:01:51

11  be redone, which we don't think is -- is minimal, if any.  And

12  of the any, that burden is on us, not on them.

13       THE COURT:  Actually, the burden is on them to prove

14  their case.

15       MR. ACEDO:  Well, the burden is on us to supplement or    11:02:07

16  produce.  But all this is a moot point if the Ninth Circuit

17  comes down and decertifies.  I can't imagine what discovery

18  would be left.  That's a very real possibility.  Again, we

19  argue manifest error, and that was one of the three

20  circumstances the Court would take these type of cases.    11:02:27

21       THE COURT:  Is one of the key issues there that if

22  these recent Supreme Court cases that are tightening up the

23  commonality requirements for (b)(3) classes, whether that's

24  going to apply to a (b)(2) class?  Isn't that one of the key

25  issues?    11:02:43

63

─ August 7, 2013 - Motion Hearing ─

1  them further.  And we're to the point where we have agreed to

2  get this set and these are the e-mails that discuss Wexford and

3  Corizon.

4        THE COURT:  My question is, what do you expect to

5  find?  Wexford was a disaster.  Everybody knows that.  What do          11:30:17

6  we need to troll through 16,000 e-mails for?

7        MS. GERLICHER:  Well, because it's a contemporaneous

8  record of what was going on, what was fixed, what was not, why

9  it was going wrong, the role of ADC, in --

10        THE COURT:  I thought they already produced all the          11:30:36

11  Wexford communications.  Is that right?

12        MS. GERLICHER:  No.  They produced communications that

13  were in the Wexford procurement file which were about the

14  procurement process, it appears to us.

15        THE COURT:  So if this were not particularly          11:30:50

16  burdensome, I would have it produced just because it's not a

17  big deal.  Would there be attorney/client communications in

18  these e-mails?

19        MS. RAND:  Yes, Your Honor, there would.  And we would

20  have to review them and redact them as well as the attachments.          11:31:05

21        THE COURT:  Can't you just filter them out for any of

22  the names of attorneys?

23        MS. RAND:  That is also filtering.  After we filter

24  them out then we still have to review for privileged.

25        THE COURT:  Why not just filter them out, everything          11:31:21

1

2

3

4

5                         C E R T I F I C A T E

6

7           I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 8th day of August,

16   2013.

17

18                         s/Laurie A. Adams

19                         _____
                            Laurie A. Adams, RMR, CRR

20

21

22

23

24

25

EXHIBIT 5

EXHIBIT 5

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | CIV 12-0601-PHX-NVW |
| vs. | ) ) | Phoenix, Arizona April 26, 2013 |
| Charles Ryan and Richard Pratt, in their official capacities, | ) ) ) ) | 2:14 p.m. |
| Defendants. | ) ) ) | |

_____

BEFORE:   THE HONORABLE NEIL V. WAKE, JUDGE

REPORTER'S TRANSCRIPT OF PROCEEDINGS

ORAL ARGUMENT

Official Court Reporter:
Linda Schroeder, RDR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 32
Phoenix, Arizona  85003-2151
(602) 322-7249

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1   search and see if it was something that was unduly burdensome.

2   And if it was unduly burdensome, we would address it with them

3   again.  After running the searches, we found out the extent of

4   how many e-mails were included and what we were looking at and

5   determined that when we pulled these and tried to manually

6   convert them in January after we finally nailed down terms in

7   December, we found out it was going to be too time -- it was

8   not an effective or cost efficient means, which is when

9   discussions arose again.

10          THE COURT:  What about this proposal of the three

11   people, the two defendants and Dr. Adu-Tutu, and you search a

12   couple months of e-mails of each?  What about that?  How would

13   that play out?

14          MS. ZUERLEIN:  For the top three individuals, which I

15   think is the most relevant -- it's what gets to whether or not

16   something is deliberately indifferent -- we're looking at about

17   60,000 e-mails.  And I think that it's possible we could finish

18   that by your discovery cutoff, which I believe is September.

19          And that was what we had been talking to plaintiffs

20   about, that at the time we have not been able to get an

21   agreement to limit it to those top three individuals.  And,

22   again, these numbers are based on through November of 2012, so

23   it is going to expand further up to date.

24          THE COURT:  All right.  Mr. Medsker, come on back.

25   I'm having a hard time understanding why we need any of this at

12

1    all.  This is a lawsuit about the inadequacy of the level of

2    medical care.  That's going to require apprehending the actual

3    facts of what levels of care are provided.

4         You're going to need an expert and so are they about

5    what is such a low level that it falls below the constitutional

6    minimums.  I'm at a loss as to why you or anybody needs to

7    troll through tens of thousands or hundreds of thousands of

8    e-mails from anybody.  Go ahead.

9         MR. MEDSKER:  Certainly, Your Honor.  The thing that

10   we have to show is systemwide deliberate indifference.  And the

11   e-mails of not only these three individuals but also the

12   individuals who were responsible for healthcare at each of the

13   facilities and those individuals who were responsible for the

14   relationship with Wexford, which provided the healthcare, those

15   e-mails are the best contemporaneous evidence.

16        THE COURT:  Why?  I mean, you've got a huge volume of

17   business in corrections in a large statewide prison system.

18   You're going to have zillions of e-mails.  What are you looking

19   for?  The e-mails to say I sure hope we never get sued for this

20   because what we're doing is unconstitutional?

21        And for that you want to spend months and months and

22   months and huge amounts of labor and money?

23        MR. MEDSKER:  Well, Judge Wake, we know those

24   e-mails --

25        THE COURT:  When I was in law school, they told a

1      MS. MITCHELL:  Your Honor, could I just address that

2  point for one minute?

3      THE COURT:  Well, no.  We'll hear from Mr. Medsker in

4  turn.

5      Well, anyway, I want to hear this, but just to tell me

6  there are cheaper ways to do this doesn't answer my question.

7  What are we doing it at all?

8      MR. MEDSKER:  We're doing it at all because as

9  plaintiffs, as prisoner plaintiffs, we're entitled to evidence,

10  and we're entitled to discovery that is reasonably likely to

11  lead to evidence.  And it's our burden here to prove systemwide

12  deliberate indifference that's currently going on and to show

13  that the prison was on notice of that.  And there are

14  e-mails --

15      THE COURT:  But, you know, look, I know a lot more

16  than I ever wanted to know about corrections healthcare.

17      MR. MEDSKER:  Understood.

18      THE COURT:  And whatever else you think, the people

19  who do this know a lot about it, and they usually know when

20  they're in trouble.  And when the level of care is simply

21  resulting in not providing care, long delays, and things that

22  you can establish on a gross level of data, that's all you need

23  to win.

24      And so I'm just wondering what is the value of

25  trolling through all of this to find some well-meaning and

UNITED STATES DISTRICT COURT

18

1    perhaps correct physician in the system who said we're not

2    getting enough here.

3          Let's suppose we had that.  Is it worth spending all

4    this time and labor to find that when what will really matter

5    is the systemic data itself as to what resources are being put

6    in rather than looking for the embarrassing e-mail?

7          I can tell you that's what I'm going to care about,

8    about the systemic data.  And I will be aided by expert

9    witnesses who are -- at least whichever ones are believable to

10   me.  That's what's going to matter.

11         So it seems to me that's what ought to be examined

12   rather than -- Well, I am talking freely to help you understand

13   my concerns and to respond to them.

14         MR. MEDSKER:  Of course, Judge Wake.  We are not doing

15   this to harass or embarrass.  We're doing it in our right to

16   find the best evidence of notice.  And we know that it exists

17   because we've seen some of it.

18         THE COURT:  Why not do rifle shot discovery at those

19   people?  You say you already know some of them.  If you have

20   some and you've got great complaining memos that are specific,

21   you've got that.  Why do we have to spend all this time to get

22   a few more?

23         MR. MEDSKER:  Your Honor, this is not rifle shot

24   discovery, respectfully.  We've worked time and time again to

25   narrow this to approximately 36 months of e-mail.  And the

UNITED STATES DISTRICT COURT

1    reason that it's not working and that it's resulting in so much

2    time and cost is the system they're employing, they can't even

3    modify search terms.  Once they've run the searches, that's

4    what you get.  So even if there was a way for us to narrow it

5    down, the way they're doing it doesn't allow us to find the

6    evidence that these prisoners have a right to to prove their

7    case.

8            THE COURT:  Go ahead.

9            MR. MEDSKER:  Your Honor, what we need today and what

10   the prisoners are entitled to is a way to get forward to a

11   productive path for discovery.  As we cited in our brief,

12   e-mails have been used in prison cases before.  They're

13   contemporaneous.  There's no deposition now that we can take

14   that would get evidence that is as good as e-mails about the

15   level of healthcare at the time.

16           THE COURT:  That makes no sense to me at all.  The

17   evidence that matters about the level of healthcare is going to

18   be the gross evidence about budgeting, staffing, number of

19   people being served.  There are probably data out there that

20   relate to delays or wait times.  Maybe there aren't.  But

21   that's what's going to matter.  And when you get that, if

22   you're right, you'll prove your case.

23           MR. MEDSKER:  And we believe that the e-mails will

24   show that the defendants were on notice that those gross levels

25   existed.

1          But I don't think it's accurate to say they've

2     produced all of the electronic e-mails on those.

3          THE COURT:  Well, this seventh joint discovery dispute

4     is a very high level abstraction and a claim of entitlement and

5     objection to expansive electronic discovery.  That's not what

6     you just said here.

7          I'm going to think out loud for a minute.  I'm not

8     disposed to grant the broad electronic discovery that you

9     claim.  Even as you've narrowed it, it appears to me to be

10    burdensome and overbroad, and there are likely to be better and

11    more focused ways to get it than requiring expansive searches

12    of e-mails involving -- that obviously are going to involve

13    people who are dealing with the entire administration of the

14    Department of Corrections.  So I'm not disposed to grant that.

15         And I am, again, I see this case -- and I will repeat

16    myself hopefully briefly, only briefly -- I see this case as

17    not turning on some smoking gun e-mail where somebody admits

18    something or complains about something.

19         I see this case turning on the gross data about the

20    level of care and how that relates to the population being

21    served, the demands being made.

22         Of course it's going -- You're going to have to prove

23    up the case with respect to your named plaintiffs about their

24    conditions, their needs, levels of care that relate to them,

25    and how those levels of care follow below the constitutional

1   And I don't think that that's unreasonable.  We understand this

2   is a different kind of case.  We litigate big antitrust cases,

3   and, believe me, we understand the difference here and the

4   difference of your approach.

5         THE COURT:  Of course there is no antitrust law

6   anymore anyway, is there?

7         MS. MITCHELL:  Well, some of our clients wish not, but

8   it seems to still happen occasionally.

9         But so we're trying to be reasonable.  I think if you

10  just leave this as the parties talk, we're going to continue to

11  have these issues, and we're going to get closer and closer to

12  the discovery cutoff.  And it would be most helpful for us to

13  have these documents, so when our experts go out, they know

14  about it.  Whether you want to refer us to a magistrate to just

15  try and come up with a really focused plan, that's fine with

16  plaintiffs.

17        THE COURT:  Well, I've had some discussion with you

18  all about that, and my only -- my main -- I've talked about

19  having a discovery master and having both of you pay half of

20  it.  But I haven't gotten to that point yet, because so far, by

21  maintaining my familiarity with your disputes, I maintain my

22  ability to give you very prompt action.  So I might have to get

23  that but not yet.

24        And you know, if the evidence shows that the

25  Department had serious systemic deficiencies before the Wexford

1    contract, the idea that we'll fix the deficiencies by saving

2    money on paying less to an outside contractor, well, that will

3    just help your case, not hurt it.

4         MS. MITCHELL:  But we still have to find the evidence

5    of the actual deficiencies and bring that to you.  The cure

6    letter isn't going to win the case for us, and we understand

7    that, and we want to find that evidence and have access to it.

8         THE COURT:  Here's what I'm disposed to do now is,

9    with the benefit of these remarks, simply -- I don't know if

10   I'm denying or affirming -- but terminating this discovery

11   dispute to direct you all to continue to address this in light

12   of the comments that I've given you.

13        And I think you'll have an idea of if you continue to

14   reach an impasse on something much more specific, you can both

15   have an idea of the way I'm likely to see it.

16        And so that will empower you to reach much more

17   focused resolutions that you can both live with on the theory

18   that you think you'll probably lose if you take it any further.

19        But if you can't, then bring it back, and I'll give

20   you my more focused decisions.

21        Do either of you wish to say anything further about

22   this before I get to that deferral resolution?

23        MS. MITCHELL:  No, Your Honor.

24        MR. GOTTFRIED:  No, Your Honor.

25        THE COURT:  All right.  Then with respect to the

1                    C E R T I F I C A T E

2

3        I, LINDA SCHROEDER, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6        I FURTHER CERTIFY that the foregoing pages constitute

7    a full, true, and accurate transcript of all of that portion of

8    the proceedings contained herein, had in the above-entitled

9    cause on the date specified therein, and that said transcript

10   was prepared under my direction and control.

11       DATED at Phoenix, Arizona, this 7th day of May, 2013.

12

13                          s/Linda Schroeder
                    Linda Schroeder, RDR, CRR

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

EXHIBIT 6

EXHIBIT 6

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; *et al.*, and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director; *et al.*,<br><br>Defendants. | NO.  CV12-0601-PHX-NVW<br><br>**DEFENDANTS' FIFTEENTH SUPPLEMENTAL DISCLOSURE STATEMENT** |

Defendants, through counsel and pursuant to Federal Rule of Civil Procedure 26(a)(1), submit their **Fifteenth** Supplemental Disclosure Statement.

2860367.1

1   delivery of oral and dental care; reporting on those services with the monitoring MGAR

2   reports; and monitoring and reviewing those services for patterns; compilation and

3   analysis of statistical data; ensuring compliance with federal and state laws; and her

4   knowledge of Corizon's performance under the Contract with ADC.

5           9.      Sam Tardibuono, ADC HS Contract Monitoring Bureau, Contract
                    Compliance Monitor, ASPC-Douglas
6                   c/o Struck Wieneke & Love, P.L.C.

7                   Sam Tardibuono is the current Contract Monitor at ASPC-Douglas. Please

8   see Exhibit Bates Numbered ADC123464-123467 for his credentials and qualifications.

9   Mr. Tardibuono will testify regarding his monitoring of policies, practices, and procedures

10  for provision of health care to ADC's inmate population; delivery of medication to

11  inmates; delivery of mental health care and dental care only as required for monitoring

12  and reporting in the MGAR; his activities in evaluation of mental health services provided

13  by Corizon, reporting on those services with the monitoring MGAR reports; and

14  monitoring and reviewing those services for patterns; compilation and analysis of

15  statistical data; ensuring compliance with federal and state laws; and his knowledge of

16  Corizon's performance under the Contract with ADC.

17          10.     David Robertson, D.O., ADC HS Contract Monitoring Bureau,
                    Quality/Clinical, Medical Program Administrator
18                  c/o Struck Wieneke & Love, P.L.C.
19

20                  Dr. David Robertson is the current HS Contract Monitoring Bureau,

21  Quality/Clinical, Medical Program Administrator. Please see Exhibit Bates Numbered

22  ADC123413-123418 for his credentials and qualifications. Dr. Robertson will testify

23  pursuant to FRCP 26(a)(2)(C).  He will testify regarding ADC policies, practices, and

24  procedures including those related to medical care, review and investigation of medical

25  grievances, inmate death investigations and mortality reviews, implementation by Corizon

26  of electronic medical records, Corizon's telemedicine system; his knowledge of Plaintiffs'

27  medical health needs and the continuous improvements in the delivery of health care to

28  the ADC inmate population. Dr. Robertson will also testify regarding the mortality

                                              13

1  reviews he completed.

2        Dr. Robertson will also testify regarding the medical care provided to

3  Plaintiff Shawn Jensen and that the medical care was appropriate and within the

4  applicable standard of care.  He will further testify regarding specific allegations made by

5  Mr. Jensen as it relates to his medical care in connection with his treatment for prostate

6  cancer as well as his current prognosis.

7        *Specifically, Dr. Robertson will testify that it was within his regular duties*

8  *as a physician to provide medical treatment to inmates, and he specifically provided*

9  *medical treatment to Inmate Jensen during the period of October 2009 through August*

10  *2010.  As part of that treatment, he would also review the medical records of other*

11  *providers, including outside consultants, and these records would be included in the*

12  *chart.  Dr. Robertson will testify that the care and treatment he provided to Plaintiff*

13  *Jensen for prostate cancer and follow-up care from October 2009 through August 2010,*

14  *as well as the care provided by the outside providers was to a reasonable degree of*

15  *medical probability within the standard of care generally accepted for the care and*

16  *treatment for persons with Plaintiff Jensen's medical issues.  Dr. Robertson will testify*

17  *consistent with the content of the treatment records he authored and/or reviewed during*

18  *the course of his treatment of Plaintiff Jensen as contained in the medical records*

19  *produced in this case and referenced as Bates Numbers ADC004374-ADC005069;*

20  *ADC073108-ADC73149;  ADC074716-074959;  ADC084701-084878;  ADC123280-*

21  *ADC123340;  ADC123379-ADC123383;  ADC130309-ADC130339;  ADC197447;*

22  *ADC222075-222099; ADC222242-222310; and, ADC232228-232229.*

23        *Dr. Robertson will testify that Jensen underwent a radical prostatectomy*

24  *on 7/15/10 at Mountain Vista Medical Center.  See medical record ADC004889.  Dr.*

25  *Robertson will testify that following his surgery, Plaintiff Jensen submitted an HNR on*

26  *7/30/10 stating that his catheter was leaking.  ADC005045.  He was evaluated by a*

27  *nurse who replaced his catheter bag.  Id.  On 7/31/10, Plaintiff Jensen submitted*

28  *another HNR stating that his catheter was constantly leaking.  ADC005044.  On 8/1/10,*

14

1   *Jensen was seen on the nursing line, and the nurse offered to call a doctor to check on*

2   *changing him to a larger catheter, but Jensen declined. ADC004629. Jensen stated*

3   *that he "just wanted to take it out." Id. On 8/2/10, Jensen was seen again for leakage,*

4   *and the provider ordered irrigation of the catheter. ADC004628. The irrigation was*

5   *performed with no improvement. Id. On 8/4/10, an outside urology consult was*

6   *requested for Jensen. ADC004680. On 8/5/10, Jensen was examined at Mountain*

7   *Vista Medical Center, and the Foley catheter was found to be outside of the bladder in*

8   *the pelvic cavity. ADC004684, ADC004682. Jensen elected to undergo surgery for*

9   *closure of the bladder, replacement of the Foley catheter, and reconstruction of his*

10  *bladder neck. ADC004684, ADC004682-83.*

11          *Dr. Robertson will testify that in his opinion, Jensen needed to undergo*

12  *multiple surgeries to remedy contracture of his bladder neck as a likely result of*

13  *scarring from the prostatectomy he underwent in July 2010 and not as a result of*

14  *damage from a nurse's improper adjustment of Jensen's Foley catheter in August 2010*

15  *as alleged by Jensen. Dr. Robertson will testify that there is no evidence that a nurse*

16  *improperly irrigated his catheter or caused damage to his urethra and bladder neck as*

17  *alleged by Jensen. In addition, Jensen presented to medical with leakage around his*

18  *catheter and little return into the bag, which indicates that the Foley was not in his*

19  *bladder at the time he presented to medical. Dr. Robertson will testify that in his*

20  *opinion, Jensen himself could have manipulated the catheter and likely resulted in the*

21  *catheter coming out of the bladder and causing damage to his bladder neck. Dr.*

22  *Robertson will also testify that infection, such as the testicular infection Jensen*

23  *experienced, is a potential complication of undergoing any surgery.*

24          *Dr. Robertson will also testify regarding Jensen's receipt of chemotherapy*

25  *medications. Specifically, Dr. Robertson will testify that on 2/26/10, Jensen was*

26  *prescribed Degarelix, a hormonal therapy used in the treatment of prostate cancer, and*

27  *received the first injection on 3/3/10. ADC004958. Jensen received the second*

28  *injection on 4/7/10. ADC004840. Degarelix was ordered for Jensen in May 13, 2010,*

1    *but ADC was informed by the pharmacy that the medication was unavailable from the*

2    *manufacturer due to a product recall and would not be available until mid-June at the*

3    *earliest.   ADC004838, ADC004837, ADC004836.   Jensen was scheduled to receive the*

4    *third injection of Degarelix on July 14, 2010, but he underwent a radical prostatectomy*

5    *on 7/15/10, and the shots were discontinued.   ADC004911.*

6         *In addition, Dr. Robertson will testify that Jensen received adequate*

7    *catheter supplies following his prostatectomy and there is no evidence in his chart to*

8    *support his claim that he was provided only one condom catheter for 55 days.*

9         *Dr. Robertson will testify that the medical treatment he provided to Jensen*

10   *was timely and adequate.*

11        Dr. Robertson will testify regarding his review of Plaintiff Swartz's medical

12   records and his opinions regarding the treatment rendered to Swartz after he was involved

13   in two inmate assaults in 2010.   Specifically, he will testify regarding the follow-up care,

14   medications, and subsequent facial reconstructive surgery.   He will also testify regarding

15   Plaintiff Swartz's allegations that staff screened him with a metal detector after he

16   swallowed metal, did not refer him for an endoscopy, and told him he would have to pass

17   the metal.

18        Dr. Robertson will testify regarding his review of Plaintiff Rodriguez's

19   medical records and his opinions regarding the treatment rendered to her.   He will further

20   testify regarding Plaintiff Rodriguez's allegation that she has experienced multiple asthma

21   attacks and breathing problems as a result of her exposure to pepper spray.

22        Dr. Robertson will testify regarding his review of Plaintiff Thomas's

23   medical records and his opinions regarding the treatment provided to him.   He will further

24   testify regarding Plaintiff Thomas's specific allegations that in November 2011, he

25   overdosed on Diclofenac and did not receive medical attention, that he has experienced

26   insomnia and weight loss while in SMU, and was not prescribed a sleep aid.

27        Dr. Robertson will testify regarding his review of Plaintiff Gamez's medical

28   records and his opinions regarding the treatment provided to him.   He will further testify

1    regarding Plaintiff Gamez's specific allegations that his care was managed by a nurse

2    practitioner, he did not receive follow-up tests to confirm that he has frontal lobe

3    dysfunction, and his medications have been denied or delayed.

4            Dr. Robertson will testify regarding his review of Plaintiff Chisholm's

5    medical records and his opinions regarding the treatment provided to her.  He will further

6    testify regarding Plaintiff Chisholm's specific allegations that she was not referred to a

7    cardiologist for eight months despite experiencing chest pains and shortness of breath and

8    did not receive adequate care or testing from outside specialists.

9            Dr. Robertson will testify regarding his review of Plaintiff Licci's medical

10   records and his opinions regarding the treatment provided to her.  He will further testify

11   regarding Plaintiff Licci's specific allegations that she has experienced delays in seeing an

12   oncologist and receiving testing regarding masses on her breasts, mouth, arms, and

13   ovaries, that she experiences extreme discomfort in her cervix that impacts her bowels and

14   results in constipation, and medical staff make false claims in replies to her grievances.

15   Dr. Robertson will also testify regarding Plaintiff Licci's allegation that her port-a-cath

16   may not have been properly flushed.

17           Dr. Robertson will testify regarding his review of Plaintiff Hefner's medical

18   records and his opinions regarding the treatment provided to him.  He will further testify

19   regarding Plaintiff Hefner's specific allegations that his vision deteriorated after a nurse

20   gave him expired eye drops, he did not receive eye medication following eye surgery in

21   2006 and 2008, has not seen an ophthalmologist, and experienced delay in receiving a CT

22   scan following an injury.  He will testify regarding Plaintiff Hefner's allegation that he did

23   not receive adequate treatment after an assault.  Dr. Robertson will also testify regarding

24   Plaintiff Hefner's claim that his requests for a medical diet have been denied.

25           Dr. Robertson will testify regarding his review of Plaintiff Polson's medical

26   records and his opinions regarding the treatment provided to him.  He will further testify

27   regarding Plaintiff Polson's specific allegations that he experienced delays in receiving

28   appropriate care and medications for chronic ear pain.

1    Dr. Robertson will testify regarding his review of Plaintiff Wells' medical

2  records and his opinions regarding the treatment provided to her.  He will further testify

3  regarding Plaintiff Wells' specific allegations that she was not evaluated by a cardiologist

4  despite repeated complaints of chronic chest pain.

5    Dr. Robertson will testify regarding his review of Plaintiff Smith's medical

6  records and his opinions regarding the treatment provided to him.  He will further testify

7  regarding Plaintiff Smith's specific allegation that he was unable to write HNRs due to a

8  hand injury.

9    Dr. Robertson will testify regarding his review of Plaintiff Brislan's medical

10  records and his opinions regarding the treatment provided to him.  He will further testify

11  regarding Plaintiff Brislan's specific allegation that he has lost weight due to insufficient

12  meals.

13    In addition to testifying regarding the medical treatment of the named

14  Plaintiffs, Dr. Robertson will also testify regarding the health care provided to the

15  individual inmates specifically referred to by Plaintiffs' experts and whether the care

16  rendered was adequate, appropriate and meets the standard of care.

17    11.    Nicole Taylor, Ph.D., ADC HS Contract Monitoring Bureau,
18           Quality/Clinical, Health Services Coordinator (Mental Health Monitor) and
             former Psychologist III at ASPC-Florence
19           c/o Struck Wieneke & Love, P.L.C.

20    Nicole Taylor, Ph.D. is the current HS Contract Monitoring Bureau,

21  Quality/Clinical, ~~Health Services Coordinator~~ *Compliance Monitor II* (Mental Health

22  Monitor). Please see Exhibit Bates Numbered ADC123454-123457 for her credentials and

23  qualifications.  ***Due to privatization, the Health Services Monitoring Bureau was***

24  ***created, and Dr. Taylor subsequently transitioned from direct care into a monitoring***

25  ***position.***  Dr. Taylor will testify based on her education, training, qualifications, and

26  experience and review of records of the inmate population. ***All opinions expressed are to***

27  ***a reasonable degree of psychological probability.*** Dr. Taylor will testify regarding ADC

28  policies, practices, and procedures including those related to mental health care and

18

1   conditions of confinement, including mental health programming offered to inmates

2   housed at ASPC-Eyman, Florence, Lewis, Phoenix, Perryville, Tucson and Yuma and any

3   changes to programming that occurs up until trial; the Mental Health Technical Manual

4   and any changes to that Manual that occurs up until trial; her knowledge of Plaintiffs'

5   mental health care needs, specifically the mental health care needs and treatment of named

6   Plaintiffs Dustin Brislan and Robert Gamez; the subsequent transition to Corizon; the

7   provision of adequate care to ADC inmates in compliance with constitutional

8   requirements; relevant staffing policies, procedures, levels and issues with regard to

9   mental health personnel and changes to those policies, procedures and levels up until trial.

10   ***Dr. Taylor will testify that during the time that she was providing direct***

11   ***care that she was involved in the conception and development of many of the mental***

12   ***health programs currently running in the Maximum Custody units.  Specifically, she***

13   ***helped to identify the population, location, and programming of the Kasson Wing One***

14   ***program, CB-1 Mental Health program, and the specialized mental health***

15   ***programming at Browning and SMU I.  She will testify that she has continued to be***

16   ***actively involved in the implementation and strategic planning related to the mental***

17   ***health programs and transitional program for maximum custody inmates as a whole.***

18   ***Dr. Taylor will testify that in the course of her current position that she***

19   ***routinely reviews a random sample of approximately 200 charts located at various***

20   ***Complexes to assess contract compliance and timeliness regarding triage, referrals,***

21   ***mental health treatment plans, contacts with mental health staff, review by psychiatric***

22   ***providers of inmates on psychotropic medications, and reentry planning.  She reports***

23   ***her findings to Corizon and ADC leadership.  She will also testify that in the course of***

24   ***her position that she reviews the specific mental health MGAR findings at each of the***

25   ***seven (7) corridor complexes.  Additionally, she reviews all Mental Health grievances***

26   ***and the corresponding medical record documentation.***

27   Dr. Taylor will testify regarding the mental health care provided to and

28   mental health condition of the named Plaintiffs Swartz, Brislan, Thomas, Smith, Gamez,

1   Chisholm, Polson, Rodriguez and Verduzco.  She will testify regarding their allegations

2   related to their mental health care.

3        Specifically, Dr. Taylor will testify regarding her review of Plaintiff Stephen

4   Swartz's records relating to his allegations that despite multiple instances of self-harm, he

5   has received inadequate mental health care while on suicide watch and while housed at

6   SMU.  She will also testify regarding his allegation that he was able to access dangerous

7   objects while on suicide watch.

8        Dr. Taylor will testify regarding her review of Plaintiff Brislan's records

9   relating to his allegations that he has been placed on suicide watch for extended periods

10   but has not received therapeutic treatment to address his self-harming behavior.  She will

11   also testify regarding his allegation that he was able to access dangerous objects while on

12   suicide watch.  *She will testify that she was a treating Psychologist at Eyman during the*

13   *periods in 2006, 2007, and 2008 that Plaintiff Brislan was housed there and provided*

14   *treatment to him as documented in his medical records produced at ADC008296-*

15   *ADC008537;     ADC073455-ADC073798;     ADC107525-ADC107602;     ADC122075-*

16   *ADC122218;ADC123225-ADC123251; ADC197411-ADC197416; ADC222042-222044;*

17   *and ADC232208-10.  Dr. Taylor will testify that her treatment of Brislan during those*

18   *time periods, to a reasonable degree of psychological probability, met the applicable*

19   *standard of care.  She will also testify that she has reviewed his medical record in her*

20   *current role as a monitor for responses to the grievances he filed.*

21        Dr. Taylor will testify regarding her review of Plaintiff Thomas's records

22   relating to his allegations that while he did not have suicidal ideation when he arrived at

23   SMU, his mental condition has deteriorated and he has become suicidal and committed

24   multiple acts of self-harm.  She will also testify regarding Plaintiff Thomas's allegations

25   that he has received minimal mental health care.  *She will testify that she was a treating*

26   *Psychologist at Eyman from 2006 to 2010 and provided treatment to Plaintiff Thomas.*

27   *She will also testify that she reviewed his medical records after he filed a lawsuit in*

28   *December 2007 against her that was deemed unfounded and was dismissed.  See Cano*

20

1  *v. Taylor, et al., 739 F.3d 1214 (2014). Additionally, Dr. Taylor will testify regarding*

2  *her treatment of Thomas during 2008, 2009, and 2012. Dr. Taylor will testify consistent*

3  *with the content of the treatment records she authored and/or reviewed during the*

4  *course of her treatment of Plaintiff Thomas.    See ADC007440-ADC008295;*

5  *ADC070949-ADC071360;      ADC122921-ADC122973;      ADC197492-ADC197500;*

6  *ADC198474-ADC198491;      ADC222134-222136;      ADC229746-ADC229801;    and,*

7  *ADC232244-232251.*

8              *Specifically, Dr. Taylor will testify regarding the following:*

9              *Dr. Taylor first treated Plaintiff Thomas on April 11, 2008 during a thirty*

10  *minute mental health watch. ADC008242.   On April 14, 2008, Dr. Taylor treated*

11  *Plaintiff while he was on suicide watch. ADC008245.  He advised that he was feeling*

12  *good and was ready to return to his housing unit. Id. Dr. Taylor recommended he be*

13  *returned. Id.  The following day, on April 15, 2008, Dr. Taylor saw Thomas again*

14  *during a thirty minute mental health watch. ADC008237.*

15             *Dr. Taylor next saw Thomas on May 5, 2008 and May 8, 2008 during a*

16  *thirty minute mental health watch. ADC008207, ADC008205. Additionally, Dr. Taylor*

17  *treated Thomas on May 7, 2008.    ADC008216, ADC008206, ADC008203, and*

18  *ADC008200.*

19             *Dr. Taylor also treated Thomas in June 2008.  Specifically, she treated*

20  *him on June 9, 2008. ADC008197.  During this encounter, Thomas advised that he was*

21  *doing okay and that he was staying out of trouble and off watch. She treated him again*

22  *on June 16, 2008. ADC008196.  During this encounter, he advised that he was "doing*

23  *good." Id.*

24             *Dr. Taylor treated Thomas again in July 2008.  She saw him on July 3,*

25  *2008 where he advised he was not going to hurt himself. ADC008195.  She saw*

26  *Thomas again on July 10, 2008. ADC008193.*

27             *Dr. Taylor continued to treat Thomas in August of 2008.  She saw him on*

28  *August 4, 2008 and he advised that he was "doing well now." ADC008191.  She treated*

1    *him again on August 14, 2008.  ADC008190.*

2         *Dr. Taylor treated Thomas in September 2008.  Specifically, she saw him*
3    *on September 3, 2008 and he advised he was ready to come off of watch.  ADC008188.*
4    *Dr. Taylor took Thomas off watch at this time.  Id.  Dr. Taylor continued to treat*
5    *Thomas in October 2008.  ADC008186, ADC008183. During this visit he advised that*
6    *he was "angry because of the noise" and that he was ready for thirty minute*
7    *watches.  Id.  Dr. Taylor approved this request.  ADC008178.*

8         *Dr.     Taylor     treated     Thomas     again     on     September     16,*
9    *2009. ADC008147.  Thomas advised that he "just doesn't like the pod" he is in.  Id.  He*
10   *stated he is ready for thirty minute watches.  Id.  Dr. Taylor recommended a regular*
11   *follow-up as a result of this visit and advised he is ready for thirty minute*
12   *watches.  Id.  Dr. Taylor saw Thomas the following day, September 17, 2009, during a*
13   *cell front interview.  ADC008146.  During this visit, Thomas advising that he was doing*
14   *well and is ready for thirty minute watches.  Id.  Dr. Taylor scheduled a regular follow-*
15   *up as a result of this visit.  Id.   Dr. Taylor also placed Thomas on suicide watch on*
16   *September 17, 2009.  ADC008142.*

17        *Dr. Taylor next saw Thomas on December 13, 2009 during a cell front*
18   *interview.  ADC008132.  During this encounter, Thomas indicated he did not want to go*
19   *on suicide watch.  Id.  Dr. Taylor recommended a regular follow-up as a result of this*
20   *visit.  Id. Dr. Taylor treated Thomas again on December 20, 2009 while he was housed*
21   *at Eyman SMU II.  ADC008125.  He indicated that the problems he was having*
22   *occurred at SMU I.  Id.  She recommended a regular follow up as a result of this visit.*
23   *Id.*

24        *Dr. Taylor treated Thomas again on January 3, 2010.  ADC008114. Dr.*
25   *Taylor   next   saw   Thomas   on   January   17,   2010   during   a   cell   front*
26   *interview. ADC008094.  Thomas refused to interact with her.  Id.  Dr. Taylor again saw*
27   *Thomas on January 24, 2010 at a cell front visit.  ADC008089.  He refused to speak to*
28   *her indicating, "I don't want to see you devil woman." Id.   She recommended a*

22

1  *regular follow up as a result of this visit.  Id.*

2        *Dr. Taylor will also testify that on March 7, 2010, she attempted to*

3  *conduct a cell visit with Thomas, but he was sleeping and would not get up to speak to*

4  *her. ADC008053.  Dr. Taylor conducted a cell front visit again with Thomas on March*

5  *14, 2010.  ADC008071.  He initially refused to speak with her and then attempted to*

6  *engage in inappropriate conversation stating, "kill yourself" and "If I could get my*

7  *hands on you, I would burn your face off."  Id.  She recommended a regular follow up*

8  *as a result of both March encounters.  Id.*

9        *Dr. Taylor treated Thomas again in 2012.  On October 29, 2012, Dr.*

10  *Taylor saw Thomas on a thirty minute mental health watch.  ADC071106.  During that*

11  *encounter, Thomas advised that he would not participate in any programs at SMU I*

12  *and that he wanted to stay on watch.  Id.  Dr. Taylor saw Thomas again on October 30,*

13  *2012 where he indicated he was still suicidal.  ADC071105, ADC071186.  Dr. Taylor*

14  *then placed him on ten minute checks.  Id.*

15        *Dr. Taylor will testify to a reasonable degree of psychological probability*

16  *that her treatment of Plaintiff Thomas met the standard of care.*

17        Dr. Taylor will testify regarding her review of Plaintiff Smith's records

18  relating to his allegations that his depression has been aggravated by interruptions in his

19  mental health treatment and prolonged incarceration in SMU and that he was not seen by

20  mental health despite reporting mental health problems.

21        Dr. Taylor will testify regarding her review of Plaintiff Gamez's records

22  relating to his claim that he was not provided adequate mental health services to address

23  his deteriorating mental health. Dr. Taylor will testify regarding her review of Plaintiff

24  Chisholm's records relating to her allegations that her mental health has been adversely

25  impacted by custodial harassment.

26        *Additionally, Dr. Taylor will testify regarding her treatment of Gamez.*

27  *She will testify that she was a treating Psychologist at Florence during the period of*

28  *2010 to 2012 that Plaintiff Gamez was housed there and provided treatment to him.*

1    *She will also testify that she has reviewed his chart in her current role as a monitor for*

2    *responses to a grievance he filed.  Dr. Taylor will testify consistent with the content of*

3    *the treatment records she authored and/or reviewed during the course of her treatment*

4    *of Plaintiff Gamez.     See ADC000287-ADC001254;    ADC071394-ADC071573;*

5    *ADC122219-ADC122289;        ADC197425-ADC197434;        ADC197527-ADC198101;*

6    *ADC222050-222055; ADC222152-222241; and ADC232221-24.*

7         *Dr. Taylor first treated Gamez on July 1, 2010, for a 30-minute one-on-*

8    *one mental-health follow-up.  ADC001028.  Gamez told to her: "I'm doing alright. I*

9    *sleep ok, and eating is ok.  I don't want meds.  I don't want to be a zombie.  I wish I*

10   *could get counseling for my anger issues, also my disillusions [sic] like hearing and*

11   *seeing things.  I want to learn to block the voices." Id.  Dr. Taylor objectively observed*

12   *that Gamez appeared alert and oriented," his mood appeared euthymic; and his affect*

13   *was normal.  Id.  Gamez denied any suicidal or homicidal ideations, but reported vague*

14   *auditory and/or visual hallucinations.    Id.    Dr. Taylor diagnosed Gamez with a*

15   *psychotic disorder, but assessed no observable symptoms.  Id.  Dr. Taylor planned to*

16   *continue monitoring and charting his condition.  Id.*

17        *Dr. Taylor provided follow-up care to Gamez on August 26, 2010, during*

18   *another 30-minute one-on-one session.  Id.  Gamez told her that he believed he has*

19   *schizophrenia, stating: "I am very paranoid.  Id.  He reported losing 40 lbs since 2003*

20   *and feeling underweight.  Id.  He told her about trying to get prisoners out of "lock*

21   *down," because he believed it makes people worse and is inhumane.  Id.  He also told*

22   *her, "My mind deteriorates, and I can't concentrate. I want to get to a yard.  I don't*

23   *want meds." Id.  Dr. Taylor again observed that Gamez again appeared alert and*

24   *oriented, his mood appeared euthymic, and his affect was normal.  Id.  Gamez denied*

25   *having any suicidal or homicidal ideation, and auditory or visual hallucinations.  Id.*

26   *Dr. Taylor diagnosed a psychotic disorder but assessed no observable symptoms.  Id.*

27   *Dr. Taylor planned to continue monitoring and charting his condition.  Id.*

28        *During both her July 1, 2010 and August 26, 2010 encounter with Gamez,*

24

1   *he informed Dr. Taylor that he did not want any medication.  Dr. Taylor will testify she*

2   *did not refer Gamez to psychiatry for this reason.  She will testify that this decision was*

3   *the result of Gamez's own wishes and was within the standard of care.*

4   *On September 7, 2010, Gamez submitted a health needs request, which in*

5   *addition to other complaints, stated that he was having panic attacks, depression,*

6   *anxiety, and paranoia.  ADC0000794.  In response, Dr. Taylor treated Gamez on*

7   *September 9, 2010, during another 30-minute one-on-one session.  ADC001027.*

8   *Gamez told her that he believed he has schizophrenia, stating, "I am very paranoid."*

9   *Id.  He also told her "My mind deteriorates, and I can't concentrate. I want to get to a*

10  *yard. I don't want meds." Id.  Dr. Taylor observed that Gamez again appeared alert*

11  *and oriented, his mood euthymic, and his affect was normal.  Id.  Gamez denied having*

12  *any suicidal or homicidal ideation, and any auditory or visual hallucinations.  Id.  Dr.*

13  *Taylor again diagnosed a psychotic disorder but assessed no observable symptoms.*

14  *ADC001028.  Dr. Taylor will testify that on September 9, 2010, Gamez first indicated to*

15  *Dr. Taylor that he would be open to taking medications.  It was at this time that Dr.*

16  *Taylor referred Gamez to psychiatry.  Id.  In addition to his psychiatric referral, Dr.*

17  *Taylor planned to continue monitoring and charting his condition.  Id.*

18  *Dr. Taylor will testify to a reasonable degree of psychological probability*

19  *that her treatment of Plaintiff Gamez met the standard of care.*

20  *Psych Assistant, Beverly Yoches, treated Gamez on October 7, 2011,*

21  *during a cell-front session.  ADC001240.  Although Gamez subjectively reported that*

22  *his mood was "anxious," the psych assistant noted that he was alert and attentive, his*

23  *concentration was good, his affect normal, and his thought was logical.  Id.  She noted*

24  *that he was not threatening or banging, and that he denied he was a danger to others or*

25  *self.  Id.  Because Gamez told her he was "tired of waiting to see the doctor," she*

26  *planned to follow up to ensure that his placement on the psych line, and continue*

27  *monitoring him pursuant to policy.  Id.  After the Psych assistant treated Gamez, her*

28  *notes were reviewed and approved by Dr. Taylor in the course and scope of Taylor's job*

1   *duties.   Indeed, Dr. Taylor reviewed all notes by Dr. Yoches during this time.   Dr.*
2   *Taylor will testify that during the month of October 2011, Gamez was seen by*
3   *psychiatry.  ADC198017-020.*

4          *Psych Assistant, Beverly Yoches, followed up with Gamez on November 4,*
5   *2011 during a cell-front session.  ADC001236.  The psych associate reported that his*
6   *mood was euthymic, and again noted that he was alert and attentive, his concentration*
7   *was good, his affect normal, his thought was logical, and he denied having any suicidal*
8   *or homicidal ideation.  Id.  They further noted that he was not threatening or banging,*
9   *and assessed that he denied he was a danger to others or self.  Id.  Gamez told them,*
10  *"I'm alright . . . up and down."  Id.  The psych associate recommended to Gamez that*
11  *he submit a HNR if he needs psych services in the future, and planned to continue*
12  *monitoring his condition pursuant to policy.  Id.  After the Psych assistant treated*
13  *Gamez, her notes were reviewed and approved by Dr. Taylor in the course and scope of*
14  *Taylor's job duties.  Indeed, Dr. Taylor reviewed all notes by Dr. Yoches during this*
15  *time.  Dr. Taylor will testify that during the month of November 2011, Gamez was seen*
16  *by a psychiatrist.  ADC198013-014.*

17         *Dr. Taylor will testify to a reasonable degree of psychological probability*
18  *that the aforementioned treatment provided to Plaintiff Gamez met the standard of care.*

19         Dr. Taylor will testify regarding Plaintiff Polson's records relating to his
20  allegation that his mental health symptoms are caused or worsened by not receiving
21  adequate mental health care and that his suicidal ideation has increased as a result of his
22  housing.

23         Dr. Taylor will testify regarding her review of Plaintiff Rodriguez's records
24  relating to her allegation that her mental health care primarily involves medication and not
25  therapy. Dr. Taylor will testify regarding her review of Plaintiff Verduzco's records
26  relating to her allegation that she does not receive regular therapy.

27         *Dr. Taylor will testify that during a random pull of inmate records in*
28  *preparation of completing the September 2013 MGAR, Plaintiff Verduzco's chart was*

1    *one of the random records selected. ADC154196-200. She will testify that Jessica*

2    *Raak, the mental health auditor, reviewed Verduzco's chart and that Dr. Taylor*

3    *reviewed the results of Ms. Raak's audit. Dr. Taylor's review of the audit revealed that*

4    *her treatment was compliant with five of the six compliance measures. Specifically,*

5    *Verduzco's HNRs had been triaged within 24 hours of receipt; any referrals she had to*

6    *a psychiatrist or psychiatric mid-level provider resulted in her being seen within seven*

7    *days of the referral; any mental health treatment plans had been updated within the last*

8    *ninety days; and she was being seen by mental health staff according to policy.*

9    *Verduzco does not have a release plan so the discharge compliance measure did not*

10   *apply to her. As such, Dr. Taylor will testify to a reasonable degree of psychological*

11   *probability that the care being provided to Plaintiff Verduzco in September 2013 fell*

12   *within the standard of care.*

13   *Dr. Taylor will also testify that during a random pull of inmate records in*

14   *preparation of completing the September 2013 MGAR, Plaintiff Polson's chart was one*

15   *of the random records selected. ADC154074-78. She will testify that her review of*

16   *Polson's record revealed that his treatment was compliant with five of the six*

17   *compliance measures. Specifically, his HNR's had been triaged within 24 hours of*

18   *receipt; any referrals he had to a psychiatrist or psychiatric mid-level provider resulted*

19   *in him being seen within seven days of the referral, any mental health treatment plans*

20   *had been updated within the last ninety days; and he was seen by mental health staff*

21   *according to policy. Polson does not have a release plan so the discharge compliance*

22   *measure did not apply to him. As such, Dr. Taylor will testify to a reasonable degree of*

23   *psychological probability that the care being provided to Plaintiff Polson in September*

24   *2013 fell within the standard of care.*

25   Dr. Taylor reviewed the expert reports of Dr. Pablo Stewart, Craig Haney

26   and Eldon Vail. She will testify regarding the mental health status, care and access to

27   mental health care to the inmate population as referenced by Plaintiffs' experts, including

28   any members of the population referenced through supplementation by Plaintiffs' experts

27

1    and up until trial. Dr. Taylor will testify concerning the treatment of the named plaintiffs

2    up to the time of trial. Dr. Taylor will further testify consistent with her deposition

3    testimony.    Dr. Taylor will testify pursuant to Federal Rule of Civil Procedure

4    26(a)(2)(C).

5         12.    Ron Credio, Warden, ASPC-Eyman
6                c/o Struck Wieneke & Love, P.L.C.

7             Ron Credio is the Warden at ASPC-Eyman. He has been employed with the

8    ADC for over 18 years, starting as a Correctional Officer at ASPC-Eyman/Rynning Unit.

9    He was promoted to the position of Sergeant at ASPC-Florence/Central Unit, Lieutenant

10   at ASPC-Eyman/Meadows Unit, Captain at ASPC-Florence/Picacho and North Unit,

11   Associate Deputy Warden at ASPC-Florence/South Unit, Deputy Warden as ASPC-

12   Phoenix/Globe and Alhambra, and Deputy Warden of Operations at ASPC-Florence.

13   Warden Credio has a Bachelor of Science in Public Safety Administration, Associates

14   Degree in Corrections, and Associates Degree in Management. He is likely to testify

15   regarding his knowledge of ADC's contemporary practices and procedures in relation to

16   security operations, including general information regarding ASPC-Eyman, its cell blocks,

17   the inmates housed at ASPC-Eyman, recreation and therapy and behavioral programming

18   at ASPC-Eyman, access to healthcare and the delivery of healthcare to inmates.  Warden

19   Credio is additionally likely to have discoverable information with regard to Plaintiffs'

20   institutional history and ADC's policies and procedures, and conditions of confinement

21   with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior

22   issues; practices and policies regarding inmates with gang affiliations as well as ADC's

23   management of gang affiliated inmates; any Plaintiff's protective custody or classification

24   status at any point during their incarceration at ADC as well as the policies and

25   procedures regarding the classification, housing, programming, recreation, morale and

26   welfare programs, and fundraisers; the management of health care at each respective

27   facility, the physical layout of each of their respective facilities; alleged sanitation issues

28   at their respective facilities; food service, including nutrition requirements;, lighting

28

1   26(a)(2)(C).

2   42.   Brian Hanstad, D.M.D., Northern Regional Dental Director and Dental
3         Supervisor ASPC-Perryville
          c/o Smallwood Prison Dental Services
4         The Sack Law Firm
          Jeffrey M. Mervis
5         8270 Greensboro Drive, Suite 810
6         McLean, Virginia 22102
          (703) 883-0102

7

8         Dr. Hanstad is the Northern Region Dental Director and the Dental

9   Supervisor for ASPC-Perryville.   ***Please see Exhibit Bates Numbered ADC255799-***

10  ***ADC255880 for his credentials and qualifications.   All opinions are stated to a***

11  ***reasonable degree of dental probability.***   Dr. Hanstad will testify pursuant to Federal

12  Rule of Civil Procedure 26(a)(2)(C).

13        Dr. Hanstad will testify regarding his knowledge of and interactions with

14  named Plaintiffs Maryanne Chisholm and Charlotte Wells related to their dental care.  He

15  will testify that in his opinion, the dental treatment they received was appropriate and

16  within the standard of care.  Dr. Hanstad will testify regarding his review of Plaintiff

17  Stephen Swartz's dental records and his opinions regarding the treatment provided to

18  Swartz relating to his allegations that he had a cracked molar for two years and was told

19  the only option was to extract the tooth.  Dr. Hanstad will testify regarding his review of

20  Plaintiff Polson's dental records and his opinions regarding the treatment provided to

21  Polson relating to his allegations that he experienced long delays in receiving partial

22  dentures and treatment for broken teeth.

23        ***Specifically, Dr. Hanstad will testify that he treated Plaintiff Chisholm***

24  ***from 2011 to 2013.   See Plaintiff Chisholm's medical records as produced at***

25  ***ADC000001-ADC000286;      ADC050723-050727;      ADC071361-ADC071393;***

26  ***ADC084454-084700;      ADC123341-ADC123378;      ADC130340-ADC130719;***

27  ***ADC197417-ADC197424;    ADC222045-222049;    ADC229674-ADC229745;    and***

28  ***ADC232211-20.  Dr. Hanstad will testify that he saw Chisholm on 12/30/11 for a pain***

1  *evaluation, during which he diagnosed her with recurrent decay well below the gumline*
2  *on tooth #18.   ADC071375.   He prescribed antibiotics and scheduled her for an*
3  *extraction in two weeks.   ADC071375.   Chisholm returned to the dental clinic on*
4  *1/12/12 but refused extraction of tooth #18.   ADC071375.   She was counseled on the*
5  *consequences of refusing treatment and signed a refusal, stating she was "afraid of jaw*
6  *breakage." ADC071375, ADC000155.*

7  *Dr. Hanstad will testify that he saw Chisholm on 1/15/13 and that she*
8  *reported picking at tooth #14 due to her OCD.   ADC071374-75.   A periapical x-ray*
9  *showed signs of extreme tampering with a foreign object, and he observed Chisholm*
10 *had sheared enamel off that tooth.   ADC071375.   Chisholm reported no prior problems*
11 *with tooth #14.   Id.   A temporary filling was placed, and Chishom was instructed not to*
12 *pick at the tooth.   ADC071374.   She was seen for follow-up on 1/22/13 for placement of*
13 *a permanent filling on tooth #14.   Id.   Dr. Hanstad observed inflammation in the area*
14 *and a defect in the filling, consistent with her tampering with the area.   Id.   He again*
15 *instructed her not to use improper objects to clean her teeth.   Id.*

16 *Dr. Hanstad will testify that his recommendation to extract tooth #18 was*
17 *within the standard of care due to the level of decay observed being well below the*
18 *gumline.   Dr. Hanstad will testify that there is no support for Chisholm's claim that she*
19 *was told the only available treatment was to pull her teeth and that he in fact placed a*
20 *filling on tooth #14.   Dr. Hanstad will testify consistent with the content of the treatment*
21 *records he authored and/or reviewed during the course of his treatment of Plaintiff*
22 *Chisholm.   He will testify that his treatment of Chisholm was within the standard of*
23 *care.*

24 *Dr. Hanstad will testify regarding his treatment of Plaintiff Wells in 2013*
25 *and his review of records of treatment provided by other dentists at ADC during the*
26 *course of his own treatment of Wells.   See ADC006565-ADC007144; ADC082671-*
27 *082696;   ADC091490-091666;   ADC071920-ADC071950;   ADC122867-ADC122920;*
28 *ADC134802-ADC135377;       ADC197514-ADC197526;       ADC198521-ADC198953;*

1  *ADC222139-222151; and ADC232257-59.  He will testify that he saw Wells on 2/7/13*

2  *for a cracked molar.  ADC197519.  He diagnosed her with a fracture of tooth #13 and*

3  *placed a filling.  Id.  Wells submitted an HNR dated 2/28/13 stating that the filling was*

4  *causing her pain.  ADC197525.  She was seen for a pain evaluation on 3/6/13 and*

5  *refused treatment, stating "my tooth is not hurting any more."  ADC197521.  She*

6  *submitted an HNR dated 6/9/13 requesting a filling on a cracked lower front tooth and*

7  *was placed on the routine care list.  ADC197524.  She submitted an HNR on 8/8/13*

8  *regarding pain in her upper tooth.  ADC197523.  She was seen for a pain evaluation on*

9  *8/9/13 and reported pain on tooth #13.  ADC197519-18.  Dr. Garcia noted that the*

10  *filling on #13 was intact and explained that pain was likely due either to traumatic*

11  *occlusion or necrosis of the nerve.  Id.  Wells was prescribed ibuprofen for pain and*

12  *instructed to return for an extraction if her symptoms persisted.  ADC197518.  On*

13  *8/29/13, she submitted an HNR regarding pain in her upper tooth.  ADC197522.  She*

14  *was seen for a pain evaluation on 8/30/13 and requested that tooth #13 be pulled.*

15  *ADC197518.  Dr. Garcia planned to extract #13, but when Dr. Garcia touched tooth*

16  *#14 with the periodontal explorer, Wells jumped out of the chair and complained of*

17  *pain on tooth #14.  Id.  Dr. Garcia instructed Wells to return to the clinic when she*

18  *could identify which tooth was causing her pain.  Id.  On 9/11/13, Wells returned to the*

19  *clinic and was seen by Dr. Hanstad.  ADC197517.  She pointed to tooth #13 and*

20  *reported that it "hurts when I bite things."  Id.  Dr. Hanstad noted that past intermittent*

21  *pulpitis due to a deep fill on tooth #13 had progressed to irreversible pulpitis.  Id.  He*

22  *extracted tooth #13.  Id.  Dr. Hanstad will testify consistent with the content of the*

23  *treatment records he authored and/or reviewed during the course of his treatment of*

24  *Plaintiff Wells.*

25  *Dr. Hanstad will testify that his placement of a filling on tooth #13 was*

26  *within the standard of care.  He will testify that the filling was deep and that given*

27  *Wells' continued complaints on pain in the tooth and the progression of decay to*

28  *irreversible pulpitis, his extraction of tooth #13 was within the standard of care.  He will*

1   ***also testify that there is no evidence in Wells' chart to support her claim that a dentist***

2   ***cracked an adjacent tooth while attempting to place a filling.***

3          He may also testify regarding the dental care of other ADC inmates whom

4   he has treated or whose dental records he has reviewed, including whether their dental

5   care was appropriate and within the standard of care.

6          Dr. Hanstad will testify that upon intake, inmates are provided with dental

7   hygiene instruction.   Because of security concerns, special toothbrushes are issued.

8   Inmates are taught how to brush their teeth and how to practice good dental hygiene in the

9   corrections setting.   Inmates are also instructed on how to access dental care through

10  HNRs.

11         Dr. Hanstad will testify regarding ADC policies relating to timeliness of

12  dental intakes, routine care, and urgent care.  He will testify that per ADC policy, inmates

13  receive dental x-rays and a comprehensive oral evaluation within 30 days of intake, unless

14  it has been less than six months since the inmate was previously in ADC custody.  Dr.

15  Hanstad will testify that female inmates go through the dental intake process at Perryville.

16  He will testify that male inmates have their dental intake x-rays taken at Phoenix, but may

17  receive their comprehensive oral examination at their receiving units. Dr. Hanstad will

18  testify that intake wait times are less than 30 days statewide as of December 2013 and will

19  also testify regarding current wait times at the time of trial.

20         Dr. Hanstad will testify that ADC does not have an "extraction-only" policy.

21  He will testify that dentists at ADC perform fillings on teeth that can be restored, but

22  many teeth are non-restorable and cannot be filled.  He will explain hat many inmates

23  come into the system with little or no dental care and poor dental hygiene practices.  He

24  will testify that the incidence of "meth mouth" is very high among inmates in ADC

25  custody, particularly among the female inmates.  He will testify that for an inmate with

26  "meth mouth," extraction is often the only viable treatment option.  He will also testify

27  that whether a tooth can be restored is a matter of clinical discretion based upon a review

28  of current x-rays and a clinical examination.

59

1    Dr. Hanstad will testify that inmates may refuse dental care or specific

2    dental treatment and that refusals are to be noted on the refusal form.  He will also testify

3    that ADC policy requires that dentists obtain informed consent from inmates for oral

4    surgery, including extractions.  He will testify that dentists explain the risks and benefits

5    of the procedure, as well as any available treatment alternatives, to the inmate, and the

6    inmate signs the informed consent form if he or she decides to have the procedure

7    performed.  Dr. Hanstad will testify that the informed consent form for oral surgery does

8    not include fillings as an option because many times a filling is not an available treatment

9    alternative if the dentist is recommending an extraction.

10    Dr. Hanstad will testify that in his opinion, inmate to dentist staffing ratios

11    are not the most appropriate method for determining dental staffing needs.  He will testify

12    that determining the appropriate staffing at a correctional dental clinic depends on factors

13    such as HNR volume and security issues.  He will testify that Perryville receives the

14    highest number of HNRs of any complex statewide, even though it ranks sixth statewide

15    in terms of inmate population. He will testify that dentists at Perryville perform more

16    dental procedures than any other dental clinic statewide.  In addition, Dr. Hanstad will

17    testify that female inmates do not have the same no-show rate as male inmates.  As a

18    result, Perryville's dental staffing needs are different than other complexes.  Dr. Hanstad

19    will also testify that dentists at complexes such as Winslow, Safford, and Douglas, which

20    have smaller, lower custody populations, can generally see more patients per day than

21    dentists treating higher custody populations at complexes such as Lewis and Eyman.  He

22    will testify that maximum custody inmates must be transported by correctional staff to

23    dental appointments in restraints, which lengthens the time in between appointments.

24    Dr. Hanstad will testify that in his experience, ADC inmates sometimes

25    submit dental HNRs for reasons other than to obtain dental treatment.  He will testify that

26    some inmates in maximum custody submit HNRs to get out of their cells.  He will testify

27    that at Perryville, the dental department now has a portable dental chair which can be

28    taken to the maximum custody unit to provide dental care on-site.  This enables a dentist

1   to treat a maximum custody inmate without having to close down the entire dental clinic

2   due to the inmate's security level.  He will also testify that inmates submit dental HNRs

3   claiming they have pain in order to be seen sooner but deny having pain when they are

4   called into the clinic.

5          Dr. Hanstad will testify that in his opinion, dental staffing at ADC is

6   sufficient to meet the needs of the ADC inmate population, as evidenced by low wait

7   times for dental treatment at all complexes statewide.  He will testify that ADC policy

8   requires that urgent care requests be seen within 72 hours and routine care requests within

9   90 days.  He will testify that intake examinations must be performed within 30 days.  Dr.

10  Hanstad will testify regarding current dental wait times at the time of trial.

11         Dr. Hanstad will testify regarding reasons that an inmate may have an

12  extended wait time for dental care, such as being out to court, refusing treatment, or

13  experiencing certain health problems which require clearance from a physician prior to

14  undergoing dental treatment.

15         Dr. Hanstad will testify that dental assistants at ADC have all passed an

16  examination and possess a certification that permits them to take dental x-rays.  He will

17  testify that he has a standing order for his dental assistants to take x-rays to assist him in

18  his clinical evaluation.  Dr. Hanstad will testify that dental assistants review the inmate's

19  complaint, take a health history, and take x-rays if needed.  He will testify that dental

20  assistants do not perform dental procedures and that a dentist is always on-site at the clinic

21  during clinic hours.  Dr. Hanstad will testify regarding requirements for dental training

22  and supervision under Arizona state law.  Dr. Hanstad will testify that in his opinion,

23  having dental assistants triage dental HNRs and take dental x-rays based on a standing

24  order from their supervising dentist is within the standard of care.

25         Dr. Hanstad will testify regarding the dental priority classification system in

26  the Dental Services Technical Manual.  He will testify that dental assistants are instructed

27  to classify HNRs mentioning the words "pain" and/or "swelling" and any synonyms as

28  urgent care.  Dr. Hanstad will testify that per ADC policy, urgent care requests must be

1   seen within 72 hours.  He will testify that many urgent care requests are seen the same day
2   or within 24 hours.  He will testify that most dental clinics are open Monday through
3   Friday.  On weekends, nursing staff triage dental HNRs using dental protocols, and
4   inmates experiencing pain and swelling may be seen on sick call outside of dental clinic
5   hours.

6       Dr. Hanstad will testify that dental assistants receive on-the-job training
7   from the dentists they assist and are evaluated on their triaging skills on an on-going basis.
8   Dr. Hanstad will testify that dentists are evaluated annually through the dental peer review
9   process, which includes chart reviews to assess appropriateness of care provided.  He will
10  testify that dentists are also evaluated on their productivity, which is assessed using the
11  CDS program.  He will testify that all dentists in ADC are licensed in Arizona and must
12  complete continuing education to maintain their licensure.

13      Dr. Hanstad will testify that dental emergencies are rare at ADC and usually
14  involve broken jaws.  He will testify that dental emergencies are generally referred to
15  outside providers and hospitals.

16      Dr. Hanstad will testify that SPDS has hired two dental hygienists, one for
17  each region.  The dental hygienists travel to the complexes within their regions depending
18  on inmate demand for cleanings. Dr. Hanstad will testify that wait times for routine care,
19  which includes cleanings, average 1.5 months or less at all ADC complexes statewide as
20  of December 2013.  He will also testify regarding current routine care wait times at the
21  time of trial.

22      Dr. Hanstad will also testify regarding the capabilities of the CDS program.
23  He will testify that CDS provides a real-time snapshot of current dental requests and wait
24  times.  He will testify that inmates on the routine care list are listed in order of longest to
25  shortest waiting time.  If an inmate has been waiting for 90 days or longer, the wait time
26  for that inmate turns red to alert staff. He will testify that he can run reports on the number
27  of HNRs, the numbers of procedures performed, the number of refusals, and average wait
28  times. He will testify that CDS is linked to AIMS so that dental staff has access to

Case 2:12-cv-00601-ROS   Document 826-1   Filed 03/12/14   Page 75 of 90

1   accurate information on an inmate's housing location.  If an inmate on the routine care list

2   is transferred to another complex, the inmate is automatically transferred to the routine

3   care list at the receiving complex based on the date of the inmate's original HNR.  He will

4   testify regarding current dental statistics at the time of trial.

5           All of the opinions expressed by Dr. Hanstad herein are to a reasonable

6   degree of dental probability.

7           43.   Winfred Williams, Chief Medical Officer , M.D.
8                 c/o Corizon Health

9           Winfred Williams is Corizon's current Chief Medical Officer, and will

10  testify pursuant to FRCP 26(a)(2)(C).  He will testify regarding his knowledge of ADC's

11  policies and procedures related to the delivery of medical care to ADC's inmate

12  population; and the implementation and use of the Care Log software at Yuma. Dr.

13  Williams has a lengthy tenure with Corizon Health Services and will also testify regarding

14  his experience and expertise in privatization of health care in correctional settings and

15  Corizon's outcomes measurements in the ADC system.

16          Dr. Williams will also testify regarding his review of Plaintiff Shawn

17  Jensen's medical records and his opinions regarding the treatment rendered to Jensen.  He

18  will further testify regarding specific allegations made by Mr. Jensen as it relates to his

19  medical care in connection with his treatment for prostate cancer as well as his current

20  prognosis.

21          Dr. Williams will testify regarding his review of Plaintiff Swartz's medical

22  records and his opinions regarding the treatment rendered to Swartz after he was involved

23  in two inmate assaults in 2010.  Specifically, he will testify regarding the follow-up care,

24  medications, and subsequent facial reconstructive surgery.  He will also testify regarding

25  Plaintiff Swartz's allegations that staff screened him with a metal detector after he

26  swallowed metal, did not refer him for an endoscopy, and told him he would have to pass

27  the metal.

28          Dr. Williams will testify regarding his review of Plaintiff Rodriguez's

## IV.   <u>INSURANCE AGREEMENTS</u>

There are no relevant insurance agreements under Fed. R. Civ. P. 26(a)(1)(A)(iv).

DATED this __12th__ day of March 2014.

STRUCK WIENEKE & LOVE, P.L.C.


By __/s/ Anne M. Orcutt__
       Daniel P. Struck
       Kathleen L. Wieneke
       Rachel Love
       Timothy J. Bojanowski
       Nicholas D. Acedo
       Ashlee B. Fletcher
       Anne M. Orcutt
       STRUCK WIENEKE & LOVE, P.L.C.
       3100 West Ray Road, Suite 300
       Chandler, Arizona  85226

       Arizona Attorney General Thomas C. Horne
       Office of the Attorney General
       Michael E. Gottfried
       Lucy M. Rand
       Assistant Attorneys General
       1275 W. Washington Street
       Phoenix, Arizona 85007-2926

       *Attorneys for Defendants*

COPIES of the foregoing e-mailed this __12th__ day of March, to:

Caroline N. Mitchell
cnmitchell@jonesday.com

Sarah Kader
skader@azdisabilitylaw.org

David Cyrus Fathi
dfathi@npp-aclu.org

Donald Specter
dspecter@prisonlaw.com

Amelia Gerlicher
agerlicher@perkinscoie.com


By: __/s/ Amy Bender__
2871272.1

130

**EXHIBIT 7**

**EXHIBIT 7**

Parsons v. Ryan
Deposition of Taylor, Nicole - 9/5/2013

UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn | ) | No: |
| Jensen; Stephen Swartz; | ) | CV12-00601-PHX-NVW |
| Dustin Brislan; Sonia | ) | (MEA) |
| Rodriguez; Christina | ) | |
| Verduzco; Jackie Thomas; | ) | |
| Jeremy Smith; Robert Gamez; | ) | |
| Maryanne Chisholm; Desiree | ) | |
| Licci; Joseph Hefner; Joshua | ) | |
| Polson; and Charlotte Wells, | ) | |
| on behalf of themselves and | ) | |
| all others similarly | ) | |
| situated; and Arizona Center | ) | |
| for Disability Law, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| Charles Ryan, Director, | ) | |
| Arizona Department of | ) | |
| Corrections; and Richard | ) | |
| Pratt, Interim Division | ) | |
| Director, Division of Health | ) | |
| Services, Arizona Department | ) | |
| of Corrections, in their | ) | |
| official capacities, | ) | |
| Defendants. | ) | |
| | ) | |

DEPOSITION OF NICOLE TAYLOR, J.D., Ph.D.

September 5, 2013
9:13 a.m.
Phoenix, Arizona

Prepared by:
Marcella Daughtry, RPR
Arizona Certified
Reporter No. 50623

Prepared for:

(Copy)

Parsons v. Ryan
Deposition of Taylor, Nicole - 9/5/2013

Page 37

1   health regional director for Wexford, did you have any

2   prior experience in monitoring mental health services

3   provided by a for-profit corporation?

4       A    No.

5       Q    How do you evaluate the mental health services

6   provided by Corizon?

7              MS. CLOMAN:   Form.

8              THE WITNESS:   Are you asking for like in

9   a specific day what do I do?  Can you -- can you give

10  me more of a specific question on how do you do that?

11      Q    BY MR. FATHI:   I'm asking, what's your

12  methodology?  How do you, as you say in your resume,

13  evaluate mental health services provided by the

14  contracted vendor?  How do you do that?

15      A    Once or twice a month, myself or Ms. Raak go

16  out to each of the complexes, pull a random sample at

17  every unit and look at specific indicators that are

18  listed on the MGAR to determine whether those

19  indicators are being met, and if they are not being

20  met, at what percentage are they not being met.

21      Q    Anything else?

22      A    There is nothing else formalized.  There are

23  just things across the month that may come to my

24  attention that I would then go out and verify or send

25  off to somebody else to verify.

Parsons v. Ryan
Deposition of Taylor, Nicole - 9/5/2013

Page 245

1    which there is special mental health programming for

2    mental health prisoners?

3              MS. CLOMAN:  Form.

4              THE WITNESS:  We haven't covered the

5    lower custody programs, MTU and WTU.  I'm not sure if

6    you want to go into those or not.

7    Q    BY MR. FATHI:  Okay.  Let me rephrase my

8    question, and thank you for the clarification.

9              Have we covered all maximum custody

10   areas where there is special mental health programming

11   for mental health inmates?

12   A    Correct, yes.

13   Q    Okay.  Back to the disclosure statement.  So

14   the next topic on which you are -- we are told you are

15   going to testify is, quote, her knowledge of

16   Plaintiffs' mental health care needs, end quote.  What

17   will be your testimony on that subject?

18             MS. CLOMAN:  Form.

19             THE WITNESS:  I would testify as to my

20   knowledge on Inmate Brislan and Inmate Gamez.  I have

21   not, as far as I can tell, had any contact with any of

22   the other plaintiffs.

23   Q    BY MR. FATHI:  And what will be your testimony

24   about Mr. Brislan?

25             MS. CLOMAN:  Form.

Parsons v. Ryan
Deposition of Taylor, Nicole - 9/5/2013

Page 246

1          THE WITNESS:  My testimony about

2   Mr. Brislan would be -- would revolve around the many

3   contacts that I have had with him; the follow-ups that

4   I have had with him; my clinical opinion of his mental

5   health diagnosis, of his mental health needs, of some

6   of his concerns that he has had over time about the

7   care that he's received; as I read through his

8   declaration, some of the things that he wrote down

9   there.  And I would likely testify as to some of the

10  challenges that we see in dealing with Mr. Brislan, and

11  how we've tried to overcome them in a variety of

12  different ways.

13      Q     BY MR. FATHI:  And what is your clinical

14  opinion as to his diagnosis?

15      A     My clinical opinion is that he has a

16  borderline personality disorder.

17      Q     Is that diagnosis reflected in his health

18  record?

19      A     It is, yes.

20      Q     Are there other diagnoses in his health

21  record?

22      A     There are, yes.

23      Q     He has been diagnosed with psychotic disorder,

24  correct?

25      A     That is my understanding, yes.

Parsons v. Ryan
Deposition of Taylor, Nicole - 9/5/2013

Page 248

1   his level of functioning, so it may have been done more

2   than once.

3       Q    BY MR. FATHI:  What else will you testify to

4   regarding Mr. Brislan?

5                 MS. CLOMAN:  Form.

6                 THE WITNESS:  I think I kind of covered

7   the general topics that I would testify on with

8   Mr. Brislan.

9       Q    BY MR. FATHI:  So nothing that you haven't

10  already mentioned?

11      A    Correct.

12      Q    What about, what will be your testimony about

13  Mr. Gamez?

14                MS. CLOMAN:  Form.

15                THE WITNESS:  With Mr. Gamez I've had

16  much less contact with, and so I would have to limit my

17  testimony to the contacts that I've had with him and

18  the responses to the H&R's that I have had, the

19  one-on-ones that I have done with him, and that I don't

20  have access to his chart.  I haven't read his chart,

21  but AIMS reflects a mood disorder NOS diagnosis, and

22  that's what's been carried through rather than a

23  psychotic disorder NOS that he refers to in his

24  declaration.

25      Q    BY MR. FATHI:  So your understanding is that

EXHIBIT 8

EXHIBIT 8

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone: (602) 650-1854
    Email: dpochoda@acluaz.org
5        kflood@acluaz.org
         jlyall@acluaz.org
6   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

7   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
    *Dustin Brislan, Sonia Rodriguez, Christina Verduzco,*
8   *Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne*
    *Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson,*
9   *and Charlotte Wells, on behalf of themselves and all*
    *others similarly situated*
10
    **[ADDITIONAL COUNSEL LISTED ON**
11   **SIGNATURE PAGE]**

12              UNITED STATES DISTRICT COURT

13                   DISTRICT OF ARIZONA

14   Victor Parsons; Shawn Jensen; Stephen Swartz;       No. CV 12-00601-PHX-NVW
     Dustin Brislan; Sonia Rodriguez; Christina            (MEA)
15   Verduzco; Jackie Thomas; Jeremy Smith; Robert
     Gamez; Maryanne Chisholm; Desiree Licci; Joseph
16   Hefner; Joshua Polson; and Charlotte Wells, on      **INDIVIDUAL NAMED**
     behalf of themselves and all others similarly        **PLAINTIFFS' SECOND**
17   situated; and Arizona Center for Disability Law,     **SUPPLEMENTAL**
                                                          **DISCLOSURE STATEMENT**
18                    Plaintiffs,

19          v.

20   Charles Ryan, Director, Arizona Department of
     Corrections; and Richard Pratt, Interim Division
21   Director, Division of Health Services, Arizona
     Department of Corrections, in their official
22   capacities,

23                    Defendants.

24        Pursuant to Fed. R. Civ. P. 26(a)(1), named plaintiffs Victor Parsons; Shawn

25   Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie

26   Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph

27   Hefner; Joshua Polson; Charlotte Wells (collectively, "Prison Plaintiffs"), submit their

28

1  *Deposed Witnesses*

2  17.   David Robertson, *D.O., ADC Medical Program Administrator*
        *c/o Struck Wieneke & Love, P.L.C.*

3

4       *Dr. Robertson was previously deposed, and plaintiffs may rely on his deposition*

5  *testimony.  Dr. Robertson is expected to testify regarding ADC's monitoring,*

6  *supervision, and oversight of medical care provided by Wexford Health and Corizon;*

7  *the provision of medical care at multiple prisons since his time of employment with*

8  *ADC; the privatization of health care services, quality assurance and review of health*

9  *care; Corizon's development of an electronic health records system; and all other topics*

10 *to which he testified in his deposition. Dr. Robertson is also expected to testify with*

11 *regard to any other topic for which Defendants have identified him as having*

12 *knowledge.*

13 18.   *William Smallwood, D.D.S.*
        *c/o Smallwood Prison Dental Services ("SPDS")*

14

15      *Dr. Smallwood was previously deposed, and plaintiffs may  rely on his deposition*

16 *testimony with regard to written and unwritten dental policies and procedures; tracking*

17 *and scheduling of dental appointments at ADC facilities; the capabilities and*

18 *limitations of SPDS' Correctional Dental Software; quality assurance at ADC facilities,*

19 *including the methods, personnel, policies, and procedures used to ensure that all*

20 *dental staff provide timely and effective dental care to inmates; the hiring and*

21 *credentialing of employees who provide dental care at ADC facilities; reports,*

22 *evaluations, and statistical data regarding the provision of and need for dental care for*

23 *inmates; changes to the provision of dental care, whether formal or informal, after*

24 *March 4, 2013; SPDS' relationship with Corizon and ADC, including SPDS' bid for the*

25 *dental contract and the degree to which ADC or Corizon is involved with SPDS'*

26 *activities; and the monitoring and oversight by Corizon or ADC over SPDS' provision*

27 *of dental care at ADC facilities.*

28 19.   Nicole Taylor, *Ph.D.  ADC Mental Health Monitor*

-7-

1    *c/o Struck Wieneke & Love, P.L.C.*

2    *Dr. Taylor was previously deposed, and plaintiffs may rely on her deposition*

3    *testimony with regard to ADC's monitoring, supervision, and oversight of mental health*

4    *care provided by Corizon, as well as the provision of mental health care at multiple*

5    *prisons since her time of employment with ADC, and all other topics to which she*

6    *testified in her deposition. Dr. Taylor is also expected to testify with regard to any other*

7    *topic for which Defendants have identified her as having knowledge.*

8    **Others Not Deposed**

9       20.   James Taylor, ***former ADC Contract Compliance Program Evaluation***
10            ***Administrator, Regional Vice President for Corizon***
             ***c/o Corizon Inc.***
11

12   *Mr. Taylor was previously the Contract Compliance Program Evaluation*

13   *Administrator for ADC and currently is Regional Vice President for Corizon, Inc.*

14   *Plaintiffs will call him to testify regarding ADC's privatization of health care services,*

15   *and the compliance of Wexford Health and Corizon Inc. to the terms of the contract.*

16   *Mr. Taylor is also expected to testify with regard to his current position and the*

17   *provision of health care to ADC prisoners.  Mr. Taylor will testify with regard to any*

18   *other topic for which Defendants have identified him as having knowledge.*

19       **B.   INDIVIDUALS WHO MAY BE CALLED TO TESTIFY**

20   **Deposed Persons**

21       21.   Michael Adu-Tutu, M.D.
              *c/o Struck Wieneke & Love, P.L.C.*
22

23   *Dr. Adu-Tutu was previously the Health Services Director and Dental Program*

24   *Manager for ADC. Dr. Adu-Tutu was previously deposed, and plaintiffs may rely on his*

25   *testimony with respect the provision of dental care at ADC before his departure from*

26   *ADC, including the dental policies and procedures.  Plaintiffs may also call him to*

27   *testify at trial regarding ADC's  provision of health care to prisoners in ADC facilities*

28   *prior to his departure from ADC.*

1  *the isolation units, and any other topic for which Defendants have identified him as*

2  *having knowledge.*

3      32.   **Arthur Gross, ADC Assistant Director of Monitoring Bureau**
4            **c/o Struck Wieneke & Love, P.L.C.**

5          *Plaintiffs plan to depose Mr. Gross on September 9, 2013 regarding his current*

6  *position with ADC monitoring Corizon's compliance with the contract to provide all*

7  *health care, and may rely on his deposition testimony. Plaintiffs may call him to testify*

8  *at trial regarding Corizon's provision of health care to ADC prisoners, and any other*

9  *topic for which Defendants have identified him as having knowledge.*

10     33.   **Brian Hanstad, Dental Program Manager**
11            **c/o Corizon Health**

12         *Dr. Hanstad is one of the Dental Program Managers for the State of Arizona.*

13  *Dr. Hanstad is expected to testify about the provision of dental care at ADC facilities;*

14  *written and unwritten dental policies and procedures, including the dental triaging of*

15  *inmates for emergent, urgent, or routine dental care, processing of HNRs, scheduling*

16  *of appointments, intake, staffing, and use of outside dental providers; tracking and*

17  *scheduling of dental appointments at ADC facilities; the capabilities and limitations of*

18  *SPDS' Correctional Dental Software; quality assurance at ADC facilities, including the*

19  *methods, personnel, policies, and procedures used to ensure that all dental staff provide*

20  *timely and effective dental care to inmates; the hiring and credentialing of employees*

21  *who provide dental care at ADC facilities; reports, evaluations, and statistical data*

22  *regarding the provision of and need for dental care for inmates; and changes to the*

23  *provision of dental care, whether formal or informal, after March 4, 2013.*

24     34.   **Vanessa Headstream, ADC Health Services Contract Monitor, Nursing**
25            **Monitor**
           **c/o Struck Wieneke & Love, P.L.C.**

26

27         *Ms. Headstream was previously deposed, and plaintiffs may rely on her*

28  *deposition testimony with regard to her monitoring, supervision, and oversight of*

-12-

1

2 **CERTIFICATE OF SERVICE**

3   I hereby certify that on September 6, 2013, I e-mailed a copy of the attached

4 document to the following parties:

5 Michael E. Gottfried
  Katherine E. Watanabe
6 Lucy M. Rand
  Assistant Arizona Attorneys General
7 Michael.Gottfried@azag.gov
  Katherine.Watanabe@azag.gov
8 Lucy.Rand@azag.gov

9 Daniel P. Struck
  Kathleen L. Wieneke
10 Timothy J. Bojanowski
  Rachel Love
11 Nicholas D. Acedo
  Courtney R. Cloman
12 Ashlee B. Fletcher
  Anne M. Orcutt
13 STRUCK WIENEKE, & LOVE, P.L.C.
  dstruck@swlfirm.com
14 kwieneke@swlfirm.com
  tbojanowski@swlfirm.com
15 rlove@swlfirm.com
  nacedo@swlfirm.com
16 ccloman@swlfirm.com
  afletcher@swlfirm.com
17 aorcutt@swlfirm.com

18 *Attorneys for Defendants*

19 Jennifer Alewelt
  Asim Varma
20 Sarah Kader
  J.J. Rico
21 Cathleen M. Dooley
  ARIZONA CENTER FOR DISABILITY LAW
22 jalewelt@azdisabilitylaw.org
  avarma@azdisabilitylaw.org
23 skader@azdisabilitylaw.org
  jrico@azdisabilitylaw.org
24 cdooley@azdisabilitylaw.org

25 *Attorneys for Plaintiff Arizona Center for Disability Law*

26

27

28                                                        s/ Daniel L. Corbett

SFI-837124v1

**EXHIBIT 9**

**EXHIBIT 9**

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
District of Arizona

| | |
|---|---|
| Victor Parsons, et al., | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   CV 12-00601-PHX-NVW |
| Charles Ryan, et al., | ) |
| | ) (If the action is pending in another district, state where: |
| *Defendant* | ) _____ ) |

## AMENDED SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Brian Hanstad, D.M.D., Northern Regional Dental Director and Dental Supervisor ASPC-Perryville

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Perkins Coie LLP | Date and Time: |
|---|---|
| 2901 N. Central Avenue, Suite 2000 | 04/02/2014 9:00 am |
| Phoenix, Arizona 85012 | |

The deposition will be recorded by this method:   stenographic and video

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

Described in Attachment A on or before March 24, 2014, c/o John H. Gray, Perkins Coie LLP, 2901 N. Central Avenue, Suite 2000, Phoenix, AZ 85012, 602-351-8092

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   03/07/2014

CLERK OF COURT

OR

| | s/ John H. Gray |
|---|---|
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   **Prisoner Plaintiffs**
_____ , who issues or requests this subpoena, are:

John H. Gray, Perkins Coie LLP, 2901 N. Central Avenue, Suite 2000, Phoneix, Arizona 85012, jhgray@perkinscoie.com, 602-351-8092