Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
       jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
       avarma@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br> **PLAINTIFFS' RESPONSE TO COURT'S ORDER [DOC. 848] AND RESPONSE TO DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING DEFENDANTS' MOTION FOR RECONSIDERATION** |

78204-0001/LEGAL120555911.1

# Introduction

The Court instructed Defendants to "articulat[e] *with specificity* the facts or developments that post-date discovery that are of high-probative value and will be relied upon to establish the absence of liability," so the Court could evaluate a possible limited extension of the discovery cut-off to April 1, 2014. [Doc. 848 at 2-3 (emphasis added)] With only a smattering of specific facts or developments, Defendants' supplemental brief largely disregards the Court's request and instead identifies categories of reports and topics for evidence it wants to produce, without specifying the new facts or developments that evidence will show, or why Defendants are prejudiced if bound by the September 27, 2013 cut-off.

If Defendants had provided a particularized list, in concrete terms, of the material facts or specific developments they seek to introduce and the evidence that they intend to rely on to prove them, then the Court could have evaluated each fact to determine whether it was "highly probative," whether Defendants would be prejudiced if that fact was excluded, and what discovery Plaintiffs could pursue. But Defendants did not do that. Having failed to establish any prejudice, Defendants' Motion for Reconsideration must be denied.

Instead of complying with the Court's instructions, Defendants listed a jumble of reports and categories of evidence they want to introduce. Other than a generic description of what the reports track, there is little or no discussion of what this evidence will specifically show that is different from the state of play on September 27, 2013, or why this evidence is "highly probative," other than Defendants' assertions that the evidence will vindicate Defendants and prove Plaintiffs wrong. For example, Defendants seek to introduce more recent contract monitoring reports [Defs. Br. at 9], but they do not say what specific facts those reports show that earlier reports did not. Instead, they say they are relevant because they track "performance measures relating to the very subject matters in this lawsuit" and show ADC is closely monitoring contract performance. [*Id.*] But Defendants are not claiming that this is a "highly probative" change or that the earlier

1  MGAR reports showed that Defendants did not closely monitor contract performance.
2  This bid to extend the discovery period by another six months does not satisfy the
3  instructions imposed by the Court.

4      Nor are Defendants mindful of the April 1, 2014 proposed cut-off. Instead, they
5  propose injecting a constant stream of new evidence into this case without any
6  consideration of its impact on Plaintiffs' need for discovery or the orderly conduct of this
7  litigation. As a result, it is extraordinarily difficult for Plaintiffs to identify the evidence
8  to which they would need to respond if Defendants' Motion for Reconsideration were
9  granted.

10     In short, the burden was on Defendants to show the particular, highly probative
11 facts or developments that would be prejudicial for the Court to exclude. Their generic,
12 overbroad response failed to discharge that burden. Accordingly, the Court should deny
13 Defendants' Motion for Reconsideration altogether. In the alternative, should the Court
14 find that Defendants have presented facts that satisfy the Court's instructions in whole or
15 in part, Plaintiffs seek the discovery set forth in either Appendices A or B, as described
16 herein.[1]

### A. Defendants' Motion for Reconsideration Should Be Denied Because Their Supplemental Brief Did Not Comply with the Court's Order

19     In its Order, the Court sought to address Defendants' concerns that the exclusion of
20 evidence of changed conditions after September 27, 2013 would prejudice them, and gave
21 Defendants an opportunity to describe "with specificity" the "high[ly] probative" facts or
22 developments they would like to present. [Doc. 848 at 2] Instead of a narrow, focused
23 approach that would allow the Court to determine whether the exclusion of particular
24 post-September 27 evidence was prejudicial, Defendants submitted a 16-page brief that

---

[1] Appendix A notes there are five facts listed in Defendants' brief for which there is no identification of the supporting evidence Defendants want to introduce. The Court should either strike those facts or give Defendants a short time to identify the particular evidence they want to introduce at trial to support those facts, so Plaintiffs have an adequate opportunity to identify rebuttal evidence.

78204-0001/LEGAL120555911.1     -2-

1 lists 31 categories of documents and other information, largely without identifying the specific facts that "will be relied upon to establish the absence of liability." [*Id.*][2] Making matters worse, in many instances Defendants do not specify the evidence they want to introduce. Instead, they seek to introduce evidence on broad topics, with no mention of what that evidence will be. [*See, e.g.*, Defs. Br. (Doc. 851) at 13 ("Defendants seek to introduce evidence of several modifications to medication administration implemented after September 2013"); 14 ("Defendants seek to introduce evidence of capital improvements . . .")][3] This makes it impossible for Plaintiffs to identify the responsive discovery they would need to address Defendants' new evidence.[4]

For example, Defendants intend to introduce the updated healthcare records of all the named plaintiffs, but fail to identify a single specific fact from those records that would help their defense, much less any with "high-probative value." [*See* Defs. Br. at 10] Similarly, Defendants seek to introduce six months' worth of 19 different types of monthly reports, many of which will refer to each of the ten ADC facilities, without describing the specific facts that these reports will actually prove. [*Id.* at 2-8]

A review of the extensive documents referred to in Defendants' brief shows that they intend to introduce new evidence on virtually every disputed issue in this case, including staffing levels, timely access to care, timely and adequate examinations of

---

[2] On Friday, April 18, after 4 p.m., Defendants filed a supplement listing two more categories of reports they seek to introduce. This supplement, if considered by the Court, suffers from the same defects as their original filing.

[3] In addition, some of Defendants' categories have numerous subparts. [*See, e.g.*, Defs. Br. at 11-12 ("Mental Health Services Technical Manual"), listing 17 substantive changes Defendants have made to their mental health policies and procedures since September 27, 2013, and five additional substantive changes planned "[w]ithin the next two weeks."]

[4] In an attempt to magnify the prejudice allegedly caused to them by the September 27, 2013 cut-off, Defendants state that "[a]ll of Defendants' expert tours occurred after September 27, 2013." [Defs. Br. at 15 n.1] This is patently false. All of Dr. Seiter's tours occurred in August 2013. [Seiter Report, Ex. 3, attached to the Declaration of Amy Fettig ("Fettig Decl.") as Ex. 9, filed herewith] Dr. Dovgan visited Perryville on July 12, 2013 and Phoenix on August 9, 2013. [Fettig Decl., Ex. 10 (Dovgan Report at 31, 33)] Dr. Mendel's billing records reveal that he toured Tucson, Florence, Eyman, and Perryville the week of September 23, 2013. [Fettig Decl., Ex. 11]

Defendants' misstatement of their experts' activities and these basic historical facts certainly casts doubt on the many other unsupported assertions in their brief.

prisoners at intake, infectious diseases, chronic care, suicides, specialty care, emergency care, access to inpatient care, medication distribution, grievances, sick call requests, measurements of contract compliance for all healthcare services, care provided to each of the named plaintiffs, accreditation reports, post-September 27, 2013 revisions to ADC's contract with Corizon, recent and future revisions to technical manuals for mental health care, alleged new programs for prisoners in isolation units, medical records, crisis intervention, suicide prevention, capital improvements, and exercise for prisoners in isolation. [Defs. Br. at 2-15]  In addition to all of the exhaustive documentary evidence, Defendants intend to have at least some of their experts conduct additional prison tours and offer expert opinions on all of this evidence. [Fettig Decl. ¶¶ 2-3]

In addition, Defendants refuse to recognize even the April 1 cut-off proposed by the Court [Doc. 848 at 2], indicating their intention to offer evidence of developments after April 1, some of which have yet to occur. [*See, e.g.*, Defs. Br. at 11 (electronic health records), 11-12 (Mental Health Technical Manual), 14-15 (physical plant modifications)]  The Court has already indicated its intention to exclude evidence past the discovery cut-off and about hypothetical future developments ("No witness may offer expert testimony regarding future, unspecified events" [Doc. 815 at 3]), and it should adhere to that decision.

In short, Defendants plan to use an extension of the discovery cut-off to litigate an entirely different time period than that which has been the focus of the litigation, and this Court's orders, to date.  That is extremely prejudicial to Plaintiffs.

The parties and the Court have spent an enormous amount of time and money in the last two years conducting discovery in this case.  All the while, "the Court's September 27, 2013 discovery deadline was real and known to both sides. . ." [Doc. 848 at 2]  While the Court's efforts to determine whether Defendants would be prejudiced by considering the admission of limited post-discovery cut-off evidence is eminently reasonable, Defendants' utter failure to respond to the Court's efforts in a specific way confirms that they will suffer no prejudice if their motion for reconsideration is denied.  In

1    the alternative, should the Court rule otherwise, Plaintiffs request that the Court order
2    Defendants to respond to the discovery requested in either Appendix A or Appendix B.

### B. The Court Should Deny the Motion Because It Would Result in a Complete Duplication of General and Expert Discovery

An enduring theme of this litigation is the gap between Defendants' stated policies and their actual practices. As the Court has correctly recognized, "Plaintiffs' claim is that *despite* ADC stated policies, the actual provision of health care in its prison complexes suffers from systemic deficiencies that rise to the level of deliberate indifference."[5] [Doc. 372 at 13 (emphasis in original)] Thus, if Defendants are permitted to introduce their proposed barrage of evidence about policies and programs that post-date the September 27, 2013 cutoff, Plaintiffs will be severely prejudiced by having to redo their discovery to determine the extent to which those policies and programs are actually implemented in practice.

In the last two years Plaintiffs have invested thousands of attorney hours in conducting discovery and spent hundreds of thousands of dollars in expert witness fees alone. The parties have in the last few weeks taken eleven expert depositions, many, if not all, of which will have to be repeated if discovery is reopened. Plaintiffs' experts have produced 745 pages of reports that describe in exhaustive and comprehensive detail how

---

[5] Plaintiffs' experts found widespread evidence from before September 27, 2013 showing that ADC and Corizon policies are routinely not followed, with catastrophic results. [*See, e.g.*, Fettig Decl., Ex. 3 (Stewart Second Supp. Report) at 5 (mortality review showing that prisoner who committed suicide "was not seen every 30 days as required by policy"); Ex. 2 (Stewart Supp. Report) at 8 (criminal investigative report of another prisoner suicide, finding that nurses disregarded "watch swallow" orders and made false entries in medication records); Ex. 5 (Cohen Supp. Report) at 5, 52 (ADC medical director concluded prisoner died from preventable AIDS-related pneumonia after the failure to provide the prisoner an HIV test pursuant to policy, despite two different requests); *id.* at 5, 19-25 (describing case of a prisoner who died of Hodgkin's lymphoma, a highly treatable form of cancer, in which ADC's medical director identified a half-dozen failures by staff to follow clinical guidelines or policies on timely access to care); Ex. 6 (Wilcox Report) at 25-26 ("extremely fragile patients with chronic conditions" are not able to see appropriate medical staff because ADC fails to follow its sick-call/triage procedures); Ex. 8 (Shulman Report) at 22-24 (analyzing wait times based on over 300 records, and finding significant percentages of visits outside requirements for routine and urgent care, including 10% of patients in pain waiting over 23 days for care, and 10% of patients requesting routine care waiting over 210 days)]

1 the health care systems and the conditions in isolation harm Plaintiffs and the class they
2 represent. The experts relied on their tours of the prisons; the healthcare and master file
3 records of hundreds of prisoners; deposition testimony of Defendants' employees,
4 contractors, and percipient witnesses; and reviews of voluminous documents produced
5 previously in discovery.

6 These reports, a sample of which is filed herewith under seal [Fettig Decl., Exs. 1
7 through 8], describe in great detail the harm that Plaintiffs and the plaintiff class have
8 suffered and the risk of harm that they face daily because of the unconstitutional
9 conditions, policies, and practices in ADC's prisons. To a large extent, they belie
10 Defendants' policies and dubious statistics because they show that the actual care that
11 plaintiffs receive and the isolated conditions under which they live cause serious harm and
12 death.

13 For example, Defendants wish to offer in evidence "the total number of inmates
14 who are receiving prescriptions," "the total number of inmates who are receiving
15 treatment for infectious diseases," and numerous similar statistics post-dating the
16 September 27, 2013 cut-off. [Defs. Br. at 4-7] But such figures do not tell the whole
17 story. What matters is not how many prisoners are receiving treatment, but whether
18 defendants have a system in place to ensure that prisoners with medical, mental health, or
19 dental needs actually receive *adequate and timely* treatment for those needs. *See*
20 *Hoptowit v. Ray*, 682 F.2d 1237, 1253-54 (9th Cir. 1982) ("The Eighth Amendment
21 requires that prison officials provide a system of ready access to adequate medical care.");
22 *Brown v. Plata*, 131 S. Ct. 1910, 1940 (2011) ("all prisoners . . . are at risk so long as the
23 State continues to provide inadequate care").

24 The types of evidence Defendants propose to introduce are, for the most part, not
25 new. However, Plaintiffs have spent the last two years gathering evidence of actual
26 conditions within the ADC healthcare system, in part to rebut the misleading picture
27 presented by ADC reporting. To properly assess the relevance and accuracy of ADC's
28 reports and meet the legal standard, Plaintiffs must gather evidence of conditions from the

1  same time period, and cannot rely on conditions from before September to assess new
2  reports that Defendants have created six months later.  Accordingly, Plaintiffs' experts
3  would have to re-inspect the prisons (but may be unable to do so on such short notice),
4  review recent records for hundreds of prisoners, review the documents that Defendants
5  plan to produce and those that Plaintiffs request, and prepare new reports on conditions in
6  the last six months. [*See* Docs. 835, 836 (Declarations of Dr. Robert Cohen and Dr. Todd
7  Wilcox)]

8    In addition to new expert reports, Plaintiffs' discovery would necessarily have to
9  focus on the numerous data reports that Defendants intend to rely on almost exclusively
10 for post-September developments.  While many of these types of reports have been
11 previously produced, Defendants are relying heavily on changes allegedly reflected in the
12 newer reports.  Moreover, Defendants now purport to rely almost entirely on these reports
13 for conditions in a six-month period, making their accuracy much more significant.
14 Plaintiffs must be able to assess both the underlying methodology and the underlying data
15 to determine whether the reports reflect actual conditions.

16   For example, Defendants seek to introduce evidence of the "average wait time" for
17 various health care services.  [Defs. Br. at 3-5]  But without reviewing the underlying
18 data, average wait times are of limited value, since even an apparently low average can
19 obscure lengthy and potentially life-threatening wait times for some prisoners.[6]
20 Accordingly, if Defendants are allowed to introduce such averages, they must be ordered
21 to produce the underlying information from which the averages were calculated and make
22 available for deposition those responsible for collecting the information and performing
23 the calculations.[7]

---

[6] For example, an "average" wait time of ten days could reflect (1) 100 prisoners each waiting ten days (mean/median), (2) 90 prisoners waiting five days and ten prisoners waiting 55 days (mean), or (3) 60 prisoners waiting ten days, 20 prisoners waiting 90 days, 10 prisoners waiting 300 days, and 10 who have never been seen (median or mode).

[7] As Defendants have already changed their method of calculating wait times at least once during this litigation [Fettig Decl., Ex. 12 (Hanstad Dep.) at 83], it is essential that Plaintiffs have access to information on Defendants' current methodology.

1  The Court should not extend discovery through April 1, 2014, and beyond, in the
2  unfettered way Defendants propose because much of the work that Plaintiffs have done,
3  relying in good faith on the discovery cut-off, will have to be duplicated.

**Conclusion**

Defendants have failed to demonstrate with specific facts of high probative value that they will be prejudiced if the Court does not re-open discovery. Therefore, Defendants' Motion for Reconsideration must be denied. If, however, the Court does not deny the Motion, Plaintiffs request the discovery set forth in either Appendix A or Appendix B.

Dated: April 21, 2014

**PRISON LAW OFFICE**

By: /s/ Donald Specter
   Donald Specter (Cal. 83925)*
   Alison Hardy (Cal. 135966)*
   Sara Norman (Cal. 189536)*
   Corene Kendrick (Cal. 226642)*
   **PRISON LAW OFFICE**
   1917 Fifth Street
   Berkeley, California 94710
   Telephone:  (510) 280-2621
   Email:   dspecter@prisonlaw.com
            ahardy@prisonlaw.com
            snorman@prisonlaw.com
            ckendrick@prisonlaw.com

*Admitted *pro hac vice*

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:   dbarr@perkinscoie.com
         agerlicher@perkinscoie.com
         keidenbach@perkinscoie.com
         jhgray@perkinscoie.com
         mdumee@perkinscoie.com
         jpeters@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email: dfathi@npp-aclu.org
afettig@npp-aclu.org
aquereshi@npp-aclu.org

*Admitted *pro hac vice*. Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email: cnmitchell@jonesday.com
aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email: jlwilkes@jonesday.com
tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:  kmamedova@jonesday.com
        jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone: (949) 851-3939
Email:  kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**

By:  s/ Sarah Kader
    Sarah Kader (Bar No. 027147)
    Asim Varma (Bar No. 027927)
    5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
    Telephone: (602) 274-6287
    Email:  skader@azdisabilitylaw.org
            avarma@azdisabilitylaw.org

    J.J. Rico (Bar No. 021292)
    Jessica Jansepar Ross (Bar No. 030553)
    **ARIZONA CENTER FOR DISABILITY LAW**
    100 N. Stone Avenue, Suite 305
    Tucson, Arizona 85701
    Telephone: (520) 327-9547
    Email:  jrico@azdisabilitylaw.org
            jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 21, 2014, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Timothy J. Bojanowski
Rachel Love
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
rlove@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

　　　　　　　　　　　　　　　　s/ D. Freouf