Index of Exhibits to Declaration of Amy Fettig

Exhibit A:    **[FILED UNDER SEAL]**   Cover and pages 34 and 214-215 of the deposition of Richard P. Seiter, Ph.D., dated April 10, 2014

Exhibit B:    **[FILED UNDER SEAL]**  Cover and page 57 of the deposition of Joseph V. Penn, M.D. CCHP FAPA, dated April 11, 2014.

Exhibit C:    **[FILED UNDER SEAL]**   Cover and pages 4-6 and 21-23 of the Confidential Expert Report of Richard P. Seiter, Ph.D., dated December 18, 2013.

Exhibit D:    **[FILED UNDER SEAL]**  Cover and pages 25 and 27 of the Confidential Supplemental Expert Report of Richard P. Seiter, Ph.D., dated March 26, 2014.

Exhibit E:    **[FILED UNDER SEAL]**   Cover and pages 48, 54, and 57 of the Confidential Expert Report of Joseph V. Penn, M.D. CCHP FAPA, dated December 18, 2013.

Exhibit F:    Cover and pages 5-6, 8, 28-32, 35-36, 53-54, 71 and 75 of Defendant's 19th Supplemental Disclosure Statement, dated April 25, 2013.

Exhibit G:    **[FILED UNDER SEAL]**  Cover and page 19 of the Rebuttal Report of Craig Haney, Ph.D., J.D., dated January 31, 2014.

Exhibit H:    **[FILED UNDER SEAL]**  Cover and page 2 of the Rebuttal Declaration of Eldon Vail, dated January 31, 2014.

Exhibit I:    Cover and pages 47, 52-54, 61, 67-68, 130-131, 147-148, and 160 of the deposition of Dr. Craig Haney, Ph.D., J.D., dated March 14, 2014.

Exhibit J:    Cover and page 54 of the deposition of Eldon Vail, dated February 28, 2014.

# Exhibit A

# FILED UNDER SEAL

# Exhibit B

# FILED UNDER SEAL

# Exhibit C

# FILED UNDER SEAL

# Exhibit D
# FILED UNDER SEAL

# Exhibit E

# FILED UNDER SEAL

# Exhibit F

1   Arizona Attorney General Thomas C. Horne
    Office of the Attorney General
2   Michael E. Gottfried, Bar No. 010623
    Lucy M. Rand, Bar No. 026919
3   Assistant Attorneys General
    1275 W. Washington Street
4   Phoenix, Arizona 85007-2926
    Telephone: (602) 542-4951
5   Fax: (602) 542-7670
    Michael.Gottfried@azag.gov
6   Lucy.Rand@azag.gov

7   Daniel P. Struck, Bar No. 012377
    Kathleen L. Wieneke, Bar No. 011139
8   Rachel Love, Bar No. 019881
    Timothy J. Bojanowski, Bar No. 22126
9   Nicholas D. Acedo, Bar No. 021644
    Ashlee B. Fletcher, Bar No. 028874
10  Anne M. Orcutt, Bar No. 029387
    STRUCK WIENEKE & LOVE, P.L.C.
11  3100 West Ray Road, Suite 300
    Chandler, Arizona  85226
12  Telephone:  (480) 420-1600
    Fax:  (480) 420-1696
13  dstruck@swlfirm.com
    kwieneke@swlfirm.com
14  rlove@swlfirm.com
    tbojanowski@swlfirm.com
15  nacedo@swlfirm.com
    afletcher@swlfirm.com
16  aorcutt@swlfirm.com
    *Attorneys for Defendants*
17
                    **UNITED STATES DISTRICT COURT**
18
                        **DISTRICT OF ARIZONA**
19
    Victor Parsons, *et al.*, on behalf of themselves      NO.  CV12-0601-PHX-NVW
20  and all others similarly situated; *et al.*, and
    Arizona Center for Disability Law,
21
                                    Plaintiffs,       **DEFENDANTS' NINETEENTH**
22                                                    **SUPPLEMENTAL DISCLOSURE**
           v.                                         **STATEMENT**
23
    Charles Ryan, Director; *et al.*,
24
                                    Defendants.
25

26          Defendants,  through  counsel  and  pursuant  to  Federal  Rule  of  Civil

27  Procedure  26(a)(1),  submit  their  **Nineteenth**  Supplemental  Disclosure  Statement.

28

    2891510.1

programming in ADC facilities; education opportunities and availability to ADC populations; CCTV programing;  implementation of mental health programming at ADC facilities, recreation, employment, and education activities provided to ADC inmates, and the conditions of confinement at ADC facilities, including all matters raised in the court's certification of the class and sub classes as it relates to conditions of confinement, which may include, lighting, food service, recreational activities, mail, food, watch, reading materials and the like; statistics, reports and historical data relating to mental, medical and dental care; and his knowledge of security operations and conditions in maximum custody.

Mr. McWilliams will also testify regarding the changes implemented and anticipated for maximum custody inmates, specifically inmates who are in maximum custody and designated as Seriously Mentally Ill.  Mr. McWilliams will testify that mental health inmates in maximum custody have been clustered in various housing areas and ADC has identified office space for mental health staff in those housing areas.  ADC has built large recreation enclosures for use by multiple inmates at the same time and in some units, recreation fields will be used by 50-60 inmates at a time.  Inmates are working as porters, groundskeepers, maintenance works, kitchen workers and in other various capacities.  Mental health group programming as well as self-help television programs are being offered.  ADC is also starting to facilitate groups to include ADC programs staff with several new groups planned.  Some units include contact visitation.  A step system is being implemented to allow the evaluation of inmates with the highest step receiving the most out-of-cell activity.  This system is based on time, participation in programs and the inmate's general behavior.  Religious services are also available.  Plans are being made to expand the outdoor recreation in groups and on recreation fields.  Even more jobs are being identified and inmates will be screened and/or trained to work in those jobs.  Tables are being placed in pods and runs for increased group out-of-cell interaction.  Proposals are being reviewed for various new out-of-cell activities that will increase and encourage positive socialization.  Programs are being reviewed and staff is being trained to facilitate

5

1  groups with plans to implement those new programs in January 2014.  Maximum custody

2  inmates have been reviewed for movement to lower custody levels and placement in open

3  cell blocks, such as CB1 and CB2 in ASPC-Florence's Central Unit.  Plans to open more

4  blocks are scheduled to begin in 2014.  ADC is also currently reviewing housing areas to

5  cluster inmates designated as Seriously Mentally Ill in a more open living environment.

6  Mr. McWilliams will testify to security equipment changes like using security chairs for

7  inmate groups in place of individual holding enclosures.  Additionally, he will testify

8  regarding the cutting of windows in solid cell doors in inmate housing with mental health

9  issues to enhance observation.  In some cases this involves facilitating groups with

10  inmates unrestrained.  Mr. McWilliams will also testify as to the implementation and

11  positive outcomes related to these changes once the changes have been made.

12  　　　　　Mr. McWilliams has reviewed the reports of Plaintiffs' experts Eldon Vail

13  and Craig Haney.  Mr. McWilliams will testify regarding the conditions of confinement as

14  alleged by both Mr. Vail and Mr. Haney and as to the conditions of confinement for those

15  inmates in maximum custody or detention units that may change up until the time of

16  trial.  Mr. McWilliams will testify regarding the classification system for mentally ill

17  inmates placed in maximum custody and detention units, specifically but not limited to the

18  fact that ADC's classification system has been reviewed and validated by expert Dr.

19  James Austin through the American Correctional Association and the National Institute of

20  Corrections. Further, every inmate receives an annual classification review, which is an

21  interactive process including the inmate.

22  　　　　　Mr. McWilliams will discuss the concepts and terminology he observed at a

23  training course on working with difficult/violent offenders at the National Institute of

24  Corrections – states participating in the training had numerous, different classifications

25  and terms for inmates housed in their highest custody prisons.  He will also testify that

26  Arizona uses a concept of four custodies, minimum, medium, close and maximum.  Mr.

27  McWilliams will also testify regarding the ability of inmates, with the exception of those

28  inmates on Death Row, to earn their way out of maximum custody or detention units and

emphasis ADC places on de-escalation techniques, barring emergency situations requiring immediate response.  Mr. McWilliams will also address conditions of confinement issues raised by named Plaintiffs.

Mr. McWilliams will testify as to the current status of all of these areas, the allegations contained in Plaintiffs' expert reports, and changes that may be implemented up until trial.  Mr. McWilliams will testify consistent with his deposition testimony.  Mr. McWilliams will testify pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).

4.　　Richard Rowe, M.D., former ADC Quality/Clinical, Medical Program Administrator, HS Division
c/o Struck Wieneke & Love, P.L.C.

Dr. Richard Rowe is the HS Division, Quality/Clinical Medical Program Administrator.  Please see Exhibit Bates Numbered ADC123462-123463 for his credentials and qualifications.  Dr. Rowe was previously deposed and Defendants will rely on his deposition testimony. In addition to his deposition testimony, Dr. Rowe will testify pursuant to FRCP 26(a)(2)(C) with regard to recommendations made to him by doctors at various ADC facilities and the procedure by which recommendations are made to him; policies, practices, procedures, and processes of the administration of all health care services to inmates housed at ADC; relevant staffing policies and procedures; implementation of structural and programming improvements in ADC facilities; policies and procedures including those related to medical health care as well as the provision of adequate care to ADC inmates in compliance with constitutional requirements; his role in authoring inmate mortality reviews; his involvement in working with outside providers as a result of the ACCHS legislation and privatization legislation.  Dr. Rowe will also testify regarding the mortality reviews he completed.

Dr. Rowe will also testify regarding his review of Plaintiff Shawn Jensen's medical records and his opinions regarding the treatment rendered to Jensen.  He will further testify regarding specific allegations made by Mr. Jensen as it relates to his medical care in connection with his treatment for prostate cancer as well as his current

12.   Ron Credio, Warden, ASPC-Eyman
c/o Struck Wieneke & Love, P.L.C.

Ron Credio is the Warden at ASPC-Eyman. He has been employed with the ADC for over 18 years, starting as a Correctional Officer at ASPC-Eyman/Rynning Unit. He was promoted to the position of Sergeant at ASPC-Florence/Central Unit, Lieutenant at ASPC-Eyman/Meadows Unit, Captain at ASPC-Florence/Picacho and North Unit, Associate Deputy Warden at ASPC-Florence/South Unit, Deputy Warden as ASPC-Phoenix/Globe and Alhambra, and Deputy Warden of Operations at ASPC-Florence. Warden Credio has a Bachelor of Science in Public Safety Administration, Associates Degree in Corrections, and Associates Degree in Management. He is likely to testify regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Eyman, its cell blocks, the inmates housed at ASPC-Eyman, recreation and therapy and behavioral programming at ASPC-Eyman, access to healthcare and the delivery of healthcare to inmates.  Warden Credio is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements,; lighting issues, conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates.   Warden Credio will also provide foundational testimony for institutional records.

13.   Gerald Thompson, DW, ASPC-EYMAN-SMU I
c/o Struck Wieneke & Love, P.L.C.

Deputy Warden Gerald Thompson is likely to testify regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Eyman, its cell blocks, the inmates housed at SMU-I, and recreation, therapy and behavioral programming at SMU-I, and access to healthcare and delivery of healthcare to the inmates.   Deputy Warden Thompson is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities;   food service, including nutrition requirements;, lighting issues, conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates.   Deputy Warden Thompson will also provide foundational testimony for institutional records.

14.   Assistant Deputy Warden Munoz, ASPC-Eyman-Browning Unit
c/o Struck Wieneke & Love, P.L.C.

Assistant Deputy Warden Munoz is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Eyman, its cell blocks, the inmates housed at ASPC-Eyman, recreation and therapy and behavioral programming at ASPC-Eyman, and access to healthcare and delivery of healthcare to the inmates.

29

Assistant Deputy Warden Munoz is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements;, lighting issues, conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Assistant Deputy Warden Munoz will also provide foundational testimony for institutional records.

15.    Stephen Morris, DW, ASPC-Eyman-Browning Unit (and former DW, ASPC-Florence-East)
c/o Struck Wieneke & Love, P.L.C.

Deputy Warden Stephen Morris is assigned to the Browning Unit at ASPC-Eyman, and is likely to testify regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Eyman, its cell blocks, the inmates housed in Browning Unit, recreation at Browning Unit, therapy and behavioral programming at Browning Unit, and access to healthcare and delivery of healthcare to the inmates. Deputy Warden Morris is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification

30

status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; food service, including nutrition requirements;, lighting issues,  alleged sanitation and extermination  issues at their respective facilities; conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Deputy Warden Munoz will also provide foundational testimony for institutional records.

      16.    Lance Hetmer, Warden, ASPC-Florence
              c/o Struck Wieneke & Love, P.L.C.

Lance Hetmer is the Warden at ASPC-Florence.  He is responsible for the oversight of a multi-custody facility of approximately 4,270 inmates and approximately 1,055 full time staff.  Warden Hetmer began his career with the ADC over 25 year ago as a Correctional Officer at the ASPC-Douglas facility.  He was promoted through the ranks, holding the positions of sergeant, lieutenant and captain.  With each promotion, he gained knowledge and experience in working with all custody levels at ASPC-Safford, Perryville, and Tucson.  For the last 13 years he has held management positions of Associate Deputy Warden, Deputy Warden, and Deputy Warden of Operations. Warden Hetmer is likely to testify regarding his knowledge of ADC's historical and contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Florence, its cell blocks, the inmates housed in each cell block, recreation for all security levels, therapy and behavioral programming for all security levels, and access to healthcare and delivery of healthcare to the inmates. Warden Hetmer is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies

regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues and extermination issues at their respective facilities; food service, including nutrition requirements;, lighting issues, conditions of confinement and management of SMU units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Deputy Warden Hetmer will also provide foundational testimony for institutional records.

17.    Amy Barnes, ADW, ASPC-Florence-Kasson Unit
c/o Struck Wieneke & Love, P.L.C.

Deputy Warden Amy Barnes is assigned to the Kasson Unit at ASPC-Florence, and is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Florence, its cell blocks, the inmates housed in Kasson Unit, recreation at Kasson Unit, therapy and behavioral programming at Kasson Unit, and access to healthcare and delivery of healthcare to the inmates. Deputy Warden Barnes is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; conditions of confinement and management of maximum

32

been in the corrections field for 24 years, holding the positions of Correctional Officer I, Correctional Programs Officer I and II, Correctional Programs Supervisor, Associate Deputy Warden, and Deputy Warden. She was the Deputy Warden of Programs at the Hutchinson Correctional Facility for the Kansas Department of Corrections for 3 years. In the field of corrections, Warden Larson has worked with male and female inmates, and juvenile offenders. Additionally, she worked in correctional and probationary boot camps for adults and juveniles. She is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Winslow, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to the inmates. Warden Larson is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements;, lighting issues; conditions of confinement and inmate management; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Larson will also provide foundational testimony for institutional records.

21.     Judy Frigo, Warden, ASPC-Perryville
        c/o Struck Wieneke & Love, P.L.C.

Warden Judy Frigo is the Warden at ASPC-Perryville. Please see Exhibit Bates Numbered ADC123426-123428 for her credentials and experience. Warden Frigo is

likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Perryville, its cell blocks, the inmates housed in each Unit, recreation at each Unit, therapy and behavioral programming at each Unit, and access to healthcare and delivery of healthcare to the inmates. Warden Frigo is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; food service, including nutrition requirements; lighting issues;   conditions of confinement and management of maximum units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates. Warden Frigo will also provide foundational testimony for institutional records.

22.   James O'Neil, Warden, ASPC-Phoenix (and former DWOP, ASPC-
Perryville)
c/o Struck Wieneke & Love, P.L.C.

Warden James O'Neil is likely to testify regarding his knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding both ASPC-Phoenix and ASPC-Perryville, their housing units, the inmates housed at ASPC-Phoenix and ASPC-Perryville, and recreation, therapy and behavioral programming at both ASPC-Phoenix and ASPC-Perryville.   Warden O'Neil is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement

SPDS provides timely and appropriate care to ADC inmates.

All of the opinions expressed by Dr. Smallwood herein are to a reasonable degree of dental probability.

41.   Ernest Trujillo, ADC Southern Regions Operations Director (SROD)
      c/o Struck Wieneke & Love, P.L.C.

Ernest Trujillo is the Southern Region Operations Director of ADC.  Please see Exhibit Bates Numbered ADC123472-123477 for his credentials and experience. Mr. Trujillo is likely to testify with regard to the delivery of medical, dental and mental health care to the inmates; his activities in ensuring compliance with all Department Orders, Procedural Manuals, Post Orders, and Standard of Operations as they apply to security and operational practices, staff safety, the welfare of the inmate population; his supervision of ADC facilities, including policy and program development and implementation statewide with regard to security operations, inmate programming, and standardization of staffing; ensuring the implementation of the Department's Strategic Plan and other agency initiatives, and standardization of processes and procedures in all facilities.

Mr. Trujillo will also testify regarding the changes implemented for maximum custody inmates, specifically inmates who are in maximum custody and designated as Seriously Mentally Ill.   He will also testify regarding the positive outcomes related to these changes once the changes have been made.

Mr. Trujillo has reviewed the reports of Plaintiffs' experts Eldon Vail and Craig Haney.  Mr. Trujillo will testify regarding the conditions of confinement as alleged by both Mr. Vail and Mr. Haney and as to the conditions of confinement for those inmates in maximum custody or detention units that may change up until the time of trial.  Mr. Trujillo will testify regarding the classification system for mentally ill inmates placed in maximum custody and detention units, specifically but not limited to the fact that ADC's classification system has been reviewed and validated by Dr. James Austin of the

1    American Correctional Association and the National Institute of Corrections. Further,

2    every inmate receives an annual classification review, which is an interactive process

3    including the inmate.   Mr. Trujillo will also testify regarding the ability of inmates, with

4    the exception of those inmates on Death Row, to earn their way out of maximum custody

5    or detention units and the criteria for such movement.  Mr. Trujillo will testify that there

6    are various groups of mental health inmates in maximum custody or detention units,

7    which each require special considerations in how ADC addresses their housing and

8    movement.   Additionally, Mr. Trujillo will testify regarding the training that all

9    correctional staff receives and the training that staff assigned to mental health units are

10   undergoing , including ASIST Training and other specialized training regarding inmates

11   with mental illness.  Officers are selected to work in those areas of maximum custody

12   housing mentally-ill inmates based on their experience level and demonstrated ability to

13   address situations that may arise.  These officers serve 5 years at these posts before

14   rotating in order to provide consistency in these housing areas.  Further, all sergeants and

15   lieutenants will be trained in motivational interviewing as part of crisis intervention

16   training.

17          Mr. Trujillo will also testify regarding the frequency with which inmates

18   have contact with individual staff, whether it be correctional or medical staff.  Mr. Trujillo

19   will testify regarding the opportunity for recreation within the maximum custody and

20   detention units.  Further, maintenance issues throughout ADC are regularly addressed

21   with those issues positing a security or safety concern given higher priority.  Mr. Trujillo

22   will testify as to the changes occurring at Perryville Complex – Lumley Unit that affects

23   the programming access and conditions of confinement of mentally ill inmates in that

24   unit.  Mr. Trujillo will also testify regarding the issues related to mentally ill inmates in

25   maximum custody or detention units that are unique to Perryville as the only complex that

26   houses female inmates with exception of George Ward at the Phoenix Complex.

27          Mr. Trujillo will further testify regarding the requirement that staff and

28   visitors to maximum custody and detention units wear safety gear.  He will testify that

53.     Julie Jackson, DW, ASPC-Florence
        c/o Struck Wieneke & Love, P.L.C.

Deputy Warden Julie Jackson is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Florence, its cell blocks, the inmates housed at ASPC-Florence, and recreation, therapy and behavioral programming at ASPC-Florence. Deputy Warden Jackson is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding inmates with gang affiliations as well as ADC's management of gang affiliated inmates; any Plaintiff's protective custody or classification status at any point during their incarceration at ADC as well as the policies and procedures regarding the classification, housing, programming, recreation, morale and welfare programs, and fundraisers; the management of health care at each respective facility, the physical layout of each of their respective facilities; alleged sanitation issues at their respective facilities; conditions of confinement and management of maximum custody units; inmates' access to programming, visitation, and recreation time; and educational programming available to inmates.

54.     Sandra Lawrence, DW, ASPC-Lewis-Stiner Unit (and former DW of
        ASPC-Lewis-Bachman)
        c/o Struck Wieneke & Love, P.L.C.

Deputy Warden Sandra Lawrence is likely to testify regarding her knowledge of ADC's contemporary practices and procedures in relation to security operations, including general information regarding ASPC-Lewis/Stiner Unit, its cell blocks, the inmates housed at Stiner Unit, and recreation, therapy and behavioral programming at ASPC-Lewis. Deputy Warden Lawrence is additionally likely to have discoverable information with regard to Plaintiffs' institutional history and ADC's policies and procedures, and conditions of confinement with respect to their respective

71

1   facilities; Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies
2   regarding inmates with gang affiliations as well as ADC's management of gang affiliated
3   inmates; any Plaintiff's protective custody or classification status at any point during their
4   incarceration at ADC as well as the policies and procedures regarding the classification,
5   housing, programming, recreation, morale and welfare programs, and fundraisers; the
6   management of health care at each respective facility, the physical layout of each of their
7   respective facilities; alleged sanitation issues at their respective facilities; conditions of
8   confinement and inmate management; inmates' access to programming, visitation, and
9   recreation time; and educational programming available to inmates.

10          59.     Lacy Scott, DW, ASPC-Perryville-Lumley
11                  c/o Struck Wieneke & Love, P.L.C.

12          Deputy Warden Lacy Scott is likely to testify regarding his knowledge of
13   ADC's contemporary practices and procedures in relation to security operations, including
14   general information regarding ASPC-Perryville/Lumley Unit, its cell blocks, the inmates
15   housed at Lumley Unit, and recreation, therapy and behavioral programming at ASPC-
16   Lumley Unit.   Deputy Warden Scott is additionally likely to have discoverable
17   information with regard to Plaintiffs' institutional history and ADC's policies and
18   procedures, and conditions of confinement with respect to their respective facilities;
19   Plaintiffs' disciplinary, managerial, and behavior issues; practices and policies regarding
20   inmates with gang affiliations as well as ADC's management of gang affiliated inmates;
21   any Plaintiff's protective custody or classification status at any point during their
22   incarceration at ADC as well as the policies and procedures regarding the classification,
23   housing, programming, recreation, morale and welfare programs, and fundraisers; the
24   management of health care at each respective facility, the physical layout of each of their
25   respective facilities; alleged sanitation issues at their respective facilities; conditions of
26   confinement and management of maximum custody units; inmates' access to
27   programming, visitation, and recreation time; and educational programming available to
28   inmates.

# Exhibit G

# FILED UNDER SEAL

# Exhibit H
# FILED UNDER SEAL

# Exhibit I

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF ARIZONA


VICTOR PARSONS, ET AL.,            )
                                   )
          PLAINTIFFS,              )
                                   )
     VS.                           )
                                   )Case No.2:12-CV-00601
CHARLES RYAN; RICHARD PRATT,       )            PHX-NVW
                                   )
          DEFENDANTS.              )
                                   )
                                   )
                                   )
_____)


          The deposition of CRAIG WILLIAM HANEY, was held

on Friday, March 14, 2014, commencing at 9:02 a.m., at

71 Stevenson Street, Suite 400, San Francisco,

California, before Rhiannon Smith, Certified Shorthand

Reporter, No. 13265, in and for the State of California.


JOB NO.:     203483

REPORTED BY:  Rhiannon Smith, CSR#13265

CRAIG WILLIAM HANEY - 3/14/2014

1    didn't -- that was my decision, not his, but as I recall

2    all the other people selected for the interview

3    participated.

4        **Q.  Do you recall which unit it was where the inmate**

5    **you just spoke of was not participating, or either unit**

6    **or name?**

7        A.  I don't recall offhand.  I can determine it from

8    looking at my notes.

9        **Q.  And what kind of behavior was it that the inmate**

10   **was exhibiting that led you to the conclusion he wasn't**

11   **going to participate?**

12       A.  He simply didn't -- he simply didn't answer the

13   questions.

14       **Q.  Now, you told me, I believe, previously that the**

15   **confidential interviews lasted approximately an hour?**

16       A.  It varied, but that's an estimate.

17       **Q.  What was your -- what was the purpose of you**

18   **conducting the confidential interviews?**

19       A.  It was to get a more in-depth understanding of

20   how prisoners were reacting to and being affected by the

21   condition of their confinement.

22       **Q.  What kind of questions did you ask the inmates**

23   **during the confidential interview?**

24       A.  I asked them, first of all, to provide me with

25   some background information about themselves.  It

1    BY MS. LOVE:

2        Q.  If you go back to G, all right.  So looking back

3    to Exhibit 3, tab G, Bates number Haney 308 and 310,

4    this is -- I know this is the questionnaire form for Mr.

5    Sanchez, but is this the form of the questionnaire you

6    used for all the confidential inmate interviews you

7    conducted at ADC?

8        A.  It is.

9        Q.  Is this a questionnaire that you yourself

10   developed?

11       A.  It is.

12       Q.  When did you develop this questionnaire?

13       A.  Early 1990s.

14       Q.  What was the purpose of creating this

15   questionnaire?

16       A.  In order to provide a structured interview format

17   to engage in a more in-depth assessment of conditions of

18   confinement.

19       Q.  Was this a questionnaire specifically targeted as

20   doing interviews of inmates that are housed in a maximum

21   custody setting?

22       A.  Yes.

23       Q.  Since the 1990s when you created this

24   questionnaire, do you know how many -- in how many cases

25   you have used this questionnaire?

1    A.   I don't know exactly.  I have used it in a number

2    of cases.  It's a standard format that I use.

3    **Q.   Below on this Bates number 308, which am I**

4    **correct that this is the first page of the**

5    **questionnaire?**

6    A.   It is.

7    **Q.   Under the information where you're looking at the**

8    **name of the inmate, current housing, et cetera, there is**

9    **a paragraph of text that is underlined that starts with**

10   **the words, "I have a series of questions to ask you."**

11   A.   Yes.

12   **Q.   Do you read this verbatim to inmates when you**

13   **start the questionnaire, this underlying text?**

14   A.   I don't read it to them.  I can pretty much

15   recite it verbatim myself now, but it was on the

16   original questionnaire as a reminder to make that

17   prefatory statement when I first started to use it.  I

18   just left it on the questionnaire.  I typically just do

19   it by memory.

20   **Q.   And then under the text that's underlined there**

21   **is a list on the first page and list of 13 -- what**

22   **should I call these, 13 symptoms?  13 conditions?**

23   A.   They're symptoms.  They're conditions.  They're

24   indices of stress and distress.

25   **Q.   And how did you come up with this list of 13 here**

CRAIG WILLIAM HANEY - 3/14/2014

1   on this first page, and then we'll talk about the second

2   page?

3       A.  These are symptoms of psychological stress that

4   appear in the literature.  There are a number of studies

5   that have been done using these particular symptoms

6   dating back to a book by Jones, Health Risks of

7   Imprisonment published in the 1970s, and so I simply

8   gleaned the specific symptoms from the various symptom

9   checklists, psychological stress indices or assessment

10  devices and tools people use.

11      Q.  And these are symptoms you have gleaned from the

12  literature that specifically relate to inmates in a

13  maximum custody setting?

14      A.  These are more general indices of psychological

15  stress or distress.  These are widely used as symptoms

16  of stress in a variety of settings or situation.

17      Q.  Next to the right of each symptom you have a

18  numerical scale of zero to 4.  Zero being never, 1 being

19  occasional, 2 being some, 3 being often, and 4 being

20  constantly; is that correct?

21      A.  Correct.

22      Q.  Tell me what your method is then to decide

23  whether A, a person that you're speaking with has one of

24  these numbered symptoms, and second, how would you

25  assess whether the inmate would fall into categories 1,

CRAIG WILLIAM HANEY - 3/14/2014

1    this case of the ADC inmates, did you use a

2    questionnaire for any of the cell-front interviews you

3    conducted?

4        A.  No.

5        Q.  Why is it that you wouldn't do a questionnaire

6    during a cell-front interview of ADC inmates?

7        A.  Two reasons.  The first that it's impractical.

8    It's time consuming, and the cell-front interviews

9    really didn't allow for that.  The second and more

10   important reason is that these are confidential

11   interviews, and so it is more difficult for prisoners to

12   be candid and to candidly talk about symptoms that they

13   may be experiencing or ways they're being

14   psychologically troubled or under distress when it is

15   possible other people will overhear.  So it's a much

16   more appropriate set of questions to ask in a

17   confidential setting.

18       Q.  During the cell-front views you conducted in this

19   case, did you -- realizing you didn't use the

20   questionnaire as part of your interview, did you ask

21   inmates if they were experiencing any of the types of

22   symptoms that you have on your questionnaire?

23       A.  I didn't ask them those questions specifically.

24   Often times they volunteer ed them.  So even though they

25   were non confidential interviews, sometimes prisoners

```
 1      custody staff and administrators typically worked out
 2      the time we would be given access to a room and access
 3      to the medical records, medical and psychiatric records,
 4      and so it varied depending upon what time that was and
 5      whether or not I had conducted the interviews or not.
 6          Q.  What was the purpose of reviewing medical records
 7      related to the person you conducted confidential
 8      interviews with?
 9          A.  To get to understand them better, to get to
10      understand their condition, their mental health
11      condition in the institution, and to look at the extent
12      to which their treatment program was reflected and being
13      documented, whether or not there was any evidence of
14      progress notes, and whether or not there was any change
15      in their mental health condition.
16          Q.  For inmates' records, the confidential
17      interviews, for any records you reviewed after you
18      conducted an interview with an inmate, did you look to
19      see whether or not the information provided to you by
20      the inmate in the confidential interview was consistent
21      or contrary to information provided in the medical
22      record?
23          A.  Sometimes I did to the extent to which I could.
24      Often times it was not possible to draw any inferences
25      from the records.
```

1      Q.  What do you mean by that?

2      A.  The records were a mess uniformly, uninformative,

3   chaotically organized, contained almost no information

4   many instances, so it really wasn't possible to check

5   against any of the information I had acquired.

6      **Q.  As you sit here today, are there any inmates that**

7   **you conducted confidential interviews of that stand out**

8   **in your mind as being someone who in their interview**

9   **they report information to you that, you know, sends out**

10  **that red flag of is this person telling me the truth, is**

11  **this true, and then you went to go look at the medical**

12  **records to try to actually verify specific information**

13  **provided to you by the inmate?**

14               MR. SPECTER:  Vague.  Incomplete

15   hypothetical.

16               THE WITNESS:  I don't recall believing or

17   reaching a conclusion that the inmates were misleading

18   me.  I didn't have that kind of interview with anyone,

19   and as I described earlier, the records themselves were

20   hardly probative of much of anything in most cases.

21   There were a few exceptions.

22   BY MS. LOVE:

23      **Q.  In doing your tours and conducting the random**

24  **cell-front interviews while on site, did you review**

25  **medical records related to any of those inmates?**

CRAIG WILLIAM HANEY - 3/14/2014

 1    you interviewed in this case including both confidential

 2    and cell-door interviews?

 3       A.  I haven't counted them.  It's reflected in my

 4    notes.  Each inmate I interviewed or talked to, I

 5    recorded their names.

 6       Q.  Well, I counted and I cannot say that my count is

 7    100 percent right on.  I counted about 78 interviewed

 8    between cell-door interviews and confidential; does that

 9    sound within the realm of possibility?

10       A.  It's possible, yes.

11       Q.  And when I count through your report the specific

12    inmates that you interviewed considering both

13    confidential and cell-door interviews that you

14    specifically discuss by name in your report comes to

15    around 47 inmates; that sound in the realm of

16    reasonability?

17       A.  Can you say that again?

18       Q.  Yes.  When I look at your report I counted up how

19    many inmates whose names specifically appear in your

20    report that you interviewed either by cell-front

21    interview or confidential interview, and I came up with

22    a figure of about 47 inmates specifically named in your

23    report.

24            MR. SPECTER:  I'm sorry, I'm a little

25    confused.  I thought you said 78 just a minute ago.

```
 1            MS. LOVE:  78 interviewed total but 47
 2   specific references as to named in your report.
 3            MR. SPECTER:  Okay.
 4            THE WITNESS:  That could be.  I haven't done
 5   the count.  I'll accept your representation of your
 6   count.
 7   BY MS. LOVE:
 8     Q.  Why did you choose the inmates you chose to
 9   specifically discuss by name in your report?
10     A.  Well, simply because they were -- they had said
11   something that was illustrative of the more general
12   point that I was making.  You have a record of what all
13   the inmates that I talked to said.  If you look at that
14   record, you'll see there were other inmates who said
15   very much the same thing.  I had to keep the report at a
16   manageable or level or manageable level.  It was long,
17   as you have already noted anyway, so I had to make a
18   selection from a number of possible people to cite or
19   quote to use, and I -- simply I picked the ones that
20   seemed illustrative.  I could have used others other
21   than that.  There was no other special logic to it.
22     Q.  Were any of the inmates that you specifically
23   discuss by name in your November report, do those
24   constitute, quote, unquote, the worst case inmates you
25   interviewed?
```

CRAIG WILLIAM HANEY - 3/14/2014

1    problematic.  It's problematic even for otherwise even

2    mentally healthy people.  So I see those two things as

3    very much going together.

4        **Q.  Do you know that at ADC in the Browning unit**

5    **where the STG validating members are confined, that they**

6    **an opportunity to debrief and then work their way out of**

7    **maximum custody?**

8        A.  Yes, and I talked to some prisoners about that

9    process, and I -- you know, I know it is in theory

10    available.  Many prisoners expressed concerns about

11    whether or not it was really being done, whether they

12    could get access to it, what the implications of the

13    debriefing process would be, and so it's -- my

14    understanding of it was it was very much a work in

15    process -- progress, and I don't know exactly how it's

16    operating, and I read how it's supposed to operate and

17    I've heard the inmates store about how it does.

18        **Q.  And did you do any analysis of the average**

19    **lengths of stay of an STG validated inmate in maximum**

20    **custody at ADC?**

21        A.  No, I asked for that data and I was never given

22    it.  I think that was a discovery request, and at least

23    I have never seen it.

24        **Q.  In the medical records that you have been**

25    **provided in this case for review, did you do any**

1 **statistical analysis to determine how many times a**

2 **particular inmate saw the psychiatrist, saw a**

3 **psychologist, a psychiatric associate, a nurse, an M.D.?**

4    A.  I didn't do a statistical analysis of it.  I

5 looked in the records to determine how often that

6 occurred, and I was struck by the infrequency of it.

7 The records appear to be me to be woefully incomplete in

8 most instances.  So I was never sure whether or not what

9 I was seeing full picture, whether or not -- whether

10 there were things that were missing.  I saw records of

11 many requests and many more infrequent actual contacts,

12 and often times the contacts themselves would indicate

13 on the record cell-front, 5 minutes, cell-front, you

14 know, 7 minutes, not long-term clinical contacts but

15 rather cell-front interactions.

16    **Q.  In your opinion what is the minimum amount of**

17 **time that a cell-front interaction between an inmate and**

18 **a mental health professional should be?**

19           MR. SPECTER:  That's vague.

20           THE WITNESS:  I don't have an estimate of

21 minimal interaction but when that's the only contact

22 somebody is getting, and in many instances that appeared

23 to be the case, then 5 minutes or even 10 minutes

24 wouldn't ordinarily be enough, and certainly when you

25 take into account the fact that these contacts are

CRAIG WILLIAM HANEY - 3/14/2014

1    interview?

2        A.  I don't know exactly.  I was at that unit for

3    several hours, and I don't remember.  I talked to her

4    early in this process, as I recall, when it was

5    determined I was not going to be able to interview her

6    confidentially, and then a little bit later when I

7    passed by her cell again to go to another cell-front

8    interview, she gestured and called out to me to come

9    back and see, and I talked to her for a little while

10   longer.

11       Q.  Also on this use of force and significant

12   incident reports, there's four reports for Inmate

13   Thomas, did you also review those?

14       A.  I did.

15       Q.  In your supplemental report you were critical of

16   defense experts, Dr. Penn and Dr. Cider, for not

17   speaking to any inmates during their tours of

18   facilities, why is that?

19       A.  Well, each of them reached conclusions about the

20   effects of conditions of confinement on a group of

21   people none of whom they had ever bothered to converse

22   with, and that just seemed to me to be problematic in

23   the extreme.

24       Q.  Are you aware it would be inappropriate for

25   Doctors Penn or Cider to interview the named plaintiffs

CRAIG WILLIAM HANEY - 3/14/2014

1                DEPOSITION OFFICER'S TRANSCRIPT

2

3    STATE OF CALIFORNIA    )
                            ) SS.
4    COUNTY OF SAN FRANCISCO)

5

6         I, Rhiannon Smith, hereby certify:

7         I am a duly qualified Certified Shorthand

8    Reporter, in the State of California, holder of

9    Certificate Number CSR 13265 issued by the Court

10   Reporter's Board of California and which is in full

11   force and effect.  (Bus. & Prof. SS 8016)

12        I am not financially interested in the action and

13   am not a relative or employee of any attorney of the

14   parties, or of any of the parties.  (Civ. Proc SS

15   2025.320(a))

16        I am authorized to administer oaths or

17   affirmations pursuant to California Code of Civil

18   Procedure, Section 2093(b), and prior to being examined,

19   the deponent was first placed under oath or affirmation

20   by me. (Civ. Proc. SS. 2025.320, 2025.540(a))

21        I am the deposition officer that stenographically

22   recorded the testimony in the foregoing deposition and

23   the foregoing transcript is a true record of the

24   testimony given. (Civ. Proc. SS. 2025.540(a))

25             I have not, and shall not, offer or provide any

CRAIG WILLIAM HANEY - 3/14/2014

1    services or products to any party's attorney or third

2    party who is financing all or part of the action without

3    first offering same to all parties or their attorneys

4    attending the deposition and making same available at

5    the same time to all parties or their attorneys. (Civ.

6    Proc. SS. 2025.320(b))

7         I shall not provide any service or product

8    consisting of the deposition officer's notations or

9    comments regarding the demeanor or any witnesses,

10   attorney, or party present at the deposition to any

11   party or any party's attorney or third party who is

12   financing all or part of the action, nor shall I collect

13   any personal identifying information about the witness

14   as a service or product to be provided to any party or

15   third party who financing all or part of the action.

16   (Civ. Proc. SS. 2025.320(c))

17

18   Dated: March 26, 2014

19

20                    _____

21                      Rhiannon Smith, CSR 13265

22

23

24

25

# Exhibit J

1                  UNITED STATES DISTRICT COURT

2                     DISTRICT OF ARIZONA

3     _____

4     Victor Parsons, et al.,        )
                                     )
5                    Plaintiff(s),   )
                                     )
6     vs.                            )  CV 12-00601-PHX-NVW
                                     )  (MEA)
7     Charles Ryan; Richard          )
      Pratt,                         )
8                                    )
                     Defendant(s).   )
9     _____

10            DEPOSITION UPON ORAL EXAMINATION OF

11                     ELDON W. VAIL

12    _____

13                        9:00 A.M.

14                    FEBRUARY 28, 2014

15              901 FIFTH AVENUE, SUITE 1400

16                   SEATTLE, WASHINGTON

17

18

19

20

21

22

23

24    REPORTED BY:  HOPE J. YEAGER, CCR 2208

25



YAMAGUCHI OBIEN MANGIO
court reporting, video and videoconferencing
800.831.6973   206.622.6875
production@yomreporting.com
www.yomreporting.com

1   write it down; is that correct?

2       A.  Yeah.  Significance is a word I might modify a

3   little bit.

4       Q.  Sure.

5       A.  If it was different information or new

6   information, I would have written it down.  If it was

7   just the same story I was hearing, I didn't necessarily

8   always write that down.

9       Q.  How many inmates did you interview at cell

10  front?

11      A.  I think I counted at one point, but I don't

12  remember what the number was.  There's some records in

13  the declaration, if I remember right, in the report.

14  Let me look at the right report.

15          On Page 6 at the bottom of the page, what I

16  say is during these tours, I spoke with well over 108

17  including the 28.  So it's not a precise number.

18      Q.  Yeah.  In your notes, I counted 112 total.

19  Does that sound about right?

20      A.  About right.

21      Q.  Of the 48 that were listed in the letter, you

22  interviewed 28.  Do you know why you didn't interview

23  the other 20?

24      A.  No.

25      Q.  Did any of the inmates refuse to be


YAMAGUCHI OBIEN MANGIO
court reporting, video and videoconferencing

800.831.6973   206.622.6875
production@yomreporting.com
www.yomreporting.com

```
 1                   REPORTER'S CERTIFICATE

 2

 3        I, HOPE J. YEAGER, the undersigned Certified Court

 4   Reporter, pursuant to RCW 5.28.010 authorized to administer

 5   oaths and affirmations in and for the State of Washington, do

 6   hereby certify that the sworn testimony and/or proceedings, a

 7   transcript of which is attached, was given before me at the

 8   time and place stated therein; that any and/or all witness(es)

 9   were duly sworn to testify to the truth; that the sworn

10   testimony and/or proceedings were by me stenographically

11   recorded and transcribed under my supervision, to the best of

12   my ability; that the foregoing transcript contains a full,

13   true, and accurate record of all the sworn testimony and/or

14   proceedings given and occurring at the time and place stated

15   in the transcript; that a review of which was requested; that

16   I am in no way related to any party to the matter, nor to any

17   counsel, nor do I have any financial interest in the event of

18   the cause.

19        WITNESS MY HAND AND DIGITAL SIGNATURE this 9th day of

20   March, 2014.

21

22        [signature: Hope J. Yeager]

23
     HOPE J. YEAGER
24   Washington State Certified Court Reporter, #2208
     hyeager@yomreporting.com
25
```



**YAMAGUCHI OBIEN MANGIO**
court reporting, video and videoconferencing
**800.831.6973   206.622.6875**
production@yomreporting.com
www.yomreporting.com