1   Arizona Attorney General Thomas C. Horne
Office of the Attorney General
2   Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
3   Assistant Attorneys General
1275 W. Washington Street
4   Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
5   Fax: (602) 542-7670
Michael.Gottfried@azag.gov
6   Lucy.Rand@azag.gov

7   Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
8   Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
9   Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
10  Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
11  STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
12  Chandler, Arizona  85226
Telephone:  (480) 420-1600
13  Fax:  (480) 420-1696
dstruck@swlfirm.com
14  kwieneke@swlfirm.com
rlove@swlfirm.com
15  tbojanowski@swlfirm.com
nacedo@swlfirm.com
16  afletcher@swlfirm.com
aorcutt@swlfirm.com
17  jlee@swlfirm.com
*Attorneys for Defendants*

18                **UNITED STATES DISTRICT COURT**

19                    **DISTRICT OF ARIZONA**

20  Victor Parsons, *et al.*, on behalf of themselves      NO. 2:12-cv-00601-NVW
    and all others similarly situated; and Arizona
21  Center for Disability Law,
                                        Plaintiffs,   **Proposed Lodged: DEFENDANTS'**
22              v.                                    **MOTION FOR SUMMARY**
                                                      **JUDGMENT**
23  Charles Ryan, Director, Arizona Department
    of Corrections; and Richard Pratt, Interim       **FILED UNDER SEAL**
24  Division Director, Division of Health Services,
    Arizona Department of Corrections, in their
25  official capacities,
                                       Defendants.
26

27

28

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-NVW<br><br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      SEVERAL NAMED PLAINTIFFS SHOULD BE DISMISSED                                    1

II.     PLAINTIFFS CANNOT ESTABLISH THE CONSTITUTIONAL CLAIMS
        THEY RAISE IN THEIR COMPLAINT                                                    2

        A.      The Medical Care Plaintiffs Cannot Establish an Eighth Amendment
                Violation                                                                6

        B.      If the Named Plaintiffs are Not Dismissed, the Class Claims Should
                be Decertified                                                          21

        C.      Plaintiffs' Individual Claims Are Not Traceable to Systemic
                Deficiencies, and to the Extent Any Deficiencies Exist, They are Not
                Systemwide                                                              22

III.    Several Certified Medical Claims Should Be Dismissed                            27

IV.     The Dental Claims Must Be Dismissed                                             33

        A.      Failure to Provide Timely Access to Basic Dental Treatment              34

        B.      The Alleged Practice of Extracting Salvageable Teeth                    43

V.      THE CONDITIONS OF CONFINEMENT CLAIMS SHOULD BE
        DISMISSED AS A MATTER OF LAW                                                    45

        A.      The Use of Chemical Agents on Inmates Using Psychotropic
                Medications is Not Per Se Unconstitutional                              46

        B.      Recreation                                                              49

        C.      Social Isolation                                                        49

        D.      Constant Cell Illumination                                              49

        E.      Property                                                                51

        F.      Nutrition                                                               56

CONCLUSION                                                                              56

Defendants Charles Ryan and Richard Pratt ("Defendants") move for summary judgment on all of the claims asserted in the Complaint and certified by the Court. This Motion is supported by the following Memorandum of Points and Authorities and the contemporaneously filed Statement of Facts ("DSOF") and Exhibits. In filing this Motion, Defendants expressly preserve the arguments made in their pending appeal.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   SEVERAL NAMED PLAINTIFFS SHOULD BE DISMISSED

Plaintiff **Brislan** was released from ADC custody on December 5, 2013. An inmate's release from custody, or from the environment in which he is subjected to the challenged policy, renders his claim for injunctive or declaratory relief moot. *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012). Thus, his claims are moot and he should be dismissed as a named Plaintiff and class representative.[1]

After this case was certified, Defendants deposed Plaintiffs REDACTED
. A class representative must be able to "prosecute the action vigorously on behalf of the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). In determining a plaintiff's adequacy to represent a class, a court must consider the "zeal and competence" of the class representative. *Fendler v. Westgate-Cal. Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949) ("diligence, wisdom and integrity" are important class representative traits). These Plaintiffs professed such ignorance and ambivalence about the case during their depositions that they cannot be deemed adequate representatives of the class and should be stripped of that status.

- REDACTED

---

[1] The Court previously dismissed former Plaintiff Parsons on similar grounds (released on parole). (Dkt. 372 at 19.)

1    REDACTED

2

3    • REDACTED

4

5

6

7    • REDACTED

8

9

10   • REDACTED

11

12

These Plaintiffs should not be class representatives.

**II.    PLAINTIFFS CANNOT ESTABLISH THE CONSTITUTIONAL CLAIMS
         THEY RAISE IN THEIR COMPLAINT**

**Standing**.  Article III's imminent injury requirement applies to this case.  *See Allen v. Wright,* 468 U.S. 737, 754 (1984), (a litigant's "asserted right to have the Government act in accordance with law is not sufficient," by itself, to confer standing and therefore federal jurisdiction), *abrogated on other grounds by Lexmark Intern, Inc. v. State Control Components*, 134 S.Ct 1379 (2014). The Supreme Court, in *Lewis v. Casey*, held that Article III's actual injury requirement must be satisfied in all federal cases, class actions and individual actions, including inmate lawsuits alleging inadequate healthcare, and further held that a healthy inmate who has suffered no deprivation of needed medical treatment can assert a claim of inadequate medical care "simply on the ground that the prison medical facilities were inadequate."  518 U.S. 343, 350 (1996).

As Defendants pointed out in their motion to dismiss, which they incorporate here, not all of the named Plaintiffs alleged harm resulting from their allegations.  (Dkt. 50 at 3-7.)  Plaintiffs survived that motion because the Court assumed the allegations to be true <u>and</u> because it construed the complaint as raising five general claims.  (Dkt. 175 at 3-

2

5.)   Subsequently, however, the Court certified more narrowly framed claims – six medical care claims, two mental health care claims, and two dental care claims – and just one class with <u>all</u> of the named Plaintiffs as class representatives.   (Dkt. 372 at 22.)

But not all of the named Plaintiffs allege medical, dental, and mental-health injuries.  Brislan and Thomas have no medical or dental claims; Licci, Jensen, Hefner, and Smith have no dental or mental health claims; Gamez, Rodriguez, and Verduzco have no dental claims; and Plaintiff Wells has no mental-health claims.  Moreover, many of the named Plaintiffs do not allege any harm resulting from the certified practices. For example, only three of thirteen Plaintiffs raise de facto tooth-extraction policy and inadequate-emergency-treatment claims, and only four of thirteen Plaintiffs allege a claim based on inadequate care for suicidal or self-harming inmates. And only one of eight Plaintiff-subclass representatives raises a limited-property claim, only two of eight Plaintiff-subclass representatives raise a constant-cell-illumination claim, and only three of eight Plaintiff-subclass representatives allege an insufficient-nutrition claim.  When, as here, a class action involves multiple claims, "at least one named class representative must have Article III standing to assert a claim against each defendant." *Miller v. Am. Family Mut. Ins. Co.*, 2010 WL 2926051, at *2 (D. Ariz. 2010) (citing *O'Shea v. Littleton,* 414 U.S. 488, 494 (1974)).

At the summary judgment stage, Plaintiffs have the burden to show that each named Plaintiff has standing – i.e., suffered an "injury in fact" with a "causal connection" between the injury and the complained of conduct – to assert every one of the certified claims.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Plaintiffs cannot satisfy that burden, and those Plaintiffs that lack standing to raise a claim on behalf of themselves or on behalf of the class/subclass must be dismissed.

**Systemwide**.  "Systemic" is an oft-repeated adjective by Plaintiffs, but it is devoid of meaning absent proof that the practice certified for class treatment actually exists across the entire ADC system and is a failure giving rise to an Eighth Amendment violation.  *See*, *e.g.*, *Porras v. Cnty. of Los Angeles*, 2006 WL 4941837, at *4 (C.D. Cal.

2006).  Proof of such a systemic claim "entails a heavy burden." *Dunigan ex rel. Nyman v. Winnebago Cnty.,* 165 F.3d 587, 591 (7th Cir. 1999).  Thus, a mere showing that one, two, or even nine out of the ten ADC facilities provide constitutionally inadequate care at some point in time does not establish a "systemwide deficiency."  It was Plaintiffs' burden to define their proposed healthcare class, *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980), and they did so very broadly.  Unlike the class action in *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995), which challenged the constitutionality of healthcare and certain conditions at a single California facility (Pelican Bay), or the single facility challenge to health care provided at the Bedford Hills Correctional Facility in *Dean v. Coughlin*, 804 F.2d 207 (2nd Cir. 1986), this action seeks injunctive and declaratory relief against <u>all 10</u> facilities in the ADC prison system. Plaintiffs must therefore prove an Eighth Amendment violation throughout all 10 facilities, regardless of differences in local facility administration and medical care.  *See*, *e.g.*, *Webb v. Goord*, 340 F.3d 105, 109 (2nd Cir. 2003) ("But, taken together, the claims do not establish the existence of a policy or practice existing throughout the DOCS system, or within a single DOCS facility."). Plaintiffs cannot show this.

In addition, as they allege in the Complaint and as this Court has reiterated many times, each individual Plaintiff carries the burden of proving that his or her allegedly constitutionally deficient healthcare was caused by a systemic failure, not simply a policy or custom-driven instance of alleged medical indifference.

**Statute of Limitations**. Federal courts apply the state law limitations period in § 1983 actions. *Pouncil v. Tilton*, 704 F.3d 568, 573 (9th Cir. 2012).  In Arizona, the applicable limitations period for personal injury (and Section 1983) actions is two years under A.R.S. § 12-542.  Because Plaintiffs filed their Complaint on March 22, 2012, any claim accruing prior to March 22, 2010, is barred as untimely, and evidence associated therewith cannot be considered in connection with any of the individual or class claims asserted.

***Monell* Liability**.  Because Defendants are sued solely in their official capacities

4

(Dkt. 1, ¶¶ 21-22), the policy or custom requirement of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), applies with equal force to this action for injunctive relief. *Los Angeles Cnty. v. Humphries*, 131 S. Ct. 447, 452 (2010); *Hafer v. Melo*, 502 U.S. 21 (1991). Therefore, Plaintiffs must show that a policy or custom was the moving force behind the alleged constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Liability "may not be predicated on isolated or sporadic incidents" and "[t]he custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled.'" policy. *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell,* 436 U.S. at 691). In other words, isolated and sporadic instances of inadequate treatment by subordinate ADC staff is insufficient to hold Defendants liable. Although related to Plaintiffs' "systemic deficiencies" theory, *Monell* is a separate defense and must be satisfied for the Court to find Defendants liable under § 1983.

**Eighth Amendment Violation**. To prove an Eighth Amendment claim for denial of adequate health care, an inmate must demonstrate a "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). "A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (internal quotations omitted). A prison official is deliberately indifferent if he knows of and disregards a serious medical condition or is aware of facts from which the inference could be drawn that a substantial risk of harm exists, and actually draws such an inference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

> ### A.    The Medical Care Plaintiffs Cannot Establish an Eighth Amendment Violation.

The named Plaintiffs challenging the constitutionality of their medical care cannot show negligence, let alone deliberate indifference under the Eighth Amendment. These

1    seven inmates, **Chisholm, Swartz, Licci, Jensen, Hefner, Wells**, and **Polson**

2    (collectively "Medical Care Plaintiffs"), are presumably the most extreme examples class

3    counsel could find to personify their healthcare challenge against ADC, yet each received

4    a level of care rivaling (if not exceeding) what non-incarcerated persons receive when

5    scheduling appointments, obtaining prescription refills, obtaining specialty consultations,

6    and other medical treatment.  These Plaintiffs' claims are either factually unfounded or, at

7    most, amount to a disagreement with the medical judgments exercised by ADC healthcare

8    providers with respect to their individual circumstances.  The sheer quantity of healthcare

9    encounters with medical staff by these Plaintiffs demonstrates responsive and medically

10   attentive care and refutes Plaintiffs' Eighth Amendment claims.

11           **Plaintiff Chisholm:**[2]  REDACTED

12

13

14

15

16

17

18

19

20

21

22

23

24           [2] Chisholm's declaration was cited by the Court to support the following certified
      issues: Failure to provide timely access to health care; Failure to provide necessary
25    medication and medical devices; and Failure to provide care for chronic diseases and
      protection from infectious disease. (Dkt. 372 at 7-8, 16.)
26           [3] REDACTED

27

28

6

REDACTED

REDACTED

1

2

3   Chisholm's complaints  REDACTED

4   ⬚ do not satisfy either the objective or subjective components of the

5   deliberate indifference prong of the Eighth Amendment analysis. (DSOF ¶¶ 696, 3241-

6   3389.) Moreover, to the extent there were any prolonged delays, Chisholm cannot

7   reasonably attribute such delays to purposeful cruelty, the alleged existence of an

8   actionable policy or custom of ADC, or a systemwide deficiency. (DSOF ¶¶ 3241-3389.)

9   **Plaintiff Swartz:** [5]  REDACTED

10

11

12

13   REDACTED

14

15

16

17

18

19

20   _____

21   [4] REDACTED

22

23

24

25

26   [5] The Court cited Swartz's declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication and medical devices; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

27

28

1  REDACTED

2

3

4

5

6

7     REDACTED

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Swartz's claims show, at best, a disagreement with ADC and outside specialists as

23  to the proper course of treatment REDACTED , but falls far short of evidence

24  needed to sustain an Eighth Amendment claim, and is also not enough to prove any

25    [6] The potential for abusing Tramadol and other pain-killers is reason enough to

26  require that increases in dosage of non-formulary drugs be approved sparingly and
carefully. *See Ramirez v. Swindle,* 2012 WL 5828549, at *8 (E.D. Cal. 2012). Such an

27  approval process is particularly appropriate REDACTED

28
                                    9

1  actionable ADC policies or customs by Director Ryan or Mr. Pratt.  (DSOF ¶¶ 694, 2435-

2  2736.)

3  REDACTED

4

5

6

7  This testimony is incomplete and

8  misleading.   (DSOF ¶¶ 2435-2736.)   REDACTED

9

10

11

12

13

14

15

16

17

18

19  REDACTED

20

21

22

23

24

25

26

27  Swartz's REDACTED claim does not

28  rise to the level of an Eighth Amendment violation. *See Kennedy v. Byus*, 2009 WL

10

1   31452, at *6 (E.D. Ark. 2009); *White v. Mahone*, 2009 WL 2566967, at *6-7 (C.D. Ill.

2   2009).  (DSOF ¶¶ 2670-2736.)  Nor is it proof of a systemwide violation.

3        Plaintiffs also relied on Swartz for their failure to provide necessary medication

4   claim.  (Dkt. 1, ¶ 44.)  Swartz alleged that he was transferred from Phoenix to Lewis in

5   December 2011, and allegedly had to wait several weeks before he began to receive his

6   psychotropic meds previously prescribed. (Id.) REDACTED

7

8

9

10

11

12

13

14

15

16        There is no evidence of delay, interruption, or

17  anything close to a "policy and practice" with respect to disruptions in medication supply

18  following his transfer.  (DSOF ¶ 2685-2691.)

19        **Plaintiff Licci**:[7]  REDACTED

20

21

22

23        Such an admission undermines her Eighth Amendment claim,

24  particularly given the fact that REDACTED was present in 2001, she was out of prison from

25  _____

26  [7] The Court cited Licci's declaration to support the following certified issues:
    Failure to provide timely access to health care; Failure to provide care for chronic diseases
    and protection from infectious disease; and Failure to provide timely access to medically
27  necessary specialty care. (Dkt. 372 at 7-8, 16.)

28

1    2004-2009 and never sought treatment or testing REDACTED

2    during that period, and her post-2009 incarceration has resulted in her frequently being

3    seen by facility providers and outside specialists REDACTED

4

5

6        REDACTED

7

8

9

10

11

12

13

14

15

16

17

18

19

20                                                                    Such individualized

21   disagreements with her extensive course of treatment are both incompetent and

22   insufficient to survive summary judgment. *Toguchi*, 391 F.3d at 1056; *Victor v. Milicevic,*

23   2008 WL 907319, at *4 (N.D.N.Y. 2008).

24        **Plaintiff Jensen:[8]** REDACTED

25

26        [8] The Court relied on Jensen's declaration to support the following certified issues:
     Failure to provide timely access to health care; Failure to provide necessary medication
27   and medical devices; Failure to provide care for chronic diseases and protection from
     infectious disease; and Failure to provide timely access to medically necessary specialty
28   care. (Dkt. 372 at 7-8, 16.)

                                         12

1  REDACTED
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
    [9] REDACTED
28

1  REDACTED  Regardless, this single allegation cannot form the basis of a deliberate

2  indifference claim, nor reasonably suggest a policy or practice or systemwide deficiency.

3  **Joseph Hefner:**[10]  REDACTED

14  REDACTED

21  )

22  Hefner's complaint about a CT scan not being taken until October 27, 2011 is

23  ——————————

24  [10] The Court cited Hefner's declaration to support the following certified issues:
Failure to provide timely access to health care; Failure to provide necessary medication

25  and medical devices; and Failure to provide timely access to medically necessary specialty
care. (Dkt. 372 at 7-8, 16.)

26  [11] REDACTED

14

belied by his admission that: (1) he had x-rays taken of his chest after the assault, and (2) an MRI and CT scan both turned up negative as far as showing any broken bones or internal injuries (DSOF ¶¶ 3697-3708.) Given these admissions, Hefner cannot survive summary judgment on his medical claims because he was seen by ADC medical staff for five continuous days after the assault, and the slight delay in performing a CT scan and other tests did not violate the Eighth Amendment given their subsequent occurrence and negative results.

**Plaintiff Wells:**[12]   REDACTED

---

[12] The Court relied on Wells' declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication and medical devices; Failure to provide care for chronic diseases and protection from infectious disease; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

1    REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17    **Plaintiff Polson:**[13]  REDACTED

18

19

20

21

22

23    _____

24    [13] The Court relied on Polson's declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication; Failure to provide care for chronic diseases and protection from infectious disease; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

25

26    [14]REDACTED

27

28

REDACTED

Polson cannot show deliberate indifference in light of the extensive medical treatment he received, and Polson's subsequent complaints REDACTED do not rise to the level of deliberate indifference. *See Gusman v. Bd. of Prisons*, 2006 WL 680851, at *8 (M.D. Pa. 2006). Moreover, to the extent Polson could prove misdiagnosis or even unconstitutional treatment by ADC medical staff (or outside specialists), there is no proof of an ADC policy or custom, or that his allegation was caused by a systemwide deficiency.

**Medical Care Plaintiffs – Healthcare Encounters**.  When evaluating whether the medical treatment afforded an inmate has satisfied constitutional minima, the Ninth Circuit has emphasized the number of medical visits as some evidence of the prison's attentiveness to an inmate's care. *See, e.g., Cano v. Taylor*, 739 F.3d 1214, 1217 (9th Cir. 2014) ("The record is replete with health need request forms filed by [inmate] and the record indicates that [inmate] was seen by mental health care employees regularly for his complaints"); *see generally Estelle v. Gamble,* 429 U.S. 97, 107 (1976).

The sheer number of encounters the seven Medical Care Plaintiffs had with medical staff (nurses, mid-line providers, physicians) between March 22, 2010 and April 1, 2014, highlights a responsive and caring group of healthcare providers – the antithesis of what Plaintiffs must prove to show deliberate indifference under the Eighth

REDACTED

17

1  Amendment:

2  REDACTED

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22  **Additional Plaintiff Healthcare Encounters.**   The number of encounters with

23  medical staff by the remaining Plaintiffs, REDACTED

24

25

26  further highlights this

27  point.

28  REDACTED

18

REDACTED

REDACTED

Several of these Plaintiffs' specific healthcare allegations – made to support their request for class certification – are also false. For instance, to support their failure to provide necessary medication claim, REDACTED

REDACTED

1 REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19    These facts do not even suggest medical negligence, let alone deliberate

20 indifference.

21    To support Plaintiffs' understaffing claim, REDACTED

22

23

24

25

26

27

28

21

REDACTED

**B.** **If the Named Plaintiffs are Not Dismissed, the Class Claims Should be Decertified.**

Rule 23(c)(1)(C), Fed.R.Civ.P., authorizes the Court to alter or amend a class certification order before final judgment. *See Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 633 (9th Cir. 1982).

In the declarations submitted to the Court to support class certification, all of the named Plaintiffs described their own health care experiences in the gloomiest of terms, misleading the Court as to the quantity and quality of care they had received. REDACTED

22

1    REDACTED                                                                    .

2          By misrepresenting the facts in order to secure a favorable class certification ruling,

3    Plaintiffs have provided the Court with ample grounds on which to amend the certification

4    order by either decertifying the class, or those portions of it infected by the exaggerations

5    made by Plaintiffs.

6          **C.    Plaintiffs' Individual Claims Are Not Traceable To Systemic
              Deficiencies, and to the Extent Any Deficiencies Exist, They Are Not

7              Systemwide.**

8          Neither the Medical Care (above) nor Dental Care (below) Plaintiffs can establish a

9    constitutional violation under the Eighth Amendment. If, however, this Court finds an

10   issue of fact concerning Plaintiffs' deliberate indifference claims, each named Plaintiff

11   must still prove that any constitutionally inadequate care was the result of systemic

12   deficiencies at ADC, and not merely isolated instances of malevolent care, or facility-

13   specific problems.  This "specific causation" principle applies with equal force to the

14   claims of the Mental Health Plaintiffs.  More important, all class claims for injunctive

15   relief are similarly subject to this same formidable burden of proving that allegedly

16   unconstitutional care was caused by systemic deficiencies throughout ADC. *See Wellman*

17   *v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983).

18         This conclusion is compelled by three distinct principles: (1) unlike other class

19   actions targeting a specific prison facility, Plaintiffs brought this action challenging the

20   care delivered at all 10 ADC facilities; (2) without any proof of prison overcrowding

21   putting a pervasive, systemwide strain on health care resources similar to the 190% over-

22   capacity problem in *Plata,* Plaintiffs cannot rely on the economics of supply and demand

23   to prove any systemic deficiency; and (3) a pattern of systemic deficiencies is not subject

24   to proof by illustration or anecdote, but requires statistically reliable evidence of systemic

25   cruelty, such as "gross statistical disparities" between Plaintiffs' systemic-failure

26   hypothesis and a control group.  *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882,

27   920 (E.D. Cal. 2009); *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977); *Int'l Broth. of*

28

1   *Teamsters v. United States*, 431 U.S. 324, 339 (1977).[15]  Plaintiffs cannot show either that

2   their individual claims were the result of systemic deficiencies, or that any deficiencies are

3   in fact systemwide.

4          The prison facilities at Douglas, Winslow, and Safford routinely have scored well

5   above 90% green/amber in monthly Green Amber Red ("MGAR") reports, which monitor

6   contract compliance.  These same facilities (and ASPC-Phoenix) rarely, if ever, generate

7   any type of health care grievances by inmates,[16] underscoring a high level of contentment

8   among a population of patients that are inclined to protest and complain about the most

9   trivial of matters. (DSOF ¶¶ 179, 183, 184, 186.) Although temporary staffing shortages

10  may exist at certain facilities for certain health care positions, as a whole ADC/Corizon

11  has gone from 626.02 healthcare full time employees ("FTEs") in March 2013 to 766.96

12  FTEs in March 2014 – a 17% staffing increase and underlining exceeding the Corizon-ADC contract

13  requirement of 731.30 FTEs. (DSOF ¶ 171.) It is further evident that the facilities

14  benefitting the most from Corizon's concentrated recruitment of healthcare providers are

15  the complexes that have historically scored lower in MGAR reporting:  Eyman, Lewis,

16  and Tucson, where there is now an overall surplus of FTEs. (DSOF ¶¶ 161, 163, 167.)

17         This dramatic increase in hiring and the use of Locums has generally improved

18  wait times and the quality of health care delivered across ADC facilities. (DSOF ¶¶ 147-

19  150, 160-169.)  The staffing surplus is far better than staffing vacancy rates found to be

20  constitutionally adequate in *Casey v. Lewis*, 834 F.Supp. 1477, 1486, 1546 (D. Ariz. 1993)

21  (ADC was not deliberately indifferent to medical needs when it "had a 13.9% overall

22  medical staff vacancy rate" at the time of trial); and *Coleman v. Brown*, 938 F.Supp.2d

23  955, 984–85 (E.D. Cal. 2013) (mental health staff vacancy rate of 29% was unacceptably

24  ───────────────

25  [15] Another obstacle for Plaintiffs is addressed separately in Defendants' Motion to
     Strike Plaintiffs' Experts – quantification of the relative risk of the inmate class members
     and the unreliability of their opinions. (Dkt. 882.)

26  [16] Health care delivered at Safford has generated only 5 inmate grievances during
27  the past 12 months, Winslow 26 grievances (25 related to quality of medical care),
     Douglas 20 grievances, and Phoenix 0 health care grievances. (DSOF ¶¶ 184, 186, 179,
28  183.)

1   high; per 2009 staffing plan, vacancy rate should not exceed 10%).

2          At the complexes in Douglas, Phoenix, Safford, and Winslow, the average wait

3   time in March 2014 to see a nurse was less than 1.5 days, and less than 7 days to see a

4   doctor (1.3 days in Phoenix, 1 day in Safford, and 4.2 days in Winslow). (DSOF ¶¶ 147-

5   150.)  The grievance history at these facilities reinforces this wait-time data, as there were

6   0 grievances filed during the past year at the Douglas, Phoenix, Safford and Winslow

7   facilities for delay in care.  (DSOF ¶¶ 179, 183, 184, 186.)  Even Perryville, where five of

8   the named Plaintiffs are incarcerated, has seen only 2 grievances for delay in care in the

9   past year, and none since November 2013. (DSOF ¶ 182.) These wait times at such

10  facilities are far better than the 18.5 days currently required to see a doctor outside of

11  prison – especially in Boston, where the average wait time to see a family physician is 66

12  days.[17]  *See, e.g., Noble v. Three Forks Reg'l Jail Auth.*, 2014 WL 503579, at *4 n.6 (E.D.

13  Kent. 2014) (inmate "also complains about having to wait four days to see Dr. Hamilton, a

14  wait-time that is significantly lower than the average doctor wait-time for non-prisoners").

15         Beyond the health care delivered at Douglas, Safford, Winslow, and Phoenix

16  (where, not coincidentally, not a single Plaintiff is incarcerated), the ADC system as a

17  whole is functioning well, with 9 of the 10 facilities certified under National Commission

18  on Correctional Health Care ("NCCHC") standards. (DSOF ¶ 19.) Regarding medication,

19  60,553 prescribed medications were dispensed in the month of March 2014 across all

20  ADC facilities. (DSOF ¶¶ 151-153.)   ADC also completed outpatient transports of

21  inmates to specialty care on 827 occasions in March of 2014, totaling 7,130 specialty care

22  transports over the prior 12 months. (DSOF ¶ 159.) The sheer number of medical,

23  psychology, psychiatric, chronic care and outside specialty care visits by the named

---

[17] *See*  http://www.washingtonpost.com/blogs/wonkblog/wp/2014/01/29/in-cities-the-average-doctor-wait-time-is-18-5-days/ (last visited May 14, 2014). *See also* "*Study: Average Wait for Doctor's Appointment in Cities Was 18.5 Days*," California HealthLine:http://www.californiahealthline.org/articles/2014/1/30/study-average-wait-for-doctors-appointment-in-cities-was-18-5-days;
http://www.merritthawkins.com/uploadedFiles/MerrittHawkings/Surveys/mha2014waitsurvPDF.pdf

1     Plaintiffs during the past four years forecloses any reasonable suggestion that ADC is

2     behaving with purposeful cruelty stemming from systemwide practices at all 10 facilities.

3     One does not get from a complaint to systemic simply through colorful anecdotes. *See*

4     *Porras*, 2006 WL 4941837, at \*4; *Henderson v. City and Cnty. of San Francisco*, 2006

5     WL 3507944, at \*10 (N.D. Cal. 2006).

6         The gross data for dental care also convincingly shows responsive care.  There

7     were 46,112 HNRs for dental in the past year, with 60,440 dentist-patient visits, 6,334

8     dental hygienist visits, 25,474 x-rays taken, 10,263 fillings, 11,275 simple extractions, and

9     7,339 cleanings. (DSOF ¶ 172.)  In addition, 1,298 inmates had dentures or partial

10     dentures completed. The routine care wait time (for non-urgent care such as cleanings and

11     fillings) in March 2014 ranged from a low of half a month at Winslow to 1.5 months at

12     Safford, or 45 days, well below the 90-day contract requirement.  (DSOF ¶¶ 173-174.)

13     For dentistry, there is a systemic theme of quality and responsiveness in the months after

14     Corizon/Smallwood took over in March, 2013.  (DSOF ¶¶ 172-178.)

15         ADC/Corizon received 18,985 HNR forms from an inmate population of more than

16     34,000 in March 2014. (DSOF ¶ 146.)  One would expect a state agency with a systemic

17     policy of deliberate indifference to engage in statistically substantiated patterns of grossly

18     delayed and abysmal healthcare – as opposed to increased staffing levels, reduced

19     mortality rates,[18] rigorous NCCHCC accreditation requirements, and treat their patients

20     more expeditiously than its free world counterparts.  Plaintiffs have failed to satisfy their

21     burden of proving that any inadequacies in the Plaintiffs or class of obtaining healthcare

22     were the result of systemic failures.  (DSOF ¶¶ 677-685, 19, 146-187.)

23

24

25

26

27

28

---

[18] ADC's morbidity rates have been lower than the national average for jails and prisons since 2003, approximately 15-20% lower.  (DSOF ¶¶ 677-685.)

III.    **SEVERAL CERTIFIED MEDICAL CLAIMS SHOULD BE DISMISSED.**

**Mitigating Infectious Diseases**.[19]  Plaintiffs allege that ADC fails to mitigate the risk of infectious diseases by maintaining unsanitary facilities, including "urine-soaked mattresses, uncontrolled infestations of vermin, and cell walls and floors covered with black mold or smeared with feces, spit, and blood of other inmates." (Dkt. 1, ¶ 62.)  This is not true.  (*See* DSOF ¶¶ 200-04, 1471-89.)  Medical areas, living areas, and cells are cleaned and inspected daily, and an exterminator sprays cells, showers, and housing unit common areas on a monthly basis. Cells are cleaned prior to an inmate being newly assigned to a cell, including bunk mattress cleaning/exchange/replacement depending on the cleanliness or condition of the previously used mattress. (DSOF ¶¶ 1471-89; *see also* DSOF ¶¶ 200-04, 436, 467, 631, 2994.)   Furthermore, ADC has specific policies, procedures, and training in place that deal with the prevention, surveillance, and treatment of suspected or confirmed communicable diseases.  (DSOF ¶¶ 427-41.)  Plaintiffs do not have any proof to support their claim on a systemwide basis.  *See Anderson v. Cnty. of Kern*, 45 F.3d 1310 (9th Cir. 1995); *Martinez v. Garza*, 2011 WL 23670, at *10 (E.D. Cal. 2011).

**Medical Devices**.[20]  Plaintiffs allege that ADC has a policy and practice of not providing medically necessary devices. (Dkt. 1, ¶ 50.) However, ADC has specific policies addressing the administration of medical devices.  (DSOF ¶¶ 376-81.)  To support their allegation, Jensen alleges that he was given an inadequate number of catheters.  (Dkt. 1, ¶ 50.)  But ADC provides inmates like Jensen catheters and absorbent pads (in two-week supply increments), and instructs them how to properly use them. (DSOF ¶¶ 382-409, 2135-410.)  REDACTED

---

[19] The Court certified as a claim: "Failure to provide . . . protection from infectious disease." (Dkt. 372 at 22.)

[20] The Court certified as a claim: "Failure to provide necessary . . . medical devices." (Dkt. 372 at 22.)

REDACTED

**Timely Emergency Treatment**.[21]  Plaintiffs allege that ADC has a policy and practice of not providing prisoners with timely emergency responses and treatment.  (Dkt. 1, ¶ 37.)  They contend that security and health staff are not adequately trained to respond to and evaluate emergent medical situations.  (*Id*., ¶¶ 39, 41.)  This claim is purportedly supported by the allegations of Hefner, Jensen, Swartz, and Wells, which are all refuted above.  What is left are four isolated incidents.  (*Id*., ¶¶ 39, 41, 42, 43.)  These incidents, and any other allegations Plaintiffs may come up with, do not establish a systemwide deficiency.

Staff is required to assess and render aid in all medical emergencies, including suicide attempts, within three minutes of becoming aware of a non-responsive inmate. (DSOF ¶¶ 272, 595, 597.)  REDACTED

All licensed nurses are trained in providing emergency nursing care, and are provided emergency response orders, which are step-by-step written instructions from a provider on how to provide emergency acute care to an inmate during a life-threatening event.  (DSOF ¶¶ 275, 276, 277.)  REDACTED

The chief of security and shift commanders are given written instructions about the appropriate intervention for each medical emergency which may arise from a chronic condition existing in the institution.  (DSOF ¶ 278.)  Correctional officers are required to receive health-related training every two years so that they can recognize when to refer an inmate to healthcare staff and to be able to provide emergency care until healthcare staff arrives. (DSOF ¶ 279.)  This training includes administration of first aid, recognizing the

---

[21] The Court certified as a claim: "Failure to provide timely emergency treatment." (Dkt. 372 at 22.)

need for emergency care and intervention in life threatening situations (e.g., heart attack), recognizing acute manifestations of certain chronic illness (e.g., asthma, seizures), adverse reactions to medications, recognizing signs and symptoms of mental illness, knowledge of procedures for suicide prevention, appropriate referral of healthcare complaints, and procedures and precautions with respect to infectious and communicable diseases, and cardiopulmonary resuscitation. (DSOF ¶ 280.) All corrections staff are trained in suicide prevention/crisis intervention, which includes mock drills and information presentation. (DSOF ¶¶ 469, 470-72, 474, 481.) Staff keep an ADC issued Suicide Prevention Card on their person, and Corizon provides emergency medical and mental health care 24 hours a day, seven days a week. (DSOF ¶ 473.) Additionally, Corizon maintains continual onsite nursing staff, who are able to contact offsite medical, dental, and mental health practitioners for consultation. (DSOF ¶ 290.)

ADC's timely emergency care is further supported by the fact that between April 2013 and March 2014, ADC conducted thousands of emergency inmate transports to local hospitals. (DSOF ¶¶ 139, 159, 283-84.) The record is devoid of evidence sufficient to withstand summary judgment on their theory of insufficient emergency staffing on a systemwide basis. *See Graves v. Arpaio*, 2008 WL 4699770, at \*34 (D. Ariz. 2008).

\*        \*        \*

The Court certified six broad healthcare/medical claims, which track similarly-named headings in Plaintiffs' Complaint. Defendants do not believe the Court intended to certify every allegation in the Complaint, but out of an abundance of caution, they move to dismiss the following sub-allegations to the extent those allegations have been certified.

**HNR Forms**. Under a heading pertaining to timely access to health care, Plaintiffs allege that HNR forms are not available in housing units, staff only provide photocopies of HNRs and then reject them for that reason or refuse to provide forms, and officers refuse to forward forms to medical. (Dkt. 1, ¶ 27.) The record is devoid of evidence showing that these allegations are true on a systemic level, much less in isolated instances. Inmates are given written information about how to access emergency and routine

29

1   healthcare at intake, and access to healthcare signs are posted throughout the complexes in

2   both English and Spanish.  (DSOF ¶¶ 206-07.)  HNRs are available in each housing unit

3   and accessible to inmates, and HNR forms are picked up daily by health staff.  (DSOF ¶¶

4   210-11, 1869-74.)  Medical will accept and respond to any medical request, regardless of

5   the form it is written on, including photocopies of HNR forms and even verbal requests.

6   (DSOF ¶¶ 213-17, 1875-82.)    The thousands of HNR forms obtained, completed, and

7   submitted by just the named Plaintiffs in this action underscore the availability and daily

8   processing of such forms, without ADC interference, as do the more than 20,000 HNR

9   forms ADC inmates submitted in March 2014 alone.  (DSOF ¶¶ 146, 2276-83, 2411-34,

10  2543-45, 2688-733, 2753-93, 2643-64, 2914-49, 3034-71, 3132-64, 3183-230, 3342-84,

11  3407-12, 3419-21, 3431-43, 3544-80, 3676-83, 3733-57, 3777-975, 3999-4020, 4056-64,

12  4300-26.)

13       **HNR Assistance**.  Under the same heading, Plaintiffs allege that staff "sometimes"

14  prohibits inmates from assisting other inmates in completing HNRs.  (Dkt. 1, ¶ 28.)  There

15  is no ADC policy that imposes such a prohibition.  (DSOF ¶¶ 217, 1876-78.)  Although

16  security staff cannot assist an inmate with filling out their HNR forms for security and

17  confidentiality reasons, medical staff and other inmates are not prohibited from assisting

18  them.  (DSOF ¶¶ 213-17, 1877-78.)  Plaintiffs' factual basis for this claim is Smith's

19  allegation that he has a hand injury that prevents him from writing, and staff refuse to

20  assist him.  (DSOF ¶¶ 1875-82.)  REDACTED

21

22

23

24

25

26

27

28                                                        This claim has no basis in fact and does not

1   support a systemwide deficiency, much less deliberate indifference.

2       **Medical Diets**.  Under a heading pertaining to chronic care, the Complaint alleges

3   that ADC does not provide medical diets ordered for inmates with chronic conditions such

4   as high blood pressure, high cholesterol, kidney failure and diabetes, and instead they are

5   given a high-fat, high-sodium, nutritionally inadequate diet.  (Dkt. 1, ¶ 60.)  Plaintiffs

6   conducted no discovery to support this speculative theory, and it is not addressed in their

7   experts' Rule 26(a)(2)(B) reports.  This contention also ignores facts to the contrary such

8   as several ADC policies and practices on the subject.  (DSOF ¶¶ 1843-51.)   The

9   undisputed fact is that ADC provides nutritionally adequate meals to all inmates.  (DSOF

10  ¶¶ 1820-59.)  More importantly, inmates with chronic conditions who need a medical diet

11  are given one.  (DSOF ¶¶ 1848-50.)

12      The sole allegation to support Plaintiffs' allegation is an allegation by Plaintiff

13  Hefner, who alleges that he was denied a medical diet for his GERD.  (Dkt. 1, ¶ 60.) REDACTED

14

15

16

17

18

19

20

21             Nonetheless, this is far from evidence of a systemwide deficiency.  *See*

22  *Douglas v. Banks*, 2012 WL 822824, at *8 (N.D. Cal. 2012).

23      **Indoor Smoking Ban**.  Also under the chronic care heading is an allegation that

24  ADC does not enforce its ban on indoor smoking.  (Dkt. 1, ¶ 61.)  Plaintiffs Gamez and

25  Thomas vaguely allege that second-hand cigarette smoke has triggered asthma attacks.

26  (Id.)  In accordance with state law, ADC prohibits smoking inside any enclosed area or

27  building, and within 20 feet from any building entrance.  (DSOF, ¶¶ 444-46.) General

28  population inmates may only smoke outside of buildings in approved areas. (DSOF, ¶¶

447-51.) All inmates are advised of the tobacco policies during orientation, ADC employees are required to enforce these smoking policies, and "No Smoking" signs are conspicuously posted at every entrance and other areas where smoking is prohibited. (DSOF, ¶¶ 452-53.) The failure to comply with these rules results in criminal penalties and disciplinary sanctions. (DSOF, ¶¶ 454-56.)

REDACTED

These two alleged instances are not enough to support a systemwide claim of deficient care. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993) (exposure to environmental tobacco smoke requires proof of exposure to unreasonably high levels of smoke contrary to contemporary standards of decency); *Turner v. Leggett*, 421 F. App'x 129, 132 (3d Cir. 2011); *Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001); *Pryor-El v. Kelly*, 892 F. Supp. 261, 267 (D.D.C. 1995).

**Watch Cell Conditions**.  Under a heading titled, "Defendants Deprive Suicidal and Self-Harming Prisoners of Basic Mental Health Care," Plaintiffs allege that watch cells are "often filthy, with walls and food slots smeared with other prisoners' blood and feces, reeking of human waste," mental health staff "show a lack of professionalism and little compassion for prisoners," and correctional staff on watch units harass, insult, taunt, and deploy "sporting use of pepper spray" on watch inmates.  (Dkt. 1, ¶¶ 84, 87.)  There is absolutely no evidence to support these allegations, much less on a systemwide basis. (DSOF, ¶¶ 200-04; 467; 623; 630; 1471-89; 1998-2012; 2796-97; 2805; 2811; 2885-88; 2950-63; 2994; 3016.)

Plaintiffs allege that inmates on watch are provided only a suicide smock that barely covers their thighs and a thin blanket, and are deprived of a mattress.  (Dkt. 1, ¶ 85.)  Inmates are placed on suicide watch when their behavior is self-destructive, the inmate is displaying suicidal behavior, or the inmate attempts suicide and/or has a documented history of attempting suicide and there are warnings indicating an impending

1  suicide attempt, or the inmate verbally threatens to commit suicide and/or to cause self-

2  inflicted wounds. (DSOF, ¶¶ 457-61.) Watch cells are retrofitted so that inmates cannot

3  inflict self-harm or commit suicide; they are designed to be suicide resistant. (DSOF, ¶¶

4  462-64; 515-18.) Inmates on continuous watch and ten minute watch are provided two

5  safety blankets, a safety smock (if required), and a suicide resistant mattress. (DSOF, ¶¶

6  508; 519.)  Inmates on thirty minute watch are permitted one set of personal clothing

7  (excluding belts and shoelace's), regular bedding, and a non-suicide mattress. (DSOF, ¶¶

8  523-28) REDACTED

9                                                             Plaintiffs cannot provide any evidence

10 that inmates on watch are forced to sleep on the floor, or that any such allegation is in fact

11 systemwide. (DSOF, ¶¶ 457-605.)

12      Plaintiffs allege that inmates have access to dangerous objects while on watch.

13 (Dkt. 1, ¶¶ 8, 88.)  To support this contention, they allege that Plaintiff Brislan cut himself

14 with objects on several occasions, and that Plaintiff Swartz swallowed multiple foreign

15 objects while on watch.  (Id.)  As discussed above, ADC watch cells are designed, and

16 intended to be, suicide resistant and are retrofitted so that inmates cannot inflict self-harm

17 or commit suicide. (DSOF, ¶¶ 463; 516.) The allegations by these two inmates do not

18 establish that there is a systemwide deficiency.

19      Finally, Plaintiffs allege that ADC uses watch to punish prisoners for alleged

20 disciplinary infractions.  (Dkt. 1, ¶ 89.)  Watch cells are not used for that purpose, and

21 Plaintiffs have no evidence that they are or that this is an isolated event, let alone a

22 systemwide practice. (DSOF, ¶¶ 463; 515-18; 567-81; 1957; 1968-77.)

23 **IV.   THE DENTAL CLAIMS MUST BE DISMISSED.**

24      "[D]elay in providing a prisoner with dental treatment, standing alone, does not

25 constitute an eighth amendment violation." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th

26 Cir. 1989). Class action plaintiffs must also demonstrate that the "delays occurred to

27 patients with [dental] problems so severe that delays would cause significant harm and

28 that Defendants should have known this to be the case." *Hallett v. Morgan,* 296 F.3d 732,

745–46 (9th Cir. 2002); *see also Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) ("The mere failure to provide a routine tooth cleaning doesn't create a serious medical need."). Plaintiffs' dental claims should be dismissed.

### A.    Failure to Provide Timely Access to Basic Dental Treatment

Within seven days of entering ADC, all inmates receive a panorex x-ray or bite wing x-rays, a dental exam consisting of either the screening of the x-rays or visual evaluation by a dentist or hygienist, and oral hygiene instruction. (DSOF ¶¶ 702, 725.) The dentist will chart all required treatment, outline the treatment plan, determine the extent of treatment required, take and record a dental/medical history on the dental chart, record all existing restorations and missing teeth on the dental chart, and place a color-coded label on the chart to indicate an inmate's treatment level.[22] (DSOF ¶¶ 703, 706.) Inmates with routine dental needs must be seen within 90 days, inmates with urgent dental needs must be seen within 72 hours, and inmates with emergency dental needs must be seen within 24 hours. (DSOF ¶¶ 792, 797.)

REDACTED

yet the record shows that their dental needs were not sufficiently severe under *Hallett*, and that any delays in treatment were of their own making. All of their claims should be evaluated in the context of the concession REDACTED

**Plaintiff Polson**: Polson alleges that he waited five months to see a dentist for a broken tooth, and did not see a dentist for six months after his initial visit. (Dkt. 1, ¶ 18-71.) He further alleges that he waited three years to receive partial dentures. (Id.)

REDACTED

---

[22] The classes are: Class I (no further treatment needed), II (routine treatment needed), or III (immediate treatment needed). (DSOF ¶ 703.)

REDACTED

---

[23] Dentures are provided according to a priority system, with first priority given to inmates requiring full dentures in order to be able to chew, and second priority given to inmates requiring partial dentures due to not being able to properly chew because of a large number of missing or non-occluding teeth.  (DSOF ¶ 709.)

1   REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15   **Plaintiff Chisholm**: REDACTED

16

17

18

19

20

21

22

23

24

25   REDACTED

26

27

28

1   REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14   **Plaintiff Swartz**: REDACTED

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED

**Plaintiff Wells**: REDACTED

REDACTED

**Legal Analysis**.   A delay in treatment cannot form the basis for an Eighth Amendment violation when the delay is attributable to the prisoner. *See Hartsfield v. Colburn*, 491 F.3d 394, 396-98 (8th Cir. 2007) (45-day delay in referring a prisoner to an oral surgeon to have three teeth extracted did not amount to deliberate indifference where delay was partly caused by inmate's own delay in submitting a second sick call request when pain persisted); *Yoon v. Hickman*, 171 Fed. Appx. 541, 542 (9th Cir. 2006) ("Moreover, any delays in treatment were, in part, attributable to [inmate's] refusal to show up for five scheduled appointments with [prison dentist].")

The record shows that Plaintiffs Polson, Chisholm, Swartz, and Wells received dental attention suitable to their expressed needs, their asserted needs were never "severe" under *Hallet*, and that any delays were the result of their own refusals, time out of ADC custody, health conditions that precluded treatment, or failure to submit follow-up HNRs.

REDACTED

[24] REDACTED

40

REDACTED

**Polson** REDACTED

. *See Crawford v. Bennett*, 2008 WL 5429892, at *9 (D. Mont. 2008).

REDACTED

a removable partial denture typically requires 5-7 office visits, and three months of delay was due to the lab.  (DSOF ¶¶ 844-49, 865, 871, 1035-36). *See Smith v. Grounds*, 2010 WL 4700219 (N.D. Cal. 2010) (rejecting Eighth Amendment claim based on similar time lapse for extraction/denture work; "the fabrication process for complete and partial dentures is a multi-step process involving a number of clinical and laboratory steps, each dependent upon the other"); *Greenlaw v. Hill*, 2007 WL 1876515 (D. Ore. 2007) (16-month delay between extractions and denture fitting did not amount to deliberate indifference).  REDACTED ,

REDACTED

REDACTED

1  REDACTED

2

3     **Swartz's** REDACTED

4

5

6

7

8

9

10

11     **Wells'** REDACTED

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26        The experiences of these Plaintiffs represented the class' best hopes at painting an

27  extreme picture of delayed or deficient dental care, yet the record establishes that all were

28  timely treated and none was the victim of deliberate indifference, let alone suffered any

serious harm in a manner attributable to any ADC policy. This by itself should compel summary judgment on the class claim. The claim also fails, however, because Plaintiffs cannot show a systemwide deficiency, or that these Plaintiffs' allegations were caused by a systemic deficiency. In the past year, ADC dental staff have accommodated 60,440 dentist visits and 6,334 hygienist visits, and administered 34,294 comprehensive exams, 25,474 x-rays, 10,263 fillings, 7,339 cleanings, and 1,298 dentures. (DSOF ¶ 172.) And wait times for routine dental care over the past ten months are well below the 90-day requirement (and no more than 45 days in March 2014 at all facilities). (DSOF ¶¶ 994, 1001, 173-74.) This claim must be dismissed.

**B.    The Alleged Practice of Extracting Salvageable Teeth**

Plaintiffs' challenge here is to a medically permissible ADC policy of delegating to treating dentists the decision of whether to recommend fillings, root canals, apiectomies, or extractions when encountering inmates with widely varying symptoms of tooth decay. This claim should be rejected on its face because a difference of opinion concerning appropriate medical care – either between a physician and the prisoner, or between medical professionals – does not amount to deliberate indifference. *Toguchi*, 391 F.3d at 1058. This aside, the Named Plaintiffs cannot prove an Eighth Amendment violation.

**Plaintiff Chisholm**: REDACTED

**Plaintiff Swartz**: REDACTED

1   REDACTED

2

3

4

5

6

7

8

9

10

11

12       **Plaintiff Wells**:  REDACTED

13

14

15       **Legal Analysis**.  The decisions by prison dentists to offer extractions on teeth they

16   deem non-restorable is reasonable; Plaintiffs' claims represent an (unqualified) difference

17   of opinion as to the restorability of certain teeth, REDACTED

18       REDACTED                                 The Ninth Circuit, and district courts within the

19   circuit, have repeatedly rejected class and individual claims predicated on such a theory.

20   *See Hallett*, 296 F.3d at 745; *Finley v. Parker*, 253 Fed.Appx. 634, 636 (9th Cir. 2007);

21   *Yoon*, 171 Fed. Appx. at 542; *Brooks v. Andrews*, 2006 WL 403859, at *10 (E.D. Cal.

22   2006).

23       Swartz, REDACTED

24       REDACTED                                      , cannot survive summary judgment as such a

25   disagreement between medical professionals is not enough to present a claim of deliberate

26   indifference. Wells REDACTED                         which REDACTED undermines

27   Plaintiffs' theory that ADC has an "extraction only" policy rather than one that vests the

28   treating dentist with discretion as to the restorability of each tooth he or she encounters.

44

1    Polson REDACTED

2

3

4            If ADC truly had a practice of extracting teeth that could be saved,

5    its dentists are routinely violating this phantom policy, as their treatment of even the

6    representative Plaintiffs illustrates that the dental treatment of each is driven by the dental

7    symptoms of each one. *See Halla v. Schriro*, 2006 WL 3735983, at *5 (D. Ariz. 2006) (if

8    ADC had an unwritten policy of "filling of only one tooth per visit," "the evidence shows

9    that Defendants violated it by frequently providing more care than the policy would have

10   allowed. This does not amount to deliberate indifference."). Plaintiffs also cannot show

11   that this handful of supposed misclassifications from an inmate population of 34,000 has

12   become a "de facto" policy of ADC, such that ADC is pursuing a systemic practice of

13   exposing all inmates to a substantial risk of serious harm.

14   **V.    THE CONDITIONS-OF-CONFINEMENT CLAIMS SHOULD BE
        DISMISSED AS A MATTER OF LAW**

15

16           Plaintiffs' conditions-of-confinement claims must be analyzed in the context of

17   several well settled principles: (1) uncomfortable, restrictive or even harsh living

18   conditions do not implicate the Eighth Amendment, *Rhodes v. Chapman*, 452 U.S. 337,

19   347 (1981); (2) courts should consider the circumstances, nature, and duration of a

20   deprivation of life's necessities in determining whether a constitutional violation has

21   occurred, *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000); and (3) deference to the

22   expertise of prison administrators is owed when reviewing a prison regulation, and the

23   regulation must be upheld if it is reasonably related to legitimate penological interests,

24   *Turner v. Safley*, 482 U.S. 78, 89 (1987). *See also Brown v. Plata,* 131 S.Ct. 1910, 1928

25   (2011); *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2009). As the Court has already

26   recognized, many of the conditions that Plaintiffs challenge here have been rejected many

27   times before. [25]

28           [25] *See*, *e.g.*, *Graves v. Arpaio*, 633 F. Supp. 2d 834, 848 (D. Ariz. 2009), *aff'd*, 623

                                            45

**A.      The Use of Chemical Agents on Inmates Using Psychotropic Medications is Not Per Se Unconstitutional.**

Only three Plaintiffs complain of actually being pepper sprayed, or threatened with the use of such force.   Of these three Plaintiffs (Rodriguez, Verduzco and Brislan), Verduzco is the torchbearer for this claim. (Dkt. 1 at ¶ 87.) REDACTED

The Ninth Circuit has repeatedly held that chemical agents may be used against inmates for disruptive activity or non-compliance with prison rules. *See Allen v. Bosley*, 253 Fed.Appx. 658 (9th Cir. 2007); *Eccleston v. Oregon ex rel. Oregon Dep't of Corr.*, 168 F. App'x 760, 761 (9th Cir. 2006); *Clement v. Gomez*, 298 F.3d 898, 903-04 (9th Cir. 2002); *Spain*, 600 F.2d at 196.  Moreover, ADC's use-of-force policy is a thoughtful one that requires officers to deploy a progressive continuum, from the least amount of force possible to the maximum level permitted, commensurate with the circumstances of the

F.3d 1043 (9th Cir. 2010); *Baptisto v. Ryan*, 2006 WL 798879, at ** 27-28, 33 (D. Ariz. 2006); *Hampton v. Ryan*, 2006 WL 3497780, at **11-15 (D. Ariz. 2006), *aff'd*, 288 F.App'x 404 (9th Cir. 2008); *Walker v. Schriro*, 2006 WL 2772845, at **7-9 (D. Ariz. 2006); *see also Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979); *Jonas v. Schriro*, 2006 WL 2772641 (D. Ariz. 2006).

[26] The mere threat of force does not rise to a constitutional violation. *See Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996); *Perez v. Sisto*, 2010 WL 2880165, at *15 (E.D. Cal. 2010).

[27] REDACTED

1   incident. (DSOF ¶¶ 614-643.) REDACTED

2   

3   

4   

5   

6   

7   

8   

9        The fact that an inmate has a mental illness or is taking psychotropic medications

10   does not constitutionally exempt the use of OC spray from this progression. *See Deorle v.*

11   *Rutherford,* 272 F.3d 1272, 1283 (9th Cir. 2001) ("We do not adopt a per se rule

12   establishing two different classifications of suspects: mentally disabled persons and

13   serious criminals"); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003)

14   ("some force was surely justified in restraining [mentally ill arrestee] so that he could not

15   injure either himself or the arresting officers.").  More importantly, because Plaintiffs are

16   seeking an order enjoining ADC from <u>ever</u> using chemical agents on inmates taking

17   psychotropic medications, on suicide watch, or those who are mentally ill under <u>any</u>

18   circumstances (Dkt. 240-1, ¶ 48; Dkt. 292-1, ¶ 32), they must show that the policy in

19   question authorizing this use of non-lethal force – when warranted by the inmate's unruly

20   behavior – was done "maliciously and sadistically for the very purpose of causing harm."

21   *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  They cannot do this, REDACTED

22   

23   

24   

25        The Ninth

26   Circuit has already rejected a similar claim brought against former ADC Director Stewart

27   for having a policy that merely authorized the use of pepper spray against recalcitrant

28   inmates. *See Stewart v. Stewart*, 60 Fed.Appx. 20, 22 (9th Cir. 2003).

Such a sweeping edict is unsupported by legal authorities, and certainly cannot be traceable to any "systemic" practice or policy designed with sadistic or malicious intent by prison administrators. *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The Supreme Court has never held, nor have we or any other court of appeals, so far as we can determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth Amendment . . . ."); *Howard v. Nunley*, 2010 WL 3785536, at *3 (E.D. Cal. 2010) ("The use of mace, tear gas or other chemical agent of the like nature when reasonably necessary to ... subdue recalcitrant prisoners does not constitute cruel and inhuman punishment.").[28]

The use of chemical agents is a valuable, non-lethal tool for corrections officers in the use-of-force continuum, and Plaintiffs' desire to eliminate its use entirely would have dire results not contemplated by Plaintiffs, and contradicts the deference afforded to them in matters of internal order and security. *Whitley*, 475 U.S. at 321–22. Consider, for example, an inmate in a psychiatric unit (on psychotropic medication) who has obtained a razor or other weapon and is attempting suicide, but lashes out at officers attempting to intervene.  Are the officers required to stand back uttering ineffective verbal commands, or skip the easily deployed OC spray and escalate to the more difficult and dangerous use of arm-bar and carotid holds, batons, tasers or more harmful devices to save the inmate and preserve officer safety?  Of course not.  REDACTED

Because the use of chemical agents has not been constitutionally condemned

---

[28] The extreme position taken by Plaintiffs is inconsistent with the aspirational standard promoted by the <u>ABA Criminal Justice Standards on the Treatment of Prisoners,</u> of which certain Plaintiffs' counsel (Fathi and Fettig) are acknowledged as contributors. Unlike the categorical ban Plaintiffs seek here, Standard 23-5.8(d) does <u>not</u> exempt mentally ill inmates from the appropriate use of chemical spray but simply calls for consideration when practicable and contemporaneous documentation, things that ADC policy already includes.

1   by either the Ninth Circuit or this Court, and such force is within the discretion of prison

2   officials to authorize when the occasion justifies its use, Plaintiffs have failed to establish

3   any Eighth Amendment violation under *Whitley* by the mere existence of a policy that

4   permits the use of chemical agents against inmates on psychotropic medication.

5        **B.    Recreation**

6        Plaintiffs' challenge to ADC's recreational policies for maximum custody inmates

7   has been rejected several times before.  Maximum custody inmates are afforded six hours

8   of outdoor exercise weekly, in two-hour blocks, three times per week.  (DSOF ¶¶ 1285,

9   1302-1314, 1366-1406, 1439-1444, 1561, 1561, 1572-1576, 1580, 1582, 1605, 1609.)

10  Inmates on watch are afforded the same recreation as their assigned custody level unless

11  contraindicated by mental health staff. (DSOF ¶¶ 1499-1501, 3094, 3232.) Some

12  maximum custody inmates have the opportunity to recreate on the yard, while others

13  recreate in enclosures that allow fresh air and sunlight, communication between inmates,

14  and exercise (stretching, cardiovascular exercise, strength training, calisthenics, walking,

15  jogging in place, and isometrics).  (DSOF ¶¶ 1572-1654.) Inmates can also exercise in

16  their cells.  Many inmates, including several Plaintiffs, often refuse recreation. (DSOF ¶¶

17  2809-2810, 3013, 3074, 3165.)   The provision of at least six hours of weekly time

18  outdoors for exercise is sufficient to satisfy constitutional minima.

19       **C.    Social Isolation**

20       This claim suffers from several distinct defects.  First, it appears to be an attempt

21  by Plaintiffs to collaterally attack the findings and outcome of the disciplinary hearing

22  process that resulted in such restricted housing placement.[29]  (DSOF ¶¶ 1253-1281, 1282-

23  1292, 1293-1294.)But as the Ninth Circuit has emphasized, "administrative segregation,

24  even in a single cell for twenty-three hours a day, is within the terms of confinement

25  ordinarily contemplated by a sentence." *Anderson,* 45 F.3d at 1316. Because a disciplinary

26  ─────────────
        [29] REDACTED

27

28

1   assignment to segregation housing is within the terms of one's confinement, this subclass
2   claim should be narrowly construed to focus on the <u>conditions</u> of confinement, rather the
3   fact or duration of such confinement in a segregation unit. *See Muhammad v. Close*, 540
4   U.S. 749, 750-55 (2004).

5       More importantly, the conditions in ADC's lockdown housing units do not
6   unconstitutionally deprive the Subclass members of life's necessities in violation of the
7   Eighth Amendment.  (DSOF ¶¶ 1295-1868.) As this Court emphasized in *Hampton*, the
8   solitary confinement to which certain inmates are subjected does not put them in total
9   isolation, and their confinement in such units is not indeterminate.  2006 WL 3497780, at
10  *12 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989) (inmates do
11  not have a right to "unfettered visitation")).[30]

12      Maximum custody inmates have plenty of opportunities for social interaction.  In
13  addition to the at least  six hours per week of outdoor recreation (some of which include
14  group recreation), they are offered 30 minute showers three times a week, which is in
15  addition to their recreation time; some inmates are double celled; they are allowed to place
16  at least one telephone call per week (opportunity for increase in the Step Program), up to
17  15 minutes in duration; they are allowed at least one, 2-hour non-contact visit a week
18  (some are allowed contact visits) (opportunity for increase in Step Program); they are
19  offered an assortment of out-of-cell programming and WIPP work opportunities (porters,
20  kitchen workers, maintenance, etc.); the cells provide inmates the opportunity to see
21  others and to speak to other inmates, security, medical, religious and programming

22

23      [30] *See also Freemon v. Ryan*, 2011 WL 5169342, at *16 (D. Ariz. 2011) ("The
24  undisputed evidence shows that Plaintiff has opportunities for limited social contact and,
    therefore, is not isolated to a degree that would violate the Eighth Amendment."); *Jonas*,
    2006 WL 2772641, at *4 (plaintiff failed to show that social interaction was
25  constitutionally inadequate in SMU II, where inmates are allowed one non-contact visit
    per week for a maximum of two hours, with up to four visitors at one time, and one five-
26  minute phone call per week, have contact with staff and are permitted to see prison and
    religious counselors, may have a radio and a television, and may pursue individual
27  educational courses from their cells.); *Aguilar v. Schriro*, 2006 WL 2471830, at *3 (D.
    Ariz. 2006) (same, plus plaintiffs had access to mental health services); *Bermudez v.*
28  *Ryan*, 2006 WL 2547345, at *3 (D. Ariz. 2006) (same).

personnel through either a perforated steel cell front, a vision panel in the door or cell wall or an open front; they can send and receive letters; they can visit with the facility chaplain or religious volunteers that are in the units almost daily; some can participate in weekly group out-of-cell religious worship; they can participate in the Maximum Custody Population Management Step Program earning more out of cell time, increased property/commissary, work programs and programming through positive behavior; certain levels of Step Program inmates may participate in in-pod recreation and social activities to include unit contests, unit newsletters, hobby craft, educational television programs and inmate fundraisers; certain levels of Step Program inmates may participate in weekly out-of-cell group programming in a wide range of classes including Cultural Diversity, Money Management; Responsible Thinking, Self-Control, Social Values, Substance Abuse, Thinking for a Change, Re-Entry, Feelings, CORE Skills, Conflict Resolution, Commitment to Change, Resources for Change, Living a Better Life, Domestic Violence and Merging Two Worlds classes; certain mental health and Step Program inmates may participate in mental health 1:1 counseling, group counseling and psycho-educational classes; certain levels of the Step Program inmates may participate in group recreation including basketball tournaments and kickball tournaments as well as yoga classes for females; all cells provide sufficient ventilation (either through open cell fronts fixed with metal bars, perforated metal cell front doors or individual cell ventilation) and exposure to natural light via in-cell windows, cell fronts that face windows, or skylights in the housing units and they have access to a television.  (DSOF 1572-1654, 1560-61, 1655-59, 1664, 1490-94, 1295-97, 1563-69, 1663, 1298-1301, 1570-71, 1689, 1469-70, 1660-62, 1302-1470, 1561-62, 1883, 1490-1559, 1560-71, 1572-1641, 1660-1693, 1860-68.)

### D.    Constant Cell Illumination

The subclass claim related to cell illumination is foreclosed by this Court's *Hampton* decision and other Ninth Circuit precedent. *Hampton* involved this Court's review of the security illumination policy for SMU II, wherein each cell contained a bed against the far wall, and a lighting fixture containing four lights above the mirror over the

sink, one of which lights was a seven-watt fluorescent security light that remained illuminated 24 hours per day.  2006 WL 3497780, at *13.

The Court previously cited the declaration testimony of Plaintiffs Brislan and Rodriguez at the class certification stage, yet neither party can establish an Eighth Amendment violation. REDACTED

The named Plaintiffs have failed to satisfy the objective component of the Eighth Amendment (sufficiently serious harm),[31] particularly where the wattage in their cells (7 watt bulbs positioned approximately 7-8 feet away from bed) was low-level, similar to a night-light.[32]  (DSOF at ¶¶1698-1700; 1714-1819.)

---

[31] *See McDaniels v. Elfo*, 2013 WL 7231585, at *12 (W.D. Wash. 2013) ("The mere allegation the light was so bright plaintiff 'had no way of telling whether it was day or night' . . .does not suffice to demonstrate that the continuous illumination was objectively harmful."); *Bull v. Beard*, 2013 WL 5797586, at *8-9 (S.D. Cal. 2013) (dismissing claim where plaintiff failed to allege what lights were constantly on or how bright they were, and that he suffered *grave* sleeping problems or other sufficient harms); *Franklin v. Scribner*, 2011 WL 1311743, at *9 (S.D. Cal. 2011) (holding plaintiff failed to allege sufficient facts to state a claim "as to the type of lighting in his cell or its brightness, without which he cannot demonstrate the existence of an objectively serious deprivation."); *see also Murray v. Edwards Cnty. Sheriff's Dep't*, 248 F. App'x 993, 998 (10th Cir. 2007) (plaintiff failed to show that 75-watt bulbs placed two-three feet outside his cell and constantly on caused him sufficiently serious injury); *Wiles v. Ozmint*, 2010 WL 5811355, at *7 (D.S.C. 2010) (finding plaintiff's claim that he suffered medical consequence from cell illumination was meritless because "Plaintiff's medical records fail to support his claim that he is suffering from any serious medical condition as a result of sleep deprivation, fatigue, or related ailments.").

[32] *See Vasquez v. Frank*, 290 Fed.Appx. 927, 929 (7th Cir. 2008) (constant light from 9-watt fluorescent bulb does not constitute an "extreme deprivation"); *Chavarria v. Stacks*, 102 Fed. App'x 433 (5th Cir. 2004) (holding that prison policy requiring 24-hour illumination of cells in administrative segregation, which allegedly caused an inmate to suffer sleep deprivation, did not violate the Eighth Amendment); *Franklin v. Smalls*, 09CV1067-MMA RBB, 2013 WL 941569, at *7-8, 18-20 (S.D. Cal. Mar. 8, 2013) (constant light from 7-watt fluorescent bulb was not excessively bright so as to be unconstitutional); *see also McGee v. Gold*, 2010 WL 5300805, at *5 (D. Vt. 2010) (10-watt incandescent bulb); *McBride v. Frank*, 2009 WL 2591618, at *5 (E.D. Wis. Aug. 21, 2009) (9-watt fluorescent bulb does not objectively deny the "minimal civilized measure of life's necessities."); *Carr v. Tousley*, 2009 WL 1514661, at *19 (D. Idaho 2009) (9-watt bulb); *Walker v. Woodford*, 593 F. Supp. 2d 1140, 1152 (S.D. Cal. 2008) (7–watt compact fluorescent bulb as bright as a 40-watt incandescent bulb); *Wills v. Terhune*, 404 F.Supp.2d 1226, 1230–31 (E.D. Cal. 2005) (holding 24-hour illumination by 13-watt bulb

Furthermore, not all ADC maximum custody housing unit cells have night security lights that cannot be controlled by inmates, but of those units that do, the in-cell constant night security lights used for nighttime lighting of maximum custody cells are low-level, 7-watt bulbs that enhance security at the facility, yet are dim enough to provide an adequate sleeping environment for the inmates.[33]   (DSOF at ¶¶1696-1698.) The nightlights are very different from the much brighter security lights and the regular fluorescent lights that are used in the cells during the day.  (DSOF at ¶1699.) The 7-watt security light must remain on at night to afford correctional staff visibility into the cell to confirm the inmate's welfare while sleeping, to identify the inmate, and to rule out nighttime misconduct.  (DSOF at ¶¶1700-1712.)  *See also Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir. 2013).  Such low-watt, security nightlights are far preferable to the use of flashlights.[34] (DSOF at ¶¶1706-09.) The use of low-level nightlights is standard practice for correctional facilities across the country, and the level of illumination used is the minimum amount necessary to sufficiently address security concerns and to allow correctional staff to observe inmates during the night and regular sleeping hours.[35] (DSOF ¶¶1700-01.)

---

constitutional because it was not of the type that caused "grave sleeping problems" and, there was no evidence in the medical records that he suffered symptoms from the lighting conditions).

[33] In addition, inmates are permitted to cover their eyes with small cloths if they wish to when they sleep as long as correctional personnel conducting safety and welfare checks are able to see flesh and determine that the inmate is breathing.

[34] The exclusive use of flashlights to conduct night time safety and security checks enables inmates to detect when officers are making rounds and thus plan instances of assault, contraband use/exchange, and escape plans around those security checks.  (DSOF at ¶1707.)  Additionally, an officer may have to stop and shine a flashlight in a cell for extended time in order to confirm the safety and security of an inmate, running the risk of creating conflict between inmates and staff because inmates may view the use of a flashlight as harassment.

[35] Specifically, the nightlights enable correctional personnel to observe the wellbeing of an inmate at night, including detecting illness, medical emergency, ensuring suicide precautions, and detecting physical or sexual assaults, and ensure that inmates are not attempting to escape or engage in other illicit activities, such as use or exchange of contraband. The level of illumination used also permits correctional personnel to make regularly required security checks, as described above, without having to turn on the daytime fluorescent lighting (and wake sleeping inmates) each time a security check is made.

1    Courts in this District have rejected virtually identical lighting claims involving

2    the same ADC facilities under scrutiny here. *See Jose v. Thomas*, 2012 WL 2091527, at

3    *6 (D. Ariz. 2012); *Rotondo v. Ryan*, 2012 WL 424384, at *13 (D. Ariz. 2012); *Jonas v.

4    Schriro*, 2006 WL 2772641 (D. Ariz. Sept. 25, 2006); *Baptisto*, 2006 WL 798879, at

5    **18-21.  ADC's restricted use of minimal, 7-watt lighting for the security and safety

6    purposes set forth above is reasonably related to the legitimate penological objectives of

7    ADC officials, precluding an Eighth Amendment violation against the State.  (DSOF at

8    ¶¶1694-1819.)

9    **E.    Property**

10    This class claim is anchored to the allegation, "Property is extremely limited. Many

11    prisoners have no radio or television."  (Dkt. 1, ¶ 93.)  ADC policy restrictions on the type

12    and amount of property an inmate can possess in his or her cell do not offend the Eighth

13    Amendment. Indeed, this claim appears frivolous, as the property items sought have

14    nothing to do with any inmate's health, hygiene, or safety needs under *Farmer*, but are

15    simply leisure items sought to pass the time.  (DSOF at ¶¶1861, 2024, 2042-45, 1374-76,

16    1386-88, 1404-06, 1442-44.)

17    Nonetheless, inmates in maximum custody are permitted to have appliances such

18    as televisions, cassette players, and headphones.[36]   (DSOF ¶¶1861, 2042-43, 1707.)

19    Although access to some items are dictated by an inmate's disciplinary infractions or

20    mental health, these temporary restrictions are necessary to modify behavior or prevent

21    self-harm.  (DSOF ¶¶1863-68.) *See Beard*, 548 U.S. 521, 530 (2006) (among "several

22    justifications for the prison's policy, including the need to motivate better behavior on the

23    part of particularly difficult prisoners, the need to minimize the amount of property they

24    control in their cells, and the need to ensure prison safety", court stated it "need go no

25    further than the first justification, that of providing increased incentives for better prison

26    behavior.")

27    _____

[36] REDACTED                                      ADC officials have assisted segregation

28    inmates o                                      h charitable programs.

54

1   Courts have routinely rejected similar claims brought by high-custody inmates

2   challenging the type or amount of property they can possess in their cells.  *See Anderson*

3   *v. Cnty. of Kern*, 45 F.3d 1310, 1314 (9th Cir. 1995); *Barnett v. Centoni,* 31 F.3d 813, 816

4   (9th Cir. 1994); *Wilson v. Timko,* 972 F.2d 1348 (9th Cir. 1992); *Turner v. Upton*, 2013

5   WL 4852689, at *5, 12 (M.D. Ga. 2013); *Harrison v. Bledsoe*, 2010 WL 186804, *5-6

6   (M.D. Pa. 2010); *Stockton v. Tyson*, 2011 WL 5118456, at *3 (E.D. Cal. 2011);

7   *Lerajjareanra-O-Kel-ly v. Johnson,* 2009 WL 1513285, at *2 (D. Idaho 2009); *Chhoun v.*

8   *Woodford*, 2005 WL 1910930, at *10 (N.D. Cal. 2005); *Owens v. Ayers*, 2002 WL 73226,

9   at *3 (N.D. Cal. 2002).  Judge Bolton reached the same conclusion when faced with a

10   similar Eighth Amendment claim of an inmate at SMU-II: "It is irrelevant for Eighth

11   Amendment purposes what criteria prison officials use to limit Plaintiff's access to music

12   and reading materials, as the Court can find no case where depriving an inmate of such

13   materials amounted to cruel and unusual punishment." *Baptisto*, 2005 WL 2416356, at

14   *14 (D. Ariz. 2005).[37]

15   Plaintiffs cannot prove that their temporary deprivation of such items is

16   "sufficiently serious" harm under the objective component of the Eighth Amendment, or

17   that ADC officials were deliberately indifferent to a substantial risk of serious harm from

18   enforcing such an undeniably reasonable restriction.  Moreover, ADC clearly has a

19   legitimate penological interest in restricting the type and amount of property a Subclass

20   inmate may possess—as a behavior-modification technique, to minimize prisoner

21   bartering, or to reduce opportunities for starting a fire or crafting weapons—and such

22   ────────────────

[37] Another reason to grant summary judgment on this property claim is the absence
23   of any cognizable interest under Arizona law in keeping personal property items while an
   inmate is assigned to a restricted segregation housing unit. *See, e.g., Blum v. State of*
24   *Arizona*, 171 Ariz. 201, 207, 829 P.2d 1247, 1253 (App. 1992) ("ADOC may adopt
   policies limiting the amount of property prisoners may keep in their cells"); and *Ward v.*
25   *Ryan,* 623 F.3d 807, 811-12 (9th Cir.2010) (Arizona statutes creating a property interest in
   prison wages "do not give inmates a full and unfettered right to their property"). "Property
26   interests are created by state law." *Nevada Dept. Of Corrections v. Greene,* 648 F.3d
   1014, 1019 (9th Cir.2011). A property interest that has been recognized and protected by
27   state law triggers due process protections. *Board of Regents v. Roth,* 408 U.S. 564, 544
   (1972). Without any due process protection over the subject property items, it is illogical
28   to believe Eighth Amendment protection could exist over the same items.

1    interests are reasonably related to the property restriction.  (DSOF ¶¶ 1865-68.)

2        **F.    <u>Nutrition</u>**

3        "'[T]he Eighth Amendment requires only that prisoners receive food that is

4    adequate to maintain health."  *LeMaire v. Maass,* 12 F.3d 1444, 1456 (9th Cir. 1993).

5    Male maximum custody inmates receive – Monday thru Sunday – two meals per day: a

6    Mega Sack meal consisting of breakfast and lunch, and a hot dinner.  (DSOF ¶ 1829.)The

7    weekly menu averages 2,657 calories per day; the menu for general population inmates is,

8    on average, 2,805 calories per day.  (DSOF ¶¶ 1834-37.)  Utilization of the Mega Sack

9    meal plan offers the inmates individual control over when they would like to eat breakfast

10   and lunch.  (DSOF ¶¶ 1853-57.)  It also lessens the burden on prison operations associated

11   with the necessary personnel required to serve meals cell to cell, and thereby frees up

12   correctional personnel in the afternoon hours to provide for necessary inmate movement

13   and escorts, safety and welfare checks along with movement of inmates to showers,

14   recreation, programming, visitation, medical appointments, etc.  (DSOF ¶¶ 1856-57.)  The

15   caloric intake for male inmates in maximum custody is reduced to compensate for

16   decreased energy needs and to account for security issues, however, it is still adequate in

17   all nutrients according to the Recommended Daily Allowance standards of the National

18   Academies of Science–National Research Council if all the foods are eaten.  (DSOF ¶¶

19   1830-32.)   Female maximum custody inmates receive the same menu as general

20   population inmates, which averages 2266 calories per day.[38]  (DSOF ¶ 1836.)These menus

21   meet or exceed the recommended nutrient amounts as specified by Recommended Dietary

22   Allowances from the National Academy of Sciences.  (DSOF ¶ 1837.)

23       Two Arizona district court judges have recently rejected inmate challenges to this

24   same restricted-movement meal plan. *See Gamez v. Ryan,* No. CV10-2663-PHX-JWS

       _____

       [38] Inmates on watch are provided the same meals (including special medical diets),
25   in frequency and nutritional quality, as meals served to general population inmates, but
26   served free of items that can be used for self-harm (e.g., bones, trays, sacks, napkins,
     cellophane).  (DSOF ¶¶ 1838; 579.)  And this caloric intake does not include calories
27   consumed via commissary purchases, which maximum custody inmates can make. (DSOF
28   ¶¶ 1286, 1561, 2043.)

(MEA), Doc. No. 86 at 6, (D. Ariz. Dec. 21, 2012) ("The record makes clear that Plaintiff receives three meals per day but two meals are delivered in the morning at the same time and one meal is delivered in the evening. Plaintiff has not introduced any legal authority suggesting that the prison is prohibited from streamlining the distribution of meals to inmates in the manner currently being employed."); and *Maloney v. Ryan*, 2013 WL 3945921, at *6-8 (D. Ariz. 2013) (J. Broomfield) (rejecting 8th Amendment claim of ASPC-Florence Muslim inmate to mega-sack meal plan during Ramadhan as two meals gave inmate recommended daily caloric intake for sedentary lifestyle).[39]   The caloric intake – which is the same for all female inmates, and only slightly less for male maximum custody inmates – satisfies constitutional standards.  (DSOF ¶¶ 1820-59.)

## CONCLUSION

For these reasons, Defendants are entitled to summary judgment on all claims.

---

[39] *See also Standley v. Ryan*, 2012 WL 3288728, at *14 (D. Ariz. 2012); *Galvan v. Arpaio*, 2011 WL 6210818, at *4 (D. Ariz. 2011); *Baptisto*, 2006 WL 798879, at **6, 27-28; *Jonas*, 2006 WL 2772641, at *3. Several other courts have also upheld the streamlined distribution of meals to inmates. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982).

1        DATED this 14ᵗʰ day of May, 2014.

2                                    STRUCK WIENEKE & LOVE, P.L.C.

3

4                            By /s/ Daniel P. Struck
                                 Daniel P. Struck
5                                Kathleen L. Wieneke
                                 Rachel Love
6                                Timothy J. Bojanowski
                                 Nicholas D. Acedo
7                                Ashlee B. Fletcher
                                 Anne M. Orcutt
8                                Jacob B. Lee
                                 STRUCK WIENEKE & LOVE, P.L.C.
9                                3100 West Ray Road, Suite 300
                                 Chandler, Arizona  85226
10
                                 Arizona Attorney General Thomas C. Horne
11                               Office of the Attorney General
                                 Michael E. Gottfried
12                               Lucy M. Rand
                                 Assistant Attorneys General
13                               1275 W. Washington Street
                                 Phoenix, Arizona 85007-2926
14
                                 *Attorneys for Defendants*
15
2889597.1
16

17

18

19

20

21

22

23

24

25

26

27

28

58

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on May 14, 2014, I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF System for filing **UNDER SEAL** and

4

transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

5

Alison Hardy:                ahardy@prisonlaw.com

6

Amy Fettig:                  afettig@npp-aclu.org

7

Caroline N. Mitchell:        cnmitchell@jonesday.com; mlandsborough@jonesday.com;

8

nbreen@jonesday.com

9

Corene T. Kendrick:          ckendrick@prisonlaw.com; edegraff@prisonlaw.com

10

Daniel Clayton Barr:         DBarr@perkinscoie.com; docketphx@perkinscoie.com;
sneilson@perkinscoie.com

11

Daniel Joseph Pochoda: dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

12

David Cyrus Fathi:           dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

13

Donald Specter:              dspecter@prisonlaw.com

14

James Duff Lyall:            jlyall@acluaz.org; gtorres@acluaz.org

15

Cathleen M. Dooley:          cdooley@azdisabilitylaw.org

16

J.J. Rico:                   jrico@azdisabilitylaw.org

17

John Howard Gray:            jhgray@perkinscoie.com; slawson@perkinscoie.com

18

Kirstin T. Eidenbach:        keidenbach@perkinscoie.com; dfreouf@perkinscoie.com;

19

docketphx@perkinscoie.com

20

Jerica L. Peters:            jpeters@perkinscoie.com

21

Matthew Benjamin de Mee: mdumee@perkinscoie.com; cwendt@perkinscoie.com

22

Michael Evan Gottfried:Michael.gottfried@azag.gov; colleen.jordan@azag.gov;
lucy.rand@azag.gov

23

Sara Norman:                 snorman@prisonlaw.com

24

Asim Varma:                  avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org;

25

phxadmin@azdisabilitylaw.org

26

David C. Kiernan:            dkiernan@jonesday.com; lwong@jonesday.com

27

John Laurens Wilkes:         jlwilkes@jonesday.com, dkkerr@jonesday.com

28

Kamilla Mamedova:            kmamedova@jonesday.com

59

| | |
|---|---|
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Taylor Freeman: | tfreeman@jonesday.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org, mlauritzen@azdisabilitylaw.org |
| Katherine E. Watanabe: | Katherine.Watanabe@azag.gov, susan.oquinn@azag.gov |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, pdrew@perkinscoie.com |
| Lucy Marie Rand: | Lucy.Rand@azag.gov, Geneva.Johnson-Joksch@azag.gov |
| Ajmel Quereshi: | aquereshi@npp-aclu.org |
| Jessica Jansepar Ross | jross@azdisabilitylaw.org |

I hereby certify that on this same date, I served the attached proposed lodged sealed document by email, on the following:

> Caroline N. Mitchell
> Sarah Kader
> David Cyrus Fathi
> Donald Specter
> Amelia Gerlicher

/s/ Daniel P. Struck

60