Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028824
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                          Plaintiffs,<br><br>      v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                          Defendants. | NO. 2:12-cv-00601-NVW<br><br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Pursuant to Fed. R. Civ. P. 56(c)(2) and LRCiv 56.1(a), Defendants submit

the following facts in support of their Motion for Summary Judgment.

## I.   ADC FACILITIES

1.   The Arizona Department of Corrections ("ADC") has ten different facilities (or Arizona State Prison Complexes ("ASPC")): Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma. (Ex. 137, ¶ 3; Ex. 138, ¶17.)

2.   On March 31, 2014, these facilities' total inmate population was 34,444. (Ex. 138, ¶18.)

3.   Of this population, there were 3,109 male inmates in maximum custody and 57 female inmate in maximum custody. (Ex. 138, ¶19.)

4.   On this same date there were 335 male inmates and 111 female inmates in intake who are subject to similar recreation and shower access restrictions as maximum custody inmates, however, intake generally takes only a few days and upon completion of intake and classification, the inmate is transferred to his or her assigned housing unit. (Ex. 138, ¶20.)

5.   On March 31, 2014, ASPC-Douglas had 2,376 inmates. (Ex. 138, ¶21.)

6.   On March 31, 2014, ASPC-Eyman had 5,128 inmates. (Ex. 138, ¶22.)

7.   On March 31, 2014, ASPC-Florence had 4,028 inmates. (Ex. 138, ¶23.)

8.   On March 31, 2014, ASPC-Perryville had 3,757 inmates. (Ex. 138, ¶24.)

9.   On March 31, 2014, ASPC-Phoenix had 655 inmates. (Ex. 138, ¶25.)

10.   On March 31, 2014, ASPC-Lewis had 5,502 inmates. (Ex. 138, ¶26.)

11.   On March 31, 2014, ASPC-Safford had 1,713 inmates. (Ex. 138, ¶27.)

12.   On March 31, 2014, ASPC-Tucson had 4,998 inmates. (Ex. 138, ¶28.)

13.   On March 31, 2014, ASPC-Winslow had 1,731 inmates. (Ex. 138,

¶29.)

14. On March 31, 2014, ASPC-Yuma had 4,556 inmates. (Ex. 138, ¶30.)

15. Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma are considered corridor facilities because of their proximity to Phoenix and Tucson. (Ex. 161 at 108-109.)

16. Douglas, Safford, and Winslow are not corridor facilities, and house healthier, low custody inmates. (Ex. 161 at 109.)

17. Florence and Eyman house death row inmates, Security Threat Groups ("STG") inmates, sex offenders, and some general population inmates. (Ex. 161 at 108.)

18. Lewis houses primarily protective custody inmates. (Ex. 161 at 108.)

19. All facilities, except Eyman, are in compliance with National Commission on Correctional Health Care ("NCCHC") standards and are accredited. (Ex. 162 at 87-88, 91.)

**A.     ASPC-Douglas**

20. The NCCHC continued Douglas' accreditation on June 26, 2009. (Ex. 137-A: ADC016043-ADC016060.)

21. The NCCHC conducted a reaccreditation review at ASPC-Douglas on March 26-28, 2012. On June 28, 2013, the NCCHC awarded the complex Continuing Accreditation with Verification, finding that it met 97% of the applicable essential standards and 100% of the important standards, and requested submission of additional compliance documentation regarding REDACTED
(Ex. 137-B: ADC_P000888-ADC_P000901.)

22. On November 19, 2013, the NCCHC awarded full accreditation to ASPC-Douglas finding sufficient evidence that the complex was in 100% compliance with all applicable essential and important standards under the NCCHC 2008 Standards for Health Services in Prisons. (Ex. 137-C: ADC_P000974-ADC_P000976.)

**B.**     **ASPC-Florence**

23.     The NCCHC awarded  ASPC-Florence full continuing accreditation on November 18, 2011, finding sufficient evident that the complex was in 100% compliance with all applicable essential and important standards under the NCCHC 2008 Standards for Health Services in Prisons. (Ex. 137-D: ADC016061-ADC016066.)

**C.**     **ASPC-Lewis**

24.     The NCCHC continued Lewis' full continuing accreditation on November 12, 2010, finding sufficient evidence that the facility was 100% in compliance with all applicable essential and important standards under the NCCHC 2008 Standards for Health Services in Prisons.  (Ex. 137-E: ADC016067-ADC016070.)

**D.**     **ASPC-Yuma**

25.     The NCCHC accredited ASPC-Yuma in November 2010. (Ex. 137-F: ADC016081.)

26.     In March 2011, the NCCHC found sufficient evidence that ASPC-Yuma was in 100% compliance with all applicable essential and important standards and awarded full accreditation under the NCCHC 2008 Standard for Health Services in Prisons.  (Ex. 137-G: ADC_P000965-ADC_P000973.)

**E.**     **ASPC-Perryville**

27.     ASPC-Perryville houses all female inmates.  (Ex. 161 at 109.)

28.     The NCCHC continued Perryville's accreditation on July 2, 2009. (Ex. 137-I: ADC016082-ADC016089.)

29.     The NCCHC conducted a reaccreditation review at ASPC-Perryville on April 10-13, 2012.  On June 28, 2013, the NCCHC awarded the complex Continuing Accreditation with Verification, finding that it met 92% of the applicable essential standards and 100% of the important standards, and requested submission of additional compliance documentation regarding   REDACTED

(Ex. 137-I: ADC_P000902-ADC_P000915.)

4

30.     On October 11, 2013, the NCCHC awarded the complex Continuing Accreditation with Verification, fining that it met 97% of the applicable essential standards and 100% of the important standards, and requested further submission of additional    compliance    documentation    regarding    REDACTED                                (Ex. 137-J: ADC_P000916-ADC_P000919.)

31.     On November 18, 2013, the NCCHC awarded full accreditation to ASPC-Perryville finding sufficient evidence that the complex was in 100% compliance with all applicable essential and important standards under the NCCHC 2008 Standards for Health Services in Prisons.  (Ex. 137-K: ADC_P000977-ADC_P000979.)

**F.        ASPC-Phoenix**

32.     ASPC-Phoenix is the intake and reception center for all male inmates. (Ex. 161 at 108.)

33.     The NCCHC continued Phoenix's accreditation on July 2, 2009, finding the complex to be in 100% compliance with all applicable essential and important standards under the NCCHC 2008 Standard for Health Services in Prisons. (Ex. 137-L: ADC016090-ADC016096.)

34.     The NCCHC conducted a reaccreditation review at ASPC-Phoenix on February 27-28, 2011.   On June 28, 2013, the NCCHC awarded the complex Continuing Accreditation with Verification, finding that it met 97% of the applicable essential standards and 97% of the important standards, and requested submission of additional    compliance    documentation    regarding    REDACTED                                . (Ex. 137-M: ADC_P000920-ADC_P000933.)

35.     On November 22, 2013, the NCCHC awarded full accreditation to ASPC-Phoenix finding sufficient evidence that the complex was in 100% compliance with all applicable essential standards and 97% of important standards under the NCCHC 2008 Standards for Health Services in Prisons.   (Ex. 137-N: ADC_P000980-ADC_P000983.)

**G.**     **ASPC-Safford**

36.     On June 28, 2013, the NCCHC voted to continue full accreditation of ASPC-Safford for its compliance with NCCHC's Standards for Health Services in Prisons. (Ex. 137-O: ADC140103.)

**H.**     **ASPC-Tucson**

37.     ASPC-Tucson is considered a medical hub because of its proximity to the University of Arizona.  (Ex. 161 at 109.)

38.     The NCCHC continued Tucson's accreditation on June 26, 2009. (Ex. 137-P: ADC016097-ADC016106.)

39.     The NCCHC conducted a reaccreditation review at ASPC-Tucson on March 12-16, 2012.  On June 28, 2013, the NCCHC placed the complex on probation, finding that it met 81% of the applicable essential standards and 93% of the important standards, and requested submission of additional compliance documentation regarding REDACTED

Ex. 137-Q: ADC_P000934-ADC_P000950.)

40.     On November 8, 2013, the NCCHC Accreditation Committee voted to maintain ASPC-Tucson on probation, finding that it complied with 86% of the essential standards and 97% of the important standards, and requested submission of additional compliance documentation regarding REDACTED

(Ex. 137-R: ADC_P000951-ADC_P000959.)

41.     On February 6, 2014, the NCCHC Accreditation Committee awarded ASPC-Tucson Continuing Accreditation with Verification, finding that it met 92% of all applicable essential standards and 97% of all important standards under the NCCHC 2008

Standards for Health Services in Prisons, and requested the submission of additional

compliance documentation regarding REDACTED

, prior to April 6, 2014.  (Ex.

137-S: ADC257099-ADC257107.)

**I.**          **ASPC-Winslow**

42.     The NCCHC continued Winslow's accreditation, with verification,

on February 27, 2009.  On June 26, 2009, the NCCHC found that ASPC-Winslow was in

100% compliance with all applicable essential and important standards under the NCCHC

2008 Standards for Health Services in Prisons and awarded the complex full accreditation.

(Ex. 137-T: ADC016136-ADC016138.)

43.     The NCCHC conducted a review for continued accreditation of

ASPC-Winslow on February 29 and March 1, 2012.  On June 28, 2013, the NCCHC

decided to award Continuing Accreditation with Verification to ASPC-Winslow, fining

that it met 97% of the essential standards and 96% of the important standards, and

requested submission of additional documentation regarding REDACTED

(Ex. 137-LL:

ADC140119-ADC140131.)

44.     On November 19, 2013, the NCCHC awarded full accreditation to

ASPC-Winslow finding sufficient evidence that the facility was in 100% compliance with

all applicable essential and important standards under the NCCHC 2008 Standards for

Health Services in Prisons.  (Ex. 137-V: ADC_P000960-ADC_P000964.)

**II.**     **DEFENDANTS RYAN AND PRATT**

45.     Charles Ryan is the Director for the Department of Corrections, and

has been the Director since January 30, 2009.  (Ex. 161 at 15.)

46.     Director Ryan ("Director") is ultimately responsible for the health

care provided to inmates and for the conditions of their confinement.  (Ex. 161 at 16.)

47.     The Director delegates oversight of inmate healthcare to the Division

Director of ADC's Health Services Contract Monitoring Bureau ("Assistant Director"). (Ex. 161 at 16.)

48. The Director has weekly meetings with each of his division directors and deputy directors, including weekly meetings with the Division Director. (Ex. 161 at 17.)

49. At the time this lawsuit was filed, Richard Pratt was the Interim Assistant Director, following the retirement of Dr. Michael Adu-Tutu in February 2012. (Ex. 162 at 10-11.)

50. Art Gross took over as Assistant Director in October 2012. (Ex. 162 at 11.)

51. Pratt was renamed the Interim Assistant Director on March 1, 2013. (Ex. 137, ¶ 5.)

52. It is Pratt's opinion that ADC provides adequate healthcare to inmates. (Ex. 162 at 97.)

## III.    ADC HEALTHCARE

53. It is the mission of ADC's Health Services Division to "provide constitutionally mandated health care to the offenders of the Arizona Department of Corrections," and Health Services Staff "hold to the basic tenets of the modern Hippocratic Oath" as guiding principles. (Ex. 137KK: ADC010656; Ex. 163 at 191.)

54. One of ADC's goals for FY 2013-2017 is to "provide cost effective constitutionally mandated correctional health care," which includes providing for the health care of the inmate population committed to the Department of Corrections" "in accordance with the laws of the state of Arizona and in accordance with the state constitution and the constitution of the United States." (Ex. 161 at 23-25.)

55. ADC's healthcare budget for fiscal year 2014 is $131,500,000: $125,000,000 paid to Corizon and $6,500,000 devoted to monitoring and litigation costs. (Ex. 161 at 39-40.)

## IV.    HEALTHCARE PRIVATIZATION

56.    Arizona House Bill ("H.B.") 2010 was introduced in third special session of the Forty-Ninth Legislature.  See House Summary on H.B. 2010, Committee on Appropriations, July 29, 2009: "HB 2010 makes various changes related to criminal justice that are necessary to implement the FY 2009-10 state budget."

57.    On September 3, 2009, the Governor approved H.B. 2010. See CRIMINAL JUSTICE BUDGET RECONCILIATION, 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) (WEST).

58.    H.B. 2010 required ADC to "issue a request for proposals to privatize all correctional health services that are provided in a state owned and operated facility." CRIMINAL JUSTICE BUDGET RECONCILIATION, 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) (WEST).

59.    H.B. 2010 required ADC to "issue a request for information for the privatization of all correctional health services, including all medical and dental services, that are provided in a state owned and operated facility," by October 1, 2009. See CRIMINAL JUSTICE BUDGET RECONCILIATION, 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) (WEST).

60.    Prior to publication of the request for information, the request had to be submitted to the Joint Legislative Budget Committee for review. See CRIMINAL JUSTICE BUDGET RECONCILIATION, 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) (WEST).

61.    ADC was required to "award a contract to a private provider of correctional health services that will provide such services, including all medical and dental services, at a cost below the fiscal year 2007-2008 total cost to the state for such services." See CRIMINAL JUSTICE BUDGET RECONCILIATION, 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) (WEST).

62.    Requests for proposals were required to be submitted for review to the joint legislative budget committee no later than January 1, 2010 and before issuance of

9

a contract. See CRIMINAL JUSTICE BUDGET RECONCILIATION, 2009 Ariz. Legis. Serv. 3rd Sp. Sess. Ch. 6 (H.B. 2010) (WEST).

63.    H.B. 2154 was introduced in the first regular session of the Fiftieth Legislature, which set a new time frame for finding a contractor to manage correctional health services.  2011 Ariz. Legis. Serv. 1st  Sess. Ch. 278 (H.B. 2011).

64.    It required ADC to issue a Request for Information (RFI) within 30 days after the effective date for the privatization of all correctional health services, including medical and dental services, and required that responses to the RFI be submitted to ADC within 30 days after the RFI was issued and that ADC was to provide the JLBC any information submitted. 2011 Ariz. Legis. Serv. 1st  Sess. Ch. 278 (H.B. 2011).

65.    ADC was then required to issue a RFP to privatize all correctional health services within 90 days after the JLBC reviewed the information and provided final instructions.  2011 Ariz. Legis. Serv. 1st Sess. Ch. 278 (H.B. 2011).

66.    RFPs were required to be submitted by January 3, 2012.  (Ex. 137-CC: ADC014359; ADC014419.)

67.    Wexford Health Sources, Inc., Corizon Inc., and Centurion Managed Care of Arizona, LLC timely submitted their responses to the RFP. (Ex. 161 at 34.)

68.    Wexford was initially awarded the contract, as it was determined to be the "best qualified bidder," which was not dictated by "price" but based on an overall evaluation of a number of factors; Wexford scored better than the other two bidders.  (Ex. 161 at 32-36, 41-42.)

69.    Wexford began its tenure on July 1, 2012.  (Dkt. # 321-2 at 4, ¶ 8.)

70.    When the privatization process started, staff "started looking for other employment" and morale was low in the months leading up to the July 2012 transition date.  (Ex. 163 at 60-61, 66; Dkt. # 321-2 at 11, ¶ 42.)

71.    To help stabilize the health services work force and ensure that mandated health services were provided on a statewide basis until contractor takeover, on March 5, 2012, the Director issued an Instruction authorizing ADC to pay a retention

10

bonus of three percent of the employee's base annual salary, not to exceed a maximum of $3,000.00, for health services employees who remain employed until the contractor take over date.  (Ex. 137-JJ: DI 311; ADC082057.)

72.    After ADC issued its Cure Notice and Sanction Letter, Wexford was required to put together a plan of action and present it to ADC.  (Ex. 161 at 143-144, 155.)

73.    Wexford never did this, however, and instead, during a November 7, 2012 presentation (which was intended for that purpose), Wexford representatives presented a PowerPoint criticizing ADC and its provision of health care.  (Ex. 161 at 143-144; Ex. 164 at 22-29.)

74.    Wexford presented only parts of the PowerPoint, and it was designed as a "one-way communication; Wexford did not want a dialogue.  (Ex. 161 at 143-144; Ex. 165 at 29-30.)

75.    Wexford refused to provide a copy of the PowerPoint to ADC.  (Ex. 161 at 143-144; Ex. 164 at 28; Ex. 165 at 29.)

76.    The PowerPoint was their response to the Cure Notice; it "was an exit strategy." (Ex. 161 at 156.)

77.    There was no truth to the allegations in the PowerPoint. (Ex. 162 at 70; Ex. 163 at 138-143.)

78.    Following the presentation, the Director asked Wexford's CEO if he was interested in continuing the contract, and Wexford indicated that they were and would develop a plan of action. (Ex. 161 at 143-144.)

79.    The next day, Wexford informed ADC that it wanted to sever the contract; ADC agreed because Wexford did not want to continue.  (Ex. 161 at 156-157; Ex. 162 at 55.)

80.    REDACTED

81.    To ensure continuity of healthcare, ADC went back to Corizon and Centurion as possible vendor successors.  (Ex. 161 at 160-161; Ex. 165 at 40.)

82.    Corizon was awarded the contract.  (Ex. 161 at 161; Ex. 137-W:

11

ADCPROC-011038-40; Ex. 137-CC: ADC014103-14419; Ex. 137-BB: ADCPROC-005625-6688.)

83.     The Director approved the Corizon contract.  (Ex. 161 at 21.)

84.     Corizon began its tenure on March 4, 2013.  (Dkt. # 344.)

85.     The correctional health services contract (the "Contract") incorporates ADC's October 21, 2011 RFP No. ADOC12-001105 as well as the Contractor's proposals and supplemental proposals. (Ex. 137-W: ADCPROC-011038-40; see generally, Ex. 137-Z: ADCPROC-005488-537; Ex. 137-AA: ADCPROC-005541-77; Ex. 137-BB: ADCPROC-005626-6688; Ex. 137-V: ADC-PROC010933-1016; Ex. 137-X: ADCPROC011031-36; Ex. 137-CC: ADC014103-419.)

86.     The Contractor agrees to provide medical, dental, pharmaceutical, and mental health services at all Arizona state prison complexes.  (Ex. 137-CC: RFP § 2.10-2.13; ADC014140-212.)

87.     It also agrees to provide routine, urgent and emergency healthcare to all inmates and establish preventative healthcare practices.  (Ex. 137-V: RFP § 2.7.2; ADC014172-73.)

88.     The Contract requires that the Contractor provide all inmates with constitutionally mandated care and must comply with all ADC orders, instructions and procedures.  (See Ex. 137-CC: RFP § 1.19; § 2.2.17; § 2.6.4; ADC014128, ADC014145-46, ADC014166.)

89.     The Contractor also must comply with NCCHC standards for health and mental health services, "which address general areas of care and treatment, health records, administration, personnel and medical-legal issues."  (See Ex. 137-CC: RFP § 2.2.49; ADC014150.)

90.     The NCCHC is an agency that provides certification of health care offered in jails, prisons and juvenile confinement facilities.  (Ex. 137-V: RFP § 2.2.49; ADC014150.)

91.     The Contract establishes specific requirements for, among other

things:  (1) urgent and emergency care; (2) timely access to care; (3) medical provider staffing; (4) chronic illness and infectious disease care; (5) medical diets; (6) a telemedicine program; (7) segregated or isolated inmate care; (8) medication management; (9) dental care; (10) mental health services; (11) suicide prevention; and (12) responding to inmate grievances.  (Ex. 137-CC: ADC014140-244).

92.    Wait times on Health Needs Request ("HNRs") cut in half from Wexford to Corizon.  (Ex. 165 at 119)

93.    Despite privatization, ADC has the ultimate responsibility to provide constitutionally mandated health care.  (Ex. 161 at 29, 31)

94.    The Director holds weekly meetings with Corizon representatives, all of which touch upon, in part, "staffing relative to the hiring of their provider resources." (Ex. 161 at 18, 20-21.)

## V.    ADC CONTRACT MONITORING

95.    In order to ensure compliance with contractual requirements and ensure inmate safety and health, Corizon is responsible for "meeting specified quarterly performance outcomes and measures, by discipline, deemed crucial in measuring compliance with [ADC] expectations of service delivery…." (Ex. 137-cc: RFP § 2.20.1; ADC014225-26.)

96.    Corizon is required to establish internal quality improvement programs and utilization management programs to help self-monitor their compliance with the Contract. (Ex. 137-cc: RFP § 2.8.12, ADC014180-81; § 2.13.6, ADC014209; § 2.14, ADC014212-215.)

97.    The Contract also allows ADC to maintain oversight through appointing a Contract Monitor and regular audits and reports.  (Ex. 137-CC: RFP § 2.18; § 2.19; § 2.20, ADC014222-34.)

98.    The Health Services Contract Monitoring Bureau oversees contract compliance and quality/clinical care.  (Dkt. # 618-1 at 9, ¶ 3.)

99.    The contract compliance component is responsible for ensuring that

private vendors are fulfilling their contractual obligations with ADC.  (Dkt. # 618-1 at 9, ¶ 3.)

100. Corizon's performance is measured by evaluating performance measures on a daily basis.  (Ex. 137, ¶ 8.)

101. Each facility has a contract monitor that is responsible for ensuring Corizon's compliance with its duties relating to health care under the ADC-Corizon contract.  (Dkt. # 618-1 at 9, ¶ 3; Ex. 137-CC: RFP § 2.19.1; ADC014224.)

102. The contract compliance monitors have years of clinical and correctional experience, and they go through orientation and training, including on-the-job training.  (Ex. 165 at 17-18; Ex. 166 at 18-20; Ex. 163 at 67-68.)

103. The contract monitor conducts random and routine reviews (Ex. 137-CC: RFP § 2.19.2.3; ADC014224), quarterly audits (Ex. 137-CC: RFP § 2.20; ADC014225-34) and meetings with Corizon staff (Ex. 137-CC: RFP § 2.19.2.4; ADC014224) to:  (1) "review inmate access to care, compliance with NCCHC Standards, and adherence to required [ADC] policies, procedures and regulatory directives" to assure that inmates' health service needs are adequately met, and (2) review the terms of the Contract to assure the needs of the State and ADC are adequately met.  (Ex. 137-CC: RFP § 2.19.2.1-3; ADC014224.)

104. The contract monitor reviews multiple performance outcomes and measures, such as timeliness of providing medical services and mental health assessments and the accuracy of medical records.  (Ex. 137-CC: RFP § 2.20.2.1-12; ADC014226-34.)

105. Each month, ADC contract monitors evaluate a selected number of these performance measures at each facility. (Ex. 137, ¶ 9.)

106. The contract monitors at each facility measure the same performance measures that are selected for that month. (Ex. 137, ¶ 10.)

107. There are over two hundred performance measures. (Ex. 137, ¶ 11.)

108. Forty three (43) performance measures are sanctionable if non-compliant for that measurable quarter. (Ex. 137, ¶ 12.)

109.    These 43 sanctionable performance measures are measured every month at each facility, in conjunction with additional non-sanctionable selected performance measures for that particular month. (Ex. 137, ¶ 13.)

110.    Sanctionable performance measure results are computed based upon quarterly results tallied by the months in that specific quarter. (Ex. 137, ¶ 13.)

111.    The total number of non-sanctionable performance measures evaluated in a particular month varies from month to month. (Ex. 137, ¶ 14.)

112.    The contract with Wexford required 100 percent compliance with the sanctionable performance measures. (Ex. 137, ¶ 15; Ex. 161 at 26-27; Ex. 166 at 54-55.)

113.    During Wexford's tenure, it became clear that many of the performance measures were too subjective, making it difficult to determine compliance in a consistent manner. (Ex. 137, ¶ 16.)

114.    When Corizon took over, ADC re-tooled the performance measures so that they were more objective and measureable. (Ex. 137, ¶ 17.)

115.    Although the goal was still 100 percent compliance with every sanctionable performance measure, the performance measures were separated into three levels (Level 1, 2, 3), and compliance threshold levels were created (less than 100 percent) based on the level of the performance measure. (Ex. 137, ¶ 18.)

116.    In March, April, May, and June 2013 (Quarter 1), each level required a minimum 75 percent compliance rate. (Ex. 137, ¶ 19.)

117.    In July, August, and September 2013 (Quarter 2), Level 1 performance measures required a minimum 75 percent compliance, Level 2 performance measures required a minimum 78 percent compliance, and Level 3 performance measures required a minimum 80 percent compliance. (Ex. 137, ¶ 20.)

118.    In October, November, and December 2013 (Quarter 3), the compliance levels were modified again: Level 1 performance measures required a minimum 80 percent compliance, Level 2 performance measures required a minimum 83 percent compliance, and Level 3 performance measures required a minimum 85 percent

1    compliance. (Ex. 137, ¶ 21.)

2           119.   In January, February, and March 2014 (Quarter 4), the compliance

3    levels were modified again: Level 1 performance measures required 85 percent

4    compliance, Level 2 performance measures required 88 percent compliance, and Level 3

5    performance measures required 90 percent compliance. (Ex. 137, ¶ 22.)

6           120.   If a facility meets the performance measure's compliance level in a

7    given month, it receives a green rating. (Ex. 137, ¶ 23.)

8           121.   If it does not meet the compliance level, the contract monitor assigns

9    it either an amber or red rating. (Ex. 137, ¶ 24.)

10          122.   Any performance measure that does not meet the compliance level

11   requires a corrective action plan. (Ex. 137, ¶ 25.)

12          123.   Contract monitors expect to receive corresponding corrective action

13   plans with two weeks, and would either approve it or reject it and specify what more

14   needed to be done.  (Ex. 166 at 89-90.)

15          124.   A corrective action plan is a "team effort to improve the quality of

16   care."  (Ex. 163 at 192.)

17          125.   The monitors are responsible for determining, in their professional

18   judgment, whether Corizon is complying with a specific performance measure.  (Ex. 165

19   at 107; Ex. 166 at 22, 25, 48, 71, 74-75, 143.)

20          126.   The quality/clinical care component of the Bureau is primarily

21   responsible for overseeing the quality of care that is provided to ADC inmates, including

22   medical care, dental care, and mental health care, and ensuring that certain standards are

23   met.  (Dkt. # 618-1 at 9, ¶ 6.)

24          127.   These employees focus on the clinical aspect of the care provided.

25   (Dkt. # 618-1 at 9, ¶ 6; Ex. 166 at 19-20.)

26          128.   ADC and Corizon representatives meet weekly for approximately

27   one to two hours.  (Ex. 165 at 54-55; Ex. 166 at 122, 124; Ex. 163 at 95, 116.)

28          129.   The Health Services Contract Monitoring Bureau, including the

1   contract compliance monitors and the Assistant Director, review the MGARs for
2   deficiencies. (Ex. 161 at 136.)

3          130.   The Director believes that Corizon is providing adequate health care.
4   (Ex. 161 at 30, 77-78.)

5   **VI.**    **CORIZON REPORTING**

6          131.   Corizon is required to prepare and submit various reports, including:
7   quarterly statewide Chronic Condition/DM Program Reports; monthly HNR Appointment
8   Reports; monthly Inmate Formal Grievance Reports; monthly Inmate Wait Times Report;
9   monthly statewide Intake Report; monthly Staffing Reports; and quarterly statewide
10  Utilization Review Reports. (Ex. 137-CC: RFP § 2.14.2.5, ADC014213; § 2.18,
11  ADC014222-24; RFP Exhibit 2: Required Reporting, ADC014265-68.)

12         132.   Corizon is also required to submit additional or ad hoc reports that
13  may be needed to respond to grievances, inquiries complaints or other questions raised by
14  inmates or others. (Ex. 137-CC: RFP § 2.18.6, ADC014223.)

15         133.   Corizon produces monthly reports, many of which are required under
16  the contract with ADC. (Ex. 137, ¶ 30.)

17         134.   A staffing report, which lists – REDACTED

18–23 [REDACTED]

24  (Ex. 137, ¶ 31.)

25         135.   An HNR/appointment report, which lists – REDACTED

26–27 [REDACTED]

28  (Ex. 137, ¶ 32.)

17

136.    An inmate wait time report, which lists – REDACTED

(Ex. 137, ¶ 33.)

137.    A dental wait time report, which lists – REDACTED

This report is created by Smallwood Prison Dental Services, who provides dental care for ADC inmates. (Ex. 137, ¶ 34.)

138.    A dental utilization report, which lists – REDACTED

. This report is created by Smallwood Prison Dental Services. (Ex. 137, ¶ 35.)

139.    An emergency transportation report, which lists – for each facility – the number of medical emergency off-site transports by ambulance, van, or life flight. It also lists those inmates who were transported, the date and mode of transportation, why they were transported, and where they were transported to. (Ex. 137, ¶ 36.)

140.    An outpatient/specialty consultation transportation report, which lists – for each facility – the number of off-site outpatient transports, and a list of those inmates who were transported. (Ex. 137, ¶ 37.)

141.    A medication report, which lists – REDACTED

(Ex. 137, ¶ 38.)

142.    A grievance report, which lists – for each facility – the number of grievances received regarding the quality of medical care, dental care, and mental health care, delay in care, medication, requests to be seen, staff conduct, and requests for off-site treatment, and for each grievance, it lists the inmate's name, the date the grievance was

18

received, the date it was responded to, and the nature of the response. (Ex. 137, ¶ 39.)

143. A CAG (Corrections at a Glance), FAQ (Frequently Asked Questions), and PBMS (Performance Based Measures System) report, which is a compilation of measures that reports the number of:  hospital admissions; inmates admitted to hospitals for medical conditions (for each facility), inmates with and receiving treatment for HIV, AIDS, MRSA (for each facility), Tuberculosis, and Hepatitis C; inmate medical deaths; inmates treated for an emergency condition (for each facility); van, ambulance, and air emergency transports; specialty consults ordered (for each facility); specialty consult appointments completed (for each facility); AHCCCS applications completed; medical grievances received (for each facility); health needs requests received; inmates attending peer education groups; inmate prescriptions; inmates currently undergoing dialysis; inmates assessed by a mental health professional; and inmates diagnosed with an Axis I mental health disorder receiving treatment. (Ex. 137, ¶ 40.)

144. All of these reports are compiled by Corizon and/or Smallwood staff, and are based on either contract specifications or ad hoc requests by ADC. (Ex. 137, ¶ 41.)

145. The wait times in these reports are calculated by comparing the date an HNR was received and the date the corresponding appointment or encounter with healthcare staff was completed.  (Ex. 137, ¶ 42.)

146. Between May 1, 2013 and March 31, 2014, Corizon has reported receipt of more than 174,000 HNRs related to medical care, and more than 19,000 additional HNRs relating to mental health care:



REDACTED

REDACTED

# REDACTED

[Ex. 137-DDD: ADC122046-48; Ex. 137-EEE: ADC122057-58; Ex. 137-GGG: ADC231223-24, ADC231227-28; Ex. 137-III: ADC153774-76; Ex. 137-JJJ: ADC231060, ADC231062; Ex. 137-KKK: ADC231088, ADC231090; Ex. 137-LLL: ADC261116, ADC261118; Ex. 137-MMM: ADC231165-66, ADC231168-69; Ex. 137-OOO:

ADC231214-15, ADC231217-18; Ex. 137-PPP: ADC261648-49, ADC261651-52; Ex. 137-QQQ:   ADC263288-89,   ADC263288-89,   ADC263291-92;   Ex.   137-RRR: ADC267274-75, ADC267277-79.]

147.   The reported average wait times to see a Nurse, Health Care Provider and Mental Health Practitioner at ASPC-Douglas in response to HNRs submitted from May 1, 2013 to March 31, 2014 are as follows:

| Month | Nurse | Provider | Mental Health |
|-------|-------|----------|---------------|
| May-13 | REDACTED | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

[Ex. 137-FFF: ADC122017; Ex. 137-HHH: ADC231434; Ex. 137-III: ADC153774-76; Ex. 137-JJJ: ADC231060, ADC231062; Ex. 137-KKK: ADC231088, ADC231090; Ex. 137-LLL: ADC231116, ADC231118; Ex. 137-MMM: ADC231165-66, ADC231168-69; Ex.   137-OOO:   ADC231214-15,   ADC231217-18;   Ex.   137-PPP:   ADC261648-49, ADC261651-52;   137-QQQ:   ADC263288-89,   ADC263291-92;   Ex.   137-RRR: ADC267274-75, ADC267277-79.]

148.   The reported average wait times to see a Nurse, Health Care Provider and Mental Health Practitioner at ASPC-Phoenix in response to HNRs submitted from May 1, 2013 to March 31, 2014 are as follows:

| Month | Nurse | Provider | Mental Health |
|-------|-------|----------|---------------|
| May-13 | REDACTED | | |
| | | | |
| | | | |
| | | | |

[Ex. 137-FFF: ADC122017; Ex. 137-HHH: ADC231434; Ex. 137-III: ADC153774-76; Ex. 137-JJJ: ADC231060, ADC231062; Ex. 137-KKK: ADC231088, ADC231090; Ex. 137-LLL: ADC231116, ADC231118; Ex. 137-MMM: ADC231165-66, ADC231168-69; Ex. 137-OOO: ADC231214-15, ADC231217-18; Ex. 137-PPP: ADC261648-49, ADC261651-52; Ex. 137-QQQ: ADC263288-89, ADC263291-92; Ex. 137-RRR: ADC267274-75, ADC267277-79.]

149.    The reported average wait times to see a Nurse, Health Care Provider and Mental Health Practitioner at ASPC-Safford in response to HNRs submitted from May 1, 2013 to March 31, 2014 are as follows:



[Ex. 137-FFF: ADC122017; Ex. 137-HHH: ADC231434; Ex. 137-III: ADC153774-76; Ex. 137-JJJ: ADC231060, ADC231062; Ex. 137-KKK: ADC231088, ADC231090; Ex. 137-LLL: ADC231116, ADC231118; Ex. 137-MMM: ADC231165-66, ADC231168-69; Ex. 137-OOO: ADC231214-15, ADC231217-18; Ex. 137-PPP: ADC261648-49, ADC261651-52; Ex. 137-QQQ: ADC263288-89, ADC263291-92; Ex. 137-RRR: ADC267274-75, ADC267277-79.]

150.    The reported average wait times to see a Nurse, Health Care Provider and Mental Health Practitioner at ASPC-Winslow in response to HNRs submitted from May 1, 2013 to March 31, 2014 are as follows:

| Month | Nurse | Provider | Mental Health |
|---|---|---|---|
| May-13 | REDACTED | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

[Ex. 137-FFF: ADC122017; Ex. 137-HHH: ADC231434; Ex. 137-III: ADC153774-76; Ex. 137-JJJ: ADC231060, ADC231062; Ex. 137-KKK: ADC231088, ADC231090; Ex. 137-LLL: ADC231116, ADC231118; Ex. 137-MMM: ADC231165-66, ADC231168-69; Ex. 137-OOO: ADC231214-15, ADC231217-18; Ex. 137-PPP: ADC261648-49, ADC261651-52; Ex. 137-QQQ: ADC263288-89, ADC263291-92; Ex. 137-RRR: ADC267274-75, ADC267277-79.]

151.    Between April 1, 2013 and March 31, 2014, Corizon has reported that the following numbers of prescriptions have been written at each of the Complexes in the ADC Northern Region (Eyman, Florence, Lewis, Phoenix, and Winslow):

| | Eyman | Florence | Lewis | Phoenix | Winslow |
|---|---|---|---|---|---|
| Apr-13 | REDACTED | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

[Ex. 137-QQQQ: ADC118397-406; Ex. 137-SSSS: ADC153875-84, ADC155077-86; Ex. 137-VVVV: ADC203051-60; Ex. 137-PPPP: ADC231890-91; Ex. 137-YYYY: ADC261816-25; Ex. 137-ZZZZ: ADC263371-80; Ex. 137-AAAAA: ADC267368-77.]

152.    Between April 1, 2013 and March 31, 2014, Corizon has reported that the following numbers of prescriptions have been written at each of the Complexes in the ADC Southern Region (Douglas, Perryville, Safford, Tucson, and Yuma):



[Ex. 137-QQQQ: ADC118397-406; Ex. 137-SSSS: ADC153875-84, ADC155077-86; Ex. 137-VVVV: ADC203051-60; Ex. 137-PPPP: ADC231890-91; Ex. 137-YYYY: ADC261816-25; Ex. 137-ZZZZ: ADC263371-80; Ex. 137-AAAAA: ADC267368-77.]

153.    On average, there are more than 60,000 prescriptions written a month across all ten of the ADC Complexes at issue, with more than 730,000 prescriptions written in the past year at a total cost of more than $14,802,000.

|  | Number Written | Total Cost |
|---|---|---|
| **Apr-13** | 52,603 | $1,209,507 |
| **May-13** | 67,069 | $1,282,442 |
| **Jun-13** | 56,336 | $1,026,305 |
| **Jul-13** | 61,967 | $1,194,570 |
| **Aug-13** | 63,461 | $1,181,198 |
| **Sep-13** | 58,769 | $1,194,230 |
| **Oct-13** | 65,822 | $1,330,801 |
| **Nov-13** | 60,152 | $1,157,017 |
| **Dec-13** | 63,576 | $1,290,512 |
| **Jan-14** | 64,467 | $1,471,207 |
| **Feb-14** | 57,864 | $1,194,384 |
| **Mar-14** | 60,553 | $1,270,086 |
| **TOTAL** | **732,639** | **$14,802,259** |

[Ex. 137-QQQQ: ADC118397-406; Ex. 137-SSSS: ADC153875-84, ADC155077-86; Ex. 137-VVVV: ADC203051-60; Ex. 137-AAA: ADC230795, ADC230822; Ex. 137-PPPP: ADC231890-91; Ex. 137-YYYY: ADC261816-25; Ex. 137-ZZZZ: ADC263371-80; Ex. 137-ZZZZ: ADC267169; Ex. 137-AAAAA: ADC267368-77.]

154.    Between April 1, 2013 and March 31, 2014, Corizon has reported that the following number of Specialty Medical Appointments (consisting of on-site specialty care, outside specialist appointments, and telemedicine appointments) have been completed in each months at each of the Complexes in the ADC Northern Region (Eyman, Florence, Lewis, Phoenix, and Winslow):

| | | | | |
|---|---|---|---|---|
| REDACTED | | | | |

[Ex. 137-AAA: ADC230812-14; Ex. 137-BBB: ADC230833-35; Ex. 137-CCC: ADC267186-88.]

155.    Between April 1, 2013 and March 31, 2014, Corizon has reported that the following number of Specialty Medical Appointments (consisting of on-site specialty care, outside specialist appointments, and telemedicine appointments) have been completed in each months at each of the Complexes in the ADC Southern Region (Douglas, Perryville, Safford, Tucson, and Yuma):

| | Douglas | Perryville | Safford | Tucson | Yuma |
|---|---|---|---|---|---|
| REDACTED | | | | | |

[Ex. 137-AAA: ADC230812-14; Ex. 137-BBB: ADC230833-35; Ex. 137-CCC: ADC267186-88].

156.    In the one year since April 1, 2013, Corizon has completed 9,478 specialty care appointments, averaging more than 950 appointments a month in each of the six months since October 1, 2013.

| | Total |
|---|---|

| | |
|---|---|
| Apr-13 | 477 |
| May-13 | 523 |
| Jun-13 | 634 |
| Jul-13 | 763 |
| Aug-13 | 670 |
| Sep-13 | 670 |
| Oct-13 | 856 |
| Nov-13 | 1,049 |
| Dec-13 | 834 |
| Jan-14 | 926 |
| Feb-14 | 931 |
| Mar-14 | 1,145 |
| **TOTAL** | **9,478** |

[Ex. 137-AAA: ADC230812-14; Ex. 137-BBB: ADC230833-35; Ex. 137-CCC: ADC267186-88].

157.   While some services have been provided to inmates either through specialty clinics held at the ADC Complexes or via-telemedicine, most of the specialty care is provided where ADC operations physically transport one or more inmate to an outside specialists medical practice for evaluation and treatment.  Between April 1, 2013 and March 31, 2014, Corizon has reported that it has coordinated with ADC operations personnel to complete the following number of outside prisoner transports for outside medical appointments in each months at each of the Complexes in the ADC Northern Region (Eyman, Florence, Lewis, Phoenix, and Winslow):

| | Eyman | Florence | Lewis | Phoenix | Winslow |
|---|---|---|---|---|---|
| Apr-13 | REDACTED | | | | |
| REDACTED | | | | | |

29

[Ex. 137-AAA: ADC230793-94; Ex. 137-BBB: ADC230821; Ex. 137-CCC: ADC267168-69].

158.    Between April 1, 2013 and March 31, 2014, Corizon has reported that it has coordinated with ADC operations personnel to complete the following number of outside prisoner transports for outside medical appointments in each months at each of the Complexes in the ADC Southern Region (Douglas, Perryville, Safford, Tucson, and Yuma):



[Ex. 137-AAA: ADC230793-94; Ex. 137-BBB: ADC230821; Ex. 137-CCC: ADC267168-69].

159.    In the one year since April 1, 2013, ADC and Corizon have coordinated to complete 7,130 outside transports for prisoners to have outside medical specialty care, completed 9,478 specialty care appointments, averaging more than 650 outside transports a month in each of the six months since October 1, 2013.

|  | Total |
|---|---|
| Apr-13 | 438 |
| May-13 | 536 |
| Jun-13 | 238 |
| Jul-13 | 534 |
| Aug-13 | 571 |
| Sep-13 | 630 |
| Oct-13 | 834 |
| Nov-13 | 548 |
| Dec-13 | 553 |
| Jan-14 | 603 |
| Feb-14 | 818 |
| Mar-14 | 827 |
| **TOTAL** | **7,130** |

[Ex. 137-AAA: ADC230793-94; Ex. 137-BBB: ADC230821; Ex. 137-CCC: ADC267168-69.]

160.    The Contract calls for Corizon to have a certain number of full-time equivalents (FTEs) in each position at each complex in accordance with their proposal. The number of FTEs reported is calculated by determining the total number of hours actually worked by Corizon employees, registry services, *locum tenens* providers, and temporary employees at each facility, dividing by the number of working days in each month, and dividing by 8 hours a day.  During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Douglas:



REDACTED

[Ex. 137-FFFFF: ADC202976; Ex. 137-GGGGG: ADC202987; Ex. 137-HHHHH: ADC231844; Ex. 137-IIIII: ADC231855; Ex. 137-JJJJJ: ADC231868; Ex. 137-KKKKK: ADC231879; Ex. 137-LLLLL: ADC261803; Ex. 137-MMMMM: ADC263358; Ex. 137-NNNNN: ADC267355.]

161.    During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Eyman:



ASPC-Eyman

| Position | Contract Staffing Plan | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 |
|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | | | |



[Ex. 137-FFFFF: ADC202977; Ex. 137-GGGGG: ADC202988; Ex. 137-HHHHH: ADC231845; Ex. 137-IIIII: ADC231856; Ex. 137-JJJJJ: ADC231869; Ex. 137-KKKKK: ADC231880; Ex. 137-LLLLL: ADC261804; Ex. 137-MMMMM: ADC263359; Ex. 137-NNNNN: ADC267356.]

162.    During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Florence:

**ASPC-Florence**

| Position | Contract Staffing Plan | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 |
|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

[Ex. 137-FFFFF: ADC202978; Ex. 137-GGGGG: ADC202989; Ex. 137-HHHHH: ADC231846; Ex. 137-IIIII: ADC231857; Ex. 137-JJJJJ: ADC231870; Ex. 137-KKKKK: ADC231881; Ex. 137-LLLLL: ADC261805; Ex. 137-MMMMM: ADC263360; Ex. 137-NNNNN: ADC267357.]

163.   During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Lewis:

[Ex. 137-FFFFF: ADC202979; Ex. 137-GGGGG: ADC202990; Ex. 137-HHHHH: ADC231847; Ex. 137-IIIII: ADC231858; Ex. 137-JJJJJ: ADC231871; Ex. 137-KKKKK: ADC231882; Ex. 137-LLLLL: ADC261806; Ex. 137-MMMMM: ADC263361; Ex. 137-NNNNN: ADC267358.]

164.    During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Perryville:

[Ex. 137-FFFFF: ADC202980; Ex. 137-GGGGG: ADC202991; Ex. 137-HHHHH: ADC231848; Ex. 137-IIIII: ADC231859; Ex. 137-JJJJJ: ADC231872; Ex. 137-KKKKK: ADC231883; Ex. 137-LLLLL: ADC261807; Ex. 137-MMMMM: ADC263362; Ex. 137-NNNNN: ADC267359.]

165.   During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Phoenix:



[Ex. 137-FFFFF: ADC202981; Ex. 137-GGGGG: ADC202992; Ex. 137-HHHHH: ADC231849; Ex. 137-IIIII: ADC231860; Ex. 137-JJJJJ: ADC231873; Ex. 137-KKKKK: ADC231884; Ex. 137-LLLLL: ADC261808; Ex. 137-MMMMM: ADC263363; Ex. 137-NNNNN: ADC267360.]

166.   During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Safford:

| ASPC-Safford | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Position | Contract Staffing Plan | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 |
| REDACTED | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

[Ex. 137-FFFF: ADC202982; Ex. 137-GGGGG: ADC202993; Ex. 137-HHHHH: ADC231850; Ex. 137-IIIII: ADC231861; Ex. 137-JJJJJ: ADC231874; Ex. 137-KKKKK: ADC231885; Ex. 137-LLLLL: ADC261809; Ex. 137-MMMMM: ADC263364; Ex. 137-NNNNN: ADC267361.]

167.    During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Tucson:



[Ex. 137-FFFF: ADC202983; Ex. 137-GGGGG: ADC202994; Ex. 137-HHHHH: ADC231851; Ex. 137-IIIII: ADC231862; Ex. 137-JJJJJ: ADC231875; Ex. 137-KKKKK: ADC231886; Ex. 137-LLLLL: ADC261810; Ex. 137-MMMMM: ADC263365; Ex. 137-NNNNN: ADC267362.]

168.   During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Winslow:

| ASPC-Winslow | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Position | Contract Staffing Plan | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 |
| REDACTED | | | | | | | | | | |

REDACTED



[Ex. 137-FFFF: ADC202984; Ex. 137-GGGGG: ADC202995; Ex. 137-HHHHH: ADC231852; Ex. 137-IIIII: ADC231863; Ex. 137-JJJJJ: ADC231876; Ex. 137-KKKKK: ADC231887; Ex. 137-LLLLL: ADC261811; Ex. 137-MMMMM: ADC263366; Ex. 137-NNNNN: ADC267363.]

169. During the nine month period from July 1, 2013 through March 31, 2014, Corizon has reported that the following number of full-time equivalent (FTE) employees have provided medical services in the following positions at ASPC-Yuma:

**ASPC-Yuma**

| Position | Contract Staffing Plan | | Jul-13 | Aug-13 | Sep-13 | Oct-13 | Nov-13 | Dec-13 | Jan-14 | Feb-14 | Mar-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | | | | |



41



[Ex. 137-FFFF: ADC202984; Ex. 137-GGGGG: ADC202995; Ex. 137-HHHHH: ADC231852; Ex. 137-IIIII: ADC231863; Ex. 137-JJJJJ: ADC231876; Ex. 137-KKKKK: ADC231887; Ex. 137-LLLLL: ADC261811; Ex. 137-MMMMM: ADC263366; Ex. 137-NNNNN: ADC267363.]

170.   The ADC Contract calls Corizon to provide the equivalent of REDACTED full-time licensed medical staff (identified for purposes of this motion as Licensed Practical Nurses (LPN), Registered Nurses (RN), Assistant Correctional RN Supervisor II, Correctional RN Supervisor I, Correctional RN Supervisor II/Director of Nursing (DON), Nurse Practitioners (including Physician Assistants), Staff Physicians, and Complex Medical Directors) across the ten Complexes at issue.  The following summarizes the actual monthly staffing level of all licensed medical staff compared to the contract requirement of REDACTED statewide FTEs:

| Month | Actual Licensed FTEs | % of Surplus/(Shortage) |
|---|---|---|
| March 2013 | REDACTED | -12.27% |
| April 2013 | REDACTED | -10.91% |
| May 2013 | REDACTED | -3.73% |
| June 2013 | REDACTED | 4.12% |
| July 2013 | REDACTED | -2.48% |

| | | |
|---|---|---|
| August 2013 | REDACTED | 3.21% |
| September 2013 | REDACTED | 7.88% |
| October 2013 | REDACTED | 6.72% |
| November 2013 | REDACTED | 8.63% |
| December 2013 | REDACTED | 7.26% |
| January 2014 | REDACTED | 4.89% |
| February 2014 | REDACTED | 12.29% |
| March 2014 | REDACTED | 17.48% |

[Ex. 137-DDDDD: ADC117064; Ex. 137-EEEEE: ADC121167; Ex. 137-FFFFF: ADC202975; Ex. 137-GGGGG: ADC202986; Ex. 137-BBBBB: ADC231821; Ex. 137-CCCCC: ADC231832; Ex. 137-HHHHH: ADC231843; Ex. 137-IIIII: ADC231854; Ex. 137-JJJJJ: ADC231867; Ex. 137-KKKKK: ADC231878; Ex. 137-LLLLL: ADC261802; Ex. 137-MMMMM: ADC263357; Ex. 137-NNNNN: ADC267354.]

171.   For all contractually required positions statewide under the Contract, Corizon has reported the following number of FTE's each month, based upon the number of hours actually worked.

| Month | Actual Total FTEs |
|---|---|
| March 2013 | REDACTEDED |
| April 2013 | REDACTED |
| May 2013 | REDACTED |
| June 2013 | REDACTED |
| July 2013 | REDACTED |
| August 2013 | REDACTED |
| September 2013 | REDACTED |
| October 2013 | REDACTED |
| November 2013 | REDACDACTED |

| December 2013 | 690.48 |
| January 2014 | 687.78 |
| February 2014 | 745.17 |
| March 2014 | 766.96 |

[Ex. 137-DDDDD: ADC117064; Ex. 137-EEEEE: ADC121167; Ex. 137-FFFFF: ADC202975; Ex. 137-GGGGG: ADC202986; Ex. 137-BBBBB: ADC231821; Ex. 137-CCCCC: ADC231832; Ex. 137-HHHHH: ADC231843; Ex. 137-IIIII: ADC231854; Ex. Ex. 137-JJJJJ: ADC231867; Ex. 137-KKKKK: ADC231878; Ex. 137-LLLLL: ADC261802; Ex. 137-MMMMM: ADC263357; Ex. 137-NNNNN: ADC267354.]

      172.    For the year from April 1, 2013 through March 31, 2013, Corizon has reported the following utilization statistics, relating to actual dental services rendered at all ten of ADC complexes at issue each month:



[Exs. 137-SSS, 137-TTT, 137-UUU, 137-VVV, 137-WWW, 137-XXX, 137-YYY, and

137-ZZZ: ADC231257-64; Ex. 137-AAAA: ADC267281-83.]

173.   Between April 1, 2013 and March 31, 2014, Corizon has reported the following average Inmate Wait Times (in months) for Routine Dental Care at each of the Complexes in the ADC Northern Region (Eyman, Florence, Lewis, Phoenix, and Winslow):

| | Eyman | Florence | Lewis | Phoenix | Winslow |
|---|---|---|---|---|---|
| Mar-13 | REDACTED | | | | |

[Ex. 137-BBBB: ADC267337.]

174.   Between April 1, 2013 and March 31, 2014, Corizon has reported the following average Inmate Wait Times (in months) for Routine Dental Care at each of the Complexes in the ADC Southern Region (Douglas, Perryville, Safford, Tucson, and Yuma):

| | Douglas | Safford | Tucson | Perryville | Yuma |
|---|---|---|---|---|---|
| Mar-13 | REDACTED | | | | |



[Ex. 137-BBBB: ADC267337.]

175.    For all ten ADC Complexes at issue, the Average Routine Dental Care Wait Time, has fallen below the contractually required three-month time period at each complex since July 2013.  [Ex. 137-BBBB: ADC267337.]

176.    Between April 1, 2013 and March 31, 2014, Corizon has reported the following average Inmate Wait Times (in months) for Intake Dental Care at each of the Complexes in the ADC Northern Region (Eyman, Florence, Lewis, Phoenix, and Winslow):

|  | Eyman | Florence | Lewis | Phoenix | Winslow |
|---|---|---|---|---|---|
| Mar-13 | REDACTED |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

[Ex. 137-BBBB: ADC267337.]

177.    Between April 1, 2013 and March 31, 2014, Corizon has reported the following average Inmate Wait Times (in months) for Intake Dental Care at each of the Complexes in the ADC Southern Region (Douglas, Perryville, Safford, Tucson, and Yuma):



[Ex. 137-BBBB: ADC267337.]

178.    For all ten ADC Complexes at issue, the Average Intake Dental Care Wait Time, has fallen below the contractually required one-month time period at each complex since September 2013:

47





[Ex. 137-BBBB: ADC267337.]

179.   For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Douglas, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| REDACTED | | | | | | | | |
|---|---|---|---|---|---|---|---|---|

[ADC121159-61;  ADC153809-15;  ADC231318-19;  ADC231323-55;  ADC231379;
ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

180.  For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Eyman, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[ADC121159-61;  ADC153809-15;  ADC231318-19;  ADC231323-55;  ADC231379;
ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

180.  For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Florence, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |



[ADC121159-61; ADC153809-15; ADC231318-19; ADC231323-55; ADC231379; ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

181.   For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Lewis, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[ADC121159-61; ADC153809-15; ADC231318-19; ADC231323-55; ADC231379; ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

182. For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Perryville, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[ADC121159-61; ADC153809-15; ADC231318-19; ADC231323-55; ADC231379; ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

183. For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Phoenix, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

| REDACTED | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

[ADC121159-61;   ADC153809-15;   ADC231318-19;   ADC231323-55;   ADC231379;
ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

184.   For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Safford, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[ADC121159-61;   ADC153809-15;   ADC231318-19;   ADC231323-55;   ADC231379;
ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

185.   For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Tucson, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[ADC121159-61; ADC153809-15; ADC231318-19; ADC231323-55; ADC231379; ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

186.  For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Winslow, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

53

| REDACTED | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

[ADC121159-61;   ADC153809-15;   ADC231318-19;   ADC231323-55;   ADC231379; ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

187.   For the period from April 1, 2013 to March 31, 2014, Corizon reported the following number of formal grievances filed at ASPC-Yuma, categorized by the following areas of concern:

| FORMAL GRIEVANCE CATEGORY | Quality of Medical Care | Quality of Dental Care | Quality of Mental Health Care | Delay in Care | Medication | Request to be seen | Request for Off-site | Total |
|---|---|---|---|---|---|---|---|---|
| REDACTED | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

[ADC121159-61;   ADC153809-15;   ADC231318-19;   ADC231323-55;   ADC231379; ADC231402; ADC231425; ADC261708-09; ADC263306; ADC267297.]

## VII.   ADC'S MEDICAL POLICIES

188.   The Health Services Technical Manual ("HSTM") provides "guidance for Health Services Division staff to ensure access to, and provision of, high quality and well organized Health Services to inmates that are incarcerated in facilities that are under the medical auspices of the Arizona Department of Corrections." [ADC010655, ADC011174-11230.)

A.     **Intake Screening and Inmate Transfers**

189.   Receiving screening take place immediately upon arrival for all inmates, and inmates who present with a possible life-threatening condition are immediately referred for care.  (Ex. 137-KK: HSTM, Ch. 5, Sec. 2.0, Para. 1.0-1.1; Ex. 137-KK: ADC010817.)

190.   Staff complete a medical history questionnaire, observe the inmate's appearance and behavior, assess for communicable diseases, perform a nursing physical exam, including blood pressure, pulse, respiration, temperature, eye exam, urinalysis, and TB symptomology, and perform a nursing dental screening (visual inspection of the mouth). (Ex. 137-KK: HSTM, Ch. 5, Sec. 2.0, Para. 3.1-3.5; Ex. 137-KK: ADC010818.)

191.   When clinically indicated, inmates are immediately referred to an appropriate health care service; immediate health needs are identified and addressed, and potentially infectious inmates are isolated. (Ex. 137-KK: HSTM, Ch. 5, Sec. 2.0, Para.3.9; Ex. 137-KK: ADC010818.)

192.   Nursing staff review the intake record of an inmate within 12 hours of his arrival to the facility to ensure that medications and emergent/urgent needs are met in a timely manner. (Ex. 137-KK: HSTM, Ch. 5, Sec. 2.0, Para. 3.0; 137-KK: ADC010818.)

193.   A medical provider physically examines the inmate by the end of the second full day of an inmate's arrival at a facility.

194.   Nursing staff perform a chart review of an inmate within 12 hours of his arrival to a unit from another unit, and physically assesses the inmate within 24 hours of his or her arrival.  (Ex. 137-KK: HSTM, Ch. 5, Sec. 5; Ex. 137-KK: HSTM, Ch. 5, Sec. 2.1, Para. 2.1; Ex. 137-KK: HSTM, Ch. 5, Sec. 5.0, Para. 2.1; Ex. 137-KK: ADC010821, ADC010842; Doc. 321-2, ¶ 10.)

195.   The nursing staff also complete a medical work-up form and verify that the inmate has all required medical equipment, medication and supplies. (Ex. 137-KK: HSTM, Ch. 5, Sec. 5.0, Para. 2.1; Ex. 137-KK: ADC010842.)

**B.** **Confidentiality**

196.   Clinical encounters are conducted in private, without being observed or overheard by security personnel, to the extent safety and security can be maintained. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.2, Para. 4.0-4.1; Ex. 137-KK: ADC010831; Ex. 137-GG: Department Order ("DO") 1101.01, Sec. 1.1.2; Ex. 137-GG: ADC048545; Doc. 321-2, ¶ 28.)

197.   Security personnel are present (in the same room) only if the patient poses a probable risk to the safety of the health care provider or others."  (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.2, Para. 4.4; ADC010831; Doc. 321-2, ¶ 28)

198.   When safety is a concern and full visual privacy cannot be afforded, alternative strategies for partial privacy, such as a privacy screen, will be utilized. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.2, Para. 4.3; ADC010831; Doc. 321-2, ¶ 28)

199.   When triage is required to be conducted at the inmate's cell, health services staff will take extra precautions to promote private communication between health staff and the patient."   (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.2, Para. 4.2; ADC010831; Doc. 321-2, ¶ 28.)

**C.** **Facility Inspections**

200.   Documented clinic inspections are conducted to ensure a clean and sanitary working environment; areas inspected include nurses stations, storage areas, exam rooms, pharmacy/medication rooms, x-rays, lab, medical records office, and other administrative clinic office areas.   (Ex. 137-KK: HSTM Ch. 2, Sec. 10., Para. 2.1; ADC010698)

201.   Each facility also has regularly scheduled environmental inspections, which include cleanliness and safety of all inmate housing, laundry and housekeeping practices, pest control measures, equipment inspection and maintenance, and occupational and environmental safety measures.  (Ex. 137-KK: HSTM Ch. 2, Sec. 6.0, Para. 1.0-1.1; ADC010717.)

202.   Wardens, deputy wardens, and associate deputy wardens are required

to conduct frequent, unannounced formal inspections of the facility, at varying hours of the day and night, including casual interviews of staff and inmates. (Ex. 138-B: DO 703.02, Sec. 1.1; ADC082176.)

203.   In addition to formal inspections, deputy wardens, associated deputy wardens, correctional officer IVs and chiefs of security spend a minimum of ten hours per week, at varying hours of the day and night, touring housing units and health units, with attention given to sanitation issues and overall attitude of staff and inmates. (Ex. 138-B: DO 703.02, Section 1.2; ADC082176-77.)

204.   Line supervisory staff conduct daily inspections of their areas of responsibility to assess inmate morale and the quality of their care and supervision, and provide them the opportunity for informal access to key staff. (Ex. 138-B: DO 703.02, Sec. 1.7; ADC082178.)

**D.   Access to Healthcare**

205.   It is ADC practice and policy to provide all inmates with timely and effective health care.  (Doc. 321-2, ¶ 11.)

206.   Upon arrival at each facility, inmates are given written information, in English and Spanish, about how to access emergency and routine medical, mental health, and dental services, including instruction regarding the purpose, use, and preparation of an HNR form, the fee for service program, the grievance process for health-related complaints; this information is also given verbally during intake. (Ex. 137-KK: HSTM, Ch. 5, Sec. 2.01, Para. 2.1; ADC010818)

207.   Access to healthcare signs are posted throughout the complexes in both English and Spanish.  (Ex. 137-KK: HSTM, Ch. 5, Sec. 1.0, Para. 2.1; HSTM Ch. 5, Sec. 2.0, Para. 2.1; ADC010801; ADC010818.)

208.   Inmates are not denied care due to being indigent.  (Ex. 137-KK: HSTM. Ch. 5, Sec. 1.0, Para. 3.4; ADC010801.)

209.   The HSTM, Chapter 5, Section 3.1, sets forth ADC's policy for inmate access to necessary health care.  (Doc. 321-2, ¶ 12.)

210.    All inmates access non-emergency health care by making an appointment, which is done by completing a non-emergency Health Needs Request (HNR). (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.0, Para. 1.1; HSTM, Ch. 5, Sec. 3.1, Para. 1.2; ADC010823; ADC010826; Ex. 137-GG: DO 1101.03, Sec. 1.1; ADC048545; Doc. 321-2, ¶ 12.)

211.    Completed HNRs are deposited in a labeled box and picked up daily by health staff. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 1.2, -2.3, -2.6; ADC010826-27; Ex. 137-GG: DO 1101.03, Sec. 1.2; ADC048545-46; Doc. 321-2, ¶ 12.)

212.    Inmates retain the goldenrod copy of the HNR. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 2.3; ADC010826.)

213.    Healthcare staff will accept and resolve requests for healthcare in any form, e.g., by HNR or Inmate Letter.  (Ex. 137, ¶ 26.)

214.    It is not the practice in the facilities to refuse requests for health care simply because the request is not on the approved form for such a request. (Ex. 137, ¶ 26.)

215.    Requests are not ignored simply because they are not made in an HNR form or because they are made on photocopies of an HNR form. (Ex. 137, ¶ 27.)

216.    Healthcare staff will also accept and resolve verbal requests for healthcare treatment. (Ex. 137, ¶ 28.)

217.    Healthcare staff will also accept and resolve HNR Forms that are filled out by another inmate. (Ex. 137, ¶ 29.)

218.    Nursing staff review and triage the HNR within four hours of receiving the HNR, and schedule the inmate for an appointment. (Doc. 321-2, ¶ 12; Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 1.2, -3.0-3.1; ADC010826-27.)

219.    Triaging of HNRs is performed to sort and classify the inmates' health requests to determine priority of need and the proper place for inmate care to be rendered. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 3.0; ADC010827; Doc. 321-2, ¶ 12.)

220.    HNRs that indicate the inmate may have or be suffering from a condition that requires immediate attention will be scheduled to be seen the same day that

the HNR is received. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 3.3; ADC010827; Doc. 321-2, ¶ 12.)

221.   If the triaging nurse is able to acquire/provide/schedule an immediate response to the inmate's needs (e.g., medications update, blanket, diet comment, review of lab/x-ray report, or creating an inmate communique), he/she will do so. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 4.0; ADC010827.)

222.   If the triaging nurse cannot determine what the inmate needs or cannot provide what the inmate requests, the inmate is seen within 24 hours. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 4.0; ADC010827; Doc. 321-2, ¶ 12.)

223.   An HNR that requests only information may be returned to the inmate with the appropriate response without the need for making an appointment. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 3.3; ADC010827.)

224.   At the discretion of the health services staff, and with consideration of time constraints and other inmates, at a given scheduled appointment more than one medical issue or complaint may be addressed or attended to; only one co-pay charge will be made for a single visit regardless of the number of issues addressed. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.1, Para. 5.0; ADC010827-28.)

225.   Missed appointments can occur for a variety of reasons, including inmate refusal or security-generated complications. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.1, Para. 1.0; ADC010888)

226.   If an inmate misses a scheduled appointment, it is reviewed to determine whether it needs to be rescheduled; this review is performed on a comparative priority basis to determine whether the inmate should be seen prior to existing appointments or the appointment should be cancelled altogether. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.1, Para. 1.0; ADC010888)

227.   If medical staff is unable to see all inmates scheduled for an important on a given day, any inmates that were not seen are rescheduled to be seen as early as possible and at the next available appointment time. (Ex. 137-KK: HSTM, Ch. 5,

59

Sec. 7.1, Para. 2.0; ADC010888)

228.   An inmate may cancel an appointment that was created by his HNR for limited medical attention on the Nurses' line (e.g., cold symptoms that have improved since submitting the HNR). (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.2, Para. 1.1; ADC010890.)

229.   HNR requests that have resulted in scheduling a physician/provider, mental health practitioner, and dental staff, and appointments initiated by nursing and/or a medical provider as follow up visits, counseling, additional procedures, lab testing, etc., cannot be cancelled by the inmate without coming to medical and completing a Refusal to Submit to Treatment form. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.2, Para. 1.2, -1.4; ADC010890-91.)

230.   An inmate cannot cancel an appointment to address a serious medical condition without coming to the health unit and being informed of the impact of refusing care and treatment for the medical issue. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.2, Para. 1.3; ADC010890-91.)

231.   Completion of a Refusal to Submit to Treatment form must be signed by the inmate and his signature witnessed by staff. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.2, Para. 2.0-2.2; ADC010891.)

232.   If an inmate refuses to accept treatment and refuses to fill out a Refusal to Submit to Treatment form, his refusal is witnessed by staff and documented. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.2, Para. 3.0-4.5; ADC010891-92; Ex. 137-GG: DO 1101.12; ADC048560-61.)

233.   HNRs requesting non-emergency mental health or dental services are referred to the relevant mental health or dental staff within twenty four hours of receipt of the HNR form. (Ex. 137-GG: DO 1101.03, Sec. 1.2.2.1; ADC048546.)

234.   In the event an HNR requests a serious mental health or dental emergency, nursing staff is to contact available mental health or dental staff, including on-call staff, after-hours, weekends, and holidays. (Ex. 137-GG: DO 1101.03, Sec. 1.2.2.2-1.2.2.3; ADC048546.)

235.   Mental health staff are required to review HNRs requesting mental health services upon receipt, and review HNRs requesting mental health services received during weekends/ and/or holidays no later than the next working day. (Ex. 137-GG: DO 1101.03, Sec. 1.3.1-1.3.2; ADC048546.)

236.   Mental health staff are required to respond to HNRs requesting non-emergency mental health services within five working days. (Ex. 137-GG: DO 1101.03, Sec. 1.3.3; ADC048546.)

237.   Mental health staff are required to respond to HNRs indicating serious mental health symptoms or complaints within twenty four hours by conducting a face-to-face evaluation. (Ex. 137-GG: DO 1101.03, Sec. 1.3.4; ADC048546.)

238.   Dental staff are required to review HNRs requesting dental services upon receipt, and review HNRs requesting dental services received during weekends/ and/or holidays no later than the next working day. (Ex. 137-GG: DO 1101.03, Sec. 1.4.1-1.4.2; ADC048547.)

239.   Dental staff are required to respond to HNRs requesting non-emergency dental services within five working days. (Ex. 137-GG: DO 1101.03, Sec. 1.4.3; ADC048547.)

240.   Dental staff are required to respond to HNRs indicating serious dental symptoms or complaints within twenty four hours by conducting a face-to-face evaluation. (Ex. 137-GG: DO 1101.03, Sec. 1.4.4; ADC048547.)

241.   The Contract requires that, within 72 hours after an inmate is incarcerated, medical staff must conduct an intake medical, dental and mental health assessment, assign each inmate a medical score and mental health score, and then develop treatment plans, as necessary for each inmate.  (Ex. 137-CC: RFP § 2.9.1-5, ADC014182-83.)

242.   Under the Contract, Corizon is responsible for ensuring all health service providers provide routine specialty care within 60 days, urgent care within 30 days and immediate emergency care.  (Ex. 137-CC: RFP § 2.8.6.2, ADC014176.)

## E. Staffing

243.   Under the Contract, Corizon is expected to "employ sufficient staffing and utilize appropriate resources to achieve contractual compliance." (Ex. 137-CC: RFP § 2.17.1, ADC014218).

244.   Corizon was required to propose a staffing plan to demonstrate how they will adhere to or exceed all applicable standards of care at each prison complex and health service unit. (Ex. 137-CC: RFP § 2.17.6.1, ADC014220-21).

245.   Corizon was also required to propose a staffing plan for onsite specialty services, such as dialysis, optometry and ultrasound. (Ex. 137-CC: RFP §2.10.5.1, ADC014185.)

246.   Corizon is required to develop safe nurse staffing patterns, according to the American Nurses Association Principles on Safe Staffing, based on the needs of each unit. (Ex. 137-CC: RFP § 2.10.9.2, ADC014190-91).

247.   Corizon is also required to have a physician on-call 24 hours a day, seven days a week, who must come onsite as needed to make assessments, write orders or provide care. (Ex. 137-CC: RFP § 2.10.16.1, ADC014192).

248.   The infirmary also must be supervised by an onsite RN 24 hours a day, seven days a week. (Ex. 137-CC: RFP § 2.10.16.1.4, ADC014192).

249.   Mental health practitioners also must be available at all institutions 24 hours a day, seven days a week. (Ex. 137-CC: RFP § 2.13.3, ADC014209).

250.   During after-hours, weekends and holidays, mental health practitioners must be available by telephone for emergency consultation and direction. (Ex. 137-CC: RFP § 2.13.3, ADC014209).

251.   The Contractor is also required to implement mental health practice guidelines based on nationally accepted standards and train staff on these guidelines. (Ex. 137-CC: RFP § 2.13.8, ADC014209).

252.   All staff are subject to ADC's review and approval, and Corizon is required to notify and consult the Warden and Contract Monitor before terminating any

professional staff.  (Ex. 137-CC: RFP § 2.17.6.5, ADC014221).

253.   All staff are required to receive training on basic life support, first aid, suicide prevention and recognizing signs and symptoms of mental disorders or chemical dependence. (Ex. 137-CC: RFP § 2.17.7.4, ADC014222).

254.   All primary care clinicians, including medical physicians, dentists, nurse practitioners, physician assistants, psychiatrists and PhD level psychologists, are also required to have annual peer reviews, as required by NCCHC standards.  (Ex. 137-CC: RFP § 2.8.14, ADC014181.)

**F.   Health Services Fees**

255.   Pursuant to A.R.S. § 31–201 and DO 1101, inmates are charged a $4.00 co-pay for each healthcare visit. (Ex. 137-KK: HSTM Ch. 5, Sec. 8.0, Para. 3.0; ADC010893.)

256.   The following inmates or medical visits by inmates, are exempt from paying this co-pay and fees for prescriptions, medication, or prosthetic devices: medical visits initiated by the medical or mental health staff of the department; medical visits to a physician by inmates who are referred by a physician assistant or nurse practitioner; any condition requiring regular examination, treatment, or follow up as determined and documented by medical staff; inmates who are undergoing follow-up medical treatment for chronic diseases; inmates at reception centers; juvenile inmates; pregnant inmates; seriously mentally ill inmates; developmentally disabled inmates who are housed in a special programs unit; inmates who are housed in unit 8 at the Florence prison facility; inmates who are inpatients at the Alhambra prison facility special programs psychiatric hospital or at the Flamenco prison facility mental health treatment unit; and all visits to IPC (Inpatient Components, which function like a medical infirmary with overnight bed accommodations). (Ex. 137-KK: HSTM Ch. 5, Sec. 8.0, Para. 8.1-8.3; ADC010894-95.)

257.   No inmate is denied care due to lack of funds or being indigent. (Ex. 137-KK: HSTM Ch. 5, Sec. 8.0, Para. 2.0; ADC010893.)

**G.**     **Nurse Line**

258.    The nurse line is available for inmates for follow-up encounters as ordered by a provider, as well as routine services such as annual TB testing, vital sign checks, educational services, and wound care. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.0, Para. 3.1; ADC010824.)

259.    The Contract requires Corizon to respond to inmate HNRs for non-emergency care (or sick call), allow inmates to sign-up for sick call seven days a week, and triage the sick call list every day.  (Ex. 137-CC: RFP § 2.2.53. ADC014150).

**H.**     **Diagnostic Follow-up**

260.    Medical staff are required to track important diagnostic reports and consultation requests. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.0, Para. 1.0; ADC010886.)

261.    Diagnostic reports are reviewed by a provider, and signed, stamped, and dated prior to filing into the inmate's medical record. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.0, Para. 2.0; ADC010886.)

262.    Nursing staff are required to follow through with orders from providers to assure that the order is completed as ordered. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.0, Para. 5.0; ADC010887.)

263.    Laboratory staff follow-up on pending lab results with the laboratory contractor, forward lab results to the appropriate provider for review, and notify the provider immediately of any critical results. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.0, Para. 3.0; ADC010887.)

264.    Radiology technologists are required to follow-up with the radiologist contractor if reports are not timely received. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.0, Para. 6.0; ADC010887.)

**I.**     **Telemedicine Services**

265.    ADC provides telemedicine services in its major facilities to reduce the need for outside sendouts for medical attention, thus minimizing security issues and escort requirements. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.2, Para. 3.0; ADC010831.)

266.    Telemedicine appointments are prescheduled each month, similar to offsite medical appointments. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.2, Para. 3.2-3.4; ADC010831.)

267.    Appointments for telemedicine services may only be refused at the telemedicine location to permit full disclosure to the inmate by the medical specialist of the medical consequences of his refusal. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.2, Para. 1.5; ADC010891.)

268.    Per the Contract, Corizon was required to develop a telemedicine program, according to NCCHC standards, and submit a plan to expand telemedicine services.  (Ex. 137-CC: RFP § 2.8.9.1, ADC014178; RFP § 2.8.9.7, ADC014179.)

269.    ADC "has a long history of utilizing telemedicine services and has made significant investments in an infrastructure to support such services in each ASPC location."  (RFP § 2.8.9, ADC014178).

270.    A telemedicine program is beneficial in a correctional setting because it decreases transportation costs, increases community and staff safety, and improves the quality, coordination and efficiency of health care services through improved access and availability of specialty services. (Ex. 137-CC: RFP § 2.8.9, ADC014178).

271.    The Contractor is also required to review its telemedicine plan semi-annually and submit reports, assessing efficiency, quality and inmate satisfaction and proposing revisions to the program. (Ex. 137-CC: RFP § 2.8.9.2-4, ADC014178-79).

**J.    Emergency Care**

272.    Staff is required to assess and render aid to all medical emergencies, including suicide attempts, within three minutes of becoming aware of a non-responsive inmate.  (Ex. 137-KK: HSTM Ch. 1, Section 6.0, Para. 7.0; ADC010689; Ex. 138-I: DO 807.08, Sec. 1.1; ADC013987.)

273.    In the event that an inmate is found non-responsive, in a state of medical emergency, or in the act of attempting suicide, staff must assess the situation and render in-cell aid as soon as possible.  (Ex. 138-I: DO 807.08, Sec. 1.3; ADC013987.)

274.   REDACTED

275.   All licensed nurses are trained in providing emergency nursing care to the patient in need of those services. (Ex. 137-KK: HSTM, Chapter 5, Section 1.5; Doc. 321-2, ¶ 15; ADC010815-16.)

276.   Nurses are provided emergency response orders, which are step-by-step written instructions from a provider on providing emergency acute care to an inmate during a life-threatening event. (Ex. 137-KK: HSTM Ch. 5, Sec. 1.5, Para. 1.1; ADC010815, ADC011071-85.)

277.   Annual documentation and demonstration of skills and knowledge in regards to the Nursing Assessment/Procedures, Emergency Response Orders is required of all licensed nurses. (Ex. 137-KK: HSTM, Chapter 5, Section 1.5; Paragraph 3.1; Doc. 321-2, ¶ 15.)

278.   The Chief of Security and shift commanders are given written instructions about the appropriate intervention for each medical emergency which may arise from a chronic condition existing in the institution. (Ex. 137-GG: DO 1101.07, Sec. 1.1.1; ADC048551.)

279.   Correctional officers are required to receive health-related training every two years so that they can recognize when to refer an inmate to healthcare staff and to be able to provide emergency care until healthcare staff arrives. (Ex. 137-KK: HSTM Ch. 3, Sec. 8.0; ADC010740-41.)

280.   This training includes administration of first aid, recognizing the need for emergency care and intervention in life threatening situations (e.g., heart attack),

66

recognizing acute manifestations of certain chronic illness (e.g., asthma, seizures), adverse reactions to medications, recognizing signs and symptoms of mental illness, knowledge of procedures for suicide prevention, appropriate referral of healthcare complaints, and procedures and precautions with respect to infectious and communicable diseases, and cardiopulmonary resuscitation.   (Ex. 137-KK: HSTM Ch. 3, Sec. 8.0, Para. 1.1; ADC010740.)

281.   If a medical emergency is considered life threatening, 911 is immediately contacted. transportation.  (Ex. 137-KK:  HSTM Ch. 7, Sec. 5.0, Para. 1.1; ADC010951.)

282.   Security provides support and arranges for emergency transportation. (Ex. 137-KK: HSTM Ch. 5, Sec. 1.1, Para. 1.1; HSTM Ch. 7, Sec. 5.0, Para. 2.1; ADC010802, ADC010951; Ex. 137-GG: DO 1101.06, Sec. 1.2; ADC048551; Ex. 138-D: DO 705.07; ADC048492-93.)

283.   Specific portions of the inmate's medical records are transported with the inmate during an emergency transportation.  (Ex. 137-KK: HSTM Ch. 7, Sec. 5.0, Para. 4.1; ADC010952.)

284.   Emergency transport includes ground transportation or air transportation.  (Ex. 137-KK: HSTM Ch. 7, Sec. 5.0, Para. 1.0; ADC010950.)

285.   ADC contracts with local hospitals for emergency care, trauma, intensive care, and routine hospitalized care for all anticipated medical conditions. (Ex. 137-KK: HSTM, Ch. 7, Sec. 3.0, Para. 1.0, -1.4; ADC010942.)

286.   Hospital admissions can be prescheduled, direct (for urgent situations), or emergent (emergency room). (Ex. 137-KK: HSTM, Ch. 7, Sec. 3.0, Para. 4.1; ADC010943.)

287.   Once admitted and hospitalized, ADC medical staff monitors the inpatient care and can authorize additional procedures proposed by the hospital/specialist. (Ex. 137-KK: HSTM, Ch. 7, Sec. 3.0, Para. 5.1; ADC010944.)

288.   Once discharged, the inmate is returned to an ADC health services

67

1    unit and assessed; staff determine any continuity of care issues, identify any medications

2    the inmate may have been sent back with, obtain new prescriptions, identify any follow-

3    up with a provider and/or return visits to a specialist, and identify any special needs for

4    continued recovery. (Ex. 137-KK: HSTM, Ch. 7, Sec. 3.0, Para. 7.1, -7.3; ADC010944.)

5           289.   The Contract requires Corizon to provide a "standardized program of

6    routine, urgent and emergency healthcare" for all inmates at a level "equivalent or

7    surpassing the community standard of care."  (Ex. 137-CC: RFP § 2.7.2.1, ADC014172;

8    RFP § 2.10.21, ADC014193; § 2.11.4, ADC014199-200.)

9           290.   The Contract requires Corizon to provide emergency medical or

10   mental health care 24 hours a day, seven days a week and maintain continual onsite

11   nursing staff, who "may contact medical, dental, and mental health practitioners by

12   telephone for consultation and direction." (Ex. 137-CC: RFP § 2.7.2.2, ADC014173; RFP

13   § 2.10.21, ADC014193; RFP § 2.2.33, ADC014147; RFP § 2.12.23.1, ADC014206.)

14          291.   The Contract also requires Corizon to establish a network of off-site

15   medical providers and coordinate inmate transportation for emergency and non-

16   emergency care.  (Ex. 137-CC: RFP § 2.8.7.4, ADC014177; § 2.10.18-19, ADC014193.)

17          292.   REDACTED

18

19

20

21

22                            [Ex. 137-BB: Corizon Contract; ADCPROC-

23   006325.]

24          293.   REDACTED

25

26

27

28

REDACTED

[Ex. 137-BB: Corizon Contract; ADCPROC-006333, emphasis added.]

**K.** **Chronic Care**

294.   A chronic condition is an illness or condition that affects an individual's well-being for an extended interval, and generally is not curable, but can be managed to provide optimum functioning within any limitations the condition imposes on the individual. (Ex. 137-KK: HSTM Ch. 5, Sec. 3.0, Para. 2.2; ADC010823.)

295.   Chronic conditions include diabetes, hypertension, cardiac disease, TB, asthma, seizure, HIV/AIDs, tuberculosis, hepatitis C, and cancer. (Ex. 137-KK: HSTM, Ch. 5, Sec. 3.0, Para. 2.2.a; HSTM Ch. 5, Sec. 5.1, Para. 2.0; ADC010823-24, ADC010845, ADC011021.)

296.   Inmates are screened at intake for chronic conditions, and provided a treatment plan that includes the frequency of follow-up examinations, type and frequency of diagnostic testing, therapeutic medications and modalities, and patient education. (Ex. 137-KK: HSTM, Ch. 5, Sec. 1.4, Para. 1.1, -3.0; ADC010813-14, ADC011054-59.)

297.   There is no healthcare fee for chronic conditions examinations and treatment. (Ex. 137-KK: HSTM Ch. 5, Sec. 5.1, Para. 1.1; ADC010844.)

298.   Facilities are required to ensure the existence and use of a chronic condition tracking system by which inmates who have been identified as having a chronic condition can be scheduled regularly for various examination, evaluation and follow-up care. (Ex. 137-KK: HSTM Ch. 5, Sec. 5.1, Para. 5.0; ADC010845; Ex. 137-GG: DO 1101.07, Sec. 1.1.3; ADC048551.)

299.   Inmates with chronic conditions are scheduled routinely for three to twelve months based upon their health status. (Ex. 137-KK: HSTM Ch. 5, Sec. 3.0, Para. 2.2.a; ADC010823-24.)

300.   Inmates with chronic or monitored conditions are required to be examined at least every six months; diabetic inmates are required to be seen at least once a quarter.  (Ex. 137-KK: HSTM, Ch. 5, Sec. 1.4, Para. 2.3; HSTM Ch. 5, Sec. 5.1, Para. 3.1; ADC010813, ADC010845.)

301.   Healthcare staff is required to reorder medications and treatment for inmates with chronic conditions in a timely manner to avoid interruption or unnecessary delay. (Ex. 137-GG: DO 1101.07, Sec. 1.1.4; ADC048551.)

302.   All inmates over 55 years of age are offered an annual physical examination, and inmates with chronic or other monitored conditions are required to have an annual physical.  (Ex. 137-KK: HSTM, Ch. 5, Sec. 1.4, Para. 2.1-2.2; HSTM, Ch. 5, Sec. 3.0, Para. 5.2; HSTM, Ch. 5, Sec. 5.1, Para. 3.2; ADC010813; ADC010824; ADC010845.)

303.   The senior nursing staff member on each unit ensures that inmates with chronic conditions are scheduled to be examined and/or treated at least every six months by a medical provider.  [Ex. 137-KK: HSTM, Chapter 5, Section 5.1, Paragraph 3.1; Doc. 321-2, ¶ 19)

304.   Physicians, physician's assistants, the director of nursing and nurses are required to re-order medications and treatments for inmates with chronic conditions in a timely manner so the inmates receive the necessary treatment for their chronic conditions without interruption or delay.   [Ex. 137-GG: DO 1101.07, Sec. 1.1.4, ADC048551; Doc. 321-2, ¶ 19.)

305.   Inmates with chronic disease are provided information that is designed to increase their ability to monitor and manage their health status. (Ex. 137-KK: HSTM, Ch. 6, Sec. 1.0, Para. 4.0; ADC010897.)

306.   Under the Contract, Corizon was required to develop and implement Chronic Condition Disease Management programs, identify chronically ill inmates, ensure these inmates are visited by a medical provider at least twice a year or more often as required, develop treatment plans for these inmates, and assign a case manager (such as a

70

RN, behavioral health or other clinical staff) to work with inmates with complex, high cost conditions.  (Ex. 137-CC: RFP § 2.10.6, ADC014188-90.)

### L.      Infirmary Care

307.    Inmates that require more definitive and supportive care than an inmate can receive in general housing areas are placed in specially designed and staffed areas known as IPC (Inpatient Components), which function like a medical infirmary with overnight bed accommodations, to provide for this level of care.  (Ex. 137-KK: HSTM, Ch. 7, Sec. 4.0, Para. 1.0; ADC010946.)

308.    Movement in and out of an IPC is controlled and directed by medical staff and is based upon medical condition; IPCs are not used for detention or other security purposes. (Ex. 137-KK: HSTM, Ch. 7, Sec. 4.0, Para. 1.1; ADC010946.)

309.    All visits to an IPC are at no charge to the inmate. (Ex. 137-KK: HSTM, Ch. 7, Sec. 4.0, Para. 1.4; ADC010947.)

310.    The level of care provided in an IPC includes: acute care (any combination of frequent observation, assistance with care activities, dressing changes, IV fluids or medications, self-care instructions, or pain management); complete care (unable to perform any self-care, needs to be turned, may need suctioning, oxygen-dependent, bowel and bladder care, tube feedings); supportive (able to perform own care but needs constant supervision and verbal cueing); and convalescent (can do own care but lacks stamina to function in general population). (Ex. 137-KK: HSTM, Ch. 7, Sec. 4.0, Para. 2.0; ADC010947.)

311.    Nursing staff observe, visit, and assess IPC inmates on a daily basis, and a medical provider is required to visit an IPC inmate no more than every 72 hours. (Ex. 137-KK: HSTM, Ch. 7, Sec. 4.0, Para. 3.2-3.5; ADC010947.)

### M.      Specialty Care

312.    The rates that ADC can pay outside providers is set by statute; some providers to refuse to accept the statutory rate, but this is not something that ADC can control.  (Doc. 321-2, ¶ 22.)

313.   Health Services Technical Manual Chapter 4, Section 3.0, Paragraph 8.1, sets forth ADC's policy regarding X-rays.  (Doc. 321-2, ¶ 23.)

314.   All X-rays are reviewed by medical staff at the facility upon taking them; this is known as a "wet read." (Doc. 321-2, ¶ 23.) [ADC010798].

315.   If something is visible based on that "wet read," treatment is immediately provided. (321-2, ¶ 23.)

316.   The X-ray is then packaged and sent off site to a contract radiologist to interpret the X-ray.  (321-2, ¶ 23.) [ADC010798]

317.   The contract radiologist reviews the X-ray, issues a written report, and then returns the X-ray and report to medical staff for review and any further action if necessary.  (321-2, ¶ 23.) [ADC010798]

318.   If an emergent interpretation is needed, the X-ray is taken to the outside radiologist or hospital.  (321-2, ¶ 23.) [ADC010798]

319.   If an urgent interpretation is needed, medical staff will call the outside radiologist and request an expedited interpretation.  (Doc. 321-2, ¶ 23.) [ADC010798]

320.   Medical staff is required to "maintain a tracking log of x-rays sent to the radiologist contractor" and to "follow up with the contractor if reports are not received within the amount of time specified in the contract."  (Ex. 137-KK: HSTM, Chapter 5, Section 7.0, Paragraph 6.0; [ADC010887]; Doc. 321-2, ¶ 23.)

321.   Inmates are prescheduled for offsite appointments and hospital visits. (Ex. 137-KK: HSTM Ch. 5, Sec. 1.1, Para. 2.1; ADC010802.)

322.   Upon returning from an offsite appointment, medical staff will review the medical information, assess the inmate, and determine if any additional medications and/or interventions are required. (Ex. 137-KK: HSTM Ch. 5, Sec. 1.1, Par. 2.5; ADC010803.)

323.   Refusal of appointments for off-site medical care by specialists must be completed by the inmate, in person, at the inmate's unit whenever possible based on

availability of health staff to take the refusal. (Ex. 137-KK: HSTM, Ch. 5, Sec. 7.2, Para. 1.6; ADC010891.)

324.    Inmates' serious medical needs are met by providing specialty care beyond the medical capabilities of the prison staff by providing a system of efficient management of requesting, deliberation, monitoring, and tracking proposals for specialty services via outside consultations.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0; ADC010938.)

325.    This process aids in ADC's delivery of medical services that are comparable with a community standard of care.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0; ADC010938.)

326.    Consultations may be performed in-house, at an outside location, or by way of videoconferencing/telemedicine.   (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0; ADC010938.)

327.    The Facility Health Administrator ("FHA") develops the process for smooth management of specialty clinical support.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0; ADC010938.)

328.    It is the responsibility of the individual Provider staff to monitor their orders and to ensure successful coordination of local and regional access to community providers for specialty care.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0; ADC010938.)

329.    It is the responsibility of the attending Physician or Mid-Level provider to follow their requests for specialty care to ensure that the needs of the patient are met.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0; ADC010938.)

330.    It is the responsibility of the Correctional Registered Nurse Supervisor II to monitor nursing staff compliance.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0; ADC010938.)

331.    It is the responsibility of the FHA to ensure that all requests for medical services submitted to the Medical Review Committee (MRC) are accurate and complete; the FHA neither approves nor denies any requests for medical services.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 1.1; ADC010938.)

332.   The Medical Review Committee ("MRC") ensures that all requests for approval of medical services is based upon sound medical necessity.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 1.2; ADC010938.)

333.   The Key Contract Provider ensures that the request for approval of medical services are brought before the Medical Review Committee and discussed for medical necessity.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 1.3; ADC010938.)

334.   The Clinical Coordinator ("CC") serves as the facilitator for the Medical Review Committee.  The CC will forward request that have been approved by the MRC to the Central Office Medical Review Board ("MRB") for final decision on any request.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 1.3; ADC010939.)

335.   The CC is also responsible for all travel arrangements and appropriate documentation preparation to accompany the inmate for any consultations. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 1.3; ADC010939.)

336.   While the CC is responsible to ensure that the pertinent medical holds are entered, local policies are developed to ensure that inmates who are scheduled for a necessary specialty visit or treatment remain in the current location, regardless of who actually makes the entry.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 1.3; ADC010939.)

337.   The CC also schedules and documents all MRC meetings.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 1.3; ADC010939.)

338.   The Medical Review Committee consists of the FHA and the KCP, all medical providers, and the clinical coordinator. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.1; ADC010939).

339.   The MRC meets at least every two weeks to discuss requests for consultation or services. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.1; ADC010939).

340.   All requests for specialty or outside of ADC healthcare services must be submitted to the MRC on the Consultation Report form #70400064. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.1; ADC010939.)

341.   At the time of approval by MRC and submission to the Central

Office MRB, a case appropriate "medical hold" will be placed on the AIMS system in accordance with HSTM guidance and complex procedures to guarantee that the inmate is not moved to another facility prior to disposition of the request and to allow for receipt of desired services for approved requests. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.2; ADC010939.)

342. This information and the request will be forwarded for further consideration from the Central Office Medical Review Board ("MRB"). (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.2; ADC010939.)

343. Requests that are approved by MRC following discussion are entered into a database by the CC. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.2; ADC010939.)

344. The database is reviewed periodically (at least weekly) by the CC for review of decisions made by MRB and assurance that appropriate result feedback is received and provided to the appropriate complex health services staff. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.2; ADC010939.)

345. The CC then follows up with Central Office on any outstanding Consultation Requests that remain in a "pending approval" status after five business days and report on those outstanding consult requests at the next Medical Review Committee meeting. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.2; ADC010939.)

346. The HROD ensures each complex MRC complies with Department Orders and Health Services Division Technical Manual guidance and ensures further consistency in the procurement of health related goods and services delivered to the inmate population among complexes within the region. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.3; ADC010939.)

347. The review is accomplished by utilization review, ratio of referrals to inmate population, prison comparisons and the review of current monthly reports, which are produced at the facility level. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.4; ADC010939-40.)

348. The statistics are then compiled and distributed to the Facility Health

Administrator by the Health Services Division Administrator.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 2.4; ADC010940.)

349.   The Medical Review Board (MRB) consists of the Medical Program manager, clinical program managers, and the Health Services Coordinator.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 3.0; ADC010940.)

350.   Only the medical program manager may deny any request that has been approved by MRC.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 3.1; ADC010940.)

351.   Medical records and documentation requirements are set to ensure that pending appointment is transferred from the sending facility to the receiving facility. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 4.0; ADC010940.)

352.   The correctional Registered Nurse Supervisor II (CRNSII) monitors nursing staff and ensures that systems are in place and followed to inform and convey inmates to specialty appointment. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 4.1; ADC010940.)

353.   Additionally CRNSII coordinate the necessary in-service training to accomplish this process in an accurate and timely manner.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 4.1; ADC010940.)

354.   The Medical Record Scheduled Appointment Form is used for Outside Referrals.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.0; ADC010940.)

355.   Inmates are scheduled for appointments as indicated by the specific discipline providing the requirement service or exam.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.1; ADC010940.)

356.   Upon completion of the scheduled appointment any subsequent appointment that is scheduled shall be noted in the appropriate health unit appointment book and shall be noted on the "Scheduled Appointment" form. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.1; ADC010940.)

357.   The "Scheduled Appointment" form shall note in columnar format: (1) the date the inmate was seen; (2) the date of the scheduled appointment; (3) the

appointment location; (4) the appointing discipline; and (5) the indicating reason for the specific health care appointment.   (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.1; ADC010940.)

358.   In the event that an appointment is to be scheduled and there are compelling reasons for why it cannot be scheduled at the time of the initial appointment, columns as noted above, shall be completed. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.2; ADC010940.)

359.   The author of the initial appointment or the staff member noting the order shall document in the progress note the reason for the postponement of the next scheduled appointment.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.2; ADC010940.)

360.   When the determination has been made that the appointment, as noted above, is to be made; a member from the respective discipline places the appointment date in the unit appointment book and on the Schedule Appointment form. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.3; ADC010940.)

361.   Upon completion of the scheduled appointment the actual date the inmate was seen is then noted in the "date seen" column.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.4; ADC010940.)

362.   If the initial date of the scheduled appointment is changed, the unit appointment book reflects the rescheduled date. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.5; ADC010940.)

363.   In addition, "rescheduled" shall be noted in the "date seen" column of the Scheduled Appointment form and a new total entry is completed.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 5.5; ADC010940.)

364.   Upon the Clinical Coordinator's receipt of the Medical Review Board's approval of an outside consultation, the clinical coordinator arranges for the outside appointment as directed by local posts orders and contacts the sending medical unit nursing staff with the specific information as outlined in herein.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 6.0; ADC010940-41.)

365.   The unit nursing staff are responsible for the completion of this form. (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 6.0; ADC010941.)

366.   The nurse noting the orders of the medical provider is responsible to enter the proper information into the column noting the actual date the inmate was seen upon the inmate's return from the outside consultation; subsequent follow-up appointments on or off the prison complex must be documented as directed herein.  (Ex. 137-KK: HSTM, Ch. 7, Sec.2.0, Para 7.0; ADC010941.)

367.   When a health care provider determines an outside specialist appointment is requirement for diagnoses or treatment of an inmate the health care stall shall: (1) explain the clinical need to the inmate (Ex. 137-GG: DO 1101.04, Sec. 1.1.1; ADC048548); (2) complete the Inmate Outside Consultation Appointment Agreement, Form 1101-74   (Ex. 137-GG: DO 1101.04, Sec. 1.1.2; ADC048548); and (3) ask the inmate to sign the Inmate Outside Consultation Appointment Agreement form (Ex. 137-GG: DO 1101.04, Sec. 1.1.3; ADC048548).

368.   If an inmate refuses to sign the Inmate Outside Consultation Appointment Agreement form (e.g., chooses not to go to a specialty appointment): (1) the health staff informs the inmate no specialty appointment will be made (Ex. 137-GG: DO 1101.04, Sec. 1.2.1; ADC048549); and (2) an informed refusal is documented in the medical record.  (Ex. 137-GG: DO 1101.04, Sec. 1.2.2; ADC048549).

369.   If the inmate agrees and signs the Inmate Outside Consultation Appointment Agreement form, the appointment shall be made and scheduling shall proceed according to routine procedures.   (Ex. 137-GG: DO 1101.04, Sec. 1.3.1; ADC048549.)

370.   If, on the scheduled appointment day, the inmate refuses to go to the appointment or refuses to be seen by the consultant at the specialty clinic, the security staff will issue a disciplinary ticket to the inmate utilizing the Inmate Disciplinary Report, Form 803-1, in accordance with DO 803, Inmate Discipline System.  (Ex. 137-GG: DO 1101.04, Sec. 1.4; ADC048549.)

### N.   Terminal Care

371.   If an inmate is in need of terminal care, they are placed in an infirmary setting or taken to the hospital.  (Ex. 137, ¶ 24.)

372.   All patients diagnosed terminally ill will have a care plan; physical measures, such as ice packs, heat, position changes and air mattresses will be used as needed to enhance the comfort of the inmate; medications will be given as ordered by the Health Care Provider to achieve maximum comfort for the inmate; and food and fluids will be provided as tolerated by the inmate. (Ex. 137-KK: HSTM, Ch. 7, Section 7.0, Para. 2.0; ADC010960; Ex. 137, ¶ 26.)

373.   Hospice care is provided for inmates who are in the last stages of a diagnosed terminal illness, and focuses on the achievements the patient is able to make in face of physical deterioration.  (Ex. 137-KK: HSTM, Ch. 7, Section 7.0, Para. 3.0; Pratt Dec., ¶ 25; ADC010960.)

374.   Inmates become eligible for hospice care when they are diagnosed with a terminal disease and a prognosis of one year or less to live. (Ex. 137-KK: HSTM, Ch. 7, Sec. 7.4, Para. 2.1; ADC010968.)

375.   All measures are taken to preserve the inmate's dignity while in terminal/hospice care. (Ex. 137-KK: HSTM, Ch. 7, Section 7.4, Para. 1.6; ADC010967.)

### O.   Medical Devices

376.   Orthoses, prosthetic devices, and mechanical aids are specialized mechanical devices used chronically to support or supplement joints or limbs, or are artificial devices to replace missing body parts. (Ex. 137-KK: HSTM, Ch. 7, Sec. 11.0, Para. 1.0; ADC010975.)

377.   Appropriate but elective Orthoses, prostheses, and aids to impairment are those services/devices which are not essential to prevent significant deterioration in the essential health of an inmate, but nevertheless are reasonably expected to significantly improve the quality of life for the patient as it relates to a proven chronic or ongoing medical condition, and include, for example, dentures, dental prosthetics (partials), glasses,

contact lenses, artificial eyes, artificial limbs, certain knee/ankle/foot braces, hernia support belts, hearing aids, special support hose, footwear, and suspenders. (Ex. 137-KK: HSTM, Ch. 7, Sec. 11.0, Para. 1.1; ADC010975.)

378.   In determining whether to issue an elective medical device, medical considers the urgency of the need, time left on sentence, overall necessity, morbidity, mortality, functional disability and expected improvement, alternatives, risk/benefit, cost/benefit, and security concerns. authorized and not generally charged to the inmate. (Ex. 137-KK: HSTM, Ch. 7, Sec. 11.0, Para. 3.0; ADC010976.)

379.   Medical aids issued as part of acute treatment for a limited medical condition such as casts, splints, ace wraps, and canes/crutches/braces, are routinely authorized and not generally charged to the inmate. (Ex. 137-KK: HSTM, Ch. 7, Sec. 11.0, Para. 1.3; ADC010976.)

380.   Hardware that is an essential part of a medically necessary procedure such as heart valves, cardiac stent, and inter-occular lens implants, are routinely authorized and not generally charged to the inmate. (Ex. 137-KK: HSTM, Ch. 7, Sec. 11.0, Para. 1.4; ADC010976.)

381.   Inmates are not denied necessary medical devices because of lack of funds. (Ex. 137-KK: HSTM, Ch. 7, Sec. 11.0; ADC010975.)

**P.      Self-Catheterization and Colostomy Care**

382.   ADC ensures all inmates who need to perform intermittent self-catheterization or maintain and manage a colostomy, have access to a semi-private area and have been provided the necessary supplies.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1 ADC010902.)

383.   Intermittent catheterization is the temporary placement of a catheter (tube) to remove urine from the body.  (Ex. 137-KK: Health Services Technical Manual Ch. 6, 4.1; ADC010902.)

384.   This is usually done by placing the catheter through the urethra (the tube that leads from the bladder to the outside opening) to empty the bladder.  (Ex. 137-

1  KK: HSTM, Ch. 6, Sec. 4.1 ADC010902.)

2          385.    The Correctional Registered Nurse Supervisor II ensures the Inmate's

3  Unite Nursing Staff have instructed the inmate on proper technique of self-catheterization.

4  (Health Services Technical Manual Ch. 6, 4.1.) The Unit Nursing Staff provides the

5  inmate with adequate supplies to meet his/her specific needs.  (Ex. 137-KK: HSTM, Ch. 6,

6  Sec. 4.1 ADC010902.)

7          386.    Inmates are afforded adequate supplies to meet their specific needs or

8  those needs as ordered by an ADC Medical Provider.  (Ex. 137-KK: HSTM, Ch. 6, Sec.

9  4.1, Para 1.0; ADC010902.)

10          387.    Upon an inmate's assignment to a prison unit or upon his return from

11  a medical specialist consultation or service, Nursing Staff reviews the inmate's medical

12  record and interviews the inmate to determine the type, quantity of supplies, and products

13  in excess of the establish minimums the inmate will require.  (Ex. 137-KK: HSTM, Ch. 6,

14  Sec. 4.1, Para 1.0; ADC010902.)

15          388.    The minimum amount of medical supplies for a catheterization is a

16  two-week supply. (Ex. 137-KK: Health Services Technical Manual Ch. 6, 4.1;

17  ADC010903.)

18          389.    The two week supply includes: 2 urinary catheters; 1 catheter

19  lubricant (frequency quantity-dependent); two bottles of liquid anti-bacterial soap; 1

20  packet of paper towels; 1 catheter storage container (denture cup or laboratory bag);

21  absorbent pads(one per day); a basin for catheter cleaning purposes; and a urinary

22  receptacle for urinary collection.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para. 2.1 ;

23  ADC010903.)

24          390.    Some patients may require catheterization for a short period of time

25  or on an occasional basis.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para. 3.1.1;

26  ADC010903.)

27          391.    The goal of intermittent catheterization is to prevent urinary tract

28  infections, further bladder or kidney damage, and to completely empty the bladder.  (Ex.

137-KK: HSTM, Ch. 6, Sec. 4.1, Para. 3.1.2; ADC010903.)

392.   Most patients are able to learn how to perform this procedure.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 3.1.2; ADC0101903.)

393.   To perform clean intermittent self-catheterization (CIDC), the patient must learn the basic location of the important locations in the urinary system.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 3.1.3; ADC010903.)

394.   Additionally, the patient must have the physical ability to reach the urethra, and must be able to move the equipment as necessary.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 3.1.4; ADC010903.)

395.   Patients who are unable to see the urethra are taught how to feel for the proper location of the urethral opening.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 3.1.4; ADC010903.)

396.   A CISC catheter may be reused for 2 weeks.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 3.1.5; ADC010904.)

397.   The instructional procedure for CISC is also available in the Inmate Institutional Handout.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 5.0; ADC010904.)

398.   Inmates are provided with the following instructions on how to clean their CISC:

399.   Assemble all equipment: catheter, lubricant, drainage receptacle.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 4.1 ADC010904.)

400.   Wash your hands thoroughly with soap and water and clean the penis and urethral opening.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 4.2; ADC010904.)

401.   Lubricate the catheter. (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para 4.3; ADC010904.)

402.   Hold the penis on the sides, perpendicular to the body.  (Ex. 137-KK: HSTM, Ch. 6, Sec. 4.1, Para. 4.4; ADC010904.)

403.   Begin to gently insert and advance the catheter.  (Ex. 137-KK: HSTM, Ch. 6, Sec.4.1, Para 4.5; ADC010904).

404. You will meet resistance when you reach the level of the prostate. Try to relax by deep breathing, and continue to advance the catheter.  (Ex. 137-KK: HSTM, Ch. 6, Sec.4.1, Para 4.6; ADC010904.)

405. Once the urine flow states, continue to advance the catheter another 1 inch and hold it in place until the urine flow stops and the bladder is empty.  (Ex. 137-KK: HSTM, Ch. 6, Sec.4.1, Para 4.7; ADC010904.)

406. Withdraw the catheter in small steps to make sure the entire bladder empties.  (Ex. 137-KK: HSTM, Ch. 6, Sec.4.1, Para 4.8; ADC010904.)

407. Wash the catheter with soap and water.   Rinse the catheter completely and dry the outside.   (Ex. 137-KK: HSTM, Ch. 6, Sec.4.1, Para 4.9; ADC010904.)

408. Store the catheter in a clean, dry, secure location.  (Ex. 137-KK: HSTM, Ch. 6, Sec.4.1, Para 4.10; ADC010904.)

409. Record the amount of urine obtained, as instructed by your health care provider.  (Ex. 137-KK: HSTM, Ch. 6, Sec.4.1, Para 4.11; ADC010904.)

**Q.** **Medication Distribution**

410. ADC's policy on medication management and distribution provides for a consistent and uniform system of delivery of prescription medications to the inmate population.  (Doc. 321-2, ¶ 30.)

411. Health Services Technical Manual Chapter 5, Section 6.0, sets forth the policy to ensure that medications are delivered on a daily basis in a uniform and consistent manner throughout the Department, and that accountability is maintained in all phases of the delivery process.   (Doc. 321-2, ¶ 30.)

412. Prescription medications are administered to individuals only upon the order of a physician, dentist, psychiatrist, or other legally authorized individual.  (Ex. 137-KK: Health Services Technical Manual Chapter 5, Section 6.4, Paragraph 1.0; Pratt Dec., ¶ 31.)

413. All prescriptions are tracked by the pharmacy.  (Doc. 321-2, ¶ 33.)

414.   Prescriptions for chronic care conditions are automatically refilled. (Doc. 321-2, ¶ 33.)

415.   If an inmate is prescribed a medication for which there is no refill, a sticker is included with his prescription.  (Doc. 321-2, ¶ 33.)

416.   That sticker can be submitted with an HNR request if that inmate feels he needs a refill of his prescription.  (Doc. 321-2, ¶ 33.)

417.   Inmates who request a renewal of a prescription must be evaluated by a licensed practitioner who has the capability of prescribing medication. (Doc. 321-2, ¶ 34.)

418.   If an inmate simply needs a refill of a prescription that is still current, it is not necessary for that inmate to be seen by a medical provider. (Doc. 321-2, ¶ 34; Ex. 137-KK: HSTM Ch. 4, Sec. 1.0-1.6.)

419.   Under the Contract, Corizon is required to establish a medical delivery system that meet the following minimum time requirements: (1) new prescriptions and approved non-formulary medications ordered by 3:00 PM shall be available the next day by 2:00 PM; (2) refills shall be available 3-5 days prior to due date; (3) STAT medications and pharmaceutical supplies shall be available within 6 hours of placing order; and (4) emergency delivery of life sustaining medications within one hour of placing order.  (Ex. 137-CC: RFP § 2.12.23.4, ADC014206.)

420.   Corizon is responsible for ensuring "inmates are provided immediate access to pharmaceuticals not maintained onsite" and prescribing any needed medications or special needs orders.   (Ex. 137-CC: RFP § 2.9.1, ADC014182; § 2.12.23.4, ADC014206).

421.   Per the Contract, Corizon was required to establish a Pharmacy and Therapeutics Committee, consisting of medical providers, nurses, and pharmacists, to review medication usage and make recommendations regarding changes to the drug formulary.  (Ex. 137-CC: RFP § 2.8.11, ADC014179-80).

422.   Corizon is required to have a registered pharmacist conduct regular

(at least quarterly) onsite audits of each facility health unit.  (Ex. 137-CC: RFP § 2.12.5, ADC014202; RFP § 2.12.32.2.6, ADC014208).

423.   Corizon is also required to conduct quarterly Pharmacy and Therapeutics Committee meetings to review formulary and non-formulary usage, prescribing practices, drug utilization review, education information, drug costs and other topics relevant to pharmacy operations.  (Ex. 137-CC: RFP § 2.12.21, ADC014205).

424.   Corizon is also required to establish a system to provide urgent, necessary medication ordered after-hours, ensure continuation of chronic medications if delay would adversely affect inmate's health, and ensure medications are distributed according to provider's orders or approved nursing protocols. (Ex. 137-CC: RFP § 2.12.23, ADC014206.)

425.   Corizon is required to document and maintain Medication Administration Records (MARs) that show the inmate's prescription, the prescribing practitioner, inmate's allergies, and the staff member delivering the medication, as well as a Keep-On-Person prescription log for all medications given to inmates.  (Ex. 137-CC: RFP § 2.12.25-26, ADC014206-07).

426.   Corizon is also required to have a non-formulary request process (Ex. 137-CC: RFP § 2.12.29, ADC014207), track all non-formulary requests (Ex. 137-CC: RFP § 2.12.31, ADC014207), complete and review quarterly medication audits (Ex. 137-CC: RFP § 2.12.32.2.6, ADC014208) and review trending non-formulary medication requests and usage (Ex. 137-CC: RFP § 2.12.32.2.7, ADC014208.)

**R.     Infectious Diseases**

427.   HSTM Ch. 2, Sec. 5.0, and DO 1102 provides the procedure for the surveillance, prevention, diagnosis and treatment of suspected or confirmed communicable diseases.  [Ex. 137-KK: ADC010715, ADC011060-70; ADC054843-864.)

428.   Inmates with suspected or confirmed cases of communicable diseases are evaluated, placed in isolation if necessary, and treated, and other individuals in contact with the inmate are investigated and treated. (Ex. 137-HH: DO 1102.03, Sec. 1.1-1.9; DO

1102.08; ADC054847-49, ADC054855-56.)

429.   Inmates deemed infectious remain isolated until treatment is completed and further evaluation and testing ensures they are no longer infectious. (Ex. 137-HH: DO 1102.04, Sec. 1.3; ADC054849.)

430.   Staff treating and transporting the inmate follow careful procedures to ensure that they are not infected and to ensure that the disease is not further spread. (Ex. 137-HH: DO 1102.04, Sec. 1.1-1.8; ADC054849-50; Ex. 137-HH: DO 1102.08, Sec. 1.2-1.3; ADC054855.)

431.   Facility staff, health staff, and local and state agencies are notified of a suspected or confirmed case and coordinate together so that it can be contained and treated as quickly as possible. (Ex. 137-HH: DO 1102.03; ADC054843-864.)

432.   Health staff are trained in the management of communicable diseases, including preventative measures and contact investigation. (Ex. 137-HH: DO 1102.03, Sec. 1.4.1; DO 1102.08; ADC054848-49, ADC054855-56.)

433.   There are specific precautions and procedures for controlling, managing, investigating, and treating airborne infections, waterborne and foodborne infections, tuberculosis, and HIV. (Ex. 137-HH: DO 1102.04; DO 1102.05; DO 1102.06; ADC054849-50-55.)

434.   All licensed nurses are required to be trained in identifying, screening, and providing appropriate treatment to inmates for lice, scabies, and ringworm. (Ex. 137-KK: HSTM, Ch. 2, Sec. 8; ADC010720-21.)

435.   Inmates are screened for these ectoparasites at intake, and can be screened in the provider line.  [Ex. 137-KK: ADC010720.)

436.   Several measures are taken if an inmate has an ectoparasite, including washing linens and clothing, washing mattress and bedding, discarding hygiene materials, isolating the inmate, and treatment.  (Ex. 137-KK: HSTM Ch. 2, Sec. 8, Para. 2.0-5.3; ADC010720-21.)

437.   Nursing staff screen inmates for tuberculosis at intake or no later than

7 days from admission.  (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.5, Para. 1.0; ADC010918-20.)

438.    Inmates with tuberculosis are immediately placed in airborne infection isolation, treated, and monitored. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.5, Para. 2.3-2.4; ADC010921; Ex. 137-HH: DO 1102.05; ADC054851-54.)

439.    Medical staff treating inmates with tuberculosis wear particulate masks, cases are reported to the State Health Department within one working day of receipt of diagnosis, and staff conduct a contact investigation to identify all individuals who had contact with the diagnosed inmate. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.5, Para. 2.6-2.7; ADC010921-22.)

440.    Communicable disease cases or suspected cases are reported to the local Health Department and the Arizona Department of Health Services. (Ex. 137-HH: DO 1102.01; ADC054844.)

441.    Per the Contract, Corizon was required to implement an Infection Control program, including surveillance, preventative techniques, and reporting and treatment of infections according to NCCHC standards, CDC guidelines, OSHA regulations, and local and state laws.  (Ex. 137-CC: RFP § 2.8.15, ADC014181-82).

**S.    <u>Medical Sharp and Tool Control</u>**

442.    HSTM Ch. 2, Section 3.0 outlines the procedure for the safe and effective handling, control and disposal of potentially dangerous items and materials.  (Ex. 137-KK: ADC010707-13.)

443.    Infectious waste is discarded in appropriately labeled containers.  (Ex. 137-KK: HSTM, Ch. 2, Sec. 3.1; ADC010709.)

**T.    <u>Smoking</u>**

444.    Smoking inside any enclosed area or building is prohibited. (A.R.S. § 36–601.01; Ex. 137-KK: HSTM, Ch. 6, Sec. 2.0, Para. 1.0; ADC010898; Ex. 138-A: DO 109.01, Sec. 1.1; ADC082058; Ex. 138-A: DO 109.03, Sec. 1.1; ADC082059; Ex. 138-C: DO 704.06, Sec. 1.1.9; ADC012685; Ex. 138, ¶120.)

445.    Smoking is prohibited 20 feet from any building entrance, and is

limited to outside designated areas that do not subject normal traffic to second-hand smoke (e.g., smoking shall be prohibited near entrances to buildings). (Ex. 137-KK: HSTM, Ch. 6, Sec. 2.0, Para. 1.0; ADC010898; Ex. 138-A: DO 109.01, Sec. 1.2; ADC082058; Ex. 138-C: DO 704.06, Sec. 1.1.9; ADC012685; Ex. 138, ¶121.)

446.    Smoking and the possession of tobacco and all smoking-related materials are totally prohibited by inmates assigned to reception centers, minors units, all detention units, and all medical units. (Ex. 137-KK: HSTM, Ch. 6, Sec. 2.0, Para. 2.3; ADC010898; Ex. 138-A: DO 109.03, Sec. 1.2; ADC082059; Ex. 138, ¶122.)

447.    General population inmates may only smoke outside of all buildings in approved areas. (Ex. 138-A: DO109.03, Sec. 1.3; ADC082059; Ex. 138, ¶123.)

448.    Maximum custody inmates are prohibited from smoking cigarettes. (Ex. 138, ¶124.)

449.    Maximum custody inmates are prohibited from smoking cigarettes for the legitimate penological reason of contraband control where maximum custody inmates on the most restricted status (restriction to cell, individual recreation, shower movement status) are not permitted to smoke. (Ex. 138, ¶125.)

450.    Permitting other maximum custody inmates on less restricted status to smoke and possess cigarettes leads to cigarettes becoming valued contraband functioning as currency among the inmate population. (Ex. 138, ¶126.)

451.    Restriction on smoking for all maximum security inmates therefore eliminates the potential for cigarettes functioning as inmate currency, prevents contraband exchange and prevents maximum security inmates from using cigarettes for gambling, bartering, debt payment or inmates with cigarettes holding positions of power over other inmates – all conduct prohibited in prison in order to preserve and control safety and security. (Ex. 138, ¶127.)

452.    All inmates are advised of the tobacco policies during orientation. (Ex. 137-KK: HSTM, Ch. 6, Sec. 2.0, Para. 3.0; ADC010898; Ex. 138, ¶128.)

453.    ADC employees are required to enforce these smoking policies and

88

post "no smoking" signs are conspicuously posted at every entrance and other areas where smoking is prohibited. (Ex. 138-A: DO 109.02, Sec. 1.1; ADC082058-59; Ex. 138, ¶129.)

454.    Any person who smokes where prohibited is guilty of a petty offense and is subject to imposition of a fine of not less than $50 (and no more than $300), pursuant to A.R.S. § 36-601.01(k).  (Ex. 138-A: DO109.02, Sec. 1.4; ADC082059; Ex. 138, ¶130.)

455.    Inmates who violate the smoking policy are subject to disciplinary action, including restricting future tobacco-related purchases from the inmate store.  (Ex. 138-A: DO109.03, Sec. 1.5-1.6; ADC082059; Ex. 138, ¶131.)

456.    Inmates may submit grievances related to smoking violations. (Ex. 138-A: DO 109.04, Sec. 1.1-1.2; ADC082059-60; (Ex. 138, ¶132.).)

**U.    Suicide and Mental Health Watch**

457.    Any staff member who becomes aware of an inmate who is at risk of a suicidal gesture/acute mental health issue to notify the shift commander or mental health staff so appropriate measures to protect the inmate can be initiated. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.6; ADC010927.)

458.    Inmates are placed on suicide watch when REDACTED (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.6, Para. 1.0; ADC010927; Ex. 138-G: DO 804.01, Sec. 1.12.1.3; ADC107485.)

459.    Only a licensed mental health provider is authorized to cancel or remove a suicide watch. (Ex. 138-G: DO 804.01, Sec. 1.12.1.3; ADC107485.)

460.    Inmates are placed on mental health watch when REDACTED (Ex. 138-G: DO 804.01, Sec. 1.12.1.4; ADC107486.)

461.   Only a licensed mental health provider is authorized to cancel or remove a mental health watch. (Ex. 138-G: DO 804.01, Sec. 1.12.1.4; ADC107486.)

462.   When an inmate remains on a watch, a staff member on each shift is assigned the responsibility of conducting the timed watch. (Ex. 138-G: DO 804.01, Sec. 1.12.2; ADC107486.)

463.   Watch cells are approved by a mental health professional, and generally have no fixtures, appliances, or bars which could be used with the inmate's clothing in a self-harm attempt. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.6, Para. 2.1; ADC010927.)

464.   Inmates are stripped searched, and all objects that may be used as a weapon for self-harm are removed. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.6, Para. 2.2; ADC010928.)

465.   A combination of health services staff, security staff, and mental health staff visually check the inmate for his welfare at ordered specified intervals. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.6, Para. 2.3; ADC010928.)

466.   All visits by health staff are documented, and the medical staff member performing a welfare check ensures that the inmate responds verbally or is seen moving purposefully. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.6, Para. 3.0; ADC010928.)

467.   All watch cell are cleaned at least weekly or when the inmate comes off watch.  (Ex. 138-K: PO 36, Sec. 1.13; ADC_S000247.)

468.   Corizon is required to provide comprehensive mental health services, including suicide and mental health watches, initial and ongoing evaluations and assessments, development and periodic review of individual treatment plans, psychiatric services,  psychotropic medication evaluations, administration and follow-ups, individual and group psychotherapy, specialized psycho-educational groups and other special programs, psychological autopsies, discharge and transitional planning, proper documentation, and consultation with medical, support and custodial staff on treatment and programming concerns.  (Ex. 137-CC: RFP § 2.13.10, ADC014210.)

## V.      Suicide Prevention

469.    All staff receive training in the identification and management of suicidal inmates. (Ex. 138-I: DO 807.01, Sec. 1.1; ADC013968.)

470.    This training includes eight hours of suicide prevention/mental health instruction, which includes mock drills, information presentation, and practice in applying Maximum Behavioral Control Restraints.   (Ex. 138-I: DO 807.01, Sec. 1.1.1; ADC013968.)

471.   Mock drills consist of:  REDACTED

(Ex. 138-I: DO 807.01, Sec. 1.1.2.1-1.1.1.2.6; ADC013968.)

472.    Staff also receives training on how to identify inmates who may be at risk for suicide; how to identify how risk times, locations, and methods for suicide; how to identify incidents and situations that may trigger a suicide attempt; how to identify possible signs of suicidal intent; the role of the Department staff in preventing inmate suicide and the Department's policy on inmate suicide prevention. (Ex. 138-I: DO 807.01, Sec. 1.1.3.1- 1.1.3.5; ADC013968.)

473.    Additionally, all staff keep a Department issued Suicide Prevention Card on their person.   (Ex. 138-I: DO 807.01, Sec. 1.1.3.6; ADC013969.)   Staff are familiar with the four sections of the card and refer to the card as an aide in the identification of suicide warning signs. (Ex. 138-I: DO 807.01, Sec. 1.1.3.6.1-1.1.3.6.2; ADC013969.)

474.    Additionally, staff are educated on staff conduct required in the event of a suicide attempt, after an inmate death by suicide, and the liability issues associated with inmate suicide.  (Ex. 138-I: DO 807.01, Sec. 1.1.3.7-1.1.3.9; ADC013969.)

475.  REDACTED

,

REDACTED

(Ex. 138-I: DO 807.01, Sec. 1.1.4.1 – 1.1.4.3 ; ADC013969.)

476.   All non-correctional series staff are trained in the identification and management of suicidal inmates.  (Ex. 138-I: DO 807.01, Sec. 1.2 ; ADC013969.)

477.   This includes two hours of suicide prevention/mental health instruction.  (Ex. 138-I: DO 807.01, Sec. 1.2.1 ; ADC013969.)

478.   Additionally, non-correctional series staff are trained on detailed information regarding inmate suicide and suicide prevention including:  how to identify inmates who may be at risk for suicide; how to identify high risk times, locations, and methods for suicide; how to identify incidents and situations that may trigger a suicide attempt; how to identify possible signs of a suicidal intent; the role of the department staff in preventing inmate suicide and the Department's policy on inmate suicide prevention; conduct required in the event of a suicide attempts; conduct required after an inmate death by suicide; liability issues associated with inmate suicide. (Ex. 138-I: DO 807.01, Sec. 1.2.1 – 1.2.2.8 ; ADC013969.)

479.   Staff will keep on their person a Department issued Suicide Prevention Card and will familiarize themselves with the four sections of the card as well as refer to the card as an aide in the identification of suicide warning signs.   (Ex. 138-I: DO 807.01, Sec. 1.2.2.9 – 1.2.2.9.2 ; ADC013970.)

480.   Health and mental health staff are instructed on clinically-ordered restraints for serious self-injurious behavior and participate in mock drill training. (Ex. 138-I: DO 807.01, Sec. 1.2.2; ADC013970.)

481.   All correctional series staff and staff assigned to institutional units receive annual Refresher Suicide Prevention training including:  two hours of annual training; how to identify inmates who may be a risk for suicide; how to identify high risk times, locations, and methods for suicide; how to identify incidents and situations that may trigger suicide attempt; how to identify possible signs of suicidal intent; review of all

changes to the Department's suicide prevention policy or procedures; discussion of experiences learned from any recent suicides and/or attempts in the Department. (Ex. 138-I: DO 807.01, Sec. 1.3-1.3.7; ADC013970.)

482.    REDACTED

(Ex. 138-I: DO 807.01, Sec. 1.4; ADC013970.)

483.    All staff that have regular contact with inmates must successfully complete basic first aid and CPR training and refresher training as needed to remain certified. (Ex. 138-I: DO 807.01, Sec. 1.5; ADC013970.)

484.    At least quarterly wardens must incorporate into training programs, scenarios that require REDACTED

. (Ex. 138-I: DO 807.01, Sec. 1.6-1.6.2; ADC013970.)

485.    The staff training bureau incorporates intervention standards into all applicable lesson plans and curricula.  (Ex. 138-I: DO 807.01, Sec. 1.7; ADC013970.)

486.    All inmates processed through the Department's reception centers are administered the Mental Health Assessment by the mental health staff working on his/her arrival.  (Ex. 138-I: DO 807.02, Sec. 1.1.1; ADC013971.)

487.    Return to custody inmates are administered the Mental Health Assessment form by mental health staff at the receiving complex no later than one working day after arrival. (Ex. 138-I: DO 807.02, Sec. 1.2; ADC013971.)

488.    New admissions and return-to-custody inmates arriving on psychotropic medications and/or with a mental health or suicide history are instructed to sign an authorization to disclose health and/or mental health records from outside providers within one working day of arrival.  (Ex. 138-I: DO 807.02, Sec. 1.3; ADC013971.)

489.    Refusal of authorization is noted in the inmate's medical record. (Ex.

138-I: DO 807.02, Sec. 1.3.1; ADC013971.)

490.    Medical and mental health staff made a reasonable effort to obtain prior health and mental health inpatient and outpatient records. (Ex. 138-I: DO 807.02, Sec. 1.3.1; ADC013971.)

491.    Requests for prior records are made within ten working days of arrival. (Ex. 138-I: DO 807.02, Sec. 1.3.2; ADC013971.)

492.    Whenever an inmate is identified as at a significant risk for suicide by any means, including self-report, nonverbal behavior, historical information, or information from any other individual, the inmate is referred immediately to mental health staff for further assessment, treatment, and/or placement on a watch. (Ex. 138-I: DO 807.02, Sec. 1.4; ADC013971.)

493.    Watch types include Continuous Watch, One Officer to Multiple Inmates Continuous Watch, and Interval Watch (30,10).  (Ex. 138-I: DO 807.02, Sec. 1.4.1-1.4.5; ADC013971-72.)

494.    Suicide risk assessment includes, but is not limited to: triggers for prior self-harm, loss of relationship, isolation, threats or perceived threats from others; suicide risk factors including previous suicide attempts, family members who have attempted or completed suicide, history of depression or other mental health problems, history of chronic substance abuse or dependence, history of serious medical problems or medical problems affecting body image or lifestyle, history of violence and poor coping skills; signs of suicide attempt as examples of inflicting self-injury, communicating suicidal intent or plan, making final arrangements, hopelessness, depression, anxiety, apprehension, social withdrawal, unexpected or unexplained improvement in mood after period of depressed mood, disorientation, unusual or disorganized thinking, anger/hostility, agitation, under the influence of mind or mood altering substances.  (Ex. 138-I: DO 807.02, Sec. 1.5-1.5.3; ADC013972.)

495.    Additional suicide assessment includes levels of lethality of prior acts of self-harm; mental status examination; current medications; current psychiatric

diagnosis; recommendations/treatment plan. (Ex. 138I: DO 807.02, Sec. 1.5.4-1.5.8; ADC013972.)

496.    Staff do not rely entirely on an inmate's denial of suicide risk when the inmate's behavior, mental health status, history, or information from other sources suggest otherwise. (Ex. 138-I: DO 807.02, Sec. 1.5.9; ADC013972.)

497.    Suicide risk assessments are documented in the mental health section of the medical record. (Ex. 138-I: DO 807.02, Sec. 1.5.10; ADC013973.)

498.    Any significant history of serious self-harm or suicide attempts is clearly documented on the Problem List contained in the inmate's medical record. (Ex. 138-I: DO 807.02, Sec. 1.6; ADC013973.)

499.    Mental health staff document any known history of serious self-harm in the inmate's medical chart and update their DI 85 suicide attempt history status accordingly. (Ex. 138-I: DO 807.02, Sec. 1.7; ADC013973.)

500.    Serious self-harm is defined as self-injury potentially lethal methods such as: hanging; overdose involving lethal substances; methods that were likely to be potentially lethal considering the time of day, setting, degree to staff supervision, or likelihood of rescue or intervention, e.g. cutting attempts occurring in the middle of the night. (Ex. 138-I: DO 807.02, Sec. 1.7.1-1.7.1.3; ADC013973.)

501.    All department staff are aware of issues of suicide risk, share pertinent information with appropriate mental health and security staff, and make referrals as needed to mental health and security staff. (Ex. 138-I: DO 807.03, Sec. 1.1-1.1.1; ADC013973.)

502.    All department staff have their suicide card on their person and immediately notify their supervisor and shift commander when an inmate communicates or displays signs of suicidal intent or when an inmate demonstrates bizarre or unusual behavior. (Ex. 138-I: DO 807.03, Sec. 1.1.1-1.1.3; ADC013973.)

503.    Moreover, staff stays with the inmate, actively listens , and maintain contacts through conversation, eye contact, and body language when immediate risk of

self-harm is present. (Ex. 138-I: DO 807.03, Sec. 1.1.4; ADC013973.)

504.    Staff  also  documents  in  an  Information  Report  inmate communications or other observed signs of suicidal intent or observed bizarre or unusual behavior.  (Ex. 138-I: DO 807.03, Sec. 1.1.5; ADC013973.)

505.    The shift commander immediately notifies mental health staff of the potentially suicidal or mentally disordered inmate during non-business hours including nights and holidays contacts nursing staff and the scheduled Mental Health Urgent Responder. (Ex. 138-I: DO 807.03, Sec. 1.2; ADC013973.)

506.    In  the  event  mental  health  staff  cannot  be  contacted,  REDACTED

(Ex. 138-I: DO 807.03, Sec. 1.2.3; ADC013974.)

507.    In  the  event  of  a  subsequent  consultation  with  the  Mental  Health Urgent  Responder,  the  type  of  watch  may  be  modified  consistent  with  the recommendation of the consultation.  (Ex. 138-I: DO 807.03, Sec. 1.2.4; ADC013974.)

508.    Mental health staff complete the Mental Health Disposition Form, identifying  the  type  and  frequency  of  the  inmate's  watch  checks,  as  well  as  other conditions of the watch and the items to be issues with the inmates, such as a safety (suicide) blanket, safety (suicide) smock, clothing, personal property, types of meals, etc. (Ex. 138-I: DO 807.03, Sec. 1.3; ADC013974.)

509.    During non-business hours including nights and holidays, health care staff, in consultation with the Mental Health Urgent Responder, complete the Mental Health Disposition form. (Ex. 138-I: DO 807.03, Sec. 1.3.1-1.3.2; ADC013974.)

510.    One copy of the Mental Health Disposition Form is provided to security staff and the second copy is filed in the mental health record. (Ex. 138-I: DO 807.03, Sec. 1.3.1-1.3.2; ADC013974.)

511.    The Deputy Warden ensures that the shift commander: REDACTED

1   REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16   . (Ex. 138-I: DO 807.03, Sec. 1.4; ADC013974.)

17   512.   All housing units/blocks/living areas, with and without precautionary

18   watch cells, contain emergency equipment, REDACTED

19   (Ex. 138-I: DO 807.04, Sec. 1.1; ADC013975.)

20   513.   The department warden inspects all equipment monthly and verifies

21   all equipment is in working order.  (Ex. 138-I: DO 807.04, Sec. 1.1.1; ADC013975.)

22   514.   Emergency equipment in all housing units is located and available for

23   utilization REDACTED .   (Ex.  138-I:  DO  807.04,  Sec.  1.1.2;

24   ADC013975.)

25   515.   Inmates placed on all levels of watch are housed in designed watch

26   cells that have high visibility to staff. (Ex. 138-I: DO 807.04, Sec. 1.2; ADC013975.)

27   516.   All  designed  watch  cells  are  as  suicide-resistant  as  reasonably

28   possible, free of all obvious protrusions and tie-off points, and provide full visibility.  (Ex.

138-I: DO 807.04, Sec. 1.2.1; ADC013975.)

517.   Designated cells are inspected quarterly by the responsible Key Contact Psychologist, and Deputy Warden or designee(s) to ensure they continue to be as suicide-resistant as is reasonably feasible. (Ex. 138-I: DO 807.04, Sec. 1.2.2; ADC013975.)

518.   Prior to inmate placement in or return to a watch cell, security staff searches the inmate and the cell for any items which could potentially be used for self-harm and remove all such items and extraneous objects. (Ex. 138-I: DO 807.04, Sec. 1.3; ADC013975.)

519.   Inmates on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch and Ten Minute Watch are provided with a minimum of two safety blankets, a safety smock, a suicide resistant mattress and a small supply of toilet paper (i.e. a strand no longer than 12 inches ) minus the cardboard roll. (Ex. 138-I: DO 807.04, Sec. 1.4; ADC013975.)

520.   Whenever clothing is removed from a suicidal inmate, a safety smock is issued; no inmate is ever placed in a cell naked. (Ex. 138-I: DO 807.04, Sec. 1.4.1; ADC013975.)

521.   Any additional items provided to the inmate are pre-approved by mental health staff.  (Ex. 138-I: DO 807.04, Sec. 1.4.2-1.4.1.6; ADC013975-76.)

522.   The maximum allowed items for a continuous watch, one officer to multiple inmate continuous watch, and ten minute watch include:  REDACTED

(Ex. 138-I: DO 807.04, Sec. 1.4.2-1.4.1.6; ADC013975-76.)

523.   REDACTED

mental health staff approves additional items only when deemed safe and clinically appropriate. (Ex. 138-I: DO 807.04, Sec. 1.4.2.2- 1.4.2.3; ADC013976.)

524.    Physical restraints are avoided whenever possible and used only as a last resort when the inmate is physically engaging in self-destructive behavior. (Ex. 138-I: DO 807.04, Sec. 1.4.3; ADC013976.)

525.    REDACTED                                    (Ex. 138-I: DO 807.04, Sec. 1.4.3; ADC013976.)

526.    Unless contraindicated by mental health staff, each inmate on a Continuous Watch, One Officer to Multiple Inmate Continuous Watch, and Ten Minute Watch is afforded showers, telephone privileges, recreation, and visitation all in accordance with his/her custody level. (Ex. 138-I: DO 807.04, Sec. 1.4.4; ADC013976.)

527.    Any contradiction by mental health staff is noted in the inmate's medical chart as part of a SOAP note.  (Ex. 138-I: DO 807.04, Sec. 1.4.4; ADC013976.)

528.    Inmates on Thirty Minute Watch are provided with a minimum of one set of personal clothing (excluding belts and shoelace's), regular bedding, personal hygiene items (excluding razors or razor blades), toilet paper, mattress, and reading and writing material.  (Ex. 138-I: DO 807.04, Sec. 1.5; ADC013976.)

529.    Any additional items provided to the inmate are pre-approved by mental health staff only when deemed safe and clinically appropriate. ).  (Ex. 138-I: DO 807.04, Sec. 1.5.1 – 1.5.1.1.9; ADC01397-77.)

530.    The maximum allowed items for Thirty Minute Watch include: REDACTED

(Ex. 138-I: DO 807.04, Sec. 1.5.1 – 1.5.1.1.9; ADC013967-77.)

531.    REDACTED                                    .
(Ex. 138-I: DO 807.04, Sec. 1.5.1.2; ADC013977.)

532.    Unless contraindicated by mental health staff, each inmate on Thirty Minute Watch is afforded showers, telephone privileges, recreation, and visitation in accordance with his/her custody level. (Ex. 138-I: DO 807.04, Sec. 1.5.1.2; ADC013977.)

533.   Inmates are never placed on a Continuous Watch, One Officer to Multiple Inmates Continuous Watch, Ten Minute Watch, or Thirty Minute Watch as a disciplinary sanction or as a means to address problematic inmate behavior unrelated to mental health issues.  (Ex. 138-I: DO 807.04, Sec. 1.6; ADC013977.)

534.   Any deviations from the above Continuous Watch, One Officer to Multiple Inmate Continuous Watch, Ten Minute Watch, or Thirty Minute Watch conditions require prior approval from the Mental Health Program Management in consultation with Offender Operations.  (Ex. 138-I: DO 807.04, Sec. 1.7; ADC013977.)

535.   Closed-circuit television monitoring never substitute or replace in-person visual checks by security staff, although they may be used to supplement observation.  (Ex. 138-I: DO 807.05, Sec. 1.1; ADC013977.)

536.   Thirty Minute Watches are ordered when an inmate demonstrated acute signs or symptoms of significant mental disorder, but is not acting in a manner indicating significant suicide risk or risk to others due to a mental illness.  (Ex. 138-I: DO 807.05, Sec. 1.2.1; ADC013977.)

537.   This watch provides a closer and more structured observation for inmates whose mental status could deteriorate or who become suicidal. (Ex. 138-I: DO 807.05, Sec. 1.2.1.1; ADC013977.)

538.   Mental health staff complete an assessment whenever an inmate is placed on a Thirty Minute Watch. (Ex. 138-I: DO 807.05, Sec. 1.2.2.1-1.2.2.1.; ADC013977.)

539.   If an inmate is placed on this watch during non-business hours including nights or holidays, mental health staff complete the mental health assessment no later than the next working day and evaluate the inmates at least once per day while this was is in effect.  (Ex. 138-I: DO 807.05, Sec. 1.2.2.1-1.2.2.1.; ADC013977.)

540.   The shift commander, mental health or medical health care staff may order a Thirty Minute Watch when an inmate is considered a possible risk to engage in self-destructive or suicidal behavior. (Ex. 138-I: DO 807.05, Sec. 1.2.3; ADC013977.)

541.    Only the mental health or medical health care staff are authorized to cancel this watch. (Ex. 138-I: DO 807.05, Sec. 1.2.3; ADC013977.)

542.    During non-business hours, including nights or holidays, medical staff complete a health and welfare check on the inmate on a thirty minute watch at least once each day and contact the mental health urgent responder if needed.  (Ex. 138-I: DO 807.05, Sec. 1.2.4; ADC013978.)

543.    When pre-approved by both security and mental health staff, inmates on all levels of watch may be double-bunked, in accordance with the Health Services Technical Manual. (Ex. 138-I: DO 807.05, Sec. 1.2.5; ADC013978.)

544.    Security shall conduct visual welfare checks of inmates on Thirty Minute Watch at staggered intervals not to exceed every 30 minutes. (Ex. 138-I: DO 807.05, Sec. 1.2.6-1.2.6.4; ADC013978.)

545.    Visual checks occur at random times within each thirty minute interval, but no longer than 30 minutes pass between each random check. (Ex. 138-I: DO 807.05, Sec. 1.2.6-1.2.6.4; ADC013978.)

546.    Breathing and signs of life are clearly observed. (Ex. 138-I: DO 807.05, Sec. 1.2.6-1.2.6.4; ADC013978.)

547.    Security staff observe whether items in the inmate's possession match those authorized by mental health staff on the mental health disposition form. (Ex. 138-I: DO 807.05, Sec. 1.2.6-1.2.6.4; ADC013978.)

548.    Visual checks are documented on the observation record. (Ex. 138-I: DO 807.05, Sec. 1.2.6-1.2.6.4; ADC013978.)

549.    Mental Health Staff order a Ten Minute Watch when an inmate has demonstrated significant signs or symptoms of significant mental disorder and is acting in a manner indicating high suicide risk and/or to others due to a mental illness. (Ex. 138-I: DO 807.05, Sec. 1.3.1-1.3.1.1; ADC013978.)

550.    This watch provides a closer and more structured observation for inmates whose mental status could deteriorate or who could become suicidal.  (Ex. 138-I:

DO 807.05, Sec. 1.3.1-1.3.1.1; ADC013978.)

551. The shift commander or health care staff may order this watch when an inmate is considered a possible risk to engage in self-destructive or suicidal behavior. (Ex. 138-I: DO 807.05, Sec. 1.3.2; ADC013978.)

552. Only the mental health care staff are authorized to cancel this watch. (Ex. 138-I: DO 807.05, Sec. 1.3.2; ADC013978.)

553. During nights, weekends, and holidays the Urgent Responder may initiate this watch and will be contacted in accordance with the mental health technical manual. (Ex. 138-I: DO 807.05, Sec. 1.3.3; ADC013978.)

554. Security stall conduct visual welfare checks of inmates on Ten Minute Watch at staggered intervals not to exceed every 10 minutes. (Ex. 138-I: DO 807.05, Sec. 1.3.4-1.3.4.4; ADC013978-79.)

555. Visual checks occur at random times within each thirty minute interval, but no longer than 10 minutes pass between each random check. (Ex. 138-I: DO 807.05, Sec. 1.3.4-1.3.4.4; ADC013978-79.)

556. Breathing and signs of life are clearly observed. (Ex. 138-I: DO 807.05, Sec. 1.3.4-1.3.4.4; ADC013978-79.)

557. Security staff observe whether items in the inmate's possession match those authorized by mental health staff on the mental health disposition form. (Ex. 138-I: DO 807.05, Sec. 1.3.4-1.3.4.4; ADC013978-79.)

558. Visual checks are documented on the observation record. (Ex. 138-I: DO 807.05, Sec. 1.3.4-1.3.4.4; ADC013978-79.)

559. Mental health staff complete a suicide risk assessment before the end of the Ten Minute Watch as defined in DO 807.02. (Ex. 138-I: DO 807.05, Sec. 1.3.5; ADC013979.)

560. If an inmate is placed on a Ten Minute Watch during non-business hours including nights and holidays, mental health staff complete and assessment no later than the next working day. (Ex. 138-I: DO 807.05, Sec. 1.3.5; ADC013979.)

561.   Mental health staff evaluate inmates on ten minute watches once per day. (Ex. 138-I: DO 807.05, Sec. 1.3.6; ADC013979.)

562.   During non-business hours including nights and holidays, health staff shall evaluate the inmate once per day.  (Ex. 138-I: DO 807.05, Sec. 1.3.6; ADC013979.)

563.   Mental health order a One Officer to Multiple Inmate Continuous Watch when an inmate demonstrates signs or symptoms of significant mental disorder and is acting in a manner indicating imminent suicide risk or risk to others due to a mental illness. (Ex. 138-I: DO 807.05, Sec. 1.4.1-1.4.1.1; ADC013979.)

564.   This watch is for inmates whose mental health status has deteriorated and are considered actively suicidal or a risk to others due to a mental illness.  (Ex. 138-I: DO 807.05, Sec. 1.4.1-1.4.1.1; ADC013979.)

565.   The shift commander or health care staff may order this watch when an inmate is considered to be actively engaged in self-harm or considered by mental health staff to be at high imminent risk for suicide or self-harm and is presenting with significant risk factors and signs of suicidal intent. (Ex. 138-I: DO 807.05, Sec. 1.4.2-1.4.2.1; ADC013979.)

566.   During weekends, the Urgent Responder is contacted in accordance with the Mental Health Technical Manual. (Ex. 138-I: DO 807.05, Sec. 1.4.2-1.4.2.1; ADC013979.)

567.   One Officer to Multiple Inmate Watch is also indicated when: (1) the suicidal or mental health inmate cannot be immediately place in a designated watch cell, e.g., the inmate is placed in a standard cell, holding cell or enclosed area not routinely used for watch purposes; (2)the placement area contains protrusions or tie-off points that could be used in a suicide attempts; (3)the inmate by necessity retains objects or items that could be used in a suicide attempt e.g., medical items/appliances, sanitary pads, additional clothing, etc.; or (4) the inmate is returning from the hospital after medical treatment for self-harm.  (Ex. 138-I: DO 807.05, Sec. 1.4.3-1.4.3.4; ADC013979.)

568.   On a One Officer to Multiple Inmate Watch, security staff shall:

observe inmates on a direct, uninterrupted basis and shall have a clear, unobstructed view of the inmate and note "one officer to multiple inmate continuous visual observation" for one officer to multiple continuous watch on the observation record. (Ex. 138-I: DO 807.05, Sec. 1.4.4-1.4.4.2; ADC013980.)

569.    Mental health staff complete an assessment before the cancelation of the One Officer to Multiple Inmate Continuous watch as defined in DO 807.02. (Ex. 138-I: DO 807.05, Sec. 1.3.5; ADC013980.)

570.    If an inmate is placed on a One Officer to Multiple Inmate Continuous Watch during non-business hours including nights and holidays, mental health staff complete and assessment no later than the next working day. (Ex. 138-I: DO 807.05, Sec. 1.3.5; ADC013980.)

571.    If an inmate is placed on a Ten Minute Watch during non-business hours including nights and holidays, mental health staff complete and assessment no later than the next working day. (DO 807.05, Sec. 1.3.5; ADC013980.)

572.    Mental health staff evaluate inmates on Ten Minute Watches once per day. (Ex. 138-I: DO 807.05, Sec. 1.3.6; ADC013980.)

573.    During non-business hours including nights and holidays, health staff shall evaluate the inmate once per day. (Ex. 138-I: DO 807.05, Sec. 1.3.6; ADC013980.)

574.    Security staff conducting watches notify mental health staff immediately through the shift commander of any significant changes in an inmate's behavior while on watch. (Ex. 138-I: DO 807.05, Sec. 1.5 – 1.5.1; ADC013980.)

575.    During non-business hours including nights and holidays, security staff immediately contact the Mental Health Urgent Responder through Control. (Ex. 138-I: DO 807.05, Sec. 1.5 – 1.5.1; ADC013980.)

576.    The shift commander tours the watch cell area once every four hours to ensure observation records are complete, accurate, and posted along with mental health disposition forms and those visual checks are being performed in a staggered, random manner. (Ex. 138-I: DO 807.05, Sec. 1.6; ADC013980.)

577.   Security staff ensures that an inmate on any watch are provided with the following: toilet use upon request; fluid intake (minimum eight ounces), at least once per hour, while awake; regularly scheduled meals, including special medical and religious diets of the same quantity and nutritional quality as meals served to the general population. (Ex. 138-I: DO 807.05, Sec. 1.7-1.7.3; ADC013980.)

578.   Paper sack lunches or food served on paper or shatter-resistant trays not requiring eating utensils may be provided to inmates on a Continuous watch, One Officer to Multiple Inmate Continuous Watch, and Ten Minute watch if necessary, but should be of the same quantity and nutritional quality as meals served to the general population; prescribed medication, in unit dosage and by watch swallow. (Ex 138-I: DO 807.05, Sec. 1.7.4.1- 1.7.5 ADC013980-81.)

579.   Food served should be free of items that can be used for self-harm e.g. bones; paper trays, sacks, napkins, and all other extraneous items are removed after the inmate completes eating; cellophane is removed from food prior to serving the food to the inmate.  (Ex. 138-I: DO 807.05, Sec. 1.7.4.1- 1.7.5 ADC013980-81.)

580.   When evaluating inmates on watch during normal waking hours, mental health and health care staff interact with and do not just observe inmates.  (Ex. 138-I: DO 807.05, Sec. 1.8 ADC013981.)

581.   Mental health and medical health care staff document their evaluations of inmates on watch as progress notes in the mental health section of the inmate's medical record. (Ex. 138-I: DO 807.05, Sec. 1.9-1.9.1; ADC013981.)

582.   In the first progress note after an inmate is placed on watch, mental health staff document the circumstances that necessitated the watch and an assessment of the inmate's current status. (Ex. 138-I: DO 807.05, Sec. 1.9-1.9.1; ADC013981.)

583.   Inmates on any watch do not have their watch status downgraded or discontinued until mental health staff has: (1) assessed the inmate (2) thoroughly reviewed the inmate's medical and mental health record, any other relevant documentation; and (3) conferred with security staff about the inmate's observed behavior on watch.  (Ex. 138-I:

105

DO 807.05, Sec. 1.10-1.10.3 ;ADC013981.)

584.   Upon an in-person evaluation by the licensed medical health staff, inmates on watch may be downgraded as clinically indicated. (Ex. 138-I: DO 807.05, Sec. 1.11-1.11.1; ADC013981.)

585.   Mental health inmates who are not suicidal and who have been placed on a one officer to multiple inmate continuous watch because they cannot be placed in a designated watch cell may be directly and completely discontinued from watch. (Ex. 138-I: DO 807.05, Sec. 1.11-1.11.1; ADC013981.)

586.   Each change in watch status and or/conditions of watch, e.g. allowed items, is documented on a new mental health disposition form, with both copies of the previous mental health disposition being lined out and signed, stamped, dated, and timed by the mental health staff making the change. (Ex. 138-I: DO 807.05, Sec. 1.12-1.12.2; ADC013981.)

587.   Mental health staff document the rationale for the change in watch status or conditions in the mental health record as a SOAP progress note. (Ex. 138-I: DO 807.05, Sec. 1.12-1.12.2; ADC013981.)

588.   Mental health and the shift commander ensure that, when needed, a new observation record is initiated if there is a change in watch status.  (Ex. 138-I: DO 807.05, Sec. 1.12-1.12.2; ADC013981.)

589.   When watch status is discontinued altogether, the current Mental Health Disposition form is modified as above with "cancelled" noted on the form.  (Ex. 138-I: DO 807.05, Sec. 1.13; ADC013981.)

590.   Only a psychiatrist , psychologist, other licensed mental health staff or a non-licensed mental health staff member in consultation with a licensed psychologist may modify watch status, discontinue watch status, or make changes in the conditions of the watch.  (Ex. 138-I: DO 807.05, Sec. 1.14 ADC013981.)

591.   Watch status or discontinuation of watch status occurs only after an in-person evaluation of the inmate on watch performed by a licensed mental health staff

member. (Ex. 138-I: DO 807.05, Sec. 1.14.1 ADC013982.)

592.    Upon complete discontinuation of watch status, mental health staff prepare a discharge summary as a note-to-file documenting the following: (1) initial reason for the watch; (2) observed behavior during the period of watch (3) any evaluation, staffing or consultation regarding the inmate on watch (4) therapeutic or other interventions; (5) rationale for discontinuation of watch; (6) specific communication with mental health and security staff on the unit receiving the inmate from watch, i.e., who was contacted, with a brief synopsis of the communication.  (Ex. 138-I: DO 807.05, Sec. 1.15-1.15.6; ADC013982.)

593.    All inmates who have been discharged after a downgraded continuous watch or one officer to multiple inmate continuous watch shall be seen by mental health staff within seven days of returning to their unit and as clinically indicated thereafter.  (Ex. 138-I: DO 807.07, Sec. 1.1; ADC013987.)

594.    Inmates being discharged from a Ten Minute or Thirty Minute Watch, but who were not placed on one officer to multiple inmate continuous watch, shall be seen after discharge from watch by mental health staff as clinically indicated.  (Ex. 138-I: DO 807.07, Sec. 1.1; ADC013987.)

595.    All staff assess and render aid to ALL medical emergencies, including suicide attempts, as soon as possible or within no longer than three minutes of becoming aware of a non-responsible inmate or an inmate in medical crisis. (Ex. 138-I: DO 807.08, Sec. 1.1-1.2; ADC013987.)

596.    Wardens ensure that Post Orders incorporate the three minute emergency response standard.  (Ex. 138-I: DO 807.08, Sec. 1.1-1.2; ADC013987.)

597.    In the event that an inmate is found non-responsive, in a state of medical emergency, or in the act of attempting suicide, staff assess the situation and render in-cell aid as soon as possible or within no longer than three minutes of becoming aware of the situation.  (Ex. 138-I: DO 807.08, Sec. 1.3; ADC013988.)

598.    In all instances, a minimum of two staff, including non-security staff,

1  are present before accessing the cell to respond and initiate aid. (Ex. 138-I: DO 807.08,

2  Sec. 1.4 ADC013988.)

3      599.   For all emergency responses, REDACTED

4  

5  

6  

7  

8  

9  

10  

11  

12                                                                    .

13  (Ex. 138-I: DO 807.08, Sec. 1.5.-1.5.5; ADC013988.)

14      600.   REDACTED

15  

16  

17  

18                                        (Ex. 138-I: DO 807.08, Sec. 1.5.3.1-

19  1.5.3.2; ADC013988.)

20      601.   REDACTED

21  

22  

23  

24  

25  

26          (Ex. 138-I: DO 807.08, Sec. 1.6-1.6.5; ADC013988.)

27      602.   REDACTED

28

REDACTED

(Ex. 138-I: DO 807.08, Sec. 1.7-1.7.4 ; ADC013989-91.)

603.   Upon discovery of an inmate who is non-responsive, stall never presume the inmate is dead and instead implement life saving measures. (Ex. 138-I: DO 807.08, Sec. 1.8; ADC013991.)

604.   ADC is doing things to help prevent suicide such as training staff, enhancing social interaction, double celling, treatment programs for mentally ill, enhanced programs for SMI, and the step programs.  ADC also has good watch programs.  (Ex. 205: 180:2-24.)

605.   Corizon staff is required to collaborate with Security Personnel and develop a suicide prevention strategy.  (Ex. 137-CC: RFP § 2.13.17.3, ADC014212).

**W.   <u>Detention</u>**

606.   Health staff is notified within one hour after an inmate is placed in detention, and immediately if the inmate is injured or appears to be ill.  (DO 1101.05, Sec. 1.1.1-1.1.2; Ex. 137-GG: ADC048549.)

607.   Upon notification, nursing staff is required to immediately review the inmate's medical records to determine if any health issues exist that would be impacted by his detention status. (DO 1101.05, Sec. 1.2.1; Ex. 137-GG: ADC048549.)

608.   If the inmate is injured or appears to be ill, nursing staff conducts an immediate hands-on assessment; otherwise, health staff will visit the inmate within twenty four hours of notification.  (DO 1101.05, Sec. 1.2.2-1.2.3; Ex. 137-GG: ADC048549.)

609.   SMI inmates are visited by mental health staff within 24 hours of notification, except on weekends and holidays when the inmate is seen by a nurse in consultation with a mental health staff. (DO 1101.05, Sec. 1.2.4; Ex. 137-GG: ADC048550.)

610.   Mental health staff is required to follow-up with a face-to-face visit with the SMI inmate on the first working day following the inmate's placement in

detention., and to ensure timely and appropriate follow-up mental health treatment upon the inmate's release from detention. (DO 1101.05, Sec. 1.2.5; Ex. 137-GG: ADC048549.)

611.   Inmates with little or no contact with other individuals are monitored daily by health staff and at least once a week by mental health staff. (DO 1101.05, Sec. 1.2.3.1.1; Ex. 137-GG: ADC048550.)

612.   Inmates who have limited contact with staff or other inmates are monitored three days a week by medical or mental health staff. (DO 1101.05, Sec. 1.2.3.1.2; Ex. 137-GG: ADC048550.)

613.   Inmates who are allowed periods of recreation or other routine social contact among themselves while in detention are checked weekly by medical or mental health staff. (DO 1101.05, Sec. 1.2.3.1.3; Ex. 137-GG: ADC048550.)

## X.   Use of Force

614.   Force is used only after every other reasonable attempt to neutralize the real or potential danger has been considered and determined ineffectual. (Ex. 138-G: DO 804; ADC107478, Ex. 138, ¶134.)

615.   The use of force is reserved for situations where no other reasonable alternative is available to prevent escape, imminent death, serious bodily harm, or the taking of hostages. (Ex. 138-G: DO 804; ADC107478; Ex. 138, ¶135.)

616.   The use of force is never used as punishment or retaliation. (Ex. 138-G: DO 804; ADC107478; Ex. 138, ¶136.)

617.   Staff only uses physical force when persuasion, counseling, warnings, and direct order are found to be insufficient to obtain cooperation from the inmate. (Ex. 138-G: DO 804.04; ADC107490; Ex. 138, ¶137.)

618.   REDACTED

(Ex. 138-G: DO 804.04; ADC107490; Ex. 138, ¶138 .)

619.   REDACTED

REDACTED

. (Ex. 138-G: DO 804.04, Sec. 1.1.2; ADC107490-91; Ex. 138, ¶ 139 .)

620.   Less-than-lethal physical force may also be used to ensure compliance with Department Orders and/or written instructions, and to ensure the health, hygiene, and well-being of an inmate. (Ex. 138-G: DO 804.04, Sec. 1.1.3; ADC107491 Ex. 138, ¶ 140.)

621.   REDACTED

(Ex. 138-G: DO 804.04, Sec. 1.1.4; ADC107491; Ex. 138, ¶ 141.)

622.   Less-than-lethal physical force is deployed on a progressive continuum, from the least amount of force possible to the maximum level permitted, commensurate with the circumstances of the incident. (Ex. 138-G: DO 804.04, Sec. 1.2; ADC107491; Ex. 138, ¶142.)

623.   When possible, staff should use progressive force as follows: REDACTED

(Ex. 138-G: DO 804.04, Sec. 1.2.1; ADC107491-92; Ex. 138, ¶ 143.)

624.   When utilizing progressive force, REDACTED

(Ex. 138-G: DO 804.04, Sec. 1.2.2; ADC107492-93; Ex. 138, ¶ 144.)

625.   In all applications involving the use of force, patience is emphasized

111

1    and consideration must be given to alternative solutions, such as waiting the inmate out,

2    before initiating or escalating the use of force.  (Ex. 138-G: DO 804.04, Sec. 1.2.3;

3    ADC107493; Ex. 138, ¶ 145.)

4            626.   REDACTED

5

6

7                              (Ex. 138-G: DO 804.04, Sec. 1.2.3; ADC107493; Ex. 138, ¶ 146.)

8            627.   REDACTED

9

10                             (Ex. 138-G: DO 804.05, Sec. 1.1; ADC107495 Ex. 138, ¶ 147.)

11           628.   REDACTED

12

13

14                                                                           (Ex. 138-G: DO

15   804.05, Sec. 1.1; ADC107495; Ex. 138, ¶ 148.)

16           629.   Chemical agents may be used to avoid the use of additional force, to

17   prevent injury to employees and inmates, or to stop imminent danger to staff or inmates.

18   (Ex. 138-G: DO 804.05, Sec. 1.2; ADC107496; Ex. 138, ¶ 149.)

19           630.   Staff using OC spray must complete ADC approved training before

20   using OC spray. (Ex. 138-G: DO 804.05, Sec. 1.2.1; ADC107496; Ex. 138, ¶ 150.)

21           631.   REDACTED

22

23

24

25

26           (Ex. 138-G: DO 804.05, Sec. 1.2.3; ADC107496; Ex. 138, ¶ 151.)

27           632.   Decontamination procedures are employed as soon as possible

28   following the use of chemical agents on an inmate. (Ex. 138-G: DO 804.05; ADC107503-

112

04; Ex. 138, ¶ 152.)

633.   REDACTED

(Ex. 138-G: DO 804.05, Sec. 1.4.2; ADC107497; Ex. 138, ¶ 153.)

634.   REDACTED

(Ex. 138-G: DO 804.05, Sec. 1.4.5; ADC107497; Ex. 138, ¶ 154.)

635.   REDACTED

Ex. 138-G: DO 804.04, Sec. 1.4; ADC107493-94; Ex. 138, ¶ 155.)

636.   The video recordings are retained for a minimum of one year. (Ex. 138-G: DO 804.04, Sec. 1.5; ADC107494-95; Ex. 138, ¶ 156 .)

637.   Within three days after a use-of-force incident, the use of force is evaluated by a review committee.  (Ex. 138-G: DO 804.04, Sec. 1.6; ADC107494-95; Ex. 138, ¶ 157)

638.   A use-of-force report is created for each use-of-force incident. (Ex. 138-G: DO 804.05, Sec. 1.5-1.6; ADC107498-99; Ex. 138, ¶ 158.)

639.   REDACTED

(Ex. 138, ¶159.)

640. In REDACTED

REDACTED

REDACTED

REDACTED (Ex. 138, ¶160.)

641. REDACTED

REDACTED

REDACTED (Ex. 138, ¶161.)

642. REDACTED

REDACTED . (Ex. 138, ¶162.)

643. REDACTED

REDACTED (Ex. 138, ¶163.)

**Y.    Medical Grievances**

644. Department Order 802 governs ADC inmate grievances and sets forth the procedures that inmates must follow to complete the prison administrative grievance process.  (Dkt. 50-1, ¶ 5.)

645. DO 802 – effective as of July 13, 2009 – applies to all inmate grievances submitted after July 13, 2009 through the present. (Dkt. 50-1, ¶ 5.)

646. Any ADC inmate, regardless of disciplinary status, housing location, or classification, may use the Inmate Grievance System.  (DO 802.01, Sec. 1.6; Dkt. 50-1, ¶ 6.)

647. This includes inmates in a complex detention unit, segregation unit, or suicide watch cell.  (Dkt. 50-1, ¶ 6.)

648. Appropriate provisions have been made to ensure that all inmates have access to the Inmate Grievance System. (Dkt. 50-1, ¶ 6.)

649. Staff are required to ensure that there are no barriers for inmate access to grievance forms and that inmates have the ability to file grievances and appeals

in a timely and confidential manner.  (DO 802.01, Sec. 1.7; Dkt. 50-1, ¶ 6.)

650. ADC educates inmates about the Inmate Grievance System by providing both written and oral explanations of the Inmate Grievance Procedure at reception centers and again as part of the orientation process each time an inmate is transferred to another facility.  (DO 802.09, Sec. 1.2; Dkt. 50-1, ¶ 7.)

651. A copy of the Inmate Grievance System policy is kept at each prison facility's inmate resource library and is available for inmates to use. (Dkt. 50-1, ¶ 7.)

652. Inmates may use the Inmate Grievance System to grieve issues related to any aspect of institutional life or condition of confinement that directly and personally affects the inmate grievant.  (DO 802.01, Sec. 1.1; Dkt. 50-1, ¶ 8.)

653. The ADC Inmate Grievance System provides a separate review process for medical-related grievances, including medical, dental, and mental health grievances/issues ("Medical Grievance Process").  (Dkt. 50-1, ¶ 9.)

654. The Medical Grievance Process is a three-step review process for inmates seeking resolution of medical issues encountered while incarcerated.  (Dkt. 50-1, ¶ 9.)

655. The first step is the Informal Complaint Resolution: an inmate must attempt to informally resolve a medical complaint by submitting an Inmate Letter (Form 916-1) ("Informal Complaint" or "Informal Resolution") to the inmate's counselor/assigned CO III within ten (10) work days from the date of the action that caused the inmate's complaint. (Dkt. 50-1, ¶ 9a.)

656. The CO III contacts the appropriate medical staff for a response and has fifteen (15) work days from receipt of the inmate's Informal Resolution to investigate and attempt to resolve the issue and to provide a response to the Informal Resolution ("Informal Resolution Response") to the inmate.  (DO 802.02; Dkt. 50-1, ¶ 9a.)

657. The second step is the Formal Grievance to the Facility Health Administrator ("FHA"): if an inmate is unsatisfied with the CO III's Informal Resolution Response, the inmate may initiate a "Formal Grievance" by submitting to the CO

IV/Grievance Coordinator an Inmate Grievance (Form 802-1) within five (5) work days from receipt of the CO III's Informal Resolution Response. (Dkt. 50-1, ¶ 9b.)

658.   The Grievance Coordinator logs in (the Formal Grievance, assigns it a number, and then forwards it to the FHA for review, investigation, and response.  DO 802.03; Dkt. 50-1, ¶ 9b.)

659.   The third and final step is the Appeal to the Director of the ADC: if an inmate is unsatisfied with the FHA's Formal Grievance Response, the inmate may initiate a "Director's-Level Appeal" to the Director of the ADC by submitting to the Unit Grievance Coordinator an Inmate Grievance Appeal (Form 802-3) within five (5) work days from receipt of the Formal Grievance Response.  (Dkt. 50-1, ¶ 9c.)

660.   The Grievance Coordinator logs in the Director's-Level Appeal and within five (5) work days of receipt of the Director's Appeal from the inmate, forwards it to the Grievance Appeals Investigator, who reviews it in consultation with ADC physicians as necessary and prepare a draft response for the Health Services Director's review, and then forwards to the Director for his signature, either affirming, partially affirming or reversing the FHA's decision. (Dkt. 50-1, ¶ 9c.)

661.   Corizon healthcare staff is responsible for handling inmate grievances regarding correctional health services and forwarding a copy of formal grievances to the ADC Contract Monitor.  (Ex. 137-CC: RFP § 2.16, ADC014218.)

662.   Under ADC policy, an inmate must appeal to the Director to exhaust the medical grievance procedure, and the failure to properly appeal through to the Director's Decision constitutes a failure to exhaust available administrative remedies. (DO 802.01, Sec. 1.5; Dkt. 50-1, ¶ 10.)

663.   A computerized Inmate Medical Grievance Appeal Log of appeals to the Director ("Medical Appeal Log") is electronically maintained at the ADC's Central Office, which records and tracks any Director's-Level Appeals that are submitted.  Dkt. 50-1, ¶ 12.)

664.   Plaintiff  Jensen  REDACTED

REDACTED

(Dkt. 50-1, ¶ 13b.)

665.   Plaintiff  Swartz  REDACTED

1    • REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   (Dkt. 50-1, ¶ 13c.)

27        666.   Former  inmate  Dustin  Brislan  REDACTED

28



- REDACTED

(Dkt. 50-1, ¶ 13e.)

667.   Plaintiff  Rodriguez  REDACTED

(Dkt. 50-1, ¶ 13g.)

668.   Plaintiff  Verduzco  REDACTED

- REDACTED

(Dkt. 50-1, ¶ 13h.)

669.   REDACTED

(Dkt. 50-1, ¶ 13i.)

670.   Plaintiff Smith REDACTED

REDACTED

(Dkt. 50-1, ¶ 13j.)

671.   Plaintiff  Gamez  REDACTED

1          (¶ 61)

2    •   REDACTED

3

4

5

6

7

8

9    (Dkt. 50-1, ¶ 13l.)

10         672.   Plaintiff  Chisholm  REDACTED

11

12

13

14

15

16

17

18

19

20

21   (Dkt. 50-1, ¶ 13o.)

22         673.   Plaintiff Licci  REDACTED

23

24

25

26

27

28



(Dkt. 50-1, ¶ 13p.)

674.   Plaintiff  Hefner  REDACTED

(Dkt. 50-1, ¶ 13q.)

675.   Plaintiff  Polson  REDACTED

• REDACTED

(Dkt. 50-1, ¶ 13t.)

676.   Plaintiff Wells REDACTED

REDACTED

(Dkt. 50-1, ¶ 13x.)

**Z.**   **Mortality Rates**

677.   The United States Department of Justice, Bureau of Justice Statistics collects data from each state Department of Corrections, as well as the Federal Bureau of Prisons as to each inmate death in custody.  (Ex. 123-C: ADC_P001021.)

678.   Survey reports are received, the data is verified, and mortality rates are calculated as a national average, and periodically published, based upon calendar year data.  (Ex. 123-C: ADC_P001021-25.)

124

679.   To permit comparison based upon the different size of state and federal corrections departments, that Bureau of Justice Statistics calculates a mortality rate, based upon the number of deaths per 100,000 prisoners.   (Ex. 123-C: ADC_P001023.)

680.   Mortality rates are calculated by multiplying the number of deaths in custody by 100,000 and then dividing by the mid-year or end-year state prison population, based upon available data.  (Ex. 123-C: ADC_P001023.)  The BJS recognizes that while there is no sampling error, there may be random error with a small number of deaths in custody, less than 100, as well as various short-term fluctuations and irregularities.  (Ex. 123-C: ADC_P001023.)

681.   While ADC operates on a fiscal year, it also collects and reports on the number of deaths in custody that occur, as part of its ADC Report of Inmate Assault Data, as of June 30, 2013, which contains a full year worth of data.  (Ex. 138-EE: ADC_S000017.)

682.   The following is a comparison of the number of deaths in ADC custody from the fiscal year ending June 30, 2005, the ADC mortality rate calculated using the BJS methodology set forth in DSOF ¶ 680 above, and the reported BJS Nationwide Prison Mortality Rate, for all causes of death, reported for the years ending from December 31, 2005 to December 31, 2011.

683.

## Comparison of ADC and Nationwide Mortality Rate - All Causes of Death

|  | ADC Deaths | ADC Population | ADC Mortality Rate |
| --- | --- | --- | --- |
| 6/30/2005 | 65 | 31826 | 204 |
| 12/31/2005 |  |  |  |
| 6/30/2006 | 88 | 33705 | 261 |
| 12/31/2006 |  |  |  |
| 6/30/2007 | 61 | 35851 | 170 |





Comparion of ADC and Nationwide Mortality Rate (2005-2013)

| | | | |
|---|---|---|---|
| 12/31/2007 | | | |
| 6/30/2008 | 100 | 37910 | 264 |
| 12/31/2008 | | | |
| 6/30/2009 | 93 | 39626 | 235 |
| 12/31/2009 | | | |
| 6/30/2010 | 86 | 40458 | 213 |
| 12/31/2010 | | | |
| 6/30/2011 | 86 | 40226 | 214 |
| 12/31/2011 | | | |
| 6/30/2012 | 87 | 40011 | 217 |
| 6/30/2013 | 83 | 40048 | 207 |

[Ex. 123-C: ADC_P001013; Ex. 138-EE: ADC_S000017.]

684.

685.    Over time, it is readily apparent that while there are year-to-year fluctuations in prison mortality rates, that on the whole, the prisoner mortality rate for the Arizona Department of Corrections is less than the national prison mortality rate.    [Ex. 123-C: ADC_P001013; Ex. 138-EE: ADC_S000017.]

**AA.    Dr. Mendel's Expert Opinions**

686.    The National Commission on Correctional Healthcare (NCCHC) is the leading national organization in the development of healthcare standards for

126

1    correctional facilities. (Ex. 189 at ¶ 10.)

2            687.    The mission of the NCCHC is to improve the quality of health care in

3    jails, prisons, and juvenile confinement facilities. (Ex. 189 at ¶ 10.)

4            688.    With support from the major national organizations representing the

5    fields of health, law, and corrections, NCCHC's leadership has established standards for

6    health services for correctional facilities, which serve as a framework to ensure that

7    systems, policies, and procedures are keeping with nationally recognized best practices.

8    (Ex. 189 at ¶ 10.)

9            689.    Regarding Plaintiff Jensen's claim REDACTED

10   REDACTED

11   REDACTED

12   REDACTED (Ex. 189 at ¶¶ 28-34.)

13       690.    REDACTED

14   REDACTED

15   REDACTED (Ex. 189 at ¶ 30.)

16       691.    REDACTED

17   REDACTED (Ex. 189 at ¶ 31.)

18       692.    REDACTED

19   REDACTED. (Ex. 189 at ¶ 31.)

20       693.    REDACTED

21   REDACTED

22   REDACTED (Ex. 189 at ¶ 31.)

23       694.    Regarding Plaintiff Swartz's claim REDACTED

24   REDACTED

25   REDACTED

26   REDACTED

27   REDACTED

28   REDACTED

1  36-43.)

2       695.   Regarding REDACTED



VIII. **ADC DENTAL CARE POLICIES**

702.   Within seven days of entering ADC, all inmates receive a panorex x-ray or bite wing x-rays; a dental exam consisting of either the screening of the x-rays or visual evaluation by a dentist or hygienist; and oral hygiene instruction.  (Ex. 137-GG: DO 1101.10, Sec. 1.1.1; ADC048555.)

703.   Dentists classify all inmates according to their dental treatment needs through the visual exam or screening of x-rays as Class I (no further treatment needed), II (routine treatment needed), or III (immediate treatment needed).  (Ex. 137-GG: DO 1101.10, Sec. 1.1.2; ADC048555.)

704.   Class III inmates who received only a screening of x-rays at intake are seen by a dentist within 30 days at the receiving facility.  (Ex. 137-GG: DO 1101.10, Sec. 1.1.3; ADC048556.)

705.   Class I and II inmates who request treatment at the receiving facility will be seen by the dentist within three months from the date of initial screening.  (Ex. 137-GG: DO 1101.10, Sec. 1.1.4; ADC048556.)

706.   During the first appointment at the receiving facility, the dentist will chart all required treatment, outline the treatment plan in sequential order, determine the extent of treatment required, take and record a dental/medical history on the dental chart, record all existing restoration and missing teeth on the dental chart, and place a color-coded label on the chart to indicate whether an inmate is classified as Class I, II, or III. (Ex. 137-GG: DO 1101.10, Sec. 1.1.4; ADC048556.)

707.   If a Class II or III inmate refuses treatment at the initial appointment, the inmate will have to submit a request for any further treatment.  (Ex. 137-GG: DO 1101.10, Sec. 1.1.4; ADC048556.)

708.   Each dental clinic maintains a list of inmates requesting full or partial dentures and found by a dentist to be in need of them.  (Ex. 137-GG: DO 1101.10, Sec. 1.2.5; ADC048557-048558.)

709.   Dentures are provided according to a priority system, with first

priority given to inmates requiring full dentures in order to be able to chew, and second priority given to inmates requiring partial dentures due to not being able to properly chew because of a large number of missing or non-occluding teeth.  (Ex. 137-GG: DO 1101.10, Sec. 1.2.5; ADC048557.)

710.    Each complex maintains a schedule of on-call dentists for emergency dental care.  (Ex. 137-GG: DO 1101.10, Sec. 1.3; ADC048558.)

711.    If a dental emergency arises outside of regular clinic hours, health care staff will notify the on-call dentist to arrange for the provision of necessary dental treatment.  (Ex. 137-GG: DO 1101.10, Sec. 1.3.1; ADC048558.)

712.    Outside dental treatment for a dental emergency does not require prior approval from the Statewide Dental Director.  (Ex. 137-GG: DO 1101.10, Sec. 1.5; ADC048559.)

713.    Dental program managers participate on the Central Office Continuous Quality Improvement (CQI) Committee, which meets quarterly to review CQI reports and activities.  (Ex. 137-KK: STM Ch. 1, Sec. 5.0, Para. 1.0, 1.1; ADC010672-010673.)

714.    Dental staff also participate on the monthly CQI committees at each complex.  (Ex. 137-KK: HSTM Ch. 1, Sec. 5.0, Para. 1.2; ADC010673.)

715.    Each dentist is peer reviewed using a sample of inmate charts following the procedures outlined in HSTM Chapter 1, Section 5.1.  (Ex. 137-KK: HSTM Ch. 1, Sec. 5.1; ADC010682-010684.)

716.    Inmates may submit grievances regarding their dental treatment utilizing the medical grievance system outlined in HSTM Chapter 1, Section 8.0 and DO 802.  (Ex. 137-KK: HSTM Ch. 1, Sec. 8.0; ADC010696-010697.)

717.    ADC requires health care providers to obtain informed consent for examinations, treatments, and procedures. (Ex. 137-KK: HSTM Ch. 8, Sec. 2.0, Para. 1.0; ADC010980.)

718.    The health care provider must explain the procedure/treatment/test in

language and terms the inmate can understand. (Ex. 137-KK: HSTM Ch. 8, Sec. 2.0, Para. 1.0; ADC010980.)

719.    The explanation must include what is to be done and the reason for doing the procedure/test/treatment, and the benefits of the treatment must be explained as well as any risks and possible side effects. (Ex. 137-KK: HSTM Ch. 8, Sec. 2.0, Para. 1.0; ADC010980.)

720.    The provider must also explain the existence of any alternative test, procedure, or treatment.  (Ex. 137-KK: HSTM Ch. 8, Sec. 2.0, Para. 1.0; ADC010980.)

721.    The provider must document the discussion on the Consent to Treat Form and have the inmate sign the completed Consent to Treat Form before two witnesses documenting that the inmate understands what has been explained to him or her.  (Ex. 137-KK: HSTM Ch. 8, Sec. 2.0, Para. 2.0, 2.1; ADC010980.)

722.    The completed Consent to Treat Form is filed in the inmate's Health Record File.  (Ex. 137-KK: HSTM Ch. 8, Sec. 2.0, Para. 2.3; ADC010980.)

723.    The informed consent requirement is waived if an emergency requires immediate medical intervention for the safety of the inmate or if a court order to treat has been obtained.  (Ex. 137-KK: HSTM Ch. 8, Sec. 2.0, Para. 3.0; ADC010980.)

724.    The clinical goals of the dental care program are that inmates are free of acute infection and acute active dental disease, have sufficient masticatory function so that eating and general health are adequately maintained, and have knowledge of basic oral hygiene to be able to practice self-care and prevention.  (Ex. 137-LL: DSTM Ch. 4; ADC010561.)

725.    Upon entry into ADC, each inmate receives a dental screening by a dentist or qualified health care staff trained by the dentist within seven days of admission. (Ex. 137-LL: DSTM Dental Procedure 770.1; Sec. 3.1; ADC010583.)

726.    Within 30 days of admission, each inmate receives either a panorex x-ray or full mouth series of x-rays. (Ex. 137-LL: DSTM Dental Procedure 770.1; Sec. 3.2; ADC010583.)

727.   Inmates re-admitted to the system who have not been examined within the last six months will have a complete dental examination within 30 days of arrival and the examining dentist will determine the need for dental x-rays.  (Ex. 137-LL: DSTM Dental Procedure 770.1; Sec. 3.2.2; ADC010583.)

728.   All dental x-rays are reviewed by a dentist. (Ex. 137-LL: DSTM Dental Procedure 770.1; Sec. 3.3; ADC010583.)

729.   Inmates who were not examined by a dentist at the intake facility will be examined by a dentist at the receiving facility within 30 days of admission.  (Ex. 137-LL: DSTM Dental Procedure 770.1; Sec. 3.5; ADC010583.)

730.   If an inmate refuses the initial or re-admission x-rays or examination, a Refusal of Treatment form shall be completed.  (Ex. 137-LL: DSTM Dental Procedure 770.1; Sec. 3.6; ADC010583.)

731.   The initial oral examination includes at a minimum review of medical history, hard and soft tissue exam as delineated by the dental chart, periodontal probing of selected teeth, development and documentation of a treatment plan, and assignment of an appropriate priority classification.   (Ex. 137-LL: DSTM Dental Procedure 770.3; Sec. 4.11.4.7, Para. 2-7; ADC010591.)

732.   An emergency oral examination includes at a minimum review of medical history, completion of a soft and hard tissue examination, charting of emergent conditions and evident pathology, and updating of classification and treatment plan status, if applicable.  (Ex. 137-LL: DSTM Dental Procedure 770.3; Sec. 4.11.4.8, Para. 1-4; ADC010591.)

733.   All entries in the dental chart will be made under the authority and responsibility of the dentist. (Ex. 137-LL: DSTM Dental Procedure 770.3; Sec. 4.11.4.7; ADC010591.)

734.   The DSTM establishes four levels of dental priorities.  (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 3.1; ADC010584-010585.)

735.   Priority 1 (Emergency Care) includes conditions requiring immediate

assessment, such as postoperative uncontrolled bleeding, facial swelling of a life-threatening nature or causing severe facial deformity, fracture of the mandible, maxilla, or zygomatic arch, avulsed dentition, extreme pain that is not responsive to dental treatment guidelines, and introral lacerations that require suturing to include the vermillion border of the lips.  (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 3.1.1; ADC010584.)

736.    Priority 2 (Urgent Care) includes conditions such as fractured dentition with pulp exposure, acute dental abscess, an oral pathological condition that may severely compromise the general health of the inmate, and acute necrotizing ulcerative gingivitis.  (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 3.1.2; ADC010584.)

737.    Priority 3 (Routine Care) includes conditions that require treatment to restore the form and function of an inmate's oral tissues and are not solely elective or cosmetic, such as caries, chronic periodontal conditions, non-restorable teeth, edentulous and partially edentulous patients requiring replacement, temporary, sedative, or immediate restorations, and non-functional broken prosthetic appliances (if the inmate qualifies), TMJ disorders, periodic examinations, gingival recession/root sensitivity, and routine dental prophylaxsis.    (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 3.1.3; ADC010584-010585.)

738.    Priority 4 (Exempt Conditions) are not treated at ADC and include fixed prosthodontics (crown and bridge), orthodontics, removal of asymptomatic third molars or impactions without pathology, treatment of discoloration, stains, and cosmetic defects, ridge augmentations, and vestibular extensions/implants. (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 3.1.4; ADC010585.)

739.    All inmates are classified according to the dental classification system upon initial examination.  (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 4.1; ADC010585.)

740.    The priority classification is re-evaluated and updated, if necessary, at each dental visit. (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 4.2; ADC010585.)

741.    The scheduling of dental appointments is based on the current

relative priority of the inmate's dental condition within the dental classification system. (Ex. 137-LL: DSTM Dental Procedure 770.2; Sec. 4.3; ADC010585.)

742.   DSTM Dental Procedure 770.4 sets forth procedures for chart review and continuity of dental treatment when an inmate moves from one facility to another. (Ex. 137-LL: DSTM Dental Procedure 770.4; Sec. 1.0; ADC010592.)

743.   A dentist performing a chart review upon transfer should evaluate the medical record problem list to determine if any high priority dental procedures are in process and/or if any medical holds relating to dental treatment are in place; evaluate the treatment plan and if the inmate is undergoing prosthetics, serial extractions, or root canal, schedule the inmate for continuing treatment; and evaluate the dental history to see if premedication is indicated.   (Ex. 137-LL: DSTM Dental Procedure 770.4; Sec. 3.2; ADC010592.)

744.   If the preliminary dental screening indicates an urgent status, the inmate should be appointed as soon as possible.  (Ex. 137-LL: DSTM Dental Procedure 770.4; Sec. 3.3; ADC010592.)

745.   If the intake dental examination has not been done, or if the inmate has not been clinically examined by a dentist, the inmate is scheduled to see the dentist within 30 days of arrival.   (Ex. 137-LL: DSTM Dental Procedure 770.4; Sec. 3.3; ADC010592.)

746.   If the inmate has not been seen/treated for an outstanding routine care HNR at the previous facility, the inmate's name should be inserted on the routine care waiting list at the receiving facility by the date of submission of the HNR.  (Ex. 137-LL: DSTM Dental Procedure 770.4; Sec. 3.4; ADC010592.)

747.   Inmates requesting dental treatment of a non-emergent nature may request a dental appointment by submitting an HNR.   (Ex. 137-LL: DSTM Dental Procedure 770.5; Sec. 3.2.1; ADC010593.)

748.   Inmates undergoing continuation of treatment, such as root canal therapy, prosthetics, or serial extractions should be re-appointed by the dentist.  (Ex. 137-

LL: DSTM Dental Procedure 770.5; Sec. 3.3.2; ADC010593.)

749.    Inmates requiring routine dental work, such as fillings, are required to submit an HNR for each visit if they wish to continue treatment.  (Ex. 137-LL: DSTM Dental Procedure 770.5; Sec. 3.3.3; ADC010593.)

750.    A complete health history must be taken before administration of dental x-rays.  (Ex. 137-LL: DSTM Dental Procedure 771.1; Sec. 3.1.1.1; ADC010597.)

751.    All dental staff must hold a current Basic Life Support Certificate by the American Red Cross or equivalent.  (Ex. 137-LL: DSTM Dental Procedure 771.2; Sec. 4.0; ADC010599.)

752.    Each dental clinic must maintain a medical emergency kit.  (Ex. 137-LL: DSTM Dental Procedure 771.2; Sec. 5.0; ADC010600.)

753.    All dental staff must have current CPR certification.  (Ex. 137-LL: DSTM Dental Procedure 771.3; Sec. 3. 1; ADC010601.)

754.    Medical emergency drills are held annually at each dental facility, including monitoring vital signs, administration of oxygen, administration of CPR, administration of $CO_2$ enriched air, administration of medication, coordination with medical staff, and review of responsibilities assigned to each staff member.  (Ex. 137-LL: DSTM Dental Procedure 771.3; Sec. 3.2; ADC010602.)

755.    A medical hold should be initiated when the following dental procedures are initiated: reduction of fractured facial bones, endodontic treatment, prosthetics, and any other condition requiring continued observation or follow-up by the dentist.  The pertinent treatment is recorded on the Problem List and Continuous Progress Notes in the dental chart, and dental staff notifies the medical records department to enter the information into AIMS.  (Ex. 137-LL: DSTM Dental Procedure 771.4; Sec. 3.2, 3.3; ADC010602.)

756.    DSTM Dental Procedure 771.5 establishes the criteria used to determine an inmate's eligibility for dental prostheses and the priorities by which they will be provided.  (Ex. 137-LL: DSTM Dental Procedure 771.5; Sec. 1.0; ADC010603.)

757. An inmate is eligible for a full denture under the following circumstances: medically compromised patients who as a result of missing teeth are exhibiting a significant medical condition that can be ameliorated by return to adequate masticatory function (first priority); patients needing full upper or lower dentures or both as a result of extractions performed as part of an ongoing treatment plan or who have lost teeth while in ADC (second priority); and inmates who entered ADC with missing teeth and are edentulous upper and/or lower (third priority). (Ex. 137-LL: DSTM Dental Procedure 771.5; Sec. 4.1; ADC010603.)

758. A partial denture will only be provided if an inmate's occlusion score is 15 or less and the inmate does not have active caries, moderate or severe periodontal disease, mobility of abutments, or inadequate oral hygiene. (Ex. 137-LL: DSTM Dental Procedure 771.5; Sec. 4.2; ADC010603.)

759. Partial dentures are provided under the following circumstances: medically compromised patients who as a result of missing teeth are exhibiting a significant medical condition that would be ameliorated by return to adequate masticatory function (first priority); inmates who qualify as a result of extractions performed as part of an on-going treatment plan or who have lost teeth while in ADC (second priority); inmate who entered ADC with missing teeth (third priority). (Ex. 137-LL: DSTM Dental Procedure 771.5; Sec. 4.2; ADC010604.)

760. A complete dental scaling is performed before impressions are taken for construction of a partial denture. (Ex. 137-LL: DSTM Dental Procedure 771.5; Sec. 4.2; ADC010604.)

761. DSTM Dental Procedure 771.6 provides the protocol for the replacement of full or partial dentures supplied to inmates by ADC. (Ex. 137-LL: DSTM Dental Procedure 771.6; Sec. 1.0; ADC010605.)

762. DSTM Dental Procedure 771.8 provides the criteria for the provision of endodontic therapy at ADC. (Ex. 137-LL: DSTM Dental Procedure 771.8; Sec. 1.0; ADC010606.)

763.    DSTM Dental Procedure 772.1 provides infectious and hazardous materials control procedures for ADC dental clinics.   (Ex. 137-LL: DSTM Dental Procedure 772.1; Sec. 1.0; ADC010611.)

764.    DSTM Dental Procedure 772.2 provides procedures for handling, control, and disposal of sharps and hazardous materials at ADC dental clinics.  (Ex. 137-LL: DSTM Dental Procedure 772.2; Sec. 1.0; ADC010612.)

765.    DSTM Dental Procedure 773 provides the criteria for determining an inmate's eligibility for wisdom tooth removal at ADC.   (Ex. 137-LL: DSTM Dental Procedure 773; Sec. 1.0; ADC010615.)

766.    DSTM Dental Procedure 773.1 provides the procedure for suspending dental treatment by dentists when the inmate is uncooperative in the execution of his/her dental treatment plan.  (Ex. 137-LL: DSTM Dental Procedure 773.1; Sec. 1.0; ADC010616.)

767.    DSTM Dental Procedure 773.2 defines the availability of dental services for inmates with terms of incarceration of six months or less.   (Ex. 137-LL: DSTM Dental Procedure 773.2; Sec. 1.0; ADC010617.)

768.    Priority 1 (emergency) and 2 (urgent care) are available to all inmates regardless of the length of their sentence.  (Ex. 137-LL: DSTM Dental Procedure 773.2; Sec. 3.2, 3.3; ADC010617.)

769.    Other dental treatment should not be initiated when there is insufficient time to achieve completion.  (Ex. 137-LL: DSTM Dental Procedure 773.2; Sec. 3.3; ADC010617.)

770.    DSTM Dental Procedure 773.3 defines the types and extent of periodontal services available for inmates at ADC.  (Ex. 137-LL: DSTM Dental Procedure 773.3; Sec. 1.0; ADC010618.)

771.    DSTM Dental Procedure 773.4 provides procedures for continuation of orthodontic treatment of inmates entering ADC who are undergoing orthodontic treatment. (Ex. 137-LL: DSTM Dental Procedure 773.4; Sec. 1.0; ADC010619.)

772.   DSTM Dental Procedure 773.5 establishes the procedure for informed consent for dental procedures and right to refuse dental treatment.  (Ex. 137-LL: DSTM Dental Procedure 773.5; Sec. 1.0; ADC010620.)

773.   DSTM Dental Procedure 774 provides guidelines for charging inmates for dental care.   (Ex. 137-LL: DSTM Dental Procedure 774; Sec. 1.0; ADC010622.)

774.   DSTM Dental Procedure 782 establishes a system of continuing quality improvement of the dental services program through a peer review system.  (Ex. 137-LL: DSTM Dental Procedure 782; Sec. 1.0; ADC010627.)

775.   DSTM Dental Procedure 785 provides guidelines for evaluation and management of TMJ disorders at ADC.  (Ex. 137-LL: DSTM Dental Procedure 785; Sec. 1.0; ADC010631.)

776.   DSTM Dental Procedure 786 provides a standardized procedure for keeping dental materials and pharmaceuticals current and properly disposed of prior to the manufacturer's expiration date.  (Ex. 137-LL: DSTM Dental Procedure 786; Sec. 1.0; ADC010633.)

777.   DSTM Dental Service Procedure 787 governs evaluation and triage of dental HNRs.  (Ex. 137-LL: DSTM Dental Procedure 787; ADC010634.)

778.   Dental assistants evaluate HNRs using the dental classification system (Dental Procedure 770.2).  (DSTM Dental Procedure 787; Sec. 5.1; ADC010634.)

779.   Inmates whose requests are considered Priority 1 or 2 will be scheduled for clinical evaluation by the dental assistant that day or the next clinical day. (Ex. 137-LL: DSTM Dental Procedure 787; Sec. 5.1; ADC010634.)

780.   The dental assistant's clinical evaluation includes the collecting and recording of information regarding an inmate's complaint of pain, oral bleeding, or facial swelling.  (Ex. 137-LL: DSTM Dental Procedure 787; Sec. 3.0; ADC010634.)

781.   The dental assistant also reviews the inmate's health history, performs an oral evaluation, and takes dental x-rays to assist the dentist in determining the

severity of the dental condition.  (Ex. 137-LL: DSTM Dental Procedure 787; Sec. 5.2; ADC010634.)

782.    The dental assistant SOAP notes and dental x-rays are recorded in the dental section of the Inmate Health Record.  (Ex. 137-LL: DSTM Dental Procedure 786; Sec. 5.7; ADC010634.)

783.    The dental records and x-rays of inmates who received a dental assistant evaluation will be reviewed and acknowledged by a dentist within one business day.  (Ex. 137-LL: DSTM Dental Procedure 787; Sec. 5.3; ADC010634.)

784.    The inmate is rescheduled for treatment by the reviewing provider based on the priority level of the inmate's dental condition.  (Ex. 137-LL: DSTM Dental Procedure 787; Sec. 5.5; ADC010634.)

785.    If the reviewing provider has any question regarding the dental assistant's evaluation, the dentist should see the inmate within 24 hours. (Ex. 137-LL: DSTM Dental Procedure 787; Sec. 5.5; ADC010634.)

786.    The DSTM also includes policies regarding infection control during pre-treatment, post-treatment, and laboratory procedures, and a hazard communication plan. (Ex. 137-LL: DSTM Ch. 8, 9; ADC010636-010647.)

787.    ADC policy properly addresses and categorizes by priority emergency, urgent, and routine care.  (Ex. 122 at ¶ 71.)

788.    ADC's dental policies as stated in the DSTM are within the standard of care. (Ex. 122 at ¶ 71.)

789.    Elective dentistry, including fixed prosthodontics (crown and bridge), cosmetic defects, ridge augmentations, and vestibular extensions/implants, which is not available at ADC, is a luxury even for the private sector.  (Ex. 122 at ¶ 72.)

790.    ADC policy complies with NCCHC standard P-E-06, which requires a "system of established priorities for care when, in the dentist's judgment, the inmate's health would otherwise be adversely affected."  (Ex. 122 at ¶ 73.)

791.    The contract with Corizon includes additional requirements relating

to dental, including timeliness of care and required reporting.  (Ex. 122 at ¶ 74.)

792.   The contract requires that the contractor (Corizon/Smallwood) provide urgent dental care within 72 hours and routine dental care within 90 days.  (Ex. 137-CC: Contract Request For Proposal (RFP) §§ 2.11.5 and 2.11.6, ADC013200.)

793.   The contract also requires compliance with all applicable NCCHC standards.  (Ex. 137-CC: RFP § 2.11.4, ADC014199.)

794.   The NCCHC has established wait times for intakes and urgent care: the NCCHC standards require that inmates receive an oral screening within seven days of intake and an oral examination by a dentist within 30 days.  (Ex. 122-E: P-E-06, Attachment E to Dovgan Decl.

795.   The NCCHC also recommends that urgent care requests be seen within 72 hours.  (Ex. 122-F: Appendix G: Guidelines for a Correctional Dental Health Care System at 168, Attachment F to Dovgan Decl.)

796.   ADC policy complies with NCCHC standards for timeliness of intake and urgent care.  (Ex. 122 at ¶ 78.)

797.   ADC policy is being routinely followed at all dental clinics statewide.  (Ex. 122 at ¶ 79.)

**B.      Dental Standard of Care**

798.   While the delivery of dental care in a prison is somewhat different than in a private dental office, the standard of care in prison is the same as in private practice.  (Ex. 122 at ¶ 52.)

799.   Dr. Shulman agrees that the quality of care should be the same in a correctional setting as in private practice.  (Ex. 169 at 86:22-87:3.)

800.   The National Commission on Correctional Health Care (NCCHC) publishes standards for the proper management of a correctional health services delivery system.  (Ex. 122 at ¶ 53.)

801.   Correctional facilities that comply with these standards may be accredited by the NCCHC through an external peer review process.  (Ex. 122 at ¶ 54.)

802.   The NCCHC standard for oral care states: "Oral care under the direction and supervision of a dentist licensed in the state is provided to each inmate. Care is timely and includes immediate access for urgent or painful conditions.  There is a system of established priorities for care when, in the dentist's judgment, the inmate's health would otherwise be adversely affected."  (Ex. 122-E: P-E-06, Attachment E to Dovgan Decl.)

803.   The NCCHC also establishes requirements for dental intake screening and examinations and recommendations for treatment of urgent care.  (Ex. 122-F: P-E-06 and Appendix G: Guidelines for a Correctional Dental Health Care System, Attachment E, F to Dovgan Decl.)

C.   **Dental Care at ADC**

804.   Dental care at ADC is provided by Smallwood Prison Dental Services ("SPDS"), a private company owned by Dr. William Smallwood, who subcontracts with Corizon to provide dental care.  (Ex. 122 at ¶ 61.)

805.   SPDS has been providing dental care at ADC since March 4, 2013 after taking over from Wexford, which provided dental care at ADC from July 1, 2012 to March 3, 2013.  (Ex. 122 at ¶ 62.)

806.   SPDS was incorporated in 2003.  (Ex. 168 at 8:19-22.)

807.   SPDS provides dental services to inmates in the states of Georgia (over 40,000 inmates), Florida (90,000 inmates), Virginia, and Arizona (36,000 inmates). (Ex. 168 at 8:23-9:3.)

808.   In Dr. Smallwood's opinion, based upon his experience in employing over 400 dental professionals, managing dental care in over 110 prisons, and having responsibility for the dental care of over 160,000 inmates, there were no systemic problems with dental operations at ADC when SPDS took over from Wexford.  (Ex. 168 at 164:18-21, 164:25-165:1, 166:15-20.)

809.   The problems SPDS encountered when it took over from Wexford were not systemic and were fixed within a few months.  (Ex. 168 at 168:13-22.)

810.   In Dr. Smallwood's opinion, ADC's Dental Services Technical Manual is better than most states.  (Ex. 168 at 23:11-14.)

**D.**     **Access to Dental Care**

811.   Inmates at ADC submit a Health Needs Request (HNR) form to request dental care.  (Ex. 122 at ¶ 80.)

812.   HNRs are collected daily by nursing staff, who triage them and separate them by type of service requested.  (Ex. 122 at ¶ 81.)

813.   HNRs requesting dental care are given to dental staff. (Ex. 122 at ¶ 81.)

814.   Dental assistants triage the HNRs and classify the inmate's request as urgent, routine, or exempt based on the priorities defined in the DSTM.  (Ex. 122 at ¶ 82.)

815.   Inmates must generally submit an HNR each time they desire dental treatment, but per ADC policy, appointments for serial extractions and prostheses are made by the dentist without the need for additional HNRs.  (Ex. 122 at ¶ 83.)

816.   Inmates are automatically appointed by the dentist for serial extractions and prostheses without submitting additional HNRs.  (Ex. 122 at ¶ 84.)

817.   Inmates at ADC are scheduled for appointments based on the priorities defined in the DSTM.  Inmates with urgent care needs are scheduled first, then inmates on the routine care list.  (Ex. 122 at ¶ 85.)

818.   Inmates on the routine care list are generally seen in the order in which they submit their HNRs, but the order may vary slightly based on security issues. (Ex. 122 at ¶ 86.)

819.   Dental clinics will often schedule inmates by yard to maximize efficiency and minimize security concerns. (Ex. 122 at ¶ 86.)

820.   Dentists at ADC practice quadrant dentistry, meaning that multiple teeth in one quadrant of the mouth can be treated in a single appointment if clinically appropriate. (Ex. 122 at ¶ 87.)

821.   Inmate refusals of dental appointments and no shows are documented

in their dental charts.  (Ex. 122 at ¶ 88.)

**E.** **Dental Intakes**

822.    ADC policy requires that all inmates receive an oral screening by a dentist or qualified health care staff within seven days of admission, either a pano x-ray or a full mouth series of x-rays within 30 days, and an oral examination within 30 days.  (Ex. 137-LL: DSTM 770.1, ADC010583.)

823.    At intake, inmates are educated on proper oral hygiene and review a video designed for that purpose.  (Ex. 122 at ¶ 90.)

824.    Inmates are also instructed on how to access dental care within ADC. (Ex. 122 at ¶ 91.)

825.    ADC policy regarding intake procedures complies with NCCHC oral care standard P-E-06.  (Ex. 122 at ¶ 92.)

826.    All ADC dental clinics are in compliance with ADC policy and NCCHC compliance indicators for intake procedures.  (Ex. 122 at ¶ 93.)

827.    Dr. Shulman concedes that inmates at ADC have access to basic dental care.  (Ex. 169 at 213:12-24.)

**F.** **Dental Treatment of the named Plaintiffs**

REDACTED

REDACTED



REDACTED



REDACTED

862.   The standard of care does not allow for impressions for long-term partials to be made until preparatory dental work has been completed.  (Ex. 122 at ¶ 297.)

863.   REDACTED

871.   REDACTED

2.   **Plaintiff Chisholm**



1        879.   Chisholm was seen by Dr. Hanstad one week later (12/30/2011),

2   when he REDACTED



REDACTED





REDACTED



1    REDACTED



1    REDACTED )

2          942.   Dr. Thorpe, the oral surgeon who treated REDACTED holds a current

3    1301 anesthesia permit to administer general anesthesia in the State of Arizona.  (Ex. 122-

4    H at ¶ 358.

5          943.   It is normal practice for oral surgeons, such as Dr. Thorpe, to

6    administer general anesthesia in their office.  (Ex. 122 at ¶ 351.)

155





REDACTED

REDACTED

982.    To perform dental treatment on an inmate with continued chest pain after a heart attack without clearance from her physician is below the standard of care. (Ex. 122 at ¶ 384.)

983.    To imply that dental treatment should have been performed on her regardless of her physical complications is itself below the standard of care. (Ex. 122 at ¶ 384. )

REDACTED

987.    Both dentists' treatment recommendations were within the standard of care. (Ex. 122 at ¶ 386.)

1   REDACTED

2

3

4          989.   There is a gray area in which one dentist may attempt to place a large

5   filling with the knowledge that the tooth may "die" as a result of the treatment while

6   another may decide that an extraction is appropriate.  (Ex. 122 at ¶ 387.)

7   REDACTED

8

9

10

11       **G.      <u>Timeliness of Dental Care</u>**

12          991.   Under the Contract, Smallwood is required to have dental

13   practitioners available 24 hours a day, seven days a week, including after-hours and

14   weekend for emergency consultation and direction.    (Ex. 137-CC: RFP § 2.11.3,

15   ADC014199).

16          992.   Inmates with emergency dental needs must be seen within 24 hours.

17   (Ex. 137-CC: RFP § 2.11.4, ADC014199-200).

18          993.   Inmates with urgent dental needs must be seen within 72 hours.

19   (Ex. 137-CC: RFP § 2.11.5, ADC014200).

20          994.   Inmates with routine dental needs must be seen within 90 days of

21   receipt of an HNR.  (Ex. 137-CC: RFP § 2.11.6, ADC014200.)

22          995.   Dr. Shulman agrees that there are timelines for emergency, urgent,

23   and routine care in the contract which are enforced against the dental contractor.  (Ex. 169

24   at 148:4-20, 149:17-20.)

25          996.   A wait time of three months for routine dental care is becoming the

26   industry standard in correctional dentistry.  (Ex. 168 at 61:18-20.)

27   REDACTED

28

1    REDACTED

2

3

4

5

6

7

8

9

10

11

12          1002.  SPDS inherited a backlog of dental requests from Wexford.  (Ex. 122

13   at ¶¶ 156, 165.)

14          1003.  Within less than two months, SPDS brought wait times for routine

15   dental treatment within contract compliance at 8 out of 10 complexes, and in less than

16   four months, SPDS brought wait times for routine dental treatment within contract

17   compliance at all 10 complexes.  (Ex. 122 at ¶ 156.)

18          REDACTED

19

20          1005.  SPDS eliminated the backlog of inmates needing care it inherited

21   from Wexford within a reasonable time.  (Ex. 122 at ¶ 165.)

22          REDACTED

23

24

25

26

27

28

REDACTED

1010. ADC's guidelines for routine care and intake wait times are similar to or even better than would be found in private practice. (Ex. 122 at ¶ 160.)

1011. The average wait time for an urgent-type issue in private practice is approximately 5.4 days. (Ex. 122 at ¶ 161.)

1012. Private dental offices generally schedule cleanings six months in advance. (Ex. 122 at ¶ 162.)

1013. Wait times for dental treatment may be extended due to inmates being away at court, inmate refusals of care, inmate health issues that prevent provision of dental care, and security issues. (Ex. 122 at ¶ 163.)

1014. Extended wait times for dental treatment at ADC are usually occasioned by an inmate being out to court or experiencing medical issues, such as heart problems, that preclude dental treatment prior to medical clearance. (Ex. 122 at ¶¶ 163-64.)

1015. There are always about three or four inmates on the dental wait list who are out to court. (Ex. 170 at 116:22-117:2.)

1016. These inmates are noted in CDS. (Ex. 170 at 116:25-117:1.)

1017. An inmate who is out to court is out of ADC custody and cannot be brought into the dental clinic for treatment. (Ex. 122 at ¶ 163.)

1018. Inmates who are out to court remain on the wait list and are included in average wait times. (Ex. 170 at 118:9-19.)

1019. Inmates who are out to court are usually gone for weeks or months. (Ex. 170 at 118:12-13.)

REDACTED

1021.  If an inmate has an urgent dental issue during a facility lock-down the facility health administrator in conjunction with nursing and security staff can determine whether the inmate should be brought to the dental clinic for treatment.  (Ex. 170 at 120:21-121:21.)

1022.  Even if wait times for routine dental care were longer than the contract requirement of 90 days, there would likely be no resulting harm, because a restorable tooth will not become non-restorable in a matter of weeks or even months.  (Ex. 122 at ¶¶ 166-71.)

REDACTED

1032.  A few HNRs being treated outside guidelines is to be expected in a system as large as ADC.  (Ex. 122 at ¶ 177.)

1033. SPDS has an appropriate number of dentists, dental hygienists, and dentist assistants to properly treat all inmates within the ADC guidelines as evidenced by average wait times for dental treatment. (Ex. 122 at ¶¶ 187, 190; Ex. 168 at 104:4-11.)

1034. CDS provides SPDS a real-time view of current dental wait times at all ADC complexes statewide.  This allows SPDS to shift dentists, dental assistants, and dental hygienists to other facilities to meet inmate demand for dental treatment.  (Ex. 122 at ¶¶ 178-181; Ex. 168 at 67:8-23; Ex. 170 at 112:20-113:5.)

REDACTED

**H.** **Dental Staffing**

1038. The ratio of dentists to inmates is not determinative of appropriate dental staffing at a correctional facility.  (Ex. 122 at ¶¶ 183-85; Ex. 169 at 99:9-102:4; Ex. 168 at 65:2-5, 65:12-15; 67:18-23.)

REDACTED

1040. Multiple factors affect dental staffing needs at a correctional facility, including type of facility, inmate population, demand for dental services, proximity of

163

other dental facilities, and security level.  (Ex. 122 at ¶¶ 174-77; Ex. 168 at 65:12-15; 67:18-23.)

1041.  CDS offers a real-time picture of wait times at each facility, and allows the dental directors to move staff to facilities with longer wait times.  (Ex. 170: Hanstad Dep. 112:20-113:5.)

1042.  SPDS hired dental hygienists in approximately June 2013.  (Ex. 168 at 108:1-14.)

1043.  If a dental hygienist is not available at a facility, the dentists perform cleanings.  (Ex. 170 at 209:21-23.)

1044.  Dental hygienists at ADC can provide gross debridement, scaling and root planning, take bite wing x-rays, and enter SOAP notes.  (Ex. 170 at 209:8-12.)

1045.  Low wait times for dental treatment at all complexes statewide, coupled with the results of quality assurance reviews and peer reviews, shows that the current staffing level is sufficient to meet the dental needs of the ADC population.  (Ex. 168 at 104:4-11.)

1046.  REDACTED

**I.      CDS**

1048.  SPDS uses CDS, a proprietary software program for managing patient requests, appointments, and treatment.  (Ex. 122 at ¶ 146.)

1049.  CDS provides information on all aspect of corrections dentistry, including wait times, dentures, restorations, extractions, emergency care, urgent care, routine care, medical diets, and dental grievances.  (Ex. 168 at 14:4-14, 16:12-17, 22:1-5.)

1050. CDS includes a real-time wait list and monthly and daily reporting capabilities. (Ex. 168 at 83:14-18.)

1051. CDS includes transfer reports, which track inmate movements across ADC facilities for continuity of care. (Ex. 168 at 84:13-23.)

1052. CDS also includes a scheduling inquiry, which shows each dentist's schedule and the types of procedures scheduled for that dentist. (Ex. 168 at 85:1-10.)

1053. CDS includes a utilization management report which shows each facility's production. (Ex. 168 at 85:11-14.)

1054. CDS also produces graphs of this data. (Ex. 168 at 85:14-17.)

1055. CDS includes a management summary, which shows in red any inmate who has been waiting 90 days or longer for routine care. (Ex. 168 at 102:22-103:8.)

1056. Prior to CDS, dental appointments were tracked manually. (Ex. 122 at ¶ 147.)

1057. If an inmate submitted multiple HNRs, the inmate might be on the routine care list multiple times. (Ex. 122 at ¶ 147.)

1058. If an inmate transferred to a different complex, the inmate would have to resubmit an HNR at the receiving complex to be placed on the routine care list there. (Ex. 122 at ¶ 147.)

1059. CDS is linked to ADC's inmate management system (AIMS) and is updated daily. (Ex. 122 at ¶ 148.)

1060. If an inmate on the routine care list transfers to a different complex, the inmate is automatically placed on the routine care list at the new complex in the order in which he submitted his HNR. (Ex. 122 at ¶ 149.)

1061. CDS includes alerts when an inmate submits multiple HNRs for the same reason. (Ex. 122 at ¶ 149.)

1062. The routine care wait list at each complex is organized in CDS from longest to shortest wait time from the date of receipt of an HNR. (Ex. 122 at ¶ 150.)

1063. The CDS software automatically calculates the number of days an inmate has been waiting. (Ex. 122 at ¶ 151.)

1064. If an inmate has been waiting on the routine care list for 90 days or longer, the record turns red to alert dental staff. (Ex. 122 at ¶ 151.)

1065. There is also an alert for urgent care requests that have not been seen within 72 hours. (Ex. 122 at ¶ 151.)

1066. These alerts allow the regional dental directors and Dr. Smallwood to reallocate staff resources if needed. (Ex. 122 at ¶ 152.)

1067. For example, if one complex has several inmates who have requested cleanings who are nearing 90 days on the wait list, a dental hygienist can be sent to that complex. (Ex. 122 at ¶ 152.)

**B.      Extraction Policy**

1068. From April 2013 through March 2014, ADC inmates submitted 46,112 HNRs, resulting in 60,440 dental appointments and 6,342 refusals of dental care. (Ex. 122 at ¶¶ 195-96.)

1069. During this period, dentists at ADC performed 10,263 fillings, 11,275 simple extractions, and 2,330 surgical extractions. (Ex. 122 at ¶¶ 195-96.)

1070. There were also 7,339 cleanings performed and 1,298 full and partial dentures completed. (Ex. 122 at ¶¶ 195-96.)

REDACTED

1072. Whether a tooth should be extracted is a matter of clinical judgment. (Ex. 122 at ¶ 198.)

REDACTED

1074. Conditions in which a tooth cannot be restored include cavities well below the gum line, periapical pathology in a patient who cannot have root canal therapy,

166

severe periodontitis, severe mobility, and acute inflammation in the area that is destructive to the apex of the tooth.  (Ex. 170 at 141:10-142:2.)

1075.  Dentists at ADC will save a tooth if it can be saved.  (Ex. 122 at ¶ 199.)

REDACTED

1077.  It is easier to fill a tooth than to extract it.  (Ex. 122 at ¶ 200.)

1078.  Individual dentists have latitude to make clinical decisions based on their knowledge, skill, and judgment.  (Ex. 122 at ¶ 211.)

1079.  While one dentist may recommend extraction, another dentist may decide to fill the tooth; neither is below the standard of care. (Ex. 122 at ¶ 211.)

1080.  The standard of care is what a reasonable and prudent dentist would do in a like or similar situation.  (Ex. 122 at ¶ 212.)

1081.  It is not malpractice for a dentist to extract a tooth when the dentist determines that the long-term prognosis of a tooth is poor.  (Ex. 168 at 110:24-111:2.)

1082.  If an inmate has meth mouth, extractions are usually required.  (Ex. 168 at 112:18-22.)

1083.  Every dental case is different, and a number of factors influence whether a tooth becomes non-restorable, including oral health care, the inmate's past history, and how often he or she has been to the dentist in the past.  (Ex. 168 at 53:24-54:2.)

REDACTED

1086.  Making a determination as to whether a tooth is restorable without

167

viewing x-rays is itself below the standard of care.  (Ex. 122 at ¶ 217.)

1087.  Whether a tooth is restorable is a matter of clinical discretion that can only be adequately assessed with x-rays and an oral examination.  (Ex. 122 at ¶ 208; Ex. 168 at 113:8-12.)

REDACTED

1089.  In some cases, it may also be necessary to review a pre-operative intraoral photograph of a tooth to determine whether it was properly extracted.  (Ex. 122 at ¶ 208.)

REDACTED

J.    **Informed Consent**

1097.  To obtain informed consent for a dental procedure, the dentist should communicate the risks and benefits of the procedure and any available treatment alternatives to the patient.  (Ex. 122, ¶ 220.)

1098. It is the dentist's responsibility to communicate this information orally, on a written form, or both.  (Ex. 122, ¶ 221.)

1099. Dentists at ADC orally explain the risks, benefits, and alternatives of dental procedures to the patient.  (Ex. 122, ¶ 222.)

1100. ADC inmates also sign a written informed consent form for dental procedures, confirming that the dentist explained the risks, benefits, and any treatment alternatives.  (Ex. 122, ¶ 223.)

1101. It is the dentist's responsibility to communicate with the patient regarding any available treatment alternatives.  (Ex. 122: ¶ 226.)

1102. It does not matter whether the dentist communicates this information orally or in writing, so long as the patient understands the information.  (Ex. 122, ¶ 226.)

1103. For some patients, oral communication may be a more effective method of communicating this information.  (Ex. 122, ¶ 226.)

1104. An inmate does not need to be advised of treatment options that are not clinically appropriate.  (Ex. 122, ¶ 225.)

1105. The ADC Informed Consent form complies with NCCHC standards. (Ex. 122, ¶ 228.)

**K.**     **Dental Assistant Triage**

1106. At ADC, dental assistants review HNRs and assign them a priority using Dental Procedure 770.2.  (Ex. 122, ¶ 94.)

1107. While ADC Dental Procedure 770.2 does not specifically use the word "pain," all dental assistants at ADC are trained that an HNR stating "pain" or any synonym for pain, such as ouch, hurt, abscess, or swelling, should be classified as urgent care.  (Ex. 122, ¶¶ 95-98; Ex. 168 at 151:8-12; Ex. 170 at15:22-16:2.)

1108. ADC has a pattern and practice of placing a pain HNR on the urgent care list.  (Ex. 170 at 251:10-14.)

1109. New dental assistants receive on-the-job training with an experienced dental assistant and the dentist on how to triage HNRs.  (Ex. 168 at 152:21-153:16; (Ex.

170 at 190:17-20.)

1110.  Dental assistants also receive training on security, provision of dental care in a correctional setting, infection control, the ADC Dental Services Technical Manual, and CDS.  (Ex. 168 at 124:16-125:21.)

1111.  The likelihood of a dental assistant being in the dental clinic without a dentist present is extremely low.  (Ex. 168 at 177:15-178:5.)

1112.  If a dental assistant is unsure whether to classify an HNR as urgent care, he or she will ask the supervising dentist.  (Ex. 122 at ¶ 97.)

1113.  Dentists spot-check HNRs to check whether dental assistants are properly classifying HNRs regarding pain as urgent care.  (Ex. 122 at ¶ 98; Ex. 170 at 16:6-24, 24:20-25:5.)

1114.  Dentists review HNRs as part of the treatment they provide to the inmates when they come in for their appointments.  (Ex. 168 at 178:20-25; Ex. 122 at ¶ 98; Ex. 170 at 18:18-25.)

1115.  If there is a problem with a dental assistant incorrectly classifying an HNR as urgent or routine care, the dentist will see the HNR when the inmate is seen for his or her appointment and can counsel the dental assistant on the appropriate procedure. (Ex. 168 at 179:1-12.)

1116.  Dental assistants receive a formal annual evaluation by the supervising dentist which includes an evaluation of attendance, infection control, and triage of HNRs. (Ex. 168 at 145:1-146:3; Ex. 170 at 161:17-162:5.)

REDACTED

1118.  Arizona Administrative Code Section R4-11-701(B) provides that "a dental assistant may perform the following procedures and functions under the general supervision of a licensed dentist: (1) Train or instruct patients in oral hygiene techniques, preventive procedures, dietary counseling for caries and plaque control, and provide pre-

and post-operative instructions relative to specific office treatment; (2) Collect and record information pertaining to extraoral conditions; and (3) Collect and record information pertaining to existing intraoral conditions."

1119. Arizona law does not prohibit a dental assistant from classifying a patient's dental needs as either urgent or routine.   Ariz. Adm. Code § R4-11-702 (limitations on procedures or functions performed by a dental assistant under supervision).

1120. Arizona Administrative Code Section R4-11-702 provides that a dental assistant shall not perform the following procedures or functions: (1) A procedure which by law only licensed dentists, licensed dental hygienists, or certified denturists can perform; (2) Intraoral carvings of dental restorations or prostheses; (3) Final jaw registrations; (4) Taking final impressions for any activating orthodontic appliance, fixed or removable prosthesis; (5) Activating orthodontic appliances; or (6) An irreversible procedure.

1121. General supervision as used in the Arizona dental regulations and statutes means that the dentist is not required to be physically present.  (Ariz. Admin. Code § R4-11-101; Ex. 122 at ¶ 104.)

1122. Direct supervision requires that the dentist be physically present. (Ariz. Admin. Code § R4-11-101; (Ex. 122 at ¶ 104.)

REDACTED

1124. A dentist is almost always present at each ADC dental clinic during clinic hours. (Ex. 122 at ¶ 105.)

1125. On the rare occasion that a dentist is not present, each complex maintains an on-call roster of dentists who can be reached by the dental assistant for a telephonic consultation. (Ex. 122 at ¶ 105.)

REDACTED

REDACTED

1127. If the dentist is not present, the dentist may nonetheless make a diagnosis and prescribe antibiotics by telephone if appropriate based on the information collected and conveyed by the dental assistant.  (Ex. 122 at ¶ 106.)

1128.  In this situation, the dentist is the one authorizing any medication and making clinical decisions by proxy. (Ex. 122 at ¶ 106.)

1129.  This is common in private practice and is within the standard of care. (Ex. 122 at ¶ 106.)

1130.  If the dentist is not present to render treatment or is unable to render a diagnosis based on the information conveyed by the dental assistant, the patient can be stabilized and scheduled for follow-up with the dentist when he or she returns to the clinic.  (Ex. 122 at ¶ 106.)

1131.  Arizona law permits dental assistants to collect information pertaining to intraoral conditions, which includes looking inside the patient's mouth and taking x-rays.  (Ex. 122 at ¶ 103; Ex. 168 at132:8-10; Ex. 170 at 178:1-18, 185:19-186:2.)

1132.  Dental assistants can look in the mouth to see if there is an obvious problem, such swelling or a large hole in a tooth.  (Ex. 168 at 114:18-115:8.)

1133.  Dental assistants can also look for swelling on the outside of an inmate's cheek.  (Ex. 168 at 115:8-10.)

1134.  The information collected from an intraoral review and x-ray may be conveyed to the dentist by the dental assistant.  (Ex. 122 at ¶ 103.)

1135.  The dental assistant can describe what he or she observes on an x-ray and in a patient's mouth to the dentist, but may not interpret x-rays or diagnose the patient. (Ex. 122 at ¶ 103.)

1136.  A dental assistant is permitted to record clinical findings in the chart. (Ex. 122 at ¶ 107.)

REDACTED

REDACTED

1138.  ADC policy regarding dental assistant triage complies with Arizona law.  (Ex. 122 at ¶ 108.)

1139.  In practice, dental assistants at ADC work within the boundaries of Arizona law.  (Ex. 122 at ¶ 109.)

1140.  Dentists at ADC are all licensed in Arizona.  (Ex. 168 at 126:16-19.)

1141.  Dentists at ADC would be subject to disciplinary action by the Arizona Dental Board of Examiners if they permitted dental assistants to act outside the scope of Arizona law. A.R.S. § 32-1263(A)(14).

1142.  ADC policy is also consistent with the American Dental Association's (ADA) literature regarding dental assistant job functions.  (Ex. 122 at ¶ 111.)

1143.  The ADA states that dental assistants may perform the following work: assisting the dentist during a variety of treatment procedures; taking and developing dental radiographs (x-rays); asking about the patient's medical history and taking blood pressure and pulse; serving as an infection control officer, developing infection control protocol and preparing and sterilizing instruments and equipment; helping patients feel comfortable before, during, and after dental treatment; providing patients with instructions for oral care following surgery or other dental treatment procedures, such as the placement of a restoration (filling); teaching patients appropriate oral hygiene strategies to maintain oral health (e.g., tooth brushing, flossing and nutritional counseling); taking impressions of patients' teeth for study casts (models of teeth); performing office management tasks that often require the use of a personal computer; communicating with patients and suppliers (e.g., scheduling appointments, answering the telephone, billing and ordering supplies); and helping to provide direct patient care in all dental specialties, including orthodontics, pediatric dentistry, periodontics and oral surgery.  (See Careers in the Dental Profession: Dental Assisting Word of Mouth, Ex. 122-H.)

1144.  Having dental assistants triage HNRs is similar to what occurs in

private practice when a patient calls to schedule an appointment.  (Ex. 122 at ¶ 113.)

1145.  When a patient calls a dental office for an appointment, the patient never talks to a dentist.  (Ex. 122 at ¶ 114.)

1146.  The patient is generally greeted by a front office employee with little to no formal dental training or a dental assistant who, using his or her training, knowledge, and experience, determines whether to schedule the patient for an appointment on an urgent or routine basis.  (Ex. 122 at ¶ 114.)

REDACTED

1148.  There is no need to have a dentist at ADC make triage decisions that are routinely made by dental assistants or front office employees in private practice.  (Ex. 122 at ¶ 115.)

1149.  Having dental assistants at ADC triage HNRs is within the standard of care.  (Ex. 122 at ¶ 116.)

REDACTED

**L.**    **Dental X-Rays**

1151.  Dental assistants are trained to take x-rays, and it does not take a dental degree to perform that simple function.  (Ex. 122 at ¶ 117; Ex. 168 at 128:14-16.)

1152.  Arizona law expressly permits dental assistants to take x-rays under the general supervision of a dentist.  See A.R.S. § 32-1291(A) ("A dental assistant may expose radiographs for diagnostic purposes under the general supervision of a dentist licensed pursuant to this chapter if the assistant has passed an examination approved by the board.").

1153.  All ADC dental assistants have taken an exam and received a certificate to take dental x-rays.  (Ex. 122 at ¶ 119; Ex. 168 at 123:23-124:15.)

1154.  All dentists at ADC are licensed in Arizona.  (Ex. 122 at ¶ 119; Ex.

168 at 126:16-19.)

1155.  Dental assistants may take x-rays without direct supervision from a dentist if there is a standing order from a dentist.  (Ex. 168 at 128:24-129:17.)

1156.  Each dentist at ADC has a standing order for the dental assistants he or she supervises to take x-rays.  (Ex. 122 at ¶ 120; Ex. 170 at179:25-180:21.)

1157.  Having a standing order to take x-rays is permissible under Arizona law and is within the standard of care.  (Ex. 122 at ¶ 121; Ex. 168 at 34:22-35:12.)

1158.  Standing orders are routinely used in private dental practices.  (Ex. 122 at ¶ 122; Ex. 168 at 34:22-35:12.)

1159.  In private practice, a dental assistant takes and records a patient's dental health history, looks inside the patient's mouth, and takes x-rays, if needed, all before the dentist sees the patient.  (Ex. 122 at ¶ 123.)

1160.  Dental assistants are capable of deciding which teeth to x-ray.  (Ex. 122 at ¶ 124.)

1161.  If a patient points to a tooth that is causing pain, the dental assistant should take an x-ray of that tooth.  (Ex. 122 at ¶ 124.)

1162.  X-rays are a pre-requisite to any treatment on any particular tooth.  (Ex. 122 at ¶ 124.)

1163.  Therefore, an x-ray must be taken of any area that needs treatment or might need treatment.  (Ex. 122 at ¶ 124.)

1164.  Dr. Shulman agrees that an x-ray must be taken of a tooth before the tooth is extracted.  (Ex. 169 at 83:23-25.)

1165.  Taking an x-ray each time a patient comes in for a pain evaluation is within the standard of care.  (Ex. 122 at ¶ 125.)

REDACTED

**M.**     **Removal From The Routine Care List After An Urgent Care Appointment**

1167. Dentists at ADC have discretion to remove an inmate from the routine care list if the inmate submits an HNR for pain and is seen for an urgent care appointment. (Ex. 122 at ¶ 229; Ex. 170 at 128:22-129:3.)

1168. If the inmate is removed from the routine care list, the inmate is instructed by the dentist to submit a new HNR if he or she wishes to be placed back on the routine care list. (Ex. 122 at ¶ 229; Ex. 170 at 128:22-129:3.)

1169. This practice is used to prioritize care such that an inmate who is seen for an urgent care appointment is not seen again for a routine care appointment ahead of another inmate on the routine care list who has not been seen at all. (Ex. 122 at ¶ 230.)

1170. A dentist may also decide in his or her clinical discretion to keep an inmate on the routine care list despite being seen for an urgent care appointment. (Ex. 122 at ¶ 231.)

1171. This practice is reasonable and relies on the discretion of the dentist to determine the fair and clinically appropriate prioritization of dental treatment to inmates. (Ex. 122 at ¶ 232.)

1172. SPDS allows facilities the discretion to permit an inmate to have more than one HNR at a time. Smallwood Dep. 77:6-10.

1173. If an inmate is seen for an urgent care appointment and provided antibiotics to reduce swelling, the inmate does not need to resubmit an HNR to receive treatment for the tooth; the dentist schedules the inmate for follow-up treatment. (Ex. 168 at 86:5-88:19.)

1174. If an inmate is required to submit a new HNR to be placed back on the routine care list, he or she will have to wait at most six weeks under current average wait times to receive the routine treatment previously requested. (Ex. 122 at ¶ 233.)

1175. Waiting six weeks for routine dental care is certainly reasonable and within the standard of care. (Ex. 122 at ¶ 234.)

1176.  It is highly unlikely that any dental decay present will progress to the point that a restorable tooth becomes non-restorable within a matter of weeks or even months while an inmate waits his or her turn on the routine care list.  (Ex. 122 at ¶ 235.)

**N.**     **Pain**

1177.  Tooth pain is subjective. (Ex. 122 at ¶ 236.)

1178.  A patient may report that a tooth is "painful" because it is sensitive to hot and cold.  (Ex. 122 at ¶ 237.)

1179.  Tooth sensitivity is a common problem, and does not usually involve treatment, or if it does, is not an urgent matter that needs to be seen within 72 hours. (Ex. 122 at ¶ 237.)

1180.  An inmate who reports transient "pain" when exposed to hot or cold is experiencing tooth sensitivity, not odontogenic pain.  (Ex. 122 at ¶ 237.

1181.  Placing that inmate on the routine care list is appropriate and within the standard of care. (Ex. 122 at ¶ 237.)

1182.  "Sensitive teeth" are not the same as having odontogenic pain.  (Ex. 122 at ¶ 238.)

1183.  Odontogenic pain is caused by infection or irreversible pulpitis.  (Ex. 122 at ¶ 239.)

1184.  Odontogenic pain should be classified as urgent care and seen on an expedited basis.  (Ex. 122 at ¶ 240.)

1185.  ADC's practice of classifying all pain as urgent care is within the standard of care.  (Ex. 122 at ¶ 241.)

**O.**     **Lost or Fractured Restorations**

1186.  A broken or lost filling is classified as routine care.  (Ex. 168 at 161:7-13.)

1187.  Lost or fractured restorations do not, in the absence of pain, swelling, or other signs of infection, require treatment on an expedited basis.  (Ex. 122 at ¶ 242.)

1188.  Similarly a broken filling without pulp exposure is not an urgent care

1    issue.  (Ex. 122 at ¶ 243.)

2        1189.  If there is also pain, swelling, or other signs of infection present, the

3    tooth should be evaluated as urgent care.  (Ex. 122 at ¶ 244.)

4        1190.  If there is no pain, swelling, or other signs of infection associated

5    with the missing or fractured restoration, the patient should be seen as routine care. (Ex.

6    122 at ¶ 244.)

7        1191.  If an inmate with a lost or fractured filling who has been placed on

8    the routine care list begins experiencing pain or swelling while waiting, he or she can

9    submit an HNR for pain and will be seen according to urgent care guidelines.  (Ex. 122 at

10   ¶ 248.)

11       1192.  A tooth with a missing or fractured restoration will not generally

12   suffer harm if left untreated for months, or even in some cases, years.  (Ex. 122 at ¶ 245.)

13       1193.  A lost or fractured restoration does not necessarily place a tooth at

14   greater risk of decaying or becoming non-restorable in a matter of a few months.  (Ex. 122

15   at ¶ 246.)

16       1194.  ADC policy dictates that inmates are seen within 90 days for routine

17   care requests.  (Ex. 122 at ¶ 247.)

18       1195.  Current wait times for routine dental treatment are 45 days or less.

19   (Ex. 122 at ¶ 247.)

20       1196.  Lost fillings are not likely to result in irreversible pulpitis over a

21   period of 90 days and almost certainly not within only 45 days. (Ex. 122 at ¶ 247.)

22       REDACTED

23

24

25   **P.**   **Dentures and Chewing Difficulty**

26       1198.  ADC provides full and partial dentures to qualifying inmates.  (Ex.

27   122 at ¶ 250; Ex. 137-GG: DO 1101.10, Sec. 1.2.5, ADC048557-048558; Ex. 137-LL:

28   DSTM Dental Procedure 771.5, ADC010603-010604.)

1199.  Per ADC policy, inmates must have at least six months left on their sentence to qualify for dentures to make sure there is sufficient time to complete the device before the inmate is released from ADC custody.  (Ex. 122 at ¶ 251; Ex. 137-LL: DSTM Dental Procedure 771.5, Sec. 4.7, ADC010604. )

1200.  It is difficult to quantify a reasonable length of time for provision of dentures because a particular patient may require extensive preparatory treatment prior to beginning the process of making dentures.  (Ex. 122 at ¶ 253.)

1201.  Preparatory treatment may include extractions, fillings, and periodontal treatment.  (Ex. 122 at ¶ 253.)

1202.  In addition, any extractions must heal for at least several weeks prior to the inmate's next appointment for dental treatment.  (Ex. 122 at ¶ 253.)

1203.  Once the preparatory work is completed and the process of making dentures starts, an inmate will likely have between five and seven appointments.  (Ex. 122 at ¶ 254.)

1204.  Most steps of the process require sending materials to an outside lab and waiting for other materials to be mailed back.  (Ex. 122 at ¶ 255.)

REDACTED

1206.  Five to six months is a reasonable length of time between starting impressions for dentures to delivering the completed dentures.  (Ex. 122 at ¶ 257.)

1207.  Waiting longer than five to six months for dentures would not be problematic because any chewing difficulty can be addressed through the provision of a soft diet until dentures are completed.  (Ex. 122 at ¶ 257.)

1208.  CDS tracks both partial and full dentures from start to finish.  (Ex. 122 at ¶ 258.)

1209.  Once an inmate begins the process for making dentures, the inmate does not need to submit further HNRs and is reappointed by the dentist.  (Ex. 122 at

¶ 259.)

1210.  While undergoing the process of obtaining full or partial dentures, inmates may be prescribed mechanical soft diets.  (Ex. 122 at ¶ 260.)

REDACTED

1212.  During the period of April 2013 through March 2014, there were 1,298 full and partial dentures completed at ADC.  (Ex. 122 at ¶ 261.)

1213.  The partial dentures provided at ADC are the same as provided in private practice.  (Ex. 122 at ¶ 262.)

**Q.**   **Dental Emergencies and After Hours Dental Care**

1214.  True dental emergencies are rare.  (Ex. 122 at ¶ 129.)

1215.  Inmates experiencing dental emergencies are generally transported to local hospitals.  (Ex. 122 at ¶ 130.)

1216.  Most ADC complexes have only a few dental emergencies a year, and the most common dental emergencies at ADC are broken jaws.  (Ex. 122 at ¶ 131.)

1217.  Other dental emergencies include uncontrolled bleeding and airway restriction.  (Ex. 170 at 200:1-2.)

1218.  Inmates requiring emergency dental care are generally brought to the medical or dental clinic by security staff and do not submit HNRs.  (Ex. 122 at ¶ 132.)

1219.  Most dental clinics at ADC are open Monday through Friday from 8:00 to 5:00.  (Ex. 122 at ¶ 133.)

1220.  HNRs are collected seven days a week.  (Ex. 122 at ¶ 134.)

1221.  After dental clinic hours, nursing staff review dental HNRs.  (Ex. 122 at ¶ 135.)

1222.  If an inmate submits an HNR on a weekend indicating pain and/or swelling, the inmate can be evaluated by nursing staff using dental protocols. (Ex. 122 at ¶ 135.)

1223.  Nursing staff is trained on protocols for dental emergencies.  (Ex. 170 at 198:20-200:5.)

1224.  Each complex also maintains an on-call schedule for dentists outside clinic hours.  (Ex. 122 at ¶ 136.)

1225.  Having nursing staff evaluate after-hours pain complaints using dental protocols is within the standard of care.  (Ex. 122 at ¶ 137.)

REDACTED

**R.**   **Dental Monitoring**

REDACTED

1229.  ADC also employs facility contract monitors at each complex who evaluate contract compliance using the MGAR tool, which includes oral care metrics. (Ex. 168 at 170:6-22.)

1230.  The ADC facility contract monitors evaluate contract compliance. (Ex. 170 at 135:9-136:9.)

REDACTED

1233.  The oral care MGARs track compliance with the contract regarding the following metrics: provision of oral hygiene and preventive oral care education at intake; oral examination by a dentist within 30 days; wait times for routine dental care;

evaluation of 911's within 24 hours of HNR submission; development and documentation of dental treatment plans in the medical record; conduct of daily inventories for all dental instruments before the first patient and after the last; monthly checks of expiration dates; flagging of expired medications within 30 days of expiration and disposal upon expiration; x-rays taken of the tooth/teeth that are addressed during an emergency (911) visit; maintenance of a dental wait time log/report; maintenance of the MSDS binder; provision of medications that are prescribed by the dentist; timeliness of equipment repairs; timeliness of fulfillment of orders for materials/supplies; completion of dental chart entries with military time and signature over name stamp; completion of treatment plan section C and priority section D of the dental chart; posting of x-ray certification/registration certificates in the dental clinic; weekly spore testing logs for the autoclaves; and availability of a mechanism for immediate notification of a positive spore count.  See, e.g., Ex. 137-QQ: ADC210275-210276.

1234.  ADC monitors the timeliness of dental intakes and dental treatment on a monthly basis.  See, e.g., Ex. 137-BBBB: ADC267337.

1235.  ADC also monitors dental utilization statistics, including the numbers and types of dental procedures performed, the numbers of HNRs for dental treatment submitted, and the number of dental treatment refusals on a monthly basis.  See, e.g., Ex. 137-AAAA: ADC267281-267283.

1236.  ADC also reviews dental staffing on a regular basis.   See, e.g., Ex. 137-NNNNN: ADC267354-267364.

REDACTED

REDACTED

REDACTED

1244. ADC inmates are also permitted to submit complaints regarding dental care at ADC to the Arizona Board of Dental Examiners, but no complaints were submitted in the last five years by inmates regarding dental care at ADC.  (Ex. 122 at ¶ 265.)

1245. Dr. Hanstad and Dr. Weekly perform quarterly and annual peer reviews of the dentists in their regions.  (Ex. 168 at 115:18-116:8; Ex. 170 at 145:6-146:3.)

1246. These peer reviews include chart audits to assess the quality of care provided. (Ex. 168 at 115:18-116:8; Ex. 170 at 145:6-146:3.)

1247. Dr. Smallwood and the regional directors monitor productivity of dentists and the numbers and types of dental procedures performed by each dentist.  (Ex. 168 at 118:7-17, 22-25.)

1248. In addition, Dr. Smallwood and the regional directors monitor wait times for routine and urgent care and will reallocate staff if necessary to address inmate demand.  (Ex. 168 at 67:8-23.)

1249. This is particularly true for dental hygienists, who travel to dental clinics in their region to perform cleanings based on inmate request volumes.  (Ex. 168 at

96:15-97:5.)

1250. CDS allows for real-time monitoring of inmate requests for dental care; wait times; compliance with ADC policy guidelines for intake, routine, and urgent care wait times; dental procedures performed; treatment refusals; and current wait lists. (Ex. 168 at 14:4-20, 15:20-16:20. )

1251. CDS also includes alerts when an inmate has been on the routine care list for 90 days or longer or has been waiting for urgent care for 72 hours or longer. (Ex. 168 at 103:17-103:9.)

1252. REDACTED ADC contract monitors, and REDACTED from Corizon all have access to CDS to monitor wait times and other dental statistics. (Ex. 168 at 47:1-9.)

## IX.    ADC MAXIMUM CUSTODY, WATCH, AND DETENTION POLICIES

### A.    Classification

1253. ADC employs a custody classification system in order to safely management the inmate population, reasonably restricting activity for those inmates who constitute a risk to self, the public, prison personnel or other inmates based upon analysis of the inmate's crime, time to serve, institutional behavior and/or membership in a security threat group (STG). (Ex. 138-E: DO 801.01, Sec. 1.2.4, ADC040614.)

1254. ADC custody classification employs an objective, standardized rating system that is based on factual data gathered from factual documentation. (Ex. 138-E: DO 801.01, Sec. 1.2.4, ADC040614.)

1255. The custody classification assessment is based on an in-depth interview, and a detailed evaluation of court documents and information acquired from other agencies concerning the inmate's background and criminal history. (Ex. 138-E: DO 801.01, Sec. 1.4; ADC040616.)

1256. ADC has four custody levels: minimum, medium, close, and maximum. (Ex. 161 at 123.)

1257. There is no such thing as isolation. (Ex. 167 at 156-157.)

184

1258.  ADC does not recognize or use the term "isolation cell." (Ex. 138, ¶37.)

1259.  The word "isolation" implies that an inmate has no ability to communicate, interact, or socialize with other humans and does not leave his or her cell. (Ex. 138, ¶38.)

1260.  While depending on custody classification level, some ADC inmates are required to remain in their cells for an average of approximately 22 hours per day because of the risk the inmates presents to self, the public, prison personnel or other inmates, this applies only to certain inmates that are classified as maximum or close custody and certain inmates who are on detention status. (Ex. 138, ¶39.)

1261.  The appropriate general nomenclature in the ADC system used to define inmates who are confined to their cells on average, approximately 22 hours a day, is "maximum custody inmates" or "maximum custody cells." (Ex. 138, ¶40.)

1262.  Maximum custody inmates represent the highest risk to the public and staff and require frequent monitoring.   (Ex. 138-E: DO 801.01, Sec. 1.2.4; ADC040614.)

1263.  Certain criteria require an inmate to be classified as maximum custody, including inmates sentenced to death, inmates sentenced to a life sentence for the first two years served, inmates who are validated and un-renounced members of a Security Threat Group ("STGs"), and inmates with an internal risk score of 5.  (Ex. 138-E: DO 801.03, Sec. 1.1-1.2; ADC040619-20; Ex. 138-H: DO 806.07, Sec. 1.1.1-1.1.2; Ex. 138-E: DO 801.12; ADC 040661-62.)

1264.  Generally, an inmate can be classified as "maximum custody" if they committed a serious underlying offense (e.g.., first degree murder), if they committed violent, disruptive, or riotous acts while incarcerated, if they escaped or attempted to escape, or if they pose a serious threat to the security of the institution.  (Ex. 138-E:  DO 801.04; ADC040621-36; DO 801.09; ADC040647-53; DO 801.11; ADC040656-58.)

1265.  An inmate's classification can be increased whenever the inmate's

behavior or new information becomes known that indicates increased security measures are appropriate to ensure the safety of the public, staff, and/or other inmates. (Ex. 138-E: DO 801.06, Sec. 1.2; ADC040636-37; Ex. 167 at 23.)

1266. Upon formal classification review and except for condemned row inmates, an inmate's classification can also be decreased if inmate behavior and information indicates that the inmate is likely to successfully be assigned to a less secure environment and is not a threat to the safety of the public, staff, and/or other inmates at the recommended level of supervision. (Ex. 138-E: DO 801.06, Sec. 1.5-1.6, ADC040638.)

1267. To become eligible for a custody reduction, a validated STG member must either successfully renounce STG membership and debrief or satisfactorily complete the STG Step-Down Program. (Ex. 138-H: DO 806.07, Sec. 1.2-1.3; DO 806.08, Sec. 1.1-1.4.)

1268. Inmates approved for maximum custody are reviewed 180 days from maximum custody approval and annually thereafter, unless the approval for maximum custody was an override, in which case the inmate's classification is reviewed every 180 days. (Ex. 138-E: ADC040614; DO 801.11, Sec. 1.4; ADC040660-61.)

1269. Eyman-SMU 1 Unit, Eyman-Browning Unit, and Florence-Central Unit house all of the male-general population inmates that are classified as maximum custody. (Ex. 138, ¶48.)

1270. Perryville-Lumley Special Management Unit houses all of the female-general population inmates that are classified as maximum custody. (Ex. 138, ¶49.)

1271. Several other units are used to house exclusively non-general population inmates classified as maximum custody (e.g., protective custody, sexual offenders, and mental health inmates), including Eyman-Rynning Unit, Phoenix-B Ward, Phoenix-Flamenco King, and Lewis-Rast PS. (Ex. 138, ¶50.)

REDACTED

REDACTED

1277. Mental health staff is notified before an inmate is placed in a maximum custody cell, and the inmate is evaluated within 72 hours of being placed in a maximum custody cell.  (Ex. 167 at 26-28, 34-35; Ex. 138, ¶55; Ex. 137-CC: RFP § 2.7.2.4-5, ADC014173.)

1278. Under the Contract, medical staff are required to monitor inmates daily and qualified health professionals must monitor these inmates at least once a week. (Ex. 137-CC: RFP § 2.7.2.5.1, ADC014173).

1279. Medical or qualified mental health professionals are required to monitor limited contact inmates three days a week.  (Ex. 137-CC: RFP § 2.7.2.5.2, ADC014173).

1280.  All other segregated inmates must be "checked weekly by medical or a qualified mental health professional."  (Ex. 137-CC: RFP § 2.7.2.5.3, ADC014173).

1281. Rounds are performed by qualified health care professionals and documented. (Ex. 137-CC: RFP § 2.7.2.5.3, ADC014173).

**B.**       **Detention**

1282.  Inmates may be placed in detention status as necessary to ensure the safe, secure, and orderly operation of a facility, to ensure the integrity, and pending

187

completion, of an ongoing investigation, while determining eligibility for protective segregation, for observation status to identify, minimize, and intervene in the possibility of self-destructive behaviors, pending institutional review and classification placement (such as pending transfer to a higher custody level), pending revocation of parole, work furlough, home arrest, or temporary, mandatory, or provisional release, or to fulfill disciplinary sanctions. (Ex. 138-G: DO 804.01, Sec. 1.1; ADC107479-80; Ex. 138, ¶56.)

1283. Not all inmates who receive a disciplinary sanction and thus are placed on "detention status" are required to be moved to a maximum custody cell; instead, they may be allowed to stay in their existing cell with limited privileges while their disciplinary sanction is carried out.  (Ex. 138, ¶57.)

1284. Inmates on detention status are offered showers and a shave three different days each week.  (Ex. 138-G: DO 804.01, Sec. 1.2.6.1; ADC107481; Ex. 138, ¶58.)

1285. Inmates on detention status are offered exercise outside their cell for at least two hours on three different days of each week. (Ex. 138-G: DO 804.01, Sec. 1.2.6.5; ADC107481; Ex. 138, ¶59.)

1286. Inmates on detention status have access to personal property and access to commissary purchases, except when precluded by disciplinary sanctions, as outlined in DO 909. (Ex. 138-G: DO 804.01, Sec. 1.2.7; ADC107481; Ex. 138, ¶60.)

1287. Inmates on detention status can have visits by counseling/mental health staff upon request or as needed. (Ex. 138-G: DO 804.01, Sec. 1.2.9; ADC107481; Ex. 138, ¶61.)

1288. Inmates on detention status have telephone privileges, except when precluded by disciplinary sanctions. (Ex. 138-G: DO 804.01, Sec. 1.2.14; ADC107482; Ex. 138, ¶62.)

1289. The Warden/Deputy Warden, in conjunction with an investigation, may restrict or curtail the above items (except meals) and all other inmate contact when objective evidence demonstrates such items or contact would impede or nullify an

investigation, cause the destruction of evidence, or lead to the commission of a crime or violation of facility rules. (Ex. 138-G: DO 804.01, Sec. 1.3.1; ADC107482; Ex. 138, ¶63.)

1290. Detention logs for inmates on detention status track acceptance/refusal of scheduled meals, shower times, exercise times, and telephone times. (Ex. 138-G: DO 804.01, Sec. 1.4.2; ADC107482; Ex. 138, ¶64.)

1291. Correctional officers conduct a general sanitation inspection of all areas in the unit during each shift, and sanitation deficiencies are corrected as quickly as possible. (Ex. 138-G: DO 804.01, Sec. 1.9; ADC107485; Ex. 138, ¶65.)

1292. Correctional officers conduct random, periodic welfare checks, in addition to checks at specifically timed intervals. (Ex. 138-G: DO 804.01, Sec. 1.10; ADC107485; Ex. 138, ¶66.)

**C.**       **Housing Assignment**

1293. Maximum custody inmates (except death row inmates, inmates convicted of first degree murder in their first 180 days review period, and validated non-debriefed STG members) may be celled with another inmate if they meet certain criteria. (Ex. 138-C: DO 704.08, Sec. 1.2.4, -1.2.6; ADC012689; Ex. 138, ¶67.)

1294. Staff considers the following in determining whether to cell two maximum custody inmates together: history of institutional violence, the inmates' convictions, disciplinary history, STG related, and physical and mental conditions. (Ex. 138-C: DO 704.08, Sec. 1.2.8; ADC012690; Ex. 138, ¶68.)

**D.**       **Telephone Privileges**

1295. Generally, maximum custody inmates are allowed to place one telephone call per week, up to fifteen minutes in duration.  (Ex. 138-LL: DO 915.12, Sec. 1.5.1.2; ADC013169; Ex. 138, ¶69.)

1296. Generally, inmates on detention status are allowed one call of ten minutes per week. (Ex. 138-LL: DO 915.12, Sec. 1.5.1.1; ADC013169; Ex. 138, ¶70.)

1297. Maximum custody inmates participating in ADC's Maximum Custody Population Management Step Program as provided by Director's Instruction

189

#326 are afforded increased telephone privileges as they progress through the three step behavioral modification program.  (Ex. 138, ¶71).

**E.** **Visitation**

1298.  Generally, maximum custody inmates are permitted non-contact visitations.  (Ex. 138-S: DO 911.04, Sec. 1.6; ADC013119; Ex. 138, ¶72.)

1299.  A non-contact visit is a visit between an inmate and visitor conducted with a barrier between them, thereby preventing any physical contact. (Ex. 138-S: DO 911.04, Sec. 1.6; ADC013132; Ex. 138, ¶73.)

1300.  Generally, maximum custody inmates are allowed one, 2-hour non-contact visit per week.  (Ex. 138-S: DO 911.08, Sec. 1.3; ADC013126; Ex. 138, ¶74.)

1301.  Maximum custody inmates participating in ADC's Maximum Custody Population Management Step Program as provided by Director's Instruction #326 are afforded increased visitation privileges as they progress through the three step behavioral modification program.  (Ex. 138, ¶75.)

**F.** **Programming and Maximum Custody Population Management**

1302.  ADC's management of its maximum custody inmates has evolved greatly over the last several years.  (Ex. 138, ¶491.)

1303.  ADC has added programs, initiated individual and group programming in housing units, improved recreation facilities, built new and larger recreation facilities to allow side by side individual recreation and group recreation, expanded privileges, implemented expanded inmate worker programs, expanded out of cell time, and created a behavioral incentive step program to reinforce positive inmate behavior, leading to increased privileges and for some, progression back to general population. (Ex. 138, ¶492.)

1304.  This expansion of maximum custody programs is in line with national initiatives to modify conditions of confinement for maximum custody inmates – those inmates that for prison officials are the most challenging to manage because of demonstrated criminal and institutional behavior that poses significant risk to prison

190

safety and security.  (Ex. 138, ¶493.)

1305.  The modification of conditions of confinement for ADC's maximum custody inmates and increase in programs was not a result of the Parsons litigation. (Ex. 138, ¶494.)

1306. Rather, the changes are consistent with corrections industry progression that started in 2009. (Ex. 138, ¶495.)

1307.  The initial program started in 2009 in the CB 2 program. (Ex. 138, ¶496.)

1308. Screening inmates into a privilege based behavioral modification program is effective to allow many maximum custody inmates to earn time out of cell and increased privileges, leading to behavior modification and transition preparation for reduction in custody. (Ex. 138, ¶497.)

1309. The CB-2 program started in 2009 provided a behavioral modification and earned incentives program for general population maximum custody inmates as well as inmates identified as mental health inmates.  (Ex. 138, ¶498.)

1310.  In September 2009 the Walking I5 Program started in CB- 2.  (Ex. 138, ¶499.)

1311.  This program was developed for male maximum custody inmates who qualified for integration to a lower custody level based on good behavior. (Ex. 138, ¶500.)

1312.  As part of the program, these inmates were permitted more time out of cell and opportunity to participate in WIPP inmate porter jobs as well as recreate as a group on the recreation field. (Ex. 138, ¶501.)

1313. In January 2012, ASPC-Florence, Central Unit implemented CB-1 Behavioral Health and Kasson –Wing 1 Mental Health Programs that provided a three stage program where as inmates progressed through the stages, the inmates were afforded opportunities for eating dinner in communal chow halls (stage 2), attend group recreation one day a week (in addition to two other individual recreation periods) (stage 2 or 3),

attend group therapy sessions, work as WIPP porter jobs where eligible (stage 3), participate in contact visits (stage 3). (Ex. 138, ¶502.)

1314. In 2012, Perryville-Lumley Unit also began group recreation, communal dining and eligibility for WIPP porter jobs where female maximum custody inmates demonstrated positive behavior. (Ex. 138, ¶503.)

1315. In September, 2013, ADC Northern Region Operations Director C. McWilliams prepared a Position Paper – Maximum Custody Population Management. (Ex. 138, ¶504; Ex.138-T.)

1316. The purpose of the Position Paper was to further develop a comprehensive system of classification and housing for maximum custody inmates using a progression of movement to allow inmates to progress through maximum custody units based upon positive behavior modification and programming. (Ex. 138, ¶506; Ex. 138-T.)

1317. A multi-disciplined committee was formed to assess and make recommendations on ways to provide increased programming and out of cell activities to ADC maximum custody inmates.  (Ex. 138, ¶507.)

1318. Input was gathered from security, programs, mental health, classification, policy, information technology, training and administrative staff.  (Ex. 138, ¶508.)

1319. ADC also incorporated portions of successful programs in past and current behavioral modification programs from other states, including the state of Washington.  (Ex. 138, ¶509.)

1320.  Under the proposal and pilot program, which was already in progress as of September 2013, ADC maximum custody inmates were provided the opportunity to progress through maximum custody units, earning more privileges and obtaining more out of cell opportunities to prepare the inmates for lowered classification or release from custody.  (Ex. 138, ¶510)

1321. The proposed program provided for step progression through the program based upon positive behavior modification and programming, with increased

privileges providing an incentive for maximum custody inmates to demonstrate behavioral change and motivation in order to increase inmates' chance of success both in the prison setting as well as in the community, once released. (Ex. 138, ¶511.)

1322. In addition, the proposed program provided opportunity for positive inmate-staff interactions as well as inmate-inmate positive interactions which in turn creates a more positive and professional prison environment, leading to positive inmate behavior changes and less recidivism. (Ex. 138, ¶512.)

1323. To prepare for implementation of the proposed program, ADC trained all COIIIs working with mental health inmates to run groups and all line staff working in mental health pods to have awareness in handling mental health issues, as well as interacting with mental health inmates. (Ex. 138, ¶513.)

1324. Hundreds of staff were trained before the end of 2013. (Ex. 138, ¶514.)

1325. The September 6, 2013 Position Paper – Maximum Custody Population Management, culminated in ADC Director's Instruction #326, Maximum Custody Population Management dated March 27, 2014. (Ex. 138, ¶515; Ex. 138-U.)

1326. Director's Instruction #326 is progressive and in line with similar states undergoing modification of conditions of confinement for maximum custody inmates, programs and movement of high risk inmates. (Ex. 138, ¶517; Ex. 138-U.)

1327. As illustration, in 2014, ADC will host all state directors of departments of corrections conference in Arizona for tours of ADC facilities to educate other departments of corrections as to Arizona's progressive maximum custody inmate management protocols, programs, policies and procedures, including as implemented in Director's Instruction #326. (Ex. 138, ¶518.)

1328. Director's Instruction #326 officially went into in effect on March 27, 2014 – although many programs were already running prior to issuance of the Instruction. (Ex. 138, ¶519; Ex. 138-U.)

1329. Director's Instruction #326 serves to facilitate a process that requires

1    inmates in maximum custody to work through a program utilizing a step system providing

2    the opportunity to participate in jobs, programs and other out of cell activities.

3    (Attachment U, Director's Instruction #326, Purpose). (Ex. 138, ¶520; Ex. 138-U.)

4    1330.  Director's Instruction #326 culminates from changes that began in

5    2009 as ADC embarked on increasing maximum custody inmates' out of cell time and

6    programming. (Ex. 138, ¶521.)

7    1331.  Pursuant to Director's Instruction #326, ADC maximum custody

8    inmates who demonstrate program compliance and positive behavior may progress from

9    controlled housing to open privilege based housing where inmates may move outside a

10   cell without restraints. (Ex. 138-U: Purpose; Ex. 138, ¶522.)

11   1332.  Inmates classified to maximum custody units are assigned to specific

12   housing areas using a system of steps for managing the inmates in the least restrictive

13   ways necessary to carry out ADC's Mission.  (Ex. 138-U: Section 1.4; Ex. 138, ¶523.)

14   1333.  This applies to general population maximum custody inmates as well

15   as specialty maximum custody population inmates:  mental health, validated STG, Step

16   Down Program for STG, inmates who debrief from STG, sex offenders, protective

17   custody, and condemned row.  (Ex. 138-U: Section 1.4.1-1.4.2; Ex. 138, ¶524.)

18   1334.  In the Step Program, maximum custody inmates start at a base level

19   and progress through the three step program by actively participating in a variety of

20   offered programs, obeying facility rules, socializing well with inmates and personnel, not

21   engaging in self harm, demonstrating positive work ethic, not engaging in STG activity

22   and genuinely showing interest in self-improvement. (Ex. 138, ¶525.)

23   1335.  Within five days of arrival to maximum custody, inmates are

24   reviewed by an Assessment Team consisting of a Correctional Officer III, security

25   supervisor and Associate Deputy Warden or designee to determine appropriate maximum

26   custody housing location.  (Ex. 138-U: Section 1.2; Ex. 138, ¶526.)

27   1336.  The review includes analysis of a face to face inmate interview, the

28   maximum custody placement instrument; seriousness of incident resulting in maximum

custody placement; inmate interview demeanor and attitude; AIMS and file review; special security concerns and mental health review conducted within 72 hours of arrival. (Attachment U, Director's Instruction #326). (Ex. 138-U: Section 1.2.2, 1.2.3; Ex. 138, ¶527.)

1337. The inmate is then assigned a maximum custody housing location that based upon the above review factors, allows the inmate to begin with the appropriate three level step system to afford the inmate appropriate privileges and out of cell time while at the same time protecting the safety and security of the inmate, facility personnel and other inmates.  (Ex. 138-U: Section 1.2.4; Ex. 138, ¶528.)

1338. Advancement through the step levels and movement to a less controlled housing location requires the inmate to complete all programs identified in the Step Program Matrixes for each housing location.   (Ex. 138-U: Section 1.3 and Attachments F-L Program Matrixes; Ex. 138, ¶529.)

1339.  Maximum custody inmates must follow all program requirements on a daily basis for a minimum of 30 consecutive days in order to qualify for advancement to the next step. (Ex. 138-U: Section 2.0, 2.1; Ex. 138, ¶530.)

1340. Inmates in the step program must comply with the following requirements to remain eligible for step advancement:   grooming and hygiene in accordance with Department Order 704, Inmate Regulations; shower two times per week; remain compliant with medication orders if prescribed by a mental health provider; participate in designated classes/programs; refrain from creating excessive noise, banging or yelling at others; refrain from disrespectful or insulting behavior along with the use of profanity; refrain from throwing any substance at facility personnel or other inmates; and maintain cell cleanliness in accordance with Department Order 704, Inmate Regulations. (Ex. 138-U: Section 2.2; Ex. 138, ¶531.)

1341. Any violations of the above requirements or engaging in assault, destruction of property or other behavior determined by the Program Team to require corrective action may result in forfeiture of time in Step I and placement back to the

beginning of Step 1.  (Ex. 138-U: Director's Instruction #326, Section 2.3; Ex. 138, ¶532.)

1342.  Inmates in Steps II and III must also comply with the above requirements and also complete programs and requirements provided in the Step Program Matrixes. (Ex. 138-U: Section 2.4; Ex. 138, ¶533.)

1343.  The Program Team meets monthly to review any potential step advancement/regression cases and may convene prior to the monthly meeting to determine regression or removal from the Step Program.  (Ex. 138-U: Section 2.6; Ex. 138, ¶534.)

1344.  Inmates who complete Step III for a minimum of 30 consecutive days, without incident, may be eligible for consideration for custody reduction or placement in a less controlled housing location. (Ex. 138-U: Section 2.7; Ex. 138, ¶535.)

1345.  Under Director's Instruction #326, ASPC-Eyman, Browning Unit has the least amount of out of cell activities and ASPC-Florence, Central Unit has the most. (Ex. 138-U: Section 1.5.1; Ex. 138, ¶536.)

1346.  Browning Unit houses the maximum custody population that includes the most problematic and security threat inmates:  condemned row, validated STG and STG Step Down inmates (who have their own step down program).  (Ex. 138-U: Section 1.4.2; Ex. 138, ¶537.)

1347.  The progression for general population, to include general population mental health inmates, starts at ASPC-Eyman, Browning Unit and ends at ASPC-Florence, Central Unit.  (Ex. 138-U: Section 1.5.1.1; Ex. 138, ¶538.)

1348.  Maximum custody sex offender progression begins at ASPC-Eyman, SMU I and ends at ASPC-Eyman, Rynning Unit (with most, if not all, maximum custody inmates at Rynning Unit in Step III of the program).  (Ex. 138-U: Section 1.5.1.2; Ex. 138, ¶539).

1349.  Maximum custody protective custody progression begins at ASPC-Eyman, SMU I and ends at ASPC-Lewis, Rast Unit (with most if not all, maximum custody inmates at Rast Unit in Step III of the program).  (Ex. 138-U: Section 1.5.1.3).

(Ex. 138, ¶540.)

REDACTED

1351. All maximum custody female inmates are housed at Yard 30 at ASPC-Perryville, Lumley Unit. (Ex. 138-U: Section 1.5.2). (Ex. 138, ¶542.)

1352. Location of the step assignments were decided based upon physical plant of the facilities hosting maximum custody units and recreation facilities. (Ex. 138, ¶543.)

1353. Since 2004, correctional officers posted in maximum custody housing units have been specifically trained on tactical communication to ensure that correctional personnel are able to effectively communicate with those inmates that have the lesser contact with inmates and personnel without a barrier between them as compared to general population inmates; ensure that correctional personnel recognize verbal and non-verbal cues from inmates that indicate ensuing safety and security concerns; ensure that correctional personnel verbally control an escalating situation in order to quell the escalation by means of verbal communication; and ensure that correctional personnel engage in conflict resolution between inmates. (National Institute of Corrections adapted curriculum). (Ex. 138, ¶544.)

1354. Additionally since 2004, correctional officers posted in maximum custody housing units have also been trained in flexible supervision strategies as well as officer role in influencing behavior to enable correctional personnel to supervise inmates effectively and adjust supervision and treatment of inmates based upon inmate individual personality and behavior in order to get positive results from the inmates. (National Institute of Corrections adapted curriculum). (Ex. 138, ¶545.)

1355. Furthermore since 2008, correctional personnel posted in maximum custody housing units have been trained in crisis intervention and conflict resolution to ensure the ability of correctional personnel to use skill sets beyond command and control

tactics to include effective verbal communication; continuous supervision of behaviors and detection of cues indicative of ensuing self-harm, assaults, unexpected medical emergencies and inmate dissention; and utilization of communication response tools to manage a crisis, keep order and teach inmates accountability – all leading to a more constructive correctional environment. (Ex. 138, ¶546.)

1356.  In January 2014, ADC initiated training of Correctional Officer IIIs working in maximum and close custody housing unit in group dynamics in order to further develop skills for these personnel to conduct quality inmate programs in ADC maximum custody housing units to include:  giving groups and individuals increasing responsible tasks; facilitating communication; managing group conflict and tension; establishing group agreement; facilitating the learning process; effectively communicating; facilitating group discussions and exercises; enhancing problem solving skills; encouraging inmate participation; and control of inmates engaging in intimidation or class disruption. (Ex. 138, ¶547.)

## 1.     Restrictive Status Housing Program Incentives

1357.  In addition to Steps I, II and III, each maximum custody housing unit also contains a designated housing area for Restrictive Status Housing Program (RSHP) inmates.  (Ex.138-U: Section 5.0, 5.1; Ex. 138, ¶548.)

1358.  Inmates who commit one of ADC's Forbidden Three Acts may be placed in RSHP by the RSHP Independent Review Committee, Complex Warden, receiving Complex Warden, and/or Regional Operations Director. (Ex. 138-U: Section 5.2, 5.2.1; Ex. 138, ¶549.)

1359.  The Forbidden Three Acts include serious assaults on staff, serious inmate on inmate assaults with weapons and multiple inmates assaulting an inmate with a serious injury.  (Ex. 138-U: Section 5.2; Ex. 138, ¶550.)

1360.  Inmates placed in RSHP are reviewed by mental health staff within 72 hours of placement.  (Ex. 138-U: Section 5.4; Ex. 138, ¶551.)

1361.  RSHP inmates are reviewed by the Program Team at a minimum of

every 30 days for program participation and step progression.  (Ex. 138-U: Section 5.6; Ex. 138, ¶552.)

1362.  RSHP inmate property is limited to hygiene items, towel, wash cloth; two jumpsuits, two sets of underwear and socks (clean set exchange provided after every shower); legal materials; religious materials; reading and writing materials; one pair each of shower shoes and deck shoes.  (Ex. 138-U: Section 5.0, 5.7; Ex. 138, ¶553.)

1363.  RSHP inmate property and privileges are earned back by demonstration of positive behavior and participation in mandatory programs.  (Ex. 138-U: Section 5.8; Ex. 138, ¶554.)

1364.  Visitation is restricted for the first 30 days and restrictions may be extended based upon disciplinary violation sanctions or program non-compliance.  (Ex. 138-U: Section 5.9; Ex. 138, ¶555.)

1365.  Phone calls are restricted for the first 90 days but inmates are still permitted to send and receive letters.  (Ex. 138-U: Section 5.10; Ex. 138, ¶556.)

1366.  RSHP inmates are offered recreation a minimum of six hours per week and must shower three times per week like all other maximum custody inmates.  (Ex. 138-U: Section 5.11; Ex. 138, ¶557.)

1367.  RSHP has three steps, requiring a minimum stay in Step I for 30 days, Step II for 60 days and Step III for 30 days.  (Ex. 138-U: Section 6.0, 7.0, 8.0; Ex. 138, ¶558.)

1368.  RSHP inmates may revert back to a prior step or stay in a current step for more than the minimum period of time for violation of program rules.  (Ex. 138-U: Section 6.0, 7.0, 8.0; Ex. 138, ¶559.)

1369.  Step II property and privileges are increased to possession of a television in cell (loaner if available); non-contact visits (once per month for two hours); and limited commissary (new hygiene and food purchase only).  (Ex. 138-U: Instruction #326, Section 7.2, 7.2.1, 7.2.2, 7.2.3; Ex. 138, ¶560.)

1370.  Step III property and privileges are increased to two non-contact

visits per month for two house each; one phone call per month for 15 minutes; and increased commissary.  (Ex. 138-U: Section 8.2, 8.2.1, 8.2.1.1, 8.2.1.2, 8.2.1.3; Ex. 138, ¶561.)

**2.    ASPC-Eyman, Browning Unit Step Program Incentives**

1371.  Browning Unit general population, STG and condemned row maximum custody inmates must participate in a three step behavioral modification program.  (Ex. 138-U: Attachment F; Ex. 138, ¶562.)

1372.  Each step requires a minimum 30 day participation period and adherence to program expectations. (Ex. 138-U: Attachment F; Ex. 138, ¶563.)

1373.  An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior. (Ex. 138-U: Attachment F; Ex. 138, ¶564.)

1374.   Incentives provided to Step I inmates include:

- Store - $60/week and $80 at Christmas;
- Phone – once 15 minute call/month;
- Visitation – one non-contact visit block per week;
- Recreation – 3 two hour periods per week – individual enclosures;
- Library services;
- TV and personal property per DO 909;
- Securepack – once per quarter within security limitations on certain items.

(Ex. 138-U: Attachment F; Ex. 138, ¶565.)

1375.  Incentives provided to Step II inmates include:

- Store - $80/week and $120 at Christmas;
- Phone – two 15 minute calls per month;
- Visitation – two non-contact visit blocks per week;
- Recreation – 3 two hours periods per week, one of which can be in the 10'x10' interactive enclosures;

- Library services;
- TV and personal property per DO 909;
- Securepak – once every other month within security limitations on certain items;
- Fundraisers – participate in inmate fundraisers;
- Hobby Craft – origami and pencil drawing.

(Ex. 138-U: Attachment F; Ex. 138, ¶566.)

1376.  Incentives provided to Step III inmates include:

- Store - $100/week and $160 at Christmas;
- Phone – three 15 minute calls per month;
- Visitation – three non-contact visit blocks per week;
- Recreation – 4 two hours periods per week, all can be in the 10'x10' interactive enclosures;
- In-pod recreation;
- Library services;
- TV and personal property per DO 909;
- Securepak – once every month within security limitations on certain items;
- Fundraisers – participate in inmate fundraisers;
- Hobby Craft – origami and drawing;
- WIPP – eligible for job as pod porter.

(Ex. 138-U: Attachment F; Ex. 138, ¶567.)

**3.      ASPC-Eyman, Browning Unit Programming**

1377.  Prior to April 2014, maximum custody inmates at ASPC-Eyman, Browning Unit were employed as porters, working outside their cells (approximately 60 positions). (Ex. 138, ¶568.)

1378. Prior to April 2014, the Browning Unit already ran 8 inmate programs for maximum custody inmates to include: Cultural Diversity, Money

Management, Responsible Thinking, Self-Control, Social Values, Substance Abuse, Thinking for a Change and Re-Entry. (Ex. 138, ¶569.)

1379.  Each program session runs 8 weeks and meets once per week for one hour.  (Ex. 138, ¶570.)

1380.  Each program can accommodate 8 inmate students.  (Ex. 138, ¶571.)

1381.  The Thinking for a Change and Re-Entry programs each run two sessions concurrently (8 inmates per session for a total of 16 at one time for Thinking for a Change and Re-Entry programs). (Ex. 138, ¶572.)

1382.  Accordingly, Browning Unit provides the potential for 80 maximum custody inmates to spend an additional one hour out of cell each week to attend program classes assuming no inmate is taking more than one class at a time.  (Ex. 138, ¶573.)

**4.      ASPC-Eyman, SMU I Step Program Incentives**

1383.  SMU I Unit maximum custody inmates must participate in a three step behavioral modification program.  (Ex. 138-U: Attachment I; Ex. 138, ¶574.)

1384.  Each step requires a minimum 30 day participation period and adherence to program expectations. (Ex. 138-U: Attachment I; Ex. 138, ¶575.)

1385.  An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior. (Ex. 138-U: Attachment I; Ex. 138, ¶576.)

1386.   Incentives provided to Step I inmates include:

- Store - $60/week and $80 at Christmas;
- Phone – once 15 minute call per week;
- Visitation – one non-contact visit block per week (2 hours);
- Recreation – six hours per week to include one-time per month in 10'x10' enclosure (two SMU inmates);
- Library services;
- TV and personal property per DO 909;
- Securepack – once per quarter within security limitations on certain

items.

(Ex. 138-U: Attachment I; Ex. 138, ¶577.)

1387.   Incentives provided to Step II inmates include:

- Store - $80/week and $120 at Christmas;
- Phone – one 15 minute calls per week;
- Visitation – two non-contact visit blocks per week;
- Recreation – six hours per week to include one-time per month in 10'x10' enclosure (up to four inmates) and one time per month in 20'x40' basketball enclosure (up to four inmates);
- Library services;
- TV and personal property per DO 909;
- Securepak – once every other month within security limitations on certain items;
- Fundraisers – participate in inmate fundraisers;
- Hobby Craft – origami and pencil drawing.

(Ex. 138-U: Attachment I; Ex. 138, ¶578.)

1388.   Incentives provided to Step III inmates include:

- Store - $100/week and $160 at Christmas;
- Phone – one  15 minute call per week;
- Visitation – three non-contact visit blocks per week;
- Recreation – six hours per week to include one time per month in 10'x10' enclosure (up to four inmates), one time per month in 20'x40' basketball enclosure (up to eight inmates), and one time per month recreation on par course field;
- Library services;
- TV and personal property per DO 909;
- Securepak – once every other month within security limitations on certain items;

- Fundraisers – participate in inmate fundraisers;
- Hobby Craft – origami and pencil drawing;
- Unrestricted escorts – may be eligible on case by case basis;
- WIPP – eligible for jobs as pod porter and kitchen worker.

(Ex. 138-U: Attachment I; Ex. 138, ¶579.)

### 5.     ASPC-Eyman, SMU I Programming

1389.  Prior to April 2014, maximum custody inmates at ASPC-Eyman, SMU I Unit were employed as porters, working outside their cells in WIPP positions (approximately 120 positions).  (Ex. 138, ¶580.)

1390.  Prior to April 2014, the SMU I Unit already ran 7 inmate programs for maximum custody inmates to include: Feelings, Responsible Thinking, Self-Control, Social Values, CORE Skills, Substance Abuse and Mental Health Group.   (Ex. 138, ¶581.)

1391.  With the exception of the Mental Health Group, each program session runs 8 weeks and meets once per week for one hour.  (Ex. 138, ¶582.)

1392.  With the exception of the Mental Health Group, each program can accommodate 16 inmate students.  (Ex. 138, ¶583.)

1393.  With the exception of the Mental Health Group, all above referenced programs each run two sessions concurrently, thereby providing the potential for 32 inmate students to participate in each of the programs thus translating to a total of 192 maximum custody inmates offered the opportunity to spend an additional one hour out of cell each week to attend program classes assuming no inmate is taking more than one class at a time.  (Ex. 138, ¶584.)

1394.  The Mental Health Group session runs 4 weeks and the subjects of the mental health groups change monthly (i.e., Relaxation Techniques, Sleep Hygiene, Anger Management, Self-Esteem, Depression, Triggers, Regulating Emotion, Stages of Change, Effective Coping Skills, Anxiety, Impulsivity and Healthy Communication sessions scheduled for 2014) .  (Ex. 138, ¶585.)

1395. Mental Health Group runs of two classes per day, Monday through Friday for a total of 10 classes per week. (Ex. 138, ¶586.)

1396. Each Mental Health Group program runs one hour each session and can accommodate 11 inmates per class. (Ex. 138, ¶587.)

1397. At any one time, 110 inmates may participate in the Mental Health Group. (Ex. 138, ¶588.)

1398. Accordingly, there is the potential for 302 inmates to participate in SMU I programming. (Ex. 138, ¶589.)

1399. Inmate demand for participation in the programs, however, is less than the available openings in the Feelings, Responsible Thinking, Self-Control, Social Values, CORE Skills, Substance Abuse programs. (Ex. 138, ¶590.)

1400. While there is availability for 16 participants in each class, only an average of approximately 11 to 14 inmate students actually participate. (Ex. 138, ¶591.)

### 6. ASPC-Florence, Central Unit Step Program Incentives

1401. Central Unit maximum custody inmates must participate in a three step behavioral modification program. (Ex. 138-U: Attachment H; Ex. 138, ¶592.)

1402. Each step requires a minimum 30 day participation period and adherence to program expectations. (Ex. 138-U: Attachment H; Ex. 138, ¶593.)

1403. An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior. (Ex. 138-U: Attachment H; Ex. 138, ¶594.)

1404. Incentives provided to Step I inmates include:

- Store - $60/week and $80 at Christmas;
- Phone – one 15 minute call per week;
- Visitation – one non-contact visit block per week (2 hours);
- Recreation – 3 two hour periods each week in the standard individual recreation enclosure;
- Library Service;

205

- TV and personal property per DO 909;
- Loaner TV for those that do not currently have a TV for use with ETV programming;
- Securepak may be purchased once per quarter within security imitations on certain items.

(Ex. 138-U: Attachment H; Ex. 138, ¶595.)

      1405.  Incentives provided to Step II inmates include:

- Store - $80/week and $120 at Christmas;
- Phone – one 15 minute call per week;
- Visitation – one 2 hour non-contact visit block per week/ once a month inmates may receive a two hour contact visit;
- Recreation – one hour, six times a week on recreation field;
- Meals in chow hall;
- Library service – with access to special library materials;
- TV and personal property per DO 909;
- Securepak – once every other month within security limitations on certain items;
- Hobby Craft – origami and pencil drawing;
- WIPP – eligible for select jobs;

(Ex. 138-U: Attachment H; Ex. 138, ¶596.)

      1406.  Incentives provided to Step III inmates include:

- Store - $100/week and $160 at Christmas;
- Phone – one 15 minute call per week;
- Visitation – one 2 hour contact visit block per week;
- Recreation – two hours, three times a week on recreation field;
- Library service;
- TV and personal property per DO 909;
- Securepak – once every month within security limitations on certain

items;

- Hobby Craft – origami and pencil drawing;
- WIPP – eligible for select jobs;
- Special Fundraisers;

(Ex. 138-U: Attachment H; Ex. 138, ¶597.)

### 7.   ASPC-Florence, Central Unit – CB-1

1407.  Prior to April 2014, maximum custody inmates at ASPC-Florence, Central Unit – CB-1 were employed working outside their cells (approximately 30 positions for 75 inmates).   (Ex. 138, ¶598.)

1408.  Prior to April 2014, CB-1 already ran a Social Values program that is open to 8-12 student inmates.  (Ex. 138, ¶599.)

1409.  The program session runs 8 weeks and meets once per week for one hour. (Ex. 138, ¶600.)

1410.  While the Social Values program can accommodate 8-12 student inmates, actual participation is traditionally less than class capacity. (Ex. 138, ¶601.)

1411.  CB-1 also provided prior to April 2014, Lifers, Arts and Crafts, Tournaments, Psychotherapy and Psych Education programs. (Ex. 138, ¶602.)

1412.  These continuous programs run once a week for 45 minutes. (Ex. 138, ¶603.)

1413.  The Lifers, Psychotherapy and Psych Education programs can accommodate 15 inmates. (Ex. 138, ¶604.)

1414.  The Arts and Crafts and Tournaments programs can accommodate 10 inmates. (Ex. 138, ¶605.)

1415.  The Lifers, Arts and Crafts and Tournaments program all run one session, meeting once a week. (Ex. 138, ¶606.)

1416.  The Psychotherapy and Psych Education programs all run six sessions concurrently. (Ex. 138, ¶607.)

1417.  In all, 227 CB-1 inmates are provided the opportunity for an

additional 45 minutes to one hour out of cell a week if an inmate is participating only in one program.  (Ex. 138, ¶608.)

### 8.   ASPC-Florence, Central Unit Programming – CB-2 and CB-3

1418.  Prior to April 2014, maximum custody inmates at ASPC-Florence, Central Unit – CB-2 and CB-3 were employed working outside their cells (approximately 170 positions for 285 inmates).  (Ex. 138, ¶609.)

1419.  Prior to April 2014, CB-2 and CB-3 already ran (or were already in the process of implementing) three inmate programs for maximum custody inmates to include:  Self Control, Responsible Thinking and Social Values (Social Values for CB-2 and CB-3 were already in the implementation process before April 2014 and went "on-line" with inmate attendance before the end of April 2014).  (Ex. 138, ¶610.)

1420.  Each program session runs 8 weeks and meets once per week for one hour.  (Ex. 138, ¶611.)

1421.  Each program can accommodate 8-12 inmate students.   (Ex. 138, ¶612.)

1422.  The Self Control program runs two sessions concurrently so total, 24 inmates can participate in this program per session.  (Ex. 138, ¶613.)

1423.  While the programs can accommodate 8-12 student inmates, actual participation is traditionally less than class capacity.  (Ex. 138, ¶614.)

1424.  Prior to April 2014, CB-2 and CB-3 provided the opportunity for 36 inmates to spend an additional hour out of cell each week for programming (with programming increased for CB2 in April for the Social Values program).  (Ex. 138, ¶615.)

1425.  In addition to the above, the following self-paced, self-study classes were provided to CB-3 maximum custody inmates in 2012 and started again in March of 2013:  Conflict Resolution, Substance Abuse, Living a Better Way, Broken Wings, Causes and Cure, Victim Awareness, Commitment to Change and Resources for Change.  (Ex. 138, ¶616.)

**9.    ASPC-Florence, Central Unit Programming – CB Kasson (CB-5)**

1426.  Prior to April 2014, maximum custody inmates at ASPC-Florence, Central Unit – CB Kasson (CB-5) were employed working outside their cells (approximately 12 positions for 43 inmates).  (Ex. 138, ¶617.)

1427.  Prior to April 2014, Kasson already ran a Social Values program. (Ex. 138, ¶618.)

1428.  The program session runs 8 weeks and meets once per week for one hour.  (Ex. 138, ¶619.)

1429.  While the program can accommodate 8-12 inmate students per session, actual participation is traditionally less than class capacity.  (Ex. 138, ¶620.)

1430.  CB Kasson provides 12 inmates the opportunity to spend an additional hour out of cell each week for programming.  (Ex. 138, ¶621.)

**10.    ASPC-Florence, Central Unit Programming – Restricted Housing (CB-7)**

1431.  Restricted housing inmates are not afforded work programs because of attendant safety and security risks presented by these inmates who have committed one of the Forbidden Three Acts (serious assaults on staff, serious inmate on inmate assaults with a weapon and multiple inmates assaulting an inmate with serious injury).  (Ex. 138, ¶622.)

1432.  Prior to April 2014, Central Unit Restricted Housing (CB-7) already ran 3 inmate programs to include:  Self Control, Responsible Thinking and Social Values. (Ex. 138, ¶623.)

1433.  Each program session runs 4 weeks and meets twice per week for one hour. (Ex. 138, ¶624.)

1434.  Each program can accommodate 3-5 inmate students. (Ex. 138, ¶625.)

1435.  The Self Control program runs two sessions concurrently (3-5 inmates per session for a total of 6-10 inmates participating at one time). (Ex. 138, ¶626.)

1436. The Responsible Thinking and Social Values programs each run four sessions concurrently (3-5 inmates per session for a total of 12-20 inmates participating in each program at a time). (Ex. 138, ¶627.)

1437. Accordingly, 50 Restricted Housing inmates are afforded the opportunity to spend an additional hour out of cell each week for programming. (Ex. 138, ¶628.)

1438. Actual inmate participation in the programming is traditionally less than total available occupancy in the program sessions. (Ex. 138, ¶629.)

**11.     ASPC-Perryville, Lumley Unit Step Program Incentives**

1439. Lumley Unit female maximum custody inmates must participate in a three step behavioral modification program. All condemned female inmates participate in all incentives and stages with the exception of non-contact visits, separately from non-condemned inmates. (Ex. 138-U: Attachment J; Ex. 138, ¶630.)

1440. Each step requires a minimum 30 day participation period and adherence to program expectations. (Ex. 138-U: Attachment J; Ex. 138, ¶631.)

1441. An inmate may be reduced to a prior step based upon program non-compliance, certain disciplinary violations or demonstration of poor socialization skills and/or non-cooperative behavior. (Ex. 138-U: Attachment J; Ex. 138, ¶632.)

1442. Incentives provided to Step I inmates include:

- Store - $60/week and $80 at Christmas;
- Phone – one 15 minute call per week (same for condemned inmates);
- Visitation – one non-contact visit block per week (2 hours);
- Recreation – one hour, six times a week;
- Library Service;
- TV and personal property per DO 909;
- Securepak may be purchased once per quarter within security imitations on certain items.

(Ex. 138-U: Attachment J; Ex. 138, ¶633.)

1443. Incentives provided to Step II inmates include:

- Store - $80/week and $120 at Christmas;
- Phone – one 15 minute call per week (condemned inmates receive two 15 minute calls per week);
- Visitation – one 3 hour non-contact visit block per week;
- Recreation – one hour, six times a week in 12 inmate groups;
- Library service;
- TV and personal property per DO 909;
- Securepak – once every other month within security limitations on certain items;
- Hobby Craft – origami and pencil drawing;
- WIPP – eligible for select jobs;
- Movement – unrestrained out of cell;
- Dining room access – breakfast and dinner meals;
- Photos – inmate only on New Year's Day, Valentine's Day, Mother's Day and Father's Day.

(Ex. 138-U: Attachment J; Ex. 138, ¶634.)

1444. Incentives provided to Step III inmates include:

- Store - $100/week and $160 at Christmas;
- Phone – one 15 minute call per week (condemned inmates receive three 15 minute calls per week);
- Visitation – one 3 hour non-contact visit block per week; after 180 days in Step II, shall be granted contact visits in four hour blocks and utilize vending machines;
- Recreation – one hour, six times a week in 14 inmate groups;
- Library service;
- TV and personal property per DO 909;
- Securepak – once every month within security limitations on certain

items;

- Hobby Craft – origami and pencil drawing;
- WIPP – eligible for select jobs;
- Movement – unrestrained out of cell;
- Dining room access – all meals;
- Photos – families on New Year's Day, Valentine's Day, Mother's Day and Father's Day.
- Loaner appliances – television, music player and fans when available;
- Group activities – televised sport and entertainment programs.

(Attachment U, Director's Instruction #326, Attachment J; Ex. 138, ¶635.)

### 12.    ASPC-Perryville, Lumley Unit Programming

1445.  Prior to April 2014, female maximum custody inmates at ASPC-Perryville – Lumley Unit were employed in positions to include the following:  porter, construction (remodeling of kitchen), kitchen deep cleaning, watering shrubbery and working in the library (approximately 10 positions for 57 maximum custody inmates). (Ex. 138, ¶636.)

1446.  Prior to April 2014, the Lumley Unit already ran 6 out of cell programs for Stage II and III maximum custody inmates:  Self Control, Responsible Thinking, Domestic Violence, Merging Two Worlds, Thinking for a Change and Social Values.  (Ex. 138, ¶637.)

1447.  Self-Control, Responsible Thinking and Social Values programs run 8 weeks per session.  (Ex. 138, ¶638.)

1448.  Domestic Violence, Merging Two Worlds and Thinking for a Change programs run 10 weeks per session.   (Ex. 138, ¶639.)

1449.  Self-Control, Responsible Thinking and Social Values programs meet once each week for one hour.  (Ex. 138, ¶640.)

1450.  Domestic Violence, Merging Two Worlds and Thinking for a Change

programs meet once each week for 1.5 hours.  (Ex. 138, ¶641.)

1451.  Self-Control and Responsible Thinking programs can accommodate 5 inmate students per session.  (Ex. 138, ¶642.)

1452.  Domestic Violence, Merging Two Worlds and Thinking for a Change programs can accommodate 5-8 inmate students per session. (Ex. 138, ¶643.)

1453.  The Social Values program can accommodate 6-8 inmate students per session.  (Ex. 138, ¶644.)

1454.  Stage I maximum custody inmates may participate in the Self Control and Responsible Thinking programs, but participate on a self-study basis, in cell.  (Ex. 138, ¶645.)

1455.  In addition to the above, prior to April 2014, Perryville-Lumley already  offered the following additional activities to Step II and/or Step III maximum custody female inmates:  yoga (one class per week for 1.5 hours – accommodation of 2 separate groups of 5 inmates); Step III social activity (one class per week for 1.5 hours – educational movies); religious services (1.5 hours twice a month – accommodation of 8-10 inmates with separate services provided for condemned inmates); Step III therapeutic class – "Relationships" (one class per week for one hour – accommodation of 5 inmates). (Ex. 138, ¶646.)

1456.  Finally, Perryville-Lumley female maximum custody inmates are offered one-on-one therapy, as needed and determined by mental health providers.  (Ex. 138, ¶647.)

1457.  In the last five years, more than 100 female maximum custody inmates have been released from maximum custody by completing programming.  (Ex. 138, ¶648.)

**13.    Evolution of Maximum Custody Conditions of Confinement and Programming**

1458.  Implementation of modifications of maximum custody conditions of confinement has been an evolving and progressing process since 2009.  (Ex. 138, ¶649.)

1459. As examples, in mid-2009, ASPC-Florence started a WIPP work crew assignment program for maximum custody inmates from Central Unit to work out of cell in education, maintenance, shoeshine, laundry, library, barber and porter positions. (Ex. 138, ¶650.)

1460. Approved Central Unit maximum custody inmates were also permitted recreation in groups of 52 and communal chow in the same numbers. (Ex. 138, ¶651.)

1461. In July 2009, a pilot program was also started for ASPC-Florence, Central Unit – CB-2 maximum custody inmates that permitted unrestrained escorts to recreation and showers and group recreation for 52 inmates at a time. Maximum custody inmates were also screened and selected for work and education programs providing increased out of cell time and interaction with inmates and prison personnel. (Ex. 138, ¶652.)

1462. Likewise in July 2009 ASPC-Florence implemented the Walking Max Program in Central Unit – CB-2 which permitted increased out of cell time for screened and approved inmates to include increased contact visitation, some meals in the chow hall, unescorted movement to recreation and showers, group recreation for 52 inmates at a time and WIPP work programs. (Ex. 138, ¶653.)

1463. In 2010 ASPC-Florence implemented the ETV Block Daily Broadcast behavioral series program for Central Unit maximum custody inmates that permitted inmates to self-study courses that were also broadcast on televisions located in certain units where inmates could watch the programs from their cell fronts. Programs included Living a Better Way, Domestic Violence – Broken Wings, Victim Awareness, Conflict Resolution, Commitment to Change, Substance Abuse, Resources for Change. (Ex. 138, ¶654.)

1464. In May 2012, mental health inmates were selected to participate in a mental health program in CB1 receiving 1:1 individual therapy, group therapy and psycho-educational therapy. (Ex. 138, ¶655.)

1465.  In August 2012, a psychiatric tech was assigned to CB-1 to develop recreational activities to include basketball and kickball tournaments, hobby craft and a CB-1 inmate newsletter.  Release preparation groups were also formed.  (Ex. 138, ¶656.)

1466.  In May 2012, inmates were also selected to participate in a mental health program in CB Kasson, Wing 1 that also included 1:1 individual therapy, group therapy and psycho-educational therapy.  (Ex. 138, ¶657.)

1467.  In the fall of 2013, group therapy started to take place in the recreation facilities at the Kasson Unit allowing small groups to program uncuffed.  (Ex. 138, ¶658.)

1468.  In December 2012, a psychiatric tech was assigned to Kasson Wing 1 to develop recreational activities and psycho-educational programs such as meditation, poetry, Kasson newsletter and "Doing All Day" Lifer's Group.  (Ex. 138, ¶659.)

1469.  ASPC- Florence Central Unit – CB-1, CB-2 and CB-3 has also added group religious services as of early 2013 allowing inmates not presenting a safety and security risk to gather for 1 to 1.5 hours once a week for communal worship.  Cell side services are also offered.  (Ex. 138, ¶660.)

1470.  ADC maximum custody inmates are not subjected to "isolation", but instead are provided ample opportunity to interaction with others, out of cell time and programming necessary to not only facilitate the necessary restricted living and movement measures designed to keep ADC's prisons safe from inmate assault, staff assault, escape, disturbance, uprisings, and self-harm, but also provide maximum custody inmates the opportunity to progress to increased privileges and for some, progression back to general population.  (Ex. 138, ¶661.)

G.        **Cell Cleanliness**

1471.  Cell sanitation is very important to promote hygiene, prevent spread of illness and disease, promote favorable living conditions, and protect safety and security for inmates and ADC personnel. (Ex. 138, ¶85.)

1472.  All living areas are inspected daily by staff to promote these

objectives.  (Ex. 138-C: DO 704.07, Sec. 1.1; ADC012688; Ex. 138, ¶86, 89.)

1473.  Correctional personnel make daily cell inspections to promote these objectives. (Ex. 138, ¶86, 89.)

1474.  Inmates are required to sweep and neatly maintain their cells. (Ex. 138-C: DO 704.06, Sec. 1.4.1, ADC012685; Ex. 138, ¶87.)

1475.  Inmates are given plastic trash containers in all living areas, which must be emptied daily. (DO Ex. 138-C: 704.06, Sec. 1.4.6; ADC012686; Ex. 138, ¶86, 88.)

1476.  Cells are cleaned prior to an inmate being newly assigned to the cell, including bunk mattress cleaning/exchange/replacement depending on the cleanliness or condition of the previously used mattress.  (Ex. 138, ¶90.)

1477.  Inmate porters clean the cell and paint it if necessary, before a newly assigned inmate moves into a cell.  (Ex. 138, ¶91.)

1478.  Inmate porters clean the run areas and showers. (Ex. 167 at 103.)

1479.  Upon assignment to a new cell, the newly assigned inmate may request and be provided cleaning supplies to clean the cell again, if the inmate wishes; this includes inmates placed in watch cells.  (Ex. 138, ¶92.)

1480.  Inmates are issued cleaning supplies a minimum of once a week in order to clean their cells. (Ex. 138, ¶93.)

1481.  Each cell has running water and thus inmates are permitted to use the water and any soap available in their cells to clean their cells between the weekly issuance of cleaning supplies. (Ex. 138, ¶94.)

1482.  All common areas and showers in inmate housing units are cleaned by inmate porters on a daily basis.  (Ex. 138, ¶95.)

1483.  ADC contracts with extermination companies to spray cells, showers, and housing unit common areas on a monthly basis.  (Ex. 138, ¶96.)

1484.  These policies and operational practices apply equally to general population and maximum custody cells.  (Ex. 138, ¶99.)

216

1485.   Inmates are prohibited from covering cell windows as such conduct impedes correctional personnel's ability to conduct safety and welfare checks and allows inmates the opportunity to engage in self-harm, contraband use or exchange, destruction of property, arson, assault, escape or other prohibited conduct. (Ex. 138-C: DO 704.06, Sec. 1.1.2; ADC012684-85; Ex. 138, ¶97)

1486.   Socialization between inmates is permitted on their own runs or rooms.  (Ex. 138-C: DO 704.06, Sec. 1.4.7; ADC012686.)

1487.   Inmates are authorized one pillow, one mattress, one blanket for summer and two blankets for winter; they may receive additional items with written authorization from medical or administrative staff. (Ex. 138-C: DO 704.06, Sec. 1.4.5.1; ADC012686; Ex. 138, ¶98.)

1488.   Cell property may be restricted upon determination by medical or administrative staff in order to prevent the inmate from engaging in self-harm. (Ex. 138, ¶100.)

1489.   ADC has been making capital improvements to its maximum security units since 2009, including opening up cell fronts for better observation and communication of/between inmates, and installing also windows facing outside so that inmates can see other inmates during recreation.  (Ex. 161 at 111-112-116)

**H.**          **Cell Configuration**

1490.   Maximum custody inmates represent the highest safety and security risk to the public, other inmates and facility personnel because they have the greatest risk of violence, predatory conduct, assaultive conduct or escape. (Ex. 138, ¶164.)

1491.   Because of maximum custody inmates' criminal and institutional history as described above, prison officials must assign these inmates to the most secure and closely monitored housing units, providing the highest level of monitoring and controlled movement. (Ex. 138, ¶165.)

1492.   The following ADC prison complexes operate maximum custody inmate housing units within the complex: ASPC-Eyman, ASPC-Florence, ASPC-Lewis,

ASPC-Perryville, and ASPC-Phoenix. (Ex. 138, ¶166.)

1493.   ASPC-Lewis houses male protective custody inmates only, and ASPC-Phoenix houses mental health inmates. (Ex. 138, ¶167.)

1494. Many of ADC's "maximum custody" cells have double bunks and house two inmates in one cell, thereby providing the inmates with constant opportunity for interaction with another inmate.  (Ex. 138, ¶168.)

1495.  While cell configurations among the complexes vary based upon year built and design, all maximum custody cells provide sufficient ventilation (either through open cell fronts fixed with metal bars, perforated metal cell front doors or individual cell ventilation).  (Ex. 138, ¶169.)

1496. Additionally, all maximum custody housing units and cell configurations provide exposure to natural light via in-cell windows, cell fronts that face windows or skylights in the housing units.  (Ex. 138, ¶170.)

1497. Moreover, all maximum custody cells provide inmates the opportunity to see others and to speak to other inmates, correctional personnel, medical personnel, and programming personnel through either a perforated steel cell front, a vision panel in the door or cell wall or an open cell front – metal bar configuration.  (Ex. 138, ¶171.)

1498.  All ADC maximum custody cells provide sufficient space for inmates to  engage in stretching, tai chi or yoga in their cells and such exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.  (Ex. 138, ¶172.)

1499.  All ADC maximum custody cells provide sufficient space for inmates to engage in cardiovascular exercise, including, but not limited to, marching in place, jogging in place, jumping an imaginary rope or doing "burpees" or "up-downs" in their cells and such exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.  (Ex. 138, ¶173.)

1500.  All ADC maximum custody cells provide sufficient space for inmates

to engage in strength training, including, but not limited to, pushups, sit-ups, planks, triceps dips, lunges, squats, etc. – all plyometric exercises often performed by non-incarcerated individuals in their own homes.  (Ex. 138, ¶174.)

1501.  Such in-cell strength training exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell. (Ex. 138, ¶175.)

1502.  Cell configurations for ADC's maximum custody units are as follows. and are represented by photographs of cells and cell fronts in ASPC-Eyman, ASPC-Florence and ASPC-Perryville.  (Ex. 138, ¶176, 677; Ex. 138-II, 138-JJ, 138-KK.)

    **1.**       **ASPC-EYMAN**

          **a.**      **Browning Unit**

REDACTED

REDACTED

1514.  Each cell is equipped with a bed, stool, desk, toilet, and sink with hot and cold running water.  (Ex. 138, ¶188.)

**b.    SMU I**

REDACTED

1519.  Each cell is equipped with a bed (or two beds if double bunked), stool, desk, toilet, and sink with hot and cold running water (mixer, one button).  (Ex. 138, ¶193.)

**2.    ASPC-FLORENCE**

1520.  ADC's Florence prison complex operates the following maximum custody units:  Cell Blocks 1, 2, 3, 4, 5, 7, and Kasson.  (Ex. 138, ¶194.)

**a.    Cell Block 1**

REDACTED



REDACTED

1527.  Each cell is equipped with a bed, shelving, toilet, and sink. (Ex. 138, ¶201.)

**b.**     **Cell Block 2**

REDACTED

1532.  Each cell is equipped with a bed, shelving, toilet, and sink.  (Ex. 138, ¶206.)

**c.**     **Cell Blocks 3 and 4**

REDACTED

REDACTED

1536.  All cells in both CB3 and CB4 face exterior housing unit windows. (Ex. 138, ¶210.)

REDACTED

1542.  Each cell in CB3 and CB4 is equipped with a bed, a table with an attached stool, shelving, toilet, and sink. (Ex. 138, ¶216.)

**d.      Cell Blocks 5 and 7**

REDACTED

1546.  All cells in CB5 and CB7 have an outside-facing window at the back of the cell. (Ex. 138, ¶220.)

1547.  The CB5 and CB7 cell doors contain a window that faces the pod

area to allow inmates to look out of the cell from the door. (Ex. 138, ¶221.)

1548.   All cells are equipped with a bed, a table/desk with a seat, shelving, toilet, and sink. (Ex. 138, ¶222.)

### e.   Cell Block Kasson

REDACTED

1551.   All cells have a window at the back of the cell to the outside which allows natural light into the cell.  The window to the outside is covered with a perforated steel grating on the interior for security purposes.  (Ex. 138, ¶225.)

1552.   All Kasson maximum custody cells have been retrofitted with a window in the steel cell door to allow inmates to look out of the cell from the door.  (Ex. 138, ¶226.)

REDACTED

1554.   All cells are equipped with a bed, a table with an attached stool, a TV shelf (the mental health watch cells do not have the TV shelf), toilet, and sink.  (Ex. 138, ¶228.)

### 3.   ASPC-PERRYVILLE

#### a.   Lumley Unit

REDACTED

1557.  Each cell has two outside-facing windows that allow natural light into the cell.  (Ex. 138, ¶231.)

REDACTED

REDACTED

1559.  Each cell is equipped with a bed, chair, desk, waste basket, sink with hot and cold running water, shelving, open closet, and a toilet, with the exception of 12 mental health watch cells which consist of a bed, sink, and toilet.  (Ex. 138, ¶233.)

**I.**         **Out of Cell Time**

1560.  The amount of time that an ADC maximum custody inmate is permitted to be out of his or her cell varies widely depending upon the inmate's classification, custody level and reason(s) for his or her placement in a particular maximum custody unit. (Ex. 138, ¶360.)

1561.  Depending on classification and program status, maximum custody inmates are permitted to leave their cells, as more specifically set forth below, for numerous reasons including not limited to shower time, out of cell recreation, programming opportunities, medical appointments, communal chow service, commissary trips, visitation and inmate job assignments.  (Ex. 138, ¶361.)

1562.  Work opportunities are offered to all inmates, including select inmates in maximum custody. (Ex. 138-Q: DO 903.01, Sec. 1.2.1; ADC012939; DO 903.04, Sec. 1.1.1; ADC012948.)  (Ex. 138, ¶362.)

1563.  In addition to personal telephone calls and visits, maximum custody inmates are permitted legal calls and legal visits where the inmate has ongoing criminal or civil litigation matters.  (Ex. 138, ¶363.)

1564.  Per ADC Department Order 902, Inmate Legal Access to the Courts, ADC inmates including maximum custody inmates are permitted 30 minute outgoing collect call legal calls as well as telephone access for court ordered telephonic hearing. (Ex. 138, ¶364.)

1565.  Legal calls are not monitored or recorded.  (Ex. 138, ¶365.)

1566.  Legal calls for telephonic court hearings are paid for by ADC.  (Ex. 138, ¶366.)

1567.  Inmates can request legal calls 24 hours in advance by submitting a

Legal/Emergency Telephone Call Request form and upon approval the phone calls shall be scheduled.  (Ex. 138, ¶367.)

1568.  Legal phone calls may be denied or suspended only due to security concerns and may not be denied as a form of discipline.  (Ex. 138, ¶368.)

1569.  Incoming legal calls from attorneys may also be facilitated but ADC personnel must first contact the inmate to determine if the inmate wishes to receive the call and the inmate must complete the Legal/Emergency Telephone Call Request form to accept or refuse an attorney initiated legal call.  (Ex. 138, ¶369.)

1570.  Attorney visits for ADC inmates, including maximum custody inmates, are permitted where the attorney requests the visit at least 48 hours in advance of the visit (waivers of this advance request period may be waived in emergency situations). (Ex. 138, ¶370.)

1571.  Attorney visits are permitted subject to security clearance of the attorney or attorney's agent.  Attorney visits may be contact visits or non-contact visits depending on the custody level of the inmate or any other safety or security concerns that may preclude a contact visit.  (Ex. 138, ¶371.)

**J.** 	**Recreation**

1572.  Maximum custody inmates are afforded six hours of outdoor exercise weekly, generally in two hour blocks, three times per week. (Ex. 138-C: DO 704.10, Sec. 1.1; ADC012693; Ex. 138, ¶372.)

1573.  The two-hour block, three times per week schedule facilitates efficient operations and scheduling so that each maximum custody inmate is provided equal opportunity for meaningful out of cell recreation time considering the number of maximum custody inmates that ADC incarcerates.  (Ex. 138, ¶373.)

1574.  Inmates housed in mental health units at the Lumley and Alhambra Units are afforded the same number of hours weekly for exercise as general population inmates – one hour in duration, six times a week. (Ex. 138-C: DO 704.10, Sec. 1.7; ADC012694; Ex. 138, ¶374.)

1575.  However, inmates that are on mental health or suicide watch may be offered less than six hours per week of out of cell recreation time at the clinical discretion of the mental health provider in order to protect the health and safety of the particular inmate.  (Ex. 138, ¶375.)

1576.  If recreation must be cancelled for legitimate operational or safety and security reasons such as a staffing shortage, inclement weather or facility emergency lockdown, recreation time will be made up for those inmates who missed recreation if time permits.  (Ex. 138, ¶376.)

1577.  Maximum custody inmates are provided water during exercise periods.  Outdoor enclosures are covered to provide shade and have either a mister system or evaporative cooler system that is turned on when the outdoor temperature exceeds 100 degrees. (Ex. 138-C: DO 704.10, Sec. 1.4-1.6; ADC012694; Ex. 138, ¶377.)

1578.  Mental health unit inmates' access to exercise areas is determined by mental health staff.  (Ex. 138, ¶378.)

1579.  Inmates must be clean shaven at all times; beards are not permitted, except for medical or religious reasons. (Ex. 138-C: DO 704.02, Sec. 1.4-1.5; ADC012682; Ex. 138, ¶379.)

1580.  Recreation time is in addition to other out-of-cell time, including showers.  (Ex. 161 at 175.)

1581.  Inmates are provided water during exercise period, and outdoor enclosures are covered to provide shade and have either a mister system or evaporative cooler system. (Ex. 138-C: DO 704.10, Sec. 1.4-1.6; ADC012694.)

1582.  Inmates housed in mental health units are afforded the same number of hours for exercise weekly as general population inmates. (Ex. 138-C: DO 704.10, Sec. 1.7; ADC012694.)

1583.  Inmates must keep their identification card on their person at all times when out of cell, including recreation, except during a work or recreational activity where the supervising staff member holds the identification card. (Ex. 138-C: DO 704.03,

Sec. 1.2, 1.3; ADC012682-83; Ex. 138, ¶380.)

1584. An inmate's current physical appearance must match his or her inmate identification card at all times.  The purpose of this policy is to protect against inmates changing their appearance (hair length, facial hair, etc.) in order to impede or prevent inmate counts, impede or prevent officer verification of inmate identity, and to thwart or control escape attempts and resulting escape detection and apprehension.  (Ex. 138, ¶381.)

1585.  In order to control contraband, prevent assaults and/or self-harm, and thwart escape attempts, inmates are subject to reasonable searches when electing to participate in out of cell recreation and other activities. (Ex. 138, ¶382.)

1586.  Maximum custody inmates in Central Unit, SMU I, and Browning Unit are closely monitored and, as a result, are subjected to a visual strip search coming out of cell on the way to recreation and other activities.  (Ex. 138, ¶383.)

1587.  Returning from recreation back to cell, these inmates are subject to a non-intrusive pass through a metal detector and a pat down search. (Ex. 138, ¶384.)

1588.  All other maximum custody inmates are subject to a non-intrusive pass through a metal detector and a pat down search when returning from recreation back to cell.  (Ex. 138, ¶385.)

1589.  All of the recreation enclosures provide the inmates with access to fresh air and sunlight, allow for communication between inmates in adjoining enclosures, and allow inmates to exercise.  (Ex. 138, ¶386.)

1590.  As to exercise, the individual recreation enclosures provide ample space for inmates to engage in stretching, cardiovascular exercise, and strength training. (Ex. 138, ¶387.)

1591.  For safety and security purposes, exercise in individual recreation enclosures is limited to the use of a handball, hacky sack, and calisthenics, with an emphasis on large muscle exercise, including walking, jogging in place, and isometrics. (Ex. 138, ¶388.)

1592. The provision of a handball or hacky sack to an inmate in an individual recreation enclosure upon request, allows the inmate an object to entertain himself with while at the same time preventing the inmate from using a recreation object for the purpose of self-harm or assault upon personnel. (Ex. 138, ¶389.)

1593. Inmates who are limited to individual enclosure recreation have proven, by their criminal, institutional or disciplinary history, that they present significant risks of harm to self, other inmates or prison personnel. (Ex. 138, ¶390.)

1594. The recreation enclosures, including the individual recreation enclosures, allow ample space to engage in stretching, tai chi or yoga. (Ex. 138, ¶391.)

1595. The recreation enclosures, including the individual recreation enclosures, allow ample space for inmates to engage in cardiovascular exercise, including, but not limited to, marching in place, jogging in place, jogging/walking/marching the perimeter of the enclosure or back and forth, jumping an imaginary rope or doing "burpees" or "up-downs". (Ex. 138, ¶392.)

1596. The recreation enclosures, including the individual recreation enclosures, allow ample space for inmates to engage in strength training, including, but not limited to, pushups, sit-ups, planks, triceps dips, lunges, squats, etc. – all plyometric exercises often performed by non-incarcerated individuals in their own homes. (Ex. 138, ¶393.)

1597. Individual recreation enclosures are warranted in the maximum custody classification prison environment based upon inmate criminal history, disciplinary history, and institutional behavior. (Ex. 138, ¶394.)

1598. It is an undeniable fact that some inmates are violent, difficult to manage, and, if permitted access to another human being – be it correctional personnel, medical personnel or another inmate, are likely to assault another person. (Ex. 138, ¶395.)

1599. Inmates with such demonstrated criminal, disciplinary or institutional history cannot be placed in a recreation enclosure with another inmate. (Ex. 138, ¶396.)

1600. Such individual recreation, however, does not deprive the inmate of

228

the opportunity to converse with other inmates, ask questions of prison personnel, recreate, lounge, breath fresh air, enjoy sunshine, and engage in exercise. (Ex. 138, ¶397.)

1601. REDACTED

1605. ADC inmates are not compelled to attend recreation – it is their choice to participate or not. (Ex. 138, ¶402.)

1606. It is also not unusual for inmates to elect not to go to recreation based upon personal preference, activity level, etc. (Ex. 138, ¶403.)

1607. Inmates who refuse the opportunity for recreation are nevertheless still offered the option to shower. (Ex. 138, ¶404.)

1608. Generally, recreation for ASPC Eyman and ASPC Florence maximum custody inmates is scheduled in three day per week, two hour per session blocks in order that approximately 3,000 male maximum custody inmates are provided equal access to recreation on a weekly basis. (Ex. 138, ¶405.)

1609. Photographs illustrate the recreation facilities for ASPC-Eyman,

ASPC-Florence and ASPC-Perryville.  (Ex. 138, ¶677; Ex. 138-II; 138-JJ; 138-KK).

1.    **ASPC-EYMAN**

1610. The Eyman complex provides maximum custody individual recreation enclosures at the end of every pod except for two pods.  (Ex. 138, ¶407.)

1611. The size of each end-of-pod recreation enclosure is 10'9" x 23'6".  (Ex. 138, ¶408.)

REDACTED

1615. Maximum custody inmates in Eyman individual recreation enclosures have access to a handball and hacky sack for entertainment and exercise.  (Ex. 138, ¶412.)

1616. Additionally, there are ten outside recreation enclosures and a basketball court between Wings 1 and 2 of Browning and SMU. (Ex. 138, ¶413.)

1617. The ten outdoor recreation enclosures are 10' x 10'.  (Ex. 138, ¶414.)

1618. These outdoor recreation enclosures are situated side by side so that inmates may converse with each other if they wish to do so. (Ex. 138, ¶415.)

1619. The 10' x 10' enclosures are made from expanded metal and square tubing.  (Ex. 138, ¶416.)

1620. There is a shade screen on top of these enclosures, along with a misting system.  (Ex. 138, ¶417.)

1621. The Eyman basketball court is 20' x 40' where multiple inmates may play basketball at once at Browning Unit outside Wing 1 and 2.  (Ex. 138, ¶418.)

1622. Eyman has another 20' x 40' basketball court outside Wing 3. (Ex. 138, ¶419.)

1623. SMU I has two 20' x 40' basketball courts outside Wings 1 and 2. (Ex. 138, ¶420.)

REDACTED

1625. The ten outdoor recreation enclosures (10'x10') and basketball courts are also used by mental health inmates moved to SMU I who are housed in Wings 1 and 2. (Ex. 138, ¶422.)

1626. SMU I has a large recreation enclosure outside Wing 3 measuring 20'x40'. (Ex. 138, ¶423.)

1627. SMU I additionally has one 50' x 90' recreation enclosure outside of Wing 3. (Ex. 138, ¶424.)

1628. Water is provided to inmates in Eyman maximum recreation facilities via water jugs attached to the individual recreation enclosures for inmate self-service. (Ex. 138, ¶425.)

1629. Group recreation enclosures offer self-service water to recreating inmates via large water jugs available in the enclosure. (Ex. 138, ¶426.)

2.    **ASPC-FLORENCE**

1630. Inmates in maximum custody at the Florence Complex are allowed individual recreation in outdoor expanded metal enclosures. (Ex. 138, ¶427.)

1631. These individual enclosures measure approximately 10'x10', have a sunscreen cover over the top, and have a misting system that is turned on when the outdoor temperature reaches 100 degrees. (Ex. 138, ¶428.)

1632. Inmates in the Max Phase Program (CB-2 and CB-3), Behavioral Health Program (CB-1), and Mental Health Program (Kasson/Wing 1) are provided group recreation privileges at the Step 2 and 3 levels. (Ex. 138, ¶429.)

1633. At Step 2, the inmates are offered one day of group recreation, along with two days of individual recreation. (Ex. 138, ¶430.)

1634. Step 3 inmates are offered three days of group recreation. (Ex. 138,

¶431.)

1635.  The group recreation for the CB-1, CB-2, and CB-3 inmates is on the Central Unit recreation field with potentially up to 120 inmates (all Step 1 and 2 inmates) per turn.  (Ex. 138, ¶432.)

1636.  The Central Unit recreation field provides a variety of recreation equipment and facilities to include a basketball court, volleyball court, track, par exercise course and equipment, covered tables, all-purpose recreation field, water fountain, and thermos jugs for water.  (Ex. 138, ¶433.)

1637.  Inmates at Kasson Wing 1 are offered recreation in 19'x19' recreation enclosures with four inmates permitted in each enclosure.  (Ex. 138, ¶434.)

1638.  The Kasson Wing 1 group enclosures are outfitted with basketball hoops and backboards, and one has multi-station exercise equipment.  (Ex. 138, ¶435.)

1639.  Inmates recreating in individual recreation enclosures at the Florence Complex may take up to two large water bottles with them to recreation, and officers check on the inmates every 30 minutes and replenish their water bottles upon request from thermos jugs on carts.  (Ex. 138, ¶436.)

1640.  Group recreation enclosures have water jugs available in the enclosures for inmate self-service of water. (Ex. 138, ¶437.)

1641.  The Central Unit recreation field provides a water fountain for inmates to drink from.  (Ex. 138, ¶428.)

**3.    ASPC-PERRYVILLE**

1642.  Female maximum custody inmates assigned to the Perryville Lumley Unit receive one hour of outdoor recreation, six days per week. (Ex. 138, ¶439.)

1643.  There are three different steps of recreation enclosures provided at Perryville for recreation of female maximum security inmates.  (Ex. 138, ¶440.)

1644.  Step I is the first phase of recreation a maximum custody female inmate is eligible for and is individual recreation in an individual recreation enclosure. (Ex. 138, ¶441.)

1645. The Step I recreation enclosures have the following dimensions: four enclosures are 12' x 12'; four enclosures are 24' x 12'; and one enclosure is 10' x 21'. (Ex. 138, ¶442.)

REDACTED

1647. Each Step I enclosure has a bench seat, and inmates have access to playing cards and sports balls for entertainment and exercise. (Ex. 138, ¶444.)

1648. Step I individual recreation enclosures are situated side by side so inmates may converse with each other. (Ex. 138, ¶445.)

1649. The Step II and III recreation enclosure measures 210' x 180' x 145'. (Ex. 138, ¶446.)

REDACTED

1651. This recreation enclosure provides volleyball net and two shaded structures with four tables for socializing. (Ex. 138, ¶448.)

1652. Step II and III inmates have access to sports balls, cards, and table games for entertainment and exercise. (Ex. 138, ¶449.)

1653. Water is provided to inmates in Perryville individual maximum custody recreation enclosures via water jugs attached to the enclosures for inmate self-service. (Ex. 138, ¶450.)

1654. The Step II and III recreation enclosure offers self-service water to recreating inmates via large water jugs available in the enclosure or on the field. (Ex. 138, ¶451.)

**K.** **Showers**

1655. ADC maximum custody inmates (including detention status) are offered showers (and shave for males) three days each week. (Ex. 138-G: DO 804.01, Sec. 1.2.6.1; ADC107481; Ex. 138, ¶452.)

1656. Inmates are allotted 30 minutes for each shower/shave. (Ex. 138, ¶453.)

1657.   Shower/shave time is in addition to the six hours of recreation offered to maximum custody inmates per week. (Ex. 138, ¶454.)

1658.   Accordingly, considering three opportunities per week for two hours of recreation each period, plus three 30 minute showers per week, maximum custody inmates are permitted, at a minimum, 7.5 hours of out of cell time per week. (Ex. 138, ¶455.)

1659. Close custody inmates on watch status are also permitted three showers per week, 30 minutes per shower. (Ex. 138, ¶456.)

**L.**     **Human Interaction**

1660. ADC maximum custody inmates have ample opportunity for daily human interaction. (Ex. 138, ¶457.)

1661. Maximum custody inmates are free to send and receive letters to and from incarcerated family and friends.  (Ex. 138, ¶458.)

1662. Maximum custody inmates may send and receive inter-facility mail to incarcerated family upon application and ADC approval of the same where such communication would not compromise safety and security of prison operations – for example, risk of escape planning, exchange of contraband or STG activity communication. (Ex. 138, ¶459.)

1663. Maximum custody inmates may also be afforded two telephone calls per year with an incarcerated family member upon application and ADC approval of the same where such communication would not compromise safety and security of prison operations – for example, risk of escape planning, exchange of contraband or STG activity communication. (Ex. 138, ¶460.)

1664. Maximum custody inmates may converse with cellmates where double bunked.  (Ex. 138, ¶461.)

1665. Maximum custody inmates also communicate with each other by talking through ventilation systems or talking to inmates in the cells on either side of them. (Ex. 138, ¶462.)

234

1666.  In addition, maximum custody inmates may converse with each other during recreation, whether recreating in individual enclosures, in group enclosures or on open recreation yards. (Ex. 138, ¶463.)

1667. Maximum custody inmates who participate in programming, communal chow or inmate work programs as part of Director's Instruction #326 Maximum Custody Population Management Step Program (discussed below) may converse with other inmates, correctional personnel and programming personnel. (Ex. 138, ¶464.)

1668. Maximum custody inmates may converse with mental health and medical personnel as associated with mental health and medical needs, interviews, examinations and treatment. (Ex. 138, ¶465.)

1669. Maximum custody inmates may participate in visitation and telephone calls commiserate with custody level with minimum telephone call and visitation opportunities increasing for maximum custody inmates participating in Director's Instruction #326 Maximum Custody Population Management Step Program (discussed below). (Ex. 138, ¶466.)

1670. Furthermore, maximum custody inmates have the opportunity for interaction with correctional personnel as they perform irregular safety and security checks.  (Ex. 138, ¶467.)

1671. Pursuant to ADC DO 804, Inmate Behavior Control, correctional officers conduct inmate welfare checks at random, periodic intervals, no less than once per hour. (Ex. 138, ¶468.)

1672.  Therefore, maximum custody inmates have the opportunity to speak to correctional personnel at least 24 times per 24 hours.  (Ex. 138, ¶469.)

1673. At any one time, however, there may be several correctional personnel in a unit (including rover correctional officers) performing a variety of functions such as security and welfare checks, delivery of mail or commissary, performing escorts, etc., providing inmates with additional opportunity to speak to correctional

personnel. (Ex. 138, ¶470.)

1674. In September 2013, ASPC-Eyman, Browning and SMU I Units, ASPC-Florence, Central Unit, and ASPC-Perryville, Lumley Unit, implemented correctional officers serving in a rover position.  (Ex. 138, ¶471.)

REDACTED

REDACTED

1682. The addition of the rover correctional officers greatly increases the frequency of security and welfare checks, increasing the frequency to on average, security and welfare checks performed irregularly at approximately 30 minute intervals. (Ex. 138, ¶479.)

1683. Since implementation of the rover correctional officer positions, a rover discovered an inmate in Central Unit in cardiac arrest.  Discovery enabled medical personnel to revive the inmate and facilitate emergency hospital transport. (Ex. 138,

1  ¶480.)

2  1684. A rover correctional officer also discovered an inmate in SMU

3  attempting to hang himself.  Detection enabled correctional personnel to intervene and

4  prevent the attempted suicide.  (Ex. 138, ¶481.)

5  1685.  At the Lumley Unit, a rover correctional officer discovered an inmate

6  with red marks around her neck.  A cell search uncovered a sheet tied into a noose and the

7  inmate admitted she stopped her suicide attempt when she heard the rover correctional

8  officer making security and welfare checks. (Ex. 138, ¶482.)

9  1686. These examples of additional correctional officer presence in

10  maximum custody units preventing or saving inmates from self-harm or medical

11  emergency all occurred in the fall of 2013.  (Ex. 138, ¶483.)

12  1687. For those maximum custody inmates who eat in their cells, these

13  inmates have the opportunity for two additional correctional personnel interactions in

14  addition to at least 24 interactions via inmate safety and welfare checks. (Ex. 138, ¶484.)

15  1688. In addition, Correctional Officer III or IV, Lieutenants, and/or

16  Captain level correctional personnel perform daily maximum custody unit rounds.  (Ex.

17  138, ¶485.)

18  1689. In addition, facility Chaplains make once per week rounds in

19  maximum custody units in addition to the religious volunteers that are permitted to

20  minister to maximum custody inmates on an almost daily basis (on an individual cell front

21  visit basis (if the inmate is confined to cell depending on security status). (Ex. 138, ¶486.)

22  1690. Either librarians or designated correctional personnel also make

23  rounds in maximum custody units once per week to deliver books requested by inmates,

24  providing yet another opportunity for contact with a person.  (Ex. 138, ¶487.)

25  1691. Maximum custody inmates are permitted to purchase watches or

26  calendars to keep track of time. (Ex. 138, ¶488.)

27  1692. Correctional personnel also closely interact with close custody

28  inmates on watch status as needed; specifically, correctional officers must conduct

constant watch, or 10 or 30 minute watches depending on inmate watch status which may include medical watch, security watch, suicide watch, and mental health watch. (Ex. 138, ¶489.)

1693.  While an inmate on watch status is not required to verbally interact with correctional personnel, if an inmate does not respond to an officer during watch checks with either a verbal or non-verbal response, the officer will still ensure status and safety of the inmate via a visual check inmate welfare through the cell door to determine that the inmate is breathing. (Ex. 138, ¶490.)

**M.**         **Cell Illumination**

1694.  Run and dormitory lights are turned on no later than 6:30 am and turned off no later than 10:00 p.m., daily.  (Ex. 138-C: DO 704.06, Sec. 1.4.4.1-1.4.4.2; ADC012686; Ex. 138, ¶234.)

1695.  Some maximum custody cells have night security lights in the cells that can be controlled by the inmate or by staff.  (Ex. 138, ¶235.)

1696.  Some maximum custody cells have night security lights that cannot be controlled by inmates.  (Ex. 138, ¶236.)

1697.  Other maximum custody cells have no security lights located in-cell, but have night security lighting running along the cell runs that provide correctional officers sufficient light to perform safety and security checks while also allowing inmates to sleep.  (Ex. 138, ¶237.)

1698.  The in-cell constant night security lights used for nighttime lighting of maximum custody cells (non-watch cells) are low-level, 7-watt bulbs that enhance security at the facility, yet are dim enough to provide an adequate sleeping environment for the inmates.  (Ex. 138, ¶238.)

1699.  The nightlights are very different from the much brighter security lights and the regular fluorescent lights that are used in the cells during the day. nightlights emit light that is comparable to a nightlight that persons may use in their home. (Ex. 138, ¶239.)

1700. The use of low-level nightlights is standard practice for correctional facilities across the country.  (Ex. 138, ¶240.)

1701. The level of illumination used is the minimum amount necessary to sufficiently address security concerns and to allow correctional staff to observe inmates during the night and regular sleeping hours.  (Ex. 138, ¶241.)

1702. Specifically, the nightlights enable correctional personnel to observe the wellbeing of an inmate at night, including detecting illness, medical emergency, ensuring suicide precautions, and detecting physical or sexual assaults, and ensure that inmates are not attempting to escape or engage in other illicit activities, such as use or exchange of contraband.  (Ex. 138, ¶242.)

1703. The level of illumination used also permits correctional personnel to make regularly required security checks, as described above, without having to turn on the daytime fluorescent lighting (and wake sleeping inmates) each time a security check is made.  (Ex. 138, ¶243.)

1704. Security checks are performed at frequent and random intervals throughout the day and night to monitor and protect the safety and security of the inmates and the facility, and officers must be able to observe skin and detect whether an inmate appears to be breathing.  (Ex. 138, ¶244.)

1705. In short, some cell illumination during sleeping hours is essential to adequately check safety and security of inmates.  (Ex. 138, ¶245.)

1706. While flashlights are used in some instances to conduct security checks, it is more efficient and desirable to employ illumination either in-cell or on the cell runs to enable officers to perform regular safety and security checks during sleeping hours.  (Ex. 138, ¶246.)

1707. The sole use of flashlights to conduct night time safety and security checks enables inmates to detect when officers are making rounds and thus plan instances of assault, contraband use/exchange, and escape plans around those security checks.  (Ex. 138, ¶247.)

1708.  Additionally, an officer may have to stop and shine a flashlight in a cell for extended time in order to confirm the safety and security of an inmate.  (Ex. 138, ¶248.)

1709.  Further, a flashlight alternative runs the risk of creating conflict between inmates and staff because inmates may view the use of a flashlight as harassment.  The current illumination practice eliminates staff discretion and control over how long to shine the light and how often to do so.  (Ex. 138, ¶249.)

1710.  Maximum custody watch cells require illumination at a higher wattage than the 7-watt nightlights in order to allow officers to maintain a visual on the inmates for safety and security reasons.  (Ex. 138, ¶250.)

1711.  The wattage of lighting in all maximum custody cells allows inmates to sleep while enabling correctional officers to perform appropriate safety and security checks.  (Ex. 138, ¶251.)

1712.  In addition, inmates are permitted to cover their eyes with small cloths if they wish to when they sleep as long as correctional personnel conducting safety and welfare checks are able to see flesh and determine that the inmate is breathing.  (Ex. 138, ¶252.)

1713.  Specific security lighting for ADC's maximum custody units are described as follows.  (Ex. 138, ¶253.)

1.    **ASPC EYMAN**

a.    **Browning Unit**

REDACTED

240

REDACTED

**b.**   <u>**SMU I**</u>

REDACTED

REDACTED



REDACTED

1737. Continuous lighting for inmates assigned to BMU and Mental Health watch cells serves the legitimate penological objective of keeping inmates on watch status safe and facilitating correctional officer ability to carry out frequent visual observation of the inmate without having to enter the cell or disturb the inmate to verify safety and security of the inmate.  (Ex. 138, ¶277.)

1738. Watch status duration varies based upon the specific circumstances necessitating the watch status in the first place but is designed to be a more temporary condition. (Ex. 138, ¶278.)

REDACTED

REDACTED

2.      **ASPC FLORENCE**

        a.      **CB-1**

REDACTED

REDACTED

**b.** **<u>CB-2</u>**

REDACTED

**c.** **<u>CB-3</u>**

REDACTED





REDACTED

d.      <u>**CB-4**</u>

REDACTED

e.      <u>**CB-5 and CB-7**</u>

REDACTED

1    REDACTED

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17          f.      **<u>CB-Kasson</u>**

18       REDACTED

19

20

21

22

23

24

25

26

27

28                                                            )

REDACTED

1787. Continuous lighting for inmates assigned to the Kasson Watch cells serves the legitimate penological objective of keeping inmates on watch status safe and facilitating correctional officer ability to carry out frequent visual observation of the inmate without having to enter the cell or disturb the inmate to verify safety and security of the inmate.  (Ex. 138, ¶327.)

1788. Watch status duration varies based upon the specific circumstances necessitating the watch status in the first place but is designed to be a more temporary condition.  (Ex. 138, ¶328.)

REDACTED

1   REDACTED

2

3

4

5

6

7

8

9

10

11

12

13       3.       **ASPC PERRYVILLE**

14               a.       **Lumley Unit**

15   REDACTED

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED

**N.** **Food Service**

1820. DO 912 addresses health and sanitation requirements and restricted diets and "ensures that inmates are provided nutritious meals." (Ex. 138-V: DO 912; ADC013137-41, ADC137971-92; Ex. 138, ¶101.)

1821. The goal for ADC's food service is "to have a quality food service program that provides the most nutritious, appetizing and cost effective meal possible." (Ex. 138-AA; ADC040552.)

1822. The Contract Food Service Staff is required to provide "regular and restricted diets that are nutritionally adequate, regularly monitored and compatible with the needs of inmates." (Ex. 138-BB; ADC040580.)

1823. Food is prepared in a manner that is efficient and sanitary, including safe food preparation practices and operation to preclude spreading of communicable diseases. (Ex. 137-KK: HSTM Ch. 2, Sec. 7.0; ADC010719.)

1824. ADC staff provides dietary consultations for inmates with specific medical diagnosis. (Ex. 138-BB; ADC040584; Ex. 138, ¶102.)

1825. Each facility is required to adhere to the procedures and standards in the Food Service Technical Manual ("FSTM") and the Diet Reference Manual ("DRF"). (Ex. 138-BB; ADC040550-73, ADC040574-609; Ex. 138, ¶103.)

1826. The FSTM provides health guidelines, sanitation requirements, inspections, financial responsibilities, meal schedules, restricted diet guidelines, food service operations, training, security protocol, safety standards, and food preparation and transportation guidelines. (Ex. 138-BB; ADC040551-73; Ex. 138, ¶104.)

1827. The DRF provides a list of, and procedure for providing, medical and religious diets available (restricted diets), and dietary guidelines and protocols for the general population, inmates with restricted movement, and inmates on suicide/mental health watch. (Ex. 138-BB; ADC040574-609; Ex. 138, ¶105.)

1828. The DRF requires that the menu for general population inmates provide approximately 2900 (+/- 200) calories per day for men and 2200 (+/- 200)

calories per day for women, and provide adequate but not excessive calories, adequate fiber, moderate sodium, limited saturated fats (< 10% calories, total fat to 20-35% calories), and a decrease in added sugars. (Ex. 138-BB; ADC040587.)

1829. Maximum custody inmates receive – Monday thru Sunday – two meals per day: a Mega Sack meal consisting of breakfast and lunch, and a hot dinner. (Ex. 138-BB; ADC040557; Ex. 138, ¶106.)

1830. The caloric intake for inmates in maximum custody is reduced to compensate for decreased energy needs and to account for security issues (no hot liquid items. (Ex. 138-BB; ADC040588; Ex. 138, ¶114 .)

1831. The DRF requires that the menu for maximum custody inmates provide approximately 2600 calories per average per day for males, and 2200 calories per average per day for females. (Ex. 138-BB; ADC040588; Ex. 138, ¶115 .)

1832. This diet is adequate in all nutrients according to the Recommended Daily Allowance standards of the National Academies of Science–National Research Council if all the foods are eaten. (Ex. 138-BB;ADC040588.)

1833. ADC's private food vendor has six weekly menus. (Ex. 138-CC; ADC078652-79003; Ex. 138, ¶116.)

1834. For maximum custody male inmates, the Week 1 menu provides 2626 calories per day; the Week 2 menu provides 2706 calories per day; the Week 3 menu provides 2608 calories per day; the Week 4 menu provides 2726 calories per day; the Week 5 menu provides 2604 calories per day; and the Week 6 menu provides 2670 calories a day; for an average of 2657 calories per day. (Ex. 138-CC; ADC078656.)

1835. For all other male inmates, the six weekly menus average 2805 calories per day. (Ex. 138-CC; ADC078656.)

1836. Maximum custody female inmates receive the same six weekly menus as non-maximum custody female inmates; the Week 1 menu provides 2280 calories per day; the Week 2 menu provides 2229 calories per day; the Week 3 menu provides 2332 calories per day; the Week 4 menu provides 2260 calories per day; the

251

Week 5 menu provides 2260 calories per day; and the Week 6 menu provides 2235 calories a day; for an average of 2266 calories per day.  (Ex. 138-CC; ADC078656.)

1837.  These menus meet or exceed the recommended nutrient amounts as specified by Recommended Dietary Allowances from the National Academy of Sciences. (Ex. 138-CC; ADC078658.)

1838.  Inmates on watch are provided the same meals (including special medical diets), in frequency and nutritional quality, as meals served to general population inmates, but served free of items that can be used for self-harm (e.g., bones, trays, sacks, napkins, cellophane).  (Ex. 138-I: DO 807.06, Sec. 1.2.2.5; ADC013985; Ex. 138-BB; ADC040588; Ex. 138, ¶117.)

1839.  Inmates with a medical diagnosis are provided a restricted diet appropriate for their medical condition.  (Ex. 138-BB; ADC040582; Ex. 138, ¶118.)

1840.  Inmates with diabetes are provided the general population menu, which incorporates the principles endorsed by the ADA for diabetes care in correctional institutions regarding carbohydrates, protein, fat, and fiber amounts. (Ex. 138-BB; ADC040589.)

1841.  Inmates with diabetes are also provided prescribed snacks, three times a day, which are handed out during regular meal times.  (Ex. 138-BB; ADC040602.)

1842.  Inmates with hypertension are provided the general population menu, which incorporates the nutritional principles for hypertension management outlined by the NCCHC.  (Ex. 138-BB; ADC040590.)

1843.  Medical diets are available when medically necessary. (Ex. 137-GG; DO 1101.01, Sec. 1.1.1; ADC048544.)

1844.  Per the Contract, Corizon is responsible for prescribing and coordinating the ordering and delivery of restricted medical diets, according to ADC's Diet Reference Manual.  (Ex. 137-CC: RFP § 2.10.26, ADC014197).

1845.  Medical diets are special diets ordered for temporary or permanent health conditions that restrict the types, preparation, and/or amounts of food. (Ex. 137-

KK: HSTM, Ch. 7, Sec. 1.3, Para. 1.0; ADC010913.)

1846.  Inmates that require medical diets are identified either at intake, by exam, or by changes in physical condition. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.3, Para. 2.0; ADC010913; Ex. 138, ¶119.)

1847.  A medical diet must be supported by medical documentation from the prescribing practitioner. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.3, Para. 3.0; ADC010914.)

1848.  Special medical diets are available for inmates undergoing renal dialysis (renal dialysis diet), or that have chronic conditions of the liver or acute kidney disorders (controlled protein diet), wasting syndrome, pregnant, allergies, gluten intolerant, stomach illness (liquid diets), cancer or HIV with tissue wasting (liquid supplements), or undergoing chemotherapy. (Ex. 138-AA; ADC040577-78; Ex. 138-BB; ADC040592-605.)

1849.  A clinician's decision to stop a medical diet is a therapeutic decision. (Ex. 137-KK: HSTM, Ch. 7, Sec. 1.3, Para. 3.2; ADC010914.)

1850.  A mechanical/dental soft diet is provided for inmates who have difficulty in chewing due to illness, injury, recent dental procedure, or that may be edentulous, and it consists of foods that do not require mastication and are easily swallowed. (Ex. 138-BB; ADC040591.)

1851.  The mechanical/dental soft diet is based on the general population menu, and regular items are used whenever possible; items are chopped, ground or mashed to the inmate's ability to chew. (Ex. 138-BB; ADC040591.)

1852.  Food service employees are responsible for ensuring sanitary standards in all food service operations and for training staff and inmates on personal cleanliness/hygiene, as well as sanitary preparation of food, food storage, serving meals, and the care and maintenance of equipment.  (Ex. 138-W: DI 301; ADC079035.)

1853.  ADC utilizes the Mega Sack meal plan that includes breakfast and lunch served simultaneously.  (Ex. 138, ¶107.)

1854. Utilization of the Mega Sack meal plan offers the inmates individual control over when they would like to eat breakfast and lunch.  (Ex. 138, ¶108.)

1855. Additionally, with the exception of some Step 2 and 3 inmates in the Director's Instruction #326 Maximum Custody Population Step Program (discussed below), most maximum custody inmates at ASPC Eyman and ASPC Florence are fed in-cell. (Ex. 138, ¶109.)

1856. The Mega Sack meal plan lessons the burden on prison operations associated with the necessary personnel required to serve meals cell to cell.  (Ex. 138, ¶110.)

1857. The Mega Sack meal plan thereby frees up correctional personnel in the afternoon hours to provide for necessary inmate movement and escorts, safety and welfare checks along with movement of inmates to showers, recreation, programming, visitation, medical appointments, etc. (Ex. 138, ¶111.)

1858. Maximum custody female inmates at ASPC Perryville-Lumley unit receive three meals a day, Monday through Friday.  (Ex. 138, ¶112.)

1859. On weekends, the ASPC Perryville-Lumley unit maximum custody inmates receive a brunch meal providing both breakfast and lunch, and a dinner meal – with the caloric total being the same as a three meal per day plan.  (Ex. 138, ¶113.)

**O.** **Property**

1860. All inmates are authorized to possess property as outlined in the Inmate Property List.  (Ex. 138-R: DO 909.01, Sec. 1.1; ADC013030, ADC013058-66; Ex. 138, ¶76.)

1861. Inmates in maximum custody are permitted to have appliances such as televisions, cassette players, and headphones. (Ex. 138-R: DO 909.01, Sec. 1.1ADC013063; ADC013063; Ex. 138, ¶77.)

1862. Inmates may not possess any property item in excess of the total amount allowed.  (Ex. 138-R: DO 909.02, Sec. 1.1; ADC013030; Ex. 138, ¶78.)

1863. Cell property may be restricted upon determination by medical or

254

administrative staff in order to prevent the inmate from engaging in self-harm.  (Ex. 138, ¶79.)

1864.  Access to these appliances may be restricted for maximum custody inmates based upon disciplinary sanction.  (Ex. 138, ¶80.)

1865.  Restricting access to these appliances constitutes a reasonable behavioral modification sanction as the restriction is based upon a formal disciplinary sanction finding and is limited in time.  (Ex. 138, ¶81.)

1866.  Maximum custody inmates participating in ADC's Director's Instruction #326 Maximum Custody Population Management Step Program as are afforded increased property allowances as they progress through the three step behavioral modification program.  (Ex. 138, ¶82.)

1867.  Property afforded to inmates place on watch status is an individualized determination made by mental health personnel and correctional personnel depending on the circumstances requiring the watch status.  (Ex. 138, ¶83.)

1868.  Property restrictions may be imposed in order to eliminate inmate access to property items that the inmate may use for purposes of self-harm or a weapon used as against mental health, medical or correctional personnel.  (Ex. 138, ¶84.)

**P.**     **Health Needs Request Process**

1869.  ADC inmates (including maximum custody inmates) may advise prison medical personnel of non-emergency medical requests or requests for appointments by submission of a written form called a Health Needs Request ("HNR") form. (Ex. 138, ¶662.)

1870.  After completion of the HNR, the inmate must drop the HRN in the appropriately labeled drop box located in the housing unit. (Ex. 138, ¶663.)

1871.  Medical personnel collect the HNRs from the drop boxes daily. (Ex. 138, ¶664.)

1872.  HNRs are available in each housing unit and accessible to inmates. (Ex. 138, ¶665.)

1873.  For those maximum custody inmates who may not come out of cell without restraints for safety and security reasons, medical personnel collect HRNs from those inmates during their daily rounds in the unit when they pass out medications.   (Ex. 138, ¶666.)

1874.  HNRs are also available to maximum custody inmates on daily basis when correctional personnel make rounds with the forms cart passing out various Departmental forms.  (Ex. 138, ¶667.)

1875.  If an inmate does not have an HNR form, he or she can simply write their medical request on a piece of paper and submit it via the drop box or medical personnel methods noted above.  (Ex. 138, ¶668.)

1876.  Inmates are not disciplined or prohibited from assisting another inmate in filling out an HRN. (Ex. 138, ¶669.)

1877.  Inmates who are illiterate or may require assistance in completing an HNR may request assistant from medical personnel when the medical personnel do their daily rounds/tours in the maximum custody units to pass out medications. (Ex. 138, ¶670.)

1878.  Correctional personnel are not tasked with assisting illiterate or inmates requiring assistance to complete HNRs where medical personnel are available daily to do so and to require correctional personnel to perform this task would divert correctional personnel from their assigned security duties.   HIPPA concerns are also implicated as correctional personnel do not have access to inmate personal medical information. (Ex. 138, ¶671.)

1879.  Inmates also have the option to advise administrative, programming or supervisory personnel who make regular rounds in housing units that the inmate needs direction or assistance with filling out HNRs. Such personnel would then advise appropriate medical personnel that a particular inmates needs assistance in completing an HNR.  (Ex. 138, ¶672.)

1880.  If an inmate makes a verbal non-emergency health needs request to correctional personnel, correctional personnel will instruct the inmate on the HRN process

256

1   for non-emergency matters as explained above. (Ex. 138, ¶673.)

2   1881.  If an inmate makes a verbal request for emergency health needs, the
3   correctional officer will notify the shift commander who will then notify medical
4   personnel that an inmate is in need of emergency assistance.  (Ex. 138, ¶674.)

5   1882.  If correctional personnel detect on their own that an inmate may need
6   emergency medical assistance, the correction personnel are trained to immediately call for
7   an ICS medical response.  (Ex. 138, ¶675.)

8   **Q.**          **Work Program**

9   1883.  Work opportunities are offered to all inmates, including select
10  inmates in maximum custody. (Ex. 138-Q: DO 903.01, Sec. 1.2.1; ADC012939; DO
11  903.04, Sec. 1.1.1; ADC012948; Ex. 138, ¶133.)

12  **R.**          **Grievance Procedure**

13  1884.  The Inmate Grievance System for non-medical issues has five levels:
14  (1) the inmate must first try to resolve his issue through informal means, such as
15  discussion with staff in the area most responsible for the complaint or by the submission
16  of Inmate Letters (DO 802.02, Sec. 1.1); (2) if the inmate is unable to resolve the issue
17  through informal means, within ten working days after he becomes aware of the specific
18  issue, he may submit an Informal Complaint or an Inmate Letter to his assigned CO III
19  (DO 802.02, Sec. 1.2); (3) if the inmate is not satisfied with the Response of the CO III,
20  within five working days from receipt of the Response he may submit a Formal Grievance
21  to which the Deputy Warden responds (DO 802.03. Sec. 1.1, -1.5); (4) if the inmate is not
22  satisfied with the Deputy Warden's Response, within five working days from receipt of
23  the Response he may submit an Inmate Grievance Appeal to the Warden (DO 802.04,
24  Sec. 1.1); and (5) if the inmate is not satisfied with the Warden's Response to the
25  Grievance Appeal, he may Appeal to the ADC Director within five working days from the
26  receipt of the Response (DO 802.05, Sec. 1.1).  (__¶ 9.)

27  1885.  Under ADC policy, an inmate must appeal to the Director to exhaust
28  the non-medical grievance procedure, and the failure to properly appeal through to the

1   Director's Decision constitutes a failure to exhaust available administrative remedies.

2   (DO 802.01, Sec. 1.5; __ ¶ 10.)

3          1886.  Plaintiff Swartz REDACTED

4

5

6

7

8

9

10

11

12

13

14   REDACTED

15          1887.  Former ADC inmate Dustin Brislan REDACTED

16

17

18

19

20

21

22

23

24          1888.  Plaintiff  Rodriguez REDACTED

25

26

27

28



REDACTED

1889.  Plaintiff  Verduzco  REDACTED

1890.  Plaintiff  Thomas  REDACTED

1   REDACTED

2

3

4

5

6

7

8   1891.  Plaintiff Smith REDACTED

9

10

11

12

13

14

15

16   1892.  Plaintiff Gamez REDACTED

17

18

19

20   1894.  Plaintiff  Chisholm REDACTED

21

22

23

24

25

26   1895.  Plaintiff Polson REDACTED

27

28

REDACTED

**S.**          **Dr. Seiter's Expert Opinions**

REDACTED

1897.  Maximum Custody inmates are very difficult to manage.  (Ex. 123, ¶ 23.)

1898.  Management of these inmates is very time consuming and expensive, but the risk to others makes it a critical function for prison systems.  (Ex. 123, ¶ 23.)

1899.  The prisons in which they are housed must be physically secure, with cells rather than dormitories, with armed perimeters, and use materials that prevent compromise.  (Ex. 123, ¶ 23.)

1900.  Staffing levels must be higher for emergency response, for monitoring inmates, and because many services must be delivered.  (Ex. 123, ¶ 23.)

1901.  Inmate movements are either individually in restraints or under continuous staff monitoring.  (Ex. 123, ¶ 23.)

1902.  Daily procedures must be carefully planned and executed, as lack of attention to detail or trying to take shortcuts in operations can lead to assault or escape attempts.  (Ex. 123, ¶ 23.)

1903.  Staff working with high or maximum-security inmates must be constantly diligent to insure both staff and inmate safety.  (Ex. 123, ¶ 23.)

REDACTED

REDACTED



REDACTED

1920.  Every new correctional officer receives 280 hours of training at the Correctional Officer Training Academy (COTA).  (Ex. 123, ¶ 29.)

1921.  The curriculum includes Direct Supervision of Inmates (eight hours) emphasizing "creating a pro-social environment and reinforcing pro-social behavior," Direct Supervision Communications (3 hours) focusing on "how officers use this to gain cooperation of inmates," Non-Violent Crisis and Conflict Resolution (16 hours) to include "concepts of non-forceful crisis and conflict resolution," Signs and Symptoms (1.5 hours) regarding the "management of the mentally disordered inmate," and Suicide Prevention (2 hours) with "the role of staff in preventing suicides."  (Ex. 123, ¶ 29.)

1922.  In addition, all staff receive at least 40 hours of annual refresher training.  (Ex. 123, ¶ 29.)

1923.  For correctional officers, this includes Correctional Analysis and Response to Emergencies (7 hours) which is training to prevent inmate self-harm and suicide, Prison Rape Elimination Act (4 hours), and Suicide Prevention (1 hour).  (Ex. 123, ¶ 29.)

REDACTED



REDACTED

1    REDACTED



27          1951.  A recent publication by the Bureau of Justice Statistics reported there

28    were 2,186 suicides in state prisons in the 11 years from 2001 to 2011, with 185 suicides

1  in 2011. (Ex. 123, ¶ 35.)

2  1952.  During these 11 years, the average national suicide mortality rate in

3  state prisons was 16 per 100,000 inmates. (Ex. 123, ¶ 35.)

4  1953.  During these 11 years, Arizona had 67 suicides, with an average

5  annual mortality rate of 18 suicides per 100,000 inmates. (Ex. 123, ¶ 35.)

6  1954.  During FY2012, Arizona had six suicides and a rate of 15 per

7  100,000, and, during FY2013, there were seven suicides as reflected in the BJS Report.

8  (Ex. 123, ¶ 35.)

9  REDACTED

10

11  REDACTED

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28  .



REDACTED

1969.  The role and practice for watches is delineated in the Mental Health Technical Manual and DO 807. (Ex. 123, ¶ 40.)

1970. Each  facility  has  post  orders  describing  correctional  officer responsibilities for the Watch cells. (Ex. 123, ¶ 40.)

1971. Inmates  are  placed  on  watches  by  mental  health  staff  who  also determine the inmate's risk of harm to themselves and the type of monitoring required (continuous, every 10 minutes, or every 30 minutes). (Ex. 123, ¶ 40.)

1972.  This approach and monitoring is consistent with other prison systems and includes more frequent monitoring than National Commission on Correctional Health Care (NCCHC) standards. (Ex. 123, ¶ 40.)

REDACTED





REDACTED

REDACTED

2001.  In the middle of an emergency situation, it is difficult to determine if there is an imminent threat of death or serious bodily injury. (Ex. 123, ¶ 59.)

REDACTED

REDACTED

REDACTED

REDACTED

2035.  Illumination in the cells enables officers to perform health and safety checks each hour on the inmates. (Ex. 123, ¶ 88.)

2036.  This is critical for several reasons: (1) officers are instructed to "view skin" and be sure they see "living and breathing" individuals; and (2) officers are required to have constant movement and make regular checks of inmates in their cells, and if it was too dark, there would be no way to assure that inmates were not suffering from any medical issues. (Ex. 123, ¶ 88.)

REDACTED

2038.  In addition, inmates are often in two-person cells, and staff need to see in the cells to be sure inmates are not fighting or one inmate is not assaulting another. (Ex. 123, ¶ 88.)

2039.  Illumination is also necessary to perform security checks to assure that inmates do not have contraband, engage in activities which pose a danger to staff or other inmates, or attempt an escape. (Ex. 123, ¶ 88.)

REDACTED

REDACTED

2047.  Caloric counts are reduced (compared to general population inmates) for inmates on lock-down or subject to restricted movement to compensate for decreased energy needs. (Ex. 123, ¶ 100.)

2048.   Inmates at Perryville in Stage 2 go to the dining room for breakfast and dinner, and have a sack meal for lunch. (Ex. 123, ¶ 101.)

2049.  Those in Stage 3 go to the dining room for all meals. (Ex. 123, ¶ 101.)

2050.  In the Florence CB-2 Phase Program, inmates in Step 3 go to the dining room for one meal per day and receive a mega sack for the others. (Ex. 123, ¶ 101.)

REDACTED



1  REDACTED

2

3

4

5

6

7

8

9

10  **X.**   **NAMED PLAINTIFFS**

11      **A.**      **Victor Parsons**

12          2068. Plaintiff Parsons was released on parole in November 2012, and

13  dismissed from this lawsuit on March 6, 2013.  (Dkt. 321-2 at 4, ¶ 7; Dkt. 372 at 23.)

14      **B.**      **Shawn Jensen**

15      REDACTED

16

17

18

19

20

21

22

23

24

25

26

27

28

REDACTED



REDACTED



REDACTED



REDACTED





REDACTED





REDACTED



REDACTED



REDACTED



REDACTED







REDACTED

REDACTED



REDACTED



REDACTED



REDACTED



REDACTED



REDACTED



REDACTED

REDACTED



REDACTED

REDACTED

REDACTED



REDACTED

REDACTED



REDACTED



C.      **<u>Stephen Swartz</u>**

REDACTED





REDACTED

REDACTED

REDACTED

REDACTED

REDACTED



REDACTED

REDACTED



REDACTED

REDACTED



REDACTED

REDACTED



REDACTED

REDACTED





REDACTED

REDACTED



REDACTED

1   REDACTED



REDACTED



REDACTED

REDACTED



REDACTED



REDACTED



REDACTED

REDACTED

REDACTED

REDACTED

**D.**     **Dustin Brislan**

REDACTED



REDACTED

REDACTED

REDACTED



REDACTED



REDACTED

REDACTED

REDACTED

    **E.**        **Sonia Rodriguez**

REDACTED

REDACTED

REDACTED



REDACTED

REDACTED

REDACTED



REDACTED

REDACTED

F.        **Christina Verduzco**

REDACTED

REDACTED

REDACTED





































**H.**

















REDACTED



**I.** REDACTED









Case 2:12-cv-00601-ROS   Document 896   Filed 05/16/14   Page 381 of 477











REDACTED







REDACTED











encounters







REDACTED











REDACTED

3483.  He noted an MRI with contrast was necessary to further define the

cervical mass REDACTED





REDACTED





















REDACTED





REDACTED







REDACTED





















REDACTED





3790.  In response, he was told he had an appointment with a doctor in





























REDACTED





REDACTED



























REDACTED



REDACTED



























1    DATED this 14th day of May 2014.

2                                        STRUCK WIENEKE & LOVE, P.L.C.

3

4                              By /s/ Daniel P. Struck

5                                 Daniel P. Struck
                                  Kathleen L. Wieneke
6                                 Rachel Love
                                  Timothy J. Bojanowski
7                                 Nicholas D. Acedo
                                  Ashlee B. Fletcher
8                                 Anne M. Orcutt
                                  Jacob B. Lee
9                                 STRUCK WIENEKE & LOVE, P.L.C.
                                  3100 West Ray Road, Suite 300
10                                Chandler, Arizona  85226

11                                Arizona Attorney General Thomas C. Horne
                                  Office of the Attorney General
12                                Michael E. Gottfried
                                  Lucy M. Rand
13                                Assistant Attorneys General
                                  1275 W. Washington Street
14                                Phoenix, Arizona 85007-2926

15                                *Attorneys for Defendants*

16   2889605.1

17

18

19

20

21

22

23

24

25

26

27

28

                                      475

**CERTIFICATE OF SERVICE**

I hereby certify that on May 15, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing **UNDER SEAL** and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:            ahardy@prisonlaw.com

Amy Fettig:              afettig@npp-aclu.org

Caroline N. Mitchell:    cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:      ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:     DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

Daniel Joseph Pochoda: dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

David Cyrus Fathi:       dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:          dspecter@prisonlaw.com

James Duff Lyall:        jlyall@acluaz.org; gtorres@acluaz.org

Cathleen M. Dooley:      cdooley@azdisabilitylaw.org

J.J. Rico:               jrico@azdisabilitylaw.org

John Howard Gray:        jhgray@perkinscoie.com; slawson@perkinscoie.com

Kirstin T. Eidenbach:    keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com

Jerica L. Peters:        jpeters@perkinscoie.com

Matthew Benjamin de Mee: mdumee@perkinscoie.com; cwendt@perkinscoie.com

Michael Evan Gottfried:Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov

Sara Norman:             snorman@prisonlaw.com

Asim Varma:              avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

David C. Kiernan:        dkiernan@jonesday.com; lwong@jonesday.com

John Laurens Wilkes:     jlwilkes@jonesday.com, dkkerr@jonesday.com

Kamilla Mamedova:        kmamedova@jonesday.com

1

2

Jennifer K. Messina:       jkmessina@jonesday.com

Taylor Freeman:            tfreeman@jonesday.com

3

4

Sarah Eve Kader:           skader@azdisabilitylaw.org, mlauritzen@azdisabilitylaw.org

Katherine E. Watanabe: Katherine.Watanabe@azag.gov, susan.oquinn@azag.gov

5

6

Amelia M. Gerlicher:       agerlicher@perkinscoie.com;docketPHX@perkinscoie.com,
                           pdrew@perkinscoie.com

7

Lucy Marie Rand:           Lucy.Rand@azag.gov, Geneva.Johnson-Joksch@azag.gov

8

Ajmel Quereshi:            aquereshi@npp-aclu.org

9

Jessica Jansepar Ross      jross@azdisabilitylaw.org

10

11

      I hereby certify that on this same date, I served the attached proposed lodged sealed

document by email, on the following:

12

13

14

      Caroline N. Mitchell
      Sarah Kader
      David Cyrus Fathi
      Donald Specter
      Amelia Gerlicher

15

16

      /s/ Daniel P. Struck

17

18

19

20

21

22

23

24

25

26

27

28