1   Arizona Attorney General Thomas C. Horne
    Office of the Attorney General
2   Michael E. Gottfried, Bar No. 010623
    Lucy M. Rand, Bar No. 026919
3   Assistant Attorneys General
    1275 W. Washington Street
4   Phoenix, Arizona 85007-2926
    Telephone: (602) 542-4951
5   Fax: (602) 542-7670
    Michael.Gottfried@azag.gov
6   Lucy.Rand@azag.gov

7   Daniel P. Struck, Bar No. 012377
    Kathleen L. Wieneke, Bar No. 011139
8   Rachel Love, Bar No. 019881
    Timothy J. Bojanowski, Bar No. 022126
9   Nicholas D. Acedo, Bar No. 021644
    Ashlee B. Fletcher, Bar No. 028874
10  Anne M. Orcutt, Bar No. 029387
    Jacob B. Lee, Bar No. 030371
11  STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
12  Chandler, Arizona  85226
    Telephone:  (480) 420-1600
13  Fax:  (480) 420-1696
    dstruck@swlfirm.com
14  kwieneke@swlfirm.com
    rlove@swlfirm.com
15  tbojanowski@swlfirm.com
    nacedo@swlfirm.com
16  afletcher@swlfirm.com
    aorcutt@swlfirm.com
17  jlee@swlfirm.com

18  *Attorneys for Defendants*

19              **UNITED STATES DISTRICT COURT**
                   **DISTRICT OF ARIZONA**
20
    Victor Parsons, *et al.*, on behalf of themselves       NO. 2:12-cv-00601-NVW
21  and all others similarly situated; and Arizona
    Center for Disability Law,
22                                      Plaintiffs,
                                                           **DEFENDANTS' MOTION FOR**
23          v.                                             **SUMMARY JUDGMENT**

24  Charles Ryan, Director, Arizona Department
    of Corrections; and Richard Pratt, Interim
25  Division Director, Division of Health Services,
    Arizona Department of Corrections, in their
26  official capacities,
                                     Defendants.
27

28

# <u>TABLE OF CONTENTS</u>

**Page**

I.    SEVERAL NAMED PLAINTIFFS SHOULD BE DISMISSED ........................ 1

II.   PLAINTIFFS CANNOT ESTABLISH THE CONSTITUTIONAL CLAIMS
      THEY RAISE IN THEIR COMPLAINT ........................................................... 2

      A.   The Medical Care Plaintiffs Cannot Establish an Eighth Amendment
           Violation ............................................................................................ 6

      B.   If the Named Plaintiffs are Not Dismissed, the Class Claims Should
           be Decertified .................................................................................... 21

      C.   Plaintiffs' Individual Claims Are Not Traceable to Systemic
           Deficiencies, and to the Extent Any Deficiencies Exist, They are Not
           Systemwide ....................................................................................... 22

III.  Several Certified Medical Claims Should Be Dismissed ............................. 27

IV.   The Dental Claims Must Be Dismissed ....................................................... 33

      A.   Failure to Provide Timely Access to Basic Dental Treatment ............ 34

      B.   The Alleged Practice of Extracting Salvageable Teeth ...................... 43

V.    THE CONDITIONS OF CONFINEMENT CLAIMS SHOULD BE
      DISMISSED AS A MATTER OF LAW .......................................................... 45

      A.   The Use of Chemical Agents on Inmates Using Psychotropic
           Medications is Not Per Se Unconstitutional ..................................... 46

      B.   Recreation ......................................................................................... 49

      C.   Social Isolation ................................................................................. 49

      D.   Constant Cell Illumination ................................................................ 49

      E.   Property ............................................................................................. 51

      F.   Nutrition ............................................................................................ 56

CONCLUSION ..................................................................................................... 56

Defendants Charles Ryan and Richard Pratt ("Defendants") move for summary judgment on all of the claims asserted in the Complaint and certified by the Court.  This Motion is supported by the following Memorandum of Points and Authorities and the contemporaneously filed Statement of Facts ("DSOF") and Exhibits.  In filing this Motion, Defendants expressly preserve the arguments made in their pending appeal.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.      <u>SEVERAL NAMED PLAINTIFFS SHOULD BE DISMISSED</u>

Plaintiff **Brislan** was released from ADC custody on December 5, 2013.   An inmate's release from custody, or from the environment in which he is subjected to the challenged policy, renders his claim for injunctive or declaratory relief moot.  *Alvarez v. Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012). Thus, his claims are moot and he should be dismissed as a named Plaintiff and class representative.[1]

After this case was certified, Defendants deposed Plaintiffs **Verduzco**, **Gamez**, **Thomas**, and **Wells**.   A class representative must be able to "prosecute the action vigorously on behalf of the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).   In determining a plaintiff's adequacy to represent a class, a court must consider the "zeal and competence" of the class representative. *Fendler v. Westgate-Cal. Corp.*, 527 F.2d 1168, 1170 (9th Cir. 1975); *see also Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949) ("diligence, wisdom and integrity" are important class representative traits). These Plaintiffs professed such ignorance and ambivalence about the case during their depositions that they cannot be deemed adequate representatives of the class and should be stripped of that status.

- Verduzco testified she did not recall seeing the Complaint or helping her attorneys answer written questions, she did not know what a class action was or what her role in the lawsuit was, she did not recall the status of this lawsuit, she did not know when the last hearing was or what it was about, she did not know who represented her in this lawsuit, she believed the attorneys who attended her

---

[1] The Court previously dismissed former Plaintiff Parsons on similar grounds (released on parole). (Dkt. 372 at 19.)

1

deposition were representing her in her criminal case, and she has eight invisible friends and "play[s] with them every time they come by." (DSOF ¶¶ 2893-2895.)

- Gamez testified he did not know what a class action was or how it differed from a regular lawsuit, the current status of the case, and what he wanted out of the case; he further testified that he did not think he was "part of the medical services" claims in the complaint, and did not know what "inadequate medical services" he was alleging. (DSOF ¶¶ 3167-3168.)

- Thomas testified he did not know who Richard Pratt was or that Pratt was a defendant in this lawsuit, and he was unaware of what he needed to prove to establish the claims in this lawsuit, and that there was an appeal pending. (DSOF ¶ 3019.)

- Wells testified that she did not read any portion of the Complaint before it was filed, and did not know the status of the case or when the last hearing was. (DSOF ¶ 3978-3979.)

These Plaintiffs should not be class representatives.

## II.   PLAINTIFFS CANNOT ESTABLISH THE CONSTITUTIONAL CLAIMS THEY RAISE IN THEIR COMPLAINT

**Standing**.  Article III's imminent injury requirement applies to this case.  *See Allen v. Wright,* 468 U.S. 737, 754 (1984), (a litigant's "asserted right to have the Government act in accordance with law is not sufficient," by itself, to confer standing and therefore federal jurisdiction), *abrogated on other grounds by Lexmark Intern, Inc. v. State Control Components*, 134 S.Ct 1379 (2014). The Supreme Court, in *Lewis v. Casey*, held that Article III's actual injury requirement must be satisfied in all federal cases, class actions and individual actions, including inmate lawsuits alleging inadequate healthcare, and further held that a healthy inmate who has suffered no deprivation of needed medical treatment can assert a claim of inadequate medical care "simply on the ground that the prison medical facilities were inadequate."  518 U.S. 343, 350 (1996).

As Defendants pointed out in their motion to dismiss, which they incorporate here, not all of the named Plaintiffs alleged harm resulting from their allegations.  (Dkt. 50 at 3-7.)  Plaintiffs survived that motion because the Court assumed the allegations to be true and because it construed the complaint as raising five general claims.  (Dkt. 175 at 3-5.)

1    Subsequently, however, the Court certified more narrowly framed claims – six medical
2    care claims, two mental health care claims, and two dental care claims – and just one class
3    with <u>all</u> of the named Plaintiffs as class representatives.  (Dkt. 372 at 22.)

4    But not all of the named Plaintiffs allege medical, dental, and mental-health
5    injuries.  Brislan and Thomas have no medical or dental claims; Licci, Jensen, Hefner, and
6    Smith have no dental or mental health claims; Gamez, Rodriguez, and Verduzco have no
7    dental claims; and Plaintiff Wells has no mental-health claims.  Moreover, many of the
8    named Plaintiffs do not allege any harm resulting from the certified practices. For
9    example, only three of thirteen Plaintiffs raise de facto tooth-extraction policy and
10   inadequate-emergency-treatment claims, and only four of thirteen Plaintiffs allege a claim
11   based on inadequate care for suicidal or self-harming inmates. And only one of eight
12   Plaintiff-subclass representatives raises a limited-property claim, only two of eight
13   Plaintiff-subclass representatives raise a constant-cell-illumination claim, and only three
14   of eight Plaintiff-subclass representatives allege an insufficient-nutrition claim.  When, as
15   here, a class action involves multiple claims, "at least one named class representative must
16   have Article III standing to assert a claim against each defendant." *Miller v. Am. Family*
17   *Mut. Ins. Co.*, 2010 WL 2926051, at *2 (D. Ariz. 2010) (citing *O'Shea v. Littleton,* 414
18   U.S. 488, 494 (1974)).

19   At the summary judgment stage, Plaintiffs have the burden to show that each
20   named Plaintiff has standing – i.e., suffered an "injury in fact" with a "causal connection"
21   between the injury and the complained of conduct – to assert every one of the certified
22   claims.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Plaintiffs cannot
23   satisfy that burden, and those Plaintiffs that lack standing to raise a claim on behalf of
24   themselves or on behalf of the class/subclass must be dismissed.

25   **Systemwide**.  "Systemic" is an oft-repeated adjective by Plaintiffs, but it is devoid
26   of meaning absent proof that the practice certified for class treatment actually exists
27   across the entire ADC system and is a failure giving rise to an Eighth Amendment
28   violation.  *See*, *e.g.*, *Porras v. Cnty. of Los Angeles*, 2006 WL 4941837, at *4 (C.D. Cal.

2006).  Proof of such a systemic claim "entails a heavy burden." *Dunigan ex rel. Nyman v. Winnebago Cnty.,* 165 F.3d 587, 591 (7th Cir. 1999).  Thus, a mere showing that one, two, or even nine out of the ten ADC facilities provide constitutionally inadequate care at some point in time does not establish a "systemwide deficiency."  It was Plaintiffs' burden to define their proposed healthcare class, *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980), and they did so very broadly.  Unlike the class action in *Madrid v. Gomez*, 889 F.Supp. 1146 (N.D. Cal. 1995), which challenged the constitutionality of healthcare and certain conditions at a single California facility (Pelican Bay), or the single facility challenge to health care provided at the Bedford Hills Correctional Facility in *Dean v. Coughlin*, 804 F.2d 207 (2nd Cir. 1986), this action seeks injunctive and declaratory relief against <u>all 10</u> facilities in the ADC prison system. Plaintiffs must therefore prove an Eighth Amendment violation throughout all 10 facilities, regardless of differences in local facility administration and medical care.  *See*, *e.g.*, *Webb v. Goord*, 340 F.3d 105, 109 (2nd Cir. 2003) ("But, taken together, the claims do not establish the existence of a policy or practice existing throughout the DOCS system, or within a single DOCS facility."). Plaintiffs cannot show this.

In addition, as they allege in the Complaint and as this Court has reiterated many times, each individual Plaintiff carries the burden of proving that his or her allegedly constitutionally deficient healthcare was caused by a systemic failure, not simply a policy or custom-driven instance of alleged medical indifference.

**Statute of Limitations**. Federal courts apply the state law limitations period in § 1983 actions. *Pouncil v. Tilton*, 704 F.3d 568, 573 (9th Cir. 2012).  In Arizona, the applicable limitations period for personal injury (and Section 1983) actions is two years under A.R.S. § 12-542.  Because Plaintiffs filed their Complaint on March 22, 2012, any claim accruing prior to March 22, 2010, is barred as untimely, and evidence associated therewith cannot be considered in connection with any of the individual or class claims asserted.

***Monell* Liability**.  Because Defendants are sued solely in their official capacities

4

(Dkt. 1, ¶¶ 21-22), the policy or custom requirement of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), applies with equal force to this action for injunctive relief. *Los Angeles Cnty. v. Humphries*, 131 S. Ct. 447, 452 (2010); *Hafer v. Melo*, 502 U.S. 21 (1991). Therefore, Plaintiffs must show that a policy or custom was the moving force behind the alleged constitutional violation. *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). Liability "may not be predicated on isolated or sporadic incidents" and "[t]he custom must be so 'persistent and widespread' that it constitutes a 'permanent and well settled.'" policy. *Trevino v. Gates,* 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell,* 436 U.S. at 691). In other words, isolated and sporadic instances of inadequate treatment by subordinate ADC staff is insufficient to hold Defendants liable. Although related to Plaintiffs' "systemic deficiencies" theory, *Monell* is a separate defense and must be satisfied for the Court to find Defendants liable under § 1983.

**Eighth Amendment Violation**. To prove an Eighth Amendment claim for denial of adequate health care, an inmate must demonstrate a "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). "A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (internal quotations omitted). A prison official is deliberately indifferent if he knows of and disregards a serious medical condition or is aware of facts from which the inference could be drawn that a substantial risk of harm exists, and actually draws such an inference. *Farmer v. Brennan*, 511 U.S. 825, 838 (1994). "A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).

**A.     The Medical Care Plaintiffs Cannot Establish an Eighth Amendment Violation.**

The named Plaintiffs challenging the constitutionality of their medical care cannot show negligence, let alone deliberate indifference under the Eighth Amendment. These

1   seven inmates, **Chisholm, Swartz, Licci, Jensen, Hefner, Wells**, and **Polson**

2   (collectively "Medical Care Plaintiffs"), are presumably the most extreme examples class

3   counsel could find to personify their healthcare challenge against ADC, yet each received

4   a level of care rivaling (if not exceeding) what non-incarcerated persons receive when

5   scheduling appointments, obtaining prescription refills, obtaining specialty consultations,

6   and other medical treatment.  These Plaintiffs' claims are either factually unfounded or, at

7   most, amount to a disagreement with the medical judgments exercised by ADC healthcare

8   providers with respect to their individual circumstances.  The sheer quantity of healthcare

9   encounters with medical staff by these Plaintiffs demonstrates responsive and medically

10  attentive care and refutes Plaintiffs' Eighth Amendment claims.

11      **Plaintiff Chisholm**:[2]  Chisholm claims it took her six months to receive an inhaler

12  prescribed by a pulmonologist, and that although she had chest pains in April 2011, she

13  did not see a cardiologist until December 2011. (Dkt. 240–1 at 250, ¶¶ 16-17.) Chisholm's

14  medical records do not support these assertions, as her first HNR referencing her

15  pulmonary respiratory specialist (not a pulmonologist) prescribing an inhaler was April

16  22, 2012, ADC medical staff could find no record of any prescription and therefore asked

17  for a faxed copy at a May 8, 2012 appointment, and Dr. Lockhart thereafter prescribed

18  two inhaler medications to begin May 18, 2012.  (DSOF ¶¶ 3241-3248.) Consistent with

19  this, and contrary to her allegation, Chisholm testified that it only took "weeks and weeks"

20  or "six weeks" – not six months – to receive her inhalers.  (DSOF ¶ 3246.)

21      The alleged 8-month "delay" in seeing an outside cardiologist mistakenly equates

22  chest pains and shortness of breath with an immediate entitlement to see a cardiologist.[3]

23

24      [2] Chisholm's declaration was cited by the Court to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary

25  medication and medical devices; and Failure to provide care for chronic diseases and protection from infectious disease. (Dkt. 372 at 7-8, 16.)

26

27      [3] These subjective symptoms were first revealed to Dr. Lockhart during a routine April 20, 2011 exam, and were made in the context of Chisholm wanting to be relieved of

28  work duty in the hot afternoon sun. (DSOF ¶¶ 3254-3259.) Dr. Lockhart ordered chest x-rays and an EKG test, which was "normal with sinus rhythm." (Id.)

(DSOF ¶¶ 3250-3279, 3332-3334.) It also ignores Chisholm's enrollment in ADC's chronic care clinic for hypertension where her vital signs were monitored, chest x-rays and EKG testing were done (and were within normal limits), blood pressure medication was prescribed, pulmonary hypertension testing was postponed by Chisholm, and other possibilities like sleep apnea were discussed with her (she reported symptoms of sleep apnea, a common cause of pulmonary hypertension).  (DSOF ¶¶ 3281-3331.)  Indeed, Chisholm's medical records indicate she had <u>48 visits</u> with ADC medical staff (nurses, mid-level practitioners and physicians) from March 22, 2010 to June 30, 2012.  (DSOF ¶¶ 3349, 3353, 3357.)  Moreover, Chisholm's dismay at not seeing a cardiologist sooner amounts to an unqualified disagreement with the judgment of ADC's physicians as to whether a cardiologist consult was medically justified.  (DSOF ¶¶ 3250-3279, 3332-3334, 3344.)  Not only did Chisholm never submit any HNRs demanding to see a heart specialist, it was not until Chisholm visited with ADC medical staff on December 14, 2011, that an outside cardiologist consult was ordered (due primarily to higher cholesterol results), and she was thereafter promptly seen by a cardiologist at the Cardiac Arrhythmia Institute on January 27, February 3, and March 22, 2012 for further cardiac evaluation and testing (with negative results). (DSOF ¶¶ 672, 3250-3279, 3280-3334.)  She also concedes that she has never been diagnosed with a heart problem by any provider, and that the cardiologist's tests did not reveal any heart problems.  (DSOF ¶¶ 3332-3334.)

Chisholm further claims to have "experienced many delays in receiving prescribed medications" which forced her "to file numerous HNRs." (Dkt. 240-1 at 250, ¶ 18.) During her deposition, however, defense counsel explored her extensive prescription regime – which includes no fewer than eight prescriptions for various psychiatric, heart, thyroid, pain and cholesterol ailments (DSOF ¶¶ 3386-3389), and Chisholm acknowledged that some drugs are promptly renewed. (DSOF ¶¶ 3386-3389.)  Her records further reveal that any delays were occasioned by her unwillingness to stand in the nurses line for specific prescriptions, and a prescription for Naproxen was refilled the day

after she complained about its confiscation during a cell search.[4]  (DSOF ¶¶ 3388-3389, 3341-3343.)

Chisholm's complaints of delay associated with her inhalers, cardiologist consult, and prescription refills do not satisfy either the objective or subjective components of the deliberate indifference prong of the Eighth Amendment analysis. (DSOF ¶¶ 696, 3241-3389.) Moreover, to the extent there were any prolonged delays, Chisholm cannot reasonably attribute such delays to purposeful cruelty, the alleged existence of an actionable policy or custom of ADC, or a systemwide deficiency. (DSOF ¶¶ 3241-3389.)

**Plaintiff Swartz:**[5]  Swartz's medical care allegations stem from two separate assaults – on February 26, and July 3, 2010 – and the alleged delay in referring him to outside specialists in plastic surgery and ophthalmology, and obtaining pain treatment. (Dkt. 240-1 at 299-300, ¶¶ 4-9.)

It is undisputed that Swartz was air-evacuated to Maricopa County Medical Center immediately after the February 26 assault for emergency treatment, and that Swartz received facial reconstruction surgery (oral maxillofacial) on March 4, 2010. (DSOF ¶¶ 2468-2483.) The professed need for plastic surgery stems from Swartz's unfounded, subjective belief that he needed <u>additional</u> surgery beyond that facial reconstruction surgery.  (DSOF ¶¶ 2606, 2660, 2467, 2561, 2576.)  Yet Dr. Thorpe, the oral surgeon, informed Swartz during a July 26, 2010 outside consultation that there would be no

---

[4] Two of Chisholm's prescriptions, Gabapentin and Naproxen, are both pain medications designed to treat her fibromyalgia. (DSOF ¶ 3387.) The unfilled prescription for Gabapentin prescribed by Dr. Lockhart in April 2012 resulted in Chisholm's HNR in August complaining about delay, yet Chisholm acknowledged that when this drug went to committee, it was available only as a "watch swallow" option, and could only be obtained via the daily "pill call." (DSOF ¶¶ 3388.) Chisholm has anxiety about standing in line for this pill call; indeed, it was this anxiety that caused her to refuse Elavil (which she conceded completely alleviated her pain from fibromyalgia), because it was available only via the pill call line.  (DSOF ¶ 3389.)

[5] The Court cited Swartz's declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication and medical devices; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372  at 7-8, 16.)

further surgery or treatment. (DSOF ¶¶ 2558-2559.) With respect to an outside ophthalmologist, no medical personnel suggested the possible need for an eye specialist until his July 26, 2010 visit with Dr. Thorpe, and an ophthalmology consult was requested on October 27, 2010, only after Swartz first raised an issue with blurry vision. (DSOF ¶ 2560.) Swartz was seen by an ophthalmologist less than three months later on January 14, 2011. (DSOF ¶¶ 2581-2582.)

Regarding treatment for pain, Swartz alleged in his prior declaration that he had to submit multiple HNRs in the months after the attack before he was approved on June 1, 2010 for Tramadol, a non-formulary drug, which Swartz admitted was renewed in July, "but no additional medications were added and the dose was not increased" requiring additional HNRs and a delay in approving the increased dosage (from 50mg to 100 mg). (Dkt. 240-1 at ¶ 8.) His medical records, however, show that he was appropriately given pain medication in the weeks and months after the March 4, 2010 oral surgery (without complaints), and he was approved the prescribed Tramadol on June 1 after the pharmacy obtained his lab results on May 26 (which was a prerequisite to filling the prescription Swartz had obtained in April). (DSOF ¶¶ 2502-2669.) Regarding the increased dosage of Tramadol (recommended October 27, 2010 but not approved until January, 2011), such a modest 2 ½ month delay in approving an increased dosage of a pain killer for an inmate prone to suicide attempts and drug abuse falls far short of the "sufficiently serious" prong of deliberate indifference, and is an individualized claim, not a systemic deficiency.[6] (DSOF ¶¶ 2580, 2589.)

Swartz's claims show, at best, a disagreement with ADC and outside specialists as to the proper course of treatment for his facial injuries, but falls far short of evidence needed to sustain an Eighth Amendment claim, and is also not enough to prove any

_____

[6] The potential for abusing Tramadol and other pain-killers is reason enough to require that increases in dosage of non-formulary drugs be approved sparingly and carefully. *See Ramirez v. Swindle*, 2012 WL 5828549, at *8 (E.D. Cal. 2012). Such an approval process is particularly appropriate with respect to Plaintiff Swartz, who was known to take prescription drugs "on the streets" and has had recurring overdose and suicide attempts.

actionable ADC policies or customs by Director Ryan or Mr. Pratt.  (DSOF ¶¶ 694, 2435-2736.)

To support two other class claims – failure to provide timely emergency treatment and failure to provide suicidal and self-harming prisoners basic mental health care – Swartz also alleged that he swallowed metal in September 2011, and that staff merely "ran a metal detector wand over me, and told me I would have to wait to pass the pieces of metal." (Dkt. 1, ¶ 41; Dkt. 240-1 at 300-01, ¶¶ 8, 10-11.) This testimony is incomplete and misleading.   (DSOF ¶¶ 2435-2736.)   On September 3, 2011, Swartz was sent to the hospital after he ingested a spring and wire, and underwent an endoscopy in which Dr. Panetta removed two wires and one "bolt" successfully.   (DSOF ¶¶ 2671-2673.) On September 4, 2011, Swartz was again sent to the hospital for an endoscopy after he ingested a steel bolt, returning from the hospital on September 5, 2011.  (DSOF ¶¶ 2674-2675.)  On September 7, 2011, Swartz complained again of swallowing a metal object. (DSOF ¶ 2676.) Dr. Bell advised that Swartz was to be placed on a metal detecting chair or wanded and if no metal was present, he was to be sent back to his cell.  (DSOF ¶ 2677.) Swartz admitted he was given both tests, which came back negative, so he was sent back to his cell.  (DSOF ¶ 2678.)  Swartz was then x-rayed on September 8, with follow-up x-rays on September 21 and 28, 2011.  (DSOF ¶ 2679.)

Moreover, Swartz admitted at his deposition that he received x-rays showing multiple pieces of metal, claiming he painfully passed a paperclip over the course of the next several weeks. (DSOF ¶ 2680.) Significantly, however, this was the only time he was forced to pass an object, as Swartz admitted that "[a]ny other time, it was removed, any of the objects were removed, with endoscopy."  (DSOF ¶ 2736.) Whatever inferences one can draw from an inmate repeatedly swallowing metal objects in an attempt to harm himself, the evidence shows that ADC provided hospitalization with endoscopic removal, numerous x-rays, and treatment to assist Swartz in removing the objects from his body. (DSOF ¶¶ 2670-2736.)   Swartz's metal-swallowing, medical assistance claim does not rise to the level of an Eighth Amendment violation. *See Kennedy v. Byus*, 2009 WL

10

31452, at *6 (E.D. Ark. 2009); *White v. Mahone*, 2009 WL 2566967, at *6-7 (C.D. Ill. 2009).  (DSOF ¶¶ 2670-2736.)  Nor is it proof of a systemwide violation.

Plaintiffs also relied on Swartz for their failure to provide necessary medication claim.  (Dkt. 1, ¶ 44.)  Swartz alleged that he was transferred from Phoenix to Lewis in December 2011, and allegedly had to wait several weeks before he began to receive his psychotropic meds previously prescribed. (Id.) Swartz was transferred from Baker Ward back to Lewis on December 22, 2011, and he was seen on January 11, 2012, where he reported needing a referral to psychiatry for evaluation, and that he was currently taking Prozac. (DSOF ¶¶ 2686-2687.)   Swartz submitted his first HNR requesting a mental health evaluation on January 19, 2012, falsely claiming that he had submitted two previous requests. (DSOF ¶ 2688.) He stated only that he had questions about his medications.  In response, he was seen on January 23, 2012 (four days later), and the doctor prescribed Risperdal (an antipsychotic drug), as well as Benadryl, Prozac and CaCO3. (DSOF ¶ 2689.)  A progress report dated January 31, 2012, shows no complaint about his medications, and notes that he was feeling "well," and had denied any suicidal or homicidal ideations. (DSOF ¶ 2690.) There is no evidence of delay, interruption, or anything close to a "policy and practice" with respect to disruptions in medication supply following his transfer.  (DSOF ¶ 2685-2691.)

**Plaintiff Licci**:[7]  Licci's medical complaint focuses solely on her desire to have been sent earlier to a specialty oncologist for suspected cancer treatment and misdiagnosis allegations. (Dkt. 240-2 at 10-14, ¶¶ 3-29.) She candidly admits that she joined this lawsuit because she disagrees with the type of medical treatment she has received at ADC. (DSOF ¶ 3581.) Such an admission undermines her Eighth Amendment claim, particularly given the fact that her cancer was present in 2001, she was out of prison from

---

[7] The Court cited Licci's declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide care for chronic diseases and protection from infectious disease; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

2004-2009 and never sought treatment or testing of ovarian cancer or masses in her body during that period, and her post-2009 incarceration has resulted in her frequently being seen by facility providers and outside specialists – more than <u>147</u> medical visits from 2010-2014 – with Licci merely questioning why biopsies have not been done on her cysts that all her doctors do not believe are necessary.  (DSOF ¶ 3851.)

It is also misleading for Licci to assert delay between the alleged "troubling symptoms" in late 2010 and her seeing an outside oncologist in February and May 2012. (Dkt. 240-2 at 10, 13, ¶¶ 4, 25-26.) This overlooks the undisputed fact that no ADC physicians ever suspected the recurrence of cancer (Dr. Lockhart merely noted elevated ammonia levels in her blood labs on November 30, 2010), the outside oncology consult was not requested until May 18, 2011 (after she reported lumps in her breast and neck on self-exam), and the fact that Licci was treated by ADC physicians (Drs. Lockhart, Irving, Rodriguez and Encisco) and nurses and outside providers more than <u>35</u> times during this same 15-month period in which she was provided with blood tests, a pap smear (negative), mammograms (negative), ultrasounds (negative) at outside imaging providers, a colonoscopy at Arrowhead Hospital (negative), a CT scan for her pelvis and abdomen at Tempe St. Luke's Hospital, an MRI at Insight Imaging, and an outside consultation at Affiliated Southwest Surgeons.  (DSOF ¶¶ 3397-3582.) Despite negative test results and the collective assessment of her treating physicians concluding that no cancer had recurred, Licci is still not convinced. (DSOF ¶¶ 701, 3397-3582.) Such individualized disagreements with her extensive course of treatment are both incompetent and insufficient to survive summary judgment. *Toguchi*, 391 F.3d at 1056; *Victor v. Milicevic,* 2008 WL 907319, at *4 (N.D.N.Y. 2008).

**Plaintiff Jensen:**[8]  Jensen criticizes ADC for several delays in obtaining medical

---

[8] The Court relied on Jensen's declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication and medical devices; Failure to provide care for chronic diseases and protection from infectious disease; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

care related to his prostate cancer, and efforts to alleviate pain associated with his catheter. (Dkt. 240-2 at 38-44, ¶¶ 5-45.)  Jensen alleged he had six years of "elevated" PSA levels, but was not diagnosed with prostate cancer until October 2009 when it had progressed to Stage 2.  (Dkt. 249, Ex. O ¶¶ 5-7.)  Aside from being outside the statute of limitations, this is grossly misleading, as Jensen's first elevated PSA result was on August 30, 2006, when his PSA level was 7.1.  (DSOF ¶ 2078.) After a pelvic ultrasound on November 21, 2006 showed no prostate masses and the prostate was noted to be within normal limits, a urology consultation was submitted January 3, 2007, and approved one week later. (DSOF ¶¶ 2079-2080, 2084.)  Between 2007 and August 11, 2009 (when he was seen regarding his elevated PSA levels), Jensen failed to submit any HNRs regarding the urology consultation and never advised medical staff of the fact that he never had gone to his urology consult.  (DSOF ¶ 2095.)

Once Jensen was tested and informed on November 10, 2009 that he had prostate cancer, he had further urology consults on December 16, 2009 (Dr. Robertson), February 16, 2010 (Advanced Urology Specialists) and April 8, 2010 (Dr. Robertson), treatment options were discussed, and independently researched by Jensen, and his PSA levels dropped from a 12.0 on February 17, 2010 to a 5.0 on March 17, 2010 and then to a 1.9 in April, 2010—likely the result of his receiving hormone therapy in February and April. (DSOF ¶¶ 2099, 2107, 2109, 2116, 2113, 2114, 2125, 2122, 2124, 2127-2133.) Jensen's prostatectomy on July 15, 2010 at Mountain Vista Medical Center was successful and the cancer was removed using a state of the art da Vinci robotic surgical process.  Labs taken after his surgery repeatedly showed a PSA of  less than 0.1.[9]  (DSOF ¶¶ 2117, 2119, 2196, 2205, 2215, 2280.)

Finally, to the extent Jensen blames ADC Nurse Assistant Cordova of negligence in manipulating his catheter on August 1, 2010 in a way that resulted in subsequent infections, pain, or bladder problems, there is no evidence to support this claim. (DSOF ¶¶

---

[9] Jensen concedes that "for the last 21 months compared to the previous 16 months of suffering and repeated operations, I'm functional, I'm healthy…." (DSOF ¶ 2434.)

13

690-693.) Regardless, this single allegation cannot form the basis of a deliberate indifference claim, nor reasonably suggest a policy or practice or systemwide deficiency.

**Joseph Hefner:**[10]  Hefner points to delays in receiving eye medication (eye drops or cream) from 2006 to 2009, and the receipt of eye drops September 12, 2006 that were allegedly expired, which he claims caused him to negatively react and contract iritis and later acute glaucoma. (Dkt. 240-2 at 60-61, ¶¶ 5-7.) Even if these untimely claims are considered, they are without merit.  There exists no competent medical evidence to link Hefner's iritis to expired eye drops, as iritis was more likely caused by blunt trauma or other causes – like the weed striking Hefner's eye on September 12, 2006 or his eye's reaction to the weed or weed-killer residue – and there is also no admissible evidence that iritis (inflammation of the iris) caused any glaucoma.[11]  (DSOF ¶¶ 3601-3605.)  Hefner's allegations of a two-day or week delay in getting prescribed eye drops (*Id.* at 60, ¶ 7), do not rise to the level of an Eighth Amendment violation.

Hefner's other medical claim is that despite filing HNRs on April 3, May 3, and May 27, 2011, for pain from a March 26, 2011 assault, he did not see a physician until June 29, 2011, and that despite a CT scan being requested by a doctor on August 1, it did not occur until October 27, 2011. (DSOF ¶¶ 3697, 3703.)  This testimony is false, as Hefner acknowledged that he was treated on the day of the assault at a Yuma hospital, released to a lock-down (protective custody) unit the same day, and then repeatedly seen by ADC medical staff on March 27, 28, 29, 30, and 31 for treatment for injuries from the assault.  (DSOF ¶ 3704.)

Hefner's complaint about a CT scan not being taken until October 27, 2011 is

_____

[10] The Court cited Hefner's declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication and medical devices; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

[11] A hospital consult November 25, 2006 also shows that Hefner's eye problems were not caused by expired medication, but attributable either to an allergic reaction to neomycin or possibly acute, angle glaucoma. (DSOF ¶ 3605.) A 2007 lab report also reveals Hefner testing positive for HLA B27, indicating a disease that predisposes him to iritis. (DSOF ¶ 3606.)

belied by his admission that: (1) he had x-rays taken of his chest after the assault, and (2) an MRI and CT scan both turned up negative as far as showing any broken bones or internal injuries (DSOF ¶¶ 3697-3708.) Given these admissions, Hefner cannot survive summary judgment on his medical claims because he was seen by ADC medical staff for five continuous days after the assault, and the slight delay in performing a CT scan and other tests did not violate the Eighth Amendment given their subsequent occurrence and negative results.

**Plaintiff Wells:**[12]   Wells complains of delay in being referred to a cardiologist for heart problems, implying that her symptoms were ignored from October 2009 until she was sent to a hospital with stabbing chest pains in February 2010.  (Dkt. 240-2 at 67-68, ¶¶ 3-5, 11.)  Her medical records, however, show that her high blood pressure (hypertension) was reported by Wells at her intake examination, and she was prescribed a blood pressure medication. (DSOF ¶ 3987.)  She received prompt and regular attention in the months thereafter.  (DSOF ¶¶ 695, 3986-4327.)

Furthermore, Wells never requested to see a cardiologist (Wells Depo. at 36), but was given significant treatment for hypertension by ADC nurses and Dr. Lockhart.  She was seen in January 2010 by Dr. Lockhart repeatedly for her hypertension. (DSOF ¶¶ 4002-4005.)  When Wells was seen by a nurse on January 20, she denied any headaches or chest pains, confessed that she didn't "like taking my pills," and was put on a "watch swallow" order to ensure the blood pressure pills were taken. (DSOF ¶¶ 4006-4009.) Dr. Lockhart noted "noticeable improvement now that she is watch swallow" in a January 28 appointment.  (DSOF ¶¶ 4019-4021.) She was continued on Lisinopril and, despite almost daily vital sign readings monitoring her blood pressure on January 28, February 2, 4, 8, 9, 10, and 12, Wells complained of "stabbing" chest pains on February 15, 2010, EMS was

---

[12] The Court relied on Wells' declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication and medical devices; Failure to provide care for chronic diseases and protection from infectious disease; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

15

called, and she was taken to West Valley Hospital for emergency treatment.  (DSOF ¶¶ 4022-4031.)  The hospital physician ruled out myocardial infarction, and after finding a blocked artery, the doctor performed an angiogram procedure to implant a cardiac catheter or stent.  (DSOF ¶¶ 4032-4034.) Wells' chest pain was resolved and she was discharged back to the prison February 17, 2010 in stable condition.  (DSOF ¶¶ 4035-4036.)

Following her discharge, Wells was seen frequently by nurses and ADC physicians for follow-up care for her hypertension, EKG tests were done, she was seen by an outside cardiologist at regular four-month intervals from 2010-2012, and additional blood pressure medication was prescribed.  (DSOF ¶¶ 4036-4290.)   Between her hospital discharge February 17, 2010 and August 8, 2012, Wells was provided medical visits at least 190 times, including 14 outside consultations with a cardiologist and two appointments with a nephrologist. (DSOF ¶¶ 4036-4283, 4300-4326.) With the general and specialized treatment Wells had been receiving by ADC physicians (Drs. Lockhart, Palmer, and Cecil), and an outside cardiologist (Dr. Askari) and nephrologist to explore possibly related kidney issues (Dr. Masood), it is not surprising that she concedes her blood pressure is now under control, particularly since 2012. (DSOF ¶ 4327.)

**Plaintiff Polson:**[13]  Polson claims he had to wait "days or weeks before I am seen by someone from medical staff and given ear drops or antibiotics."  (Dkt. 240-2 at 77, ¶ 19.)  He questions the efficacy of the antibiotics he is prescribed, and also contends that his HNRs in August of 2010 about ear infections did not produce a visit until he was seen by a nurse at his cell-front August 30, 2010 after he had blood oozing from his left ear with a lot of pain.  (*Id*. at 77-78, ¶ 20.)[14]

---

[13] The Court relied on Polson's declaration to support the following certified issues: Failure to provide timely access to health care; Failure to provide necessary medication; Failure to provide care for chronic diseases and protection from infectious disease; and Failure to provide timely access to medically necessary specialty care. (Dkt. 372 at 7-8, 16.)

[14] This was during a time when Polson was having psychotic episodes in which he imagined the smell of smoke/burning in his cell; the nurse examined him at the cell and could not find any blood, at which point Polson produced two, blood-soaked 2X2s, reporting they were in his ear. (DSOF ¶¶ 3863-3866.) Another cell-front visit the following day (in which he was pulled out by security to check his left ear) noted dry

Polson was seen by ADC medical staff repeatedly for his chronic ear infections between May 28, 2008 and November 23, 2013 – the first and last dates when he complained of ear pain in HNRs.  (DSOF ¶¶ 3777-3856, 3859.) He was prescribed numerous antibiotics, Ibuprofen, ear drops, and Nasolide spray.  (DSOF ¶¶ 3937-3938.) He was seen by ADC physicians, PA's, nurses, and outside ENTs and audiologists. (DSOF 3881-3889, 3893-3909, 3939-3975.)  Polson cannot show deliberate indifference in light of the extensive medical treatment he received, and Polson's subsequent complaints of infections in his other ear (and the disagreement as to the source of the dried blood found in September, 2010) do not rise to the level of deliberate indifference. *See Gusman v. Bd. of Prisons*, 2006 WL 680851, at *8 (M.D. Pa. 2006). Moreover, to the extent Polson could prove misdiagnosis or even unconstitutional treatment by ADC medical staff (or outside specialists), there is no proof of an ADC policy or custom, or that his allegation was caused by a systemwide deficiency.

**Medical Care Plaintiffs – Healthcare Encounters**.  When evaluating whether the medical treatment afforded an inmate has satisfied constitutional minima, the Ninth Circuit has emphasized the number of medical visits as some evidence of the prison's attentiveness to an inmate's care.  *See*, *e.g.*, *Cano v. Taylor*, 739 F.3d 1214, 1217 (9th Cir. 2014) ("The record is replete with health need request forms filed by [inmate] and the record indicates that [inmate] was seen by mental health care employees regularly for his complaints"); *see generally Estelle v. Gamble,* 429 U.S. 97, 107 (1976).

The sheer number of encounters the seven Medical Care Plaintiffs had with medical staff (nurses, mid-line providers, physicians) between March 22, 2010 and April 1, 2014, highlights a responsive and caring group of healthcare providers – the antithesis of what Plaintiffs must prove to show deliberate indifference under the Eighth

---

blood in the left ear canal, but with no signs or symptoms of infection and hearing within the normal limit, with a superficial scratch to the canal noted. (DSOF ¶¶ 3869-3871.) A September 10, 2010 visit to a physician's assistant confirmed a scratch, likely caused by Polson using Q-tips to clean the ear, but his hearing in the left ear was intact. (DSOF ¶¶ 3876-3880.)

Amendment:

> Chisholm: During this time frame, Chisholm submitted 43 HNRs, and had 82 encounters with medical staff, including 16 chronic care appointments, and 8 outside consultations with specialists. (DSOF ¶¶ 3348, 3361, 3384, 3383.)

> Swartz:  During this time frame, Swartz submitted 181 HNRs, and had 141 encounters with medical staff, including 2 chronic care appointments and 4 outside consultations with specialists. (DSOF ¶¶ 2695, 2708, 2729-2734.)

> Licci: During this time frame, Licci submitted 81 HNRs, and had 147 encounters with medical staff, including 18 chronic care appointments, and 21 outside consultations with specialists. (DSOF ¶¶ 3547, 3559, 3576, 3579.)

> Jensen: During this time frame, Jensen submitted 33 HNRs, and had 212 encounters with medical staff, including 5 chronic care appointments, and 38 outside consultations with specialists. (DSOF ¶¶ 2414, 2426, 2429, 2432.)

> Hefner: During this time frame, Hefner submitted 80 HNRs, and had 77 encounters with medical staff, including 18 outside consultations with specialists. (DSOF ¶¶ 3736, 3749, 3757.)

> Wells: During this time frame, Wells submitted 85 HNRs, and had 256 encounters with medical staff, including 11 chronic care appointments, and 24 outside consultations with specialists. (DSOF ¶¶ 4303, 4315, 4322, 4326.)

> Polson: During this time frame, Polson submitted 116 HNRs, and had 40 encounters with medical staff, including 4 chronic care appointments, and 3 outside consultations with specialists. (DSOF ¶¶ 3942-3945, 3975, 3974.)

**Additional Plaintiff Healthcare Encounters.**   The number of encounters with medical staff by the remaining Plaintiffs, as well as the number of encounters with mental health staff (psych tech, psych associate, psychologist, psychiatric nurse, psychiatric mid-level provider, psychiatrist) by the Plaintiffs with mental health claims (Gamez, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Chisholm, Polson) further highlights this point.

> Gamez: During this time frame, Gamez submitted 350 HNRs, and had

18

174 encounters with medical staff (including 9 chronic care appointments and 6 outside consultations with specialists), 45 encounters with psychology staff, and 38 encounters with psychiatry staff, for a total of 257 encounters with healthcare staff. (DSOF ¶¶ 3186, 3199, 3226, 3230, 3209, 3221-3222.)

Brislan:   During this time frame, Brislan submitted 190 HNRs, and had 77 encounters with medical staff (including 1 outside consultations with specialists), 160 encounters with psychology staff, and 61 encounters with psychiatry staff, for a total of 298 encounters with healthcare staff. (DSOF ¶¶ 2756, 2769, 2793, 2778, 2790-2791.)

Rodriguez: During this time frame, Rodriguez submitted 63 HNRs, and had 208 encounters with medical staff (including 8 chronic care appointments and 4 outside consultations with specialists), 83 encounters with psychology staff, and 76 encounters with psychiatry staff, for a total of 367 encounters with healthcare staff.  (DSOF ¶¶ 2846, 2859, 2883, 2868, 2884, 2878-2879.)

Verduzco:  During this time frame, Verduzco submitted 177 HNRs, and had 502 encounters with medical staff (including 9 chronic care appointments and 6 outside consultations with specialists), 245 encounters with psychology staff, and 119 encounters with psychiatry staff, for a total of 866 encounters with healthcare staff.  (DSOF ¶¶ 2917, 2927, 2939, 2948-2949.)

Thomas:  During this time frame, Thomas submitted 122 HNRs, and had 145 encounters with medical staff (including 4 chronic care appointments and 3 outside consultations with specialists), 233 encounters with psychology staff, and 69 encounters with psychiatry staff, for a total of 447 encounters with healthcare staff.  (DSOF ¶¶ 3037, 3050, 3070-3071, 3058, 3066, 3067.)

Smith:   During this time frame, Smith submitted 127 HNRs, and had 57 encounters with medical staff (including 1 outside consultation with specialists), 20 encounters with psychology staff, and 12 encounters with psychiatry staff, for a total of 89 encounters with healthcare staff.  (DSOF ¶¶ 3135, 3146, 3154, 3162, 3163.)

Swartz:  In addition to his medical encounters during this time frame, Swartz had 228 encounters with psychology staff, and 95 encounters with psychiatry staff, for a total of 464 encounters with healthcare staff. (DSOF ¶¶ 2718, 2727, 2728.)

Chisholm:   In addition to her medical encounters during this time frame, Chisholm had 8 encounters with psychology staff, and 16 encounters with psychiatry staff, for a total of 106 encounters with healthcare staff. (DSOF ¶¶ 3368, 3378, 3379.)

19

Polson:  In addition to his medical encounters during this time frame, Polson had 47 encounters with psychology staff, and 57 encounters with psychiatry staff, for a total of 144 encounters with healthcare staff. (DSOF ¶¶ 3963, 3972, 3973.)

Several of these Plaintiffs' specific healthcare allegations – made to support their request for class certification – are also false.  For instance, to support their failure to provide necessary medication claim, **Robert Gamez** alleged that after Wexford took over he was denied an inhaler for about a month, and then was given "a different one with less effective medication," and that Wexford stopped his "nose spray entirely with no substitution."  (Dkt. 240-1 at 224, ¶ 20.)   An HNR dated August 13, 2012, shows, however, that Gamez received Albuterol, which is the same inhaler medication he had been using previously. (DSOF ¶3178.)  Gamez also admitted that a document exists from April 15, 2010, showing that Gamez was overusing his inhalers. (DSOF ¶3177.) Regarding his nose spray, an HNR shows that he requested a refill on "nasal spray" for the first time on September 20, 2012, but refused a medical record review without reason the following day.  (DSOF ¶3179.)  Seventeen days later, he submitted another request for a refill of "nasal spray" and inhalers, with delivery occurring the following day and Gamez later completing a form on December 10, 2012 revealing he had received "nasal spray."   (DSOF ¶¶3181-3182.)

**Smith** alleged that in April 2008 he did not get his Tegretol or Celexa for a week, and instead was given Chlorpromazine without any evaluation or consultation, and that this medication was changed to Lithium in July 2008 without consultation until September 2008, and refilled in March 2009 without a consultation or evaluation. Smith also complained of stomach pain and vomiting from the Lithium in November 2009, which continued through August 2011.  (Dkt. 240-1 at 291-92, ¶¶ 7–13.)  The Lithium-related allegations are not borne out by his medical records, which show that his prescription for Tegretol was changed at his own insistence (Tegretol was not working for him), and he even signed a consent form for Lithium in 2008.  (DSOF ¶3108.)   Despite his claims that his prescription for Lithium was refilled without his consent in March 2009, a progress

20

report dated March 13, 2009, shows that his prescription for Lithium and Celexa were expiring, and he wanted to continue taking them. (DSOF ¶3111.) Concerning his upset stomach in November 2009, Smith submitted an HNR on November 29, 2009, stating that he was getting sick because he was taking the Lithium on an *empty stomach*. (DSOF ¶3112.) Upon consultation with the doctor, Smith was prescribed Tums because the doctor suspected that the problem was not the Lithium, but likely due to an acid reflux problem. (DSOF ¶3113.) On January 11, 2010, Smith submitted an HNR stating that Tums was not working, and requested to keep the Lithium on his person, and acknowledged that he should not be taking it on an empty stomach. (DSOF ¶3115.) He complained, however, that the Lithium was given to him before dinner. (DSOF ¶3116.) Healthcare staff explained that he was on an extended release Lithium which does not cause upset stomach, and had already been given Tums. (DSOF ¶3117.) Healthcare staff still changed the time his Lithium was administered to the morning so that he would not have to take it on an "empty" stomach. (DSOF ¶3118.) When Smith refused a test on November 29, 2012 to measure the Lithium level in his body, falsely claiming that his medications were stopped "weeks" ago, the doctor discontinued the prescription for Lithium. (DSOF ¶3127.) On October 28, 2013, Smith submitted an HNR requesting to be placed back on Lithium, which was re-prescribed for him on November 13, 2013. (DSOF ¶3128.) These facts do not even suggest medical negligence, let alone deliberate indifference.

To support Plaintiffs' understaffing claim, **Sonia Rodriguez** alleged that she filed an HNR on July 10, 2012, asking for help with "the shaking and tremors I was experiencing," and was told two weeks later, "You will be scheduled, there is a waiting list," and was never seen. (Dkt. 240-1 at 280, ¶ 7.) This claim stems from Rodriguez losing her inhaler as reported by her on June 25, 2012, which resulted in a same-day appointment with the nurse who observed that Rodriguez appeared weak and shaky, and her breathing sounded wheezy and slightly diminished. (DSOF ¶2833-2835.) Medical staff administered an inhaler solution (Albuterol), which appeared to treat Rodriguez's

21

problems, making her breathing strong and clear.  (DSOF ¶2836.)  The provider then advised Rodriguez to submit an HNR requesting a replacement inhaler.  (DSOF ¶2837.)  On July 10, 2012, Rodriguez submitted an HNR stating that she needs "something" to help her with her shaking.  (DSOF ¶2838.)  Staff responded that she would be scheduled and there was a waiting list.  (DSOF ¶2839.)  Although she claims she was never treated, Rodriguez was actually seen the next day, July 11, 2012, by a provider who prescribed Albuterol, which had helped before. (DSOF ¶2840.) Despite Rodriguez submitting multiple HNRs in the following months on other issues, she did not again report or request a problem with "shaking" or "tremors," as she now alleges.  (DSOF ¶2841.)

**B.    If the Named Plaintiffs are Not Dismissed, the Class Claims Should be Decertified.**

Rule 23(c)(1)(C), Fed.R.Civ.P., authorizes the Court to alter or amend a class certification order before final judgment.  *See Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 633 (9th Cir. 1982).

In the declarations submitted to the Court to support class certification, all of the named Plaintiffs described their own health care experiences in the gloomiest of terms, misleading the Court as to the quantity and quality of care they had received.  Jensen endured six years of "elevated" PSA levels before his prostate cancer was diagnosed in 2009?  Not true.  His first elevated test was in 2006, he failed to follow-up for two years on an oncology consult he knew had been approved in January 2007, and the fact that he is now cancer-free as a result of ADC's excellent treatment and retention of outside specialists surely militates against deliberate indifference.  Chisholm going six months without a prescribed inhaler?  Not true.  It was 5 weeks, and the delay was due to the third-party respiratory specialist's failure to forward the prescription to ADC staff.  Licci having to wait more than a year to see an outside oncologist for "troubling symptoms" of possible cancer?  Only if one considers raised ammonia levels "troubling," and only if one ignores 115 medical visits during that same period, including pap smears (negative), mammograms (negative), colonoscopies (negative), pelvic ultrasounds (showing a benign

22

1   cyst), CT scans (negative), an MRI (negative), and other forms of diagnosis and treatment.

2       By misrepresenting the facts in order to secure a favorable class certification ruling,

3   Plaintiffs have provided the Court with ample grounds on which to amend the certification

4   order by either decertifying the class, or those portions of it infected by the exaggerations

5   made by Plaintiffs.

6   **C.    Plaintiffs' Individual Claims Are Not Traceable To Systemic
        Deficiencies, and to the Extent Any Deficiencies Exist, They Are Not
7       Systemwide.**

8       Neither the Medical Care (above) nor Dental Care (below) Plaintiffs can establish a

9   constitutional violation under the Eighth Amendment. If, however, this Court finds an

10  issue of fact concerning Plaintiffs' deliberate indifference claims, each named Plaintiff

11  must still prove that any constitutionally inadequate care was the result of systemic

12  deficiencies at ADC, and not merely isolated instances of malevolent care, or facility-

13  specific problems.  This "specific causation" principle applies with equal force to the

14  claims of the Mental Health Plaintiffs.  More important, all class claims for injunctive

15  relief are similarly subject to this same formidable burden of proving that allegedly

16  unconstitutional care was caused by systemic deficiencies throughout ADC. *See Wellman*

17  *v. Faulkner,* 715 F.2d 269, 272 (7th Cir. 1983).

18      This conclusion is compelled by three distinct principles: (1) unlike other class

19  actions targeting a specific prison facility, Plaintiffs brought this action challenging the

20  care delivered at all 10 ADC facilities; (2) without any proof of prison overcrowding

21  putting a pervasive, systemwide strain on health care resources similar to the 190% over-

22  capacity problem in *Plata,* Plaintiffs cannot rely on the economics of supply and demand

23  to prove any systemic deficiency; and (3) a pattern of systemic deficiencies is not subject

24  to proof by illustration or anecdote, but requires statistically reliable evidence of systemic

25  cruelty, such as "gross statistical disparities" between Plaintiffs' systemic-failure

26  hypothesis and a control group.  *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882,

27  920 (E.D. Cal. 2009); *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977); *Int'l Broth. of*

28

1    *Teamsters v. United States*, 431 U.S. 324, 339 (1977).[15]  Plaintiffs cannot show either that

2    their individual claims were the result of systemic deficiencies, or that any deficiencies are

3    in fact systemwide.

4         The prison facilities at Douglas, Winslow, and Safford routinely have scored well

5    above 90% green/amber in monthly Green Amber Red ("MGAR") reports, which monitor

6    contract compliance.  These same facilities (and ASPC-Phoenix) rarely, if ever, generate

7    any type of health care grievances by inmates,[16] underscoring a high level of contentment

8    among a population of patients that are inclined to protest and complain about the most

9    trivial of matters. (DSOF ¶¶ 179, 183, 184, 186.) Although temporary staffing shortages

10   may exist at certain facilities for certain health care positions, as a whole ADC/Corizon

11   has gone from 626.02 healthcare full time employees ("FTEs") in March 2013 to 766.96

12   FTEs in March 2014 – a 17% staffing increase and <u>exceeding</u> the Corizon-ADC contract

13   requirement of 731.30 FTEs. (DSOF ¶ 171.) It is further evident that the facilities

14   benefitting the most from Corizon's concentrated recruitment of healthcare providers are

15   the complexes that have historically scored lower in MGAR reporting:  Eyman, Lewis,

16   and Tucson, where there is now an overall surplus of FTEs. (DSOF ¶¶ 161, 163, 167.)

17        This dramatic increase in hiring and the use of Locums has generally improved

18   wait times and the quality of health care delivered across ADC facilities. (DSOF ¶¶ 147-

19   150, 160-169.)  The staffing surplus is far better than staffing vacancy rates found to be

20   constitutionally adequate in *Casey v. Lewis*, 834 F.Supp. 1477, 1486, 1546 (D. Ariz. 1993)

21   (ADC was not deliberately indifferent to medical needs when it "had a 13.9% overall

22   medical staff vacancy rate" at the time of trial); and *Coleman v. Brown*, 938 F.Supp.2d

23   955, 984–85 (E.D. Cal. 2013) (mental health staff vacancy rate of 29% was unacceptably

24   _____

25   [15] Another obstacle for Plaintiffs is addressed separately in Defendants' Motion to
     Strike Plaintiffs' Experts – quantification of the relative risk of the inmate class members
26   and the unreliability of their opinions. (Dkt. 882.)

27   [16] Health care delivered at Safford has generated only 5 inmate grievances during
     the past 12 months, Winslow 26 grievances (25 related to quality of medical care),
28   Douglas 20 grievances, and Phoenix 0 health care grievances. (DSOF ¶¶ 184, 186, 179,
     183.)

high; per 2009 staffing plan, vacancy rate should not exceed 10%).

At the complexes in Douglas, Phoenix, Safford, and Winslow, the average wait time in March 2014 to see a nurse was less than 1.5 days, and less than 7 days to see a doctor (1.3 days in Phoenix, 1 day in Safford, and 4.2 days in Winslow). (DSOF ¶¶ 147-150.) The grievance history at these facilities reinforces this wait-time data, as there were 0 grievances filed during the past year at the Douglas, Phoenix, Safford and Winslow facilities for delay in care. (DSOF ¶¶ 179, 183, 184, 186.) Even Perryville, where five of the named Plaintiffs are incarcerated, has seen only 2 grievances for delay in care in the past year, and none since November 2013. (DSOF ¶ 182.) These wait times at such facilities are far better than the 18.5 days currently required to see a doctor outside of prison – especially in Boston, where the average wait time to see a family physician is 66 days.[17] *See, e.g., Noble v. Three Forks Reg'l Jail Auth.*, 2014 WL 503579, at *4 n.6 (E.D. Kent. 2014) (inmate "also complains about having to wait four days to see Dr. Hamilton, a wait-time that is significantly lower than the average doctor wait-time for non-prisoners").

Beyond the health care delivered at Douglas, Safford, Winslow, and Phoenix (where, not coincidentally, not a single Plaintiff is incarcerated), the ADC system as a whole is functioning well, with 9 of the 10 facilities certified under National Commission on Correctional Health Care ("NCCHC") standards. (DSOF ¶ 19.) Regarding medication, 60,553 prescribed medications were dispensed in the month of March 2014 across all ADC facilities. (DSOF ¶¶ 151-153.) ADC also completed outpatient transports of inmates to specialty care on 827 occasions in March of 2014, totaling 7,130 specialty care transports over the prior 12 months. (DSOF ¶ 159.) The sheer number of medical, psychology, psychiatric, chronic care and outside specialty care visits by the named

---

[17] *See* http://www.washingtonpost.com/blogs/wonkblog/wp/2014/01/29/in-cities-the-average-doctor-wait-time-is-18-5-days/ (last visited May 14, 2014). *See also* "*Study: Average Wait for Doctor's Appointment in Cities Was 18.5 Days,*" California HealthLine:http://www.californiahealthline.org/articles/2014/1/30/study-average-wait-for-doctors-appointment-in-cities-was-18-5-days; http://www.merritthawkins.com/uploadedFiles/MerrittHawkings/Surveys/mha2014waitsurvPDF.pdf

Plaintiffs during the past four years forecloses any reasonable suggestion that ADC is behaving with purposeful cruelty stemming from systemwide practices at all 10 facilities. One does not get from a complaint to systemic simply through colorful anecdotes. *See Porras*, 2006 WL 4941837, at *4; *Henderson v. City and Cnty. of San Francisco*, 2006 WL 3507944, at *10 (N.D. Cal. 2006).

The gross data for dental care also convincingly shows responsive care. There were 46,112 HNRs for dental in the past year, with 60,440 dentist-patient visits, 6,334 dental hygienist visits, 25,474 x-rays taken, 10,263 fillings, 11,275 simple extractions, and 7,339 cleanings. (DSOF ¶ 172.) In addition, 1,298 inmates had dentures or partial dentures completed. The routine care wait time (for non-urgent care such as cleanings and fillings) in March 2014 ranged from a low of half a month at Winslow to 1.5 months at Safford, or 45 days, well below the 90-day contract requirement. (DSOF ¶¶ 173-174.) For dentistry, there is a systemic theme of quality and responsiveness in the months after Corizon/Smallwood took over in March, 2013. (DSOF ¶¶ 172-178.)

ADC/Corizon received 18,985 HNR forms from an inmate population of more than 34,000 in March 2014. (DSOF ¶ 146.) One would expect a state agency with a systemic policy of deliberate indifference to engage in statistically substantiated patterns of grossly delayed and abysmal healthcare – as opposed to increased staffing levels, reduced mortality rates,[18] rigorous NCCHCC accreditation requirements, and treat their patients more expeditiously than its free world counterparts. Plaintiffs have failed to satisfy their burden of proving that any inadequacies in the Plaintiffs or class of obtaining healthcare were the result of systemic failures. (DSOF ¶¶ 677-685, 19, 146-187.)

---

[18] ADC's morbidity rates have been lower than the national average for jails and prisons since 2003, approximately 15-20% lower. (DSOF ¶¶ 677-685.)

III.    **SEVERAL CERTIFIED MEDICAL CLAIMS SHOULD BE DISMISSED.**

**Mitigating Infectious Diseases**.[19]   Plaintiffs allege that ADC fails to mitigate the risk of infectious diseases by maintaining unsanitary facilities, including "urine-soaked mattresses, uncontrolled infestations of vermin, and cell walls and floors covered with black mold or smeared with feces, spit, and blood of other inmates." (Dkt. 1, ¶ 62.)  This is not true.  (*See* DSOF ¶¶ 200-04, 1471-89.)  Medical areas, living areas, and cells are cleaned and inspected daily, and an exterminator sprays cells, showers, and housing unit common areas on a monthly basis. Cells are cleaned prior to an inmate being newly assigned to a cell, including bunk mattress cleaning/exchange/replacement depending on the cleanliness or condition of the previously used mattress. (DSOF ¶¶ 1471-89; *see also* DSOF ¶¶ 200-04, 436, 467, 631, 2994.)   Furthermore, ADC has specific policies, procedures, and training in place that deal with the prevention, surveillance, and treatment of suspected or confirmed communicable diseases.  (DSOF ¶¶ 427-41.)  Plaintiffs do not have any proof to support their claim on a systemwide basis.  *See Anderson v. Cnty. of Kern*, 45 F.3d 1310 (9th Cir. 1995); *Martinez v. Garza*, 2011 WL 23670, at *10 (E.D. Cal. 2011).

**Medical Devices**.[20]   Plaintiffs allege that ADC has a policy and practice of not providing medically necessary devices. (Dkt. 1, ¶ 50.) However, ADC has specific policies addressing the administration of medical devices.  (DSOF ¶¶ 376-81.)  To support their allegation, Jensen alleges that he was given an inadequate number of catheters.  (Dkt. 1, ¶ 50.)  But ADC provides inmates like Jensen catheters and absorbent pads (in two-week supply increments), and instructs them how to properly use them. (DSOF ¶¶ 382-409, 2135-410.)   Jensen was provided a plethora of catheters.  (DSOF ¶¶ 2341-410.)  Notably, Jensen did not feel the need to exhaust all administrative remedies with respect

---

[19] The Court certified as a claim: "Failure to provide . . . protection from infectious disease." (Dkt. 372 at 22.)

[20] The Court certified as a claim: "Failure to provide necessary . . . medical devices." (Dkt. 372 at 22.)

to this claim.  (DSOF ¶¶ 664, 2433-34.)  Regardless, Jensen's lone allegation does not show a systemwide deficiency.

**Timely Emergency Treatment**.[21]  Plaintiffs allege that ADC has a policy and practice of not providing prisoners with timely emergency responses and treatment.  (Dkt. 1, ¶ 37.)  They contend that security and health staff are not adequately trained to respond to and evaluate emergent medical situations.  (*Id.*, ¶¶ 39, 41.)  This claim is purportedly supported by the allegations of Hefner, Jensen, Swartz, and Wells, which are all refuted above.  What is left are four isolated incidents.  (*Id.*, ¶¶ 39, 41, 42, 43.)  These incidents, and any other allegations Plaintiffs may come up with, do not establish a systemwide deficiency.

Staff is required to assess and render aid in all medical emergencies, including suicide attempts, within three minutes of becoming aware of a non-responsive inmate. (DSOF ¶¶ 272, 595, 597.)  Within three minutes of responding to an emergency, staff must activate the Incident Command System ("ICS"), which notifies supervisory staff and medical responders, and render aid as soon as possible. (DSOF ¶ 274.)  All licensed nurses are trained in providing emergency nursing care, and are provided emergency response orders, which are step-by-step written instructions from a provider on how to provide emergency acute care to an inmate during a life-threatening event.  (DSOF ¶¶ 275, 276, 277.)  If a medical emergency is considered life threatening, 911 is immediately contacted. (DSOF ¶ 281.)

The chief of security and shift commanders are given written instructions about the appropriate intervention for each medical emergency which may arise from a chronic condition existing in the institution.  (DSOF ¶ 278.)  Correctional officers are required to receive health-related training every two years so that they can recognize when to refer an inmate to healthcare staff and to be able to provide emergency care until healthcare staff arrives. (DSOF ¶ 279.)  This training includes administration of first aid, recognizing the

---

[21] The Court certified as a claim: "Failure to provide timely emergency treatment." (Dkt. 372 at 22.)

need for emergency care and intervention in life threatening situations (e.g., heart attack), recognizing acute manifestations of certain chronic illness (e.g., asthma, seizures), adverse reactions to medications, recognizing signs and symptoms of mental illness, knowledge of procedures for suicide prevention, appropriate referral of healthcare complaints, and procedures and precautions with respect to infectious and communicable diseases, and cardiopulmonary resuscitation. (DSOF ¶ 280.) All corrections staff are trained in suicide prevention/crisis intervention, which includes mock drills and information presentation. (DSOF ¶¶ 469, 470-72, 474, 481.) Staff keep an ADC issued Suicide Prevention Card on their person, and Corizon provides emergency medical and mental health care 24 hours a day, seven days a week. (DSOF ¶ 473.) Additionally, Corizon maintains continual onsite nursing staff, who are able to contact offsite medical, dental, and mental health practitioners for consultation. (DSOF ¶ 290.)

ADC's timely emergency care is further supported by the fact that between April 2013 and March 2014, ADC conducted thousands of emergency inmate transports to local hospitals. (DSOF ¶¶ 139, 159, 283-84.) The record is devoid of evidence sufficient to withstand summary judgment on their theory of insufficient emergency staffing on a systemwide basis. *See Graves v. Arpaio*, 2008 WL 4699770, at *34 (D. Ariz. 2008).

\*       \*       \*

The Court certified six broad healthcare/medical claims, which track similarly-named headings in Plaintiffs' Complaint. Defendants do not believe the Court intended to certify every allegation in the Complaint, but out of an abundance of caution, they move to dismiss the following sub-allegations to the extent those allegations have been certified.

**HNR Forms**. Under a heading pertaining to timely access to health care, Plaintiffs allege that HNR forms are not available in housing units, staff only provide photocopies of HNRs and then reject them for that reason or refuse to provide forms, and officers refuse to forward forms to medical. (Dkt. 1, ¶ 27.) The record is devoid of evidence showing that these allegations are true on a systemic level, much less in isolated instances. Inmates are given written information about how to access emergency and routine

healthcare at intake, and access to healthcare signs are posted throughout the complexes in both English and Spanish.  (DSOF ¶¶ 206-07.)  HNRs are available in each housing unit and accessible to inmates, and HNR forms are picked up daily by health staff.  (DSOF ¶¶ 210-11, 1869-74.)  Medical will accept and respond to any medical request, regardless of the form it is written on, including photocopies of HNR forms and even verbal requests.  (DSOF ¶¶ 213-17, 1875-82.)   The thousands of HNR forms obtained, completed, and submitted by just the named Plaintiffs in this action underscore the availability and daily processing of such forms, without ADC interference, as do the more than 20,000 HNR forms ADC inmates submitted in March 2014 alone.  (DSOF ¶¶ 146, 2276-83, 2411-34, 2543-45, 2688-733, 2753-93, 2643-64, 2914-49, 3034-71, 3132-64, 3183-230, 3342-84, 3407-12, 3419-21, 3431-43, 3544-80, 3676-83, 3733-57, 3777-975, 3999-4020, 4056-64, 4300-26.)

**HNR Assistance**.  Under the same heading, Plaintiffs allege that staff "sometimes" prohibits inmates from assisting other inmates in completing HNRs. (Dkt. 1, ¶ 28.)  There is no ADC policy that imposes such a prohibition.  (DSOF ¶¶ 217, 1876-78.)  Although security staff cannot assist an inmate with filling out their HNR forms for security and confidentiality reasons, medical staff and other inmates are not prohibited from assisting them.  (DSOF ¶¶ 213-17, 1877-78.)  Plaintiffs' factual basis for this claim is Smith's allegation that he has a hand injury that prevents him from writing, and staff refuse to assist him.  (DSOF ¶¶ 1875-82.)  Smith submitted 127 HNR forms between March 22, 2010 and April 1, 2014.  (DSOF ¶¶ 3132-35.)  He does curls ("40 pounds in peanut butter"), shoulder presses, and push-ups in his cell – approximately three to four hundred push-ups a day in 2010 and 2011, and about 1,500 push-ups a day at the time of his deposition.  (DSOF ¶¶ 3093-97.)  He testified that it is "very seldom" that his hand injury prevents him from writing, that there has only been "like one time, per time period while I've been here" when he was unable to write an HNR request "because, usually there's other people around that help me if I need help," and that his cellmate types up his requests for him.  (DSOF ¶¶ 3098-100.)  This claim has no basis in fact and does not

support a systemwide deficiency, much less deliberate indifference.

**Medical Diets**.  Under a heading pertaining to chronic care, the Complaint alleges that ADC does not provide medical diets ordered for inmates with chronic conditions such as high blood pressure, high cholesterol, kidney failure and diabetes, and instead they are given a high-fat, high-sodium, nutritionally inadequate diet.  (Dkt. 1, ¶ 60.)  Plaintiffs conducted no discovery to support this speculative theory, and it is not addressed in their experts' Rule 26(a)(2)(B) reports.  This contention also ignores facts to the contrary such as several ADC policies and practices on the subject.  (DSOF ¶¶ 1843-51.)  The undisputed fact is that ADC provides nutritionally adequate meals to all inmates.  (DSOF ¶¶ 1820-59.)  More importantly, inmates with chronic conditions who need a medical diet are given one.  (DSOF ¶¶ 1848-50.)

The sole allegation to support Plaintiffs' allegation is an allegation by Plaintiff Hefner, who alleges that he was denied a medical diet for his GERD.  (Dkt. 1, ¶ 60.)  This presumably derives from his "acid reflux" treatment that he received in 2010 and 2011.  (DSOF ¶¶ 3719-23.)  But nowhere during that treatment did Hefner request a medical diet, nor was one recommended.  (DSOF ¶¶ 3723-29.)  Hefner was advised to avoid certain foods that could upset his stomach and prescribed medication; as of March 2011 there was no evidence of a GERD condition.  (DSOF ¶¶ 3720, 3729.)  Hefner also testified that he bought spicy and oily foods from the commissary, against doctor's orders, and his commissary purchases reflect that he indulged in such foods.  (DSOF ¶¶ 3720, 3730-31.)  Nonetheless, this is far from evidence of a systemwide deficiency.  *See Douglas v. Banks*, 2012 WL 822824, at *8 (N.D. Cal. 2012).

**Indoor Smoking Ban**.  Also under the chronic care heading is an allegation that ADC does not enforce its ban on indoor smoking.  (Dkt. 1, ¶ 61.)  Plaintiffs Gamez and Thomas vaguely allege that second-hand cigarette smoke has triggered asthma attacks.  (Id.)  In accordance with state law, ADC prohibits smoking inside any enclosed area or building, and within 20 feet from any building entrance.  (DSOF, ¶¶ 444-46.) General population inmates may only smoke outside of buildings in approved areas. (DSOF, ¶¶

31

447-51.) All inmates are advised of the tobacco policies during orientation, ADC employees are required to enforce these smoking policies, and "No Smoking" signs are conspicuously posted at every entrance and other areas where smoking is prohibited. (DSOF, ¶¶ 452-53.) The failure to comply with these rules results in criminal penalties and disciplinary sanctions. (DSOF, ¶¶ 454-56.)

Thomas refuted his claim, testifying that he has never experienced any problems because he was around someone who was smoking cigarettes, and that the only time he is exposed to someone smoking is when he goes to medical or "when I walk through the yard." (DSOF, ¶¶ 3032-33.) These two alleged instances are not enough to support a systemwide claim of deficient care. *See Helling v. McKinney*, 509 U.S. 25, 35 (1993) (exposure to environmental tobacco smoke requires proof of exposure to unreasonably high levels of smoke contrary to contemporary standards of decency); *Turner v. Leggett*, 421 F. App'x 129, 132 (3d Cir. 2011); *Richardson v. Spurlock*, 260 F.3d 495, 498 (5th Cir. 2001); *Pryor-El v. Kelly*, 892 F. Supp. 261, 267 (D.D.C. 1995).

**Watch Cell Conditions**. Under a heading titled, "Defendants Deprive Suicidal and Self-Harming Prisoners of Basic Mental Health Care," Plaintiffs allege that watch cells are "often filthy, with walls and food slots smeared with other prisoners' blood and feces, reeking of human waste," mental health staff "show a lack of professionalism and little compassion for prisoners," and correctional staff on watch units harass, insult, taunt, and deploy "sporting use of pepper spray" on watch inmates. (Dkt. 1, ¶¶ 84, 87.) There is absolutely no evidence to support these allegations, much less on a systemwide basis. (DSOF, ¶¶ 200-04; 467; 623; 630; 1471-89; 1998-2012; 2796-97; 2805; 2811; 2885-88; 2950-63; 2994; 3016.)

Plaintiffs allege that inmates on watch are provided only a suicide smock that barely covers their thighs and a thin blanket, and are deprived of a mattress. (Dkt. 1, ¶ 85.) Inmates are placed on suicide watch when their behavior is self-destructive, the inmate is displaying suicidal behavior, or the inmate attempts suicide and/or has a documented history of attempting suicide and there are warnings indicating an impending

suicide attempt, or the inmate verbally threatens to commit suicide and/or to cause self-inflicted wounds. (DSOF, ¶¶ 457-61.) Watch cells are retrofitted so that inmates cannot inflict self-harm or commit suicide; they are designed to be suicide resistant. (DSOF, ¶¶ 462-64; 515-18.) Inmates on continuous watch and ten minute watch are provided two safety blankets, a safety smock (if required), and a suicide resistant mattress. (DSOF, ¶¶ 508; 519.)   Inmates on thirty minute watch are permitted one set of personal clothing (excluding belts and shoelace's), regular bedding, and a non-suicide mattress. (DSOF, ¶¶ 523-28) Even Verduzco admitted that she has blankets when it is cold in the watch cells. (DSOF, ¶¶ 3011; 508; 519-20; 2958-59; 2985.) Plaintiffs cannot provide any evidence that inmates on watch are forced to sleep on the floor, or that any such allegation is in fact systemwide. (DSOF, ¶¶ 457-605.)

Plaintiffs allege that inmates have access to dangerous objects while on watch. (Dkt. 1, ¶¶ 8, 88.)  To support this contention, they allege that Plaintiff Brislan cut himself with objects on several occasions, and that Plaintiff Swartz swallowed multiple foreign objects while on watch.  (Id.)  As discussed above, ADC watch cells are designed, and intended to be, suicide resistant and are retrofitted so that inmates cannot inflict self-harm or commit suicide. (DSOF, ¶¶ 463; 516.) The allegations by these two inmates do not establish that there is a systemwide deficiency.

Finally, Plaintiffs allege that ADC uses watch to punish prisoners for alleged disciplinary infractions.  (Dkt. 1, ¶ 89.)  Watch cells are not used for that purpose, and Plaintiffs have no evidence that they are or that this is an isolated event, let alone a systemwide practice. (DSOF, ¶¶ 463; 515-18; 567-81; 1957; 1968-77.)

## IV.    <u>THE DENTAL CLAIMS MUST BE DISMISSED.</u>

"[D]elay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation." *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989). Class action plaintiffs must also demonstrate that the "delays occurred to patients with [dental] problems so severe that delays would cause significant harm and that Defendants should have known this to be the case." *Hallett v. Morgan,* 296 F.3d 732,

745–46 (9th Cir. 2002); *see also Peralta v. Dillard*, 744 F.3d 1076, 1086 (9th Cir. 2014) ("The mere failure to provide a routine tooth cleaning doesn't create a serious medical need."). Plaintiffs' dental claims should be dismissed.

### A.   Failure to Provide Timely Access to Basic Dental Treatment

Within seven days of entering ADC, all inmates receive a panorex x-ray or bite wing x-rays, a dental exam consisting of either the screening of the x-rays or visual evaluation by a dentist or hygienist, and oral hygiene instruction. (DSOF ¶¶ 702, 725.) The dentist will chart all required treatment, outline the treatment plan, determine the extent of treatment required, take and record a dental/medical history on the dental chart, record all existing restorations and missing teeth on the dental chart, and place a color-coded label on the chart to indicate an inmate's treatment level.[22] (DSOF ¶¶ 703, 706.) Inmates with routine dental needs must be seen within 90 days, inmates with urgent dental needs must be seen within 72 hours, and inmates with emergency dental needs must be seen within 24 hours. (DSOF ¶¶ 792, 797.)

Plaintiffs rely on Plaintiffs Polson, Chisholm, Swartz and Wells to advance their "timely access" claim, yet the record shows that their dental needs were not sufficiently severe under *Hallett*, and that any delays in treatment were of their own making. All of their claims should be evaluated in the context of the concession by Plaintiffs' dental expert, Dr. Jay Shulman, that ADC "[i]nmates have access to dental services" and ADC "[i]nmates are getting treatment for dental care." (DSOF ¶ 827.)

**Plaintiff Polson**: Polson alleges that he waited five months to see a dentist for a broken tooth, and did not see a dentist for six months after his initial visit. (Dkt. 1, ¶ 18-71.) He further alleges that he waited three years to receive partial dentures. (Id.) Polson's most recent confinement began on February 21, 2008, when a panoramic dental x-ray was taken. (DSOF ¶ 828.) The intake exam noted no urgent dental issues. (DSOF ¶ 829.) Presumably following a prison assault in which Polson claims half his teeth were

---

[22] The classes are: Class I (no further treatment needed), II (routine treatment needed), or III (immediate treatment needed). (DSOF ¶ 703.)

knocked out, he was seen by a dentist on April 9, 2008, and was placed on a soft diet. (DSOF ¶¶ 3976, 830.)  Polson submitted an HNR on May 13, 2008, stating: "I would like to get partials and any other care that needs to be done with my teeth. I have talked to my dentist on streets and she says partials would be best."[23]  (DSOF ¶ 831.)  He submitted an HNR on July 22, 2008, complaining of delay in getting scheduled for dentures while acknowledging that he needed "teeth pulled for the dentures," and another HNR on October 8, 2008 indicating he needed "everything in my mouth fixed cavitys [sic] teeth pulled what ever."  (DSOF ¶ 833.)

He submitted an HNR on November 1, 2008, that stated that one of his front teeth "was dead broke off a copple [sic] days ago" and that he would like his teeth fixed asap "so I can get the partials [sic]."  (DSOF ¶ 834.)  He was scheduled for dental treatment on April 9, 2009, but refused, stating:  "I feel fine with my teeth right now."  (DSOF ¶ 835.) Polson thereafter submitted an HNR on July 20, 2009, stating: "I would like to prosead [sic] on getting my dentures and or partials…I know theirs [sic] a lot so let's start pulling the teeth that need to be pulled and fix the diet if we half [sic] to a liquid for a while." (DSOF ¶ 837.)  This new HNR put him on the routine care list and he was seen by a dentist on November 17, 2009, with tooth numbers 9 and 10 extracted.  (DSOF ¶ 838.) He was then scheduled for an appointment on December 9, 2009, for more extractions, which he refused.  (DSOF ¶ 840.)  Polson thereafter submitted an HNR on December 23, 2009, indicating that he had refused due to his extraction holes not healing, but was prepared to "go head and [reschedule] to get my work done, before I get a partials." (DSOF ¶ 841.)  He was placed on the waiting list and had tooth number 30 extracted on March 23, 2010.  (DSOF ¶ 842.)  After Polson complained of pain and a dry socket from the extraction, he was seen on an urgent basis by the dentist on March 30, 2010, and again on April 1, 2010, and given gauze, dry socket paste, Ibuprofen, and a prescription for

---

[23] Dentures are provided according to a priority system, with first priority given to inmates requiring full dentures in order to be able to chew, and second priority given to inmates requiring partial dentures due to not being able to properly chew because of a large number of missing or non-occluding teeth.  (DSOF ¶ 709.)

Penicillin V.  (DSOF ¶ 843.)  On April 30, 2010, Polson's extraction work was completed with the removal of tooth numbers 24 and 23.  (DSOF ¶ 844.)

Polson was seen by the dentist on June 16, 2010, and given fillings for cavities on tooth numbers 4 and 5.  (DSOF ¶ 845.)  He was seen again on July 2, 2010, for continued treatment with a diagnosis of gingivitis, had a cleaning, and was given oral hygiene instructions.  (DSOF ¶ 846.)  On August 12, 2010, Polson had preliminary impressions made for his partial dentures, with his next visit for final PVS impressions on October 14, 2010.  (DSOF ¶ 848.)  Polson was thereafter given his bite registration by the dentist on December 9, 2010, a preliminary fit was taken January 27, 2011, with the partials returned to the lab for finishing, and delivery of the partials with care and use instructions on April 26, 2011 (he dropped and broke the denture into 2-3 pieces two days later, necessitating further appointments and repair work).  (DSOF ¶¶ 849-50.)  Polson's remaining HNR related to dental involved efforts to stay on the soft diet, which he eventually persuaded the dentist to allow despite his partial denture. (DSOF ¶ 851.)

**Plaintiff Chisholm**:  Chisholm alleges she did not have a tooth cleaning for more than 6 ½ years after her initial dental cleaning in September 2005, although she neglects to mention that she spent more than two years of this period in federal custody (August 2006 to September 2008).  (DSOF ¶¶ 873-74.)  Once she arrived back at ASPC-Perryville, she submitted an HNR on September 7, 2008 for a cleaning, stating:  "I've not seen dental in 3 years (I was away at court). Could you please schedule a cleaning?"  (DSOF ¶ 875.)  She was placed on the routine care list and, when scheduled for a cleaning on December 9, 2008, Chisholm refused.  (DSOF ¶ 876.)  Although warned of the consequence of her refusal ("plaque build-up will continue"), she did not submit another HNR seeking dental care for more than three (3) years thereafter.  (DSOF ¶ 877.)

On December 23, 2011, Chisholm finally submitted a dental-related HNR, but was silent on the issue of cleaning, stating: "I lost a filling in my back left molar. Half of my tooth is open and exposed. I am in pain. Please help."  (DSOF ¶ 878.)  She was seen by Dr. Hanstad one week later (on December 30, 2011), when he diagnosed recurrent decay

well below the gum line, and she was given an antibiotic for infection control, and rescheduled for an extraction in two weeks. (DSOF ¶¶ 879-80.)  When she returned on January 12, 2012, Chisholm refused the extraction.  (DSOF ¶ 881.)

Chisholm submitted an HNR on August 13, 2012, indicating she still wanted replacement of two missing crowns, but reiterated she was not in any pain, did not want her teeth pulled, and claiming that she had not been scheduled for a cleaning in over 6 ½ years.  (DSOF ¶ 884.)  Chisholm was placed on the routine care list and saw the dentist on January 15, 2013.  (DSOF ¶ 887.)  Dr. Hanstad diagnosed signs of "extreme tampering with a foreign object" on tooth number 14, placed a temporary sedative filling on the tooth, and scheduled her for a follow-up one week later. (DSOF ¶¶ 887-92.)  On January 22, 2013, Dr. Hanstad noted a defect in the temporary filling and gingival inflammation in the area likely due to continued tampering, again advised her not to use foreign object to clean/floss her teeth, and placed a permanent filling on the tooth. (DSOF ¶¶ 892-93.)

**Plaintiff Swartz**:  Swartz alleges he had a cracked molar for two years, implying that he had to wait that long to be treated by a dentist.  (DSOF ¶ 903.)  His dental records, however, show that he was given an intake dental exam on December 18, 2009, telling the dentist "no pains." (DSOF ¶ 905.)  Swartz did not submit an HNR for dental until more than two years later on January 17, 2012, in which he stated: "My remaining upper left molar is giving [me] extreme pain. The tooth is cracked open, so far it is not infected. But the pain is intense. May I please be seen by dental ASAP." (DSOF ¶ 907.)  Swartz was seen one week later on January 24, 2012, where the dentist found gingival recession, decay into the pulp, and concluded the tooth was non-restorable due to irreversible pulpitis. (DSOF ¶ 908.)  The dentist recommended extraction of #13, and gave Swartz Ibuprofen. (DSOF ¶ 909.)  When he returned one week later for the appointment to extract #13, Swartz refused and wanted more Ibuprofen. (DSOF ¶ 910.)

Swartz later returned to the dentist on August 13, 2012 for a pain evaluation but refused treatment.  (DSOF ¶ 911.)  He also was seen by the dentist on August 31, 2012 after complaining of pain, and indicated his filling had come out and tooth #31 was

hot/cold sensitive. (DSOF ¶ 912.)  Despite the dentist's opinion that #31 lost a restoration and had deep decay, and #32 was malposed, causing a food trap distal to #31, Swart *refused* to have either extracted but elected to have the dentist put a temporary filling on #31 (although the dentist advised him the prognosis was poor and he may need an extraction at the oral surgeon's office).  (DSOF ¶¶ 913-16.)  After Swartz submitted an HNR on September 2, 2012, complaining of unbearable pain and stating, "I think I need the tooth pulled," he was seen two days later on September 4, diagnosed with irreversible pulpitis on #31, with both #31 and #32 impacted near the nerve, and referred to an oral surgeon, Dr. Barlow.  (DSOF ¶¶ 917-18.)  Once at Dr. Barlow's office on September 24, 2012, Swartz refused extractions on #31 and #32, but said he wanted #13 extracted.  (DSOF ¶ 919.)  Swartz also claimed Dr. Barlow told him that #32 should not be pulled and #31 could have a crown, although there is no evidence to support this assertion in Dr. Barlow's consult report.  (DSOF ¶ 920-21.)  Swartz was thereafter scheduled for an October 10, 2012 pain evaluation (after submitting an October 5, 2012 HNR for pain on his upper left molar), which Swartz refused.  (DSOF ¶ 922.)  He submitted another HNR for pain on February 19, 2013, which resulted in a February 25, 2013 dental appointment, and yet another refusal by Swartz.  (DSOF ¶ 923.)

A March 17, 2013 HNR complaining of a cracked tooth resulted in a March 27, 2013 appointment for an evaluation of #19.  (DSOF ¶ 924.)  The dentist found no visible decay and that the pulpitis was reversible; Swartz was advised of the same and told that he needed to submit an HNR if he wanted a filling.  (DSOF ¶¶ 925-26.)  When Swartz was seen by the dentist on May 22, 2013, for an HNR he submitted on May 12, 2013, complaining of wisdom tooth pain, Swartz refused treatment, and denied he had submitted any HNR on the issue. (DSOF ¶ 927.)   When he submitted an HNR on May 27 complaining of a cracked filling on his rear molar, he was scheduled for an exam June 5, 2013, but he again refused treatment, claiming he did not submit an HNR.  (DSOF ¶¶ 928-29.)

**Plaintiff Wells**:  Wells contends she had fillings from two teeth broken in 2010 without any repair for months, that a dentist cracked an adjacent tooth in November 2011, and that she had refused tooth extractions and endured pain for several months before her fillings were replaced. (DSOF ¶ 945.)  Her dental records, however, reveal the following:

| | |
|---|---|
| 11-13-2009: | Intake exam; instructed to submit an HNR for dental treatment (DSOF ¶ 946); |
| 2-15-2010: | Admitted to West Valley Hospital (heart attack symptoms), with a stent placed (DSOF ¶ 948); |
| 7-29-2010: | Wells told by dentist that per protocol, she could not undergo dental treatment for 6 months following heart event; dentist noted she could be scheduled for a filing on #13 sometime after August 15, 2010 (DSOF ¶ 949); |
| 11-3-2010: | Cleared by cardiologist to have dental treatment and filling done on tooth #13 (DSOF ¶ 955); |
| 12-19-2010: | Post-operative sensitivity to the new filling results in HNR for "pain" (DSOF ¶ 956) |
| 12-22-2010: | Wells seen by dentist, with diagnosis of normal post-op sensitivity; Wells further complains of pain in tooth #18 that date, and refuses extraction (DSOF ¶ 957-58). |
| 1-24-2011: | Wells submits new HNR for fillings(DSOF ¶ 959). |
| 5-9-2011: | Wells had tooth #18 filled (DSOF ¶ 960). |
| 5-20-2011: | HNR submitted for jaw and ear pain and an abscess (DSOF ¶ 961). |
| 5-24-2011: | Dentist examined her, checked the injection site, and found no treatment needed (DSOF ¶ 962); |
| 7-28-2011: | HNR for broken filling, and nerve exposure on two fillings (DSOF ¶ 963); |
| 8-01-2011: | Wells seen by dentist for chipped tooth on #14, and diagnosed with recurrent caries. Wells also diagnosed with irreversible pulpitis on #13, but she refused an extraction on that tooth (DSOF ¶ 964). |
| 8-07-2011: | Wells submitted HNR requesting fillings in two upper teeth (DSOF ¶ 965); |
| 11-7-2011: | Wells received a filling on #14 (DSOF ¶ 966). |
| 02-7-2013: | After a chipped tooth HNR for routine care, Wells received a filling on tooth #13 (DSOF ¶ 969). |
| 02-28-2013: | HNR for pain on recently filled tooth (DSOF ¶ 970); |
| 03-06-2013: | Wells refused treatment (DSOF ¶ 971); |
| 06-09-2013: | HNR requesting filling on a bottom tooth (DSOF ¶ 972); |
| 08-08-2013: | HNR for pain on upper tooth (DSOF ¶ 973); |
| 08-09-2013: | Wells seen, complaining of pain on #13; dentist determined pain was likely due to either traumatic occlusion or necrosis.  Wells was given Ibuprofen and told to return to the clinic for an extraction if her symptoms persisted (DSOF ¶ 974); |

39

08-29-2013:  HNR for pain (DSOF ¶ 977);

08-30-2013:  Wells seen for pain appointment (DSOF ¶ 978); and

09-11-2013:  Wells seen for extraction on #13 (DSOF ¶ 979).

**Legal Analysis**.   A delay in treatment cannot form the basis for an Eighth Amendment violation when the delay is attributable to the prisoner. *See Hartsfield v. Colburn*, 491 F.3d 394, 396-98 (8th Cir. 2007) (45-day delay in referring a prisoner to an oral surgeon to have three teeth extracted did not amount to deliberate indifference where delay was partly caused by inmate's own delay in submitting a second sick call request when pain persisted); *Yoon v. Hickman*, 171 Fed. Appx. 541, 542 (9th Cir. 2006) ("Moreover, any delays in treatment were, in part, attributable to [inmate's] refusal to show up for five scheduled appointments with [prison dentist].")

The record shows that Plaintiffs Polson, Chisholm, Swartz, and Wells received dental attention suitable to their expressed needs, their asserted needs were never "severe" under *Hallet,* and that any delays were the result of their own refusals, time out of ADC custody, health conditions that precluded treatment, or failure to submit follow-up HNRs.

**Chisholm's** lengthy delay in receiving a requested cleaning (a routine procedure for a non-severe condition) is not attributable to ADC as she became a federal custody inmate in August, 2006 for more than two years, returning to ADC custody in September, 2008.  (DSOF ¶¶ 873-74.)  That she refused a cleaning on December 9, 2008 similarly relieves ADC from any suggestion of deliberate indifference in providing preventative dental care, particularly given her failure to submit any dental HNR until three years later on December 23, 2011 (which was promptly provided 7 days later), and she postponed until August 13, 2012 any request for the procrastinated cleaning.  (DSOF ¶¶ 876, 878-80, 884.)  Accordingly, when accounting for the 30-month federal custody period at a private facility, and the 44-month period from 2008-2012 during which Chisholm failed to submit an HNR requesting a cleaning,[24] Chisholm is responsible for at least 6 years of this

---

[24] After Chisholm refused the dental cleaning scheduled on December 9, 2008 and was warned of possible plaque build-up, she spent a three-year period submitting no fewer than 22 HNRs requesting medical and mental health care for a variety of symptoms (*e.g.*, lower bunk assignment, numerous prescription refills, a skin allergy, vision loss, cortisone

1     "delay."

2     **Polson** had reservations about dentures until at least July 20, 2009.  He then

3     refused prerequisite dental work on April 9, 2009 and December 9, 2009, which pushed

4     Polson to the bottom of the routine care list each time after he reversed course and sought

5     treatment, thereby prolonging his wait further than had he kept the originally schedule

6     date(s).  (DSOF ¶ 863.)  The 3 ½ month period between his last tooth extractions on April

7     30, 2010 and his August 12, 2010 visit to start the denture process by taking preliminary

8     impressions was occupied by two separate visits in June and July for fillings and gingivitis

9     treatment, and some transition period is appropriate following extractions to enable

10    healing.  (DSOF ¶ 865). *See Crawford v. Bennett*, 2008 WL 5429892, at *9 (D. Mont.

11    2008).

12    Once the multiple extractions were finally completed on April 30, 2010 and some

13    fillings and periodontal work was done in June and July, the dentist took preliminary

14    impressions on August 12, 2010, final PVS impressions on October 14, 2010, a bite

15    registration on December 9, 2010, and a preliminary fit on January 27, 2011, the dentures

16    were sent to the laboratory for finishing and final delivery/insertion on April 26, 2011 – an

17    8 ½ month period that even Plaintiffs' expert believes is not out of the ordinary as a

18    removable partial denture typically requires 5-7 office visits, and three months of delay

19    was due to the lab.  (DSOF ¶¶ 844-49, 865, 871, 1035-36). *See Smith v. Grounds*, 2010

20    WL 4700219 (N.D. Cal. 2010) (rejecting Eighth Amendment claim based on similar time

21    lapse for extraction/denture work; "the fabrication process for complete and partial

22    dentures is a multi-step process involving a number of clinical and laboratory steps, each

23    dependent upon the other"); *Greenlaw v. Hill*, 2007 WL 1876515 (D. Ore. 2007) (16-

24    month delay between extractions and denture fitting did not amount to deliberate

25    indifference).  Finally, Polson was on a mechanical soft diet during this period,

26

27    injections, fibromyalgia, pulmonary hypertension, problems with stress, anxiety, and
      pressure, blood pressure, and medication adjustment), but did not file a single dental-
      related HNR until she sought care for tooth #18 on December 23, 2011 after losing a
28    filling, which was timely acted upon by Dr. Hanstad.  (DSOF ¶ 876-80.)

ameliorating any chewing harm and precluding a showing of purposeful cruelty by the State.

**Swartz's** catalogue of alleged delay reveals an inmate whose pain complaints were quickly evaluated, albeit Swartz disagreed with several of the recommended treatments and repeatedly refused treatments. His first HNR related to dental was not submitted until January 17, 2012 (for a cracked molar), and he was seen within 7 days. (DSOF ¶¶ 907-08.) Indeed, each of Swartz's pain-expressing HNRs submitted in January, August, September and October 2012, and February and March 2013, was greeted with a dentist visit within one week, with several of those resulting in appointments the same day or within 48 hours. (DSOF ¶ 934.)

**Wells'** complaint of delay is refuted or explained by her serious heart condition, which ruled out dental treatment until medically authorized, delaying care from November 2009 to November 2010. (DSOF ¶¶ 946-55.) Once cleared by her cardiologist and Dr. Lockhart, Wells received a filling on tooth #13. (DSOF ¶ 955.) When she later complained of pain December 20, 2010, she was seen two days later, with the diagnosis of normal post-op sensitivity on tooth #13, and Wells' pain complaint in tooth #18 resulted in an extraction recommendation that she refused. (DSOF ¶¶ 956-58) Wells' January 24, 2011 HNR request for fillings resulted in routine care treatment 3 ½ months later as tooth #18 was filled. (DSOF ¶ 959-60.) When Wells later submitted an HNR for jaw and ear pain on May 20, 2011, she was seen by the dentist four days later. (DSOF ¶¶ 961-62.) Wells submitted an HNR on July 28, 2011 for a broken filling and was seen four days later with a diagnosis of irreversible pulpitis for tooth #13 and recurrent caries on tooth #14, with treatment refused. (DSOF ¶¶ 963-64.) Significantly, both her HNRs expressing some degree of pain on August 8 and 29, 2013 were treated by the dentist within 24 hours. (DSOF ¶¶ 973-4, 977-78.)

The experiences of these Plaintiffs represented the class' best hopes at painting an extreme picture of delayed or deficient dental care, yet the record establishes that all were timely treated and none was the victim of deliberate indifference, let alone suffered any

serious harm in a manner attributable to any ADC policy.  This by itself should compel summary judgment on the class claim.  The claim also fails, however, because Plaintiffs cannot show a systemwide deficiency, or that these Plaintiffs' allegations were caused by a systemic deficiency.  In the past year, ADC dental staff have accommodated 60,440 dentist visits and 6,334 hygienist visits, and administered 34,294 comprehensive exams, 25,474 x-rays, 10,263 fillings, 7,339 cleanings, and 1,298 dentures.  (DSOF ¶ 172.)  And wait times for routine dental care over the past ten months are well below the 90-day requirement (and no more than 45 days in March 2014 at all facilities).  (DSOF ¶¶ 994, 1001, 173-74.)  This claim must be dismissed.

## B.   The Alleged Practice of Extracting Salvageable Teeth

Plaintiffs' challenge here is to a medically permissible ADC policy of delegating to treating dentists the decision of whether to recommend fillings, root canals, apiectomies, or extractions when encountering inmates with widely varying symptoms of tooth decay. This claim should be rejected on its face because a difference of opinion concerning appropriate medical care – either between a physician and the prisoner, or between medical professionals – does not amount to deliberate indifference. *Toguchi*, 391 F.3d at 1058.  This aside, the Named Plaintiffs cannot prove an Eighth Amendment violation.

**Plaintiff Chisholm**:  Chisholm's extraction claim hinges on care she requested for a lost filling on December 23, 2011, resulting in an appointment 7 days later when Dr. Hanstad diagnosed recurrent decay well below the gum line on tooth #18, and she was given an antibiotic for infection control, and rescheduled for an extraction in two weeks. (DSOF ¶¶ 878-80.)  She refused the extraction January 12, 2012.  (DSOF ¶ 881.)

**Plaintiff Swartz**: Swartz claims he had to wait two years to fix a cracked molar, and was put in the position of deciding between a tooth extraction or saving the tooth and enduring pain. (DSOF ¶ 903.)  His dental records, however, show that after an intake dental exam December 18, 2009, he did not submit an HNR for dental until more than two years later on January 17, 2012. (DSOF ¶¶ 905-07.)  Swartz was seen one week later on January 24, 2012, and the dentist found gingival recession, decay into the pulp, and

43

1    concluded the tooth was non-restorable due to irreversible pulpitis.  (DSOF ¶ 908.)  The

2    dentist recommended extraction of #13, and gave Swartz Ibuprofen. (DSOF ¶ 909.)  When

3    he returned one week later for the appointment to extract #13, Swartz refused and wanted

4    more Ibuprofen. (DSOF ¶ 910.)

5         Swartz also had a series of disputes with his treating dentist in August 2012,

6    culminating in a September 24, 2012 referral to an oral surgeon, Dr. Barlow, when he

7    refused extraction, allegedly because he was told by Dr. Barlow that tooth #32 should not

8    be pulled and #31 could have a crown. (DSOF ¶¶ 911-21.)  Several other appointments

9    followed in October 2012, and February and March 2013, where Swartz repeatedly

10   refused extractions of other teeth or was told that other teeth were restorable.  (DSOF ¶¶

11   22-26.)

12        **Plaintiff Wells**: Wells' ADC dental history has already been recounted, but

13   includes fillings on two teeth (#13 and #18), and a disagreement with the dentist on

14   whether certain teeth should be extracted or were restorable.  (DSOF ¶¶ 945-79.)

15        **Legal Analysis**.  The decisions by prison dentists to offer extractions on teeth they

16   deem non-restorable is reasonable; Plaintiffs' claims represent an (unqualified) difference

17   of opinion as to the restorability of certain teeth, which not even their own expert is

18   willing to criticize. (DSOF ¶ 1037.) The Ninth Circuit, and district courts within the

19   circuit, have repeatedly rejected class and individual claims predicated on such a theory.

20   *See Hallett*, 296 F.3d at 745; *Finley v. Parker*, 253 Fed.Appx. 634, 636 (9th Cir. 2007);

21   *Yoon*, 171 Fed. Appx. at 542; *Brooks v. Andrews*, 2006 WL 403859, at *10 (E.D. Cal.

22   2006).

23        Swartz, who claims an oral surgeon (Dr. Barlow) told him that he believed one of

24   the two teeth could be restored with a crown, cannot survive summary judgment as such a

25   disagreement between medical professionals is not enough to present a claim of deliberate

26   indifference. Wells had fillings done on multiple teeth, which dental work undermines

27   Plaintiffs' theory that ADC has an "extraction only" policy rather than one that vests the

28   treating dentist with discretion as to the restorability of each tooth he or she encounters.

44

Polson had extractions on no fewer than five teeth during a 5 ½ month period – all of which teeth Polson agreed needed to be extracted – but he also had fillings for cavities done on tooth numbers 4 and 5 before his impressions for his denture were made. (DSOF ¶¶ 837-38, 842-48.)  If ADC truly had a practice of extracting teeth that could be saved, its dentists are routinely violating this phantom policy, as their treatment of even the representative Plaintiffs illustrates that the dental treatment of each is driven by the dental symptoms of each one. *See Halla v. Schriro*, 2006 WL 3735983, at *5 (D. Ariz. 2006) (if ADC had an unwritten policy of "filling of only one tooth per visit," "the evidence shows that Defendants violated it by frequently providing more care than the policy would have allowed. This does not amount to deliberate indifference.")  Plaintiffs also cannot show that this handful of supposed misclassifications from an inmate population of 34,000 has become a "de facto" policy of ADC, such that ADC is pursuing a systemic practice of exposing all inmates to a substantial risk of serious harm.

## V.  THE CONDITIONS-OF-CONFINEMENT CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW

Plaintiffs' conditions-of-confinement claims must be analyzed in the context of several well settled principles: (1) uncomfortable, restrictive or even harsh living conditions do not implicate the Eighth Amendment, *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); (2) courts should consider the circumstances, nature, and duration of a deprivation of life's necessities in determining whether a constitutional violation has occurred, *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000); and (3) deference to the expertise of prison administrators is owed when reviewing a prison regulation, and the regulation must be upheld if it is reasonably related to legitimate penological interests, *Turner v. Safley*, 482 U.S. 78, 89 (1987). *See also Brown v. Plata,* 131 S.Ct. 1910, 1928 (2011); *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2009). As the Court has already recognized, many of the conditions that Plaintiffs challenge here have been rejected many times before. [25]

---

[25] *See*, *e.g.*, *Graves v. Arpaio*, 633 F. Supp. 2d 834, 848 (D. Ariz. 2009), *aff'd*, 623

A.   **The Use of Chemical Agents on Inmates Using Psychotropic Medications is Not Per Se Unconstitutional.**

Only three Plaintiffs complain of actually being pepper sprayed, or threatened with the use of such force.   Of these three Plaintiffs (Rodriguez, Verduzco and Brislan), Verduzco is the torchbearer for this claim.  (Dkt. 1 at ¶ 87.)  Rodriguez was allegedly only threatened with the use of pepper spray "just a couple of times" in 2012 for arguing with correctional officers,[26] and Brislan is no longer in custody and similarly admitted that his recalcitrant conduct justified its use.[27]   (DSOF ¶¶ 2794-2808, 2811, 2888.)  Verduzco admits that pepper spray was used on her as a consequence of her failing to follow facility rules, such as failing to respond to officer calls to see the inmate awake when on watch status, and refusing to stop assaulting another inmate.  (DSOF ¶¶ 2950-3010, 3016.)

The Ninth Circuit has repeatedly held that chemical agents may be used against inmates for disruptive activity or non-compliance with prison rules.  *See Allen v. Bosley*, 253 Fed.Appx. 658 (9th Cir. 2007); *Eccleston v. Oregon ex rel. Oregon Dep't of Corr.,* 168 F. App'x 760, 761 (9th Cir. 2006); *Clement v. Gomez*, 298 F.3d 898, 903-04 (9th Cir. 2002); *Spain*, 600 F.2d at 196.  Moreover, ADC's use-of-force policy is a thoughtful one that requires officers to deploy a progressive continuum, from the least amount of force possible to the maximum level permitted, commensurate with the circumstances of the

---

F.3d 1043 (9th Cir. 2010); *Baptisto v. Ryan*, 2006 WL 798879, at ** 27-28, 33 (D. Ariz. 2006); *Hampton v. Ryan*, 2006 WL 3497780, at **11-15 (D. Ariz. 2006), *aff'd*, 288 F.App'x 404 (9th Cir. 2008); *Walker v. Schriro*, 2006 WL 2772845, at **7-9 (D. Ariz. 2006); *see also Spain v. Procunier*, 600 F.2d 189, 199 (9th Cir. 1979); *Jonas v. Schriro*, 2006 WL 2772641 (D. Ariz. 2006).

[26] The mere threat of force does not rise to a constitutional violation. *See Keenan v. Hall,* 83 F.3d 1083, 1092 (9th Cir. 1996); *Perez v. Sisto*, 2010 WL 2880165, at *15 (E.D. Cal. 2010).

[27] Plaintiff Dustin Brislan referenced several episodes of being sprayed with chemical agents during his deposition, but has not alleged in the Complaint any Eighth Amendment claim arising from such use of force incidents. (Dkt. 1 at ¶¶ 9, 87-88.) The reason for his exclusion is apparent: Brislan was pepper sprayed in 2006 (outside the limitations period) during an attempt to cut himself, pepper spray "does not have any effect on" him, and the occasions on which he was more recently sprayed involved admittedly unruly behavior – incidents in 2012 at Lewis where he was sprayed for "throwing items at a staff member," ripping the suicide blankets to shreds and "using them to pull a fire sprinkler out of the wall," and refusing to submit to restraints. (DSOF ¶ 2794-2808, 2811.)

incident. (DSOF ¶¶ 614-643.) When possible, staff is required to use progressive force as follows:  psychological (physical presence of officer, body language, verbal and non-verbal communications); aerosol sprays; stun devices (taser); non-lethal weapons (bean bags, knee-knockers, sting balls, flash bangs, CS/OC grenades and projectiles); service dogs; cell extraction teams; and lethal force.  (DSOF ¶ 623.) Chemical agents can be used to avoid the use of additional force, to prevent injury to employees and inmates, or to stop imminent danger to staff or inmates, and staff using OC spray must complete ADC approved training before using OC spray.  (DSOF ¶¶ 629-630.)

The fact that an inmate has a mental illness or is taking psychotropic medications does not constitutionally exempt the use of OC spray from this progression.  *See Deorle v. Rutherford,* 272 F.3d 1272, 1283 (9th Cir. 2001) ("We do not adopt a per se rule establishing two different classifications of suspects: mentally disabled persons and serious criminals"); *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) ("some force was surely justified in restraining [mentally ill arrestee] so that he could not injure either himself or the arresting officers.").  More importantly, because Plaintiffs are seeking an order enjoining ADC from <u>ever</u> using chemical agents on inmates taking psychotropic medications, on suicide watch, or those who are mentally ill under <u>any</u> circumstances (Dkt. 240-1, ¶ 48; Dkt. 292-1, ¶ 32), they must show that the policy in question authorizing this use of non-lethal force – when warranted by the inmate's unruly behavior – was done "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  They cannot do this, especially when the only three Plaintiffs who advance it have either not been pepper sprayed since 1993 (Rodriguez), or were sprayed during incidents in which use of the spray was admitted by the inmates (Verduzco and Brislan) to have been objectively justified by their violation of prison rules. (DSOF ¶¶ 2794-2808, 2811, 2885-2888, 2950-3010, 3016.) The Ninth Circuit has already rejected a similar claim brought against former ADC Director Stewart for having a policy that merely authorized the use of pepper spray against recalcitrant inmates. *See Stewart v. Stewart*, 60 Fed.Appx. 20, 22 (9th Cir. 2003).

1    Such a sweeping edict is unsupported by legal authorities, and certainly cannot be

2    traceable to any "systemic" practice or policy designed with sadistic or malicious intent

3    by prison administrators.  *See Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984) ("The

4    Supreme Court has never held, nor have we or any other court of appeals, so far as we can

5    determine, that the use of tear gas or a chemical agent is a per se violation of the Eighth

6    Amendment . . . ."); *Howard v. Nunley*, 2010 WL 3785536, at *3 (E.D. Cal. 2010) ("The

7    use of mace, tear gas or other chemical agent of the like nature when reasonably necessary

8    to ... subdue recalcitrant prisoners does not constitute cruel and inhuman punishment.").[28]

9    The use of chemical agents is a valuable, non-lethal tool for corrections officers in

10   the use-of-force continuum, and Plaintiffs' desire to eliminate its use entirely would have

11   dire results not contemplated by Plaintiffs, and contradicts the deference afforded to them

12   in matters of internal order and security. *Whitley*, 475 U.S. at 321–22. Consider, for

13   example, an inmate in a psychiatric unit (on psychotropic medication) who has obtained a

14   razor or other weapon and is attempting suicide, but lashes out at officers attempting to

15   intervene.  Are the officers required to stand back uttering ineffective verbal commands,

16   or skip the easily deployed OC spray and escalate to the more difficult and dangerous use

17   of arm-bar and carotid holds, batons, tasers or more harmful devices to save the inmate

18   and preserve officer safety?  Of course not.  ADC policy requires consideration of

19   alternative solutions, the physical and mental characteristics of the inmate, and the

20   inmate's mental impairment; mental health staff is contacted prior to a cell extraction;

21   inmates are immediately decontaminated and seen by medical after its use; and all use-of-

22   force incidents are documented and reviewed, and videotaped when planned. (DSOF ¶¶

23   614-643.)  Because the use of chemical agents has not been constitutionally condemned

24

25   ───────────────

     [28] The extreme position taken by Plaintiffs is inconsistent with the aspirational
26   standard promoted by the <u>ABA Criminal Justice Standards on the Treatment of Prisoners</u>,
     of which certain Plaintiffs' counsel (Fathi and Fettig) are acknowledged as contributors.
27   Unlike the categorical ban Plaintiffs seek here, Standard 23-5.8(d) does <u>not</u> exempt
     mentally ill inmates from the appropriate use of chemical spray but simply calls for
28   consideration when practicable and contemporaneous documentation, things that ADC
     policy already includes.

by either the Ninth Circuit or this Court, and such force is within the discretion of prison officials to authorize when the occasion justifies its use, Plaintiffs have failed to establish any Eighth Amendment violation under *Whitley* by the mere existence of a policy that permits the use of chemical agents against inmates on psychotropic medication.

## B.   Recreation

Plaintiffs' challenge to ADC's recreational policies for maximum custody inmates has been rejected several times before.  Maximum custody inmates are afforded six hours of outdoor exercise weekly, in two-hour blocks, three times per week.  (DSOF ¶¶ 1285, 1302-1314, 1366-1406, 1439-1444, 1561, 1561, 1572-1576, 1580, 1582, 1605, 1609.) Inmates on watch are afforded the same recreation as their assigned custody level unless contraindicated by mental health staff. (DSOF ¶¶ 1499-1501, 3094, 3232.) Some maximum custody inmates have the opportunity to recreate on the yard, while others recreate in enclosures that allow fresh air and sunlight, communication between inmates, and exercise (stretching, cardiovascular exercise, strength training, calisthenics, walking, jogging in place, and isometrics).  (DSOF ¶¶ 1572-1654.) Inmates can also exercise in their cells.  Many inmates, including several Plaintiffs, often refuse recreation. (DSOF ¶¶ 2809-2810, 3013, 3074, 3165.)   The provision of at least six hours of weekly time outdoors for exercise is sufficient to satisfy constitutional minima.

## C.   Social Isolation

This claim suffers from several distinct defects.  First, it appears to be an attempt by Plaintiffs to collaterally attack the findings and outcome of the disciplinary hearing process that resulted in such restricted housing placement.[29]  (DSOF ¶¶ 1253-1281, 1282-1292, 1293-1294.)But as the Ninth Circuit has emphasized, "administrative segregation, even in a single cell for twenty-three hours a day, is within the terms of confinement ordinarily contemplated by a sentence." *Anderson,* 45 F.3d at 1316. Because a disciplinary

---

[29] Plaintiffs' experts adhere to the belief that mentally ill inmates should never be placed in isolation housing units, and would (if they could) either flatly forbid such disciplinary sanctions or require prison officials to conduct a mental health review prior to or as part of the disciplinary hearing process.

1    assignment to segregation housing is within the terms of one's confinement, this subclass

2    claim should be narrowly construed to focus on the <u>conditions</u> of confinement, rather the

3    fact or duration of such confinement in a segregation unit. *See Muhammad v. Close*, 540

4    U.S. 749, 750-55 (2004).

5         More importantly, the conditions in ADC's lockdown housing units do not

6    unconstitutionally deprive the Subclass members of life's necessities in violation of the

7    Eighth Amendment.  (DSOF ¶¶ 1295-1868.) As this Court emphasized in *Hampton*, the

8    solitary confinement to which certain inmates are subjected does not put them in total

9    isolation, and their confinement in such units is not indeterminate.  2006 WL 3497780, at

10   *12 (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989) (inmates do

11   not have a right to "unfettered visitation")).[30]

12        Maximum custody inmates have plenty of opportunities for social interaction.  In

13   addition to the at least  six hours per week of outdoor recreation (some of which include

14   group recreation), they are offered 30 minute showers three times a week, which is in

15   addition to their recreation time; some inmates are double celled; they are allowed to place

16   at least one telephone call per week (opportunity for increase in the Step Program), up to

17   15 minutes in duration; they are allowed at least one, 2-hour non-contact visit a week

18   (some are allowed contact visits) (opportunity for increase in Step Program); they are

19   offered an assortment of out-of-cell programming and WIPP work opportunities (porters,

20   kitchen workers, maintenance, etc.); the cells provide inmates the opportunity to see

21   others and to speak to other inmates, security, medical, religious and programming

22

---

23   [30] *See also Freemon v. Ryan*, 2011 WL 5169342, at *16 (D. Ariz. 2011) ("The undisputed evidence shows that Plaintiff has opportunities for limited social contact and, therefore, is not isolated to a degree that would violate the Eighth Amendment."); *Jonas*,

24   2006 WL 2772641, at *4 (plaintiff failed to show that social interaction was constitutionally inadequate in SMU II, where inmates are allowed one non-contact visit

25   per week for a maximum of two hours, with up to four visitors at one time, and one five-minute phone call per week, have contact with staff and are permitted to see prison and

26   religious counselors, may have a radio and a television, and may pursue individual educational courses from their cells.); *Aguilar v. Schriro*, 2006 WL 2471830, at *3 (D.

27   Ariz. 2006) (same, plus plaintiffs had access to mental health services); *Bermudez v. Ryan*, 2006 WL 2547345, at *3 (D. Ariz. 2006) (same).

28

personnel through either a perforated steel cell front, a vision panel in the door or cell wall or an open front; they can send and receive letters; they can visit with the facility chaplain or religious volunteers that are in the units almost daily; some can participate in weekly group out-of-cell religious worship; they can participate in the Maximum Custody Population Management Step Program earning more out of cell time, increased property/commissary, work programs and programming through positive behavior; certain levels of Step Program inmates may participate in in-pod recreation and social activities to include unit contests, unit newsletters, hobby craft, educational television programs and inmate fundraisers; certain levels of Step Program inmates may participate in weekly out-of-cell group programming in a wide range of classes including Cultural Diversity, Money Management; Responsible Thinking, Self-Control, Social Values, Substance Abuse, Thinking for a Change, Re-Entry, Feelings, CORE Skills, Conflict Resolution, Commitment to Change, Resources for Change, Living a Better Life, Domestic Violence and Merging Two Worlds classes; certain mental health and Step Program inmates may participate in mental health 1:1 counseling, group counseling and psycho-educational classes; certain levels of the Step Program inmates may participate in group recreation including basketball tournaments and kickball tournaments as well as yoga classes for females; all cells provide sufficient ventilation (either through open cell fronts fixed with metal bars, perforated metal cell front doors or individual cell ventilation) and exposure to natural light via in-cell windows, cell fronts that face windows, or skylights in the housing units and they have access to a television.  (DSOF 1572-1654, 1560-61, 1655-59, 1664, 1490-94, 1295-97, 1563-69, 1663, 1298-1301, 1570-71, 1689, 1469-70, 1660-62, 1302-1470, 1561-62, 1883, 1490-1559, 1560-71, 1572-1641, 1660-1693, 1860-68.)

### D.    Constant Cell Illumination

The subclass claim related to cell illumination is foreclosed by this Court's *Hampton* decision and other Ninth Circuit precedent. *Hampton* involved this Court's review of the security illumination policy for SMU II, wherein each cell contained a bed against the far wall, and a lighting fixture containing four lights above the mirror over the

1  sink, one of which lights was a seven-watt fluorescent security light that remained

2  illuminated 24 hours per day.  2006 WL 3497780, at *13.

3      The Court previously cited the declaration testimony of Plaintiffs Brislan and

4  Rodriguez at the class certification stage, yet neither party can establish an Eighth

5  Amendment violation.  Brislan even acknowledged ADC's security/welfare interest in his

6  deposition.  (DSOF at ¶2812)  Same with Rodriguez; she acknowledged that this lighting

7  was a condition she experienced while on suicide watch, where officers clearly have

8  heightened responsibilities to monitor the welfare of the inmate. (DSOF at ¶2889).  The

9  named Plaintiffs have failed to satisfy the objective component of the Eighth Amendment

10  (sufficiently serious harm),[31] particularly where the wattage in their cells (7 watt bulbs

11  positioned approximately 7-8 feet away from bed) was low-level, similar to a night-

12  light.[32]  (DSOF at ¶¶1698-1700; 1714-1819.)

13

14  [31] *See McDaniels v. Elfo,* 2013 WL 7231585, at *12 (W.D. Wash. 2013) ("The
   mere allegation the light was so bright plaintiff 'had no way of telling whether it was day
15  or night' . . .does not suffice to demonstrate that the continuous illumination was
   objectively harmful."); *Bull v. Beard*, 2013 WL 5797586, at *8-9 (S.D. Cal. 2013)
16  (dismissing claim where plaintiff failed to allege what lights were constantly on or how
   bright they were, and that he suffered *grave* sleeping problems or other sufficient harms);
17  *Franklin v. Scribner*, 2011 WL 1311743, at *9 (S.D. Cal. 2011) (holding plaintiff failed to
   allege sufficient facts to state a claim "as to the type of lighting in his cell or its
18  brightness, without which he cannot demonstrate the existence of an objectively serious
   deprivation."); *see also Murray v. Edwards Cnty. Sheriff's Dep't*, 248 F. App'x 993, 998
19  (10th Cir. 2007) (plaintiff failed to show that 75-watt bulbs placed two-three feet outside
   his cell and constantly on caused him sufficiently serious injury); *Wiles v. Ozmint*, 2010
20  WL 5811355, at *7 (D.S.C. 2010) (finding plaintiff's claim that he suffered medical
   consequence from cell illumination was meritless because "Plaintiff's medical records fail
21  to support his claim that he is suffering from any serious medical condition as a result of
   sleep deprivation, fatigue, or related ailments.").

22  [32] *See Vasquez v. Frank*, 290 Fed.Appx. 927, 929 (7th Cir. 2008) (constant light
   from 9-watt fluorescent bulb does not constitute an "extreme deprivation"); *Chavarria v.*
23  *Stacks*, 102 Fed. App'x 433 (5th Cir. 2004) (holding that prison policy requiring 24-hour
   illumination of cells in administrative segregation, which allegedly caused an inmate to
24  suffer sleep deprivation, did not violate the Eighth Amendment); *Franklin v. Smalls*,
   09CV1067-MMA RBB, 2013 WL 941569, at *7-8, 18-20 (S.D. Cal. Mar. 8, 2013)
25  (constant light from 7-watt fluorescent bulb was not excessively bright so as to be
   unconstitutional); *see also McGee v. Gold*, 2010 WL 5300805, at *5 (D. Vt. 2010) (10-
26  watt incandescent bulb); *McBride v. Frank*, 2009 WL 2591618, at *5 (E.D. Wis. Aug. 21,
   2009) (9-watt fluorescent bulb does not objectively deny the "minimal civilized measure
27  of life's necessities."); *Carr v. Tousley*, 2009 WL 1514661, at *19 (D. Idaho 2009) (9-
   watt bulb); *Walker v. Woodford*, 593 F. Supp. 2d 1140, 1152 (S.D. Cal. 2008) (7–watt
28  compact fluorescent bulb as bright as a 40-watt incandescent bulb); *Wills v. Terhune*, 404
   F.Supp.2d 1226, 1230–31 (E.D. Cal. 2005) (holding 24-hour illumination by 13-watt bulb

Furthermore, not all ADC maximum custody housing unit cells have night security lights that cannot be controlled by inmates, but of those units that do, the in-cell constant night security lights used for nighttime lighting of maximum custody cells are low-level, 7-watt bulbs that enhance security at the facility, yet are dim enough to provide an adequate sleeping environment for the inmates.[33] (DSOF at ¶¶1696-1698.) The nightlights are very different from the much brighter security lights and the regular fluorescent lights that are used in the cells during the day. (DSOF at ¶1699.) The 7-watt security light must remain on at night to afford correctional staff visibility into the cell to confirm the inmate's welfare while sleeping, to identify the inmate, and to rule out nighttime misconduct. (DSOF at ¶¶1700-1712.) *See also Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir. 2013). Such low-watt, security nightlights are far preferable to the use of flashlights.[34] (DSOF at ¶¶1706-09.) The use of low-level nightlights is standard practice for correctional facilities across the country, and the level of illumination used is the minimum amount necessary to sufficiently address security concerns and to allow correctional staff to observe inmates during the night and regular sleeping hours.[35] (DSOF ¶¶1700-01.)

---

constitutional because it was not of the type that caused "grave sleeping problems" and, there was no evidence in the medical records that he suffered symptoms from the lighting conditions).

[33] In addition, inmates are permitted to cover their eyes with small cloths if they wish to when they sleep as long as correctional personnel conducting safety and welfare checks are able to see flesh and determine that the inmate is breathing.

[34] The exclusive use of flashlights to conduct night time safety and security checks enables inmates to detect when officers are making rounds and thus plan instances of assault, contraband use/exchange, and escape plans around those security checks. (DSOF at ¶1707.) Additionally, an officer may have to stop and shine a flashlight in a cell for extended time in order to confirm the safety and security of an inmate, running the risk of creating conflict between inmates and staff because inmates may view the use of a flashlight as harassment.

[35] Specifically, the nightlights enable correctional personnel to observe the wellbeing of an inmate at night, including detecting illness, medical emergency, ensuring suicide precautions, and detecting physical or sexual assaults, and ensure that inmates are not attempting to escape or engage in other illicit activities, such as use or exchange of contraband. The level of illumination used also permits correctional personnel to make regularly required security checks, as described above, without having to turn on the daytime fluorescent lighting (and wake sleeping inmates) each time a security check is made.

Courts in this District have rejected virtually identical lighting claims involving the same ADC facilities under scrutiny here. *See Jose v. Thomas*, 2012 WL 2091527, at *6 (D. Ariz. 2012); *Rotondo v. Ryan*, 2012 WL 424384, at *13 (D. Ariz. 2012); *Jonas v. Schriro*, 2006 WL 2772641 (D. Ariz. Sept. 25, 2006); *Baptisto*, 2006 WL 798879, at **18-21.  ADC's restricted use of minimal, 7-watt lighting for the security and safety purposes set forth above is reasonably related to the legitimate penological objectives of ADC officials, precluding an Eighth Amendment violation against the State.  (DSOF at ¶¶1694-1819.)

**E.   Property**

This class claim is anchored to the allegation, "Property is extremely limited. Many prisoners have no radio or television."  (Dkt. 1, ¶ 93.)  ADC policy restrictions on the type and amount of property an inmate can possess in his or her cell do not offend the Eighth Amendment. Indeed, this claim appears frivolous, as the property items sought have nothing to do with any inmate's health, hygiene, or safety needs under *Farmer*, but are simply leisure items sought to pass the time.  (DSOF at ¶¶1861, 2024, 2042-45, 1374-76, 1386-88, 1404-06, 1442-44.)

Nonetheless, inmates in maximum custody are permitted to have appliances such as televisions, cassette players, and headphones.[36]  (DSOF ¶¶1861, 2042-43, 1707.) Although access to some items are dictated by an inmate's disciplinary infractions or mental health, these temporary restrictions are necessary to modify behavior or prevent self-harm.  (DSOF ¶¶1863-68.) *See Beard*, 548 U.S. 521, 530 (2006) (among "several justifications for the prison's policy, including the need to motivate better behavior on the part of particularly difficult prisoners, the need to minimize the amount of property they control in their cells, and the need to ensure prison safety", court stated it "need go no further than the first justification, that of providing increased incentives for better prison behavior.")

---

[36] As acknowledged by Plaintiff Thomas, ADC officials have assisted segregation inmates obtain loaner TVs made available through charitable programs.

Courts have routinely rejected similar claims brought by high-custody inmates challenging the type or amount of property they can possess in their cells.  *See Anderson v. Cnty. of Kern*, 45 F.3d 1310, 1314 (9th Cir. 1995); *Barnett v. Centoni,* 31 F.3d 813, 816 (9th Cir. 1994); *Wilson v. Timko,* 972 F.2d 1348 (9th Cir. 1992); *Turner v. Upton*, 2013 WL 4852689, at *5, 12 (M.D. Ga. 2013); *Harrison v. Bledsoe*, 2010 WL 186804, *5-6 (M.D. Pa. 2010); *Stockton v. Tyson*, 2011 WL 5118456, at *3 (E.D. Cal. 2011); *Lerajjareanra-O-Kel-ly v. Johnson,* 2009 WL 1513285, at *2 (D. Idaho 2009); *Chhoun v. Woodford*, 2005 WL 1910930, at *10 (N.D. Cal. 2005); *Owens v. Ayers*, 2002 WL 73226, at *3 (N.D. Cal. 2002).  Judge Bolton reached the same conclusion when faced with a similar Eighth Amendment claim of an inmate at SMU-II: "It is irrelevant for Eighth Amendment purposes what criteria prison officials use to limit Plaintiff's access to music and reading materials, as the Court can find no case where depriving an inmate of such materials amounted to cruel and unusual punishment." *Baptisto*, 2005 WL 2416356, at *14 (D. Ariz. 2005).[37]

Plaintiffs cannot prove that their temporary deprivation of such items is "sufficiently serious" harm under the objective component of the Eighth Amendment, or that ADC officials were deliberately indifferent to a substantial risk of serious harm from enforcing such an undeniably reasonable restriction.  Moreover, ADC clearly has a legitimate penological interest in restricting the type and amount of property a Subclass inmate may possess—as a behavior-modification technique, to minimize prisoner bartering, or to reduce opportunities for starting a fire or crafting weapons—and such

---

[37] Another reason to grant summary judgment on this property claim is the absence of any cognizable interest under Arizona law in keeping personal property items while an inmate is assigned to a restricted segregation housing unit. *See, e.g., Blum v. State of Arizona*, 171 Ariz. 201, 207, 829 P.2d 1247, 1253 (App. 1992) ("ADOC may adopt policies limiting the amount of property prisoners may keep in their cells"); and *Ward v. Ryan,* 623 F.3d 807, 811-12 (9th Cir.2010) (Arizona statutes creating a property interest in prison wages "do not give inmates a full and unfettered right to their property"). "Property interests are created by state law." *Nevada Dept. Of Corrections v. Greene,* 648 F.3d 1014, 1019 (9th Cir.2011). A property interest that has been recognized and protected by state law triggers due process protections. *Board of Regents v. Roth,* 408 U.S. 564, 544 (1972). Without any due process protection over the subject property items, it is illogical to believe Eighth Amendment protection could exist over the same items.

55

1  interests are reasonably related to the property restriction.  (DSOF ¶¶ 1865-68.)

2       F.      **Nutrition**

3       "'[T]he Eighth Amendment requires only that prisoners receive food that is

4  adequate to maintain health."  *LeMaire v. Maass,* 12 F.3d 1444, 1456 (9th Cir. 1993).

5  Male maximum custody inmates receive – Monday thru Sunday – two meals per day: a

6  Mega Sack meal consisting of breakfast and lunch, and a hot dinner.  (DSOF ¶ 1829.)The

7  weekly menu averages 2,657 calories per day; the menu for general population inmates is,

8  on average, 2,805 calories per day.  (DSOF ¶¶ 1834-37.)  Utilization of the Mega Sack

9  meal plan offers the inmates individual control over when they would like to eat breakfast

10 and lunch.  (DSOF ¶¶ 1853-57.)  It also lessens the burden on prison operations associated

11 with the necessary personnel required to serve meals cell to cell, and thereby frees up

12 correctional personnel in the afternoon hours to provide for necessary inmate movement

13 and escorts, safety and welfare checks along with movement of inmates to showers,

14 recreation, programming, visitation, medical appointments, etc.  (DSOF ¶¶ 1856-57.)  The

15 caloric intake for male inmates in maximum custody is reduced to compensate for

16 decreased energy needs and to account for security issues, however, it is still adequate in

17 all nutrients according to the Recommended Daily Allowance standards of the National

18 Academies of Science–National Research Council if all the foods are eaten.  (DSOF ¶¶

19 1830-32.)   Female maximum custody inmates receive the same menu as general

20 population inmates, which averages 2266 calories per day.[38]  (DSOF ¶ 1836.)These menus

21 meet or exceed the recommended nutrient amounts as specified by Recommended Dietary

22 Allowances from the National Academy of Sciences.  (DSOF ¶ 1837.)

23      Two Arizona district court judges have recently rejected inmate challenges to this

24 same restricted-movement meal plan. *See Gamez v. Ryan,* No. CV10-2663-PHX-JWS

25      _____
[38] Inmates on watch are provided the same meals (including special medical diets),
26 in frequency and nutritional quality, as meals served to general population inmates, but
   served free of items that can be used for self-harm (e.g., bones, trays, sacks, napkins,
27 cellophane).  (DSOF ¶¶ 1838; 579.)  And this caloric intake does not include calories
   consumed via commissary purchases, which maximum custody inmates can make. (DSOF
28 ¶¶ 1286, 1561, 2043.)

(MEA), Doc. No. 86 at 6, (D. Ariz. Dec. 21, 2012) ("The record makes clear that Plaintiff receives three meals per day but two meals are delivered in the morning at the same time and one meal is delivered in the evening. Plaintiff has not introduced any legal authority suggesting that the prison is prohibited from streamlining the distribution of meals to inmates in the manner currently being employed."); and *Maloney v. Ryan*, 2013 WL 3945921, at *6-8 (D. Ariz. 2013) (J. Broomfield) (rejecting 8th Amendment claim of ASPC-Florence Muslim inmate to mega-sack meal plan during Ramadhan as two meals gave inmate recommended daily caloric intake for sedentary lifestyle).[39]   The caloric intake – which is the same for all female inmates, and only slightly less for male maximum custody inmates – satisfies constitutional standards.  (DSOF ¶¶ 1820-59.)

## **CONCLUSION**

For these reasons, Defendants are entitled to summary judgment on all claims.

---

[39] *See also Standley v. Ryan*, 2012 WL 3288728, at *14 (D. Ariz. 2012); *Galvan v. Arpaio*, 2011 WL 6210818, at *4 (D. Ariz. 2011); *Baptisto*, 2006 WL 798879, at **6, 27-28; *Jonas*, 2006 WL 2772641, at *3. Several other courts have also upheld the streamlined distribution of meals to inmates. *See Berry v. Brady*, 192 F.3d 504, 507 (5th Cir. 1999); *Cunningham v. Jones*, 667 F.2d 565, 566 (6th Cir. 1982).

1

DATED this 14ᵗʰ day of May, 2014.

2

STRUCK WIENEKE & LOVE, P.L.C.

3

4

By /s/ Daniel P. Struck

5

Daniel P. Struck
Kathleen L. Wieneke
Rachel Love

6

Timothy J. Bojanowski
Nicholas D. Acedo

7

Ashlee B. Fletcher
Anne M. Orcutt

8

Jacob B. Lee
STRUCK WIENEKE & LOVE, P.L.C.

9

3100 West Ray Road, Suite 300
Chandler, Arizona  85226

10

Arizona Attorney General Thomas C. Horne

11

Office of the Attorney General
Michael E. Gottfried

12

Lucy M. Rand
Assistant Attorneys General

13

1275 W. Washington Street
Phoenix, Arizona 85007-2926

14

15

*Attorneys for Defendants*

2889597.1

16

17

18

19

20

21

22

23

24

25

26

27

28

58

**CERTIFICATE OF SERVICE**

I hereby certify that on May 14, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing **UNDER SEAL** and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

| | |
|---|---|
| Alison Hardy: | ahardy@prisonlaw.com |
| Amy Fettig: | afettig@npp-aclu.org |
| Caroline N. Mitchell: | cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com |
| Corene T. Kendrick: | ckendrick@prisonlaw.com; edegraff@prisonlaw.com |
| Daniel Clayton Barr: | DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com |
| Daniel Joseph Pochoda: | dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org |
| David Cyrus Fathi: | dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org |
| Donald Specter: | dspecter@prisonlaw.com |
| James Duff Lyall: | jlyall@acluaz.org; gtorres@acluaz.org |
| Cathleen M. Dooley: | cdooley@azdisabilitylaw.org |
| J.J. Rico: | jrico@azdisabilitylaw.org |
| John Howard Gray: | jhgray@perkinscoie.com; slawson@perkinscoie.com |
| Kirstin T. Eidenbach: | keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com |
| Jerica L. Peters: | jpeters@perkinscoie.com |
| Matthew Benjamin de Mee: | mdumee@perkinscoie.com; cwendt@perkinscoie.com |
| Michael Evan Gottfried: | Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov |
| Sara Norman: | snorman@prisonlaw.com |
| Asim Varma: | avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org |
| David C. Kiernan: | dkiernan@jonesday.com; lwong@jonesday.com |
| John Laurens Wilkes: | jlwilkes@jonesday.com, dkkerr@jonesday.com |
| Kamilla Mamedova: | kmamedova@jonesday.com |

59

| | |
|---|---|
| Jennifer K. Messina: | jkmessina@jonesday.com |
| Taylor Freeman: | tfreeman@jonesday.com |
| Sarah Eve Kader: | skader@azdisabilitylaw.org, mlauritzen@azdisabilitylaw.org |
| Katherine E. Watanabe: | Katherine.Watanabe@azag.gov, susan.oquinn@azag.gov |
| Amelia M. Gerlicher: | agerlicher@perkinscoie.com;docketPHX@perkinscoie.com, pdrew@perkinscoie.com |
| Lucy Marie Rand: | Lucy.Rand@azag.gov, Geneva.Johnson-Joksch@azag.gov |
| Ajmel Quereshi: | aquereshi@npp-aclu.org |
| Jessica Jansepar Ross | jross@azdisabilitylaw.org |

I hereby certify that on this same date, I served the attached proposed lodged sealed document by email, on the following:

Caroline N. Mitchell
Sarah Kader
David Cyrus Fathi
Donald Specter
Amelia Gerlicher

/s/ Daniel P. Struck