Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: dpochoda@acluaz.org
        jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
*Dustin Brislan, Sonia Rodriguez, Christina Verduzco,*
*Jackie Thomas, Jeremy Smith, Robert Gamez,*
*Maryanne Chisholm, Desiree Licci, Joseph Hefner,*
*Joshua Polson, and Charlotte Wells, on behalf of*
*themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON
  SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: skader@azdisabilitylaw.org
        avarma@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | **PLAINTIFFS' MOTION TO COMPEL DISCOVERY IN LIGHT OF THE COURT'S ORDER (DOC. 871) REOPENING DISCOVERY THROUGH APRIL 1, 2014** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

**INTRODUCTION**

With the extension of the relevant time period of discovery and the introduction of a wide array of reports and other information that were not part of the previous record, Defendants have put at issue an extraordinary amount of data.  Their summary judgment filing, with a 474-page, 4,327-fact statement of facts with 40,000 pages of exhibits [Doc. 873], illustrates that their approach is to lard the record with a mass of evidence and to claim that Plaintiffs have failed to demonstrate system-wide constitutional failures.

To respond, Plaintiffs require access to sufficient evidence to test Defendants' claims and to probe beyond the surface of the reports and policies that Defendants claim prove they meet constitutional standards.  An enduring theme of this litigation, from Plaintiffs' perspective, has been the often sizable gap between Defendants' written policies and their actual practices.  As the Court has correctly recognized, "Plaintiffs' claim is that *despite* ADC stated policies, the actual provision of health care in its prison complexes suffers from systemic deficiencies that rise to the level of deliberate indifference."  [Doc. 372 at 13]  Obviously, the mere promulgation of a facially adequate policy (which Plaintiffs do not concede) does not by itself lead to constitutional government conduct.  *See Orantes-Hernandez v. Holder*, 321 F. App'x 625, 628 (9th Cir. 2009) ("The government's insistence that the existence of its forms and policies alone obviates the need for the injunction misses the point . . . .  [T]he injunction seeks to remedy the government's actual practices, not just its policies on paper.")[1]

Accordingly, Plaintiffs should be provided specified documents that show whether these new policies are actually being implemented in practice, or whether they instead constitute a Potemkin village erected solely for the purpose of this litigation.

Plaintiffs invested substantial resources—both time and money—in developing a record as of the September 27, 2013 close of discovery.  The extension of the relevant period was not the result of any wrong-doing by Plaintiffs.  Accordingly, the Court should

---

[1] Plaintiffs' experts have found widespread evidence that ADC and Corizon policies are routinely not followed, sometimes with fatal results.  [*See* Doc. 858 at 5 n. 5]

1   take the steps necessary to ensure that Plaintiffs are not prejudiced by the extension.  A

2   one-sided extension that allows Defendants to inject new evidence while denying

3   Plaintiffs the same quality of evidence to refute that new evidence as they had for the

4   earlier time period, would be highly prejudicial.

5        Plaintiffs have evaluated the new evidence Defendants intend to introduce, the

6   summary judgment motion and statement of facts, and the motion to preclude Plaintiffs'

7   experts and evidence submitted in support, and have proposed reasonable discovery that

8   will enable them to respond to all of this new evidence, both at summary judgment and at

9   trial.   The parties have engaged in meaningful efforts to meet-and-confer about the

10  discovery Plaintiffs need, as detailed in the Declaration of David Fathi, filed herewith.

11  Although the parties have reached agreement on some of the evidence to be produced (*see*

12  Section V), disputes persist.   Plaintiffs respectfully request that the Court compel

13  production of the specific discovery identified below.

14  **BACKGROUND**

15       Prior to the September 27, 2013 discovery cut-off, Plaintiffs requested that it be

16  extended by 90 days.   "[T]o avoid forfeiting the value of the discovery that has taken

17  place," the Court denied Plaintiffs' request for a 90-day extension of discovery and

18  instead ordered narrow additional productions.   [Doc. 567 at 4]  Plaintiffs' subsequent

19  trial preparations focused on the evidence as of the September 27 cut-off, including

20  Plaintiffs' expert reports.   This included relying on prisoner files and extensive other

21  evidence that had been amassed with great effort during the discovery period.

22       When Defendants ignored that cut-off in their own expert reports, Plaintiffs

23  brought a motion to strike, [Doc. 753], which was largely granted on February 26, 2014.

24  Doc. 815.  Plaintiffs took the depositions of Defendants' experts after the Court affirmed

25  the September 27, 2013 cut-off and focused on cross-examining each expert's opinions on

26  evidence as of that date.  *See infra*, Part III.  After those depositions were complete, the

27  Court ruled that it was extending the relevant time period to include a wide array of

28  evidence Defendants sought to introduce from the September 28, 2013 to April 1, 2014

1   period.  [Doc. 871]  The Court made clear that Plaintiffs could obtain some discovery for

2   this additional period, but disputes have arisen over the contours of that discovery.  [*Id.*]

3   The parties met and conferred about those disputes, and reached agreement on some

4   points.  *See* Part V *infra*, Declaration of David Fathi ("Fathi Decl.")[2] ¶¶ 5, 14, Exs. 4, 13.

5   Areas of dispute remain, as detailed below.

6   **ARGUMENT**

7   **I.    Plaintiffs Will Be Prejudiced By The Discovery Extension If They Do Not Receive Access To The Requested Prisoner Files**

8

9        Among the new discovery Defendants are permitted to introduce are eleven reports

10   that aggregate data for more than 23,600 prisoner files for a given month.  The reports, on

11   their face, raise many questions about the accuracy of the data.  For example, the

12   Monitored Conditions Report shows 502 prisoners statewide with diabetes as of March

13   2014—an almost a 40% drop from the 827 prisoners with diabetes listed for February

14   2014.  [*See* Fathi Dec. ¶¶ 15-16, Ex. 14 at ADC265965]  The same report shows a 46%

15   drop in prisoners with heart disease between January and February 2014.  [*Id.*]  The

16   Infectious Disease Report shows a 70% drop in prisoners with AIDS between February

17   and March 2014.  [*Id.* ¶¶ 15, 17, Ex. 15]  Reports from the prior year contain similarly

18   questionable data.  The Chronic Conditions Reports for 2013 and 2014 show a 70%

19   decline in the number of prisoners statewide with serious mental illness (SMI)—from

20   3,178 in October 2013 to only 934 prisoners in February 2014.  [*Id.* at Ex. 14 at

21   ADC230243]

22        To understand whether this data accurately portrays the state of health care in the

23   prisons and whether it supports Defendants' claim that they are providing constitutionally

24   adequate care, Plaintiffs need to be able to test it in two ways:  (1) Plaintiffs need evidence

25   to test whether the more recent data is under-reporting health care needs; and (2) Plaintiffs

26

27

28        [2]  Unless otherwise noted, all citations to exhibits are to the Fathi Declaration.

1    need to review medical files to determine whether prisoners with identified health care

2    needs are receiving constitutionally adequate care.

3         When granting extensions of discovery cut-offs late in litigation, courts allow a

4    sufficient opportunity for the opposing party to identify evidence to avoid prejudice.  *See*

5    *Multibank 2009-1 Res-ADC Venture, LLC v. San Diego Cmty. Housing Corp.*, No.

6    09cv2880 JLS (NLS) 2011 WL 2970921, at *5 (S.D. Cal. July 20, 2011) (reopening

7    discovery so that both parties could conduct discovery and specifically so that the non-

8    moving party could conduct discovery regarding the moving party's previously

9    undisclosed trial exhibits).  Plaintiffs should not be prejudiced by the Court's decision to

10   extend the relevant time period by being deprived of sufficient evidence to prove their

11   case.

12        Plaintiffs asked Defendants to update the health care and institutional files they

13   previously provided for Plaintiffs' experts' inspection or review, to include all new

14   documents in the files since the date of inspection or production through April 1.  Despite

15   having previously criticized Plaintiffs' experts for reviewing too few files,[3] Defendants

16   rejected this proposal as impossible.  [*See* Ex. 4 at 2]  Updating those files would be fair,

17   because Plaintiffs would have access to the same files for the extended period that they

18   had for the original period, and Plaintiffs' experts could review documents from the new

19   time period to determine if their opinions regarding the adequacy of care or conditions of

20   isolation had changed.

21        However, in an effort to resolve this issue with Defendants, Plaintiffs requested

22   that Defendants alternatively produce the following files:[4]

23        ➢ An update of all prisoner files relied on by Plaintiffs' experts;[5]

24   _____

25   [3] Plaintiffs contend the number of files that they reviewed through the
     September 27, 2013 cut-off was adequate and believe that is a defensible position.

26   [4] *See* Fathi Decl., ¶¶ 3-14 and Exs. 2-12 for the correspondence relating to the file
     requests and meet and confers.

27   [5] This includes the health care file of each prisoner specifically named in the
     Plaintiffs' expert reports and the health care and institutional files of prisoners listed in the
28   tour notes of Eldon Vail, for a total of 363 files (Cohen-38; Haney-59; Stewart-73; Vail-
     106; Wilcox-74; Williams-13), excluding the 13 named plaintiff files reviewed.  [*See*

➢ An update of all prisoner files where Plaintiffs wrote to Defendants and brought a specific prisoner's need for medical treatment to Defendants' attention; and,

➢ A random sample of the past year's worth of documents in the health care and institutional files of prisoners referenced in the reports that Defendants are now adding to the record. Where there is a substantial change in the number of prisoners with a reported condition, Plaintiffs also asked for a random sample of the files of prisoners removed from the reports, to ensure that the removal was medically justified. [*See* Appendix A]

The parties met-and-conferred regarding Plaintiffs' proposal, and reached partial agreement, but disputes remain for the Court's resolution.

**A.    Files of Prisoner Whose Cases Plaintiffs' Experts Relied Upon**

Plaintiffs' experts reviewed and described inadequate conditions of confinement regarding medical care, mental health care, isolation and dental care for a sufficient number of prisoners to prove that Defendants' conditions of confinement are constitutionally inadequate. Defendants will now claim that information is stale. Plaintiffs need access to updated versions of the health care and institutional files of prisoners whose cases they relied upon to demonstrate that the unconstitutional conditions persist. Plaintiffs' experts should not be exposed to cross-examination on the currency of their opinions because a very belated extension of the relevant time period deprived them of sufficient information to meaningfully update their opinions.

Plaintiffs respectfully request the Court order Defendants to produce **all new documents in the healthcare and institutional files previously relied upon by Plaintiffs' experts, from the date of prior production or review through April 1, for the prisoners listed in Exhibit 5, at Attach. A.**

**B.    Prisoners Whose Medical Needs Were Specifically Brought to Defendants' Attention by Plaintiffs.**

During the course of the litigation, Plaintiffs have identified prisoners with significant medical needs and brought those individual cases to Defendants' attention. [*See* Ex. 16] Plaintiffs seek the production of a year's worth of documents from the

Ex. 5, Attach. A]

1  medical files of 19 of these prisoners.  [Ex. 5 at 1, Attach. B]  If Defendants have not

2  addressed these prisoners' needs and provided them constitutionally adequate care, that

3  will be a significant indicator of the adequacy of the medical care being provided to class

4  members system-wide.  If individual advocacy by an opposing party in litigation cannot

5  secure adequate medical attention for persons with serious health care needs, then the

6  likelihood that other prisoners with substantial needs are successfully navigating the

7  medical care system appears low.  Accordingly, given Defendants' contention that there

8  have been significant recent improvement, Plaintiffs and their experts should be allowed

9  to test this contention with review of these health care files.

10  Plaintiffs respectfully request the Court order Defendants to produce **all**

11  **documents dated April 1, 2013 to April 1, 2014 in the healthcare files of prisoners**

12  **whose medical needs were specifically brought to Defendants' attention by Plaintiffs'**

13  **counsel, for the prisoners listed in Exhibit 5, Attachment B.**

14  ### C.  Prisoners Whose Files Are Relevant to the Reports and Evidence
15  Defendants Were Allowed to Introduce

16  The Court is allowing Defendants to introduce 21 types of reports and five areas of

17  evidence (that did not identify specific documents or reports) that post-date the

18  September 27, 2013 cut-off that previously governed the parties' pre-trial preparation.

19  Plaintiffs request less than 2 percent of files to test the accuracy of these reports.

20  Plaintiffs seek production of a sample of the files that underlie these reports.  The

21  parties have agreed on the methodology for this selection, [Exhibit 5 at 2] including the

22  number of files that will be produced—approximately 150 files in total.  However, on

23  May 16 the parties reached an impasse on two details.  [Ex. 13]

24  First, for the health conditions where there was a decrease of 20% or more in the

25  past year in the number of prisoners listed, Defendants have thus far refused to produce a

26  sampling of files from the universe of prisoners who were dropped from the lists.[6]

27  _____

28  [6]  There are nine medical conditions for which there was a drop of more than 20% in the number of people listed within the past year:  heart disease, diabetes, tuberculosis,

Second, Defendants stated they would only produce documents in these files for the six month time period of September 27, 2013 to April 1, 2014.  Plaintiffs require a year's worth of documents from these files for their experts' review, because one purpose of these reviews are to determine if prisoners with certain conditions are being seen regularly by their providers, and a six month window is too short to make a thorough assessment.

Plaintiffs respectfully request the Court order Defendants to produce:

> **(1)    Using the agreed upon methodology, a sample of health care files from the prisoners who were dropped from the heart disease, diabetes, AIDS, serious mental illness, and MRSA conditions lists;**
>
> **(2)    For all health care files produced, provide all documents dated between April 1, 2013 and April 1, 2014.**

For reports for which this methodology does not work – Dental Wait Time and Dental Utilization Reports, Mental Health Service Technical Manual Modifications, and Director's Instruction 326 – Plaintiffs proposed that Defendants produce 20 dental files per institution from 5 prisons, 10 files per institution of Seriously Mentally Ill (SMI) prisoners at 7 facilities that house prisoners with higher levels of mental health needs, and 20 health care and institutional files from prisoners at each of the four isolation units (Eyman-Browning, Eyman-SMU I, Florence-Central (including Kasson), and Perryville-Lumley SMA).  [Ex. 5 at 2-3]

The parties reached an agreement on dental files, (*see* Part V), but an impasse on the other two issues.  Plaintiffs respectfully request the Court order Defendants to produce:

> **(1)    Ten health care files (April 1, 2013-April 1, 2014) for SMI prisoners per institution at Phoenix, Perryville, Lewis, Yuma, Eyman, Florence, and Tucson prisons.**

---

AIDS, serious mental illness (SMI), MRSA, chlamydia, syphilis, and gonorrhea.  [Fathi Decl. ¶ 15, Exs. 14-15]  Of those nine, Plaintiffs have requested medical files relating to five categories:  heart disease, diabetes, AIDS, serious mental illness, and MRSA. Defendants are still evaluating this request, and plaintiffs will update the Court if they agree to production.

(2)     **Twenty health care and institutional files (April 1, 2013-April 1, 2014) for prisoners at each of the isolation units (Eyman-Browning, Eyman-SMU I, Florence-Central (including Kasson), Perryville-Lumley SMA).**

II.     **Plaintiffs Will Be Prejudiced by the Extension of the Cut-Off Date if Complete Records Are Not Produced for All Prisoners Who Received Medical Parole ("Imminent Danger" Release) Between Sept. 27, 2013 and April 1, 2014**

Plaintiffs requested documents in the health care files for the year prior to release for three terminally ill prisoners granted medical parole ("imminent danger" release) by the Arizona Board of Executive Clemency in the six month period.[7]   [Ex. 2 at 2] Defendants refuse to produce these documents on the grounds that Plaintiffs had not previously made such a document request.  [Ex. 5 at 3-4]

Defendants' objection is baseless; there is nothing in the Court's order [Doc. 871] limiting reopened discovery to past document requests.  Similar to the health records of prisoners who died in ADC custody, these documents are critical to evaluate the medical care provided prior to commutation.  In fact, Plaintiffs' Counsel has learned that two of the three people died within weeks of release, showing how sick they had become while in prison, and had they not been released, they would have died in custody.  [Fathi Decl. ¶ 25].  Plaintiffs need an opportunity to show that Defendants are decreasing the statistics on the number of deaths by releasing prisoners shortly before their deaths.

Plaintiffs respectfully request the Court order Defendants produce: **health care records for the year prior to release for the three prisoners granted "imminent danger" release between September 27, 2013 and April 1, 2014.**

III.    **Plaintiffs Will Be Prejudiced by the Extension of the Cut-Off Date if They Are Not Allowed to Depose Defendants' Experts on their Reliance on Post-September 27 Facts and Developments**

Under the Court's February 6, 2014 Order, April 11, 2014 was deadline for completing expert depositions.  [Doc. 780 at 2]  Plaintiffs deposed Defendants' expert witnesses on April 4 (Dovgan), April 9 (Mendel), April 10 (Seiter), and April 11 (Penn). At that time, the Court had ruled that September 27, 2013 was the cut-off date for

---

[7]  Clemency board staff provided Plaintiffs' counsel with these individuals' names and release dates.

1    evidence to be admitted at trial; evidence of developments after that date would not be

2    admitted on the issue of Defendants' liability.  [Feb. 26, 2014 Order, Doc. 815 at 2-3]

3          In compliance with and reliance upon the order in effect, Plaintiffs limited their

4    depositions of Defendants' experts to their opinions based on facts as they existed on or

5    before September 27, 2013, and explicitly advised the experts of this limitation at the

6    outset of the depositions:

7          Q.  Okay.  Also today, consistent with the Court's order, at this deposition
           I'm only going to be asking you for your knowledge of conditions in ADC
8          up to September 27th, 2013.

9          Ex. 17, Seiter Dep., p. 10, lines 21-14.

10         Q.  Now, the Court has ruled in this case that the cutoff date for evidence is
           September 27th, 2013.  So I'm going to be asking you about conditions in
11         the Arizona prison system as they existed on or before September 27th,
           2013.

12   [Ex. 18, Penn Dep., p. 27, line 23 – p. 28, line 2]

13

14         On April 30, 2014, the Court reversed its earlier ruling and indicated its intention to

15   admit evidence through April 1, 2014.  Doc. 871.  Accordingly, the depositions of

16   Defendants' experts should be reopened to allow Plaintiffs to question them about their

17   reliance on facts and developments between September 27, 2013 and April 1, 2014.

18         Defendants' experts have placed decisive reliance on post-September 27 facts and

19   developments in forming their opinions.  Indeed, all of Defendants' experts except Dr.

20   Seiter conducted expert tours after September 27; *all* of Dr. Penn's tours took place after

21   that deadline.  A comprehensive list of the post-September 27 information relied upon by

22   Defendants' experts in their initial December 2013 reports can be found at Doc. 753-1.

23         Defendants continued to supply their experts with post-September 27 evidence

24   even after the experts had submitted these reports.  Dr. Penn conducted an additional

25   prison inspection on March 24, 2014.  All of Defendants' experts submitted supplemental

26   reports on March 26, 2014, which relied heavily on post-September 27 developments.[8]

27   _____

28         [8] *See* Ex. 19, Dovgan Supp. Report, March 26, 2014, Ex. A (citing October 2013
     MGAR reports and dental records through February 2014); Ex. 20, Mendel Second Supp.

1      It is axiomatic that Plaintiffs must be allowed to depose Defendants' experts on *all*

2   the facts and data they relied upon in forming their opinions.  The Court's order extending

3   the evidence cutoff date by more than six months was a significant change in the litigation

4   that postdated  Plaintiffs' depositions of Defendants' experts.   At the time of those

5   depositions in early April 2014, Plaintiffs reasonably and in good faith relied upon the

6   Court's order excluding evidence after September 27, 2013.  They should not now be

7   penalized for that reliance.  **Plaintiffs should accordingly be allowed to reopen each of**

8   **Defendants' experts' depositions for four hours to examine his opinions that rely on**

9   **facts and developments between September 27, 2013 and April 1, 2014**. [9]

10  **IV.     Plaintiffs Will Be Prejudiced by the Extension of the Cut-Off Date if They Do**

11  **Not Receive Additional Discovery to Test Defendants' New Evidence.**

12      In addition to supplements and samples of health care files and institutional records

13  (*see* Part I and II), Plaintiffs requested certain specific discovery needed to test

14  Defendants' new evidence.  Plaintiffs bifurcated their request between documents needed

15  immediately to prepare their opposition to Defendants' summary judgment motion

16  (currently due on June 18, 2014), versus documents needed by mid-July for trial.

17  Defendants have agreed to produce some documents, but in several cases have either

18  refused to produce documents by a date certain, or have refused to produce the documents

19  at all.

20

21

22  Report, March 26, 2014, Ex. A (citing MGAR reports through December 2013, medical
    records through February 2014, and February 2014 NCCHC reports); Ex. 21, Penn Supp.

23  Report, March 26, 2014, Ex. A (same as Mendel, as well as January 1, 2014 Mental
    Health Technical Manual (MHTM)); Ex. 22, Seiter Supp. Report, March 26, 2014, at 2

24  (citing January 1, 2014 MHTM as an "important new document"); *id.* at 14 (citing
    March 6, 2014 interview with Dr. Taylor); *id.* at 25 (March 7, 2014 interview with ADC
    Northern Region Operations Director McWilliams).

25  [9]   The Court's April 30 order allows Plaintiffs "4-hour supplemental depositions of
    Defendants' experts who supplement their reports limited to their supplemental opinions."

26  [Doc. 871 at 2]  Plaintiffs should be allowed a seven-hour deposition of any expert who
    supplements his report, to allow for questioning on both supplemental opinions and the

27  expert's reliance on post-September 27 information.  If an expert does not supplement his
    report, Plaintiffs should be allowed a four-hour deposition to explore the expert's reliance

28  on post-September 27 developments.

**A.**     **Documents Needed Immediately for Summary Judgment Opposition**

Plaintiffs identified categories in Defendants' supplemental briefs [Doc. 851 at 11-14; Doc. 857 at 2] where Defendants did not describe or name the documents that they planned to rely upon; rather they said they would "introduce evidence" on a particular topic or policy change.   Plaintiffs requested that to the extent there were documents Defendants planned to introduce or use as the basis of arguing the existence of facts, they be identified and produced.   Likewise, Plaintiffs requested documents sufficient to show that announced policy changes were implemented in practice.   *See Ware v. Jackson Cnty.,* 150 F.3d 873, 882 (8th Cir. 1998) ("the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced"). Specifically,[10] Plaintiffs requested the following documents dated prior to April 1, 2014 be produced immediately:

> ➢ Medication Administration Modifications:  Defendants described four changes to the way medications are administered and distributed to prisoners.  [Doc. 851 at 13]  Plaintiffs have requested (1) drafts of the four policy changes (if they existed), and (2) documents sufficient to show training of health care and custody staff on the new policies has occurred.  [Ex. 2 at 12]

> ➢ Director's Instruction 326:  Defendants described this new policy for prisoners in isolation units designed to provide more out-of-cell activities and privileges based on their behavior and programming.  [Doc. 851 at 13] Plaintiffs requested (1) documents sufficient to show the program changes have been implemented, and (2) any institution or unit-specific post orders or memos implementing the changes.[11] [Ex. 2 at 12]

> ➢ Mental Health Services Technical Manual:   Defendants will rely on a January 1, 2014 revision to the Mental Health Services Technical Manual (MHSTM) which, according to Defendants, contains policy revisions in 17

---

[10]  Plaintiffs are mindful of the Court's instruction to present it "with a specific dispute about specific, identifiable documents."  Doc. 871 at 3.  At the meet and confers, the parties discussed what might specifically be "documents sufficient to show," but Counsel for Defendants could not give a specific name for a document.
   The Court has authorized 30(b)(6) depositions on these topics, and the depositions will presumably allow Plaintiffs to identify at least some of the relevant documents. However, in light of the Court's admonition that "[t]his supplemental discovery is the only discovery that will be permitted" [Doc. 875 at n.1], Plaintiffs are obliged to include a request for these documents in the instant motion.
[11]  At the May 8 and 16 meet and confers, Defendants stated that they would check to see if there are logs or other documents that show program changes have occurred, and to the extent any institution-specific post orders or memos to staff were issued prior to April 1, would produce them.  [Ex. 4 at 6, Ex. 13; *see also* Part V below]

different areas of mental health care.  [Doc. 851 at 11-12]  Plaintiffs requested documents sufficient to show if these 17 revisions are being implemented.  [Ex. 2 at 11-12]

➢ Crisis Intervention/Suicide Intervention:  Defendants will rely on evidence of recent trainings of staff on crisis intervention and suicide prevention, and the creation of security "rover" positions, to rebut Plaintiffs' mental health claims and claims regarding conditions of confinement in isolation.  [Doc. 851 at 14]  Plaintiffs requested (1) Serious Incident Reports (SIRs) and supporting documentation and videos for any incidents of self-harm and attempted suicides, and (2) schedules for the new rovers showing hours actually worked, and in which housing units.[12]  [Ex. 2 at 12]

➢ Prisoner Self-Harm and Mortality Data:  Defendants said this data is evidence that rates of self-harm and suicide are decreasing, and they will use it to rebut Plaintiffs' conditions-of-confinement claims, including the challenge to the use of chemical agents on prisoners on psychotropic medications.  [Doc. 857 at 2]  Plaintiffs requested SIRs on the use of force in isolation, including videos and reports for any use of force on prisoners on psychotropic medication. [Ex. 2 at 12]  Defendants refuse to produce these SIRs. [Ex. 4 at 6, Ex. 13]

Therefore, Plaintiffs request the Court order Defendants to produce:

**(1) Drafts of the changes in medication administration policy, if there are any;**

**(2) Documents sufficient to show training of health care and custody staff on the new medication policies;**

**(3) Serious Incident Reports (SIRs) and supporting documentation for any use of force on prisoners on psychotropic medication.**

Finally, one of the reports Defendants plan to introduce is their Monthly Infectious Disease/Clinical Report, which purportedly "shows the total number of inmates who are receiving treatment for infectious diseases . . . [and] will show there is not a systemic deficiency."  [Doc. 851 at 4]  The diseases recorded in the reports include HIV/AIDS, Hepatitis A/B/C, tuberculosis, MRSA, and sexually transmitted infections.  [*Id.*]

In order to determine if the reports accurately reflect prisoners are actually receiving adequate treatment for infectious diseases, Plaintiffs requested "[a]ny correspondence, memos, or investigations" on two topics:   (1) the September 2013

---

[12] Defendants agreed to produce these suicide attempt/self-harm SIRs, and the parties agreed that Plaintiffs may choose two days from each month from October 2013 through March 2014, and Defendants will produce records from those days showing the hours actually worked by rovers, and in what units.  [*See* Part V]

1    exposure of diabetic prisoners to Hepatitis C (and other infectious diseases) due to a

2    nurse's re-use of a syringe or vial, and (2) the outbreak of infectious diseases at the

3    infirmaries at the Florence, Perryville, and Tucson prisons.  [Ex. 2 at 4]  Defendants

4    would not discuss any request regarding email or communications, stating they refuse to

5    produce any email or do any ESI searches.  [Ex. 4 at 7, *see also infra* Part IV(B)]

6        Plaintiffs are prejudiced if they are not allowed documents regarding these two

7    topics, because they go to show if the prisoners exposed to Hepatitis C (and/or other

8    diseases) at Lewis prison, and prisoners exposed in the three infirmaries to MRSA,

9    scabies, and other infectious diseases, are receiving adequate treatment, and what steps, if

10   any, Defendants have taken to address future outbreaks of infectious disease at these four

11   facilities.  This is a narrow request regarding specific incidents and facilities.  Plaintiffs

12   are asking for a limited date range, have search terms to be used to further narrow the

13   request, and have identified the four ADC employees whose correspondence or files

14   should be searched.

15       Specifically, Plaintiffs request (1) a search for the time period of September 27,

16   2013 to April 1, 2014, (2) and only in the records of Defendants Ryan and Pratt, former

17   ADC Health Care Monitoring Bureau Director Arthur Gross, and ADC Medical Program

18   Monitor Dr. David Robertson.  Plaintiffs will provide Defendants with narrow search

19   terms to use.

20       Plaintiffs respectfully request that the Court order Defendants:  **produce copies of**

21   **correspondence, memos, or investigations into the September 2013 exposure of**

22   **Hepatitis C at Lewis prison, and any outbreaks of infectious diseases at the**

23   **infirmaries at Perryville, Tucson, and Florence prisons, using the limits proposed by**

24   **Plaintiffs.   To the extent any document is withheld on the basis of privilege,**

25   **Defendants must produce a privilege log.**

26       **B.    Documents Needed by July for Trial**

27       In their initial review of these various reports Defendants are now permitted to use,

28   Plaintiffs' counsel observed that the data and numbers listed do not appear to be accurate.

For example, many reports will list a prison with nothing but zeroes under it, likely indicating that no data was reported for that month.   Another example is that in Defendants' diabetes report, the number of prisoners listed as diabetic dropped by more than 300 from February to March 2014.   *See* Part I above.   Given the apparent inconsistencies and problems in the data itself, Plaintiffs requested that no later than July 18, 2014, Defendants provide the following discovery for specified reports:

> ➢ Any analysis or discussion, formal or informal, regarding the quality, sufficiency, or limitations of the data gathered by Corizon and/or ADC for the report, including but not limited to quality assurance reports, reviews or spot checks of the data, and discussions contained in emails or memos regarding the quality, sufficiency, or limitations of the data.

> ➢ All underlying data for the reports produced from October 2013 to March 2014.

> ➢ Any written instructions to staff who gather, compile, report, or enter data that is used in the reports.

[Ex. 2 at 9]

Defendants flat out refused to discuss this request, stating that they were not going to perform ESI searches or provide email.  [Ex. 4 at 7]  Defendants' expert reports, and their summary judgment motion, are based squarely on these reports and the data therein. To the extent the data is inaccurate or missing, Plaintiffs need the requested documents (1) to identify and confirm what Plaintiffs believe are the causes of the deficiencies in the data, (2) determine whether Defendants are aware of the data deficiencies (yet are presenting the data as accurate to the Court), and (3) what steps, if any, ADC and Corizon have taken to improve the accuracy of the data and train the staff who are supposed to gather, compile, report, or enter the data.  These types of quality assurance documents appear to have been contemplated by this Court, as it noted that appropriate discovery would include "documents supporting computation and definition of wait times or statistics."  [Doc. 871 at 2]

Specifically, Plaintiffs request (1) a search for the time period of September 27, 2013 to April 1, 2014, (2) and in the records of Defendants Ryan and Pratt, former ADC Health Care Monitoring Bureau Director Arthur Gross, ADC Medical Program Monitor

Dr. David Robertson, ADC Mental Health Program Monitor Dr. Nicole Taylor, and ADC Dental Program Monitor Karen Chu.  Plaintiffs will provide Defendants with narrow search terms to use.

Plaintiffs respectfully request that the Court order that Defendants produce no later than July 18, 2014:

> **(1)** **Any correspondence, memos, or email regarding the quality, sufficiency, or limitations of the data gathered by Corizon and/or ADC for the reports, using the limits proposed by Plaintiffs;**

> **(2)** **Any written instructions provided to staff who gather, compile, report, or enter data that is used in the reports.**

**To the extent any document is withheld on the basis of privilege, Defendants must produce a privilege log.**

**V.    Issues the Parties Have Resolved.**

The parties have reached agreement that Defendants will produce the following documents:

> ➢ Dental care:  Routine care list for each facility on the day the March 2014 wait time report was run, showing date of request and type of treatment requested; and appointment list from December 1, 2013 to March 31, 2014 for Perryville, Lewis, Eyman, Yuma, and Safford, including date seen, date of HNR, and type of appointment or reason seen.  Further, Defendants will produce dental records for 80 prisoners from the appointment list, based on mutually agreed methodology.  [Ex. 2 at 4; Ex. 13]

> ➢ Samples of Health Care Files:  Using the methodology proposed by Plaintiffs, a sample of health care files for prisoners who appear on the new reports and lists for certain medical conditions, for the period of September 27, 2013 to April 1, 2014.  The time period and the scope of the pull list is disputed.  (*See* Part I(C) above).

> ➢ Director's Instruction 326:  Documents sufficient to show whether programmatic changes in isolation units have been implemented, including any logs or any institution-specific instructions, post orders, etc. that were generated before April 1, 2014.  (*See* Part IV above).

> ➢ Crisis Intervention/Suicide Prevention:  Serious incident reports (SIRs) and supporting documentation and videos for any incidents of self-harm and attempted suicide, and Plaintiffs may choose two days from each month from October 2013 through March 2014, and Defendants will produce records from those days showing the hours actually worked by security rovers, and in what units.  (See Part IV above).

1
2
    ➢ <u>Mental Health Services Technical Manual</u>:  Documents sufficient to show whether the 17 policy revisions to the Mental Health Services Technical Manual have been implemented.  (See Part IV above).

3
4
5
    Plaintiffs respectfully request the Court to order Defendants to **complete their production no later than May 30, 2014, in light of Plaintiffs' June 18, 2014 deadline to file their response to Defendants' summary judgment motion.**

6
7
8
    Additionally, the parties have reached agreement that Defendants will begin immediately to produce on a rolling basis as they are compiled, and Defendants state that they will try to complete the production no later than mid-July:

9
10
    ➢ <u>Death records</u>:  All death records (health care files, psych autopsies, mortality reviews, internal investigations) for all prisoners who died between September 27, 2013 and April 1, 2014.

11
12
    Plaintiffs respectfully request the Court order Defendants **to complete their production of death records no later than July 18, 2014.**

13
    A proposed order is filed herewith.

14
Dated:  May 16, 2014               **ACLU NATIONAL PRISON PROJECT**

15
16
17
18
19
20
21
By:   s/ David Fathi
      David C. Fathi (Wash. 24893)*
      Amy Fettig (D.C. 484883)**
      Ajmel Quereshi (Md. 28882)**
      **ACLU NATIONAL PRISON PROJECT**
      915 15th Street N.W., 7th Floor
      Washington, D.C. 20005
      Telephone:  (202) 548-6603
      Email:    dfathi@npp-aclu.org
                 afettig@npp-aclu.org
                 aquereshi@npp-aclu.org

22
23
      *Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
      **Admitted *pro hac vice*

24
25
26
27
28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              keidenbach@perkinscoie.com
              jhgray@perkinscoie.com
              mdumee@perkinscoie.com
              jpeters@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
              jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Warren E. George (Cal. 53588)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              ckendrick@prisonlaw.com
              wgeorge@prisonlaw.com

*Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
              aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
              tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
              jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone: (949) 851-3939
Email:    kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

1                              **ARIZONA CENTER FOR DISABILITY LAW**

2

3                              By:   s/ Sarah Kader

4                                  Sarah Kader (Bar No. 027147)
                                  Asim Varma (Bar No. 027927)

5                                   5025 East Washington Street, Suite 202
                                  Phoenix, Arizona 85034

6                                   Telephone:  (602) 274-6287
                                  Email:     skader@azdisabilitylaw.org

7                                                        avarma@azdisabilitylaw.org

8                                   J.J. Rico (Bar No. 021292)
                                  Jessica Jansepar Ross (Bar No. 030553)

9                                   **ARIZONA CENTER FOR DISABILITY LAW**
                                  100 N. Stone Avenue, Suite 305

10                                  Tucson, Arizona 85701
                                 Telephone:  (520) 327-9547

11                                  Email:     jrico@azdisabilitylaw.org
                                                jross@azdisabilitylaw.org

12

13                              *Attorneys for Arizona Center for Disability Law*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on May 16, 2014, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                                Michael E. Gottfried
                                 Katherine E. Watanabe
7                                  Lucy M. Rand
                           Assistant Arizona Attorneys General
8                             Michael.Gottfried@azag.gov
                              Katherine.Watanabe@azag.gov
9                                Lucy.Rand@azag.gov

10                               Daniel P. Struck
                                 Kathleen L. Wieneke
11                               Timothy J. Bojanowski
                                   Rachel Love
12                               Nicholas D. Acedo
                                 Ashlee B. Fletcher
13                               Anne M. Orcutt
                                  Jacob B. Lee
14                       STRUCK WIENEKE, & LOVE, P.L.C.
                                dstruck@swlfirm.com
15                              kwieneke@swlfirm.com
                               tbojanowski@swlfirm.com
16                               rlove@swlfirm.com
                                nacedo@swlfirm.com
17                              afletcher@swlfirm.com
                                aorcutt@swlfirm.com
18                               jlee@swlfirm.com

19                            *Attorneys for Defendants*

20                                          s/ S. Neilson

21

22

23

24

25

26

27

28