**EXHIBIT 1**

**EXHIBIT 1**

**From:** Halloran, Wendy [mailto:whalloran@kpnx.com]
**Sent:** Friday, May 02, 2014 2:51 PM
**To:** NICK, DOUG; LAMOREAUX, BILL; RYAN, CHARLES
**Cc:** DBodney@steptoe.com; Phillips, Mark
**Subject:** Media Request from Wendy Halloran at 12 News

Dear Director Ryan, Bill and Doug,

Thank you. If I can't get this request fulfilled in one week, I would like the actual amount of the billing expenses for Parsons et al. v. Ryan et al. from the law firm Struck Wieneke & Love to the department from October 2013 through April 2014. I will take that figure if the documents can't be provided for my deadline.

Also, I must take this time to point something out. What is the reason you have redacted the billing expenses for the law firm? We believe these blanket redactions are unacceptable and the public has a right to know exactly what it is paying for.

At this time, I ask for you to lift the redaction. And if you are unwilling, you will need to provide me with a basis for redaction that is acceptable under the law. I am copying our attorney David Bodney on this email.

Best Regards,

Wendy Halloran

***Wendy Halloran***
Investigative Reporter
P: 602 444-1357
C: 602 526-0640
whalloran@12news.com

**12 NEWS/KPNX-TV**
**200 E. Van Buren Street**
**Phoenix, AZ 85004-2238**

**From:** NICK, DOUG [mailto:DNICK@azcorrections.gov]
**Sent:** Friday, May 02, 2014 9:40 AM
**To:** Halloran, Wendy; LAMOREAUX, BILL; RYAN, CHARLES
**Subject:** RE: Media Request from Wendy Halloran at 12 News

Wendy:

I have received this request and we are reviewing.

Doug

**From:** Halloran, Wendy [mailto:whalloran@kpnx.com]
**Sent:** Thursday, May 01, 2014 6:52 PM
**To:** LAMOREAUX, BILL; NICK, DOUG; RYAN, CHARLES
**Subject:** Media Request from Wendy Halloran at 12 News

Dear Director Ryan, Bill and Doug,

I hope this finds you well. I am going to need a supplement to my prior request for records.

I will need the current billing records related to the litigation Parsons et al. v. Ryan et al. from the law firm Struck Wieneke & Love to the department from October 2013 through April 2014, including both the outside law firms and expert witnesses.

My request did not cover that time frame, so I need more recent information on how much money has been spent defending this class action lawsuit.

Please let me know how soon you can make these records available for inspection and copying. I am working on an investigative report and will be calling soon with details and seeking comment, if you can. Which I realize, because of the pending litigation you might not be able to.

Please let me know about the current billing records at your earliest convenience.

Best Regards,

Wendy Halloran

*Wendy Halloran*
Investigative Reporter
P: 602 444-1357
C: 602 526-0640
whalloran@12news.com

**12 NEWS/KPNX-TV**
**200 E. Van Buren Street**
**Phoenix, AZ 85004-2238**



**EXHIBIT 2**

**EXHIBIT 2**

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **Victor Parsons**, et al., on behalf of themselves and all others similarly situated; and **Arizona Center for Disability Law**, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| vs. | ) |
| **Charles Ryan**, Director, Arizona Department of Corrections; and **Richard Pratt**, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

No.  **CV 12-00601-PHX-NVW**

**Phoenix, Arizona**
**August 7, 2013**
**10:00 a.m.**

_____

BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**

(*Motion Hearing*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

16

**August 7, 2013 - Motion Hearing**

1    have this ready to go?

2            MR. ACEDO:  Well, we are on the tail end.  I would

3    estimate we're probably two-thirds of the way through.  This

4    last third is the home stretch.  We have got a lot of

5    depositions, a lot of depositions to take.  If we take them        10:21:25

6    now --

7            THE COURT:  I'm not sure I bought into the 50 or 75

8    depositions.

9            MR. ACEDO:  We don't either.  Again, I'm playing a

10   guessing game.  But even if it was eight more --                    10:21:36

11           THE COURT:  By the way, I apologize for being

12   disorganized in my comment, but you are going to have to submit

13   to more than two hours of deposition for Mr. Ryan and Mr. -- is

14   it Mr. Pratt, or -- but the federal rule presumptively says

15   seven hours, but that's really a minor issue.  This really         10:21:59

16   bleeds over into discovery management.

17           MR. ACEDO:  And if I could just finish with the

18   discovery, we are at the tail end.  But there are still 12

19   expert tours, one going on right now.  Those don't need to take

20   place.                                                             10:22:20

21           THE COURT:  I don't understand these expert tours.

22   They look to me like they are being done in lieu of

23   interrogatories, walking around the prison asking people

24   questions.  That's what interrogatories are for.

25           MR. ACEDO:  And that has been our position from the        10:22:32

17

August 7, 2013 - Motion Hearing

1   get-go.  But we heeded this Court's advise to act reasonably.

2   We did not want to have to fight that in front of you.

3        THE COURT:  I fear that I may have intimidated you all

4   earlier, and I regret that.

5        MR. ACEDO:  Well, we're 41 tours into it.  And that's        10:22:48

6   the past.  But the fact of the matter is there's 12 left.  And

7   none of them are mental health tours.  I believe eight of the

8   12, none of the plaintiffs are there.  Two of the three experts

9   that are touring have already conducted tours at other

10  facilities.  There's no reason for those to happen, none.  As    10:23:06

11  far as the depositions, even if you cut it off at 25, they

12  still have some left.

13       From our view --

14       THE COURT:  What do these depositions -- this issue of

15  the systemic and class challenge here, I have always understood  10:23:28

16  to be aimed at the gross level of provision of services that

17  seem to me to be easily ascertainable from gross data and

18  applying them to industry standards about providing medical

19  care to -- in correction settings.  I have not envisioned that

20  that meant walking through all the prisons asking lots of        10:23:54

21  people questions.

22       I will give you a -- I apologize if this comparison is

23  not fair.  But if you want to know how many people are riding

24  on a bus system you can look at the data at the central

25  management of the bus system, or you can interview lots and      10:24:16

UNITED STATES DISTRICT COURT

————August 7, 2013 - Motion Hearing————

1  lots of people at the bus stations.  Looks to me like they are

2  interviewing people at the bus stations.  And so I have got

3  serious concerns about how this whole thing is going.

4          MR. ACEDO:  As do we.  As do we, Your Honor.  And

5  that's why we have focused on the tours so much.  And it's                 10:24:34

6  baffling in plaintiffs' discovery proposal, they spend most of

7  it complaining that they weren't even broader than they wanted.

8  That's unbelievable.  They essentially provided a list of

9  deposition questions that they didn't get to ask, that we were

10  protecting individuals because -- protecting ourselves because        10:24:54

11  there were no -- this is a Rule 34 deposition.  We had no

12  protection.  They were roving depositions.

13          But that's besides the point.  We agree these expert

14  tours are outrageous, excessive, unduly burdensome.  There's 12

15  left and those can stop.  Those can stop today, right now.              10:25:12

16          THE COURT:  Well, I have come back to the fact that a

17  lot of them have already been done, and I am very reluctant to

18  waste what's been done, even if it was excessive.  I am much

19  more inclined to bring this to closure so that we do not run

20  the risk of a year or two from now having to do this all over         10:25:29

21  again if the Court of Appeals certifies the class

22  certification.  That would be a waste that would be

23  intolerable.

24          So I'm really looking for a way to bring to an end

25  what I fear may be inappropriate discovery so that we have              10:25:49

1

2

3

4

5                     C E R T I F I C A T E

6

7           I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10          I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15          DATED at Phoenix, Arizona, this 8th day of August,

16   2013.

17

18                       s/Laurie A. Adams

19                       Laurie A. Adams, RMR, CRR

20

21

22

23

24

25

**EXHIBIT 3**

**EXHIBIT 3**

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**BY EMAIL TRANSMISSION ONLY**

May 19, 2014

Mr. Tim Bojanowski
Struck, Wieneke & Love
3100 W. Ray Rd., Suite 300
Chandler, AZ 85226

Dear Tim:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

I write in response to your letter of May 15.  You purport to summarize the parties' May 8 discussion regarding expert inspections of the isolation units by Dr. Haney and Mr. Vail, but your account of this discussion is unfortunately not entirely accurate.

If there are photographs depicting the physical plant changes that have allegedly taken place in the isolation units, plaintiffs request that they be promptly produced.  We also request production of documents showing that programs described in ADC and Corizon policies are actually being provided in the isolation units.  At no time during our May 8 telephone conversation did we reject any offer of such photographs or documentation.

We did say that photographs and program documentation are not a substitute for Plaintiffs' experts viewing these allegedly changed conditions on-site -- just as defendants' experts did -- and talking with the class members who are the purported beneficiaries of these changes.  I did not interrupt anyone during the call, but once defendants had made clear that they would not permit the requested expert tours and declined to reconsider their position, I did say that there was little point in arguing about the issue further.

Very truly yours,

David C. Fathi

Cc:     All counsel of record

**EXHIBIT 4**

**EXHIBIT 4**

# In The Matter Of:

*Parsons  vs.*

*Ryan*

---

*Richard P. Seiter, Ph.D. - videotaped*

*April 10, 2014*

*Confidential - Subject to Protective Order*

---

*7330 North 16th Street, Suite A100*

*Phoenix, Arizona  85020*

*602.266.6535 Office    877.266.6535 Toll Free*

*www.glennie-reporting.com*

*office@glennie-reporting.com*



Glennie Reporting Services

Original File 041014rs.txt

Min-U-Script® with Word Index

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

10

1   it.

2       Q    Okay.  Did you bring any documents with you

3   today?

4       A    No.

5       Q    All right.  So I want to start with a little

6   bit of terminology so we're all on the same page.

7       A    Okay.

8       Q    When I say ADC, I mean the Arizona Department

9   of Corrections.  And when I say isolation or isolation

10  units, I'm referring to the Court's order, the

11  terminology the Court has adopted in this matter, which

12  is the subclass of prisoners who were subjected to

13  confinement in a cell for 22 hours or more each day or

14  confinement in the following housing units:  Eyman

15  Special Management Unit, Eyman Browning Unit, Florence

16  Central Unit, Florence Kasson Unit, or Perryville

17  Lumley Special Management Area.

18      A    Okay.

19      Q    Do you understand that terminology?

20      A    Yes.

21      Q    Okay.  Also today, consistent with the Court's

22  order, at this deposition I'm only going to be asking

23  you for your knowledge of conditions in ADC up to

24  September 27th, 2013.

25      A    Up to September --

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

11

1    Q    Up to --

2    A    -- 27th, 2013?

3    Q    Exactly.

4    A    And when you say my knowledge of conditions --

5    okay.  I think I understand.

6    Q    All right.  If it's unclear at any point in

7    time, I -- I will try to clarify for you.

8    A    All right.

9    Q    All right.  When were you first approached

10   about testifying as an expert for defendants in this

11   lawsuit?

12   A    Probably May or June of 2013.

13   Q    Uh-huh.  And -- and when did you decide to

14   take the case?

15   A    I agreed to begin a review of the documents

16   and come to Arizona sometime during the summer of 2013,

17   and I don't know at what point in time I actually felt

18   I was willing to sign on as an expert for the

19   defendants, but sometime after that.

20   Q    Uh-huh.  So you -- you reviewed documents

21   prior to agreeing to be the expert witness in this

22   case?

23   A    In -- in my mind, I had not yet agreed to be

24   an expert witness.  I'm not sure if I agreed in Tim's

25   mind or by contract, but I wasn't committed to the case

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

51

1   prisoners in isolation units similar to those in ADC

2   because they have a life sentence?

3                  MR. BOJANOWSKI:  Form.

4                  THE WITNESS:  I -- I would implement a

5   policy similar to their current assessment that, one,

6   they are maximum custody inmates, and then that they

7   would be assessed beyond their initial classification

8   as to risk and be placed in one of the three new levels

9   that they're -- that they are -- that they have and are

10  implementing now.

11     Q    BY MS. FETTIG:  What about ADC's policy

12  towards life sentence prisoners as of 9 -- September

13  22 -- 2013?

14     A    Well --

15                 MR. BOJANOWSKI:  Same objection.

16                 Go ahead.

17                 THE WITNESS:  -- again, I believe they

18  had some of that then, that they had step programs, and

19  everyone was not in the definition of isolation at that

20  time.  And -- and of course, as I said, I know

21  they -- the new director's order is -- is -- says that

22  inmates with a life sentence can be placed at any of

23  the three or the four levels of -- of assignments, even

24  though they stay at maximum custody, but all of those

25  would not fit the definition of isolation.

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

52

1      Q     BY MS. FETTIG:  But I'm talking about as of

2   September 2013.

3      A     And again, I'm saying --

4      Q     What was your understanding then?

5      A     I think they had some of both.  That was my

6   understanding as some --

7      Q     So is it your testimony that life sentence

8   prisoners didn't have to spend two years in maximum

9   custody in September 2013?

10                  MR. BOJANOWSKI:  Form.

11                  THE WITNESS:  No.  They did have to

12  spend two years in maximum custody, but all maximum

13  custody assignments did not meet the definition of

14  isolation.

15     Q     BY MS. FETTIG:  Well, the definition of

16  isolation is 22 hours in a cell or confinement in

17  Eyman, Browning, Central -- Florence Central, Florence

18  Kasson, Perryville.

19     A     Well, then I'm mistaken, because I was

20  thinking it was an and, not an or.  That I think they

21  were probably all housed in those, but they were not

22  separated or in their cells 22 hours a day.

23     Q     Uh-huh.  And how do you know that?

24     A     Review of the policies, the step program,

25  seeing inmates out of cells, seeing inmates on rec

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

65

1    their highest defined level on the objective

2    classification system, similar to maximum custody, or

3    in the Bureau of Prisons, we used to have numbers.  At

4    level -- level five were the penitentiaries.  In Ohio,

5    I think we used -- we had four levels and -- or -- and

6    maximum was the highest.

7                   So many use max; some use high.  That --

8    what I'm saying is that 15 percent -- 10 percent at the

9    highest level would be low across the board.

10                  Now, when you are getting at the

11   definition of isolation, that is the status, not the

12   classification, and -- and so I'm not sure what your

13   question is about --

14      Q    BY MS. FETTIG:  Uh-huh.

15      A    -- the status, but if it is, is 10 percent

16   high for that status?  Is that --

17      Q    Yes.

18      A    I'd say --

19      Q    That's my question.

20      A    -- yeah, it's higher than the average state,

21   yes.

22      Q    Are you aware of --

23      A    I'm sorry.  Let me go back.  But I wouldn't

24   agree 10 percent in ADC is in that status.

25      Q    As of September 2013?

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

67

1    above.

2              And again, back to -- it's -- it's hard

3    for me to say what was the case in September, because I

4    do know, you know, when I -- when I first began review

5    of documents in June, and through my visits in August,

6    and through my discussion with ADC staff on -- on what

7    they were doing in terms of reviewing inmates for that

8    status and modifying and changing from -- if you would

9    say -- and I don't know if they ever were, a pure,

10   everybody was in the isolation status to where they

11   will be when the March 2014 director's instruction is

12   fully implemented.  That was in evolution, and I'm not

13   sure where they were in September, but I do know every

14   one of these 3394 inmates were not in that status.

15             I don't know how many weren't, and I

16   don't know exactly which ones, but as I said in my

17   report, I -- I talked about the step programs.  The

18   step programs gave the opportunity for many out-of-cell

19   times, and those were -- the step programs I described

20   were in effect in August of 2013.  Did that make sense?

21   Was I clear?

22      Q    BY MS. FETTIG:  Let's turn to page 4 of your

23   report.

24      A    Okay.  Can -- can I ask why -- what is

25   significant about September 2013?  I wasn't -- I was

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

68

1  there in August.  I would think you'd be interested in

2  what I saw when I was there.

3      Q    The Court has determined that as the cutoff

4  date for its determination of liability.

5      A    Oh, okay.  Thank you.

6              MR. BOJANOWSKI:  Well, form.  I -- I

7  think you aren't representing that accurately at -- at

8  the current time.  I think it's still open to

9  determination.

10     Q    BY MS. FETTIG:  Well, what I will say is we

11  are -- we are limiting this deposition to the current

12  court order --

13     A    I understand.

14     Q    -- which has --

15     A    Okay.

16     Q    -- established September --

17     A    I had heard --

18     Q    -- 27, 2013.

19     A    That's why it's difficult for me, because I

20  saw it in August, and I know where they were moving and

21  such, but I don't -- I don't know exactly what -- what

22  the status was in September.  I wasn't there.

23              MR. BOJANOWSKI:  We'll just -- we'll

24  just note an objection for the record as to the

25  limitations placed.

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

82

1   is a mental health group and the other is an

2   educational group with topics such as pre-release

3   planning or dealing with their incarceration."  How do

4   you know that?

5       A    As footnoted, from my interview with Greg

6   Fizer.

7       Q    So this statement is just based on your

8   interview with Greg Fizer?

9       A    No.  As I've answered all the questions, I'm

10  sure he helped clarify what those groups were.  That

11  one was an education group, and one was a mental health

12  group.

13      Q    Looking at footnote 24, you note that the

14  inmate count and individual and group programming was

15  provided from that November 19th, 2013 interview

16  with -- with Greg Fizer.  Did he indicate that these

17  programs that you discussed with him were -- were

18  implemented before September 27th, 2013?

19      A    It was my understanding they were, yes.

20      Q    Why?

21      A    Because I was talking about my tour, being

22  there, what I saw, and asking him to help clarify

23  things that were in my mind from my tour.  I wasn't

24  saying as of today.  When I did my interview, phone

25  interview, was to help clarify those things so I could

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

83

1   write my report.

2                    I could have done it September 1st.  I

3   just didn't get to it in terms of putting this all

4   together after my tours.  I didn't have enough time to

5   do that by -- I didn't know the relevance of the

6   September date or maybe I would have tried to have

7   gotten some of that done beforehand, but I didn't.

8       Q    Going down to the next paragraph, you state

9   that at SMU 1 there is a step program for prisoners

10  with high mental health needs that provides

11  pro-socialization recreation, and the prisoners

12  participate in cognitive restructuring and the release

13  preparation programs.  Where did you get this

14  information from?

15      A    Well, the footnote there is from Mr. McAdorey,

16  but I saw the step programs and actions and talked to

17  staff about them while I was there in August.

18      Q    Uh-huh.  You say that you saw the step

19  programs in action.  What do you mean by that?

20      A    Well, the step program allows additional

21  privileges, more out-of-cell time, special group

22  recreation, activities, and so I saw those

23  differentiations between the steps while I was there.

24                   THE VIDEOGRAPHER:  I'm sorry, Counsel

25  but we have to change the tape.

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

85

1   want -- all right.  Prosocial programming and

2   incentivize --

3      Q    It says they participate in cognitive

4   restructuring and release preparation programs, you

5   said.

6      A    Oh, okay.  I -- I started to comment on the --

7   the sentence before that.  The pro-socialization

8   recreation component is where they place inmates

9   together on the recreation yard and in small groups and

10   large groups and larger groups and see how they respond

11   to others in terms of expanding the number of people

12   that are going to be involved in recreation.

13             As I recall, the cognitive

14   structuring -- restructuring and release preparation

15   is -- is -- is basically that.  What will they face in

16   the community?  The focus is on what will they face

17   when they return to the general population, and what

18   will they face when they are released from prison.  And

19   to begin -- cognitive restructuring is just, as

20   described to me and as I understand it, to begin to

21   think about those kinds of issues and how they are

22   going to respond to them.

23      Q    Uh-huh.  And where did that information come

24   from?

25      A    Probably a combination of the -- the staff I

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

86

1    talked to at SMU 1, and then a confirmation that I got

2    from Mr. McAdorey when I called him later on.

3        Q    And in terms of the pro-socialization

4    recreation as you've termed it, you witnessed people in

5    the outdoor cages, is that correct, while you were on

6    the tours?

7        A    I witnessed people in -- in -- in the four or

8    five different settings of recreation that -- that are

9    available.  And I don't recall which ones at which

10   facilities that I saw inmates in.

11       Q    Were you able to confirm how often prisoners

12   received recreation in the outdoor recreation cages?

13       A    Confirm?

14       Q    Through --

15       A    One, through policy --

16       Q    Uh-huh.

17       A    -- and through some review of logs, and -- and

18   so if you mean every week checking to see whether they

19   got their six hours a week, no, I did not look at every

20   week, but as whatever I talked about in both this and

21   my rebuttal report.

22       Q    In terms of the cognitive restructuring and

23   release preparation programs, did you ever see any

24   documents regarding those programs at SMU 1?

25       A    Again, I saw program plans at a variety of

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

89

1     Q   BY MS. FETTIG:  So in footnote 27, you say

2  that the program information on cognitive restructuring

3  and release preparation was information provided to you

4  by James McAdorey in a telephone interview on

5  November 4th, 2013.  During that conversation, did he

6  indicate to you that these programs that you discussed

7  were implemented by September 27th, 2013?

8            MR. BOJANOWSKI:  Form.

9            THE WITNESS:  I -- I don't recall, but

10  my discussion with he and the other interviews that I

11  did as a follow-up were regarding my August visits, and

12  I was trying to clarify what I saw and get more

13  specific so I could include it in the report.

14     Q   BY MS. FETTIG:  Uh-huh.  During the interview

15  with Greg Fizer and James McAdorey or any of your

16  interviews, did you talk about future plans at the

17  units with them?

18     A   There was one person I talked about future

19  plans, and it is noted in my notes, because one of the

20  deputy wardens that I talked to -- I don't remember

21  which one -- was on the committee that -- that had been

22  in effect for several months.  And in the whole

23  evolution of ADC and moving to where they are with the

24  director's instruction that's now been issued, one of

25  those deputy or assistant deputy wardens was on that

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

90

1    committee, and so -- I'm sure it was a he in this case,

2    told me about a little bit more of the work and -- and

3    I'm sure I put it my notes from the telephone

4    conversation.

5        Q    Uh-huh.  When you were actually asked --

6        A    Oh, wait.  I'm sorry.  And also Dr. Taylor was

7    on that committee, too, and so she also -- and I'm sure

8    it's in my notes with my discussion with Dr. Taylor

9    also, told me about -- you are saying future.  I mean,

10   they -- they had been evolving, and some of them were

11   already in place and other ones were going in place

12   then, and other ones are in the director's instruction

13   in the future from now.

14       Q    Uh-huh.  When you were actually at SMU 1 in

15   August of 2013, who did you talk to?

16       A    I don't recall.  I don't remember all the

17   names.  I'm sure the -- let's see.

18                Okay.  So SMU 1, 27, I'm sure

19   Mr. McAdorey was with us, and I talked to the warden at

20   each facility and talked to correctional officers.  I

21   mean, I don't -- I don't recall any of the names.

22       Q    In that same paragraph there's a sentence that

23   says, "In the BMU at Browning, their programming is

24   based on behavior modification, as clinical staff

25   create expectations and incentives," blah, blah, blah,

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

91

1   blah.  Where did you get this information?

2       A    Again, part of my tour, and then follow-up

3   with, as is footnoted there, with Stephen Morris.

4       Q    Uh-huh.

5       A    And in my notes of the step programs, I -- I

6   refer to some of these in -- in the notes of my step

7   programs, and I -- again, that's one of the exhibits.

8       Q    Did you witness any of these programs taking

9   place at BMU?

10      A    Step programs, yes.

11      Q    What?  What did you see?

12      A    Similar to what I said before; different

13  privileges, different out-of-cell-time activities,

14  different recreational opportunities in terms of groups

15  or different yards and such.

16      Q    Uh-huh.  What -- what out-of-cell activities

17  did you see at BMU?

18      A    I don't recall BMU versus the many other

19  places I saw, but in each case where they had step

20  activities -- and I think BMU was a little more, as I

21  noted here, behavioral modification approaches with

22  incentives, that they took very basic approach with

23  those inmates, as it says.  It could be as little as

24  giving them a piece of candy or a loaner TV.

25                 So I'm sure as I walked through I saw

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

92

1   televisions in -- in some cells and not televisions in

2   other cells.  So those kind of -- those -- those pieces

3   of evidence were in place when I was there.

4       Q    In any of the units that you visited from

5   Perryville to Florence to -- to the Eyman complex, did

6   you make any estimates about actual out-of-cell time

7   for the inmates there?

8                   MR. BOJANOWSKI:  Form.

9                   THE WITNESS:  Cumulative, I don't think

10  I -- no.  And I'm sure I didn't represent it in my

11  report.  I don't think I ever went through and -- and

12  did an accumulation of in addition to the recreation

13  and showers and visiting and medical and individual

14  counseling or group counseling and such.  No, I

15  don't -- I never went through and said, what would this

16  total in terms of number of hours?

17      Q    BY MS. FETTIG:  Again, in footnote 28, you

18  reference an interview from November 4, 2013 with

19  Stephen Morris, the deputy warden at Eyman Browning

20  Unit.  During that conversation, did he indicate that

21  the programs you discussed were implemented as of

22  September 2013?

23                  MR. BOJANOWSKI:  Form.

24                  THE WITNESS:  Again, we were talking

25  about programs that I saw and -- and what was going on

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

93

1    during my visit.  So my understanding was that they

2    were in effect when I was there in August, in -- in all

3    of these cases, unless -- I would have noted it in my

4    notes if it was something that was going to be started

5    later on.

6        Q    BY MS. FETTIG:  Uh-huh.  When you were

7    actually at Browning in August of 2013, do you recall

8    what you were told about the programming there?

9                    MR. BOJANOWSKI:  Form.

10                   THE WITNESS:  Not specifically, except

11   what I note either in my notes or in the report.

12       Q    BY MS. FETTIG:  And for -- for the Browning

13   programs, did you review any inmate records to check to

14   see that they were actually attending programs and

15   group counseling?

16       A    No, I did not.

17                   MR. BOJANOWSKI:  Form.

18       Q    BY MS. FETTIG:  Since you didn't speak to any

19   prisoners in any of these units, how do you actually

20   know how these programs are operating on a daily basis?

21                   MR. BOJANOWSKI:  Form.

22                   THE WITNESS:  How do I know how they are

23   operating?  Either through program schedules or

24   discussions with staff.

25       Q    BY MS. FETTIG:  How do you know if the

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

100

1      A      Same answer --

2      Q      Okay.

3      A      -- on all of these.

4      Q      For -- going back to Browning, though, I see

5   you've got BMU listed, then STG step down and then step

6   one, step two, step three.

7      A      Right.  Because the steps -- the step program

8   is different.

9      Q      Okay.  So the only -- is it the case that the

10  only step programs at Browning are the BMU or the STG

11  step down?

12     A      That's the only one I referenced here.  I

13  don't -- I don't recall.

14     Q      For CB3 on the next page, and you -- there are

15  no steps actually noted under CB3, it's just a

16  reference to something that's happening in

17  January 2014.  So is it safe to say that as of

18  September 2013 there was no step program here?

19                MR. BOJANOWSKI:  Form.

20                THE WITNESS:  I would say yes, at least

21  from what I put in here.  Obviously per my notes, that

22  in January they were going to put in the step program

23  similar to CB2.  And it may be -- I'm not sure -- they

24  might have been going to change the population in that,

25  as well.  I don't -- I don't know.  I -- I forget.

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

101

1      Q    BY MS. FETTIG:  For some of these step

2    programs like Perryville and Eyman, you note -- and

3    Browning -- you note a particular number of inmates in

4    each step.

5      A    In some of them --

6      Q    Is that from your tours?

7      A    Pardon me?

8      Q    Is that -- is that from your tours?  Where is

9    that information from?

10     A    Yes.  It would have been from my tours.  Like

11   in Perryville where I say how many, or follow-up.  It

12   could have been -- it could have been in one of my

13   follow-up calls with the deputy warden to clarify

14   certain things as I'm then putting them into the

15   report, I might have asked that question.

16     Q    Did you receive any documentation on the

17   number of prisoners?  For example, that Perryville has

18   42 inmates in stage 1?

19     A    If I did, it would be listed in Exhibit 2.

20     Q    Okay.  What documentation are you aware of

21   that these programs were actually happening?

22     A    I saw -- I could -- I could see the different

23   stages.

24     Q    Uh-huh.

25     A    I saw the different yards.  I saw the

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

102

1   different property.  I saw inmates in the dining room.

2   So I saw those kind of things that were relevant to the

3   different steps.

4       Q    So did you see that at Perryville Lumley?

5   What exactly did you see there?

6       A    I saw three different rec yards.  I saw

7   inmates in the dining room.  I saw different property,

8   available inmates.  I saw inmates moving, some

9   unrestrained.  I saw phones on the rec yard, to the

10  best of my recollection.

11      Q    Uh-huh.  How about Eyman SMU 1; what did you

12  witness there that leads you to believe there was a

13  step program operating?

14      A    Well, my memory gets a little more fuzzy when

15  it comes to the -- the -- the male -- the male

16  facilities.  So I've got to review this and see if it

17  helps.

18               I saw the different recreation yards,

19  different recreation structures, enclosures.  I saw

20  closed-circuit televisions.

21      Q    When you say closed-circuit televisions, what

22  are you talking about?

23      A    Televisions where they do programming.  I'm

24  trying to remember if I saw some in the cell house at

25  that facility or in a group counseling room.  I saw

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

103

1   group counseling rooms with televisions where they did

2   closed-circuit programming, where they put it on a

3   videotape or do certain programming, but that was

4   offered sometimes over the television instead of being

5   live or group led or a combination thereof, a blended

6   kind of program.

7       Q    Did you see any of those programs happening?

8       A    I don't recall in what facilities I saw group

9   programming, or I know I saw some individual

10  counseling, inmates in -- in group -- in individual

11  offices.  I don't recall if I saw any group

12  programming.  I think I did, but I don't -- I don't

13  recall.

14      Q    Did you see anything else at Eyman SMU 1 that

15  you believe indicates that there are -- that the step

16  program is operational?

17      A    Okay.  I mentioned recreation yards.  I

18  mentioned counseling areas and property.  This talks

19  about half-court basketball.  I know I referenced where

20  I saw inmates playing basketball together in a -- in a

21  group, three-on-three basketball game.  I don't know if

22  that is Eyman or Browning, but it's in my notes.

23              I talk about inmates working.  I saw

24  inmates working.  I don't recall exactly where, but it

25  could be in my notes, but I saw inmates working in a

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

104

1    variety of places.  I saw inmates with televisions, so

2    I could say those things at Eyman, that I saw as

3    indication of step programs.

4        Q    What did you see inmates working at?

5        A    Some were -- some were porters, janitors,

6    doing sanitation; some were -- there's some pictures

7    attached to the report that show inmates working on a

8    job.  I'm not sure what they're doing.  I think they

9    were kind of breaking up a sidewalk or replacing a

10   sidewalk or doing something.  I saw inmates taking out

11   trash out of the housing unit, sweeping, a variety of

12   things.  Oh, I saw inmates working in food service,

13   working in the dining room.

14       Q    Were they maximum security prisoners?

15       A    Yeah.  They were inmates in the step programs.

16       Q    Did you ever -- do you have any idea how many

17   prisoners at Eyman SMU 1 have a job?

18       A    No.

19       Q    Have you ever seen any documentation?

20       A    I saw -- well, as I said, I saw inmates -- all

21   jobs within the housing unit, so I saw -- probably saw

22   inmates cleaning there.  That's documentation.

23       Q    At Browning at BMU, what -- what did you

24   witness on your tours that leads you to believe that

25   the program that you've described here is actually

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

105

1   operational?

2       A    I don't recall.  Now, this one is a little

3   more difficult because they didn't have, as I recall,

4   the different outside recreation areas.  Again, I can't

5   remember in each case, but as I describe it, there --

6   there -- there wasn't the -- the obvious even physical

7   location difference of the status.

8               I know those inmates are very fragile,

9   so to say, in terms of their -- their behaviors and --

10  and a lot of self-harm and cutting and such, so I think

11  again it's things like handing them a piece of candy

12  for performing or giving them a loaner television or

13  headsets, headphones.  I assume I saw head --

14  televisions and headphones in some, but it's not as

15  obvious as some of the other ones where I said they

16  were, you know, programming or in recreation or working

17  on a job.  I don't think they do that in the step

18  programs at BMU.

19      Q    How about at the STG step down; what did you

20  witness during your tour that leads you to believe that

21  that's an operational program?

22      A    Again, I probably saw porters.  They have

23  porters there.  Did I see inmates in the day room?

24  Again, I don't recall which facilities, but, you know,

25  in step three it says they can go unrestrained and --

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

106

1   and I saw inmates in group settings.  I have some

2   pictures as well, four inmates out of their cells at a

3   time.  So I could have seen that.  I don't remember

4   every place.

5                   I saw inmates out of the cells.  I saw

6   inmates in groups and recreation.  I saw inmates in

7   programming.  I saw property.  I saw people on jobs,

8   but I can't remember, unless it's in my notes, which of

9   the facilities I witnessed those in or it was occurring

10  at the time I was there.

11       Q    Uh-huh.  So anything extra at Florence CB1

12  that you recall from your tours that indicate that that

13  is an operational step program?

14       A    Yeah.  That was the first facility I was at,

15  and so -- I mean of the male facilities, and so it's a

16  little more vivid in my -- my memory.  But, you know,

17  there again, I saw -- saw a large group of inmates

18  going unrestrained at the commissary, 20 inmates

19  standing outside the commissary chatting with each

20  other waiting to pick up their commissary.  I saw 30

21  inmates on the rec yard.  I saw inmates working on a

22  job in a group setting.  And, again, I think there's a

23  picture of that in the report.  So I saw quite a bit at

24  Florence and CB1 and CB2.  I saw inmates working in the

25  kitchen.

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

108

1   of with their mental health units do some kind of step

2   program, and with their maximum custody units do some

3   kind of step program.

4       Q    Are you aware of any --

5       A    So I assume they wouldn't do them unless they

6   were effective, but, again, I'm not a mental health

7   professional.  I'm not familiar with that literature,

8   evidence-based literature, as I said before, in mental

9   health.

10      Q    Okay.  So let's go back to page 7 of your

11  report.  The first full paragraph on that page, you are

12  talking about the rover position.  Are you familiar

13  with that?

14      A    Yes.

15      Q    About three-quarters of the way down, it

16  says -- referencing ADC, "It has added several security

17  positions as, quote/unquote, 'rovers' to be in,

18  quote/unquote, 'constant motion' to provide additional

19  security checks at unexpected times in order to reduce

20  the opportunity for self-harm."  How did you learn

21  about these new positions?

22      A    I think I first heard about -- I'm not sure if

23  I heard about them from the first meeting I had with

24  the ADC executives, but I know Director Ryan talked

25  about them when I talked -- talked to him that week.

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

109

1     Q    Uh-huh.  Do you know if you took notes during

2  your conversation with Dr. Ryan?

3     A    Director Ryan?

4     Q    Director Ryan, yeah.  Did you take notes?

5     A    No.

6     Q    Okay.  During your tours, did you see the

7  rover positions?

8     A    I'm not sure.

9     Q    Uh-huh.

10     A    I mean, you see a lot of correctional officers

11  moving around, and so I'm not sure which one was a

12  rover and which one was the -- the unit officer.

13     Q    Uh-huh.  Do you know if the rover position had

14  actually been instituted at the time of your tours?

15     A    I think so, yeah.  I would say yes.

16     Q    And -- and what do you base that on?

17     A    Well, I saw the -- the post orders for it.

18  People talked about it as if it was occurring.  I don't

19  think I walked up to any officer and said, are you a

20  rover or not?  People referred to them regularly in

21  terms of -- of -- and much -- and much of the material

22  that I reviewed regarding suicides was well before

23  that, and the entire initiative to -- in fact, I'm sure

24  they talked about converting positions into these

25  rovers and what they did to move budget money and such.

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

110

1    So it was my understanding, yes, they were in -- in

2    effect at that time.

3         Q    Uh-huh.  So looking down to footnote 36 on

4    page 7, it says, "Correctional officer positions have

5    been reassigned to create 'rover' posts at Florence,

6    Eyman, Eyman Browning, Perryville Lumley," and you list

7    the numbers.  Where is this information from?

8         A    I don't recall, but I must have asked at each

9    place how many rovers they had.  And so that kind of

10   confirms to me that, yes, they had them operational

11   then.  I don't recall -- I must have asked either every

12   place or -- I don't recall where I got that.

13        Q    Uh-huh.  Would it be in your notes if you

14   learned it during the tours?

15        A    It should -- it should be somewhere, you know,

16   in notes or in an interview.  I -- I don't -- I don't

17   recall where I got that.  I don't remember if it was on

18   a staffing pattern.  I don't recall where I got that.

19   Forgot the specifics.

20        Q    Okay.  Well, I'm at a breaking point right

21   now, and I think it's probably -- it's almost 12:30, so

22   it might be a good time to take a little lunch.

23             MS. FETTIG:  So shall we go off the

24   record.

25             THE VIDEOGRAPHER:  Going off the record.

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

139

1    smaller group.  Two, they do more unescorted,

2    unrestrained movements to recreation, and it's more

3    adjacent, so it's a lot easier to get inmates to

4    recreation there in terms of time consumption and such

5    that it's probably easier to do there.

6         Q    So turning to page 14, the fourth paragraph

7    down, at the very end, again, I just have a factual

8    question for you, Dr. Seiter.  You said at SM -- "Eyman

9    SMU 1, I was shown a new recreation yard that they are

10   developing for group recreation with a 'par' exercise

11   program."

12        A    Yeah.  I'm sorry, which paragraph is that?

13        Q    It's -- well, it's the fourth down, but the

14   third full.

15        A    Okay.  Wait a minute.

16        Q    You are talking about the -- of a possible

17   'par' exercise program?

18        A    I haven't found it yet.  The third full one?

19        Q    Yes, at the very end.

20        A    "In other" -- beginning with, "In other

21   facilities"?

22        Q    Yes.

23        A    Oh, yes, last sentence there?

24        Q    Yes.

25        A    Right.

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

1    Q    The par exercise program, what -- what do you

2  mean by par?

3    A    Par is kind of a fitness -- a fitness routine.

4  You go to this station, and you do pull-ups, and you go

5  to do this station and you do push-ups.  You go to this

6  station and you do jumping jacks, that kind of thing.

7    Q    Do you know when the program was scheduled to

8  be operational?

9    A    No, I saw it, and I think I even have a

10 picture of it in here.  In my August tour, I saw the

11 rec yard.

12   Q    But it was -- it was your understanding at

13 that time that it wasn't operational?

14   A    They -- they were putting up a final fence

15 that needed to be put in, and it looked to me like it

16 was ready to go as soon as they did that.

17   Q    Okay.  So page 15, the second paragraph down

18 starting with, "Recreation does not only take place" --

19   A    Yes.

20   Q    -- "during the six hours inmates are taken to

21 outside recreation enclosures.  I've viewed several

22 inmates recreating in their cells," and you mentioned

23 that you had seen prisoners recreating in their cells.

24 Is it your opinion that in-cell exercise is adequate

25 for physical health?

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

148

1      A     That's -- that's the professional judgment,

2  professional definition by -- by mental health

3  professionals and people, other -- others.  And so I

4  would -- I would say that is extreme social isolation,

5  and I don't think that occurs in any correctional or

6  system that I'm aware of.

7      Q     During your tours or in your subsequent

8  interviews, did you ever talk to ADC staff about how

9  prisoners get out of the isolation units in ADC?

10     A     Yes.

11     Q     What's your understanding of how that happens?

12     A     Class -- through the classification process,

13 because they are placed there in the classification

14 process.  We are talking about maximum custody --

15     Q     Correct.

16     A     -- or a particular subset of that?

17     Q     Let's -- let's -- let's say maximum custody --

18     A     Okay.

19     Q     -- for the purposes of --

20     A     They are placed --

21     Q     -- this discussion.

22     A     -- there through the objective classification

23 system, and they are removed from there through the

24 objective classification system.  When they get fewer

25 than -- you know, whatever number of points triggers

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

149

1    it.  I forget if it's 62 or if it's 38 or whatever, but

2    whatever number of points triggers it.  The same is

3    true when they go below that number of points, then

4    they are reduced to close, close custody, but that is

5    maximum custody.

6               Then to go back to our classification

7    versus status and the definition of isolation, the step

8    programs and the delineation of what it takes to move

9    from step to step, which was described to me and I

10   talked about in here, but I know you are -- you are

11   sensitive to the September date, but is clearly now

12   delineated in ADC policy even though it was in practice

13   when I toured the facilities in August, clearly

14   differentiate what it takes to move from one step to

15   the other.  And as I said, many of those steps are not

16   within the definition of isolation as per the court

17   order.

18       Q    Do you know how these step movements are

19   communicated to the prisoners?

20       A    The DI is given to the inmates, so that

21   written policy is given to every inmate.  It says on

22   the cover it's the inmates as well as the staff.  I

23   know I saw some structure of steps as I toured the

24   facilities.  We talked about that before, and it's

25   probably an assumption that they were given copies of

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
**Confidential - Subject to Protective Order**

174

1   Q    So is it your opinion the watch cells, though,

2   are generally used for mental health watch?

3   A    Yes.

4   Q    Is that your understanding?

5   A    Mental health, self-harm, yes.

6   Q    Let's take a look at page 17, and it is the

7   first para- -- first paragraph.  There's a long

8   paragraph on page 17.  Closer to the bottom you are

9   talking about a conversation you had with Dr. Taylor

10  regarding the rover positions in the isolation units.

11  And you indicate, quote, that they were added

12  specifically to watch out for and keep inmates from

13  self-harm.  Do you see where I am --

14  A    Yes.

15  Q    -- quoting that from?

16  A    Yes.

17  Q    Okay.  Do you know why self-harm is such a

18  concern in these units?

19  A    I know why the rover positions were added, and

20  that's because -- I think I addressed it in my first

21  report -- the number of suicides that ADC had each

22  year, and they were declining, declining, declining.  I

23  think they went from 18 down to 15 per 100,000 inmates.

24  And hitting the national average, I think they felt

25  very good about that, and then they had a spike up.

Richard P. Seiter, Ph.D. - videotaped - 04/10/2014
Confidential - Subject to Protective Order

175

1           As any conscientious correctional

2    administrator, they didn't want to tolerate that; said,

3    what more can we do?  So I described many things they

4    put in place, and one was, let's take -- let's reassign

5    some of these staff, because inmates, and particularly

6    the ones on -- in the isolation units where staff make

7    their 30-minute or hour checks, whatever is required,

8    and go through and -- and have to really keep moving to

9    do that and try to cover all their ground.

10           Once they go past a cell, an inmate

11    doesn't expect them to come back for another 30

12    minutes.  Now, even though policy says do it randomly,

13    don't do it on the half hour, do it whenever, inmates

14    can know to expect that once they go by, they are

15    probably not coming back for a few minutes.  If I want

16    to self-harm myself, this is the time to do it.

17           The rover positions are to be a

18    surprise, to move without any kind of order randomly

19    and -- and let inmates know or if they are seeking to

20    self-harm themselves, that they would find that, and

21    they have been successful at doing that in many -- in a

22    few cases, as I was told.

23    Q     Is it your understanding that the rover

24    positions are only in the maximum security units?

25    A     I think so, but the reason they are is that

Glennie Reporting Services, LLC
602.266.6535  www.glennie-reporting.com

**Richard P. Seiter, Ph.D. - videotaped - 04/10/2014**
**Confidential - Subject to Protective Order**

176

1   that's where you get -- you know, inmates are not out

2   of their cells during the day, and -- and the officers

3   are doing the rounds, and that's when they're more

4   routine in terms of going by the cells.

5            So when they are out of the cells, they

6   are on the work details or they are in programs or in

7   school or whatever, you don't have that issue of where

8   you need a rover to pop around as much.  Or, I mean,

9   I'm sure if they had enough staff to create a rover

10  position in every cell house, they'd do it, but they

11  only had a certain amount without budget increases they

12  could redeploy.

13           And so that's where they put them, where

14  they would be most useful, because of inmates were

15  locked in their cells rather than the cells were open

16  and they could move in and out.

17       Q    Doesn't the fact that ADC needs a rover

18  position that's solely dedicated to keeping prisoners

19  from self-harming themselves tell you that the living

20  conditions in these units are harming people?

21                MR. BOJANOWSKI:  Form and foundation.

22                THE WITNESS:  I'd say no, and I don't

23  know if the suicide data would show that.

24       Q    BY MS. FETTIG:  Why not --

25                MR. BOJANOWSKI:  Same objection.

**Confidential - Subject to Protective Order**

222

1    STATE OF ARIZONA    )
                          )
2    COUNTY OF MARICOPA )

3

4              I, Marcella L. Daughtry, a Certified

5    Reporter, Certificate No. 50623, in the State of

6    Arizona, do hereby certify that the foregoing witness

7    was duly sworn to tell the whole truth; that the

8    foregoing pages constitute a full, true, and accurate

9    transcript of all proceedings had in the foregoing

10   matter, all done to the best of my skill and ability.

11   Pursuant to request, notification was provided that the

12   deposition is available for review and signature.

13

14             I FURTHER CERTIFY that I am not related

15   to nor employed by any of the parties hereto, and have

16   no interest in the outcome.

17

18             WITNESS my hand this 11th day of April,

19   2014.

20

21                          _____

22                          Marcella L. Daughtry
                            Arizona Certified
23                          Reporter No. 50623

24

25

**EXHIBIT 5**

**EXHIBIT 5**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) ) ) ) ) ) | No. CV12-00601-PHX-NVW (MEA) |
| Plaintiffs, | ) ) | SUBJECT TO |
| vs. | ) ) | PROTECTIVE ORDER |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) ) | 30(b)(6) DEPOSITION OF ARIZONA DEPARTMENT OF CORRECTIONS |
| Defendants. | ) ) ) | Continuation of Docket No. 81 |

CARSON ANTON MCWILLIAMS

(Topics 1-9, 11, 13, 14, 16)

September 27, 2013
9:01 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    classifies out of maximum custody on a custody override?
2        A.    Once again, I don't know for sure that we track
3    that daily as a practice, but -- so I don't know that, if
4    it does or not.
5        Q.    Do you think that your computer system can
6    track that percentage in the same way you described it
7    likely tracks the percentage going in?
8                MS. LOVE:  Form and foundation.
9                THE WITNESS:  Yes, I would think it could.
10       Q.    BY MS. EIDENBACH:  Is ADC working to change its
11   process for moving prisoners through its maximum custody
12   units?
13               MS. LOVE:  Form, foundation.
14               THE WITNESS:  Can you clarify that a little
15   bit.
16       Q.    BY MS. EIDENBACH:  Sure.  Dr. Taylor talked in
17   her deposition about something called the Strategic Plan
18   Initiative.  Are you familiar with that?
19       A.    Yes, I am.
20       Q.    Can you describe what that is.
21       A.    It's a plan that we've been working on for
22   quite a while of expanding our programming that we've
23   been doing in CB 2 and CB 1 and Central Unit.
24       Q.    And are you working with anybody on this
25   initiative?

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1      A.    I have worked with people on it.  At the
2  moment, I'm not doing anything with it, but I have.
3      Q.    Do you know if anyone's doing anything with it
4  at the moment?
5              MS. LOVE:  Form.
6              THE WITNESS:  I think at this point right
7  now, we're in the process of just getting some things
8  together to move forward.
9      Q.    BY MS. EIDENBACH:  What things?
10     A.    We're looking at some ideas and some
11 programming possibilities making sure that our staff are
12 trained in doing some certain types of programming.
13     Q.    What types of programming?
14     A.    It would be self -- it would be like cognitive
15 behavior-type issues, anger management, different types
16 of programs that could be administered by our program
17 staff.
18     Q.    So in your mind, is gathering this information
19 and getting information on these training programs
20 different than working on the initiative itself?
21     A.    Well, I think we know -- I think the initiative
22 is pretty much -- I think we know what we want to do.
23     Q.    What do you want to do?
24              MS. LOVE:  Form and foundation.
25              THE WITNESS:  We want to make more

1    availability like CB 2 in our max custody units.

2        Q.    BY MS. EIDENBACH:  Besides the goal that you

3    just described, are there any other goals of the

4    initiative?

5              MS. LOVE:  Form and foundation.

6              THE WITNESS:  Well, of course, making sure

7    you've got the right inmates in the right place.  So

8    you've got to have a look at classification of the entire

9    max custody group to try to, for lack of a better term,

10   get cream of the crop so you could actually get -- safety

11   is the main thing here.  Safety for staff and safety for

12   other inmates as well as the public to ensure that we're

13   putting the right inmates in the right housing areas so

14   that we can minimize any type of violence.

15       Q.    BY MS. EIDENBACH:  As it stands now in its

16   current form, are there provisions in the initiative for

17   how it's going to work?

18             MS. LOVE:  Form and foundation.

19             THE WITNESS:  Not approved by the director

20   yet.

21       Q.    BY MS. EIDENBACH:  But proposed?

22       A.    Yes, proposed.

23       Q.    Can you describe those provisions?  How is the

24   initiative supposed to work?

25             MS. LOVE:  I'm going to object to this line

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

```
 1   of questioning.  I'm going to allow you to continue.  I'm
 2   going to note my objection for the record that this is
 3   far beyond the scope of the 30(b)(6) notice, which refers
 4   to and is asking for testimony regarding current policies
 5   and procedures, and you're talking about future plans and
 6   initiatives.  So our objection is that this is overbroad
 7   as to the scope of the 30(b)(6).  But go ahead.
 8            MS. EIDENBACH:  And we'll obviously object
 9   on the record to that reading of the narrowness of the
10   topic.
11      Q.    BY MS. EIDENBACH:  I'm assuming you probably
12   need to rehear the question now.
13            MS. EIDENBACH:  Can you read it back.
14            (The requested portion of the record was
15            read by the reporter.)
16            THE WITNESS:  Like I said, this isn't
17   approved, so I can't say how it's really going to work.
18      Q.    BY MS. EIDENBACH:  I understand.
19      A.    It would be -- roughly, we have three major
20   maximum custody units on the male side, and that's
21   Browning, SMU 1 and Central Unit.  That's where the vast
22   majority of our max custody inmates are housed at.  So
23   there would be a system set up where Browning, being the
24   most secure environment and the most restrictive
25   environment, because that's where the most violent
```

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   inmates are housed at.

2          SMU 1 being the intermediate area with

3   specialty consideration for sex offenders and protective

4   custody inmates because there's no place else for them to

5   go.

6          And then Central Unit being the least

7   restrictive, most open environment.  And, of course,

8   Central Unit is more amenable to that because it has an

9   athletic field, it has a chow hall that inmates can go

10  to, and it has a contact visitation room.  So it opens up

11  more ability for privileges.

12         So it would be along -- lines along that

13  setting and then how things fall into place in each one.

14      Q.    So the new initiative would change some of the

15  operations as they currently stand; is that right?

16         MS. LOVE:  Form and foundation.

17         THE WITNESS:  Yes, it would.

18      Q.    BY MS. EIDENBACH:  Is there a time frame for

19  when you hope to implement the new initiative?

20      A.    Well -- and this once again is my opinion.

21      Q.    Absolutely.

22      A.    The staff have to be on board, trained, and

23  educated as well as the inmate population has to be

24  educated before we open the doors and change a lot of

25  things.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    Q.    Do you have any idea how long it would take to
2    get your staff trained?
3              MS. LOVE:  Foundation.
4              THE WITNESS:  My speculation on the time
5    line is about 90 days.
6    Q.    BY MS. EIDENBACH:  Who has to approve this
7    initiative before it can be implemented?
8    A.    Director Ryan.
9    Q.    And has Director Ryan seen the initiative?
10   A.    Yes, he has.
11   Q.    Do you know if he's currently considering the
12   initiative?
13   A.    Yes, he is.
14   Q.    And do you have any idea when he might approve
15   it?  Has he let you all know the time frame for approval?
16   A.    I would have to think it's going to be
17   relatively soon.
18   Q.    Is the initiative going to be implemented all
19   at once or would it be in phases?
20   A.    It would be in phases.
21   Q.    And what would the first phase be?
22   A.    The first phase would be opening up of CB 3 in
23   Central Unit -- this is my opinion again.
24   Q.    Understood.
25   A.    It would be opening up CB 3 in Central Unit.

1   And so we can get the reward side of it going with

2   inmates seeing the privileges and getting to be involved

3   in some of those type of out-of-cell-type activities.

4        Q.    And what would the next phase be?

5        A.    The next phase would be consolidating some

6   mental health inmates into SMU 1 so that we have them all

7   in one area.  Not the ones in Central Unit but the ones

8   out at Browning so that we can provide a more centralized

9   service.

10       Q.    And would that be the final phase or would

11  there be another phase after?

12       A.    There would be a few more after that.

13       Q.    Can you describe those.

14       A.    We would have to open up some programming

15  opportunities in SMU 1 to include -- this is my opinion

16  again -- an outside rec area that's like a par course, a

17  basketball court, things along those lines.  And then

18  there would also be an expansion of the step-down program

19  for STGs to enable more people an opportunity to take

20  advantage of that in a shorter period of time.

21              There would also be some incentive

22  privileges placed into Browning Unit so that inmates in

23  the higher stages, if you have like a stage 1, 2, and 3,

24  one being the lowest, 3 being the highest, they could

25  have out-of-cell time and maybe in small groups.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1           And then eventually opening up Central Unit,
2    pretty much the whole unit.  CB 4 would be the next part
3    of that.  And basically opening that yard up totally.
4           MS. EIDENBACH:  Okay.  We'd like to request
5    on the record production of the Strategic Plan
6    Initiative.  It hasn't been produced to us yet, so we
7    have not seen it.
8           And we've been going for a little --
9           MS. LOVE:  What request for production has
10   it been requested in?
11          MS. EIDENBACH:  I would imagine that it
12   would probably be responsive to several, but I'm happy to
13   provide you specific cites.
14          We've been going for a little over an hour.
15   Do you need a break or should we plow forward?
16          THE WITNESS:  I'm fine.
17          MS. LOVE:  Fine.
18          (Exhibit 419 was marked.)
19   Q.    BY MS. EIDENBACH:  Have you ever seen this
20   document before?  I'll give you time to flip through it.
21   Just look up when you have finished looking through it.
22   A.    Yes, I've seen it.
23   Q.    Were you consulted in these programs?
24   A.    Yes.
25   Q.    Were you involved in the implementation of

1  these programs?
2      A.    Well, involved in the implementation might mean
3  something different to me than you.  I wasn't hands on
4  involved in it, but I have went to these areas and
5  observed things, yes.
6      Q.    Were you operationally involved in the
7  implementation?
8      A.    Once again, not hands on but in the big
9  picture, yes.
10     Q.    Was anyone else involved in the implementation?
11     A.    The people -- the wardens and the staff that
12  are working in those facilities would be the people that
13  did the hands-on type changes.
14     Q.    And if you look at the cover page, it indicates
15  that mental health staff collaborated with operations on
16  the changes at Florence and Eyman.  Is that your
17  understanding?
18     A.    Yes, that's correct.
19     Q.    Do you know who those mental health staff were?
20     A.    The main ones -- the main one was Nicole
21  Taylor.  Some of the staff wouldn't be here anymore
22  because this was a few years ago when this was all
23  started, but Nicole Taylor would be the main person.
24     Q.    Do you remember the names of any of the others?
25     A.    Oh, geez.  I can't think of one right now.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   Nicole is the person I normally dealt with with this.

2       Q.    Do you know what the motivation was for

3   creating these new programs?

4       A.    Well, I could tell you a little bit of the

5   history.  About four years ago is when we started looking

6   at changing some things inside maximum custody with

7   out-of-cell-type time.  That was when we opened up the

8   CB 2 program.  I just happened to be the warden at

9   Florence when that happened, so I was the person that did

10  that.

11          My experience, and I've been in this

12  Department a long time, is that if you have the right

13  privilege system and you select the screening inmates

14  very well, it's effective to let inmates have more

15  privilege type of systems out of their cells and do more

16  activities.  So that was why we started that program to

17  do that.

18          We went to the mental health side of it

19  because we also found that mental health inmates

20  oftentimes don't -- aren't as open and they don't get

21  involved as much when they're out in between two, for

22  lack of a better term, thugs that intimidate them

23  constantly.  So if you take the mental health inmates and

24  put them in one place where the people on both sides of

25  them are the same -- it's kind of like in school, taking

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   all the kids that get picked on in class and putting them
2   in one class, and they aren't picked on anymore.
3          So you put them all together, and it does
4   two things.  One of them is they feel more comfortable,
5   and the other thing it does is it gives us easier access
6   to them so that we can do -- the site staff can see
7   people more frequently because you don't have the escort
8   time frame, which is somewhat of a problem in any type of
9   facility that is more restricted.
10         So there's a benefit for everyone in that,
11  staff and inmates.  So that's why we started
12  consolidating things, making easier access for staff and
13  give the inmates a chance to develop in a little bit
14  different way.  And we have seen some very positive
15  things from it.
16     Q.    What positive things have you seen?
17     A.    Inmates are more talkative, more interactive.
18  Incidents of self-harm have reduced.  You know, there's a
19  big difference.  When we first opened up the athletic
20  field for the mental health inmates, the first few times
21  we took them out there, they just stood around and looked
22  at the basketball.  Now they actually play with it.  So
23  it's kind of like coming out of their shell a little bit.
24  So I do think that's been positive in that respect.
25         It also gave us an opportunity to put -- we

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    put TVs up on the walls of the cell block, and then we

2    show a video.  Like at 7:00 in the morning, we say, watch

3    this video.  And at 9:00 you have a group, and you talk

4    about it.  Because in a cell block, it's hard to do

5    because they'd be spread out.  You couldn't do it.  You'd

6    have to have a TV in front of every cell.  This way, we

7    can do it.  So it gave us the ability to do different

8    types of programming and to get the message out to that

9    group of inmates in an easier format.  So I think it's

10   been beneficial in that respect, yes.

11       Q.    You mentioned that you got information about,

12   using your example, a mentally ill inmate housed between

13   two intimidating inmates.  How did you get that

14   information?  Was it reports from COs?  Was it reports

15   from mental health staff?

16       A.    It's kind of a combination of things.  It's

17   experience from what I've seen in the past to what --

18   just talking.  I know a lot of inmates for a long period

19   of time.  So talking to some inmates, too, and some of

20   them just say, you know, these guys are scary.  And they

21   are.

22       Q.    You also talked about the benefits you've seen.

23   Have you been monitoring these benefits in any sort of

24   statistical way?

25       A.    Well, we're keeping statistics on self-harm and

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   this is more of an individual-type conversation because I
2   have those conversations with officers.  I have those
3   conversations with a lot of our line staff.
4       Q.    You mentioned an example of a video being shown
5   at like 7 in the morning, and then at 9 there would be
6   group discussing that video.  What yards or facilities is
7   that program in place?
8       A.    It's in CB 1 in Central Unit.
9       Q.    Is that the only unit?
10      A.    That's the only one where we're using that
11  approach.  Now, we put programs on CCTV, our closed
12  circuit television, in all of Florence and Eyman because
13  you can't individualize that.  But all of our inmates
14  that are in our mental health programming can see that.
15  So yes, they have the opportunity.  Not everybody is
16  involved in the groups.  CB 1 is the most open
17  environment we have of that group.  So that's why they --
18  we're focusing more on that group, funneling people in
19  from other areas to that building as they either advance
20  in their own progression or bed space becomes available.
21      Q.    And the groups to discuss the video, are those
22  held daily?
23      A.    No.  They would be a couple times a week.
24      Q.    And who leads the groups?
25      A.    Someone from the psych staff.  Usually either a

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    psych tech or psychologist.
2         Q.    And who attends the groups?
3         A.    They would have to be mental health inmates.
4    Those are the only ones that attend those types of
5    groups.
6         Q.    Is there a limitation on the number of inmates
7    who can attend each group?
8         A.    Yeah, there's a limit on it.
9         Q.    Do you know what the limit is?
10        A.    I think -- it would kind of depend on the
11   group.  Those types of groups would be 8 to 10 I think
12   would be the limit because everybody has to participate.
13   There might be have other types of groups we do where
14   more inmates would be involved, but I would say most
15   groups would be the 8 to 10 size.
16        Q.    What other types of groups do you use?
17        A.    There's some groups where, you know, that some
18   of our psych techs instruct, and I don't know the real
19   details of those.  But I know I've walked into the group
20   area in Central Unit before, which is the chow, the
21   dining hall, and there's been at least I'd say a dozen to
22   maybe 14 inmates in there interacting.  So that would
23   lead me to believe that there's groups that are larger.
24        Q.    I'd like to have you turn to -- I think it's
25   the second page, but it's the page with the Bates stamp

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1      A.    Correct.

2      Q.    And when the mental health staff recommend a

3  prisoner be placed in BMU, do they send you a report or a

4  document relaying that recommendation?

5      A.    We would certainly be notified about it because

6  security would have to move the inmate.  But I don't

7  think they send us a written report about that.  I think

8  they would just notify us that this inmate is being

9  brought into that program, and we would bring the inmate

10  to that area.

11      Q.    Do you know when the BMU program was

12  implemented?

13      A.    Oh, gosh.  It was probably about -- I was still

14  a warden at Florence.  I left there in May of 2011.  So

15  it was before that.  I don't know exactly, but I remember

16  having a meeting with the warden of Eyman and I believe

17  Dr. Shaw about it.

18      Q.    Is the program fully implemented now?

19      A.    What do you mean by fully implemented?

20      Q.    Are there any parts of the program that are not

21  currently in place?

22              MS. LOVE:  Form.

23              THE WITNESS:  It's being used.  It's not

24  full of inmates, but it's being used.  So I would say

25  yes, it's functioning.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    Q.    BY MS. EIDENBACH:  So it's ongoing at this
2  point?
3    A.    Yes.
4    Q.    Are the holding enclosures in the old officer
5  dining room built?
6    A.    Yes, they are.
7    Q.    And how many enclosures are there?
8    A.    Six or eight.  I've been in there before, but
9  I'm not sure of the count.  I think it might be eight.
10   Q.    How often do BMU prisoners recreate in the
11 outside enclosures?
12   A.    I would -- and I don't know for a fact on that
13 because some of those -- you know, some of that depends
14 on what's going on with them psychologically.  But they
15 have the opportunity to do it, like any other inmate
16 would have, three times a week.  But I don't know if they
17 actually do that or not all the time.
18   Q.    Does anybody monitor how many of them are able
19 to recreate for their --
20   A.    Yes.
21   Q.    Do you know who monitors that?
22   A.    The unit does.  There's records kept on all
23 recreation.
24   Q.    Does the BMU still operate on a three-level
25 system?

1      A.    I would think so.  I'm not positive of that,

2   but I don't think a whole lot of changes have been made

3   there.  And to my knowledge, there hasn't been any.

4      Q.    Do you know about those three levels?

5      A.    Yes.  It's -- well, and I refer to them usually

6   as stages, but yes.  And it's based on your progression

7   through the behavior for the most part, interaction.  So

8   I would think yes, they're still using it, because

9   everybody else is.  So I would assume they still are.

10     Q.    What criteria determines an inmate's progress

11  through the levels?

12     A.    Well, there's a couple of things.  One of

13  them -- now, BMU is a little bit different than the

14  stages we use in some other mental health programs

15  because BMU is a lot more intensive because some of these

16  inmates are very psychotic-type inmates.  But generally

17  speaking, it's a combination of your daily behavior and

18  programming that we provide, your participation in it.

19            So in the areas where the inmates aren't

20  quite so psychotic, we have workbooks, you know, and

21  things that we give them, and they -- it's not like you

22  have a right or wrong answer so much as that you

23  participate and you put some things in there.  And then

24  we look at them and make sure that you're trying to

25  address what's going on in the workbook.  And then you

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   move up through stages through those type of things.

2           And some of that is your interaction with

3   others.  And we're not going to double bunk people or

4   take them to an open field area if they're exhibiting,

5   you know, aggressive behavior because it goes back to the

6   safety issue.  So it's a combination of things.

7       Q.    Who determines when a prisoner gets moved from

8   one stage to the next?

9       A.    In BMU, it would be the psych staff solely

10  making those decisions because you're dealing with a much

11  more problematic inmate and a psychotic-type inmate.  In

12  a program like CB 1, it's more of a team effort approach

13  where the line officer and the program staff, the

14  administrators of the unit, the mental health staff, they

15  all staff the inmate and talk about things.

16      Q.    And in terms of Browning BMU, how is the

17  decision to move a prisoner from one stage to the next

18  documented?

19      A.    They would be through the notes that the psych

20  staff use.  It would be in their file.

21      Q.    How long do the levels or stages last?

22      A.    That, again, would depend on the individual.

23      Q.    Is there a minimum?

24      A.    I don't want to -- usually when we first start

25  out, you've got to do at least 30 days.  But I think you

 1  can progress relatively quickly if you are really someone
 2  who's out there trying to make changes.
 3      Q.    Do you know the privileges associated with each
 4  stage?
 5      A.    In BMU, I couldn't quote them to you.  I'm
 6  probably more familiar with them at other places because
 7  BMU is so different than most of the rest of these
 8  places.  BMU is small, and most of those inmates don't do
 9  a whole lot.  They just don't function well.  So it's
10  really not a good representative of what's going on with
11  the stage system or the privilege system.
12      Q.    Looking back at the first section of the page
13  that we're on in Exhibit 419, is it still the case that
14  only level 3 prisoners are given group counseling?
15      A.    No.  We have some level 2 inmates that are
16  involved in counseling.
17      Q.    How do you determine which level 2 inmates get
18  to participate in group counseling?
19      A.    I would think -- some of it might -- is going
20  to be a waiting list because the numbers -- like once
21  again, using CB 1 as an example, there's very few people
22  in stage 1, only a handful.  Maybe five or six.  The vast
23  majority of them are stage 3.  Vast majority.  And then
24  there's a few in stage 2.  So we're letting pretty much
25  all of those guys, the 2s and 3s, participate in some

1    things.

2              Now, there are some differences.  The stage

3    2s, they get to go to the athletic field once a week, but

4    they don't go to the chow hall.  All of the stage 3s go

5    to the chow hall.  The last time I looked at numbers in

6    there was a few weeks ago, but out of the let's say 90

7    people that were in that program at the time, I think 93

8    it was like people, all but about a dozen of them were

9    stage 3.

10   Q.      And what you've just described relates to CB 1?

11   A.      Right.

12   Q.      Do you know if it's different for BMU?

13   A.      I'm sure it's different for BMU because the

14   inmate is so different.  I mean, you might have an inmate

15   there that doesn't want to participate in anything.  So,

16   I mean, it's -- some of it is based on your ability and

17   your desire to do things.  And unfortunately, the people

18   in BMU are not a good -- like I said, they're not a good

19   representation of what's going on because they don't want

20   to do a whole lot of things, if anything, besides act

21   out.

22   Q.      So sticking with BMU as best you can, do you

23   know how often group counseling is offered to inmates in

24   BMU?

25   A.      Right now, I can't say for sure if there's any

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1  group going on there because most of the things I see in
2  BMU right now are incidents.  Inmates trying to assault
3  people, assaulting staff, hurting themselves, acting out
4  in very violent ways.  Most of the things going on there
5  are crisis management is what's happening there.
6       Q.   Do you know if there are any level 3 prisoners
7  at the BMU right now?
8       A.   I don't think there are any.
9       Q.   Now I'd like you to turn to -- two pages
10 back --
11      A.   263?
12      Q.   64.  So ADC050864.
13      A.   Okay.
14      Q.   This is talking about -- I'd like to direct
15 your attention to the section talking about double bunks
16 at Browning SMU.  Where are the double bunk cells at
17 Browning?
18      A.   They're on wings 1 and 2.
19      Q.   Okay.  And has the three-phased recreation
20 program mentioned here been implemented at this point?
21      A.   Yes, it has.
22      Q.   When was it implemented?
23      A.   I'd say -- this is a guess -- about eight
24 months ago it was -- everything was completed so they
25 could do things I think.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1      Q.    And do you know what the program entails?

2      A.    That was again based on behavior for the most

3  part and your interaction in the pods.  Stage 3s can go

4  out and use the large basketball court.  I know they also

5  do some -- stage 2s can, too, but stage 2s can only use

6  it once.  Stage 3s can use it a couple times.  And then

7  the other rec might be in the individual enclosures.  But

8  they would exercise together.

9            And they do have some jobs going on there,

10  too, now.  They have some inmates going out and

11  portering, and that would be stage 3s.

12      Q.    And the recreation yards used in this program,

13  where are those located?

14      A.    Right behind the clusters themselves, there are

15  doors that go out -- I don't know if you've ever seen the

16  physical layout of these places, but they're right

17  outside of those areas from the housing area.

18      Q.    Basically on the unit or near?

19      A.    Everything is inside the unit.

20      Q.    And are there outside enclosures as well that

21  are used?

22      A.    Yeah, there's individual ones and there's a

23  large one.  It's a basketball court.  And it's got two

24  hoops, two backboards, and you can play basketball.

25      Q.    Can you describe the individual outside

1    enclosures.

2       A.    They are concrete base with expanded metal

3    fencing, and they have mister systems on them with a tarp

4    cover across the top to shade.  And then there's a water

5    dispenser that's a jug there so there's water there.

6    That's the outdoor ones that are involved in this.

7    That's what you're referring to, right?

8       Q.    Uh-huh.  And what level or stage gets to use

9    the individual outdoor enclosures?

10      A.    Everybody can go outside -- see, there's two

11   types of rec areas inside SMU, as I'm sure you're aware

12   of that.  There's the one at the end of the run, and

13   there's the outside ones.  And the mental health group,

14   we're doing -- and we're trying to do things a lot --

15   more with outdoor-type activities.  They can go outside

16   and use those.  Everybody can.

17           The large one, the large wired enclosure,

18   that is for the higher level group, the stage 3 guys.

19   And they can play basketball and do some stuff along

20   those lines.

21           Stage 2 inmates can also go out, but they

22   can only use it once.  The other group gets to use it

23   twice.

24      Q.    And by once or twice, you mean per week?

25      A.    Yes.  The other time, you would do it in

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    another area, the outside enclosures.

2       Q.    So that means level 1s would be in the

3    individual outside enclosures?

4       A.    Yes.  And they can also do -- if they did group

5    there, which they do do some groups, they can do those

6    either inside at the enclosures there or they can do them

7    outside at the individual enclosures.  It's kind of hot

8    sometimes to do those outside with the staff standing

9    there, so that's why they go inside.  In the cooler

10   months, they can do those outside because the staff are

11   not standing in the sun for an hour.

12      Q.    Do you know how many prisoners participate in

13   this program?

14      A.    At Browning Unit, this is a guess, but around

15   70.  That's that particular program.  There's other

16   programs inside Browning Unit.  STGs are separate.

17      Q.    We're probably going to get to all of them.

18   We'll just take them one at a time.

19              (Exhibit 420 was marked.)

20      Q.    BY MS. EIDENBACH:  Have you ever seen this

21   document before?

22      A.    I've -- I think I've looked at it before.  I

23   don't know if I've seen this particular one dated this

24   date.

25      Q.    Do you know who prepares this?

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   building that breaks down everything where they're at,

2   because it's a very complicated layout, and they do have

3   a map that labels where everybody is.  And when I go

4   there, I grab it so I can kind of navigate in the place.

5   But yes, there is one.

6        Q.    Other than the map, is there any written

7   document reflecting which pods are double bunk and which

8   are single bunk in SMU?

9        A.    Count sheets.

10        Q.    Account or count?

11        A.    Count sheets.

12        Q.    Turning back to Exhibit 419, has the

13   three-phase recreation enclosures at the exit of each

14   pod, have those been built?

15        A.    Not at the exit of each pod is not done, but we

16   have one side completed, and they're working on the other

17   one.

18        Q.    The side that's completed, is it open?

19        A.    Yes.

20        Q.    And when was it completed?

21        A.    I think it was after Browning's.  I think it

22   was around maybe five months ago.

23        Q.    And when do you expect the second one to be

24   completed?

25        A.    I don't have a time frame on that.  I know

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    they're in the process.

2        Q.    So there are just two enclosures that are being

3    built; is that right?

4        A.    At this moment.  This is the area, though,

5    where we're looking at putting the par course outside.

6    So that's going to change the dynamics of this particular

7    building because we're going to put an outdoor recreation

8    yard.  At least that's the plan.

9        Q.    And has it been decided where that would be

10   located?

11       A.    Yes, it has been.

12       Q.    Where would it be located?

13       A.    Where it used to be.  Because they used to have

14   one out there.  It's in the same place.  There's no sense

15   in recreating the wheel.  There's a concrete slab out

16   there for the basketball court.  In fact, when I was the

17   warden of Florence, I went over and took the basketball

18   court down, cut down the poles, so I could use them on

19   Central Unit.  So we're going to put them right back in

20   the same place.

21       Q.    Do these enclosures allow all mental health

22   prisoners to engage in the three-phase recreation

23   program?

24       A.    Yes.  At SMU 1, it would afford all mental

25   health inmates to have the opportunity to.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    Q.    And just to be clear, we're talking about not
2  the large outdoor recreation area but the two recreation
3  areas at the exits; is that right?
4    A.    Yes, that's what we're talking about.  But we
5  would allow -- we have to break it down a little
6  differently because it is the protective custody and the
7  sex offenders.  So we have to make that a little
8  different, but they would all be afforded the opportunity
9  to use those, yes.
10    Q.    Who gets to use the enclosure that's completed
11  and open now?
12    A.    It's mental health inmates that are the GP
13  mental health inmates.  So the ones that aren't the sex
14  offenders and the protective custody group.  It would be
15  the general population mental health max custody inmates.
16    Q.    And just so that I'm clear, I know we've
17  probably already talked about some of this, but looking
18  at the description of the three phases in this memo,
19  let's just walk through each one.
20              So take a look at Phase 1, which is the
21  bottom of 862, first open bullet.  Has Phase 1 recreation
22  been implemented?
23    A.    Not the entire building, but the part that is
24  being used, yes.
25    Q.    So that's the out --

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1      A.     Outdoor.

2      Q.     Outdoor.  Okay.

3             And how many prisoners participate in this

4  on a daily basis, would you say?

5      A.     I couldn't guess that one.  That's an estimate.

6  I wouldn't want to try to guess.  It's a significant

7  number, but I don't know what it is.

8      Q.     How about weekly?

9      A.     That would even be harder.  Inside this

10 building is over 1,000 inmates.  So it would be hard to

11 say.

12     Q.     I'll have you turn the page so that we're

13 looking at ADC050863.  And you'll see Phase 2 at the top.

14 Has Phase 2 recreation been implemented?

15     A.     Yes, it has.

16     Q.     And when was that implemented?

17     A.     Roughly about five months ago is when they got

18 that going.  And that -- I wouldn't know the number of

19 that, either, but it is happening, though.

20     Q.     And can you estimate how many prisoners

21 participate in this program on a daily basis?

22     A.     I can't.  I can't guess at numbers.  There's

23 such a high volume of people there.

24     Q.     And looking at the next open bullet discussing

25 Phase 3.  Has Phase 3 recreation been implemented?

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

```
 1       A.     Yes, they have the basketball hoop, yes.
 2       Q.     And when did that begin?
 3       A.     That's the same time period, about five months
 4   ago.
 5       Q.     Sorry to ask you this again, but just to make
 6   sure that your answer is the same, can you estimate how
 7   many prisoners participate in Phase 3 on a daily basis?
 8       A.     I don't know a number.  I wouldn't want to
 9   guess.
10       Q.     And weekly?
11       A.     No, I can't estimate that.
12       Q.     Just had to make sure.
13              All right.  Let's turn the page.  So we're
14   on ADC050864, looking at the section entitled Double
15   Bunks Browning/SMU.
16       A.     Uh-huh.  Yes.
17       Q.     These are the double bunked cells that would be
18   shown on the map -- this is discussing the double bunked
19   cells that are shown on the map that we were discussing
20   earlier?
21       A.     Yes.
22       Q.     Has the three-phase program mentioned here been
23   implemented?
24       A.     Yes, it is.
25       Q.     Do you know when that was implemented?
```

1    A.    It was first before SMU 1.  So it was probably
2    six to eight months.  I think about eight months is what
3    I would recall as the date for that.
4        Q.    And what does this program entail?
5        A.    Same principle.  If you have a roommate and
6    you're double bunked, you can rec with your roommate into
7    the larger enclosures.  Stage 1s get the outside
8    enclosure but individual.  And then the stage 3 inmates
9    get basketball court they can use.  Stage 2s can actually
10   use that once a week also, but the stage 3s get to use it
11   twice a week.
12       Q.    And what recreation yards are used for this
13   program?
14       A.    It's on the wings 1 and 2 side of the building.
15   That probably doesn't mean much to you, but that's the
16   side it's on.
17       Q.    So the recreation yards are on the unit for
18   this program?
19       A.    Yes.  They're outside, like I described
20   earlier, outside the doors of the clusters.  There's a
21   door right outside there.
22       Q.    And these are different than the newly
23   constructed enclosure that's outside the exit that we
24   were just talking about?
25       A.    Same place.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1      Q.    Okay.  So they're outside enclosures?

2      A.    Yes.

3      Q.    And can you describe those outside enclosures?

4      A.    Well, there's various sizes.  There's the

5  regular size enclosure which is the individual, and then

6  there's a little bit bigger one where we can put two

7  people.  And then there's a much larger one where we have

8  a basketball court with two backboards and hoops so you

9  can actually play basketball.

10            The enclosures themselves, outside of the

11  big one with the basketball hoop, doesn't, but the

12  smaller ones have the mister systems and the tarp over

13  the top with the shade, and the water jugs are attached

14  to the enclosures themselves.

15      Q.    Is the larger unit with the basketball courts

16  concrete as well or is that like fence?

17      A.    It's concrete with like a metal weave fencing.

18      Q.    Do you know how many prisoners participate in

19  the Double Bunks Browning/SMU program?

20      A.    Not as many as at one.  But I would estimate on

21  that one probably about a hundred bunks, a hundred cells.

22      Q.    A hundred bunks and 50 cells or --

23      A.    A hundred cells.  Because there's 120.  There's

24  60 in each -- the way the clusters are set up, they're

25  right across from each other.  So there's 60 here and 60

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    here.  It's 120.  And then down one hallway is -- one
2    hallway is shorter than the other one.  One hallway has
3    120, the other one has 240.  So out of that, about 100.
4         Q.    Are double bunked?
5         A.    Yes.
6         Q.    So that means 200 prisoners?
7         A.    Right.
8         Q.    So other than the changes we've just spoken
9    about relating to SMU, have there been other changes to
10   the SMU programming since this memo was approved?
11        A.    Just like at SMU 1, there are now WIPP jobs,
12   porter jobs, inmate worker jobs for inmates in these max
13   custody programs where they can come out and work.  They
14   had something already, but they implemented one at SMU 1
15   and SMU 2, which is Browning Unit is SMU 2.
16        Q.    Do you know how many inmates participate in the
17   porter program?
18        A.    At Browning it's a small number, probably
19   around 15 or 20.  And then at SMU 1, it would be a little
20   higher than that because there's more inmates, but maybe
21   double that.
22        Q.    What does a porter do?
23        A.    They come out and clean the run areas, the
24   showers, self-runs, things like that.
25        Q.    How does a prisoner get a job?  Do they apply?

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    A.    That would be the first thing.  They have to

2  have a desire to do it because we don't make these guys

3  work.  We're not going to make somebody work that doesn't

4  want to.  Not in the max custody.  So they'd have to have

5  the desire first.

6           We would screen them.  We're going to put

7  the inmates to work that do a combination of things.  One

8  is we believe that they're going to be safe.  And the

9  second thing would be is they're trying to help

10  themselves.  They're out there programming and trying to

11  do the right things to better themselves.  So this is

12  kind of a reward to show them that we're working with

13  them also.

14    Q.    Is the mental health staff involved in

15  determining whether a prisoner is appropriate for a

16  porter job?

17    A.    In the mental health areas, they would have

18  some say-so in it.  In the regular GP areas, there

19  wouldn't be any need because they wouldn't work with

20  those inmates.

21    Q.    In the GP areas, who would make the

22  determination then?

23    A.    That would be based on the program staff and

24  the security staff.

25    Q.    And who are the program staff?

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    health than it is for regular max custody.

2       Q.    BY MS. EIDENBACH:  How does it work for mental

3    health?

4       A.    The rotation policy for mental health staff is

5    five years unless you request it, the staff -- they can

6    request to be moved out.

7       Q.    Can they request to stay longer?

8       A.    No.

9       Q.    Is there a minimum length of time that each

10   level lasts in SMU?

11      A.    I don't think it's a set time frame.  Like I

12   said, in the beginning you'd have to at least do 30 days

13   so we can evaluate people and see how they're going to

14   act.  But after that initial phase, it's based on what

15   you do.  So if you participate and you behave, then

16   you're going to move right along and advance.  So you

17   would have to have, you know -- you could do it a little

18   quicker if you really were someone who is really

19   involved.

20      Q.    Do you know what privileges are associated with

21   the three different levels at SMU?

22      A.    Well, the rec is the biggest one probably.

23   Now, we're trying to -- we haven't got it established yet

24   because there are some complications with it, but we're

25   trying to expand the phones so that more calls could be

1   made with the higher stages.  Which I'm sure we'll
2   accomplish, but it's an outside company, so we're working
3   with them to make that happen.  We have met with them,
4   though, to do that.
5           And then there's a set of privileges -- like
6   I said, this is a system that progresses into Central
7   Unit.  So the goal is to do this:  Get you established
8   and get you stabilized on behavior at Browning Unit.
9   Then move you to SMU 1 and give you a little bit more
10  exposure on an outside rec field and working and doing a
11  few more things so that you can see how you interact with
12  other inmates.  Then move you over to Central Unit, and
13  that's where the real privilege system kicks in, where
14  you get the bulk of them, because the physical plant
15  allows that.  It doesn't allow that in those other places
16  because they don't have dining halls and developed rec
17  fields and contact visitation areas and things like that
18  that we have to build.
19          So the Central Unit, the privilege system
20  breaks down with you get to go to the chow hall and eat
21  meals.  You get to go to the athletic field as a group,
22  and there we send about as much as 100 inmates at the
23  time, 80 inmates at one rec turn.  You get to have
24  contact visitation.  You get to work, have a job.  And
25  you get to participate in more opportunities as far as

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1  groups and self-help-type groups even.

2      Q.    So just to be clear, what you just described

3  relates to Central Unit, not SMU 1; is that right?

4      A.    Well, SMU 1 has some of those things, but they

5  don't have a chow hall, they don't have a rec field yet.

6  So it's kind of like apples and oranges with what the

7  physical plants are.  But what we're trying to move and

8  what we talked about earlier with the strategic planning

9  is we're trying to move a system that is really more

10  structured where you move in between these places,

11  getting a little bit more privileges as you move.  Every

12  place has some, but as you -- your behavior and

13  participation warrants it and you advance, so you

14  don't -- it's not quite this clear-cut because every

15  place would have a breakdown.  But let's just say SMU --

16  Browning would be stage 1, SMU 1 would be stage 2, and

17  Central Unit would be stage 3.

18          But it's not that clear.  That's why I don't

19  want to make it look like it's that clear cut, but that's

20  the theory idea of trying to give people a path to move

21  so that they could advance into these areas.  And then

22  Central Unit would be where you could get pretty much

23  everything that you could get at close custody as far as

24  out-of-cell privileges go.

25          And then the next step, of course, would be

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    to move into a community just like with the mental health
2    group, move them into a community in a close custody yard
3    where they were still kept together.
4         Q.    So the idea is that as you're moving to less
5    and less restricted levels, you're actually physically
6    moving to facilities that have more offerings.  Is that
7    right?
8         A.    That's the big global concept.  But you have to
9    realize, and that's why I said, it's so hard to explain
10   this if you don't work it.  Because there's another --
11   the other components are the sex offenders and the
12   protective custody inmates still have to get things.  So
13   their little world is more condensed, but they still get
14   the same system internally.  So you still have to do
15   SMU 1 with that group.  But the theory is as you move
16   from place to place, you get more privileges, and Central
17   Unit being the most, Browning being the least.
18        Q.    So focusing on SMU 1, what privileges does a
19   level 1 get right now?
20        A.    A stage 1 inmate would get very little besides
21   they get to go outside to rec into an outside enclosure.
22        Q.    For how many hours a week?
23        A.    Six.
24        Q.    What about a level 2 at SMU 1?
25        A.    Then they would get to do the bigger rec area

1   bottom of the wait list begin to move upwards?

2       A.   Correct.

3       Q.   Do you know how many inmates are currently on

4   the wait list for group counseling at SMU 1?

5       A.   I wouldn't know, but I would think every inmate

6   that's not in a group is waiting to be in one that's at

7   that stage 2 level.  I don't know why they wouldn't be.

8       Q.   So at SMU 1, what privileges does a level 3

9   prisoner have?

10      A.   They could come out and have jobs.  They get to

11  do the large rec enclosure twice a week.  So that's

12  probably the biggest ones.  The job one is a real big one

13  with the inmates.

14      Q.   So how much out-of-cell time do prisoners get

15  in SMU 1?

16      A.   It's hard to say.  If you're a porter and you

17  get visits -- this gets back to that same thing we talked

18  about a while ago.  You could have double the hours of

19  someone who doesn't have those things.  So it kind of

20  depends on what your life is about too.

21           Since we're talking about things we're in

22  the process of doing, we're also in the process of

23  putting some tables into the pod areas where we're going

24  to allow the stage 3 inmates to have some out-of-cell

25  time sitting at the tables maybe playing cards or maybe

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    eating dinner.  Because we don't have the chow hall, so
2    we thought, let's try this then.  Stage 3s, when we
3    brought the dinner in, because we deliver it to their
4    cells, we could let them come out and let them sit at the
5    tables and eat.
6        Q.    And the out-of-cell time, does that apply to
7    all SMU 1 prisoners or just those in the mental health
8    program?
9        A.    As it stands right now, it's applying to the
10   mental health group, but it's expanding through our
11   strategic planning to all maximum custody inmates, no
12   matter what your classification is, except we'll have a
13   few more restrictions on condemned row.  There's going to
14   have to be a few things that we don't let them do.
15       Q.    And is that expansion part of the strategic
16   plan that we discussed earlier?
17       A.    Yes, it is.
18            MS. EIDENBACH:  I'm kind of in the middle of
19   a section, but I'm not near the end.  So it is noon.
20   Would you like to take half an hour break for lunch?
21            MS. LOVE:  Do you want to finish your
22   subject?  I mean, I'm fine.  I can go forward, but it's
23   just what everybody else's preference is.
24            MS. EIDENBACH:  So maybe we'll finish this
25   and take a break for lunch.

1          MS. LOVE:  Form, foundation.
2          THE WITNESS:  I don't know if there's a
3    waiting list for those.
4          Q.    BY MS. EIDENBACH:  Do you know if anyone would
5    know?
6          A.    Probably the mental health provider.
7          Q.    So for the non-therapeutic groups run by COs at
8    SMU 1, where do those groups take place?
9          A.    Some of them -- majority of them take place in
10   the holding enclosures in the old officer dining area.
11   That's where the majority of them take place.  They could
12   take place -- it kind of depends on the weather.  When
13   it's 120, it's kind of hard to stand out there and do
14   that.  So you could do them outside in the holding
15   enclosure out there.
16          Now, what we're headed toward and doing them
17   in -- just without restraint gear sitting in a room, this
18   would be for the people that are stage 3-type inmates.
19   But just like in a regular group setting.
20          Q.    Do you know how many prisoners participate in
21   groups, not including those who are on a waiting list?
22          MS. LOVE:  Form.  At SMU 1?
23          Q.    BY MS. EIDENBACH:  SMU 1, yes.
24          A.    I don't know a number, no.
25          Q.    Do you know how many COs run groups?

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    programming for prisoners in SMU 1 that we haven't
2    discussed that you can think of?
3        A.    Well, the only one we didn't discuss was having
4    medical -- request that they go to medical to get like
5    nurses line.  So that happens, of course.  Besides that,
6    no.
7        Q.    Are there any other special mental health
8    programs at SMU that we haven't discussed?
9        A.    No.
10       Q.    Other non-mental health programs for inmates at
11   SMU 1 that we haven't discussed?
12       A.    At one -- we're working on getting things going
13   for all max custody, sex offenders, and protective
14   custody inmates so they can have some type of out-of-cell
15   programming whether they have mental issues or not.
16       Q.    Is that expansion part of the strategic plan we
17   have discussed?
18       A.    Yes, it is.
19       Q.    So it has not yet been implemented?
20       A.    No, it hasn't.
21            MS. EIDENBACH:  I think we're at a good
22   stopping place for lunch.  Let's go off the record.
23            (A recess was taken from 12:21 p.m. to
24            1:04 p.m.)
25       Q.    BY MS. EIDENBACH:  We've talked a little bit

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   there that will participate so they can actually program
2   and get the best we can out of this for as many inmates
3   as we possibly can.  So with that being said, probably
4   every cell block has some people in it that are mental
5   health.
6               We're in the process right now of removing,
7   whether they want to or not, we're going to remove all
8   the ones out of 5 and 7 that have mental health scores of
9   3s just so we can get them into more open-type cell
10  blocks.
11      Q.    So CB 1 is where those inmates involved in the
12  mental health program are housed; is that right?
13      A.    That's correct.
14      Q.    Okay.  And CB 2 is the behavioral program?
15      A.    CB 2 is the general population, what we call
16  the walking 5 program.
17      Q.    And then CB 3 and 4 and 5 and 7 are general
18  population maximum custody; is that right?
19      A.    Correct.
20      Q.    And what programs exist for CB 3, 4, 5, and 7?
21      A.    There are no programs outside of the cell that
22  we are using in those buildings at this time.  All the
23  concentration of inmate programming that's out of the
24  cell -- we do programming inside the cell that's done
25  through our closed circuit television system.  You can

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1       A.      That's correct.

2       Q.      Are there any MH-3s in cell blocks 3 and 4?

3       A.      Yes, there are.  Now, we're moving them all

4    into CB 4.  So we're going to cluster them all in CB 4.

5       Q.      And has this already begun?

6       A.      Yes, it has begun.

7       Q.      And what percentage would you say complete is

8    that movement?

9       A.      It's a real small performance measure because

10   right now we're just moving them on a case-by-case basis.

11   But I'd say maybe 10 percent.

12      Q.      And do you have a date by which you plan to

13   have all MH-3 inmates moved to CB 4 who are in --

14      A.      The date that I have in mind -- this is just me

15   speaking.  The date that I would like to make it happen

16   is by the end of October.

17      Q.      And is there an official date other than the

18   date you're hoping for?

19      A.      There's not an official one yet, but I'm

20   pushing to get one.

21      Q.      And who are you pushing?

22      A.      I've been talking with our director about

23   setting a date for it.  I've given him a time line of

24   what I'd like to see happen between now and Christmas.

25   That's one of the phases to happen, to move those guys by

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1  October into that building.  So there are several issues
2  in that.  That's just one of them.
3     Q.    And at that point, CB 4 would become like CB 1,
4  2, and Kasson because it would be specifically housing
5  mental health program inmates?
6     A.    Not just yet.  It will soon.  But there's some
7  other things we've got to accomplish with that.  This
8  group is not quite as amenable to things as the CB 1
9  group is.  So we've got to walk and talk with those guys,
10 expose them to some things at a much slower pace to get
11 them where they feel comfortable to come out of their
12 cells and doing some things.
13    Q.    So for female inmates, the max custody yard at
14 Perryville is Perryville-Lumley SMA; is that correct?
15    A.    That's correct.
16    Q.    And in the exhibit that you have before you,
17 219, is Perryville SMA included in that memo?
18                MS. LOVE:  419?
19                MS. EIDENBACH:  419, sorry.
20                THE WITNESS:  It doesn't look like it, no.
21    Q.    BY MS. EIDENBACH:  Do you know why it wasn't
22 included?
23    A.    I would imagine because they have already
24 had -- they've had a program going on there for quite
25 some time, for several years.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1      Q.     So are there mental health programs at
2   Perryville SMA?
3      A.     I know they do one-on-one, but I'm not sure
4   what they do outside of that.  I know it's a very small
5   group of inmates.
6      Q.     Do you know how many?
7      A.     I would estimate around 70 to 90.
8      Q.     Do you know if they conduct any groups for
9   mental health inmates at Perryville SMA?
10     A.     I can't say for sure on that, no.
11     Q.     Have you ever seen a schedule similar to
12  Exhibit 420 listing the groups available at Perryville
13  SMA?
14     A.     No, I haven't.
15     Q.     Do you know if the program at Perryville SMA
16  uses stages like the other max custody yards?
17     A.     Yes, they do, because I know they base their
18  recreation and their chow hall use based on the stages.
19     Q.     Are the stages used at Perryville the same as
20  the stages used at the other max custody yards in their
21  mental health programs?
22     A.     1, 2, and 3, yes.
23     Q.     And the process for progressing through the
24  levels is the same at Perryville; is that right?
25     A.     I don't know if that process is quite the same.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    It was already existing, and I don't know if it's the
2    same in that respect.  I think theirs might be more time
3    based on X amount of months doing this, X amount of
4    months doing something else.  I'm not sure on that.
5         Q.    Is there a policy in place governing the
6    movement of inmates through the stages at Perryville SMA?
7         A.    I don't believe it's in policy yet because we
8    were going to go and develop one, but then when we
9    started talking about the strategic planning and the
10   things that we were going to change, we decided let's
11   just change it once and do it for everything.  So we
12   haven't developed that policy yet.
13        Q.    So the strategic plan that we've been talking
14   about today would include changes at Perryville?
15        A.    Yes, it would.
16        Q.    Do you have any idea how long the stages last
17   at Perryville SMA?
18        A.    I'm not sure, but I think it's a few months at
19   least to get to the -- takes several months to get to the
20   highest one, which is stage 3.
21        Q.    And that's lock step, so you have to complete a
22   minimum amount of time before you can progress?
23        A.    I believe so.  I'm not real -- I've been out
24   there and looked at the program, and I've seen the
25   recreation, watched them go to the chow hall, went to the

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1      Q.    So it's your testimony that no reports or

2    documents are ever generated at ADC that analyze or

3    record the length of stays of a prisoner in isolation?

4                    MS. LOVE:  Form and foundation.  Misstates.

5                    THE WITNESS:  No, that wouldn't be my

6    statement because we just generated one a few weeks ago

7    because we are looking at all the max custody inmates.

8    We've done that kind of stuff before.  I wouldn't be the

9    first one to do that.

10     Q.    BY MS. EIDENBACH:  Why did you generate the one

11   a few weeks ago?

12     A.    Because we're in the process of looking at

13   every inmate in maximum custody to see where they can be

14   appropriately placed -- remember that pecking order I

15   described a while ago.  So that we can know where to

16   place people.

17     Q.    And who generated the report?

18     A.    It was generated through our classification

19   administrator.

20     Q.    And who received the report?

21     A.    A group of staff that I had put together to do

22   this project.

23     Q.    Who are the staff?

24     A.    There's some staff members that are

25   classification specialists that are looking at reviewing

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   these inmates.

2       Q.    Can you give me their names?

3       A.    I can, I imagine.  I'm not sure if it -- yeah,

4   I can give them to you.  Macadorie, Espinoza, Cattrell,

5   Stacy Crabtree, myself.  That's the main group of it.

6   There might be one or two other people.  We've got a

7   couple CO IIIs that are doing part time working it, but

8   they rotate around.

9       Q.    Is a prisoner's length of stay in isolation

10  ever a consideration in the decision to retain or release

11  the prisoner from isolation?

12              MS. LOVE:  Form.

13              THE WITNESS:  Would you repeat that

14  question.

15      Q.    BY MS. EIDENBACH:  Sure.  Is the length of a

16  prisoner's stay in isolation ever a consideration in the

17  decision to keep him or her in isolation or to release

18  them to a general population or other max custody yard?

19              MS. LOVE:  Form and foundation.

20              THE WITNESS:  Generally speaking, no.

21      Q.    BY MS. EIDENBACH:  Why not?

22      A.    It's a point system, and you're scored out by

23  points.  And that's -- that's how it works.  So if your

24  points are always -- if your points stay at a high level,

25  then you would remain in maximum custody.

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

```
 1        A.     I don't believe they do the Memo of
 2   Expectations.  I know 2 did because that was the original
 3   one we developed for our max custody inmates to become
 4   workers and to get out into the yard unrestrained.  And
 5   that was a -- to be honest, a little bit more volatile
 6   group because some of those guys were well-experienced
 7   criminals.  Behaving, but well experienced.  Some of the
 8   CB 1 inmates, their issues are more on the mental health
 9   side of things.  These are the guys that are more like
10   the wolves type people.
11        Q.     Is there a name for the program that uses the
12   step matrix?
13        A.     Well, we have an informal name.  We call it the
14   Walking 5 Program.  And the only reason we call it that
15   because they're max custody inmates that they're walking
16   around without restraints.  But once we changed some
17   things -- I'm sure we're not going to use that
18   terminology going forward because we're going to open up
19   more cell blocks, and then it's going to become more of
20   this tiered system that we talked about earlier where
21   more of the stage 3 inmates are in Central.  The stage 2
22   inmates, outside of protective custody and the sex
23   offenders, are in SMU 1.  And more of the stage 1
24   inmates, including the condemned row and STG, which are
25   also separate, are in Browning.  So we can have some more
```

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   organization to where people are at with different levels
2   of privileges based on where you're housed wide at.
3        Q.    So when was the Walking 5 Program implemented?
4        A.    Four years ago.  I left there being the warden
5   in May of 2011.  I believe we started it exactly four
6   years ago.  I believe we started it in September of 2009.
7   That's the way I remember it.
8        Q.    Do you know how many prisoners are in the
9   Walking 5 Program?
10       A.    Well, the bed capacity, we keep it fairly full.
11  The bed capacity is 156.
12       Q.    And what is the criteria for placement in the
13  Walking 5 Program?
14       A.    It's a series of classification or factors you
15  look at.  And they're everything from prior discipline
16  history, severity of discipline.  So if you have violent
17  acts as opposed to a lot of minor-type things.  Your
18  time, your original crime, your gang affiliation.  Now,
19  none of these things exclude you.  But if you fit on a
20  lot of them, it's going to.  Your programming that you've
21  done in the past.  Looking at those type of things.
22  Recent type of violations.  So let's say you got a couple
23  of discipline violations in the past six months, you're
24  not going to qualify.  So it's really based on your
25  internal behavior, your original crimes, your propensity

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    to violence.  Things like that.

2        Q.    And the matrix contained in these documents

3    only applies to CB 2, it's not used in any other max

4    custody yard or program?

5        A.    No, just applies to CB 2.  Now, some of these

6    things do apply in other places, but not all of them.  So

7    this is just CB 2's program in a nutshell here with what

8    they're doing.

9        Q.    Do other units have a similar matrix that they

10   use?

11       A.    Yeah, in fact, we just developed a new one that

12   is a little bit more complex for the project we're doing

13   now.  It actually has more categories.  And we're trying

14   to actually automate this one so we can input everything

15   and let our computer system prioritize them for us.  But

16   it has about 20 categories that we're looking at in it.

17       Q.    So if you look at ADC139523.  It's the last

18   page.

19       A.    Yes.

20       Q.    It mentions CB 1 over in the far right column.

21       A.    Yes.  Let's see.  Far right.  Yeah.  In-Pod

22   Activities.

23       Q.    So is this page the matrix for CB 1?

24       A.    Actually, this one might be -- well, we do have

25   the loaner TV program in there and we've got recreation

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1    awards to include the ribbons.  Yeah, this one looks
2    like -- this looks like actually this is the CB 2 one,
3    and this is the CB 1 one.  Yes, it is.  They have their
4    own little newsletter.  I don't see it listed here,
5    but...
6         Q.    Does Kasson Unit have a similar matrix?
7         A.    It would.  It doesn't have -- I don't think
8    quite as elaborate as this, but it does have -- it's
9    something they give to the inmates to tell them what the
10   privilege options are.  And they do have a newsletter
11   also.  In fact, theirs is called The Kassonian.  And they
12   have art contests and poetry contests.  They do a lot of
13   the similar things.  It's just not quite as detailed as
14   CB 1 because the CB 1 inmates are a little bit
15   functioning.
16        Q.    What about SMU at Eyman, do they have a matrix?
17        A.    They have -- it's a little bit different than
18   this.  They have just recently, though, put out something
19   that does break down some of their privilege systems.
20   Because we had a meeting about a couple months ago and
21   basically told everybody to start following the Central
22   Unit model because the Central Unit was the most
23   organized of all of them because they've been around the
24   longest.  So we said, these guys have gone through the
25   growing pains and they have some of this stuff down, so

Case 2:12-cv-00601-ROS   Document 911-1   Filed 05/19/14   Page 102 of 103

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

1   follow what they're doing and everybody get on the same

2   page with that respect.

3           So that's when we told them we want all of

4   the CO IIIs to get involved in the counseling groups

5   because the only place that was doing back then was

6   Central Unit.  Now Browning Unit's doing it.  SMU 1 will

7   start soon.  So we're trying to get everybody involved in

8   the same type of things.  It might not be exactly the

9   same programs, but the overall idea will be the same.

10      Q.   What about Perryville, do they have a matrix

11  similar to this?

12      A.   Yes, they do.  I don't know the detail of it,

13  but I know they have something that they put out as

14  Phoenix Complex.

15      Q.   I was going to ask you, other than CB 1, CB 2,

16  Kasson, Phoenix, Eyman, and Perryville, are there any

17  other units that have a matrix?

18      A.   To my knowledge, with the addition of Phoenix,

19  no.  I think they might be developing something down in

20  Tucson, but I haven't seen that yet.

21      Q.   Looking back at 523, so the last page of the

22  exhibit, CB 1, do you know when this program was put into

23  place?

24      A.   Yes.  It was May of 2012, I believe.

25      Q.   And how many prisoners are in this program?

GLENNIE REPORTING SERVICES, L.L.C.
602.266.6535   www.glennie-reporting.com

30(b)(6) ADOC (Carson Anton McWilliams) - 9/27/13

```
 1   STATE OF ARIZONA    )
                         )
 2   COUNTY OF MARICOPA  )

 3

 4           I, CAROLYN T. SULLIVAN, a Certified

 5   Reporter, Certificate No. 50528, in the State of Arizona,

 6   do hereby certify that the foregoing witness was duly

 7   sworn to tell the whole truth; that the foregoing pages

 8   constitute a full, true, and accurate transcript of all

 9   proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14           I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18           WITNESS my hand this 14th day of October,

19   2013.

20

21

22                       Carolyn T. Sullivan, RPR
                         Arizona Certified
23                       Reporter No. 50528

24

25
```