**Index of Exhibits to the Declaration of Amy Fettig**

Exhibit A:   Letter dated May 9, 2014 from David Fathi to Dan Struck

Exhibit B:   Letter dated May 13, 2014 from Kathleen L. Wieneke to David Fathi

Exhibit C:   Letter dated May 19, 2014 from David Fathi to Tim Bojanowski

Exhibit D:   May 27, 2014 Director's Instruction #326, Maximum Custody Population Management [ADC261959-261985]

Exhibit E:   Cover and pages 56 and 59-60 of the deposition of Dr. Craig Haney, Ph.D., J.D., dated March 14, 2014

# Exhibit A

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



**BY ELECTRONIC MAIL ONLY**

May 9, 2014

Dan Struck
Struck Wieneke & Love
3100 West Ray Road
Chandler, AZ 85226
Email: dstruck@swlfirm.com

        **RE:   Parsons v. Ryan**

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*

*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

Dear Dan:

I write to summarize the discussion on our May 8 call, including where the parties reached agreement, declared an impasse, or stated that they need to do more research on an issue. If this does not comport with your memory, please let me know immediately. To the extent the parties stated they would research a matter and get back to the other side, we agreed the responses will be provided on Monday, May 12.

## I.    Extension of due date for Plaintiffs' discovery motion

We pointed out that Plaintiffs' discovery motion is currently due on May 14, the same day as motions for summary judgment and motions challenging expert testimony. We asked that you stipulate to a two-day extension for the discovery motion until May 16, to allow Plaintiffs to review your summary judgment motion and perhaps narrow our discovery requests accordingly. You agreed to this stipulation; you did not condition your agreement upon Plaintiffs' motion taking any particular form.

Shortly after the conclusion of our call, you emailed me to say that you were withdrawing your stipulation in retaliation for my statement, in response to a question from Defendants' counsel, that Plaintiffs plan to file a motion rather than a "one-pager." This is not the first time you have entered into a stipulation and then abruptly backed out; such tactics are not conducive to productive negotiations. We will present our motion for an extension to the Court and indicate your opposition.

## II.    Expert Tours of Isolation Units and Programming

The parties could not agree whether Plaintiffs' isolation experts will conduct additional tours to observe the programmatic and physical plant changes that Defendants contend have occurred between September 27, 2013 and April 1, 2014. Accordingly, Plaintiffs will bring this to the Court for resolution.

### III.    Depositions

We explained that at the time Defendants' experts were deposed, the Court's February 26, 2014 Order (Doc. 815), affirming the September 27, 2013 discovery cut-off date, was in effect.  Accordingly, when deposing Defendants' experts, we did not ask questions about post-September 27 information because we were relying upon the Court's order.

You agreed that if Defendants' experts issue additional reports, Plaintiffs will be entitled to four hours of deposition of each expert under the Court's order, and may ask about the experts' reliance on post-September 27 information or developments in addition to any supplemental opinions the expert might offer. However, you did not agree to additional depositions if Defendants' experts do not issue additional reports, stating that you want to review the deposition transcripts and determine if you think questions were already asked about post-September 27 evidence.  You said you would get back to us on this topic.

The parties also discussed having one or two people on each side serve as point persons in arranging and scheduling the additional depositions authorized by the Court.  We stated that we did not know if we are going to need all of the authorized depositions at this time, and will have a better idea after reviewing Defendants' motion for summary judgment.

### IV.    Prisoner Health Care and Institutional Records

#### A.    Supplementing Health Care and Institutional Files Previously Made Available for Inspection or Production

On May 7, 2014, I sent you a letter with a list of prisoners whose medical and/or institutional files were previously made available to Plaintiffs' experts for review.  We request that we be provided a supplemental production of all documents in the file that are dated after the file was produced or inspected. We explained that this supplementation is necessary to test Defendants' contention that health care and conditions of confinement have greatly improved in the six months since the original discovery cut-off date.  Our experts previously reviewed those files and concluded that ADC's health care and isolation units have systemic problems that put prisoners at serious risk of substantial harm.  They need to review any new documents in these same prisoners' files to determine if the care or conditions have improved or not.

You stated that you have supplemented the production of documents from the named plaintiffs' medical files through April 1 (except for Victor Parsons, whose records you decline to supplement), and you will not otherwise supplement the production of health care and institutional files.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

The parties declared an impasse on the supplementation of these records.

## B. Death Records and Files of Prisoners Granted Medical Parole ("Imminent Danger" Release)

Plaintiffs requested that Defendants produce the "death records" (health care file, psych autopsy, mortality review, and any investigations) of all ADC prisoners who died between September 27, 2013 and April 1, 2014. Plaintiffs identified 67 deaths announced on ADC's website during this time.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Lucy stated that Defendants can produce only the 22 records on which the investigation is complete, and will not produce records in cases where investigation is still ongoing, even though the files are in ADC's possession. She asserted that past productions of death records were done this way, although we pointed out that we had never been given this reason for not producing records before. Lucy also stated that "many" of the prisoners who died were in the custody of the private prisons when they died, or were housed at a private prison and then only briefly transferred to Tucson before their death. However, she confirmed that the past production of records for deaths from March 4, 2013 to September 27, 2013 was complete, and that no records had been withheld from production on the basis that investigations were not complete, or because the prisoner was transferred to Tucson shortly before dying.

After further discussion we confirmed that there is 1, perhaps 2, of the 67 prisoners who died while housed at Kingman. Lucy said she thought the universe of prisoners transferred to Tucson shortly before their death was also 1 or 2 cases. I explained that these latter files are nonetheless needed because we need to evaluate the care they were receiving at Tucson prior to their death, and in order to make that assessment we need to know what their medical conditions were leading up to the transfer. We reached an impasse on the production of these prisoners' records.

You stated that putting aside these one or two cases in dispute because of the transfer from a private prison to Tucson, Defendants will agree to produce these death records on a rolling basis, beginning with the 22 for which the investigations are complete. You stated you thought that all records could be produced by July. Caroline requested you ask ADC how many investigations from the October-April time period will likely still be ongoing in July. You stated that you would ask and provide us more detail on timing.

We requested the medical files for three persons who were paroled for medical reasons between September 27, 2013 and April 1, 2014. We established that we were using the phrase "medical parole" to mean the "imminent danger"

3

releases granted by the Arizona clemency board.  You objected on the grounds that these files had never been requested before, to which we responded that to our knowledge, these are the first prisoners given "imminent danger" release since Corizon took over care.  This assertion is based upon a phone conversation that counsel had on Monday with staff at the clemency board who provided us with those individuals' names.  In any event, the parties agreed they are at an impasse regarding the medical records of these three individuals.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

### C.    Additional Health Care and Institutional Files

We are requesting a sample of health care and/or institutional files of the prisoners listed in your various reports, to test the accuracy of the data and representations in the reports.  We are also requesting a sample of health care and/or institutional files of prisoners classified as MH3 or above and/or as Seriously Mentally Ill (SMI), and of prisoners housed in the isolation units.  These are in addition to the files previously reviewed by our experts that we need supplemented, because they are being used for different purposes.

You stated that you would provide a random sample of all class members, not the prisoners listed in your reports.  We do not agree that such a methodology is appropriate, and stated our position that Plaintiffs' experts, not Defendants, must decide which files Plaintiffs' experts review, subject to Defendants' right to attack their methodology.  You also expressed concern that we are requesting too many records.  We pointed out that Defendants' experts have attacked Plaintiffs' experts for not reviewing *enough* records to enable them to reach valid conclusions.  We cannot be put in the position where Defendants limit our experts' access to records, and at the same time attack our experts for not reviewing enough records.  I suggested that Plaintiffs could agree to smaller sample sizes if Defendants will stipulate that those samples are large enough to enable Plaintiffs' experts to reach valid conclusions.

We said that we will review the lists/reports and get back to you with a proposal on sample size.

At the end of the call, Amelia asked about the dental routine care and appointment lists requested on page 3 of my May 6, 2014 letter.  You stated that if Dr. Smallwood can generate such a list, it will be provided.

### V.    Documents That Do Not Match the Description or Name of Those in Past Productions

Given that some of the reports described in your supplemental brief were referred to by names that we had not seen on reports previously provided, we asked you to confirm that we correctly understood what you were referring to in your brief.  To the extent your brief referred to new reports not previously

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

produced, we request immediate production of all reports through April 1, 2014.

To recap, in my May 6 letter, I identified the following discrepancies:

- **1.f. Monthly Infectious Disease/Clinical Report**: we have previously been produced Monthly Clinical Data Reports, Monthly Hepatitis C Reports, and Quarterly Infectious Disease Reports. We requested "Monthly Infectious Disease Reports" if they are something different and exist.

- **1.g. Monthly Monitored Conditions Report**: we were previously given a Monitored Conditions Report, dated March 12, 2013; a DM Program Report; and Quarterly Monitored Condition Reports. We requested "Monthly Monitored Condition Reports" if they are something different and exist.

- **1.h. Monthly Inmate Suicide Report**: we were previously provided "Inmate Assault, Self-Harm, & Mortality Data" reports. We requested "Monthly Inmate Suicide Reports" if they are something different and exist.

- **1.i.  Monthly Outside Consult Report**: we were previously provided "Quarterly Network Providers Directory" and "Quarterly Hospitalization Statistics" reports. We requested "Monthly Outside Consult Reports" if they are something different and exist.

- **1.j.  Monthly Special Accommodations Report**: we could not identify any report from a past production that had this name, or contained information similar to your description of this report in your brief. We requested production of all of these reports, or that you direct us to the already-produced reports to which this refers.

- **16.  State Prison Capabilities for Medical, Mental Health, and Dental Treatment Services Reports**: we were provided reports with these names for the months of June 2012, October 2013, and January 2014. We requested production of all other monthly reports through April 1, 2014, or confirmation that these three reports listed are all that exist.

You stated that Defendants would compare my letter and listed Bates ranges to your supplemental brief and confirm if these were indeed the same reports.

## VI.    Documents That Support "Evidence" Defendants Plan to Introduce

There were several categories in Defendants' supplemental brief where Defendants did not describe or name the documents that you plan to rely upon; only that Defendants planned to "introduce evidence" on a particular topic. We are requesting that to the extent there are documents that you plan to

introduce or use as the basis of arguing the existence of facts, you identify and
produce these documents.

To recap, in my May 6 letter, I identified the following areas where no
documents were described:

- **8. Medication Administration Modifications**:  We requested
  documents pertaining to the four described changes.
- **9. Director's Instruction 326**:  We requested (1) documents sufficient
  to show that the programmatic changes have been implemented; and
  (2) any institution/unit-specific post orders, documents, etc.
  implementing DI 236.  With regard to (1), you stated that you will
  check and see if there are logs or some other documents that show these
  programmatic changes are occurring; and with regard to (2), given the
  DI was issued in late March, to the extent any institution-specific post
  orders, etc. were generated before April 1, you will produce those
  documents.
- **11. Crisis Intervention/Suicide Prevention**:  We requested
  documents (1) showing self-harm incidents and suicide attempts since
  the implementation of these policies; and (2) schedules for these new
  "rovers" showing hours actually worked, and in what units and housing
  areas.  You stated that with regard to (2), you anticipate the evidence
  would be via testimony, but would check because you thought that
  Defendants already produced "rover" schedules.  Request (1) under this
  category is similar to a request made regarding your 15th category of
  documents, see the next bullet point.
- **15. Inmate Assault, Self-Harm, and Mortality Data**.  We requested
  (1) Serious incident reports (SIRs) on use of force in isolation,
  including videos and reports for any use of force on prisoners on
  psychotropic medication, and (2) SIRs and supporting documentation
  and videos for any incidents of self-harm and attempted suicides.

You stated that you would get back to us on providing the SIRs and supporting
videos/documents on incidents of self-harm or suicide, but Defendants refuse
to produce any SIRs, documents, or videos on use of force on prisoners on
psychotropic meds.  I explained that we need those to counter your claim in
your Supplement to Supplemental Brief that this evidence would be used to
show that the use of pepper spray and force on mentally ill prisoners had a
penological purpose.

We agreed we were at an impasse on SIRs for use of force on prisoners on
psych meds, and you would get back to us regarding SIRs on suicides and self-
harm.

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

**VII.   Documents Requested for Production by July 18, 2014**

On page 12 of my letter on categories # 9 (DI 326) and # 11 (Suicide Prevention), we requested lesson plans, schedules, curricula, and documents sufficient to show that these programs or trainings actually occurred.  You stated that it was your understanding that the suicide prevention training has nothing new to produce, that it is the same training used for a few years and for which we already have information.  I pointed out that your supplemental brief describes the "recent implementation of crisis intervention/suicide prevention training to staff."  (Doc. 841 at 14).

<u>You stated you would get back to us as to what types of documents exist that show the changes have occurred, and whether there actually is anything new for suicide prevention training that has not been produced.</u>

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION

Similarly, with regard to page 11 of my letter, regarding category # 7 (Changes to the Mental Health Services Technical Manual), we requested documents that show the policy changes are actually being implemented, and do not exist only on paper.  <u>You stated that you would see what types of documents are sufficient to show the policy changes have occurred.</u>

Finally, with regard to the request at page 9 of my letter for the production of documents, including emails or memos, regarding the quality, sufficiency, or limitations of the data collected by Corizon and/or ADC for the reports listed at Part 1, subparts a-c, e-i, and k-r of Defendants' supplemental brief, you stated that Defendants will not produce any email or correspondence.  <u>The parties are at an impasse.</u>

Please let me know immediately if this does not comport with your recollection or notes.  We look forward to exchanging information with you on Monday.

Very truly yours,

David C. Fathi

Cc:   All counsel

# Exhibit B



STRUCK WIENEKE & LOVE                    3100 West Ray Road, Suite 300, Chandler, Arizona 85226 | 480.420.1600 | swlfirm.com

May 13, 2014

Daniel P. Struck
Partner

Kathleen L. Wieneke
Partner

Rachel Love
Partner

Timothy J. Bojanowski
Partner

Christina Retts
Partner

Jamie D. Guzman
Associate

Nicholas D. Acedo
Associate

Tara B. Zoellner
Associate

Amy L. Nguyen
Associate

Ashlee B. Fletcher
Associate

Anne M. Orcutt
Associate

Kevin J. Nguyen
Associate

Jacob B. Lee
Associate

Mark A. Bracken
Associate

David C. Lewis
Of Counsel

___**VIA EMAIL ONLY**___

David Fathi, Esq.
ACLU
National Prison Project
915 15th Street, NW
7th Floor
Washington, DC  20005-2112

> **Re:**   ___Parsons, et al. v. Ryan and Pratt___
> ___U.S. District Court of Arizona; 2:12-cv-00601___

Dear David:

Thank you for your letter of May 9, 2014, regarding your request for additional discovery.  As we mentioned on the phone call, your letter of May 6th detailing the additional discovery that you would like to engage in goes far beyond that what was contemplated by Judge Wake in his April 30, 2014 Order. Specifically, Judge Wake stated that "The Court cannot, at this juncture, authorize a blanket request for production of documents."     The Court specifically pointed out that the Plaintiffs' request set forth in Appendix A of Doc. 858 was "impermissibly broad."  Notwithstanding that admonition, Plaintiffs have requested documents and discovery that far exceed that which was requested in Appendix A. In any event, several of the points in your May 9 letter are inaccurate and/or need further clarification.  Defendants' concessions regarding discovery in no way constitute a waiver regarding the objections to the admissibility of evidence or that Plaintiffs' experts' methodology is reasonable or reliable.  Further, Defendants do not concede that the production of this information allows Plaintiffs and their witnesses to provide testimony and opinions on areas that they could or should have gone into previously.

## I.   EXTENSION OF DUE DATE FOR PLAINTIFFS' DISCOVERY MOTION.

We fail to understand Plaintiffs' refusal to abide by Judge Wake's directive to file a joint one-pager on any discovery disputes.   When we agreed to a two-day extension, it was only because we are preparing Motions that were due on May 14th. When you clarified that you had no intention of following the joint one-pager requirement, there appeared to be no need for an extension of this deadline.   Giving Plaintiffs an opportunity to review Defendants' summary judgment motion to determine what discovery you might want to request to defeat it provides an unfair

David Fathi, Esq.
May 13, 2014
Page 2

advantage to Plaintiffs that we believe was contemplated by the Court when setting the May 14 deadline for raising any "last resort" discovery disputes. Your statement regarding Defendants "backing out" of extensions is not accurate. Indeed, the Defendants have only refused to stipulate to one extension, despite the fact that Plaintiffs have refused to stipulate to similar extensions at nearly every opportunity.

## II.   EXPERT TOURS OF "ISOLATION" UNITS AND PROGRAMMING

Judge Wake made it clear that additional tours will not be authorized.   In an effort to be accommodating, Defendants agreed to provide Plaintiffs with additional photographs of physical plant changes in the maximum security units, which Plaintiffs declined. We also agreed to provide Plaintiffs with other evidence of programming efforts in these units. Plaintiffs insisted that photographs and programming would not allow their experts to "talk to class members". Surely this could be accomplished by arranging interviews with class counsel and relaying the information to the experts, if necessary. Plaintiffs declined.

## III.   DEPOSITIONS

We can't agree to allow additional depositions with respect to information that was already contained in the reports of the Defendants' experts. We agreed to follow Judge Wake's Order with respect to up to four hours for any expert in the event that a supplemental report is prepared. In light of the fact, though, that Plaintiffs already have taken seven hours for each of these experts, we can't agree to additional time for questions related to opinions of which you were well aware prior to the deposition. Just as Plaintiffs held Defendants to seven hours and no more on Plaintiffs' expert depositions, Plaintiffs should not get the benefit of additional time to depose these experts simply because you didn't have time to ask these questions the first time.

You also told us that you have not decided whether Plaintiffs would be taking any of the additional depositions set forth by the court. Please advise as soon as possible as to whether you plan to depose the witnesses set forth on page 2 of the April 30th Order.

## IV.   PRISONER HEALTH CARE AND INSTITUTIONAL RECORDS

Plaintiffs have requested sampling of health care and institutional files of prisoner from various reports. Defendants have carefully considered Plaintiffs' proposal. Defendant will agree to a random pull of medical files from all but one of the lists in Attachment C. No files will be pulled from the Special Accommodations Report. No Plaintiffs' expert has previously opined on any issues relating to these matters. Thus, any "supplement" on these issues would be improper. No institutional files will be produced on random sample. The Court's Order specifically refers to a random of sample of "medical files". The files pulled will be from September 2013 to April 2014.

David Fathi, Esq.
May 13, 2014
Page 3

As for the "death records" listed in Section "H", Defendants will produce the death records, previously defined as one-year of medical records prior to death, mortality reviews and any psychology autopsies, for the persons identified in A - O, to the extent not already previously produced.

Plaintiffs are requesting both the March and February lists for diabetes generate the random sample of files to be produced. Defendants will provide one monthly report from which the random sample of files will be generated. Please select whether Plaintiffs want the February or March 2014 list to generate the random sample for production.

Plaintiffs have requested 10 health care files per institution to be selected using a random number generator from alphabetical lists of all prisoners classified as seriously mentally ill ("SMI") Perryville, Lewis, Yuma, Tucson, Florence, Eyman, and Phoenix.

We can agree to provide some files of SMI inmates to be randomly selected. The number of files is still to be determined.

Plaintiffs have requested 20 health care and institutional files from prisoners in each of the four isolation units (Eyman-SMU 1, Eyman-Browning, Florence-Central (including Kasson), and Perryville-Lumley SMA). Defendants deny this request.

As for the files listed in Attachment A, Defendants will not supplement the records reviewed by Vail and Haney on-site, as such a production is entirely too burdensome. Defendants will not produce any files from Attachment B.

As you can imagine, the time to pull and copy this many medical files is significant and creates an enormous burden on the facilities. At this time, we do not have a reasonable estimate on the time it will take to pull and copy the records requested, but it is not a matter of days, but a matter of many weeks to be sure.

Please do not hesitate to contact us if you questions.

Very truly yours,

Kathleen L. Wieneke
For the Firm

KLW:kjp
2902414

# Exhibit C

LEGAL DEPARTMENT
NATIONAL PRISON
PROJECT



## BY EMAIL TRANSMISSION ONLY

May 19, 2014

Mr. Tim Bojanowski
Struck, Wieneke & Love
3100 W. Ray Rd., Suite 300
Chandler, AZ  85226

Dear Tim:

AMERICAN CIVIL
LIBERTIES UNION FOUNDATION

PLEASE RESPOND TO:
NATIONAL PRISON PROJECT
915 15TH STREET, NW
7TH FLOOR
WASHINGTON, DC 20005-2112
T/202.393.4930
F/202.393.4931
WWW.ACLU.ORG

DAVID C. FATHI
DIRECTOR
ATTORNEY AT LAW*


*NOT ADMITTED IN DC;
PRACTICE LIMITED TO
FEDERAL COURTS

I write in response to your letter of May 15.  You purport to summarize the parties' May 8 discussion regarding expert inspections of the isolation units by Dr. Haney and Mr. Vail, but your account of this discussion is unfortunately not entirely accurate.

If there are photographs depicting the physical plant changes that have allegedly taken place in the isolation units, plaintiffs request that they be promptly produced.  We also request production of documents showing that programs described in ADC and Corizon policies are actually being provided in the isolation units.  At no time during our May 8 telephone conversation did we reject any offer of such photographs or documentation.

We did say that photographs and program documentation are not a substitute for Plaintiffs' experts viewing these allegedly changed conditions on-site -- just as defendants' experts did -- and talking with the class members who are the purported beneficiaries of these changes.  I did not interrupt anyone during the call, but once defendants had made clear that they would not permit the requested expert tours and declined to reconsider their position, I did say that there was little point in arguing about the issue further.


Very truly yours,

David C. Fathi


Cc:      All counsel of record

# Exhibit D

**ARIZONA DEPARTMENT OF CORRECTIONS**
**DIRECTOR'S OFFICE**

**MEMORANDUM**

**TO:**        **DISTRIBUTION**

**FROM:**      **CHARLES L. RYAN, DIRECTOR**

**DATE:**      March 27, 2014

**SUBJECT:**   Director's Instruction #   326   , Maximum Custody Population Management


This Director's Instruction is effective immediately and will remain in effect until incorporated into the appropriate Department Order.  This Director's Instruction shall be reviewed for modifications after 90 days.


**PURPOSE**:

This Director's Instruction is being implemented to facilitate a process that requires inmates in maximum custody to work through a program utilizing a step system providing the opportunity to participate in jobs, programs and other out of cell activities.  Based on behavior and programming, inmates may progress from controlled based housing to open privilege base housing where movement outside a cell is without restraint equipment.

This modifies the concept of programming maximum custody inmates involved in commission of one the Forbidden Three Acts (see definition) and the Guiding Principles (see definition) developed by the Association of State Correctional Administrators (ASCA).

**PROCEDURE:**

**1.0      INTAKE AND ASSESSMENT**

    1.1      Inmates shall be assigned to maximum custody pursuant to Department Order 801, Inmate Classification.

        1.1.1      This does not apply to inmates assigned to the Restrictive Status Housing Program (RSHP).  Inmates placed in the RSHP shall remain in the program until successful completion.

            1.1.1.1      If necessary, a classification override shall be used in the RSHP until completion.

            1.1.1.2      If an inmate is removed from the RSHP due to disruptive behavior (or for any other reason) they must return to the RSHP to complete, once the issue is resolved.

    1.2      Upon arrival to maximum custody, inmates shall initially be assigned to the intake and assessment area at the Arizona State Prison Complex (ASPC) – Eyman, Browning Unit, except population groups that require specialty housing (see definition).  The Assessment Team consisting of a Correctional Officer III (CO III), security supervisor and Associate Deputy Warden or designee shall within five work days:

1

ADC261959

1.2.1    Utilizing orientation materials, orient new arrivals on expectations of maximum custody population management and RSHP.

1.2.2    Conduct a face to face interview with the inmate.

1.2.3    Conduct a review to place inmates in the appropriate maximum housing location. The review shall include:

      1.2.3.1    The maximum custody placement instrument;

      1.2.3.2    Seriousness of incident resulting in placement in maximum custody;

      1.2.3.3    Inmates demeanor and attitude during the interview process;

      1.2.3.4    AIMS and file review;

      1.2.3.5    Any special security concerns;

      1.2.3.6    Mental health review conducted within 72 hours of arrival.  Any concerns or special needs shall be reported immediately to the unit chief of security or shift commander.

1.2.4    Begin with appropriate step level using a three step system to afford inmates privileges and out of cell time, with Step I being the most controlled and Step III being the least.

1.2.5    The CO III shall document the housing location and step level on the appropriate AIMS screen.

1.2.6    The COIV or designee shall notify Central Office Movement to schedule all inmates requiring external movement from intake to other maximum custody units.

1.3    Advancement through step levels and/or movement to a less controlled housing location requires completion of all programs identified in the Step Program Matrixes for each housing location.

1.4    Inmates classified to maximum custody units shall be assigned to specific housing areas, using a system of steps for managing inmates in the least restrictive way necessary to carry out the Department's Mission.

1.4.1    This applies to general population maximum custody groups, and

1.4.2    Specialty maximum custody population groups:

      1.4.2.1    Mental Health;

      1.4.2.2    Validated Security Threat Groups (STG);

      1.4.2.3    Step Down Program for STGs;

      1.4.2.4    Inmates who debrief from STG;

      1.4.2.5    Sex Offenders;

ADC261960

1.4.2.6    Protective Custody;

1.4.2.7    Condemned Row.

1.4.3    General population inmates at ASPC–Eyman, Browning Unit will remain in Step I but may receive additional programming (such as Anger Management, Pre-Release, Substance Abuse, etc.) until they qualify for transfer to ASPC–Eyman, SMU I.

1.4.3.1    The step system is suspended while the inmate is on a mental health or security watch.

1.4.4    Assignments to specific housing areas within maximum custody and the step level assigned are not appealable or grievable.

1.5    Step Levels – All maximum custody units (see Attachments F – L Program Matrixes).

1.5.1    The step level incentives for males vary in out-of-cell activities based on the unit where the inmate is housed.  ASPC–Eyman, Browning Unit has the least amount of out-of-cell activities and ASPC–Florence, Central Unit has the most.

1.5.1.1    The progression for general population, to include general population mental health inmates, begins at ASPC–Eyman, Browning Unit and ends at ASPC–Florence, Central Unit.

1.5.1.2    Maximum custody sex offenders begin at ASPC–Eyman, SMU I and end at ASPC–Eyman, Rynning Unit (most, if not all, maximum inmates at Rynning Unit should be Step III).

1.5.1.3    Maximum protective custody inmates begin at ASPC–Eyman, SMU I and end at ASPC-Lewis, Rast Unit (most, if not all, maximum inmates at Rast Unit should be Step III).

1.5.1.4    Maximum custody inmates on condemned row or validated as STG members are housed at ASPC–Eyman, Browning Unit.

1.5.2    Female inmates classified as maximum custody shall be assigned to Yard 30 at the ASPC-Perryville, Lumley Unit.

1.5.3    Male and female inmates who are receiving mental health treatment at ASPC–Phoenix, Alhambra Unit shall be assigned step levels.

**2.0    STEP PROGRAM – MAXIMUM CUSTODY POPULATION, EXCEPT RESTRICTIVE STATUS HOUSING PROGRAM**

2.1    Inmates must follow all program requirements on a daily basis to qualify for advancement and incentives for a minimum of 30 consecutive days in order to be eligible for consideration to advance in steps.

2.2    Inmates must comply with following requirements:

2.2.1    Grooming and Hygiene, in accordance with Department Order 704, Inmate Regulations;

ADC261961

2.2.2     Shower - Required to shower two times per week;

2.2.3     Medication Compliance – Must remain compliant with medication orders if prescribed medication from mental health provider;

2.2.4     Education and/or Program Classes – Required to participate in designated classes/programs;

2.2.5     Refrain from creating excessive banging, noise and yelling (at other inmates or staff);

2.2.6     Refrain from being disrespectful, insulting or using profanity;

2.2.7     Throwing – Any substance out of cell at staff or inmate may result in disciplinary placement in alternative housing and prolonged stay in Step I;

2.2.8     Cell cleanliness, in accordance with Department Order 704, Inmate Regulations.

2.3     Specific actions referenced below may result in immediate forfeiture of time within Step I and placement back to the beginning of Step I.  Program non-compliance and any disciplinary resulting in a major violation shall result in reversion to Step I or removal from their current program and placement in Step I at Browning.

2.3.1     Failure to comply with Department Order 704, Inmate Regulations;

2.3.2     Failure to take a minimum of two showers per week;

2.3.3     Assault of any type;

2.3.4     Destruction of property;

2.3.5     Any other behavior the Program Team agrees on that warrants corrective action.

2.4     Inmates in Step II and III must comply with Step I requirements and complete programs identified in the Step Program Matrixes.

2.5     Inmates shall retain incentive items earned as they advance through the step system.

2.6     The committee shall meet monthly to review any potential step advancement/regression cases. The Program Team may convene prior to the scheduled meetings to determine regression or removal from program upon commission of a serious rule violation or significant negative behavior.

2.7     Inmates who have completed Step III for a minimum of 30 consecutive days, without incident, may be eligible for consideration for placement in a less controlled housing location or custody reduction.

**3.0     BROWNING UNIT STEP PROGRAM -** This unit houses numerous maximum population groups which include the most problematic and security threat inmates.

3.1     Condemned row, validated STG and STG Step Down inmates have their own step program (see Attachment F).

4

ADC261962

3.2     All general population inmates will receive incentives, but remain in Step I until transfer to another maximum unit (see Attachment F).

## 4.0     MENTAL HEALTH INMATES

4.1     Maximum custody male inmates classified as MH-3 and above, including Serious Mentally Ill (SMI) inmates, shall be evaluated by Mental Health staff for program / treatment plans within 72 hours of placement.  The inmates shall be subsequently placed into the appropriate program based on the decision by the clinical staff and in their subgroup classification (general population, sex offender, protective custody).

4.1.1     ASPC–Florence, Central Unit:

4.1.1.1     Kasson Wing One Program houses male inmates requiring significant mental health interventions.  This program has small group interactions for those inmates who display difficulty with large group activities.  Based on their progress in the program, they will be referred either to SMU I (general population) or Central Unit – CB 1 or CB 4 by the clinical staff at Kasson.

4.1.1.2     Cell Block 1 Program houses male general population inmates requiring a less controlled housing environment, while still receiving enhanced programming and socialization skill building.

4.1.1.3     Cell Block 4 Program houses male general population inmates requiring a less controlled housing environment, while still receiving enhanced programming and socialization skill building.  Most of the beds will be reserved for the SMI population.

4.1.2     ASPC-Eyman, SMU I:

4.1.2.1     Behavioral Management Unit (BMU) houses male inmates requiring significant interventions due to continual acts of serious self-harm.  The inmates can graduate, or be removed, from this program and placed in the Kasson Wing One Program or in SMU 1 (general population).

4.1.2.2     General population male inmates requiring an intermediate level of control and enhanced programming and socialization skill building will be housed together.

4.1.2.3     Sex Offenders - Male sex offenders requiring any level of control can be housed in SMU I.  The inmates who achieve Step III will be considered for placement at ASPC – Eyman, Rynning Unit.

4.1.2.4     Protective Custody – Male protective custody inmates requiring any level of control can be housed at SMU I.  The inmates who achieve Step III will be considered for placement at ASPC-Lewis, Rast Unit.

4.1.3     ASPC-Phoenix, Alhambra / Flamenco Unit:

4.1.3.1     Alhambra / Baker Ward – Male inmates requiring an inpatient mental health facility shall be placed at Baker Ward by the clinical staff in the field and admitted/discharged by the clinical staff at Baker Ward.

5

4.1.3.2    Flamenco / King Ward – Male inmates requiring an inpatient mental health facility shall be placed at King Ward by the clinical staff in the field and admitted/discharged by the clinical staff at Flamenco.

4.2    Maximum custody female inmates classified as MH-3 and above (including SMI inmates) shall be evaluated by Mental Health staff within 72 hours of placement at ASPC-Perryville, Lumley Unit, Yard 30.

4.2.1    ASPC-Phoenix, Alhambra / Flamenco Unit, George Ward – Female inmates requiring an inpatient mental health facility shall be placed at George Ward by the clinical staff in the field and admitted/discharged by the clinical staff at Flamenco.

## 5.0    RESTRICTIVE STATUS HOUSING PROGRAM (RSHP)

5.1    A housing area shall be designated in all maximum custody units to classify inmates to RSHP.

5.2    Inmates who commit one of the Forbidden Three Acts (serious assaults on staff, serious inmate on inmate assaults with a weapon and multiple inmates assaulting an inmate with serious injury) may be placed in RSHP.  This decision is made by the sending Complex Warden, receiving Complex Warden and the Regional Operations Director (ROD) based on seriousness of act and security concerns.

5.2.1    If RSHP Independent Review Committee has a conflicting assessment with Wardens / ROD initial placement, final decision will be made by the Division Director, Offender Operations.

5.2.2    Inmates with a mental health score of 3 or higher shall be placed in RSHP at an alternate location with consultation from mental health staff.

5.3    The RSHP Review Committee shall see the inmates within three business days of RSHP:

5.3.1    Explain reason for placement;

5.3.2    Develop program plan and discuss with inmate;

5.3.3    Explain requirements for return to general population.

5.3.4    Document decisions on program plan form and in AIMS.

5.4    The Mental Health staff shall complete the review within 72 hours of placement in restrictive housing and shall provide immediate notification to the appropriate staff of any concerns or special needs.

5.5    The RSHP Independent Review Committee shall also be established to evaluate the unit Review Committee's initial or continued placement of inmates into the RSHP.

5.5.1    The RSHP Independent Review Committee shall meet at least once every 30 days.

5.5.2    The Mental Health staff shall participate in all reviews by the Independent Review Committee for inmates that remain in program longer than 180 days.

5.5.3    Document reviews on review log and in AIMS.

6

ADC261964

5.6     The Program Team shall review inmates in RSHP at a minimum of every 30 days for program participation and step progression.

5.7     Inmate property is inventoried upon placement and limited to the following:

      5.7.1     Hygiene items, towel and wash cloth;

      5.7.2     Two jumpsuits and two sets of underwear and socks. Clean jumpsuit and set of underwear and socks shall be provided after each shower (exchange only).

      5.7.3     Legal materials;

      5.7.4     Religious materials;

      5.7.5     Reading and writing materials;

      5.7.6     One pair shower shoes and one pair deck shoes.

5.8     Property and privileges are limited during housing in this program (see Attachments F – L).

      5.8.1     Property and privileges will be earned by participation in mandatory programs and behavior and shall be assessed at monthly reviews by the Program Team.

5.9     Visitation shall be prohibited for at least the first 30 days in the program and may be extended based on discipline sanctions or program non-compliance.

5.10    Phone calls are prohibited for Steps I and II and may be extended based on disciplinary sanctions or program non-compliance.

5.11    Recreation is in an interactive recreation area three times per week for two hours.

5.12    All inmates enter the program at Step I, with Step I being the most controlled and Step III being the least controlled.

      5.12.1    Restraints are used at all steps in the RSHP.

## 6.0     STEP I – IN THIS STEP FOR MINIMUM of 30 days:

6.1     Inmate must follow all program requirements on a daily basis to advance in the step system.

      6.1.1     Grooming and Hygiene, in accordance with Department Order 704, Inmate Regulations;

      6.1.2     Showers – Required to shower three times per week;

      6.1.3     Exchange jumpsuit, underwear and socks after each shower;

      6.1.4     Cell cleanliness, in accordance with Department Order 704, Inmate Regulations;

      6.1.5     Refrain from creating excessive noise, yelling or banging;

      6.1.6     Refrain from being disrespectful, insulting or using profanity;

ADC261965

6.1.7     Follow all direction given by staff;

6.1.8     Participate and complete all assignments or programs.

**7.0     STEP II – IN THIS STEP FOR MINIMUM of 60 days.**

7.1     Same requirements as Step I must be met.

7.2     Property and privileges are increased based on behavior and program participation. The inmate may:

7.2.1     Have TV (loaner if available) in cell;

7.2.2     Receive non-contact visits (one per month for two hours);

7.2.3     Receive limited store (new hygiene and food purchase only).

**8.0     STEP III – IN THIS STEP UNTIL COMPLETION OF PROGRAM OR REVERSION TO LOWER STEP (MINIMUM of 30 days):**

8.1     Same requirements as Step I and II must be met.

8.2     Property and incentives increased by behavior program participation.

8.2.1     All earned in Steps I and II plus increases below:

8.2.1.1     Receive non-contact visits (two per month for two hours);

8.2.1.2     One phone call per month up to 15 minutes;

8.2.1.3     Increase in store purchase (see Attachments F - L).

**9.0     ASSOCIATES OF INMATES – FORBIDDEN THREE ACT**

9.1     Housing areas may be designated in close and maximum custody units to house inmate associates of inmates who have committed a Forbidden Three Act.

9.1.1     Inmate associates will be determined by the Deputy Warden after conferring with line staff on all three shifts.

9.1.2     Housing areas shall be identified to house Forbidden Three Act associates and other predatory inmates. These inmates shall have modified privileges and property limitations that will be consistent statewide.

9.1.3     Completion of group sessions will be required prior to return to general population.

**DEFINITIONS:**

ASSESSMENT TEAM – Team of staff that assess and assign inmates entering maximum custody to internal housing assignment. Members include security, program and administrative staff.

FORBIDDEN THREE ACTS – Serious assaults on staff, serious inmate on inmate assaults with a weapon and multiple inmates assaulting an inmate with serious injury.

ADC261966

GUIDING PRINCIPLES –

1.     Provide a process, a separate review for decisions to place an inmate in maximum custody;

2.     Provide periodic classification reviews of inmates in maximum custody every 180 days or less;

3.     Provide in-person mental health assessments, by trained personnel within 72 hours of an inmate being placed in maximum custody and periodic mental health assessments thereafter including an appropriate mental health treatment plan;

4.     Provide structured and progressive levels that include increased privileges as an incentive for positive behavior and/or program participation;

5.     Determine an inmate's length of stay in maximum custody on the nature and level of threat to the safe and orderly operation of general population as well as program participation, rule compliance and the recommendation of the person(s) assigned to conduct the classification review as opposed to strictly held time periods;

6.     Provide appropriate access to medical and Mental Health staff and services;

7.     Provide access to visiting opportunities;

8.     Provide appropriate exercise opportunities;

9.     Provide the ability to maintain proper hygiene;

10.    Provide program opportunities appropriate to support transition back to a general population setting or to the community;

11.    Collect sufficient data to assess the effectiveness of implementation of these guiding principles;

12.    Conduct an objective review of all inmates in maximum custody by persons independent of the placement authority to determine the inmates' need for continued placement in maximum custody;

13.    Require all staff assigned to work in maximum custody units receive appropriate training in managing inmates on maximum custody status.

GROUP RECREATION AREA – Outdoor recreation enclosure with basketball court and table.

INTERACTIVE RECREATION AREA – Outdoor recreation enclosure that is in close proximity to other holding enclosures and allows for controlled social interaction between inmates.

OPEN PRIVILEGE BASED HOUSING – Least restrictive housing area in the maximum custody units housing areas.  They are the Step III inmates at Central Unit, Rynning Rast and Lumley Units.

PROGRAM TEAM – Team consisting of Offender Operations and may include Support Services personnel and Mental Health professionals (i.e., Unit Psychologist, Psych-Associate, and Psych-Technician).  Operations staff members include Unit Administrator(s), Captain(s), Correctional Officer IV(s), Correctional Sergeant(s), Correctional Officer(s) III, and Correctional Officer(s) II assigned to unit/housing area.  Support Services staff members include teachers, chaplains and treatment counselors.  These staff review inmates monthly to decide step movement, housing and program completion.  Any decision concerning the inmate's mental health well-being is chaired by the senior clinical staff member present within their scope of their authority.

9

RESTRICTIVE STATUS HOUSING PROGRAM –Program designated to address Forbidden Three offenses and give inmates an opportunity to modify behavior in a positive way so they can return to the general population.

RESTRICTED STATUS HOUSING PROGRAM (RSHP) INDEPENDENT REVIEW COMMITTEE – Committee of at least three staff (Deputy Warden, chief of security and classification COIV) which do not work in the unit where the RSHP is located.  This committee meets monthly and reviews all inmate placements into RSHP.  They also review, need for continued assignment of inmates in the program for more than 180 days.

RESTRICTIVE STATUS HOUSING PROGRAM (RSHP) REVIEW COMMITTEE – Committee in Restrictive Status Housing Program that conducts face to face reviews with inmates being placed into program.  They discuss reason for placement and program to follow to return to general population.  It is made up of security and program staff but may have Support Services and Contract Mental Health members.

SPECIALTY HOUSING – Areas where inmates are housed that cannot be assigned to general population, i.e., sex offenders, protective custody, condemned row, etc.


**ATTACHMENTS:**

A – General Population and Specialty Housing Flowchart
B – Security Threat Group Housing Flowchart
C – Condemned Row Flowchart
D – Mental Health Housing Flowchart
E – Restrictive Housing Flowchart
F – Browning Unit Step Program Matrix
G – Central Unit Mental Health Step Program Matrix
H – Central Unit General Population Step Program Matrix
I – SMU I Step Program Matrix
J – Lumley Unit Step Program Matrix
K – Restrictive Housing Step Program Matrix
L – Baker / George / King Step Program Matrix
M – Browning Unit Mandatory Programs
N – Central Unit / Lumley / SMU I Mandatory Programs
O – Restrictive Housing Mandatory Programs


{Original Signature on File}

ADC261968



**General Population and Specialty Housing**

Inmate approved for max per DO 801 process

Specialty Housing in SMUI

Is inmate okay for GP placement?

No

Assessment Team conducts initial face to face interview and determines unit and step placement within 5 days

Yes

Browning Intake

Sex Off SMUI or Rynning

PC SMUI or Rast

Assessment Team conducts initial face to face interview and determines unit and step placement within 5 days

Team: ADW, COIII, and security supervisor
COIII: documents in AIMS

Advancement through step levels and/or movement to a less controlled housing location requires completion of all programs identified in Attachments for each housing location.

Does inmate require high level of max supervision?

Yes

Place in Browning

No

Program Team conducts face to face interview and determines unit and step placement every 30 days

Does inmate require moderate level of max supervision?

Step 1
Minimum 30 days

Reviews same as current DO 801 – every 180 days

No

Yes

Place in SMU I

Step 2
Minimum 30 days

Step 3
Minimum 30 days

Does inmate require lower level of max supervision?

Upon successful completion of Step 3, inmate advances to next lowest Max unit or close custody, as appropriate

Yes

Place in Central Unit

Attachment A

ADC261969



**Security Threat Group Housing**

Inmate approved for max per DO 801 process

Inmate transferred to Max unit

Is inmate STG status?

No → Place in appropriate Max housing

Yes

MH Review conducted within 72 hours

MH Review Does inmate have a significant mental health issues requiring intensive intervention?

Is inmate Debriefer?

Yes → Did inmate pass polygraph?

No

Yes → Inmate receives appropriate MH treatment

No

Does inmate choose Step Down pgm?

Eligible for close custody

No

Yes

Inmate remains STG validated

Inmate participates and successfully completes

Step 1 Minimum 30 days

Step 2 Minimum 30 days

Step 3 Minimum 30 days

Inmate remains in Max custody while in validated status

Attachment B

ADC261970



## Condemned Row Housing

Inmate moved to Condemned Row

MH Review conducted within 72 hours

MH Review
Does inmate have a significant mental health issues requiring intensive intervention?

Yes

Inmate receives appropriate MH treatment

Classification conducted through DO 801 process

Step 1
Minimum 30 days

Step 2
Minimum 30 days

Step 3
Minimum 30 days

Attachment C

ADC261971



**Mental Health Housing**

Assessment Team conducts initial interview

MH Review conducted within 72 hours

Place inmate in appropriate unit

No

Inmate is male. Does he have any MH issues?

No ← Is inmate female and have MH needs? → Yes

Place in Perryville Lumley (Bld 30)

Yes

Does inmate have significant MH needs and is not a candidate for Max program?

No → Does inmate have intermediate MH needs?

Yes

Yes

Place in Central Unit CB4 (SMIs) or SMUI BMU

Place in Central Unit, SMU I or Kasson

Yes

Has inmate improved MH status and is a candidate for programming

Has inmate improved MH status, was successful in program, and is well functioning?

Remain in Central Unit CB4 or SMUI

Remain in Central Unit CB1 or Kasson

Attachment D

ADC261972



**Restrictive Status Housing**

"Forbidden 3" incident occurs

- Serious assaults on staff
- Serious inmate on inmate assaults (w/ weapon)
- Multiple inmates assaulting an inmate (w/serious injury)

Sending and receiving wardens and ROD notified for Restrictive Status Housing consideration

Does wardens or ROD approve for Restrictive Housing? — No → Inmate not moved to Restrictive Status Housing

Yes

Inmate placed in Restrictive Status Housing (GP=Central; SO/PC=SMUI) and Assessment Team assign inmate to program

Team: ADW, CO III or correctional series staff member
COIII:  Documents in AIMS

MH Review conducted within 72 hours

MH Review Does inmate need MH intervention? — No →

Program Team conducts reviews weekly and determines step changes as appropriate

Advancement through step levels and/or movement to a less controlled housing location requires completion of all programs identified in Attachments.

Yes

Kasson, Central Unit

Does inmate successfully complete Step 3?

Step 1 Minimum 30 days

Step 2 Minimum 60 days

Step 3 Minimum 30 days

Yes

Move inmate to: SMUI (moderate max), or; Central (low max), or; A close custody unit

NO

Attachment E

ADC261973

# Browning Unit (GP/STG/Condemned Row) Step Program Matrix

| *Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| **Intake**<br>• Orientation and sign Memo of Expectations for max custody step plan<br><br>**Expectations in Step I:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/individual groups as per program plan<br>• Medication compliance<br>• Participate in the Re-Entry Program for all those within 18 months of release<br>• Spend a minimum of 30 days in Step I | • Store – $60 a week / $80 at Christmas<br>• Phone – One 15 minute call per month<br>• Visitation – One non-contact visit block per week<br>• Recreational Activities – 3 two hour periods each week in the standard enclosure<br>• Library Services<br>• TV and personal property – per DO909<br>• Securepak - once per quarter within security limitations on certain items | **Movement to Step II:**<br>• Minimum of 30 days in Step I<br>• Display behavior that is cooperative and respectful<br>• No discipline in previous 30 days<br>• Be recommended by Unit Program Team<br><br>**Expectations in Step II:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/individual groups as per program plan<br>• Demonstrate positive social interaction skills | **Store** $80 a week / $120 at Christmas<br>• Phone – Two 15 minute call per month<br>• Visitation – Two non-contact visit blocks per week<br>• Recreational Activities – 3 two hour recreation periods each week, one of which can be in the 10 x 10 interactive enclosure<br>• Library Services<br>• TV and personal property – per DO909<br>• Securepak - once every other month within security limitations on certain items<br>• Fundraisers -Participate in fundraisers<br>• Hobby Craft – Origami and pencil drawing<br><br>**Reduction to Step I:**<br>• Found guilty of an A or B violation<br>• Two or more misdemeanor violations within 90 days while in Step II<br>• Refusal to program; consistently demonstrate poor socialization skills and/or non-cooperative behavior<br>• All decisions will be made by Unit Program Team on a case by case basis | **Movement to Step III:**<br>• Minimum of 30 days in Step II<br>• Display behavior that is cooperative and respectful<br>• Must complete or actively participating in all programs as per program plan<br>• Be Recommended by Unit Program Team<br><br>**Expectations in Step III:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/individual groups as per program plan<br>• Maintain "meets expectation" on all work evaluations<br>• Consistently demonstrate positive social interaction skills<br>• Demonstrate good work ethic<br><br>**Incentives for Step III:**<br>• Store - $100 a week / $160 at Christmas<br>• Phone - three 15 minute calls per week<br>• Visitation – Three per week | • Recreational Activities - Four outdoor recreation periods a week. All can be in the 10 x 10 interactive enclosures<br>• In pod recreation<br>• Library Services<br>• TV and personal property - per DO909<br>• Securepak - once every month within security limitations on certain items<br>• Fundraisers - Participate in fundraisers<br>• Hobby Craft - Drawing, origami<br>• WIPP - jobs as pod porter<br><br>**Reduction to Step II:**<br>• Found guilty of misdemeanor disciplinary violation<br>• Repeated demonstration of poor behavior<br>• All decisions will be made by Unit Program Team on a case by case basis<br><br>**Reduction to Step I:**<br>• Found guilty of an A or B violation<br>• Refusal to program; consistently demonstrate poor socialization skills and/or non-cooperative behavior<br>• All decisions will be made by Unit Program Team on a case by case basis |

ADC261974

## Central Unit Mental & Behavioral Health Custody Step Program Matrix

| Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| **Intake**<br>• Orientation and sign Memo of Expectations<br>• Intakes from GP cell blocks<br>• Intakes from Wing 1 or SMU programs will be evaluated for step placement<br><br>**Expectations**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Medication compliance<br>• Participate in the Re-Entry Program for all those within 18 months of release<br>• Participation in all appointments | **Mental Health Program Only / CB-2Max Step**<br>• Loaner TVs or pod flat screens for programming and recreation viewing<br>• Journals<br>• Recreation awards to include ribbons<br>• *RECREATION*<br>• *MEALS*<br>• *STORE*<br>• *SECUREPAK*<br>• *VISITATION* | **Movement To Step II**<br>• Minimum of 30 days in BH Program<br>• Minimum of four weeks in MH Program<br>• Display behavior that is cooperative and respectful<br>• Be recommended by Unit Program Team<br><br>**Expectations in Step II**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Complete two Self-Improvement Programs (A47)<br>• Demonstrate positive social interaction skills<br>• Participate in Transitioning Program | • Meals in chow hall<br>• Access to special library materials<br>• One day per week of group recreation (A47)<br>• Recreation awards to include ribbons, extra drawing paper and additional colored pencils<br>• Hobbycraft – Pencil drawing supplies<br>• Securepak - every other month within security limitations on certain items<br><br>**Reduction to Step I**<br>(May also result in removal from program or movement to a different program)<br>• Found Guilty of A or B violations<br>• 3 or more misdemeanor violations within 90 Days while in Step II<br>• Refusal to program, consistently demonstrate poor socialization skills and/or non-cooperative behavior<br>• All decisions will be made by Unit Program Team on a case-by-case basis. | **Movement to Step III**<br>• Minimum of 30 days in Program (A47)<br>• Minimum of 60 days in MH Program (A48)<br>• Display Behavior that is consistently cooperative and respectful<br>• Must have completed two Self-Improvement Programs (A47)<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br><br>**Expectations in Step III**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Consistently demonstrate positive social interaction skills<br>• Complete four additional self-improvement classes (A47)<br>• Demonstrate good work ethic<br>• All decisions will be made by Unit Program Team on a case-by-case basis. | • Recreation on the field three x per week<br>• One 2 hour contact visit per week<br>• All WIPP opportunities<br>• Special fundraisers<br>• In pod activities (CB1)<br>• Opportunity for mural painting<br>• Securepak - every month within security limitations on certain items<br>• Store<br>• Hobbycraft<br>• Library<br>• TV & personal property<br><br>**Reduction to Step II**<br>(May also result in removal from program or movement to a different program)<br>• Found guilty of misdemeanor disciplinary violation<br>• Repeatedly demonstrating poor social interaction skills<br>• Found guilty of two or more disciplinary violations in a 90 day period<br>• Refusal to program, consistently demonstrate poor socialization skills and/or non-cooperative behavior<br>• All decisions will be made by Unit Program Team on a case-by-case basis. |

## Central Unit Mental & Behavioral Health Custody Step Program Matrix

| Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|--------|------------------|---------|-------------------|----------|--------------------|
|  |  |  |  |  | **Reduction to Step I**<br>• Found guilty of Class A or select B disciplinary violations<br>• Refusal to program<br>• All decisions will be made by Unit Program Team on a case-by-case basis<br>• Repeatedly demonstrating poor social interaction skills |

ADC261976

## Central Unit Maximum Custody Step Program Matrix

| Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| **Intake:**<br>• Orientation and sign Memo of Expectations for maximum custody step plan<br>• Intakes from GP cell blocks<br>• Intakes from A47 & A08 will be evaluated for step placement<br><br>**Expectations:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/individual groups as per program plan<br>• Medication compliance<br>• Participate in the Re-Entry Program for all those within 18 months of release<br>• Participation in all appointments | **Mental Health Program Only / CB-2 Max Step:**<br>• Store - $60/week $80/Christmas<br>• Phone – One 15 minute call per week<br>• Visitation - One non-contact visit per week / 2 hours<br>• Recreation - 3 two hour periods each week in the standard enclosure<br>• Library Services<br>• TV and personal property - per DO 909<br>• Loaner TVs for those that do not currently have a TV for use with ETV programming<br>• Securepak - once per quarter within security limitations on certain items | **Movement To Step II:**<br>• Minimum of 30 days in program<br>• Display behavior that is cooperative and respectful<br>• No discipline in previous 30 days<br>• Be recommended by Unit Program Team<br><br>**Expectations in Step II:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/individual groups as per program plan<br>• Complete two Self-Improvement Programs (ETV)<br>• Demonstrate positive social interaction skills<br>• Demonstrate good work ethic in all job assignments | • Store - $80/week $120/holiday<br>• Phone – One 15 minute call per week<br>• Visitation - One non-contact visit per week for two hours / once a month inmate can have a two hour contact visit<br>• Recreation - on the field one day per week<br>• Meals in chow hall<br>• Library – Access to special library materials<br>• WIPP – Opportunity for select WIPP jobs<br>• Hobbycraft – Origami and pencil drawing<br>• Securepak – Once every other month within security limitation on certain items<br><br>**Reduction to Step II:**<br>• Found Guilty of an A or B violation<br>• Two or more misdemeanor Violations within 90 Days while in Step II<br>• Refusal to program, consistently demonstrate poor socialization skills and/or non-cooperative behavior<br>• One misdemeanor violation may result in loss of job for 30 days-then you must re-apply<br>• All decisions will be made by Unit Program Team on a case-by-case basis | **Movement to Step III:**<br>• Minimum of 30 days in Program.<br>• Display behavior that is consistently cooperative and respectful<br>• Must have completed two Self-Improvement Programs<br>• Be recommended by Unit Program Team<br><br>**Expectations in Step III:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/individual groups as per program plan<br>• Complete two additional Self-Improvement Classes<br>• Consistently demonstrate positive social interaction skills<br>• Demonstrate good work ethic<br>• All decisions will be made by Unit Program Team on a case-by-case basis<br><br>**Incentives to Step III:**<br>• Store - $100/week $160/holiday<br>• Phone – One 15 minute call per week<br>• Visitation – One 2 hour contact visit per week<br>• Recreation - On the field three times per week | • Library Services<br>• TV and personal property - per DO 909<br>• WIPP Opportunities<br>• Hobbycraft – Origami and Pencil Drawing<br>• Special Fundraisers<br>• Securepak -once per month within security limitations on certain items<br><br>**Reduction to Step II:**<br>• Found guilty of a misdemeanor disciplinary violation<br>• Repeatedly demonstrating poor social interaction skills<br>• One misdemeanor violation may result in loss of job for 30 days-then you must re-apply<br>• All decisions will be made by Unit Program Team on a case-by-case basis<br><br>**Reduction to Step I:**<br>• Found guilty of class A or select B disciplinary violations<br>• Refusal to program<br>• Repeated demonstration of poor behavior<br>• All decisions will be made by Unit Program Team on a case-by-case basis |

ADC261977

## SMU I Maximum Custody Step Program Matrix

| STEP I | STEP I INCENTIVES | STEP II | STEP II INCENTIVES | STEP III | STEP III INCENTIVES |
|---|---|---|---|---|---|
| **Intake:**<br>• Orientation and sign Memo of Expectations for max custody step plan<br><br>**Expectations Step I:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Medication compliance<br>• Participate in the Re-Entry Program for all those within 18 months of release<br>• Spend a minimum of 30 days in Step I | • Store – $60 a week / $80 at Christmas<br>• Phone – One 15 minute call per week<br>• Visitation – One non-contact visit block per week<br>• Recreational activities – six hours per week to include one-time per month in 10x10 enclosure (two inmates / SMU)<br>• Library Services<br>• TV and personal property - per DO909<br>• Securepak - once per quarter within security limitations on certain items | **Movement to Step II:**<br>• Minimum of 30 days in Step I<br>• Display behavior that is cooperative and respectful<br>• No discipline in previous 30 days<br>• Be recommended by Unit Program Team<br><br>**Expectations Step II:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Demonstrate positive social interaction skills<br><br>**Incentives Step II:**<br>• Store - $80 a week / $120  at Christmas<br>• Phone – One 15 minute call per week<br>• Visitation – Two non-contact visit blocks per week | • Recreational Activities – six hours per week to include one-time per month in 10x10 enclosure (up to four inmates) and one X per month in 20x40 basketball enclosure (up to four inmates)<br>• Library Services<br>• TV and personal property - per DO909<br>• Securepak - once every other month within security limitations on certain items<br>• Fundraisers<br>• Hobby Craft – Origami and pencil drawing<br><br>**Reduction to Step I**<br>• Found guilty of a A or B violation<br>• 2 or more misdemeanor violations within 90 Days while in Step II<br>• Refusal to program; consistently demonstrate poor socialization skills and/or non-cooperative behavior<br>• All decisions will be made by Unit Program Team on a case by case basis | **Movement to Step III:**<br>• Minimum of 30 days in Step II<br>• Display behavior that is cooperative and respectful<br>• Be recommended by Unit Program Team<br><br>**Expectations Step III:**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Demonstrate positive social interaction skills<br><br>**Incentives Step III:**<br>• Store –$100 a week / $160  at Christmas<br>• Phone – One 15 minute call per week<br>• Visitation – Three non-contact visit blocks per week<br>• Recreational Activities – Six hours per week to include one-time per month in 10x10 enclosure (up to four inmates), one-time per month in 20x40 basketball enclosure (up to eight inmates), and one-time per month recreation/par course field | • Library Services<br>• TV and personal property - per DO909<br>• Securepak - once every other month with security limitations on certain items<br>• Fundraisers<br>• Hobby Craft - Origami and Pencil Drawing<br>• Unrestrained escorts – May be eligible<br>• WIPP – Eligible for porter and kitchen positions<br><br>**Reduction to Step II:**<br>• Found guilty of misdemeanor disciplinary violation<br>• Repeated demonstration of poor behavior<br>• All decisions will be made by Unit Program Team on a case by case basis<br><br>**Reduction to Step I:**<br>• Found guilty of Class A or select B disciplinary violations<br>• Refusal to program; consistently demonstrate poor socialization skills and/or cooperative behavior<br>• All decisions made by Unit Program Team on a case by case basis |

Attachment I

ADC261978

# Lumley Unit Maximum Custody Step Program Matrix

| Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| **Intake**<br>• Orientation and sign Memo of Expectations for max custody step plan<br><br>**Expectations**<br>• Follow Rules and Regulations including DO704<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Participate in the Re-Entry Program for all those within 18 months of release<br>• Medication compliance<br>• Participation in all appointments | • Recreation - One hour, six times a week<br>• Visitation – One non-contact two hour block per week<br>• Store - $60 a week / $80 at Christmas<br>• Library Services<br>• TV and personal property, per DO909<br>• Securepak may be purchased once per quarter within security limitations on certain items<br>• Phone – One 15 minute call per week (same for condemned inmates) | **Movement To Step II**<br>• Minimum of 30 days in Step I<br>• Display behavior that is cooperative and respectful<br>• Be Recommended by Unit Program Team<br>• No discipline in previous 30 days<br><br>**Expectations Step II:**<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Follow Rules and Regulations including DO704<br>• Demonstrate positive social interaction skills<br><br>**Incentives Step II:**<br>• Store - $80 a week / $120 at Christmas<br>• Hobby Craft – Origami and Pencil Drawing<br>• Library services<br>• Phone – One 15 minute call per week (Condemned inmates two per week / 15 minutes) | • TV and personal property, per DO909<br>• Recreation – 12 inmate groups, one hour six days a week<br>• Dining room access for breakfast and dinner meals<br>• Movement – unrestrained out of cell<br>• Select WIPP jobs<br>• Visits – one, 3 hour non-contact block<br>• Photos – inmate only on New Year's Day, Valentine's Day, Mother's Day and Father's Day<br>• Securepak – once every other month within security limitations on certain items<br><br>**Reduction to Step I:**<br>• Refusal to program<br>• Found guilty of a A or B violation<br>• 2 or more misdemeanor violations within 90 Days while in Step II<br>• Refusal to program<br>• Consistently demonstrate poor socialization skills and/or non-cooperative behavior<br>• All decision made by Unit Program Team on a case-by-case basis | **Movement to Step III:**<br>Minimum of 30 days in Step II<br>• Display behavior that is cooperative and respectful<br>• Be Recommended by Unit Program Team<br><br>**Expectations to Step III:**<br>• Participate in prescribed programs/classes/ individual groups as per program plan<br>• Consistently demonstrate positive social interaction skills<br>• Follow Rules and Regulations including DO704<br><br>**Incentives to Step III:**<br>• Loaner appliances – TV, music player and fans (when available)<br>• Recreation - 14 inmate groups, one hour six days a week<br>• Library access<br>• WIPP jobs<br>• All meals in dining room<br>• Fundraisers – food only<br>• Movement – unrestrained out of cell<br>• Group activities – televised sport and entertainment programs | • Visits – 180 days in Step III shall be granted contact visits; four hour blocks and utilize vending machines<br>• Photos – families on New Year's Day, Valentine's Day, Mother's Day and Father's Day<br>• Hobby Craft – Origami and Pencil Drawing<br>• Store - $100 a week / $160 at Christmas<br>• Securepak – once a month within security limitation on certain items<br>• Phone – One 15 minute call per week (condemned inmates three per week, 15 minutes)<br><br>**Reduction to Step I:**<br>• Refusal to program<br>• Found guilty of class A or select B disciplinary violations<br>• Repeated demonstration of poor behavior<br>• All decision made by Unit Program Team on a case-by-case basis<br><br>**Reduction to Step II:**<br>• Found guilty of misdemeanor disciplinary violation<br>• Repeated demonstration of poor behavior<br>• All decision made by Unit Program Team on a case-by-case basis |

*Condemned inmates participate in all incentives and stages with the exception of no contact visits, separately from non-condemned unless noted

Attachment J

ADC261979

## Restrictive Housing Step Program Matrix

| Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| **Intake**<br>• Orientation and sign Memo of Expectations<br><br>**Expectations**<br>• Follow Rules and Regulations including DO704.<br>• Participate in prescribed programs/classes/Individual groups as per program plan<br>• Spend a minimum of 30 days in Step I<br>• Maintain Personal Hygiene – Mandatory shower three times a week | • Recreation three times a week for two hours in Rec. enclosures.<br>• No visitation allowed<br>• No phone calls allowed<br>• Store - limited to $10 a week Hygiene & Stationary only<br>• Allowable personal property; 1 box of verified legal material (current active cases only), religious material consistent with detention placement, 1 each of hygiene items (shampoo, soap, etc...) and 1 book<br>• Clothing allowed will consist of 2 jumpsuits, 2 t-shirts, two boxers, 2 pairs socks, deck shoes, shower shoes, one towel, and one washcloth | **Movement To Step II**<br>• Minimum of 30 days in Step I<br>• Display behavior that is cooperative and respectful<br>• Must have completed programs designated by the Unit Program Team<br>• Be recommended by Restricted Housing Committee<br><br>**Expectations in Step II**<br>• Follow Rules and Regulations including DO704.<br>• Participate in prescribed programs/classes/Individual groups as per program plan<br>• Demonstrate Positive Social Interaction Skills<br>• Must not have received any discipline in previous 30 days<br>• Maintain Personal Hygiene – Mandatory shower three times a week | • Recreation three times a week in Rec. enclosures<br>• 1 two hour visit per month<br>• Store – limited to $15 a week ($10/Hygiene $5/Limited Store Menu)<br>• Step I personal property allowance to include television<br>• Allowed access to library resources<br><br>**Reduction to Phase I**<br>• Found Guilty of any Discipline Violation<br>• Refusal to Program, Consistently, demonstrate poor socialization skills and/or non-cooperative behavior<br>• Decision made by Restrictive Housing Committee | **Movement to Step III**<br>• Minimum of 60 days in Step II<br>• Must have continued to Display Behavior that is cooperative and respectful<br>• Must have completed all Prescribed Programs as per the Program Plan<br><br>**Expectations in Step III**<br>• Follow Rules and Regulations including DO704.<br>• Participate in prescribed programs/classes/Individual groups as per program plan<br>• Consistently Demonstrate Positive Social Interaction skills<br>• Prepare for reentry to the General Population<br>• Maintain Personal Hygiene – Mandatory shower three times a week | • Recreation three times a week for two hours in Rec. enclosures<br>• 2 two hour visits a month<br>• One fifteen minute phone calls a month<br>• Store – limited to $20 a week ($10/Hygiene $10/Limited Store Menu)<br>• Personal property allowance – legal / religious material and television<br>• Allowed access to library resources<br><br>**Reduction to Step I**<br>• Found Guilty of Class A or Select Class B Disciplinary Violations<br>• Refusal to Program<br>• Decision Made by Restrictive Housing Committee<br><br>**Reduction to Step II**<br>• Found Guilty of any Discipline Violation<br>• Repeatedly demonstrating poor behavior<br>• Decision Made by Restrictive Housing Committee |

# Baker / King / George (female) Wards Step Program Matrix

| Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| **Intake:**<br>• Orientation and sign memo of expectations<br>• Inmate will be evaluated by mental health staff 72 hours after arrival for Step Placement<br><br>**Expectations:**<br>• Participate in prescribed activities – two groups per week for Baker Ward and minimum of three groups per week for King Ward<br>• Medication compliance<br>• Participation in all appointments<br>• Follow rules and regulations including DO 704. Spend a minimum of 30 days in Step I Maintain personal hygiene | • Baker Ward – meals served meals in house<br>• King Ward – meals served in the dining hall<br>• Baker Ward - have access to Token Program which allows additional recreation, library, and telephone access with approval from the Treatment Team<br>• Baker Visitation –one 2 hour non-contact visit with approval of the Treatment Team per week.<br>• King Visitation – one 3 hour contact visit per week<br>• Store - $60 on the specialized mental health store list per week with Treatment Team authorization<br>• One 15 minute telephone call with Treatment Team authorization<br>• Baker Recreation – Seven days per week.<br>• King Recreation – Six days per week | **Movement to Step II:**<br>• Minimum of 30 days in Step I<br>• Display behavior that is cooperative and respectful<br>• Be recommended by the Treatment Team.<br><br>**Expectations in Step II:**<br>• Continue to participate in prescribed activities - two groups per week for Baker and minimum of three groups per week for King<br>• Demonstrate positive social interaction skills<br>• Follow rules and regulations including DO 704.<br>• Demonstrate good work ethic<br>• Medication compliance<br>• Participation in all appointments<br><br>**Incentives in Step II:**<br>• Store - $80 on the specialized mental health store list per week with Treatment Team authorization<br>• Loaner TV program available per approval of Treatment Team<br>• Dinner meal Baker Ward offered in Dining area<br>• Fundraisers | • WIPP King Ward - Porter, Floor crew, Laundry Porter, Education Aids, Library Aids<br>• WIPP Baker Ward - Porter, Library Aids, ADA Porter<br>• Baker Recreation – Seven days per week.<br>• King Recreation – Six days per week<br>• Baker Visitation –one 2 hour non-contact visit with approval of the Treatment Team per week.<br>• King Visitation – one 3 hour contact visit per week<br>• King Ward Appliances allowed per DO 909<br>• One 15 minute telephone call with Treatment Team authorization<br>• Photos per DO 911<br><br>**Reduction to Step I:**<br>(may also result in removal from program or movement to a different unit)<br>• Refusal to program<br>• Decision made by the Treatment Team<br>• Consistently demonstrate poor socialization skills<br>• Found guilty of a Disciplinary violation with recommendation of the Treatment Team | **Movement to Step III:**<br>• Minimum of 60 days in Step II<br>• Display behavior that is cooperative and respectful<br>• Be recommended by the Treatment Team<br>• Must show full engagement in program<br><br>**Expectations in Step III:**<br>• Baker Ward - prepare to transcend to a higher level of mental health program<br>• Baker Ward - participate in five groups per week and a minimum of three groups per week for King Ward<br>• Baker Ward inmates will participate in Rec. Therapy three times per week<br>• Demonstrate positive social interaction skills<br>• Follow rules and regulations including DO 704<br>• Demonstrate good work ethic<br>• Medication compliance<br>• Participation in all appointments<br><br>**Incentives in Step III:**<br>• Fundraisers<br>• Photos per DO 911<br>• King Ward – appliances per DO 909 | • Baker Ward inmates may be eligible for placement at another inmate treatment unit<br>• Baker Ward -may receive additional activities based on the Token Program evidenced by sustained positive behavior<br>• WIPP King Ward - Porter, Floor crew, Laundry Porter, Education Aids, Library Aids<br>• WIPP Baker Ward - Porter, Library Aids, ADA Porter<br>• Store - $100 on the specialized mental health store list per week with Treatment Team authorization<br>• Baker Visitation –one 2 hour non-contact visit with approval of the Treatment Team per week.<br>• King Visitation – one 3 hour contact visit per week<br>• Phone – one 15 minute telephone call with Treatment Team authorization<br><br>**Reduction to Step II:**<br>(may also result in removal from program or movement to a different program)<br>• Refusal to program<br>• Decision made by the Treatment Team<br>• Found guilty of a Disciplinary violation with recommendation of the Treatment Team |

Attachment L

ADC261981

## Baker / King / George (female) Wards Step Program Matrix

| Step I | Step I Incentive | Step II | Step II Incentive | Step III | Step III Incentive |
|---|---|---|---|---|---|
| | | | | | **Reduction to Step I:** (may also result in removal from program or movement to a different program)<br>• Refusal to program<br>• Decision made by the Treatment Team<br>• Consistently demonstrate poor socialization skills<br>• Placed on a mental health watch<br>• Self-Harm, fighting, and Assaultive behavior<br>Found guilty of a Disciplinary violation with recommendation of the Treatment Team |

Attachment L

ADC261982

## Browning Unit Mandatory Programs

| | Mandatory To Move to Next Level | Addictive Behaviors | If releasing within 6 months- mandatory |
|---|---|---|---|
| **Level 1**<br>**Initial Placement** | Self-Control- self study<br><br>Responsible Thinking-self study | | Merging two Worlds- self study |
| **Level 1**<br>**Step Down** | Hazelden- Socialization Workbook- Part 1 -*Where Have I Been?* | | Merging two Worlds- self study |
| **Level 2**<br>**Initial Placement** | Self-Control-small class<br><br>Hazelden- Socialization Workbook- Parts 1 &2  -*Where Have I Been*? and *What Works, What Doesn't* | Substance Abuse-small class<br>***Only if inmate has an SA problem!***<br>12- Step Meetings | Merging two Worlds- self study |
| **Level 2**<br>**Step Down** | Self-Control- small class<br><br>Hazelden- Socialization Workbook- Part 2 - *What Works, What Doesn't* | Substance Abuse-small class<br>***Only if inmate has an SA problem!***<br><br>12- Step Meetings | Merging two Worlds- self study |
| **Level 3**<br>**Initial Placement** | Responsible Thinking- small class<br><br>Hazelden- Socialization Workbook- Part 3 – *How Do I Change?* | 12- Step Meetings | Merging two Worlds- small class |
| **Level 3**<br>**Step Down** | Responsible Thinking- small class<br><br>Hazelden- Socialization Workbook- Part 3 –*How Do I Change?* | 12- Step Meetings | Merging two Worlds- small class |

Please note that 12 Step Meetings are voluntary. However, the SA class is not voluntary if the Team determines the inmate needs it.

Attachment M

ADC261983

## Central / Lumley / SMU I Mandatory Programs

|  | Mandatory To Move to Next Level | Addictive Behaviors | Optional Additional Programs for Team to Assign to Inmate | If releasing within 6 months- mandatory |
|---|---|---|---|---|
| **Level 1 Initial Placement** | Self-Control- self study<br><br>Responsible Thinking-self study |  | Social Values-self study | Merging two Worlds- self study |
| **Level 1 Step Down** | Core Skills- self study |  |  | Merging two Worlds- self study |
| **Level 2 Initial Placement** | Self-Control-small class<br><br>Responsible Thinking-small class | Substance Abuse-small class<br>*Only if inmate has an SA problem!* | Hazelden- Socialization Workbook<br>12- Step Meetings<br>Money Management-small class<br>Social values-small class | Merging two Worlds- small class |
| **Level 2 Step Down** | Core Skills- small class<br><br>Money Management-small class |  | 12- Step Meetings | Merging two Worlds- small class |
| **Level 3 Initial Placement** | Feelings- small class<br>Thinking For A Change ( may start in Level 2) |  | Hazelden- Socialization Workbook<br>12- Step Meetings<br>Core Skills-small class<br>Money Management-small class<br>Social Values-small class | Merging two Worlds- small class |
| **Level 3 Step Down** | Feelings-small class<br>Thinking For A Change (may start in Level 2) |  | 12- Step Meetings | Merging two Worlds- small class |

Please note that 12 Step Meetings are voluntary. However, the SA class is not voluntary if the Team determines the inmate needs it.

Attachment N

ADC261984

## Restrictive Housing Mandatory Programs

| | Mandatory for All To Move to Next Level | Addictive Behaviors | If releasing within 6 months- mandatory |
|---|---|---|---|
| **Restrictive Housing Level 1** | Self-Control- self study | | Merging two Worlds- self study<br><br>Responsible Thinking-self study |
| **Restrictive Housing Level 2** | Social Values- self  study<br><br>Responsible Thinking-self study<br><br>Core Skills- self study | Substance Abuse-self study<br><br>***Only if inmate has an SA problem!***<br><br>12 Step Meetings | Merging two Worlds- self study |
| **Restrictive Housing Level 3** | Social Values- small class | 12 Step Meetings | Merging two Worlds- self study |

Please note that 12 Step Meetings are voluntary. However, the SA class is not voluntary if the Team determines the inmate needs it.

Attachment O

ADC261985

# Exhibit E

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF ARIZONA


VICTOR PARSONS, ET AL.,          )
                                 )
          PLAINTIFFS,            )
                                 )
     VS.                         )
                                 )Case No.2:12-CV-00601
CHARLES RYAN; RICHARD PRATT,     )          PHX-NVW
                                 )
                                 )
          DEFENDANTS.            )
                                 )
                                 )
                                 )
_____ )


     The deposition of CRAIG WILLIAM HANEY, was held
on Friday, March 14, 2014, commencing at 9:02 a.m., at
71 Stevenson Street, Suite 400, San Francisco,
California, before Rhiannon Smith, Certified Shorthand
Reporter, No. 13265, in and for the State of California.


JOB NO.:     203483
REPORTED BY:  Rhiannon Smith, CSR#13265

CRAIG WILLIAM HANEY - 3/14/2014

1    A.  Yeah, some.

2    **Q.  Are there numbers, like frequency numbers that**

3    **you attach to the definition of occasion, some, often,**

4    **and constantly?**

5    A.  It's an estimate, so, you know, sometimes they'll

6    give me a frequency, and then I try to translate, and

7    often times I'll ask them, and so I'll say some or

8    often, and I'll let them pick the particular option.

9    That's typically the way I do it, so if they don't give

10   me an option that matches up against this, I try to

11   provide them with an option so I can get them to

12   interpret what they mean by the specific frequency.

13   **Q.  If an inmate would say to you, you know, you ask**

14   **him, "Have you recently been having headaches?"  And**

15   **they say, "Yeah, constantly," do you then follow up and**

16   **ask the person, "What do you mean by constantly?"**

17   A.  Yeah, usually.  I mean you'll see in the notes

18   themselves there are often times text entries.  I often

19   times say, "Tell me about that.  Tell me what causes

20   them.  Do you know what causes them?  Do you know when

21   they happen?"  I'm not just interested in their answers

22   to the specifics, but rather these are ways of getting

23   at the larger or deeper understanding of the experience

24   that they're having.

25   **Q.  Does the category of 4, constantly, to you, does**

CRAIG WILLIAM HANEY - 3/14/2014

1    **thumbing through tab G of Exhibit Number 3, that the**

2    **back sides of questionnaires have handwriting on them;**

3    **that's your handwriting, right?**

4        A.  It is.

5        **Q.  And are those notes that's you're taking**

6    **simultaneous with doing the questionnaire of the inmate?**

7        A.  No, the interview begins with a more general

8    brief social and institutional history, and those are

9    the notes that are on the back side of the page, and

10   then typically after that has been completed I turn to

11   the specifics.

12       **Q.  What is the purpose of your obtaining social and**

13   **institutional history from an inmate that you conduct a**

14   **confidential interview with at the outset of the**

15   **interview?**

16       A.  I'm trying to understand who they are, to get to

17   know who they are to understand something about their

18   life.  It's also, I think, useful to establish rapport.

19   It is difficult to ask people specific questions about

20   specific symptoms, particularly in the prison context if

21   you have not had an opportunity talk with them to give

22   them the chance to relax and feel comfortable.  If I

23   were to simply begin with asking questions I think it

24   will be difficult for people to feel comfortable enough

25   to be candid.  So I talk to them, about their

1    background, ask them questions about things that have

2    happened to them and at a period of time when we have

3    gone through all that information, and it sort of

4    naturally builds up to the present, so if you're talking

5    about the past and end chronologically with the present,

6    now they're in this particular institution, it makes --

7    it's a more coherent interview process to then talk

8    about what are you experiencing now?  How are you being

9    affected now?

10        Q.  And based upon the information provided by you or

11   -- sorry, provided to you by an inmate during the

12   confidential interview, and I'm speak of your experience

13   here in this case, you don't then make a diagnosis based

14   upon the symptoms they report, correct?

15        A.  No, I don't make diagnoses.

16        Q.  You're just simply looking at what symptoms or

17   conditions an inmate is reporting to you?

18        A.  Correct.

19        Q.  In this case with respect to the -- with respect

20   to the questionnaires that you filled out, did you do

21   any sort of statistical analysis of the information

22   reported to you across all questionnaires that you

23   received?

24        A.  I did not.

25        Q.  In the cell-front interviews you conducted in

1                DEPOSITION OFFICER'S TRANSCRIPT

2

3      STATE OF CALIFORNIA     )
                              ) SS.
4      COUNTY OF SAN FRANCISCO)

5

6          I, Rhiannon Smith, hereby certify:

7          I am a duly qualified Certified Shorthand

8      Reporter, in the State of California, holder of

9      Certificate Number CSR 13265 issued by the Court

10     Reporter's Board of California and which is in full

11     force and effect.  (Bus. & Prof. SS 8016)

12         I am not financially interested in the action and

13     am not a relative or employee of any attorney of the

14     parties, or of any of the parties.  (Civ. Proc SS

15     2025.320(a))

16         I am authorized to administer oaths or

17     affirmations pursuant to California Code of Civil

18     Procedure, Section 2093(b), and prior to being examined,

19     the deponent was first placed under oath or affirmation

20     by me. (Civ. Proc. SS. 2025.320, 2025.540(a))

21         I am the deposition officer that stenographically

22     recorded the testimony in the foregoing deposition and

23     the foregoing transcript is a true record of the

24     testimony given. (Civ. Proc. SS. 2025.540(a))

25             I have not, and shall not, offer or provide any

1  services or products to any party's attorney or third

2  party who is financing all or part of the action without

3  first offering same to all parties or their attorneys

4  attending the deposition and making same available at

5  the same time to all parties or their attorneys. (Civ.

6  Proc. SS. 2025.320(b))

7          I shall not provide any service or product

8  consisting of the deposition officer's notations or

9  comments regarding the demeanor or any witnesses,

10  attorney, or party present at the deposition to any

11  party or any party's attorney or third party who is

12  financing all or part of the action, nor shall I collect

13  any personal identifying information about the witness

14  as a service or product to be provided to any party or

15  third party who financing all or part of the action.

16  (Civ. Proc. SS. 2025.320(c))

17

18  Dated: March 26, 2014

19

20          _____

21                  Rhiannon Smith, CSR 13265

22

23

24

25