Index of Exhibits to

Declaration of Kirstin T. Eidenbach

Exhibit 1:    Excerpts of Deposition of Brie Williams, M.D.

Exhibit 2:    Excerpts of Deposition of John W. Dovgan, D.D.S. (UNDER SEAL)

Exhibit 3:    Confidential Expert Report of Lawrence H. Mendel, D.O., FSCP, CCHP, dated January 18, 2013 (UNDER SEAL)

Exhibit 4:    Excerpts of the Confidential Expert Report of Joseph V. Penn MD CCHP FAPA, dated January 18, 2013

Exhibit 5:    Confidential Expert Report of Richard P. Seiter, Ph.D., dated January 18, 2013 (UNDER SEAL)

Exhibit 6:    Confidential Expert Report of John W. Dovgan, DDS, dated January 18, 2013 (UNDER SEAL)

Exhibit 7:    Excerpts of Deposition of Lawrence Harold Mendel, DO, FSCP, CCHP (UNDER SEAL)

Exhibit 8:    Excerpts of Deposition of Joseph V. Penn, MD, CCHP, FAPA (UNDER SEAL)

Exhibit 9:    Excerpts of Deposition of Richard P. Seiter, Ph.D. (UNDER SEAL)

Exhibit 10:   Excerpts of Deposition of Brian T. Hanstad, D.M.D., dated April 2, 2014

Exhibit 11:   Excerpts of August 7, 2013 Hearing Transcript

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

THE DISTRICT OF ARIZONA


VICTOR PARSONS, ET AL.,                    )
                                           )
               PLAINTIFFS,                 )
                                           )
         VS.                               )
                                           )Case No.2:12-CV-00601
CHARLES RYAN; RICHARD PRATT,               )          PHX-NVW
                                           )
               DEFENDANTS.                 )
                                           )
                                           )
                                           )
_____   )


        The deposition of BRIE WILLIAMS, M.D., was held

on Tuesday, April 8, 2014, commencing at 8:58 a.m., at

71 Stevenson Street, Suite 400, San Francisco,

California, before Rhiannon Smith, Certified Shorthand

Reporter, No. 13265, in and for the State of California.



REPORTED BY:  Rhiannon Smith, CSR#13265

JOB NO.: 203488

1    APPEARANCES:

2

        ON BEHALF OF THE PLAINTIFFS:

3

     DAVID C. FATHI

4

            American Civil Liberties Union Foundation

5

            915 15th Street, NW, 7th Floor

6

            Washington, DC 20005

7

            Telephone:  202-548-6603

8

9    ASIM VARMA

10            Arizona Center for Disability Law

11            5025 East Washington Street, Suite 202

12            Phoenix, AZ 85034

13            Telephone:  602-274-6287

14

15       ON BEHALF OF THE DEFENDANTS:

16     RACHEL LOVE

17            Struck Wieneke & Love

18            3100 West Ray Road, Suite 300

19            Chandler, AZ 85226

20            Telephone:  480-420-1603

21

22

23

24

25

1    the geriatrics textbook.

2        Q.  **I'm concerned with my age and where I'm at on the**

3    **spectrum.**

4        A.  There are 30-year-olds who have the medical

5    conditions of a 70-year-old, and there are very

6    occasionally much older adults that seem physically much

7    younger.  I think in terms of trying to narrow the

8    universe in a reasonable way as much as possible a lot

9    of times we'll try to arbitrarily say, you know,

10   somewhere around -- in the prison system and criminal

11   justice individuals we'll try to say somewhere in the

12   50s, which I believe is the definition I gave in this

13   report.  That said, you know, I direct a medical

14   geriatric at the VA and we have young people who would

15   really benefit from a comprehensive geriatric approach

16   to care, and we have much older adults who we don't

17   really feel like need a very geriatric approach to care.

18       Q.  **My understanding is that in conjunction with this**

19   **litigation matter, the Parsons case, that the -- I guess**

20   **age cutoff for older adult or older inmate is 50; is**

21   **that correct?**

22       A.  I think that -- I mean, I interviewed some people

23   who were younger as well.  So people who -- I think that

24   what we -- what I was asked to do was to really think

25   about the health care conditions that are common in

1   older adults but not specifically only to older adults.

2   So but in general the best way to find the highest

3   concentration of those people is an age cutoff, but it's

4   not always determined by age alone.

5       **Q.  In this case the age of 50, which was determined**

6   **to be what was considered geriatric or older adult in**

7   **this case was that number 50, was that something that**

8   **you decided or that counsel decided, plaintiff's counsel**

9   **decided?**

10      A.  You know what, again, it's not -- I don't quite

11  agree that that was the age that at it was decided

12  equals geriatric, per se.  I think that was the sampling

13  frame to find a representative or to find a

14  concentration of people to speak with, you know, sort of

15  a parsimonious way of identifying people who would have

16  some of the conditions we were interested in looking at,

17  but I wouldn't say that we defined -- do you see what

18  I'm saying?  That it had to be -- that we were

19  specifically defining older adults, per se.  That said,

20  there is a lot of literature to suggest that, you know,

21  this kind of nebulous phrase of geriatric is generally

22  50 or 55, somewhere in the 50s.  There are many prison

23  jail systems that create sort of geriatric units in the

24  40s, and there are some, I understand, that are higher.

25          So in terms of who decided on that age, I don't

BRIE WILLIAMS, M.D. - 4/8/2014

1              DEPOSITION OFFICER'S TRANSCRIPT

2    STATE OF CALIFORNIA    )
                            ) SS.
3    COUNTY OF SAN FRANCISCO)

4

5         I, Rhiannon Smith, hereby certify:

6         I am a duly qualified Certified Shorthand

7    Reporter, in the State of California, holder of

8    Certificate Number CSR 13265 issued by the Court

9    Reporter's Board of California and which is in full

10   force and effect.  (Bus. & Prof. SS 8016)

11        I am not financially interested in the action and

12   am not a relative or employee of any attorney of the

13   parties, or of any of the parties.  (Civ. Proc SS

14   2025.320(a))

15        I am authorized to administer oaths or

16   affirmations pursuant to California Code of Civil

17   Procedure, Section 2093(b), and prior to being examined,

18   the deponent was first placed under oath or affirmation

19   by me. (Civ. Proc. SS. 2025.320, 2025.540(a))

20        I am the deposition officer that stenographically

21   recorded the testimony in the foregoing deposition and

22   the foregoing transcript is a true record of the

23   testimony given. (Civ. Proc. SS. 2025.540(a))

24        I have not, and shall not, offer or provide any

25

BRIE WILLIAMS, M.D. - 4/8/2014

1    services or products to any party's attorney or third

2    party who is financing all or part of the action without

3    first offering same to all parties or their attorneys

4    attending the deposition and making same available at

5    the same time to all parties or their attorneys. (Civ.

6    Proc. SS. 2025.320(b))

7        I shall not provide any service or product

8    consisting of the deposition officer's notations or

9    comments regarding the demeanor or any witnesses,

10   attorney, or party present at the deposition to any

11   party or any party's attorney or third party who is

12   financing all or part of the action, nor shall I collect

13   any personal identifying information about the witness

14   as a service or product to be provided to any party or

15   third party who financing all or part of the action.

16   (Civ. Proc. SS. 2025.320(c))

17

18   Dated: 4/10/2014

19

20                           _____

21                             Rhiannon Smith, CSR 13265

22

23

24

25

# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

# FILED UNDER SEAL

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8


# FILED UNDER SEAL

# EXHIBIT 9

# FILED UNDER SEAL

# EXHIBIT 10

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Victor Parsons; Shawn Jensen;     )
Stephen Swartz; Dustin Brislan;   )
Sonia Rodriguez; Christina        )
Verduzco; Jackie Thomas; Jeremy   )
Smith; Robert Gamez; Maryanne     )
Chisholm; Desiree Licci; Joseph   )
Hefner; Joshua Polson; and        )
Charlotte Wells, on behalf of     )
themselves and all others         )
similarly situated; and Arizona   )
Center for Disability Law,        )
                                  )
            Plaintiffs,           )
     v.                           ) Case No.
                                  ) CV12-00601-PHX-NVW (MEA)
Charles Ryan, Director,           )
Arizona Department of             )
Corrections; and Richard Pratt,   )
Interim Division Director,        )
Division of Health Services,      )
Arizona Department of             )
Corrections, in their official    )
capacities,                       )
            Defendants.           )
_____    )


DEPOSITION OF BRIAN T. HANSTAD, D.M.D.

Phoenix, Arizona
April 2, 2014; 9:12 a.m.


Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona  85020-5275

602.266.6535                          Prepared by:
www.glennie-reporting.com             Janet Hauck, RPR
                                      Arizona CR No. 50522

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 4

1                DEPOSITION OF BRIAN T. HANSTAD, D.M.D., was

2    taken on April 2, 2014, commencing at 9:12 a.m., at

3    Perkins Coie, LLP, 2901 North Central Avenue, Suite 2000,

4    Phoenix, Arizona, before JANET HAUCK, RPR, a Certified

5    Reporter, Certificate No. 50522, for the State of Arizona.

6

7    APPEARANCES:

8    For Plaintiffs:

9            PERKINS COIE, LLP
             John Gray, Esq.
10           Kirstin T. Eidenbach, Esq.
             Alexis E. Danneman, Esq.
11           2901 North Central Avenue, Suite 2000
             Phoenix, Arizona  85012

12

13   For Defendants:

14           STRUCK WIENEKE & LOVE
             Timothy J. Bojanowski, Esq.
15           3100 West Ray Road, Suite 300
             Chandler, Arizona  85226

16

17

18

19

20

21

22

23

24

25

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 20

1      Q.     Immediately before Smallwood took over who was

2  your employer?

3      A.     Wexford.

4      Q.     Did you become a Wexford employee as soon as

5  Wexford took over from ADC?

6      A.     Yes, I did.

7      Q.     And you stayed in the same position, your

8  employer just changed?

9      A.     I received the promotion to regional director

10  upon Smallwood.  With the Wexford I was simply the

11  Perryville supervisor.

12      Q.     What are your job responsibilities as the

13  regional director?

14      A.     I monitor the turnaround times and wait times

15  for both emergency, routine, and urgent care HNRs for five

16  facilities.

17      Q.     And what are those five facilities?

18      A.     It's Perryville, Lewis, Yuma, Winslow, and now

19  I've got Safford.

20      Q.     Do you have a role in supervising any of the

21  remaining facilities?

22      A.     Indirectly, the other director and I speak,

23  share ideas.

24      Q.     What is your indirect role in supervising those

25  facilities?

BRIAN T. HANSTAD, D.M.D. - 04/02/14

1    A.    I am familiar with some of the staff that work

2    throughout the state.  I worked with a lot of staff,

3    almost everybody, so if he has an issue he can bounce it

4    off me.

5    Q.    But you don't directly study or supervise the

6    other facilities; is that right?

7    A.    I do not.

8    Q.    So it's fair to say that your expertise is

9    limited just to the five facilities that you supervise?

10            MR. BOJANOWSKI:  Form; foundation.

11            Go ahead and answer if you can.

12            THE WITNESS:  Yes.

13    Q.    BY MR. GRAY:  In monitoring those five

14    facilities what do you do to monitor them?  What's your

15    process?

16    A.    Daily I go into the CDS system, computer

17    system, I monitor the number of outstanding HNRs, the wait

18    times for each facility, the current volume, and the

19    production produced which can be broken down into classes.

20    Q.    And by production produced, do you mean the

21    types of appointments that were done?

22    A.    Correct.

23    Q.    And you do this daily for each facility that

24    you're responsible for?

25    A.    All five, yes.

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 110

1  wait time report generated by Smallwood CDS system.  Is

2  that what it appears to be to you?

3      A.   I cannot speculate.  This could have come from

4  Excel.  This doesn't look as familiar to me, to be honest.

5      Q.   Take a moment to look at the wait times listed,

6  and let me know if they appear accurate to you --

7               MR. BOJANOWSKI:  Form.

8               Go ahead.

9      Q.   BY MR. GRAY:  -- for the months and facilities

10  listed.

11               MR. BOJANOWSKI:  Form; foundation.

12               Go ahead.

13               THE WITNESS:  With the exception of

14  Douglas, this looks to be in line with the improving

15  trends we've seen at the ADC facilities.

16      Q.   BY MR. GRAY:  To your knowledge, does this

17  accurately state the wait times of the facilities for the

18  months listed, which is March 2013 through November 2013?

19               MR. BOJANOWSKI:  Form; foundation.

20               THE WITNESS:  I cannot accurately answer

21  that.

22      Q.   BY MR. GRAY:  Can you accurately answer it for

23  any of the facilities?

24               MR. BOJANOWSKI:  Same objection.

25               THE WITNESS:  Perryville, because I'm there

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 111

1    every day, I can answer accurately.  This looks to be our

2    average wait time.

3         Q.    BY MR. GRAY:  At Perryville in March of 2013

4    the wait time was 4, and it's been highlighted, whoever

5    produced the document, as does not meet standards.  Do you

6    agree that in March 2013 the wait time at Perryville did

7    not meet standards for routine wait times?

8                   MR. BOJANOWSKI:  Form; foundation.

9                   THE WITNESS:  To the bounds of the

10   contracts routine carryover 90 days, no, it did not.

11        Q.    BY MR. GRAY:  And for example, Yuma at the

12   bottom line, Yuma in March 2013 had a wait time of eight

13   months for routine care, and it's been, again, highlighted

14   by whoever produced the document as does not meet

15   standards.  Do you agree that an eight-month wait time for

16   routine care does not meet standards?

17                   MR. BOJANOWSKI:  Form; foundation.

18                   THE WITNESS:  It definitely does not meet

19   standards.

20        Q.    BY MR. GRAY:  Are requests for teeth cleaning

21   put on the normal wait -- is that just put on the normal

22   routine care list and that's calculated in the wait time

23   calculation for routine care, or are teeth cleaning

24   requests done separately?

25        A.    They are calculated with the remainder of

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 135

1   other month.  The other portion of that CAP was to obtain

2   a stamper that goes along with our intake exam.  We stamp

3   all the incoming intakes.  The new stamper was to contain

4   the letters OHI.

5       Q.    BY MR. GRAY:  And this process that you've been

6   describing, is this something that's done by Corizon; is

7   that what you said?

8       A.    Yes.

9       Q.    Has the Arizona Department of Corrections

10  monitored any of the facilities that you are responsible

11  for --

12              MR. BOJANOWSKI:  Form.

13      Q.    BY MR. GRAY:  -- to your knowledge?

14      A.    There is a monitor physically present at each

15  of the sites, yes.

16      Q.    Who is the monitor for each of the five sites

17  that you're responsible for?

18      A.    I can answer Perryville.

19      Q.    And who is that?

20      A.    Mark Haldane.

21      Q.    And Mr. Haldane is not a dentist, right?

22      A.    Correct, he is not.

23      Q.    So what are your interactions with Mr. Haldane?

24      A.    He's a very pleasant man, very thorough man.  I

25  think he's an ex-attorney.  It's usually one way.  I do

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 148

1              MR. BOJANOWSKI:  Form; foundation.

2              THE WITNESS:  I do not know.  I know it

3   says dentist.

4        Q.   BY MR. GRAY:  The questions on the peer review

5   sheet are not specific to dental care; is that right?

6              MR. BOJANOWSKI:  Form.

7              Go ahead.

8              THE WITNESS:  No.

9        Q.   BY MR. GRAY:  No, as in correct, they're not

10  specific to dental care?

11       A.   Correct, they are not.

12       Q.   Who fills these out?  Well, do you fill these

13  out?

14       A.   Yes.

15       Q.   And did you fill out every one that is in a

16  stack of documents that you produced?

17       A.   No.

18       Q.   How do you determine which dentist filled out a

19  particular form?

20       A.   What site they are from.

21       Q.   And how can you tell that from looking at the

22  document?

23       A.   The doctor's name being reviewed is in the

24  upper right-hand corner.

25       Q.   So the doctor's name being reviewed is

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 149

1  handwritten in the upper right-hand corner, you could then

2  cross-reference that to a list of dental staff at each of

3  the facilities and determine who filled out the Corizon

4  peer review sheet?

5      A.    Yes.

6      Q.    And so the person who has your position as it

7  relates to Perryville but at another facility would have

8  done these for the other facilities; is that right?

9      A.    Yes.

10     Q.    So you don't do these for all five facilities

11 that you're responsible for?

12     A.    No.

13     Q.    Do you find that filling out the Corizon peer

14 review sheet that is not specific to dental care helpful?

15          MR. BOJANOWSKI:  Form.

16          THE WITNESS:  Somewhat.

17     Q.    BY MR. GRAY:  Do you think it could be more

18 helpful if it was specific to dental care?

19          MR. BOJANOWSKI:  Form.

20          THE WITNESS:  Yes.

21     Q.    BY MR. GRAY:  Have you ever suggested that it

22 be made more specific to dental care?

23     A.    Yes.

24     Q.    And who did you suggest that to?

25     A.    The Perryville health administrator.

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 168

1             MR. BOJANOWSKI:  Form.

2             THE WITNESS:  It is adequate today.

3     Q.   BY MR. GRAY:  You said "today" at the end.  Has

4  it been adequate as long as you've been at ADC?

5             MR. BOJANOWSKI:  Form.

6             THE WITNESS:  I do not have enough info to

7  answer that.

8     Q.   BY MR. GRAY:  Well, just in the time you've

9  worked at ADC.  I'm just talking about the time you've

10 actually been at ADC, so not before 2008, obviously.  So

11 has it been adequate at the time you've been at ADC?

12            MR. BOJANOWSKI:  Form.

13            THE WITNESS:  I cannot answer for that full

14 period.

15    Q.   BY MR. GRAY:  What information would you need

16 to answer for the full period?

17    A.   I was not at the director level at the whole

18 time.

19    Q.   So you could only answer with respect to the

20 facilities that you were responsible for at a given time?

21    A.   Yes.

22    Q.   So you can answer for Winslow for part of the

23 time, for Perryville for part of the time, and for the

24 five facilities you're responsible for as of today; is

25 that right?

BRIAN T. HANSTAD, D.M.D. - 04/02/14

1     A.    Yes.

2     Q.    Okay.  So let's start with Winslow.  From the

3 time you were at Winslow, what was your opinion about the

4 staffing ratio?

5           MR. BOJANOWSKI:  Form.

6           THE WITNESS:  Constitutionally adequate.

7     Q.   BY MR. GRAY:  What does that mean to you?

8           MR. BOJANOWSKI:  Same objection.

9           Go ahead.

10          THE WITNESS:  I was able to do my job and

11 keep current.

12    Q.   BY MR. GRAY:  What do you mean by "keep

13 current"?

14    A.    I could see urgent care in a timely fashion,

15 and I could see routine care in a timely fashion.

16          MR. GRAY:  Let's take a quick break.

17          (Recess from 2:22 p.m. to 2:36 p.m.)

18    Q.   BY MR. GRAY:  What is meth mouth?

19    A.    It's a very complex, destructive process on

20 teeth that involves a chemical and bacterial process by

21 which the teeth are destroyed sometimes from the inside

22 out.

23    Q.   Does it require having done meth?

24          MR. BOJANOWSKI:  Form.

25          THE WITNESS:  Yes.  I'm going, is there a

BRIAN T. HANSTAD, D.M.D. - 04/02/14

1    14, "Dr. Hanstad will testify that in his experience ADC

2    inmates sometimes submit dental HNRs for reasons other

3    than to obtain dental treatment."

4              What do you base that opinion on?

5       A.    Them telling me sometimes:  I'm sorry, Dr. H.

6    I wanted to get out of my cell.  They are very forthright

7    with me.  They tell me they want to see their girlfriend.

8       Q.    So this is based on your anecdotal experience

9    treating patients at Perryville?

10      A.    Yes.

11      Q.    So you don't know, for example, how often

12   inmates submit HNRs for other reasons at other facilities;

13   is that right?

14              MR. BOJANOWSKI:  Form; foundation.

15              MR. GRAY:  I will clarify the question.

16      Q.    BY MR. GRAY:  Based on your experience just at

17   Perryville, you don't have an opinion about how often

18   inmates at other facilities submit dental HNRs for reasons

19   other than to obtain dental treatment?

20              MR. BOJANOWSKI:  Form.

21              THE WITNESS:  I don't have the clarity to

22   answer that accurately.

23      Q.    BY MR. GRAY:  How many inmates in the last six

24   months have submitted dental HNRs for reasons other than

25   to obtain dental treatment at Perryville?

BRIAN T. HANSTAD, D.M.D. - 04/02/14

Page 255

1  STATE OF ARIZONA      )
                          )
2  COUNTY OF MARICOPA    )

3

4              I, JANET HAUCK, a Certified Reporter,

5  Certificate No. 50522, in the State of Arizona, do hereby

6  certify that the foregoing witness was duly sworn to tell

7  the whole truth; that the foregoing pages constitute a

8  full, true, and accurate transcript of all proceedings had

9  in the foregoing matter, all done to the best of my skill

10 and ability.  Pursuant to request, notification was

11 provided that the deposition is available for review and

12 signature.

13

14             I FURTHER CERTIFY that I am not related to

15 nor employed by any of the parties hereto, and have no

16 interest in the outcome hereof.

17

18             WITNESS my hand this 10th day of April,

19 2014.

20

21

22             _____
               Janet Hauck, RPR
23             Arizona Certified
               Reporter No. 50522
24

25

# EXHIBIT 11

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

_____

| | |
|---|---|
| **Victor Parsons,** et al., on behalf of themselves and all others similarly situated; and **Arizona Center for Disability Law,** | ) ) ) ) ) |
| | ) |
| Plaintiffs, | ) |
| vs. | ) |
| | ) |
| **Charles Ryan,** Director, Arizona Department of Corrections; and **Richard Pratt,** Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) ) |
| | ) |
| Defendants. | ) |

No.  **CV 12-00601-PHX-NVW**

**Phoenix, Arizona**
**August 7, 2013**
**10:00 a.m.**

BEFORE:  **THE HONORABLE NEIL V. WAKE, JUDGE**

(*Motion Hearing*)

Official Court Reporter:
Laurie A. Adams, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC 43
Phoenix, Arizona 85003-2151
(602) 322-7256

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1    For the Plaintiffs:

 2            PERKINS COIE LLP
              By:  Amelia M. Gerlicher, Esq.
 3            By:  John H. Gray, Esq.
              2901 N. Central Ave.
 4            Suite 2000
              Phoenix, AZ 85012

 5
              ARIZONA CENTER FOR DISABILITY LAW - PHOENIX, AZ
 6            By:  Jennifer A. Alewelt, Esq.
              5025 E. Washington St.
 7            Suite 202
              Phoenix, AZ 85034

 8
      For the Defendants:
 9
              STRUCK WIENEKE & LOVE, P.L.C.
10            By:  Nicholas D. Acedo, Esq.
              By:  Ashlee B. Fletcher, Esq.
11            By:  Timothy J. Bojanowski, Esq.
              By:  Kathleen Wieneke, Esq.
12            3100 W. Ray Road
              Suite 300
13            Chandler, AZ 85226

14            OFFICE OF THE ATTORNEY GENERAL - PHOENIX
              By:  Lucy M. Rand, Esq.
15            1275 W. Washington St.
              Phoenix, AZ 85007-2926
16

17

18

19

20

21

22

23

24

25
```

———August 7, 2013 - Motion Hearing———

1    closure and we can proceed on the named plaintiffs.

2            MR. ACEDO:  Well, Your Honor --

3            THE COURT:  Go ahead.

4            MR. ACEDO:  We don't think that this discovery would

5    go to waste.  I mean, the facilities aren't changing.  They          10:26:07

6    don't need to take additional tours.  The facilities are

7    staying the same.  The depositions, not that many depositions

8    have been taken so far.  Would they need to retake those

9    depositions?  Well, let's assume that they did.  And we're not

10   agreeing to that, but let's assume that they did.  They would       10:26:26

11   be very limited.  What has happened since the case was stayed?

12   These wouldn't be seven-hour depositions.  These would be one-

13   or two-hour depositions.  And some of them wouldn't even need

14   to be taken again.  Contract monitors, for example, individuals

15   that don't have any relevant information with respect to the         10:26:44

16   individual plaintiffs' claims.  A lot of these depositions were

17   just were more broad, systemic that went towards the class

18   claims.

19            So there weren't that many that have been taken.

20   There's far more that are yet to be taken that we can stop.  I       10:27:00

21   don't think --

22            THE COURT:  Tell me the character of these untaken

23   depositions.

24            MR. ACEDO:  I believe --

25            THE COURT:  I mean, if this is a matter of the               10:27:11

─────── August 7, 2013 - Motion Hearing ───────

1   again, I read the *Chamberlan* opinion again last night.  If you

2   read it closely, it contemplates that things should stop

3   because of the uncertainty, because if they reverse that order

4   it drastically changes the face of the lawsuit.

5          THE COURT:  But does it drastically change it?          10:31:43

6          MR. ACEDO:  We think it does.  We think it does.  And

7   we know that's a hard concept to grapple with.  But a perfect

8   example are these contract monitors from multiple facilities

9   that they want to depose.  Why would they need to depose all

10  those contract monitors if it were just one plaintiff's claim?   10:32:02

11  Why would they tour a facility where none of the plaintiffs are

12  housed?  Those are concrete examples.

13         Why would we have to answer interrogatories that ask,

14  provide us the list of names of all prisoners who have this

15  chronic condition?  Well, it's unnecessary.                      10:32:19

16         THE COURT:  Well, yeah.  Well, I need to hear from the

17  other side.  But it does appear to me that the scope of the

18  discovery that's been sought greatly exceeded what I had

19  contemplated.

20         MR. ACEDO:  And what's set up now, if there is no         10:32:43

21  stay, that will continue for the next three or four months.

22         Thank you.

23         THE COURT:  All right.  Ms. Gerlicher.

24         MS. GERLICHER:  Yes, Your Honor.

25         THE COURT:  Ms. Gerlicher, are you with -- what firm      10:33:12

1    And all these documents are generally attorney's eyes only.

2          THE COURT:  Here's what I'm going to do.  I'm

3    persuaded that I'm not quite confident about the security

4    issues, so I'm going to direct you all to continue to dialogue

5    about this.  If you don't reach an agreement you can submit          11:38:34

6    that to me with your statements of your positions of what can

7    or cannot be done to protect security.

8          But I am determining that the attorney/client issues

9    are adequately dealt with by filtering and the clawback.

10          MS. GERLICHER:  Okay, Your Honor.          11:38:52

11          THE COURT:  All right.  As I said, I'm going to take

12    this under advisement.  And if we do go forward, I'm going to

13    expect you all to -- I may set limits on what can go forward,

14    and beyond any limits that I set, I'm going to direct you to

15    confer about further limitation in light of the direction I          11:39:37

16    have given in this hearing.

17          MR. ACEDO:  Your Honor, we would ask in the

18    alternative if you deny our stay that at least the expert

19    tours, these ones that are coming up this week, next week, be

20    cancelled.  We have laid out in our papers that there's no          11:40:08

21    reason to do them and they are unduly burdensome, just as an

22    alternative request.

23          MS. GERLICHER:  One of those experts has not yet

24    toured, Your Honor.  As we have pointed out, we're willing to

25    cancel the others subject to stipulation.  And the expert who          11:40:23

1

2

3

4

5                              C E R T I F I C A T E

6

7          I, LAURIE A. ADAMS, do hereby certify that I am duly

8    appointed and qualified to act as Official Court Reporter for

9    the United States District Court for the District of Arizona.

10         I FURTHER CERTIFY that the foregoing pages constitute

11   a full, true, and accurate transcript of all of that portion of

12   the proceedings contained herein, had in the above-entitled

13   cause on the date specified therein, and that said transcript

14   was prepared under my direction and control.

15         DATED at Phoenix, Arizona, this 8th day of August,

16   2013.

17

18                              s/Laurie A. Adams

19                              _____
                                Laurie A. Adams, RMR, CRR

20

21

22

23

24

25