1   Daniel Pochoda (Bar No. 021979)
    James Duff Lyall (Bar No. 330045)*
2   **ACLU FOUNDATION OF ARIZONA**
    3707 North 7th Street, Suite 235
3   Phoenix, Arizona 85013
    Telephone:  (602) 650-1854
4   Email: dpochoda@acluaz.org
               jlyall@acluaz.org
5   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

6   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz,*
    *Dustin Brislan, Sonia Rodriguez, Christina Verduzco,*
7   *Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne*
    *Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson,*
8   *and Charlotte Wells, on behalf of themselves and all*
    *others similarly situated*

9   **[ADDITIONAL COUNSEL LISTED BELOW]**

10  Sarah Kader (Bar No. 027147)
    Asim Varma (Bar No. 027927)
11  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
12  Phoenix, Arizona 85034
    Telephone:  (602) 274-6287
13  Email: skader@azdisabilitylaw.org
               avarma@azdisabilitylaw.org
14
    *Attorneys for Plaintiff Arizona Center for Disability Law*
15  **[ADDITIONAL COUNSEL LISTED BELOW]**

16                  UNITED STATES DISTRICT COURT

17                       DISTRICT OF ARIZONA

18  Victor Parsons; Shawn Jensen; Stephen Swartz;          No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina                (MEA)
19  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
20  Hefner; Joshua Polson; and Charlotte Wells, on         **DECLARATION OF CRAIG**
    behalf of themselves and all others similarly          **HANEY, Ph.D., J.D.**
21  situated; and Arizona Center for Disability Law,

22                          Plaintiffs,

23          v.

24  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
25  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
26  capacities,

27                          Defendants.

28

1    I, Craig Haney, Ph.D., J.D., declare:

2         1.    As I noted in an earlier declaration that I filed in this case, I am an academic

3    psychology professor.    I was trained in a distinguished research-oriented graduate

4    program, and I regularly teach graduate courses in research methods in the social

5    psychology Ph.D. program at the University of California, Santa Cruz.    The social

6    psychology graduate program at Santa Cruz is a doctoral program for which I also serve

7    as Director.  I am also a Distinguished Professor in the University of California system, a

8    distinction reserved for professors who have reached the very highest level of the

9    professoriate, after being nominated by our respective universities and undergoing a

10   national and international review.    In addition, I recently served as a member of a

11   committee of the nation's most esteemed scientific organization, the National Academy of

12   Sciences.  Our committee was charged with the responsibility of scientifically analyzing

13   the causes and consequences of the high rates of incarceration in the United States and

14   proposing recommendations for reform.[1]

15        2.    My education, training, and academic and professional experience have

16   taught me that the propriety, validity, or correctness of any particular method of collecting

17   data is determined by the context in which it is implemented and the purposes for which it

18   is used.  The task that I undertook in this case—in addition to summarizing the scientific

19   literature on the negative psychological consequences of isolated confinement and

20   whether and how those negative consequences could be exacerbated in the case of

21   prisoners who were suffering from serious mental illness—was to engage in an empirical

22   investigation and analysis of whether and how the patterns, practices, conditions, and

23   consequences of isolated confinement in the Arizona Department of Corrections (ADC)

24   facilities placed prisoners, including those suffering from serious mental illness, at a

---

26   [1] The analysis and recommendations appear in: The Growth of Incarceration in the
27   United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce
     Western, et al.). [Report of the National Academy of Sciences Committee on the Causes
     and Consequences of High Rates of Incarceration in the United States.] Washington, DC:
28   National Academy Press (2014).

serious risk of psychological harm.  My empirical investigation was restricted primarily to the facilities that I inspected and in which I conducted interviews.  However, to the extent to which the polices, practices, and conditions that gave rise to this risk of harm applied system-wide (as reflected in the documentation I asked for and was provided), I opined about their broader implications.  My reading of the reports filed by other Plaintiffs' experts in this case indicates that they undertook similar empirical investigations and appropriate document reviews, and reached similar conclusions, albeit ones with somewhat different emphases than my own.

3.    Although I was guided by scientific research in the conclusions that I reached and by scientific methods in the data collection that I undertook as part of my empirical investigation, I did not engage in a comprehensive scientific study that was designed to produce precise calculations of the exact numbers of prisoners who were affected by the many serious problems that I uncovered.  Such a study not only would be completely unprecedented in prison litigation such as this, but also would be prohibitively expensive (costing hundreds of thousands of dollars or more to conduct), and require essentially complete access to the ADC (well beyond the limited access that Defendants have permitted).  Much more importantly, however, because of the magnitude of the problems that were encountered in the ADC by myself and by other Plaintiffs' experts, and because of the prevailing constitutional standards by which that host of problems are to be judged, such a study would be (and is) entirely unnecessary.

4.    Specifically, the problems that I and other Plaintiffs' experts encountered in the ADC were far from subtle.  Rather, they were glaring and egregious in nature.  The problems also were not difficult to identify or infrequent in number.  They were ubiquitous in the facilities that I toured and inspected.  The conditions of confinement were starkly severe, precisely the kind that are known to produce serious adverse psychological reactions.  Prisoner after prisoner complained about the harshness of his/her surroundings and lack of meaningful mental health care, and described significant levels of frustration and suffering.  It was entirely unnecessary (and meaningless) to employ

"inferential statistics" to gauge the psychological and legal significance of these glaring problems.

5.   Moreover, many of these problems were the product of undisputed patterns and practices that either were explicitly written into ADC policy, stemmed directly from things that were conceded by ADC employees and officials in documents and depositions, or were explicitly (and often repeatedly) documented in the regular course of the ADC's own internal monitoring process.   My own November 7, 2013 Expert Report cited numerous such documents as the basis for my opinion—from the ADC's ill-advised (but undisputed) policy of placing seriously mentally ill prisoners in isolated confinement, to deposition testimony about the lack of mental health care, to glaring staffing vacancy rates, to various reports (so-called "MGAR Reports") by the ADC's own Mental Health Contract Monitor that identified serious problems throughout the system.

6.   In any event, the methodology that I employed in this case was entirely consistent with the approach I and other experts have taken to accomplish these tasks in other prison litigation cases.   It is used in cases such as these not only because it has become the standard or "benchmark" approach, but also because it provides a very sound basis on which to reach conclusions about the nature and effect of prison conditions and practices in a particular prison or prison system.

7.   To specifically restate the methodology that I (and the other experts in this case) employed:   I reviewed an extensive number of documents before, during, and after I visited the correctional facilities about which I opined; I toured and inspected specific ADC facilities and, within them, toured and inspected all or representative examples of the isolation units that they contained; I spoke to staff members in the course of my tours (to the extent permitted by Defendants' counsel); and I conducted a number of interviews—cell front interviews from prisoners randomly selected as I passed through a number of the units and out-of-cell confidential interviews with a group of prisoners that were either named Plaintiffs in the case or that I randomly selected myself (consistent with the ground rules arrived at as a result of negotiations between the parties) to be

1   representative of prisoners housed in specific kinds of units.   After those tours, I

2   requested, was sent, and reviewed additional documentation that either became especially

3   relevant after my tours and interviews and/or that was eventually provided by Defendants

4   pursuant to discovery proceedings.  I focused on those places, people, and documents that

5   were most relevant to the areas and issues about which I was asked to render an opinion.[2]

6   I made a point of examining information and data from a variety of different sources, so

7   that I could determine whether and to what degree they were consistent and cross-

8   corroborated one another.  Again, although their individual area of focus and expertise

9   was somewhat different from my own, it is my understanding that the other Plaintiffs'

10  experts followed more or less the same approach and proceeded essentially in this manner.

11          8.      There are many factors that underscore the propriety of this approach and

12  that rebut the unsubstantiated claims made in the Defendants' Motion to Preclude

13  Plaintiffs' Experts.  For one, as I have noted, these exact methods and approaches are

14  followed as a matter of course in this kind of litigation, by literally every competent expert

15  who undertakes this work.  I have been directly involved as an expert witness in prison

16  litigation since the late 1970s.  In addition to the prison cases in which I have been

17  directly involved, because prison litigation, prisoners' rights, and the nature and effect of

18  prison conditions are primary areas of academic study for me, I have made a point of

19  acquiring and maintaining knowledge about how such cases are prepared more generally

20  (including those cases in which I am not directly involved).  The methodology that I and

21  other Plaintiffs' experts have used in this case is essentially the same methodology that

22  has been employed in every prison conditions lawsuit with which I am familiar.  Indeed,

23  the data base that was obtained in this case is broader and more comprehensive than a

24  number of cases with which I am familiar.  Notably, Defendants do not (and I believe

25  cannot) cite a single case in which a significantly different, better approach was followed.

26  _____

27      [2]  For example, as I said in my November 7, 2013 Expert Report: "I made a point
    of visiting a representative sample of housing units where prisoners with mental illness
    were housed, in addition to isolation housing units with general population maximum
28  custody prisoners."  Paragraph 10.

1    As I will discuss later in this Declaration, their own experts have not followed a
2    methodology that is remotely as rigorous, reliable, or scientifically defensible.

3         9.    In fact, the methods and approaches that I and other Plaintiffs' experts
4    followed in this case were already established when I began serving as an expert for the
5    United States Department of Justice in institutional litigation in the late 1970s [e.g.,
6    *Hoptowit v. Ray*, 682 F.2d 1237 (9th Cir. 1982)].   Experts like myself who worked with
7    the Special Litigation Section of the Department of Justice in those early years have
8    continued to employ these approaches and methods up to the present time.   Indeed,
9    experts who work with Department of Justice <u>still</u> operate in basically the same way—
10   examining documents, conducting tours, and engaging in prisoner and staff interviews.

11        10.   For example, the methodology that was recently used by the Department of
12   Justice in its investigation of the Pennsylvania prison system (an investigation that was
13   coincidentally taking place at almost the same time as the investigation of Arizona prisons
14   was being conducted by Plaintiffs' experts in the present case) was virtually identical to
15   the one Plaintiffs' experts have used.  Thus, the Department of Justice attorneys and their
16   expert consultants "conducted on-site inspections" of a number of correctional facilities in
17   Pennsylvania in August 2013, during which they "reviewed documents" that included
18   "policies and procedures, medical and mental health records, cell histories, incident
19   reports, disciplinary reports, suicide reports, and unit logs."[3]   Just as we did, they also
20   "observed prisoners in various settings throughout the facilities."[4]   In addition, as the
21   Department of Justice reported: "Our expert-consultants interviewed and/or reviewed
22   records of more than two dozen prisoners who they have concluded were directly harmed
23   by their conditions in solitary confinement in various ways, including mental
24   deterioration, increased psychosis, and acts of self-harm and suicide."[5]

25

26      [3]  United States Department of Justice, Civil Rights Division, <u>Investigation of the</u>
     <u>Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners With</u>
27   <u>Mental Illness and/or Intellectual Disability</u>, February 24, 2014, p. 4.
        [4]  Ibid.
28      [5]  Ibid. at p. 11-12.

11.     It is important to note that the Department of Justice used these data—the same kind of data obtained in exactly the same way as Plaintiffs' experts in this case—to reach conclusions about a wide variety of "systemic" and "system-wide" constitutional deficiencies.   The Pennsylvania prison system is considerably larger than the Arizona system, operating 26 facilities that hold approximately 50,000 prisoners, including nearly 3,000 who are in solitary or isolated confinement.[6]   In the present case, multiple Plaintiffs' experts have conducted literally hundreds of interviews and reviewed thousands of pages of documents to reach conclusions about a prison system in Arizona that operates fewer than half the number of institutions as Pennsylvania and holds only about 60% of its number of prisoners.

12.     Moreover, the methods and approaches followed in this case are exactly the ones that Dr. Stewart and I followed in reaching our opinions in *Brown v. Plata* [131 S. Ct. 1910 (2011)], a case in which our expert reports and testimony were repeatedly cited by the United States Supreme Court as part of the basis for its decision.

13.     Defendants continue to characterize the data on which Plaintiffs' expert reports are based as "biased" and "cherry picked."   This represents a fundamental mischaracterization.  For one, as I noted, many of the conclusions that Plaintiffs' experts reached were based on ADC written policies, admissions by former or current ADC employees and officials, or ones supported by reports written by the monitors that Defendants themselves retained to analyze their prison system's performance along many key dimensions at issue here.

14.     Second, many of the conclusions that Plaintiffs' experts reached were based on direct observations of actual conditions of confinement, ones that are not in dispute and whose physical dimensions and environmental characteristics are a matter of factual record.  Defendants fail to explain why or how they believe that these things are a matter

---

[6]  Ibid. at p. 5.

of "interpretation" that has been somehow "biased" by the manner in which Plaintiffs' experts have observed and noted them.

15.     Third, the Defendants continue to assert that the information relied upon by myself and other Plaintiffs' experts is "incomplete, biased … and spoon-fed" by Plaintiffs' counsel.  Yet they provide no evidence about exactly what such flawed information was conveyed or relied upon and exactly how it was inaccurate or biased. Their main argument is that because the information Plaintiffs' experts obtained and employed was not "randomly" acquired (as they define it) and not "statistically analyzed" (in ways they never quite define or specify), it is somehow insufficient and unreliable. This misconstrues the nature of the inquiry that has been undertaken in this case (and that is undertaken in cases like it).

16.     In some instances, Defendants' criticism that the data on which the Plaintiffs' experts relied was not "randomly" selected literally makes no sense whatsoever.  For example, Defendants apparently object to the fact that many of the documents I reviewed, including master files and medical files for a number of Plaintiffs (named Plaintiffs and others whom I interviewed), were allegedly biased or unrepresentative because "[t]here is no indication that Plaintiffs' counsel randomly selected the records."  I cannot fathom why it would be important (or even rational) to "randomly" select records like these for an expert to review, rather than to provide that expert with records for the prisoners whom he interviewed and whose records he requested to see (as was done here).

17.     Defendants' ignore the fact that, except for the interviews that were intentionally done with named Plaintiffs (something that, for obvious reasons, is both legally and methodologically sensible), the overwhelming majority of the hundreds of interviews that were collectively conducted by Plaintiffs' experts were done with prisoners who were selected on a random and unbiased basis and therefore yielded a representative picture of the way in which the ADC prisoners were describing and

1    reacting to the manner in which they were being treated and their conditions of
2    confinement.

3         18.    It is perhaps worth clarifying a misconception that colors much of
4    Defendants' criticism of Plaintiffs' experts and the approach to data gathering that we
5    followed. "Random" selection is used to obtain unbiased and representative samples that
6    allow conclusions to be reached about the larger population from which they are selected.
7    In laboratory settings, especially, where researchers have complete control over the
8    method of random selection, they can obtain "true" random samples by relying on random
9    numbers that are typically computer-generated to ensure the randomness of the sample.  I
10   used this technique myself in the case of interviewees I selected in advance for in-depth,
11   confidential interviews.  But these kind of "true" random samples are often impossible to
12   obtain in real-world settings where access to random number generators is infeasible.

13        19.    In this case, it was important to select some inmates to interview in various
14   housing units and to conduct those interviews cell front, so that specific aspects of their
15   conditions of confinement could be discussed in the environments in which the prisoners
16   were experiencing them.  Those samples could not be specified in advanced.  In fact,
17   Plaintiffs' experts often did not know in advance which housing units we would be
18   touring (so that it would have been impossible to randomly select prisoners in advance of
19   entering the units).  Once in the units, it was infeasible (and unnecessary) to consult a
20   random number generator to select interviewees.  So we did the next best (and entirely
21   appropriate) thing—Plaintiffs' experts selected randomly on our own, that is, with no
22   prior knowledge of the inmates whom we interviewed and no pre-existing pattern in mind.
23   This method is frequently used in "in situ" research projects, where data are collected in
24   real world or "field" settings.

25        20.    In fact, Defendants were present, on the cellblocks, and taking notes,
26   throughout the entire period that Plaintiffs' experts were randomly selecting interviewee
27   and conducting their cell front interviews.  They have alleged no systematic patterns or

28

1   described any specific, overt bias in the choice of particular prisoners whom I and other

2   Plaintiffs' experts interviewed.[7]

3       21.    In any event, other Plaintiffs' experts and I employed methods of obtaining

4   much of the information on which we relied that <u>did</u> ensure that the prisoners who

5   provided it were selected in an unbiased manner and were therefore representative of

6   those living in the units about which we opined.  As I say, conducting cell front interviews

7   with prisoners unknown to the interviewer and selected with no particular logic or bias <u>is</u>

8   a completely acceptable form of random selection, even though it is not a pure random

9   sample of the sort that would be possible to obtain in a research laboratory.  Defendants'

10   practice of belittling or attempting to delegitimize this practice by placing the term

11   "random" in quotes each time they refer to it does not substitute for providing an analysis

12   or rationale for why the Defendants claim that it is unacceptable or produces data that are

13   unrepresentative or unreliable.  They provide none.

14       22.    In addition, Defendants criticize Plaintiffs' experts for what they

15   characterize as an insufficient number of prisoners whom they have interviewed and on

16   whose information they in part rely.  It is important to note that, collectively, Plaintiffs'

17   experts have interviewed several hundred prisoners, selected in the unbiased manner

18   described above, to ensure that they are representative of the Plaintiff class.  Although

19   they do not specify the number of interviews they would find acceptable, they maintain

20   that however many interviews Plaintiffs' experts conducted, they were too few in number.

21   (This contention is particularly ironic in light of the fact that, as I will discuss below,

22   Defendants' experts failed to interview a single prisoner, despite those experts opining at

23   length about whether and how the prisoners were being affected by conditions and

24

25         [7] In my case, Defendants also criticize the fact that the number of interviews I
conducted was guided in part by the size of the units from which I was selecting prisoners

26   to interview and amount of time I had to complete the interviews.  These are entirely
appropriate practical considerations that guide formal research projects as well as the kind

27   of special investigation that was undertaken here.  I am unclear why Defendants imply
that these practical constraints are improper or what alternatives they believe should have

28   been pursued instead.

treatment in the ADC.)  It is important to note that even a comparatively small number of interviews, if selected in an unbiased way, so as to be representative of the larger population, can provide a great deal of insight into the typical or average reactions experienced by that larger population.  (This is what allows relatively small samples of no more than a few hundred or thousand respondents in public opinion surveys to relatively accurately predict the outcome of national presidential elections, where the likely votes of many millions of citizens are being predicted.)  In any event, the fact that Plaintiffs' experts collectively conducted several hundred interviews, and relied <u>in part</u> on those responses, in conjunction with a wide variety of other information (including direct observations and extensive document review) is a strength not a weakness of the data on which their opinions are based.

23.    More generally, it is important to emphasize that qualified experts on prison conditions and their effects on inmates employ a range of scientifically legitimate methods to reach conclusions about whether and how prison systems are functioning properly and providing constitutionally adequate care to prisoners.  Those legitimate methods—because of the practical considerations mentioned above—only very rarely include anything that approximates truly random sampling.  In addition to the practical considerations, however, this is also because conclusions about whether there are systemic inadequacies which place prisoners at a substantial risk of serious harm do not require statistically precise calculations of the exact number of prisoners who are adversely affected.  On the contrary, inferences can be drawn about how a system is functioning by looking at a variety of indicators, exactly as Plaintiffs' experts have done in this case.  That is especially true in cases such as this one in which, as I noted earlier, the indicators are glaring, egregious, and ubiquitous.

24.    Contrary to Defendants' assertions, it is entirely possible to extrapolate to systemic problems from analyzing information collected from multiple representative sources, whether or not they have been "statistically analyzed."  Although it would not be appropriate to attempt to extrapolate to a precise quantitative calculation ("X number of

1    prisoners are affected in Y ways"), it is entirely appropriate to conclude, as we have in this

2    case, that the egregious and endemic problems that we have identified are "systemic,"

3    "widespread," and place prisoners at "substantial risk of harm."

4         25.    As I say, Defendants present no factual demonstrations of how the

5    approaches that were used by Plaintiffs' experts actually were biased or produced data

6    that were unrepresentative.  Instead, they continue to confuse or mischaracterize methods

7    of focusing in on specific issues (e.g., looking at cases that have been identified as

8    examples of a particular issue or problem) with those that are "biased."   Similarly,

9    criticizing experts because they read some but not all of the "approximately 70

10   depositions that have been taken in this matter" fails to acknowledge that different experts

11   had different areas of interest and expertise that rendered their review of literally every

12   deposition, covering every issue, unnecessary and irrelevant.   In my own case, for

13   example, I read the depositions of the persons most relevant to the issues about which I

14   was asked to opine.  This hardly represents "cherry picking"—I selected the depositions

15   of persons whose knowledge and expertise was germane to my opinions—those are the

16   ones I was provided and reviewed, and they are the ones I appropriately relied on in

17   forming my opinions.  Defendants have failed to indicate how or why that entirely

18   reasonable process omitted pertinent information or yielded opinions that were

19   contradicted by some other deposition that I did not request, was not provided, and did not

20   review.  Similarly, I reviewed the files of persons whom I interviewed—those were the

21   ones I requested and those were the ones I was provided (although Defendants provided

22   them long after they had been requested, making it impossible to review all of them in

23   advance of my deposition).  In any event, the documents and records were not hand- or

24   "cherry-" picked by counsel; I selected them and did so for the obvious reason that they

25   were the ones most relevant to my analysis and opinion—not to bias or support but rather

26   to enable and formulate them.

27        26.    As I stated above, I do not know of any case in which a substantially

28   different or better methodology has been used and Defendants do not provide any

examples of a superior approach having been used in any similar litigation.  Frankly, it is difficult to know whether Defendants' objections to Plaintiffs' experts on the basis of their assertions that we did not implement their particular (and, as I have explained above, unduly narrow) definition of "random selection" and subject our findings to "statistical analysis" are intended as a serious critique.  I say this because Defendants' own experts presented an approach that was vastly inferior to the one Plaintiffs' experts used.  As I noted in my January 31, 2014 Rebuttal Report, Drs. Penn and Seiter opined about the effects of specific conditions of confinement on a group of prisoners whom they had never met.  Of course, since they did not conduct any prisoner interviews, they could not and did not "randomly select" them.  And, since they had no data whatsoever about prisoner reactions to their treatment or the conditions of confinement to which they were exposed, they could not have "statistically analyzed" any such data.  Indeed, they did not collect anything from prisoners that could be analyzed in any fashion (or even reviewed or described).

27.    Beyond that, however, they relied on the opinions of correctional officials and employees who themselves had done none of the things that Defendants now criticize Plaintiffs' experts for having only approximated.  Unless has not yet been disclosed, I have seen no indication that Defendants have "sampled," or "randomly selected," or "statistically analyzed," or used "inferential statistics" in any of their descriptions or assessments of their own prison system.  Unlike Plaintiffs' experts, who have been given only limited access to the Arizona prison system, and had limited time with which to collect the data that allowed us to analyze its functioning, Defendants have had unlimited access and years to do so.  Yet they have not.

28.    The analytical approach and the empirical investigation that Plaintiffs' experts undertook is not only the standard approach in cases such as this, and entirely appropriate to the task at hand, but also vastly superior in virtually every way to the approach and data on which Defendants have relied.  The approach and methodology

1   taken by Plaintiffs' experts were conscientious, appropriate to the task at hand, and

2   provided a sound basis for the conclusions that were reached.

3       29.    Attached hereto as Exhibit 1 is my report dated November 7, 2013,

4   including all appendices.

5       30.    Attached hereto as Exhibit 2 is my report dated January 31, 2014, including all

6   appendices.

7       Executed this 17th day of June, 2014 in Santa Cruz, California.

8

9                     Craig Haney PhD, JD.

10                    Craig Haney, Ph.D., J.D.

11  **ADDITIONAL COUNSEL:**

12                    Donald Specter (Cal. 83925)*
                  Alison Hardy (Cal. 135966)*

13                    Sara Norman (Cal. 189536)*
                  Corene Kendrick (Cal. 226642)*

14                    Warren E. George (Cal. 53588)*
                  **PRISON LAW OFFICE**

15                    1917 Fifth Street
                  Berkeley, California 94710

16                    Telephone:  (510) 280-2621
                  Email:    dspecter@prisonlaw.com

17                                   ahardy@prisonlaw.com
                               snorman@prisonlaw.com

18                                 ckendrick@prisonlaw.com
                               wgeorge@prisonlaw.com

19                    *Admitted *pro hac vice*

20                    David C. Fathi (Wash. 24893)*

21                    Amy Fettig (D.C. 484883)**
                  Ajmel Quereshi (Md. 28882)**

22                    **ACLU NATIONAL PRISON PROJECT**

23                    915 15th Street N.W., 7th Floor
                  Washington, D.C. 20005

24                    Telephone:  (202) 548-6603
                  Email:    dfathi@npp-aclu.org

25                                 afettig@npp-aclu.org
                               aquereshi@npp-aclu.org

26                    *Admitted *pro hac vice*. Not admitted

27                    in DC; practice limited to federal
                  courts.

28                    **Admitted *pro hac vice*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:     dbarr@perkinscoie.com
              agerlicher@perkinscoie.com
              keidenbach@perkinscoie.com
              jhgray@perkinscoie.com
              mdumee@perkinscoie.com
              jpeters@perkinscoie.com

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
              aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com
              tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
              jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone: (949) 851-3939
Email: kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR
DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
         avarma@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
**ARIZONA CENTER FOR
DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone: (520) 327-9547
Email: jrico@azdisabilitylaw.org
         jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability
Law*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on June 18, 2014, I electronically transmitted the above document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Michael E. Gottfried
Katherine E. Watanabe
Lucy M. Rand
Assistant Arizona Attorneys General
Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck
Kathleen L. Wieneke
Timothy J. Bojanowski
Rachel Love
Nicholas D. Acedo
Ashlee B. Fletcher
Anne M. Orcutt
Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.
dstruck@swlfirm.com
kwieneke@swlfirm.com
tbojanowski@swlfirm.com
rlove@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

s/ Delana Freouf