1    Daniel Pochoda (Bar No. 021979)
     James Duff Lyall (Bar No. 330045)*
2    **ACLU FOUNDATION OF ARIZONA**
     3707 North 7th Street, Suite 235
3    Phoenix, Arizona 85013
     Telephone:  (602) 650-1854
4    Email: dpochoda@acluaz.org
             jlyall@acluaz.org
5    *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

6    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin*
     *Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
7    *Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,*
     *Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of*
8    *themselves and all others similarly situated*

9    **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

10   Sarah Kader (Bar No. 027147)
     Asim Varma (Bar No. 027927)
11   **ARIZONA CENTER FOR DISABILITY LAW**
     5025 East Washington Street, Suite 202
12   Phoenix, Arizona 85034
     Telephone:  (602) 274-6287
13   Email: skader@azdisabilitylaw.org
             avarma@azdisabilitylaw.org
14   *Attorneys for Plaintiff Arizona Center for Disability Law*

15   **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

16              UNITED STATES DISTRICT COURT

17                  DISTRICT OF ARIZONA

18   Victor Parsons; Shawn Jensen; Stephen Swartz;    No. CV 12-00601-PHX-NVW
     Dustin Brislan; Sonia Rodriguez; Christina       (MEA)
19   Verduzco; Jackie Thomas; Jeremy Smith; Robert
     Gamez; Maryanne Chisholm; Desiree Licci; Joseph
20   Hefner; Joshua Polson; and Charlotte Wells, on   **PLAINTIFFS' RESPONSE IN**
     behalf of themselves and all others similarly    **OPPOSITION TO**
21   situated; and Arizona Center for Disability Law, **DEFENDANTS' MOTION TO**
                                                       **PRECLUDE EXPERTS**
22              Plaintiffs,

         v.
23
     Charles Ryan, Director, Arizona Department of
24   Corrections; and Richard Pratt, Interim Division
     Director, Division of Health Services, Arizona
25   Department of Corrections, in their official
     capacities,
26
                Defendants.
27

28

78204-0001/LEGAL122120884.6

# **TABLE OF CONTENTS**

**Page**

Table of Authorities ........................................................................................... iii

Background ......................................................................................................... 2

    I.     MEDICAL EXPERTS ......................................................................... 2

         A.    Robert L. Cohen, M.D. ............................................................ 2

         B.    Todd Randall Wilcox, M.D., M.B.A., CCHP-A .............................. 3

    II.    MENTAL HEALTH EXPERT ........................................................ 4

    III.   DENTAL EXPERT ........................................................................ 6

    IV.   ISOLATION EXPERTS ................................................................ 8

         A.    Eldon Vail ............................................................................... 8

         B.    Craig Haney, Ph.D, J.D .......................................................... 10

         C.    Brie Williams, M.D., M.S ...................................................... 12

Legal Standard ................................................................................................ 13

Argument ......................................................................................................... 15

    I.     DEFENDANTS' MOTION DOES NOT SUPPORT WHOLESALE EXCLUSION OF PLAINTIFFS' EXPERTS ............................................. 15

    II.    PLAINTIFFS' EXPERTS WERE NOT REQUIRED TO CONDUCT A SCIENTIFIC REVIEW TO OFFER OPINIONS ................................. 16

         A.    Plaintiffs' experts are offering specialized opinions ...................... 16

              1.    Plaintiffs' Experts' Qualifications ......................................... 18

              2.    Plaintiffs' Experts' Methodologies ....................................... 19

         B.    Even using Defendants' standard, Plaintiffs' experts selected appropriate samples ............................................................. 21

         C.    Plaintiffs' experts did not need to conduct additional statistical analyses ................................................................................ 22

         D.    Defendants' experts used methods that were similar to, but less thorough than, those used by Plaintiffs' experts ...................... 23

    III.   DEFENDANTS' CRITICISMS OF THE METHODOLOGIES OF PLAINTIFFS' EXPERTS GO TO WEIGHT, NOT ADMISSIBILITY ................................................................................. 27

# TABLE OF CONTENTS
## (continued)

**Page**

IV.   DEFENDANTS' ALTERNATIVE ARGUMENTS ARE WITHOUT MERIT .................................................................................... 29

     A.   Dr. Cohen's and Dr. Wilcox's opinions are not cumulative ............ 29

     B.   Plaintiffs' experts' opinions about facilities that they did not tour should not be excluded ............................................................. 31

Conclusion ....................................................................................................... 33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Abrams v. Ciba Specialty Chemicals Corp.*,
   2010 WL 779273 (S.D. Ala. Mar. 2, 2010) ................................................. 30

*Ahanchian v. Xenon Pictures, Inc.*,
   624 F.3d 1253 (9th Cir. 2010) ................................................................. 31

*Biltmore Assocs., L.L.C. v. Thimmesch*,
   2007 WL 5662124 (D. Ariz. Oct. 15, 2007) ................................................. 14

*Brown v. Plata*,
   131 S. Ct. 1910 (2011) .................................................................... passim

*Casey v. Lewis*,
   834 F. Supp. 1477 (D. Ariz. 1993) ........................................................... 32

*Coleman v. Wilson*,
   912 F. Supp. 1282 (E.D. Cal. 1995) ............................................... 18, 28, 29

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D.N.J. 2004) ........................................................... 16

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ...................................................................... passim

*Deal v. Hamilton Cnty. Bd. of Educ.*,
   392 F.3d 840 (6th Cir. 2004) ................................................................. 14

*Donahoe v. Arpaio*,
   2013 WL 5604349 (D. Ariz. Oct. 11, 2013) ................................................. 29

*Graves v. Arpaio*,
   No. CV77-479-PHX-NVW ................................................................. 10

*Hangarter v. Provident Life & Acc. Ins. Co.*,
   373 F.3d 998 (9th Cir. 2004) ........................................................... 19, 29

*In re Apollo Grp. Inc. Sec. Litig.*,
   527 F. Supp. 2d 957 (D. Ariz. 2007) ......................................................... 17

*In re Titanium Dioxide Antitrust Litig.*,
   2013 WL 1855980 (D. Md. May 1, 2013) ................................................... 28

*Jama v. Esmor Corr. Servs., Inc.*,
   2007 WL 1847385 (D.N.J. June 25, 2007) ........................................... 27, 28

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, L.L.C.*,
   2003 WL 25674799 (S.D. Cal. Apr. 10, 2003) ............................................. 29

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999)..........................................................................14, 16

*Mathews v. Novartis Pharm. Corp.*,
  2013 WL 5780415 (S.D. Ohio Oct. 25, 2013)...........................................28

*Messick v. Novartis Pharm. Corp.*,
  747 F.3d 1193 (9th Cir. 2014) ..................................................................27

*New Hampshire v. Maine*,
  532 U.S. 742 (2001)....................................................................................31

*Parsons v. Ryan*,
  ___ F.3d ____, 2014 WL 2523682 (9th Cir. June 5, 2014)..................15, 18, 19

*Placencia v. I-Flow Corp.*,
  2012 WL 5877624 (D. Ariz. Nov. 20, 2012)...............................................17

*Rodriguez v. Cnty. of Stanislaus*,
  2010 WL 2720940 (E.D. Cal. July 8, 2010) ...............................................30

*Ruiz v. Johnson*,
  37 F. Supp. 2d 855 (S.D. Tex. 1999), *rev'd and remanded on other
  grounds*, 243 F.3d 941 (5th Cir. 2001) ........................................17, 18, 19, 32

*Sapiro v. Sunstone Hotels Investors, L.L.C.*,
  2006 WL 6255441 (D. Ariz. Aug. 24, 2006)...............................................17

*Sciele Pharma, Inc. v. Brookstone Pharm., LLC*,
  2011 WL 3844891 (N.D. Ga. Aug. 30, 2011) .............................................28

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-
  CIO*,
  313 F. Supp. 2d 213 (S.D.N.Y. 2004)...........................................................27

*United States v. Brown*,
  415 F.3d 1257 (11th Cir. 2005) ..................................................................14

*United States v. H & R Block, Inc.*,
  831 F. Supp. 2d 27 (D.D.C. 2011)...............................................................27

*United States v. Halifax Hosp. Med. Ctr.*,
  2014 WL 68579 (M.D. Fla. Jan. 8, 2014)....................................................28

*United States v. Hankey*,
  203 F.3d 1160 (9th Cir. 2000) ....................................................................16

*United States v. Sandoval-Mendoza*,
  472 F.3d 645 (9th Cir. 2006) ......................................................................16

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Wilson v. Maricopa Cnty.*,
  2006 WL 3051870 (D. Ariz. Oct. 26, 2006) ................................................................. 17

**OTHER AUTHORITIES**

Fed. R. Evid. 702 ................................................................................................................. 14

Ariz. R. Civ. P. 26(b)(4)(d) ............................................................................................... 31

Charles A. Wright, et al., 29 Fed. Practice & Procedure § 6266 (2014) ............................ 15

United States Dep't of Justice, Civil Rights Div., *Investigation of the Pa.
  Dep't of Corrs.' Use of Solitary Confinement on Prisoners With Mental
  Illness and/or Intellectual Disability* (Feb. 24, 2014) ..................................................... 11

Defendants move to exclude every single one of Plaintiffs' seven experts: Robert L. Cohen, M.D.; Todd Randall Wilcox, M.D., M.B.A., CCHP-A; Pablo Stewart, M.D.; Jay D. Shulman, D.M.D., M.A., M.S.P.H.; Eldon Vail; Craig Haney, Ph.D., J.D.; and Brie Williams, M.D., M.S.[1]   Defendants do not seriously contest the experts' qualifications or the relevance of any of their opinions; rather, Defendants contend their opinions are unreliable because they allegedly used non-random, non-representative samples selected by Plaintiffs' counsel and did not perform any statistical analyses to justify extrapolation of their opinions to the ADC system as a whole.   Defendants' arguments fail for at least three reasons.

First, Plaintiffs' experts are providing **specialized** opinions, which have been distinguished by the case law from **scientific** opinions that might require greater statistical analysis.  *See infra* at 16-20.  Specialized opinions are reliable because they are based on the experts' analyses of the facts in light of their experience and training.  To evaluate whether ADC suffers from system-wide deficiencies, Plaintiffs' experts relied not only on their undisputed expertise, but also on information gathered from prison tours, medical chart reviews, master files, death records, deposition testimony, ADC policies and procedures, ADC's own monitoring reports (known as MGAR reports), prisoner interviews, communications between ADC employees and between ADC and its medical contractors, and other sources of evidence.  In prison cases involving allegations of constitutional violations, courts have determined that similar methodologies and analyses (in some cases conducted by the same experts as in this case) are reliable.

Second, Defendants' criticisms of the experts' samples go to the weight, not the admissibility, of the experts' opinions.  The experts, based on their experience, elected to obtain samples targeted to specific conditions (*e.g.*, mental illness, chronic conditions, dental pain, etc.) or issues (*e.g.*, deaths, suicides, etc.) that would reveal whether ADC

---

[1]  Several of Plaintiffs' experts have testified as experts in other prison cases.  For example, Dr. Stewart, Dr. Cohen, and Mr. Vail recently testified before this Court in *Graves v. Arpaio*, No. CV77-479-PHX-NVW.  Dr. Stewart also testified in the 2008 evidentiary hearing in that case.

places prisoners at risk of substantial harm and worked with Plaintiffs' counsel to obtain those records.  Defendants' unsupported belief that the experts' samples should have been larger is a matter for cross-examination.  And courts in other prison cases have rejected the argument that exclusion is warranted when experts review records selected by counsel.  Indeed, all disagreement about the size, composition, and selection of samples can be effectively addressed at trial.

Third, Defendants are estopped from asserting that Plaintiffs' experts did not have sufficient information.  They insisted throughout the course of discovery that the Court limit the number of prison tours that the Plaintiffs' experts could conduct as well as the amount of time that they could spend in each prison, the number and scope of depositions, and the extent of document production, including medical records.  Ultimately, the Court agreed with Defendants and limited the scope and duration of Plaintiffs' expert tours and document requests, and Defendants cannot now reverse course simply to try to exclude Plaintiffs' experts.

### Background

Plaintiffs' experts' training and experience in their respective fields give them a unique expertise to discuss not only the treatment of specific individuals, but also system-wide deficiencies in healthcare and the conditions of isolated confinement, and the effects those deficiencies are likely to have on inmate populations.  Defendants' characterization of Plaintiffs' experts' methodology is persistently misleading and often simply false.  The sources cited by Defendants often fail to support, and sometimes affirmatively contradict, their factual assertions.

## I.   MEDICAL EXPERTS

### A.   Robert L. Cohen, M.D.

Dr. Robert L. Cohen, a medical doctor and expert in the field of correctional medicine with 30 years of experience, has been appointed by federal courts to serve as a monitor in cases challenging the provision of medical care to prisoners, including in Michigan, New York State, and Florida.  [Declaration of Robert Cohen, M.D., dated

June 16, 2014 ("Cohen Decl."), Ex. 1 ¶ 1]  He has been a member of the New York City Board of Corrections since 2009, served as a member of the National Commission on Correctional Health Care ("NCCHC") for 17 years, provided primary care to jail inmates at Rikers Island, and published extensively on health care for the incarcerated.  [*Id.*]

To prepare his report, Dr. Cohen toured ADC's two largest prisons, Lewis and Eyman, where he interviewed prisoners (but was not permitted to interview staff), reviewed medical records, and observed the facilities.  [*Id.* ¶ 3]  In addition, Dr. Cohen reviewed testimony from ADC witnesses; health care data, monitoring reports, and other documents produced by ADC; and additional medical records, including over three dozen medical records for prisoners who died while in ADC custody.  [*Id.*]  Dr. Cohen directed Plaintiffs' counsel to pull medical records from Lewis and Eyman according to a specific protocol.  [Declaration of Corene Kendrick, dated June 18, 2014 ("Kendrick Decl.") ¶ 2]  As directed by Dr. Cohen, 5-10 records were randomly pulled from several different patient lists provided by ADC, including lists of patients with chronic disease and patients receiving specialty consults and/or emergency care.  [*Id.* ¶ 5]

### B.    Todd Randall Wilcox, M.D., M.B.A., CCHP-A

Dr. Todd Randall Wilcox, the Medical Director of the Salt Lake County Jail System, has worked in the field of correctional medicine for over 17 years.  [Declaration of Todd Randall Wilcox, M.D., dated June 17, 2014 ("Wilcox Decl."), Ex. 1 at 1]  He is the president-elect of the Society of Correctional Physicians and the chair of the Committee of Physician Certification of the NCCHC.  [*Id.* at 2]  He is one of a small number of physicians to be certified by the NCCHC at an advanced level (CCHP-A).  [*Id.* at 1]  A leader in the field of correctional medicine, he has been called on to consult with the National Institute of Corrections, the American Jail Association, and the American Correctional Association, as well as by state prison officials and county jail administrators to assist in evaluating and improving their healthcare delivery systems.  [*Id.*]

Dr. Wilcox reviewed thousands of pages of documents in preparing his reports for this case.  [*Id.* at 2]  He read transcripts from the depositions of over 10 prisoners, prison

administrators, and health care officials.  [*Id.*]  He also toured five ADC prisons, including two large medical facilities (Tucson and Florence) and the only female facility (Perryville).  [*Id.*]  On his tours, he interviewed dozens of prisoners, read documents regarding health care delivery encountered at the prisons, and reviewed over a hundred patient charts.  [*Id.*]  The charts were selected through a combination of methods, all of which were performed at Dr. Wilcox's direction or by Dr. Wilcox himself.  [Wilcox Decl. ¶¶ 5-7]  Some were chosen randomly from lists of chronic care patients by Prison Law Office staff at Dr. Wilcox's direction.  [*Id.* ¶ 6; Kendrick Decl. ¶ 2]  Others were chosen based on specific categories:  for example, Dr. Wilcox reviewed all charts for women who were or had recently been pregnant.  [Wilcox Decl. ¶ 7]  Others were chosen by Dr. Wilcox based on information he learned on his prison tours.  [Wilcox Decl., Ex. 1 at 3]   After his tours, Dr. Wilcox reviewed the 125 medical records relied on by Defendants' medical expert, Dr. Mendel.  [Wilcox Decl., ¶ 18, Ex. 3 at 1]

## II.     MENTAL HEALTH EXPERT

Dr. Pablo Stewart is a board-certified psychiatrist and Clinical Professor in the Department of Psychiatry at the University of California, San Francisco School of Medicine.  [Declaration of Pablo Stewart, M.D., dated June 16, 2014 ("Stewart Decl.") ¶ 1]  He has been retained by Plaintiffs to provide an opinion on the mental health care provided to prisoners confined in ADC.  [*Id.* ¶ 2]

Dr. Stewart spent eight days touring seven ADC prison complexes:  Tucson, Florence, Eyman, Perryville, Phoenix, Lewis, and Yuma.  He viewed cells and other housing areas, mental health treatment spaces, mental health programming areas, exercise enclosures, and other areas to which prisoners have access.  He interviewed prisoners at cell front and in private settings and also reviewed prisoner medical records.  [*Id.* ¶¶ 3, 4]

Dr. Stewart selected the prisoners to interview and the records to review in two primary ways.  First, at his request, Plaintiffs' counsel compiled lists of prisoners who had mental health needs, and he attempted to interview those prisoners.  However, he was unable to interview many of these prisoners or review their records because they had been

1    transferred to other institutions, were not in their housing unit at the time of his visit, or

2    were unavailable for other reasons.  [*Id.* ¶ 5]

3         Second, as he walked through the units, Dr. Stewart approached prisoners in their

4    cells, introduced himself, and asked if they were receiving mental health care and if they

5    would be willing to speak with him.  He then asked to review these prisoners' records.

6    This method avoids selection bias because in most cases Dr. Stewart had no information

7    about the prisoner's mental health status when he approached the prisoner.  The majority

8    of prisoners Dr. Stewart interviewed were selected by him in this way.  [*Id.* ¶ 6; *see also*

9    Mot., Ex. Q (Dep. Tr. of Pablo Stewart, M.D., dated Mar. 28, 2014) at 75:2-10 ("the

10   names provided by counsel were the real small minority of the people that I saw")][2]

11        Dr. Stewart relied on a multitude of sources of information in addition to prisoner

12   interviews and record reviews.  He relied on the MGAR reports; psychological autopsies,

13   mortality reviews, and other documents pertaining to ADC prisoners who committed

14   suicide; large numbers of ADC policies; and depositions of ADC staff, Corizon staff, and

15   others.  A complete list of the documents he reviewed is set forth in the appendices to his

16   reports.  [*See* Stewart Decl., Exs. 1-4]  These documents were provided to him by

17   Plaintiffs' counsel in response to his requests for specific categories of relevant

18   documents.  [Stewart Decl. ¶ 10][3]

19        Dr. Stewart's methodology in this case is based upon his years of experience

20   working in and evaluating correctional mental health programs.  It is consistent with the

21   methodology he has used in numerous other evaluations of correctional mental health

_____

22

23        [2] Defendants' statements that "Plaintiffs' counsel also selected the 118 Plaintiffs
     Dr. Stewart interviewed" and that Dr. Stewart "did not assist Plaintiffs' counsel in any
24   way in selecting charts for review" are not supported by the cited sources, and they are
     false.  [Doc. 900 (Defendants' Motion to Preclude Plaintiffs' Experts ("Mot.")) at 23]  In
25   fact, approximately two-thirds of the prisoners interviewed by Dr. Stewart do not appear
     in the lists provided by counsel.  [*Compare* Mot., Ex. U *with* Stewart Decl., Ex. 1, Ex. B]
26        [3] Defendants' assertion that "Plaintiffs' counsel selected all of the documents
     Dr. Stewart reviewed" is supported only by citation to these appendices.  [Mot. at 23]  The
27   unsurprising fact that Dr. Stewart received documents from Plaintiffs' counsel—
     Defendants do not suggest how else he should have obtained them—does not establish
28   that he did not exercise professional judgment in selecting and analyzing the documents
     he reviewed.

care, and with the standards of experts in the field of correctional mental health.  Pure random sampling is not the standard in the field of correctional mental health care and would not be appropriate for the task Dr. Stewart was given in this case.  Dr. Stewart has evaluated mental health care in numerous prisons, jails, and juvenile facilities, including the entire California and New Mexico prison systems, the Maricopa County Jails, and the San Francisco County Jails.  In none of these evaluations has he used pure random sampling.  [Stewart Decl. ¶¶ 7-9, 12]

## III.   DENTAL EXPERT

Jay Shulman, D.M.D., M.A., M.S.P.H., has had a 40-year career as a dentist spanning clinical, research, teaching, and expert consulting experience, primarily in and regarding large public institutions (the military and correctional facilities).  He is certified by the American Board of Dental Public Health, one of nine specialties recognized by the American Dental Association.  He has written over 55 peer-reviewed articles and three book chapters, served as a reviewer for several dental journals, and served on the editorial board of the *Journal of Public Health Dentistry*, the official journal of the specialty.  In addition to other expert assignments over the last 10 years, he has been the court expert in two major class action settlements involving dental care throughout a prison system, in California and Ohio.  His work in military and correctional dentistry, combined with his training in Dental Public Health focusing on population-based care, gives him a unique expertise to discuss not only specific cases of dental care, but also system-wide deficiencies in dental care and the effects those deficiencies are likely to have on inmate populations.  [Declaration of Jay D. Shulman, DMD, MA, MSPH, dated June 17, 2014 ("Shulman Decl.) ¶¶ 1-3]

Dr. Shulman chose the majority of the records he reviewed using an appointment list that Defendants represented as showing 18 months of dental appointments.  The appointments were labeled by type, *e.g.*, "exam," "dental work," "cleaning," "dental pain and swelling."  [Shulman Decl. ¶ 7]  The list did not specify whether the appointments

were for intake, routine, or urgent care.[4]   Based on Dr. Shulman's experience with dental systems, he finds that addressing pain in a timely manner is an excellent measure of the responsiveness of a dental care system.   Accordingly, Dr. Shulman primarily selected prisoners who had one or more "pain and swelling" appointments.   [Shulman Decl. ¶¶ 9-10]   Dr. Shulman then forwarded the list of records to Plaintiffs' counsel and requested that they add records for any prisoners whose dental grievances Defendants were in the process of producing, as well as dental records that had been mentioned in the January 2013 Oral Care MGAR.   Dr. Shulman also visited nine ADC facilities (Tucson, Safford, Yuma, Perryville, Lewis, Eyman, Douglas, Florence, and Phoenix).   Once on-site at each facility, he requested a copy of the current "routine care list" and selected several prisoners from that list to review as well.   [Shulman Decl. ¶¶ 11-12; *see also id.*, Ex. 1 at 9]

These records—the appointment list records, the grievances and MGAR records, and the records from the current routine care list—constitute the 300 records that Dr. Shulman reviewed for the purposes of his report.[5]   In each case, Dr. Shulman reviewed the prisoner's entire dental record back to approximately 2009, including both routine and urgent care requests and appointments.   [Shulman Decl. ¶ 13]   In addition,

---

[4]   In ADC dental care, "urgent" care requests are those that must be seen within 72 hours and "routine" care requests must be seen within 90 days.   Urgent care is defined in the Dental Services Technical Manual to include abscesses and other serious issues, but not pain.   Defendants claim that all pain requests are treated as urgent care, but that is a disputed issue in this case.   The term "emergency" is sometimes used to refer to urgent care requests (*see* Mot. at 31), but true emergencies, such as broken jaws, are rare in dentistry and do not generate appointments that would appear on the appointment list used by Dr. Shulman.

[5]   This methodology—also described in Dr. Shulman's report issued November 8, 2013—contradicts Defendants' statement in their motion that Dr. Shulman "does not know" who selected the records pulled for him to review at facilities.   [Mot. at 22]   Moreover, the section of Dr. Shulman's deposition that Defendants cite in support of that statement includes Dr. Shulman's testimony that he did not know if there were files available during his tours that he did not pick and that he *did not recall* who may have chosen records that did not come from the appointment list.   [Mot., Ex. M (Dep. Tr. of Jay D. Shulman, D.M.D., M.A., M.S.P.H., dated Mar. 20, 2014) at 73:14-25 (emphasis added)]   In fact, Dr. Shulman specifically corrected counsel on that point:  Q: "So if I understand your testimony correctly, you simply don't know?" A: "I cannot recall."   [*Id.* at 74:24-75:1]

1  Dr. Shulman reviewed ADC's Dental Services Technical Manual, numerous documents
2  produced by Smallwood Prison Dental Services and ADC, deposition transcripts of ADC
3  and Smallwood employees, and other miscellaneous documents.  [Shulman Decl. ¶ 5]

4  **IV.   ISOLATION EXPERTS**

5       **A.   Eldon Vail**

6       Eldon Vail is a former corrections administrator with nearly 35 years of experience
7  working in and administering adult institutions.  He served for four years as the Secretary
8  of the Washington State Department of Corrections (WDOC) and seven years as the
9  Deputy Secretary.  Before becoming a corrections administrator, he held various line and
10 supervisory level positions in a number of prisons and juvenile facilities in Washington, in
11 addition to serving as a Juvenile Parole Officer and pre-release supervisor.  He also served
12 as the Superintendent (Warden) of three adult institutions, including facilities with
13 maximum-security inmates.  [Declaration of Eldon Vail, dated June 16, 2014 ("Vail
14 Decl.") ¶ 1]

15      To prepare his reports, Mr. Vail states:  "'I approached my review of the facts in
16 this case as if I was the new Director of the system seeking the information I would need
17 to identify the nature of the problem(s) and begin to craft solution(s).'"  [Vail Decl. ¶ 6]
18 He employed several modes of review and analysis.  He reviewed thousands of pages of
19 documents, including the pleadings in this case, ADC policies, ADC internal reports and
20 materials, declarations and depositions of ADC and Corizon officials as well as class
21 members, inmate master and medical files, grievance and death records, and ADC training
22 materials.  [*Id.* ¶ 3]  He also inspected the isolation units identified by the Court's class
23 certification order over five days in July and August 2013.  [*Id*. ¶ 4]  During those
24 inspections he interviewed over 100 inmates, 28 in a confidential setting.  [*Id.*]

25      To select inmates for confidential interviews, he drew from a pool of prisoners who
26 had been involved in "serious incidents" in the isolation units.  This sample allowed him
27 to target the in-depth interviews toward the population with some of the most critical
28 needs, due to involvement in self-harm and use of force incidents where chemical spray is

1    deployed.  [*Id*. ¶ 7]  This selection was done by reviewing the complete and unedited logs

2    of serious incident reports ("SIR") received from ADC.  These logs include a brief

3    description of incidents.  From those lists, he selected a large number of inmates to

4    interview based on the factors of race, ethnic origin, and physical location.  Those he

5    decided to interview were then pared down by matching his selections with the rosters of

6    prisoners who were currently at the facilities he planned to inspect.  He had no knowledge

7    of who he was selecting beyond the brief information in Defendants' SIR logs.  [*Id*.]

8    Interviewing inmates who experience difficulties in the custodial setting is an excellent

9    tool for stress-testing the system's operations, and this type of sampling is most

10   appropriate in the context of this case where his task is to determine whether the

11   conditions of confinement in the isolation units put inmates, especially those with mental

12   illness, at a risk of harm.  [*Id*. ¶ 8]  As part of his inspection, Mr. Vail also interviewed the

13   named plaintiffs who were in the isolation units at the time of his inspection, and he

14   conducted numerous cell front interviews of inmates in every housing unit he inspected.

15   Mr. Vail selected prisoners to interview based on who was awake and willing to speak to

16   him.  [*Id*. ¶¶ 9-10]

17        In Mr. Vail's experience as a correctional administrator, interviewing inmates is

18   critical to understanding the true functioning of a corrections system.  [*Id*. ¶ 11]  In his

19   evaluation of such interviews he gives great weight to recurring themes that emerge from

20   these conversations.  [*Id*. ¶ 12]  He also substantiates the data gathered from inmate

21   interviews through extensive document and record review.[6]  [*Id*. ¶ 13]  The methodology

22   that Mr. Vail employed in reviewing the conditions of confinement in ADC's isolation

23   _____

24        [6] Defendants falsely claim (at 24) that Mr. Vail "admitted his methodology is
     flawed regarding his opinion that recreation time is cancelled too frequently" and that his

25   opinion is based solely on the records of Plaintiffs Gamez and Smith.  Mr. Vail's actual
     methodology related to this opinion was to verify consistent inmate claims related to

26   recreation cancellation by also reviewing ADC's own documents that support the fact that
     opportunities for exercise are often canceled in the isolation units.  [Vail Decl. ¶ 13; *id.*,

27   Ex. 1 ¶ 49]  Mr. Vail specifically reviewed the individual logs of inmates he interviewed
     during his inspection, individual Inmate Detention Records produced after his tour, and

28   ADC's internal reports citing the reasons for the cancellations, which were most often due
     to shortage of staff.  [*Id.* ¶ 13]

units is similar to that he used in other cases, including his expert review in California for *Coleman v. Brown*. In this Court, he also used a similar approach in *Graves v. Arpaio* without conducting on-site inspections. [*Id.* ¶ 14]

### B.  Craig Haney, Ph.D, J.D.

Dr. Craig Haney is a professor of psychology at the University of California, Santa Cruz, where he also directs the social psychology doctoral program. Dr. Haney is also a Distinguished Professor in the University of California system, a distinction reserved for professors who have reached the very highest level of the professoriate, after being nominated by their respective universities and undergoing a national and international review. He trained in a distinguished research-oriented graduate program and regularly teaches graduate courses in research methods in the social psychology Ph.D. program. In addition, he recently served as a member of a committee of the nation's most esteemed scientific organization, the National Academy of Sciences. This committee was charged with the responsibility of scientifically analyzing the causes and consequences of the high rates of incarceration in the United States and proposing recommendations for reform. [Declaration of Craig Haney, Ph.D., J.D., dated June 17, 2014 ("Haney Decl.") ¶ 1]

Dr. Haney used his undisputed expertise in psychology to engage in an empirical investigation and analysis of whether and how the practices, conditions, and consequences of isolated confinement in the Arizona Department of Corrections facilities place prisoners, including those suffering from serious mental illness, at a serious risk of psychological harm. [*Id.* ¶ 2] The methodology he used for this task included review of an extensive number of documents before, during, and after his inspection of the isolation units, including policies and procedures, medical records, prisoner institutional files, Defendants' admissions and interrogatory responses, monitoring reports, deposition transcripts, and program documents; inspection of specific ADC facilities, including all or representative examples of their isolation units; discussions with staff members in the course of the tours (to the extent permitted by counsel for the defendants); and prisoner interviews—cell front interviews from prisoners randomly selected as he passed through a

number of the units, and out-of-cell confidential interviews with a group of prisoners that were either named plaintiffs in the case or that he randomly selected to be representative of prisoners housed in specific kinds of units.  After those tours, he requested, was sent, and reviewed additional documentation.  Dr. Haney examined information and data from a variety of different sources so that he could determine whether and to what degree they were consistent and cross-corroborated one another.  [*Id.* ¶¶ 7, 25; *see also id.*, Ex. 1, App. C]

Dr. Haney's methodology, similar to that of the other experts in this case, is entirely consistent with the "benchmark" approach used in prison litigation cases and provides a very sound basis on which to reach conclusions about the nature and effect of prison conditions and practices in a particular prison or prison system.  [*Id.* ¶¶ 6, 8]  These methods were already established when Dr. Haney began serving as an expert in prison litigation cases for the United States Department of Justice ("DOJ") in the late 1970s. Indeed, they are the very same methods that the DOJ currently employs.[7]  [*Id.* ¶¶ 9-11] The methods and approaches used by Dr. Haney in this case are also exactly the ones used in reaching his opinions in *Brown v. Plata*, in which his expert report and testimony were repeatedly cited by the Supreme Court.  [*Id.* ¶ 12 (*see Brown v. Plata*, 131 S. Ct. 1910, 1932-33, 1935 (2011))]

---

[7] For example, the methodology that was recently used by the Department of Justice in its investigation of the Pennsylvania prison system in 2013 was virtually identical to the one used by Plaintiffs' experts.  Thus, the Department of Justice attorneys and their expert consultants "conducted on-site inspections" of a number of correctional facilities in Pennsylvania in August 2013, during which they "reviewed documents" that included "policies and procedures, medical and mental health records, cell histories, incident reports, disciplinary reports, suicide reports, and unit logs."  [*See* Haney Decl. ¶ 10; United States Dep't of Justice, Civil Rights Div., *Investigation of the Pa. Dep't of Corrs.' Use of Solitary Confinement on Prisoners With Mental Illness and/or Intellectual Disability* (Feb. 24, 2014) at 4, *available at* http://www.justice.gov/crt/about/spl/documents/pdoc_finding_2-24-14.pdf]  Notably, the DOJ used the same kind of data utilized by Plaintiffs' experts to reach its conclusion of "systemic" and "system-wide" constitutional deficiencies in a system that operates 26 facilities and holds approximately 50,000 prisoners.  [Haney Decl. ¶ 11]

1

### C.   Brie Williams, M.D., M.S.

2       Dr. Williams is a licensed and board-certified physician and Associate Professor of

3   Medicine at the University of California, San Francisco, with substantial experience and

4   expertise in the health of incarcerated persons.  [Declaration of Brie Williams, M.D.,

5   M.S., dated June 17, 2014 ("Williams Decl."), ¶ 1; *id.*, Ex. 1, Ex. A]  She will provide

6   opinions on the risks to health posed by isolated confinement as practiced in ADC.  [*Id.*

7   ¶ 2]  She spent three full days conducting on-site inspections of ADC's isolation units:

8   Florence (Central and Kasson Units); Eyman (SMU and Browning Units); and Perryville

9   (Lumley Special Management Area).  [*Id.* ¶ 3]  At each complex she inspected housing

10  units, exercise enclosures, and other areas to which prisoners have access.  She

11  interviewed prisoners at cell front and outside of their cells.  She also reviewed medical

12  records at each facility, and requested additional records, which Defendants failed to

13  produce.  [*Id.* ¶ 4]

14      Dr. Williams identified the prisoners for interviews and record reviews in two

15  ways.  First, she informed Plaintiffs' counsel that it would be important to interview some

16  prisoners who were older, had chronic medical conditions, and/or had physical

17  disabilities, because such persons could be at especially high risk from the limited

18  physical activity available to them in isolated confinement.  At her instruction, Plaintiffs'

19  counsel created a list of those prisoners, which Dr. Williams used to conduct interviews

20  and to review records.  Second, as she walked through the isolation units, she spoke with

21  additional prisoners whose names were not on the list, and later reviewed their medical

22  records.  Dr. Williams selected these prisoners herself.  [*Id.* ¶ 5]  A comparison of the list

23  created by counsel with Dr. Williams' notes confirms that Dr. Williams interviewed and

24  reviewed records of numerous prisoners whose names do not appear on the list.

25  [*Compare* Mot., Ex. KK *with* Williams Decl., Ex. 1, Ex. B][8]

26  _____

27      [8] Defendants' claim (at 17) that "Dr. Williams did not select the approximately 78
    inmates she requested to interview and whose records she requested to review" is not
    supported by the sources Defendants cite, and as explained in Dr. Williams' Declaration,
28  it is false.

Based on her experience, Dr. Williams concluded that true random sampling was neither necessary nor appropriate to the task she was asked to perform, which was to ascertain whether conditions of isolated confinement pose a substantial risk of serious harm to prisoners.  That inquiry depends largely on understanding the physical environment in which prisoners are housed, and the policies and practices to which they are subject.  For this evaluation, there is simply no reason to engage in random sampling of prisoners for the purpose of interviews or record review.  [Williams Decl. ¶ 7]

The prisoner interviews and record reviews Dr. Williams performed are only one among many sources of information she relied upon in forming her opinions.  Her visual inspection of the cells and exercise areas in the isolation units, her review of discovery materials describing the conditions and duration of isolated confinement, and her extensive review of the medical literature all contributed to her conclusion that isolated confinement as practiced in ADC poses a substantial risk of serious harm, including increased morbidity and mortality, to prisoners of older age, with chronic medical conditions, and/or with physical disabilities.[9]  [*Id.* ¶ 8]

### Legal Standard

Expert testimony is admissible if (1) the witness is "qualified as an expert by knowledge, skill, experience, training, or education"; (2) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the

---

[9] Defendants' attacks on Dr. Williams are baseless.  Defendants complain that counsel selected the institutions she visited, but these are the institutions identified by name in the Court's definition of the isolation subclass.  [Doc. 372 at 22]  They criticize the definition of "isolated confinement" she employed, but that, too, is entirely consistent with the definition used by the Court in defining the subclass.  [*Compare* Williams Decl., Ex. 1 at 1 ("being confined to a prison cell nearly all the time with access to an exercise enclosure approximately 6-7 hours per week") *with* Doc. 372 at 22 ("confinement in a cell for 22 hours or more each day")]  Defendants' allegation (at 16) that Dr. Williams "decided to make 50 years old the cut-off age" is contradicted by Dr. Williams' deposition, in which she testified that "I don't quite agree that that was the age that at it [sic] was decided equals geriatric, per se," and pointed out that she interviewed younger prisoners as well.  [Declaration of Kirstin Eidenbach, dated June 18, 2014 ("Eidenbach Decl."), Ex. 1 (Dep. Tr. of Brie Williams, M.D., Apr. 8, 2014) at 20:18-21:24]  Defendants' claim (at 16) that Dr. Williams "does not know how many inmates in the ADC system meet this definition [over the age of 50]" is not supported by the cited testimony.

evidence or to determine a fact in issue"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  Under Rule 702, the court acts as a gatekeeper to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993).  Expert testimony is reliable if it "has a reliable basis in the knowledge and experience of the relevant discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (citation and quotation marks omitted).  "The inquiry envisioned by Rule 702 is . . . a flexible one," *Daubert*, 509 U.S. at 594, and must be "tied to the facts of a particular case," *Kumho Tire*, 526 U.S. at 150 (citation and quotation marks omitted).

Rule 702 should be applied with a "liberal thrust" favoring admission.  *Daubert*, 509 U.S. at 588.  "The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system."  Fed. R. Evid. 702 advisory comm. notes (2000 Amendments) (citation and quotation marks omitted).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  Moreover, admissibility standards for expert testimony are even more relaxed in a bench trial.  As pointed out by the Arizona District Court,

> [t]he court's gatekeeping role is necessarily different if the case is tried by the court as opposed to a jury.  Where the gatekeeper and the factfinder are one and the same—that is, the judge—the need to make such decisions prior to hearing the testimony is lessened.  Where the factfinder and the gatekeeper are the same, the court does not err in admitting the evidence subject to the ability later to exclude it or disregard it if it turns out not to meet the standard of reliability established by Rule 702.

*Biltmore Assocs., L.L.C. v. Thimmesch*, 2007 WL 5662124, at *2 (D. Ariz. Oct. 15, 2007) (internal citations and quotation marks omitted); *see also United States v. Brown*, 415 F.3d 1257, 1269 (11th Cir. 2005) ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself."); *Deal v. Hamilton Cnty. Bd. of*

1    *Educ.*, 392 F.3d 840, 852 (6th Cir. 2004) ("The 'gatekeeper' doctrine was designed to

2    protect juries and is largely irrelevant in the context of a bench trial.").[10]

3                                            **Argument**

4    **I.    DEFENDANTS' MOTION DOES NOT SUPPORT WHOLESALE**
          **EXCLUSION OF PLAINTIFFS' EXPERTS**
5

6            Defendants only challenge the reliability of the opinions of Plaintiffs' experts; they

7    do not seriously dispute the Plaintiffs' experts' qualifications or the relevance of those

8    opinions.[11]   Nor do Defendants dispute Plaintiffs' experts' opinions about individual

9    prisoners' care, MGAR reports, or the many other documents each expert reviewed.

10   While Defendants' Motion seeks to exclude Plaintiffs' experts in their entirety, the

11   Motion actually argues only that Plaintiffs' experts cannot discern system-wide

12   deficiencies by reviewing only a limited number of medical records.  The Motion leaves

13   untouched the experts' opinions, for example, that certain of Defendants' written policies

14   are inadequate, that Defendants have failed to follow their written policies on multiple

15   occasions, that particular prisoners suffered injury, and that Defendants' own records and

16   deposition testimony show inadequate policies, practices, monitoring, and supervision.

17

18          [10]   *See also* Charles A. Wright, et al., 29 Fed. Practice & Procedure § 6266 (2014)
     ("[S]ince *Daubert* is aimed at protecting jurors from evidence that is unreliable for
19   reasons they may have difficulty understanding, the standards for admission may be
     relaxed where the judge is the trier of fact.").
20          [11]   Defendants' argument (at 26) that "Dr. Williams was retained by Plaintiffs to
     render opinions regarding a sub-class that this Court did not certify" is frivolous.
21   Dr. Williams was retained "to provide [an] opinion about the risks of isolated confinement
     on physical health, especially for older adults" but her opinions are not limited to older
22   prisoners.  [Williams Decl., Ex. 1 at 1, 19 (concluding that isolated confinement in ADC
     poses a substantial risk of serious harm "to prisoners of older age, with chronic medical
23   conditions, and/or with physical disabilities")]  This Court has granted, and the Ninth
     Circuit has affirmed, certification of a subclass of prisoners subjected to isolated
24   confinement with regard to, *inter alia*, lack of recreation and extreme social isolation.
     [Doc. 372 at 22-23]  Dr. Williams' opinions are plainly relevant to these issues.  The fact
25   that some subclass members may be more susceptible to harm than others is not a reason
     to exclude Dr. Williams' testimony on the risk presented by these conditions.  *See*
26   *Parsons v. Ryan*, __ F.3d ___, 2014 WL 2523682, *13 (9th Cir. June 5, 2014) ("As the
     district court recognized, although a presently existing risk may ultimately result in
27   different future harm for different inmates—ranging from no harm at all to death—every
     inmate suffers exactly the same constitutional injury when he is exposed to a single
28   statewide ADC policy or practice that creates a substantial risk of serious harm.").

1    Those opinions alone are sufficient to support a finding of widespread constitutional

2    violations warranting an injunction.  In any event, Defendants' Motion lacks merit and

3    must be denied.

## II.    PLAINTIFFS' EXPERTS WERE NOT REQUIRED TO CONDUCT A SCIENTIFIC REVIEW TO OFFER OPINIONS

### A.    Plaintiffs' experts are offering specialized opinions

6          Case law makes a clear distinction between expert testimony based on scientific

7    knowledge and that based on specialized knowledge.  Plaintiffs' experts in this case are in

8    the latter category.

9          Specialized expertise relies on the cumulative and particular experience gained by

10   a skilled professional over the course of his or her career, and for this reason, courts

11   distinguish such experts from scientific experts.  For example, when deciding whether the

12   testimony of a police gang expert was reliable, the Ninth Circuit noted that "[t]he *Daubert*

13   factors (peer review, publication, potential error rate, etc.) simply are not applicable to this

14   kind of testimony, whose reliability depends heavily on the knowledge and experience of

15   the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203

16   F.3d 1160, 1169 (9th Cir. 2000)*.*  Similarly, Defendants' **own authority** points out that

17   "the *Daubert* factors do not always fit neatly into or easily translate into the context of

18   nonscientific testimony.  ***Indeed, the inquiry into an expert's reliability may focus***

19   ***instead upon personal knowledge or experience***." *Crowley v. Chait*, 322 F. Supp. 2d

20   530, 536 (D.N.J. 2004) (internal citation and quotation marks omitted) (emphasis added);

21   *accord Kumho Tire*, 526 U.S. at 150 (stating that "the relevant reliability concerns may

22   focus upon personal knowledge or experience").

23         The Ninth Circuit recognizes that "[b]ecause medical expert opinion testimony 'is

24   based on specialized as distinguished from scientific knowledge, the *Daubert* factors are

25   not intended to be exhaustive or unduly restrictive.'" *United States v. Sandoval-Mendoza*,

26   472 F.3d 645, 655 (9th Cir. 2006) (citation omitted).  The court cautioned that "[a] trial

27   court should admit medical expert testimony if physicians would accept it as useful and

28   reliable." *Id.*  Similarly, a court in the District of Arizona determined that a correctional

1   expert's opinion that, based on his experience, a jail fell below the applicable standards of
2   care was sufficiently reliable.  *Wilson v. Maricopa Cnty.*, 2006 WL 3051870, at \*1-2 (D.
3   Ariz. Oct. 26, 2006).  The court pointed out that "[o]peration of the jail is not a scientific
4   process subject [to] mathematical measurements or laboratory analyses.  Mr. Bair's
5   opinions, like those of Defendants' expert[s], necessarily are based on years of experience
6   and training."  *Id.* at \*2.[12]

7        In a case involving the Texas prison system, the court rejected an argument that
8   plaintiffs' experts (including Dr. Haney) should have used "statistically-valid methods . . .
9   in their 'sampling' of charts, cases, and inmates" rather than relying on "isolated incidents
10  of potential constitutional violations."  *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 889-92 (S.D.
11  Tex. 1999), *rev'd and remanded on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered*
12  *to on remand*, 154 F. Supp. 2d 875 (S.D. Tex. 2001).  The court reasoned that "an expert's
13  evaluation of a prison system's quality of medical care, use of force, or protection of
14  inmates is not the type of testimony that necessarily implicates *Daubert*'s requirement of
15  scientific methodology."  *Id.* at 890.  As is true in this case, the "reliance by the
16  defendants on statistics as the sole methodology for establishing system-wide violations in
17  [the prison system] is misplaced."  *Id.* at 891.  The court pointed out that "human events
18  of the past cannot be sampled so perfectly as to permit a statistically valid analysis."  *Id.*
19  (citation and quotation marks omitted).  The court concluded that the methods and
20  analyses of plaintiffs' experts were sound, *id.*, including Dr. Haney's opinions which were

---

21  [12] *See also Placencia v. I-Flow Corp.*, 2012 WL 5877624, at \*10 (D. Ariz.
22  Nov. 20, 2012) (concluding that an expert's opinions that were based on her experience
    and training were reliable when "[t]he process of obtaining FDA approvals and applying
23  FDA regulations is not subject to mathematical measurements or laboratory analyses.");
    *In re Apollo Grp. Inc. Sec. Litig.*, 527 F. Supp. 2d 957, 964 (D. Ariz. 2007) (finding an
24  expert's opinions were reliable because "[a]lthough Defendants attempt to classify
    Dr. Finkelman's opinions as scientific, the reliability of Dr. Finkelman's testimony
25  depends mainly on his specialized knowledge and experience in human resources
    management and organizational psychology, both of which are extensive."); *Sapiro v.*
26  *Sunstone Hotels Investors, L.L.C.*, 2006 WL 6255441, at \*4 (D. Ariz. Aug. 24, 2006)
    (determining that an expert's methodology was sufficiently reliable when "[his] review of
27  information specifically related to the San Marcos [hotel], combined with his own
    knowledge and experience relating to Legionnaires' Disease, led to the conclusions he has
28  formed in this case").

1  based on tours of the institutions, interviews of inmates and staff, and review of a variety
2  of institutional documents.  *Id.* at 909 n.96.

3    Similarly, in one of the cases at issue in *Plata*, the court determined that the
4  experts' chart reviews, personal observations, and interviews with clinical staff provided
5  sufficient evidence of the conditions of mentally ill prisoners.  *Coleman v. Wilson*, 912 F.
6  Supp. 1282, 1302-03 (E.D. Cal. 1995).  The court reasoned that "[t]he clinical testimony
7  of plaintiffs' experts is precisely the type of testimony contemplated by the Federal Rules
8  of Evidence: testimony offered by three psychiatrists and one clinical psychologist
9  concerning the condition of mentally ill inmates based on statements by inmates, review
10  of medical records, personal observations, and interviews with custodial and clinical
11  staff."  *Id.* at 1303.  The court concluded that "[t]his evidence, together, with the
12  testimony of inmate witnesses called at trial, plainly demonstrates the suffering of
13  mentally ill inmates incarcerated in the California Department of Corrections."  *Id.*  These
14  are the same types of methodologies used, and opinions offered, by Plaintiffs'
15  experts here.

16       **1.**  **Plaintiffs' Experts' Qualifications**

17    Plaintiffs' experts possess the requisite experience and expertise to opine whether
18  ADC policies and practices place prisoners at substantial risk of serious harm.  In the
19  recently published opinion affirming class certification, the Ninth Circuit described
20  Dr. Cohen, Dr. Shulman, Dr. Stewart, and Dr. Haney as "four specialists in prison medical
21  care and conditions of confinement."  *Parsons*, 2014 WL 2523682, at \*2.  Specifically,
22  the court pointed out that (1) Dr. Cohen is "an expert in prison health care, court-
23  appointed monitor in several other similar cases, and member of the New York City
24  Board of Corrections"; (2) Dr. Shulman is "a dentist with extensive experience practicing
25  in and examining military, educational, and correctional dentistry programs"; (3) Dr.
26  Stewart is "a professor of psychiatry with extensive experience in correctional mental
27  health care"; and (4) Dr. Haney is "a professor of social psychology with extensive

28

1    experience studying the psychological effects of imprisonment and the consequences of

2    solitary confinement."[13]  *Id.* at *6-8; *see also supra* 2-3, 4-8, 10-11.

3        Dr. Wilcox, Dr. Williams, and Mr. Vail are also eminently qualified to offer

4    opinions on their respective areas of expertise.  Dr. Wilcox, a board-certified physician,

5    directs the medical department of a large jail system, and regularly consults with state and

6    local correctional systems and national organizations to improve delivery of care for

7    prisoners.  Dr. Williams is a board-certified physician and professor of medicine who has

8    provided medical care in the California prison system and has conducted extensive

9    research on the health of incarcerated persons.  [Williams Decl., Ex. 1, Ex. 1]  Mr. Vail

10   has over 35 years of corrections experience, including serving as Secretary of Corrections

11   and Deputy Secretary of Corrections for the State of Washington.  [Vail Decl. ¶ 1]  In the

12   course of his experience, Mr. Vail not only served as Warden in prisons with maximum

13   custody prisoners, he also presided over the development and implementation of programs

14   for the mentally ill in prison, including those in segregation settings.  [*Id.* ¶¶ 1, 3]

15       Thus, the experience and training of Plaintiffs' experts provide a sufficient

16   foundation for the reliability of their opinions.  *See Hangarter v. Provident Life & Acc.*

17   *Ins. Co.*, 373 F.3d 998, 1018 (9th Cir. 2004) ("Given that, unlike scientific or technical

18   testimony, the reliability of [an expert's] testimony was not contingent upon a particular

19   methodology or technical framework, the district court did not abuse its discretion in

20   finding [the expert's] testimony reliable based on his knowledge and experience.").

21                    **2.    Plaintiffs' Experts' Methodologies**

22       Defendants cite no authority to support their contention that Plaintiffs' experts

23   were required to conduct random sampling, review a statistically significant sample of

24   medical records, or interview a statistically significant sample of prisoners.  Indeed, in

25   *Brown v. Plata*, the Supreme Court upheld the evidentiary foundation of the district

26   _____

27       [13]  Dr. Haney has also been described as "***the nation's leading expert in the area***
     ***of penal institution psychology***.  Having both a Ph.D. in Psychology and a J.D. from
     Stanford, Dr. Haney has spent his career studying the psychological aspects of systems of

28   incarceration."  *Ruiz*, 37 F. Supp. 2d at 908-09, 908 n.93 (emphasis added).

court's findings of constitutional violations in California prisons without requiring any statistical studies and relying on some of the same experts (Dr. Haney and Dr. Stewart) who will testify in this case.  131 S. Ct. 1910, 1932-35 (2011) (noting that Dr. Haney's expert report was based on eight prison tours and that other experts, including Dr. Stewart, submitted reports based on similar observations).[14]

Here, the opinions of Plaintiffs' experts are based on multiple sources of evidence, including prison tours, prisoner interviews, and reviews of medical records, master files, death records, deposition testimony, policies and procedures, MGAR reports, and hundreds of other documents produced by Defendants.[15]  For example, Mr. Vail reviewed thousands of pages of discovery documents, inspected all of the isolation units enumerated in the Court's Order, and interviewed over 100 prisoners.  [Vail Decl. ¶¶ 3-4]; Dr. Haney similarly engaged in extensive document review, toured the isolation units and conducted both confidential and cell-front interviews with numerous prisoners.  [Haney Decl. ¶ 7]

Moreover, in some cases, Plaintiffs' experts reviewed all available records, covering the waterfront and doing much more than a statistical sample.  For example, Dr. Cohen reviewed all prisoner deaths from natural causes that occurred at ADC between March 4, 2013 and September 27, 2013 (*i.e.*, from the date that Corizon assumed management until the original Court-ordered discovery cut-off date), as well as deaths that occurred during the two years prior.  [Cohen Decl., Ex. 3 ¶¶ 3-173; *Id.*, Ex. 1 ¶¶ 149-249] Dr. Wilcox reviewed all records for women who were currently pregnant during his July 2013 tour of the Perryville complex, or who had been pregnant within the previous six months.  [Wilcox Decl. ¶ 7]  Dr. Stewart reviewed all suicides that occurred between March 4 and September 27, 2013.  [Stewart Decl., Ex. 4 at 1]

---

[14]  Indeed, numerous authorities, including the Centers for Medicare & Medicaid Services of the U.S. Department of Health and Human Services, state that **non**-random sampling is the norm in health care quality assurance.  [*See* Wilcox Decl. ¶ 14]

[15]  Shulman Decl., Haney Decl., Wilcox Decl., Williams Decl., Stewart Decl., Vail Decl., and Cohen Decl.

### B.    Even using Defendants' standard, Plaintiffs' experts selected appropriate samples

Defendants take Plaintiffs' experts to task for allegedly failing to obtain random and statistically significant samples.  Defendants present no evidence or authority to support their contention that Plaintiffs' experts did not rely on a sample that was sufficiently large or random. The sufficiency of Plaintiffs' experts' evidentiary foundation should be left to the trier of fact.  *See Daubert*, 509 U.S. at 596.

Randomly selecting prisoners or medical records from the entire inmate population would have been nonsensical in this case.  Plaintiffs' experts used smaller, more targeted populations to evaluate care provided to certain inmates, such as those with chronic conditions, mental illness, or dental pain.  [*See, e.g.*, Wilcox Decl. ¶ 14]  To render opinions on those matters, Plaintiffs' experts generally drew their sample from a smaller population composed of applicable inmates.  To draw records from the entire population to evaluate, for example, dental treatment, would be a tremendous waste of resources, as many prisoners have had little or no contact with dental providers, particularly during the relevant period.  [*See, e.g.*, Eidenbach Decl., Ex. 2 (Dep. Tr. of John W. Dovgan, D.D.S., dated Apr. 4, 2014) at 40:9-20 (after selecting records for review from the medical chart room at several facilities, defendants' dental expert switched to using a dental appointment list because he was finding too many records that did not have recent dental care)]  Plaintiffs' experts also focused on critical incidents, such as deaths or other bad outcomes, to assess whether those incidents were the result of systemic deficiencies.  As Mr. Vail pointed out, he deliberately used the Significant Incident Report (SIR) logs to select prisoners to interview in a confidential setting because his experience as a corrections administrator has taught him that interviewing prisoners who experience difficulties in a custodial setting "is an excellent tool for stress-testing the system's operations."  [Vail Decl. ¶ 8]

Defendants' specific criticism of Plaintiffs' experts related to "random" sampling betrays a misconception of the approach to data gathering that Plaintiffs' experts

followed.  As Dr. Haney explains, "true" random sampling is appropriate to laboratory settings, where researchers have complete control over the method of selection, relying on random numbers that are typically computer-generated to ensure the randomness of the sample.  [Haney Decl. ¶ 18]  In this case, true random sampling was neither feasible nor necessary for the findings the experts were asked to make.  [Williams Decl. ¶ 7; Haney Decl. ¶ 19]  The experts' decision to randomly select prisoners on their own, that is, without prior knowledge of the inmates whom they interviewed and no pre-existing pattern in mind, was an appropriate and effective methodology.  Indeed this research method is frequently used in "in situ" research projects, where data is being collected in "field" settings.  [Haney Decl. ¶ 19]

In cases where it was appropriate, Plaintiffs' experts did use random sampling.  For example, Dr. Haney used a random number table to select the inmates he wanted to interview from a roster of inmates housed in the units.  [Mot. at 5, Ex. I at 36:14-37:14]  Plaintiffs' experts also relied heavily on ADC's own monitoring reports, known as MGAR reports, which according to Defendants are prepared by ADC monitors who employ random sampling.  [Shulman Decl. ¶ 11; Stewart Decl. ¶ 10; Haney Decl. ¶ 5]

## C.  Plaintiffs' experts did not need to conduct additional statistical analyses

Throughout their motion, Defendants repeatedly assert that Plaintiffs' experts did not conduct enough statistical analyses, although they never identify what statistical tests the experts should have performed, or cite any authority that such tests would be necessary or appropriate in this case.  Moreover, contrary to Defendants' contentions, Plaintiffs' experts *did* perform statistical analyses, when appropriate, of the data that they collected during their prison tours and chart reviews.  For example, Dr. Shulman repeatedly quantified his findings, explaining throughout his report the number of problematic behaviors and incidents he identified in the records he reviewed, as well as calculating the overall wait times experienced by those prisoners.  [Shulman Decl., Ex. 1]  In addition, Dr. Stewart calculated ADC's annual rate of suicides per 100,000 prisoners,

1  finding that it is substantially higher than the national average for state prisons.  [Stewart

2  Decl., Ex. 1 at 52]

3        Defendants further contend, again without citing any authority, that Plaintiffs'

4  experts were required to perform statistical analyses in order to extrapolate their findings

5  to the general population.  This argument makes no sense.  This is not a case in which

6  Plaintiffs' experts are attempting to ascertain the incidence of a trait or condition among

7  ADC's 34,000 prisoners.  As Dr. Haney points out:

8           Contrary to Defendants' assertions, it is entirely possible to
            extrapolate to systemic problems from analyzing information
9           collected from multiple representative sources, whether or not
            they have been "statistically analyzed."  Although it would not
10          be appropriate to attempt to extrapolate to a precise
            quantitative calculation ("X number of prisoners are affected
11          in Y ways"), it is entirely appropriate to conclude, as we have
            in this case, that the egregious and endemic problems that we
12          have identified are "systemic," "widespread," and place
            prisoners at "substantial risk of harm."
13

14  [Haney Decl. ¶ 24]  Relying on prisoner interviews, record review, and an abundance of

15  additional information, Plaintiffs' experts identified system-wide deficiencies in health

16  care and conditions of confinement that place prisoners at substantial risk of serious harm.

17  Nothing more is required.

18

19      **D.    Defendants' experts used methods that were similar to, but less
              thorough than, those used by Plaintiffs' experts**

20        Defendants' criticism of Plaintiffs' experts is belied by the methodology employed

21  by their own experts.  Each of Defendants' experts claimed that the care and conditions in

22  ADC were adequate but did not conduct a statistical study.  [*See generally* Eidenbach

23  Decl., Ex. 3 (Confidential Expert Report of Lawrence H. Mendel, D.O. FSCP, CCHP,

24  dated Dec. 13, 2013), Ex. 4 (Excerpts of Confidential Expert Report of Joseph V. Penn

25  MD CCHP FAPA, dated Dec. 13, 2013), Ex. 5 (Confidential Expert Report of Richard P.

26  Seiter, Ph.D., dated Dec. 18, 2013), Ex. 6 (Confidential Expert Report of John W.

27  Dovgan, DDS, dated Dec. 18, 2013), and Ex. 7 (Dep. Tr. of Lawrence Harold Mendel,

28

1  DO, FSCP, CCHP, dated April 9, 2014) at 28:6-8, 39:23-25 (did not know what

2  percentage of files he reviewed or whether that review was statistically significant)]

3      In fact, Defendants' experts' methodology was similar to, although far less

4  exhaustive than, the methodology employed by Plaintiffs' experts.  [*See, e.g.*, Eidenbach

5  Decl., Ex. 7 at 190:2-5 (Dr. Mendel generalized about the adequacy of urgent care from

6  "handful" of cases); *id*. at 208:4-18 (reviewed "less than a dozen charts" along with other

7  information to determine whether appointments are scheduled in a timely manner); *id*. at

8  114:23-115:1 (reviewed MGAR reports); *id*. at 72:18-23; (reviewed deposition

9  testimony); *id*. at 23:17-18, 201:1-8 (toured facilities and interviewed staff); *id*. at 27:23-

10  28:1 (gave instructions to attorneys about what medical records to pull); *see also*

11  Eidenbach Decl., Ex. 2 at 44:4-10 (Dr. Dovgan toured facilities chosen by counsel (the

12  same facilities toured by Dr. Shulman)); *id*. at 43:22-44:3 (reviewed 147 prisoner

13  records); *id*. at 40:9-20 (changed his methodology for picking charts to using an

14  appointment list in order to find more recent treatment)]

15      As an example of Defendants' misplaced criticism, they fault Dr. Stewart for

16  reviewing 206 prisoner medical records and interviewing 118 prisoners.  [Mot. at 23]  But

17  Defendants' own psychiatrist Dr. Penn had reviewed the medical records of only 16

18  prisoners[16] from three of the ten prisons when he concluded in his December 18, 2013

19  report that ADC's mental health system "revealed no significant problems or concerns."[17]

20  [Eidenbach Decl., Ex. 4 at 90]  Several months later, Dr. Penn testified at his deposition

21  on April 11, 2014 that he had reviewed a total of 65 prisoner records.  [Eidenbach Decl.,

22  Ex. 8 at 71:14-72:16]  He was unable to answer basic questions about how he selected the

23  records he reviewed ("Q. How did they come up with these ten names?  A. I have no

---

[16]  This and subsequent figures referring to Dr. Penn's record review do not include the records of the named plaintiffs or those of deceased prisoners.

[17]  At his deposition, Dr. Penn was unable to recall whether he had reviewed any records in addition to these 16, but agreed that "if you reviewed a given medical record, it would be identified either in your [December 18, 2013] report or in Appendix A." [Eidenbach Decl., Ex. 8 (Dep. Tr. of Joseph V. Penn, MD, CCHP, FAPA, dated Apr. 11, 2014) at 67:21-24]  No additional records are identified in either place.

1    idea"), and admitted that his review of records at Tucson and Lewis "wasn't a – a random

2    record review." [*Id.* at 65:17-23, 74:16-17; *see also id.* at 63:1-13, 64:6-17]  He testified

3    that he only took notes on ten of the 65 records he reviewed (*id*. at 70:10-71:13), and

4    destroyed some of his notes. [*Id*. at 49:18-25]

5         Similarly, Defendants claim that Dr. Haney's methodology should be discounted

6    because, "[a]lthough this method appears to utilize a random sampling of inmates to be

7    interviewed at each unit Dr. Haney visited, Dr. Haney did not ensure a statistically

8    significant sample size." [Mot. at 6]  They further criticize Mr. Vail because they claim

9    his confidential interviews were not "randomly" selected since he spoke with prisoners

10   whose names were collected from serious incident reports.  [*Id.* at 12]  Defendants,

11   however, offer no indication or citation to what they consider to be a "statistically

12   significant sample size" or why "randomly" picking interview subjects is critical to an

13   expert's analysis of conditions in the isolation units.  Defendants' dubious claims are

14   echoed in the actions of their own experts.  In his deposition, Defendants' expert,

15   Dr. Richard Seiter, claimed that a sample size must be 5%. [Eidenbach Decl., Ex. 9 (Dep.

16   Tr. of Richard P. Seiter, Ph.D., dated April 10, 2014) at 164:23-165:4]  When asked what

17   justified that number, he could only cite to "research methodology" from "any body of

18   research." [*Id.* at 165:5-10]  It is telling, however, that Dr. Seiter did not know how many

19   ADC staff he interviewed; he admitted that he did not interview 5% of ADC staff, but

20   thought he "probably" interviewed 5% of maximum custody staff; and he did not bother

21   to ensure a 5% sampling in his own interviews for this case. [*Id.* at 165:11-20]

22        Defendants also attempt to discount the findings of Dr. Haney and Mr. Vail by

23   claiming that their methodology is flawed because they did not perform a "statistical

24   analysis" in support of their findings that the conditions in ADC's isolation units related to

25   such things as recreation, heat, use of chemical agents, the lack of mental health treatment,

26   and the impacts of social isolation, place prisoners at risk of significant harm.  [Mot. at 6-

27   7, 12-13]  Yet their own expert, Dr. Seiter, did not base his findings on statistical analysis.

28   For instance, he did not review records or logbooks to see if recreation is recorded or

1    cancelled; indeed he admitted that he did not recall looking at any recreation records.

2    Instead, he simply asked Deputy Warden Fizer.  [Eidenbach Decl., Ex. 9 at 201:6-202:5]

3    Likewise, Dr. Seiter based his claim that "inmates involved in one of the high need mental

4    health units receive both individual and group counseling and are involved in structured

5    programming" merely on discussions with staff and seeing program schedules.   [*Id*.

6    at 74:4-14]  He did not check a single inmate file to confirm participation in any of these

7    programs.  [*Id*. at 74:15-17]  Likewise, Dr. Seiter's claim that at Perryville Lumley-SMA

8    "mental health staff do a walk-through and cell-front interviews with all 70 inmates on a

9    daily basis" is not based on any documentary evidence or statistical analysis but merely

10   discussions with staff and seeing staff doing some walk-throughs at the time of his tour.

11   [*Id*. at 74:18-75:17]  Dr. Seiter's claims about mental health programming for the isolation

12   units at Florence, SMU I, and Browning are similarly founded on staff interviews and

13   observations during tours without supporting documentation or analysis that the alleged

14   programs are actually occurring.  [*See id*. at 80:15-81:22, 83:8-23, 93:12-24]

15        Similarly, Plaintiffs fault Dr. Shulman for not selecting a random sample of

16   patients who had requested dental care, extrapolating his findings to the entire ADC

17   population, doing a staffing analysis, analyzing changes in wait times under Smallwood,

18   or analyzing median urgent care wait times under Smallwood.[18]  Dr. Dovgan did none of

19   this.  He selected his records first from the chart room, and then, after determining that far

20   too many records contained no recent treatment, selected his records from the current

21   routine care list—in  other words, patients who had requested care in the last 45 days, and

22   not necessarily when ADC or Wexford was providing treatment.  [Eidenbach Decl., Ex. 2

23   at 38:3-41:14]  Dr. Dovgan neither quantified his findings nor provided any statistical

24   analyses in his reports, and he relied entirely on dental staff interviews and official reports

25   for his understanding of current wait times.

26   _____

27        [18]  Defendants also criticize Dr. Shulman for not considering "no shows" in his
     analysis of wait times.  It is not clear what Defendants mean by that criticism as it is
     facially incorrect.  [*See* Shulman Decl., Ex. 1 at 10 (describing how Dr. Shulman treated
28   no shows in calculating wait times)]

## III.   DEFENDANTS' CRITICISMS OF THE METHODOLOGIES OF PLAINTIFFS' EXPERTS GO TO WEIGHT, NOT ADMISSIBILITY

Defendants mention, but do not seriously argue, that Plaintiffs' experts should have reviewed every health record and interviewed every prisoner at ADC.  That of course would have been impossible.  Rather than contesting the experts' use of samples, Defendants only take issue with each expert's sample size, selection of records, and conclusions derived from that sample.  Such contentions can be adequately addressed during cross-examination and therefore speak only to the weight of the expert's opinions, ***not*** to their admissibility.  *See Messick v. Novartis Pharm. Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) (issues regarding the accuracy of an expert's opinion are a matter of weight, not admissibility); *United States v. H & R Block, Inc.*, 831 F. Supp. 2d 27, 34 (D.D.C. 2011) ("While the Court agrees with the plaintiff that the survey's response rate appears, by any standard, to be quite low, . . . this concern goes to the weight, not the admissibility, of the evidence because the survey was not so unreliable as to be deemed inadmissible.") (internal citation and quotation marks omitted); *Jama v. Esmor Corr. Servs., Inc.*, 2007 WL 1847385, at *27 (D.N.J. June 25, 2007) (pointing out that challenges to the accuracy of Dr. Mendel's conclusions go to their weight, not their admissibility); *U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Local Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) (gathering authority and explaining that "small sample size goes to the weight rather than to the reliability (and admissibility) of a study").

In a case involving one of Defendants' own experts (Lawrence Mendel), the plaintiffs argued that Dr. Mendel's conclusions about the quality of care provided to 1,600 detainees were flawed because his sample size was too small to generate reliable statistics. *Jama*, 2007 WL 1847385, at *26.   The court noted that Dr. Mendel used "the scientifically accepted technique of sampling," even though not random, to evaluate the effectiveness of contracted medical staff at an INS facility.  *Id.* at *27.  The court found that "Dr. Mendel's use of ***seventy-nine*** medical request forms submitted by the ***nine***

1    plaintiffs is a sample sufficiently sized to have probative value." *Id.* (emphasis added).

2    The court concluded that Dr. Mendel's methodology had no major errors as "[his]

3    statistical data is of a type reasonably relied upon by experts, and will aid the jury in

4    making factual determinations." *Id.*

5         Courts in other types of cases agree that whether an expert's sample is too small,

6    not representative, or biased can be addressed on cross-examination. *See United States v.*

7    *Halifax Hosp. Med. Ctr.*, 2014 WL 68579, at *2 (M.D. Fla. Jan. 8, 2014) (finding that

8    defendants' criticism that the expert's sample of 104 claims out of a population of 21,554

9    short-stay hospital admissions was too small and unrepresentative goes to the weight of

10   the evidence); *Sciele Pharma, Inc. v. Brookstone Pharm., LLC*, 2011 WL 3844891, at *9

11   (N.D. Ga. Aug. 30, 2011) (concluding that defendants' issues with the expert's small

12   sample size and allegedly leading and biased questions go to the weight of his testimony).

13        In *Coleman*, the court also rejected defendants' argument that expert declarations

14   "based on medical files 'pre-selected' by plaintiffs' counsel" were "not evidence of

15   inmate suffering or of the prevalence of mental illness in the [prisons]." 912 F. Supp. at

16   1303. The court found that the defendants' attacks on the sources and selection of records

17   were without merit, noting that "Fed. R. Evid. 703 provides experts with wide latitude to

18   offer opinions, including those that are not based on firsthand knowledge or observation."

19   *Id.* (citation and internal quotation marks omitted).

20        Where, as here, hundreds of thousands of pages have been produced during

21   discovery and countless depositions have been taken, an expert cannot feasibly review the

22   entire record and may need to be guided by counsel to relevant documents. *See In re*

23   *Titanium Dioxide Antitrust Litig.*, 2013 WL 1855980, at *9 (D. Md. May 1, 2013) (noting

24   that the amount of discovery, and the expert's procurement of that discovery, can be

25   introduced at trial but such facts "do not warrant [the expert's] exclusion . . . because they

26   fail to challenge the reliability of his method"); *Mathews v. Novartis Pharm. Corp.*, 2013

27   WL 5780415, at *22 (S.D. Ohio Oct. 25, 2013) ("NPC also argues that Dr. Vogel's

28   criticisms are based on documents cherry-picked by Plaintiffs' counsel, and are based on

1    insufficient facts and data. These objections, however, go to the weight to be given
2    Dr. Vogel's testimony, not its admissibility.").

3        Courts recognize that experts should not be excluded for a limited review of
4    underlying materials. *See Donahoe v. Arpaio*, 2013 WL 5604349, at *9 (D. Ariz. Oct. 11,
5    2013) (finding that the expert's reliance on the summaries and conclusions of others do
6    not require exclusion); *see also Hangarter*, 373 F.3d at 1017 n.14 ("Although Defendants
7    during voir dire argued that Caliri's selection of documents to review went to the
8    reliability of his 'methodology' as an expert, the district court correctly surmised that
9    questions regarding the nature of Caliri's evidence went more to the 'weight' of his
10   testimony—an issue properly explored during direct and cross-examination").

11       Finally, as in *Coleman*, Defendants "have pointed to nothing which suggests that a
12   different but nonetheless sensible methodology for selecting files to review would have
13   materially altered the evidence before this court."  912 F. Supp. at 1303 n.23.

14   **IV.    DEFENDANTS' ALTERNATIVE ARGUMENTS ARE WITHOUT MERIT**

15       Defendants' two alternative arguments are mutually contradictory.  They first
16   argue that the testimony of Drs. Cohen and Wilcox are cumulative, and then argue that
17   they and other experts should not be permitted to testify about prisons that they did not
18   personally tour, even though Drs. Cohen and Wilcox each toured different prisons.  Both
19   cannot be true, and neither has merit.

20       **A.    Dr. Cohen's and Dr. Wilcox's opinions are not cumulative**

21       Defendants ask that the Court bar either Dr. Wilcox or Dr. Cohen from testifying,
22   claiming that allowing both physicians to testify would be "needlessly cumulative."  [Mot.
23   at 33]  This represents an abrupt about-face for Defendants, who previously argued that
24   their fourteen proposed expert witnesses were not duplicative or cumulative, and that
25   "drawing the lines between cumulative and non-cumulative testimony is a formidable task
26   best left for trial."  [Doc. 794 at 15-16; *see also Koito Mfg. Co., Ltd. v. Turn-Key-Tech,*
27   *L.L.C.*, 2003 WL 25674799, at *2 (S.D. Cal. Apr. 10, 2003) (denying motion to exclude

28

1  expert testimony, finding party will have opportunity to raise objections at trial)]

2  Defendants' argument should be rejected for the same reason.

3       Moreover, Rule 403 of the Federal Rules of Evidence permits the Court to exclude

4  relevant evidence only when its probative value is substantially outweighed by the

5  needless presentation of cumulative evidence.  The exclusion of evidence under Rule 403

6  "is an extraordinary remedy which should be used only sparingly since it permits the trial

7  court to exclude concededly probative evidence." *Rodriguez v. Cnty. of Stanislaus*, 2010

8  WL 2720940, at *1 (E.D. Cal. July 8, 2010) (citation and quotation marks omitted).  Since

9  Defendants do not argue that the evidence is irrelevant or that the probative value is

10  substantially outweighed by what they see as cumulative evidence, their motion must be

11  denied.

12       In any case, the evidence of the two experts is not cumulative.  Their opinions

13  focus on different facilities and different issues.  Dr. Cohen toured two large prisons,

14  Lewis and Eyman, and reviewed monitoring data from three smaller prisons per court

15  order, and expressed his opinions about care in those facilities and the system generally.

16  [Cohen Decl., Ex. 1]  Dr. Wilcox toured five different prisons and expressed his opinions

17  about inadequate care at those and other facilities.  [Wilcox Decl., Ex. 1]  Dr. Cohen

18  expressed critical opinions about the inadequate care received by prisoners who died

19  while in ADC custody, but Dr. Wilcox did not.  [Cohen Decl., Ex. 1 ¶¶ 149-249]

20  Conversely, Dr. Wilcox is the only expert who will testify about the limited value of

21  accreditation by the NCCHC.  He is also the only expert who will rebut the conclusions of

22  Defendants' medical expert that certain data about mortality rates and the care received by

23  diabetics demonstrate that Defendants are providing adequate care.  [Wilcox Decl., Ex. 2

24  at 1-5]  Here, Plaintiffs' experts reached similar opinions, based on review of different

25  evidence, thus the testimony of both should be admitted.  *See Abrams v. Ciba Specialty*

26  *Chemicals Corp.*, 2010 WL 779273, at *5 (S.D. Ala. Mar. 2, 2010) (explaining that

27  experts are only cumulative and subject to exclusion if the experts offer testimony "based

28

1    on the same underlying evidence," rather than "differing lines of evidence to reach their

2    conclusions . . . such that their testimony is complementary rather than redundant").[19]

3    **B.    Plaintiffs' experts' opinions about facilities that they did not tour**
             **should not be excluded**
4

5    Defendants also argue that Plaintiffs' experts should be precluded "from offering

6    opinions regarding facilities that they did not personally tour or otherwise review." [Mot.

7    at 36] This argument also has no merit.[20]

8    First, Defendants are judicially estopped from now arguing that tours they

9    previously claimed were unnecessary and an undue burden are essential to Plaintiffs' case.

10   *See New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (judicial estoppel prevents a

11   party from taking a position clearly inconsistent with its earlier position where the party

12   used its prior inconsistent position to prevail on another issue, so that allowing the party to

13   reverse course would give it an unfair advantage). Defendants objected to more tours and

14   the Court granted their request in part. [*See* Eidenbach Decl., Ex. 11 (Hrg. Tr., dated

15   Aug. 7, 2013) at 19:4-7 ("I mean, the facilities aren't changing. They don't need to take

16   additional tours. The facilities are staying the same."), 23:11-12 ("Why would they tour a

17

18   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

     [19] Even under Arizona Rule of Civil Procedure 26(b)(4)(d), which does not
19   supersede Federal Rule of Evidence 403 here, a court may allow multiple experts on the
     same issue upon a showing of good cause. "'Good cause' is a non-rigorous standard that
20   has been construed broadly across procedural and statutory contexts." *Ahanchian v.*
     *Xenon Pictures, Inc.*, 624 F.3d 1253, 1259 (9th Cir. 2010). Even assuming Plaintiffs'
21   experts could be construed as addressing the same "issue," good cause would exist here
     because of the magnitude of the data involved in this case and the time constraints faced
22   by Drs. Cohen and Wilcox. To develop an expert opinion about ADC's medical care
     delivery system, which encompasses outpatient, inpatient, and specialty care to 34,000
23   male and female prisoners in ten prisons, is an enormous task. Travel to remote facilities
     coupled with review of tens of thousands of pages in discovery, mandated that Plaintiffs
24   retain two medical experts.
     [20] It also seeks to impose upon Plaintiffs a limitation Defendants have no intention
25   of observing themselves. For example, Dr. Penn testified that he intends to opine about
     mental health care at Winslow, Safford, and Douglas, despite the fact that he has neither
26   visited those facilities nor reviewed any records of prisoners at those facilities.
     [Eidenbach Decl., Ex. 8 at 53:23-54:10] Even more egregious is Defendants' reliance on
27   "employee experts," who intend to offer opinions on the entire ADC system and its
     operation as a whole based on knowledge of only a few facilities. [*See e.g.*, Eidenbach
28   Decl., Ex. 10 (Dep. Tr. of Brian Hanstad, D.M.D., dated April 2, 2014); Doc. 794-2 at
     45:14-49:14]

1   facility where none of the plaintiffs are housed?"), and 69:17-20 ("… [W]e would ask in

2   the alternative if you deny our stay that at least the expert tours, these ones that are

3   coming up this week, next week, be cancelled.  We have laid out in our papers that there's

4   no reason to do them and they are unduly burdensome…"); and Doc. 567 (Aug. 9, 2013

5   Order) at 4; Doc. 611 (Aug. 30, 2013 Order) at 1]   Defendants cannot now exclude

6   Plaintiffs' experts by arguing they should have taken tours that Defendants successfully

7   urged the Court to restrict.

8          Second, other than boilerplate references to Rule 702 and *Daubert*, Defendants

9   offer no authority for this argument, which has been explicitly rejected in a statewide case

10   challenging prison health care.  *Ruiz*, 37 F. Supp. 2d at 888 ("This court does not agree,

11   however, with defendants' apparent contention that plaintiffs would have to evaluate

12   every single one of the over 100 institutions in TDCJ–ID to make their case."); *see also*

13   *Plata*, 131 S. Ct. at 1935 (Dr. Haney testified in California statewide prison case after

14   touring eight prisons); *Casey v. Lewis*, 834 F. Supp. 1477 (D. Ariz. 1993) (plaintiffs'

15   medical and psychiatric experts did not visit all ADC facilities but testified to systemic

16   deficiencies).

17          Third, Plaintiffs' experts relied on sufficient evidence to express systemic opinions.

18   Plaintiffs' experts conducted over 30 prison tours.  [Mot. at 37]  By the end of discovery,

19   Plaintiffs' medical and mental health experts toured seven of the ten ADC prisons, the

20   isolation experts toured all of the isolation units, and the dental expert toured nine out of

21   the ten prisons.  [*Id*.]  When Plaintiffs' experts reviewed prisoner health records at a given

22   prison, they did not limit themselves to health care provided at that facility, but also

23   reviewed the care provided at the prisoner's previous facilities.  [Stewart Decl. ¶ 11;

24   Shulman Decl. ¶ 13 (he reviewed all care back to 2009)]  In addition to the prison tours,

25   all of the experts also relied on documentary evidence and deposition testimony that

26   captured information about ADC's health care system and conditions of confinement in

27   isolation.  Much of this evidence was systemic in nature rather than limited to specific

28

1   facilities.  [*See, e.g.*, Stewart Decl., Ex. 1 at 11 (quoting testimony of ADC Mental Health

2   Monitor that care provided to ADC prisoners does not meet constitutional requirements)]

3       Finally, as is true with all of Defendants' other arguments, this argument goes to

4   the weight of the evidence and does not warrant exclusion of testimony.

5                                    **Conclusion**

6       For all the reasons stated above, this Court should deny Defendants' Motion to

7   Preclude Plaintiffs' Experts in its entirety.

8   Dated:  June 18, 2014                    **PERKINS COIE LLP**

9

10                                  By:   s/ Kirstin T. Eidenbach
                                         Daniel C. Barr (Bar No. 010149)
                                         Amelia M. Gerlicher (Bar No. 023966)
11                                       Kirstin T. Eidenbach (Bar No. 027341)
                                         John H. Gray (Bar No. 028107)
12                                       Matthew B. du Mée (Bar No. 028468)
                                         Jerica L. Peters (Bar No. 027356)
13                                       **PERKINS COIE LLP**
                                         2901 N. Central Avenue, Suite 2000
14                                       Phoenix, Arizona 85012
                                         Telephone:  (602) 351-8000
15                                       Email:    dbarr@perkinscoie.com
                                                   agerlicher@perkinscoie.com
16                                                 keidenbach@perkinscoie.com
                                                   jhgray@perkinscoie.com
17                                                 mdumee@perkinscoie.com
                                                   jpeters@perkinscoie.com
18
                                         Daniel Pochoda (Bar No. 021979)
19                                       James Duff Lyall (Bar No. 330045)*
                                         **ACLU FOUNDATION OF**
20                                       **ARIZONA**
                                         3707 North 7th Street, Suite 235
21                                       Phoenix, Arizona 85013
                                         Telephone:  (602) 650-1854
22                                       Email:    dpochoda@acluaz.org
                                                   jlyall@acluaz.org
23
                                         *Admitted pursuant to Ariz. Sup. Ct.
24                                       R. 38(f)

25

26

27

28

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Warren E. George (Cal. 53588)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
              ahardy@prisonlaw.com
              snorman@prisonlaw.com
              ckendrick@prisonlaw.com
              wgeorge@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)**
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
              afettig@npp-aclu.org
              aquereshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
  in DC; practice limited to federal
  courts.
**Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
              aamiri@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com
             tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
             jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone:  (949) 851-3939
Email:    kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARIZONA CENTER FOR DISABILITY LAW**

By:   s/ Sarah Kader
Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email:     skader@azdisabilitylaw.org
             avarma@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
Jessica Jansepar Ross (Bar No. 030553)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:     jrico@azdisabilitylaw.org
             jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

1

## CERTIFICATE OF SERVICE

2      I hereby certify that on June 18, 2014, I electronically transmitted the above

3   document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4   Notice of Electronic Filing to the following CM/ECF registrants:

5

6                        Michael E. Gottfried
                       Katherine E. Watanabe
7                         Lucy M. Rand
                  Assistant Arizona Attorneys General
8                  Michael.Gottfried@azag.gov
                   Katherine.Watanabe@azag.gov
9                    Lucy.Rand@azag.gov

10                        Daniel P. Struck
                       Kathleen L. Wieneke
11                      Timothy J. Bojanowski
                          Rachel Love
12                      Nicholas D. Acedo
                        Ashlee B. Fletcher
13                       Anne M. Orcutt
                         Jacob B. Lee
14                STRUCK WIENEKE, & LOVE, P.L.C.
                    dstruck@swlfirm.com
15                  kwieneke@swlfirm.com
                  tbojanowski@swlfirm.com
16                    rlove@swlfirm.com
                    nacedo@swlfirm.com
17                  afletcher@swlfirm.com
                    aorcutt@swlfirm.com
18                    jlee@swlfirm.com

19                      *Attorneys for Defendants*

20                             s/ Delana Freouf

21

22

23

24

25

26

27

28