Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
         jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
         avarma@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br>                         Plaintiffs, <br><br>         v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br>                         Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br><br> **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**Page**

Table of Authorities ...................................................................................... iv

Introduction ................................................................................................... 1

Argument ....................................................................................................... 2

I.  DEFENDANTS' MOTION FAILS TO MEET THE BASIC SUMMARY JUDGMENT STANDARD. .................................................... 2

II.  PERVASIVE DEFECTS IN DEFENDANTS' MOTION PREVENT SUMMARY JUDGMENT. ............................................................................. 3

    A.  Defendants Misstate the Eighth Amendment Standard. ................... 3

    B.  Plaintiffs' Experts' Opinions Bar Summary Judgment. .................... 5

    C.  The Court Should Reject Defendants' Attempt to Subdivide Plaintiffs' Claims. ............................................................................. 9

    D.  Defendants Fail to Show an Absence of a Genuine Issue of Material Fact Regarding System-wide Practices. ........................... 11

    E.  Defendants Cannot Prevail on Summary Judgment Because Their Motion Ignores Systemic Issues Predating Late 2013. .......... 12

III.  GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE MEDICAL CLAIMS. .................... 13

    A.  Plaintiffs Have Evidence of Systemic Deficiencies. ....................... 13

        1.  Plaintiffs Dispute Defendants' Claims of Timely Access to Qualified Healthcare Staff. ................................... 13

            a.  Staffing Levels. ....................................................... 13

            b.  Wait Times. .............................................................. 14

        2.  The Allegedly Low Number of Grievances Filed at Some Prisons Does Not Negate Systemic Healthcare Deficiencies. ........................................................................ 16

        3.  Plaintiffs Dispute the Inferences that Defendants Seek to Draw from the Raw Number of Various Healthcare Indicators. ....................................................................... 17

        4.  NCCHC Accreditation Does Not Establish the Lack of Systemic Healthcare Deficiencies. ....................................... 18

    B.  Defendants are not Entitled to Summary Judgment on Specific Certified Questions. ........................................................................ 19

**TABLE OF CONTENTS**
**(continued)**

**Page**

1.   Policy Contents are Not Dispositive. .................................. 19

2.   Factual Disputes Prevent Summary Judgment
Regarding Systemic Problems in Emergency Care. ............ 20

3.   Material Facts in Dispute Preclude Summary Judgment
on the Adequacy of Defendants' Administration and
Provision of Medication and Medical Devices. ................... 21

4.   Material Facts are in Dispute Regarding Defendants'
Policies and Practices Leading to the Spread of
Infectious Diseases. ............................................................ 23

5.   Material Facts are in Dispute Regarding the Adequacy
and Quality of Medical Diets. ............................................ 24

6.   There Are Material Factual Disputes Regarding the
Health Needs Request (HNR) Process. ............................... 24

IV.   THE COURT SHOULD DENY SUMMARY JUDGMENT ON THE
DENTAL CLAIM.  ....................................................................... 25

A.   Defendants Ignore Nearly All the Shortcomings in ADC
Policy and Practice that Put Prisoners at Risk of Inadequate or
Delayed Dental Care.  .................................................... 25

B.   Defendants Cannot Establish Constitutionally Adequate
Dental Care as a Matter of Law. ...................................... 27

1.   Wait Times are Not Dispositive. .......................... 27

2.   Named Plaintiffs Demonstrate the Risk of Serious
Harm to the Plaintiff Class. ................................... 29

C.   Defendants Misunderstand the Issue of Avoidable Extractions. ..... 31

V.   SUMMARY JUDGMENT ON THE ISOLATION CLAIM IS
INAPPROPRIATE. ........................................................................ 32

A.   The Parties Dispute Whether Plaintiffs are Subject to Extreme
Social Isolation and Minimal Environmental Stimulation. ............ 33

B.   Defendants Cannot Establish that Plaintiffs Receive Adequate
Exercise.  ..................................................................... 36

C.   The Parties Dispute Facts Regarding 24-Hour Illumination. ........... 37

D.   The Parties Dispute Facts Regarding the Use of Chemical
Agents on Prisoners With Mental Illness. ....................................... 39

**TABLE OF CONTENTS**
**(continued)**

Page

    E.    The Parties Dispute Whether Plaintiffs are Provided Inadequate Nutrition........................................................... 41

VI.    DEFENDANTS DO NOT SERIOUSLY CHALLENGE THE MENTAL HEALTH CLAIM. ...................................... 42

VII.    DEFENDANTS' REMAINING ARGUMENTS DO NOT WARRANT SUMMARY JUDGMENT. ................................... 43

    A.    Defendants Cannot Use Their Summary Judgment Motion To Reargue Class Certification................................ 43

    B.    Plaintiffs Have Standing................................................. 44

    C.    Plaintiffs' Claims Are Not Barred by the Statute of Limitations. ................................................................ 47

Conclusion ........................................................................................ 47

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alvarez v. Hill,*
   667 F.3d 1061 (9th Cir. 2012) ..................................... 44

*Armstrong v. Davis,*
   275 F.3d 849 (9th Cir. 2001) ..................................... 45

*Aytch v. Sablica,*
   498 F. App'x 703 (9th Cir. 2012) ................................ 29

*Berry v. Peterman,*
   604 F.3d 435 (7th Cir. 2010) ..................................... 30

*Boulies v. Ricketts,*
   518 F. Supp. 687 (D. Colo. 1981) ................................ 18

*Brown v. Plata,*
   131 S. Ct. 1910 (2011) ......................................... 9, 43

*Bulthuis v. Rexall Corp.,*
   789 F.2d 1315 (9th Cir. 1985) ..................................... 8

*Casey v. Lewis,*
   834 F. Supp. 1477 (D. Ariz. 1993) ........................... 13, 34

*Castaneda v. Partida,*
   430 U.S. 482 (1977) ............................................... 9

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986) ............................................... 2

*Central Delta Water Agency v. United States,*
   306 F.3d 938 (9th Cir. 2002) ..................................... 45

*Chance v. Armstrong,*
   143 F.3d 698 (2d Cir. 1998) ..................................... 32

*Clark v. California,*
   739 F. Supp. 2d 1168 (N.D. Cal. 2010) ........................ 43

*Clement v. Gomez,*
   298 F.3d 898 (9th Cir. 2002) ..................................... 41

*Coleman v. Brown,*
   2014 WL 1400964 (E.D. Cal. Apr. 10, 2014) ................ 39, 40

*Coleman v. Schwarzenegger,*
   922 F. Supp. 2d 882 (E.D. Cal. 2009) ........................... 9

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Coleman v. Wilson*,
  912 F. Supp. 1282 (E.D. Cal. 1995)....................................................................... 34, 40

*Comer v. Stewart*,
  215 F.3d 910 (9th Cir. 2000) ..................................................................................... 34

*Dean v. Coughlin*,
  623 F. Supp. 392 (S.D.N.Y. 1985)............................................................................. 30

*Doe v. City of San Jose*,
  2009 WL 1010846 (N.D. Cal. Apr. 14, 2009) ....................................................... 42, 45

*Drummond v. City of Anaheim*,
  343 F.3d 1052 (9th Cir. 2003) ................................................................................... 41

*Evans v. Cnty. of San Diego*,
  2008 WL 842459 (S.D. Cal. Mar. 27, 2008) ............................................................ 47

*Evergreen Int'l, S.A. v. Marinex Constr. Co., Inc.*,
  477 F. Supp. 2d 697 (D.S.C. 2007)............................................................................ 11

*Farmer v. Brennan*,
  511 U.S. 825 (1994)............................................................................................... 3, 45

*Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*,
  528 U.S. 167 (2000).................................................................................................... 12

*Gates v. Cook*,
  376 F.3d 323 (5th Cir. 2004) ..................................................................................... 18

*Gomez v. Vernon*,
  255 F.3d 1118 (9th Cir. 2001) ................................................................................... 12

*Graves v. Arpaio*,
  2008 WL 4699770 (D. Ariz. Oct. 22, 2008)......................................................... 18, 41

*Greeno v. Daley*,
  414 F.3d 645 (7th Cir. 2005) ..................................................................................... 17

*Grenning v. Miller-Stout*,
  739 F.3d 1235 (9th Cir. 2014) ............................................................................. 18, 38

*Guatay Christian Fellowship v. Cnty. of San Diego*,
  670 F.3d 957 (9th Cir. 2011) ..................................................................................... 42

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*,
  907 F. Supp. 2d 492 (S.D.N.Y. 2012)........................................................................ 43

*Hallett v. Morgan*,
  296 F.3d 732 (9th Cir. 2002) ..................................................................................... 30

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Harper v. Showers,*
  174 F.3d 716 (5th Cir. 1999) .................................................................. 38

*Hartsfield v. Colburn,*
  371 F.3d 454 (8th Cir. 2004) .................................................................. 30

*Helling v. McKinney,*
  509 U.S. 25 (1993) ................................................................................. 45

*Home Design Services, Inc. v. Schroeder Constr.,*
  2012 WL 527202 (D. Colo. Feb. 16, 2012) ............................................. 11

*Hunt v. Dental Dep't,*
  865 F.2d 198 (9th Cir. 1989) .................................................................. 29

*Hutto v. Finney,*
  437 U.S. 678 (1978) ............................................................................... 34

*Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corrs.,*
  2012 WL 6738517 (S.D. Ind. Dec. 31, 2012) .......................................... 35

*Int'l Bhd. of Teamsters v. United States,*
  431 U.S. 324 (1977) ................................................................................. 9

*Johnson v. California,*
  543 U.S. 499 (2005) ................................................................................. 3

*Jones'El v. Berge,*
  164 F. Supp. 2d 1096 (W.D. Wis. 2001) ................................................. 35

*Jordan v. Gardner,*
  986 F.2d 1521 (9th Cir. 1993) ................................................................ 40

*Keenan v. Hall,*
  83 F.3d 1083 (9th Cir. 1996) ........................................................ 38, 41, 42

*Koch v. Lewis,*
  216 F. Supp. 2d 994 (D. Ariz. 2001) ...................................................... 34

*Kuahulu v. Employers Ins. of Wausau,*
  557 F.2d 1334 (9th Cir. 1977) ................................................................ 44

*LaMarca v. Turner,*
  662 F. Supp. 647 (S.D. Fla. 1987) .......................................................... 19

*Langley v. Coughlin,*
  715 F. Supp. 522 (S.D.N.Y. 1989) ......................................................... 35

*Lopez v. Peterson,*
  329 F. App'x 95 (9th Cir. 2009) ............................................................. 30

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Los Angeles Cnty., Cal. v. Humphries,*
131 S. Ct. 447 (2010) ........................................................................... 11

*Lyon v. U.S. Immigration & Customs Enforcement,*
___ F.R.D. ___, 2014 WL 1493846 (N.D. Cal. Apr. 16, 2014) ............................ 43, 44

*Madrid v. Gomez,*
889 F. Supp. 1146 (N.D. Cal. 1995) ....................................................... 34, 40

*Maffei v. N. Ins. Co. of N.Y.,*
12 F.3d 892 (9th Cir. 1993) ....................................................................... 8

*Mendocino Envtl. Ctr. v. Mendocino Cnty.,*
192 F.3d 1283 (9th Cir. 1999) ................................................................... 5

*Miller ex rel. Jones v. Stewart,*
231 F.3d 1248 (9th Cir. 2000) ................................................................. 34

*Monell v. Dep't of Soc. Servs.,*
436 U.S. 658 (1978) ............................................................................. 11

*Morales Feliciano v. Rossello Gonzalez,*
13 F. Supp. 2d 151 (D.P.R. 1998) ............................................................. 18

*Nat'l Ass'n for Advancement of Multijurisdiction Practice v. Berch,*
973 F. Supp. 2d 1082 (D. Ariz. 2013) ........................................................ 11

*Orantes-Hernandez v. Holder,*
321 F. App'x 625 (9th Cir. 2009) ............................................................. 20

*Oregon Advocacy Center v. Mink,*
322 F.3d 1101 (9th Cir. 2003) ................................................................. 46

*Owner-Operator Indep. Driver Ass'n, Inc. v. Usis Commercial Servs., Inc.,*
2006 WL 1084013 (D. Colo. Apr. 25, 2006) ................................................. 10

*Parsons v. Ryan,*
___ F.3d ___, 2014 WL 2523682 (9th Cir. June 5, 2014) .......................... passim

*Pickern v. Holiday Quality Foods Inc.,*
293 F.3d 1133 (9th Cir. 2002) ............................................................. 45, 47

*Pierce v. Cnty. of Orange,*
526 F.3d 1190 (9th Cir. 2008) ................................................................. 37

*Porter v. Cal. Dep't of Corr.,*
419 F.3d 885 (9th Cir. 2005) ..................................................................... 2

*Primavera Familienstifung v. Askin,*
130 F. Supp. 2d 450 (S.D.N.Y. 2001) ......................................................... 11

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Rodriguez v. West Publ'g Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................................ 44

*Ruiz v. Johnson*,
    37 F. Supp. 2d 855 (S.D. Tex. 1999), *rev'd on other grounds*,
    243 F.3d 941 (5th Cir. 2001) ................................................. 18, 32, 34, 35

*Scarver v. Litscher*,
    371 F. Supp. 2d 986 (W.D. Wis. 2005) ............................................................ 32

*Sosa v. Hiraoka*,
    920 F.2d 1451 (9th Cir. 1990) ............................................................................ 47

*Spain v. Procunier*,
    600 F.2d 189 (9th Cir. 1979) .............................................................................. 41

*Surowitz v. Hilton Hotels Corp.*,
    383 U.S. 363 (1966) ............................................................................................ 43

*Susan B. Anthony List v. Driehaus*,
    573 U.S. ___ (2014) (slip op. ) .......................................................................... 45

*Thomas v. Bryant*,
    614 F.3d 1288 (11th Cir. 2010) .......................................................................... 39

*Thomas v. Newton Int'l Enters.*,
    42 F.3d 1266 (9th Cir. 1994) ................................................................................ 8

*Thomas v. Ponder*,
    611 F.3d 1144 (9th Cir. 2010) ............................................................................ 37

*Toussaint v. McCarthy*,
    597 F. Supp. 1388 (N.D. Cal. 1984)
    *aff'd in part and rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986) ................. 37

*U.S. Audio & Copy Corp. v. Philips Bus. Sys. Inc.*,
    1983 WL 1818 (N.D. Cal. Apr. 25, 1983) ......................................................... 10

*United States v. Graf*,
    610 F.3d 1148 (9th Cir. 2010) ............................................................................ 42

*United States v. Lummi Indian Tribe*,
    235 F.3d 443 (9th Cir. 2000) ......................................................................... 9, 44

*Ware v. Jackson Cnty.*,
    150 F.3d 873 (8th Cir. 1998) .............................................................................. 20

*Whitley v. Albers*,
    475 U.S. 312 (1986) ............................................................................................ 40

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Wilkerson v. Stalder*,
   639 F. Supp. 2d 654 (M.D. La. 2007) ........................................................... 32

*Wilson v. Seiter*,
   501 U.S. 294 (1991) ............................................................................... 10, 32

**STATUTES**

42 U.S.C. §§ 10801-10851 ............................................................................... 46

**OTHER AUTHORITIES**

Local Rule of Civil Procedure 56.1 ..................................................................... 3

Wright, Miller, & Kane, 7AA Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.) ........................ 46

1

**Introduction**

2          Defendants apparently believe that this case is merely an agglomeration of

3     damages claims by individual prisoners, each of whom prevails only by showing a

4     discrete instance of past wrongdoing by Defendants that resulted in concrete physical

5     injury.  Indeed, Defendants devote most of their motion to disputing the minutiae of the

6     Named Plaintiffs' past encounters with healthcare and prison staff, as if the details of a

7     2008 dental appointment would be dispositive.  [*See generally* Defendants' Motion for

8     Summary Judgment ("Motion") at 5-22, 33-45][1]

9          The Ninth Circuit correctly diagnosed, and firmly rejected, Defendants'

10    mischaracterization of Plaintiffs' claims:

11                    Here, the defendants describe the plaintiffs' claims as little
                       more than an aggregation of many claims of individual
12                    mistreatment.   That description, however, rests upon a
                       misunderstanding of the plaintiffs' allegations.   The
13                    Complaint does not allege that the care provided on any
                       particular occasion to any particular inmate (or group of
14                    inmates) was insufficient, but rather that ADC policies and
                       practices of statewide and systemic application expose all
15                    inmates in ADC custody to a substantial risk of serious harm.
                       This kind of claim is firmly established in our constitutional
16                    law.

17    *Parsons v. Ryan*, ___ F.3d ___, 2014 WL 2523682, at *11-12 (9th Cir. June 5, 2014)

18    (internal citation omitted).  The Ninth Circuit called this "a fundamental misunderstanding

19    of . . . Eighth Amendment doctrine[] and the plaintiffs' constitutional claims."  *Id*. at *11.

20    Because this misunderstanding fatally infects Defendants' Motion, the Motion should be

21    denied in its entirety.

22          As both this Court and the Ninth Circuit correctly recognized, the issue in this case

23    is whether ADC's healthcare system and conditions of confinement in isolation expose

24    class members to a substantial risk of serious future harm to which the defendants are

25    deliberately indifferent.  *Id*. at *13.  "Since *Helling* and *Farmer*, [the Ninth Circuit has]

26    repeatedly recognized that prison officials are constitutionally prohibited from being

27    _____

28          [1] To the extent that any historical facts are material, disputes about these facts, as
       described below, clearly bar summary judgment.

deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm." *Id.* at *12. As in those cases, "[t]he named plaintiffs allege that they are all exposed to a substantial risk of serious harm, not that their particular experiences in the past violated the Eighth Amendment." *Id.* at *19 n.31.

Accordingly, this case will be decided largely on expert testimony regarding whether ADC policies and practices expose prisoners to a substantial risk of serious harm. Also significant will be Defendants' own documents showing the state of ADC healthcare and isolation conditions, such as those showing that ███████████████████████ ████████████████████████████████████████████████████████████████████ [Declaration of Caroline N. Mitchell, dated July 11, 2014 ("Mitchell Decl."), Exs. 59-61.] Because Plaintiffs' expert reports and other evidence establish disputes of material fact on all claims, Defendants' Motion must be denied.

## Argument

## I. DEFENDANTS' MOTION FAILS TO MEET THE BASIC SUMMARY JUDGMENT STANDARD.

Defendants bear the burden to show that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). That burden requires more than filing exhibits supporting Defendants' view of the facts because the district court "does not make credibility determinations or weigh conflicting evidence" at this stage. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

As this Court noted, "it is difficult to see how a motion for summary judgment could be granted that requires 4,327 facts to be undisputed" because defeating the Motion "only requires presentation of a disputed material fact on each claim." [Doc. 962 at 1] What is more, Defendants' statement of facts "greatly exceeds" Local Rule 56.1 [*id.*], as countless facts either (a) are not cited or discussed in the brief, (b) focus on minute details that miss the point of Plaintiffs' claims, or (c) ignore directly contrary evidence and opinion from Plaintiffs' experts. This alone provides a basis for denying the Motion.

LRCiv 56.1.   Consistent with the Court's directive, Plaintiffs have not individually responded to each of the 4,327 facts asserted by Defendants, but have filed an abbreviated statement disputing certain material facts.

## II.   PERVASIVE DEFECTS IN DEFENDANTS' MOTION PREVENT SUMMARY JUDGMENT.

Defendants' ongoing fundamental misunderstanding of this case infects their presentation of the law and the framing of their entire Motion.

### A.   Defendants Misstate the Eighth Amendment Standard.

The Eighth Amendment is violated when prison officials, acting with deliberate indifference, expose prisoners to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  Defendants repeatedly misstate the legal standard governing Plaintiffs' Eighth Amendment claims.

Contrary to Defendants' repeated, unsupported assertions [*e.g.*, Motion at 8, 26, 42] that Plaintiffs must show "purposeful cruelty," the Supreme Court has held that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 511 U.S. at 842.

Defendants also argue that Plaintiffs' Eighth Amendment claims are governed by the "reasonable relationship" test of *Turner v. Safley*, 482 U.S. 78 (1987).  [Motion at 45] As Defendants are surely aware, this is incorrect.  "[W]e have not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison. … This is because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment." *Johnson v. California*, 543 U.S. 499, 511 (2005).

Moreover, Defendants' emphasis on the details of the Named Plaintiffs' histories is misplaced.  Defendants repeatedly argue that specific incidents of past treatment of the Named Plaintiffs do not rise to the level of an Eighth Amendment violation.  Indeed, the majority of Defendants' Motion and separate statement of facts discuss only the minutiae

of the Named Plaintiffs.  But the Ninth Circuit recently instructed that this is not the appropriate inquiry in a class action seeking injunctive and declaratory relief under *Farmer*.  There is a significant difference, the court explained, "between a claim that an inmate has already suffered harm and a claim that he has been exposed to a substantial risk of serious harm."  *Parsons*, 2014 WL 2523682, at *12 (citing *Thomas v. Ponder*, 611 F.3d 1144, 1151 n.5 (9th Cir. 2010)).   In the former situation, an individualized determination is necessary; in the latter, it is not.  *Id.*  "What all the members of the putative class [] have in common is their alleged exposure, as a result of the specified [system-wide] policies and practices that govern the overall conditions of healthcare services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent."  *Id.* at *13.

Accordingly, "[b]ecause plaintiffs do not base their case on deficiencies in care provided on any one occasion, this Court has no occasion to consider whether these instances of delay—or any other particular deficiency in medical care complained of by the plaintiffs—would violate the Constitution."  *Id.* at *13 (quoting *Brown v. Plata*, 131 S. Ct. 1910, 1925 n.3 (2011)).   Thus, to deny summary judgment, this Court need not "determine the effect of . . . policies and practices upon any individual class member (or class members) or . . . undertake any other kind of individualized determination" because while "[s]ome inmates may not actually be harmed, . . . they are all allegedly exposed to a risk of harm."  *Id.* at *14, 15.

As the Court has recognized, this case has five claims:  one claim alleging an inadequate and insufficient healthcare system; claims alleging deficient medical, mental health, and dental care; and a claim asserting that conditions in Defendants' isolation units constitute cruel and unusual punishment.  [Doc. 372 at 22]  As explained more fully below, Plaintiffs have raised disputed issues of material fact on all claims.  Thus, to deny this Motion, the Court does not need to parse through Defendants' mischaracterizations and misuse of the Named Plaintiffs' institutional and healthcare files. [Doc. 962 at 2 ("It

1  will not require controverting (or even reading) every fact asserted in Defendants' motion

2  and statement of facts.")]

3       Further, the defensive vehemence with which Defendants proclaim the excellence

4  of care provided to the Named Plaintiffs only serves to underscore the disputed nature of

5  the adequacy of that care. In fact, the degree to which Defendants' policies and practices

6  place the Named Plaintiffs at substantial risk of serious harm is very much in dispute.

7  [*See, e.g.*, Desiree Licci (cancer survivor denied access to oncologist for well over a year

8  after she began to develop lumps all over her body and experience significant pain and

9  fatigue, placing her at risk of harm should the cancer have turned out to have returned),

10  Plaintiffs' Responsive Statement of Facts ("PRSOF") ¶ 205; Shawn Jensen (prostate

11  cancer survivor denied adequate care for elevated PSA levels, placing him at grave risk of

12  injury or death from possible recurring cancer; denied adequate supply of clean catheters,

13  forcing him to re-use dirty catheters and risk infection), *see infra* page 22 and PRSOF

14  ¶ 205; Christina Verduzco (chronically mentally ill patient who suffered toxicity due to

15  inadequate monitoring of her psychotropic medication), PRSOF ¶ 205; Joshua Polson

16  (dentures patient who suffered significant delays while unable to consistently get the

17  proper mechanical soft diet, resulting in hunger, lost weight, and inability to take

18  medications; and who further lost hearing in his right ear after persistent delayed and

19  faulty medical care), PRSOF ¶¶ 205, 867][2]

20      **B.**    **Plaintiffs' Experts' Opinions Bar Summary Judgment.**

21       Defendants attempt to demonstrate [Motion at 23-36] that they are entitled to

22  summary judgment because selected records suggest a functioning healthcare system and

23  because any evidence Plaintiffs raise to the contrary should be rejected as anecdotal.

24

---

25      [2] In addition, the fact that Defendants' state of mind is an element of Plaintiffs'
Eighth Amendment claims militates against summary judgment. *See Mendocino Envtl.*

26  *Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1302 (9th Cir. 1999) ("questions involving a
person's state of mind . . . are generally factual issues inappropriate for resolution by

27  summary judgment") (internal citation and quotation omitted). Plaintiffs, in their
Statement of Facts, present evidence from which the Court could find Defendants Pratt

28  and Ryan to be deliberately indifferent. [PSSOF ¶¶ 15, 51]

1   Their arguments ignore Plaintiffs' experts altogether, and misleadingly cherry-pick recent
2   evidence to defeat clearly disputed issues of fact.

3        In defending their system, Defendants entirely ignore both the opinions and
4   methodology of Plaintiffs' experts, and flippantly denigrate as "colorful anecdotes" [*id.*
5   at 26] the evidence put forth by Plaintiffs' experts in hundreds of pages of reports
6   documenting shocking levels of pain, suffering, preventable permanent injury,
7   disfigurement, and death of class members, resulting from Defendants' deliberate
8   indifference to these systemic problems.  Plaintiffs' experts traveled the state and
9   reviewed extensive collections of records, learning from the records and numerous
10  prisoner interviews how ADC's policies and procedures work in practice and affect the
11  prisoner population.  Accordingly, their reports provide analysis of the numerous system-
12  wide problems with ADC healthcare and conditions of isolation that cause a substantial
13  risk of harm, and also describe specific examples of the past effects these policies have
14  had on the prisoner population.

15       For example, Dr. Cohen's reports describe how 23 different prisoners from across
16  the state recently died after experiencing serious medical lapses resulting from systemic
17  deficiencies.  [Doc. 965 (Cohen), Ex. 1 ¶¶ 149-249; Ex. 3 ¶¶ 8-173]  Similarly,
18  Dr. Stewart's reports draw a clear connection between ADC's systemic problems (in
19  medication administration, mental health staffing levels, and inadequate training of
20  custody and medical staff) and avoidable suicides and permanent physical injury from
21  self-harm.  [*See, e.g.*, Doc. 967 (Stewart), Ex. 1 at 10-18, 21-37, 49-58; Ex. 2, *generally*;
22  Ex. 4, *generally*]  Plaintiffs' experts also found multiple prisoners—statewide, not just at
23  one or two institutions—who were developing terminal cancer or full-blown AIDS
24  because of systemic problems in distributing medication or delays in seeing doctors.
25  [Doc. 966 (Wilcox), Ex. 1 at 6-8, 24-25, 29-32, 48-50, 55-58, 65, 68, 72-73, 83-84; Ex. 3
26  at 2-5, 11-12, 14-16, 18-20, 22-28; Doc. 965 (Cohen), Ex. 1 ¶¶ 17-27, 70-91, 126-127,
27  187-209 and App. C, *generally*; Ex. 3, *generally*]  Dr. Shulman identified ADC's policies

28

1  and practices related to triage and routine care that combine to delay care and jeopardize

2  patients' teeth and overall health.  [Doc. 969 (Shulman), Ex. 1 at 16-28]

3     These are not mere "colorful anecdotes."  Plaintiffs' experts extensively

4  documented numerous other system-wide shortcomings in medical care that place the

5  lives and health of plaintiff class members at substantial risk of serious harm:

- Excessive delays in access to care and outright denial of care.  [PSSOF ¶¶ 9-10, 14, 16-20, 28-29, 39; see Doc. 965 (Cohen), Ex. 1 ¶¶ 10, 18-26, 31, 32, 58-68, 72-78, 153-158, 187-194, 196-209, and App. C ¶¶ 3, 27, 42, 56, 88-89, 93-94, 96-97, 104-105, 108-110; Ex. 2 at ¶¶ 13-14, 16; Ex. 3 ¶¶ 3, 14, 41, 58-60, 62-64,104-105, 111, 117, 127; Doc. 966 (Wilcox), Ex. 1 at 6-7, 17-18 (citing Dep. of David W. Robertson, D.O. dated Aug. 26, 2013 at 88-90, 93, 95; Dep. of Mark T. Haldane, JD dated Sept. 19, 2013 at 45-46), 24-25, 27-31, 33-35; Ex. 3 at 9-10, 11-13, 15, 22, 28; Doc. 969 (Shulman), Ex. 1 at 23-28; see also infra pages 14-15, 21-24, 25-32]

- Failure to provide timely emergency treatment.  [PSSOF ¶¶ 20-22; see Doc. 965 (Cohen), Ex. 1 ¶¶ 160-173, 176-182, 235, 238, 241-243, and App. C ¶¶ 108-110; Ex. 3 ¶¶ 91-95, 99-101, 128-136; Doc. 966 (Wilcox), Ex. 1 at 36-38; see also infra pages 15, 20-21]

- Failure to provide necessary medication and medical devices.  [PSSOF ¶¶ 23-26; see Doc. 971 (Williams), Ex. 1 at 16-17; Doc. 965 (Cohen), Ex. 1, App. C ¶¶ 58-59; see also infra pages 21-22]

- Insufficient healthcare staff.  [PSSOF ¶¶ 1-5; see Doc. 965 (Cohen), Ex. 1 ¶¶ 29-31, 39-53; Doc. 966 (Wilcox), Ex. 1 at 17-21; Ex. 2 at 5-6; Doc. 969 (Shulman), Ex. 1 at 11-16; Doc. 967 (Stewart), Ex. 1 at 11-18; see also page 6 infra pages 13-14, 23, 25, 27, 32 n. 27]

- Failure to provide chronic care and infectious disease prevention.  [PSSOF ¶¶ 18, 27-30; see Doc. 965 (Cohen), Ex. 1 ¶¶ 32, 72-74, 104-108, 111-112, 126, 131, App. C at ¶¶ 14, 30-43, 78, 109-113; Doc. 966 (Wilcox), Ex. 1 at 9, 16, 31-32, 35, 40, 48, 56-57, 63, 67, 69, 73, 83-84; Ex. 2 at 3; Ex. 3 at 2-5, 14-16, 18-19; see also infra pages 15, 23-24]

- Failure to provide timely access to necessary specialty care.  [See Doc. 965 (Cohen), Ex. 1 ¶¶ 79-91; Ex. 3 ¶¶ 58, 78, 115-117, 121, 123, 127, 151; Doc. 966 (Wilcox), Ex. 1 at 55-62; Ex. 3 at 1, 16; PSSOF ¶ 19]

- Failure to provide appropriate and timely access to basic dental care.  [PSSOF ¶ 39; see Doc. 969 (Shulman), Ex. 1 at 10-28; Ex. 2 at 9-18; Ex. 3 at 2-5]

- Policies and practices that combine to increase the extraction of teeth that could be saved.  [PSSOF ¶¶ 44, 46; see Doc. 969 (Shulman), Ex. 1 at 28-32; Ex. 2 at 20-21]

27   Defendants' Motion makes no case for summary judgment on Plaintiffs' mental

28  health claim (see infra at 42-43), but even if it had, Plaintiffs' expert, Dr. Stewart,

identified multiple systemic deficiencies in the delivery of mental health care that raise disputed questions of fact, including:

- Pervasive and longstanding shortages of qualified mental health staff [PSSOF ¶ 48; *see* Doc. 967 (Stewart), Ex. 1 at 11-18];

- Systemic problems in prescribing and providing psychotropic medications to mentally ill prisoners [*id.* at 21-29], and the inadequate and delayed monitoring of prisoners prescribed psychotropic medications [PSSOF ¶ 49; Doc. 967 (Stewart), Ex. 1 at 29-32 and 46-49];

- A state-wide failure to provide basic mental health therapy and programming [*id.* at 33-40] or adequate inpatient mental healthcare.  [PSSOF ¶ 50; *see* Doc. 967 (Stewart), Ex. 1 at 40-44]

Finally, Plaintiffs' experts have documented in great detail how extreme social isolation and environmental deprivation, lack of exercise, and other conditions in isolated confinement pose a substantial risk of serious harm to prisoners.  *Infra* at 32-42.

Summary judgment cannot be granted where, as here, Plaintiffs' experts offer opinions demonstrating that there are genuine disputes about material facts.  *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1270 (9th Cir. 1994) ("Expert opinion evidence is itself sufficient to create a genuine issue of disputed fact sufficient to defeat a summary judgment motion."); *Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1318 (9th Cir. 1985) ("Expert opinion is admissible and may defeat summary judgment if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, even though the underlying factual details and reasoning upon which the opinion is based are not.").  Indeed, "it is reversible error in a summary judgment proceeding to exclude expert testimony offered by a plaintiff on a factual issue if the exclusion deprives the plaintiff of a permissible inference that could be drawn by the finder of fact on that issue." *Maffei v. N. Ins. Co. of N.Y.*, 12 F.3d 892, 897 (9th Cir. 1993).  Plaintiffs' experts opine that Defendants' policies and practices expose the Plaintiff class to a substantial risk of serious harm from inadequate medical, mental health, and dental care, and from conditions of confinement in isolation.  Summary judgment therefore must be denied.[3]

---

[3] Defendants implicitly attempt to discount these opinions [Motion at 23] by claiming Plaintiffs lack sufficient statistical evidence.  Their own authority rejects this

1

2

### C.   The Court Should Reject Defendants' Attempt to Subdivide Plaintiffs' Claims.

3    Similar to their attempts to subdivide Plaintiffs' claims into thirteen personal injury

4    claims, Defendants likewise attempt to substantively subdivide Plaintiffs' claims to an

5    absurd degree, seeking judgment on "claims" such as "HNR assistance," "medical diets,"

6    and "recreation." [Motion at 30-31, 49]  The Court has already rejected this tactic once

7    [Doc. 175] and should do so again.

8    In their motion to dismiss [Doc. 50], Defendants argued that Plaintiffs' complaint

9    "presented 51 separate claims for relief," and sought dismissal of those "claims" on

10   various grounds.  [Doc. 175 at 4]  The Court rejected this argument, finding instead that

11   the complaint "alleg[es] five claims for relief," which it characterized as "deliberate

12   indifference to inmates' healthcare," "deliberate indifference to inmates' medical care,"

13   "deliberate indifference to inmates' dental care," "deliberate indifference to inmates'

14   mental healthcare," and "deliberate indifference to inmates' conditions of confinement in

15   isolation." [*Id.* at 4, 5]  That ruling is the law of the case, and the Court should not revisit

16   it now.  *See United States v. Lummi Indian Tribe*, 235 F.3d 443, 452 (9th Cir. 2000)

17   (under the "law of the case" doctrine, "a court is generally precluded from reconsidering

18   an issue previously decided by the same court, or a higher court in the identical case").

19

20   premise.  *See Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 942 (E.D. Cal. 2009)
     (noting that statistics regarding death rates are "of limited value"); *id.* at 895 (statistic

21   regarding prisoner deaths, "awful as it is, barely provides a window into the waste of
     human life occurring behind California's prison walls due to the gross failures of the

22   medical delivery system").  Rather than relying on statistics, the *Coleman* court—and the
     Supreme Court decision affirming it—largely rest upon the testimony of experts who

23   observed and discussed systemic problems, including two of the experts in this case.  *See
     id.* at 926 (repeatedly citing the work of Dr. Craig Haney and Dr. Pablo Stewart in support

24   of finding); see also *Plata*, 131 S. Ct. at 1932-33 (citing Dr. Haney's testimony about
     inadequate mental healthcare); *id.* at 1935 (citing favorably Dr. Haney's and Dr. Stewart's

25   testimony based on observations they made during prison tours).  Defendants' remaining
     cases are similarly inapplicable.  *See, e.g.*, *Castaneda v. Partida*, 430 U.S. 482, 494

26   (1977)  (underlying  claim  required  a  statistical  showing  of  "substantial
     underrepresentation," a factor not present here); *Int'l Bhd. of Teamsters v. United States*,

27   431 U.S. 324, 339 (1977) (noting that statistics can serve an "important role" in
     discrimination cases, but cautioning that "their usefulness depends on all surrounding

28   facts and circumstances").  [*See also* Doc. 963 (Plaintiffs' Response in Opposition to
     Defendants' Motion to Exclude Experts)]

1    Similarly, the Ninth Circuit rejected "defendants' argument that each named plaintiffs'

2    description of past injuries must be treated as its own claim for Eighth Amendment relief,

3    potentially subject to unique defenses." *Parsons*, 2014 WL 2523682, at *19 n.31.[4]

4          Moreover, Defendants are parsing Plaintiffs' claims far too finely and taking an

5    extremely myopic view of the case.  Defendants' request that the Court examine medical

6    diets or emergency care in isolation fails to recognize that "[s]ome conditions of

7    confinement may establish an Eighth Amendment violation in combination when each

8    would not do so alone," *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal citation,

9    quotation, and emphasis omitted), and would deprive Plaintiffs of the opportunity to make

10   such a showing.   The sub-parts of the claims on which Defendants seek summary

11   judgment are so closely intertwined with other parts of Plaintiffs' case that granting partial

12   summary judgment on those sub-parts will not advance case management or judicial

13   efficiency.  *See Owner-Operator Indep. Driver Ass'n, Inc. v. Usis Commercial Servs.,*

14   *Inc.*, 2006 WL 1084013, at *1 (D. Colo. Apr. 25, 2006) (denying partial summary

15   judgment despite finding that the evidence on portions of claims was weak because the

16   "claims are similar to each other," "somewhat complex," and involve "intricately

17   intertwined" theories and "concatenated issues of fact and law," so that piecemeal

18   resolution would "not significantly simplify" the case for trial); *U.S. Audio & Copy Corp.*

19   *v. Philips Bus. Sys. Inc.*, 1983 WL 1818, at *5 (N.D. Cal. Apr. 25, 1983) (despite

20   expressing doubt over one theory of antitrust liability, the court declined to grant partial

21   summary judgment, noting the "significant overlap in proof of [the] different theories").

22   For example, in this case, the provision of emergency care depends on staffing levels,

23   quality of care, outside providers, ability of prisoners to request care, and many other

24   variables.  Thus any attempt by Defendants to obtain summary judgment on emergency

26        [4] Defendants describe the issues on which the Court granted class certification as
27   "claims," a characterization that finds no support in the Court's class certification order.
     [*See, e.g.*, Motion at 27 nn.19, 20]  That order once again stated that this action "present[s]
28   five claims for relief" and granted class certification as to seventeen "alleged practices."
     [Doc. 372 at 1, 22]

1    care alone must fail because it is too intertwined with these other, related issues to be

2    segregated.  In addition, even if the Court were to grant summary judgment on emergency

3    care this would not have any practical impact on what the court must consider in deciding

4    the claim as a whole.[5]

5

6        D.    **Defendants Fail to Show an Absence of a Genuine Issue of Material Fact Regarding System-wide Practices.**

7        Defendants contend [Motion at 3-5, 23] that Plaintiffs must show systemic harm

8    and that ADC policies or customs are the moving force behind the constitutional

9    violations.  Defendants' Motion, however, fails to identify any undisputed facts on those

10   issues and offers almost no legal analysis.  The Motion should be denied on that ground

11   alone.[6]

12       Further, Plaintiffs have based their claims on systemic policies and practices.  *See*

13   *Parsons*, 2014 WL 2523682, at *11 (Plaintiffs' claim is that "ADC policies and practices

14   of statewide and systemic application expose all inmates in ADC custody to a substantial

15   risk of serious harm").  Notwithstanding Defendants' attempts to characterize every

16   instance of inadequate care as an outlier, Plaintiffs' experts have opined that it is ADC's

17   systemic policies and practices—not mere lapses in care—that put prisoners at risk of

18   inadequate healthcare and conditions of confinement.[7]

19   _____

20       [5] In any event, "Rule 56 permits a party to seek summary judgment only as to an entire claim; a party may not seek summary judgment on a portion of a claim."  *Home Design Services, Inc. v. Schroeder Constr.*, 2012 WL 527202, at *1 (D. Colo. Feb. 16,

21   2012).  *Accord Evergreen Int'l, S.A. v. Marinex Constr. Co., Inc.*, 477 F. Supp. 2d 697, 699 (D.S.C. 2007) ("A party is simply not entitled to summary judgment if the judgment

22   would not be dispositive of an entire claim.");  *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 539 (S.D.N.Y. 2001) ("[D]espite the language of Rule 56(a) permitting a

23   party to seek summary judgment on 'all or any part' of a claim, entry of a partial judgment as to a single claim is not permitted under the Federal Rules").  *See also Nat'l Ass'n for*

24   *Advancement of Multijurisdiction Practice v. Berch*, 973 F. Supp. 2d 1082, 1091 n.8 (D. Ariz. 2013) ("The 2010 amendments to Rule 56 did not alter the standard for granting

25   summary judgment and, therefore, cases applying the prior version of Rule 56 remain applicable.").

26       [6] Defendants' reliance on *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), misses the mark entirely.  That case applies to suits against municipal entities, not state

27   officials.  *Los Angeles Cnty., Cal. v. Humphries*, 131 S. Ct. 447, 449 (2010).

28       [7] Defendants' inexplicable allegation that they are entitled to summary judgment because deficiencies in ADC healthcare are not "systemic" should similarly be rejected

**E.     Defendants Cannot Prevail on Summary Judgment Because Their Motion Ignores Systemic Issues Predating Late 2013.**

Aside from largely irrelevant detail regarding the Named Plaintiffs, Defendants' Motion mentions little that occurred before late 2013, and nothing regarding healthcare provided by Wexford or ADC prior to Corizon's arrival in March 2013. Defendants cannot succeed by ignoring all but the last few months. To the extent that they rely on developments since the filing of this lawsuit in March 2012, they are in reality making a voluntary cessation argument. But "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks omitted). This Court has similarly made clear "Defendants' changes at the prison since the filing of this lawsuit also do not preclude an injunction." [Doc. 815 at 2-3 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982))] Indeed, even if, contrary to the evidence, Defendants had made recent improvements to ADC policy and practice, the years of inadequacies that led to this lawsuit create issues of fact as to whether prisoners have been and will continue to be placed at risk of harm. [*See* Doc. 590, Ex. 2 (Wexford document detailing numerous deficiencies caused by ADC); Doc. 240 and 292 (sealed), Exs. B-E (Plaintiffs' experts previously opining about dangerous conditions through the end of 2012)]

---

because this is an argument about the scope of the Eighth Amendment violation, not whether a violation exists. Even if the undisputed facts established the lack of systemic violations—and they assuredly do not—Defendants would not be entitled to summary judgment, as the Court would still need to consider whether individual plaintiffs suffered constitutional violations and were entitled to a remedy. *See Gomez v. Vernon*, 255 F.3d 1118, 1130 (9th Cir. 2001) (affirming district court's order granting injunctive relief to six individual prisoners while denying class-wide relief).

1

2

**III.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE MEDICAL CLAIMS.**

3

   **A.   Plaintiffs Have Evidence of Systemic Deficiencies.**

4

5

6

7

8

9

Defendants baldly assert [Motion at 23-24] that Plaintiffs cannot show that ADC suffers from system-wide deficiencies affecting patient care.  They allege staffing levels are high, wait times are low, and grievances are few, while the facilities successfully address tens of thousands of requests and health needs.  The evidence they cite in support of these sunny assertions, however, is disputed, incomplete, misleading, and does not warrant summary judgment.

10

11

   **1.   Plaintiffs Dispute Defendants' Claims of Timely Access to Qualified Healthcare Staff.**

12

   **a.   Staffing Levels**

13

14

15

16

17

18

19

20

21

22

23

Defendants gloss over the parties' dispute regarding timely access to qualified healthcare clinicians by relying on one fact that is not dispositive:   that the total percentage of full-time equivalent (FTE) healthcare staff exceeds the ADC-Corizon contracted amount.[8]  [Motion at 24]  But Defendants then qualify that assertion, admitting that "temporary staffing shortages may exist at certain facilities for certain healthcare positions."  [*Id*.]  Indeed, the staffing reports ***Defendants*** cite show that statewide, month after month, critical higher level positions such as medical director, staff physician, or psychiatrist are consistently vacant.  [Doc. 937, Defs.' Ex. 137, Attachs. IIIII through MMMMM at ADC231854, 231867, 231878, 261802, 261812, 263357, 267354]  The reports also call into question the quality of the staff, showing that to the extent FTE positions are filled, it is often with temporary agency staff, or Corizon employees working

24

---

25

26

27

28

   [8]  Defendants misleadingly cite [Motion at 24] *Casey v. Lewis*, 834 F. Supp. 1477, 1486, 1546 (D. Ariz. 1993), to claim that a 13% vacancy rate in healthcare staff is constitutional.  In that case, the court found that "the problem of inadequate numbers of staff still exists.   Both plaintiffs' and defendants' experts testified at trial that the defendants still needed more medical staff. Defendants admit that they could provide better care with additional medical staff."  *Id.* at 1545.  Accordingly, the court ordered ADC to submit a plan for staffing, among other things, to cure the constitutional violations. *Id*. at 1552.

1   massive amounts of overtime.[9]  [*Id.*]  Dr. Cohen described the multiple problems that can

2   result from overreliance upon temporary staff.  [Doc. 965, Ex. 2 ¶¶ 29-31]  What is more,

3   Defendants wholly ignore that staffing was almost undisputedly low when Wexford was

4   ADC's contractor.  [Docs. 240 and 292 (sealed), Exs. B-E, EE; Doc. No. 590, Ex. 2]

5   These alone create disputed questions of fact.

6        Even if the prisons were staffed as Defendants allege, Plaintiffs' healthcare experts

7   opined that ADC-Corizon's contracted number of staff is inadequate.  [*See* Doc. 965,

8   Ex. 1 ¶¶ 39-53; Doc. 966 Ex. 1 at 17-21; Ex. 2 at 5-6; Doc. 967, Ex. 1 at 11-18]  For

9   example, Dr. Cohen described the contracted staffing level as "alarmingly low," and noted

10  that when Corizon took over as the provider in March 2013, it eliminated 30 medical

11  service positions, including almost one-third of the staff physicians and 15% of the

12  Registered   Nurses.    [Doc. 965  (Cohen),   Ex. 1   ¶¶ 40,   43,   *citing to*

13  AGA_Review_00006402 (Mitchell Decl., Ex. 6)]

14            **b.    Wait Times**

15       Defendants  suggest  [Motion at 25-26]  that  supposedly  shorter  wait  times  for

16  medical care warrant summary judgment.  In support of this theory, they cite wait times at

17  four small facilities in March 2014.    This evidence is inadequate and misleading.

18  Defendants' own documents show that the average wait time statewide to see a doctor

19  doubled ████████████████████████████████ [PSSOF ¶ 16]  But this

20  measure does not tell the whole story, because it only accounts for the time between a

21  nurse referral and a subsequent appointment with a doctor.   ADC fails to measure or

22  report the time it takes ADC to get HNRs from the boxes where prisoners deposit to them

23  _____

24       [9] Defendants also use ***unlicensed*** healthcare staff.  The October 2013 monitoring
     report for Lewis states "Database [sic] of all licensure staff indicates that there are 9
25   nursing staff, 4 [mental health] staff, 1 dental staff and 2 providers with noted licenses that
     are expired."  [Doc. 937, Defs.' Ex. 137, Attach. TT at ADC210412; *see also* Yuma report
26   (Dec. 2013), Doc. 937, Defs.' Ex. 137, Attach. ZZ at ADC268322 ("[T]he site compliance
     monitor spoke directly with the Administrative Assistant, and it was determined that some
27   of the licenses of medical staff were not current and up to date."); Tucson report
     (Sept. 2013), at Doc. 937, Defs.' Ex. 137, Attach. XX at ADC210170-72 (finding no
28   training certificates, licenses, or diplomas on file for four psychiatrists treating mentally ill
     prisoners)]

1    to the health unit, the time nurses take to triage HNRs or refer the patient to a doctor after

2    a nursing appointment, or how long the patient waits overall from submitting the request

3    to being seen by the doctor.  [PSSOF ¶ 8]

15    [Mitchell Decl., Exs. 12-15]

16         And even if selected recent wait times were probative of timely access to care, wait

17    times have been indisputably higher over the last two years, particularly under ADC and

18    Wexford.   Plaintiffs' evidence reveals systematic and extreme delays in prisoners

19    receiving medication; being seen on nurse's line; seeing a dentist, psychiatrist or doctor;

20    having regular chronic care or psych medication check-ups as clinically indicated;

21    receiving outside specialty care; or being sent to the hospital for urgent conditions.  These

22    delays have put all class members at serious risk of significant harm, and Plaintiffs'

23    experts have documented many prisoners who have experienced injury or death as a result

24    of the delays.[10]  [*See supra* pages 5-8]

_____

[10]  In addition, Plaintiffs' experts question the accuracy of the underlying data, and the credibility of Defendants' data is an issue of fact for trial.  [Doc. 966 (Wilcox), Ex. 2 at 6-8]

### 2. The Allegedly Low Number of Grievances Filed at Some Prisons Does Not Negate Systemic Healthcare Deficiencies.

Defendants point [Motion at 25] to the low number of grievances allegedly filed at the Douglas, Perryville, Phoenix, Safford, and Winslow prisons as evidence there are no systemic deficiencies in healthcare. This argument falls flat for at least two reasons.

First, the rate at which prisoners file grievances does not lead to the conclusion that the healthcare system is functioning properly. [*See* Doc. 965 (Cohen), Ex. 2 at ¶¶ 21-22] As Dr. Wilcox pointed out, "prisoners frequently refrain from filing grievances for many reasons, including fear of retaliation, frustration with what they see as a meaningless process, and low literacy levels. . . . Thus, the fact that only a small number of grievances was produced to Dr. Mendel does not automatically connote satisfaction with the responsiveness or efficacy of the system – in fact, it might demonstrate the exact reverse."[11] [Doc. 966 (Wilcox), Ex. 2 at 8-9] Dr. Wilcox opined that ADC's policy giving custody staff access to prisoners' health information to respond to the first level of grievances understandably makes some prisoners reluctant to share their healthcare needs, depressing the number of formal grievances filed.[12] [*Id.* at 8; *see also* Doc. 965 (Cohen), Ex. 2 ¶ 22]

Second, Defendants' reliance on the raw number of grievances presupposes that they are accurately tracking grievance submissions and responses. In fact, the trier of fact could find Defendants' data reports to be profoundly unreliable. For example, some prisons report ***zero*** grievances for the entire month, and it is unclear whether no grievances were filed for the month, or Defendants failed to accurately log and report the

---

[11] ███████████████████████████████████████████████████████████████ [Mitchell Decl., Exs. 18-19]

[12] Defendants' prisoner grievance appeal investigator testified that under ADC's statewide policy on grievances, prisoners must first file an informal complaint before they can file a formal grievance, and pursuant to the policy, correctional officers answer the informal grievances and have access to prisoners' confidential health information to do so. [Mitchell Decl., Ex. 20 (Dep. of Juliet Respicio-Moriarty dated Sept. 23, 2013) at 11:1-16]

1  data.  [Doc. 937, Defs.' Ex. 137, Attachs. JJJJ at ADC231379; KKKK at ADC231402;

2  LLLL at ADC231425; MMMM at ADC261709; NNNN at ADC263306; OOOO at

3  ADC267297]

### 3. Plaintiffs Dispute the Inferences that Defendants Seek to Draw from the Raw Number of Various Healthcare Indicators.

6  Defendants cite [*e.g.*, at 26] several miscellaneous numbers, such as off-site

7  transports in March 2014, HNRs filed in March, medications provided in March, dental

8  appointments conducted in the past year, healthcare "encounters" by Named Plaintiffs,

9  and the mortality rate, claiming that the numbers demonstrate a well-functioning system.[13]

10  These raw numbers alone fall far short of establishing a constitutional healthcare system.

11  *See Greeno v. Daley*, 414 F.3d 645, 653-54 (7th Cir. 2005) (mere receipt of some

12  treatment is not dispositive of Eighth Amendment claim; "a prisoner is not required to

13  show that he was literally ignored") (citation omitted).  The key is not how many

14  appointments ADC prisoners allegedly had, but how many appointments the prisoner

15  class **needed**, the **time** prisoners waited for those appointments, the **quality** of treatment (if

16  any) received at those appointments, the availability and consistency of follow-up care

17  and medication, the ability to effectively request and receive appointments, and the

18  policies and practices in place to ensure that timely and effective appointments are

19  available.

20  For example, Defendants [Motion at 17-20, 25-26] boast of the number of

21  "encounters" the Named Plaintiffs allegedly had with healthcare staff.  But those numbers

22  are suspect because Defendants liberally count as encounters interactions that fail to meet

23  their own definition, which defines "clinical encounters" as "interactions between inmates

24  and health care providers that involve a treatment and/or exchange of confidential

25  information."  [*See* PSSOF at ¶ 3; Doc. 937, Defs.' Ex. 137, Attach. KK]  Defendants

26

27  _____

[13] Plaintiffs' expert Dr. Wilcox disputes Defendants' calculated mortality rate, as
28  his analysis shows a higher death rate for prisoners than the one touted by Defendants.
[Doc. 966 (Wilcox), Ex. 2 at 4-5]

1   count events that involve no interactions as "encounters" and also double-count

2   "encounters." [*See* PRSOF ¶¶ 779-80, 2757-59, 2761, 2765-67, 3222] All of this raises

3   questions of fact. But even if Defendants could establish a fixed ***number*** of encounters,

4   that would not establish quality of care. Quantity does not equal quality. To the contrary,

5   quantity could signal inadequate, delayed, duplicative, confused or ineffectual care.

6   [Mitchell Decl., Ex. 75]

7

8   ### 4.   NCCHC Accreditation Does Not Establish the Lack of Systemic Healthcare Deficiencies.

9   Defendants suggest [Motion at 25] that accreditation of some of their facilities by

10  the National Commission on Correctional Health Care ("NCCHC") means that the trier of

11  fact cannot find Defendants liable. But Defendants cite no authority to support their

12  contention that accreditation alone is *per se* compliance with the Constitution. In fact, this

13  Court expressly rejected that argument in a case about the Maricopa County jail system,

14  explaining that

15  > [t]he Court decides independently whether there are current
16  > and ongoing violations of pretrial detainees' constitutional
    > rights and does not rely on any determinations made by an
    > accrediting organization such as the NCCHC. … The NCCHC
17  > 'essential' standards do not specifically focus on all of
    > [prisoners'] constitutional rights.… Some of the NCCHC
18  > 'essential' standards address administrative functions and are
    > not narrowly tailored to meet constitutional requirements.

19

20  *Graves v. Arpaio*, 2008 WL 4699770, at *25 (D. Ariz. Oct. 22, 2008) (citations omitted).

21  The Court went on to find that healthcare provided by the defendants was unconstitutional

22  despite NCCHC accreditation. *Id.*; *see also Grenning v. Miller-Stout*, 739 F.3d 1235,

23  1241 (9th Cir. 2014) (accreditation by American Correctional Association (ACA) does not

24  entitle defendants to summary judgment on Eighth Amendment claim).[14]

25  _____

26  [14] Other courts have characterized the argument made by Defendants as "absurd," *Gates v. Cook*, 376 F.3d 323, 337 (5th Cir. 2004), or "simply ludicrous." *Boulies v.*

27  *Ricketts*, 518 F. Supp. 687, 689 (D. Colo. 1981). *See also Ruiz v. Johnson*, 37 F. Supp. 2d 855, 902 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001) (NCCHC accreditation "simply

28  cannot be dispositive" of the question whether medical care is constitutional); *Morales*

1       Plaintiffs' experts Dr. Wilcox and Dr. Shulman have similarly opined that NCCHC

2   accreditation does not prove that medical or dental care is being delivered in accordance

3   with prevailing standards.  [Doc. 966 (Wilcox), Ex. 2 at 9; Doc. 969 (Shulman), Ex. 1

4   at 3-4; Ex. 2 at 8]  The Court should reject Defendants' bald reliance on the NCCHC with

5   no explanation of the accreditation process or standards, much less how that process or

6   standards establish constitutional care.  Finally, Plaintiffs have raised triable issues of fact

7   about whether Defendants actually comply with NCCHC standards based on the evidence

8   made available in this case.  [*See* PRSOF ¶ 19]

9

10      **B.**    **Defendants are not Entitled to Summary Judgment on Specific Certified Questions.**

11      Defendants specifically address and request dismissal of several certified questions

12  regarding medical care (emergency care, infectious disease control, and medical devices)

13  as well as several allegations raised in the Complaint as support for Plaintiffs' claims.  As

14  explained above, these arguments lack merit because they seek summary judgment on

15  subparts of Plaintiffs' claims.  Even if summary judgment were theoretically available on

16  these subparts, however, Defendants rely on facts that are in dispute.

17      **1.**    **Policy Contents are Not Dispositive.**

18      In each of the specific issues Defendants raise, their primary argument is that ADC

19  has a policy covering allegedly proper conduct.  Even assuming those written policies

20  describe constitutionally adequate medical standards, Defendants cite nothing showing

21  that  they comply with, or enforce, the relevant policies.  Moreover, as this Court has told

22  Defendants, their argument "miss[es] the mark" because "Defendants' oft-repeated

23  contention that Plaintiffs' allegations are inconsistent with ADC policies misunderstands

24  the substance of Plaintiffs' claims.  Plaintiffs' claim is that *despite* ADC stated policies,

25  the actual provision of health care in its prison complexes suffers from systemic

26  

27  *Feliciano v. Rossello Gonzalez*, 13 F. Supp. 2d 151, 158 n.3 (D.P.R. 1998) (medical care found unconstitutional despite recent NCCHC accreditation); *LaMarca v. Turner*, 662 F.

28  Supp. 647, 655 (S.D. Fla. 1987) (ACA accreditation has "virtually no significance" to lawsuit because accredited prisons have been found unconstitutional.).

deficiencies that rise to the level of deliberate indifference." [Doc. 372 at 12-13]  *See also Orantes-Hernandez v. Holder*, 321 F. App'x 625, 628 (9th Cir. 2009) ("The government's insistence that the existence of its forms and policies alone obviates the need for the injunction misses the point.  *Orantes I, II*, and *III* make it clear that the injunction seeks to remedy the government's actual practices, not just its policies on paper."); *Ware v. Jackson Cnty.*, 150 F.3d 873, 882 (8th Cir. 1998) ("the existence of written policies of a defendant are of no moment in the face of evidence that such policies are neither followed nor enforced") (jail case).  As discussed below, expert opinions, declarations, and documentary evidence create an issue of fact whether Defendants comply with those policies.

### 2.      Factual Disputes Prevent Summary Judgment Regarding Systemic Problems in Emergency Care.

Defendants rely heavily on their emergency care policies and on their efforts to refute the Named Plaintiffs' contentions to urge they are entitled to summary judgment as to timely emergency responses and treatment.  [*See* Motion at 8-16, 28-29]  As noted above, policies are not proof of constitutionally adequate care.  Moreover, Plaintiffs have shown disputed question of fact as to emergency care, as to Named Plaintiffs and the class as a whole.  [*See* PSSOF ¶¶ 20-22]

Plaintiffs' experts detail specific instances in which the lack of timely emergency treatment compromised prisoners' health, and sometimes contributed to their deaths.  [*See* PSSOF ¶ 21]  Defendants' own reports also contain evidence of recent dangerous deficiencies in the provision of emergency care, including ADC nurses who are not properly certified to perform CPR, emergency response bags that contain insufficient or expired supplies, and ███████████████████████████████████████

███████████████████████ [*See*, Doc. 937, Defs.' Ex. 137, Attachs. YY at ADC210641 (Oct. 2013) (three nurses at Winslow did not have current CPR certification); SS at ADC267978 (Dec. 2013) (only 50% of AEDs at Florence are available); XX at ADC268225-26 (Dec. 2013) (████████████████████████████████████); SS at

1   ADC267978 (Dec. 2013) (███████████████████████████████

2   ████████); *id.* at ADC210366 (Oct. 2013) (Florence Globe Unit "man down bag has

3   nothing in there to be checked and has not been opened in 2 years"); XX at ADC210598-

4   600 (Oct. 2013) (█████████████████████████████████████████

5   ████████)]

6
7

### 3. Material Facts in Dispute Preclude Summary Judgment on the Adequacy of Defendants' Administration and Provision of Medication and Medical Devices.

8       Defendants seek summary judgment [Motion at 27] on a "certified claim"

9   regarding medical devices, again relying on the existence of related policies and disputed

10   issues of fact.  As this Court has noted, however, multiple Named Plaintiffs' declarations

11   show examples of Defendants' "[f]ailure to provide necessary medication and medical

12   devices."  [Doc. 372 at 16 (citing Named Plaintiffs' declarations)]  Those same

13   declarations warrant denial of summary judgment here.

14       Further, Plaintiffs' experts detail documented harm and risk of harm to prisoners

15   due to Defendants' practice of inadequately providing medical devices and supplies.

16   [PSSOF ¶ 23; s*ee, e.g.*, Doc. 971 (Williams), Ex. 1 at 16-17 (disabled prisoner who uses

17   wheelchair but was not provided a walker or shower chair to assist him in ambulating in

18   cell and in showering); Doc. 965 (Cohen) Ex. 1, App. C ¶ 58 (prisoner who was so

19   disabled that it took him 40 minutes with a walker to get from his unit to the pill line, was

20   not given a wheelchair until after he collapsed on the yard); *id.* ¶ 59 (disabled prisoner

21   who was not provided a shower chair and had his wheelchair taken away, even though he

22   had fallen eight times in the preceding six months)]

23       ADC's own documents also describe problems with prisoners obtaining necessary

24   medical appliances and devices.  [*See, e.g.* Mitchell Decl., Exs. 28-29 (ADC069792-93

25   (Dec. 2012) (███████████████████████████████████████

26   ████)); Mitchell Decl., Ex. 29 (ADC088757 and 088759 (March 2013) (numerous

27   medical appliances – braces, catheters, glasses – sitting in the Lewis medical hub,

28   undelivered to prisoners)); Doc. 937, Defs.' Ex. 137, Attachs. TT at ADC209295

1   (July 2013) (staffing shortage at Lewis leading to failure to provide prisoners dressing

2   changes to wounds); XX at ADC210553-54 (Oct. 2013) (Tucson: "An Urgent consult was

3   written 9/27 to ENT, due to cochlear implant failure.  It fell out resulting in a hole in the

4   side of the skull behind the [prisoner']s ear.  As of 10/11 no documentation was found in

5   the chart regarding approval, or a scheduled appointment.")]

6       Defendants attempt to refute Plaintiffs' evidence of inadequate care on this issue by

7   disputing Named Plaintiff Jensen's allegations regarding whether he received adequate

8   catheters.  They assert he "was provided a plethora of catheters" and cite to 60 statements

9   of fact listing dates that he was prescribed or given catheters and urine bags.   While

10  medical records show that Mr. Jensen was provided some catheters, disputes exist

11  regarding whether (1) he was provided an adequate supply, given his medical and toileting

12  needs;[15] (2) he developed multiple infections attributable to catheter reuse [PSSOF

13  ¶ 25];[16] and (3) his wife was forced to purchase the catheters that the prison provided to

14  him.[17]  Defendants' bald statement that Mr. Jensen was provided catheters, therefore, fails

15  to demonstrate that the relevant, material facts are undisputed.

16  _____

17  [15]  After the prison provider denied a request for a new supply of external catheters
    in May 2011, the outside urologist told the prison that the external catheters should not be
18  discontinued.  [See Doc. 937, Defs.' Ex. 53 at ADC074940-41 (urologist notes no reason
    to discontinue at this time); Defs.' Ex. 42 at ADC004587-90]

19  [16]  On September 21, 2010, Mrs. Jensen notified ADC that Mr. Jensen was having
    problems getting adequate catheters.  [Mitchell Decl. Ex. 30 (PLTF-PARSONS-003647)]
20  Mr. Jensen submitted a HNR on September 27, 2010 stating he only received two
    catheters, one of which was the wrong size; and the notation on the bottom of the HNR
21  states a new order for catheters was not written until October 20, 2010.  [Doc. 937, Defs.'
    Ex. 42 at ADC004830]  On October 14, 2010, Mr. Jensen filed a HNR describing pain
22  and infection in his testicles.  [Id. at ADC004829]  He was seen on October 20, 2010 by
    the nurse practitioner, who diagnosed a testicular infection and ordered catheters.  [Id. at
23  ADC004622-23]  The next day he was rushed to the emergency room because of pain and
    the infection, and he was diagnosed with epididymitis (infection of the epididymis, the
24  tube that connects the testes to the vas deferens) and epididymo-orchitis (when the
    infection spreads to the testes), and prescribed Cipro, a powerful antibiotic.  [Id. at
25  ADC004671-73]  It was not until November 2, 2010, after he saw a urologist (at which
    time he still had the infections) that new catheters finally were dispensed to him.  [Id. at
26  ADC004666; DSOF ¶ 2343]

27  [17]  Mrs. Jensen purchased catheters for Mr. Jensen on several occasions, and
    emailed with the Tucson facility health administrator (FHA) to arrange the delivery of
28  them to the prison.  On December 6, 2010, Mrs. Jensen emailed the FHA to say she would
    "order another supply of external catheters" for her husband, and she would "handle it the
    same way as last time[,]" and on May 17, 2011, Mrs. Jensen ordered 100 catheters to be

### 4. Material Facts are in Dispute Regarding Defendants' Policies and Practices Leading to the Spread of Infectious Diseases.

Defendants move [Motion at 27] on the issue of their failure to mitigate infectious disease, once again relying almost entirely on their own written policies. But Plaintiffs' experts described both unsanitary conditions and how healthcare staffing deficiencies, delays in care, and systemic policies exacerbate the spread of infectious diseases. For example, Dr. Cohen described unsanitary conditions in clinical space at Eyman and Lewis prisons, such as Lewis' dirty, foul-smelling hospital unit that had broken drain pipes and standing water in a cell housing a medically fragile patient. [Doc. 965 (Cohen), Ex. 1 ¶¶ 104-108, 111-112 and Photographs 4-5; *see also* Mitchell Decl., Ex. 33 (ADC052580-81) (similar description of Lewis's hospital unit by ADC's monitor: "On a side note – the entire unit smells of urine, even with the cell doors closed. A couple of inmates were checked that wear briefs and they were extremely wet and unable to state how long they had been on."); Doc. 968 (Vail), Ex. 1 ¶¶ 40-44 (describing unsanitary isolation cells at Eyman and Florence infested with roaches); Doc. 971 (Williams), Ex. 1 at 19 (describing severely cracked mattress and cracked fabric on chairs in medical area, presenting risk of disease transmission)]

Dr. Cohen found that prisoners with chronic infectious diseases such as hepatitis and HIV are at "particular risk" because of ADC's systemic failure to adequately track and manage their healthcare appointments and medication renewals. He found "multiple cases in which the lapses were so shocking and dangerous that I felt ethically obligated as a medical professional to bring them to the immediate attention of the ADC and Corizon staff."[18] [Doc. 965 (Cohen), Ex. 1 ¶ 10] Dr. Cohen and Dr. Wilcox also described

---

delivered by UPS to the prison. [Mitchell Decl. Ex. 31 (PLTF-PARSONS-003676-3679, 3681, 3796-97)]

[18] Defendants' first contractor, Wexford, reported ████████████████████████ ████████████████████████████████████████████████████████████ [PSSOF ¶ 29; Mitchell Decl., Ex. 40]

1    systemic problems leading to prisoners not receiving appropriate HIV, Hepatitis, MRSA

2    or wound care [PSSOF ¶ 29] and flaws in ADC policy regarding treatment of infectious

3    diseases such as tuberculosis, measles, or chickenpox [PSSOF ¶ 30].  Defendants' internal

4    communications also reveal evidence of a scabies outbreak and high incidence of dialysis

5    catheter infections.  [Mitchell Decl., Ex. 25]

6    
7                    **5.**     **Material Facts are in Dispute Regarding the Adequacy and**
                              **Quality of Medical Diets.**

8           Defendants ask [Motion at 31] the Court for summary judgment on the section of

9    Plaintiffs' Complaint describing the ADC's failure to provide medical diets for prisoners

10   with chronic conditions because there are policies on this issue, and ADC provides

11   "nutritionally adequate meals to all inmates."[19]  Yet again, Defendants' policies alone do

12   not establish that the policies are effective, followed, or enforced, nor does their bald

13   assertion establish that there is no issue of fact.  Moreover, Plaintiffs' experts addressed

14   this issue, and dispute that the "heart healthy diet" used by ADC is an appropriate medical

15   diet for all the prisoners who are on it, particularly for diabetics.  [*See* Doc. 966 (Wilcox),

16   Ex. 1 at 74-75][20]

17   
18                   **6.**     **There Are Material Factual Disputes Regarding the Health**
                              **Needs Request (HNR) Process.**

19          Contrary to Defendants' argument [Motion at 29-30], the HNR system is not

20   automatically constitutional even if "more than 20,000" HNRs were filed in March 2014

21   and Named Plaintiff Smith was able to submit HNRs despite a hand injury.  Similar to

22   Defendants' argument about the number of healthcare appointments, the quantity of

23   HNRs filed is not dispositive.  In fact, the greater the quantity of HNRs, the less likely that

24   ─────────────────

25   [19] *See infra* at 41-42 for disputes regarding the nutritional adequacy of the diets
     provided to prisoners housed in isolation units.

26   [20] Defendants further address this issue by disputing what they falsely characterize
     as the "sole allegation" supporting the argument, that Named Plaintiff Hefner has never

27   been provided a medical diet for his gastroesophageal reflux disease (GERD).  But the
     assertions they make to dispute Mr. Hefner's claims are themselves disputed.  Contrary to
     Defendants' statements, Mr. Hefner repeatedly requested a medical diet and one was

28   recommended.  [*See* Doc. 937, Defs.' Ex. 115 at ADC122335; Mitchell Decl., Exs. 71-74]

1   HNRs are leading to timely and appropriate care, as prisoners seen in a timely manner
2   have less reason to file multiple HNRs than prisoners waiting for needed care.  [Doc. 966
3   (Wilcox), Ex. 2 at 7-8]  The better question is whether the HNR process is constitutionally
4   adequate to allows  prisoners to request and receive needed care in a timely manner.
5   Plaintiffs have submitted evidence that the HNR process remains ineffective, and
6   accordingly summary judgment is inappropriate.  [*See* Doc. 965 (Cohen), Ex. 1 ¶¶ 64-65
7   (describing delays in medical care at Eyman's isolation units because of the policies
8   regarding how HNR forms are processed); Doc. 966 (Wilcox), Ex. 1 at 26-31 (finding the
9   HNR process lacking at the five prisons he toured); *see also supra* pages 14-15 (█████
10  █████████████████████████████████████)]

## IV.   THE COURT SHOULD DENY SUMMARY JUDGMENT ON THE DENTAL CLAIM.

### A.   Defendants Ignore Nearly All the Shortcomings in ADC Policy and Practice that Put Prisoners at Risk of Inadequate or Delayed Dental Care.

15      Similar to the medical claim, Defendants ignore most of the major problems
16  Dr. Shulman identified in ADC's dental care system and focus almost entirely on specific
17  instances of individual prisoners' care.  Dr. Shulman identified several policies and
18  procedures that combine to create systemic failures to provide constitutionally adequate
19  dental care.  They include:

- Persistent understaffing that has lengthened wait times and encouraged practices that  compromise patient care to reduce those wait times [PSSOF ¶ 31; Doc. 969 (Shulman), Ex. 1 at 15];

- Formal policies that limit access to urgent care and treat all non-urgent care the same, increasing triage errors and making it impossible to assess how long patients wait for care [PSSOF ¶ 32; Doc. 969 (Shulman), Ex. 1 at 17-18];

- ADC's admitted practice of using dental assistants to triage HNRs and perform dental examinations, risking inadequate care by unqualified providers as well as inaccurate triage that forces prisoners needing urgent care to potentially wait for months on the routine care list [PSSOF ¶ 34; Doc. 969 (Shulman), Ex. 1 at 18; Ex. 2 at 15-16];

- ADC's policy of kicking patients off of the routine care list if they receive urgent care for other dental issues (the "prisoner's dilemma") [PSSOF ¶ 36; Doc. 969 (Shulman), Ex. 1 at 25];

1

- ADC's inadequate treatment of chewing difficulty [PSSOF ¶ 37; Doc. 969 (Shulman), Ex. 1 at 32];

2

3

- ADC's inadequate monitoring of the provision of dental care [PSSOF ¶ 38; Doc. 969 (Shulman), Ex. 1 at 35-38; Ex. 2 at 8 ("ADC lacks an effective means of verifying that [the dental contractor] is even complying with its policies")].

4

Given that the evidence demonstrates a pervasive and system-wide risk of serious harm,

5

Defendants' decision to turn a blind eye to these prominent criticisms dooms their Motion

6

on the dental claim.[21]

7

Defendants tout their own written policies, entirely ignoring both evidence that the

8

policies are not followed and Dr. Shulman's opinions that the policies fail to ensure that

9

prisoners are effectively triaged, scheduled, and treated in a timely manner.[22]   [PSSOF

10

¶ 39]   For example, Defendants' passing reference to policies regarding how quickly

11

prisoners requesting care must be seen assumes that prisoners are properly triaged into the

12

urgent and routine care lists, but Dr. Shulman found that prisoners needing urgent care

13

often are erroneously placed on the routine care list, where they wait weeks or months for

14

needed care.   [PSSOF ¶ 35, 41; Doc. 969 (Shulman), Ex. 1 at 23, 40-42 (listing 30

15

prisoners who were assigned to the Routine Care List despite stating pain in their HNR

16

and, as a result, were not scheduled for up to 137 days)]   Moreover, Dr. Shulman traces

17

delays in seeing dental providers to various system-wide issues—including permitting

18

dental assistants to make triage decisions, failing to include "pain" in the formal definition

19

of urgent care, and telling patients in pain they can only be seen if they want their teeth

20

21

22

[21] Defendants' only mention of Dr. Shulman in their Motion is two quotations from Dr. Shulman's deposition where he states that prisoners "have access to dental services" and are "getting treatment for dental care," and Defendants urge the Court to evaluate Plaintiffs' claims in light of these "concessions."   [Motion at 34]   Although this should go without saying, Plaintiffs acknowledge that prisoners may **eventually** get dental services and treatment.   Plaintiffs claim, as they always have, that under Defendants' policies and practices, access to dental care is too often **delayed**, and the treatment given is too often **inadequate**, both of which create an unreasonable risk of serious harm.   [*See, e.g.*, Doc. 1 at 41]

23

24

25

26

[22] Defendants make much of their initial intake exams, while ignoring Dr. Shulman's criticism that these exams fail to assess or record the acuity of dental needs, because ADC policy has no priorities or timelines within its catchall "routine care." [PSSOF ¶ 33]

27

28

1    pulled—the frequency and propriety of which are all disputed.  [*See* Doc. 969 (Shulman),

2    Ex. 2 at 15, 16]

3         Moreover, Defendants' attempt to paint their current dental system as well-

4    functioning should be viewed in context.  Even Defendants' own dental staff and expert

5    witnesses admit ███████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ███████████████████████████████████████████████████ dental staff

12   were sometimes found literally taking naps on the job.  [Mitchell Decl., Ex. 35(Hanstad

13   Dep.) at 75:23-76:12]

14   **B.    Defendants Cannot Establish Constitutionally Adequate Dental Care as**
15   **a Matter of Law.**

16        The Court need go no further to deny summary judgment on the dental claim.  But

17   if it does, the arguments Defendants bother to raise lack merit.  Defendants' argument is

18   essentially two-pronged: (1) there cannot possibly be systemic issues when the dental

19   system sees numerous patients and wait times are below contractual requirements; and

20   (2) the Named Plaintiffs lack sufficiently severe dental injuries and suffered delays only

21   of their own making.  Defendants not only misconstrue Plaintiffs' arguments, but their

22   own arguments rely on disputed issues of fact and misstatements of law.

23        **1.    Wait Times are Not Dispositive**

24        Summary judgment is not appropriate simply because Defendants contend [Motion

25   at 43] that "wait times for routine dental care over the past ten months" are below 90 days.

26   Even taking Defendants' assertions on their face, whether a particular delay in *this* prison

27   system puts prisoners at risk is a factual dispute inappropriate for summary judgment.

28   [Doc. 969 (Shulman), Ex. 1 at 23]

1    As a preliminary matter, current wait times alone do not warrant summary

2    judgment on the dental claim because Defendants' own agents admitted that wait times

3    during the pendency of this case have been so long as to put prisoners at risk.  [PSSOF

4    ¶ 40; Mitchell Decl., Ex. 35 (Hanstad Dep.) at 111:3-19 (March 2013 wait times for

5    Perryville and Yuma did not meet standards); Mitchell Decl., Ex. 34 (Smallwood Dep.) at

6    51:25-52:14 (███████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████████████████████

8    ███████████████████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████████████████████████

10   ███████████████████████████████████████████████████████████████████████

11   ██████████████████████████████████    But even current wait times do not support

12   summary judgment because the meaning of Defendants' wait time reports is disputed.

13   Further, to the extent Defendants argue that wait times cause no harm because they

14   are relatively short, this argument presupposes that all prisoner requests are properly

15   triaged and that everyone waiting 45-90 days for care is able to do so.  As described in

16   Dr. Shulman's report, prisoner requests are often improperly triaged, leaving patients in

17   pain on the routine care list.  [Doc. 969 (Shulman), Ex. 1 at 19]  And because ADC places

18   all non-urgent requests onto the same routine care list, Defendants have no way of

19   knowing whether 90 days (or longer) jeopardizes a prisoner's teeth or general health.

20   [PSSOF ¶ 33; Doc. 969 (Shulman), Ex. 1 at 17-18][23]  Accordingly, the "official" wait

21   times, by themselves, do not demonstrate that patients are not at risk of harm.

22   Finally, and more insidiously, Defendants' reported dental wait times do not reflect

23   the true time an prisoner must wait for care.  Defendants imply, and their own expert

24   apparently believes, that a reported 45 day "average wait time" means that prisoners are

25   ────────────────

26   [23] Plaintiffs also believe that Defendants' practice of removing patients from the
     routine care list when they have an urgent care appointment (regardless of whether the
27   two requests are related) deflates official wait times while increasing the individual
     patient's real waiting time to have the routine issue resolved.  [PSSOF ¶ 43; Doc. 969
28   (Shulman), Ex. 1 at 28]  Defendants do not dispute that they do this.  [DSOF ¶¶ 1168,
     1171]

seen, on average, 45 days after submitting their HNR.  [PSSOF ¶ 42; Doc. 937, Defs.'
Ex. 122 ¶ 247 (current average wait times are 45 days or less), ¶ 233 (prisoners "wait at
most 6 weeks under current average wait times to receive the routine treatment")]  That is
how wait times were previously calculated.  [PRSOF ¶ 175]  But ADC's subcontractor
Smallwood Prison Dental Services in fact calculates wait times by taking the mean of the
current wait times of all prisoners who are *currently waiting* for routine care.  [PRSOF
¶ 175][24]  Thus, prisoners wait far longer for routine care than Defendants' reported wait
time would suggest.  ██████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████  [PSSOF ¶ 45]

### 2.      Named Plaintiffs Demonstrate the Risk of Serious Harm to the Plaintiff Class

Defendants cannot defeat the dental claim by contending that particular Named
Plaintiffs did not have "sufficiently severe" dental needs or that certain delays "were of
their own making."  [Motion at 34]  That approach misses the point.  As explained above,
this case is not about instances of past treatment of individual plaintiffs.  Because
Plaintiffs have presented evidence that ADC's dental system places prisoners at
substantial risk of serious harm, summary judgment should be denied without regard to
the specifics of their prior care.

Even if the Court decided to parse through the individual prisoners' lack of dental
care, Plaintiffs allege far more than delay "alone."  As Defendants' own cited authority
confirms, delay that causes "pain" or "result[s] in permanent damage" is unconstitutional,
and "repeated[]" failures to provide dental care go beyond merely "isolated occurrence[s]
of neglect."  *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989); *see also Aytch v.*

---

[24] To provide a simple illustration, assume a wait list of 10 prisoners, where one
prisoner is seen each day and one new prisoner is placed on the list each day, so each
prisoner waits 10 days to be seen.  However, after seeing that day's patient, Smallwood
would report the "average wait time" for that list as five days—the average amount of
time that prisoners on the list have been waiting (add 0 through 9, divide by 10).  Thus,
ADC's statistics misleadingly slash wait times.  [PRSOF ¶ 175]

1   *Sablica*, 498 F. App'x 703 (9th Cir. 2012) (delay with pain may show deliberate

2   indifference); *Lopez v. Peterson*, 329 F. App'x 95 (9th Cir. 2009) (allegations regarding

3   delay in dental care were sufficient to state a colorable claim for deliberate indifference to

4   serious medical needs).[25]  This is especially true when delays occur while prisoners suffer

5   from "swollen or infected gums, a broken denture, or pain in the teeth or mouth."  *Dean v.*

6   *Coughlin*, 623 F. Supp. 392, 395 (S.D.N.Y. 1985) (dental delays warranted injunction,

7   and dismissing government's attempt to blame the inmates for the lack of care).  Plaintiffs

8   have presented evidence that ADC policies frequently force prisoners to wait in pain, or

9   while suffering conditions such as fractured teeth that, left untreated, are likely to cause

10  painful decay and loss of teeth.  [PRSOF ¶ 1186][26]

11       Named Plaintiffs are illustrative examples of these deficiencies, demonstrating the

12  risks suffered by the plaintiff class, as well as some of the consequences, including long

13  routine care delays compromising general health and the teeth at issue (Polson, Wells,

14  Swartz, Chisholm); unacceptably long waits after complaining of serious pain (Swartz,

15  Chisholm); inappropriate dental assistant triage delaying treatment (Polson); inappropriate

16  treatment of chewing difficulty (Polson); and the prisoner's dilemma (Wells, Chisholm).

17  [PRSOF ¶ 205]  As demonstrated by the arguments in Defendants' motion, they dispute

18  _____

19       [25]  *See also Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) (two-month delay in
    treating pain created issue of material fact about prison doctor's deliberate indifference);
20  *Hartsfield v. Colburn*, 371 F.3d 454 (8th Cir. 2004) (reversing summary judgment for jail
    physician and nurse where inmate alleged that defendants delayed dental treatment for six
    weeks, causing increased pain and complications from loose and infected teeth).
21       [26]  Defendants rely heavily on *Hallett v. Morgan*, 296 F.3d 732 (9th Cir. 2002),
    which is distinguishable for numerous reasons.  First, *Hallett* was an appeal following an
22  evidentiary hearing, where the question was whether the trial court's factual findings were
    "clear error," and thus says little about the evidence needed to defeat summary judgment.
23  *Id.* at 744.  Second, the evidence in *Hallett* showed routine wait times of only three to six
    weeks, with emergencies treated within one day, and no evidence of unnecessary
24  extractions.  By contrast, Plaintiffs have evidence that prisoners have to wait *in pain* for
    lengthy periods and are exposed to a risk of avoidable extractions.  Third, *Hallett* included
25  no careful discussion of policies and procedures, much less practices relating to
    inadequate triage, training, and monitoring, which are all present here.  [Doc. 969
26  (Shulman), Ex. 2 at 15-16]  Finally, even if *Hallett* did suggest that a risk of harm was
    insufficient, that suggestion has been rejected here, as the Ninth Circuit recently held in
27  this case that "prison officials are constitutionally prohibited from being deliberately
    indifferent to policies and practices that expose inmates to a substantial risk of serious
28  harm."  *See Parsons*, 2014 WL 2523682, at \*12.

1   both the underlying facts and the connection between plaintiffs' issues and ADC's

2   policies and practices.  [*Compare* Motion at 33-45 *with* Doc. 969 (Shulman), Ex. 2 at 22-

3   24 (tying Named Plaintiffs' issues to the systemic issues he identified)]

4           **C.    Defendants Misunderstand the Issue of Avoidable Extractions.**

5           Dr. Shulman opined that ADC's practices and policies lead to unnecessary and

6   avoidable extractions.  [Doc. 969 (Shulman), Ex. 2 at 20 ("ADC's practices put inmates at

7   risk of having teeth extracted when those teeth could be saved if better practices were in

8   place.")]  Defendants' motion ignores Dr. Shulman's opinion and instead tries to knock

9   down a straw man, arguing that Named Plaintiffs simply have a "difference of opinion"

10  over dental care.  [Motion at 44]  But the question is not whether any particular tooth is or

11  is not appropriate for extraction, but rather whether ADC's practices as a whole lead to

12  extractions that would have been avoided with adequate dental care.  Dr. Shulman

13  identified five intersecting and unreasonable policies and practices that lead to avoidable

14  extractions, including:   (1) an inadequate consent policy; (2) a triage system that

15  inappropriately assigns patients who submit HNRs stating pain to the Routine Care List;

16  (3) allowing minimally-trained individuals to respond to HNRs; (4) forcing patients to

17  choose between waiting in pain for a filling or receiving an extraction immediately (the

18  prisoners' dilemma); and (5) the lack of any requirement or practice that dentists

19  differentiate between conditions assigned to routine care, allowing everything not

20  qualifying as "urgent" to languish on the routine care list.  [PSSOF ¶ 46]

21          Defendants' Motion does not even touch on these criticisms (although their

22  statement of facts purports to dispute the existence or impropriety of these policies).

23  Focusing on whether extractions were necessary at the time of the eventual extraction

24  misses the point if other deficient practices make it more likely that a tooth will

25  deteriorate.  [PSSOF ¶ 44; Doc. 969 (Shulman), Ex. 2 at 21 (because "[d]ental disease

26  progresses over time, and a tooth that is restorable will likely deteriorate over time,"

27  failure to timely identify and properly treat dental issues ultimately results in extractions

28  that would have been unnecessary)]  ADC cannot simply hide its other failures by saying

1  that extractions (ultimately) become an "easier and less efficacious treatment." *See*

2  *Chance v. Armstrong*, 143 F.3d 698 (2d Cir. 1998).

3

4  ## V.  SUMMARY JUDGMENT ON THE ISOLATION CLAIM IS INAPPROPRIATE.

5      Defendants attempt to subdivide Plaintiffs' isolation claim into the discrete

6  practices certified by the Court, and seek summary judgment individually on almost all of

7  these practices.[27]  As already explained (*supra* at 9-11), this is impermissible.  Moreover,

8  it betrays a fundamental misunderstanding of Plaintiffs' claim and Eighth Amendment

9  law.

10      "Some conditions of confinement may establish an Eighth Amendment violation in

11 combination when each would not do so alone, but only when they have a mutually

12 enforcing effect that produces the deprivation of a single, identifiable human need."

13 *Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (internal quotation marks and emphasis

14 omitted).   Social interaction and environmental stimulation are basic human needs.

15 *Wilkerson v. Stalder*, 639 F. Supp. 2d 654, 677-78 (M.D. La. 2007); *Scarver v. Litscher*,

16 371 F. Supp. 2d 986, 1001 (W.D. Wis. 2005); *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914-

17 15 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on*

18 *remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001) (finding prison officials "deliberately

19 indifferent to a systemic pattern of extreme social isolation and reduced environmental

20 stimulation" in segregation units).

21      Plaintiffs' claim is that even if conditions in ADC's isolation units do not

22 individually rise to the level of an Eighth Amendment violation (which Plaintiffs do not

23 concede), they combine to deprive prisoners of their basic human need for social

24 interaction and environmental stimulation.   *See Scarver*, 371 F. Supp. 2d at 1001

25 (conditions including 24-hour illumination, near-constant cell confinement, and infrequent

26

27      [27] Significantly, Defendants do not seek summary judgment on the first isolation
   practice certified by the Court:  "Inadequate psychiatric monitoring because of chronic
28 understaffing."  [Doc. 372 at 23]

human interaction "could have a mutually enforcing effect causing the deprivation of a prisoner's basic human need for social interaction and sensory stimulation").[28]

Because there are abundant disputes of material facts regarding the risk posed by confinement in ADC's isolation units, summary judgment on the isolation claim must be denied.

### A.   The Parties Dispute Whether Plaintiffs are Subject to Extreme Social Isolation and Minimal Environmental Stimulation.

Defendants allege that prisoners in isolation "are not subjected to 'isolation'" and "have ample opportunity for daily human interaction."  [DSOF ¶¶ 1470, 1660]  They allege that these prisoners "leave their cells … for numerous reasons" including programming and job assignments.  [DSOF ¶ 1561]

Plaintiffs dispute these allegations.  [PRSOF ¶ ¶ 1257, 1470, 1561-62, 1660] ADC's isolation units subject prisoners to extreme isolation with minimal human contact and extremely limited out-of-cell time.  [PRSOF ¶ 1257]  "The ADC isolation units I toured have some of the most extreme levels of social isolation I have seen in my years as a corrections professional."  [PRSOF ¶ 1257; Doc. 968 (Vail), Ex. 2 at 12]  Defendants admit that some prisoners in isolation are not allowed to have jobs.  [PRSOF ¶ 1562] "Programming" reaches only a small minority of prisoners in isolation, with "group programming" sometimes conducted with prisoners locked in their individual cells. [PRSOF 1561; *see also* PSSOF 52-53]

---

[28] Thus, for example, the severe restrictions on property in ADC's isolation units are properly analyzed not as a freestanding Eighth Amendment claim, but rather as a factor that combines with other conditions such as social isolation and severely limited exercise to deprive prisoners of a minimal level of social interaction and environmental stimulation.  Defendants allege (at 54) that "Inmates in [isolation] are permitted to have appliances such as televisions, cassette players, and headphones."  [DSOF ¶ 1861] Plaintiffs dispute these allegations. Defendants' own Statement of Facts makes clear that not all prisoners in isolation are permitted these items.  [PRSOF ¶ 1861]  Moreover, prisoners are not provided a television or radio by ADC; some prisoners are allowed to purchase them, but many lack the resources to do so.  [*Id.*, Doc. 968 (Vail), Ex. 2 ¶ 34]  In any event, as stated by Plaintiffs' experts, a radio or television is not an adequate substitute for human contact.  [*Id.*]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The damaging effects of confinement in ADC's isolation units have been repeatedly acknowledged by the Ninth Circuit and this Court. *See, e.g., Miller ex rel. Jones v. Stewart,* 231 F.3d 1248, 1252 (9th Cir. 2000) ("it is well accepted that conditions such as those present in [Browning Unit][29] … can cause psychological decompensation to the point that individuals may become incompetent"); *Comer v. Stewart*, 215 F.3d 910, 916 (9th Cir. 2000) ("we and other courts have recognized that prison conditions remarkably similar to [Browning Unit] can adversely affect a person's mental health"); *Koch v. Lewis*, 216 F. Supp. 2d 994, 1002 n.12 (D. Ariz. 2001) ("[d]etention in [Browning Unit] for five and one-half years borders on cruel and unusual punishment."). And similar conditions in other prison systems have been held to violate the Eighth Amendment. *See, e.g., Ruiz*, 37 F. Supp. 2d at 914-15 ("extreme social isolation and reduced environmental stimulation" in segregation units violates the Eighth Amendment).[30]

More specifically, there is a clear judicial consensus that the isolated confinement of prisoners with serious mental illness violates the Eighth Amendment. In *Casey v. Lewis*, 834 F. Supp. 1477 (D. Ariz. 1993), this Court found an Eighth Amendment violation based on ADC's practice of housing mentally ill prisoners in lockdown facilities including the Special Management Unit ("SMU"). Acknowledging that "lockdown damages, rather than helps, mentally ill inmates," the Court found that "despite their knowledge of the harm to seriously mentally ill inmates, ADOC routinely assigns or transfers seriously mentally ill inmates to SMU" and other segregation facilities, a practice the court characterized as "appalling" and "inexcusable." *Id.* at 1548, 1550; *accord Coleman v. Wilson*, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995) (segregated housing of mentally ill prisoners violates the Eighth Amendment); *Madrid v. Gomez*, 889

---

[29] Browning Unit was formerly known as SMU II.
[30] As Defendants concede (Motion at 45), the duration of isolated confinement is a factor in the Eighth Amendment analysis. *See Hutto v. Finney*, 437 U.S. 678, 686-87 (1978) ("the length of confinement cannot be ignored"). Remarkably, Defendants do not track the mean or median length of prisoners' stay in isolation, but admit that prisoners may be housed in these conditions "for upwards of 20 years." [PSSOF ¶ 55; Mitchell Decl., Ex. 38 (Defendant Charles Ryan's Responses to Plaintiff Robert Gamez's First Set of Interrogatories, dated Sept. 16, 2013), Answer to Interrogatory No. 2]

1  F. Supp. 1146, 1265-66 (N.D. Cal. 1995) (same).  Hundreds of seriously mentally ill

2  prisoners are confined in ADC's isolation units.  [PSSOF ¶ 54][31]

3          Plaintiffs have submitted ample expert evidence of the substantial risk of serious

4  harm to prisoners subjected to the starkly deprived environment of ADC's isolation units,

5  including but not limited to those suffering from mental illness.  [PRSOF ¶ 1257; PSSOF

6  ¶¶ 52-53; Doc. 967 (Stewart), Ex. 1 at 58 ("Isolated confinement – that is, confinement in

7  a cell for 22 or more hours each day with limited social interaction and environmental

8  stimulation – can be profoundly damaging to mental health even for prisoners with no

9  known mental illness."); Doc. 968 (Vail), Ex. 1 ¶ 27 ("There is broad consensus in the

10  corrections and mental health community that placement of mentally ill inmates in

11  isolation creates a significant risk of harm."); Doc. 970 (Haney), Ex. 1 ¶ 48 ("prisoners in

12  these isolation units, are at serious risk of significant harm due to their conditions of

13  confinement.  This is especially true for those prisoners who suffer from mental illness.")

14  (footnote omitted);  Doc. 971 (Williams), Ex. 1 at 19 (concluding that "isolated

15  confinement as practiced in ADC poses a substantial risk of serious harm, including

16  increased morbidity and mortality, to prisoners of older age, with chronic medical

17  conditions, and/or with physical disabilities.")]  Summary judgment must be denied.[32]

18  ───────────────────────

19      [31] *See also Ind. Prot. & Advocacy Servs. Comm'n v. Comm'r, Ind. Dep't of Corrs.*,
    2012 WL 6738517, at *17 (S.D. Ind. Dec. 31, 2012) ("the severe conditions in the

20  segregation units cause a predictable deterioration of the mental health of seriously
    mentally ill prisoners"); *Jones'El v. Berge*, 164 F. Supp. 2d 1096, 1125-26 (W.D. Wis.

21  2001) (granting preliminary injunction ordering removal of seriously mentally ill
    prisoners from "supermax" prison); *Ruiz*, 37 F. Supp. 2d at 915 (conditions in segregation

22  units "clearly violate constitutional standards when imposed on the subgroup of the
    plaintiffs' class made up of mentally-ill prisoners"); *Langley v. Coughlin*, 715 F. Supp.

23  522, 540 (S.D.N.Y. 1989) (failure to exclude from segregated housing "those individuals
    who, by virtue of their mental condition, are likely to be severely and adversely affected
    by placement there" states an Eighth Amendment claim).

24      The cases Defendants cite (Motion at 50 & n.30) were brought by individual
    prisoners who were (with one exception) acting *pro se*, with neither counsel nor expert

25  evidence.  And *none* of Defendants' cases involved a prisoner with serious mental illness.
        [32] *See also* Doc. 968 (Vail), Ex. 1 ¶ 18 ("The conditions of confinement for

26  inmates in isolation in ADC facilities results in extreme social isolation and other
    hardships that are . . . . harmful for all inmates, but especially for the mentally ill.");

27  Doc. 967 (Stewart), Ex. 3 at 8 ("Placing seriously mentally ill prisoners in ADC's
    isolation units is a recipe for serious harm or death, including aggravation of mental

28  illness, self-mutilation, and suicide.").

1        **B.    Defendants Cannot Establish that Plaintiffs Receive Adequate Exercise.**

2        Defendants allege that prisoners in isolation are "afforded six hours of outdoor

3   exercise weekly, generally in two hour blocks, three times per week." [Motion at 49;

4   DSOF ¶ 1572] Defendants assert that the enclosures in which recreation occurs provide

5   the prisoners with access to fresh air and sunlight, allow for communication between

6   prisoners in adjoining enclosures, and allow prisoners to exercise. [Motion at 49; DSOF

7   ¶ 1589] Defendants further allege that if recreation is cancelled, "recreation time will be

8   made up for those inmates who missed recreation if time permits." [DSOF ¶ 1576]

9        Plaintiffs dispute these allegations. [PRSOF ¶¶ 1572, 1576, 1589, 1595]

10  Recreation is regularly cancelled and not rescheduled. As a result, prisoners frequently do

11  not receive six hours of recreation as required by ADC policy. [Doc. 968 (Vail), Ex. 1

12  ¶ 49 (recreation logs demonstrate that it is common for prisoners not to be offered six

13  hours of recreation each week, as "at least one of the recreation periods within a week's

14  time is frequently cancelled"); Ex. 2 ¶ 36 (cancelled exercise periods are usually not made

15  up); Doc. 970 (Haney), Ex. 1 at 38, 88 (discussing exercise cancellations)][33] In addition,

16  the exercise areas in the isolation units are "in almost all cases, too small to permit

17  adequate exercise to preserve physical health and prevent deconditioning;" some are "not

18  much larger than the prisoners' cells." [Doc. 971 (Williams), Ex. 1 at 13]

19              "[E]xercise is one of the most basic human necessities
                protected by the Eighth Amendment." Like food, it is "a basic
20              human need protected by the Eighth Amendment." *Keenan v.
                Hall,* 83 F.3d 1083, 1091 (9th Cir. 1996); *see also Wilson,* 501
21              U.S. at 304. Our case law uniformly stresses the vital
                importance of exercise for prisoners. *See LeMaire v. Maass,*
22              12 F.3d 1444, 1457 (9th Cir. 1993) ("Exercise has been
                determined to be one of the basic human necessities protected
23              by the Eighth Amendment."); *Spain v. Procunier,* 600 F.2d
                189, 199 (9th Cir. 1979) ("There is substantial agreement
24              among the cases in this area that some form of regular outdoor

25  _____

26       [33] *See also* Doc. 240 and 292 (sealed), Ex. F (Declaration of Dustin Brislan) ¶ 11
    ("We are supposed to get 6 hours a week of exercise outside our cells, but exercise is
27  often cancelled so we get less than that"); Ex. R (Declaration of Joshua Polson) ¶ 18
    ("When I was in SMU I was unable to go to rec except for maybe once a week . . . .
28  Sometimes our chance to go to the rec pen was cut because there were not enough staff to
    supervise us.").

exercise is extremely important to the psychological and physical well-being of the inmates.").

*Thomas v. Ponder*, 611 F.3d 1144, 1151-52 (9th Cir. 2010) (quotation marks omitted). "Determining what constitutes adequate exercise requires consideration of the physical characteristics of the cell and jail and the average length of stay of the inmates." *Pierce v. Cnty. of Orange,* 526 F.3d 1190, 1211-12 (9th Cir. 2008) (internal citation and quotation omitted); *see also Toussaint v. McCarthy*, 597 F. Supp. 1388, 1402, 1412 (N.D. Cal. 1984) (requiring a minimum of eight hours of outdoor exercise per week for prisoners in segregation), *aff'd in part and rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986).[34]

Plaintiffs have presented expert evidence that the denial of adequate physical exercise exposes prisoners in ADC's isolation units to a substantial risk of serious harm. [PRSOF ¶ 1589; Doc. 968 (Vail), Ex. 1 ¶¶ 48-49 (absence of group exercise for all but a few prisoners exacerbates isolation beyond what is necessary for safety and security); Doc. 971 (Williams), Ex. 1 at 13 ("[s]uch limited access to physical exercise poses a substantial risk of serious harm to older prisoners as well as those with chronic medical conditions and/or physical disabilities")]  Summary judgment must be denied.

### C.    The Parties Dispute Facts Regarding 24-Hour Illumination.

Defendants allege that "[t]he wattage of lighting in all maximum custody cells allows inmates to sleep while enabling correctional officers to perform appropriate safety and security checks."  [DSOF ¶ 1711]  Plaintiffs dispute these allegations.  The twenty four hour illumination of isolation cells deprives prisoners of sleep, which can lead to a variety of health problems including   decreased cognitive functioning, falls, and premature death.  [PRSOF at ¶ 1711][35]

---

[34] Remarkably, Defendants fail to cite a single case in support of their argument that they are entitled to summary judgment on this issue.

[35] Although Defendants state in their brief that nocturnal lighting consists of "low-level, 7-watt bulbs" [Motion at 53], their Statement of Facts makes clear that significantly higher wattage is used in some isolation cells.  [DSOF ¶¶ 1710, 1733-34 (SMU 1), 1781-99 (Kasson), 1800-19 (Lumley)]

1      Sleep "undoubtedly counts as one of life's basic needs." *Harper v. Showers*, 174

2 F.3d 716, 720 (5th Cir. 1999). Moreover, "[t]here is no legitimate penological

3 justification for requiring [inmates] to suffer physical and psychological harm by living in

4 constant illumination. This practice is unconstitutional." *Keenan v. Hall*, 83 F.3d 1083,

5 1090 (9th Cir. 1996) (internal citation and quotation omitted).

6      *Grenning,* 739 F.3d 1235, involved a prisoner who was exposed to 24-hour

7 illumination for 13 days while housed in the Special Management Unit (SMU). *Id.* at

8 1237. Prison officials defended the practice based on the same rationales Defendants

9 employ here. *Id.* The Ninth Circuit held that Grenning's verified complaint stating that

10 the light interfered with his sleep and caused him other ill effects was sufficient to defeat

11 summary judgment. *Id.* at 1241*; accord Keenan*, 83 F.3d at 1091 (verified complaint

12 alleging sleep problems as a result of 24-hour lighting was sufficient to withstand

13 summary judgment, notwithstanding contrary affidavit by prison staff).[36]

14      Dr. Williams states that 24-hour illumination "would be likely to exacerbate sleep

15 difficulties, with the negative health consequences described above." [PRSOF ¶ 1711;

16 Doc. 971 (Williams), Ex. 1 at 14 (*see id.* at 11-12, citing cognitive and functional decline,

17 increased risk of falls, early mortality, and other effects of insomnia/poor sleep quality)]

18 Plaintiffs have also stated in their declarations that 24-hour illumination interferes with

19 their sleep and causes other ill effects.[37] As in *Grenning* and *Keenan*, this is sufficient to

20 defeat summary judgment.

21

22

23

---

24     [36] The *Grenning* court further held that a prison employee's declaration reciting light meter readings from SMU cells was not dispositive because—like the evidence

25 submitted by Defendants in this case—it did not allow the court to "determine … how bright the lighting in Grenning's cell actually was." 739 F.3d at 1240.

26     [37] *See* Doc. 240 and 292 (sealed), Ex. F (Brislan Decl.) ¶ 11 (reporting disorientation, insomnia, and difficulty distinguishing between day and night in isolation units illuminated 24 hours a day); Ex. J (Declaration of Sonia Rodriguez) ¶ 12 (24 hour

27 illumination causes insomnia and "makes my mental health worse"); Ex. S (Declaration of Christina Verduzco) ¶ 8 (reporting aggravation of mental health condition due to 24 hour

28 illumination).

1
2

**D.     The Parties Dispute Facts Regarding the Use of Chemical Agents on Prisoners With Mental Illness.**

3     Defendants allege that ADC staff only use force "after every other reasonable

4 attempt to neutralize the real or potential danger has been considered and determined

5 ineffectual." [DSOF ¶ 614]  Moreover, "use of force is reserved for situations where no

6 other reasonable alternative is available to prevent escape, imminent death, serious bodily

7 harm, or the taking of hostages." [DSOF ¶ 615]  Chemical agents "may be used to avoid

8 the use of additional force, to prevent injury to employees and inmates, or to stop

9 imminent danger to staff or inmates." [DSOF ¶ 629]

10     Plaintiffs dispute these allegations.  Prisoners in isolation, including those with

11 serious mental illness, are regularly sprayed with chemical agents for trivial reasons when

12 their behavior poses no immediate risk of harm to themselves or others, such as refusing

13 to uncover their hands or head or are refusing to come to the front of the cell for pill call.

14 [PRSOF at ¶¶  614-15, 629; Doc. 967 (Stewart), Ex. 1 at 62 (Plaintiff Christina Verduzco

15 sprayed twice for "'refusing directives to come to the cell front for pill call'"; another

16 mentally ill prisoner sprayed for "'fail[ing] to follow verbal directives'" while hanging

17 from a sheet)][38]

18     Use of chemical agents like pepper spray on mentally ill prisoners can violate the

19 Eighth Amendment. *Thomas v. Bryant*, 614 F.3d 1288, 1310-11 (11th Cir. 2010) (use of

20 chemical agents on prisoner with mental illness "constituted an extreme deprivation

21 sufficient to satisfy the objective prong" of the Eighth Amendment); *Coleman v. Brown*,

22 2014 WL 1400964, at *7 (E.D. Cal. Apr. 10, 2014) (describing use of force, including

23 pepper spray, on mentally ill prisoners as "horrific" and finding continuing Eighth

24

25

26     [38]  Defendants assert that Plaintiffs seek to enjoin ADC from ever using chemical agents on prisoners with mental illness under any circumstances.  [Motion at 47]

27 Defendants' citations do not support this statement, and it is false.  In any event, the issue currently before the Court is not the contours of an appropriate remedial order, but

28 whether Defendants have carried their burden of showing there is no dispute of material fact.  They have not.

Amendment violation).[39]  Plaintiffs have presented expert evidence that Defendants' use of pepper spray on mentally ill prisoners poses a substantial risk of serious harm and, in many cases, is completely unjustified by legitimate security needs.  [PRSOF ¶ 614; Doc. 967 (Stewart), Ex. 1 at 60 (the use of chemical spray on persons who are engaging in self-harm is contraindicated); Ex. 3 at 5-6 (use of chemical agents on a mentally ill prisoner worsened her overall mental condition); Doc. 970 (Haney), Ex. 1 ¶ 55 (ADC's policy of subjecting mentally ill prisoners to chemical spray adds to "the grave risks of harm for prisoners with mental illness in the isolation units"); Doc. 968 (Vail), Ex. 1 ¶ 19 ("ADC routinely and inappropriately uses chemical agents, such as Oleoresin Capsicum (OC) products, against mentally ill inmates without considering the impact on the inmate and the effective management of the inmate population."); Ex. 2 ¶ 8 (use of chemical agents against mentally ill prisoners "places them at risk of serious harm, and can undermine security on the unit."); Ex. 3 ¶¶ 3-9 (discussing videos documenting inappropriate use of chemical agents on mentally ill prisoners held in isolation)][40]  Accordingly, summary judgment must be denied.[41]

---

[39]  This Court phrased the issue as "[u]se of chemical agents against inmates on psychotropic medications" [Doc. 372 at 23], but the categories are largely coextensive; a person prescribed psychotropic medication by definition has a mental illness.

[40]  *See also* Doc. 240 and 292 (sealed), Ex. M (Thomas Decl.) ¶ 10; Ex. S (Verduzco Decl.) ¶ 9; Ex. J (Rodriguez Decl.) ¶ 11.

[41]  Defendants wrongly contend that this issue is governed by the "malicious and sadistic" standard of *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  [Motion at 47]  That standard applies only when suit is brought for damages arising out of a specific, identified "measure taken" by an officer that a plaintiff alleges to be excessive force.  *Whitley,* 475 U.S. at 320, 321.  *Whitley* does not apply where, as here, prisoners sue top prison officials over a use of force **policy** or **practice**; under these circumstances, the relevant inquiry is those officials' deliberate indifference.  *Jordan v. Gardner*, 986 F.2d 1521, 1528 (9th Cir. 1993) (deliberate indifference standard, not *Whitley*, applies to challenge to policy regarding cross-gender body searches:  "When, as here, officials formulate a policy in circumstances where there are no particular constraints on the officials' decisionmaking process . . . and the implementation of the policy will inflict pain upon the inmates on a routine basis, we need not look for a showing of action taken 'maliciously and sadistically' before Eighth Amendment protections are implicated.") (citation omitted); *accord Coleman*, 912 F. Supp. at 1322 ("deliberate indifference standard [not *Whitley*] applies to plaintiffs' claim concerning use of tasers and 37mm guns against inmates with serious mental disorders"); *Madrid*, 889 F. Supp. at 1250 (deliberate indifference standard applies to challenge to use of force policy).  Even if the "malicious and sadistic" standard applied, there is ample evidence from which the Court could find that standard satisfied.

1

2

### E.     The Parties Dispute Whether Plaintiffs are Provided Inadequate Nutrition.

3      Defendants allege that ADC "'ensures that inmates are provided nutritious meals'."

4  [DSOF ¶ 1820]  In particular, Defendants allege that prisoners in isolation are provided

5  "approximately 2600 calories per average per day for males, and 2200 calories per

6  average per day for females."  [DSOF ¶ 1831]  Allegedly, "[t]his diet is adequate in all

7  nutrients according to the Recommended Daily Allowance standards of the National

8  Academies of Science–National Research Council."  [DSOF ¶ 1832]

9      Plaintiffs dispute these allegations.  [PRSOF ¶¶ 1820, 1831-32, 1837]  Prisoners in

10  isolation are fed only twice a day on a haphazard schedule.  They routinely receive meals

11  that consist of nothing more than bread, peanut butter and/or small amount of sandwich

12  meat, a ¾ ounce package of chips or popcorn, mayonnaise, and instant coffee.  [PRSOF ¶

13  1820]   Those who are indigent and cannot afford to buy food from the commissary go

14  hungry.  [*Id.*]  Prisoners report having lost between ten and forty pounds.  [*Id.*]

15      "Adequate food is a basic human need protected by the Eighth Amendment.  While

16  prison food need not be tasty or aesthetically pleasing, it must be adequate to maintain

17  health."  *Keenan*, 83 F.3d at 1091 (citation and quotation omitted); *see also Graves*, 2008

18  WL 4699770, at *46 (finding violation of pretrial detainees' constitutional right to

19  adequate nutrition).

20

21

22  [*See* Doc. 967 (Stewart), Ex. 3 at 6 (after viewing video of pepper spraying of plaintiff

23  Christina Verduzco, "I do not possess an adequate vocabulary to properly express how egregious it was to pepper spray this extremely ill individual")]

***None*** of the cases cited by Defendants [Motion at 46-48] involve the use of

24  chemical agents on persons with mental illness or those taking psychotropic medications; some do not involve chemical agents at all.   Other cases are selectively quoted or

25  misleadingly characterized by Defendants and actually support Plaintiffs' position. *See,*

26  *e.g.*, *Drummond v. City of Anaheim*, 343 F.3d 1052, 1059 (9th Cir. 2003) (use of force against mentally ill arrestee was "clearly constitutionally excessive"); *Clement v. Gomez*,

27  298 F.3d 898, 904 (9th Cir. 2002) (failure to "develop an adequate policy to address obvious risks" of pepper spray states Eighth Amendment claim); *Spain*, 600 F.2d at 194-

28  95 (affirming finding that "excessive and inappropriate" use of chemical agents violated Eighth Amendment).

1    In *Keenan*, the pro se plaintiff's verified complaint was sufficient to defeat

2    summary judgment on his claim of inadequate nutrition, notwithstanding that defendants

3    produced contrary evidence.  *Keenan*, 83 F.3d at 1091.  Similarly in this case, several

4    plaintiffs have stated under oath that ADC's food is nutritionally inadequate and that they

5    have lost weight as a result.  [Docs. 240 and 292 (sealed), Ex. F (Brislan Decl.) ¶ 14

6    (reporting 20-30 pound weight loss due to only being fed twice a day and bag lunches

7    sometimes missing items); Ex. M (Thomas Decl.) ¶ 11 (reporting 30 pound weight loss

8    due to only receiving two meals per day at SMU); *see also* PRSOF ¶ 1820; Doc. 968

9    (Vail), Ex. 1 ¶ 56 (reciting prisoner accounts of weight loss, which the expert verified)]  In

10   addition, Plaintiffs' experts state that delivering meals only twice a day further

11   exacerbates the isolation and lack of human contact suffered by prisoners in ADC's

12   isolation units.  [Doc. 970 (Haney), Ex. 1 ¶ 74 ("The stark conditions in isolation are

13   further exacerbated by ADC's policies that allow for . . . infrequent, reduced calorie

14   meals. . . ."); Doc. 968 (Vail), Ex. 2 ¶ 32 ("serving food only twice a day" is a "way[] in

15   which inmates in ADC isolation units are deprived of even the most basic human

16   contacts")]

17   **VI.   DEFENDANTS DO NOT SERIOUSLY CHALLENGE THE MENTAL**
18   **HEALTH CLAIM.**

19   While Defendants purport to seek summary judgment "on all of the claims asserted

20   in the Complaint" [Motion at 1], they default on making any showing on Plaintiffs'

21   mental health claim, providing no argument or evidence regarding that claim.

22   Accordingly, Defendants cannot obtain summary judgment on that claim.  *See Guatay*

23   *Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 986-87 (9th Cir. 2011)

24   (rejecting assertion unsupported by "argument or legal authority"); *United States v. Graf*,

25   610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by

26   citations to the record or to case authority are generally deemed waived."); *Doe v. City of*

27

28

1   *San Jose*, 2009 WL 1010846, at *1 n.1 (N.D. Cal. Apr. 14, 2009) (denying summary

2   judgment on claims for which defendants offered "no analysis").[42]

3   **VII.   DEFENDANTS' REMAINING ARGUMENTS DO NOT WARRANT**

4   **SUMMARY JUDGMENT.**

    **A.   Defendants Cannot Use Their Summary Judgment Motion To Reargue**

5   **Class Certification.**

6       Defendants repeatedly ask the Court to decertify the class or dismiss certain Named

7   Plaintiffs.  But the time to oppose class certification has passed, especially in light of the

8   Ninth Circuit's recent affirmance of class certification.  Even if a summary judgment

9   motion were the proper vehicle for revisiting certification, "a court may not disturb its

10  prior [class certification] findings absent some significant intervening event or a showing

11  of compelling reasons to reexamine the question."  *Gulino v. Bd. of Educ. of City Sch.*

12  *Dist. of City of N.Y.*, 907 F. Supp. 2d 492, 504 (S.D.N.Y. 2012) (internal quotation marks

13  and citation omitted).  No such event or showing is present here.[43]

14      Mr. Brislan's release on parole does not rise to this level.  A California district

15  court recently (and after this Court's order dismissing Victor Parsons) rejected the

16  argument that a named plaintiff who has been released from custody must be dismissed.

17  *Lyon v. U.S. Immigration & Customs Enforcement*, ___ F.R.D. ___, 2014 WL 1493846, at

18  *6-9 (N.D. Cal. Apr. 16, 2014).  In that class action by persons in custody pending

19  deportation proceedings, the court held that a deported plaintiff could represent the class

20

21      [42] To the extent Defendants seek summary judgment regarding the conditions of
    watch cells, Plaintiffs dispute Defendants' factual allegations [Motion at 32-33], and thus
22  summary judgment is inappropriate.  [*See* PRSOF ¶ 519 (lack of mattress or clothing in
    watch cells); ¶ 614 (use of pepper spray on prisoners in watch cells)]
23      [43] Even if these decertification arguments were timely, they are incorrect.
    Defendants are simply wrong [at 1] to suggest that "ignorant" or mentally ill prisoners
24  cannot be adequate class representatives.  *See, e.g., Surowitz v. Hilton Hotels Corp.*, 383
    U.S. 363, 372 (1966) (rejecting claim that a plaintiff who "is uneducated generally and
25  illiterate in economic matters, could never under any circumstances be a plaintiff in a
    derivative suit brought in the federal courts."); *Plata*, 131 S. Ct. at 1922 (noting that case
26  involved a "class of prisoners with serious mental disorders"); *Clark v. California*, 739 F.
    Supp. 2d 1168, 1172 (N.D. Cal. 2010) (granting relief for class of "prisoners with
27  developmental disabilities incarcerated within California's prison system").  Defendants'
    argument would prevent mentally ill persons from ever vindicating their Constitutional
28  rights through a class action.

1   "in spite of his removal and waiver of the right to appeal" because he had standing when

2   the action was filed and "it is not certain that any given individual, named as a plaintiff,

3   would stay in detention long enough for a district judge to certify the class." *Id.* at *9.

4   That same logic applies to prisoners like Brislan, who does not lose his ability to represent

5   an inherently transitory prison class in a multi-year lawsuit.  Defendants rely on *Alvarez v.*

6   *Hill*, 667 F.3d 1061, 1064 (9th Cir. 2012), but that case is inapplicable because it involves

7   a single plaintiff seeking injunctive relief only for himself.  Even if the Court were to find

8   that Mr. Brislan's release mooted his claim, the proper course would be to add a substitute

9   class representative.  *See Kuahulu v. Employers Ins. of Wausau*, 557 F.2d 1334, 1336-37

10  (9th Cir. 1977).[44]

11      Even if Defendants' assertions were true as to Brislan, Defendants do not challenge

12  the class representative status of most of the Named Plaintiffs.  Because at least some

13  plaintiffs undisputedly remain in the case, summary judgment on the class claims should

14  be denied, and the Court should not revisit class certification.  *See Rodriguez v. West*

15  *Publ'g Corp.*, 563 F.3d 948, 961 (9th Cir. 2009) (adequacy requirement "is satisfied as

16  long as one of the class representatives is an adequate class representative").

17      **B.    Plaintiffs Have Standing.**

18      In an attempt to have the Court revisit its order denying Defendants' motion to

19  dismiss [Doc. 175], Defendants argue again that certain (unidentified) Named Plaintiffs

20  did not suffer physical injury and thus lack standing.  The Court, however, already held

21  that the Plaintiffs have standing, and that ruling is law of the case.  *See Lummi Indian*

22  *Tribe*, 235 F.3d at 452.

23      Even if the issue were again open to debate, Defendants do not specify which

24  Plaintiffs they believe lack standing, nor do they identify any "undisputed facts" (or any

---

[44] This Court is not bound by its earlier decision dismissing Plaintiff Parsons, which was issued before *Lyon* and before class certification.  In fact, Mr. Parsons is now back in ADC custody and again subject to the statewide policies and practices challenged here, illustrating the fluid nature of the prison class and the need to deny Defendants' Motion.  Accordingly, if the Court dismisses Brislan as a plaintiff due to his release, it should reinstate Parsons as a plaintiff due to his re-incarceration.

1   evidence at all) suggesting that any particular Plaintiff lacks standing.   The Motion

2   therefore should be denied.  *See Doe*, 2009 WL 1010846, at *1 n.1 (denying summary

3   judgment on claims for which defendants offered "no analysis").

4        In any event, Plaintiffs have standing because they are all exposed to a "substantial

5   risk of serious harm," as shown elsewhere in this Response.  *Farmer*, 511 U.S. at 828;

6   *Parsons*, 2014 WL 2523682, at *13 (finding that exposure to risk of harm constitutes an

7   Eighth Amendment injury, and collecting cases illustrating how "many inmates can

8   simultaneously be endangered by a single policy").   Thus, Plaintiffs need not have

9   suffered physical injury or illness to have standing for an Eighth Amendment claim—the

10   exposure to risk is the "injury" for standing purposes.  *Helling v. McKinney*, 509 U.S. 25,

11   33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an

12   unsafe, life-threatening condition in their prison on the ground that nothing yet had

13   happened to them."). [45]

14        The Supreme Court recently affirmed that an "allegation of future injury" is

15   sufficient to confer standing if there is a "'substantial risk' that the harm will occur".

16   *Susan B. Anthony List v. Driehaus*, 573 U.S. ___ (2014) (slip op. at 8) (citations

17   omitted).[46]   Because that is exactly the harm alleged by Plaintiffs, standing is clearly

18   established.

19   _____

20   [45] Moreover, in a class action, the standing inquiry is broadened beyond the named plaintiffs:

21       Class membership may also be relevant to show an immediate
22       likelihood of future injury.   Where a named plaintiff is a
         member of a plaintiff class, and "members of the class have
23       repeatedly suffered personal injuries in the past that can fairly
         be traced to the [defendants'] standard ... practices," the
24       defendant's treatment of the class as a whole must be
         considered to determine whether the individual plaintiff "ha[s]
25       been and will continue to be aggrieved by the defendants'
         [illegal] pattern of conduct."

26   *Armstrong v. Davis*, 275 F.3d 849, 864 (9th Cir. 2001).
27   [46] *See also Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir.
     2002) (recognizing that "a plaintiff who is threatened with harm in the future because of
28   existing or imminently threatened non-compliance with [federal law] suffers 'imminent
     injury'"); *Central Delta Water Agency v. United States*, 306 F.3d 938, 947 (9th Cir. 2002)

1      Finally, Defendants' standing arguments must fail as to the mental health and

2  isolation claims in this case, because those claims are also asserted by plaintiff Arizona

3  Center for Disability Law ("ACDL"), whose claims survive independent of the class

4  claims.   [Doc. 1 ¶¶ 74, 90 p. 70-71]   ACDL is a non-profit law firm designated as

5  Arizona's Protection and Advocacy agency, charged with advocating for persons with

6  mental illness pursuant to the Protection and Advocacy for Individuals with Mental Illness

7  Act of 1986 ("PAIMI"), 42 U.S.C. §§ 10801-10851.   Specifically, under PAIMI,

8  Protection and Advocacy organizations such as ACDL are authorized to "pursue … legal,

9  and other appropriate remedies to ensure the protection of individuals with mental illness

10  who are receiving care or treatment in the State." *Id.* § 10805(a)(1)(B).   The interests that

11  ACDL seeks to vindicate by bringing this lawsuit are central to its purpose.   [Mitchell

12  Decl., Ex. 58 (Declaration of Peri Jude Radecic) ¶ 4]

13      The Ninth Circuit has recognized that a protection and advocacy agency has

14  associational standing to litigate the rights of its constituents with mental illness as long as

15  "at least one of [ACDL's] constituents would have had standing to present, in his or her

16  own right, the claim (or the type of claim) pleaded by the association." *Oregon Advocacy*

17  *Center v. Mink*, 322 F.3d 1101, 1112 (9th Cir. 2003) (internal quotation marks omitted).

18  Hundreds, if not thousands, of ADC prisoners with mental illness (including, but not

19  limited to, the Named Plaintiffs) have standing to assert the challenges to ADC's mental

20  health and isolation practices set forth in the Complaint.   [*See* PSSOF 54]   Accordingly,

21  ACDL has standing to assert these claims on behalf of its constituents, and could pursue

22  these claims even if *none* of the Named Plaintiffs had standing to do so.

23

24

25  ("[T]he possibility of future injury may be sufficient to confer standing on plaintiffs; threatened injury constitutes 'injury in fact'") (citations omitted); Wright, Miller, & Kane,

26  7AA Fed. Prac. & Proc. Civ. § 1785.1 (3d ed.) ("[T]o avoid a dismissal based on a lack of standing, the court must be able to find that both the class and the representatives have

27  suffered some injury requiring court intervention.   But this requisite of an injury is not applied too restrictively.   If plaintiff can show that there is a possibility that defendant's

28  conduct may have a future effect, even if injury has not yet occurred, the court may hold that standing has been satisfied.").

## C.     Plaintiffs' Claims Are Not Barred by the Statute of Limitations.

Defendants contend that any "claim" accruing before March 22, 2010 is barred as untimely, evidently premised on their persistent mistaken belief that Plaintiffs' "claims" are distinct instances of past harm.  But where Plaintiffs allege that Defendants currently place prisoners at a substantial risk of serious harm, specific examples of previous injuries are evidence directly relevant to proving Defendants' policies and practices exposing Plaintiffs to that risk notwithstanding any statute of limitations.

Moreover, allegations of conduct occurring prior to the limitations period are actionable if they are part of a "continuing violation" of the plaintiffs' rights.  *Sosa v. Hiraoka*, 920 F.2d 1451, 1455 (9th Cir. 1990).  When a civil rights plaintiff "seeks injunctive relief against an ongoing violation, he or she is not barred from seeking relief . . . by the statute of limitations." *Pickern*, 293 F.3d at 1135.  Defendants' practices of exposing prisoners to risk of medical, mental health, and dental harm, as well as harm from isolated confinement, are longstanding and ongoing, and thus neither any of Plaintiffs' "claims" nor any evidence regarding particular allegations is barred.  *See, e.g., Evans v. Cnty. of San Diego*, 2008 WL 842459 (S.D. Cal. Mar. 27, 2008) (applying continuing violation analysis to claim of deliberately indifferent medical care).

## Conclusion

For all of these reasons, Defendants' Motion for Summary Judgment should be denied in its entirety.

Dated: July 11, 2014                                    **JONES DAY**

By:   s/ Caroline N. Mitchell
     Caroline N. Mitchell (Cal. 143124)*
     Amir Q. Amiri (Cal. 271224)*
     555 California Street, 26th Floor
     San Francisco, California 94104
     Telephone:  (415) 875-5712
     Email:    cnmitchell@jonesday.com
                    aamiri@jonesday.com

     *Admitted *pro hac vice*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Daniel C. Barr (Bar No. 010149)
Amelia M. Gerlicher (Bar No. 023966)
Kirstin T. Eidenbach (Bar No. 027341)
John H. Gray (Bar No. 028107)
Matthew B. du Mée (Bar No. 028468)
Jerica L. Peters (Bar No. 027356)
**PERKINS COIE LLP**
2901 N. Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  (602) 351-8000
Email:    dbarr@perkinscoie.com
          agerlicher@perkinscoie.com
          keidenbach@perkinscoie.com
          jhgray@perkinscoie.com
          mdumee@perkinscoie.com
          jpeters@perkinscoie.com

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
          jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
Warren E. George (Cal. 53588)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com
          wgeorge@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
              afettig@npp-aclu.org
              aquereshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com
              tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
              jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone: (949) 851-3939
Email:    kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Dustin Brislan; Sonia*
*Rodriguez; Christina Verduzco; Jackie*
*Thomas; Jeremy Smith; Robert Gamez;*
*Maryanne Chisholm; Desiree Licci; Joseph*
*Hefner; Joshua Polson; and Charlotte*
*Wells, on behalf of themselves and all others*
*similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**


By:   s/ Sarah Kader
     Sarah Kader (Bar No. 027147)
     Asim Varma (Bar No. 027927)
     5025 East Washington Street, Suite 202
     Phoenix, Arizona 85034
     Telephone: (602) 274-6287
     Email:    skader@azdisabilitylaw.org
             avarma@azdisabilitylaw.org

     J.J. Rico (Bar No. 021292)
     Jessica Jansepar Ross (Bar No. 030553)
     **ARIZONA CENTER FOR
     DISABILITY LAW**
     100 N. Stone Avenue, Suite 305
     Tucson, Arizona 85701
     Telephone: (520) 327-9547
     Email:    jrico@azdisabilitylaw.org
             jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

1

## CERTIFICATE OF SERVICE

2          I hereby certify that on July 11, 2014, I electronically transmitted the above

3  document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4  Notice of Electronic Filing to the following CM/ECF registrants:

5

6                              Michael E. Gottfried
                               Katherine E. Watanabe
7                                  Lucy M. Rand
                         Assistant Arizona Attorneys General
8                            Michael.Gottfried@azag.gov
                             Katherine.Watanabe@azag.gov
9                               Lucy.Rand@azag.gov

10                              Daniel P. Struck
                              Kathleen L. Wieneke
11                                Rachel Love
                             Timothy J. Bojanowski
12                              Nicholas D. Acedo
                               Ashlee B. Fletcher
13                               Anne M. Orcutt
                                  Jacob B. Lee
14                     STRUCK WIENEKE, & LOVE, P.L.C.
                              dstruck@swlfirm.com
15                            kwieneke@swlfirm.com
                                rlove@swlfirm.com
16                          tbojanowski@swlfirm.com
                               nacedo@swlfirm.com
17                           afletcher@swlfirm.com
                              aorcutt@swlfirm.com
18                              jlee@swlfirm.com

19                          *Attorneys for Defendants*

20                                          s/ D. Freouf

21

22

23

24

25

26

27

28