**Index of Exhibits to the Declaration of Caroline N. Mitchel in Support
of Plaintiffs' Response to Defendants' Motion for Summary Judgment**

Exhibit 1:      **[FILED UNDER SEAL]** Email exchange dated November 21, 2013 between Arthur Gross and Matthew Musson [AGA_Review_00107026-028]

Exhibit 2:      **[FILED UNDER SEAL]** Excerpts from the deposition transcript of Vickie Bybee, taken on October 10, 2013

Exhibit 3:      Excerpts from the deposition transcript of David Robertson, D.O. taken on August 26, 2013

Exhibit 4:      **[FILED UNDER SEAL]** Email exchange dated February 20, 2013 between Trudy Dumkrieger, Richard Pratt, and Kathleen Campbell  [AGA_Review_00001721]

Exhibit 5:      **[FILED UNDER SEAL]** Email exchange dated March 6, 2014 between Matthew Harvey and Marlena Bedoya  [AGA_Review_00109142-145]

Exhibit 6:      **[FILED UNDER SEAL]** Cover email and attached chart entitled "Arizona Staffing Comparison"  [AGA_Review_00006400-002]

Exhibit 7:      **[FILED UNDER SEAL]** Performance report entitled "April 2013 Eyman Complex" [ADC088814-845]

Exhibit 8:      **[FILED UNDER SEAL]** Performance report entitled "July 2013 Safford Complex" [ADC137341-359]

Exhibit 9:      **[FILED UNDER SEAL]** Performance report entitled "April 2013 Winslow Complex"  [ADC089060-083

Exhibit 10:     **[FILED UNDER SEAL]** Performance report entitled "July 2013 Florence Complex" [ADC137229-267]

Exhibit 11:     **[FILED UNDER SEAL]** Performance report entitled "July 2013 Tucson Complex" [ADC137360-401

Exhibit 12:     **[FILED UNDER SEAL]** Email dated December 10, 2013 from Matthew Musson to Von Marschik  [AGA_Review_00113522-523]

Exhibit 13:     **[FILED UNDER SEAL]** Photograph  [AGA_Review_00113532]

Exhibit 14:     **[FILED UNDER SEAL]** Photograph  [AGA_Review_00113539]

Exhibit 15:     **[FILED UNDER SEAL]** Email dated March 4, 2014 from Vanessa Headstream to Christy Somner and Brenda Mastopietro  [AGA_Review_00113556]

Exhibit 16:     Excerpts from the deposition transcript of Lawrence H. Mendel, D.O., FSCP, CCHP taken on April 9, 2014

Exhibit 17:    **[FILED UNDER SEAL]** Email exchanged dated November 15, 2012 Jen Mielke-Fontaine, Kathleen Campbell, and Jim Taylor  [AGA_Review_00074092]

Exhibit 18     **[FILED UNDER SEAL]** Email dated October 8, 2013 and with the subject line "Jacobson ADC100455 Grievance Appeal C11-212-013"  [AGA_Review_105026-027]

Exhibit 19:    **[FILED UNDER SEAL]** Email dated October 8, 2013 and with the subject line "Jacobson ADC100455 Grievance Appeal C11-212-013"  [AGA_Review_00105189-190]

Exhibit 20:    Excerpts from the deposition transcript of Juliet Respicio-Moriarty, taken on September 23, 2013

Exhibit 21:    **[FILED UNDER SEAL]** Email exchange dated August 7, 2012 between Kathleen Campbell and Richard Pratt  [AGA_Review_00038283-285]

Exhibit 22:    **[FILED UNDER SEAL]** Email exchange dated August 11, 2011 between Joe Profiri and Richard Pratt  [AGA_Review_00039879-881]

Exhibit 23:    **[FILED UNDER SEAL]** Email exchange dated August 12, 2012 Jim Taylor and Terry Allred  [AGA_Review_00039933-935]

Exhibit 24:    **[FILED UNDER SEAL]** Selected emails addressed to or sent by Defendant Charles Ryan  [AGA_Review_00005108, 00005109, 00006399, 00008922-23, 00010542, 00013133-61, 00013196-201, 00014059, 00014574-76, 00037454-66, 00039854-855, 00053833-41, 00092774, 00092935, 00010669-70, 00010793-96]

Exhibit 25:    **[FILED UNDER SEAL]** Selected emails addressed to or sent by Defendant Richard Pratt  [AGA_Review_00000576, 00001704-705, 00001708-709, 00001721, 00003971, 00004833-34, 00004885, 00005250-85, 00006400-12, 00006420-21, 00007088-93, 00007168-73, 00007214-15, 00009729, 00009872, 00012782-783, 00013058-59, 00013126-127, 00013429-430, 00014035-437, 00014452-58, 00016470, 00016658-64, 00017095-096, 00017516-517, 00020527, 00021106, 00022990-991, 00035490-92, 00035542-43, 00077255-56, 00090043-45, 00095602-04, 00104124-25, 00104413-14, 00105026-27, 00106250-251, 00106776-78, 00107602-06, 00107684-687, 00113242-243, 00113556-64, 00115613-614]

Exhibit 26:    **[FILED UNDER SEAL]** Report entitled "Arizona Inmate Wait Times Report" dated October 2013  [ADC231437]

Exhibit 27:    **[FILED UNDER SEAL]** Report entitled "Health Needs Requests – Medical" dated March 2014  [ADC267274-279]

Exhibit 28:    **[FILED UNDER SEAL]** Performance report entitled "December 2012 Tucson Whetstone"  [ADC069789-807]

Exhibit 29:     **[FILED UNDER SEAL]** Arizona Department of Corrections' Health Services Contract Monitoring Bureau Memorandum dated March 2013  [ADC088756-762]

Exhibit 30:     **[FILED UNDER SEAL]** Email dated September 21, 2010 sent by Rhonda Jensen to James Clenney  [PLTF-PARSONS-003647]

Exhibit 31:     **[FILED UNDER SEAL]** Email exchange dated December 6-7, 2012 between Rhonda Jensen and Helena Valenzuela  [PLTF-PARSONS-003676-686]

Exhibit 32:     **[FILED UNDER SEAL]** Email exchange dated May 18, 2011 between Rhonda Jensen and Helena Valenzuela  [PLTF-PARSONS-003796-797

Exhibit 33:     **[FILED UNDER SEAL]** Performance report entitled "November 2012 Lewis Complex"   [ADC052565-717]

Exhibit 34:     **[FILED UNDER SEAL]** Excerpts from the deposition transcript of William Smallwood, D.D.S, taken on April 7, 2014

Exhibit 35:     Excerpts from the deposition transcript of Brian T. Hanstad, D.M.D, taken on April 2, 2014

Exhibit 36:     **[FILED UNDER SEAL]** Excerpts from the deposition transcript of John W. Dovgan, D.D.S, taken on April 4, 2014

Exhibit 37:     **[FILED UNDER SEAL]** Email exchange dated June 13, 2013 between William Smallwood, Vickie Bybee, Cyndy Hale, and Brian Hanstad  [SPDS000890-91]

Exhibit 38:     Excerpt of Defendant Charles Ryan's Responses to Plaintiff Robert Gamez's First Set of Interrogatories dated September 16, 2013

Exhibit 39:     **[FILED UNDER SEAL]** Excerpts from the Confidential Expert Report of Joseph V. Penn, MD, CCHP, FAPA dated December 18, 2013

Exhibit 40:     **[FILED UNDER SEAL]** Summary Action Plan dated September 25, 2012  [WEXFORD000241-244]

Exhibit 41:     **[FILED UNDER SEAL]** Email exchange dated March 20, 2014 and attachment between Catherine Midgette and Arthur Gross  [AGA_Review_00110169-71]

Exhibit 42:     **[FILED UNDER SEAL]** Email exchange dated December 5, 2013 and attachment between Marlena Bedoya and Richard Pratt  [AGA_Review_00111062-065]

Exhibit 43:     Excerpts from the 2014 Standards for Health Services in Prisons, published by the National Commission on Correctional Health care (NCCHC).

Exhibit 44:     **[FILED UNDER SEAL]** Eyman Complex Quarterly Report for the period April 2013 through June 2013  [ADC137754-766]

Exhibit 45:     **[FILED UNDER SEAL]** Lewis Complex Quarterly Report for the period April 2013 through June 2013  [ADC137780-792]

Exhibit 46:     **[FILED UNDER SEAL]** Email exchange dated January 15, 2013 between Karen Chu and Joe Profiri    [AFA_Review_00094913-916]

Exhibit 47:     **[FILED UNDER SEAL]** Excerpts from the deposition transcript of Karen L. Chu taken on May 15, 2013

Exhibit 48:     Excerpts from the deposition transcript of Robert Corosco Gamez taken on August 6, 2013

Exhibit 49:     Excerpts from the deposition transcript of Plaintiff Dustin Brislan taken on August 9, 2013

Exhibit 50:     Excerpts from the deposition transcript of Jackie Robert Thomas taken on August 8, 2013

Exhibit 51:     Excerpts from the deposition transcript of Christina Angelica Verduzco taken on August 15, 2013

Exhibit 52:     Excerpts from the deposition transcript of Jeremy Scott Smith taken on August 20, 2013

Exhibit 53:     Excerpts from the deposition transcript of Stephen Oliver Swartz taken on August 22, 2013

Exhibit 54:     Excerpts from the deposition transcript of Joshua W. Polson taken on August 23, 2013

Exhibit 55:     **[FILED UNDER SEAL]** Excerpts from the deposition transcript of Arthur Gross taken on September 9, 2013

Exhibit 56:     Excerpts from the deposition transcript of Mark T. Haldane, J.D. taken on September 19, 2013

Exhibit 57:     Excerpts from the deposition transcript of Carson McWilliams taken on July 1, 2014

Exhibit 58:     Declaration of Peri Jude Radecic dated June 16, 2014

Exhibit 59:     **[FILED UNDER SEAL]** Letter dated March 5, 2014 to Woodrow A. Myers, Jr., M.D. [ADC320249-53]

Exhibit 60:     **[FILED UNDER SEAL]** Letter dated April 23, 2014 to Mark Jansen, CCHP [ADC320254-56]

Exhibit 61:     **[FILED UNDER SEAL]** Letter dated June 4, 2014 to Mark Jansen, CCHP [ADC320258-60]

Exhibit 62:      **[FILED UNDER SEAL]** Email exchange dated August 11, 2010 between Rhonda Jensen and various recipients  [PLTF-PARSONS-003644-645]

Exhibit 63:      **[FILED UNDER SEAL]** Email exchange dated November 2, 2010 between Rhonda Jensen and Charles Flanagan  [PLTF-PARSONS-003659-662]

Exhibit 64:      **[FILED UNDER SEAL]** Mountain Vista Medical Center Operative Report, relating to Shawn Jensen, dated August 5, 2010  [PLTF-PARSONS-000257-258]

Exhibit 65:      **[FILED UNDER SEAL]** Mountain Vista Medical Center Preoperative History and Physical Report, relating to Shawn Jensen, dated August 5, 2010  [PLTF-PARSONS-000259-261]

Exhibit 66:      **[FILED UNDER SEAL]** Email exchange dated October 22, 2013 between Kathleen Campbell and David Robertson  [AGA_Review_6428-29

Exhibit 67:      **[FILED UNDER SEAL]** Email exchange dated October 17, 2013 between Kathleen Campbell and David Robertson  [AGA_Review_110215-16]

Exhibit 68:      **[FILED UNDER SEAL]** Email exchange dated October 18, 2013 between Kathleen Campbell, Trudy Dumkrieger and David Robertson  [AGA_Review_104004-005]

Exhibit 69:      **[FILED UNDER SEAL]** Email exchange dated October 30, 2013 between Kathleen Campbell, Arthur Gross and Richard Pratt  [AGA_Review_103421]

Exhibit 70:      **[FILED UNDER SEAL]** Email exchange dated January 30, 2014 between David Roberson and Joe Profiri [AGA_Review_114688-90]

Exhibit 71:      **[FILED UNDER SEAL]** Inmate Grievance Response dated July 25, 2012 addressed to Joseph Hefner [ADC263629]

Exhibit 72:      **[FILED UNDER SEAL]** Inmate Letter Response dated April 6, 2012 addressed to Joseph Hefner [ADC263642-43]

Exhibit 73:      **[FILED UNDER SEAL]** Inmate Grievance dated April 13, 2012 filed by Joseph Hefner [ADC263645-46]

Exhibit 74:      **[FILED UNDER SEAL]** Inmate Grievance dated April 13, 2012 filed by Joseph Hefner  [ADC263673]

Exhibit 75:      **[FILED UNDER SEAL]** Email dated November 15, 2013 from Winfred Williams to David Robertson, Patrick Arnold, Richard Rowe, James Taylor, Brenda Mastopietro and Vickie Bybee  [AGA_Review_00113990]

# EXHIBIT 1

# FILED UNDER SEAL

# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; ) | No. CV12-00601- |
| Stephen Swartz; Dustin Brislan; ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco;) | |
| Jackie Thomas; Jeremy Smith; Robert ) | |
| Gamez; Maryanne Chisholm; Desiree  ) | |
| Licci; Joseph Hefner; Joshua Polson;) | |
| and Charlotte Wells, on behalf of  ) | |
| themselves and all others similarly ) | |
| situated; and Arizona Center for   ) | |
| Disability Law,                    ) | |
|                                    ) | |
|         Plaintiffs,                ) | |
|     vs.                            ) | |
|                                    ) | |
| Charles Ryan, Director, Arizona    ) | |
| Department of Corrections; and     ) | |
| Richard Pratt, Interim Division    ) | |
| Director, Division of Health       ) | |
| Services, Arizona Department of    ) | |
| Corrections, in their official     ) | |
| capacities,                        ) | |
|                                    ) | |
|         Defendants.                ) | |
|                                    ) | |

DAVID W. ROBERTSON, DO

August 26, 2013
9:18 a.m.
Phoenix, Arizona

Prepared by:
Carolyn T. Sullivan, RPR
Arizona Certified
Reporter No. 50528

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

Page 101

1   locums.

2                    What do you understand that to mean?

3                    MR. BOJANOWSKI:  Form, foundation.

4                    THE WITNESS:  Where are you?

5        Q.    BY MS. KENDRICK:  Bottom of 189.

6        A.    And what is your question?

7        Q.    How you interpret "this is the world of locums"

8   to mean.

9                    MR. BOJANOWSKI:  Form, foundation.

10       Q.    BY MS. KENDRICK:  Are they undependable?

11                   MR. BOJANOWSKI:  Same objection.

12                   THE WITNESS:  Many times they don't meet

13  the -- they can't pass security or their licensures are

14  not in effect.  There are many factors that impact the

15  availability of locums.

16       Q.    BY MS. KENDRICK:  What is the "can't pass

17  licensure"?

18       A.    Is their license good in Arizona.

19       Q.    Do you guys use out-of-state locums?

20       A.    Only if they have licensure in Arizona.

21       Q.    And can't pass security, that's the ADC

22  requirements?

23       A.    Yes.

24       Q.    So no arrests?

25       A.    They have to have a clean record.

Parsons v. Ryan
Deposition of David W. Robertson, DO - 8/26/2013

Page 198

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA )

3

4               I, CAROLYN T. SULLIVAN, a Certified

5    Reporter, Certificate No. 50528, in the State of Arizona,

6    do hereby certify that the foregoing witness was duly

7    sworn to tell the whole truth; that the foregoing pages

8    constitute a full, true, and accurate transcript of all

9    proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14              I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18              WITNESS my hand this 5th day of September,

19   2013.

20

21

                            Carolyn T. Sullivan, RPR
22                          Arizona Certified
                            Reporter No. 50528
23

24

25

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8

# FILED UNDER SEAL

# EXHIBIT 9

# FILED UNDER SEAL

# EXHIBIT 10

# FILED UNDER SEAL

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 12

# FILED UNDER SEAL

# EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

# FILED UNDER SEAL

# EXHIBIT 15

# FILED UNDER SEAL

# EXHIBIT 16

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen;      )    No. CV12 00601
Stephen Swartz; Dustin Brislan;    )    PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of   )
themselves and all others similarly )
situated; and Arizona Center for    )
Disability Law,                     )
                                    )
          Plaintiffs,               )
     vs.                            )
                                    )
Charles Ryan, Director, Arizona     )
Department of Corrections; and      )
Richard Pratt, Interim Division     )
Director, Division of Health        )
Services, Arizona Department of     )
Corrections, in their official      )
capacities,                         )
                                    )
          Defendants.               )
                                    )

DEPOSITION OF

LAWRENCE HAROLD MENDEL, DO, FSCP, CCHP

April 9, 2014
9:03 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275
                         Prepared by:
602.266.6535             Carolyn T. Sullivan, RPR
www.glennie-reporting.com    Arizona CR No. 50528

Lawrence Harold Mendel, DO, FSCP, CCHP - 04/09/2014

66

1    think the HNR to be picked up.  Were these wait times

2    starting from when a prisoner submitted an HNR, do you

3    know?

4              MS. WIENEKE:  Form.

5              THE WITNESS:  This reflects from the -- my

6    understanding is, and this is what my graph says, says

7    provider wait time from the time the patient submitted

8    the HNR.

9        Q.   BY MR. SPECTER:  Okay.

10       A.   Excuse me, I'm sorry.  From the time that they

11   were scheduled to be seen by the provider.

12       Q.   I see.  So we don't know from this graph how

13   long before that the prisoner waited to be seen to be

14   scheduled; is that right?

15             MS. WIENEKE:  Object to form.

16             THE WITNESS:  That's correct.

17       Q.   BY MR. SPECTER:  And waited to be scheduled, in

18   other words, can you define that for me a little bit.

19   What does that mean?

20       A.   I'm not sure what you're asking.

21       Q.   It was your words as I understood them.  You

22   said that it reflects the wait time --

23             MR. SPECTER:  Why don't you read back what

24   he said.  I'm sorry.

25             (The requested portion of the record was

265

1   STATE OF ARIZONA   )
                       )
2   COUNTY OF MARICOPA )

3

4            I, CAROLYN T. SULLIVAN, a Certified

5   Reporter, Certificate No. 50528, in the State of Arizona,

6   do hereby certify that the foregoing witness was duly

7   sworn to tell the whole truth; that the foregoing pages

8   constitute a full, true, and accurate transcript of all

9   proceedings had in the foregoing matter, all done to the

10  best of my skill and ability.  Pursuant to request,

11  notification was provided that the deposition is

12  available for review and signature.

13

14           I FURTHER CERTIFY that I am not related to

15  nor employed by any of the parties hereto, and have no

16  interest in the outcome.

17

18           WITNESS my hand this 10th day of April,

19  2014.

20

21                         Carolyn T. Sullivan

22

23                         Carolyn T. Sullivan, RPR
                           Arizona Certified
                           Reporter No. 50528
24

25

# EXHIBIT 17

# FILED UNDER SEAL

# EXHIBIT 18

# FILED UNDER SEAL

# EXHIBIT 19

# FILED UNDER SEAL

# EXHIBIT 20

Parsons v. Ryan
30(b)(6)  Deposition of AZ Dept of Corrections Juliet Respicio-Moriarty - 9/23/2013

```
                UNITED STATES DISTRICT COURT
                     DISTRICT OF ARIZONA
Victor Parsons; Shawn Jensen;    )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;  )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of   )
themselves and all others similarly )
situated; and Arizona Center for    )
Disability Law,                     )
                                    )
          Plaintiffs,               )
     vs.                            )
                                    )
Charles Ryan, Director, Arizona     )
Department of Corrections; and      )
Richard Pratt, Interim Division     ) 30(b)(6) DEPOSITION
Director, Division of Health        )        OF
Services, Arizona Department of     ) ARIZONA DEPARTMENT
Corrections, in their official      )   OF CORRECTIONS
capacities,                         )
                                    )   Continuation of
          Defendants.               )    Docket No. 78
                                    )


                JULIET RESPICIO-MORIARTY

                      (Topic 3)

                 September 23, 2013
                     9:08 a.m.
                  Phoenix, Arizona


                    Prepared by:
                    Carolyn T. Sullivan, RPR
                    Arizona Certified
                    Reporter No. 50528
```

Parsons v. Ryan
30(b)(6)  Deposition of AZ Dept of Corrections Juliet Respicio-Moriarty - 9/23/2013

Page 11

1        Q.    So if you turn to what's marked as page 3 in
2    here.  At the top it says 802.02, Informal Complaint
3    Resolution.  It doesn't specify medical or non-medical.
4    Does that mean that this process applies to medical
5    grievances as well?
6        A.    Yes, it does.
7        Q.    And it says in the process that the CO III --
8    it says this at 1.3.  The CO III is supposed to contact
9    medical staff to attempt to resolve the complaint and
10   respond.
11       A.    Yes, it does.
12       Q.    Are correctional officers supposed to have
13   access to confidential health information?
14             MR. STRUCK:  Form.
15             THE WITNESS:  If it's related to the job --
16   to their responsibility, yes.
17             (Exhibit 406 was marked.)
18       Q.    BY MS. KENDRICK:  So what I'm handing you as
19   Exhibit 406 is an Inmate Letter Response that's Bates
20   stamped ADC116132 on the bottom.  And in it, the CO III
21   writes to the prisoner in response to his inmate letter,
22   his informal resolution has been forwarded to Complex
23   Medical for information and resolution.  Is that how
24   they're supposed to handle these?
25       A.    Yes.

Parsons v. Ryan
30(b)(6)  Deposition of AZ Dept of Corrections Juliet Respicio-Moriarty - 9/23/2013

Page 32

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA )

3

4              I, CAROLYN T. SULLIVAN, a Certified

5    Reporter, Certificate No. 50528, in the State of Arizona,

6    do hereby certify that the foregoing witness was duly

7    sworn to tell the whole truth; that the foregoing pages

8    constitute a full, true, and accurate transcript of all

9    proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14             I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18             WITNESS my hand this 7th day of October,

19   2013.

20

21                          Carolyn T. Sullivan, RPR
22                          Arizona Certified
                            Reporter No. 50528
23

24

25

# EXHIBIT 21

# FILED UNDER SEAL

# EXHIBIT 22

# FILED UNDER SEAL

# EXHIBIT 23

# FILED UNDER SEAL

# EXHIBIT 24

# FILED UNDER SEAL

# EXHIBIT 25

# FILED UNDER SEAL

# EXHIBIT 26

# FILED UNDER SEAL

# EXHIBIT 27

# FILED UNDER SEAL

# EXHIBIT 28

# FILED UNDER SEAL

# EXHIBIT 29

# FILED UNDER SEAL

# EXHIBIT 30

# FILED UNDER SEAL

# EXHIBIT 31

# FILED UNDER SEAL

# EXHIBIT 32

# FILED UNDER SEAL

# EXHIBIT 33

# FILED UNDER SEAL

# EXHIBIT 34

# FILED UNDER SEAL

# EXHIBIT 35

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) Case No. ) CV12-00601-PHX-NVW (MEA) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |
| _____ | ) |

DEPOSITION OF BRIAN T. HANSTAD, D.M.D.

Phoenix, Arizona
April 2, 2014; 9:12 a.m.

Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona  85020-5275

                                Prepared by:
                                Janet Hauck, RPR
602.266.6535                    Arizona CR No. 50522
www.glennie-reporting.com

16

1    dentists that there's an acute situation occurring.  Those

2    HNRs would go into the pain category of requests.

3         Q.    Maybe I'm not asking my question clearly.  So

4    the situation, say, is a dental assistant receivers an

5    HNR, reviews it, puts it into the routine category, puts

6    another one into the urgent category, et cetera.  Is there

7    a process by which that dental assistant's decisions are

8    supervised by someone else or reviewed by someone else

9    after the fact?

10        A.    Yep.

11        Q.    And what is that process?

12        A.    We will go through stacks as doctors to look at

13   the verbiage, the words, that they were correctly

14   categorized.

15        Q.    And how often does that happen?  Actually, how

16   often do you do it?

17        A.    I try to do it -- every day I grab a couple,

18   make sure --

19        Q.    You have a couple HNRs each day?

20        A.    Yes, sir.

21        Q.    Do you know how often any other dentists review

22   HNRs to determine whether they were properly triaged?

23        A.    I do the majority of reviews as the supervisor,

24   yes.

25        Q.    So you don't know if other dentists do the same

Brian T. Hanstad, D.M.D. - 04/02/2014

17

1   or how often they do it?

2        A.    They know the ground rules and the verbiage, so

3   when the HNR is in the file they will do it as well when

4   they walk into the operatory when the inmate is there.

5   This is a pain evaluation.  This is a routine care

6   evaluation.

7        Q.    But in terms of going through stacks of HNRs

8   that people have already triaged and going through for the

9   purpose of deciding whether it was properly triaged, do

10  you know how often that happens?

11       A.    I would say almost every visit when the dentist

12  walks into the operatory.

13       Q.    And how do you know that?

14       A.    It's logical, as dentists, when we look and see

15  there's an HNR where they are saying they are in pain and

16  they are here within 24, 48 hours, reviewing that

17  verbiage.  If they ask for a cleaning and they're there

18  that quick, something is wrong.

19       Q.    Just so I understand, so the way you know how

20  HNRs are reviewed is just from the logic of being a

21  dentist; is that right?

22            MR. BOJANOWSKI:  Form.

23            Go ahead.

24            THE WITNESS:  Logically, when you get a

25  request that says:  Ow, I'm infected, I'm in pain, there's

18

1   a different tone than when someone says:  If I could,

2   please, could I get a cleaning?

3      Q.   BY MR. GRAY:  My question is just -- I'm trying

4   to figure out how you know the practices of other

5   dentists' review of HNRs.  And it sounded like you said

6   you just know from your experience as a dentist that's how

7   it works, and I just wanted to make sure that was the only

8   basis of --

9      A.   The training that we all go through teaches us

10   to prioritize more urgent care, more urgent needs, and

11   treat them more expeditiously.

12      Q.   But you don't talk to each dentist about how

13   often they go through and review each set of HNRs or how

14   often they supervise the triage, for example?

15             MR. BOJANOWSKI:  Form.

16             Are you asking about a CQI process here, or

17   are you just asking him what --

18      Q.   BY MR. GRAY:  So my question is:  Have you

19   spoken to any other dentists about how often they will

20   review HNRs for quality control?

21             MR. BOJANOWSKI:  Form.

22             Go ahead.

23             THE WITNESS:  It's part of the procedure

24   when you walk into an appointment to review the HNR before

25   you do anything.

Brian T. Hanstad, D.M.D. - 04/02/2014

19

1          Q.    BY MR. GRAY:  But my question is a simple one,
2     which is just, have you spoken with anyone about how often
3     they do it?
4                      MR. BOJANOWSKI:  Do you understand the
5     question?
6                      THE WITNESS:  I don't think I understand
7     the question.
8                      MR. BOJANOWSKI:  Okay.
9          Q.    BY MR. GRAY:  So, Dr. Hanstad, if you don't
10    understand a question, feel free to ask me.
11         A.    Okay.
12         Q.    So what's unclear about the question?
13         A.    How often do I ask them about how often they
14    reviewed HNRs?
15         Q.    I don't know if you do at all.  I'm just asking
16    whether or not you have asked any other dentist how often
17    they review HNRs.
18         A.    Not to my recollection.
19         Q.    At some point you became -- well, in spring of
20    2013 you became the regional director?
21         A.    When Smallwood Prison Dental Services took
22    over, that's when I received the promotion to director,
23    yes.
24         Q.    And then you became a Smallwood employee?
25         A.    Correct.

Brian T. Hanstad, D.M.D. - 04/02/2014

24

1    that right?

2        A.    Mm-hmm.

3        Q.    So how does that HNR get put into CDS?

4        A.    It's reviewed by a dental assistant and then

5    entered by a dental assistant into the CDS system.

6        Q.    And does that happen daily?

7        A.    Yes, multiple times a day.

8        Q.    Is there a dental assistant in each facility

9    that does this?

10       A.    Multiple.  Most are trained to do almost

11   everything in the clinic, yes.

12       Q.    And those dental assistants are allowed to do

13   that review and enter in the CDS on their own; is that

14   right?

15       A.    Under my supervision.

16       Q.    What type of supervision of this entering the

17   CDS do you provide?

18             MR. BOJANOWSKI:  Form.

19             Go ahead.

20             THE WITNESS:  Occasional reviews of, like I

21   said, the verbiage and categorization of the HNRs.

22       Q.    BY MR. GRAY:  What do you mean by "occasional"?

23       A.    I try to do it once a day at least.

24       Q.    Once a day of each HNR or once a day of a set

25   of HNRs?

Brian T. Hanstad, D.M.D. - 04/02/2014

25

1      A.    I would say a set, occasional random check.

2      Q.    Same as the looking through the HNRs at

3  Perryville, just to pick a couple and see if they were

4  done correctly?

5      A.    Yes.

6      Q.    And then once the HNR is in the CDS system, how

7  does the CDS system calculate all of the data?  It spits

8  out statistics about wait times and productivity and all

9  the things you mentioned.  What's the process by which CDS

10 does all those calculations?

11            MR. BOJANOWSKI:  Form; foundation.

12            Go ahead.

13            THE WITNESS:  When an HNR is entered it

14 goes under DOR, date of request.  That populates a date

15 that is compared to the DOS, which is the date of service.

16 The difference of time is the time it took that HNR to be

17 seen.  Something we never had.

18     Q.    BY MR. GRAY:  And what date on the HNRs is the

19 date of request?

20     A.    Date of request is the date that is checked in

21 by medical services.  It's a stamp.

22     Q.    So it's not the date that the inmate places on

23 the HNR?

24     A.    It is not.

25     Q.    Why is that?

75

1              Go ahead.

2                   THE WITNESS:  Not to my immediate

3    knowledge, no.

4         Q.    BY MR. GRAY:  Are there any other improvements

5    to dental care that you've seen in recent months or in the

6    last year?

7                   MR. BOJANOWSKI:  Same objection.

8                   Go ahead.

9                   THE WITNESS:  Other than what I mentioned?

10        Q.    BY MR. GRAY:  Yes, other than what you

11   mentioned.

12        A.    Supplies are timely, they're purchased in a

13   timely manner.

14        Q.    You mentioned quality of the staff as well?

15        A.    Yes.

16        Q.    So it's not just the numbers, it's also the

17   quality of the people?

18        A.    Yes.

19        Q.    And do you feel there's been an improvement in

20   the quality of dental staff that have been hired?

21                   MR. BOJANOWSKI:  Form; foundation.

22                   Go ahead.

23                   THE WITNESS:  I am a lot more cautious of

24   who we bring in the building.  If someone is there -- in

25   the past corrections has a reputation of:  Oh, yeah, you

76

```
 1    go there and take a nap.  I don't allow that anywhere in
 2    my facilities.  I get people who want to be involved with
 3    public service, not just collect a paycheck.  That's huge.
 4         Q.    BY MR. GRAY:  Did that always happen before
 5    Smallwood took over?
 6                   MR. BOJANOWSKI:  Form; foundation.
 7                   THE WITNESS:  Did what always happen?
 8         Q.    BY MR. GRAY:  You said the traditional
 9    stereotype or assumption is that people will go work at
10    prisons to -- I think you said take a nap.  Is that what
11    you saw happening before Smallwood took over?
12         A.    I have.
13                   MR. BOJANOWSKI:  Foundation.
14                   THE WITNESS:  I have.
15         Q.    BY MR. GRAY:  Sorry.  Did you say:  I have?
16         A.    I have.
17         Q.    Can you think of any ways that you would like
18    to improve dental care at ADC that haven't been done yet?
19                   MR. BOJANOWSKI:  Form; foundation.
20                   THE WITNESS:  I would like to continue to
21    recruit new grads into public service and show them what
22    an opportunity it is to help a population that has needs
23    as high as an inmate population.
24         Q.    BY MR. GRAY:  And anything else that you would
25    like to see done to improve dental care at ADC?
```

1      Q.    Okay.  That is your e-mail address, correct?

2      A.    Yes.

3      Q.    The last paragraph says, "Keep in mind, the

4  calculation of wait times is not based on the one longest

5  wait time.  It is the average of all requests, which CDS

6  calculates."

7            Do you have an understanding of what that

8  means?

9      A.    I believe it's just an average of all the time

10  of HNRs entered, takes the sum of that, divides it by the

11  number of HNRs, gives an average of what someone is

12  waiting.  The reason for that is we can have one or two

13  that have been out to court or unavailable for months at a

14  time, so we felt this was a more accurate representation

15  of wait times, what an average wait time is.

16      Q.    Was there a time when ADC calculated wait times

17  not as an average?

18            MR. BOJANOWSKI:  Form; foundation.

19            Go ahead.

20      Q.    BY MR. GRAY:  I think you said earlier it was

21  just whatever the longest time was; is that right?

22            MR. BOJANOWSKI:  Same objection.

23            Go ahead.

24            THE WITNESS:  I believe they did, yes.

25      Q.    BY MR. GRAY:  So under the old system the wait

85

1   times were done by the longest wait time that was

2   currently in queue, right?

3       A.    Yes.

4       Q.    And now it's done as an average?

5       A.    We have both measures now actually in place.

6       Q.    And the average is done so that you can --

7       A.    Eliminate outliers.

8       Q.    So if there are a few people who have really

9   long waits they won't affect the overall average very

10  much?

11              MR. BOJANOWSKI:  Form; foundation.

12              THE WITNESS:  Yes.

13      Q.    BY MR. GRAY:  And in calculating the wait times

14  when does the clock start?  In other words, how do you

15  determine how long an inmate has been waiting?

16      A.    Using the purest metric, which is the time the

17  HNR is received and stamped by Health Services to the time

18  that service is rendered, that's the only metric we use

19  now that everything is pretty much under control.

20      Q.    And what do you mean when you say, "the service

21  is rendered"?

22      A.    The day of their appointment.

23      Q.    So whatever the first appointment is they have,

24  or what if there's a follow-up appointment that's needed?

25  I guess, suppose the care requires multiple appointments

111

1   every day, I can answer accurately.  This looks to be our

2   average wait time.

3       Q.   BY MR. GRAY:  At Perryville in March of 2013

4   the wait time was 4, and it's been highlighted, whoever

5   produced the document, as does not meet standards.  Do you

6   agree that in March 2013 the wait time at Perryville did

7   not meet standards for routine wait times?

8            MR. BOJANOWSKI:  Form; foundation.

9            THE WITNESS:  To the bounds of the

10  contracts routine carryover 90 days, no, it did not.

11      Q.   BY MR. GRAY:  And for example, Yuma at the

12  bottom line, Yuma in March 2013 had a wait time of eight

13  months for routine care, and it's been, again, highlighted

14  by whoever produced the document as does not meet

15  standards.  Do you agree that an eight-month wait time for

16  routine care does not meet standards?

17           MR. BOJANOWSKI:  Form; foundation.

18           THE WITNESS:  It definitely does not meet

19  standards.

20      Q.   BY MR. GRAY:  Are requests for teeth cleaning

21  put on the normal wait -- is that just put on the normal

22  routine care list and that's calculated in the wait time

23  calculation for routine care, or are teeth cleaning

24  requests done separately?

25      A.   They are calculated with the remainder of

118

```
 1              Go ahead.
 2              THE WITNESS:  I can offer a general opinion
 3   the reasons, but --
 4        Q.   BY MR. GRAY:  But that's no what this opinion
 5   that you've disclosed is about, right?
 6        A.   I believe that's the case, yes.
 7        Q.   Okay, thank you.
 8        A.   Thank you.
 9        Q.   If an inmate misses an appointment because he
10   or she is gone to court, how does that affect the wait
11   time calculation?
12        A.   Most of the time they're gone for a number of
13   months, weeks to months.
14        Q.   Sorry, I'll clarify.
15        A.   Sure.
16        Q.   I meant more technically, like logistically.
17   So an inmate misses an appointment, is that inmate's HNR
18   still pending and will still count toward wait times?
19        A.   Yes.
20        Q.   What if an inmate refuses care and then submits
21   a new HNR; how does that affect the wait times?
22        A.   If we get a refusal on an HNR the clock starts
23   over, which logically makes sense.
24        Q.   So if an inmate submits an HNR once for
25   whatever it is, something related to their teeth, they
```

Brian T. Hanstad, D.M.D. - 04/02/2014

119

1    then refuse care, they then submit another HNR for the

2    same issue, the wait time will be calculated based on the

3    second HNR?

4         A.    Yes, because we offered to render care, that

5    care was refused.

6         Q.    And is the wait time for the first HNR taken

7    into account in wait time calculations, the one that was

8    refused?

9              MR. BOJANOWSKI:  Form.

10              THE WITNESS:  I don't think I understand

11   the question.

12        Q.    BY MR. GRAY:  Sure.  I'll do an example.  That

13   would make it easier.  Say an inmate submits an HNR, waits

14   one month, sees the dental facility, refuses care.  Is

15   that one-month time put into the overall wait time

16   calculation, or does it not count because it was a

17   refusal?

18        A.    While that HNR is active, meaning while they

19   are on the wait list, that HNR is included in the

20   calculation of our wait times.  Once they refuse it drops

21   off our radar, yes.

22        Q.    What if an inmate misses an appointment due to

23   security issues, a security reason that the inmate can't

24   make the appointment?  Logistically, how does that affect

25   wait times?

Brian T. Hanstad, D.M.D. - 04/02/2014

190

1    used as synonyms when referring to how quickly an inmate

2    will need care?

3                   MR. BOJANOWSKI:  Form.

4                   THE WITNESS:  No.  They are separate

5    categories.

6        Q.    BY MR. GRAY:  Is it your understanding that

7    this Dental Procedure 770.2 lists the categories of

8    ailments that should be prioritized into each category?

9                   MR. BOJANOWSKI:  Form.

10                  THE WITNESS:  It gives examples, yes.

11       Q.    BY MR. GRAY:  And do you have an opinion as to

12   whether -- well, I guess that's not an opinion.  It's just

13   a question.  Do you try to implement this procedure?

14       A.    Yes.

15       Q.    What do you do to try to implement this

16   procedure?

17       A.    I train dental assistants to categorize

18   incoming HNRs based on these three categories.

19       Q.    What type of training do you provide?

20       A.    Direct on-the-job training.

21       Q.    Is there any formal training provided by

22   Smallwood to train dental assistants about how to triage

23   into these categories?

24       A.    No.

25       Q.    Is there formal training provided by Corizon or

Brian T. Hanstad, D.M.D. - 04/02/2014

191

1    ADC about how to triage inmates into these categories?

2        A.    No.

3        Q.    At any time when you've been working at ADC

4    facilities has there been any formal training to dental

5    assistants on how to triage?

6              MR. BOJANOWSKI:  Form.

7              THE WITNESS:  Direct on the job only.

8        Q.    BY MR. GRAY:  So by "on the job," I assume you

9    mean it's not written down, the training materials aren't

10   in writing, they're done orally?

11       A.    They basically follow this pattern.

12       Q.    So the training is basically to instruct the

13   dental assistant to follow what's written in the

14   procedure?

15       A.    Correct.

16       Q.    Okay.  I see that under Urgent Care it does not

17   list pain explicitly as falling under urgent care; is that

18   correct?

19       A.    That is correct.

20       Q.    Do you think pain should be prioritized as

21   urgent care?

22             MR. BOJANOWSKI:  Form.

23             THE WITNESS:  Yes.

24       Q.    BY MR. GRAY:  Do you think the policy would be

25   clear if it listed pain clearly under urgent care in this

255

1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA  )

3

4              I, JANET HAUCK, a Certified Reporter,

5   Certificate No. 50522, in the State of Arizona, do hereby

6   certify that the foregoing witness was duly sworn to tell

7   the whole truth; that the foregoing pages constitute a

8   full, true, and accurate transcript of all proceedings had

9   in the foregoing matter, all done to the best of my skill

10  and ability.  Pursuant to request, notification was

11  provided that the deposition is available for review and

12  signature.

13

14             I FURTHER CERTIFY that I am not related to

15  nor employed by any of the parties hereto, and have no

16  interest in the outcome hereof.

17

18             WITNESS my hand this 10th day of April,

19  2014.

20

21

22  _____
    Janet Hauck, RPR
23  Arizona Certified
    Reporter No. 50522
24

25

# EXHIBIT 36

# FILED UNDER SEAL

# EXHIBIT 37

# FILED UNDER SEAL

# EXHIBIT 38

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 22126
Nicholas D. Acedo, Bar No. 021644
Courtney R. Cloman, Bar No. 023155
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
ccloman@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>Plaintiffs,<br><br>v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>Defendants. | NO. 2:12-cv-00601-NVW<br><br>**DEFENDANT CHARLES RYAN'S RESPONSES TO PLAINTIFF ROBERT GAMEZ'S FIRST SET OF INTERROGATORIES (NOS. 1-25)** |

Defendant Charles Ryan, pursuant to FED. R. CIV. P. 33 and through

counsel, answers Plaintiff Robert Gamez' First Set of Interrogatories as follows.

**INTERROGATORIES**

**INTERROGATORY NO. 1:**

IDENTIFY all CHEMICAL AGENTS that ADC STAFF carry and/or use on PRISONERS; including, but not limited to those CHEMICAL AGENTS which ADC staff are DESCRIBED as having used in ADC's Use of Force Reports.

**ANSWER TO INTERROGATORY NO. 1:**

**Defendant objects that this Interrogatory is overbroad, vague, and ambiguous.  Without waiving said objections, ADC Staff may use Oleoresin Capsicum ("OC") fogger and pepper-ball gun.**

**INTERROGATORY NO. 2:**

State the mean and median length of stay for PRISONERS housed in ISOLATION.

**ANSWER TO INTERROGATORY NO. 2:**

**Defendant objects that this Interrogatory is overbroad, vague, and ambiguous.  Defendant additionally objects to Plaintiff's definition and use of the term "ISOLATION."  Plaintiffs' definition of "ISOLATION" includes several different types of housing assignments, each with its own criteria for assignment. Inmates may be housed in a detention unit in disciplinary segregation, investigative detention, mental health observation, or pending placement into a maximum security unit.  Moreover, the term "ISOLATION" implies solitary confinement; however, inmates housed in the housing units listed in Plaintiffs' definition of "ISOLATION" may or may not have cellmates.**

**Defendant further objects that calculating a mean or median length of stay in "ISOLATION" would be meaningless, as the length of time an inmate is housed in a location meeting Plaintiffs' definition of "ISOLATION" varies drastically depending on the reason for the housing placement.  Inmates serving death or life sentences could be housed in a location meeting Plaintiffs' definition of "ISOLATION" for upwards of 20 years, while inmates on mental health or suicide**

3

1  watch could be housed in a location meeting Plaintiffs' definition of "ISOLATION"
2  for a single day.   Inmates in disciplinary segregation may be placed in a housing
3  location meeting Plaintiffs' definition of "ISOLATION" for a period of 30 or 45
4  days.

5  **INTERROGATORY NO. 3:**

6  State the custody level and other eligibility requirements for the Women's
7  Treatment Unit (WTU) at ASPC-Perryville.

8  **ANSWER TO INTERROGATORY NO. 3:**

9  Defendant objects that this Interrogatory is overbroad, vague, and
10  ambiguous.   The guidelines for enrollment in WTU are outlined in the Arizona
11  Department of Corrections' Mental Health Technical Manual previously produced
12  as Bates Numbers ADC011232-ADC011332 and Mental Health Technical Manual,
13  revised August 15, 2011 previously produced as Bates NumbersADC031959-
14  ADC032044.

15  **INTERROGATORY NO. 4:**

16  State the capacity of the Women's Treatment Unit (WTU) at ASPC-
17  Perryville, the number of women currently enrolled in the WTU, the number of women
18  currently on the waiting list for the WTU, and the mean length of time between addition
19  to the waiting list and acceptance into the WTU.

20  **ANSWER TO INTERROGATORY NO. 4**

21  Defendant objects that this Interrogatory is overbroad, unduly
22  burdensome, compound, vague, and ambiguous.   Without waiving these objections,
23  there is no waiting list for enrollment in WTU. Defendant will supplement as
24  capacity and current enrollment.

25  **INTERROGATORY NO. 5:**

26  State the custody level and other eligibility requirements for Baker Ward at
27  ASPC-Phoenix.

28

4

1   **BHU, SMA, WTU, MTU, Baker and Flamenco Units.   Defendant will supplement**

2   **where possible, subject to all objections.**

3                           DATED this __16th__ day of September 2013.

4                                                   STRUCK WIENEKE & LOVE, P.L.C.

5

6                                       By /s/ Courtney R. Cloman
                                                Daniel P. Struck
7                                               Kathleen L. Wieneke
                                                Rachel Love
8                                               Timothy J. Bojanowski
                                                Nicholas D. Acedo
9                                               Courtney R. Cloman
                                                Ashlee B. Fletcher
10                                              Anne M. Orcutt
                                                STRUCK WIENEKE & LOVE, P.L.C.
11                                              3100 West Ray Road, Suite 300
                                                Chandler, Arizona  85226
12
                                                Arizona Attorney General Thomas C. Horne
13                                              Office of the Attorney General
                                                Michael E. Gottfried
14                                              Lucy M. Rand
                                                Assistant Attorneys General
15                                              1275 W. Washington Street
                                                Phoenix, Arizona 85007-2926
16
                                                *Attorneys for Defendants*
17

18  COPIES of the foregoing e-mailed this
     __16th__ day of September, 2013 to:
19
    Caroline N. Mitchell
20  cnmitchell@jonesday.com

21  Jennifer Alewelt
    jalewelt@azdisabilitylaw.org
22
    David Cyrus Fathi
23  dfathi@npp-aclu.org

24  Donald Specter
    dspecter@prisonlaw.com
25

26  By:___/s/ Amy Bender_____

27  2808952.1

28
                                        12

# EXHIBIT 39

# FILED UNDER SEAL

# EXHIBIT 40

# FILED UNDER SEAL

# EXHIBIT 41

# FILED UNDER SEAL

# EXHIBIT 42

# FILED UNDER SEAL

# EXHIBIT 43

# STANDARDS FOR HEALTH SERVICES

# IN PRISONS

## 2014

These standards represent the official position of the National Commission on Correctional Health Care with respect to requirements for health services in prisons. They do not necessarily represent the official position of supporting organizations or individuals represented on the National Commission on Correctional Health Care Board of Directors.

National Commission on Correctional Health Care

**P-A-01**
*essential*

### ACCESS TO CARE

**Standard**

Inmates have *access to care* to meet their serious medical, dental, and mental health needs.

**Compliance Indicator**

The responsible health authority (RHA) identifies and eliminates any barriers to inmates receiving health care.

**Definition**

*Access to care* means that, in a timely manner, a patient can be seen by a clinician, be given a professional clinical judgment, and receive care that is ordered.

**Discussion**

This standard intends to ensure that inmates have access to care to meet their serious health needs and is the principle on which all National Commission on Correctional Health Care standards are based. It is also the basic principle established by the U.S. Supreme Court in the 1976 landmark case *Estelle v. Gamble*.

Unreasonable barriers to inmates' access to health services are to be avoided. Examples of unreasonable barriers include the following:
1. Punishing inmates for seeking care for their serious health needs
2. Assessing excessive fees that prevent or deter inmates from seeking care for their serious health needs, or assessing any fees for treatments arising from sexual abuse
3. Deterring inmates from seeking care for their serious health needs, such as holding sick call at 2 a.m., when this practice is not reasonably related to the needs of the institution
4. Having an understaffed, underfunded, or poorly organized system with the result that it is not able to deliver appropriate and timely care for patients' serious health needs

The NCCHC position statement Charging Inmates a Fee for Health Care Services offers additional guidance about fee-for-service programs; it is available at www.ncchc.org.

3

**P-A-02**
*essential*

**RESPONSIBLE HEALTH AUTHORITY**

### Standard

The facility has a designated health authority responsible for *health care* services.

### Compliance Indicators

1.  The responsible health authority (RHA) arranges for all levels of health care and assures quality, accessible, and timely health services for inmates.
2.  The RHA's responsibilities are documented in a written agreement, contract, or job description.
3.  The RHA is on site at least weekly.
4.  The RHA may be a physician, *health administrator*, or agency. Where the agency acting as RHA is a state, regional, national, or corporate entity, there is also a designated individual at the local level to ensure that policies are carried out. When this authority is someone other than a physician, final clinical judgments rest with a single, designated, licensed, *responsible physician*.
5.  Where there is a separate organizational structure for mental health services, there is a *designated mental health clinician*.
6.  All aspects of the standard are addressed by written policy and defined procedures.

### Definitions

*Health care* is the sum of all actions, preventive and therapeutic, taken for the physical and mental well-being of a population. Health care includes medical, dental, mental health, nutrition, and other ancillary services, as well as maintaining clean and safe environmental conditions.

A *health administrator* is a person who by virtue of education, experience, or certification (e.g., MSN, MPH, MHA, FACHE, CCHP) is capable of assuming responsibility for arranging all levels of health care and ensuring quality and accessible health services for inmates.

A *responsible physician* is a designated MD or DO who has the final authority at a given facility regarding clinical issues.

A *designated mental health clinician* refers to a psychiatrist, psychologist, or psychiatric social worker who is responsible for clinical mental health issues when mental health services at the facility are under a different authority than the medical services.

*Qualified health care professionals* include physicians, physician assistants, nurses, nurse practitioners, dentists, mental health professionals, and others who by virtue of their education, credentials, and experience are permitted by law to evaluate and care for patients.

**Discussion**

This standard seeks to ensure a coordinated health care system. The RHA functions to assure that health services are organized, adequate, and efficient. If this designated authority is not a physician, the responsible physician supervises the clinical aspects of health care.

A single, designated responsible physician (an MD or DO) is required in all instances. The responsible physician supervises clinical judgments regarding the care provided to inmates at the facility. This includes establishing and implementing policies for the clinical aspects of the program; monitoring the appropriateness, timeliness, and responsiveness of care and treatment; and reviewing the recommendations for treatment made by health care clinicians in the community.

When a facility's satellite program is a significant distance from the main unit, it is recommended that an on-site *qualified health care professional* be designated as the RHA for the satellite.

# EXHIBIT 44

# FILED UNDER SEAL

# EXHIBIT 45

# FILED UNDER SEAL

# EXHIBIT 46

# FILED UNDER SEAL

# EXHIBIT 47

# FILED UNDER SEAL

# EXHIBIT 48

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Victor Parsons, et al, on        )
behalf of themselves             )
and all others similarly         ) NO. 2:12-cv-00601-NVW
situated; and Arizona Center     )
for Disability Law,              )
                                 )
                Plaintiffs,      )
                                 )
vs.                              )
                                 )
Charles Ryan, Director,          )
Arizona Department of            )
Corrections; and Richard         )
Pratt, Interim Division          )
Director, Division of Health     )
Services, Arizona Department     )
of Corrections, in their         )
official Capacities,             )
                                 )
                                 )
                Defendants.      )
_____  )


DEPOSITION OF ROBERT COROSCO GAMEZ



Florence, Arizona
August 6, 2013
9:30 a.m.



REPORTED BY:
CHRISTINE JOHNSON, RPR, RMR
Certified No. 50383

PREPARED FOR:

**Robert Gamez - 8/6/2013**
**PARSONS v. RYAN, 2:12-CV-00601-NVM**

Page 147

1   weight because of a medical problem or a mental health

2   problem?

3        A    I can't say for sure.

4        Q    Did you talk to anyone about losing weight?

5        A    Yeah.

6        Q    What did they say?

7        A    I'm supposed to -- I spoke to one of the nurses

8   and doctors and they told me that I was fine.

9        Q    Since August of 2010, have you been concerned

10  about losing weight?

11       A    Yeah.

12       Q    Why?

13       A    Because the meals.

14       Q    Because of the meals?

15       A    Yeah, because of the meals that we're receiving.

16  They cut down on the meals.

17       Q    What did they cut down on the meals, when?

18       A    I think it was like in -- I think it was like in

19  2010.

20       Q    What do you mean they cut down on the meals?

21       A    Well, they started feeding us less calories and

22  less food and started giving us less food.

23       Q    Did they give you two meals a day instead of three

24  meals a day?

25       A    Yes, that's what they're giving us now, two meals

Robert Gamez - 8/6/2013
PARSONS v. RYAN, 2:12-CV-00601-NVM

Page 148

1   a day.  The sack lunch that you just ate right now, I'm

2   assuming that came from the kitchen, right, yeah, that's

3   what we get.

4       Q    How do you know the calories were less?

5       A    How do I know the calories were less?

6       Q    Yeah, you just said that the calories were less.

7       A    Yeah, the calories are less.

8       Q    How do you know?

9       A    Because I have -- because I've studied them.

10      Q    How have you studied them?

11      A    How have I studied it?  I read -- I read the

12   department owner -- the department order.

13      Q    It has the amount of calories in there?

14      A    It does.

15      Q    Does it say the calories are the same or more?

16      A    That's what it says.

17      Q    Okay.  So why do you think that's not true?

18      A    Actually -- actually, they're less.  They admit

19   that they're less.

20      Q    They admit that they're less?

21      A    They're less than what we were getting previously.

22   Yeah, they do.

23      Q    And that was your studying?  That's what you base

24   your claim that you're getting less calories on?

25      A    No, that's not what I base them on.

Page 149

1      Q     What do you base your claim that you're getting

2   less calories?

3      A     Losing weight and feeling debilitated.

4      Q     How much less calories were there?

5      A     I'm not sure.

6      Q     You just said you studied it.

7      A     Yeah, I have -- without having the document in

8   front of me and, I mean --

9      Q     Did you ask any medical person professional about

10  the less calories and the losing weight?

11     A     A professional?

12     Q     Any medical --

13     A     Do you consider a nurse here?

14     Q     Yes, I consider a nurse a professional, any

15  medical personnel.

16     A     Oh, yeah, I have.

17     Q     What did they tell you?

18     A     They compared my height and my weight to some

19  chart and they said that I was -- that my weight was

20  perfectly fine --

21     Q     Uh-huh.

22     A     -- for I guess for my height.

23     Q     Has anybody ever told you your weight is

24  unhealthy?

25           MR. du MEE:  Objection to form.

Robert Gamez - 8/6/2013
PARSONS v. RYAN, 2:12-CV-00601-NVM

Page 150

1          THE WITNESS:  Has anybody ever told me that my

2    weight was unhealthy?  Who is anybody?  Are you talking

3    about DOC nurses?

4    BY MR. GOTTFRIED:

5          Q    Any medical professional, any medical personnel?

6          A    I can't remember.

7          Q    Okay.  When was the last time you had an

8    hallucination?

9          A    Hearing voices?

10         Q    I don't know.  Is that what you consider a

11   hallucination?

12         A    Yeah.

13         Q    Okay.  When was the last time you heard voices?

14         A    Last night.

15         Q    Yeah.  Did you -- do you hear them every night?

16         A    Yeah, I do.

17         Q    Only at night?

18         A    It seems like they only come around at night,

19   yeah.

20         Q    Have you told anybody about it recently?  You said

21   you told Nurse Carter a week or two ago.

22         A    Yeah, I did.

23         Q    Or not Nurse Carter, whatever she is.

24         A    Psych Associate Carter, psych associate.

25         Q    When was the last time you remember telling

Robert Gamez - 8/6/2013
PARSONS v. RYAN, 2:12-CV-00601-NVM

Page 163

1   you that you're not getting enough exercise?

2        A    No.

3        Q    Can you tell me of any physical problem you've had

4   because you're not getting exercise?

5        A    Physical?

6        Q    Yes.

7        A    Yeah, joint pain, back pain, knee pain, hands.

8        Q    Do those go away when you have exercise?

9        A    If -- yeah, they do.  If I do push-ups or

10  something, if I do push-ups in my cell, it kind of helps it

11  a little bit.

12       Q    Okay.  You can do push-ups in your cell any time

13  though; right?

14       A    Yeah.

15       Q    I think you said that the -- that lights are on 24

16  hours a day in the cell?

17       A    With the exception of the security lights.

18       Q    With the exception of the security lights.  What

19  does that mean?

20       A    They stay on 24 hours a day.

21       Q    The security lights stay on 24 hours a day?

22       A    In Browning, yeah, Browning Unit.

23       Q    That's where you are now?

24       A    Since February 2012.

25       Q    So at some period of the day, the lights are -- or

Robert Gamez - 8/6/2013
PARSONS v. RYAN, 2:12-CV-00601-NVM

Page 164

1  night, the lights are dimmed; right?  There's just -- just

2  the security lights?

3      A    Yes.

4      Q    And the security lights are much dimmer than the

5  normal lights?

6      A    They're not much dimmer, but they are a slightly

7  dimmer.

8      Q    Do you have any idea what the difference in power

9  between the two lights are, the normal lights and the

10  security lights?

11      A    No.

12      Q    Where the -- are the security lights in relation

13  to your cell?

14      A    Directly -- directly above my sink, directly above

15  my sink.

16      Q    Okay.  And those are the only lights that are on

17  at night?

18      A    No, there's pod lights stay on, too.

19      Q    In the hallway?

20      A    Yeah -- no, no, not the hallway, like directly

21  outside my door.

22      Q    Uh-huh.

23      A    Yeah, the pod lights.

24      Q    Pot lights, P-O-T?

25      A    No, P-O-D, pod lights.

**Robert Gamez - 8/6/2013**
**PARSONS v. RYAN, 2:12-CV-00601-NVM**

                                                      Page 165

 1       Q    Where do they shine?

 2       A    Where do they shine?

 3       Q    Yeah, do they shine into the cell?

 4       A    Yeah, they do.

 5       Q    If you turn your back to the lights -- can you

 6   turn your back to the lights when you're sleeping?

 7       A    Yeah.

 8       Q    Okay.  Are you able to sleep with the lights?

 9       A    No.

10       Q    You're not able to sleep?

11       A    No.

12       Q    You don't sleep at all?

13       A    Okay.  Can you ask it again?

14       Q    Yeah, are you able to sleep with the lights like

15   that?

16       A    Yeah.

17       Q    Okay.  Do the lights keep you up at night?

18       A    Sometimes they do.

19       Q    Can you turn your back so the lights aren't

20   shining in your eyes when you're sleeping?

21       A    You could turn your back to where the lights are

22   located at, but it illuminates your whole room.

23       Q    There's really no way to describe how much -- can

24   you try to describe how much it illuminates your room?

25       A    I mean, you can see light.

Robert Gamez - 8/6/2013
PARSONS v. RYAN, 2:12-CV-00601-NVM

Page 213

1  STATE OF ARIZONA  )

2  COUNTY OF MARICOPA)

3          BE IT KNOWN that the foregoing deposition was

4  taken before me pursuant to stipulation of counsel; that I,

5  Christine Johnson, RPR, RMR, Certified Reporter No. 50383,

6  in the State of Arizona and by virtue thereof, am authorized

7  to administer an oath; that the witness before testifying

8  was duly sworn by me to testify to the whole truth; that the

9  questions propounded by counsel and the answers of the

10  witness thereto were taken down by me and reduced to print

11  under my direction; that deposition review and signature

12  were requested; that the foregoing 210 pages are a full,

13  true and accurate transcript of all proceedings and

14  testimony had and adduced upon the taking of said

15  deposition, all to the best of my skill and ability

16          I FURTHER CERTIFY that I am in no way related

17  to any of the parties hereto nor am I in any way interested

18  in the outcome hereof.

19          DATED at Phoenix, Arizona, this _____ day

20  of _____, 2013.

21

22          _____

23          CHRISTINE JOHNSON, RPR, RMR
                Certified Reporter
              Certificate No. 50383

24

25

# EXHIBIT 49

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


| | |
|---|---|
| VICTOR PARSONS; et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) ) ) ) |
| Plaintiffs, | ) No. ) 2:12-cv-00601-NVW ) |
| vs. | ) ) |
| CHARLES RYAN, Director, Arizona Department of Corrections; and RICHARD PRATT, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |



VIDEOTAPED DEPOSITION OF DUSTIN BRISLAN



Phoenix, Arizona
August 9, 2013



Reported by:
Mark Miller, RMR
Certified Reporter
Certificate No. 50474



Prepared For:
The Court
(Original)

Page 140

1  but tell me why else it is stressful for you.

2      A.    They leave the lights on day and night, they

3  never turn them off.  We are fed only sandwiches, which

4  that is pretty much how it is in all max custody now, but

5  three times a day we are fed bag lunches, that is it.  You

6  have two little suicide blankets and a suicide smock that

7  are extremely rough.

8      Q.    Tell me what a suicide smock is.

9      A.    I don't know what it is.  It has Velcro and you

10  can strap it on.  It is supposed to be -- you can't

11  destroy it, that is what they say, but I have proved

12  otherwise.

13          You can't sleep in it, really.  And I am not

14  going to wear it.  It looks like a summer dress.  I am not

15  a woman.  So I refuse to wear it and I just wrap a blanket

16  around me.

17          It is horrible.  The conditions are foul.

18  At times I found feces on the wall, urine on the wall,

19  urine on the floor, food splattered everywhere.  And they

20  would not clean the cells at all.

21          And it is very stressful.  Staff would bang

22  on the doors to harass the inmates, they would go inside

23  the pods to harass the inmates, which led to a lot of

24  people cutting and self-harming, which ultimately led to

25  them using excessive force by spraying excessive amounts

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 161

1  day.

2              Is that correct?

3      A.   Well, the three meals just started before -- here

4  at Baker ward they do it different.  Yes, three meals over

5  here -- we were just getting sandwiches and that didn't --

6  I don't think it is the right amount of calories,

7  honestly, to eat sandwiches; I think it is what caused all

8  the weight loss in all of us.  I think that is why they

9  switched it.

10             But at SMU you only get fed twice a day.

11  You get one bagged lunch that they call the megasack, and

12  they give that to you at 6:00 in the morning.  Your next

13  meal would be at 5:00 or 6:00 in the evening.  So there is

14  a 12-hour gap in between the meals.

15     Q.   The dinner -- and let's talk about SMU for a

16  moment, the twice-a-day meals.

17             The 6:00 a.m. megasack, what is in that?

18     A.   Three sandwiches.  You have your -- the meat --

19  whatever the meat is.  They would fluctuate between peanut

20  butter and egg.  Every other day you would get either an

21  egg or peanut butter.

22     Q.   Okay.

23     A.   They had the chips and the cookie, and that is

24  it.

25     Q.   Do you get a drink?

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 162

1       A.   Yes.   You get like the coffee in little Kool-Aid

2  packages.

3       Q.   Kool-Aid packages, is that what you said?

4       A.   A little tiny package.   Couldn't even make a full

5  cup, these little Styrofoam ones.

6       Q.   When you say "three sandwiches," is there meat

7  and bread on the sandwiches?

8       A.   Yes, meat and bread.   And that is if you even get

9  that.   Sometimes -- like a lot of times you are missing

10  stuff out of your bag and you have to raise a big fuss

11  just to get fed, then they will wait four or five hours

12  before they give it to you, if they give it to you.

13      Q.   Is there cheese on the sandwiches?

14      A.   Yes, sometimes there is cheese.   It is

15  actually -- they have the diet spreadsheet in the canteen,

16  and it explains to you exactly what meals are which.

17      Q.   And then your evening meal you said is about 6:00

18  p.m.?

19      A.   Yes.

20      Q.   How is that delivered to you?

21      A.   They bring -- they have a food cart, and they use

22  these things called utensils.   And instead of weighing it,

23  they will use the utensil that they say is the same

24  weight, and a lot of times you only get a little tiny

25  piece of food, and you know by looking at your tray that

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 163

1    you are not getting fed the right amount.

2        Q.   It is a tray?

3        A.   Yes.

4        Q.   Is it a hot meal?

5        A.   Yeah, it is hot.  It usually comes warm or cold.

6        Q.   And what is a typical meal that you would find on

7    a dinner tray?

8        A.   It is really -- it will -- I will give you an

9    example.  Like spaghetti.  You get the spaghetti with the

10   sauce, and it is not really even sauce.  It is just -- I

11   don't know what it is.  It is real, real -- there is

12   supposed to be meat in it, but there is hardly any meat.

13   Then you get the green beans and a salad and two pieces of

14   toast, and that is it.  Then you will get Jello or it is

15   pudding, but the portion sizes are very minimal.

16       Q.   Okay.

17       A.   That is why so many of us, especially me, I have

18   had real bad weight problems to where I dropped to 144

19   pounds, because I am not being fed enough, and even my

20   diet --they put me on a wasting diet, and I still lost

21   weight.

22       Q.   When were you put on the wasting diet?

23       A.   I am on the diet again right now for two months.

24   I was on this diet approximately seven and a half or six

25   and a half months ago.  I weighed 144.  I was getting

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 164

1  wasting syndrome, which means I get extra food, two

2  resources, three milks in the morning and two milks at

3  night, and I only gained from 144 to 150 in six months.

4      Q.   Now do you have any dietary restrictions that you

5  have placed on yourself?

6      A.   I don't understand.

7      Q.   Do you eat meat?

8      A.   Yes, I eat meat.

9      Q.   Have you ever requested the vegetarian diet?

10     A.   Yes, I have.

11     Q.   When did you request that?

12     A.   2010, I started to request it; 2011 I filed a

13  grievance.

14     Q.   For?

15     A.   The vegetarian diet.

16     Q.   To receive it?

17     A.   Yes.  They refused to give it to me.

18              Then the chaplain came and asked me some

19  questions, and I answered all of them correctly, and then

20  they gave me the diet.  But as I was in the middle of the

21  diet, it just stopped, and I started getting a different

22  diet that came out of nowhere.  I never got seen from

23  medical for this diet or anything.  It was a mechanical

24  soft with resource and milk, which doesn't even exist.

25  There is no such diet.  It is either a wasted syndrome

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 165

1  with resource and milk or a mechanical soft.  There is no

2  such diet.

3      Q.   You are saying there is no such diet as a

4  mechanical soft?

5      A.   With resource and milk.

6      Q.   Okay.

7      A.   That diet does not exist in the system.

8      Q.   Now you said that when you were requesting the

9  vegetarian diet, the chaplain came and spoke to you.

10              Did you request the vegetarian diet for

11  religious reasons?

12     A.   Yes.

13     Q.   What were those reasons?

14     A.   It is the Seventh-day Adventist religion, and the

15  fundamental beliefs and your personal fundamental

16  beliefs -- before you got the fundamental beliefs of the

17  church, your personal fundamental beliefs, your commitment

18  of faith and all of that, they all tie in together as

19  being a part of this diet.

20     Q.   And is part of that not eating meat?

21     A.   Yes.

22     Q.   But you eat meat now?

23     A.   Yes.  I really had no choice in the matter.  They

24  kind of took it away from me.

25     Q.   When did they take it away from you?

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

                                                      Page 166
1            And when we say "it," we are talking about
2  the vegetarian diet?
3       A.   Yes.
4            They took it away by giving me the
5  mechanical soft with resource and milk diet that doesn't
6  even exist.
7       Q.   When did they give you that mechanical soft with
8  resource and milk?
9       A.   Wow.  I think towards the end of 2011.  No, it
10 had to be sooner than that.  Yes, it was kind of towards
11 the end of 2011.  I am going to say September or October I
12 started getting this diet.
13      Q.   How long did you have the mechanical soft with
14 resource and milk?
15      A.   I had it for quite a while, actually.  It was
16 probably about a year almost.  I had it all the way
17 until -- all the way through Lewis complex and almost all
18 the way back to -- actually, all the way back to SMU-1.
19      Q.   And when you were off the mechanical soft with
20 resource and milk, what diet did you receive?
21      A.   After that they were giving me a regular diet for
22 a little bit, then I went to see medical, and they put me
23 immediately back on, but this time a wasting syndrome with
24 resource and milk.
25      Q.   Is what you are on now?

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

                                                        Page 167

 1      A.   Yes.  They renewed it for two months.

 2      Q.   Do you know what your current weight is?

 3      A.   I think 150 was my last weight.

 4      Q.   When were you weighed last?

 5      A.   Two weeks ago.

 6      Q.   And you have been prescribed various weigh-ins

 7 with medical, right?

 8      A.   Yes.

 9      Q.   But at times you have refused to be weighed?

10      A.   No, I have never refused to be weighed.

11      Q.   Have you ever requested to only be weighed by a

12 certain scale?

13      A.   Yes, I have, because the scales that were being

14 used were inaccurate.  When I request to be weighed on a

15 specific scale, basically they call that a refusal,

16 because they refuse to allow me -- I didn't refuse, they

17 refused to pull me out at that time.

18      Q.   Would you allow them to weigh you on the other

19 scales?

20      A.   Yes.  I would -- in all reality, the scales -- at

21 one point they were over -- they were showing our weights

22 to be over, but at the time that I was requesting to be

23 put on different scales, they were actually weighing

24 under.  So by me standing on a scale if I wanted to cheat

25 and try to get this diet prolonged, I could have done it.

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 168

1  Their scales defaulted.  And they also added belly chain

2  weight to the scale.  These chains weigh three to four

3  pounds, and they would add this to the weight of my body.

4  And I don't walk around with this belly chain all day, so

5  it is not a part of my weight.

6      Q.   So when you wanted to be weighed on a certain

7  scale, if they said no, would you allow them to weigh you

8  on the other scales?

9      A.   Yes.  I would have protested it and I probably

10  would have filed paperwork on it.

11      Q.   If food is missing from your lunch, what is it

12  that you do to rectify that?

13      A.   I complain, I have held the trap, I have cut

14  because I was so mad and anxious that I self-harmed, I

15  have -- usually they -- it has been kind of 50/50.

16  Sometimes they will give it to me and other times I would

17  have to actually hold the trap or barricade myself or

18  just -- when I get to that point it is so bad, they make

19  me so angry that I will almost be into a blind rage and I

20  cannot -- my mood fluctuates, it skyrockets, and it is

21  very bad at that point.

22      Q.   When you say you "hold the trap," what does that

23  mean?

24      A.   I stick my arm out the trap and make them get a

25  supervisor.  If you request a supervisor at SMU, they

Dustin Brislan - 8/9/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 196

1  STATE OF ARIZONA          )

2  COUNTY OF MARICOPA        )

3              BE IT KNOWN that the foregoing deposition

4  was taken by me pursuant to stipulation of counsel; that I

5  was then and there a Certified Reporter in and for the

6  County of Maricopa, State of Arizona, and by virtue

7  thereof authorized to administer an oath; that the witness

8  before testifying was duly sworn by me to testify to the

9  whole truth; that the questions propounded by counsel and

10 the answers of the witness thereto were taken down by me

11 in shorthand and thereafter transcribed into typewriting

12 under my direction; that the foregoing pages are a full,

13 true and accurate transcript of all proceedings and

14 testimony had and adduced upon the taking of said

15 deposition, all to the best of my skill and ability.

16              A REVIEW OF the transcript was requested.

17              I FURTHER CERTIFY that I am in no way

18 related to nor employed by any parties hereto nor am I in

19 any way interested in the outcome hereof.

20              DATED at Phoenix, Arizona, this 20th day of

21 August, 2013.

22

23                              Mark Miller
                                CCR # 50474
24

25

# EXHIBIT 50

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, ) ) ) ) ) ) | |
| | No. 2:12-cv-00601-NVW |
| Plaintiffs, ) ) | |
| v. ) ) | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, ) ) ) ) ) ) ) ) | |
| Defendants. ) ) | |

VIDEOTAPED DEPOSITION OF JACKIE ROBERT THOMAS

Florence, Arizona
August 8, 2013
9:09 a.m.

REPORTED BY:
SHELLEY E.D. PEARCE, RPR
Certified Reporter
Certificate No. 50301

PREPARED FOR:
THE COURT

(Original)

Page 59

1    A.   Yes, just a little bit.

2    Q.   Just a little bit?

3    A.   Yes.

4    Q.   But it has gotten better?

5    A.   Yes.

6    Q.   Would you say your mental health is better now

7  than it was a year ago?

8    A.   No.

9    Q.   Why not?

10   A.   Because I still hear voices, and I still see

11 things that's not there, and I still sometimes have

12 suicidal ideations, and I still act up once in a while

13 with putting a light cover over my light so I could block

14 it out 'cause it's too hot.

15   Q.   Because it's too hot?

16   A.   Yeah, and too bright.

17   Q.   When was the last time you were on suicide

18 watch?

19   A.   I don't remember.

20   Q.   It's my understanding that it's been quite some

21 time since you've been placed on suicide watch; is that

22 accurate?

23   A.   Yeah.

24   Q.   Because you've been doing better?

25   A.   Yeah.

Page 62

1    Q.    Where do you weigh yourself at?

2    A.    Medical.

3    Q.    How often?

4    A.    Every time I go up there.

5    Q.    How often do you go to medical, on average?

6    A.    Whenever they decide to pull me out.

7    Q.    Why do you think you've lost weight as a result

8   of being in isolation?

9    A.    Because -- because I have not been able to go

10  outside and work -- walk around the track or anything --

11  or anything, so they make me sit at home.  I stay at home

12  in my cell.

13   Q.    So --

14   A.    And I -- and I work out a lot when I'm not on my

15  medication, and that burns a lot of fat and all my muscles

16  and stuff get -- start coming out and everything.

17   Q.    So you believe you've lost weight as a result of

18  you working out?

19         MS. FLOOD:  Form.

20         Go ahead.

21         THE WITNESS:  No.

22  BY MS. FLETCHER:

23   Q.    Why do you think you've lost weight, then?

24   A.    Because we get two meals a day here.

25   Q.    So it's because you get two meals a day?

CORRECTED Jackie Robert Thomas - 8/8/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 63

1      A.    Yeah.

2      Q.    Do you know how many calories are contained in

3   each of those meals?

4      A.    No.

5      Q.    Are you aware that ADC has a policy on meals for

6   restrictive movement inmates?

7           MS. FLOOD:  Form.

8           THE WITNESS:  No.

9   BY MS. FLETCHER:

10     Q.    You also allege that you've experienced multiple

11  failures in the administration of your medication; is that

12  correct?  It's the first page, if you want to look at it,

13  paragraph 12.

14          MS. FLOOD:  This one?

15          MS. FLETCHER:  Uh-huh.

16          MS. FLOOD:  We'll put this over here.

17          THE WITNESS:  Yes.

18  BY MS. FLETCHER:

19     Q.    Can you describe for me the time periods when

20  you believe you were improperly given medication?

21     A.    Can you explain that to me differently so I can

22  understand it, please.

23     Q.    Can you tell me every time that you were

24  improperly given medication?

25     A.    About five times.

CORRECTED Jackie Robert Thomas - 8/8/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 94

1    Q.   Double bunk?

2    A.   Yeah.

3    Q.   And that would alleviate or that would take away

4  your concerns about being --

5    A.   Yeah.

6    Q.   -- scared?

7         You didn't discuss this earlier when I asked you

8  what your claims were, but are you alleging that you've

9  suffered any harm as a result of lighting in your cell?

10   A.   Lighting?  Like this kind of lighting?

11   Q.   Any kind of lighting at all.

12   A.   Yeah.

13   Q.   Can you describe that for me?

14   A.   It's bright and it's too hot to keep my cell

15  cooled down with the light that's on.  It stays on from

16  6:00 in the morning sometimes until 2:00 at night -- in

17  the morning.

18   Q.   Okay.  So it's not 24 hours?

19   A.   No.  Sometimes they leave them on that long

20  because other people request it, but sometimes they turn

21  them off.

22   Q.   Was the lighting different in 2 Dog than it is

23  in 2 Baker?

24   A.   No.

25   Q.   It's the same?

Page 95

1        A.    It's the same.

2        Q.    And what -- how have you been harmed as a result

3   of that lighting?  How has that hurt you?

4        A.    It gives me real bad headaches because of the

5   brightness and the light, and then it makes me -- my eyes

6   go craz- -- blurry and stuff where I can't see that well,

7   so I block it out with a -- with my blanket.

8        Q.    And you said that sometimes but not always a

9   light is on for 24 hours?

10       A.    Yeah, sometimes.

11       Q.    How big is that light?  Is it a security light?

12  Is it a light like in this room?

13       A.    It's a security light, like that big and that

14  thick.

15       Q.    Okay.

16       A.    But there's no dimness to it.  You can't turn it

17  off inside your cell.  You've got to have the tower turn

18  it off.

19       Q.    So that light is actually inside your cell and

20  not in the pod?

21       A.    Yeah.  The pod lights are -- are like this, but

22  they're a little bit shorter.  They're like that.  Like a

23  square.

24       Q.    And you don't have the ability to turn

25  your in-cell light on or off?

Page 96

1      A.   No.

2      Q.   I want to go back to --

3           MS. FLETCHER:  Actually, the videographer said

4    we need to change tape soon, so it might be a good time to

5    change them.

6           THE VIDEOGRAPHER:  This is the end of media

7    number 1 in the continuing deposition of Jackie Thomas.

8    Today's date is August 8, 2013.  The time is 11:13 a.m.

9           (Recess taken from 11:13 to 11:15 a.m.)

10          THE VIDEOGRAPHER:  We're back on the record.

11   This is the beginning of media number 2 and the continuing

12   deposition of Jackie Thomas.  Today's date is August 8,

13   2013.  The time is 11:15 a.m.

14   BY MS. FLETCHER:

15     Q.   Okay.  Mr. Thomas, I want to go back to the

16   medications that you've been on while you've been

17   incarcerated.  And to help you with this, I'm going to

18   mark this as Exhibit 2.  This is your declaration.

19          (Exhibit 2 marked.)

20          MS. FLOOD:  Okay.  This has a staple; is that

21   okay?

22          CO III RADFORD:  That's fine --

23          MS. FLOOD:  Are we good?

24          CO III RADFORD:  -- 'cause we're sitting right

25   here.

Page 185

1  STATE OF ARIZONA        )
                           )      ss.
2  COUNTY OF MARICOPA      )

3

4           BE IT KNOWN that the foregoing deposition

5  was taken by me pursuant to stipulation of counsel; that

6  I, Shelley E.D. Pearce, RPR, Certified Reporter No. 50301,

7  in the State of Arizona, and by virtue thereof, am

8  authorized to administer an oath; that the witness before

9  testifying was duly sworn by me to testify to the whole

10 truth; that the questions propounded by counsel and the

11 answers of the witness thereto were taken down by me and

12 reduced to print under my direction; that the foregoing

13 184 pages are a full, true, and accurate transcript of all

14 proceedings and testimony had and adduced upon the taking

15 of said deposition, all to the best of my skill and

16 ability.

17     I FURTHER CERTIFY that I am in no way related to nor

18 employed by any of the parties hereto, nor am I in any way

19 interested in the outcome hereof.

20     DATED at Phoenix, Arizona, this 14th day of August,

21 2013.

22

                          _____
23                        SHELLEY E.D. PEARCE, RPR
                          Arizona Certified Reporter
24                        Certificate No. 50301

25

# EXHIBIT 51

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, et al., on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | ) <br> ) <br> ) <br> ) <br> ) <br> )   No. <br> )   2:12-cv-00601-NVW |
| Plaintiffs, | ) <br> ) |
| v. | ) <br> ) |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

VIDEOTAPED DEPOSITION OF CHRISTINA ANGELICA VERDUZCO

Goodyear, Arizona
August 15, 2013
9:33 a.m.

REPORTED BY:
SHELLEY E.D. PEARCE, RPR
Certified Reporter
Certificate No. 50301

PREPARED FOR:
THE COURT

(Original)

Page 8

1   And I may ask you for clarification.  Okay?

2       A.   Yes.

3       Q.   Okay.  How are you feeling today, Ms. Verduzco?

4       A.   I refuse to answer that question.

5       Q.   Why?

6       A.   'Cause I don't know how I'm feeling.  I'm always

7   feeling like this, like I'm --

8       Q.   And what --

9       A.   Like, inside I'm scared and I don't -- my mind

10  just -- it's, like, real foggy.  Plus, I don't have

11  glasses and I can't really see.  So I'm like, wait a

12  minute.  And, then, I'm going to have a visit later on

13  today and Monday was my birthday, so it's just been very

14  kind of hard for me to be so stable and not being next to

15  my family or anybody.  You know, it's been a hard week.

16  It's been a hard two weeks for me ever since they moved

17  me, so I'm kind of just barely adapting to this.  Not

18  this, but you know.

19      Q.   When you say "this," what do you mean?

20      A.   I mean to like -- I've been in prison for some

21  time, about seven, 10 years, whatever, and -- I don't know

22  what I'm talking about.  But, like, I've been feeling --

23  my medication has got me feeling weird.  I just got a shot

24  on Monday.  Okay?  A shot of Haldol I get every month.

25      Q.   You get every month or every Monday?

Page 39

1   say it in those exact words, but -- like, the one who did

2   the bombs and that, 911, wasn't -- the terrorist, wasn't

3   that...

4       Q.   Do you have access to any reading material?

5       A.   Yeah, they come around -- once -- whenever --

6   yes.

7       Q.   You said that you now know that it's good for

8   you to get out of your cell and go to rec.

9       A.   Right.

10      Q.   When did you come to that conclusion?

11      A.   That's what the officers told me, the

12  counselors.  I need to go to rec every day.

13      Q.   Uh-huh.

14      A.   And I figured out myself that I do need to.  I

15  need that air.  I need -- I need space.  You know what?  I

16  mean, I need -- I need to spread my wings.  You know what

17  I mean?  You can't be locked up in a little room like

18  that.  All I can do is -- well, it's not really much to do

19  in there, but it's not the same as being out there where

20  you could just go to the corner and buy yourself a taco.

21  You know what I mean?  Here, their food is crap, but hey.

22      Q.   What did you have for breakfast?

23      A.   Pancakes.

24      Q.   Were they bad?

25      A.   They weren't that good, but I was hungry.  I

Page 40

1    usually don't eat breakfast or lunch.

2        Q.    Why?

3        A.    'Cause I don't like the food.

4        Q.    When you got your breakfast this morning, the

5    pancakes, tell me how you got your meal delivered to you.

6        A.    Through the door.

7        Q.    And on your tray --

8        A.    There's a -- it's a door and it has a little

9    thing right here.

10       Q.    And when you got your food tray, what else was

11   on it besides pancakes?

12       A.    Syrup, butter.

13       Q.    Did you have a drink, milk or coffee, or --

14       A.    Milk and coffee, sugar.  I think that was it.

15       Q.    Do you have any money on an account so you can

16   buy from the commissary?

17       A.    Sometimes they give me $20 a month.  And meaning

18   by "they" is either my mother or my grandfather.

19       Q.    What's the last thing you bought at the

20   commissary?

21       A.    Some hygiene.

22       Q.    What kind of hygiene?

23       A.    Suave shampoo.

24       Q.    Do you ever buy food at the commissary?

25       A.    Sometimes.

                                                        Page 43

1   right.  Why do you think that is?

2        A.    'Cause when I was younger, I did bad drugs and

3   they really messed me up.

4        Q.    Who are you suing in this case?

5        A.    You guys know.

6        Q.    I'm sorry?

7        A.    Perryville.

8        Q.    You're suing Perryville?

9        A.    Yeah.

10       Q.    Okay.  And what are you suing Perryville for?

11       A.    Treating me wrong, treating these people wrong

12   in here.  They need to change.  They've slowly been doing

13   it.  I mean, I know people who have serious problems.

14   Like, one girl, she had cancer and -- well, with the

15   medical thing that they have here, if it's really, really

16   serious, actually, it takes time for them to find out if

17   it's serious.  That's the sad part.  And when it is that

18   serious and something bad happens, that's when they make a

19   change.  They don't like to believe the people around here

20   'cause, usually, they just want to go see a girlfriend or

21   probably to get drugs or I don't know.

22       Q.    Who is Richard Pratt?

23       A.    I don't recall.

24       Q.    Who is Charles Ryan?

25       A.    I don't recall.

Page 86

```
 1  STATE OF ARIZONA        )
                            )     ss.
 2  COUNTY OF MARICOPA      )

 3

 4            BE IT KNOWN that the foregoing deposition

 5  was taken by me pursuant to stipulation of counsel; that

 6  I, Shelley E.D. Pearce, RPR, Certified Reporter No. 50301,

 7  in the State of Arizona, and by virtue thereof, am

 8  authorized to administer an oath; that the witness before

 9  testifying was duly sworn by me to testify to the whole

10  truth; that the questions propounded by counsel and the

11  answers of the witness thereto were taken down by me and

12  reduced to print under my direction; that the foregoing 85

13  pages are a full, true, and accurate transcript of all

14  proceedings and testimony had and adduced upon the taking

15  of said deposition, all to the best of my skill and

16  ability.

17       I FURTHER CERTIFY that I am in no way related to nor

18  employed by any of the parties hereto, nor am I in any way

19  interested in the outcome hereof.

20       DATED at Phoenix, Arizona, this 21st day of August,

21  2013.

22

                      _____
23                    SHELLEY E.D. PEARCE, RPR
                      Arizona Certified Reporter
24                    Certificate No. 50301

25
```

# EXHIBIT 52

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, et al., on ) | |
| behalf of themselves and all ) | |
| others similarly situated; and ) | |
| Arizona Center for Disability ) | |
| Law, ) | No. |
| ) | 2:12-cv-00601-NVW |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| Charles Ryan, Director, Arizona ) | |
| Department of Corrections; and ) | |
| Richard Pratt, Interim Division ) | |
| Director, Division of Health ) | |
| Services, Arizona Department of ) | |
| Corrections, in their official ) | |
| capacities, ) | |
| ) | |
| Defendants. ) | |
| ) | |

VIDEOTAPED DEPOSITION OF JEREMY SCOTT SMITH

Florence, Arizona
August 20, 2013
9:45 a.m.

REPORTED BY:
SHELLEY E.D. PEARCE, RPR
Certified Reporter
Certificate No. 50301

PREPARED FOR:
THE COURT

(Original)

Page 72

1    Q.   Yes.  Let's go ahead and talk about SMU-1.  When
2  you're at SMU-1 --
3    A.   At SMU-1, if I was taking it in the morning, it
4  would be sometime between 9:00 a.m. and noon.  And if I
5  was taking it at night, it would be sometime between
6  3:30 p.m. and 9:00 p.m.
7    Q.   Okay.  And when is your dinnertime at SMU-1?
8         MR. PODSIADLIK:  Foundation.
9         THE WITNESS:  Anywhere between 3:30 p.m. and
10  7:00 p.m.
11  BY MS. RAND:
12    Q.   When you were at Lewis, what time was your --
13  what time did you have your meals on a particular -- on an
14  average day?
15         MR. PODSIADLIK:  Foundation.
16         THE WITNESS:  There is no average day in Lewis.
17  BY MS. RAND:
18    Q.   Okay.
19    A.   You can -- breakfast and lunch, you'll be served
20  breakfast and lunch anytime between 6:00 a.m. and
21  7:00 p.m., and they don't -- they don't let you out for
22  dinner there.  They give you dinner sacks.  Sometimes
23  you'll get your dinner sacks before you get your breakfast
24  or lunch.  There is no -- Lewis is really screwed up.
25  There's no really pattern.  They don't...

Page 76

1  BY MS. RAND:

2      Q.   Are you able to purchase food items from the

3  store?

4      A.   Depending on my status, yes.

5      Q.   What kind of things are you able to purchase

6  from the store?  What kind of food items are you able to

7  purchase from the store?

8           MR. PODSIADLIK:  Form.

9           THE WITNESS:  Soups, chips, peanut butter.

10 BY MS. RAND:

11     Q.   Have you purchased those kind of items, the

12 food, the chips, the peanut butter, from the store?

13     A.   Yes, I do.

14     Q.   And how often are you allowed to purchase from

15 the store?

16          MR. PODSIADLIK:  Form, foundation.

17          THE WITNESS:  I'm allowed to purchase things

18 from the store every week.

19 BY MS. RAND:

20     Q.   And how often do you actually do it?

21          MR. PODSIADLIK:  Form.

22          THE WITNESS:  It varies.  I mean, it depends on

23 what type of year it is and how my family's doing, really.

24 So I don't -- sometimes once a month, sometimes once a

25 week.

                                                          Page 93

1  problems with Lithium, were you receiving more food at

2  that period?

3          MR. PODSIADLIK:  Form, foundation.

4          THE WITNESS:  What period would you be talking

5  about?

6  BY MS. RAND:

7      Q.   Okay.  You said that you were having stomach

8  pains and throwing up from November of 2009, and it looks

9  like you still were having it as of July of 2010.  I was

10  just curious whether or not you were receiving additional

11  food during that time period.

12          MR. PODSIADLIK:  Form.

13          THE WITNESS:  Yes, I was between -- sometime in

14  January or February of 2010, they stopped giving us three

15  meals a day and started giving us two meals a day.  So

16  from that time until July 2010, I was getting less food,

17  yes.

18  BY MS. RAND:

19      Q.   Okay.  You were getting less food?

20      A.   Yes.

21      Q.   Okay.  It says in paragraph 12 that stomach

22  pains from the Lithium continued all the way until late

23  August of 2011.  What occurred in 2011 --

24          MR. PODSIADLIK:  Foundation.

25  BY MS. RAND:

Jeremy Scott Smith - 8/20/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 209

1  STATE OF ARIZONA        )
                           )    ss.
2  COUNTY OF MARICOPA      )

3

4             BE IT KNOWN that the foregoing deposition

5  was taken by me pursuant to stipulation of counsel; that

6  I, Shelley E.D. Pearce, RPR, Certified Reporter No. 50301,

7  in the State of Arizona, and by virtue thereof, am

8  authorized to administer an oath; that the witness before

9  testifying was duly sworn by me to testify to the whole

10 truth; that the questions propounded by counsel and the

11 answers of the witness thereto were taken down by me and

12 reduced to print under my direction; that the foregoing

13 208 pages are a full, true, and accurate transcript of all

14 proceedings and testimony had and adduced upon the taking

15 of said deposition, all to the best of my skill and

16 ability.

17     I FURTHER CERTIFY that I am in no way related to nor

18 employed by any of the parties hereto, nor am I in any way

19 interested in the outcome hereof.

20     DATED at Phoenix, Arizona, this 29th day of August,

21 2013.

22

                          _____
23                        SHELLEY E.D. PEARCE, RPR
                          Arizona Certified Reporter
24                        Certificate No. 50301

25

# EXHIBIT 53

DISTRICT OF ARIZONA

Victor Parsons, et al., on          )
behalf of themselves and all        )
others similarly situated; and      )
Arizona Center for Disability       )
Law,                                )
                                    )
                    Plaintiffs,     )
                                    )
vs.                                 )   NO. 2:12-cv-00601-NVW
                                    )
Charles Ryan, Director,             )
Arizona Department of               )
Corrections; and Richard Pratt,     )
Interim Division Director,          )
Division of Health Services,        )
Arizona Department of               )
Corrections, in their official      )
capacities,                         )
                                    )
                    Defendants.     )
_____     )

VIDEOTAPED DEPOSITION OF STEPHEN OLIVER SWARTZ

Buckeye, Arizona
August 22, 2013
9:00 a.m.

REPORTED BY:
NICOLE TATLOW, RPR
Certified Reporter
Certificate No. 50671

PREPARED FOR:
THE COURT

(Original)

Case 2:12-cv-00601-ROS   Document 1024-1   Filed 07/14/14   Page 133 of 186
Stephen Oliver Swartz - 8/22/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 211

1   cells, they are ten times worse than the suicide watch cells

2   in the detention units.

3       Q.    Okay.

4       A.    Okay?

5       Q.    I need you to answer my question.  And I'm --

6       A.    Well, that's what I'm trying to do.

7       Q.    -- going to move to strike --

8       A.    That's what I'm trying to do.

9       Q.    Okay.  Go ahead.

10      A.    Okay?  You asked me, what harm did I suffer by

11  not being transferred to the state hospital.  That's what

12  I'm explaining to you.  Okay?

13      Q.    Go ahead.

14      A.    They kept me in an isolation cell 24 hours a day,

15  with the lights on 24 hours a day, with three cold meals a

16  day, no hot meals, no dairy products, no vegetables.  Okay?

17  No way to take a shower because I had no hygiene products,

18  no shower shoes, no towel.  I had to shower barefoot.  I had

19  to dry off with an old stinky ass T-shirt.  Excuse me.

20          Um, and I even asked myself, I guess in a moment

21  of clarity, while I was being held in one of those cells, I

22  said, "What the hell are you doing?"  I had a beard this

23  long and hair down to about the middle of my back.  Because

24  I -- even in that moment of clarity, I realized that I was

25  deteriorating.  Do you understand?  Up here.

Stephen Oliver Swartz - 8/22/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 276

1  STATE OF ARIZONA       )
                          )    ss.
2  COUNTY OF MARICOPA     )

3

4              BE IT KNOWN that the foregoing deposition was

5  taken by me pursuant to stipulation of counsel; that I,

6  Nicole Tatlow, RPR, Certified Reporter No. 50671, in the

7  State of Arizona, and by virtue thereof, am authorized to

8  administer an oath; that the witness before testifying was

9  duly sworn by me to testify to the whole truth; that the

10 questions propounded by counsel and the answers of the

11 witness thereto were taken down by me and reduced to print

12 under my direction; that deposition review and signature

13 were requested; that the foregoing 275 pages are a full,

14 true and accurate transcript of all proceedings and

15 testimony had and adduced upon the taking of said

16 deposition, all to the best of my skill and ability.

17             I FURTHER CERTIFY that I am in no way related

18 to nor employed by any of the parties hereto nor am I in any

19 way interested in the outcome hereof.

20             DATED at Phoenix, Arizona, this 3rd day of

21 September, 2013.

22

23             _____

24                     NICOLE TATLOW, RPR
                        Certified Reporter
25                      Certificate No. 50671

# EXHIBIT 54

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Victor Parsons, et al., on    )
behalf of themselves          )
and all others similarly      ) NO. 2:12-cv-00601-NVW
situated; and Arizona Center  )
for Disability Law,           )
                              )
            Plaintiffs,        )
                              )
vs.                           )
                              )
Charles Ryan, Director,       )
Arizona Department of         )
Corrections; and Richard      )
Pratt, Interim Division       )
Director, Division of Health  )
Services, Arizona Department  )
of Corrections, in their      )
official Capacities,          )
                              )
                              )
            Defendants.        )
_____ )


VIDEOTAPED DEPOSITION OF JOSHUA W. POLSON


Florence, Arizona
August 23, 2013
9:16 a.m.


REPORTED BY:
CHRISTINE JOHNSON, RPR, RMR
Certified No. 50383

PREPARED FOR:

Joshua W. Polson - 8/23/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 150

1   of don't want to take something you'll be puking up.

2       Q    How much do you weigh?

3       A    About one something, like about 130.

4       Q    How tall are you?

5       A    Six one, way underweight.

6       Q    How much did you weigh when you came into ADOC

7   this last time?

8       A    About 155 or 160, maybe.  I know it wasn't 130.  I

9   know that.

10      Q    This last time would have been in 2006; correct?

11      A    No, last time would have been 2008.

12      Q    Okay.

13      A    2006 is when I got out my first time in prison and

14  I weighed 185 pounds.  That was before they changed this

15  two-meal thing and actually before they changed the menu,

16  too.

17      Q    How long were you out in -- did you say 2006?

18      A    Yeah.

19      Q    How long were you out?

20      A    Two weeks exactly, 14 days.  I went in to my

21  parole officer and asked her for help and she locked me back

22  up.

23      Q    And you think that in 2006, you weighed -- what

24  did you say, 180?

25      A    185 when I got out.

Page 151

1      Q    In November of 2006, according to your records,

2  you weighed 152.  Are you aware of that?

3      A    That's not what I weighed when I weighed myself at

4  home.  So I don't know.

5      Q    Well, I'm glad I don't have your scale.

6      A    I mean, this is a DOC scale.

7      Q    Well, I'd rather have that one.

8      A    Or the diet they give you.

9      Q    Do you know how much you weighed the last time you

10 were weighed here at --

11     A    No.

12     Q    -- DOC?

13     A    I don't even -- I haven't seen a doctor in a

14 probably couple months.

15     Q    In February of 2008, you weighed 158.

16          MR. du MEE:  Object to form.

17 BY MS. WIENEKE:

18     Q    Were you aware of that?

19     A    No.

20     Q    Okay.

21     A    What about, 2009, what did I weigh?

22     Q    In 2009, while at Lewis, you were put on watch

23 because you beat up your cellie.

24     A    Security watch 2009 February something.

25     Q    February 4th.

Joshua W. Polson - 8/23/2013
PARSONS v. RYAN, 2:12-CV-00601-NVW

Page 163

1  STATE OF ARIZONA   )

2  COUNTY OF MARICOPA)

3          BE IT KNOWN that the foregoing videotaped

4  deposition was taken before me pursuant to stipulation of

5  counsel; that I, Christine Johnson, RPR, RMR, Certified

6  Reporter No. 50383, in the State of Arizona and by virtue

7  thereof, am authorized to administer an oath; that the

8  witness before testifying was duly sworn by me to testify to

9  the whole truth; that the questions propounded by counsel

10  and the answers of the witness thereto were taken down by me

11  and reduced to print under my direction; that deposition

12  review and signature were requested; that the foregoing 161

13  pages are a full, true and accurate transcript of all

14  proceedings and testimony had and adduced upon the taking of

15  said deposition, all to the best of my skill and ability

16          I FURTHER CERTIFY that I am in no way related

17  to any of the parties hereto nor am I in any way interested

18  in the outcome hereof.

19          DATED at Phoenix, Arizona, this _____ day

20  of _____, 2013.

21

22          _____

23          CHRISTINE JOHNSON, RPR, RMR
                Certified Reporter
              Certificate No. 50383

24

25

# EXHIBIT 55

# FILED UNDER SEAL

# EXHIBIT 56

```
                  UNITED STATES DISTRICT COURT
                     DISTRICT OF ARIZONA

Victor Parsons; Shawn          )   No:
Jensen; Stephen Swartz;        )   CV12-00601-PHX-NVW
Dustin Brislan; Sonia          )   (MEA)
Rodriguez; Christina           )
Verduzco; Jackie Thomas;       )
Jeremy Smith; Robert Gamez;    )
Maryanne Chisholm; Desiree     )
Licci; Joseph Hefner; Joshua   )
Polson; and Charlotte Wells,   )
on behalf of themselves and    )
all others similarly           )
situated; and Arizona Center   )
for Disability Law,            )
              Plaintiffs,       )
     v.                        )
Charles Ryan, Director,        )
Arizona Department of          )
Corrections; and Richard       )
Pratt, Interim Division        )
Director, Division of Health   )
Services, Arizona Department   )
of Corrections, in their       )
official capacities,           )
              Defendants.       )
                               )


               DEPOSITION OF MARK T. HALDANE, JD
                    September 19, 2013
                         9:00 a.m.
                     Phoenix, Arizona


                         Prepared by:
                         Marcella Daughtry, RPR
                         Arizona Certified
                         Reporter No. 50623

                         Prepared for:

                         (Copy)
```

Page 36

1  yes.  And some of it may be also the Health Service

2  Technical Manual.

3      Q    But the things that in your job you look at

4  every month are primarily the things on the MGAR,

5  correct?

6              MS. CLOMAN:  Form.

7              THE WITNESS:  It's the things -- it's on

8  the compliance side of the MGAR.  The MGAR has several

9  different sections, and I look at the compliance areas.

10     Q    BY MR. du MÉE:  What are the other sections

11  that you don't look at?

12     A    Well, I am not responsible for the clinical

13  areas including nursing, pharmacy.  I am not

14  responsible for mental health.  I am not responsible

15  for parts of dental/oral care monitoring.  So --

16     Q    Have there been times in the past when you

17  have been tasked with filling out those sections of the

18  MGAR, though?

19              MS. CLOMAN:  Form.

20              THE WITNESS:  Any monitor can report any

21  deficiency that they find in any section of the MGAR

22  if they -- if they feel like that's something that they

23  are -- that they have knowledge to do.  I have in fact

24  filled out dental areas because a lot of it is -- is

25  not really directly related to care; it's more form and

Parsons vs Ryan
Deposition of Mark T. Haldane, JD - 9/19/2013

Page 37

1   time frames and those sorts of things, which are

2   readily obtainable through documentation.

3       Q    BY MR. du MÉE:  Who does the dental portion of

4   the MGAR at Perryville now?

5                 MS. CLOMAN:  Foundation.

6                 THE WITNESS:  Dr. Chu is our statewide

7   dental monitor.  And so I don't know exactly what --

8   it's been a little while actually since oral care has

9   been on the MGAR.  I'm not sure.  It's probably been a

10  few months, but I think she does some of it, and then

11  parts of it I would do.

12      Q    BY MR. du MÉE:  Do you know if dental is on

13  the MGAR for September 2013?

14      A    Not to my knowledge.

15      Q    What about mental health; who does that

16  section?

17                 MS. CLOMAN:  Foundation, form.

18                 THE WITNESS:  We have two -- what's her

19  name?  She's fairly new.  I can't recall the mental

20  health monitor's name.

21      Q    BY MR. du MÉE:  Would it be Erin Barlund?

22      A    No, it would not.  I don't --

23      Q    That's okay.  If you don't remember --

24      A    But she works under Dr. Taylor and Steve

25  Bender, I think, and I can't remember.  That's

Parsons vs Ryan
Deposition of Mark T. Haldane, JD - 9/19/2013

Page 42

1   healthcare in your role as a contract monitor?

2       A    Observed it, I have seen inmates going into

3   the offices of mental health providers and nurses,

4   sure.

5       Q    But you aren't there for the appointments, of

6   course?

7       A    Absolutely not.

8       Q    Right.  That makes sense.

9            What about dental care; have you

10  observed the delivery of dental care in your role as a

11  contract monitor?

12      A    I have seen many inmates sitting in dental

13  chairs getting dental services, yes.

14      Q    But again, you are not a dentist; you don't

15  have any dental training?

16      A    No, I do not.

17      Q    So if you were to testify about either of

18  those issues, you would primarily be testifying just

19  based on your review of the medical records, correct?

20            MS. CLOMAN:  Form.

21            THE WITNESS:  Yes, that's true.

22      Q    BY MR. du MÉE:  Now, the next section here, it

23  says, "His activities in evaluation of mental health

24  services provided by Corizon, reporting on those

25  services with the monitoring MGAR reports."

Parsons vs Ryan
Deposition of Mark T. Haldane, JD - 9/19/2013

Page 266

1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA  )

3

4            I, Marcella L. Daughtry, a Certified

5   Reporter, Certificate No. 50623, in the State of

6   Arizona, do hereby certify that the foregoing witness

7   was duly sworn to tell the whole truth; that the

8   foregoing pages constitute a full, true, and accurate

9   transcript of all proceedings had in the foregoing

10  matter, all done to the best of my skill and ability.

11  Pursuant to request, notification was provided that the

12  deposition is available for review and signature.

13

14           I FURTHER CERTIFY that I am not related

15  to nor employed by any of the parties hereto, and have

16  no interest in the outcome.

17

18           WITNESS my hand this 3rd day of October,

19  2013.

20

21                      _____
                        Marcella L. Daughtry
22                      Arizona Certified
                        Reporter No. 50623
23

24

25

# EXHIBIT 57

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, ) ) ) ) ) ) ) ) ) ) ) ) ) | No. CV12 00601 PHX-NVW (MEA) |

        Plaintiffs,    )
   vs.               )
                      )
Charles Ryan, Director, Arizona   )
Department of Corrections; and    )
Richard Pratt, Interim Division   )
Director, Division of Health     )
Services, Arizona Department of    ) 30(b)(6) DEPOSITION
Corrections, in their official    )       OF
capacities,                  ) ARIZONA DEPARTMENT
                         )  OF CORRECTIONS
        Defendants.      )
                        )

CARSON MCWILLIAMS

July 1, 2014
9:08 a.m.
Phoenix, Arizona

Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

                            Prepared by:
602.266.6535              Carolyn T. Sullivan, RPR
www.glennie-reporting.com    Arizona CR No. 50528

1      A.     For the most part, yes.  We moved 130 inmates

2   actually yesterday.  But I probably ought to clarify.

3   This DI is not written into stone just yet.  It's a DI.

4   So we're in the stage right now of collecting information

5   to see what we need to modify before we turn it into a

6   DO.  So there will be some minor changes to some things.

7   The idea, though, of that, concentrating our SMI

8   population together, is still going to be the same.  But

9   instead of CB 4, it might be CB 1, but it will be one

10  place.

11     Q.     Prior to April 1, 2014, had you concentrated

12  the SMI population in CB 4?

13     A.     No.  We had some in there, but we had some of

14  them in other places.  We would concentrate them but in

15  different max custody areas.  What we're trying to do now

16  is put all of them into one max custody area, and that's

17  for a couple of reasons, the main one being to make it

18  more accessible to services.  If you put them all in one

19  place, it makes it easier for staff to do those things.

20     Q.     So prior to April 1st of this year, was there

21  any particular SMI program at CB 4?

22              MS. LOVE:  Form and foundation.

23              THE WITNESS:  Not at CB 4 because the focus

24  hadn't quite went there yet.  It was more in Kasson and

25  SMU I.

1    actually.  Under section 6.0, Step I.  So do the steps
2    apply to all maximum custody inmates?
3        A.    Yes, they do.  They apply to all max custody
4    inmates.
5        Q.    And so the minimum here is 30 days.  Under
6    Step I, I don't see -- is it the case that there are no
7    visits allowed under Step I?
8        A.    That's correct, there aren't any.
9        Q.    No recreation?
10       A.    That's just in restrictive status housing.
11   That's not the Step I in our regular, mainstream maximum
12   custody.
13       Q.    So section 6.0 only applies to restrictive
14   status housing?
15       A.    Yes.  It's under the category of the
16   Restrictive Status Housing Program, so that just applies
17   to that particular group.
18       Q.    So let me just make sure that I understand
19   this.  So section 5.0 is Restrictive Status Program.  And
20   then section 6.0 is only the Step Program for restrictive
21   status housing?
22       A.    Yes.  This is talking about just the steps
23   inside the restrictive status housing for 7.0 and 8.0
24   also.
25       Q.    So in the main body of this Director's

1     want to do that, we would have a CO III or program staff

2     member assist them.

3         Q.    Looking down the Mandatory column for Level 2,

4     there's a Self-Control-small class.  How often do these

5     mandatory programs occur in a week?

6         A.    Most of them occur once a week, and they run

7     for about eight weeks.

8         Q.    Looking at that Level 2 -- actually, let me ask

9     you this:  In the far left column it says Level 1 Initial

10    Placement, Level 1 Step Down.  Can you define for me what

11    initial placement and step down mean here?

12        A.    This would be the STGs going into the Step Down

13    Program.  The start of it -- the Step Down Program has

14    three increments in it that you have to go through before

15    you move into the close custody area.

16        Q.    So initial placement applies to whom, Level 1

17    initial placement?  Does that apply to non-STG persons?

18        A.    These could be other types of inmates, the

19    initial placement ones.  The step down itself is a

20    different -- it's a program that the STGs only are

21    involved in where they move into the Step Down Program to

22    get moved back into general population mainstream at

23    close custody.  It's a combination of things here.

24        Q.    So for Level 2 Initial Placement, it says the

25    Self-Control small class, would every Level 2 prisoner be

1  in the Self-Control small class on a weekly basis?

2      A.    No.   They would all be eligible.   But we

3  wouldn't have the staffing to put them all in there every

4  week.   They'd have to wait their turn.

5      Q.    And how long does that take usually?

6      A.    It would depended on how many people are in

7  that category.   It's a math equation.   It's based on your

8  need for it, though.   Like let's say you were someone who

9  was going to be released from prison in the next year,

10 your priority is going to be here than someone who's

11 doing life.

12     Q.    Do you know how long prisoners generally wait

13 to get into these mandatory programs?

14     A.    I don't have any idea how long they would wait.

15     Q.     Is it the case that they cannot move in step

16 level until they finish these mandatory programs?

17     A.    They would have to participate to advance.

18 Now, Browning obviously is a little bit different than

19 some other places because it's the worst of the worst

20 group of inmates.   Some inmates wouldn't be afforded this

21 opportunity until later because of the things they've

22 done.   The person that murders someone isn't going to be

23 the highest priority.   That person is going to deal with

24 some other things first, the discipline side of things,

25 adjusting behavior.   The person that's trying to perform

68

1      A.    I don't know exact number, no.

2      Q.    Do you have a rough estimate?

3      A.    I'm not sure on that either.  I know more

4  CO IIIs are involved in it now, but I don't know the

5  exact numbers that we would be doing out at Browning.

6      Q.    For prisoners at Browning who are at large, do

7  you have an estimate of how many hours out of their cell

8  they would be spending on a weekly basis for Step I?

9      A.    For Step I, it's probably about eight to nine.

10     Q.    And how about Step II?

11     A.    Step II, you could probably add -- some being

12 in groups, you would add probably another hour of that,

13 so maybe it would be nine or ten.

14     Q.    And those nine hours, what are you counting in

15 there for Step I?

16     A.    Rec time, shower time, and then any type of

17 program they might be in.

18     Q.    Would you say the vast majority of Step I

19 Browning prisoners are in a group program?

20     A.    Not the majority, no.

21     Q.    Do you have a sense of the percentage?

22     A.    I really would hate to even speculate on that.

23 I know it's less than 50, but I wouldn't want to

24 speculate on it.

25     Q.    How about for Step II?

1        A.    Well, Step II would be the nine to ten hours.

2    But I don't want to speculate on that.  I know it's less

3    than 50, but --

4        Q.    Less than 50 percent?

5        A.    Yes.

6        Q.    And the same thing for Step III?

7        A.    Correct.  We wouldn't have the staffing to do

8    it any other way.

9        Q.    Let's look at your Declaration, Exhibit 554,

10   page 62.  There's a section that's entitled Eyman,

11   Browning Unit Programming.

12       A.    Okay.

13       Q.    Paragraph 569, it says:  Prior to April 2014,

14   Browning Unit already ran 8 inmate programs for maximum

15   custody.

16            Were these eight inmate programs running at

17   the same time?

18       A.    No.

19       Q.    How many would run at the same time?

20       A.    I can't tell you for sure.  Each CO III would

21   be doing an individual-type group.  So if you had half

22   your CO IIIs doing them, it would be maybe four.  But I

23   can't say for sure.

24       Q.    And you say prior to April 2014.  Prior when?

25   Like are you talking March 2014 or January?

86

1  of 2014.

2      Q.    I notice looking at page 68 and 69, CB 4 isn't

3  listed.

4      A.    We haven't opened CB 4 yet.

5      Q.    So are inmates living in CB 4?

6      A.    Yes, they are.

7      Q.    But the program is not implemented; is that

8  right?

9      A.    We're getting some things going in there, but

10  we're in the process of moving the inmates.  I had stated

11  earlier, yesterday we moved 130 inmates in and out of

12  there.  So we're getting the right inmate population in

13  that building.

14      Q.    But at the time of this Declaration, the

15  program wasn't implemented?

16      A.    We hadn't started moving them around yet.

17      Q.    So on page 69, paragraph 615, it says:  Prior

18  to April 2014, CB-2 and CB-3 provided the opportunity for

19  36 inmates to spend an additional hour out of cell each

20  week for programming.

21          When was that accurate?

22      A.    That should have been started in January

23  because that's when we started the majority of those

24  groups.

25      Q.    And do you know what percentage of prisoners in

87

1   CB 2 and CB 3 36 inmates represents?

2       A.    The percentage of that would be -- I have to do

3   a little math in my head here.  That would be about 15

4   percent.

5       Q.    So 15 percent of inmates had access to one

6   additional hour a week of programming.  And you said

7   that's accurate as of January 2014?

8       A.    Yeah.

9       Q.    Up until April 2014?

10      A.    Yeah.  It's probably increased a little since

11  then.

12      Q.    Let's turn to Attachment H.  And that is

13  ADC261977.

14              MS. LOVE:  Of Exhibit 553?

15              MS. FETTIG:  Yes.  Of DI 326.

16      Q.    BY MS. FETTIG:  And it's entitled Central Unit

17  Maximum Custody Step Program Matrix.

18      A.    Yes.

19      Q.    And I just want to make sure that I understand

20  what units in Central this applies to.

21      A.    This would apply to our open cell blocks, which

22  would be CBs 1, 2, and 3.  The other -- cell block 4 will

23  be in the next couple -- next month.  But the other cell

24  blocks are on a different type of -- I mean, they don't

25  get some of these privileges.  They don't have the same

93

1      Q.     So the CO III programs -- looking at paragraph

2   621, it says:  CB Kasson provides 12 inmates the

3   opportunity to spend an additional hour out of cell

4   programming each week.

5                Do you know what percentage of Kasson

6   prisoners that is?

7      A.     Well, this is only talking about Wing 1.  So on

8   Wing 1 in Kasson, we have 48 cells I believe.  So it

9   would be 25 percent.

10      Q.     So in Kasson, other than Wing 1, what DI 326

11   program would apply to them?

12      A.     Well, it doesn't apply to much of it because

13   there's a difference.  Kasson is also a detention

14   building.  Detention is different than population

15   management max custody inmates.  So it doesn't really

16   apply to detention inmates.

17      Q.     So other than the Wing 1 folks, does DI 326

18   apply to any of the Kasson prisoners?

19      A.     There's a few overflow on Wing 2 that are

20   mental health because we have more than 48 people.  So

21   there might be a handful that are on Wing 2 that are part

22   of the program.

23      Q.     Of Wing 1?

24      A.     Yes.

25      Q.     And any other prisoners that DI 326 would apply

95

1      Q.     More than once a month or all the time?  I'm
2  just looking at H right now.
3      A.     You just get the one.  But you get the contact
4  visit, yeah.
5      Q.     Once a month?
6      A.     Yes.
7      Q.     And then when you're at Step III --
8      A.     Then you get them all the time.
9      Q.     Then it's all contact visits?
10     A.     Weekly, yes.
11     Q.     So in terms of out-of-cell time between Step II
12  and III for CB 2 and CB 3, is there any difference?  Is
13  it going to be the same amount of hours roughly?
14     A.     Yes.  If you have the same stuff going on, if
15  you have visits, you've got a job, yeah.
16     Q.     How many hours a week of programming?
17     A.     And that varies from individual.  I mean, it
18  could be a few hours a week, and it could be just one
19  hour a week.  It could be zero hours a week if you were
20  on a waiting list.  But that varies by individual.
21     Q.     Do you have a sense at CB 2 and CB 3 how many
22  program slots are available for Step II?
23     A.     I'm not positive on that, but I would estimate
24  there was a few dozen on each one.
25     Q.     And for Step III as well or in addition?

1      Q.     So paragraph 581 says:   Prior to April 2014,

2   SMU I Unit already ran 7 inmate programs for maximum

3   custody inmates.  And then it lists them.  Are these

4   seven programs running concurrently?

5      A.     Yes.   These are the ones we started in January,

6   and they run -- they all start at the same time, the same

7   week.

8      Q.     And one of the programs is the mental health

9   group.  Does that only apply to the inmates who are in

10  the mental health housing units?

11     A.     Yes.

12     Q.     Mental health is separate?

13     A.     Yes.

14     Q.     So looking at paragraph 584, you say there's a

15  total of 192 maximum custody inmates offered the

16  opportunity to spend an additional one hour out of cell

17  each week.  Do you know what percentage of the SMU I

18  inmates that number represents?

19     A.     Yes.   That would represent about 20 percent.

20     Q.     In paragraph 586, you say:   Mental Health Group

21  runs two classes per day, Monday through Friday for a

22  total of 10 classes per week.

23            How many classes a week do mental health

24  inmates take, do you know?

25     A.     That varies.   And that also has an impact on

1  and the Merging Two Worlds were probably prior to that.

2  So they might have been running them maybe six months or

3  more prior.  But overall, let's say the January time

4  frame, we know that those were started again.

5      Q.   And were all six programs running at the same

6  time?

7      A.   Yes.

8      Q.   For Step III and Step II prisoners?

9      A.   Yes.

10      Q.   So is it the case that at Lumley SMA, there

11  were no out-of-cell programs for Step I prisoners?

12      A.   Correct.

13      Q.   How about if the prisoner is a mental health

14  inmate?

15            MS. LOVE:  Form.

16            THE WITNESS:  That could be different there.

17  I mean, like I said, they do have a Mental Health Program

18  there, and they have mental health staff.  It's

19  individualized on how that's dealt with.  So I can't

20  really tell you, yeah, this is how it works.  But yes,

21  there could be that based on the inmate's need, something

22  could have occurred differently.  And they definitely had

23  the one-on-one contact.

24      Q.   BY MS. FETTIG:  And would that be monthly?

25      A.   The requirement is monthly.  They might have

114

1    giving them.  So the reading material we focus on during

2    this first step is more program-oriented-type reading

3    material.

4         Q.   But not general library access?  Is that

5    accurate?

6         A.   That's accurate.

7         Q.   On Step II, are you allowed any phone access?

8         A.   On Step II, you -- I don't believe you get

9    phone access until you get to Step III.  On Step III you

10   get one 15-minute phone call per month.

11        Q.   For this program matrix, as in all of them,

12   there are the prescribed programs that you have to

13   mandatorily participate.  I just want you to take a look

14   at Attachment O.  And that's at ADC261985.  It says

15   Restsrictive Housing Mandatory Programs.  Are those the

16   programs that restrictive status prisoners would have to

17   participate in?

18        A.   These are the mandatory ones.  There are other

19   ones that we do or can do.  But these are the mandatory

20   ones, yes.

21        Q.   And is it accurate to say that there are no

22   out-of-cell programs until Level III?

23        A.   Level III only is the group that comes out for

24   the group counseling.

25        Q.   And how often would that be?

1    should use, yes.

2         Q.    BY MS. FETTIG:  Just looking at the first page

3    of the document, it looks like it's for Friday, March

4    14th, 2014.

5         A.    Yes.

6         Q.    And I see the code is 2102 reentry program.

7         A.    Yes.  It would be that class, but yes.

8         Q.    Is that accurate?

9         A.    Yes.  That would be the code for the class.

10        Q.    So just to -- the next thing over is group

11   location ALT.  It says:  C/Building 29.

12        A.    That's where it's being held.  That place that

13   we talked about that they remodeled.

14        Q.    And then the next line I understand inmate name

15   and number, housing.  It looks like 30 building and then

16   I'm assuming that's the actual cell number?

17        A.    Yes, it is.

18        Q.    And then group.  What does that stands for?

19        A.    I don't know.

20        Q.    So looking at this particular roster, it looks

21   like it starts -- the group, the reentry group started at

22   1700 and ended at 1800.  I'm assuming that's what it

23   means?

24        A.    Yes.

25        Q.    And the first -- and this is for March 14th.

1   Let me just double check something.  So if you could turn

2   to page ADC280755.  And this is for Friday, 4/4/2014, the

3   reentry program.  It looks like it's the same program to

4   me with the same -- basically the same inmates.  Eugenia

5   Acothley, Elizabeth Etsitty, Brianna Lerma.

6       A.    You're talking about the 280755?

7       Q.    280755, yeah.  And at the bottom there's a

8   handwritten note that says:  The above inmates are Stage

9   I, they were not allowed to come out of their cell for

10  class.  I had individual sessions with every single one

11  of them.

12      A.    This is a different date on the top, but, yeah.

13  The month --

14      Q.    It's a month later.

15      A.    Or two weeks later or three weeks.

16      Q.    So is it accurate that at Stage I, these women

17  are going to be recorded in a group session but not

18  actually have a group session?

19           MS. LOVE:  Form and foundation.

20           THE WITNESS:  Well, it looks like they did

21  it individually with them in this particular case.

22  That's why they wrote that on there.  So they're still

23  doing the group, they're just not doing it together.

24  Now, we just did this in Perryville.  We just put these

25  tables in, like we talked about, those chairs.  In

150

1  Perryville, we put tables that now enable them to

2  restrain people to the bottom of the table so they can't

3  stand up and move around, but they can have their hands

4  free.  So now they would actually have the ability to do

5  some things that they didn't have the ability to do

6  before.  And we just put those in a few weeks ago.  Just

7  before I went on vacation.

8      Q.    BY MS. FETTIG:  Well, this is dated April 4th,

9  2014.

10     A.    Right.  It would have been after that.

11     Q.    So at that time --

12     A.    At that time they didn't have that ability.

13          (Exhibit 559 was marked.)

14     Q.    BY MS. FETTIG:  Are you familiar with this

15 document at all?  Have you ever seen it?

16     A.    I haven't seen this per se, but it looks like

17 it's a program scheduling document.

18     Q.    I'll represent to you that it was produced by

19 the defendants as a document from Lumley SMA entitled

20 2014-04-30 as Perryville Lumley Unit Schedule A.  To your

21 knowledge is this an accurate representation of the

22 program schedule at Lumley?

23     A.    To my knowledge.  I mean, I couldn't quote the

24 program schedule at Lumley to you.  I know they do it.

25 This is a little bit different format than other places

160

1    the defendants as a document from Browning entitled

2    2014-04-30 as of - Browning Unit Program Schedule.  And

3    at the bottom there's a handwritten phrase that says

4    Current Training Schedule.  And that's how the document

5    was produced to us.

6         A.    Okay.

7         Q.    Looking at this schedule, there's nothing on

8    Saturday, Sunday, Monday.  On Tuesday you've got one

9    Thinking for Change class and then some classes on

10   Wednesday, Thursday, Friday.  Again, so what I am

11   understanding from you is that not all the mandatory

12   programs are running at the same time at Browning?

13             MS. LOVE:  Form and foundation.

14             THE WITNESS:  Browning is dramatically

15   different because of who's housed there, yes.  And just

16   the ability to move the inmates is dramatically different

17   than open the doors and letting them come out without

18   restraints and those type of things.  So yes, it's

19   different.

20        Q.    BY MS. FETTIG:  So do you have any reason to

21   believe that Exhibit 564 is not the current schedule as

22   of 4/30/2014 at Browning?

23             MS. LOVE:  Form and foundation.

24             THE WITNESS:  I wouldn't have any reason to

25   know one way or the other, yes.

165

1   STATE OF ARIZONA    )
                        )
2   COUNTY OF MARICOPA )

3

4            I, CAROLYN T. SULLIVAN, a Certified

5   Reporter, Certificate No. 50528, in the State of Arizona,

6   do hereby certify that the foregoing witness was duly

7   sworn to tell the whole truth; that the foregoing pages

8   constitute a full, true, and accurate transcript of all

9   proceedings had in the foregoing matter, all done to the

10  best of my skill and ability.  Pursuant to request,

11  notification was provided that the deposition is

12  available for review and signature.

13

14           I FURTHER CERTIFY that I am not related to

15  nor employed by any of the parties hereto, and have no

16  interest in the outcome.

17

18           WITNESS my hand this 7th day of July, 2014.

19

20

21

                Carolyn T. Sullivan, RPR
22              Arizona Certified
                Reporter No. 50528
23

24

25

# EXHIBIT 58

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
ARIZONA CENTER FOR DISABILITY LAW
5025 East Washington Street, Suite 202
Phoenix, Arizona  85034
(602) 274-6287
skader@azdisabilitylaw.org
avarma@azdisabilitylaw.org
*Attorneys for Plaintiff*
*Arizona Center for Disability Law*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

VICTOR ANTONIO PARSONS, et al.,

        Plaintiffs,

v.

CHARLES RYAN, et al.,

        Defendants.

No. 2:12-CV-00601-NVW

**DECLARATION OF
PERI JUDE RADECIC IN
SUPPORT OF PLAINTIFFS'
RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT**

Hon. Neil V. Wake

I, Peri Jude Radecic, declare:

    1.    I am an attorney licensed to practice in the State of Arizona.  Until June 6, 2014, I was the Executive Director of the Arizona Center for Disability Law, a plaintiff in this litigation.  If called as a witness, I could and would testify competently to the facts stated herein, all of which are within my personal knowledge.

    2.    Plaintiff Arizona Center for Disability Law ("ACDL") is a non-profit law firm designated as Arizona's authorized protection and advocacy agency under the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI"), 42 U.S.C.

§ 10801, *et seq.* Pursuant to PAIMI, ACDL has statutory authority to "pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State." *Id.* § 10805(a)(1)(B).

3. Eighty percent of ACDL's PAIMI advisory council is made up of individuals who have received, are receiving, or are family members of individuals receiving mental health services.

4. ACDL is pursuing this action to protect and advocate for the rights and interests of prisoners who are "individuals with mental illness" as that term is defined in 42 U.S.C. § 10802. The interests that ACDL seeks to vindicate by bringing this lawsuit – the protection of the rights of individuals with mental illness – are central to ACDL's purpose.

I declare under penalty of perjury the foregoing is true and correct.

Executed this _16_ day of June, 2014.


Peri Jude Radecic

-2-

# EXHIBIT 59

# FILED UNDER SEAL

# EXHIBIT 60

# FILED UNDER SEAL

# EXHIBIT 61

# FILED UNDER SEAL

# EXHIBIT 62

# FILED UNDER SEAL

# EXHIBIT 63

# FILED UNDER SEAL

# EXHIBIT 64

# FILED UNDER SEAL

# EXHIBIT 65

# FILED UNDER SEAL

# EXHIBIT 66

# FILED UNDER SEAL

# EXHIBIT 67

# FILED UNDER SEAL

# EXHIBIT 68

# FILED UNDER SEAL

# EXHIBIT 69

# FILED UNDER SEAL

# EXHIBIT 70

# FILED UNDER SEAL

# EXHIBIT 71

# FILED UNDER SEAL

# EXHIBIT 72

# FILED UNDER SEAL

# EXHIBIT 73

# FILED UNDER SEAL

# EXHIBIT 74

# FILED UNDER SEAL

# EXHIBIT 75

# FILED UNDER SEAL