Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | NO. 2:12-cv-00601-NVW <br><br><br> **Proposed Lodged <u>Redacted</u>: DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Arizona Attorney General Thomas C. Horne
Office of the Attorney General
Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-4951
Fax: (602) 542-7670
Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

Daniel P. Struck, Bar No. 012377
Kathleen L. Wieneke, Bar No. 011139
Rachel Love, Bar No. 019881
Timothy J. Bojanowski, Bar No. 022126
Nicholas D. Acedo, Bar No. 021644
Ashlee B. Fletcher, Bar No. 028874
Anne M. Orcutt, Bar No. 029387
Jacob B. Lee, Bar No. 030371
STRUCK WIENEKE & LOVE, P.L.C.
3100 West Ray Road, Suite 300
Chandler, Arizona  85226
Telephone:  (480) 420-1600
Fax:  (480) 420-1696
dstruck@swlfirm.com
kwieneke@swlfirm.com
rlove@swlfirm.com
tbojanowski@swlfirm.com
nacedo@swlfirm.com
afletcher@swlfirm.com
aorcutt@swlfirm.com
jlee@swlfirm.com

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons, *et al.*, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>                                   Plaintiffs,<br><br>             v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>                                   Defendants. | NO. 2:12-cv-00601-NVW<br><br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>REDACTED |

# TABLE OF CONTENTS

Page

I.    PLAINTIFFS DID NOT SATISFY THEIR BURDEN OF PROOF         1

      A.    Evidentiary Deficiencies                           2
      B.    Substantive Deficiencies                           6

II.   CONDITIONS-OF-CONFINEMENT CLAIMS                        13

      A.    Property                                          15
      B.    Nutrition                                         15
      C.    Exercise                                          16
      D.    Cell Illumination                                 17
      E.    Use of Chemical Agents                            18
      F.    Social Isolation                                  19

III.  DENTAL CLAIMS                                           21

      A.    Dr. Shulman's Faulty Criticisms                   21
      B.    No Eighth Amendment Violation                     24

IV.   MEDICAL CLAIMS                                          28

      A.    Systemwide Deficiencies                           28
      B.    Individual Certified Practices                    31

V.    DECERTIFICATION                                         34

VI.   PLAINTIFF BRISLAN                                       35

CONCLUSION                                                    35

Plaintiffs' legal theory is that systemwide deficiencies in healthcare and conditions of confinement expose all inmates to a substantial risk of serious harm.  The systemwide deficiencies allegedly stem from seventeen ADC practices.  Those practices are based on the named Plaintiffs' allegations and the opinions of their experts. The expert opinions are based on inmate records, inmate interviews, and other documents describing particular prior instances of care. Thus, Plaintiffs' underlying proof of these alleged systemwide practices—and the crux of their case—is a collection of prior instances involving specific inmates, including themselves.  To defend against these claims, Defendants must establish that the alleged systemwide practices do not exist. That can be accomplished by disproving their foundation, specifically by showing that the named plaintiffs' allegations are false, and/or their experts' opinions are supported by insufficient or anecdotal evidence or not on a systemwide scale.  If the underlying evidence is inadequate or nonexistent, then the concluding opinions are flawed and Plaintiffs' legal theory fails because there is no evidence that inmates are at substantial risk of serious harm.

Plaintiffs contend that Defendants misunderstand their claims.  They argue that the truth or falsity of the factual allegations in their Complaint—on which their claims for relief were "predicated"—are irrelevant, despite relying on those same allegations to defeat Defendants' Motion to Dismiss.  They argue that the named Plaintiffs' specific allegations are also "largely irrelevant," despite relying on them to secure class certification. They argue that their experts' anecdotal "evidence" is unimportant. What matters, they assert, is that their experts concluded the care and conditions are unconstitutional on a systemwide scale.  Plaintiffs are forced into this argument because Defendants have pinpointed the evidence underlying those claims, and it is woefully deficient.  Plaintiffs' theory is not immune from attack, as they suggest. They have not satisfied *their* burden to withstand summary judgment.

## I.      PLAINTIFFS DID NOT SATISFY THEIR BURDEN OF PROOF

A party moving for summary judgment need only "point out the lack of evidence supporting the nonmoving party's claim [and] need not produce evidence negating that

1

claim." [1] *Donahoe v. Arpaio*, 986 F.Supp.2d 1091, 1102–03 (D. Ariz. 2013) (citations omitted). Defendants' Motion shifted the burden to Plaintiffs to "show that there are genuine issues of material fact." *Id*. To do this, Plaintiffs were required to "produce evidence to support its claim or defense by more than simply showing 'there is some metaphysical doubt as to the material facts.'" *Id*. The Court may consider a statement of fact undisputed if Plaintiffs failed to dispute it. Fed.R.Civ.P. 56(e)(2).

### A.   Evidentiary Deficiencies

**Undisputed Facts**.  There are 4,327 paragraphs in Defendants' Statement of Facts. 2,917 paragraphs were cited in Defendants' Motion for Summary Judgment.  Plaintiffs dispute only 125 total paragraphs.  Only 56 of those paragraphs were cited in the Motion—or 1.92%.  To cover the fact that they have no evidence to dispute thousands of material facts (despite having seven experts, being provided more than 500,000 pages of production documents, deposing more than 50 witnesses, and conducting more than 50 expert tours), Plaintiffs write these off as immaterial facts, including:

- Between September 27, 2013 and April 1, 2014, the average reported HNR wait times at ASPC-Douglas, Phoenix, Safford and Winslow, was 1.8 days to see a nurse, 3.9 days to see a mid-level provider or physician,

---

[1] Normally, this is an easy task and does not require a voluminous statement of facts because it "should include only those facts that the Court needs to decide the motion." LRCiv 56.1(a).  But this case is not normal.  There are thirteen named Plaintiffs, who make dozens of individual allegations.  There are only five claims in the 74-page, 151-paragraph Complaint, but each one is limitless on its face. The Court certified 17 alleged practices, but the scope of those practices are equally ambiguous. It appears that these certified practices were based on a combination of the allegations in the Complaint, and the allegations made by the named Plaintiffs *and* their experts in their declarations supporting class certification. After class certification, Plaintiffs have insisted that anything related to healthcare is fair game, even if it was not alleged in their Complaint or certified as a practice. Even their Response includes allegations beyond the Complaint.

Unsure how narrow or broad the Court would interpret Plaintiffs' "claims," Defendants interpreted them broadly out of an abundance of caution.  Thus, Defendants addressed allegations in the Complaint, in declarations, and in the Court's class certification order.  Defendants maintain that each and every statement of fact is material to these allegations. There are so many only because Plaintiffs have alleged so much, broadly and inconsistently, and because evidence depicting a deliberately caring healthcare system is so voluminous. Because LRCiv 56.1(a) requires that each material fact "be set forth in a separately numbered paragraph," facts that provide context were separately numbered. The Court "needs" those facts "to decide the motion." *Id.*

and 2.2 days to see a mental health practitioner (DSOF ¶¶ 145, 147-150); Corizon has written and filled more than 431,000 prescriptions (id. ¶¶ 151-153); and Corizon has completed more than 6,400 medical specialty appointments (id. ¶¶ 154-156).

- Plaintiffs' dental expert, Dr. Shulman, conceded that inmates at ADC have access to basic dental care (DSOF ¶ 827), and did not identify any inmate who experienced irreparable harm as a result of a delay in receiving dental treatment (id. ¶ 1030).

- Cell restrictions for maximum custody inmates, who represent the highest risk and require frequent monitoring, are necessary because of the security risk they present to themselves, the public, staff, and other inmates (DSOF ¶¶ 1260, 1262); and Director's Instruction 326 affords maximum custody inmates even more opportunities for out-of-cell time than they previously had (id. ¶¶ 1258-1470).

The Court should deem all undisputed facts admitted.

Instead of responding to and disputing Defendants' statements of fact and showing the Court what precisely is in dispute, Plaintiffs send the Court on a wild goose chase, directly citing to various documents filed on the Court's docket.  And nearly every citation they provide in their Response is to multiple citations, with a range of pages or paragraphs.  For example, the first bulleted-record cite in the Response at page 7 ("Excessive delays in access to care and outright denial of care") references dozens of paragraphs and pages of expert opinions, which in turn, incorporate dozens of additional documents and/or entire expert reports, including the entire Appendix C of Dr. Cohen's expert report (a 36-page summary opinion regarding care), and the entire 29-page supplemental report by Dr. Wilcox.  The last string of citations incorporates by reference all the arguments and record citations in pages 14-15, 21-24, and 25-32 of the Response itself.  Plaintiffs do the same thing at Page 15, incorporating all record citations from pages 5-8 of the Response—which includes Page 7 and the bullet point and original citation itself.  So, for this single assertion, Plaintiffs have pointed the Court to hundreds of pages, most of which are, at best, only marginally or tangentially relevant, before bringing the reader back to the same citation that began the chase.

3

Plaintiffs are hoping to capitalize on the Court's self-imposed two-week ruling deadline. (Dkt. 962.) It is impossible to verify each of their citations in that timeframe. It was Plaintiffs' responsibility to "identify with reasonable particularity the evidence that precludes summary judgment." *Best W. Int'l, Inc. v. AV Inn Associates 1, LLC*, 2010 WL 2595274, at *5 (D. Ariz. 2010); *see also Indep. Towers of Washington v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs."). The Court should not merely assume that an issue of fact exists, and it is not obligated to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allan,* 91 F.3d 1275, 1279 (9th Cir. 1996).

**Inadmissible Evidence**. Plaintiffs attached 75 Exhibits to their Response. They did not disclose 42 of them in their Disclosure Statement, including Exhibits 1, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 19, 21, 22, 23, 24, 25, 28, 29, 33, 37, 40, 41, 42, 43, 44, 45, 46, 58, 59, 60, 61, 66, 67, 68, 69, 70, and 75. (Att. 1.) These Exhibits must be stricken and cannot be relied upon to defeat summary judgment. Fed.R.Civ.P. 37(c)(1). On June 27, 2014—two weeks before, and in anticipation of filing their Response and relying on these Exhibits—Plaintiffs removed all previously listed trial exhibits from their Disclosure Statement, and replaced them with a catch-all that includes as their trial exhibits *anything* that Defendants are aware of: "all documents, electronically stored information, and tangible things made known to Defendants during the pendency of this litigation . . . including . . . all information made known to defendants in all other writings in this proceeding." (Att. 1.) Presumably, they did this to (1) prohibit Defendants' from efficiently preparing for trial, and (2) to use previously undisclosed evidence at trial and in opposition to summary judgment, a flagrant and egregious tactic. The Court should strike all Exhibits relied upon that were removed from Plaintiffs' Disclosure Statement.[2]

**Expert Opinions**. Plaintiffs rely nearly exclusively on their experts' reports— most of them are unsworn and rely on hearsay—to defeat summary judgment. Although

---

[2] The 42 Exhibits identified above were not listed in Plaintiffs' Disclosure Statement even before they deleted their listed trial exhibits.

certain expert opinions *may* create an issue of fact (as the negligence cases they cite show), "[c]onclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). This is particularly so in Eighth Amendment cases. *See Clouthier v. County of Contra Costa,* 591 F.3d 1232, 1252 (9th Cir. 2010) (plaintiff's expert affidavit opining that, "based on a review of the incident," he believed mental health and custodial staff failed to work together, and noting "an inadequacy in training which appears to be purposefully indifferent to the mental health needs of pre-trial detainees" was insufficient to avoid summary judgment). Also in this context, opinions that merely establish a difference in medical opinion do not establish deliberate indifference. *Sanchez v. Vild,* 891 F.2d 240, 242 (9th Cir. 1989). Plaintiffs' experts' opinions are largely speculative, conclusory, opine as to the ultimate legal issue, and at most assert a difference of medical opinion.

An even bigger deficiency—and one that definitively precludes *any* consideration of their expert reports—is that Plaintiffs failed to include with their Response the documents/emails/records that their experts allegedly reviewed and relied upon (almost exclusively) to form their opinions. At the summary judgment stage, "materials that are not yet in the record—*including materials referred to in an affidavit* or declaration—*must be placed in the record.*" *Jones v. Corr. Corp. of Am.*, 2013 WL 56119, at *18 (D. Ariz. 2013) (quoting Fed.R.Civ.P. 56 Advisory Comm. Note, 2010 amendments) (emphasis in original). This includes healthcare records and files relied upon and referenced in a healthcare expert's report. *Id*. Because Plaintiffs did not provide the Court with the documents and records their experts relied upon in forming their opinions, the reports cannot be considered. *Id*.

Finally, Plaintiffs' experts' opinions must be stricken and not considered for all of the reasons asserted in Defendants' pending *Daubert* Motion, which they incorporate here. Without any expert testimony, which is the foundation of their case, their lawsuit should be dismissed.

## B.   Substantive Deficiencies

**Changing Theories.**   As discussed throughout this Reply, Plaintiffs attempt to modify their claims to skirt around incontrovertible arguments defeating those they raised in their Complaint.  They "cannot raise a new theory of liability in opposition to summary judgment." *Harris Technical Sales, Inc. v. Eagle Test Sys., Inc.*, 2008 WL 343260, at *17 (D. Ariz. 2008).  Their new theories should be summarily denied.

**Named Plaintiffs**. The named Plaintiffs argue that they do not need to show that they themselves are exposed to a substantial risk of harm to take their claims to trial. This is a preposterous position, particularly when Plaintiffs relied on their allegations to defeat Defendants' Motion to Dismiss and to certify the class and subclass.  It also ignores what the Court has repeatedly told them at nearly every hearing:  "They have to win – every class representative has to win their own lawsuit." (Dkt. 551, R.T. 1/25/13 at 12–13; see also Dkt. 57, R.T. 7/20/12 at 8–9; Dkt. 556, R.T. 8/7/13 at 10–11, 24–26, 48–49.) "You're going to have to prove up the case with respect to your named plaintiffs about their conditions, their needs, levels of care that relate to them, and how those levels of care fall below the constitutional minimums for them in a way that's probable." (Dkt. 446, R.T. 4/26/13 at 33.)  "[I]f you don't prove it as to the named plaintiffs it unravels the basis for class certification." (R.T. 8/7/13 at 24-26.) Plaintiffs repeatedly acknowledged this was their burden.  (R.T. 7/20/12 at 9; R.T. 1/25/13 at 12–13; R.T. 8/7/13 at 17.)

Article III of the U.S. Constitution requires that each named Plaintiff prove that they are actually exposed to a substantial risk of serious harm.  "[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26, 40 n.20 (1976) (quotation omitted).[3]   And standing must be *proven* at the

---

[3] The Ninth Circuit's decision affirming the class certification order does not relieve Plaintiffs of their burden to prove standing. The selected quotes from that opinion were made in the court's commonality analysis; the issue of standing was not before the court.  *See Parsons v. Ryan*, 2014 WL 2523682, at **10-13 (9th Cir. June 5, 2014). The

1    summary judgment stage by affidavit or other evidence; mere allegations are not enough.[4]

2    *Lewis v. Casey*, 518 U.S. 343, 358 (1996).  To establish standing, a class representative

3    must show that their exposure to the alleged risk of harm is "concrete and particularized,"

4    "actual or imminent, not conjectural or hypothetical," and "fairly traceable" to the

5    certified practices.  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).

6    Plaintiffs' Eighth Amendment theory requires them to show (1) a substantial risk— one

7    that is "sure or very likely to cause serious illness and needless suffering" and gives rise to

8    "sufficiently imminent dangers," *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)—(2) of

9    serious harm—one that "could result in further significant injury or the unnecessary and

10   wanton infliction of pain," *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992).

11        In their Motion and Statement of Facts, Defendants raised the issue of standing,

12   pointed out that many of the named Plaintiffs did not even make allegations falling within

13   several certified practices, and refuted allegations made by the named Plaintiffs in the

14   complaint and their class-certification declarations.  It was then *Plaintiffs'* burden to prove

15   that they have standing to proceed on *all* certified practices.  *Washington Envtl. Council v.*

16   *Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013).   None of the Plaintiffs provided new

17   declarations supporting their own claims.  Plaintiffs REDACTED

18                                                                      and REDACTED

19                         did not dispute any issues of fact specifically refuting their medical

20   allegations, and the other named Plaintiffs collectively disputed only a handful of

21   statements of fact.[5]  As the DSOF shows, Plaintiffs' own deposition testimony and

---

quotes actually derive from *Brown v. Plata*, 131 S.Ct 1910, 1925 n.3 (2011), which also
did not address standing.  Plaintiffs take these quotes out of context.

        [4] The Court's standing ruling at the motion-to-dismiss stage is not law of the case
because, at that time, the Court accepted as true Plaintiffs' allegations of standing. They
cannot rely on those allegations at the summary judgment stage, but rather must
affirmatively demonstrate standing with evidence now. *Lujan v. Defenders of Wildlife*,
504 U.S. 555, 561 (1992). Standing was also measured at that time against Plaintiffs' five
alleged Counts, not the seventeen certified practices. (Dkt. 175 at 4.)

        [5] Plaintiffs REDACTED
                                              REDACTED
t                                 l alleg                         sed *infra*.

7

medical records controvert the allegations they previously made and reveal that their care exceeds constitutional minima:

- REDACTED was extensively tested at Perryville via biopsy, MRI, CT scan, ultrasound and physical exam, all of which confirmed she did not have cancer and thus explains the alleged delay in referring her to an oncologist REDACTED

- REDACTED was promptly enrolled in Perryville's chronic care clinic for her complaints of chest pain and hypertension, where her blood pressure/vital signs were monitored frequently from mid-January to February 15, 2010 (without any alarming results justifying sending her to a hospital or cardiologist), and CT scans, chest x-rays, EKG tests and physical exams did not indicate the need for an urgent cardiologist consult before she was seen by Affiliated Cardiologists of Arizona on July 7, 2010, which found no abnormalities from either the stress test or EKG. REDACTED

- REDACTED does not dispute ADC's diagnosis of and treatment of prostate cancer. He merely offers his spouse's two emails and an outside surgeon's record recounting *Jensen's version* of Nurse Cordova negligently manipulating his catheter in early August, 2010. REDACTED This does not dispute any of Jensen's other claims, including alleged delays in receiving a biopsy, delays in receiving chemotherapy medication and failure to provide a sufficient quantity of catheters.

- REDACTED does not dispute the history of ADC's treatment of his ear infections from 2008-2013 REDACTED including his August 30, 2010 complaints of blood in his ear being found to be a superficial scratch REDACTED

- REDACTED alleges now that her inhaler prescription was delayed for a month, but the record they cite is an April 17, 2012 prescription from an outside pulmonologist with a fax header showing it was not transmitted to ADC until a month later on May 17, 2012, and ADC130345 shows Dr. Lockhart prescribed the inhaler the next day REDACTED She also does not dispute evidence showing that her subjective complaints of chest tightness/pain in the Spring of 2011 were objectively tested via EKG and x-rays, with negative results, and that treatment by an outside cardiologist January 27 and February 3, 2012 came from a December 17, 2011 ADC referral, prompted by elevated cholesterol results and shortness of breath complaints during a December 14 exam REDACTED

8

- REDACTED does not dispute evidence showing proper treatment after he swallowed a foreign object via endoscopies REDACTED Although he disputes his approval and receipt of Tramadol, including the increased dosage REDACTED he does not question that the pharmacy's original approval of the drug on June 1 (after an April prescription date) was necessarily delayed because it needed to obtain Swartz's lab results on May 26 REDACTED

- REDACTED does not dispute any of the evidence surrounding ADC's extensive treatment following his March 26, 2011 assault, or his alleged iritis from eye drops in 2006 REDACTED

Plaintiffs also do not seriously dispute the number of encounters each of them have had. Instead they claim that "[q]uantity does not equal quality," and bristle at the idea that the frequency of healthcare encounters is a factor warranting summary judgment. But they ignore *Cano v. Taylor*, 739 F.3d 1214, 1217 (9th Cir. 2014) and *Estelle v. Gamble,* 429 U.S. 97, 107 (1976), both of which emphasized the frequency of inmate treatment as probative in determining whether the Eighth Amendment was violated. Focusing solely on how much care was needed, and the quality thereof, are arguments for medical negligence cases, not deliberate indifference cases.[6]

Regarding Plaintiffs' associational standing argument, even assuming that the ACDL does have associational standing to raise certain claims, its standing does not save the individual named Plaintiffs, the class, or the subclass. The ACDL is a separate plaintiff, and more importantly, it is not a class representative. If the individual named Plaintiffs do not have standing, then they must be dismissed; and if they are dismissed, the class and subclass claims are dismissed as well. All of this, however, assumes that the

---

[6] The term "encounter" as used in Defendants' Motion was not to satisfy a glossary definition of "clinical encounter" in a technical manual, but for its common meaning to indicate a meeting or face-to-face interaction, which is an opportunity for an inmate to seek additional medical or mental health care. Notably, of the 2,246 encounters between the 13 named Plaintiffs and healthcare personnel between March 22, 2010 and April 1, 2014, Plaintiffs have identified a total of nine (9) that may not meet the strict definition of "clinical encounter" to support their argument that Defendants have "overstated" the number of encounters. Moreover, Plaintiffs have failed to refute the point that ADC's mental health professionals are trained to use a cell-front visit not only to treat an inmate, but to assess an inmate to determine if a more private one-on-one session is necessary. (DSOF ¶¶ 1925-1926, 1931, 1933.)

ACDL has demonstrated associational standing. But their showing consists of a bare statement that "[h]undreds, if not thousands," of ADC inmates have a mental illness. That undisputed assertion does not prove that any one of these inmates is exposed to a concrete and imminent substantial risk of serious harm that is traceable to Defendants' conduct.

**Systemwide Deficiencies**. It was Plaintiffs' burden to establish a genuine issue of material fact regarding systemwide practices. *Donahoe*, 986 F.Supp.2d at 1102–03. And their conclusory assertion that their experts "have opined" that the alleged practices are systemwide does not satisfy that burden. Their experts' opinions are foundationally flawed and bald conclusions do not create an issue of fact. Plaintiffs were required to show the Court that *each* certified practice is in fact present at *all ten* ADC facilities, *see Lewis*, 518 U.S. at 360 n.7. They did not do this, likely because if you peel back the layers of any one of their expert's opinions, it is not supported by evidence spanning across all ten (or even a majority of) facilities, but instead based on a handful of unrelated isolated incidents at a few facilities. Footnote 7 of their Response is enlightening because in arguing that evidence of systemwide deficiencies is not dispositive, they admit that the Court must resolve "whether individual plaintiffs suffered constitutional violations and were entitled to a remedy." This is inconsistent with their argument that they do not need to establish that the named Plaintiffs are suffering a constitutional violation. Plaintiffs cannot prove either argument.

**_Monell_ Custom and Policy**. Plaintiffs also do not satisfy their burden to show that the certified practices were the moving force behind the alleged constitutional violations. *See Los Angeles County v. Humphries*, 131 S.Ct. 447, 452 (2010). The *Monell* principle applies with equal force to municipalities and state officials sued in their official capacity "because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, n.10 (1989).

**Partial Claims**. Plaintiffs contend that they have only five "claims" and Defendants should not be granted summary judgment on any "part of" these claims. Although their complaint listed five Counts, each Count was based upon the "policies and

10

practices described" in the preceding allegations. Moreover, the Court subsequently certified seventeen practices, which refined these claims. Those are the claims that are to be adjudicated on a classwide basis, not Plaintiffs' original five Counts.  Defendants moved for summary judgment on nine of these certified practices.  These are stand-alone claims—built upon very specific allegations—that the class was required to prove at trial. Nonetheless, the Court can and should grant summary judgment on any "part" of Plaintiffs' claims under the 2010 Amendments to Rule 56.  *See Ridgeway v. Mon-Dak Trucking, Inc.*, 2012 WL 5380343, at *3 (D. Mont. 2012).

Regarding the five specific allegations that were highlighted in Plaintiffs' complaint and which were alleged under headings that track several certified practices— e.g., medical diets and indoor smoking (which fall under the certified practice of "failure to provide care for chronic diseases")—Defendants agree with Plaintiffs that these are not "claims" in the case.  Therefore, there should be no mention of these allegations at trial. To the extent Plaintiffs are hoping to introduce any evidence relating to these allegations to merely support their claims, however, they should not be entitled to because, as discussed below, they have failed to create an issue of fact.  Plaintiffs cannot argue that an allegation is not a claim to avoid summary judgment on that allegation and then introduce evidence of that allegation at trial to support their claim.

**Continuing-Tort Theory**.  Plaintiffs argue that evidence prior to March 22, 2010, is relevant and admissible under a continuing-tort theory. That theory, however, is rarely applied in § 1983 cases outside the discrimination context. *Green v. Los Angeles Cnty. Superintendent of Sch.*, 883 F.2d 1472, 1480 (9th Cir. 1989). It does not apply here because Plaintiffs cannot establish the requisite close relationship between the timely and untimely medical acts, most of which involve discrete incidents by different medical staff, under different employers, and at different facilities and units.  *See*, *e.g.*, *Shannon v. Babb*, 103 F. App'x 201, 201–02 (9th Cir. 2004), *Knox v. Davis*, 260 F.3d 1009, 1013-14 (9th Cir. 2001). Plaintiffs' contention that "specific examples of previous injuries are evidence directly relevant to proving Defendants' policies and practices exposing Plaintiffs to that

11

risk" does not establish the requisite relationship; and more importantly, this admission is directly at odds with its prior arguments that instances of past care are not relevant to this case. They cannot have it both ways.

**Outdated Evidence and Voluntary Cessation**. Plaintiffs argue that the evidence prior to November 2012 creates an issue of fact, and that the care and conditions after that date constitutes a voluntary cessation—even though this doctrine is relevant only to the mootness defense, which Defendants have not raised. This is once again inconsistent with their lead arguments that past conduct is not relevant. Nonetheless, to the extent Defendants have focused on ADC/Corizon care and conditions since 2013, it is because the Supreme Court has instructed that plaintiffs seeking injunctive relief must establish that the conditions "at the time of summary judgment" are unconstitutional. *Farmer v. Brennan*, 511 U.S. 825, 845–46 (1994); *see also Green v. Mansour*, 474 U.S. 64, 73 (1985). Plaintiffs cannot rely on outdated evidence to defeat summary judgment.[7]

Even if Defendants raised mootness—which they have not—Plaintiffs' voluntary cessation argument is unavailing. Voluntary cessation applies *only* if the changes arose "*because of* the litigation." *Sze v. I.N.S.*, 153 F.3d 1005, 1008 (9th Cir. 1998). Plaintiffs have failed to make this connection, and therefore have not satisfied *their* burden. The changes, modifications, and/or improvements in ADC healthcare that are reflected in the current evidence are not "because of" Plaintiffs' lawsuit, but because of circumstances outside this litigation, namely: the statutory privatization of healthcare which started in 2009 and the contractual provisions requiring certain levels of care, and the transitions of two private healthcare providers (Wexford in July 2012 and Corizon in March 2013). *See*

---

[7] Though they do not attach it as an Exhibit, they cite to Dkt. 590, Ex. 2, slides from a PowerPoint presentation given at a meeting on November 2012 between Wexford and ADC officials. This document should be stricken as Plaintiffs have no foundation to introduce these slides at trial. They are also completely devoid of factual and legal support. Wexford's Director of Operations, who attended the presentation, subsequently testified that the presentation was not a judgment on the constitutionality of the healthcare system because "obviously" she is "not a legal expert." (Dkt. # 543–1 at 74–89.) She also testified that many issues were "fixed" by the time that healthcare transitioned from Wexford to Corizon. (Id.) Plaintiffs do not dispute the fact that this document has no evidentiary value. (DSOF ¶¶ 72-80.)

1  *Sze*, 153 F.3d at 1008 (rejecting voluntary cessation argument that action occurred
2  because plaintiffs "drew particular attention" to the case because it "demonstrated no
3  more than correlation" and not causation).

4  **II.   CONDITIONS-OF-CONFINEMENT CLAIMS**

5       Faced with a mountain of legal authority upholding the constitutionality of each
6  individual certified condition, Plaintiffs shift their "claim" to a single, amorphous
7  "conditions-of-confinement" claim based on a totality-of-conditions theory. This theory
8  fails at the outset because it was not certified by the Court. It also does not apply.
9  Plaintiffs selectively quote *Wilson v. Seiter*, 501 U.S. 294, 304–05 (1991), by removing
10 the italics for "some" and omitting critical language following the words "human need":

> *Some* conditions of confinement may establish an Eighth
> Amendment violation 'in combination' when each would not
> do so alone, but only when they have a mutually enforcing
> effect that produces the deprivation of a single, identifiable
> human need such as food, warmth, or exercise— for example,
> a low cell temperature at night combined with a failure to
> issue blankets. *Compare Spain v. Procunier*, 600 F. 2d 189,
> 199 (CA9 1979) (outdoor exercise required when prisoners
> otherwise confined in small cells almost 24 hours per day),
> *with Clay v. Miller*, 626 F. 2d 345, 347 (CA4 1980) (outdoor
> exercise not required when prisoners otherwise have access to
> dayroom 18 hours per day). To say that some prison
> conditions may interact in this fashion is a far cry from saying
> that all prison conditions are a seamless web for Eighth
> Amendment purposes. Nothing so amorphous as 'overall
> conditions' can rise to the level of cruel and unusual
> punishment when no specific deprivation of a single human
> need exists.

20 (Emphasis in original).  Thus, while it makes sense to consider the combined effect of
21 limitations on outdoor exercise with lockdown cell conditions, *Spain*, 600 F.2d at 199,
22 most of Plaintiffs' conditions' theories are disparate or unrelated to producing a "single,
23 identifiable human need such as food, warmth or exercise." Plaintiffs' contention that they
24 are going after the "basic human need for social interaction and environmental stimulation"
25 is precisely the type of "seamless web" and "amorphous" combinations denounced in
26 *Wilson*.[8]  *See also Chappell v. Mandeville*, 706 F.3d 1052, 1061 (9th Cir. 2013).

27
28      _____
        [8] The fact that neither the Supreme Court nor the Ninth Circuit have ever held that

13

Moreover, the "totality-of-conditions" theory applies only when each individual condition does "not" establish an Eighth Amendment violation. *Wilson*, 501 U.S. at 304–05. It does not apply when, as here, each individual condition *is* constitutional. *See Hoptowit v. Ray*, 682 F.2d 1237, 1246-47 (9th Cir. 1982) ("A number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation."). In other words, two constitutional conditions cannot add up to an unconstitutional deprivation. Plaintiffs' pursuit of "broad prison reform" cannot be done under the guise of an Eighth Amendment challenge. *Id.*

Plaintiffs also contend that the "reasonable relationship" standard of *Turner v. Safley,* 482 U.S. 78 (1987) does not apply to Eighth Amendment claims. Plaintiffs are on the wrong side of this debate, as the quoted statement in *Johnson v. California*, 543 U.S. 499, 509, 511 (2005), is the epitome of dicta—the Supreme Court was adjudicating an Equal Protection claim by a California inmate challenging CDCR's racial segregation policy, and rejected replacing the strict scrutiny standard of racial classifications with deferential review. Moreover, the source of *Turner* deference is the separation-of-powers doctrine, which does not vanish in Eighth Amendment cases that implicate the legitimate penological interests of prison officials: "[w]e made quite clear that the standard of review we adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990); *see also Florence v. Burlington*, 132 S.Ct. 1510, 1515-16 (2012). Both the

---

"environmental stimulation" is an "identifiable human need," and the Ninth Circuit and courts in this District have upheld as constitutional the individual conditions, also undermines Plaintiffs' burden of proving that Defendants acted with deliberate indifference in continuing those policies. *Farmer*, 511 U.S. at 839-40.

The Tenth Circuit has recently considered, and rejected, a similar "environmental stimulation" theory. In *Silverstein v. Federal Bureau of Prisons*, 559 Fed.Appx. 739 (10th Cir. 2014), an inmate, relying on Dr. Haney's review of his records and expert opinion of sensory deprivation and psychological injury, challenged similar conditions at the BOP's supermax facility in Colorado. The court held that, even assuming that "a lack of social contact and environmental stimulation rises to an Eighth Amendment violation," the inmate's living conditions were not unconstitutional because he was not devoid of either social contact or environmental stimuli. *Id.* at 755.

1    Supreme Court and the Ninth Circuit have recognized *Turner*'s deference in conditions-

2    of-confinement cases after *Johnson*.  *See Brown*, 131 S.Ct. at 1928 ("Courts must be

3    sensitive to the…need for deference to experienced and expert prison administrators");

4    *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010) ("Prison officials are entitled to

5    deference whether a prisoner challenges excessive force or conditions of confinement.").

6        **A.     Property**

7        Plaintiffs have essentially given up on their stand-alone claim that inmates "have

8    no radio or television," which is the allegation in their Complaint (Dkt. 1, ¶ 93), and

9    instead argue (in a footnote) that it is simply a "factor that combines with other conditions"

10   to arise to a deprivation. They fail to refute the legal authority upholding Defendants'

11   *temporary* property restrictions to *some* maximum custody inmates for disciplinary

12   reasons. *See*, *e.g.*, *Baptisto v. Ryan*, 2005 WL 2416356, at *14 (D. Ariz. 2005). And they

13   do not dispute that televisions and radios are available to them.  (DSOF ¶¶ 1860-1868.)

14   Instead, they argue that ADC does not pay for these luxuries.  Aside from not being pled

15   in their Complaint, this assertion borders the ridiculous.  Plaintiffs provide no authority

16   for the proposition that a prison must pay for a television when an inmate cannot afford

17   one.  This claim should be dismissed.

18       **B.     Nutrition**

19       Plaintiffs' Complaint alleged that the diet for maximum custody inmates did not

20   "meet their minimal nutritional needs."  (Dkt. 1, ¶ 95.)  But they do not refute the Arizona

21   district decisions that have upheld the diets they are provided as being nutritionally

22   adequate.  Instead, in response to the undisputed fact that their caloric intake exceeds

23   federal recommendations (and for female inmates it is the same as inmates in general

24   population), they complain about what they are served (which is grossly inaccurate, see

25   DSOF, Ex. 138-CC at ADC78652-79003) and their inability to afford food from

26   commissary. These are not valid Eighth Amendment complaints. *Keenan*, 83 F.3d at 1091.

27   Their "evidence" to dispute the nutritional adequacy of their diets is (1) the opinion of two

28   named Plaintiffs that their diet is "nutritionally inadequate" and their claim that they have

15

"lost weight as a result," and (2) their experts' view that the delivery of only two meals a day "further exacerbates the isolation and lack of human contact."  These subjective weight-loss views are misleading,[9] and insufficient to genuinely dispute the holdings in cases like *Gamez* and *Maloney* and the caloric evidence presented.  Anecdotal evidence from two inmates also does not support a "systemwide" practice of providing inadequate nutrition. Moreover, Dr. Haney and Vail's dismay that two meal deliveries "exacerbates" the lack of human contact was not a theory advanced in the complaint. Nevertheless, increasing "social interaction" is not the purpose of serving meals, and it does not produce a "single, identifiable human need such as food, warmth, or exercise."

### C.    Exercise

This claim was based on Plaintiffs' challenge to ADC's recreation policy (Dkt. 1, ¶ 92), which has been upheld as constitutional. *See*, *e.g.*, *Hampton v. Ryan*, 2006 WL 3497780, *14 (D. Ariz. 2006), *aff'd*, 288 F. App'x 404 (9th Cir. 2008), *Baptisto*, 2006 WL 798879, at * 21, 34-35.  Now, Plaintiffs do not challenge the policy, but challenge the number of recreation cancellations. The Court did not, however, certify the outdoor recreation claim to weigh over the wisdom or frequency of cancellations by individual staff members, the loss or exercise privileges by specific inmates, or the regularity of inmates answering the call for exercise.  These are not issues capable of classwide resolution. And whether any named Plaintiff or member of the subclass has temporarily lost recreational access through misconduct, or staff have inappropriately denied recreation on any specific occasion, is inconsequential to Plaintiffs' policy-based challenge. *Bull v. City and County of San Francisco*, 595 F.3d 964, 967 & n.6 (9th Cir. 2010).  Furthermore, their evidence of frequent (systemwide) cancellations is based merely on the vague and inconsistent declarations of two named Plaintiffs, describing personal experiences, and conclusory assessments by their experts.

---

[9] For instance, one of the named Plaintiffs testified in his deposition that he could not explain or point to any proof that he has lost weight as a result of being placed in maximum custody, he lost weight because he "works out a lot and it burns a lot of fat," and his weight fluctuates – he gains weight and then he loses weight. (DSOF ¶¶ 3077-79.)

### D.    Cell Illumination

Plaintiffs do not refute the overwhelming authority that has upheld ADC's illumination policy and similar policies.  Instead, they purportedly dispute the legitimate penological justifications for 24-hour lighting in some ADC maximum custody cells (monitoring an inmate's well-being or misconduct while preserving staff safety) with their experts' assessment that sleep deprivation "can" lead to health problems, and two named Plaintiffs' assertions that they have had trouble sleeping.  This evidence, however, does not undermine the penological justifications put forth by Defendants or override what courts have already accepted as being justified.[10]  Nor is it proof of a systemwide injury. They cite *Grenning v. Miller-Stout*, 739 F.3d 1235 (9th Cir. 2014), but that case actually proves Defendants' point: challenges to 24-hour lighting are fact-specific and turn on many individual inquiries that cannot be resolved on a classwide basis.[11]  The only illumination issue capable of class treatment is the penological wisdom of utilizing 24-hour, low-watt lighting at certain maximum-security units (particularly suicide-watch cells), and that issue cannot survive this Court's reasoning in *Hampton* or the unrebutted security concerns put forth by Defendants.  Moreover, unlike the inmate in *Grenning*, Plaintiffs Brislan and Rodriguez, who championed this claim, acknowledged ADC's security interest in their depositions.  (DSOF ¶¶ 2812 , 2889.)

---

[10] Plaintiffs do not contest the fact that inmates are permitted to cover their eyes with small cloths if they wish so long as staff can observe flesh and determine an inmate to be breathing. (DSOF ¶ 1712.)

[11] Plaintiffs also cite *Keenan*, but that case involved "large florescent lights directly in front of and behind his cell," such that the inmate could not distinguish night from day. 83 F.3d at 1090. The ADC units that actually utilize 24-hour security lighting primarily involve 7-watt or 9-watt bulbs similar to a child's nightlight, *Hampton*, 2006 WL 3497780, at *13, and are intended to afford staff visibility into the cell to confirm the inmate's welfare while sleeping, to identify the inmate, and to rule out nighttime misconduct. (DSOF ¶¶1700-1712.) And given the variety of lighting used at the four relevant maximum custody units (DSOF ¶¶ 1694-1819), the theoretical assertions advanced by Plaintiffs' experts concerning the effects of nighttime lighting on an inmate's health—experts who never personally observed the security lights in operation—is insufficient to defeat summary judgment. The only higher illumination is certain Behavior Modification Unit ("BMU") and Watch cells at SMU and Florence, which utilize two 32 or 39 watt bulbs in cell for safety and security reasons that Plaintiffs have failed to refute.

### E.      Use of Chemical Agents

Plaintiffs once again pivot away from what they alleged and what is a certified practice.  In conjunction with their motion for class certification, Plaintiffs specifically asserted that they were seeking a categorical ban—no matter the occasion—on the use of pepper spray against inmates on psychotropic medication.  (Dkt. 240-1 at 163–164, ¶ 48; Dkt. 292-1 at 14, ¶ 32; Dkt. 331 at 1 n.1.)  Apparently understanding now that this is a sure-fail position, they contend that they do not challenge ADC's policy, but are pursuing the allegation that inmates in maximum custody are "regularly sprayed with chemical agents for trivial reasons." Having emphasized to the Court when seeking class certification that it was the mere existence of an ADC policy that permits the use of chemical agents on inmates on psychotropic medication, Plaintiffs should be estopped from expanding this claim into an inquiry into the regularity and alleged triviality of the use-of-force incidents against subclass members.[12]

When the inquiry is limited to a review of an ADC policy that merely authorizes the use of chemical spray against recalcitrant inmates who may also be on psychotropic medication as one of numerous non-lethal responses, the policy authorizing chemical spray as one of many non-lethal options is unquestionably constitutional under the Eighth Amendment.[13]  *See Stewart*, 60 Fed.Appx. at *22; *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984); *Spain*, 600 F.2d at 196.  Plaintiffs' cited authority does not support their claim.[14]  Moreover, Defendants' security interests are paramount.  (DSOF ¶¶ 614-43.)

_____

[12] Even if allowed to proceed, Plaintiffs provide only a handful of incidents concerning a few named Plaintiffs to support their new theory, which is clearly not enough to establish a systemic deficiency. And Plaintiffs do not refute Defendants' showing that the use of chemical spray each time was justified. (DSOF ¶¶ 2462-2466, 2799- 2805, 2811, 2888, 2950-3010, 3016.)

[13] The Eighth Amendment standard in prisoner excessive force cases *is* the malicious and sadistic standard of *Whitley v. Albers*, 475 U.S. 312 (1985). *See Stewart v. Stewart*, 60 Fed.Appx. 20, at *22 (9th Cir. 2003).

[14] *Thomas v. Bryant*, 614 F.3d 1288, 1305-06 & 1321-24 (11th Cir. 2010): (1) applied the "deliberate indifference" standard because prison officials had waived the more stringent "sadistic and malicious" standard required by *Whitley*; (2) affirmed an injunction in favor of a single inmate; and (3) restricted only the non-emergency and non-spontaneous use of chemical agents, while recognizing the need for correctional officers

18

**F.     Social Isolation**

This claim reflects a debate over principle rather than fact: Plaintiffs' expert (Dr. Haney) believes that mentally ill inmates should never be assigned to maximum custody, and Defendants believes such confinement is permissible under the Eighth Amendment given the opportunities for showering, recreation, phone calls, visitation, and social interaction with security staff, medical personnel and religious leaders that *all* subclass inmates have, and the additional contact visitation, group recreation, work opportunities, and extensive programming that some subclass members have as outlined in the Motion at 50-51.   Because it is well within the executive branch's expertise and constitutional prerogative on how best to manage an inmate population that has been determined in need or deserving of maximum custody, ADC's judgment should not be disturbed by Dr. Haney's public policy preferences.

Plaintiffs do not refute the plethora of cases in this District that have upheld the conditions in ADC's maximum custody units, and instead rely on habeas corpus cases involving competency claims or other proceedings by Arizona inmates that do not involve the Eighth Amendment, a Texas case involving an effort to terminate a consent decree, and two California district cases.   The only case deserving of rebuttal is *Casey v. Lewis*, 834 F.Supp. 1477, 1543–52 (D. Ariz. 1993).   Contrary to Plaintiffs' representations, the district court there did *not* find ADC's then-routine assignment or transfer of seriously mental ill inmates to SMU II "appalling" or "inexcusable"—it found it "inappropriate" because such officials used lockdown as an "alternative to mental health care for inmates with serious mental illnesses" and in light of other factors, including the fact that "both the plaintiffs' and defendants' experts agreed that it is inappropriate to house acutely psychotic inmates in segregation facilities for more than three days."   834 F.Supp. at

---

to have leeway to use such agents in emergency and spontaneous situations against mentally ill inmates. *Coleman v. Brown*, 2014 WL 1400964, at **1, 5–7 (E.D. Cal. 2014), involved the state's request to terminate a longstanding injunction, it did not involve a class seeking a categorical ban on the use of chemical spray against mentally ill inmates, and it was aided by the use of video-recordings of the subject use-of-force incidents and a CDCR policymaker's testimony that all such incidents were within policy.

1547-48. The four units at issue today are neither operated nor utilized the same way SMU-II may have operated 21 years ago.  Plaintiffs' definition of "isolation" broadly encompasses several different types of inmates, each of whom is subject to a maximum stay in maximum custody, including (1) inmates serving death or life sentences (indeterminate); (2) disciplinary segregation (30-45 days); and (3) inmates on mental health/suicide watch (short term).  The maximum custody units are <u>not</u> used as a substitute for mental health programming. Moreover and unlike *Casey*, this claim is brought by Plaintiffs as a conditions-of-confinement claim focusing on limited social interaction opportunities for the subclass (not mental health care generally), and is subject to this Court's and the Ninth Circuit's dispositive analysis in *Hampton*.  That some members of the subclass suffer from mental illness does not convert this specific conditions claim into one challenging the constitutional propriety of ADC's mental-health programming.  Plaintiffs cannot revise the subclass, nor avoid the binding impact of *Hampton* and other federal cases, simply by emphasizing a subset of mentally-ill inmates.

Finally, the undisputed facts show that maximum custody inmates are *not* "isolated" but, like the inmate in *Silverstein*, have daily social interaction.[15]  Plaintiffs' reliance on their experts' views of how "minimal" the human contact is, or the fact that not all subclass inmates have programming opportunities, is not enough, for these views amount to mere characterizations of undisputed facts that Plaintiffs have made no effort to rebut.[16]

---

[15] Plaintiffs do not dispute that maximum custody inmates have regular and significant human interactions with medical staff (DSOF ¶¶ 1278-1281); with correctional line and supervisory staff – more than 24 times each day (id. ¶¶ 1668, 1670-1688); with their cellmates and other inmates in their housing location (id. ¶¶ 1293-1294, 1485-1486, 1494, 1506, 1515, 1664-1666); by telephone (id. ¶¶ 1295-1297, 1663); with visitors (id. ¶¶ 1298-1300, 1669); during congregate religious activities (id. ¶ 1458); during out of cell work and group programming sessions (id. ¶¶ 1377-1382, 1389-1400, 1407-1430, 1432-1438, 1445-1457, 1667); through access to their legal counsel (id. ¶¶ 1564-1654, 1567, 1570); showers (id. ¶¶ 1655-1658); mail (id. ¶¶ 1661-1662); group recreation (id. ¶¶ 1621-1623, 1626-1627, 1629, 1632-1638, 1649-1652); chaplaincy and librarian rounds (id. ¶¶ 1689-1690); additional daily rounds by medical staff for the collection of HNRs from each cell front (id. ¶ 1873); and, additional daily rounds by ADC staff with the "forms cart" to provide any forms maximum custody inmates request (id. ¶ 1874).

[16] DSOF at ¶¶ 1572-1654, 1560-61, 1655-59, 1664, 1490-94, 1295-97, 1563-69, 1663, 1298-1301, 1570-71, 1689, 1469-70, 1660-62, 1302-1470, 1561-62, 1883, 1490-1559, 1560-71, 1572-1641, 1660-1693, 1860-1868.

That Dr. Haney and Vail can look at the same showering, recreation, phone calls, visitation, and social interaction with security staff, medical personnel and religious leaders, that this Court found *not* to violate the Eighth Amendment in *Hampton*, and declare them to be "extreme," "profoundly damaging," or presenting a "substantial risk of serious harm" merely proves the principle that expert opinions "will not ordinarily establish constitutional minima." *Hoptowit*, 682 F.2d at 1246.

## III.  DENTAL CLAIMS

### A.  Dr. Shulman's Faulty Criticisms.

Plaintiffs accuse Defendants of ignoring Dr. Shulman's opinions, but his conclusory criticisms (understaffing, allegedly deficient triaging, wait times, classification procedure, chewing difficulty[17] and monitoring[18]) were addressed in both the Motion and Statement of Facts,[19] and most of these criticisms are outside the scope of the Court's certification order anyway. Because his sweeping conclusions are built on hypotheticals—resulting from his unwillingness to challenge the individual clinical judgments by a given

[17] Dr. Shulman's criticism of ADC's treatment of inmates' chewing difficulty was neither certified for class treatment, nor an adequate basis for an Eighth Amendment claim. PSSOF ¶ 37 and the cited page of Dr. Shulman's report merely includes Dr. Shulman's empty conclusion: REDACTED
E s he refers, much less explain how they result in inadequate treatment of chewing difficulty. Other than their assertion that Plaintiff Polson alone (not class members) REDACTED Plaintiffs have shown o received) despite his receipt of partial dentures. (DSOF at ¶¶ 830, 832, 836, 839, 851-56, 866 & 872.) Such evidence falls short of proof of a systemic deficiency and a *Monell* policy.

[18] Dr. Shulman relies almost entirely on the deposition of Dr. Chu for his opinion that ADC does not adequately monitor dental care, ignoring Dr. Chu's evaluation of clinical dentistry through site visits, chart reviews, and interviews, practices which Plaintiffs fail to dispute. (DSOF ¶¶ 1237-38.) Plaintiffs also fail to dispute that Defendants review monthly reports on dental wait times, staffing, and utilization and review and investigate dental grievances. (DSOF ¶¶ 1234-36.) Regardless, the alleged failure to monitor a contractor is akin to inadequate supervision of an employee under § 1983, and is unnecessary to reach unless an underlying Eighth Amendment violation is first shown. *City of Los Angeles v. Heller*, 475 U.S. 796 (1986). It was also not raised anywhere in their Complaint.

[19] DSOF ¶¶ 827, 995-1007, 1024-31, 1037, 1071-73, 1084-95, 1123-26, 1137, 1147-50, 1164, 1211, 1226-32.

21

dentist and examine any dental x-rays to determine the progression of tooth decay—these criticisms are insufficient to defeat summary judgment.[20]

Plaintiffs rely on Dr. Shulman's conclusory opinions REDACTED They place particular emphasis on Dr. Shulman's opinions on triaging and classification, contending that dental assistants are not qualified to distinguish between an urgent and routine dental need, that some urgent needs are misclassified as routine, and that the ADC policy definition of "Urgent" should be modified to include any inmate complaint of "pain."[21] Not only was this deficient triage or classification issue not certified for class treatment, his triaging criticism falls short of the type of proof necessary to sustain a systemwide, Eighth Amendment violation.

Dr. Shulman's "random" selection of 300 inmate HNRs from January 22, 2010 to June 13, 2013 fails to support his triaging hypothesis. First, his calculation of an average wait time of 6 days for urgent care is skewed for not examining the more recent Smallwood period from 2013-14, for which Dr. Shulman has conceded: REDACTED )[22] Indeed, the only Plaintiff REDACTED who has sought treatment for dental pain (since Smallwood cleared the backlog in early 2013) was seen within 24 hours of her submission of the HNR(s) in August 2013. (Dkt. 895 at 39-40.) Second, only 14% of the 300 dental HNRs sampled by Dr. Shulman

___

[20] Dr. Shulman's opinion criticizing dentists for REDACTED d                                                    e of giving dentists discretion to remove inmates from the routine care list when they are seen for an urgent care appointment is designed to provide efficient dental treatment for all ADC inmates. (DSOF ¶ 1169.)

[21] Plaintiffs' desire to modify the definition of what constitutes an "Urgent" dental need to include any symptom referencing "pain" is misguided. As Plaintiffs have repeatedly emphasized, actual practices matter more than written policies, and Plaintiffs have not identified any pain-expressing HNRs under Smallwood from 2013-14 that have not resulted in treatment within 72 hours—consistent with dental assistant training that all pain symptoms are classified as urgent. (DSOF ¶¶ 1107-08.)

[22] 93% of Dr. Shulman's "random" sampling of these 300 dental charts is focused on the pre-Smallwood period.

1   included "triaging" by a dental assistant, and only 7 of the 300 dental charts reviewed

2   involved a visit without a dentist present. (DSOF ¶¶ 1126-47.) Finally, there is nothing

3   inappropriate in having a dental assistant classify a dental need as urgent or routine. *See*

4   A.R.S. § 32-1291 (duties of dental assistant); Ariz.Adm.Code R4-11-701 (functions of

5   dental assistants); *see also Finley v. Parker*, 253 Fed.Appx. 634, *636 (9th Cir. 2007).[23]

6   Plaintiffs' triaging/classification theory fails due to their failure to rebut the fact

7   that urgent care is ordinarily delivered in less than 72 hours, and the fact that routine care

8   is delivered within 1.6 months at all ADC facilities, since Smallwood took over in 2013.[24]

9   Thus, even if ADC/Wexford dental personnel have occasionally in the past misclassified

10  an urgent symptom as routine, the fact that all ADC inmates are currently seen by a

11  Smallwood dentist within 1.6 months (DSOF ¶¶ 1000-1001), precludes Plaintiffs from

12  establishing that any hypothetical tooth decay—which Dr. Shulman has never attempted

13  to validate by examining x-rays—is progressing so rapidly in those 7 weeks so as to

14  render the tooth non-restorable. *See, e.g., Hallett v. Morgan*, 296 F.3d 732, 745-46 (9th

15  Cir. 2002); and *Casey,* 834 F.Supp. at 1507.  Judge Campbell rejected a similar criticism

16  of ADC's routine care scheduling policy in *Lanzeiri v. Stewart*, 2005 WL 2449998, at *6

17  (D. Ariz. 2005).[25]

18  Dr. Shulman's triaging theory—based on a small and outdated sampling of

19  HNRs—is also too speculative to provide concrete proof of a systemic deficiency created

20

21  [23] Plaintiffs falsely assert that ADC has an  REDACTED
                                                 ADC
22  p                                             does not cite any supporting evidence.

23  [24] Plaintiffs argue that, "under ADC and Wexford, there was 'no organizational
    structure' for dental and ADC's method of tracking prisoners was a 'nightmare,' which
24  helped create nine-month backlogs for dental care." Such organizational and backlog
    issues are no longer present. Indeed, the only dental Plaintiff who has sought pain-related
25  dental treatment after the "backlog" was eliminated in the Spring of 2013 is [REDACTED], whose
    two HNRs promptly resulted in dental visits within 24 hours. (Dkt. 895 at 3    ; DSOF
26  ¶¶ 973-74, 977-78.)

27  [25] *Lanzeiri* also forecloses Dr. Shulman's identical criticism of ADC policy for
    "treat[ing] all non-urgent care the same" and Plaintiffs' argument that "because ADC
28  places all non-urgent requests onto the same routine care list, Defendants have no way of
    knowing whether 90 days (or longer) jeopardizes a prisoner's teeth or general health."

23

1    and maintained with deliberate indifference by ADC officials.  With undisputed evidence

2    that all 10 ADC facilities ordinarily respond to HNRs on an urgent basis within 72 hours,

3    and provide routine care in 7 weeks or less (several facilities in less than two weeks), the

4    triaging and classification theories—which form the basis of Plaintiffs' timely access

5    claim—must be rejected.

6        **B.    No Eighth Amendment Violation.**

7        **Dental Wait Time Data**.  Given Dr. Shulman's concession that REDACTED

8    ████████████████████████████    under Smallwood, Plaintiffs argue that "current

9    wait times alone do not warrant summary judgment on the dental claim because

10   Defendants' own agents admitted that wait times during the pendency of this case have

11   been so long as to put prisoners at risk." [26]  Plaintiffs misrepresent the testimony of Drs.

12   Smallwood and Hanstad to support this assertion.  When asked to speculate whether "it's

13   possible that somebody could have a tooth that if you see them within 3 months, the tooth

14   could still be restored, but if you see them in 9 months it can't be restored," Dr.

15   Smallwood testified that "it's possible" but that "even that time is not that significant."

16   (Dkt. 936–1, Ex. 168 at 54:8-15.)  Dr. Hanstad similarly did not testify that wait times

17   have been so long as to put inmates "at risk." [27]  Given undisputed evidence that even

---

[26] Plaintiffs also refer to Dr. Shulman's opinion that "persistent understaffing" has produced longer wait times, but this contention is not supported by PSSOF ¶ 31 or Dr. Shulman's report.  Dr. Shulman conducted no analysis of staffing levels at ADC dental clinics, and merely points to an arbitrary ratio of dentists to inmates which fails to take into account variables such as facility size and layout, inmate demand for dental services, and security levels. (DSOF ¶ 1040.) Moreover, the undisputed evidence shows that wait times have *decreased*, not increased, statewide with Smallwood, rendering immaterial the alleged need for additional dental staff.  (DSOF ¶¶ 1001-1002.)

[27] Drs. Smallwood and Hanstad testified that wait times were longer than three months at only three ADC facilities *in March 2013*, the month of the transition from Wexford to Corizon/SPDS.  Dr. Smallwood testified that when SPDS took over provision of dental care in March 2013, there was a six-month backlog of dental requests at Lewis and a nine-month backlog at Yuma.  (Dkt. 1091, Ex. 34 at 52:2-10.)  Dr. Hanstad testified that in March 2013, routine care wait times at Perryville and Yuma did not meet contract standards for wait times. (Dkt. 1019, Ex. 35 at 111:3-19.)  Plaintiffs ignore wait times for the remaining seven ADC complexes and completely ignore wait times at any complex from April 2013 to April 2014.  That wait times were longer than contract requirements at three facilities in a single month in 2013—and specifically the month of the transition from Wexford to Corizon—is not material to whether Defendants currently provide constitutionally adequate dental care to ADC inmates at all 10 facilities.

hypothetical wait times longer than 90 days would not render a tooth non-restorable, and Dr. Shulman's inability to determine whether a shorter wait time would have prevented an extraction (DSOF ¶¶ 1022, 1094-95, 1176, 1196), the wait time data demonstrates timely access to dental care.

Plaintiffs also argue that "reported dental wait times do not reflect the true time an inmate must wait for care" because of how Smallwood calculates the average, indicating a dental assistant reported wait times "6 to 9 months behind" while Smallwood's calculation showed only 2.2 months. The string of emails from which Plaintiffs make this claim were in June of 2013 from the Yuma Facility Health Administrator, who questioned where a discrepancy existed, but Dr. Smallwood explained that the dental assistant reports were manual and unreliable, while CDS (dental tracking software) automatically calculates an average wait time for all requests submitted.[28] (Dkt. 1019, Ex. 37.) Dr. Smallwood further explained that over the prior month, more than 280 patients were scheduled per week at Yuma to get caught up. (Id.) Thus, the misunderstanding of the Yuma FHA on which Plaintiffs premise their "dispute" is not a genuine issue of material fact sufficient to defeat summary judgment on the timely access claim, and as the average wait time for routine dental care has dropped to between 0.6 and 1.6 months, significantly below the contractually required three months. (DSOF ¶¶ 792, 1000-1001.)

**Named Plaintiffs**. Because Defendants' Motion thoroughly debunked the illusion of maltreatment of the named Plaintiffs trumpeted at the class certification stage, Plaintiffs essentially argue a "hands-off" approach to their own individual treatment, saying this case "is not about instances of past treatment of individual plaintiffs" but about whether ADC's "dental system places prisoners at substantial risk of serious harm." Plaintiffs cannot brush off their perfectly acceptable dental treatment by a preference for trial by

---

[28] Average wait times are calculated by taking the total wait times divided by the number of inmate waits per facility: how long patients have been waiting from their Date of Request until they receive an appointment. Using the *longest* wait time at each facility improperly focuses on *a single inmate* at each facility, which is not a statistically reliable nor accurate representation of what "the system" provides.

abstraction.  Proof that the dental Plaintiffs received constitutionally adequate dental care is compelling evidence that systemic deficiencies do not exist.

Plaintiffs contend that the individual experiences of the dental Plaintiffs are "illustrative examples of these deficiencies" to wit: "long routine care delays REDACTED ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛, "unacceptably long waits" REDACTED "inappropriate dental assistance triage" REDACTED, "inappropriate treatment of chewing difficulty" REDACTED, and "the prisoner's dilemma" REDACTED    Yet the undisputed evidence establishes that the delays and waits were either self-inflicted or innocently explained, REDACTED was appropriately triaged (the denture fitting process was necessarily delayed for extractions he conceded he needed but continued to postpone), REDACTED chewing issues were handled with a mechanical soft diet, which was renewed repeatedly and continues today despite his dentures, and the only "dilemma" REDACTED faced was owing to their non-restorable teeth.  (Dkt. 895 at 34-40.)[29]  Having elected not to substantiate their class claims with statistical data showing clear and injury-producing patterns at all 10 facilities, and having now dismissed the individual experiences of the Plaintiffs as irrelevant, Plaintiffs have nothing left on which to build a non-speculative case of systemic deficiencies. *See Porras v. Cnty. of Los Angeles*, 2006 WL 4941837, at *4 (C.D. Cal. 2006).

**Avoidable Extraction Policy**. Plaintiffs contend Defendants misunderstands their extraction policy argument, saying "the question is not whether any particular tooth is or is not appropriate for extraction, but rather whether ADC's practices as a whole lead to extractions that would have been avoided with adequate dental care," and then point back to Dr. Shulman's criticisms of the triaging practices, the qualifications of dental assistants, an "inadequate consent policy" relating to extractions, forcing inmates to choose between

---

[29] What Plaintiffs label as "the prisoner's dilemma" is really a euphemism for an inmate disagreeing with the treating dentist's judgment that a tooth's pulpitis is irreversible or beyond restoration. Courts repeatedly reject such arguments. *See Yoon v. Hickman*, 171 Fed. Appx. 541, at *542 (9th Cir. 2006); *Alexander v. State of Nevada*, 2012 WL 6562135, at *8 (D. Nev. 2012).

waiting for a filling or receiving an extraction, and not allowing dentists to prioritize routine care conditions. Defendants have already addressed Plaintiffs' triaging and dental assistance objections, the informed consent objection is baseless, [30] and Judge Campbell rejected Plaintiffs' routine-care, prioritization argument in *Lanzeiri*. What remains is the notion that inmates in pain should not be put in the dilemma of waiting for a filling versus having an immediate extraction. Unfortunately for Plaintiffs, they have failed to present any evidence that inmates are systematically put in such a dilemma, nor could they given the average time an ADC inmate must wait for a filling—1.6 months, provided the tooth in question is restorable. *See Halla v. Schriro*, 2006 WL 3735983, at *5 (D. Ariz. 2006) ("It is common knowledge that tooth decay is not a condition that necessarily calls for immediate care. Dr. Sears considered a filling to be routine care for which an inmate is placed on a routine care list...there is no evidence to show that [defendants] knew that his teeth were decaying more rapidly than expected and that they were deliberately indifferent by disregarding his needs.").

Defendants fully understand Plaintiffs' "avoidable extractions" theory. It is plagued by the stacking of multiple, faulty assumptions that cannot be squared with the evidence. Given Dr. Shulman's significant concessions and undisputed proof that all ADC inmates expressing any type of pain are put on the urgent care list and seen within 72 hours, the avoidable extraction claim is reduced to either unfounded dismay over the high number of tooth extractions, a misguided effort to shift the consequences of poor dental hygiene from the patient to the provider, or irrelevant regret that ADC does not adopt a tiered scheduling policy for routine care like California—none of which is of a constitutional dimension. For those inmates whose teeth are restorable in fact, fillings will be done, with

---

[30] Although not explained, Dr. Shulman objects to the ADC Informed Consent form for extractions because it does not specifically list a filling as an alternative treatment option. But a filling is not an available treatment alternative if a tooth is clinically determined to be non-restorable. Furthermore, informed consent is a process, not just a form, and dentists orally communicate available treatment alternatives and risks/benefits to inmates. There is no basis for Dr. Shulman's implicit belief that the extraction consent form needs to include the dentist-patient discussion in its entirety.

work completed between two weeks and seven weeks depending on the inmate's facility. For inmates whose teeth are not restorable in fact, extraction is the only option. The mere passage of time on the routine care list does not render salvageable teeth non-restorable, absent convincing evidence that inmates submitting dental HNRs and being put on the routine care list are systematically seeking treatment of teeth on the verge (within days or a few weeks) of irreversible pulpitis. But because Dr. Shulman REDACTED

(Dkt. 948–1, Ex. 2 at 20), Plaintiffs cannot prove the "avoidable" part of their speculative "extraction" theory.

## IV.   MEDICAL CLAIMS

### A.   Systemwide Deficiencies

**Staffing Levels**. Plaintiffs contend that ADC-contracted staffing levels are "inadequate" simply because Dr. Cohen calls them "alarmingly low," criticizes vacancies in higher-level positions (but fails to connect such vacancies with any healthcare shortcomings) and the use and quality of temporary workers,[31] and objects to Defendants' characterization of *Casey v. Lewis*.[32]  These arguments are opinions and conclusions only, lacking the requisite level of proof needed. The dispositive question is, when do staffing levels satisfy constitutional minima, not, when do staffing levels meet an opposing expert's conceptions of "adequacy"?  One might point to past court decisions, including

---

[31] The Response misstates the record regarding temporary staff, as Corizon's VP of Operations (Bybee) was describing locums not receiving largely irrelevant training concerning employee orientation and paperwork, and Dr. Robertson's deposition answers were in response to questions about an email and why locums are often unavailable to fill-in immediately, and was not commenting on any locum's competence. (Dkt. 1029, Ex. 2-3.) With respect to "medical errors," the temporary nurse who reused syringes or vials on August 22, 2012 (resulting in prompt corrective action, testing the Hep C inmate for HIV [negative], and a plan to test all inmates possibly exposed) is the only incident presented by Plaintiffs.

[32] Plaintiffs clearly misread *Casey*, as it was the desire to ensure ADC officials continued to implement pilot programs and staff hiring in a setting of increasing number of inmates that caused the district court to monitor the case, 834 F.Supp. at 1552, but that remedial monitoring does nothing to alter the conclusion of law that 13.9% medical staff vacancy rate at the time of trial "did not rise to a level of deliberate indifference to the serious medical/dental needs of the inmates." *Id.* at 1486 & 1546-47.

*Casey*, *Coleman v. Brown*, 938 F.Supp.2d 955, 984-85 (E.D. Cal. 2013) (department instructed to not allow vacancy rate to exceed 10%), or an appellate court's emphasis in a landmark class action that the "Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare and Medicaid provide for the aged or the needy." *Ruiz v. Estelle*, 679 F.2d 1115, 1149 (5th Cir. 1982). Or one might wonder how staffing levels could possibly be constitutionally condemned here when the named Plaintiffs cannot identify a single instance where supposed staffing shortfalls caused delay or compromised care that actually harmed an inmate. *Casey*, 834 F.Supp. at 1545. But when ADC staffing levels are increased by 17% between March 2013 and April 2014, and result in a current *surplus* of providers (DSOF ¶ 171)[33] and produce medical wait times *lower* than what the average American experiences (18.5-day wait) when scheduling an appointment, one cannot conclude that Defendants have acted with purposeful cruelty. [34]

**Wait Times and HNR Process.** Faced with Defendants' evidence that inmates at Douglas, Phoenix, Safford, and Winslow were able, on average, to see a nurse in less than 1.5 days and a doctor in less than 7 days, Plaintiffs shift focus from facility-specific to statewide average. But a statewide average does not refute the fact that the average wait times in March 2014 at five of the ten ADC facilities at issue (Yuma, Winslow, Phoenix, Safford and Douglas) was less than 7 days, and far exceeds constitutional (and even community) standards. [35] Plaintiffs' statewide-average theory does not establish a

---

[33] Plaintiffs allude to the elimination of 30 contracted staff positions by Corizon in March 2013, but PSSOF ¶ 5 is immaterial and grossly misleading, as it is based upon a comparison of staffing models, rather than the numbers of actual staffed hours worked to provide medical, mental health, and dental services. This documents shows that Wexford contracted to provide 180.33 FTEs more than it could fill, filling only 581.35 FTEs of the contracted 761.68. By contrast, Corizon had 627.29 FTEs filled in March 2013, and increase of 45.84 FTE personnel actually working immediately following the takeover from Wexford. Moreover, Plaintiffs do not dispute the fact that Corizon has increased staff by 17% by hiring more than 140 additional FTEs. (DSOF ¶ 171.)

[34] The phrase "purposeful cruelty" simply describes the subjective component of the stringent deliberate-indifference standard, which equates to criminal recklessness. *See Sherman-Bey v. Cate*, 2012 WL 6864600, at *3 (C.D. Cal. 2012).

[35] Plaintiffs' statewide average is misleading nonetheless. Although 22 days was

"systemic deficiency," *Lewis*, 518 U.S. at 360 n.7, and is really an attempt to bury facts that directly refute their claim.[36]

Plaintiffs clarify in their Reply that their HNR-access claim is really a (much broader) challenge to the HNR "process," i.e., the *effectiveness* of the HNR process, and argue that "ADC fails to measure or report the time it takes ADC to get HNRs from the [deposit] boxes…to the health unit," and embed photos showing a stack of HNRs. The stack of HNRs photographed by an ADC monitor in December 2013 (more than 200 unprocessed at the Browning Unit of ASP-Eyman) is misleading, and ADC's immediate response upon discovering the matter underscores the absence of deliberate indifference. Not only was this backlog confined to a single unit (Browning) in a single facility (Eyman), ADC's monitor demanded an immediate Corrective Action Plan ("CAP") from Corizon and received one,[37] such that the backlog had been eliminated by early March, 2014. Moreover, this HNR "processing" theory tied to a single unit is too isolated and temporary to create a genuine issue on Plaintiffs' timely access claim, as medical wait times under Corizon are systematically low and any delays insufficient to show an Eighth Amendment violation.

**Grievances.** Plaintiffs challenge the relatively low number of grievances at ADC facilities by citing their experts' beliefs that inmates often do not file grievances due to "fear of retaliation, frustration with what they see as a meaningless process, and low literacy levels." These excuses cannot be squared with the well-documented propensity of

---

the statewide average wait time to see a *provider* in March 2014, the statewide average wait time to see a *nurse* was only 4 days. Moreover, the average for this single month is skewed higher due to longer wait times at 3-4 facilities.

[36] Plaintiffs do not challenge ADC's lower than average morbidity rates.

[37] The December 10, 2013 email from ADC captures a state monitor unwilling to tolerate HNR-processing delays by the Browning Unit nursing staff, the identification of seven of those HNRs in the stack warranting expedited consideration (prescription refills or pain) and the assignment of a nurse to "expeditiously address" the emergency HNRs, and the submission of a CAP by Corizon and estimated completion date. (Dkt. 1019, Ex. 12.) Moreover, the MGARs illustrate that a CAP was provided in response to the finding on the December 2013 MGAR at Eyman. (DSOF, Ex. 137-RR at ADC267899.) Plaintiffs' omitted the response to the e-mail message attached as Dkt. 1028, Ex. 15, which is provided here at Attachment 2 for consideration pursuant to Fed.R.Evid. 106.

inmates to file grievances, litigate, and challenge virtually every aspect of their incarceration. *Jones v. Bock*, 127 S.Ct. 910, 914 (2007). Plaintiffs also claim a factfinder could find the grievance data "profoundly unreliable" because some prisons report zero grievances for the entire month, but such empty speculation has never been a viable method of avoiding summary judgment.

**NCCHC Accreditation.** Plaintiffs misstate Defendants' position on NCCHC accreditation. Defendants are not arguing that NCCHC accreditation is "*per se* compliance with the Constitution" or otherwise dispositive of their constitutional claim, but rather is an important factor to consider because it is probative evidence regarding whether a systemwide problem exists. *See Yellow Horse v. Pennington County*, 225 F.3d 923, 926, 928-29 (9th Cir. 2000); *Tumath v. County of Alameda*, 1996 WL 660611, at *3 (N.D. Cal. 1996). Plaintiffs' effort to eliminate any reliance on such accreditation is unfounded.

### B.   Individual Certified Practices

Plaintiffs argue that written policies are less important than actual practices. Written policies are clearly relevant as a starting point, and they shift the burden to Plaintiffs to show that these written policies are not being followed on a systemwide basis. Plaintiffs failed to do that with respect to each of the practices identified in Defendants' Motion.   As an initial matter, Plaintiffs make no argument to defend their "indoor smoking ban" allegation.   They have abandoned their HNR access/forms allegations (in light of their shift to an allegation of a faulty HNR process).   And their almost non-existent effort to defend their watch-cell allegation (relegated to a footnote and a conclusory statement of dispute) falls short of fulfilling their evidentiary burden.[38] Summary judgment is appropriate on these three claims.

**Emergency Care**. To support their emergency-care claim, Plaintiffs rely on their experts' opinions, "Defendants' own reports" that suggest ADC nurses may not be

---

[38] The paragraphs they cite to demonstrate a disputed issue of fact refer only to a lack of a mattress in one cell, and pepper spray being used on watch cell inmates. (PRSOF ¶¶ 519, 614.) This is plainly insufficient to prove a systemic deficiency.

"properly certified to perform CPR," and equipment with insufficient or expired supplies or malfunctioning AEDs at "many facilities."  Dr. Cohen, Dr. Wilcox, and Vail opine that the lack of timely emergency treatment has been detrimental to ADC inmates, including contributing to the death of some.  Such conclusory assertions are insufficient to preclude summary judgment, as none of these experts make any effort to explain the connection between the timeliness of emergency treatment and any harm befalling a particular inmate, and also fail to present evidence that any emergency delays are widespread across the entire ADC system, rather than the few instances they selected to support their conclusion.  When Plaintiffs refer to "Defendants' own reports" they are alluding to a few MGARs, which merely show the absence of a tracking system for a provider's licensure at Winslow's Kaibab Unit, and that one nurse at that Unit had a CPR certification that had lapsed.  The reference to expired emergency response bags is to citations in the MGARs regarding certain units at Florence and Tucson in October and December of 2013—isolated incidents that fall short of proving a facility-wide much less statewide problem.[39]

**Medical Diet**.  The theory alleged in the Complaint was that Defendants had a "policy and practice of not providing medical diets" for inmates with chronic conditions.  (Dkt. 1, ¶ 60.) Defendants demonstrated that they do in fact provide medical diets for inmates with chronic conditions, and so Plaintiffs have changed their theory and now contend that they are challenging the *adequacy* of the medical diet. This claim was never raised in their Complaint, it was not certified by the Court, and it was not included in their expert reports.[40]  Moreover, simply saying they "dispute" a fact or practice (here, the

---

[39] The MGARs only noted that during one month, at two complexes, Corizon staff were not maintaining a log of daily checks of the AEDs at the units.  There is no evidence that an AED was missing or was malfunctioning, and Corrective Action was requested to ensure that checks of the AED on each nursing shift were logged daily. (DSOF, Ex. 137-SS at ADC267978-267979; and Ex. 137-XX at ADC268225-268227.)

[40] Dr. Wilcox provided only an unsubstantiated opinion that ADC's REDACTED is not "REDACTED . Plaintiffs offer no testi W cox elabora abetic inmates, the identification of such affected inmates to enable ADC to probe this allegation, and none of the named Plaintiffs' allegations support this charge by Dr. Wilcox.

adequacy of the medical diet) is not enough. Plaintiffs' designation of Plaintiff REDACTED as their spokesman for this claim—an inmate with acid reflux disease who admits ignoring medical advice and buying spicy foods but was on acid-reducing medication and never requested a medical diet for GERD (DSOF at ¶¶ 3719-3731)—falls short of proving a systemic failure, particularly where those with GERD are already on a heart-healthy diet and can self-monitor and regulate the foods they consume.

**Medical Devices**.  Plaintiffs' evidence to support this claim boils down to two disabled inmates allegedly in need of a walker or shower chair for showering, and an inmate whose walker allegedly should have been replaced with a wheelchair during his wait in the pill line.  Not only do Plaintiffs fail to provide contextual information for these events that would otherwise prove the absence of deliberate indifference,[41] these isolated criticisms fall short of a *Monell* policy or systemwide failure. Citing "ADC's own documents," Plaintiffs further point to a 5-month delay for a prosthetic repair, the storage of "numerous medical devices" in the Lewis medical hub awaiting delivery to inmates, a Lewis staffing shortage supposedly leading to a failure to provide dressing changes for wounds, and a cochlear implant that had not been replaced for 14 days. Even if true, this clearly fails to prove Eighth Amendment cruelty on a systemic basis.

Regarding Plaintiff REDACTED catheters, Plaintiffs acknowledge that "Mr. REDACTED was provided some catheters" but contend the supply was inadequate, that infections resulted from re-use, and that his wife had to purchase more to supplement his supply. But the evidence referenced in footnotes 15-17 involve at worst communication errors between providers and a spouse committed to augmenting the inmate's considerable supply, not deliberate indifference on a level satisfying the *Estelle* standard.[42]  Moreover, REDACTED

---

[41] Dr. Williams described how one inmate was denied an ADA shower (Dkt. 951-1, Ex. 1 at 16-17), but because Plaintiffs do not attach the underlying medical records, the truth of that assertion cannot be verified by the Court and it should not be considered.

[42] As Mr. REDACTED is well aware from multiple training sessions, such devices are *designed for re-u*   er the device is thoroughly cleaned. (DSOF ¶¶ 382-409, 2140, 2146, 2165.) During the period between REDACTED successful prostatectomy and March 13, 2013—which included stretches in which ____ not use a catheter—medical records show REDACTED was supplied with no fewer than 706 catheters. (Id. at ¶¶ 2342-2410.)

experience in acquiring a quantity of catheters he finds unacceptable is insufficient to satisfy the far more-demanding "systemic deficiencies" claim for medical devices Plaintiffs elected to pursue on behalf of the class in this case.

**Infectious Disease Prevention**.  Relying on their experts, who in turn rely on anecdotes and hearsay, Plaintiffs argue that unsanitary conditions exist that can lead to the spread of infectious diseases.  But their evidence consists of Dr. Cohen describing a "dirty, foul-smelling hospital unit that had broken pipes and standing water" at Lewis, and an ADC monitor referencing the smell of urine at the same hospital unit (where an inmate had just wet himself).  Vail also refers to Eyman and Florence being "infested with roaches" while Dr. Williams decries a cracked mattress and chair fabric (aka furniture wear and tear) in the medical area "presenting [the] risk of disease transmission."  Not only are these "examples" misleading,[43] at best they represent the subjective views of Plaintiffs' experts as to a small portion of specific facilities they found objectionable during their tours at 2-3 facilities, and fail to create a genuine issue as to systemwide conditions.  Plaintiffs' contentions regarding infectious disease "treatment" and "care" are not relevant to their conditions-based claim, and their allegations of "scabies outbreak" and "dialysis catheter infections" are baseless. (Att. 3; Dkt. 1028, Ex. 25.)

## V.   DECERTIFICATION

A district court may decertify any portion of its class certification order before final judgment. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *see generally* Fed.R.Civ.P. 23(c)(1)(C). After having an opportunity to test the evidence Plaintiffs submitted to secure class certification, Defendants have shown that much of that evidence

---

[43] Dr. Cohen refers to a REDACTED x-ray room at Eyman—a room not in use by inmates or staff becau orted to Browning Unit for x-rays—and a unit at Lewis with a broken pipe. (Dkt. 945-1, Ex. 1, ¶ 104.) Vail's report refers only to his tour at one unit in Florence and the observation of chipped paint, leaking showers and toilets, dripping water from the roof, and roaches collected by the inmates to show him. (Dkt. 949-1, Ex. 1 at 20-22.) Not only is much of this evidence inadmissible hearsay, Plaintiffs failed to contest any of the evidence concerning facility inspections and cell cleanliness outlined in DSOF ¶¶ 201-04, 467, 1471-84, 1823 & 1852, and none of the experts testified that such conditions were representative at all units at the respective Lewis or Florence facility, much less systemic at all 10 facilities across the state.

was false, overstated, or inadequate.  The Court is well within its discretion to decertify the class, the subclass, any certified practice, or any class representatives as it deems fit. At a minimum, Plaintiffs REDACTED should be dismissed as class representatives.  Their post-class certification depositions show that they are completely ambivalent about the class and claims they have been charged to represent. *See Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 525 (C.D. Cal. 2012) ("Individuals are not adequate representatives of a class when 'it appears that they have abdicated any role in the case beyond that of furnishing their names as plaintiffs.'").  None of the cases Plaintiffs cite to keep them in involved Fed.R.Civ.P. 23(a)(4) or a determination that mentally ill individuals can proceed as class representatives.

## VI.     PLAINTIFF BRISLAN

The parties agree that Brislan's release moots any individual claims he may have. Brislan did not allege any medical or dental claims, and he has not made any showing that he had standing to pursue his mental health claims.  He should not be retained as a class representative.  Former plaintiff Parsons should not be brought back into the case under any circumstances.  He was dismissed *before* the class and subclass were certified, and at no time after his return to ADC did Plaintiffs request leave to amend their Complaint.  If the Court substitutes Parsons or any other inmate as a class representative, Defendants should have an opportunity to conduct class and merits discovery regarding his claims.

CONCLUSION

Defendants' Motion for Summary Judgment should be granted in full.

DATED this 28th day of July, 2014.

STRUCK WIENEKE & LOVE, P.L.C.


By /s/ Daniel P. Struck
    Daniel P. Struck
    Kathleen L. Wieneke
    Rachel Love
    Timothy J. Bojanowski
    Nicholas D. Acedo
    Ashlee B. Fletcher
    Anne M. Orcutt
    Jacob B. Lee
    STRUCK WIENEKE & LOVE, P.L.C.
    3100 West Ray Road, Suite 300
    Chandler, Arizona  85226

    Arizona Attorney General Thomas C. Horne
    Office of the Attorney General
    Michael E. Gottfried
    Lucy M. Rand
    Assistant Attorneys General
    1275 W. Washington Street
    Phoenix, Arizona 85007-2926

    *Attorneys for Defendants*

2925625.1

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing **UNDER SEAL** and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Alison Hardy:              ahardy@prisonlaw.com

Amy Fettig:                afettig@npp-aclu.org

Caroline N. Mitchell:      cnmitchell@jonesday.com; mlandsborough@jonesday.com; nbreen@jonesday.com

Corene T. Kendrick:        ckendrick@prisonlaw.com; edegraff@prisonlaw.com

Daniel Clayton Barr:       DBarr@perkinscoie.com; docketphx@perkinscoie.com; sneilson@perkinscoie.com

Daniel Joseph Pochoda: dpochoda@acluaz.org; danpoc@cox.net; gtorres@acluaz.org

David Cyrus Fathi:         dfathi@npp-aclu.org; astamm@aclu.org;hkrase@npp-aclu.org

Donald Specter:            dspecter@prisonlaw.com

James Duff Lyall:          jlyall@acluaz.org; gtorres@acluaz.org

Cathleen M. Dooley:        cdooley@azdisabilitylaw.org

J.J. Rico:                 jrico@azdisabilitylaw.org

John Howard Gray:          jhgray@perkinscoie.com; slawson@perkinscoie.com

Kirstin T. Eidenbach:      keidenbach@perkinscoie.com; dfreouf@perkinscoie.com; docketphx@perkinscoie.com

Jerica L. Peters:          jpeters@perkinscoie.com

Matthew Benjamin de Mee: mdumee@perkinscoie.com; cwendt@perkinscoie.com

Michael Evan Gottfried:Michael.gottfried@azag.gov; colleen.jordan@azag.gov; lucy.rand@azag.gov

Sara Norman:               snorman@prisonlaw.com

Asim Varma:                avarma@azdisabilitylaw.org; emyers@azdisabilitylaw.org; phxadmin@azdisabilitylaw.org

David C. Kiernan:          dkiernan@jonesday.com; lwong@jonesday.com

John Laurens Wilkes:       jlwilkes@jonesday.com, dkkerr@jonesday.com

Kamilla Mamedova:          kmamedova@jonesday.com

37

Jennifer K. Messina:      jkmessina@jonesday.com

Taylor Freeman:           tfreeman@jonesday.com

Sarah Eve Kader:          skader@azdisabilitylaw.org, mlauritzen@azdisabilitylaw.org

Katherine E. Watanabe: Katherine.Watanabe@azag.gov, susan.oquinn@azag.gov

Amelia M. Gerlicher:      agerlicher@perkinscoie.com;docketPHX@perkinscoie.com,
                          pdrew@perkinscoie.com

Lucy Marie Rand:          Lucy.Rand@azag.gov, Geneva.Johnson-Joksch@azag.gov

Ajmel Quereshi:           aquereshi@npp-aclu.org

Jessica Jansepar Ross     jross@azdisabilitylaw.org

I hereby certify that on this same date, I served the attached proposed lodged sealed document by email, on the following:

Caroline N. Mitchell
Sarah Kader
David Cyrus Fathi
Donald Specter
Amelia Gerlicher

/s/ Daniel P. Struck