**Index of Exhibits Attached to Notice of Filing**

Exhibit 1:   Report of Robert Cohen, M.D. dated November 8, 2013, including all appendices

Exhibit 2:   Rebuttal report of Robert Cohen, M.D. dated January 31, 2014, including all appendices

Exhibit 3:   Supplemental report of Robert Cohen, M.D. dated February 24, 2014, including all appendices

Exhibit 4:   Confidential Report of Todd Randall Wilcox, November 8, 2013

Exhibit 5:   Confidential Rebuttal Report of Todd Randall Wilcox, January 31, 2014

Exhibit 6:   Confidential Supplemental Report of Todd Randall Wilcox, April 2, 2014

Exhibit 7:   Report of Pablo Stewart, M.D. dated November 8, 2013, including all appendices

Exhibit 8;   Supplemental report of Pablo Stewart, M.D. dated December 9, 2013, including all appendices

Exhibit 9:   Rebuttal report of Pablo Stewart, M.D. dated January 31, 2014, including all appendices

Exhibit 10:   Second supplemental report of Pablo Stewart, M.D. dated February 24, 2014, including all appendices

Exhibit 11:   Report of Jay D. Shulman, D.M.D., M.A., M.S.P.H. dated November 8, 2013, including all appendices

Exhibit 12:   Rebuttal report of Jay D. Shulman, D.M.D., M.A., M.S.P.H. dated January 31, 2014, including all appendices

Exhibit 13:   Supplemental report of Jay D. Shulman, D.M.D., M.A., M.S.P.H. dated February 24, 2014, including all appendices

Exhibit 14:   Report of Eldon Vail dated November 8, 2013, including all appendices

Exhibit 15:   Report of Eldon Vail dated January 31, 2014, including all appendices

Exhibit 16:   Report of Eldon Vail dated February 24, 2014

Exhibit 17:    Report of Craig Haney, Ph.D., J.D. dated November 7, 2013, including all appendices

Exhibit 18:    Report of Craig Haney, Ph.D., J.D. dated January 31, 2014, including all appendices

Exhibit 19:    Report of Brie Williams, M.D., M.S. dated November 8, 2013, including all appendices

Exhibit 20:    Report of Brie Williams, M.D., M.S. dated December 9, 2013, including all appendices

Exhibit 21:    Rebuttal report of Brie Williams, M.D., M.S. dated January 31, 2014, including all appendices

# EXHIBIT 1

# CONFIDENTIAL REPORT
# OF ROBERT L. COHEN, M.D.

*Parsons, et al. v Ryan, et al.*

No. 2:12-cv-00601-NVW

NOVEMBER 8, 2013

Confidential Information – Subject to Protective Order

# TABLE OF CONTENTS

I. OPINIONS ................................................................................................................ 3

II. BASES FOR MY OPINIONS ................................................................................. 5

  A. Case Study ........................................................................................................ 5

  B. Failed Medical Care System ............................................................................ 8
    1. Central Management ................................................................................ 11
    2. Written Procedures .................................................................................. 12
    3. Qualified Staffing .................................................................................... 13
      a. Insufficient Allocated Positions .................................................... 13
      b. Failure to Fill Allocated Positions ................................................ 15
    4. Intake Screening ...................................................................................... 18
    5. Timely Access to Medical Care ............................................................. 18
      a. Sick Call ......................................................................................... 18
      b. Chronic Care .................................................................................. 22
      c. Specialty Care ................................................................................ 26
    6. Adequate Physical Space ........................................................................ 32
      a. Clinic Space ................................................................................... 32
      b. Medical Beds ................................................................................. 38
    7. Access to Medication .............................................................................. 40
      a. Medication Delivery ...................................................................... 40
      b. Medication Continuity ................................................................... 43
      c. Poor Prescribing Practices ............................................................ 44
      d. Delayed Non-Formulary Approvals .............................................. 45
    8. Medical Records ..................................................................................... 45
    9. Quality Assurance ................................................................................... 47
      a. Quality Improvement Program ...................................................... 47
      b. Death Review ................................................................................. 48
        1. ADC Death Review Process .................................................... 49
        2. Inadequate Care in Prisoner Deaths ....................................... 50

III. CONCLUSION ..................................................................................................... 79

PRSN-RLC 00002

I, Robert L Cohen, declare:

1.      I am a medical doctor and expert in the field of correctional medicine, with 30 years of experience in the field. I have been appointed by federal courts to serve as a monitor in cases challenging the provision of medical care to prisoners, including in Michigan, New York State, and Florida. I have also been a member of the New York City Board of Corrections since 2009, served as a representative of the National Commission on Correctional Health Care for 17 years, provided primary care to jail inmates at Rikers Island, and published extensively on health care for the incarcerated.[1]

2.      I have been retained by plaintiffs' counsel in the *Parsons* case as an expert in correctional health care.  I have been asked to give my opinion about in the adequacy of the Arizona Department of Corrections (ADC) health care delivery system.  My billing rate in this action is $300 per hour, with a daily rate for out of town work of $2500.

3.      At plaintiffs' request and in order to develop my opinions, I conducted an investigation that included visits to the two largest prison complexes (Lewis and Eyman), interviews with prisoners at those two prisons, including the named plaintiffs, and review of medical charts of prisoners with serious chronic medical diseases, hospitalizations, emergency care and specialty consults for those prisons.[2]  In addition, I reviewed the testimony of ADC, Corizon, and Wexford staff, documents produced to plaintiffs' counsel by ADC regarding health care delivery, and various monitoring reports and data

---

[1] A copy of my Curriculum Vitae is attached as Appendix A.  Included in my CV is a list of all publications I have authored in the last ten years, and a list of all other cases in which, during the previous four years, I have testified as a witness at trial or by deposition.

[2] I also requested to review the medical files of all inmates from those Lewis and Eyman who had died in the previous 12 months.  Prior to the tours, the Defendants were given the list of names of charts that I wanted to review.  During the tours, however, I was able to review only one deceased prisoners' chart, because ADC policy is to send the medical charts to headquarters after a prisoner's death, and none of the other files were on site at the prisons or otherwise available for me to review.

Confidential                                                                                    PRSN-RLC 00003

created by ADC and its contractors for the two prisons I visited, and for Douglas, Safford and Winslow prisons. Finally, I reviewed the records for ten patients who died in ADC custody in 2011 and 2012, and physician reviews of these records prepared at my direction . [3]

4.       The methodology I used for selecting the medical charts to review is as follows.  First, I reviewed the ADC monitoring reports for the two prisons for the months leading up to the tours.  Ten to 15 names of prisoners identified by Defendants' monitors as receiving inadequate chronic, specialty, or emergency care were selected from each list at random.  Second, I reviewed the "Monitored Conditions" reports produced by Defendants that listed, as of March 2013, all prisoners housed at the institutions with chronic conditions or diseases including tuberculosis, hypertension, diabetes, cancer, cardiac conditions, COPD/asthma, seizures, HIV, AIDS, Hepatitis C, pregnancy, or other respiratory conditions.  Approximately 10 to 12 prisoners with diabetes, five to 10 prisoners with HIV, 10 to 12 prisoners with hypertension, and five to 10 prisoners with seizure disorders were selected at random.  Some of the individuals selected had more than one chronic condition, or had been identified in Defendants' monitoring reports. Third, I reviewed the most recent Emergency Transports reports produced by Defendants for the prisons and a sample of about 5 to 10 names was selected at random.  I also reviewed the lists of those referred for specialty consults, provided by Defendants and from which names were selected.  Fourth, I also reviewed medical charts for some patients that I encountered during my site visits, and an additional chart provided to plaintiffs' counsel by the patient's family. [4]

_____

[3] A complete list of the documents that I reviewed for purposes of preparing this expert report is attached as Appendix B.

[4]  Throughout this report, I cite patient examples illustrating the systemic care deficiencies that I have identified.  Rather than include a case study for each in the body of this report, I have attached as  Appendix C a patient by patient summary that I prepared after interviewing patients and  reviewing medical charts, reflecting a more comprehensive discussion of the charts for the patients cited in this report.

Confidential

PRSN-RLC 00004

5.      The ten files I reviewed for prisoners who had died (excluding the file mentioned in footnote 2), were the selected as follows.  Three of the files were chosen because defendants had produced mortality reviews that I could compare to the medical records.  The remaining seven were chosen because they were among the most recent deaths for which plaintiffs have received medical records.

## I.    OPINIONS

6.      Based upon my extensive background in correctional medicine, experience as a medical monitor in several states, and my investigation into the conditions in the Arizona prisons, my opinion is that the ADC health care delivery system is fundamentally broken and is among the worst prison health care systems I have encountered.

7.      Because of this profoundly deficient system, prisoners with serious medical conditions are regularly deprived of necessary medical care and suffer substantial harm, and even death, as a result.   Moreover, all prisoners in this system are at risk of serious harm and/or death, because the system as a whole is not equipped to provide them with necessary medical care when they experience serious medical needs.

8.      The ADC's system, as it currently exists under Corizon's management, is disorganized, under-resourced, understaffed, and completely lacking in the capacity to monitor itself and correct the systemic dysfunction that currently exists.  Thus, unless ADC dramatically reverses its course, it will continue to operate in a way that harms patients by denying them necessary care for serious medical conditions.

9.      The ADC prisons I visited are unable to sustain the basic delivery of medical care because of limited clinical staffing and the overwhelming number of prisoners who have serious, long-standing, and complicated medical care needs, causing lengthy treatment delays.  The long delays in care needlessly compound and aggravate

3

medical conditions that, had they been addressed sooner would have been managed and resolved.  The documents I reviewed, including ADC contract monitoring reports, medical records and death reviews, establish that the conditions I observed are typical throughout the state.

10.     Prisoners with chronic conditions, including HIV, diabetes, cancer, seizure disorders, hepatitis and hypertension, are particularly at risk in the ADC's system.  While many patients with chronic illnesses can be managed and live with relatively stable health, ADC's system lacks an adequate tracking and management system to ensure that patients have regular provider visits and medication renewals.  Not surprisingly, I found numerous patients at both prisons who were much sicker than they would have been had they been adequately managed.  In fact, there were multiple cases in which the lapses were so shocking and dangerous that I felt ethically obligated as a medical professional to bring them to the immediate attention of the ADC and Corizon staff.

11.     Defendants' medication delivery systems are inadequate for the size of the population they serve, and are plagued by short-staffing at a number of their prisons. Too many prisoners, with too few staff and insufficient resources, leads inevitably to medication delays and inadequate treatment documentation. The result is that ADC prisoners receive their medications late or not at all, and suffer as a result, as was evident in my patient interviews and review of charts.

12.     Unless medical records and scheduling information are managed, organized, and maintained effectively, appropriate health-care services cannot be provided.  ADC lacks the ability to adequately manage and maintain medical records and patient scheduling information.

13.     A functioning Quality Assurance program is a critical element in any medical care system, enabling the system to assess and evaluate care provided its patients so that systemic deficiencies may be identified and addressed.  To the extent that any medical quality assurance activities are occurring in the ADC, they are plainly

4

inadequate.

14.     There are more prisoners requiring specialized placement for medical reasons than Arizona can accommodate. Arizona has not provided adequate medical beds for disabled prisoners, aged inmates, and prisoners who need some form of sheltered living due to their medical or mental health conditions.

15.     The clinical spaces that I toured are too small for the prison population, and in all but one or two cases, I never observed any actual medical care being delivered in these spaces.  Rather, I observed locked, dark and empty rooms that I was told were exam rooms, but lacked basic medical equipment.  Medical equipment was broken, covered in dust, and in some cases based on logs attached to them, had not been repaired or checked in more than a decade.

16.     My observations at the prisons and extensive review of documents demonstrate that the gross systemic deficiencies in the ADC's health care delivery system are deeply rooted, long-standing and will require substantial effort to remedy.  During the last 15 months, the ADC medical care system has shifted from ADC management, to Wexford and then to Corizon, but privatization has failed to resolve the long-running health care problems.  Rather than invest in addressing the serious systemic deficiencies in their program, ADC chose to outsource their system to the lowest bidder, not once, but twice.  At no time during this series of management hand-offs has ADC demonstrated the will or capacity to address these deep-seated issues.

## II.     BASES FOR MY OPINIONS

### A.     Case Study

17.     I discuss many examples of poor medical care in this report, but I present the case of ███████████████ here because it vividly illustrates the myriad systemic breakdowns that have plagued ADOC, Wexford, and Corizon, over a period of many months, and the impact these breakdowns have on patient care.

5

18.     I interviewed Mr. ███ at his cell on Eyman's Browning Unit and reviewed his medical record.  Mr. ███ developed severe throat pain in April 2012. He was finally treated on 6/5/12 with amoxicillin for a sore throat.  The condition did not respond.  On 7/14/12 Mr. ███ placed one of many "health needs requests" (HNRs) complaining of unrelenting pain.  He wrote, presciently: "This is a severe, possibly lethal problem and I need someone there to take some action to treat this problem."  Mr. ███ was not seen by the nurse practitioner until July 20, six days later.  The abscess ruptured spontaneously four days after that.  He was seen by a physician at a local hospital who ordered two types of antibiotics, but he received only one. The infection persisted, and Mr. ███ remained in extreme pain.   His suffering continued.

19.     On 8/17/2012 he was again prescribed a course of two antibiotics and again the medical staff provided only one. He placed an HNR on 8/21/2012 requesting that this problem be addressed. The nursing staff elected to take no action, and to refer the problem to the health care practitioner on 8/24/2012.  ADC 135625.  That day, the Nurse Practitioner, Jane Houdeshel asked that the medications be "pulled out of RDSA". (unknown abbreviation).  ADC 136602.  On 9/19/12, Mr. ███ was finally seen by Dr. Joel Cohen, an ENT surgeon, who recommended a tonsillectomy.  ADC 136603. Although he was in great pain, and suffering from a persistent infection unresponsive to multiple courses of antibiotics, surgery for removal of his tonsils was not performed for over two months, on 11/20/12.  The surgical pathology report was faxed to Dr. Cohen the next day, 11/21/12.  The tonsils showed moderate to poorly differentiated squamous cell carcinoma of the left tonsil, involving full thickness of the submitted material, extending into the muscle, and extending to the margin of the resection.

20.     Although Dr. Cohen saw the surgical pathology report (ADC 136593) on 11/21/12, no follow-up was scheduled for the patient.   For the next three and a half months, Mr. ███'s cancer was not treated.

21.     On 3/3/13 Mr. ███ placed an HNR.  He was not seen for more than

6

three weeks, until 3/28/13.  He told Mr. Salyer, the Physician Assistant (PA) that he had been experiencing throat problems since January.  Mr. ███ noticed swollen lymph nodes on the left side of his neck.  He told the PA that Dr. Cohen, the ENT surgeon, had told him he had a "Huge ugly tonsil."  Mr. Salyer examined Mr. ███ and confirmed that he had adhesions and significantly swollen lymph nodes.  On that day, Mr. Salyer requested Corizon approve an ENT urgent consultation because of these findings, but Mr. ███ waited almost seven more weeks to be seen by Dr. Cohen.

22.   Dr. Cohen saw Mr. ███ on 5/14/2013. He noted bilateral neck masses. He performed two fine needle aspiration biopsies.  Since Dr. Cohen already knew that Mr. ███ had untreated cancer of the tonsil, it is unclear why he performed these biopsies.  Dr. Cohen asked for a CT scan of the neck in preparation for radiation therapy. On 6/7/13, Dr. Cohen sought an emergency consultation with an oncologist.

23.   On 6/17/13 Mr. ███ placed another HNR complaining of increasing throat pain, and asking for follow up on the referral for a CT scan and an oncology appointment.  ADC 136631.  On 6/24/13, one week later, he received his response: "Your consultation has been approved and appointment has been scheduled."  The CT scan, which had been urgently recommended on May 14 was not performed until July 2, 2013, four months after Mr. ███'s HNR complaining about swollen lymph nodes.  The CT scan showed "bilateral submandibular complex solid contrast enhancing masses and associated anterior neck lymphadenopathy, likely nasopharyngeal malignancy."  In plain English:  large solid masses in his salivary glands, swollen lymph nodes, and the diagnosis of nasopharyngeal cancer, a cancer of the upper throat.

24.   Remarkably, but entirely consistent with prior delays, this CT report was sent to the Eyman medical staff on 7/2/13 but not reviewed by health care staff until 7/8/13.  On that day, Mr. ███'s scheduled oncology appointment was inexplicably cancelled.  He was finally seen by oncology more than a month after the emergency consult was requested.  On July 13, PA Ainslie reviewed the oncology recommendations

7

for PET/CT scan, Dental evaluation, Medical Oncology Consultation, and 21st Century Oncology Consultation.  ADC 136612.  These consultations requests were written on July 13, but were not faxed for approval to the Corizon Clinical Coordinator until 7/15/13. ADC 136613-616.

25.    Two days later, at the time of my visit to Eyman-Browning, on 7/17/13, ██████████ still had not received any treatment for the cancer.  Mr. ██████'s treatment for an extremely painful, life-threatening condition was characterized by consistent failures to provide basic medical care.  His pain was ignored for months.  His failure to respond to the minimal treatment offered was ignored.  Even when he was ordered treatment, he was not provided the ordered medications.  Repeated urgent requests for specialty consultation were delayed for weeks and months.  Urgent surgical treatment for a painful condition was delayed for months.  The extensive cancer left in his neck after his left tonsil was removed was ignored. In March 2013, he noted increasing lymph nodes.  Medical, nursing staff and central office staff all became aware of his untreated cancer, but for the next four months, no treatment was offered.

26.    In my more than three decades of doing this work, I have never seen such callous disregard demonstrated over and over again.  Beginning in March 2012, medical staffs were fully aware that ██████████ was in severe pain, and did not treat him.  When they finally realized that he had an uncontrolled infection, they delayed treatment.  When he required surgery, the surgery was delayed.  When he was diagnosed with cancer, his biopsy was ignored.  When he sought care for the spreading cancer in March 2013, he again experienced delay after delay.  Four months after the rediscovery, he had received no treatment.  This is a horrifying example of a failed system that places every seriously ill man and woman it serves at extreme risk.

**B.    Failed Medical Care System**

27.    Although shocking, Mr. ██████'s case is not anomalous.  Instead, it is a

8

tragic but predictable outcome of an appallingly poor medical care system that lacks the essential building blocks of an effective health care delivery system and has for years been inadequately staffed, funded and resourced.  Moreover the types of lapses and delays I found in Mr. █████'s case are consistent with the types of problems I found repeatedly in reviewing files and talking with patients.

28.    Based on my experience in correctional health care systems, a sound system for a large statewide prison system like Arizona's must include at least the following nine elements: (1) a centralized organizational and management structure; (2) written policies and procedures that are implemented and followed consistently; (3) qualified medical staffing; (4) prompt intake/screening; (5) timely access to primary and specialty medical care, including for the chronically ill; (6) adequate clinical facilities; (7) medication distribution system; (8) a functioning medical records system; and (9) quality assurance, including a viable death review process.   ADC's health care delivery system is broken because these essential elements, to the extent they exist, are ill-functioning and are so under-resourced and poorly managed that they are largely ineffective.

29.    Despite the fact that these deficiencies are and have been amply demonstrated, including in Wexford's and Corizon's care data, ADC's contract monitoring reports, and individual medical charts, ADC has failed to develop and fund adequate staffing patterns and to allocate sufficient resources necessary to address the longstanding systemic problems.

30.     When Wexford Health took over ADC's medical care delivery system, it found it "had to start from the basics and rebuild a dysfunctional program," and advised ADC that this was a task "far beyond the scope of the project described in the RFP." Wexford 000049.  Meeting with ADC officials in November, 2012 Wexford staff set forth the myriad system failures it had uncovered, and admitted that "[t]he current class action lawsuits are accurate."  Wexford 000130.

31.    Based on my investigation, that admission is unfortunately as accurate

9

PRSN-RLC 00011

today with respect to Corizon as it was with respect to Wexford in November, 2012.   A
survey of cases I reviewed while visiting prisons in July shows no significant changes in
care for many prisoner patients who have been the victims of continuing poor care from
the Arizona Department of Corrections, Wexford, and now Corizon.  To illustrate, and as
set forth below and  in more detail in Appendix C, ████████'s diabetes has been
poorly controlled since November, 2012, his insulin regimen has been chaotic and
dangerous for close to a year, and he has not been provided with an ophthalmology
consult for close to a year; ████████'s diabetes care has been poorly managed from
at least October 2012 until the current time; ████████' diabetes has been poorly
controlled and his medications mismanaged since January, 2013; ████████' diabetes
has been poorly controlled since December, 2012 and medical staff failed to recognize
that fact; ████████'s diabetes and hypertension have been poorly managed since
November, 2012; ████████ has been waiting for cataract surgery since September,
2012, and his pain medications have been mismanaged during that same period of time;
████████, a diabetic, has not had a required eye exam for over two years; ████
████ has not had the urology specialty consult that was ordered for him on January 1,
2012; ████████ has been waiting 18 months for necessary eye surgery; ████████
has had care for his HIV disease mismanaged since January, 2013; ████████'s HIV
care has similarly been mismanaged since February, 2013; and ████████  as
described above, has not received treatment for a dangerous cancer that was diagnosed in
November, 2012.

32.    I also found numerous cases where  the medical care mismanagement is
clearly solely the responsibility of Corizon, including: ████████'s hypertension
has been mismanaged since May, 2013; ████████'s medications were not
renewed and critical lab results were not reviewed under Corizon; ████████ suffered
a delay in getting a necessary urology consultation under Corizon; ████████ received
no timely cardiology consultation through Corizon after his pacemaker failed; ████████

10

███'s MRSA has been mismanaged by Corizon; ███████ has had no clinical or cardiology consultation follow-up under Corizon following an acute heart attack; ████ waited six months to receive treatment for his kidney cancer and relief for the severe pain he suffered from bony metastases; and ███████ died because Corizon mismanaged his coccidioidomycosis pneumonia beginning in May, 2013.  In all of these cases, these patients' suffered harm and serious risk of harm, needlessly.

33.     These continuing and sometimes lethal failures to provide adequate medical care to prisoners with serious and long-standing medical problems demonstrate anew that management of patients with serious medical care problems and complications cannot be done on the cheap.  Corizon, like Wexford and the Arizona Department of Corrections before it, has proved again that where corners are cut in providing medical care by having too few professional staff and an inadequate budget, patients will suffer, and sometimes die, because of systemic neglect. Prisoners are getting lost in the medical care system; their serious chronic diseases are not being followed as closely as they should be; and requests for necessary outside medical consultation are going unfilled.

### 1.     Central Management

34.     Although the ADC health care services were privatized, ADC is ultimately accountable and responsible for the statewide administration of health care.  ADC created a Health Services Contract Monitoring Bureau, mostly comprised of administrators and health care staff who oversaw the delivery of health care by ADC prior to privatization. However, in terms of day-to-day activities, it appears that the contractor Corizon functions largely on its own in terms of deciding how (and whether) to deliver medical care.

35.     The failures of the existing management structure are well-illustrated by the ADC's Health Services Contract Monitoring Bureau, which, on a monthly basis, generates lengthy reports regarding compliance with the health care contract at each of

Confidential

the prisons.  Although these reports consistently document ongoing failures to comply with the contract requirements in many critical areas, including requirements to screen and process sick call requests timely, to implement chronic care treatment plans and to deliver necessary medications, it is not clear who, if anyone, ever reviews these reports. The head of the Bureau testified he does not read the reports on a monthly basis.  Gross Dep. 13:17-14:2; *see also* Campbell Dep. 143:2-5 (Program Evaluation Administrator who supervises contract monitors does not read all of the monthly MGARs).

36.     The ADC's most recent Quarterly Monitoring Reports, covering April through June 2013, document Corizon's consistent non-compliance with critical program measurements for sick call and chronic disease management for the state's two largest prisons, Lewis and Eyman.  ADC 137754, 137780.  These non-compliance findings are repeated in each of the months of July through September, 2013.  These findings are entirely consistent with the extreme level of dysfunction that I observed when visiting those two prisons.  Indeed, as part of the monthly auditing program, Corizon is required by contract to develop Corrective Action Plans (CAPs) for every performance measure with an unsatisfactory score.  However, they frequently fail to produce the CAPs. Headstream Dep. 146:19-148:2 (despite repeated findings of noncompliance, Lewis did not submit CAPs).  Defendants also have failed to produce the CAPs for review by Plaintiffs' counsel or me.

37.     Despite these repeated failures, ADC management has failed to enforce the CAP requirement.   Haldane Dep. 56:12-57:17; 143:12-143:17; Medel Dep. 160:17-161:15; Campbell Dep. 130:22-131:8.  Instead, they continue to generate audit reports month after month that bear witness to gross systemic failures without addressing them, or requiring their contractor to address them.

### 2.     Written Procedures

38.      A constitutionally adequate correctional medical care delivery system for a

Confidential                                                                                          PRSN-RLC 00014

prison system with 33,000 prisoners must have and consistently follow comprehensive written policies and procedures.  My review of documents and observations at Eyman and Lewis, and review of the MGAR reports establishes that there is a system-wide practice of not following the ADC and Corizon policies and procedures because, among other things, a failure to provide adequate staffing, supervision and resources to promote compliance.

### 3.  Qualified Staffing

39.    The foundation of any sound health care delivery system is staffing adequately trained and in sufficient number to address the patient population's health care needs.  Without a sufficient number of clinicians on staff, it is simply impossible to ensure that prisoners receive the care that they require.

### a.  Insufficient Allocated Positions

40.    Corizon's current clinical staffing allocation is so alarmingly low that, even if all positions were filled, which is not the case, it would be impossible for the system to delivery adequate health care to the number of prisoners currently in the ADC system.

41.    Inadequate clinical staffing has long been a problem for ADC.  Institutions were not fully staffed by ADC during the April 2-July 1, 2012 transition period from ADC to Wexford.  Pratt Dep. 21:22-22:12.  One doctor characterized that time as a period of "a great exodus of staff, both from the mental health and medical areas that weren't being filled."  Crews Dep. 18:5-12.

42.    Staffing continued to be a problem under Wexford.  "It was an understood" that staffing levels at the institutions was one of Wexford's concerns prior to taking over delivery of health care.  Pratt Dep. 29:6-10.  "A smaller staffing ratio creates a greater risk." (Shaw Dep. 125:5-6)  As ADC's Joe Profiri wrote, "Based on the documentation from Mr. Pratt the core problem is staffing.  The inadequacy of staffing levels are the root cause of all other deficiencies, none of which can be effectively remediated or sustained

Confidential

PRSN-RLC 00015

with any success until staffing deficiencies are corrected.  Wexford should be laser focused on addressing staffing."  AGA_Review_00037464.

43.     Given that staffing had been identified as a critical issue under ADC and Wexford, I was stunned to learn that Corizon, upon taking over the system in March, 2013, apparently eliminated 30 medical service positions, including almost one third of the staff physician positions and about 15% of the RN positions. AGA_Review_00006402.

44.     The next month, ADC monitor, Mark Haldane, reported staffing problems for nurses at Eyman prison.  "[T]he tentative schedule for May has large gaps in nursing coverage.  It appears that there are days that there is no coverage in any of the cell blocks."  AGA_Review_00013126.  He further explained, "Even at current staffing levels, nurses are finding ways around standard practice… making errors …and omitting some tasks. . . . Apparently nursing staff at all Eyman units are being cut."  *Id*.  He concluded with, "staffing remains a concern of nursing supervisors at Florence and Eyman and many others (including me)."  *Id.*

45.     Currently, the full-time clinician staffing allocated for each of the larger prisons, and Phoenix, with its specialized missions, is extraordinarily thin.[5]  Douglas complex, which houses approximately 2,200, is allocated no physicians and only a single mid-level practitioner (*i.e.,* a nurse practitioner or physician's assistant).  Eyman, Lewis and Yuma, with approximately 5,300, 5,400 and 4,500 prisoners respectively, are each allocated only a single physician and three mid-level practitioners.  Tucson houses over 5,000 prisoners, including the sickest prisoners in the system (Robertson Dep. at 32:3-

---

[5]   Under Corizon, each of the prisons is allocated a Medical Director, and I believe that position must be filled by a physician.  I have been told that the Medical Director may have clinical duties.  However, given the administrative duties typically demanded of a Medical Director in a prison complex serving several thousand people, it is not possible for the director to have a full clinical schedule, thus I have not included them in my count of clinicians.

14

15), yet has only two physician positions and three mid-level positions.  With 4,060 prisoners, Florence has two physician and two mid-level positions.   Perryville, which has the only intake unit in the state for women and houses over 3,700 women prisoners, has two physician and five mid-level positions.   Phoenix is a smaller facility with approximately 680 prisoners, but it has several specialized missions, with a 40 bed licensed acute mental health unit and a 135 bed licensed intermediate mental health unit, a transitional care unit for mental health inmates, and the state's primary intake unit for men,  Phoenix has only a single physician position and four mid-level positions.  ADC 153777-153793.

### b.   Failure to Fill Allocated Positions

46.   As noted above, staffing at this level would be grossly inadequate for the number of Arizona prisoners if all positions were filled, but Corizon has not been able to fill even these few positions.  According to the July 2013 Arizona staffing report, 4.5 of the state's 10 physician positions were vacant.  *Id.*  The September 2013 report shows some improvement, but the system is still short almost three full physician positions, and more than four of its ten Medical Director positions are vacant.  ADC 155099.

47.   In addition, many other key allocated positions have been vacant.  July: ADC 153779  (Eyman had  no Medical Director, a 37.8% vacancy rate for RNs, and a 60% vacancy rate for RN Supervisors);  ADC 153782-83 (Lewis lacked a Medical Director, and had a 32% vacancy rate for RNs) and Bybee Dep. at 50:3-7 (Lewis does not have a Facility Health Administrator);  ADC 153791 (Winslow, allocated a full-time medical director and mid-level practitioner has only a half-time director);  September: (Douglas has no medical director and only nurse practitioner position is vacant); (Eyman has no medical director); (Lewis has no medical director, and 32% vacancy rate for RNs); (Safford has only 1 LPN for 6.10 positions); (Winslow's one nurse practitioner position is vacant).   ADC 155099.

Confidential                                                                          PRSN-RLC 00017

48.     Dr. Robertson opined that Corizon has been unable to fill its clinical staff positions because they do not pay enough (Robertson Dep. at 96:9-96:23), and the COO of Corizon testified Corizon has increased the salary matrix for physicians and medical directors but the number of applicants for those positions did not increase after the salary changes.  Bybee Dep. at 52:13-53:1.

49.     Corizon's staffing deficiencies have been evident and documented at the Eyman complex since the start of their contract in March of this year.  4/9/13 MGAR, ADC 088836 (In 4/13, Eyman site manager reported that he did not have a medical director or director of nursing at Eyman and had only two providers, one physician and one mid-level).  ADC's monitor wrote on 4/12/13, "There is no provider on any unit at Eyman Complex today…. Some inmates are going weeks without medications.  For example, ███████████████████ wrote an HNR stating, 'I have been without my seizure medications since the 23rd of March and I've begun having some bad seizures.  My meds were renewed last month.  I've written medical and the nurse said she called pharmacy, yet still I have no meds.' . . . .  His chart sits on a provider cart on a yard… with no provider.  They have been without a provider for 6 weeks." AGA_Review_00015753.  Regarding Browning unit, he writes that he had been told their chronic care appointments were "pretty good," but then found their "HNR referrals were backlogged to December."  *Id.*

50.     Serious problems are documented at other prisons as well.  4/25/13 MGAR, ADC 088893 ("[Lewis] staffing patterns not supportive of required performance measures at present."), 4/17/13 MGAR, ADC 088995 ("[Staffing at Safford] continues to be an area of potential concern.  Corizon has approved fewer nurses than previously were employed."), 4/16/13 MGAR, ADC 089077 ("There has not been a contractor physician at the Winslow or Apache medical units as of this date during the month of April with the exception of one day at each unit that a doctor did chart reviews and saw a total of three inmates"), 4/19/13 MGAR ADC 089081.  (Noting that Winslow needs a medical

16

director, mid-level provider, LPN, medical technician, x-ray technician, and a PCT ).

51.   The ADC has continued to document the staffing problems since then.
7/31/13 MGAR, ADC 137224 (As of July 31, 2013, "although several vacancies have
been filled [at Eyman], there are presently no staff working on site in several key
positions.  These include nursing supervision (3x), Medical Director, Clinical
Coordinator, and the Assistant FHA."), 9/5/13 MGAR, ADC 154043 (As of September 5,
2013, the following positions [at Douglas] were not filled:  1 FTE medical director, 1
FTE mid-level practitioner, 1 FTE dental assistant, 0.75 FTE dentist, 0.90 FTE LPN, 0.40
FTE nursing assistant, 0.50 FTE RN…These are critical positions to have unfilled as the
staffing plan submitted by Corizon allows for no back-up coverage built into it).

52.   The monitoring reports also suggest that Corizon does not employ
sufficient temporary staff to meet the medical needs of the inmate population.  4/22/13
MGAR, ADC 088911 ("Current staffing patterns [at Lewis] are affecting nursing and
provider lines.  All locum and registry nursing has been cut with no noted replacement of
F/T staff to cover shortages at present.").

53.   Very predictably, inadequate staffing drives appointment backlogs and
treatment delays.  4/15/13 MGAR, ADC 088843 ("Provider staffing is woefully
inadequate.  As of April 12, complex-wide [at Eyman] there were over 450 charts in
provider review carts."), 7/22/13 MGAR, ADC 137342 ("Though efforts at increasing
current staffing levels [at Lewis] continue, the shortages in all areas to include providers
for medical and psychiatry and in areas of nursing clearly compromise the ability of
current staff to manage the extensive medical needs of the population."), 4/16/13 MGAR,
ADC 089077 (without physician at Winslow, "[c]hart reviews have not been conducted
and likely wouldn't be even if a full time physician started today as it would take the rest
of the month to catch up on the backlog of inmates needing to be seen and the backlog of
chart reviews.").

Confidential

PRSN-RLC 00019

### 4. Intake Screening

54.   Prompt intake screening is essential in a correctional setting to ensure, among other things, that patients receive timely medications for serious medical conditions, are screened for communicable diseases and are identified as requiring ongoing attention from specialty consultants.

55.   The vast majority of intake screening in the ADC takes place at Phoenix (for men) and Perryville (for women), two prisons that I did not visit.

### 5. Timely Access to Medical Care

56.   In order to ensure that prisoners are able to request medical care when they need it, prisons must have a system for prisoners to make their health care needs known, and for ensuring those requests are evaluated and addressed in a timely manner.   For prisoners who suffer from chronic illnesses, the prison must have a system for tracking and scheduling appointments regularly to ensure continuity of care.  For those who require care beyond the expertise of their primary care provider, the prison must have a system of referral to specialists.

### a. Sick Call

57.   The ADC has a "sick call process" that patients use by submitting a "health needs request" (HNR) for which they must pay $4 for each request, if they have funds. Under ADC's policies, HNRs are supposed to be collected every day, and for those requests listing symptoms, the patient should be seen by an RN within 24 hours (72 hours for weekends).  Health Services Technical Manual, ADC 010827.  If the patient needs further medical attention, he or she is supposed to be scheduled to see the provider (physician or mid-level) within seven days.

58.   At the prisons I visited, it was clear these requirements are routinely ignored, causing patients to endure pain and suffering unnecessarily, as demonstrated

18

above in the ██████ case, and in many other cases I reviewed.   Among other prisoners

who experienced harm because of delayed care was ████████████.  On 5/10/13,

he submitted an HNR at Eyman complaining of a cyst in his armpit. He wrote:

"Excruciating" "I can hardly move my arm. I think it has to drain. Emergency. Please see

me ASAP. I can pay the $4 for this emergency visit. Thanks and God bless." On 5/13/13

he was told that he would be scheduled to the nurses' line. Six days later, he submitted a

second HNR stating "Well now it is all infected. I have red streaks running down my

arm."  ADC 136482.  On 5/24/13, two weeks after he submitted the HNR complaining of

severe pain from his abscess, he was seen by an RN who confirmed that he had an

abscess.  Nurse Dorsica cleaned the wound, cultured it, and prescribed an antibiotic,

clindamycin 150 mg three times a day and put bacitracin on the wound.  Mr. ██████'s

infection was cultured as methicillin resistant staph aureus.  This is a very serious

infection.  Treatment of a serious painful bacterial infection should not be delayed for

two weeks.

     59.     ██████████████ a 40 year old man who has hypertension, asthma,

epilepsy, and a history of a pituitary tumor, had his last chronic care visit a year before

my July 2013 visit to Lewis.  His April 20, 2013 HNR stated: "I'm losing my vision,

difficulty seeing, experiencing pain and pressure and loss of peripheral vision."  In the

three months after submitting the HNR, Mr. ████ was not seen by an RN or an MD.

     60.     ████████████████ right leg has been amputated. He submitted an

HNR at Eyman for repair of his right prosthetic leg on May 1, 2012. On September 4,

2012, four months later, his HNR was reviewed, and an appointment with a physician's

assistant was scheduled.  ADC 136478. Mr. ████████ was not seen by the physician's

assistant about his broken prosthesis until April 9, 2013, eleven months after he placed

his HNR.

     61.     Named plaintiff Stephen Swartz, 102486, reported that because of the

shortage of medical staff at Lewis, it takes prisoners an average of three months to see the

Confidential

PRSN-RLC 00021

doctor from the time they file a HNR.  He reports that he submitted an HNR on January 13, 2013, requesting evaluation of a pigmented enlarging mass on his waist. He received no response and continued to submit HNR's. He was finally seen on June 26, 2013, more than five months later.

62.     Named plaintiff Joseph Hefner at the Lewis-Barchey Unit, likewise reported he has encountered significant delays in care.  When I interviewed him, he had recently had surgery on his left eye for glaucoma.  However, following the surgery, he had not gotten the medications he needed or had a follow-up with the ophthalmologist, and he described symptoms that I found very troublesome and indicative of a possibly detached retina.  He had pain behind the eyes, floaters, blurriness and spots.  He had to file numerous HNRs (ADC 122325-28) but didn't see the prison doctor until July 12. According to Hefner, the prison doctor didn't do any sort of exam, not even pulling out the ophthalmoscope, and told Hefner his eye looked fine.

63.     According to Mr. Hefner, nurses' line occurs only twice a week on the yard, and it takes eight weeks to be seen at the nurse's line from the time of filing a HNR. He said after nurses' line, it takes another 4 to 6 weeks to see the doctor.   Other prisoners I spoke to at Lewis reported similar delays.

64.     Prisoners housed in Eyman's SMU-I and Browning isolation units reported that custody staff will not give prisoners a blank HNR when they ask for them. The process is that the prisoner has to first write a "kite" (an informal letter) to the officers requesting blank HNR forms, and then a couple days later on the graveyard shift, they will be delivered blank forms.  Once the prisoner fills out an HNR, they have to give them to custody officers and not the pill nurses or others coming in the unit.  This type of custodial involvement is problematic because being forced to disclose medical information to custodial staff violates the prisoners' right to medical privacy.

65.     ADC is aware of the failure of prisons to conduct nurse triage within 24 hours of reviewing the HNR, although it appears some staff may have tried to hide the

problem.  ADC's compliance monitor Terry Allred documented on 5/22/13 that staff had found a backlog of HNRs dating back to December 2012.  According to Allred, "it was clearly stated to [the person who discovered it] that the finding was not to be revealed to the audit team."  AGA-Review_00017341.

66.     MGAR reports likewise amply document the problem.   7/25/13 MGAR, ADC 137185 ("Of 40 medical charts reviewed [at Douglas] (10 at each unit), 18 were not seen within 24 hours of their respective HNR being triaged."); 7/31/13 MGAR, ADC 137201 (Of 50 charts reviewed[at Eyman (10 on each yard), 22 inmates were not seen on nurses line within 24 hours following the triage of their HNR.); 7/30/13 MGAR, ADC 137268 ("Of the 30 inmate medical charts audited (complex wide), only 3 of those noted patient encounters within the required 24 hour period.  Of those same 30 inmate medical records, which included 7 '911' or emergent requests, 1 was seen on the same day of submission, while the other 6 were seen on average 6.2 days later."); 8/30/13 MGAR, ADC 137465-66 (Reporting that 32 out of 51 charts reviewed at Eyman indicated that sick call inmates were not being seen within 24 hours of HNR triage); 9/17/13 MGAR, ADC 154348 (Noting that Winslow had a 70% compliance rate with measure requiring inmates to be seen within 24 hours of HNR triage and requesting a corrective action plan); 9/27/13 MGAR, ADC 154050-51 (Reporting that 30 out of 50 charts reviewed at Eyman showed that sick call inmates were not being seen within 24 hours of HNR triage); 9/27/13 MGAR, ADC 154148 ("10 charts pulled from each unit [at Eyman] for the month.  The percentage that were not seen within 24 hours of triage:  Morey 80%, Stiner 40%, Buckley 50%, Barchey 60%, Rast 90%, Backman 70%, and Eagle Point/Sunrise 90% . . . Of those HNRs which were of the 911 variety:  the standard wait time was 1-20 days after triage.")

67.     Audits likewise demonstrate the long wait times for provider appointments, following nurse triage.  For the month of July, 2013, Corizon reported wait times of up to six months for patients to see their Primary Care Provider (PCP) at Eyman, and up to six

Confidential

PRSN-RLC 00023

weeks at Lewis.  ADC 153838.   For September, wait times at Eyman remain up to six months, while wait times at Lewis are up to a month.  ADC 155093.

68.     The ADC's monitoring reports also show regular delays in access to primary care provider clinicians.   4/16/13 MGAR, ADC 088816 ("In almost no cases are sick call referrals seen within 7 days.  Rynning Unit [Eyman] has not had a provider for 6 weeks.  No unit reported having a provider more than two days per week.  Hundreds of HNR appointments/referrals are backlogged at every unit.  The backlogged appointments go back to August.  Hundreds of charts are on provider carts in the Complex, many at units without a provider to see the patients."); 4/30/13 MGAR, ADC 088893 ("A random audit of 20 nursing patients complex wide [at Lewis] reflected that only about 10% saw the provider within the 7 days period as required."); 4/16/13 MGAR, ADC 089062 ("Referrals to providers from sick call have not been seen within 7 days because Winslow has not had a provider this month."); 7/8/13 MGAR ADC 137403 (Requesting corrective action plan for the failure to have "referrals to providers from sick call being seen within seven (7) days" performance measure at Winslow.  These consistent and widespread delays pose a threat of significant harm to the prisoner patients.

### b.     Chronic Care

69.      A prison medical care system must provide adequate care to the most challenging of its patients. Those patients are often the sickest, have chronic multi-system diseases, and require close monitoring to keep their complicated diseases from spiraling out of control. Thus, a critical measure of the success, or lack of success, of a prison medical care delivery system is how well that system manages patients with serious diseases that require chronic care.

70.     ADC has failed to implement a functioning tracking system that ensures that chronically ill prisoners see their providers on a regular basis.  According to Kathy Campbell, the prisons use different systems at different prisons to schedule chronic care

22

appointments, including an electronic program called IHAS, and a system based on index cards.  9/11/13 Campbell Dep.171:20-172:11.  Corizon's VP Vickie Bybee acknowledged that IHAS could generate some chronic care tracking report, "if used," but testified that most prisons were not using it.  Bybee Dep. 107:7-17.   Others testified that the IHAS program was not used consistently or was otherwise flawed.   See Headstream Dep. 163:1-21; Dr. Crews Dep. 99:2-13; Mullenix Dep. 36:9-37:4;  Fisher Dep. 23:1-15.

71.    Without an effective tracking system, seriously ill patients cannot be effectively monitored and managed, and many will deteriorate.  This is precisely what I found in the prisoners I interviewed and the files I reviewed.

72.    At Eyman and Lewis, I routinely heard prisoners with chronic conditions complain that they were not scheduled for regular appointments.  When I was able to review their medical charts, the records often documented these lapses.  For example, ███████████████ (Eyman) has Hepatitis C.  He told me he sought follow-up for this chronic condition.  On December 30, 2012, he placed an HNR in order to see a provider.  On January 18, 2013, there was a response sent to Mr. ████ – "Appointment set."  As of July 16th, when I reviewed his medical record, six and a half months later, the HNR was unanswered, and there was no documentation that he had seen a provider for a chronic care appointment.

73.    Similarly, ██████████████████, Lewis, has HIV infection.  Unfortunately his infection is not responding to prescribed treatment.  Laboratory studies obtained on April 12, 2013 showed a low CD4 count of 230/mm3, and a high viral load of 3264.  Importantly, three months before, on January 18, 2013, the viral load was undetectable.  Although Dr. Merchant reviewed the laboratory studies on May 11, 2013, Mr. █████ had not been informed of the deterioration of his condition and no action has been taken to ameliorate it as of the date I reviewed the file.

74.    When a person with HIV infection on treatment with previously undetectable viral loads develops a high viral load, this deterioration must be investigated

23

promptly.  Resistance can develop to treatment, and can result in rapid deterioration of the patient's clinical status.  Mr. ▮▮▮▮▮ already has a very low CD4 count.  Should it drop below 200, as is likely given his trend, he will be at high risk for opportunistic infections.  It is extremely disturbing that Mr. ▮▮▮▮▮' deteriorating condition is not being addressed.  Additional studies must be urgently obtained to determine if he is resistant to his current medications, appropriate treatment should be provided, and if T-cells have fallen further, appropriate medications must be provided to prevent opportunistic infections.

75.    Diabetes mellitus likewise requires proper management.  Without it, the patient's HgA1c levels (hereafter A1c levels) [6]  will be elevated, as will his blood sugars.  A prisoner-patient whose diabetes is not properly controlled runs the risk of blindness from diabetic retinopathy, and kidney failure from proteinuria (excessive protein in the urine, a complication of diabetes that tells medical staff that the diabetes patient runs the risk of kidney failure).  Diabetics require regular eye exams to look for diabetic retinopathy as well as regular kidney function testing for proteinuria.

76.    Medical charts that I reviewed for diabetic prisoners revealed a pattern of very poor care resulting in increased morbidity and an elevated risk of death in some cases.   See, e.g., ▮▮▮▮▮▮▮ (no change in insulin dosage despite persistently high A1c level); ▮▮▮▮▮▮ (change to insulin dosage caused rise in A1c level, was prescribed wrong types of insulin for his condition); ▮▮▮▮▮ (A1c over 12.9 for a year, no adjustment to insulin); ▮▮▮▮▮ (A1c increases from February to May, but provider documents his control is improving); ▮▮▮▮▮▮ (referred for

---

[6] The A1c test is a common blood test used to diagnose type 1 and type 2 diabetes and to gauge how well the condition is controlled. The A1c test result reflects the patient's average blood sugar level for the past two to three months. The higher the A1c level, the poorer the blood sugar control and the higher the patient's risk of diabetes complications. The goal for most diabetics is a level less than 7.

24

optometry check on 3/18/12, with no appointment at last chronic care follow up on

5/12/12), ▮▮▮▮▮▮▮ (poorly controlled diabetic, incorrectly characterized by

provider as "fair" control, with no recent eye exam or tests for proteinuria); ▮▮▮▮

▮▮▮▮ (no eye exam for last two years); ▮▮▮▮▮▮▮▮ (no treatment for

proteinuria). [7]

     77.    I found many other cases where chronic care patients were very poorly

managed, whether or not they were regularly seen by their provider. ▮▮▮▮▮▮▮▮

(critical lab studies for HIV delayed, and once done, not reviewed for weeks); ▮▮▮▮▮

▮▮▮ (no prescription changes for patient with persistently very high blood pressure

values); ▮▮▮▮▮▮▮ (on warfarin therapy, INR lab results were consistently

reviewed 3-6 weeks after they were drawn.);[8] ▮▮▮▮▮▮ (no chronic care

appointment between 2/27/13 and 7/16/13, with INR levels dangerously out of range and

abnormal A1c); ▮▮▮▮▮▮▮ (failure to prescribe anti-seizure medications; patient has

frequent seizures as a result); ▮▮▮▮▮▮ (medications unchanged for patient with very

high blood pressure; intervals too lengthy between visits).

     78.    ADC's monitoring reports document chronic care inmates often are not

seen by the provider every three to six months, as specified in the inmate's treatment

plan. 4/26/13 MGAR, ADC 088799 (Douglas inmate with hypertension was last seen in

June 2012, was supposed to be seen in August 2012, but had not had a chronic care

appointment as of 4/26/13. Douglas inmate with seizures was due to be seen in October

2012, but had not had a chronic care appointment as of 4/5/13. Douglas inmate with

seizures was due to be seen in November 2012, but had not had a chronic care

---

[7] As noted above, I have attached as Appendix C my summary of my review of the medical charts for the patients discussed in my report.

[8] Warfarin is used to prevent clot formation.  It is a drug which is safe only within a very narrow range, and ineffective or very dangerous outside of that range. The degree of anticoagulation is measured by the INR test.  Patients on warfarin must have their INR measured frequently, with warfarin dosage adjusted immediately, based on the results of the test.

Confidential

PRSN-RLC 00027

appointment as of 4/5/13);  4/14/13 MGAR, ADC 088982 (Inmate arrived at Safford on 1/19/12 but he did not receive chronic care appointment for his asthma, hypertension, and Hepatitis C until more than a year later on 3/6/13), 4/19/13, ADC 089065 (At Winslow "multiple [chronic care] charts noted out of compliance in being seen by Provider (every three (3) to six (6) months) as specified in the inmate's treatment plan."); MGAR, ADC 137472-73 (At Eyman in August, 25 out of 50 charts reviewed showed that chronic care patients were not being seen by the provider every three to six months as specified in the inmate's treatment plan), MGAR, ADC 137527-28 (At Lewis in August, 53 out of 76 charts reviewed showed that chronic care patients were not being seen by the provider every three to six months as specified in the inmate's treatment plan); 9/30/13 MGAR, ADC 154059-60 (At Eyman, 24 out of 50 charts reviewed showed that chronic care inmates were not being seen by the provider every three to six months as specified in the inmate's treatment plan); 9/30/13 MGAR, ADC 154059-60 (At Eyman, inmate with previous chronic care appointment on 3/15/12, seen 7/22/13.  Inmate with previous chronic care appointment on 2/2/12, seen 9/24/13.  Inmate with previous chronic care appointment on 6/11/12, not seen as of 9/16/13); 9/25/13 MGAR, ADC 154152-54 (At Lewis, 50 out of 71 charts reviewed showed that chronic care patients were not being seen by the provider every three to six months as specified in the inmate's treatment plan).

### c.     Specialty Care

79.    In addition to primary care, some prisoners will require access to specialty providers.  A sound prison medical care system must ensure that those prisoners are referred to a specialist on an urgent or routine basis, are timely seen, and then followed up by their provider so that any recommended treatment may be provided.  ADC does not have an effective system for ensuring that prisoners receive specialty care when needed. Corizon Vice President Vickie Bybee and others documented this problem on May 10,

2012, in an email exchange indicating a backlog of almost 1000 specialty consult referrals that were more than three months old.  "We continue to be made aware of consults not processed at the sites in loose filing, in medical records as we see patients." AGA_Review_00016658.

80.     In my chart review, I discovered notable failures to refer prisoners for specialty services when they are clearly indicated.  For example, ███████████████, a diabetic, requires yearly eye exams to monitor for diabetic retinopathy, had not had an eye exam for two years.  Mr. ██████████ has HIV infection, and entered the prison with a low T-cell level and a high viral load of 221,310, but was not referred to an HIV specialist until July 2, 2013, five months after his admission to the prison system. Mr. ██████████, was diagnosed with a three inch mass in his throat on 5/9/13.  When I reviewed his chart more than two months later, I found a CT scan and ultrasound showing the mass, but no diagnosis or referral to a specialist, despite the fact that the mass may be cancerous.

81.     Patient charts demonstrate that when ADC prisoners are referred for specialty care, the appointments can be delayed or never occur.  A urology consult was ordered for Mr. ███████, 67676, on January 1, 2012, because he had symptoms of a urethral stricture, but the consult had not taken place by my July 2013 visit. ████████ ██████, was referred for an ophthalmology consultation on March 5, 2013, and again on July 17, 2013, both for monitoring diabetic retinopathy and for surgical correction of the ectropion, an eye condition which poses a serious risk of infection.  In his July 17, 2013 consultation request to Corizon, his provider noted: "left eye pronounced ectropion, irritation of eye, injected sclera . . . This is [a] case which has been delayed approximately 2 years."  ADC 136680.  Mr. ██████████████ with his failing pacemaker, had cardiology consult requests dating March 22, 2013 and April 29, 2013. ADC 136528.  As of July 17, 2013 no consultation had been approved or provided.

82.     ███████████████, also suffered a delay in his specialty referral. Mr.

27

██████ injured his hand on August 13, 2012.  Although medical staff saw him and advised that his hand was not broken, it remained extremely painful and swollen.  An x-ray, taken four weeks after the injury on September 10, 2012, showed a boxer's fracture of the hand with distal angulation.  The x-ray report was not reviewed by the prison physician, Dr. Merchant until September 21, 2012, ten days later.  Dr. Merchant made note of the fracture and requested an orthopedic consultation as soon as possible. Mr. ██████ was finally seen at an orthopedic consultation on November 14, 2012, three months after the injury.

83.     As set forth above, Mr. ██████ endured a seven week delay when waiting for his urgent appointment with the ENT to treat his cancer, a six week wait for an urgent CT scan, and a 33 day wait for a "stat" oncology appointment.  Mr. ██████████ likewise suffered unconscionable delays in his care for cancer.  He had complained for months of chest pain, but had received only Tums for indigestion.  After several visits to the provider in May and June, 2013, he was sent to the hospital on 6/19/13 when he complained of chest pain and vomiting blood.  Mr. ██████ told me he was diagnosed with small cell lung cancer.  The hospital recommended a PET scan and oncology consult.  Both were ordered on 6/27/13, ASAP.  However, when I interviewed Mr. ██████ a month after his diagnosis, neither the PET scan nor the consult had happened.  Small cell cancer is generally treated with chemotherapy, but Mr. ██████ had received only pain medication since his diagnosis.

84.     When patients do have a consult report, the prison often fails to schedule the necessary follow-up appointment with the providers so that the patient may receive the care recommended by the specialist.  For example, named plaintiff Mr. Hefner reported in his Declaration dated November 1, 2012 a long history of eye pain and vision problems, eye surgeries, and delays in his medical care. Mr. Hefner had cataract surgery on June 13, 2013. He reported that following the surgery he developed flashing lights, floaters, and blurred vision. He submitted an HNR on June 19, 2013 complaining of pain

28

PRSN-RLC 00030

in his eye and difficulty seeing. Mr. Hefner has iritis, an inflammation of the external eye, which causes pain and blurred vision.  The ophthalmologist Dr. Heller ordered steroid eye drops and antibiotic eye drops. Mr. Hefner received the steroid eye drops, but not the antibiotic drops. The medical record supports his statement because it shows that the antibiotic order was not acted on until July 15, 2013, the day his attorney and I met with him. That day, Mr. Hefner was still having difficulty seeing and was in pain. He has been unable to obtain follow-up care for his painful condition. I informed Dr. Winfred Williams, Corizon's regional medical director for Arizona, of my concerns regarding Mr. Hefner's medical problem.

85.  Mr. ██████████ suffered an acute heart attack on 3/27/13.  Management of an acute heart attack requires maintenance of anti-platelet therapy.  When I reviewed his file at Lewis, I noted that, in the intervening three and a half months, there was no evidence that Mr. ████ has seen a provider during that period, or that he had had any follow-up cardiology consultations.  There were also no MARs (medication administration records) for May or June, 2013.  This failure to follow up with a patient after a major health event is shocking.

86.  ██████████████, a 47 year old man, was housed at ASPC-Winslow. Mr. ████ suffered severe pain for more than six months before receiving adequate pain medication, and his cancer treatment was deliberately delayed more than four months. Mr. ████ complained of back pain.  He was scheduled for evaluation of this complaint on 1/23/13 but the appointment was cancelled because no practitioner was available.  He was finally seen for his HNR on 2/21/13 by a nurse, and on 2/26/13 by a nurse practitioner.  He failed to respond to treatment for his back pain.  The x-ray of his lower spine taken on the 2/26/13 was not filed in the chart on 3/12/13 and the NP ordered another x-ray, which was taken six weeks later, on April 22, 2013.  This film showed bony abnormalities consistent with cancer.  Corizon denied requests by the Nurse Practitioner for an MRI scan.  Mr. ████ suffered increasing pain and lost the ability to

29

PRSN-RLC 00031

bear weight on his right leg.  He could not walk without crutches.

87.     The plain x-ray film of the bones taken 4/22/13 was strongly suggestive of cancer. On 5/23/13 CT scans of the Abdomen and Pelvis were ordered to definitively identify the source of the cancer and evaluate its spread.  On June 10, 2013, Dr. Moyse noted in the medical record that "Request for CT of Abdomen and Pelvis was denied. Inmate needs to be seen …for follow-up." Finally, almost two months later, on 7/23/13, a CT scan of the Pelvis and hip was performed which showed that Mr. ███ did have cancer, it had spread to both of his hips, and was so extensive that a fracture of his hip was impending.  The CT scan of the abdomen was not performed at this time.

88.     A CT scan of the abdomen was performed six weeks later on 9/3/13.  It showed that Mr. ███ had cancer of the right kidney, with increasing metastatic bone involvement.  It is frightening to read that Corizon denied the MRI scan ordered to determine the source of his cancer, and denied then delayed the critical CT scans for more than four months.  During this period, Mr. ███'s cancer spread, the delay of treatment worsened his chance of effective treatment, and left him to suffer severe cancer pain without treatment.  He did not see an oncologist until after August 30, 2013.  He was never provided with radiation therapy although radiation therapy has been shown to be effective for relieving bone pain from metastatic kidney cancer. It was not until August 21, 2013, four months after the x-ray showed that he had probable metastatic bone involvement causing his pain, that Mr. ███ was provided with appropriate pain medication.

89.     Mr. ███'s mistreatment demonstrates multiple failures in the Arizona Department of Corrections medical program: delays in responding to an HNR, delays in care because of staff unavailability, disorganized medical records with delays in access to reports, intentional prolonged delays in diagnosis and treatment of cancer by the Corizon specialty care coordinator.  These failures were accompanied by severe untreated cancer pain, and according to Corizon medical staff, a terminal prognosis.  A request to the

30

Board of Executive Clemency for early release due to imminent death was submitted by
Dr. David Robertson on September 30, 2013.  Dr. Robertson noted that Mr. ████'s right
kidney had been removed, and that he would "start chemotherapy in a few weeks."  The
decision by Corizon to deny the CT and deny the MRI requests when they were aware
that Mr. ████ had bone changes indicative of metastatic cancer is terrifying to this
reviewer, and demonstrates the grave danger to prisoners who are forced to live under
Corizon's medical control.

90.     ADC's monitoring reports show that prisoners who are referred for
specialty care on an urgent basis, meaning they are supposed to be seen within 30 days of
the consult's initiation, are often not seen within that timeframe.  9/30/13 MGAR, ADC
154056 (At Eyman, only 1 out of 12 charts reviewed showed that urgent consultations
were being seen within 30 days of the consultation being initiated); 9/25/13 MGAR,
ADC 154151 ("There is no urologist available to see inmates with approximately 10-12
inmates with urology consults pending."); 7/12/13 MGAR, ADC 137343 (Reporting that
an urgent request to receive an echocardiogram was submitted for Safford inmate on
5/6/13 and the echocardiogram was performed on 7/2/13); 7/30/13 MGAR, ADC 137187
(Inmate  received an urgent request for a urology consultation on 7/1/13 which was not
approved as of 7/29/13.  An unknown inmate received an urgent request for a cardiology
consultation on 6/13/13 which was not approved as of 7/29/13);  7/31/13 MGAR ADC
137270 (Listing a sample of 22 urgent consultations requested for Lewis inmates that had
not been scheduled within 30 days of the consultation being initiated).

91.     The monitoring reports also show that consultation reports often are not
timely reviewed by providers for patients returning from specialty care.  9/25/13 MGAR,
ADC 154150 (Reporting that only 11 out of 20 charts reviewed showed that consultation
reports were being reviewed by the provider within 7 days of receipt); 4/14/13 MGAR,
ADC 088981 (Reporting that an outside consultation for a Safford inmate was dated
2/27/13 but was not reviewed by a provider as of 4/11/13), 9/30/13 MGAR, ADC

31

                                                    PRSN-RLC 00033

154056-57 (At Eyman, only 1 out of 12 charts reviewed showed that consultation reports were being reviewed by the provider within 7 days of receipt); 9/25/13 MGAR, ADC 154150 (At Lewis, only 11 out of 20 charts reviewed showed that consultation reports were being reviewed by the provider within 7 days of receipt)

### 6.   Adequate Physical Space

92.   Prison health care systems must allocate and equip sufficient space so that medical care can be delivered in a confidential and hygienic setting, and must either maintain sufficient medical beds on-site, or contract for medical beds for those patients requiring inpatient or infirmary level beds.

### a.   Clinic Space

93.   The Eyman and Lewis prison complexes lack sufficient clinical space to provide constitutionally adequate medical care, given the number of prisoners housed at the prisons and the number of prisoners with chronic medical conditions who are at each prison.  According to the most recent chronic care reports provided by Defendants, dated March 12, 2013, at Lewis, more than 20% of the total population had one or more chronic condition that needs regular monitoring: 1,187 chronic care patients out of a total population of 5,591.[9]  ADC 095002-095052.  At Eyman, chronic care patients account for an even higher percentage of the prison population:  2,173 out of 5,235 total prisoners, or 41.5%.  ADC 094844-094931.  (These numbers also show that it is physically and mathematically impossible for timely and minimally adequate chronic care to be provided, given the number of clinicians allocated to the two facilities).

94.   As detailed below, the prisons appears to be making minimal use of the limited clinical space.  In functioning correctional health care systems, the yard medical clinics are the busiest section of the prison.  Nurses and doctors are examining and

---

[9] The daily populations for Lewis and Eyman prison on March 12, 2013 are available on ADC's website at
http://www.azcorrections.gov/adc/PDF/count/03122013%20count%20sheet.pdf.

Confidential

PRSN-RLC 00034

treating patients; prisoners are lined up inside and outside the clinics awaiting care. Correctional officers would be stationed outside and inside the clinics, escorting prisoners to and from appointments as needed, or providing supervision of the patients waiting at the clinics.  Similarly, prison infirmaries, inpatient hospitals, and health care units should be busy places with medical staff on rounds, delivering medications and providing care and assistance with activities of daily living to the infirm and sick.

95.     This was not the case at the two prisons I inspected: the unit clinics were eerily quiet shuttered and dark offices, medical equipment was nonfunctional or covered in dust, and there was no indication that any medical care was being delivered.   Indeed, some clinics had the air of a Potemkin village, with clinics and equipment on display, but curiously, neither clinical staff nor patients.  This observation has been similarly highlighted in Defendants' monitoring reports.  See Eyman, August 2013, ADC 137465 ("it appeared that Meadows, Cook, and Rynning were not conducting NL five days a week.")  Lewis, June 2013, ADC 117986 ("A true sick call is not occurring as defined in contract 5 days a week, Monday through Friday on all Lewis units"); Lewis, July 2013, ADC 137268 ("There is no dedicated nursing sick call line being offered on any unit."); 6/24/13 MGAR, ADC 117911 ("[At Douglas] [a]ccording to the FHA, due to the cutback of staff, primarily nurses and med techs, she has had to curtail daily nurse lines at both Mohave and Gila Units to 3 days only.")

96.     On the first day of the Lewis tour, I began by inspecting the main medical facility referred to as "the hub," which contains an infirmary-like facility of 11 beds, dental space, and medical space.  We were shown the offices designated for the medical providers, none of which had people in them – they were all dark and locked. We walked by the four holding cells for the prisoners awaiting medical care, they were concrete rooms that could probably hold 15-20 prisoners. They were all completely vacant. Similarly, outside the hub were five or six holding cells; each looked like they could seat

33

about 15 or 20 people. There were not any prisoners outside the hub waiting for medical care.

97.     The medical hub does not have any negative pressure rooms, which are used to house patients suspected to have tuberculosis or other communicable diseases. Effective isolation of persons with suspected pulmonary tuberculosis, measles, or chickenpox requires that they are placed in airborne infection isolation room.  This must be a private room with negative air pressure and a minimum of 6 to 12 air changes per hour.  Doors to the isolation room must remain closed, and all persons entering must wear a respirator with a filtering capacity of 95% that allows a tight fit over the nose and mouth.[10]  Even if a person with suspect tuberculosis is to be transferred to a hospital for treatment, while they are waiting to be transferred they must be housed in a negative pressure room.  I later learned that no ADC prison facility has negative pressure rooms. Def's Resp. to Pltf Verduzco's First RFA's, # 179.

98.     The Facility Health Administrator ("FHA") showed us two small rooms in the hub that used to be holding cells, but had been converted to private exam rooms. They were locked, dark, and empty. We went into one of these exam rooms and found that it had no exam tables or any other medical equipment in it, just a cabinet, a book shelf, and a sink.

99.     In the maximum security Rast unit, we found the suite of medical offices empty, with all the offices dark and locked.  The FHA said that the clinic was closed that day because there were no medical staff.  He said, "this was designed to be a free standing full capability medical unit but we only use one exam room."  When I asked him why this was the case, the attorney for ADC told him not to answer the question.

---

[10] General Principles of Infection Control, in UpToDate.com, accessed 11/2/13. UpToDate is an evidence-based, peer-reviewed online medical textbook, written and edited by leading medical experts, which is constantly updated.  It is the standard textbook of medicine in the United States today.

34

100.    I requested that they unlock the rooms.  The FHA opened up a series of empty rooms he said were exam rooms, but there was no furniture or fixtures other than sinks and empty shelving units.  There was an X-ray room, but no X-ray machine in it. The FHA stated that no X-rays were done. We finally got to the one exam room that is in use and had an exam table.  There was no paper on the exam table, and there was no soap in the soap dispensers.

101.    The medical area in Lewis's Barchey unit only had two offices, and one exam room.  The exam table did not have paper on it, and when I asked the nurse on duty and the Director of Nursing where the paper was stored, counsel for Defendants told me I was "browbeating" the witness and threatened to terminate the tour if I asked a single other question of any other line staff.  Counsel for Defendants told the Director of Nursing to not answer the question about where the paper is stored.  It is very unsanitary for a health care clinic to not have paper on the exam tables that can be changed after each patient is examined.

102.    On July 17-18, 2013, I toured the ASPC-Eyman prison.  Unlike Lewis prison, Eyman does not have a central medical hub for the entire complex; each unit has medical space within it.  I also inspected living units, interviewed prisoners, and reviewed medical charts.  As in Lewis, there was little or no medical care being provided.[11]

103.    In the SMU-1 unit's medical area, we found a small exam room, which had an exam table set up with paper, an ophthalmoscope, and the blood pressure machine was on another wall, with no cuff attached. There was an x-ray viewer, and a sink.  A larger exam room was locked, dark and not in use.  In this larger room, there was a gurney, but

---

[11] Prisoners in the isolation units have their recreation on small concrete areas adjacent to the cell areas at Eyman complex.  I asked to see the recreation area off the section of the 1-Delta pod where Named Plaintiff Smith was housed.  It was about ██ by ██ feet  with ██████ feet high walls and a grate overhead obstructing the view of the ██ky.  ██bout ██ feet ██ ██e ground over the door, a swastika and the Nazi slogan "Sieg Heil" was pai██ted on the wall in large letters.  It looked like it had been there for quite a while and had been painted there – it was worn.

no ophthalmoscope or blood pressure machine.  There was a sink, and a door to the X-ray room.

104.    Medical staff told me that the X-ray technician was on site daily, so I asked to go into the X-ray room that was off the exam room.  The room was locked, dark, hot and stuffy.  The x-ray machine was a very old model.  The x-ray table and controls were covered with a thick layer of dust, as was the lead vest that was hanging on the wall.  I found a notice on the machine that said it was last inspected on January 2001.  Jim Taylor, a Corizon regional vice president, said that the room was not used and prisoners who need X-rays are transported to the Browning Unit.

105.    There was a door that said "Darkroom" that was inside the X-ray room.  It was a closet approximately ▉ feet by ▉ feet.  To the left against the wall were at least 7 or 8 bankers' boxes stacked up, with stacks of HNRs and other medical documents.  To the right were shelves cluttered with half-opened boxes of the various equipment used for blood draws.  [See Photograph 1]



**Photograph 1**

106.    On the ground to the right, in front of the shelves were two or three five-gallon jugs half-full of brownish liquid.  The opposite wall from the door had a crudely cut-out doorway/crawl space to the adjacent office; it was approximately ▉ foot high. To the right of the crawl space, was a giant barrel approximately ▉ feet high and ▉ feet diameter, filled almost to the top with pipettes, blood bags, etc.  The barrel was

36

PRSN-RLC 00038

sitting on top of an open rusty drain about ███ feet square.   [See Photographs 2 and 3]




Photograph 3



Photograph 2

107.   I

asked to go into the medication room, but nobody on the tour had keys; only the pill nurses have keys to these rooms.  I confirmed with the staff on the tour that this is the room where the "man down" bag for emergencies is stored.

108.   In Eyman's Browning Unit, we again found the medical unit empty of prisoners.  Most of the rooms were locked, dark and empty.  The first exam room we went into looked like the others we had seen – the paper for the table was on the ground, no blood pressure cuff on the machine, sink, and minimal equipment.

109.   In Rynning unit's medical area, we found a few prisoners in the unit, and pill line was going on outside when we showed up. We were shown an exam room that didn't have an exam table in it, just an office and desk.  It was dark and locked.  The second exam room we were told was for "nurses' line" but again it had a desk but no exam table or equipment.  The room was dark, locked, not in use.

110.   The third exam room had an exam table in it.  There was a nurse but no patients.  There was no blood pressure machine on the wall. The fourth exam room was larger and a prisoner was being seen.  It had two gurneys in it, an EKG machine, two large and one small oxygen tanks, two wheelchairs, one neck brace, and one back board.

37

There was the blood pressure machine on the wall, but no cuff.

**b.**     **Medical Beds**

111.    Lewis's "L-11" unit appears to be a sheltered living unit set aside for patients who may be too medically fragile to return to the general population.  The day that I visited, we found a unit that was dark, dirty and smelly.  In the first cell that I entered, I found that the prisoner's sink had a broken drain pipe and was draining into a bucket that was three-quarters full of water.  [See Photographs 4 and 5]



**Photograph 4**



**Photograph 5**

112.    Such unsanitary conditions for a unit for medically fragile persons can lead to the spread of infectious disease.  The prisoner housed in that room used a wheelchair due to multiple strokes, and he reported that he had developed multiple ulcers and pressure sores from sitting in a diaper in his wheelchair for long periods of time.  Such unsanitary conditions in the same room with a prisoner with open wounds is a recipe for disaster.

113.    In that unit, I interviewed ████████████████ a 55-year-old man

38

PRSN-RLC 00040

who has had two strokes, and is disabled. He is unable to transfer independently from bed to wheelchair, and from wheelchair to toilet. He had been transferred in and out of L-11, where I interviewed him, and other sites at least five times in the two months prior to my visit. Each time he is sent back to L-11 because he requires nursing support for all activities, secondary to his left-sided paralysis. Because of the stroke, and inability to transfer, he is completely dependent on nursing staff. However, other medical staff at L-11 treat him as if he is lying, and can transfer, and do not provide him with the basic toileting services he needs. This results in Mr. ███████ sitting for prolonged periods in his own urine and feces. Mr. ██████ states that he has disciplinary write-ups for failure to put on his underpants, something he is physically unable to do because of his strokes. According to Mr. ███████ his transfers to other living units at Lewis, including isolation cells, over the previous six weeks were all related to new prisoners requiring infirmary beds at L- 11.

114.   In the same unit, I also interviewed ███████████████. Mr. ██████ has a painful chronic skin condition called ectodermal dysplasia.  Ectodermal dysplasia is a life-threatening condition characterized by a lack of sweat glands.  Persons with this genetic disorder are at great risk from overheating and heat intolerance because they cannot sweat and get rid of excess heat.  It is an understatement to say Arizona experiences excessive heat.  Mr. ██████ told me he spent one year in lockdown as punishment for seeking medical treatment.  Because his body cannot easily get rid of excess heat, it is vital that Mr. ██████ live in a climate controlled environment, such as L-11, without exposure to high temperatures.  Mr. ██████ was recently transferred out of L-11 to Buckley, and then transferred back.  The reason he was transferred out was because there was a patient who was being transferred out of a hospital, and no infirmary level beds were available.   This is one of multiple examples I have found of a patient being transferred in and out of L-11 because of the shortage of skilled nursing beds or sheltered housing in the Arizona system.

39

PRSN-RLC 00041

115.    At Eyman, I reviewed the case of Mr. ██████████ who was housed in the general population despite his obvious need for nursing care that was unavailable in that setting.  Mr. ████ is a 75-year-old man with multiple serious medical problems, including incontinence of bowel and bladder, diabetes mellitus, coronary artery disease, hypertension, and ADA/mobility issues.  His medical conditions required a higher level of nursing care than is available at Eyman, but despite pleas from Dr. Rumsey, the medical director, and the nursing staff, he had not been transferred to a facility with appropriate clinical support. Instead, during the period from June 6, 2013 through July 14, 2013 he was hospitalized six times. Each time he was sent to the hospital because his complex medical problems required more intensive nursing care than was available at Eyman/Meadows, and each time the hospital sent him back because he required skilled nursing care, not hospitalization.   ADC 136687-696.  The last note in the medical record when I reviewed it was dated 7/16/13: "Security notified staff that I/M ████ was on his way back to Meadows unit from MVH [Mountain Valley Hospital].  MVH notified that Dr. Rumsey had given a written order the day he was sent out that the inmate was not appropriate to return to this yard due to non-compliance and in need of a higher level of care. Deborah from MVH ok'd for inmate to return to the hospital. Security notified. DON Bito'nn said he is taking care of finding a bed for inmate. Nursing supervisor Meyers notified of the above. /s Shahi, CPN."  ADC 136696.

### 7.    Access to Medication

116.     Prisoners must be able to receive necessary medications for their serious medical needs.  Defendants' practice and unwritten policy of failing to supervise, manage and support medication distribution has created a system that has been, and currently is, profoundly dysfunctional resulting in serious risk of harm to patients throughout the state.

### a.    Medication Delivery

117.    I observed a dangerous medication distribution practice at a unit in the

Confidential

Eyman prison complex.  Medications are removed from blister packs in the medical area and placed in labeled small cups with prisoners' names written on a separate lid.  These cups are then taken to a distribution site in the yard, or to cells of inmates in segregation.  There is no way for prisoners to identify if they are receiving the right medications, nor can the nurse assure him/herself that they are dispensing the correct medication to the correct patient.  Because generic forms of same medication can come in different shapes, sizes, and colors, it is never safe to "pre-pour" medications from a labeled container outside of the patient's presence.

118.    An ADC pharmacy monitor discovered at Lewis "2 large trash bags full of medication being returned to PharmaCorr with both expired and adulterated medication cards …. The adulterated patient specific cards… are missing the original Pharmacy label and are being utilized for other patients."  AGA_Review_00017096.  This utter disregard for accepted medication distribution practices is shocking.

119.    ADC also has a dangerous medication distribution practice of having custody officers deliver "Keep on Person," or "KOP" medications, to prisoners.  9/13 MGAR ADC 154168 (at Lewis, KOP delivered by security staff).   Corizon staff confirmed during my tours, and in subsequent depositions, that this is still the delivery practice.  Gross Dep. 63:22-64:1; Mielke-Fontaine Dep. 278:15 (at Florence).  This practice is problematic:  custodial officers are not trained health care staff and giving them access to and knowledge of prisoners' prescriptions violates health privacy law and creates an opportunity for that information to be used improperly.

120.    ADC has a legacy of dangerous medication distribution practices.  Last year at Lewis, more than 100 prisoners were exposed to Hepatitis C after a subcontracted nurse reused a syringe in a vial of insulin.  September 21, 2012 letter from Joe Profiri to Karen Mullenix re: Written Cure Notification ADC 027855-856.

121.    Named plaintiff Mr. Polson also told me about medication delivery problems.  When I saw him at Lewis in July, 2013, he informed me that he has mania, is

41

                                                                                                PRSN-RLC 00043

supposed to receive lithium, but frequently is not provided with his medication due to staff shortages.  In fact, he had not been given his lithium that morning, and he was acting manic during the interview.  Mr. Polson reported in his Declaration dated November 1, 2012 that beginning in 2009 his lithium levels were not regularly checked. My review of his MARs demonstrated that he did not receive eight doses of lithium in April, 2013, and did not receive six doses of this medication in June, 2013. His lithium level was measured on June 13, 2013 and was low, at 0.3 meq/liter. The goal of treatment with lithium is to achieve a serum level of 0.8 to 1.2 meq/liter. No dosage adjustment was made in response to this non-therapeutic serum level. The low level is likely due to the missed doses, as Mr. Polson suggests. In a patient with known mania, on lithium treatment, inadequate dosage of prescribed lithium can precipitate a manic state.  At the time I reviewed his file in mid-July, 2013, Mr. Polson has not seen a psychiatrist since December 2012, a delay of more than seven months.

122.    While at Rast unit in Lewis complex, I spoke with named plaintiff Stephen Swartz, who reported that due to a shortage of security staff to escort the pill nurses, the insulin delivery has been late and the diabetic prisoners are having problems getting their shots and food on time. He said the morning pill run can occur anytime between 2 am and 8 am.

123.    ADC's recent monitoring reports document widespread and continuing delays in delivering medication to patients.  9/30/13 MGAR, ADC 154085 (Noting that an Eyman inmate's Cymbalta was ordered on 7/29/13 but inmate did not receive the medication until 9/13/13); 9/25/13 MGAR, ADC 154171-73 (At Lewis, 43 out of 70 charts reviewed showed unreasonable delays in inmates receiving prescribed medications); 4/26/13 MGAR, ADC 088809 (Noting delays in inmates receiving keep on person medications at Douglas); 7/30/13 MGAR, ADC 137220 (Giving Eyman a "red" designation for unreasonable delays in inmates receiving prescribed medications); 7/24/13 MGAR, ADC 137207-08 ("Several issues are of concern with this location

42

PRSN-RLC 00044

[Eyman].  They include no response from existing D.O.N. on multiple medication issues that have been printed and sent from the online PharmaCorr/Corizon Patient profile.  The patient continuity of care may be jeopardized.")  4/18/13 MGAR, AD C088908 (Reporting that, according to staff, medications that arrive at Lewis from the PharmaCorr[12] facility on Friday are not delivered to inmates until Tuesday); 4/29/13 MGAR, ADC 088841 (Reporting that none of the non-formulary medication requests found at Eyman were returned within 24 to 48 hours).

### b.    Medication Continuity

124.    A sound prison health care system must have processes in place to ensure that prescriptions are timely renewed and refilled.  ADC lacks an effective system to accomplish this.

125.    In Rast unit, I spoke to several prisoners, chosen at random, at cellfront.  Every single prisoner I spoke to reported gaps of up to six weeks in getting refills of chronic care and psychotropic medication.

126.    Medication lapses are a problem for all patients, but can be particularly dangerous for patients with conditions like HIV, where lapses can cause the patient to develop drug-resistance.  ███████████████  for example, has HIV infection and requires daily anti-viral medications.  His anti-viral therapy (Atripla) lapsed repeatedly during the first half of 2013.  Predictably, the forced interruptions in his HIV therapy caused by failure to renew his medications resulted in the deterioration of his clinical condition. His viral load, the main measure of therapeutic success in HIV treatment, had been undetectable, measured as <20 copies/ml in December 2012 and April 2013. ADC 136705, 136706.  However, by June 5, 2013 his viral load had increased more than ten times, to 231 copies/ml  (ADC 136707) suggesting failure of treatment due to missed

---

[12] The PharmaCorr facility is located in Oklahoma, and prescriptions are faxed from the prisons to Oklahoma, and then a pharmacist fills the prescription and sends it out via overnight mail

43

doses, and possibly the development of resistance to the anti-viral medication. There was also a 15% drop in his T- cells from the March 18, 2013 laboratory studies.  ADC 136708

127.   Prisoners prescribed chronic care medications, like Mr. █████ have lapses because their medications are not timely renewed.  9/30/13 MGAR, ADC 154085-87 (At Eyman, 41 out of 50 charts reviewed showed that chronic care medication expirations dates were not being renewed prior to expiration); 8/15/13 MGAR, ADC 137548 (At Lewis, 29 out of 74 charts reviewed showed that chronic care medications were allowed to expire without renewal); 8/28/13 MGAR, ADC 137535 ("I continue to alert the site [Lewis] on expired chronic medications needing filled/refilled");  7/30/13 MGAR, ADC 137282 (At Lewis, 50 out of 80 charts reviewed showed that chronic care medications were allowed to expire without renewal).

### c.      Poor Prescribing Practices

128.   It is fundamental to primary care medicine to prescribe medications to patients based upon a clinical contact with the patient.  In ADC, however, there appears to be a practice of changing patient's medication without first seeing or advising the patient.  This is a harmful practice.

129.   Mr. █████████ was hospitalized when he suffered a heart attack on 3/27/13, and was started on standard medications for his condition, including clopridogel and aspirin, which prevent clotting of the coronary artery.  ADC's Dr. Merchant ordered these medications on an emergency basis when Mr. ████ returned to Lewis complex on 3/30/13, but the order for clopridogel was crossed out with no explanation.  Mr. ████ did not receive his aspirin, and the clopridogel was not provided until two days later, on 4/2/13.

130.   Mr. ██████████, has peripheral neuropathy secondary to his diabetes mellitus. He had been receiving gabapentin at a dose of 1800 mg twice a day for this condition. On March 26, 2013 his practitioner decreased his dose by 2/3 to 600 mg twice

44

a day without seeing him or documenting a reason. Mr. ███████ was forced to file multiple HNRs to have his gabapentin dose restored.  Mr. █████████, also had his gabapentin cut without documenting a reason, as did Mr. ██████.

131.   Mr. ████████ was diagnosed with MRSA, and prescribed clindamycin by an RN.  Unfortunately, the RN prescribed a dose that was much too low. Diagnosis and treatment of suspected MRSA requires a physician, physician's assistant, or nurse practitioner. MRSA diagnosis and treatment is a clinical decision not appropriate for RN level staff.

132.   Mr. ██████████, has diabetes and proteinuria (protein in his urine). Treatment of proteinuria is required to decrease the risk of kidney failure for persons with diabetes.  However, Mr. ████████ received no treatment for this known complication of diabetes.

### d.   Delayed Non-Formulary Approvals

133.   The medication problems include lapses in the approval process for non-formulary medications.  Delays in gaining approval compound medication delivery delays.  9/30/13 MGAR, ADC 154158-59 ("Lewis continues to struggle with Corizon [pharmacy] policy/procedure.  Upon a second visit to the facility, … the non-formulary pending file showed 94 requests that evidently needed follow up.  According to nursing, they were not sure of any resolution of the 94 requests. ")  7/9/13 MGAR, ADC 137414 ("[At Winslow,] [p]roviders and the inventory coordinator are not being notified of denials or approvals [of non-formulary decisions].")

### 8.   Medical Records

134.    An accurate, organized and up-to-date medical record is an essential tool for delivering adequate health care.

135.   In the medical records that I have reviewed, I found a pattern of patient care delays affecting, among other things, the timely and appropriate review of health needs

45

requests (HNRs), access to nurse triage and primary care providers, regular chronic care treatment appointments, timely access to medically necessary specialty care, and the prescription and delivery of necessary medications. The individual patient charts were completely disorganized and often lacked documents that would be critically important to a medical provider in delivering care.

136.    The poor quality of the patient charts is in part due to a systemic failure to properly maintain and file medical records. For example, as noted above, when touring Eyman, I discovered in a closet off the X-ray room, six or seven bankers' boxes containing thousands of pages of unfiled medical records. [See Photograph 6] The records I observed on top were HNRs that were at least six months old.



**Photograph 6**

137.    The situation I observed at Eyman was not anomalous. ADC's monitoring reports corroborate my findings that the records are often not current, accurate, consistent or chronologically maintained. 9/30/13 MGAR, ADC 154065-66 (Complex-wide at Eyman, in 32 out of 50 charts reviewed, medical records were not current, chronologically maintained with all documents filed in the designated location); 9/12/13 MGAR, ADC 154352 (Reporting that only 70% of medical records reviewed at Winslow

PRSN-RLC 00048

were current, accurate, and chronologically maintained with all documents filed in the designated location).  4/15/13 MGAR, ADC 088826 ("There is not consistency between the units either in the use of the [continuity of care/transfer summary] forms or the filing of them [at Eyman]."); 4/15/13 MGAR, ADC 088815 ("At Rynning, the receipt of HNRs is often not date-stamped."); 4/18/13 MGAR ADC 088897 ("[At Lewis] [t]here are volumes of loose filing piled up in the medical records room, including consult reports, hospital records, HNRs, lab results, etc."); 4/22/13 MGAR, ADC 088904 (at Lewis, "I can find no evidence that there is any consistency in no-show reporting among the noted disciplines of medical, dental, or mental health."); 4/18/13 MGAR, ADC 088897 ("MAR from Nov. 2012 to Mar. 2013 are piled on carts and shelves in the med records area."); 4/24/13 MGAR, ADC 088908 (A review of medication administration records for all units indicated records not completed in accordance with standard nursing practices; insulin and medication MARS document missing  doses of medications, among other problems).

### 9.    Quality Assurance

138.    Health care delivery systems, including prison medical systems, must have a system for evaluating the delivery of services and quality of care for patients.  The elements of a program include the assessment or evaluation of the quality of care; identification of problems or shortcomings in the delivery of care; designing activities to overcome these deficiencies; and follow-up monitoring to ensure effectiveness of corrective steps.

### a.    Quality Improvement Program

139.    The contract with Wexford required the company to submit a "Quality Management Program Description encompassing the Continuous Quality Improvement Program structure" within sixty days of the award of the contract. ADC Notice of Request for Proposal for Privatization of Health Care and Wexford Bid, ADC 14180.   In

Confidential

the absence of a structured program to examine health care quality in a health care delivery system of this size, life-threatening practitioner errors and systemic problems will be overlooked or ignored, creating a potentially dangerous situation for patients.

140.   Although he testified that he is responsible for the quality of medical care, defendant Pratt indicated that he was not familiar with Wexford's quality management program, and had not received any of their quality improvement reports.  Pratt Dep. 27:15-16, 113:17-114:10.

141.   Dr. Winfred Williams, Corizon's Regional Medical Director, testified that Corizon collects internal data to measure contract compliance, and that Corizon shares that information with ADC, if ADC requests it through Vice President Vickie Bybee. Williams Dep. 21:11-24:22.   ADC's Dr. Robertson testified that he does not have access to Corizon's proprietary software program for tracking prisoners' medical conditions. Robertson Dep. 80:3-11.   Given the extreme dysfunction in the health care delivery system, this approach to monitoring quality is grossly inadequate.

## b.   Death Review

142.    Adequate death reviews are an essential part of a minimally adequate correctional medical delivery system.  Death reviews evaluate the quality of care provided to the deceased prisoner-patient.  They not only should consider whether a death was preventable but also identify other correctable deficiencies, systemic or involving particular providers, regardless of whether those deficiencies affected the outcome.  To be minimally adequate, death reviews must identify and address deficiencies and when appropriate result in referral for further investigation either by prison medical managers (so that identified systemic or personnel issues can be addressed) and/or peer review committees (when inappropriate clinical care is identified). Results of this process should be tracked.

143.   The ADC death reviews are a sham because obvious and egregious

Confidential                                                                  PRSN-RLC 00050

deficiencies in medical care are not identified, cases are not referred for further investigation and reviews, and the process involves no tracking. This includes cases in which a death was possibly preventable or in which inadequate care possibly resulted in the prisoner dying sooner than he otherwise would have, as well as cases in which gross deviations from basic standards of care, while not affecting the outcome, are ignored.

144.    My opinion is based on review of the testimony regarding death reviews by the doctors who conduct those reviews at the Arizona Department of Corrections, certain death reviews and related documents such as autopsy reports (in this regard, I understand that the only death reviews provided to plaintiffs' counsel thus far were completed a year ago; I will supplement this report if and when more recent reviews are received), the ADC medical records of prisoner-patients who have died with physician reviews performed at my direction, and my experience as described above.

### 1.    ADC Death Review Process

145.    Final death reviews for the ADC have been done by Drs. Robertson and Rowe.  Robertson Depo at 121:18-23.  Dr. Rowe has done death reviews since at least March 2012, including some deaths that occurred in 2011.   Rowe Dep. at 76:1-16, 79:1-15 (reviews in last six months) and 93:1-13 (reviewing 2011 deaths).  Dr. Robertson has done reviews since July 2012.  Robertson Dep. at 12:6-10 and 121:1-13.   He testified that the reviews are conducted in order to identify systemic issues; but he has not yet identified any systemic issues.  Robertson Dep. at 122:25-123:8.  Dr. Robertson's qualifications as a reviewer are questionable, as he is neither board-certified nor board-eligible.  Robertson Dep. at 14:25-15:2, 191:22-24.

146.    That only the two doctors do the final death reviews violates ADC policy, which requires the reviews be completed by a committee that includes a nursing manager, a program monitor, and others. Department Order 1105, December 19, 2012, at pp. 2-5. http://www.azcorrections.gov/Policies/1100/1105.pdf.  That the multi-disciplinary

49

PRSN-RLC 00051

requirement mandated by the policy is not observed renders the death reviews inadequate.

147.   The most shocking and egregious fact regarding the ADC death reviews is the failure to identify even the most obvious deficiencies in care and thus take any action to further review or correct any problem.  The doctors who do them say that they review "the appropriateness of care" (Rowe Depo at 76:23 - 77:4) and that the purpose is to "identify systemic issues."  Robertson Depo at 122:25 - 123:2.   But in fact, and again according to the doctors who do them, the actual reviews done have neither identified systemic problems nor trends or anything that "raised any flags" of concern, and have not resulted in referrals of any matter for further investigation.  Rowe Depo at 164:2-21; Robertson Depo at 123:3-8.

148.   As explained below through case examples, this failure to identify problems is appalling given that grossly substandard and inadequate care is obvious in the medical records of many prisoner deaths, and in some cases likely contributed to the death.  The failure of death reviews to identify problems, or refer cases for investigation, is a certain sign of a completely inadequate medical delivery/quality assurance process and creates a substantial risk of harm to prisoner-patients.

## 2.     Inadequate Care in Prisoner Deaths

149.   I reviewed medical records and, in some cases, mortality reviews and autopsies, for patients who died in 2011 and 2012.  I understand that plaintiffs have requested, but have not yet been provided the records for patients who have died more recently.  Although the records that I reviewed reflect care that was provided over a year ago, I found that the patterns of significant delays, lapses and generally poor medical care evident in those records are consistent with the substantial problems I have identified that currently exist in Arizona.

150.   ██████████ died on ██████ at age 57.  The autopsy report states that he

50

died from gastrointestinal hemorrhage due to his liver cirrhosis.  It also states that Mr. ████'s squamous cell carcinoma was a "factor which significantly contributed to death." ADC 061737.  The ADC death review cause of death findings are in accord, listing the primary cause of death as acute GI hemorrhage, the secondary cause as hepatitis C with cirrhosis, and the tertiary cause was the metastatic cancer in the right arm. ADC 033639. The ADC death review determined that Mr. ████'s care "met community standards without negative findings." ADC 033642.  In fact, Mr. ████ received extremely poor care, including at a key juncture from a doctor (Robertson) who is one of the two physicians who conduct ADC death reviews.

151.   On February 11, 2012, Mr. ████ was noted to have increasing abdominal swelling.  ADC 041550.  He was sent to the emergency department and had an abdominal computed tomography (CT) scan performed that showed multiple disturbing findings (ADC 041552) including "tortuous vessels consistent with varices noted paraesophageal region at GE junction" (Paraesophageal varices are dilated veins located next to the esophagus that can rupture and cause bleeding that can lead to death.) It also noted a "marked degree of ascites throughout the abdomen and pelvis" and a 2-cm lesion in the liver that was "suspicious for focal lesion."  In advanced cirrhosis, the liver becomes increasing scarred.  Blood has difficulty flowing through it and tends to flow through veins which surround the esophagus.  These esophageal veins (varices) become enlarged and fragile due to the excess blood flow, and are at great risk for bleeding. Bleeding from esophageal varices is a frequent cause of death in persons with advanced cirrhosis. Another consequence of advanced cirrhosis is build-up of fluid in the abdomen. This fluid is called ascites.  Patients with ascites are at increased risk of infection and death.  There are no further records of what was done in the emergency department.

152.   On February 22, 2012, Mr. ████'s doctor at the prison, David Robertson, reviewed the CT scan results, initialing the report (ADC 041552) and writing a short progress note listing the findings, including "marked ascites."  ADC 041466.  Dr.

Robertson's "Plan" for care stated, "This is a sick man.  Prognosis poor [without] dramatic intervention."

153.    But there was no intervention at all, let alone "dramatic intervention" regarding the obvious alarming CT scan results, by Dr. Robertson or anyone else. The basic standard of care for patients with cirrhosis calls for: (1) removal of ascites fluid to improve comfort and to analyze fluid for infection with clinically apparent new-onset ascites; (2) treatment of patients with cirrhosis and ascites with sodium restriction and drugs to increase urine output (diuretics); and (3) in patients with cirrhosis and small varices that have not bled but have met criteria for increased risk for bleeding, medications to decrease the flow of blood into the portal vein are recommended to prevent the esophageal varices from bleeding.  These medications are called non-selective beta blockers.  Propranolol and nadolol are common drugs in this category which are routinely used as prophylaxis to prevent esophageal varices from bleeding. There is no evidence in the medical record that he was offered any of these standard treatments for patients with ascites and esophageal varices.  The use of non-selective beta blockers for patients with esophageal varices is recommended in the published guidelines of the The American Association for the Study of Liver Diseases (AASLD).[13]

154.    The ADC death review finding, prepared by Dr. Rowe, that care met community standards and that the review revealed no negative findings is incorrect.    Mr. ▮▮▮▮ should have received non-selective beta blockers to reduce his risk of variceal bleeding.

---

[13] Prevention and management of gastroesophageal varices and variceal hemorrhage in cirrhosis., Garcia-Tsao G, Sanyal AJ, Grace ND, Carey W,  Practice Guidelines Committee of the American Association for the Study of Liver Diseases, Practice Parameters Committee of the American College of Gastroenterology,  Hepatology. 2007;46(3):922.

Confidential

PRSN-RLC 00054

155.   Mr. █████ also did not receive adequate treatment of his malignancy (squamous cell carcinoma on right forearm).   Specifically, when Mr. █████ was hospitalized from 7/12/11-7/18/11 for this condition, he was seen by an orthopedic surgeon and a general surgeon.  Both recommended amputation of part of his arm and other interventions; both also suggested that cure of the malignancy was possible but his case was complicated.  ADC 041740, ADC 041742.   The hospital discharge report states that the surgeon "felt that [Mr. █████'s condition] was too complicated and that it should be evaluated by an orthopedic oncologist for possible amputation or at least excision of an affected area."  ADC 041729.  In accord with the surgeon's determination, the hospital discharge instructions stated that Mr. █████ should "follow up with the orthopedic oncologist within 1 to 2 weeks."  Id.

156.   Upon return from the hospital to the prison Mr. █████ on 7/20/11 met with his primary care provider, Dr. Robertson.  ADC 041624.  The doctor's progress note states that the hospital specialist assessment and recommendations were discussed, and that Mr. █████ at that time refused treatment until he spoke with his wife and received what the doctor termed a "second opinion."  Id.  The patient's position was reasonable, and his prison doctor in fact agreed with it, since on 7/19/11, he (the doctor) submitted an urgent request for the orthopedic oncology specialist consult recommend by the hospital specialists.  ADC 041727.

157.   However, from the date of Mr. █████'s discharge from the hospital (7/18/11) until the time of his death █████ he was never sent to or seen by an orthopedic oncologist.  This was despite urgent, repeated requests for this consultation made by primary care providers on 7/19/11, 1/31/12 and 3/6/12.  ADC 041727, ADC 041565, and ADC 041465.  Mr. █████ died less than a week after the last request.  The failure over many months to provide the recommended and repeatedly requested urgent consult strongly suggests a systemic problem in obtaining specialty services, which is consistent with my observations in more recent cases.  It is also an obvious instance of

53

PRSN-RLC 00055

very poor care.

158.    The only post-7/18/11 hospital discharge specialty consult received by Mr. ████ was on 8/25/11, when he saw an oncologist (unclear whether an orthopedic oncologist).  ADC 041657.  This oncologist recommended further consultation with a hand surgeon and an MRI.  *Id.*  Again, neither a hand surgeon consult nor an MRI were ever received by Mr. ████, even though a provider made repeated urgent requests for them.  ADC 041567-ADC 041568.  That neither this consult nor the MRI were provided despite repeated urgent provider requests once again suggests a systemic problem in obtaining specialty services, which is consistent with my observations regarding specialty referrals in general.  And again, it represents poor care.

159.    Given the inadequate care for Mr. ████'s liver condition and failure to obtain a specialty consultation for his cancer, as described above, which likely hastened his death, it is disturbing that the ADC death review found no problems, determined that his care met community standards, and took no action to further review, investigate, or correct problems.  The Mortality Review Committee Final Report requires the reviewer to codify their findings.  Mr. ████ failed to receive indicated preventive measures for his esophageal varices, and failed to receive repeatedly ordered surgical oncology consultation. The Review Committee selected: "Meets community standards without negative findings."  That conclusion is inconsistent with the identified failures of care.

160.    Mr. ████ died on ████ at age 52. ████.  He had a history of chronic obstructive lung disease, a heart attack, and hepatitis C, and he died at University Physicians Hospital on ████ of a cardiac arrest.  His death was due to severe septic shock, a complication of overwhelming infection (sepsis) and multi-organ failure (renal, hepatic and pulmonary failure).  ADC 042749-755.  Autopsy confirmed this diagnosis (ADC 032613) and final blood cultures revealed Staph Aureus.  ADC 032614.

161.    The ADC death review concluded that Mr. ████'s care met community standards and the review included no negative findings.  ADC 033659 – ADC 033662.  It

54

also did not identify any contributing cause, including any medical delivery system or clinical failure or issue. ADC 033659. However, the ADC mortality review regarding Mr. ███'s death was totally inadequate. As explained below, it failed to identify numerous points at which basic medical intervention might have averted his death. The review is also at points materially inaccurate or misleading.

162. Mr. ███ appears to have been in his usual state of health until 3/7/11 at which time he developed severe back pain. He was seen by providers on 3/7/11, 3/10/11 (twice ) and 3/11/11 for continued symptoms. ADC 042742-746. Until the last visit, providers failed to recognize the severity of his symptoms and signs of sepsis. On 3/7/11 he had a high temperature of 102.6. ADC 042746. At each visit he had low levels of oxygen (hypoxic) and rapid heart rate (tachycardia) which were ignored by the medical staff. There are numerous points of contact with health care providers where Mr. ███ s serious symptoms should have prompted investigation as to their origin. Had basic lab tests been ordered or had he been referred to the emergency room (ER) at any of these visits, his death almost certainly could have been avoided.

163. Mr. ███ was finally sent to the ER on 3/11/11, at which time, it was too late. The ADC death review calls his death "natural" and "unavoidable" but this is inaccurate. Sepsis (widespread infection) is almost always treatable with antibiotics and fluids if caught early enough. Delay in treatment is often fatal. Had Mr. ███ been referred to the ER when he first developed symptoms his death almost certainly could have been averted.

164. In addition, the death review states that the "[r]ecord showed that the inmate was afebrile [without fever] when sent to the hospital." ADC 033661. This appears to suggest that the diagnosis of sepsis was not clear. What the reviewer fails to include in his report was that Mr. ███ had a fever to 102.6 on 3/7/11, the first day he had symptoms of back pain which was never worked up or acted upon and was the first sign of underlying infection. ADC 042746. There were in fact numerous alarm signs

55

PRSN-RLC 00057

that should have prompted a more thorough and earlier work-up by health care providers. It is unclear why the death review is silent on these matters.

165. On 3/7/11, an ICS ("Incident Command System," ADC's code for emergency) was called (ADC 024331) by officers because Mr. ██████ was out of breath which was attributed to a back injury. The medical record is not entirely clear, but it appears that Mr. █████ was not seen by a clinician or registered nurse but only a licensed practical nurse (LPN), who then obtained a telephone order from a Nurse Practitioner. ADC 042746. The note documented a temperature of 102.6, an elevated heart rate of 140, normal blood pressure, and an oxygen saturation of 88%. Mr. █████ complained of injuring his back during a softball game on Saturday and also complained of a sore throat and cough. On exam the provider documented wheezing in all of his lung fields. He gave him albuterol after which time his oxygen saturation improved to 90%, ordered antibiotics (apparently for the sore throat) and sent him back to housing.

166. The care provided on 3/7/11 was inadequate. Wheezing in a patient with a history of chronic obstructive pulmonary disease and low oxygen levels is consistent with a COPD exacerbation and merits either close monitoring with frequent albuterol and steroids or referral to an emergency room. The progress note assessment includes no mention of the severe tachycardia (elevated heart rate) and fever, both of which are signs of an infection. None of these ancillary symptoms or vital signs are explained by his back sprain alone. The basic standard of care given the patient's presentation would have been to at least obtain basic labs and an x-ray to identify the source of the fever or referral to the emergency room. None of this was done.

167. On the morning of 3/10/11, another ICS was called because Mr. █████ was unable to get out of bed or walk. ADC 042746. He was evaluated at medical at which time he was again noted to be tachycardic (heart rate 105) and hypoxic (oxygen 88% on room air). ADC 042746. Both of these findings again point to some type of pulmonary process; the hypoxia (low oxygen level) is not explained by his back injury. On

56

examination he was noted to have burns on his lower back from the heating pad he was using. *Id.* The physician was called and Mr. ▮▮▮▮ was again given albuterol (his oxygen improved to 91%), cyclobenzaprine, a muscle relaxant, for muscle spasms, and counseled to drink more fluids. ADC 042743. At this point, Mr. ▮▮▮▮'s severe pain and disability, and continued hypoxia should have prompted clinical investigation. The standard of care would be to order an x-ray, carefully examine the patient, and attempt to identify the reason for worsening back pain. None of this was done.

168.    On 3/10/11 at 7:36 p.m., another ICS was called after Mr. ▮▮▮▮ fell in the bathroom. ADC 024337. He was evaluated again in medical where he complained that "I've been throwing up all day. I can't move, my back is all seized up. I can't do anything and the pain is driving me crazy." ADC 042743. The provider noted that Mr. ▮▮▮▮ was on the gurney "writhing in pain" and "grimacing" and vomiting into the wastebasket. *Id.* He was still tachycardic (heart rate 112), with a low oxygen level (94%). The nurse practitioner on call recommended rest, a nausea medication and continued heat and cyclobenzaprine for muscle spasms. *Id.* No physical examination was performed, and no laboratory tests were ordered. At this point, Mr. ▮▮▮▮'s health was clearly deteriorating. He had been seen three times in the previous few days, twice for emergencies on 3/10/13. Although it was not certain that he was septic (he was afebrile, blood pressure was normal), the basic standard of care required investigation into why his pain was clearly worsening days after an injury, and why he had hypoxia and was vomiting. Again, basic lab tests and imaging of his back should have been done, or if not available at the prison, Mr. ▮▮▮▮ should have been referred to an emergency room. None of this was done. Mr. ▮▮▮▮ was not a young healthy man. He had chronic lung disease and had already had a heart attack. His deteriorating condition required careful clinical investigation and monitoring. He received neither.

169.    On ▮▮▮▮ at 11:10 a.m., another ICS was called when Mr. ▮▮▮▮ was found in bed screaming and grabbing his back and his head "and talking nonsense

57

phrases." ADC 024340. He was taken to medical where a nurse (unclear if a RN or LPN) evaluated him. ADC 042742. The medical staff documented the security staff who referred Mr. ███ indicated he "had been crying about pain all night," raising serious questions about whether security staff should have brought him to medical sooner (it was at that point close to 11 a.m.). *Id.* At this point, Mr. ███ was still hypoxic (oxygen 88%), tachycardic (heart rate 135), tachypneic (respiratory rate 34, normal is usually 18 breaths/minute), and had a dry mouth. Mr. ███ was crying about back pain and yelling "I can't breathe." *Id.*

170.    A nurse practitioner was contacted who appropriately referred him to the local ER and gave him albuterol. *Id.* IV fluids were not begun, which is significant because such fluids are a cornerstone therapy in septic shock, and might have saved Mr. ███ s life if started earlier. Even without knowing he was septic, the basic standard of care calls for fluids to be started on a patient with a heart rate of 135 and dry mucous membranes while waiting for emergency medical responders to arrive and transport the patient. The medical note only states, "Attempted IV unsuccessful." *Id.*

171.    Mr. ███ was initially evaluated and treated at South Eastern Arizona Medical Center, but was transferred to UPH, where he died less than 24 hours later of septic shock and multi-organ failure. ADC 042749.

172.    As stated above, the ADC death review found no problems with care or any issue. This is shocking. As explained, the review should have found a failure to recognize symptoms or signs and a delay in access to care. It should also have investigated the poor note regarding attempted IV fluids and the substantive reason an IV was unsuccessful.

173.    The death review's conclusion "Unavoidable" is also inadequate. For the reasons stated, Mr. ███'s demise was at the least possibly preventable and almost certainly would have been averted with timely medical intervention. At the least, the death review should have identified the problems discussed above and taken action to

Confidential

minimize the risk of recurrence, so as to reduce a substantial risk to prisoner-patients. Multiple practitioners failed to correctly interpret the signs of early sepsis. The death review process should have identified this failure, and developed training for nursing and provider staff regarding the diagnosis and treatment of early sepsis. Instead, the death review under "Lessons Learned" simply stated, "None." ADC 033661. Unfortunately, this was true. Mr. ████'s death was preventable had the signs of early sepsis, in a man with multiple medical problems, been addressed with the seriousness his situation deserved.

174. ████████ died on ████, at age 57. The care he received while at ASPC likely resulted in a hastened death and was woefully inadequate. However, the ADC death review, while cryptically indicating there were medication delivery, medical prescribing, and patient non-adherence issues, concluded that there were no negative findings and that care met community standards. ADC 033694-0033697.

175. Mr. ████ had a past medical history of end-stage liver disease, presumably from hepatitis C, with known esophageal varices and prior hepatic encephalopathy (confusion and altered level of consciousness as a result of liver failure). He was admitted to the hospital twice in the year preceding his death with complications related to his liver disease. ADC 046783, ADC 046799. Mr. ████ was pronounced dead on ████████████ in his cell after being found disoriented, actively vomiting blood and with a pool of blood around him on the floor. ADC 046780. The autopsy confirmed the likely cause of death to be bleeding to death from esophageal varices (varicose veins of the esophagus – enlarged, tortuous, and fragile) associated with his underlying liver disease. ADC 040266. Persons with end-stage liver disease often have developed fragile swollen veins around the esophagus, because their scarred liver blocks blood from its normal path, and blood backs up into the esophageal veins. The walls of these swollen veins become thin and break, causing severe and often fatal bleeding. Although patients with end-stage liver disease are at medical risk, there were several factors in this case,

59

PRSN-RLC 00061

relating both to acute and long-term mismanagement that likely resulted in a hastened death.

176.    Mr. ███ had multiple serious complications of his liver disease while he was in prison in 2011.  On 5/28/2011 staff responded when Mr. ███ was found to be confused, feverish and with a heart rate in the 130s.  ADC 046793.  On exam, he was noted to be oriented only to name, have 4+ pitting edema (massive swelling of his legs), and a bloated abdomen.  *Id.* He was evaluated by an RN and a nurse practitioner, given fluids and Tylenol, and released to the yard.

177.    This was grossly inadequate care.  When a patient with end-stage liver disease, with a past history of hepatic encephalopathy presents with abnormal mental status, a fever and evidence of ascites (swollen abdomen due to fluid accumulation), the basic standard of care requires evaluation for spontaneous bacterial peritonitis (SBP).  This is a life threatening but easily treatable infection of the abdomen.  Diagnosis requires obtaining a sample of fluid from the abdomen by placing a needle into the belly (paracentesis), examining the fluid under a microscope, performing tests on the ascitic fluid, and, if appropriate, promptly starting antibiotics.   The risk of recurrence of spontaneous bacterial peritonitis (SBP) is increased in patients who have had prior SBP, as Mr. ███ did.

178.    Mr. ███ was known to have severe liver disease.  The development of confusion, fever, and rapid heart rate in the setting of severe liver disease is ominous, and requires prompt evaluation and treatment in a hospital setting.  Mr. ███ should have been sent directly to an emergency room for assessment and treatment of his hepatic encephalopathy and probable SBP.

179.    Mr. ███ was hospitalized from 10/29/11 through 11/5/11.  ADC 046817.  It was a complex hospitalization: he was treated for SBP, a gastrointestinal bleed and sepsis. *Id.*  On 11/28/2011 Mr. ███ saw a provider.  ADC 046782.  At that time, Mr. ███ said he had worsening shortness of breath and leg edema.  *Id.*  His heart rate was

60

115 and he was noted to be in respiratory distress.  He was given an increased dose of furosemide, a diuretic, and scheduled to be seen in one week.

180.    The increase in furosemide was an appropriate response to his increasing shortness of breath, and increased leg swelling (edema).  However,  the presentation of new symptoms of increasing shortness of breath, leg swelling, and rapid heart rate in a man with advanced liver disease who was recently hospitalized for internal bleeding and severe infection, is ominous.  Mr. ███'s medical condition at this point required close monitoring, with vital sign measurement several times a day, in a clinical setting.  If this type of setting were not available at the prison, he required hospitalization.

181.    This was not done, and rather predictably, his condition deteriorated and another emergency response was called two days later, on 11/30/11, because of Mr. ███'s persistent shortness of breath and abdominal pain.  ADC 046781.  His heart rate had now increased to over 120 with worsening leg edema.  He was re-instructed how to properly use his medications and was told to contact medical if his symptoms worsened.

182.    This too was grossly inadequate.  Mr. ███'s persistent tachycardia, respiratory distress and worsening edema are all indications that he should have been moved to the emergency department.  Had he been referred to the emergency department during either episode on 11/28/11 or 11/30/11, when he was clearly decompensating, treatment might have prevented the massive esophageal bleeding which occurred on 12/2/11.

183.    In addition to the severe deficiencies of care for acute conditions, there were several gross deviations from the standard of chronic care for patients with liver cirrhosis.  Patients with liver cirrhosis must be screened every 6 months with imaging and blood tests because of the increased incidence for cancer of the liver.   During Mr. ███'s hospitalization in late October/early November 2011, a CT scan of his abdomen was done showing a "hypodense lesion in the right lobe of the liver" (ADC 046829), which may have been HCC (liver cancer).   I cannot say whether this contributed to his

61

PRSN-RLC 00063

death, but he did not receive the standard of care in terms of HCC monitoring.

184.   Mr. ████ had esophageal varices. The basic standard of care for patients with varices is to provide medication (a beta blocker) to reduce the chance of future bleeding.  Mr. ████ was started on nadolol (a type of beta blocker) during his hospitalization in late October/early November 2011, but for unclear reasons this medication was not ordered or continued after he left the hospital and returned to ADC. The failure to provide this basic medication is another example of very poor care.

185.   Finally, patients with esophageal varices, gastrointestinal bleeding, and a history of spontaneous bacterial peritonitis (ADC 046805) should be started and continued on antibiotic prophylaxis for SBP.  This is a practice guideline recommendation of the American Association for the Study of Liver Disease.[14] This was not done in Mr. ████'s case.

186.   When Mr. ████ was found in his cell vomiting blood on ████ the emergency response care was adequate.  However, had Mr. ████ been appropriately managed, especially with regard to the days leading up to the date of his demise, he likely would have been in the hospital and able to receive more appropriate medical care potentially ending with a more favorable outcome. It is shocking that the ADC death review found no problems with the care in this case, and required no further review or corrective action.

187.   ████████ was a prisoner at Arizona State Prison Complex in Florence.  He died ████████████████ at age 41.  There was a significant delay of diagnosis and initiation of chemotherapy.

188.   Mr. ████ had a swollen right testicle.  He was taken to the Florence Hospital Emergency Room on 5/3/2011 and treated for an infection.  The chart does not contain any records from Florence Hospital.  One week after the ER visit, Mr. ████

---

[14]http://www.aasld.org/practiceguidelines/Documents/ascitesupdate2013.pdf (Accessed on April 23, 2013)

Confidential

PRSN-RLC 00064

filed an HNR, inquiring: "5/3/2011 Florence Hospital ER…can I please know the results of tests…still in a lot of pain." ADC 045315. It is standard of care to request an urgent testicular ultrasound for a man of this age with an enlarged tender testicle that has not responded to treatment for infection. Persistent swelling of the testicle strongly suggests cancer or other serious condition. An urgent ultrasound was mandatory. No testicular ultrasound was ordered. On 5/24/2011 in another Health Needs Request (ADC 045314), Mr. ███ complained that the antibiotics he had been given had not worked. On 5/25/2011, Mr. ███ was seen by a physician's assistant and prescribed more antibiotics for presumed orchitis (infection of testicle). ADC 045352 Medical staff again failed to obtain an ultrasound.

189. On 6/7/2011, ███ was seen by an acute care physician at the prison (ADC 045348) who noted continued right testicle swelling and sent him to the hospital. On 6/13/2011, Mr. ███ underwent removal of his right testicle (ADC 045349), which was sent for pathology testing. His diagnosis of cancer (specifically, extra nodal NK/T cell lymphoma, nasal type, of the right testicle), an aggressive form of the disease, was made a few days later, approximately six weeks after his initial complaint. ADC 045346. Had a testicular ultrasound been performed when Mr. ███ initially presented with the complaint of testicular swelling, the malignancy would have been detected much more rapidly, and treatment could have been started in a timely fashion. Rapid initiation of treatment is paramount in the case of aggressive malignancy; NK/T cell lymphoma is an aggressive malignancy.

190. On 3/6/12, notes from 21st Century Oncology of Arizona document "lump of about 2 cm diameter on the medial aspect of his left thigh…will follow closely." ADC 045238. This issue in fact received no follow-up based on review of the available medical records. It appears likely that this lesion was spread of the lymphoma to Mr. ███' thigh, but this was not further assessed or diagnosed until more than three months later.

63

PRSN-RLC 00065

191.   A biopsy was done of thigh lesions on 6/21/2012 at St. Luke's Hospital during Mr. ███ hospitalization. Per the pathology report (ADC 045088), this lesion was consistent with cutaneous lymphoma, which means Mr. ███ either had lymphoma that was refractory to the initial chemotherapy regimen (did not respond) or a relapse of lymphoma.  Regardless of whether the thigh lesions represented relapse or remission, Mr. ███ did not receive timely treatment with alternative chemotherapy agents or an intensification of his regime that could have improved his outcome once it was clear his cancer was more advanced than previously thought.

192.   There is little documentation leading up to what I believe was Mr. ███' final hospitalization (the last medical records available are date 6/22/2012 at which point Mr. ███ was critically ill, and he passed away on ███ ). The documentation that is available, however, includes vital signs documented on 5/28/2012, which show inadequate care.  ADC 045051.  Mr. ███ requested discharge from the medical ward back to his normal prison unit since he stated he had completed chemotherapy.  On that date, he had abnormal vital signs: a temperature of 95.5 degrees and pulse of 108.  *Id.* These vital signs indicated that Mr. ███ met the criteria for the Systemic Inflammatory Response Syndrome, a physiologic state that is often the body's response to an infectious insult.  While these vital sign abnormalities are not specific for one particular condition, they always warrant further investigation since they may be the first sign that a serious illness is present.  However, ADC medical staff did no further investigation into these abnormal vital signs.  Generally it is the standard of care to take a further history, review of systems, perform a physical exam and potentially order diagnostic testing. Rather than doing any of these things, the medical staff at the prison approved Mr. ███'s request to go back to his normal prison unit that day without any further medical care.  Since Mr. ███ had just completed a cycle of chemotherapy, the possibility that he had developed sepsis, an overwhelming infection, from a low white count had to be considered seriously, but was not.

64

PRSN-RLC 00066

193.    Four days later, on 6/1/2012 at 15:50, a registered nurse noted that Mr. ███ was "defecating on self," "scared to eat due to vomiting" and demonstrating "slow cognition," and was given a "verbal order from Dr. Rowe -- send inmate back…for closer observation." ADC 045050.  There are no further notes in the medical chart until 6/1/2012 at 22:00, when Mr. ███ was again found to have abnormal vital signs and was administered intravenous fluids.  ADC 045049.  He was not sent to a hospital until 23:56 that day, nearly 8 hours after he presented with symptoms of a serious illness.

194.    The fact that Mr. ███ was admitted to a hospital four days after he was discharged from the prison medical ward (on the morning of 6/2/2012) further indicates that he was already falling ill on 5/28/2012, and the medical providers in the prison at that time failed to recognize the warning signs of sepsis.  ADC 045058.  At the hospital, he was found to have neutropenic (low white blood cell count, due to effects of chemotherapy) sepsis, pneumonia, and small bowel obstruction.  ADC 045058-64.  Delay in the diagnosis of these serious medical conditions very likely contributed to Mr. ███ death.

195.    Mr. ███████, who died on █████ at age 60, experienced inappropriate delays in care while in custody, including inadequate follow-up for obvious skin lesions.  Without an autopsy report or mortality review (not yet provided to plaintiffs, I am informed), I cannot determine whether these lapses may have contributed to his death.  I will supplement this report as necessary if additional documents are received.

196.    On 6/5/11, Mr. ██████ submitted a health needs request, stating "I have skin cancer in 3 locations on my neck and back that need attention."  ADC 043967.  On 6/14/11, he was seen by a registered nurse who stated he would be seen by a medical provider, indicating that the appointment should take place on 6/23/11.  ADC 043896.  No such appointment took place.

197.    On 7/5/11, a continuity of care transfer summary was prepared regarding

65

Mr. ███████. ADC 043895. It failed to document the need for a provider exam regarding the skin cancer, as ordered by nurse on 6/14/11. On 7/11/11, apparently after a transfer, a new arrival record review was done regarding Mr. ███████ but it did not note the need for the exam. ADC 043894.

198.    On 7/15/11, Mr. ███████ submitted a second HNR regarding his skin lesions, stating, "I have skin cancer on my neck and shoulder. Please schedule me for treatment." ADC 043965. A handwritten note on the request, presumably done by staff, states "schedule [health care provider] for follow-up." *Id.* No such appointment happened, and he did not have the required nurse triage assessment.

199.    On 8/31/11, Mr. ███████ submitted a third HNR regarding his skin, stating, "I have skin cancer on my neck – It bleeds. Please schedule me for treatment."   ADC 043964. In response, a registered nurse wrote on the form, "[healthcare provider follow-up] schedule." *Id*. No such appointment happened, and again, he had no nursing assessment.

200.    On 9/7/11, a medical provider reviewed Mr. ███████'s records, without seeing him. The provider's note states that two HNRs re skin cancer with bleeding had been received from Mr. ███████ and orders, "Please schedule [doctor line] visit to evaluate." ADC 043893. No such appointment took place.

201.    On 12/17/11, Mr. ███████ submitted a fourth HNR regarding his skin conditions, stating, "[m]y skin cancer is progressing. It's likely that surgery is necessary now! Please schedule me." ADC 043963. He was not seen.

202.    On 1/11/12, a doctor wrote a note in the medical record, based apparently only on a review of documents, stating that Mr. ███████ needs to be scheduled to see a doctor as soon as possible regarding, among other things, the concern and requests about skin cancer. ADC 043891.

203.    On 2/17/12, eight months after his first request, after multiple nurse and provider orders, Mr. ███████ finally saw a medical provider about his skin cancer. ADC

66

043891.  The provider noted Mr. ███████'s history of skin cancer, documented  multiple

lesions and wrote "may be cancerous [and] needs attention."  ADC 043889, ADC

043904.  The medical provider requested a dermatology consult.  ADC 043904.

204.    On 4/24/12, Mr. ███████ again saw a medical provider, who noted the

continuing need to see a dermatologist.  ADC 043886.  The provider submitted another

dermatology consult, pointing out that the consult had been previously requested in mid-

February.  ADC 043900.  The provider described the need for the consult as "semi-

urgent" and wrote the word "EXPEDITE" in capital letters near the top of the request

form.  *Id*.

205.    On 5/29/12, Mr. ███████ was seen by a registered nurse, who noted his skin

lesions, stated that a doctor should evaluate them, and indicated that Mr. ███████ will be

seen by a doctor on 7/10/12.  ADC 043885.  He was not.

206.    On 6/11/12, Mr. ███████ submitted a formal letter regarding his skin

cancer.  Among other things, he wrote, "These spots are painful and they bleed through

my shirt and occasionally on my bed sheet."  ADC 043956.  A handwritten statement on

the letter, presumably by medical staff, indicated that Mr. ███████ would be scheduled to

see a nurse.  *Id*.  There is no record of any such appointment.

207.    On 7/31/12, Mr. ███████ submitted yet another letter about his condition.

"This is my 5th or 6th request to get my skin cancer removed.  It's painful and it bleeds."

ADC 043952.  A medical provider writes on the letter, "will set up [appointment]."  *Id*.

208.    On 8/3/12, a medical provider entered an order in the chart to set up an

appointment regarding Mr. ███████ s skin lesions.  ADC 043884.  No such appointment

ever happened.  On ███████ Mr. ███████ died, fifteen months after he told staff of his

skin cancer, and eight months after his referral to a dermatologist.

209.    There were in this case multiple instances delay, multiple instances of a

lack of follow-up, and a failure to provide necessary (and repeatedly ordered) specialty

services in response to Mr. ███████'s obviously very troubling skin lesions.  These

67

failures exposed Mr. ▮▮▮▮ to a substantial risk of harm.

210.    Mr. ▮▮▮▮▮▮▮, at the time of his death on ▮▮▮▮ was 33 years old.
Mr. ▮▮▮▮▮ had advanced liver disease/cirrhosis, a condition known to ADC
medical staff at least as early as 1/5/11, when a Physician Assistant (PA) documented that
Mr. ▮▮▮▮▮ stated that in October and November 2010 he was diagnosed with the
condition by a specific doctor after specific tests.  ADC 043021.  The PA asked to get
medical records from previous doctor at Maricopa Medical Center (MMC) and ordered a
GI (gastro-intestinal) consult.   Id.

211.    The PA saw him again a week later, on 1/12/11.  ADC 043020.  The PA
noted abdominal ascites (an accumulation of fluid) and lower extremity edema
(swelling), assessing the condition as consistent with end stage liver disease.  Id.   The
next day, Mr. ▮▮▮▮▮ was observed as being pale and jaundiced, with swelling of
the lower extremities.  ADC ADC 043019.  He was seen by a doctor, who upon
assessment of him and just-received lab results, diagnosed End-Stage Liver Disease and
wrote, "no cure, only comfort measures."  ADC43018.  However, no medication was
ordered.

212.    On 1/23/11, Mr. ▮▮▮▮▮ submitted an HNR, asking to get
medication for his liver condition and mentioning he had been on it at the county jail.
ADC 043199.  He complained of "real bad" swelling of his feet.  Id.  On 1/25/11, he was
seen by medical staff.  ADC43016.  The note for this encounter includes no objective
section or assessment and the only plan is to request records from MMC.  Id.

213.    However, just as was the case earlier in January 2011, no medication was
prescribed on 1/25/11 – or in the subsequent days or weeks.  While it was appropriate to
request previous medical records, Mr. ▮▮▮▮▮ s medical conditions alone, as
empirically known and observed at the time, required restarting medication – the standard
set of medication for liver cirrhosis patients - upon his arrival to the ADC without waiting
for the jail medication list.  Failure to order medication in these circumstances is a gross

68

example of poor care.

214.    On 3/3/11, Mr. ███████ again filled out a health needs request, stating he had liver cirrhosis, "can't take the pain anymore," and that he had not seen a doctor for two months, as well as noting where his previous medical records could be accessed and asking for medication.  ADC42951.  After seeing a provider, Mr. ████ ███ was transferred to the hospital for swelling.  ADC 043014.  This hospitalization likely could have been avoided if the patient had been receiving his medications since the time of transfer.

215.    On 3/7/11, when Mr. ████████ was seen by a provider back at the prison, he still was not on any medication except Tylenol #3; the provider noted that they were "still awaiting med list" from the previous provider and finally ordered medications for end-stage liver disease symptoms that day.   ADC 043011.  Again, there was a long unnecessary delay in ordering medication for this patient, which resulted in needless suffering and likely caused an unnecessary hospitalization.

216.    The medical records are replete with additional examples of Mr. ████ ███ receiving very poor medical care.  For example, on 3/28/11 he was seen by a nurse and complained of dizziness.  ADC 042996.  No vital signs were recorded, even though doing so is a basic requirement of a minimally adequate nursing assessment.  Mr. ████████ was not referred to a provider, and his dizziness was dismissed as a complication of one of his medications, propranolol.  *Id.*  However, there are many other possible and far more serious diagnoses that must be considered in any patient with Mr. ████████ s serious condition; he should have been referred to a doctor.  The very next day, on 3/29/11, he was found unresponsive on the floor by a guard and taken to hospital where he was treated for hepatic encephalopathy; he remained there for approximately 10 days.  ADC 042995, ADC 042992-ADC 042993.

217.    On 6/8/11, Mr. ███████ was hospitalized for hepatic encephalopathy.  ADC 042960.  Upon return to prison on 6/14/11, Mr. █████████ was hospitalized

69

PRSN-RLC 00071

again almost immediately with confusion and other symptoms.  ADC 042959.  In the 6/21/11 discharge summary, hospital doctors recommended follow-up with a gastroenterology specialist within one week.  ADC 043084.  The specialist follow-up did not occur until 9/14/11.  ADC 042887.  This is a totally inappropriate delay in care.

218.   The specialist on 9/14/11 recommended a diagnostic procedure, endoscopy of the esophagus, stomach, and duodenum (EGD) with possible banding if esophageal varices were seen.  ADC 042887.  Varices are dilated blood vessels; esophageal varices that are left untreated can lead to life-threatening internal bleeding, which can be fatal. Mr. ████████ s EGD was performed on 9/28/11, and demonstrated 3 large varices. Banding, a procedure which compresses the weakened veins to prevent them from bleeding, was performed.   ADC 042888.   As such, the three month delay in providing the urgent gastroenterological consultation created a significant risk of harm to the patient.

219.   At the time the banding was done, the GI specialist recommended a repeat EGD in three to six months.  ADC 042888.   Yet in the following nine months prior to Mr. ████████ s death no further EGDs are documented.  This is substandard care and created a significant risk of harm.

220.   On 1/26/12, Mr. ████████ was seen because results from a lab test based on a sample taken on 12/29/11 showed abnormal low white blood cell count and low platelets, which can contribute to increased risk for infection and life-threatening bleed, respectively.  ADC 042828.  He was sent for a STAT (emergency) lab draw and an order made that he be seen again by a doctor by February 1st (within five days).  *Id.* However, his next visit did not take place until 3/16/12 – six weeks later.  *Id.*  This shows non-existent mechanisms for follow-up, failure to act on physician orders, and very poor primary care.

221.   When Mr. ████████ was seen by a doctor on 3/16/12, the labs ordered on 1/26/12 were re-ordered, suggesting the previously ordered tests were never done.

70

ADC 042828. The newly re-ordered lab tests were never done by prison staff. On 4/10/12, Mr. ███████ had an emergency department visit for confusion (hepatic encephalopathy). AD C042827. When seen back at the prison on 4/12/12, the labs were ordered yet again, and lab tests were ordered every two weeks to check electrolyte levels. ADC 042827. Despite that order, in the three months that remained until death, only a single lab test was done. ADC 042899–902. This failure to follow doctor's orders for a basic diagnostic procedure again shows grossly substandard care.

222. On 5/1/12, Mr. ███████ had the only set of labs drawn in response to the order that such labs be done every two weeks. ADC 042899 – ADC 042902. The results were reported on 5/3/12 but not reviewed by a provider until 5/9/13. Id. The results among other things showed low potassium, which requires repletion that same day. Id. Low potassium in a patient with advanced liver disease can cause hepatic encephalopathy. However, potassium was not provided and Mr. ███████ was not seen by a provider for follow-up on those lab results until 5/22/12. ADC 042827. This was an inappropriate delay in following up abnormal labs.

223. At the 5/22/12 visit, Mr. ███████ was noted to be jaundiced and to have 4+ pitting edema (severe swelling), suggestive of worsening liver failure and increased edema. ADC 042827. He was ordered TED hose (compression stockings). Id. Such stockings help prevent blood clots in his legs but do little for the swelling. This was inappropriate treatment of his edema. His diuretics should have been increased to help decrease the edema, and he should have been on a sodium-restricted diet.

224. Mr. ███████'s final admission to Tempe hospital occurred on 7/10/12. ADC 042871, ADC 042839. He was admitted to the hospital for an infection of his leg. *Id.* He died on ██████ Cause of death was determined to be complications of severe left lower extremity cellulitis, and he was also determined to have hepatic cirrhosis secondary to chronic alcohol abuse with acute renal failure and hypertension. ADC 062594. Mr. ███████ had advanced liver disease. This is a complex medical

71

problem, requiring coordinated treatment, which Mr. ████████ did not receive.

225.     ████████ was a 52 year old woman with a history of hypertension, asthma and a prior heart attack in 2009 who died while in custody on ████. She was found dead in her cell and the cause of death is unclear from the medical records provided (I will supplement this report if the death review, autopsy, or other records are received). However, Ms. ████ received poor care in the months preceding her death; in particular, she had a history of a serious cardiac condition that was not addressed and an episode of seizure activity and associated problems that were not adequately addressed by health care providers.

226.     On 2/21/12, during an initial facility intake assessment, Ms. ████ was noted to have a history of, among other conditions, a myocardial infarction (heart attack) in 2009. ADC 041306. On 4/2/12, staff was called to see Ms. ████ when she suffered seizure-like activity that occurred while she was sitting at a table. ADC 041325. A licensed professional nurse (LPN), not a registered nurse, assessed Ms. ████. The LPN note indicates that Ms. ████ did not remember all of what had just happened to her. The LPN told her to "increase water intake. Stop smoking and picking up buds off ground." *Id.* Nothing else was done. This is entirely inappropriate management. Ms. ████ has no history of seizure disorder and it is unclear if this episode was truly a seizure or some other neurologic or cardiac event; the patient should have been seen by a doctor that day. The LPN was acting outside the scope of her training.

227.     On 4/4/12, Ms. ████ was seen by a nurse practitioner (NP) for "multiple complaints." ADC 041324. Ms. ████ had submitted a request for care, received 4/3/12, stating, "on 4/2/12, I passed out two times. I have a past history including 2 strokes [and] a heart attack. I am having problems remembering anything that has happened since 4/2/12. I don't remember passing out . . . ." ACD041429. The NP performed a physical exam which was normal except for some mild abdominal pain and

72

diagnosed her with "dehydration" and "anxiety." ADC 041324. She also ordered an EKG, abdominal ultrasound, a chest x-ray and labs to assess for pancreatitis--which were all normal. *Id.* The NP also referred her for psychiatry counseling due to the recent death of her spouse. *Id.* Although the labs ordered were reasonable as was the psychiatry referral, attributing episodes of "blacking out" to dehydration and anxiety is inappropriate (especially because Ms. ███████'s blood pressure was high (160/85), arguing somewhat against dehydration).

228.    The basic standard of care given Ms. ███████'s history of heart attack and stroke and multiple episodes of blacking out, calls for a provider to obtain a more detailed history to determine if this was due to a neurologic problem or cardiac problem-especially given her history of having a heart attack. Generally, patients who have suffered a heart attack are treated with multiple medications which have been shown to decrease the risk of another heart attack. These medications include: beta blockers, ACE inhibitors, and statins (drugs which lower cholesterol). Ms. ██████ was not provided the benefit of any of these medications besides aspirin.

229.    This failure to provide standard treatment to prevent another heart attack was not addressed anywhere in her primary care visits. Although she had a history of a heart attack and two strokes, no laboratory evaluation of her cholesterol was ever measured. Her multiple episodes of unexplained loss of consciousness required thorough cardiac evaluation. She needed an echocardiogram, an ambulatory cardiac monitor (to monitor the heart rhythm for a twenty four hour period), and complete ultrasound evaluation of the arteries supplying her brain. None of these tests were ordered.

230.    ████████████ was found dead in his cell on ███████ with the cause of death unclear from the medical records (I was not provided an autopsy report or death review, and will supplement this report if such documents are hereafter received). Mr. ████████ was a 55 year old male with a history of untreated high cholesterol and pre-diabetes. He did not receive treatment for either condition. One month prior to his death he

73

complained of chest pain on multiple occasions.  He was treated with antacids only.  He received no evaluation for possible coronary artery disease.  Given his age, his elevated cholesterol and triglycerides (another fat which predisposes to heart attacks), his family history of early heart attacks and his pre-diabetic state, he was at significant risk for a heart attack.

231.    Mr. ████ was transferred from ASPC-T/Winchester to Eyman/Meadows on 7/13/11; at that time he was documented to have a history of high cholesterol and a history of basal cell skin cancer but was not on any medications.  ADC 043278.  He had a new arrival medical review on 7/18/11, which noted his history of skin cancer, and he was referred to a health care provider.  ADC 043277.  He was not seen until 1/13/12, six months later.  ADC 043276.  This was a completely inappropriate length of time to wait to see a provider for follow-up.  He was not provided any diagnostic evaluation for elevated cholesterol, and received no treatment for it.

232.    At his chronic condition visit on 1/13/12, Mr. ████ was noted to be on no medications and have no complaints except being worried about diabetes because of a history of diabetes in his family.  ADC 043276.  The provider documented that he had a history of high cholesterol, but no recent laboratory tests.  Basic lab tests including tests for diabetes and high cholesterol were ordered.  *Id.*  These tests were never performed, and no further testing was obtained.

233.    On July 12, 2012, Mr. ████ was seen again for chronic care follow-up.  He complained of on-and-off chest tightness at night which was relieved with sitting up.  ADC 043274.  The provider note clearly documents that Mr. ████ had a strong family history of early coronary artery disease/heart attacks (a brother had a heart attack before he was 50 years old) and other risk factors including obesity and a history of high cholesterol.  *Id.*  The provider ordered a cholesterol test, advised "lifestyle modifications" and tried famotidine (an antacid type medication) to see if the chest pain was due to esophageal reflux, caused by acid from the stomach irritating the esophagus, or

74

heartburn.  ADC 043274.  This is inappropriate and dangerous.  Although Mr. ███████'s

symptoms certainly could be due to heartburn, chest tightness in a middle-aged obese

male with high cholesterol and a strong family history of heart attacks always requires a

cardiac work-up.  The basic standard of care required obtaining labs and referring Mr.

███████ for a stress test to see if his symptoms were due to coronary artery disease. This

was not done.  Starting an antacid alone was completely inappropriate.

234.    Mr. ███████ did get labs done on 8/9/12 which showed a markedly elevated

total cholesterol of 280 mg/dL and triglycerides of 407 mg/dL (ADC 043289) -- these

most certainly should have been checked when he was first transferred in 2011 and he

should have been started on medication for his cholesterol.  His untreated high

cholesterol and elevated triglyceride put him at high risk for a heart attack.

235.    On ███████ at 6:30 am, an emergency was called after Mr. ███████ was

found in his dorm, unresponsive.  ADC 043273.  Staff on site started CPR. They applied

the AED which did not advise a shock.  Emergency services arrived and the patient was

pronounced dead at the scene at 6:53 am.  Given that Mr. ███████ was already cold and

stiff when he was found, he was likely dead for some time prior to being discovered.

236.    No autopsy is available, but a heart attack is the most likely cause of death.

Mr. ███████ should have received treatment directed towards lowering cholesterol and

triglyceride levels in his blood.  When he complained of recurrent episodes of chest pain,

he should have received urgent cardiology consultation, specifically a stress test, to

identify and treat probable coronary artery disease.  His sudden death was most likely due

to coronary artery disease.  This was a definite failure of preventive care which was

probably contributory to his death.

237.    ███████ was a 66 year old male with a history of  hepatitis C

cirrhosis, diabetes (on insulin) and hypertension who died on ███████ – approximately

two weeks after being received in custody – while receiving care at a hospital for

gastrointestinal bleeding, hepatic coma, sepsis, and other conditions, likely due to his

75

PRSN-RLC 00077

underlying cirrhosis. Similar to other cases, Mr. ███ received extremely poor care for his liver disease.

238.   During his reception center screening on 8/2/12, medical staff recorded that Mr. ███ stated he had coughed up blood on 7/15/12, and that he was supposed to have had banding of his esophageal varices.   ADC 042654.  This information was not followed up.  The standard of care in such a situation would be an immediate referral to a doctor or emergency room, and/or an expedited endoscopy in the next few days.

239.   Mr. ███ also had a psychiatric assessment on 8/2/12 which documented severe episodes of depression a few weeks prior and also documented depressed mood, flat affect, confusion and slowed speech and concluded that there were no emergent mental health needs.  ADC 042652.   All of these findings can also be symptoms of worsening liver function and hepatic encephalopathy (an antecedent to hepatic coma)--but this was not addressed.

240.   Mr. ███ was seen by a provider on 8/4/12 for chronic care follow-up where he was noted to have "prob[able] impending liver failure" and noted to have shortness of breath, edema and ascites.  ADC 042660.   The assessment stated that he had diabetes, hypertension, coronary artery disease, Hepatitis C with abnormal liver function tests.  *Id.*  However, instead of obtaining urgent consultation and follow-up, the physician ordered routine labs, a chest x-ray, and an albuterol inhaler.  No changes in medication were ordered, and no urgent follow-ups for management of his liver failure were initiated.  This was outrageously poor care.  In a patient that was clearly assessed to have "impending liver failure," the swelling in his legs and abdomen (ascites) were due to his liver disease.  The basic standard of care calls for adding diuretics to treat the swelling and an assessment for other signs of liver decompensation, such as confusion and mental slowness that could be consistent with hepatic encephalopathy.  Given the symptoms note on 8/2/12, Mr. ███ likely should have been started on lactulose, a medication used to prevent hepatic encephalopathy and coma.

76

241.    In addition, the physician should have addressed the previous report of coughing up blood and either referred the patient to the ER or for urgent outpatient endoscopy as described above.  Patients with ascites need to be evaluated for possible infection of the abdomen, spontaneous bacterial peritonitis.  Patients with a history of variceal bleeding should be treated with a beta blocker, such as nadolol. None of these urgent actions were taken.

242.    Five days later, on 8/7/12, Mr. ███████ was seen by a doctor for follow-up for his lab results, but again none of the treatments he needed were ordered.   ADC 042658.  Later that same day, Mr. ████████ threw up two cups of bright red fluid consistent with blood.  He was evaluated by the nurse and noted to be "confused and lethargic."  The doctor on call was telephoned and Mr. ██████ was sent to the emergency room.  ADC 042657.  The hospital diagnosed him with a massive upper gastrointestinal bleed.  ADC 042672-673.

243.    Had physicians addressed his complaints of bleeding at the time of intake on 8/2/12, this might have been addressed earlier, and his death possibly averted.  Mr. ███████ had multiple serious medical problems on admission to prison, and was in an unstable condition.  He received shockingly inadequate care.

244.    ██████████████ was a 50 year old male who died on █████ of a spontaneous subarachnoid hemorrhage, bleeding in the brain cause by the spontaneous rupture of an aneurysm.  ADC 065591.  Ruptured aneurysms are spontaneous and not preventable.  However, Mr. █████████ received extremely inadequate care while in ADC.

245.    On 3/16/11 Mr. ████████ was seen by a doctor who noted that he had a history of a heart attack in 2010, for which he was taking appropriate medications (a beta blocker, plavix, aspirin, ace-inhibitor and lovastatin); the doctor continued these medications for 180 days and ordered a follow-up visit for September 2011.  ADC 046928-929, ADC 046933.  The doctor also reviewed labs from January 2011 which

77

PRSN-RLC 00079

were largely normal and appropriately ordered repeat lab tests. An echocardiogram performed on 6/27/11 was mildly abnormal, demonstrating low normal global contractility, and mildly enlarged left ventricle. (ADC046932)  These are signs that the heart has sustained mild injury, probably from the heart attack that had occurred in 2010.

246.   Mr. ███████ was next seen by the doctor after he passed out in the yard on 8/22/11.  He was noted to have a low blood pressure (BP 80/50) and to be sweating profusely.  He was given fluids and sent back to the yard; health care providers believed he had passed out due to the heat.  ADC 046927.  The note from this episode is only a few sentences and lacks a full history and physical.  Because Mr. ███████'s has had a heart attack, and as well as abnormalities on his 6/27/11 echocardiogram, serious heart disease should have been at the top of the list of possible explanations for his passing out. He was at significant risk for developing an arrhythmia (abnormal heart beat) which can cause loss of consciousness.   The standard of care for evaluating loss of consciousness in a 50 year old man with a prior heart attack mandated  a detailed history and basic tests, including an immediate EKG, urgent laboratory studies, and possibly cardiac stress testing, none of which were obtained.

247.   Mr. ███████ was seen briefly by a nurse on 3/24/12 for a twisted ankle, but did not have a chronic care follow-up until 6/6/12, when he was seen by a nurse practitioner.  ADC 046923, ADC 046921.   In other words, the chronic care follow-up appointment that the doctor in March 2011 ordered to take place in September 2011 did not take place, and no such appointment took place for another additional eight months. This is a fifteen month interval between chronic care visits, completely inappropriate and dangerous.

248.   At the 6/6/12 visit, the nurse practitioner documented that Mr. ███████ had a history of a heart attack and had previously been on plavix, aspirin (both blood thinners), a beta blocker, ace inhibitor (blood pressure medications also used in people with a history of heart attacks) and lovastatin (a cholesterol medication) but that all of his

78

medications expired in October 2011. ADC046921. The fact that Mr. ▓▓▓▓▓▓'s medications expired and he was neither seen by a physician nor had his medications renewed for approximately eight months is a gross deviation from minimal standards of care. It is also predictable given the failure to assure timely chronic care clinic visits.

249. The nurse practitioner documented a normal exam, normal blood pressure. *Id.* She appropriately ordered basic lab tests, but only prescribed aspirin and failed to re-start any of Mr. ▓▓▓▓▓▓'s previous medications. This was totally inadequate care. Almost all patients with a documented history of coronary artery disease, which Mr. ▓▓▓▓▓▓ clearly had, should be maintained on aspirin, a beta blocker, ace-inhibitor and a cholesterol medication. The standard of care required re-starting Mr. ▓▓▓▓▓▓'s previous medications while also obtaining laboratory tests. The failure to do so raises concerns about the medical knowledge of mid-level providers (nurse practitioners, etc.) in ADC and the degree of physician oversight of those providers.

## III. CONCLUSION

250. The health care system in recent years, whether run by the ADC, Wexford or Corizon, clearly lacks the capacity to address the needs of the many ADC prisoners with serious medical needs. As a result, prisoners are denied basic and necessary health care for their serious medical needs, and they are suffering substantial harm as a result.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 8th day of November, 2013 at New York City, New York.

Robert L. Cohen, M.D.

79

PRSN-RLC 00081

# APPENDIX A

Confidential

# Robert L. Cohen, MD

314 West 14th Street (W) 212-620-0144
New York, NY 10014 (F) 212-691-8588
 BobbyCohen@aol.com

**EDUCATION**

A.B., Princeton University, 1970
M.D., Rush Medical College, 1975

**POSTGRADUATE TRAINING**

Residency, Medicine, Cook County Hospital, 1978
Chief Residency, Cook County Hospital, 1979
Board Certification, Internal Medicine - 1978

**PROFESSIONAL EMPLOYMENT**
Clinical Practice in General Internal Medicine
New York City, 1988 –

Medical Director
Cicatelli Associates
New York, NY, 2007 --

Attending Physician
Department of Medicine
Langone Medical Center
New York University School of Medicine, 2010 –

Attending Physician
St. Vincent's Hospital and Medical Center
New Yorkl, NY  1988-2010

Medical Director
AIDS Center
St. Vincent's Hospital and Medical Center, NYC
January 1989 - October 1990.Robert L. Cohen, MD

Vice President for Medical Operations
New York City Health and Hospitals Corporation
1986-1988

Confidential

Robert L. Cohen, MD                                                                 Page 2

Director
Montefiore Medical Center
Rikers Island Health Services
1982 - 1986

Associate Medical Director
Rikers Island Health Servi
1981 - 1982

Attending Physician
Department of Medicine
Cook County Hospital
1979 - 1981

**FACULTY APPOINTMENTS**

Clinical Assistant Professor
Department of Social Medicine and Clinical Epidemiology
Albert Einstein College of Medicine
1985 – 2008

Clinical Instructor
Department of Medicine
New York University School of Medicine
2010 –

**INSTITUTIONAL REVIEW BOARD MEMBERSHIP**
Vice Chairman
Institutional Review Board
Montefiore Medical Center
1984 - 1986

Member
Institutional Review Board
City University of New York
2000 –

**TESTIMONY OVER LAST FOUR YEARS**

- <u>Martin Hernandez Banderas v. United States, CV 08-6594 PSG (CTx)</u>

- <u>Baires v. United States Case No.: CV 09-5171 CRB</u>

- <u>Lin Li Qu, et.al v. Cornell Companies, Inc. et al, USDC C.A. No. 09-53-S-DLM</u>

- <u>Castaneda v. US, Central Dist. Of California, CV07-07241 DDP (JCx)</u>

- <u>Jennings v. Hart - Case No. 3:08cv0028, Western District of VA</u>

**MEDICAL EXPERT -- PRISON HEALTH**

**Federal Court Appointed Monitoring of Health Care in Prisons and Jails**

Michigan, Hadix v. Johnson, 2003 – present
*Court Appointed monitor for oversight of medical care of in several Michigan Prisons*

Ohio, Austin v. Wilkinson, 2002 -- 2005
*Member of two person Medical Monitoring Team to monitor compliance with settlement agreement regarding medical care in Ohio State Penitentiary*

Connecticut, Doe v. Meachum, 1990 -- present
*Medical expert at trial and court appointed monitor of compliance with settlement agreement covering care of all HIV infected prisoners in Connecticut.*

New York State, Milburn v. Coughlin, 1989 -- present
*Continuing review of compliance with health care consent agreement*

Washington, D.C. 1986 - 2000
*Court appointed medical expert involved in monitoring compliance with several consent agreements regarding medical care at the DC Jail as well as DC prisons at Lorton (VA)*

Florida, Costello v. Wainwright, 1983 through 1988
*Review of compliance with settlement agreement in all Florida Prisons State Court Appointed Monitor*

Philadelphia, PA, Jackson v. Hendricks, 1991 -- 1999
*Review of compliance with consent agreement on medical care within Philadelphia jails*

**Department of Justice Appointed Medical Expert**

Cook County Jail, 1982 (Chicago, IL)
Essex County Youth House, 1995 – 1999

Robert L. Cohen, MD                                                          Page 4

**RECENT PRESENTATIONS**

"Inhumane and Ineffective: Solitary Confinement in Michigan and
Beyond." University of Michigan Journal of Race and Law, February 2, 2013

"The Impact of Solitary Confinement on Prisoner Health", WHO Health in Prison Project,
Copenhagen, Denmark, October 12, 2012

Dialogues on Detention:  "Applying Lessons from Criminal Justice Reform to the Immigration
Detention System", Human Rights First, University of Texas, Austin, TX, September 12, 2012

"Health Care for Detained Immigrants US and Europe", Health in Prison
and Throughcare: Provision and continuity of care for those in the criminal
Justice System, Abano Terme - Italy, October 7, 2011

Prisoners' Human Rights and Day to Day Correctional Health, 4th Academic and
Health Policy Conference on Correctional Health, March 10, 2011, , Boston, MA

Mass Incarceration and Correctional Medicine: The Dialectics of Caring for
Prisoners, Albert Einstein College of Medicine , February 16, 2011

Strategies for assuring the civil rights of detained persons: U.S. and International
Perspectives; American Public Health Association, Denver, November 8, 2010

Why the United States Should Adopt the Optional Protocol to the Convention
Against Torture; International Conference on Prison Health Care/WHO Health in
Prison Project, Madrid, Spain, November, 2009

What is the Physician's Responsibility in an era of Mass Incarceration,
Offender Health Research Network, Manchester, England, May 2009

Health Care for Immigration Detainees: What Should Be The Standard?
Panel of the ABA Council on Immigration, February 13, 2009, Boston, MA

Medical Consequences of Mass Incarceration, 2ème Université d'Eté de
Médecine en Milieu Pénitentiaire, Association of French Correctional Medicine
Physicians, Perpignan France, May 21, 2008

American Exceptionalism: The Health Consequences of Mass Incarceration
2nd Annual Conference of the International Journal of Prison Health Care,
Varna, Bulgaria, October 21, 2007

HIV/AIDS in Custody: Advocacy for Prevention, Care and Treatment In
Correctional Settings and on Reentry, NYC Bar Association January 10, 2007

Robert L. Cohen, MD                                                                 Page 5

**PUBLICATIONS**

Allen-S, Wakeman-S, Cohen-R, Rich-J, Doctors in US Prisons in the Era of Mass Incarceration, International Journal of Prisoner Health, 6(3):99–106, 2010

Cohen-R., "Health and Public Health Advocacy for Prisoners" in Puisis-M, et.al, *Clinical Practice in Correctional Medicine*, Elsevier, 2006.

deLone-M, Cohen-R, et.al, Standards for Health Services in Correctional Institutions, 3rd edition, American Public Heatlh Association 2003

Cohen-R., The Medical Intake Examination, in Puisis-M, Cohen-R, et al, *Textbook of Correctional Medicine, Mosby, St. Louis, 1998.*

Frickhofen-N, Abkowitz-JL, Safford-M, Berry-M, Antunez-De-Mayolo-J., Astrow-A, Cohen-RL, King-LN,et.al., Persistent B19 Parvovirus Infection in Patients Infected with HIV-1, Annals of Internal Medicine, Vol. 113, No. 12, 926-933, Dec. 15, 1990.

Laudicina, S., Goldfield, N., Cohen, R., Financing for AIDS Care, The Journal of Ambulatory Care Management,Vol. II, No. 2, 55-66, May 1988.

Selwyn, Peter A., Feiner, Cheryl, Cox, Charles P., Lipshutz, Carl & Cohen, Robert L., Knowledge about AIDS and High-Risk Behavior Among Intravenous Drug Users in New York City, AIDS, Vol. 1, No. 4, 247-254, 1987.

Cohen, Robert L., Case Studies: A Prisoner in Need of a Bone Marrow Transplant, Hastings Center Report, Vol. 17, No. 5, 26-27, 1987.

Bayer, Ronald, Carol Levine, Susan M. Wolf et. al. HIV Anti-body Screening: An Ethical Framework for Evaluating Proposed Programs. JAMA Vol. 256, No. 3: 1768-1774, 1986.

Cohen, Robert L., Oliver Dennis, Pollard-Sigwanz, Cathy, Leukopenia and Anergy as Predictors of AIDS, JAMA, Vol. 255, No. 10, 1289, 1986.

Whitman S, King L, Cohen R, Epilepsy and Violence: A Scientific and Social Analysis. In: Whitman S, and Hermann B, ed. The Social Dimensions of Psychopathology. Oxford University Press, 1986.

Cohen, R., AIDS: The Impending Quarantine, Bulletin of the Health Policy Advisory Committee, Vol. 17, No. 3, 9-14, 1985.

Whitman S, Coleman T, Patron C, Desi B, Cohen R, King L, Epilepsy in Prison: Elevated Prevalence and No Relationship to Violence. Neurology, Vol. 34, No. 6, June, 1984.

Cohen, Robert L., Imprisoned Plasma Donors: A Medical-Ethical Case and Comment, Journal of Prison & Jail Health, Vol. 2, No. 1, 41-46, 1982

# APPENDIX B

Confidential

**Depositions**

| | |
|---|---|
| 13.09.13 | Mark Haldane Deposition |
| 13.09.20 | Jenny Mielke-Fontaine Deposition |
| 13.10.08 | Neil A. Fisher, M.D. Deposition |
| 13.10.13 | Winfred D. Williams, M.D. Deposition |
| 13.05.21 | Karen D. Mullenix Deposition |
| 12.09.19 | Richard H. Rowe, M.D. Deposition |
| 12.10.03 | Tracy Crews, M.D. Deposition |
| 12.10.03 | Ben L. Shaw, Ph.D Deposition |
| 12.10.04 | Richard Pratt Deposition |
| 13.08.26 | David W. Robertson, D.O. Deposition |
| 13.09.09 | Arthur Gross Deposition |
| 13.09.11 | Kathleen Campbell, RN Deposition |
| 13.10.10 | Vickie Bybee Deposition |
| 13.08.27 | Vanessa Headstream, RN |

**Documents**

| | |
|---|---|
| ADC010648-011231 | Health Services Technical Manual |
| ADC094844 | Monitored Conditions Report, Eyman – 13.03.12 |
| ADC095001 | Monitored Conditions Report, Lewis – 13.03.12 |
| ADC137741-137753 | Compliance Quarterly Report, Douglas – June 2013 |
| ADC137741-137753 | Compliance Quarterly Report, Eyman – June 2013 |
| ADC137780-137792 | Compliance Quarterly Report, Lewis – June 2013 |
| ADC137819-137831 | Compliance Quarterly Report, Safford – June 2013 |
| ADC137845-137857 | Compliance Quarterly Report, Winslow – June 2013 |
| ADC153777-153793 | Arizona Contract Staffing Percentage Report – 13.07.29 |
| ADC153838 | Inmate Wait Times Report – July 2013 |
| ADC 155093 | Inmate Wait Times Report – September 2013 |
| ADC155099 | Arizona Monthly Staffing Report – September 2013 |
| AGA Review 00006402-6412 | Arizona Staffing Comparison Roll-Up |
| AGA Review 00007226 | Email |
| AGA Review 00013126-13127 | Email |
| AGA Review 00015752-15755 | Email |
| AGA Review 00016658 | Email |
| AGA Review 00017095-17096 | Email |
| AGA Review 00017341 | Email |
| AGA Review 00037462-37466 | Email |
| ADC088796 | Compliance Report, Douglas – April 2013 |
| ADC088814 | Compliance Report, Eyman – April 2013 |

1

PRSN-RLC 00089

| | |
|---|---|
| ADC088892 | Compliance Report, Lewis – April 2013 |
| ADC088979 | Compliance Report, Safford – April 2013 |
| ADC089060 | Compliance Report, Winslow – April 2013 |
| ADC117910-117926 | Compliance Report, Douglas – June 2013 |
| ADC117985-118002 | Compliance Report, Lewis – June 2013 |
| ADC137359 | Compliance Report, Safford – June 2013 |
| ADC137185-137200 | Compliance Report, Douglas – July 2013 |
| ADC137201-137228 | Compliance Report, Eyman – July 2013 |
| ADC137268-137288 | Compliance Report, Lewis – July 2013 |
| ADC137402-137418 | Compliance Report, Winslow – July 2013 |
| ADC137465-137496 | Compliance Report, Eyman – August 2013 |
| ADC137525-137554 | Compliance Report, Lewis – August 2013 |
| ADC137610-137625 | Compliance Report, Safford – August 2013 |
| ADC154049-154094 | Compliance Report, Eyman – September 2013 |
| ADC154147-154181 | Compliance Report, Lewis – September 2013 |
| ADC154347-154368 | Compliance Report, Winslow – September 2013 |
| ADC014403-014248 | RFP |



| | |
|---|---|
| No Bates Number | Death Narrative – █ |
| No Bates Number | Review – █ |
| No Bates Number | Review – █ |
| No Bates Number | Review – █ |
| No Bates Number | Death Review – █ |
| No Bates Number | Death Narrative – █ |
| No Bates Number | Death Review – █ |
| No Bates Number | Report – █ |
| No Bates Number | Addendum – █ |
| No Bates Number | Report – █ |
| No Bates Number | Report – █ |
| No Bates Number | Report – █ |
| No Bates Number | Report – █ |
| █ | █ |
| ADC122290-122321 | Joseph Hefner Medical Records – 13.03.01 to 13.07.15 |
| ADC122322-122337 | Joseph Hefner Medical Records – 13.03.01 to 13.07.15 |
| ADC122338-122354 | Joshua Polson Medical Records – 13.03.01 to 13.07.15 |
| ADC122355-122370 | Joshua Polson Medical Records – 13.03.01 to 13.07.15 |
| ADC130287-130308 | Joshua Polson Medical Records – ORC and Rxs |
| ADC131368-131405 | Joshua Polson Medical Records – 12.03.08 to 12.10.23 |
| ADC122465-122490 | Stephen Swartz Medical Records – 13.03.01 to 13.07.15 |
| ADC122491-122510 | Stephen Swartz Medical Records – 13.03.01 to 13.07.15 |
| ADC122511-122527 | Stephen Swartz Medical Records – 13.03.01 to 13.07.15 |

Confidential



ADC122528-122551          Stephen Swartz Medical Records – 13.03.01 to 13.07.15
ADC122552-122565          Stephen Swartz Medical Records – 13.03.01 to 13.07.15
ADC133730-133866          Stephen Swartz Medical Records – 95.07.11 to 97.12.09
ADC133867-134306          Stephen Swartz Medical Records – 09.11.18 to 11.06.29
ADC134307-134801          Stephen Swartz Medical Records – 11.10.05 to 12.10.23




3

Confidential                                                    PRSN-RLC 00091



ADC 027855-856

September 21, 2012 letter from Joe Profiri to Karen Mullenix re. Written Cure Notification

4

Confidential

# APPENDIX C

Confidential

## APPENDIX C

### 1.    Diabetic Care

1.     If diabetes mellitus is not managed properly, the patient's HgA1c levels (hereafter A1c levels) will be elevated, as will his blood sugars. A prisoner-patient whose diabetes is not properly controlled runs the risk of blindness from diabetic retinopathy, and kidney failure from proteinuria (excessive protein in the urine, a complication of diabetes that tells medical staff that the diabetes patient runs the risk of kidney failure). He or she may also suffer from peripheral neuropathy, an intensely painful condition if not managed properly with appropriate pain medication. Proper treatment of diabetes therefore absolutely requires regular eye exams to look for diabetic retinopathy as well as regular kidney function testing for proteinuria.

2.     Medical charts that I reviewed for diabetic prisoners revealed a pattern of very poor care resulting in increased morbidity and an elevated risk of death in some cases.

3.     ██████████ (Eyman; █████). Mr. █████ has multiple serious medical problems, including uncontrolled diabetes, diabetic retinopathy with prior laser treatment, high cholesterol, and coronary artery disease with a prior heart attack. In addition, he is disabled, requiring a wheelchair.  Review of his medical record shows a chaotic chart. The only recent laboratory study available in the chart demonstrated uncontrolled diabetes with an A1c level of 9.6 on November 29, 2012. Mr. █████ apparently trying himself to manage his diabetic retinopathy, had been requesting to see an ophthalmologist since November 4, 2012. He was informed that he would be "placed on the eye list" on December 4, 2012, but as of July 17, 2013 he had not been seen. Dr. Rumsey, the medical director at Eyman, had asked for a consultation with the retina specialist on May 30, 2013, but there has been no ophthalmology consultation for at least a year. This lack of access to ophthalmology for Mr. █████ who has diabetic retinopathy, is dangerous and can lead to blindness.

1

PRSN-RLC 00094

4.      The insulin regimen prescribed for Mr. ██████ is chaotic. He is being treated with a hazardous combination of multiple types of insulin: regular insulin, NPH, and Levemir, at a combined dosage of 170 units per day. These should not be used together because their interaction cannot be predicted.  It is not recommended to use two long acting insulin preparations (NPH and Levemir).  It is also the case that the current treatment is  not controlling Mr. █████'s diabetes.  Mr. █████ needs access to an endocrinologist to manage his diabetes since staff and Eyman are unable to treat him effectively.

5.      Mr. █████'s treatment presents multiple serious failures: lack of access to proper medical care, failure to appropriately manage his chronic disease, lack of adequate medical records, lack of access to specialty consults outside the prison, and failure to deliver proper medication.

6.      ████████ (Eyman; ██████). Mr. █████ has diabetes, chronic obstructive pulmonary disease  (COPD), hypertension, and neuropathy. I reviewed the status of Mr. █████'s medical care during my visit to Eyman prison on July 18, 2013. His A1c level, a measure of how well his diabetes is controlled, had been elevated for the eight months prior to my visit. Ideally, a patient's A1c level should be below 7.0. Mr. █████'s level on December 13, 2012 was 8.7; his level on May 13, 2013 was also 8.7 (ADC 136574). In addition, his daily finger stick blood sugar readings are always high, frequently over 300 and often over 400 mg %. He is receiving a mixture of 70/30 NPH and regular insulin twice a day, in addition to supplemental regular insulin. There has been no change in his insulin treatment since at least October, 2012, which indicates to me that there is insufficient review of the status of chronic care patients with diabetes. In addition, Mr. █████ complained that he receives insulin at irregular times.

7.      Mr. █████'s treatment for his diabetes demonstrates lack of access to care, failure of timely delivery of necessary medications, and very poor management of his chronic disease, diabetes mellitus. He is at serious risk for diabetic retinopathy, loss of

2

kidney function, and already suffers from peripheral neuropathy.

8.　██████████ (Eyman; ██████). Mr. ██████ is a 35-year-old man with insulin-dependent diabetes that was diagnosed when he was 25 years old. His diabetes has been poorly controlled, with inadequate follow-up. His A1c level has been elevated since January, 2013. He placed Health Needs Requests (HNRs) on April 30, May 2, and May 5, 2013 indicating that his blood sugar levels had been high for the last few months after his insulin was changed to NPH 70/30. When his labs were drawn on July 5, 2013, his A1c was 8.8, indicating poorly controlled diabetes. There was no evidence in the medical record I reviewed that the laboratory studies obtained on Mr. ██████ had in fact been reviewed by the medical provider. In addition, Mr. ██████ is receiving an inappropriate combination of three different kinds of insulin for his diabetes: Lantus, a long acting insulin, NPH 70/30 a combination of a medium acting insulin with regular insulin, as well as regular insulin on a sliding scale basis.  The use of premixed insulins is not recommended for patients with type 1 diabetes, as intensive regimens require frequent adjustments of the pre-meal injection  of short-acting or rapid-acting insulin.

9.　In addition, he is receiving two different kinds of long acting insulin, Lantus and NPH 70/30 NPH has an intermediate duration of action (2 hours after injection for onset of action, i.e., begins to reduce blood sugar); regular insulin has an onset of action within 30 minutes; and Lantus has a slower onset (70 minutes) and a longer duration (24 hours).  Giving three types of insulin preparations at the same time will make it difficult to achieve appropriate glucose levels, as Mr. ██████ has experienced.  Use of two different long acting preparations is not recommended. Appropriate care would be to provide Lantus once a day at a fixed dosage, with sliding scale regular insulin before each meal and evening snack.

10.　Mr. ██████ treatment for his diabetes demonstrates lack of access to care, very poor management of his chronic disease, and mismanagement of his medications. In addition, if there was proper review of his medical records, particularly his medication

3

administration records (MARs), a knowledgeable practitioner would see that his diabetes medications are being mismanaged.

11.        ████████ (Lewis; ██████). Mr. ██████ has diabetes, peripheral neuropathy secondary to diabetes, diabetic retinopathy, hypertension, and hepatitis C. On December 20, 2012 he received 48 units of regular insulin, instead of 48 units of combined 70/30 NPH insulin at 3:20 a.m. This was three times the usual dose of regular insulin, and could have caused a severe hypoglycemic reaction any time in the next 4 to 6 hours. He was kept in the nursing station until 5:00 AM and then sent back to his yard. There was no follow-up of his blood sugar for the rest of that day. Mr. ██████' diabetes is very poorly controlled. His A1c level was 9.9 on April 30, 2013. This was the second consecutive time that his A1 C level was over 9.6. However, despite these laboratory results, which demonstrated very poor control of his diabetes, at his chronic care visit on May 22, 2013 the practitioner characterized his diabetes control as "fair." A1c levels greater than 7.0 are very poor, not fair, and are associated with increased rates of progression of diabetic neuropathy and diabetic retinopathy, an irreversible and debilitating complication of diabetes that can lead to blindness. Mr. ██████ has not had a recent eye exam, which is essential in his situation, and there was no recent monitoring of his urinary protein, also required for prevention of kidney disease in persons with diabetes.

12.        Mr. ██████ also has peripheral neuropathy secondary to his diabetes mellitus. He had been receiving gabapentin at a dose of 1800 mg twice a day for this condition. On March 26, 2013 his gabapentin dose was decreased by 2/3 to 600 mg B. I. D. There was no reason given in his medical chart for decreasing the dose, and Mr. ██████ was not informed by any practitioner that his pain medication was going to be drastically decreased. He was forced to file multiple HNRs to have his gabapentin dose restored.

13.        My review showed multiple failures to provide Mr. ██████ necessary

4

medical care.  These failures are characteristic of my review of medical care at Lewis and Eyman. He received the wrong dose of medication for his diabetes. His pain medication, prescribed to control a painful complication of his diabetes, namely peripheral neuropathy, was decreased dramatically without reason, and without informing him in advance. His chronic medical condition, diabetes mellitus, is not being treated effectively and despite recurrent laboratory confirmation that his diabetes is out of control, medical staff ignore this information and write in the medical record that his care is adequate.

14.      ███████ (Lewis ████). Mr. ████ suffers from diabetes, painful diabetic peripheral neuropathy, hypertension, and hepatitis C. Hepatitis C is not included in his problem list. The problem list is the one-page summary of all of a patient's chronic conditions, so that medical providers can see the information at a glance. The failure to document a disease such as hepatitis C on a problem list can lead to delays in treatment or no treatment at all. Mr. ████ has had persistent elevations of his blood sugar. On November 20, 2012 his A1c was 8.8, and on February 26, 2013, it was 8.0. This February 26, 2013 laboratory was not noted until his chronic care visit of June 18, 2013, four months later, when his insulin dose was increased. Mr. ████ also has painful peripheral neuropathy caused by his diabetes, and was treated with gabapentin 1200 mg, twice a day. Without informing him, this dosage was cut by one third, to 800 mg twice a day. Mr. ████'s blood pressure has been consistently elevated since October 23, 2012 when it was 152/92. On February 7, 2013 it was 166/99, and on March 14, 2013 his blood pressure was 170/104. On April 22, 2013, when he was finally treated for hypertension, his blood pressure was 164/100. Inappropriately, he was treated with atenolol, a drug which is potentially dangerous in a person with diabetes because it blocks the response to low blood sugar (hypoglycemia), and can prevent the patient from seeking treatment.

15.      Mr. ████'s chronic medical problems were ignored and untreated. Laboratory and radiology results were obtained but not reviewed, and though abnormal, not followed up. His treatment for painful neuropathy due to his diabetes was

5

PRSN-RLC 00098

significantly reduced without reason and without informing him. This practice of cutting pain medication without reason or discussion was described as routine practice by many men I interviewed at Lewis prison.

16.     The poor medical care given to Mr. ███ demonstrates lack of access to care, failure of timely delivery of the appropriate medications, and failure to manage his chronic diseases.

17.     ████████ (Eyman; ████). Mr. ████ is another prisoner housed at Eyman who has diabetes. As explained above, patients with diabetes are at risk for loss of sight because of diabetic retinopathy. Mr. ████ has not had an eye examination for the past two years. Diabetes management requires annual ophthalmology examinations. These have not been provided to Mr. ████. Mr. ████'s case indicates that prisoners requiring regular chronic care are being lost in the system because of poor medical review practices and poor recordkeeping.

18.     Mr. ████'s case demonstrates lack of access to care, failure to appropriately manage his chronic disease, lack of adequate medical records, and lack of access to specialty consults.

19.     ████████ (Eyman; ████). Mr. ████ is a patient with uncontrolled diabetes and poorly controlled thyroid function following a thyroidectomy (removal of his thyroid) for thyroid cancer. At his last chronic care clinic, on July 16, 2013, none of his laboratory studies was available. Although his A1c level has been significantly abnormal for the past year, never less than 12.9, there was no indication that his insulin dosage had been adjusted. This suggests extremely poor management and control of Mr. ████'s diabetes.

20.     Mr. ████'s case demonstrates failure of access to care, failure to provide appropriate medications for his chronic serious disease, failure to appropriately manage his chronic disease, and failure to maintain adequate medical records.

21.     ████████ (Eyman; ████). Mr. ████ suffers from diabetes

6

mellitus. He has proteinuria as indicated by his elevated micro-albumin levels. Treatment of proteinuria is required to decrease the risk of kidney failure for persons with diabetes. However, Mr. ███████ is not receiving any treatment for this known complication of diabetes. Also, Mr. ███████ has filed multiple HNRs complaining about the irregularity of his insulin administration. He wrote that he received medication irregularly between the hours of 3:00 AM and 8:00 AM. His insulin administration needs to be at fixed times relative to his meals.

22.     The poor care provided to Mr. ███████ for his diabetes demonstrates failure of access to appropriate care, failure to timely deliver appropriate medications, and failure to manage the known and serious consequences of his chronic disease.

23.     ███████ (Eyman; ████). Mr. ███████ has multiple serious medical problems including diabetes and hypertension. There are no medication administration records (MARs) in his chart for March, May, and June 2013. Mr. ██████s diabetes is poorly controlled; his A1c level has increased from 8.1 on February 21, 2013 to 8.8 on May 17, 2013. Despite this deterioration in control, Dr. Rumsey noted that control of his diabetes had improved. This is another example of poor chronic care for a man with diabetes. Also, a urology specialty consult was ordered for Mr. ███████ on January 1, 2012 for symptoms of a urethral stricture, but no consult has taken place.

24.     Mr. ███████'s case demonstrates failure of access to appropriate care, failure to appropriately manage his chronic disease, failure to maintain adequate medical records, and failure to provide access to specialty consults.

25.     ███████ (Eyman; ████). Mr. ███████ has diabetes mellitus. His last chronic care appointment was on May 10, 2012, more than a year ago. Mr. ███████ placed an HNR to see an optometrist on March 18, 2011. ADC 135452. At the time of his last chronic condition follow-up, on May 10, 2012 he was still waiting for the in-house optometry clinic. ADC136451.

26.     Mr. ███████'s care demonstrates failure of access to care, failure to

7

PRSN-RLC 00100

appropriately manage his chronic disease, and failure to provide a specialty consult, to an optometry clinic, inside prison.

27.      ████████ (Eyman; ████). Mr. ████ has diabetes, hypertension, and hypothyroidism. He also has severe left ectropion, an outward turning of the lower eyelid which increases exposure of the ocular surface and sensitive mucous membrane of the inner lid, and disrupts normal tear drainage patterns. Surgical correction was first recommended on January 31, 2012. A partial procedure was performed to correct the ectropion but never completed.  ADC 136678.  He has been waiting 18 months for the surgery. Dr. Rumsey, the medical director at Eyman, requested an ophthalmology consultation on March 5, 2013, and again on July 17, 2013, both for monitoring diabetic retinopathy and for surgical correction of the ectropion, which poses a serious risk of infection. Dr. Rumsey, in his July 17, 2013 consultation request to Corizon, noted: "left eye pronounced ectropion, irritation of eye, injected sclera . . . This is [a] case which has been delayed approximately 2 years."  ADC 136680.  The delays experienced by Mr. ████ in obtaining the necessary ophthalmology consultation for his diabetic retinopathy evaluation and severe ectropion demonstrate serious problems in access to specialty consultation. Failure to detect asymptomatic diabetic retinopathy can result in blindness. Dr. Rumsey has demonstrated extreme frustration with the failure of the consultation process with Corizon.

28.     The poor medical care provided to Mr. ████ demonstrates failure of access to necessary care, failure to appropriately manage his chronic disease, and failure to provide him with access to specialty consults outside the prison.

29.      ████████ ████ is a 60 year old man with diabetes, hypertension, hepatitis C and elevated cholesterol.  His medical record is disorganized and laboratory slips are in the chart but unfiled.  He has painful diabetic neuropathy.  In May, 2013 he was receiving gabapentin 1200 mg twice a day for painful diabetic neuropathy.  In June, 2013, his dosage was suddenly decreased 75% to 300 mg of gabapentin, twice a day.

8

There is no chart entry by the provider explaining the reason for the dramatic reduction in the dose of the medication, and Mr. ███ was not informed of the fact of the dosage reduction or the reason.  This is one of many cases described to me in interviews and confirmed by chart review that men with chronic painful conditions are being denied their pain medication.

### 2.    HIV Care

30.    HIV disease, another chronic disease, can be managed with proper medication and is no longer regarded as a necessarily fatal disease. When properly managed and treated, an HIV patient's viral load will decrease, and remain low and stable. Also, a prisoner's T-cell count, the measure of a partially restored and functioning immune system, will remain elevated and stable if HIV disease is properly managed. Proper management absolutely requires timely delivery of the appropriate medications. If delivery of these medications is interrupted by failure of the medical delivery system to get the necessary medications to the prisoner-patient on time, HIV disease can spiral out of control with the viral load increasing dramatically while at the same time T-cell counts plunge.

31.    Below, I evaluated several cases of ADC prisoners with HIV.  As is true for diabetic care, I found that treatment of prisoners with HIV disease has been characterized by lack of access to care, failure of timely delivery of the appropriate medications, and failure of appropriate management of a serious chronic disease.

32.    ███████ (Eyman; ████). Mr. ███ has HIV infection and is supposed to be on treatment with daily anti-viral medications. He has consistently had his anti-viral therapy (Atripla) interrupted by failure to renew his ordered medications. It is extremely dangerous if an HIV positive patient has any interruptions or delays in receiving his medications, because he can develop drug-resistant HIV or AIDS. There are no MARs in the medical record for February or March, 2013. A MAR from January 2013 shows that no Atripla was dispensed.  ADC 136713.  Once again, in April 2013, no

9

PRSN-RLC 00102

Atripla was dispensed. Mr. ▮▮▮ ran out of Atripla on May 23, 2013, and did not receive any medication until June 4, 2013.  ADC 136713.

33.     On May 24, 2013, after his medication was not refilled, Mr. ▮▮▮ wrote an "informal complaint" to the health unit supervisor. In it, Mr. ▮▮▮ predicted that these missed doses of his HIV medication would have significant adverse consequences: "This is a major issue and significant concern for me, as each time doses are missed, it creates an opportunity for resistance to current meds, decreasing the rate of survival. This is not the first time this is happened under the current contractors [i.e., Corizon]."

34.     The response to Mr. ▮▮▮'s complaint confirmed that his medications were not provided from May 24, 2013 through June 3, 2013.  ADC 136713.  As Mr. ▮▮▮ had predicted, the forced interruptions in his HIV therapy caused by failure to renew his medications resulted in the deterioration of his clinical condition. His viral load, the main measure of therapeutic success in HIV treatment, had been undetectable, measured as <20 copies/ml in December 2012 and April 2013.  ADC 136705,136706. However, by June 5, 2013 his viral load had increased more than ten times, to 231 copies/ml suggesting failure of treatment due to missed doses, and possibly the development of resistance to the anti-viral medication. There was also a 15% drop in his T- cells from the March 18, 2013 laboratory studies.

35.     Disturbingly, the clinical care accompanying the failure to provide medication was also very deficient. Laboratory studies obtained on March 8, 2013, were not reviewed by a provider until June 6, 2013, and there is no indication that Mr. ▮▮▮ was examined. On June 13, 2013 the laboratory results from June 6, 2013 were reviewed, and the again showed a significant jump in viral load and a decrease in T-cells. Again, Mr. ▮▮▮ was not examined. The physician's assistant, Mr. Ainslie, misinterpreted the June 6, 2013 results as showing "HIV in remission."  This false information was communicated to Mr. ▮▮▮.

36.     This serious failure to provide timely medications to a patient with HIV

10

PRSN-RLC 00103

disease resulted in development of significant viral load, which had previously been undetectable, as well as a significant decrease in T-cells. The physician's assistant demonstrated a fundamental failure to understand the significance of the abnormal laboratory tests, and did not undertake any action to address this therapeutic failure.

37.     Mr. ██████'s case demonstrates failure to provide appropriate management of a serious chronic disease, failure to timely deliver his essential HIV disease medication, failure to maintain adequate medical records, and failure to provide timely access to care.

38.     ██████ (Lewis; ██████). Mr. ██████ has HIV infection, hepatitis C, asthma, and epilepsy. Prior to his admission into the Arizona prison system on January 31, 2013, Mr. ██████ was receiving antiviral therapy for his HIV disease. However, his HIV medications were not re-ordered until February 7, 2013, one week after his admission to the prison system. Such a delay is symptomatic of a broken health care intake and assessment process. No HIV laboratory studies on Mr. ██████ were obtained until March 4, 2013. Those studies showed a low T-cell level and a high viral load of 221,310 copies two and a half months after they were ordered. These lab results were not reviewed by a provider until April 26, 2013. Mr. ██████ did not have his first chronic care appointment until June 3, 2013, more than four months after his incarceration. He was not referred to an HIV specialist until July 2, 2013, five months after his admission.

39.     This is another example of the failure to provide minimal chronic care for men with serious medical conditions requiring regular follow-up. Mr. ██████'s case demonstrates the consequences of that failure. The laboratory studies obtained on March 4, 2013 suggested that Mr. ██████'s HIV disease had become resistant to his medications. Failure to maintain continuity of medication causes resistance. These results also mandated that resistance testing be ordered and that an effective anti-viral therapy be provided. As of my review of Mr. ██████'s case four months later, no resistance testing, no modification of anti-viral therapy, and no specialty consultation had taken place.

11

PRSN-RLC 00104

During this period, Mr. ██████'s HIV infection is likely to have deteriorated dramatically.

40.    Mr. ██████'s case demonstrates failure of access to care, failure of timely delivery of the appropriate medications, gross failure of the appropriate management of a serious chronic disease, failure to review and understand medical records, and failure to provide timely access to a specialist in HIV disease.

41.    ██████████ (Eyman; ████). Mr. ██████ has HIV infection, although this serious chronic medical condition is not on any problem list, nor is he included on the monitored conditions report. On May 10, 2013 he submitted an HNR complaining of a cyst in his armpit. He wrote: "Excruciating" "I can hardly move my arm. I think it has to drain. Emergency. Please see me ASAP. I can pay the $4 for this emergency visit. Thanks and God bless." On May 13, 2013 he was told that he would be scheduled to the nurses' line. He submitted a second HNR on May 19, 2013 stating "Well now it is all infected. I have red streaks running down my arm."  ADC 136482. On May 24, 2013, two weeks after he submitted the HNR complaining of severe pain from his abscess, he was seen by A. Dorsica, an RN. RN Dorsica confirmed that he had an abscess, and that although it had burst, it was still firm, suggesting a persistent abscess. Nurse Dorsica cleaned the wound, cultured it, and prescribed an antibiotic, clindamycin 150 mg three times a day and put bacitracin on the wound. The wound tested positive for methicillin resistant staph aureus (MRSA), a serious infection.

42.    There were many medical failures with respect to Mr. ██████'s care. Medical staff failed to include this man with HIV infection on a chronic medical condition report, and failed to include HIV infection on the problem list. A fourteen day delay for a painful infection in anyone, but particularly a person with HIV infection, is a dangerous lapse that could have fatal consequences. Delayed treatment of MRSA or sepsis, an overwhelming infection of a painful abscess, in an HIV positive person is dangerous given the patient's suppressed immunity. Proper treatment of suspected

12

MRSA infection should be drainage of any abscess, and antibiotic treatment. The recommended dosage for clindamycin should be 300 to 450 mg q8h or q6h. The dosage chosen by the RN was much too low. Diagnosis and treatment of suspected MRSA requires a physician, physician's assistant, or nurse practitioner. MRSA diagnosis and treatment is a clinical decision not appropriate for RN level staff.

43.     Mr. ███████'s care demonstrates failure of access to appropriate care, failure to provide the timely delivery of appropriate medications, and failure to appropriately manage a serious infection in a person with a significant chronic disease.

### 3.     Hypertension

44.     Hypertension is a common illness.   Untreated hypertension is the major cause of stroke, renal failure, a major risk factor for heart attacks, and a major contributor to the development of heart failure.   Very mild hypertension can be treated with diet and lifestyle modification, but chronic moderate and severe hypertension require lifelong treatment with medications.   Failure to receive these medications regularly can cause spikes in blood pressure which can cause a stroke or heart attack.

45.     Patients being treated for hypertension require regular monitoring of their blood pressure, regular chronic care visits, scheduled based upon the severity of the hypertension and its response to therapy.   They also need regular laboratory monitoring to prevent the development of medication side effects.   They require regular electrocardiograms, and routine evaluation for congestive heart failure, and occasionally cardiology consultation.   Most important is regular monitoring of blood pressure, and uninterrupted treatment with appropriate effective medication.

46.     Patient with heart disease require chronic care monitoring.   Heart disease can result from inadequate blood supply to the heart, from diabetes, from hypertension, from infection, and from mechanical problems such as heart valve disease, heart muscle disease, and irregular rhythms.   Treatment can be extremely complicated, and often requires specialized diagnostic testing, specialty consultation, and frequent monitoring.

13

Inadequately treated heart disease can cause severe pain, great difficulty breathing, swelling of the legs, as well as sudden death.

47.     Patients with heart disease generally require multiple daily medications, many of which, such as anti-coagulant medications, require constant monitoring. Systems for monitoring of chronic heart disease require frequent chronic care visits, with intervals determined by the severity of the illness, and the response to therapy.  Frequent laboratory testing is required, and results must be reviewed promptly.  It is often necessary to carry out a carefully organized sequence of testing in a short period of time. Absent a carefully designed and monitored system of access to specialty consultation, patients with significant heart disease can suffer unnecessary but significant, sometimes fatal, consequences.

48.     ██████████ (Lewis, ██████). Mr. ████ is a 40 year old man who has hypertension, asthma, and epilepsy, and has had a pituitary tumor.  His medical record is grossly disorganized, with misfiled records.  The last chronic care visit occurred one year ago, on July 24, 2012.  Mr. ████ placed an HNR on April 20, 2013 stating: "I'm losing my vision, difficulty seeing, experiencing pain and pressure and loss of peripheral vision. In the three months since submitting the HNR, Mr. ████ was never seen by an RN or an MD.  His chronic medical problems are not being monitored.

49.     Mr. ████ filed an HNR on May 4, 2013, alerting staff that he had run out of medications.   This patient with asthma, epilepsy, and hypertension requires regular chronic care monitoring, including routine blood tests, and physical examination to determine if his blood pressure is controlled, if he having any complication of his epilepsy and blood pressure medications.  These are basic components of medical care not being provided to Mr. ████.

50.     ████████████ (Lewis, ██████). Mr. ██████████ has renal failure. When I interviewed him at Lewis, his blood pressure has been uncontrolled for the previous month.   He told me that his blood pressure was "through the roof" and that he

14

only saw a nephrologist every 90 days.  A review of the 15 blood pressure measurements taken in June and July confirmed his statement.  40% of his blood pressure readings had a systolic pressure greater than 180.

51.  This is extremely dangerous.  Management of blood pressure in a patient with chronic renal failure is not simple, but there were no demonstrated medication changes to address this very high blood pressure, which is putting Mr. ████ at great risk for a stroke.

52.  ██████████ (Eyman; ██████). Mr. ██████ is a 46-year-old man with hypertension, diabetes, hyperlipidemia, and neuropathy. His hypertension has been poorly managed over the last two months. During the period May 14, 2013 through July 9, 2013 his blood pressure was measured on five occasions and never fell below 172/92, a dangerously high level. On July 9, 2013, the week before my visit to Eyman prison, his blood pressure was measured at 184/88. This patient with hypertension, diabetes, and hyperlipidemia has had uncontrolled blood pressure for over two months. He should be referred to a specialist because clinical staff at Eyman are unable to treat him effectively, but no consultation has been sought.

53.  Mr. ██████'s care demonstrates failure of access to appropriate care, failure to provide access to specialty consultation outside the prison, and failure to appropriately manage a serious chronic disease.

54.  ████████ (Eyman; ██████). Mr. ████ has hypertension. He was sent to the emergency room in early February 2013 for atrial fibrillation. He was hospitalized on March 5, 2013. The hospital doctor said he required continued hospitalization, but a SOAP note showed that he was returned to the prison that same day. He refused his anticoagulation medicine on May 29, 2013. His previous INR level (a measurement of the amount of anti-coagulation being achieved) from February 28, 2013 was at 10.6, dangerously high, putting him at risk for excessive bleeding, including major hemorrhage.  Others of his INR's were all too low: April 3, 2013 - 1.12; April 25, 2013 -

15

1.07; May 7, 2013 - 1.13; May 14, 2013 - 1.11, putting him at risk for developing dangerous blood clots. Mr. ███ also has poorly controlled diabetes mellitus; his A1c level is abnormal but he has not been seen and any recent chronic care clinic. In fact, his last visit to a chronic care clinic was February 27, 2013. He was not given a physical examination at that time.

55.     Mr. ███'s case demonstrates a failure of chronic care. He was not seen in a chronic care clinic for five months, although his labs showed INR/anticoagulation problems and diabetes as both uncontrolled. Mr. ███'s case demonstrates failure of access to appropriate care, failure to timely deliver appropriate medications, failure of appropriate management of two chronic diseases, and failure to utilize emergency care at an outside hospital.

56.     ███████ (Eyman, ███). Mr. ███████ has hypertension, Marfan's syndrome, and a mechanical aortic valve. He has to take warfarin and aspirin to prevent the valve from clotting; any such clotting has potentially fatal consequences. During 2013, he had to file HNRs on February 12, April 3, April 23, and May 2 because the medical service failed to renew his warfarin medication. ADC 136457-459. My review of his medical record also demonstrates that when the laboratory results for INR, the gauge of success of his anti-coagulation medications, were received, there were consistent and dangerous delays of three to six weeks before the labs were reviewed. ADC 136455-456. Mr. ███████'s anticoagulation medications were consistently not provided, and his HNR responses were delayed. Critical laboratory values were not reviewed in a timely manner. This is another demonstration of extremely poor care for a patient with complicated multisystem diseases.

57.     Mr. ███████'s case demonstrates failure of access to care, failure of timely delivery of appropriate medications, and failure to appropriately manage his chronic diseases.

58.     ███████ (Eyman; ███). Mr. ███████ has diabetes, hypertension,

16

and epilepsy. Mr. ███ also suffered a stroke which has resulted in significant limitation to his ambulation. Problem one: he is dependent on a walker. His anti-seizure medications were only available as directly observed therapy ("watch swallow"), which required him to spend 40 minutes each day using his walker to get to the medical distribution area. Mr. ███ reported that he was not going to meals because he couldn't safely use his walker. On June 13, 2013 he collapsed in front of the Meadows Housing Unit. Problem 2: Mr. ███ developed blood in his urine on April 11, 2013. He was sent to the hospital and a urinary catheter was placed. A urology consultation was requested from Corizon on April 13, 2013 and approved by Dr. Rumsey on April 15, 2013. The consultation request was re-faxed on April 18, 2013. It was re-faxed and called in on May 13, 2013. A note on June 14, 2013 indicates that the urology consult was still pending. There was no report of a consultation in the medical record. Although Mr. ███ was so disabled that it took him 40 minutes to get his medication, he was not evaluated for a wheelchair until he collapsed on the yard. Additionally, despite hospitalization for unexplained blood in his urine, multiple requests for urology consultation were ignored by the Corizon consultation system for more than three months. The care provided to Mr. ███ demonstrates failure of access to care, failure to provide access to outside specialty consultations, and failure to provide appropriate management of his chronic diseases.

59. ███ (Eyman; ███). Mr. ███ has multiple serious medical problems including COPD, hypertension, schizophrenia, and ischemic cardiomyopathy (a condition in which the heart can no longer pump enough blood to the rest of the body because of serious coronary artery disease), and has a defibrillating pacemaker in place. This pacemaker failed on March 19, 2013. The cardiologist requested that the patient be followed up to have his pacemaker checked in two weeks. A consult was directed to Corizon requesting the consultation on March 22, 2013. It was faxed again to Corizon on April 29, 2013. As of July 17, 2013 no consultation had been approved or provided.

17

(ADC 136528) Mr. ███ also has severe mobility issues, has had a hip replacement, and falls frequently. This is of great concern because of his prosthetic hip. On March 18, 2013 Mr. ███ requested a shower chair, but the request was denied. He fell on April 29, 2013 because he could not maneuver with the crutches he was given when his wheelchair was taken away. He requested a shower chair again following a fall on May 19, 2013. No wheelchair was provided to him because "there was no consensus between Corizon Health and corrections on medical chairs yet." ADC 136526-527.  On June 10, 2013 it was noted in Mr. ███'s medical chart that he had fallen eight times in the preceding six months.

60.    Mr. ███'s case illustrates lack of access to necessary specialty consultation, demonstrated by the failure to provide a cardiology consultation after his pacemaker failed. It also demonstrates lack of access to necessary support for severe motor disability: Mr. ███ needs both a wheelchair and a shower chair.

### 4.    Cancer

61.     Patients with cancer require careful monitoring, in consultation with surgical and medical sub-specialists.  Therapies for cancer include surgery, radiation, and medication, and, frequently two or three of these treatment modalities in carefully organized sequence.  Frequent diagnostic scans are essential to diagnosis and treatment, and these scans – nuclear medicine, MRI, CT – need to be done expeditiously, prior to initiation of definitive therapy.  Because delays in diagnosis can result in metastatic spread of localized cancer, time is of the essence in access to diagnostic and therapeutic resources for patients with cancer.   All patients with treatable cancer will require frequent specialty consultation off site, and must be accommodated without delay. Patients with cancer that is no longer amenable to curative treatment will still require complex palliative care which can include surgical, medical, and radiation treatment. Effective referral systems, transportation to multiple off-site visits, and close monitoring by physicians within the prison are essential to basic care of prisoners with cancer.

18

Confidential

62.      ███████████ (Lewis; ███████). I interviewed Mr. ███████ in his room on L-11, Lewis's medical hub. Mr. ███████ reported to me that he had complained repeatedly for months about chest pain, but each time was told by LVN's that he had indigestion or acid reflux, and was given Tums. He was seen by a clinician on May 10, 2013, for his chronic care. He has hypertension and elevated cholesterol. Although his blood pressure was 160/90, this was considered "fair" control and no change in his medications was made. An EKG was ordered. On June 1, 2013, he complained of heartburn, headache, and a cough for two days. His blood pressure was extremely high, 185/112. His blood pressure medications were changed, and he was scheduled to be followed up in three days.

63.      One week later, on June 9, 2013 he complained of burning chest pain. His blood pressure was still elevated at 160/112. He was sent to the emergency room for treatment of a possible heart attack. On June 19, 2013 he again complained of chest pain, and had nausea and was vomiting for three days, including vomiting blood. He was sent to the ER at West Valley Hospital where, according to Mr. ███████, he was diagnosed with small cell lung cancer. The hospital recommended two consultations: a PET scan to determine if there was spread of the cancer, and an oncology consultation for treatment. On June 27, 2013 the PET scan and oncology consultation were both ordered ASAP.

64.      One month after his diagnosis, when I interviewed Mr. ███████ and reviewed his medical record, he had not received a PET scan nor had he received an oncology consultation to determine therapeutic options. Small cell lung cancer is generally treated with chemotherapy.  The only treatment that Mr. ███████ had received was pain medication.

65.      This is an extraordinary situation, and symptomatic of the many failings of the medical care treatment provided by the Arizona Department of Corrections and its medical care contractors. Mr. ███████ had a newly diagnosed lung cancer without the benefit of biopsy, a PET scan, or an oncology consultation. Mr. ███████'s case

19

demonstrates failure of access to timely care, failure to diagnose and appropriately manage a serious disease, and failure of access to specialty consultation outside the prison.

66.      ███████ (Eyman ████). Mr. ██████ developed severe throat pain. He was treated on June 5, 2012 with amoxicillin for his sore throat. Seven weeks later, on July 20, following seven weeks of severe pain, he was treated with clindamycin 500 mg b.i.d., with a referral to an ear nose and throat (ENT) specialist. Four days later he suffered a spontaneous rupture of a peri-tonsillar abscess. A CT scan of his neck, done with contrast on July 24, 2012, showed cervical adenopathy. He was seen two months later, on September 19, 2012 by a Dr. Joel Cohen, an ENT specialist, who recommended surgery. The surgery was performed on November 20, 2012. The biopsy report to the ENT on November 21, 2012, showed "moderate to poorly differentiated squamous cell carcinoma, involving full thickness of tumor, tumor extensive." No follow-up was scheduled for Mr. ██████. An ENT follow-up was requested on March 28, 2013 because of adhesions of the left base of Mr. ██████'s tongue to his tonsillar fossa. Dr. Cohen, the ENT, saw Mr. ██████ on May 14, 2013. He ordered a PET scan. Two months later, at the time of my visit, Mr. ██████ had not received any treatment for the cancer diagnosed in November 2012, nine months earlier.

67.      The denial of basic care to Mr. ██████ is inexcusable. His cancer was left untreated for nine months. Even after his diagnosis was "rediscovered," by Dr. Cohen on May 14, 2013, after the original failure to follow up on the cancer of his tonsil diagnosed back in November 21, 2012, Mr. ██████ waited two months for the beginning of a plan to treat his cancer. Mr. ██████'s lack of treatment for his tonsillar cancer for over eight months demonstrates failure of access to medical care, failure to appropriately manage a serious disease, failure of timely access to specialty consultations, and failure to follow and treat a patient with a life-threatening illness.

68.      It is particularly distressing to see the same lackadaisical response to Mr.

20

██████'s untreated cancer when the medical staff, including Drs. Cohen and Williams, are aware that they injured Mr. ██████, perhaps irreparably, by failing to follow-up on his diagnosis last November.  I would have expected to have his consultations and scans done immediately, and definitive treatment initiated, rather than have to plead with the Regional Medical Director, two months after "rediscovery," to provide Mr. ██████ the care that he desperately needs.

69.   ██████ (ASPC Winslow, ██████).  Mr. ██████ is a forty seven year old man who complained of back pain sometime prior to January 23, 2013.  No response to his complaint was provided by the medical staff.  On February 21, 2013, he again complained of back pain and right groin pain.  He reported on that date that he had been told he had degenerative joint disease of his spine in 2009.

70.   Mr. ██████ was scheduled to be seen by medical staff on January 24, 2013, but he was not seen because, according to the note written by Vickie Anne Johnson on January 23, 2013:  "No HCP (Health Care Practitioner) on 1/24/13, R/s (reschedule) to 1/29/13.  On January 29, 2013 there is a one line note by Nurse Practitioner Daniel Gallegos, stating; "IM (inmate) complains of LBP (low back pain) secondary (to) degenerative disk disease."  There is no record of any examination of the patient, or discussion with the patient by Mr. Gallegos.  On February 14, 2013, two weeks later, Nurse Julie Lucek noted Mr. Gallegos entry.

71.   On February 20, 2013, Mr. ██████'s HNR was scheduled for the Nurses line.  He was seen on February 21, 2013 by Michal Boyd, RN.  Nurse Boyd listened to Mr. ██████'s complaint of severe back pain and referred him to see an HCP.   He was examined on February 26, 2013, by Mr. Gallegos.  Mr. Gallegos noted that Mr. ██████ has back pain radiating to his right groin.  The pain increased with walking.  Mr. Gallegos diagnosed sciatica, back and leg pain secondary to compression of nerves leaving the spinal cord, ordered an x-ray of the lumbo-sacral (lower) spine, and ordered an intramuscular injection of 80 mg of triamcinolone, a steroid medication, to address the

21

PRSN-RLC 00114

back pain.  He also ordered 50 mg amitryptilline, a medication which sometimes relieves pain of nerve origin (neuropathy).

72.     A lumbar spine x-ray was obtained on February 26, 2013.  The findings were:  "Alignment is satisfactory with djd [degenerative disk disease] and slight disc space narrowing evident at L3-4 and L5-S1 suggests djd.  Lumbar MRI or CT may be helpful in view of radicular symptoms."   Unfortunately the x-ray report was not read by any clinical staff until it was seen, three months later, on May 28, 2013, by Nurse Practitioner Hamilton.

73.     On March 12, 2013, Mr. Gallegos saw Mr. ███ again, noted that the pain was not resolved, and again ordered an x-ray of his spine.  On March 26 he saw Mr. ███ and was unable to find any x-ray report.  He wrote:  "Why has X-ray not been done yet."   On April 22, 2013, Dr. Steven Ward, a radiologist at Little Colorado Medical Center, reviewed the x-ray ordered by Mr. Gallegos.  Dr. Ward wrote: "Multilobulated lucent lesion involving the right acetabulum (bone which adjoins the hip and the pelvis) raising the suspicion of a cystic or lytic lesion.  Further evaluation with CT should be considered."  The radiologist recommended the CT scan because this type of lesion strongly suggests metastatic cancer.

74.     On May 6, 2013, Mr. ███ was seen by an RN.  Mr. ███ explained that he had been in pain for three months, that his pain was very severe whenever he tried to stand up, that he was using large amounts of ibuprofen, and that he would like to have crutches.  He was observed to have an uneven and unsteady gait, was unable to perform a straight leg lift, and had difficulty bending at the waist.  Dr. Williams was notified.   One week later Mr. ███ was given an injection of toradol, a pain medication, was issued crutches, and the x-ray results were faxed to Dr. Williams.  Dr. Williams did not see Mr. ███ but gave telephone approval for the pain medication, the crutches, and a follow-up appointment.  On May 13 Mr. ███ was seen by Julie Lucek, an RN.  On May 22 Mr. ███ was seen by NP Hamilton, who ordered additional pain medication,

22

meloxicam, and a CT scan was ordered.

75.     On May 23, 2013 Nurse Practitioner Hamilton filled out the form requesting Corizon to approve a CT scan of the abdomen and pelvis.  NP Hamilton noted the following reasons for justifying the CT scans: Mr. ███ was unable to bear weight on his right leg, he had significant decreased strength in his right leg, and the multi-lobulated lucent lesion (cystic/lytic) in the right acetabulum.  There was no response by Corizon for the requested CT scan.  On June 10, 2013, Dr. Moyse noted that Corizon had denied the request for the CT of the Abdomen and Pelvis.  A request for an MRI was made; the request was also denied by Corizon.

76.     Mr. ███ was not seen again until June 21, 2013, one month later.  He stated he was waiting for his MRI, and that the pain medications were not helping him and the pain was now radiating down to his right hip.  He stated that he could not put pressure on his right hip to walk.  This inability to walk was confirmed by NP Hamilton, who again noted that there was an acetabular lesion.  Physical therapy was ordered.

77.     He was scheduled for follow up with a health care provider on July 22, 2013, but again, no Health Care Provider was available.  A CAT scan of the pelvis was finally obtained on July 23rd, three months after the cystic/lytic multi-lobulated acetabular lesion was identified.  As expected, it showed cancer:  "Large expansile lytic lesion of R lower ilium involves acetabulum w/ ST mass highly suspicious for metastatic disease such as renal cell CA (cancer), needs f/u & possible biopsy.  Increase in size since lumbar spine radiographs of 4/22/13.   Also, lytic lesion of L(eft) femoral neck suspicious for met(astasis), concerning for impending pathologic fx (fracture)."

78.     This report was seen by NP Hamilton on July 25.  A repeat plain film of the right hip obtained on July 24 also showed the lytic lesion of the right hip.  The comment about an impending pathologic fracture was made to advise the clinicians responsible for Mr. ███'s care that he was at risk for a hip fracture because he had an undiagnosed cancer which had spread to his right and left hips, and the left hip metastasis

Confidential

was likely to cause the hip to break.   One week later, on August 1, 2013, NP Hamilton
reviewed the results of the CT scan with Mr. ███      and informed him that he probably
had cancer, that he was at high risk for a broken hip because of the spread of the cancer,
and that he would be transferred to a "corridor facility" for biopsy and oncology
consultation.

79.     On August 10, 2013 he was transferred to APCT-Tucson.   On August 21
he was finally prescribed morphine for the severe pain of cancer which had metastasized
to his bones six months earlier.   An oncology consultation was requested on August 12,
2013.   As of August 30, 2013, oncology consultation was still pending, and Mr. ███
had received no treatment for his spreading cancer.

80.      A request to the Board of Executive Clemency for early release due to
imminent death was submitted by Dr. David Robertson on September 30, 2013.   Dr.
Robertson noted that Mr. ███ 's right kidney had been removed, and that he would
"start chemotherapy in a few weeks."

81.     This tragic situation demonstrates a complete breakdown of medical care
for a patient with painful metastatic cancer.   He waited a month before there was any
response to his initial HNR.   On several occasions scheduled appointments with health
care practitioners were cancelled, because no health care practitioner was
available.   Serious pain from cancer was treated with ibuprofen.   Ordered x-rays with
critical findings were not acted on, allowing the cancer to spread.   Corizon refused to
allow Mr. ███ to have an MRI.   They denied the initial request for absolutely critical
CT scans while they were aware that his plain x-ray showed a likely cancer which
absolutely required these studies in order to identify and treat the cancer.   After cancer
was demonstrated on a CT scan on July 23, two more months passed before surgical
removal of the kidney allowed for pathological analysis and formulation of a cancer
treatment plan, which as of September 30, 2013, five months after it was presumed that
he had cancer, had not begun.

24

PRSN-RLC 00117

82.     The decision by Corizon to deny the CT and MRI requests when they were aware that Mr. ████ had bone changes extremely suggestive of metastatic cancer is terrifying to this reviewer, and underscores the grave danger faced by prisoners who are forced to live under Corizon's medical control in Arizona's prisons.

### 5.     Other Access to Care Cases

83.     In addition to finding serious problems with treatment for prisoners with chronic health conditions, I also found significant health care delivery problems in the charts of some prisoners with non-chronic medical care conditions.

84.     Stephen Swartz, (Lewis,102486).  I interviewed Mr. Swartz, a named plaintiff, at the Lewis facility.  He reported that because of the shortage of medical staff at Lewis, it takes prisoners an average of three months to see the doctor from the time they file a HNR.  He reports that he submitted an HNR on January 13, 2013, requesting evaluation of a pigmented enlarging mass on his waist. He received no response and continued to submit HNR's. He also told me that he had chronic disturbing facial pain and numbness secondary to prior surgery, which had been treated effectively with tramadol, but that medication had since been discontinued.

85.     He was finally seen on June 26, 2013, more than five months later.  Dr. Merchant recommended an ultrasound of the testicle and a general surgery consultation for the mass on his waist.  He also noted that Mr. Swartz had facial numbness secondary to the surgery which required treatment.  None of these consultations had occurred as of the time of my review.

86.     Joshua Polson (Lewis, 187716).  I interviewed named plaintiff Mr. Polson at the Lewis facility.  Mr. Polson told me about medication delivery problems.  He informed me that he has mania, is supposed to receive lithium, but frequently is not provided with his medication due to staff shortages.  In fact, he had not been given his lithium that morning, and he was acting manic during the interview.

87.     Mr. Polson reported in his Declaration dated November 1, 2012 that

Confidential                                                                                      PRSN-RLC 00118

beginning in 2009 his lithium levels were not regularly checked. My review of his MARs demonstrated that he did not receive eight doses of lithium in April, 2013, and did not receive six doses of this medication in June, 2013. His lithium level was measured on June 13, 2013 and was low, at 0.3 meq/liter. The goal of treatment with lithium is to achieve a serum level of 0.8 to 1.2 meq/liter. No dosage adjustment was made in response to this non-therapeutic serum level. The low level is likely due to the missed doses, as Mr. Polson suggests. In a patient with known mania, on lithium treatment, inadequate dosage of prescribed lithium can precipitate a manic state.  At the time I reviewed his file in mid-July, 2013, Mr. Polson has not seen a psychiatrist since December 2012, a delay of more than seven months.

88.    Joseph Hefner (Lewis, 203653).  Named plaintiff Joseph Hefner at the Lewis-Barchey Unit, reported he has encountered significant delays in care.  When I interviewed him, he had recently had surgery on his left eye for glaucoma.  However, following the surgery, he had not gotten the medications he needed or had a follow-up with the ophthalmologist, and he described symptoms that I found very troublesome and indicative of a possibly detached retina.  He had pain behind the eyes, floaters, blurriness and spots.  He had to file numerous HNRs (ADC 122325-28) but didn't see the prison doctor until July 12.  According to Hefner, the prison doctor didn't do any sort of exam, not even pulling out the ophthalmoscope, and told Hefner his eye looked fine.

89.    According to Mr. Hefner, nurse's line occurs only twice a week on the yard, and it takes eight weeks to be seen at the nurse's line from the time of filing an HNR.  He said after nurse's line, it's another 4 to 6 weeks to see the doctor.   Other prisoners I spoke to at Lewis reported similar delays.

90.    ███████████ (Eyman; ██████). Mr. █████'s right leg has been amputated. He suffered a broken prosthesis. He requested, by HNR, repair of his right prosthetic leg on May 1, 2012. On September 4, 2012, five months later, his HNR was reviewed, and an appointment with a physician's assistant was scheduled.  ADC 136478.

26

PRSN-RLC 00119

Mr. ███ was not seen by the physician's assistant until April 9, 2013, eleven months after he placed his HNR. Mr. █████'s case demonstrates failure to treat prisoners with disabilities, and provide them with the necessary durable medical equipment. The eleven month failure to respond to his HNR is inexcusable.

91.      ███████████ (Lewis, ████). Mr. ███████ is a 55-year-old man who has had two strokes, and is disabled. He is unable to transfer independently from bed to wheelchair, and from wheelchair to toilet. He had been transferred in and out of L-11, the infirmary where I interviewed him, and other sites at least five times in the two months prior to my visit. Each time he is sent back to L-11 because he requires nursing support for all activities, secondary to his left-sided paralysis. Because of the stroke, and inability to transfer, he is completely dependent on nursing staff. (Nurse practitioner Ende documented on May 17, 2013 that Mr. ██████ is unable to transfer.) However, other medical staff at L-11 treat him as if he is lying, and can transfer, and do not provide him with the basic toileting services he needs. This results in Mr. ██████ sitting for prolonged periods in his own urine and feces. Mr. ██████ states that he has disciplinary write-ups for failure to put on his underpants, something he is physically unable to do because of his strokes. According to Mr. ██████ his transfers to other units at Lewis, including isolation cells, over the previous six weeks were all related to new prisoners requiring infirmary beds at L-11.

92.      ██████████ (Eyman; ████). Mr. █████ has multiple medical problems including hepatitis C, chronic obstructive lung disease, hypertension, neuropathy secondary to vertebral compression fractures, and a dense cataract in his left eye. He was being treated with gabapentin 900 mg three times a day for his documented neuropathy, due to spinal fractures he sustained while a soldier in Vietnam. However, his medication dose was arbitrarily decreased to 800 mg twice a day, a 40% decrease, without explanation and without a physician telling Mr. ██████ about the reduction. Mr. █████ was able to get the proper dose re-established, but he suffered unnecessary but

27

predictable pain when his medication dose was dramatically decreased.

93.     Mr. ███████ has also been diagnosed with a cataract of his left lens which requires removal and lens replacement. He has been waiting for cataract surgery since September 23, 2012.

94.     This arbitrary reduction of Mr. ███████'s pain medication for a painful neuropathy from spinal fractures sustained while on military service in Vietnam is incomprehensible. Also, there has been a delay in the scheduled cataract surgery for nine months. Mr. ███████'s case demonstrates failure of access to care, failure of timely delivery of the appropriate medications, and denial of access to specialty consults outside the prison.

95.     ███████████ (Lewis; ███████). Mr. ███████ has hepatitis C, osteomyelitis (chronic bone infection), and epilepsy. He had his initial intake physical at ASPC-Phoenix. At that time, Mr. ███████ was noted to be on depakote, clonazepam, and gabapentin for control of his epilepsy. These medications were not prescribed. On May 22, again, the Lewis medical staff failed to continue his anti-seizure medications. Beginning on June 30, 2013 he began to have frequent seizures. At that time, Mr. ███████ was housed on L-11. Mr. ███████'s case demonstrates failure of access to care, failure of timely delivery of appropriate medications, and failure to provide continuity of care.  The consequences were sadly predictable.  If medical staff are not competent to continue a patient's anti-seizure medications, that patient's condition will deteriorate and  frequent seizures will be the result.

96.     ███████████ (Eyman; ███████) Mr. ███████ has multiple medical problems including: colon cancer, prostate cancer, and hypertension. My review of his medical record demonstrated that management of his hypertension is inadequate. On October 1, 2012 his blood pressure was measured at 198/120. This is an extremely dangerous level, placing him at great risk for stroke or kidney failure. No treatment was recommended. He was next seen three and a half months later, at a chronic care review. At that time his

28

blood pressure was 174/110, still extremely high. Despite this out of control reading, follow-up was scheduled to take place six months later, rather than in two weeks, which would have been appropriate. On May 26, 2013 Mr. ███ was diagnosed by an RN with MRSA cellulitis, which was treated by a telephone order. Diagnosis and treatment of cellulitis should be performed by a clinician (i.e., a medical doctor, a physician's assistant, or a nurse practitioner).

97.     Mr. ███'s case illustrates once again serious problems with the Arizona Department of Corrections chronic care system: serious problems were ignored, there were long delays between appointments, all secondary to there being an insufficient number of doctors during 2012 and 2013 as described repeatedly in the MGAR reports. Once again, as shown in the case of Mr. ███, above, MRSA was inappropriately treated by an RN when Mr. ███ should have been seen and followed by a clinician. Mr. ███'s case demonstrates failure of access to care, and failure to appropriately manage his chronic disease.

98.     ███████ (Lewis; ████). Mr. ███ is being treated for breast cancer. Secondary to his cancer, and its surgical treatment, he has lymphedema, chronic swelling of his left arm. On May 2, 2013 he had increased swelling of his left arm. He was sent to the emergency room and returned with treatment recommendation for MRSA cellulitis. After his return from the hospital, he had no further follow-up to make sure that the treatment was effective.

99.     MRSA cellulitis and a patient with lymphedema requires careful follow-up to assure adequate treatment. The lymphedema decreases circulation to the infected area, and oral antibiotics may not reach the infection in adequate dosage to cure the cellulitis, therefore clinical follow-up including physical examination is required to assure that healing of the infection has occurred.  Follow-up for treatment of Mr. ███'s cellulitis was mandatory, but was neither scheduled nor provided. Mr. ███'s case demonstrates failure of access to care, failure of timely delivery of the appropriate medications, and

29

failure to appropriately manage a chronic disease.

100.   ████████ (Lewis; ████). Mr. ████ is 55 years old. On March 27, 2013 he experienced severe chest pain. He was seen by an LPN, not an RN or physician. He had to wait 30 minutes for an EKG to be taken because of staff shortages at the Lewis medical hub. He had three EKGs, all of which showed he was having an acute heart attack. He was taken to West Valley Hospital (WVH) and returned on March 30, 2013. At WVH Mr. ████ was started on clopridogel (Plavix), metoprolol, aspirin, and lisinopril, all standard treatment for an acute myocardial infarction (MI). The most important elements of this treatment are the clopridogel and aspirin, because they prevent clotting of the coronary artery. Medical staff were aware of the importance of continuing this medication, and Dr. Merchant placed an emergency (STAT) order for clopridogel, metoprolol, lisinopril, and atenolol on March 30, 2013, but the emergency order for clopridogel was crossed out without explanation. Mr. ████ did not receive that medication until April 2, 2013, two days later. He also did not receive aspirin, another critical component of management of an acute heart attack. Mr. ████'s medical record was disorganized, recent cardiology consultations were not present in the medical records, and the MARs for May and June, 2013, were not present in his chart. There were no further clinical notes in Mr. ████'s chart since his return from WVH three and a half months earlier.

101.   Management of an acute heart attack requires maintenance of anti-platelet therapy. Although medical staff were aware that this was a medical emergency, necessary medications were not obtained for two days. There was no evidence of follow-up cardiology consultations present in the chart, and no further clinical follow-up was provided to this man with an acute heart attack. Furthermore, an LPN should not be the person evaluating and treating an individual with severe chest pain, as this is outside their scope of practice. This lack of care provided to Mr. ████ is extremely disturbing, but unfortunately consistent with other failures rooted in the lack of a health-care staff

30

necessary to provide urgent care, to prescribe and deliver ordered medications in a timely manner, to provide proper care for chronic conditions, and to address the disorganized state of the medical records.

102. ▮▮▮▮▮▮ (Eyman; 165447). Mr. ▮▮▮ is a 75-year-old man with multiple serious medical problems, including incontinence of bowel and bladder, diabetes mellitus, coronary artery disease, hypertension, and ADA/mobility issues. He has received very poor care at Eyman. His medical conditions require a higher level of nursing care than is available at Eyman, but despite pleas from Dr. Rumsey, the medical director, and the nursing staff, he has not been transferred to a facility with appropriate clinical support. Instead, during the period from June 6, 2013 through July 14, 2013 he was hospitalized six times. Each time he was sent to the hospital because his complex medical problems required more intensive nursing care than was available at Eyman/Meadows, and each time the hospital sent him back because he required skilled nursing care, not hospitalization. ADC 136687-696. The last note in the medical record when I reviewed it was dated July 16, 2013: "Security notified staff that I/M ▮▮▮ was on his way back to Meadows unit from Mountain Valley Hospital (MVH). MVH notified that Dr. Rumsey had given a written order the day he was sent out that the inmate was not appropriate to return to this yard due to non-compliance and in need of a higher level of care. Deborah from MVH okayed the inmate to return to the hospital. Security was notified. DON Bito'nn said he is taking care of finding a bed for the inmate. Nursing supervisor Meyers notified of the above. /s Shahi, CRN."

103. Mr. ▮▮▮'s case demonstrates a lack of adequate skilled nursing home level beds. He was transferred out six times in five weeks and returned each time. There is no coordination between medical and security, and there has historically been a lack of necessary medical infirmary beds in the Arizona system to care for an elderly, ill, disabled, incontinent patient like Mr. ▮▮▮.

104. ▮▮▮▮▮▮ (Lewis; ▮▮▮). Mr. ▮▮▮ injured his hand on August 13,

31

2012. He was seen by the medical staff who told him that his hand was not broken. His injury remained extremely painful, and his hand swelled up. An x-ray of the hand was ordered on August 24, 2012. He submitted an HNR on August 25, 2012. The x-ray of his hand was not taken until September 10, 2012. The x-ray showed a boxer's fracture of the hand with distal angulation. On September 11, 2012, Mr. ████ submitted another HNR requesting to be advised of the results of his x-ray. The x-ray report was not reviewed by Dr. Merchant until September 21, 2012, ten days later. Dr. Merchant made note of the fracture and scheduled an appointment to see Mr. ████ on September 25, 2012. On that same day he requested an orthopedic consultation as soon as possible. Mr. ████ was finally seen at an orthopedic consultation on November 14, 2012, three months after the injury. Mr. ████ never received surgical treatment. He now has a persistent hand deformity, has decreased grip strength and healed fractures of the 4th and 5th metacarpal bones.

105. This case represents an all too common confluence of the multiple failures of the medical care system in Arizona prisons to provide minimal care for a serious painful condition with potentially serious consequences. There was a delay in follow-up, a delay in ordering x-ray, a delay in noting the results of the x-ray, a delay in requesting the consultation, and a delay in obtaining the consultation. The victim here was Mr. ████ who now has a deformed hand with decreased grip strength.

106. ████ (Lewis; ████). On April 21, 2013 Mr. ████ placed an HNR stating: "Knot on the lower left side of the middle of my throat. It's a little painful and I don't know what it is." On May 9, Mr. ████ was seen on the nurses' line, and referred to nurse practitioner Ende, who noted a three inch mass, possible thyroid in origin. Nurse practitioner Ende ordered laboratory studies, an urgent ultrasound of the neck, and a follow-up appointment in four weeks. There is no follow-up note in the chart. Laboratory studies obtained on May 22, 2013 showed an elevated LDH of 421. An ultrasound was obtained on May 21, 2013 but not read until June 13, 2013. It showed a solid cystic

32

enlarged mass, left side of neck. A CT scan with IV contrast was ordered by Dr. Merchant, approved on June 13, 2013, and performed two weeks later on June 27, 2013. As of July 16, 2013 there was no report of the results of the CT scan or any other follow-up notes in Mr. ████'s chart. There was no diagnosis of the cystic mass, and no follow-up had been scheduled.

107.   Mr. ████'s case demonstrates failure to obtain a timely consultation, and failure to follow up with a necessary radiology examination. Almost three months have passed since Mr. ████ discovered a possible cancerous lump in his neck. The results of a critical test performed weeks ago have not been obtained.

108.   ████████ (Eyman; ████ 7). This 80-year-old man was a chronic care patient who had diabetes mellitus, hepatitis C, and hypertension. Mr. ████ complained of chest pain and lung pain on May 18, 2013. On May 21, 2013 he complained of itching, which he attributed to his NPH insulin. He was seen in the chronic care clinic on May 28, 2013 and a new insulin formulation, levemir (insulin detenir), was started. On June 4, 2013, he complained of chills and sweats and chest discomfort. A chest x-ray showed bilateral pneumonia with right-sided effusion. He was seen on June 5, 2013 and started on levaquin, 750 mg a day for ten days. His white blood cell count, a measure of the seriousness of his infection, was 16,000 /mcL. On June 7, 2013, his oxygen saturation was low at 94%, his respiratory rate was high at 20/minute. No rash was noted on examination by the nurse practitioner, Janet Houdeshel.  Mr. ████ was not seen again by the medical staff after June 7, 2013. On June 11, a repeat chest x-ray was requested by Dr. Ramsey. The film was not reviewed by the medical staff until June 13, 2013.  On June 13, 2013 Dr. Ramsey told the nursing staff to send Mr. ████ to the hospital. There had been no nursing or medical evaluations for the prior six days of this 80-year old man with bilateral pneumonia and diabetes. No follow-up evaluation was scheduled. Mr. ████ was sent urgently to Florence Medical Center in Anthem, Arizona, and then transferred to Tempe St. Luke's Hospital. His condition deteriorated, and he died at

33

Tempe St. Luke's Hospital. The final diagnosis was primary coccidioidomycosis.

109.    There was a delay in diagnosis for this man complaining of chest pain and lung pain, who was incarcerated in Arizona, a state with the highest incidence of Valley Fever in the country.  Had his significant complaint of chest and lung pain on May 18, 2013 been urgently addressed, with an EKG and chest x-ray as required for an 80 year old man with diabetes, he would likely have been diagnosed, and treatment begun , four weeks earlier.  Had his complaint been responded to urgently, as required his chances of recovery would have been dramatically improved.

110.    Instead, Mr. ███████ waited two and a half weeks to be seen for his extremely serious complaints of chest and lung pain. When the chest x-ray showed a pleural effusion, and infiltrates in both lungs, in an 80-year-old man with diabetes mellitus and hypertension, he was clearly much too sick for general population and required immediate hospitalization. Instead, he was placed in general population, and not examined again for six days.  Mr. ███████ received extremely poor care from the Arizona Department of Corrections.  The delays in diagnosis and failure to provide emergency care and hospitalization when required contributed to his death.  This case demonstrates failure of access to timely care, failure to appropriately diagnose and manage chronic diseases, failure to provide access to specialty consultation outside the prison, and failure to provide timely access to emergency care.

111.    ██████████████ (Lewis ███████).  Mr. ███████ has HIV infection. Unfortunately his infection is not responding to prescribed treatment. Laboratory studies obtained on April 12, 2013 showed a low CD4 count of 230/mm3, and a high viral load of 3264. Importantly, three months before, on January 18, 2013, the viral load was undetectable. Although Dr. Merchant reviewed the laboratory studies on May 11, 2013, Mr. ███████ has not been informed of the deterioration of his condition and no action has been taken to ameliorate. When a person with HIV infection who treatment with previously undetectable viral loads develops a high viral load, this deterioration must be

34

investigated promptly. Resistance can develop to treatment, and can result in rapid deterioration of the patient's clinical status. Mr. ███ already has a very low CD4 count. Should it drop below 200, as is likely given his trend, he will be at high risk for opportunistic infections. It is extremely disturbing that Mr. ███' deteriorating condition is not being addressed. Additional studies must be urgently obtained to determine if he resistant to his current medications, appropriate treatment should be provided, and if T-cells have fallen further, appropriate medications must be provided to prevent opportunistic infections.

112. ███████ (Lewis, ███. I interviewed Mr. ███ in his room in L-11, the infirmary unit at Lewis. Mr. ███ has a painful chronic skin condition called ectodermal dysplasia. Ectodermal dysplasia is a life-threatening condition characterized by a lack of sweat glands. Persons with this genetic disorder are at great risk from overheating and heat intolerance because they cannot sweat and get rid of excess heat. It is an understatement to say Arizona experiences excessive heat. Mr. ███ told me he spent one year in lockdown as punishment for seeking medical treatment. Because his body cannot easily get rid of excess heat, it is vital that Mr. ███ live in a climate controlled environment, such as L-11, without exposure to high temperatures. It is apparent that Mr. ███ is in great distress, and requires additional treatment.

113. Mr. ███ was recently transferred out of L-11 to Buckley, and then transferred back. The reason he was transferred out was because there was a patient who was being transferred out of a hospital, and no infirmary level beds were available. This is one of multiple examples I have found of a patient being transferred in and out of L-11 because of the shortage of skilled nursing beds or sheltered housing in the Arizona system. ███████ (Eyman, ███). Mr. ███, a 46 year old man, has Hepatitis C. He told me he sought follow-up for this chronic condition. On December 30, 2012, he placed an HNR in order to see a provider. On January 18, 2013, there was a response sent to Mr. ███ – "Appointment set." As of July 16th, when I reviewed his medical

Confidential

PRSN-RLC 00128

record, six and a half months later, the HNR was unanswered, and there was no documentation he had seen a provider for a chronic care appointment.

Confidential                                                                 PRSN-RLC 00129

# Appendix D

**Robert L. Cohen, M.D.**
Revised List of Testimony in Previous Four Years

1. *Martin Hernandez Banderas v. U.S.*, CV 08-6594, N.D. Cal. (testified at trial)

2. *Baires v. U.S.*, CV-09-5171, C.D. Cal. (testified at deposition)

3. *Lin Li Qu v. Cornell Companies, Inc*, C.A. No. 09-53-S, D.R.I. (testified at deposition)

4. *Jennings v. Hart*, No. 3:08-cv-00028, W.D. Va. (testified at deposition)

5. *Castaneda v. California*, Case No.: VCO50229, Los Angeles County Superior Court (testified at deposition and trial)

SFI-850521v1

# EXHIBIT 2

# CONFIDENTIAL REBUTTAL REPORT
# OF ROBERT L. COHEN, M.D.

*Parsons, et al. v Ryan, et al.*

No. 2:12-cv-00601-NVW

JANUARY 31, 2014

Robert L. Cohen, M.D.

Confidential Information – Subject to Protective Order

1.      I have reviewed the Confidential Expert Report of Lawrence H. Mendel, D.O., and submit the following Rebuttal Report.

2.      The overall message Dr. Mendel presents is that, while Arizona Department of Corrections had problems with health care delivery in the past, Corizon has "fundamentally changed" health care in the Arizona prisons, and "many of the issues raised in the original case have been addressed…."  Mendel, 8.  According to him, Corizon has transformed the health care delivery system so that the ADC is now operating "within the standard of care for correctional systems." *Id.* at 49.

3.      As a preliminary matter, I am not familiar with the concept of a "standard of care for correctional systems."  The duty of a physician is to deliver care to patients consistent with the community standard of care.  It appears Dr. Mendel may believe a lesser standard of care applies when a patient is incarcerated.  If that is his position, then I strongly disagree.   If Dr. Mendel's point is that ADC is delivering health care consistent with the community standard, I also disagree.  The delivery system that I observed, and the medical records that I have reviewed, provide no support for such an opinion.  The death records for prisoners who died in mid-2012 (the latest date for which I was provided death records) vividly illustrate a deeply entrenched pattern of neglectful and harmful medical care resulting from widespread systemic deficiencies. The medical records I reviewed in July and thereafter, selected at random from lists of prisoners with medical care concerns, showed that prisoners continue to suffer because of unconscionable delays and neglect.  This impression was amply supported by my observations while visiting prisons and talking to prisoners, and by my review of deposition transcripts and numerous other documents and records, including defendants' own system audits.

4.      That the health care system has not fundamentally changed was made starkly apparent this month, when ADC and Corizon admitted that a Corizon nurse failed to follow standard injection protocols and may have exposed 24 prisoners at ASP-Lewis

to hepatitis B and C.  The nurse administering the insulin pricked the patients' fingers to check their blood sugar and then used the same needle to draw insulin from a multi-use vial, thereby potentially contaminating the insulin provided to other patients.  PLTF – PARSONS 031300.  Remarkably, as I set forth in my initial report, there was a very similar exposure incident less than 18 months ago at this same prison, where more than 100 prisoners were also possibly exposed to hepatitis B and C due to faulty nurse practices under Wexford, the previous health care contractor.  Unfortunately, this type of mistake is predictable, and even to be expected, in a system that is as understaffed and poorly managed as the Arizona Department of Corrections.

5.      In my report, I documented numerous examples of failed care illustrating systemic deficiencies that expose ADC prisoners to harm and to risk of harm.  Dr. Mendel charges that my report made no effort "to address whether the alleged deficiencies occurred during the period when treatment was provided by ADC, by Wexford, or by Corizon."  Mendel, 48.  I can only conclude that Dr. Mendel failed to read my report before responding to it.  Had Dr. Mendel read my report, he would have observed that, with the exception of the death cases, virtually every patient I described in my report, and in appendix C to my report, suffered from poor care under Corizon, either exclusively, or because Corizon failed to remedy or continued to provide the poor care begun under ADC and Wexford.

6.      ███████████ whose poor medical care I discuss at pages 5-8 of my report, is one of the many prisoners I discussed who has received poor care at ADC, including from Corizon.   To recap, ██████████ was diagnosed with cancer in November, 2012, but defendants did not schedule any follow-up care for ██████████ for three and a half months, and his cancer was left untreated.  Because of badly swollen lymph nodes, he requested to see a doctor by an HNR dated March 3, 2013. A physician's assistant requested that Corizon approve an urgent ENT consultation. Despite the presence of an untreated dangerous cancer, Corizon did not allow ██████████ to see an ENT surgeon

2

until May 14, 2013. The ENT surgeon requested a CT SCAN and an emergency consultation with an oncologist; these requests were directed to Corizon. The CT scan was not performed until July 2, 2013, 4 months after ███████████ complained by HNR of swollen lymph nodes. The CT SCAN, when finally done, showed a cancer of the upper throat. On Corizon's watch there were further delays in reviewing ███████████ CT report, and scheduling an appointment with an oncologist. As of July 17, 2013, on Corizon's watch, ███████████ had still not received any treatment for his cancer.  Corizon ignored and failed to treat ███████████ cancer for more than 4 months. Had Dr. Mendel reviewed my discussion of ███████████ case, it is inconceivable he would have opined that I made no effort to address whether the atrocious care was provided by Corizon.

7.    Dr. Mendel also asserts I made no effort to identify the causes of the "alleged deficiencies." I did - - Corizon is incapable of recognizing and responding to serious medical problems.  Cohen, 8.  Finally, Dr. Mendel questions whether I have opined that ███████████ "purported example[ ] of improper care" was the result of "an unfortunate outcome, a simple mistake, provider negligence, or a systemic problem." Mendel, 48.  It is clear that ███████████ poor care is the result of an uncaring system of medical care, indifferent to a life-threatening cancer.  I said so in my report: ███████████ care "is a horrifying example of a failed system that places every seriously ill man and woman it serves at extreme risk."  Cohen, 8.  That system is now being run by Corizon.

METHODOLOGY

8.    In my initial report, I described the methodology I used to develop my opinions on the adequacy of the ADC health care delivery system.  This process included two-day visits to two of ADC's largest facilities, as well as the review of numerous documents, including deposition testimony for ADC, Wexford and Corizon staff; documents produced to plaintiffs by ADC, including ADC's monthly contract monitoring reports, medical records and death reviews for patients who died, medical records for several named plaintiffs, and a randomly selected sample of medical records at the two

prisons that I visited.  I selected the largest number of randomly selected medical records to review on site that was consistent with the time allowed by defendants for the site visit.

9.      Dr. Mendel contends that, because the sample sizes at the two prisons I visited were limited, that no valid conclusions about gross systemic deficiencies could be drawn.  Dr. Mendel mischaracterizes my report.  As indicated above, the chart reviews were one factor that informed my opinions of the overall care.  The charts I reviewed, randomly chosen from a sample of prisoners with emergency or chronic medical problems, amply demonstrated a level of dysfunction consistent with my observations while at ASPC-Eyman and ASPC-Lewis, my review of the ADC's own contract monitoring reports and other ADC data, and the ADC deposition testimony.  Further, my opinions in this action draw upon my lengthy career in correctional health care, including as the Director of Rikers Island Health Services and as a medical expert in prison conditions cases over the past three decades, and on my review of medical literature.[1]

10.     Based upon all of these factors, I state with a high degree of confidence that the ADC health care delivery system is fundamentally broken and among the worst prison health care systems I have seen.[2]

11.     My opinion is based upon conditions, documents and records that have existed in the ADC for years and, according to the ADC monitoring reports and other ADC data, continued to exist through the end of September, 2013, which was the latest date for which I received information and records.  Dr. Mendel seems to claim that, since September, Corizon has reversed course, and is now providing adequate care.  Given the level of disarray I observed in records, documents, deposition transcripts and at the

---

[1] A complete list of the documents that I reviewed for purposes of preparing this rebuttal report is attached as Appendix A.

[2] I have learned that defendants recently provided to plaintiffs additional documents that Dr. Mendel relied upon for his expert opinion, in addition to the medical records for prisoners who have died since March 4, 2013.  After reviewing them, I may include a discussion of those documents in my supplemental report.

facilities that I visited, and the ADC's recent press release describing the possible exposure of 24 prisoners to hepatitis B and C, I find Dr. Mendel's assertion that the ADC and Corizon have "reached a point where an inmate in ADC custody can expect timely access to appropriate care" (Mendel, 49) to be wholly implausible.

RESPONSE TO DR. MENDEL'S OPINIONS

Care for Named Plaintiffs

12.     During my visits to Eyman and Lewis, I found numerous examples of significantly delayed care that subjected prisoners to harm and risk of harm.  My report documents over three dozen recent cases in which patients should have been seen for acute care, chronic care, and/or specialty care, but did not receive timely care.  Many suffered harm as a result and, sadly, I have learned that three of those patients have died since I reviewed their files.  (███████████████████████████████.)  Dr. Mendel does not dispute my analysis of these cases except with regards to NPs Swartz, Polson and Hefner.

13.      I interviewed named plaintiff Mr. Swartz on July 15, 2013, and reviewed his medical record.  Mr. Swartz submitted a health needs request (HNR) on January 13, 2013 requesting evaluation of an enlarging mass on his waist.  My review of his medical record confirmed that Mr. Swartz waited five months to have this mass evaluated by a physician.  Dr. Mendel's review of Mr. Swartz's medical records re-confirms that this long delay did occur, and further notes that the enlarging mass required surgical removal, which occurred on September 5, 2013.

14.     Although Dr. Mendel states that there were no complaints regarding pain in 2013, review of the Mr. Swartz's medical record shows that he did complain of significant facial pain secondary to a 2010 traumatic event.   The chart also shows that Mr. Swartz complained about this pain to Dr. Merchant on June 26, 2013.  The record indicates that Dr. Merchant was aware of this pain, and ordered pain medication, tramadol, for this chronic pain.  Dr. Merchant wrote that control of the chronic facial pain

might require prescription of a higher dose of pain medication. This medication had been prescribed previously, but the prescription had run out on April 23, 2013 and had not been renewed.   ADC 122468

15.     I interviewed named plaintiff Mr. Polson and reviewed his medical record. Mr. Polson reported to me on July 15, 2013 that he frequently was not provided with his ordered lithium carbonate, the medical treatment for his manic psychosis ordered by a psychiatrist. I reviewed his medical record and confirmed that during the three month period April through June, 2013, he had not received 42 out of 182 doses of his medication to prevent recurrence of mania. ADC 122345-122348. His lithium level was checked on June 13, 2013 and was found to be low, 0.3 meq/liter, well below the desired serum level of between .8meq/liter to 1.2 meq/liter. ADC 122344. The purpose of obtaining serum lithium levels is to assure that dosage is adequate, and not toxic. Despite this low level, no adjustment of his lithium dose was made, and no investigation of the cause of the low serum level was carried out. Inadequate doses of lithium carbonate, as reflected by serum level, are less likely to prevent recurrent episodes of mania. Mr. Polson was seen by a psychiatrist on May 13, 2013, who renewed the lithium prescription. However Mr. Polson received no lithium from May 7 through May 20, 2013.[3]

16.     Mr. Polson also complained of chronic ear pain and delays in accessing ordered referrals to outside specialists. Dr. Mendel stated that "none of these claims have been substantiated in the expert reports." Mendel 13. In fact, medical staff from Eyman submitted a referral for Mr. Polson to see an otolaryngologist on June 28, 2011. The purpose of the consultation was to "Please evaluate (R) Hearing Loss, (B) Chronic Ear Pain (no current signs of infection), (and) Deviated Nasal Septum." The consult was finally approved, almost nine months later, on March 19, 2012. The approved consult

---

[3] In my Report, I incorrectly stated that Mr. Polson had not seen a psychiatrist since December, 2012.  Cohen, 42.

never took place.  A copy of the approved consult has a line through it with a handwritten notation marked "No Show."  There is no indication on the consult form nor in the medical record of the reason why Mr. Polson was not brought to the appointment. ADC_M000195

17.     Named plaintiff Hefner had surgery for removal of a cataract on June 13, 2013.  Complications of cataract surgery are rare, but do occur.  These complications include bacterial infection.  Standard post-operative care includes examination by an ophthalmologist 1 day, seven days, and four weeks postoperatively.[4] Mr. Hefner developed disturbing symptoms several days later, including eye pain, flashing lights, and difficulty seeing and submitted an HNR on June 19, 2013.  The ophthalmologist ordered steroid eye drops and antibiotic eye drops.  The steroid eye drops were provided, but the prescribed antibiotic eye drops, ordered by the ophthalmologist, were not.  Mr. Heffner did not receive the ordered antibiotic treatment given until July 15, 2013, four weeks later, the day I interviewed him.  I did notify Dr. Winifred Williams, Corizon's regional medical director for Arizona, of my concern that Mr. Hefner was not receiving appropriate post-operative care**.**

Clinic Space

18.     The clinic space at Eyman and Lewis prison complexes that I observed was insufficient for the number of prisoners served those prisons, and much of the space that was allocated  appeared to be deserted and little used.  At both complexes, I found that many of the clinical exam rooms were "locked, dark and empty."  Cohen,  34, 37.

19.     Dr. Mendel claims that he was shown the dark and empty rooms that I observed at Lewis, and that he was advised they were located in a unit that is not used because prisoners from that unit receive the majority of their care at "the hub."  Mendel,

---

[4] Up-to-date, Cataracts in Adults, referenced January 26, 2014; http://www.uptodate.com/contents/cataract-in-adults?source=search_result&search=cataracts+in+adults&selectedTitle=1~150

47.  He further claims that he "was told Dr. Cohen was informed of this information during his tour."  *Id*.  Dr. Mendel does not identify who provided him with this false information.  While at Lewis, I visited the medical clinics at Rast and Barchey Units.  I was advised by staff that all of the unit clinics were identical, and that they were used daily.  While in Rast unit, I was told the clinic was not in use at the time of our visit because the pill nurse had to leave the clinic to provide named plaintiff Polson his psychiatric medications, based on our insistence that he receive them.

20.     No one ever told me that the clinics were not in use because patients received care at the hub.  On the contrary, both FHA Cameron Lewis and Dr. Williams advised me that the Lewis hub clinic was used only for specialty and emergency care, and all sick call and chronic care occurs in the unit clinics.  Indeed, this arrangement is consistent with Dr. Mendel's description of the how the clinics are generally set up:

> In most cases, medical encounters occur on the prison unit where the inmate is assigned.  ADC facilities generally consist of multiple units.  Most of these units are surrounded by a separate secure perimeter and many have a specific program focus or security level.  The provision of care at the prison unit decreases the need to move inmates and reduces the dependency of providers on the custody staff.

Mendel, 9.

<u>Grievances</u>

21.     Dr. Mendel's report includes a section on his grievance review.  Defendants did not produce the appeals that Dr. Mendel reviewed until January 30, 2014, making it impossible for me to review them in time to provide informed comment on his findings.  However, I disagree with his implied assertion that grievances are a reliable indicator of the strength or weakness of a prison health care system.  Grievances can, and should be, a component of quality assurance review.  In a functioning health care system, grievances provide a mechanism for identifying individual health care needs which are not being adequately addressed, as well as identifying systemic problems.  However, in July 2013,

prisoners in the prisons of Arizona consistently informed me that they were aware that the situation regarding health care services was extremely chaotic.  Their descriptions of the magnitude of failures to provide them minimal access to nursing sick call, access to physicians, access to specialists, and access to medications was consistent with the findings in the monthly reports filed by Arizona Department of Correction Monitors in their monthly reports.  See, *e.g.*, ADC 137185, 137201, 137268, 137465-66, 154050-51, 154148 (delays for nurse triage); ADC 88799, 088982, 137527-28, 154059-60; 154152-54 (delays for chronic care);  ADC 088893, 089063, 137403 (delays for sick call); ADC 154056, 154151, 137343, 137270 (delays for specialty care).  Prisoner observations were also consistent with the Wexford presentation to the AZ Department of Corrections on November 7, 2012.  That Power Point presentation also described the systemic failure of the Arizona correctional health care program to provide basic services to prisoners.

22.    In my opinion, the relatively low number of appeals, as reported by Dr. Mendel, more likely reflects the prisoners' understanding that  the Arizona Department of Correction did not have the capacity to respond the their medical needs. Prisoners described to me that their HNRs would be returned with notations saying that their request for care has been noted, and that they were "scheduled to be scheduled" to be seen.  They further reported that these appointments, when they did happen, were long delayed.

23.    Dr. Mendel provides an analysis of grievances at only two institutions.  The fact that the most serious grievances regarding necessary specialty consultations had been resolved at the time of his review reveals nothing about the significance of the grievance, the actual delay in access to services suffered by the prisoners, and the medical consequences of the delay.

Staffing

24.    The staffing data Dr. Mendel relies on for October, 2013, which had not been available to me when I prepared my report, shows that the vacancy rates for Medical

9

Directors (must be filled by a physician) and staff physicians have risen sharply since Corizon's takeover.  According to ADC's data, in March, 2013, Corizon had a 22% vacancy rate for Medical Directors, and a 20% vacancy rate for staff physicians. AGA_Review_00019436.[5]  As of October, 2013, the vacancy rates for these two positions were considerably worse, 52% and 39% respectively.  ADC 203041.  At that point, the ADC had fewer than 11 full time physicians working at the ten state prisons, a ratio of 1 physician for every 3000+ state prisoners.  Moreover, two of the full time physicians working in the prisons are Medical Directors in the larger prisons, and thus are unlikely to have significant clinical duties, which brings the ratio closer to 1 physician for every 3800 prisoners as a practical matter.

25.    As of October, 2013 at the five larger prisons (all with prisoner populations greater than 4000), each had a combined vacancy rate of 50% or more for their physician positions, and Florence, with two staff physician and a medical director position, had just .8 of a physician, a 73% vacancy rate.  This physician shortage at the larger prisons is particularly problematic because prisons of this size should have a Medical Director with few, if any, clinical duties.

26.    According to Dr. Mendel, Corizon has directed "considerable efforts" to recruit providers, with "visible" results.  Mendel, 20.  In fact, Corizon's recruitment efforts for physician providers have obviously failed spectacularly.

27.    Corizon's recruitment for Nurse Practitioner positions has had some success, as the vacancy rate has fallen from 51% in March, 2013, to 9% in October, 2013. That Corizon has filled some of the NP positions does not change my opinion that the ADC lacks sufficient staff to provide care to the 34,000 ADC state prisoners.  While NPs are valuable members of a health care team, their scope of practice is more limited than the scope of a physician's practice, and thus, they cannot be substituted for physicians on

---

[5] Had Corizon not reduced the number of staff physician positions that month, the vacancy rate would have been at 45%.  (AGA Review_00006402.)

a system-wide basis.

28.     According to the latest data provided us by Dr. Mendel, there are approximately 45 mid and upper level medical providers working at ADOC facilities (including PRN and registry providers), with a population of 34,073.[6]  California, with approximately three times the population of prisoners, had 386 medical providers for 123,334 prisoners in August 2014.[7]  California has over twice the medical staffing ratio as Arizona.   Dr. Mendel, appropriately, does not identify a national standard for medical staffing.  The current staffing, in my opinion, is not adequate for the size and medical acuity of the prisoner population in Arizona.

29.     In addition to recruitment of nurse practitioners, according to Dr. Mendel, Corizon addresses provider and nursing vacancies by contracting with temporary agencies.  Mendel, 21.  He claims that, during an eight month period, Corizon hired temporary physicians to provide over 4,000 hours of care, or approximately 500 hours per month. This works out to approximately 45 hours per month for each of the 11 state prisons, or one week's coverage.  Clearly, this is grossly insufficient to address a system-wide 40-50% vacancy rate for physicians.

30.     Moreover, reliance on temporary physicians is not an acceptable or sustainable strategy for covering ADC's long-term and intractable vacancies.  Although there is no difference in the kind of medical care that prisoners need from that in the general populations, correctional health systems pose significant barriers to the delivery of minimally necessary care.  Physicians who have not worked at the Arizona Department of Corrections need to be trained in the complexities of delivering care in a complex system which is not organized around patient need, but in which there are

---

6

http://www.azcorrections.gov/adc/reports/capacity/bed_2013/bed_capacity_oct13.pdf.
PLTF-PARSONS 031601.
7 http://www.cphcs.ca.gov/docs/special/Public-Dashboard-2013-08.pdf accessed
01/26/14

multiple, and constantly changing barriers to patient access, and to delivery of prescribed treatments.  Physicians who have not worked in prisons are often understandably anxious, and overly dependent on correctional staff.  They do not know what is allowed and what is forbidden, and thus may allow their clinical decisions to be guided by custody concerns rather than the community standard of care.

31.     Additionally, the use of large numbers of temporary physician staff has a significant deleterious effect on the health care of prisoners at the ADC.  Effective health care systems are built around providers who monitor their patients on a consistent basis and develop relationships with those who need regular care.  This is especially true in the correctional setting for patients with chronic medical conditions.  Chronic care of complex medical conditions cannot be effectively provided without continuity of provider, particularly in systems such as the ADC, where medical records are often poorly kept and chaotic.  In my experience, having temporary medical staff rotate through clinical positions creates a much greater risk that patients will receive inadequate health care, particularly for their chronic health conditions.  Continuity of physician care for patients with chronic illness is associated with decreased hospitalizations and emergency department visits, and improved receipt of preventive services.[8]

<u>Access to Care/Wait times</u>

32.     As Dr. Mendel states, "[a]ccess to care is a quintessential element of correctional healthcare," and lengthy wait times for health care are not acceptable on a long term basis.  Mendel, 9-10.  Relying on data that was not previously provided to me, he claims that the "statewide provider wait time" has fallen significantly.  *Id.*, 10

33.     In my opinion, Dr. Mendel's discussion of wait times is based on incomplete data, his analysis of that data is flawed, and his conclusion that wait times

---

[8] <u>Cabana MD</u>, <u>Jee SH</u>., Does continuity of care improve patient outcomes?, *J Fam Pract.* 2004 December;53(12):974-9, PLTF-PARSONS-031892

have fallen statewide is unreliable.   The analysis must be based upon several months of data, for each facility, with information provided regarding the numbers of each type of clinical encounter performed.  Data must be presented for length of time from request to visit for HNR nurse visits, and for the length of time from request to provider encounter for nurse initiated physician visits.  Dr. Mendel does not provide the data required to justify his conclusion.

### CONCLUSION

34.     Nothing in Dr. Mendel's report changes my opinion that the ADC health care delivery system is fundamentally broken, and that prisoners are at serious risk of harm because the system as a whole is not equipped to provide them with necessary care for their serious medical needs.

APPENDIX A

List of Documents Reviewed for Rebuttal Report

Documents cited in Appendix B of Cohen Report

Report of Lawrence H. Mendel

http://www.uptodate.com/contents/cataract-in-adults?source=search_result&search=cataract&selectedTitle=1~150

http://www.cphcs.ca.gov/docs/special/Public-Dashboard-2013-08.pdf

| | |
|---|---|
| WEXFORD 000001 | 11/7/12 PowerPoint |
| ADC088796-088813 | Compliance Report – Douglas – April 2013 |
| ADC088892-088913 | Compliance Report – Lewis – April 2013 |
| ADC088979-088997 | Compliance Report – Safford – April 2013 |
| ADC089060-089083 | Compliance Report – Winslow – April 2013 |
| ADC122017 | Corizon Inmate Wait Times Report – May 2013 |
| ADC122338-122354 | Polson, 187716, Medical Records |
| ADC122465-122490 | Swartz, 102486, Medical Records |
| ADC137185-137200 | Compliance Report – Douglas – July 2013 |
| ADC137201-137228 | Compliance Report – Eyman – July 2013 |
| ADC137268-137288 | Compliance Report – Lewis – July 2013 |
| ADC137341-137359 | Compliance Report – Safford – July 2013 |
| ADC137402-137418 | Compliance Report – Winslow – July 2013 |
| ADC137465-137496 | Compliance Report – Eyman – August 2013 |
| ADC137525-137554 | Compliance Report – Lewis – August 2013 |
| ADC154049-154194 | Compliance Report – Eyman – September 2013 |
| ADC154147-154181 | Compliance Report – Lewis – September 2013 |
| ADC155093 | Corizon Inmate Wait Times September 2013 |
| ADC203041 | Monthly Staffing Report October 2013 |
| ADC203348 | Corizon Inmate Wait Times Report November 2013 |
| ADC_M000195-000206 | Polson, 187716, ENT Records |
| AGA_REVIEW_0006402 | AZ Staffing Comparison |

| | |
|---|---|
| AGA_REVIEW_00019436 | October 2013 Corizon Staffing Report |
| PLTF-PARSONS-031592-0316032013 | ADC Monthly Population Reports |
| PLTF-PARSONS-031300 | ADC News Release, 1/9/14 |
| PLTF-PARSONS-031892-031898 | Cabana MD, Jee SH., Does continuity of care improve patient outcomes?. *J Fam Pract.* 2004 December;53(12):974-9 |

# EXHIBIT 3

# CONFIDENTIAL SUPPLEMENTAL REPORT
# OF ROBERT L. COHEN, M.D.

*Parsons, et al. v Ryan, et al.*

No. 2:12-cv-00601-NVW

FEBRUARY 24, 2014

Robert L. Cohen, M.D.

Confidential Information – Subject to Protective Order

1.      I reviewed medical records and, when available, mortality reviews that

defendants provide for ADC prisoner patients who died of natural causes between March

4, 2013 and September 27, 2013.  According to the defendants, 40 prisoners died during

this period.   I reviewed the records for the 28 prisoners whose deaths were not classified

by ADC as accidental deaths, suicides or homicides.

2.      In each of the twenty-eight cases, I was provided with medical records for

approximately one year prior to the death, and for 16 cases, I was also provided an ADC

Mortality Review.   Some records were incomplete, and none included an autopsy

report.[1]

3.      For my November 2013 report, I reviewed records for deaths in 2012 and

found patterns of significant delays, lapses and generally poor medical care.  My findings

were consistent with my review of care at the prisons I visited in July 2013.

4.      The records I reviewed for the 2013 deaths reveal that the legacy of poor

care under ADC and Wexford management has continued under Corizon.  In at least 13

of the 28 cases, patients received care that was grossly deficient and well below the

standard of care.[2]   In some of these cases, the poor care clearly caused or hastened their

death, while in others this is very likely, but would require an autopsy review to confirm.

It is alarming that almost half of the natural deaths occurring during the brief half year

---

[1] Attached as Appendix A is a list of the documents I reviewed to prepare this report.

[2] In eight of the 28 cases, the medical records I received were so sparse that it was difficult to draw conclusions about the care provided.  In two of these files, I also found evidence of access to care problems.  See infra at pp 53-56.

period under review would reveal such significant problems with delivery of basic medical services.

5.      In most of these 13 cases, patients suffered unnecessary severe pain and treatment complications because care was delayed or denied repeatedly.    The serious failures of care described below are not just the results of one doctor's failure, or one health administrators' incompetency.  They occurred at different institutions, with different nurses, different providers and different administrators.  They have in common ADC's centralized, dysfunctional medical program.  These records provide a grim window into a system that is grossly dysfunctional on many levels and poses an unacceptable risk of harm to the patients who must rely on it.

**Mortality Reviews**

6.      In my initial report, I opined that the ADC's death review process failed "to identify even the most obvious deficiencies in care and thus take any action to further review or correct any problem."  Cohen Report at 50.  I concluded that this failure "is a certain sign of a completely inadequate medical delivery/quality assurance process and creates a substantial risk of harm to prisoner-patients."  *Id.*

7.      For this supplemental report, I reviewed 30 additional ADC Mortality Reviews. Of those reviews, I focused on the sixteen that reviewed "natural" deaths that occurred between █████ and ███████, and compared them to the medical records I was provided.  (I did not have the autopsies for these decedents, and I did not receive a Mortality Review for all of the natural deaths that I reviewed.)  Dr. Robertson performed all but one of these reviews, with the last being done by Dr. Rowe.  This most recent

review of documents confirms my opinion that the ADC's mortality review process fails to identify obvious deficiencies in care despite a clear need for corrective action, and that this gross failure places prisoner patients at substantial risk of harm.

8.     In fourteen of the sixteen reviews that I evaluated in conjunction with the medical records, Dr. Robertson indicated that the care provided met community standards without negative findings.  These cases include:

a.     ██████████ a case involving shocking delays in care for laryngeal cancer that may have shortened his life.  On several occasions in the months before his death, he was denied appropriate pain medication for his metastatic cancer.  (See pp. 35-38, infra.)

b.     ██████████ a 49 year old woman, had several serious chronic conditions that required careful monitoring.  Although she had orders for weekly lab tests, she stopped having those tests months before her death, although there was no "stop" order.  The prison never scheduled a necessary specialty consult, and she was unnecessarily prescribed medications that are dangerous when described together.  (See pp. 46-48, infra.)

c.     ██████████ age 36, died of liver failure.  Shortly before his death, he presented to a nurse with symptoms of liver disease, and had highly abnormal labs.  At that point, he should have been hospitalized for acute liver injury, or at the very least examined by a physician.  He was not. (See pp. 53-55 infra.)

3

d.      ■■■■■■■■, age 52, had liver and heart disease.  In the three weeks before his death, medical staff failed to recognize his need for emergent response when he presented with unstable vital signs and extremely abnormal lab results.  (See pp. 50-51, infra.)

e.      ■■■■■■ age 54, died of lung cancer that was not detected until days before his death.  During the months before his death, he steadily deteriorated, experienced numerous falls, and complained of severe pain, yet was never properly worked up to determine the cause of his alarming symptoms.  Instead, he was repeatedly ridiculed by nursing staff for "faking" his symptoms.  (See pp. 25-32, infra.)

f.      ■■■■■■, age 59, showed clear signs of sepsis in the week before he died, but ADC failed to provide necessary and timely emergency care.  (See pp. 41-44, infra.)

9.      In each of these cases, the medical records demonstrate serious medical lapses that caused the patients harm, may have hastened their deaths and, in many cases, demonstrate systemic deficiencies.  In a functioning health care system, any of these gross deficiencies would have triggered corrective action to protect patients in the future. That Dr. Robertson could conclude that these cases complied with the community standard of care is incomprehensible.

10.     In two of these cases, the reviewers correctly concluded that the patients' deaths could have been prevented or delayed by more timely intervention.   In both cases,

the reviewers' Corrective Actions are grossly inadequate to address the problems identified.

11.    According to Dr. Rowe, the identified lapse in the case of ████████ ████ was the "failure to follow-up tests results," *i.e.,* provide an HIV test despite two requests.   ADC211618.  (See p. 51 infra.)  The patient died from preventable AIDS-related pneumonia ██████████.  The Corrective Action Dr. Rowe proposed was "It is anticipated that the EHR implementation will address transfer issues as it relates to continuity of care in order to minimize misplaced or lost information during transfer." As ADC still lacks an electronic health record, this "Corrective Action" is no action at all.

12.    In the case of ████████████ a 38 year-old patient who unnecessarily died of a highly treatable form of cancer, Dr. Robertson identified more than a half dozen failures, including delay in access to care, failure to follow clinical guidelines, and failure to follow up on test results.  Dr. Robertson made recommendations to "develop a tracking system for more important/urgent cases; have more providers available to review the reports that come in; develop a system where nursing may screen lab reports … and call provider when necessary."  ADC211652.  For a Corrective Action plan, he simply refers to these brief recommendations.  The failure to develop a comprehensive plan to address the myriad lapses evident in this clearly avoidable death is simply inexcusable and is symptomatic of a system that is incapable of assessing and correcting its gross deficiencies.

**Inadequate Care In Prisoner Deaths**

13.     Several of the cases demonstrate shockingly poor care for patients suffering from various forms of cancer.  The medical record of ████████ vividly illustrates the ongoing pattern of delayed and inadequate care. ████████ died of metastatic liver cancer on ████████.  A mass in his liver which was suspicious for liver carcinoma had been identified in December 2011. Had he received appropriate treatment when it was first identified, his cancer most likely would have not metastasized and might have even been curable.  The level of care provided, however, under the ADC, Wexford and Corizon delayed his access to diagnosis, denied him treatment for his cancer, and ignored his complaints for relief of the severe pain of his metastatic disease.

14.     ████████ had cirrhosis and Hepatitis C, which placed him at significantly increased risk for development of hepatocellular carcinoma. Abnormal abdominal CT scans were obtained in December 2011, January 11, 2012, and February 1, 2012.  They all showed a liver mass suggestive of liver cancer.   These scans required definitive evaluation for possible hepatic carcinoma, a disease which is treatable if found early.   Diagnosis was delayed, no treatment was offered, and ████████ suffered great pain and a possibly preventable death.

15.     The earliest records I received for ████████ show a CT scan that was done of the chest, abdomen and pelvis at an outside hospital on 12/05/11. The CT scan showed a 2.8 cm liver mass that was worrisome for hepatocellular carcinoma.  The radiologist recommended a triple phase MRI.  ADC214629. On 2/1/12, ████████ had another CT scan done of his liver  which showed that he still had a 2.8 cm mass in his

liver.  The radiologist opined that the persistent lesion was not consistent with hepatocellular carcinoma, but still recommended that a liver biopsy be performed because there was clear evidence of advanced liver disease.  ADC214615.

16.     He was also noted to have an enlarged lymph node around the splenic artery and a stable pulmonary nodule which was biopsied on 1/11/12 and 2/1/12. ADC214629.   Both of these biopsies were negative for malignancy.  These are essentially the only records I was provided for the pre-June 2012 period.

17.     It is unclear who ordered the two follow-up CT scans and the two lung nodule biopsies as I received no records from the ADC that indicate these procedures were ordered, performed, or that the abnormal results acknowledged.  It appears that no action was taken following the February 1, 2012 CT scan, which recommended liver biopsy.  ADC214615.

18.     This CT scan finding in a patient with known cirrhosis is highly suggestive for liver cancer and merited expedited workup and treatment (with an MRI as recommended and referral to an oncologist or hepatologist for treatment of the likely cancer).  In addition, given that he was noted to have cirrhosis with esophageal varices, ███████████ should have been put on propranolol prophylaxis to prevent esophageal variceal bleeding.  (Varices are enlarged veins around the esophagus, commonly seen in persons with cirrhosis of the liver. They are fragile, and are easily torn causing life threatening bleeding.  Preventive treatment with propranolol, or other beta blocker medication, is indicated.  See November 2013 Cohen Report at 52.)  There is no record that this occurred.   In addition, all patients with cirrhosis due to hepatitis C should

receive a right upper quadrant (RUQ) ultrasound every 6 months to screen for liver

cancer, and possibly an alpha-fetoprotein (AFP) blood test. Since no records are

available prior to 2012, it is unclear if ███████ received any of this chronic care for

his cirrhosis.  If an AFP blood test had been ordered and the results reviewed in January

2012, it is possible that his liver cancer would have been identified at an early stage, prior

to its metastasis.

19.    On 6/6/12, ███████ was seen for a chronic care visit by a nurse

practitioner who documented that he "claims he was diagnosed with liver cancer

metastatic to the lung." Dr. Catsaros reviewed this note and ordered a chest x-ray.

ADC214696. The x-ray was negative. Again, most physicians would be highly concerned

about this history and obtain all of ███████ records and refer him for immediate

workup and treatment. There is no record that this happened.

20.    ███████ filed a Health Needs Request (HNR) on 6/8/12 stating that he

was still in a lot of pain from his liver cancer. He was put on naprosyn and placed on

nurse's line for 6/9/12.  ADC214646. Again, no action was taken re: his liver cancer, and

per the notes, it appears that perhaps providers did not believe his reported history.

21.    ███████ was not seen until 6/21/12, at which time he was referred to

the provider for pain management and his history of liver cancer. ADC214696.

22.    On 6/27/12, ███████ submitted an HNR stating that "When I used the

bathroom on 6/26/12, there was a lot of blood, most of it was dark in my stool. There is

pain from my liver due to the cancer all the time. Some days better than others. There

was no pain from my bowels at that time. I will let you know if it happens again."

ADC214645.  It appears that this HNR was not reviewed until 7/3/12 at which time he

was seen by nurse Brian Staples  (ADC214696), who documented that the patient

complained of blood in his stool and liver pain.  The nurse documented normal vital

signs, a soft stomach and RUQ pain and gave ██████████ supplies to do 3 fecal occult

blood tests (which came back negative later that day—this is not helpful though, given

that the patient reported frank blood earlier) and again, referred him to the provider

(second request since 6/21/12; he was scheduled for 7/16/12).  ADC214695.  This is

completely inappropriate.  Melena (dark blood in the stool) is usually a sign of upper

gastrointestinal bleeding and should always be evaluated emergently.  In patients with

known cirrhosis, the most likely cause is from esophageal variceal bleeding.  ████

████ was known to have esophageal varices from his December 2011 CT scan. Even

if this was not known, most providers would have referred him to the emergency room

because even though his vital signs were stable at the time of evaluation, patients with

esophageal variceal bleeding are at high risk for acute decompensation and death. At

minimum, the nurse should have called a physician on call to describe the situation, and

determine if further referral was necessary. In addition, he definitely should have been

started on propranolol for bleeding prophylaxis if his vital signs were stable.  It is

fortunate that ██████████ did not have further bleeding at that time, which could have

caused death.

    23.    On 7/16/12, ██████████ was finally seen by a physician, Dr. Catsaros.

ADC214692.  Dr. Catsaros documented stable vital signs and appropriately referred him

for a liver biopsy of the mass (urgent referral: ADC214809) and gave him Tylenol #3 for

pain.  While this is appropriate, he should also have ordered basic labs, an AFP to help with his cancer workup, and propranolol prophylaxis for his esophageal varices.  He should have determined his hepatitis A and B status and provided hepatitis immunization if needed. None of this appears to have been addressed.

24.     On 7/31/12, ███████████ filed another HNR complaining of pain. ADC214641.  He was seen by a nurse on 8/6/12 (ADC214689) who noted that the Tylenol #3 ordered by Dr. Catsaros was not on formulary and the prescription had been returned on 7/25/12 with a non-formulary drug request form which had been filled out. No one had filled this out, so since 7/16/12, ███████████ had continued to suffer in pain. He was appropriately given vicodin for 7 days.

25.     On 8/6/12, ███████████ was seen again by Dr. Catsaros for chronic care for Hepatitis C and liver cancer.  ADC214697.  He added lisinopril for ███████████ elevated blood pressure, but again, did not start propranolol or obtain any labs.

26.     A liver biopsy performed on 8/8/12 revealed a poorly differentiated adenocarcinoma.  ADC214811.  ███████████ was seen by Dr. Catsaros on 8/27/12 (ADC214688) and appropriately referred to an oncologist for consultation and treatment. ADC214804.   This urgent referral was ignored.

27.     He was seen again by Dr. Catsaros on 9/6/12 for a chronic care visit where again, none of the cirrhosis chronic care measures described previously were done, and the plan was "refer to oncology."  ADC214687.  Dr. Catsaros wrote a progress note on 9/6/12 stating "We have not heard yet from oncology." ADC214686. At this point, ███████ ███████ has had untreated known liver cancer since at least December 2011. Most

10

physicians would have followed up with the referral coordinator to obtain an urgent oncology consult. This was not done.

28.     On 10/17/12, ███████ filed another HNR stating, "I need to see an oncologist for cancer of the liver. I need my liver cancer taken care of. It has been too long!!" ADC214958.

29.     Three and a half weeks passed before ███████ was seen, not in response to the HNR, but for a new complaint.   On 11/10/12, ███████ was seen by an RN, complaining of lightheadedness and dizziness since the previous day. ADC214683. The nurse documented mild orthostasis (i.e., decline of blood of blood pressure when standing up), noting that ███████ "loses balance upon standing".  He was simply counseled to not change positions too frequently and scheduled for the provider line on 11/15/12. This is completely inappropriate. First, the nurse did not address any of ███████ HNR request—there is no mention of why he still had not seen oncology, despite an urgent referral that was submitted on 8/27/12, more than two months earlier. Secondly, dizziness and lightheadedness in a patient with known cirrhosis and liver cancer could be a sign of internal bleeding and severe anemia. ███████ should have been seen immediately by a physician, assessed for the need for IV fluids, had a blood count checked, and possibly even have been referred to the emergency room. None of this was done, again, reflecting very poor medical knowledge and triaging systems amongst the nursing staff.

30.     On 11/12/12, Dr. DeGuzman wrote a second referral to oncology for evaluation and treatment of ████████ hepatic adenocarcinoma.  ADC214786.  This referral was also ignored.

31.     On 11/27/12, ████████ was seen by Dr. DeGuzman (his first visit with a physician since 9/6/12, which is highly inappropriate given his untreated liver cancer). Dr. DeGuzman wrote a third oncology consult, marked urgent, and ordered basic laboratory tests and 60-day follow-up. He did not start ████████ on propranolol or obtain an AFP as described above.  ADC214684.

32.     On 12/5/12, ████████ filed another HNR requesting "I would like to see the doc about my liver cancer and the lack of doing something about it. It has been almost a year and nothing has been done! You guys have not been able to keep my pain meds together once I got them ordered and that took 7 months."  ADC214957.  The response by the nurse to this HNR was 'see medical provider 12/10/12', however, there is no indication that ████████ was actually seen by the physician on this date—only that his chart was reviewed. This again points to poor systems of follow-up care, especially for urgent cases.

33.     On 12/10/12, Dr. Catsaros reviewed the record and noted that ████████ had still not seen an oncologist (despite referrals submitted on 8/27/12 and 11/12/12). ADC214681.  He appropriately submitted another urgent oncology referral noting that this was the third referral (it was actually the fourth).  ADC214699.  However, no other attempts were made to expedite the oncology appointment. Clearly, the mechanisms for outside referrals and follow-up are severely broken in this system.

34.    Given that the three previous referrals (made almost 4 months previously) were completely ignored, in a patient with documented cancer, most physicians would not have simply written another referral. They would have contacted the referral coordinator or even considered sending the patient to the hospital to be admitted for treatment if there were no other options. None of this was done.

35.    On 12/20/12, ████████ had lab tests done, which, not surprisingly revealed abnormal liver function tests. Again, no AFP was ordered. ADC214819. A nurse practitioner was contacted on 12/26/12 regarding these lab results, and ████████ was seen by a nurse. ADC214679. He reported pain and fatigue. There is no mention at all of his oncology follow-up or cancer.

36.    On 12/31/12, ████████ was seen by Dr. Moyse who documented continued pain, renewed his vicodin and simply wrote "follow-up with oncology consult." ADC214677. Given ████████ cancer, which was detected ONE YEAR earlier on CT scan, it is horrifying that he has still not seen an oncologist despite numerous requests by the treating doctor. Most physicians would have taken further action as described previously. In addition, his pain is clearly inadequately controlled on vicodin, and it is extremely likely that his cancer has progressed since his last imaging— most physicians would have started him on a stronger pain medication and obtained repeat imaging.

37.    On 1/28/13, an emergency was called by prison guards for severe abdominal pain. ADC214674. ████████ was found to have guarding of his right upper quadrant, although normal vital signs. He was evaluated by Dr. Moyse and the plan

13

was simply to give him intramuscular pain medications until his scheduled visit with the oncologist later that week. Again, this is inappropriate. Although ███████████ had stable vital signs, as noted above, acute abdominal pain in a patient with liver cancer raises concerns of possible hemorrhage or other complications. At minimum, he should have had an urgent RUQ ultrasound and laboratory tests, or been referred to the ER. After this episode of worsened pain, ███████████ was finally switched from vicodin to morphine 15mg twice daily.  ADC214672.

38.     On 1/31/13, more than one year after his initial CT scan showing liver cancer and more than 5 months after his oncology referral, ███████████ was finally seen by Dr. Gopal at 21st Century Oncology.  The oncologist reviewed the CT scan from February 2012 and the biopsy results and noted that the pathology from the liver biopsy showed poorly differentiated adenocarcinoma. The oncologist recommended getting a repeat CT scan of the chest/abdomen/pelvis and tumor markers to determine if this truly was liver cancer versus metastatic cancer from some other source.  ADC214748, ADC218784.

39.     On 2/1/13 (and again 2/14/13), Dr. Moyse noted the recommendations described above from 21st Century Oncology.  ADC214784. Follow-up was initially scheduled for 2/7/14, and then 2/21/14, but each of these dates was crossed out for unclear reasons.  See ADC214784.

40.     On 2/17/13, ███████████ submitted an HNR complaining that his pain medications were not working.  ADC214952.

41.     On 2/19/13, Dr. Moyse ordered the requested lab tests again.  On 2/20/13, ███████████ finally had his labs done which revealed a markedly elevated AFP of 5248, confirming a diagnosis of hepatocellular carcinoma. ADC214818.

42.     On 2/25/13, Dr. Moyse reviewed ███████████ chart and documented that ███████████ still needed the CT scan of his neck/chest/abdomen/pelvis for staging and to rule out metastases (ADC214673) and filed a referral.  ADC214785. This was an additional three week delay after the oncologists' recommendation from 2/1/13.

43.     On 2/28/13, a nurse finally responded to ███████████ 2/17/13 HNR for additional pain medications, noting that he had also lost 9 lbs in 2 months and had constant pain due to cancer. He was appropriately referred to the provider for an increase in pain medications, but there are no records to indicate he was seen in response. ADC214673

44.     On 3/4/13, ███████████ finally had his CT scans done (more than 1 month after oncology recommended them) which unfortunately showed a 2x2x2.1cm necrotic mass in his L neck consistent with metastatic liver cancer as well as numerous lung masses and lymph nodes, and multiple liver masses with portal venous thrombosis. ADC214790, ADC214799.  In short, his malignancy was widely metastatic, beyond cure, as a direct result of the numerous delays he faced in workup and oncology referral. Surgical resection of isolated hepatocellular cancer lesions in the liver can be curative. Had he been offered treatment when his mass was first identified (2.8cm in December 2011),   he might have been cured of his cancer.

45.     On March 4, 2013, Corizon assumed responsibility for ███████████ care.

15

46.     On 3/5/13, Dr. Moyse reviewed the chart and requested urgent oncology follow-up.  ADC214673, ADC214803. Unfortunately, similar to previous episodes, it does not appear that oncology follow-up was ever scheduled or that ████████ ever saw 21st Century Oncology again. It also appears that no one gave ████████ the results of his CT scan until one month later, which is unethical.

47.     On 3/7/13, ████████ filed another HNR requesting follow-up on his request to increase pain medications to which he received a response over 10 days later (on 3/18/13) that simply said "no increase at this time per MD."  ADC214950.  Given ████████ CT scan findings of widely metastatic cancer, it is shocking that any physician would deny such a patient increased pain medications, prolonging their suffering. On 3/15/13, ████████ filed an HNR requesting an increase in pain medication from morphine 15mg twice daily to morphine 30mg twice daily. ADC214949.

48.     On 3/25/13, ████████ morphine was increased to 30mg twice daily. ADC214670.

49.     Also on 3/25/13, Director Charles Ryan denied ████████ Grievance Appeal seeking adequate pain management and timely treatment of his disease.  In the denial, Mr. Ryan recounted part of ████████ treatment history, including that he had returned to ADC custody on 2/7/12, and was referred for a liver biopsy five months later. The denial further stated that ████████ was referred to an oncologist in August 2012, and was not seen until 1/31/13.   Mr. Ryan advised ████████ to continue to follow the recommendations of ADC medical staff and to advise them immediately regarding pain

16

issues, and to submit an HNR regarding "additional medical concerns or needs."  PLTF-
PARSONS-032037.

50.    Two days later, on 3/27/13, ███████████ filed another HNR requesting to
be seen by a doctor as soon as possible. ADC214946. He was placed on the nurse's line,
but never seen.

51.    On 4/7/13, ███████████ filed another HNR stating, "I Just got my answer
back from Mr. C. Ryan that my cancer has metastasized that was an answer from 1.5
years ago! To what extend have the cells divided? How much time do I have left?"
ADC214945.

52.    On 4/8/13, he was finally seen by a physician who noted that ███████████
now had swelling of his abdomen (ascites) and swelling (edema) of his lower extremities.
ADC214667. There is no mention of his oncology follow up appointment, prognosis or
advance directive, which should have been addressed.

53.    On 5/2/13, ███████████ was seen by a nurse and noted to be was retaining
large amounts of fluid.  ADC214665.  He was appropriately sent to the University
Physicians Hospital Emergency Department, where he was hospitalized from 5/3-5/6/13.
The hospital summary clearly documents that ███████████ has metastatic liver cancer
and had received no treatment for the past 1.5 years.  ADC214751. The note also
documents that they discussed his cancer with him and that he "wants to go back to his
unit, not hospice." ADC214758.

54.    ███████████ returned to the ADC and was scheduled for the provider line
on 5/7/13 to review his medications—but was apparently not actually seen on that day.

17

There are no further provider notes until ███████████ repeat hospitalization at UPH

from 5/25/13-5/28/13. It is unclear who referred him to UPH on 5/25/13, if anyone

evaluated him in between these visits to determine a plan of care, or to follow-up with

oncology.

55.    During this hospitalization (ADC214702), ███████████ was found to have

altered mental status and interview of the guards who accompanied him revealed that "he

has been altered for the past few days."  ADC214727.  He was treated for elevated

calcium.  The hospital staff recommended palliative care with hospice.

56.    On 5/29/13, ███████████ was evaluated by a nurse upon his return to

prison and sent to the acute medical unit because he was too weak to be on the yard.

ADC214664.

57.    On 5/30/13, Dr. Moyse saw him and determined that he was 'clinically

dying' and didn't seem to understand what was going on.  ADC214663.  He was

continued on pain management, with palliative intent. On 5/31/13, he was sent to the

University Medical Center South Emergency Department when he was found by nursing

staff to be unresponsive.  ADC214659.  No further records are available, but this is where

he presumably passed away on ██████.

58.    ███████████ cause of death was hepatocellular carcinoma that was left

untreated for over 1.5 years and was certainly treatable, and possibly curable, if he had

received treatment at diagnosis.  His care was continuously abysmal.  He was denied

basic diagnostic testing.  He submitted repeated requests for treatment and was ignored.

Indeed, he was never provided with any treatment for a treatable disease.  Instead, his

cancer was allowed to metastasize. On frequent occasions, including the three months

prior to his death, from ████████████████████████ after the extent of his

metastatic cancer was well known, his requests for pain relief were ignored, and he was

allowed to remain in severe pain, without benefit of medical examination or treatment.

No diagnosis, no treatment, preventable deterioration, preventable death, and failure to

treat severe cancer pain comprised ██████████ appalling experience with ADC health

care.  The neglec ██████████ endured during the last 18 months of his life amply

illustrates the overwhelming dysfunction in the ADC's sick call, diagnostic testing,

specialty referral and poor training/supervision of clinicians.

     59.    The case of ████████████████ is likewise shocking.  ██████████

died of untreated Hodgkin's lymphoma on ██████, about a month after the Corizon

takeover, at age 38.  This is a shocking death because, as the ADC's mortality review

acknowledges, this young man's death was entirely avoidable.

     60.    His mortality review correctly identifies a 3+ month delay between ████

██████ lymph node biopsy results which showed Hodgkin's lymphoma and the time

that ADC providers reviewed these results and referred him for treatment.  ADC211650-

652.  However, the review fails to identify any of the delays that occurred after ████

was referred for oncology treatment in February 2013, including failure to obtain

appropriate diagnostic tests as recommended by oncology, and failure to have port placed

for administration of chemotherapy immediately as ordered.  Because no port was placed,

██████████ died without ever having received a single dose of chemotherapy.  Given that

cure rates for Hodgkin's lymphoma can be as high as 84%, the fact that ███████ died at age 38 without even being given treatment for his (likely curable) cancer is a tragedy.

61.      ███████ was a previously healthy male with no chronic conditions who first filed an HNR on 10/27/12 complaining of painful lumps on his neck.  ADC214094. Dr. Joseph Moyse saw him two days later, noted a rapidly enlarging neck mass in his L-sided lymphatic chain, concluded that he needed to be assessed  for Hodgkin's lymphoma and referred him for a CT of the neck.  ADC214017,  ADC214037.   Utilization review, however, denied this request and recommended a biopsy instead.   ADC214036.  On 10/29/12, ███████ was evaluated by Dr. DeGuzman who agreed that the mass was suspicious for Hodgkin's lymphoma and recommended a biopsy and CT scan, chest x-ray and a complete blood count for work-up.  ADC214016. The biopsy was performed on 10/31/12.  ADC 214015.

62.      ███████ 11/1/12 lab tests showed a markedly lower hemoglobin compared to his 2010 baseline (ADC214050 and ADC214053), which is suggestive of severe underlying disease. Both of these results were noted by Dr. Moyse on 11/19/12. His chest x-ray done on 11/6/12 showed no masses, but a CT chest scan was recommended by radiology.  ADC214048.  I found no CT results in his record.

63.      The 10/31/12 biopsy reports should have been reviewed expeditiously, so that treatment could be provided.  Instead, they were not obtained and reviewed until 2/8/13, over three months later.

64.      On 11/14/12, Dr. Moyse reviewed an 11/3/12 report from LabCorp, stating that the pathology from the lymph node biopsy was forwarded to UCLA for further

review.  ADC214049, ADC214015. Dr. Moyse reviewed ███████ medical record on 11/19/12, noting the negative chest x-ray and that they were waiting for biopsy results from UCLA before proceeding with the CT of the neck.  ADC214014. He wrote a similar note in the chart on 11/26/12, "Still waiting for result of biopsy from UCLA." ADC214014. After this, there are no follow-up notes until February, 2013.  The failure of ███████ physicians to follow up on the missing report for over two months, despite signs that he suffered from Hodgkin's lymphoma suggests a critical lack of tracking systems, and a failure to recognize a patient requiring time sensitive therapy for a life-threatening illness.  Had ADC obtained these results, ███████ care would have been drastically altered, and he would likely be alive today.

65.     When Dr. Kevin Lewis finally reviewed the pathology report on 2/8/13 (ADC214013), he noted the diagnosis of Hodgkin's lymphoma and submitted an urgent consult for oncology (ADC214034), a CT of the chest/abdomen/pelvis for staging and basic laboratory tests, and e-mailed the clinical coordinator for urgent approval and scheduling of both consults.  ADC214013.  He also ordered the patient to be seen on the provider line in 2 weeks for a status update.  *Id.*  I found no records documenting this follow-up visit, again demonstrating failed tracking systems and a disturbingly casual response to a a life or death situation.

66.     ███████ laboratory tests done on 2/14/13 revealed a low albumin of 2.7, an elevated alkaline phosphatase of 273 (both abnormal liver function tests) and a hemoglobin of 9.3 (low red blood cells, consistent with significant anemia) (ADC214044-ADC214045)—markedly worsened compared to his previous labs done in

November 2012 and reflecting a worse stage of Hodgkin's lymphoma than what he likely had at the time of the biopsy. Dr. Moyse reviewed these labs and scheduled provider line follow-up 1 month after his oncology appointment. ADC214012

67.     The CT of the chest, abdomen and pelvis was done on 2/21/13, two weeks after the original request, however I was unable to find results in the chart.  There are also numerous medical records that are missing from ███████ oncology provider, 21st Century Oncology.

68.     On 2/27/13, three weeks after the referral, ███████ was seen by the oncologist (ADC214012), however the evaluation note is missing from the medical record. The physician order sheet from the oncology group recommended port placement ASAP for chemotherapy, an echocardiogram to determine ejection fraction (which would affect the choice of chemotherapy agents), and scheduled the patient for a bone marrow biopsy on March 5th.  ADC214031.  The oncologist also ordered a follow-up clinic visit on March 21st.  *Id.*  These orders were all noted by Dr. Moyse who submitted consults for the port placement and echocardiogram.  ADC214012, ADC214032 and ADC214033.

69.     ███████ appears to have been seen by 21st Century Oncology on 2/28/13, however, again, no note is available.   The recommendations from that visit are to obtain pulmonary function tests (PFT's) as soon as possible and then every two months while the patient is on chemotherapy.  . ADC214028. Again, it is unclear what was actually done at this visit since there are no notes—but there is no evidence that ███ ███ ever had the intravenous port for chemotherapy placed, received chemotherapy,

nor had the bone marrow biopsy.  It does not appear that anyone at the ADC actually reviewed these notes, or that PFTs were ordered, again pointing to poor systems of follow-up.

70.     On March 4, 2013, Corizon assumed responsibility for ██████████ medical care.

71.     On 3/4/13 ██████████ again had a visit at 21st Century Oncologists, for which, again, no notes are available. The order sheet only documents that the consultant wanted weekly labs and that chemotherapy would be delivered bi-weekly on March 7th, 21st, April 4th and April 18th.  ADC214027.  According to this note, ██████████ should have already had his port placement done as previously ordered on 2/27/13 and also have received 4 rounds of chemotherapy by April 18th. Had these orders actually been carried out, it is very likely that ██████████ would not have died on ██████████   None of these orders appear to have been noted or carried out by ADC providers—again, pointing to a highly disorganized system of carrying out consultant orders and providing follow-up care which is particularly disastrous in cases such as this which require great urgency.

72.     There is no evidence available in the medical record that ██████████ went to his appointment on March 5th at 11am for a bone marrow biopsy as scheduled by 21st Century Oncology, nor is there any indication why this appointment was not kept.

73.     On 3/22/13, ██████████ filed an HNR that read, "I was informed that I have Cancer and would be receiving chemotherapy, it's been months yet they have not started my treatments. Prior to that I went for test, all this has been going on for over 6 months." "I need medical attention, time is of [the] essence."  ADC214008. The HNR clearly

outlines the chemotherapy regimen, port placement and diagnostic testing he was supposed to receive (but had not), suggesting that none of the 21st Century Oncology orders were carried out. He still had not received port placement, which was ordered "ASAP" almost a month earlier on 2/27/13. Of note, this HNR was written on an inmate grievance (letter) form, because no HNR forms were available to ████████ *Id.*

74.     Perhaps in response to this HNR, a nurse on 3/24/13 documented that she or he had placed a call on the status of the chemotherapy. ADC214012.  There was no documented response. ████████ 3/22/13 HNR should have generated an immediate and aggressive response by Corizon utilization/referral management staff to arrange for immediate placement of his port and whatever testing was required prior to initiation of chemotherapy.  Instead, they apparently did nothing.

75.     Instead, ████████ was scheduled for insertion of a peripheral access port(for administration of  cancer chemotherapy) on ██████ by which date, according to 21st Century Oncology's orders, he should have already received 4 chemotherapy treatments.  He had received none. ████████ initially refused his appointment stating he was "tired" and was noted by nursing staff to look very different compared to his baseline – he had lost a lot of weight.  He didn't appear well, and when the nurse measured his oxygen saturation it was low, at 92% (normal oxygen saturation is greater than 95%). Instead of referring him for clinical evaluation by a physician , she referred him to mental health.  ADC214012.

76.     At this point, in light of his significant hypoxia, anemia severe fatigue, untreated cancer, ██████████ physician should have considered a referral to an emergency room or direct admission to the hospital.  This did not happen.

77.     Instead he was returned to his cell where he died later that afternoon.

78.     ██████████ died due to untreated Hodgkin's lymphoma.  His death was preventable.  He died of neglect.   He found his own cancer and requested diagnosis and treatment on October 22, 2012.  Hodgkin's disease is a cancer which usually responds to therapy and  is usually curable.  The clinical failures that led to ██████████ death were not isolated unusual errors.  They were systematic.  Medical care for prisoners require a system in which access to specialty consultation, diagnostic and therapeutic procedures occurs in a timely manner.  Each of these systems failed.  Six months later, ██████████ ██████ died, without ever having received treatment.  He was 38 years old.

79.     ██████████, died in hospital at age 54 of previously undiscovered adenocarcinoma of the lung.  ADC211705.  He was housed in an infirmary unit at ASPC-Florence until shortly before his death.

80.     ██████████ suffered from multiple serious chronic illnesses, including diabetes, hypertension, chronic obstructive pulmonary disease, coronary disease, hypothyroidism, and schizophrenia.  ADC219546.  ██████████ had received seven cardiac stents, sustained three heart attacks, and experienced reversible ischemic events affecting his brain.  He was not a well man.  ADC219372 In late 2012, his condition deteriorated dramatically when he was hospitalized with chest pain, for which he apparently underwent a cardiac catheterization.  ADC219945, ADC219948.

25

81.     During the succeeding six weeks, ███████ had multiple hospital visits and admissions.   ADC219908 (12/25/12 – abdominal pain); ADC219836  (1/5/13 – hematuria);  ADC219866 (1/13/13 – chest pain); ADC219765 (1/19/13 –blood in his urine); ADC219781 (1/23/13 – chest pain);  ADC219793 (1/24/13 – chest pain);ADC219938 (1/28/13 - slurred speech and possible stroke).

82.     In February, ███████ health further deteriorated and he fell on several occasions:  ADC219544 (2/8/13 – fell out of bed); ADC219543 (2/27/13 – fell in shower).

83.     On 2/19/13, he reported chest pains to a nurse and stated that he had not received all of his medications.  ADC219544.  The nurse obtained vital signs, but did not refer him for a physician appointment.  He did have an EKG, which was normal.

84.     On 3/26/13, ███████ reported that he was unable to move.  ADC219539.  It appears he may have been seen by a provider, who wrote "neuro reflex excellent."  There is no documentation of what type of exam was performed.  *Id.*

85.     On 4/11/13, he was returned to the hospital with chest pains and high blood pressure (180/88).  ADC219424.

86.     On 4/24/13, he again reported chest pains in the evening.  ADC219425.  The nurse consulted the on-call physician, who prescribed a narcotic pain reliever.  *Id.* He was returned to his infirmary bed around midnight the same night. There is no indication that ███████ was seen by a physician to follow up on this episode.

87.     On 4/28/13, he fell out of his bed and complained of chest pain.  ADC219423.  There is no indication that a physician saw him after this episode.

88.     On 5/2/13 he was found unresponsive on the floor of his room.  On 5/3/13 he was sent to Florence Hospital and admitted.  He was found to be profoundly anemic, with a hemoglobin of 8.3 gms/Dl (normal hemoglobin 13.8-17.2 gms/DL) and an altered mental state.  He received a blood transfusion of two units.  He returned from Florence Hospital at Anthem on 5/4/13.  The discharge summary was not reviewed by the medical staff at the prison until four days later, on 5/8/13.  There is no mention in the medical record of his anemia, or of the fact that he received a transfusion..  ADC219405-ADC219409   The profound anemia was probably the reason why he fell on the two prior occasions.

89.     On 5/5/13 at 0330, within 10 hours of his return from Florence Hospital, he complained of burning in his stomach.  He had not been seen by a provider since he returned from the hospital. His blood pressure was 205/103, and his pulse was 113, both extremely abnormal, but he was not examined by a licensed provider.  Dr. Vukcevic was contacted by phone and prescribed pain medication and ranitidine for abdominal pain.  An appointment in the prison medical clinic was scheduled for 5/8/13.  ADC219403

90.     At 0900 on 5/5/13, five hours later, ███████ was brought to the yard medical clinic by correctional staff, who stated that he was complaining of chest pain.  The nursing staff wrote: "I/M denies chest pain, states his complaint was abdominal pain."  He was not examined by a physician or other licensed provider.  Dr. Vukcevic was called again and ordered an antibiotic and clonidine, for treatment of uncontrolled hypertension.  An EKG was also obtained "for MD evaluation the next day," 5/6/2013.  There was no evaluation of ██████ on 5/6/13 or 5/7/13.  ADC219402.

27

91.     On 5/8/13 ███████ was initially noted to be slurring words and

unresponsive.  He had his "tongue rolled in mouth mumbling and slurring speech."  He

complained of back pain with a severity of 10/10.   His blood pressure was measured at

201/89 , dangerously elevated, placing ████████ at great risk for a stroke or another heart

attack.  His pulse was also significantly elevated at 115/minute.  ADC219401,

ADC219402.

92.      Despite these grossly abnormal vital signs, RB, the physician's assistant

wrote VSS (vital signs stable).    Parenthetically he noted "(BP was elevated mildly)."

The physician's assistant evaluated the patient and during the course of his evaluation

described the patient as initially slurring his words, but by the end of the examination, no

longer slurring.    The PA prescribed pain medication, but indicated that he also believed

that ████████ was being manipulative.  No EKG was ordered and no EKG from 5/5/13

was reviewed.  ADC219401.

93.     The nurses in his unit believed that ████████ was faking his symptoms and

did not provide him with the care he required.  On 5/10/13 a nurse wrote in the chart that

████████ had not been showering and that pills were found in his bed.  The nurse wrote

"i/m is malingering and continuing manipulative behavior."  ADC219398.

94.     On 5/12/13, ████████ complained of shortness of breath: "I can't catch my

breath."  His oxygenation was very low at 91% and he was breathing rapidly, at 21 per

minute.  He was not examined by a provider, but Dr. Vukcevic was called and prescribed

an albuterol inhaler.   Sometime later the same day, ████████ fell and was found

unresponsive.  When he came to, he complained of pain.  He was breathing rapidly at 24

per minute, and his pulse was rapid at 102/minute. No provider examined ████ after

his fall, no EKG was obtained, and no laboratory studies were ordered.  ADC219399.

95.    On 5/15/13 ████ complained that he was short of breath, wheezing,

feeling dizzy, and had back pain.  He was noted to have urinated in his bed the previous

night, and it was noted in the medical record "CO's also confirm that IM is NOT [caps in

original] getting out of bed much and is demanding people do things for him."  Vital

signs on this date were extremely abnormal.  The BP was 184/97, pulse was very

elevated at 111, respirations were elevated at 20/minute and oxygen saturation was

significantly decreased at 90%.  Additionally, physical examination revealed rales

(sounds consistent with pneumonia) on both sides of the lung when inhaling and

exhaling.  ████ was given a nebulizer treatment but ████ did not feel there was

any improvement in his breathing.  No EKG was obtained.  A chest x-ray was ordered,

but was never obtained.  The provider's note concludes:  "Increase fluids, Increase

walking.  DO NOT [emphasis in original] allow patient to lay in bed indefinitely!  Must

walk to get anything he needs! Discussed urination issue and he admits he has been lazy

with his personal ADL (Activities of Daily Living) care (urinating, hygiene [sp], etc.)"

ADC219396.

96.    On 5/16/13 a nurse wrote:  "continue to monitor for malingering

behavior."  ADC219397.

97.    On 5/17/13 at 0030, ████ requested emergency medical attention

stating "I can't breathe."  The LPN's response was: "IM (inmate) constantly initiates

attention seeking behavior.  Always signaling nurse 'come here' and will repeat the same

29

exagerated [sp] comment time and time again of the topic we covered the previous 5 minutes before.  …. Previously stated 'I can't walk.' Inmate walked fine in front of security and medical staff, sat in his wheel chair." Plan: "Educate i/m to stop playing games, stopping seeking attention."  ADC219395.

98.      On 5/23/13 at 1700 ███████ complained of coughing up yellow phlegm and being short of breath for three days.  "Sats (oxygen saturation) decreased 82% RA." The "8" is than crossed out and replaced with a "9."  Oxygen saturations in the previous weeks and been from 90% to 94%; 92% would not have represented a decrease, but 82% would have been a significant decrease.  The on-call provider was contacted, who recommended checking blood sugar and oxygen saturation every 30 minutes.  The only other oxygen saturation measured, at 1800, also showed "82%" which was again rewritten with the "8" crossed out and replaced by a "9." ██████ was then sent back to his room. ADC219395

99.      No follow-up was scheduled.  On 5/27/13, just after midnight, ██████ again requested emergency care, stating "I can't breathe."  His oxygen saturation was measured at 83-85%, dangerously low.  He was breathing rapidly, at 32 respirations per minute, twice the normal respiratory rate.  His pulse was 114/minute and his blood pressure was elevated to 184/78.  He was very ill and unable to breathe.  Remarkably, and disturbing, the provider on call, rather than send ██████ out for emergency evaluation and treatment,  elected to treat ██████ with oral prednisone and oral antibiotics.  He also ordered nebulizer treatments.  The on-call provider requested that ██████ be seen that morning.  ██████ was sent back to his housing unit.  ADC219394.

30

100.    Later that morning at 06:30, ███████ again requested emergency care.  He complained of shortness of breath and inability to sit or stand.  He complained of coughing up blood, and said he hadn't eaten in days.   Dr. Vukcevic was called and told the nursing to staff to give ███████ more oxygen, and to send him via transportation with the ADC van to Florence Anthem hospital.   ADC219393

101.    ███████ was sent to the hospital, where it was discovered he had previously undiagnosed stage IV terminal cancer.  ADC219393.

102.    ███████ had multiple life threatening medical conditions, which were well documented.  He had sustained multiple heart attacks and had seven stents.  He had unstable angina, with recurrent severe chest pain.  He had recurrent transient ischemic attacks -- brief duration reversible episodes of  neurological symptoms, including slurring of speech.  He was chronically short of breath.  He had metastatic lung cancer that was undiagnosed.  During the last month of his life in the ASPC-Florence, he was constantly accused of lying about his medical condition, and criticized for inactivity.   When he was emergently hospitalized after several falls and episodes of loss of consciousness which were found to be due to profound anemia, on his return  he was criticized and chastised for inactivity.  He spent the last two weeks at ASPC Florence with severe chest pain and difficulty breathing, while provider staff ignored him and nursing staff humiliated him and accused him of exaggerating his symptoms.  Two weeks later, on ███████ he died from Stage IV lung cancer.

103.    Even in retrospect, in preparation of their mortality review, Corizon staff and Dr. Robertson did not identify the following item on their checklist:  "Failure to

31

communicate effectively with patient," as a contributing factor to his death.
ADC211704.  Based on their review, they had no recommendations for change regarding
policy, procedure, or education.  Corizon's abandonment of ███████ as he lay dying
requires education, new policies, and supervision.  Medical staff consistently failed to
provide him with access to care for chest pain and shortness of breath.  It did not happen
once, or twice.  Time after time he sought care and was denied access to relief for his
shortness of breath, for his pain, and for his underlying complicated medical illness.  His
severe anemia was ignored, and he was allowed to continue to fall, and forced to walk
alone when he was severely disabled by his illness and required assistance  The mortality
review of ███████ should be redone to reflect necessary changes in practice for treatment
of patients with severe chronic disease.    ADC211707.

104.    ███████████ was another young cancer victim.  He died at age 37 of
familial colorectal cancer on ██████ at ASPC-Tucson.   At the time of his death, he also
suffered from Hepatitis C and peripheral neuropathy due to chemotherapy.  The records I
was provided begin on 9/24/12.  According to an oncology note dated 10/26/12, ██████
████████ was first diagnosed with rectal cancer in December 2011.  ADC221288.  He
had a biopsy in December of 2011 which showed adenocarcinoma, moderately to poorly
differentiated  with perineural invasion.  A CT of the abdomen and pelvis showed
possible liver metastases.  He got 12 doses of FOLFOX chemotherapy.  *Id.*

105.    He was seen on 11/7/12 by colorectal surgery to review the CT scan results,
(ADC221290) and then on 11/26/12 by his oncologist.  ADC221282.  His oncologist,
however, did not have documentation of his CT scan.  The oncologist noted that they

wanted to see the patient in 3 months, and to consider second line chemo.  ADC221282.
The corresponding physician order, however, changed the follow up visit to 4 months
out.  ADC221291.  This delay is excessive for a patient with advanced stage cancer.

106.    On 12/4/12, a PET scan was ordered for ███████████ but he did not
undergo the test until almost two months later.  When finally available, the 2/1/13 PET
scan results showed very advanced disease – liver metastases, bony metastases and
probable lung nodules.  ADC221410.  He subsequently underwent two rounds of
chemotherapy.  ADC221267.

107.    On 3/15/13, ███████████ potassium was critically high at 6.2.  There
was one day delay in treatment notification to ███████████ doctor, and no EKG was
performed to determine if there was cardiac toxicity from the elevated potassium.  ████
███████ received treatment with  furosemide.  His physician appropriately ordered
further labs, but failed to order an EKG, as should have been done to assess whether there
was any adverse effects on his heart being caused by the elevated potassium.
ADC221265, ADC221266 and ADC221312.

108.    ███████████ began to complain of back pain and leg weakness on
4/6/13. He was found to have a fever of 101.2, and  the prison physician sent him to the
hospital to rule out neutropenic fever., often a sign of severe infection caused by
depletion of white blood cells from chemotherapy.   ADC221252. ███████████
received an appropriate work-up, including a chest x-ray, CT scans of the head and spine,
and blood cultures.  ADC221448-ADC221452, ADC221419- ADC221440.  The CT
showed T1 metastasis and a T3 compression fracture.  ADC221439.  An MRI was

recommended to check for spinal cord compression.  *Id.*  The MRI is not available in the medical record.

109.   ██████████ underwent chemotherapy until 7/30/13, when he refused to continue.  ADC221605.  On 8/7/13, his provider wrote to "continue comfort care."  ADC221546.   During this period he had poor pain control.  He wrote an HNR on 8/10/13 saying that he was pain which made it difficult to sleep, and that was losing weight.  ADC221645.  Five days later, without provider evaluation, the nurse wrote back to him that Dr. Thompson had said that he was on the maximum medication for his condition.  *Id.*  Dr. Thompson should have evaluated ██████████ and discussed his request for pain management.

110.   On 9/8/13, ██████████ complained that he felt like he had pneumonia or  respiratory infection.  ADC221644.  He did not see the nurse until 9/12/13, when he was found to have a rapid  heart rate (122 beats per minute).  ADC221539.  Although he was referred to the physician, it appears he was not seen until 9/18/13,  a ten day delay for a dying, sick patient with vital sign abnormalities.  On that date, he again had a rapid heartbeat, and a low oxygen level.  He had lost 45 lbs., and complained of brownish sputum.  ADC 221538.  Dr. Catsaros noted that ██████████ blood had been drawn for labs a month ago, but the results were not yet in the file.  He was found dead by a nurse ██████████ on ██████  ADC221533.

111.   ██████████ had a familial cancer which is very resistant to treatment.  However, treatment of this cancer does relieve pain and extend life.  The PET scan was necessary to determine the response to chemotherapy; the delay of two months is

inexcusable, and delayed necessary treatment.  When ███████████ decided to stop

active cancer treatment, he still required supportive palliative care which was not

provided appropriately or timely.  The systemic problems which plague ADC affected

███████████  Abnormal laboratory tests were lost to follow-up.  There was a two

month delay in getting his PET scan, which delayed further necessary therapy.   When he

was dying, he was repeated denied access to timely effect relief of pain and shortness of

breath.   When a patient is dying, in pain, with a very rapid pulse and is short of breath, a

request for provider assistance should be considered urgent, not delayed for ten days.

███████████ did not have a curable disease.  However, when he lay dying, his

requests for relief of pain and suffering should have been heeded, not ignored.

112.  ███████████ died on ██████ at ASPC-Tucson while receiving palliative

care for glottis (laryngeal) carcinoma and small cell lung cancer with extensive

metastasis.  He was 53 years old.  His care was marked by serious delays and alarming

neglect of his treatment and pain issues.

113.  ███████████ underwent radiation treatment for laryngeal cancer in the spring

of 2012.  Following his final radiation treatment on 4/13/12, it appears he was not seen

again by an oncologist again until 8/29/12.  ADC212912, ADC 212918.  ███████████ began

submitting HNRs complaining of throat pain in early August 2012.  ADC213025.  On

8/9/12, he wrote asking for morphine for his pain related to his throat cancer, and

explaining that the Tylenol that he was given was not effective for his pain.  *Id.*  I found

no physician's progress note documenting a physician appointment in response to this

request, but on the request itself, a physician wrote in response four days later "Dr. Latif

at 21st Century on 4/30/12 states you were non-compliant with treatment and 'no symptomatic treatment was needed.' Therefore, the morphine was discontinued by myself." *Id.* This callous response to a patient with a history of a painful cancer, who had been poorly followed since treatment had ended four months earlier, is shocking, and suggests inadequate training and/or supervision of clinicians.

114.   On 8/17/12, ███████ submitted another HNR, complaining of throat pain that interrupted his sleep. ADC213023. In response, someone wrote "you have a pending appointment with the doctor." *Id.* The patient submitted another HNR on 8/17/12, requesting ice to soothe his throat, explaining that although he drank water frequently, his throat remained dry because he had undergone radiation. ADC213022. The HNR was apparently reviewed on 8/22/12, when someone wrote in response, "Water is fine." *Id.* Based on the records I was provided, it appears that ███████ did not see a physician in response to any of these HNRs.

115.   Dr. Latif, ███████ oncologist, saw him on 8/29/12, and referred him to an Ear Nose and Throat (ENT) specialist to evaluate the patient's vocal cords response to the radiation. ADC212920. ███████ ADC physician, Dr. Bell, apparently did not review the report until a month later, on 9/28/13. *Id.* The ENT consult did not take place for another two months. ADC212948. On 11/26/12, the ENT, Dr. Lee, noted that ███████ complained of constant neck pain that he had had for four months. ADC212947. Dr. Lee wrote that he had not detected recurrence of the cancer by physical exam, and that the laryngoscopic exam was consistent with healing after radiation and

chemotherapy.  *Id*.  He recommended a PET scan to rule out residual disease or recurrence to explain his neck pain.  *Id.*

116.    This PET scan should have been scheduled expeditiously.  It was not.  In fact, it was not scheduled for another eleven weeks.  This is shocking.  On 2/6/13, the scan results showed that ██████ had metastatic cancer.  ADC212943-ADC212944. ██████ continued to submit HNR's complaining of pain, including on 2/11/13, when he wrote, "the cancer in my throat is killing me with pain  I just had a PET[(text says PAP] scan so I know now that you know now this is to be true.  I need antibiotics and pain meds.  The Tylenol I eat like candy and still they do nothing. I need morphine." ADC213018.  In response, someone wrote, "We don't issue morphine."  *Id.*  On 2/14/13, ██████ was prescribed tramadol, a pain medication, which was ineffective, and was finally prescribed morphine two weeks later on 2/27/13. ADC212999, ADC212993. This delay in providing effective pain medications was unnecessary and shows a system that lacks the capacity to provide necessary care to patients when they require it, and callously allows patients with metastatic cancer to suffer severe pain without providing treatment.

117.    ██████ died two and a half months after receiving the PET scan.  The ADC's failure to adequately monitor this patient's condition following his radiation and chemotherapy in April, 2012, and the delays in scheduling his ENT follow-up consultation and PET scan may are extremely disturbing.  ██████ death demonstrates multiple systemic failures.  Urgent diagnostic testing and consultation was delayed for many months – he waited two months for ENT consultation and 11 weeks for the urgent

PET scan. .  Requests for management of cancer pain were rejected with callous written responses and  denial of treatment, rather than with basic clinical courtesy.

118.    It is particularly disturbing that these written comments were not identified by Dr. Robertson in his mortality review.  There were clear failures in assuring access to care, and in place of effective provider to patient communication, part of the checklist of the Corizon mortality review, there was ridicule and intentional refusal to treat cancer pain.  ADC211611-15.

119.    Poor care in the ADC is not limited to cancer patients.  The records I reviewed also demonstrated serious deficiencies in the ADC's care for the chronically seriously ill. ████████████████, was a prisoner at Florence when he died at age 52. His past medical history included coccidioidomycosis (Valley Fever), tuberculosis, partial lung resection, bilateral hip replacements, and chronic lung disease.  He was sent to the hospital for chest pain and shortness of breath on 3/26/13 where he was diagnosed with sepsis and pneumonia, and he died ████████████   ADC215611-13 ADC218194,  ADC218324, ADC218301.  No autopsy results are available.

120.    The patient was seen in a pulmonology clinic on 4/19/12 for consultation regarding his extremely complicated lung disease.  ADC218217-ADC218218.  The pulmonary consultant recommended follow-up in 3 months, though this appointment did not occur.  At the 4/19 visit, he had pulmonary function tests which demonstrated severe pulmonary disease.  He was on a medication, theophylline, which is rarely used now due to high risk profile and narrow therapeutic window.  This medication can reach toxic levels and can lead to arrhythmias, seizures, vomiting and death.  In all the records

provided from 4/12/12 to the date of ███████ death on ██████ there is no record of a theophylline level.  See ADC218224-ADC218231.

121.   Eight months after the April pulmonology consult, on 12/28/12, ADC's Dr. Vukcevich ordered a chest x-ray  to rule out pneumonia.  ADC218185. ████████ chest x-ray results were suggestive of a pneumothorax (an abnormal collection of air or gas in the space that separates the lung from the chest wall).  ADC218236.  He was started on antibiotics for 10 days for probable pneumonia.  Labs were ordered on this date, including a theophylline level (apparently never done).  ADC218188.  The MD who evaluated ████████ also requested a  STAT pulmonary  consult on 1/1/13.  ADC218191. On 1/10/13, the pulmonary consult was denied, with suggestions to instead repeat the chest x-ray.  ADC218194.  Given this patient's severe COPD and extensive pulmonary history, including TB and coccidioidomycosis, as well as abnormal findings on the chest x-ray the consult should have been scheduled expeditiously.  This denial was inappropriate.

122.   ████████ repeat chest x-rays on 1/11/13 and on 1/23/13, again showed possible pneumothorax.  ADC218234, ADC218235, ADC218195,  On 1/23/13 the radiologist recommended a CT scan because the nature of ████████ lung disease could not be resolved with a plain x-ray film.  ADC218234.  On 2/1/13 another chest x-ray showed left upper lung collapse and that pneumothorax again could not be excluded. Again the radiologist recommended that a CT scan be done in order to diagnose and treat ████████ lung disease. ADC218233.

123.   A repeat reading of this chest x-ray was called into the medical department at ASPC-Florence on 2/2/13.  ADC218177 and ADC218232.  ██████████ was again sent to the Health Unit at Florence and again treated for pneumonia on 2/2/13.   ADC218177, ADC218178.  This was the second time he was treated for pneumonia in less than five weeks.  On 2/2/13, he was treated with azithromycin, an oral antibiotic.  ADC218197. This oral antibiotic is inappropriate treatment of persistent pneumonia in a patient with severe restrictive and obstructive lung disease.  Pulmonary consultation and CT scan was required to appropriate treat ██████████, but he was denied consultation.  The "stat" (i.e. immediate) pulmonary consultation as requested one month earlier might have prevented this hospitalization.

124.   Finally on 3/12/13, Dr. Michael Thompson submitted a request was submitted to Corizon for the critically necessary lung CT scan. Corizon did not respond to this request.  The CT scan never occurred.  ADC218176.

125.   On 3/26/13, at 0200, the inmate was noted to have difficulty breathing per security.  He was appropriately triaged and an ambulance was called which transported him to Mt. Vista Hospital.  Of note, the EKG machine at the prison facility was not working.  ADC218174.

126.   At Mt. Vista Hospital he received 2 liters of saline and was transferred to Tempe St. Luke's Hospital.  No notes are available from the brief Mt. Vista Hospital admission.  Limited hospital notes are available from Tempe St. Luke's Hospital, (History + Physical  and discharge summary only), but they note an extensive left lower lobe infiltrate on chest x-ray.   ADC218327-28.  His discharge summary (death

40

summary) from ███████████ noted that he died of sepsis, acute renal failure and

hypotension.  ADC218324.

127.    ██████████ had severe lung disease with complex radiological findings.

He had had part of his lung removed.  He had been treated for active tuberculosis and

coccidioidomycosis (valley fever).  Evaluation of his x-rays and his pulmonary status was

behind the capabilities of the on-site physician staff at Florence, but their request for

emergency pulmonary consultation was denied.   Two requests by radiologists for CT

scan's were ignored, and when a CT scan was finally requested, Corizon staff ignored the

request.    ██████████ had a persistent pneumonia in from December 2012 through March

2013.  The failure to adequately diagnose and treat ██████████ complex pulmonary

disease and his persistent pneumonia contributed to his death from sepsis on ██████████

███   Failure to provide timely access to necessary consultation and radiologic testing

contributed to his death from inadequately treated pneumonia.  The delays experienced

by ██████████ in obtaining access to necessary pulmonary consultation and CT scans are

the consequences of the systemic failure to provide these basic essential services to

prisoners in the ADC.

128.    ██████████, ██████ died at ASPC – Tucson on ██████████ at the age of

58.   He had multiple medical problems including chronic liver disease with esophageal

varices.  He was treated prophylactically with propranolol, a drug that lowers the pulse

and blood pressure, and spironolactone, another drug which lowers blood pressure and

serves as a diuretic, to decrease fluid accumulation.  ██████████ received inadequate

medical care and inexcusable delays in access to necessary emergency care that contributed to or possibly caused his death.

129.    According to his hospital discharge summary, ███████ died of ventilator dependent respiratory failure type 4 and septic shock in addition to other diagnoses. ADC215340.   Based on his labs, imaging and provider notes from ███████ hospital records, ███████ died from septic shock, due to overwhelming infection from clostridium difficile, a diarrheal illness.

130.    On 7/19/2013, ███████ complained of several days of diarrhea, back pain and that he had fallen down in his cell.  His blood pressure was 122/72.  He was only given ibuprofen, and no further evaluation occurred.  ADC215395, ADC215238.

131.    Four days later, on 7/23/2013, at 0540, he complained of back pain and was found to have a blood pressure of 82/54, which is extremely low.  His pulse was 90, and his oxygen saturation was 97%.  ADC215393.  ███████ was on two medications, propranolol and spironolactone, for chronic liver disease.  Dr. Bynum, the on call physician, was contacted and ordered a non-steroidal anti-inflammatory medication (NSAID) called ketoralac (Toradol) to treat his back pain.  Dr. Bynum did not examine ███████, order any laboratory examinations, or schedule a follow-up appointment.  It is not usual to treat patients with diarrhea with NSAID's.  It is dangerous to ignore a blood pressure of 82/54.  ███████ should have been evaluated immediately by a physician. This did not happen.  Instead, the medical staff at ASPC-Tucson continued to administer ███████ long-term medications spironolactone and propranolol, both of which lower blood pressure.

132.    On 7/24/2013 at 1945, ███████ was found confused in his cell with an even lower blood pressure of 78/43.  His oxygen saturation had decreased to 95%.  He could not speak, was disoriented, and could not walk.  The RN notified the on-call provider, Dr. Bynum who ordered that ███████ be given one liter of normal saline intravenously over three hours.  ADC215238.

133.    This previously ambulatory alert patient now had profound hypotension, profound mental status change with confusion, inability to speak, and unable to walk.  He was clearly seriously, if not critically, ill, with signs of sepsis, and should have been transported to a medical facility immediately by EMS for examination by a physician as soon as this blood pressure was discovered. This was not done.   Although fluid administration is the first step in responding to suspected sepsis, the failure of Corizon medical and nursing staff at the Rincon facility to refer ███████ emergently was completely inappropriate.

134.    Six hours later, on 7/25/2013 at 0200, ███████ blood pressure fell even more to 60/30. A blood pressure this low is generally inadequate to maintain blood flow to internal organs. At this time, ███████ was finally taken to the emergency room. ADC215245.  The emergency room physician reported that ███████ was also in tremendous pain when he arrived at the hospital.  ADC215342.

135.    On 7/23/2013, 7/24/2013 and 7/25/2013, ASPC-Tucson medical staff recorded ███████ as having low blood pressures consistent with shock, but he was denied appropriate treatment until 7/25/2013, when his illness progressed to being beyond salvage.  Sepsis should have been suspected on 7/23/13 and appropriate

emergency care sought.  No treatment or follow-up of his profound hypotension was provided or planned.   When his blood pressure continued to fall on the evening of July 24, 2013, when he lost the ability to speak, and when he became disoriented, medical and nursing staff still refused to send him to the hospital.  The failure of the medical staff to recognize and act on his clear need for emergent care over several days shows poor training and supervision of staff.

136.    Delay in antibiotic treatment of sepsis dramatically decreases the chance of survival.  If ███████ had been treated emergently beginning at 0540 on July 23, when his blood pressure was extremely low but he was conscious and ambulatory, he could have been treated with fluids and antibiotics, and his bacterial sepsis was likely to have responded favorably to treatment.  Intentional delaying treatment for an additional forty hours made the chance of successful treatment extremely unlikely.  ███████ died of sepsis and respiratory failure on ███████     The failure of the medical and nursing staff to provide emergency care to a crtically ill patient is extremely disturbing.  There is a systemic failure in the ADC with regard to provider staff  attending  to patients with serious medical needs.  Repeatedly serious signs and symptoms are obtained by nurses, reported to providers, without any response.  Providers do not come to see patients with serious medical complaints.  This systemic failure of physicians and other providers to respond directly to urgent and emergent medical problems contributed to ███████ death from sepsis..

137.                       ███████         died at ASPC – Tucson on ███████   He was 72 years old.  At the time of his death, he suffered from multiple serious medical problems,

44

including coronary artery disease, ischemic cardiomyopathy/congestive heart failure, diabetes, hypertension, atrial flutter, history of pulmonary embolism, anemia and chronic kidney disease.  He was receiving multiple medications: Lisinopril, pravastatin, warfarin, aspirin, furosemide, aspirin, and nebulizer treatment for asthma/COPD. He was also receiving mental health care (ADC 212453), and his mental illness contributed to his intermittent refusals of medication.

138.    Throughout June 2013, ███████████ refused to take his multiple prescribed medications. These medications were necessary to sustain ███████████ health, and without them, he was at high risk of suffering an adverse outcome including congestive heart failure exacerbation, cardiac arrhythmia, stroke, pulmonary embolism or myocardial infarction. Unfortunately on ███████  ███████████ was found unresponsive on the floor of his cell. CPR was administered and EMS was called in a timely fashion, but emergency responders were unable to revive ███████████ and he was pronounced dead in his cell. It is highly likely that his refusal of medications and medical treatment , and the failure to see mental health professionals to review the reasons for his refusals, hastened or possibly even caused his death.

139.    ███████████ did not have an immediate psychiatric evaluation or medical work up.  On 6/18/2013, after many days of refusing medical treatment, a medical provider wrote "pt verbally acknowleges (sic) understanding but maintains refusal. He is unable to give me a reason why he is refusing meds…place on psych provider line for assessment."  ADC212442.  To demonstrate capacity to make one's own medical decisions, a patient must be able to explain medication refusals.

140.   On 6/24/2013, a "Psych Associate II" Michelle Merbeth saw ███████████ regarding his refusal to take medications.  ADC 212752.  Ms. Merbeth wrote "Explored IM reasons for stopping medications and he indicated they were making him sick (detailed explanation that did not appear to make sense), and states he believes the nursing staff is doing something wrong and there is a multimillion dollar lawsuit…IM appeared to be fatigued, confused, bizarre/paranoid thoughts."  ADC212752.  This assessment further raises concern for an organic or psychiatric disorder leading to irrational behavior and decisions regarding his health.

141.   Ms. Merbeth wrote in her 6/24 assessment "Mood d/o, hx delusional d/o" and in her plan "requested psychiatry evaluation."  ADC212752.   Because ███████████ had multiple serious medical problems, and was refusing to take his medications, a psychiatric evaluation was required urgently.  Unfortunately, ███████████ died before receiving the planned psychiatric evaluation.

142.   ███████████████, was 49 when she died at ASPC – Perryville.  She suffered from severe congestive heart failure.  Her ejection fraction was extremely low 8-15% (normal is greater than 55%).  She had recently been given an intracardiac defibrillator (ICD), and it had discharged twice when she experienced dangerous arrhythmias.  ███████████ was receiving many medications: albuterol, allopurinol, aspirin, bumetanide, carvedilol, lactulose, lisinopril, loratidine, losartan, pravastatin, potassium, omeprazole, promethazine, and spironolactone.

143.   The last time ███████████ saw a cardiologist was May 15 for analysis of her ICD (the full chart note is not provided).  Her previous cardiology consultation was on

March 22, 2013.  During the March visit, the cardiologist recommended that the patient take bumetanide 2mg twice a day and spironolactone 12.5mg daily.  ADC217521.  Yet on 3/18/13, Perryville's Dr. Irving increased the patient's spironolactone to 100mg twice daily with no discussion of why this decision was made.  ADC217213.  This represents a dosage more than 15 times that recommended by the cardiologist, and may have contributed to the deterioration in kidney function.

144.    During a three-week period (3/6/13 - 3/27/13), ▮▮▮▮▮▮▮ serum creatinine level, which reflects kidney function, rose from normal to significantly raised (1.43).  A note from 4/9/13 states that the provider "spoke with the nephrologist" and deemed that the increase was due to "cardiorenal syndrome."  ADC217477.  The provider writes that a nephrology consult request was written on 4/19/13 (ADC217477), and yet the only record of such a request is from May 7, 2013 (ADC217698).  The patient was not seen by a nephrologist prior to her death two weeks later.

145.    The provider also states that the patient requires "weekly labs."  There is evidence of laboratory data from: 3/6, 3/27, 4/5, 4/11, and 4/19 (ADC217307-217313; ADC217578-217580; ADC217552-217555) but none after that, despite the fact that there is no "stop" order for the weekly lab checks.   There is a request that labs be drawn "today" on May 10, 2013 (ADC217779), but there is no record of these being done.  Notably, on ▮▮▮▮▮▮, the patient had already been reporting daily symptoms, and she died ▮ days later.

146.    Finally, this patient was prescribed losartan 25mg daily and had been taking this consistently from January 2013 until her death.  Close to the time of her death

47

- on May 9, 2013 - she was also started on lisinopril 2.5mg daily.   ADC217592.  The combination of losartan and lisinopril can lead to dangerously high levels of potassium, which can cause sudden death.  There was never any reason given for adding this medication, and there was no follow-up laboratory data check, which is customary if patients are going to be on both agents.

147.   ██████████ serious medical conditions warranted more careful monitoring of her condition and analysis of medication interactions.  Although  providers placed orders for weekly laboratory checks (ADC217477; ADC217561; ADC217767), no laboratory studies were obtained after April 19, 2013.  The medical examiner report does not include any information on this patient's serum testing (electrolytes or creatinine), but it is possible that ██████████ may have had an electrolyte disturbance that precipitated her death.  Frequent monitoring of electrolytes as ordered, particularly after changes in cardiac medications, is essential in the care of patients with severe cardiomyopathy.  It must be noted, however, that the prognosis for patients with ██████████ degree of heart failure, and her functional disability, is very poor.

148.   ██████████████████, was a 58 year old man with chronic kidney disease, diabetes, complicated by neuropathy  and amputation of his second toe on his left foot, hypertension, coronary artery disease (after insertion of stents), dementia and a diagnosis of hypereosinophilic syndrome, a rapidly fatal disease.  He died ██████ at ASPC-Tucson. The records provided contained multiple gaps, and I was provided no autopsy or other death   records, so I am not able to determine his cause of death.

48

149.    From 7/21/12 to 3/4/13, █████████ was admitted to the hospital at least six times, and his health deteriorated rapidly.  During his hospital admission of 9/3/12 through 9/14/12 █████████ was diagnosed with Hypereosinophilic Syndrome, for which he was appropriately treated with steroids.  Hypereosinophilic Syndrome is a group of blood disorders that occur when a patient has a high numbers of eosinophils — a type white blood cells that play an important role in the immune system. Over time, these high numbers of eosinophils enter various tissues, causing inflammation and eventually damaging organs, most commonly targeting the skin, lung, heart, blood and nervous system. This is a very serious illness with a high mortality. At discharge, it was noted that he would require surgical, renal and oncology follow-up appointments.  ADC220445.

150.    During the months after his return to prison, █████████ was frequently noted to be anemic but was never adequately evaluated for treatment of this condition. He tested positive for gastrointestinal bleeding on a Fecal Occult Blood Test (FOBT) on 11/9/12, and again on 11/14/12.  ADC220452.  However, the FOBT is a screening test for colorectal cancer, designed for the general population.  A patient like █████████, with profound anemia, should have had a gastro-intestinal work-up, including a colonoscopy and EGD to localize the source of the blood loss.  The staff noted ███ █████ gastro-intestinal bleeding and provided him iron, and appears to have referred him for a GI work-up on 11/20/12 (ADC220450), but there is no record that this consult ever happened.   Even after a later hospital admission, when █████████ again tested FOBT positive and underwent two blood transfusions, he still received no EGD or colonoscopy.  ADC220827.

151.    Additionally, on 11/27/12, he was referred on an urgent basis to Hematology to identify and treat other causes of anemia.  An oncology referral was provided on 2/26/13, three months later.  The failure to timely schedule these critical evaluations for this very fragile patient, and the failure of his physicians to follow up when they were not done, falls well below the standard of care and demonstrates a poorly functioning specialty referral process.

152.    ███████████ chart often references his confused mental state.  See ADC220454 (11/12/12 note – "confusion:); ADC220628 (12/15/12 note – "hallucinating" and "confused"); ADC220680 (12/23/12 note – dementia "chronic in nature"); ADC220654 (1/6/13 report – "demented at baseline").  On 2/12/13, a psychologist found that he had cognitive impairment due to encephalopathy (a build-up of ammonia in the brain), and recommended bringing in a health care proxy to make further decisions about his health care.  ADC221000.  There is no indication in the chart that a health care proxy was contacted.

153.    Following ███████████ EGD and feeding tube placement on 5/11/13, there are virtually no medical records, although he did not die until ███████ ADC220856, ADC220803.  Without those records, I cannot opine as to whether the care he received hastened his death or caused him unnecessary pain.   This lack of documentation is distressing, and has great significance for clinical care, since the chart I reviewed is the medical record available to the medical staff for the last three months of his life.

154.    ███████████, died ███████, when he was 52 years old. He had a receiving screening on February 12, 2013.   He had Hepatitis C infection, end stage liver disease,

and a history of hepatic encephalopathy.    On 2/12/13 an admission history and physical was performed and labs were ordered.  ███████  was continued on his usual medications including a furosemide, potassium, omeprazole, and lactulose for hepatic encephalopathy,

155.    ███████  2/14/13 lab results were extremely abnormal, showing a bilirubin of 4.1, platelets of 79K, a serum ammonia of 292 micrograms/dl, and an albumin of 2.7 Gms/Dl.   These values suggested advanced, unstable liver disease. These labs were not reviewed.

156.    On 2/27/13, he submitted an HNR because he was too weak to walk to get his medications.  He was seen two days later on 3/1/13 by physician's assistant D. Onore. He was noted to have respirations of 24, oxygen saturation of 92%, a pulse of 105, BP 136/82, and a temperature of 97.2.  These are unstable vital signs, suggesting significant respiratory distress.  Labs were ordered to be drawn on 3/5/13.

157.    On 3/5/13 he complained of spitting up blood, abdominal pain and swelling, light color of stool, with shortness of breath for three weeks.   He was admitted to the hospital where he died on ███████ of complications of end stage liver and kidney disease.

158.    Medical staff failed to appreciate that his weakness and unstable vital signs on 3/1/13 represented significant deterioration in his status, and required emergent evaluation.   This is another example of the systemic failure of physicians and other providers at ADC to respond to medical complaints of patients with complex serious illness.

159.    ████████ died at age 24 at Yuma Regional Medical Center on ████ from respiratory failure due to AIDS-related pneumocystis carinii pneumonia. ADC213053.  According to his Mortality Review, he entered ADC custody on 2/16/12. ADC211618.  On 12/31/13, he was transferred to Yuma County Detention Center for a court appearance.  *Id.*  While at YCDC, he became ill on 2/23/13.  He was sent to the hospital five days later, where he was diagnosed with AIDS.  ADC213062.

160.    HIV/AIDS is highly treatable with timely diagnosis and, had ████████ HIV status been identified earlier, his death could have been prevented.  According to the Mortality Review, ████████ was ordered an HIV test on 2/17/12, the day after he entered ADC custody.   ADC211618.  On 12/26/31, he submitted an HNR requesting HIV testing.  ADC213177.   The fact that this critical test was not performed despite two requests was responsible for his death.   Had the HIV test been provided to him on 2/17/12 or on 12/24/12, as he had requested, he would have been treated with medications to to restore his immune system.  and to prevent pneumocystis pneumonia, the infection which killed him.

161.    ████████, died on ████████ at the age of 54.  He had end-stage liver disease, hepatic encephalopathy and massive ascites requiring frequent paracentesis (withdrawal of fluid from the peritoneal cavity) for relief of pain.  Of note, on February 26, 2013, ██ days before his death, ████████ condition was noted to be deteriorating dramatically, had become disoriented, and was unable to take his "keep on person" medication appropriately.  Dr. Barclay ordered that his medicine be provided to him directly (DOT – directly observed therapy), which was appropriate.  However he also

ordered that ████████ be placed in segregation status.  Patients with end stage disease

should not be placed in segregation because of their illness.  They should be provided

necessary treatment and accommodations in a supportive environment.  ADC218967

162.   Of the twenty-eight files that I reviewed, eight had records that were quite

brief and/or markedly incomplete, making a comprehensive review of care provided

impossible. 

Nevertheless, in two of the abbreviated records, I also found evidence of health care

lapses that point to systemic problems.

163.   ████████████, died at ASPC-Lewis on ████████ of liver and kidney

failure.

164.   On 4/8/13, he was evaluated by an RN, who wrote that the patient stated

others told him he had "yellowing of the eyes."  ADC217794-ADC217796.  The nurse

reported that the patient's eyes had a "slight yellowing of color."  The patient also

reported that his urine was "very dark," and a urine dip done that date showed bilirubin

was present, a sign of possible liver disease.  ADC217795.  Although these notes are

stamped by Dr. Merchant, there is no evidence that Dr. Merchant or any other licensed

provider examined the patient.

165.   The combination of jaundiced eyes, dark urine, and urine with clear

evidence of bilirubin spillage raises serious concerns about hepatitis, and requires an

urgent evaluation by a physician.  Instead ████████ was treated with an antibiotic for

bronchitis, and liver studies were obtained.

166.     Laboratory studies obtained on 4/8/13 were critically abnormal, showing

elevated bilirubin, evidence of liver injury, and abnormal thyroid levels.  It does not

appear that these results were reviewed by a physician.  These studies showed, available

on 4/10/13, revealed that ████████ was having acute liver failure.  His bilirubin was

extremely high 8.1 mg/DL (0.2-1.2 normal), and his liver enzymes were AST/ALT

703/799 U/L, more than twenty times the normal range.   His kidney function was

completely normal at that time, and he had no evidence of chronic viral hepatitis

infection because his tests were negative for hepatitis B and C virus. ADC217815-

ADC217817.   Prior laboratory studies are not available, but in 2012 ████████

received atorvastatin at the facility, and laboratory studies of liver function would have

been required to monitor his treatment.

167.     ████████ was finally brought to the hospital on 4/13/13.  ADC217801.

By this time his liver was failing; his bilirubin was 64, his liver enzymes were 2901/1755

U/L (AST/ALT) and his creatinine 3.1.  ADC217806.  These results demonstrate liver

and kidney failure.

168.     ████████ had been in good health, and was not receiving any

medications at the time of his death.  The sudden development of signs of severe liver

injury on ████████ should have been prompted immediate physician evaluation.

When his laboratory results were available on 4/10/13 he should have been hospitalized

for diagnosis and treatment of acute and severe liver injury.   There was a dramatic

deterioration of ████████ liver status from 4/8/13 to 4/13/13 when he was

hospitalized.

169.   Dr. Robertson's mortality review suggests that nothing should have been done differently and that ████████ probably died of chronic viral hepatitis.  Dr. Robertson's mortality review fails to acknowledge that ████████ presented with liver disease on 4/8/13 but was not provided treatment, that Dr. Merchant stamped his agreement with the nurse's faulty assessment and plan without seeing the patient, that the critically abnormal laboratory studies from 4/8/13 were not reviewed, and that necessary emergency clinical response failed to occur.  AC 211654-56   Systemically, there is a failure to assure that ordered laboratory tests are reviewed in a timely manner by a competent provider, and that an abnormal results elicit appropriate clinical response.

170.   ████████████ died on ██████ at ASPC-Yuma, at age 56.  He had a history of endocarditis, DVT and anemia.  ADC221020.  Hospital records were not available to me, and I do not know the cause of his death.  On 6/10/13, he saw a nurse because he complained of fatigue and found it hard to walk. ADC221023.  His pulse was high (104) and his temperature was 99.8. No examination took place, and the patient was evidently sent back to his housing, and the nurse directed that the patient's chart be "designated for practitioner review."  ADC221024.  I found no evidence that a practitioner reviewed his file, however.

171.   His next clinical and encounter was dated two weeks later on 6/24/13, when he again saw a nurse, complaining of severe leg pain and difficulty walking. ADC221020.  Again, his pulse was high (106) and he was breathing rapidly, 24 times per minute.  Laboratory studies that had been obtained on 6/12/13 were noted to be abnormal,

with low platelets 76,000 (150-400,000 normal) and low hemoglobin of 10 gms (13.5-17.5 normal) .  ADC221142.

172.    Noting the patient's history of deep vein thrombosis, that nurse performed a cursory review, again sent him back to his cell, and directed that he be referred to a practitioner on a routine basis.  ADC221024.  On both occasions, ▮▮▮▮▮▮▮▮ complaints should have prompted a complete exam by a physician or mid-level provider. This did not happen.

173.    On 6/25/13, he complained of leg pain and difficulty walking. ADC221018.  This time, he was finally sent to a local hospital for his complaints.  ▮▮▮ ▮▮▮▮▮▮ died ▮▮▮▮▮▮▮▮▮▮▮.  The fact that ▮▮▮▮▮▮▮▮▮ was seen twice for serious symptoms yet was not evaluated by a practitioner either time indicates that there is a lack of access to provider care and a failure by nursing staff to recognize and respond to serious medical symptoms.

**Conclusion**

174.    For all of the reasons stated above, my opinion remains that the ADC's medical care delivery system is sorely deficient, and places Arizona state prisoners are serious risk of substantial harm.

**APPENDIX A**
**List of Documents Reviewed for Supplemental Report**



ADC211587-211591   – Mortality
ADC211592-211596   – Mortality
ADC211597-211601   – Mortality
ADC211602-211605   – Mortality
ADC211606-211610   – Mortality
ADC211611-211615   – Mortality
ADC211616-211619   – Mortality
ADC211620-211624   – Mortality
ADC211625-211628   – Mortality
ADC211629-211633   – Mortality
ADC211634-211638   – Mortality
ADC 211639-211643   – Mortality
ADC211644-211648   – Mortality
ADC211649-211653   – Mortality
ADC211654-211658   – Mortality
ADC211659-211663   – Mortality
ADC211664-211668   – Mortality
ADC211669-211673   – Mortality
ADC211674-211678   – Mortality
ADC211679-211683   – Mortality
ADC211684-211688   – Mortality
ADC211689-211693   – Mortality
ADC211694-211698   – Mortality
ADC211699-211703   – Mortality
ADC211704-211708   – Mortality
ADC211709-211712   – Mortality
ADC211713-211716   – Mortality
ADC211717-211721   – Mortality
ADC211722-211726   – Mortality
ADC211727-211731   – Mortality
ADC211732-211736   – Mortality
ADC211737-211741   – Mortality
ADC211742-211746   – Mortality
ADC215611-215615   – Mortality
ADC212062-212093   – Medical v2
ADC212094-212154   – Medical v3
ADC212155-212252   – Med v2
ADC212253-212310   – Medv09
ADC212311-212420   – Med v10
ADC212421-212756   – Med v11
ADC212757-212773   – Medical v3
ADC212774-213046   v2
ADC213047-213181   – Medical v1

ADC213182-213322 ██████████ – Medical v4
ADC213323-213577 ██████████ – Medical v5
ADC213578-213611 ███████████ – Medical v1
ADC213612-213639 ██████████ – Medical v1
ADC213640-213956 ███████████ – Medical v1
ADC213957-214002 ██████████ – Medical v1
ADC214003-214120 ███████████ – Medical v2
ADC214121-214372 ████████ – Medical v3
ADC214373-214607 ████████ – Medical v4
ADC214608-214648 ██████████ – Medical v4
ADC214649-215007 ██████████ – Medical v5
ADC215008-215234 █████████ – Medical v5
ADC215235-215397 █████████ – Medical v3
ADC215398-215543 █████████ – Medical v6
ADC215616-215671 ██████████ – Medical
ADC215672-215777 ██████████ – Medical v3
ADC215778-215937 █████████ – Medical v08
ADC215938-216126 █████████ – Medical v09
ADC216127-216257 █████████ – Medical v10
ADC216258-216453 ██████████ – Medical
ADC216454-216509 ██████████ – Medical v2
ADC216510-21561 ████████ – Medical IPC v1
ADC216562-216649 ████████ - Medical IPC v2
ADC216650-216885 █████████ – Medical v4
ADC216886-217143 █████████ – Medical v5
ADC217144-217354 █████████ – Medical v6
ADC217355-217584 █████████ – Medical v7
ADC217585-217785 █████████ – Medical v8
ADC217786-217825 ██████████ – Medical v2
ADC217826-217861 ███████████ – Medical v3
ADC217862-218017 █████████ – Medical v2
ADC218018-218085 █████████ – Medical v7
ADC218086-218108 ██████████ – Medical
ADC218109-218164 ████████ – Medical v7
ADC218165-218342 ████████ – Medical v8
ADC218343-218380 █████████ – Medical v5
ADC218381-218437 █████████ – Medical
ADC218438-218607 █████████ – Medical v8
ADC218608-218728 ██████████ – Medical v4
ADC218729-218942 ██████████ – Medical v5
ADC218943-219365 ████████ – Medical v1
ADC219366-220037 ███████ – Medical
ADC220038-220134 ██████████ – Medical v1
ADC220135-220285 ██████████ Medical v2
ADC220286-200439 ██████████ – Medical v3
ADC220440-221001 █████████ – Medical



58



ADC221002-221245 ███████████ – Medical v3
ADC212146-221656 ████████████9 – Medical v2-4
ADC221657-222035 █████████ – Medical
PLTF-PARSONS-032037 ████ Appeal
No Bates Number - ███ – 14.01.30
No Bates Number – ██ - 14.01.30
No Bates Number - ████ - 14.02.06
No Bates Number – ████ - 14.02.06
No Bates Number – ████ - 14.02.06
No Bates Number – ███ - 14.02.06
No Bates Number – ████ - 14.02.06
No Bates Number – ███ - 14.02.06
No Bates Number – ████ - 14.02.06
No Bates Number – ███ - 14.02.09
No Bates Number – ███ - 14.02.10
No Bates Number – ███ - 14.20.12
No Bates Number – ██ - 14.02.12
No Bates Number – ███ - 14.02.12
No Bates Number – ███ - 14.02.12
No Bates Number – ████ - 14.02.13
No Bates Number – ███ - 14.02.13
No Bates Number – ███ - 14.02.13
No Bates Number – ███ - 14.02.13
No Bates Number – ████ - 14.02.13
No Bates Number – ███ - 14.02.17
No Bates Number – ████ - 14.02.17
No Bates Number – ███ - 14.02.18
No Bates Number – ███ - 14.02.21
No Bates Number – ███ - 14.02.21

# EXHIBIT 4

# CONFIDENTIAL REPORT OF

# TODD RANDALL WILCOX, M.D., M.B.A., C.C.H.P.-A

*Parsons, et al. v Ryan, et al.*

No. 2:12-cv-00601-NVW

NOVEMBER 8, 2013

Confidential Information – Subject to Protective Order

# TABLE OF CONTENTS

I.   Introduction and background ............................................................................. 1
   A.   Qualifications ................................................................................................. 1
   B.   Information sources ...................................................................................... 2
   C.   Methodology ................................................................................................. 3
   D.   Acronyms ....................................................................................................... 4
II.   Opinions ............................................................................................................ 5
   A.   Essential building blocks to a correctional healthcare delivery system ............ 8
      1.   Centralized organization/management structure ......................................... 8
         (a)   ADC to Wexford to Corizon ................................................................. 9
         (b)   Current oversight: the MGAR system ................................................. 11
      2.   Consistently followed policies and procedures ......................................... 15
      3.   Adequate staffing ..................................................................................... 17
      4.   Adequate physical facilities ..................................................................... 22
   B.   Timely access to care ................................................................................. 24
      1.   Sick call/HNR system .............................................................................. 25
      2.   Chronic care ............................................................................................ 32
      3.   Emergency care ........................................................................................ 36
      4.   Inpatient care ........................................................................................... 38
      5.   Custody involvement ................................................................................ 39
      6.   End-of-life care and waivers of treatment ............................................... 41
   C.   Exercise of professional medical judgment ............................................... 43
      1.   Access to care .......................................................................................... 44
      2.   Medical records and access to medical histories ..................................... 44
      3.   Use of nurses as primary care providers .................................................. 51
      4.   Specialty care .......................................................................................... 55
      5.   Substandard care decisions ..................................................................... 62
   D.   Delivery of care that is ordered .................................................................. 67
      1.   Providers' orders ...................................................................................... 67
      2.   Medication administration and monitoring ............................................... 69
      3.   Labs, imaging, and other tests ................................................................. 72
      4.   Special medical diets ............................................................................... 74
   E.   Protection from preventable negative outcomes ......................................... 75
      1.   Quality assurance .................................................................................... 76
      2.   Grievance process .................................................................................... 78
      3.   Screening .................................................................................................. 79
III.   Conclusion ...................................................................................................... 81

I, Todd Wilcox, declare:

I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.

## I.      Introduction and background

This report assesses Arizona's prison medical care by reviewing the system's building blocks (such as adequate staff and facilities) and its performance in four broad categories: timely access to care, the exercise of professional medical judgment, delivery of care that is ordered, and processes to minimize preventable negative outcomes.  I found major deficiencies in all of these primary drivers of healthcare, as I discuss in detail below.

### A.      Qualifications

I have worked as a physician in jail and prison environments for 17 years.  My opinions in this case are derived from extensive experience in the design, administration, and delivery of correctional healthcare as well as the national standards that govern the field.  I actively practice in correctional healthcare as the Medical Director of the Salt Lake County Jail System and I am frequently called upon as a consultant to assist facilities and organizations nationally in improving their delivery of care, including Maricopa County (Phoenix, AZ), California Department of Corrections and Rehabilitation, Mississippi Department of Corrections, Pima County (Tucson, AZ) Department of Institutional Health, Seattle-King County Jail System (Seattle, WA), the National Commission on Correctional Health Care (Chicago, IL), the National Institutes of Corrections, the American Jail Association, the American Correctional Association, and The Rand Corporation.

I am one of a select group of individuals to have achieved the advanced level of certification in correctional healthcare (CCHP-A) from the National Commission on Correctional Health Care and I frequently present to national audiences on pertinent

topics in this field of medicine.  I am the president-elect of The Society of Correctional Physicians and I am currently the chairman of the National Commission on Correctional Health Care's Committee on Physician Certification.

My curriculum vitae is attached as Appendix A.  The cases in which I have been deposed and/or given trial testimony in the last four years are listed in Appendix B, along with my rate of compensation for my work on this case and publications subsequent to those listed on my curriculum vitae.

### B.    Information sources

I undertook an extensive investigation to develop my opinions expressed in this report.  I reviewed thousands of pages of documents produced by the State in this case, as well as documents produced by Wexford and Corizon.  I reviewed well over a hundred partial and full healthcare records of Arizona prisoners and carried out several dozen patient interviews.  I reviewed depositions of prisoners, Arizona Department of Corrections (ADC) staff, and Wexford and Corizon staff as well as Defendants' Responses to Plaintiff Verduzco's First Set of Requests for Admission.  These documents are listed in Appendix C.  In addition, I reviewed documents during the course of my tours, such as binders and loose filing and notices posted on the walls.  I describe these documents in the course of this report.

I toured five prison complexes in Arizona: Phoenix, Perryville, Yuma, Florence, and Tucson.  At each complex, I viewed the majority of the clinical and support facilities where medical care was prepared and delivered, including inpatient units, exam rooms, urgent care facilities, medication rooms, medical records rooms, and medical supply rooms.  I also witnessed pill call at Yuma's Cheyenne Unit and I toured one food preparation unit.  I reviewed numerous healthcare records, logs, and binders (such as descriptions of medical diet options and medication administration processes).

2

### C.    Methodology

I reviewed several dozen patient healthcare records at every prison I toured.  I did not review a random sample; instead, I chose to look at files of specific types of prisoners.  This is because when evaluating a healthcare delivery system, it is not generally as helpful to examine care for healthy people as it is to look at the treatment of sick people, particularly those with complex or chronic conditions that require coordination, communication, and judgment.  Therefore, I attempted to focus on records of people with diabetes, hypertension, HIV, kidney failure, hepatitis, and infections.  I reviewed records for cancer patients and pregnant women, and for people who had been identified on ADC's monitoring reports as not receiving tests or specialty care or experiencing other problems with care.  I reviewed records for the class representatives.  I also looked through lab reports, diagnostic test logs, and Health Needs Requests on site at each facility to identify patients who had objective findings that were concerning and then I asked for their charts to be pulled for my review and if I found areas of concern I would frequently request that the patient be pulled for me to interview to confirm my findings.

I felt it was important to speak directly with the patients in order to gather additional information and to make my own professional medical judgment with respect to the acuity of their illness as best I could without being able to examine them except visually.  I also randomly spoke to prisoners on my tours about their healthcare challenges and I routinely reviewed their medical files in order to verify the information they gave me.  I asked prisoners about information I heard from staff, and staff about information I heard from prisoners.  I was able to verify information I gathered through consulting multiple sources and triangulating the information available to me.

On the tours of the institutions, my goal was to observe general living conditions for the patients and the working conditions for medical care staff.  I performed a basic check to see if the standard equipment was present and to get a broad sense of how the

3

flow of patient care operated, from screening to sick call to routine appointments and medication administration to chronic care.

Although my role on these tours was to gather information, I felt obligated to report life-threatening cases to the prison officials and attorneys for the State and for Corizon who accompanied me on these tours when I discovered them.  I reported such problems at Perryville (█████████████████████████████), Yuma (███████████████████████████████████████████████), Florence (███████████████████████████████████████), and Tucson (█████████████████████████████████████████████████████), many of whom are discussed in some detail in this report.

### D.   Acronyms

Although I try to avoid professional lingo, a certain number of acronyms are unavoidable in the healthcare and correctional contexts.  Throughout this report, I refer to the following, some of which are Arizona-specific terms:

CNA  Certified nursing assistant

CO    Correctional officer

DOT  Direct observation therapy (medications that patients must take in view of medical staff who give it to them)

HCP  Health care provider[1]

HNR  Health needs request

ICS   Incident Command System (emergency response protocol)

IPC   Inpatient Care Unit

KOP  Keep on person (medications that patients can self-administer)

LPN  Licensed practical nurse

---

[1]For purposes of this report, I use the term "provider" to mean primary care provider: physician, nurse practitioner, or physician's assistant.

4

PA    Physician's assistant

RN    Registered nurse

## II.    Opinions

In my opinion, the medical care provided in Arizona prisons is significantly below community standards and places patients at serious risk of harm.  In order to provide community standard of care in a correctional setting, a system must be in place – complete with centralized management, policies and procedures, adequate staff and clinical space and budget – that allows patients reasonable access to healthcare providers, professional clinical judgment on their case, delivery of the care that is ordered, and self-correcting processes designed to minimize preventable negative outcomes.  I discuss defendants' systemic deficiencies in each of these major categories in the following sections.  I identified these deficiencies in my reviews of patient healthcare records and interviews with patients as well as in the documents produced by the State and others and the depositions of various staff and administrators.

I toured five of the ten prison complexes in the Arizona system and undertook thorough reviews of the care at those institutions.  My findings in this report are system-wide, however, and not just confined to those five complexes.  I am confident in making systemic findings for several reasons.  First, the deficiencies in care were consistent across the prisons that I toured.  I found some variations and distinctions, but overall the prison complexes I toured were subject to the same serious problems, as described throughout this report.  Second, those problems were of a system-wide nature, caused by deficits in organizational structure, staffing, and quality assurance measures that are not the responsibility of individual prisons to develop.  In addition, I have seen testimony that policies and practices are statewide, as are the deficits.  Third, I reviewed many dozens of healthcare records of prisoners who had been housed at prisons around the state.  I have therefore reviewed care from a wide range of prisons beyond what I toured.  Finally, I have reviewed numerous documents attesting to poor care and serious deficits throughout

5

the system.  These documents are listed in Appendix C and I allude to them throughout the report.

Before I move on to a methodical review of the elements of the healthcare delivery system, I would like to discuss an emblematic case.  One patient I met in my investigation experienced so many errors in so many areas that his case serves as an introduction of sorts to the remainder this report.

███████████████████ whom I met in Yuma's La Paz unit on August 1, 2013, has experienced horrendous care in ADC with potentially disastrous consequences.  On April 19, 2013, he received a diagnosis of advanced colon cancer as a result of an emergency department visit for abdominal pain.  As of August 1, it had not even been staged.  Staging is critical for cancer cases and it requires a number of diagnostic tests in order to know how extensive the cancer is at the time of diagnosis.  All treatment plans for cancer depend heavily on staging because the treatment plans vary widely based on the severity and spread of disease.   On a fundamental level, the staging process answers the question regarding whether the cancer is locally contained or whether it has metastasized to involve organ systems other than where the cancer started.  The failure to stage this new cancer diagnosis guaranteed that care could not proceed because no treatment plan could be formulated.  His medical records contain a referral for consultation, but it had not yet been done in early August.  This is a patient for whom every day counts, and more than 100 days had passed since initial diagnosis without even taking the first step toward a treatment plan.

There were numerous serious errors in his care.  It is a screening failure: he should have had a screening colonoscopy at age 50 (he is 51 currently).  It is an access to care failure: on December 12, 2012, he complained of lumps and bowel problems but received no follow-up; on January 10, 2013, a physician's assistant saw him for his complaints of lumps in stomach and change in bowel habits on the provider line but did not perform a rectal exam or perform a test for blood in his stool; on January 21, 2013, his labs showed

6

that he was anemic with strong evidence of iron deficiency, which is very common in colon cancer cases, but the physician's assistant did nothing to evaluate these abnormalities further when he signed off the labs.  On March 7, 2013, a prison doctor ordered a screening test for colon cancer that came back positive (occult blood positive); the test result was sent to the facility doctor for review and no action was taken to evaluate this abnormal critical lab further.  Staff did not know he had cancer until April 19, when they found a huge tumor and obstructed bowel.  They should have known far earlier.  ███████ was not referred to oncology until May 8 and not seen until July 5.  The PET and CT scans ordered at that time to accomplish the staging had not been done by early August.

His case also shows additional treatment planning failures: he has no teeth and cannot open his mouth well and he has a deformity of his gumline.  As a result, it is not possible to fit him with dentures without completing some dental surgery to enable the dentures to fit properly.  In cancer patients it is critical to maintain nutrition, weight, and hydration to help them deal with their treatment.  Dealing with his eating limitations is a long-term planning issue.  I saw no evidence of any such planning in his file, and he told me there had been none, to his knowledge.  Instead of treating him so he can effectively masticate, the prison system has left him untreated and edentulous.  I saw him again at the end of October when I toured Tucson and he was edentulous and he appeared much more gaunt and in significant pain.  He informed me that he had seen the oncologist on October 24, 2013, and that chemotherapy had finally been ordered.  He was six months after initial diagnosis of his cancer and treatment had yet to begin.

Moreover, his case shows medication failures: he has severe pain from his advanced colon cancer and obstructed bowel.  At Yuma, he was given Vicodin (hydrocodone / acetaminophen) four times a day, which is a short-acting pain killer that is medically inappropriate for chronic cancer pain.  To make matters worse, the Facility Health Administrator at Yuma executed a written order dated June 21, 2013, that I saw

7

posted that mandated that all pain medication be crushed prior to administration, which greatly reduces the duration of effectiveness of an already short-acting medication. As such, his pain regimen was inappropriate and ineffective for the severity of his disease.

Finally, his case raises serious ethical concerns: when I saw him again by chance in Tucson he told me that his pain regimen had been changed to longer acting medications but that the nursing staff refused to give him his pain medications until he signed a broad waiver of care that was initiated by his assigned nurse with no physician involvement. By his account, this waiver – which I reviewed, and on its face find unethical and deeply disturbing – was offered to him under troublingly coercive circumstances. I discuss the profound ethical and legal violations inherent in this situation below, in Section II.B.6.

In sum, this patient's experience displays the incompetence, heartlessness, and deliberate indifference I found throughout the system as a whole. ██████ is dying a needless, painful, and preventable death.

## A.  Essential building blocks to a correctional healthcare delivery system

It is well established that functional healthcare delivery systems are comprised of certain building blocks that allow them to provide effective care. As all competent healthcare administrators know, the failure to carefully design, implement, and maintain these building blocks can cause a system to devolve quickly into chaos and substandard care. In the Arizona system, I found ample evidence that most of these elements are either missing or profoundly flawed.

### 1.  Centralized organization/management structure

It is axiomatic that a functional system must be well structured, with clear lines of authority, oversight, and accountability. The healthcare delivery system in Arizona prisons has none of these characteristics. Instead, it has experienced years of chaos. The State ran its own healthcare system for many years, before contracting to the lowest bidder in July 2012. Wexford, the company that won the contract, by ADC's own

account failed utterly to implement a healthcare system that met minimum constitutional requirements, and was replaced in early March 2013 by Corizon, the next lowest bidder. Corizon has run healthcare in the Arizona prisons since that time.

(a)     **ADC to Wexford to Corizon**

It is clear from the documents and depositions I have reviewed that medical care has been systematically deficient during these transitions.

With ADC in charge prior to July 2012, healthcare reportedly suffered from many of the same deficits I see in the present system and discuss throughout this report, including failures in intake screening, with "grossly incomplete" transfer summaries, poor documentation of medical histories, and failure to provide preventive care (WEXFORD000023-25)[2] ; medical records that were disorganized, incomplete, and sometimes lost (27, 68); chaotic and unreliable chronic care (29, 73); poor care for HIV patients, with incorrect dosages and medication combinations that placed patients at risk for developing drug-resistant HIV (35); a backlog of thousands of referrals for outside specialty consultations dating to 2008 (39-40); lack of negative airflow infirmary beds (43); care "below acceptable standards" (46), inadequate or nonexistent quality improvement programs and "[w]idespread quality deficiencies" (54); nurses practicing outside the scope of their licenses (59); and "longstanding medication administration practices that were not only dangerous and outside accepted scope of practice, but also threatened nurses' licensure" (66-67).  In sum, "[t]he ADC system is broken, and does not provide a constitutional level of care."  WEXFORD000003; see also ADC048247-48250.  More specifically, "[a]fter working within the ADC inmate health care system for four months, Wexford Health finds the current class action lawsuits to be accurate." WEXFORD000003; see also WEXFORD000130 (same), WEXFORD000075 (as of

---

[2] The citations in this sentence are to documents produced by Wexford, with the Bates number prefix WEXFORD0000.  For the sake of efficiency, I do not repeat the prefix for each citation.

November 2012, "[p]rocesses and practices outlined in detail in the ADC's current class action lawsuits remain present; the ADC has not shared any improvement plans with Wexford Health"). At least one high-level ADC official admits to problems pre-dating Wexford's arrival. ADC's Medical Program Administrator admits that chronic care was a problem when ADC ran its own medical care because of short-staffing. Deposition of David Robertson, August 26, 2013 (Robertson Depo), at 65:1-65:6.

Wexford's eight-month tenure in Arizona was rife with serious problems. On September 21, 2012, ADC sent a "Written Cure Notification" to Wexford's Director detailing 20 significant areas of non-compliance, including, again, the same problems outlined in this report: lack of basic building blocks of a healthcare delivery system (inadequate staffing leading to treatment failures; inadequate quality assurance measures; poor communication between field staff, prison administrators, and Wexford); failure to provide timely access to care (patients not getting seen, patients' health needs requests and grievances ignored, chronic care patients not identified); and failure to provide care that is ordered (medication delivery failures, interruptions, discontinuations and changes; specialty care not provided). ADC027854-ADC027860. All deficiencies were identified at all ten ADC complexes. *Id*. at ADC027863-ADC027869. Wexford, in response, did not dispute the deficiencies; instead, they placed the blame on ADC, stating that they could not cure them in 90 days and that most "are long-standing issues, embedded into ADC health care policy and philosophy, and which existed well before Wexford Health assumed responsibility for the program." ADC027941-ADC027942.

In March 2013, Corizon assumed responsibility for healthcare in Arizona prisons. This report is grounded on information dated since that time, although I include older data when relevant. The current fundamental failures I describe are nearly identical to Wexford's portrait of ADC (WEXFORD000001-131) and to ADC's portrait of Wexford. ADC027854-27860. Corizon has clearly has not managed to turn this ship around.

There are surface differences between ADC and Wexford and Corizon, but care has been egregiously bad for years, under direct supervision of all three.  I can state this confidently not only because of the finger-pointing reports from ADC and Wexford, but also because the types of problems I found and describe in this report – such as the widespread failure to follow policies, provide timely care, and deliver appropriate medications -- are chronic ones that do not develop overnight.  I have also seen compelling evidence, in patients' charts and in the documents and depositions I have reviewed, that the problems are of long standing.

Privatization is inherently risky in the correctional realm, as Joe Profiri, ADC's Contract Bed Operations Director, points out: the profit motive leads to corners being cut.  AGA_Review_00037464 ("Wexford by design will maintain minimum staffing to maximize profits").  It also leads to dilatory and inadequate responses to serious and life-threatening treatment failures: I agree with Mr. Profiri that Wexford (and Corizon as well, from my review) has displayed a lack of urgency to repair the problems, which "is all to[o] often a component missing with privatization."   AGA_Review_00037465.

As Mr. Profiri stated, "Wexford's failure[s] in many ways are our failures." AGA_Review_00037462.  The same is true of Corizon, and any private company the State contracts with to provide essential services.  ADC is ultimately responsible for the lengthy catalogue of deficiencies and damage I describe in this report.

### (b) Current oversight: the MGAR system

The oversight structure Arizona uses to monitor Corizon and ensure that care is delivered in its prisons is the Monthly Green-Amber-Red (MGAR) reporting process.  In this system, certain performance measures -- such as timeliness of sick call, scheduling of urgent specialty consultations, and appropriate medical records filing -- are selected each month.  Not all measures are monitored all the time.  Declaration of Kathleen Campbell, Dkt. No. 707-1, October 28, 2013, at ¶ 4.  The ADC monitor measures compliance for the selected performance measures, and enters a finding of green, amber, or red to

11

indicate compliance levels.  *Id.*  The computerized system automatically generates an emailed request for a corrective action plan (CAP) to Corizon to address each individual deficient finding.  *Id.* at ¶ 7.  Any CAP is entered into the MGAR system, but the monitor does not know unless he or she looks for it in the system, and the CAP for each individual performance measure is stored separately, making the review of a large number of CAPs onerous.  *Id.* at ¶¶ 8, 11-12.

The MGAR process, while providing extensive evidence of the deficiencies of Wexford's and Corizon's performance, is a failure as a management oversight structure. While the MGAR reports are helpful for pointing out certain errors and omissions, they are not effective measures of compliance.  At least one monitor agrees: the Perryville monitor testified that MGARs are "probably not" a fair representation of compliance. Haldane Depo, 136:20-137:5.  The Corizon Vice President for Operations testified that she did not think the MGARs were a meaningful quality assurance process.  Deposition of Vickie Bybee, October 10, 2013, at 6:17-6:18, 90:10-90:14; 91:7-91:20.

There are several reasons for this.  First, monitors have no meaningful standards. The MGARs list performance standards and rate them on a color based system (green, yellow, and red) to indicate compliance levels.  The scoring is arbitrary, there are no scoring standards, and the results do not conform to anything that resembles meaningful performance grading.  Deposition of Kathleen Campbell, September 11, 2013, at 71:8-71:12 (no scoring criteria).  The deficiencies associated with this process are demonstrated by the monitors themselves: Deposition of Arthur Gross, September 9, 2013, at 107:6-107:12 (individual monitors decide based on own judgment when a deficiency changes from amber to red); Deposition of Marlena Bedoya, September 10, 2013, at 113:15-113:24, 158:24-159:13 (decisions about severity and significance of data reported in MGARs based on personal feelings; Tucson monitor has no rubric); Deposition of Jenny Mielke-Fontaine, September 20, 2013, at 98:24-99:1, 238:16-238:21 (difference between amber and red is "subjective"), 229:9-229:24 (MGAR "is a

12

subjective tool"), 317:10-317:16 (no policy directs monitors on number of charts to review); Deposition of Anthony Medel, September 17, 2013, at 64:5-65:8, 192:25-193:8 (no personal rules for Yuma monitor about what colors correspond to what percentages compliance); Deposition of Mark Haldane, September 18, 2013, at 162:6-163:21 (although specific performance standard not met, it was marked green by Perryville monitor because "other deficiencies [are] of higher priority" and "if everything is a priority, then nothing is a priority"), 164:2-164:10, 165:12-166:14 (green rating for one item despite noncompliance over 30% because "progress [was] being made").

Second, the rating system is unreliable.  I found deplorable treatment errors and systemic deficiencies in care at the Yuma complex, but the ADC monitor has never given Corizon a red mark because he does not believe they have warranted it.  Medel Depo, 116:22-116:23.  He rated one item amber that had a 44% compliance score, down from 55% the previous month.  Medel Depo, 215:12-220:13.  The same monitor was unable to explain why he rated Corizon better on staffing in June 2013 than in July 2013, despite the fact that staffing numbers were better in July.  Medel Depo, 209:7-213:21.

Third, some monitors also lack the necessary skills to be effective.   Mark Haldane, the Perryville monitor, has no formal health training at all.  Haldane Depo, 13:9-13:11.   Arthur Gross, ADC Assistant Director over the Health Monitoring Bureau which is responsible for the monitoring, has no clinical medical training.  Deposition of Arthur Gross, September 9, 2013, 10:4-10:14.

Compounding all these problems is the fact that the individuals in charge of the healthcare system do not take the monitors or their reports seriously.  Mr. Gross, the Health Monitoring Bureau chief, does not read the monthly MGAR reports or any CAPs from Corizon.  Gross Depo, 13:17-14:2 (MGARs), 97:4-97:9 (CAPs).  ADC's Medical Program Administrator similarly does not read the monthly MGAR reports.  Robertson Depo, 79:13-79:16, 120:6-120:12.  He knows so little about the process that he believes that if a monitor identifies a specific problem as amber status in an MGAR, it is the

13

monitor's responsibility to follow up on the problem and see that it is addressed (a responsibility disavowed by the monitors, as I discuss below).  Robertson Depo, 83:11-83:21.

Although MGARs are inadequate measures of compliance, they do contain valuable information about deficiencies; many of my conclusions are informed by the problems they describe.  However, I see no evidence that the MGAR process has contributed to any solutions for these problems, primarily because there is no evidence that the monitors or anyone else takes appropriate action to correct problems, even if they find chronic noncompliance.  Bedoya Depo - Tucson, 160:8-160:21 (not the monitor's responsibility to take action if a measure is in noncompliance for consecutive months), 220:17-221:3 and 221:9-221:12 (monitor can't fix problems); Haldane Depo – Perryville, 78:5-78:17 (his responsibility is to report the problem; he can't force compliance), Haldane Depo – Perryville, 63:22-65:4, 176:25-178:23, 65:8-65:24 (monitor's role is to "keep reporting it, and if it's important to somebody above my level, then they can get it corrected.  If it's not that big of a deal, if nobody cares, then it probably isn't my job to care either"), 53:12-56:1 ("no powers to force [Corizon] to do anything"); Mielke-Fontaine – Florence, 212:23-213:5 (Corizon's job, not hers, to solve problems), 213:6-213:10 (no change to her responsibilities if she finds repeated, chronic noncompliance).

The utility of these reports is further limited because monitors do no analysis: they do not investigate causes of noncompliance.  Bedoya Depo - Tucson, 196:4-196:7 (no investigation of causes for noncompliance); Mielke-Fontaine Depo – Florence, 112:4-112:7 (not her job to look at past performance), 299:8-299:9 (no analysis of MGAR data), 196:7-197:23 (found poor compliance with patient access to care in July 2013, but did no follow-up or analysis).

There are also areas of oversight that the MGARs do not even address.  For example, ADC does not monitor whether Corizon performs adequate training or orientation for staff.  Gross Depo, 95:17-95:20.   The MGAR process does not address

whether informed consents have been obtained.  Deposition of Kathleen Campbell, September 23, 2013, at 52:19-53:6.  The monitor for the Phoenix complex, where all male ADC prisoners undergo intake screening, does not know the requirements for intake medical screening; her job is merely to "monitor if they have complied with completing all the forms. . . . Medical, clinically what they're to be doing. . . that's not my area." Deposition of Helen Valenzuela, August 23, 2012 (Valenzuela Depo), 87:20-89:20.

The monitoring ultimately is ineffective.  The CAP process is, essentially, a farce: chronic noncompliance is simply reported over and over and over again, and to the extent CAPs are even produced, nobody appears to review them to see if they are effective. Campbell Depo (September 11, 2013), 90:11-90:13 (statewide nursing monitor did not track whether she or the nurses she supervised ever received a CAP); Winland Depo, 41:16-41:23 (statewide pharmacy monitor has never seen a CAP); Haldane Depo – Perryville, 54:1-55:12 (CAPs had "canned responses" that "in many instances [were] not responsive to the issue that was raised"), 56:12-57:17, 143:3-143:17; Mielke-Fontaine Depo – Florence, 101: 6-101:9, 102:2-102:18 (doesn't know whether CAPS required for amber or red findings).  The persistent deficiencies that plague ADC institutions highlight the inefficacy of the review process.

### 2.  Consistently followed policies and procedures

Policies and procedures are fairly standardized across correctional healthcare systems.  In the Arizona system, I was struck by the widespread violation of the policies and the lack of oversight and accountability that would compel compliance.

Basic healthcare policies – such as those governing sick call timelines, chronic care management, healthcare records filing, and specialty consultations -- are violated in the Arizona system to a distressing degree.  For the sake of space, I will not repeat here the evidence set forth throughout this report, particularly in Sections II.B.1, II.B.2, II.C.2, II.C.3, II.C.4, II.D.1, and II.D.2.

15

In addition to its abysmal record in following its own policies, Arizona also lacks some critical written policies.  The following are all policy omissions that fall below community standard of care for correctional healthcare systems: (all citations are to Defendants' Responses to Plaintiff Verduzco's First Set of Requests for Admission, June 11, 2013): ADC policy does not require diabetic prisoners be referred to ophthalmology if healthcare staff detect the presence of retinopathy (Response 211); ADC policy does not require that healthcare staff consult with an HIV specialist prior to initiating, changing, or discontinuing medications for HIV positive prisoners (Response 241); ADC policy does not require that prisoners with COPD be given an annual pneumonia or flu shot (Responses 199-202); ADC policy does not require that prisoners on anticoagulants have their blood tested every 4 weeks to measure their INR levels, and if the level is not within the therapeutic range that they be monitored every 7 calendar days (Responses 193-196); ADC does not have a tuberculosis control program at each prison complex (Response 167); ADC policy does not require that prisoners with symptoms of pertussis be single-celled (Response 171); ADC policy does not require that prisoners with symptoms of influenza be single-celled (Response 173); ADC policy does not require that healthcare staff always have a sharps container within arm's reach when using a needle or sharp instrument to reduce the possibility of blood-borne pathogen exposure (Response 189);  ADC policy does not require prisoners suspected or confirmed to have chicken pox be isolated in a negative pressure room (Response 179); and ADC policy does not require prisoners with tuberculosis symptoms or positive tuberculosis tests be isolated in a respiratory isolation room (ADC does not have a respiratory isolation room, and states that if a provider suspects a prisoner has tuberculosis, that inmate will be sent to the hospital) (Responses 169-170).

Arizona lacks other policies that, while not strictly necessary in order to provide community standard of care, are nonetheless good practice.  Because their absence contributes to the deficiencies in the system and because adoption of these policies would

16

be helpful as one aspect of system reform, I set them out as recommendations but not requirements: ADC policy does not require that prisoners on anticoagulants be examined by a healthcare clinician at least every 90 days (Response 197); ADC policy does not require prisoners with chronic obstructive pulmonary disease and forced expiratory volume 1 score < 50% be seen by a clinician at least every 90 days (Response 203); ADC policy does not require prisoners with cirrhosis be given at the time of diagnosis a baseline screening esophagogastroduodenoscopy for the diagnosis of esophageal and gastric varices (Response 229); ADC policy does not require prisoners with cirrhosis be screened with an abdominal ultrasound at least every 180 days (Response  231); ADC policy does not require prisoners with cirrhosis be examined by a clinician at least every 90 days (Response 233); ADC policy does not require prisoners with chronic Hepatitis C be given annual blood tests for their levels of aspartate transaminase, gamma glutamyl transpeptidase, bilirubin, platelets, and international normalized ratio level (Response 235); ADC policy does not require prisoners with chronic Hepatitis C be screened with an abdominal ultrasound at least every 180 days (Response 237); ADC policy does not require prisoners whose seizures are managed with anti-epileptic drugs be examined by a healthcare clinician at least every 180 days (Response 253).

### 3.     Adequate staffing

Staff are the backbone for medical care delivery.  There is no dispute that there is a medical staffing crisis in the Arizona prisons.  The ADC Assistant Director over the Health Monitoring Bureau admits that "there are shortages of providers that need to be addressed" (Gross Depo, 97:22-23), and that as of June 2013, "the staffing patterns were insufficient.  They were at 53 percent of staffing positions."  Gross Depo, 115:7-9.

The evidence to support his conclusion is overwhelming.[3]  Robertson Depo, 88:14-88:16, 90:8-90:15 (in April 2013 at Florence South Unit, staffing problems caused

---

[3] The numbers of prisoners in these individual units is relevant to the compliance numbers I describe.  For the sake of efficiency, I have not included the population

the unit to be more than 500 behind on chronic care with at least 100 charts pending review), 93:15-93:21 (only one part-time physician at Tucson when the contract indicated that two should be employed); 95:9-95:13 (monitors are always pressing for more staff); 104:3-104:11 (staff shortages are "an outstanding issue" at all prisons); Haldane Depo - Perryville, 45:6-46:2 (Perryville is persistently noncompliant with requirement that referrals from sick call to providers be seen within 7 days because they "don't have the staff to meet that requirement, and it's almost never met"), 222:15-223:5 ("staffing shortages throughout the complex" and "nurses [were] reporting that without the ability to use registry staff or overtime and with nurse hours being cut beginning the week of 4/28/13, they do not have the ability to fill all shifts "); Deposition of Jeffrey Sharp, October 9, 2012, at 50:20-51:1 (according to Perryville physician, not enough medical staff at complex to provide adequate care).  As of September 27, 2012, 35% budgeted full-time equivalent healthcare positions and 47% of all budgeted full-time equivalent medical provider positions statewide were vacant. ADC035214, ADC049045-49055.

ADC's own monitoring reports describe that widespread understaffing leads to inadequate care and delays in care.  See, for example, ADC154342 (September 30, 2013) (nurses at Tucson frequently get called off, leaving the unit understaffed for total care patients); ADC154338 (September 28, 2013) (open positions at Tucson lead to missed sick call deadlines and chronic care backlogs); ADC154210-11 (September 18, 2013) (Perryville San Pedro does not have an RN and Perryville San Carlos has only one pill nurse); ADC154210 (September 18, 2013) (vacancies throughout Perryville "affect the ability of existing staff to meet the needs of all" patients); ADC137395  (July 29, 2013) (Tucson's open positions include 1.5 LPNs, 3.7 nursing assistants, 1.5 physicians, 4.1 RNs, 1 RN supervisor, and 1 regional director); ADC137335 (July 29, 2013) (open positions per the contract staffing pattern at Phoenix leave staffing insufficient to meet

---

number for every housing unit in every reference in this report.  Instead, I attach as Exhibit D a recent ADC population report to give some context to these numbers.

prisoner needs); ADC137309 (July 26, 2013) (for at least one year, Perryville has had only one nurse on duty between 0500 and 0700, and she conducts diabetic lines, leaving no nurse to respond to emergencies or the use of restraints); ADC137445 (July 25, 2013) (Yuma lacks 0.5 LPN, 3 full-time nurse practitioners, 0.4 nursing assistants, 1 physician, and 0.6 RNs); ADC137260 (July 26, 2013) (Florence is only 80% staffed); ADC137445 (July 25, 2013) (Yuma is not fully staffed and not able to meet the needs of the prison population); ADC137259 (July 19, 2013) (Florence Globe has only one RN working on assignment, and labs had not been drawn since March); ADC088885 (April 30, 2013) (Florence South has no regularly scheduled healthcare provider); ADC089055 (April 29, 2013) (Tucson staff vacancies include 1 nurse practitioner, 1 RN supervisor, 2 staff RNs, 7 nursing assistants, 1 psychologist, 2 mental health registered nurses, 1 physician, and 1 regional director); ADC088949 (April 30, 2013) (Perryville lacks a Director of Nursing, Assistant Director of Nursing, and a nursing supervisor); ADC088886  (April 29, 2013) ("Florence complex has onl[y] one HCP and two mid level providers at this time" and "[a]ll units have numerous in[ma]tes overdue for chronic care visits and referrals"); ADC088930 (April 29, 2013) (Perryville lacks dedicated medical records staff in three units); ADC088976 (April 28, 2013) (upper management at Phoenix Aspen does not permit overtime and the use of agency despite an "extremely high back load number of intakes, resulting in medical and medical records staff working until midnight); ADC089108 (April 26, 2013) (At Yuma, "staffing is not adequate/effective to meet[] the facility's needs"); ADC088951 (April 24, 2013) (April schedule at Perryville shows no or partial coverage by CNA some days leaving one RN for 5-7 infirmary patients, two of which are high acuity and one of which requires two-person transfer); ADC088885-86 (April 23, 2013) (according to nurses, nurse shifts at Florence are unfilled because hours are being cut, and they are prevented from using registry staff or overtime); ADC089057 (April 17, 2013) (Tucson infirmary has six total or almost total care inmates and only one day shift, part-time second aid staff); ADC088885 (April 16, 2013) (per Florence Central

19

staff, use of overtime or registry nurses is not permitted resulting in May schedule coverage gaps in the infirmary, on Sundays, and in cell blocks on some days); ADC088852 (April 14, 2013) (no provider on site during March at Florence Globe); ACD088771 (April 5, 2103) (Phoenix has only one mid-level staff member providing "all the patient care at this facility"); and ACD088750 (April 3, 2013) (Florence has only two full-time medical providers for all units and one part time medical provider for South and Kasson).

Some staffing problems appear to have grown worse under Corizon's management.  The Tucson Medical Director reacted with dismay in February 2013 to the news that Corizon would cut back significantly on the already over-extended providers: "Our skeleton just lost a foot and tibia."  AGA_Review_00001721.  He explained that he "[a]nticipate[s] the already overloaded backlog to get worse over the next few months" and warned that "[a]ll providers are telling me they are mentally, emotionally and physically exhausted already and so am I. . . . there is absolutely no way we can provide contract required coverage w/ current staffing."  *Id.*

Nursing coverage appears be similarly strained under Corizon: an ADC monitor noticed in April 2013 that Florence Central's May schedule showed "days that there is no coverage in any of the cell blocks"; Eyman's Cook Unit showed nursing hours cut by 40 hours per week.  AGA_Review_00013126.  The monitor noted that "[e]ven at current staffing levels," nurses were cutting corners to keep up with their work, including pre-signing medication administration reports, failing to take patients' vital signs, and failing to update problem lists in medical records.  *Id.*  See also AGA_Review_00001704 (Corizon cut pharmacy technical staff in half at Tucson, down to four pharmacy technicians for more than 5000 patients); AGA_Review_00009347 (as of March 28, 2013, pharmacy staff at Tucson too small to ensure prisoners are provided medications on release: "the current system IS NOT working").

I saw evidence of inadequate staffing on my tours.  At Tucson, the Medical Director's concerns from February, quoted above, were clearly justified:  there were only two physicians in the complex, one of whom is the medical director and thus has administrative duties in addition to seeing patients.  The other is part-time.  These numbers are completely inadequate for a prison with 5,000 prisoners.  One patient in the infirmary (called IPC, or inpatient care unit), ███████████████, told me he hardly ever sees a doctor, which does not surprise me.  Nursing care suffered from similar deficits: there were only two RNs for 40 patients in the IPC.[4]  I saw some of the results of Tucson's staffing deficiency on my tour: a large number of lab results and consult results and x-ray reports, some of which showed significant abnormalities, that had not been filed or reviewed for four to six weeks (described in more detail below in Section II.D.3).

At Perryville, I saw a notation in a healthcare record for a heart patient named ███████████████: her chronic care follow-up form dated April 2, 2013, by D.O. DL Palmer indicated that "I have concerns of patient on this yard – no weekend nurse coverage."

Staffing shortages endanger patients.  Sharp Depo, 52:23-52:25, 53:1-9 (according to Perryville physician, the staffing problems can create delays in providing medical care which can create a serious medical risk).  They do this in a variety of ways: they lead to excessive delays in access to care (Section II.B, below), healthcare staff acting outside the scope of their licenses (Section II.C.3, below), the failure to carry out providers' orders (Section II.D.1, below), and the failure to review and file diagnostic test results (Section II.D.3, below).

---

[4] Nursing staff is spread thin in other Tucson units as well: I saw a chart on my October 25 tour which laid out the nurse staffing per unit: in Cimmaron, 1 RN 2 LPNs; in Winchester, 1 RN 2 LPNs;in the Minors Unit, no RN 1 LPN (for passing out meds only); in Santa Rita, 2 RNs 1 LPN; in Rincon, 2 RNs 1 LPN; in Whetstone D, 1 RN 2 LPN; in Whetstone E, 0 1 LPN; in Manzanita  D, 2 RNs 1 LPN.  There are not enough nurses to meet the needs of these patients.

21

### 4.    Adequate physical facilities

My observation of the physical facilities at prisons I toured showed me that basic elements are there: equipment, exam rooms, storage facilities, lab draw rooms, medication storage rooms were generally acceptable and generally clean.[5]

While the form was usually acceptable, the scale of the physical facilities is far too small: the clinic areas I toured in Perryville, for example, were surprisingly small and the infirmary – the highest level of care for the entire women's prison of over 3600 women – had only seven beds.  At the time of my tour, only three were filled.  I could not help wondering where all the sick women were, because in that large a population, many more infirmary beds are needed.

I was also shocked at the extremely small medication rooms in the prisons I toured.  They simply do not have the capacity to address the medical needs of the number of people they are intended to serve.

Further, even undersized physical facilities are drastically underutilized, as was clear both from my personal observations and from the serious deficits in care evident in the healthcare records and from the interviews with prisoners.  For one thing, there is no possible way staff are identifying and treating the medical needs of the population, given how few medications are being dispensed.  I saw in Florence North an open metal case filled with medication bins.  The population in this unit was 1078 at that time, and in a population that size I would have expected to see many more medications than were in the bins on the shelves of this metal case.  Similarly, in Yuma, on a yard of 1000 inmates there were only three medication bins, far too small for the population.  Because of the

---

[5] There are scattered problems with physical facilities for patient living and care, however.  A Perryville physician testified about conditions in Lumley Unit Building 30, with prisoners living in cells exposed to the weather, with no climate control in the heat of the Arizona summers, and a small exam room on the end of the building for medical care delivery: "I was kind of shocked . . . that the prisoners would live like that and I would be expected to provide medical care in that physical facility."  Sharp Depo, 82:20-83:19.  I viewed that unit and agree that the facilities and patient living conditions are substandard: the cells are indeed exposed to the heat and the outdoor elements and the exam room is airless and lacks basic equipment and facilities for medical care delivery.

dramatic lack of evidence of medication I saw on my first day of touring Yuma, I specifically requested to attend a medication pass to verify my concerns.  On my second day I attended medication pass on Yuma's Cheyenne Unit which had a population of approximately 800 prisoners.  Pill line started at 11:58 am and was complete by 12:12 pm and a total of seven patients received medications that I observed.  It is simply not possible to believe that the healthcare needs of the prisoner population are adequately met when less than 1% of the population receives medications from pill line.

It is not just the paucity of medications being dispensed that leads me to believe that the medical facilities are underutilized.  I toured five prison complexes over a total of approximately eight days and saw hardly any encounters with nurses or primary care providers, hardly any patients in waiting areas, and hardly any medication being delivered.  Aside from a few scattered finger sticks, a very few patients with providers, one short pill call, and a dozen prisoners waiting to be seen outside one clinic, I saw no evidence of care being delivered on my tours.  Instead, I saw staff in their offices or moving around the prison and many empty exam rooms that clearly were not in routine use.  On all of the tours I looked in the biohazard waste disposal cans present in the exam and treatment areas.  These are generally not emptied daily in medical care settings and they contained scant biohazard waste material.  This is not a definitive finding but it is an observation across the system that correlates with the general paucity of care I observed.  It is simply impossible that so few people are in need of medical care at these prisons.  In prisons the size of those I toured, even ones holding a primarily healthy population, I would expect the clinics to be a bustle of activity, with patients being seen, waiting to be seen, having vital signs taken, obtaining medications, being tested, and so forth.

I was surprised to hear that ADC does not have a negative-pressure rooms or respiratory isolation rooms; their policies state that any prisoners requiring such housing are sent to outside hospitals.  Responses 169-70 and 179, Defendants' Responses to Verduzco's First Set of Requests for Admission.  A system this size should have these

facilities.  In a correctional facility there are multiple reasons why patients would need respiratory isolation as part of a precautionary step while they are assessed or treated.  It is simply not reasonable in a system of this size to send all of these patients to the hospital.  Many of these patients require extended isolation while the disease workup is completed.  If Arizona does send all of the patients who legitimately need this type of isolation to the hospital, the cost would be extraordinary and wasteful.

**B.      Timely access to care**

Having discussed some of the building blocks of a medical care delivery system, I turn now to consider the four broad categories of care.  The most important major category of a functional medical care delivery system is access to care: the seemingly simple task of getting patients to see nurses and providers.  Arizona fails this fundamental task.  I have seen a shocking number of delays in access to care or even complete denials of care in Arizona's prisons.  Some delays I saw were catastrophic and entirely preventable; other delays were less damaging to patients simply through luck of the draw: if a tumor turns out to be benign, a lengthy delay in providing a biopsy does not result in morbidity or mortality.  However, the systematic failure to provide timely access to care places all patients at an unreasonable risk of serious harm.  Patients with significant injuries or illnesses in the Arizona prison system are not safe: they are at serious risk of preventable negative outcomes.

One typical example of delayed access to care provides an introduction to the topic. ████████████████ at Perryville found a lump in her breast on February 27, 2013.  She filed an HNR immediately, saying the lump was "very sore."  She was initially seen by a nurse on February 28 and a nurse practitioner on March 7.  She had a mammogram performed on April 3 that resulted in an urgent consult being submitted by the facility doctor on that same date.  There are several notes in her chart from her facility doctor that trace the care:  May 6 (biopsy re-faxed to Dr. Irving); May 15 (still waiting for approval for biopsy); May 21 (no biopsy yet); May 22 (verbal approval for consult);

May 29 (official approval still pending doctor left message again); June 5 (doctor discussed case with supervising doctor still awaiting official consult approval); June 11 (doctor called and informed that patient was scheduled with surgeon); June 18 (patient sees surgeon for pre-op evaluation); June 20 (consult written to obtain biopsy per surgeon's recommendation); July 1 (local doctor sees patient again no biopsy yet); July 18 (patient has biopsy of breast mass); July 22 (patient given results of biopsy).  The patient had Grade III invasive ductal breast cancer and it took five months to get a simple tissue diagnosis because of profound delays in access to care, even with her local physician actively advocating for her. The string of delays and incompetent treatment decisions is a catastrophe for ███████.  She now faces a much more invasive and toxic treatment regimen with the probability of much more extensive surgery needed to address her advanced cancer than if she had been worked up expeditiously.  The delays also greatly increase the risk of recurrence and metastasis of the cancer than if the cancer had been dealt with immediately upon discovery.

### 1.    Sick call/HNR system

Correctional healthcare systems are resource-limited environments.  In that setting, the most critical component of a sick call system is triage and it must be done face to face by an appropriately licensed healthcare provider (RN or above in Arizona), it must be done within 24 hours of receipt of the health needs request (HNR) and it must contain the basic elements of an assessment including brief history, vital signs, exam, and a disposition.  This is the doorway to care, and patients must be seen quickly, sorted out, and provided quick referrals to urgent care or provider appointments as needed.

Arizona's sick call and HNR system is not effective and patients face lengthy, sometimes life-threatening, delays in obtaining care.  Pursuant to Arizona's policies, prisoners in need of medical care must file written HNR forms, which are required to be triaged within four hours of the time they are stamped as received.  ADC010827.  The patients are to be seen the same day for urgent needs; otherwise, they are to be seen by

nurses for sick call ("nurse line") within 24 hours of the triage (or up to 72 hours if it is a weekend and clinically appropriate).  *Id.*  If higher level attention is warranted, patients must be seen by providers within seven days after that ("provider line"), as monitored on the MGARs.  My review of healthcare records, documents, and depositions and my interviews with patients demonstrated to me that Arizona has a system-wide deficiency in providing an effective sick call process.  The barriers to access at the front end are significant.  Prisoners with serious conditions, including extremely fragile patients with chronic conditions, simply cannot get seen by the appropriate medical personnel.

Because this element is so critical, I expended significant effort to understand the HNR process on my tours, in my staff interviews, in my patient interviews, and in my chart reviews.  What I discovered is that a triage system does not exist anywhere I visited. The existing sick call system consists of prisoners submitting HNRs to a mailbox; the HNRs are collected and answered several days after submission with the universal answer consisting of some variant of "you will be scheduled."  There were no signs of triage, no face-to-face assessment in a timely fashion, no vital signs, and no disposition.  I was unable to track individual HNRs through the process from submission to a provider visit and most of the charts I reviewed had stacks of HNRs that did not result in healthcare visits.  I did find sporadic evidence of what was termed "nursing sick call lines" that were conducted by LPNs long after the HNRs are submitted.  LPNs are not legally allowed to perform "assessments" on patients so those nursing sick call visits are ineffective and the LPNs are practicing outside of their legal scope of practice.  The patients I interviewed assured me, however, that the prison system is unerringly effective at charging them the fee for submitting an HNR and it happens very quickly even though the healthcare encounter they pay for often does not happen quickly or may not ever occur.  An excellent example of the consequences of an inadequate triage system and using nurses outside of their scope is the case of ███████████████ that I discuss in Section II.C.3.

26

The documentation of Arizona's failure to provide patients with timely access to care is overwhelming. ADC's Assistant Director over the Health Monitoring Bureau acknowledges that prisoners are not being seen in the appropriate time frames after the HNR is triaged by the nurse, and says he told Corizon to correct this problem. Gross Depo, 66:24-67:11. ADC's monitors document extreme backlogs in HNR and nurse and provider lines. See, for example, ADC154280 (September 30, 2013) (in September, Tucson had 11 missed sick call lines, 357 HNR backlog, 226 provider chart review backlog, 303 nurse line backlog, and a 535 provider line backlog); ADC154338 (September 28, 2013) (open positions at Tucson lead to missed sick call deadlines and chronic care backlogs); ADC137626 (August 28, 2013) (at Tucson, 20 missed sick call lines, backlog of HNRs (439), charts requiring provider review (252), backlog for nurse lines (317) and provider lines (393)); ADC137395 (July 29, 2013) (Tucson has backlogged charts needing provider reviews); ADC137360-61 (July 29, 2013) (Tucson Whetstone had 231 unprocessed HNRs, a provider line backlog at 322, and a nurse sick call backlog at 169, with similar statistics for Winchester, Cimarron, Rincon West Medical, Catalina, and Manzanita, and Santa Rita); ADC137309 (July 26, 2013) (Perryville San Carlos and Santa Maria have provider review chart backlogs); ADC088949 (April 30, 2013) ("[p]rovider lines, nurse lines, and chronic care appointments are each backlogged to varying degrees" at Perryville); ADC089000 (April 28, 2013) (April had only 29 provider line visits, with over 140 prisoners waiting to be seen, and a 227 prisoner backlog for the nurse line at Tucson Cimarron); ADC088745 (April 4, 2013) (at Florence Central, 36 HNRs were awaiting nurse line); Valenzuela Depo, 139:5-139:13 (sick call not occurring according to policy at Phoenix).

Arizona nurses consistently fail to see patients within 24 hours of the HNR review. Haldane Depo - Perryville, 206:3-206:15, 34:5-34:12 (requirement "almost never met at Lumley"); Bedoya Depo – Tucson, 159:20-24, 186:17-24 (timeliness is common problem); ADC154281-85 (September 29, 2013) (56 of 80 Tucson charts reviewed show

27

noncompliance); ADC154096-97 (September 30, 2013) (Florence units 82% noncompliant); ADC154183 (September 24, 2013) (in September to date, 36% of sick call appointments untimely in Perryville); ADC137583 (August 30, 2013) (at Phoenix, nearly all files show noncompliance); ADC137497 (August 30, 2013) (at Florence, nearly all files show noncompliance); ADC137629 (August 29, 2013) (Tucson prisoner had multiple HNRs for surgical, prescription, and medical device issues all of which have not been addressed); ADC137627 (August 29, 2013) (67 of 80 Tucson charts reviewed show noncompliance); ADC137497-98 (August 21, 2013) (32 of 44 Florence files noncompliant); ADC137363-65 (July 31, 2013) (at Tucson, 57 of 80 files noncompliant); ADC137259 (July 30, 2013) (Florence Central and South have stacks of HNRs waiting to be seen on sick call and by the provider); ADC137395 (July 29, 2013) (2-3 week wait for Tucson prisoners who file HNRs); ADC137419-20 (July 23, 2013) (widespread noncompliance in Yuma files); ADC089002 (April 29, 2013) (Tucson patient not seen for more than a month after HNR); ADC088848 (April 15 and 27, 2013) (at Florence, most charts reviewed show noncompliance); ADC089085 (April 26, 2013) (noncompliance on multiple yards at Yuma); ADC088915 (April 23, 2013) (custody levels and housing at Perryville Lumley interfere with compliance); ADC088847-48 (April 14 and 27, 2013) (36 of 54 records reviewed at Florence Globe show noncompliance).

ADC prisoners frequently do not see a provider within seven days of sick call. Haldane Depo, 45:13-46:2 (Perryville is persistently noncompliant with requirement that referrals from sick call to providers be seen within seven days because they "don't have the staff to meet that requirement, and it's almost never met"); ADC137632 (August 29, 2013) (37 of 44 Tucson charts reviewed noncompliance); ADC137556 (August 26, 2013) (Perryville noncompliant); ADC137424-25 (July 23, 2013) (widespread noncompliance at Yuma); ADC089087 (April 26, 2013) (same ); ADC088852 (April 18, 2013) (Florence

28

East sick call referrals seen in April were old as January 26); ADC088852 (April 14, 2013) (Florence Globe prisoners not seen in 7 days as there was no provider in March).

Some of the delay derives from the failure to conduct sick call consistently five days a week. See ADC154137 (September 30, 2013) ("[s]ick call is not being conducted 5 days a week at any unit on Florence complex. . . . Chronic condition back log of appointments is growing. Many inmates are not seen as ordered or required by disease management guidelines"); ADC154183 (September 24, 2013) (in September, only Perryville Lumley held sick call 5 days per week to date); ADC137497 (August 30, 2013) (sick call does not appear to be running 5 days a week on any unit in Florence); ADC137259 (July 30, 2013) (Florence sick call is not completed daily, requiring prisoners to continually reschedule); ADC137360 (July 29, 2013) (28 sick call lines were missed in July in Tucson); ADC088885 (April 30, 2013) (sick call line in Florence Central not run Monday to Friday); ADC089000 (April 29, 2013) (sick call not conducted 5 days a week at Tucson Rincon Minors); ADC089000 (April 28, 2013) (sick call not conducted 5 days a week at Tucson Cimarron); ADC088847 (April 27, 2013) (Florence Kasson demonstrated no evidence of a sick call nurses line during April); ADC089085 and ADC089108 (April 26, 2013) (multiple yards without sick call at Yuma); ADC088746 (April 4, 2013) (sick call was not conducted in Florence East Monday through Friday per policy); ADC088745 (April 4, 2013) (sick call was not conducted in Florence Central Monday through Friday per policy).

These findings are consistent with what I heard from prisoners, who described waits of weeks or months after submitting HNRs for conditions that should have been addressed in a far more timely fashion. In the healthcare records I reviewed, I saw numerous examples of HNRs that were ignored or had extremely delayed responses. For example, ███████████████████ in Tucson had testicular cancer and completed a course of chemotherapy at the end of 2012. He filed repeated HNRs seeking follow-up care. Despite his persistent attempts to receive care through the HNR process, his first

follow-up appointment after chemotherapy did not occur until June 11, 2013. A CT scan was ordered at that time and done on July 17, 2013, and he was finally seen in follow-up on September 25, almost a year after completing chemotherapy. The Arizona Cancer Center requested that he been seen again within one month but as of late October 2013 that visit has not occurred, and did not appear to be scheduled in the medical record. All of this delay has potentially life-threatening consequences for ███████ and yet the delays in care are attributable completely to the caregivers, not to this well informed and very concerned patient.

At Perryville, I found in my chart reviews a pregnant woman named ███████ ███████ whom staff had clearly forgotten about – as of July 31, 2013, she hadn't been seen since early May, when she arrived at the prison. An ultrasound consult was ordered for her on May 22, 2013, which is standard of care for pregnant women, but the ultrasound had not been completed. It is shockingly negligent not to obtain an ultrasound in a high-risk pregnant woman and the consequences are potentially dire for her and her baby. She told me that her due date was September 18.[6]

Clearly the HNR system in Arizona is broken. An appropriate way to run such a system would be for every HNR have a serial number on it, which gets a logged into a system by number and date. The log can then be reviewed closely to make sure that there are timely follow ups to medical needs set forth in the HNR. Under Arizona's current practice, nobody tracks HNRs electronically. Responses 36 & 37, Defendants' Responses to Plaintiff Verduzco's First Set of Requests for Admission (June 11, 2013); see also Mielke-Fontaine Depo – Florence, 221:5-221:11 (the only way Florence monitor knows about the timeliness of the triaging of HNRs is by pulling the patients' charts), 317:22-317:25 (monitor would not know if a patient is not seen in response to an HNR).

---

[6] I told the Perryville Director of Nursing the patient's name and number and urged her to have the patient seen and given the ultrasound that had been ordered two and a half months ago. She said "thank you" and walked away without writing the name down.

Thus, if an HNR is lost no one will know about it, and there's no accountability -- no way to reconcile a HNR request with actual proof that medical staff received it, saw it, and provided the necessary care. This allows staff to avoid their responsibilities. (I was not surprised to read about the discovery, in November 2012, of a pile of 768 HNRs in an office in Florence's Central Unit, many of which had not even been stamped or triaged. AGA_Review_00074092.) Also, the existing HNR process imposes a barrier to medical care. Prisoners soon recognize that the system is efficient at charging $4 to file HNRs, but not at responding to their healthcare needs. This creates a disincentive for prisoners to turn in HNRs: they know they will not get seen by medical staff but they do know that they will be charged. Prisoners delay asking for care until they are sicker and sicker, at greater risk of negative outcomes, and far more difficult to treat. Throughout my interviews on my visits, the prisoners consistently described a broken and unfair HNR process. They also explained that the workaround for the HNR process is to find a sympathetic corrections officer who, if sufficiently impressed with the patient's concerns, will call medical and make arrangements for an appointment. I describe my concerns with this situation in Section II.B.5.

The HNR process is also used to obtain refill medications. Prisoners with prescriptions who need a refill are required to submit the refill request on an HNR. In my experience, this process is designed to fail. Continuity of care for serious medical problems is compromised regularly because of the choice to use this broken HNR system to refill medications. One example of this deficiency occurred with ███████████ ███████ who is a very well-informed patient with HIV who is on a four-drug treatment cocktail. In order for him to be treated successfully he has to be on these four drugs consistently and without any gaps in daily therapy. Review of his medical records demonstrates clearly that the system has been unable to get him all four of his HIV medications refilled at the same time and the patient has filled out multiple HNRs explaining that he is missing some of the drugs from his regimen as a result of the HNR

31

medication renewal process.    In looking at the medication administration records in his chart, it is obvious that he has had big breaks in therapy and that he has been getting less than his four medications and that all of the medications are out of sync with each other. The consequence for the patient is that treatment with less than all four of the medications at the same time induces resistance in the HIV virus and his immune system is failing because of incomplete therapy.  All of this is unnecessary, but if Arizona continues to rely on this rudimentary HNR process that is horribly broken, cases like this will continue to be the norm.

### 2.    Chronic care

Chronic care clinics are a major focus of healthcare in any correctional setting. Preventive care is essential with chronic care patients; it is impossible to provide community standard of care without regularly scheduled appointments that allow providers to track the progress of these patients and ensure appropriate treatment modification are made.

Insulin dependent diabetes is a good example.  The standard of care is to schedule most of these patients for visits every three months.  Providers will examine the patients, review how things have been going, update their care records, and obtain the basic healthcare screening needs.  Various tests are employed at regular intervals, and providers can appropriately weigh risk and treatment options.

In Arizona prisons, the chronic care is haphazard at best.  There is no meaningful computerized tracking system for appointments for chronic care inmates who are supposed to see a provider every six months, just a physical appointment book.[7] Robertson Depo, 136:16-136:25.  Not surprisingly, chronic care prisoners in ADC

---

[7] According to Corizon Arizona Regional Medical Administrator Dr. Williams, Corizon has been using the IHAS database to track chronic care, but "it's our impression that the database is not complete," so they are developing a new system called Care Log. Williams Depo, 30:18-31:20, 32:20-32:24.  The new database will not track how often chronic care patients are seen by providers, however.  *Id.* at 36:24-37:3.

commonly do not see providers every three to six months as specified by their treatment plans; some chronic care patients go for years without seeing a provider.  See, for example, ADC154294-96 (September 30, 2013) (at Tucson, widespread noncompliance in charts reviewed); ADC154228-29 (September 27, 2013) (15 of 43 Phoenix charts reviewed show noncompliance); ADC154108-10 (September 27, 2013) (74% noncompliance at Florence); ADC137587 (August 2013) (41% noncompliance at Phoenix); ADC137502-03 (August 21, 2013) (noncompliance rate ranges from 70% to 90% at Florence); ADC137637-40 (August 19, 2013) (noncompliance at Tucson); ADC137395 (July 29, 2013) (examinations past due for chronic care patients at Tucson); ADC137309 (July 26, 2013) (chronic care appointments not timely completed at Perryville); ADC088861 (April 27, 2013) (8 of 9 Florence South chronic care files reviewed demonstrate noncompliance); ADC088860 (April 27, 2013) (5 of 5 Florence Central files reviewed showed noncompliance); ADC089091 (April 27, 2013) (chronic care patients at Yuma Dakota and La Paz not seen as specified in treatment plans); ADC089091 (April 24, 2013) (Yuma Cheyenne prisoner who had open heart surgery in 2005 had not been seen by chronic care); ADC088958 (April 21, 2013) (noncompliance at Phoenix Aspen); ADC089017 (April 20, 2013) (Tucson prisoner with chronic seizures last saw chronic care provider on 11/10/11); ADC088927 (April 12 and 16, 2013) (at Perryville, 2 of 9 San Carlos charts and 7 of 11 San Pedro charts show noncompliance); ADC088772 (April 5, 2013) (some chronic care patients at Phoenix have not been seen for years).

Moreover, ADC has severe appointment backlogs for many chronic care prisoners. ADC154137 (September 30, 2013) (at Florence, "[c]hronic condition back log of appointments is growing" and therefore "many inmates are not seen as ordered or required by disease management guidelines"); ADC154338 (September 28, 2013) (open positions at Tucson lead to chronic care backlogs); ADC088885 (April 30, 2013) (Florence South is 500+ behind on chronic care appointments with at least 100 charts to

review); ADC088885 (April 30, 2013) (Florence North's mid-level provider is 150+ behind on chronic care appointments and has 100+ charts to review); ADC088885 (April 30, 2013) (Florence East's assigned healthcare provider is 250+ behind on chronic care appointments and has approximately 75-80 charts to review); ADC088949 (April 30, 2013) (Perryville chronic care appointments are backlogged); ADC088885 (April 30, 2013) (Florence Central is behind 400+ chronic care appointments); ADC089108 (April 26, 2013) (Yuma La Paz has a 3-4 month backlog of chronic care visits); ADC088746 (April 4, 2013) (chronic care at Florence East is 250+ appointments behind and 58+ charts were on a cart awaiting review).

Many chronic care patients are simply not managed according to ADC policy. See, for example, ADC154298-300 (September 30, 2013) (at Tucson, 9 of 10 Rincon/HU9 charts, 5 of 10 Rincon charts, 6 of 10 Manzanita charts, 7 of 10 Catalina charts, 8 of 10 Winchester charts, 6 of 10 Santa Rita charts showed that disease management guidelines were not developed and implemented for chronic disease or other conditions not classified as chronic care); ADC154112-13 (September 27, 2013) (Florence develops and implements disease management guidelines only 26% of the time for chronic disease and other conditions not classified as chronic care); ADC154230 (September 27, 2013) (28 of 49 Phoenix charts reviewed demonstrated noncompliance with disease management guidelines for chronic disease or other conditions not classified as chronic care); ADC088862 (April 27, 2013) (25 of 36 Florence chronic care files reviewed showed noncompliance with disease management guidelines).

My chart reviews and patient interviews bore out this data. I saw chronic care problems at Phoenix, especially for patients with seizures and diabetes, particularly in the coordination of insulin and finger sticks. See also AGA_Review_00006398 (March 5, 2013, email notes multiple chronic care patient forms missing important information and two significantly late chronic care appointments at Phoenix).

34

At Florence, chronic care was similarly bad.  ███████████ had deficient and very sporadic attention for his poorly controlled diabetes, with blood sugars consistently in the 300s and some over 400 with no notes from the provider or nurses.  At those blood sugar levels the patient could very easily slip into diabetic ketoacidosis, a life- threatening condition brought about by abnormally high sugars.  I saw no acknowledgement that the nurses appreciated that risk or attempted to intervene to reduce it.  Day after day his sugars ran high with no intervention.   In addition, these out-of-control sugar levels cause accelerated damage to his other major organs so the longer he stays out of control the faster his other systems will fail.  His long-term blood work returned a Hemoglobin A1C level on September 3, 2013, of 10.9% which indicates extremely poor blood sugar control.  In looking at his medical records, he was housed at Lewis earlier in his incarceration where his sugars were well controlled and his Hemoglobin A1C was 6.4%, indicating ideal management.  He clearly can be managed successfully; he just needs proper care.   He put in an HNR on August 14: "want to see doctor to see why my sugars levels are so high" but he has yet to be seen as of the end of October.

I saw records for a Florence patient with diabetic retinopathy (███████████ ███████), who had only one chronic care visit on June 27, 2013.  His records appropriately indicated he should be seen every 60 days, but as of October 16, 2013, no follow-up visit had been scheduled.  A patient with HIV (███████████) at Florence had labs and a visit on January 13, 2013 (as far as I could tell from the file); the six-month follow-up that was requested (and is appropriate) was not done as of October 16, 2013.

These deficiencies present a serious danger because we know that those patients are fragile and at risk for developing significant complications.  With this group of patients, more than anywhere else, an ounce of prevention is worth a pound of cure, because many complications of these diseases are preventable if clinicians keep a careful watch on them.

35

### 3.    Emergency care

The problems described above with staffing and the HNR/sick call process also present barriers to appropriate responses to medical emergencies.  See, for example, ADC137365 (July 31, 2013) (Tucson prisoner submitted an emergency HNR for chest pains on 6/15/13 and was not seen until 7/9/13).

Custody staff play an essential role in providing first response emergency services. Given the fact of incarceration, they are simply the only people around who can do so.  It is essential for prisoner health and safety that these staff be properly trained and responsive to medical emergencies.  I saw many examples in the documents produced by the State of just the opposite: dereliction of emergency response duty by custody staff, often with dire results.  ADC 49423-24 (Employee Disciplinary Letter suspending sergeant 8 hours without pay: "As a supervisor you are required to respond to emergency incidents on your unit. You failed to respond to this emergency ICS for twenty five minutes after it was initiated. You also failed to generate the travel orders for this inmate to be transported which delayed her from obtaining medical treatment"); ADC 49438-39 (Employee Disciplinary Letter demoting sergeant to CO II for having an inmate perform CPR on another inmate who subsequently died); ADC 49440-42 (Employee Disciplinary Letter suspending CO II 40 hours without pay for "leaving the inmate experiencing a medical emergency, unattended, sitting on the floor").

I also saw multiple failures of custody staff to perform basic safety and welfare check on prisoners as required by ADC policy.  These failures also endanger the health of prisoners.  ADC 024177 – 83 (officer saw prisoner lying with head towards wall and legs draped over bunk's edge at 6:25 a.m., was called to other duties, and returned hours later to find inmate same position, dead, with rigor mortis set in: "another officer is 'supposed to' cover her post.  However that does not always happen, and the issue has been addressed as it is 'a constant battle'" (024180)); ADC 49412-14 (disciplinary letter suspending CO II 40 hours without pay for failing to conduct and log hourly security

36

checks after prisoner found dead); ADC O24972 – 024973 (prisoner died of lung cancer in cell; body was stiff and cold when found); ADC049457-58 (disciplinary letter suspending CO II 80 hours without pay for falsifying records and lying to investigators about conducting security, health, and welfare checks of bathroom after prisoner found unresponsive in bathroom); ADC049471-73 (disciplinary letter firing CO II after prisoner found dead in cell, strangled by cellmate, with rigor mortis setting in; investigation determined staff did not observe living breathing flesh during his checks); ADC049474-75 (disciplinary letter suspending CO II for 40 hours without pay for same violation, same incident); ADC049465-68 (disciplinary letter demoting lieutenant to sergeant for failure to post a replacement officer on unit for an hour, during which prisoner committed suicide).

Staffing failures in ADC emergencies are not confined to custody staff.  In one particularly disturbing case, on March 11, 2013, a prisoner in Tucson was found "covered in blood and feces" with "three lacerations from his neck and one laceration to his inner right forearm above the wrist" and "incomprehensible" speech.  AGA_Review_ 00007169.   Custody staff requested medical assistance, but the night nurse apparently did not have a vehicle and the Complex Shift Commander "had no staff available to pick up medical personnel."  AGA_Review_00007168.  An ambulance was called and arrived 16 minutes later.  AGA_Review_00007169.  For this patient, every minute counted and the lack of quick medical response might have had troubling consequences.  Apparently, this is not the only time such a barrier to effective emergency response has been noted.  AGA_Review_00007168 ("it seems like this also happened in the case of ███████ as well where they couldn't respond").

At Perryville in August 2012, three prisoners overdosed in the course of several hours, but not one was sent to the hospital.  AGA_Review_00038450.  According to one staff at the institution, "one provider . . . said she medically cleared two over the phone – which was not true.  One LPN requested guidance from the RN and was denied any and

she was left to her own devices.  One RN. . . asked another RN to falsify documentation. Bottom line – 3 OD's – none sent and everybody blaming someone else." *Id.*  See also ADC 025117 (RN refused to respond to asthmatic breathing emergency because she did not want to "burn her own gas"; patient died before he arrived at the hospital).

### 4.    Inpatient care

I toured all three inpatient care units in ADC: Perryville, Florence, and Tucson. Generally, the physical plant was fine for basic in-prison inpatient care, especially given the availability of contract hospitals to provide more complex specialty services.[8] However, care was not significantly better in the inpatient setting than I have described for outpatients in the Arizona system.  The recognition that these are extremely high-needs patients did not translate into better or more attentive treatment.  I saw evidence of serious problems with inpatient care in patient cases and other evidence that I discuss elsewhere in this report: inadequate staffing, discussed in Section II.A.3;  nurses practicing as primary care providers (███████████), discussed in Section II.C.3; failure to provide needed specialty referrals (███████████████████), discussed in Section II.C.4; failure to fulfill providers' orders ███████████████████ ████████████ discussed in Section II.D.1; and failure to provide necessary diagnostic tests ████████ discussed in Section II.D.3.

I saw other examples of problems with inpatient care in the ADC monitoring reports.  See, for example, ADC137397 (July 29, 2013) (Tucson infirmary patients not seen every 72 hours by a doctor or mid-level provider as required); ADC088885 (April

---

[8] One disturbing finding I saw in many of the ADC monitors' reports, however, was in the lack of a functioning call light system in many of these units.  See ADC154140 (September 27, 2013) (three infirmary rooms at Florence do not have a call system); ADC154214 (September 26, 2013) (Perryville does not have an infirmary call system); ADC137519 (August 29, 2013) (there is no working call light in the single man rooms at Florence); ADC137578 (August 27, 2013) (Perryville's infirmary patients must call through the door for staff as there is no call system).  Almost more disturbing is the fact that Dr. Williams, the Corizon Arizona Regional Medical Director, was unaware of any such problems.  Williams Depo, 128:22-129:6.

30, 2013) (Florence Central infirmary and HU8 prisoners are not receiving required physician rounds or follow up, and approximately 160 charts are awaiting provider review for labs, reports, medication renewals, and the like); ADC089057 (April 16, 2013) (Tucson prisoner had 33 falls in the infirmary since November 2012, the last of which required a craniotomy); ADC088887 (April 28, 2013) (as of 4/25/13, prisoners in the Florence infirmary and HU8 had not been seen for at least six days); ADC089057 (April 17, 2013) (Tucson infirmary has six total or almost total care inmates and only one day shift, part time second aid staff); ADC089057 (April 17, 2103) (Tucson infirmary has no supervising nurse 24 hours a day);  ADC088951 (April 24, 2013) (April schedule at Perryville shows no or partial coverage by CNA some days, leaving one RN for 5-7 infirmary patients, two of which are high acuity and one of which requires two person transfer.

### 5.   Custody involvement

Custody support is essential to achieve physical access to care.  In Arizona they act as gatekeepers to care, both preventing patients from reaching medical staff and intervening to try to get patients seen by medical staff (which demonstrates access problems as well as raising privacy concerns).

In the absence of a functional sick call system, custody staff act as gatekeepers for medical care: patients must persuade them that they need help in order to get to medical staff.  Many prisoners described having to beg custody staff to help them get medical care.  For example, ███████████████████ at Perryville went into labor in June 2013.  She told me that her water broke in the morning, but staff refused to take her to the hospital.  She reported that nurses refused to believe that her water broke, even though they tested the liquid and it tested positive for amniotic fluid.  After having contractions all day, she reported, she started to scream at about 7:45 p.m., and officers called 911 and had her taken to the hospital, where she gave birth.

██████████████████ also at Perryville, told me that she went into labor on July 27, 2013.  She reported that at approximately 11 a.m. she told a correctional officer she was in labor, only to be told to "wait until the contraction is over, I'll bring a wheelchair." At noon, she says, she was rolled to medical, where she waited for over an hour; by the time an ambulance was called and arrived, her contractions were one minute apart.  She told me she got to the hospital at 1:55 p.m. and had the baby 20 minutes later. Throughout, she says, she was never checked for dilation.  Medical staff seem to have almost entirely abdicated responsibility to custody staff to get these women to the hospital to give birth.

██████████████████ is a young otherwise healthy patient I met at Florence North Unit, who has had multiple methicillin-resistant staph aureus (MRSA) outbreaks in 2013. He told me that when he developed his second outbreak in May 2013 he walked immediately to the medical office on his yard to seek care because he knew what the problem was as a result of his previous outbreak a few months earlier.  The medical department refused to see him even for basic triage and told him to turn in an HNR to be seen.  ██████████ told me that he knows how fast these MRSA infections spread so he immediately appealed the refusal to the Deputy Warden on the custody side and after proving to the Deputy Warden that he had turned in an HNR and showing him his rapidly advancing infection, the Deputy Warden had him escorted to medical and demanded that they care for him.  The medical staff did ultimately care for him after correctional officer insistence for that episode but follow-up care that was ordered by the providers in his medical record has not been carried out and no attempt to eradicate the MRSA from his system has been undertaken so he can avoid future infections.

Reliance on custody staff as gatekeepers to such a degree is a dangerous practice. Unlicensed, unqualified people are making medical decisions.  It also raises patient privacy concerns, as does the practice in ADC of having custody officers dispense keep-

on-person (KOP) medications at some prisons.  Gross Depo, 63:22-64:1; Mielke-
Fontaine Depo – Florence, 278:11-278:15 (Florence).

###### 6.      End-of-life care and waivers of treatment

I encountered one situation that is worth describing in detail, since to me it is
emblematic of the utter disregard for patient care presented by the Arizona prison system,
as well as serious problems with understaffing and lack of oversight.  In the Inpatient
Care Unit at the Tucson complex, I chose two patients to interview because they were
both alert and talkative; I knew nothing about them beforehand.  After hearing their
medical concerns, I reviewed their healthcare records.  Both of their records had on
prominent display a blanket cessation of care form.  This type of document is commonly
called a "do not resuscitate" (DNR) form, but these were far broader: they included a
waiver of ongoing care, lab work, intravenous medication and sustenance, and the like.
These forms were filled out by the nurse in the unit and signed by the nurse and the
patients.  There were no informed consents documented by a physician or competency
evaluations by a psychiatrist

Surprised and concerned about such comprehensive waivers of treatment without
the protections that standard of care requires in such situations, I went back to talk to the
patients.  The first patient (█████████████) acknowledged his signature on the
form and identified it as "the form I had to sign before the nurse would give me any pain
medications."  I asked him to clarify and he told me that when he came to that unit he
was in so much pain from his colon cancer that he was crying in bed at night and couldn't
sleep.  He requested his pain medications and the nurse told him that she was worried that
his pain medications might kill him so she wouldn't give him any pain medications until
he signed the form.  I clarified the information a third time with him and had him repeat
his story to be sure I fully understood.

The second patient (██████████████) has end stage liver disease that results
in occasional increases in his blood ammonia level which results in hepatic

encephalopathy.  He was recently in the hospital for hepatic encephalopathy and during that time he was not conscious of his surroundings or what was happening to him, as is typical in such situations.  He does not remember being at the hospital or any of the care he received.  At the hospital, they executed a DNR upon admission, as is standard practice with conscious patients, despite his inability to comprehend his actions.  The attorney for the State on my tour informed me that the hospital DNR was merely carried forward to the Arizona prison system and that the one I saw in his file, signed in ADC custody, was simply "extra."  I am extremely concerned, based on the documentary evidence I reviewed, that this patient executed the hospital DNR while he was totally incompetent with a sky-high ammonia level.  In my opinion, no reasonable physician would honor such a document.  After his condition stabilized at the hospital, he was returned to Tucson and signed the comprehensive waiver of care order I saw in his file.  I asked him if he knew what the form was for.  He told me that could not read the form when he signed it because he didn't have his glasses, and had no understanding of what it was.  I explained the form to him and he indicated that those were not his desires.  As with the first patient, there is no record of any physician or psychiatrist involvement in this process.

I hesitate to generalize from two data points, but it is at the very least striking and disturbing that two such blatant violations of patients' rights to treatment and to agency in end-of-life decisions could exist with no apparent review or oversight.  Any medical professional should be disturbed on a on medical, psychological, ethical, emotional, humanistic, and legal level by the mere existence of these forms in these patients' files, lacking as they do any informed consent, provider involvement, or indicia of  review, much less the patients' accounts of coercive circumstances under which they were signed.

I believe that this practice has a great deal to do with the severe and profoundly irresponsible understaffing I observed in these high-acuity care settings.  I also suspect

42

that many more patients in this unit have such forms in their files and that it is essentially a work reduction technique by an overwhelmed understaffed nursing group with extremely limited physician engagement.

I did see an indication of other questionable practices in Tucson relating to DNRs and end of life care.  Shawn Jensen (032465), a class representative, testified in his declaration of November 6, 2012, that he and others had been presented with living wills, healthcare power of attorney forms, and DNR forms in Tucson in March 2012. According to Mr. Jensen, prisoners were given no education about the forms and no assistance with reading them; no healthcare staff were available to answer their questions; patients were simply told to complete them.  Prisoners who were monolingual Spanish speakers were provided with forms only in English.  This report makes it all the more urgent to investigate such matters thoroughly and to ensure patients in Arizona's custody are provided individual education and information about their options.

End of life planning and compassionate palliative care are important components of the practice of medicine, but they must be done with extreme caution in a correctional setting, with assiduous attention to detail, multiple independent reviewers, meticulous observation of informed consent requirements, and continual review of the appropriateness of the end of life plans given the condition of the patient.  None of that was present in Tucson.  The circumstances surrounding the clear violations of these patients' rights suggest that the problem is widespread and places patients at serious risk of denial of care.  I am deeply concerned that I do not know, and am unable to discover the depth and breadth of this problem, given the limitations placed on my ability to investigate in this case.

### C.    Exercise of professional medical judgment

The heart of a functional healthcare delivery system is the ability of the appropriate clinicians to exercise their professional medical judgment regarding patient care.  In order for that to happen, providers must first be able to see patients and second

43

must be equipped with the appropriate information to diagnose and treat them.  Nurses cannot dictate care in the same way; I am extremely concerned about the degree to which Arizona relies on nurses practicing outside the scope of their licenses to provide basic care.  I am similarly concerned about the degree to which providers are denied access to consultations from appropriate specialists, thereby forcing them to make patient care decisions outside the scope of their expertise.  Finally, I saw extensive evidence that providers often simply make very bad treatment decisions, and sometimes disastrously bad ones, to the serious detriment of their patients.

### 1.    Access to care

The issues I discussed above relating to timely access to care in Section II.B are relevant in this context.  Patients must be seen and care needs identified, both on intake and throughout their prison terms.  If access to care is poor, the system blocks professional judgment from operating.

In Arizona prisons, access to care for many patients is so poor that they are forced to rely on the "professional medical judgment" of custody staff, as described above in Section II.B.5.  If they can persuade officers, sergeants, or lieutenants that they need treatment, those staff will sometimes break through the barriers set up by the healthcare delivery system.

### 2.    Medical records and access to medical histories

Providers cannot render a professional medical judgment without appropriate medical data.  If a provider sees a diabetic without access to the blood sugar data because it hasn't been filed yet, or without results because they have not arrived, he or she is treating the patient with a blindfold, lacking appropriate information about the condition.  Without a full medical record, providers don't have adequate information to render a professional medical judgment.  The problem is compounded for complex or chronic care patients.  If the charts lack historical information on the patient, filed in a logical place, it makes treating that patient very difficult, if not impossible.  Arizona's Assistant Director

44

over the Health Monitoring Bureau agrees.  Gross Depo, 122:25-123:6 (it is important to have paperwork properly filed so that the information can be in a chronological order for others to read and interpret).

The charts I reviewed at all the prisons were inadequate to convey current patient care.  Simply put, they were a gigantic mess.  There was often no way to track the care logically through the chart; it was generally very hard to tell medical histories and medication administration.   Medication orders should be consistent with the medical administration records (MARs), but in the Arizona charts I reviewed, I saw very little correlation between the orders and the MARs.  It was often unclear who had ordered a medication and when that medication needed to be renewed.   While half of the medication record might be in the medical chart, half of it might be somewhere else (for example in a Pharmacorr binder), which makes no sense. A treating clinician picking up a chart to review before an appointment or a provider trying to design a treatment plan would have no idea what the medications the patient is taking.  This is a patient safety issue.  It is no wonder Arizona makes the prisoners submit medication refills via HNRs -- none of the healthcare staff can tell when something needs to be renewed based on the records I reviewed.

I was not surprised to read the reports from ADC monitors of record-keeping delays and errors.  See, for example, ADC154302 (September 30, 2013) (46 of 80 Tucson charts reviewed showed that medical records were not current, accurate, or chronologically maintained with all the documents filed in the designated location); ADC137309 (July 26, 2013) (Perryville San Carlos has a large amount of unsecured and incorrectly sectioned filing); ADC088931 (April 29, 2013) (Perryville San Pedro and San Carlos have significant backlogs of MARs in loose filing); ADC088930 (April 29, 2013) ("[l]oose filing at [Perryville] San Carlos can be measured in feet.  Unfiled MARs date back to January"); ADC088915-18 (April 23, 2013) (large amount of loose filing at Perryville Santa Maria, San Carlos, and Lumley prevented an accurate assessment of sick

45

call); ADC088929 (April 18, 2013) (medical records not current, accurate, and chronologically maintained with all documents filed in the designated location at multiple Perryville units).

The monitors have also consistently found that prisoner medical records often lack necessary information, as was my experience.  See, for example, ADC154383-84 (September 30, 2013) (at Yuma, 7 of 10 Cibola charts, 9 of 10 Dakota charts, 5 of 10 Cheyenne charts, 4 of 10 Cocopah charts, and 7 of 10 La Paz charts reviewed were not noted daily with time, date, and name of the person taking the orders off); ADC137393 (July 31, 2103) (medication errors at Tucson are not all documented); ADC137256-7 (July 30, 2013) (non-formulary medication approval or denial not in charts at Florence); ADC137443 (July 29, 2013) (31 of 50 Yuma charts reviewed have missing initials on dates indicating that the medicine was not administered); ADC137236 (July 14, 2013) (hospital-setting open reduction notation missing for a Florence prisoner's oral surgery on 6/21/13); ADC088887 (April 28, 2013) (on 4/11, there were no daily nursing notes on any charts reviewed in Florence); ADC088874 (April 18, 2013) (staff report Florence East does not report or document appointment no-shows); ADC088864-65 (April 14, 2013) (0 of 10 files Florence Central files reviewed had provider orders taken off and daily annotated with time, date, and name of person taking the orders off); ADC088856 (April 14, 2013) (4 of 10 Florence Globe charts reviewed revealed consultation reports were not timely reviewed by providers).  It was not a surprise to me to read that a five-foot stack of unfiled records was found in the Tucson complex in February 2013. AGA_Review_00004833.

According to the monitors, medication administration records (MARs), an essential aspect of record-keeping, are frequently not completed to standard nursing practices: they often lack doses, routes, frequencies, start dates, and nurses' signatures. See, for example, ADC154407-08  (September 30, 2013) (at Yuma, 9 of 10 Cibola MARs, 9 of 10 Cocopah MARs, 10 of 10 Cheyenne MARs, 10 of 10 Dakota MARs, and

9 of 10 La Paz MARs noncompliant); ADC154327-332 (September 30, 2013) (at Tucson, 10 of 10 IPC/HU9 charts, 6 of 10 Rincon charts, 10 of 10 Manzanita charts, 10 of 10 Catalina charts, 10 of 10 Whetstone charts, 8 of 10 Minors/CDU charts, 10 of 10 Winchester charts, 6 of 10 Santa Rita charts, and 7 of 10 Cimarron charts reviewed had noncompliant MARs); ADC154306 (September 30, 2013) (16 of 32 Tucson MARs noncompliant); ADC154137 (September 30, 2013) ("MARs are not being completed correctly at any unit on Florence complex"); ADC154115-16 (September 30, 2013) (33 or 34 Florence MARs noncompliant); ADC154245 (September 27, 2013) (MARs at Phoenix are not compliant, and "nurse signatures do not match initials on MARs, prescription information crossed out and written over without initiating a new MAR entry"); ADC154205-07 (September 26, 2103) (at Perryville, 10 of 10 MARs at San Carlos, Santa Cruz, Lumley, PU/SM/PI, and San Pedro noncompliant); ADC154385-86 (September 1, 2013) (42 of 46 Yuma MARs noncompliant); ADC137591 (August 28, 2013) (medication at Phoenix is administered without a retrievable record of the recipient); ADC137656-59 (August 26, 2013) (at Tucson, 8 of 10 MARs at Rincon, 6 of 10 MARs at Santa Rita, 6 of 10 MARs at Manzanita, 8 of 10 MARs at Whetstone, 6 of 12 MARs at Catalina, 5 of 10 MARs at Winchester, 8 of 8 MARs at Minors, 9 of 10 MARs at CDU, 7 of 10 MARs at IPC/HU9, and 9 of 10 MARs at Cimarron not compliant); ADC137331 (July 31, 2013) (conflicting MARs for allergies for Phoenix prisoner); ADC137331 (July 31, 2013) (MAR for Phoenix prisoner has blank spaces on administration of antibiotics, no start date shown, and no diagnosis); ADC137295 (July 24, 2013) (Perryville MARs may be inaccurate); ADC137254-5 (July 30, 2013) (9 of 10 Florence East MARs, 10 of 10 Florence North MARs, and 10 of 11 Florence South MARs noncompliant); ADC137442-43 (July 29, 2013) (at Yuma, 8 of 10 La Paz MARs, 8 of 10 Cibola MARs, 10 of 10 Dakota MARs, 7 of 10 Cheyenne MARs reviewed were noncompliant); ADC137373-74 (July 24, 2013) ("the MARs are so messed up" at Tucson Santa Rita); ADC137303 (July 16, 2013) (Perryville Santa Maria, Santa Rosa, and

Piestewa Unit MARs noncompliant); ADC137303 (July 19, 2013) (Perryville San Pedro and Lumley MARs noncompliant); ADC088880-81(April 28, 2013) (multiple blank dates in most MARs reviewed at Florence); ADC089105 (April 27, 2013) (MARs at Yuma Dakota, Cocopah, and La Paz noncompliant); ADC089093 (April 27, 2013) (multiple MARs completed incorrectly at Yuma La Paz and Dakota); ADC088742 (April 4, 2013) (many MARs at Florence incomplete or filled out incorrectly).

I reviewed historic MARs in the medical records I read as well as active MARs in the different medical treatment areas of the facilities I visited.  As suggested by the monitoring reports, I found that they are a documentation disaster.  For example, in the chart of ███████████████, whom I discussed above, I counted eight different MARs for August 2013.  Each of the MARs contained some of his ordered medications, but each one was different from the rest by one or two medications.  I was unable to figure out what medications he was actually supposed to be on because the MARs overlapped so much and there were no orders in the chart to use as a reference.  It is no wonder the patient complained about not getting all of his HIV medications; clearly, nobody knew what to do.

I also saw examples of obvious nursing disregard for medication orders.  ████ ████████████ is a Florence patient who is on court-ordered treatment for injectable long-acting Haldol Decanoate via a Psychotropic Medication Review Board (PMRB) order.  There was an indication in the MAR that the patient was due for his shot on October 23, 2013.  I visited the facility on October 25 and the nurse in that unit indicated that she did not know if the medication had been given since it was not properly recorded.  We found the medication on the shelf unused.  Similarly, ██████████ ████████ was ordered Haldol Decanoate to be administered on October 18, 2013, by PMRB order indicating that he "can't refuse."  Nobody could determine whether he had received his critical medication because a temporary nurse had been on shift that day and none of the nurses knew how to contact her to determine whether she gave the

48

medication or not.  The issue remained unclarified for at least a week prior to my October

25 tour and nobody was able to resolve the issue and provide me an answer as to whether

this critically mentally ill patient had been treated.

Another example of medication misadventure is the case of ██████████

█████ who is currently being treated with Enbrel, a Tumor Necrosis Factor inhibitor

that is quite expensive.  He saw the specialist and an order was written on October 9,

2013, to change his Enbrel dosing to a new dose.  The nurse made a notation in the MAR

that the new dose was not to start until November 1 despite the fact that the medical order

in the physician's written order section of the medical record clearly states that the new

dosing was to begin October 9.  The nurse overruled a specialist's medical management

of a fragile patient in clear violation of scope of practice and medical oversight, but

undetectable in this system unless someone is looking closely.

Also not surprisingly, ADC has major backlogs for provider chart review.  See, for

example, ADC154226 (September 27, 2013) (0 of 11 Phoenix charts reviewed showed

that consult reports were reviewed by the provider within 7 days of receipt);

ADC137360-61 (July 29, 2013) (Tucson Whetstone had 106 charts awaiting provider

review, with serious backlogs also at Winchester, Cimarron, Rincon West Medical,

Catalina, Manzanita, and Santa Rita); ADC137395 (July 29, 2013) (Tucson has

backlogged charts needing review); ADC137369-71 (July 26, 2013) (Tucson Rincon,

Catalina, Manzanita, and Santa Rita each have dozens of consult reports awaiting

review); ADC137309 (July 26, 2013) (Perryville San Carlos and Santa Maria have

provider review chart backlogs); ADC137236-37 (July 14 and 30, 2013) (most reviewed

Florence South, Central, and North charts not timely reviewed by provider); ADC137236

(July 14, 2013) (Florence prisoner's 5/4/13 hospital discontinued orders were not

reviewed as of 7/11/13); ADC137259 (July 30, 2013) (every Florence unit except Kasson

has 70+ charts waiting to be reviewed); ADC088943 (April 30, 2013) (at Perryville, the

medical director is providing direct care to inmates in addition to her other

responsibilities and has not been able to conduct monthly or quarterly chart reviews);
ADC088746 (April 4, 2013) (Florence East charts with labs, x-ray reports, hospital notes,
and consultant notes dating back to early February have not been reviewed).

In addition, there are problems at least in Perryville with getting information back
from outside hospital stays, which makes post-inpatient planning, at a time when a
patient is particularly fragile, very difficult.  ADC 52804 ("there continues to be a delay
in receiving hospital documentation, discharge information and/or recommendations.
Staff are unaware who is responsible for this task"); ADC 52823 ("[t]his continues to be
an issue for the provider to receive the hospital records, information &/or
recommendations. It has occurred that the provider had not received these records by the
time of the inmate's hospital follow up appt with the provider. It is unclear to staff,
including providers – who actually is responsible for this task to be completed in a timely
manner"); ADC 52782-83 ("[t]he hospital admission, care provided, tests done, discharge
recommendations or follow up is not provided to the staff/providers, per staff – in a
timely manner. It is unclear who is responsible for this task"); ADC 52760 ("[h]aving
hospital record information, discharge information &/or recommendations is difficult to
obtain in a timely manner.  Staff state their frustrations with this task and it is unclear
who is actually responsible for this task").

In my review of medical records areas on my tours I found many examples of
records that had not yet been reviewed by providers and the data that they were supposed
to review was quite old.  For example, in Tucson I found entire shelves of medical
records that contained loose filing that was over a month old waiting for providers to
review.  I reviewed the records myself and found many abnormal lab results and
radiology findings that had yet to be acted upon.  In addition, I found fifty-six lab results
and radiology results in a file that indicated that the charts could not be found.  As such,
the abnormal results were just sitting there with no place to be filed and no action taken
on the abnormalities.

50

### 3.    Use of nurses as primary care providers

Patients are denied a clinician's professional medical judgment if nurses or other staff are called upon to make decisions that standard of care – and sometimes professional licensing requirements – reserve for primary care providers.  This happens all too often in the Arizona system.  See ADC137397 (Tucson infirmary patients are not being seen every 72 hours by doctor or mid-level provider, as policy requires, but are instead seen by LPN, CNA, or RN).  In Yuma, I saw extensive evidence of this practice: LPNs doing RN work and RNs doing primary care provider work that should only be done by physicians, physicians' assistants, or nurse practitioners.  My review of medical records for ██████████ in the Dakota Unit (████) provides one example.  ████ ████ experienced horrible follow-up after a hospital stay for three days with gastro-intestinal bleeding at the end of May 2013.  The day after his return, he complained of chest and abdominal pain.  He was seen only by an LPN, with no provider follow-up. (He was frequently seen by an LPN, including for chronic care appointments).

 Other Arizona prisons also have this problem.  I saw RNs reviewing labs and ordering treatment for end stage renal disease patient ██████████████, in Florence.  My review of medical records of ████████████████ at Yuma showed multiple violations of nursing scope of practice.  ████████████ has end-stage AIDS and he is a very complicated patient.  He has been seen multiple times by LPNs for healthcare and the LPNs have diagnosed him and treated him for problems such as upper respiratory infections and a chronic rash.  I requested to see this patient and it is clear that the LPNs' and RNs' management of him is medically incorrect, as described in more detail in Section II.C.4.  They are well outside of the scope of their practice and they are far over their heads in even trying to assess a patient of this complexity.  Sadly, he has suffered serious harm as a result of their mismanagement, all as a result of nurses attempting to practice medicine.

The dialysis program is essentially run by a nurse on a day-to-day basis.  I reviewed all of the dialysis charts (approximately 12) at Florence and a nurse orders the labs, interprets the labs, decides on what changes need to be made on the dialysis prescription, and writes orders for post-dialysis management.  This is boldly beyond the scope of practice for a nurse.  The nephrologist overseeing the dialysis care within the system has inappropriately delegated prisoner dialysis treatment to a nurse and technicians.

Another example of nurses practicing beyond their scope is the nurse who attempted to provide postoperative management to Shawn Jensen (032465), who underwent a robotic radicle prostatectomy on July 15, 2010, and discharged on July 18, 2010, with instructions to follow up in three weeks for Foley removal.  On July 20, 2010, and July 31, 2010, Mr. Jensen submitted two HNRs reporting leaking from his catheter site.  He was finally seen on August 1, 2010, at which time the nurse offered him pads.  He was again seen the following day, and instead of referring the patient to the provider for appropriate post-operative management of an indwelling catheter in a surgical site the nurse attempted to complete what she believed to be a Foley irrigation by "twist[ing] the catheter, manipulate[ing] the catheter, push[ing] it in further" in order to "try[] to get it to drain better."  No improvement was documented.  Fortunately, Mr. Jensen was already scheduled to be seen by the urologist on August 5, 2010, at which time he reported to the hospital with no urine in his leg bag and "soaked towels in his perineal area [in an attempt] to keep himself dry"; the urine had leaked through the towels into his orange jumpsuit.  The cystogram completed at the hospital showed that the catheter was "located anterior and outside the bladder," and his urine had been leaking into his abdominal cavity.  As a result of this botched procedure by the nurse, Mr. Jensen required emergency surgery to repair the tear in his bladder neck and remove the Foley from his abdomen.  Mr. Jensen has continued to experience severe complications, and require a

52

number of operations, as a result of the nurse's inappropriate manipulation of an indwelling surgical drain.

Another example of nurses practicing beyond their scope is the case of Charlotte Wells (247188).  On February 20, 2010, days after Ms. Wells received heart surgery to address her blocked artery, she complained of chest pain again at 7:15pm. ADOC0005180-81.  At that time, she was seen by a nurse who treated her based on phone conversations with Dr. Enciso, the covering doctor that day.  *Id.*  She was never examined and appropriate diagnostic assessments were not completed.  Her pain reportedly improved with treatment and she was sent back to the yard.  *Id*.  Medical standards of care indicate that patients who have recently received a stent are at high risk for getting a blood clot and having a heart attack post-procedure. Thus, any chest pain in a recently stented patient is usually very concerning and should be evaluated thoroughly by a medical provider instead of a nurse.

I found another dramatic example of nurses practicing outside of their legal scope of practice in the chart of ██████████████.  There is a remarkable note in his chart dated July 12, 2013, indicating that telephone orders supposedly written by the Family Nurse Practitioner at 0430 the previous day were not written by or given by the Family Nurse Practitioner.  It appears that the nurse on call decided to give this patient prescription medications without appropriate provider orders and she forged the order in the chart.  When I looked at the provider orders, there were no orders in the chart corresponding to this incident, suggesting that someone had removed them from the record.

In general, these practices not only violate licensing requirements but they can all too easily result in bad outcomes.  They also provide evidence of poor staffing in the Arizona system.

The following nightmarish example details how such a practice can seriously injure patients. ██████████████ is a patient I chose to interview randomly in

53

the infirmary in Tucson.  He related the following history, which I confirmed from a review of his healthcare records.  On July 20, 2013, this previously healthy 42-year-old patient complained of neck and back pain and was seen by an LPN.  He had a fever of 99.1 and the LPN did not examine him or consult anyone about him.  She determined that he was OK and sent him back to his unit.  It was a violation of the scope of practice for this staff member to make decisions about his care, and indeed the LPN made a drastically poor decision to provide no follow-up.  Two days later, the patient again complained of back and neck pain and was again assessed by an LPN, who failed to take his temperature and decided to give him an injectable non-steroidal pain medication (Toradol).  It was again a violation of the LPN scope of practice to assess this patient.  This time, he was scheduled to see a provider on the following day.  At that time, the RN found he had a temperature of 100.0 degrees and gross neurological deficits.  He was sent to an outside emergency room, where it was found that he has an abscess of his neck muscles and epidural spinal abscess.  He was sent to University Hospital for surgery and then transferred to St. Luke's Hospital for several months and then returned to Tucson IPC, where I saw him bed-bound, with no physical therapy and no prevention from complications of bed rest, foot drop on the left leg, fixed flexion contractures in the left hand, and an indwelling Foley catheter that had been in place for weeks.  This case is a tragedy across the board.  The fact that the healthcare system used LPNs out of scope virtually guaranteed a delay in diagnosis.  LPNs are not taught to do physical examinations; they are not taught pathophysiology; and they have no experience assessing sick patients, developing a plan to work up the problem, and pursuing a proper diagnosis.  As a result, ███████ likely suffered much more significant neurological damage than necessary because of the delay in diagnosis.

███████ is now experiencing a different type of neglect.  He is bed-bound, no care is rendered to him to help him gain strength and range of motion, and he is slowly and needlessly dwindling physically.  The nursing staff have placed a Foley catheter into

54

his bladder; in my experience and based on the factors he presents, this decision was likely made because they grew tired of helping him urinate into a bottle.  This places him at unnecessary risk for developing additional infections, all because there are not enough staff to help him with basic bodily functions.  He also returned from the hospital with a hard cervical collar in place, which is a very unusual long-term intervention and it runs significant risk of causing long term impairment.  I asked him if any of the physicians had seen him to discuss his need to wear the C-collar and he replied that nobody had discussed any plans with him in the six weeks that he has been back.  I reviewed his chart and could find no clinical indication for continued use of a hard C-collar.  This case is a tragedy of errors.  Even now, given all that has happened, he could still make a modest recovery and retain the ability to perform activities of daily living, but he is being completely ignored in his bed by the staff and quickly losing what remains of his physical capabilities.  I was so moved by his neglect that I called his case out to Corizon Arizona Regional Medical Director Dr. Williams and the attorneys for the State and Corizon in the hope they would intervene on his behalf.

### 4.   Specialty care

The exercise of professional judgment sometimes requires more in-depth knowledge than primary care providers possess.  In these cases, the provider must be able to refer patients for specialty consultations.  This essential step often does not happen in Arizona.  Haldane Depo - Perryville, 204:19-205:4, 45:13-46:2 (referrals have been an "issue of noncompliance," "pretty much . . . every month"); Sharp Depo, 47:18-48:2 (concerns with specialty referrals that have "loomed larger with time" and continue to present).  Patients are harmed as a result.

I saw numerous examples of people whose cases clearly required input from specialists or a more advanced understanding of their complex needs but yet they were not referred for that care.  For example, ███████████████ in Yuma's La Paz Unit, has end-stage liver disease, with very little liver function left.  He is very fragile and has a

55

complex case that is being mismanaged.  When I saw him in early August 2013, he needed to see a hepatologist urgently.  He never had, although he had been in ADC for more than three years.

Similarly, ███████████████ is HIV positive and housed in the Tucson complex.  His medications are not renewed regularly, resulting in gaps of up to a month without them (a grievance I saw in his file dated December 4, 2012, signed by Director Ryan, agrees he went without HIV medications for 30 days).  As I discussed earlier, HIV medication management has to be done correctly and patients need to receive all of their HIV medications every day without gaps or the virus can mutate and further damage the immune system.  █████████ CD4 count (a common measure of the strength of his immune system) dropped dramatically due to the medication mismanagement.  If the virus has become resistant, the medications might need to be entirely changed.  Despite his poor care and obvious deterioration, he has never been seen by an HIV specialist.

███████████████ housed in the Manzanita Unit IPC in Tucson, is an extremely fragile 31-year-old patient with lupus and multiple sclerosis; the intersection of these two major diseases makes him an extremely complicated patient in need of specialty care.  He has been seen by a rheumatologist on telemedicine, but not enough, and some of the recommendations of the specialist have been ignored. In a well-functioning system he would be seen regularly by multiple specialists and have regular labs to measure the effect of the medications.  He is not getting such care and as a result, his life expectancy will be shortened and he will likely become debilitated.

Another example, ███████████████ is a patient who has lupus.  It had initially been incorrectly diagnosed as Sjogren's disease in 2007.  He saw a rheumatologist via telemedicine in 2011 who diagnosed lupus, but he did not see a rheumatologist again (by telemedicine) for two years, which is far too long.

Even when referrals are actually made, they are all too often delayed so long as to place the patients at serious risk of harm.  I addressed the case of ███████████

56

██████ earlier in the report in relationship to nurses attempting to manage his end-stage AIDS.  The complexity of his case allows me to make additional points with respect to the failure to have him treated by an HIV specialist.  At the point in time that I saw him his CD4 count was 64 and he was suffering from a horrible whole-body rash.  When the LPNs finally gave up trying to manage his rash they referred him to the facility doctor. The facility doctor felt he was allergic to his Atripla (combination medication containing efavirenz, emtricitabine, and tenofovir).  To deal with his rash, she decided to switch him to Truvada (combination medication of emtricitabine and tenofovir).  Her decision-making is just nonsensical.  Not only did she not eliminate the medications that she thought he was allergic to by switching him to Truvada, she put him on sub-therapeutic dosing of HIV medications by prescribing only Truvada.  As such, she placed him at grave risk for the development of drug-resistant virus and for the acceleration of his decline.  She obviously does not understand basic HIV management or the medications used to manage this disease.  Additionally, because his CD4 count is so low and his immune system is so compromised, he absolutely must be on prophylactic antibiotics to prevent opportunistic infections.  Under her management he has received none of the appropriate antibiotics, which is a complete violation of the standard of care.  I interviewed ██████ and saw that his rash, a direct result of his low CD4 count, is actually quite serious.  The mismanagement of his HIV within the prison system has contributed directly to his decline and he is in desperate need of management by an HIV specialist.  On May 23, 2013, an infectious disease consult was ordered, but it was never done.  This failure is catastrophic for ██████; the deficiencies in care that he has experienced in ADC are life-threatening.

██████ has basal cell cancer (a skin tumor).  He was given a definitive diagnosis in a biopsy on May 1, 2012, and at the same time a consultation was appropriately requested for dermatology, plastic surgery and a CT scan of his neck.  The CT scan was not done until February 5, 2013, and the dermatology and plastic surgery

consultations have never happened.  A repeat order for a dermatology consultation was written on July 22, 2013.  Although the biopsy removed some of the growth, cancer cells remained in the margins and if they are not removed, the cancer will continue to grow and metastasize.   If left untreated this condition is potentially fatal and can cause deformity and pain.

I met Shawn Jensen (032465), a class representative in this case, in ASPC-Tucson. He had been waiting for a CT scan for an aneurysm in his heart that was first ordered in July 2010; it was finally done the day before my tour.  Fortunately, there were no significant negative findings, but the delay of more than three years for this test placed Mr. Jensen at unreasonable risk of harm and caused him prolonged and unnecessary distress.

████████████████████ in Florence has newly diagnosed significant rectal cancer.  He had a consult written to oncology on September 24, 2013, for initial evaluation.  This consult is essential for his care, but as of October 16, 2013, I saw no evidence in his file that it was approved, scheduled, or completed.  Similarly, ███████ ████████████, also at Florence, has a large hepatic cyst.  He had received excellent care prior to incarceration and his physician wrote a letter on July 8, 2013, outlining the care plan for the patient's multiple significant problems.  That care plan included a cardiology consult and a general surgery consult to evaluate his large hepatic cyst for surgical treatment.  A cardiology consult was written by a physician's assistant within the prison on September 3, 2013, but he did not write a general surgery consult despite the fact that it was recommended in the same letter.   Both specialty consults are essential for his care, but as of October 16, 2013, I saw no evidence in his file that the cardiology was approved, scheduled, or completed and the general surgery consult had been completely disregarded and never initiated.

Referrals do not appear to be tracked in any meaningful way.  Mielke-Fontaine Depo – Florence, 251:9-251:19 (no list of urgent consultations at a facility; only way to

58

find out is to look at the file for each consult ordered).  Corizon Arizona Regional Medical Director Dr. Williams, along with one colleague, reviews all utilization management requests, including for off-site specialty care.  Deposition of Winfred Williams, October 10, 2013 (Williams Depo), at 16:7-16:13.  The requests are entered into a computer system, as are approvals and denials, and appointment schedulers at the prisons are informed of the approvals.  *Id.* at 84:6-84:15, 85:25-86:5, 90:7-90:19.

An effective healthcare delivery system requires more, however: it must have the capacity to track referrals with a time line for completion and provider notification.  The time line is essential because time frames vary: some referrals need to go immediately, others must be completed quickly but are not immediate, and still others can be completed on a longer time line or can happen when there is room in the schedule. Referrals must also be tracked so that cancellations, which are an unfortunate reality in correctional medicine due to factors such as court dates and institutional emergencies, are minimized and referrals are rescheduled promptly as needed.  I see no evidence of these essential measures in the Arizona prisons.

Neither ADC nor Corizon requires that providers who make specialty referrals be notified about whether the referral was approved.  Williams Depo, 87:3-14; Responses 257 and 259, Defendants' Responses to Verduzco's First Set of RFAs (all healthcare staff referrals to outside contractors must be reviewed and approved by a committee of healthcare and ADC administrative staff , but ADC policy does not require the committee to notify the referring healthcare staff whether the referral was approved or denied); Responses 260 and 262, Defendants' Responses to Verduzco's First Set of RFAs (Corizon policy requires all healthcare staff referrals to outside specialty contractors be reviewed and approved by a committee of healthcare staff, but Corizon policy does not require the committee to notify the referring healthcare staff whether the referral was approved or denied).  Not surprisingly, the primary care providers are not in fact always notified of the status of referrals.  Sharp Depo, 71:19-72:4, 72:5-24 (physician who

59

practiced at Eyman, Florence, and Perryville testified he would not always be notified
whether a specialty referral was approved and this was a "concern about adequacy of
care").  This is a problem because it is the job of the primary care physicians to track the
continuity of care for patients under their care.  They are expected to manage the patient
up to the point of the referral, assess the new information obtained from the referral, and
then implement a new care plan for the patient based on the referral.  If they don't know
the status of a referral, how can they reasonably manage their patients in this chaotic
resource-limited environment?

Even when notified, providers often do not review referral reports in a timely
manner.  ADC154105 (September 30, 2013) (13 of 42 Florence files reviewed show
consultation reports were not reviewed by the provider within seven days of receipt);
ADC137428 (July 29, 2013) (5 of 9 Yuma La Paz charts reviewed do not have
consultation reports reviewed by provider within seven days of receipt).

Although referrals are not effectively tracked, ADC monitors have catalogued
extensive delays that serve to bolster my opinion that this aspect of care in Arizona
prisons is completely broken and just missing in many cases.  See, for example,
ADC137629 (August 29, 2013) (Tucson prisoner's 7/11/13 urgent orthopedic consult
request for foreign body in knee with repeated infections has not been addressed);
ADC137628 (August 29, 2013) (Tucson prisoner with basal cell cancer not scheduled to
go out for treatment despite numerous HNRs requesting such); ADC137365 (July 31,
2013) (Tucson prisoner submitted an emergency HNR for chest pains on 6/15/13 and was
not seen until 7/9/13); *id.* (July 31, 2013) (Tucson prisoner with an aortic aneurysm
measuring 4.2 cm on 6/16/11 and 4.7 cm on 10/25/12 had an urgent cardiology
consultation dated 5/28/13, but apparently had not been seen as of 7/10/13); ADC137238
(July 30, 2013) (Florence prisoner had an urgent surgery requested on 5/30 and had not
been seen as of 7/25); ADC137236 (July 30, 2013) (Florence prisoner had an urgent
consultation written on 5/30/13 and was not seen as of 7/25/13); ADC137425 (July 23,

2013) (a Yuma provider's telephone order for two prisoners with abscesses was not "signed" as of 7/15); ADC137369 (July 11, 2013) (Tucson prisoner received a cardiology consult on 6/6/13 for syncopal episodes, was referred for a walking EKG and follow-up appointment with cardiology, but was not sent for an EKG; another Tucson prisoner's cardiology follow-up approved 2/7/13 but not seen by 7/3/13; a third Tucson prisoner with testicular mass and urethral stricture seen by urology on 1/30/13, consults submitted 3/26/13, but not yet seen/scheduled; a fourth Tucson prisoner's urgent colonoscopy consult was written 12/31/12, approved 3/13/13, but not yet scheduled); ADC137322 (July 8, 2013) (an urgent consultation for a Phoenix prisoner was written on 5/15/13, entered on 5/24/13, and had not been scheduled as of 7/8/13); ADC088863 (April 30, 2013) (Florence North prisoner who was exposed to HIV positive blood on 4/24 had no progress note or SOAPE note documenting the incident nor an indication that the prisoner was seen by medical after exposure); ADC089013 (April 29, 2013) (an urgent cardiology consult for a prisoner at Tucson Whetstone written on 6/7/12 was not reviewed by a provider until 3/8/13); ADC088858 (April 27, 2013) (prisoner's recommended left heart catheter/angiogram was not addressed at Florence South; another prisoner delayed in beginning radiation therapy for prostate cancer at Florence North); ADC088856 (April 27, 2013) (prisoner at Florence North with urgent oncology request on 2/25/13 was not seen until 4/10/13, with consult re-written on Corizon form on 3/29/13); ADC088746 (April 4, 2013) (Florence Central appears "out of compliance for scheduling specialty care appointments"); ADC037152 (October 2012) (Tucson prisoner had "urgent cardiology written 8/16/12 approved 9/14/12 not scheduled as of 10/1/12"; another "[i]nmate was seen by cardiology on 3/28/12 requested 2D Echo and adenosine stress test. If these test[s] are abnormal consider cardiac catheterization, otherwise f/u in one year. Dr. DeGuzman has ordered Consult urgent on 4/30/12. Inmate has not been seen [as of October 2012 review]. There is no indication the studies have been approved to be done"); ADC 52782-83 (November 2012) (Perryville prisoners are not being

referred out in a timely manner for specialist reviews, and outside medical consultations are not reviewed in a timely manner by prison healthcare providers, including "consult report dated 09/27 and was signed on 11/13/12").

Urgent consults are often not seen as required within 30 days.  See, for example, ADC154103 (September 30, 2013) (8 of 10 urgent consults at Florence noncompliant); ADC154226 (September 27, 2013) (2 of 3 Phoenix urgent consults noncompliant); ADC137428 (July 29, 2013) (5 of 9 Yuma La Paz charts reviewed noncompliant).

In my review of the medical records across all of the facilities I visited, the failure to schedule consult appointments in a timely fashion was rampant in the charts.  On the whole I found the on-site physician consultation requests to be medically appropriate and it is clear that the breakdown is at the system level with delays, obfuscations, alternate treatment plans, and frequently total disregard for the consultation requests.  In most of the cases I reviewed, the failure to accomplish the consultation was a clear violation of the standard of care for the disease being treated.

### 5.    Substandard care decisions

To this point, I have discussed the exercise of professional judgment in terms of what is needed to get the patient in front of the provider and to get the provider the tools needed to make treatment decisions.  There is another element, however: those treatment decisions must be consistent with community standard of care.  In the Arizona system, all too often the providers make treatment decisions that are clearly substandard and endanger their patients.

Because human error is a reality of life, a responsible healthcare delivery system builds in methods to find and correct such problems. [9]  A rigorous quality assurance

---

[9] The fact that human error is inevitable does not make it excusable.  The errors and omissions I describe in this section are serious and harmful; some, in my opinion, are actionable.  My point here, however, is that because people are fallible, particularly in chaotic systems such as I have seen in Arizona, a responsible health care system must be prepared to find and address mistakes before they impact patient care.

program, a functional patient feedback loop (such as through HNRs and grievances), and high-quality staff who communicate well with one another and are supported by a responsive system that delivers assistance in the form of appropriate diagnostic testing and timely specialty referrals are all essential elements to correct for the known factor of human error.  As discussed elsewhere in this report, Arizona lacks all of these elements. The results, for some of the many patients who are placed at severe risk, are described below.

████████████████ at Perryville experienced terrible medical judgment in wound care.  She told me she was returned to the prison on June 12, 2013, after delivering by a Caesarian section in an outside hospital.  She reported that she noticed her wound was leaking and infected after only a few days and she asked for attention at the medical unit several times but was sent away each time, finally being told, by an officer, "if you come back again without an appointment, we'll write you a ticket."  As a result, she said she was on the yard for two weeks with an open incision (she was later told it was more than an inch deep.)  Finally, she was taken to the infirmary, where the wound started to heal.  As of July 30, when I saw her, medical staff were packing the wound with sugar -- the kind of packets you use for coffee.  This treatment was documented in her medical records.  I have never anything like it in my years practicing medicine and it definitely does not conform to the standard of care.

At ASPC-Phoenix, I saw the healthcare records for ████████████████ whose name had appeared on the HIV chronic care list.  The chart clearly stated that he is not HIV+, and that he had purportedly lied about that status in 2008.  However, test results in the file that were several years old showed that he has an active case of syphilis, and there was no indication in the file that anyone had done anything about his illness.

████████████████, in Yuma, urgently needs wound care that works; his current inadequate treatment has transformed a treatable infection into a huge, gaping wound that requires immediate plastic surgery and reconstruction on his leg.  This patient

63

has lost his ability to walk as a result of a year's worth of mismanagement of a simple wound and inept treatment.  When I spoke with him on August 2, 2013, his wound was being treated with silvadene, which is silver in a cream, typically used for initial burn treatment.  It is a ridiculous choice for this purpose and its chronic use does not conform to the standard of care.

　　　　Also at Yuma, I interviewed and reviewed the charts for ██████████████ ████████ a 69-year-old with hypertension.  On June 10, 2013, at 1:15 a.m., he complained of chest pain.  An RN evaluation by L. Sanders told him to "drop HNR" and "return[] to dorm."  At 7:50 a.m., he complained of chest pain again, and this time RN A. Gutierrez appropriately sent him to the emergency room.  He had a heart attack.  In sum, medical staff lost six and a half hours during this patient's heart attack through RN error and lack of effort.  Fortunately, he lived, but the risk of injury or even mortality was high.

　　　　██████████████████ also in Yuma, has out-of-control diabetes.  In December 2012, in county jail, he was found to have a very low blood platelet count, possibly as a result of medication he was given (Depakote).  At that time, it was 62, which is an alert to medical staff.  On March 5, 2013 (after he had arrived in ADC), it was at 49 and his white blood cell count was at a critical low.  His liver function was normal on that date.  These test results were not reviewed for five days, which is far too long for such abnormal findings, and nothing was done even after they were reviewed.  On May 17, 2013, his lab values had changed radically and he had substantially high liver enzyme readings.  These results were not read until June 6, an even longer and less excusable delay, and again, nothing was done as a result.  These abnormal lab results showed serious liver dysfunction and dysfunction in the production of the cells of the blood system and should have been quickly addressed.  In addition, he has lost vision in his eyes due to his diabetes but no retinal exam has been completed, his blood sugars are routinely out of control with no attempts at management, and he is not on an ACE inhibitor to protect his kidneys, which is a clear violation of the standard of care. ██

█████ case is error compounded on error, with critical physical exam findings and critical lab values that as of August 2, 2013, were unaddressed, and routine chronic disease management that has been poorly designed and implemented.

██████████████ in Yuma's Cheyenne Unit, has a severe case of Crohn's Disease, which is fistulizing: his bowel walls are breaking down and fecal matter leaks out into other areas, which is life threatening.  He is an extremely fragile patient, at serious risk, who requires constant vigilance.  He was admitted to the hospital with a significant fistula and abscess where he was stabilized and then transferred to Florence where he recovered.  The hospital started him on Remicade (a tumor necrosis factor inhibitor) which is the standard of care for management of fistulizing Crohn's Disease.  By his report he received two doses.   However, when he was transferred back to Yuma, Corizon declined to continue his Remicade and switched him to asacol.  Since starting the asacol he has decompensated several times and ended up back in the hospital.  The cardinal error in this case was stopping the Remicade, apparently because of a central office utilization review decision.  Remicade is a unique medication that is the standard of care for this patient's disease and the only thing that really works to reduce the development of fistulas.  Once it is started, it must be maintained since it is usually not possible and medically dangerous to restart Remicade in patients because of extreme risk of allergic reaction upon re-exposure to this medication.  As such, it is very unfortunate that the poor decision-making within the system probably has eliminated as a treatment option the only medication that really works by exposing him to Remicade for a couple of doses and then stopping it.

In Tucson, ██████████████ complained of swelling in his chest for more than a year.  He was told repeatedly by medical staff that it was only a cyst, but when it was finally biopsied in March 2013, it was found to be Stage IVB Hodgkin's Lymphoma.  No care was pursued until May 2013.  The cancer is now untreatable because it is so far advanced.

65

████████████████ in Tucson, is 17 years old.  He has shotgun pellets in his knee and a plate in his femur that is probably infected.  His infections have been partially treated through antibiotics and dressing changes, but the underlying problem is the plate, which clearly needs to be removed.  He was seen by an orthopedic surgeon at the hospital, who ordered that he be seen again on September 19, 2013.  As of October 24, he did not have an appointment.  He has only 10 degrees range of motion in his knee, and will likely be disabled at a young age because of this failure to provide adequate care.

████████████████ also in Tucson, has heart problems, but there is not a single EKG in his healthcare records.  He has an artificial heart valve which requires anti-coagulation medication.  He is on a high dose of Coumadin which has failed to produce an appropriate amount of thinning of his blood.  His treatment plan was not changed for over a year even though there is ample lab evidence in the chart that his plan is failing.  He is also on ibuprofen, which is contraindicated with Coumadin.

Desiree Licci (150051) suffers from a prolapsed uterus, Stage III cystocele, and Stage III rectocele, and a hysterectomy was recommended by Dr. Irving.  ADC122691, ADC122684.  However, since Ms. Licci does not objectively fit the classic criteria for a hysterectomy, her subjective complaints and reports of pain were not considered.

Ms. Licci has a history of breast and ovarian cancer.  In late 2010, she began to experience a series of symptoms, including fatigue, pain, and congestion, and she also began to feel multiple masses on her arms, breasts, eyelid and mouth.  In November 2010, her provider attributed her symptoms to Hepatitis C.  In February 2011, her provider noted that the question of whether her symptoms indicated a reoccurrence of cancer was a question for experts.  ADC005459.  Ms. Licci continued to experience symptoms that were increasing in severity.  She submitted a number of HNRs requesting care.  See, e.g., ADC0010810, 0010808, 0010799.  On May 14, 2011, in response to her HNR regarding the lump in her arm, she was told that the "Hep C issue" would be addressed first.  ADC005905.  In response to another HNR submitted May 14, 2011,

66

regarding a visit with oncology, the response notes "all in good time. You have multiple problems. Consult to oncology written on 5/18/11." ADC005906.  After a number of attempts to get treatment for her symptoms and lumps, she finally received a properly administered CT scan in September 2011 which revealed numerous masses in her reproductive system.  ADOC0010633-34.  Ms. Licci then received an MRI in March 2012 which confirmed multiple masses in her reproductive system.  Ms. Licci was finally seen by an oncologist in February and May 2012, who concluded that she had a "simple cyst," without conducting any type of biopsy in this cancer survivor.  She needs be evaluated by a gynecologist for proper management of her reproductive system issues.

### D.   Delivery of care that is ordered

The third major component of an adequate medical care system is the right to treatment.  Patients must not only be seen by appropriate clinicians and given appropriate diagnoses and treatment orders; they must actually receive the care – medications, labs and other diagnostic tests, special diets -- that is ordered.  Teamwork, communication, and good documentation are essential to ensure that care that is ordered is actually provided to patients.  I have observed multiple barriers in the Arizona system that interfere with care delivery.

### 1.   Providers' orders

Orders written by providers must actually be carried out.  Throughout the Arizona system I saw a consistent pattern of ordered care – medications, labs, nursing care, follow-up appointments, specialty referrals – not getting done.   This is another symptom of a badly understaffed medical care system.

In Florence North and East, I was also struck by the divide between nursing and medical staff in terms of orders not being carried out.  For example, I talked with ███ ██████████ a patient with MRSA and multiple episodes of serious staph infections. There were orders to medical staff to call him in for a wound check to see if he had healed from his infections, but he was never brought in to be seen.

████████████████████, in Tucson, has prostate cancer that was partially treated. His doctor appropriately recommended that his prostate be reduced chemically with Casodex to allow him to function normally without a Foley catheter, which he has had for 14 months.  The recommendation was denied, which subjects this patient to needless pain and suffering.

████████████████████ housed in the Manzanita IPC in Tucson, is an extremely fragile 31-year-old patient with lupus and multiple sclerosis; the intersection of these two major diseases makes him a very complicated patient in need of specialty care.  Some of the recommendations of the specialist he has seen have been ignored.

████████████████████ is housed in the Florence infirmary because he has very aggressive multiple sclerosis (MS).  He has been evaluated by an outside neurologist (Dr. Ales Hlubocky) who described his situation as "very active MS, disease is aggressive impacting ADL's significantly."  On August 13, 2013, Dr. Hlubocky recommended Tysabri infusions because of the severity of the disease and because of its aggressive appearance on neurological imaging.  So far the Tysabri has not been approved and there is a notation in the patient's record that Corizon is seeking to find a second neurologist to seek an alternative to the Tysabri treatment that has been recommended.  As of October 15, 2013, no Tysabri has been administered to the patient, no follow-up has occurred with his neurologist, no appointment has been scheduled with the second neurologist, and the patient is bed-bound.  His disease continues to progress without any treatment and he has now lost the ability to feed himself because his hand tremor is so severe that he cannot get food into his mouth.  The other prisoners on his unit help feed him because the IPC where he is housed is so short-staffed with nurses that this is his only option despite the fact that in my understanding it is technically against ADC policy.  Without treatment he will continue to lose function, lose vision, lose the ability to sit and care for his basic body needs, and his life span will be significantly shortened.

68

Throughout my chart reviews it was common to see labs ordered but never done, medications ordered but not approved, medications ordered but not administered by the nurses, ADA accommodations ordered but not provided, consults ordered but never approved or scheduled, follow-up appointments requested by providers but never scheduled, and medical diets ordered but not received.  In the Arizona prison system prisoners invest a tremendous amount of time, effort, money, and suffering into finally getting to see a provider; it is such a tragedy that when those providers do order appropriate healthcare interventions, the system is all too often not accurate, expeditious, or motivated to ensure that the care is delivered.

### 2. Medication administration and monitoring

Prescribed medications must be provided to patients in a timely, consistent manner.  Medications must be renewed regularly and without interruption, and prisoners must be able to transfer housing locations without medication interruptions.  The system must ensure appropriate monitoring of efficacy and side effects.  Arizona fails in all these areas, as high-level administrators acknowledge.  Robertson Depo, 143:23-144:9 (ADC's Medical Program Administrator describes gap in delivery of medications under Corizon, including the delivery of HIV medication); Gross Depo, 61:20-62:2 (ADC Assistant Director over the Health Monitoring Bureau notes that ADC has identified problems with medication management, including refill, reordering, and dispensing), 62:22-63:4 (there are problems both with the pharmacy refilling the medications and because doctors aren't rewriting prescriptions as needed); Williams Depo, 54:6-54:25, 56:21-56:24 (Corizon Arizona Regional Medical Director admits to problems with Corizon's pharmacy services, with "some discrepancy between the expiration report and the patients actually being on medications").

The ADC monitors' reports show that administration of prescription medication is frequently delayed or missed.  ADC154207 (September 26, 2013) (16 of 24 Perryville MARs showed unreasonable delays in prescription medication distribution); ADC137255

69

(July 30, 2103) (Florence prisoner hospitalized after not receiving antibiotics following surgery); ADC137432 (July 30, 2013) (prisoner at Yuma Cheyenne presumably went without psych medication when his 5/28/13 HNR was not addressed until 6/19/13); ADC137443 (July 29, 2013) (31 of 50 Yuma charts reviewed have missing initials on dates indicating that the medicine was not administered); ADC137390 (July 29, 2013) (Tucson prisoner went 20 days without medication despite filing HNR alerting staff to upcoming medication expiration dates) ADC137294-5 (July 24, 2013) (pill line delays at Perryville); ADC137293 (July 24, 2013) (boxes of undistributed medications were found on multiple occasions at Perryville); ADC137264 (July 14, 2013) (Florence prisoner (163888) had an order for intravenous Primaxin [antibiotic] upon discharge from the hospital, and although this was brought to the attention of nursing staff on 7/5/13, there was still no medication as of 7/8/13); ADC137305 (July 5, 2013) (at Perryville San Carlos, three inmates who were prescribed antibiotics did not receive them); ADC089051 (April 30, 2013) (Tucson prisoner's (15141) Rifaximin marked not available from 4/1/13 to 4/24/13; ADC088880-81(April 28, 2013) (8 of 10 reviewed MARs at Florence North had multiple blank dates indicating medications not administered); ADC088880-81 (April 28, 2013) (6 of 10 reviewed MARs at Florence Kasson had multiple blank dates indicating medications not administered); *id.* (April 28, 2013) (10 of 10 reviewed MARs at Florence East had multiple blank dates indicating medications not administered); ADC088880-81 (April 28, 2013) (8 of 10 reviewed MARs at Florence Central had multiple blank dates indicating medications not administered); ADC088973 (April 21, 2013) (multiple prisoners at Phoenix Aspen did not have medications for April); ADC088744 (April 4, 2013) (MARs at Florence Kasson listed medications that were not available to prisoners for multiple days in a row in March); ADC088742 (April 4, 2013) (minimum of 47 patients in Florence East who were consistently absent from "watch swallow" medication line).

Corizon policy requires prisoners to file an HNR to request that chronic care prescription medication be refilled (Response 31, Defendants' Responses to Verduzco's First Set of RFAs), a practice that practically guarantees patients will face medication interruptions.  They do: prisoners consistently reported to me that it takes a week or more to get refills.  At Tucson, I saw many HNRs for medication renewal that were over a month old; they had not been reviewed by a prescriber so they were not refilled.

The ADC monitors have documented extensively that prescriptions are commonly allowed to expire before being reordered or renewed and expired medication continues to be distributed.  ADC154137 (September 30, 2013) ("[m]edications are not being ordered prior to expiration on any unit on Florence complex"); ADC154333 (September 30, 2013) (Tucson staff reordered 0 of the 140 formulary prescriptions reviewed either on or prior to expiration, and only 5 after expiration); ADC137603 (August 29, 2013) (only 66% of chronic care medications in Phoenix are being reviewed prior to expiration); ADC137576 (August 20, 2013) (medicine renewal compliance is 67% at Perryville); Winland Depo, 129:6-129:11 (127 prescriptions identified as expired in Phoenix); ADC137339 (July 19, 2013) (Phoenix Aspen notes 64 expired medications cards in with current administered medications); id. (July 31, 2013) (multiple units at Phoenix document currently using medications that have expired); ADC137256 and ADC137240 (July 30, 2013) (51 of 375 Florence prescriptions were renewed after expiration); ADC137395 (July 29, 2013) (medications are not ordered, filled, or refilled on time at Tucson); ADC137240 (July 29, 2013) (medications are improperly refrigerated and not timely renewed at Florence); ADC137306 (July 29, 2013) (71 of 165 Perryville prescriptions expired prior to renewal date); ADC137430 (July 25, 2013) (a "more diligent approach to filling and refilling expired medication must be adopted" in Yuma); ADC137333 (July 25, 2013) (52 of 103 prescriptions reviewed at Phoenix expired prior to renewal date); ADC137323-29 (July 24, 2013) (64 expired medicine cards from April 2013 to July 2013 are in the currently used bins at Phoenix); ADC137313-14 (July 12 ,

71

16, and 19, 2013) (expired medication in use in KOP and DOT bins at Perryville San Pedro, Lumley Santa Cruz,  Santa Rosa, Santa Maria, and Piestewa); ADC137306  (July 15, 2013) (at Perryville, 86 of 154 prescriptions reviewed expired prior to their renewal date and 20 of 154 prescriptions ran reviewed out of medication prior to their renewal date); ADC137306  (July 15, 2013) (review of Perryville July 1-8 stop date report showed chronic condition medication expiration dates were not being reviewed prior to expiration); ADC137259 (July 30, 2013) (medications at Florence are expiring before being reordered); ADC088890 (April 15, 2013) (numerous medications in the "Man Down" bag at Florence were expired, some for over one year); ADC089106 (April 27, 2013) (many delays in receiving medication at Yuma); ADC088947 (April 22, 2013) (43 of 112 reviewed mental health and chronic care prescriptions at Perryville were expired without renewals).

Some of the medication delivery problems are caused by staffing deficits.  For example, Corizon slashed in half the number of pharmacy technicians at Tucson. AGA_Review_00001704-1705.  This has caused problems such as those documented above in this Section.  It has also led to problems not monitored in the MGAR process: for example, as of March 28, 2013, pharmacy staff at Tucson were unable to ensure prisoners are provided medications on release.  AGA_Review_00009347 -9349.

### 3.    Labs, imaging, and other tests

Diagnostic tests are an essential part of any medical care system.  Arizona fails all too often to provide labs, x-rays, CT and PET scans, and other tests that are ordered by providers as crucial diagnostic tools.

Some tests that are ordered are simply never done.  In Florence, I noticed in the chart of one patient with Hepatitis C (███████████) that there was no record of his current viral load even though there was an order to draw that lab on August 19, 2013. When I asked for any records indicating his current viral load, I was told by Corizon Arizona Regional Medical Director Dr. Williams that there were no results in the file

72

because it had not been done.  It is important in treating Hepatitis C patients to understand their viral load because it correlates with the severity of the disease and determines the success of treatment.  In Tucson, ███████████████, who is HIV positive, had appropriate labs ordered but never drawn (as confirmed by the Corizon attorney on the tour), so his providers know nothing about where he is in the disease process and cannot effectively treat him.  He is admitted into the Inpatient Care Unit where he has had a number of medical complications that have required care but the medical doctors do not even have the basic healthcare information about his underlying condition even though it is prominently listed as an active problem in his chart.  This is just bad healthcare.

Another Tucson patient, ████████████████ has basal cell cancer (a skin tumor).  He was given a definite diagnosis in a biopsy on May 1, 2012, and at the same time an order was placed for a CT scan of his neck.  The CT scan was not done until February 5, 2013.  If left untreated this condition is potentially fatal and can cause deformity and pain.

Even if lab tests are done, they are sometimes not timely filed or reviewed, which renders them useless for patient care.  In the clinic at Santa Rita unit in Tucson, I saw a great deal of loose filing of lab results and consult results and x-ray reports which were upwards of four to six weeks old and had clearly never been looked at by anyone – they were not organized into the patients' files and there were no signatures indicating review or any follow up.  Such delays can be dangerous to patients: I looked at many of the unreviewed lab reports and found significant abnormal levels.   If lab results are not reviewed promptly, they do the patient no good – they might as well not have been ordered.  These errors speak to lack of staff and provider availability.

My findings are bolstered by the testimony of ADC's own staff.  See Sharp Depo, 54:21-56:5 (according to Perryville physician, it currently takes 2-4 weeks to get x-ray reports from radiologist; such delays can and have posed a serious risk to patients);

73

ADC137319 (July 31, 2013) (no regular medical provider line in Phoenix, resulting in untimely review of laboratory results); ADC088856 (April 14, 2013) (review of imaging and lab results at Florence Globe was delayed, including an x-ray result that was received on 2/27/13 and not reviewed until 4/5/13 and an abnormal lab dated 3/14/13 and still not reviewed as of 4/5/13). See also Maryann Chisholm (200825) for delays in reviewing lab work and consult orders.

### 4. Special medical diets

Medical diets are necessary as part of the overall care plan for some patients. Healthcare providers order these special medical diets just like medications because in many instances a proper medical diet is more efficacious at treating a problem than prescription medications. As such, I always pay attention to making sure that certain types of patients receive appropriate diets because it is so essential to successful disease management. I was shocked to discover that Arizona prisons have extremely limited disease-specific diets. The most common special diet in a correctional facility is a calorie-controlled diabetic diet. This does not exist in the Arizona prison system. I pulled diet binders that listed the diets available, I pulled diet order forms that were used for ordering diets, I pulled lists of medical diets that the kitchen was preparing for individual patients and not a single mention of a diabetic diet was found. This is inconceivable to me as a clinician as it eliminates one of the most important variables in managing diabetics—moderating the amount of sugar (carbohydrates) they consume.

Florence's Deputy Warden for Operations, Julie Jackson, attempted to explain the medical diet issue to me and indicated that a few years ago medical diets were eliminated in favor of a universal "heart healthy diet" in the ADC. She explained that the heart healthy diet was used for almost all medical diets regardless of condition and it has greatly simplified the process of producing food in the prisons. She informed me that the diabetics were all given the heart healthy diet and they did just fine on it. Based on her assertions I sought to find evidence of the universal diet's effectiveness. I reviewed

74

blood sugar logs for diabetic patients, chronic care notes for diabetics, and standard diabetic laboratory monitoring results in the medical records.  What I discovered, not surprisingly, is that while the universal heart healthy diet may be convenient for corrections, it is not effective in managing diabetic patients.  A very high percentage of the insulin-dependent patients had sugar levels that were poorly controlled.  For example, when ███████████████ came into the system, his Hemoglobin A1c level (an indicator of long-term blood sugar control covering about 90 days of time) was 7.6%, which indicates that he was in reasonably good control prior to incarceration. After he moved to Florence and began the heart healthy diet plan, his finger stick blood glucose readings jumped up consistently to the 300 to 400 range and his Hemoglobin A1cs increased to 10.3 and 10.6 on respective tests.  As determined by the objective evidence he went from being a well-controlled diabetic to a very poorly controlled diabetic, at risk for severe disease complications.[10]  The insulin was the same and the patient is the same; the primary variable that changed was the diet.  I saw many examples of this phenomenon and while I did not have the time in the prisons or access to the documentation I need to examine the entirety of the medical diet dilemma, I see it as a major issue that deserves more study since I believe that the inappropriate diet issues in the prison contribute dramatically to the disease issues that I did study in detail.

### E.   Protection from preventable negative outcomes

Healthcare administrators know that a significant number of negative outcomes can be prevented through carefully implemented quality assurance, patient feedback, and

---

[10] Another breakage in the system is that if a blood sugar goes above 400, nursing staff are ordered to call a medical doctor so that action can be taken.  I routinely saw blood sugars over 400, up to 500, with no notes, no assessment, and medical staff simply giving insulin and calling it good treatment with no provider involvement despite medical orders to call.  I saw no indication that anyone had called a provider about ██████████ blood sugar readings.

screening mechanisms.  I saw no evidence that any of these measures have been meaningfully implemented in the Arizona system.

### 1. Quality assurance

People make mistakes.  This is an unavoidable fact of human nature.  In order to find and correct errors before they harm patients, healthcare administrators establish quality assurance mechanisms.

An effective quality assurance process requires structured and systemic review of healthcare processes throughout the whole system.  This is typically done by identifying a problem to be investigated, developing a hypothesis, performing a review of a statistically significant number of charts by a qualified individual or group to assess the evidence of care, calculating appropriate statistics to prove or disprove the hypothesis, formulating proposed action plans to improve the item being reviewed if necessary, developing policy and procedure to implement the new action plans, and then re-assessing the results of the changes in the future to determine that the identified problems have actually been corrected.

I saw no evidence that such system exists in ADC, which does an inadequate job of providing this essential aspect of healthcare delivery.  The MGAR monitoring system is no substitute for a true quality assurance program.   It is merely an incident reporting tool with no analysis of cause and effect and it simply is not an adequate tool to assess healthcare quality in any way.

Dr. Winfred Williams, the Corizon Arizona Regional Medical Director, oversees and supervises doctors in the system, including peer review based on chart reviews. Williams Depo, 9:1-9:4, 12:20-13:5.  He looks at "clinical outcomes data," including information about patient HIV viral loads and insulin levels and the like, from the laboratory database to measure performance.  *Id.* at 17:25-18:6, 20:16-20:22, 21:22-23:4.

76

Corizon also conducts quality assurance studies with review performance measures analogous to the MGARs.[11]  *Id.* at 24:23-26:1.

From Dr. Williams's own description of his processes, however, it is clear to me that they are not an adequate quality assurance mechanism.  For one thing, he does not have enough information.  He has only seen a few MGAR reports, he does not receive official reports from medical directors, and he does not receive any reports that review delays in patient care.  Williams Depo, 16:17-16:21, 15:11-15:17, 21:2-21:10.  Weekly conference calls with providers (*id.* at 15:18-16:6) and occasional trips to the field (*id.* at 14:1-14:6) are no substitute for methodical information-gathering.  Nor is a review of lab numbers in a database: such data give you some information about patient health, but they do not pinpoint deficits with quality of care.  (If a patient's numbers are subnormal, is the problem in delayed access to care?  Medication delivery?  Interaction with other medications?)  Without reviewing patient charts, it is impossible to tell whether the medical care delivery system is working and if not, where the problem lies.  Moreover, without reviewing additional data and performing thorough reviews at the site, it is impossible to tell what these numbers are missing.  For example, how many patients should have had labs drawn but did not?  The answer cannot be found in reviewing lab results.

The fact that Dr. Williams is unaware of serious care delivery problems in the system he oversees demonstrates the inadequacy of any quality assurance mechanisms currently in use.  Although he believes he can determine the rate at which chronic care patients are timely seen by assessing the computerized lab data (*id.* at 46:16-50:18), his belief is clearly misplaced: as of October 2013, he did not know that in June 2013, some

---

[11] I was not provided with any of these studies.  My understanding is the Corizon has not produced them in this litigation.  I would be happy to review any such studies, but I am confident, based on the evidence I have seen and documented in this report, that any quality assurance measures Corizon is taking are ineffective.

chronic care appointments at Eyman were overdue by many months – and several for over a year. *Id.* at 57:6-58:2, 59:24-60:4. He did not know that in July 2013, 68% of chronic care appointments at Eyman were late. *Id.* at 60:6-64:14 (actual question and response at 64:1-64:14). Most chillingly, Dr. Williams is either unaware of or unpersuaded by the serious staffing deficits I cataloged in Sections II.A.3 and II.B.2, above: he believes that Corizon currently has adequate providers to meet chronic care guidelines: "from what I've seen when I've been out to the sites, I notice that the patients are being seen and provider lines are being done. And patients are scheduled." Williams Depo, 45:9-45:23. *See also* Bybee Depo, 8:13-8:16, 24:24-25:12 (Corizon vice president of operations for Arizona believes that Corizon has enough providers to see patients 7 days after nurse's line).

### 2.    Grievance process

Patient grievances are an important source of information for healthcare administrators and practitioners. They are another essential element of quality assurance programs in correctional settings. Of course, patients file many meritless grievances, but the meritorious ones make the process worthwhile: in any system, people can slip through the cracks and the grievance process affords an opportunity for them to be heard, for errors to be corrected, and for oversights to be addressed.

The healthcare grievance process does not work in Arizona prisons. For one thing, neither ADC nor Corizon tracks grievances electronically. Responses 38 & 39, Defendants' Responses to Verduzco's First Set of RFAs. Without that capability, the feedback loop cannot be effective, and staff and administrators cannot learn from their mistakes. An effective grievance process relies on statistical analysis of patterns to uncover issues that need to be addressed. Extracting any meaningful quality data from grievances is simply not possible without any tracking, categorization, or analysis of the grievances as an overall data set. In Arizona, problems conveyed on grievances come in one by one, unit by unit, prison by prison and they are addressed individually without any

sense of the larger healthcare delivery process within the Arizona Department of Corrections.

The grievance system also is unreliable when responses are significantly delayed. I have seen some evidence of delays in Arizona.  ADC036793 (ASPC-Perryville Grievances Performance Measures: "[a]s of October 15, 2012, there were 260 informal grievances [and] 7 formal grievances that had not been answered. Of the informal grievance, only 23 were compliant with this standard" requiring a response within 15 working days of receipt per Department Order 802); ADC089042 (April 27, 2013) (7 past due inmate grievances and 28 overdue incomplete inmate letter responses to date at Tucson); ADC088938 (April 29, 2013) (10 of 32 informal grievances due by 4/29 at Perryville were not answered within the allotted time and approximately 60 informal grievances awaiting site managers signatures).

### 3.    Screening

Correctional healthcare systems must have an initial screening process to catch urgent or emergent needs (for example, major injuries from the arrest process) and then a secondary, more thorough screening that is an actual clinical encounter to address medications, infectious disease control, and the like.

Arizona's intake screening process, which takes place for male prisoners at the Phoenix facility, is faulty.  ADC's Phoenix monitor has repeatedly told Corizon of intake compliance problems.  Valenzuela Depo, 108:7-108:21.  These problems include physical exams not occurring in a timely fashion.  ADC088954 (April 28, 2013) (5 of 10 charts reviewed at Phoenix C area had not had a physical examination completed by a medical provider by the second day of the intake process); ADC088998 (April 29, 2013) (as of 4/29/13, 8 minors at Tucson Rincon Minors yard had not had a physical exam by a provider completed within two days of the intake process); AGA_Review_00009556 (as of March 31, 2013, 14 Phoenix intake charts show no timely physical exam).

Another problem involves lab testing: "lab results are <u>not consistently</u> transferred with the inmate in his medical records to his permanent yard in a timely manner creating a situation of unavailability of laboratory results to medical staff at the inmate's permanent facility."  AGA_Review_00009559-9560 (listing multiple lab results not filed or not reviewed by provider) (emphasis in original).

Perhaps the main constraint on intake processing is that the space set aside for it -- Alhambra Unit at Phoenix -- is very small.  Since Alhambra can house only a limited number of prisoners awaiting transfer, when new buses arrive there is serious pressure to move people out as quickly as possible, as documented on a series of frantic emails I reviewed between ADC and Corizon staff in June 2013.   AGA_Review_00021332-21333 ("Alhambra only has a capacity of 336 beds.  Intake continues to be extremely high.  As of right now we are negative 90 inmates, with only 17 ready to move.  We need at least 48 more scheduled out for today.  Medical has 190 roll overs and tomorrow we have 103 arrivals putting Alhambra at almost 130 negative").  As one staff member put it, "We can not operate intake this way."  *Id.*

ADC ascribes the hold-up to Corizon: "[m]ovement out of Alhambra is being impeded by the current medical process.  Inmates are getting backed up there without bed space to house them."  AGA_Review_00021381-21382 (also noting large numbers of prisoners awaiting medical processing; "it's like this almost daily").  As a result, prisoners are rushed through the process and it is not always adequately completed.  For example, physicians' orders are substandard: Dr. Robertson, ADC's Medical Program Administrator, determined that "notes are scanty and some are even copied for a pre-signed progress note and place[d] in chart with minor modifications.  (This is unacceptable.)"  AGA_Review_00018506.  I agree.  Dr. Robertson also points out that other providers do not trust Alhambra's intake labs, a "serious" issue that "needs to be looked at."  *Id.*  Untrustworthy labs could be another symptom of rushed processing.

These are problems of long standing.  Dr. Fisher from Wexford found that transfer summaries coming out of Phoenix for men were "grossly incomplete," with many sections left completely blank.  Deposition of Neil Fisher, October 8, 2013 (Fisher Depo), at 16:18-17:8, 88:21-89:16; WEXFORD000023.  Transfer summaries from Perryville for women were "better, but still challenged."  WEXFORD000023.  This meant that providers lack a patient's full medical and social history.  *Id.* at 107:19-108:17.  Wexford detailed extensive deficiencies in the screening process in November 2012, including the failure to implement a proper intake screening process and the failure to provide tuberculosis testing and preventive care.  WEXFORD000023-25.

Corizon has not cured all of these deficiencies.  According to the ADC monitor for Phoenix, Corizon has been notified repeatedly of problems but has not addressed them in a meaningful or lasting way.  ADC118026 ("[t]he health services intake process is problematic in medically processing inmates and entering the information on a timely basis resulting in a serious delay of ADOC inmates being moved or transferred out to other facilities. Corizon upper management at the Phoenix Complex have been previously and currently made aware of this on several occasions and were provided with suggestions for making improvements. They have shown a momentary attention to address the problems with the intake process; however, it is temporary with limited to no follow up to assure correction").  In sum, "[i]t seems there exists an attitude of ignoring the ineffective current medical intake process combined with a non urgency to maintain timely intake medical inmate processing."  *Id*

## III.   Conclusion

Medical care in Arizona prisons is simply inadequate to meet the basic needs of many of the prisoners who experience illness and injury while in custody.  Throughout my investigation, I found evidence of a system in disarray: poor management structure and lines of authority; systematic violations of policies and procedures as well as omitted policies that are necessary for patient care; staff spread far too thin to provide for

patients' needs; malfunctioning sick call process and consequent significant barriers to care; dangerously inadequate chronic care patient management; serious concerns regarding emergency and inpatient care; signs of custody interference with care; disturbing waivers of treatment at least in the Tucson infirmary; a widespread failure to provide patients with appropriate provider medical judgment due to chaotic and disorganized medical records, nurses acting outside of the scope of their licenses, denial of specialty care consultations, and substandard decision-making; inability to provide patients with medically necessary medications and diagnostic tests; and the inability to self-correct or to address known risks of harm through quality assurance, grievance, and screening mechanisms.   All of these problems are chronic but also current.  All of them harm patients.

My follow-up experience with two patients I met during my tours is symptomatic to me of the system's failures.  I discussed the case of ████████████████ in Section II.C.5 on substandard care decisions.  He is the Yuma patient in urgent need of wound care: his inadequate treatment had transformed a treatable infection into a large pus-filled gaping wound that required immediate vascular surgery with reconstructive plastic surgery on his leg.  After I interviewed him on August 2, 2013, I arranged for ████████ to show his wound to Corizon's Arizona Regional Medical Director Dr. Williams as well as the lawyers for the State and for Corizon on the tour and I described for them why the current long-standing wound management for him was incorrect and what steps need to be pursued quickly to address this treatable problem.

I understand that ████████ wrote to the Prison Law Office in September and again on October 23, 2013, reporting that he still had not received meaningful care for his wound.  According to the copy of the grievance I was shown, dated October 22, 2013, ████████ was taken on September 17 to Yuma Regional Medical Center where he was given an IV drip and other aggressive treatment and told by a plastic surgeon that he would require several surgeries.  This finding is consistent with what I would expect if

82

the wound I saw in August continued to be incompetently treated to that point.
According to ███████, three days after arriving at the hospital he was moved to the
Tucson prison, where he was denied any treatment for several days and was then returned
to Yuma, where he is once again on the same inadequate treatment regimen: bandage
changes three times a week.

I have not been able to review ███████ healthcare records because they have
not been produced by the State, although they were requested after my tour, so I cannot
verify his account.  If what he relates is true, however, it is outrageous and demonstrates
deliberate indifference to his serious medical needs.   What started off as a manageable
problem has turned into a catastrophe for this patient as a result of a year of incompetent
wound care management.  Without adequate treatment, there is a very real possibility that
he may require amputation to control the infection.

The second patient is ███████ whom I discussed in Section
II.C.4 regarding failure to provide him with specialty care.  ███████ has end-stage
AIDS and is a very sick and fragile patient.  After I met with him and reviewed his chart
at Yuma, I told Dr. Williams and the attorneys for the State and for Corizon that his case
was being seriously mishandled by the facility providers with a treatment plan that fell
well short of the standard of care.  He needed urgently to see an HIV specialist to correct
fundamental treatment errors and omissions.  I pointed out that on May 23, 2013, an
infectious disease consult had been ordered, but it had never been completed.

I have been provided with a copy of ███████ medical chart through
October 7, 2013.  From the documentation, I see that he was in fact seen by an HIV
specialist on August 19, 2013, several weeks after I informed Dr. Williams of his
dangerously mishandled care.  The specialist confirmed my initial findings and ordered a
panel of diagnostic tests necessary to evaluate the patient in light of his failed treatment
and to reset the treatment plan as best as possible.  A follow-up appointment with the
HIV specialist one month later was also ordered.  As of October 7, only two of the

83

medical tests ordered have been completed.  Additionally, the consults ordered by the

HIV specialist have not been completed.  ███████████ life continues to be at great

risk due to horrendous care.

I mention these two cases because to me they represent the extraordinary depth of

indifference to serious medical needs manifested in the medical care system in the

Arizona prisons.  I am an expert for the plaintiffs in a major lawsuit over treatment, and I

pointed out these cases of prisoners who are dying due to substandard care to the attorney

representing the State and to the doctor who oversees medical care in Arizona prisons.

Months later, the patients continue to receive dangerously poor care.  These are routine

correctional medical cases where the standard of care is unequivocal and should be

obvious to any competent physician.  Furthermore, the path forward to treat these patients

adequately is easily accomplished with a very high likelihood of success.  If the State

cannot fix these two cases, in the glare of litigation, how can it be trusted to provide

decent care for those thousands of patients whose care does not come under outside

scrutiny?

After touring the facilities, talking with patients, reading well over 100 charts, and

reviewing the abundance of evidence in this case, it is clear to me that medical care in

Arizona prisons is dangerously bad.  The care I have seen in ADC is as poor as I've ever

seen in a correctional setting, and certainly worse than Maricopa County at the time I

testified in the *Graves v. Arpaio* case.  It is true system failure.


I declare under penalty of perjury under the laws of the State of Arizona and the

United States of America  that the foregoing is true and correct.

Executed this 8th day of November, 2013, at Salt Lake City, Utah.

_____

Todd R. Wilcox, MD, MBA, CCHP-A

**Appendix A to Confidential Expert Report of Todd Randall Wilcox**

# Todd Randall Wilcox, M.D., M.B.A., C.C.H.P.-A.

ADDRESS: 4760 S. Highland Drive, # 105
Salt Lake City, UT  84117
(385) 743-1744

EMPLOYMENT: **Chief Executive Officer**, Wellcon, Inc.
May 1996 to present

**Medical Director**, Salt Lake County Jail System
May 1996 to present

**Attending Physician**, After Hours Medical
August 2001 to present

**Senior Consultant**, Phase 2 Consulting
January 2003 to December 2009

**Medical Director**, Maricopa County Jail System
November 2004 to February 2006

**Attending Physician,** Wasatch Physician Services
July 1996 to January 2000

**Attending Physician**, State of Utah Department of Corrections
August 1997 to January 1999

**Staff Physician**, Salt Lake County Jail
June 1994 to May 1996

EDUCATION: M. B. A.
**University of Utah David Eccles School of Business**
Salt Lake City, UT
September 1996 to June 1998

Residency in Orthopaedic Surgery
**University of Utah**
July 1993 to July 1996

Internship in General Surgery
**University of Utah**
    July 1992 to June 1993

M.D.
**Vanderbilt University School of Medicine**
    Nashville, TN
    August 1988 to May 1992

B.S.
**Duke University**
    Durham, NC
    Major:  Biological Psychology
    August 1984 to May 1988

MEDICAL
LICENSURE:    Utah
    Arizona

BOARD
CERTIFICATIONS:  American Board of Urgent Care Medicine

ADVANCED
CERTIFICATIONS:  American Academy of HIV Medicine (AAHIV Specialist)
    Advanced Certified Correctional Health Care Provider (CCHP-A)

FACULTY
APPOINTMENTS:  Medical School Admissions Committee, University of Utah School
of Medicine
Faculty Instructor, Correctional Crisis Intervention Team
Academy, Salt Lake County, UT
Adjunct Instructor of Medicine, University of Utah School of
Medicine
Adjunct Professor of Chemistry, Salt Lake Community College
Faculty Instructor, University of Utah School of Nursing

PROFESSIONAL
APPOINTMENTS:  President-elect, Society of Correctional Physicians, 2013
Chairman, Physician Certification Committee, National
Commission on Correctional Health Care, 2012-2013
Board of Directors, National Commission on Correctional Health
Care—Certified Correctional Healthcare Professional Board
Chairman, Electronic Medical Records Taskforce for the National
Commission on Correctional Healthcare, 2002

Treasurer, Society of Correctional Physicians, 2012
Medical School Admissions Committee, University of Utah School
of Medicine, 2012-13

HONORS:              Medical Director for National Commission on Correctional
                     Healthcare Facility of the Year, 2001
                     Angier B. Duke Memorial Scholarship
                     Boettcher Foundation Scholar
                     Jostens Foundation Scholar

PROFESSIONAL
MEMBERSHIPS:         American Medical Association
                     American College of Emergency Physicians
                     American Jail Association
                     Society of Correctional Physicians
                     American Correctional Health Services Association
                     American Academy of Urgent Care Medicine
                     American Academy of HIV Medicine

CORRECTIONAL
CONSULTING:          American Jail Association
                     National Institute of Corrections
                     California Department of Corrections
                     Maricopa County Correctional Health Care, AZ
                     Pima County Department of Institutional Health, Tucson, AZ
                     Santa Clara County Jail System, CA
                     Washington County Jail, UT
                     Utah County Jail, UT
                     Seattle-King County Jail System, WA
                     Mississippi Department of Corrections
                     National Commission on Correctional Healthcare

PUBLICATIONS:        Wilcox TR.  Critical Commandments in Correctional Health Care:
                     Part 1.  CorrectCare.  Chicago:  National Commission on
                     Correctional Health Care, Spring 2013.  27:2, 20.

                     Wilcox TR.  Developing an Effective Alcohol Withdrawal
                     Protocol.  Correctional Health Care Report.  Civic Research
                     Institute, Inc., May 2003:  49-50, 63-64.

Goble EM, Kane SM, Wilcox TR, Doucette SA.  Meniscal Allografts.  In:  McGinty JB, ed. *Operative Arthroscopy*. Philadelphia:  Lippincott-Raven Press; 1996:  317-31.

Goble EM, Kane SM, Wilcox TR, Olsen RE.  Advanced Arthroscopic Instrumentation.  In:  McGinty JB, ed.  *Operative Arthroscopy*.  Philadelphia:  Lippincott-Raven Press; 1996:  7-12.

Wilcox TR, Goble EM.  Indications for meniscal allograft reconstruction.  *American J of Knee Surgery* 9:  35-6, 1996.

Wilcox TR, Goble EM, Doucette SA.  Goble technique of meniscus transplantation.  *American J of Knee Surgery* 9:  37-42, 1996.

Goble EM, Downey DJ, Wilcox TR.  Positioning of the tibial tunnel for ACL reconstruction.  *J Arthroscopy*  12:  415-18, 1995.

Wilcox TR.  Treatment modalities in infected total joint arthroplasties.  {In prep}.

Morris JA, Wilcox TR, Reed GW, et al.  Safety of the blood supply:  surrogate testing and transmission of hepatitis C in patients after massive transfusion.  *Annals of Surgery*  219:  517-26, 1994.

Wilcox TR, Morris JA, Green NE.  Case report:  Pediatric ankle fractures.  *Tennessee Medical Journal*.  85:  217-19, 1992.

Morris JA, Wilcox TR, Frist WH.  Pediatric organ donation:  the paradox of organ shortage despite the remarkable willingness of families to donate.  *Pediatrics*  89:  411-15, 1992.

Morris JA, Wilcox TR, Noreuil T, and Frist WH.  Organ donation:  a university hospital experience.  *Southern Medical Journal* 83:  884-88, 1990.

Cogbill TH, Moore EE, Feliciano DV, Wilcox TR, et al.  Conservative management of duodenal trauma:  a multicenter perspective.  *Journal of Trauma*  30:  1469-75, 1990.

Morris JA, Moore EE, Feliciano DV, Wilcox TR, et al.  Post-traumatic renal failure:  a multicenter study.  *Journal of Trauma* 31:  1584-90, 1991.

Wilcox TR, contributing author to The Admissions Essay by Helen W. Power and Robert DiAntonio.  Lyle Stuart, Inc., Seacausus, NJ, 1987, pp. 116-7, 197, 206-8, 219-20.

PRESENTATIONS:  National Commission on Correctional Healthcare Jail Standards Course
Chronic Disease Management in Correctional Facilities
Pain Management in Correctional Healthcare
Alcohol Withdrawal Syndrome
Drug Withdrawal Syndromes
Effective Correctional Medical / Mental Health Intake Screening
Endocrine Emergencies
Excited Delirium and Sudden In-Custody Death Syndrome
Hematologic Emergencies
Safe Restraint and Intensive Medical Management Practices
Medical Effects of Mental Health Medications
Neurological Emergencies
Effective Nursing Triage in Correctional Settings
Orthopedic Emergencies
Point of Care Laboratory in Correctional Healthcare
Managing Hypertension in Correctional Healthcare
Seizure Assessment and Treatment
How To Work Well with EMS
Effective Wound Care Practices in Correctional Healthcare
14-day Assessments in Corrections
Electronic Health Records for Institutional Medicine

EXPERT
PANELS:  Rand Corporation Expert for Modified Delphi Process to Determine Quality Measures for Correctional Healthcare—June 2009

American Jail Association / National Institute of Corrections Expert for Mental Health in Jails Focus Group and National Satellite Broadcast—June 2009

PATENTS:  United States Patent 5,681,289
Chemical Dispensing System
Issued October 28, 1997

United States Patent 5,891,101
Chemical Dispensing System Methodology
Issued April 17, 1999

United States Patent 5,895,375
Chemical Dispensing System Components
Issued April 17, 1999

**Appendix B to Confidential Expert Report of Todd Randall Wilcox**

**Deposition/Trial testimony in the last four years**

**2009**
Rohrbaugh v. Prison Health Services
Combs v. Prison Health Services
Turner v. CorrectHealth / Dekalb County, GA

**2010**
Williams v. Gamble

**2011**
Thomas v. Arizona
Williams v. Gamble

**2012**
Dawkins v. CHS, NJ
Turpen v. Graham, GA
Cady vs. Cumberland, ME
Braillard v. Maricopa County, AZ – Diabetes
Sumers-Eskridge v. Kaschubeck et al.
Brooks v. San Joaquin County

**2013**
Marcum v. Scioto County
Galambos v. Cumberland
Siple v. Columbia County
Baires v. USA

**Publications authored in the last 10 years**

Wilcox TR.  Critical Commandments in Correctional Health Care:  Part 1.  CorrectCare. Chicago:  National Commission on Correctional Health Care, Spring 2013.  27:2, 20.

Wilcox, TR.  Critical Commandments in Correctional Health Care: Part 2.  CorrectCare Chicago: National Commission on C0rrectional Health Care, Summer 2013. 27:3, 19.

Wilcox TR.  Developing an Effective Alcohol Withdrawal Protocol.  Correctional Health Care Report.  Civic Research Institute, Inc., May 2003:  49-50, 63-64.

**Compensation**

I am compensated for my services on this case at a rate of $225 per hour, or a daily rate of $1800 for out-of-town work.

**Appendix C to Confidential Expert Report of Todd Randall Wilcox**

**Deposition Transcripts**

| | |
|---|---|
| 12.08.23 | Helena Valenzuela, Ph.D |
| 12.09.19 | Richard H. Rowe, MD |
| 12.10.09 | Jeffrey Alan Sharp, MD |
| 13.05.20 | Daniel L. Conn |
| 13.05.21 | Karen D. Mullenix |
| 13.08.26 | David W. Robertson, DO |
| 13.08.27 | Vanessa Headstream, RN |
| 13.09.09 | Arthur Gross |
| 13.09.10 | Marlena D. Bedoya |
| 13.09.11 | Kathleen Campbell, RN |
| 13.09.17 | Anthony N. Medel |
| 13.09.18 | Martin J. Winland |
| 13.09.18 | Mark T. Haldane, JD |
| 13.09.20 | Jenny Mielke-Fontaine |
| 13.09.23 | Juliet Respicio-Moriarty |
| 13.09.23 | Kathleen Campbell, RN |
| 13.10.08 | Neil A. Fisher, MD |
| 13.10.10 | Vickie Bybee |
| 13.10.10 | Winfred D. Williams, MD |

**Documents Produced by Defendants**

| | |
|---|---|
| ADC000001-000286 | Medical Records - Chisholm, Maryanne, 200825 |
| ADC004375-005078 | Medical Records – Jensen, Shawn, 032465 |
| ADC005375-005967 | Medical Records – Licci, Desiree, 150051 |
| ADC006565-007144 | Medical Records – Wells, Charlotte, 247188 |
| ADC010648-011234 | Health Services Technical Manual |
| ADC024171-024221 | ███████████████ - Death Investigation |
| ADC024949-024988 | ███████████████ - Death Investigation |
| ADC025079-025109 | ██████████████████ - Death Investigation |
| ADC025079-025139 | ████████████ - Death Investigation |
| ADC027829-027931 | Numerous documents including full ADC Cure Letter to Wexford and Wexford Response |
| ADC027854-027876 | 12.09.21 ADC Cure Letter to Wexford |
| ADC027941-027943 | 12.10.01 Wexford Response to ADC Cure Letter |
| ADC035204-035295 | Florence Compliance Reports – September 2012 |
| ADC036993-037228 | Tucson Compliance Reports – October 2012 |
| ADC040550-040573 | DO 912 Food Service System |
| ADC040574-040609 | Diet Reference Manual |
| ADC048247-048250 | 12.09.24 Wexford COO Conn email to ADC Director Ryan |
| ADC049045-049055 | 12.09.27 Wexford Vacancy Report |
| ADC049377-049480 | ADC Employee Reprimands |

| | |
|---|---|
| ADC050749-050764 | Medical Records – Jensen, Shawn, 032465 |
| ADC051013-051256 | Medical Records – Jensen, Shawn, 032465 |
| ADC052422-052564 | Florence Compliance Reports – November 2012 |
| ADC052718-052839 | Perryville Compliance Reports – November 2012 |
| ADC052840-052896 | Phoenix Compliance Report – November 2012 |
| ADC053118-053171 | Winslow Compliance Reports – November 2012 |
| ADC053285-053285 | Yuma Compliance Reports – November 2012 |
| ADC054007-054020 | Perryville Weekly Executive Meeting Minutes July-Nov. 2012 |
| ADC067540-067690 | Florence Compliance Reports – October 2012 |
| ADC068031-068239 | Perryville Compliance Reports – October 2012 |
| ADC068240-068321 | Phoenix Compliance Reports – October 2012 |
| ADC068893-068940 | Winslow Compliance Reports – October 2012 |
| ADC068941-069143 | Yuma Compliance Reports – October 2012 |
| ADC069300-069401 | Florence Compliance Reports – December 2012 |
| ADC069514-069597 | Perryville Compliance Reports – December 2012 |
| ADC069598-069643 | Phoenix Compliance Reports – December 2012 |
| ADC069824-069863 | Winslow Compliance Reports – December 2012 |
| ADC069864-69947 | Yuma Compliance Reports – December 2012 |
| ADC070136-070270 | Florence Compliance Reports – January 2013 |
| ADC070399-070478 | Perryville Compliance Reports – January 2013 |
| ADC070511-070570 | Phoenix Compliance Reports – January 2013 |
| ADC070792-070841 | Winslow Compliance Reports – January 2013 |
| ADC070842-70948 | Yuma Compliance Reports – January 2012 |
| ADC071361-071393 | Medical Records - Chisholm, Maryanne, 200825 |
| ADC071574-071678 | Medical Records – Licci, Desiree, 150051 |
| ADC071920-071950 | Medical Records – Wells, Charlotte, 247188 |
| ADC073108-073149 | Medical Records – Jensen, Shawn, 032465 |
| ADC074716-074959 | Medical Records – Jensen, Shawn, 032465 |
| ADC074960-074972 | Medical Records – Licci, Desiree, 150051 |
| ADC084399-084406 | Florence Compliance Reports – February 2013 |
| ADC084407-084416 | Perryville Compliance Reports – February 2013 |
| ADC084417-084424 | Phoenix Compliance Reports – February 2013 |
| ADC084439-084446 | Winslow Compliance Reports – February 2013 |
| ADC084447-084453 | Yuma Compliance Reports – February 2013 |
| ADC084454-084700 | Medical Records - Chisholm, Maryanne, 200825 |
| ADC084701-084878 | Medical Records – Jensen, Shawn, 032465 |
| ADC088742-088755 | Florence Monitoring Reports – March 2013 |
| ADC088763-088770 | Perryville Compliance Report – March 2013 |
| ADC088771-088779 | Phoenix Monitoring Report – March 2013 |
| ADC088789-088791 | Winslow Monitoring Report – March 2013 |
| ADC088792-088795 | Yuma Monitoring Report – March 2013 |
| ADC088846-088891 | Florence Monitoring Reports – April 2013 |
| ADC088914-088953 | Perryville Monitoring Report – April 2013 |
| ADC088954-088978 | Phoenix Monitoring Report – April 2013 |
| ADC088998-089059 | Tucson Compliance Reports – April 2013 |

| | |
|---|---|
| ADC089060-089083 | Winslow Monitoring Report – April 2013 |
| ADC089084-089112 | Yuma Monitoring Report – April 2013 |
| ADC093959-094136 | Inmates in Custody Five Years or More |
| ADC094265-094391 | The Drug Utilization Report |
| ADC094932-095000 | Monitor Conditions Report – Florence |
| ADC095053-095081 | Monitor Conditions Report – Perryville |
| ADC095082-095087 | Monitor Conditions Report – Phoenix |
| ADC095167-095179 | Monitor Conditions Report – Winslow |
| ADC095180-095216 | Monitor Conditions Report – Yuma |
| ADC095666-107477 | "ORC Approval" – Referrals to Outside Providers |
| ADC108131 | ADC Medical Transports All Complexes, Dec. 2012 |
| ADC108132 | ADC Medical Transports All Complexes, Jan. 2013 |
| ADC108133 | ADC Medical Transports All Complexes, Feb. 2013 |
| ADC108134 | ADC Medical Transports, Statewide, Dec. 2012 |
| ADC108135 | ADC Medical Transports, Statewide, Jan. 2013 |
| ADC108136 | ADC Medical Transports, Statewide, Feb. 2013 |
| ADC108208-109790 | Executive Report, 2012 Emergencies |
| ADC108208-109790 | Executive Reports – Medical 2012 |
| ADC109791-110429 | Executive Report, 2013 Emergencies |
| ADC109791-110429 | Executive Reports – Medical 2013 |
| ADC110442-114357 | Executive Reports – 2011 to 2013-06-13 |
| ADC116148-116159 | Phoenix Medical Grievances |
| ADC116937-117042 | Winslow Medical Grievances |
| ADC117051-117063 | Yuma Medical Grievances |
| ADC122669-122681 | Medical Records – Licci, Desiree, 150051 |
| ADC122682-122697 | Medical Records – Licci, Desiree, 150051 |
| ADC122698-122706 | Medical Records – Licci, Desiree, 150051 |
| ADC122704-122836 | Medical Records – Licci, Desiree, 150051 |
| ADC122867-122895 | Medical Records – Wells, Charlotte, 247188 |
| ADC122896-122920 | Medical Records – Wells, Charlotte, 247188 |
| ADC123280-123340 | Medical Records – Jensen, Shawn, 032465 |
| ADC123341-123378 | Medical Records - Chisholm, Maryanne, 200825 |
| ADC123379-123383 | Medical Records – Jensen, Shawn, 032465 |
| ADC130309-130328 | Medical Records – Jensen, Shawn, 032465 |
| ADC130329-130339 | Medical Records – Jensen, Shawn, 032465 |
| ADC134802-135377 | Medical Records – Wells, Charlotte, 247188 |
| ADC137229-137267 | Florence Compliance Reports – July 2013 |
| ADC137289-137315 | Perryville Compliance Reports – July 2013 |
| ADC137316-137340 | Phoenix Compliance Reports – July 2013 |
| ADC137360-137401 | Tucson Compliance Reports – July 2013 |
| ADC137419-137450 | Yuma Compliance Reports – July 2013 |
| ADC137497-137524 | Florence Compliance Reports – August 2013 |
| ADC137558-137582 | Perryville Compliance Reports – August 2013 |
| ADC137583-137609 | Phoenix Compliance Reports – August 2013 |
| ADC137626-137669 | Tucson Compliance Reports – August 2013 |

| | |
|---|---|
| ADC137684-137716 | Yuma Compliance Reports – August 2013 |
| ADC153777-153793 | 13.07.29 Corizon Contract Staffing Percentage Report |
| ADC154095-154146 | Florence Compliance Reports – September 2013 |
| ADC154182-154218 | Perryville Compliance Reports – September 2013 |
| ADC154219-154257 | Phoenix Compliance Reports – September 2013 |
| ADC154279-154346 | Tucson Compliance Reports – September 2013 |
| ADC154369-154421 | Yuma Compliance Reports – September 2013 |
| ADC155202-155417 | Medical Records - ███████ |
| ADC156083-156324 | Medical Records – ███████ |
| ADC156723-157010 | Medical Records – ███████ |
| ADC158650-159525 | Medical Records – ███████ |
| ADC160076-160427 | Medical Records – ███████ |
| ADC160811-161109 | Medical Records – ███████ |
| ADCPROC010933-011016 | Corizon Supplemental Proposal |
| AGA_Review_00001704 | |
| AGA_Review_00001721 | |
| AGA_Review_00004833 | |
| AGA_Review_00006398 | |
| AGA_Review_00007168 | |
| AGA_Review_00007170 | |
| AGA_Review_00009347 | |
| AGA_Review_00009556 | |
| AGA_Review_00013126 | |
| AGA_Review_00017516 | |
| AGA_Review_00018434 | |
| AGA_Review_00018506 | |
| AGA_Review_00021332 | |
| AGA_Review_00021381 | |
| AGA_Review_00037462 | |
| AGA_Review_00038450 | |
| AGA_Review_00074092 | |

**Documents Produced by Plaintiffs**

| | |
|---|---|
| PLTF-PARSONS-000165-000220 | Medical Records – Jensen, Shawn, 032465 |
| PLTF-PARSONS-000221-000385 | Medical Records – Jensen, Shawn, 032465 |

**Documents Produced by Wexford**

WEXFORD000001-000131 - 12.11.07 Powerpoint

**Other documents**

12.03.22 Complaint (Parsons v Ryan)
12.11.06 Jensen Executed Declaration

13.06.11 Def Ryan's Response to Plt Verduzco's 1ˢᵗ Set of RFAs and ROGs
13.10.28 Doc 707-1 Exhs 1-8 to Defs' Reply
13.10.11 Medical Grievance filed by prisoner, ███████████

**Prisoners' healthcare records reviewed during tours**

**Florence**



**Perryville**



Chisholm, Maryanne, 200825

Licci, Desiree, 150051

Verduzco, Christina, 205776
Wells, Charlotte, 247188

**Phoenix**



**Tucson**

Jensen, Shawn, 032465

**Yuma**



# APPENDIX D

ADC INSTITUTIONAL CAPACITY COMMITTED POPULATION

| 8-Nov-13 | | | OPERATING CAPACITY | | | | | | | | | INMATE COMMITTED POPULATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | RATED | | | TEMPORARY | | | SPECIAL USE | | | RATED | | TEMPORARY | | | TOTAL | INSIDE | OUTSIDE | GRAND |
| Custody | UNIT | USE | G.P. | M/MH | TOTAL | T/G.P. | T M/MH | TOTAL | S.U. | T/S.U. | TOTAL | G.P. | M/MH | T/G.P. | T M/MH | TOTAL | S.U./T.S.U | TOTAL | TOTAL | TOTAL |
| **ASPC-DOUGLAS** | | | | | | | | | | | | | | | | | | | | |
| MIN | Gila | GP | 632 | | 632 | 203 | | 835 | | | 0 | 632 | | 124 | | 756 | 0 | 756 | 0 | 756 |
| MED | Mohave | GP | 803 | | 803 | 124 | | 927 | | | 0 | 803 | | 100 | | 903 | 0 | 903 | 17 | 920 |
| | Complex Detention | DET | | | 0 | | | | 45 | 44 | 89 | | | | | | 4 | 4 | | 72 |
| MIN | Eggers | GP | 240 | | 240 | | | 240 | | | 0 | 237 | | | | 237 | 0 | 237 | 0 | 237 |
| MIN | Papago | GP | 250 | | 250 | 90 | | 340 | | | 0 | 250 | | 87 | | 337 | 0 | 337 | 0 | 337 |
| | **TOTAL** | | 1925 | 0 | 1925 | 417 | 0 | 2342 | 45 | 44 | 89 | 1922 | 0 | 311 | 0 | 2233 | 68 | 2301 | 21 | 2322 |
| **ASPC-EYMAN** | | | | | | | | | | | | | | | | | | | | |
| MED | Cook | SO | 796 | | 796 | 657 | | 1453 | | | | 796 | | 637 | | 1433 | 0 | 1433 | 11 | 1444 |
| MED | Meadows | SO | 796 | | 796 | 330 | | 1126 | | | | 1123 | | | | 1123 | 0 | 1123 | 5 | 1128 |
| | Meadows Detention | DET | | | 0 | | | | 40 | 40 | 80 | | | | | | 69 | 69 | 0 | 69 |
| MED | Rynning A42 | SO | 400 | | 400 | | | 400 | | | | 397 | | | | 397 | 0 | 397 | 3 | 400 |
| CLOSE | Rynning A37 | SO | 400 | | 400 | | | 400 | | | | 377 | | | | 377 | 0 | 377 | 3 | 380 |
| MAX | Rynning A46 | SO | | | 0 | 80 | | 80 | | | | | | 68 | | 68 | 0 | 68 | 0 | 68 |
| MAX | SMU I | GP | 328 | | 328 | 56 | | 384 | 7 | | 7 | 328 | | 20 | | 348 | 0 | 348 | 8 | 356 |
| MAX | SMU I EAST | SO | 176 | | 176 | 64 | | 240 | | | | 176 | | 51 | | 227 | 0 | 227 | 1 | 228 |
| MAX | SMU I P.C. | PC | 352 | | 352 | 72 | | 424 | 1 | | 1 | 352 | | 17 | | 369 | 0 | 369 | 9 | 378 |
| | SMU I Detention | DET | | | 0 | | | | 96 | | 96 | | | | | | 57 | 57 | 0 | 57 |
| MAX | SMU I M/H Watch | MH | | 8 | 8 | | | 8 | | | | | 8 | | | 8 | 0 | 8 | 0 | 8 |
| MAX | Browning Unit | GP | 596 | | 596 | 110 | | 706 | | | | 596 | | 42 | | 638 | 0 | 638 | 18 | 656 |
| MAX | Browning D/Row | DR | 132 | | 132 | | | 132 | | | | 112 | | | | 112 | 0 | 112 | 6 | 118 |
| MAX | Browning M/H Watch | MH | | 20 | 20 | | | 20 | | | | | 14 | | | 14 | 0 | 14 | 1 | 15 |
| MAX | Browning BMU | MH | | 20 | 20 | | 10 | 30 | | | | | 12 | | | 12 | 0 | 12 | 0 | 12 |
| | **TOTAL** | | 3976 | 48 | 4024 | 1369 | 10 | 5403 | 144 | 40 | 184 | 4257 | 34 | 835 | 0 | 5126 | 126 | 5252 | 65 | 5317 |
| **ASPC-FLORENCE** | | | | | | | | | | | | | | | | | | | | |
| MAX | Central Unit | GP | 712 | | 712 | | | 712 | | | | 684 | | | | 684 | 0 | 684 | 17 | 701 |
| MAX | Central Unit Phase III | GP | 156 | | 156 | | | 156 | | | 0 | 133 | | | | 133 | 0 | 133 | 1 | 134 |
| MAX | Central Unit CB 1 MH | MH | | 120 | 120 | | | 120 | | | | | 105 | | | 105 | 0 | 105 | 2 | 107 |
| | Kasson Detention | DET | | | | | | | 64 | | 64 | | | | | | 48 | 48 | 3 | 51 |
| MAX | Kasson MH | MH | | 64 | 64 | | | 64 | 8 | | 8 | | 47 | | | 47 | 15 | 62 | 3 | 65 |
| MAX | Housing Unit 8 | MED | | 22 | 22 | 20 | | 42 | | | 0 | | 21 | | 0 | 21 | 0 | 21 | 1 | 22 |
| MAX | Health Unit | MED | | | | | | | 15 | | 15 | | | | | | 12 | 12 | 0 | 12 |
| MED | East Unit | GP | 600 | | 600 | 80 | | 680 | | | 0 | 600 | | 68 | | 668 | 0 | 668 | 8 | 676 |
| MIN | North Unit | GP | 972 | | 972 | 124 | | 1096 | | | 0 | 972 | | 106 | | 1078 | 0 | 1078 | 1 | 1079 |
| MED | South Unit | SO | 544 | | 544 | 421 | | 965 | | | 0 | 544 | | 420 | | 964 | 0 | 964 | 5 | 969 |
| MIN | Globe | GP | 250 | | 250 | 52 | | 302 | | | 0 | 250 | | 8 | | 258 | 0 | 258 | 0 | 258 |
| | Globe Detention | | | | | | | | 9 | | 9 | | | | | | 0 | 0 | 0 | 0 |
| | Tempe St. Lukes | | | | | | | | 26 | | 26 | | | | | | 11 | 11 | 0 | 11 |
| | **TOTAL** | | 3234 | 206 | 3440 | 697 | 0 | 4137 | 122 | 0 | 122 | 3183 | 173 | 602 | 0 | 3958 | 86 | 4044 | 41 | 4085 |
| **ASPC-PERRYVILLE-F** | | | | | | | | | | | | | | | | | | | | |
| MED | Santa Cruz | GP | 768 | | 768 | | | 768 | 2 | | 2 | 679 | | 0 | | 679 | 0 | 679 | 11 | 690 |
| CLOSE | Lumley Unit | GP | 480 | | 480 | | | 480 | | | 0 | 206 | | 0 | | 206 | 0 | 206 | 2 | 208 |
| MAX | Lumley SMA | GP | 108 | | 108 | 24 | | 132 | | | 0 | 81 | | 0 | | 81 | 0 | 81 | 0 | 81 |
| MED | Santa Maria WTU | MH | | 24 | 24 | | | 24 | | | 0 | | 20 | | | 20 | 0 | 20 | 0 | 20 |
| MED | Lumley Watch Cells | MH | | 12 | 12 | | | 12 | | | 0 | | 9 | | 0 | 9 | 0 | 9 | 0 | 9 |
| MAX | Recp&Asmnt | GP | 96 | | 96 | 48 | | 144 | | | 0 | 71 | | 0 | | 71 | 0 | 71 | 0 | 71 |
| CLOSE | Minors Unit | GP | 22 | | 22 | | | 22 | 3 | | 3 | 2 | | 0 | | 2 | 0 | 2 | 0 | 2 |
| MIN | San Pedro | GP | 432 | | 432 | | | 432 | 2 | | 2 | 424 | | 0 | | 424 | 0 | 424 | 4 | 428 |
| MED | Santa-Maria | GP | 360 | | 360 | | | 360 | 2 | | 2 | 305 | | 0 | | 305 | 0 | 305 | 6 | 311 |
| | Complex Detention | DET | | | | | | | 26 | 16 | 42 | | | | | | 12 | 12 | 1 | 13 |
| | Perryville IPC | MED | | | | | | | 7 | | 7 | | | | | | 3 | 3 | 2 | 5 |
| MIN | Piestewa Unit | GP | 260 | | 260 | | | 260 | | | 0 | 260 | | | | 260 | 0 | 260 | 0 | 260 |
| MIN | Santa Rosa Unit | GP | 390 | | 390 | | | 390 | | | 0 | 387 | | | | 387 | 0 | 387 | 2 | 389 |
| MIN | San Carlos | GP | 1250 | | 1250 | | | 1250 | | | 0 | 1233 | | | | 1233 | 0 | 1233 | 8 | 1241 |
| | **TOTAL** | | 4166 | 36 | 4202 | 72 | 0 | 4274 | 42 | 16 | 58 | 3648 | 29 | 0 | 0 | 3677 | 15 | 3692 | 36 | 3728 |
| **ASPC-PHOENIX** | | | | | | | | | | | | | | | | | | | | |
| MAX | Reception | GP | 207 | | 207 | 129 | | 336 | | | 0 | 207 | | 130 | | 337 | 0 | 337 | 4 | 341 |
| MAX | Inmate Worker | GP | 30 | | 30 | 25 | | 55 | | | 0 | 30 | | 25 | | 55 | 0 | 55 | 0 | 55 |
| MED | B-Ward | MH | | 40 | 40 | | 8 | 48 | | | 0 | | 27 | | 0 | 27 | 0 | 27 | 0 | 27 |
| CLOSE | Flamenco Ida Ward- M | MH | | 25 | 25 | | | 25 | | | 0 | | 21 | | | 21 | 6 | 27 | 0 | 27 |
| CLOSE | Flamenco Ida Watch M | MH | | 15 | 15 | | | 15 | | | 0 | | 5 | | | 5 | 0 | 5 | 0 | 5 |
| CLOSE | Flamenco John PS- M | MH | | 30 | 30 | | | 30 | 7 | | 7 | | 22 | | | 22 | 0 | 22 | 0 | 22 |
| MAX | Flamenco King - M | MH | | 35 | 35 | | | 35 | | | 0 | | 27 | | | 27 | 0 | 27 | 0 | 27 |
| CLOSE | Flamenco-F | MH | | 20 | 20 | | | 20 | 2 | | 2 | | 12 | | | 12 | 0 | 12 | 0 | 12 |
| MED | Aspen/SPU | MH | | 150 | 150 | | | 150 | | | 0 | | 146 | | | 146 | 0 | 146 | 1 | 147 |
| | **TOTAL** | | 237 | 315 | 552 | 154 | 8 | 714 | 9 | 0 | 9 | 237 | 260 | 155 | 0 | 652 | 6 | 658 | 5 | 663 |
| **ASPC-LEWIS** | | | | | | | | | | | | | | | | | | | | |
| CLOSE | Morey | GP | 800 | | 800 | | | 800 | 16 | | 16 | 792 | | | | 792 | 15 | 807 | 10 | 817 |
| | Morey Detention | DET | | | 0 | | | 0 | 80 | | 80 | | | | | | 79 | 79 | 1 | 80 |
| CLOSE | Rast | PC | 356 | | 356 | | | 356 | | | 0 | 350 | | | | 350 | 0 | 350 | 0 | 350 |
| MAX | Rast PC | PC | 48 | | 48 | | | 48 | | | 0 | 25 | | | | 25 | 0 | 25 | 1 | 26 |
| | Lewis Medical | MED | | | 0 | | | 0 | 13 | | 13 | | | | | | 14 | 14 | 0 | 14 |
| MED | Stiner Level G.P. | GP | 800 | | 800 | 300 | | 1100 | | | 0 | 800 | | 276 | | 1076 | 0 | 1076 | 11 | 1087 |
| | Stiner Detention | DET | | | 0 | | | 0 | 70 | | 70 | | | | | | 70 | 70 | 2 | 72 |
| MIN | Bachman PC | PC | 300 | | 300 | 76 | | 376 | | | 0 | 300 | | 41 | | 341 | 0 | 341 | 2 | 343 |
| MED | Bachman PC | PC | 300 | | 300 | 76 | | 376 | | | 0 | 300 | | 43 | | 343 | 0 | 343 | 5 | 348 |
| | Bachman Detention | DET | | | 0 | | | 0 | 80 | | 80 | | | | | | 80 | 80 | 3 | 83 |
| CLOSE | Buckley PC | PC | 800 | | 800 | | | 800 | 16 | | 16 | 788 | | | | 788 | 21 | 809 | 3 | 812 |
| MED | Barchey PC | PC | 400 | | 400 | 150 | | 550 | | | 0 | 400 | | 121 | | 521 | 0 | 521 | 3 | 524 |
| MED | Barchey PC | PC | 400 | | 400 | 150 | | 550 | | | 0 | 400 | | 140 | | 540 | 0 | 540 | 4 | 544 |
| MIN | SUNRISE | GP | 100 | | 100 | | | 100 | | | 0 | 98 | | | | 98 | 0 | 98 | 0 | 98 |
| MIN | EAGLE POINT | GP | 300 | | 300 | | | 300 | | | 0 | 297 | | | | 297 | 0 | 297 | 2 | 299 |
| | **TOTAL** | | 4604 | 0 | 4604 | 752 | 0 | 5356 | 275 | 0 | 275 | 4550 | 0 | 621 | 0 | 5171 | 279 | 5450 | 47 | 5497 |
| **ASPC-SAFFORD** | | | | | | | | | | | | | | | | | | | | |
| MIN | Fort Grant | GP | 588 | | 588 | 160 | | 748 | | | 0 | 588 | | 40 | | 628 | 0 | 628 | 0 | 628 |
| | Miles Detention | DET | | | 0 | | | 0 | 25 | 24 | 49 | | | | | | 35 | 35 | 0 | 35 |
| MIN | Graham | GP | 615 | | 615 | 96 | | 711 | | | 0 | 615 | | 64 | | 679 | 0 | 679 | 1 | 680 |
| MED | Tonto | GP | 250 | | 250 | 60 | | 310 | | | 0 | 250 | | 56 | | 306 | 0 | 306 | 7 | 313 |
| | Tonto Detention | DET | | | 0 | | | 0 | 6 | | 6 | | | | | | 0 | 0 | 0 | 0 |
| | **TOTAL** | | 1453 | 0 | 1453 | 316 | 0 | 1769 | 31 | 24 | 55 | 1453 | 0 | 160 | 0 | 1613 | 35 | 1648 | 8 | 1656 |

**ADC INSTITUTIONAL CAPACITY COMMITTED POPULATION**

| Custody | UNIT | USE | RATED G.P. | RATED M/MH | RATED TOTAL | TEMP T/G.P. | TEMP T M/MH | TEMP TOTAL | SPECIAL USE S.U. | SPECIAL T.S.U. | SPECIAL TOTAL | RATED G.P. | RATED M/MH | TEMP T/G.P. | TEMP T M/MH | TOTAL | TOTAL S.U./T.S.U. | INSIDE TOTAL | OUTSIDE TOTAL | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **8-Nov-13** | | | | | | | | | | | | | | | | | | | |
| | **ASPC-TUCSON** | | | | | | | | | | | | | | | | | | | |
| CLOSE | Cimarron | GP | 288 | | 288 | | | 288 | | | | 253 | 0 | | | 253 | 0 | 253 | 2 | 255 |
| MED | Cimarron | GP | 384 | | 384 | | | 384 | | | 0 | 347 | | 0 | | 347 | 0 | 347 | 4 | 351 |
| | Cimarron Detention | DET | | | 0 | | | 0 | 48 | 48 | 96 | | | | | 0 | 114 | 114 | 2 | 116 |
| CLOSE | Rincon MH Watch | MH | | 55 | 55 | | | 55 | | | 0 | | 32 | | | 32 | 0 | 32 | 0 | 32 |
| CLOSE | Rincon BHU | MH | | 56 | 56 | | | 56 | | | 0 | | 41 | | | 41 | 0 | 41 | 1 | 42 |
| CLOSE | Rincon Medical | MED | | | 0 | | | 0 | 50 | | 50 | | | | | 0 | 25 | 25 | 2 | 27 |
| CLOSE | Rincon S.N.U. | MED | | 16 | 16 | | | 16 | | | 0 | | 14 | | | 14 | 0 | 14 | 1 | 15 |
| CLOSE | Rincon Transitory | TRANS | | | 0 | 30 | | 30 | | | 0 | | | 18 | | 18 | 0 | 18 | 1 | 19 |
| CLOSE | Rincon | GP | 512 | | 512 | | | 512 | | | 0 | 474 | | | | 474 | 0 | 474 | 10 | 484 |
| CLOSE | Minors | GP | 146 | | 146 | | | 146 | | | 38 | | | | | 38 | 0 | 38 | 0 | 38 |
| MAX | Minors | GP | 36 | | 36 | | | 36 | | | 0 | 12 | | | | 12 | 5 | 17 | 0 | 17 |
| MED | Santa Rita | GP | 768 | | 768 | | | 768 | | | 0 | 740 | | 0 | | 740 | 0 | 740 | 13 | 753 |
| MED | Manzanita S.N.U. | MED | | 25 | 25 | 20 | | 45 | | | 0 | | 25 | | 13 | 38 | | 38 | 2 | 40 |
| MED | Manzanita | GP | 309 | | 309 | 179 | | 488 | 0 | | 0 | 309 | | 146 | | 455 | NA | 455 | 12 | 467 |
| | Manzanita Detention | DET | | | 0 | | | 0 | 12 | 11 | 23 | | | | | 0 | 20 | 20 | 2 | 22 |
| MED | Winchester | GP | 400 | | 400 | 336 | | 736 | | | 0 | 400 | | 308 | | 708 | 0 | 708 | 14 | 722 |
| | Winchester Detention | DET | | | 0 | | | 0 | 12 | 12 | 24 | | | | | 0 | 17 | 17 | 0 | 17 |
| | Complex Detention | DET | | | 0 | | | 0 | 40 | 40 | 80 | | | | | 0 | 75 | 75 | 1 | 76 |
| MIN | Catalina | GP | 360 | | 360 | | | 360 | | | 0 | 343 | | 0 | | 343 | 0 | 343 | 14 | 357 |
| MIN | Whetstone | GP | 1250 | | 1250 | | | 1250 | | | | 1223 | | 0 | | 1223 | 0 | 1223 | 3 | 1226 |
| **TOTAL** | | | 4453 | 152 | 4605 | 545 | 20 | 5170 | 178 | 111 | 289 | 4139 | 112 | 472 | 13 | 4736 | 256 | 4992 | 83 | 5075 |
| | **ASPC-WINSLOW** | | | | | | | | | | | | | | | | | | | |
| MIN | Coronado | GP | 492 | | 492 | 136 | | 628 | | | 0 | 492 | | 50 | | 542 | 0 | 542 | 2 | 544 |
| MED | Cimarron | GP | 400 | | 400 | | | 400 | | | 0 | 365 | | | | 365 | 0 | 365 | 7 | 372 |
| CLOSE | Kaibab | GP | 400 | | 400 | | | 400 | | | 0 | 385 | | | | 385 | 0 | 385 | 1 | 386 |
| | Complex Detention | DET | | | 0 | | | 0 | 20 | 19 | 39 | | | | | 0 | 23 | 23 | 0 | 23 |
| MIN | Apache | GP | 334 | | 334 | 80 | | 414 | | | 0 | 334 | | 13 | | 347 | 0 | 347 | 0 | 347 |
| | Apache Detention | DET | | | 0 | | | 0 | 12 | | 12 | | | | | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | | | 1626 | 0 | 1626 | 216 | 0 | 1842 | 32 | 19 | 51 | 1576 | 0 | 63 | 0 | 1639 | 23 | 1662 | 10 | 1672 |
| | **ASPC-YUMA** | | | | | | | | | | | | | | | | | | | |
| MED | Cheyenne | GP | 800 | | 800 | | | 800 | | | 0 | 795 | | 0 | | 795 | 5 | 800 | | |
| | Cheyenne Detention | DET | | | 0 | | | 0 | 40 | 39 | 79 | | | | | 0 | 70 | 70 | 0 | 70 |
| MIN | Cocopah | GP | 250 | | 250 | 80 | | 330 | | | 0 | 250 | | 77 | | 327 | 0 | 327 | 2 | 329 |
| CLOSE | Dakota | GP | 800 | | 800 | | | 800 | 16 | | 16 | 763 | | | | 763 | 0 | 763 | 6 | 769 |
| | Dakota Detention | DET | | | 0 | | | 0 | 80 | | 80 | | | | | 0 | 66 | 66 | 0 | 66 |
| MED | Cibola | GP | 1250 | | 1250 | | | 1250 | | | 0 | 1164 | | 0 | | 1164 | 0 | 1164 | 28 | 1192 |
| MIN | La Paz | GP | 1250 | | 1250 | | | 1250 | | | 0 | 1244 | | 0 | | 1244 | 0 | 1244 | 11 | 1255 |
| **TOTAL** | | | 4350 | 0 | 4350 | 80 | 0 | 4430 | 136 | 39 | 175 | 4216 | 0 | 77 | 0 | 4293 | 136 | 4429 | 52 | 4481 |
| **TOTAL IN-STATE** | | | 30024 | 757 | 30781 | 4618 | 38 | 35437 | 1014 | 293 | 1307 | 29181 | 608 | 3296 | 13 | 33098 | 1030 | 34128 | 368 | 34496 |
| | **CONTRACT BEDS** | | | | | | | | | | | | | | | | | | | |
| MED | CACF - GEO | SO | 1000 | | 1000 | 280 | | 1280 | 40 | | 40 | 1000 | | 267 | | 1267 | 10 | 1277 | 6 | 1283 |
| MIN | Phx. West- DWI - GEO | DUI | 400 | | 400 | 100 | | 500 | 20 | | 20 | 400 | | 93 | | 493 | 3 | 496 | 6 | 502 |
| MIN | Flor. West- RTC - GEO | RTC | 200 | | 200 | 50 | | 250 | 4 | 4 | 8 | 200 | | 7 | | 207 | 1 | 208 | 0 | 208 |
| MIN | Flor. West- DWI - GEO | DUI | 400 | | 400 | 100 | | 500 | 10 | 7 | 17 | 400 | | 91 | | 491 | 7 | 498 | 0 | 498 |
| MED | Kingman MTC- Hualapai | GP | 1400 | | 1400 | 108 | | 1508 | 73 | | 73 | 1400 | | 15 | | 1415 | 62 | 1477 | 26 | 1503 |
| MIN | Kingman MTC- Cerbat | GP | 2000 | | 2000 | | | 2000 | 80 | | 80 | 1904 | | | | 1904 | 68 | 1972 | 15 | 1987 |
| MIN | Marana - MTC | GP | 500 | | 500 | | | 500 | 8 | | 8 | 488 | | | | 488 | 2 | 490 | 3 | 493 |
| PC | Navajo County Jail | PC | 50 | | 50 | | | 50 | | | | 50 | | | | 50 | 0 | 50 | 0 | 50 |
| **TOTAL CONTRACT** | | | 5950 | 0 | 5950 | 638 | 0 | 6588 | 235 | 11 | 246 | 5842 | 0 | 473 | 0 | 6315 | 153 | 6468 | 56 | 6524 |
| **TOTAL IN-STATE** | | | 30024 | 757 | 30781 | 4618 | 38 | 35437 | 1014 | 293 | 1307 | 29181 | 608 | 3296 | 13 | 33098 | 1030 | 34128 | 368 | 34496 |
| **TOTAL CONTRACT** | | | 5950 | 0 | 5950 | 638 | 0 | 6588 | 235 | 11 | 246 | 5842 | 0 | 473 | 0 | 6315 | 153 | 6468 | 56 | 6524 |
| **GRAND TOTAL** | | | 35974 | 757 | 36731 | 5256 | 38 | 42025 | 1249 | 304 | 1553 | 35023 | 608 | 3769 | 13 | 39413 | 1183 | 40596 | 424 | 41020 |
| **TOTAL STATE MALE** | | | 25858 | 701 | 26559 | 4546 | 38 | 31143 | 970 | 277 | 1247 | 25533 | 567 | 3296 | 13 | 29409 | 1015 | 30424 | 332 | 30756 |
| **TOTAL CONTRACT MALE** | | | 5950 | 0 | 5950 | 638 | 0 | 6588 | 235 | 11 | 246 | 5842 | 0 | 473 | 0 | 6315 | 153 | 6468 | 56 | 6524 |
| **TOTAL MALE** | | | 31808 | 701 | 32509 | 5184 | 38 | 37731 | 1205 | 288 | 1493 | 31375 | 567 | 3769 | 13 | 35724 | 1168 | 36892 | 388 | 37280 |
| **TOTAL STATE FEMALE** | | | 4166 | 56 | 4222 | 72 | 0 | 4294 | 44 | 16 | 60 | 3648 | 41 | 0 | 0 | 3689 | 15 | 3704 | 36 | 3740 |
| **GRAND TOTAL** | | | 35974 | 757 | 36731 | 5256 | 38 | 42025 | 1249 | 304 | 1553 | 35023 | 608 | 3769 | 13 | 39413 | 1183 | 40596 | 424 | 41020 |

| STATE MALE | TOTAL OPERATING CAPACITY | POPULATION | VACANCIES |
|---|---|---|---|
| MINIMUM CUSTODY | 9335 | 8953 | 382 |
| MEDIUM CUSTODY | 13458 | 13651 | -193 |
| CLOSE CUSTODY | 4729 | 4800 | -71 |
| MAXIMUM CUSTODY | 3285 | 3011 | 274 |
| RECEPTION -MAX | 336 | 341 | -5 |
| TOTAL | 31143 | 30756 | 387 |

| CONTRACT MALE | TOTAL OPERATING CAPACITY | POPULATION | VACANCIES |
|---|---|---|---|
| MINIMUM CUSTODY | 3750 | 3688 | 62 |
| MEDIUM CUSTODY | 2838 | 2836 | 2 |
| TOTAL | 6588 | 6524 | 64 |
| TOTAL MALE | 37731 | 37280 | 451 |

| STATE FEMALE | TOTAL OPERATING CAPACITY | POPULATION | VACANCIES |
|---|---|---|---|
| MINIMUM CUSTODY | 2332 | 2331 | 1 |
| MEDIUM CUSTODY | 1152 | 1023 | 129 |
| CLOSE CUSTODY | 534 | 234 | 300 |
| MAXIMUM CUSTODY | 132 | 81 | 51 |
| RECEPTION-MAX | 144 | 71 | 73 |
| TOTAL | 4294 | 3740 | 554 |
| GRAND TOTAL | 42025 | 41020 | 1005 |

| COMMUNITY SUPERVISION OFFENDERS | |
|---|---|
| Arizona Parole Prior TIS | 78 |
| Interstate Parole | 544 |
| Work Furlough | 0 |
| Home Arrest | 15 |
| Truth In Sentencing (TIS) | 5072 |
| SACRC Community Corrections Center | 55 |
| Daily Total | 5764 |

| COUNTY JAIL INTAKE | Male | Female | Both |
|---|---|---|---|
| County Jail Intake 11/08/13 | 56 | 23 | 79 |
| County Jail Transfers Pending | 0 | 0 | 0 |
| Inside Count | 36892 | 3704 | 40596 |
| Outside Count | 388 | 36 | 424 |
| Offical Daily Count | 37336 | 3763 | 41099 |

RATED BEDS PLUS TEMPORARY BEDS = OPERATING CAPACITY (R+T=OC).
SPECIAL USE BEDS ARE NOT INCLUDED IN THE OPERATING CAPACITY.
INMATES TEMPORARILY ASSIGNED TO SPECIAL USE BEDS ARE INCLUDED IN THE TOTAL POPULATION COUNT AND ARE REFLECTED IN THE TOTAL OPERATING CAPACITY VACANCIES.
THEREFORE THE BED VACANCY NUMBER CAN BE NEGATIVE WHEN THE NUMBER OF INMATES IN SPECIAL USE BEDS EXCEED THE VACANCIES IN OPERATING CAPACITY.

CURRENTLY THERE ARE NO FEMALE INMATES IN CONTRACT BEDS.

# EXHIBIT 5

# CONFIDENTIAL REBUTTAL REPORT OF TODD RANDALL WILCOX, M.D., M.B.A., C.C.H.P.-A

*Parsons, et al. v Ryan, et al.*
No. 2:12-cv-00601-NVW
January 31, 2014

Confidential Information – Subject to Protective Order

I have reviewed the report of Dr. Lawrence H. Mendel submitted in this case.  I believe many of the facts underlying his opinion are unexplained, undocumented, unproven, and in many cases clearly incorrect.  I also find his reasoning and medical opinions seriously flawed in several areas.

## I.      Outcome measures

Dr. Mendel relies on two sets of outcome measures in drawing his sweeping conclusions about Arizona prison healthcare: data from diabetic patients and mortality rates.   I agree that relevant outcome measures can be extremely helpful in evaluating system performance.  I would have welcomed the opportunity to review such data for my report, but when I requested it, I was informed by plaintiffs' counsel that it had not been provided.  I therefore reviewed with interest Dr. Mendel's outcome measures.

I was disappointed in what I saw.  Outcome measures are only useful to the extent they are based on reliable data.  It is therefore essential to take basic steps to assess the validity of the data before drawing conclusions from it.  Unfortunately, Dr. Mendel does not appear to have performed even an elementary review of the numbers he cites.  As a result, he has made several key errors and overlooked profound flaws that render his conclusions utterly unreliable.

### A.      Diabetes care

Diabetes care, in Dr. Mendel's view, is "the best overall measure of the effectiveness of a correctional healthcare system."  Confidential Expert Report of Lawrence H. Mendel, D.O., FSCP, CCHP, December 18, 2013, at 27 (hereafter "Mendel Report").  I agree that it is a reasonable barometer of several interconnected healthcare processes in correctional settings.  Dr. Mendel and I differ, however, on how to measure whether a system provides community standard of care in this area.  His approach is to look solely at outcome measures -- HgA1c and LDL levels -- and not at any individual patient care, and his results demonstrate the risks of such a limited methodology.

The most famous diabetes study ever conducted is called the Diabetic Control and Complications Trial (DCCT).  The conventional therapy group for the DCCT, under a treatment regimen very similar to that employed by ADC, had a median HgA1c of 9.1%.  The intensive therapy group, with a far superior treatment regimen than that employed in ADC, had a median HgA1c of 7.2%.   DCCT Research Group, "The Effect of Intensive Treatment of Diabetes on the Development and Progression of Long-Term Complications in Insulin-Dependent Diabetes Mellitus," New England Journal of Medicine, vol. 329, no. 14 (Sept. 30, 1993).  See also "The Diabetes Control and Complications Trial/ Epidemiology of Diabetes Interventions and Complications Study at 30 Years: Overview," Diabetes Care, vol. 37, pages 9-16 (January 2014).  This was an academic study that demonstrated that even under tight clinical management very few diabetics can achieve sustained HgA1c levels below 7%.

Another important data point is the Geisinger Diabetes Group.  Geisinger is a private healthcare network that is the national benchmark for preventative practices and diabetic control in large populations.  Their diabetes control program is considered state of the art, and includes many things unheard of in a correctional environment, such as nutritional counseling, individual meal plans, carbohydrate counting, exercise plans, diabetic education, disease support groups, and endocrinology consultations (http://www.geisinger.org/services/endocrinology/diabetes.html).   Under the most rigorous medical, dietary, and behavioral management they are able to achieve HgA1c levels of less than 7% in fewer than half of their diabetic patients.  Bloom et al., "Redesign of a Diabetes System of Care Using an All-or-None Diabetes Bundle to Build Teamwork and Improve Intermediate Outcomes," Diabetes Spectrum, vol. 23, no. 3 (2010).  See also Ali et al., "Achievement of Goals in U.S. Diabetes Care, 1999-2010," New England Journal of Medicine, vol. 368, no. 17 (April 25, 2013) at 1613-24 (after a decade of diabetic management progress, only approximately half of diabetics achieve HgA1c levels of less than 7%).

Against this backdrop, Dr. Mendel's claim that more than 70% of diabetics in ADC have achieved HgA1c levels of less than 7% over six months is not credible.

The Low Density Lipoprotein (LDL) values presented by Dr. Mendel are similarly difficult to believe. The National Health and Nutrition Examination Survey (NHANES) studies showed only 56.8% of the study group were able to achieve an LDL less than 100. Ali et al., "Achievement of Goals in U.S. Diabetes Care, 1999-2010." Corizon reports, and Dr. Mendel repeats without question or explanation, that 61% of its diabetic management group achieves an LDL less than 100. Mendel Report at 30. The results from academic studies occur under intense dietary and medical management. I saw no evidence of any similar efforts at ADC in my tours and review of the charts. Consequently, results better than the literature are difficult to believe without corroboration.

Additional lab data in the documentation produced with Dr. Mendel's report exhibit similar unreliability. In the same Corizon lab monitoring report, HIV management is cited as perfect—100% of HIV patients who have been on HAART (Highly Active Anti-Retroviral Therapy) for 12 weeks or more have an undetectable viral load in the third quarter of 2013. ADC_M000001. This result suggests that every HIV patient in the system is perfectly managed and has a perfect clinical response to treatment. In my clinical experience and to my knowledge of the literature, this result is not an achievable outcome measure across a large population. In my review of HIV-positive patients in ADC I found the care to be disorganized, illogical, poorly executed, and beneath the standard of care in some cases. I found several cases of poor management where HIV viral loads had been ordered but never carried out, and therefore the extent of the mismanagement was not documented objectively. As such, I find the claim of 100% perfection in this difficult and complex patient population to be unbelievable.

3

### B.      Mortality rates

The other outcome measure relied on by Dr. Mendel is the ADC's mortality rate, compared to the national average in prisons and jails.  Mendel Report at 31-32.

Dr. Mendel's analysis misses the mark: comparisons of crude mortality rates, without controlling for other factors that drive mortality, tell us nothing.  The single greatest driver of mortality rates overall is age.  Other factors with significant impact on death rates that should be controlled in any cross-population comparison include gender, ethnicity, and length of prison stay.  Without controlling for these factors, we cannot draw any conclusions as to why ADC's mortality rate might be lower than the national average.  See Curtin and Klein, "Direct Standardization (Age-Adjusted Death Rates)," U.S. Department of Health and Human Services/Centers for Disease Control and Prevention/National Center for Health Statistics (March 1995).

Even if comparing the mortality rate of the plaintiff class with the national average in prisons and jails were a useful exercise, Dr. Mendel's conclusions would still be wrong: the mortality rate for the plaintiff class in this case is in fact very close to his cited national average, and rising steadily.  We obtain different numbers because his calculations appear to include ADC prisoners in both state-run and private prisons.  (It is difficult to tell, since he does a poor job of citing his data sources.)  This lawsuit, however, includes only ADC prisoners in state-run facilities.  In 2012, there were 84 deaths in state-run facilities, out of an average population of 33,089.[1]  In 2013, there were

---

[1] I obtained the total number of 2012 deaths in custody from ADC_M000207. That document reports a total of 87 deaths in custody, which includes deaths that occurred in private prisons.  I reviewed the accompanying documents for each death and excluded the three that occurred in private prisons, found at ADC_M000268, ADC_M000274, and ADC_M000290.  I obtained the average population in state-run facilities for 2012 by taking the average of the monthly population reports issued by ADC in that year.  See PLTF-PARSONS-031580-031591.

87 deaths in state-run facilities, out of an average population of 33,664.[2]  Thus the mortality rate for the relevant population was 253.9 per 100,000 in 2012 and 258.4 per 100,000 for 2013.  Those figures demonstrate that contrary to Dr. Mendel's statements, the mortality rate in ADC prisons is increasing under Corizon's involvement and it is very near the national average.

## II.    Faulty reasoning

Many of Dr. Mendel's sweeping conclusions about healthcare in the ADC are flawed.  He argues that care is adequate because staffing is improved, wait times are better, grievances are minimal, and Arizona prisons are accredited by the NCCHC.  I examine each of these points in turn, along with his review of the few individual cases he discusses.

### A.    Staffing

Dr. Mendel offers a graph to demonstrate staffing improvements.  Mendel Report at 20.  The graph is confusing and misleading, however.  For one thing, the vertical axis is not labeled with any units of measure.  I am assuming, from a review of the cited data, that it refers to Full Time Employee Equivalents, but I cannot be sure.  For another, Dr. Mendel makes the elementary mistake of graphing his staffing numbers, which are discrete data, using a continuous data method.  Staffing numbers go up or down in blocks, not in gradual slopes.  It is misleading, for this type of data, to connect the dots and color in the graph beneath the line you create.  Moreover, the layering of the different elements (mid-levels, staff physicians, and medical directors) on top of each other improperly aggregates the data, producing a graph that does not match up to any stated

---

[2] I could not obtain the total number of 2013 deaths in custody from the same source as I found 2012 deaths, since the documents produced to me were not complete to the end of the year.  I therefore reviewed all the public announcement of 2013 deaths in custody by ADC, excluding executions and deaths occurring at private prisons.  PLTF-PARSONS-031631-031717.  I obtained the average population in state-run facilities in 2013 by taking the average of the monthly population reports issued by ADC in that year.  See PLTF-PARSONS-031592-031603.

data source.  For example, if you read this graph literally, in October 2013 ADC had almost 45 units of whatever-is-being-measured of medical directors.  That result does not correlate with any data disclosed.

Perhaps the most misleading aspect of Dr. Mendel's graph is that it gives the impression that all three important staffing levels – medical directors, physicians, and mid-level providers – have increased significantly under Corizon's management. However, when I looked at the underlying data, I found that that is not the case. Although in this period Corizon did increase the woefully inadequate number of mid-level providers, it also reduced the woefully inadequate numbers of physicians and medical directors.  All three job categories remain below the contractually required levels.

The graph is also, in one area, dead wrong.  Dr. Mendel's graph shows the aggregate staffing level for May 2013 for his three groups at 31 or 32 (my guess at the breakdown, based on a purely visual review of the graph, would be Medical Directors 6, Staff Physicians 10, and Mid-Level Providers 16).  He cites ADC117064 for the May 2013 figures, but that document shows the aggregate staffing levels for these groups to be below 25 (Medical Directors 5.5, Staff Physicians 4.5, Nurse Practitioners 14.75[3]).  That same document indicates that Corizon has secured only 0.77 FTEs of Medical Director staffing, 0.9 FTEs of physician staffing, and 3.47 FTEs of nurse practitioner staffing from various temporary agencies which still leaves them well short of contract minimums.

### B.  Access to care: waiting times

Dr. Mendel states that "significant progress" has been made in recent months, after my tours and document reviews, such that nearly every facility has a "provider wait time" of less than eight days, with a statewide average of seven days.  Mendel Report at

---

[3] "Mid-Level Providers" are not listed as a category in this document (ADC117064).  The only staffing category that could be considered a mid-level provider is Nurse Practitioner, so that is the number I have used.

9-10.  I looked at the underlying data Dr. Mendel cites and found it questionable at best.

According to a document cited by Dr. Mendel, there were no provider HNRs and no wait

time at all to see providers at Perryville in the month of May 2013.[4]  Mendel Report at

10; ADC122017.  What can this mean?  How is it possible?  The same document has no

provider information from Lewis at all in May 2013.  The same document also shows a

four-month wait time to see a provider at Eyman, and Yuma appears to be so short-

staffed with providers that it is projected to take 1-2 months for the system to see a mere

34 patients who have requested provider healthcare.  *Id.*  Another document Dr. Mendel

cites for his chart (ADC155093) shows no Provider HNRs at Winslow in September

2013.  Yet another document (ADC203348) shows no scheduled provider appointments

and zero provider wait time at Phoenix in November 2013.  The data that Dr. Mendel

uses to defend the care at ADC is all over the map, incomplete, internally inconsistent

and it exemplifies in one report the systemic issues in this case.  Quite simply, Corizon

and ADC are unable to describe their own operation accurately with statistical

performance numbers.  As such, it is illogical to attempt to defend the system using

reports that are so glaringly inaccurate and incomplete.

A review of the Health Needs Request report for October 2013 (ADC203032), a

document not cited by Dr. Mendel, provides some insight into the ongoing Health Needs

Request problems in the ADC.  According to that report, 17,367 medical HNRs were

submitted by prisoners statewide in October 2013.  Out of that number, a total of 7,513

(43.3%) were scheduled to see a nurse and 3,478 (20.0%) were then scheduled to see a

provider.  While the reported decrease in wait times is laudable, the real problem is that

the majority of patients requesting healthcare are not seen by anybody.  Out of 17,367

requests for treatment, only 7,513 were scheduled to be seen even by a nurse, leaving

---

[4] He fails to define his terms, so it is difficult to tell what exactly he is claiming.  What exactly does the "provider wait time" measure?  The time from the filing of an HNR to its triage?  From the triage to a nurse's line?  The nurse's line to a provider line?  The entire stretch, from the filing of an HNR until a patient is seen by a provider?

9,854 requests for care with no face-to-face review.  We have no information about why they were not seen and do not know if leaving the majority of patients with no face-to-face evaluation is appropriate.  I strongly suspect it is not.[5]

Another disturbing aspect of this October 2013 data is what I call "throughput" to the providers – how many patients filing HNRs get seen at a higher level than a nurse?  The 20% figure in October 2013 seems extremely low to me, given my experience of patients' written requests and my review of HNRs from ADC prisoners' files.  This rate varies by facility: at Douglas, only 12.3% of HNRs result in a provider visit, Tucson runs at 9.7%, and Perryville has only 8.2% provider throughput.

To me, the primary issue is not the wait times for those who do see providers but rather overall access to care within the system.  This data confirms my opinion that access to healthcare is extremely constrained and staffing is inadequate to meet the demands of the system.

### C.    Grievances

Dr. Mendel's reliance on grievances as probative evidence of the adequacy of health care is ill-advised.  In my experience evaluating and operating correctional healthcare systems I have found that prisoners frequently refrain from filing grievances for many reasons, including fear of retaliation, frustration with what they see as a meaningless process, and low literacy levels.  In Arizona, prisoners might feel reluctant to share their healthcare needs on a document that is seen by custody staff.  See Deposition of Juliet Respicio-Moriarty, September 23, 2013, at 10:14-11:25.  An inadequate grievance tracking process might also yield a smaller number of grievances in the records than were in fact filed.  Thus, the fact that only a small number of grievances was produced to Dr. Mendel does not automatically connote satisfaction with the

---

[5] Dr. Mendel makes the questionable assumption that "patient requests have been triaged and prioritized based upon the acuity of the medical need."  Mendel Report at 10.  He provides no support for this statement.  ADC's own monitors have found exactly the opposite to be true, as I did and described at length in my report.

responsiveness or efficacy of the system – in fact, it might demonstrate the exact reverse. There is much more we need to know about this information source before we can use it to draw conclusions about the healthcare system.  For these reasons, I do not place much credence in an analysis that concludes that a lack of grievances demonstrates satisfaction with the healthcare available.

### D.   NCCHC standards

I agree that the National Commission on Correctional Health Care serves a valuable purpose in helping correctional facilities improve healthcare for prisoners.  I am well aware of the accreditation process and I agree that in general it is a positive achievement for a facility to become accredited.  However, I am also well aware of the significant shortcomings of the accreditation survey process.  In Arizona, several of the prisons that are accredited have not been surveyed on site since 2010, and obviously a great deal has changed since then.  In addition, while some of the prisons retain accreditation, they are technically on probation because of significant deficiencies found on their last survey.  As such, being accredited does not always mean that the healthcare is being delivered in accordance with prevailing standards.  A prime example of this disconnect occurred in Maricopa County, Arizona.  The jail system there had been accredited for a long time, yet the court ultimately found in *Graves vs. Arpaio* that many of the core elements of care did not meet prevailing standards and the court ordered remedies to bring the jail into compliance.

### E.   Individual cases

Dr. Mendel states that he did review a few of the medical charts that I referred to in my expert report.  Unfortunately, it is clear that he performed a very selective review of information and in many cases he missed the entire point for why that patient's management fell beneath the standard of care, as a close examination shows:

- Shawn Jensen (032465) had a confirmed elevation in his prostate specific antigen (PSA, a marker of cancer) on August 30, 2006.  It took two years

and 10 months for ADC to get him seen by a urologist and the biopsy took three years and two months from the initial abnormal lab test.  No reasonable clinician would endorse a three-year cancer workup with an elevated PSA as reasonable and meeting the standard of care.  The fact that he did not have metastatic disease at the time of his surgery, a fact Dr. Mendel relies on, is hardly a defense for this extraordinarily delayed workup and treatment.  Mendel Report at 11-12.

In addition, Dr. Mendel disputes my finding that it was inappropriate for a nurse to complete a Foley irrigation for Mr. Jensen.  Mendel Report at 12-13.  His dispute is based on his misreading of the chart, however.  While nurses frequently do manage Foley catheters within their scope of practice, this was a somewhat different case.  The Foley catheter was actually a surgical drain strategically placed by the physician.  It is well established in the medical community that surgical drains are managed by doctors only; thus, no nurse should have manipulated Mr. Jensen's catheter regardless of level of licensure.

- ████████████████ is a diabetic patient who complained of vision loss on 12/12/12.  As of my tour on 7/29/13 he had never been seen by an optometrist.  In addition, he became critically sick with critically abnormal labs between 3/2013 and 6/2013.  His critical lab values were signed off late and no follow-up monitoring was ordered.  His diabetes was poorly controlled in prison with a HgA1C of 8.7% on 5/19/2013, which was a significant increase over his long established baseline.  He was so sick I felt the need to inform Dr. Williams of the extreme risks to this patient under his current management.  Dr. Mendel, however, indicates in his report that he reviewed this patient's chart and makes no mention of the violations of

the standard of care.  Instead, he appears to defend the care by affirming that he was finally seen by an optometrist.  Mendel Report at 23.

- Desiree Licci (150051) is a breast and ovarian cancer survivor who began to experience abnormal symptoms in November 2010.  It took ADC more than two years to have her seen by an oncologist.  Dr. Mendel states "her medical treatment has been consistent with the applicable standards of medical care."  Mendel Report at 25. I wholeheartedly disagree.  No reasonable clinician thinks that a two-year workup for possible gynecological cancer recurrence is appropriate.  Dr. Mendel notes that surgery was scheduled after my visit; I very much hope that this is true and that it has taken place.

- Dr. Mendel indicates that he reviewed the care of ███████████████, who has suffered from a chronic leg wound that has been improperly treated over the course of many months.  Dr. Mendel admits that the care was inappropriate but blames Wexford and indicates that the wound appears to be improving.  Mendel Report at 40.  I am not sure how he came to that conclusion since he never saw the patient.  When I reviewed ████ ██████ care in August 2013, five months after Corizon took over, it was evident to me that Corizon was continuing a wound care treatment plan that did not meet standard of care for many months with no provider oversight and that ██████████ wound was allowed to fester and grow to the point that significant reconstructive surgery would be necessary to repair his leg. I very much hope that ████████████ wound is in fact improving, but I have very little faith in Dr. Mendel's vague statement, especially since the treatment provided ██████████ clearly had not improved in the two months after I told Dr. Williams of Corizon and the ADC and Corizon attorneys in this case that his care was dangerously deficient.

- Dr. Mendel also indicates that he reviewed the care of ████████████
  ████████. He agrees with me that the infectious disease consult for
  management of his advanced AIDS was delayed but claims that all of the
  care ordered by the infectious disease telemedicine appointment on August
  21, 2013 (three weeks after I alerted Corizon's Dr. Williams and the
  Corizon and ADC lawyers to the serious deficiencies in his care), has been
  implemented. Mendel Report at 26. When I reviewed the updated chart on
  October 7, 2013, the care from that appointment had not been implemented.
  I hope Dr. Mendel has more recent information because without competent
  care this patient does not have long to live.

## III.    Additional information

I have been informed that in the last week the defendants have provided additional
documents and information relied on by Dr. Mendel in issuing his report. After
reviewing these documents, I may issue a supplemental report to address this recent
production.

January 31, 2014

_____

Todd R. Wilcox, M.D., M.B.A., C.C.H.P.-A

12

**Appendix A to Confidential Rebuttal Report of Todd Randall Wilcox**

In addition to the documents listed in my initial report, I reviewed the following documents for this rebuttal report:

Confidential Expert Report of Lawrence H. Mendel, December 18, 2013

ADC 2013 Inmate Death Notification (PLTF-PARSONS-031631 - PLTF-PARSONS-031717)

ADC117064-117074

ADC121178-121178

ADC122017-122017

ADC155093

ADC155099

ADC203032

ADC203036

ADC203041

ADC203348

ADC_M_000001

ADC_M_000207-000381

AGA_REVIEW_00019436

AGA_REVIEW_00020573

Mohammed K. Ali et al., Achievement of Goals in U.S. Diabetes Care, 1999-2010, New England Journal of Medicine, vol. 368, no. 17 (April 25, 2013) (PLTF-PARSONS-031614 - PLTF-PARSONS-031625)

ADC 2012 Institutional Capacity & Committed Population Monthly Reports (PLTF-PARSONS-031580 - PLTF-PARSONS-031591)

ADC 2013 Institutional Capacity & Committed Population Monthly Reports (PLTF-PARSONS-031592 - PLTF-PARSONS-031603)

Lester R. Curtin and Richard J. Klein, Direct Standardization (Age-Adjusted Death Rates), U.S. Department of Health and Human Services/ Centers for Disease Control and Prevention/National Center for Health Statistics (March 1995) (PLTF-PARSONS-031569 - PLTF-PARSONS-031579)

Frederick J. Bloom et al., Redesign of a Diabetes System of Care Using an All-or-None Diabetes Bundle to Build Teamwork and Improve Intermediate

Outcomes, Diabetes Spectrum, vol. 23, no. 3 (2010) (PLTF-PARSONS-031626 - PLTF-PARSONS-031630)

DCCT Research Group, The Effect of Intensive Treatment of Diabetes on the Development and Progression of Long-Term Complications in insulin-Dependent Diabetes Mellitus, New England Journal of Medicine, vol. 329, no. 14 (Sept. 30, 1993) (PLTF-PARSONS-031604 - PLTF-PARSONS-031613)

# EXHIBIT 6

# CONFIDENTIAL SUPPLEMENTAL REPORT OF TODD RANDALL WILCOX, M.D., M.B.A., C.C.H.P.-A

*Parsons, et al. v Ryan, et al.*
No. 2:12-cv-00601-NVW
April 2, 2014

Confidential Information – Subject to Protective Order

I have reviewed the 125 medical records that Dr. Mendel consulted in developing his opinion about the Arizona prison health care delivery system.[1]  According to Dr. Mendel, the information he reviewed, including these patients' charts, "shows incontrovertible evidence of [ADC's] ability to identify and resolve major challenges" and to operate "within the standard of care for correctional systems."  Mendel Report at 49.  Having reviewed the same records, it is my opinion that the evidence contained in them contradicts his wholehearted endorsement of the ADC's healthcare system.  In addition, I have also reviewed recent records for named plaintiff Shawn Jensen, and these records likewise reveal a health care system that is seriously flawed.

## I.      Records Reviewed by Dr. Mendel

The medical records that constitute one of the bases for Dr. Mendel's expert opinions are notable for several reasons.  First, the records clearly contradict and undermine data that Dr. Mendel presented in his initial report and cited in support of his contention that patients with chronic conditions are well controlled.  Second, like the records that I reviewed at the Arizona prisons I visited, they revealed ongoing healthcare delivery problems, including poor scheduling and follow-up for ordered tests, lack of timely access to care, uninformed treatment decisions, failure to deliver ordered medications, and inadequate access to specialty care.  Because of these serious and ongoing barriers to care, some Arizona prisoners are suffering unnecessary pain and bad outcomes, and all are subject to an unreasonable risk of serious harm.  Third, they are an

---

[1] Because defendants did not start to produce these records until ten weeks after Dr. Mendel submitted his report, I was unable to address them in my earlier rebuttal report.

odd assortment: there is an unusual number of HIV patients, and the scope of many of the records was limited.  Fourth, as was true of all of the ADC patient charts I have reviewed, these records were incomplete and very poorly maintained.

### A.     The Records Dr. Mendel Reviewed Refute Corizon Chronic Care Data

Dr. Mendel relies heavily on a single-page report, produced by Corizon, that purports to list outcome measures for patients with diabetes, patients taking blood thinners, and patients with HIV.  ADC_M00001.  The report is the centerpiece of his argument that ADC cares for its patients appropriately.

I found the report's outcome measures to be questionable on their face and based on my independent review of Arizona prison medical care, as I described in my rebuttal report.  After being provided copies of the medical charts that Dr. Mendel reviewed, I was able to explore his conclusions regarding outcome measures in relation to the information he had to compare them with.  I found that the patient charts clearly demonstrate the utter unreliability of the outcome measures.

#### 1.     HIV Management

According to Corizon's report, in the third quarter of 2013, 100% of HIV positive patients taking antiretrovirals in Arizona prisons had an undetectable viral load.  The medical records Dr. Mendel reviewed conclusively establish that this is false.  For example, ██████████████████ is HIV-positive and also suffers from profound psychosis that is well managed on medications.  Like many HIV-positive patients, ███ ███████ has been treated with a combination of antiretroviral medications that was, for quite a while, effectively managing his condition.  The disease management data in his

2

record demonstrates excellent clinical outcomes for his HIV early in this medical record. On January 30, 2013, his viral load was undetectable and his immune system was in excellent shape with a CD4 count of 498.  He was tested again on May 1, 2013, and his viral load then was undetectable and his CD4 was done but the result is illegible.

However, after Corizon began providing the healthcare, they apparently adopted a practice of distributing HIV medications as Keep On Person (KOP) medications (i.e., the patient is provided a supply of medications a month at a time to manage on his or her own), rather than administering each dose as was previously done for ███████.  There are a number of HNRs in ███████ medical record where he complains that he is not receiving his HIV or mental health medications (ADC232654, p. 139; ADC232656, p. 141; ADC232658, p. 143).  There are also notes from his mental health provider on September 17, 2013, that indicate the patient reported he has not received his medications "in a while" (ADC232703, p. 188).  I attempted to correlate the patient's allegations with the Medication Administration Records (MARs) in his medical record but the record-keeping is so inadequate as to fall below standard of care for medication administration documentation and they provide no guidance on whether he did or did not receive his HIV medications (Sustiva and Truvada) or his mental health medication (Trilafon).  What is bizarre about ███████ management is that his critical medications are KOP and some of his other non-critical medications (Benzotropine and Gabapentin) are Direct Observe, and the nurses document his compliance for these non-critical medications daily.  If the system makes him come to the window to get his medications every day, why not administer his critical medications to him at the same time?

3

What we do know from the record is that this previously stable patient suffered virologic failure (dramatically increased HIV viral load despite an ongoing HIV treatment regimen) as evidenced by an HIV viral load of 86,708 (log 4.94) on August 22, 2013, and that on the same date his CD4 count crashed to 284, which is a dramatic decrease over just a few months.  When HIV-positive patients hit a CD4 of 200, the immune system is generally considered to be so compromised that preventative antibiotics are initiated.  Corizon's failure to recognize that psychotic prisoners, and indeed any prisoner with mental illness or developmental delays, may require an individualized medication plan for life-sustaining prescriptions is shocking.  What is even more shocking is that after ███████████ markedly abnormal viral load and decreased CD4 result became known in August, nobody within Corizon investigated why he is failing therapy or attempted to implement any corrective action.

This patient is currently being managed by a Physician's Assistant (PA) who does not even make mention of his elevated HIV viral load in the clinic note dated October 8, 2013 (ADC232520, p. 5).  Clearly the PA cannot competently manage this complex patient.  Based on the medical records in this chart, ███████████ is currently in danger of rapid progression toward AIDS.  Fortunately, the PA has requested an Infectious Disease consult to help manage ███████████ care.  I hope that the ordered consult has occurred and resulted in the appropriate interventions to provide life-saving treatment that has been lacking.

The above case demonstrates failures on many levels.  The medical care is deficient, mental health care is ineffective, nursing care does not comply with basic

standards of nursing documentation, the medication management (nursing and pharmacy) is failing to maintain continuity of care.  The significant increase in this patient's viral load clearly demonstrates the overall failure of management as well as contradicting Corizon's outcome measure.

Another case in Dr. Mendel's records with similar results is that of ███████ ███████ who has been on prescribed HIV medications.  He had an HIV viral load of 104,659 (Log 5.02) on September 10, 2013.  This lab result is indicative of total virologic failure and no definitive management of that problem is evident in the chart.  ███████ needs urgent management to avoid potentially damaging long-term consequences. Continuing to provide HIV medications that clearly are ineffective is medically inappropriate and financially wasteful.  See also ███████ ███████ another HIV-positive patient who was on medications during the third quarter of 2013 and did not have in undetectable viral load (ADC234186).

These three HIV patients had elevated viral load results reported in the third quarter of 2013.  Obviously the lab report that Dr. Mendel relied on that claimed that 100% of HIV patients on medications in the third quarter of 2013 had undetectable viral loads is not accurate, something Dr. Mendel knew or should have known from his record review.

## 2.    Diabetes Management

In his report, Dr. Mendel states that he believes that diabetes care is the best overall measure of the effectiveness of a correctional healthcare system (Mendel Report at 27) and that one lab value report can therefore determine the efficacy of the system.  I

don't agree with that oversimplification of a complex healthcare system any more than I would agree that the health of a patient can be summarized with one vital sign.  However, I am willing to entertain his hypothesis and to test it against the patients he reviewed.

There were not many diabetic charts to examine.  Given his reliance on diabetes as a single measure of success of ADC, it is surprising to me that Dr. Mendel did not select more diabetic patients for his chart review.  Remarkably, out of the 125 charts that he claims to have reviewed, only three patients were insulin-requiring diabetics and only three were non-insulin dependent diabetics.

The evidence of care contained in these few charts bolsters my opinion of substandard care in Arizona prisons and undermines Dr. Mendel's conclusions.

### a.  Insulin-Requiring Diabetics

With respect to the insulin-requiring diabetics, none of them was within acceptable clinical control and appropriate chronic care management.  ███████████████

███████ had reasonable blood glucose control (HgA1c of 6.7%) but his blood pressure was significantly elevated (180/98) with no intervention by the medical staff.   Blood pressure control is critical to minimize the complications of diabetes and this patient is poorly managed.  Furthermore, this patient is on phenytoin for a seizure disorder. Phenytoin is a medication that requires monitoring of blood levels and there is not a single order or result to check his phenytoin level.  This case is an example of poor medical management and poor nursing management of a diabetic patient.  Based on the information available in this chart, Dr. Mendel's hypothesis that acceptable diabetes care predicts effective healthcare across the board is not supported.

Another insulin-requiring diabetic in Dr. Mendel's chart set is ████████████

██████. He is a very poorly controlled diabetic with HgA1c levels ranging from 8.9% to

12.9% and he has significant end-organ compromise from his diabetes in the form of

diabetic retinopathy, renal failure, and severe neurologic compromise of his feet.  Despite

his extremely poor control of his diabetes and all of his complications, he is still being

managed using only intermediate- and short-acting insulin.  This is remarkably

rudimentary medical management given what is available in today's healthcare

marketplace for patients like this.  In this case, the opposite of Dr. Mendel's hypothesis is

proven:  this patient has very ineffective diabetes care as well as very ineffective medical

care.

A third insulin-requiring diabetic in this chart series is ████████████████  I

am familiar with ██████████ care from having encountered him on my tours.   I

reviewed his master chart and I saw him personally to confirm his issues.  His overall

healthcare was so concerning to me that I specifically identified him to the staff at Yuma

and attorneys for the State and Corizon as a patient who was in serious medical trouble.

According to the data available in the chart that I reviewed, ████████████  HgA1c was

8.7% on May 19, 2013.  Dr. Mendel indicates that he reviewed this patient's chart, but

what was provided to him was a highly truncated version that covers only 44 days of care

from October 6, 2013, to November 20, 2013.  Apparently he was not shown the earlier

care where this young patient's diabetes was completely out of control, his liver function

was seriously compromised, and two of his three basic blood cell types (white cells and

platelets) were at critically low levels.  Instead, Dr. Mendel was shown a few pages of

7

records that did not reveal the extent of this patient's mismanagement.  This case fails to support Dr. Mendel's hypothesis as well.

### b.    Non-Insulin Dependent Diabetics

One of the diabetics whose chart was reviewed by Dr. Mendel who does not require insulin is ███████████████  His HgA1c on June 5, 2013, was 6.4%.  Under Dr. Mendel's theory of care, this result establishes that the rest of his healthcare is adequate.  However, review of his chart indicates that this patient is also HIV-positive and seriously mentally ill.  The medical record is replete with systemic errors of care.  There are multiple examples of the patient's not receiving his critical chronic care medications from the pharmacy on time and being without medication.  The Medication Administration Records in this chart are not completed in accordance with the standard of nursing documentation so it is not possible to determine whether and when he received certain medications.  In addition, this patient is on HIV medication that should be monitored for efficacy periodically.  According to his medical record, his critical HIV labs (CD4 and HIV viral load) were ordered by the clinicians five separate times:  June 7, 2013 (ADC245368); September 11, 2013 (ADC245367); November 20, 2013 (ADC245364); December 12, 2013 (ADC245365); and January 25, 2014 (ADC245364).  Despite these five orders for labs, not a single lab result is in his chart or mentioned in his clinical notes.  The failure of the system to carry out provider orders puts the providers in an impossible situation: they cannot manage their patients safely.  This patient's records similarly disprove Dr. Mendel's hypothesis.

████████████████████ is another diabetic who does not require insulin whose chart is on Dr. Mendel's list.  While his diabetes care is under good management, he had significantly poor care for his hand fracture in November 2013.  At that time he was diagnosed with an open fracture of his fifth metacarpal and he was sent to the emergency room on November 6, 2013. The emergency room stabilized him and sent him back with recommendations for care including pain management and an urgent follow-up visit with the hand surgeon within one week. Unfortunately this was not done. A notation in the chart indicates that this urgent consult was not even requested until November 19, 2013, and it would not be scheduled to occur until December 19, 2013—a full five weeks after the hand surgeon had thought it necessary he be seen. An open fracture requires skilled emergency management to ensure appropriate treatment and to safeguard against a significant bone infection.  The treatment in this case falls well below the standard of care for this condition.  Again, this is a case where the patient's diabetic management shows success but that success cannot be generalized to the overall success of the healthcare delivery system.

The last patient in this series who has diabetes that does not require insulin is ████ ████  She has moderately controlled diabetes and her most recent hemoglobin A-1 C is 7.1% as of January 2014.  ADC 239663.  Review of her chart demonstrates multiple deficits of care that show substantial delay in her healthcare management.  She had labs drawn on October 29, 2013, that showed multiple abnormal values, but those labs were not signed off by a provider within ADC until January 3, 2014.  ADC239665.  Additional labs were drawn on January 15, 2014 and they also contain significant abnormal results.

Those labs were not signed off until February 13, 2014.  ADC239661.  Again this case does not support Dr. Mendel's hypothesis—her diabetic care might be close to target but the systemic delivery of care in her case is well below the community standard.

As I have previously discussed in my rebuttal report, Dr. Mendel relies on HgA1c data produced by Corizon that reports clinical outcomes with diabetics that greatly exceed the best of the best in healthcare—their stated results are just too good to be possible.  As we see in the analysis of the charts, the HIV results Corizon reports as perfect turned out not to be nearly as good as they claim and not a single one of the diabetics in this series had acceptable healthcare globally.  As such, the evidence simply does not support Dr. Mendel's arguments.

### B.  The Records Dr. Mendel Reviewed Reveal a Broken System

After reviewing Dr. Mendel's charts, my prior opinions are strengthened: Arizona prisoners are at serious risk from dangerously inadequate medical care.

### 1.  Patients Suffer From Delayed Care

In my review of the healthcare system in Arizona prisons on site tours, on-site chart reviews, off-site chart reviews, and additional documentation review, I have found the most pervasive theme throughout the entire system to be that of delay.  I have described in great detail the poor care I found in many cases, with serious delay as a significant component of the treatment deficits.  Far from being isolated or anecdotal, it is clearly pervasive, affecting major business practices and healthcare transactions throughout the ADC.  Below are some illustrations of this profound deficit that I found within the charts Dr. Mendel reviewed.

███████████████████ illustrates many of the issues faced by patients within the ADC who have serious chronic medical conditions.  ███████████ suffers from Factor VIII Deficiency (Hemophilia A) and frequently has significant bleeding episodes that require Factor VIII infusion to stop.  These episodes are extremely painful.  The patient has had so many significant bleeding episodes that have required emergency trips to the hospital that the providers within ADC have attempted to stock Factor VIII for emergent use within the prison system.  Unfortunately, the pharmacy has been unable to supply this common treatment.  As a result, ███████████ has had multiple episodes where he bleeds significantly into his muscles and develops large painful hematomas (bruises) that ultimately require Factor VIII infusions.  To treat his pain, the ADC providers have placed him on Vicodin, a standard oral pain medication.  However, as noted on January 4, 2013, by Dr. Laura Brown, the pharmacy that services ADC is unable supply the Vicodin in sufficient amounts, so Dr. Brown put ███████████ on a pain medication ration that cut his dose down significantly and effectively provided no meaningful pain relief for his condition.  ADC234522.  Her instructions about this to the nursing staff are written in a memo and she indicates that "He will just have to toughen up as narcotics are not always available."  ADC234783.  I find her memo, and the attitude it expresses, to be untenable.  She had multiple options available to her for substitute medications, but instead of attempting to advocate for her patient, she resigned herself to the systemic problem and left her patient to suffer needlessly.

███████████████████ housed at ASPC-Lewis, is another patient who has experienced significant delays.  He originally submitted an HNR on April 21, 2013, for a

mass on his neck.  He was seen 18 days later on May 9, 2013.  An urgent consult for an

ultrasound was filled out but not completed until May 21, 2013.  Based on the results of

that ultrasound, a biopsy was scheduled which took three months to approve and

accomplish.  The biopsy results showed that he had Hodgkin's Lymphoma.  Following

that result, the patient was set up on September 24, 2013, with an oncology appointment

to develop a plan of care.  This appointment took five weeks to set up and the note from

that visit with 21st Century Oncology indicates that they will be closing their prisoner

clinic and that ███████ care will need to be accomplished at another clinic in the

future.  ADC238026. The patient was eventually seen in another oncology clinic on

November 6, 2013, for his lymphoma.  In total, it took ADC seven months to work up

and initiate treatment on an obvious case of Hodgkin's Lymphoma.  That deviates

significantly from the standard of care for this condition and places this patient at serious

risk of harm.  Unfortunately, this case is remarkably similar to that of ███████ as

described in Dr. Cohen's 2/24/14 Supplemental Expert Report.  In that case, ███████

developed a neck mass that was suspicious for Hodgkin's Lymphoma in October 2012.

He received no treatment for his highly treatable condition, and died ███████

Cohen Supplemental Report at 19-25.

       ███████ is a patient with a number of complicated issues. He

has severe coronary artery disease, he is suffering with chronic unstable angina, he has

had four stents placed previously, and he has a left below-knee amputation. His chart

epitomizes ADC's delay in care in managing a complicated chronically ill patient.  He

was seen by orthopedics in May 2011 and they recommended a bilateral shoulder MRI to

12

evaluate his bilateral shoulder pain. That order was not placed into the system until almost seven months later in January 2012.  It took another six months for the order to be carried out: it was completed on June 15, 2012.  The MRI showed significant rotator cuff tears bilaterally and an orthopedic consult was entered into the system on August 1, 2012, to evaluate the possibility of surgery for this patient.  It has taken 16 months for him to finally see orthopedics back in return and he had a completed orthopedic consult on December 19, 2013.  It has taken ADC 31 months to do a simple work-up for bilateral rotator cuff tears in a patient who is significantly compromised as a result of his leg amputation. That is unreasonable and far below the standard of care.  Even after 31 months the problem has yet to be resolved and the surgery has not been completed.

In addition, ███████████ was not supplied with baby powder, the usual method of avoiding damaging friction between his skin and the sleeve of his prosthesis.  As a result, he had breakdown of his prosthesis which ultimately caused breakdown of his skin on the stump in his leg.  This is a terrible and easily avoidable outcome for this highly compromised patient.  Dr. Merchant admitted that the patient's medications and his management have been inappropriate due to a pharmacy error.  (ADC245917).  On April 10, 2013, a consult for the repair of his prosthesis to minimize the damage to his stump was entered.  That prosthesis repair was completed on January 10, 2014 -- a full nine months after it was put in to the system.  That is unreasonable and caused ███████████ to suffer needless pain.

Additional examples of delay and fragmentation of care in Dr. Mendel's records include numerous cases where patients have been unable to receive timely diagnostic

imaging to receive required treatment.  See, e.g., ████████████████ (recurrent

shoulder dislocations; MRI took three months to schedule); ████████████████ (x-

ray order to be completed on August 7, 2013; not done, no results in chart); ████████

████████ (complained of acute ankle pain on June 8, 2013; took two and a half months

for x-ray); ████████████████ (June 25, 2013, order for a thyroid ultrasound;

never completed); ████████████████ (diagnosed with a left testicular cyst, referred

for repeat ultrasound; never done).

Similarly, providers order lab tests, often essential to the management of chronic

illnesses, and they are not completed or they are done late.  See, e.g., ████████████

████████████████ (HIV-positive patient had appropriate monitoring lab work ordered

on April 3, 2013, but not drawn until four months later; additional lab work ordered on

February 5, 2013, but never drawn); ████████████████ (pregnant patient arriving in

ADC had a blood sugar of 155, which is significantly high and requires monitoring and

workup; a lab test was ordered but never completed and no further monitoring was done

for her gestational diabetes mellitus for three months); ████████████████ (HIV-

positive patient with multiple HIV labs ordered but never completed); ████████████

████████ (HIV-positive patient had labs ordered May 16, 2013, but no record that they

have been drawn or completed; he remains on medication, which is irresponsible

treatment); ████████████████ (HIV-positive patient with viral load ordered on June

19, 2013; no result in chart); ████████████████ (HIV-positive patient with no labs

ordered for first six months in prison and two-month delay after labs finally ordered);

█████████████████ (mentally ill HIV-positive patient on HIV medication with no monitoring since January 1, 2013).

When labs are done and the results are abnormal, follow-up is often untimely or non-existent.  See, e.g., ███████████████████████ (three separate positive tests for blood in his stool on February 13, 14, and 15, 2013; no follow-up for very ominous finding); ██████████████ (chest x-rays done to monitor his lung disease with documented abnormalities; took three weeks before provider signed off on result); ████████████████ (unusual laboratory finding on complete white count (monocytosis) required a pathologist to determine the validity of the results; test has never been completed and the evaluation of this patient's potentially ominous lab results remains incomplete).

The records also document numerous delays for patients seeking primary care for serious conditions.  See, e.g., ████████████████ (submitted HNRs for genitourinary issues; no record of healthcare professional evaluation or treatment); ███████████████ (submitted HNR for care for acute shoulder injury, not seen for three weeks); ██████████████████ (Hepatitis C patient submitted 10 HNRs over 13 months regarding his condition; never seen by provider in response); ████████████████████ (patient with cardiac rhythm abnormalities and palpitations waited for eight months for a provider to see him regarding his stated complaint); ████████████████████ (complained of chest pain; not seen for five days and then only by a nurse and never worked up appropriately for the chest pain); ████████████████████ (year and a

half wait for a provider evaluation for knee and ankle pain following surgery, despite

numerous HNRs).

Some patients who require specialty consult care are unable to receive it.  See,

e.g., ███████████████████ (cardiac patient referred for appropriate cardiology consult

denied with no justification); ████████████████████ (patient with history of lung cancer

denied oncology evaluation for possible recurrence, in the one-month period of records

provided); ██████████████████ (patient with left testicular cyst referred for urology

consult on May 11, 2012, but there is no evidence in the chart that the consult has been

completed); ████████████████ (HIV-positive patient referred to Infectious Diseases

on April 10, 2013; September 9, 2013; September 17, 2013; and October 2, 2013, all

without success).

Prisoners with serious chronic conditions must be provided their life–sustaining

medications on a consistent basis.  The records Dr. Mendel reviewed show that

medication lapses happen too often in Arizona prisons, and because ADC's medication

administration records are rarely complete, it is impossible to verify whether

prescriptions that are timely renewed are actually provided to the patients.  Medication

lapses are particularly problematic for patients receiving treatment for HIV, as lapses in

these medications can lead to acceleration of the disease, development of resistance,

increased side effects, and difficulty in disease management long-term.  See, e.g., ██████

████████████████ (multiple instances where HIV medications were not delivered timely);

███████████████████ (multiple medication lapses, including a three-week period in

the fall of 2012, when CD4 count plummeted from  600 to 300).

### 2.     ADC Patients Reviewed During Expert Site Visits Continue to Receive Poor Care

During my visits to ADC facilities during the summer of 2013, I encountered a number of medically compromised patients who were in danger because of the poor health care they were receiving.  These patients included ███████████████, a very fragile patient with end-stage liver disease at Yuma.  At the time I met him he was very poorly managed and had complications from his disease that had resulted in multiple hospitalizations.  Dr. Mendel reviewed his chart, but he was apparently provided with only 44 days of medical history spanning October 7 to November 20, 2013.  However, within that small amount of charting, it is clear that ████████ care continues to be inadequate.  During that time, he had a critical ammonia level that took five days for anyone to evaluate (ADC240336).  That is clinically unacceptable and it places the patient at grave risk.  This is purely a systemic process issue and staffing issue and it is emblematic of the problems that exist within the ADC.

████████████████ is another Yuma prisoner who has received grossly substandard care for his complicated condition and is now suffering complications as a result.  █████████ suffers from a very serious type of Crohn's Disease which causes fistulas (tunnels) to develop through the walls of his intestines and into other organs.  He has been hospitalized many times for this condition and he has required many surgeries.  When I saw him, I was surprised to discover that he was not on Remicade, the standard medication used for this condition.  He reported to me that he had been started on Remicade, but Corizon had denied it long-term due to cost.  The denial was confirmed in

his medical record.  I was so concerned about him after reviewing his chart and talking

with him that I identified him to prison and Corizon staff and attorneys as a very at-risk

patient who needed sophisticated care beyond what was available at Yuma.  Specifically,

he needed Remicade and a gastroenterology/surgery treatment team experienced with

managing fistulizing Crohn's Disease.

Unfortunately none of my recommendations were heeded and ██████████

continues to have substantial problems as evidenced by his record in this chart review.

As with ██████████ Dr. Mendel only reviewed a few weeks of medical records for this

very complicated patient.  It is evident, however, even from the small timeframe of

records provided, that ██████████ continues to suffer the consequences of poor care.

Since I met him over the summer, he has developed a significant fistula between his

rectum and his bladder and has had a major infection as a result.  He has not been

restarted on his Remicade and at this point is probably not even a candidate for that

medication given his complications.  He very badly needs to be transferred to a prison

near a major medical center that has experience with dealing with his condition.

Remaining in Yuma under the inexperienced care available there will be a death sentence

for him.

In my initial report, I referred to the case of ██████████ an AIDS

patient who had been referred to an Infectious Disease Specialist in May, but had not

seen one by the time of my site visit to Yuma in July.  According to Dr. Mendel, ████

██████████ was finally seen by the appropriate specialist on August 21, 2013, and the

Yuma staff had implemented the consultant's recommendations.  Dr. Mendel concluded

18

that ███████████ was receiving "appropriate specialty care" and had not been harmed by the delayed access to care.  Again, Dr. Mendel was provided with only a fraction of the actual medical record: October 6 to November 20, 2013.  As a result, he did not see the records that documented ███████████ truly substandard and dangerously incompetent HIV management, the failure to send him to the consultants, the failure to draw the appropriate labs, and the patient's ongoing suffering as a result of this mismanagement.  He is another patient I felt compelled to raise with Corizon and ADC staff  and attorneys because his life was truly at risk.  After months of delay, they had him seen by an HIV specialist and his care was moving ahead appropriately until the very end of this chart that was produced when the local provider decided to stop all of his HIV medications.  This was clearly the wrong decision and the reason for it is unclear.  I hope it was only a temporary hiatus as this patient is at extreme risk for serious complications and death.

### C.    Limited Records Sample

While he criticized plaintiffs' expert reports for the size of their records sample, Dr. Mendel considered fewer records from the seven prisons that he visited than Dr. Cohen and I reviewed.  In his first supplemental report, Dr. Mendel wrote that his practice is to "request records from nurse's and provider's lines for a randomly selected day, approximately two weeks prior to [the] visit."  Mendel Supp. Report at 4.  He further stated that he typically chose 12 or more records from each category.  *Id.*  However, based upon the records he provided plaintiffs, the most records he reviewed for any prison was 31 (Yuma), and at Phoenix, he reviewed only 7.

Additionally, the disease spectrum contained in the medical records does not correlate with normal disease prevalence.  Specifically, there were an abundance of HIV-positive patients and a dearth of diabetic patients.  It is unclear how Dr. Mendel arrived at these charts but the selection does not appear to be random.  Finally, many of the records provided were quite limited, covering only one or two months of care for prisoners who had long treatment histories.  Most of the short records were for patients whose complete records I had reviewed for my report and identified as experiencing serious care deficiencies.  These limited record excerpts reviewed by Dr. Mendel did not provide sufficient information from which to draw meaningful conclusions about the totality of care for these patients in the Arizona system.

### D.    Organization of Medical Records

In Dr. Mendel's report, he states that he found the records to be "organized in a manner used by many other correctional systems."  He does note that he found some isolated documentation issues but he opines that this was not a systemic pattern.  While I do agree that the use of tabs is common in paper charts across medical systems and that is the system used in ADC, I found it extremely difficult to review these charts and come to an understanding of the documentation and the flow of the healthcare experience.  Whenever I evaluate medical records for their adequacy I try to place myself in the position of a treating clinician using the medical record to care for patient.  In that sense I find the ADC records extraordinarily difficult to use, inaccurate, incomplete, and illegible. The deficiencies are severe enough to compromise patient care.  The poor quality of the medical records must inescapably have a substantial impact on the

productivity of the providers.  It is even difficult simply to figure out the elements of the care being provided, given how poorly the documentation is maintained.  Many of the providers and nurses within the ADC system have illegible handwriting.  Illegible care plans are dangerous, and practically guarantee that follow-up care will be missed.  If you can't read it, you can't follow it.

The nursing documentation contained in the charts is atrocious.  Most of the documentation is in the form of the Medication Administration Records (MARs), which is the record that is supposed to document the Seven Rights of Medication Administration: right patient, right route, right drug, right amount, right time, right documentation, and right to refuse.

ADC medication administration records do not comply with the above national standard for nursing care.  On the whole, the MARs are a mess.  Clearly the practices vary from facility to facility throughout ADC and some nurses do document within the standard of care, whereas others take phenomenal shortcuts and there is no meaningful information that can be derived from reviewing their documentation on the medication administration record.  In addition, many charts are missing several months of medication administration, so there is no way for a clinician to determine compliance.  Without knowing medication compliance, a provider cannot assess why a treatment plan is not succeeding.  In my review of Dr. Mendel's charts I attempted to go back and verify many treatment failures using the MARs.  I found them to be wholly inaccurate, incomplete, and unusable.  As such the nursing documentation within the ADC falls substantially short professional standards overall.

21

## II.    Recent Medical Records for Shawn Jensen

Dr. Mendel maintains that plaintiffs' experts have identified few cases where access to care has been a factor in the outcome of a class member's care.  Mendel Report at 11.  He then sets forth the case of named plaintiff Shawn Jensen, who experienced a three-year delay before his prostate cancer was diagnosed and treated in 2009.  Dr. Mendel concludes that "[t]here were … no issues as a result of any delay," implying that the delay was not significant.  *Id.* at 12.  As set forth in my rebuttal report, a three-year delay for a cancer work-up cannot be endorsed as reasonable.   Furthermore, review of recent records show clearly that the initial delay actually did cause problems that are only now being manifested.

Since submitting my rebuttal report, I have been provided and reviewed Mr. Jensen's more recent medical records.  I was alarmed to find that the pattern of neglect and delay evident in the years leading up to Mr. Jensen's 2010 prostatectomy has continued, even after Mr. Jensen began showing clinical signs of recurrent cancer.  Indeed, more than one year after the likely recurrence was identified, a medically reasonable treatment plan to address his probable recurrence of prostate cancer has not been developed or implemented by a qualified specialist.  Instead, Mr. Jensen has once again experienced long delays in being given needed tests and approvals to see specialists.  These delays increase the probability that the cancer will be more widespread and harder to treat, they put Mr. Jensen at increased risk that metastatic lesions will compromise other organ systems, and they place Mr. Jensen at increased risk for pain and decreased quality of life.

## A.       Why and When to Treat Prostate Cancer

Prostate cancer is the second leading cause of cancer death in American men,

behind only lung cancer, killing approximately 30,000 men a year.  While prostate cancer

grows more slowly than other cancers, this does not mean that it should be ignored or

untreated.  It is a type of cancer that often metastasizes to nearby internal organs and the

bones, and can result in devastating and crippling injuries or death.  For example, prostate

cancer, if untreated, can metastasize to the liver, causing acute liver failure, which is

incredibly painful and usually results in death.  Additionally prostate cancer cells often

metastasize to the bones closest to the prostate: the hips, pelvis, spine, or femur

(thighbone).  A metastatic lesion on such critically important weight-bearing bones can

lead to catastrophic results, including crippling fractures.

After a man has been treated for prostate cancer, the standard of follow-up care is

to measure his serum prostate-specific antigen (PSA) every three months to detect for

signs of possible recurrence of the cancer, since many recurrences following initial

treatment can be successfully treated.  The PSA is an excellent tumor marker in men with

an established diagnosis of prostate cancer, and is particularly useful because the majority

of recurrences following radical prostatectomy or radiation treatment for localized

prostate cancer are asymptomatic.  When the PSA level exceeds 0.1, it means that it is

probable that there is persistent or recurrent disease.

There are certain risk factors associated with more aggressive prostate cancers, as

well as a more aggressive recurrence of prostate cancer.  The risk of recurrence is higher

in men who have a family history of prostate cancer, are older, or are overweight.

Another well-established risk factor is if a man is a Vietnam veteran who was exposed to Agent Orange or other defoliants, as these chemicals increase the risk of developing soft tissue cancers, including prostate cancer.  Men with these risk factors need careful follow-up and very close monitoring.  I am told Mr. Jensen was exposed to Agent Orange while serving in Vietnam.  He is also older (65) and overweight.

### B.    Failure to Monitor and Treat Mr. Jensen for Recurring Cancer

Despite Mr. Jensen's significant risk factors for cancer recurrence, ADC has failed to appropriately monitor him, and once he showed clear signs of relapse, has failed to provide him timely and necessary treatment.

ADC has failed to perform PSA tests every three months since Mr. Jensen's 2010 surgery.  It appears that Mr. Jensen had only two PSA tests performed through early 2013, and one of those tests was performed only after Mr. Jensen requested it.  ADC004538, PLTF-PARSONS-32162.  This failure to test his PSA level every three months is unacceptable and below the standard of care.  A copy of the test results was not his medical file, but other documents in his medical file reference his level to be 1.2 in February 2013.  ADC123383.

Given Mr. Jensen's elevated risk factor for recurrence and the fact that the PSA level was 12 times higher than what would have been the normal limit after a prostatectomy (1.2 versus 0.1), upon receiving the February 6, 2013, results, the provider should have immediately referred him to a qualified specialist for examination and to develop and implement a cancer treatment plan that best meets his needs and level of cancer.  The two most common options for the cancer treatment plan would be either to

provide full pelvic radiation  therapy or to initiate androgen deprivation therapy using a drug like leuprolide (Lupron).  The typical dosage of Lupron  is a shot that is administered every three months.

Neither of these courses of treatment was adopted.  Instead, Mr. Jensen saw Dr. Catsoros, a primary care provider, on February 19, 2013.  At that appointment, despite the elevated PSA score, Dr. Catsoros failed to refer Mr. Jensen to an oncologist.  He wrote that Mr. Jensen's degree of control of the cancer was "good" and that his clinical status was "improved."  ADC123382.  A week later, Dr. Catsoros ordered another PSA test.  ADC123381.  The second PSA test confirmed that Mr. Jensen's PSA level was indeed 1.2.  ADC123330.

Dr. Catsoros apparently made a request for a urology consultation on April 1, 2013, but Mr. Jensen did not see an urologist until May 20, 2013.  ADC130312, ADC123318-328.  The urologist's assessment was worsening prostate cancer, and he ordered an abdominal CT scan and a bone scan to stage Mr. Jensen's cancer and to determine if he had any bony metastatic disease.  The purpose of the testing was to determine his status at that point in time and to develop a treatment plan for him.  The urologist requested that Mr. Jensen return within three weeks to review, and reported to Corizon that he needed to be evaluated by oncology to determine the type of cancer treatment.  ADC123320, ADC123328.

Mr. Jensen was tested again on June 5, 2013, after he submitted an HNR, and the level had increased to 1.9.  ADC123329.  Mr. Jensen had a bone scan and CT scan on June 7, 2013.  ADC123309-123311.  Fortunately, the scans did not show evidence that

the cancer had metastasized to his bones.  Although Mr. Jensen had the appropriate

staging testing completed, nobody used the results of that testing to implement an

appropriate treatment plan for him.

The prison nurse practitioner sent a consultation request to Corizon headquarters

on June 20, 2013, requesting the Mr. Jensen have follow up specialist appointments with

a urologist and nephrologist.  ADC123291-123292.  He did not see Dr. Banti, the

urologist, until July 17, 2013, more than two months after the previous appointment and

almost a month after the consultation was requested.   ADC222285-222286.

Dr. Banti's plan called for Lupron at 22.5 mg and a PSA test in three months, a

clinically reasonable plan.  ADC222286.   Unfortunately, there is no evidence in the

medical record through January 2014 that this plan was ever implemented.

In the months following, Mr. Jensen's PSA continued to rise.  As of August 7,

2013, it was 2.22, and by October 9, 2013, was 2.93.  ADC222295, ADC222290.

Mr. Jensen was seen by a different urologist, Dr. Goldberg, on October 29, 2013,

who diagnosed prostate cancer, and reported back to Corizon that Mr. Jensen needed a

bone scan "ASAP."  ADC222262.  This second bone scan was required because no

treatment was initiated after his previous bone scan, and they had to see if the delay in

care had resulted in metastasis of the cancer to his bones.

Still, his PSA continued to rise.  On December 11, 2013, it measured 4.21.

ADC222288.  On December 18, 2013, Mr. Jensen had his bone scan.  ADC222255.

Again, fortunately, no evidence of cancer was found in his bones.

By this point in his care, Mr. Jensen falls into another high-risk category (in addition to the Agent Orange exposure, age and weight) for the development of metastatic disease.  In the tracking of his PSA levels, his doubling time (the time for PSA level to double in value) is approximately six months.  This short doubling time should be particularly concerning to those caring for him, but I found no mention in the medical record that anybody has taken this new high risk factor into consideration.

Furthermore, it is clear from the pathology report that when his initial radical prostatectomy was completed in 2010, the margins of the surgical resection contained tumor.  This is yet another high risk factor for recurrence.  It was known from the onset and documented that Mr. Jensen was a high risk for a recurrence, and yet I see no evidence in the record that anybody has acknowledged this or has taken it into consideration in referring him for the development of a treatment plan.  ADC123294.

By the end of 2013, Mr. Jensen still had not been examined by an oncologist.  On January 9, 2014, his file was apparently reviewed by Dr. Richard Kosierowski, who is an oncologist that Corizon contracts with nationally to provide guidance and second opinions regarding care plans for cancer patients in the Corizon system.  PLTF-PARSONS-031985.  Dr. Kosierowski apparently reviewed Mr. Jensen's chart and denied care without examining the patient and without accurate facts.  Dr. Kosierowski states that Mr. Jensen "appears to have been on Lupron" and denies the prison provider's request for a urology consultation.  *Id.*  Dr. Kosierowski clearly has some questions and concerns about Mr. Jensen's care and his current status.  These were set forth in his note, and yet as of today there is no documentation that he resolved these concerns or followed

27

up on the patient's management.  As a result, Mr. Jensen has been left in limbo awaiting a decision from a physician he has never seen.

As of January 24, 2014, Mr. Jensen had not been examined by an oncologist, nor has he had a cancer treatment plan developed.  Mr. Jensen filed HNRs on January 20 and 29, 2014, asking to have his PSA tested again and to see a cancer specialist.  PLTF-PARSONS 031981-31983.  I am especially concerned that Mr. Jensen reported in early February that he has sharp pains in his left hip because that is the most common clinical symptom for the presentation of a metastatic lesion in the bone.  PLTF-PARSONS 031984.  I have been informed that Mr. Jensen reported very recently that he has yet to be seen by an oncologist and nobody has implemented a cancer treatment plan for him.

In reviewing the records available to me in this case it is clear that Mr. Jensen's care regarding his prostate cancer is dangerously mismanaged, disorganized, and delayed, and falls well below the standard of care.

## III.    Conclusion

I have reviewed hundreds of medical records in this action, met dozens of patients whose care I needed to clarify following their chart reviews, toured five facilities to understand the care delivery process, met with ADC and Corizon staff, and reviewed extensive documentation of external evaluations and contract monitoring.  I have also reviewed Dr. Mendel's reports endorsing the care provided by ADC.  It is clear that the deficiencies within the Arizona prison healthcare system exist on both a systemic level as well as an individual care level.  Throughout the system there are multiple deficiencies that cause medically necessary care to be delayed, denied, fragmented, and difficult to

access. Even when patients are able to access care, many of the providers are delivering substandard treatment. These errors are not caught because there are no satisfactory quality assurance mechanisms identified or correct them. As such, the entire health care system is failing to accomplish its mission.

If this grossly deficient health care system existed in the free market sector, the patients would grow frustrated with it and would seek care in other areas of the marketplace. Unfortunately for the prisoners, this is the only system available to them and as such it needs to be adequate to meet their basic healthcare needs. At this point, that is not the case, and the prisoners are at extreme risk for harm from the systemic substandard care.

The only path to achieve an adequate health care system involves a significant rethinking and restructuring of the healthcare entity within the Arizona Department of Corrections. Significant investment in infrastructure will be necessary, carefully structured training will be necessary to achieve a change of culture, and the business practices and systemic operational issues that plague the system will need to be redesigned and monitored closely to ensure that they meet the needs of this large population. Until that occurs patients will continue to have very poor access to health care resources, and they will continue to be at tremendous risk for negative healthcare outcomes and unnecessary death.

April 2, 2014

_____
Todd R. Wilcox, M.D., M.B.A., C.C.H.P.-A