# EXHIBIT 7

# Expert Report of Pablo Stewart, M.D.

*Parsons v. Ryan*, No. 2:12-cv-00601-NVW (MEA) (D. Ariz.)

November 8, 2013

## **Background and Qualifications**

I am a physician licensed to practice in California, with a specialty in clinical and forensic psychiatry. A true and correct copy of my current *curriculum vitae*, which includes all my publications in the last ten years, is attached hereto as **Exhibit A.** My background and experiences as relevant to my expert testimony in this proceeding are set forth below.

In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland. In 1982, I received my Doctor of Medicine from the University of California San Francisco, School of Medicine. In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the University of California San Francisco (UCSF), School of Medicine. In 1985-1986, I served as the Chief Resident of the UCSF Department of Psychiatry at San Francisco General Hospital and was responsible for direct clinical supervision of seven psychiatric residents and three to six medical students.

Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illnesses in correctional and other institutional contexts. In my work, I have specialized in community and correctional treatment programs for individuals with chronic and severe mental illnesses, as well as substance abuse and related disorders. I have also specialized in diagnosis, treatment, and care programs for persons with Major Depressive Disorder and Posttraumatic Stress Disorder (PTSD), in the management of patients with dual diagnoses and the application of psychotropic medication to such individuals, and in the history and use of psychotropic medications in institutionalized populations.

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I have designed and taught courses in correctional psychiatry at the University of California, San Francisco. I have also designed and taught courses on the protocols for identifying and treating psychiatric patients with various disorders and have supervised psychiatric residents in teaching hospitals. I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance abuse, and preventative medicine.

I also have extensive experience managing, monitoring, and reforming correctional mental health systems. Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of the University of California, San Francisco, which was located at San Francisco General Hospital. In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco. My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

Between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco. In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the 12-bed locked inpatient treatment unit at the San Francisco General Hospital. At the time, mental health care in the San Francisco's jails was subject to a consent decree in the case *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992).

I have also served as a psychiatric expert or consultant to various federal courts or other organizations implementing remedial decrees covering the provision of mental health care in correctional institutions. For ten years, between April 1990 and February of 2000, I served as a

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

court-appointed medical and psychiatric expert in the consent decree case *Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636. Among other things, that case involved the provision of adequate psychiatric care to mentally ill inmates at the California Medical Facility (CMF) in Vacaville, California.

My experiences working on the *Gates* case also informed me about the difficulty of providing mental health services in locked, high security units. As part of the *Gates* case, CMF was forbidden from housing mentally ill inmates in its Willis Unit, a three-tier administrative segregation unit, because of the severity of conditions and the acknowledged difficulty of providing adequate mental health services in this type of setting.

Between October 1996 and July 1997, I served as a psychiatric expert for the United States District Court for the Northern District of California in the case of *Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Cal. 1995), an omnibus case involving psychiatric care and other issues at Pelican Bay State Prison in Crescent City, California. In my work on the *Madrid* case, I gained first-hand knowledge concerning the severe impact of prolonged isolation in segregation units on mentally ill inmates, as well as additional concrete understanding of the need for constant monitoring of both non-mentally ill and mentally ill inmates in lock up units in order to prevent any further decompensation, since housing in these units by itself sometimes causes, contributes to and/or intensifies psychiatric instability.

Between July of 1998 and February of 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and treatment facilities operated by the State of Georgia. In that case, I monitored an Agreement between the United

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

States Department of Justice and the State of Georgia designed to improve the quality of care in its juvenile detention facilities. The Agreement encompassed mental health care, medical care, educational services, and treatment programs. As part of the monitoring in that case, Georgia created significant new mental health treatment programs with dedicated staffing and capacity limitations, including most significantly a new inpatient treatment facility for boys and a second new inpatient treatment facility for girls.

The Agreement also included a provision forbidding the prior practice of housing suicidal youths in administrative segregation units, and required "mainstream" housing and suicide watch monitoring of such youths. The youths would go to school and work during the day, and would continue their suicide watch in their housing units overnight. This provision was introduced because it had become clear under the prior practices that suicidal youths frequently would not come forward with their suicidal feelings because they did not want to be locked down in administrative segregation for suicide watch. This further demonstrated to me the dangerous and damaging nature of isolation in locked units for suicidal individuals. It also demonstrated to me the dangerous nature of punitive suicide watch conditions when they discourage suicidal individuals from coming forward and seeking treatment.

Between June of 2003 and December of 2004, I was hired by the State of New Mexico as a defense expert for the implementation phase of the psychiatric sections of the "Ayers Agreement" covering the New Mexico Corrections Department (NMCD). The Agreement was a settlement between a class of New Mexico prisoners and the NMCD concerning the provision of adequate psychiatric care for inmates in New Mexico's highest security facility. The Ayers Agreement concerned a mental health treatment program in a disciplinary detention unit similar to the Security Housing Unit (SHU) at Pelican Bay State Prison. New Mexico implemented the

4

new treatment program with an acknowledgement that they needed to maintain minimum clinical staff-to-inmate ratios given the severe nature of the housing conditions in the locked-down unit, and the potential for mental decompensation.

I have also worked as an expert consultant for the United States Department of Justice (USDOJ) on inspections and remedial work in connection with youth facilities in California and Michigan. In August and September of 2003, I was retained as a medical and psychiatric expert for the USDOJ in connection with an inspection of the N.A. Chaderjian Youth Correction Facility in Stockton, California. In that inspection, we looked at overcrowding and whether the level of psychiatric care being provided met constitutional minimums, based on the number of wards and the limited number of staff. We concluded that the facility was badly overcrowded and understaffed. At the time, the facility consisted entirely of locked units, and the inspection found that the staff failed to provide minimally adequate medical and mental health services, that the facility locked down its wards excessively, that medication delivery was faulty, that the level of ward access to yard and recreation was insufficient, and that the institution's suicide prevention efforts were underdeveloped, overwhelmed, and ineffective.

Between March of 2003 and the summer of 2006, I worked as an expert for the USDOJ in connection with inspections to identify and remedy various problems at the Maxey Training School, a youth facility with large medical and mental health treatment programs in Whitmore Lake, Michigan. The case involved the adequacy of medical and mental health care provided at the facility. The case included an investigation of excessive lock-downs of suicidal youths.

In 2007 and 2008, I prepared expert statements and testified before the three-judge panel in the *Coleman/Plata* overcrowding litigation in California. My expert report in that case was cited twice in the Unites States Supreme Court decision upholding the three-judge court's

5

imposition of an order requiring California to reduce overcrowding.

I have presented numerous papers before mental health professionals, prosecuting and defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including prison mental health services, dual diagnosis, mental illness, alcohol and drug abuse, and the treatment of substance abuse. These presentations and publications include: "Alcohol and Other Drugs and the Courts" (2010), "The Mentally-Ill Offender in Reentry Courts" (2010); "Mental Health Aspects of Diminished Capacity and Competency" (2007); "Methamphetamine-Induced Dual Diagnosis Issues" (2006); "Proper Assessment of Drug Court Clients" (2006); "Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices" (2004); "Cultural Considerations in Working with the Latino Patient" (2002); "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders" (2001); "Managing People of Different Pathologies in Mental Health Courts" (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering" (1999); "Working With the Substance Abuser in the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999); "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder" (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention Deficit Disorder, Substance Abuse,

6

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Psychiatric Disorders and Related Issues" (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

I am currently a Diplomat of, and have served as an Examiner for, the American Board of Psychiatry and Neurology.

Since 1986, I have held academic appointments as Clinical Instructor, Assistant Clinical Professor, Associate Clinical Professor, and Clinical Professor in the Department of Psychiatry, University of California, San Francisco, School of Medicine. I received the Henry J. Kaiser Award for Excellence in Teaching in 1987 and was selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic years 1988-1989, 1990-1991, and 1994-1995. I designed, planned, and taught "Drug and Alcohol Abuse" and "Alcoholism," one-unit courses covering major aspects of drug and alcohol abuse; supervised fourth-year medical students in the care of dually diagnosed patients at the Psychiatric Continuity Clinic, Haight Ashbury Free Clinic; facilitated a weekly psychiatric intern seminar on "Psychiatric Aspects of Medicine," and lectured on addictionology and substance abuse to the School of Pharmacy, University of California, San Francisco. I also coordinated a course on Prisoner Health at University of California San Francisco School of Medicine between January 2002 and January 2004.

I have held numerous positions with responsibility for ensuring the quality of clinical services provided by inpatient and community-based programs. From 1997 to 1998, I was Director of Clinical Services for San Francisco Target Cities Project. I also served as (1) Medical Director of the Comprehensive Homeless Center, Department of Veterans Affairs Medical Center in San Francisco, where I had overall responsibility for the medical and psychiatric services at the Homeless Center; (2) Chief of the Intensive Psychiatric Community Care Program, Department

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of Veterans Affairs Medical Center in San Francisco, a community-based case management program; (3) Chief of the Substance Abuse Inpatient Unit, Department of Veterans Affairs Medical Center in San Francisco, where I had overall clinical and administrative responsibilities for the unit; and (4) Psychiatrist, Substance Abuse Inpatient Unit, where I provided consultation to the Medical/Surgical Units regarding patients with substance abuse problems. Between 2006 and 2009, I served as a member of the Board of Directors of the Physician Foundation at the California Pacific Medical Center.

I also served as a Physician Specialist to the Westside Crisis Center, San Francisco, from 1984 to 1987, and to the Mission Mental Health Crisis Center from 1983 to 1984. I was the Chief of Psychiatric Services at the Haight Ashbury Free Clinic from 1991 until February 2006. I also worked as a Technical Assistance Consultant to the Center for Substance Abuse Treatment, which is part of the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services.

I have also been employed as Psychiatric Consultant to the San Francisco Drug Court and to the Hawaii (Honolulu) Drug Court.

I currently work as a private psychiatric consultant and as a Clinical Professor in the Department of Psychiatry at the University of California San Francisco, School of Medicine ("UCSF"). At UCSF, I currently facilitate a weekly psychotherapy-training group for residents in the Department of Psychiatry as well as performing other teaching responsibilities.

**Introduction to Opinions**

I have been retained by plaintiffs' attorneys in this case as an expert on prison mental health care and prison psychiatry. I have also been retained to offer my expert opinion on matters relating to whether the current system of providing mental health care, and current conditions of

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

confinement for prisoners with mental illness, in the Arizona Department of Corrections (ADC) meet constitutional minima.

My opinions at this stage of this case are necessarily constrained by the limited amount of information I have. For example, it is my understanding that many of the relevant documents requested by plaintiffs' counsel have not yet been produced by defendants, and that some depositions of ADC personnel, including defendants Ryan and Pratt, are not yet available. Nevertheless, based upon the information presently available to me, I am able to reach the following preliminary opinions. These should not be taken as an exhaustive list of the opinions I will reach in this case, and I reserve the right to supplement or modify these opinions as more information becomes available.

**Opinion:   The mental health care currently provided in the Arizona Department of Corrections does not meet minimum standards of care.**

It is my opinion that the ADC mental health programs I observed at each of the prisons I visited are not meeting the minimum standard of care in a number of interrelated and interacting ways, as described more fully below.  This opinion is based on inspection tours of the following ADC prison complexes:   ASPC-Tucson (July 8-9, 2013); ASPC-Florence (July 15, 2013); ASPC-Eyman (July 16, 2013); ASPC-Perryville (July 18, 2013); ASPC-Phoenix (July 19, 2013); ASPC-Lewis (July 22, 2013); and ASPC-Yuma (July 23, 2013).   The notes that I took during my inspection tours of ADC prisons are attached hereto as **Exhibit B** and incorporated herein as a part of this report.   In addition to my inspection tours, this opinion is based upon the monitoring reports, medical records, depositions, and other documents I have reviewed in connection with this case. The documents I reviewed are listed in **Exhibit C**.  I may use any or all of these documents to illustrate my opinions at trial.

9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Based upon my review, it is apparent that mental health care services in ADC are in a state of disarray, and have been for some time. The lack of a functioning mental health program poses a substantial risk of serious harm to prisoners with mental health needs. Although the day-to-day provision of health care, including mental health care, was privatized by the state and since July 1, 2012 has been performed by private contractors (first Wexford and now Corizon), all relevant policies and procedures for the provision of mental health care are centralized with statewide application. (Shaw dep., 157:13-24). ADC has a statewide Monitoring Bureau that monitors the contractor's provision of health care, including mental health care, at all state-owned and operated prisons. (Pratt dep., 19:10-24, 40:7-9). Furthermore, the systemic problems that I have identified existed prior to July 1, 2012, when ADC directly provided mental health care to the prisoners in its custody.

It is my opinion that the chronic shortage of mental health staff, delays in providing or outright failure to provide mental health treatment, the gross inadequacies in the provision of psychiatric medications, and the other deficiencies identified in this report are statewide systemic problems, and prisoners who need mental health care have already experienced, and will experience, a serious risk of injury to their health if these problems are not addressed. Additionally, the problems that the named plaintiffs experienced and continue to experience with ADC's mental health system are typical of the problems one would expect to see as a result of this wholly inadequate correctional mental health system. In my experience in correctional mental health care, these types of systemic problems have been addressed through an injunction directed against the directors and administrators of the prison system.

I note that I am not alone in my conclusion that ADC mental health services do not meet constitutional minima. After four months of providing health care to ADC prisoners, Wexford

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Health Sources concluded that "[t]he current class action lawsuits are accurate" and "[t]he ADC

system is broken, and does not provide a constitutional level of care." (Wexford 130, 003). And

on September 5, 2013, Nicole Taylor, ADC Mental Health Monitor, testified as follows:

> Q. I think you testified that you anticipate being able to testify a year from now that the
> care provided to ADC inmates meets constitutional requirements. Is that correct?
>
> * * *
>
> THE WITNESS: That is my expectation, yes.
>
> Q BY MR. FATHI: Could you testify to that effect today?
>
> A I think there are areas that need improvement before I could testify to that today, and
> those are the pieces that I have worked with Corizon to identify and come up with a plan.

(Taylor dep., 277).

**Opinion:  Inadequate Staffing**

It is my opinion that the pervasive and longstanding staffing shortages in ADC's health

care system undermine the ability of clinicians to provide minimally adequate mental health care

services.

The provision of sufficient numbers of qualified mental health staff is the foundation of

any minimally adequate prison mental health care system. Without a sufficient number of

properly qualified mental health staff, it is impossible to provide adequate mental health

treatment.  In addition, shortages of other health care staff, such as nurses and medical records

staff, can negatively affect the delivery of mental health services, even if those employees are not

formally classified as mental health staff.

It is apparent that there have been and continue to be severe systemwide shortages of

mental health staff in ADC, both before and after health care services were privatized on July 1,

2012.  Indeed, Wexford concluded that "Staff shortages have existed for so long that site-level

11

employees have become complacent with operating below industry standards." (Wexford 0064).

In an August 13, 2012 memo to Joe Profiri, ADC Contract Beds Operations Director, Dr. Ben Shaw, ADC Mental Health Contract Monitor, detailed how mentally ill prisoners receiving psychiatric medications were not receiving the required face-to-face meeting with psychiatry providers every three months due to staffing shortages:

> Wexford's current level of psychiatry staffing is grossly insufficient to meet [its] contractual requirement. Further, this staffing level is so limited that patient safety and orderly operation of ADOC facilities may be significantly compromised. ... Wexford currently has 14.85 psychiatry FTE's allocated to address the clinical needs of 8,891 patients who are prescribed psychotropic medications. Wexford now employs a total of 5.95 FTE psychiatry providers (approximately 33% of their allocation) which 8.9 FTE's are vacant (leaving a vacancy rate of 66%). Audit findings that support the position that Wexford's psychiatry staffing is insufficient to provide a safe level of services are as follows: [findings omitted]

(Memo from Ben Shaw to Joe Profiri, Aug. 13, 2012, ADC027770).

In his October 3, 2012 deposition regarding the provision of mental health care at ADC prisons, Dr. Shaw testified that as of August 2012, the Perryville, Lewis, Eyman, Florence, and Tucson complexes, which collectively house 90 to 95% of the mental health population, each had less than half of their psychiatric provider full time equivalent (FTE) positions filled. (Shaw dep., 126:22-127:10). In the September 21, 2012 Cure Notification sent to Wexford, ADC cited "inadequate staffing levels in multiple program areas at multiple locations;" "staffing levels creating inappropriate scheduling gaps in on-site medical coverage, including In-Patient Component;" and "Staffing levels forcing existing staff to work excessive hours, creating fatigue risks." (Letter from Joe Profiri to Karen Mullenix, Sept. 21, 2012, ADC027858).

In his October 3, 2012 deposition, Dr. Shaw testified to numerous current vacancies statewide among mental health staff. (Shaw dep., 60:6 – 67:4). For example, he testified that, as of that date, 0 of 2 psychiatric nurse practitioner/physician assistant positions were filled (Shaw

12

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

dep., 64:2-9); 1 out of 5 psych supervisor psychiatrist positions were filled (Shaw dep., 64:22-65:9), and 0.5 out of 3 psychiatrist positions were filled (Shaw dep., 65:23-25). Dr. Shaw also testified that, as of August 8, 2012, there was no psychiatrist at either the Florence or Lewis complexes (Shaw dep., 76:22-77:1, 78:19-22).

Dr. Shaw also testified to mental health staffing shortages that existed before the July 1, 2012 privatization of health care. (Shaw dep., 83:7 – 97:3). He testified that, as of June 20, 2012:

> a. the psychiatrist, nurse practitioner, and midlevel care provider positions at Florence were all vacant, as were two out of four psychologist positions (Shaw dep., 86:16-88:5).

> b. The clinical director position, psychiatrist supervisor position, and one of two psych nurse coordinator positions at Phoenix were all vacant (Shaw dep., 93:10-94:11).

> c. All four psychiatrist positions at Tucson were vacant (Shaw dep., 95:21-96:14) ADC concentrates higher-acuity mental health prisoners at Tucson (Shaw dep., 97:4-12).

Dr. Shaw further testified that as of June 20, 2012, some of these positions had been vacant for approximately one year (Shaw dep., 86:8-11, 93:16-17).   It appears that ADC's staffing shortages are longstanding; Dr. Shaw testified that as of February 2011, only 2.5 out of 14 ADC psychiatric provider positions were filled by state employees. (Shaw dep., 102:14-21). Dr. Tracy Crews testified that she was the sole psychiatry provider for the entire Perryville complex from August 2010 until March 2011, when a psychiatry nurse practitioner finally was hired. (Crews dep., 36:10-37:24, 83:4-22). She testified that given 2011 statistics indicating 1,382 female prisoners classified as higher mental health needs (MH-4 or MH-3), a single psychiatrist with a caseload this high does not meet the acceptable standard of care. (Ex. V, at 84:9-22). I concur in her opinion – such a psychiatrist staffing ratio does not meet basic requirements for adequate mental health care.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Five months into the Wexford contract, severe staffing shortages persisted systemwide. The Wexford Health Sources Vacancy Report dated November 30, 2012 (ADC 49067) shows significant mental health staff shortages at all seven of the prison complexes I inspected. According to this report, there were no psychiatrists at the Florence, Lewis, Perryville, or Yuma complexes. The statewide vacancy rate for psychiatrists was 65%. The statewide vacancy rate for psychiatric physician assistants/nurse practitioners was 100%.

The Arizona Monthly Staffing Report dated June 2013 (ADC 121167) shows that significant staffing shortages remain. The statewide vacancy rate for mental health nurse practitioners remained at 100%; it appears that these services were simply not being provided. The statewide vacancy rate for psychiatrists was 27%, but was significantly higher at some large complexes (50% at Florence (121170), 50% at Tucson (121175), 100% at Lewis (121171)). At her September 5, 2013 deposition, Dr. Taylor testified that approximately 5 out of 8.5 psychiatrist positions were filled, yielding a vacancy rate of 41%, and one out of five psychiatric nurse practitioner positions were filled, for a vacancy rate of 80%. (Taylor dep., pp. 131-32, 141-42). Significantly, this is an even lower level of psychiatrist staffing than the 5.95 positions that Dr. Shaw concluded were "insufficient to provide a safe level of services."

ADC's July 2013 auditing reports (known as "MGAR Reports") detail the harmful effects on patient care of these continuing staffing shortages (spelling and typographical errors in the originals):

> Medications are not being re-ordered prior to expiration. Central, and South units were found to have stacks of HNR's waiting to be seen on sick call and by the HCP. Every unit with the exception of Kasson had a 3 tier cart/shelf full (70+) of charts waiting to be reviewed by a HCP for everything from RX renewal, hosp follow up, chronic care, sick call referral, test results, HNR requests. Sick call is not fully completed daily on every unit which requires the unseen inmates to be rescheduled over and over. Medicaitons are being pre-poured in order to be able to complete a med pass. Care plans are not bing completed in the IPC. Orders are

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> not being noted daily. Proper tracking mechanisims are not being set up or maintained for consults, non-formulary meds, etc. Documentation is not being fully completed. Many of the NET's are not being completed on one side or the other and placed in the inmates record. Refusals are not being completed for inmates who do not show up for meds or appointments.

137259 (Florence July 2013).

> Performance measure is not met. Though efforts at increasing current staffing levels continue, the shortages in all areas to include, providers for medical and psychiatry and in areas of nursing clearly compromise the ability of current staff to manage the extensive medical needs of the population.

137285 (Lewis July 2013).

> Although the staffing pattern allows for only 3 medical records clerks and a supervisor, that staffing is not meeting the contract requirements for medical records. Although there has been improvement since the Medical Records Supervisor was hired, a significant amount of loose filing remains, especially at San Carlos. There is a large amount of filing in the records that is neither secured by fasteners nor in the correct section.

> The med pass at Lumley is scheduled for 1000. It is outside the 1 hour perameter for delivering meds every day. I understand that the med pass time is going to be changed to 1130 to accomodate the med nurse schedule, but with the 1700 med pass remaining the same, care should be taken to ensure that the BID times are far enough apart to ensure that there is no over-medication. KOPs have not been delivered in a timely fashion at Lumley. For the first time, this week (7/25) I observed a backlog of KOPs at Santa Maria, as well.

> There is one night nurse on duty between 0500 and 0700. She conducts diabetic lines. That leaves no nurse to respond to ICSs or as was the case on 7/23/13, to respond to the use of restraints. This has been an issue for at least a year and pre-dates the Corizon contract, but staffing during that 2 hour period is inadequate.

> There remains a shortage of providers. For example, the provider review charts are backlogged, especially at San Carlos and Santa Maria. Referrals to the provider lines from nurse lines are not seen within 7 days at any of the units. Chronic care appoinments are not being completed within the contractual timeframes.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

> I have not determined if the failure to meet contractual requirements is the result of an insufficient number of staff, an inefficient deployment of existing staff, or a productivity issue. However, there are requirements that are currently not being fulfilled with the current pattern of staffing.

137309 (Perryville July 2013).

> The staffing continues to be insufficient to meet the needs of the inmate population at this Complex, due to the backlog of processes that need to be caught up, as witnessed by back-logged charts needing Provider reviews, Inmates continuing to wait to see both Nursing and/or a Provider. Juveniles not being seen by Dental for intake since 6/26/2013, and IMs continuing to wait 2-3 weeks past the date that they submit an HNR. Medications continue to be an issue with them not being ordered, filled/refilled on time despite pointing out to Corizon staff what is causing the majority of the issues regarding this topic for our Complex, and Chronic Care inmates being far past due for their examinations.

137395 (Tucson July 2013).

> Although several vacancies have been filled, there are presently no staff working on site in several key positions.  These include nursing supervision (3x) Medical Director, Clinical Coordinator, and the Assistant FHA.  Although Corizon has made significant strides in the last 60 days, additional attention needs to be paid to areas of nursing staff, provider efficiency, appointment backlogs, and Mental Health staffing levels.

137224 (Eyman July 2013).

> [B]ased on the staffing matrix the facility is not at the optimum level to be in compliance to meet the needs of the inmate population at this time.

137445 (Yuma July 2013).

For reasons that are unclear to me, the August 2013 MGAR reports do not address staffing levels (see "Inadequate Monitoring and Oversight," below), but the September 2013 reports show continuing serious deficiencies:

> Sick call is not being conducted 5 days a week at any unit on Florence complex. MARs are not being completed correctly at any unit on Florence complex. Chronic condition back log of appointments is growing.  Many inmates are not seen as ordered or required by disease management guidelines. Medications are

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

not being ordered prior to expiration on any unit on Florence complex.

ADC 154137 (Florence Sept. 2013).

Based off the MGAR findings for the month of September [staff] adequacy and effectiveness is not sufficient to meet the needs of the inmate population.

ADC 154089 (Eyman Sept. 2013).

Mental health staff at San Carlos have caseloads in excess of 500.  A large amount of time is spent just noting orders.  There is one psychiatrist onsite at Perrville.  The number of patients he can see is limited, given the travel between yards and other duties he has.  There are vacancies throughout the Complex that affect the ability of existing staff to meet the needs of all the inmates.

ADC 154210-11 (Perryville Sept. 2013)

Aspen (MTU) did not have a psychiatrist last week, 9/23/13 through 9/27/13.  The medical provider is going to MTU approximately once a week.  This is limiting inmate access to medical and psychiatric care.

ADC 154251 (Phoenix Sept. 2013)

There continues to be only a locum Psychiatrist on board, and no word on recruiting efforts in this area.

ADC 154175 (Lewis Sept. 2013)

All positions are not yet filled therefore; sickcall deadlines are still not being met, and Chronic care backlogs do still remain an issue.

ADC 154338 (Tucson Sept. 2013)

The September 2013 reports reveal another significant staffing issue.  They disclose that there is no training certificate, license, or diploma on file for four psychiatrists who are providing services in ADC.  (ADC 154338-39).  It is fundamental and essential that the current licensure of psychiatrists and other health care staff be verified.

17

In addition, the reports identify a psych associate who "has no license yet." (ADC 154339). ADC relies on psych associates for a wide range of mental health treatment functions: "they provide all on-site mental health services to the ADC inmates, including group, individual, crisis evaluation." (Taylor dep., p. 173-74, 176). ADC justifies this reliance based on the assertion that all psych associates are licensed:

Q. So psychology associates are all licensed?

A. Yes, they are.

(Taylor dep., pp. 57, 176-77).

Given that this is apparently not true, I have grave concerns about the extent of ADC's reliance on these unlicensed employees to provide mental health care.

Dr. Taylor testified that she has repeatedly told various ADC staff, including defendants Pratt and Ryan, that she believes Corizon needs to provide additional mental health staff. (Taylor dep., pp. 149-50). She has also expressed to defendant Pratt and others her view that Corizon is not fully complying with the contract in the area of mental health care. (Taylor dep., pp. 157-58). It is my opinion that many of the deficiencies set forth below are attributable, in whole or in part, to ADC's chronically inadequate health care staffing.

**Opinion: Inadequate medical records**

Accurate, reliable medical records are an essential element of mental health care. The record should be a complete history of the patient's mental health condition, diagnoses, and treatment. The record is also an essential means of communication between mental health providers. This is especially true in a prison setting, in which patients are typically treated by multiple providers and periodically transferred between institutions. For these reasons, health care providers rely upon up to date and accurate medical records. The maxim "not noted, not

18

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

done," meaning that if something is not contemporaneously noted in the medical record, we assume that it did not occur, is based upon this need for accurate and up to date medical records.

The medical records I examined during my inspections of ADC prisons fell far short of minimal standards. At every prison I visited, the records were disorganized to the point of being chaotic, and frequently incomplete, making it very difficult or impossible to follow the patient's history and course of treatment. I have rarely, if ever, seen such poor quality medical records in a state prison system or any system.

It is important to fully understand the consequences of inadequate medical records. Absent organized, complete, reliable records, effective treatment is impossible, and the patient is at serious risk of harm due to receiving inappropriate treatment, with resultant worsening of his or her underlying mental illness.

Unlike many modern prison systems, ADC does not have an electronic medical record system. The records are in the form of file folders, with paper documents filed under tabs that have labels such as "mental health," "provider orders," and "HNRs." While these tabs could theoretically be useful as a means of organizing the record, in the ADC records I reviewed this system was not functional. The "mental health" and/or "provider orders" tabs were frequently empty, or missing altogether. Conversely, some files had two "mental health" or two "provider orders" tabs, with documents divided between them seemingly at random. It was very common to find documents misfiled under the wrong tab. Many records had loose, unfiled documents stuck in the file. I saw at least one record with a document from an entirely different prisoner erroneously filed in the record.

Many records had essential portions missing altogether. The problem list is a summary document that lists a patient's major health care conditions, as well as drug allergies and other

essential information. The problem list is very important to allow health care staff to quickly

access critically important health care information about a patient, particularly in an emergency

situation. I reviewed records in which the problem list was missing, and many more where the

problem list was only partially completed.

As discussed in detail below, other essential elements of the record, such as the Mental

Health Treatment Plan and Medication Administration Records (MARs), were also frequently

missing or only partially completed.

Examples of patients whose records were chaotic and disorganized include:

1.           ,      -This patient had been on the Baker unit at the Phoenix complex for approximately nine months when I evaluated him. He is apparently being treated with lithium and Risperdal but I could not be sure. This was due to the most recent MAR being from April 2013 and the fact that there were no medication orders in the medical record. The medical record was very disorganized and I could not determine what was actually going on with this patient.

2.           ,      -This patient had two suicide attempts within 9 months of my evaluation. He was housed on the Flamenco unit of the Phoenix complex. His chart was very disorganized, with the period from 12/1/12 through 2/28/13 missing. No provider orders were in the chart and I was unable to determine which, if any, medications he was taking. These problems are especially serious given his recent suicide attempts.

3.           ,      -This patient has a history of a serious suicide attempt by scalping himself. His chart was extremely disorganized and contained "double" sections -- that is, there were two medication administration tabs, two mental health tabs, as well as several other duplicate sections in his chart. A psychiatric progress note stated,"Continue Cogentin, Haldol and Symmetrel," but there was no corresponding medication order. As with Mr.       this degree of chart disorganization is dangerous given Mr.       history of a serious suicide attempt.

ADC monitors have noted deficiencies in the medical records. Lewis 137537 ("chart

notes were completely out of order"); Lewis 137539 ("discrepancies in chart made it impossible

to tell inmate's Mental Health Score"). Wexford also noted a "History of poor or non-existent

documentation in medical records." (Wexford 114).

20

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opinion:  Inadequate medication system**

The proper prescription and administration of medication is an essential element of mental health treatment.  Patients who are not prescribed appropriate medications, or who do not receive their medications as prescribed, will not improve and will almost always deteriorate, often to a point of being a danger to themselves and others, or becoming gravely disabled. Obviously in a prison setting, the patient is entirely dependent on the prison health care staff to prescribe, obtain, and timely deliver the medications necessary to treat his or her mental illness.

In a September 21, 2012 letter to Wexford, Mr. Profiri describes a situation in which "a significant number of inmates may not have been receiving their medications as prescribed due to expired prescription(s) and inappropriate renewals or refills." (Letter from Joe Profiri to Karen Mullenix, Sept. 21, 2012, ADC027855). In his deposition, Dr. Shaw testified that this problem involved approximately 5,000 prisoners, about 1,500 of whom were prescribed psychotropic medications. (Shaw dep., 49:14 – 51:1). These prisoners did not receive their medications for periods ranging from a few days to up to a month. (Shaw dep., 50:16 - 21). Mr. Profiri wrote in his letter that "it was apparent … that Wexford was aware of the expired medication issue, but had not taken adequate, if any, action to correct it." (Letter from Joe Profiri to Karen Mullenix, ADC027855). Failure to provide medications as prescribed poses a serious risk to patient health and safety.

The same September 21 letter from ADC to Wexford describes a prisoner in Florence-Central Unit who was found hanging from a sheet on August 23, 2012. (Letter from Joe Profiri to Karen Mullenix, ADC027856). The prisoner had been prescribed a mood stabilizer, but did not receive his medication for the first 23 days of August. (Letter from Joe Profiri to Karen Mullenix, ADC027856). I agree with Mr. Profiri that "[f]ailing to deliver psychotropic

21

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

medication as prescribed is a significant, non-compliance issue." (Letter from Joe Profiri to Karen Mullenix, ADC027856).   Furthermore, I believe that incidents such as this prisoner's suicide attempt are the foreseeable result of the failure to provide him with his necessary psychotropic medication.

ADC admits that it lacks a reliable system for ensuring the delivery of prescribed medications. In its September 21, 2012 letter to Wexford, ADC describes problems with "[i]ncorrect, incomplete, inconsistent medication administration or documentation of care provided," including: a backlog of prescriptions that were expiring or had expired, and needed review/renewal; incorrect or incomplete pharmacy prescriptions (i.e., medication not matching chart order, wrong dosage); inappropriate discontinuation of or change of medication; inconsistent process to approve nonformulary medication; inconsistent or contradictory medication refill and/or return procedures; inadequate pharmacy reports; inconsistent documentation of Medication Administration Records (MARs); and inconsistent provision of release, transfer, and/or renewal medications. (Letter from Joe Profiri to Karen Mullenix, ADC027858-59).

In addition to the situation described above, in his August 13, 2012 memorandum, Dr. Shaw wrote that an August 1, 2012 audit at Perryville found that 54 patients' medications had expired in July. (Memo from Ben Shaw to Joe Profiri, Aug. 13, 2012, ADC027770). In addition, there were 75 women at Perryville who had been prescribed and stabilized on psychotropic medications at County Jail facilities, none of whom had had their medications prescribed and continued, as ADC policy requires. (Memo from Ben Shaw to Joe Profiri, Aug. 13, 2012, ADC027770- 71).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Richard Pratt testified that the delivery of medication has deteriorated since Wexford took over on July 1, 2012. (Pratt dep., 36:17-37:1, 51:12-52:1). Mr. Pratt, who is the interim assistant director of the Monitoring Bureau, testified that he did not know whether Wexford has fixed these medication delivery problems. (Pratt dep., 63:21-65:13). Similarly, in an August 17, 2012 memo from Paulette Boothby, ADC Pharmacy Monitor, to Mr. Profiri, Ms. Boothby writes that at the Florence complex, "many inmates have gone without Psych meds for 30 days or more." (Memo from Paulette Boothby to Joe Profiri, Aug. 17, 2012, ADC027796). Ms. Boothby's memo repeatedly refers to staffing shortages adversely affecting pharmacy operations (id. at ADC027795, ("[Wexford's] staffing levels on site are a big concern"); id. at ADC027796, ("there are not enough staff to accomplish this task"); id. at ADC027797 ("More staff is needed immediately to provide continuity of care")).

In light of these facts, I am particularly concerned by a memo to Lewis Complex Inmates from Wexford and ADC, dated June 26, 2011.[1] This memo states that "chronic care medications will no longer be refilled automatically" and "medications will not be refilled without an HNR [Health Needs Request form]." (Memo from Lewis Medical/Wexford Health Services to Lewis Complex Inmates, June 26, 2011 [sic], PLTFPARSONS- 013132). In light of the dysfunctions of the HNR system detailed below, this medication distribution system poses a significant risk of interruption of psychotropic medications, with potentially grave results.

Mr. Pratt states that in his judgment as a medical professional, it would be better if a person with a need for chronic care medications, which include psychotropic medications, were provided a continual supply of his or her medication. (Pratt dep., 83:5- 10). In her deposition, Dr.

---

[1] Based on the balance of the memo, the correct date appears to be June 26, 2012. I understand that counsel for ADC and Wexford have stipulated that the correct date is 2012.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Crews described the problems that are associated with patients having their psychotropic medication run out or expire – they can have a relapse of their problems, and there is a "kindling effect" with bipolar and psychotic disorders where the more times a patient goes off medications and has symptoms the harder it will be to get control of those symptoms and treat her. (Crews dep., 82:10-24).

These problems in the delivery of medication appear to pre-date the transfer of responsibility to Wexford. Dr. Crews, the Perryville supervising psychiatrist for six years prior to Wexford's takeover, testified that if she could not see the patient before her prescription(s) expired, "each month the nurse would lay down [...] a stack of scripts for me, and I would fill them until the patient could be seen." (Crews dep., 77:4-77:6). In 2011, Dr. Crews refused to renew or write prescriptions for psychotropic medication for Florence prisoners she had never seen, and would never see. (Crews dep., 92:1-13; 93:11-17). In his October 9, 2012 deposition, Dr. Jeffrey Sharp, a primary care physician at Perryville, testified that he is expected to renew psychotropic medications for patients whom he has never seen. (Sharp dep., 85:17-86:8). Dr. Sharp testified that he does not feel competent to do so or comfortable doing so. (Sharp dep., 85:17-87:14). This is an inappropriate and illegal practice that puts patients at risk of serious harm.

There does not appear to have been any meaningful improvement in these areas under Corizon.  ADC MGAR reports document multiple problems with medication administration, including critical information, such as the patient's diagnosis, missing from the MAR; medications not given with no documented explanation; medications listed as "unavailable," or marked as "refused" with no documentation; and the MAR simply left blank. (Tucson 137656, 137658, Perryville 137569-70, Eyman 137485-86; Phoenix 137600; Lewis 137544; Yuma

137703). A particularly concerning finding is that "[m]edication [is] documented as being given post-inmate release" (Perryville 137561), which suggests the possibility of falsification of medication records.

At the Lewis facility, "[t]here continues to be confusion concerning documentation of HNR's, medication given from clinic stock, and MAR's in general" (Lewis 137534). As of August 26, 2013, the reviewer found an "incomplete copy of July MAR, no evidence of medication administration in Aug (no MAR available)" (Lewis 137547). The reviewer was also "unable to substantiate compliance due to excessive 'holes' in MAR not indicating availability of medication" (Lewis 137547). Florence had medications marked as "not available" for 7 to 10 days, as well as numerous other problems with the MARs (Florence 137514).

Serious problems exist at Phoenix, ADC's dedicated mental health facility. "Review demonstrates continued noncompliance issues with documentation on MARs." (Phoenix 137600). Martin Winland, ADC Pharmacy Monitor, is "extremely concerned" with the situation at Phoenix, where "Medication is being administered with no readily retrievable record of the recipient." (Phoenix 137591). On August 7, 2013, Mr. Winland "could not locate July MARs for patient charts on Baker and was unable to locate a nurse on Baker for approximately 15 minutes to ask about the MAR's" (Phoenix 137592). He added that "We continue to gather evidence of inmates being transferred from Phoenix to other complexes without medications." (Phoenix 137592-93)

There are significant delays in providing prescribed medications, and medications are listed as "not available," or simply not given without explanation (Perryville 137573). At Lewis, "lithium [was] ordered 7/13/13 with first documented dose administered 8/14/13" (Lewis 137548). At Florence, delays of 5-10 days were noted between the medication order and receipt

25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

of the medication by the patient (Florence 137515).

There continue to be major problems with medications expiring prior to renewal.  In the August 2013 MGAR report, Mr. Winland wrote that "[m]edications must be filled/refilled in a timelier manner," noting approximately 16,000 medications not addressed between March and July 2013.  (Perryville 137560 – appears in all MGARs).  Of 698 prescriptions, 229 expired prior to renewal date at Perryville (Perryville 137576), and of 317 prescriptions, 145 expired prior to reorder date at Phoenix (Phoenix 137591).   Numerous medications are expiring without renewal at Lewis, Yuma, and Florence (Lewis 137548, Yuma 137705; Florence 137516).  Mr. Winland writes, "I continue to alert facilities on expired chronic medications needing filled/refilled" (Yuma 137697).

Medication errors are occurring with no corrective action plans being created (Tucson 137659; Eyman 137489).    At Florence, medication errors involving missed doses "are not documented or forwarded to the [Facility Health Administrator]" (Florence 137515).

There are significant delays in obtaining non-formulary medications (Tucson 137660; Perryville 137577).  See also Phoenix 137591-92 (one patient had a non-formulary medication order pending for approximately one month); Phoenix 137603 (nonformulary request submitted one month previously; no response found in file); Lewis 137549 (nonformulary request submitted 6/13, medication approval on 8/2/13).  "Florence complex does not have a tracking mechanism in place to ensure non-formulary requests are reviewed and returned within 24 to 48 hours" (Florence 137517).   Monitors noted at multiple facilities that providers are not being timely notified of approval or denial of their requests for non-formulary medications.  (Tucson 137663; Perryville 137577; Eyman 137489; Lewis 137549; Phoenix 137604).  My record review confirmed significant delays in processing requests for non-formulary psychotropic medications.

(Ryan Tenny, 263981 (Eyman))

My findings are consistent with the problems documented in the MGAR reports by ADC

monitors. At every facility I visited, I reviewed numerous records where the MAR was simply

missing for one or more months. Some charts had no MARs at all. This is an extremely serious

problem, as it makes it impossible to know what medications the patient is taking, and if they are

being delivered to him or her as prescribed.

Another common problem I encountered is that medication orders were missing from the

record. This means that patients were being administered powerful psychotropic medications,

without a legal or clinical justification. That is, there is no record of who prescribed the

medication, at what dose, for how long, and for what clinical indication. In many cases the

combination of missing MARs, missing medication orders, and other critical information

missing from the chart made it difficult or impossible to follow the patient's course of treatment.

See "Inadequate Medical Records," above.

At every facility I inspected, numerous prisoners complained of erratic delivery of their

mental health medications. The medical records I reviewed confirmed that prisoners frequently

do not receive their prescribed medications. Sometimes there is a note in the chart that the

medication is "not available;" in other cases, there is no explanation at all. A partial list of these

records is set forth below.

1.               ,        -Lewis-When I saw him he was on a 30-minute watch for erratic behavior. His chart documents worsening psychotic symptoms. Prior to this he had not received his medications for over a week. There are multiple chart entries about his not receiving his medications in the past. He has submitted multiple HNR's about this problem, with limited success. The most recent MAR in the chart is from April 2013. I am unable to determine which, if any, medications he's receiving.

2.               ,      -Lewis-He is diagnosed with PTSD/Depression for which he is supposed to take Risperdal and celexa. He states that he had not gotten his meds for over two months. There is no medication order section in his chart. The June MAR has five

27

blanks where meds were apparently not given. There is no July MAR in the chart. I am unable to tell which meds he is prescribed and if he is receiving them.

3.              ,     -Lewis-He is diagnosed with Mood Disorder, NOS. A chart note from 7/18/13 states, "IM reports he is out of his psych meds and has been for four months." There was no follow up to this note. There is no MAR for July 2013 as well as no psychiatric medication orders. Patient claims he hasn't seen a psychiatrist since his arrival at Lewis, which is confirmed by the chart.

4.              ,     -Perryville-She is SMI per the problem list and is prescribed Prozac. She submitted a HNR on 6/10/13 stating that she hasn't been getting her Prozac. The June MAR is not in the chart and the July MAR notes that she had missed several doses of her Prozac in July.

5.              ,     -Yuma-He has been ordered Haldol Decanoate but it is unclear from the chart if he has been receiving it. A "cell front" visit from 3/15/13 states "hasn't been getting meds for over two weeks" but there is no MAR to confirm or refute this.

6.              ,     -Yuma-I saw him while he was on a 30-minute watch for worsening psychotic symptoms and suicidal ideation. His chart is very disorganized and it is unclear what meds he's being prescribed. The MAR's from April and May 2013 note periods of more than a week when he wasn't administered his meds. There is an unsigned verbal order from 7/17/13, which lists Cogentin and Risperdal as his medications. A faxed order from 7/22/13 lists Paxil, Risperdal, Cogentin and Depakote as his medications. There is no July MAR to confirm or refute this fact. I am unable to determine which meds, if any, he's receiving.

7.              ,     -Yuma-He is diagnosed with Schizophrenia. He believes that he is prescribed Navane and Cogentin but there is no med order section in his chart. He has been at Yuma for over a month and has not seen a psychiatrist. His most recent visit with a psychiatrist occurred 3/28/13 in which meds were discussed but no orders written.

Non-delivery of prescribed psychotropic medications can be extremely dangerous. It can result in serious and sometimes irreversible worsening of the patient's mental illness. And as illustrated by the case described at p. 20, it can result in self-harm or suicide.

During my inspection tours, I observed additional problems with the distribution of medications. While some prisoners have medications delivered to their cells, others are required to line up at a distribution point to receive their medications, a process known as "pill call" or "med pass." During my visit to the Perryville facility, I asked to observe the med pass that was

28

scheduled for 10:00 a.m.    There were several delays, and the med pass finally began approximately an hour late. During this time, the women waiting for their medications were required to wait outside in the full sun. Several of the women told me that they sometimes refuse their medications because they are unwilling or unable to stand in the sun waiting for them. I also observed a med pass at the Tucson facility, where prisoners similarly told me that they will sometimes refuse their medications rather than wait for long periods in the extreme heat.

**Opinion:  Inadequate monitoring of prisoners taking psychotropic medication**

Patients taking psychotropic medication need to be monitored by a psychiatrist. The frequency depends on the clinical situation, but in no cases should it be any less frequent than every 90 days. ADC lacks a reliable system to ensure that prisoners taking psychotropic medications are meaningfully evaluated on a regular basis by a psychiatrist. In Dr. Shaw's August 13, 2012 memo he wrote that "Wexford's current level of psychiatry staffing is grossly insufficient" to meet the requirement that mentally ill prisoners receiving psychotropic medications are assessed face to face every three months. (Memo from Ben Shaw to Joe Profiri, Aug. 13, 2012, at ADC027770). He also noted that:

> Audit at Lewis on 8/5/2012 found that of the 10 charts evaluated, none (0%) had been seen by psychiatry provider in the past 30 days.
>
> Audit at Eyman on 8/6/2012 found that of the 20 charts evaluated, none (0%) had been seen by psychiatry provider in the past 30 days.

(Memo from Ben Shaw to Joe Profiri, Aug. 13, 2012, at ADC027771).

Similarly, in an August 13, 2012 memo to Mr. Profiri, Terry L. Allred, Compliance Monitor II, ASPC-Lewis, notes the resignation of the Chief Psychiatrist at Lewis, with no discussion of a replacement. (Memo from Terry L. Allred to Joe Profiri, Aug. 13, 2012, at ADC028113). Mr. Allred writes, "[t]his has led to the medical provider renewing [mental health]

29

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

medications which levels concern to the fact that they could go nearly 1 year in some cases without direct psychiatry intervention." (Memo from Terry L. Allred to Joe Profiri, Aug. 13, 2012, at ADC028113). In a February 3, 2011 email to her supervisors, Dr. Crews stated that some patients on psychotropic medications at Perryville "have not been seen for 6 months or longer." (Email from Tracy Crews to Ben Shaw, Feb. 3, 2011, at PLTF-PARSONS-000007).

The August 2013 MGAR reports confirm that prisoners taking psychotropic medications, including those classified by ADC as seriously mentally ill (SMI), are not being seen by a psychiatrist or even a psychiatric mid-level provider every 90 days. (Tucson 137650; Perryville 137564; Eyman 137480; Phoenix 137595). On 8/29/13, the ADC monitor noted that "Inmate was last seen 5/8/13 when psych meds were [discontinued]. Since that date, inmate has sent 4 HNR's asking for help and reporting he wants back on his psych meds. Inmate has yet to be seen." (Eyman 137480). On 8/29/13, the monitor noted "inmate doesn't appear to have been seen since 11/15/12" (Phoenix 137595). As of 8/29/13, one Lewis prisoner "has not been seen since 11/21/12;" another "more than likely has expired meds," and a third is "possibly SMI and really needs to be seen" (Lewis 137540-41). At Yuma on 8/29/13, the monitor noted a "SMI inmate with a [medication expiration] date of 4/20/13; inmate is likely without psych meds," and several similar cases. Yuma 137699. The monitor found several SMI prisoners at Florence who are "past due for psychiatry visit." (137509).

The September 2013 MGAR reports continue to show grave and highly dangerous deficiencies in this area. At Yuma, the ADC monitor observed that "many of the inmates' medications expired because they were not seen by Psychiatry to be renewed. Many of the inmates were also SMI. This poses a potential risk of serious harm to the inmate." (ADC 154398). At Tucson, the monitor noted that "[s]ome of the [Return to Clinic] dates were from as

early as last March and still had not been seen. This poses a potential risk of serious harm to the inmate" (ADC 154317). Shockingly, this problem exists even at Phoenix, the dedicated mental health treatment facility, where 4 of the 6 patients who were not timely seen were SMI. The ADC monitor pointed out that "[i]nmates at this Complex are there to receive more comprehensive MH services, and should not miss their required Psychiatry appointments." (ADC 154239).

The monitor noted many cases, at multiple institutions, of patients whose medications had simply been allowed to expire (e.g. ADC 154077, 154399). Of particular concern is the monitor's finding that many patients who were not timely seen, or whose medications were allowed to expire, were SMI and/or confined in maximum security units.

My record review similarly disclosed numerous prisoners taking psychotropic medications who were not seen by a psychiatrist every 90 days; in some cases, the intervals were far longer. It is also essential that a patient who discontinues psychotropic medication be closely followed by a psychiatrist in case the patient decompensates and medications need to be restarted. This was not done in cases I reviewed. Examples include:

1. ▉▉▉▉▉, ▉▉▉ -This patient has a history of being treated with Paxil and Risperdal. He began requesting to be put back on these meds on 5/20/13. As of the date of my visit, a psychiatrist still hadn't seen him. When I saw him he was on a 10 minute watch status for being on a hunger strike for unclear reasons.

2. ▉▉▉▉▉, ▉▉▉ -She is diagnosed with Psychotic Disorder NOS and was being treated with Haldol. This medication was stopped on 4/8/13 for unclear reasons. On 7/16/13 she was described as being "floridly psychotic." I saw her on 7/18/13 when she was on a 30-minute watch status and I noted her to be displaying delusional thought content. She began to decompensate after the Haldol was discontinued and was not seen for over three months. This lack of follow up resulted in her becoming floridly psychotic and needing to be placed on a watch status.

3. ▉▉▉▉▉, ▉▉▉ -She is diagnosed with Major Depressive Disorder with psychotic features and had been treated with an antipsychotic and a mood stabilizer. Her meds were stopped on 3/5/13 for unclear reasons. She was not seen again until 7/10/13. During this

31

hiatus, she became increasingly psychotic and depressed. This lack of timely follow up resulted in her decompensating needlessly.

## Opinion: Inadequate monitoring and management of medication therapeutic levels and side effects

Many psychotropic medications have side effects, some of which can be quite serious and, if not properly managed, can result in permanent damage to the patient. Accordingly, monitoring of and management of medication side effects is an essential element of mental health treatment.

ADC does not have an adequate system in place to monitor and manage medication side effects. During my inspections, I evaluated a number of patients who were obviously suffering from side effects that were not adequately managed and, in some cases, not noted in the medical chart. Examples include:

1. Jackie Thomas, 211267-He was being treated with Haldol Decanoate every 4 weeks. This amount of medication was causing him to be very sedated as well as causing significant Extra Pyramidal symptoms (EPS). Of note, despite being treated with this powerful medication and displaying significant side effects, he still had persistent auditory hallucinations.

2.          ,      -He was being treated with Thorazine and was displaying prominent EPS.

3.          ,      -He is diagnosed with Schizophrenia, Chronic, paranoid type and was being treated with Haldol. On my exam he was displaying akathesia, a very uncomfortable and potentially irreversible side effect. There is no indication from the chart that the treating psychiatrist was aware of this problem.

4. Sonia Rodriguez, 103830-She was prescribed a tremendous amount of Haldol Decanoate, 200 mg every 4 weeks. A review of the chart revealed that she was being treated for "A/V hallucinations." When I saw her she was so sedated that she was lying on the floor of her cell. When she was able to stand up I noted that she was displaying severe akathesia. I also noted from the chart that she only sees the psychiatrist every three months, which is inadequate in her case.

32

5.                   ,      -She is being treated with very high dose Haldol decanoate, 150 mg every three weeks, for unclear reasons. She displayed significant EPS upon my exam.

It is also critically important to monitor the blood levels of certain psychotropic medications, such as Lithium. If the level is too low, the patient will not receive the desired therapeutic effect; if it is too high, it can be toxic. ADC does not appear to have a reliable system in place to monitor and, when necessary, adjust medication levels. Patients whose medication levels were not adequately monitored include:

1.               ,      -Eyman-No psychiatric documentation that the patient is being treated with lithium. Lithium level of 0.2 (therapeutic range is 0.7-1.2) was obtained and no indication from the chart that anyone noted it or did anything about this very subtherapeutic level.

2.               ,      -Eyman-Most recent lithium level in the chart is from 11/30/12 which was 0.4. No follow up noted in the chart.

3.               ,      -Phoenix-She is diagnosed with Bipolar Disorder, NOS and was being treated with a variety of psychotropic medications including lithium. She was suffering from lithium toxicity (tremors, fatigue, confusion) for several months. She had to submit a HNR to get her symptoms evaluated. When she was finally seen her lithium level was 1.8 (which is in the toxic range).

4.               ,      -Phoenix-His chart was extremely disorganized so it was very difficult to follow the course of his treatment. Although the patient was being treated with lithium there were no medication orders in the chart or a progress note explaining why the patient needed treatment with lithium. He did have a lithium level on 5/22/13, which was in the subtherapeutic range (0.5). The psychiatrist noted this level but then did nothing about it.

## Opinion:  Inadequate access to care

ADC does not have a reliable means for prisoners to make their mental health needs known, and to have those needs met, in a timely manner by qualified staff. According to Dr. Shaw, the Health Needs Request (HNR) form is the primary means by which prisoners access

non-routine mental health care (Shaw dep., 104:1-11). Dr. Shaw wrote in his August 13, 2012 memo:

> At the Perryville-Lumley Unit 123 HNR's were found requesting to be seen by a psychiatry provider. These patients were waiting to be seen for up to 60 days. None of the patients had been seen or scheduled to be seen at that point in time.

(Memo from Ben Shaw to Joe Profiri, Aug. 13, 2012, at ADC027771).

Similarly, in ADC's September 21, 2012 letter to Wexford, the Department cited "untimely handling of Health Needs Requests." (Letter from Joe Profiri to Karen Mullenix, Sept. 21, 2012, at ADC027859). In a February 3, 2011 email to Dr. Shaw, titled "Please Help," Dr. Tracy Crews, then the psychiatrist supervisor at Perryville, wrote "[c]urrently, on most yards here, we are backed up 3-4 months with the HNRs and longer for regular follow-ups." (Email from Tracy Crews to Ben Shaw, Feb. 3, 2011, at 1 PLTFPARSONS-000007).

It is clear that untimely handling of HNRs remains a serious problem. The August 2013 MGAR for Tucson shows the following backlogs: HNRs, 439; charts requiring provider review, 252; nurse line, 317; provider line, 393 (ADC 137626). And HNRs for mental health services are not consistently being triaged within 24 hours of receipt (Tucson 137647; Lewis 137537). Even once the HNRs are triaged, patients not being seen within 24 hours of HNR being triaged (Tucson 137627; Perryville 137555; Eyman 137465; Phoenix 137583; Lewis 137525; Yuma 137684). At Florence patients are being seen as long as 24 days after placing an HNR, or not seen at all (Florence 137497). Sick call is not being conducted as scheduled (Tucson, 137626; Eyman, 137465). At Florence, "there was not evidence of sick call being conducted five days a week on [a]ny unit on Florence Complex" (Florence 137497).

Patients referred to a provider are not being seen within 7 days of referral (Tucson 137632; Perryville 137556; Eyman 137469; Lewis 137525; Yuma 137688; Florence 137499-

34

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

137500).  More specifically, patients referred to a psychiatrist or mid-level provider are not seen

within 7 days of referral; at Tucson, Dr. Taylor notes that "many of the delays between referral

date and date seen were extremely lengthy," and provides several examples.  (Tucson 137647).

Perryville (137562) and Eyman (137478) had prisoners who had *never* been seen after referral.

Lewis (137537-38) had patients, including some who are SMI, who had been referred in early

June and still not seen as of 8/29/13.  Yuma (137698) had SMI prisoners who had been referred

in February, March, and April and still not seen as of August 29, 2013.  Several SMI prisoners

were not timely seen at Florence (137508).

The September 2013 MGAR reports show that serious problems persist.  At Lewis, the

ADC monitor (writing on September 30, 2013) documented that "there were many inmates who

had still not been seen after being referred [to psychiatry] in June and July," as well as one

patient who was referred on 4/11/13 and not seen until 9/5/12 (ADC 154160).  She also cited a

9/5/13 note "in which clinician notes 'inmate desperately needs psych meds,'" but no referral to

psychiatry was documented (ADC 154161).  Similarly at Eyman, the monitor noted that "[m]ost

of the referrals [to psychiatry] were not simply just past 7 days, but still had not been seen.

Some of the referrals were from June and July and had yet to be seen [as of 9/30/13]" (ADC

154074).  She made similar findings at Tucson, adding that "[t]here is potential for serious harm

to the inmate." (ADC 154315).  At Yuma, "inmates were referred as early as December '12 and

still not yet seen, inmates were referred two and three times and still not yet seen, half of the

inmates were SMI, and in one instance the meds expired because the inmate was never seen after

being referred." (ADC 154395).

The problems detailed in the MGAR reports are consistent with my observations.  I saw

many records with HNRs pleading for mental health care, which were answered only after many

35



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

days, or not at all. Examples include:

1. ▮▮▮▮▮▮▮, ▮▮▮▮ -Lewis-He has a history of being treated with Paxil and Risperdal. He began requesting to be put back on his meds on 5/20/13. As of the date of my visit he still hadn't been seen by a psychiatrist. A psych associate saw him on 6/3/13 in response to his HNR submitted on 5/20/13. A psychologist saw him on 7/9/13 for a five-minute visit. His last visit with a psychiatrist was 9/19/12.

2. ▮▮▮▮▮▮▮, ▮▮▮▮ -Lewis-He was diagnosed with Mood Disorder, NOS, with no input from a psychiatrist. Upon arrival at Lewis, he had to wait 12 days to be seen by a psych associate. He has submitted multiple HNR's requesting to be seen by a psychiatrist but hadn't been seen as of the date of my inspection.

3. ▮▮▮▮▮▮▮, ▮▮▮▮ -Yuma-See summary in "Lack of Inpatient Care," below.

4. ▮▮▮▮▮▮▮, ▮▮▮▮ -Yuma-He is diagnosed with Psychosis NOS as noted in a treatment plan from 1/29/13 that was completed without any psychiatric input. A 3/1/13 Telepsychiatry faxed note stated that his follow up appointment was in five months (8/1/13.) Mr. ▮▮▮ submitted an HNR on 5/23/13 requesting "I need stronger meds; I need to talk to psych." The response to this HNR didn't occur until 6/4/13 and stated, "you're scheduled for telemed." In the progress note section of the chart I located a faxed medication order without a corresponding progress note that increased Mr. ▮▮▮ antipsychotic medication.

I also saw numerous referrals to a psychiatrist that did not occur within the indicated timeframe, or at all. Examples include:

1. ▮▮▮▮▮▮▮, ▮▮▮▮ Eyman. I evaluated this patient on 7/16/13. The most recent treatment plan was from 9/6/12 when he was diagnosed with Bipolar I Disorder and Schizoaffective Disorder. He was not receiving any medications because "they ran out of Lithium, Abilify and Benadryl." There were no medication orders in the chart. At the time of my evaluation he had been waiting over a month to see a psychiatrist.

2. ▮▮▮▮▮▮▮, ▮▮▮▮ -Eyman. At the time of my evaluation he was extremely psychotic and suicidal. There was a HNR in his chart dated 5/9/13 and he had been seen by a mental health provider on 7/16/13. Also, no evidence in that chart that he had been seen by a psychiatrist during this period. This is especially bothersome given the severity of psychotic and suicidal symptoms.

3. ▮▮▮▮▮▮▮, ▮▮▮▮ -Eyman. The most current treatment plan in his chart was from 12/26/12, which was completed without any input from a psychiatrist. At that time, he was diagnosed with Mood Disorder NOS. The only MD visit documented in his chart occurred on 3/18/13. This was a Telepsychiatry visit during which the patient was prescribed a low dose of an antidepressant medication. Upon my evaluation he presented as very depressed and

complaining of depressive symptoms. The patient has been waiting four months to see a psychiatrist.

My review also disclosed mental health crises that clearly called for the involvement of a psychiatrist, but no such involvement occurred.

1.       ,     -Lewis-This is an extremely cognitively impaired individual who is diagnosed with "Borderline IQ." He had six watch placements between 5/15/13 and 7/1/13 for self-harm (swallowing a screw and banging his head on the cell door.) At no time during these episodes of self-harm did a psychiatrist evaluate him. The only psychiatric involvement throughout this period was a note from 5/8/13 at which time the psychiatrist discontinued his medication.

2.       ,     -Phoenix-When I saw him he was on ten-minute watch status for refusing to eat. There is no evidence in the chart of any psychiatrist involvement. Last psychiatrist note is from 6/14/13.

**Opinion: Lack of Mental Health Programming**

An adequate correctional mental health care system must provide a full range of treatment modalities; a system that relies primarily or exclusively on medication does not provide an acceptable level of care. It is my opinion that the ADC mental health care system relies almost exclusively on medication (which it fails to provide reliably or appropriately), and does not provide an appropriate level of non-medication mental health programming.

I spent eight full weekdays inspecting seven ADC prison complexes, including the units where the most severely mentally ill prisoners are housed. At every facility, I was surprised to see little or no mental health programming. At the Eyman complex, I saw evidence of one group that had recently ended and spoke to two prisoners who had participated in the group and said that the groups routinely consist of them watching videos. At Perryville, I briefly witnessed 6-8 prisoners taking part in a group discussion with a psychologist. But with very few exceptions, I saw no programming taking place during my inspections. This is an extraordinary experience

37

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that I do not recall having in any other prison system.

I was told by ADC and Corizon staff that mental health treatment groups occur regularly, but when I asked for documentation, I was told that each prisoner's group attendance is documented in his or her medical chart. While some of the charts I reviewed contained sheets showing group attendance, these appeared to be pre-prepared, identical documents in which the prisoner's name was simply filled in. Even assuming the accuracy of these documents, the group participation they showed was infrequent and episodic. I also saw documentation showing that scheduled groups had been canceled due to lockdowns and other security issues.

Dr. Taylor testified that some groups are run by psychology technicians, who may have no formal education beyond a high school diploma. Taylor dep., pp. 176, 181. She also testified that no groups are currently available at the Perryville SMA. Taylor dep., p. 225. She did not know if mental health groups were currently running at Phoenix-Baker. Taylor dep., p. 239. Dr. Taylor testified to receiving a recent email stating that mental health programs at Florence-Central were not occurring as scheduled. (Taylor dep., pp. 160-61). Dr. Pastor, who I understand was designated by Corizon to testify about mental health treatment in ADC, was unable to describe any mental health programming that occurs in the isolation units (Pastor depo, pp. 82, 189).

I was also told that prisoners receive cellfront contacts from mental health staff. But the few cellfront contacts I witnessed lasted between three and five minutes, which is not long enough for meaningful mental health treatment. In addition, even lengthier cellfront contacts are of very limited value because the lack of confidentiality often inhibits patients from speaking freely about their symptoms.

At the Perryville facility, I spoke to a number of women enrolled in the Women's

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Treatment Unit Program (WTU).  While the women were positive about the program's benefits, it has significant limitations.  First, its enrollment is currently limited to eight women, a tiny fraction of the number of women in ADC with serious mental health needs.  Second, because it is located on a medium custody yard, women with higher custody classifications are ineligible.  Finally, all eight of the women currently in the program are stable on antidepressant medication.  The severity of mental illness among this group was significantly lower than that I observed in other areas of the Perryville facility.  Thus, while the program appears to be a positive experience for the few women able to enroll in it, it is not addressing the needs of the most seriously mentally ill.

ADC's monitoring reports confirm my observations, making clear that patients classified as MH3 and above, including those classified as SMI, are not being seen by non-psychiatrist mental health staff as required by policy.  At Eyman, multiple SMI prisoners were "past due for psychology visit;" one patient had not been seen by psychology since his arrival at Eyman more than 4 months previously (Eyman 137479).  Similarly at Florence, numerous SMI prisoners were "past due for psychology visit" (137509).  At Lewis, one prisoner "has not been seen by psychology staff since 2009" (Lewis 137539).  At the Phoenix facility, "80% of SMI charts pulled at [the Men's Treatment Unit] had not been seen as per policy."  (Phoenix 137594).  Similar problems were found at the Yuma complex (137699).

Dr. Taylor apparently shares my concern that ADC relies excessively on medication management to the exclusion of other essential treatment modalities.  In a monitoring report on the Tucson complex, Dr. Taylor wrote:  "I also have concerns that the inmates are receiving medication management and not other therapeutic interventions."  (Tucson 137649).  Similarly, in a report on the Perryville facility, she wrote, "Many of the mental health contacts were

39

completed by a psychiatrist and not a psychologist or psych associate. I have concerns about inmates only receiving medication management and not receiving other therapeutic interventions." (Perryville 137563).

The lack of non-medication treatment modalities can cause serious harm to patients. At the Yuma complex, I interviewed          , #          Mr.          told me that he is a combat veteran and suffers from Posttraumatic Stress Disorder (PTSD). His chart confirmed this diagnosis, and noted that he is classified as MH-4, denoting a high level of mental health needs. On June 13, 2013, the psychiatrist noted in his chart: "He has severe, agitated PTSD and should be on a unit that provides counseling services, which is not available at Yuma."

## Opinion:  Lack of inpatient care

An adequate correctional mental health system must provide the full continuum of care – from outpatient counseling and medication, through inpatient hospitalization. It is entirely foreseeable that the most severely mentally ill prisoners will require an inpatient level of care, and such care must be readily available.

Unfortunately, it appears that ADC lacks a reliable system to ensure that prisoners needing a higher level of mental health care are transferred in a timely fashion to appropriate facilities. During my inspection tours, I saw numerous patients who required an inpatient level of care, but were not receiving it. Examples include:

1.          ,          -Yuma-He carries the SMI designation and had recently been treated at the Flamenco unit at Phoenix. He is diagnosed with PTSD. A Telepsychiatry visit on 6/13/13 noted "severe agitated PTSD and should be on a unit that provides counseling services which are not available at Yuma." The patient has filed several HNR's asking for help which have all gone unheeded. Mr.          is a very sick individual who requires immediate transfer to an inpatient psychiatric unit.

2.          ,          -Eyman-He is diagnosed with Psychotic disorder, NOS and is described in the progress notes as being "loud and argumentative." He is being treated with high dose Haldol decanoate, 150mg every 4 weeks. Upon my evaluation, he was extremely

40

psychotic, shouting and cursing at me. He actually ran full speed into the Plexiglas door of his cell while I was standing there. He is very sick and a danger to himself. He requires immediate transfer to an inpatient psychiatric facility.

3. ▇▇▇▇▇▇, ▇▇▇▇-Perryville-She is an extremely psychotic woman who was on a "constant watch" at the time of my evaluation for banging her head. Of note, her most recent treatment plan was dated 9/19/11. There was a very brief psychiatric note on 6/26/13. When I saw her she was shouting incoherently at the walls of her cell. She is very impaired and requires an inpatient level of care.

Dr. Crews, former psychiatrist supervisor at Perryville, testified that she has "seen it take weeks" to get a prisoner transferred to ADC's mental health facilities in Phoenix (Crews dep., 117:1-13). Dr. Crews also testified that ADC policy bars prisoners classified as security level five, including Plaintiff Christina Verduzco, from being placed at Phoenix's Flamenco Unit, an inpatient facility with more intensive treatment (Crews dep., 136:20-137:19). Dr. Crews, who left Perryville in late June 2012, testified specifically about Ms. Verduzco, "we were trying to get her out there [Phoenix] for the last month or so that I was there." (Crews dep., 138:14-15). Flamenco is the only ADC inpatient facility available to female prisoners. (Shaw dep., 216:2-4). Dr. Crews agreed that Plaintiff Verduzco is in a "catch-22," in that she is ineligible for Flamenco, yet she is too unstable for Perryville's Women's Treatment Unit, which offers the treatment best suited to help her stabilize and manage her mental health condition. (Crews dep., 141:9-22). Dr. Taylor confirms that Flamenco is a Level Four facility, and a Level Five prisoner cannot be transferred there without an override. Taylor dep., p. 244.

More fundamentally, there is a serious question whether the Phoenix facilities are able to provide appropriate inpatient care. In her August 13, 2012 memo to Mr. Profiri, Helena Valenzuela, ADC Phoenix Complex Compliance monitor, noted a "[m]edical and [p]sychiatric nurse shortage on various shifts." (Memo from Helena Valenzuela to Joe Profiri, Aug. 13, 2012, at ADC028140). She also related an incident in which "an inmate had displayed a reaction to a

41

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

psych medication and nursing staff was unable to contact a psychiatrist. The nurse called 5 psychologists on the roster and none responded." (Memo from Helena Valenzuela to Joe Profiri, Aug. 13, 2012, at ADC028140).   It is surprising that the nurse would call psychologists, since they are not involved in any way with the administration of psychotropic medications or qualified to evaluate or treat adverse reactions to medication.  This is further evidence of scarcity of psychiatrists within ADC. Ms. Valenzuela notes several additional significant problems at the Phoenix facilities, including medical records that are "disorganized and incorrectly completed" and a lack of confidentiality during medical and mental health interviews. (Memo from Helena Valenzuela to Joe Profiri, Aug. 13, 2012, at ADC028141).

Finally, she states:

> I have requested a current programming schedule with specific group titles and scheduled times. No schedule has been submitted to me. I observe the Flamenco inmate group areas at various times during the day. *I occasionally observe inmates viewing TV explained to me as group mental health programming.*

(Memo from Helena Valenzuela to Joe Profiri, Aug. 13, 2012, at ADC028141 (emphasis added)). Needless to say, watching television is not group mental health programming, and it is disturbing that it is being represented as such at ADC's dedicated mental health facility.

As noted above, the staffing shortages, medication deficiencies, and access to care problems that pervade ADC exist at the Phoenix facility as well, significantly limiting its ability to care for the most seriously mentally ill prisoners in the ADC system.

During my inspection tours I heard several ADC staff refer to Baker unit as an inpatient facility, but it does not resemble any hospital that I have ever been associated with.  It was a prison with cells that had a small area that could be used for "treatment" and a large dayroom adjacent to the unit.  The patients on the Baker unit were fairly unremarkable for the severity of

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

their mental illness. I feel confident in saying that in that the majority of the inmates that we interviewed on the SMU and Kasson units were significantly more psychiatrically impaired than those in Baker. Thus, Baker is not being used to treat the most seriously mentally ill prisoners in ADC.

Interviewing several patients on the Baker unit it became clear that their "treatment" consisted of dayroom time, which consisted of being locked in individual cages and being allowed to watch TV for an hour or two a day. I did observe a psychological associate visiting her patients; the contacts took place at the cellfront and were in the range of 3-5 minutes, if that long. I saw no evidence of therapeutic groups occurring, and the patients confirmed that groups "haven't really gotten started yet." I agree with Dr. Stallcup, a psychologist at the Lewis complex, who told me, "Baker's not a psych hospital." One prisoner on Baker told me that "it's like a 5-yard," and "I want to get a ticket so I can go back to SMU where I have more privileges." (Austin Breshears, 214264). Mr. Breshears told me he had never attended groups since being at Baker, and there was no evidence of group attendance in his chart.

Flamenco Unit was notable for housing much more severely impaired inmates, although it was advertised as the less acute unit. Especially noteworthy was Plaintiff Dustin Brislan, whom I had evaluated at SMU on July 16, who had been transferred to Flamenco shortly thereafter. While at SMU I noted him to be extremely agitated and psychotic. He remained in this same state on the Flamenco unit, where he had been placed on a mental health watch status. Incredibly, his chart did not follow him from the SMU. Thus, at the time of my follow-up evaluation on July 19, he had been housed in Flamenco unit for three days without the benefit of his medical records. It is unclear to me if previous orders from the SMU were in effect, or if new orders had been written since he arrived at Flamenco, although I found no evidence of either.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

We toured a women's inpatient psychiatric facility located in the Flamenco Unit (George). As with the men, the women I observed and spoke with, although suffering from conditions such as major depression and anxiety disorder, were significantly less impaired than the women I had evaluated on July 18 at the SMA at the Perryville facility.

Touring the Aspen Unit revealed male prisoners who were significantly mentally ill, but I felt were appropriately housed in this less restrictive setting. This unit would be ideal for many of the inmates I had previously evaluated at other facilities, but because Aspen is a medium custody unit, many are unable to participate due to their custody level. This is not to say that the men on the Aspen Unit were not mentally ill; based on interviews and chart reviews, I found inmates routinely being treated with multiple psychotropic medications for psychotic disorders as well as serious mood disorders.

In summary, it appears that the Phoenix facility suffers from the same deficiencies that infect other aspects of the ADC mental health care system, and is not being used to treat those prisoners who require an inpatient level of care. Many prisoners who desperately need inpatient treatment are instead housed in other units, frequently in highly restrictive conditions of 22-24 hour lockdown.

**Opinion:  Inadequate treatment plans**

An adequate treatment plan is the foundation of minimally effective mental health treatment. A treatment plan must be formulated by the key members of the treatment team; it must be regularly updated to reflect changes in the patient's condition; and it must be readily accessible when treatment is rendered.

The treatment plans I reviewed in ADC do not meet minimum standards. In most cases the plan reflected no involvement by or input from the psychiatrist. If the patient's treatment

44

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

includes psychotropic medication – which was the case in virtually every chart I reviewed – this is a serious omission.  More generally, the treatment plans were often incomplete, with key information missing; out of date; or simply missing from the chart altogether.

ADC's monitoring reports confirm that treatment plans, including those for prisoners classified as SMI, are not completed, not updated, or missing entirely (Tucson 137648; Perryville 137563; Eyman 137479; Phoenix 137594; Lewis 137538; Yuma 137698; Florence 137508). ADC 154316 (Tucson Sept. 2013) (noting that of "the charts out of compliance, all but one were either SMI inmates or they simply did not have a treatment plan at all (not just needing an update").  Dr. Taylor confirmed in her deposition that the treatment plans for SMI prisoners are not reliably reviewed every 90 days, as required by policy.  Taylor dep., pp. 274-75.  This problem was also noted by Wexford ("required mental health treatment plans were infrequently developed and/or updated") (Wexford 0094).

**Opinion:  Risk of Heat Injury or Death**

It is a well-established medical fact that mentally ill individuals are at greater risk of suffering serious heat-related health problems.  These problems include heat exhaustion and heat stroke.  These are conditions in which the body's temperature-regulating system breaks down and internal body temperature rises, sometimes causing irreversible brain damage and organ system failure.  The death rate for heat stroke ranges from 10% to 75%, depending on several variables, including how promptly treatment is sought.

The mentally ill are a high-risk group due to several factors.  Their cognitive functioning is often impaired, which can prevent them from taking adequate precautions to protect themselves from heat-related health problems.  Also, some of the symptoms of heat-related health problems such as feeling poorly, irritability, anxiety, and confusion can also be seen in a

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

variety of mental illnesses. This often results in the mentally ill not even appreciating that they are suffering from heat-related health problems.

Another extremely serious risk factor that places the mentally ill at greater risk of suffering from heat-related problems is the use of psychotropic medications. Many medications used to treat mental illness increase the risk of heat-related health problems. Antipsychotic medications impair the body's ability to regulate its own temperature. Antipsychotic, antidepressant and anticholinergic medications all impair the body's ability to perspire and hence cool itself off. Lithium causes significant fluid loss that can exacerbate heat-related health problems. Finally, a common side effect of psychotropic medications is sedation. All of these factors combine to place the mentally ill, especially those treated with psychotropic medications, at significant risk of suffering from heat-related health problems, including serious injury and death. Unfortunately, this risk has already come to fruition in the Arizona Department of Corrections; Dr. Crews testified about a prisoner taking psychotropic medication who died of heatstroke (Crews dep., 103:5 - 104:3). For all of these reasons, protection from heat injury is an essential element of the proper use of psychotropic medications to treat mental illness.

Heat-related health problems are completely preventable. At-risk individuals, including those taking psychotropic medications, should be housed in areas where the ambient temperature does not exceed 85 degrees Fahrenheit. Even in this relatively cool environment, at risk individuals should have unlimited access to cold fluids. The temperature of the fluids is important as the body absorbs cooler solutions faster. Cold water is the best type of fluid replacement. Other fluids, like Gatorade, should also be provided as they contain electrolytes that are lost as a body perspires. Humidity is also an important variable, since higher humidity reduces the body's ability to cool itself through perspiration. Patients taking these medications

46

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

should be counseled on heat risk, and staff who work with at risk individuals should receive special training in the recognition and treatment of heat-related health problems.

It is critically important that correctional facilities have in place effective policies to ensure that prisoners on psychotropic medications are protected from dangerous heat levels in their housing units. For example, by court order, the Maricopa County Jail requires that prisoners taking psychotropic medications be housed in areas where the temperature does not exceed 85 degrees Fahrenheit.  By contrast, ADC has no policy specifying temperature limits for areas housing prisoners taking psychotropic medications. (Plaintiff Dustin Brislan's First Set of Requests for Admission (Nox. 1-78) and First Set of Interrogatories (Nos. 1-2) to Defendant Charles Ryan *and Defendant Charles Ryan's Answers Thereto*, Sept. 24, 2012, at Req. for Admis. No. 33).  Dr. Crews testified that Perryville did not keep a master list of prisoners on psychotropic medications to ensure that they would not be housed in hot temperatures (Crews dep., 100:2-11).

I conducted expert inspections of several ADC prisons during July 2013.  I found the heat in the housing areas to be stifling, and saw obvious signs that both prisoners and staff were suffering from its effects.  I have never encountered as many complaints from prisoners about extreme heat as I did during these inspections.

I was informed by plaintiffs' counsel that my request to bring a thermometer on my expert inspections was denied by defendants' counsel.  Therefore, I do not know the exact temperatures in the housing units I visited during my inspections, although given the extreme heat I experienced I believe it to be very likely that they exceeded 85 degrees Fahrenheit on many occasions.  It is my opinion that accurate temperature readings from ADC prisons are important for assessing the risk of heat injury and death to prisoners who are taking psychotropic

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

medications.

I have reviewed the temperature data provided by the defendants in this case. Although the data are fragmentary and incomplete, they are sufficient to show that ADC prisoners taking psychotropic medications are at grave risk of heat injury or death. Six of the seven prison complexes I inspected had multiple temperature readings over 85 degrees; some had readings well over 90 degrees, and some readings were 100 degrees or higher. Defendants' First Supplemental Response to Plaintiff Sonia Rodriguez's First Set of Interrogatories (throughout); see also, e.g., ADC140732, 140919, 142764 (Perryville), 142852 (Tucson), 140383 (Eyman). These temperature levels are extremely dangerous to persons taking psychotropic medications.

The seventh prison complex I inspected was ASPC-Florence which, according to defendants, "does not track indoor temperatures." Defendants' First Supplemental Response to Plaintiff Sonia Rodriguez's First Set of Interrogatories, at p. 30. This is extremely concerning to me. ASPC-Florence is a large prison complex, housing hundreds of prisoners who are prescribed psychotropic medications. During my inspection of ASPC-Florence, the heat was almost unbearable, and it was apparent that both prisoners and staff were suffering from its effects. At one point I entered an empty cell and stood for about 5 minutes, at which point I had to rush out because it was so uncomfortable I began to feel ill. I find it shocking that absolutely no effort is made to monitor temperatures, and the accompanying risk of injury or death to prisoners who are taking psychotropic medications.

Also disturbing is that ASPC-Lewis formerly monitored indoor temperatures, then inexplicably appears to have stopped doing so. While the defendants supplied 2012 temperature data from that prison, I am informed that they claim to have no such data from the summer of 2013. See Defendants' First Supplemental Response to Plaintiff Sonia Rodriguez's First Set of

48

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Interrogatories. Lewis, like Florence, is a large prison complex housing many hundreds of prisoners taking psychotropic medications. Given that the 2012 readings showed dangerously high temperatures, it is baffling to me that responsible prison administrators would simply stop taking these measurements.

I am also very concerned to learn that temperatures at ASPC-Phoenix regularly exceed 85 degrees. ASPC-Phoenix is ADC's dedicated mental health facility; it is thus entirely foreseeable that a very large proportion of its prisoners will be taking psychotropic medications. The absence of effective climate control at ASPC-Phoenix poses a grave risk of harm to these prisoners.

Finally, both my interviews and my chart reviews confirmed that ADC prisoners taking psychotropic medications are not routinely counseled on the risk of heat injury or death, how to recognize its symptoms, and how to protect themselves.

**Opinion: Lack of Language Interpretation for Mental Health Treatment**

Accurate mental health diagnosis and effective mental health treatment require accurate communication between the patient and the provider. The patient must be able to describe his or her emotional and cognitive state, and the provider must be able to observe often subtle cues in the patient's speech. It goes without saying that such communication requires a common language.

During my inspection of ADC prisons, I encountered a large number of prisoners who spoke Spanish and appeared to speak little or no English. Because I am fluent in Spanish, I was able to communicate effectively with these prisoners in that language. But I am concerned that ADC has no system for providing effective, qualified, confidential interpretation for mental health diagnosis and treatment.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I am particularly concerned about ▮▮▮▮▮▮▮▮, ▮▮▮▮ I saw Mr. ▮▮▮▮ ▮▮▮ in the maximum security portion of the minors' unit at ASPC-Tucson. He was 17 years old. At the time that I saw him, he was on continuous suicide watch, and had been stripped of all his clothes. When I interviewed him, he pointed to an exposed sprinker fixture in his cell and said "I could kill myself."

I interviewed Mr. ▮▮▮▮▮▮ in Spanish, and his record confirms that he does not speak English. His record further shows that he has an IQ of 75, indicating a poor to very poor range of intellectual functioning. He has been diagnosed with psychotic disorder NOS, and in the months prior to my visit had been repeatedly placed on watch for mental health reasons, including expressing a desire to kill himself.

Despite his serious illness and vulnerability, I saw no indication that ADC has taken steps to ensure that Mr. ▮▮▮▮▮▮ is able to communicate effectively with mental health staff. His record specifically refers to mental health staff having difficulty communicating with him due to the language barrier.

There are also multiple references to mental health staff using corrections officers as interpreters to communicate with Mr. ▮▮▮▮▮▮. This is highly inappropriate for a number of reasons. As a threshold matter, using custody staff necessarily results in inappropriate disclosure of confidential health care information. Dr. Pastor testified that using corrections officers to interpret for mental health treatment would be inconsistent with Corizon policy, as "that is an issue of patient confidentiality." (Pastor dep. at 39).

The presence of custody staff may also cause the patient to self-censor or alter his or her communications with the provider, depriving the provider of critically important information. For example, if a patient is bothered by intrusive thoughts of harming or killing corrections

50

officers, he is unlikely to disclose that to his mental health provider in the presence of a corrections officer.

More fundamentally, as mentioned above, a mental health provider must make very subtle assessments, such as whether a patient is paranoid or attending to internal stimuli, and whether his or her thoughts are tangential. This requires an interpreter who is not only fluent in both languages, but is also specifically trained in interpretation, including specialized psychiatric vocabulary.

When I asked Dr. Shaw to what extent ADC employs mental health staff who are able to communicate in Spanish, he said he did not know. And ADC apparently has no system in place to ensure that those who provide interpretation for mental health purposes meet any kind of minimal qualifications or receive any kind of training. This is an inappropriate and dangerous practice that creates a risk of serious harm to patients, as inaccurate interpretation can result in critically important information being distorted or lost.

I note that this problem is apparently not limited to mental health treatment. An ADC monitoring report refers to a Spanish-surnamed prisoner whose scheduled chronic care did not occur "due to IM not speaking English" (Tucson 137636).

**Opinion: Inadequate Suicide Prevention**

One of the most critical functions of a prison mental health system is the prevention of suicide. In his deposition, Dr. Shaw acknowledged "a serious gap in our ability to provide suicide prevention." (Shaw dep., 284:24 – 285:3). I agree with Dr. Shaw that there are serious deficiencies in ADC's suicide prevention policies and practices, and believe that these systemic policies and practices pose a substantial risk of serious harm to ADC prisoners.

According to ADC discovery responses in this case, the prison system had six suicides in

51

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

all of 2012.  As of October 21, 2013, there have been nine thus far this year.  Assuming that ADC has no additional suicides this year (and assuming an ADC prisoner population of 40,000), this yields an annual suicide rate of 22.5 per 100,000 prisoners, which is well above the national average for state prisons of 16 per 100,000 (140136).

Particularly concerning is that there were three suicides at ASPC-Eyman alone in an eighteen-day period between April 22 and May 10, 2013.  (See Defendants' Response to Plaintiff Wells' First Set of Interrogatories, at p. 2.)  A fourth suicide occurred at Eyman on June 19, and a fifth on October 21, 2013.  (Inmate Death Notifications 6/19/2013, 10/21/2013; Media Advisory: Pinal County Medical Examiner Releases Report on Hausner's Death, 7/11/2013.)  Five suicides at a single institution in six months is an extraordinary level of lethality, and is indicative of serious deficiencies in ADC's suicide prevention practices.

It appears that ADC fails to ensure that correctional staff conduct regular security checks on prisoners.  Such checks are essential to ensure that suicidal behavior is detected promptly so that suicides can be prevented.  ADC's investigation of the suicide of K.P. at Florence-Central Unit revealed that required checks at 2:00 and 3:00 am were not conducted, although an officer falsified records to indicate that they were. (Memo from O. Valencia to Warden Hetmer, Mar. 26, 2012, at ADC026944).  The prisoner was found hanging at 4:56 a.m. that same day. (Id.).  And an investigation into the suicide of prisoner D.M. at Lewis-Rast Unit showed that a corrections officer failed to perform the required hourly security checks after coming on shift at 6:00 a.m.; the prisoner was found hanging at 11:10 a.m. (Letter from Deputy Warden McCarville to [redacted] Alcaraz, Apr. 27, 2011, at ADC025768).

There are significant problems with ADC's use of suicide watch. If a prisoner is placed on watch because he or she is believed to be at risk of suicide, it is critically important that the

watch be supervised by qualified mental health staff. However, ADC policy does not require that a prisoner on suicide watch be evaluated face-to-face by a psychiatrist (Shaw dep., at 164:15-19). In addition, ADC policy allows a prisoner to be taken off suicide watch by an unlicensed mental health staff member (Shaw dep., at 234:12-235:16). The decision to remove a prisoner from suicide watch is one of the most significant decisions prison mental health staff make; it should be entrusted to highly trained, licensed mental health professionals.

Moreover, prisoners who are placed on watch specifically because of suicidal behavior, or for other mental health reasons, are not adequately monitored by custody staff. During my inspection tours I spoke with and observed numerous prisoners who were, in theory, on "10-minute watch." In numerous cases at multiple institutions, I observed from the log sheet posted outside the watch cell that the prisoner was, in fact, not being checked every ten minutes. In many cases, the delay between checks was far longer. Dr. Taylor testified that this is a violation of policy. Taylor dep., p. 188-89.

The dangers caused by inadequate watch practices are illustrated by the case of ████████ , DOC No. ████ In August 2012, he attempted suicide while housed at Florence-Central Unit. Several days later, he attempted suicide again, this time while on 10-minute watch. It is very disturbing that Mr. ████ was able to attempt suicide while ostensibly on a 10-minute watch. Dr. Taylor wrote in an email, "It will be important to gather all the information about what happened last night as this inmate was being maintained on a 10-minute watch," and "I will be following up with Security to determine how such an incident could have occurred while on 10-minute watch." (48221-22). However, during her deposition, Dr. Taylor was unable to recall what, if anything, she learned from Security about this incident (Taylor dep., 186-87).

53

Another example is _____, _____ an SMI prisoner. On April 5, 2013, he submitted an HNR saying "I'm going to kill myself." Despite this clear statement of suicidal intent, he was not placed on watch until four days later, on April 9, and his first contact with mental health staff was April 10.

According to an April 29, 2013 progress note in his chart, _____, _____ told staff that he had been sexually assaulted. (ADC 137052). There was no apparent mental health follow-up other than placing him on watch. Sexual assault is a well-known precipitator of suicide in a prison setting. While placing Mr. _____ on watch was appropriate, there should have been much more extensive follow-up by mental health staff.

Finally, it is important to note that virtually all of the deficiencies in mental health treatment detailed in this report increase the risk of prisoner suicide. As illustrated by the incident described at p. 20 above, when prisoners do not reliably received their prescribed mental health medications, they may decompensate to the point where they attempt to kill themselves. Similarly, inadequate ability to make one's mental health needs known; inadequate monitoring by psychiatrists and other mental health staff; lack of mental health programming; and the unavailability of inpatient mental health treatment for those who need it all increase the risk of suicide.

A number of prisoners who committed suicide received inadequate mental health care, which might have contributed to their death. In her deposition, Dr. Taylor testified about a prisoner who had been without his medications for eight days, and then hanged himself. She added, "[h]e was refusing [his medications], and potentially had that information been given to the mental health staff, he might have been placed on watch, he might have been forced medicated and he might not have done that." Taylor dep., pp. 71-72. She described another

54

suicide in which the prisoner had not been seen by mental health staff within 30 days, in violation of policy. Taylor dep., pp. 74-75.

### ████████, ADC ████

I reviewed the records of ████████, ADC ████ A review of his records reveals that the lack of timely and appropriate psychiatric care directly contributed to his suicide on ████. An overview of his condition prior to his suicide shows that he was psychotic in that he felt that there were ghosts in the prison and that the world would end in May 2012. He was refusing to eat or drink and was noted to be smearing his feces on the walls of the safety cell. These symptoms were noted as early as March 29, 2012. He was found in his cell on ████ with a knotted sheet around his neck without a pulse.

The patient was seen by a psychiatric nurse practitioner on 4/19/12 when he received a diagnosis of "rule out psychosis and mood disorder not otherwise specified." Medications were not considered at that time but a PMRB (involuntary medication process) would be accomplished if he continued to not eat or drink. A psychiatrist saw him briefly on 4/26/12. The psychiatrist felt that the patient was manipulating and was not delusional. This assessment by the psychiatrist is especially curious given that a week later he pursued a PMRB and initiated treatment with the antipsychotic medication Haldol. Of note, the patient did not receive any psychiatric follow up until 6/7/12, nearly 5 weeks after the initiation of treatment with antipsychotic medication. At that time he was seen by the nurse practitioner. As noted above, the patient was found dead in his cell three weeks later.

There are many serious problems with the care that the patient received prior to his suicide. Other than one brief visit, the psychiatrist never fully evaluated the patient. Of note, the psychiatrist began treatment with the antipsychotic, Haldol, without fully evaluating the patient.

At no time was a transfer to an inpatient psychiatric hospital considered. This is despite the fact that the patient was delusional and gravely disabled. Finally, even after medications were begun, the patient did not receive a timely follow up. That is, he went five weeks on the medication without being seen by any psychiatric practitioner. This is an excessive amount of time given his clinical condition and the fact that a new medication had been initiated. This death was completely avoidable. The lack of timely and appropriate psychiatric care directly contributed to this death.

█████████, █████

Mr. █████ was a chronically mentally ill individual who carried the diagnosis of Schizophrenia, Paranoid Type prior to being incarcerated in the ADC. On intake, 9/30/11, he stated his diagnosis was paranoid schizophrenia and that he had been off medications for 2 months. He was referred to mental health but was not seen or evaluated until he became suicidal due to paranoid ideation about being hurt by other inmates on 10/7/11. He submitted an HNR to resume his medications on the day of his safety watch and was told that doctors don't prescribed "sleeping meds". He was placed on a total of 3 safety watches for suicidal ideation over the course of the next month without once being evaluated by a psychiatrist or psychiatric NP. Referrals were made but he was not seen until 11/3/11. During the period, 10/7/11 through 11/3/11, he was noted to be acutely symptomatic with intermittent periods of confused sensorium, impaired concentration, depressed mood and bizarre and tangential thought processes.

In his assessment, the MD documented that Mr. █████ may be seeking sedating medications versus suffering from schizophrenia. The medical diagnosis of "thin" was given and in medical records he was noted to have "wasting syndrome" and was extremely cachectic. He

56

was given a diagnosis of polysubstance dependence and a rule out of cognitive deficits. Despite 3 weeks of intermittent psychotic thought processes, paranoia and suicidal ideation, and despite displaying intermittent altered sensorium with severe cachexia, no medical workup was ordered. He was given Prozac 20mg with follow up in 5 weeks. There was no consent form signed for the Prozac. Despite being acutely suicidal 3 times and displaying acute psychotic symptoms on mental status examination, he was not referred for hospitalization or followed by a psychiatrist on a regular basis.

On 11/7/11, he reported swallowing a piece of metal. He was not medically evaluated until 11/9/11 and there was no documentation of any intervention taken. He requested to see a psychiatrist as soon as possible on 11/10/11. Despite stating he swallowed a foreign object because he was depressed, he was not evaluated by a psychiatrist. He continued to endorse "paranoid thoughts", suicidal ideation and depression and despite continuing to be on safety watches, he was not seen by a psychiatrist until 11/25/11.

On assessment, the MD does not document or otherwise seem to know that Mr. ████ was currently on Prozac. He appeared to be acutely psychotic and was given the diagnoses of psychosis and mood disorder NOS. He was started on Risperdal for psychotic symptoms and Benztropine (Cogentin) to prevent EPS. Consents were documented. No labs, vital signs or medical conditions were documented. He was given a follow up of 12 weeks with the MD despite just initiating new medications and presenting with severe and acute symptoms. He was assessed again in 2 weeks by the MD and started on Zoloft instead of Prozac for depression. Consent was documented. Again he was noted to be "confused" and no labs or medical workups were initiated. Follow up is given at 12 weeks, an inappropriate time given his degree of dangerous, suicidal behaviors and psychotic symptoms.

57

He continued to swallow foreign objects and intermittently displayed paranoid ideation, disorganized thought process, suicidal ideation and depression. On 1/26/12, he becomes severely psychotic with paranoid delusions and was placed again on safety watch. A psychiatrist did not assess him until 2/17/12, nearly one month after the onset of severely worsening psychotic symptoms. At that time, Risperdal was increased and he was started on Benadryl for agitation. Follow up was given at 4 months despite severe psychotic symptoms and documented self-injurious behaviors.

There was no medical workup for his severe cachexia and altered sensorium. Letters written by Mr.  demonstrated severely disorganized thought processes, delusional thought content and possible grandiosity. He was seen by medical staff on 2/17/12 for cachexia and given a diagnosis of "Wasting syndrome."

Mr.  hung himself on . It is my opinion, which I hold to a reasonable degree of medical certainty, that the extremely poor psychiatric care he received directly contributed to his suicide. His death was completely preventable.

## Opinion: Inappropriate Use of Isolated Confinement on the Mentally Ill

Isolated confinement – that is, confinement in a cell for 22 or more hours each day with limited social interaction and environmental stimulation – can be profoundly damaging to mental health even for prisoners with no known mental illness. For those with serious mental illness, such as psychotic disorders and major mood disorders, it can be devastating, leading to severe deterioration in mental health, self-harm, or suicide. For these reasons, the American Psychiatric Association has declared that "prolonged segregation of adult inmates with serious

58

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates." "Prolonged segregation" is defined as "duration of greater than 3-4 weeks."[2]

These facts appear to be well known to ADC; Dr. Crews, psychiatrist supervisor at Perryville, testified that "[a] person who doesn't have mental illness being isolated for long periods could develop mental illness or mental illness symptoms from being isolated," and that "almost all" mental illnesses can be exacerbated by long periods of isolation (Crews dep., at 127:3-14). Yet Dr. Shaw testified that there is no ADC policy barring the housing of prisoners with serious mental illness in isolated confinement, and that such prisoners are currently housed in SMU 1, Browning, Florence-Central, Florence-Kasson, and Perryville-SMA. (Shaw dep., at 135:21- 137:2).

I inspected all of these units, and was very concerned to see significant numbers of seriously mentally ill individuals who were actively psychotic and agitated, who did not appear to be either receiving treatment or responding to treatment upon clinical evaluation. These were extremely sick people, who are at grave risk of exacerbation of their illness as a result of the harsh conditions of their confinement.

I have reviewed the declarations of Plaintiffs who suffer from serious mental illness and who have been housed in isolated confinement in ADC. The experiences they describe – including exacerbation of symptoms, paranoia, and hallucinations – are typical of the reactions I would expect from seriously mentally ill persons exposed to these conditions.

It is a well-established fact that cell confinement for 22 or more hours a day negatively affects prisoners with serious mental illness. This occurs in two different ways. First, prolonged cell confinement contributes to a worsening of the individual's underlying mental illness.

---

[2] American Psychiatric Association Official Actions, *Position Statement on Segregation of Prisoners With Mental Illness,* Approved by the Board of Trustees December 2012.

Second, it can cause the onset of new symptoms of mental illness. A common example is that prolonged cell confinement for someone suffering from major depressive disorder would likely cause the prisoner to develop psychotic symptoms such as paranoia or auditory hallucinations. The standard of care for the seriously mentally ill is that they receive a minimum of ten hours a week of unstructured, out of cell activity, such as yard or dayroom time, and an additional ten hours a week of structured out of cell therapeutic activity. It is apparent that this standard is not being met in the ADC, where many prisoners in the isolation units receive only six hours a week of out-of-cell time.

During my inspection tours, I saw many prisoners in the isolation units who were obviously seriously mentally ill, and were experiencing harm from this. Examples include _____, _____, and _____, all of whom are discussed elsewhere in this report. They should be not be housed in these units, where conditions are only making them worse.

## Opinion: Inappropriate Use of Chemical Agents on the Mentally Ill

ADC policy permits the use of chemical agents (such as pepper spray) on prisoners while they are on suicide watch or other mental health watch, or when they are engaging in self-harm. (Shaw dep., at 130:20-131:10). ADC policy also permits the use of chemical agents on prisoners who are seriously mentally ill (Crews dep., at 114:5-8) and those who are taking psychotropic medications. (Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2) to Defendant Charles Ryan *and Defendant Charles Ryan's Answers Thereto*, Sept. 24, 2012, at Req. for Admis. No. 38 - 43).

The use of chemical agents on prisoners with mental illness can be extremely harmful and is contraindicated with these patients. It can increase fear, paranoia, and mistrust; inflict

60

lasting psychological damage; aggravate the symptoms and severity of mental illness; and reduce the chances of successful mental health treatment in the future. It can also increase the risk of self-harm or suicide. For example, ████████████, ADC ██████ was pepper-sprayed just weeks before his suicide. ADC 89320. (See "Inadequate Suicide Prevention," above).

In many cases, the mentally ill prisoner against whom chemical agents are used will be in an acutely psychotic state. He or she may be unable to comply with or even comprehend custody directives because of a psychotic or delusional state. In these circumstances, the behavior that prompts the use of chemical agents -- disobedience to custody commands – is a direct result of the prisoner's mental illness.

In almost all cases, the use of chemical agents on prisoners with mental illness can be totally avoided by appropriate mental health care. At the first sign of a patient decompensating, appropriate mental health intervention should be utilized to prevent worsening of their underlying condition. If the prisoner is failing to comply with custody directives, mental health staff should be called to speak with the prisoner, both to attempt to persuade the prisoner to comply and to assess whether the prisoner's behavior is a symptom of his or her mental illness.

Mr. Fizer testified that chemical agents are used "almost daily" at Florence Central unit, including for the purpose of stopping a prisoner from engaging in self-harm. Fizer dep., p. 193. It is hard to think of a more compelling example of the dysfunction of ADC's mental health care system than the use of chemical agents on prisoners who are self-harming. The use of pepper-spray when someone is engaged in self-harm is completely contraindicated.

I reviewed reports regarding the use of chemical agents at the Eyman, Florence, and Perryville complexes and am profoundly disturbed by what I found. Chemical agents are

61

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

routinely being used against desperately mentally ill people with little or no apparent

justification, under circumstances that pose an extreme risk of serious harm. Examples include:



> Chemical agents were used on at least three occasions against               ,
>            for "ignor[ing] verbal directives." ADC 89247, 89254, 89258. As I
> describe elsewhere in this report, Mr.            is an extremely mentally ill
> individual, and the repeated use of chemical agents poses a grave risk of harm.
>
> Chemical agents were used against               ,            because she was
> banging and yelling in her cell. "The subject ignored verbal directives and hid
> under her bed, so staff deployed chemical agents." ADC 89363. Ms.        is
> profoundly mentally ill, and this treatment risks further exacerbating her
> condition.
>
> Chemical agents were used twice against Christina Verduzco, 205576, for
> "refusing directives to come to the cell front for pill call." ADC 89367. That the
> response to a seriously mentally ill woman's hesitation to take her medication
> would be to pepper spray her is beyond belief. This is one of the most egregious
> examples of mistreatment I have ever seen.
>
>               ,            "was placed on a 10-minute mental health watch for
> monitoring of unusual behavior. Staff deployed chemical agents when
> refused staff directives to submit to a strip-search." ADC 89319. This seriously
> ill man was being placed on watch because of concerns about his mental health.
> If indeed he was experiencing a psychotic break or other mental health crisis,
> pepper spraying him at this moment of maximum vulnerability would likely
> inflict serious and lasting psychiatric harm.
>
> A corrections officer "observed                          . . . hanging from a woven
> sheet in his housing location. Staff deployed chemical agents when the inmate
> failed to follow verbal directives." ADC 89334. It is shocking that the officer's
> first response upon finding Mr.        hanging was to pepper spray him. In
> addition to the obvious and gratuitous cruelty of this act, Mr.        breathing
> was already compromised by hanging. By further impairing his ability to breathe,
> the use of pepper spray posed a serious risk of injury or death.

In none of these incidents was there any indication that mental health staff had attempted to talk

to the prisoner before chemical agents were used.

I was also very disturbed to see chemical agents being used frequently in Florence-

Kasson Unit. The routine use of chemical agents in what purports to be a mental health unit is

both extremely harmful, and a sign that appropriate mental health care is not being provided.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The use of chemical agents in a mental health unit can not only harm the prisoner who is the direct target, but can also seriously traumatize other mentally ill prisoners in the unit.

ADC's use of pepper spray on prisoners with mental illness – both in response to self-harm and under other circumstances -- appears to be another symptom of the systemic lack of adequate mental health care.

## Opinion:  Inappropriate use of psychiatry via videolink

Telepsychiatry can be an effective method of providing mental health services if certain protections are in place.  As with any mental health treatment, the patient must be able to give informed consent to receiving care via telepsychiatry.  The setting must be one that ensures confidentiality for the patient.  The provider must receive training about the availability and reliability of the medication distribution system.  This is very important in that the provider has to be confident that his or her medication orders will be carried out in a timely manner and that the patient will in fact receive the prescribed medication.  The provider must be kept informed about patient non-compliance and the emergence of any untoward side effects as they occur, and not have to wait until the next visit to address these issues.  The provider also must have intimate knowledge of the mental health system within which he or she is working.  That is, he or she must know what type of emergency or inpatient services are available.  The provider must have access to the patient's entire medical record, preferably in an electronic format, so as to base his or her medical decisions on the patient's actual medical history and not some abbreviated version that they might receive from the patient.  This point cannot be emphasized enough.  Also, medications are just one part of a patient's overall treatment and as such the psychiatrist must be able to participate in the overall treatment planning.  This is especially important given that the

psychiatrist is the most highly trained mental health professional on the treatment team and should have direct input into the patient's course of treatment.

It is apparent that ADC's use of telepsychiatry is not accompanied by these safeguards. While touring CB1 at ASPC-Florence, it came to my attention that every patient I spoke to who was being prescribed psychotropic medication was having visits with the psychiatrist via videolink. Dr. Shaw informed us that the patient is brought to the videolink accompanied by a member of the nursing staff. They then are hooked up with the psychiatrist in some remote location (often his or her home) where they spend a few minutes with the doctor via videolink. The prescribing psychiatrist does not have the chart during the evaluation and the medication follow-up.

In reviewing medical records of individuals who were receiving their medications via videolink, I found evidence of faxed medication orders as well as faxed progress notes from the prescribing physician. This confirms what Dr. Shaw told us about the prescribing physician not having the chart in front of him or her when seeing the patient.

Dr. Shaw informed us that psychiatry is provided by videolink at Florence, Eyman, Lewis, and Yuma. An October 17, 2013 email from Charles Ryan explains that videolink psychiatry takes place at Browning Unit for the Eyman complex, and prisoners from other units are placed in restraints and transported to Browning Unit for this purpose. Pltf-Parsons 030694-696.

Patients receiving inadequate or inappropriate treatment via telepsychiatry include:

1.           ,     -Yuma-He has been receiving medications for Bipolar Disorder since 1997. The chart is very disorganized and it is difficult to determine what is his actual care. He apparently is receiving care via telemed. There are two faxed copies of psychiatric progress notes in the chart. Neither one addresses the fact that Mr.      is suffering from severe medication side effects (EPS). There are no medication orders in the chart even

64

though the most recent MAR reflects the fact that he is receiving an antipsychotic and mood stabilizer medication, albeit on an inconsistent basis.

2.           ,      -Florence-He is being treated with four different psychotropic medications. There is a faxed med order dated 5/24/13 without an accompanying progress note. There is also an undated medication order in the chart. I am unable to determine what, if anything, this undated med order has to do with the overall care of this patient.

3.             ,     -Florence-There is a faxed med order and a faxed progress note in the chart. As with the two cases noted above, it is evident that the psychiatrist ordered the medications without the benefit of having the patient's chart in front of him or her.

4.             ,     -Florence. I found two separate sets of faxed med orders and faxed progress notes. One is from 2/27/13 and the other is from 6/28/13. These visits are separated by four months and neither one occurred with the psychiatrist having the benefit of reviewing the patient's chart prior to prescribing the psychotropic medications.

5.          ,      -Florence-This is a telemed patient whose diagnosis listed in the chart is not the same as the diagnosis listed by the telemed psychiatrist. This is a potentially deadly mistake that could result in severe harm to the patient.

## Opinion: Patients Who Remain Highly Symptomatic

During my inspection tours I was concerned to find a large number of patients who remained highly symptomatic. This means either that they are not receiving treatment, or that their treatment is not effective; in either case, corrective action must be taken.

One example is         ,       whom I evaluated in Eyman-Browning Unit. When I evaluated him, he was very confused, standing at times naked in his cell, responding to internal stimuli, and was unable to communicate with us in any sort of rational manner. Upon reviewing his chart, I saw that it was only the day prior to my arrival that there were any mental health notes documenting the degree of psychosis that he was experiencing. This raises the question whether he was so acutely psychotic that he only began to display these symptoms in the last couple of days. In that case, he should be sent to the hospital for closer evaluation, as this may indicate a very serious neuropsychiatric problem. On the other hand, he had been on

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

this unit for some time, and it is more likely that he had been displaying significant psychotic symptoms over an extended period of time, and no action had been taken.

Other examples of patients who remain highly symptomatic include:

1.  ▮▮▮, ▮▮▮-Lewis-Upon my evaluation Mr. ▮ was shouting incoherently as well as banging objects in his cell. He was very agitated and psychotic. He has a history of treatment with Thorazine, Lithium and Haldol. His chart was very disorganized so it is difficult to tell what treatment he is actually receiving. There was one medication order for Risperdal, Tegretol and Benadryl noted on the June 2013 MAR that was for six months, 2/6/13-8/5/13. By itself, the period of time covered by this med order is inappropriate. The problems associated with this order are made worse by the fact of the patient's clinically deteriorated state.

2.  ▮▮▮, ▮▮▮ Eyman-Mr. ▮▮▮ was observed sitting on his bed, mute, not responding to my attempts to engage him in conversation. After several attempts, he started yelling at me in a loud, incoherent and psychotic manner. A review of his chart reveals that he is only receiving meds on an "as needed basis." That is, he is not prescribed medications on a regular basis but rather when the staff feels he needs them. There is no way to determine from the chart if he is receiving any medications for his serious psychotic disorder. Based on his clinical presentation, it is apparent that he is not receiving adequate medication to address his mental disorder.

3.  ▮▮▮, ▮▮▮-Eyman-He is diagnosed with Psychosis NOS. He presented in a near catatonic condition in that he was mute and posturing. The chart also indicated that he has somatic delusions. These are very serious symptoms of an underlying psychotic disorder. His most current treatment plan was from 5/20/12 and it appears that his last dose of antipsychotic medication was administered on 3/4/13. It is obvious from the chart and his clinical presentation that Mr. ▮▮▮ has fallen between the cracks of the mental health system.

4.  ▮▮▮, ▮▮▮ Perryville-This is an acutely mentally ill individual who was on a 10-minute watch for being a danger to herself. She was wearing a suicide gown and complaining of the heat when I evaluated her on 7/18/13. She was not prescribed any medications. A 7/15/13 chart entry noted her to be "acting bizarre and disoriented." The chart entry also noted that she is refusing to drink water. She should have been immediately moved into a hospital setting to evaluate her for heat-related illness. Instead, she was placed in a suicide gown with 10-minute checks.

5.  ▮▮▮, ▮▮▮-Perryville-She presented as psychotic and agitated stating "I don't agree with meds." She has a history of mental health treatment outside of prison. A chart entry from 7/17/13 noted her diagnosis to be Schizoaffective Disorder. It went on to state, "she does appear persistently and acutely disabled" from her mental disorder and could suffer harm as a result of it. It is unclear why she is not being treated with antipsychotic medication instead of being placed on a 30-minute watch.

6. Dustin Brislan, 164993, Phoenix-I evaluated him at the SMU on 7/16/13 and at Phoenix on 7/19/13. At the SMU he was extremely agitated and questionably psychotic. I was unable to review his chart at the SMU as I was informed that he was being transferred to the Flamenco Unit. On the Flamenco Unit, his condition was unchanged in that he was agitated, yelling and possibly psychotic. I was unable to review his chart at the Flamenco Unit as it remained at the SMU. It is extremely poor care to admit someone to a hospital (Flamenco Unit) without a chart and without any admitting orders. I questioned the warden about this practice and he informed me that the orders "follow an inmate" from their previous placement until new orders are written by a local MD. The question in this case is since there is no chart, whose orders are the staff following? Also, how can a proper assessment occur without reviewing his past psychiatric history and treatment records?

## Opinion: Miscellaneous poor care

I evaluated a number of other patients whose care falls below minimal standards. One theme that is common to many of these cases is that the patient is overmedicated and/or prescribed very potent, long-acting anti-psychotic medication without an appropriate clinical indication. This fact, which was observed throughout my tours, suggests to me that these medications are administered regardless of the psychiatric indication, for the convenience of the staff. That is, staff only have to administer medication once a month, or once every 2-3 weeks, as opposed to on a daily basis.

A few examples of the inadequate care I observed follow:

1. ⬛⬛⬛⬛⬛, ⬛⬛ Florence-Medication orders dated 6/24/13 and 6/27/13 were written without the benefit of an accompanying progress note. This means that the psychiatrist wrote these orders, including orders for high dose Haldol decanoate (100 mg every four weeks) without evaluating the patient.

2. ⬛⬛⬛⬛⬛, ⬛⬛ Florence-Medication orders were written on 6/17/13 for Haldol 15mg twice a day and Haldol decanoate 100mg every three weeks. This is a tremendous amount of Haldol. When I evaluated the patient on 7/15/13 he was extremely sedated, so much so he was unable to get out of his bunk to speak with me. There was no indication in the chart that the prescribing psychiatrist was aware of the degree of the patient's sedation.

3. ⬛⬛⬛ ⬛⬛⬛, ⬛⬛ -Eyman-The patient is diagnosed with Undifferentiated Schizophrenia and was prescribed Haldol decanoate 50 mg every four weeks. A psychiatrist note from 5/20/13 stated, "He refused to speak at exam. I feel he continues to be in need of

67

the injection." It is very unclear from the chart how the prescribing psychiatrist is able to order Haldol decanoate when the patient won't cooperate with the exam. When I examined Mr. ▮▮▮▮ he was so impaired as to be mute and unable to speak with me.

4. ▮▮▮▮▮▮▮, ▮▮▮-Phoenix-The staff refused to allow me to interview this patient because "he was too volatile." A psychiatrist note from 7/18/13 observed that the patient did not have a "DSM DX." It went on to state, "It is my opinion that Mr. ▮▮▮ can be a potential danger to others, self and continue to be PAD." A PMRB was held on 7/18/13. The net result is that the staff are planning to force medicate Mr. ▮▮▮ with Haldol decanoate in the absence of a formal psychiatric disorder.

5. ▮▮▮▮▮▮▮, ▮▮▮-Perryville-She has a long history of psychotic symptoms. She is paranoid about medications and has refused to take them in the past. A psychiatrist ordered an extremely high dose of Haldol decanoate, 100mg every four weeks, without evaluating the patient.

6. ▮▮▮▮▮; ▮▮▮-Perryville-The chart documents that she is diagnosed with Borderline Personality Disorder. The chart further documents that she is being treated with lithium for this condition. Borderline Personality is not a clinical indication for lithium treatment.

7. ▮▮▮▮▮▮▮, ▮▮▮-Eyman-Mr. ▮▮▮ is diagnosed with Dementia. On 6/30/13 staff placed him on a PMRB. This is a potentially life threatening move in that antipsychotic medication is contraindicated in patients with dementia. The use of antipsychotics in the demented places them at risk for death.

8. ▮▮▮▮▮▮▮, ▮▮▮-Yuma-A chart review reveals that Mr. ▮▮▮ is being treated with the powerful antipsychotic, Thorazine, for sleep. Thorazine is an older antipsychotic medication that is used in the treatment of psychotic disorders and not sleep disorders. This means that the patient is inappropriately being subjected to potentially irreversible side effects such as Tardive Dyskinesia in order to treat a sleep problem.

## Opinion: Inadequate mental health care of named plaintiffs

I have been asked to opine on the care received by the named plaintiffs in this case. For

the reasons set forth below and elsewhere in this report, I believe that all of these prisoners have

received and continue to receive inadequate care, and are at substantial risk of serious harm from

deficiencies in ADC's mental health care system.

1. Dustin Brislan, 164993-He carried the SMI designation prior to his incarceration at the Maricopa County Jail in 2009. Jail staff confirmed his SMI status and noted that he had been treated with both antipsychotics and antidepressants in the community. I evaluated him at the SMU on 7/16/13. He had two recent incidents of self-harm, during one of which

chemical agents were used against him. A treatment plan dated 4/3/13 listed his diagnosis as Personality Disorder NOS. Of note this plan was done without psychiatric involvement. A psychiatry note from 5/2/13 listed his diagnosis as Mood Disorder NOS and he was prescribed the antidepressant Wellbutrin 100mg twice daily. At the SMU I found him to be extremely agitated and questionably psychotic. I was unable to review his chart at the SMU as I was informed that he was being transferred to the Flamenco Unit. I had a follow up evaluation with him on 7/19/13 on the Flamenco Unit; His condition was unchanged in that he was agitated, yelling and possibly psychotic. I was unable to review his chart at the Flamenco Unit as I was informed by staff that it remained at the SMU. It is extremely poor care to admit someone to a hospital (Flamenco Unit) without a chart and without any admitting orders. I questioned the warden about this practice and he informed me that the orders "follow an inmate" from their previous placement until new orders are written by a local MD. The question in this case is since there is no chart, whose orders are the staff following? Also, how can a proper assessment occur without reviewing his past psychiatric history and treatment records? Of note, I reviewed his medical records that were sent on 7/26/13. In these records, I found a treatment plan and admission orders that were dated 7/17/13. Either the staff misinformed me about not having a chart on my 7/19/13 visit, or a chart was backdated after my visit. I find the handling of this case to be extremely problematic.

2. Robert Gamez, 131401-In addition to his suffering from mental illness, Mr. Gamez also is being treated for asthma and an autoimmune disease for which he is prescribed multiple medications. A psychiatry note dated 4/18/13 documented that Mr. Gamez "still hears voices." He was diagnosed with Psychotic Disorder NOS and prescribed Risperdal, Cogentin and Sertraline (Zoloft.) The MAR from June 2013 confirms that Mr. Gamez was receiving these medications. He then submitted an HNR on 6/14/13 requesting to be taken off all of his psychotropic medications due to the "dangerously high temperatures." He went on to state that the high temperatures combined with his medications were causing an exacerbation of his mental illness. On 6/24/13 he once again requested to be taken off his psychotropic medications as the combination of the heat and his medications were causing an exacerbation of his medical problems. A faxed medication order dated 6/27/13 discontinued his Risperdal and Cogentin. A progress note on the same date confirmed that his medications were stopped. This is a very serious case where a patient had to request stopping his medications because of heat-related problems. There are no further notes in the chart to document how the patient is doing without his antipsychotic medication.

3. Joshua Polson, 187716-He carries the SMI designation and also suffers from asthma. Mr. Polson is diagnosed with "bipolar & PTSD" as noted on a psychiatry note from 5/15/13. He submitted an HNR on 5/6/13 complaining that he hadn't been receiving his lithium. He was told by a member of the nursing staff that they had run out of lithium. The MAR from May 2013 confirms this fact and also noted that he didn't receive his lithium from 5/7/13-5/20/13. Mr. Polson was seen by a psychiatrist on 5/15/13 who confirmed that he has been without his lithium since 5/7/13. His prescription for lithium was rewritten at that time but it was not administered until 5/20/13. No documentation exists in the medical record explaining why this patient was denied his previously prescribed psychotropic medication for a period of 13 days.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

4.  Sonia Rodriguez, 103830-She has a long history of serious psychotic and mood symptoms for which she had been prescribed psychotropic medication. She is currently diagnosed with "Schizophrenia, paranoid type" and is prescribed multiple high-dose psychotropic medications.  She had a serious suicide attempt on 4/30/13, which required her being transported to an outside hospital for stabilization. When asked about this suicide attempt, she stated "I took a bunch of pills; I just wanted to die." I evaluated her on 7/18/13 at Perryville. I found her lying on the floor of her cell, appearing extremely sedated. When she did stand up, I noted her displaying significant signs of akathesia.  A chart entry from 7/8/13 documented that she is prescribed Prozac, Cogentin, and Buspar in addition to two antipsychotic medications.  At the time of my evaluation she was prescribed Geodon 60 mg twice a day and Haldol decanoate, 200mg every four weeks. This is a tremendous amount of medication. She was experiencing severe side effects from this medication combination and was at extreme risk of heat-related medical problems.  I cannot adequately express how bad and dangerous is her psychiatric care.

5.  Christina Verduzco, 205576.  This is a chronically mentally ill individual who I evaluated on 7/18/13 at Perryville.  I noted her to have auditory and visual hallucinations as well as thought process difficulties.  At the time of my evaluation she was being treated with Haldol decanoate, Depakote, Prozac and Cogentin. She had also experienced two very serious bouts of dehydration, which required IV therapy.  In addition she was noted to be toxic from her Depakote. Her Depakote level was noted to be 123 with normal range being from 50-100 mcg/ml. She is an extremely ill individual who has already suffered through serious medication-related problems.  More importantly, she remains acutely psychotic.  She requires immediate treatment in a psychiatric hospital where her medications can be more closely monitored and her clinical condition stabilized.

6.  Jackie Thomas, 211267-He is a 28 year-old individual who I evaluated at Eyman prison on July 16, 2013.  His chart listed a variety of diagnoses for him including Bipolar Affective Disorder, mixed, Psychosis, Psychosis NOS and Psychotic Disorder NOS. Throughout his time at Eyman he has received Haldol decanoate, 50 mg every four weeks.  My evaluation revealed that he continues to experience auditory hallucinations, appears very sedated from the medication and displays prominent extrapyramidal side effects (EPS.) Mr. Thomas submitted an HNR reporting, "I'm having a couple of things going on in my head." There is no evidence on the chart that this HNR was addressed.  Mr. Thomas told a psych associate on 7/9/13 that the current meds are making him sleep every day and is requesting to be seen ASAP by the prescribing psychiatrist. There is no evidence in the chart that this occurred. Of note, a 6/4/13 psychiatrist note listed follow-up as every 3 months.  This is a case which calls out for closer psychiatric supervision, as the patient remains symptomatic with significant medication side effects.

7.  Stephen Swartz, 102486-Mr Swartz is a 50 year-old individual who I evaluated at the Lewis prison on 7/22/13.  The most current treatment plan is from 1/21/13 and was completed without any involvement from the prescribing psychiatrist.  This treatment plan lists the diagnosis as Mood Disorder NOS. The chart is very disorganized which makes it difficult to follow Mr. Swartz's treatment course.  The last visit with a psychiatrist apparently occurred

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

in January 2013.  Between January 2013 and the time of my evaluation in July 2013, Mr. Swartz had spent considerable time on watch status as a DTS.  During this time he was noted to have swallowed several "foreign objects," "inflicted self-harm causing lacerations and open wound to left arm," as well as being on a hunger strike.  At no time during this period did a psychiatrist evaluate him. Also, he experienced ongoing problems with his meds.  That is, there were considerable disruptions with the timely delivery of his medications.  For example, he was told that "they were out of Risperdal" and didn't receive this medication for a week.  This is obviously very poor care that resulted in severe harm to Mr. Swartz.

8.   Maryanne Chisholm, 200825-Ms. Chisholm is a 48 year-old individual who I evaluated at the Perryville prison. The most recent treatment plan found in her chart is from 4/19/12.  It lists her diagnoses as "Bipolar Disorder II/OCD/Social Anxiety." She also suffers from a variety of medical problems and takes thyroid replacement therapy.  She has experienced significant difficulties with her psychotropic medications. A psychiatrist saw Ms. Chisholm on 4/1/13 and noted her medications to include Depakote, Buspar and Prozac. A note from 4/26/13 states "Ran out of Prozac, had to fight to get Buspar/Depakote KOP-ran out 30 days." In response to this information, the RN noted, "Prozac refilled 4/22/13" and "Buspar/Depakote refilled 4/19/13." Finally, she told me that she had previously been treated with Elavil but she had stopped taking it because it was too difficult to wait in line to receive this medication.

9.   Jeremy Smith, 129438-I evaluated Mr. Smith while he was housed in a lockdown unit at the Eyman prison.  He was housed in a cell that was reinforced by Plexiglas. Staff informed me that Mr. Smith had recently destroyed the sprinkler heads in two separate cells, which necessitated his being placed into this special cell.  Mr. Smith has a long history of being treated with mood stabilizing medications for Bipolar Disorder. These medications include Lithium, Tegretol and Celexa.  A review of his chart revealed that he had been on Lithium as recently as November 2012.  For reasons that aren't immediately apparent, Mr. Smith's treatment with Lithium was discontinued. This discontinuation may be due in part to his not fully cooperating with blood testing but his chart is silent on what was the actual reason. Regardless, Mr. Smith's aggressive and agitated behavior can be directly attributed to his not receiving treatment for his bipolar condition.  He was asking to be restarted on Lithium when I evaluated him on 7/16/13.  Also, a psychiatrist had not seen him by the time of my evaluation.

**Opinion:  Inadequate monitoring and oversight**

Health care services in ADC, including mental health care, are provided through a contract with Corizon, a private, for-profit corporation.   ADC staff monitor Corizon's performance using the monthly MGAR report.  As discussed at length above, ADC's monitoring

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

has revealed numerous severe deficiencies in the provision of mental health care services.  But ADC's monitoring is deficient in significant respects.

First, there are a number of critical areas of performance that are not regularly monitored. For example, the quarterly MGAR report for April through June 2013 lists nine items under the heading "Suicide Prevention Program," such as "Are mental health and medical visits documented for inmates on suicide watch?"   (ADC 137756-57).   Monitoring Corizon's performance on these items would a positive step toward implementing an effective suicide prevention program, but as far as I can tell, these items were simply not monitored in April, May, or June of 2013.  In fact, ADC Monitor Mark Haldane testified that these items have *never* been monitored as part of the MGAR process.  (Haldane dep., p. 233).  This is particularly disturbing given the rash of suicides ADC experienced in late April and early May of 2013; after those tragic events, I cannot understand why monitoring these items was not seen as an urgent priority. Similarly, the quarterly report lists seven items under the heading "Segregated Inmates," including "Are SMIs placed in segregation seen within 24 hours by mental health staff?" and six items under "Emergency Psychotropic Medication" (ADC 137757, 137764).  Again, it appears that these items were simply not monitored in April, May, or June of 2013.

Another significant deficiency is that no psychiatrist is involved in ADC's monitoring of mental health services.  Taylor dep., p. 51.  While some aspects of mental health treatment can be adequately monitored by a psychologist, others – such as the quality of psychiatric care provided – require the training and clinical judgment of a psychiatrist.

ADC monitoring of mental health services seems disorganized and ad hoc.  The mental health monitor testified that she has no written job description and received no formal training. Taylor dep., pp. 27, 33-34.  As of September 5, 2013, she had not visited several of the prison

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

complexes. Taylor dep., pp. 44, 47-48. She does not monitor whether group mental health programming is occurring as scheduled. Taylor dep., pp. 61-63. And she does not speak with prisoners as a routine part of her monitoring visits. Taylor dep., pp. 41, 43, 44. Because there are aspects of mental health treatment that will not always be apparent from the record – particularly records as disorganized and chaotic as those I found in ADC – this failure to speak with the patients who are actually receiving the treatment is a significant gap in monitoring.

Finally, monitoring is of very little value if problems that it reveals are not corrected. Dr. Taylor testified that when the ADC monitor finds a deficiency with Corizon's performance, Corizon is expected to create a corrective action plan. Taylor dep., pp. 119-20. However, she also testified that except for the Yuma and Phoenix facilities, she has *never* received a corrective action plan in response to any deficiency identified in Corizon's provision of mental health services. Taylor dep., pp. 123-24.

Similarly, Dr. Taylor testified that she monitors whether prisoner suicides were preventable, but does not write anything down about her conclusions. Taylor dep., pp. 69, 114. This is a mystifying and disturbing statement. Obviously the main purpose of reviewing a prisoner suicide is to determine how to prevent suicides in the future. If the findings and lessons of such a review are not reduced to writing so that they can be communicated to others, much of the value of that review is lost.

Nor is Corizon carrying out adequate monitoring or oversight. Dr. Joseph Pastor, who I understand was designated by Corizon to testify regarding its mental health operations in ADC, testified on October 4, 2013, that he was not aware of any problems with renewal of psychiatric medications or timely administration of psychotropic medications in ADC. Pastor dep., pp. 162-67. As described above, such problems are severe, longstanding, and pervasive throughout

73

ADC. The fact that Corizon claims to have no knowledge of these problems shows a complete failure of monitoring and oversight that puts patients at risk of harm.

## Conclusion

Based upon the information summarized above, it is my opinion that the current state of mental health care services in the Arizona Department of Corrections poses a substantial risk of serious harm to prisoners who require mental health care. I have reviewed the declarations of Plaintiffs who have raised mental health claims in this case. These declarations describe problems such as HNRs receiving delayed or no response; brief, infrequent, and superficial interactions with mental health staff; difficulties in receiving psychotropic medications; and endemic delays in receiving any kind of mental health care. These problems are entirely typical and predictable outcomes of the systemic deficiencies I have described above.

Of course not all ADC prisoners will be harmed by these deficiencies in exactly the same way – some will die, some will suffer injury short of death, and some will be lucky enough to escape permanent injury altogether. But the problems described above are systemic in nature, and require systemic solutions. The ADC mental health care system is highly centralized, governed by policies of statewide application. (Shaw dep., at 157:13-24). In my experience as a court expert in other class action lawsuits challenging mental health services in prisons, court orders directed at prison administrators who oversee the entire system can bring about the needed changes to provide relief to the class as a whole, by reducing the risk of harm faced by all prisoners.

## Compensation

I am being compensated for my work in this case at the rate of $300 per hour, with a daily cap of $2500.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Testimony**

A list of the cases in which I have provided expert testimony in the last four years is attached as **Exhibit D.**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated this 8th day of November, 2013 at San Francisco, California.

PABLO STEWART, M.D.

76