# EXHIBIT 8



# Supplemental Expert Report of Pablo Stewart, M.D.

*Parsons v. Ryan*, No. 2:12-cv-00601-NVW (MEA) (D. Ariz.)

December 9, 2013

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I submit this supplemental report to address recently-produced documents and other information that was not available to me at the time of my initial report. In the interest of brevity I have tried not to repeat information set forth in my initial report; accordingly, the two reports should be read together. I reserve the right to supplement or modify these opinions as additional information becomes available.

## Opinion: Inadequate medical records

1.  ████████████████ -His medical record is very disorganized with the pages out of order and entire sections missing. It is extremely difficult to follow the course of his treatment. The most current MAR is from May 2013. A random note indicates that he received a Haldol decanoate shot on 6/26/13 but this could not be confirmed from the medication orders section of the chart. There is an entry indicating that he is also being treated with lithium. Again, medication orders and laboratory data do not confirm this fact.

2.  ████████████████ -The medical chart is very disorganized. There are many loose pieces of paper in the chart and there is no problem list. It is very difficult to adequately follow his clinical course of treatment. I noted him to be psychotic with prominent manic symptoms, yet he was not receiving a mood stabilizing medication, at least as far as I could ascertain from this very messy and disorganized medical record.

3.  ████████████████ -See summary below.

## Opinion: Inadequate medication system

1.  ████████████████ -The medical record does not contain any orders by a psychiatrist for any psychotropic medications. The MAR for May 2013, however, lists both Prozac and Remeron as being prescribed for this patient. Upon clinical interview the patient reports being prescribed Prozac for over a year but says that he hasn't gotten it for over a week because "they ran out of it." There is no way to confirm or deny this from the medical record. Also, the patient was not aware that he was prescribed Remeron.

2.  ████████████████ – According to the ADC Mortality Review, Mr. ███ was placed on "ten minute suicide watch for emotional lability" on October 29, 2012. He was seen on November 1 by the psychiatrist, who ordered Risperidone 2mg Qpm and Cogentin 1mg Qpm. These medications had not been delivered to Mr. ███ by the time he hanged himself four days later on ████████████████. ADC 138453.

3. ⬛⬛⬛⬛⬛⬛⬛⬛ -The patient complained to me that he had not been receiving his medications for the 2½ weeks he had been on the CDU. He also complained to me that he was experiencing auditory hallucinations. A 6/28/13 psychology visit confirmed, "Mr. ⬛⬛ has not received his psych medications. He will be referred to psychiatry. He states that it has been a month since he has had his medication." The most recent MAR in the medical record is from April 2013 so there was no way to confirm or deny the status of his medication administration. The medical record was also very disorganized but it appears that Mr. ⬛⬛ was seen by a psychiatrist on 5/7/13 who discontinued his antipsychotic medication without documenting an adequate reason for this change in treatment.

## Opinion: Lack of language interpretation for mental health treatment

1. ⬛⬛⬛⬛⬛⬛⬛⬛ -The patient is Spanish speaking and carries the diagnosis of "Paranoid Schizophrenia" for which he is prescribed antipsychotic medication. Upon my clinical interview, the patient appeared to be responding to internal stimuli and was displaying EPS (legs were shaking.) He told me, in Spanish, that this problem with his legs had been going on for several months. There were no signed consents in his chart for psychotropic medication. A mental health note from 6/12/13 stated that the patient was unable to answer questions for his treatment plan due to "limited English." Surprisingly, the same clinician in another portion of the medical record documents that the patient "states he is doing well. He shared he loves to sleep and does not like to engage in activities." There is no indication who translated for the staff member, or if she has recently learned to speak Spanish.

## Opinion: Inadequate access to care

1. ⬛⬛⬛⬛⬛⬛⬛⬛ -I interviewed this patient on July 8, 2013. He was actively psychotic and reported to me that he had heard voices since at least 2008. At the time of my interview he was not receiving any medications. Mr. ⬛⬛ informed me that "banging" helps him control the voices. A psychiatrist visit from 2/13/13 noted that the patient was experiencing side effects from Navane and discontinued this antipsychotic medication. No other antipsychotic medication was prescribed to replace the Navane. Of note, the next psychiatric visit didn't occur until just before my July 8, 2013 visit. This visit apparently occurred on July 2, 2013 and it included prescribing the patient a variety of psychotropic medications. But on July 8, the patient reported to me that he was not receiving any medications. Also, the medical record failed to document if the patient was receiving any medications from the July 2, 2013 order. This represents very poor care in that the patient should

2

have been continued on a different antipsychotic medication after he developed side effects from the Navane. Also, the staff should not have waited almost five months to restart him on psychotropic medication.

2.               -He is an actively psychotic individual who I evaluated on the Behavioral Health Unit. He had been placed on this unit due to his cutting himself. He reported that sometimes he still hears voices but that he tries not to listen and that the medications help. He has a history of psychiatric treatment and was being prescribed psychotropic medications in jail prior to his arrival at ADC. His jail medications were not continued at ADC and he eventually decompensated. It was only after this decompensation that he was restarted on medications. This is an obvious case in which the patient's jail medications should have been continued upon his arrival at ADC. He needlessly suffered due to this lapse in care.

3.               -This patient has a history of treatment with both antipsychotic and antidepressant medications. My evaluation revealed that he is experiencing psychotic symptoms and that he is not receiving any psychotropic medications. A review of his medical record lists his diagnoses as Mood Disorder and Conduct Disorder. The record also confirms that he was not being prescribed any psychotropic medications at the time of my evaluation. Of note Risperdal, Cogentin and Celexa were all discontinued on 5/21/13 due to his refusing to take them. There is no indication that the prescribing psychiatrist has made any attempts to encourage the patient to take his medications. The patient also sees a psychologist monthly but again there is no indication in the medical record that she was informed of his medication refusals or that she did anything to encourage the patient to take his medications as prescribed.

## Opinion:  Inadequate monitoring and management of medication therapeutic levels and side effects

1.               -This patient's problem list from 5/15/13 notes his diagnosis as "paranoid schizophrenia." He was seen by a psychiatrist on 3/7/13 who listed the diagnosis as "Psychosis NOS" and prescribed Haldol decanoate, 150 mg every three weeks. Of note, the recommended dose of this medication for the treatment of Schizophrenia is 50 mg every four weeks. On a follow up visit which occurred on 6/26/13, the psychiatrist noted that the patient had a tremor and was suffering from Tardive Dyskinesia but renewed his Haldol decanoate at the previously elevated dose of 150 mg every three weeks. This case raises several serious concerns about the quality of mental health treatment: 1) There is no documentation explaining why the diagnosis on the problem list and the psychiatrist's diagnosis are not the same; 2) The patient is being prescribed a tremendous amount of antipsychotic medication.

3

There is no justification noted in the chart for this high dose of medication; 3) Upon my examination, the patient was displaying significant medication-induced side effects (tremor and other involuntary movements consistent with Tardive Dyskinesia.) The psychiatrist noted these problems but yet failed to do anything about them. All of these issues represent very poor care.

2. ▆▆▆▆▆▆▆▆ -See summary above.

## Opinion: Miscellaneous poor care

1. ▆▆▆▆▆▆▆▆ -This case demonstrated extremely poor care. A psychology note from 6/28/13 states "I/M is termed 'the monkey' by staff and inmates. This appellation may not be helpful." On 5/30/13 Dr. Sherman gives a telephone order for Haldol decanoate 100mg. She documents very clearly a diagnosis of Antisocial Personality Disorder with no auditory hallucinations but yet persisted in prescribing 100 mg of Haldol decanoate. There is no approved clinical indication for the use of an antipsychotic medication in the treatment of Antisocial Personality Disorder. Also, there were no mental health progress notes for the period August 2010 through February 2013.

2. ▆▆▆▆▆▆▆▆ -This is yet another case where an inmate was prescribed an antipsychotic medication in the absence of an appropriate diagnosis. Mr. ▆▆▆▆▆ was diagnosed by Dr. Harrison as suffering from Antisocial Personality Disorder and was treated with the antipsychotic medication Risperdal. He also went six months without seeing a psychiatrist, from September 2012 to March 2013, even though he was receiving antipsychotic medication.

3. ▆▆▆▆▆▆▆▆ -Mr. ▆▆▆▆▆ diagnoses are listed as "possible BPD 301.83; ASPD 301.70." Of note, both of these are personality disorder diagnoses. The patient reported to me that he was prescribed the antipsychotic, Risperdal, the antidepressant, Paxil and the mood stabilizer, Trileptal. This medication combination was confirmed in the medical record. The MAR for June notes that the Trileptal was "not available" for the period of June 1-8, 2013. Mr. ▆▆▆▆▆ had a serious suicide attempt on 5/20/13 by medication overdose. He had another serious suicide attempt on 6/24/13 by swallowing razors. He was on a 30-minute watch when I evaluated him. There was no indication from the medical record why, even after two serious suicide attempts, Mr. ▆▆▆▆▆ was not referred to a higher level of care. There is a very high risk that he will attempt to kill himself again. He deserves much more finely coordinated treatment that would include at a minimum diagnostic and medication reviews and referral to inpatient treatment.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opinion:  Lack of Mental Health Programming**

In my initial report I noted that I observed an extraordinary lack of mental health programming in ADC, even in units that are designated to house prisoners with mental illness (pp. 37-40).  My observation is confirmed by a July 9, 2013 email from defendant Pratt, in which he writes:

> I just received an alarming phone call from [ASPC-Florence] Warden Hetmer regarding continued viability of [mental health] programming at CB1 and Kasson because staff have been redirected by [ASPC-Florence Facility Health Administrator] Parkinson???  We need some clarification. Visits are scheduled for next Monday.

AGA Review 22493.  The final sentence is apparently a reference to my expert inspection of ASPC-Florence, which occurred on Monday, July 15.  In a subsequent email on July 10, Mr. Pratt wrote to Corizon's Regional Vice President, "You may want to discuss with the Warden directly, as I think some damage control may be necessary." AGA Review 22492.

Both CB1 and Kasson are units that ADC has specifically designated to house prisoners with mental illness.  It is extremely troubling that the "continued viability of [mental health] programming" in these units is in question.


**Opinion:  Inadequate Suicide Prevention**

In my initial report I noted the sharp increase in prisoner suicides in ADC in 2013 (pp. 51-52).  On November 28, 2013, Raymundo Morin, 130151, died by suicide at ASPC-Eyman. (Inmate Death Notification, December 2, 2013).  This is the tenth suicide in ADC, and the sixth at ASPC-Eyman, thus far in 2013.  Assuming that there are no additional suicides this year, this yields an annual suicide rate of 25 per 100,000

5

prisoners, which is significantly above the national average for state prisons of 16 per 100,000.

I also discussed my observation, at multiple institutions, that prisoners who were theoretically placed on "10-minute watch" for suicidal behavior or for other mental health reasons were not, in fact, being checked every ten minutes (p. 53). The tragic and entirely foreseeable consequences of this practice are evident in the mortality review of

, who hanged himself on . The reviewer concludes that Mr. death was avoidable, writing that "[a]lthough ten minute watches were ordered and documented, it is the opinion of the reviewer that watches were not being done as ordered." ADC 138454.

In my initial report I discussed serious lapses in the mental health care provided to Mr. which directly contributed to his death by suicide on (pp. 55-56). The psychological autopsy for Mr. reveals additional grave concerns.

It is noted that "An HNR was received on the Monday after his suicide that was dated stating that he would like to talk to a 'psych doctor about his personal problems.'" ADC 197206. The Monday after Mr. suicide was .
In other words, Mr. HNR appealing for mental health assistance took *four days* to be received and reviewed. This is far below the standard of care. Obviously if this HNR had been triaged and acted upon within 24 hours, or even within 48 hours, Mr. suicide would almost certainly have been averted.

The psychological autopsy also reveals that Mr. was placed on watch on 4/15/12 for verbal suicidal ideation and a hunger strike, and on 5/12/12 for attempting to

6

jump off the top tier. ADC 197202. In other words, he was known to have a recent and significant history of self-harming behavior. And yet he was obviously not being adequately monitored, as he was able to commit suicide by strangulation, a method that takes a significant amount of time to cause death. That this occurred while Mr. ▮ was "placed in the Wing One program at Kasson unit that allows inmates more access to mental health," ADC 197206, certainly raises questions about the efficacy of this alleged mental health program.

▮

In my initial report I expressed my view that "the extremely poor psychiatric care [Mr. ▮ received directly contributed to his suicide" (p. 58). Documents I have subsequently received reveal additional egregious lapses in Mr. ▮ care.

On ▮, Mr. ▮ was found hanging in his cell in Florence Central Unit. An ADC investigator later wrote, "Responding officers were unable to enter ▮ cell due to a malfunctioning door. A tool kit had to be acquired and a panel removed before the door could be manually opened. Staff estimated there was approximately a fifteen minute delay before the ligature could be removed from ▮ neck." ADC 193394.

Obviously when a person is hanging by the neck, a delay of fifteen minutes in rendering aid will often be fatal. The inability to promptly render aid to prisoners who are hanging or have otherwise injured themselves poses a substantial risk of serious injury or death.

Mr. ▮ had been prescribed four different psychotropic medications, all of which were "watch swallow." This is an order written by the prescribing psychiatrist

meaning that the nurse administering the medication must watch the patient take the

medication and make sure that he swallows it. These medications were Sertraline 50 mg;

Benztropine 1 mg; Risperidone 1 mg; and Diphenhydramine 25 mg. ADC 193394.

In the days after Mr. ▮▮▮▮▮ suicide, an investigator interviewed the nurses

responsible for distributing medication in Central Unit, and wrote the following:

> Nurse Shaw admitted that she and other Nurses did not adhere to the
> "watch-swallow" mandate because it took them too long to complete their
> medication rounds. She said she would slide the medication packet under
> the cell door of those inmates. … She said she marked inmate ▮▮▮▮ as
> refusing his medication, when in fact she made no attempt to deliver meds
> to him.

ADC 193395. At least two other nurses told the same investigator that watch-swallow

orders were disregarded. "[Nurse] Tolentino also said the nurses do not adhere to the

watch swallow orders because it takes them too long to complete their rounds, as they are

understaffed, and get little assistance from the Officers." ADC 193407. "[Nurse Luedke]

acknowledged the watch swallow orders were not adhered too [sic]." ADC 193407.

Finally, the investigator found that Mr. ▮▮▮▮▮ medical record had been altered

after his death:

> On 3-13-12 while reviewing ▮▮▮▮ [sic] medical file at the Facilities
> Health Administrators [sic] Office at ASPC-[Florence], It ws [sic] noticed
> that the Medication Administration Record (MAR) for the dates of March
> 1, 2, 3, & 4 had been altered. When compared to the copy I received on 3-
> 04-12 which showed only the afternoon dose on 3-4-12 had been refused[,
> t]he original form in the file now showed all doses for those dates as
> refused.

ADC 193395.

Thus in Florence Central Unit, which houses large numbers of prisoners with

serious mental illness, it appears to be standard practice for nurses to disregard the orders

of prescribing psychiatrists when administering psychotropic medications. It is clear that

8

falsification of medical records also occurs.   I cannot overstate the shocking unprofessionalism and dangerousness of these practices. A mental health care system in which the orders of prescribing psychiatrists are routinely ignored is little better than no mental health care system at all.  And a system in which records are falsified is a system in which there exists no reliable history of a patient's diagnoses, symptoms, and course of treatment.  These practices pose a substantial risk of serious injury or death to patients.

I am informed that, of the 23 suicides that have occurred in ADC since January 1, 2011, psychological autopsies have been completed on approximately five.  This is an appalling statistic.  A completed suicide represents the ultimate failure of a correctional mental health program.   Every suicide should be promptly and carefully studied to determine how it occurred and how future suicides can be prevented.  To complete psychological autopsies on fewer than one-quarter of all suicides shows a startling level of indifference.

Moreover, the psychological autopsies that have been provided to me are wholly inadequate. The autopsy for                        , who hanged himself on            , is less than a page and a half in length, and contains so many typographical errors as to make it difficult to follow.  It is also dated June 19, 2013 -- approximately one month *before* Mr.          death. ADC 197200.  The autopsy for                        , who hanged herself on                        , is not signed either by the clinician who prepared it or by the reviewing Medical Program Manager. ADC 197198.  In addition, it notes that "there was a lapse in routine mental health psychological follow-ups when [Ms.    was] transferred from one unit to the next." ADC 197198. This is potentially a very significant fact, but the autopsy dismisses it without explanation: "withstanding

9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

[sic] this lapse, the evidence suggests the outcome may not have been averted." ADC 197198.

The autopsy for ▮▮▮▮▮▮, who hanged himself on ▮▮▮▮▮, was not reviewed by the Mental Health Program Manager or the Medical Program Manager until nearly a year after it was prepared. ADC 197211. The autopsy for ▮▮▮ ▮▮▮, who strangled himself on ▮▮▮▮, did not include any review of his medical chart and, apparently in violation of ADC policy, did not include an interview with his treating psychiatrist or medical staff. ADC 197205. This slipshod approach suggests that staff are merely going through the motions, and that ADC leadership is not requiring them to conduct serious psychological autopsies that will examine the cause of suicides and prevent future suicides.

10

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated this $\underline{\phantom{8}}^{TH}$ day of December, 2013 at San Francisco, California.

PABLO STEWART, M.D.

11

# Exhibit A

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## Documents sent to Dr. Pablo Stewart, 11/8/13 – 12/9/13

### Death Records

- █████████: ADC138451-55
- ████████: ADC197192-98
- █████████: ADC197256-57
- █████████: ADC197199-200
- █████████: ADC197201-06, ADC192219-437
- ██████████: ADC192973
- █████████: ADC193394-498
- █████████: ADC138589-93
- █████████: ADC197286-90
- ████████: ADC138346-50
- █████████: ADC197207-11

### Depositions

- Deposition Transcript and Exhibits: Vickie Bybee, 10/10/13
- Deposition Transcript and Exhibits: Carson McWilliams, 9/27/13
- Deposition Transcript and Exhibits: Richard Pratt, 11/7/13
- Deposition Transcript and Exhibits: Charles Ryan, 11/8/13

### Medical Files (non-named plaintiffs)

- ███████, #████████
- █████████, #█████
- █████, #████████
- ███████, #████████
- ███████, #████
- ███████, #███████
- ███████, #█████████
- ████████, #███████
- ███████, #█████
- ███████, #████████
- █████, #████████
- ████████, #█████
- ████████, #████
- █████, #████████
- ████████, #█████
- ████████, #█████████

1

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- ████████████, #███████

## Miscellaneous

- ADC166233-34: Tucson – CDU MH Roster
- ADC166235-43: Tucson – Rincon MH Roster
- ADC166244: Tucson – Minors MH Roster
- AGA_REVIEW_022492-94: Pratt email to Taylor dated 7/10/13
- PLTF-PARSONS-031179: Death Notification, ████████████, dated ██████

## Tour Photos

- Perryville (Stewart) dated 7/18/13 (redacted): ADC163900-09
- Phoenix (Stewart) dated 7/19/13 (redacted): ADC163937-71
- Tucson (Stewart) dated 7/8/13 (redacted): ADC154561-65
- Yuma (Stewart) dated 7/23/13 (redacted): ADC163972-84

2

# EXHIBIT 9

# Rebuttal Expert Report of Pablo Stewart, M.D.

*Parsons v. Ryan*, No. 2:12-cv-00601-NVW (MEA) (D. Ariz.)

January 31, 2014

PRSN-PS 00307

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**REBUTTAL REPORT OF PABLO STEWART, M.D.**

**General observations**

      Dr. Penn did not speak with any prisoners.  Penn Rep. at 4.  This is a significant methodological flaw, as prisoners may have information about mental health services that is not readily available from other sources.  More fundamentally, it is impossible to determine that a patient's mental illness is being adequately treated without speaking to him or her.  Such communication is essential because of the information the patient may verbally convey about his or her symptoms, medication efficacy and side effects, and other critical variables.  It is also essential because only by talking with the patient can the psychiatrist assess the presence or absence of signs of mental illness such as responding to internal stimuli, flattened affect, and tangential thinking.  I am not aware of any psychiatrist in the community who would conclude that a patient's mental illness was being adequately treated without speaking with that patient.  Indeed, the American Academy of Psychiatry and the Law Ethics Guidelines for the Practice of Forensic Psychiatry state that "[h]onesty, objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without a personal examination."[1]

      In his review of ADC's mental health services, Dr. Penn places decisive importance on the findings of the National Commission on Correctional Health Care (NCCHC).  But NCCHC accreditation does not mean that a prison or jail's health care meets community standards or constitutional minima.  A number of prisons and jails have been found by federal courts to provide an unconstitutional level of health care, notwithstanding their accreditation by NCCHC.

---

[1] American Academy of Psychiatry and the Law Ethics Guidelines for the Practice of Forensic Psychiatry, IV.  Honesty and Striving for Objectivity (Commentary), available at http://www.aapl.org/ethics.htm.

Confidential

PRSN-PS 00308

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Moreover, it appears that the NCCHC has relied on inaccurate information in its review of ADC mental health services. For example, the June 28, 2013 NCCHC report on ASPC-Perryville states that "In the past three years, there have been six suicides. All had death reviews, including psychological autopsies, completed." ADC_P000913 (cited in Penn Rep. at 74). ADC's discovery responses in this case list five suicides at Perryville during that period, on the following dates: July 23, 2010; September 6, 2010; March 25, 2011; January 27, 2012; and February 12, 2013.[2]

However, despite the Court's order to produce all psychological autopsies since January 1, 2011, I have received only one psychological autopsy from ASPC-Perryville (see Stewart Supp. Rep. at 9-10, discussing psychological autopsy of Forrest Day, 258301). Thus, it appears that either ADC has failed to produce the psychological autopsies as ordered by the Court, or NCCHC relied upon erroneous information in its assessment of ADC's suicide prevention program.

**Opinion:  Inadequate medication system**

Dr. Penn appears unconcerned by the fact that prisoners with mental illness miss doses of their psychotropic medication. Penn Rep. at 34-35. But as ADC's suicide prevention training materials correctly recognize, "[f]ailure to receive or take prescribed psychiatric medication" can be a trigger for suicide. ADC_S000523. It can also lead to needless suffering and aggravation of the patient's illness, in some cases making the illness more resistant to treatment.

Dr. Penn believes that requiring prisoners to wait in line outdoors for their medication "increases the opportunity for medication monitoring" and "provides an opportunity to inquire or

---

[2] Defendants' Response to Plaintiff Wells' First Set of Interrogatories, June 26, 2013, Interrogatory No. 1.

2

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

identify side effects." Penn Rep. 39. Based on the sign I saw posted at the medication window

at ASPC-Tucson, forbidding prisoners to ask any questions about their medications, I very much

doubt that this occurs.[3]

**Opinion:  Risk of Heat Injury or Death**

It is a well-established medical fact that mentally ill individuals are at greater risk of

suffering heat-related health problems. The medical literature is replete with references regarding

the association between mental illness, psychotropic medication and heat-related health

problems.[4] [5] [6] [7] [8] [9] The references I have provided are a very small sample of the articles that

appear in the scientific literature about heat-related health problems in the mentally ill. So I find

it extremely curious that Dr. Penn, without citing any medical literature, was able to report the

absence of any problems in this area. As I noted in my initial report, ADC does not have an

overall policy about heat-related health problems. So I am bewildered by his statement "I do not

believe that temperature readings measured in this manner above 90 degrees pose an undue risk

of harm."[10] I conducted an exhaustive literature search of this topic area and could find no

---

[3] See photos attached to this report as Exhibit A:  ADC 154565.

[4] *Heat-related Death and Mental Illness During the 1999 Cincinnati Heat Wave*; The American Journal of Forensic Medicine and Pathology, 22(3): 303-307, 2001.

[5] *Risk of Death Related to Psychotropic Drug Use in Older People During the European 2003 Heatwave: A Population-Based Case-Control Study*; American Journal of Geriatric Psychiatry 17:12, 1059-1067, December 2009.

[6] *Recurrent Heat-Related Illnesses During Antipsychotic Treatment*; Annals of Pharmacotherapy 2005: 39:1940-1942.

[7] *Heat Intolerance in Patients With Chronic Schizophrenia Maintained With Antipsychotic Drugs*; Am J Psychiatry, 157:8, August 2000.

[8] *Excessive Heat Exposure Can Pose Higher Risks for those on Psychotropic Medication or Other Substances;* Substance Abuse and Mental Health Services Administration, SAMHSA Blog, June 29, 2012, 1-6.

[9] *Heat-Related Illness*; Emerg Med Clin North Am. 2013 Nov; 31 (4) 1097-108.

[10] Confidential Expert Report of Joseph V. Penn, M.D., December 18, 2013, pg. 67.

3

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

reference stating temperatures above 90 degrees do not pose an undue risk of harm. I did find a reference published by the Ohio State Department of Mental Health, which defined high temperature as 90 degrees and above. I agree with Dr. Penn that there are limited shaded areas and misters in some of the recreational areas. There are no shaded areas or misters, however, at the Perryville complex where I observed women prisoners having to wait in line outside in the full sun in order to receive their psychotropic medications. And the presence of shade or misters in the recreation areas is irrelevant to the grave risk posed to prisoners by temperatures in the housing units that regularly exceed 85, 90, and sometimes 100 degrees Fahrenheit (see Stewart Rep. at 48).

In his report Dr. Penn stated "I have not identified any medical records or reports of offenders with psychotropic medications or heat related complications or death."[11] In my report I discussed the harm suffered by named plaintiffs Robert Gamez and Sonia Rodriguez. Stewart Rep. at 69-70. In addition, I have reviewed the case of named plaintiff Christina Verduzco, 205576. She is a chronically mentally ill individual whom I evaluated on 7/18/13 at Perryville. I noted her to have auditory and visual hallucinations as well as thought process difficulties. At the time of my evaluation she was being treated with Haldol decanoate, Depakote, Prozac and Cogentin. She had also experienced two very serious bouts of dehydration, one of which required IV therapy. In addition she was noted to be toxic from her Depakote. Her Depakote level was noted to be 123 with the normal range being from 50-100 mcg/ml. Her bouts of dehydration (July 4, 2013) and her very serious medications toxicity problem (June 19, 2013) are dangerous heat-related health problems.

---

[11] Ibid, pg. 67.

4

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**Opinion:  Inappropriate use of chemical agents on the mentally ill**

Dr. Penn suggests that no prisoners with mental illness have been harmed by being pepper-sprayed or by other use of chemical agents.  As noted above, I toured the Perryville facility on July 18, 2013 and had the opportunity to evaluate named plaintiff Christina Verduzco. This evaluation consisted of a face-face interview as well as a review of her medical record. She is a chronically mentally ill individual who presented with prominent auditory and visual hallucinations. She also displayed difficulties with her thought processes that interfered with her ability to express herself in a coherent manner. These psychotic symptoms were confirmed in her medical record in a July 3, 2013 entry that stated "patient is hearing voices, answering questions and asking questions with no one in the room."  At the time of my evaluation, Ms. Verduzco was being treated with several psychotropic medications including Haldol decanoate, Depakote, and Prozac. In addition to her psychiatric incapacities, she had experienced at least two bouts of dehydration, one of which required IV therapy. Finally, she was noted to be toxic from her Depakote. Her blood level of Depakote on June 19, 2013 was noted to be 123 mcg/ml with high normal being 100 mcg/ml.

I am aware that Ms. Verduzco was pepper sprayed twice for "refusing directives to come to the cell front for pill call." This action appears to stem from a complete lack of understanding of her clinical situation and is frankly vengeful in nature. Her inability to come to the cell front for pill call was most likely due to a combination of her being psychotic and possibly suffering from medication toxicity and dehydration.

I reviewed a video of the pepper-spraying of Ms. Verduzco on December 22, 2011 (ADC 197317).  Ms. Verduzco was first diagnosed as suffering from Schizoaffective Disorder, bipolar type at the Arizona State Hospital in 2004. This is a chronic psychotic condition, which is

5

PRSN-PS 00312

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

characterized by intermittent manic episodes. A review of her medical record reveals that in the 6-8 weeks prior to this use of force incident she was becoming increasingly psychotic and emotionally labile. She began to episodically refuse her psychotropic medications during the run up to this incident. Of note, she was being prescribed four different medications: Depakote delayed release, Geodon, Celexa and Cogentin. On 12/21/11, the day before she was pepper-sprayed, a chart note stated that she was disoriented with deteriorated attention and concentration. Her mood was described as hostile and her affect as labile. The staff noted that she "presented as psychotic" and was "yelling at an object on the floor." The next day she refused all of her morning medications. While she was in this unmedicated, psychotic and manic state, she did not show her face and hands to the guard when requested and was sprayed with a noxious chemical agent.

I do not possess an adequate vocabulary to properly express how egregious it was to pepper spray this extremely ill individual. It is my firm professional opinion that these acts of pepper spraying have worsened her overall mental health condition. ADC's use of chemical agents poses a grave risk of future harm to Ms. Verduzco and other prisoners with serious mental illness.


**Opinion: Inadequate suicide prevention**

Dr. Penn assumes that there were seven suicides in ADC in 2013. Penn rep. at 69. As I stated in my supplemental report, there were ten suicides in ADC between January 1 and November 28, 2013. Assuming there were no additional suicides during the remainder of the year, this yields a rate of 25 suicides per 100,000 prisoners. Stewart supp. rep. at 5-6. In the

Confidential

PRSN-PS 00313

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

period from 2001 to 2011, only nine state prison systems had a suicide rate higher than 25 per 100,000.[12]

ADC's suicide prevention training materials state that "[f]or a system the size of ADC, an "average" suicide rate would be 4-5 per year." ADC_S000540. Ten suicides in a year – during a period when ADC has allegedly been improving mental health services – is a sign of significant deficiencies in ADC's suicide prevention measures.

There is another, more fundamental flaw in Dr. Penn's analysis. While the number of suicides is one important variable, it is not sufficient to look at raw numbers alone when assessing a prison system's suicide prevention. It is also essential to ascertain whether suicides resulted from poor mental health care or were otherwise preventable. A completed suicide can reveal systemic deficiencies in staffing, in the medication distribution system, in suicide watch practices, and other essential components of a prison mental health system. Dr. Penn apparently made no attempt to review any ADC suicides in this way.

**Opinion: Inappropriate Use of Isolated Confinement on the Mentally Ill**

Unlike the American Psychiatric Association, Dr. Penn apparently does not believe that housing prisoners with serious mental illness in isolation poses a risk of harm. He writes that "there is no empirical data to suggest any cause and effect psychiatric and/or mental health impact from the limited use of higher custody levels." Penn Rep. at 77. But ADC's own suicide prevention training materials correctly recognize that there is a "[h]igher risk [of suicide] for those in isolation or in higher custody units" ADC_S000521. These materials also note that prisoners "with a history of psychiatric problems or treatment, especially depression" are at

---

[12] U.S. Department of Justice, Bureau of Justice Statistics, *Mortality in Local Jails and State Prisons, 2000-2011 – Statistical Tables* (August 2013, NCJ 242186), Table 26.

7

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

heightened risk of suicide.  ADC_S000542.  Placing seriously mentally ill prisoners in ADC's isolation units is a recipe for serious harm or death, including aggravation of mental illness, self-mutilation, and suicide.

I have inspected segregation and isolation areas in numerous prisons and jails.  I have rarely, if ever, seen anything comparable to the extreme degree of isolation imposed on prisoners in ADC's isolation units.  The construction of cells with no windows, the covering of cellfronts with Plexiglas, and other steps taken to maximize isolation pose a grave risk of serious harm to prisoners with mental illness.[13]

### Opinion:  Lack of Mental Health Programming

ADC training materials state that "[a] significant number of mentally disordered inmates are housed throughout the department, with most inmates in general population rather than in specialized mental health programs."  ADC_S000384.  As of December 9, 2013, ADC had over 10,000 prisoners classified as MH-3, MH-4, or MH-5.  ADC_S000556.  Prisoners so classified have "a recognized need, or there exists a routine or current need for mental health treatment and/or supervision."  ADC_S000322.  According to the report of defendants' expert Richard Seiter, these prisoners have moderate, high, or acute mental health needs.  Seiter Rep. at 4.  Most if not all of these prisoners require mental health programming.

Dr. Penn focuses on specialized programs like the Women's Treatment Unit (WTU) at ASPC-Perryville and the Behavioral Management Unit (BMU) at ASPC-Eyman.  Whatever the

---

[13] See photos of cells in Florence-CB 1 and Eyman attached to this report as Exhibit A:  ADC 153331, 153336, 153339-41, 154497-98.

8

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

value of these programs, they serve only a tiny fraction of the thousands of ADC prisoners with mental health needs.[14]

Much of what Dr. Penn describes is not, in fact, mental health programming. Watching television is not mental health programming; nor is working as a groundskeeper or porter, "journaling," going to an exercise enclosure, participating in STG debriefing, or visiting.[15] Many of the activities Dr. Penn describes apparently do not include any interaction with mental health staff. While some or all of these activities may have mental health benefits, they do not constitute the mental health *programming,* provided by qualified mental health staff, that is an essential element of the treatment of prisoners with mental illness.

It is also apparent that many prisoners are excluded from the few mental health programs that do exist because of their custody level. Maximum custody prisoners are excluded from the WTU, Men's Treatment Unit, and Behavioral Health Unit. Penn Rep. at 58-60. Other prisoners may be arbitrarily excluded because of their sentence structure, which bears no relationship to one's need for or ability to benefit from mental health programming. Penn Rep. at 45, 59-60. I am particularly shocked to learn from Dr. Penn's report that 30% of the prisoners ADC itself has identified as suffering from serious mental illness are categorically disqualified from structured mental health programming. Penn Rep. at 45. This is a dangerous and unjustifiable policy that poses a substantial risk of serious harm to these prisoners.

The documents that have been provided to me by plaintiffs' counsel since my last report are listed in Exhibit B. I reserve the right to supplement my opinions if additional information or

---

[14] At the time of my inspection in July 2013, the WTU program included eight women. Stewart Rep. at 39. According to defendants' expert Richard Seiter, the BMU program currently includes ten men. Seiter Rep. at 2 n. 4.

[15] See photos of prisoners at Phoenix-Baker watching commercial television, attached to this report as Exhibit A: ADC 163939-41.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

documents are provided in the future.

10

PRSN-PS 00317

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated this $\underline{30}^{TH}$ day of January, 2014, at San Francisco, California.

PABLO STEWART, M.D.

11

PRSN-PS 00318

# Exhibit A

Confidential

Confidential



CONFIDENTIAL INFO - SUBJECT TO PROTECTIVE ORDER

GV12-0601: ADC154565



PRSN-PS 00321



ASPC-EYMAN

CONFIDENTIAL INFO - SUBJECT TO PROTECTIVE ORDER

CV12-0601: ADC153336



CONFIDENTIAL INFO - SUBJECT TO PROTECTIVE ORDER

CV12-0601: ADC153339



CONFIDENTIAL INFO : SUBJECT TO PROTECTIVE ORDER

CV12-0601: ADC153340



ASPC-EYMAN

CONFIDENTIAL INFO - SUBJECT TO PROTECTIVE ORDER

CV12-0601 ADC153341

Confidential



PRSN-PS 00326

Confidential



PRSN-PS 00327

Confidential



ASPC-PHOENIX

CONFIDENTIAL INFO : SUBJECT TO PROTECTIVE ORDER

CV12-0601: ADC163939

PRSN-PS 00328

Confidential



PRSN-PS 00329

Confidential



PRSN-PS 00330

# Exhibit B

PRSN-PS 00331

**Documents sent from plaintiffs' counsel to plaintiffs' witness Dr. Pablo Stewart after his supplemental expert report was submitted on 12/9/13**

**ADC Staff Training Materials**

- Suicide and Symptoms of Mental Illness
  - In-Service
    - ADC_S000317 2014 - Signs and Symptoms of Mentally Ill Inmates
    - ADC_S000318-000361 - 2014_Signs_and_Symptoms_of_Mentally_Ill_Inmates
  - Pre-Service
    - ADC_S000362-000384 - 9.7a COTA Signs & Symptoms of Mental Disorders
    - ADC_S000385-000439 - 9.7a COTA Signs and Symptoms of Mental Disorders
    - ADC_S000440-000444 - COTA Signs & Symptoms of Mental Disorder
- Suicide Prevention
  - In-Service
    - ADC_S000445 - 2014 Inmate Suicide Prevention
    - ADC_S000446-000515 - 2014_Inmate_Suicide_Prevention
  - Pre-Service
    - ADC_S000516-000517 - 9.7 SP Risk Factor Cards
    - ADC_S000518-000534 - 9.7b Suicide Prevention
    - ADC_S000535-000553 - 9.7b Suicide Prevention LP
    - ADC_S000554-000555 - SP Risk Factor Cards

**Corizon Reports**

- ADC_M00001 - CONFIDENTIAL SPDR Report
- ADC203028 - CONFIDENTIAL Arizona - Clinical Data Report October 2013
- ADC203029 - CONFIDENTIAL Arizona - Dental Utilization Statistics October 2013
- ADC203030 - CONFIDENTIAL Arizona - Dental Wait Times Report October 2013
- ADC203031 - CONFIDENTIAL Arizona - Formal Grievances by Category October 2013
- ADC203032 - CONFIDENTIAL AZ - Health Needs Requests (HNR) Appt Report October 2013 pivot table
- ADC203033 - CONFIDENTIAL Arizona - Hepatitis C Report October 2013
- ADC203034 - CONFIDENTIAL Arizona - Hospitalization Statistics Report October 2013
- ADC203035 - Arizona - Informal Grievances by Category October 2013
- ADC203036 - Arizona - Inmate Wait Times Report October 2013
- ADC203037 - CONFIDENTIAL Arizona - Intake Report October 2013
- ADC203038 - CONFIDENTIAL Arizona - Med Mal Stats October 2013
- ADC203039 - CONFIDENTIAL AZ - Medical Transports Complex Report October 2013
- ADC203040 - CONFIDENTIAL AZ - Medical Transports Statewide Report October 2013
- ADC203041 - CONFIDENTIAL Arizona - Monthly Staffing Report October 2013
- ADC203042 - CONFIDENTIAL Arizona Statewide Grievances October 2013
- ADC203043 - CONFIDENTIAL CAG FAQ PBMS Report FY14 - October 2013

1

- ADC203044-203050 - Corizon AZ Emergency Transports by Complex Oct 2013
- ADC203051-203060 - Corizon AZ Medication Report Oct 2013
- ADC203061-203062 - Corizon AZ Inpatient Admits Oct 2013
- ADC203297 - CAG FAQ PBMS Report FY13 - June 2013
- ADC203348 - November 2013 Inmate Wait Times Report
- ADC203349 - CONFIDENTIAL November 2013 Dental Utilization-Statistics
- ADC203350 - CONFIDENTIAL November 2013 Dental Wait Time Reporting
- ADC203351 - November 2013 Hepatitis C Report
- ADC203352 - November 2013 Inmate Intakes by Complex

**Defendants' Expert Reports and Associated Productions**

- Confidential Expert Report of John Dovgan
- Confidential Expert Report of Lawrence Mendel
- Confidential Expert Report of Joseph Penn
- Confidential Expert Report of Richard Seiter
- Defendants' Expert Materials, Volume 1, January 17, 2014
- Defendants' Expert Materials, Volume 2, January 17, 2014
- Defendants' Expert Materials, Volume 3, January 17, 2014
- Defendants' Expert Materials, Volume 4, January 17, 2014

**Disclosure Statements**

- Defendants' 11th Supplemental Disclosure Statement

**Miscellaneous**

- Expert Report of Dr. Pablo Stewart
- ADC203027 - Arizona - Cert and Licensing Monthly Update October 2013
- ADC203063-203258 - Wells 2d Supp Resp - Rog 7
- ADC203259-203296 - Wells 2d Supp Resp - Rog 8
- ADC203353-203359 - Feraci Store Order History
- ADC_P000984 - ADC ID Badge re Suicide Warning Signs
- ADC_S000556 - MHclassificationbyGenderDec9

**Named Plaintiffs' Records**

- ADC203298-203347 - Licci Updated Medical Records
- ADC_M000195-000206 - Joshua Polson's ENT Records
- ADC_P000580-000858 - AIMS REPORTS - ALL NAMED PLAINTIFFS (CONFIDENTIAL)

Confidential                                                                                          PRSN-PS 00333

**NCCHS Accreditation Reports**

- ADC_P000888-000901 - Douglas 20130628 Report
- ADC_P000902-000915 - Perryville 20130628 Report.
- ADC_P000916-000919 - Perryville 20131011 Update Report
- ADC_P000920-000933 - Phoenix 20130613 Report
- ADC_P000934-000950 - Tucson 20130628 Report
- ADC_P000951-000959 - Tucson 20131108 Update Report
- ADC_P000960-000964 - Winslow 20131119 Update Report
- ADC_P000965-000973 - Yuma NCCHC - 2011-03-11 - update report
- ADC_P000974-000976 - Douglas 20131119 Update report
- ADC_P000977-000979 - Perryville 20131118 Update report
- ADC_P000980-000983 - Phoenix 20131122 Update report

**Photos**

- ADC153331 – ASPC-Eyman
- ADC153336 – ASPC-Eyman
- ADC153339-41 – ASPC-Eyman
- ADC154497-98 – ASPC-Florence
- ADC154565 – ASPC-Tucson
- ADC163939-41 – ASPC-Phoenix
- ADC163952 – ASPC-Phoenix
- ADC165980-166048 - Florence - 2013-08-20 (redacted)
- ADC166049-166110 - Lewis - 2013-08-21 (redacted)
- ADC166111-166173 - Perryville - 2013-08-19 (redacted)
- ADC166174-166183 - Perryville-Lumley - 2013-08-19 (redacted)
- ADC166184-166215 - Tucson - 2013-08-22 (redacted)

**Programs**

- ADC_P000859-000865 - Tucson HU-7 WIPP Time sheets
- ADC_P000866 - Eyman Special Mgmt Unit I Map as of 10-28-13
- ADC_P000867 - Eyman Mental Health Program Schedule
- ADC_P000882 - Eyman Weekend Recreation Schedule
- ADC_P000883-000886 - Phoenix-Baker - Introduction to Baker MH Program
- ADC_S000286-000291 - Central Unit Mental Health Programs & Schedule

**Resumes**

- ADC203360-203362 - Mark Jansen CV
- ADC203363-203364 - Mark Fleming CV

3

- ADC203365-203367 - Thomas Buenker CV
- ADC203368-203371 - William Smallwood CV

**Videos**

- ADC197317-197317 - Verduzco - UOF 11-B02-5191 - 2011-12-22
- ADC197318-197318 - Verduzco - SIR 12-03705 2012-03-25
- ADC197319-197319 - Verduzco - SIR 12-04264 2012-04-14

4

Confidential

# EXHIBIT 10



# Second Supplemental Expert Report of Pablo Stewart, M.D.

*Parsons v. Ryan,* No. 2:12-cv-00601-NVW (MEA) (D. Ariz.)

February 24, 2014



CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I have reviewed medical records, mortality reviews (where they exist) and psychological autopsies (where they exist) pertaining to the following ADC prisoners who died by suicide between February 12 and September 27, 2013:



As noted in my previous reports, there have been additional suicides in ADC since September 27, 2013, but it is my understanding that defendants refuse to produce records pertaining to those suicides. It is also my understanding that, for the eight prisoners listed above, defendants have produced only the medical records from the one-year period preceding the prisoner's suicide.

My review of these documents reveals serious systemic deficiencies, both in suicide prevention and in the provision of mental health care more generally. These deficiencies include:

Inadequate follow-up and infrequent contact with qualified mental health staff.

Poor documentation and inadequate and incomplete medical records.

Dangerous prescribing practices.

Inadequate history taking, exploration of symptoms, mental status exams, and risk assessment.

Perfunctory and inadequate mortality reviews and psychological autopsies.

As a threshold matter, it is deeply concerning that, although the most recent of these suicides took place several months ago, psychological autopsies have been completed for only three of these eight suicides. I have previously explained the importance of psychological autopsies in preventing future suicides; ADC's failure to perform them on all suicides as a matter of course shows a startling level of indifference.

In addition, the psychological autopsies and mortality reviews that do exist are, with rare exception, rote formalities; the mortality reviews usually consist of little more than checking a

1

series of boxes. They seem to have been completed with very little care; for example, the mortality review for ▆▆▆ states that there were "no clinical signs of depression or suicidality noted prior to successful attempt" (p. 2) – a statement that Mr. ▆▆▆ medical record clearly shows to be false.

The deficiencies in these reviews are exemplified by the fact that, in the mortality reviews for ▆▆▆ and ▆▆▆ in the space for "Lessons Learned" the reviewer has written "None" (the "Lessons Learned" space in ▆▆▆ mortality review was left blank). This is completely contrary to the purpose of mortality reviews in medicine. The purpose of these reviews is not to confirm that everything is fine, but to learn from bad outcomes and avoid them in the future. ADC's psychological autopsies and mortality reviews – both in the failure to perform them in all cases, and in the poor quality of those that are completed – fall far below the standard of care.

▆▆▆▆

The defendants have not provided Ms. ▆▆▆ medical file, so the only sources of information are the mortality review (which contains virtually no information) and the psychological autopsy. The latter portrays a chronically and severely mentally ill woman who had a clear escalation and worsening of symptoms in the two months prior to her suicide, with little or no apparent response from mental health staff.

Ms. ▆▆▆ had a long history of suicidal ideation, as well as a suicide attempt by hanging (psychological autopsy (PA), pp. 7-8), meaning that she was at chronically high risk for suicide. She made statements indicating DTS (danger to self) in December 2012 and January 2013 (PA, p. 8). On January 21, 2013, she said "I dream to die," and the same day reported auditory hallucinations telling her it is "okay to die" (PA, p. 12). There is no indication whether or how these symptoms were addressed, or whether they affected risk assessment, diagnosis, or treatment planning.

On ▆▆▆ , Ms. ▆▆▆ was seen by mental health and "denied any suicidal intent" (PA, p. 3). She hanged herself later that same day. There is no other information about this encounter with mental health. For example, why was she seen that day? By what level of mental health staff? What was her condition in terms of mood, thought process, speech, affect, and other elements of a mental status exam? What was the risk assessment? Given that this encounter with mental health staff occurred hours before Ms. ▆▆▆ suicide, this lack of information is puzzling and concerning.

One other aspect of Ms. ▆▆▆ mental health treatment raises additional concerns. The psychological autopsy states that Ms. ▆▆▆ became "fixated" on breathing problems (PA, p. 4). This is a fairly common symptom of a panic disorder, but there is no indication that this diagnosis was ever considered, or that Ms. ▆▆▆ ever received treatment for a panic disorder, which is a risk factor for suicide.

2



This man's medical record shows clear documentation of severe symptoms, including hallucinations, paranoia, psychosis, mood lability, and panic, for which he received little attention from mental health staff. A 10/14/12 note describes him as "crying," with very little mental health assessment, no plan to address this, and no referral to mental health (ADC 216263). Much of his contact with mental health staff consists of "cellfront check lists" which do not include a complete a mental status exam or fully evaluate hallucinations, anxiety, panic, or mood.

Throughout March and April of 2013 he is highly symptomatic, repeatedly placed on suicide watch, and at one point found to be "unstable with visual hallucination" (ADC 216424), but I can find no indication he is seen by a psychiatrist until April 18, 2013. On that date, Dr. Raza orders 450 mg Lithium BID, Risperdal 1.5 mg BID, Remeron 15 mg q pm and Cogentin 0.5 mg BID. This is a moderately aggressive starting dose for Lithium and Risperdal, which increases the risk of side effects and toxicity, yet there is no explanation in the note for this moderately aggressive regime. There are also no labs ordered; with these medications, the patient's Lithium needs to be monitored, as well as fasting labs done to establish a baseline when starting both Lithium and Risperdal. (ADC 216400-404). There is no MD follow-up until April 24, which is an unacceptably long time for a patient being started on such a combination of medications. (ADC 216393).

On May 7, 2013, Mr. ▮▮▮▮▮ is seen by Dr. Winsky, who notes that "voices continue," but inexplicably checks the box indicating "no hallucinations" (ADC 216390). Dr. Winsky changes Mr. ▮▮▮▮▮ medications, but provides no rationale for these changes; he also fails to perform a mental status exam. Dr. Winsky's order for these medication changes is dated May 17 – ten days after he wrote the note with the plan to make these changes (ADC 216379). This extraordinary delay falls far below the standard of care particularly where, as here, the patient has been highly symptomatic and suicidal in the interim. It appears that Mr. ▮▮▮▮▮ was not seen by a psychiatrist again before he hanged himself on ▮▮▮▮▮.

On May 15, 2013, Mr. ▮▮▮▮▮ was pepper-sprayed, apparently because he "was in cell [and] began to sob and started punching cell door." ADC 216281. To pepper-spray this seriously mentally ill person, who was obviously already in great distress, was completely inappropriate. It almost certainly aggravated his mental illness and may well have contributed to his suicide.

Mr. ▮▮▮▮▮ problem list indicates "multiple [psychiatric] meds" (ADC213613). The psychological autopsy recounts "a history of recurrent depression," past psychiatric treatment with antidepressants, and a suicide attempt while incarcerated. These factors identify him as a high risk for suicide. And yet his chart reveals absolutely no mental health evaluation or treatment in the last year of his life. This is particularly inexplicable given that Mr. ▮▮▮▮▮ as a

3

prisoner under sentence of death, was held in conditions of extreme isolation in ASPC-Eyman Browning Unit. Such conditions are well known to significantly increase risk of self-harm and suicide.[1] It is very concerning that a prisoner with this history, held in such conditions, would not receive any monitoring of his mental health and risk of suicide.

Mr.            committed suicide by taking "a massive overdose of amitriptyline – a medication that had not [sic] prescribed to him" (PA, p. 2). The fact that a prisoner with a history of recurrent depression and a suicide attempt while incarcerated, housed in conditions known to increase the risk of suicide, was able to obtain and stockpile a lethal dose of a medication not prescribed to him demonstrates major deficiencies in ADC's suicide prevention program.

This is an egregious case of indifference to and neglect of a person who was obviously at very high risk of suicide. A 10/17/12 "initial mental health assessment" notes a history of suicidal ideation and multiple suicide attempts by highly lethal means (hanging in 2009, shooting 5 months prior to the intake, presumably May 2012), as well as auditory hallucinations and paranoia (ADC 216457-58). A "reception center screening" form on the same date notes current depression and anxiety. ADC 216463. The following day, Mr.            submitted an HNR asking to talk to mental health "ASAP please." ADC 216499. None of these resulted in any contact from mental health. Upon transfer to Eyman-SMU on 11/27/12, he rated his depression 7 on a 10-point scale. ADC 216507. A "cellfront visit checklist" note on 12/28/12 indicates "depressed – hasn't seen [psychiatry]" ADC 216501.

Mr.            hanged himself on            at the age of 22. I can find no evidence that he was ever seen by a psychiatrist.

The mortality reviewer for Mr.            answers the question "Was sufficient care offered/provided regarding Mental Health issues?" by checking the box indicating "no." The reviewer also checked boxes for "failure to recognize symptoms or signs," "delay in access to care," "failure to follow-up/identify abnormal test results," and "failure of provider to assume responsibility for patient." The reviewer also provides the following narrative:

---

[1] A February 2014 study in the American Journal of Public Health found that detainees in solitary confinement in New York City jails were nearly seven times more likely to harm themselves than those in general population, and that the effect was particularly pronounced for juveniles and people with severe mental illness. *See* Homer Venters et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, 104:3 AM. J. PUBLIC HEALTH 442, 442-447 (March 2014), *available at* http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2013.301742

Patient initially reported no history of mental health hospitalizations, but subsequently did report he was treated briefly after a previous suicide attempt. He also reported two prior suicide attempts, one by hanging and one by shooting. It is notable that the most important indicator of a successful suicide is the number of previous attempts. Patient placed a HNR to see mental health services on 10/08/12, but was not seen for the remaining 6 weeks while he was held at the Phoenix intake site and remained classified as MH-1. When transferred to Eyman complex, he reported on 11/27/12 that he has significant degree of depression. However, no mental health follow up was scheduled as a result of his intake evaluation. Patient was seen on 12/26/12 by mental health and self-reported recurring suicidal ideation, and was placed on ten minute watch. He was taken off of watch on 12/28/12 and was not seen by mental health again prior to his suicide.

\* \* \*

Per psychological autopsy:[2] mental health score incorrectly entered into AIMS as MH-1, HNR requests for mental health services at Phoenix not acted upon, intake at Eyman showed depression, but was not referred for further services, was not seen every 30 days as required by policy, no further follow up evaluation conducted after release from suicide watch.

\* \* \*

There were signs of suicide present that were not acted upon.

The mental health care provided to Mr. ▮▮▮▮ falls far below the standard of care, and contributed to his suicide.

▮▮▮▮▮▮

According to the mortality review, this man had a history of depression requiring hospitalization, which indicates a high risk of suicide. Security referred him to mental health on 2/23/12 for suicidal ideation; the patient said he was in debt to other prisoners and thought his best option was dying. He requested protective custody in November 2012 due to difficulties with other prisoners. The reviewer also writes that "suicidality my [sic] have been exacerbated by numerous letters from his wife in Texas telling him she loved him but still needed to have sex with her boyfriend." Mortality review, p. 2.

An 11/1/12 note by an RN reads "IM to medical for protective segregation screening. Form was completed. IM denies having any suicidal thoughts." ADC213972. This is entirely inadequate as a risk assessment for a prisoner with a history of major depression and recent suicidal ideation who is currently feeling threatened to the point of seeking protective custody. The "Initial Protective Segregation Inmate MH Screening" form, also dated 11/1/12, indicates that Mr.

---

[2] No psychological autopsy for Mr. ▮▮▮▮ has been provided to me.

"seriously thought about committing suicide" about four years ago. ADC 213997. The first mental health note after this event is an unsigned 11/27/12 chart review. Although the note indicates a history of suicide attempt, the reviewer checks the box for "inmate requires no referral to mental health services at this time." Again, there is no risk assessment or mental status exam. ADC 213996. I can find no indication that Mr. was seen by mental health again before his suicide on . I can also find no indication that he was ever seen by a psychiatrist, psychologist, or other qualified mental health staff in the year preceding his suicide. Mr. treatment falls below the standard of care.

The mortality review for Mr. contains virtually no information. According to the psychological autopsy (titled "Completed Sentinel Event Review Form"), he had a diagnosis of depression NOS (ADC 211763), and had taken Remeron due to depression while in the county jail. ADC 211770. Yet his record indicates absolutely no mental health treatment or monitoring in the year preceding his suicide on , and the psychological autopsy confirms that his last contact with behavioral health was on 8/20/12. ADC211765. This is far below the standard of care, particularly given Mr. history of depression and the fact that he was housed in the isolating conditions of Florence-Central Unit.

The psychological autopsy indicates that Mr. requested protective custody on the day of his suicide, and was moved to a new housing unit as a result, but there is no further discussion of this obviously significant event. There is no indication that any suicide risk assessment was performed at this time, which should be routine in the case of a prisoner seeking protective custody.

The psychological autopsy is internally contradictory in several respects. For example, p. 3 indicates that a suicide risk assessment was completed; p. 5 says there is no documentation of such an assessment. Page 4 indicates that Mr. was taking no medications, but also says that he takes ">80% of scheduled doses." Such obvious errors reflect a lack of care in completing the psychology autopsy, and render it unreliable as a source of information and therefore of very little value in preventing future suicides.

Another deficiency involves the fact that Mr. committed suicide by cutting the blood vessels in his elbow. This raises the obvious question how he was able to obtain a cutting instrument able to inflict such lethal injuries while housed in a maximum security unit, immediately after being moved to a new cell. In addition, this is a method of suicide that typically takes a relatively long time to result in death. There is a note that there was "difficulty maintaining patient airway due to I/M stiff neck" (ADC 211773), suggesting that rigor mortis may have set in by the time Mr. was found. The fact that Mr. was not found until he was dead, possibly with rigor mortis, indicates a serious deficiency in ADC's monitoring practices.

6

The treatment received by Mr. ▮▮▮ was below the standard of care.

Mr. ▮▮▮ had a diagnosis of Psychotic Disorder NOS and was classified as MH3. ADC 218345. On 7/5/12 he sees the psychiatrist, who changes his diagnosis to Dysthymic Disorder and prescribes Wellbutrin. There is no explanation for this change to a very different diagnosis. ADC 218379. On 8/14/12, Mr. ▮▮▮ submits an HNR saying "Please cancel my Wellbutrin. Things started out remarkably well, but at about 4 weeks it all went very, very bad, with crippling depression, OCD, hostility and apathy." ADC 218368.

Mr. ▮▮▮ is not seen by the psychiatrist until 9/6/12. This is far too long a delay given the very serious and dangerous symptoms he described on 8/14/12. The 9/6/12 psychiatrist's note indicates that Mr. ▮▮▮ stopped taking Wellbutrin because "it didn't agree with him," but there is no explanation of the nature of his adverse reaction; no risk assessment; and no plan except to discontinue Wellbutrin. ADC 218376. It appears that after this, Mr. ▮▮▮ was simply ignored; the mortality review (p. 3) indicates that this was the last time he was seen by mental health before his suicide by hanging more than eight months later on ▮▮▮. A 9/21/12 "cellfront visit checklist" indicates that Mr. ▮▮▮ was dysthymic, irritable, depressed, and angry, but this apparently generated no follow up by mental health. ADC 218377.

In addition, Mr. ▮▮▮ received inadequate medical care that may well have contributed to his suicide. His Thyroid Stimulating Hormone (TSH) levels were elevated at 6.28 on 7/18/12 and 6.29 on 2/13/13. ADC 218361, 218363. This indicates possible hypothyroidism, which can exacerbate depression. Because there are no Medication Administration Records (MARs) in the file, it appears that this condition went untreated, which would have greatly increased Mr. ▮▮▮ risk of suicide.

An "Initial Mental Health Assessment" from 3/12/13 documents a previous diagnosis of Bipolar Disorder vs. Paranoid Schizophrenia, as well as multiple current medications including Lithium, Risperdal, Tegretol, Propranolol, and Benztropine. Mr. ▮▮▮ says he hears voices and sees shadows, feels paranoid, and has serious episodes of depression "at night, every other day." The form also notes previous psychiatric hospitalization, "10-15" previous suicide attempts, with the most recent "3-4 months ago." An incomplete mental status exam shows he is distracted, confused, disheveled, and anxious, with inappropriate affect and disjointed speech. This assessment, though incomplete, strongly indicates a possible psychiatric emergency requiring hospitalization; yet the only apparent response is to refer Mr. ▮▮▮ to psychiatry "@ next yard." ADC218384-85.

There is a 3/12/13 note by Dr. Cleary, indicating "continue with current medications," and attaching a prescription. There is no mental status exam, no risk assessment, no diagnosis, and

7

no rationale for prescribing these medications at these doses, which are relatively high. ADC218397, 218399.

On 3/26/13 Mr.          is seen by Dr. Bishop who, without explanation, changes his diagnosis to Anxiety Disorder NOS and Mild Mental Retardation, discontinues all his medications, and prescribes 45 mg Remeron instead. This is completely outside the norms of reasonable practice and highly dangerous. The discontinuation of relatively high doses of five medications put Mr.          at grave risk of recurrence of past symptoms, including psychosis, depression, anxiety, and suicidal ideation. Also, the starting dose for Remeron is 15 mg; 45 mg is the maximum dose. There is no documentation of the rationale for this change or acknowledgment of the risks to the patient. Follow-up is indicated as 3 months, which is far too long given this drastic medication shift. ADC218431-33.

On 4/6/13 Mr.          files an HNR saying "I would like to see the mental health doctor reason being is that I would like to speak to him about some concerns relating to my meds, if I may be seen ASAP please." ADC 218426.

On 4/16/13 Mr.          sees Dr. Bishop again. Dr. Bishop notes continuing anxiety and checks a box indicating "mood disturbance," but provides no explanation. He continues Remeron and adds Buspar 30 mg BID. Again, this is the maximum dose and inappropriate as a starting dose. Dr. Bishop again indicates follow-up in 3 months. ADC 218429. Mr.          killed himself days later.

It is very likely that these drastic and dangerous medication shifts, combined with poor follow-up, contributed to Mr.          suicide on          .

8

Dated this 24th day of February 2014, at San Francisco, California.

PABLO STEWART, M.D.

9

# EXHIBIT 11

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

**CONFIDENTIAL EXPERT REPORT OF:**

**JAY D. SHULMAN, DMD, MA, MSPH**
**9647 HILLDALE DRIVE**
**DALLAS, TEXAS 75231**
**TELEPHONE: (214) 923-8359**

**REGARDING**
**DENTAL CARE AT THE ARIZONA DEPARTMENT OF CORRECTIONS**

**NOVEMBER 8, 2013**

JAY D. SHULMAN, DMD, MA MSPH

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND BACKGROUND ................................................................. 1

    A.    Qualifications ................................................................................................ 1

    B.    Standard of Dental Care in Prison .............................................................. 2

        1.    Timeliness of Care ........................................................................... 2

        2.    Staffing ............................................................................................. 2

        3.    The National Commission for Correctional Health Care ("NCCHC") ...................................................................................... 3

        4.    The California Department of Corrections and Rehabilitation ("CDCR") ......................................................................................... 4

    C.    Description of Dental Conditions ................................................................ 5

        1.    Odontogenic Pain (Toothache) ...................................................... 5

        2.    Dental Caries ................................................................................... 6

        3.    Pulpitis ............................................................................................. 7

        4.    Lost Fillings or Crowns ................................................................... 7

        5.    Fractured Teeth ............................................................................... 7

        6.    Periodontal Infections .................................................................... 8

II.   METHODOLOGY ................................................................................................. 8

    A.    Data Collection ............................................................................................. 8

    B.    Record Review .............................................................................................. 9

    C.    Data Analysis ................................................................................................ 9

III.  OPINIONS .......................................................................................................... 10

    A.    Inadequate Dental Staffing ....................................................................... 11

        1.    Staffing Ratios ............................................................................... 11

        2.    Consequences ................................................................................. 13

        3.    Summary ......................................................................................... 15

    B.    Inadequate Process for Triaging Inmates Requiring Dental Treatment .............. 16

        1.    Existing HNR Process .................................................................... 16

        2.    The existing ADC System lacks the ability to properly categorize dental problems ............................................................................. 17

        3.    Dental assistant triage .................................................................. 18

-i-

# TABLE OF CONTENTS
(continued)

|  |  | 4. | Consequences | 21 |
|  |  | 5. | Summary | 23 |
|  | C. | | Untimely Treatment for Routine Care | 23 |
|  |  | 1. | Delay in Receiving Routine Care | 24 |
|  |  | 2. | Removing Prisoners from the Routine Care List – The ADC Prisoners' Dilemma | 25 |
|  |  | 3. | Summary | 28 |
|  | D. | | Avoidable Extractions | 28 |
|  |  | 1. | Extractions of Teeth that Could Be Restored | 28 |
|  |  | 2. | Restoring Teeth Recommended for Extraction | 30 |
|  |  | 3. | Summary | 31 |
|  | E. | | Inadequate Treatment of Chewing Difficulty | 32 |
|  |  | 1. | Denture Preparation | 32 |
|  |  | 2. | Consequences | 33 |
|  |  | 3. | Summary | 35 |
|  | F. | | Inadequate Monitoring by ADC | 35 |
|  |  | 1. | ADC Dental Monitor | 35 |
|  |  | 2. | ADC Monitoring Report for Dental Care | 37 |
|  |  | 3. | Other ADC Reports | 37 |
|  |  | 4. | Summary | 38 |
| IV. | | | CONCLUSION | 38 |

Confidential

PRSN-JDS 00003

## I.     INTRODUCTION AND BACKGROUND

### A.     Qualifications

I have been retained by Plaintiffs' counsel as an expert in dental care in correctional institutions.  I have been a dentist for over 41 years and have had careers in the military, dental education, and correctional dentistry consulting.  I am certified by the American Board of Dental Public Health, one of nine specialties recognized by the American Dental Association.  Dental Public Health "is that part of dentistry providing leadership and expertise in population-based dentistry, oral health surveillance, policy development, community-based disease prevention and health promotion, and the maintenance of the dental safety net."  [ADA, Oral Health Topics]  I also have extensive experience auditing educational, military, and correctional dental programs. My *curriculum vitae* is attached as Exhibit A.

During my 22-year military career, I had clinical, research, administrative, and command assignments in the United States, Okinawa, and Germany.  Among my assignments, I served as the Army Surgeon General's Dental Public Health Consultant and wrote dental public health policy, procedures, and technical guidance.  As Commander of the 86th Medical Detachment, I directed dental care delivery for the Army in north central Germany and operated six clinics with 20 dentists and 60 ancillary personnel.  I was responsible for the dental health of 25,000 soldiers and family members.  Among the studies I planned when I was in a research position were several on the Army's Dental Fitness Classification System, in which dentists assign patients to treatment priority groups based on the severity of dental needs.

I have served as a correctional dentistry consultant, court expert/representative, and expert witness several times since 2005.  As a court expert in two major class action settlements involving prisoner dental care, I developed an audit process based on reviewing clinical records and performed system-wide audits of programs in California (roughly 170,000 inmates in 33 institutions) and Ohio (roughly 50,000 inmates in 30 institutions) over a multi-year period. Moreover, I have performed clinical dentistry and supervised dental and dental hygiene students at the Dallas County Juvenile Detention Center.  My work in the military and correctional dentistry, as well as my training in Dental Public Health focusing on population-based care, have given me unique expertise to discuss not only specific incidences of dental care, but system-wide deficiencies in dental care and the effects those deficiencies are likely to have on inmate populations.  A complete list of the cases for which I served as an expert is attached as Exhibit B.

I have written 55 peer-reviewed articles and three book chapters, served as a reviewer for several dental journals, and served on the editorial board of the *Journal of Public Health Dentistry*, the official journal of my specialty.  Many of the papers I wrote during my academic career related to the epidemiology of dental caries (tooth decay) and oral lesions.   Four publications relate to correctional dentistry, one of which involved surveying dental programs in state corrections departments.  A complete list of my publications is included in my *curriculum vitae*.

I have been asked to render my opinion with respect to whether inmates in Arizona Department of Corrections ("ADC") facilities are subjected to a substantial risk of serious dental injury caused by ADC's systemic deficiencies.  As explained further below, my opinions are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

based on a review of dental records of the named prisoner plaintiffs and other inmates, as well as documents, reports, and depositions available at this time, as listed in Exhibit C, as well as the scientific literature.   In addition, the opinions are based on my 41 years of professional experience in dentistry and are made to a reasonable degree of dental certainty.

## B.      Standard of Dental Care in Prison

Correctional dentistry focuses on the control of acute and chronic dental pain, stabilization of dental pathology, and maintenance or restoration of function.  Dental treatment should include restorations (fillings) and not be limited to extractions.  [Makrides *et al*. at 557] These standards of dental care are based on my research and understanding of the law, the care provided in the community, and the care provided in institutions.  The standard of care used in the community at large is instructive because that standard is based on the type of care needed to protect patients from unnecessary pain and dental injury.  [*Id.*]

### 1.      Timeliness of Care

Inmates are entitled to timely treatment of their serious dental needs, as well as timely routine care, which is needed to prevent the occurrence of more serious dental injuries. Standards of dental care in the community and for correctional dentistry hold that inmates should not be forced to suffer pain or other dental injuries if those injuries could have been avoided by timely care.  [Lake County Findings Letter at 15]  Similarly, the U.S. Department of Justice ("DOJ") has held that the Civil Rights of Institutionalized Persons Act requires prisons to provide dental care consistent with generally accepted professional standards and to have sufficient treatment capacity that care is provided in a timely manner.  [*See, e.g.*, Dallas County Agreed Order § III(A)(13) (mandating reforms in the dental care provided by the jail); Cook County Agreed Order § III(c)(58) (requiring the jail to "ensure that inmates receive adequate dental care, and follow up, in accordance with generally accepted correctional standards of care. Such care should be provided in a timely manner, taking into consideration the acuity of the problem and the inmate's anticipated length of stay.")]

### 2.      Staffing

A prison system must be staffed with dental professionals qualified to provide inmates with needed dental care.  Inadequate staffing causes delay and puts inmates at a substantial risk of serious injury.  Among the minimum remedial measures identified by the DOJ to rectify deficiencies found in a jail and to protect the inmates' constitutional rights was to "[e]nsure dental hours accommodate the need for dental care."  [Lake County Findings Letter at 29]

The recommended inmate to dentist ratio for prisons is at least 1,000:1, under the assumption that dental hygiene support will be provided in addition to that ratio.  [Makrides *et al.* at 557]  The ratio requires even more dentists per inmate if an inadequate number of dental hygienists and/or appropriately-trained staff are employed, or if dentists are tasked with performing duties that dental staff typically would perform.  Thus, a staffing model for a dental program in a prison must include an appropriate mix of dentists, dental hygienists, and dental assistants.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **2**

*Dentists*.  A dentist is an advanced level provider who possesses a baccalaureate degree as well as (at minimum) a professional degree generally requiring four years of post-college study.  The practice of dentistry is the diagnosis, surgical or nonsurgical treatment, and performance of related adjunctive procedures for any disease, pain, deformity, deficiency, injury or physical condition of the human tooth or teeth, alveolar process, gums, lips, cheek, jaws, oral cavity and associated tissues.  Among the procedures performed by a dentist are tooth extractions, restorations, endodontics (root canals), periodontal scaling, curettage and surgery, and fabrication of dentures. Dentists supervise dental hygienists and dental assistants.  [AZ Code Dentistry][1]

*Dental Hygienists*.  A dental hygienist has an associate or baccalaureate degree in dental hygiene.  A dental hygienist's education emphasizes the basic sciences, which include microbiology, chemistry, pathology, anatomy and physiology.  Dental hygienists may perform oral prophylaxis, scaling, closed subgingival curettage, and root planing, administer local anesthesia, examine the oral cavity and surrounding structures, perform a periodontal examination, record clinical findings, compile case histories, and expose and process radiographs.  Moreover, a licensed dental hygienist may perform all functions authorized and deemed appropriate for dental assistants.  [AZ Code Dental Hygiene]

*Dental Assistants*.  A dental assistant is a minimally trained individual[2] with familiarity in dental physiology, dental charting, sterilization and infection control, dental x-ray techniques,[3] instrumentation, dental materials, and preventive dentistry.[4]  [AZ Dental Assisting]  For example, dental assistants employed by the State of Arizona should have, "Knowledge of: dental office and dental operative assistance procedures and techniques; the principles and methods of sterilizing instruments; oral hygiene and plaque control techniques; methods, processes, materials, instruments and equipment used in making dental appliances [and] Skill/Ability to: work with patients and assist a dentist in work; follow oral and written instructions; perform clerical work; communicate both orally and in writing."  [AZ DA Position]

### 3.      The National Commission for Correctional Health Care ("NCCHC")

Dr. Michael Adu-Tutu repeatedly stated in his deposition that ADC relies on NCCHC standards and accreditation to show that it complies with the standard of care.  The NCCHC describes itself as an organization "dedicated to improving the quality of correctional health care services and helping correctional facilities provide effective and efficient care."  [NCCHC 2008 at vi]  NCCHC accredits correctional institutions based on their compliance with, among other standards, the NCCHC Oral Care Standard.  The Oral Care Standard measures an institution's

---

[1]  Full citations are available in Exhibit C: Materials Considered.

[2]  For example, the Arizona School of Dental Assistants offers a 12 week (112 clock hour) diploma program to high school graduates.  [*See* AZ Dental Assisting]

[3]  A dental assistant may expose radiographs for dental diagnostic purposes under the general supervision of a dentist if the assistant has passed an examination.  [AZ Code Dental Assistants]

[4]  A dental assistant may polish the natural and restored surfaces of teeth under the general supervision of a dentist if the assistant has passed an examination.  [*Id.*]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

processes for providing care, requiring a full range of dental treatment (rather than just extractions) and a priority system to determine the need for more urgent care. [*See Id.* at 69-71 (Oral Care Standard (P-E-06)); NCCHC 2008 at 70 (Compliance Indictors)]

NCCHC accreditation, however, does not require that dentists audit the care actually performed at an institution in order to evaluate health outcomes. Additionally, some NCCHC standards, such as its requirement that care be "timely," do not specify auditable standards. Thus, relying on NCCHC standards or accreditation, as ADC does, fails to demonstrate that an institution meets the appropriate standard of care. To the contrary, the shortcomings of the NCCHC standards reinforce the systemic failures within ADC.

### 4. The California Department of Corrections and Rehabilitation ("CDCR")

California provides an example of a corrections system that employs a classification system with specific time frames for treating dental conditions. [*See* CDCR P&P at Ch. 5.4-3] This system, implemented in the process of improving a previously unconstitutional dental system, is an improvement over the policies and practices currently utilized by ADC. Under the CDCR system, the care required by the prisoner is categorized as Emergency, Urgent (Priority 1), Interceptive (Priority 2) or Routine (Priority 3).

    a. ***Emergency conditions*** must be treated immediately and are acute oral or maxillofacial conditions, which are likely to remain acute, worsen, or become life-threatening without intervention.

    b. ***Urgent conditions*** are designated as Priority 1A, 1B, or 1C.

        i. Priority 1A conditions must be treated within 72 hours and involve sudden onset or severe dental pain that prevents prisoners from carrying out essential activities of daily living.

        ii. Priority 1B conditions must be treated within 30 days and are sub-acute hard or soft tissue conditions that are likely to become acute without early intervention. Priority 1B conditions include a tooth that has extensive decay to the point of jeopardizing the pulp as well as a tooth that has lost a filling and is vulnerable to pulpal inflammation or destruction from normal chewing.

        iii. Priority 1C conditions must be treated within 60 days and have unusual hard or soft tissue pathology such as acute ulcerative necrotizing gingivitis and severe localized or generalized periodontitis.

    c. ***Interceptive conditions*** must be treated within 120 days and include (a) advanced decay or periodontal pathology, (b) edentulousness or lacking posterior teeth in occlusion, (c) moderate to advanced periodontitis, and (d) chronically symptomatic impacted teeth.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

    d.   **Routine conditions** must be treated within 12 months and involve (a) an insufficient number of posterior teeth to masticate a regular diet, (b) decayed or fractured teeth that require restoration with definitive materials, (c) definitive root canal treatment where allowed by policy, and (d) non-vital, non-restorable teeth requiring extraction.

Under the CDCR system, prisoners should be scheduled so that all conditions in the priority categories are treated within the specified timeframes.[5]   [CDCR Timeline Memo] Accordingly, the system minimizes the risk that prisoners will suffer continuing decay and periodontal disease that jeopardize their teeth and their overall health.

### C.    Description of Dental Conditions

#### 1.    Odontogenic Pain (Toothache)

Regardless of the size of an institution or the level of dental care provided, the requirement to treat toothaches is common to all correctional facilities. [Shulman and Sauter at 63]  Managing patients' pain is a standard part of dental practice.  Pain is managed by the appropriate use of analgesics as well as expediting the treatment of patients whose complaints of pain are clinically validated.   Among the possible non-traumatic causes of tooth pain are (a) tooth fractures (often, a tooth that has been weakened splits in the course of normal chewing), (b) pulpitis, (c) caries (decay) extending through the enamel into dentin, (d) dental (periapical or periodontal) abscess, and (e) cellulitis (a diffuse inflammation of the connective tissue caused by a spreading bacterial infection just below the skin surface).

For most infections, the appropriate treatment is to establish drainage through the tooth (if the tooth is to be saved) or to extract the tooth as soon as possible.  [*Id*. at 66]  "Delayed treatment of the original focus of infection may turn a minor problem into a serious condition." [Makrides *et al*. at 559]  NCCHC restorative dentistry guidance[6] concurs, noting that, "although restorative dental care is usually classified as routine, correctional systems need to place significant importance in providing such care to their inmates.  *Delaying or deferring restorative care in a correctional setting simply leads to an increase in oral pain, infection, or tooth loss.* As a result, dental services become inundated with emergency dental sick-call requests and more procedures to replace lost teeth with removable prosthetics."  [NCCHC 2008 at 170 (emphasis added)]

When there is no dental sick call because the dental clinic is closed or the facility has no dentist, it is critical that midlevel providers and physicians triage and manage those prisoners until a dentist can resolve the problem.  Moreover, prisoners complaining of a toothache should be examined by a midlevel provider, physician, or dentist within 24 hours of the complaint being received by prison staff. [Shulman and Sauter at 67]  "[I]n correctional settings, nurses must be

---

[5] CDCR time frames need to be adhered to as long as the time frame is consistent with the community standard of care for general dentistry.  In other words, deviation from the time frame is permitted if complying with the time frames is not, for whatever reason, in the best interest of the inmate-patient.  [CDCR Timeline Memo]

[6] Based on a white paper written by Dr. Adu-Tutu.  [NCCHC 2008 at 174]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential        PRSN-JDS 00008

able to assess teeth and gum conditions to evaluate abscesses, trauma, and cavity pain.'' [Burrow *et al.*, 2006 at 445]  Triage should be performed by registered nurses and not licensed practical/vocational nurses.[7]

### 2.   Dental Caries

Dental caries (tooth decay) is an infectious disease characterized by progressive destruction of tooth substance, beginning on the outer (enamel) surface or the exposed root surface.  Left untreated, the decay can progress, causing pain and leading to tooth loss, localized infection (dental abscess), and occasionally, systemic infection.

Caries is typically diagnosed visually and/or radiographically.  The visual appearance ranges from a "white spot" on the enamel (outer layer of the tooth) to a gaping hole in the tooth with black staining characteristic of end-stage caries.  Figure 1 is a representation of how different stages of caries may appear on a radiograph.

### Figure 1.  Interproximal Decay as Seen on a Radiograph

**A. Incipient**       **B. Moderate /**       **C. Severe**
                       **Advanced**



An incipient lesion (Figure 1A) may not be readily identified clinically because there is no "cavity" in the tooth and too little tooth has been affected to be seen on a radiograph.  Once the lesion reaches the dentin (early Figure 1B)—a tissue less resistant to decay than enamel—the patient should be scheduled for treatment.  Figure 1C shows an advanced lesion that is almost through the dentin to the pulp.  When decay reaches the pulp, the tooth will require either endodontic (root canal) treatment or extraction.[8]  Caries radiographically at or beyond the dentin

---

[7] "Nurses of varying educational levels practice in correctional facilities.  Licensed practical/vocational nurses perform tasks such as transcribing orders, administering medications, health screening, phlebotomy, providing medical treatments in an ambulatory or infirmary setting, conducting rounds in segregation units, and assisting with patient tracking systems.  Registered nurses conduct triage, perform nursing assessments, and provide direct care to patients." [LaMarre, 2006 at 419]

[8] Within ADC, endodontic treatment is rare so these teeth will almost always be slated for extraction.  In my review of 300 records, I documented only nine completed root canal treatments:   **Redacted**

.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

should receive prioritized treatment to prevent deterioration to the point that the only practical alternative is extraction.

A tooth classified as requiring routine (as opposed to urgent) treatment typically will not remain asymptomatic indefinitely.  Caries, especially once the enamel is penetrated, generally progresses, and the more time that passes before the tooth is treated (*i.e.*, filled), the greater the likelihood that decay will progress.  Progression of decay destroys tooth structure, possibly causes an abscess, and often requires extraction.  Consequently, any classification system must have timelines to ensure that a tooth originally classified as routine does not develop a severe problem due to untimely treatment.

### 3. Pulpitis

Pulpitis is an inflammation of the living tissue within the tooth.  Reversible pulpitis will resolve when the source of irritation is treated or removed.  Typically, reversible pulpitis is attributed to minor tooth fractures, caries (decay), defective or missing fillings, and occlusal (bite) discrepancies and can be treated with analgesics and a dental procedure.  The dental procedures may include removing decay and inserting a new or replacement filling, adjusting the bite, and applying desensitizing agents.  [Shulman and Sauter at 63]

When the inflamed living tissue inside the tooth (the pulp) swells and circulation is compromised, pulpitis becomes irreversible.  A tooth with irreversible pulpitis has a partially vital pulp with inflammation and degeneration that is not expected to improve.  Once pulp death (necrosis) occurs, the tissue is vulnerable to attack by bacteria, leading to infection at the apex of the tooth.  Eventually this infection spreads by resorbing bone and supporting structures.  [*Id.* at 63-64]

### 4. Lost Fillings or Crowns

It is not uncommon for fillings to fracture and fall out in whole or in part due to wear or underlying decay.  Any underlying decay should be removed expeditiously because it is generally within the dentin and close to the pulp.  Decay near the pulp may lead to irreversible pulpitis and can jeopardize the prognosis of the tooth.

When a filing falls out or fractures, the filling must be replaced in a timely manner to protect the pulp of the tooth from the effects of dentinal sensitivity, which is pain brought on by such stimulating factors as heat, cold, sweet, sour, acid, or touch.  [Endodontics at 1]  The longer dentinal sensitivity persists the greater the likelihood that what initially may have been a reversible condition will develop into irreversible pulpitis requiring root canal or extraction.  The structural integrity of the tooth also may be impaired making it vulnerable to fracturing during normal chewing.  Consequently, even a tooth in which the pulp is not exposed may develop irreversible pulpitis if the filing is not timely replaced or repaired.

### 5. Fractured Teeth

Fractures of the teeth are often the result of trauma and can be difficult to diagnose.  Non-vital teeth are more susceptible to fracture than vital teeth due to the loss of their blood supply

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

(pulp).  Moreover, because they are "dead", there is no pain associated with the fracture.  The broken tooth, however, may become an irritant to the soft tissues.

Fractured teeth are generally classified into three categories: (1) enamel only, (2) enamel into dentin, and (3) fractures involving the pulp.  Fractures that extend only into the enamel are usually asymptomatic and do not require immediate dental treatment unless the tooth is an irritant to the lips, tongue, or cheeks.  In contrast, fractures that extend into the dentin are usually symptomatic, causing tenderness, reaction to thermal changes, and pain.   While not an emergency, they should be treated to relieve the symptoms.  The greater the area of exposed dentin the more urgent the treatment need because the pulp can become necrotic, resulting in infection.  Fractures that extend into vital pulp often cause severe pain and are considered an emergency.  Bleeding from the pulp can be seen in some cases, usually as a small pinpoint of red in the dentin.  These fractures should be treated as soon as possible.

### 6.    Periodontal Infections

Periodontal (gum) infections also can cause a toothache.  Acute periodontal infections include gingival abscess, periodontal abscess, necrotizing periodontal disease, herpetic gingivostomatitis, periocoronal abscess (pericoronitis), and combined periodontic-endodontic lesions.  Resolution of these painful conditions requires physical removal of infectious material or necrotic tissue by a dentist.  Antibiotics are not a substitute for this care but may be a component of the overall treatment.  [Shulman and Sauter at 64]

## II.    METHODOLOGY

To assess the care provided in ADC institutions, I reviewed (1) the dental care records of named plaintiffs and other identified prisoners, (2) a sample of dental records from nine prisons, (3) grievances filed by those prisoners, (4) ADC policies and procedures pertaining to the provision of dental care, (5) dental staffing and wait time reports, and (6) additional Smallwood Prison Dental Services, Inc. ("SPDS") and ADC documents described in Exhibit C.  I also toured various prisons, which gave me the opportunity to see the dental facilities and to review medical records as they are maintained by ADC.  In all, this methodology provided a sufficient window into the overall quality of ADC's dental program, including the timeliness of addressing complaints of pain, identifying disease, arresting disease progress, and rehabilitating affected teeth.  To the extent my methodology differs from other Plaintiffs' experts in this case, it is largely due to the uniqueness of dental care and the nature of the opinions I have reached.  The record review that I performed is more than sufficient for me to accumulate gross data and to reach opinions to a reasonable degree of dental certainty.

### A.    Data Collection

In addition to reviewing the records of named plaintiffs and other identified prisoners, I performed record audits at each prison I visited.  Those prisons were Florence, Safford, Phoenix, Tucson, Perryville, Lewis, Eyman, Douglas, and Yuma.  The purpose of my prison visits was to collect sufficient data to allow me to opine about the quality of the ADC dental program.  When I was a Court Expert in California and Ohio, I used data collected from similar extensive record reviews to inform my opinions.  In my experience, this is an effective way to assess institutional

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **8**

dentistry.  While my primary focus was performing record audits, I also walked through dental clinics at each prison and, when possible, asked questions of a limited scope to dentists and other designees.  Those walks and discussions helped form my opinions about the dental care provided by ADC.

### B.     Record Review

I reviewed 300 health records at nine prisons, focusing on Health Needs Requests ("HNRs") for dental issues from 2009 to the present, progress notes, and consent forms.  [*See* Exhibit C]  I reviewed only entries in the selected records from 2009[9] to present so that I could assess a fairly recent examination/treatment plan and evaluate the extent to which identified dental conditions were addressed.  The 300 records included 608 appointments related to pain and 447 routine care appointments.

To select records, I used a system-wide report of all dental appointments scheduled between January 1, 2012 and approximately June 21, 2013.  [ADC091994–3617]  The report identified 22,715 appointments and listed inmate name, inmate identifier, location, and type of appointment.  Based on my experience in performing correctional and military dental audits, I estimated that a review would take about 15 minutes per record and, as a result, approximately 30 records could be reviewed each day.  Since timely addressing pain is an excellent measure of the responsiveness of a dental care system, I tried to select inmates who had one or more scheduled appointments for issues related to pain and swelling.  By selecting such appointments, I could then evaluate how timely the inmates' complaints of pain and swelling were addressed as well as the urgent and routine care that occurred before and after those appointments.

I forwarded my list of records to plaintiffs' counsel and requested that they add records for any prisoners whose dental grievances defendants were in the process of producing, as well as dental records that had been mentioned in the January 2013 Oral Care MGAR.  Once on-site at each facility, I also requested a copy of the current "Routine Care List" and selected several prisoners from that list to review as well.

In addition to the on-site record review, I reviewed the records of the named plaintiffs, to the extent they were produced, as well as the records of other prisoners who are identified in Exhibit C.

### C.     Data Analysis

While conducting my review, I summarized the HNRs and clinical entries.  For each HNR, I recorded the date of submission (per the inmate), a summary of the inmate's stated problem, and the date and a summary of the treatment plan.  For each health record, I recorded the date of treatment and a summary of the progress notes that included tooth number and procedure.  I used this information to assess the scope and timeliness of routine care as well as care provided to inmates who submitted an HNR stating pain.

---

[9]  I was primarily interested in the time period from 2010 to 2013 but recorded 2009 entries (for example, exams and treatment plans) that shed light on subsequent treatment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

To calculate an inmate's wait time after submitting an HNR, I subtracted the date that the inmate wrote on the HNR from the date the inmate was scheduled to see a provider.[10]  If the inmate refused the appointment, I treated the refusal date as the appointment date.  I used Microsoft Excel to calculate percentiles of wait times for urgent and routine care.

If additional summary information had been available, I would have reviewed it.  For instance, I would expect that a large institution like ADC, responsible for care for numerous patients, would maintain lists of all HNRs submitted, lists of wait times that more accurately display the total time from the moment the inmate requests care to the time the inmate actually receives adequate care, staffing documents showing specific locations and times with staffing shortfalls, and urgent care wait lists.  Further, I requested to review HNRs submitted over time, as well as logs for routine and urgent care—documents that would have provided information about patient care similar to that I constructed through record reviews.  However, ADC either does not maintain such gross data or has not produced it.  A failure to maintain simple gross data about the dental care provided to prisoners, including any shortcomings in that care, itself is troubling and illustrative of a lack of sufficient monitoring and control.  Moreover, as described below, because ADC's policies and procedures artificially decrease reported wait times, even the data I did review was not entirely reliable for purposes of my analysis.  Even so, I am able to make the opinions in this report with a reasonable degree of dental certainty based on the data that I have been able to accumulate from the methodology described above.

## III.    OPINIONS

The Eighth Amendment requires that prison officials provide a system of ready access to adequate dental care that addresses patients' serious dental needs, including pain, deterioration of teeth, and the inability to eat or engage in other normal activities.  It is my opinion that the consistently inadequate care documented in the records I reviewed is attributable to systemic problems caused by ADC's failure to implement, monitor, or enforce effective dental policies and practices, ensuring lapses in care, unnecessary pain and tooth loss, and continued dental problems.  Specifically, ADC's inadequate policies and practices with regard to staffing, triaging, treatment time frames (or lack thereof), tooth extraction, preparation for dental devices, and contractor monitoring individually, and in combination, create a system that fails to properly and timely identify and treat both urgent and routine dental issues experienced by inmates, as more specifically described below.  Moreover, ADC's failure to adequately monitor the care being provided by its contractors (or even to keep records that would allow adequate monitoring) means that ADC cannot ensure that it is addressing prisoners' dental needs.  These failures place all inmates at a substantial risk of serious dental injury, such as preventable pain, advanced tooth decay, and unnecessary loss of teeth.

This opinion is confirmed by my review of 300 dental records, the dental records of the named plaintiffs and other identified prisoners, documents produced in this litigation, witness testimony, and my own experience in evaluating correctional dental systems.  The inadequacies

---

[10]  Where this date differed from the date time-stamped on the HNR by more than one day, I used the time-stamped date.  For the purpose of calculating percentiles for wait times, I excluded appointments not generated by an HNR (e.g., serial extraction appointments and other appointments apparently generated by the Dental Department).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

in dental care experienced by the inmates whose records I reviewed are typical of the risk of inadequate dental care for all inmates. It is therefore my opinion that all present and future inmates with dental problems are at risk for preventable pain and tooth morbidity and mortality.

### A. Inadequate Dental Staffing

It is my opinion that ADC has inadequate treatment capacity because it does not employ enough dentists or dental hygienists. Lacking dental personnel is a systemic problem that makes it increasingly difficult for ADC to address all dental needs in a timely and adequate way. ADC's inadequate treatment capacity also results in inmates who are assigned to the Routine Care List typically having inordinately long waits to be scheduled, often resulting in unnecessary pain and deterioration of tooth structure and needless extractions. This is below the professional standard of care in the community and puts inmates at a substantial risk of dental injury, including preventable pain and loss of teeth and tooth structure.

### 1. Staffing Ratios

The recommended inmate to dentist ratio is 1,000:1 under the assumption that dental hygienists provide support independent of this ratio and that dentists are not required to perform work that dental hygienists typically would do. [Makrides *et al.* at 557] In a 1996 survey, ADC reported an inmate to dentist ratio of 763:1 and no dental hygienists at that time. [Makrides and Shulman at 299] Since that time, however, dental staffing in ADC has decreased markedly.

In a follow-up study in January 2007, ADC reported an inmate census of 34,864 and 33 dentist full-time equivalents ("FTE"), or a ratio of 1,056:1. Out of the 33 dentist FTEs, however, only 26.5 were filled (a vacancy rate of 19.7%), resulting in an adjusted inmate to dentist ratio of 1,315:1. [ADC NIC 2007] In July 2012, after Wexford Health Sources took over dental care, 19.3 FTEs—only 64% of the proposed dentist FTEs—were seeing patients, producing an inmate to dentist ratio of 1,720:1. [Wexford Vacancies 7/31] While staffing improved shortly thereafter, as of August 12, 2012, there were still only 24 FTE dentist and 32 dental assistant positions filled system-wide. Based on the October 2012 census of 33,206, the inmate to dentist ratio was 1,384:1. [Arizona Vacancies and FTE Fill Percentages Report]

| Year | Inmate/Dentist Ratio |
|------|---------------------|
| 1996 | 763:1 |
| Jan. 2007 | 1,315:1 |
| July 2012 | 1,720:1 |
| Aug. 2012 | 1,384:1 |
| June 2013 | 1,671:1 |

According to the June 2013 Corizon staffing report, Corizon/SPDS authorizes positions for 10 dental directors,[11] 20 dentists, 1.8 dental hygienists, and 43 dental assistants. [Arizona

---

[11] Dental Directors have supervisory responsibilities but primarily provide clinical care.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **11**

Staffing Roll-up June 2013]  In contrast, the Wexford contract only provided for 1 statewide dental director, 6 dental directors, 23.5 dentists, and 36 dental assistants.  This information is summarized in the following table.

| Provider | Directors | Dentists | Hygienists | Assistants |
|----------|-----------|----------|------------|------------|
| Corizon  | 10        | 20       | 1.8        | 43         |
| Wexford  | 7         | 23.5     | --         | 36         |

Corizon, therefore, has established 31.8 dental care provider positions (consisting of directors, dentists, and hygienists) compared to Wexford's 30.5 dental provider positions.  Based on the inmate population of 35,342 in September 2013, and assuming that all positions are filled, Corizon's ratio of inmates to dental care provider is, best case, 1,111:1 compared to Wexford's ratio of 1,159:1.  However, the same report shows that Corizon was operating with only 7.67 dental directors, 13.48 dentists, and 36.75 dental assistants, yielding a ratio of 1,671:1. [12]  SPDS president Dr. William Smallwood testified in July 2013 that SPDS was recruiting for only two dentist positions.  [Deposition Transcript of William Smallwood dated Aug. 20, 2013 ("Smallwood Dep.") at 227:7-20]  If the dentist positions were filled with full-time dentists, the ratio of inmates to dental providers would be 1,417:1—nearly 50 percent fewer providers available to see inmates than in 1996.

Corizon's 1.8 dental hygienist FTEs yields a ratio of 19,634 inmates per dental hygienist.  As a comparison, the CDCR has a ratio of 600 inmates per dentist and 2,000 inmates per hygienist. [13]  [CDCR P&P]  Even Corizon's ideal ratio of inmates to dental providers (1,111:1) is about 31% fewer dentists than the ADC ratio calculated in 1996 (763:1).  [Makrides and Shulman, 2002 at 299] [14]  The following table summarizes staffing provided by Corizon and Wexford (if all positions are filled) compared to that required in California prisons.

---

[12]  The September staffing report does not show meaningful improvement.

[13]  The CDCR also required that, in addition to the staff dentists in the reported ratios, each prison have a Supervising Dentist who is expected to spend 45% of his/her time seeing patients.  [See CDCR Supervising Dentist Position Statement]  The CDCR inmate to dentist and inmate to dental hygienist ratios were the result of a stipulated injunction in Carlos Perez, et al. v. James Tilton, et al., Amended Stipulation and Order (Case 3:05-cv-05241-JSW, Doc. 69 filed 8/21/2006).  The case was dismissed in August 2012 (Case 3:05-cv-05241-JSW, Doc. 726 filed 08/16/12).

[14]  Applying the 1,000:1 ratio suggested by Makrides et al. to the ADC population would require 35 dentist FTEs.  Applying the CDCR inmate to hygienist ratio of 2,000:1 would require 17.5 hygienist FTEs.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

| Provider | Inmate:Dentist | Inmate:Dental Provider | Inmate:Hygienist |
|----------|----------------|------------------------|------------------|
| Corizon | 1,178:1 | 1,111:1 | 19,634:1 |
| Wexford | 1,159:1 | 1,159:1 | -- |
| California | 600:1 | -- | 2,000:1 |

Moreover, because teeth cleaning, scaling and debridement are performed primarily by dentists at the expense of providing other treatment, Corizon/SPDS's ratio overstates the treatment capacity for procedures dentists alone may do (*i.e.*, fillings, dentures, and extractions).

### 2. Consequences

A system with an insufficient number of dentists to deal adequately with its workload is forced to delay care by increasing the amount of time in the waiting queue. In other words, insufficient staffing makes it impossible for ADC to provide timely access to basic dental care. Moreover, there is pressure to create shortcuts by reducing the care that must be provided by dentists or other licensed providers.

In December 2012, ADC's dental monitor, Dr. Karen L. Chu, drafted a list of recommendations for ADC dental care, based on her findings from reviewing grievances and visiting clinics. In her summary drafted for Director Pratt, she described one of the shortcuts reducing the burden on dentists, to the detriment of patients:

> PAIN HNRs: . . . If the dentist gives Rx for antibiotics to reduce the swelling/pain, the inmate is typically instructed to submit another HNR for treatment of the teeth causing pain. However, since the inmate will no longer be in pain, the HNR will be placed on the routine care list which may be a wait of over 90 days. This is much too long since the tooth of the tooth [sic] is urgent. This is one of the most popular complaints of inmates. Going forward, the dental clinic will take the initiative to appoint the inmate for treatment within 7-10 days after the pain visit. An urgent care list will also be maintained which does not currently exist. This will assist the clinic in keeping track of the urgent care patients so they don't get lost in the shuffle.

[AGA_Review_00090609 ¶ 1]

Dr. Chu also identified another consequence of inadequate dentist staffing.

> Treatment plans/exams: Many inmates go years without an updated treatment plan or exam. In the outside world, the general public should ideally be receiving dental exams (check-ups) every 6 months and cleanings every 6 months if their gums are normal and healthy ... more often if they have periodontal disease (gum disease). This will be more difficult to solve since the wait times are so long, extending 90 days. With the lack of dentists, this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **13**

PRSN-JDS 00016

problem will continue but at least the dentist can take the initiative
to do a quick exam while the inmate is present for treatment.

[*Id.* at ¶ 3]

Another issue Dr. Chu raised was inadequate treatment of periodontal (gum) disease. "Periodontal disease (gum disease) is very prevalent, however, it is rarely addressed in treatment plans is typically not treated.  Typical treatment would be deep cleanings called 'scaling and root planing'".  [AGA_Review_00094915]  She is correct, however, that none of the records I reviewed documented a "deep scaling or a root planing procedure."  It is likely that ADC cannot perform these treatments and keep dental wait times under control with its current level of staffing.

My record review found issues with care consistent with insufficient levels of staffing. For example, ADC requires that inmates with urgent care needs be seen within 72 hours.  Given that these have been identified as the most critical dental needs, only the physical lack of a dentist should delay these visits.  Relatedly, the lack of such dentists necessarily results in extended periods of pain for inmates whose appointments are delayed.  The following examples from my record review are typical of the harms incurred by inmates under this system.[15]

**Stephen Swartz** (102486):  Despite Mr. Swartz's submission of many HNRs over a period of months for pain associated with a maxillofacial injury and subsequent oral surgery, and despite requests by an ADC physician for approval of specialty consultations, the appointments did not occur.  [*See, e.g.*, ADC002002, 2006, 2005, 1997, 1985, 1986, 1989, 1971, 1962]  In addition Mr. Swartz submitted an HNR in January 2012 complaining of "extreme pain" from a cracked tooth.  [ADC001915]  The response—six days later—was stamped, "You are scheduled for pain evaluation."  [*Id.*]

**Redacted**     submitted an HNR on June 1, 2011 for a toothache that interfered with eating or drinking.  Ibuprofen was called into the Nurse Line on June 6, 2011— five days after he submitted the HNR.  [ADC133495]  He was seen on June 23, 2011, 22 days after his HNR was submitted, and tooth #19 was extracted.  [ADC133249]

**Redacted**     submitted an HNR on July 16, 2010 for a toothache (ADC135426), was seen as a Dental Assistant Triage on July 21 and was given ibuprofen. [ADC135391]  He was finally examined by a dentist after 12 days on July 28.  [*Id.*]

**Redacted**     submitted an HNR on November 12, 2012 stating that a filling had fallen out and was causing pain.  He was told that he would be seen for a pain evaluation, but the pain evaluation was not scheduled.  He submitted another HNR stating that he had a hole in his tooth [the lost filling] and that the tooth was sensitive to hot and cold.  He was seen on January 14, 63 days after his initial HNR, and the filling was replaced.

---

[15] I address issues with routine care separately in Section III.C, *infra* because several ADC policies and procedures combine to affect wait times at ADC.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **14**

**Redacted**          submitted an HNR on August 14, 2012 for pain (bad cavity—can't eat on left side).  After submitting other HNRs in November, January, and March for pain on the left side, he was eventually seen on May 16, 2013, 275 days after his first pain HNR, and provided an analgesic.  After three more HNRs complaining of pain, he was seen again on July 14 on a Pain Evaluation at which tooth #4 (which was identified as needing a filling at an October 2009 examination) was now found on x-ray to have periapical radiolucency.[16]  The Pain Evaluation occurred 328 days after Douglas submitted an HNR in August 2012 and 44 months after the October 2009 exam indicated that tooth #4 (and 7 other teeth) should be restored.  In my opinion, this untimely treatment not only was responsible for continual avoidable pain but jeopardized the prognosis of his untreated teeth.

**Redacted**          submitted an HNR for toothache with swelling and was seen by Nursing on January 7, 2013.  He was diagnosed with a dental infection and was given penicillin and ibuprofen.  He submitted an HNR the next day complaining of a swollen neck in addition to the toothache, was diagnosed by the medical department with a dental abscess extending to the submandibular space, and was prescribed antibiotics three different times before being seen by a dentist on January 14.  Prompt extraction of the tooth would likely have prevented the abscess from progressing to the submandibular space.

**Redacted**          experienced consistently delayed responses to HNRs about a painful wisdom tooth.  He submitted an HNR on June 26, 2012 (pain and infection in a wisdom tooth) and received no response.  He submitted another HNR on July 9 (Emergency Pain/infected wisdom tooth) and was seen on July 11 at a Pain Evaluation, 15 days after his initial HNR, where it was decided that he should be referred to an oral surgeon for extraction. After three more HNRs and pain evaluation visits, months of continual pain, and extraction of an opposing tooth to relieve pressure, his wisdom tooth (#17) was extracted on January 23, 2013.

### 3.    Summary

Staffing is the basic input for a functional dental system.  Without adequate staffing, there simply is not enough capacity to see all inmates in a timely manner or to give all inmates needed care.  Further, when understaffed prison dentists and staff are overworked, it is inevitable that inmates are placed at a substantial risk of serious dental injury.  What is more, to compensate for the lack of staffing, institutions with low staffing often establish formal or informal practices as shortcuts.  These practices, however, often exacerbate the problems of low staffing.  Based on ADC's documents and the records I reviewed, including Dr. Chu's findings, ADC does this by permitting dental assistants to perform HNR triage and in-person triage of patients to compensate for the lack of dentists, who should be performing those tasks.  Moreover, within ADC, dentists typically perform teeth cleanings or other tasks that hygienists are trained to perform, the end result being that dentists have less time to devote to providing dentist-level care to patients.

Seeing prisoners who complain of pain or have other dental issues in a timely manner requires an adequate number of dentists on staff.  My record review documented a consistent pattern of delay in treating inmates consistent with inadequate staffing levels—ADC is either

---

[16] A periapical radiolucency is consistent with a periapical abscess that can be caused by the progression of decay to the pulp. This is likely the result of treatment delay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **15**

unable to see the patients in a timely manner, or unable to keep track of all incoming requests and patients fall through the cracks. Either way, by failing to timely treat urgent care, inmates with both urgent and routine needs have treatment deferred to the point that disease progression made restoration problematic or infeasible. As a result, inmates suffer avoidable pain, tooth morbidity, and tooth mortality. While wait times have improved since March 2013 (as discussed further below), current staffing is still insufficient given the untimely care I documented.

### B.  Inadequate Process for Triaging Inmates Requiring Dental Treatment

It is my opinion that the Dental Department's policies for triaging inmates requiring dental treatment place inmates at an unreasonable risk of receiving untimely or inadequate dental care. In particular, the process (or lack thereof) for responding to HNRs places many inmates at risk of suffering preventable pain and tooth morbidity. ADC's existing triage guidelines are insufficient to properly categorize inmates in need of dental care because they fail to distinguish between types of so-called "routine care." As a result, the HNR triage process fails to appropriately address the progression of tooth decay and other chronic issues or ensure that inmates suffering tooth pain receive timely urgent dental treatment.

In addition, ADC has a policy or practice of allowing dental assistants, who are not licensed providers and do not hold dental degrees, too much discretion in determining when and if treatment will take place based on HNRs. Dental assistants also have too large a role in examining patients. The Dental Assistant Triage process is flawed in that it allows unqualified individuals to engage in clinical activities beyond their education and training. When dentists base clinical decisions on an examination performed by unqualified individuals, they fail to exercise independent clinical judgment and depart from accepted professional norms. These policies and practices are below the professional standard of care in the community and put inmates at a substantial risk of dental injury.

### 1.  Existing HNR Process

Inmates submit HNRs to inform the Dental Department that they have dental problems or to communicate a request. HNR forms are obtained by inmates on their units and submitted to Medical. A nurse reviews all HNRs and sends those regarding dental issues to the Dental Department, where they are evaluated by a dental assistant.[17]

The Dental Services Technical Manual ("DSTM") instructs that the following conditions qualify as "urgent care": fractured dentition with pulp exposure, acute dental abscess, oral pathological condition that may severely compromise the general health of the inmate, or acute necrotizing ulcerative gingivitis.[18]   [Dental Procedure 770.2 ¶ 3.1.2][19]  All other requests for

---

[17]  Dental assistants have not always triaged the HNRs. Previous ADC practice was for dental assistants to pull the records of inmates who submitted HNRs and dentists would review the records and x-rays before making triage decisions.

[18]  There are some conditions that qualify as "emergency care"—such as maxillofacial fractures, postoperative uncontrolled bleeding, facial swelling that is life threatening, and intraoral lacerations that require suturing (Dental Procedure 770.2 ¶ 3.1.1)—but those are very rare and, in most cases, are handled outside of the HNR process.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential                                                        PRSN-JDS 00019

treatment—such as fillings and cleanings—are "routine care."[20]   Urgent care visits, often referred to as "pain evals" or "911 visits", are used primarily for extractions and dispensing pain medication.[21]   Prisoners requesting what is deemed to be "urgent care" are brought in for an appointment within a few days.  Dentists see those requesting "routine care" in the order that care is requested, time permitting after each day's urgent and recurring visits are seen.[22]

### 2. The existing ADC System lacks the ability to properly categorize dental problems

The DSTM provides no timelines for urgent care appointments.  Nor are there any timelines for routine treatment.  Consequently, an inmate with a decayed tooth placed in Priority 3 (routine care) may remain there indefinitely—perhaps until the decay progresses to the point that tooth structure is lost, making restoration difficult (*i.e.*, requiring a larger filling with a poor prognosis) or requiring extraction.  Dental Procedure 770.2 provides that "[t]he scheduling of dental appointments for inmates will be based on the current relative priority of the inmate's dental condition within the dental classification system," but there is no requirement for follow-up analysis of the inmate's condition, so scheduling depends on the priority set based on the inmate's HNR.

Although the DSTM does not provide any time frames for when inmates classified as "urgent" or "routine" should be seen by a dentist, ADC required Wexford and Corizon to agree that inmates with urgent requests be seen within 72 hours and inmates with routine requests be seen within 90 days.  [ADC014200]  SPDS actively manages to these goals.  Wait times have markedly improved since March 2013.  [ADC153796]  But this improvement is not sufficient to prevent the harms associated with the deficient triage procedure (Dental Procedure 787) and the failure to account for progression of dental disease.  [Dental Procedure 770.2]  For prisoners who do not have substantial dental problems, for example incipient decay (see Figure 1, *supra*), waiting 90 days for a cleaning or a filling is not a problem.  However, when many teeth require treatment and decay has progressed (Figures 2 and 3, *supra*), delay may allow decay to progress to the point that one or more teeth are no longer restorable or will require a more complex

---

[19] References to "Dental Procedure" numbers are to procedures in the DSTM (ADC010554-647).

[20] Certain requests are Priority 4 (exempt) conditions that are not addressed by ADC. These are fixed prosthetics (crowns and bridges); orthodontics; removal of asymptomatic third molars or impactions without pathology; treatment of discolorations, stains, and cosmetic defects; and ridge augmentations and vestibular extensions / implants.  [Dental Procedure 770.2 ¶ 4.1]

[21] I found occasional instances where filings were placed on pain evaluations, but my review also indicates that staff instructs prisoners that filings are not permitted on pain evaluations.  *See, e.g.,*   **Redacted**  , March 2013 HNR for a toothache (response: "We don't do fillings on an emergency basis");   **Redacted**   October 2012 HNR for two painful teeth (response: "reinforced to patient that all dental work must be done before partials begin but fillings cannot be done on pain evals").

[22] The Dental Department schedules some prisoners without HNRs, such as those receiving serial extractions or undergoing work in preparation for dentures.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

restoration with a less optimistic prognosis. Moreover, inmates with advanced dental disease (with or without pain) will undoubtedly suffer over a 90-day wait time because they do not qualify for urgent care by ADC's definition.

Dr. Chu testified that for an inmate diagnosed with a tooth that needs filling, it would require a "pretty lengthy time" for the tooth to decay to the point where it can no longer be treated with a filling. When asked to estimate that time, she stated that it would be "[m]ore than weeks" and "[e]veryone's different." [Deposition Transcript of Karen L. Chu, DMD dated May 15, 2013 ("Chu Dep.") at 96:12-97:2] Everyone is different with respect to the rate at which decay progresses, and every tooth is different with respect to how far decay has progressed before the inmate requested an appointment. The problem is that ADC's priority system is Procrustean in that it lacks timelines associated with the expected level of disease progression in a given tooth. Dentists also do not consistently document or prioritize levels of decay. I saw very few charts noting the current status of specific teeth needing restoration, making it impossible for providers themselves to judge progression of decay.[23]

In contrast to ADC's procedure, CDCR classifies treatment needs into those that should be treated within 72 hours (Priority 1A), 30 (Priority 1B), 60 (Priority 1C), 120 days (Priority 2), and one year (Priority 3) based on the examining dentist's assessment.[24] For example, an inmate who presents with several teeth with advanced decay might be placed in Priority 1B. Once the decay is removed and an interim restoration is placed, the tooth can be classified as Priority 2 or 3.

### 3.    Dental assistant triage

The evaluation of dental HNRs at ADC is primarily the responsibility of a dental assistant, a practice that puts inmates at a serious risk of dental injury. According to Dental Procedure 787, dental assistants are responsible for evaluating the HNRs based on the Dental Classification System and assigning any inmate whose request is considered "emergency" or "urgent" for evaluation by the dental assistant that day or the next clinical day. [ADC010634-

---

[23] In a January 12, 2013 email to Director Pratt, Dr. Chu identified program changes necessary to "bring us up [to] today's industry standard"; one of which was, "Standardizing a method to keep track of treatment priority sequence for each patient." [AGA_Review_00094915 ¶ 3] Furthermore, as Dr. Chu pointed out, "Xrays have been inadequate in most dental clinics. For proper diagnosis, this will be improved upon immediately. This is one of the most significant solutions in improving quality of care and reducing negligence of the dentists." [AGA_Review_00090609 ¶ 2] Inadequate x-rays combine with inadequate examination frequency and tracking to magnify inmates' risk of serious dental harm.

[24] The Dental Program orients dentists to the system using a standardized calibration course. In the six years I spent as a Court Expert in the *Perez* case, I found the system effective in managing the progression of dental disease.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35]  If the dental assistant decides that the HNR merits routine rather than urgent care, the inmate will be placed on the Routine Care List and will not be seen until the routine care appointment.[25]

As described above, Dental Procedure 770.2 defines Urgent Care and does not mention pain.  Dr. Smallwood considers that pain is *per se* urgent care, and Dr. Chu also testified that all pain is urgent care.  [Chu Dep. at 92:14-16]  But from a practical standpoint, it is the dental assistant who decides whether a given HNR is assigned to Priority 2 (Urgent Care) or Priority 3 (Routine Care), and my record review clearly shows that not all complaints of pain are assigned to urgent care.  Dr. Smallwood testified that dental assistants decide whether to consult with a dentist based on oral instructions provided by each supervising dentist; however, neither he nor ADC is familiar with those instructions.  [Smallwood Dep. at 96:3-99:3]  Similarly, Dr. Chu testified that there are no guidelines "on what's appropriate for a dental assistant to do without input from a dentist."  [Chu Dep. at 86:10-12]

It is unreasonable to expect dental assistants (*i.e.*, high school graduates who need only have completed a 12 week (112 clock-hour) diploma program)[26] to understand the nuances of the dental symptomatology.  In fact, nothing in the knowledge and skills required of a dental assistant would prepare her for doing a clinical examination as required by a Dental Assistant Triage such as I saw documented in the records I reviewed.  While a standard orientation or on-the-job training might help to some extent, a dental assistant's education and training is simply insufficient to reasonably expect a clinically sound decision on a consistent basis.  The problem is exacerbated by the fact that ADC does not have any formalized education or training programs for dental assistants.

The importance of the triaging decision cannot be understated.  For every symptomatic tooth, there is a window of opportunity for treatment before the condition becomes irreversible and the tooth requires a root canal or extraction.  Assigning a tooth to the Routine Care List may jeopardize its prognosis.  The classification decision is a nuanced one and should be made by a dentist with the aid of the patient's chart and x-rays.

In addition to triaging HNRs, Dental Procedure 787 § 5.2 provides that if a patient is brought into a dental clinic based on an urgent need, the dental assistant "will review the inmate health history, perform an oral evaluation, and take dental radiographs, to assist in determining the severity of the dental condition."  Moreover, the dental assistant makes notes in the Inmate Health Record.  As a result, dental assistants with little or no specialized training are once again performing more than ministerial acts.  Performing an oral evaluation (*i.e.*, an assessment or examination) and reviewing a patient's health history are activities well beyond the training of a high school graduate.  Moreover, allowing a dental assistant to take radiographs without specific authorization of a dentist is below the standard of care and is in apparent conflict with the Arizona Administrative Code ("Radiation Agency") that states:

---

[25]  In contrast, medical HNRs are reviewed by registered nurses (who are licensed). [Deposition Transcript of Troy L. Evans, RN dated Sept. 17, 2013 at 39:23-40: 6; s*ee also* LaMarre, 2008 at 419]

[26]  See note 2 *supra*.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **19**

Unless there is a medical or dental indication for the exposure and **the exposure is prescribed by a licensed practitioner**,[27] a person shall not deliberately expose an individual to the useful beam from: 1) [a]n ionizing radiation machine; or 2) [a] non-ionizing radiation source, having a radiation beam known to be harmful to human tissue.

R12-1-104(c) (emphasis and footnote added).   Thus, ADC procedures give far too much discretion to a dental assistant who is not a licensed provider.   The dental assistant effectively has the power to determine who will be seen promptly, eventually, or not at all.   A dentist should perform the evaluation.[28]

Contrary to Dental Procedure 787, Dr. Smallwood contends that the decision to delegate a task to a dental assistant is left to the discretion of the dentist.   [Smallwood Dep. at 126:19-127:14]   Moreover, according to Dr. Smallwood, the Dental Assistant Assessment described in Dental Procedure 787 is a basic assessment based on examination of a prisoner's oral cavity. According to Dr. Smallwood, "[t]hey cannot identify cavities or the need for extractions—just the quadrant of the mouth that is the source of pain.   They are making a general assessment— looking for something strictly out of the normal such as a severe abscess, and major infection." [*Id.* at 61:1-62:12]   Dr. Chu recommended in December 2012 that even a basic assessment was inappropriate because "dental assistants are not qualified to diagnose conditions and most importantly have difficulty accurately describing symptoms."   [AGA_Review_00090609 at ¶ 4] In January 2013, she recommended that triage be completed by nurses—"dental assistants are not qualified and can cause more harm than good."   [AGA_Review_00094915]

In the 300 records I reviewed on my prison tours, however, there were 60 occurrences in which a Dental Assistant Triage was performed on 42 prisoners (14% of my sample). Furthermore, I documented 10 Dental Assistant Triage visits after Dr. Chu's recommendation that they be discontinued.   The progress notes made by the dental assistants suggest that they are doing more than looking for abnormalities such as severe abscess or a major infection.   In fact, they generally decide whether to take x-rays, most often without direction from a dentist, interpret the x-rays, and perform percussion tests.   The dental assistants decide whether to discuss their findings telephonically with a dentist and, if the dentist deems it appropriate, arrange for inmates to have access to antibiotics and analgesics.[29]   But the dentist on the other end of the telephone must rely on the dental assistant's clinical assessment and radiographic interpretation—this is an order of magnitude greater than Dr. Smallwood's limited ambit of

---

[27]   A policy or standing order is insufficient to qualify as a prescription.   Nor is an oral order by a dentist who has not first examined the patient.

[28]   ADC has a procedure for mid-level providers to assess inmates who file HNRs stating dental pain or swelling.   Specifically, ADC Toothache Protocol (ADC011107) provides a vehicle for timely assessment, palliation, and referral for inmates when the dental clinic is closed or a dentist is not present.   ADC, however, has chosen to have inmates with dental pain examined by dental assistants.

[29]   As Dr. Chu has recognized, "according to the Arizona Board of Dental Examiners, dental assistants are not permitted to dispense medications." [AGA_Review_00090609 at ¶4]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **20**

making a "general assessment"—looking for something "strictly out of the normal, [such as a] severe abscess, [or] major infection."  [*See* Smallwood Dep. at 62:4-12]  A dentist who relies on a clinical assessment performed by an unqualified individual has failed to exercise independent clinical judgment and has departed substantially from accepted professional norms.

To summarize, the Dental Assistant Triage process is flawed because an unqualified individual is permitted to examine patients, take x-rays *sua sponte*, and dispense medication. Moreover, an off-site dentist makes clinical decisions (such as whether or not to prescribe antibiotics) based on the dental assistant's examination and radiographic interpretation.  While not serving the patients, a Dental Assistant Triage stops the clock so that ADC can show that, even with an insufficient number of dentists, urgent care patients are "seen" within 24 to 72 hours.

### 4.    Consequences

Having a poorly defined priority system interpreted largely by untrained dental assistants leads to several predictable outcomes, and, as Dr. Chu wrote, "can cause more harm than good," including poor pain management and loss of salvageable teeth.  [*See* AGA_Review_00094915] Dental Procedure 770.1 uses a pinched definition of Urgent Care that excludes pain, and dental assistants are left to interpret whatever guidance they have been given by their supervising dentist.[30]  This combination of poor written policies and inappropriate discretion granted to dental assistants creates situations where HNRs stating dental pain are regularly mismanaged.

My review of inmate health records identified many HNRs for pain or a condition that will likely worsen without timely intervention but which were not classified as Urgent Care. Table 1 shows 31 HNRs stating pain (more than 10% of my sample) were submitted by inmates who were not assigned to urgent care between January 22, 2010 and June 13, 2013.  Of the 24 patients for which there is documented treatment, 3 had teeth extracted, 9 had teeth restored, 6 received antibiotic therapy and analgesics, 1 was treated (for a soft tissue problem) at a routine appointment, and 6 remained untreated by the date of the audit.  Three of the teeth that received antibiotic therapy were subsequently extracted.  Although these inmates were in pain at the time of the initial HNR, the median wait time for treatment was 63 days and, including those patients not yet treated at the time of the audit, the median untreated time was 73 days.

Table 2 shows inmates who submitted HNRs for broken, cracked, or chipped teeth.  Of the 24 HNRs, 18 had documented outcomes:  10 teeth were extracted, 5 were restored, 1 refused an extraction, and 2 were seen with no treatment.  (Four were not appointed by the date of the audit, and 1 did not have a transcribed progress note.)  Although these inmates stated conditions requiring prompt care in their HNRs, the median time for those who were scheduled was 67 days and the median for those who remained untreated by the date of the audit was 75 days.  Timelier treatment would have reduced the amount of avoidable pain borne by the prisoners and likely would have avoided the necessity of extracting some teeth.  As with dental pain, lost or broken fillings should be addressed expeditiously to forestall progression to the point that the tooth becomes non-restorable.  The policy or practice of not promptly replacing lost or defective

---

[30]  ADC has refused to describe this guidance in response to interrogatories.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **21**

fillings—even with a temporary restoration—is responsible for preventable pain, tooth morbidity, and mortality.

The 300 records I reviewed included 608 HNRs stating pain where there was a corresponding appointment. The 50th percentile (median) wait time from HNR submission to scheduled appointment was 6 days. Moreover, 25 percent waited 12 or more days and 10 percent waited 23 days or more.[31] As discussed previously, part of this delay likely results from insufficient staff to treat even those prisoners properly categorized as needing urgent care. However, most of the longer delays were caused by the dental assistants who mis-categorized an HNR describing pain as routine care.

I found several particularly egregious instances where ADC's poor triaging policies caused inappropriate treatment of pain and other urgent conditions.

*Joshua Polson* (187716):  In response to an HNR describing tooth pain, Mr. Polson was advised to let the Dental Department know when the pain becomes more of an issue. [ADC006138]  Mr. Polson also submitted a series of HNRs describing pain and difficulty in chewing asking for his partial denture treatment to be expedited.  He was consistently told that his care was routine and waited months for an appointment.  [*E.g.*, ADC006401, 6391, 6402, 6392]

**Redacted**      submitted an HNR in June 2013 stating that a tooth that was filled a few months ago had broken and most of the tooth was exposed.[32]  He was not seen by the date of the audit, which was 15 days after the HNR.

**Redacted**      submitted an HNR to replace a filling that fell out and was assigned to the Routine Care List the next day.  He submitted another HNR 26 days later, referring to the previous HNR and stating that the tooth was increasingly painful.  The response stated that he was on the routine list and if he wanted the tooth extracted, he should submit another HNR.  Forty-two days after the original HNR (having not been seen), he filed an HNR complaining of a toothache.  A pain evaluation was performed; the tooth was deemed to have irreversible pulpitis and was extracted.  In my opinion, the failure to examine the tooth timely, remove any decay present, and place a temporary or permanent filling was reckless, exposing him to preventable pain and worsening the prognosis of a tooth that might have been saved.

**Redacted**      submitted an HNR complaining of a painful tooth and was not assigned to urgent care.  He was not seen for routine care until 110 days later.  The experience repeated the next year when he submitted an HNR regarding a painful cavity, was not assigned to urgent care, and was eventually seen 66 days later.

---

[31]  These delays occurred over the last 3-4 years, while care was administered by ADC, Corizon, and Wexford.  The DSTM, as well as the requirement that urgent care patients be seen within 72 hours, has remained consistent during that time.

[32]  This tooth was originally treated only after **Redacted** waited over two months to be seen on a complaint of pain.  *See* page 15, *supra*.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

**Redacted**          submitted an HNR stating he had painful teeth.  It took 10 days for the Dental Department to assign him to routine care.  He was ultimately seen 60 days after filing the HNR.  He was still in pain after that visit and submitted another HNR the next day that stated the pain interfered with eating.  He was assigned to routine care and not scheduled until he filed another HNR a month later.  The response was, "With the holidays and not having a full-time dentist the wait will be longer.  Please be patient."  He was seen by a dental assistant[33] a week later and by the dentist after another week.  The dentist extracted the tooth at that appointment, which was 41 days after he filed the second HNR (complaining of pain continuing after his routine care visit) and 101 days after first complaining of painful teeth.

**Redacted**          waited 64 days to have crowns re-cemented.  For more than two months, the teeth were vulnerable to fracture and pulpal trauma from temperature.  During that time, he filed three HNRs that were deemed by the dental assistant to be routine care.  It is likely that this delay was the proximate cause of the tooth ultimately being deemed unsalvageable (and extracted).

**Redacted**          submitted an HNR stating that he had a chipped tooth that hurts when he eats and drinks.  The response was, "You are on the list for fillings.  Sometimes if the tooth hurts already, it may be too late to save the tooth.  If you are in severe pain, you can be seen as an emergency."  In other words, the dental assistant is advising the patient to essentially diagnose himself and use certain words to request treatment, without any way of knowing the actual condition of the tooth.

### 5.    Summary

The prisoners above are only a selection of the prisoners listed in Table 1—representing over 10% of my sample—who all suffered similar issues involving long-term pain and loss of teeth that likely could have been saved through prompt treatment.  These are entirely predictable consequences of ADC's policies and procedures (and lack thereof) regarding triage, including both the categories themselves and who does the categorization.  Moreover, even if ADC addressed other issues such as lack of staffing, its triage policies would continue to place prisoners at a risk of harm from pain and tooth loss.

### C.    Untimely Treatment for Routine Care

It is my opinion that ADC policy and practice combines to delay treating decay, lost fillings, and broken teeth.  Such delays allow decay to progress and tooth structure to be lost during chewing, decreasing the likelihood of a successful clinical result.  This occurs because the Dental Classification System used by ADC is Procrustean, failing to include a means for estimating the level of disease progression for each tooth and setting forth timelines for different levels of progression.  ADC's focus on "routine care" wait times fails to provide appropriate and timely care to many inmates.

---

[33] The dental assistant took an x-ray of tooth #10 and diagnosed the tooth as having decay and a possible abscess.  Compare this to Dr. Smallwood's testimony that dental assistants cannot identify cavities or the need for extractions—just the "quadrant" of the mouth that that is the source of pain.  [Smallwood Dep. at 61:1-62:12]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **23**

### 1. Delay in Receiving Routine Care

There are several sources of delay in an inmate's receiving routine care. The most basic is simply the amount of time it takes to get an appointment. My record review of the 447 HNRs requesting routine care showed that, over the last three years, the median (50th percentile) wait time for a routine care appointment was 78 days; 42 percent of the wait times were over 90 days, 30 percent were over 116 days, and 10 percent were over 210 days.

ADC requires only two types of dental reports from Corizon (and consequently, from SPDS)—a wait time report and a dental utilization report. These reports are consistent with reports provided by Wexford. Historically, ADC's reported wait times for routine care appear to have ranged from 60 days to over 9 months. Long wait times themselves raise the risk that decay will progress, particularly because ADC neither records nor monitors the status of problematic teeth. As just one example,        **Redacted**        was examined in March 2011, and tooth #2 was indicated for possible extraction[34] but was not designated as a priority on the Dental Chart. [ADC131080] He submitted an HNR to have a tooth filled and was placed on the Routine Care List. [ADC131239] When he was not seen for 208 days, he filed an HNR stating that the tooth needing a filling is causing pain and was scheduled for a Dental Assistant Triage. [ADC131219] The dental assistant took an x-ray and wrote that tooth #2 had extensive decay and was sensitive to percussion, hot, and cold. [ADC131085] The dentist ultimately diagnosed the tooth as having irreversible pulpitis, and it was extracted.[35] The delay of 208 days in routine treatment was likely responsible for the deterioration of the tooth from being an asymptomatic and "questionable extraction" to developing symptomatic irreversible pulpitis.

Based on reports provided from March to July 2013, Smallwood has been able to reduce wait times at most units down to its contractually-required 90 days, a point that was repeatedly made to me during my prison tours. Although the reduction in reported wait times is an improvement over the past, and setting a goal is itself better than the complete lack of timeframes in the DSTM, maintaining a reported wait time of 90 days does not adequately address inmates' needs for "routine" care. As described above, not all conditions can wait 90 days. Consequently, the failure of ADC policy to provide timelines consistent with disease progression places inmates at risk for preventable pain, tooth morbidity, and mortality. Moreover, even to the extent that a 90 day wait time is a reasonable goal, ADC's system is such that patients often wait far longer than the officially reported wait time.

My record reviews document a consistent pattern of delayed routine care due to a combination of insufficient staffing, inadequate triage policy, and failure to treat decay promptly. My experience studying dentistry in large institutions confirms my opinion that delays like those at ADC are likely the result of inadequate policies and practices by ADC, and are not merely isolated incidences of delayed treatment. This combination of deficiencies was responsible for inmates experiencing substantial avoidable pain, tooth morbidity, and preventable extractions. Some examples:

---

[34] I take "possible extraction" to mean that it may or may not have to be extracted.

[35] It took 21 days from the pain HNR to the extraction, which is itself unacceptable.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **24**

**Redacted**        was seen in March 2012 wanting to have tooth #18 filled.  The tooth was filled in October 2012, seven months later.  At the March 2012 visit, he was told to submit an HNR for a filling appointment.  His time on the wait list was interrupted by urgent issues with another tooth, and he only went back on the routine list for the filling on #18 in August.  As a result, his wait time, for reporting purposes, would have been recorded as less than 60 days, even though it actually took seven months to treat the original issue.

**Redacted**        was on the routine care waiting list as of November 2010 and submitted two follow-up HNRs in March and one in April 2011.  The response to her April HNR was, "You are on the list from HNR dated 11/26/10.  Wait time is 8-12 months."  She had a routine care appointment after 157 days.

*Charlotte Wells* (247188) was examined in November 2009 at which time three teeth were indicated for restoration.  [ADC0006383]  The next day she submitted an HNR for routine care and was seen 354 days later[36] for restoration of tooth #13.  [ADC0006855]  She submitted an HNR on December 19, 2010 and was seen on a pain evaluation, and was told that the filling in #13 looked good and that sometimes recently filled teeth exhibit a transient cold sensitivity. [*Id.*]  Then, inexplicably, it was suggested that tooth #13 and #18 be extracted.  She refused, stating "I want [a] filling."  [ADC135155]  She then submitted an HNR for a filling and tooth #18 was filled after 105 days.  She submitted an HNR stating that her new filling broke off, and she was in pain.  She was told that tooth #14 had recurrent caries and possible irreversible pulpitis and that extraction was recommended.  [ADC0006854]  She refused, stating, "I don't want my tooth pull[ed]", submitted an HNR for routine care, and the filling in #14 was replaced after 102 more days.  [ADC135137]

## 2. Removing Prisoners from the Routine Care List – The ADC Prisoners' Dilemma

While wait times for routine care appointments are often long, the widespread practice of removing inmates from the Routine Care List when they are seen for an urgent care appointment magnifies the delay while simultaneously deflating reported wait times.[37]  This practice appears nowhere in the DSTM but is widely applied.  One has only to read the dental assistants' responses to HNRs stating pain to see that this practice has been applied across ADC's system for the past several years.[38]  Dental assistants make it clear to inmates that fillings will not be

---

[36] The first appointment she was offered was after 257 days; however, that appointment and a subsequent one were rescheduled for medical reasons.

[37] Because reported wait times for routine care are measured from the time of the HNR that generated the appointment, HNRs that are "re-filed" after an urgent evaluation are counted only as the time between the routine care visit and most recent HNR.  Moreover, removing a prisoner higher up on the list shortens the wait time for all those lower down.

[38] Examples of statements from dental assistants include:   **Redacted**   HNR on 8/12/12 (Response: "You will be scheduled for pain and taken off the Routine Wait List.");  **Redacted**  **Redacted**   5/31/11 HNR (response: "You may only be on one schedule at a time.  I [the dental assistant] will see you first for the tooth that is bothering you");   **Redacted** HNR 10/17/12 (inquiring about her status on the Routine Care List, the response was, "You were seen for an [pain] evaluation appt. 1/25/12 and 2/7/12.  Your name was prioritized off Routine

placed at urgent care appointments and that extractions and prescribing antibiotics and analgesics are generally the only procedures that will be performed on inmates who submit HNRs for tooth pain.[39]  If the inmate attends the pain appointment, but refuses an offered extraction, he must go back on the Routine Care List to get a filling.   Dental assistants will sometimes refuse to schedule pain evaluations in response to HNRs stating pain, advising the prisoners to request a pain evaluation appointment only if "the tooth needs to be pulled."[40]

        Dr. Smallwood also testified that the routine policy was to take inmates off the Routine Care List and ask them to resubmit the HNR, although the dentist may choose to leave them on the list if the clinic's wait time is under control.  [Smallwood Dep. at 194:12-196:17]  This is perverse—it means that the longer the wait, the more likely a prisoner will have to start over.  Smallwood testified that the policy of taking prisoners off the Routine Care List is not a written one but a verbal policy from the SPDS corporate office.  [Smallwood Dep. at 197:19-198:5]  The practice, however, predates SPDS's work at ADC by several years.[41]

        As a result of this practice, for prisoners with substantial urgent care needs, obtaining routine care is a Sisyphean task—prisoners wait months to be seen for restorations, only to fall back to the beginning when they need pain treated, pain which is often a direct result of waiting too long to restore teeth experiencing decay.  Although this policy is nowhere in the DSTM and not always explicitly stated when it occurs, the size of my record review, and my resulting familiarity with how inmates are scheduled, made it possible to identify numerous instances in which inmates were removed from the waiting list apparently as a result of having an urgent care appointment or refusing to consent to the extraction of a tooth recommended by the dentist.  Just the easily identified incidents affect nearly 10 percent of the prisoners in my sample.  A sampling of these records demonstrates the dilemma in action.

        **Matthew Coleman** (260481) submitted an HNR in October 2012 for cavities causing discomfort and was assigned to routine care.  He had to have a crown re-cemented in

---

Care and you were seen for toothaches.  This HNR will put you on the Routine Care List.");    **Redacted**    1/23/12 HNR (response: "If you want the tooth out, submit another HNR").

    [39]  *See, e.g.,*    **Redacted**    March 1, 2012 progress note ("Inmate refused after it was explained that if dentist took a PA [x-ray] of the tooth, he would no longer be on the Routine Care List.");    **Redacted**    (pain evaluation on 5/30/12 noted that tooth #27 had decay and he should submit an HNR to have a filling placed; when he later complained about the wait, he was told, "Fillings are routine care.  Once you sign a refusal [for extracting the painful tooth] you are taken off the Routine Care List.");    **Redacted**    HNR 3/21/13 (response: "We don't do fillings on an emergency basis.  We can call you to evaluate pain.  Let us know.");   **Redacted**    **Redacted**    HNR 5/30/10 (advised that fillings are not done at pain evaluation appointments).

    [40]  *See, e.g,*    **Redacted**    , 3/30/09 HNR;    **Redacted**    , 6/16/13 HNR.

    [41]  The practice does have certain institutional advantages for ADC.  For example, it discourages inmates from filing new HNRs, particularly facetious ones, lowering the administrative burden in triaging, scheduling, and transporting inmates to appointments.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **26**

December—an urgent care appointment. The response to his HNR in January again requesting care for the cavities explained, "on the list for fillings per HNR 12/26/12." As of the date of the audit, another eight months later, he had not been seen for those cavities.

**Redacted** was on the Routine Care List when she submitted an HNR for pain in September 2012. She had a tooth extracted on a pain evaluation. Responses to subsequent HNRs confirm that she was taken off the Routine Care List after that visit, and returned to the list with her new HNR in October. She later withdrew an HNR submitted in January requesting that a painful tooth be pulled because she did not want to be taken off the Routine Care List.

**Redacted** was seen at intake on May 1, 2012, and 9 teeth were indicated for restoration and 4 for extraction. She immediately submitted an HNR for routine care. Six weeks later, one of the teeth marked for restoration was causing sufficient pain that it had to be extracted. At the time of the audit—433 days after her HNR for fillings—she had not received any further care.

**Redacted** first requested fillings for teeth that were starting to cause pain in April 2012 and was placed on the Routine Care List. After being told at a pain evaluation in May that he would have to wait for a routine care appointment if he did not want his tooth extracted, he was finally seen in October and one tooth was filled—187 days after his initial HNR. He submitted another HNR the next day stating that he needed another cavity filled and was placed on the Routine Care List. He did not have a routine care appointment before he was seen on a pain evaluation in January 2013, when tooth #25 was found to have an abscess. His intake exam in 2009 identified six teeth in need of restoration. Only the one filled in October 2012 had been restored as of the date of the audit.

**Redacted** was seen for a cleaning on July 15, 2013, 89 days after his most recent HNR request (thus just under the 90 day goal). However, in reality, he waited 177 days— the original request in January was cancelled as a result of a pain evaluation in April.

Table 3 includes other prisoners who were apparently removed from the Routine Care List after refusing an extraction or requesting a pain evaluation or urgent care appointment.

In addition to cases where patients were removed from the routine care list as a result of urgent care appointments, I found several cases where prisoners, knowing that an immediate pain appointment might depending on the vagaries of clinic policy or practice, delay their routine care several months, chose to forgo the pain evaluation.[42] These inmates run the risk that the painful tooth may deteriorate to the point where it is no longer salvageable. This is a cruel choice.

---

[42] **Redacted** (progress note for 6/13/13 "toothache appointment states, "Pt. denies TA appt. He would like routine care. He is already on the list. Signed Refusal [form]."); **Redacted** (refused an 8/11/12 Urgent Care appointment stating that "he [illegible] needs a filling"); **Redacted** (refused extraction in June 2012 because she wanted to remain on the Routine Care List); **Redacted** (refused an Urgent Care appointment 9/18/12 stating, "need to submit for routine dental exam"); **Redacted** (refused a 1/3/13 Urgent Care Appointment stating his reason for refusal as "routine care"); **Redacted** (progress note for March 2012 urgent care appointment states, "Inmate

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### 3.      Summary

Twenty-nine records or nearly 10 percent of those I reviewed appeared to indicate that inmates who submitted HNRs for urgent care were removed from the Routine Care List. Several other records showed inmates who refused pain appointments or extractions based on the understanding that their routine care would be delayed. Those inmates' experiences demonstrate that this practice of removing an inmate from the Routine Care List because of an urgent care visit can delay routine care materially and expose an inmate to needless pain and tooth morbidity. Moreover, because ADC wait times are based on the HNR that generated the appointment, rather than the time the inmate waits from the initial HNR (that was cancelled), this has the effect of deflating (substantially in some cases) the reported waiting time. The fact that this practice, which is stated nowhere in ADC policies, has become institutionalized shows that ADC either condoned it or was simply ignorant of it due to inadequate monitoring.

### D.      Avoidable Extractions

It is my opinion that the result of ADC's practices is to encourage inmates to allow dentists to extract teeth that could be filled. Dentists should attempt to protect a patient's teeth whenever possible. It fundamentally violates basic standards of dental care to encourage patients in pain to accept a lesser alternative (tooth extraction) by telling them that it will take "months" to be scheduled for the clinically acceptable treatment (a filling). This occurs because of the scheduling and triaging policies of ADC as well as ADC's failure to exercise oversight and prevent such conduct. Moreover, the Refusal to Submit to Treatment and Informed Consent forms, when present, were often inadequate, misleading, and clinically insufficient. This encourages inmates to acquiesce to the extraction of teeth that could be restored. These policies and practices are below the professional standard of care in the community and put inmates at a substantial risk of dental injury, in particular the loss of teeth.

### 1.      Extractions of Teeth that Could Be Restored

While extractions are a large portion of a correctional practice, extractions should be limited to teeth that cannot be restored (*i.e.*, filled). A policy that extracts salvageable teeth is unacceptable. [NCCHC at 70; APHA at 90 ¶ 8] Recommending extraction of a tooth that can be filled simply because it is more expedient is not consistent with the generally accepted standard of care. Similarly, advising a patient in pain that a salvageable tooth could be extracted expeditiously but could not be filled for several months due to wait time is below the standard of care. Where a dental system lacks the resources or oversight to treat salvageable teeth and incorrectly triages patients, inmates are at a systemic risk of receiving extractions when less invasive dental care could have been provided. The effect of the wait times for fillings is that a tooth is not treated until it has deteriorated to the point that there is little alternative to extraction. In other words, a painful tooth that does not "need" to be pulled may not be treated in sufficient time to keep it from deteriorating to the point that there is no practical alternative to extraction.

---

refused after it was explained that if dentist took a PA [x-ray] of the tooth, he would no longer be on the Routine Care List).

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

ADC's informed consent practice (or lack thereof) also increases the likelihood of unnecessary extractions. It is not consistent with the generally accepted standard of care to perform extractions without informed consent. When an extraction is recommended, the generally accepted standard of care is that the patient should be fully informed of the reason, the consequences of not consenting to the procedure, and the existence of alternative treatments if any. This information and the patient's refusal should be documented in writing. [*See, e.g.,* NCCHC 2008 at 129 (NCCHC Standard P-I-05 Informed Consent and Right to Refuse)]

Dental Procedure 773.5 (Informed Consent and Right to Refuse) states that

> When an inmate gives the dentist permission to perform an invasive dental procedure, he/she will be informed of the possible risks/consequences of the procedure. If the procedure includes the removal of one or more teeth, then the inmate will be notified if he/she is eligible for replacement teeth.
>
> . . . .
>
> If the inmate refuses the examination, treatment or procedure, dental services for that appointment will be not be [sic] provided and a Refusal of Treatment Form will be completed. The risks of the inmate's action shall be explained to him/her.

But both these directives are incomplete and do not line up with the NCCHC standards because the dentist is not required to discuss alternative treatments and memorialize that discussion in the consent form. In fact, ADC's standardized "informed consent" form does not contain any sort of requirement that alternatives be discussed. A patient who signs a consent form for an extraction without having been informed that the tooth could be filled did not give his or her informed consent. Because the written directives are incomplete and leave room for such inadequate care, it is my opinion that the lack of oversight and control leads to the unnecessary extraction of teeth.

Regular ADC practices that are reflected in the records that I reviewed also increase the likelihood of unnecessary extractions. Dental assistants routinely respond to prisoners on the Routine Care List who submit HNRs for dental pain that "if you want the tooth out, submit another HNR."[43] The pressure to have the tooth extracted is magnified by the wait times for routine care. During my record review, I saw numerous instances of responses to HNRs from prisoners who were in pain and on the Routine Care List in which they were told that wait times for Routine Care were 3-5 months,[44] 5-7 months,[45] 6-8 months,[46] 12 months or more[47] or "we don't have a dentist at this time."[48] While the wait times for routine care have decreased, the 90-day goal is too low a bar when dealing with pain. Pain should be dealt with expeditiously, and it

---

[43] *See* note 38, *supra.*

[44]   **Redacted**          , 7/31/12 HNR

[45]   **Redacted**         , 4/2/13 HNR

[46]   **Redacted**      , 10/16/12 HNR;   **Redacted**      , 10/19/12 HNR

[47]   **Redacted**       , 1/10/11 HNR

[48]   **Redacted**      , 1/15/13 HNR;   **Redacted**        , 2/19/13 HNR

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

is simply unconscionable that a prisoner is put in the position of choosing between urgent and routine care under the duress of pain.

During my review, I found several[49] instances where dental assistants advised prisoners who submitted HNRs for pain and wanted fillings that they were assigned to the Routine Care List but, if they were in substantial pain, they could submit an HNR for an urgent care appointment and the tooth would be extracted. The records in some of these examples where teeth were extracted strongly suggest that the teeth were originally salvageable when the pain was first reported.

**Redacted**       submitted an HNR on March 22, 2013 stating "Whole filling fell out.  Need to be seen."  The response was, "If tooth hurts bad enough to pull submit a pain HNR."  Thus, a dental assistant made a decision that a painful, potentially restorable tooth would not be scheduled for expedited treatment unless the inmate is willing to have it extracted.  A follow-up HNR on April 12, 2013 resulted in an extraction 5 days later—26 days after she submitted the first HNR that stated pain.  However, as discussed previously, when a filling falls out or fractures, it must be replaced in a timely manner to protect the pulp of the tooth from the effects of dentinal sensitivity.  Moreover, the longer dentinal sensitivity persists the greater the likelihood that what initially may have been a reversible condition will develop into irreversible pulpitis requiring root canal or extraction. Timely replacing the filling with either a temporary or permanent filling might have prevented a reversible pulpitis (at which point the tooth would be salvageable) from becoming irreversible.

**Redacted**       submitted an HNR on June 10, 2012 (pain on drinking hot and cold) and was seen on a pain evaluation.  She was told at the pain evaluation (6/15/12) that tooth #19 had a defective filling and she should submit an HNR for a filling appointment. [ADC153462] She submitted an HNR on June 15 for a filling appointment stating that she was experiencing pain.  She was informed that she was on the Routine Care List for a filling but, if the pain is so great that she wants the tooth extracted, she should submit an emergency HNR. She submitted an HNR on July 8 and was informed, "You are on the [Routine Care] list since 6/18/12."  She submitted another HNR on July 10 (tooth pain—can't wait for a routine appointment) and was seen on pain evaluation on July 18.  She was informed that tooth #19—the tooth she was waiting to have filled—would have to be extracted.  [ADC153461]  It was extracted on August 1.  [*Id.*]  The effect of this policy is not to treat a tooth until it has deteriorated to the point that there is little alternative to extraction.  As in the example above, timely treatment might have prevented the development of an irreversible pulpitis.

## 2.    Restoring Teeth Recommended for Extraction

In my review, I also documented occasions in which dentists recommended teeth be extracted that were later restored.  However, these prisoners were unusually persistent.  ADC's ultimate restoration of certain' prisoners teeth, therefore, does not illustrate a high quality of

---

[49] *Also, see supra*,       **Redacted**       ,   **Redacted**    , and **Redacted** **Redacted**, as well as       **Redacted**       , who was told to choose between pain and an evaluation for extraction, and chose pain, waiting six months for one filling and another five months for the second.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **30**

care.  Instead, it suggests that ADC has a practice of recommending extractions for teeth that could be saved.

**Redacted**       refused extraction of #18 (ADC137181), and it was filled 2 months later (ADC137181).

**Redacted**       refused extraction of #3, and a temporary filling was placed.  He was seen on July 5, 2013 because the temporary filling was causing problems, and a permanent filling was planned for the next visit.

*Charlotte Wells* (247188) twice signed Refusal to Submit to Treatment Forms related to extractions.  Her records indicate that in both cases, she filed an HNR for pain, saw a dentist a few days later, and was told she could either have the tooth pulled immediately or file an HNR to get a filling in several months.  [*E.g.* ADC007064, 6853-55, 6938, 7109, 7007][50]  She was rewarded for her tenacity by having fillings placed in #18 on May 9, 2011 and in #14 on November 17, 2011.  [ADC0006854]

*Maryanne Chisholm* (200825) also refused to have a painful tooth (#14) extracted because she wanted it filled.  [PLTF-PARSONS-004626]  Her chart indicates the tooth had extensive decay that required extraction.  [ADC000120]  Ms. Chisholm submitted an HNR on August 16, 2012, that states "the dentist" told her that she could have her teeth extracted or wait 6 months for routine care.  [PLTF-PARSONS-004627]  On January 22, 2013, her persistence was rewarded when a permanent restoration was placed in #14.  [ADC071374]

**Redacted**       submitted an HNR on September 27, 2012 for a painful broken filling (ADC153477) and was seen on a pain evaluation on October 2.  [ADC153466]  At a follow-up on October 18, the dentist noted "recurrent decay, deep-seated."  [*Id.*]  Because the tooth was not painful, she wanted it filled, not extracted, and she signed a refusal form.  [ADC153469]  She was told that she would have to submit another HNR for the filling appointment.  She should have been on the Routine Care List from a March 26, 2012 HNR, but it appears that the HNR was cancelled because she refused to have tooth #13 extracted.  Note however that tooth #13 did not have to be extracted.  In fact, it was eventually restored on April 11, 2013—749 days after her (apparently) cancelled routine care HNR and 169 days after her new HNR on October 24.

### 3.    Summary

Several findings led me to believe the effect of ADC's policy and practice is to permit and encourage extraction of salvageable teeth.  This bias in favor of extraction is supported by the practice of obtaining inadequate consent or refusal forms for tooth extraction.  I also

---

[50] These forms, like the consent forms used for extractions, are often perfunctory, incomplete, and erroneous.  Nowhere on the form does it mention that the alternative treatment (a filling) was possible.  While Ms. Wells' initials appear on the block:  "Patient information has been provided by nursing staff at the time of refusal and the inmate is making an informed refusal," there is no notation in her health record that nursing staff had any contact with her regarding her dental condition.  [ADC007007]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **31**

discovered that inmates were apparently removed from the Routine Care List as the result of having an urgent care appointment or refusing to consent to extraction. This delayed routine care, which had the potential to make restoration more difficult or the tooth unsalvageable. Furthermore, I found a pattern of dental assistants responding to HNRs for dental pain from prisoners on the Routine Care List that "if you want the tooth out, submit another HNR." Finally, the pressure to have the tooth extracted is magnified by the wait times for routine care. I saw numerous instances of responses to HNRs from prisoners who were in pain and on the Routine Care List in which the prisoners were told in response that wait times for routine care were several months or that "we don't have a dentist at this time." Consequently, ADC's policy and practice puts prisoners at a substantial risk of losing teeth that could be saved.

### E.    Inadequate Treatment of Chewing Difficulty

It is my opinion that ADC's policy and practice regarding prisoners who are unable to adequately chew their food is flawed and places them at risk of preventable pain, poor nutrition, and inability to take necessary medications. ADC policy does not address timing or monitoring of patients waiting to receive dental devices, thus permitting inappropriate delays and problems in receiving a proper diet. These policies and practices are below the professional standard of care in the community and put inmates at a substantial risk of dental injury, in particular the loss of teeth and other harms that result from the inability to eat (including loss of weight) or take medications.

### 1.    Denture Preparation

Unless an inmate is completely edentulous, there are usually some precursor procedures (mouth preparation) that are necessary before the denture fabrication process can begin. For complete dentures, all teeth must be extracted and the extraction sites healed. The extractions are typically done in segments, so depending on the number and location of the teeth to be extracted, it may require up to six appointments to prepare the mouth for complete dentures and fewer appointments for partial dentures since some teeth will remain. Afterwards, a dentist generally allows one month for the mouth to heal before the preliminary impressions are taken. For inmates needing partial dentures, the number of healthy or restorable teeth is critical. In fact, if critical teeth are not restorable due to delay, a partial denture would no longer be feasible and the only alternative would be complete dentures, resulting in substantial loss in chewing efficiency.

The complete denture fabrication process starts with preliminary impressions so that a custom tray can be made. The custom tray is used to take a final impression. The casts made from the final impressions are sent to a dental laboratory which produces bite rims, which are devices that allow the dentist to establish the proper distance between the jaws and position of the teeth. The bite rims are returned to the laboratory with the selected shape, size, and shade of the denture teeth. The laboratory returns the denture teeth set in wax, and they are tried in, adjusted, and returned to the laboratory for final processing. The finished dentures are then tried in and adjusted. This generally takes five to six appointments. The process for making partial dentures is more streamlined since fewer teeth are replaced and establishing the distance between the jaws can be done more readily. This usually takes only three or four appointments.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **32**

Very little of this is specified in the DSTM; it is left to the discretion of the dental clinic. No timelines are assigned in the DSTM or in ADC's contacts with Wexford and Corizon. Nor do the DSTM or the contracts reference the prescription of soft diets to patients awaiting dentures. Although some clinics maintain a list of patients currently undergoing serial extractions or denture fitting, dental clinics do not appear to have any monitoring in place tracking how long completely or partially edentulous patients have been waiting for dentures. Moreover, with no requirements in the DSTM or the contracts, ADC has no performance measures to monitor with regard to denture treatment. This lack of standards and monitoring, particularly when combined with the chronic understaffing and other issues described above, leaves patients in need of dentures at a substantial risk of long-term inability to properly chew food as well as long-term pain and discomfort.

### 2.   Consequences

My review of prisoner records found substantial delays that would be the expected consequences of such a system. Delays are primarily in the mouth preparation phase. Prisoners who require many teeth to be extracted are often placed on the Serial Extraction List, and their appointments are scheduled by the clinic so they do not have to submit HNRs.[51] While not mentioned in the DSTM, this is reasonable since it bypasses the HNR process and allows the dentist to control the appointments. However, as noted above, the wait time for these appointments is not tracked or monitored, and it can be substantial. Moreover, only extractions are addressed through this manner; prisoners who need other necessary precursor procedures— i.e, restorations and scaling—must wait on the Routine Care List, often for substantial periods. So, even if the maximum wait time is less than 90 days for a routine care procedure, the wait time is for a discrete procedure like a filling or an extraction, and prisoners must often go through the list several times in order to prepare for dentures. During this time, these patients are missing a substantial number of teeth and can be expected to have difficulty eating and considerable discomfort.

During my record review, I found several prisoners who waited an inordinate amount of time to obtain their dentures.[52]

***Joshua Polson*** (187716) submitted a series of HNRs describing pain and difficulty in chewing, asking for his partial denture treatment to be expedited. He was consistently told that

---

[51]  This is not a universal practice since it is not a part of the DSTM and is not monitored by ADC.

[52]  While the five inmates from my sample whose dentures were delayed were a small proportion of my overall sample, most inmates do not qualify for dentures because they are deemed to have sufficient ability to chew per Procedure 771.5. Accordingly, the true denominator is much smaller, and the proportion of inmates who have to wait a considerable and unreasonable time for their dentures would be much larger. For example, of the 300 records I reviewed on my prison visits, 44 prisoners submitted HNRs for dentures. Furthermore, it is possible that some of those prisoners would not ultimately qualify for dentures so the denominator would be even smaller. Assuming that those 44 prisoners are generally representative of the proportion needing dentures, the 5 records I identified would indicate problems with 11 percent of the ADC population needing dentures.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **33**

his care was routine and waited months for an appointment.  [*E.g.,* ADC006401, 6391, 6402, 6392.  He received his dentures in April 2011, 489 days after his initial HNR was submitted on December 23, 2009.[53]

**Redacted**          submitted an HNR on August 12, 2011 requesting that his remaining teeth be extracted and was assigned to the Routine Care List.  He was not scheduled for routine care for 188 days.  His treatment plan was simple: extractions and complete dentures; yet the delays in obtaining appointments were so great that as of the time of my review almost 2 years later, he had not had his first denture appointment (for impressions).[54]

**Redacted**          submitted an HNR for an extraction (in preparation for having dentures made) on June 1, 2011 and was placed on the Routine Care List.  He remained untreated after 139 days and, on October 18, 2011, submitted an HNR for pain.  He was seen 8 days later at which time two teeth were extracted.  He submitted an HNR on May 21, 2012 for partial dentures but was not seen for a preliminary impression until another 270 days later on February 15, 2013.[55]

**Redacted**          submitted an HNR on December 23, 2009 for partial dentures.[56] He submitted another HNR on May 26, 2010 and was seen 253 days later on February 3 (407 days after his original request).  For a year, he submitted HNRs for dental work consistently and had extractions and fillings.  He had so few teeth remaining that he was approved for a mechanical soft diet on May 16, 2012.  He submitted an HNR on August 22, 2012 inquiring about his status on the Routine Care List and was told that he had been placed back on it.  He was appointed for extractions 258 days later on May 8, 2013.  By July 11, 2013 (the date of the audit)—more than 3½ years after his initial HNR for partials—he still had not started the process of denture impressions.

**Redacted**          submitted an HNR in May 2012 for routine care, and the treatment plan included partial dentures.  His treatment was delayed several times because there was no full-time dentist on staff for over three months.  He received his partial dentures on July 23, 2013, which was 398 days after the treatment was originally ordered.

---

[53]  Making matters worse, Polson had continual difficulty obtaining his soft diet (while dental renewals were reasonably forthcoming, the diet provided by the kitchen is often not compliant).  Because he takes some of his medications with food, this is additionally troublesome.

[54]  Had he been assigned to the serial extraction list, rather than the Routine Care List, his extractions could have been done within 4 or 5 months and he would be ready for preliminary impressions.

[55]  From the February 15, 2013 appointment onward, he was on the Prosthetics List and did not have to submit an HNR for his remaining denture appointments.

[56]  According to February 10, 2010 and December 2, 2011 progress notes, he was a no-show for a prosthetics evaluation appointment.  When prisoners fail to show for an appointment, it is not unusual that they were unaware of the appointment because they did not receive the pass. In any event, his December 23, 2009 HNR was cancelled.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

### 3.       Summary

The provision of dentures by ADC's Dental Department is often untimely because ADC has no policy addressing timing, no procedures to ensure that treatment is timely, and no monitoring of the status of patients awaiting dentures—even though many of these patients have difficulty eating.  As I found in my record review, this places inmates at a risk of inordinate delays during the process of acquiring dentures, with attendant discomfort and difficulty in maintaining proper nutrition.

### F.       Inadequate Monitoring by ADC

It is my opinion that ADC has failed to monitor the provision of dental care to its prisoners when it was providing care directly as well as under its contracts with Wexford and Corizon.  While the Wexford and Corizon contracts require that the contractors comply with the DTSM, ADC allocates insufficient resources to monitoring the dental program.  ADC's monitoring of the clinical aspect of its program is insufficient to ensure that its vendor provides adequate dental care.  ADC's dental monitor is currently a dentist who works one day a week and has no experience in correctional health.  Consequently, she has insufficient time to develop an understanding of the DTSM or the actual practices employed by Corizon/SPDS.  Dental monitoring using the Monitoring Green, Amber, Red report ("MGAR"), ADC's sole monitoring tool, is done inconsistently without the dental monitor's involvement.  And ADC does not maintain, or require from its contractor, various documents that would improve the assessment and monitoring of dental care.  Moreover, oral care is monitored too infrequently for it to be of substantial value.  As a result of all of these factors, ADC is either unaware of or tolerates practices that result in inadequate and untimely care.  Without effective monitoring, inmates are put at a substantial risk of serious injury.  This is below the professional standard of care.

### 1.       ADC Dental Monitor

ADC does not have a full-time Dental Director as it had in the past.  Rather, it has a one–day-a-week dentist (Dr. Karen Chu).  She described her job responsibilities as, "I am the dental monitor, so I would consider myself more like a consultant.  So since I'm there one day a week, they may have, you know, different things I may need to address.  Or if they have any questions, things like that, I would give my advice."  [Chu Dep. at 8:3-9]  However, one day per week is insufficient time to adequately monitor the performance of Corizon and SPDS.  Table 4 summarizes Dr. Chu's activities based on her testimony at deposition.  Her testimony was noteworthy not so much for what she monitored, but for what she failed to monitor, which is not surprising given the inadequate amount of time ADC allocates to dental monitoring.

Most glaringly, she testified that although she added some questions to the monthly monitoring report (what is now known as the MGAR), she does not herself receive the reports and does not know who receives the reports, where they are kept (*Id.* at 44:19-45:10), or the sources of the other oral health performance standards (*Id.* at 45:18-46:11).  Nor does she receive a summary of the oral health questions (*Id.* at 50:10-51:5), or have any idea how monitors determine how the oral health measures should be scored (*Id.* at 47:24-46:21).  Dr. Chu testified that ADC neither monitors timeliness of responding and triaging HNRs nor receives information from Dr. Smallwood.  [*Id.* at 100:18-101:6]  Nor is she sure whether Dr. Smallwood monitors the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

timeliness of grievances or responds to dental grievances at all.  [*Id.* at 106:9-14]  She testified that inmate wait times were monitored with Dr. Smallwood's software but that information is not provided to anyone at ADC; nor has anyone at ADC asked Dr. Smallwood for the information. [*Id.* at 93:12-20]  In addition to not knowing what wait times are in the dental clinics, she did not even know that Dr. Smallwood's contractual obligation is to get all routine care wait times under 90 days.[57]

Dr. Chu also claimed to be unaware of many of the nuts and bolts of ADC dental care under SPDS, such as whether dental assistants are allowed to classify HNRs as routine or urgent. [*Id.* at 93:1-20]  Moreover, she testified (incorrectly per my review) that dental assistants do not take x-rays without a dentist's direction.  [*Id.* at 97:19-21]  According to Dr. Smallwood, the reason inmates at some clinics see dental assistants is because "Dentist[s] are always in charge at the facility … [, and the dentist will] decide whether he or she wants to see it or if he wants to delegate that to the dental assistant."  [Smallwood Dep. at 126:11-127:10]  Given that it was Dr. Chu's unambiguous opinion in December 2012 that dental assistants have no business triaging patients, the fact that such practices continue under SPDS indicates that ADC is not listening to its dental monitor—the only dentist in its organization.

While she did testify that she monitors for compliance with the DSTM, she does not monitor for issues related to the quality and timeliness of care such as dental staffing, provision for prescription drugs, resolution of prisoner HNRs, or special diets.  [Chu Dep. at 42:3-19, 111:7-112:1]  She explained that she doesn't have any kind of relationship with Corizon and not very much contact with the prison complexes "considering I'm only one day a week".  [*Id.* at 9:12-15, 10:9-14]  She also has very little contact with Dr. Smallwood, consisting of occasional emails and phone calls that rarely involve clinical issues.

Dr. Chu's part-time status has redounded to the detriment of the dental program.  The documents I have been provided indicate no changes in the DSTM or other system-wide policy placing her recommendations into effect.  In the past, the dental program was managed by a full-time executive—Dr. Adu-Tutu and Dr. Scalzo before him.  [Deposition Transcript of Michael Adu-Tutu, DDS dated Oct. 1, 2012 ("Adu-Tutu Dep.") at 30:19-31:13, 32:14-16]  From her emails it is clear that Dr. Chu identified several substantial problems with the inmate dental care and recommended policy changes and changes in the DSTM.  Yet, after almost a year, the DSTM remains unchanged.

Defendant Ryan also appears to simply defer any monitoring responsibility to Dr. Smallwood.  The leitmotif of Defendant Ryan's response to a series of interrogatories regarding the dental program for ADC's inmates was that the questions should be directed to Corizon's and/or Dr. Smallwood's employees.  "Per contract, Corizon and its contractors are required to comply with the Dental Services Technical Manual."  [Licci Rogs 2, 3, 4]

---

[57]  Several months after Dr. Chu's May deposition, email produced by defendants indicated that Dr. Chu did receive, in April, along with others in the monitoring bureau, information on how to access monthly wait time reports and MGAR reports.  That she was unaware of this and had not in fact reviewed the reports speaks volumes about her curiosity or concern regarding SPDS's performance.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### 2. ADC Monitoring Report for Dental Care

ADC employs monitors at each facility to collect data to measure contractor compliance. The sole monitoring instrument for health care contractor performance used by facility monitors is the MGAR. The performance measures in the MGAR are based on the NCCHC evaluation criteria and, for oral care, the DSTM. The Oral Care section of the MGAR includes 19 measures, none of which measure clinical aspects of the dental program. As the Perryville monitor, Mark Haldane, pointed out, "I [a non-clinician] have in fact filled out dental areas because a lot of it is – is not really directly related to care; it's more form and time frames and those sorts of things, which are readily obtainable through documentation." [Deposition Transcript of Mark T. Haldane, JD dated Sept. 19, 2013 ("Haldane Dep.") at 36:16-37:2] This focus on measures designed for non-clinicians necessarily produces a report that provides a limited view of clinical programs. For example, while it is useful to know if inmates are waiting over 90 days for routine dental care (measure 3), it totally ignores the clinical issue of whether inmates were correctly assigned to routine care in the first place or should have been assigned to urgent care. Similarly, measure 5, "Are treatment plans developed and documented in the medical record?", while interesting, fails to address the clinical appropriateness of the treatment plan. [ADC069956] (In fact, it is instructive to contrast these MGAR measures to Dr. Chu's 2012 findings based on grievance reviews and record audits.) And while Dr. Smallwood may have a peer review program in place, ADC does not have the capacity to perform its own clinical oversight because its dental monitor works only one day a week.

The monitors, aware that they are not monitoring clinical outcomes in dental care, believe that Dr. Chu is doing that. For example, Marlena Bedoya, the contract monitor for Tucson, stated that she does not know if Dental is in compliance with the Oral Measures. "You would have to talk with Dr. Chu." [Deposition Transcript of Marlena D. Bedoya, dated Sept. 10, 2013 at 170:1-14; *see also* Haldane Dep. at 37:3-11] But Dr. Chu, as noted above, denied any involvement in the MGAR or any active monitoring activity.

The last (and only) time the MGAR monitored oral care was January 2013. [Deposition Transcript of Terry L. Allred dated Sept. 18, 2013 at 181:15-25] Since then, ADC has chosen not to monitor the Oral Care section of the MGAR. In March 2013, ADC changed contractors from Wexford to Corizon. Yet as of September 2013, Oral Care has not been measured again. Moreover, even if oral care were measured in September, six month intervals for monitoring dental care is inadequate. The dental monitoring using the MGAR is, simply put, desultory.

### 3. Other ADC Reports

ADC does receive from SPDS a more granular report about program outputs and some measures are clinically-related but still not clinical. For example, while the Activity Period Report (ADC108137) provides more data (e.g., the number of cleanings and fillings), it is still just a workload report and provides no insight into the quality or appropriateness of the care provided. But even this report is of no use if it is not reviewed by someone with clinical insights, such as the Dental Monitor. According to her testimony, however, Dr. Chu has neither the time nor the interest to perform such a review.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

### 4.    Summary

ADC's lack of effective monitoring and oversight affects all areas of dental care in ADC facilities.  Without effective monitoring, ADC has no way to confirm whether its contractor is providing adequate dental care or whether care continues to fall below the acceptable standard of care.  In a large institution like ADC, monitoring and oversight are essential due to the numerous people required to work together to provide dental care.  Without monitoring, inmates are put at a substantial risk of injury because there is no one to ensure that dental care is being implemented appropriately.

The ADC dental program monitoring is a Potemkin village—designed only to impress. The oral care measures that comprise the January 2013 MGAR are thin gruel since they ignore the most important aspect of the program: clinical treatment.  Moreover, the MGAR produced data so condensed that it added little to my understanding of the dental program.  Based on my experience evaluating and auditing dental programs in the military, educational facilities, and departments of corrections, a proper evaluation requires gross, granular clinical data.  Thus, even if ADC went forward and formalized the MGAR, it would add little insight into dental care within ADC.

Not only does the MGAR ignore the clinical aspect of the dental program but ADC's one employee who could monitor the quality of care works only one day a week and, from her testimony at deposition, it shows.  One has only to look at the recent history of ADC dental leadership to see it is in desuetude.  Dr. Adu-Tutu was a full-time Dental Director as was his predecessor, but ADC hired a dentist one day a week to replace him.  ADC has washed its hands of dental care and defaulted its monitoring responsibility to its contractor—to the point of ignoring or rejecting recommendations of its own consultant.

## IV.    CONCLUSION

My opinions are informed by reviewing 300 prisoner health records, covering treatment from 2009 to July/August 2013; the records of the named plaintiffs, and other records as identified in Exhibit C.  Furthermore, I reviewed documents produced by ADC, Wexford, Corizon, and SPDS as well as deposition testimony.  The problems I found are from all ADC prisons, and have continued despite changes in contractors.  While staffing has improved (but is still inadequate), the program deficiencies that I have set forth remain and inmates continue to be subject to preventable pain, tooth morbidity, and tooth mortality.

The policies and procedures described above affected nearly all of the prisoners whose records I reviewed and certainly put all inmates at risk.  While some were fortunate enough to have experienced only moderate delays and received the care they requested with no lasting harm, many were not.  A significant portion of my sample experienced much worse consequences, including extended periods of pain and loss of apparently salvageable teeth.

It is my opinion that the consistently inadequate care documented in the records I reviewed is attributable to systemic problems caused by inadequate and poorly monitored policies and procedures in ADC's Dental Department.  Specifically, ADC's policies and practices with regard to staffing, triaging, treatment time frames (or lack thereof), tooth

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

extraction, preparation for dental devices, and contractor monitoring combine to create a system that fails to adequately identify, or properly and timely treat, dental issues experienced by inmates.[58] ADC's policies on these issues are in many cases themselves below the standard of care. Moreover, regular practices often fall even further short, with ADC's lack of oversight and control over dental care ensuring that inmates are at risk of receiving inadequate care. These failures place all inmates at risk not only of preventable pain, but also of tooth decay and unnecessary loss of teeth. The dental injuries documented in the prisoner dental records I reviewed are consistent with this opinion. The inadequacies in dental care experienced by the named plaintiffs and other inmates whose records I reviewed are typical of the risk of inadequate dental care for all inmates. Consequently, all present and future inmates with dental problems are at risk for preventable pain, tooth morbidity, and tooth mortality.

---

[58] **Redacted**'s case provides just one example of how ADC's multiple deficiencies combine in causing inadequate care. First, upon recognizing advanced decay at intake, the dentist should have indicated tooth #2 for expedited care. Second, instead of triage by a dental assistant, the decision to assign his next HNR to routine versus urgent care should have been made by a dentist who could interpret the examination charting and x-rays and make a clinically appropriate decision. Third, the lack of intermediate categories of timeliness between urgent and routine prevented the tooth from being treated during what might have been a window of opportunity. Finally, ADC had insufficient dental staffing to see routine care appointments within six months of the HNR, significantly increasing the likelihood that teeth would decay too far to be saved.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Page **39**

| Table 1. HNRs Stating Pain Not Assigned to Urgent Care (N=30) | | | | | | |
|---|---|---|---|---|---|---|
| Name | HNR Date | Issue | Date Assigned[59] | Date Seen | Encounter Result | Days after HNR |
| Redacted | 4/11/13 | Pain | 4/15/13 | | Not seen by date of audit (7/8/13) | 88+ days |
| Redacted | 1/9/12 | Painful cavity | 1/10/12 | 3/15/12 | Restore #18,19,20 | 66 days |
| Redacted | 7/7/10 | Painful tooth | 7/8/10 | 10/25/10 | Restore #2 | 110 days |
| Redacted | 5/14/13 | Painful teeth | 5/16/13 | | No appointment by date of audit (7/11/13) | 58+ days |
| Redacted | 12/24/12 | Sensitivity/ pain in teeth | 12/26/12 | 3/6/13 | Restore #18 | 72 days |
| Redacted | 5/28/13 | Painful bump on gums | 5/29/13 | 6/25/13 | Seen for routine appointment | 78 days |
| Redacted | 7/13/12 | Loose, rotten tooth | 8/1/12 | 8/31/12 | Tooth #2, & #5- Rx: antibiotic | 49 days |
| Redacted | 3/20/12 | Needs extractions / painful teeth | 4/2/12 | | Progress note not transcribed | |
| Redacted | 1/26/11 | Needs dental work – teeth hurt | 2/1/11 | 2/16/11 | Restore #3 | 21 days |
| Redacted | 11/17/11 | Tooth hurts when drinking hot and cold | 11/17/11 | 2/15/12 | Restore #9 | 90 days |

---

[59] The Date Assigned reflects the date on the "treatment plan" section of the HNR that would have been returned to the inmate. HNRs listed in this table use various terminology ("on routine list", "on dental list", "scheduled") that does not specify that the inmate will be seen shortly or on a "pain eval" or similarly termed visit.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

| Table 1. HNRs Stating Pain Not Assigned to Urgent Care (N=30) | | | | | | |
|---|---|---|---|---|---|---|
| **Name** | **HNR Date** | **Issue** | **Date Assigned[59]** | **Date Seen** | **Encounter Result** | **Days after HNR** |
| Redacted | 5/28/13 | Wants teeth fixed. One tooth causing headaches and problems | 5/29/13 | | No treatment by record review date (7/24/13) | 57 days |
| **Redacted** | 6/15/12 | Schedule for filling – experiencing pain | 6/18/12 | 7/18/12 | Pain eval. #19 Apical periodontitis. PVK / IBU. NV extract #19 | 8 days |
| **Redacted** | 5/27/11 | Broken tooth (pain) | 5/31/11 | | Progress note not transcribed | |
| **Redacted** | 4/10/13 | Toothache | 4/11/13 | | Progress note not transcribed | |
| **Redacted** | 9/27/10 | Broken tooth cutting into gums – needs to be pulled | 9/28/10 | | Progress note not transcribed | |
| Redacted | 3/19/12 | Toothache – can't eat or sleep | 3/26/12 | 5/8/12 | Extract #4 | 50 days |
| **Redacted** | 2/24/13 | Broken tooth – extremely painful (can't eat) | 2/26/13 | | No appointment by time of the audit (7/11/13) | 137 days |
| **Redacted** | 4/3/13 | Has a cavity that is causing a toothache | 4/4/13 | 4/18/13 | Restore #17, #19 | 15 days |
| Redacted | 3/4/13 | Cavity (see 11/14/11 HNR) starting to hurt bad | 3/5/13 | 3/6/13 | Restore #21,#3 | 113 days |
| Redacted | 6/24/12 | Broken tooth – pain when he eats | 6/26/12 | 8/30/12 | Restore #8 | 67 days |
| Redacted | 1/22/10 | Cavities hurt real bad | 1/25/10 | 2/25/10 | Restore #2 | 34 days |
| Redacted | 6/13/13 | Need filling – tooth starting to hurt | 6/18/13 | | No appointment by date of audit (8/4/13) | 52 days |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| Table 1. HNRs Stating Pain Not Assigned to Urgent Care (N=30) | | | | | | |
|---|---|---|---|---|---|---|
| Name | HNR Date | Issue | Date Assigned[59] | Date Seen | Encounter Result | Days after HNR |
| Redacted | 6/6/12 | Wisdom teeth causing problems | 6/7/12 | 8/30/12 | Pericoronitis #32. Rx: Penicillin & Ibuprofen | 85 days |
| Redacted | 4/24/13 | Toothache | 4/25/013 | | Not appointed for toothache by the date of the audit (7/11/13) | 78+ days |
| Redacted | 5/10/13 | Toothache – pain on eating | 5/13/13 | 6/5/13 | Extract #18 | 26 days |
| Redacted | 10/17/12 | Needs cavities filled. Teeth hurt (emergency) | 10/18/12 | | Progress note not transcribed | |
| Redacted | 9/25/12 | Broken tooth – in pain | 9/26/12 | 10/3/12 | Tooth # 19 – Rx: antibiotics and analgesics | 8 days |
| Redacted | 3/6/12 | Status of HNR for a filling? Pain getting worse. | 3/8/12 | 4/5/12 | #30 irreversible pulpitis. Penicillin & Ibuprofen. May need extraction | 30 days |
| Redacted | 5/13/12 | Filling fell out - pain | 5/24/12 | 10/18/12 | Refused appointment | 191 days |
| Redacted | 1/25/13 | Needs fillings. Pain with hot, cold, and sweet | 1/29/13 | 6/19/13 | Restore #31 | 145 days |
| Redacted | 7/15/12 | Toothache (pain left side of mouth) | 7/15/12 | | Progress note not transcribed | |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| Table 2. HNRs Stating Broken / Chipped Tooth Not Assigned to Urgent Care (N=20) | | | | | | |
|---|---|---|---|---|---|---|
| Name | HNR Date | Issue | Date Assigned | Date Seen | Encounter Result | Days After HNR |
| Redacted | 1/14/13 | Chipped/ cracked tooth | 1/15/13 | | No treatment by the time of the audit (7/11/13) | 178+ days |
| Redacted | 3/5/12 | Filling fell out | 3/13/12 | 5/4/12 | Restore #14 | 60 days |
| | 11/11/12 | Broken tooth | 11/13/12 | 4/9/13 | Extract # 21 | 149 days |
| Redacted | 5/14/12 | Crumbling molar needs to be extracted (no pain) | 5/15/12 | 9/26/12 | Extract #15 | 135 days |
| Redacted | 10/24/11 | Status on List? Molar is breaking | 10/25/11 | 1/4/12 | Refused extraction. "I need tooth to eat on right side" | 72 days |
| Redacted | 2/27/11 | Broken tooth / lost filling | 3/3/11 | 3/24/11 | Extract #29 | 25 days |
| Redacted | 5/27/11 | Broken tooth (pain) | 5/31/11 | | Progress note not transcribed | |
| Redacted | 9/27/10 | Broken tooth cutting into gums – needs to be pulled | 9/28/10 | 1/19/11 | Extract #13 (non-restorable) | 114 days |
| Redacted | 2/24/13 | Broken tooth – extremely painful (can't eat) | 2/26/13 | | No appointment by time of the audit (7/11/13) | 137+ days |
| Redacted | 7/25/11 | Chipped tooth | 7/27/11 | 10/4/11 | Pain Eval. Extract #29 | 71 days |
| Redacted | 8/2/11 | Cracked tooth (2nd HNR) | 8/4/11 | 10/4/11 | Pain Eval. Extract #29. NV HNR | 63 days |
| Redacted | 8/24/11 | Wants broken tooth pulled | 8/27/11 | 10/4/11 | Extract #29 | 41 days |
| Redacted | 4/18/13 | Defective filling | 4/22/13 | 6/7/13 | Extract #4 | 50 days |
| Redacted | 2/10/11 | Needs temporary crown | 2/16/11 | 5/12/11 | Restore #21 | 91 days |
| Redacted | 6/28/13 | Broken tooth | 7/1/13 | | No appointment by the time of the audit (7/11/13) | 13+ days |
| Redacted | 7/18/13 | Chipped tooth – hurts when drinks or eats | 7/23/13 | | No appointment by date of audit (7/24/13) | 6+ days |
| Redacted | 6/24/12 | Broken tooth – pain when he eats | 6/26/12 | 8/30/12 | Restore #8 | 67 days |
| Redacted | 4/1/11 | Tooth broken into 3 pieces | 4/7/11 | 10/31/11 | Extract #19 (Non-restorable). Rx: Penicillin & Ibuprofen / | 178 days |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

| Table 2. HNRs Stating Broken / Chipped Tooth Not Assigned to Urgent Care (N=20) | | | | | | |
|---|---|---|---|---|---|---|
| Name | HNR Date | Issue | Date Assigned | Date Seen | Encounter Result | Days After HNR |
| Redacted | 10/1/12 | Has broken tooth and several teeth need fillings | 10/9/12 | 12/7/12 | Pain eval. #2. Gross caries, irreversible pulpitis. Extract #2 | 67 days |
| Redacted | 3/24/13 | Sharp tooth causing pain | 3/26/13 | 5/14/13 | Restore #9 | 51 days |
| Redacted | 9/25/12 | Broken tooth – in pain | 9/26/12 | 10/3/12 | Pain Eval: #19 RX: antibiotics | 8 days |
| Redacted | 11/2/12 | Filling fell out | 11/5/12 | 3/9/13 | Restore #9 | 127 days |
| Redacted | 7/17/12 | Need front chipped tooth repaired | 7/17/12 | 1/29/13 | Restore #8 | 196 days |
| Redacted | 4/27/13 | Previously filled tooth fell apart | 4/29/13 | 6/28/13 | #14,20. Broken tooth sensitive to touch. I/M opted to watch #14. Unable to restore #20 due to equipment problem | 62 days |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| Inmate (Number) | Table 3. Prisoner's dilemma (N=24) | | |
| | Removed from Routine Care List | | Consequence for Routine Care |
| | Refused app't or extraction | Urgent care/ pain evaluation | |
|---|---|---|---|
| Redacted | ☐ | ☒ | Waited 375 days for appointment |
| Redacted | ☐ | ☒ | Removed from list after waiting 45 days |
| Redacted | ☐ | ☒ | On list in 10/2012 but not seen by audit date |
| Redacted | ☐ | ☒ | Waited 249 days for appointment |
| Redacted | ☐ | ☒ | Waited 235 days for appointment |
| Redacted | ☐ | ☒ | Waited 200 days for cleaning |
| Redacted | ☐ | ☒ | On list in 9/2011 but not seen by audit date |
| Redacted | ☐ | ☒ | On list in 1/2013 but not seen by audit date |
| Redacted | ☐ | ☒ | No longer on list |
| Redacted | ☐ | ☒ | On list in 6/2012 but not seen by audit date |
| Redacted | ☐ | ☒ | Restored to list after new HNR |
| Redacted | ☐ | ☒ | Removed from list after waiting 6 months |
| Redacted | ☒ | ☐ | Waited 169 days for filing |
| Redacted | ☐ | ☒ | Restored to list after new HNR |
| Redacted | ☐ | ☒ | Waited 627 days for appointment |
| Redacted | ☒ | ☐ | Waited 129 days for filing |
| Redacted | ☐ | ☒ | On list in 9/2012 but not seen by audit date |
| Redacted | ☐ | ☒ | On list in 3/2012 but not seen by audit date |
| Redacted | ☐ | ☒ | Had no appointments for 623 days |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

| Table 3. Prisoner's dilemma (N=24) | | | |
|---|---|---|---|
| **Inmate (Number)** | **Removed from Routine Care List** | | **Consequence for Routine Care** |
| | **Refused app't or extraction** | **Urgent care/ pain evaluation** | |
| **Redacted** | ☐ | ☒ | On list in 10/2012 but not seen by audit date |
| **Redacted** | ☐ | ☒ | On list in 11/2012 but not seen by audit date |
| **Redacted** | ☐ | ☒ | Waited over a year for appointment |
| **Redacted** | ☐ | ☒ | Removed from list for over 30 days |
| **Redacted** | ☐ | ☒ | Removal resulted in an almost 2 year delay |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

| Table 4.  ADC Dental Monitor Functions and Activities | | |
|---|---|---|
| **Functions** | **Yes** | **No** |
| Monitors Compliance with DSTM | Yes (42:3-5) | |
| Evaluates dental care provided to ADC inmates. | | Acts more like a consultant (12:9-16)<br><br>Partially (13:8-13) |
| Reviews dental grievances | Reviews grievance appeals (12:17-20; 104:10-19) | Does not log grievances she responds to or produce written reports (108:14-22) |
| Ensure dental care meets constitutional standards | Would advise ADC "if something came up" (13:19-14-9) | |
| ADC employees | | No (12:4-5) |
| Advise contract monitors | Yes. Answers questions particularly about the DSTM (24:21-25:16) | |
| Contact with Corizon | | No (30:8-10) |
| Contact with Dr. Smallwood | Occasional (28:12-13) | |
| Monitors staffing | | No (33:1-34:25) |
| Recommend changes in DSTM | Yes (40:3-23) | |
| Reviewed Corizon contract | | No (41:23-24) |
| Resolution of HNRs | | No (42:11-13) |
| Monitor diets prescribed for dental reasons | | No (42:17-19) |
| Routinely reviews institution monitoring reports (MGAR) | | No. Not routinely sent to her and does not know where they are kept (44:22-45:10)<br><br>Does not know who is notified when an oral care standard is marked red  (69:7-23) |
| Provide guidance for institution monitors to evaluate oral care standards | | No. Not exactly sure what they are told about oral care standards (47:14-25; 48:1-17) |
| Monitor institution corrective action plans with respect to oral care standards | | No. Not sure who does it (49:13-25; 50:1-6) |
| Produce reports about dental care | | No (52:10-12) |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

| Table 4.  ADC Dental Monitor Functions and Activities | | |
|---|---|---|
| **Functions** | **Yes** | **No** |
| Access Smallwood software to track HNRs | | No (70:13-19) |
| Follow-up on dental issues at complexes | | No. (74:23-76:7) |
| Monitor purchase of dental equipment | Yes (75:8-21) | |
| Monitor whether treatment plans are performed on new inmates at next facility [after intake] | Yes – but only for facilities she visits (82:12-83:17) | Not aware of anyone who monitors timeliness of treatment plans (83:15-23) |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

Confidential

# EXHIBIT A

Confidential

PRSN-JDS 00052

*Curriculum Vitae* Jay D. Shulman - Prepared November 4, 2013

# CURRICULUM VITAE - JAY D. SHULMAN

## PERSONAL INFORMATION

Address:　　9647 Hilldale Drive, Dallas, Texas  75231
Telephone:　(214) 923-8359
E-mail:　　　jayshulman@sbcglobal.net

## EDUCATION

1982　　　Master of Science in Public Health
　　　　　University of North Carolina

1979　　　Master of Arts in Education and Human Development
　　　　　George Washington University

1971　　　Doctor of Dental Medicine
　　　　　University of Pennsylvania

1967　　　Bachelor of Arts (Biology)
　　　　　New York University

## POSITIONS HELD

### Academic

2007 –　　Adjunct Professor, Department of Periodontics
　　　　　Baylor College of Dentistry

2003 - 07　Professor (Tenure), Department of Public Health Sciences
　　　　　Baylor College of Dentistry (retired October, 2007)

1993 - 03　Associate Professor, Department of Public Health Sciences
　　　　　Baylor College of Dentistry

### Military

1971 - 93　Active duty, U.S. Army. Retired July 1993 in grade of Colonel.

1990 - 93　Chief, Dental Studies Division & Interim Commander (1993),
　　　　　US Army Health Care Studies and Clinical Investigation Activity

　　　　　Directed Army Dental Corps' oral epidemiologic and health services research. Supervised a team of public health dentists, statisticians, and management analysts. Designed and conducted research in oral epidemiology, healthcare management and policy.

1987 - 90　Director, Dental Services Giessen (Germany) Military Community and Commander, 86th Medical Detachment. Public Health & Preventive Dentistry Consultant, US Army 7th Medical Command.

Page 1 of 10

PRSN-JDS 00053

Directed dental care for Army in North Central Germany. Operated 6 clinics with 20 dentists and 60 ancillary personnel. Responsible for the dental health of 25,000 soldiers and family members and for providing dental services during wartime using portable equipment. Provided technical supervision of public health and preventive dentistry programs for the Army in Europe.

1984 - 87   Chief, Dental Studies Division US Army Health Care Studies & Clinical Investigation Activity. Public Health & Preventive Dentistry Consultant to Army Surgeon General.

Directed Army Corps' oral epidemiologic and health services research. Supervised a multi-disciplinary team of public health dentists, statisticians, and management analysts. Designed and conducted research in oral epidemiology, healthcare management and policy. Technical supervision of all Army public health and preventive dentistry programs worldwide.

1982 - 84   Assistant Director for Research, US Army Institute of Dental Research.

Responsible for Management of extramural research program, performing epidemiologic research, and teaching biostatistics and epidemiology to Walter Reed Army Medical Center dental residents.

1980 - 82   Full-time graduate student (Army Dental Public Health Training Fellowship) at the School for Public Health, University of North Carolina at Chapel Hill.

1976 - 80   Director, Dental Automation
US Army Tri-Service Medical Information Systems Agency
Walter Reed Army Medical Center, Washington, DC
Directed a team of computer scientists in the development of an automated management system for the Army dental clinics and upper management.

1975 - 76   Clinical Dentist, Pentagon Dental Clinic, Washington, DC

1974 - 75   Clinical Dentist, US Army Hospital Okinawa, Japan

1971 - 74   Clinical Dentist, US Army Dental, Clinic Fort McPherson, Georgia

## BOARD CERTIFICATION AND STATE LICENSE

**Dental Licensure.**

Texas #17518 (retired)

**Board Certification.**

Certified by the American Board of Dental Public Health since 1984 (active).

Confidential

PRSN-JDS 00054

## RESEARCH - AREAS OF INTEREST

Oral epidemiology, health services research, health policy, military and correctional health.

## RECENT FUNDED RESEARCH

2010 - 12    Instrument system and technique for minimally invasive periodontal surgery (MIS). National Institutes of Health SBIR Grant 2R44DE017829-02A1 ($368,270). Principal Investigator: Dr. Stephen Harrel. Role: Paid consultant.

## CURRENT SOCIETY AND ORGANIZATION MEMBERSHIPS

1984 –    American Board of Dental Public Health

1982 –    American Association of Public Health Dentistry

2011 –    Texas Oral Health Coalition

## PROFESSIONAL ACTIVITIES

### Invited Presentations.

Apr 2012    Public Health, Public Policy, And Legal Issues Associated with Health Care in Prisons: A Dental Perspective. Presented at the University of Texas Health Science Center, San Antonio.

Apr 2009    Public Health, Public Policy, And Legal Issues Associated with Health Care in Prisons: A Dental Perspective. Presented at the University of Iowa.

Mar 2008    Public Health and Public Policy Issues Related to Dental Care in Prisons. Presented at University of North Carolina School of Public Health, Chapel Hill, NC.

Jun 2007    Characteristics of Dental Care Systems of State Departments of Corrections. Presented to annual meeting of Federal Bureau of Prisons dentists, Norman OK.

Jun 2006    Public Health Aspects of Correctional Dentistry. Presented to annual meeting of Federal Bureau of Prisons dentists, Fort Worth, TX.

Oct 2006    Opportunities for Dental Research Using the National Health and Nutrition Examination Survey. Indiana University School of Dentistry.

Aug 2006    Dental Public Health and Legal Issues Associated with Correctional Dentistry. Federal Bureau of Prisons.

Dec 2005    Opportunities for Faculty Research Using Secondary Data. Frontiers in Dentistry Lecture. University of the Pacific School of Dentistry.

Feb 2005    Advanced Education in Dental Public Health. University of Missouri, Kansas City, School of Dentistry.

Confidential                                                                                     PRSN-JDS 00055

**Consultant Activities**

2012 –  Expert Witness. *Parsons et al. v. Ryan et al.* 2:12-cv-00601-NVW (D. AZ).

2012 –  Expert Witness. *Daryl Farmer v. Gwendolyn Miles, et al.* 10-cv-05055 (N.D. IL), Eastern Division. Deposed February 1, 2013.

2012 –  Expert Witness. *John Smentek et al. v. Thomas Dart, Sheriff of Cook County et al.* 1:09-cv-00529 (N.D. IL).

2012 –  Consultant. Quentin Hall et al. v. Margaret Mimms, Sheriff of Fresno County et al. 1:11-cv-02047-LJO-BAM (E.D. CA)

2009 - 11  Expert Witness. Inmates of the *Northumberland County Prison, et al. v. Ralph Reish, et al.* 08-CV-345 (M.D. PA).

2007 - 09  Expert Witness. *Flynn v. Doyle* 06-C-537-RTR (E.D.WI.) Deposed June 5, 2008.

2006 - 12  Rule 706 Expert (monitor) and Court Representative, *Perez v. Tilton* (*Perez v. Cate*) federal class action lawsuit settlement. C05-5241 JSW (N.D. CA).

Responsible to *Perez* Court for coordinating remedies between dental (*Perez v. Tilton / Cate*), medical (*Plata v. Schwarzenegger*), and mental health (*Coleman v. Schwarzenegger*). Monitored compliance with *Perez* stipulated injunction. Monitoring completed June 2012.

2005 - 10  Rule 706 Expert (monitor), *Fussell v. Wilkinson* federal class action lawsuit settlement. 1:03-cv-00704-SSB (S.D. OH).

Performed initial fact finding, provided dental input to stipulated injunction and monitored compliance. Monitoring completed October 2010.

1999 - 03  Editorial Board *Journal of Public Health Dentistry*

1996 - 05  Editorial Board, Mosby's Dental Drug Reference

1993 - 07  *Ad hoc* reviewer: *J Public Health Dent* (10);*J Amer Dent Assoc* (6); *J Dent Educ* (3); *Pediatr* (1); *Community Dent and Oral Epidemiol* (3); *Cleft Palate Craniofacial J* (3); *Pediatr Int* (3); *J Dent Res* (2); *Caries Res* (4); *Oral Dis* (2); *J Oral Rehab* (2)

**Teaching**

Predoctoral

1993 - 2007  Director, Principles of Biostatistics

1993 - 2007  Lecturer, Applied Preventive Dentistry

1993 - 2007  Clinical Supervisor, Preventive Dentistry

2006 - 2007  Clinical Supervisor and Care Provider, Dallas County Juvenile Detention Center Dental Clinic

| 1993 - 2005 | Director, Epidemiology & Prevention |
| 1995 - 2003 | Director, Dental Public Health |

Postdoctoral

| 2007 – | Research mentor, Department of Periodontics, Baylor College of Dentistry |
| 1994 - 2007 | Director, Dental Public Health Residency |
| 1994 - 2007 | Lecturer, Research Methods |
| 2001 - 2006 | Director, Applied Biostatistics |

## PUBLICATIONS

### Peer-Reviewed (55)

1. Bansal R, Bolin KA, Abdellatif HM, Shulman JD. Knowledge, Attitude and use of fluorides among dentists in Texas. *J Contemp Dent Pract* 2012;13(3):371-375.

2. Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *J Correctional Health Care* (2012) 18:1, 58 - 65.

3. Barker TS, Cueva MA, Rivera-Hidalgo F, Beach MM, Rossman JA, Kerns DG, Crump TB, Shulman JD. A comparative study of root coverage using two different acellular dermal matrix products. *J. Periodontology* (2010) 81:11, 1596-1603.

4. Maupomé G, Shulman JD, Medina-Solis CE, Ladeinde O. Is there a relationship between asthma and dental caries? A critical review of the literature. *Journal of the American Dental Association* 2010;141(9):1061-1074.

5. Puttaiah R, Shulman JD, Youngblood D, Bedi R, Tse E, Shetty S, Almas K, Du M. Sample infection control needs assessment survey data from eight countries. *Indian Dental Journal* 2009; 59, 271-276.

6. Fransen JN, He J, Glickman GN, Rios A, Shulman JD, Honeyman A. Comparative Assessment of ActiV GP/Glass Ionomer Sealer, Resilon/Epiphany, and Gutta-Percha/AH Plus Obturation: A Bacterial Leakage Study. *Journal of Endodontics* 2008; 34(6), 725-27.

7. Beach MM, Shulman JD, Johns G, Paas J. Assessing the viability of the independent practice of dental hygiene. *J Public Health Dent.*2007;67(4):250-4.

8. Blackwelder A, Shulman JD. Texas dentists' attitudes towards the dental Medicaid program. *Pediatr Dent* 2007;29:40-4.

9. Massey CC, Shulman JD. Acute ethanol toxicity from ingesting mouthwash in children younger than 6 years of age, 1989-2003. *Pediatr. Dent.* 2006; 28:405-409.

10. Shulman JD, Carpenter WM. Prevalence and risk factors associated with geographic tongue among US adults. *Oral Dis.* 2006;12:381-386.

Confidential                                                                    PRSN-JDS 00057

11. Clark DC, Shulman JD, Maupomé G, Levy SM. Changes in dental fluorosis following cessation of water fluoridation. *Community Dent Oral Epidemiol.* 2006;34: 197-204.

12. Shulman JD, Sutherland JN. Reports to the National Practitioner Data Bank involving dentists, 1990-2004. *J Am Dent Assoc* 2006;137:523-528.

13. Holyfield LJ, Bolin KA, Rankin KV, Shulman JD, Jones DL, Eden BD. Use of computer technology to modify objective structured clinical examinations. *J Dent Educ* 2005;10:1133-1136.

14. Benson BW, Shulman JD. Inclusion of tobacco exposure as a predictive factor for decreased bone mineral content. *Nicotine Tob Res* 2005;719-724.

15. Shulman JD, Rivera-Hidalgo F, Beach MM. Risk factors associated with denture stomatitis in the United States. *J Oral Path Med* 2005;340-346.

16. Shulman JD. Is there an association between low birth weight and caries in the primary dentition? *Caries Res* 2005;39:161-167.

17. Shulman JD. The prevalence of oral mucosal lesions in U.S. children and youth. *Int J Pediatr Dent.*2005;15:89-97.

18. Bolin KA, Shulman JD. Nationwide dentist survey of salaries, retention issues, and work environment perceptions in community health centers. *J Am Dent Assoc* 2005;136 (2): 214-220.

19. Shulman JD. Recurrent herpes labialis in US children and youth. *Community Dent Oral Epidemiol* 2004; 32: 402-9.

20. Shulman JD. An exploration of point, annual, and lifetime prevalence in characterizing recurrent aphthous stomatitis in USA children and youth. *J Oral Path Med.* 2004;33: 558.66.

21. Shulman JD, Beach MM, Rivera-Hidalgo F. The prevalence of oral mucosal lesions in U.S. Adults: Data from the Third National Health and Nutrition Examination Survey. *J Am Dent Assoc* 2004;135:1279-86.

22. Bolin KA, Shulman JD. Nationwide survey of dentist recruitment and salaries in community health centers. *J. Health Care for the Poor and Underserved* 2004; 15:161-9.

23. Shulman JD, Maupomé G, Clark DC, Levy SM. Perceptions of tooth color and dental fluorosis among parents, dentists, and children. *J Am Dent Assoc* 2004;135(5):595-604.

24. Rivera-Hidalgo F, Shulman JD, Beach MM. The association of tobacco and other factors with recurrent aphthous stomatitis. *Oral Dis.* 2004;10:335-345.

25. Shulman JD, Peterson J. The association between occlusal characteristics and incisal trauma in individuals 8 - 50 years of age. *Dental Traumatology* 2004; 20: 67-74.

Confidential

PRSN-JDS 00058

*Curriculum Vitae* Jay D. Shulman - Prepared November 4, 2013

26. Buschang PH, Shulman JD. Crowding in treated and untreated subjects 17-50 years of age. *The Angle Orthodontist* 2003; 73(5):502-8.

27. Maupomé G, Shulman JD, Clark DC, Levy SM. Socio-demographic features and fluoride technologies contributing to higher TFI scores in permanent teeth of Canadian children. *Caries Res* 2003; 37(5):327-34.

28. Shulman JD, Nunn ME, Taylor SE, Rivera-Hidalgo F. The prevalence of periodontal-related changes in adolescents with asthma: Results of the Third Annual National Health and Nutrition Examination Survey. *Pediatr Dent* 2003; 25(3):279-84.

29. Makrides NS, Shulman JD. Dental health care of prison populations. *J Corr Health Care* 2002; 9(3):291-306.

30. Shulman JD, Ezemobi EE, Sutherland JN. Louisiana dentists' attitudes toward the Dental Medicaid program. *Pediatr Dent* 2001; 23(5):395-400.

31. Shulman JD, Taylor SE, Nunn ME. The association between asthma and dental caries in children and adolescents: A population-based case-control study. *Caries Res* 2001; 35:4:240-246.

32. Maupomé G, Shulman JD, Clark DC, Levy SM, Berkowitz J. Tooth-surface progression and reversal changes in fluoridated and no-longer-fluoridated communities over a 3-year period. *Caries Res* 2001; 35:2:95-105.

33. Trautmann G, Gutmann JL, Nunn ME, Witherspoon DE, Shulman JD. Restoring teeth that are endodontically treated through existing crowns. Part I: Survey of pulpal status on access. *Quintessence Int* 2000; 31(10):713-18.

34. Trautmann G, Gutmann JL, Nunn ME, Witherspoon DE, Shulman JD. Restoring teeth that are endodontically treated through existing crowns. Part II: Survey of restorative materials commonly used. *Quintessence Int* 2000; 31(10):719-28.

35. Lalumandier JA, McPhee SD, Riddle S, Shulman JD, Daigle WW. Carpal tunnel syndrome: Effect on Army dental personnel. *Milit Med* 165:372-78,May 2000.

36. McFadyen JA, Shulman JD**.** Orofacial injuries in youth soccer. *Pediatr Dent* 1999; 21:192-96.

37. Cederberg RA, Fredricksen NL, Benson BW, Shulman JD. Influence of the digital image display monitor quality on observer performance. *Dentomaxillofacial Radiology* 1999; 28:203-7.

38. Shulman JD, Niessen LC, Kress GC, DeSpain B, Duffy R. Dental public health for the 21st century: Implications for specialty education and practice. *J Public Health Dent* 1998; 58 (Suppl 1):75-83.

39. Cederberg RA, Fredricksen NL, Benson BW, Shulman JD. Effect of different lighting conditions on diagnostic performance of digital film images. *Dentomaxillofacial Radiology* 1998; 27:293-97.

Confidential

40. Shulman JD, Lewis DL, Carpenter WM. The prevalence of chapped lips during an Army hot weather exercise. *Milit Med* 1997; 162:817-19.

41. Shulman JD, Wells LM. Acute toxicity due to ethanol ingestion from mouthrinses in children less than six years of age. *Pediatr Dent* 1997; 19(6):404-8.

42. Kress G, Shulman JD. Consumer satisfaction with dental care: where have we been, where are we going? *J Am Coll Dent* 1997; 64 (1):9-15**.**

43. Shulman JD, Wells LM. Acute toxicity in children under the age of six from ingesting home fluoride products: an update. *J Public Health Dent* 1995; 57(3):150-8.

44. McFadyen JA, Seidler KL, Shulman JD, Wells, LM. Provision of free and discounted dental services to selected populations: A survey of attitudes and practices of dentists attending the 1996 Dallas Midwinter Meeting. *Texas Dent J* 1996; 113 (12):10-18.

45. Shulman JD**.** Potential effects of patient opportunity cost on dental school patients. *J Dent Educ* 1996; 60 (8):693-700.

46. Shulman JD, Lalumandier JA, Grabenstein JD. The average daily dose of fluoride: a model based on fluid consumption. *Pediatr Dent* 1995; 17 (1):13-18.

47. Solomon ES, Hasegawa TK, Shulman JD, Walker PO. An application: the cost of clinic care by dental students and its relationship to clinic fees. *J Dent Educ* 1994; 58 (11-12):832-5.

48. Shulman JD, Williams TR, Lalumandier JA. Treatment needs and treatment time for soldiers in Dental Fitness Class 2. *Milit Med* 159, 2:135-138, 1994.

49. Shulman JD, Williams TR, Tupa JE, Lalumandier JA, Richter NW, Olexa BJ. A comparison of dental fitness classification using different class 3 criteria. *Milit Med* 1994; 159 (1):5-10.

50. Amstutz RD, Shulman JD. Perceived needs for dental continuing education within the Army Dental Care System. *Milit Med* 1994; 159 (1):1-4.

51. Shulman JD, Carpenter WM, Lewis DL. The prevalence of recurrent herpes labialis during an Army hot weather exercise. *J Public Health Dent* 1992; 52 (4):198-203.

52. Brusch WA, Shulman JD, Chandler HT. Survey of Army dental practice. *J Am Coll Dent* 1987; 54 (1):54-63.

53. Lewis DM, Shulman JD, Carpenter WM. The prevalence of acute lip damage during a US Army cold weather exercise. *Milit Med* 1985; 150 (2):87-90.

54. Freund DA, Shulman JD. Regulation of the professions, results from dentistry. In Scheffler, Richard (ed.). *Advances in Health Economics and Health Services Research IV* 1984; 5(1):161-180.

55. Baumgartner JC, Brown CM, Mader CL, Peters DD, Shulman JD. Scanning electron microscopic evaluation of root canal irrigation with saline, sodium hypochlorite, and citric acid. *J Endodon.* 1984; 10 (11):525-531.

*Curriculum Vitae* Jay D. Shulman - Prepared November 4, 2013

**Book Chapters Monographs, and Non-Peer Reviewed Articles**

1. Shulman JD. Structural Reform Litigation in Prison Dental Care: The *Perez* Case. *Correctional Law Reporter* 25(2) August-September 2013.

2. Shulman JD, Gonzales CK. Epidemiology of Oral Cancer. In Cappelli DP, Mosley C, eds. <u>Prevention in Clinical Oral Health Care</u>. Elsevier (2008), 2-13.

3. Cappelli DP, Shulman JD. Epidemiology of Periodontal Diseases. In Cappelli DP, Mosley C, eds. <u>Prevention in Clinical Oral Health Care</u>. Elsevier (2008), 14-26.

4. Shulman JD, Cappelli DP. Epidemiology of Dental Caries. In Cappelli DP, Mosley C, eds. <u>Prevention in Clinical Oral Health Care</u> . Elsevier (2008), 27-43.

5. Shulman JD, Heng C. Meth Mouth: What We Know and What We Don't Know. *Fortune News* 2006;52(1):12-13.

**Abstracts Presented (25 since 2003)**

1. Yanus M, Rivera-Hidalgo F, Solomon E, Roshan S, Shulman J, Rees TD, Hummel S, Boluri A. Relationship of Candida to Oral Factors in Complete Denture Wearers. *J Dent Res 89* (Special Issue):#4445, 2010.

2. Abraham C, Rivera-Hidalgo F, Kessler H, Rees T, SL Cheng, Y, Shulman J, Solomon E. Inter-Examiner Evaluation of Fluorescence in Oral Lesions. *J Dent Res 89* (Special Issue): #4404, 2010.

3. He J, Solomon E, Shulman J, Rivera-Hidalgo F. Treatment Outcome of Endodontic Therapy with or without Patency Filing. *J Dent Res 89* (Special Issue):#1277, 2010.

4. Harrel SK, Rivera-Hidalgo F, Hamilton K, Shulman JD. Comparison of Ultrasonic Scaling Wear and Roughness Produced In Vitro. *J Dent Res* 87 (Special Issue): # 1018, 2008.

5. Harrel SK, Rivera-Hidalgo F, Shulman JD. Comparison of Surgical Instrumentation Systems for Minimally Invasive Periodontal Surgery. *J Dent Res* 87 (Special Issue): # 1020, 2008.

6. Shulman JD, Bolin KA. Characterizing Disparities in Root Surface Caries in the US. *J Dent Res* 85 (Special Issue): # 476, 2006.

7. Shulman JD, Bolin KA. Is Root Surface Caries Associated with Xerogenic Medications? *J Dent Res* 85 (Special Issue): # 477, 2006.

8. Shulman JD, Carpenter WM. Risk Factors Associated with Geographic Tongue Among US Children. *J Dent Res* 85 (Special Issue): # 1205, 2006.

9. Shulman JD, Bolin KA, Eden BD. Socio-demographic Factors Associated with Root Surface Caries Prevalence. *J Dent Res* 84 (Special Issue): # 3279, 2005.

10. Shulman JD, Carpenter WM, Rivera-Hidalgo F. Prevalence of Hairy Tongue among US Adults. *J Dent Res* 84 (Special Issue): # 1396, 2005.

Confidential                                                                   PRSN-JDS 00061

11. Eden BD, Shulman JD. Root Caries in the US by Tooth Type and Surface. *J Dent Res* 84 (Special Issue): # 2622, 2005.

12. Mobley CC, Shulman JD. Birth Weight and Caries in the Permanent Dentition of Children. *J Dent Res* 84 (Special Issue): # 86, 2005.

13. Puttaiah R, Shulman JD, Bedi R, Youngblood D, Tse E. Infection Control Profile Scores of Practitioners from Eight Countries. *J Dent Res* 84 (Special Issue): # 1026, 2005.

14. Puttaiah R, Youngblood D, Shulman JD, Bedi R, Tse E. Infection Control Practice Comparisons between Practitioners from Eight Countries. *J Dent Res* 84 (Special Issue): # 3207, 2005.

15. Foyle DM, Rivera-Hidalgo F, Shulman JD, Williams F, Hallmon W, Taylor S. Effect of Selected Therapies on Healing in Rat Calvarial Defects. *J Dent Res* 84 (Special Issue): # 1172, 2005.

16. Puttaiah R, Lin SM, Svoboda KKH, Cederberg R, Shulman JD. Quantitative Comparison of Scanning Electron and Laser Confocal Microscopy Techniques. *J Dent Res* 84 (Special Issue): # 3425, 2005.

17. Holyfield LJ, Bolin KA, Rankin KV, Shulman JD, Jones DL, Eden BD. Use of computer technology to modify objective structured clinical examinations. *J Dent Educ* 69 (1):147 # 113, 2005.

18. Benson BW, Shulman JD. Effect of antepartum natural background radiation on infant low birth weight: a pilot study. American Academy of Oral & Maxillofacial Radiology; Denver, CO. 11/6/04.

19. Shulman JD, Beach MM, Rivera-Hidalgo F. Risk factors associated with denture stomatitis in U.S. adults. *J Dent Res* 83 (Special Issue): # 422, 2004.

20. Puttaiah R, Shulman JD, Bedi R. A multi-country survey data on dental infection control KAP. *J Dent Res*; 82 (Spec Issue):# 3394, 2003.

21. Eden BD, Shulman JD. Perceived need for denture care and professional assessment of dentures. *J of Dent Res* 83 (Special Issue): # 1604.

22. Benson BW, Shulman JD. Inclusion of tobacco exposure as a predictive factor for decreased bone mineral content. *Oral Surg, Oral Med, Oral Pathol, Oral Radiol & Endo* 97(2): 266-267.

23. Eden BD, Shulman JD. Factors influencing self-perceived need for periodontal therapy: Data from the Third National Health and Nutrition Survey (NHANES III). *J Dent Res* 2003; 82(Spec Issue):#0481.

24. Shulman JD, Beach MM, Rivera-Hidalgo F. The Prevalence of oral mucosal lesions among US adults: Results from the Third National Health and Nutrition Survey. *J Dent Res* 82 (Special Issue A): # 1472, 2003.

25. Rivera-Hidalgo F, Shulman JD, Beach MM. Recurrence of aphthous ulcerations in adult tobacco smokers. *JDent Res* 82 (Special Issue A): # 0759, 2003.

# EXHIBIT

# B

PRSN-JDS 00063

**Court Expert**

2006 - 12      Rule 706 Expert (monitor) and Court Representative, Perez v. Tilton (Perez v. Cate) federal class action lawsuit settlement. C05-5241 JSW (N.D. CA). Monitoring completed June 2012.

2005 - 10      Rule 706 Expert (monitor), Fussell v. Wilkinson federal class action lawsuit settlement. 1:03-cv-00704-SSB (S.D. OH). Monitoring completed October 2010.


**Expert for Plaintiff (s)**

2012 –      Expert Witness. Daryl Farmer v. Gwendolyn Miles, et al. 10-cv-05055 (N.D. IL), Eastern Division. Deposed February 1, 2013. While Wexford is not a defendant, the case involves inadequate care by a dentist in Wexford's employ. Case survived summary judgment – trial has not been scheduled.

2012 –      Expert Witness. John Smentek et al. v. Thomas Dart, Sheriff of Cook County et al. 1:09-cv-00529 (N.D. IL). Will likely write expert report in January / February

2012 –      Consultant. Quentin Hall et al. v. Margaret Mimms, Sheriff of Fresno County et al. 1:11-cv-02047-LJO-BAM (E.D. CA). PLO is representing plaintiffs.  To date I have spent a few hours reviewing named plaintiff records but I haven't heard about the case in several months. It appears that the parties are trying to negotiate a settlement.

2009 - 11      Expert Witness. Inmates of the Northumberland County Prison, et al. v. Ralph Reish, et al. 08-CV-345 (M.D. PA). Wrote expert report but case settled before msj was filed


**Defendant (s)**

Expert Witness. Flynn v. Doyle 06-C-537-RTR (E.D.WI.) Deposed June 5, 2008. Dental care was dropped from the case.

# EXHIBIT

# C

Confidential

PRSN-JDS 00065

EXHIBIT C
MATERIALS REVIEWED

**Deposition Transcripts and Exhibits (exhibits included unless noted)**

      Terry Allred, September 18, 2013

      Dr. Michael Adu-Tutu, October 1, 2012

      Marlena Bedoya, September 12, 2013

      Kathleen Campbell, RN, September 23, 2013

      Dr. Karen Chu, May 15, 2013 (without exhibits)

      Troy Evans, RN, September 17, 2013

      Arthur Gross, September 9, 2013

      Mark Haldane, September 19, 2013

      Yvonne Maese, RN, September 20, 2013

      Anthony Medel, September 17, 2013

      Jennie Mielke-Fontaine, September 20, 2013

      John Mitchell, September 18,2013

      Dr. William Smallwood, August 20, 2013 (without exhibits)

      Stephen Swartz, August 22, 2013 (pp. 123-34 and 263-73, without exhibits)

      Salvatore Tardibuono, September 19, 2013

      Dr. Nicole Taylor, September 5, 2013

      Dr. Helena Valenzuela, August 23, 2013

      Dr. Carlos Weekly, October 23, 2012 (without exhibits)

**Named Plaintiffs' Records:**

      **Maryanne Chisholm (200825)** (Original public records request, ADC000228-71, ADC071361-93, ADC84454-700, ADC123341-78, ADC130340-719, PLTF-PARSONS-004624-28, PLTF-PARSONS-026008-010)

      **Victor Parsons (123589)** (Original public records request, ADC010146-480, ADC010343, ADC010345, ADC016675-16873, ADC071679-741, 074264-72, ADC074261-63, PLTF-PARSONS-030428-30, WEX006718-6779, WEXFORD06668-69, WEXFORD 06677)

      **Joshua Polson (205576)** (Original public records request, ADC006046-64, ADC006228, ADC006230, ADC006235-36, ADC006243, ADC017218-485, ADC017954-83, ADC050780, 071742-93, 74873-79, 122338-70, 131368-131405, PLTF-PARSONS-023973-24010, PLTF-PARSONS-026526-27187)

**Stephen Swartz (102486)** (Original public records request, ADC001404, ADC001409-18, ADC001838, ADC001915, ADC071794-919, 74414-40, 76220-82, 76283-323, 82335-494, 122465-90, 122491-565, 129076-212, 133867-134801, PLTF-PARSONS-030446)

**Charlotte Wells (247188)** (Original public records request, ADC007063-7115, ADC017909-15, ADC071920-50, 082672-896, 122867-920, 134802-135377)

**Additional Inmate Records:**

| | |
|---|---|
| **Redacted** | (ADC151155-67, ADC153556-601) |
| **Redacted** | (ADC042649-739) |
| **Redacted** | (ADC153458-63) |
| **Redacted** | (ADC130857-131367) |
| **Redacted** | (ADC153464-80) |
| **Redacted** | (ADC153481-524) |
| **Redacted** | (ADC137179-84) |
| **Redacted** | (ADC151198-209, ADC153602-46) |
| **Redacted** | (ADC153525-55) |
| **Redacted** | (ADC131406-133192) |
| **Redacted** | (ADC133193-531) |
| **Redacted** | (ADC153435-57) |
| **Redacted** | (ADC135378-438) |
| **Redacted** | (ADC135439-569) |
| **Redacted** | (ADC135570-724, ADC153647-719) |

**Inmate Records Reviewed on Expert Tours**

Florence:                    **Redacted**

Safford:                    **Redacted**

- 2 -

Confidential                                                                                     PRSN-JDS 00067

**Redacted**

**Phoenix:**                                    **Redacted**

**Tucson:**                                    **Redacted**

**Perryville:**                                    **Redacted**

**Lewis:**                                    **Redacted**

**Eyman:**                                    **Redacted**

**Douglas:**                                    **Redacted**

- 3 -

Confidential                                    PRSN-JDS 00068

**Yuma:**                                        **Redacted**

**External Documents:**

Am. Dental Ass'n. Oral Health Topics. Dental Public Health. http://www.ada.org/6876.aspx  Accessed November 4, 2013.  ("ADA, Oral Health Topics")

Lake County Jail Settlement Findings Letter re: Investigation of the Lake County Jail. December 7, 2009. Accessed at http://www.justice.gov/crt/about/spl/documents/Lake_County_Jail_findlet_12-07-09.pdf. October 18, 2012. ("Lake County Findings Letter")

Makrides, N.S. et al. (2006) Corr. Dental Servs., in M. Puisis (ed.), *Clinical Practice in Corr. Med.* (2d ed., pp. 556-563) Philadelphia, PA: Mosby Elsevier ("Makrides *et al.*")

Settlement Agreement. *U.S. v. Lupe Valdez, Sheriff of Dallas County, Tex.*, U.S. Dist. Ct. for the N. Dist. of Tex., Civ. No. 307 CV 1559-N. Accessed at http://www.justice.gov/crt/about/spl/documents/dallas_county_order_11-06-07.pdf December 11, 2009. ("Dallas County Agreed Order")

Settlement Agreement. *U.S. v. Cook County, Illinois*. U.S. Dist. Ct. for the N. Dist. of Ill., Civ. No. 10 C 2946. Accessed at http://www.justice.gov/crt/about/spl/documents/CookCountyJail_AgreedOrder_05-13-2010.pdf ("Cook County Agreed Order")

Ariz. Revised Statutes - Title 32 Professions and Occupations - Section 32-1202. Scope of practice; practice of dentistry. http://www.azleg.state.az.us/FormatDocument.asp?inDoc=/ars/32/01202.htm&Title=32&DocType=ARS. Accessed October 21, 2013 ("AZ Code Dentistry")

Ariz. Revised Statutes - Title 32 Professions and Occupations - Section 32-1281. Practicing as dental hygienist; supervision requirements; definitions. http://www.azleg.state.az.us/FormatDocument.asp?inDoc=/ars/32/01281.htm&Title=32&DocType=ARS. Accessed October 21, 2013 ("AZ Code Dental Hygiene")

Ariz. School of Dental Assisting. http://www.azdentalassistants.com/program-information.html. Accessed 10/22/13 ("AZ Dental Assisting")

Ariz. Revised Statutes - Title 32 Professions and Occupations - Section 32-1291. Dental assistants; regulation; duties. http://www.azleg.gov/FormatDocument.asp?inDoc=/ars/32/01291.htm&Title=32&DocType=ARS. Accessed October 21, 2013 ("AZ Code Dental Assistants")

- 4 -

Confidential                                        PRSN-JDS 00069

Standards for Health Servs. in Prisons.  Nat'l Comm'n on Correctional Health Care. Chicago, Ill., 2008. ("NCCHC 2008")

Cal. Dep't of Corr. and Rehabilitation, Div. of Corr. Health Care Servs. Policies and Procedures, Chapter 5.14 (IV)(A)(1). ("CDCR P&P")

Cal. Dep't of Corr. and Rehabilitation. Memorandum from Deputy Statewide Dental Director subject Treatment Timelines, Feb. 25, 2010. ("CDCR Timeline Memo")

Shulman J.D., Sauter D.T. Treatment of Odontogenic Pain, in a Corr. Setting in *J. Corr. Health Care* (2012) 18:1, 58 - 65 ("Shulman and Sauter")

Burrow, G.F. et al. (2006). Nursing in the Primary Care Setting, in M. Puisis (ed.), *Clinical Practice, in Corr. Med.* (2d ed.). Philadelphia, PA: Mosby Elsevier ("Burrow *et al*., 2006")

LaMarre M. (2006). Nursing Role and Practice in Correctional Facilities, in M. Puisis (ed.), *Clinical Practice in Corr. Med.* (2d ed., p. 421-422). Philadelphia, PA: Mosby Elsevier. ("LaMarre, 2006")

Examination, Diagnosis, and Treatment. PDQ Endodontics [serial online]. Apr. 2005;1-40. Available from: Dentistry & Oral Sciences Source, Ipswich, MA. Accessed October 8, 2013. pp. 1-2. ("Endodontics")

Nat'l Inst. of Corrections Survey on Corr. Dentistry, 2006. Ariz. Dep't of Corrections Response from Dr. Michael Adu-Tutu, Dental Program Manager, Jan. 25, 2007 ("ADC NIC 2007")

Makrides N.S. & Shulman J.D. Dental Health Care of Prison Populations in *J Corr. Health Care* (2002) 9(3):291-306. ("Makrides and Shulman, 2002").

Standards for Health Services in Correctional Institutions. Washington, DC: American Public Health Association, 2003. ("APHA").

Cal. Dep't of Corr. and Rehabilitation, Div. of Health Care Servs.  Duty Statement, Supervising Dentist, Correctional Facility ("CDCR Supervising Dentist Position Statement")

Ariz. Admin. Code. Title 12, ch. 1. Radiation Regulatory Agency. R12-1-104. ("Radiation Agency")

Am. Dental Ass'n. Scope of Practice. http://www.ada.org/2458.aspx. Accessed 10/21/11.

Ariz. Revised Statutes. Article 1. Dental Board. ("Dental Board")

Ariz. Dep't of Corr. Corrections at a Glance. Sept. 2013. Accessed at http://www.azcorrections.gov/adc/reports/CAG/2013/CAGSep13.pdf   10/11/13   ("ADC September 2013 Census")

Confidential                                                                                     PRSN-JDS 00070

Ariz. Dep't of Corr. Dep't Orders Index. Sept. 2013. Accessed at http://www.azcorrections.gov/Z_dept_orders_1.aspx#1100

**Production Documents:**

Defendant Charles Ryan's Responses to Plaintiff Desiree Licci's First Set of Interrogatories ["Licci Rogs"]

Ariz. Dep't of Corr., Div. of Health Servs.  Dental Servs Technical Manual ("DSTM") (ADC010554-647)

State of Ariz. Job Code Specification: Job Code ACV98611 - Dental Assistant ("AZ DA Position") (ADC027864-65)

Report of Ariz. Dep't of Corr. dental appointments from Jan. 1, 2013 through June of 2013 (ADC091994-3617)

Wexford Vacancies Charts, July 31, 2013 ("Wexford Vacancies 7/31") (ADC028197-98)

Ariz. Vacancies and FTE Fill Percentages, 08Aug12 (ADC016148-86) ("Ariz. Vacancies and FTE Fill Percentages Report")

Ariz. Staffing Roll-up June 2013 (ADC121167)

Emails from Chu to Pratt and others, December 13, 2012 (AGA_Review_00090609-10) and January 12, 2013 (AGA_Review_00094913-16)

RFP and Wexford contract (ADC014103-16042)

Corizon - Dental Wait Times Report Summary July 2013 (ADC153796)

Ariz. Dep't of Corr.. Nursing Protocol #13-Toothache / Dental Abscess ("ADC Toothache Protocol") (ADC011107)

Ariz. Dental Utilization Statistics May 2013 (includes native) (ADC108128-37)

*Additional documents reviewed but not cited*

     ADC010648-011231
     ADC013618-44
     ADC014761-62
     ADC018165-18202
     ADC018203-55
     ADC018256-18321
     ADC021848-49
     ADC027846
     ADC027889-29749
     ADC048458

Confidential

ADC048462-69
ADC048480-48537
ADC048543-74
ADC048598-48607
ADC048640-842
ADC049376.01
ADC049525-78
ADC053940-54006
ADC054755-56
ADC054934-55
ADC054974-55041
ADC055109-48
ADC055266-346
ADC055419-28
ADC055574-797
ADC056195-268
ADC082936-37
ADC091592-666
ADC093959-94136
ADC095666-97664
ADC099216-104736
ADC105101-106568
ADC115860-65
ADC116226
ADC117064-74
ADC117105-15
ADC117118-28
ADC117148-51
ADC117269-303
ADC117673-74
ADC121167-77
ADC121178
ADC122014-122016
ADC122060-122105
ADC123185-96
ADC139857-79
ADC140119-31
ADC153731-34
ADC153735-48

- 7 -

# EXHIBIT 12

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin
Brislan; Sonia Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez; Maryanne
Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson;
and Charlotte Wells, on behalf of themselves and all
others similarly situated; and Arizona Center for
Disability Law,

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of
Corrections; and Richard Pratt, Interim Division
Director, Division of Health Services, Arizona
Department of Corrections, in their official capacities,

Defendants.

No. CV 12-00601-PHX-NVW
(MEA)

**CONFIDENTIAL**
**REBUTTAL EXPERT REPORT OF:**

JAY D. SHULMAN, DMD, MA, MSPH
9647 HILLDALE DRIVE
DALLAS, TEXAS 75231
TELEPHONE: (214) 923-8359

REGARDING
DENTAL CARE AT THE ARIZONA DEPARTMENT OF CORRECTIONS

JANUARY 31, 2014

JAY D. SHULMAN, DMD, MA, MSPH

PRSN-JDS 00073

# TABLE OF CONTENTS

**Page**

I.  Introduction ................................................................................................... 1

    A.  Dr. Dovgan Lacks the Qualifications Necessary to Opine on System-Level Dentistry at ADC ................................................................. 1

    B.  Dr. Dovgan's Exclusive Focus on Smallwood Prison Dental Service ("SPDS") Gives a Skewed Picture of ADC's Dental Care and Ignores Systemic Risks ................................................................... 3

II.  Dr. Dovgan's Methodology Is Insufficient .................................................. 4

    A.  Dr. Dovgan's Methodology ................................................................ 4

    B.  My Methodology ................................................................................. 6

III.  Standard of Care ......................................................................................... 7

    A.  NCCHC Accreditation ........................................................................ 8

    B.  California Department of Corrections ("CDCR") .............................. 9

IV.  ADC Dental Program ................................................................................. 9

    A.  Inadequate Clinical Triage ................................................................. 9

    B.  Timeliness of Care ........................................................................... 16

    C.  Staffing ............................................................................................. 18

    D.  Avoidable Extractions ...................................................................... 20

    E.  Chewing Difficulty .......................................................................... 21

    F.  Monitoring ....................................................................................... 22

V.  Named Plaintiffs ....................................................................................... 22

VI.  Irrelevant Issues Addressed by Dovgan ................................................... 24

    A.  Meth Mouth ..................................................................................... 25

    B.  Occupational Safety & Health Administration ("OSHA") .............. 25

VII.  Conclusion ............................................................................................... 25

Confidential

## I.     Introduction

In my Expert Report dated November 8, 2013, I opined that ADC's inadequate policies and practices regarding staffing, triaging, treatment time frames (or lack thereof), tooth extraction, preparation for dentures, and contractor monitoring create a system that places all inmates at a substantial risk of serious dental injury, such as preventable pain, advanced tooth decay, and unnecessary loss of teeth. The expert report of John W. Dovgan, DDS, dated December 18, 2013, does not meaningfully rebut or alter any of my opinions.

Dr. Dovgan's lack of experience in correctional dentistry is reflected in his expert report in that he overlooks the forest for the trees. He addresses few of the fundamental problems and systemic issues that I identified in my report, leaving the remainder essentially unrebutted. For example, while he reviews the clinical records and deposition testimony of the named plaintiffs, he overlooks that their experiences are merely *examples* of the institutional dental problems that place all inmates at risk under ADC's policies, none of which he effectively addresses. Systemic issues are at the heart of this dispute, and Dr. Dovgan's failure to address the majority of those issues calls into question the validity of his entire report. Moreover, Dr. Dovgan's focus on the care provided to specific inmates is misplaced because even if it were true that they at times received quality care, it does not mean that ADC is devoid of systemic problems that place all inmates at a *risk* of injury.

Moreover, when Dr. Dovgan does purport to directly disagree with my report, he often misconstrues or misrepresents my opinions. This is compounded by his failure to provide pinpoint citations and by the fact that he relied on numerous facts and documents which I did not have access to or had insufficient time to review when I drafted my report, making it extremely difficult to analyze his opinions and the statements with which he disagrees. Some of Dr. Dovgan's other arguments are wholly irrelevant to the systemic problems I identified at ADC and do little to show that ADC's dental system delivers timely and effective dental care to inmates. Accordingly, I disagree with a number of Dr. Dovgan's opinions for reasons explained more fully below.

### A.     Dr. Dovgan Lacks the Qualifications Necessary to Opine on System-Level Dentistry at ADC

Dr. Dovgan lacks the requisite qualifications to opine on correctional dentistry. He has not worked in a correctional institution or any other large-scale institution providing dental care. Nor has he significantly published or given presentations on institutional dentistry, much less dental care in jails or prisons. His lack of experience is evident throughout his report, such as his failure to understand how the dental appointment process in the private sector differs from that in a prison. For example, he faults Maryanne Chisholm for refusing a dental appointment because she stated in her deposition that "she chose to attend a medical appointment instead on that date, even though the [dental] appointment was scheduled far in advance." [Dovgan Report at 48] He does not understand that, not only are prisoners not informed of their future movements for security reasons, but that routine dental appointments are not scheduled in advance like they are in private practice—rather, they are scheduled each day based on available capacity once more urgent requests are addressed.

Confidential                                                                                                   PRSN-JDS 00075

Dr. Dovgan's lack of experience in correctional dentistry also deprives him of the experiential framework to evaluate the information presented to him in his staff interviews. The short shrift he gives to ADC's systemic problems in his report reflects his inadequate background as well as his credulity.

Dr. Dovgan's experience is in individual (private) rather than institutional practice.[1] Institutional dentistry and its subset, correctional dentistry, are at the heart of this case. Knowledge of clinical dentistry is necessary, but not sufficient, because the claims in *Parsons* relate to systemic failures, not an individual dentist's clinical or billing behavior. Being able to evaluate whether a single inmate needs dental treatment, for example, does not qualify a dentist to opine on whether an institution's written policies and *de facto* practices create systemic-level risks for 34,000 inmates. In fact, the differences between individual and institutional or population-based practice are so great that the American Dental Association has recognized Dental Public Health as one of its nine specialties.[2]

Similarly, Dr. Dovgan's lack of experience in statistics, epidemiology, and health services research places him in a poor position to opine on my sampling methodology or defend his own. He dismisses my findings of substantial delay in the dental care of prisoners over a multi-year period with the conclusory statements:

> Out of the charts he selected, Dr. Shulman found a few examples of HNRs that were not seen within ADC guidelines, but his sample was not random and was instead chosen based on HNRs for pain and dental grievances. Given this selection, I am not surprised that he found some charts not in compliance with ADC's guidelines.

[Dovgan Report at 72] But Dr. Dovgan is not qualified to make those statements. His *curriculum vitae* fails to indicate any graduate level coursework or publications in public health, statistics, epidemiology, or research methods; domains that are foundational to the issue of sample selection, data interpretation, and analysis. Nor have any of his publications involved the methodological issues on which he opines in this case. Experience and training in this area are necessary to understand the tradeoffs between sampling theory and practicality. This shortcoming might have been mitigated had Dr. Dovgan sought assistance from an expert in those areas, but he did not; and as a result, his critique of my methodology should be rejected. Moreover, his own methodology is flawed for the reason described below.

---

[1] Institutional practice refers to dentistry performed in a large public or non-profit organization, such as the military, the US Public Health Service, Department of Veterans Affairs, the Federal Bureau of Prisons, and state and large county correctional systems.

[2] *See* the American Dental Association website, http://www.ada.org/495.aspx. Dental Public Health is defined as "that part of dentistry providing leadership and expertise in population-based dentistry, oral health surveillance, policy development, community-based disease prevention and health promotion, and the maintenance of the dental safety net." [ADA, Oral Health Topics]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                        Page **2**

**B.      Dr. Dovgan's Exclusive Focus on Smallwood Prison Dental Service ("SPDS") Gives a Skewed Picture of ADC's Dental Care and Ignores Systemic Risks**

Dr. Dovgan's focus on dental care provided after March 2013 to the virtual exclusion of treatment provided by Wexford and ADC results in an incomplete analysis of the factors affecting the provision of dental care at ADC.  Moreover, rather than addressing the underlying problems I identified in my report, he dismisses virtually all of them based on the fact that wait times have been reduced.

My report explains numerous reasons why ADC's *systemic* inadequacies in the delivery of dental care place inmates at a substantial risk of serious harm.  I use specific inmates largely as examples of how that risk has manifested, but my opinions do not rise and fall with those examples because, based on my expertise in institutional and population-based dentistry,  I am looking at the current risk to the inmates caused by the system as a whole.

Dr. Dovgan completely misses this point.  With the exception of his review of the named plaintiffs' dental records, Dr. Dovgan primarily focuses on treatment provided after March 2013— when SPDS assumed responsibility for dental care—and ignores the underlying systemic problems that gave rise to insufficient dental care during ADC's and Wexford's reign and that continue to exist at ADC.  In his report, Dr. Dovgan wrote:

> My audit revealed that the inmates Dr. Shulman used in his tables to support his theories have all, since that time, been treated within ADC guidelines for routine care in 2013.  Thus, any untimeliness in their care occurred prior to SPDS and the use of the CDS system to track HNRs and appointments.   The recent treatment of the 20 inmates with treatment in 2013 is shown in the following tables: […]

[Dovgan Report at 55]  By only focusing on recent care, Dr. Dovgan appears to tacitly agree with my findings about past untimeliness and inadequacies of care.  That certain inmates that I highlighted as examples might have received dental care since I highlighted them in my original report does not refute the fact that ADC has put, and continues to put, all inmates in a substantial risk of serious dental injury.  Similarly, that certain inmates may have received quality dental care on occasion does not disprove the existence of underlying systemic problems that put all inmates at risk.  In other words, the risks I identified still exist even though an inmate might not suffer serious injury on every occasion.[3]

The fact that SPDS may have improved wait times, moreover, does nothing to (1) correct the policies that are the root causes of the problems or (2) guarantee those problems do not arise again.  Furthermore, ADC lacks an effective means of verifying that SPDS is even complying with its policies.  Indeed, Dr. Dovgan does not address my opinions regarding ADC's failure to develop

---

[3] To put it in even simpler terms, if ten inmates request treatment each day but one is randomly ignored and never treated, it is no defense to say that the inmate ignored on Monday was treated the next time he asked for care.  Every day there remains an unacceptable risk of non-treatment.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                                      Page **3**

Confidential

and implement an effective monitoring structure for dental care. Reading his report, one would never know that ADC has a Dental Monitor (Dr. Karen Chu) or compliance monitors at each facility. In fact, he fails to rebut most of my discussion about ADC's lack of oversight of the dental program. [Shulman Report at 35-36]

Although SPDS has introduced a database that facilitates management reporting and some aspects of inmate tracking, SPDS must operate in accordance with the DSTM, which it cannot change. [Smallwood Dep. at 46:10-21; 47:20-48:3; 51:12-15; 54:4-17] Consequently, systemic problems due to deficient ADC procedures persist. For example, Dr. Dovgan indicates that, as Dr. Smallwood testified, dental assistants still evaluate inmates and make clinical assessments to triage HNRs. [*See* Dovgan Report at, *e.g.*, 12, 32; *compare with* Smallwood Dep. at 96:9-97:3, 98:4-11] Dr. Dovgan also obliquely attempts to justify the practice in which inmates are removed from the Routine Care List when they receive an Urgent Care appointment (which I describe as the ADC Prisoners' Dilemma) but makes no effort to directly address it or rebut its effects.

In short, Dr. Dovgan's opinions rest entirely on SPDS's recent improvements, not on a substantive analysis of the dental policies I identified or any changes or improvements made to those policies.

## II. Dr. Dovgan's Methodology Is Insufficient

In a study of this type, a useful methodology must be consistent and must focus on policies and practices of the system and the way they create risk for the prison population. Consequently, reviewing the treatment of individual prisoners is not an end, but simply a means to illuminate the issues that relate to systemic problems.

### A. Dr. Dovgan's Methodology

Dr. Dovgan's methodology is inadequate because it was designed to focus on dental care provided after March 2013 and because he misunderstands the importance of individual dental records in evaluating systemic harms. Furthermore, even when the records he reviewed contained pre-Smallwood information, he did not report it.

Dr. Dovgan states that he reviewed "154 [actually 149][4] charts of inmates at nine ADC facilities." This total apparently excludes the charts of the named plaintiffs, and includes "randomly selected charts reviewed by Dr. Shulman at each facility" and his "own random selection of charts at each facility." [Dovgan Report at 7]

Dr. Dovgan describes his sampling procedure for the charts he selected as follows:

> I used two methods of selecting my random sample. At a few facilities, I walked down the hallway of the chart storage room and selected a chart every third step. At the other facilities, I asked for

---

[4] Dr. Dovgan's list actually included 155 inmates, but there were 6 duplicates as a result of misspelling the name or listing an inmate by both first and last name. [*See* Dovgan Report Ex. B at 4-8]

the dental appointment list and selected every fifth patient.  I further
examined more than 30 charts while onsite so that I could evaluate
x-rays for appropriateness of care.

[*Id.*]  Dr. Dovgan does not explain why he did not use the same method at all facilities.  The result
of using two different methods is that he sampled from two different sampling frames:[5]  the chart
room (that is, all inmates in the facility) and the dental appointment list.  The chart room sample
ensured that his reviews would not yield much information on inmate dental care because not all
inmates request dental care.  To draw substantial opinions about the quality of dental care by
reviewing records of inmates who did not request that care is suspect.  While an appointment list
may be an appropriate sampling frame, his failure to explain his lack of consistency is concerning.[6]
Moreover, it is unclear how he chose the additional 30 records he reviewed for x-rays.

Based on my analysis of the list of 149 records provided in his report, Dr. Dovgan
reviewed 59 records of inmates that were in my report, as well as 34 other records of inmates that
were on a system-wide report produced by ADC purportedly containing all (22,715) dental
appointments scheduled between January 1, 2012 and approximately June 21, 2013 ("Appointment
List").  [ADC091994–3617]  The other 56 records (or 37.6% of the total) were not in my report or
on the Appointment List, and thus presumably included dental care, if at all, only very recently or
before January 1, 2012.  Many of those are presumably the records chosen in the chart room and,
as explained above, may well include no dental treatment at all.

Dr. Dovgan spends a tremendous amount of time detailing his interviews with ADC staff
(staff I was told I could not interview for any substantial period during my tours), but does not use
the medical records—or any other data—to back up their many assertions.  Indeed, he spends
virtually no time discussing what the records he reviewed show regarding the issues that I
identified in my report.  Rather, he simply indicates, for some of the facilities and not others, that
the care he saw in the charts he audited was "appropriate."  [*E.g.*, Dovgan Report at 36, 38]
Whether individual care was appropriate is, as I have explained, not the issue.

While Dr. Dovgan describes how he calculated wait times, he reports the wait times only in
connection with a handful of records he uses as examples of inmates who experienced delays.
[Dovgan Report at 53-54]  That he reported no aggregate wait times (stating only that the prisoners
have all been treated) and did not rebut the wait times for routine and urgent care I reported
[Shulman Report at 40-46] suggests that he agrees with my calculations.  Rather than calculating
wait times based on the records he reviewed, he uses SPDS reports to show wait times for each
institution from March 2013 to November 2013.

_____

[5]  A sampling frame is a list of records from which a sample is drawn that should have the
property that every element in the population has some chance of being included in the sample.
[*See*, Levy and Lemeshow at 16-17]

[6]  I have not seen this appointment list, and therefore do not know what period or what
types of appointments it covers.  A list of requests for routine care that have not yet been
addressed, for example, would include prisoners who have submitted requests for fillings and the
like who have had no occasion to require urgent care.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                            Page **5**

                                                                                          PRSN-JDS 00079

In addition, although Dr. Dovgan indicates he reviewed 801 HNRs from the charts he selected [Dovgan Report at 53], he fails to specify the time period covered by his review.[7] The remainder of his report is focused nearly exclusively on care provided by SPDS, and, combined with his failure to provide any aggregate data, suggests he has cherry-picked recent entries and ignored older problems to improve the picture presented of ADC's dental system.

### B.   My Methodology

To assess "the overall quality of ADC's dental program, including the timeliness of addressing complaints of pain, identifying disease, arresting disease progress, and rehabilitating affected teeth" [Shulman Report at 8], I reviewed dental records of randomly selected prisoners. In my experience evaluating correctional and institutional care, I found that interviews with prisoners regarding their dental treatment may be inaccurate or incomplete. Moreover, prisoner narratives would need to be corroborated by a record review. Consequently, I spent the limited time that I was allowed at the prisons on record reviews.

Similarly, I did not review x-rays because I was evaluating the overall quality of the ADC dental care system, not the quality of the care provided to any particular prisoner. Instead, I relied on the charting and treatment plans of the dentists who had an opportunity to review x-rays and examine the prisoners. Thus, if a dentist charted a tooth to be filled, I presumed that a filling was appropriate treatment. Similarly, I assumed that a tooth charted for extraction should be extracted.

### 1.   Sampling Plan

In addition to reviewing records of named plaintiffs and other identified prisoners, I performed record audits at each prison I visited to collect sufficient data to allow me to opine about the quality of the ADC dental program.  [Shulman Report at 8]  Based on my experience auditing prisons, many prisoners will not have requested dental care during the period of interest (2009-2013).  Thus, selecting records from the entire ADC population would be inefficient.[8]  My

---

[7] I have not had sufficient time since these records were produced to review all of them and evaluate the information apparently covered by Dr. Dovgan.  To the extent I was able to verify specific references in the medical records or other documents referenced by Dr. Dovgan and not produced until late January, I have done so.

[8] My co-monitor and I dealt with a similar issue as Court Experts in the *Perez* case.  The settlement agreement specified that "the court experts shall agree on a statistically appropriate number of inmate dental records that must be audited to assess compliance."  [*Perez* Agreement at 11]  We discuss the sampling frame issue at length.

> The sampling frame in a survey comprises individuals (or records) eligible to be selected.  While, on the surface, it might seem that the sampling frame should include all individuals or records, there are cases in which that would be inefficient.  Assume, for the sake of argument, that recording blood pressure on hypertensive patients before invasive (*i.e.*, restorative or surgical) procedures is determined to be an outcome of interest.

preference was to select records from a list of HNRs for dental care submitted between 2009 and 2013; however, I was informed that ADC had no such list.  As a result, I used the Appointment List referenced above.  The Appointment List has all scheduled appointments for a 17-month period but not necessarily all HNRs submitted during that period since an unknown proportion may not have been scheduled for an appointment.

From the Appointment List, I selected prisoners who had scheduled appointments for "pain and swelling" since my experience in correctional and institutional care has taught me that timely addressing pain is an excellent measure of the responsiveness of a dental care system and the level of compliance with policies and procedures.  [Shulman Report at 9]  After selecting a record from the Appointment List, I would examine the timeliness of the appointment for pain as well as reconstruct the prisoner's dental history during the period of interest.  Many of the selected records had HNRs requesting both routine care and treatment for pain. In such cases, I would ascertain the extent to which problems that generated a request for urgent care were related to routine care that had been substantially delayed.

Dr. Dovgan dismisses my findings of substantial delay in the dental care of prisoners over a multi-year period with the conclusory statement that my sample was "not random and was instead chosen based on HNRs for pain and dental grievances."  [Dovgan Report at 72]  However, he does not explain why my sample was not random, and he confuses my selection process (selection from an appointment list) with my sampling frame (prisoners on the appointment list with complaints of pain and swelling).  More fundamentally, Dr. Dovgan fails to understand that randomly selecting dental records of inmates complaining of pain or swelling is the most effective way to understand whether the inmates who require urgent dental care actually receive it.

## III.    Standard of Care

Dr. Dovgan's opinion largely says that ADC's system is good because (1) ADC complies with its own policies [Dovgan Report at 9], (2) ADC complies with NCCHC standards [*Id.* at 5-6], and (3) ADC is basically the same as private care [*Id.* at 16].  The first two opinions falsely

---

The compliance indicator "**is blood pressure recorded on patients with a history of hypertension who have undergone invasive dental procedures**" is recorded from the dental record.  If, for example, 20% of the patients were hypertensive, only 20% of the records would contain useful information.  Moreover, if only half of the hypertensive patients had invasive treatment during the period of interest, only 10% of the records would contain useful information.  Approximately 200 records would have to be sampled to yield 20 records of hypertensives that had invasive dental treatment during the period of interest.  Here it is far more efficient to sample from hypertensive patients or *a fortiori* hypertensive patients who had invasive procedures performed.  On the other hand, for outcomes such as whether a screening examination is performed within a given period, the sampling frame should comprise all patients.

[Methodological Issues at 4 (emphasis in original)]

assume, without analysis, that the DTSM and NCCHC establish a constitutional standard for timely and quality care and that ADC always follows them. Neither is true. The third opinion misstates the differences between prison dentistry and private dentistry in order to falsely suggest that ADC inmates are at no greater risk of dental injury than the public at large.

### A.    NCCHC Accreditation

Dr. Dovgan bases his ringing endorsement of the ADC dental care system in part on his conclusion that, "ADC policy as written complies with NCCHC oral care standards and guidelines."[9] [Dovgan Report at 73]  But compliance with NCCHC standards fails to demonstrate that an institution comports with the appropriate standard of care because the NCCHC Oral Care Standard does not mandate specific timelines for treatment. Moreover, NCCHC accreditation is neither necessary nor sufficient to meet the standard of care because the NCCHC audit does not focus on record reviews by dentist-auditors. In addition, NCCHC's Oral Care Standard P-E-06 is insufficient to ensure adequate prisoner dental care because it is insufficiently prescriptive with respect to timelines and scope of care. In fact, the shortcomings of the NCCHC standards reinforce the systemic failures within the ADC.

As an example, among the compliance indicators for the Oral Care Standard (P-E-06) is that a prison must provide "[O]ral treatment, not limited to extractions, … according to a treatment plan based on a system of established priorities for care." [*Id.* at 70, ¶ 4 (emphasis omitted)] Absent a policy that no treatment other than extractions will be provided, an institution could satisfy the standard even with policies and practices that result in preventable pain and tooth loss. The NCCHC sets forth no minimum scope of care.[10] Consequently, NCCHC accreditation does not ensure that ADC inmates receive adequate dental care. In many ways, it shares the same defects as the MGAR: both systems are designed for non-dentists to audit elements of a program that requires no specialized knowledge.[11] The results are simply a myopic view of a prison's dental care system.

---

[9] Dr. Dovgan implicitly assumes that ADC policy is followed and that ADC has the wherewithal to ensure that its policies are followed. I will address these assumptions later in this report.

[10] While the NCCHC provided more detailed guidelines, these guidelines are not explicitly incorporated by reference into Oral Care Standard P-E-06 and consequently they are not mandatory. [*See*, NCCHC at Appendix G] Dr. Dovgan acknowledges this. "The NCCHC also **recommends** that urgent care requests be seen within 72 hours. [Dovgan Report at 14 (emphasis added)]

[11] The letters from NCCHC to ADC describing the findings of the NCCHC reviewers found no adverse findings related to the dental program. The reviewers failed to note problems with the substance of ADC dental policies, the consistency with which the policies are applied, and endemic harmful practices that are performed at ADC but are not in any policy. For example, the lack of adequate treatment for periodontal disease noted by Dr. Chu—a major program defect— was unreported by NCCHC site visitors. It is one thing not to use a jewelers' eye but quite another when it is not a jeweler performing the examination.

**B.      California Department of Corrections ("CDCR")**

Dr. Dovgan dismisses my references to the CDCR dental care system as "my standard," representing "Dr. Shulman's belief as to what a dental program in a correctional system should encompass." [Dovgan Report at 6] He misses my point. It is not that CDCR necessarily embodies the constitutional standard; rather, CDCR had similar problems as ADC and developed its policies to address those problems within the constraints of a prison system with limited resources. For example, CDCR developed a classification system to assign wait times based on the seriousness of the dental problem, which materially reduces tooth morbidity and mortality as I described in my report. [Shulman Report at 4-5] CDCR, therefore, shows that a better standard is possible and, due to other court cases, has been followed.

**IV.     ADC Dental Program**

Dr. Dovgan concludes that ADC is in compliance with its own policies and, on that basis, opines that its dental practice is within the standard of care. [Dovgan Report at 73-74] However, while the policies in the DSTM provide written instructions, the instructions are often vague and fail to address how specific tasks should be performed. For example, nowhere does Procedure 770.5 address how a clinic should set up and maintain a Routine Care List. As a result, it has become common practice (and SPDS policy) to remove prisoners who are seen for urgent care from the Routine Care List (see discussion of the ADC Prisoners' Dilemma, *infra*). Dr. Dovgan's identification of various items in the DSTM is not the same as the DSTM having detailed instructions to ensure that the procedures are uniformly implemented across the ADC dental care system.

Moreover, compliance with ADC's own policies is insufficient when those policies are themselves inadequate. Indeed, sedulous adherence to a flawed policy has the potential to cause harm. Because he solely relies on compliance with ADC policies, Dr. Dovgan also fails to address any of the fundamental problems that I identified in my report, such as dental assistants taking x-rays *sua sponte*, performing clinical examinations, and assigning prisoners to routine or urgent care; inadequate treatment of periodontal disease; and inadequate consent and refusal.

**A.      Inadequate Clinical Triage**

**1.      Dental Assistant Assessment**[12]

ADC allows dental assistants to perform clinical tasks for which they are not qualified and, as a result, prisoners may be exposed to unnecessary ionizing radiation and are at risk of harm from poor decisions made by dentists who rely on a dental assistant's clinical examination.

---

[12] There are two issues related to triage: (1) the administrative review of HNRs and the decision whether the patient should be given an appointment for urgent care or routine care or no appointment at all, and (2) a dental assistant's performance of a clinical examination on a prisoner often in the absence of a dentist. This latter activity is referred to as Dental Assistant Evaluation, Dental Assistant Assessment, Dental Assistant Triage, or DA Triage.

Confidential

I opined in my report that ADC Procedure 787 § 5.2 is deeply flawed.  This procedure provides that if a patient is brought into a dental clinic based on an urgent need, the dental assistant "will review the inmate health history, perform an oral evaluation, and take dental radiographs, to assist in determining the severity of the dental condition."  Thus, dental assistants can take x-rays without specific instructions from a dentist, interpret the x-rays, and enter their diagnoses in the inmates' dental charts.  Whether they are acting under Procedure 787 § 5.2 or a derivative local operating procedure, post order, or standing order, such activities are below the standard of care.

Dr. Dovgan never explicitly acknowledges that dental assistants are examining patients, making diagnoses, and taking x-rays *sua sponte*.  Rather than responding to my opinions about the inadequate clinical triage process, he simply evades the issue by inappropriately conflating clinical triage (*i.e.*, performing clinical examinations in accordance with Procedure 787 § 5.2) with the administrative process of determining whether an inmate should be scheduled for an urgent care or a routine care appointment.

To support his position, Dr. Dovgan relies on American Dental Association's literature regarding dental assistant job functions.  [Dovgan Report at 11]  His citation confirms my opinion, however, because none of the functions on the list comes close to the clinical activities performed by dental assistants under Procedure 787 § 5.2.  Adherence to such a harmful policy as Procedure 787 § 5.2 is hardly laudatory and is surely below the standard of care.

Dr. Dovgan states (without providing a citation) that "Dr. Shulman claims that dental assistants and nurses are making triage decisions that are below the standard of care."  [Dovgan Report at 10]  This is a gross distortion of my report.  While I state that allowing dental assistants to make triage decisions is below the standard of care [Shulman Report at 16], I make no such statement about registered nurses with dental training and qualifications.  Dr. Dovgan misses the point that clinical triage should be performed only by mid-level or advanced level providers and not by licensed practical/vocational nurses or dental assistants.

Moreover, SPDS does not appear to understand what is permitted under Procedure 787 § 5.2.  Dr. Smallwood testified that dental assistants decide whether to consult with a dentist based on oral instructions provided by each supervising dentist; however, neither he nor ADC are familiar with those instructions.  [Smallwood Dep. at 96:3-99:3]  Dr. Smallwood also testified that a dental assistant performs a basic assessment by examining a prisoner's oral cavity and identifying the quadrant of the mouth that is the source of pain.  The dental assistant looks for something strictly out of the normal such as a severe abscess or major infection—but does not identify cavities or the need for extractions.  [Smallwood Dep. at 61:1-62:12]  According to Defendants, Dr. Brian Hanstad, the SPDS Northern Region Dental Director and the Dental Supervisor for ASPC-Perryville, also "will testify that dental assistants review the inmate's complaint, take a health history, and take x-rays if needed.  He will testify that dental assistants do not perform dental procedures and that a dentist is always on-site at the clinic during clinic hours." [Defendants' 11th Supplemental Disclosure Statement at 47]

Allowing a dental assistant to interview a patient and perform an oral assessment under direct supervision[13] is not, per se, below the standard of care; however, my record review documents that Dental Assistant Assessments occur under general supervision (*i.e.*, when a dentist was not present in the clinic). Moreover Procedure 787 § 5 anticipates that "the unit dentist may not be available" when such assessments are performed.

During my review, I found 60 Dental Assistant Assessment examinations performed on 42 prisoners. [Shulman Report at 20] And unlike the narrow ambit described by Drs. Smallwood and Hanstad, dental assistants performed intraoral examinations and percussion tests[14] and made diagnoses.[15] Furthermore, they often decided whether to take x-rays (usually without direction from a dentist) and interpreted those x-rays. The dental assistants also decided whether to discuss their findings telephonically with a dentist and, if the dentist deemed it appropriate, arranged for inmates to have access to antibiotics and analgesics. [Shulman Report at 20]

Even if dental assistants discuss their findings telephonically with the dentist, the quality of the dentist's decision is limited by the accuracy of the information that is provided, including the interpretation of the radiograph and the description of the prisoner's medical history. This is problematic for two reasons. First, the dentist's decision, such as whether or not to prescribe an antibiotic, may depend on whether there is radiographic evidence of an abscess. But in my opinion as a professional dental educator, it takes dental students years of didactic and clinical experience to develop the skills necessary to interpret radiographs. It is unlikely that dental assistants will be able to simply pick up the necessary skills because they lack the foundational knowledge in maxillofacial anatomy. Second, a dentist who relies on the dental assistant's review of an inmate's medical history to determine if he should order penicillin is more likely to erroneously order

---

[13] The Arizona Dental Practice Act does not define direct and general supervision for dental assistants specifically; however, it sets forth a definition for dental hygienists (who have far more training than dental assistants). "Direct supervision" occurs when "the dentist is present in the office while the dental hygienist is treating a patient and is available for consultation regarding procedures that the dentist authorizes and for which the dentist is responsible." "General supervision" occurs when "the dentist is available for consultation, whether or not the dentist is in the dentist's office, over procedures that the dentist has authorized and for which the dentist remains responsible." Ariz. Rev. Stat. § 32-1281(I). Since dental assistants are minimally trained individuals, their supervision should be no less stringent.

[14] Tapping on teeth and recording the patient's response. *See, for example*, 9/19/12 clinical entries for **Redacted** and 12/12/11 clinical entry for **Redacted** **Redacted** .

[15] *See, for example*, 2/7/13 clinical entry for **Redacted** where the diagnosis of "reversible pulpitis" was made. There was no documented infection, but penicillin was dispensed—an action below the standard of care. *Also see* 12/12/11 clinical entry for **Redacted** **Redacted** ("possible reversible pulpitis"); **Redacted** ("possible abscess"); **Redacted** (on 1/14/12, "at this time there is no pathology in the area" and on 10/2/12 [after taking x-ray *sua sponte* and interpreting it] "Apex involved"). Table 1 also shows some "diagnoses" recorded by dental assistants.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    Page **11**

penicillin than if he reviewed the medical history himself.  If such an error is made, a patient with a penicillin allergy could have a hypersensitivity reaction or go into life-threatening anaphylactic shock.  [Solensky at 202-203]

My findings documented the clinical overreach inherent in the Dental Assistant Assessment process and stand in stark contrast to the testimony of Dr. Smallwood, the proffered testimony of Dr. Brian Hanstad, and the unsupported opinions of Dr. Dovgan.  Moreover, the proffered testimony of Dr. Hanstad that the Dental Assistant Assessment process is within the standard of care is in direct conflict with Dr. Chu's December 2012 recommendations that even a basic assessment was inappropriate because "dental assistants are not qualified to diagnose conditions and most importantly have difficulty accurately describing symptoms."  [*See* AGA_Review_00090609 at ¶ 4]  Furthermore, in January 2013, Dr. Chu recommended that triage be completed by nurses in the absence of dentists because "dental assistants are not qualified and can cause more harm than good."  [AGA_Review_00094915; Shulman Report at 20]  Yet the procedure persists.

Dr. Dovgan's expert report is more notable for what he did not discuss.  With regard to DA Assessment in particular, the records he reviewed had several occurrences of such assessments, but he makes no mention of them.  One of the themes of his report was that the ADC dental program is within the standard of care since it follows its own policies.  [*See, e.g.*, Dovgan Report at 73 ("ADC policy as written complies with NCCHC oral care standards and guidelines.  My review of records, reports, and statistics, and my interviews with dentists and dental assistants confirm that ADC policy is being routinely followed at all dental clinics statewide.")]  However, he fails to report evidence that ADC was in violation of 787 § 5.3, which requires that records and x-rays of those inmates who received a dental assistant evaluation be reviewed and acknowledged by a dentist within 24 hours (or another dentist or the complex physician in his absence).

Had Dr. Dovgan focused on systemic issues, he would have noticed that of the 14 occurrences of Dental Assistant Assessment documented in the 59 records he and I both reviewed (listed in Table 1), only 2 of the 14 occurrences (14%) were in compliance with § 5.3.  Of the 12 that were non-compliant, eight (67%) entirely lacked a dentist signature acknowledging review of the dental assistant's note, three (25%) were signed but had no date, and one (8%) was signed five days after the note was written.  Surely a non-compliance rate of 86% is above the threshold to suggest a systemic problem.  Putting aside my opinion that the Dental Assistant Assessment is facially below the standard of care, ADC's compliance with its own procedure is so poor that it is symptomatic of its failure to monitor prisoner dental care.  Moreover, Dr. Dovgan's failure to identify or report this systemic problem stains his credibility as a correctional dentistry expert.

## 2. X-rays

Dental assistants decide when x-rays should be taken pursuant to ADC Procedure 787.  This has the potential of exposing a prisoner to unnecessary ionizing radiation.  As I explained in my report, this policy is below the standard of care.  While dental assistants with the appropriate certification commonly expose x-rays in institutional and private practice, allowing them to expose radiographs *sua sponte* is in conflict with recommendations from the American Dental Association and Food and Drug Administration.  According to the recommendations,

Confidential                                                     PRSN-JDS 00086

> Dentists should conduct a clinical examination, consider the patient's oral and medical histories, as well as consider the patient's vulnerability to environmental factors that may affect oral health before conducting a radiographic examination.

[Radiation Exposure at 20]  Dentists must prescribe radiographs for individual patients, based on patient-specific needs and their clinical judgment because exposure to ionizing radiation is irreversible. Reliance on ADC Procedure 787 is not a substitute for a dentist's clinical judgment. Moreover, as I explained in my report, dental assistants are minimally trained individuals who are not clinicians and should not exercise clinical judgment.  [Shulman Report at 3]

Dr. Dovgan appears to think my concern is with dental assistants physically taking x-rays (a standard activity in dental practice).  [*See* Dovgan Report at 20]  Rather, I criticize dental assistants having the discretion to decide which teeth should be x-rayed and when an x-ray should be taken.  That all dentists Dr. Dovgan interviewed at ADC stated that they had a "standing order for dental assistants to take **needed** x-rays on all teeth that need to be reviewed" [Dovgan Report at 20 (emphasis added)] is symptomatic of a system with inadequate policies that are poorly monitored.  Dr. Dovgan fails to recognize that it is the dental assistant, not the dentist, who must exercise clinical judgment to decide which teeth "need" to be x-rayed.

### 3.    HNR Triage

The ADC Procedure that defines Routine and Urgent Care is flawed in both concept and execution.  It is flawed in concept because it reserves Urgent Care to a small set of conditions; consequently, prisoners with advanced conditions that do not meet the pinched Urgent Care definition may be assigned to Routine Care.  It is flawed in execution because dental assistants, who are minimally trained individuals, decide whether an HNR is assigned to Urgent or Routine Care.  Both flaws have the potential to create treatment delays, placing prisoners at risk for preventable pain and tooth loss.

In my report, I opined that the underlying clinical paradigm embodied in the HNR triage guidelines in ADC Procedure 770.2 is fundamentally flawed because the distinction between routine and urgent care is insufficient to properly categorize inmates with respect to the clinically appropriate treatment window. For teeth with substantial decay that do not meet ADC's criteria for Priority 2 (Urgent Care),[16] delay in treatment may allow that decay to progress to the point that the teeth require a more complex restoration with a less optimistic prognosis or must be extracted. Similarly, Procedure 770.2 fails to provide for expedited treatment for broken or lost fillings.

---

[16]  According to Dental Procedure 770.2 ¶ 3.1, the following qualify as "urgent care": fractured dentition with pulp exposure, acute dental abscess, oral pathological condition that may severely compromise the general health of the inmate, or acute necrotizing ulcerative gingivitis. The following conditions qualify for Routine Care: caries; chronic periodontal conditions, non-restorable teeth, edentulous and partially edentulous patients requiring replacement; presence of temporary, sedative, or intermediate restorations, and TMJ disorders; periodic examination; gingival recession or root sensitivity; routine dental prophylaxis.  [*Id.* at § 3.1.3]

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    Page **13**

Even in the absence of pain, these restorable teeth may develop irreversible pulpitis while the inmate is waiting for a routine care appointment.  [Shulman Report at 7]

Dr. Dovgan disagrees with my opinion that delay may cause irreparable harm because I cannot guarantee that increased wait times "**will**" cause irreparable harm.  [Dovgan Report at 18 (emphasis added)]  His criticism rings hollow for two reasons.  First, contrary to Dr. Dovgan's statement, I did not say that wait times **will** cause irreparable harm in a particular inmate.  Instead, I stated that wait times **may** result in the progression of tooth decay and other chronic issues in any given inmate.  Second, in my experience in institutional and correctional dentistry, a system with thousands of inmates with dental needs cannot possibly avoid dental injury when delays become excessive.  And as it relates to any given inmate, while dental disease progression is difficult to predict, clearly there is a point at which a tooth becomes non-restorable.  [*See, e.g.*, Dovgan Report at 5 (noting that a tooth may develop periapical periodontitis over time, which "is treated by either an extraction of the tooth or root canal therapy")]

Dr. Dovgan also overlooks the fact that decay may progress faster in prisoners than in the general population because prisoners are provided with limited oral hygiene modalities.  For example, prisoners have limited or no access to lengths of dental floss and standard toothbrushes to satisfy their particular needs.[17]  Another factor associated with the progression of decay is reduced salivation (xerostomia).  [Shulman and Cappelli at 3]  Xerostomia is a reported side effect of many drug classes and frequently occurs with antidepressants and antipsychotics, drug classes that are often prescribed to prisoners.  [Swager and Morgan at 54]

Dr. Dovgan fails to dispute my documentation of patients who experienced irreparable harm as the result of delays in dental treatment.  [Shulman Report at 18]  Table 1 in my opening report lists 30 prisoners who were assigned to the Routine Care List despite stating pain in their HNR and, as a result, were not scheduled for up to 137 days.[18]  [*Id.* at 40-42]  Dr. Dovgan reviewed these records and failed to gainsay my findings.  Indeed, his failure to refute these data in his report suggests tacit acceptance.  Instead of addressing the issue related to triage, Dr. Dovgan presents a table that he describes as the recent treatment of 20 inmates from Table 1 of my opening report (although my table reported treatment of 30 patients).  [Dovgan Report at 55-66]  Of the 61 HNRs he lists, all were from 2013 and 52 were submitted after March 2013, with the stated goal only of showing that these patients have been seen in 2013.  [*Id.*]  This information is irrelevant to my point, and, again, Dr. Dovgan betrays his bias by focusing on treatment after SPDS began providing dental care.  Dr. Dovgan's "analysis" of those records is little more than a Potemkin tour of the records reported in my table.  [Dovgan Report at 55-66]

---

[17]  My point here is not that lengths of floss and standard toothbrushes should necessarily be provided notwithstanding security concerns but rather that inmates using less effective preventive oral hygiene modalities may have a more rapid progression of oral disease.

[18]  Dr. Hanstad's proffered testimony that all dental assistants are instructed that all HNRs saying pain, swelling, or similar are brought in for a pain evaluation rings hollow given the numerous instances of dental assistants assigning prisoners that submitted HNRs stating pain to Routine Care.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    Page **14**

Dr. Dovgan claims that "[m]any inmates make pain references in their HNRs only to be clinically evaluated as not having pain at all or even worse stating they have no pain once they see the dentist only to file another HNR later for the same issue." [Dovgan Report at 3] Notwithstanding Dr. Dovgan's doubts about "many" of the HNRs, the standard of care would be for a competent clinician to examine a patient complaining of pain so that the pain can be (as Dr. Dovgan puts it) "clinically validated." [Id.] And even if some inmates falsely complain of pain and/or refuse treatment, not even Dr. Dovgan could assert that all requests for dental treatment fall into this category so that the appropriate standard of care would be to ignore them. At least some inmates legitimately need dental treatment, and Dr. Dovgan's unsupported assertion that some inmates might be unreliable is irrelevant to whether ADC's policies and practices put all inmates at risk of serious dental injury.

Finally, in addition to these issues in the policy itself, ADC executes its own policy poorly when it inappropriately relies on unqualified dental assistants to review HNRs and to decide whether a prisoner should be scheduled for routine or urgent care. As I have explained, a dental assistant, including one at ADC, generally has minimal education and experience. ADC policies do not provide formal, standardized training and leave too much room for discretion. And ad hoc (or even formal) training by supervising dentists is insufficient because dental assistants do not have the requisite dental knowledge to evaluate HNRs as well as dental charts and x-rays (if appropriate). Similarly, they do not have the requisite dental knowledge to understand when it is necessary to ask a dentist (if one is present) to review the chart and x-rays.

Dr. Dovgan asserts that dental assistants make similar decisions in private practice. [Dovgan Report at 11-12] However, he fails to consider the difference between a private patient and a prisoner. For example, a private patient who is not satisfied with the dental assistant can insist on speaking to the dentist and likely will be able to do so. A private patient does not use an HNR process to get an appointment, and if access to the dentist is denied, the private patient can always go to another dentist. A prisoner, on the other hand, is powerless to find another dentist.

### 4.    Harm Due to Inappropriate Triage

Delay may cause two types of harm: preventable pain and further injury. In my opening report, I documented several particularly egregious examples of harm due to delay caused by ADC's systemic failures. As a result of inadequate assignments by dental assistants and the practice of removing prisoners from the Routine Care List when they are seen for urgent care, the harm suffered by inmates can be substantial. Some examples are illustrated in the cases I described in my opening report at 22-23.

Dr. Dovgan rebuts none of these examples. Rather, he cherry-picks one inmate—**Redacted**—**Redacted**—for discussion. In my report, I listed Ms. **Redacted** as having submitted an HNR stating pain on April 11, 2013—under SPDS—that was misclassified as routine care, causing her to still be waiting for treatment at the time of my review two months later. Dr. Dovgan, missing the point of the example, reviews Ms. **Redacted**'s "recent treatment," which includes two pain HNRs submitted in September 2013 and a routine care HNR submitted in October, and concludes that all treatment was within the guidelines because she was ultimately seen 108 days after her April 2013 HNR was submitted. But Dr. Dovgan fails to realize that a dental assistant improperly triaged that

HNR and did not provide Ms. **Redacted** with an urgent care appointment within 72 hours—that she was seen not far beyond the 90 day routine care guideline is beside the point.[19]

**B.      Timeliness of Care**

ADC's policies and practices combine to delay treating decay, lost fillings, and broken teeth.  Such delays allow decay to progress and tooth structure to be lost, decreasing the likelihood of a successful clinical result.  ADC's focus on "routine care" wait times fails to provide appropriate and timely care to many inmates.  [Shulman Report at 23]

**1.      Lack of Timelines**

Dr. Dovgan misses my point regarding timeliness for care.  He simply relies on ADC's compliance with NCCHC Oral Care Standards or the DSTM.  But he fails to address my critique of the validity of the NCCHC Oral Care Standard or my opinion that

> NCCHC accreditation … does not require that dentists audit the care actually performed at an institution in order to evaluate health outcomes.  Additionally, some NCCHC standards, such as its requirement that care be "timely," do not specify auditable standards.  Thus, relying on NCCHC standards or accreditation, as ADC does, fails to demonstrate that an institution meets the appropriate standard of care.  To the contrary, the shortcomings of the NCCHC standards reinforce the systemic failures within ADC.

[Shulman Report at 3-4]  Moreover, despite Dr. Dovgan's unsupported assertions, ADC policy is **not** consonant with the NCCHC standard.  Although NCCHC Oral Care Standard P-E-06 specifies that appropriate care "is timely and includes immediate access for urgent or painful conditions," NCCHC at 69, the definition of Priority 2 (urgent care) in ADC Procedure 770.2 does not include pain.

Dr. Dovgan states (again without providing a citation) that "Dr. Shulman claims that ADC policy does not dictate timeliness standards for intake, urgent, and routine care.  This is untrue." [Dovgan Report at 14]  This both misrepresents my report (I do not address intake) and is itself unsupported because, as I explained in my opening report (and as Dr. Dovgan concurs), it is the contracts, not the DSTM, that specify the relevant timeframes.  [Dovgan Report at 14]  This is an important distinction since it is an institution's policies and procedures that define its system rather than contractual language that may be changed.

---

[19] Dr. Dovgan's summary is curious, as it involves several pain appointments in quick succession, which would be the pattern expected as a tooth decays past the point it is easily restorable.  However, the records Dovgan reviewed were not produced in time for me to review them for this report.

Confidential

## 2.   Wait Times

Dr. Dovgan presents various tables to show that wait times for routine care have decreased to the point that SPDS has met and exceeded the standard in the Corizon contract. [Dovgan Report at 15-16]  But he fails to consider that the wait times computed by SPDS (as well as ADC and Wexford before it) are an artifact of (1) the start date of the HNR used for the computation, (2) the date when the appointment is presumed to have occurred, and (3) the extent to which intervening events are considered.  For example, a prisoner who submits an HNR and is examined by a dental assistant has been seen for the purposes of wait time computation—even though the dental assistant is not a licensed provider.  This has the effect of artificially deflating wait times.

Moreover, a wait time algorithm that shows that a contractor (*i.e.*, Corizon/SPDS) is meeting its contractual obligations might discount factors beyond its control, such as inmates being away at court or security issues.  But those outside factors should not be excluded when reviewing wait times under a constitutional analysis because it is ADC's responsibility to ensure adequate health care despite any operational difficulties.  Thus, an appointment that is cancelled due to lockdown or insufficient custody staff should not deflate computed wait times.

In addition, the factors that Dr. Dovgan contends affect wait times (being out to court, medical issues, and refusals) are irrelevant.  Although some inmates might be unavailable for appointments for whatever reason, there undoubtedly are inmates who are available and are waiting for dental care.  And to the extent ADC is aware of the problem of inmates being unable (or even refusing) to attend appointments for logistical and security reasons, ADC should do something to ensure that inmates can still receive dental care, not use those facts as excuses for their inadequate practices.

Further, Dr. Dovgan's opinions on these issues are overstated or simply incorrect. [Dovgan Report at 15-16]  For example, he cites inmates being out to court for as many as 600 days as affecting wait times.  But the number of inmates out to court or at a medical facility is a matter of public record and generally appears to be about 1% of the prisoner population.[20]  Moreover, this is not a new phenomenon and would affect ADC, Wexford, and SPDS wait times equally. Regardless, I used median wait times and percentiles in my calculation to minimize the effect of outliers such as Dr. Dovgan's hypothetical inmate who was out to court for 21 months.

Similarly, delays for medical issues are both relatively infrequent and not confined to any particular dental provider.  While Plaintiff Wells did experience delays in dental care because of a medical condition [Dovgan Report at 17], such occurrences are relatively infrequent.  For example in the records I reviewed, only four had entries noting that a dental appointment had to be rescheduled for a medical issue.[21]

---

[20]  *See*, for example, ADC Institutional Capacity & Committed Population for the Month Ending December 31, 2013, http://www.azcorrections.gov/adc/reports/capacity/bed_2013/bed_capacity_dec13.pdf.

[21]   **Redacted** 10/19/11;  **Redacted** 8/1/11;   **Redacted** 2/28/13;  **Redacted** 8/4/10.

Confidential

Dr. Dovgan similarly states that inmates frequently refuse care after submitting an HNR, which delays treatment.[22] He offers no support for this conclusory statement except for interviews with treating dentists.  But when the dentists' claims are compared to the reports Dr. Dovgan includes, they are wildly out of proportion.  [*E.g.*, *compare* Dovgan Report at 39 (Dr. Weekly at Florence gets "eight refusals a day on average") *with id.* at 22 (540 refusals over 8.5 months reported at Florence); *id.* at 41 (Dr. Lucas saying he receives a "high number" of refusals after pain HNRs) *with id.* at 42 (16 refusals total over 224 visits, based on the report Dovgan viewed on site)]  Regardless, this issue is irrelevant to the wait times I calculated, since I treated the date of refusal as the date of appointment.  By using frequent refusals as an excuse, Dr. Dovgan fails to recognize that treatment refusals may be an indictment of the ADC dental program because prisoners are forced to refuse care for pain in order to stay on the Routine Care List.  [*See* Shulman Report at 25-28 & Table 3 (documenting 29 records (almost 10%) that illustrate the ADC Prisoners' Dilemma, when prisoners are forced to choose between seeking urgent care for a painful tooth at the cost of losing their position on the Routine Care List)]  Dr. Dovgan entirely ignores this phenomenon, which also magnifies the delay while simultaneously deflating reported wait times.  Dr. Dovgan fails to cite any evidence that rebuts my opinion relating to the ADC Prisoners' Dilemma.  In fact, he does not mention it in his report.

### C.      Staffing

Dr. Dovgan states (again without proper citation) that "Dr. Shulman claims that staffing in a correctional system must be provided at a ratio of one dentist per 1,000 inmates."  [Dovgan Report at 18]  This oversimplifies and misstates my opinion.  I did not dictate a required ratio, but rather began my discussion by citing a recommendation made in one of the few publications relating to correctional dentistry.  [*See* Shulman Report at 2 ("The recommended inmate to dentist ratio for prisons is at least 1,000:1, under the assumption that dental hygiene support will be provided in addition to that ratio. [Makrides *et al.* at 557]")]

Staffing is a key input to any dental care system and inadequate staffing can result in hurried care, attempts to achieve efficiencies that are detrimental to the quality of care, a reduced scope of services, and increased wait times.  Although no particular ratio is required, a constitutionally-adequate system must have enough dentists to provide dentistry at the appropriate standard of care.  The recommended ratio of 1,000:1 is a reasonable starting point for staffing system-wide with adjustments for individual facilities.  ADC's ratios are significantly higher, and I found numerous issues that indicate staffing is insufficient and affecting the quality of care, none of which Dr. Dovgan refutes or even substantively addresses.  If anything, ADC's facilities need an even lower inmate-to-dentist ratio because the benchmark ratio of 1,000:1 assumes that there is a sufficient number of dental hygienists, which ADC lacks.  It is undisputed that staffing ratios should not necessarily be the same for every facility and should be tailored to the facility's mission, oral disease prevalence rates, and demographics.  Ironically, Dr. Dovgan notes that ADC's Perryville facility has the most HNRs but ranks sixth in inmate-to-dentist ratio—yet Dr. Dovgan apparently fails to realize that Perryville's high number of HNRs count means Perryville has greater staffing needs.

---

[22]  In the wait time data I reported, I treated the refusal date as the appointment date. [Shulman Report at 10]

Confidential

Dr. Dovgan's primary response to the staffing issue is to assert that reduced wait times for routine care indicate that ADC's program is within the standard of care. Moreover, he asserts that "[a]verage wait times for routine care at ADC facilities are not greater than the average wait times for many private dental offices." [Dovgan Report at 16] Since Dr. Dovgan does not cite any data with respect to private practice wait times, I am at a loss as to how to evaluate his conclusory statement, but, as noted above, private dental offices are fundamentally different than prisons.

Dr. Dovgan also opines that my focus on staffing ratios is misplaced because they are not the sole predictor of outcome and wait times; productivity is also important. [Dovgan Report at 19] SPDS tracks each provider's productivity so that they can receive productivity-based bonuses. [Id.] Dr. Dovgan provides neither documentation nor details about the putative bonus system, so his opinion lacks merit and empirical support. Further, even if productivity-based bonuses could be useful, they also create perverse incentives to run inmates through the dental facilities without any meaningful care or to calculate wait times so that it appears as though treatment is being provided more quickly than is truly the case. This is particularly concerning in light of ADC's indifference or inability to monitor its dental contractors.

### 1. Insufficient Staffing to Treat Periodontal Disease

One consequence of insufficient staffing is the inability to provide an appropriate scope of care. My review indicates that ADC's staffing is inadequate to treat moderate to advanced periodontal disease. This is below the standard of care and puts inmates at a substantial risk of dental injury, including preventable pain and loss of teeth.

In my opening report, I cited Dr. Chu's observation that while periodontal disease is common among prisoners [Clare at 92], the treatment commonly employed to treat it—deep cleaning called "scaling and root planing"—is rare. [AGA_Review_00094915] Records of recent treatment provided after Dr. Dovgan's report confirmed Dr. Chu's observation more precisely than I was able to previously.[23] In the 20 inmates whose 2013 treatment is listed in Dr. Dovgan's report, scaling and root planing procedures were only performed for one prisoner.[24] [ADC_D002497-2517] Dr. Dovgan makes no mention of this issue, despite frequent comments about how bad inmates' teeth are.

### 2. Dental Assistant Substitution

The Dental Assistant Assessment also reduces wait time by substituting minimally trained individuals for licensed dentists. Relatedly, dental assistants have not always triaged the HNRs. Previous ADC practice was for dental assistants to pull the records of inmates who submitted HNRs and then dentists would review the records and x-rays before making triage decisions. [Shulman Report at 16 n. 17] While delegating a function that was previously performed by licensed dentists to minimally trained individuals may reduce wait times, it does so at a cost

---

[23] These records listed the actual treatment codes so I did not have to attempt to subjectively determine from the treatment notes in the chart exactly what procedure was performed.

[24]      **Redacted**      [ADC_D002512]

measured in the harms I described in my opening report.  Given the incentives and work-arounds such as the substitution of dental assistants for dentists, SPDS-calculated wait times alone should not justify the staffing levels.

### D.    Avoidable Extractions

Dr. Dovgan fails to offer any meaningful response to my opinion that ADC's systemic practices place inmates at risk of having teeth unnecessarily extracted.  Instead of responding to my argument, Dr. Dovgan merely plays word games in that he asserts that ADC does not have an "extraction only" policy because ADC dentists told him that they would save teeth whenever possible.  [Dovgan Report at 21]  First, my expert report does not use the phrase "extraction only policy."  In my Declaration, I used the phrase "de facto extraction only policy" [Shulman Decl. at 16] and often referred to the problem as "avoidable extractions."

Terminology aside, my opinion is not that ADC performs only extractions.  Rather, my opinion is that ADC's practices put inmates at risk of having teeth extracted when those teeth could be saved if better practices were in place.  An inadequate consent policy, a triage system that inappropriately assigns patients who submit HNRs stating pain to the Routine Care List, and a practice that allows minimally-trained individuals to respond to HNRs combine to create a system that places prisoners at risk of harm.  That ADC sometimes performs fillings and that some teeth are beyond repair does not confute my opinion that ADC puts inmates at risk of losing teeth that could have been saved.

Dr. Dovgan also puts stock in his interpretation of "informed consent" for extractions, but he does not understand the concept.  Informed consent is a process rather than just a form; it is an actual discussion of alternatives to extraction, appropriately documented, and a true opportunity for a prisoner to make a reasonable and informed decision.  [Dovgan Report at 20]  While fillings should not be an option if the tooth is scheduled for extraction, prisoners should be informed if there are alternatives that they may exercise upon their release—that is, root canals and crowns.  A prisoner may opt to bear with some degree of pain in the hope that the tooth will remain relatively asymptomatic until his or her release.

Dr. Dovgan takes issue with my opinion that the ADC Informed Consent Form is not consistent with NCCHC policy.  But rather than attempting to identify errors in my reasoning [Shulman Report at 29], he simply responds that "Dr. Shulman also claims that the ADC Informed Consent form is not compliant with NCCHC standards.  I have reviewed the NCCHC standards on informed consent and find the ADC Informed Consent form to be within the standard of care and in compliance."  [Dovgan Report at 21]  Such ipse dixit reasoning is unpersuasive.

In an attempt to rebut my opinion, Dr. Dovgan states the truism that "Some teeth are simply non-restorable" [Dovgan Report at 22] and similarly argues that, in some cases, either a filling or an extraction may be appropriate dental care.  Dr. Dovgan's argument distracts from the issue.  Although some teeth are not restorable, many others are.  Dr. Dovgan's truism does not mean that ADC does not perform unnecessary extractions simply because some extractions are necessary.  Further, as I stated in my report, I accepted the judgment of the dentist who performed the initial treatment plan (per the charting and clinical notes) as to whether a tooth was restorable or should be extracted.  Since the examining dentist examined the patient and interpreted the x-

rays, his information was more informed than mine.  It was based on this information that I opine as to whether extraction was indicated at the time of the clinical notes.

Dental disease progresses over time, and a tooth that is restorable will likely deteriorate over time.  As I mentioned earlier, this deterioration is a function of the initial state of the tooth and other individual factors.  While Dr. Dovgan and I do not disagree on the impact of such factors, he cites those factors, such as dry mouth, as a reason that prisoners' teeth may be non-restorable.  [Dovgan Report at 23]  In contrast, I see it as an example of ADC's failure to provide timely treatment given the totality of the circumstances.[25]  What is more, Dr. Dovgan's response that some teeth might either by filled or extracted lays out an intractable conundrum.  According to his paradigm, differences in clinical judgment are solely responsible when, for example, a dentist decides to extract a tooth that months earlier another dentist treatment planned for a filling.  By semantic fiat, he tries to take the issue of harm due to disease progression resulting from untimely treatment off the table.

Dr. Dovgan also criticizes my decision not to review patient x-rays.  [Dovgan Report at 26] The fact that I did not review x-rays (or examine prisoners) is irrelevant given that I need not rely on particularized instances of care.  The issue, as I see it, is not whether an individual dentist is practicing below the standard of care but whether ADC, through inadequate policies, procedures, and monitoring, maintains a dental care system that is below the standard of care.  Many times, the dental records alone are sufficient to make this determination.  Thus, I commented when the clinical record was inconsistent with the treatment decision, such as when a tooth was extracted or recommended for extraction in the absence of a clinical justification like the tooth was non-restorable due to caries, irreversible pulpitis, or periapical pulpitis.

E.      Chewing Difficulty

Dr. Dovgan does not address my opinion about systemic problems with monitoring patients with chewing difficulties except to say that it is untrue because SPDS tracks both partial and full dentures.  [*See* Dovgan Report at 26]  Dr. Dovgan is so focused on SPDS that he fails to rebut my opinion that "**ADC policy** does not address timing or monitoring of patients waiting to receive dental devices, thus permitting inappropriate delays and problems in receiving a proper diet." [Shulman Report at 32 (emphasis added)]  That SPDS tracks aspects of the denture process is useful, but it does not track soft diets.  Similarly, Dr. Chu testified that she does not monitor whether patients are receiving diets prescribed for dental reasons.  [Chu Dep. at 42:17-19]

---

[25]  That a substantial proportion of prisoners are taking medication with dry mouth as a side effect suggests that decay will progress faster, on average, in this high-risk population than one with a lower proportion of such individuals.  Consequently  a lower  prisoner to dentist ratio will be needed to prevent unnecessary tooth morbidity and mortality, and treatment timeframes take on greater importance.  As an example, medical records indicate that Plaintiff Chisholm is taking Metoprolol, Carbamazepine, and Amitryptyline [ADC 0003878], Plaintiff Wells is taking Lisinopril and Metoprolol [ADC0005089], and Plaintiff Polson is taking Lithium Carbonate, Haloperidol, and Benztropine [ADC0004260], all of which contribute significantly to dry mouth. [Gage and Pickett at 374-5, 97-99, 454-5, 455-6, 506-7,134-5, 53-4]

### F.     Monitoring

Dr. Dovgan has virtually no meaningful response to the fact that ADC does not monitor the dental program.  His silence is particularly perplexing since it comprised a large section of my report.  He fails to address the inadequacies of ADC's monitoring of the dental program. Specifically, he makes no mention of Dr. Chu, the Dental Monitor; nor does he address the limitations of the MGAR that I discussed.  [Shulman Report at 37]  His statement that "MGARs measure some performance metrics relating to dental" [Dovgan Report at 30] is vague to the point of meaninglessness—not to mention that oral care has only been evaluated on the MGAR once in 15 months.  Moreover, his conclusory statement that "ADC reviews monthly reports on dental wait times and staffing to determine contract compliance" [*id.*] is unpersuasive in light of Dr. Chu's testimony that she has only seen one staffing SPDS report [Chu Dep. at 66:6-67:7] and has no access to the CDS software to which Dr. Dovgan referred.  [Chu Dep. at 69:24-70:21]

### V.     Named Plaintiffs

Dr. Dovgan spends considerable time in his report on the named plaintiffs who have had dental issues, comparing their deposition testimony to their dental history and evaluating the clinical treatment they received.  In doing so, he misunderstands their role in this litigation and in my report.  All the named plaintiffs are at risk from the systemic issues I identified in my report. The named plaintiffs identified in the complaint as experiencing dental issues typify the harms that result from ADC's inadequate and poorly monitored policies.  As I explained above, that a particular inmate is or is not currently suffering a dental injury weighs little on whether the inmate population at large is at risk.  Based on my experience in institutional dentistry, I can opine on the effect that ADC's policies and practices have, including the risks of dental injury, without offering a clinical opinion on any particular inmate.

In any event, Dr. Dovgan often overlooks instances of inadequate care shown in the named plaintiffs' dental records.

***Joshua Polson*** (187716) illustrates several systemic deficiencies in the ADC dental program.

- **Inadequate HNR Triage.**  Because dental assistants are given too much authority to decide clinical issues, Mr. Polson was refused appointments multiple times despite complaining of pain or the inability to eat.  [Shulman Report at 22]
- **Inadequate management of chewing difficulty.**  Joshua Polson's record shows long periods where he reported pain and difficulty chewing, but was unable to get the appropriate soft diet.  Those issues caused marked weight loss as well as the inability for Mr. Polson to take his medication.  [Shulman Report at 33-34]
- **Inadequate monitoring.**  Mr. Polson's failure to receive a soft diet consistently was due to ADC's failure to monitor whether individuals awaiting dentures receive a clinically appropriate diet.  Moreover, it took Mr. Polson well over a year to receive his

Confidential                                                                                    PRSN-JDS 00096

dentures, counting only from the time of his last refusal (at which point it had been over 18 months since he had qualified for partials).[26]

*Charlotte Wells* (247188) suffered long wait times and had teeth recommended for extraction without clinical justification.

- **Wait times**. Ms. Wells requested a filling (on tooth #13) as a result of her intake exam in 2009, but the routine care wait was 257 days—at which time the appointment was postponed a further 96 days by medical issues. Delay for medical issues is appropriate and unavoidable, but the original wait, at over 8 months, is itself unacceptable. Had that appointment been within the ADC routine care timeframe of 90 days, even with the three rescheduled appointments, #13 would have been filled five months sooner. While the rate at which decay progresses is variable, a 5-month delay is substantial. Furthermore, Ms. Wells was taking Lisinopril and Metoprolol, both of which have dry mouth as side effects. In my opinion, the 5- month delay (beyond that due to her medical condition) in conjunction with probable dry mouth was responsible for progression of the decay in #13 to the point that the attempt to fill it in November 2010 was unsuccessful. The tooth was ultimately extracted in late 2013. [ADC197517]

- **Avoidable Extractions/Prisoners' Dilemma**. Ms. Wells was twice offered extractions of teeth that were not diagnosed as needing an extraction, and both were ultimately filled. [Shulman Report at 25] The first incident occurred six weeks after receiving the filling on #13, when she submitted an HNR regarding pain in that tooth and #18 and was seen on a pain evaluation. Dr. Dovgan and I agree that nothing in the chart entry suggested a clinical reason for extraction of either tooth.[27] Dr. Dovgan states that Ms. Wells was then nevertheless "given the option of extracting these teeth." [Dovgan Report at 46-47] If the dentist did in fact merely offer to extract teeth with no identifiable issues, this is itself below the standard of care.[28] Moreover, the refusal form, which Ms. Wells signed indicating she wanted a filling, says that she was

---

[26] Dr. Dovgan faults Mr. Polson for refusing treatment thereby causing delays. In the three years between when Mr. Polson first qualified for dentures in April 2008 and when he received them in April 2011, he twice refused treatment. The first time, in April 2009, delayed treatment by approximately seven months (he refiled a request to start partials in July and was seen in November). The second time, in December 2009, was because the extraction site from his previous extraction had not healed. Rather than rescheduling Mr. Polson a short time later, Dental required him to file another HNR to restart the process and wait on the Routine Care List. I used this last HNR date in my original report to calculate Mr. Polson's wait time, even though it understates the degree to which ADC's lack of monitoring affected Mr. Polson.

[27] For example, a documented pulp vitality test or symptoms consistent with irreversible pulpitis.

[28] Dr. Dovgan dismisses this incident as "a judgment call that turned out to need extraction anyway." [Dovgan Report at 47] But based on the dentist's clinical notes, there was insufficient justification to warrant recommending extraction.

Confidential

"advised that it is necessary" for her to have two teeth extracted, with no mention of possible alternatives. A similar incident occurred several months later with regard to tooth #14. Dr. Balk's assessment was "**possible** irreversible pulpitis" (emphasis added), but there was no documentation of a test for pulp vitality. Dr. Balk recommended that #14 be extracted, Ms. Wells refused, and a filling was placed several months later. Dr. Dovgan ignores this incident entirely.

*Maryanne Chisholm* (200825) has also been the victim of delays, inadequate triage, and the prisoners' dilemma. In early 2012, she refused an extraction in a fractured tooth. The underlying records are not entirely clear, but Ms. Chisholm believes she was told that she could wait six months for routine care if her tooth was not extracted, and apparently did not understand she needed to file another HNR (or the HNR is missing). When she did file another HNR in August, she requested replacement of missing crowns. Dr. Dovgan dismisses this request as "below the standard of care," but what he means is that ADC does not offer replacement crowns. [29] [Dovgan Report at 49] In a follow-up HNR a few days later requesting to have her teeth "fixed," the dental assistant responded, "If you have a major toothache and you want it [a tooth that is bothering her] pulled, submit for a pain HNR. Wait times are 4-6 months for fillings."[30] She was not seen for five months, at which time only one tooth in need of immediate treatment was filled. This was not, as Dr. Dovgan opines, within ADC's timelines.[31]

*Stephen Swartz* (102486) illustrates a consistent lack of monitoring and follow-up care with regard to his maxillofacial injury and subsequent oral surgery, as well as an untimely response to an HNR stating pain in January 2012. [Shulman Report at 14] Dr. Dovgan addresses none of these issues, instead focusing on Mr. Swartz' deposition testimony and history of refusals. Whether or not an inmate refuses treatment on occasion has no impact on the clinical obligation to promptly respond to complaints of pain. [Dovgan Report at 50-52]

## VI.    Irrelevant Issues Addressed by Dovgan

Dr. Dovgan spends much of his report on irrelevant issues that neither directly respond to the systemic deficiencies I identified nor establish, without more, a constitutionally-adequate dental system.

---

[29] Dr. Dovgan faults Ms. Chisholm's original request for failing to understand ADC policy, stating, "it is unclear what routine care treatment she believes she would have been eligible for. ADC policy does not provide for placement of crowns. Thus any tooth needing root canal therapy and a crown would therefore have an extraction." While it is not clear (because of the five month delay) which teeth Ms. Chisholm was complaining about, she did receive a filling, rather than an extraction, at her next visit.

[30] It is hard to imagine a dentist giving that advice to a prisoner.

[31] Ms. Chisholm was taking Metoprolol, Carbamazepine, and Amitryptyline all of which have dry mouth as side effects. Consequently, treatment delay would have a more pronounced effect on decay progression for her.

A.      Meth Mouth

Dr. Dovgan spends a lot of time describing "meth mouth," which he claims "is caused by the drug methamphetamine."  [Dovgan Report at 4]  He presents a clinical photograph of what he asserts to be "a typical 'meth mouth' patient" with teeth that have deteriorated so badly that no layman, much less a dentist, would deem them to be restorable.  [*Id*. at 4]  He proceeds (without any citation) to distort my position by claiming that I would have you believe the dentist should place fillings on these teeth.  [*Id*. at 4-5]  However, nowhere in my report do I say anything that would lead a reasonable and prudent reader to infer that I would have him believe that.

Dr. Dovgan's discussion of "meth mouth" is largely irrelevant because, regardless of its prevalence among ADC prisoners, inmates still need timely access to dental care.  In fact, a population with unusually high dental treatment needs should have more dentists.  ADC also must take inmates as they find them, not wish away their dental obligations by blaming the inmates for their dental problems.  But even if Dr. Dovgan's meth mouth opinion was credible, none of the charts I reviewed (including that of Plaintiff Polson) used that term to describe the inmate's condition.  Moreover, Dr. Dovgan's reported (but unsubstantiated) observations from dental staff that a high proportion of prisoners have never had dental care is similarly irrelevant to my observations, except to the extent it demonstrates why a prison may need more dentists.

B.      Occupational Safety & Health Administration ("OSHA")

Dr. Dovgan's discussion about OSHA is irrelevant since OSHA has no jurisdiction over clinical care.  To the contrary, OSHA is a part of the US Department of Labor with a mission of "assuring safe and healthful working conditions" for employees (https://www.osha.gov/about.html, accessed Jan. 20, 2014).  Further, compliance with OSHA guidelines alone does not establish constitutional dental care.

VII.   Conclusion

ADC is subjecting prisoners to avoidable harms because of inadequate staffing, inadequate policies and practices, and inadequate monitoring.  In my opinion, based on 41 years of experience and to a reasonably degree of dental certainty, these deficiencies combine to produce a dental care system below the standard of care.

Nothing in Dr. Dovgan's report changes my opinion, although I reserve the right to amend this report upon review of the documents he relied on or additional information that may come to light.  Dr. Dovgan's opinions should be rejected because they are based on conclusory statements and misrepresent my report.  His focus was too narrow, he virtually ignored care provided by Wexford and ADC, and failed to address the presence of systemic problems I mention in my report.[32]

---

[32]  As required per court rules, my rates as an expert for this matter are as follows: $300 per hour for research, report drafting and analysis, $150 per hour for travel, and $500 per hour for attending and/or testifying at depositions or trial.

Confidential                                                                        PRSN-JDS 00099

Table 1.  Dental Assistant Evaluations in the 59 Dental Charts Dr. Dovgan and I Reviewed in Common*

| Inmate | Date | Page | X-ray taken *sua sponte* | Tests Performed | Diagnosis | Contact with Dentist Documented | Acknowledged per § 5.3 within 1 business day |
|---|---|---|---|---|---|---|---|
| Redacted | 11/2/12 | ADC_D000006 | Yes | | Gross bone loss | No | Signed but no date |
| Redacted | 10/9/12 | ADC_D000007 | Yes | Percussion | Possible caries | No | Signed but no date |
| Redacted | 1/8/13 | ADC_D000013 | Yes | | No evident pathology<br><br>Perio issues | No | Signed but no date |
| Redacted | 6/22/12 | ADC_D000013 | Yes | | Radiolucency at apex of #5 | Yes | Yes |
| Redacted | 11/3/11 | ADC_D000014 | Yes | Percussion | Carious lesions | No | No |
| Redacted | 9/21/12 | ADC_D000032 | No | Percussion | No changes in x-ray | Yes | Signed but dated 9/26/12 |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    Page **26**

| Table 1.  Dental Assistant Evaluations in the 59 Dental Charts Dr. Dovgan and I Reviewed in Common* | | | | | | | |
|---|---|---|---|---|---|---|---|
| Inmate | Date | Page | X-ray taken *sua sponte* | Tests Performed | Diagnosis | Contact with Dentist Documented | Acknowledged per § 5.3 within 1 business day |
| Redacted | 9/6/12 | ADC_D000033 | Yes | Percussion | No | Yes | Yes |
| Redacted | 7/25/12 | ADC_D000061 | Yes | Percussion | Yes<br><br>no obvious infection to apex | No | No |
| Redacted | 3/30/12 | ADC_D000204 | No | | | No | No |
| Redacted | 5/4/12 | ADC_D00020 | Yes | Percussion | No current pathology | No | No |
| Redacted | 1/27/12 | ADC_D000205 | Yes | | #31 decay | No | No |
| Redacted | 11/5/10 | ADC_D000205 | Yes | | No current pathology | No | No |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                    Page **27**

Confidential

| Table 1.  Dental Assistant Evaluations in the 59 Dental Charts Dr. Dovgan and I Reviewed in Common* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Inmate** | **Date** | **Page** | **X-ray taken** *sua sponte* | **Tests Performed** | **Diagnosis** | **Contact with Dentist Documented** | **Acknowledged per § 5.3 within 1 business day** |
| Redacted | 2/19/13 | ADC_D000412 | No | | No | No | No |
| **Redacted** | 6/20/13 | ADC_D001238 | No | Palpation | No | Yes | No |

*Note:  Of the 59 charts, there were 14 occurrences of Dental Assistant Assessment in 7 charts.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER                Page **28**

# EXHIBIT A

Confidential

PRSN-JDS 00103

*Curriculum Vitae* Jay D. Shulman - Prepared January 31, 2014

# CURRICULUM VITAE - JAY D. SHULMAN

## PERSONAL INFORMATION

Address:      9647 Hilldale Drive, Dallas, Texas  75231
Telephone:  (214) 923-8359
E-mail:        jayshulman@sbcglobal.net

## EDUCATION

1982          Master of Science in Public Health
               University of North Carolina

1979          Master of Arts in Education and Human Development
               George Washington University

1971          Doctor of Dental Medicine
               University of Pennsylvania

1967          Bachelor of Arts (Biology)
               New York University

## POSITIONS HELD

### Academic

2007 –       Adjunct Professor, Department of Periodontics
               Baylor College of Dentistry

2003 - 07   Professor (Tenure), Department of Public Health Sciences
               Baylor College of Dentistry (retired October, 2007)

1993 - 03   Associate Professor, Department of Public Health Sciences
               Baylor College of Dentistry

### Military

1971 - 93   Active duty, U.S. Army. Retired July 1993 in grade of Colonel.

1990 - 93   Chief, Dental Studies Division & Interim Commander (1993),
               US Army Health Care Studies and Clinical Investigation Activity

               Directed Army Dental Corps' oral epidemiologic and health services
               research. Supervised a team of public health dentists, statisticians, and
               management analysts. Designed and conducted research in oral
               epidemiology, healthcare management and policy.

1987 - 90   Director, Dental Services Giessen (Germany) Military Community and
               Commander, 86th Medical Detachment. Public Health & Preventive
               Dentistry Consultant, US Army 7th Medical Command.

Confidential                                                                              PRSN-JDS 00104

Directed dental care for Army in North Central Germany. Operated 6 clinics with 20 dentists and 60 ancillary personnel. Responsible for the dental health of 25,000 soldiers and family members and for providing dental services during wartime using portable equipment. Provided technical supervision of public health and preventive dentistry programs for the Army in Europe.

1984 - 87   Chief, Dental Studies Division US Army Health Care Studies & Clinical Investigation Activity. Public Health & Preventive Dentistry Consultant to Army Surgeon General.

Directed Army Corps' oral epidemiologic and health services research. Supervised a multi-disciplinary team of public health dentists, statisticians, and management analysts. Designed and conducted research in oral epidemiology, healthcare management and policy. Technical supervision of all Army public health and preventive dentistry programs worldwide.

1982 - 84   Assistant Director for Research, US Army Institute of Dental Research.

Responsible for Management of extramural research program, performing epidemiologic research, and teaching biostatistics and epidemiology to Walter Reed Army Medical Center dental residents.

1980 - 82   Full-time graduate student (Army Dental Public Health Training Fellowship) at the School for Public Health, University of North Carolina at Chapel Hill.

1976 - 80   Director, Dental Automation
US Army Tri-Service Medical Information Systems Agency
Walter Reed Army Medical Center, Washington, DC

Directed a team of computer scientists in the development of an automated management system for the Army dental clinics and upper management.

1975 - 76   Clinical Dentist, Pentagon Dental Clinic, Washington, DC

1974 - 75   Clinical Dentist, US Army Hospital Okinawa, Japan

1971 - 74   Clinical Dentist, US Army Dental, Clinic Fort McPherson, Georgia

## BOARD CERTIFICATION AND STATE LICENSE

**Dental Licensure.**

Texas #17518 (retired)

**Board Certification.**

Certified by the American Board of Dental Public Health since 1984 (active).

*Curriculum Vitae* Jay D. Shulman - Prepared January 31, 2014

## RESEARCH - AREAS OF INTEREST

Oral epidemiology, health services research, health policy, military and correctional health.

## RECENT FUNDED RESEARCH

2010 - 12    Instrument system and technique for minimally invasive periodontal surgery (MIS). National Institutes of Health SBIR Grant 2R44DE017829-02A1 ($368,270). Principal Investigator: Dr. Stephen Harrel. Role: Paid consultant.

## CURRENT SOCIETY AND ORGANIZATION MEMBERSHIPS

1982 –    American Association of Public Health Dentistry

2011 –    Texas Oral Health Coalition

## PROFESSIONAL ACTIVITIES

### Invited Presentations.

Apr 2012    Public Health, Public Policy, And Legal Issues Associated with Health Care in Prisons: A Dental Perspective. Presented at the University of Texas Health Science Center, San Antonio.

Apr 2009    Public Health, Public Policy, And Legal Issues Associated with Health Care in Prisons: A Dental Perspective. Presented at the University of Iowa.

Mar 2008    Public Health and Public Policy Issues Related to Dental Care in Prisons. Presented at University of North Carolina School of Public Health, Chapel Hill, NC.

Jun 2007    Characteristics of Dental Care Systems of State Departments of Corrections. Presented to annual meeting of Federal Bureau of Prisons dentists, Norman OK.

Jun 2006    Public Health Aspects of Correctional Dentistry. Presented to annual meeting of Federal Bureau of Prisons dentists, Fort Worth, TX.

Oct 2006    Opportunities for Dental Research Using the National Health and Nutrition Examination Survey. Indiana University School of Dentistry.

Aug 2006    Dental Public Health and Legal Issues Associated with Correctional Dentistry. Federal Bureau of Prisons.

Dec 2005    Opportunities for Faculty Research Using Secondary Data. Frontiers in Dentistry Lecture. University of the Pacific School of Dentistry.

Feb 2005    Advanced Education in Dental Public Health. University of Missouri, Kansas City, School of Dentistry.

Confidential                                                                       PRSN-JDS 00106

*Curriculum Vitae* Jay D. Shulman - Prepared January 31, 2014

## Consultant Activities

2012 –          Expert Witness. *Parsons et al. v. Ryan et al.* 2:12-cv-00601-NVW (D. AZ).

2012 –          Expert Witness. *Daryl Farmer v. Gwendolyn Miles, et al.* 10-cv-05055 (N.D. IL), Eastern Division. Deposed February 1, 2013.

2012 –          Expert Witness. *John Smentek et al. v. Thomas Dart, Sheriff of Cook County et al.* 1:09-cv-00529 (N.D. IL).

2012 –          Consultant. Quentin Hall et al. v. Margaret Mimms, Sheriff of Fresno County et al. 1:11-cv-02047-LJO-BAM (E.D. CA)

2009 - 11       Expert Witness. Inmates of the *Northumberland County Prison, et al. v. Ralph Reish, et al.* 08-CV-345 (M.D. PA).

2007 - 09       Expert Witness. *Flynn v. Doyle* 06-C-537-RTR (E.D.WI.) Deposed June 5, 2008.

2006 - 12       Rule 706 Expert (monitor) and Court Representative, *Perez v. Tilton* (*Perez v. Cate*) federal class action lawsuit settlement. C05-5241 JSW (N.D. CA).

                Responsible to *Perez* Court for coordinating remedies between dental (*Perez v. Tilton / Cate*), medical (*Plata v. Schwarzenegger*), and mental health (*Coleman v. Schwarzenegger*). Monitored compliance with *Perez* stipulated injunction. Monitoring completed June 2012.

2005 - 10       Rule 706 Expert (monitor), *Fussell v. Wilkinson* federal class action lawsuit settlement. 1:03-cv-00704-SSB (S.D. OH).

                Performed initial fact finding, provided dental input to stipulated injunction and monitored compliance. Monitoring completed October 2010.

1999 - 03       Editorial Board *Journal of Public Health Dentistry*

1996 - 05       Editorial Board, Mosby's Dental Drug Reference

1993 - 07       *Ad hoc* reviewer: Journal of Public Health Dent (10); Journal of American Dental Association (6); Journal of Dental Education (3); Pediatrics (1); Community Dentistry and Oral Epidemiology(3); Cleft Palate Craniofacial Journal (3); Pediatrics International (3); Journal of Dental Research (2); Caries Research (4); Oral Diseases (2); Journal of Oral Rehabilitation (2); British Dental Journal (3)

## Teaching

Predoctoral

1993 - 2007     Director, Principles of Biostatistics

1993 - 2007     Lecturer, Applied Preventive Dentistry

1993 - 2007     Clinical Supervisor, Preventive Dentistry

Confidential                                                      PRSN-JDS 00107

| 2006 - 2007 | Clinical Supervisor and Care Provider, Dallas County Juvenile Detention Center Dental Clinic |
| --- | --- |
| 1993 - 2005 | Director, Epidemiology & Prevention |
| 1995 - 2003 | Director, Dental Public Health |

Postdoctoral

| 2007 – | Research mentor, Department of Periodontics, Baylor College of Dentistry |
| --- | --- |
| 1994 - 2007 | Director, Dental Public Health Residency |
| 1994 - 2007 | Lecturer, Research Methods |
| 2001 - 2006 | Director, Applied Biostatistics |

## PUBLICATIONS

### Peer-Reviewed (55)

1. Bansal R, Bolin KA, Abdellatif HM, Shulman JD. Knowledge, Attitude and use of fluorides among dentists in Texas. *J Contemp Dent Pract* 2012;13(3):371-375.

2. Shulman JD, Sauter DT. Treatment of odontogenic pain in a correctional setting. *J Correctional Health Care* (2012) 18:1, 58 - 65.

3. Barker TS, Cueva MA, Rivera-Hidalgo F, Beach MM, Rossman JA, Kerns DG, Crump TB, Shulman JD. A comparative study of root coverage using two different acellular dermal matrix products. *J. Periodontology* (2010) 81:11, 1596-1603.

4. Maupomé G, Shulman JD, Medina-Solis CE, Ladeinde O. Is there a relationship between asthma and dental caries? A critical review of the literature. *Journal of the American Dental Association* 2010;141(9):1061-1074.

5. Puttaiah R, Shulman JD, Youngblood D, Bedi R, Tse E, Shetty S, Almas K, Du M. Sample infection control needs assessment survey data from eight countries. *Indian Dental Journal* 2009; 59, 271-276.

6. Fransen JN, He J, Glickman GN, Rios A, Shulman JD, Honeyman A. Comparative Assessment of ActiV GP/Glass Ionomer Sealer, Resilon/Epiphany, and Gutta-Percha/AH Plus Obturation: A Bacterial Leakage Study. *Journal of Endodontics* 2008; 34(6), 725-27.

7. Beach MM, Shulman JD, Johns G, Paas J. Assessing the viability of the independent practice of dental hygiene. *J Public Health Dent.2007*;67(4):250-4.

8. Blackwelder A, Shulman JD. Texas dentists' attitudes towards the dental Medicaid program. *Pediatr Dent* 2007;29:40-4.

9. Massey CC, Shulman JD. Acute ethanol toxicity from ingesting mouthwash in children younger than 6 years of age, 1989-2003. *Pediatr Dent*. 2006; 28:405-409.

Confidential

PRSN-JDS 00108

10. Shulman JD, Carpenter WM. Prevalence and risk factors associated with geographic tongue among US adults. *Oral Dis.* 2006;12:381-386.

11. Clark DC, Shulman JD, Maupomé G, Levy SM. Changes in dental fluorosis following cessation of water fluoridation. *Community Dent Oral Epidemiol.* 2006;34: 197-204.

12. Shulman JD, Sutherland JN. Reports to the National Practitioner Data Bank involving dentists, 1990-2004. *J Am Dent Assoc* 2006;137:523-528.

13. Holyfield LJ, Bolin KA, Rankin KV, Shulman JD, Jones DL, Eden BD. Use of computer technology to modify objective structured clinical examinations. *J Dent Educ* 2005;10:1133-1136.

14. Benson BW, Shulman JD. Inclusion of tobacco exposure as a predictive factor for decreased bone mineral content. *Nicotine Tob Res* 2005;719-724.

15. Shulman JD, Rivera-Hidalgo F, Beach MM. Risk factors associated with denture stomatitis in the United States. *J Oral Path Med* 2005;340-346.

16. Shulman JD. Is there an association between low birth weight and caries in the primary dentition? *Caries Res* 2005;39:161-167.

17. Shulman JD. The prevalence of oral mucosal lesions in U.S. children and youth. *Int J Pediatr Dent.*2005;15:89-97.

18. Bolin KA, Shulman JD. Nationwide dentist survey of salaries, retention issues, and work environment perceptions in community health centers. *J Am Dent Assoc* 2005;136 (2): 214-220.

19. Shulman JD. Recurrent herpes labialis in US children and youth. *Community Dent Oral Epidemiol* 2004; 32: 402-9.

20. Shulman JD. An exploration of point, annual, and lifetime prevalence in characterizing recurrent aphthous stomatitis in USA children and youth. *J Oral Path Med.* 2004;33: 558.66.

21. Shulman JD, Beach MM, Rivera-Hidalgo F. The prevalence of oral mucosal lesions in U.S. Adults: Data from the Third National Health and Nutrition Examination Survey. *J Am Dent Assoc* 2004;135:1279-86.

22. Bolin KA, Shulman JD. Nationwide survey of dentist recruitment and salaries in community health centers. *J. Health Care for the Poor and Underserved* 2004; 15:161-9.

23. Shulman JD, Maupomé G, Clark DC, Levy SM. Perceptions of tooth color and dental fluorosis among parents, dentists, and children. *J Am Dent Assoc* 2004;135(5):595-604.

24. Rivera-Hidalgo F, Shulman JD, Beach MM. The association of tobacco and other factors with recurrent aphthous stomatitis. *Oral Dis.* 2004;10:335-345.

Confidential

PRSN-JDS 00109

25. Shulman JD, Peterson J. The association between occlusal characteristics and incisal trauma in individuals 8 - 50 years of age. *Dental Traumatology* 2004; 20: 67-74.

26. Buschang PH, Shulman JD. Crowding in treated and untreated subjects 17-50 years of age. *The Angle Orthodontist* 2003; 73(5):502-8.

27. Maupomé G, Shulman JD, Clark DC, Levy SM. Socio-demographic features and fluoride technologies contributing to higher TFI scores in permanent teeth of Canadian children. *Caries Res* 2003; 37(5):327-34.

28. Shulman JD, Nunn ME, Taylor SE, Rivera-Hidalgo F. The prevalence of periodontal-related changes in adolescents with asthma: Results of the Third Annual National Health and Nutrition Examination Survey. *Pediatr Dent* 2003; 25(3):279-84.

29. Makrides NS, Shulman JD. Dental health care of prison populations. *J Corr Health Care* 2002; 9(3):291-306.

30. Shulman JD, Ezemobi EE, Sutherland JN. Louisiana dentists' attitudes toward the Dental Medicaid program. *Pediatr Dent* 2001; 23(5):395-400.

31. Shulman JD, Taylor SE, Nunn ME. The association between asthma and dental caries in children and adolescents: A population-based case-control study. *Caries Res* 2001; 35:4:240-246.

32. Maupomé G, Shulman JD, Clark DC, Levy SM, Berkowitz J. Tooth-surface progression and reversal changes in fluoridated and no-longer-fluoridated communities over a 3-year period. *Caries Res* 2001; 35:2:95-105.

33. Trautmann G, Gutmann JL, Nunn ME, Witherspoon DE, Shulman JD. Restoring teeth that are endodontically treated through existing crowns. Part I: Survey of pulpal status on access. *Quintessence Int* 2000; 31(10):713-18.

34. Trautmann G, Gutmann JL, Nunn ME, Witherspoon DE, Shulman JD. Restoring teeth that are endodontically treated through existing crowns. Part II: Survey of restorative materials commonly used. *Quintessence Int* 2000; 31(10):719-28.

35. Lalumandier JA, McPhee SD, Riddle S, Shulman JD, Daigle WW. Carpal tunnel syndrome: Effect on Army dental personnel. *Milit Med* 165:372-78,May 2000.

36. McFadyen JA, Shulman JD**.** Orofacial injuries in youth soccer. *Pediatr Dent* 1999; 21:192-96.

37. Cederberg RA, Fredricksen NL, Benson BW, Shulman JD. Influence of the digital image display monitor quality on observer performance. *Dentomaxillofacial Radiology* 1999; 28:203-7.

38. Shulman JD, Niessen LC, Kress GC, DeSpain B, Duffy R. Dental public health for the 21st century: Implications for specialty education and practice. *J Public Health Dent* 1998; 58 (Suppl 1):75-83.

39. Cederberg RA, Fredricksen NL, Benson BW, Shulman JD. Effect of different lighting conditions on diagnostic performance of digital film images. *Dentomaxillofacial Radiology* 1998; 27:293-97.

40. Shulman JD, Lewis DL, Carpenter WM. The prevalence of chapped lips during an Army hot weather exercise. *Milit Med* 1997; 162:817-19.

41. Shulman JD, Wells LM. Acute toxicity due to ethanol ingestion from mouthrinses in children less than six years of age. *Pediatr Dent* 1997; 19(6):404-8.

42. Kress G, Shulman JD. Consumer satisfaction with dental care: where have we been, where are we going? *J Am Coll Dent* 1997; 64 (1):9-15**.**

43. Shulman JD, Wells LM. Acute toxicity in children under the age of six from ingesting home fluoride products: an update. *J Public Health Dent* 1995; 57(3):150-8.

44. McFadyen JA, Seidler KL, Shulman JD, Wells, LM. Provision of free and discounted dental services to selected populations: A survey of attitudes and practices of dentists attending the 1996 Dallas Midwinter Meeting. *Texas Dent J* 1996; 113 (12):10-18.

45. Shulman JD**.** Potential effects of patient opportunity cost on dental school patients. *J Dent Educ* 1996; 60 (8):693-700.

46. Shulman JD, Lalumandier JA, Grabenstein JD. The average daily dose of fluoride: a model based on fluid consumption. *Pediatr Dent* 1995; 17 (1):13-18.

47. Solomon ES, Hasegawa TK, Shulman JD, Walker PO. An application: the cost of clinic care by dental students and its relationship to clinic fees. *J Dent Educ* 1994; 58 (11-12):832-5.

48. Shulman JD, Williams TR, Lalumandier JA. Treatment needs and treatment time for soldiers in Dental Fitness Class 2. *Milit Med* 159, 2:135-138, 1994.

49. Shulman JD, Williams TR, Tupa JE, Lalumandier JA, Richter NW, Olexa BJ. A comparison of dental fitness classification using different class 3 criteria. *Milit Med* 1994; 159 (1):5-10.

50. Amstutz RD, Shulman JD. Perceived needs for dental continuing education within the Army Dental Care System. *Milit Med* 1994; 159 (1):1-4.

51. Shulman JD, Carpenter WM, Lewis DL. The prevalence of recurrent herpes labialis during an Army hot weather exercise. *J Public Health Dent* 1992; 52 (4):198-203.

52. Brusch WA, Shulman JD, Chandler HT. Survey of Army dental practice. *J Am Coll Dent* 1987; 54 (1):54-63.

53. Lewis DM, Shulman JD, Carpenter WM. The prevalence of acute lip damage during a US Army cold weather exercise. *Milit Med* 1985; 150 (2):87-90.

54. Freund DA, Shulman JD. Regulation of the professions, results from dentistry. In Scheffler, Richard (ed.). *Advances in Health Economics and Health Services Research IV* 1984; 5(1):161-180.

55. Baumgartner JC, Brown CM, Mader CL, Peters DD, Shulman JD. Scanning electron microscopic evaluation of root canal irrigation with saline, sodium hypochlorite, and citric acid. *J Endodon.* 1984; 10 (11):525-531.

## Book Chapters Monographs, and Non-Peer Reviewed Articles

1. Shulman JD. Structural Reform Litigation in Prison Dental Care: The *Perez* Case. *Correctional Law Reporter* 25(2) August-September 2013.

2. Shulman JD, Gonzales CK. Epidemiology of Oral Cancer. In Cappelli DP, Mosley C, eds. <u>Prevention in Clinical Oral Health Care</u>. Elsevier (2008), 27-43.

3. Cappelli DP, Shulman JD. Epidemiology of Periodontal Diseases. In Cappelli DP, Mosley C, eds. <u>Prevention in Clinical Oral Health Care</u>. Elsevier (2008), 14-26.

4. Shulman JD, Cappelli DP. Epidemiology of Dental Caries. In Cappelli DP, Mosley C, eds. <u>Prevention in Clinical Oral Health Care</u> . Elsevier (2008), 2-13.

5. Shulman JD, Heng C. Meth Mouth: What We Know and What We Don't Know. *Fortune News* 2006;52(1):12-13.

## Abstracts Presented (25 since 2003)

1. Yanus M, Rivera-Hidalgo F, Solomon E, Roshan S, Shulman J, Rees TD, Hummel S, Boluri A. Relationship of Candida to Oral Factors in Complete Denture Wearers. *J Dent Res 89* (Special Issue):#4445, 2010.

2. Abraham C, Rivera-Hidalgo F, Kessler H, Rees T, SL Cheng, Y, Shulman J, Solomon E. Inter-Examiner Evaluation of Fluorescence in Oral Lesions. *J Dent Res 89* (Special Issue): #4404, 2010.

3. He J, Solomon E, Shulman J, Rivera-Hidalgo F. Treatment Outcome of Endodontic Therapy with or without Patency Filing. *J Dent Res 89* (Special Issue):#1277, 2010.

4. Harrel SK, Rivera-Hidalgo F, Hamilton K, Shulman JD. Comparison of Ultrasonic Scaling Wear and Roughness Produced In Vitro. *J Dent Res* 87 (Special Issue): # 1018, 2008.

5. Harrel SK, Rivera-Hidalgo F,᾽ Shulman JD. Comparison of Surgical Instrumentation Systems for Minimally Invasive Periodontal Surgery. *J Dent Res* 87 (Special Issue): # 1020, 2008.

6. Shulman JD, Bolin KA. Characterizing Disparities in Root Surface Caries in the US. *J Dent Res* 85 (Special Issue): # 476, 2006.

7. Shulman JD, Bolin KA. Is Root Surface Caries Associated with Xerogenic Medications? *J Dent Res* 85 (Special Issue): # 477, 2006.

8. Shulman JD, Carpenter WM. Risk Factors Associated with Geographic Tongue Among US Children. *J Dent Res* 85 (Special Issue): # 1205, 2006.

9. Shulman JD, Bolin KA, Eden BD. Socio-demographic Factors Associated with Root Surface Caries Prevalence. *J Dent Res* 84 (Special Issue): # 3279, 2005.

*Curriculum Vitae* Jay D. Shulman - Prepared January 31, 2014

10. Shulman JD, Carpenter WM, Rivera-Hidalgo F. Prevalence of Hairy Tongue among US Adults. *J Dent Res* 84 (Special Issue): # 1396, 2005.

11. Eden BD, Shulman JD. Root Caries in the US by Tooth Type and Surface. *J Dent Res* 84 (Special Issue): # 2622, 2005.

12. Mobley CC, Shulman JD. Birth Weight and Caries in the Permanent Dentition of Children. *J Dent Res* 84 (Special Issue): # 86, 2005.

13. Puttaiah R, Shulman JD, Bedi R, Youngblood D, Tse E. Infection Control Profile Scores of Practitioners from Eight Countries. *J Dent Res* 84 (Special Issue): # 1026, 2005.

14. Puttaiah R, Youngblood D, Shulman JD, Bedi R, Tse E. Infection Control Practice Comparisons between Practitioners from Eight Countries. *J Dent Res* 84 (Special Issue): # 3207, 2005.

15. Foyle DM, Rivera-Hidalgo F, Shulman JD, Williams F, Hallmon W, Taylor S. Effect of Selected Therapies on Healing in Rat Calvarial Defects. *J Dent Res* 84 (Special Issue): # 1172, 2005.

16. Puttaiah R, Lin SM, Svoboda KKH, Cederberg R, Shulman JD. Quantitative Comparison of Scanning Electron and Laser Confocal Microscopy Techniques. *J Dent Res* 84 (Special Issue): # 3425, 2005.

17. Holyfield LJ, Bolin KA, Rankin KV, Shulman JD, Jones DL, Eden BD. Use of computer technology to modify objective structured clinical examinations. *J Dent Educ* 69 (1):147 # 113, 2005.

18. Benson BW, Shulman JD. Effect of antepartum natural background radiation on infant low birth weight: a pilot study. American Academy of Oral & Maxillofacial Radiology; Denver, CO. 11/6/04.

19. Shulman JD, Beach MM, Rivera-Hidalgo F. Risk factors associated with denture stomatitis in U.S. adults. *J Dent Res* 83 (Special Issue): # 422, 2004.

20. Puttaiah R, Shulman JD, Bedi R. A multi-country survey data on dental infection control KAP. *J Dent Res*; 82 (Spec Issue):# 3394, 2003.

21. Eden BD, Shulman JD. Perceived need for denture care and professional assessment of dentures. *J of Dent Res* 83 (Special Issue): # 1604.

22. Benson BW, Shulman JD. Inclusion of tobacco exposure as a predictive factor for decreased bone mineral content. *Oral Surg, Oral Med, Oral Pathol, Oral Radiol & Endo* 97(2): 266-267.

23. Eden BD, Shulman JD. Factors influencing self-perceived need for periodontal therapy: Data from the Third National Health and Nutrition Survey (NHANES III). *J Dent Res* 2003; 82(Spec Issue):#0481.

24. Shulman JD, Beach MM, Rivera-Hidalgo F. The Prevalence of oral mucosal lesions among US adults: Results from the Third National Health and Nutrition Survey. *J Dent Res* 82 (Special Issue A): # 1472, 2003.

Confidential

PRSN-JDS 00113

25. Rivera-Hidalgo F, Shulman JD, Beach MM. Recurrence of aphthous ulcerations in adult tobacco smokers. *JDent Res* 82 (Special Issue A): # 0759, 2003.

Confidential                                                            PRSN-JDS 00114

# EXHIBIT B

Confidential

**E**XHIBIT **B**
**M**ATERIALS **R**EVIEWED

**All Materials Identified in Exhibit C to Expert Report dated Nov. 8, 2013**

**Named Plaintiffs' Records**

Dustin Brislan (164993) ADC197411-416
Maryann Chisholm (200825) ADC197417-424
Robert Gamez (131401) ADC197425-434
Joseph Hefner (203653) ADC197435-446
Desiree Licci (150051) ADC197448-455
Victor Parsons (123589) ADC197456-462
Sonia Rodriguez (103830) ADC197463-470
Stephen Swartz (102486) ADC197471-491
Jackie Thomas (211267) ADC197492-500
Christina Verduzco (205576) ADC197501-513
Charlotte Wells (247188) ADC197514-526

**External Documents**

Arizona Revised Statutes § 32-1281(I).  September 2013.

Levy, PS and Lemeshow, S.  Sampling for Health Professionals Lifetime Learning Publications:
Belmont, California, 1980.  ("Levy and Lemeshow")

Shulman JD, Sauter DT.  Treatment of odontogenic pain in a correctional setting.  J
Correctional Health Care (2012) 18:1, 65.  ("Shulman and Sauter")

Shork MA and Remington RD.  Statistics with Applications to the Biological and Health
Sciences, 3rd ed. Prentice Hall; Upper Saddle River, New Jersey, 2000.  ("Shork and
Remington")

Shulman JD, Cappelli DP.  Epidemiology of Dental Caries.  In Cappelli DP, Mosley C, eds.
Prevention in Clinical Oral Health Care. Elsevier (2008), 2-13.  ("Shulman and Cappelli")

Swager, LWM and Morgan, SK.  Psychotropic-induced dry mouth: Don't overlook this
potentially serious side effect.  Current Psychiatry (2011) 10:12, 54-58.  ("Swager and
Morgan")

Dental Radiographic Examinations: Recommendations for Patient Selection and Limited
Radiation Exposure.  American Dental Association Council on Scientific Affairs; U.S.

LEGAL29211279.1

Last edited January 31, 2014

Confidential

PRSN-JDS 00116

Department of Health and Human Services, Public Health Service, Food and Drug Administration.  Revised 2012.  ("Radiation Exposure")

Carlos Perez, et al. v. James Tilton, et al., Amended Stipulation and Order.  Case 3:05-cv-05241-JSW, Doc. 69 Filed 8/21/2006.  ("Perez Agreement")

Scalzo, JD and Shulman, JD.  Methodological Issues Associated with Auditing Dental Clinics.  Report of the Court Experts in the Matter of Carlos Perez, et al., Plaintiffs, v. James Tilton, et al. Defendants. United States District Court, Northern District of California, September 2006.  ("Methodological Issues")

Clare, JH.  Survey, comparison, and analysis of caries, periodontal pocket depth, and urgent treatment needs in a sample of adult felon admissions, 1996.  J Correctional Health Care (1998) 5:1, 89-102.  ("Clare")

Eke, PI, Dye, BA, Wei, L.  Prevalence of Periodontitis in Adults in the United States: 2009 and 2010.  Journal of Dental Research 91(10):914-920, 2012.  ("Eke et al.")

Solensky R.  Hypersensitivity Reactions to Bata-Lactam Antibiotics. Clinical Reviews in Allergy & Immunology (2003); 24:3, 201-219.  ("Solensky")

Gage, TW and Pickett, FA.  Dental Drug Reference, 7th ed. Elsevier Mosby: St. Louis, Missouri, 2005.  ("Gage and Pickett")

## Production Documents

Expert Report of John W. Dovgan DDS regarding Dental Care

Defendants' Eleventh Supplemental (Expert) Disclosure Statement

ADC010554-647
ADC010648-1231
ADC016148-186
ADC018165-166
ADC031959-2044
ADC027717-809
ADC027932-8254
ADC034680-37376
ADC040550-691
ADC048458-639
ADC048845-49865
ADC050809-859

-2-

LEGAL29211279.1

Confidential

PRSN-JDS 00117

ADC052219-3285
ADC054744-933
ADC055095
ADC055389-410
ADC055462-573
ADC057841-8047
ADC067141-70948
ADC082046-270
ADC082846-3025
ADC083096-105
ADC084373-453
ADC086641-645
ADC088624-683
ADC088725-9112
ADC145881-888
ADC153794-804
ADC153809-831
ADC153896-997
ADC153901
ADC155087-093
ADC155064-100
ADC166216-232
ADC19529-739
ADC170080-109
ADC170272-297
ADC200519-520
ADC203041
ADC_D000001-3381

Last edited January 31, 2014

LEGAL29211279.1

Confidential

PRSN-JDS 00118

# EXHIBIT 13

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No.   CV   12-00601-PHX-NVW (MEA) |

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

**CONFIDENTIAL
SUPPLEMENTAL EXPERT REPORT OF:**

**JAY D. SHULMAN, DMD, MA, MSPH
9647 HILLDALE DRIVE
DALLAS, TEXAS 75231
TELEPHONE: (214) 923-8359**

**REGARDING
DENTAL CARE AT THE ARIZONA DEPARTMENT OF CORRECTIONS**

**FEBRUARY 24, 2014**

JAY D. SHULMAN, DMD, MA, MSPH

78204-0001/LEGAL29580361.4

# TABLE OF CONTENTS

**Page**

I.      Background ........................................................................................................... 1

II.     ADC's Failure to Monitor the Dental Program ................................................. 1

III.    Dr. Dovgan's Sample Confirms my Findings Regarding Systemic Problems
        within ADC ......................................................................................................... 2

        A.      Methodology ........................................................................................... 2

        B.      Wait Time Computations ....................................................................... 2

        C.      Examples of Systemic Problems ............................................................ 3

        D.      Dental Assistant Assessment (Triage) ................................................... 5

IV.     Conclusion ......................................................................................................... 5

Confidential                                                    PRSN-JDS 00120

## I.   BACKGROUND

I was provided dental records and other material Dr. Dovgan used in preparing his report shortly before the deadline for my reply report and was unable to analyze them at the time.  The records included both records I had not seen before and updated recorded that I reviewed on site during prison tours.  I have now had the opportunity to analyze these records.  For the reasons set forth below, my opinions have not changed—except to become stronger.

## II.   ADC'S FAILURE TO MONITOR THE DENTAL PROGRAM

The October 2013 MGARs continue to raise substantial concerns that evidence systemic deficiencies in ADC's ability or willingness to manage its contractor, even if compliance might be better than it was at its worst.[1]

Before October, ADC had not reviewed the Oral Care measures for nine months.  This itself is inadequate care because a well-functioning dental system needs consistent, comprehensive, and reliable monitoring to be successful.  Further, without consistent monitoring, the quality of dental care is likely to decline and any positive inertia that might have been gained can be lost easily.  That ADC might monitor dental care periodically does little to alleviate the risks I identified in my previous reports.

In addition, the monitoring procedures continue to suffer from deficiencies I identified in my earlier reports.  The measures are skewed toward non-clinical clerical reviews rather than analysis of the underlying care.  For example, the reports ask whether patients with "911" issues are seen within 24 hours, not whether patients are correctly assessed as having urgent or emergency issues.[2]  Similarly, the reports ask whether x-rays are taken, not whether they are correctly assessed by a dentist.  What is more, the October MGARs do not indicate that ADC has eliminated the substantial risks of serious injury I previously identified.  ADC's inadequate monitoring, therefore, continues to be a serious problem with ADC dental care.

---

[1]  In my opening report I stated that the there was no follow-up evaluation of the Oral Care measures.  The October MGARs were first produced on January 27, 2014.  I understand that conditions after September 27, 2013 may or may not be considered at trial, but to the extent those conditions are considered, I offer these opinions with regard to the October monitoring report only, not having seen any additional related information.

[2]  Although the MGAR uses the term "emergency exam" to mean what ADC Dental Procedure 770.2 refers to as Priority 2 (or Urgent) Care, this performance measure does not align with the contractual requirement that urgent requests be seen within 72 hours.  The October Corrective Action Plan for Safford addresses this, "Reinforce with dental staff of the added specialty in CDS of urgent care and use only emergency specialty for true emergencies." [ADC210535]  However, if this measure is restricted to Priority 1 ("emergencies" per ADC Dental Procedure 770.1) there will be no measure for Urgent Care (that is, that prisoners be seen within 72 hours)—a highly problematic deficiency.

1

LEGAL29580361.5

### III.   DR. DOVGAN'S SAMPLE CONFIRMS MY FINDINGS REGARDING SYSTEMIC PROBLEMS WITHIN ADC

#### A.   Methodology

Dr. Dovgan reviewed 149 records, 59 of which I also reviewed for my opening report.[3] Of the remaining 90 records he reviewed, 20 (22.2%) did not have an HNR and a corresponding progress note (most had never sought dental care or had submitted an HNR which had not resulted in an appointment).  As a result, they are only marginally useful for the purposes of analyzing ADC dental care and useless for analyzing wait times.  Omitting these records leaves only 70 unique records—an effective sample size of 128.  This illustrates a flaw in Dr. Dovgan's methodology that I raised in my supplemental report—his sampling method yielded numerous records that provided no useful information of about dental care provided by ADC, Wexford, and Corizon/Smallwood.

In addition to the records that did have information regarding dental care, I note that Dr. Dovgan's sample set has a much higher median inmate number than the set we reviewed in common (208831 v. 183917).  Assuming inmate numbers are assigned in sequence, this indicates that the inmates in his set entered the system more recently.   This would be a logical consequence of methodology that obtains records primarily from current wait lists, as opposed to lists of patients that have already received treatment.   This confirms the bias I noted in my original report toward care provided by Smallwood/Corizon and away from care provided by ADC or Wexford.

#### B.   Wait Time Computations

I reviewed the 149 dental records that Dr. Dovgan reviewed, and computed (as I did in my opening report) the median wait times to see a provider for patients submitting HNRs stating pain and for those requesting routine care.[4]

With regard to the records I had not seen before, the median wait times are slightly longer than, but consistent with, my original sample.  The same is true of the subset of records that I had previously reviewed, as well as Dr. Dovgan's entire set of records.  When I combine all of the new records with my original sample, the overall wait times remain consistent, with a slight increase for routine care.[5]

---

[3]  As I noted in my reply report, Dr. Dovgan's list actually included 155 inmates, but there were 6 duplicates.  [Shulman Reply at 4]  Of the 59 records that we both reviewed, one had HNRs, but no treatment notes, and so was excluded from wait time calculations.

[4]  My methodology for calculating wait times is found in my Expert Report at 9-10.

[5]  For the 59 records I had seen while touring facilities, I was now able to examine the records at greater length, and was thus able to better decipher handwriting, find missing HNRs, and otherwise correct some of the notes I took originally by hand.  In addition, I added new HNRs and treatment visits since my visit to my data.  These adjustments did not change any of my overall averages.

2

Confidential

In other words, despite his emphasis on lower wait times recently reported by Smallwood, Dr. Dovgan's records do not rebut my opinions at all. The wait times were as follows:

|  | Dataset in Original Report | Dr. Dovgan's New Records | All Dr. Dovgan's Records | Combined Dataset |
|---|---|---|---|---|
| **Records Containing Data** | 293 | 70 | 129 | 366 |
| **HNRs Stating Pain** | 6 [at 22] | 7 | 7 | 6 |
| **Routine Care** | 78 [at 24] | 87 | 81 | 83 |

For HNRs stating pain, I originally reported that 25 percent waited 12 or more days [the 75th percentile] and 10 percent waited 23 days or more [the 90th percentile] to be seen. [Shulman Report at 22] In the combined dataset, the wait time for the 75th percentile remained unchanged while the 90th percentile increased slightly to 25 days.

For routine care, I originally reported the median wait time for a routine care appointment was 78 days; 42 percent of the wait times were over 90 days, 30 percent were over 116 days, and 10 percent were over 210 days. [*Id.* at 24] Median wait time based on the combined dataset is 83 days, with 45 percent of the wait times over 90 days, 30 percent were over 117 days, and 10 percent were over 196 days.

In addition to finding that the median wait times did not change, the reasons for the elevated wait times remain consistent with what I have previously identified. The principal reason median wait times for HNRs stating pain are significantly higher than the 72 hour urgent care window is their assignment to the Routine Care List rather than to Urgent Care (that is, a "911 exam" or pain evaluation).

Similarly, median wait times for routine care in the new records are elevated for the same reasons I previously observed and described, including staff shortages and the practice of cancelling routine HNRs when a patient is seen for another issue.

## C.      Examples of Systemic Problems

The charts relied upon by Dr. Dovgan record care through October or November 2013, and provide additional insight into care provided by Smallwood. They show that the practices I described in my opening report persist, notwithstanding the reported reductions in wait times.

There are numerous examples of records that illustrate the systemic problems that he did not recognize or turned a blind eye to. Examples include:

LEGAL29580361.5

Confidential

PRSN-JDS 00123

*Assigning Prisoners With Missing or Fractured Fillings to Routine Care*

- **Redacted**      submitted an HNR stating that a filling fell out and he was in pain and was placed on the routine care list.  He submitted a follow-up HNR a month later.  He was offered a filling appointment six months later.
- **Redacted**       lost a filling and was in pain and was advised in September 2013 that fillings are routine care and for an emergency, there is extraction.
- **Redacted**      had a filling fall out and complained that it was "sensitive" in October 2013.  Two weeks later, he complained of pain when consuming hot or cold liquid, but remained on the routine care list.  It is apparent by his description that his symptoms are escalating from a minor (and reversible) pulpitis to sensitivity to cold and hot suggestive of a more severe pulpitis which may or may not be reversible.  In my opinion, the treatment window for this tooth is closing.  Once the pulpitis becomes irreversible, the tooth will have to be extracted.[6]
- **Redacted**       had a temporary restoration placed in June 2010 to replace a large fractured restoration that was causing substantial pain.  The clinical note states that he was placed on the routine care list.  After more than a year without an appointment, the temporary restoration fell out, leaving him in pain again.  After several days, he refused a pain evaluation appointment because he wanted a filling, but while he was waiting for the filling, he was seen for a pain evaluation on an unrelated issue.  This visit removed him from the routine care list.

*Forcing patients to choose between pain and an extraction (the ADC Prisoners' Dilemma)*

- **Redacted**       submitted an HNR in May 2013, was scheduled for a '911' appointment, and refused the (recommended) extraction.  The note states that he will be removed from the routine care list due to this appointment and that he was instructed to file a new HNR to get back on routine list.
- **Redacted**        submitted an HNR in August 2013 indicating a missing filling and pain, and was told he must wait for routine care, or "submit another HNR if you are asking for extraction."  Two months later, he asked for the tooth to be extracted.  He was seen after 8 days, tooth #18 was found to have recurrent decay and "pulpitis" and it was extracted.
- **Redacted**       submitted an HNR for a painful broken tooth 7/19/12 and was placed on the waiting list.  He submitted an HNR for a tooth that was painful to hot and cold and was appointed for a pain evaluation which he refused.  The dental assistant's note states, "[I]nmate refused appointment for "extreme pain."  Keep on Routine List."

As I explain in my original report, the practices of not expediting appointments for lost or fractured restorations, rarely placing temporary restorations at pain evaluations, and removing patients from the Routine Care List when they are seen on a pain evaluations result in preventable pain, tooth morbidity and mortality.  Dr. Dovgan stated (without adducing data) that

---

[6]  The last treatment note is from July 24, 2013.

4

Confidential

inmates frequently refuse care; however, he does not mention any of these practices, particularly the latter, as a possible explanation for refusals.  [*See* Dovgan Report at 16]

### D.   Dental Assistant Assessment (Triage)

In my reply report I noted widespread noncompliance with ADC Procedure 787 § 5.3, which requires that records and x-rays of those inmates who received a dental assistant evaluation be reviewed and acknowledged by a dentist within 24 hours.  In fact, I found a noncompliance rate of 86%.  Dr. Dovgan's records were no different and reinforce my opinion.  I found four occurrences of Dental Assistant Assessment in the additional records he reviewed.  All the clinical notes were noncompliant; two (50%) had no signature, one of the other two had no date, and the other was dated five days after the note.  The combined dataset contains 19 occurrences and demonstrates an 89% noncompliance rate.  This is but one illustration of ADC's indifference to monitoring the dental program.

As I noted in my previous reports, ADC Procedure 787 § 5.3 is both substantively flawed and almost universally not complied with.  [*E.g.,* Shulman Reply at 12, 26-28]  The records of **Redacted**, in Dr. Dovgan's set, typify the issue.  Mr. **Redacted** submitted an HNR for a toothache and was seen on a pain evaluation,  not by a dentist—but by a dental assistant, who took an x-ray sua sponte, interpreted it, performed an oral examination, and provided antibiotics after telephonic consultation with a dentist.  He was not examined by a dentist until three weeks later, when the infected tooth was extracted.  Not only was the dental assistant triage performed poorly and outside guidelines, follow-up was not scheduled—but the visit did stop the clock for purposes of officially reporting Mr. Brown's wait time.

## IV.   CONCLUSION

Dr. Dovgan overlooks the forest for the trees.  His analysis of the HNRs and clinical notes is superficial.  His focus on analyzing compliance with ADC's treatment guidelines is important, but by no means the most important issue in this case.  Even though he opined in his report that all treatment was within the appropriate standards of care, he ignores numerous examples of patients suffering from the policies under which dental care is delivered at the ADC.  Reviewing the additional records provided to Dr. Dovgan, even weighted as they are toward patients newer to ADC without longstanding issues or complaints of pain, does not change any of the opinions I have expressed in my prior reports.

LEGAL29580361.5

Confidential                                                                                           PRSN-JDS 00125