# EXHIBIT 14

1    Daniel Pochoda (Bar No. 021979)
     Kelly J. Flood (Bar No. 019772)
2    James Duff Lyall (Bar No. 330045)*
     **ACLU FOUNDATION OF ARIZONA**
3    3707 North 7th Street, Suite 235
     Phoenix, Arizona 85013
4    Telephone: (602) 650-1854
     Email: dpochoda@acluaz.org
5            kflood@acluaz.org
             jlyall@acluaz.org
6    *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

7    *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin*
     *Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
8    *Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,*
     *Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of*
9    *themselves and all others similarly situated*

     **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**
10

11   Jennifer Alewelt (Bar No. 027366)
     Asim Varma (Bar No. 027927)
     Sarah Kader (Bar No. 027147)
12   **ARIZONA CENTER FOR DISABILITY LAW**
     5025 East Washington Street, Suite 202
13   Phoenix, Arizona 85034
     Telephone: (602) 274-6287
14   Email: jalewelt@azdisabilitylaw.org
             avarma@azdisabilitylaw.org
15           skader@azdisabilitylaw.org

16   *Attorneys for Plaintiff Arizona Center for Disability Law*

     **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**
17

18                    UNITED STATES DISTRICT COURT

19                        DISTRICT OF ARIZONA

20   Victor Parsons; Shawn Jensen; Stephen Swartz;      No. CV 12-00601-PHX-NVW
     Dustin Brislan; Sonia Rodriguez; Christina        (MEA)
     Verduzco; Jackie Thomas; Jeremy Smith; Robert
21   Gamez; Maryanne Chisholm; Desiree Licci; Joseph
     Hefner; Joshua Polson; and Charlotte Wells, on    **EXPERT REPORT OF**
22   behalf of themselves and all others similarly     **ELDON VAIL**
     situated; and Arizona Center for Disability Law,

23                        Plaintiffs,

24              v.

25   Charles Ryan, Director, Arizona Department of
     Corrections; and Richard Pratt, Interim Division
26   Director, Division of Health Services, Arizona
     Department of Corrections, in their official
27   capacities,

28                        Defendants.

---

-1-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

## I.    INTRODUCTION

1.    I am a former corrections administrator with nearly thirty-five years of experience working in and administering adult institutions.

2.    Before becoming a corrections administrator, I held various line and supervisory level positions in a number of prisons and juvenile facilities in Washington, in addition to serving as a Juvenile Parole Officer and pre-release supervisor. I have served as the Superintendent (Warden) of three adult institutions, including facilities with maximum-security inmates.

3.    I served for seven years as the Deputy Secretary for the Washington State Department of Corrections (WDOC), responsible for the operation of prisons and community corrections. I briefly retired, but was asked by the former Governor of Washington, Chris Gregoire, to come out of retirement to serve as the Secretary of the Department of Corrections in the fall of 2007. I served as the Secretary for four years, until I retired in 2011. A complete copy of my resume, detailing my work experience, is attached as **Exhibit 1**.

4.    My experience as a prison and corrections administrator included responsibility for, and a focus on, the mentally ill population and their custody, housing, and treatment. My opinions are based upon my substantial experience running correctional institutions and presiding over a statewide prison system for more than a decade, a system that successfully addressed the challenge created by the rapid influx of the mentally ill into the prison environment. In my thirty-five years of work in corrections, I have spent considerable time working to provide for the proper custody and care of the mentally ill sentenced to prison.

5.    As the Superintendent of McNeil Island Corrections Center, and as a result of legislation, I was charged by the Secretary at the time, Chase Riveland, with designing and opening a new program for mentally ill inmates within the WDOC. I did so in collaboration with leaders from a number of departments from the University of Washington (UW) who informed the design and operation of the two units, one medium

-2-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   security and one maximum security, devoted to this population.[1]   That collaboration

2   continued for nearly twenty years as UW staff came to assist the Department in improving

3   our treatment of mentally ill inmates throughout the system, with a focus on moving them

4   out of high security bed placement whenever possible.  Like other states, Washington saw

5   an influx of the mentally ill into the prison system, the result of the downsizing of mental

6   hospitals that began in the 1980's. Political and agency leadership understood the need to

7   provide treatment for this growing population and that simply housing them in a

8   maximum-security environment was counter-productive. My charge was to lead the

9   conversation about what changes needed to be made and what environment could be

10  created within a prison to provide quality treatment to the mentally ill inmate population.

11  For this program, we created a new job series, "Correctional Mental Health" workers.

12  About two-thirds of the line staff were formerly correctional officers and the other third

13  had little or no correctional experience but did have undergraduate or Master's degrees in

14  psychology or other social services majors. The leadership of the program was also a

15  hybrid of correctional and mental health staff, as well as psychiatrists and psychologists.

16  This allowed the program to blend the two disciplines to make the program safe as well as

17  effective in providing treatment to the mentally ill who were housed there. We provided

18  psycho-educational treatment. Along with treatment from the primary clinicians, inmates

19  were offered classes in areas such as anger management, symptom recognition, and

20  medication management. The living unit itself was used as an environment to practice the

21  skills being learned by the mentally ill inmates away from the pressures they can

22  experience in a general population prison. We expected staff and inmates alike to model

23  pro-social behavior. The design was proven effective.  According to researchers at the

24  UW, "[p]articipants were substantially less symptomatic when they left the program than

25  when they entered . . . . there was a significant improvement in major infractions and use

26

27  _____

   [1] McNeil Island was a 1,700-bed facility with five medium security living units and one

28  Intensive Management Unit (equivalent to the ADC's isolation unit), and a minimum-security
    unit outside the secure perimeter.

-3-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

                                                                                      PRSN-EV 00003

1   of expensive resources following program stays . . . . and, the pattern of work and school

2   assignments is one of improvement."[2]

3       6.      As Assistant Director for Prisons in Washington my responsibilities

4   included oversight of mental health programs for all prisons in the State of Washington.

5   Part of this assignment was to oversee the design of a capital project that more than

6   doubled the size of Washington's largest program for the mentally ill in order to

7   accommodate the growing number of mentally ill inmates arriving in Washington prisons.

8   Taking what I had learned from my experience on McNeil Island, my primary focus was

9   to design a housing continuum for the mentally ill that did not rely on over-classifying

10  individuals as maximum security, and instead moved them through less restrictive levels

11  of prison housing. We developed a design that allowed inmates to move through

12  progressive custody levels from maximum to minimum and to avoid segregation

13  whenever possible.

14      7.      During my tenure as the Deputy Secretary, we created a specialized high

15  security treatment unit for the mentally ill inmates who did end up in segregation separate

16  and apart from a regular segregation unit, where the inmates could be safely housed

17  without significant levels of isolation and also receive robust treatment from mental health

18  professionals.

19      8.      As Deputy Secretary and later as Secretary, I focused on providing proper

20  treatment for the mentally ill in prison on a system-wide basis. The pioneering work of the

21  McNeil program, and Washington's correctional programs for inmates placed in isolation,

22  have been extensively studied and guided by researchers from the UW.[3]

23

24      [2] D. Lovell, D. Allen, C. Johnson and R. Jemelka, *Evaluating the Effectiveness of*
25  *Residential Treatment for Prisoners with Mental Illness*, Criminal Justice and Behavior, Vol. 28
    February 2001, 83-104.
26      [3] For examples see, Lovell, *A Profile of Washington Inmates on Intensive Management*
    *Status*, University of Washington-Department of Corrections Behavioral Health Collaboration,
27  October 2010, (unpublished, attached as Exhibit 3); Lovell, *Patterns of Disturbed Behavior in a*
    *Supermax Population*, Criminal Justice and Behavior, 2008, 985; D. Lovell and R. Jemelka,
28  *Coping With Mental Illness in Prison*, Family and Community Health, 1998.

-4-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                      PRSN-EV 00004

9.     Most recently. I testified as an expert in the Eastern District Court of California in *Coleman v. Brown*, specifically addressing the issues of use of force and disciplinary procedures for mentally ill inmates.

10.     Attached hereto as **Exhibit 1** is a true and correct copy of my resume.  It details my work experience and lists the current cases for which I have been retained as an expert. My billing rate for work on this case is $150 per hour.

**II.     ASSIGNMENT**

11.     I have been retained by Plaintiffs to evaluate and offer my opinion regarding the policy and operational practices of the Arizona Department of Corrections (ADC) regarding the use of isolation units.  I understand that the Court has defined the isolation sub-class in this case as "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units:  Eyman—SMU I; Eyman—Browning Unit; Florence—Central  Unit;  Florence—Kasson  Unit;  or  Perryville—Lumley  Special Management Area."[4]

12.     The particular focus of my review has been on the conditions of confinement for inmates housed in isolation in the units identified in the Court's Order and on whether or not the inmates, especially mentally ill inmates, living in those units suffer serious harm or are subject to a substantial risk of serious harm.[5]

---

[4] *See* Order, March 6, 2013, at 22 (Doc. 372).
[5] The defendants take issue with the use of the word "isolation" to describe the conditions under which many of the mentally ill live in the ADC.  Within the corrections industry several different words are used to describe these living conditions.  In addition to "isolation," some of the most frequently used terms are "segregation," "super-max," and "solitary confinement." I use the word "isolation" throughout this Report. It was the first word I learned to describe these conditions when I started working in corrections in 1974. The Defendants use it as well in their curriculum for *Understanding Mentally Ill Inmates* on page 54: "Also, staff should know that placing this inmate in isolation may actually worsen his psychosis due to isolation, boredom, and lack of stimuli." (ADC049856).

Confidential

PRSN-EV 00005

13.     My work on this matter is ongoing.  This report summarizes my current opinions given the available information I have reviewed to date.  It is my understanding that a number of relevant documents requested by Plaintiffs' counsel have yet to be produced or were produced after the discovery cut-off date, and that some depositions of ADC personnel, including Defendants Ryan and Pratt, have not yet been taken. If additional information is produced, I reserve the right to modify or supplement my analyses and opinions accordingly.

## III.    FOUNDATION FOR EXPERT OPINION

14.     I considered information from a variety of sources in the course of my work. This includes certain information provided by the parties; court filings submitted by the parties; certain deposition testimony; and other information I have obtained from public sources.

15.     I was first contacted regarding this case in August 2012 by Plaintiffs' counsel.  My work did not commence until June of 2013 when Plaintiffs' counsel provided me a number of documents for review, including but not limited to pleadings in this case, ADC policies, the declaration and deposition of Greg Fizer as well as several internal memos, reports, and logs regarding the operation of ADC.  A complete list of the materials I reviewed in this matter is attached hereto as **Exhibit 2,** and may be referred to in footnotes and/or other references within this report.

16.     In addition to the documents reviewed, I also conducted inspections and interviews in the isolation housing units located in three prisons where class members reside. The prisons were:  Arizona State Prison Complex—Perryville on July 29, 2013, Arizona State Prison Complex—Florence on July 30 and 31, 2013, and Arizona State Prison Complex—Eyman on August 1 and 2, 2013. I was particularly interested in the conditions of confinement.  I was able to view the physical design and condition of the living units, including cells, fixtures, shower areas, and recreation areas.  During these tours, I spoke with well over 100 inmates, including 28 whom I interviewed in a

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                 PRSN-EV 00006

1   confidential setting, and the Named Plaintiffs in this action, who were currently housed in

2   the isolation units that I inspected. Staff access was very limited and, when available, they

3   frequently responded to my questions by stating, "read the policy."

4

5   **IV.   OPINIONS**

6       17.   ADC policy for isolating inmates is over-broad and fails to systematically

7   take into account the needs of mentally ill inmates.

8       18.   The conditions of confinement for inmates in isolation in ADC facilities

9   results in extreme social isolation and other hardships that are both unnecessary and

10  counter-productive to good prison security, as well as harmful for all inmates, but

11  especially for the mentally ill.

12      19.   ADC routinely and inappropriately uses chemical agents, such as Oleoresin

13  Capsicum (OC) products, against mentally ill inmates without considering the impact on

14  the inmate and the effective management of the inmate population.

15      20.   My additional opinions are stated in the body of this report.

16

17  **V.   ADC'S   CLASSIFICATION   POLICY   UNNECESSARILY   ASSIGNS**

18       **INMATES TO MAXIMUM CUSTODY**

19      21.   ADC policy on initial classification requires that all inmates serving a life

20  sentence, those that have been validated as a gang member, and those sentenced to death

21  are automatically assigned to maximum custody and are placed in an isolation unit.[6]  In

22  these cases, ADC policy ignores the individual's risk level and requires placement in

23  maximum custody. While care must be taken in assigning custody levels and institutional

24  placement to validated gang members or those with life sentences, in my experience it is

25  not necessary, or even safe, for the individual prisoner to be placed in isolation when they

26

27  ───────────────

28      [6]  ADC Department Order 801, Inmate Classification, 801.03 (describing "[n]on-
discretionary overrides") (ADC013841).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                 PRSN-EV 00007

1  can be successfully housed in lower custody levels.  Many inmates with life sentences

2  function quite well in close or medium custody.[7]  Also, even though some inmates may

3  belong to a gang, many are capable of not acting out while in the institution and can in

4  fact be motivated to set their gang behavior aside while incarcerated if it means placement

5  in a less severe prison environment than isolation.   Many states have found that even

6  inmates sentenced to death are capable of successful adjustment outside of isolation.

7  Although free movement within the institution is rarely allowed, it is not uncommon that

8  death row conditions of confinement are modified to allow routine and regular out of cell

9  contact and some limited programming in small living units.[8]  In order to avoid the known

10  risks of harm associated with time spent in isolation, the risk factors of the individual

11  inmate should control custody placement within ADC rather than unnecessary, mandatory

12  policy overrides.

13       22.    I found during my inspections and conversations with inmates housed in

14  ADC isolation units that many had been automatically placed there simply because they

15  had served time in ADC before and were released to the community from isolation status

16  at the end of their previous incarceration.[9]   This practice increases the risk that the

17  individual  prisoner  will  suffer  unnecessarily  from  the  conditions  of  confinement

18  associated with isolation in the ADC prison system in situations when it is not needed for

19  good prison security. In fact, this practice may well have the opposite effect.  Punishment

20  of an inmate for previous bad behavior that is not related to the current risk the inmate

21

22       [7] I have also had success housing carefully chosen inmates with life sentences in
23  minimum custody, although those minimum units were always inside a double fenced securely
    enclosed prison perimeter. My point here is that all inmates with life sentences are not the same
24  and the individual risk associated with each prisoner needs to be considered in determining
    custody level placement.
25       [8] From my tours I observed many small living units that would be perfect for this kind of
26  program within existing ADC facilities.
         [9] The practice of releasing inmates from isolation directly to the community has been
27  shown to be associated with an increased risk of recidivism. See David Lovell and Clark Johnson,
    *Felony and Violent Recidivism Among Supermax Prisoners in Washington State: A Pilot Study*,
28  2004.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                      PRSN-EV 00008

1   represents may undermine the inmate's perception of the legitimate authority of prison

2   officials, a critical ingredient in running a safe prison.[10]

3      23.   Also, during my tours, I found many individuals housed in isolation for

4   reasons even less serious than those described above.  I talked to several inmates who

5   were in isolation solely for their own protection, having been the victim of assault or

6   threats by other inmates, or simply because they were awaiting transfer to a lower custody

7   facility. This included some inmates who were already eligible for minimum security

8   placement.  Some of the inmates I interviewed had been waiting weeks or months for

9   transfer. While they were waiting for their transfers, they were continuing to be subjected

10  to the risk of harm associated with stays in isolation. Inmates who are victims or inmates

11  ready to transfer to lower custody levels should not be housed in isolation except for very

12  short periods of time, long enough to find them a safe bed in a less restricted living unit.

13  Despite Director Ryan's claim that "ADC does not have a policy that allows detention

14  beds or maximum custody beds to be filled based on a lack of bed space," that is exactly

15  the practice that I witnessed.[11]

16     24.   Based on my inspections of the ADC facilities, review of ADC policies and

17  practices, and review of a number of custody files, it is my opinion that ADC over-uses

18  isolation and that a significant portion of its current isolation population could be housed

19  in a less restrictive environment, including units specifically designed for mentally ill

20  prisoners with behavioral management issues.

21     25.   The result is that the ADC houses about 8% of their population in isolation,

22  a rate much higher than is found in other jurisdictions.[12] The risks of harm associated with

23

24      [10] A.E. Bottoms, *Interpersonal Violence and Social Order in Prisons*, Crime and Justice,
1999.
25      [11] Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set
26  of Interrogatories (Nos. 1-2) to Defendant Charles Ryan, and Defendant Charles Ryan's First
Supplemental Answers Thereto, at Req. for Admis. No. 27 (p. 19, lines 13-15).
27      [12] J. Austin and E. Sparkman, *Colorado Department of Corrections Administrative
Segregation and Classification Review*, National Institute of Corrections (Oct. 2011), at 17. For
28  the ADC isolation figure, *see* Arizona Department of Corrections, "ADC Institutional Capacity

-9-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

placement in isolation are well known and should be avoided or limited whenever it is safely possible to do so. ADC does not adopt this principle in policy or in practice.

## VI.   ADC   ROUTINELY   HOUSES   MENTALLY   ILL   PRISONERS   IN ISOLATION AND IGNORES THE RISK OF HARM.

26.   ADC Director Ryan admits that placement in isolation "is determined by ADC's classification policy and by inmate behavior."[13]   He goes on to say that "monitoring" for this population is enhanced.   He further claims that special treatment areas are available for seriously mentally ill inmates at Florence and Eyman.   No claim is even made regarding Perryville Special Management Area (SMA).[14]   Based on my facility inspections, interviews, and documents reviews, it is my opinion that the conditions of confinement for mentally ill inmates in ADC's isolation units put them at serious risk of harm for no legitimate correctional purpose.

27.   As an experienced corrections administrator, it is my opinion that housing mentally ill inmates in isolation is likely to exacerbate their mental illness and make management of the individual and of the entire institution much more difficult.   For more than two decades, I worked closely with mental health staff and experts from the UW to understand the risks associated with confining mentally ill inmates in isolation.   I have become familiar with the research and the evidence on the subject.   There is broad consensus in the corrections and mental health community that placement of mentally ill inmates in isolation creates a significant risk of harm.

28.   For example, in 2012 the American Psychiatric Association issued the following position statement:

> Prolonged segregation of adult inmates with serious mental

---

Committed Population," dated Oct. 31, 2013.
   [13] Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2) to Defendant Charles Ryan, *and Defendant Charles Ryan's First Supplemental Answers Thereto*, at Req. for Admis. No. 1.
   [14] *Id.*

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                       PRSN-EV 00010

illness, with rare exceptions, should be avoided due    to the potential for harm to such inmates. If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic    activities    (i.e.,    mental    health/psychiatric treatment) in appropriate programming space and adequate unstructured    out-of-cell    time    should    be    permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for these individuals.[15]

29.    Also, Dr. Craig Haney, writing about the harmful mental health effects of solitary confinement has said:

There is not a single published study of solitary or supermax like-confinement....that    failed    to    result    in    negative psychological effects. The damaging effects ranged in severity and included such clinically significant symptoms as hyper-tension,    uncontrollable    anger,    hallucinations, emotional breakdowns, chronic depression, and suicidal thoughts and behavior.[16]

30.    Writing a declaration for the court in another case, Dr. Haney has said:

As I and many other researchers and knowledgeable mental health professionals have observed, segregated housing places prisoners at grave risk of psychological harm. This is especially true when prisoners are confined in especially harsh and deprived conditions for very long periods of time. There is widespread agreement that mentally ill prisoners areparticularly susceptible to this risk of harm. There are many studies of the effects of isolation in general that underscore   the ways that it can undermine psychological well-being, and    even more substantial evidence of its negative psychological effects in prison settings. This evidence comes from a variety of sources, including personal accounts, descriptive studies, and systematic research on solitary and supermax-type units. As    I    have    noted    in previously published reviews, the data that establish these

---

[15] APA Official Actions, Position Statement on Segregation of Prisoners with Mental Illness (2012).
[16] Haney, C., Mental *Health Issues in Long Term Solitary and "Supermax" Confinement,* Crime & Deliquency, 49, 2003.

Confidential                                                    PRSN-EV 00011

1
2
3

harmful effects have been collected in studies conducted over a period of several decades, by researchers from several different continents with diverse backgrounds and a wide range of professional expertise.[17]

4   31.    From my own training and experience in the corrections field, I understand

5   what conditions of isolation can do to a person and the negative consequences that often

6   result. In Arizona, inmates in isolation are confined to a small cell—with or without a cell

7   partner—that is about the size of a small bathroom.[18] Human contact is limited to the few

8   times that staff come to the front of the cell to provide a service, such as a meal or when

9   mental health or medical staff are conducting rounds. Conversations with inmates in other

10  cells is constrained, sometimes most dramatically, depending on the unit design.

11  Recreation time, for most inmates the only time the inmate is let out of their cell, only

12  occurs 3 days a week at best in an indoor or outdoor enclosure not much larger than the

13  cell itself.[19]   There is no clear pathway to tell the inmate what they need to do to earn

14  their way out of isolation. Confined to a cell, with extreme amounts of idle time,

15  sometimes with no TV or radio and a very uncertain and unpredictable future, it is no

16  surprise that inmates begin to act out and find themselves in a spiral of behavior that will

17  keep them in isolation for longer periods of time. This kind of environment puts great

18  stress on the individual inmate that is not being alleviated or managed by the ADC staff.

19  What group treatment, education, or jobs that exist are woefully inadequate to the volume

20  of the need. Hopelessness and anger become the emotional range for the inmate and they

21  become much more difficult to manage.  The result is a prison environment in ADC that

22  puts all inmates at risk of serious harm.   It is my opinion that the incredibly high

23

24

25  [17] Expert Declaration of Craig Haney, *Coleman v. Brown*, Doc. No. 4378, at No. 38 (E.D. Calif. Mar. 14, 2013).

26  [18] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13), Resp. to Interrogatory No. 10 (describing cell size at various facilities, with some as small as 8x6 or 9x5

27  feet).

28  [19] ADC Department Order 704.10, Inmate Exercise Enclosures, at 1.1 (ADC012693); ADC Department Order 804.01, Inmate Detention and Observation, at 1.2.6.5 (ADC107481).

-12-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  incidences of self-harm on the isolation units recorded in ADC's incident reports are a

2  direct product of this environment. Unfortunately, these incidents of self-harm sometimes

3  result in actual suicides. In his deposition, Northern Region Operations Director, Carson

4  McWilliams, acknowledges that 50% of the suicides that occur in the Arizona prison

5  system take place in their protective custody units (which are isolation units).[20] He goes

6  on to say that there is a higher rate of suicide in their isolation units.[21] According to the

7  press releases on the ADC website, there have been nine suicides so far this year.[22] This

8  number of suicides should be a cause for immediate concern by the responsible

9  authorities.

10      32.     It is also my opinion that mental health watch is being used in inappropriate

11  ways in the system and this is at least partially driven by the fact that ADC is not

12  providing alternatives to isolation for inmates with serious mental health issues. In some

13  ways watch appears to be a default tool to deal with an inmate or inmates exhibiting

14  mental health problems as opposed to treatment or care. During my inspections, I spoke

15  with inmates who were on watch and inmates who had repeatedly been placed on watch.

16  One inmate at Eyman whom I spoke with while in a watch cell could not tell me how long

17  he had been there. Another inmate at that facility who hears voices told me he had spent

18  fourteen days naked in a watch cell and was sprayed many times. Also at Eyman, I spoke

19  with an inmate on watch who had been in prison for several years and was due to be

20  released to the community in less than three months. He said he was depressed and often

21  suicidal. He said there is no help for him while in watch or in the institution in general.

22  When I asked him what real help would look like, he described the treatment he received

23  while in the juvenile system as effective and helpful, treatment he did not believe he was

24  receiving in the ADC. At Florence, I talked to an inmate who was on watch for a week.

25

26      [20] McWilliams dep., 169:13-17 (Sept. 27, 2013).

27      [21] *Id.* at 170.
        [22] *See* ADC News and Events, 2013 News Archive,

28  http://www.azcorrections.gov/Minh_news_gov.asp.

-13-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                    PRSN-EV 00013

1    He said that during the time he was on watch the only conversation he had with anyone

2    was a brief check in each day with a mental health staff. At Perryville, I spoke with an

3    inmate who said that while on watch status she had to pound on her door to get someone's

4    attention. Another inmate at Perryville told me that while in watch you don't get respect

5    from the staff and that the cells are dirty and insect infected.

6         33.    Deposition testimony from the Defendants illustrates my concerns about the

7    ADC's approach to managing inmates who may be self-destructive. Mr. McWilliams

8    acknowledges the higher frequency of suicides for inmates in isolation in the ADC. In his

9    deposition he also says:

10              Q.    Do the staff working in these units undergo extra

11                    training?

12              A.    No. I think all officers get the same training.     You

13                    get the block at COTA, and then you get the annual

14                    refresher and regular training for line staff.[23]

15        34.    After I left McNeil Island and went to the central office in Washington,

16   every facility over which I had supervision had isolation units. I was frequently the final

17   sign-off for who would stay or who would be released from these units. At one of my

18   facilities, we were having a great deal of acting out by the inmates. Having had success at

19   McNeil at managing the isolation population, I decided to re-assign one of my McNeil

20   deputies to the prison with the problems to see what he could do to improve conditions.

21   He went in and found that the inmates in the unit felt stuck, had very little to do, and were

22   subjected to a great deal of staff disrespect rather than being managed professionally.

23   Problems were being escalated instead of being resolved and use of force had become a

24   daily occurrence. The deputy began to solve legitimate individual inmate problems and

25   taught the staff that he expected them to do the same. He sought and brought in individual

26   and congregate programs to the unit in partnership with some of the UW resources we had

27

28        [23] McWilliams dep., 169:13-17 (Sept. 27, 2013).

Confidential                                                                          PRSN-EV 00014

1   worked with on McNeil. He trained the staff in different approaches to manage the

2   inmates. The result was a unit that calmed down and became the model for other

3   isolations units in the Department. The other result was a book, *Total Confinement:*

4   *Madness and Reason in the Maximum Security Prison*, written by an anthropologist

5   attached to our collaboration with the UW.[24]  In the book, the author documents our work

6   with this very difficult population including our struggles, our successes, and our failures.

7   It is difficult work, but it is not impossible work. In my experience, custody staff who are

8   assigned, or better yet choose, to work with the mentally ill need intensive and specialized

9   training to be successful at their jobs. Such intensive training will not only improve

10  treatment outcomes, but also improve the overall conditions of confinement for the

11  mentally ill. As custody staff learn more about the limitations of mentally ill inmates to

12  respond to the typical prison environment, they evolve more effective techniques and

13  daily routines better suited to that population.  As noted above, that is not the practice at

14  the ADC and is fundamental to why they are struggling to keep inmates from attempting

15  to harm themselves.

16      35.    There is no question that mentally ill inmates are regularly and routinely

17  housed in isolation units within the ADC.[25] There is little evidence that the agency takes

18  into consideration the potential harmful effects that the conditions of confinement in those

19  units are having on all inmates, but especially the mentally ill, and the problems created in

20  managing its facilities that result. Inmates need a coherent structure, living conditions that

21  recognize the extreme stress social isolation creates, a staff that not only controls but

22  respects them, and robust programs to help them learn what behaviors have brought them

23

24      [24] Lorna A. Rhodes, *Total Confinement: Madness and Reason in the Maximum Security*

25  *Prison*, University of California Press, 2004.
    [25] Declaration of Benjamin Shaw, filed Jan. 8, 2013, Doc. 321-1, para. 37; Plaintiff Dustin

26  Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set of Interrogatories (Nos. 1-
2) to Defendant Charles Ryan, and Defendant Charles Ryan's First Supplemental Answers

27  Thereto, at Req. for Admis. Nos. 1-2; Shaw dep. 135:21- 137:2; 168:5-7; MH Levels Statistical
Summary (4/15/13) (ADC083096-105); MH Levels Statistical Summary (7/23/12) (ADC027759-

28  27768); MH Levels Statistical Summary (4/02/12) (ADC094442-51).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential    PRSN-EV 00015

1   into segregation and what changes in conduct they need to make in order to get out and
2   stay out.  The ADC isolation units fail this challenge in every respect.

3

4   **VII.   PHYSICAL   PLANT   CONDITIONS   OF   CONFINEMENT   IN   ADC**
5         **ISOLATION UNITS**

6       36.    From my tours and from a review of ADC policies, I found the conditions of
7   confinement for inmates held in isolation in ADC to be shocking and sometimes
8   deplorable. The problems endemic to those units are multiple—from physical plant design
9   to routine maintenance and repair to their daily operational practices—add significant risk
10  of harm to all prisoners, but especially prisoners with mental illness.

11      37.    The size and construction of the isolation units in ADC differ a great deal
12  from one to another.[26] The standards of the American Correctional Association (ACA),
13  for a segregation cell require a minimum of 80 square feet.[27]  Several of the cells I viewed
14  during my tours did not meet this requirement. All of the isolation units at Florence fail to
15  meet this standard:

16          Cell Block 1        54 square feet
17          Cell Block 2        40 square feet
18          Cell Blocks 3 & 4    54 square feet
19          Cell Blocks 5 & 7    72.96 square feet
20          Kasson        61.8 square feet

21  Cells at Perryville are 56 square feet.[28] The cell sizes referenced here are significantly
22  smaller than the ACA standard—some as small as half the recommend size or only
23  slightly larger—and add to the feeling of extreme isolation for those forced to live there.

24

25

---

[26] All information regarding the size of ADC cells comes from Defendants' Response to
26  Plaintiff Wells' First Set of Interrogatories at Response to Interrogatory No. 10.
[27] Standards for Adult Correctional Institutions, 4th Edition, American Correctional
27  Association (2012), Standard No. 4-4141.
[28] According to Defendants' Response to Wells' First Set of Interrogatories, at Response
28  to Interrogatory No. 10, the cell size at Perryville is 7 x 8 x 12.

-16-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential    PRSN-EV 00016

1    Given that most inmates held in isolation in the ADC spend four days a week, 24 hours a

2    day in their cells (the other 3 days, they are allowed 2 hours out for recreation, but it is

3    frequently canceled), the lack of adequate space within the cell is important to consider

4    when understanding the inmate's living conditions.

5         38.    There is a dearth of natural light into ADC's isolation cells. A window

6    directly to the outside from the cell, which is most common in isolations units around the

7    country, rarely exists in cells in Arizona.  Again, according to their own admissions, there

8    are no windows in any of the cells at Eyman. At Florence, about half of the cells in CB 1

9    have windows to the outside; the rest do not. In CB 1 and CB 2, there is a vent-sized

10   opening in the back of each cell that lets in a sliver of natural light, but since it is covered

11   with only a metal grate, this opening also allows heat and cold directly into the cell.

12   Inmates I interviewed during my inspection complained that their cells are intensely cold

13   during the winter as a result.  The cells at Kasson and CB 5 and 7 do have windows to the

14   outside, but the narrow slits in the windows in CB 5 and 7 look only out to the concrete

15   backside of the window in the cell adjacent. CB 3 and 4 do not have windows in their

16   cells.  What natural light does exist in many of the isolation units is either through filtered

17   windows or skylights outside of the cell.

18        39.    The unit design for isolation at Perryville is absolutely unique in my

19   experience. There is no interior living unit or common area outside of the cells.  Instead

20   the cell doors open directly to the outdoors and give one the feeling of being trapped in a

21   very small room in a dilapidated roadside motel. It was strange to witness and must be

22   much more so to be confined in these units. This design produces a number of problems.

23   For the inmates in the cells it exposes them to the intense heat of the summer or cold of

24   the winter. For the staff, it exposes them to the same. We toured in the summer and it was

25   very hot. These are the same cells used for suicide watch. I am concerned about the

26   capacity of the officers assigned to monitor the inmates on suicide watch to properly

27   conduct their duties. It would be very difficult for them to effectively conduct their duties

28   when experiencing the intense heat of the Arizona sun. Fans that were set up to cool the

-17-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    area were very loud and made it nearly impossible for me to actually talk to the inmates in

2    those units. During my five-day inspection of Arizona prisons, I found one outdoor

3    thermometer that registered 112 degrees in the shade.

4          40.    The physical condition of many of the units I visited was very poor, despite

5    the fact that multiple inmates told us they could tell a tour was about to come through

6    because of the amount of clean-up work and painting that was being done prior to my

7    arrival.  Still, I saw several examples of chipped and peeling paint in the cells where

8    inmates were living and in some common areas.  It appeared as if there was a significant

9    backlog of maintenance repairs. I saw leaking showers and toilets, some with visible rust

10   that had eaten through the fixtures.  An inmate at ASPC-Eyman showed me the constant

11   leak at the base of his toilet that he had to sop up every day.  Pieces of the toilet were

12   coming loose as he went through his daily ritual of cleaning up the mess and trying to

13   keep his cell clean and dry. Inmates showed me electrical problems that made the lights

14   flicker in their cells.  I saw broken windows and broken beds.  In CB-4 there were several

15   cells where I could see that water had been running down the cell walls, likely leaking

16   from the roof, although some inmates believed it was sewer water. Traveling to the upper

17   tiers in this cellblock, I could see that a substantial leak had been occurring for some time.

18        41.    Of particular concern to me was the condition of several of the mattresses in

19   the cells. After seeing one unmade bed in a cell with a mattress that was nearly in shreds, I

20   asked other inmates to show me their mattresses. I saw several others in the same

21   condition. Mattresses in the level of disrepair that I witnessed are a safety and security

22   hazard and are likely a health hazard as well. First of all, mattresses in this condition

23   would make for very easy places to hide contraband and would be difficult to properly

24   search. Second, because the mattress covers were literally in shreds, I am concerned that

25   bacteria, such as MRSA, could grow which would present a health hazard to the inmate.

26   Last, the mattresses were ripped in long threads. Those threads could be torn from the

27   mattresses and woven together to form a strong rope that could be used as a weapon of

28   self-harm or used against another person.

-18-<br>CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

42.     Many of the showers I inspected had layers of built up soap and grime. Inmates often complained that the showers were not routinely cleaned.  Some told me they refused showers and instead chose to try and keep clean in their small sinks (they called it a "bird-bath") rather than even try the dirty showers.  Given the level of idleness of inmates in isolation, there is really no reason that the showers could not be thoroughly cleaned once or twice a day by the inmates themselves.  It is demeaning to be expected to keep one's body clean in a space that is not kept clean itself. It reflects and communicates to the inmates a profound lack of care for their physical health and wellbeing, which is not conducive or motivating for inmates to want to participate in treatment for their mental illness.

43.     It is a well-established axiom in corrections that facility cleanliness is fundamental to prison safety and security. The level of cleanliness and disrepair I saw in the Arizona isolation units I inspected show a profound disrespect for the inmates confined there and for the profession itself. Again, given the extreme idleness suffered by the inmates in these units, there is really no excuse for failing to put some of the inmates in isolation to work by keeping their facilities clean and in good repair. This can be safely done and often is in isolation units in other prisons around the country. While ADC staff told me that some inmates did work as porters, it is clear that the numbers were not sufficient. Inmates I spoke with on my inspection constantly complained of not having enough to do. An obvious, inexpensive, and effective solution would be to put more of them to work keeping the common areas of the living units cleaned.

44.     On my first day of touring Florence, during a confidential interview in the visit room an inmate told me about a problem with roaches.  The inmate guessed I was likely going to be in his unit the next day. He was right.  He had shared my potential visit with others in the unit. By the time I arrived, several inmates had made a point of collecting roaches to show me. Some were in small jars; some were in the hands of the inmates and some wound up being confiscated by the custody staff before the inmates could show them to me.  Later on that same day in another living unit, the lawyers I was

-19-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-EV 00019

1    traveling with saw a mouse in the dayroom we were in. I was not quick enough to catch
2    sight of it but the inmate that I was talking to at the cell front did and reacted strongly. He
3    said mice were a constant problem in the unit he lived in and he showed me mouse
4    droppings on the floor that I had previously missed. I kept my eyes and ears open after
5    that, saw the droppings in other parts of the prison myself, and heard many other inmates
6    tell me of problems with insects (including scorpions) and rodents in different living units.
7          45.    I toured facilities in late July and early August and got a first-hand
8    experience of the condition the inmates live in day in and day out. I previously mentioned
9    that heat and cold could directly flow into the cells from the outdoors in CB 1 and 2,
10   obviously a concern with the extreme temperatures in Arizona. Those units are supposed
11   to be kept cool by the use of the swamp coolers. I did not find them to be effective. At the
12   end of the tiers in CB 1, there were industrial size fans set up to blow air around. The
13   noise they made was deafening and I had to raise my voice to be able to converse with the
14   inmates who lived in the cells adjacent to the fans. As I moved to the middle portions of
15   the tiers, I found that fans did not reach that far, the air was dead, and the temperature
16   even more extreme. Inmates had consistent complaints (not just in CB 1 and 2 but in
17   several of the other units as well) about the temperatures they are forced to live in. A
18   couple of inmates shared with me that during the morning yard the very day we were
19   visiting the entire group of inmates who were in the yard sat down and refused to return to
20   the unit until they got a promise that the swamp coolers would be fixed. It is significant
21   that inmates would be this organized and put themselves at risk of staging a group protest
22   in order to alleviate the problem they were having with the heat in their living unit. Two
23   days later when I was touring ASPC-Eyman, the warden accompanied me on the tour. I
24   observed that whenever the warden was in the unit his subordinate staff always propped
25   the doors of the unit open to the outside yard (and sometimes got him a chair to sit in).
26   This was a very effective method of cooling off the living unit and the degree of
27   temperature drop as a result of this practice was, I believe, a clear testament to how
28

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                    PRSN-EV 00020

1  extreme the temperatures are in those units on a daily basis. Despite the discomfort we

2  were all experiencing, we could leave at the end of the day. The inmates could not.

3      46.    As an experienced corrections administrator, I have learned that it is very

4  dangerous to expose inmates on psychotropic medications to temperatures above 85

5  degrees.   Many of the units I visited had many inmates on such medications and the

6  temperatures very likely exceeded this threshold. The temperature data that have been

7  made available to the plaintiffs confirms my perception as there are multiple temperature

8  readings over 85 degrees in the different units; some had readings well over 90 degrees,

9  and some readings were 100 degrees or higher.[29] From my training and experience, I

10 know that these temperature levels are extremely dangerous to persons taking some

11 psychotropic medications. Florence, which holds many mentally ill prisoners on

12 psychotropic medications in their isolation units, according to Defendants, "does not track

13 indoor temperatures."[30] As an experienced corrections administrator, it is unfathomable to

14 me that temperatures are not tracked at this large prison and that dangerous levels are

15 allowed with some frequency.

16     47.    Inmates in the Arizona isolation units live in cramped conditions, often

17 without a view to the outside of the cell and little natural light.  They live in cells that have

18 basic maintenance problems, with cell furnishings that are in disrepair and where common

19 spaces are often not regularly cleaned. They live in those units in temperature of great

20 extremes.  It is my opinion that these unaddressed physical plant conditions are counter-

21 productive for institutional security in general and put all inmates, but mentally ill inmates

22 in particular, at risk of harm.

23

24

25

26     [29] ASPC-Perryville, Daily Temperature Checks, ADC140513-60, ADC 140640-732,
   ADC140762, ADC140857; ASPC-Perryville, Lumley Unit, ADC141335-91; ASPC-Eyman-
27 Browning, Daily Temperature Checks, ADC140213; ASPC-Eyman (untitled), Daily Temperature
   Checks, ADC140248-50, ADC140259-60, 140386-87.
       [30] Defendants' First Supplemental Response to Plaintiff Sonia Rodriguez's First Set of
28 Interrogatories, Response to No.1, at 30.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                      PRSN-EV 00021

## VIII. OPERATIONAL PRACTICES AND CONDITIONS OF CONFINEMENT IN ADC ISOLATION UNITS

48.     Prolonged denial of outdoor exercise violates both domestic and international correctional standards, and is harmful to inmates' physical and mental well-being.   The United Nations Standard Minimum Rules for the Treatment of Prisoners requires, "Every prisoner who is not employed in outdoor work shall have at least one hour of suitable exercise in the open air daily if the weather permits."[31]   The U.S. State Department created a handbook to provide embassy officials around the world with a basic understanding of international standards for correctional systems.   That handbook states, "The prisoners should have access to recreation for no less than one hour per day."[32] The ACA has extensive standards on inmate recreation in prisons.[33] Those standards require, even for prisoners otherwise confined to their cell, "that inmates receive a minimum of one hour of exercise per day outside their cells, five days per week, unless safety or security considerations dictate otherwise."

49.     While most isolation units I have seen or am aware of in other jurisdictions offer one hour of recreation each day from five to seven days a week, ADC policy requires that recreation be offered three times a week for two hours a day for a total of six hours a week.[34] On its face this policy increases the number of days inmates must spend in their cells. If an inmate gets one hour of recreation a day, then she/he gets to come out of the cell each day. If an inmate only gets it three days a week, then she/he must regularly remain in the cell for four full days each week. A constant complaint from the inmates I interviewed, verified by a review of the available documents, shows that recreations

---

[31] *Standard Minimum Rules for the Treatment of Prisoners,* Adopted by the First     United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Standard 21(1).
[32] *A Practical Guide to Understanding and Evaluating Prison Systems*, United States Department of State, page 23.
[33] *Standards for Adult Correctional Institutions*, 4th edition, American Correctional Association (2012), Standard No. 4-4270.
[34] Perryville is an exception. They report that they offer recreation one hour a day, six days a week.

-22-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  periods are frequently canceled.  In reviewing some individual logs of inmates held in

2  isolation while on the tour and viewing recreation records in the Individual Inmate

3  Detention Records produced by the ADC since the tours,[35] I found that it was very

4  common for inmates not to be offered six hours of recreation each week—at least one of

5  the recreation periods within a week's time is frequently canceled.  Since recreation is

6  only offered three days a week to begin with (except for Perryville), the result is that in

7  addition to inmates routinely spending twenty-four hours a day in their cells at least four

8  days a week, when recreation is canceled even once a week, the amount of days and time

9  spent continuously in the cell is increased exponentially. The reason given by ADC in

10  their reports for the frequent recreation cancelations is most often "staff shortage."[36]

11  Given that one third of an inmate's allowable time out of cell each week is eliminated

12  each time a recreation period is canceled, ADC's regular and routine practice of canceling

13  recreation adds to the extreme social isolation suffered by inmates held in those units.

14  When inmates do get out for recreation, there is very little to do in the recreation cages.

15  Defendants acknowledge as much when they say, "Defendant admits that for security

16  purposes, exercise is limited to the use of a handball and calisthenics, with an emphasis on

17  large muscle exercise, including walking, jogging in place, and isometrics."[37] The absence

18  of meaningful group exercise for all but a few inmates further extends the experience of

19  isolation beyond what is necessary for safety and security.

20       50.    I have worked nearly 35 years in and around correctional institutions. I am

21  very aware of protective equipment available to staff and the circumstances where it is

22  necessary to wear such equipment.  What I experienced in the ADC isolation units is

23

24

   [35] ADC 123536-123621, 136213-136317 and 139901-140087.

25  [36] ADC Reports regarding incidents that affected meals and-or recreation and occurred in
   isolation units at Eyman, Florence (ADC094500—094572) (includes Perryville documents);

26  ASPC-Florence-Central Unit Information Reports regarding recreation cancellation
   (ADC084366-72).

27  [37] Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set
   of Interrogatories (Nos. 1-2) to Defendant Charles Ryan, *and Defendant Charles Ryan's First*

28  *Supplemental Answers Thereto*, at Req. for Admis. No. 16 (p. 12).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                      PRSN-EV 00023

1   different than what I experienced in my own state or in any other jurisdiction I have ever

2   visited.  ADC requires that stab proof vests and eye coverings be worn by all staff and

3   visitors at all times when in any isolation unit. It is unnecessary and is an exaggerated

4   response to a threat that does not routinely exist in those units.  The mandatory wearing of

5   such items sends a strong message to the inmate population about how they are perceived

6   by the staff and serves to increase the social distance between the keepers and the kept.

7   Inmates understand that all inmates are not the same, that real threats are rare and that the

8   protective equipment is most always unnecessary. This practice also sends a strong

9   message to the staff that all inmates in the units where this protective equipment is

10  required must at all times be perceived as a threat. That is an exaggerated response to the

11  actual level of threat presented by most of the inmates in the Arizona isolation units, and

12  is counterproductive to good institution security as it is likely to push the staff out of the

13  units as soon as possible in order to remove the protective gear. These practical

14  disincentives created by ADC policy will keep officers from maximizing the opportunity

15  to interact with inmates on the tiers. From my own experiences on the prison inspections,

16  the vests are heavy and cumbersome, and make one want to get out of them as soon as

17  possible. The protective helmets required at Eyman make it nearly impossible to converse

18  with inmates in the cells even if a person's voice is raised.  Every opportunity for routine

19  human interaction is transformed into the inmate having to converse with a person more

20  ready for combat than to have a normal conversation.  While I have directed that this

21  equipment be worn around certain inmates under certain circumstances,[38] to require it be

22  worn every day for all non-inmates entering these units is counterproductive to good

23  institution security, further alienates the inmate population and increases the experience of

24  social isolation. In addition to their Enhanced Security Unit at Eyman, ADC has sufficient

25  security hardware to keep staff safe in their existing facilities, including mobile plexi-

26

27      [38] For example, vests and spit helmets can be appropriate during a high security transport
        where there is a legitimate threat by a specific inmate. Those situations are rare and those inmates
28      are well known to prison authorities.

-24-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   glass shields that can be placed in front of an individual cell when a known risk by a

2   specific inmate has been identified. It is important to note that whenever I visited inmates

3   outside of the unit who were in the outdoor recreation cages, correctional officers and

4   wardens alike immediately and frequently removed their protective gear, even though we

5   were in as close proximity to the inmates as we were in the cell blocks. This is clear

6   evidence that the equipment is not needed for staff safety and is used for no purpose other

7   than to keep the inmates at a distance.

8       51.   It is typical for those responsible for running isolation units to clearly

9   describe to the inmate population what it will take for them to earn a promotion to a

10   reduced custody placement. I found no coherent process in ADC that could be articulated

11   by the inmates or staff. In my interviews with inmates, I asked them what they had to do

12   in order to get out of isolation and the vast majority could not articulate it for me. I asked

13   the staff, usually the wardens, if they had written material that described the programs for

14   the inmates. With some uncertainty, they said they thought they did, but none was

15   produced on my inspections. This absence of written material, apparently for both staff

16   and inmates, suggests whatever process ADC has in place is of little importance. I have

17   had the opportunity to review some related material that Plaintiffs' counsel received

18   during discovery.[39] In summary, those documents tell the inmates to behave, work the

19   programs available on closed circuit television and attend group sessions. They are very

20   short on specific detail that an inmate could use to begin to understand what they need to

21   do in order to be released from isolation. Universally the inmates I interviewed could not

22   tell me what they were doing or what they needed to do to earn their way out of isolation.

23       52.   I asked the inmates about the closed circuit TV programs and found it was

24   often times necessary to have the money to buy your own TV in order to participate.

25   Loaner programs apparently exist, but the facilities do not have the resources to match the

26

27

28       [39] *See* ADC 139519-139520 (Kasson) and 139521-139523 (Maximum Custody "Memo of
         Expectations," "Step Matrix," and "Mental Health and Behavioral Phase Matrix").

Confidential                                                                    PRSN-EV 00025

1    need. Even for those who had a TV and were participating, they did not understand if

2    there was a connection between completing the TV programs and earning their way out of

3    isolation.  I have yet to see a schedule of the TV programs offered, although it is my

4    understanding that it has been asked for in discovery. Inmates reported that the TV self-

5    help programs, such as masonry and carpentry, were outdated and bore little relationship

6    to the issues they believed they needed to deal with to improve their behavior.

7         53.    I also asked the inmates about their participation in groups. Many inmates

8    told me they wanted to get into groups but they could not get in.  It was very rare that I

9    found an inmate who was allowed to participate in more than one group a week.   In

10   viewing the available schedules for groups that are offered, it is very clear that the need

11   again greatly outweighs the available resource. In the McWilliams deposition, he

12   acknowledges this problem, "There's more inmates than we have staff to do the groups."[40]

13   He then admits that the mentally ill held in ADC isolation units are put on waiting lists in

14   order to receive proper group treatment for their mental illness.[41]

15        54.    Based on my observations during the prison inspections, my interviews with

16   prisoners allegedly in the programs, and subsequent document review, it is my opinion

17   that there is a profound lack of a coherent program for the mentally ill in any of the

18   isolation units.  This finding is echoed in witness testimony. Dr. Pastor, designated by

19   Corizon as its mental health expert for ADC, could not describe any mental health

20   programming that occurs in the isolation units.[42]  In her deposition in September of 2013,

21   Dr. Taylor, ADC's mental health monitor, testified to a recent email from the Deputy

22   Warden at Florence Central stating that the mental health programs were not being done.[43]

23   During my inspection of the isolation units, I repeatedly heard from prisoners that they

24   wanted to participate in groups but were told none were available.  I also heard from many

25

26   _____

27   [40] McWilliams dep., 114 (Sept. 27, 2013).
     [41] *Id.* at 114:25-115:6.

28   [42] Pastor dep., 82, 189 (Oct. 4, 2013).
     [43] Taylor dep., 160-61 (Sept. 5, 2013).

-26-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   who thought groups might be starting, or who had been to one group in the week or two

2   before my visit but the program had just started.  Some prisoners remembered earlier

3   efforts at group programming that had suddenly and inexplicably stopped.  Others

4   reported sporadic individual counseling sessions or requests for counseling that went

5   unanswered.  In none of the units I toured did I observe or hear about a coherent,

6   structured and fully operational mental health program.  Instead, the programs described

7   to me appeared to be haphazard and intermittently administered. The absence of

8   meaningful programs is a major obstacle to safely manage any inmate population, but

9   especially the mentally ill.  My experience and training has taught me that without regular,

10  predictable and quality programs for the mentally ill offered by committed mental health

11  professionals, my experience and training has taught me that mentally ill inmates will

12  deteriorate and suffer, which is exactly what I believe is happening in the isolation units in

13  the ADC. During my inspection, I repeatedly spoke with prisoners who were obviously

14  suffering severe mental distress.  Many spoke of the pain they experienced living in the

15  isolation units.  For individuals with mental illness the pain of being in extreme isolation

16  often makes them more difficult to manage because of the behavioral problems created by

17  isolation.  As a result, the units themselves become more toxic and dangerous for all

18  prisoners, regardless of their mental health status.

19      55.    A common practice in prison isolation units is to check on the inmates every

20  half hour. The specific American Correctional Association standards says:

21          Written policy, procedure and practice require that all special
22          Management inmates are personally observed by a correctional
            officer twice per hour, but no more than 40 minutes apart, on
23          an irregular schedule. Inmates who are violent or mentally
            disordered or who demonstrate unusual or bizarre behavior
24          receive more frequent observation; suicidal inmates are under
25          continuing or continuous observation.[44]

26

27  ───────────────

28      [44] *Standards for Adult Correctional Institutions*, 4th edition, American Correctional
    Association (2012), Standard No. 4-4257.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                              PRSN-EV 00027

1    This requirement is fundamental to the corrections profession and I have never been in an
2    isolation unit in any jurisdiction where it was not observed. I have been unable to locate
3    any such requirement in ADC policy. Their policy identifies the need for these welfare
4    checks but does not describe a required frequency.[45] The lack of such a requirement for
5    these checks is deeply disturbing. First, it puts the inmates in these units at great risk. If a
6    medical emergency or a self-harm event occurs, staff discovery of the event might well be
7    delayed. Second, the absence of these checks occurring on a frequent basis is one more
8    example of the lack of another potential human contact for the inmates housed in
9    isolation. During my tours, the lack of frequent checks was an item of concern reported by
10    many inmates. Some said that the correctional staff only come around a couple of times a
11    shift; others said they came around every hour or two. One inmate told me of it taking
12    nearly an hour to get custody staff's attention for a medical problem and then another half
13    hour for medical to respond. Another inmate told me of a similar event where it took 5
14    hours to get anyone's attention. Several inmates told me how they must make banging
15    noises, sometimes as an individual and sometimes as a group, in order to get custody
16    staff's attention when someone needs medical attention. This lack of frequent checks
17    should be a great concern to ADC leadership. Failing to conduct welfare checks more
18    frequently represents great risk for the prisoners in their custody. Failing to ensure regular
19    and meaningful contact between staff and inmates increases the already extreme level of
20    isolation in these units.

21

22

23

---

24    [45] ADC Department Order 804, Inmate Behavior Control, 1.10.1 (ADC107485); Deputy
Warden of Florence Central Unit, Greg Fizer testified that the checks are required on the ▮
25    ▮ but he could not locate it in policy either. He says he assumes that the checks are in the post
orders. Fizer dep., October 29, 2012, pages 53-55. The post orders I received have been heavily
26    redacted. Based on what I can discern, only ▮ checks are required in the housing units. It is
unclear if this Post Order applies to the isolation units. But in any case, it provides insufficient
27    checks. ADC Post Orders, #12 Detention Unit Security Officer, #34 Yard Security Officer, #35
Housing Unit Floor Officer. ADC Post Order, Housing Unit Security Officer (5/9/12)
28    (ADC107518-24).

Confidential    PRSN-EV 00028

56.    It is not uncommon for inmates in prison to complain about the food. However, I have never heard the consistent level of food complaints that I heard from the inmates in ADC isolation units. The food is universally despised. The inmates are served a sack lunch in the morning that is supposed to provide them the first two meals of the day. This happens despite that fact that agency policy says, "When security precautions dictate, sack meals may be served."[46] Apparently, ADC believes that such security precautions in their isolation units require sack meals as a daily practice. Several inmates were determined to show me the contents of their sack and did so. It typically consists of six slices of bread, protein in the form of small sacks of peanut butter and/or what the inmates called "mystery meat," a ¾ ounce package of chips or popcorn, and a packet of mayonnaise and instant coffee. Inmates complained of losing weight as the sack provided for two of their meals each day. Some claimed they had lost 10, 20 or even 40 pounds, sometimes more. After hearing that complaint several times, I began to ask the inmates to show me their identification badge with a photo typically taken at the time of entrance to the Arizona prison system. The evidence of their weight loss was clear to me from comparing those photos to the way the inmate looks today. Some inmates even told me that they had to limit their exercise because it made them too hungry and there was not enough food. It is significant to note that ADC's policy reduces the caloric intake for inmates in isolation with the reason that this population is more "sedentary" than those in general population. For some inmates, this system clearly does not work. All inmates believe that it is absolutely necessary to have resources in the community to send them money so they can supplement their diet with purchases from the inmate canteen in order to avoid weight loss and near constant hunger. For those without such resources, they do without. Having witnessed the food offered by the state, I believe this universal belief to be absolutely correct. Finally, serving only two meals a day to the inmates in isolation, one in the morning and one in the evening, is one more limitation on the amount of human

---

[46] ADC Department Order 804, Inmate Behavior Control, 1.2.3.4 (ADC107480).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                     PRSN-EV 00029

1    interaction they have with correctional staff that serve them the meals, again increasing
2    the impact and experience of extreme social isolation.

3      57.  There are some simple, inexpensive things that could be done, that are not
4    done in the Arizona isolation units to alleviate some of the extreme isolation, idleness, and
5    despair experienced by the inmates without creating additional security risks.  One
6    example is to increase the availability of phone calls. ADC inmates in isolation are only
7    allowed one phone call a week. Calls to family are well known to be an effective
8    protective factor in managing inmates. Other jurisdictions often make phones available in
9    the recreation enclosures and do not have such a rigid restriction of one call a week.
10   Another example would be to increase the availability of religious programs. The lack of
11   access to a chaplain while held in isolation was a frequent comment by the inmates I
12   interviewed. The inmates quite simply reported that they never saw a chaplain in the
13   isolation units. In my experience, ensuring that inmates have access to chaplains in
14   isolation units, including representatives of minority religions, is not only appropriate and
15   lawful policy, it is also an excellent way to motivate inmates to stay out of trouble and
16   find some strength to help them live through the difficult experience of isolation.  I have
17   had success bringing trusted volunteers into isolation units. Anything that can be done to
18   increase human contact with inmates in isolation, including increasing expectations for
19   contact with custody staff, will serve as a calming and settling influence for inmates.

20     58.  Being segregated from the general population of a prison presents
21   difficulties of some kind for most prisoners.  But the units in ADC inflict a gratuitous
22   level of isolation that I believe places prisoners at serious risk of harm.  As I explained
23   above, in Arizona the experience of isolation is exacerbated by extremely limited access
24   to any out-of-cell time, including recreation.  It is further exacerbated by extreme levels of
25   social isolation with little human contact between prisoners and other prisoners or staff,
26   almost non-existent programming, extremely limited phone calls and visits, and even
27   limited access to religious counseling. The extreme idleness on these units is further
28   increased by policies that severely limit property so that many prisoners report pacing

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential
PRSN-EV 00030

their cells and talking to themselves as routine, daily activities.  There is also a profound lack of a coherent program to earn your way out of an isolation unit in ADC, including insufficient slots in the programs that do exist for the volume of need. Custody staff wear protective gear that is not necessary and do not check on the welfare of the inmates according to industry standard.  The conditions in the ADC isolation units present a toxic combination of factors that create substantial risks for the prisoners housed there.  As I describe below, I believe the conditions on these units increase the incidents of self-harm, lead to the use of suicide and mental health watch as a default practice for both staff and prisoners, and increase the lethality of these units.  Unfortunately, the isolation practices and policies of ADC have made these painful and sometimes tragic outcomes entirely predictable.

## IX.    SUICIDE WATCH IN THE ADC AND THE INAPPROPRIATE AND ROUTINE USE OF OC AGAINST MENTALLY ILL INMATES

59.    ADC Department Order 807, Inmate Suicide Prevention, Precautionary Watches and Maximum Behavioral Control Restraints describes a range of behavior that can cause an inmate to be placed in a watch cell, from being at serious risk of self-harm or suicide to being at imminent risk of self-harm or suicide. However, inmates report much different uses of the watch cells. They describe the use of watch cells by ADC as a mechanism for immediate and informal punishment and sometimes for retaliation. During my prison inspections, inmates told me about being put on watch status because: their regular assigned cell was dirty; they banged on their cell door; they mouthed off to staff; for refusing food trays; and they threw water on staff.  I met one inmate who had recent surgery and had his mouth wired shut. Placing inmates in suicide watch cells for reasons other than to protect them from self-harm is inappropriate and has no justification in any correctional facility.

60.    I inspected the suicide watch cells in every prison I visited. I found those cells to be beneath professional standards and to likely place the inmates housed in them

Confidential                                                                    PRSN-EV 00031

1    at an unnecessary risk of harm. At Florence, the beds in the watch cells could easily be
2    moved and had been by the inmates that were being held there during my inspection. The
3    ability to move the beds gives the inmate a tool to facilitate any serious attempt at self-
4    harm. Cell furnishings in suicide watch cells should be fixed and stationary to prevent this
5    possibility. All of the cells were much smaller than those typically designed and used to
6    safely conduct suicide watches. When I asked the wardens if there was another area
7    should an inmate need to be subjected to four or five point restraints, two of them told me
8    that it happened in these cells. In my experience, the size of the cells I inspected would
9    make it very difficult to safely restrain an inmate and greatly increase the potential for
10   injury to the inmate being restrained and to the staff as well. A restraint room should have
11   furniture that cannot be moved and sufficient floor space for four to six staff to be able to
12   work. Typically one staff will be assigned each limb of the inmate, one staff may be
13   assigned to make sure each limb is safely secured, and one medical staff should always be
14   present. All of the suicide watch cells were located in cellblocks and not in or near a
15   medical facility that is much more typical in prisons I have visited in other jurisdictions.
16   As a result, nursing staff were not located in those units but instead simply came by on
17   rounds.

18       61.    At Perryville there were a number of women inmates being held on watch
19   status.  Male officers were supervising every one of them.  Inmates on watch status are
20   given very little clothing, usually just a suicide smock, which is a paper gown down to
21   about the middle of the thigh.  Inmates have to use the bathroom in full view of the officer
22   assigned to do the watch wearing nothing but the smock. Absent an emergency situation,
23   it is entirely inappropriate to have male officers conducting watches for female inmates.
24   Some of the inmates I interviewed at Perryville complained about this practice and
25   claimed it sometimes led to inappropriate behavior by both parties.  I recommend this
26   routine practice be stopped immediately.

27       62.    In my training and experience, the use of chemical spray, including what is
28   known as "OC" spray, against mentally ill inmates should be avoided whenever possible.

-32-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                              PRSN-EV 00032

1    I have learned that using OC spray can and often does make it more difficult to manage
2    the mentally ill, especially when the inmate is decompensating or in an acute mental
3    health crisis.  A psychotic or delusional inmate may actually be unable to respond to a
4    custody order or command and the use of OC in such circumstances serves only to induce
5    psychological harm and physical pain, akin to corporal punishment.  The policy and
6    practice regarding the use of OC in the ADC ignores this information, and ADC staff
7    regularly and routinely use OC against the mentally ill, including those who are on
8    "watch' status.  This use of chemical spray often takes place in situations where the
9    inmate is simply not following orders from custody staff and in other cases where the
10   inmate is attempting self-harm.

11       63.    ADC policy on use of force appropriately authorizes the use of force in
12   order to: "Prevent suicide or serious self-inflicted injury."[47]  In that same policy, staff are
13   instructed to first use OC products if attempts at verbal intervention fail.[48]  This direct
14   instruction to staff is then followed regularly and routinely for inmates on watch status.
15   The policy offers no further guidance regarding mentally ill inmates except to say, "In
16   mental health care facilities, correctional staff shall notify and/or request intervention by
17   Mental Health staff if the inmate or staff are not in imminent danger."[49]  In all the reports
18   generated and the interviews I conducted for inmates on watch status, I did not find one
19   instance where this guidance is followed.  The routine practice is to immediately spray an
20   inmate who is disobedient or who begins to make even the most rudimentary self-harm
21   gestures.  Such a routine practice is completely inappropriate and unnecessary from a
22   corrections standpoint.

23       64.    All the use of force OC sprays that I reviewed for inmates on watch are not
24   planned use of force by ADC's own policy definition and there is no video record
25   required of what occurred.  If cameras were posted in each suicide watch area it would

26
27   [47] ADC Department Order 804.04, Inmate Behavior Control, 1.1.2.2 (ADC 107490).
     [48] ADC Department Order 804.04, Inmate Behavior Control, 1.2.1.2.1 (ADC107491).
28   [49] ADC Department Order 804.04, Inmate Behavior Control, 1.1.4 (ADC107491).

1    likely have a controlling effect on staff and inmates since they would know their behavior
2    would be recorded for review by officials at a later date. Given the great frequency with
3    which OC spray is used on inmates on watch status, cameras should be available or
4    installed in watch cells areas to protect both the inmates and the staff.

5        65.    The deposition testimony of a severely psychotic named plaintiff in this
6    case, who I have met and interviewed, illustrates the inappropriate and unnecessary use of
7    OC on mentally ill inmates. From the testimony during the inmate's deposition:[50]

8            Q. And pepper spray's been used on you when you
9                have failed to respond to the officers' calls so that they
10               can see that you are awake, that you're alert, that your
11               face is being shown, right?
12           A. Yes, yes.

13   This inmate's disability is obvious and well known to even the most casual observer. The
14   use of OC spray to wake up a sleeping inmate is completely inappropriate and uncalled
15   for.

16       66.    Records produced by Defendants show the use of OC spray as described
17   above is common practice in ADC facilities. At Perryville. I read a Serious Incident
18   Report (SIR) about an inmate who was banging her head and would not get off of the
19   toilet.[51] At the same facility, I read another SIR where the inmate was destroying her
20   helmet and would not submit to the application of handcuffs so she was sprayed.[52] These
21   examples are not outliers. They are typical of the practice in ADC where OC spray is
22   routinely used against the mentally ill on suicide watch.

23       67.    The routine overuse of OC spray in ADC's isolation units is apparent in
24   ADC's own records. I reviewed records from incident after incident in which the use of
25   OC spray was profoundly disturbing, and more often than not, appeared to involve

26

27   [50] Verduzco dep., 53:18-22 (Aug. 15, 2013).
     [51] SIR # 13-08653, Lumley (                    ) (reviewed on-site).
28   [52] SIR # 13-08377, Lumley (                    ) (reviewed on-site).

-34-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   prisoners with symptoms of mental illness. OC spray is routinely deployed with little or
2   no apparent justification on inmates for such reasons as failing to return his food tray,[53]
3   covering his light fixture with a blanket,[54] refusing to relinquish a blanket s/he had placed
4   over her head,[55] refusing to surrender a suicide smock,[56] tampering with his colostomy
5   bag,[57] refusing to come out from under his bunk,[58] refusing to take court ordered
6   medication,[59] and tearing his suicide mattress.[60] In none of the cases was the inmate or
7   the spraying officer at risk of imminent or serious harm. Rather, as discussed above,
8   officers seemingly sprayed inmates solely because they refused to obey the officer's
9   command. The volume of such incidents indicates to me that the use of chemical spray
10  unnecessarily, and in contravention of ADC policy and because ADC policy is
11  inadequate, is a frequent and regular occurrence in all ADC isolation units. Indeed, the
12  Deputy Warden of Florence Central Unit, Greg Fizer, testified that chemical agents are
13  used there "almost daily."[61]

14        68.   Arizona has made the mistake of adopting OC spray as their first response
15  in a use of force incident.[62] The logic of doing so usually rests on the erroneous
16  assumption that OC spray does not cause injury to the victim. That assumption is wrong.
17  OC spray inflicts intense physical pain. Depending upon the amount of spray used, that
18  pain can last from thirty minutes to four hours. It inflames the tissues, burns the skin and
19  makes it feel like it is on fire. It can cause temporary blindness as the eyes feel like they
20  are bubbling and boiling. It restricts the airways and one can have difficulty breathing.

21

---

22     [53] SIR # 201100103, SMU 1 (ADC089116), SIR # 201204945, Kasson (ADC089321).
       [54] SIR # 201209956, SMU 1 (ADC089237).
23     [55] SIR # 201300585, Browning (ADC089258), SIR # 201101984, Lumley (ADC089354),
      SIR # 201110986, Lumley (ADC089363).
24     [56] SIR # 201204125, Browning (ADC089205).
       [57] SIR # 201203694, Browning (ADC089203).
25     [58] SIR # 201114325, Browning (ADC089180).
       [59] SIR # 201108721, SMU 1 (ADC089158), SIR # 201113031, Kasson (ADC089303),
26     SIR # 201200401, Lumley (ADC089368).
       [60] SIR # 201103500 (ADC089274).
27     [61] Fizer dep., 193.
28     [62] ADC Department Order 804.04, Inmate Behavior Control, 1.2.1.2 (ADC107491).

-35-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    Some individuals feel like they are choking, which can lead to panic. It leaves no mark on

2    the victim but it does inflict great pain. While it is a useful tactical tool in some

3    circumstances where there is a real and imminent threat of loss of life or serious bodily

4    harm, it is also not applicable in others, especially when used on distraught and disturbed

5    inmates who are making either serious or symbolic gestures at harming themselves. In my

6    experience mental health staff have cautioned against its use against the mentally ill

7    because it can feed into the inmates' delusions and hallucinations and exacerbate their

8    condition. The ADC needs to focus their efforts on legitimate clinical interventions prior

9    to deciding it is necessary to use physical force on the mentally ill. They also need to have

10   a more agile tactical response and not rely on OC spray as their first response. Depending

11   on the situation, sometimes it is safer to simply go into the cell and use "hands on"

12   physical force techniques to intervene and control a situation.

13       69.    When touring the watch facilities at Eyman, I saw a table sitting next to the

14   officers who were conducting the watches. On the table, in full view of every inmate held

15   in that unit, were three canisters of OC spray. Whatever the intention of having these

16   weapons so visible, the impact is one of fear and intimidation, hardly the best presentation

17   to mentally inmates who are at risk for self-harm and/ or suicide. This startling evidence

18   of the agency's overreliance on this singular use of force technique raises the issue of the

19   impact on inmates in cells adjacent to an inmate who is being sprayed. Again, based on

20   my training and education, including by mental health professionals over the years,

21   observing the repeated use of OC in these units is likely to escalate the non-involved

22   prisoners' level of fear and mistrust of correctional staff and make them even more

23   difficult to manage.

24

25   **X.   ALTERNATE APPROACHES ARE READILY AVAILABLE AND IN PLACE**

26       **IN OTHER JURISDICTIONS**

27       70.    Prison systems throughout the country have found that an overreliance on

28   isolation is not necessary for good institution security or conducive to motivating inmates

-36-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    to change their behavior, and it often inflicts serious harm on prisoners, especially those

2    with mental illness. There are models that exist in many parts of the country that the ADC

3    could study, adapt, and modify in order to effectively reduce their population of inmates

4    held in isolation.

5        71.    In Mississippi, the isolation population was reduced from 1,000 inmates to

6    300. The Director of the Mississippi system, Christopher Epps, who is also the current

7    president of the American Correctional Association, reports that violence in his prisons

8    has been reduced as his isolation population has come down.  Speaking of what he learned

9    from his experience of reducing the number of inmates in isolation in his prisons, Mr.

10   Epps has said, "If you treat people like animals that is exactly how they will behave."[63]

11       72.    The state of Maine reduced their population held in isolation by 60%

12   without an increase in prison violence. An article in *The Crime Report* is especially

13   illustrative for the ADC:

> In a matter of weeks this spring, Commissioner Ponte
> dramatically reformed the Maine State Prison's supermax
> the Special Management Unit or SMU. Like others across
> the country it had been plague by inmates "cutting up," by
> suicides and suicide attempts, hunger strikes, assaults on
> guards, guard assaults on inmates and in Maine's case,
> unexplained inmate deaths…Like its counterparts elsewhere,
> Maine's SMU had been increasingly accused of being a
> torture chamber, especially for the mentally ill…
> One immediate result is that the unit is calmer, and no
> great disruption has occurred from putting inmates back
> into the prison general population.[64]

---

[63] Erica Goode, N.Y. Times, *Prisons Rethink Isolation, Saving Money, Lives and Sanity*, Mar. 10, 2012.  Mr. Epps also testified before the U.S. Senate about Mississippi's reform of its solitary confinement practices.  He said:  "We needed a different approach," Mr. Epps told a committee of United States Senators last year. "Corrections professionals and the criminal justice system must be careful not to use administrative segregation in prison to manage those who we are mad at because this is an expensive option that takes away resources from . . . the services most needed to make a better society."  Written Testimony of Christopher Epps, Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences, U.S. Senate Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights (June 19, 2012).

[64] The Crime Report, *Maine's Dramatic Reduction of Solitary Confinement*, July 20, 2011.

-37-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

73.   Similar reductions have occurred in the State of Virginia where their isolation population has been reduced by 62% through the implementation of a step-down program:

> First, prison officials evaluate inmates to identify the best candidates for success. These men are provided with classes and programs covering areas such as substance abuse, anger management, social skills development and problem-solving. Initially during group discussions, participants are confined adjacently in small cells; as they progress, they are handcuffed to desks and finally are permitted to take part without any restraints. Privileges to attend group meals and extended recreation periods are earned and serve as motivation.[65]

74.   Before these more recent transitions in other jurisdictions, the State of Washington has worked for more than a decade to establish effective step down programs for inmates who repeatedly returned to isolation. We targeted the most recalcitrant inmates to see what we could do to offer them structured interventions that developed the internal skills and self-control necessary to help them live in general population. Our success with program outcomes was once again studied by researchers from the University of Washington.[66] Much has been learned in Washington from these initial efforts and their step down programs continue to operate and improve to this day.

## XI.   RECOMMENDATONS FOR CHANGE

75.   In the name of safety and security, the ADC engages in multiple practices that are counterproductive to its stated aims and harmful to the prisoners in its custody. Overreliance on isolation as a primary means of control results in a harmful environment for all inmates, and especially those with mental illness. Moreover, the actual operations of those units—extreme levels of isolation and idleness, frequent use of peppers spray,

---

[65] Patrick A. Hope and Adam P. Ebbin, Wash. Post, *Virginia Turns Away From Solitary Confinement*, Sept. 6, 2013.

[66] D. Lovell, *The Reintegration Program (RIP) at the Washington State Penitentiary: A Program Evaluation* (2009) (attached as Exhibit 4; internal memo by Lovell re: *CBCC ITP Evaluation*, July 20, 2010 (attached as Exhibit 5).

-38-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                 PRSN-EV 00038

1  and unstable, infrequent, and incoherent "programming"—results in a correctional

2  environment that exacerbates the already grave risks presented by ADC's over-use of

3  isolation. A predictable and stable custody environment that would help mentally ill

4  prisoners feel safe is essential to prepare inmates to be ready to engage in treatment. That

5  environment does not currently exist within ADC. In order to produce change that will

6  reduce the harmful impact of isolation, especially for the mentally ill, I recommend the

7  following changes:

8       1.    Change the current policies that define who is placed in isolation at

9           reception. Very few inmates arriving in a prison system should be placed

10          directly into isolation. No one should be placed in isolation simply because

11          they are identified as a gang member, because they have a life sentence, a

12          death sentence, or because they were last released to the community from

13          that status.

14      2.    Using criteria similar to what other states have done, review the population

15          currently housed in ADC isolation to determine who can safely be classified

16          to alternate housing locations and who should be diverted from isolation due

17          to mental illness. Since the ADC clearly houses prisoners in isolation who

18          do not require that level of security, re-invest the savings generated from

19          predictable isolation unit closures to enhance programs for the mentally ill.

20      3.    Screen inmates prior to placement in isolation units to divert seriously

21          mentally ill individuals from placement in isolation units and create true

22          mental health treatment units for prisoners who require greater security

23          levels and behavior management. These programs must encourage and

24          allow inmates to progress through reduced levels of custody. Authority and

25          control of those units should be a partnership of custody and mental health

26          staff. Have inmates involved in structured treatment activities throughout

27          the day and appropriate levels of out-of-cell time. Select custody staff to

28          work in those units who have the capacity and the desire to work with the

-39-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

mentally ill and provide the staff with extensive training.

4. Create separation units that are not isolation units for those needing protection within the ADC.

5. For those inmates who cannot be immediately diverted from isolation, create an evidenced based and coherent step down program so the inmates know what they need to do in order to earn their way out. As stated above, there are models around the country that are in place and working that could be modified and adopted for ADC's use. Many of those programs are set up with the goal of moving inmates out of segregation quickly if the inmate fully participates and completes the individual program plan established for them.

6. For those inmates who cannot be diverted from isolation immediately, improve the conditions of confinement in those units by:

- Establish temperature controls so that inmates, and especially those on psychotropic medications, are not put at risk due to excessive heat.
- Require wellness checks, including assessment of both mental and physical health of inmates in isolation consistent with ACA standards at a minimum.
- Establish routine and regular cleaning and preventive maintenance schedules.  Use inmate labor whenever possible.
- Investigate the insect and rodent problems in the isolation units and solve them.
- Reevaluate the two-meal sack lunch program for nutritional adequacy and have officers serve meals three times a day.
- Implement measures that decrease isolation and increase socialization for all inmates in isolation, including increasing phone access for prisoners, increasing contact visits, increasing staff interaction with prisoners, and where possible, increasing prisoner interaction with

-40-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    other prisoners, e.g., through work and program activities.

2    • Improve access to recreation and recreation equipment, and allow for

3    group recreation programs for all prisoners in isolation, not just those

4    in particular programs or housing units. Offer recreation at least five

5    days a week instead of three and allow for steady increases in out-of-

6    cell time and congregate activities for all prisoners. Ensure that

7    sufficient staff are present to run recreation. Implement a policy that

8    discourages cancellation of recreation and provides for make-up

9    sessions.

10   • Do not require staff and visitors to wear protective gear in isolation

11   units except when there is a specific and articulated reason to do so.

12   7.    Change ADC's policy and practice for inmates on suicide watch as well as

13   the policy of using chemical spray on individuals with serious mental

14   illness.

15   • Do not allow the use of OC spray against the mentally ill unless there

16   is an imminent threat of death or serious bodily injury and only after

17   meaningful clinical intervention has occurred.

18   • Make sure watch cells are properly equipped to provide a safe

19   environment for the inmates.

20   • Install video cameras in watch cell areas to document when spray is

21   used.

22

23

24

25

26

27

28

-41-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-EV 00041

1

2

3   Executed on the __8th__ day of __November__ 2013 in Olympia, WA.

4

5

6

7

8                                              Eldon Vail

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-42-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                    PRSN-EV 00042

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     dpochoda@acluaz.org
           kflood@acluaz.org
           jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@npp-aclu.org
           afettig@npp-aclu.org
           aquereshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted
 in DC; practice limited to federal
 courts.
**Admitted *pro hac vice*

-43-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:   cnmitchell@jonesday.com
         dkiernan@jonesday.com
         scalderon@jonesday.com
         srauh@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:   jlwilkes@jonesday.com
         tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:   kmamedova@jonesday.com
         jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

-44-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARIZONA CENTER FOR DISABILITY LAW**
Jennifer Alewelt (Bar No. 027366)
Asim Varma (Bar No. 027927)
Sarah Kadar (Bar No. 027147)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:    jalewelt@azdisabilitylaw.org
              avarma@azdisabilitylaw.org
              skadar@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
Cathleen M. Dooley (Bar No. 022420)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:    jrico@azdisabilitylaw.org
              cdooley@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                    PRSN-EV 00045

# EXHIBIT 1

PRSN-EV 00046

**ELDON VAIL**
1516 8th Ave SE
Olympia, WA. 98501
360-349-3033
Nodleliav@comcast.net

### WORK HISTORY

Nearly 35 years working in and administering adult and juvenile institutions, and probation and parole programs, starting at the entry level and rising to Department Secretary. Served as Superintendent of 3 adult institutions, maximum to minimum security, male and female. Served as Secretary for the Washington State Department of Corrections (WADOC) from 2007 until 2011.

| | | |
|---|---|---|
| Secretary | WADOC | 2007-2011 |
| Deputy Secretary | WADOC | 1999-2006 |
| Assistant Deputy Secretary | WADOC | 1997-1999 |
| Assistant Director for Prisons | WADOC | 1994-1997 |
| Superintendent | McNeil Island Corrections Center | 1992-1994 |
| Superintendent | WA. Corrections Center for Women | 1989-1992 |
| Correctional Program Manager | WA. Corrections Center | 1988 |
| Superintendent | Cedar Creek Corrections Center | 1987 |
| Correctional Program Manager | Cedar Creek Corrections Center | 1984-1987 |
| Juvenile Parole Officer | Division of Juvenile Rehabilitation | 1984 |
| Correctional Unit Supervisor | Cedar Creek Corrections Center | 1979-1983 |
| Juvenile Institution Counselor | Division of Juvenile Rehabilitation | 1974-1979 |

### SKILLS AND ABILITIES

- Ability to analyze complex situations, synthesize the information and find practical solutions that are acceptable to all parties.

- A history of work experience that demonstrates how a balance of strong security and robust inmate programs best improves institution and community safety.

- Leadership of a prison system with very little class action litigation based on practical knowledge that constitutional conditions are best achieved through negotiation with all parties and not through litigation.

- Extensive experience as a witness, both in deposition and at trial.

- Experience working with multiple Governors, legislators of both parties, criminal justice partners and constituent groups in the legislative and policymaking process.

- Skilled labor negotiator for over a decade. Served as chief negotiator with the Teamsters and the Washington Public Employees Association for Collective Bargaining Agreements. Chaired Labor Management meetings with Washington Federation of State Employees.

- Excellent public speaking and writing abilities.

1

Confidential

### *HIGHLIGHTS OF CAREER ACCOMPLISHMENTS*

- Reduced violence in adult prisons in Washington by over 30% during my tenure as Secretary and Deputy Secretary even though the prison population became much more violent and high risk during this same time period.

- Achieved dramatic reduction in escapes, including from minimum-security facilities.

- Increased partnerships with non-profits, law enforcement and community members in support of agency goals and improved community safety.

- Implemented and administered an extensive array of evidence based and promising programs:

  o Education, drug and alcohol, sex offender and cognitive treatment programs.
  o Implemented risk based sentencing via legislation and policy, reducing the prison populations of non-violent, low risk offenders, including the Drug Offender Sentencing Alternative and the Family and Offender Sentencing Alternative. http://www.doc.wa.gov/community/fosa/default.asp
  o Pioneered extensive family based programs resulting in reductions in use of force incidents and infractions and improved reentry outcomes for program participants.
  o Established Intensive Treatment Program for mentally ill inmates with behavioral problems.
  o Established step down programs for long-term segregation inmates resulting in significant reduction in program graduate returns to segregation. http://www.thenewstribune.com/2012/07/10/2210762/isolating-prisoners-less-common.html

- Initiated the Sustainable Prison Project; http://blogs.evergreen.edu/sustainableprisons/

- Administered the only state agency that bent the curve on health care costs while improving treatment outcomes.

- Focused the department on becoming a better asset to the community by expanding inmate and community supervision work programs.

- Improved efficiency in the agency by administrative consolidation, closing 3 high cost institutions and eliminating over 1,200 positions. Housed inmates at lowest possible custody levels, also resulting in reduced operating costs

- Successful settlement of the Jane Doe class action law suit, a PREA case regarding female offenders in the state's women's' prisons.

- Avoided class action lawsuit regarding religious rights of Native Americans. http://seattletimes.nwsource.com/html/opinion/2015464624_guest30galanda.html

- Led the nation's corrections directors to support fundamental change in the Interstate Compact as a result of the shooting of 4 police officers in Lakewood, WA.

2

PRSN-EV 00048

- Dramatically improved media relations by being aggressively open with journalists, challenging them to learn the difficult work performed by corrections professionals on a daily basis.

- Long term collaboration with the University of Washington focusing on the mentally ill in prison and management of prisoners in and through solitary confinement.

### *EDUCATION AND OTHER BACKGROUND INFORMATION*

- Post graduate work in Public Administration - The Evergreen State College, Washington - 1980 and 1981

- Bachelor of Arts - The Evergreen State College, Washington – 1973

- National Institute of Corrections and Washington State Criminal Justice Training Commission - various corrections and leadership training courses

- Member of the American Correctional Association

- Associate member, Association of State Correctional Administrators

- Guest Speaker, Trainer and Author for the National Institute of Corrections

- Commissioner, Washington State Criminal Justice Training Commission 2002-2006, 2008-2011

- Member, Sentencing Guidelines Commission 2007-2011

- Instructor for Correctional Leadership Development for the National Institute of Corrections (NIC)

- Advisory Panel Member, *Correctional Technology—A User's Guide*

- Author of *Going Beyond Administrative Efficiency—The Budget Crisis in the State of Washington*, published in Topics of Community Corrections by NIC

- Consultant for *Correctional Leadership Competencies for the 21ˢᵗ Century*, an NIC publication

- Consultant for Correctional Health Care Executive Curriculum Development, an NIC training program

- Co-chair with King County Prosecutor Dan Satterberg, *Examining the Tool Box: A Review of Supervision of Dangerous Mentally Ill Offenders* http://www.dbhds.virginia.gov/documents/Adm/080101-KingCountyReport.pdf

- Guest lecturer on solitary confinement at University of Montana Law School in 2012

3

## *CURRENT ACTIVITIES*

- On retainer with Pioneer Human Services http://www.pioneerhumanservices.org/

- Serve on the Board of Advisors for Huy, a non-profit for supporting Native American Prisoners

- Retained as an expert witness in the following cases:

  - *Mitchell v. Cate,*
    No. 08-CV-1196 JAM EFB
    United States District Court, Eastern District of California,
    Declarations for the court March 4, 2013, May 15, 2013 and
    June 7, 2013
    Deposed on July 9, 2013
  - *Parsons, et al v. Ryan,*
    No. CV 12-06010 PHX-NVW
    United States District Court of Arizona
  - *Gifford v. State of Oregon,*
    No. 6:11-CV-06417-TC
    United States District Court, For the District of Oregon,
    Eugene Division,
    case settled 2013
  - *Ananachescu v. County of Clark,*
    No. 3:13-cv-05222-BHS
    United States District Court, Western District of Tacoma
  - *Coleman et al v. Brown, et al,*
    No. 2:90-cv-0520 LKK JMP P
    United State District Court, Eastern District of California,
    Declarations for the court, March 14, 2013 and May 29, 2013,
    Deposed on March 19, 2013 and June 27, 2013
    Testified on October 1, 2, 17 and 18, 2013
  - *Peoples v. Fischer,*
    No. 1:11-cv-02694-SAS
    United States District Court, Southern District of New York
  - *Dockery v. Epps,*
    No. 3:13-cv-326 TSL JMR
    United States District Court for the Southern District of Mississippi,
    Jackson Division
  - *C.B., et al v. Walnut Grove Correctional Authority et al,*
    No. 3:10-cv-663 DPS-FKB,
    United States District Court for the Southern District of Mississippi,
    Jackson Division
  - *Graves v. Arpaio,*
    No. CV-77-00479-PHX-NVW,
    United States District Court of Arizona

4

PRSN-EV 00050

**SAMPLE REFERENCES:** contact information available upon request:

Chris Gregoire, former Governor, State of Washington
Tom McBride, Executive Secretary, Washington Association of Prosecuting Attorneys
Chase Riveland, Riveland Associates
Rowland Thompson, Executive Director, Allied Daily Newspapers

5

Confidential

# EXHIBIT 2

## CONFIDENTIAL
## Subject to Protective Order

Confidential

**Documents sent from plaintiffs' counsel to plaintiffs' witness Eldon Vail**

**Death Records**

- █████████████ : ADC032045-185
- █████████████ : ADC061490-648, PLTF-PARSONS-002206-10
- █████████████ : ADC040693-1302
- █████████████ : ADC041302-459
- █████████████ : ADC061649-723, ADC067194-220
- █████████ : ADC038909-9086
- █████████████ : ADC024880-929, ADC037377-514
- █████████████ : ADC039086-168
- █████████████ : ADC042032-349
- █████████ : ADC042350-55
- █████████ : ADC026255-415
- █████████████ : ADC025271-370, ADC039273-321, ADC042356-461
- █████████████ : ADC024516-61, ADC032292-405, ADC042462-606
- █████████████ : ADC061998-2260, PLTF-PARSONS-001958-63
- █████████████ : ADC026743-811, PLTF-PARSONS-001964-70
- █████████████ : ADC062287-357
- █████████████ : ADC039343-426, PLTF-PARSONS-001971-79
- █████████████ : ADC024930-48, ADC037515-685, ADC039445-644
- █████████████ ADC062358-405, PLTF-PARSONS-001901-04
- █████████████ : ADC026672-742, ADC033654-58, ADC037686-994, ADC062406-526, PLTF-PARSONS-002281-92
- █████████████ : ADC042823-3199, ADC062527-602
- █████████████ : ADC025175-270, ADC037995-8217, ADC062603-77
- █████████████ : ADC062678-734
- █████████ : ADC043269-95
- █████████ : ADC062735-828
- █████████████ : ADC024775-879
- █████████ : ADC062914-83
- █████████████ : ADC062984-3138
- █████████████ : ADC032686-776
- █████████████ : ADC043882-971
- █████████████ : ADC047720-958, PLTF-PARSONS-000386-428, PLTF-PARSONS-000746-1341, PLTF-PARSONS-001421-581, PLTF-PARSONS-002116-24
- █████████ : ADC063515-711
- █████████████ : ADC025844-6071, ADC033674-78, ADC043296-308, ADC063712-836
- █████████████ : ADC024562-95, ADC034363-429, ADC063837-967
- █████████████ : ADC032879-937

1

PRSN-EV 00053



- █████████████ : ADC044182-455
- █████████████ : ADC032938-3025, PLTF-PARSONS-001914-17
- █████████████ : ADC024598-716, ADC033684-88, ADC038394-434, ADC064610-839
- █████████████ : ADC026154-95, ADC034430-38, ADC064840-5029
- █████████████ : ADC025372-843
- █████████████ : ADC044456-840
- █████████████ : ADC033048-168
- █████████████ : ADC026957-7099, ADC033689-94, ADC044841-994
- █████████████ : ADC026416-671, ADC044995-5043, ADC065030-272
- █████████████ : ADC045044-537
- █████████████ : ADC026196-254
- █████████████ : ADC026930-55, PLTF-PARSONS-002293-303
- █████████████ : ADC047244-719, PLTF-PARSONS-002304-312
- █████████████ : ADC024949-88, ADC034462-615, PLTF-PARSONS-002313-18
- █████████████ : ADC024362-480, ADC033191-335, ADC038437-703
- █████████████ : ADC045579-6408
- █████████████ : ADC025110-39, ADC046409-42, PLTF-PARSONS-002319-25
- █████████████ : ADC046443-777
- █████████████ : ADC046918-46, ADC065370-599
- █████████████ : ADC024171-221, ADC034616-19, ADC065600-767
- █████████████ : ADC026072-153, ADC033699-709, ADC038704-06, ADC065768-896
- █████████████ : ADC065906-6204
- █████████████ : ADC066299-413
- █████████████ : ADC066492-743
- █████████████ : ADC066744-87, PLTF-PARSONS-001987-89
- █████████████ : ADC024481-515, ADC034620-79, ADC066788-7045
- █████████████ : ADC033537-638, PLTF-PARSONS-001941-42

## Declarations

- Declaration of G. Fizer, 12/24/12 (Exhibit 4, Defendants' Response to Plaintiffs Motion for Class Certification)
- Declaration of B. Shaw, 12/21/12 (Exhibit 1, Defendants' Response to Plaintiffs Motion for Class Certification)

## Department Orders and Director's Instructions

- ADC011582-92: DO 105 – Information Reporting
- ADC092398: DO105 Attachment – Incidents Requiring a Significant Incident Report
- ADC012120-45: DO 509 – Employee Training and Education
- ADC012447-68: DO 524 – Employee Assignments and Staffing
- ADC012628-34: DO 606 – Internal Inspections Program

2

- ADC012644-56: DO 701 – Inmate Accountability
- ADC082174-80: DO 703 – Security/Facility Inspections
- ADC012680-96: DO 704 – Inmate Regulations
- ADC012725-34: DO 708 – Searches
- ADC013837-59: DO 801 – Inmate Classification
- ADC048527-37: DO 802 – Inmate Grievance Procedure
- ADC013875-910: DO 803 – Inmate Disciplinary Procedure
- ADC013911-22: DO 804 – Inmate Behavior Control
- ADC107478-505: DO 804 – Inmate Behavior Control, updated 6/7/12 (restricted)
- ADC082205-26: DO 805 – Protective Custody
- ADC013941-66: DO 806 – Security Threat Groups (STGs)
- ADC013967-93: DO 807 – Inmate Suicide Prevention, Precautionary Watches, and Maximum Behavior Control Restraints
- ADC013994-014004: DO 809 - Earned Incentive Program
- ADC082227-35: DO 811 - Individual Inmate Assessments and Reviews
- ADC012938-62: DO 903 -  Inmate Work Activities
- ADC082236-52: DO 904 - Inmate Religious Activities/Marriage Requests
- ADC013018-28: DO 906 - Inmate Recreation/Arts & Crafts
- ADC013029-74: DO 909 - Inmate Property
- ADC013075-98: DO 910 - Inmate Education and Resource Center Services
- ADC013099-136: DO 911 - Inmate Visitation
- ADC013137-41: DO 912 - Food Service
- ADC013142-65: DO 914 - Inmate Mail
- ADC013166-79: DO 915 - Inmate Phone Calls
- ADC013180-82: DO 916 – Staff-Inmate Communications
- ADC013210-17: DO 920 – Inmate Special Education Services
- ADC048543-73: DO 1101 - Inmate Access to Health Care
- ADC048574-97: DO 1103 – Inmate Mental Health Care, Treatment, and Programs
- ADC048608-12: DO 1105 – Inmate Mortality Review
- ADC082042-5: DI 145 -  Strip Searches
- ADC082054-55: DI 300: 703 Monthly "GAR" Inspections
- ADC084421: DI 301: Modification of DO 912, Food Service

**Depositions**

- *ADC, Wexford, and Corizon Staff*
    - o  Deposition Transcript: Kathleen Campbell, RN, 9/11/13
    - o  Deposition Transcript: Kathleen Campbell, RN, 9/23/13
    - o  Deposition Transcript: Greg Fizer, 10/29/12
    - o  Deposition Transcript and Exhibits: Arthur Gross, 9/9/13
    - o  Deposition Transcript: Carson McWilliams, 9/27/13

3

- o   Deposition Transcript and Exhibits: Joseph Pastor, 10/4/13
- o   Deposition Transcript: Nicole Taylor, J.D., Ph. D., 9/5/13
- o   Deposition Transcript and Exhibits: Martin Winland, 9/18/13
- *Plaintiffs*
  - o   Deposition Transcript: Dustin Brislan, 8/8/13
  - o   Deposition Transcript: Robert Gamez, 8/6/13
  - o   Deposition Transcript: Joshua Polson, 8/23/13
  - o   Deposition Transcript: Sonia Rodriguez, 8/13/13
  - o   Deposition Transcript: Jeremy Smith, 8/20/13
  - o   Deposition Transcript: Jackie Thomas, 8/8/13
  - o   Deposition Transcript: Christina Verduzco, 8/15/13

### Discovery Responses

- Dkt. 191: Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Requests for Admissions (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2)
- Dkt. 491: Defendants Charles Ryan's Response to Plaintiff Christina Verduzco's First Set of Requests for Admission (Nos. 1-285) and First Set of Interrogatories (Nos. 1-2)
- Dkt. 527: Defendants' Response to Plaintiff Wells' First Set of Interrogatories, with Exhibits A-G
- Dkt. 538: Defendants' First Supplemental Response to Plaintiff Wells' First Set of Interrogatories
- Dkt. 570: Defendants' Response to Plaintiff Rodriguez's First Set of Interrogatories
- Dkt. 642: Defendant Ryan's Response to Plaintiff Gamez's First Set of Interrogatories and Requests for Admission
- Dkt. 686: Defendants' First Supplemental Response to Plaintiff Sonia Rodriguez's First Set of Interrogatories

### Executive Reports

- *Dry Cell Watches*
  - o   ADC108139-207: All Units – 1/1/12 to 6/10/13
- *Executive Reports*
  - o   ADC110442-14357: Executive Reports – 2011 to 2013-06-13
- *Inmate Disciplinary Reports*
  - o   ADC091830-75: Eyman Inmate Disciplinary Report, 2/1/13 to 5/29/13
  - o   ADC091877-95: Florence Inmate Disciplinary Report, 2/1/13 to 5/29/13
  - o   ADC091904-45: Perryville Inmate Disciplinary Report, 2/1/13 to 5/29/13
- *Medical*
  - o   ADC108208-9790: All Units – 1/1/12 to 6/10/13
- *Suicides Attempted*
  - o   ADC094578: All units – printed 6/13/13
- *Suicide Watches*
  - o   ADC110442-4376: All units – 1/1/12 to 6/13/13

4

PRSN-EV 00056

- *Use of Force Reports*
  - ○ ADC089116-260: Eyman: SMU I and Browning – 2011-1-1 to 2013-2-6
  - ○ ADC089261-352: Florence: Central and CB1-CB5, CB7, CBK – 2011-1-1 to 2013-2-6
  - ○ ADC089353-379: Perryville: SMU I and Browning – 2011-1-1 to 2013-2-6

**Grievances**

- ADC016217-8164: Plaintiffs' medical grievance files
- ADC023557-4169: Plaintiffs' Non-medical grievance files
- ADC074296-366: Grievance appeal logs, January 2011 to January 2013
- ADC089380-91: Grievance appeals, non-medical, conditions – 2011-1-1 to 2013-4-24
- ADC089392-442: Grievance appeals, non-medical – 2011-1-1 to 2012-12-21

**Master Files (non-named plaintiffs)**

- ▢▢▢▢▢ – Master File: ADC162660-865
- ▢▢▢▢▢ – Master File: ADC162866-3257
- ▢▢▢▢▢ – Master File: ADC163258-447
- ▢▢▢▢▢ – Master File: ADC163448-885
- ▢▢▢▢▢ – Master File: ADC138007-27
- ▢▢▢▢▢ – Master File: ADC138778-86
- ▢▢▢▢▢ – Master File: ADC138787-866
- ▢▢▢▢▢ – Master File: ADC138867-963
- ▢▢▢▢▢ – Master File: ADC138964-9078
- ▢▢▢▢▢ – Master File: ADC139079-135
- ▢▢▢▢▢ – Master File: ADC139635-682
- ▢▢▢▢▢ – Master File: ADC139136-64
- ▢▢▢▢▢ - Master File: ADC139165-304
- ▢▢▢▢▢ – Master File: ADC139305-449
- ▢▢▢▢▢ – Master File: ADC138028-176
- ▢▢▢▢▢ – Master File: ADC139683-94
- ▢▢▢▢▢ – Master File: ADC139450-79

**Medical Files (non-named plaintiffs)**

- ▢▢▢▢▢ : WEX000001-131
- ▢▢▢▢▢ : ADC145972-6069
- ▢▢▢▢▢ : ADC146070-393
- ▢▢▢▢▢ : ADC146394-918
- ▢▢▢▢▢ : ADC146919-7126
- ▢▢▢▢▢ : ADC147127-513
- ▢▢▢▢▢ : ADC147514-8098
- ▢▢▢▢▢ : ADC148099-459

5

- : ADC148460-628
- : ADC148629-9079
- : ADC149080-766
- : ADC149767-815
- : ADC149816-887
- : ADC149888-50069
- : ADC150070-1259
- : ADC151260-02
- : ADC151603-992
- : ADC151993-2080
- : ADC152081-370
- : ADC152371-3326

**Meeting Minutes**

- ADC076324-417: Florence, Management Meeting/Deputy Warden's Meeting Minutes, 2011
- ADC076418-529: Florence, Management Meeting/Deputy Warden's Meeting Minutes, 2012
- ADC076530-46: Florence, Management Meeting/Deputy Warden's Meeting Minutes, January to February 2013
- ADC076547-615: Florence-Central, Deputy Warden Team Management Meeting Minutes, 2011
- ADC076616-67: Florence-Central, Deputy Warden Team Management Meeting Minutes, 2012
- ADC076668-75: Florence-Central, Deputy Warden Team Management Meeting Minutes, January to February 2013
- ADC077039-60: Perryville, Weekly Executive Team Meeting Minutes, January-March 2011
- ADC077274-76: Perryville, Weekly Executive Team Meeting Minutes, March 2011
- ADC083106-311: Eyman, Executive Staff Meeting Minutes, March 2011 to April 2012
- ADC083312-66: Eyman-Browning, Management Meeting Minutes, 2012
- ADC083367-455: Eyman-SMU 1, Special Management Meeting Minutes, 2012
- ADC083456-667: Perryville, Weekly Executive Team Meeting Minutes, March 2011 to March 2013

**Miscellaneous**

- ADC027724-58: Powerpoint presentation, ADC mental health programs in isolation units
- ADC027733: Photographs of recreation enclosures for mental health units
- ADC027751: Eyman-SMU 1 diagram showing location of mental health recreation enclosures
- ADC027759-68: Mental health levels statistical summary, dated July 23, 2012
- ADC031959-2044: Mental Health Technical Manual
- ADC040610-91: Classification Technical Manual (revised October 28, 2010)
- ADC040692: Replacement Page for ADC's Classification Technical Manual, dated April 13, 2012
- ADC048345: Fancy Significant Incident Report
- ADC048379-410: Fancy Use of Force Checklist and Witness Sheets

6

- ADC048411-32: Holbrook Significant Incident Report
- ADC049045-77: Wexford Vacancy Reports, dated September and November 2012
- ADC049646-81: Inmate Suicide Prevention Training
- ADC049803-65: Training, Understanding Mentally Ill Inmates
- ADC050861-67: Memorandum to Charles Ryan from Robert Patton and Richard Pratt dated April 30, 2012, entitled "Increase of Mental Health for Max Custody"
- ADC050868-80: ADC Medical and Mental Health Score Inmate Distribution
  - ADC050868: Mental health levels statistical summary, dated 6/30/10
  - ADC050869-72: Mental health levels statistical summary, dated 8/9/11
- ADC055572-73: SMI Segregated Population, dated December 7, 2012
- ADC074367-80: Eyman DO 703 Report, April 2011
- ADC074402-09: Florence DO 703 Report, April 2011
- ADC083096-105: Mental health levels statistical summary, dated April 15, 2013
- ADC084366-72: ASPC-Florence-Central Unit Information Reports re Cancelled Recreation
- ADC091667-823: Eyman-Browning Correctional Service Log
- ADC093734-958: Mental health details reports, dated 4/26/13
- ADC094392-499: Mental health statistical summaries for 2011, 2012, and 2013
- ADC094500-72: ADC reports regarding missed meals
- ADC094573: Diagram of ASPC-Eyman-Browning Unit Typical Wing Layout
- ADC094576-77: Recreation Enclosures Dimensions Memo, dated 4/29/13
- ADC117064-74: May 2013 Monthly Staffing Reports
- ADC121167-77: June 2013 Monthly Staffing Reports
- ADC139481: Inmate Outcount, Perryville SMA, dated 7/18/13
- ADC139482-83: Weekly Programming for WTU, dated 7/1/13
- ADC139516-18: ASPC-Eyman-Browning Unit Activity Schedule, dated 8/1/13
- ADC139519-20: Kasson Mental Health Program
- ADC139521-23: Maximum Custody Step Matrix
- ADC139524: Perryville SMA mental health group schedules
- ADC139525-28: Mental health programming schedule, July and August 2013
- ADC140132-48: Governor's Briefing on ADC Mental Health Initiatives and Suicide Prevention Strategies, dated 5/22/13
- ADC140185-512: ASPC-Eyman Temperature Logs
- ADC140513-2832: ASPC-Perryville Temperature Logs
- ADC153777-93: Corizon Contract Staffing Percentage Report, dated 7/29/13
- ADC153834-35: Corizon Health Needs Requests (HNR) Appointment Report, July 2013
- PLTF-PARSONS-030686-96: Inmate Death Notifications and Email from Charles Ryan dated 10/11/13

**Monitoring (Compliance) Reports**

- *Eyman*

7

- o   ADC028093-97: Eyman Compliance Report dated 8/13/12
- o   ADC034917-5203: Eyman Compliance Report, September 2012
- o   ADC067241-539: Eyman Compliance Report, October 2012
- o   ADC052305-421: Eyman Compliance Report, November 2012
- o   ADC069206-99: Eyman Compliance Report, December 2012
- o   ADC070023-135: Eyman Compliance Report, January 2013
- o   ADC084391-98: Eyman Compliance Report, February 2013
- o   ADC088727-41: Eyman Compliance Report, March 2013
- o   ADC088814-45: Eyman Compliance Report, April 2013
- o   ADC117651-84: Eyman Compliance Report, May 2013
- o   ADC117927-951: Eyman Compliance Report, June 2013
- o   ADC137754-66: Eyman Quarterly Compliance Report, June 2013
- o   ADC137201-28: Eyman Compliance Report, July 2013
- o   ADC137465-96: Eyman Compliance Report, August 2013
- o   ADC154049-94: Eyman Compliance Report, September 2013
- *Florence*
  - o   ADC028098-110: Florence Compliance Report dated 8/13/12
  - o   ADC035204-95: Florence Compliance Report, September 2012
  - o   ADC067540-690: Florence Compliance Report, October 2012
  - o   ADC052422-564: Florence Compliance Report, November 2012
  - o   ADC069300-401: Florence Compliance Report, December 2012
  - o   ADC070136-270: Florence Compliance Report, January 2013
  - o   ADC084399-406: Florence Compliance Report, February 2013
  - o   ADC088742-55: Florence Compliance Report, March 2013
  - o   ADC088846-91: Florence Compliance Report, April 2013
  - o   ADC117685-717: Florence Compliance Report, May 2013
  - o   ADC117952-84: Florence Compliance Report, June 2013
  - o   ADC137767-79: Florence Quarterly Compliance Report, June 2013
  - o   ADC137229-67: Florence Compliance Report, July 2013
  - o   ADC137497-524: Florence Compliance Report, August 2013
  - o   ADC154095-146: Florence Compliance Report, September 2013
- *Perryville*
  - o   ADC028130-38: Perryville Compliance Report dated 8/13/12
  - o   ADC035459-619: Perryville Compliance Report, September 2012
  - o   ADC068031-239: Perryville Compliance Report, October 2012
  - o   ADC052718-839: Perryville Compliance Report, November 2012
  - o   ADC069514-97: Perryville Compliance Report, December 2012
  - o   ADC070399-510: Perryville Compliance Report, January 2013
  - o   ADC084407-16: Perryville Compliance Report, February 2013
  - o   ADC088763-70: Perryville Compliance Report, March 2013
  - o   ADC088914-53: Perryville Compliance Report, April 2013
  - o   ADC117738-65: Perryville Compliance Report, May 2013

8

PRSN-EV 00060

- o ADC118003-25: Perryville Compliance Report, June 2013
- o ADC137793-805: Perryville Quarterly Compliance Report, June 2013
- o ADC137289-315: Perryville Compliance Report, July 2013
- o ADC137555-82: Perryville Compliance Report, August 2013
- o ADC154182-518: Perryville Compliance Report, September 2013
- ADC138773: Segregated Inmates Compliance Sheet, blank
- ADC139857-79: Draft MGAR User Guide (used at training on 9/19/13)

**Named Plaintiff Master Files**

- ADC022704-3099: Brislan Master File
- ADC137871-81: Brislan Master File, Updated
- ADC020695-1192: Gamez Master File
- ADC127405-24: Polson Master File
- ADC018792-9563: Rodriguez Master File
- ADC022356-504 and ADC023100-379: Smith Master File
- ADC022145-355: Thomas Master File
- ADC137947-70: Thomas Master File, Updated
- ADC019564-20121: Verduzco Master File

**Named Plaintiff Medical Records**

- *Brislan*
  - o ADC008296-537: Brislan Medical Records, 1/26/10 to 3/8/12
  - o ADC016217-499: Brislan Medical Grievances
  - o ADC018105-141: Brislan Medical Grievances
  - o ADC073455-798: Brislan Medical Records, 3/9/12 to 2/12/13
  - o ADC074276-79: Brislan Medical Grievances
  - o ADC107525-602: Brislan Medical Records, Maricopa County Jail, 2000
  - o ADC122075-3237: Brislan Medical Records, 3/1/13 to 7/15/13
  - o ADC123238-51: Brislan Medical Records, ORC, Rx August 2013
- *Gamez*
  - o ADC000287-1258: Gamez Medical Records, 10/17/97 to 3/15/12
  - o ADC017495-879: Gamez Medical Grievances
  - o ADC018005-45: Gamez Medical Grievances
  - o ADC071394-573: Gamez Medical Records, 3/6/12 to 2/12/13
  - o ADC074441-577: Gamez Medical Records, University Medical Center
  - o ADC122219-89: Gamez Medical Records, 3/1/13 to 7/15/13
- *Polson*
  - o ADC005959-6574: Polson Medical Records, 8/2/04 to 5/16/06, 5/30/06 to 8/30/06, 9/30/06 to 4/10/07, 2/21/08 to 3/8/12
  - o ADC017218-485: Polson Medical Grievances

9

PRSN-EV 00061

- o ADC017954-83: Polson Medical Grievances
- o ADC071742-93: Polson Medical Records, 3/9/12 to 2/12/13
- o ADC074973-74: Polson Medical Records, John C. Lincoln
- o ADC074975: Polson Medical Records, Phoenix Baptist
- o ADC107603-72: Polson Medical Records, Maricopa County Jail, 2002
- o ADC122338-70: Polson Medical Records, 3/1/13 to 7/15/13
- o ADC131368-405: Polson Medical Records, 3/8/12 to 10/23/12
- *Rodriguez*
  - o ADC008538-10121: Rodriguez Medical Records, 3/9/1994 to 3/28/03, 6/10/09 to 3/16/12
  - o ADC017916-17: Rodriguez Medical Grievances
  - o ADC073890-4120: Rodriguez Medical Records, 3/9/12 to 2/12/13
  - o ADC074976-6190: Rodriguez Medical Records, Maricopa Medical Center
  - o ADC076191-218: West Valley Hospital
  - o ADC107672-959: Rodriguez Medical Records, Maricopa County Jail, 2007
  - o ADC123384-89: Rodriguez Medical Records, 2/10/13 to 2/28/13
  - o ADC122371-464: Rodriguez Medical Records, 3/1/13 to 7/15/13
- *Smith*
  - o ADC007145-439: Smith Medical Records, 3/17/08 to 3/15/12
  - o ADC017984-8004: Smith Medical Grievances
  - o ADC074121-213: Smith Medical Records, 3/16/12 to 2/12/13
  - o ADC076219: Smith Medical Records, Recovery Innovations
  - o ADC117587-630: Smith Medical Records, Maricopa County Jail
  - o ADC127369-75: Smith Medical Records, Rx and CIPS
  - o ADC127376-81: Smith Medical Records, 2/10/13 to 2/28/13
- *Thomas*
  - o ADC007440-8295: Thomas Medical Records, 11/3/06 to 3/8/12
  - o ADC017918: Thomas Medical Grievances
  - o ADC070949-1360: Thomas Medical Records, 3/9/12 to 2/12/13
  - o ADC074273-75: Thomas Medical Grievances
- *Verduzco*
  - o ADC002289-4373: Verduzco Medical Records, 5/10/06 to 3/19/12
  - o ADC121331-2074: Verduzco Medical Records, Arizona State Hospital, 2006
  - o ADC122720-3780: Verduzco Medical Grievances, 3/1/12 to 7/15/13
  - o ADC123390-400: Verduzco Medical Records, 2/10/13 to 2/28/13
  - o ADC136885-901: Verduzco Medical Records from Expert Tours

**Named Plaintiff – Other**

- *Brislan*
  - o Individual Detention Records, ADC139904-38
- *Gamez*

10

PRSN-EV 00062

- o   Individual Detention Records, ADC139939-40027
- *Polson*
  - o   Individual Detention Records, ADC136213-54
- *Rodriguez*
  - o   Individual Detention Records, ADC136255-314
- *Smith*
  - o   Individual Detention Records, ADC140028-87
- *Swartz*
  - o   Individual Detention Records, ADC136316-17
- *Thomas*
  - o   Individual Detention Records, ADC139901-03
- *Verduzco*
  - o   Individual Detention Records, ADC123484-3621

**No Bates Range**

- ADC Locator Codes – Confidential
- Browne, Angela, "Prisons Within Prisons: The Use of Segregation in the United States", *Federal Sentencing Reporter*, Vol. 24, No. 1, October 2011
- List of SIRs with Prisoner Names and ID Numbers

**Nutrition**

- ADC077368-403: Diet Reference Manual
- ADC077955-77: Food Services Technical Manual
- ADC078656-59: ADC Menus Nutritional Content and Statement of Nutritional Adequacy
- ADC078703-45: Weekly Menu Cycles

**Pleadings**

- Dkt. 1: Plaintiffs' Class Action Complaint for Injunctive and Declaratory Relief
- Dkt. 372: Order

**Post Orders**

- *Eyman*
  - o   ADC088634: Eyman PO – Mental Health Emergencies
  - o   ADC088637-38: Eyman PO – Mental Health SMI Designation
  - o   ADC088646-48: Eyman PO – Emergency Response Plan
  - o   ADC088655: Eyman PO – Watch Swallow for Psychotropic Medication
  - o   ADC088663-69: Eyman PO – Detention Unit Security Officer (restricted)
  - o   ADC088671-77: Eyman PO – Housing Unit Security Officer (restricted)
  - o   ADC088678-82: Eyman PO – Yard Security Officer (restricted)

11

- o ADC107506-12: Eyman PO-12 – Detention Unit Security Officer, updated 5/19/12 (restricted)
  - o ADC107513-17: Eyman PO-34 – Yard Security Officer, updated 5/19/12 (restricted)
  - o ADC107518-24: Eyman PO-35 – Housing Unit Security Officer, updated 5/19/12 (restricted)
  - o
- *Florence*
  - o ADC029012-13: PO-07-69 – Florence PO: Detention Status - Protective Segregation and Administrative Detention
  - o ADC029054: PO-07-81 - Florence HS PO: Mental Health Emergencies
  - o ADC029115-16: PO-07-124 - Florence HS PO: Health Checks for Max Security Inmates Central Unit
  - o ADC029117-18: PO-07-125 - Florence HS PO: Detention Checks – CB-K, Wing 3
- *Perryville*
  - o ADC029139: PO-11-0102B - Perryville HS PO: Health Needs Request Submittal and Pick Up in CDU and SMA Units

**Tour Photos**

- *Eyman*
  - o ADC153327-44 - Photos - Eyman (Stewart Tour) – 7/16/13 (redacted)
  - o ADC153345-52 - Photos - Eyman (Cohen Tour) – 7/17/13
  - o ADC153353-54 - Photos - Eyman (Cohen Tour) – 7/18/13
  - o ADC153355-91 - Photos - Eyman (Haney Tour) – 7/23/13 (redacted)
  - o ADC153392-406 - Photos - Eyman (Vail Tour) – 8/1/13 (redacted)
  - o ADC153407-20 - Photos - Eyman (Vail Tour) – 8/2/13 (redacted)
  - o ADC153421-34 - Photos - Eyman (Williams Tour) – 8/15/13 (redacted)
- *Florence*
  - o ADC154422-46 - Photos - Florence (Haney Tour) – 7/19/13 (redacted)
  - o ADC154447-77 - Photos - Florence (Haney Tour) – 7/22/13 (redacted)
  - o ADC154478-505 - Photos - Florence (Stewart Tour) – 7/15/13 (redacted)
  - o ADC154506-33 - Photos - Florence (Vail Tour) – 7/31/13 (redacted)
  - o ADC154534-47 - Photos - Florence (Williams Tour) – 8/14/13 (redacted)
- *Perryville*
  - o ADC163886-99 - Photos - Perryville (Haney Tour) – 7/18/13 (redacted)
  - o ADC163900-09 - Photos - Perryville (Stewart Tour) – 7/18/13 (redacted)
  - o ADC163910-25 - Photos – Perryville (Vail Tour) – 7/29/13 (redacted)
  - o ADC163926-36 - Photos - Perryville (Williams Tour) – 8/16/13 (redacted)

Confidential

PRSN-EV 00064

# EXHIBIT 3

Confidential

A Profile of Washington Inmates on Intensive Management Status

David Lovell

University of Washington-Department of Corrections Behavioral Health

Collaboration

October, 2010

Confidential

Profile of IMS Inmates

## Executive Summary

This description covers 520 inmates on Intensive Management Status (IMS) at two different points in time—2000 and 2006—referred to as the *index IMS assignment* from which infraction rates and return to IMS are calculated. To assist in planning policies and programs, the following topics are covered:

- General characteristics of IMS vs. general population (GP) inmates;
- Security threat group involvement;
- Mental health issues;
- Assaults on staff;
- Return to IMS;
- Policy directions.

**General Characteristics.** Intensive Management Status is the assignment of inmates to extended administrative segregation to reduce serious threats to institutional security or to the safety of inmates and staff. Many differences between IMS and GP offenders are predictable:

- Leaving aside sex offenders, 71% of IMS inmates are serving terms of homicide or violent offenses against persons, vs. 42% of GP inmates;
- Half of IMS inmates are serving terms of 10 years or more, vs. 33% among GP inmates.
- The average annual infraction rate among IMS inmates was 6.8 per year, compared to 1 per year for general population inmates;
- IMS inmates are similar in racial classification to GP inmates, but a rising percentage—14% in 2000, 23% in 2006—are identified as Hispanic, vs. 10% of GP inmates, reflecting increasing activity of Latino gangs in Washington's prisons.

Despite these unsurprising patterns, there was great variation among IMS inmates in length of prison and IMS terms and rates of prison misbehavior. The average length of the IMS term decreased between 2000 and 2006, from 26 months to 21 months.

**STG Involvement.** Over half of IMS inmates have been identified as STG-affiliated. White supremacists predominated in 2000 (37% of all STG members on IMS); between then and 2006, the Latino share of STG affiliates among IMS STG members rose from 18% to 39%, with a concomitant decline in the share of white supremacists.

- Among IMS inmates, STG affiliates and non-affiliates showed similar infraction rates;
- Non-affiliates were more likely to show increased infraction rates after IMS assignment (25% vs. 18%), and served longer IMS terms: 28 months vs. 20 months.

**Mental Illness.** *Serious mental illness* (SMI) is defined as a major thought or mood disorder that significantly impairs functioning, causes substantial pain or disability, and requires continuing

ii

PRSN-EV 00067

treatment. Given the vagaries of mental health diagnosis and documentation in DOC records, a variety of sources must be used to provide reliable estimates of rates of serious mental illness.

- A sample of IMU residents in 2000 found 20% with documented evidence of SMI;
- A systematic survey of all prisoners in 2002 identified 17% of IMU residents as SMI.

For the 2006 IMS group, data from OBTS covered the entire population but were limited to two useful indicators: (1) assessment by a mental health professional as seriously mentally ill; (2) diagnosis with one of a group of severe illnesses. Those meeting either indicator were counted as showing *mental health problems;* those meeting both criteria were counted as *SMI.*

- Excluding inmates at SOU, 18% of IMS inmates in 2006 were counted as SMI.
- Inmates with mental health problems had longer IMS terms (21 months vs. 12 months). This discrepancy is only partly accounted for by their higher rates of infractions on IMS.
- STG affiliates showed higher rates of mental illness than expected: excluding people at SOU, mental health problems were found in 25% of IMS STG cases.

Several federal court rulings have required prison systems in other states to avoid long-term placement of SMI offenders in the equivalent of IMUs. The *Madrid v. Gomez* court in California also excluded persons with borderline personality disorders, brain damage or mental retardation, or impulse-ridden personalities. This description evokes the offenders—not necessarily SMI, but with repetitive patterns of disruptive, irrational, or egregious conduct in a variety of prison settings—who, in Washington, are called *behaviorally disturbed.*

- As noted above, a detailed sample of IMU residents in 2000 documented strong evidence of SMI in 20% of cases.
- With the addition of clinical symptom ratings in interviews, OBTS records of psychotic episodes or self-injury, and evidence of development disability or traumatic brain injury, the percentage of IMU residents with mental health-related issues—a broader concept than mental illness, including those called behaviorally disturbed—rose to 45%.
- Both the 2000 study and patterns of behavior found in the current study raise questions about the effectiveness of the IMU regime in deterring disruptive behavior among offenders with mental health problems.

**Staff Assaults.** There were 158 IMS offenders (30%) who had assaulted staff: 356 incidents, 23 aggravated. Of inmates who assaulted staff after the index term, 95% returned to IMS.

- Only one-quarter of inmates with previous staff assaults did so again after IMS, but this rate was twice that of those with no previous staff assaults.

We may infer that IMS deters staff assaults only if the correlation between previous and subsequent assaults is explained in terms of an underlying predisposition.

- STG members assaulted staff at a slightly lower rate than other IMS inmates.

iii

Profile of IMS Inmates

- IMS inmates with mental health problems, however, were far more likely to commit staff assaults: 40%, compared to 18% of other inmates.

If sanctions are less likely to deter offenders with mental illness, this factor may explain their disproportionate representation on IMS, as well as their proclivity for infractions on IMS.

**Return to IMS.** *IMS Recidivism* is defined as return to IMS within 3 years of release from the index term in 2000 or 2006. Overall, offenders returned to IMS at a rate of 55%, but the rate increased from 49% for the 2000 group to 60% for the 2006 group.

- The length of the IMS term made no difference to recidivism when other variables such as STG membership were taken into account.
- Inmates with mental health problems returned to IMS at about the same rate as others..
- Recidivism rates were higher among STG offenders (66%), especially members of Latino STGs (70%); the increasing presence of Latino STG members, therefore, may explain the increase in recidivism between the 2000 and 2006 groups.
- Among STG affiliates, Norteños returned to IMS at the high rate of 80%, probably because they were relatively low in number and subject to attack on sight by their rivals.

Return to IMS differs from recidivism in the community in that no set of official record variables has been found that predicts IMS recidivism with reasonable accuracy. The apparent success of IMS stepdown programs at WSP and CBCC, however, suggests that there are causes of IMS recidivism that may be addressed by intervention. These factors are not regularly assessed or documented in official records.

**Policy Directions.** Most offenders affiliated with STGs are unlikely to reject an allegiance central to their identity. They may be encouraged to modify their behavior, however, by programs that help them recognize an interest in freedom that outweighs the short-term gains of violence and racketeering.

- The effectiveness of incapacitation and deterrence through IMS is limited by the continuing influx of new gang members.
- Behavioral incentives and offender change programs in general population, IMU-based stepdown programs, and transfers to less intense settings may all be used, depending on circumstances, to reduce levels of violence associated with STG affiliation.

Legal and ethical concerns about protection from harm, as well as the evident failure of IMS to deter misbehavior by inmates with mental health problems, suggest that the Department should formalize policies and procedures to divert inmates with mental illness from IMS.

- Diversion from IMS requires mental health professionals to assess clinical status and needs of mentally ill inmates at administrative segregation hearings.
- Diversion also requires reliable systems for identifying inmates with mental illness and safe alternative programs for those whose behavior warrants maximum custody.

iv

## Introduction

Intensive Management Status (IMS) may be defined as the assignment of inmates to extended administrative segregation, a preventive measure to address substantial threats to institutional security or to the safety of inmates or staff. This description of IMS inmates in Washington is intended to help the Department address policy issues about the use of IMS to control security threat groups (STGs), rates of mental illness in IMS, and the problem of "behaviorally disturbed" inmates. At this point, no systematic data are available about another major challenge facing DOC, the use of IMS for protective custody.

This profile relies on DOC's administrative datasets, in particular the offender tracking data in OMNI and mental health data collected from OBTS, to describe two groups of IMS inmates:

- IMS inmates identified and described in studies conducted in 2000 (N=227);
- Inmates on IMS as of January 1, 2006 (N=293);[1]

The *index IMS* assignment is the term an inmate was serving when, in 2000 or 2006, he appeared in a snapshot of all IMS inmates. The index assignment is the point that defines two distinct *cohorts* and from which previous IMS assignments and return to IMS are measured.

### Demographics and Criminal History

IMS inmates are roughly comparable to general population (GP) inmates in racial classification.,



Chart 1. Racial Affiliations of IMS Inmates
- white
- Afr Amer
- Natv Amer
- Asian/PI
- Other

Among IMS inmates, 14% were identified as Hispanic in 2000 and 23% in 2006, compared to 10% among GP inmates (2008).

---

[1] Because 11 inmates were in both cohorts, this analysis actually covers 509 different individuals, but 520 IMS cases, who are referred to throughout this report as "inmates" to simplify the presentation.

Given the purpose of IMS, it is not surprising that, as in our past studies, it was found that IMS inmates have been convicted of more violent crimes, serve longer sentences, and have much higher rates of infractions.





Leaving aside sex offenders, who are under-represented on IMS, 71% of IMS inmates are serving terms of homicide or violent offenses against persons, vs. 42% of GP inmates. There were 5 IMS inmates under sentence of death, and 41 (8%) serving terms of life without parole.

**Diversity.** Although of course IMS inmates have more violent records, longer prison terms, and higher infraction rates than GP inmates, it is critical to acknowledge the wide variation among IMS inmates. Because there is no typical IMS offender, DOC faces the challenge of making

2

programs and policies consistently serve the principal security objectives of IMS while bringing about change among inmates with diverse histories, capabilities, and attitudes.

**Table 1. Variability Among IMS Inmates\***

| Statistic | Prison Term (years) | Index IMS Term (months) | Annual Major Infraction Rate** |
|---|---|---|---|
| Mean | 9.3 | 24 | 4.0 |
| Median | 8.3 | 17 | 2.6 |
| Standard Deviation | 5.8 | 21 | 5.0 |
| Minimum | 0.4 | 1 | 0.0 |
| Maximum | 35.7 | 192 | 52.5 |

\*The maximum prison term reflects those inmates sentenced to life without parole, whose prison terms are presumed to end when they reach 75 years of age.

\*\*The average among GP inmates was measured at 1 per year in an earlier study.

Variability among IMS inmates is shown by the broad range from minimum to maximum values, high standard deviations, and the differences between the means and the medians, reflecting the influence of a small number of inmates on the extreme high end of each variable.

**Infractions, IMS Terms, and Release to the Community.** The average length of an IMS term decreased from 2000 to 2006, from 26 months to 21 months.

- The number of IMS assignments per inmate ranged from 1 to 11, with an average of 2.3.
- The average annual infraction rate before the index IMS assignment was 6.8;
- In 68% of cases, infraction rates went down after the index IMS term; in 21% of cases, infraction rates went up after the index IMS term; the remaining 11% maintained approximately the same rate.

The most common or significant infractions—comprising almost two-thirds of the 15,000 infractions committed by these 520 inmates—were divided into categories:

- *Violent*, following DOC's criteria for violent incidents;
- *Racket-related*, consisting of STG activities and possession of controlled substances;
- *Disobedient*, such as refusing orders and endangering safety;
- *Disturbed,* consisting of threatening, throwing objects, setting fires, and flooding;\

3

David Lovell, UW                                                    IMS Inmates

Over 300 inmates were infracted for fighting, averaging 2.5 incidents apiece; inmates infracted for threatening, an equally prevalent infraction, were even more repetitious, averaging 4.5 incidents apiece.   Infractions classified as disobedient were the most common, comprising over 5,000 incidents, partly because so many types of infractions were included under this heading. There were 6 inmates infracted for an infraction labeled "homicide," which covers both attempted and successful deadly assaults: though not for lack of effort by the perpetrators, in these instances the victim did not die.  Assaults on staff were singled out for separate analysis, presented below after discussions of security threat groups and mental illness.

**Release to the Community.**  If prisoners with violent records re-enter society directly from IMU, we may be concerned that long-term isolation would render them even less able to cope with the behavior of others.  These concerns were supported by a UW study showing that IMU offenders released directly to the community re-offended sooner and at higher rates than comparable IMS offenders with three months or more in less restrictive settings before release.[2]

- Of 250 IMS offenders in this study who had been released from prison, there were 66 (26%) released directly from IMU.

- Given discussions of this problem and the UW study's preliminary findings during 2003-2006,, it was surprising to find that the percentage released directly to the community *increased* between the 2000 and 2006 cohorts, from 19% to 33%.

One obstacle to transitioning IMS offenders through less restrictive settings is the risk they pose in general population, and some factors may have changed between 2000 and 2006.  In the next two sections, we consider the risks associated with STG status and mental illness.

## Security Threat Group Involvement

Security threat group (STG) activities are a major source of violence in prisons.  Just over half of IMS inmates were identified as active STG members:

- Among IMS inmates in 2000, 57% have been identified as active STG members;

- Among IMS inmates in 2006, 52% have been identified;

- The apparent decrease may only reflect the longer period for intelligence collection about the 2000 group;

- Among IMS inmates affiliated with STGs, the percentage active in Latino groups increased dramatically between 2000 and 2006, with a concomitant reduction in the predominance of white supremacists among active STG members on IMS.

---

[2] Lovell, D., Johnson, L.C., & Cain, K.C.. 2007. Recidivism of Supermax Prisoners in Washington State. *Crime and Delinquency,* 53(4): 633-656.

4



Chart 4. Affiliations of STG Members on IMS, 2000 & 2006

**STG Involvement, Infractions, and IMS Terms.** Given the attention drawn by the behavior of inmates identified as active in STGs, some observations were unexpected:

- Affiliated and non-affiliated IMS inmates showed no difference in annual infraction rates.
- STG-affiliated inmates were *more* likely to improve their infraction rates after their index IMS assignments:
  - o Among affiliates, 73% showed lower rates, 18% higher;
  - o Among non-affiliates, 60% showed lower rates, 25% higher.
- STG-affiliated inmates had shorter average index IMS stays:: 20 months vs. 28 months for non-affiliates, but averaged more IMS terms: 2.6 vs. 2.

In addition to STG involvement, mental illness—which is more highly concentrated among non-STG affiliates—also affects outcomes such as length of stay and infraction rates.

## Mental Health Issues in IMS Inmates

The concept of *serious mental illness* (SMI) is intended to capture those prisoners for whom mental health treatment is medically necessary by virtue of the obligation to protect persons from harm while they are wards of the state. These are the critical elements in DOC's definition of mental illness, following the standard set in Ohio as part of a federal court consent decree:

- Major thought or mood disorder, causing
- Significant impairment of functioning in prison (judgment, behavior, capacity to recognize reality), and

5

- Substantial pain or disability, so that
- Continuing treatment is necessary.

**Counting SMI.** Identification of inmates as SMI has been problematic for a variety of reasons: insufficient psychiatric staffing at key facilities such as the reception center and WSP; different understandings of SMI among mental health professionals; reliance on contract psychiatrists who do not always document diagnosis in DOC records; unreliable entry and updating of electronic records; and contention about ascribing SMI to offenders with severe behavior problems. In 1998, the UW collaborated with DOC, DSHS, and the Washington Institute for Mental Health Research and Training to document SMI among offenders who had been released as part of a large-scale community transition study which has served as a baseline for subsequent program evaluation efforts. A variety of indicators were combined in an algorithm that has since been refined in subsequent studies: a random sample of IMU residents in UW's 2000 study, and a 2003 study that identified all inmates with SMI as of June, 2002 and found rates of 10% among all prisoners, 13% among residents of major institutions.[3] Because the current study of IMS residents was limited to electronic records, mental health status was measured only for the 2006 cohort because, by then, two relatively useful indicators were commonly documented:

1. Certification of Serious Mental Illness by a mental health professional, recorded in the OBTS DT86 screen ("Interview Confirms SMI"); or

2. Diagnosis of Schizophrenia, Schizoaffective Disorder, Psychosis unspecified, Bipolar Disorder, Major Depression, Organic Thought or Mood Disorder, or Borderline Personality Disorder (these diagnoses are selected because treatment is usually medically necessary).

Inmates meeting either indicator are described in this report as showing *mental health problems* or as *mental health cases*; those meeting both criteria are classified as *SMI*. Chart 5 presents rates of SMI, conservatively defined, in the 2000 IMU sample, the IMU inmates in the 2003 prevalence study, and the 2006 IMS cohort (excluding inmates at SOU).



---
[3] Lovell, D. 2003. Identification of offenders with serious mental illness in Washington Department of Corrections facilities. Olympia, WA: Department of Corrections.

6

These estimates are not fully comparable because of differences in population and sources of evidence; furthermore, the 2000 and 2006 estimates are likely both to miss some undocumented SMI inmates and count others (false positives) whom a more detailed examination would exclude. Nevertheless, the rough similarity of the estimates provides a measure of the presence in IMUs of offenders for whom DOC is obligated to provide medically necessary treatment.

**SMI, Disturbed Offenders, and IMS Policy.**  Several federal court rulings—*Madrid v Gomez* (California) and *Jones'El v Berge* (Wisconsin) have found it a constitutional violation to assign prisoners with serious mental illness to their states' supermax facilities. The *Madrid* court also listed further factors, highlighted below, that characterize prisoners who, in Washington, are often labeled *behaviorally disturbed*:

> Such inmates consist of the already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable." … Such inmates are not required to endure the horrific suffering of a serious mental illness or major exacerbation of an existing mental illness before obtaining relief.

Most DOC staff can identify the prisoners to whom the concept *behaviorally disturbed* applies: those who have shuttled back and forth between prisons and between disciplinary and treatment settings, disrupting living units, and engaging in desperate or egregious behavior for incomprehensible or seemingly trivial reasons. While the term is sometimes used to distinguish "behavioral" inmates from those with mental illness, many of them are eventually recognized as mentally ill. Nevertheless, *disturbed* is not a clinical term; it refers not to an underlying disposition but to a pattern of behavior, conditioned by prison settings, which has defied understanding and intervention.

Our 2000 study included a 40% random sample of IMU inmates who were interviewed and whose charts were reviewed. Table 2 summarizes the prevalence of indicators of psychological disturbance similar to those described in the *Madrid* ruling:

- Serious Mental Illness, defined operationally by DOC classification, diagnosis, medications, and housing records;

- Marked or severe psychiatric symptoms shown in interviews, measured by BPRS scores;

- Psychotic or self-injurious episodes described in OBTS and medical chart notes;

- Indications of brain damage in medical charts.

Chart 6 displays the rising prevalence of mental health issues with the addition of each indicator. These four measures have been presented roughly in descending order, in terms of the reliability of the evidence we were able to gather and their relationship to serious mental illness. Taken together, they point to a high rate of mental health issues.

7

Table 2. Forms of Disturbance or Impairment in IMU Residents
(N=131)

| Measure | Number | Percent |
|---|---|---|
| Official record evidence of SMI | 26 | 20% |
| BPRS Symptoms | 19 | 15% |
| Self-Injury or Psychotic Episodes | 32 | 24% |
| Brain Damage | 36 | 30% |



In addition to legal and ethical concerns, one may question whether housing either mentally ill or behaviorally disturbed prisoners is compatible with the mission of Intensive Management: to contain inmates committed to violence, rackets, or organized power struggles with authorities and other groups of prisoners. The commitment to organized power struggles with prison authorities has been explicit in our interviews with IMS prisoners associated with STGs, especially white supremacist groups, but many non-affiliated inmates have also chosen violent or exploitative prison careers. In addition to a high degree of surveillance and physical security, IMUs attempt to control behavior through a combination of incentives and disincentives that presume that IMS prisoners will improve their behavior in order to gain more freedom or avoid further restrictions and long-term isolation. Our studies have cast doubt on the effectiveness of this regime for both inmates with serious mental illness and the behaviorally disturbed.[4]

Rates of mental illness were significantly lower among STG members, but still high:

---

[4] Lovell, D. 2008. Patterns of disturbed behavior in a Supermax population. *Criminal Justice and Behavior,* 35(8), 985-204.

Confidential

- With SOU inmates removed, the respective percentages of mental health problems were 25% among STG affiliates and 36% among non-affiliates.

- Even with the stricter standard of *SMI*, requiring both certification and a qualifying diagnosis, over 14% of STG members, not in SOU, were mentally ill.

From these findings one may infer either (1) that the qualifications for STG membership are relatively low, requiring a less organized, willful set of aptitudes than one might have expected; or (2) that impulsive or disorganized STG members are more likely than others to incur IMS.

Inmates with mental health problems generally spend longer time on IMS:

- Mental health cases spent far more time in their index IMS term (21 months vs. 12 months), and more total IMS time: 50 months vs. 23 months.

- Inmates with mental health problems also committed *infractions on IMS* at almost 3 times the rate of the non-mentally ill (4 vs. 1.4 per year). Although, for obvious reasons, this factor is highly correlated with longer IMS stays, it does not completely explain the longer stays of inmates with mental illness.

- IMS inmates classified as SMI were less likely than those without mental illness to lower their infraction rates after the index IMS assignment (51% vs. 68%).

We have distinguished between serious mental illness and mental health problems, more broadly defined. Many of those with mental health problems who don't meet criteria for SMI would qualify as disturbed. In either case, there is a high proportion of IMS offenders whose behavior hasn't responded well to sanctions. The next section goes into detail about a behavior that poses the question of the deterrent function of IMS in its most acute form: assaults by inmates on staff.

## Assaults on Staff

We found that 30% of IMS offenders have assaulted staff. Whatever the numerical significance of this rate, prevention of staff assault—for reasons so obvious it would be insulting to state them—looms large among objectives of the IMS institution.

There were 158 offenders (30%) who assaulted staff: 356 incidents, 23 of them aggravated. There is a clear relationship between staff assault and IMS assignment:

- Of 53 offenders who committed staff assault after their index IMS term, 45 (85%) returned to IMS.

It is less clear, however, whether IMS deters future staff assaults. Of those who committed staff assault, half did so before their first IMS assignment, half afterwards. Table 2 compares post-index staff assaults for inmates with and without previous staff assaults.

9

David Lovell, UW                                                    IMS Inmates

**Table 2.  Relationship of Pre-IMS to Post-IMS Staff Assaults**

|  |  | Previous Staff Assault | | Total |
|---|---|---|---|---|
|  |  | Yes | No |  |
| Post-Index Staff Assault | Yes | 25<br>26% | 54<br>13% | 79<br>15% |
|  | No | 73<br>74% | 368<br>87% | 441<br>85% |
|  | Total | 98<br>100% | 422<br>100% | 520<br>100% |

*Note.* N=520; $\chi^2$=9.978, df=1, p=.002, odds ratio=2.33.

- Offenders with a previous staff assault were twice as likely to commit assaults after IMS.

- On the other hand, only one-quarter of those with previous staff assaults committed new ones after their index IMS assignment.

If we assume that some inmates are intrinsically more prone than others to custodial assault, then the higher rate of post-index assaults among previous offenders may be explained by that fact.  If this explanation is accepted, then the lower rate *after* IMS suggests that IMS may deter future assaults.  This explanation requires that we identify a condition or disposition that inclines inmates to assault staff.  How is this behavior related to the two main topics of this report:  STG involvement and mental illness?

- Among IMS inmates there is no significant relationship between STG involvement—not even white supremacist allegiance—and staff assault.  Indeed, the rate of staff assault is slightly lower, though not significantly so, among STG members.

- Inmates with mental health problems, however, did commit far more than their share of staff assaults: 42% of SMI inmates and 40% of the broader group with mental health problems assaulted staff, compared to 18% of other inmates..

- Aggravated staff assaults were comparatively rare (21 offenders, 23 incidents), and no more common among inmates with mental illness than among others.[5]

If mental illness, broadly defined, qualifies as a condition or disposition that inclines inmates to commit staff assaults, how susceptible is this behavior to deterrence?

- Prisoners with mental illness comprised 36% of the 2006 cohort and over half of those with staff assaults before their index IMS assignment;

---

[5] These statistics only cover IMS inmates; in the whole inmate population, one might well find that staff assault is directly related to STG involvement, or more weakly related to mental illness.

10

Confidential                                          PRSN-EV 00079

- Of 13 previous assaulters with new assaults after the index IMS term, 11 (85%) were mental health cases.

### Table 3. Mental Illness and New Staff Assaults After IMS Among Offenders with Previous Staff Assaults

| | | Mental Health Problems | | |
| | | Yes | No | Total |
|---|---|---|---|---|
| Post-Index Staff Assault | Yes | 11 | 2 | 13 27% |
| | No | 14 | 22 | 36 73% |
| | Total | 25 | 24 | 49 |

*Note.* N=49 offenders with previous staff assaults in 2006 cohort; $\chi^2$=8, p=.005, odds ratio=8.6.

Evidently, IMS offenders who assault staff are less likely to be deterred by the prospect of renewed solitary confinement if they are mentally ill. The numbers, however, are low; furthermore, among the mentally ill as among all IMS inmates, a substantial majority—61% among those with mental health problems, 82% among others—have committed no staff assaults. Moreover, as we shall see in the next section, inmates with mental illness appear no more likely than others to return to IMS once released. For these reasons, the greater proclivity for staff assaults among inmates with mental illness doesn't wholly explain their disproportionate presence on IMS.

The legal constraints on the use of IMS for inmates with serious mental illness (and, perhaps, those with irrationally impulsive tendencies) have been described. The challenge of living up to the principle embodied in these constraints—not to harm the mentally ill by subjecting them to prolonged solitary confinement—is at its highest with staff assaults. On the other hand, if IMS assignment is a weaker deterrent to staff assault among the mentally ill, the Department has all the more reason to find more creative ways of addressing the relationship between mental illness and this major institutional safety issue.

### Return to IMS

In this analysis, *IMS Recidivism* is defined as return to IMS status within 3 years of release from the index term in 2000 or 2006.

- Of 520 inmates, 169 were removed from analysis because they left prison within 3 years without return to IMS.

11

Confidential                                    PRSN-EV 00080

- An additional 3 inmates were removed from analysis because they had not been released from their index IMS term, leaving a total of 348 cases for recidivism analysis.
- The overall rate of IMS recidivism—return to IMS within 3 years—was 55%.

**SMI and Recidivism.** Because comprehensive data on the two primary mental illness measures were available only for the 2006 cohort, the association between mental illness and IMS recidivism is analyzed only for this cohort..

- In the 2006 cohort, mentally ill inmates—broadly or narrowly defined—and others showed the same rate of IMS recidivism (60%).
- IMS inmates at SOU were less likely to return to IMS than others (7 out of 16, 43%) but the numbers are too low to permit interpretation.

Because no significant association between mental illness and IMS recidivism was found in the 2006 cohort—despite higher rates of staff assault among the mentally ill—subsequent analysis uses the entire sample of 348 cases and omits mental illness.



**Factors Associated with Recidivism.** Comparative rates of IMS Recidivism for various groups of IMS inmates are displayed in Chart 7. Noteworthy in this chart is the increased rate of IMS recidivism between the 2000 and 2006 cohorts, and the high rate of IMS recidivism among Latino STG affiliates, especially Norteños. It was noted earlier that between 2000 and 2006, the proportion of Latino STG members rose by 20 points, from 18% of all STG members on IMS to 39%. The proclivity of these offenders for returning to IMS may well explain the increase in IMS recidivism between 2000 and 2006.

- The especially high rate among Norteños may be due to the intense rivalry between the two Latino groups for "control of the yard," with orders to attack on sight. Since there

12

are over twice as many Sureños as Norteños, the practice of assigning both fight participants to IMS, if gang-affiliated, leaves Norteños disproportionately likely to incur IMS: an equation well understood by their rivals.

**Prediction of recidivism.** One policy issue requiring assessment of recidivism is the duration of the initial IMS assignment, now set at 6 months. Would it make any difference to IMS recidivism if this presumptive term were shortened or lengthened?

- Very few inmates (3%) served 4 months or less. Those who served less than 6 months or 6-12 months returned at a rate of 50%; those who served longer terms at 60%.

- The duration of the IMS term made no contribution to predicting IMS recidivism when other relevant factors were included such as STG affiliation, previous IMS terms, and types of infractions.

If the length of IMS stay doesn't affect recidivism, what does? In the case of recidivism in the community, reasonably accurate probabilities can be derived from a limited set of official record variables: age at first offense and release from prison, number of past misdemeanors and past felonies, types of past offenses (e.g., drug offenses), low vs. high infraction rates, mental health and treatment status. The following measures were compiled to assess whether similarly accurate probabilities could be derived from correctional records:

- Past infraction rates, categories of common infractions, and custodial assault;

- Number of IMS assignments, length of index assignment, cumulative IMS time;

- STG status;

- Whether the index offense was violent;

- Demographic characteristics such as age and racial or ethnic classification.

Exploratory analysis was conducted on variables associated with IMS recidivism, selecting those with the highest contributions to logistic regression equations, testing for spurious correlations, and recoding variables to increase predictive power. The results were not encouraging.

- Predictive accuracy was assessed through ROC analysis, in which a score of 0.5 represents random prediction, 1.0 perfect. Straining ingenuity to analyze available variables, the best equation produced a mediocre ROC of 0.703, an insufficient improvement over chance to warrant policy or programmatic use of this set of variables.

- Furthermore, the variables included in the best equation were repetitive (three variables for STG affiliation) or theoretically mysterious: for example, violent index offenses and previous involvement in rackets were included as factors that *reduced* the probability of recidivism, probably as an artifact of the weakness of the prediction model.

- Custodial assault did contribute to predicting IMS recidivism, but only when assaults committed after the index IMS assignment were included. In that case, however,

13

custodial assaults are a *reason* for IMS assignment, not a factor that would assist advance prediction of who was likely to return to IMS.

The failure to generate a set of reliable IMS predictors, by means of the official record variables available for this study, does not mean IMS recidivism has no patterns. If not, there would be no place to intervene; results of stepdown programs, however, demonstrate the promise of systematic efforts to help IMS inmates redirect their attitudes and goals and test prosocial behaviors in safe social situations. Therefore, if interventions are to be guided by risk factors for recidivism, we would have to develop reliable indicators of the unmeasured attitudes and habits which, among the diversity of inmates in IMS, distinguish those most likely to continue endangering themselves or others.

## Policy Directions

It has been said that three main groups of offenders comprise those on IMS: inmates with mental illness, STG affiliates, and inmates needing protection. These groups are not exclusive: some STG affiliates are mentally ill, and both mental illness and STG involvement may provide reasons to seek protection. The self-protection motive is often disguised, and violence against staff or other inmates may be a means of obtaining protection without admitting as much. Partly for this reason, official record data are lacking on protective custody issues among IMS inmates. Concluding, suggestions, therefore, are limited to STG and mental illness issues in IMS.

**STG Involvement.** The substantial expansion of IMS beds since 2000 has been matched by an increase in IMS placements, largely attributable to conflicts between Latino groups. The Department appears to recognize that it cannot manage STG-related violence through IMS alone.

- Due to external social factors, STG affiliation prevails in many neighborhoods and is established long before most inmates come to prison. Unless the Department pursues the costly policy of proliferating IMU beds, the influx of new affiliates with incentives to attack each other exceeds the rate at which they can be incapacitated through IMS.

- Reports from staff and administrators at WSP suggest that separating rival groups in different close custody quadrants helps reduce violence; such gains are precarious, however, since STG incentives may lead allied groups, e.g., different sets of Sureños, to attack each other.

- For many offenders, STG identity is so deeply rooted that a frontal assault—whether through sanctions or positive incentives—is unlikely to succeed: A gang unit detective asked, "what alternative can you offer to integrity?" And a stepdown program graduate declared, "I'm always going to have this. The gang is going to be in my heart, it's such a big part of my life. That doesn't mean I'm going to be gang-banging."

The last comment holds the key to the Department's strategy. Interviews with administrators, staff, and inmates indicate that a variety of techniques may encourage affiliated offenders to

14

refrain from STG-related rackets and violence without directly challenging their loyalty to their comrades. What is effective will depend on an inmate's affiliation (since rules vary among STGs), his status, and his sentence structure. To the limited extent that the interest of gangs in the well-being of their members outweighs their interest in exploiting them, they may support offender change programs.

> There have so many high-ranking guys from all the "cars" through this program that it's now accepted.

Some offenders can be brought to a new understanding of where their interests lie:

> Fighting for power in prison makes no sense; we should make freedom the goal.

For those serving long sentences, freedom may consist in transfers to settings with fewer restrictions and more options for personal development while in prison; for others, it may mean release to the community with enhanced prospects for remaining outside. Methods of strengthening members' interest in freedom, as opposed to the interests of those who exploit them, include incapacitation, deterrence, incentives for better behavior such as the level system in WSP close custody units, transfers to settings in which the pressure to participate is reduced, and IMU-based offender change programs—such as the promising IMS stepdown interventions mounted at WSP and CBCC.

**Mental Illness.** Legal and ethical concerns about protection from harm, as well as the evident failure of IMS to deter misbehavior by inmates with mental illness, indicate it is time for the Department to formalize policies to decrease the use of IMS for inmates with mental illness. The principle that IMS is a last resort—the exception, not the rule—should be embodied in procedures to divert those with serious mental health problems.

- Whether or not an inmate is mentally ill, if a dangerous situation develops on a living unit, prison authorities are perfectly justified, indeed obliged, to prevent injury. If the first response is to remove the apparent source or target of danger from general population, there is no point in second-guessing.

- Intervention should be focused, therefore, on the decision to formalize an emergency segregation action through hearings to assess the need for administrative segregation and, eventually, intensive management status. If an inmate has been classified as mentally ill, a mental health professional should participate and provide an assessment of the inmate's clinical status, the consequences of extended segregation, and steps needed to reduce the danger the inmate poses to himself or others.

- Diversion from IMS is not accomplished simply by writing policies and procedures, but by developing or expanding alternatives to IMS—such as Intensive Treatment programs for maximum custody inmates with mental illness.

- Diversion from IMS for those with mental illness requires that an inmate's clinical status *matters* in the IMS decision. If so, continuing efforts to systematize mental health evaluation and treatment are required so that an inmate's clinical status is *known* when housing and classification decisions are made.

15

# EXHIBIT 4

PRSN-EV 00085

The Reintegration Program (RIP) at Washington State Penitentiary:

A Program Evaluation

David Lovell, Ph.D., M.S.W.

University of Washington

August, 2009

Confidential

PRSN-EV 00086

# Reintegration Program, Washington State Penitentiary
## Executive Summary

The Reintegration Program at Washington State Penitentiary (RIP) was designed to promote a successful transition to general population of Intensive Management Status (IMS) offenders through a combination of incentives for appropriate behavior, programs to develop pro-social habits, and opportunities to practice social coping skills in a safe, but less restrictive, setting.

**Program Approach.** Social learning theory emphasizes the capacity of participants for rational reflection and treats behavior as a product of individual propensities, the institutional setting, and the way people understand their roles in that setting.

- As students of their own behavior, participants produced a Time-Line Self-Analysis that reviewed their prison records and analyzed choices at each juncture;

- Participants chose among a variety of courses that emphasized practical skills (Conflict Management, Communication Skill) and developing cognitive understanding and empathy (Victim Issues, Diversity in Prison).

- After Step 0, in which staff and program candidates evaluated their suitability for the program, participants moved through 6 steps: Steps 1-4 (RIP-In) took place in IMU, using cell front interviews and written materials; Steps 5 and 6 (RIP-Out) were held in a vacated wing of the old Unit 1 segregation unit, with a dayroom for group activities and the opportunity for participants to go to yard and chow with other offenders.

**Program Implementation.** Guided by the program approach, and in the absence of established recipes for treating supermax offenders, staff and administrators developed the program content and procedures from scratch. Implementation was delayed until mid-2006 by negotiations for resources and by the pace of physical renovation at WSP. State budget cuts in response to the global fiscal crisis led to the closing of the program in Spring of 2009.

- This study covers 116 participants enrolled during the program's 33 months, almost all of them serving time for non-sexual violent offenses such as robbery, assault, and homicide.

- Only 10% of participants were African American, vs. 19% in general population; but 28% were Hispanic, vs. 9% in general population.

- STG affiliations were reported for 70% of participants, 36% associated with Latino organizations (predominantly Sureño), and 20% white supremacist.

During the years of planning and program execution, RIP faced a series of challenges.

- There were two changes of leadership at WSP and at DOC;

- There was a complete turnover in program staff;

i

Confidential

- Periodic closing of units and movements of offenders as part of facility reconstruction produced dramatic ups and downs in program participation;
- Staff and participants alike came under pressure from peers who distrusted the program.

Nevertheless, the program won intense commitment among the administrators and staff involved, and was appreciated by participants who were considered among the most dangerous and intransigent offenders at WSP.

**Program Outcomes.** An outcome analysis group consisted of 48 participants with at least 6 months of post-program exposure who were still in prison when data were collected in March of 2009. Of these, 24 were classified as program graduates, 24 as non-graduates.

- RIP participants were compared with a control group of 103 offenders drawn from a previous study of offenders on IMS, selected according to criteria of comparability with RIP participants (violent offense, STG membership, post-IMS exposure).
- RIP graduates averaged 9 months in their index IMS term, vs. 13 months for non-grads and 17 months for controls. Graduates had significantly lower previous annual infraction rates than non-graduates (4.95 vs. 9.17) but were comparable to controls (6.03).

The principal measure of program effectiveness was return to IMS.

- RIP graduates fared better than non-graduates: 3 out of 24 graduates returned, whereas 7 out of 24 non-grads returned and another 4 were retained on IMS.
- Overall, 23% of participants returned to IMS, vs. 37% of controls.
- The clearest outcome evidence compares RIP Grads to controls: 3 out of 24 RIP grads (12.5%) returned to IMS, vs. 37% of controls. The odds of success vs. failure were 4 times better for RIP grads than for controls.

**Interpretation of Results**. RIP was designed to test participants' commitment to living safely among others; furthermore, random assignment of participants to intervention and control groups wasn't feasible. For these reasons, statistical tests cannot tell us whether the results of the program are due to its clinical benefits rather than to selection of graduates through the testing process or other differences between RIP grads, non-grads, and controls.

- To address the issue of interpretation, we take into account comments such as, "Every single one of them in the past could and would have caused trouble. These were high-powered guys."
- The clinical benefits of the program are also supported by the ability of participants to describe specifically how it affected them and why it made a difference. Common themes included the availability of counselors, respect for individual differences, the relevance of mini-courses to their issues, and what they learned from a searching review of their past patterns.

ii

PRSN-EV 00088

**Lessons Learned**.  The results and the response by staff and participants support the social learning approach to IMS offenders.  Two specific design improvements are recommended for future stepdown programs:

- Provide participants with a more limited and focused set of choices among mini-courses to improve efficiency and consistency of the program's clinical focus;

- Build in from the beginning a post-program placement, support, and counseling component to help participants cope with peer pressure and other stresses in general population.

Program acceptance by staff and administrators outside the program was a challenge throughout the program's tenure.

- More widespread support might be generated by a broader effort to educate members of the prison community about the program's methods and objectives, e.g., make presentations at roll call, work with other unit managers on the role of the program within the institution;

- Stability would be enhanced by ensuring that staff are specifically selected for the program and securing a location and resources before launching it.

Because an IMS stepdown program addresses men who have caused trouble and injured staff and other inmates, staff are naturally going to be suspicious because it may seem that participants don't really deserve help.  In addition to providing specific evidence of a program's safety benefits, it is important to be clear about the connection between genuine accountability and the program's premise of respect for the participants' capacity for rational choice.

Confidential

PRSN-EV 00089

## Introduction

The Reintegration Program at Washington State Penitentiary (RIP) was designed to promote a successful transition to general population of Intensive Management Status (IMS) offenders through a combination of incentives for appropriate behavior, programs to develop pro-social habits, and opportunities to practice coping skills in a safe, but less restrictive, setting. After three years of planning and negotiating for space and resources, RIP enrolled its first participants in June, 2006. RIP was terminated in March, 2009, in response to severe cuts in state budgets brought on by the global financial crisis.

During the years of planning and program execution, RIP faced a series of challenges.

- There were two changes of leadership at WSP and at DOC;
- There was a complete turnover in program staff;
- Because the entire facility underwent major reconstruction, periodic opening and closing of Intensive Management Units (IMUs) and designated program space produced dramatic ups and downs in levels of program participation;
- Staff and participants alike came under pressure from peers who distrusted the program.

Nevertheless, the program won intense commitment among a small group of administrators and staff. It gained the grudging respect and finally gratitude of participants, who had been notoriously dangerous adherents and enforcers of the "convict code." And strong evidence of successful outcomes can be found in the data collected for this study:

- Of 24 participants who completed the program, only 3 (12.5%) returned to IMS status, vs. 38 of 103 (37%) in a comparable group of offenders on IMS just before the program began.

Interpretation of this surprisingly positive finding is complicated because the program was designed to test participants before graduation, and because random assignment of participants to control groups was not feasible with this maximum custody program. In this report, reflections on years of collaboration and discussion with administrators, staff, and participants will be used to shed light on this pioneering effort to change the relationship between the prison and some of its toughest residents.

## Program Development

The need for the RIP program was identified by the IMU Process Improvement Team at its August 29, 2002 meeting in which the team adopted the objective of establishing an IMU step-down program. In subsequent discussions, Washington State Penitentiary was chosen as the program pilot site. At WSP, prospective program administrators and staff worked with IMU staff and administrators to define criteria and incentives for program participation and protocols

Confidential                                                                 PRSN-EV 00090

for moving participants through a level system like the IMU levels.  As of February 2003, however, when we began working with the design team, little had been established about the program's approach to offender change.

**Philosophical Approach.**  Applying the analysis of Toch and Adams in *Acting Out: Maladaptive Behavior in Confinement*, we suggested that the program adopt a social learning approach with several key features.

- The concept of a prison career emphasizes that actions cannot simply be explained by enduring individual attributes such as psychopathy.  While people are in prison their lives follow a trajectory that reflects their changing dispositions, the way they fit or fail to fit their settings, and the expectations others have of them.

- Social learning depends on the participant's capacity for self-reflection which is exploited by three principal methods:

  1. Participants must become students of their own behavior.  To this end, a "Time Line Self Analysis" component requires participants to review and consider the implications of choices they made at particular junctures in their prison careers.

  2. Intervention is voluntary and individualized.

  3. Because the social community affects how participants understand themselves, realism about what needs to change can best be established by analyzing behavior in small group settings, with others who live in the same community and are affected by what each member does.

The social learning approach always takes account of the institutional setting and the presence of others as well as individual traits and states. Its suitability to the situation of IMS offenders is illustrated by comments on a confidential Aggression Questionnaire:

> I observed that this questionnaire tends to lean towards finding out my propensity for violence in my relations with the people in my environment.  Let me be frank.  First, I live in a bad place (and may have to for some time).  I've developed a socially unacceptable disposition & a temperament that I would describe as "flash forward."  I easily get angry, &, depending on the circumstance, I have the capability to cool off quickly.  This is unfortunately a dog eat dog environment—the "flash forward" temperament has served me well . . . It is important to recognize, I plan to change many of my actions & social rapport.

Using social relations in a small group setting as a laboratory for reflection and change suits the primary requirement of any IMS transition program:  since IMS offenders have been removed from face-to-face social interaction, prudence suggests the need for a safe social environment in which social behavior can be tested before participants are transferred to general population.

**Program Planning.**  Until the fall of 2003, discussions about the program revolved around criteria for program participation, in particular whether the program should be voluntary; the use of incentives for program participation; and whether some phases of the program would indeed be conducted outside the IMU.  The decision not to coordinate program steps with existing IMU

RIP Evaluation                                                                                          2

levels allowed planners to disentangle program needs from IMU management principles. By the Spring of 2004, a team of staff and administrators had completed a detailed proposal that incorporated the social learning approach, and outlined program requirements as well as a series of mini-courses from which participants would choose. The creativity of staff had been unleashed, and initially skeptical IMU administrators had signed on to the effort. Two program stages were planned:

1. RIP-In, using cell front interviews and written materials, would take place while participants were still living in IMU;

2. RIP-Out, in which participants would live in a secure but more open setting with a dayroom for group activities and the opportunity to go to yard and chow with other offenders, was planned for part of Unit 1, which was to be vacated and renovated as part of the planned reconstruction of WSP.

During the next two years, program development slowed down while negotiations for resources and space proceeded. Program implementation was also delayed by hold-ups in WSP's ambitious capital construction program, which program developers planned to exploit for program resources as well as space. There is a chronic sense in prisons that resources are limited, as in other public services, and supporters believed that using staff positions freed up by closing units during periods of renovation would be more palatable than allocating new positions to the program.

Anticipated and actual changes in leadership at DOC and at WSP also played a role in the slow pace of program implementation. Initiatives are often delayed while mid-level administrators assess the attitudes and intentions of new leadership. A new Governor was elected in 2004, a new Secretary of Corrections was appointed early in 2005, and within a year a new Superintendent was appointed at WSP. By the time the program was launched in 2006, the correctional program manager who had led efforts to develop RIP had been reclassified and reassigned as part of efforts to cut costs and streamline administration.

Supporters understood that acceptance of the program by WSP staff would be tenuous until it had begun to show results. Some administrators and staff in IMU and segregation units had raised obstacles and advocated policies that would have undermined the program approach. Because their support was needed to carry out the program, efforts to sell the program focused primarily on this relatively small group. In retrospect, a broader effort to educate members of the WSP community about the program's methods and objectives might have gained it more widespread support; but one may be confident that at the time, program planners were fully occupied with keeping their heads above water.

Confidential
PRSN-EV 00092

## Program Implementation

**Applying the Social Learning Approach.** When RIP began enrolling participants in June of 2006, it was not the only offender change program offered in the WSP IMU. Offenders assigned IMS were generally required to complete either Anger Management or a Cognitive Behavioral Change program. These programs were delivered by workbooks that residents completed in their cells; interaction with staff about content was available but not essential.

Like other IMS programs, RIP adopted a step system in which increasing opportunities were provided as participants completed each step: steps 0-4 were conducted in IMU, 5 and 6 in close custody. Otherwise, RIP departed substantially from existing prison program models both inside and outside IMU.

- Not only was RIP voluntary, there was a substantial preliminary process of engagement (Step 0) and a detailed written application, reviewed and revised, before a team decision about admission in which the candidate participated.

- Research presented in trainings indicated that programs have little effect on high-risk offenders unless sufficient contact hours are provided. Adequate intensity of treatment required hiring a core group of staff whose primary responsibility was the program.

By far the most important difference between RIP and other programs to which participants had been exposed, was its responsiveness to individual differences.

- Certain core requirements were common to all participants: Time-Line Self-Analysis, First Steps, and Behavior Management Plans for each new step. To assist in self-analysis, participants were given an individualized chronological time line of their prison careers including such official records as housing and custody changes, segregation, and infractions. By design, the content with which participants fulfilled the common requirements varied according to their individual histories and needs.

- A large variety of mini-courses were available, from which participants chose two at each step. These included not only skill-building courses such as Communication Skills, Emotional Management, Conflict Management, and Problem Solving, but courses designed to stimulate cognitive understanding and empathy, such as Victim Issues, Diversity in Prison, and Society and Government.

Responsivity is a well-established principle in correctional treatment. Within the social learning approach of RIP, it meant that the behavior of participants was not treated only as an expression of deficits, to be corrected by building new skills, but as a consequence of core principles of action around which their lives had been constructed.

> This program appealed to me because it wasn't just about what you gotta do to stay out of IMU.
>
> Anger is not my problem. I fight because I'm supposed to; it was the right thing to do.

> I'd always thought of myself as a nice guy, respectful, opening doors for ladies. But when I read my self-analysis, I understood that I'd lived my life as an immoral person, a dirt bag.

To engage participants at such a fundamental level, one must begin by respecting—which does not mean endorsing—their point of view.:

> While the focus is on behavior, to support motivation it is critical that we use the offender's own words to talk about issues, rather than insisting on his accepting our terms. (Anthony Coker, Manager, Correctional Service Canada, Violence Prevention Program, personal communication)

This approach requires empathy and commitment on the part of staff. As the program was put into place, staff training concerned not only such standard fare as building effective teams, but understanding the difference between the ethical framework that most staff take for granted and the worlds in which offenders had been formed. Six months into the program, staff said:

> The longer they stay in the program, the more responsive they become. It was the theory, it's about the offenders. We will be there, we have kept our promise.

The availability of staff was appreciated by participants, but frequent interaction also served to provide staff with richer information about the thinking and commitment of participants. The authenticity of participants' engagement with staff and their ability to match words with deeds was tested as the program proceeded. This did not mean that participants had to pretend that a sudden transformation had taken place in their identity.

> I'm not an inmate, I'm a convict. I follow the code. They talk to me about the trust issue: I don't.

> I'm always going to have this. The gang is going to be in my heart, it's such a big part of my life. That doesn't mean I'm going to be gang-banging.

### Table 1.  Participant Status as of March, 2009 (N=116)

| Status | Number | Percent |
|---|---|---|
| Still in program | 31 | 27% |
| Graduate | 28 | 24% |
| Released from prison | 3 | 3% |
| Transferred | 7 | 6% |
| Withdrew | 17 | 15% |
| Terminated | 30 | 26% |

**Participant Characteristics.** Here we present a quantitative profile of 116 offenders who participated in the program to varying degrees during its 33-month life. Mutual testing of participants and staff is illustrated by statistics on participant status when the program ended (Table 1). The hard-core IMS composition of RIP is demonstrated by participants' index offenses and gang affiliations. Like other IMS offenders, RIP participants had a considerably

Confidential                                                          PRSN-EV 00094

higher proportion of violent index offenses than general population inmates. The absence of sex offenders among RIP participants suggests that they were less likely than other IMS offenders to have been placed on that status for protection. Furthermore, the vast majority of RIP participants had been identified as affiliated with Security Threat Groups (STGs).

**Table 2. Index Offenses:**
**RIP Participants (N=116), IMS Offenders, and General Population Inmates**

| Offense Type | Number | Percent | IMS Pct (N=348)* | General Pop Pct (N=18,627) |
|---|---|---|---|---|
| Drug Offenses | 7 | 6% | 4% | 12% |
| Property, Other Offenses | 17 | 15% | 12% | 20% |
| Robbery, Assault, etc. | 68 | 59% | 44% | 34% |
| Sex Offenses | 0 | 0% | 16% | 21% |
| Homicide | 24 | 21% | 24% | 14% |

*Note: From a 2008 UW study of all offenders on IMS as of January 1, 2006.

**Table 3. Security Threat Group Affiliation, RIP Participants (N=116)**

| Affiliation | Number | Percent |
|---|---|---|
| None | 35 | 30% |
| White Supremacist | 23 | 20% |
| Norteño | 12 | 10% |
| Sureño | 30 | 26% |
| Crip, Blood, BGD | 13 | 11% |
| Other, Natv American | 3 | 3% |

IMS offenders in the previous UW study resembled general population offenders in racial classification. In RIP, there was a lower percentage of African Americans and a higher percentage of white inmates (Table 4).

- Among RIP participants, 28% identified themselves as Hispanic, vs. 9% in general population. As in previous studies, this difference reflects the influence of Latino gangs.

- A smaller number of RIP participants qualified for outcome analysis, which required that they had left the program at least six months before March of 2009, when outcome data

RIP Evaluation

Confidential

were collected. In that analysis, offenders identifying as Hispanic constituted less than 15% of outcome cases and 8% of program graduates, indicating that more Latino offenders joined the program in its later stages.

**Table 4. Racial Classification, RIP Participants (N=116)**

| Classification | Number | Percent | General Pop Pct (N=18,627) |
|----------------|--------|---------|----------------------------|
| White | 98 | 84% | 71% |
| African American | 11 | 10% | 19% |
| Native American | 5 | 4% | 5% |
| Asian/Other | 2 | 3% | 5% |

**Program Vicissitudes.** Program integrity was assessed by requiring staff to track their clinical encounters with participants: time spent at cell front, in individual interviews, or in group settings working with participants on their issues. Chart 1 demonstrates dramatic ups and downs in levels of program activity.

**Chart 1. RIP Monthly Contact Hours, 2006 - 2008**



The low number of contact hours in the early months reflects the six-month delay in the anticipated opening of Unit 1, which provided more opportunity for programming and was followed by a sharp increase in program delivery. At this point, however, there was a rapid turnover in program staff so that, by mid-2007, we found an almost entirely different group.

Confidential                                                          PRSN-EV 00096

Although these staff were even more committed than the first group to the objectives and methods of the program, the transition caused disruptions in program delivery.

While the move to Unit 1 finally enabled the program to work as intended, it heightened conflicts that had been evident over months and years of program development.

- There were 50 beds in the wing of Unit 1 allocated to the program, occupied by less than a dozen RIP participants. These segregation beds were coveted by custody staff coping with a continuing increase in gang-related violence and other tensions.

- Furthermore, the newly visible use of half a dozen staff members for a small number of participants provided fuel for resentment on the part of non-program staff who already had reasons for suspicions about a program that appeared to offer benefits to some of the least popular prisoners at WSP.

Evidently, not all COs hid their feelings from participants:

> Unit 1 was cool, but so many people didn't believe in the program. We were under intense scrutiny, with people hoping that you do fail.

Nor were program staff exempted from criticism by peers:

> [When the program was discontinued,] people would come up to me and say, 'I'm glad we're getting rid of RIP, it's bullshit.' And I'd say, 'just what do you know about the program,' and they'd say, 'it's just bullshit. They're not holding inmates accountable.'

The rapid turnover of staff after the first six months probably reflected a combination of administrative inexperience, emerging philosophical differences, and pressure from non-supportive peers. In the late summer and early fall of 2007, as part of the continuing revolution in the geography of WSP, the IMU was closed temporarily, with residents transferred to an older segregation unit. Early in 2008, recruitment was slowed by difficulty coordinating with the new IMU facility and rumors of the program's impending move to another location. When program integrity was compromised as a by-product of organizational and physical changes at WSP, some staff saw a lack of administrative commitment.

> Shutting down the IMU sunk us . . . Seg is more toxic, and it influenced our participants.

> [The Director] was never really given a chance to succeed.

When the program was closed, in the wake of budgetary calamity and yet another reorganization of spaces, the supporters of the program all believed, fairly or unfairly, that it really happened because the system at WSP just couldn't tolerate it.

## Program Outcomes

A smaller outcome analysis group that permitted follow-up was generated from the 116 participants by removing those still in the program (31), those with less than six months of post-program exposure (35), and those released from prison (2).

Confidential                                                                    PRSN-EV 00097

- Of the 48 analysis cases, 21 graduated at Step 6; 3 who transferred earlier to other prisons with custody promotions were also treated as graduates for analysis purposes.

**RIP Grads vs. Non-Grads.** Not surprisingly, RIP graduates were enrolled in the program much longer than non-graduates (averaging 300 days vs. 129) and averaged over three times as many clinical contact hours (129 vs. 34). The disparity between the number of days in the program and clinical contact hours is partly explained by the brief nature of the primary cell-front form of interaction during RIP-In (Steps 0-4, in IMU).

- Participants averaged 9 hours of contact at each step from 0 through 4, vs. 43 at Step 6 and 49 at Step 6.

- Low contact hours at the IMU steps also reflect periods of delay when no RIP-Out program space was available.

The principal outcome measure is return to IMS. The 24 RIP Non-Grads included 4 who were never promoted from IMS; for purposes of this comparison, these were treated as failures along with 7 who subsequently returned to IMS.

**Table 6. Failure Rates, RIP Grads vs. Non-Grads (N=48)**

| | | Failure | | |
| | | New IMS or retained (4 cases) | | |
| | | Yes | No | Total |
|---|---|---|---|---|
| **RIP Grad** | Yes | 3 | 21 | 24 |
| | | 12.5% | 87.5% | |
| | No | 11 | 13 | 24 |
| | | 46% | 54% | |
| | Total | 14 | 34 | 48 |
| | | 29% | 71% | |

Note: Failure, Grads vs. Non-Grads: $\chi^2$=6.45, df=1, p=.024; odds ratio=5.9

- Graduates averaged 9 months in their index IMS term, vs. 13 months for non-grads.

- Grads averaged 4.95 annual pre-IMS major infractions, vs. 9.17 for non-grads (both rates much higher than the 1 per year found in a previous study of general population inmates)

- A lower percentage of grads were classified as STG-involved (54% vs. 75%).

These differences suggest that non-graduates may have been more impulsive than graduates and therefore less likely to persevere in the program and remain out of trouble once released from IMS. That RIP graduates had shorter index IMS stays suggests that program completion, or the

Confidential                                                                PRSN-EV 00098

behaviors and attitudes that supported it, may have contributed to an earlier favorable reclassification.

- One strength of the program was its ability to test the commitment of participants. By the same token, however, it is difficult to distinguish the contribution of the clinical benefits of the program from the contribution of pre-existing differences and the testing process.

**RIP Grads vs. Controls.** To provide a clearer test of effectiveness, we compared RIP graduates to a control group drawn from a previous UW study of 348 offenders on IMS as of January, 2006. Many of this group were seriously mentally ill; while offenders with major mental health issues were not excluded from RIP, the program was not suitable for seriously disorganized or psychotic inmates. Since almost all RIP participants had non-sexual violent index offenses, and two-thirds were STG involved, a number of cases were eliminated, in the following order, to render the control group equivalent to RIP participants:

- Those assigned Intensive Treatment Status at the special offender unit for mentally ill prisoners, n=53;
- Those still on IMS, n=21;
- Those cases with less than 180 days post-IMS exposure, n=67;
- A proportionate random sample of those with more than 731 days post-IMS exposure, n=29;
- Those subsequently enrolled in RIP, n=6;
- Those with sexual or non-violent offenses, n=45;
- A proportionate random sample of non-STG cases, n=17;
- Those with multiple indicators of flagrant mental illness, n=7.

The final control group totaled 103 IMS offenders. They averaged 17 months of post-IMS exposure, compared to 19 months for RIP Grads, indicating that RIP Grads had, if anything, a better chance of failure during the exposure period. Some differences are displayed in Table 7.

### Table 7.  RIP Grads (n=24) vs. Controls (n=103)

| Variable | Grads | Controls |
|---|---|---|
| Index IMS Months (avg) | 9 | 17 |
| Pre-IMS Infraction Rate (yrly avg) | 4.95 | 6.03 |
| STG Involvement (%)* | 54% | 64% |
| African American (%) | 8% | 19% |
| Hispanic (%)* | 8% | 30% |

*The rate of STG involvement among controls is equivalent to rates of STG involvement in RIP if both grads and non-grads are included; our final analysis compares all RIP cases to controls.

Confidential                                                                        PRSN-EV 00099

Though average infraction rates are higher among controls, the difference is not statistically significant.  There is no obvious explanation for the major difference in IMS terms.

**Table 8.  New IMS, RIP Grads vs. Controls (N=127)**

|              |       | New IMS |       |       |
|--------------|-------|---------|-------|-------|
|              |       | Yes     | No    | Total |
| **RIP Grad** | Yes   | 3       | 21    | 24    |
|              |       | 12.5%   | 87.5% |       |
|              | No    | 38      | 65    | 103   |
|              |       | 37%     | 63%   |       |
|              | Total | 41      | 86    | 127   |
|              |       | 32%     | 68%   | 100%  |

Note:   New IMS, Grads vs. Controls:  $\chi^2$=5.3,  df=1, p=.028; odds ratio=4.1

Table 8 shows striking and significant differences in outcomes between RIP Grads and controls. The odds of success vs. failure were 7:1 for RIP Grads, 5:3 for controls.  Based on the ratio of these odds, we may say that RIP Grads were four times as likely to succeed as controls.

Because differences between RIP Grads and Non-Grads appeared equally as strong as those between RIP Grads and controls, one may suspect that these results are due to the selection of graduates through the program testing process rather than to clinical changes produced by the program.  To allay this suspicion, we compare the entire RIP group to controls.  The 4 RIP non-graduates who had been classified as failures are excluded from this analysis because offenders retained on IMS were excluded from the control group.

**Table 9.  New IMS, RIP  vs. Non-Grads (N=147)**

|         |       | New IMS |       |       |
|---------|-------|---------|-------|-------|
|         |       | Yes     | No    | Total |
| **RIP** | Yes   | 10      | 34    | 44    |
|         |       | 23%     | 77%   |       |
|         | No    | 38      | 65    | 103   |
|         |       | 37%     | 63%   |       |
|         | Total | 48      | 99    | 147   |
|         |       | 33%     | 67%   |       |

Note:   New IMS, RIP vs. Controls: $\chi^2$=2.81, df=1, p=.124 (.067 1-tailed); odds ratio=1.99

Confidential

These results fall short of statistical significance because with such a low number of cases, the difference between groups is not large enough to establish a less than 5% probability that the results could have occurred by chance. We address below the underlying issue of what explains the positive findings. Meanwhile, it is worth noting that RIP participants, even if they failed to complete the program, were twice as likely to succeed as members of the control group. Furthermore, of the 48 RIP follow-up cases, only 5 were still on IMS when data were collected.

## Implications

This final section has two objectives:

1. To explain why our positive findings results may credibly be attributed to the program rather than to uncontrolled differences between the program and the control group; and

2. To draw some lessons from the brief but eventful career of RIP at WSP.

**Interpreting Results.**  Inherent limitations to research design in maximum custody studies mean that statistical findings, no matter how strong, cannot establish whether participants would have succeeded without the program,.  In such a case, interpretation is aided by taking seriously how the people involved explain their own behavior.  Many RIP participants were well known to staff because of frequently disruptive behavior or long-standing connections to security threat groups.  About these men, one veteran staff member commented as follows:

> The group who graduated all behave well; even one of those who failed is much better now.  Every single one of them in the past could and would have caused trouble.  These were high-powered guys.

No doubt one of the factors that distinguished those who persevered from those who failed or dropped out was how fed up they were with the path they had taken.  This theme was vividly expressed by a man in another stepdown program, featured in previous reports as a prime example of someone for whom IMS was designed:

> At some point you  realize that if you keep going on like this you're going to spend the rest of your life in a cage, and that's just fucking retarded.

Minor collateral incentives (out of cell time, mirror in cell) had little influence on decisions  to join or continue in the program.  Rather, participants were moved by longer-term incentives such as the prospect of staying out of IMU, promotions in custody levels, and contact visits and other forms of reconnection with the world outside prison.

> My family wanted me to do it.  I've been in, out, in, out.  I thought, I'd give it a shot, at least I tried.  They want for me to be placed in a different prison.

> What's respected is strength and violence; I was at the top of the food chain.  I've tried to change  in the past, but you can't crawl out from under your reputation.  I'd like to change my reputation with staff . . . you can't beat DOC physically.

These men, however, had not previously succeeded in governing their moment-to-moment responses by a long-term perspective. A paradigm case of such a transformation was provided by

Confidential                                                                                          PRSN-EV 00101

a man with STG ties and a well-established reputation as an enforcer; after leaving the IMU stage of the program, he was assaulted by another inmate in the yard.  Instead of beating the other man to a pulp, as his reputation required, he defended himself by bear-hugging his assailant:

> I was thinking:  just now, I didn't swing; will they look down upon me? But if I did I'd be losing out on everything:  no completing the program, not being able to see my son, my Dad, my Mom who's in the hospital  . .

Several months earlier, this man had described some effects of the program:

> It has been challenging:  you gotta be honest . . . Now I'm more calm, think things over, pay attention to people's opinions.

The argument for attributing our positive findings to the influence of the program is strengthened by the ability of participants to describe specifically what made a difference to them:

> At first I thought it was a snitch program, but when I began meeting daily, I saw that it wasn't; they were more interested in what I was thinking.  I did a lot of writing, bringing out aspects of myself I hadn't seen.

> Counselors talking to you every day; there's more interaction . . . The self-analysis helps you figure out a  lot of things about yourself.

> Point one, it was individually suited; point two, the counselors were there whenever you needed them and they work hard for you; point three, the self analysis.  This was the toughest part, it made you realize you're not a good person.

> There was a lot of one-on-one time . . . The program teaches you to stop and decide how you want to handle something.

> There was good information:  communication skills, dealing with stress, victim issues—seeing the ripple effect of what you do, conflict management—things you can say if people get in your face.

When asked what was most important, several participants named the specific staff members with whom they worked during the final months of the program.  The factor most difficult to control in any treatment program is the commitment and communication skills of staff.  This objective is aided by the authority to recruit and select staff but also requires explicit discussion, in this process, of the rationale for the program approach and the attitudes it requires of staff.

In summary, the participants we interviewed supported the social learning approach of the program.  Common themes included the availability of counselors, respect for individual differences, the relevance of mini-courses to their issues, and what they learned from a searching review of their past patterns.

**Lessons Learned:  Program Design.**  The enthusiasm and creativity of staff was reinforced by asking them to build the program, and most participants appreciated the difference between the program content and prepackaged courses such as anger management, cognitive behavioral change, and moral reconation training.

Confidential

- Nevertheless, a more limited and focused set of choices among mini-courses would provide clearer structure and consistency while still respecting the individuality and diversity of participants.

In 2008, Step 7—follow-up on graduates in general population—was added to the program tracking system jointly managed by UW and program staff. Participants need to be prepared to counter the suspicions of former associates and resist the temptation to prove themselves by resuming previous roles. This challenge is particularly acute for men with STG affiliations who are returned to close custody:

> If you start treating other people better, you become the enemy. It turns out [the members of my group] weren't really my friends . . . I'm challenged every day . . . I have to walk away vs. bash their skull in and drag 'em in my house.

Others evidently fared better because they had higher status to begin with and were more accommodating, maintaining relations with former allies without joining in their projects.

> Those who were really my friends know how important it is for me to be the way I am today. I'm trying to stay out of trouble and they respect that.

Some participants were able to transition quickly to medium custody. This move aroused suspicions (what did you do to get that?), but also relieved pressure to maintain a reputation on mainline: "The whole helpfulness was coming to medium . . . you still need aftercare."

- Any program for IMS transition needs to build in post-IMS planning and support from the beginning.

**Lessons Learned:  Program Implementation.**  The sections on planning and implementation described a combination of challenges:  resources, space, staff turnover, and resistance by staff not directly involved in the program.  One veteran administrator, commenting about "a lack of knowledge about how to implement a program that valuable," made specific suggestions:

- Talk about the program at roll call;

- Make presentations at each of the living units;

- Ensure that staff are specifically selected for the program;

- Work with other unit managers on the role of the program within the institution;

- Secure a location and resources before launching a program.

This last recommendation will be particularly difficult to achieve over the next few years. Furthermore, specific programs are always at risk for accidental damage as a by-product of institution or system-wide decisions about how to match bodies to beds at various custody levels and how to construct living spaces that minimize physical risks for staff and prisoners at large.

Finally, a comment about program acceptance.  It is common to defend treatment programs by arguing that good treatment is good custody; so common that one must wonder why this

RIP Evaluation                                                                                    14

argument isn't more effective. Part of the answer lies in specific evidence, such as that presented here, that a program improves safety and security by helping offenders change dangerous behavior. The paradox, however, is that participants accepted the program because its message was not about what the institution needed, but about respect: we're offering this program because we think it will meet needs you can recognize as yours—at least once we take the time to work through what matters to you. While it is natural to classify this approach as a form of "help," this term is misleading for two reasons. To offenders, it may suggest that staff know what's good for them, a suggestion unlikely to carry conviction with the kind of men who joined this program. To staff, it suggests that we want to do something good for these people; but what they have done to others makes it hard to think they have anything coming to them.

What is lost in this argument, of course, is the distinction between respecting a person's point of view and accepting what they do. The same battle was waged ten years ago, when Gary Jones, with respect as a watch-word, pushed through a new regime at WCC IMU that brought about dramatic reductions in violence, property damage, and cell extractions, amidst repeated warnings that reforms were undermining the principles by which dangerous men must be managed. Among the WCC innovations were periodic "walk-arounds," in which residents could speak with ranking institutional administrators, and sometimes got immediate relief when complaints were reasonable and readily addressed. This practice is now standard in all IMUs, and it may seem strange that it was once so controversial. Perhaps step-down programs for IMS inmates, likewise based on the principle of respect for their rational capacities, will someday seem an equally obvious matter of common sense.

Confidential

# References

Lovell, D. 2008. 2008.  Patterns of disturbance in a supermax population. *Criminal Justice and Behavior,* 35(8), 985-204.

Lovell, D. and Bouagga, Y.  2008.  *Characteristics of Intensive Management Status Inmates, Washington DOC.*  Olympia, Washington: Department of Corrections, unpublished.

Lovell, D., Cloyes, K., Allen, D. & Rhodes, L. (2000). Who lives in super-maximum custody? A Washington State study. *Federal Probation*, 64(2): 33-38.

Rhodes, L. (2004). *Total confinement: Madness and reason in maximum security*. Berkeley: University of California Press.

Toch, H. and Adams, K. (2002). *Acting Out:  Maladaptation in Prisons*. Washington, DC: American Psychological Association.

Yazar, Reyhan.  2001.  The Violence Prevention Program: Intensive Correctional Treatment. *Corrections Today*, April, 2001, 102-107.

# Acknowledgements

At the UW:  Clark Johnson developed the program tracking database that allowed measurement of program delivery, and his expert assistance in compiling complex correctional data from a variety of sources made it possible to analyze program and outcome data.  Kevin Cain provided essential methodological advice. Lorna Rhodes, Yasmine Bouagga, and Jorge Martinez offered insights based on interviews of inmates and staff at WSP and other facilities.

Neither this report nor the program it describes would have been possible without the dedication of administrators and staff at DOC.  Steve Ramsey, Carla Schettler, Emily Tillotson, Charlie Bull, Tomas Wilson, and Mary Moss played key roles in the design and implementation of the program, and in helping us understand what was going on.  The several dozen participants who spoke freely with us in interviews also deserve credit for their role in the program and in this report, although confidentiality rules prevent us from naming them.

Confidential                                                                                   PRSN-EV 00105

# EXHIBIT 5

PRSN-EV 00106

July 20, 2010

TO:        Sean Murphy, Dan Pacholke, Geri Newman, Tim Hunter

FROM:    David Lovell

SUBJECT:  CBCC ITP Evaluation

This memo covers 106 CBCC Intensive Transition Program (ITP) participants who had joined the program as of September, 2009. A more complete report and analysis will be completed later.

Comparison with WSP RIP. ITP resembles the RIP program at WSP in several critical respects. Both programs promoted personal change and institutional safety by helping offenders learn how to live safely in general population through a combination of counseling, offender change courses, incentives, and an opportunity to practice prosocial behavior in a secure social setting. Both programs included a trial period in a maximum security setting and proceed in steps—4 Phases for ITP, 6 Steps for RIP—with different combinations of interventions and increased responsibility at each level. ITP took from RIP the value of "high presence"—frequent interaction between participants and staff—as a critical part of intervention. Finally, both programs showed promising outcomes, with graduates returning to IMS at a far lower rate than control groups of IMS offenders. Furthermore, participants were able to describe what it was about the program that had helped them change, supporting an attribution of results to the program rather than to pre-existing differences between participants and controls. There were also, however, substantial differences between programs:

* While several of the CBCC courses, notably Self Repair and Commitment to Change, were developed by staff at CBCC, the program also used established interventions such as Moral Reconation Therapy and Getting It Right.

* ITP has been sustained with minimal dedicated staff FTE, due to substantial contributions of time and energy from administrators and staff. In addition to developing and facilitating many ITP courses, mental health professionals conducted assessments and provided an hour of individual counseling a week to each participant during Phases 1-3.

* CBCC ITP benefits from an ideal location, the old YOP facility, separate from general population with ample classroom space and three pods with graduated levels of custody.

* RIP participants moved through program steps at an individualized pace, whereas CBCC participants proceeded in small cohort groups of 5 or 6 with defined periods for each phase. RIP also included an extensive "timeline self analysis" that required participants to write a reflective description of their choices at critical junctures in their lives, including their prison careers. In these respects, the overall program at RIP was more individualized, although mental health counseling in ITP provides substantial individualized support.

Confidential

* Finally, all RIP participants were on IMS when they entered the program and retained that status well into the program. ITP, however, was designed also to divert offenders from IMS. Among ITP participants, 23% had never been on IMS in the current incarceration, and another 17% had completed their previous IMS long before program entry.

**Description of ITP Participants.** As of September, 2009, ITP had enrolled 106 participants. Of these, 13 were still in the program. Of the remaining 93 offenders, there were 59 (63%) who graduated, 14 (15%) transferred or released from prison, and 20 (22%) terminated.

Program graduates averaged almost a year in the program; non-graduates, 8 months. A few participants were suspended and returned later, joining a later cohort at an earlier program phase.

ITP participants were similar in racial classification to general population offenders (about 70% white), but showed a much higher proportion with Hispanic origin (22% vs. 10%). Like IMS offenders in previous studies—referred to as Non-ITP IMS—ITP participants were younger than general population offenders, had longer sentences, had been convicted of more violent crimes, and showed much higher infraction rates (averaging 3.3 major infractions per year, vs. 1 per year among general population offenders).

* ITP participants had a less serious criminal record than IMS offenders generally. Their average sentence length, while long, was 150 months, vs. 220 months for non-ITP IMS. There were 3 (3%) serving terms of Life Without Parole, vs. 8% of Non-ITP IMS (an additional 5 non-ITP IMS were under a death sentence).



2

- As in the RIP program, ITP participants had a higher rate of STG membership at 70% than non-ITP IMS offenders (54%). Latino STG members, especially Nortenos, have been especially active in ITP.



Chart 2. Affiliations of STG Members in ITP (N=166) and 2005 IMS Offenders (N=293)

**Program Outcomes.** The primary outcome measure was IMS recidivism, i.e., return to IMS status. For this purpose, 59 ITP participants with at least six months of follow-up in prison after leaving the program were compared to a control group from previous IMS studies.

- The 309 control cases were selected to match the ITP group in length of prison follow-up, rates of mental illness, and rates of STG membership (which is associated with a higher likelihood of return to IMS).

- Controls had higher average annual infraction rates than ITP participants (6.6 vs.5.2) but showed equal percentages in the more consequential general categories of low, medium, and high rate infractors.

- There were more controls with index violent (non-sex) offenses (76% vs. 54%), which—for reasons that have not been studied—is associated with a *lower* probability of IMS recidivism.

Although STG membership and previous infraction rates are associated with higher IMS recidivism, and index violent offenses with lower rates, a recent study of IMS recidivism shows that no combination of official record variables provides accurate predictions of IMS recidivism. It is reasonable to infer that recidivism is generated by unmeasured attitudes and habits, with which stepdown programs such as RIP and ITP have attempted to intervene. This inference would be supported by successful program outcomes.

3

ITP Evaluation Summary

David Lovell, UW

Table 1 compares all ITP participants to controls, Table 2 ITP graduates to controls. Lower rates of recidivism for ITP participants were significant and striking, even more so with program graduates. The odds of success over failure were 6 times greater for program graduates than for controls.

Table 1. Return to IMS, ITP Participants vs. IMS Controls

|  |  | Return to IMS | | Total |
|---|---|---|---|---|
|  |  | Yes | No |  |
| ITP | Yes | 15 | 44 | 59 |
|  |  | 25% | 75% |  |
|  | No | 142 | 167 | 309 |
|  |  | 46% | 54% |  |
|  | Total | 157 | 211 | 368 |

$\chi^2=8.5$, p=.002, odds ratio=2.5

Table 2. Return to IMS, ITP Graduates vs. IMS Controls

|  |  | Return to IMS | | Total |
|---|---|---|---|---|
|  |  | Yes | No |  |
| ITP Grad | Yes | 5 | 37 | 42 |
|  |  | 12% | 87.5% |  |
|  | No | 142 | 167 | 309 |
|  |  | 46% | 54% |  |
|  | Total | 147 | 204 | 351 |

$\chi^2=17.6$, p=.000, odds ratio=6.3

Controls were followed up longer than ITP participants—the average time "at risk" before the study was completed was 24 months for ITP participants, 28 months for controls—but in both groups, 90% of those who recidivated did so in less than two years.

In light of the previous discussion of differences between ITP and RIP, it is worth noting that it was evidently much more difficult to graduate from the RIP program, and this factor may have affected the pattern of results.

4

- Half of the 48 subjects of the RIP outcome study had graduated from the program (including 4 who left the program early with favorable transfers), compared to 70% of ITP outcome study subjects.

- Among those who didn't complete the programs, RIP non-graduates failed at a lower rate than ITP non-graduates:  7 out of 24 (30%) vs. 10 out of 17 (59%).

- As a result of these countervailing differences, 75% of participants in both programs—whether graduates or not—had succeeded in avoiding return to IMS until the point that data were collected, averaging about two years.

Caution should be exercised about these comparative findings. Differences in policies and methods of maintaining program records make it difficult to assess the extent of systematic differences in the way that participants were tested and weeded out if they seemed unready for general population or unresponsive to staff efforts.

Next Steps. In any study without random assignment of subjects to participant and control groups—a design to which there are substantial ethical, practical, and political drawbacks in IMS studies—differences in outcomes do not establish that the program was responsible for the difference. This difficulty is particularly acute for IMS stepdown programs, which include the objective of testing the readiness of participants to live safely in general population. By design, therefore, those who succeed in the program have already shown themselves as more committed to change than those who fail or who never choose to participate.

To aid interpretation of results, one must assemble evidence that participants would have been less likely to succeed without the program. To make this case, it is important to rule out alternative explanations, and the comparability of control groups is part of that argument. The other part of the argument, to be developed in a more discursive report, analyzes the ability of participants and staff to describe how the program made a difference. This evidence will be equally as valuable as the results reported here when DOC applies the lessons of these promising programs to future program design and to broader concerns about how offenders are treated and how violence is controlled in Washington's prisons.

5

PRSN-EV 00111

# EXHIBIT 15

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        kflood@acluaz.org
        jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,
Stephen Swartz, Dustin Brislan, Sonia Rodriguez,
Christina Verduzco, Jackie Thomas, Jeremy Smith,
Robert Gamez, Maryanne Chisholm, Desiree Licci,
Joseph Hefner, Joshua Polson, and Charlotte Wells, on
behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-NVW (MEA) <br><br><br> **REBUTTAL DECLARATION OF ELDON VAIL** |

-1-

**Introduction**

1.    I submit this report to rebut statements made in the report of Defendants'
witness Dr. Richard Seiter, and pertinent parts of the report of Dr. Joseph Penn, which
were served on December 18, 2013.

2.    As I stated in my report of November 8, 2013, I spent five days inspecting
three prisons where class members are housed in isolation in Arizona Department of
Corrections (ADC) prisons. I interviewed over 100 inmates and reviewed a large volume
of documents prior to writing that report. A list of those documents was attached to that
report. I have reviewed several dozen full or complete inmate files, grievance records and
death records for this case. Since writing the first report I have reviewed the Defendants'
expert reports, the deposition of Charles Ryan and a variety of other documents. A full
list of the additional documents I reviewed is attached hereto as Appendix A. I
approached this case as if I was the new Director of the system seeking the information I
would need to identify the nature of the problem(s) and begin to craft solution(s). Despite
Defendants' failure to provide all the information I have requested, based on my three
and a half decades of experience as a corrections worker and administrator, I am
completely confident that the documents I reviewed, and the inspection and interviews I
conducted provide sufficient basis for the opinions set forth in my reports.  In contrast, I
am concerned that Dr. Seiter did not undertake sufficient analysis of the actual conditions
of confinement in which inmates in the isolation units live.  In particular, his failure to
speak with prisoners in the isolation units is significant.  I do not know of any competent
corrections professional who would form an opinion about the functioning of a prison
system without speaking to a single inmate.

3.    As stated in my first report, I have been retained by Plaintiffs' counsel to
evaluate and offer my opinion regarding the policy and operational practices of the
Arizona Department of Corrections (ADC) regarding the use of isolation units.   I
understand that the Court has defined the isolation sub-class in this case as "All prisoners

who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units:  Eyman—SMU I; Eyman—Browning Unit; Florence—Central Unit; Florence—Kasson Unit; or Perryville—Lumley Special Management Area."[1]

4.   The particular focus of my review has been on the conditions of confinement for inmates housed in isolation in the units identified in the Court's Order and on whether or not the inmates, especially mentally ill inmates, are subject to a substantial risk of serious harm.[2]

5.   My opinions, restated here, have not changed as a result of the new information I have received or Defendants' experts' reports. In fact, those opinions continue to be strengthened as a result of my increased understanding of the situation in ADC facilities.  I note that many of the documents cited in Defendants' expert reports were not produced with those reports, and it is therefore impossible to evaluate fully all of the claims made in those reports.[3]  I therefore reserve the right to supplement this report when I have had the opportunity to review all of the pertinent sources relied upon by Defendants' experts.

6.   ADC policy for isolating inmates is over-broad and not justified by security considerations, and fails to systematically take into account the needs of mentally ill

---

[1] *See* Order, March 6, 2013, at 22 (Doc. 372).
[2] The defendants take issue with the use of the word "isolation" to describe the conditions under which many of the mentally ill live in the ADC.  Within the corrections industry several different words are used to describe these living conditions.  In addition to "isolation," some of the most frequently used terms are "segregation," "super-max," and "solitary confinement."  I use the word "isolation" throughout this Report. It was the first word I learned to describe these conditions when I started working in corrections in 1974. The Defendants use it as well in their curriculum for *Understanding Mentally Ill Inmates* on page 54: "Also, staff should know that placing this inmate in isolation may actually worsen his psychosis due to isolation, boredom, and lack of stimuli." (ADC049856).
[3] Defendants produced additional documentation just prior to the deadline for my rebuttal report and without sufficient time to review the production carefully.  I will supplement this report with any findings based on those documents in a further report as needed.

-3-

1    inmates, including the need to exclude seriously mentally ill prisoners from the isolation

2    units.

3         7.   The conditions of confinement for inmates in isolation in ADC prisons result

4    in extreme isolation and other hardships that are both unnecessary and counter-productive

5    to good prison security, as well as harmful for all inmates, but especially for the mentally

6    ill.

7         8.   ADC routinely and inappropriately uses chemical agents, such as Oleoresin

8    Capsicum (OC) products, against mentally ill inmates without considering the impact on

9    the inmate and the effective management of the inmate population.  This practice harms

10   mentally ill inmates, places them at risk of serious harm, and can undermine security on

11   the unit.

12        9.   My work in this matter is ongoing. I reserve the right to modify or supplement

13   my opinions, as new information is made available.

14   **Classification Policy and Practice**

15        10.  Dr. Seiter comments in his report on the ADC Classification policy (D01) and

16   on maximum custody inmates.[4] These sections are most revealing in that they show the

17   fundamental flaw in Dr. Seiter's analysis of ADC's over-use of isolation. A prison

18   system's classification scoring system, no matter if it has or has not been validated, bears

19   no necessary relationship to the actual conditions of confinement found in that system's

20   prisons. The practice in ADC assumes that inmates who are maximum custody must be

21   placed in isolation. Most jurisdictions make a distinction between assigning an inmate to

22   their highest level of general population confinement and placing someone in isolation or

23   segregation. Arizona does not. All maximum inmates are placed in isolation.

24        11.  Classification language is not the same across prison systems. Sometimes

25   prisons systems call their highest level of general population "maximum", others call it

26   "close". Some systems call isolation placement "super-max", others call it "maximum".

27   _____

28        [4] Seiter report, pages 1-3 (ADC203612-14).

-4-

There are other terms in use as well. But most prison systems have enormous differences in the conditions of confinement between those two groups—super-max and maximum. The ADC makes no such distinction and the result is unnecessary harm to inmates, especially to mentally ill inmates.

12. There is a fundamental difference between inmates who are demonstrating current problems containing their own (usually) assaultive behavior and who belong in some form of segregation for their own safety and the safety of others, and those who are not exhibiting such behavior. ADC by policy and practice repeatedly makes the mistake of assigning inmates to isolation not on the basis of actual behavior, but rather based on other concerns where security is not appropriately implicated.  These factors include placement in isolation solely due to a prisoner's committing sentence; due to belief that the prisoner is a gang member; for purposes of protection; because the prisoner has been a victim; because the prisoner was in isolation the last time he or she was released from prison; or because there is no less secure bed available. On top of these problems of over-classification, ADC's system is especially problematic because it makes no provision to exclude the mentally ill from placement in isolation. Based on my experience in the State of Washington, my current work in other jurisdictions, and my study of the ADC system, I believe there are many individuals who suffer the extremely isolating conditions of confinement in ADC's isolation units who could be better and more safely managed, for both staff and for inmates, in other, less isolating, prison environments.

13. Dr. Seiter accurately reports that, "One of the management challenges facing Arizona is the many different Maximum Custody inmates and the variety of security and program aspects of the different populations".[5] As described above, these challenges are of ADC's own creation because they make the mistake of isolating inmates who don't need that level of security. In my experience, such a policy is counter-productive as inmates are well aware of who really belongs in isolation and who does not. Such a

---

[5] Ibid, page 2 (ADC203613).

1   policy erodes the inmate's perception of the legitimacy of the authority of corrections

2   staff, a critical ingredient to achieving institution safety and security.[6]

3       14. Dr. Seiter says, "Maximum custody inmates are very difficult to manage".[7]

4   His statement ignores the distinction I make in the above paragraphs between general

5   population inmates for whom maximum custody placement is appropriate, and those

6   inmates whose current conduct is so dangerous that some form of segregation housing is

7   necessary for a short period of time.  In my experience, some maximum custody general

8   population inmates are actually quite easy to manage. To offer just one example, in my

9   experience inmates coming into a prison system with a life sentence often have the

10  capacity to be quiet, compliant and cooperative. In ADC, by policy, they must start their

11  time in maximum custody, which means isolation even though their classification score

12  would show they could be managed in a less severe environment.

13      15. Placement in isolation should be reserved for inmates who actually are a much

14  more difficult population to manage.  Specifically, any form of isolation housing should

15  be used sparingly and only for those who have demonstrated current behavior of

16  sufficient severity to justify their segregation from general population. ADC and Dr.

17  Seiter treat these populations as if they are the same. They are not.  And most prison

18  systems classify them separately and provide for a significant distinction in the

19  conditions of confinement between maximum custody general population inmates and

20  those housed in isolation.

21      16. Dr. Seiter and the ADC make no such distinction when they conflate

22  maximum custody general population with isolation. The result is that ADC uses

23  isolation when it is inappropriate and not justified by security needs  and causes

24  unnecessary harm to inmates, especially mentally ill inmates.

25

26

27      [6] See Appendix B, Anthony E. Bottoms, *Interpersonal Violence and Social Order in Prisons*, 26 CRIME AND JUSTICE 205, 254-81 (1999) (PLTF-PARSON 031718-795).

28      [7] Seiter report, page 2 (ADC203613).

**Use of Force and the Inappropriate Use of Chemical Agents Against the Mentally Ill**

17. The Defendants failed to provide Plaintiffs all the information available to Dr. Seiter and as a result he has had more access to Use of Force (UOF) report information than I have.[8] However, I have reviewed Dr. Seiter's report and three videos regarding inmate Christina Verduzco, which Dr. Seiter has also seen and writes about. Ms. Verduzco is a named plaintiff in this case, who I have met and interviewed, and whose records I have reviewed. It is well documented that she suffers from mental illness and asthma.[9] These three videos clearly illustrate the problem of the inappropriate use of chemical agents against the mentally ill on psychotropic medications which I identified in my report.

18. Dr. Seiter describes the videos as follows, "In two of the videos, she is smiling and laughing with staff after the use of force. Staff in all of these acted professionally and followed prescribed procedures".[10] I am astounded by his findings.

19. In each of these videos, Ms. Verduzco is on mental health watch in cells set aside for close observation of inmates at risk of self-harm or suicide. She is wearing nothing at all or just a suicide smock and is lying on the floor, covered with a single blanket.[11] She is sprayed solely because she will not show the correctional officer her face and hands when ordered to do so. The ADC Use of Force policy states, "In Mental Health care facilities, correctional staff shall notify and/or request intervention by Mental

---

[8] Seiter report, pages 12-13 (ADC203623-24). It appears that Seiter had access to all the UOF records for Florence, Eyman SMU 1 and Browning and Perryville Lumley from July 1, 2012-February 5, 2013, and selected fifteen packets for review and then three related videos from that fifteen. I had no such access.
[9] Absent an imminent threat where there is no alternative, use of OC spray is contraindicated for inmates who suffer from asthma.
[10] Seiter report, page 59 (ADC203670).
[11] In my first report I opined on how inappropriate it is for ADC to allow male officers to routinely supervise female inmates on suicide or mental health watch. These videos illustrate the problem with this practice in graphic detail as Ms. Verduzco is repeatedly exposed. This is not the kind of situation where viewing the unclothed body of female inmates by male staff can legitimately be justified. I continue to recommend that this issue be addressed in the ADC.

Health staff if the inmate or staff are not in imminent danger."[12] By no stretch of the imagination in any of these videos does Ms. Verduzco present an imminent threat. It appears that she is doing nothing more than trying to get some sleep. There is no evidence that any mental health intervention was contemplated or completed. In my experience, such an intervention by mental health staff would be highly likely to result in no UOF at all.

20. These three videos appear to be planned use of force situations and there is other ADC policy language that applies to those circumstances as well. ADC policy appropriately calls for and describes the steps for a planned use of force including the following statement: "Prior to scheduling a planned cell extraction in a Mental Health unit...the shift commander shall contact the Mental Health staff or psychologist for special handling instructions, if any, unless the situation dictates otherwise."[13] Again, no such effort was made.

21. The lack of any planning for what is to happen after the inmate is sprayed is also evident in these videos. In a situation where you are spraying an inmate in a cell in order to gain compliance with a lawful order in a situation that is not imminent, it is appropriate in every jurisdiction with which I am familiar to treat the incident as a planned use of force; you must be prepared for a cell extraction should the use of the spray fail. In contrast to such professional practice, it is clear in one of the videos of Ms. Verduzco that staff had not identified a clean cell with appropriate bedding to house her after she has been sprayed and decontaminated. Ms. Verduzco simply had to wait in restraints while the staff figured out where to move her. This lack of planning increases the danger to everyone involved, as the inmate is simply required to wait as the staff do the work they should have done before they sprayed her. If there was serious resistance from the inmate, this lack of planning would very likely result in injury to the staff or the

---

[12] ADC DO 804.04, Inmate Behavior Control, 1.1.4 (ADC107491).
[13] ADC DO 804.05, 1.4.5 (ADC107497).

inmate. The fact that Ms. Verduzco does not violently act out in these moments is more evidence that she presents very little real threat and everyone knows it. This further undermines the justification for any use of force in these situations. Instead, it suggests that the real reason for using the spray was to punish the mentally ill inmate for being disobedient when she struggled to follow the orders of correctional staff.

22. In the videos, it is further evident that there is no team assembled to deal with the situation should a cell extraction be necessary, and there is no evidence of any attempt to involve mental health staff to try to avoid use of force. Why Dr. Seiter believes these videos are evidence ADC staff "followed proscribed procedures" is inexplicable.

23. Seiter also describes the staff as acting "professionally" in these three UOF events. If I were making a training video to show staff the very definition of unprofessional behavior, I would use these videos as examples. As a former prison Superintendent (Warden) and Department of Corrections Secretary, assuming they had been appropriately trained, I would also discipline my staff if they had behaved the way ADC staff behave in these videos. If staff have not been appropriately trained, the responsibility rests with agency leadership.

24. Nearly every male officer in these videos does not have their protective vests appropriately fastened. Instead they are hanging open, leaving the sides of their torso vulnerable to a strike, a kick or a stabbing attempt. None of the staff are outfitted with a gas mask, a basic tenet for using OC spray in a planned UOF situation. The result is predictable. You can hear many staff coughing throughout the UOF events, equipped only with personal handkerchiefs to attempt to protect them from the effects of the spray. If the situation actually did turn violent, many staff would be ill equipped to be able to function properly.

25. In the videos, the staff off-handedly use vulgar language and in one of the videos they openly complain about their co-workers from another department, a practice that can fuel inmate efforts to split staff in order to gain their own way. All of these

behaviors are unprofessional in the correctional environment. They are unacceptable and should be the subject of corrective or disciplinary action in a well-run system. The behavior demonstrated by the staff in these three videos illustrates a complete lack of understanding and likely inadequate training about the proper use of force in a correctional facility, especially against the mentally ill. The spraying of OC against Ms. Verduzco was unnecessary and the staff seem to know it given their lack of attention to legitimate security precautions in these use of force situations. It appears that the OC spray is being administered to simply punish a disobedient mentally ill inmate.

26. Dr. Seiter also reports that, "In two of the videos, she was smiling and laughing with the staff after the use of force".[14] In fact, in one of those videos the staff laugh at Ms. Verduzco for the steam coming off of her hair after she is sprayed. At one point, Ms. Verduzco makes an inappropriate sexual comment, which causes the staff to laugh. At other times, she makes faces, talks to the camera, shouts obscenities and makes odd gestures with her hands. Last, in one of the videos, she does smile when she is left to sit outdoors for awhile as the staff try and figure out where to put her. She clearly states that it is more pleasurable to be out of her cell and outdoors, making her own comment on the conditions of confinement she has suffered for most of her time in prison.

27. Dr. Seiter's conclusion that the use of force and chemical agent spray against Ms. Verduzco is somehow appropriate and professional remains incomprehensible to me. Rather, it is an example of ADC's disregard for both the needs of the mentally ill and sound correctional management practices. In my experience, mentally ill inmates are often not capable of immediately following the orders of correctional staff. This is one of the reasons why housing individuals with mental illness in isolation settings is inappropriate and ineffective. It is also a key reason why correctional staff must bring the skills of a trained mental health professional to the scene in an attempt to de-escalate the situation when problems occur. But in ADC facilities, staff demand that the inmate

---

[14] Seiter report, page 59 (ADC203670).

immediately respond to an order and when they don't (because often they can't) staff assume they are simply disobedient and administer chemical spray. This is not only likely to exacerbate the symptoms of the mentally ill inmate, but it has an effect on the other inmates in the unit who witness this abuse, may be physically affected by the spray, and increase their own fear and distrust of the staff assigned to supervise them.

28. Such policies and practices create a cycle of behavior where the conditions of confinement become more restricted and the inmate's behavior, which they struggle to control, is simply punished rather than treated. The result is even more behavioral problems from the mentally ill inmate, and too often, other inmates on the unit. ADC's over-use of OC spray on prisoners with mental illness too frequently punishes them for the symptoms of their illness, undermining any clinical relationships and treatment that might be occurring, and increasing safety concerns for the entire unit.

29. Dr. Seiter analyzes three other video records of UOF situations that I have not seen and that were not produced with his report. Based on the summary in Dr. Seiter's report, it appears that at least one of the videoed incidents appears to involve inappropriate staff behavior very similar to what I have documented in the Verduzco videos. In Video 2, an inmate needs to be taken to a Mental Health watch cell, but he refuses to come out of his cell and is then repeatedly sprayed with OC. Documentation provided by Dr. Seiter includes no reference to the mental health intervention required by ADC policy.[15]

30. As I illustrated above, current ADC policy makes provision for a consultation/intervention by mental health staff prior to a UOF only in a Mental Health unit. As noted above, the evidence shows this intervention is not taking place, even in a mental health suicide watch cell before force is used. Even if it were, the written policy does not go far enough. As is the routine practice in many prison systems across the country, mental health interventions should be occurring with all inmates known to be

---

[15] Ibid, page 58 (ADC203669).

-11-

mentally ill prior to implementing use of force in a controlled situation, regardless of whether or not they are housed in a designated mental health unit. In my experience, such interventions will definitely reduce the need to actually use force, which will in turn improve the ability to manage the inmate in the correctional environment, and not inflict unnecessary harm.

**Conditions of Confinement, Extreme Social Isolation and Lack of Treatment**

31. The ADC isolation units I toured have some of the most extreme levels of social isolation I have seen in my years as a corrections professional. Staff interaction with inmates is minimal. For example, many of the units, such as those at Kasson and Eyman, have very small cellblocks and staff are not specifically posted in the unit so interactions are limited to the few times staff are mandated to be on the units to carry out specific tasks. In many of the units, due to the physical layout of the unit, inmates cannot see a staff member at all except for when they are passing through to deliver meals, conduct counts, etc. Dr. Seiter speaks of a rover position in his report, but if that position exists it is not a Post Order we received from ADC during discovery.[16] And even as described, that position does not provide the type of meaningful, human contact needed to lessen the extreme social isolation on ADC's isolation units. When I interviewed inmates, they consistently reported that staff were only seen in the units a couple of times each shift, that mental health contacts at the cell front are no more than a brief "drive by," and that their requests for contact with mental health staff went unanswered or took weeks before they were fulfilled.

32. Beyond the lack of staff interaction with inmates, the conditions on the isolation units provide few, if any, opportunities for other meaningful human interaction. Inmates in those units do not have adequate opportunities to interact with each other, even in a controlled setting. The ability to yell through an air vent or scream across a tier to another inmate is not normal human interaction, and it is not sufficient to lessen the

---

[16] Seiter report, page 7 (ADC203618).

-12-

impact of isolation on these units. Further, ADC's other policies, such as only offering exercise 3 days a week, allowing phone calls in such a way as to keep the inmate in his cell to make the call, limited outside visitation – even for the few inmates allegedly allowed occasional contact visits, and even serving food only twice a day, are all ways in which inmates in ADC isolation units are deprived of even the most basic human contacts.   These policies and practices lead to increased levels of social isolation experienced by inmates in each of the isolation units.

33. As described by Dr. Seiter, there is some physical difference in the isolation units at the different complexes I visited in the ADC.[17] Units CB 1-4 in Florence Central have open bar cells-fronts that allow for some limited communication from cell to cell. CB 1 and CB 2 are clearly what I would call "preferred housing" among the isolation cells in the ADC because there is a better ability to communicate with fellow inmates. But these units are also extremely small (40 to 54 square feet), well below the standards of the American Correctional Association (which are 80 square feet) and they are not properly ventilated. Dr. Seiter highlights these cells in his photographs attached to his declaration. From the three prisons I visited—Florence, Eyman and Perryville, Dr. Seiter has two photos of the cells from these prisons, both of them from Florence Central, CB 1-4.[18] This is not an accurate portrayal of a typical isolation cell in an ADC facility. He does not show pictures of the cell fronts from CB 5 and 7, Kasson, Eyman or Perryville, which are either perforated or solid steel doors that allow for very little light or and virtually no communication with other inmates.[19] Many of them don't even have a window with an outside view. Isolation cells with solid or perforated doors vast majority of such cells in the 3 prisons I inspected and their design coupled with the operational

---

[17] Defendants' Response to Plaintiff Wells' First Set of Interrogatories, pages 7-13.

[18] Seiter report, Exhibit 10, ADC203678 & ADC203680 (showing photographs produced as ADC166000 and ADC166010).

[19] He does attach one photo of a solid steel cell door from Lewis in Exhibit 11, 166104, which are much more typical of the isolation cells in the ADC.  See ADC203680.

practices of ADC indeed result in extreme social isolation.  Interaction between inmates or with staff passing by in the vast majority of ADC isolation cells is very, very difficult.

34.  ADC's allowance for some property for inmates in the isolation units is also insufficient to ameliorate the extreme social isolation of these units.  If the inmate had the resources to buy a TV, it was some help with the boredom and depression, but access to TV or radio is not a substitute for human interaction.  Such devices do not cure the fundamental problem of extreme isolation in ADC, especially for the mentally ill.  Moreover, many prisoners do not have the resources to purchase TVs or radios, even though many prisoners I interviewed, including those with obvious mental illness, were desperate to have even this small relief from the profoundly isolating conditions on these units.  Due to this lack of access, even the limited in-cell programming via CCTV that ADC claims to offer is not available to all inmates.

35.  Adding to the extreme despair and hopelessness generated by the conditions on these units is the lack of coherence or direction for inmates on how they can work their way out of isolation.  During my inspections, I noted the inmates' collective expression that they don't know what to do to earn their way out of isolation. Without a coherent program for inmates to understand what they need to do to earn release from isolation, their frustration, depression and consequent acting out will increase and make the institution more difficult to manage. That is the condition of ADC isolation units today.

36. As mentioned above, ADC's exercise policies and practices exacerbate isolation on these units.  Dr. Seiter quotes the policy in describing the exercise allowed for inmates in isolation within ADC facilities, but fails to note the inherently isolating aspects of a three-day-a-week exercise policy, and again fails to examine the actual implementation of that policy. While ADC offers, in policy, six hours of exercise a week for each inmate, those hours are offered in two-hour blocks only three days each week. This means that four days a week inmates spend the entire day locked down in their cells.

-14-

For inmates confined to an isolation cell, this means they don't even get the minimal human contact associated with a restrained escort by custody staff to a exercise area for most days of the week, every week. As I observed in my first report, "I found that it was very common for inmates not to be offered six hours of exercise each week—at least one of the exercise periods within a week's time is frequently cancelled".[20] And, as ADC has admitted, in most cases, cancelled sessions are not made up.[21]  The result of this regular and routine practice is more social isolation -- well beyond what I have seen in my own or in other jurisdictions.

37.   In Exhibit 9 Dr. Seiter shows photographs of some of the exercise enclosures in ADC facilities. Based on my interviews of inmates, the areas most commonly used at Eyman-SMU I and Eyman-Browning are from the first photo of the exhibit.[22]  These enclosures resemble a concrete bunker without windows or a view of the outside world, other than the partially open roof which allows prisoners to see a slice of the sky.  A handball may be allowed, but there is otherwise no equipment and there are not always misting systems in these enclosures to keep inmates cool in summer – contrary to ADC policy.[23]  The new outdoor exercise cages are a definite improvement over the concrete bunker enclosures at Eyman, but when I inspected facilities, many inmates had yet to be able to access them and those that did told me they got to them once every week or two. Still, even with improved exercise enclosures, ADC policy limits the exercise available to most inmates in isolation units to three days a week--at best--so the inmates remain without exercise four days a week.[24]  Very few inmates got access to the big yard at

---

[20] Vail report, November 8, 2013, page 23.
[21] Fizer dep. 82:23-83:11; Plaintiff Dustin Brislan's First Set of Requests for Admission (Nos. 1-78) and First Set of Interrogatories (Nos. 1-2) to Defendant Charles Ryan, *and Defendant Charles Ryan's First Supplemental Answers Thereto*, at Req. for Admis. No. 17.
[22] See ADC203571 (showing photograph produced as ADC 153343)
[23] Grievance of R. Gamez and response, August 14, 2013 (PLTF-PARSONS-030781-85).
[24] I was told during my inspection of Lumley-SMA that recreation for the women is conducted 6 days a week, one hour a day, in contrast to ADC's formal policy.

Florence Central or Lumley-SMA, and few had access to the larger exercise cages at Eyman. I spent some time with the inmates in the Florence Central yard and what I came away with was that this was a group that didn't belong in isolation at all. Some inmates in the isolation units may benefit from the slightly improved conditions of exercise in the outdoor cages, and the ability to interact somewhat with other inmates that the cages allow. But even with this improvement in exercise for some inmates, the isolation conditions overall continue to be too isolating and the opportunities for exercise too few, especially for the mentally ill.

38. Dr. Seiter offers in his report the observation that some inmates will engage in exercise activities while in their cells. Of course many inmates will attempt to do some sort of exercise in their tiny cells, but such in-cell exercise provides limited opportunity for real exercise and no opportunity for social interaction. It is not a substitute for being able to get out of the cell and interact with other human beings and in some circumstances in the ADC, see the sky or breathe fresh air. In-cell exercise is no relief from social isolation or sensory deprivation.

39. Dr. Seiter reports that he witnessed inmates in isolation making phone calls -- as did I. Phone calls help inmates cope with the stress of isolation when they can stay connected to family and friends on the street. But unique to Arizona, the phone calls are made by portable phone while the inmate stays in the cell instead of being escorted to a booth to make the call.[25] This practice is one less opportunity for human interaction with the staff. Moreover, the limited amount of phone calls allowed for inmates in isolation cannot compensate for the extremely isolating conditions to which they are routinely subjected on a daily basis. And some inmates have no one to call so telephone access provides no relief from unremitted isolation.

---

[25] It is my understanding that some inmates at Lumley-SMA may be able to use payphones on the yard. However, this is the exception in the ADC system for inmates in isolation units.

40.   Out of cell time can ameliorate the impact of prolonged confinement in isolation. That is one of the reasons that programs should be offered for inmates housed in such an environment. Dr. Seiter makes much of what he believes are significant opportunities for treatment of the mentally ill housed in ADC isolation units.[26] He asked ADC staff what treatment is going on and they told him that at Perryville, "each individual receives individual counseling monthly, and those with a need receive weekly counseling". Staff at Florence told him that inmates in CB 1 receive individual counseling monthly and participate in two groups a week.  Staff at Kasson told him that inmates there receive the same.  At Eyman, staff told him that inmates receive cognitive restructuring and pre-release classes. If these programs were being consistently offered to these populations, they would have an impact on time spent in the cells and would provide more human contact and give inmates something to look forward to. But other than the claims of ADC staff, I have seen no evidence that inmates are receiving that minimal level of programming in these facilities.  Even if such programming were consistently available, the few additional hours out-of-cell per week would not be sufficient to ameliorate the damaging effects of the extreme conditions of social isolation and idleness on ADC's isolation units, especially for the seriously mentally ill.

41.   The description of programming and treatment on the ADC isolation units in the Seiter report is, however, entirely inconsistent with what I repeatedly heard from inmates during my inspection of those facilities. For example, in Florence Central, CB 1, I did not encounter a single inmate that told me he was able to participate in two groups a week. Some inmates said they went to group once a week, but some said they never did. Some inmates reported one-on-one sessions, but others said they have never received one. At Kasson, I found more inmates that reported they were able to participate in groups, but some inmates reported they only had one group a week and some received no

---

[26] Dr. Penn made similar findings regarding alleged mental health programs in his report.  However, as Dr. Seiter is the respondent for my report, I direct most of my comments to his findings.

-17-

one-on-ones. My interviews with other inmates at Florence Central revealed the same pattern of episodic treatment or total absence of treatment. The same is true from my interviews at Eyman. A few inmates were able to participate in a single group or had an occasional one-on-one, but the more common refrain was that despite their desire and effort to try and get into a group or receive other mental health services, they were frustrated by being unable to do so. At Perryville, I found no evidence that groups were occurring at all and several inmates did not receive any individual counseling as was reported in Dr. Seiter's declaration.

42. I note that in the report of Dr. Penn he relates that Dr. Taylor of ADC informed him that as of July 2013, she estimates that of all inmates designated as seriously mentally ill (SMI), 70% participate in structured programming, but the remaining 30% are not eligible because they are on death row; have validated security threat group (STG) or management problems; are in detention - either disciplinary or have a pending PC request; or are on mental health watch.[27] There is no justifiable security reason for denying programming to seriously mentally ill prisoners based on these classification issues.[28] Classification is not a reason for denying necessary care. And in my experience, prisoners with these types of classifications can be included in mental health programming in general population housing units, segregation housing units and mental health treatment units without security concerns.

43. It is unfortunate that the reality of the programming described by the staff to Defendants' experts does not match the level or nature of programming that is actually provided. However, even if ADC did have some fully operational programs as described by Dr. Seiter and Dr. Penn, and I have not seen evidence that they do, those programs

---

[27] Penn report, page 45.
[28] Being placed on mental health watch might justify not attending a group session, depending upon the opinion of the treating mental health clinician. However, during my tours, I repeatedly heard from prisoners who were on mental health watch, or who had been on mental health watch, who reported having no meaningful interaction with mental health clinicians and very limited access to mental health care of any kind both generally and while on watch.

would still be insufficient to ameliorate the extreme social isolation suffered by prisoners in ADC isolation units, especially mentally ill prisoners.  The fact that ADC does not exclude seriously mentally ill prisoners from its isolation units continues to place those prisoners at extreme risk of harm.  Whether or not ADC provides some access to mental health programming to some inmates in isolation, some of the time, does not solve the fundamental problem that ADC is placing seriously mentally persons in its isolation units in the first place.  The conditions on ADC's isolation units are counterproductive for individuals with serious mental illness; such conditions cause behavioral problems and exacerbate mental illness.

44.  I believe that Plaintiffs' counsel has repeatedly requested all program schedules and program information for the facilities in question.  The limited documentation Defendants actually produced in no way illustrates that there are enough programs slots to serve the number of mentally ill inmates housed in the ADC isolations units.[29]  What new documentation the Defendants produced as part of their expert reports also does not provide clear evidence of the alleged programs actually being implemented in these units. None of this documentation demonstrates programs, opportunities for social interaction, and out-of-cell time sufficient to overcome the extreme isolation conditions on the units, which places all inmates, and especially those with serious mental illness, at extreme risk of harm.

45.  In Dr. Seiter's report, Exhibit 5, he provides an outline of purported step programs in the ADC isolation units.  It is unclear where all the information on these programs was drawn from – it certainly exceeds what I've seen in the policies produced by ADC and in the self-reports of inmates in the actual units, most of whom had little understanding or information about any programs.  Based on my experience in corrections, such programs have limited value for mentally ill inmates who have difficulties following and understanding rules and making rational choices.  As a result

---

[29] See ADC 139516-18, 139524 and 139525-28.

they are often trapped on the lowest, most isolating levels of a step system.  They may get to a higher level every once in a while, and then fall back down to the lowest level where their behavior is worsened due to the exacerbating mental health impacts of isolation. The result is that mentally ill prisoners frequently spend months or years trapped in the most isolating conditions where they do not receive the type of programming, human contact and psychological support they need to prevent their illness from escalating, while at the same time the conditions prevent their behavior from improving and they suffer serious harm from prolonged isolation.

**Colorado Study on Effects of Administrative Segregation**

46.  Dr. Seiter relies on a 2010 study out of the State of Colorado which looked at the impacts of long-term isolation on mentally ill inmates and concluded that most did not experience worsening mental health symptoms, although many did not get better and remain symptomatic in solitary.[30] That study stands alone in its conclusion regarding the impact of isolation on mentally ill individuals, and has been repeatedly criticized for its flawed methodology. It has not been accepted by the corrections community at large. Even the Colorado Department of Corrections rejected its findings and has gone in a different direction, removing mentally ill inmates from Administrative Segregation.

47.  Peter Scharff Smith, internationally known researcher and author on corrections issues, including solitary confinement, has written about the flaws inherent in the Colorado study. In an article about the study he concludes:

> The Colorado study suffers from several major problems. First, some of the most relevant research available was not used and it was wrongly claimed that previous research was biased and flawed. Secondly, the way the self-reported data was collected very likely made these data unreliable. Thirdly, the study's authors ignored that their crisis data seriously questioned the validity of their self-reported data and in fact suggested that AS might have serious health effects. Fourth, the

---

[30] Maureen L. O'Keefe, Kelli J. Klebe, Alysha Stucker, Kristin Sturm & William Leggett, *One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, State of Colorado (2010), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf.

majority of the study participants apparently came directly from segregation, and thus were likely to be harmed from solitary confinement before the study started. Finally, the Colorado study in fact did not compare segregation/solitary confinement with non-segregation/solitary confinement since most of the GP participants also went into solitary confinement during the study. Imagine a similar situation with, for example, medical research on the effects of a new type of medicine where it turns out that most of the control group participants also received the new medicine being tested both during the study and prior to the study start. It does not make sense. It is therefore extremely difficult to gain any valuable information about the effects of AS and solitary confinement from the Colorado study.[31]

48.   Other corrections researchers, Stuart Grassian and Terry Kupers, have reported similar concerns. They report that relying on inmates to assess their own psychological conditions is a fundamental flaw in the Colorado study. They also point out that the Colorado researchers failed to evaluate test results in light of the prison mental health records.[32]

49.   Within the larger corrections community, the Colorado study is not accepted as definitive. It is being used by jurisdictions that wish to defend practices that are harmful to inmates. In fact, the direction the State of Colorado has taken with its segregation/solitary confinement population is illustrative of the larger national perspective.

50.   In 2011, the Colorado Department of Corrections asked the National Institute of Corrections to evaluate its segregation practices. The result was a comprehensive report that laid out a blueprint to reduce their segregation population and improve the conditions of confinement for those inmates housed in that status.[33] The Executive

---

[31] Peter Scharff Smith, *The Effects of Solitary Confinement: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation*, Corrections & Mental Health (2010), National Institute of Corrections, *available at* http://nicic.gov/Library/025885.

[32] Appendix C, Stuart Grassian & Terry Kupers, *The Colorado Study vs. The Reality of Supermax Confinement*, 13 Correctional Mental Health Report 1 (2011) (PLTF-PARSONS-031796, 802-04).

[33] James Austin & Emmitt Sparkman, *Colorado Department of Corrections Administrative Segregation and Classification Review*, National Institute of Corrections (2011), *available at* http://www.ccjrc.org/pdf/2011_Solitary_Confinement_Report.pdf.

-21-

Director of the Colorado DOC indicated that he would be implementing the recommendations of the study.[34]

51. After the Colorado study was issued, in 2011, the Colorado legislature directed the DOC to report annually on the agency's progress to remove mentally ill and developmentally disabled inmates from segregation.[35]

52. Finally, in December of 2013, the interim Director of Prisons issued a memo to his staff directing that inmates diagnosed with a major mental illness not be assigned to administrative segregation.[36] Even the Colorado DOC did not act upon the flawed study from its jurisdiction. Rather, it paid attention to the larger body of research—and years of correctional experience—confirming the harm done to inmates, mentally ill and non-mentally ill, by placement in isolation. The Colorado Department of Corrections, the source of the study Dr. Seiter cites to support his supposition that isolation does not harm mentally ill persons, has rejected that study and now excludes seriously mentally ill persons from isolation, while at the same time reducing its population in segregation and improving the conditions of confinement.

**The National Perspective**

53. Dr. Seiter concludes his report by saying, "It is my opinion that the evolution of Arizona Department of Corrections policy and practices regarding Maximum Custody inmates is similar to those of other correctional agencies and professional organizations".[37] I do not agree. The isolation policy and practices in the ADC lag considerably behind what is occurring in other jurisdictions.

---

[34] *See* Act of June 3, 2011, 2011 Colo. Sess. Laws 289, 1342 (codified at 17-1-113.9), *available at* http://tornado.state.co.us/gov_dir/leg_dir/olls/sl2011a/sl_289.pdf (requiring an annual report from the Department of Corrections to the legislature concerning "the status of administrative segregation" and "reclassification efforts for offenders with mental illnesses or developmental disabilities, including duration of stay, reason for placement, and number and percentage discharged").

[35] Ibid.

[36] Memo to Wardens from Lou Archuleta, Interim Director of Prisons, Colorado DOC, December 10, 2013 (PLTF-PARSONS-031299).

[37] Seiter report, page 26.

54. Dr. Seiter relies on a resolution by the Association of State Corrections Administrators (ASCA) in his attempt to ground his opinion.[38] Again, Dr. Seiter focuses on the written word of policy and not on the actual practice when he says the ADC is "in line with current professional thinking and consistent with the suggested ASCA guidelines."[39] The ASCA resolution are guidelines written quite broadly and do not address or analyze what happens when you conflate general population inmates with inmates who require isolation and place both groups into the isolation environment, which is the actual ADC practice.[40] Even so, ADC fails to comply with the ASCA guidelines in policy and in practice.

55. Arizona fails to meet even the most basic introductory definition offered by ASCA which states, "Restricted housing is a form of housing for inmates whose continued presence in the general population would pose a serious threat to life, property, self, staff or other inmates, or to the security or orderly operation of a correctional facility. This definition does not include protective custody."[41] Inmates placed in isolation based solely on their committing offense, or because they are believed to be a gang member, because they have been victims, because they were in isolation the last time they were released from prison, or because they have lengthy waiting periods

---

[38] ASCA, Resolution #24—*Restricted Housing Status Guidelines*, September 4, 2013, *available at* http://www.asca.net/system/assets/attachments/6386/ASCA%20Resolution%20%23%20 24%20Final.pdf?1381938344.
[39] Seiter report, page 25 (ADC203636).
[40] The ASCA guidelines come on the heels of a report by the Yale Law School (Hope Metcalf et al., *Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies*, A Project of the Liman Public Interest Program at Yale Law School (June 2013), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2286861) that simply gained access through ASCA to policies related to isolation from the members of ASCA. It is primarily a policy survey that points out policy trends and differences as well as the multiple areas where further research is needed regarding isolation/segregation units in order to explore and understand what is actually going in these units in American prisons.
[41] ASCA Resolution #24.

-23-

awaiting transfer to a less secure bed do not meet this definition. It is undisputed that the ADC houses many protective custody inmates in isolation.[42]

56. ADC fails to meet even the minimal guidelines offered by ASCA. For example, Plaintiff allege and their experts support the fact that ADC does not provide "appropriate access to mental health staff and services,"[43] nor do they develop "an appropriate mental health treatment plan"[44] for mentally ill inmates placed in isolation. Even Dr. Seiter acknowledges that the ADC falls short of the ASCA guidelines (principle 11) when he says, "It is not yet clear how ADC will collect data to assess the effectiveness of implementation of their evolving plans for Maximum Custody."[45]

57. ADC is out of step with what is occurring in other jurisdictions. What is going on in Arizona is not consistent with what is going on nationally. As I detailed in the previous section of this report, Colorado is moving forward aggressively to reduce the number of inmates held in isolation, improve the conditions of confinement and find alternate placements for the mentally ill. And other states and jurisdictions have made or are making significant changes in their isolation practices.

58. In the New York Department of Correctional Services, the mentally ill are not placed in their Special Housing Units but instead diverted to Residential Mental Health Treatment Units.[46] In those units inmates are provided, in addition to exercise, "four hours of structured out-of-cell therapeutic programming and/or mental health treatment on a daily basis".[47] (Inmates in one 38-bed unit are provided with two hours.)

---

[42] Ryan depo, page 171, line 4.
[43] ASCA Resolution #24, principle 6.
[44] ASCA Resolution #24, principle 3.
[45] Seiter report, page 25.
[46] N.Y. Cor. Law § 137: NY Code – Section 137: Program of treatment, control, discipline at correctional facilities.
[47] Part 320 Residential Treatment Units, Section 320.3, New York State Department of Corrections and Community Supervision

59. In the California Department of Corrections and Rehabilitation, a system that is currently being sued for placement of mentally ill persons in isolation, policy requires that seriously mentally ill inmates are offered at a minimum ten hours of treatment per week, whether they are housed in isolation or general population.[48] Compare that requirement to the best-case scenario in the ADC when staff say that some mentally ill inmates are offered two group sessions and an individual counseling session per week, a claim that is not supported by any verifiable evidence.

60. As I detailed in my last report, several jurisdictions--the examples I offered were Mississippi, Virginia and Maine--have successfully reduced the number of inmates held in isolation, in some cases reporting improved institutional security as a result. More recently, New Mexico Corrections Secretary Gregg Marcantel outlined a plan to state legislators to cut the state's segregation population by half over the next year.[49]

61. What to do with inmates who legitimately need to be held in some form of segregation is a national conversation and one that has been occurring for a long time, for at least the last couple of decades in my home State of Washington. Attached as Appendix D (PLTF-PARSONS 031820-37) to this report is a power point presentation offered by the current Secretary of the Washington DOC, Bernard Warner, at a recent ASCA meeting. This power point is offered as an example of a state that takes this problem seriously, one which is working to build upon and develop evidence based programs, one which uses data to understand what the system is doing and whether it is working, and one which works to provide alternatives for the mentally ill. It is a far cry from the incoherent and feeble attempts taking place in ADC prisons today.

---

[48] California Department of Corrections and Rehabilitation, Mental Health Services Delivery System Program Guide, p. 12-4-8 (2009), *available at* http://www.cdcr.ca.gov/dchcs/docs/mental%20health%20program%20guide.pdf.

[49] Associated Press, *New Mexico Prisoner Segregation Under Review*, LAS CRUCES SUN-NEWS, Nov. 24, 2013, http://www.lcsun-news.com/las_cruces-news/ci_24592049/new-mexico-prisoner-segregation-under-review.

**Conclusion: Promises are Not Enough**

62.   Whether ADC launched its alleged effort to focus on improving the conditions of confinement and providing better mental health care to inmates in isolation as a result of the filing of this lawsuit is a recurrent theme in this case. Whether they did or not, the new and promised programs sketched in Dr. Seiter and Dr. Penn's reports do not reflect sound correctional practice, and they are insufficient to meet the level of need. Moreover, these programs remain so inchoate that neither inmates caught in this system—or indeed this writer—can hope to understand what the programs are and how inmates are supposed to function or thrive in them.

63.   ADC officials make promises about what they are developing and what they are going to do. Both Dr. Seiter and Dr. Penn rely extensively on ADC's plans for the future in evaluating the system's treatment of the isolation subclass. It is impossible to evaluate those promises. I submit that these promises about what ADC is going to do are irrelevant to determining what is going on in the isolation units today – or what may ultimately be going on in those units months from now. Instead of making promises, ADC needs to re-examine who they place in isolation and make significant reductions in the number of people who are housed in those units. ADC needs to dramatically improve the conditions of confinement for all inmates housed in isolation. ADC must offer meaningful programs for inmates that result in release from isolation upon successful completion. And last, but certainly not the least, ADC needs to stop placing seriously mentally ill prisoners in isolation units, and instead develop alternate, appropriate programs for mentally ill inmates who require segregation from the general population.

Executed on the 3lst day of January 2014 in Olympia, WA.

E. V

Eldon Vail

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:    dpochoda@acluaz.org
          kflood@acluaz.org
          jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:    dspecter@prisonlaw.com
          ahardy@prisonlaw.com
          snorman@prisonlaw.com
          ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
          afettig@npp-aclu.org
          aquereshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

**ARIZONA CENTER FOR DISABILITY LAW**
Asim Varma (Bar No. 027927
Sarah Kadar (Bar No. 027147)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:    jalewelt@azdisabilitylaw.org
          avarma@azdisabilitylaw.org
          skadar@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
**ARIZONA CENTER FOR
DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:    jrico@azdisabilitylaw.org
          cdooley@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

# Appendix A

# APPENDIX A

## *Documents received from Plaintiffs' Counsel after submission of initial expert report on November 8, 2013*

### ADC Staff Training Materials

- Suicide and Symptoms of Mental Illness
  - In-Service
    - ADC_S000317 2014 - Signs and Symptoms of Mentally Ill Inmates
    - ADC_S000318-000361 - 2014_Signs_and_Symptoms_of_Mentally_Ill_Inmates
  - Pre-Service
    - ADC_S000362-000384 - 9.7a COTA Signs & Symptoms of Mental Disorders
    - ADC_S000385-000439 - 9.7a COTA Signs and Symptoms of Mental Disorders
    - ADC_S000440-000444 - COTA Signs & Symptoms of Mental Disorder
- Suicide Prevention
  - In-Service
    - ADC_S000445 - 2014 Inmate Suicide Prevention
    - ADC_S000446-000515 - 2014_Inmate_Suicide_Prevention
  - Pre-Service
    - ADC_S000516-000517 - 9.7 SP Risk Factor Cards
    - ADC_S000518-000534 - 9.7b Suicide Prevention
    - ADC_S000535-000553 - 9.7b Suicide Prevention LP
    - ADC_S000554-000555 - SP Risk Factor Cards

### Corizon Reports

- ADC_M00001 - CONFIDENTIAL SPDR Report
- ADC203028 - CONFIDENTIAL Arizona - Clinical Data Report October 2013
- ADC203029 - CONFIDENTIAL Arizona - Dental Utilization Statistics October 2013
- ADC203030 - CONFIDENTIAL Arizona - Dental Wait Times Report October 2013
- ADC203031 - CONFIDENTIAL Arizona - Formal Grievances by Category October 2013
- ADC203032 - CONFIDENTIAL AZ - Health Needs Requests (HNR) Appt Report October 2013 pivot table
- ADC203033 - CONFIDENTIAL Arizona - Hepatitis C Report October 2013
- ADC203034 - CONFIDENTIAL Arizona - Hospitalization Statistics Report October 2013
- ADC203035 - Arizona - Informal Grievances by Category October 2013
- ADC203036 - Arizona - Inmate Wait Times Report October 2013
- ADC203037 - CONFIDENTIAL Arizona - Intake Report October 2013
- ADC203038 - CONFIDENTIAL Arizona - Med Mal Stats October 2013
- ADC203039 - CONFIDENTIAL AZ - Medical Transports Complex Report October 2013
- ADC203040 - CONFIDENTIAL AZ - Medical Transports Statewide Report October 2013

- ADC203041 - CONFIDENTIAL Arizona - Monthly Staffing Report October 2013
- ADC203042 - CONFIDENTIAL Arizona Statewide Grievances October 2013
- ADC203043 - CONFIDENTIAL CAG FAQ PBMS Report FY14 - October 2013
- ADC203044-203050 - Corizon AZ Emergency Transports by Complex Oct 2013
- ADC203051-203060 - Corizon AZ Medication Report Oct 2013
- ADC203061-203062 - Corizon AZ Inpatient Admits Oct 2013
- ADC203297 - CAG FAQ PBMS Report FY13 - June 2013
- ADC203348 - November 2013 Inmate Wait Times Report
- ADC203349 - CONFIDENTIAL November 2013 Dental Utilization-Statistics
- ADC203350 - CONFIDENTIAL November 2013 Dental Wait Time Reporting
- ADC203351 - November 2013 Hepatitis C Report
- ADC203352 - November 2013 Inmate Intakes by Complex

**Death Records**



- : ADC138451-138455
- : ADC138574-138578, ADC190930-191062 , ADC197201-197206
- : ADC197192-197198
- : ADC197256-197257
- : ADC192219-437, ADC138280-138284
- : ADC192973, ADC138436-138440
- : ADC138599-138603
- : ADC193394-498, ADC193232-193393
- : ADC138589-93
- : ADC197286-90
- : ADC138346-50, ADC194265-194282
- : ADC138619-138623
- : ADC197207-197211
- : ADC194468-194528

**Defendants' Expert Reports and Associated Productions**

- Confidential Expert Report of John Dovgan
- Confidential Expert Report of Lawrence Mendel
- Confidential Expert Report of Joseph Penn
- Confidential Expert Report of Richard Seiter
- Defendants' Expert Materials, Volume 1, January 17, 2014
- Defendants' Expert Materials, Volume 2, January 17, 2014
- Defendants' Expert Materials, Volume 3, January 17, 2014
- Defendants' Expert Materials, Volume 4, January 17, 2014

**Depositions**

- Deposition Transcript and Exhibits: Richard Pratt, 11/7/13
- Deposition Transcript and Exhibits: Charles Ryan, 11/8/13

**Disclosure Statements**

- Defendants' 11th Supplemental Disclosure Statement

**Grievances (plaintiffs and non-named plaintiffs)**

- ████ : ADC198954-199097
- ████ ADC199098-199125
- ████ : ADC199126-144
- Brislan: ADC199145-56
- ████ ADC199157-64
- ████ ADC199165-214
- ████ : ADC199215-22
- ████ ADC199223-320
- ████ : ADC199321-33
- ████ ADC199334-43
- ████ : ADC199344-52
- ████ : ADC199353-65
- ████ ADC199366-89
- Gamez: ADC199390-557
- ████ ADC199558-78
- ████ : ADC199579-89
- ████ ADC199590-98
- ████ : ADC199599-622
- ████ : ADC199623-31
- ████ : ADC199632-40
- ████ : ADC199641-53
- ████ ADC199654-72
- ████ ADC199673-83
- ████ ADC199684-90
- ████ : ADC199691-97
- ████ ADC199698-706
- ████ ADC199707-15
- ████ ADC199716-26
- ████ : ADC199727-37
- ████ ADC199738-46
- ████ : ADC199747-52
- ████ ADC199753-62

- ███████ ADC199763-76
- ███████ ADC199777-86
- ███████ ADC199787-97
- ███████ ADC199798-876
- ███████ ADC199877-915
- ███████ ADC199916-37
- ███████ ADC199938-47
- Rodriguez: ADC199948-77
- ███████ ADC199978-200000
- ███████ ADC200001-18
- ███████ ADC200019-30
- ███████ ADC200031-40
- ███████ ADC200041-66
- ███████ ADC200067-90
- ███████ ADC200091-130
- ███████ ADC200131-39
- ███████ ADC200140-48
- ███████ ADC200149-200158

**Master Files (non-named plaintiffs)**

- ███████ ADC195245
- ███████ ADC195508-908
- ███████ ADC195509-90
- ███████ ADC168131-548
- ███████ ADC168549-637
- ███████ ADC168638-815
- ███████ ADC168816-55
- ███████ ADC168856-960
- ███████ ADC168961-9213
- ███████ ADC169214-397
- ███████ ADC169398-542
- ███████ ADC169543-660
- ███████ ADC169661-818
- ███████ ADC169819-35
- ███████ ADC169836-69
- ███████ ADC169870-919
- ███████ ADC169920-45
- ███████ ADC169946-59
- ███████ ADC169960-79
- ███████ ADC169980-70005
- ███████ ADC170006-46
- ███████ ADC170047-56

**Miscellaneous**

- AGA_REVIEW_00022492 - Pratt Email to Taylor July 10, 2013
- ADC203027 - Arizona - Cert and Licensing Monthly Update October 2013
- ADC203063-203258 - Wells 2d Supp Resp - Rog 7
- ADC203259-203296 - Wells 2d Supp Resp - Rog 8
- ADC203353-203359 - Feraci Store Order History
- ADC_P000984 - ADC ID Badge re Suicide Warning Signs
- ADC_S000556 - MHclassificationbyGenderDec9
- PLTF-PARSONS-030744-54 – Gamez Grievance
- PLTF-PARSONS-030781-85 – Gamez Grievance
- PLTF-PARSONS-031179 – Death Notice for ▇▇▇ dated ▇▇▇▇▇
- PLTF-PARSONS-031180 - Memo Mental Health Qualifiers, Ad-Seg
- PLTF-PARSONS-031235 – Metcalf et al., "Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies"
- PLTF-PARSONS-031299 – Archuleta Memo, Colorado Dept. of Corrections, re: Mental Health Qualifiers (M-Code)

**Named Plaintiffs' Records**

- ADC203298-203347 - Licci Updated Medical Records
- ADC_M000195-000206 - Joshua Polson's ENT Records
- ADC_P000580-000858 - AIMS REPORTS - ALL NAMED PLAINTIFFS (CONFIDENTIAL)

**NCCHS Accreditation Reports**

- ADC_P000888-000901 - Douglas 20130628 Report
- ADC_P000902-000915 - Perryville 20130628 Report.
- ADC_P000916-000919 - Perryville 20131011 Update Report
- ADC_P000920-000933 - Phoenix 20130613 Report
- ADC_P000934-000950 - Tucson 20130628 Report
- ADC_P000951-000959 - Tucson 20131108 Update Report
- ADC_P000960-000964 - Winslow 20131119 Update Report
- ADC_P000965-000973 - Yuma NCCHC - 2011-03-11 - update report
- ADC_P000974-000976 - Douglas 20131119 Update report
- ADC_P000977-000979 - Perryville 20131118 Update report
- ADC_P000980-000983 - Phoenix 20131122 Update report

**Photos**

- ADC165980-166048 - Florence - 2013-08-20 (redacted)
- ADC166049-166110 - Lewis - 2013-08-21 (redacted)
- ADC166111-166173 - Perryville - 2013-08-19 (redacted)

- ADC166174-166183 - Perryville-Lumley - 2013-08-19 (redacted)
- ADC166184-166215 - Tucson - 2013-08-22 (redacted)

**Plaintiffs' Expert Reports**

- Expert Report of Craig Haney, Ph.D., J.D.
- Expert Report of Pablo Stewart, M.D.
- Expert Report of Eldon Vail
- Expert Report of Brie Williams, M.D., M.S.

**Programs**

- ADC_P000859-000865 - Tucson HU-7 WIPP Time sheets
- ADC_P000866 - Eyman Special Mgmt Unit I Map as of 10-28-13
- ADC_P000867 - Eyman Mental Health Program Schedule
- ADC_P000882 - Eyman Weekend Recreation Schedule
- ADC_P000883-000886 - Phoenix-Baker - Introduction to Baker MH Program
- ADC_S000286-000291 - Central Unit Mental Health Programs & Schedule

**Resumes**

- ADC203360-203362 - Mark Jansen CV
- ADC203363-203364 - Mark Fleming CV
- ADC203365-203367 - Thomas Buenker CV
- ADC203368-203371 - William Smallwood CV

**Use of Force and Significant Incident Reports**

- ADC197317-197317 - Verduzco - UOF 11-B02-5191 - 2011-12-22
- ADC197318-197318 - Verduzco - SIR 12-03705 2012-03-25
- ADC197319-197319 - Verduzco - SIR 12-04264 2012-04-14
- ADC197320-197320 - Verduzco - SIR 12-04264 2012-04-14
- ADC197321-197322 - Verduzco - 2011-07-14 SIR11-8212
- ADC197323-197324 -Verduzco - 2011-10-28 SIR11-12792
- ADC197325-197356 -Verduzco - 2011-11-04 SIR11-13116
- ADC197357-197358 -Verduzco - 2011-11-28 SIR11-14066
- ADC197359-197360 -Verduzco - 2012-01-25 SIR12-0986
- ADC197361-197362 -Verduzco - 2012-02-05 SIR12-1451
- ADC197363-197366 - Verduzco - 2012-02-24 UOF 12-B02-0840
- ADC197367-197369 -Verduzco - 2012-03-25 IR 12-B02-1255
- ADC197370-197378 - Verduzco - 2012-03-29 UOF 12-B02-1324 re SIR 12-03705 (9)
- ADC197379-197380 -Verduzco - 2012-04-06 SIR12-4264.
- ADC197381-197382-Verduzco - 2012-04-14 IR 12-B02-1543

- ADC197383-197384 -Verduzco - 2012-05-21 IR 12-B02-2163
- ADC197385-197386 -Verduzco - 2012-07-03 IR 12-B02-2797
- ADC197387-197388 -Verduzco - 2012-07-04 SIR12-8297
- ADC197389 -Verduzco - 2012-08-18 IM Disciplinary
- ADC197390-197391 -Verduzco - 2012-08-18 IR 12-B02-3450
- ADC197392-197393 -Verduzco - 2012-10-18 SIR12-13061
- ADC197394-197395 -Verduzco - 2012-10-23 IR 12-B02-4360
- ADC197396-197398 -Verduzco - 2012-11-01 IM Disciplinary
- ADC197399-Verduzco - 2012-11-13 IM Disciplinary
- ADC197400-197401 - Verduzco - 2012-11-13 IR 12-B02-4628
- ADC197402-197402 - Thomas - 2011-04-08 IM Disciplinary re UOF 11-A08-04152
- ADC197403-197405 - Thomas - 2011-11-02 IR 11-A45-0045
- ADC197406-197409 - Thomas - 2011-11-02 SIR 11-13010
- ADC197410-197410 - Thomas - 2012-01-22 IM Disciplinary re UOF 12-A08-0423

# Appendix B



# CHICAGO JOURNALS

---

Interpersonal Violence and Social Order in Prisons
Author(s): Anthony E. Bottoms
Source: *Crime and Justice*, Vol. 26, Prisons (1999), pp. 205–281
Published by: The University of Chicago Press
Stable URL: http://www.jstor.org/stable/1147687
Accessed: 28/01/2014 12:19

---

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at
http://www.jstor.org/page/info/about/policies/terms.jsp

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of
content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms
of scholarship. For more information about JSTOR, please contact support@jstor.org.



*The University of Chicago Press* is collaborating with JSTOR to digitize, preserve and extend access to *Crime and Justice.*

http://www.jstor.org

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 12:19:10 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031718

*Anthony E. Bottoms*

# Interpersonal Violence and Social Order in Prisons

ABSTRACT

The incidence of acts of interpersonal violence in prisons is influenced by the characteristics of inmates but also by aspects of the prison environment and by the continual dynamic interaction between prisoners, prison staff, and the physical and social context within which they are placed. Enhanced physical restrictions can often reduce levels of violence due to restrictions on opportunity but may also sometimes lead to a loss of legitimacy that can escalate violence. Previously understudied aspects of prison social life include routines and staff-prisoner relationships, both of which are central to the maintenance of everyday social order. Prisoner-staff assaults are particularly associated with the potential "friction points" of the prison regime and the prison day, but some officers seem more skilled at handling these friction points in ways that avoid violence. The study of prisoner-prisoner violence presents a paradox, with a frequently described pervasiveness of the rule of force within inmate society yet also surprisingly high levels of day-to-day prisoner safety; explaining this paradox is a key issue for future research.

For analytical purposes, the topic of prison violence has been usefully divided by Braswell, Montgomery, and Lombardo (1994) into two main types of behavior, namely "interpersonal violence" and "collec-

Anthony E. Bottoms is Wolfson Professor of Criminology at the Institute of Criminology, University of Cambridge. Grateful acknowledgment is made for intellectual stimulus from colleagues working on Cambridge-based prison research projects, especially Will Hay, Alison Liebling, and Richard Sparks. Parts of the introduction and Section IV of this essay are adapted and developed from A. E. Bottoms and R. Sparks, "How Is Order in Prisons Maintained?" in *Security, Justice and Order in Prison: Developing Perspectives*, edited by A. Liebling (Cambridge: University of Cambridge, Institute of Criminology, 1997). Kimmett Edgar of Oxford University made valuable comments on an earlier draft of Section VI.

© 1999 by The University of Chicago. All rights reserved.
0192-3234/1999/0026-0006$02.00

205

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:17:58 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031719

206      Anthony E. Bottoms

tive violence." These authors do not, however, address the important question: What primarily distinguishes these two categories?

The kernel of the answer to this question, I suggest, lies in the relationship between prison violence and the social order of the prison. When so-called collective violence occurs, it brings with it *a significant breakdown in the normal patterns of social order in the institution*—a breakdown that is seen most spectacularly, of course, in major prison riots such as those at Attica, New York, in 1970 and Santa Fe, New Mexico, in 1980. By contrast, when people speak of "interpersonal violence," they refer to violent events that take place *within the everyday frameworks of the prison's social order*. Such events, although occurring within "everyday frameworks," can of course be extremely serious; they might involve, for example, a homicidal assault or a major injury, and they might generate considerable fear among at least some prisoners and some staff. Yet, notwithstanding the very serious character of some interpersonal violence, it differs from collective violence in that it poses no decisive challenge to the continued smooth functioning of the prison *as an organization:*[1]

> Organizations (offices, factories, schools, hospitals, prisons) direct the activities of their members via the precise control of time; their hierarchies are reflected and sustained in their "zoning" of space; they monitor their own activities through surveillance, considered both as the collation and storage of information (files, records, inventories, accounts) and through direct "supervision," especially of subordinate members. Organizations use "specially designed locales" (Giddens 1987, p. 157) to facilitate their continuous activity. Such buildings (of which prisons are an obvious instance . . . ) are "power containers: physical settings which through the interaction of setting and social conduct generate administrative power" (Giddens 1987, p. 157). (Sparks, Bottoms, and Hay 1996, pp. 75–76)

[1] Three qualifications to this statement are required in the interests of full accuracy. First, interpersonal violence, especially if serious, does produce some temporary disturbance to some aspects of the prison's social order. Second, it follows that the distinction between "collective violence" and "interpersonal violence," though clear in most contexts, will be difficult to apply to some intermediate incidents. Third, it must be pointed out that even in the case of major riots, the authorities always eventually regain control of the prison—even if this process takes several weeks (see Woolf [1991] on the disturbances in England at Manchester Prison and elsewhere in 1990).

This content downloaded from 198.91.32.137 on Tue, 28 Jan PLTF-PARSONS-031720
All use subject to JSTOR Terms and Conditions

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 156 of 276

This essay does not discuss collective violence in prisons, a topic that would merit a separate review essay.[2] Rather, the focus here is on interpersonal violence in prisons—on prisoners assaulting prisoners and prisoners assaulting staff members.[3] Following the line of thought sketched above, the essay seeks to understand interpersonal violence within the framework of the prison's everyday social functioning. Of course, interpersonal violent acts are committed by individuals (or by individuals acting in small groups), and it is always important to consider the background characteristics, the life histories, and the current emotional states of those who assault. (This is especially the case in the prison setting, since prisons by definition contain a disproportionate number of individuals who can reasonably be described as "violence-prone.") Yet interpersonal prison violence, although always committed by individuals, also always occurs *within the social context of daily prison life;* and prisons, as the quotation above will already have made clear, are in a very real sense "special places" (Bottoms and Sparks 1997, p. 16). It follows that, in discussing interpersonal prison violence, some close attention needs to be paid to the social organization of the prison, as well as to the characteristics and histories of individual prisoners.

Prisons are special places, with a special kind of social organization, in at least six senses. These are as follows:

First, as Goffman (1961) famously observed, prisons are, in common with other kinds of organizations such as boarding schools, mental hospitals, barracks, and monasteries, total institutions. That is to say, in such institutions people ("inmates") regularly sleep, eat, work, and play on the same premises in a process that might be described as "batch living." Hence, such institutions have a tendency to encompass the lives of their inmates "to a degree discontinuously greater" than other social institutions, a discontinuity that is "often built right into the physical plant" through features such as "high walls, barbed wire . . . or moors" (Goffman 1961, p. 4). These important observations, however, need qualification in two senses. First, while all "total institu-

---

[2] For discussions of collective violence in prisons, see, e.g., Useem and Kimball (1989), R. Adams (1992), Colvin (1992), and sec. III of Braswell, Montgomery, and Lombardo (1994).

[3] There is, of course, a third type of prison interpersonal violence, namely staff members assaulting prisoners. This is an important topic, but it raises a distinct set of issues, which for reasons of space cannot be tackled here. For discussions of staff violence to prisoners see, e.g., Marquart (1986); chaps. 8, 10, and 11 in Braswell, Montgomery, and Lombardo (1994); Human Rights Watch (1996).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2020 from RLTF.PARSONS-031721
All use subject to JSTOR Terms and Conditions

tions" share certain common characteristics, it does not follow that they are all identical—clearly, there are some significant and easily identified differences between barracks, monasteries, and prisons. Moreover, Goffman's use of the adjective "total," although graphic and making an important point, is potentially misleading. Now that we live in a globalized, media-dominated age (where, e.g., in-cell televisions are no longer a rarity in prisons) it is easy to see that total institutions are not as "total," nor as impervious to external influences, as the terminology might seem to imply. Although prisons were almost certainly more "total" in the past, the reality is that they have always been, to some extent, influenced by the sociopolitical milieu in which they are set (for an extended discussion of this point see Jacobs 1977).

Second, unlike some total institutions, prisons are, in a real sense, *punitive establishments*. Liberal penologists have often declared, following Alexander Paterson (see Ruck 1951) that offenders are sent to prison "as a punishment, and not for punishment." But not even the most liberal penologist would deny that imprisonment is part of a country's *penal system* (note the adjective "penal"); and any penal system has among its features both the prevention of crime (through general deterrence, incapacitation, and so on) and the imposition of censure on convicted criminals (see von Hirsch 1993). Prisoners themselves are acutely aware of these matters. As King (1985, p. 187) once bluntly observed: "For as long as we have prisons . . . then we will continue to hold prisoners against their will. *At bottom that is what it is about*" (emphasis added).

Third, as in other organizations ("total" or otherwise), within prisons there is a special internal organization of both *space and time*. There are routine practices—for example, of feeding, work, educational opportunities, recreation, and locking up—that take place at scheduled times and in scheduled places. These routines create a patterning of the day, and different "atmospheres" or "social climates" in different locations (or at different times of the day in the same location), focused around a particular activity. Such patternings and social climates bite deeply into the everyday consciousness of both custodians and captives; and they can vary substantially in different prisons.[4]

---

[4] See, e.g., the comment by the English Research and Advisory Group on the Long-Term Prison System that one important element in a prison regime is its "*degree of structure* . . . by [which] we mean the degree to which prisoners are free to make choices about their use of time and space. The degree of structure present in regimes varies considerably from one type of establishment to another throughout the prison system. Local prisons, for example, are characterised by a highly structured regime where particular

PLTF-PARSONS-031722

Fourth, it follows from the above that, as in other organizations, the reiteration of a *daily routine* is central to the prison's nature as an institution. The British sociologist Giddens (1984, 1987) has argued persuasively that everyone's daily life contains a significant element of routine, and that social theorists need to pay close attention both to how everyday routines structure and sustain social institutions over time,[5] *and* to how individuals assimilate new routines and, in time, are thus enabled to cope with many aspects of contemporary life by developing everyday skills that they hardly realize they have.[6] Since most prisons have a more pronounced daily routine than other social institutions, it is not surprising that all of these features can easily be uncovered, in any prison setting, by a careful observer. Yet the importance of routines, though not absent from the research literature on prisons, has been insufficiently analyzed by most prison scholars, particularly given that this is such a prominent feature of every prisoner's and every prison officer's daily life. However, none of the above should be read as an assertion that prison life (or social life in other contexts) is *nothing but* the orderly repetition of routines. People are not automata. And sometimes, routines will be resented or rebelled against by those who are subjected to them: though on closer examination, as we shall see later in this essay, such rebellions themselves sometimes prove to have at least a partially patterned or predictable character (e.g., some moments in the daily routine seem particularly likely to be subject to challenge and possible disruption).

Fifth, there is the complex issue of *staff-prisoner relationships*. As Sykes (1958) indicated in his early and classic book *The Society of Captives*, once permanent solitary confinement has been eschewed by a prison system, and the prisoners are allowed some degree of "association" (as English prison administrators still call it), it follows that the

---

pre-determined activities take place at particular pre-determined times and in particular pre-determined places. By comparison, prisoners in a dispersal prison have a much greater degree of choice about how and where they spend their time" (Home Office 1987, para. 82; emphasis in original).

[5] For example, the daily reproduction of the social institution of the school is achieved by, among other processes, routine actions in thousands of households every morning, with parents ensuring that their children have all the appropriate accessories (coat, lunch, schoolbooks, etc.), and then bundling them into the car or toward the school bus.

[6] For example, driving a car requires much concentration for the new driver, but skillful driving can be accomplished almost subconsciously by the experienced motorist. This latter kind of activity is usefully called "practical consciousness" by Giddens: he argues that actions of this sort are "not directly motivated," but rather consist "of all the things that actors know tacitly about how to 'go on' in the contexts of social life, without being able to give them direct discursive expression" (Giddens 1984, p. xxiii).

This content downloaded from 198.91.32.137 on Tue, 28 Jun 2016 19:26:37 UTC
All use subject to JSTOR Terms and Conditions

HLTF-PARSONS-031723

210     Anthony E. Bottoms

prison becomes, in miniature, a kind of castelike social system, with two main sets of players: the captors and the captives. But, for prison officers, all this creates some difficulties. It is they who must ensure that the daily social routines are followed, and that the business of the prison day follows a smooth and orderly progression. (In a very real sense, a prison officer's day can be said to have been "successful" when the day's routines have been accomplished, the prisoners are all safely locked in their cells, and *nothing untoward has happened all day.*) Yet for prison officers to achieve these "orderly progressions" is by no means simple. The routines are prescribed (see above), but it is prison officers who must persuade prisoners to follow these routines. And they must do this notwithstanding that the prisoners are in prison against their will; that (at least in most day-to-day situations) prisoners heavily outnumber prison officers; and that, to many prisoners, the incentives or disincentives (rewards and punishments) that the prison system offers have little real meaning. Sykes's conclusion, reaffirmed by many scholars since his day, was that the guards have to resort to many small "accommodations"[7] to get the job done. Subsequent researchers have also observed the very real interpersonal skills intuitively deployed by many basic-grade prison officers in such contexts (perhaps, e.g., in defusing a potentially very tense situation in a cell block over a new directive from the prison's governor; see generally Sparks, Bottoms, and Hay 1996; Liebling and Price 1999). It follows from all this that the maintenance of order in a prison never just "happens," and nothing (certainly not simple repression) guarantees its continuity. If "order" of some sort exists in most prisons (and it does), then it is something that is accomplished by people (especially prison officers) as an outcome of certain distinct kinds of work. All such work is skilled and knowledgeable activity. It requires personal agency, even though many of the actions involved (more especially the routinized ones) are in the sphere of "practical consciousness" (see n. 6) rather than being carefully calculated or deliberated-over. Identifiable special measures directed specifically toward keeping or restoring "control" in a particular prison may indeed be part-and-parcel of the work of accomplishing order, but they are emphatically not the whole of it. Rather, order in prisons is to a large extent achieved through the subtle interplay of relationships

[7] Sykes calls these accommodations "corruptions," but the use of this term seems distracting and rather misleading: see Sparks, Bottoms, and Hay (1996), p. 42.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 ...
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031724

between prison officers and prisoners, as they work their way through the prison day. Thus we ultimately cannot understand day-to-day order in prisons unless we understand both the prison's daily routines and the interpersonal (but structured) relationships that grow up around them.

Sixth, prisons are, by their nature, restricted *geographical locales*, or *places*. This is a point that is too often overlooked, both in the academic literature, and by senior managers in prison headquarters who can on occasion become overly preoccupied with abstract management systems. But on the ground, in any given prison, a shrewd observer often notices that the prison walls do not simply surround those people (staff and prisoners) who are there at a given moment. Rather, the walls *contain a whole history*. For example, an in-depth study of two English maximum–security prisons was conducted by a research team that included the present author (Sparks, Bottoms, and Hay 1996). These two prisons had, at that time, very different regimes. One prison, Long Lartin, had for special historical reasons evolved a somewhat relaxed supervisory style, perhaps epitomized by the remark of a previous governor that "you may have to lose some control in order to gain control" (quoted in Bottoms and Light 1987, p. 15). Over time, this supervisory style had won very substantial support and loyalty from the uniformed officers in the prison, who referred to it proudly as the "Long Lartin ethos." The other prison, Albany, had suffered two major crises of control in fairly quick succession; and these setbacks had very seriously eroded the professional self-confidence of the frontline staff, who argued strongly that the only way for the prison to regain and retain firm control was to adopt a deliberately restrictive regime. No incoming governor of Long Lartin, whatever his/her preferred management style, could afford to ignore the "Long Lartin ethos," and the uniformed staff's loyalty to it, which significantly influenced many day-to-day staff-prisoner interactions in the cell blocks and elsewhere. No incoming governor of Albany, whatever his/her preferred management style, could afford to ignore the uniformed staff's fearful and demoralized state, based directly on the prison's recent history. Any seasoned observer of prisons will be able to recall other situations where a particular prison's recent (or even not-so-recent) history has been similarly important because of key memories and perceptions of staff, or prisoners, or both. As Giddens (1984, p. 367) neatly puts it, in such contexts we have to take account of the fact that "the continuity of the

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 from PLTF-PARSONS-031725
All use subject to JSTOR Terms and Conditions

212    Anthony E. Bottoms

biography of the individual is expressed in, and also expresses, [elements of] institutional reproduction."[8]

As later sections of this essay will indicate, it has now become something of a commonplace in the research literature on prisons to say that interpersonal violence can only properly be understood by an "interactionist" approach, that is to say an approach that takes into account not only the characteristics of individual prisoners, and not only the nature of the prison environment (as exemplified in the six points made above), but also what Wright (1991a, p. 217) has called "the fit between person and environment" (or, in the less mechanical language that I would prefer, the continual dynamic process of interaction between the prisoners, the staff, and the environment they both inhabit). Yet when we turn to the world of prison policy documents, matters are often very different. As King and McDermott (1990, p. 449) have observed, official discourse on prison control problems "sometimes pays lip-service to the capacity of the system to generate its own trouble," yet in practice it "falls back time and again on a model that locates trouble primarily in the dispositions of individual prisoners."[9] One reason for such a disjunction is, perhaps, that prison scholars have failed adequately to develop socially contextualized accounts of prison violence that make real connections to the lived daily experience of prison administrators. Researchers speak of "interactionist" approaches, but they have rarely addressed the minutiae of the average prison day, or considered in detail how violence can arise within this social order.

This essay is intended, in part, to redress this balance. While providing a general (and, I hope, fair) overview of the literature on prison interpersonal violence, there is a special emphasis on understanding such violence within the context of the everyday social order of prisons as organizations. This emphasis derives from the research, mentioned above, into two contrasting English maximum-security prisons (see Sparks, Bottoms, and Hay 1996, where a fuller theoretical elaboration of some aspects of this approach may also be found).

In pursuit of these aims, the remainder of this essay is organized in

---

[8] The original quotation refers to "the continuity of institutional reproduction." I have amended this because, as the Albany example shows, elements of institutional reproduction that deliberately reject past practices may also be attributable to the continuity of the biography of individuals.
[9] A notable exception to this generalization, in England, was the major report on prison disturbances published a year after King and McDermott had made their comment; see Woolf (1991).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031726

the following way. Section I asks what interpersonal prison violence is, how it can be measured, and how frequently it occurs. Section II considers the evidence relating to some basic possible correlates of interpersonal prison violence, such as age, gender, race, and sentence conditions. Section III assesses what convincing evidence we have that a prison's environmental conditions (to use a very all-encompassing term) do indeed have an influence on the level and the types of interpersonal violence. Section IV then asks the too-often ignored question as to how daily social order is in fact maintained in most prisons most of the time. After this somewhat elaborate (but, I would argue, necessary) set of maneuvers, we are in a better position to consider interpersonal prison violence "in the round." The remaining two sections then focus briefly on the two main types of interpersonal prison violence, asking what can be freshly learned about them from the approach that this essay recommends, and what gaps in our knowledge remain. Section V addresses prisoner-staff violence from this perspective, while Section VI considers prisoner-prisoner violence.

## I. How Much Interpersonal Prison Violence?

One needs only to pose seriously the question, "How much prison violence?" to realize that there are no easy answers. Davies (1982, p. 150) provides a useful starting point in suggesting how difficult it is to define what is or is not a violent incident in the prison context. As he puts it: "There are degrees of aggression and violence which lie on a continuum, for example: shouting, 'squaring up,' pushing or shoving, slapping, scratching, butting, punching, biting, elbowing, kneeing, kicking, knifing, shooting, (causing an explosion). In prison, an inmate might find himself on a violence disciplinary report for virtually any of these activities, from pushing to knifing inclusive."

   Nor do the definitional problems stop there. For even if, in a particular situation, there is an admitted use of force (e.g., a slap or a punch), it can often be argued that the force used was justified—for example, an inmate might say he/she used force in self-defense, or a guard might say he/she used force as a necessary tactic, and to a reasonable extent, to quell an infractious prisoner. There is also the further complicating issue of nonphysical types of victimization. Bowker (1980), in an influential early study, identified four types of victimization among prisoners, namely physical victimization, psychological victimization, economic victimization, and social victimization. It is not hard to appreciate that, to a prisoner, some kinds of continuous economic or psy-

This content downloaded from 198.91.32.137 on Tue, 28 Jan ...
All use subject to JSTOR Terms and Conditions
PLTF-PARSONS-031727

214        Anthony E. Bottoms

chological victimization could be more hurtful than, say, a single phys-
ical slap. (Very similar issues arise when considering victimization and
abuse within family and spousal contexts. See, e.g., Bijleveld 1998; van
Dijk et al. 1998.)

In this essay, in order to keep the scope of the discussion within rea-
sonable limits, I shall confine the analysis to *the unjustified use of, and
threats of, actual physical force in prison*. But this initial definitional step
is only a beginning. Accurately measuring prison violence, so defined,
poses many further problems—not least since anyone with any knowl-
edge of prisons knows that a considerable proportion of assaults and
physical threats are known only to the parties concerned, and therefore
do not find their way into the official prison assault figures.

In considering the measurement of international variations in com-
munity crime rates, Lynch (1995, p. 21) makes the following pragmatic
and sensible suggestion about data sources: "Police statistics should be
used for comparing crimes that are known to be well reported to the
police and that are consistently well reported across nations. This in-
cludes homicide, motor vehicle theft, and burglaries involving forcible
entry. Victim surveys should be used for comparing classes of crime
that are not well reported to the police."

Following this advice, obviously one should use victim surveys to as-
sess the levels of most interpersonal violence in prisons, since prison
assaults are certainly not "well reported" to the authorities, and nor,
probably, are they "consistently . . . reported" in different prisons. Un-
fortunately, for the purposes of the present essay, such a conclusion is
of limited assistance, because victim surveys are at present not at all
well developed in the prisons context (see further below). As for
Lynch's first category of crimes (i.e., those where the use of official
data would apparently be appropriate because of high and consistent
reporting and recording), there are few types of incident in the prison
setting that are at present known to fall within such a definition. An
obvious possible candidate is prison homicide—but, as we shall see, the
extent and the technical quality of the data available on this topic is at
present quite limited. Thus the question "How much prison vio-
lence?" can, at this time, be answered only very tentatively and approx-
imately.

## A. Studies of Physical Victimization in Prisons

As far as I am aware, the jurisdiction that, at present, has the most
extensive available set of information on physical victimization in pris-
ons is England and Wales. I shall, therefore, begin with a description

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:20:58 PM
All use subject to JSTOR Terms and Conditions

LITE-PARSONS-031728

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 164 of 276

TABLE 1

Recorded Disciplinary Offenses of Assault and Fighting in Prison
Service Establishments Housing Male Prisoners, England and Wales,
1990–96 (Rates per 1,000 Inmate Population)

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|
| A. Assaults on staff: | | | | | | | |
| All establishments | 37 | 42 | 48 | 60 | 61 | 50 | 39 |
| Local prisons | 42 | 48 | 55 | 74 | 81 | 71 | 56 |
| Open prisons | 3 | 0 | 5 | 3 | 3 | 1 | 2 |
| Closed training prisons | 33 | 33 | 40 | 43 | 42 | 34 | 26 |
| YOIs | 43 | 47 | 55 | 64 | 66 | 63 | 49 |
| Remand centers | 76 | 121 | 110 | 137 | 106 | 83 | 57 |
| B. Assaults on inmates: | | | | | | | |
| All establishments | 30 | 33 | 33 | 41 | 39 | 38 | 34 |
| Local prisons | 32 | 33 | 31 | 38 | 41 | 43 | 36 |
| Open prisons | 2 | 3 | 4 | 2 | 4 | 3 | 3 |
| Closed training prisons | 17 | 18 | 17 | 19 | 18 | 15 | 15 |
| YOIs | 120 | 118 | 140 | 146 | 151 | 153 | 168 |
| Remand centers | 159 | 182 | 189 | 211 | 175 | 206 | 184 |
| C. Fighting: | | | | | | | |
| All establishments | 93 | 91 | 95 | 104 | 101 | 93 | 89 |
| Local prisons | 83 | 84 | 88 | 93 | 93 | 96 | 94 |
| Open prisons | 12 | 8 | 7 | 8 | 4 | 4 | 4 |
| Closed training prisons | 71 | 55 | 55 | 54 | 49 | 53 | 47 |
| YOIs | 383 | 375 | 416 | 497 | 501 | 462 | 526 |
| Remand centers | 439 | 523 | 499 | 518 | 522 | 473 | 437 |

Source.—Data are derived from relevant annual volumes of *Statistics of Offences against Prison Discipline and Punishments in England and Wales.*

Note.—YOIs = young offender institutions.

of what is known from these British sources. As will be seen, making
sense of the available data is far from straightforward.

In England and Wales, the prison authorities are by statute required
to publish annually a statistical return of all the recorded disciplinary
offenses in every prison. Recorded data for assaults and fighting in
male prisons since 1990, with a breakdown by type of prison, are given
in table 1. These data show that, overall, in 1996 there was a rate of
thirty-nine per thousand inmate population for prisoner–staff assaults,
thirty-four per thousand for prisoner-prisoner assaults, and eighty-
nine per thousand for offenses of fighting.[10] However, further examina-
tion of table 1 shows first, interesting changes over time (with rates

[10] In principle, an "assault" is unjustified violence by one person on another; and
"fighting" is a bilateral or multilateral physical conflict, in which no one party is neces-
sarily the aggressor. Obviously, in practice the distinction is not at all clear-cut.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 16:17:41 PM
All use subject to JSTOR Terms and Conditions

BULTE-PARSONS-031729

216     Anthony E. Bottoms

peaking in 1993–94), and second, some marked variations by types of institution.[11] On the latter point, open prisons have very low rates for all three offenses. The two kinds of establishments for persons aged under twenty-one (YOIs and remand centers) have much higher rates than the adult prisons both for inmate-inmate assaults and (especially) for fighting. Adult closed prisons (i.e., local prisons and closed training prisons) have more recorded inmate-staff assaults than inmate-inmate assaults; but in the institutions for young offenders (YOIs and remand centers) this pattern is reversed. These are intriguing apparent differences, yet, from these data alone, there is no way of judging whether the picture they present is a valid one, or how far it is a product of, for example, differential use of discretion by prison staff in different kinds of establishment.

In 1991, in England and Wales, the first National Prison Survey (NPS) was conducted, with a random sample of all prisoners being interviewed on a range of topics, including the prison regime (work and education programs, etc.), relationships with prison officers, and preparations for release (for sentenced prisoners near release). The response rate for the survey was very good (90 percent). In the NPS, one question was asked on prison assaults: this was a simple yes/no question, inquiring "Have you been physically assaulted in any way by another inmate in the last six months"?[12] Overall, 9 percent of prisoners responded affirmatively to this question (Dodd and Hunter 1992, p. 54); however, there was a marked skew by age, with 15 percent of under-twenty-one's saying they had been assaulted, as compared with only 4 percent of prisoners over fifty.[13] But if we try to compare these data with those in table 1, we immediately run into difficulties. The NPS statistics are *prevalence* data only, with no follow-up question be-

---

[11] In England, there is no distinction between "jails" and "prisons," and the U.K. government is responsible for all custodial establishments for persons aged fifteen and over. The main types of institution are: (1) for those under twenty-one, "remand centers" (for those not yet sentenced) and "young offender institutions" or "YOIs"; (2) for adults, local prisons (holding remands and short sentence prisoners), and a variety of "training prisons" of ascending degrees of security, namely "open prisons" (for category D inmates who can be trusted not to escape); category C training prisons; category B training prisons; and maximum-security prisons holding category A prisoners (known as "dispersal prisons").

[12] For those who had been incarcerated on this occasion for less than six months, interviewers were instructed to substitute the words "since you have been in prison," in place of "in the last six months."

[13] These data include responses by female prisoners, but these constituted only 6 percent of the sample, reflecting their proportion in the prison population. See further Subsec. IIE below.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 18:44:58 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031730

ing asked about the frequency of recent assaults; but the information in table 1 is incidence data. At first sight, the overall NPS prevalence figure for inmate assault seems to be just under three times higher than the official 1991 inmate-inmate incidence data (90 vs. 33). However, this may not be accurate, because some incidents classed as assaults by NPS respondents might have been prosecuted, in the prison disciplinary code, as "fighting" (see n. 10). The total incidence figure for 1991 for inmate-inmate assaults *plus* fighting is 124 per thousand inmates: this is nearly 40 percent higher than the NPS prevalence rate, though the difference could of course be attributable to repeat victimization.

In the late 1980s, King and McDermott (1995) carried out a major study of many aspects of prison regimes in England, focusing on five adult prisons (though they did not write up their full results until after publication of the NPS). King and McDermott had distributed self-completion questionnaires to inmates in all their prisons, but they took this step only "at the very end of the fieldwork in each prison when both the researchers personally, and the aims of the research, were well known" (King and McDermott 1995, pp. 20–21). Over eleven hundred usable questionnaires were received. No formal data on response rates are given, but it can reasonably be inferred that the rate of completed responses in most of the prisons was substantially lower than in the NPS.[14] Overall, King and McDermott report that 12.5 percent of their sample said they had been assaulted *at some time while in their current prisons;* 6.8 percent of respondents claimed to have been sexually attacked; and 33 percent said they had been threatened with violence. The prevalence figures for assaults (sexual and otherwise) are obviously higher than those for adults in the NPS, but exact comparisons are impossible because of the different time frames used in the two surveys (for a detailed discussion on this point, see King and McDermott 1995, p. 120). There is also the separate and complex issue of the very different methodologies adopted in the two studies.[15]

[14] Approximate response rates can be calculated from the numbers of completed questionnaires, plus the data given by the authors on intended sample coverage (p. 21n.) and the average daily population (ADP) in each prison (pp. 17–19). On this basis, four of the prisons had response rates between 45 percent and 53 percent, while the fifth (the local prison) had a response rate of 80 percent.

[15] The National Prison Survey used an interview approach, but with interviewers meeting the prisoner-respondent for the first time in the survey context (as with most surveys of the general population). King and McDermott (see text) had deliberately tried to build up a degree of personal trust before distributing their questionnaires; but they preferred to rely on prisoners completing their own written responses, rather than an interview format.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 on PLTF-PARSONS-031731
All use subject to JSTOR Terms and Conditions

218      Anthony E. Bottoms

TABLE 2

Self-Reported Victimization Prevalence Rates in Current Prison
for Three Kinds of Violent Incident in Five English Prisons
for Adult Males, 1985–86 (Percent)

| | Prevalence of Victimization for: | | | |
| --- | --- | --- | --- | --- |
| | Assaults | Sex Attacks | Threats of Violence | Sample N |
| Local prison: remand prisoners | 10 | 5 | 35 | 211 |
| Local prison: sentenced prisoners | 7 | 3 | 26 | 201 |
| Open prison | 2 | 3 | 14 | 168 |
| Closed training prison (category C) | 10 | 7 | 36 | 269 |
| Closed training prison (category B) | 22 | 12 | 43 | 156 |
| Closed training prison (maximum security) | 30 | 13 | 49 | 155 |
| Overall percent figure | 13 | 7 | 33 | 1,160 |

SOURCE.—King and McDermott (1995), table 3.1 (p. 122).

In the King-McDermott research, the prevalence rates for all three
types of violent incident varied substantially by prison—for assaults,
for example, from 2 percent in an open prison to 30 percent in a maxi-
mum security training prison (see table 2). Most of these differences
are encouragingly consistent with the variations in the official data
shown in table 1; but the data for the local prison in the King-
McDermott study are unfortunately much harder to interpret.[16]

Fieldwork for a further research study was carried out in England in
1994–95; unlike the previous surveys, the principal topic of the re-
search was on this occasion victimization and bullying in institutions.
The study, by researchers from Oxford University, was carried out in
two adult prisons holding sentenced offenders (one category B; one
category C; see n. 11 above), and two YOIs, one of which also func-
tioned as a Remand Center (see O'Donnell and Edgar 1996a, 1996b,
1998a, 1998b). Like King and McDermott, the Oxford researchers

[16] The authors note that "the victimization rates for both remand and convicted pris-
oners in Birmingham were somewhat lower than we had expected," a result that they
attributed to the substantially lower number of hours that prisoners spent out of their
cells in this prison (as in most local prisons in England) (King and McDermott 1995,
pp. 121–23). However, this suggestion, while valid in itself, does not take account of the
fact that Birmingham, unlike most of the prisons in the King-McDermott study, had a
substantial proportion of its population sharing cells. Cell sharing also potentially facili-
tates assaults, and there were suggestions in an earlier study of Birmingham Prison that
in-cell assaults occurred quite frequently (Davies 1982).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 ...
All use subject to JSTOR Terms and Conditions
PLTF-PARSONS-031732

TABLE 3

One-Month Self-Reported Victimization Rates for Three Kinds
of Incident in Four English Prison Service Establishments
for Males, 1994–95 (Percent)

| | YOI plus Remands | Small YOI | Adult Closed Training (Category C) | Adult Closed Training (Category B) |
|---|---|---|---|---|
| Assault: | | | | |
| None | 68 | 74 | 83 | 80 |
| One/two | 28 | 24 | 16 | 19 |
| More often | 4 | 1 | 1 | 1 |
| Robbery/extortion: | | | | |
| None | 89 | 92 | 98 | 95 |
| One/two | 7 | 5 | 1 | 4 |
| More often | 4 | 3 | 0 | 2 |
| Threats of violence: | | | | |
| None | 54 | 60 | 75 | 73 |
| One/two | 38 | 37 | 23 | 24 |
| More often | 8 | 3 | 2 | 3 |
| Sample N | 650 | 185 | 213 | 518 |

SOURCE.—O'Donnell and Edgar (1998a), pp. 26, 28, 30.
NOTE.—All percents sum to 100. YOI = youth offender institution.

chose to rely on a prisoners' written self-completion questionnaire as
their main quantitative data source; but in the Oxford study, the ques-
tionnaires were apparently completed under more controlled condi-
tions,[17] and the survey response rate was substantially higher than in
the King-McDermott research (90 percent, identical to that for the
NPS).

The Oxford study focused specifically on six particular types of vic-
timization, each of which was described on the questionnaire in ordi-
nary language. Three of these six related to violence or threats of vio-
lence, and respondents were asked to state whether they had been
victimized during the last month for each incident type. The main re-
sults for the three types of violent victimization are shown in table 3.

[17] After an extensive period of qualitative fieldwork in each establishment, O'Donnell
and Edgar made personal visits to prisoners while they were locked in their cells, ex-
plaining the purpose of the research and its confidentiality. They then left the inmate
with a victimization questionnaire, returning after half an hour to collect it. If there were
any blank sections, the prisoner was encouraged to complete the questionnaire, and usu-
ally did so.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:14:44 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031733

For each incident type, the first row of table 3 gives the percentage claiming no victimization. From the obverse of these figures, one can derive prevalence data comparable with the NPS and the King-McDermott study, though for the much shorter time period of one month. As may be seen, for assaults in the young offender establishments the claimed victimization prevalence rate is over 25 percent in both institutions in a one-month period (cf. the NPS figure of 15 percent for prisoners under twenty-one, in a six-month period). For sentenced adult offenders, the prevalence rate for assaults in the O'Donnell-Edgar study was lower than for the young prisoners, but was still close to 20 percent. A comparison with the prevalence rates in the King-McDermott study, for the same types of adult prison, is particularly interesting given the apparent similarity of the methodology employed in the two studies:

> Category B Prison:
>   King-McDermott:
>     22 percent prevalence (any time in this prison)
>   O'Donnell-Edgar:
>     20 percent prevalence (in last month)
> Category C Prison:
>   King-McDermott:
>     10 percent prevalence (any time in this prison)
>   O'Donnell-Edgar:
>     17 percent prevalence (in last month)

Clearly, the O'Donnell-Edgar figures are, prima facie, substantially the higher. However, adequate reconciliation of the figures in the two studies poses difficult questions, including methodological issues.[18]

The O'Donnell-Edgar study is the first published prison victimization study in England to have considered issues of *incidence* as well as *prevalence*. However, the question of incidence was operationalized in the research only in an imprecise fashion. (Respondents who claimed any victimization in the last month were asked whether this had hap-

---

[18] Apart from the difference in response rates, one other relevant factor is that, in both surveys, the researchers asked about inmates' level of victimizing behavior, as well as about victimization. In the King-McDermott study, it was reported that "prisoners were, understandably, somewhat more reluctant to report" predatory behavior (p. 125); however, in the O'Donnell-Edgar study admitted levels of victimizing behavior were in general very similar to self-reported levels of victimization (O'Donnell and Edgar 1998*a*, chap. 3).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 ... PLTF-PARSONS-031734
All use subject to JSTOR Terms and Conditions

pened, within that time frame, "once or twice," or more often.) Relevant data are given in table 3. Among all victimized respondents, the proportion claiming multiple victimization (three times or more in the last month) was particularly high for robbery/extortion in the two young offender institutions (4 percent among 11 percent victimized in one establishment; 3 percent among 8 percent victimized in the other). This finding is of particular interest, because in the Oxford research, robbery was the type of violent victimization with substantially the lowest prevalence rates. In other words, robbery/extortion was, in this study, the rarest type of violent victimization, *but in young offender institutions it was also the kind of violent victimization whose victims were, proportionately, most likely to be repeatedly victimized.* These data are interestingly congruent with other analyses in the O'Donnell-Edgar study, concerning the extent of the overlap between victims and victimizers. Both for assaults and for threats of violence, there was a substantial element of *mutuality* in the data: being a victim of these offenses was strongly associated with being a victimizer also. But for robbery, the pattern was quite different—"those who were robbed did not rob others" (O'Donnell and Edgar 1996*b*, p. 3). For this offense, it seemed, there was little mutuality—rather, the few who were victimized could be victimized frequently, and they did not attack others in reply.

Although it is important not to read too much into one exploratory study, the apparent differences in the O'Donnell-Edgar research between more and less "mutual" prison victimization seems well worth much fuller exploration in a range of different prison contexts. I shall return to this theme in Section VI below.

After recently reviewing the rather limited number of prison victimization studies carried out in North America, Maitland and Sluder (1998, p. 57) commented that there has been a strong tendency in such research "to operationalize victimization narrowly, with many scales composed of only three or four items . . . [and] focused on a few forms of physical victimization." As will be clear from the preceding account, this conclusion also holds true, to a substantial extent, for Britain. Hence, there is a very strong case for a much fuller development and use of victim survey methodology in the prisons context in the future.[19] In any such development, careful note should be taken of the many methodological lessons to be learned from the now extensive literature

---

[19] As well as other possible methods for uncovering "hidden violence," such as the analysis of prison medical records (on which see Davies 1982).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:21:00 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031735

222        Anthony E. Bottoms

on victim surveys on crime in ordinary residential communities (see, e.g., Maung [1995] on the British Crime Survey).

Among the published North American prison victimization studies, one of the most interesting is Cooley's (1993) research in five adult male Canadian Federal prisons (though the total sample in this research was small: $N = 117$). Unlike any of the British researchers previously discussed, Cooley employed what has become, in general criminological research, the standard approach in victim survey methodology, namely an interview-based approach, using a Victimization Screening Schedule, and, where appropriate, Incident Report Forms (see Maung 1995). Cooley asked his respondents to recall prison victimizations over a twelve-month period, for which period he had access to the official disciplinary data for the five institutions studied. For assaults and fights, victim survey data were more than three times higher than the official rates (Cooley 1993, p. 489), though multiple victimizations were rarer than might reasonably have been expected in a twelve-month time frame. By contrast, in a study of young prisoners (mean age 21) in a Midwestern U.S. state, Maitland and Sluder (1998) found what must be regarded as relatively low prevalence rates for some kinds of victimization, but also data suggesting that "a significant proportion of prisoners are subjected to multiple forms of victimization" (p. 64).[20]

A substantial number of the published studies on interpersonal prison violence rely only or mainly on recorded disciplinary incidents from official files. It is very clear (see the preceding discussion) that such data often substantially understate the extent of violent victimization among inmates. But it is also important to glean what we can from the research literature about known biases (or lack of bias) in the recorded data—that is, to consider what evidence there is that some kinds of incident, or attacks against certain sorts of victims, are particularly likely or unlikely to find their way into the official data sources. In such an analysis, there are of course two particularly important "filtering points" to consider—first, the extent to which inmates are willing to report victimizations, and second, the extent to which staff may differentially report or record certain incidents.

---

[20] Maitland and Sluder collected prevalence data only, but did so on a wide range of fourteen items about victimization experiences (see their table 3). "Multiple victimization," in their study, refers to inmates reporting several different kinds of victimization while serving their current term of imprisonment: the researchers found that 69 percent of the sample had experienced *at least ten* of the fourteen listed kinds of victimization (p. 64).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031736

As regards the reporting of violence to the authorities by inmates, all sources seem to agree (though sometimes only with anecdotal evidence) that this is rare. At the same time, it is clear that action of this kind is sometimes taken by prisoners, and there would be merit in a more systematic exploration of this phenomenon. O'Donnell and Edgar (1998a, pp. 41–42) touch on this issue briefly, with evidence that between 10 percent and 20 percent of victims of assaults and threats, among both adults and young prisoners, were prepared to make a formal complaint to the authorities about the incident. These authors point out, however, that prisoners who do make complaints in this way have to be prepared, potentially, to have their identity discovered by other inmates. Given that there is a strong subcultural norm against "grassing" (i.e., acting as an informer), the possibility of such discovery means that making a formal complaint is often an inmate's last resort—as one prisoner put it, when asked whether he had informed the authorities: "Not yet, but I might have to." Those who made formal complaints also had to accept the possibility that this might result in their being transferred to another institution, in the interests of their own safety (even though this second prison might be less geographically convenient for family visits, and/or have a less agreeable regime).

What of the filtering process exercised by prison staff in respect of reporting prisoner assaults? We will return to this issue again in Section V, but for the moment it can be noted that the research literature contains several examples of differential responses by staff to known institutional misconduct by inmates, and these differences will obviously potentially affect the statistical distribution in any sample of officially recorded prison violence. Perhaps most importantly for present purposes, there is some suggestive research evidence of a differential staff response by the prisoner's race and by institutional classification.

Both these variables were found to be relevant in a small study ($N = 84$) by Silberman (1995) in a male maximum-security prison in the United States. In the prison studied ("Central"), a classification system known as the Adult Internal Management System (AIMS) was used (see Quay 1984). This system is designed to differentiate prisoners who are aggressive and independent (known as "heavies"), from those who are passive and dependent ("lights"), and those who fall into neither of these categories ("moderates"). According to self-reported aggressive behavior scales applied by the researcher, heavies had, in Central, threatened or assaulted others (inmates and staff) significantly more often than moderates or lights. But, Silberman additionally reports, the

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 16:04:35 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031737

224        Anthony E. Bottoms

detection rate for assaults was higher among heavies because they were subjected to closer official surveillance (p. 93). Hence, the much higher officially recorded assault rate among heavies partly reflected actual inmate behavior, but was also partly an artefact of prison management practices that generated higher detection. Turning to race, self-reported assaultiveness was similar between black and white prisoners, but blacks were significantly more likely to have been officially cited for assault. This differential treatment, however, seemed not to be attributable to "overt racial bias" (p. 105), but rather to the fact that black prisoners were more likely than whites to be labeled as heavies by the AIMS classification system, and were consequently subject to closer surveillance by guards.[21]

Silberman's results on race are not dissimilar to those found in an earlier and much-cited article by Poole and Regoli (1980). That study had found that whites and blacks were equally likely to engage in prison rule-breaking activity (not simply assaults), but that blacks were more likely to be officially reported for rule infractions. Moreover, a prior record of official disciplinary action was shown to be strongly related to the decision to take official action in the case of blacks, while prior record exerted "no measurable effects" (p. 942) in the citation of whites. In short, there was a "cumulative labeling effect" (p. 943) that acted to the detriment of blacks. In part, the authors suggest, these cumulative effects might be the product of institutional processes: "Prior official reactions may lead guards to a pattern of closer surveillance of labeled inmates. This greater vigilance is likely to result in more frequent detection of infractions" (p. 943).

While processes of the above kind have not been unambiguously demonstrated in the research literature in studies with large samples, nevertheless it is clear that cumulative labeling effects of the kind described are possible. Researchers cannot, therefore, at present reasonably rule out the existence of such effects; and one of the challenges for future research in this area is to investigate such possible processes more thoroughly.

In addition to factors of the above kind, formal citation for prisoner-prisoner assaults can potentially vary by the personal attitudes of indi-

[21] However, as Silberman (1995) notes, the AIMS classification depends heavily on prior criminal justice records (for any stage of processing from arrest onward) and on social factors such as employment histories and family status. Consequently, "the differential treatment of black prisoners at Central is primarily a consequence of racial bias in society as a whole, rather than policies generated at this institution" (p. 95).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 ... <br>All use subject to JSTOR Terms and Conditions
PLTF-PARSONS-031738

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 174 of 276

vidual prison officers. For example, from a questionnaire study of correctional officers in Texas, Eigenberg (1994) developed as a dependent variable a nine-item scale measuring officers' willingness to respond officially to prisoner rape. The independent variables that were most strongly associated with this scale were first, attitudes toward appropriate "social distance" between officers and prisoners (those who maintained less social distance and a more rehabilitative approach to prisoners were more willing to react officially to prisoner rape); and second, attitudes toward women (those who endorsed a more conservative, home-based role for women in society were less likely to respond officially to prisoner rape, perhaps because they were also more willing to endorse stereotypical beliefs about the nature of the act of rape).

### B. Prison Homicides

Many jurisdictions have reassuringly low rates of homicide victimization among prisoners, and where this is so, assessing any kind of time-trend in prison homicide rates is statistically hazardous.

By comparison with other jurisdictions, the United States has a relatively high prison homicide rate, but unfortunately it is not possible from the available sources to derive fully accurate figures over time. For the period before 1978, only data from occasional (although thorough) national surveys can be adduced. Since 1978, there has been a regularly reported figure for sentenced prisoners whose deaths were "caused by another," but (see the "Note on Sources" attached to table 4) a few of the deaths included in these totals are not homicides; moreover, since the late 1980s a number of jurisdictions have not sent in returns.

The data shown in table 4 are therefore clearly imperfect. Nevertheless, they do reveal a general pattern that is probably accurate. The rate of inmate homicides per ten thousand prisoners shows a curvilinear pattern: it apparently increased sharply in the 1970s, and then steadily declined, eventually falling well below its 1960s levels. The pattern is so pronounced that it probably cannot be attributed to the known weaknesses in the data set.

I shall return in Section III to possible reasons for this apparent pattern. For the moment, however, one important point is worth noting. A possible explanation of the observed homicide time-trend relates to the use of the death penalty in the United States, since there was a de facto moratorium on executions from 1967 onward (Bedau 1982,

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 19:38:50 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031739

TABLE 4

Imputed Inmate Homicide Victimizations among Sentenced
Prisoners in the United States, 1965–94

| Year | Imputed no. of Inmate Homicides | Rate per 10,000 prisoners | Jurisdictions Not Reporting |
|---|---|---|---|
| 1965 | 53 | 25 | 5 |
| 1973 | 124 | 61 | 0 |
| 1974 | 114 | 52 | 6 |
| 1975 | 110 | 46 | 6 |
| 1978 | 89 | 30 | 0 |
| 1979 | 84 | 28 | 0 |
| 1980 | 127* | 40 | 0 |
| 1983 | 86 | 21 | 0 |
| 1984 | 128† | 29 | 0 |
| 1986 | 100 | 19 | 1 |
| 1987 | 91 | 16 | 2 |
| 1988 | 67 | 11 | 4 |
| 1989 | 67 | 10 | 4 |
| 1990 | 49 | 7 | 3 |
| 1991 | 62 | 8 | 5 |
| 1992 | 67 | 8 | 6 |
| 1994 | 68 | 7 | 3 |

SOURCES.—Data on imputed homicide victimizations in this table have been derived from a number of sources, listed below. Data from sources (i)–(iii) inclusive include only inmate-inmate homicides; but source (iv) uses a wider definition: (i) for 1965, from Sellin (1967); (ii) for 1973, from Sylvester, Reed and Nelson (1977); (iii) for 1974 and 1975, from a special survey reported in the *Sourcebook of Criminal Justice Statistics 1978*, p. 641; (iv) for 1978 onward, from the annual tables, reported in successive *Sourcebooks of Criminal Justice Statistics*, identifying causes of death among sentenced prisoners. The data given are for deaths "caused by another," which explanatory notes in the *Sourcebook* indicate incorporates "all inmates whose deaths were caused accidentally or intentionally by another inmate or by prison personnel."

\* This figure includes thirty-nine cases from New Mexico. A total of thirty-three inmates were killed in the Santa Fe riot in New Mexico in 1980 (see Colvin 1992).

† This figure includes 25 inmate homicides in Texas, which can be attributed to the special events in the Texas prison system at that time (see Crouch and Marquart 1989, chap. 7).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:47 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031740

pp. 24–25), with a resumption of executions only in the 1980s. However, an explanation of this kind is made harder to sustain by the fact that cross-sectional comparisons of prison homicides in jurisdictions with and without the death penalty have revealed no discernible effects of an apparently deterrent kind (Wolfson 1982; Bedau 1997, pp. 176–77). As Bedau (p. 177) notes, the available data on this point are not conclusive, but they are suggestive.

## II. Some Basic Features of Interpersonal Prison Violence

In this section, data on some of the main possible correlates of interpersonal prison violence are presented as an essential background to the discussion in later sections. As other reviewers have already thoroughly covered some of this ground, the treatment of certain topics within this section is relatively brief, and readers are referred to the cited sources for more detailed analyses.

In reviewing research results of this kind, it is necessary to refer to studies relating to prisons in several different jurisdictions. The details of the day-to-day social settings in such prisons can vary substantially, and (see the later sections of this essay) such settings may sometimes substantially influence levels of prison violence. These issues should be borne in mind as caveats in considering the research results here cited.

### A. Age

One of the most consistently established correlates of interpersonal prison violence is that, in general, younger inmates are more often the perpetrators of such violence (for literature citations see, e.g., Goetting and Howsen 1986, pp. 51–52; Ditchfield 1990, pp. 48–55; K. Adams 1992, pp. 202–3; and for a recent time-series analysis, see Walters 1998).

Among the more interesting analyses of this issue is that by MacKenzie (1987), conducted in four medium and maximum security prisons for males in three U.S. states. MacKenzie used three measures of conflict/aggression for each prisoner: a self-reported scale (Inmate Conflicts) designed to measure the amount of conflict the respondent had with other prisoners; another self-reported scale (Guard Conflicts) designed to measure conflicts with guards; and the officially recorded number of (Major Misconduct) tickets for the inmate in question. For inmates aged twenty or over, seven separate age-bands were identified (the oldest being 50+), and all three of the conflict measures showed

This content downloaded from 198.91.32.137 on Tue, 28 Jan ... 
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031741

228    Anthony E. Bottoms

a significant decline in rates from younger to older age-bands. However, the speed of decline differed: the Major Misconduct scale dropped rapidly from age twenty to age thirty to thirty-four, and slowly thereafter; but Inmate Conflicts and Guard Conflicts dropped only slowly in the twenties. A related finding was that an "assertiveness" measure was strongly correlated with individuals' Inmate Conflict and Guard Conflict scores at all ages, but the relationship between assertiveness and individuals' Major Misconduct tickets was limited to those under thirty. Separate analyses of anxiety suggested that these differences between younger and older prisoners were not accounted for by differential stress levels or by differential ability to cope when under stress. Rather, the younger inmates seemed to be willing to "act out" their assertiveness more freely and with less inhibitions, so acquiring more tickets for Major Misconduct—or, as Kenneth Adams (1992, p. 302) puts it when discussing this study, perhaps younger inmates tend to resolve their conflicts "in ways that are demonstrably visible and that advertise toughness and strength."[22] These are intriguing results that deserve research replication. One implication of the results is to emphasize again that one cannot necessarily treat recorded prison disciplinary infractions as a valid measure of aggression, even in comparative analyses between groups of prisoners within the same institutions.

The research literature additionally suggests that younger inmates are more likely to be victimized in the prison context than are older inmates (see, e.g., Cooley 1993; O'Donnell and Edgar 1998a). However, in interpreting this finding one needs to bear in mind that frequently in prison systems younger inmates are placed in separate, age-segregated institutions or housing blocks.

## B. Race

Findings on race and the commission of interpersonal prison violence have been mixed (see, e.g., Ellis, Grasmick, and Gilman 1974; Petersilia 1983; K. Adams 1992, pp. 301–2). The most recent, and very large-scale study was conducted by Harer and Steffensmeier (1996), using data for male prisoners in the federal prison system (inmate $N$ = 24,000). This study is particularly notable for two reasons. First, the

[21] This pattern was even more evident in the small group ($N$ = 31) of inmates aged nineteen or less in the MacKenzie study. This group had much the highest rate of Major Misconduct tickets of any age group, but their Inmate Conflict and Guard Conflict scores were lower than those of the twenty to twenty-four year age group.

This content downloaded from 198.91.32.137 on Tue, 28 Jan ... All use subject to JSTOR Terms and Conditions

authors were interested in the question of the effects of race net of controls, and they introduced many more control variables than do most comparable analyses. Second, the research focused on two separate dependent variables, namely "prison violence" and "prison alcohol/drug violations," with differing results: black inmates were found, after applying statistical controls, to have higher prison interpersonal violence rates than whites, but lower rates of alcohol/drug misconduct.[23] These results are interpreted by the researchers as supportive of a racially based "subculture of violence" thesis—a subculture which, it is suggested, has been developed in the outside community, and then "imported" into the prison by black inmates. However, such an interpretation depends crucially on the assumption, explicitly made by the authors, that at least in the federal prison system official rates of misconduct "reflect real differences in behavior and are not simply a product of discretionary sanctioning practices on the part of prison staff" (p. 330). But this seems a very bold assumption—not least in the light of the research discussed at the end of Section I.A above.

Research results on the relationship between race and victimization in prison, using victim survey data, are sparse. However, O'Donnell and Edgar (1996a, tables A and B), in their English study, found different results for adult prisoners and for young offender institutions: for adults, there was no significant difference in victimization by ethnic group, but among young prisoners, whites and Asians were significantly more likely to be victimized than were blacks. In their U.S. victimization study among younger prisoners, Maitland and Sluder (1998, tables 7–9) similarly found that whites had significantly higher victimization rates than nonwhites.

## C. Criminal and Social History

There are two main considerations regarding the histories of those who resort to violence in prisons: criminal history and mental illness or disturbance. As regards criminal history, the research studies are not consistent in their results. However, as Kenneth Adams (1992) summarizes, with the exception of those convicted of homicide, most studies suggest that "violent offenders tend to have higher prison infraction rates than nonviolent offenders" (p. 305). But in interpreting this finding, it is important to recall the apparently paramount importance of

[23] To simplify the analysis, Harer and Steffensmeier excluded from their sample non-U.S. citizens and persons from ethnic groups other than blacks and whites, e.g., Hispanics.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 07:48:32 AM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031743

230      Anthony E. Bottoms

young age, a variable that shows a much stronger correlation with prison violence (whatever measure of such violence is adopted). Hence studies of the criminal history of perpetrators of prison violence that do not control for age are of limited value.

In a cross-sectional study of 942 inmates from ten prisons in New York State, Wright (1991*b*) found that, as well as being younger, those found guilty of any assault in prison "tend to have histories of unemployment, are less educated . . . are more likely to be single [and] were incarcerated for the first time at a younger age" (p. 12). As Wright points out, these data are consistent with the social histories described by Irwin (1970) for what he calls "state-raised youth": that is, persistent young offenders with relatively unstable social lives, who made an early start to their criminal careers, and have spent a disproportionate amount of time in children's homes and/or state institutions for juvenile offenders. Such a description is, of course, also very familiar from the results found for persistent offenders in criminal career research (for a summary, see, e.g., Farrington 1997).

Given the high "dark figure" for prison violence, one point that is crucially raised by research results of the above kind is: How representative are those officially identified as having committed prison violence of the broader universe of those who at some time have resorted to such violence? Here, the fact of a high dark figure for violent incidents in prison does not necessarily invalidate the representativeness of studies of the characteristics of a sample of identified offenders. For example, in a Danish self-report study among school children, Balvig (1988) reported that although only one in ten of relatively serious delinquent incidents had led to the offender being identified by the police, nevertheless, 90 percent of all those who had committed such offences with any frequency had been caught and identified as an "official" offender on at least one occasion. Given such a factual constellation, if the characteristics of identified offenders differ significantly from those of the population as a whole, some reasonable validity might be inferred for the statistical differences found.

Kenneth Adams (1992) offers a very different argument, which seeks to establish especially the validity of data on the characteristics of repeat offenders against the prison disciplinary code: "While an occasional misbehavior report cannot be accorded much significance as an adjustment problem, frequent or systematic violations of prison rules are much less ambiguous signs of adjustment difficulties, especially when the focus is on extreme or chronic offenders. . . . [This argu-

This content downloaded from 198.91.32.137 on Tue, 28 Jan ...
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031744

ment] is reinforced further by the implausibility of describing inmate misbehavior as constructive problem-solving efforts to deal with one's situation given that the formal disciplinary process carries serious adverse consequences for the inmate" (pp. 296–97).

Two comments may be made about this approach. First, a data source on rule infractions (in the present context, especially aggressive rule-infractions) has, by a subtle shift, been called into service as an indicator of "adjustment problems." This "adjustment," however, is assessed only from the viewpoint of the authorities, and does not take into account the possibly very different demands on the inmate to adjust to the subcultural world of inmate life (Silberman 1995, p. 27; see also Sec. VI below). Second, and more important, in a context where the vast majority of violent acts are apparently undetected, it should be clear that those who are formally identified as repeat offenders may well be atypical of the larger universe of those who are prepared, when occasion demands, to resort to violence to achieve their own ends. For example, a research focus on *formally identified repeat offenders* will very likely overstate the proportionate significance, within the universe of interpersonal prison violence, of those whose violence is less calculated and is thus more associated with emotional or mental health problems. Given this background, the important and detailed work of Toch and Adams (1989), which pays special attention to a smallish group of so-called DDIs, or "disturbed-disruptive inmates," needs to be read with some care. DDIs undoubtedly exist, and form a significant element within the total picture of prison violence; but a focus on official data sources on repeat offenders will almost certainly lead to disproportionate attention being focused on the DDI group.

Given the above comments, it is particularly important to note that there is some evidence of heightened psychiatric impairment even among general samples of those who have *any record of prison violence* (see, e.g., Wright 1991*b*; K. Adams 1992, pp. 306–8). Perhaps the study of greatest interest in this regard is Baskin, Sommers, and Steadman's (1991) analysis of over three thousand prisoners in New York State, where the sampling procedures specifically excluded those inmates housed in special mental health housing units. The researchers developed three simple scales to measure psychiatric impairment while in prison: these were labeled respectively as "confusion," "depression," and "manifest symptomatology" (for the scales used, see appendix A of the cited source). The dependent variables used in the analysis were yes/no measures of four types of prison violence within the last ninety

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 16:44:03 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031745

days, as assessed by prison case managers: these were violence to an-
other prisoner, violence to prison staff, destruction of prison property,
and "violence to self" (attempted suicide or self-harm). In a multivari-
ate analysis, controlling for age, race, gender, and criminal history, and
so on, the confusion scale was found to be strongly statistically associ-
ated with both violence to prisoners and violence to staff, while the
depression scale was, not unexpectedly, even more closely associated
with violence to self. There is, therefore, some reasonable general evi-
dence of a link between emotional disorder and interpersonal prison
violence, though as will become clear in Section III, other variables are
certainly also very important in influencing this kind of behavior.

### D. Sentence Variables

Two variables relating to general administrative dimensions of the
inmate's prison experience have been especially studied for their possi-
ble association with interpersonal prison violence: they are the inmate's
security level and the phase of his or her sentence.

Research studies have consistently shown that rates of prison vio-
lence are higher in maximum-security than in lower-security prisons
(for an example, see the data in table 2, from King and McDermott's
[1995] inmate questionnaire). Data such as this, however, are in them-
selves of limited value, since obviously prisoners considered to be more
"difficult" may be placed in higher custody levels, and it might there-
fore simply be the combined individual effects of "difficult prisoners"
that are being measured. Some analyses have, therefore, attempted to
assess the importance of security level while controlling for various in-
dividual-level variables (see, e.g., Mandaraka-Sheppard 1986; Baskin,
Sommers, and Steadman 1991; Wright 1991a; Cooley 1993). These
studies have used different individual-level variables as controls and
also different measures of prison violence (official and self-reported);
but all have found higher security levels to be associated with greater
violence. It is therefore possible, as Wright (1991a, p. 235) puts it, that
"more structured, more authoritarian settings may engender more dis-
ruptive behavior. This finding is consistent with the literature on envi-
ronmental effects, which suggests that the more control inmates feel
they exercise within their settings, the less likely they are to experience
adjustment problems."

Care must be taken, however, before firmly accepting such a conclu-
sion. Although the cited studies each control for some individual-level

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014...
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031746

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 182 of 276

effects, they may not control either for sufficient numbers of such variables or for various possible interactive effects (see further Subsec. IV D below).

When we turn to the literature on phase of sentence, we find a much more variegated picture. A number of writers have found that predatory aggression appears to peak relatively early in the inmate's sentence, and then decline—a pattern found particularly strongly among younger prisoners (see, e.g., Toch and Adams 1989, and the discussion of various studies in K. Adams 1992). If this is a true finding, it has at least two possible interpretations: first, that the majority of prisoners "learn to adapt successfully to the prison setting" (K. Adams 1992, p. 331); or second, that inmates far away in time from their potential parole dates may feel less inhibited about prison offending (see, e.g., Ellis, Grasmick, and Gilman 1974). However, it is also notable that the studies finding an "early in sentence" effect tend overwhelmingly to be based on official indices of the commission of prison violence. Hence it is of special interest that Wright (1991a, p. 235) found, in multivariate analyses with the same sample of prisoners, that: using official data, newly arrived prisoners had higher infraction rates than longer-serving inmates; but using self-reports of aggressive behavior, "time incarcerated" did not appear in the multivariate model. The implication of these results is, as Wright points out, that "shorter and longer-term inmates do not have different actual rates of aggressiveness, but that the responsiveness of the system determines who will be charged with rule infractions" (p. 235). If this interpretation is valid, then clearly it is also of some potential relevance that: the Toch-Adams study found a much stronger "time-decline" effect for younger inmates than for adults, and that MacKenzie (1987) found that younger prisoners in her sample showed greater disjunction between official infraction rates and self-reported measures of Prisoner Conflict and Guard Conflict (see the discussion in Subsec. A above).

A few studies have also examined violent victimization by time in sentence, with equally inconclusive results. Thus, for example, Cooley (1993), in his Canadian study, found that those who were victimized were more likely to be in the early stages of their sentence, but this finding has not been replicated in other studies (e.g., Wooldredge 1994; O'Donnell and Edgar 1996a, 1996b).

In summary, therefore, the inmate's security level has been shown by research to be consistently related to prison violence, though the

This content downloaded from 198.91.32.137 on Tue, 28 Jan BLTE+PARSONS-031747
All use subject to JSTOR Terms and Conditions

interpretation of this finding is not clear-cut. By contrast, the research evidence on prison violence and time in sentence must at present be regarded as very uncertain.

### E. Gender

The available data on interpersonal prison violence and gender are sparse, but also quite provocative. As is well known, in general studies of crime commission in the community, males consistently appear to offend more often than females, especially for certain kinds of offense, including violence; and these gender differences are generally replicated by self-report studies, at least for offenses of any seriousness (see, e.g., Graham and Bowling 1995).

Some aspects of the data on interpersonal prison violence fully conform to this pattern. For example, very few prison homicides involve women as either assailants or victims: of the 374 imputed homicides of sentenced prisoners in the United States from 1986 to 1990 inclusive (see table 4), only two occurred in women's prisons. Similarly, in the Baskin, Sommers, and Steadman (1991) study in New York State, it was noted that "the frequency of recorded incidents of prison violence during the ninety-day period under study varied greatly by gender" (p. 276), in the expected direction.

But results of this kind are by no means universal in the literature. For example, in England recorded data for prison assaults and fighting are substantially higher, overall, in women's prisons than in male institutions (see table 5); and in the English NPS similar proportions of female and male prisoners said they had been assaulted in the last six months.[24] An analogous North American study, using official data for all prison infractions, is that by Tischler and Marquart (1989) in Texas, which found that "females . . . did not differ from males on the total number of offenses committed, nor did they differ with respect to the number of serious infractions" (p. 512).[25]

Once again, the data patterns are inconclusive; but from the available evidence it seems to be at least possible that, while serious violence in women's prisons is rare (cf. the homicide data), minor violence

[24] This result is not reported in the official publication on the NPS (see Dodd and Hunter 1992, chap. 5). I am indebted to John Ditchfield of the Home Office Research and Statistics Directorate for obtaining this information for me.

[25] There were also some qualitative differences within these general results. In particular, "male inmates were more likely to direct an attack towards correctional staff members; females were more likely to attack one another physically, with and without weapons" (p. 512).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 16:22:09 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031748

TABLE 5

Comparison of Male and Female Establishments: Recorded
Disciplinary Offenses of Assault and Fighting, England and Wales,
1990–96 (Rates per 1,000 Inmate Population)

| | 1990 | 1991 | 1992 | 1993 | 1994 | 1995 | 1996 |
|---|---|---|---|---|---|---|---|
| A. Assaults on staff: | | | | | | | |
| Male establishments | 37 | 42 | 48 | 60 | 61 | 50 | 39 |
| Female establishments | 137 | 126 | 137 | 162 | 144 | 131 | 115 |
| B. Assaults on inmates: | | | | | | | |
| Male establishments | 30 | 33 | 33 | 41 | 39 | 38 | 34 |
| Female establishments | 55 | 47 | 74 | 86 | 77 | 77 | 59 |
| C. Fighting: | | | | | | | |
| Male establishments | 93 | 91 | 95 | 104 | 101 | 93 | 89 |
| Female establishments | 141 | 123 | 136 | 140 | 181 | 158 | 150 |

SOURCES.—Data are derived from relevant annual volumes of *Statistics of Offences
against Prison Discipline and Punishments in England and Wales.*

is not. If further studies were to support such a conclusion, then this
would provide strong prima facie evidence of an environmental effect,
with the transition from the outside community to the prison tending
to heighten levels of women's minor violence, at least as compared
with those of men. I shall return to this point in Section III below,
when discussing the results of the multivariate study by Mandaraka-
Sheppard (1986).

III. Do Environmental Factors Affect Prison Violence?
A main feature of the analysis in this essay (see the Introduction) is to
attempt to set interpersonal prison violence within the context of daily
social order in prisons. But, as a preliminary to such an analysis, we
must first consider what convincing evidence there is that variables
connected to the prison's environment (in the broadest sense of that
term) do indeed influence the amount and type of violence.

A useful starting point is Wright and Goodstein's (1989) essay of a
decade ago on correctional environments. As these writers point out,
three broad groups of prison environment studies can usefully be dis-
tinguished, namely: (i) those focusing on the physical characteristics of
the prison environment, such as architecture and the degree of crowd-
ing in the institution; (ii) transactional studies, mostly by social psy-
chologists, focusing on "interactions between people and events or
settings and . . . the social ecology of these person/environment trans-

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 16:49:45 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031749

236      Anthony E. Bottoms

actions" (p. 259); and (iii) studies that do not focus on the prison environment directly but instead infer an environmental effect from empirical analyses of prison system policy changes and their intended and unintended consequences. I shall adopt a similar framework for analysis in this section, though the three types of studies will be considered in a different order than in the Wright-Goodstein review. Additionally, the third category will be expanded to include studies that draw conclusions inferring environmental effects from radical changes in prisoners' environments occurring other than as a result of alterations in prison system policies.

### A. Studies Inferring Environmental Effects on Prison Violence

The essential common characteristic of this first kind of research study is that a feature or features of the environment of a given prisoner changes substantially, and then a before-and-after analysis of the transition is conducted. From such an analysis, environmental effects may then be inferred, though obviously there are a number of potential threats to the validity of any such conclusion (see, generally, Cook and Campbell 1979).

A particularly interesting analysis of this kind was conducted by Cooke (1989) at the so-called Special Unit in Barlinnie Prison, Glasgow, Scotland (see also, more generally, Cooke 1991). The Special Unit, now closed, was in its day a famous separate enclave within Barlinnie Prison, reserved for a very small number of male long-term prisoners who had proved very disruptive in the main prison system. The unit was originally designed on "therapeutic community" lines (see, e.g., Jones 1968), to which it subsequently did not adhere in full; nevertheless, the notion of "the community" within the unit (embracing both inmates and staff) remained an important organizing concept, and "community meetings" were regularly held (see Whatmore [1987] for a brief description of the unit; Boyle [1984] for an inmate's account; and Bottomley, Liebling, and Sparks [1994] for a qualitative research assessment). Another extremely important feature of life in the unit was its high level of privileges, which were significantly greater than those available to other long-term inmates in Scotland.[26] Special Unit

---

[26] Many observers have commented on the paradox whereby some of the most disruptive prisoners in the Scottish system received, in the Special Unit, a particularly generous level of privileges. However, the smallness of the Special Unit, and the complexities of the administrative systems involved, made it virtually impossible for any prisoner successfully to plan to reach the Unit by a program of disruption.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 11:11 ... 
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031750

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 186 of 276



Fig. 1.—Barlinnie special unit: assaults and serious incidents before, during, and after time in unit. Solid circles = total number of incidents; open squares = number of individuals assaulted; solid diamonds = number of serious incidents. Source: Cooke (1989), used with permission.

privileges included virtually unlimited visiting facilities for families and friends, the right not to work if one did not wish to do so, the opportunity to cook and eat nonprison food, and access to in-cell television. Of these, it is quite clear that the visiting privilege was particularly valued by prisoners, not least because Barlinnie Prison is situated in the heart of Glasgow, Scotland's largest and most criminal city, and visiting was therefore relatively easy and convenient for the families of most of the unit's prisoners.

Cooke (1989) showed that for individual prisoners, the level of assaults and other serious incidents committed by residents in the Special Unit was markedly lower than for the same inmates in the years in prison immediately before their unit experience. Moreover, as can be seen in figure 1, average violence levels dropped very sharply on entering the unit, prima facie suggesting a situational or environmental explanation for the change in behavior (i.e., living conditions in the unit were radically different from those in the main prison system, and this change, it was suggested, significantly affected prisoners' behavior). Cooke argued that a main situational factor in operation was that of

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 14:17:41 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031751

238      Anthony E. Bottoms

greater autonomy for the prisoner; that is, prisoners had much more say in their choice of daily activities in the unit than in mainstream prisons and more say also about the way that the unit was run.[27] A further situational mechanism suggested by Cooke (1989, p. 141), and which others would probably regard as more important than the autonomy factor, relates to incentives and disincentives: that is, prisoners greatly preferred the Special Unit environment (especially the visits) to that of ordinary prisons, and they were well aware that the unit had a strict rule disallowing physical violence, serious breach of which would result in immediate expulsion back to the "mainstream." Thus the total environmental context might well provide a powerful disincentive to act violently, though in the absence of more detailed research data this point cannot be definitively established.[28]

   Two other studies from which environmental effects on prisoners' behavior have been inferred relate to important policy changes in the 1970s and 1980s in two states, California and Texas.

   In the early 1970s, violence in Californian prisons reached what the state's Department of Corrections described as "intolerable" levels. Tighter security was therefore ordered at all twelve state adult prisons from a given date, to include "lockdowns" at the four maximum-security prisons. Bidna (1975) carried out a before-and-after analysis of prison violence in California at this time. The tighter security policies apparently had some success, since there was a significant decline in the overall rate of stabbings from time 1 to time 2.[29] Moreover, there was a change in the pattern of stabbings: fewer stabbings in time 2 involved heavy weapons, and stabbings perpetrated by cliques or with a racial basis proportionately declined, while those arising from personal conflicts proportionately rose. One could reasonably infer from these data that more restrictive management policies had reduced the opportunities for stabbings and for the acquisition of heavy weapons, and had

[27] There was also a very rapid grievance procedure available: any member of the community with a grievance could at any time call a "community meeting," which it was expected that everyone (officers and prisoners) would attend.

[28] In the longer term, however, Cooke argued that more normative factors came into play, as the unit's nonviolent philosophy and encouragement of prisoners' self-fulfillment via various individual programs, were gradually internalized by the prisoners. Cooke (1989) believes that such processes help to explain the lower long-term violence rates of the Special Unit sample (i.e., when they returned to the mainstream prison system: see fig. 1), though he carried out no empirical investigation to test this hypothesis.

[29] Bidna selected two particular indices of prison violence, namely stabbings and assaults on staff, on the grounds that "few if any" of such events are likely to go unrecorded. This is an incorrect assumption as regards assaults on staff (see Sec. V), so I have not here discussed Bidna's results relating to this offense.

This content downloaded from 198.91.32.137 on Tue, 28 Jan
All use subject to JSTOR Terms and Conditions

also restricted the extent to which cliques and racial groups could effectively combine to perpetrate stabbings. Further analysis, however, revealed a less successful outcome for one group of prisoners. There was a marked change in the location of stabbings from time 1 to time 2: the rate of stabbings per 100 inmates in general prison locations declined by over half, while the rate of stabbings in "special security housing" doubled. The more restrictive policy was therefore apparently unsuccessful in the "special security" locations, though the research was unable to investigate in detail why this was so. Bidna (1975, pp. 42–43) speculates that the increases were perhaps due to a more violent group of prisoners in the security units, but on the facts this seems unlikely.[30] An alternative possible explanation was also raised by the author, namely that "with limited exercise available in security units, the energies and tensions which inmates formerly released in general population exercise periods and other available diversions may have found an outlet in violent activity" (p. 43). I shall return to this suggestion at a later point in this essay.

The Texas Department of Corrections had, up to the 1980s, operated a control system that relied heavily on two strategies: the unofficial use of force by guards (Marquart 1986), and the so-called building tender (BT) system, whereby certain inmates were selected as "trusties" and were assigned various officer-like functions such as being turnkeys or bookkeepers. In certain circumstances, BTs were given the authority to "break up inmate fights, give orders to the other inmates [and] perform head counts" (Crouch and Marquart 1989, pp. 187–88). Perhaps unsurprisingly, those inmates selected as BTs were very predominantly whites. Following intervention by the U.S. federal courts, the BT system had to be completely dismantled and the abuse of force by guards curbed. The immediate result, researchers found, was an "authority vacuum" (Crouch and Marquart 1989, p. 185), in which prisoner violence rapidly escalated—in 1984, for example, there were an unprecedented twenty-five inmate homicides (see explanatory note to table 4), rising to twenty-seven in 1985. Several proffered explanations for this change, such as the arrival of a different kind of inmate,

---

[30] During the period from time 1 to time 2, there was an overall increase in the prison population in California, and also (as a result of the restrictive management policies) a higher proportion of prisoners were sent to special security housing. One might reasonably expect (although Bidna does not discuss the point) that given such circumstances the average "prespecial housing" profile for time 1 special housing inmates would be more serious than at time 2 (i.e., the time 1 inmates were a smaller and more extreme group).

This content downloaded from 198.91.32.137 on Tue, 28 Jan XX:XX:XX PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031753

240     Anthony E. Bottoms

were discounted for various reasons by the researchers evaluating the changes (Crouch and Marquart 1989, pp. 196–98). Instead, after examining various pieces of detailed evidence, these authors offer what they regard as a much more adequate explanation, based on the changing nature of the social order in Texas prisons:

> The court-ordered reforms dissolved the inmate power structure that had for so long been controlled and defined by the authorities. Dominant convicts soon emerged and filled the authority vacuum left by the building tenders and by a [now] seemingly powerless security force. The transition in control precipitated a crisis in [inmate] self-protection. While some inmates succumbed to the advances of the stronger aggressive prisoners, others secured weapons. Weapons were increasingly involved in disputes. . . . These conditions offered fertile ground for the growth of prison gangs . . . [and] the gangs that emerged have been responsible for a disproportionate amount of prison violence. (Crouch and Marquart 1989, p. 220)

By 1986, however, the evidence suggested that matters had changed again. A recovery of confidence by staff, plus the extensive use of administrative segregation, helped the Texas Department of Corrections to establish "a new prison order," which in time produced a marked reduction in deaths and injuries (Crouch and Marquart 1989, chap. 8). Thus indicators of prison violence levels in Texas had, over time, followed a bell-shaped curve, not dissimilar to that found for prison homicides in the United States as a whole (table 4). It is therefore tempting to wonder whether the U.S. prison homicide trends in table 4 can have a similar explanation, given the liberalization of many state prison systems in the late 1960s and early 1970s (following the civil rights protests of the 1960s, and the courts' abandonment of the traditional "hands-off" doctrine for prison litigation); and given also the subsequent establishment of a "new prison professionalism," spearheaded initially by the activities of the American Correctional Association from the late 1970s (Silberman 1995, pp. 120–26). But for the moment, these suggestions must be regarded only as speculative.

None of the three case studies considered in this subsection provides irrefutable evidence of an environmental effect on interpersonal prison violence. But the authors of each of the three studies postulates the radical environmental changes described as being, in each case, the

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 FLTF * PARSONS-031754
All use subject to JSTOR Terms and Conditions

most adequate explanation of the changed patterns of violence observed. The three studies taken together thus seem to provide powerful evidence that changed prison environments can indeed affect levels of interpersonal violence.

### B. Physical Characteristics of the Prison Environment

As is well known, in the field of criminal policy powerful voices have been raised, backed by strong research evidence, in favor of so-called situational crime prevention, a strategy that focuses especially on the manipulation of the physical environment so as to reduce the opportunities for crime (see, e.g., Clarke 1995). Among the particular strategies suggested by advocates of situational crime prevention are "target-hardening" and "target removal"; restricting access to the potential target by restraints on the movements of potential offenders, and restricting access to the means of committing crime, such as the availability of potential weapons (guns, knives, etc).

It is not at all surprising that prison officials have for many years been deploying various kinds of "situational crime prevention" in the prisons context, without calling them by that name (see, generally, Bottoms, Hay, and Sparks 1990). It is also not surprising that the research evidence continues to suggest that some of the physical characteristics of particular prisons, and their permitted routines, may indeed enhance the opportunities for various kinds of infraction of the prison rules, including physical violence. We have already encountered this in reverse in Bidna's California study: the more restrictive security policy seemed to reduce the opportunities both for stabbings in general and for the development of gangs and cliques in particular. Very similar implications emerged from the detailed study of Long Lartin prison, England (Sparks, Bottoms, and Hay 1996). As mentioned in a previous section, Long Lartin had enjoyed a traditionally liberal regime policy for a maximum security prison; and detailed contrast with another maximum security prison (Albany) showed, for example, that Long Lartin had much more liberal rules about informal inmate association and movements, including the official approval of so-called cell association (two or more prisoners meeting informally in an inmate's cell). These enhanced freedoms were greatly prized by most Long Lartin prisoners; but they had a "down side." Inmates' qualitative evidence, as well as some quantitative evidence relating to the use of alarm bells in the prison and the number of head injuries treated in the prison hospital (Sparks, Bottoms, and Hay 1996, pp. 259–62), all suggested

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 19:13:55 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031755

that the considerable freedom of movement and association in Long Lartin was sometimes abused by some prisoners to "settle a score" by violent means. When this occurred, it was not at all difficult for the aggressor to choose a location that was poorly supervised—and the existence of cell association certainly made this choice easier, given the particular architectural design of the cell blocks in Long Lartin.[31] Moreover, the substantially greater freedom of movement and association in Long Lartin apparently facilitated the establishment of a more complex set of inmate social networks in Long Lartin than in Albany, including the easier development of gangs and cliques. These more complex social networks were empirically reflected in the kinds of violent incident that came to official notice in Long Lartin (Sparks, Bottoms, and Hay 1996, chap. 7; note again the close congruence with the results from Bidna's earlier Californian research).

Other data are also congruent with the potential importance of an "opportunity" dimension in prison violence. For example, in England prison regimes were liberalized, with more time out of cell in the early 1990s, and then tightened again in mid-decade: official assault rates rose and then fell correspondingly (see table 1). Or again, in the recent Oxford study, and taking the four studied institutions together, the shower areas were regarded by prisoners as the most unsafe part of the prison, because of the opportunities they provided for undetected attacks (see O'Donnell and Edgar 1999, table 4). Yet one must also be careful not to infer, from results such as these, that the existence of certain physical characteristics in a prison will automatically promote violence. Within the boundaries of the Barlinnie Special Unit (see Cooke 1989), for example, prisoners had significantly more freedom of movement and association than they did even at Long Lartin; yet violence levels in the unit were very low (see Subsec. A). I shall return to this apparent paradox in Section IV.

Awareness of the potential importance of the "opportunity" factor in the genesis of prison violence has led to the so-called new generation of prison architecture (see, e.g., Home Office 1985). In a nutshell, such architecture seeks to incorporate desirable features of situational crime prevention into prison design. Such features may include: separated smallish housing units, each with its own exercise area; security corridors linking housing units, but with barrier gates to isolate hous-

---

[31] There were six cell blocks at Long Lartin, each containing three "spurs" set at ninety degrees to the next spur; staff operated from the landing where the three spurs met.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 F. PARSONS-031756
All use subject to JSTOR Terms and Conditions

ing units in an emergency and a separate corridor to which staff only have access; cells within housing units placed around a living area, so that officers operating informally in the living area have a clear sight of all cell entrances (unlike in the traditional "corridor design"; see fig. 2); and a special attempt to "normalize" the atmosphere and expectations of the housing units, and other facilities, by, for example, replacing "barred doors . . . with wooden ones [and] concrete floors with carpets" (Wener 1994, p. 2).

Typically, "new generation" architecture has been implemented hand-in-hand with a so-called direct supervision management model, which "had as its basic tenet the notion that visual contact—even if omnipresent—was in itself insufficient for adequate supervision. Rather, it proposed placing officers in direct contact with inmates to facilitate closer observation and communication. The officer's job was no longer to watch and respond to inmate problems, but to predict and prevent them . . . One physical implication of this model was the elimination of the traditional enclosed officer station" (Wener 1994, p. 2).

As will be noted, there are several different conceptual strands within the "direct supervision" package. Among these are, especially, the reduction of opportunities for inmate-inmate violence in unsupervised or poorly supervised space, so creating a safer environment; the deliberate manipulation of the symbolic features of the environment, so that the reduced-opportunity physical design does not feel oppressive to inmates;[32] and the development of a proactive, preventive role and style for basic-grade prison staff.

The research evidence on the direct supervision approach is suggestive but not conclusive. As Wener (1994, p. 3) notes, there is some evidence that the approach reduces prison violence, and this evidence "comes from anecdotal [accounts] . . . , survey research (Farbstein and Wener 1989) and individual and comparative case studies (Wener, Frazier, and Farbstein 1985)." But apart from the usual methodological difficulties in evaluation studies, a complicating factor in this instance is that individual institutions' implementation of the "direct su-

[32] Additionally, within the direct-supervision approach, emphasis is placed on giving prisoners as much *autonomy* and *choice* as possible, consistently with the maintenance of a safe environment. It is interesting that at the Wolds private prison in England, which adopted a direct supervision approach in a building with a more traditional prison design, the initially granted level of inmate autonomy had to be restricted because of behavior such as cell theft and "taxing" (extracting goods/money through threats; see James et al. 1997, pp. 70–71).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:17:57 PM
All use subject to JSTOR Terms and Conditions

BLITE-PARSONS-031757



Fig. 2.—Floor plan of part of a "new generation design" prison. Source: Adapted from part of floor plan of Norfolk County Sheriff's Correctional Center, Mass., as illustrated in Farbstein, Liebert, and Sigurdson (1996, p. 15).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 13:11:20 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031758

pervision" style has varied substantially in detail, and this has resulted in emphasis being differentially placed, in different prisons, on one or more of the varying conceptual strands within "direct supervision" (see, e.g., Farbstein, Liebert, and Sigurdson 1996). Hence, it is not always easy to know from the published studies exactly what it is that has been evaluated.

Before concluding this subsection, one other physical characteristic of the prison environment should be mentioned, especially because it has featured fairly prominently in the previous literature on prison violence—namely, overcrowding. Extensive citations to relevant publications will be found in the detailed overview of overcrowding research by Gaes (1994). In the section of this overview dealing with overcrowding and violence, Gaes makes two linked central points. The first is that the results of the empirical studies on crowding and violence are inconsistent and one reason for this inconsistency is that "researchers have failed to examine the proximal causes of violence as well as the formal mechanisms that prison administrators use to control or limit violence" (p. 329). The second point is that there has been insufficient adequate theorization, and theory testing, in this field. For example, it is a basic assumption of much crowding research that the effects of crowding are mediated through stress and the consequences of stress, but most researchers have "failed to do strong tests of these theoretical assumptions" (p. 337). Gaes's strong emphasis in these conclusions is thus both on the importance of theory and on the importance of detailed studies of how violence actually emerges in day-to-day prison life. These emphases are highly congruent with the basic framework and assumptions of the present essay.

## C. Transactional and Interactive Analyses of Prison Violence

In prison sociology, there is a famous and extended debate between the so-called deprivation and importation models. The deprivation model argues, essentially, that inmates' adaptation to the prison, and the development of inmate subcultures, arises as a response to what Sykes (1958) called "the pains of imprisonment"—the deprivation of liberty, goods, and services; personal autonomy; personal security; and heterosexual relationships. The "importation" model, by contrast, argues that prisoner adaptations and subcultures are primarily influenced by what the prisoner brings into the institution: personal history, informal links with particular social groups, formal affiliations with organized crime syndicates, and so on. The generally agreed resolution of

This content downloaded from 198.91.32.137 on Tue, 28 Jan ... PLTF-PARSONS-031759
All use subject to JSTOR Terms and Conditions

246       Anthony E. Bottoms

this debate has been that both preprison socialization experiences and
the experiences of imprisonment (including deprivation), together with
important extraprison influences during one's prison stay (e.g., major
events in a prisoner's family life), all in fact influence prisoner adapta-
tions (see, e.g., Thomas, Peterson, and Zingraff 1978; Goodstein and
Wright 1989). The reasons for this conclusion are, in retrospect, really
rather obvious. As Porporino and Zamble (1984, p. 409) put it in a
slightly different context: "Generally speaking, there are few attitudi-
nal or behavioral dispositions that are so powerful as to totally deter-
mine actions in all situations, and few environmental events which can
compel identical responses from people with varying dispositions. We
would expect that the interaction between the individual and his envi-
ronment would be the most powerful determinant of behavior."

Within the more restricted field of prison violence studies very simi-
lar conclusions have been reached. This body of research literature
therefore adds to the cumulative evidence, as previously described in
this and earlier sections, that emphasizes the importance of a full study
of the prison's daily environment when analyzing interpersonal prison
violence. I shall illustrate the contribution of this kind of approach
by discussing one little-known publication (an English study by
Mandaraka-Sheppard) and one very well-known strand of American
research work (deriving especially from the contributions of Toch and
Wright).

Mandaraka-Sheppard (1986) studied the dynamics of inmate aggres-
sion in six English prisons for women. For present purposes, central
attention focuses on the researcher's "physical violence" scale, which
was a self-reported behavior scale with a five-point range, tested for
its reliability and validity (pp. 62–63). The "violence" items were, in
substance, mostly relatively minor events, such as "fighting with a
group of inmates," "fighting with staff," and "throwing things at in-
mates during an argument." The author's eventual composite multi-
variate analysis (see her chap. 7) suggested that institutional variables
accounted for the bulk of the statistical variance in the physical vio-
lence scale, though of course these institutional variables were them-
selves not necessarily uninfluenced by preprison characteristics. To
give a specific example, within the composite analysis one of the vari-
ables correlating most strongly with "physical violence level" was an
institutional variable measuring "defiant or compliant attitude to pres-
ent prison" (see Mandaraka-Sheppard 1986, chap. 4). A significant
proportion of the variance in prisoners' defiance-compliance scores

This content downloaded from 198.91.32.137 on Tue, 28 Jan BLTF·PARSONS-031760
All use subject to JSTOR Terms and Conditions

was statistically explained by preprison variables such as age (older in-
mates were less defiant) and what was labeled as a "potency" score
(roughly, hard/masculine vs. soft/feminine; the latter were less defi-
ant). But, even when these preprison variables had been taken into ac-
count, there was a very specifically prison-focused dimension that was
reflected in the defiance/compliance scores. As Mandaraka-Sheppard
put it, the implication was that "although compliant inmates in the
context of prisons are likely to be inmates who are older, rated as less
potent [etc.] . . . yet there will still be non-compliant inmates from
these categories (i.e., older, [less potent] etc.) *if the institution is lacking
in order, [is] preventing autonomy of inmates, and is using severe punish-
ments*" (p. 189, emphasis added).

In other words, Mandaraka-Sheppard found truly interactive effects
between preprison and institutional variables, and both kinds of effect
were clearly related to the physical violence scale used.

Comparing this study with others in the literature, it can be said to
show particularly clearly and decisively the apparent importance of in-
stitutional variables. As the author put it, within her study "institu-
tional characteristics appear to exert an independent (i.e., direct) in-
fluence upon misbehavior within the prison" (p. 191). The apparent
special clarity of these "environmental" effects within this research
project might possibly be related to the fact that the six prisons studied
were women's prisons, and the "violence" was substantively relatively
minor. For it could be the case that, given women's low preprison vio-
lence levels, their institutional violence is more likely than that of men
to be especially influenced by their prison environment. It could also
be the case that minor institutional violence is more likely to be partic-
ularly influenced by environmental factors. These are matters that de-
serve fuller exploration in future research.

In a seminal text, Toch (1977) analyzed nine hundred interviews
with prisoners in five New York State maximum-security prisons, fo-
cusing on the problems prisoners faced in confronting incarceration.
Content analysis yielded eight separate dimensions of prisoner con-
cerns about life in prison, namely privacy, safety, structure, support,
emotional feedback, social stimulation, activity, and freedom. Subse-
quently, Toch developed a questionnaire (the Prison Preference In-
ventory or PPI) to tap the individual's preferences, needs, or concerns
relating to these eight dimensions; and Wright (1985) developed a sep-
arate instrument (the Prison Environment Inventory or PEI) to assess
institutional environments along the same dimensions. Kenneth Ad-

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 from 197.37
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031761

248     Anthony E. Bottoms

ams (1992, pp. 318–24) provides an excellent summary of work in this tradition. Briefly, Toch (1977) initially demonstrated that individual prisoners varied in their environmental preferences or needs (e.g., older inmates valued structure and placed less emphasis on freedom, but younger inmates especially valued freedom). In a subsequent series of studies, Wright (see esp. Wright 1991*a*, 1991*b*) examined the relationship between the actual prison environment and inmate adjustment to prison. Two of Wright's variables are of special interest here—namely, those of self-reported aggression ("external problems") and prison victimization (suffering injury or being taken advantage of, i.e., "physical problems"). For both measures, Wright (1991*a*) found that not only individual characteristics, and, not only environmental characteristics, but also measures focusing on "the fit between person and environment" were significantly related to the dependent variable.

There is thus a consistent message from these and other studies that researchers into interpersonal prison violence who approach their task with a less than fully interactive framework (i.e., focusing on the individual *and* the environment, *and* on the way that the individual reacts to the specific environment) will have provided an incomplete picture.

Yet some anxieties remain about the Toch-Wright approach, which is in danger of presenting too static a picture. To speak of "the fit between person and environment," as Wright does, suggests first, that "person" and "environment" are two readily separable categories, and second, that a particular environment will "fit" a particular type of prisoner, tout court. Such an approach fails to take the "interactionist" or "transactionalist" approach to its logical conclusion, namely that persons adapt to, and change in, environments, and that social environments are always shaped by human contributions. Hence, there is no static "fit," but rather a series of continual interactions and transactions. As Wener (1994, p. 4) has usefully put it, following his extensive studies of physical environments in prisons, it looks as if the most appropriate conceptual framework will make three key assumptions, namely: "It is artificial to separate the psychological and organizational aspects of the setting—they are mutually dependent and important; the setting's effect on violence is in part mediated by the way in which inmates perceive and respond to their situation; and individual characteristics of inmates, such as personality and psychopathology, may in some cases lead directly to violent behavior, *but [they] also affect, and are affected by other aspects of the setting*" (emphasis added).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031762

Much recent work in social theory, such as "structuration theory" (see Giddens 1984, applied in the prisons context by Sparks, Bottoms, and Hay 1996) conveys exactly the same message.

### D. Conclusions and Implications

Criticisms can of course always be made of the validity or generalizability of particular research studies. But there seems little doubt, from the research reviewed in this section, that Kenneth Adams (1992) was right to conclude that, taken together, the evidence is clear: *"Inmates behave differently in different prison settings"* (p. 315).

What is not yet so clear is whether prison administrators have really grasped the implications of this conclusion, but those implications must surely include the following: first, that when high levels of interpersonal prison violence occur, officials seeking causes and remedies must look hard at the prison environment and at prison management practices, as well as at the problems posed by particular high-profile inmates; and second, that attempts to predict "troublesome inmates" (through "risk profiles" and the like), will always be imperfect, for the research evidence is clear that " 'troublesomeness' and similar concepts are not just naturally occurring phenomena, carried around by individuals as a set of characteristics, identifiable in advance and just waiting to erupt" (King and McDermott 1990, p. 453).

Even researchers sympathetic to an environmental approach can easily fall into the trap identified by King and McDermott in this last quotation. For example, we have seen that Bidna (1975), in his important early article on environmental changes in California, postulated that, given the limited opportunities for physical exercise in special security housing units, perhaps inmates in such units—after the state-imposed restrictions—channeled "the energy and tensions which [they] formerly released in the general population exercise periods into violent activity" (p. 43). But to speak in this manner is to adopt a kind of "hydraulic" theory of violence in which individuals have a "violence potential" that must be actualized or else sublimated in physical exercise. Among other things, this excludes the meaning of a given environment to participants and the way they themselves shape, mold, and sometimes transform that environment. A more subtle approach than this is needed; and the argument of this essay is that appropriate subtlety is unattainable unless we pay close attention to the day-to-day life of prisons.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 10:55:25 AM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031763

250      Anthony E. Bottoms

### IV. How Is Order Maintained in Prisons?

The central focus of this essay is on interpersonal prison violence, not collective violence; and we have noted (see the Introduction) that the distinguishing feature of interpersonal prison violence is that it takes place within the normal social frameworks of the day-to-day functioning of the prison. Cressey (1961, p. 2) famously commented that "one of the most amazing things about prisons is that they 'work' at all." Despite all the disadvantages that prison administrators face (e.g., they are dealing with some of the most violent and recalcitrant members of the general population, who are in prison against their will, and who heavily outnumber the guard force), the fact is that, in Cressey's words, "the social system which is a prison does not degenerate into a chaotic mess of social relations which have no order and make no sense."

If, therefore, we are to pursue a fully interactive approach to interpersonal prison violence (see Sec. III), it is vital at this point in the argument to "reverse the lens" away from a concentration on prison violence per se, and to consider instead, in Cressey's language, that "amazing thing" about prisons—that most of the time they are *not* places that "have no order and make no sense."

#### A. Maintaining Social Order

Quite often, prison administrators speak of the "problems of control" in prisons. Inmates, however, tend to be uncomfortable with this language (which has rather obviously sprung from the particular preoccupations of those with official responsibilities in the criminal justice system). By contrast, prisoners are much more receptive to the concept of "order" in prisons, for most of them positively value an orderly framework, both to the prison day, and to the idea of progression through a prison sentence. Order and predictability make it easier to "do your time."[33]

Building on these ideas, in *Prisons and the Problem of Order* (Sparks, Bottoms, and Hay 1996, p. 119) we offered formal definitions of "order" and "control" in the prisons context, as follows:

> *Order:* an orderly situation is any long-standing pattern of social relations (characterized by a minimum level of respect for persons)

---

[33] Indeed, one of the mechanisms used in concentration camps to destabilize inmates psychologically was to alter the camp regime at very regular intervals, perhaps daily. Routines thus have the effect of assisting everyone—in and out of prisons—to maintain what Giddens (1984) describes as a level of "ontological security" in day-to-day living.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 from 
All use subject to JSTOR Terms and Conditions
BLTF-PARSONS-031764

in which the expectations that participants have of one another
are commonly met, though not necessarily without contestation.
Order can also, in part, be defined negatively as the absence of
violence, overt conflict or the imminent threat of the chaotic
breakdown of social routines.

*Control:* the use of routines and of a variety of formal and
informal practices—especially, but not only, sanctions—which
assist in the maintenance of order, whether or not they are
recognized as doing so.

Thus, in the prisons context, "order" is a dynamic social equilibrium,
while "control" is, in effect, a set of strategies or tactics used by prison
administrators to achieve order.

Two things follow. First, there are many different kinds of possible
social order in prisons—a fact that was obvious to us as researchers,
faced with studying two of the seven maximum-security institutions (or
"dispersal prisons") within the English prison system, and realizing
quickly that these two prisons (Albany and Long Lartin) had radically
different regimes and radically different staff philosophies (see earlier
discussion). Second, if the focus is—as I am contending it should be—
on "order" and "dynamic social equilibrium," then the prison re-
searcher's focus of attention needs to be much wider than the prison
itself. Manifestly, there is a "problem of order" in outside society as
well as in the prison, and this general problem of order has been widely
reflected upon by sociologists and by political philosophers (see gener-
ally Wrong 1994).

Wrong offers a self-confessedly simplified but heuristically very use-
ful characterization of three major approaches to the problem of order
in classical political philosophy: "Hobbes's solution was coercive,
Locke's stressed mutual self-interest, and the Rousseau of *The Social
Contract* gave primacy to normative consensus" (p. 9).

Wrong goes on to complain—rightly—that too often only one or
other of these three approaches has been emphasized by analysts of
social order. Hence, he argues, normatively oriented sociologists have
placed too much reliance on norms and values; some traditions in po-
litical thought have tended to exaggerate the role of force, coercion,
and constraint; and economists have "notoriously overstressed eco-
nomic interest." But when one looks at empirical social realities, there
is no particular justification for giving primacy to one of these ap-
proaches, since none of them "precludes or subsumes the others, but

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031765

252        Anthony E. Bottoms

| A. | INSTRUMENTAL/PRUDENTIAL | 1. | Incentives |
|----|----|----|----|
|    |    | 2. | Disincentives |
| B. | NORMATIVE | 1. | Normative Consensus/ Acceptance |
|    |    | 2. | Legitimacy |
| C. | CONSTRAINT-BASED | 1. | Physical Restrictions on Individual |
|    |    | 2. | Restrictions on Access to Target |
|    |    | 3. | Structural Constraints |

FIG. 3.—Reasons for social/legal compliance. Source: author

. . . on the contrary, all three may operate conjointly in concrete human societies" (p. 9).

This is an extremely valuable insight. So let us pursue Wrong's threefold classification, conjointly with the emphasis of this section on *order* rather than *disorder*. We can then quickly identify the fact that each of the main classical approaches to order—the normative, the coercive, and the instrumental—can lead, in a given situation, to what may seem to a given social actor to be rather compelling reasons for complying with a particular set of rules or expectations. This possible list of main reasons for social and legal compliance is set out schematically in figure 3.

As figure 3 shows, from an instrumental or prudential perspective, two simple reasons for compliance may operate—incentives and disincentives. Both may, of course, be relevant in the prison context, as some prisoners' reactions to parole incentives, and to threats of punishment, readily demonstrate. The second perspective on compliance—the normative approach—likewise contains two main reasons for compliance, but these need a little more explanation. The first is normative consensus or acceptance: for example, within an Orthodox Jewish extended family there may be a unanimous consensus on strict observance of the Sabbath. In such a context, no one forces the family members to comply with the rules about what may and may not be done on the Sabbath (hence, coercion is absent), nor do incentives and

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 13:47:38 PM
All use subject to JSTOR Terms and Conditions

BLTF-PARSONS-031766

disincentives predominate (though they may certainly be present if, e.g., disobedience might entail ostracism by the family). Rather, the predominant reason for observance is family members' acceptance of the truth of Orthodox Judaism and their individual and joint commitment to the normative prescriptions that this religion expects its adherents to observe. And despite the moral pluralism of the late twentieth century, there remains much normative consensus in contemporary societies—for example, a consensus against killing others and burgling others' homes. Much socialization (in families, schools, and communities) attempts to inculcate such norms in the young and to reinforce symbolically the importance of the moral values that the norms embody.

The other reason for compliance, from within a normative framework, is *legitimacy*—that is, compliance with a rule because it has been promulgated by a person or body with legitimate authority, acting in a proper way to exercise that authority. Hence, some people might obey the speed limit on a motorway, not because they are normatively committed to it (they might prefer a much higher limit), but because the speed limit has been set by the appropriate legal authorities within a democratic state.[34]

In prisons, normative reasons for compliance may seem at first sight to be of little relevance—approaches based on incentives/disincentives, and/or on coercion and constraint, might seem to be much more to the point. To the contrary, as I shall argue in the next subsection, legitimacy in particular is of crucial importance in securing compliance in the prisons context.

The third main approach to compliance is that based on coercion and constraint. Some reasons for compliance, within this approach, are physical—a prisoner locked alone in his cell cannot assault anyone; or a group of prisoners wishing to gain access to their personal files may find that the security restrictions surrounding the file store make the task of breaking into the store impossible. The final reason for compliance within this framework is subtly different, and is best called "structural constraint." In society at large structural constraints vary enormously, but their distinguishing feature is that they in effect compel

---

[34] Indeed, the law's perceived legitimacy may induce persons to obey even where they regard the particular directive as being positively objectionable. For example, in Britain some of those who in the late 1980s disagreed on moral grounds with the then newly enacted Community Charge ("Poll Tax") nevertheless felt bound to comply because the tax constituted a validly enacted measure of a democratically elected government.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 01:16:01 PM
All use subject to JSTOR Terms and Conditions

ALT-PARSONS-031767

the obedience of the subject, not through the rational calculus of self-interest (incentives and disincentives), nor through any kind of normative commitment on the part of the subject, but simply through the weight of the power relations involved and/or through resignation to the fact that "this is the way things are round here," and they cannot be changed.[35] So stated, it is not hard to see that structural constraints may operate in the prisons context.

## B. Legitimacy

In England, the prestigious Woolf Inquiry into the disturbances at Manchester Prison and elsewhere in 1990 took the view that a widespread sense of *injustice* among prisoners about their general treatment in prison was causally implicated in the scale of the disorders (see, e.g., Woolf 1991, paras. 9.24, 14.437–38). "Injustice" was a term used by Lord Justice Woolf in a rather broad way, to include the basic "quality of life" for prisoners (adequate living quarters, food, and so on), various informal aspects of inmate life (including the manner of prisoners' treatment at the hands of staff), and formal procedures (such as the disciplinary and grievance systems).

Woolf did not use the term "legitimacy," but in the debates following publication of the Woolf Report, my colleagues and I took the view that, if indeed "justice" does help to sustain order in prisons (as Woolf proposed) then it does so because of the contribution that it makes to the legitimation of the prison authorities and the prison regime in the eyes of the prisoners. In our analysis, the acquiescence or otherwise of prisoners to the kinds of authority claimed or exercised over them by officials is a variable matter, centered around a complex matrix of interactions between prisoners' expectations of their captivity, and the reality of that captivity. In particular, the core issue is whether, judged by the reasonable standards of the wider community in which the prison is set, prisoners come to see the behavior of their custodians as being justifiable, comprehensible, consistent and hence *fair*—or, alternatively, unwarranted, arbitrary, capricious, and overweening (for fuller analyses, see Sparks and Bottoms 1995; Sparks, Bottoms, and Hay 1996).

---

[35] The distinction between structural constraint and normative consensus is in principle conceptually clear, but in practice may be difficult to draw. For example, in a traditional society some women may conform to prescribed gender roles because they are strongly normatively committed to them; others may conform only because of structural constraint; others may analyze their conformity as containing some element both of structural constraint and of normative commitment.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 F. PARSONS-031768
All use subject to JSTOR Terms and Conditions

| Criteria of legitimacy | Corresponding form of non-legitimate power |
|---|---|
| 1.  Conformity to rules (legal validity) | Illegitimacy (breach of rules) |
| 2.  Justifiability of rules in terms of shared beliefs | Legitimacy deficit (discrepancy between rules and supporting shared beliefs, absence of shared beliefs) |
| 3.  Legitimation through expressed consent | Delegitimation (withdrawal of consent) |

Fig. 4.—Beetham's dimensions of legitimacy. Source: Beetham (1991), p. 20

A main theoretical source drawn on in our analysis is that of the political theorist Beetham (1991). Beetham argues that virtually all systems of power relations, including ones which are quite autocratic, stand in need of legitimation. Conversely, they encounter particular kinds of problems when power is exercised in nonlegitimate ways (see fig. 4).

As figure 4 shows, Beetham identifies three separate (but of course interconnected) "dimensions" of legitimacy, which roughly correspond to the traditional preoccupations of three different academic specialisms that have considered legitimacy as a concept. The three "dimensions" are thus respectively of special interest to lawyers (Has power been legally acquired, and is it being exercised within the law?), to political philosophers (Are the power relations at issue morally justifiable?), and finally, to social scientists (What are the actual beliefs of subjects about issues of legitimacy in that particular society?) (Beetham 1991, p. 4 ff.). This scheme usefully reminds us that formal legality is only one aspect of legitimacy, and is not on its own a sufficient criterion of it, in prisons as elsewhere. Legitimacy also requires that office holders (such as wardens and prison officers) act fairly; and that they can and do justify what they do to those who are affected by their decisions and practices (such as prisoners and their families), thus heightening the likelihood that their authority will be assented to.

Empirical support for this last point comes from the work of Tyler (1990). Using data from a panel study of Chicago citizens' encounters with the police and courts, Tyler argues that people are generally more concerned with issues of *procedural fairness* (Has their case or situation

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 ...
All use subject to JSTOR Terms and Conditions

been treated in a fair way? Are like cases treated similarly? and so on), and of the *manner* of their treatment (e.g., Are they accorded respect by police in on-street encounters?) than they are with the outcome of their own case tout court. In Tyler's view, in "special communities" (like prisons) where news travels fast and people know each others' business, such niceties matter all the more.[36] Tyler's argument is that people view their encounters with authority as "information about the group that the authority represents and to which the parties to the dispute or allocation belong" (Tyler 1990, p. 175). Hence, every transaction with an authority figure raises questions that extend "far beyond those connected with the issue to be decided" (p. 175). Such issues include "representation, neutrality, bias, honesty, quality of decision, and consistency" (p. 175) and more generally of esteem. In short, we can postulate from Tyler's work—when we extrapolate from it into the prison context—that *ordinary everyday encounters between staff and prisoners can have crucial implications for the nature of the power relations in the prison, and to the validity of the staff's claims to justified authority—* that is, to legitimacy. This view has been further supported by more recent research work, including work in English prisons (see, e.g., James et al. 1997; Paternoster et al. 1997; Liebling and Price 1999).

One final point about legitimacy must be made. It has been challengingly put to me that to emphasize legitimation within the framework of order maintenance in prison is ultimately simply a recipe for "being nice" to prisoners, "giving them everything they want," and, in some versions "appeasing them." (For a full discussion of this important objection, see Sparks, Bottoms, and Hay 1996, pp. 329–36.) But, on careful examination, that proves not to be the case. To emphasize legitimation is, certainly, to emphasize the general moral obligation on those in power to consider the consequences of their decisions for those under their care, and to be able to give a morally justifiable account of those decisions. But that does not entail giving assent to every far-fetched request made by prisoners. However, straying, in one's

---

[36] Specifically, Tyler (1990) argues, from the data in his panel study, that *fair procedures* were more important to respondents than fair *outcomes*, partly because of lack of knowledge of outcomes in cases other than their own. Moreover, generally speaking, even if "unfavorable *outcomes* are delivered through *procedures viewed as fair*, the unfavorable outcomes *do not harm the legitimacy* of legal authorities" (p. 107, emphasis added). In "special communities," where people know each others' business, outcomes are more likely to be generally known, *but so is the way that the authorities treat fellow-subjects*; hence, consistency of procedural treatment can, in such communities, be added to the list of other dimensions of procedural fairness (e.g., the politeness, apparent honesty, and ethicality of officials in their encounters with citizens; pp. 153–54).

This content downloaded from 198.91.32.137 on Tue, 28 Jan ...
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031770

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 206 of 276

prison decision making, too far from the generally accepted moral code of a society may ultimately have severely practical consequences for prison order. One implication of the emphasis on legitimacy is that *if one is unable to provide, on reasonable request, a morally justifiable account of decisions made, then this may ultimately be instrumental in producing just the kinds of disorders that wardens and staff want to avoid.*

### C.  Social Order in Prisons

From the arguments of the two previous subsections, we can now postulate a theoretical model as to how order in prisons is maintained (see fig. 5). The model takes as given that some characteristics of the inmate population, such as age, will be relevant to the degree of potential disruptiveness within the establishment (box 4). Seven main additional variables are then identified as relevant to order maintenance. Five of these are based on reasons for social/legal compliance, as identified in figure 3 (boxes 1, 2, 3, 5, and 6). The two remaining variables relate to the key mediating role of the staff (box 8) and the sometimes considerable importance, in the prisons context, of specific incidents and their consequences (box 7).

The model is based on research findings, and especially on a linked series of studies carried out at Cambridge University in recent years, (see, e.g., Ahmad 1996; Sparks, Bottoms, and Hay 1996; Liebling et al. 1999; Liebling and Price 1999). It is, however, far from a final product. Rather, it should be regarded as a heuristic model, developed from existing research, but requiring further and more explicit testing and refinement.

In more detail, the main factors postulated as relevant to the maintenance of order in prisons can be described as follows (the numbers given refer to the box numbers in fig. 5).

1. *Legitimation (Leading to Assent: 1A).*  This concept has been outlined above. Within box 1 of figure 5, three different dimensions of legitimacy in prisons are identified, namely the perceived fairness of the staff, the perceived fairness of various regime features (such as visits, search policies, time out of cell, etc.), and distributive fairness (based on perceptions of formal procedures such as the discipline and complaints mechanisms). This very useful threefold understanding of fairness in prisons is derived from Ahmad's (1996) pioneering research study of inmates' perceptions of fairness. Among other things, Ahmad found that prisoners did not make simple blanket judgments about fairness or unfairness, but rather drew distinctions between different

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 16:59:58 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031771



FIG. 5.—Maintaining good order/good behavior in prisons: a speculative and interactive model. Source: author

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 19:17:47 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031772

aspects of their prison experience (e.g., a particular inmate might regard the uniformed staff as generally very fair in a given prison, while regarding the time allowed out of cell as moderately fair, and the searching policies as unfair).

2. *Power and Routines as Structural Constraints.* The concept of legitimation refers, in the prisons context, to inmates' normative judgments on some aspects of their incarceration. But compliance may, obviously, also be achieved in prisons through structural constraints, with no necessary element of normative acceptance by inmates. One element of such constraint will be the obviously displayed power of the state, represented in prisons by the prison staff (and by prisoners' knowledge that staff can be heavily reinforced by the police, and if necessary the military, in an emergency). Another element of structural constraint is, however, the prison routine itself. Routines are a very prominent feature of prison life (see the Introduction). They clearly assist prison staff effectively to fulfill some of the prison's essential tasks of "self-maintenance" (Sykes 1958) but they also carry some benefits for inmates in providing an element of predictability to prison life. Thus prisoners' largely subconscious acquiescence to the prison's routines constitutes an element of structural constraint which helps to achieve overall order in the prison.

3. *Normative Involvement in Projects.* More rarely, some prisoners become strongly committed to prison projects of one kind or another (e.g., an educational course or some recreational activity such as weightlifting) that provides them with a real involvement in the goals of at least some staff in the prison. Such an involvement may have the effect of aiding the overall maintenance of order in the institution (cf. Hirschi 1969).

5. *Incentives and Disincentives.* Some "carrot-and-stick" techniques are, of course, a standard feature of virtually all prison regimes, although the emphasis on them varies from jurisdiction to jurisdiction. Incentives and disincentives certainly sometimes work in reducing prison violence—see, for example, Ellis, Grasmick, and Gilman (1974) on the importance for prison violence of a prisoner's proximity or otherwise to his parole date. That example, however, also illustrates another very important aspect of incentives and disincentives, and one that is apparent in the outside world as well as in prisons (see von Hirsch et al. 1999): namely, that incentives work better if they are linked in some meaningful way to the subject's normative commitments. Thus in the outside world those with strong normative links to

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 12:57:04 PM
All use subject to JSTOR Terms and Conditions

law-abiding communities have been shown to be more easily deterrable than persons without such links. Similarly, the parole incentive can be expected to be of significantly more relevance to the prisoner with strong family ties.[37]

6. *Degree of Physical Constraint.*   We have seen in a previous section, from research such as that of Bidna (1975), that enhanced physical constraints can sometimes operate to reduce prison violence. Paradoxically, however, enhanced restraints can sometimes actually *encourage* violence as a form of rebellion against the degree of constraint imposed by the authorities. I return to this paradox in Subsec. *D* below.

7. *Specific Incidents.*   I noted in the introduction to this essay that prisons are places that, to an extent, can have an importance within the meaning structure and biographical continuities of individuals. A consequence of this fact is that a particular major incident in a prison (e.g., a fire started by an inmate, in which some staff members become trapped, and for a while placed in real danger) can have social reverberations and consequences in that institution for a lengthy period of time. The incident will help to shape the consciousness of key players in the prison social world, and will probably be referred to again and again in future debates on the theme of order in that particular prison.

8. *Staff Deployment, Approaches, and Skills.*   The final dimension represented in figure 5 relates to the role of the prison staff. The importance of this dimension was again demonstrated in Ahmad's (1996) research, where the author considered that the single most important empirical result of his study was the centrality of prisoners' perceptions of staff fairness: "Perceived unfairness of staff is a problem that affects not just the relationship between prisoners and staff, but all other aspects of prison life, including perception of fairness of [various aspects of] the regime, and satisfaction with complaints and grievances. . . . [For example], the data suggest that if staff are perceived as fair, prisoners will perceive the overall prison [experience] as fair even though

---

[37] Incentives approaches in prisons are, however, not always successful. For example, in English prisons in the 1990s a new "Incentives and Earned Privileges" (IEP) scheme was introduced, with the aim of improving prisoner behavior through enhanced incentives for good conduct. A research evaluation showed that, at least in the early days of the scheme, its effect in changing behavior was minimal, notwithstanding that most prisoners agreed in principle with the incentives philosophy. A main reason for the disappointing result regarding behavior was that the IEP scheme was seen by most prisoners as having, in practice, reduced fairness levels in the prison (e.g., because IEP enhanced staff discretion, and this discretion was sometimes seen as having been exercised arbitrarily). See Liebling et al. (1999).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 11:05:11 AM
All use subject to JSTOR Terms and Conditions

BLTF-PARSONS-031774

they may not be satisfied with specific aspects of the regime and their perceived fairness" (Ahmad 1996, pp. 246, 241).

Thus, as suggested in the heuristic model shown in figure 5, staff approaches and skills can in a real sense act as a mediating force between some of the other factors shown (e.g., the degree of physical constraint and surveillance) and the eventual outcome of good or bad prisoner behavior. For a fuller discussion of this key role of the prison staff in the maintenance of order, see Liebling and Price (1999).

As previously indicated, the model shown in figure 5 requires further testing and refinement. But for the moment, it perhaps brings coherently together some of our understandings, based on existing research into the problems of prison order and prison violence.

It should finally be emphasized that this heuristic model should be seen as potentially *fully interactive,* especially as regards the key dimension of legitimacy: for example, an officious emphasis by staff on physical constraints may have a cost in terms of legitimacy. This point is developed more fully in the next subsection.

### D. Tensions for Prison Administrators

If the model suggested in the previous subsection has validity, then it might also be of relevance to prison administrators in considering possible "control strategies" intended to strengthen the sense of order in the institution.

Pursuing this line of thought, toward the end of *Prisons and the Problem of Order* we set up a speculative model of some styles of prison control, focused on prison regimes that were known to us through our own or others' research (see Sparks, Bottoms, and Hay 1996, p. 328). Part of that speculative model is presented here as figure 6: included in this figure are the researchers' suggestions about how one might appropriately describe aspects of the regimes of four prisons, namely Albany, Long Lartin, Barlinnie Special Unit, and Marion (the former end-of-the-line penitentiary in the U.S. Federal system; see Ward 1987).

What figure 6 very well illustrates is that within the interactive model presented in figure 5 there can be some real tensions for prison administrators. In particular, it is striking when considering the "plus" and "minus" notations in the first two rows of figure 6 that there seems to be a very real tension between the dimensions of "legitimacy" and of "physical control." A loosening of physical restrictions will probably be appreciated by most prisoners and may therefore enhance the per-

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 PLTF-PARSONS-031775
All use subject to JSTOR Terms and Conditions

262      Anthony E. Bottoms

|  | MARION | ALBANY (main) | LONG LARTIN | BARLINNIE Sp. Unit |
|---|---|---|---|---|
| Level of situational control | +++ | + | — | — — |
| Legitimacy | — — — | — (disputed) | + (disputed) | ++ |
| Model of social control delivery | redundant? | 'rule of rules' routinization good service | civility/discretion routinization privileged status | autonomy participation |
| Status of prisoner | dangerous object | dangerous subject | thinking agent (some dangerous) | participant |

FIG. 6.—A speculative model of some styles of prison control. Source: Adapted from Sparks, Bottoms, and Hay (1996), p. 328.

ceived legitimacy of the regime. But it may easily also create more areas in the prison, at more times, that are unsupervised by staff, and therefore provide many more opportunities for hidden violence.[38] Conversely, to impose additional physical restrictions, especially of a severe character, will almost certainly lead to a legitimacy deficit; and that deficit may well in the end play itself out in enhanced violence. This is consistent with Wright's (1991a, p. 235) comment, noted earlier, that "more structured, more authoritarian settings may engender more disruptive behavior." Although the matter cannot now be established with certainty, mechanisms such as these seem to be the most plausible explanation of Bidna's results (see Subsec. IIIA above). In the general housing units in Californian prisons, it appears likely that the enhanced physical restrictions reduced violence as a result of enhanced situational control. But in the special security housing, the allocation of more inmates to this status, plus enhanced physical restrictions within the units, seems likely to have led to a severe legitimacy deficit, leading to enhanced violence.

[38] As previously noted, however, low situational control can coexist with low violence levels, if other mechanisms for securing compliance are in operation—as in Barlinnie Special Unit.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:47 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031776

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 212 of 276

If these speculations have merit, the final question that they raise is, obviously, whether it is in fact possible to create a prison regime that imposes tight situational controls without loss of legitimacy. The likeliest way of achieving this, within our present knowledge, seems likely to lie with the "new generation architecture plus direct supervision" package, if implemented in an appropriate way.[39] Unfortunately, most writers on direct supervision have not considered the relevant issues using this set of concepts. However, an optimistic answer to the question posed above is perhaps suggested by King's (1991) careful comparative analysis of two high-security prisons, Gartree in England and Oak Park Heights in Minnesota, the latter built to "new generation" specifications. Although prison violence levels are generally higher in the United States than in Britain, and although the population profiles of the two prisons did not particularly suggest that Gartree had the more difficult group of inmates, nevertheless, the self-reported victimization levels in Oak Park Heights were only a third of those in Gartree, using the same research instrument in both prisons (King 1991; see also King and McDermott 1995, pp. 123–24).

## V. Prisoner-Staff Violence

Patterns of prisoner assaults against prison staff have been studied less fully than prisoner-prisoner assaults. But much can be learned from the few research studies that are available.

### A. Environmental and Social Context

Atlas (1983) studied the sites of recorded assaults in four Florida prisons, distinguishing between inmate-inmate and inmate-staff assaults. Among other variables, he considered whether the site of the assault was in an area of the prison that was directly supervised, or had only limited staff supervision. Reworking the data in his table 4, an interesting pattern emerges. Most recorded assaults of all kinds took place in areas of only limited supervision. However, while only 10 percent of recorded inmate-inmate assaults were in areas of direct supervision, that was true of 20 percent of inmate-staff assaults. Because so many unreported prisoner-prisoner assaults occur out of sight of staff, it seems very unlikely that this difference is an artefact of reporting and recording processes; and if that is correct, then an initial point to note

---

[39] Though this does not always occur in practice—see, e.g., Farbstein, Liebert, and Sigurdson (1996); and James et al. (1997).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 14:50:10 PM
All use subject to JSTOR Terms and Conditions
BLTF-PARSONS-031777

264      Anthony E. Bottoms

is that prisoner-staff assaults are more likely than prisoner-prisoner as-
saults to be *public events*.

Other analyses of the physical location of prisoner-staff assaults sug-
gest that they take place disproportionately often in inmates' residen-
tial areas, and in special security housing units; by contrast, other areas
of the prison (gym/recreation areas, workshops, and so on) are under-
represented (Kratcoski 1988; Light 1991; Sparks, Bottoms, and Hay
1996, pp. 234–35).

Light (1991) carried out a content analysis of official records relating
to nearly seven hundred prisoner-staff assaults in New York State; in
particular, he studied what he described as the "themes" of the as-
saults, that is, the immediate context within which they had taken
place. In the cases where a theme could be identified from the records,
six contexts were dominant and they accounted for over four-fifths of
the cases. These contexts were (in decreasing order of frequency):
(i) *Officer's Command* (assault on officer following explicit command to
inmate); (ii) *Protest* (assault occurs because inmate considers himself to
be the victim of unjust or inconsistent treatment by a staff member);
(iii) *Search* (assault occurring during search of a prisoner's body or cell,
excluding specific contraband searches); (iv) *Inmates' Fighting* (assault
on officer intervening in fight between inmates); (v) *Movement* (assault
during movement of inmates from one part of the prison to another);
and (vi) *Contraband* (assault consequent upon a staff member suspecting
inmate of possessing contraband items).

Examining and reflecting on these categories, several relevant issues
emerge. First, in several of the categories the assault has arisen in cir-
cumstances where formal legal *power* is being explicitly asserted by the
officer—by the issuing of a command, by undertaking a search, or by
an interaction concerning alleged contraband. It is, of course, central
to a prison's social system that, formally speaking, prison officers have
extensive powers over inmates. But, as we have seen in the Introduc-
tion, most prison officers most of the time choose to avoid overt dis-
plays of power and instead rely on staff-prisoner relationships and on
some limited "accommodations" to get them (and the prisoners)
through the prison day. On occasions, however, the officer feels that
power has to be asserted—and perhaps at these times assaults on the
officer may be most likely to occur. Naturally, different officers may
choose to "draw the line" in this way at different threshold-points (see
Subsec. *B* below) and with varying personal styles (Liebling and Price
1999).

This content downloaded from 198.91.32.137 on Tue, 28 Jan
All use subject to JSTOR Terms and Conditions

Two other apparent themes arise from Light's categorization (see above), namely *routines* and *legitimacy*. The "protest" category speaks for itself as an illustration of dimensions of legitimacy within the prison (see Sec. IV above). The "movement" category is an illustration of violence arising directly out of aspects of the prison's daily routine (see further below), and the "inmates' fighting" category exemplifies the hazards to which prison officers may be subject in carrying out their routine tasks, in this case their role of "peacekeeper" between inmates (cf. Liebling and Price 1999).

The themes of *power* and *routines* are further illustrated by some data on the timing of recorded disciplinary offenses (including assaults) at Albany Prison, England, in 1988 (see Sparks, Bottoms, and Hay 1996, pp. 233–36). Four particular moments of the prison day were found to be especially associated with recorded disciplinary incidents: these were "morning unlock" (when prisoners are woken and expected to begin the day's routine), the start of the morning (0900 hours) and afternoon (1415 hours) work periods (when prisoners are moved from cell blocks to workshops), and evening lockup. Between them, these four very short periods of the day, each lasting about ten minutes, accounted for 25 percent of all the prison's recorded disciplinary incidents, thus confirming "conventional wisdom in prisons . . . that incidents are most likely to occur at particular moments such as unlock and 'bang-up' " (Sparks, Bottoms, and Hay 1996, p. 235).

From these various data sources a clear pattern emerges. Prisoner-staff assaults, it seems, are mostly not random events, but are very disproportionately likely to occur at what might be described as the "rubbing-points" of the prison's social order, that is, at particular moments of the daily routine such as unlock and the movement to work, during particular routines such as searches, and on particular occasions when the officer decides that power has to be asserted (by a command or a contraband search). But individual officers may handle these "critical events" very differently from one another.

*B. Officers' Age and Experience*

In the late 1980s, Kratcoski (1988) carried out a small study of two American correctional facilities (one federal, one state), and discovered that more experienced prison officers (in terms of length of service in the job) were proportionately less likely to be the victims of recorded prisoner-staff assaults. Very similar results were reported in England

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 PLTF-PARSONS-031779
All use subject to JSTOR Terms and Conditions

266    Anthony E. Bottoms

at about the same time, in a study of a large local prison (Davies and Burgess 1988).

More recently, the British researcher Ditchfield (1997) has carried out two more extensive statistical studies on this issue. The first study examined data on recorded prisoner-staff assaults in all male closed establishments in England and Wales (Ditchfield 1997, pp. 1–11), while the second study reanalyzed data from a 1994 survey of basic-grade prison officers ($N = 1,800$) which had included a yes/no question on whether the officer had been assaulted in the past six months (Ditchfield 1997, pp. 42–46).

In the first study, a regression analysis was carried out on an institutional basis, with the rate of prisoner-staff assaults in each prison as the dependent variable. In the final regression model covering all establishments, "staff age" in the prison (i.e., percentage of older/younger staff in the prison) "emerged as the best predictor of assault rates" (p. 1) outstripping even average inmate age. However, in this study Ditchfield also included variables relating to staff experience. He found that age and length of experience were almost equally predictive of recorded prisoner-staff assaults, and thus more or less interchangeable in the various statistical models; hence he preferred to speak of an "age/ experience factor." Interestingly, when particular types of prison were separately analyzed, low-security (category C) institutions constituted an exception to these general patterns, with "staff age/experience" failing to emerge as significantly related to prisoner-staff assault levels.

In Ditchfield's second study, the age/experience factor was again highly significant. However, as this was an individually based rather than an institutional data set, it was possible to carry out a more refined disaggregation of the age/experience issue. This analysis produced an interactive result. For young officers (under thirty), length of experience seemed to have no effect on whether the officer said he or she had been assaulted (though regardless of length of experience, self-reported assault victimizations were highest in this younger age group). There was a slight experience effect for officers aged thirty to thirty-nine; but in older officers (forty plus) there was a marked experience dimension, with the more experienced officers reporting lower assault rates. These intriguing results suggest that age per se (with concomitantly limited life experience) may be the key variable for officers under thirty, but for those above that age lack of experience in the job might be of greater importance. Clearly, however, this single result should not be taken as definitive, especially as the dependent variable used in

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 18:14:44 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031780

the second study was a simple dichotomized one (whether assaulted in the past six months).

With the exception of Ditchfield's second study, all the research on the age/experience issue has used data relating to *formally recorded assaults* on prison staff.[40] Using such data, the lower assault rate for older/more experienced staff could reflect either or both of the following: greater interpersonal skills in older/more experienced officers, so that such officers are better able to prevent conflict-laden situations from erupting into physical violence; a similar actual rate of assault in the different groups, but a greater propensity on the part of the younger/less experienced staff to place prisoners on formal disciplinary reports for more minor assaults (arising, perhaps, from a lower level of confidence in their own authority).

Clearly, both these possibilities have some intuitive plausibility. But Ditchfield's second study—based on self-reported victimizations by officers—perhaps provides some evidence that the results of the studies using formal assault rates are not simply the product of differential reporting and recording practices.[41]

Further research on these issues is obviously required. In the meantime, however, it is worth noting that results of the above kind can have clear practical consequences for prison managers. Thus, for example, in a longitudinal analysis of recorded assaults against prison officers in England in the period 1988–93, Ditchfield (1997, pp. 37–42) found that during these years the proportion of uniformed prison staff under thirty in the English prison service increased sharply (from 16.5 percent to 28 percent), and hence that "a significant proportion of the increased rate of assaults on staff since 1988–89 has been caused by the exceptionally large increase in the numbers of young and inexperienced staff joining the service" (p. vii).[42]

*C. Conclusions*

Although research on prisoner-staff violence is underdeveloped, it seems clear from the available literature that this kind of behavior is

[40] It is also possible that the respondents to the staff survey (used in Ditchfield's second study) had formally recorded assaults principally in mind.
[41] Though see n. 40 above.
[42] In a recent time-series analysis in Canada, Walters (1998) found that, at an aggregate level within the prison system as a whole, mean length of service by staff was *positively* associated with violence levels. Walters seeks to interpret this result in systemic terms, but the mechanisms that might be involved are not altogether clear.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:47 PM
All use subject to JSTOR Terms and Conditions
PLTF-PARSONS-031781

intimately bound up with the core issues of *daily routines* and of *staff-prisoner relationships* to which attention was drawn in the Introduction to this essay. There is some evidence that such assaults are closely connected to the potential "friction points" of the prison regime (e.g., searches) and of the prison day (e.g., morning unlock). But there is also evidence that some officers may be more skilled than others in handling these "friction points," and that officers' age and prior experience may be key variables in this regard. There is, further, at least a hint (in Ditchfield's 1997 finding about minimum-security prisons) that skilled officer handling of friction points may be of less practical significance for the assault levels in low-security prisons, perhaps because the regimes in such prisons have fewer potential friction points. There is clearly here a rich seam for future research, which should be intimately linked to the understudied but important topic of staff-prisoner relationships in prisons (see Liebling and Price 1999).

### VI. Prisoner-Prisoner Violence

Part of the aim of this essay is to consider interpersonal prison violence within the daily frameworks of the prison social order. From such a perspective, when we turn from prisoner-staff to prisoner-prisoner interpersonal violence, we move—at least to some extent—into a different social world. This is the social world of the prisoner subculture, of shifting alliances between groups of prisoners and of antagonisms that may culminate in a serious assault in an unsupervised place. Indeed, some have portrayed the prisoners' hidden world as akin to a Hobbesian "state of nature," and a "war of every man against every man":

> For WARRE, consisteth not in Battell onely, or the act of fighting; but in a tract of time, wherein the Will to contend by Battell is sufficiently known. . . . For as the nature of Foule weather, lyeth not in a showre or two of rain; but in an inclination thereto of many dayes together; So *the nature of War, consisteth not in actuall fighting; but in the known disposition thereto, during all the time there is no assurance to the contrary*. . . .
>
> In such condition, there is no place for Industry; because the fruit thereof is uncertain: and consequently no Culture of the Earth, no Navigation, . . . ; no Arts; no Letters; no Society; and *which is worst of all, continuall feare, and danger of violent death;* and the life of man, solitary, poore, nasty, brutish, and short. (Hobbes 1973, pp. 64–65, emphasis added)

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 11:16:46 AM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031782

There are in the prisons literature anecdotal accounts, seemingly carrying a ring of validity, that paint a picture of inmate society very close to Hobbes's nightmarish vision. Lowman (1986), for example, comments that "even the most naive of new inmates soon come to realise the pervasiveness of the rule of force" (p. 255) in the prisoners' world, and he offers a harrowing real-life example of the kind of social choices and pressures that may be forced on prisoners (p. 256).

And yet there is a paradox. Some recent researchers have carried out surveys of prisoners' sense of safety, with surprisingly positive results. King and McDermott (1995, pp. 141–42), for example, asked their sample of prisoners to rate in general terms how safe or dangerous was the prison in which they were located. For all five prisons taken together, the mean response (on a five-point scale from −2 [very dangerous] to +2 [very safe]) was +0.45, though these scores did vary substantially by prison.[43] O'Donnell and Edgar (1996a, 1999) in their Oxford study, asked the rather more specific question whether their respondent-prisoners felt safe from assault, and received positive answers from 60 percent or more in all four of the institutions they studied, despite the high self-reported victimization rates in these institutions (see table 3).[44]

How can we explain this apparent paradox (hereafter referred to as the "safety paradox")—of the frequently described "pervasiveness of the rule of force" in the inmate world, as against apparently much more positive answers to questions on safety? No definitive answers to this question can be offered in the present state of the research evidence, but some suggestive pointers may be available.

*A. Basic Aspects of the Inmate Experience*

We may begin with two apparently near-universally agreed points about the inmate experience. The first of these relates to the dominant norms of the inmate world, the second to the dangerousness of certain locations.

Lowman (1986, pp. 254–55) speaks of "two disciplines" in prison—the discipline of the officials and the discipline of the inmate world.

---

[43] The "most unsafe" prisons were the local prison (Birmingham) and the maximum security training prison: both had mean scores in the minus range.
[44] The O'Donnell-Edgar study did include a catergory B prison with some of the functions of a local prison, but it did not include a maximum security prison (cf. n. 43 above). It is also worth observing that in the NPS, even higher overall safety levels were reported (Dodd and Hunter 1992), but this could be a methodological artefact arising from reluctance to admit lack of safety in prison to an unknown interviewer.

This content downloaded from 198.91.32.137 on Tue, 28 Jan PLTF-PARSONS-031783
All use subject to JSTOR Terms and Conditions

Contrary to Foucault's (1977) perception, Lowman argues that the surveillance of officials "is nothing compared to that exercised by inmates over each other" for, except when locked alone in a single cell, "one is never beyond the scrutiny of inmate eyes." Moreover, many of those eyes belong to people who advocate "the use of physical violence as the ultimate resolution to all conflict," in a value system that is truly based on machismo (p. 248; see also Toch 1997, chap. 21 on "hypermasculinity and prison violence").[45] While detailed accounts of inmate value systems in the research literature vary, and there is also some evidence that such systems may differ in different types of institution, yet there are very few prison scholars who would argue that Lowman's portrayal of the core values of the inmate world is fundamentally misconceived.

Lowman further points out that, for prisoners, "quite frequently custodial staff are out of sight" (pp. 254–55); and it is this that makes certain locations in the prison seem so potentially dangerous (on this, see e.g., O'Donnell and Edgar 1999). There can be no reasonable doubt that "out of sight" locations exist in most prisons and that they are an obvious target area for prisoners wanting to settle conflicts by force.

Yet we must also note a third fact about the experience of being a prisoner. While most new prisoners (especially first-timers) are disoriented and fearful on arrival in the prison, there is now substantial research evidence that over time they gradually work out ways of coping with this strange social world (see, e.g., Ericson 1975; Zamble and Porporino 1988; Liebling and Krarup 1993). As far as I am aware, no surveys of prisoners' feelings of safety have yet analyzed such perceptions by phase of custody, but one might reasonably hypothesize from the above-cited literature that this might be a relevant variable. One might also expect, for the same reasons, that indices of violence and victimization might vary with phase of custody, though as we have seen (Subsec. IID above) the existing data on this point are at present very inconclusive.

What is clearly lacking is adequate longitudinal data on how, as their sentence progresses, prisoners view the surveillance and demands of other inmates and their own ability to remain safe in this world. Nor

---

[45] Obviously these remarks are made in the context of prisons for males. The literature on violence in women's prisons (see Subsec. IIE above) is not sufficiently well developed to be able to say with any confidence how far such comments would also hold true in that different context.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:45:18 PM
All use subject to JSTOR Terms and Conditions

ALTE-PARSONS-031784

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 220 of 276

do we know much about the changing patterns of friendships and alliances that prisoners enter into as time goes on. Without such data, our knowledge of prisoner-prisoner violence and the "safety paradox" mentioned in the introduction to this section, will necessarily remain incomplete.

## B. Personal Protection Strategies

Since there is no doubt that many prisoners face potential dangers from at least some other prisoners, analyses of inmates' personal protection strategies seem to be called for in any full account of prisoner-prisoner violence. Again, however, the literature on this topic is sparse (though see esp. McCorkle 1992).

Broadly, there seem to be several main kinds of personal protection strategies available to prisoners. They include the following: (1) *withdrawal* (avoid certain activities or certain areas of the prison, spend more time in cell, etc.), (2) *seek support from other inmates* (e.g., from one's own home town), (3) *seek support or formal protection from staff*, (4) *"suspended identity" and temporary manipulation of self-image* (attempt, at least to an extent, to suspend one's preprison identity and to construct an inauthentic prison identity through impression management, e.g., by appearing more "macho" than one really is), (5) *utilization of skills* (make available to other inmates any special skills that one possesses—e.g., well-educated prisoners helping others to frame petitions), (6) *passive-aggressive protection* (e.g., acquire homemade weapons and make clear to other prisoners that one has done so), and (7) *preemptive strike* (in McCorkle's research [1992, p. 166], a number of prisoners suggested to the researcher that " ' 'getting tough' often requires more than 'tough talk' "; for a full analysis of a preemptive strike of this kind ["Incident LL1"] in a maximum-security prison, see Sparks, Bottoms, and Hay [1996], pp. 239, 253–55).

McCorkle's (1992) evidence, based on a study in Tennessee, was that individual prisoners might often adopt several different personal protection strategies at various points in their sentence. But two broad styles of personal protection tended to predominate: namely "withdrawal/avoidance," a strategy especially adopted by fearful, older, and socially isolated inmates; and "aggressive and proactive techniques," especially adopted by younger inmates. Unfortunately, however, McCorkle did not include all of the above-listed strategies within his research framework; in particular, he omitted the "suspended identity" approach. Empirical support for the adoption of

This content downloaded from 198.91.32.137 on Tue, 28 Jan
All use subject to JSTOR Terms and Conditions
BLTF-PARSONS-031785

272      Anthony E. Bottoms

"suspended identity" strategies by prisoners has been provided by
Schmid and Jones (1991), who argue that by embracing this approach
"inmates are able to forestall more radical identity change and to
maintain a general sense of identity continuity for most of their prison
careers" (p. 415). It is therefore at least possible that the adoption of
impression management techniques of this sort may help prisoners to
feel safe in prisons, despite the apparent "pervasiveness of the rule of
force" in the culture around them. However, at present such a sugges-
tion must remain speculative.

We noted in the previous subsection some research evidence to the
effect that prisoners, from a position of initial disorientation, gradually
develop ways of coping with the social world of the prison. There is
no evidence, at present, concerning the extent to which prisoners' per-
sonal protection styles may alter as these "prison coping strategies"
gradually gain ground, but this topic also would appear to be worthy
of future exploration.

## C. Daily Routines and Daily Choices

From one perspective, being a prisoner among prisoners is a lifestyle
that requires continual choices. Do I try to be friendly to Inmate X or
to avoid him? If I am waiting to use the telephone and another pris-
oner seeks to usurp my place in the line, what do I do? Do I shout
insults at other prisoners to show that I am "one of the lads," even if
I might receive a mild assault in response? (see, generally, Edgar and
O'Donnell 1998).

Choices of this kind are clearly relevant to the incidence of prisoner-
prisoner violence. McCorkle (1992) usefully reminds us that many
physical assaults between prisoners "follow challenges to machismo,
strivings for status, or disreputable dealings on the sub rosa economy"
(p. 170). Hence, choosing to engage such activities will, prima facie,
increase the risk of violent victimization; yet some striving for status
or machismo often seems to the individual inmate to be necessary for
survival in the inmate world (on this paradox, see further Edgar and
O'Donnell [1998]). By contrast, continual withdrawal from challenges
to status or machismo might well be "interpreted by aggressive in-
mates as signs of weakness and vulnerability," so that those who "opt
out" in this way "risk being assigned to a pool of victims who can easily
be robbed . . . or dominated" (McCorkle 1992, p. 170).

These dilemmas posed by McCorkle take us back to the very impor-
tant distinction, made by O'Donnell and Edgar, and supported in their

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 17:05:34 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031786

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 222 of 276

data, between "mutual victimization" (those who were victims *and* aggressors in different assault incidents) and "vulnerable victimization" (those who were repeatedly victimized without retaliation) (see also Edgar and O'Donnell 1998). We lack research evidence on this point, but from an analytic standpoint it would seem that avoidance of the "vulnerable victim" status must rank as the highest priority for comfortable survival in the inmate world. If that is right, then successful "survival strategies" inevitably seem to court some risk of violent victimization. But a crucial and so far unasked question seems to be, Is it in fact possible to minimize one's participation in activities that risk violent victimization (such as striving for status or sub rosa trading) while at the same time also avoiding the potential label of "vulnerable victim"? Clearly, this kind of "tightrope-walking" will not be easy to accomplish, but how many prisoners in fact successfully achieve it? Such questions seem directly relevant to the "safety paradox" posed at the beginning of this section.

### D. Social Order and the Inmate World

At this point in the argument, it is worth returning to the broader dimensions of order maintenance in prisons, previously discussed in Section IV above. The analysis in Section IV explicitly included the official power structure of the prison and interactions between staff and prisoners as key elements in overall order maintenance. But, as Cohen (1976) has usefully pointed out, within the more limited framework of the inmates' social world, some different considerations may apply when analyzing order. Most people, Cohen argues, if they are the victim of a criminal or civil wrong, turn naturally to the official agencies (police, courts, etc.) to obtain justice. But there are some social contexts in which, when one is wronged, "the prevailing attitude and practice [in seeking redress] is some form of self-help or private vengeance" (p. 12). There is widespread evidence, in the prisons literature, of prisoners' reluctance to turn immediately to staff when victimized by other prisoners. Hence, alongside the broader questions of order maintenance in prison (see Sec. IV above), for a full explanation of prisoner-prisoner violence one also has to consider the question of social order within those parts of the inmate world that are based on "private justice" and thus have only a partial connection to the official structures.

Systems of private justice may sometimes be based on normative consensus within a cohesive social group as is the case, for example, in

PLTF-PARSONS-031787

many religious communities. But in a social context such as the prisoner community, where one has a "preference for private justice," as Cohen puts it, together with a notable lack of social cohesion in certain respects,[46] then it is easy to see that the use or threat of violence may become socially endemic. In truth, in such a social context violence has for some actors a degree of positive social utility: "violence may be used to establish, assert, and restore relationships, especially relationships of dominance, where these relationships have been threatened by challenges, by failure to exhibit appropriate deference, [or] by assertions of autonomy incompatible with the demands of the relationship" (Cohen 1976, p. 4).

It is worth reexamining the conceptual scheme of Section IV (see esp. figs. 3 and 5), with the specific context of the prisoners' world in mind. In figure 5, box 8 ("staff deployment, approaches, and skills") occupies a central mediating position, but such influences are, at least in a direct sense, largely absent in the inmates' own social world (though see Subsec. VI*E* below). Moreover, within the prisoners' world there is little compliance based on legitimacy, for few (if any) prisoners are recognized as having legitimate authority (as opposed to coercive authority) over their peers. Hence, within the prisoners' own world there is a variant kind of social order existing within the broader social order of the prison and unusually weighted toward coercive power and towards instrumental/prudential reasons for compliance. Not surprisingly, in such a social world violence is never far below the surface.

In Section IV*C* above, the definition of "order" given by Sparks, Bottoms, and Hay (1996, p. 119) was quoted. The first part of that definition characterizes order as "any long-standing pattern of social relations . . . in which the expectations that participants have of one another are commonly met, though not necessarily without contestation." The literature on inmate subcultures in prisons has consistently suggested that there is a kind of social order, in this sense, within the prisoners' own world: that is to say, there is a kind of patterning of

----

[46] Most inmates do normatively assent to certain values such as the "preference for private justice" itself. Some sociological research studies (such as that of Sykes [1958]) have emphasized the pressures within inmate society toward the adoption of a value stance of "inmate solidarity," but even such analyses readily concede that in practice the inmate world contains many individuals who do not act fully in accordance with the code of "solidarity" (see e.g., Sykes [1958], chap. 5, on the various "argot roles" in the prison he studied).

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 12:52:38 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031788

social relationships and some common understandings about how to "go on" in this social milieu, so that, to an extent at least, mutual expectations are "commonly met."[47] Hence, the evidence that we have about the prisoners' own world suggests both that it is a special kind of social context unusually weighted toward coercive power and that it nevertheless frequently contains elements of predictability and order. These considerations seem highly relevant to the "safety paradox" posed in the introduction to this section, though no studies yet exist that analyze the safety paradox in these terms.

### E. The Role of the Prison Staff

There is sometimes a tendency, when discussing prisoner-prisoner violence, to assume that this topic can be appropriately discussed with only minimal reference to the official routines and management of the prison. But such an assumption is false, as is evidenced by—in different ways—the Texas experience of the 1980s and the literature on new generation architecture and direct supervision (see Sec. III above). In Texas, management changes forced on the department of corrections by the courts led, indirectly and temporarily, to a massive increase in inmates' acquisition of makeshift weapons for self-protection and violence. Management changes designed to calm the system then achieved a reduction of this kind of personal protection strategy. In new generation prisons, the different physical layout and recommended management style could and should lead to the custodial staff being out of sight of the inmates far less often than in most traditional prisons, which obviously might well have effects on prisoner-prisoner violence. All this being the case, general questions relating to the maintenance of order in prisons (see Sec. IV above) are by no means irrelevant to issues of prisoner-prisoner assault but are in fact integrally related to them—even if, when discussing prisoner-prisoner assaults, one also has to take account of certain special features of the inmate social world.

Since it seems therefore that changing the official routines or management of the prison can indeed indirectly affect prisoner-prisoner violence levels, there is a concomitant challenge to prison administrators to consider how they might best achieve reductions in prisoner-prisoner violence by thoughtful management changes.

---

[47] For a brief overview of the literature on the sociology of prisons, with references, see Sparks, Bottoms, and Hay (1996), chap. 2.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 15:32:27 PM
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031789

276       Anthony E. Bottoms

REFERENCES

Adams, K. 1992. "Adjusting to Prison Life." In *Crime and Justice: A Review of Research*, vol. 16, edited by Michael Tonry. Chicago: University of Chicago Press.

Adams, R. 1992. *Prison Riots in Britain and in the U.S.A.* London: Macmillan.

Ahmad, S. 1996. "Fairness in Prison." Ph.D. dissertation, University of Cambridge.

Atlas, R. 1983. "Crime Site Selection for Assaults in Four Florida Prisons." *Prison Journal* 53:59–72.

Balvig, F. 1988. *Delinquent and Not-Delinquent Youth: A Study on Self-Reported Delinquency among Youth in a Metropolitan Suburb in Denmark* (Kriminalistisk Instituts Stencilserie no. 43). Copenhagen: University of Copenhagen, Institute of Criminal Science.

Baskin, D. R., I. Sommers, and H. J. Steadman. 1991. "Assessing the Impact of Psychiatric Impairment on Prison Violence." *Journal of Criminal Justice* 19:271–80.

Bedau, H. A. 1982. "Background and Developments." In *The Death Penalty in America*, 3d ed., edited by H. A. Bedau. New York: Oxford University Press.
———. 1997. "Prison Homicides, Recidivist Murder and Life Imprisonment." In *The Death Penalty in America: Current Controversies*, edited by H. A. Bedau. New York: Oxford University Press.

Beetham, D. 1991. *The Legitimation of Power*. London: Macmillan.

Bidna, H. 1975. "Effects of Increased Security on Prison Violence." *Journal of Criminal Justice* 3:33–46.

Bijleveld, C. C. J. H. 1998. "Methodological Issues in the Study of Domestic Violence Prevalence." *European Journal on Criminal Policy and Research* 6:607–15.

Bottomley, K., A. Liebling, and R. Sparks. 1994. "Barlinnie Special Unit and Shotts Unit: An Assessment." Occasional Paper no. 7/1994. Edinburgh: Scottish Prison Service.

Bottoms, A. E., W. Hay, and R. Sparks. 1990. "Situational and Social Approaches to the Prevention of Disorder in Long-Term Prisons." *Prison Journal* 80:83–95.

Bottoms, A. E., and R. Light, eds. 1987. *Problems of Long-Term Imprisonment*. Aldershot: Gower.

Bottoms, A. E., and R. Sparks. 1997. "How Is Order in Prisons Maintained?" In *Security, Justice and Order in Prison: Developing Perspectives*, edited by A. Liebling. Cambridge: University of Cambridge, Institute of Criminology.

Bowker, L. 1980. *Prison Victimization*. New York: Elsevier.

Boyle, J. 1984. *The Pain of Confinement*. London: Canongate.

Braswell, M. C., R. H. Montgomery, Jr., and L. X. Lombardo, eds. 1994. *Prison Violence in America*, 2d ed. Cincinnati: Anderson.

Clarke, R. V. 1995. "Situational Crime Prevention." In *Building a Safer Society: Strategic Approaches to Crime Prevention*, edited by M. Tonry and D. P. Farrington. Vol. 19 of *Crime and Justice: A Review of Research*, edited by M. Tonry. Chicago: University of Chicago Press.

This content downloaded from 198.91.32.137 on Tue, 28 Jan PLTF-PARSONS-031790
All use subject to JSTOR Terms and Conditions

Cohen, A. K. 1976. "Prison Violence: A Sociological Perspecitve." In *Prison Violence*, edited by A. K. Cohen, G. F. Cole, and R. G. Bailey. Lexington, Mass.: D. C. Heath & Co.

Colvin, M. 1992. *The Penitentiary in Crisis: From Accommodation to Riot in New Mexico.* Albany, N.Y.: SUNY Press.

Cook, T. D., and D. T. Campbell. 1979. *Quasi-experimentation: Design and Analysis Issues for Field Settings.* Boston: Houghton Mifflin.

Cooke, D. J. 1989. "Containing Violent Prisoners: An Analysis of the Barlinnie Special Unit." *British Journal of Criminology* 29:129–43.

———. 1991. "Violence in Prisons: The Influence of Regime Factors." *Howard Journal of Criminal Justice* 30:95–107.

Cooley, D. 1993. "Criminal Victimization in Male Federal Prisons." *Canadian Journal of Criminology* 35:479–95.

Cressey, D. R., ed. 1961. *The Prison: Studies in Institutional Organization and Change.* New York: Holt, Rinehart, & Winston.

Crouch, B. M., and J. W. Marquart. 1989. *An Appeal to Justice: Litigated Reform of Texas Prisons.* Austin: University of Texas Press.

Davies, W. 1982. "Violence in Prisons." In *Developments in the Study of Criminal Behaviour*, vol. 2, edited by P. Feldman. Chichester: Wiley.

Davies, W., and P. W. Burgess. 1988. "Prison Officers' Experience as a Predictor of Risk of Attack: An Analysis within the British Prison System." *Medicine, Science and the Law* 28:135–38.

Ditchfield, J. 1990. *Control in Prisons: A Review of the Literature.* Home Office Research Study no. 118. London: H.M. Stationery Office.

———. 1997. "Assaults on Staff in Male Closed Establishments: A Statistical Study." Home Office Research and Statistics Directorate Internal Paper. Unpublished manuscript. London: Home Office.

Dodd, T., and P. Hunter. 1992. *The National Prison Survey, 1991.* London: H.M. Stationery Office.

Edgar, K., and I. O'Donnell. 1998. "Assault in Prison: The 'Victim's' Contribution." *British Journal of Criminology* 38:635–50.

Eigenberg, H. M. 1994. "Rape in Male Prisons: Examining the Relationship between Correctional Officers' Attitudes toward Male Rape and Their Willingness to Respond to Acts of Rape." In *Prison Violence in America*, 2d ed., edited by M. C. Braswell, R. H. Montgomery, Jr., and L. X. Lombardo. Cincinnati: Anderson.

Ellis, D., H. G. Grasmick, and B. Gilman. 1974. "Violence in Prisons: A Sociological Analysis." *American Journal of Sociology* 80:16–43.

Ericson, R. V. 1975. *Young Offenders and Their Social World.* Farnborough: Saxon House.

Farbstein, J. D., D. Liebert, and H. Sigurdson. 1996. *Audits of Podular Direct-Supervision Jails.* Washington, D.C.: National Institute of Corrections.

Farbstein, J. D., and R. Wener. 1989. *A Comparison of Direct and Indirect Supervision Correctional Facilities.* Washington, D.C.: National Institute of Corrections.

Farrington, D. P. 1997. "Human Development and Criminal Careers." In *The*

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014
All use subject to JSTOR Terms and Conditions

278      Anthony E. Bottoms

*Oxford Handbook of Criminology*, 2d ed., edited by M. Maguire, R. Morgan, and R. Reiner. Oxford: Clarendon.

Foucault, M. 1977. *Discipline and Punish: The Birth of the Prison.* London: Allen Lane.

Gaes, G. 1994. "Prison Crowding Research Re-examined." *Prison Journal* 74:329–63.

Giddens, A. 1984. *The Constitution of Society.* Cambridge: Polity.

———. 1987. *Social Theory and Modern Sociology.* Cambridge: Polity.

Goetting, A., and R. M. Howsen. 1986. "Correlates of Prisoner Misconduct." *Journal of Quantitative Criminology* 2:49–67.

Goffman, E. 1961. *Asylums.* Garden City, N.Y.: Anchor Books.

Goodstein, L., and K. N. Wright. 1989. "Inmate Adjustment to Prison." In *The American Prison: Issues in Research and Policy,* edited by L. Goodstein and D. L. MacKenzie. New York: Plenum.

Graham, J., and B. Bowling. 1995. *Young People and Crime.* Home Office Research Study no. 145. London: Home Office.

Harer, M. D., and D. J. Steffensmeier. 1996. "Race and Prison Violence." *Criminology* 34:323–55.

Hirschi, T. 1969. *Causes of Delinquency.* Berkeley: University of California Press.

Hobbes, T. 1973. *Leviathan.* Everyman's Library edition. London: Dent. (Originally published 1651.)

Home Office. 1985. *New Directions in Prison Design.* London: H.M. Stationery Office.

———. 1987. *Special Units for Long-Term Prisoners: A Report by the Research and Advisory Group of the Long-Term Prison System.* London: H.M. Stationery Office.

Human Rights Watch. 1996. *All Too Familiar: Sexual Abuse of Women in U.S. State Prisons.* New York: Human Rights Watch.

Irwin, J. 1970. *The Felon.* Englewood Cliffs, N.J.: Prentice-Hall.

Jacobs, James B. 1977. *Stateville: The Penitentiary in Mass Society.* Chicago: University of Chicago Press.

James, A. L., A. K. Bottomley, A. Liebling, and E. Clare. 1997. *Privatising Prisons: Rhetoric and Reality.* London: Sage.

Jones, M. 1968. *Social Psychiatry in Practice: The Idea of the Therapeutic Community.* Harmondsworth: Penguin.

King, R. 1985. "Control in Prisons." In *Accountability and Prisons,* edited by M. Maguire, J. Vagg, and R. Morgan. London: Tavistock.

———. 1991. "Maximum Security Custody in Britain and the USA: A Study of Gartree and Oak Park Heights." *British Journal of Criminology* 31:126–52.

King, R. D., and K. McDermott. 1990. " 'My Geranium Is Subversive': Notes on the Management of Trouble in Prisons." *British Journal of Sociology* 41:445–71.

———. 1995. *The State of Our Prisons.* Oxford: Clarendon.

Kratcoski, P. C. 1988. "The Implications of Research Explaining Prison Violence and Disruption." *Federal Probation* 52(1):27–32.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 05:38:42 AM
All use subject to JSTOR Terms and Conditions
PLTF-PARSONS-031792

Liebling, A., and H. Krarup. 1993. *Suicide Attempts and Self-Injury in Male Prisons.* London: Home Office.

Liebling, A., G. Muir, G. Rose, and A. Bottoms. 1999. "Incentives and Earned Privileges for Prisoners: An Evaluation." Research Findings no. 87. London: Home Office.

Liebling, A., and D. Price. 1999. *An Exploration of Staff-Prisoner Relationships at HMP Whitemoor.* London: Prison Service.

Light, S. C. 1991. "Assaults on Prison Officers: Interactional Themes." *Justice Quarterly* 8:243–61.

Lowman, J. 1986. "Images of Discipline in Prison." In *The Social Dimensions of Law,* edited by N. Boyd. Scarborough: Prentice-Hall Canada.

Lynch, J. 1995. "Crime in International Perspective." In *Crime,* edited by J. Q. Wilson and J. Petersilia. San Francisco: ICS.

MacKenzie, D. L. 1987. "Age and Adjustment to Prison: Interactions with Attitudes and Anxiety." *Criminal Justice and Behavior* 14:427–47.

Maitland, A. S., and R. D. Sluder. 1998. "Victimization and Youthful Prison Inmates: An Empirical Analysis." *Prison Journal* 78:55–73.

Mandaraka-Sheppard, A. 1986. *The Dynamics of Aggression in Women's Prisons in England.* Aldershot: Gower.

Marquart, J. W. 1986. "Prison Guards and the Use of Physical Coercion as a Mechanism of Prisoner Control." *Criminology* 24:347–66.

Maung, N. A. 1995. "Survey Design and Interpretation of the British Crime Survey." In *Interpreting Crime Statistics,* edited by M. A. Walker. Oxford: Clarendon.

McCorkle, R. C. 1992. "Personal Precautions to Violence in Prison." *Criminal Justice and Behavior* 19:160–73.

O'Donnell, I., and K. Edgar. 1996a. "The Extent and Dynamics of Victimization in Prisons." Research Report to the Home Office. Unpublished manuscript. Oxford: University of Oxford Centre for Criminological Research.

———. 1996b. "Victimization in Prisons." Research Findings no. 37. London: Home Office, Research and Statistics Directorate.

———. 1998a. "Bullying in Prisons." Occasional Paper no. 18. Oxford: University of Oxford Centre for Criminological Research.

———. 1998b. "Routine Victimization in Prisons." *Howard Journal of Criminal Justice* 37:266–79.

———. 1999. "Fear in Prison." *Prison Journal,* vol. 79 (forthcoming).

Paternoster, R., R. Brame, R. Bachman, and L. W. Sherman. 1997. "Do Fair Procedures Matter? The Effect of Procedural Justice on Spouse Assault." *Law and Society Review* 31:163–204.

Petersilia, J. 1983. *Racial Disparities in the Criminal Justice System.* Santa Monica, Calif: Rand.

Poole, E. D., and R. M. Regoli. 1980. "Race, Institutional Rule Breaking and Disciplinary Response: A Study of Discretionary Decision Making in Prison." *Law and Society Review* 14:931–46.

Porporino, F. J., and E. Zamble. 1984. "Coping with Imprisonment." *Canadian Journal of Criminology* 26:403–22.

This content downloaded from 198.91.32.137 on Tue, 28 Jan
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031793

Quay, H. C. 1984. *Managing Adult Inmates*. College Park, Md.: American Correctional Association.

Ruck, S. K. 1951. *Paterson on Prisons*. London: Muller.

Schmid, T. J., and R. S. Jones. 1991. "Suspended Identity: Identity Transformation in a Maximum Security Prison." *Symbolic Interaction* 14:415–32.

Sellin, T. 1967. "Prison Homicides." In *Capital Punishment*, edited by T. Sellin. New York: Harper & Row.

Silberman, M. 1995. *A World of Violence: Corrections in America*. Belmont, Calif.: Wadsworth.

*Sourcebook of Criminal Justice Statistics*. Various years. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

Sparks, R., and A. E. Bottoms. 1995. "Legitimacy and Order in Prisons." *British Journal of Sociology* 46:45–62.

Sparks, R., A. E. Bottoms, and W. Hay. 1996. *Prisons and the Problem of Order*. Oxford: Clarendon.

*Statistics of Offences against Prison Discipline and Punishments in England and Wales*. Various years. London: H.M. Stationery Office.

Sykes, G. M. 1958. *The Society of Captives*. Princeton, N.J.: Princeton University Press.

Sylvester, S. F., J. H. Reed, and D. O. Nelson. 1977. *Prison Homicide*. New York: Spectrum.

Thomas, C. W., D. Petersen, and R. Zingraff. 1978. "Structural and Social Psychological Correlates of Prisonization." *Criminology* 16:383–93.

Tischler, C. A., and J. W. Marquart. 1989. "Analysis of Disciplinary Infraction Rates among Female and Male Inmates." *Journal of Criminal Justice* 17:507–13.

Toch, H. 1977. *Living in Prison: The Ecology of Survival*. New York: Free Press.

———. 1997. *Corrections: A Humanistic Approach*. Guilderland, N.Y.: Harrow & Heston.

Toch, H., and K. Adams. 1989. *Coping: Maladaptation in Prisons*. New Brunswick, N.J.: Transaction.

Tyler, R. T. 1990. *Why People Obey the Law*. New Haven, Conn.: Yale University Press.

Useem, B., and P. A. Kimball. 1989. *States of Siege: U.S. Prison Riots, 1971–1986*. New York: Oxford University Press.

van Dijk, T., S. Flight, E. Oppenhuis, and B. Duesmann. 1998. "Domestic Violence: A National Study of the Nature, Size and Effects of Domestic Violence in the Netherlands." *European Journal on Criminal Policy and Research* 6:7–35.

von Hirsch, A. 1993. *Censure and Sanctions*. Oxford: Clarendon.

von Hirsch, A., A. E. Bottoms, E. Burney, and P.-O. Wikström. 1999. *Criminal Deterrence and Sentence Severity*. Oxford: Hart.

Walters, G. D. 1998. "Time Series and Correlational Analyses of Inmate-Initiated Assaultive Incidents in a Large Correctional System." *International Journal of Offender Therapy and Comparative Criminology* 42:124–32.

Ward, D. 1987. "Control Strategies for Problem Prisoners in American Prison

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014
All use subject to JSTOR Terms and Conditions

PLTF-PARSONS-031794

Systems." In *Problems of Long-Term Imprisonment*, edited by A. E. Bottoms and R. Light. Aldershot: Gower.

Wener, R. 1994. "An Environmental Model of Violence in Institutional Settings." Division 34 Presidential Address, American Psychological Association. *Division 34 Newsletter* (October 14).

Wener, R., W. Frazier, and J. Farbstein. 1985. "Three Generations of Evaluation and Design of Correctional Facilities." *Environment and Behavior* 17:71–95.

Whatmore, P. B. 1987. "Barlinnie Special Unit: An Insider's View." In *Problems of Long-Term Imprisonment*, edited by A. E. Bottoms and R. Light. Aldershot: Gower.

Wolfson, W. P. 1982. "The Deterrent Effect of the Death Penalty upon Prison Murder." In *The Death Penalty in America*, 3d ed., edited by H. A. Bedau. New York: Oxford University Press.

Wooldredge, J. D. 1994. "Inmate Crime and Victimization in a Southwestern Correctional Facility." *Journal of Criminal Justice* 22:367–81.

Woolf, Lord Justice. 1991. *Prison Disturbances April, 1990*. London: H.M. Stationery Office.

Wright, K. 1985. "Developing the Prison Environment Inventory." *Journal of Research in Crime and Delinquency* 22:257–77.

Wright, K. N. 1991*a*. "A Study of Individual, Environmental and Interactive Effects in Explaining Adjustment to Prison." *Justice Quarterly* 8:217–42.

———. 1991*b*. "The Violent and Victimized in the Male Prison." *Journal of Offender Rehabilitation* 16:1–25.

Wright, K. N., and L. Goodstein. 1989. "Correctional Environments." In *The American Prison: Issues in Research and Policy*, edited by L. Goodstein and D. L. MacKenzie. New York: Plenum.

Wrong, D. 1994. *The Problem of Order: What Unites and Divides Society*. Cambridge, Mass.: Harvard University Press.

Zamble, E., and F. J. Porporino. 1988. *Coping, Behavior and Adaptation in Prison Inmates*. New York: Springer-Verlag.

This content downloaded from 198.91.32.137 on Tue, 28 Jan 2014 16:17:44 PM
All use subject to JSTOR Terms and Conditions

ALTE-PARSONS-031795

# Appendix C

# CORRECTIONAL MENTAL HEALTH REPORT™

## PRACTICE • ADMINISTRATION • LAW

Vol. 13 No. 1                Pages 1—16                ISSN 1526-9515                May/June 2011

## The Colorado Study vs. the Reality of Supermax Confinement

by Stuart Grassian, M.D., J.D. and Terry Kupers M.D., M.S.P.

Just about everyone who has taken a serious look at long-term isolated confinement (as in supermaximum security or long-term administrative segregation) has concluded there is serious harm from long-term isolated confinement.[1] Most of the published research regarding inmate mental health in solitary has been based upon record review and clinical interview. That body of work is extensive, and it is supported by a plethora of related studies.

There are studies of the 19th American Penitentiary System, studies of the 19th–early 20th Century German medical literature, the extensive research resulting from the Korean War and KGB interrogation practices, the research regarding profound sensory deprivation precipitated by those concerns, as well as the literature regarding other situations of social and perceptual deprivation. There are also studies of medical situations, explorers, the experience of workers wintering over at polar work stations, and so forth. And then there are the many rigorous reports and declarations filed with the courts regarding the harmful effects of long-term isolated confinement, including many

See CONFINEMENT, page 9

## Psychological Effects of Administrative Segregation: The Colorado Study

by Jeffrey L. Metzner, M.D. and Maureen L. O'Keefe, M.A.

O'Keefe, Klebe and Stucker et al. (2010) have recently completed a significant research project entitled "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation," which was funded by the National Institute of Justice (NIJ). This brief article will highlight findings from this research, which are detailed in their 163-page public report that has been submitted to NIJ.

Controversy exists regarding the wide use of long-term lockdown housing units (i.e., 23 hours per day confinement in cells) with specific reference to mental health issues. For purposes of their paper, these authors referred to such units as administrative segregation (AS). They point out that critics have argued that the conditions of AS confinement exacerbate symptoms of mental illness and create mental illness where none previously existed.

Related, in part, to the scarcity of relevant research in this area that is not significantly associated with either bias or methodological flaws, this longitudinal study's primary goals and hypotheses were described as follows.

*Goal 1: To determine which, if any, psychological domains are affected, and in which direction, by the different prison environments.* A multitude of psychological dimensions were examined, drawing from those most often cited in the literature. The broad constructs of interest were depression/hopelessness, anxiety, psychosis, withdrawal and alienation, hostility and anger control, somatization,

hypersensitivity, and cognitive impairment. We hypothesized that offenders in segregation would develop an array of psychological symptoms consistent with the SHU syndrome [as described by Grassian and Friedman (1986)], with elevations across the eight constructs.

*Goal 2: To assess whether offenders with mental illness decompensate differentially from those without mental illness.* We were particularly interested in whether long-term segregation had a differential impact based on the presence of mental illness in offenders. We sought answers to the following questions: Does AS exacerbate symptoms in offenders with mental illness? Does AS create symptoms of mental illness in those who did not exhibit any at placement? It was hypothesized that offenders with and without mental illness would deteriorate over time, but the rate at which it occurred would be more rapid and more extreme for the mentally ill.

*Goal 3: To compare the impact of long-term segregation against the general prison setting and a psychiatric care prison.* In this study, the psychological and behavioral symptoms of offenders in AS were compared to similar offenders who were sent to San Carlos Correctional Facility (SCCF) or returned to the general prison population pursuant an AS

See PSYCHOLOGICAL, next page

This issue focuses exclusively on Administrative Segregation; primarily on the "Colorado Study."

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031796

*PSYCHOLOGICAL, from page 1*

hearing. This study used a repeated measures design over the course of a year to explore whether psychological distress was attributable to the various prison environments. It was hypothesized that inmates in segregation would experience greater psychological deterioration over time than the comparison groups. [SCCF is a "psychiatric prison," which provides treatment that is less than a hospital level of care but more than a special needs unit such as is provided in a SNU, RTP, ICP, EOP, etc.].

This study also included an examination of individual characteristics such as mental health status, personality, and trauma history to determine if certain factors could predict patterns of change. The prediction analyses were exploratory in nature and we did not formulate a hypothesis about the variables that might predict differential rates of psychological decompensation (O'Keefe, Klebe and Stucker et al., 2010).

The study participants and methodology described by the authors included the following:

Study participants included male inmates who were placed in AS and comparison inmates in the general population (GP). Placement into AS or GP conditions occurred as a function of routine prison operations, pending the outcome of their AS hearing, without involvement of the researchers. All study participants classified to AS were waitlisted and placed in the Colorado State Penitentiary (CSP). Inmates who returned to GP following an AS hearing comprised the comparison groups. [There were some differences between groups on demographics, institutional behavior, and needs]. Inmates in both of these study conditions (AS, GP) were divided into two groups—inmates with mental illness (MI) and with no mental illness (NMI). There are fewer inmates with mental illness than without, but because both subgroups were of equal interest to this study, separate groups enabled over-selection of inmates with mental illness.

A third comparison group was included. This group included inmates with severe mental health problems placed in SCCF [with patterns of prison misbehavior, as measured by disciplinary violations]. The purpose of the SCCF comparison group was to study inmates with serious mental illness and behavioral problems who were managed in a psychiatric prison setting.

A total of 302 male inmates were approached to participate in the study. Thirty refused to participate. Two more offenders were considered a passive refusal and were removed for inappropriate sexual behavior towards the researcher during the first testing session. An additional 23 offenders later withdrew their consent, although the data collected to the point of their withdrawal was used. In addition to refusals and withdrawals, 10 inmates released prior to the end of the study due to discretionary releases by the Parole Board and one participant death.

Five testing sessions were initially established at 3-month intervals, beginning with the date of consent and initial administration. Therefore, tests were scheduled at 3 months, 6 months, 9 months and 12 months after the baseline assessment. However, this schedule was problematic for the AS groups. When the study began, there was a 3-month average wait for inmates to be transferred to CSP due to a shortage of AS beds. While on the waitlist, AS inmates were held in a punitive segregation bed at their originating facility. It was determined that the primary goal was to study inmates in a single long-term segregation facility (CSP) to limit confounding variables and, therefore, the baseline measure should be collected upon placement into CSP. However, it was also recognized that significant changes could occur while

*See PSYCHOLOGICAL, page 12*

---

# CORRECTIONAL MENTAL HEALTH REPORT

**Executive Editor:** Fred Cohen, Esq

**Contributing Editors:** Terry A. Kupers, M.D., M.S.P.
James Knoll IV, M.D.

**Managing Editor:** Linda Mitchell

**Publisher:** Deborah L. Launer

**Publisher:** Mark Peel

*Correctional Mental Health Report* (ISSN 1526-9515) is published bimonthly by Civic Research Institute, Inc., 4478 U.S. Route 27, P.O. Box 585, Kingston, NJ 08528. Periodicals postage pending at Kingston, NJ and at additional mailing offices. Subscriptions: $165 per year in the United States and Canada. $10 additional per year elsewhere. Vol. 13 No. 1. May/June 2011. Copyright 2011 by Civic Research Institute, Inc. All rights reserved. POSTMASTER: Send address changes to Civic Research Institute, Inc., P.O. Box 585, Kingston, NJ 08528. *Correctional Mental Health Report* is a registered trademark owned by Civic Research Institute, Inc., and may not be used without express permission.

**Editorial Board**

Kathryn A. Burns, Chief Clinical Officer, Cuyahoga Community Mental Health Board, Cleveland, OH

Jamie Fellner, Director, U.S. Program, Human Rights Watch

Craig Haney, Department of Psychology, University of California, Santa Cruz

Lindsay M. Hayes, Assistant Director, National Center on Institutions & Alternatives

Kirk Heilbrun, Ph.D., Professor, Law-Psychology Program, MCP Hahnemann University

Ron Jemelka, Ph.D., Research Director, Texas Health Quality Alliance

Jeffrey L. Metzner, M.D., Clinical Professor of Psychiatry, University of Colorado Health Sciences Center

James R.P. Ogloff, J.D., Ph.D., Director of Psychological Services, Forensicare Foundation Professor of Clinical Forensic Psychology, Monash University, Melbourne, Australia

Randy K. Otto, Ph. D., Department of Mental Health Law & Policy, Florida Mental Health Institute

Robert J. Powitzky, Ph.D., Chief Mental Health Officer, Oklahoma Department of Corrections

Charles L. Scott, M.D., Associate Clinical Professor of Psychiatry, University of California, Davis

Clarence J. Sundram, J.D., Former Chairman, New York State Commission on Quality of Care for the Mentally Disabled

Hans Toch, Professor, School of Criminal Justice, State University of New York at Albany

Affiliations shown for identification purposes only. Opinions expressed do not necessarily reflect the positions or policies of a writer's agency or association. In addition, at no time does a Correctional Mental Health Report receive information from a Board Member not available to others.

The information in this publication is not intended to replace the services of a trained legal or health professional. Neither the editor, nor the contributors, nor Civic Research Institute, Inc. is engaged in rendering legal, psychological, health or other professional services. The editors, the contributors and Civic Research Institute, Inc. specifically disclaim any liability, loss or risk, personal or otherwise, which is incurred as a consequence, directly or indirectly, of the use and application of any of the contents of this publication.

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031797

# Some Observations About the Colorado Segregation Study

by David Lovell and Hans Toch

O'Keefe et al. (2010) have released a report claiming to deal with "psychological effects of administrative segregation." This is an ambitious undertaking because psychological effects of prison environments are difficult to describe. The difficulties arise because the same prison environment can affect different inmates differently, and because any given prisoner responds differently to different environments, or to the same environment under different circumstances. It is therefore important to understand the precise environmental conditions involved and the individual factors exposed to these conditions. (Toch, 1992)

## Who is in Administrative Segregation, and Why?

The O'Keefe study is set in Colorado, and the first observation to be made with respect to this setting is that "administrative segregation" in Colorado appears to be used with carefree promiscuity. At the time of the study, the Colorado system had a number of administrative segregation (AS) settings, by far the largest of which was a penitentiary with 756 beds and a hefty waiting list. The Colorado system had 20,000 prisoners. This means that fully 4% of the state's prison population was being administratively relegated to solitary confinement.

Colorado has a formal classification scheme for all prisoners except those being administratively segregated. In relation to these prisoners, the Report offers a boilerplate description of criteria used by administrators to the effect that the prisoners who were being segregated had been found to "display violent, dangerous, and disruptive behaviors." "The study did not include information about how inferences relating to "violence, dangerousness, and disruptiveness" were drawn in Colorado, but the data raises some disquieting—and unanswered—questions about who was placed in AS, and why.

The study divides the inmates being studied into "mentally ill" (MI) and "non-mentally ill" (NMI) prisoners, and compares segregated MIs and NMIs to their presumptive counterparts in the general population. According to a table of group attributes, the segregated—and presumably, "violent, dangerous and disruptive"—NMIs had

averaged 13.2 disciplinary violations, compared to 16 violations for the non-segregated NMIs. Though the recorded prison misbehavior of these segregated inmates was thus less frequent, they stood out on another attribute: Over half (54%) of the AS NMI group was Hispanic, compared to 33% of the counterpart (non-segregated) group. Here an obstacle to interpretation is raised that crops up repeatedly throughout the manuscript. Readers find themselves swimming in a flood of psychometric data; every so often a clue drifts by, lacking, however, a tether to the context—to what was going on around the prisoners and staff while they carried out this study—we are left to guess what it might mean. In this case, we know that 45% of the CSP NMI groups had been identified as gang members, and we may guess that such attributions were probably responsible for the disproportionate presence of Hispanics in this group. What did these prisoners say about their assignment to AS, how did their accounts differ from those of non-affiliated participants or members of other groups, and how might their allegiance have affected their apparent resilience? We can only speculate, thereby doing justice neither to the efforts of the authors nor to our credibility as commentators.

As for the segregated MI group, 44% was designated as needing sex-offender treatment, and 34% as having needs related to "self-destructiveness." Despite the bald assertion that "Colorado does not have protective custody for inmates" (p. 8), these are designations that plausibly describe a group of prisoners requiring protection, though hardly prisoners who, in a safe setting, would become "violent, dangerous and disruptive." For many of them, AS might have provided refuge from general population, and for all we know (note the required qualification) the need for refuge might have triggered the behavior that led to AS as well as their willingness to tolerate its restrictions.

Despite a lower proportion of sex offenders among AS inmates in Washington state (14%, 20% among the mentally ill), administrators there classified fully one-third of AS inmates as protection cases (Lovell, 2010; Pacholke, 2010); furthermore, unlike Colorado, Washington

provides other formally designated protective custody units. Indeed, protection cases often found their way into AS to avoid being labeled "PC" and presumed snitches. To what extent similar processes affected the composition of Colorado's AS population, and the response of participants to living there, we can only guess.

## Counter-Intuitive Findings

Contrary to the expectations of the authors as well as many observers and students of supermax settings, the study's findings "were largely inconsistent with our hypotheses and the bulk of literature that indicates AS is extremely detrimental to inmates with and without mental illness" (p. viii). Leafing through the report, we encounter chart after chart in which groups of participants showed little change from the beginning to the end of the one-year study, or in which a slight pattern of change among CSP inmates was paralleled by their counterparts in general population, or in which the measured changes showed improvement rather than deterioration. Most of the tests were sliced into subscales and recombined into composites (one is tempted to say, like the mortgage-backed securities that brought down the bond market and our economy); these composites were intended to measure the various "constructs" (withdrawal, alienation, hostility, etc.) that have been held to characterize the harms of solitary confinement. With 14 measures, four or five measurement intervals, five groups, and 12 constructs, the possible data points are abundant. Hence the flood of data, and the difficulty of finding an empirical mooring for a response other than, it can't be true. Nevertheless, we will try.

The most flabbergasting claim in the Report is that the researchers had recorded an initial gain in "psychological well-being" among segregated prisoners. The authors do not describe the conditions under which this alleged "improvement" in "well-being" occurred. However, "when the study began, there was a three-month average wait period for inmates to be transferred ... due to a shortage of AS beds," and, "while on the waitlist, AS prisoners were being held in

*See SEGREGATION STUDY, next page*

©2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031798

*SEGREGATION STUDY, from page 3*

punitive segregation at their originating facility" (p. 19). Elsewhere (p. 9) the Report notes that punitive segregation cells in Colorado are completely stripped down, devoid of privileges, and strictly designed for short-term punitive placement. This circumstance may have a bearing on the fact that the O'Keefe study could claim to have found its "improvement ... between the first and second period" (p. viii). Another circumstance is the AS hearing itself which, in some systems perhaps less enlightened than Colorado's, can be an aversive experience in which inmates are told just why they have no excuse for being so rotten that they deserve nothing better than the hole. Also relevant is the fact that the first week of AS in Colorado offers commensurately punitive conditions, despite the fact that the AS prisoners have presumably done nothing for which they could be punished.

Conditions of confinement in the penitentiary in which the study took place are fully catalogued in the Report, but there are no inferences drawn—nor can any be readily inferred—about the "psychological effect" of the specific sets of deprivation that are described. We thus have no way of ascertaining to what extent the damage that is invariably done in segregation settings to vulnerable prisoners by isolation, enforced inactivity and sensory deprivation might be neutralized or ameliorated by some elements of the Colorado regime, such as outside windows, choice of television programming, art supplies, recreational games and puzzles, convenient desk lights the prisoner can control, "cognitive classes," monthly visits and weekly phone calls. It is conceivable, therefore, that for some undetermined subset of study participants, the measured improvement in psychosocial functioning can be attributed to the relative comforts of AS.

We have mentioned these contextual facts because the most salient counterintuitive finding reported by O'Keefe and her colleagues is the lack of significant differences in their measures of "psychological well-being" across confinement conditions and over time. The possibility that measured gains in psychosocial functioning reflect an improvement in circumstances, however, raises questions about just what the tests were measuring. These doubts are reinforced by two considerations: (1) patterns in the data suggesting substantial but undescribed diversity within the various groups being compared, which may reflect

weaknesses in the methods of analysis applied in this report; and (2) the occasional deviations from the predominant pattern of minimal change in status, or trends in AS participants mimicked by parallel changes among their GP counterparts.

## Grasping at Straws

The examples in this section are slim reeds in this river of data. On their own, they provide little hope of avoiding the interpretation that inmates fare much better than expected under AS conditions. We describe them here for two reasons. Given the enormous systematic effort and attention to detail represented by this study, the authors deserve better than a declaration that it must not be true. On the other hand, these examples illustrate our basic argument: inmates exhibit a variety of patterns over time that cannot be understood in average terms or without reference to what their prison settings mean to them. Consequently, despite the volume of data, no systematic interpretation of the findings is possible. All we have is questions.

**Slopes and Average Values.** One set of summary statistics is presented in Table 12 (p. 53). The values are not readily interpretable, since they are derived from composite measures of "constructs" such as anxiety. The components are subscales within different instruments; selection of subscales is supported by statistical measures of reliability and "convergent validity," i.e., correlations among results of the various subscales. Subscale values are standardized by centering the mean value across the sample on 0 and dividing by the standard deviation; and the composite scores represent means of the standardized subscales. So the mean value of .30 on anxiety for the CSP MI group is 0.3 standard deviations from the mean of the entire sample. Generously assuming that we understand these manipulations, we note that in general the standard deviations for the composite scores are much greater than the means. We infer that average scores mask considerable diversity among members of the same administratively defined groups (CSP NMI, CSP MI, GP NMI, etc.).

One method by which the authors assess whether different groups change in different ways over time is "slope analysis," in which the slope of scores on each measure is calculated for each participant, and tests are run to determine whether there are significant differences in slope between, for example, AS and GP inmates. Many of the charts, however, display climbing scores from one point to another, then a horizontal line,

followed by a decrease, or the reverse, or a V or inverted V pattern. Bear in mind that these patterns reflect average values within groups, so there is likely even more variety in patterns among individual inmates. What factors might trigger shifts in the trajectories of participants? We can only guess, but the authors might have asked the inmates and reported patterns of responses.

These two observations suggest that the authors' analysis of average values within the five groups may mask wild fluctuations in levels of despair, hostility, apathy, among individuals or groups—not necessarily the administratively defined ones. This defect could be remedied by a more fine-grained analysis that identifies varieties of patterns within and across groups. If restricted to the study's psychometric instruments and their derivatives, however, such an analysis would not settle doubts about whether the measures reflect what we care about when we question the systematic use of long-term solitary confinement. Reasons for doubt on this score are illustrated by several of the findings that deviated from the general pattern.

**Deviations From the Pattern.** From our reading, under the near-drowning conditions mentioned earlier, the clearest exception to the predominant pattern is the withdrawal-alienation construct among the NMI groups (Table 15, p. 60), in which a substantial deterioration of functioning (measured by increasing values) is reported for the CSP (AS) NMI group. In the Executive Summary the authors claim that "this finding was true for the two [CSP and GP] NMI groups, so it is not attributable to AS" (p. viii). The change, however, was rather greater for the CSP (AS) group: from −31 to −.07, vs. from −.45 to −.32. These values represent movement towards the mean of the alienation-withdrawal construct value for total sample, 60% of whom were mentally ill; thus the CSP NMI group more closely resembled the mentally ill with respect to this construct at the beginning of the study than at the end. The clinical significance of this change, however, is difficult to assess because of the degree to which the data have been cooked, as described above. In the case of withdrawal, the composite score derives from two subscales of the same instrument: i.e., perhaps 5 items in the 22-item Personality Assessment Screener, a short-form test based on the Personality Assessment Inventory. To assess how consequential it is to find an average movement from −.31 to −.07 would require psychometric expertise, an understanding of the PAS, and knowledge of

*See SEGREGATION STUDY, page 14*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

May/June 2011

# What Should We Think About the Study on the Psychological Impact of Confinement at Colorado State Penitentiary? A Human Rights Perspective

by Jamie Fellner

The most troubling correctional development in recent decades may be the stunning expansion in the use of prolonged administrative segregation (AS), typically in super maximum security facilities. Unfortunately, Eighth Amendment litigation has been of little help for inmates enduring the harsh AS conditions of isolation and reduced opportunities for sensory stimulation and purposeful activities. Even when faced with contemporary and historical evidence that prolonged isolation can lead to serious psychological disturbances in previously healthy prisoners, the courts have deferred to prison officials who insist such confinement is necessary for prison safety and security. They have also trivialized the mental suffering of many, if not most, isolated inmates. The court in Madrid v. Gomez, 889 F. Supp. 1146 (N.D. CA 1995), concluded, for example, that the mental pain suffered by many inmates in the Secure Housing Unit of California's Pelican Bay State Prison did not "significantly exceed the kind of generalized psychological pain that courts have found compatible with Eighth Amendment standards."[1]

To date, the only consistent substantive bright spot in supermax litigation has been the protection of prisoners whose existing or prior mental illness puts them at high risk of serious injury to their mental health if confined in AS. In class action cases in at least 14 states, federal courts have either issued decisions or accepted settlements that prohibit or sharply limit prison officials' ability to place or keep mentally ill prisoners in isolated confinement.[2]

Given the cramped and unfriendly Eighth Amendment jurisprudence and the limited prospects for success challenging AS, it is little wonder that some prisoner rights lawyers and their psychiatric experts responded with angry concern to the publication of the results of research on the psychological effects of one year of confinement at Colorado's supermax prison, Colorado State Penitentiary (CSP).[3] They fear the research, which showed scant adverse psychological impact from CSP confinement, might undercut their efforts to reform and reduce the use of AS. (See Metzner and O'Keefe for description of research and results.)[4] As someone who has long criticized the U.S. penchant for supermax prisons and has wished U.S. courts would acknowledge how easily the pursuit of safety and security can slide into cruelty, I am nonetheless not as dismayed by the study as are some. The study does not legitimize AS, either at CSP or elsewhere, and it certainly does not obviate human rights-based criticisms.

Before limning some of the reasons for my belief the study should not frustrate supermax reform efforts, I want to address doubts that may exist about the study's integrity. I was one of three outside members of the nine person advisory committee for the study; the other six were officials with the Colorado Department of Corrections. The committee communicated and met frequently from the very beginning of the project through its conclusion. Our discussions were extensive, open and no holds-barred. The principal researchers (the head of research at the Colorado Department of Corrections and a professor in the Department of Psychology of the University of Colorado) did their best to develop a sound research protocol that would overcome some of the problems with prior studies and that would permit a scientifically valid measurement of the psychological impact of a year's confinement at CSP—a difficult enterprise at best. If there are methodological flaws in the study, they do not reflect any effort by the researchers or the Colorado Department of Corrections to skew the results.

I leave it to others to debate whether the Colorado study used the best methodology to test its hypothesis, whether there are feasible alternative methodologies that might have better captured the study participants' psychological symptoms and trajectory, and whether such alternatives would have led to different results. (If the Colorado study had found serious psychological deterioration among CSP inmates, it would no doubt have been met with criticism, but presumably from different quarters.) Without dismissing concern about the methodology, the research results are worth considering on their own terms. What does the study say—and what doesn't it say—about supermax confinement?

First, it is important to emphasize that the Colorado research did not seek to determine whether prolonged AS is necessary, whether other non-isolation based approaches to difficult or dangerous inmates might be equally if not more effective in terms of prison safety or security, or whether the specific conditions at CSP are consistent with the Eighth Amendment or human rights. It focused solely on psychological impact. I should also add that I do not endorse the actual conditions at CSP, how it is used, who is confined there (particularly the inclusion of mentally ill inmates), why, and for how long. Much of the criticism I have levied elsewhere against supermax prisons applies to CSP.[5]

## Impact on the Non-Mentally Ill

Turning to psychological impact, let us consider first the research finding that inmates who were included in the "non-mentally ill" group at CSP did not have a downward psychological trajectory. It would be a mistake to interpret this finding as proof AS does not harm healthy inmates. The study revealed that these inmates (like those diagnosed as mentally ill) were already highly symptomatic at the start of the study when they were sent to CSP, as revealed by their initial scores on multiple psychological and cognitive measures. Indeed, many already displayed "SHU syndrome." (The study did not examine why they had those symptoms, e.g., did they develop them while in segregation prior to assignment to CSP? Did they enter prison with them?) For the most part the inmates retained elevated symptoms throughout the study. If the study had assessed the impact of one year's segregation on inmates who did not already have such symptoms, the results might well have been different. Other distinctive features of the study participants also limit the extent to which the findings can be generalized. For example, inmates who were illiterate were

*See HUMAN RIGHTS, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031800

*HUMAN RIGHTS, from page 5*

excluded, and people who cannot read and write may find segregation much harder to tolerate than others.

While all supermax prisons impose misery, each imposes its own version. The basic confinement model is the same—23 to 24 hours a day of solitary in-cell confinement (although double celling exists in some segregation units), as well as extensive security measures and surveillance. But there are significant differences in the physical conditions, privileges and programs at different facilities and the Colorado study raises the question of whether those differences might affect psychological impact.

CSP has a combination of features that was not present in the supermax prisons where experts concluded the conditions produced psychological deterioration among prisoners who had not previously been mentally ill. For example, the CSP cells have windows to the outside, the cell doors have windows through which prisoners can manage to see each other (and they apparently communicate in sign language), all prisoners except those at the lowest level of privileges have access to radio and television and can participate in educational and skills-enhancing programming, they have some access to telephone and visits, they can get books, newspapers, magazines, art supplies and games, and there does not appear to be the arbitrary and excessive use of force that creates a climate of tension and fear such as existed at Pelican Bay. Prisoners who follow the rules and engage in the requisite programs progress through CSP's "quality of life" level system and most have a realistic prospect of getting back to general population (if they are not discharged or released to parole first).[6]

In light of the Colorado study and in the absence of research on differences between supermax prisons, it is at least worth speculating whether CSP's particular version of supermax confinement may be less psychologically damaging than others. Supermax facilities that differ from CSP remain as vulnerable as before to charges they cause inmates to psychologically deteriorate.

## Impact on the Mentally Ill

What about prisoners who had diagnoses of mental illness when they were sent to CSP? The study indicates that overall 7% worsened, 20% improved, and the rest remained essentially unchanged over the course of the study. It is unfortunate that the study lacked the data to tell us the total length of time the CSP participants spent at the different quality

of life levels. It is reasonable to assume that those who spent the most time at level one (the harshest) were more symptomatic and may have shown more signs of deterioration than those who progressed to and spent more time at the higher levels.

The study captures symptoms reported at specific testing intervals, and does not reflect discrete episodes of distress that may have occurred and ended between testing. Apart from the self reported symptoms, DOC clinicians documented 22 self-harming ideation or behavior "crisis" events for 10 of the mentally ill CSP study participants over the research year (one inmate accounted for one-third of those events) and 11 of them had episodes of psychotic symptoms (one inmate accounted for half of those episodes), but the study does not indicate the precise nature, severity and duration of those episodes, nor does it indicate whether the inmates had similar crises prior to CSP confinement.[7]

That some already ill prisoners got worse at CSP will not surprise anyone familiar with prolonged administrative segregation. The small proportion who deteriorated may reflect the fact that relatively few of the mentally ill study participants at CSP had been designated by Department of Corrections clinical staff as having high mental health needs.[8] The CSP results might have been different if the CSP study group had included more acutely ill inmates.

Corrections officials should not take heart that some mentally ill inmates improved in segregation. It is well known that many mentally ill inmates find general population extremely stressful and have a difficult time coping (which can lead to the misconduct that lands them in AS in the first place). Solitary in-cell confinement may offer something of a refuge for them. But the housing alternatives for the mentally ill should not be general population or segregation. If inmates with serious mental health problems are going to be confined in prison, officials need to create facilities designed and staffed to respond to their unique needs and vulnerabilities. Operated to promote prison safety primarily through isolation and deprivation, supermax prisons are counter-therapeutic. Inmates with mental illness at CSP who improved during the study nevertheless remained symptomatic. "Improve," of course, is a relative term.

Most important, the fact that 70% of the mentally ill study participants at CSP remained unchanged over the course of the study year is striking evidence that CSP is no place for the mentally ill. Staying the

same means remaining mentally ill—highly symptomatic, illness unabated. The study does not attempt to determine if the absence of improvement is the result of the conditions of confinement, the nature, quantity and quality of mental health services provided to CSP inmates, or both. But the bottom line is that the preponderance of mentally ill inmates at CSP do not get better.

## The Human Rights Perspective

There are hermits who happily shun human contact. Most of us, however, are social beings who require meaningful interaction with others to be fully human. As humans, we also need contact with the natural world, sensory and intellectual stimulation, and the opportunity to engage in purposeful activities. Unfortunately, under current Eighth Amendment case law, prisoners "deserve" no more than the minimum civilized necessities—i.e., food, shelter, warmth, sanitation, and medical care. The fact that living in segregation cut off from other people and the natural world can cause utter misery, that it can be an experience akin to "living in a tomb," is of little constitutional moment absent the creation or exacerbation of mental illness.[9]

Grounded in humanistic principles, the human rights assessment of prolonged segregation is far more critical. The starting point is international human rights treaties. Under the International Covenant on Civil and Political Rights, corrections officials have a positive obligation to respect the humanity and inherent dignity of all prison inmates, even those deemed dangerous and difficult, and the primary purpose of incarceration must be the "reformation and social rehabilitation" of inmates.[10] Human rights treaties also prohibit officials from subjecting inmates to torture or other cruel, inhuman or degrading punishment or treatment.[11]

Although corrections professionals do not like the term, human rights authorities consider administrative segregation to be a form of solitary confinement, in recognition of the fact that its defining feature is in-cell confinement that isolates inmates from each other and staff. Solitary confinement does not automatically violate human rights: the human rights assessment depends on the specific conditions, the justification for them, their duration and the vulnerabilities and needs of individual prisoners. For example, harsh conditions of isolation which are acceptable for a month may be cruel when imposed for years. Denying a

*See HUMAN RIGHTS, page 15*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*CONFINEMENT, from page 1*

by the present authors: Drs. Grassian and Kupers.[2]

One of the most stunning and inescapable statistical facts regarding long-term segregation is that on average, 50% of completed suicides by inmates occur among the 2–8% of prisoners who are housed in isolated confinement.[3] This fact can mean only two things: either it demonstrates that segregation is psychologically toxic, or else it demonstrates that the more troubled inmates who need psychiatric help are instead placed in a psychiatrically punitive environment. Of course, it is both: the more psychologically troubled inmates have less control over their behavior, and the system's response to their unacceptable behaviors is to punish them with isolation. The troubled inmate then psychologically deteriorates in segregation.

The Colorado researcher's data itself includes quite a lot of psychiatric distress and quite a few psychotic and suicidal crises among the subjects with mental illness in administrative segregation during the study period. The researchers, however, chose to ignore these crises or dismiss them as insignificant. Perhaps because they deemed this tendency towards psychiatric crisis to be pre-existing, they did not conclude that the suicidal and psychotic crises that occurred in the course of their study reflected harmful effects of isolated confinement. Importantly, they made this determination without actually interviewing the prisoners or carefully reviewing their clinical charts. This is very odd, and certainly problematic in terms of clinical science.

We will comment further on about methodology but on the issue of a pre-existing inclination, consider a hypothetical young adult who attempted suicide as an adolescent, maybe after being jilted by a girlfriend, then entered prison, and, while doing a stint in administrative segregation, despaired of ever getting out of isolation and made a serious suicide attempt. Would we dismiss the suicide attempt as a pre-existing proclivity toward self-harm that was not caused by confinement in Ad Seg? Yet that is essentially what these researchers have done regarding the psychiatric symptoms and crises experienced by the subjects they studied.

Both of the authors offered feedback to the Colorado researchers about problems in their study, but our feedback was refused, ignored or rejected. Dr. Grassian was invited by the authors to participate in their presentation of this research at the 2010 American

Psychological Association (APA) Annual Meeting, and there he pointed out several seeming fatal flaws in their methodology. Yet the Colorado research team chose not to incorporate or respond to any of these concerns. Further, they refused to provide us with the raw data from their study.

The critique offered here is based upon the report itself, discussions held (with Dr. Grassian) publicly at the presentation at the APA Meeting, presentations and discussion at a conference on supermaximum security units held in Washington, D.C. on November 18, 2010, where Dr. Kupers and Dr. Metzner spoke, and on material gleaned from discovery in *Dunlap v. Zavaras*, USDis(Ct, Colorado, Civ. No. 09-CV-01196-CMA-MEH, including the transcript of the deposition of the lead author for the Colorado Study, Maureen O'Keefe, as well as e-mail memoranda between the authors and advisors generated from the beginning of the study period and included in discovery.

## Research Subjects, Control Group

The research authors argue that in this study, the Ad Seg group with mental illness—the group whose adjustment in Ad Seg is centrally at issue in the research—has a "comparison group": the group in general population (GP) with mental illness. The authors pride themselves on having thus obtained in this manner virtually a controlled study.[4] It should be noted however that the researchers excluded all potential subjects who could not read at an eighth grade level. They provide little information as to the number or percentage of potential subjects so excluded, nor of the likely explanations for this illiteracy (how many of these were simply non-English speakers; how many had significant cognitive limitations, etc.).

This omission is quite important. It has been well-documented that illiteracy and cognitive impairment are significant risk factors for psychiatric decompensation in solitary. Thus, the researchers excluded many of the most vulnerable individuals. Similarly, the authors properly excluded inmates who did not agree to participate in the study. Of course, there were right to respect inmates' right to consent, but again the excluded group likely includes many of the inmates suffering the most harm from isolated confinement.

## Data Collection and the Problem of Validation

In the Colorado study, the researchers had the subject inmates fill out self-report

rating scales. Usually the instructions for utilizing such scales include the recommendation that they not stand alone, but rather be integrated with clinical history and examination. The Colorado researchers, however, did not use any clinical data at all. While this methodology has certain advantages, including ease in accomplishing a study, it has the major difficulty of establishing validity. The question, of course, is whether these self-report scales are a valid measure of the subject inmates' *actual* psychiatric status. In the Colorado study, this is a very dubious proposition.

In general, the instruments employed were validated only for people in life situations extremely different from that of the subject inmates. The instruments have been validated for college students, most of whom were studying psychology, and for outpatients in psychotherapy. It is not surprising that subjects in these two groups filled out the self-reports reasonably thoughtfully and accurately—their self-reports thus being a valid, reasonably accurate, reflection of their clinical state.

But *inmates* are in *no* way similarly placed. In prison, revealing weakness or psychological dysfunction is dangerous, potentially substantially different from that of the inmate to harassment, possibly even to physical danger. Moreover, in deposition,[5] Ms. O'Keefe, the first study author, was asked what explanation was given the subject inmates as to the purpose of the study. In response, she revealed that the subjects were told that the research was intended to study how inmates were adjusting to prison life. She had no real answer to the follow-up questions—whether she really thought an inmate would think it wise to declare he was adjusting poorly. Anyone with a background in corrections knows that is *not* the kind of information an inmate would likely expose. It could harm him, even surreptitiously, for example at a parole hearing or in hearings to determine whether he could progress to higher levels in Ad Seg. At her deposition, Ms. O'Keefe also admitted[6] that if an inmate reported suicidal thinking, this would be reported to prison staff. Again, there is stigma attached to mental disorder and displaying weakness in prison, and there is the likelihood of being sent to a very restrictive observation setting, all of which contributes to unbalanced reporting.

There are other problems as well. For example, the graduate student, Alyusha, who actually met with the inmates is apparently

*See CONFINEMENT, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*CONFINEMENT, from page 9*

an attractive young woman, talking with inmates who had virtually no contact with any such young attractive women. Even the research group itself noted the likely distorting effect of this fact, referring to it as the "Alyusha Effect." The inmates were likely to be reluctant to reveal weakness to this attractive young woman.

Thus, it cannot be assumed that inmate self-reports are a valid means of assessing psychiatric status. It would not be surprising if these self-reports, in fact, bore little or no relationship at all to psychiatric status.

Perhaps in an attempt to bolster the credibility of the inmate self-reports, the researchers had custody officers and mental health clinicians fill out brief forms regarding the mental health of the subject inmates. However, by their own admission at public forums,[7] the authors acknowledged that these reports were of little value. They have no idea which staff members were selected to fill out the forms, or how the forms were completed. No specific instructions were provided and over half the forms were never filled out at all. Similarly with the forms filled out by the clinicians, the authors gave no guidelines or requirements as to how the forms would be filled out. They had no information whatsoever to suggest that the clinicians did more than they would normally do in a screening interview, that is, attempt to speak to the inmate through the cell door, either by talking through the crack at the edge of the door or else by opening up the food slot and bending down in an uncomfortable position to speak through the slot. Given the daily burden of routine paper work, it would not be surprising to find that the staff put minimal or no effort at all into checking off the researchers' forms.

And, indeed, the clinician forms found even less symptomatology than the forms completed by the inmates.

## The Authors Chose to Ignore Critical Sources of Data

The most important comparison groups are the two groups of inmates with mental illness (MI) diagnosis referred for disciplinary hearing—one group was then housed in Ad Seg and the other group was then housed in GP. Since both groups have psychiatric diagnoses, there are records of mental health contacts, including symptoms reflected in clinicians' notes, diagnoses,

medications prescribed, and so forth. The Colorado researchers failed to review any of this available data and, therefore, they cannot answer even a simple question such as "Did those in Ad Seg end up requiring more medication than those in GP?"

Indeed, at deposition, Ms. O'Keefe acknowledged that the study entirely failed to track the mental health history and records of the study inmates, including their medication history; for example, whether an inmate's need for medication increased during the study period. At an oral presentation of the report in Denver, it was pointed out by an ex-inmate that, as a result of the logistics of medication distribution, inmates actually receive prescribed medications much more consistently in Ad Seg than in GP. Ms. O'Keefe acknowledged that this issue, and the availability of mental health services in general, were not examined by the study group. However, she did acknowledge that the level of mental health services was greater at CSP than in GP, and that it was indeed possible that after transfer to CSP, inmates with mental illness required increased services and medication. That issue, however, was never examined.

In general, then, the study group chose to ignore major direct sources of information (mental health records, medication records, etc.) about how the inmates with mental illness fared during the study period.

## The Authors Chose to Ignore DOC Data That Squarely Contradicted Their Conclusions

Colorado DOC files record incidents of emergency psychiatric contact (e.g. suicidal or self-destructive behavior) and emergence of psychotic symptoms. Among the group of inmates with mental illness in Ad Seg (N = 59) there were 37 such episodes during the course of the study (an average of .62 episodes per inmate—almost two for every three inmates). Among the group of inmates with mental illness in GP (N = 33), on the other hand, there were only three (.09 per inmate–less than one for every 10 inmates). Could this have been random—i.e., a reflection of some significant difference in the result? Statistically, the chance of that is entirely minute, approximately p = .0002; i.e., a chance of 1 in 5,000, an extremely small number. (In research, statistical significance requires only a probability of randomness of .05, i.e., as much as 1 in 20!) Thus, this objective data *squarely* contradicts the authors' conclusion that Ad Seg does not produce

significantly more psychiatric difficulties than does GP housing. The authors simply declined to perform this straightforward statistical analysis of data they actually reported, even after the oversight in their early public reports was explicitly pointed out by Dr. Grassian.

Additionally, this data is critical as a proper means of assessing validity of the self-reports: If the self-reports *were* a valid measure of psychiatric distress, we should see each crisis episode reflected in the inmate's corresponding self-report. If, in filling out his self-report, the inmate responds that he is doing just fine, then the self-reports are worthless. They are in no way a measure of psychiatric distress. It would have been quite easy for the authors to review those cases, a total of 37 recorded instances that would require simply a review of the corresponding self-report rating by the inmate during the time period at issue. Dr. Grassian explicitly pointed this out to the authors prior to their public presentation of the data and prior to their submission of the report. Yet the authors declined to perform this crucial check on their data.

There is irrefutable evidence that the study group *knew* there was a major problem with the validity of the self-report data. In 2008, Ms. Stucker sent an e-mail to Ms. O'Keefe expressing concern that an inmate subject in the study had just committed suicide. She then reviewed his self-report. In his self-report, he had revealed no evidence at all of any distress. Thus, at an early stage, Ms. O'Keefe was entirely aware of a major question about the validity of the inmates' self-report ratings. Evidently, the study group chose to do nothing at all to address this concern even though it would have been entirely possible to do so.

In the end, though, the authors could not escape the inevitable conclusions to be drawn from this data. As we stated in the introductory portion of this critique, statistical evidence demonstrates a dramatically increased incidence of suicide among prisoners in segregation. In this study, we see the very same result: Psychiatric crises, whether of suicidality or psychotic or other symptomatology, were dramatically more prevalent among the prisoners with mental illness placed in Ad Seg compared with those with mental illness housed in GP. Again, this can mean only that more disturbed inmates are the ones most likely

*See CONFINEMENT, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*CONFINEMENT, from page 10*

to be sentenced to Ad Seg, or that housing a group of psychiatrically impaired inmates in Ad Seg creates a much worse result than housing them in GP.

The Colorado researchers start by praising themselves for creating a comparison group (i.e., the only variable distinguishing the group with mental illness in Ad Seg from those with mental illness in GP is one variable: housing). Thus their report explicitly *excludes* the first possibility, that the mentally ill inmates sent to Ad Seg were a *different* group—a sicker group—than those housed in GP. In short, contrary to the researchers' conclusions, the study clearly demonstrates the second possibility: That Ad Seg housing is psychiatrically toxic.[3]

## Conclusion

When evaluating an inmate who has suffered some form of psychiatric deterioration during incarceration, there are several sources of data that can establish causation. Interview data, prison mental health records, and D.O.C. incident reports all provide important information about the circumstances surrounding the deterioration and the nature of the resulting psychiatric symptomatology. Over the course of years, we and others have described literally thousands of cases of individuals who decompensated in solitary confinement, recompensated when removed, and then decompensated when returned, in an endless revolving door.

The Colorado researchers elected not to talk to their subjects, nor to review records. They did paper and pencil tests but no clinical interview or even a researcher-conducted interview. Unfortunately, the results of this kind of stand-alone testing are such that the researchers can claim no harm from supermax confinement merely because the data is a scramble of numbers that mean almost anything to anyone who wants to interpret them.

There are a number of other methodological difficulties with the Colorado research report, but in the end, much of the 163-page final report consists of long and endless statistical dissections of the self-report data. Yet these minute dissections are entirely confounding and erroneous because the data they dissect does not in any meaningful manner reflect the psychiatric pathology they are supposed to be studying.

The Colorado research team did not find an absence of harm. Far from it. They found, not surprisingly, that many of the inmates who faced disciplinary sanctions for disruptive behavior were very damaged people with serious mental illness diagnoses and with very serious psychiatric problems. Their data also demonstrated emphatically that among those inmates with preexisting serious psychiatric problems, those who were placed in administrative segregation suffered far more psychiatric crises during the study period than those not placed in administrative segregation. The authors chose to ignore this glaring reality. Instead, relying only upon their very flawed methodology, they claim their study demonstrates that there was no change, or even some early improvement, in the psychological status of these inmates. In the process they ignored objective data that squarely contradicted their self-report data. This is entirely unacceptable.

Returning to the stunning statistic that, on average, 50% of completed suicides in corrections occur among the 2% to 8% of prisoners in any system who are in isolated confinement,[6] there are only two plausible explanations for this fact: Either administrative segregation causes psychiatric harm; and/or (*and* we believe "and" is the applicable word) the sentencing to Ad Seg is very often a tragic, punitive response to irrational and self-destructive behavior on the part of severely mentally ill inmates—just when a therapeutic response is urgently needed.

We need to think carefully about this. There are many very damaged people in the Colorado supermax under study. Quite a few suffer acute incidents of psychosis and commit suicide during the course of the study while others experience many disturbing symptoms, but because they are in isolated confinement, they are not being given the intense treatment their conditions require. Does it make any sense at all to conclude that supermax confinement does no harm?

*Endnotes*

*Dr. Grassian is a Board-certified psychiatrist and was on the teaching staff of the Harvard Medical School continually from 1974 until 2002. He has had extensive experience evaluating the psychiatric effects of stringent conditions of confinement, and has served as an expert in a number of both individual and class-action lawsuits addressing this issue. His observations and conclusions regarding the psychiatric effects of such confinement have*

been cited in a number of federal court decisions. Much of this work is described in "Psychiatric Effects of Solitary Confinement", published in the Washington University Journal of Law and Policy, 2006, vol. 22, pp. 325–343. Dr. Kupers is Institute Professor at The Wright Institute and practices psychiatry in Oakland. He provides expert testimony as well as consultation and staff training regarding the psychological effects of prison conditions including isolated confinement in supermaximum security units, the quality of correctional mental health care, and the effects of sexual abuse in correctional settings. He is the author of Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (1999), a co-editor of Prison Masculinities (2002), and Contributing Editor of Correctional Mental Health Report.

1. See Grassian, supra note 1 for references to the studies referred to in the text.

2. Scharff-Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature. In M. Tonry (Ed.), Crime and Justice (Vol. 34, pp. 441–528). Chicago: University of Chicago Press. See also Amicus Brief to the Supreme Court of the United States. (2005). *Brief of professors and practitioners of psychology and psychiatry as amicus curiae in support of respondents.* Supreme Court of the United States, No. 04-495.

3. Mears, D.P. & Watson, J. (2006). Towards a fair and balanced assessment of supermax prisons. *Justice Quarterly, 23*(2), 232–270; Way, B., Miraglia, R., Sawyer, D., Beer, R., & Eddy, J. (2005). Factors related to suicide in New York state prisons. *International Journal of Law and Psychiatry, 28*(3), 207–221; Patterson, R.F. & Hughes, K. (2008). Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, *Psychiatric Services, 59*(6), 676–682.

4. The authors point out that to be a controlled study, the study must randomly assign subjects to each group, whereas in this study, the subject inmates were assigned to Ad Seg or to GP by the Correctional staff, not by the study group.

5. Dunlap v. Zavaras, USDistCt, Colorado, Civ. No. 09-CV-01196-CMA-MEH. Deposition of Maureen O'Keefe, October 5, 2010, pages 136–137.

6. O'Keefe deposition, p. 187.

7. E.g., "Longitudinal Study of the Psychological Effects of Administrative Segregation", presentation at 2010 Annual Meeting of American Psychological Association, San Diego, August 14, 2010.

8. Ironically, in deposition, when Ms. O'Keefe was confronted with this massive discrepancy in crises among prisoners with mental illness in Ad Seg versus those in GP, she offered that maybe those in Ad Seg were a sicker group. Under the pressure of deposition, she seems to have momentarily forgotten that her study was founded upon a notion that there was a "control group," i.e., that the two groups were psychiatrically comparable! O'Keefe deposition pp. 196–198.

9. Op. cit. #4, Mears. ...

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*PSYCHOLOGICAL, from page 2*

inmates were held in segregation at their originating facility. Therefore, a "pre-baseline" measure was collected as close to the AS hearing as possible, which meant that the CSP groups completed six test intervals rather than five. The time between the pre-baseline and baseline measure varied according to how long the inmate was on the wait-list. The median time between pre and baseline tests was 99 days. ...

Assessment tools were selected to comprehensively cover the variety of psychological constructs associated with AS [based on the literature]. The primary constructs assessed in this study were as follows: (1) anxiety, (2) cognitive impairment, (3) depression/hopelessness, (4) hostility/anger control, (5) hypersensitivity, (6) psychosis, (7) somatization, and (8) withdrawal/alienation. Additionally, malingering, self-harm, trauma, and personality disorders were assessed. ...

The 12 self-report instruments used in this study were: (1) Beck Hopelessness Scale, (2) Brief Symptom Inventory, (3) Coolidge Correctional Inventory, (4) Deliberate Self-Harm Inventory, (5) Personality Assessment Screener, (6) Prison Simulation Inventory [created for this study], (7) Profile of Mood States, (8) Saint Louis University Mental Status, (9) State-Trait Anxiety Inventory, (10) Structured Inventory of Malingered Symptomatology, (11) Trail Making Test, and (12) Trauma Symptom Inventory.

In addition to self-report assessments, ratings of psychological functioning were obtained from clinical staff and ratings of behavior in the housing unit were obtained from correctional staff. The Brief Psychiatric Rating Scale (BPRS) was completed by clinical staff and the Prison Behavior Rating Scale (PBRS) was completed by correctional staff.

Most assessments were collected at each testing period, although personality disorders, self-harm, and trauma history were not.

Lengthy appendices provide relevant information regarding the instruments used, strengths of their psychometric properties and descriptions of the composite scores used for analysis in this research.

The conditions of confinement at CSP included the following descriptions,

Colorado State Penitentiary (CSP) opened in 1993 as a 756-bed male AS facility in its entirety. CSP has six identical pods, or living units. Each day hall contains 15 to 16 offender cells separated onto two tiers with each tier having 7 or 8 cells, a shower, and a recreation room.

The cells in CSP are 80 square feet with 35 square feet of unencumbered floor space and contain a bunk, toilet, sink, desk, and stool. Each of these items is made of metal and is mounted to the wall or floor for security. Every cell has a 5" × 45" window on the exterior wall above the offender's bunk through which the offender can see outside. There is also a window on the cell door that faces the day hall. Depending on the pod, the window is either 3.5" × 20.5" or 5" × 15". Neither of these windows opens, which precludes the offender from receiving outside air while in his cell.

Per CSP policy, offenders wanting to participate in recreation are generally permitted at least one hour five times per week (as well as to shower for 15 minutes three times per week which generally coincides with an offer to exercise). The recreation room is a 90-square foot cell that contains a pull-up bar mounted to the wall. No other exercise equipment is allowed. The only opportunity offenders have to receive fresh outside air is through two 5" × 60" grated windows on the exterior wall of the recreation room. On the interior, a glass wall faces the V-shaped day hall, so the offender in recreation is fully visible. Though prohibited by the facility, an offender in the recreation room may call out exercises to other offenders who in turn workout in their cells.

*Interpersonal Communication.* Each cell has an intercom system through which correctional officers can contact each offender from the unit's control center. While the intercom system provides a means for correctional staff and offenders to communicate with each other relatively easily, it does not afford offenders the opportunity to communicate with one another. Many offenders at CSP have become skilled in sign language. Since each day hall is V-shaped and cell doors have windows, offenders are able to communicate with

each other using sign language. This aids in keeping the noise level down in the day hall and gives inmates the opportunity to speak to each other without the risk of staff overhearing. At times, however, many inmates simply yell through their cell door so that other offenders can hear. When this happens, the day hall can become very noisy.

Due to the safety concerns of the facility and the fact that moving an AS offender from his cell is staff intensive, offenders in AS receive many services at their cell door. At CSP, officers make rounds every 30 minutes to do a visual check into the cell of every offender. Mental health clinicians are required to do monthly rounds as well. In addition to rounds, offenders receive their library service and educational services at their cell door. Once a week, a librarian picks up library kites, or requests, and distributes books and magazines to offenders who put in a kite the previous week.

CSP also has an incentive based programming system. CSP's incentive-based programming consists of three quality of life (QOL) levels. Each level brings with it more privileges; however, these privileges must be earned by the offender through appropriate behavior and compliance with CSP rules. This program includes the opportunity to earn the privilege of having a television in their cell.

Findings reported by the authors included the following:

The results of this study were largely inconsistent with our hypotheses and the bulk of literature that indicates AS is extremely detrimental to inmates with and without mental illness. ... Consistent with other research, our study found that segregated offenders were elevated on multiple psychological and cognitive measures when compared to normative adult samples [references omitted]. However, there were elevations among the comparison groups too, suggesting that high degrees of psychological disturbances are not unique to the AS environment. The GP NMI group was the only one that was similar to the normative group on a number of scales.

In examining change over time patterns, there was initial improvement in psychological well-being across

*See PSYCHOLOGICAL, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*PSYCHOLOGICAL, from page 12*

all study groups, with the bulk of the improvements occurring between the first and second testing periods, followed by relative stability for the remainder of the study. On only one measure—withdrawal—did offenders worsen over time, but this finding was only true for the two NMI groups, so it is not attributable to AS. Even given the improvements that occurred within the study timeframe, the elevations in psychological and cognitive functioning that were evident at the start of the study remained present at the end of the study.

Another hypothesis was that offenders with mental illness would deteriorate over time in AS at a rate more rapid and more extreme than for those without mental illness. Patterns indicated that the MI groups (CSP MI, GP MI, SCCF) tended to look similar to one another but were significantly elevated compared to the NMI groups (CSP NMI, GP NMI), regardless of their setting. ... As hypothesized there was a differential time effect for the MI and NMI groups on several composite measures (i.e., anxiety, hostility-anger control, hypersensitivity, somatization), but the interactions were in the opposite direction of our hypothesis; on average, the CSP NMI group did not change while the CSP MI group improved.

We stated that offenders in segregation would develop an array of psychological symptoms consistent with the SHU syndrome. As already discussed, all of the study groups, with the exception of the GP NMI group, showed symptoms that were associated with the SHU syndrome. These elevations were present from the start and were more serious for the mentally ill than non-mentally ill. In classifying people as improving, declining, or staying the same over time, the majority remained the same. There was a small percentage (7%) who worsened and a larger proportion (20%) who improved. Therefore, this study cannot attribute the presence of SHU symptoms to confinement in AS. The features of the SHU syndrome appear to describe the most disturbed offenders in prison, regardless of where they are housed. In fact, the group of offenders who were placed in a psychiatric care facility (SCCF) had the greatest degree

of psychological disturbances and the greatest amount of negative change.

Finally, in this study, we conducted some exploratory predictive analyses to determine if there were individual characteristics that could identify who may be at greater risk of psychological harm from segregation. There were no individual predictors that showed strong effects for predicting change. This could indicate that we did not have the correct predictors or that patterns of decompensation are individualized (i.e., not predictable), but it is more likely that the relative stability over time makes it difficult to predict change. A review of the findings warrants a discussion of plausible alternative explanations that might account for our results. The use of a repeated measures design enabled us to determine that change was occurring and in which direction. Even given the debate about whether or not harmful effects resulted from AS, it was never suggested that inmates might improve as this study found. The presence of comparison groups avoids an attribution error; the changes, improvements in this case (i.e., 20%), are not due to segregation. ...

Limitations of this study described by the authors included the following,

1. This study may not generalize to other prison systems, especially those that have conditions of confinement more restrictive and/or harsher than CSP.

2. There are likely other negative consequences of AS that were not studied in this project.

3. This study did not address the conditions required to *improve* inmates' mental well-being while in segregation. Although it is encouraging that many inmates with mental illness may not get worse in segregation, this study appears to indicate that many do not get better and remain symptomatic.

4. This study examined group averages. It was not designed to identify if certain individuals might be worsened by the conditions of AS; rather the purpose was to examine whether offenders on the whole, both mentally ill and non-mentally ill, are harmed by long-term segregation. Also, in the design of this study, a general linear trend in the data was assumed, which meant that the study

was not able to capture nonlinear changes over time that might have occurred. It is possible that a person in segregation could have had one or more brief episodes, possibly even severe episodes, of psychopathology that were not reflected in the data because testing occurred at three month intervals and these would not have been reflected in trend analyses of their psychological functioning. This study was not designed to assess brief changes in psychological functioning, however serious.

COMMENT: This study was remarkable from several perspectives. Given the hypothesis that structured the research and the significant effort to minimize methodological problems identified in similar attempts to study this issue (based on a comprehensive literature review), it was remarkable that the Colorado Department of Corrections not only allowed this research but had active participation from the highest levels on the advisory board and facilitated the difficult data gathering procedures. It was clear that the policy makers wanted empirical data to guide future policies, procedures, and practices.

Equally remarkable were the findings of this study. At the Colorado State Penitentiary, which is a supermax facility, this study did not support the concept of a SHU syndrome that was caused by placement in a SHU environment. However, it is uncertain whether these findings are generalizable to prison environments other than at CSP. Even more surprising was the small percentage of inmates with a serious mental illness who demonstrated deterioration during their long-term supermax confinement. In fact, the group of offenders who were placed in a psychiatric care facility (SCCF) had the greatest degree of psychological disturbances and the greatest amount of negative change. What does this all mean?

The SCCF findings are significant and may explain some of the reported findings. The inmates sent to SCCF were those who were the most symptomatic from a psychiatric perspective (i.e., required the highest level of mental health care among the various research populations). If these inmates had been sent to AS in contrast to SCCF, it is very likely that the findings would have demonstrated a statistically

*See PSYCHOLOGICAL, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031806

*PSYCHOLOGICAL, from page 13*

significant clinical deterioration for AS MI inmates, which would have been consistent with one of the study's hypotheses. Therefore, future studies should differentiate the MI groups based on needed level of mental health care.

Although this study indicated that only a small percentage of inmates with mental illness deteriorated in the AS environment, such results should not be interpreted to indicate that there is little harm associated with housing inmates with mental illness on a long-term basis in an AS environment. The clinical deterioration of any inmate is of concern and this study was unable to determine the factors predictive of such clinical deterioration. This is of particular concern in the context of the high incidence of suicides nationwide in AS environments as compared to general population housing units. This study was not designed to, and did not assess, the nature of the treatment provided to inmates with mental illness during the study period. This is a critical point because throughout the study inmates with mental illness demonstrated significant symptoms using the various study measurements as compared to the other inmate study participants without mental illness. The study did not address whether the treatment was adequate or if adequate treatment was possible to provide in a 23 hour per day locked down setting.

The above issue can be better understood using an analogy involving an inmate with very high blood glucose due to diabetes. It is possible that if such an inmate was placed in AS, his blood glucose would not get worse and, in fact remain the same. However, such an outcome would not be an acceptable one, since with proper treatment the inmate's blood glucose could be lowered to an acceptable range. If such an inmate's blood glucose remained high while in the AS environment due to access issues to adequate health care, few people would argue that the AS environment was not only detrimental but contributory to a standard of care violation if not a constitutional one. It is not hard to understand that adequate treatment for an inmate with mental illness is generally not possible in an AS environment if the 23 hour per day lockdown characteristic remains. Therefore, it would not be surprising that such inmates may not clinically deteriorate but likely would not get better (i.e., would remain symptomatic) in such environments.

It is also possible that inmates did clinically deteriorate between testing intervals but improved by the time the testing instruments were again administered. It is also possible that there was a Hawthorne effect that was a protective factor in minimizing clinical deterioration.

Regarding the presence or absence of a SHU syndrome, it is possible that the study's instruments were not sensitive to symptoms of the SHU syndrome although it is unlikely based on baseline data and the selection of the instruments as described in the 163-page report. Specifically, baseline data did demonstrate

symptoms consistent with the SHU syndrome but as previously explained the symptoms were not attributable to the AS environment. For reasons which include the limitations of the study as previously summarized by the authors, this project raises serious questions concerning causation relevant to inmates in an AS environment who demonstrate symptoms of a SHU syndrome. Specifically, this study essentially stated that such symptoms are not caused by the AS environment, at least in the Colorado State Penitentiary AS environment.

Finally, it would be an improper use of this study to state that it either advocates for the use of long term segregation or indicated that there is no harm in the use of such confinement. It is hoped that this study will facilitate further research into this very important area.

*References*

Grassian S, Friedman N. Effects of sensory deprivation in psychiatric seclusion and solitary confinement. International Journal of Law and Psychiatry 1986; [8]: 49–65.

O'Keefe ML, Klebe KJ, Suacker A, Sturm K, Leggett W: One Year Longitudinal Study of the Psychological Effects of Administrative Segregation. Funded by and submitted to the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, October 31, 2010.

*Dr. Metzner was a member of the research project's advisory board.*

*Ms. O'Keefe was the principal investigator of the NIJ research project summarized in this report.*                                                   ∎

---

*SEGREGATION STUDY, from page 4*

the distribution of scores across the sample. Since none of these conditions obtains, we are left to guess.

Another slender observation, apparently leading in the other direction, concerns the changing scores of the two NMI groups (CSP and GP) on the Prison Behavior Rating Scale (PBRS), a British instrument adapted to Colorado and completed by corrections officers observing the behavior of inmates. For the two scores displayed (p. 56)—the anti-authority scale and especially the total PBRS scores—we see rapidly rising scores over the first part of the study for the GP group, which then leveled off, and an inverse pattern for the CSP group. In English: in terms of officer observations, the GP group deteriorated over the first six months, and the CSP group got better. We can only (and

here will not) speculate about why the GP NMI group deteriorated—or acted out more vociferously—after being returned to GP. About the CSP group, the authors later note (p. 78) that the decrease in scores,

... would be an indicator that staff may be perceiving improvements, but the significant differences were from the first to the second assessment when the majority of participants changed facilities, which suggests that this is perhaps a measurement error rather than a true improvement.

This comment brings us full circle, to our opening discussion of the baseline measures in punitive segregation; but it also epitomizes the methodological limitations of the Colorado study. Whether CSP inmates were happier once they moved from punitive segregation to the relative comforts of AS

(especially beyond the first, stripped-down week) is not considered; nor is there discussion of the extent to which, under the total surveillance conditions of AS, inmates learned to accommodate themselves to staff expectations. Perhaps the improvement was not a measurement error but a reflection of the fact that, on average, human beings can get used to anything. Should this give us any comfort?

## What Is Not Measured

Pending a sophisticated assessment of this study's psychometric methodology, as well as more fine-grained analysis of distributions and patterns on those measures found to be robust, we offer one final argument. Colorado justifies the punitive regime into which AS inmates are first placed by calling it "Level I" of an "Incentive" system. If the study's measures were the right ones to answer the

See SEGREGATION STUDY, next page

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*SEGREGATION STUDY, from page 14*

right question, however, inmates would have no incentive to leave solitary confinement. Except for those (allegedly nonexistent) protection cases who prefer to remain segregated, it would be a matter of indifference to inmates whether they lived in solitary confinement or returned to GP. Clearly most prisoners are not indifferent to this choice; if they were, the entire deterrence regime for prisoner discipline would have no function. Clearly, most prisoners would prefer to live among others, and some go to great lengths to get themselves out of solitary. Either the methods employed in this study are ill suited to answering the important question about the effects of solitary confinement, or they are (on average) well suited to answering the wrong question, i.e., the question of adaptation.

In interviews with maximum custody inmates over the past 12 years, we have been struck by how calm, reasonable, and well-organized most of them have appeared. In this respect, our experience is consistent with a positive answer to the authors' question "whether prisoners are able to psychologically adapt to the conditions of AS." We have suggested, however, several respects in which this interpretation is unfounded: first, that average values mask significant variations among inmates' responses; furthermore, the study's separation of psychometric measures from the social context blocks understanding of what the measures are telling us. Under both of these fault lines, we suspect, lies a fundamental gap in methodology: the exclusive reliance on the available psychometric measures of psychological states without reference to what the states are about. In the Washington studies, looking at participants chronologically often reveals a history of dramatic breakdowns and desperate measures in AS, which might not have been expected from how they looked and sounded in interviews (Lovell, 2008). These behaviors, and the beliefs and emotions that produced them, were not abstract instances of anger, depression, or whatever is measured by psychometric instruments: rightly or wrongly, they were *about something*: that yesterday the CO slammed my cuffport when he delivered the food tray; that last year I was forced to undergo an anal cavity search; that I've been knocked down in the

level system with no foreseeable prospect of release from AS; that I'm proud to go to the hole in solidarity with my brothers; that voices are coming at me through the security lamp in my cell; that I've got to get away from these four walls.

The Colorado study will be useful if it forces critics of supermax confinement to re-examine their assumptions and methods. But no general policy conclusions should be drawn from this study without an equally systematic examination, over time, of the diverse reasons for AS placement, the variety of prisoners' attitudes and what those attitudes are about.

*References*

Toch, Hans. 1992. Living in Prison: The Ecology of Survival. Washington DC: American Psychological Association (APA Books).

Lovell, David. 2010. A profile of Washington inmates on intensive management status. Olympia. Washington Department of Corrections (unpublished report).

Pacholke, Dan. 2010. (Deputy Assistant Secretary, Division of Prisons, Washington Department of Corrections.) Personal communication.

Lovell, David . 2008. Patterns of disturbance in a supermax population. *Criminal Justice and Behavior,* 35(8): 985–204.                          ■

---

*HUMAN RIGHTS, from page 6*

mentally ill inmate access to valuable out-of-cell therapeutic interventions for a week may be tolerable, but may become inhumane when the denial persists for months. Existing human rights jurisprudence leaves little doubt that prolonged supermax confinement in the United States cannot be squared with respect for inmates' humanity. It can also violate the prohibition on cruel, inhuman or degrading treatment, and, depending on the specific circumstances, may even amount to torture.[12]

While human rights authorities recognize that solitary confinement can lead to psychological deterioration, the creation or exacerbation of mental illness is not a prerequisite for a human rights violation. Deep emotional pain suffices. There may be no way to measure empirically the misery produced by prolonged supermax confinement, but there is abundant testimony to the suffering many isolated inmates endure.[13] Even if, as the Colorado study suggests, CSP does not cause inmates confined there to psychologically deteriorate, that does not mean it passes muster under human rights law. Because

solitary confinement can be so painful—and can be literally unendurable (witness the high rate of suicide in segregation)—and because it too often fails to respect inmates' basic human dignity, human rights authorities are unanimous that it should an exceptional measure imposed only when necessary, only for so long as necessary and with the specific conditions entailing no more deprivation than is necessary. Even when solitary confinement is imposed consistent with these criteria, increased opportunities for social interaction—be it with staff, other inmates, or other people—should be provided to mitigate the impact of isolation. There is widespread agreement that prisoners with serious mental illness should never be subjected to solitary confinement. Finally, if legitimate considerations of prison safety and security mandate extended periods of solitary confinement, the conditions must be modified to even further ameliorate the isolation and to recognize the humanity of the person so confined.[14]

U.S. courts to date have not incorporated the human rights framework into their jurisprudence. But correctional officials should not wait for courts to tell them what to do. They remain obligated under treaties to which the United States is a party to protect

and respect the human rights of prisoners. I would hope the Colorado study spurs considerable reflection and policy changes both in the Colorado DOC and elsewhere.

*References*

1. Madrid v. Gomez, 889 F. Supp. 1146, 1265 (N.D. CA 1995).

2. Over the years, class action litigation in federal courts has prohibited or substantially limited or changed conditions of segregation confinement for mentally ill inmates in Alabama, Arizona, California, Connecticut, Florida, Indiana, Michigan, Mississippi, New Jersey, New Mexico, New York, Ohio, Wisconsin, and Texas.

3. O'Keefe ML, Klebe KJ, Stucker A, Sturm K, Leggett W. One Year Longitudinal Study of the Psychological Effects of Administrative Segregation. Funded by and submitted to the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, October 31, 2010.

4. Metzner JL and O'Keefe ML. Psychological Effects of Administrative Segregation: The Colorado Study. Correctional Mental Health Newsletter 2011.

5. Fellner J. Out of Sight: Super-Maximum Security Confinement in the United States. Human Rights Watch, 2000, available at http://www.hrw.org/en/reports/2000/02/01/outsight-supermaximum-security-confinement-us; Fellner, J. Afterwords: A Few Reflections. Criminal Justice

*See HUMAN RIGHTS, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

Case 2:12-cv-00601-ROS   Document 1104-7   Filed 09/08/14   Page 245 of 276

**Correctional Mental Health Report**
Civic Research Institute, Inc.
4478 Route 27 P.O. Box 585
Kingston, NJ 08528



045.J630908855
$1.089
04/27/2011
Mailed From 08528



PRIVATE ADDRESS –
CONFIDENTIAL INFO

1

---

## SUBSCRIPTION INFORMATION

Correctional Mental Health Report is published six times annually. A basic one-year subscription is $165 plus $14.95 postage and handling. Non-exempt New Jersey and New York residents please add appropriate sales tax.

TO ORDER
Complete the information below and mail to:
Civic Research Institute
P.O. Box 585
Kingston, NJ 08528
or order online: www.civicresearchinstitute.com

☐ Enter my one-year subscription to Correctional Mental Health Report at $165 plus $14.95 postage and handling.

☐ Enter my order for The Mentally Disordered Inmate and the Law, 2nd Edition by Fred Cohen, LL.B., LL.M., for $220 plus $17.50 shipping and handling.

Name _____

Agency _____

Address _____

City _____

State  Zip Code _____

Phone Number _____

E-Mail Address _____

Purchase Order # _____

---

*HUMAN RIGHTS, from page 15*

and Behavior 35:1079-1087, 2008. Fellner J and Mariner J. Cold Storage: Super-Maximum Security Confinement in Indiana. Human Rights Watch, 1997, available at http://www.hrw.org/en/reports/1997/10/01/cold-storage.

6. Needless to say, there is much to criticize about CSP, starting with, of course, the fact that mentally ill inmates are confined there. Other notable objectionable features include the fact that there's no outdoor recreation. Inmates have "recreation" in an empty indoor cell on the tier, which has open vents to let in fresh air. Inmates are escorted in full restraints to and from the recreation cell.

7. There may have been incidents of self-harming behavior/ideation or psychotic symptoms that occurred without staff's knowledge and therefore are not included in the reported events.

8. The Colorado Department of Correction uses a five-level mental health classification system, with higher numbers corresponding to higher mental health needs. Inmates at level 3 are deemed to need mental health services. Most (70%) of the CSP mentally ill study participants were at level 8, 17% were at levels 4 and 5.

9. See, e.g., Fellner J and Mariner J. Cold Storage: Super-Maximum Security Confinement in Indiana. Human Rights Watch, 1997, available at http://www.hrw.org/en/reports/1997/10/01/cold-storage.

10. Article 10, International Covenant on Civil and Political Rights.

11. Article 7, International Covenant on Civil and Political Rights, Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

12. E.g., United Nations Human Rights Committee, General Comment 20, Article 7, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 30 (1994), para. 6; United Nations Human Rights Committee: Consideration of reports submitted by States parties under Article 40 of the Convention, concluding observations of the Human Rights Committee, United States of America. New York: UNHRC, UN Doc. CCPR/C/USA/CO/3, 2006; United Nations Committee Against Torture: Consideration of reports submitted by States parties under Article 19 of the Convention, Conclusions and Recommendations of the Committee Against Torture, United States of America. New York: UN Committee Against Torture, UN Doc. CAT/C/USA/CO/2, 2006; Interim Report of the UN Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. UN General Assembly. New York: United Nations, UN Doc. A/63/ 175:18-21, 2008.

13. Reyes H: The worst scars are in the mind: psychological torture. International Review of the Red Cross 89:591-617, 2007.

14. In addition to sources cited above, see generally, Rodley NS and Pollard M. The Treatment of Prisoners under International Law, 3rd Ed., Oxford U. Press 2009; Nowak M. and McArthur E. The United Nations Convention against Torture: A Commentary, Oxford University Press, 2009; Shalev S. Sourcebook on Solitary Confinement, Mannheim Centre for Criminology, London School of Economics and Political Science, 2008, available at http://solitaryconfinement.org/uploads/sourcebook_web.pdf; The Istanbul Statement on the Use and Effects of Solitary Confinement, Adopted at the International Psychological Trauma Symposium 2007, available at http://www.solitaryconfinement.org/uploads/Istanbul_expert_statement_on_sc.pdf. ■

---

*Missing or damaged issues?*
Call Customer Service at 609-683-4450.

Reprints: Parties wishing to copy, reprint, distribute or adapt any material appearing in *Correctional Mental Health Report* must obtain written permission through the Copyright Clearance Center (CCC). Visit www.copyright.com and enter *Correctional Mental Health Report* in the "Find Title" field. You may also fax your request to 1-978-646-8700 or contact CCC at 1-978-646-2600 with your permission request from 8:00 to 5:30 eastern time.

©© COPYRIGHT CLEARANCE CENTER

PLTF-PARSONS-031809

# Appendix D



Department of
**Corrections**
WASHINGTON STATE

Solitary Confinement

Administrative Segregation

Intensive Program Management

Washington State Department of Corrections

Bernard Warner, Secretary

PLTF-PRISONER1190

# Offender Population :

▲ 18,000

▲ Seventy-percent serving time for crimes against a person

▲ Sixty-six percent are high risk to reoffend

▲ 25% STG

| Type of Offenses | |
|---|---|
| Murder 1 and 2 | 13.4% |
| Manslaughter | 1.9% |
| Sex Crimes | 20.8% |
| Robbery | 10.6% |
| Assault | 23.5% |
| Property Crimes | 18.1% |
| Drug Crimes | 9.0% |
| Other | 2.7% |

| Risk to Re-offend | |
|---|---|
| High Violent | 36.5% |
| High Non-Violent | 29.6% |
| Moderate | 18.5% |
| Low | 14.0% |
| Not Yet Classified | 1.4% |

Source: DOC Quarterly Fact Card, December 31, 2012

Department of
**Corrections**

PLTF-PARSONS-031821

# Washington Institute for Public Policy: Evidence Based Corrections (EBC) Model

- Correctional services and interventions can be effective at reducing recidivism if they....

  ○ Target criminogenic thinking

  ○ Include cognitive behavioral therapy

  ○ Consider responsivity factors such as mental health and cognitive impairment

  ○ Change how staff engage with offenders

  ○ Include quality assurance and evaluation



PLTF-PARSONS-031822

# Vera and DRW

- DOC had a long standing relationship with state university that provided data, but not strategies

- In 2011, Vera Institute of Justice (Vera) was invited to:

  ○ Assess segregation policies and practices

  ○ Analyze effects of segregated confinement

  ○ Make recommendations for handling protective custody, disciplinary, and intensive management populations

- Engaged Disability Rights Washington (DRW) about offenders with mental illness and cognitive impairment



PLTF-PARSONS-031823

# Vera's Snapshot of Solitary Confinement

**Table 1. Percent of Confined Male Population by Type of Segregation (April, 2011)**

|  | Number | Percent |
|---|---|---|
| IMU | 505 | 3.2% |
| Other segregation (DS, AS)* | 334 | 2.1% |
| General Population | 15,114 | 94.6% |
| **Total Confined** | 15,979 | 100% |

* Includes 72 beds that cannot be isolated in data but remain at/near capacity.

**Table 2. Comparison of IMU and Non-IMU Male Populations (April, 2011)**

|  | IMU | Non-IMU |
|---|---|---|
| Number of Prisoners | 505 | 15,474 |
| Average Age | 32 | 37 |
| Ethnicity |  |  |
| % Hispanic | 23.8% | 7.7% |
| % Non-Hispanic | 76.2% | 92.2% |
| Race |  |  |
| % White | 75.4% | 71.1% |
| % Black | 17.6% | 19.6% |
| % Other | 7.0% | 9.3% |
| % with STG Affiliation | 68.9% | 23.8% |
| % Mentally Ill* | 30.5% | 12.6% |

* Includes offenders identified as "dangerously mentally ill,"
"seriously mentally ill," or mentally ill according to S code of 3 or
above in PULHESDXT.

Small amount of offenders in
solitary confinement but
disproportionate amount
identified as STG or mentally ill



Department of
**Corrections**
STATE
PLTF-PARSONS-031824

# Before Vera

- Vera's findings included areas for improvement

  ○ IMS as an extended hold for SEG

  ○ Time-driven system

  ○ Different types of offenders managed the same

  ○ Over-reliance as disciplinary mechanism

  ○ High level of restriction, low level of programming

  ○ Lack of face-to-face interaction and no opportunity for congregate activity



PLTF-PARSONS-031825

# After Vera

- Shortened amount of time offender may be held on Administrative Segregation

- Mission–specific housing allows for targeted procedures and programming toward specific offender populations

- Introduction of cognitive–behavioral programs which includes congregate activity

- Structure segregation based on compliance and graduated behavior change



PLTF-PARSONS-031826

# Mission Specific Housing

Maximizing a facility's capacity and programming strengths to meet risk and need of a diverse IMS population





PLTF-PARSONS-031827

# Washington State Penitentiary – IMU





Department of
Corrections
PLTF-PARSONS-031828

➤ Targets STG offenders

  ○ General population gang units located at WSP

➤ Cognitive Behavioral Programs

  ○ Four phases of behavior change and development

  ○ Incremental reinforcers to encourage behavior change

  ○ Anger Control Training (ACT)

# Monroe Correctional Complex– IMU






PLTF-PARSONS-031829

- ▲ Targets mentally ill offenders

  - ○ Intensive Treatment Unit (ITU) mental health facility also located at MCC

- ▲ 1 MHP per 50 offenders to support:

  - ○ Routine Mental Health Rounds

  - ○ Individualized Treatment Plan/Behavior Management

  - ○ Cognitive Behavior Therapy

# Clallam Bay Corrections Center

▲ Targets chronic IMU recidivists

○ Of the 131 program graduates ITP; 107 have not returned

▲ Intensive Transition Program (ITP)

○ Provides offenders pro-social skills to successfully live in general population

○ Includes mixed CBT curriculum with phases and congregate activity

○ structured interactive programming



Department of
**Corrections**
PLTF-PARSONS-031830

# Staff Engagement

- **Give** staff professional development tools
  - Core Correctional Practices
  - Motivational Interviewing

- **Collaborate** with staff to implement system change
  - Having staff build programs, set up classrooms, etc.

- **Engage** staff in offender change
  - Encouraging interaction between offenders and staff through physical setting and interactive tools



PLTF-PARSONS-031831

# Intensive Management Population

## Number of Offenders on IMS by Month/Year



Once hovering at 600, the number of offenders on IMS is now below 400.

PLTF-PARSONS-031832

# Prevention/Deterrance Strategies

- STG offenders
  - Drive violence in general population
  - Highly represented in IMU

- Adopted community Ceasefire model in WSP gang units
  - NOTIFY offenders of expectations and community moral values"
  - Offer HELP through pro-social alternatives to gangs and violence
  - Apply PRIVILEGE RESTRICTIONS to **groups** of offenders for SPECIFIC VIOLENT ACTS



Department of
**Corrections**
STATE
PLTF-PARSONS-031833

# Next Steps

▲ Continue to identify programs that can be applied to the aggregate

▲ Quality assurance

  ○ Did we get the 'right' offenders in the 'right' interventions?

▲ Try to better meet the outlier

▲ Mental health needs by looking at individual diagnosis

▲ Measure outcomes

  ○ Measurement as behavior change not just 'in and out'



PLTF-PARSONS-031834

# Then and Now

➤ FROM suppression and containment TO **intensive programming**

    ○ Created an Offender Change Division

➤ FROM using segregation for punishment TO reserving it only for the offenders who cannot be safely managed in general population

➤ FROM managing different types of offenders the same TO mission– specific housing to target **risk, need, responsivity**

➤ FROM IMS structured as a time–driven system TO emphasizing behavior change through programming and **congregate activity.**



PLTF-PARSONS-031835

# Reflections

➤ Maintain a transparent system

➤ Collaborate with advocacy groups and researchers

➤ Helped identify strategies to manage outliers with aggregate resources

➤ Make sure the public sees the benefits

➤ Be curious

➤ Ask tough or controversial questions with critical discourse in mind

  ○ Should we be using solitary confinement for punishment?



Department of
**Corrections**
STATE

PLTF-PARSONS-031836

# The Seattle Times
Winner of Nine Pulitzer Prizes

## Local News

Home | News | Business & Tech | Sports | Entertainment | Living | Homes | Travel | Opini

Originally published January 7, 2013 at 7:33 PM | Page modified January 7, 2013 at 10:19 PM

# State prisons rethink solitary confinement

Washington's prisons are at the forefront of a new approach to solitary confinement, finding that a new focus on rehabilitation may calm some inmates' behavior in prison and prevent violence once they are back on the street.

By Jonathan Martin
Seattle Times reporter

Share:

Recommend  215

Comments (114)

E-mail article

Print

CLALLAM BAY CORRECTIONS CENTER — Being alone in your own head 23 hours a day in a 48-square-foot poured-concrete cell makes, inmates say, the mad madder and the bad even worse.

"One guy told me he had, like, 15 faces on issue paper, and he had names on them," said inmate Michael Richards, who spent about seven of the last 11 years in solitary confinement at Clallam Bay Corrections Center. "He'd say, 'Hey Bob, good morning.' He'd talk to them through the day, just to keep that contact, because he couldn't talk to anyone else."

For centuries, solitary confinement has been the big stick of prisons, the harshest means to deter



PREV  1 of 5  NEXT

BETTINA HANSEN / THE SEATTLE TIMES

Earnest Collins says he's open to change after fights twice landed him in the Intensive Management Unit at Clallam Bay. "If you're not mentally strong, it'll drive you crazy," said Collins. "You hear a lot of crazy things in IMU."

*"These are the guys who are going to be in the grocery-store line next to your daughter one day... this is an ethic and legal responsibility we have to the community."*



Department of
**Corrections**
W A S H I N G T O N   S T A T E
PLTF-PARSONS-031837

# EXHIBIT 16

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: dpochoda@acluaz.org
       kflood@acluaz.org
       jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Victor Parsons, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED BELOW]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,<br><br>           Plaintiffs,<br><br>     v.<br><br>Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,<br><br>           Defendants. | No.  CV   12-00601-PHX-NVW (MEA)<br><br>**SUPPLEMENTAL REPORT OF ELDON VAIL** |

1.     I submit this report as a result of additional materials received from the Defendants. These materials were not available at the time of my rebuttal report. My opinions have not changed as a result of my review of this additional information.

2.     In my rebuttal report,[1] I indicated that I had not yet received a post order for the "rover" position referenced in Dr. Seiter's report. I have now had a chance to review that post order and it confirms my previous conclusion that this position does nothing to ameliorate the extreme social isolation experienced by inmates housed in the Arizona Department of Corrections (ADC) isolation units.[2] In fact, the instruction in this post order is for the rover to limit his verbal interaction with inmates to "a few seconds."[3]  Apparently the purpose of this position is largely to circulate to make sure inmates aren't hurting themselves while housed in the isolation units. I have never heard of a similar position deployed for this purpose in any jurisdiction of which I am familiar. The numerous acts of self-harm, frequent use of force incidents, and pervasive mental health problems apparent in the inmates on these units, which are exacerbated or caused by the conditions of extreme isolation, are deeply concerning   and create serious risks for both inmates and staff. However, ADC's creation of the "rover" position is an inadequate response to the risks its policies and practices create for inmates housed in the system's isolation units.   The safer, more appropriate and professional approach would be to remove mentally ill inmates from the isolation units and improve the conditions of confinement for all inmates who remain incarcerated in those units by decreasing the levels of extreme social isolation and idleness. By creating a "rover" position directly ordered NOT to interact with inmates, ADC fails to confront the fundamental problem in the operation of its isolation units.  The result is that these staff members are likely to interact with inmates only after some harm has occurred. Instead of using staff primarily in crisis intervention roles, ADC should work to orient their staff to talk to the inmates and develop relationships so that they foster an environment where harm is reduced because of the positive interaction between staff and inmates.  Such an environment reduces risks for all.  If ADC created more opportunity for meaningful

---

[1] Vail declaration 1/31/14, paragraph 31.
[2] ADC S000557-000561.
[3] ADC S000560 and 000561.

-2-

interaction between staff and inmates the frequency of self-harm and suicide attempts in the ADC isolation units, and the pain inflicted on all inmates in isolation, but especially the seriously mentally ill individuals would be dramatically reduced.

3.      The materials produced by Defendants also included additional Use of Force (UOF) videos and reports cited in Dr. Seiter's report as the basis for his opinions regarding ADC's use of chemical spray.  Contrary to Dr. Seiter's conclusions, these materials reinforce the concern articulated in my previous reports that ADC's use of chemical sprays on seriously mentally ill inmates, many of whom are also taking psychotropic medications, creates a risk of unnecessary harm.

4.      In a UOF report from Kasson it describes a mentally ill inmate who refuses to submit to restraints in order to be placed in a mental health watch cell.[4] There is no reference in the report that the inmate's actual behavior presented any kind of imminent threat. He simply said that he was unable to move. After being ordered to comply the inmate was sprayed with Oleoresin Capsicum (OC) three separate times and still did not comply. The inmate was then forcibly extracted from the cell. As I said in a previous declaration, "As is the routine practice in many prison systems across the country, mental health interventions should be occurring with all inmates known to be mentally ill prior to implementing use of force in a controlled situation, regardless of whether or not they are housed in a designated mental health unit. In my experience, such interventions will definitely reduce the need to actually use force, which will in turn improve the ability to manage the inmate in the correctional environment, and not inflict unnecessary harm".[5] This example, along with others, supports my opinion that the absence of this requirement in policy and practice in the ADC regarding planned UOF events with mentally ill inmates is deficient and results in use of force that is unnecessary.

5.      A review of the related video of this planned UOF reveals additional problems.[6] In this planned use of force there is very poor planning. The staff are not prepared to protect themselves or the inmate once the UOF event begins. They are not

---

[4] ADC S000177-000188.
[5] Vail declaration 1/31/14, paragraph 30.
[6] ADC S000233, 20121207100952.MP4.

equipped with respirators. Some staff put handkerchiefs over their mouth and nose. After two unsuccessful administrations of OC the staff decide they will need to perform a cell extraction but they are not suited up and prepared to do so. The inmate is left in his cell for approximately ten minutes, exposed to OC while the staff gets suited up in protective equipment in order to perform the cell extraction. Once prepared, the inmate is sprayed again. Staff then developed their tactical cell entry plan in front of the inmate's cell, in full view and hearing of him and the other inmates on the tier. Once the staff do enter the cell you can hear them coughing as they are effected by the OC spray. This lackadaisical custody approach creates a risk of harm to the inmate and to the staff. It is likely a reflection of a common understanding that the situation they are in is not a serious risk and illustrates their casual use of OC on inmates when it is not necessary. A better approach would have been to bring mental health staff to the cell front and attempt to talk the inmate into cooperating. Mental health interventions may not be successful at de-escalating a situation 100% of the time, but in my professional experience and opinion, such an intervention often works and the attempt is absolutely necessary because the goal of policy and practice should be to eliminate the need for use of force. This is especially the case in a situation like this one where there is no imminent threat.  Mental health intervention should be required by policy in such situations. The fact that ADC does not require these interventions increases the unnecessary use of force on inmates with mental illness.

6.      Most troubling to me about this video and in another made available to me[7] is that the staff cuff the inmate behind his back and place him on a gurney face down while they transport him to decontamination and placement in a mental health watch cell. This practice is extremely dangerous and has been associated with positional asphyxia. The US Department of Justice, National Law Enforcement Technology Center instructs, "As soon as the subject is handcuffed, get him off his stomach".[8] This apparently routine practice should be eliminated and ADC should follow the guidance of the DOJ.

---

[7] ADC S000233, 20121227085906.MP4.
[8] US Department of Justice, National Law Enforcement Technology Center, *Positional Asphyxia—Sudden Death*, June 1995, page 2, available at https://www.ncjrs.gov/pdffiles/posasph.pdf.

-4-

7.      This video of the use of force at Florence Kasson unit illustrated another troubling aspect of ADC's treatment of mentally ill prisoners.  During my inspections of ADC facilities in July and August of 2013, inmates told me that placement in a mental health watch cell sometimes occurred simply as punishment and not because someone was actually at risk for suicide or self-harm. The conditions of confinement for the mental health watch cells are much more restrictive than any other kind of confinement I have witnessed in ADC. Inmates are forced to wear suicide smocks and are stripped of personal property. They even have to ask for toilet paper. Quite understandably, most inmates see placement on watch as punishment.  In this video, you can actually hear custody staff threaten to place an inmate on watch as punishment.

8.      In this video the inmate is incapacitated on his stomach with his hands cuffed behind his back and is on a gurney in a hallway.[9] An unidentified staff member says to him that if he starts to fight the officers he will be placed in a watch cell. If he does not, he can return to a regular cell. I believe the implication here is clear. While fighting the officers can never be condoned and must be addressed, the proper response would be to get the inmate into a secure cell where he can't fight the officers. Threatening to place him in a watch cell graphically illustrates that this is about punishment –rather than the prevention of self-harm—and that such a placement is actually meant to be punishment without due process.  It is also another clear illustration of unprofessional conduct in ADC's use of force and its treatment of mentally ill prisoners.

9.      In another use of force video I reviewed from Lumley, the willingness to quickly use OC spray when it might not have been necessary is again illustrated.[10] In this situation the inmate is angry about a recent disciplinary hearing. She is in her cell armed with a weapon and threatens the hearing officer who is not present on the scene. There is another inmate in the cell with her. The officer provides proper notification of the situation and requests a supervisor and a response team.  The officer then coaxes the inmate to lie down her weapon and back away from the cell door so that her cell partner can exit the cell. This occurs as directed but rather than close the door after the cell partner leaves and

---

[9] ADC S000233, 20121227085906.MP4.
[10] ADC S000234.

1    wait for a team, the officer decides to administer several seconds of OC spray while the cell

2    door is opened. The officer then pulls the inmate out of the cell by himself and takes her to

3    the ground. The inmate's face hits the pavement and you can see the blood from the injury

4    caused by this action. The cell door should have been closed after the cell partner exited the

5    cell and the officer should have waited until a team could be assembled. The opportunity

6    for a mental health intervention was missed and if that was unsuccessful, a planned cell

7    extraction could have taken place once the team arrived and the injury to the inmate may

8    well have been avoided. The review by the officer's supervisors failed to see how the

9    officer increased risk to himself and to the inmate from his rash action of unnecessarily

10   initiating use of force on his own. Their internal use of force review process was not

11   meaningful.

12       10.    In my first report I wrote extensively about the ADC's policy of

13   unnecessarily assigning inmates to maximum custody.[11] In my second report I expanded on

14   this concern.[12] The ADC makes no distinction between maximum custody general

15   population and placement in isolation. If an inmate is designated as maximum custody

16   based on Arizona's classification policy, he or she will be placed in an isolation unit,

17   regardless of whether or not such extreme segregation and social isolation is necessary for

18   the actual safety of the inmate or others. In the additional materials made available there is

19   a lengthy study of the ADC classification system.[13] The study concludes that the ADC

20   system is "valid" and makes recommendations for improvement.[14] As I said in my first

21   report, "A prison system's classification scoring system, no matter if it has or has not been

22   validated bears no necessary relationship to the actual conditions of confinement found in

23   that system's prisons".[15] Despite its irrelevance to conditions of confinement and the harm

24

25

---

26      [11] Vail declaration, November 8, 2013, paragraphs 21-25.

27      [12] Vail declaration, January 31, 2013, paragraphs 10- 16.
        [13] Validation of the Arizona Department of Corrections Objective Classification
     System: Final Report, Patricia L. Hardyman, June 26, 2013 (hereinafter "Hardyman

28   report") (ADC_S000747-837).
        [14] The report lists a document entitled "Maximum Custody Placement Process" as
     an ADC classification document provided to the researchers by ADC.  No such document
     was produced to the Plaintiffs although its title indicates that it would clearly fall within the
     scope of discovery requests about the isolation units.  Hardyman report, page 4.
        [15] Vail declaration, January 31, 2013, paragraph 10, lines 17-20.

1   created by the isolation units, however, this study does illustrate one of my points related to
2   the unnecessary use of isolation in the ADC system.  It finds that there are populations of
3   inmates placed in the isolation units in ADC who clearly don't need to be there, especially
4   those with life sentences.[16] As I said in both of my previous reports, placement in isolation
5   simply because of the committing offense is not necessary as many of these inmates are
6   quite capable of living in general population.  However, because of ADC's flawed isolation
7   policies, these inmates are placed at unnecessary risk of harm.

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[16] Hardyman report, page 36.

1    Executed on the 24th day of February, 2014 in Olympia, WA.

Eldon Vail

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:     dpochoda@acluaz.org
           kflood@acluaz.org
           jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:     dspecter@prisonlaw.com
           ahardy@prisonlaw.com
           snorman@prisonlaw.com
           ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:     dfathi@npp-aclu.org
           afettig@npp-aclu.org
           aquereshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:     cnmitchell@jonesday.com
           dkiernan@jonesday.com
           scalderon@jonesday.com
           srauh@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:     jlwilkes@jonesday.com
           tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:     kmamedova@jonesday.com
           jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

1   **ARIZONA CENTER FOR DISABILITY
    LAW**
2   Asim Varma (Bar No. 027927)
    Sarah Kadar (Bar No. 027147)
3   5025 East Washington Street, Suite 202
    Phoenix, Arizona 85034
4   Telephone: (602) 274-6287
    jalewelt@azdisabilitylaw.org
5                   avarma@azdisabilitylaw.org
    skadar@azdisabilitylaw.org
6
7   J.J. Rico (Bar No. 021292)
    **ARIZONA CENTER FOR DISABILITY
8   LAW**
    100 N. Stone Avenue, Suite 305
9   Tucson, Arizona 85701
    Telephone:  (520) 327-9547
10  Email:jrico@azdisabilitylaw.org
                   cdooley@azdisabilitylaw.org
11
12  *Attorneys for Arizona Center for Disability
    Law*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28