# EXHIBIT 17

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone: (602) 650-1854
    Email: dpochoda@acluaz.org
5              kflood@acluaz.org
               jlyall@acluaz.org
6   *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

7   *Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin*
    *Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas,*
8   *Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci,*
    *Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of*
9   *themselves and all others similarly situated*

    **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**
10

    Jennifer Alewelt (Bar No. 027366)
11  Asim Varma (Bar No. 027927)
    Sarah Kader (Bar No. 027147)
12  **ARIZONA CENTER FOR DISABILITY LAW**
    5025 East Washington Street, Suite 202
13  Phoenix, Arizona 85034
    Telephone: (602) 274-6287
14  Email: jalewelt@azdisabilitylaw.org
               avarma@azdisabilitylaw.org
15             skader@azdisabilitylaw.org

16  *Attorneys for Plaintiff Arizona Center for Disability Law*

    **[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**
17
                    UNITED STATES DISTRICT COURT
18
                         DISTRICT OF ARIZONA
19
    Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
20  Dustin Brislan; Sonia Rodriguez; Christina           (MEA)
    Verduzco; Jackie Thomas; Jeremy Smith; Robert
21  Gamez; Maryanne Chisholm; Desiree Licci; Joseph
    Hefner; Joshua Polson; and Charlotte Wells, on       **EXPERT REPORT OF**
22  behalf of themselves and all others similarly        **CRAIG HANEY, Ph.D., J.D.**
    situated; and Arizona Center for Disability Law,
23                      Plaintiffs,

24          v.

    Charles Ryan, Director, Arizona Department of
25  Corrections; and Richard Pratt, Interim Division
    Director, Division of Health Services, Arizona
26  Department of Corrections, in their official
    capacities,
27                      Defendants.
28

                              -1-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

**TABLE OF CONTENTS**

I. EXPERT QUALIFICATIONS ...................................................... 3

II. NATURE AND BASIS OF OPINION ............................................. 6

III. THE ADVERSE PSYCHOLOGICAL EFFECTS OF ISOLATION .......... 9

IV. THE EXACERBATING EFFECTS OF ISOLATION ON MENTAL
ILLNESS ................................................................................. 21

V. THE USE OF SOLITARY CONFINEMENT IN THE ARIZONA
DEPARTMENT OF CORRECTIONS ............................................. 25

A. Summary of Expert Opinions .................................................. 26
1. ADC's Use of Harsh Isolation Units and its Negative
Impact on Mentally Ill Prisoners ......................................... 26
2. Lack of Meaningful Treatment for Prisoners with Mental
Illness in Isolation ........................................................... 30
3. Extreme Social Isolation and Harsh Conditions Put All
Prisoners in Isolation at Risk of Harm ................................. 37
B. Institutional Inspections and Reviews ....................................... 44
1. Perryville Lumley Special Management Unit (SMA) ............... 44
a. Overview of Facility ............................................. 44
b. SMA's Conditions of Confinement Place All
Prisoners Housed There at Risk of Harm...................... 45
c. Excessively Harsh Conditions for Mentally Ill
Prisoners and Lack of Appropriate and
Meaningful Treatment ........................................... 47
2. Florence Central and Kasson Unit ...................................... 58
a. Overview of Facilities ........................................... 58
b. Florence Central's Conditions of Confinement
Place All Prisoners Housed There at Risk of Harm .......... 62
c. Excessively Harsh Conditions for Mentally Ill
Prisoners and Lack of Appropriate and Meaningful
Treatment .......................................................... 66
3. Eyman – SMU I and Browning Unit ................................... 84
a. Overview of Facilities ........................................... 84
b. SMU I and Browning's Conditions of Confinement
Place All Prisoners Housed There at Risk of Harm
c. Excessively Harsh Conditions for Mentally Ill ............... 85
Prisoners and Lack of Appropriate and Meaningful
Treatment .......................................................... 89

VI. CONCLUSION ...................................................................... 103

-2-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

I, Craig Haney, Ph.D, J.D., declare:

1.   I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify.

**I. EXPERT QUALIFICATIONS**

2.   I am a Professor of Psychology at the University of California, Santa Cruz, where I also currently serve as the Director of the Legal Studies Program, and the Director of the Graduate Program in Social Psychology. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards.

3.   I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement. In addition to these scholarly articles and book chapters, I have published two books: Death by Design: Capital Punishment as a Social Psychological System (Oxford University Press, 2005), and Reforming Punishment: Psychological Limits to the Pains of Imprisonment (American Psychological Association Books, 2006).

4.   In the course of my academic work in psychology and law, I have lectured and given invited addresses throughout the country on the role of social and institutional histories in explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

-3-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

5.     I also have served as a consultant to numerous governmental, law enforcement, and legal agencies and organizations, including the Palo Alto Police Department, various California Legislative Select Committees, the National Science Foundation, the American Association for the Advancement of Science, and the United States Department of Justice. For example, in the summer of 2000, I was invited to attend and participated in a White House Forum on the uses of science and technology to improve crime and prison policy, and in 2001 participated in a conference jointly sponsored by the United States Department of Health and Human Services (DHHS) concerning government policies and programs that could better address the needs of formerly incarcerated persons as they were reintegrated into their communities. I continued to work with DHHS on the issue of how best to insure the successful reintegration of prisoners into the communities from which they have come. More recently, I have served as a consultant to the Department of Homeland Security, a consultant to and an expert witness before the United States Congress, and was appointed in 2012 as a member of a National Academy of Sciences committee analyzing the causes and consequences of high rates of incarceration in the United States. (My curriculum vitae is attached to this Report as **Appendix A**).

6.     My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field, demonstrating the power of institutional settings to change and transform the people who enter them.[1]

---

[1] For example, see Craig Haney, Curtis Banks and Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney and Philip Zimbardo, The Socialization into Criminality:   On

-4-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

7.    Since then I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement). In the course of that work, I have toured and inspected numerous maximum security state prisons and related facilities (in Alabama, Arkansas, Arizona, California, Florida, Georgia, Idaho, Louisiana, Massachusetts, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), as well as prisons in Canada, Cuba, England, Hungary, and Mexico. I also have conducted numerous interviews with correctional officials, guards, and prisoners to assess the impact of penal confinement, and statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.[2]

---

Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society: Psychological and Legal Issues. (J. Tapp and F. Levine, eds., 1977); and Craig Haney and Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

[2] For example, Craig Haney and Philip Zimbardo, The Socialization into Criminality: On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223). (J. Tapp and F. Levine, eds., 1977); Craig Haney, Infamous Punishment: The Psychological Effects of Isolation, 8 National Prison Project Journal 3 (1993); Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter and R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, University of Missouri-Kansas City Law Review, 77, 911-946 (2009); Craig Haney, Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," Connecticut Public Interest Law Review, 9, 139-196 (2010); Craig Haney, The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, American Criminal Law Review, 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications

-5-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

8. I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Arkansas, California, Georgia, Texas, and Washington, and in numerous state courts, including courts in Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[3] A list of prior cases in which I have testified at trial or deposition in the past four years and a statement of compensation are attached as Appendix B.

**II. NATURE AND BASIS OF EXPERT OPINION**

9. I have been retained by counsel for the plaintiffs in Parsons v. Ryan to provide expert opinions on three inter-related topics: a) a summary of what is known about the negative psychological consequences of confinement in isolation or "supermax" prisons; b) an explanation of whether and how those negative consequences can be exacerbated for prisoners who are suffering from serious mental illness (""SMI");[4] and, finally, c) based

---

(2012)]; and Craig Haney, Prison Effects in the Age of Mass Imprisonment, The Prison Journal, 92, 1-24 (2012).

[3] For example, see Brown v. Plata, 131 S.Ct. 1910 (2011).

[4] The definition of a serious mental illness or SMI generally includes persons with a current diagnosis or significant recent history of types of DSM-IV-TR Axis I diagnoses (including schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic disorder, psychotic disorder not otherwise specified, major depressive disorders, and bipolar disorder I and II), persons who suffer from other diagnosed Axis I psychiatric disorders commonly characterized by breaks with reality, or perceptions of reality, or that lead the individual to experience significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health, and persons diagnosed with severe personality disorders that are manifested by episodes of psychosis or depression, and result in significant functional impairment involving acts of self-harm or other behaviors that have a seriously adverse effect on life or on mental or physical health.

-6-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00006

on institutional inspections and the case-specific discovery that I have been provided and reviewed, the extent to which prisoners housed in the Arizona Department of Corrections (ADC), including those who suffer from SMI, are subjected to solitary-type confinement that may place them at a serious risk of psychological harm.  A list of the documents I was provided by Plaintiffs' counsel and reviewed in advance of preparing this report is appended as Appendix C.

10.  In addition to the documents reviewed in Appendix C, I also conducted inspections and interviews in numerous facilities and housing units where members of the *Parsons* sub-class[5] reside:   Perryville–Lumley Special Management Area (SMA); Florence Central Unit; Florence Kasson Unit; Eyman – SMU I; and Eyman – Browning Unit.   These tours took place over a two week period in July 2013.  In the course of these inspections I made a point of visiting a representative sample of housing units where prisoners with mental illness were housed, in addition to isolation housing units with general population maximum custody prisoners.

11.  In the course of inspecting these ADC facilities, institution staff photographed a number of different areas inside and outside the prisons at my direction.  I have reviewed and relied on those photographs in developing my opinions in this matter, and many are cited in this report.

12.  Finally, in the course of those tours and inspections, I was able to personally interview a number of prisoners. Many of these prisoners were interviewed cell-front, in the course of inspecting the various housing units. In other instances, I was able to specifically request that a particular prisoner be brought out of his or her cell, so that I could conduct the interview at greater length and on a more confidential basis than was

---

[5] The sub-class consists of "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units:   Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area.", Order, No. CV12-0601-PHX-NVW, Doc. 372 (D. Az. Mar. 6, 2013), at 22 (granting class certification).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                           PRSN-CH 00007

1   possible in the cell blocks. I also requested on-site access to prisoner medical and mental

2   health records, which I typically reviewed at a separate time and place in the course of the

3   prison tours and inspections.

4       13.   By way of summary, it is my expert opinion that being housed in solitary or

5   isolated confinement can produce a number of negative psychological effects and places

6   prisoners at grave risk of psychological harm. I believe that these effects are now well

7   understood and described in the scientific literature. Scientific knowledge of these effects

8   derives from numerous empirical studies. The findings are "robust"—that is, they come

9   from studies that were conducted by researchers and clinicians from diverse backgrounds

10  and perspectives, they were completed and have been published over a period of many

11  decades, and they are empirically very consistent with one another. With remarkably few

12  exceptions, virtually every one of these studies has documented the pain and suffering that

13  isolated prisoners endure and the risk of psychological harm that they confront while kept

14  in isolated confinement.

15      14.   In addition, the empirical conclusions that are reached in these  studies  are

16  theoretically sound. That is, there are numerous sound theoretical reasons to expect that

17  long-term isolation, the absence of meaningful social interaction and activity, and the

18  other severe deprivations that are common under conditions of isolated or solitary

19  confinement would have harmful psychological consequences. Those conditions and

20  experiences are ones that are known to produce adverse psychological effects in contexts

21  other than prison and it makes perfect theoretical sense that they would produce similar

22  outcomes when persons encounter them in correctional settings.

23      15.   In addition, there are sound theoretical reasons to expect that prisoners who suffer

24  from SMI would have a more difficult time tolerating the painful experience of isolation

25  or solitary confinement. This is in part because of the greater vulnerability of the mentally

26  ill in general to stressful, traumatic conditions, and in part because some of the

27  extraordinary conditions of isolation adversely impact the particular symptoms from

28  which mentally ill prisoners suffer (such as depression) or directly aggravate aspects of

-8-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                              PRSN-CH 00008

1   their pre-existing psychiatric conditions.

2   16. It is my opinion that the failure of the Arizona Department of Corrections (ADC)

3   to categorically exclude prisoners who suffer from SMI from its isolation units is

4   inconsistent with sound corrections and mental health practice; it places all such prisoners

5   at substantial risk of harm. It is also my opinion that the policies, practices and

6   admissions of ADC regarding conditions of confinement in its isolation units, as depicted

7   in the documents and materials I have reviewed, the tours and inspections of facilities in

8   which I participated, and the prisoner interviews that I conducted very clearly constitute

9   exactly the kind of harsh and depriving conditions of isolated confinement that my own

10   experience and research—supported, as I noted, by decades of scientific research and

11   study by others—have found to be potentially detrimental to all human beings, regardless

12   of pre-existing mental illness. As such, all ADC prisoners are at risk of substantial

13   psychological harm under ADC's current isolation policy and practice and conditions.

14   17. I should note that, although my opinions concerning the use, nature, and effects

15   of isolated confinement in the ADC are much more developed than they were when I filed

16   my earlier Declaration in this case, it is my understanding that additional information has

17   been requested and will be forthcoming. When this additional information is finally

18   produced, of course, I will carefully review it and, if it in any way changes the opinions I

19   express herein, I reserve the right to supplement my opinion with an additional

20   declaration.

21   **III. THE ADVERSE PSYCHOLOGICAL EFFECTS OF ISOLATION**

22   18. "Solitary confinement" and "isolated confinement" are terms of art in

23   correctional practice and scholarship. For perhaps obvious reasons, total and absolute

24   solitary confinement—literally complete isolation from any form of human contact—does

25   not exist in prison and never has. Instead, the term is generally used to refer to conditions

26   of extreme (but not total) isolation from others. I have defined it elsewhere, in a way that

27   is entirely consistent with its use in the broader correctional literature, as:

28

Confidential                                                          PRSN-CH 00009

> [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[6]

Indeed, because their extreme isolation from the mainstream prisoner population, their near or complete exclusion from prison activities and programs, and the fact that they are confined in their cells virtually around-the-clock, even prisoners in "isolated confinement" who are double-celled (i.e., housed with another prisoner) may suffer some of the worst effects described in the following paragraphs. Indeed, in some ways, these prisoners have the worst of both worlds: "crowded" and confined with another person inside a small cell but simultaneously deprived of even minimal freedoms, access to programs, and "normal" and meaningful forms of social interaction.

19. Presumably designed to limit and control violence by keeping prisoners isolated from one another, solitary confinement or "supermax" prisons subject prisoners to especially harsh and deprived conditions of confinement that come with a significant risk of psychological harm. As a general matter, as I noted in passing above, psychologists know from studies of behavior and adjustment in free society that social isolation in general is potentially very harmful and can cause irreparable damage to overall psychological functioning.[7] Its effects are no less harmful in prison.

20. Indeed, there is now a reasonably large and growing literature on the many ways that solitary or so-called "supermax" confinement can very seriously damage the overall mental health of prisoners. The long-term absence of meaningful human contact and

---

[6] Craig Haney, The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful, Prison Service Journal, 12 (January, 2009), at n.1.

[7] For example, see: Graham Thornicroft, Social Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, British Journal of Psychiatry, 158, 475-484 (1991).

-10-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

1   social interaction, the enforced idleness and inactivity, and the oppressive security and

2   surveillance procedures (and the weapons, hardware, and other paraphernalia that go

3   along with them) all combine to create starkly deprived conditions of confinement. These

4   conditions predictably impair the cognitive and mental health functioning of many

5   prisoners who are subjected to them.[8]  For some, these impairments can be permanent and

6   life-threatening.

7      21.   In the admitted absence of a single "perfect" study of the phenomenon,[9] there is a

8   substantial body of published literature that clearly documents the distinctive patterns of

9   psychological harm that can and do occur when persons are placed in solitary

10   confinement. These broad patterns have been consistently identified in personal accounts

11

12   ───────────

13   [8] For example, see: Kristin Cloyes, David Lovell, David Allen and Lorna Rhodes,
    Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample,
14   Criminal Justice and Behavior, 33, 760-781 (2006): Craig Haney, Mental Health Issues in
    Long-Term Solitary and "Supermax" Confinement. Crime and Delinquency, 49, 124-156
15   (2003); and Peter Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief
    History and Review of the Literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-
16   528). Volume 34. Chicago: University of Chicago Press (2006).

17   [9] No more than basic knowledge of research methodology is required to design the
    "perfect" study of the effects of solitary confinement: dividing a representative sample of
18   prisoners (who had never been in solitary confinement) into two groups by randomly
    assigning half to either a treatment condition (say, two or more years in solitary
19   confinement) or a control condition (the same length of time residing in a typical prison
    housing unit), and conducting longitudinal assessments of both groups (i.e., before,
20   during, and after their experiences), by impartial researchers skilled at gaining the trust of
    prisoners (including ones perceived by the prisoner-participants as having absolutely no
21   connection to the prison administration). Unfortunately, no more than basic knowledge of
    the realities of prison life and the practicalities of conducting research in prisons is
22   required to understand why such a study would be impossible to ever conduct. Moreover,
    any prison system that allowed truly independent, experienced researchers to perform
23   even a reasonable approximation of such a study would be, almost by definition, so
    atypical as to call the generalizability of the results into question. Keep in mind also that
24   the assessment process itself—depending on who carried it out, how often it was done,
    and in what manner—might well provide the solitary confinement participants with more
25   meaningful social contact than they are currently afforded in a number of such units with
    which I am familiar, thereby significantly changing (and improving) the conditions of
26   their confinement.
27
28

-11-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                    PRSN-CH 00011

written by persons confined in isolation, in descriptive studies authored by mental health professionals who worked in many such places, and in systematic research conducted on the nature and effects of solitary or "supermax" confinement. The studies have now spanned a period of over four decades, and were conducted in locations across several continents by researchers with different professional expertise, ranging from psychiatrists to sociologists and architects.[10]

22. For example, mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[11] The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[12]

23. A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important

---

[10] For example, see: Arrigo, B., and Bullock, J., The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change, International Journal of Offender Therapy and Comparative Criminology, 52, 622-640 (2008); Haney, C., supra note 6; Haney, C., and Lynch, M., Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, New York University Review of Law and Social Change 23, 477-570 (1997); Smith, P., The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in M. Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006).

[11] For detailed reviews of all of these psychological issues, and references to the many empirical studies that support these statements, see: Craig Haney and Mona Lynch, supra note 10, and Craig Haney, supra note 8.

[12] Bruno M. Cormier and Paul J. Williams, Excessive Deprivation of Liberty, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, and George Scott, Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott and Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, Canadian Psychiatric Association Journal, 12, 337-341 (1969); Richard H. Walters, John E. Callagan and Albert F. Newman, Effect of Solitary Confinement on Prisoners, American Journal of Psychiatry, 119, 771-773 (1963).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

observations about the effects of isolation.[13] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation.[14] Professor Toch noted that although isolation panic could occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked an important dichotomy for prisoners: the "distinction between imprisonment, which is tolerable, and isolation, which is not."[15]

24.   More recent studies have identified other symptoms that appear to be produced by these conditions. Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior.[16]

---

[13] Hans Toch, Men in Crisis: Human Breakdowns in Prisons. Aldine Publishing Co.: Chicago (1975).

[14] Id. at 54.

[15] Id.

[16] In addition to the numerous studies cited in the articles referenced at supra notes 8 and 10, there is a significant international literature on the adverse effects of solitary confinement. For example, see: Henri N. Barte, L'Isolement Carceral, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, Einzelhaft: Eine Literaturubersicht (Solitary confinement: A literature survey), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983)

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential   PRSN-CH 00013

25. In addition, there are correlational studies of the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry Hughes

(reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, and Paul Werner, Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization"). See, also, Ida Koch, Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems, Working Papers in European Criminology, No. 7, 119 (Bill Rolston and Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring and Kerstin Adamczak, Long-Term Mental Sequelae of Political Imprisonment in East Germany, Journal of Nervous and Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

-14-

attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[17] These authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[18] In addition, signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[19]

26.   The painfulness and damaging potential of extreme forms of solitary confinement is underscored by its use in so-called "brainwashing" and certain forms of torture. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD")

---

[17] Raymond Patterson and Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, Psychiatric Services, 59, 676-682 (2008), at p. 678.

[18] Id. See also: Lindsay M. Hayes, National Study of Jail Suicides: Seven Years Later. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, Vulnerability and Prison Suicide, British Journal of Criminology, 36, 173-187 (1995); and Alison Liebling, Prison Suicide and Prisoner Coping, Crime and Justice, 26, 283-359 (1999).

[19] For example, see: Howard Bidna, Effects of Increased Security on Prison Violence, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, Felon Self-Mutilation: Correlate of Stress in Prison, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, The Implications of Research Explaining Prison Violence and Disruption, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, A Prison Environment: Its Effect on Health Care Utilization, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, Managing Violent Individuals in Correctional Settings, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, Using Situational Factors to Predict Types of Prison Violence, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

-15-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                           PRSN-CH 00015

1  and the kind of psychiatric sequelae that plague victims of what are called "deprivation

2  and constraint" torture techniques.[20]

3     27.  The prevalence of psychological symptoms (that is, the extent to which prisoners

4  who are placed in these units suffer from these and related symptoms) is often very high.

5  For example, in a study that I conducted of a representative sample of one hundred

6  prisoners who were housed in the Security Housing Unit at Pelican Bay Prison, in

7  California—a facility that California prison officials acknowledged was "modeled" on

8  Arizona's SMU I facility that they toured in advance of Pelican Bay's construction—I

9  found that every symptom of psychological distress that I measured but one (fainting

10  spells) was suffered by more than half of the prisoners who were interviewed.[21] Many of

11  the symptoms were reported by two-thirds or more of the prisoners assessed in this

12  isolation housing unit, and some were suffered by nearly everyone. Well over half of the

13  Pelican Bay isolated prisoners in this study reported a constellation of symptoms—

14  headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated

15  with hypertension.

16     28.  I also found that almost all of the prisoners whom I evaluated reported

17  ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger

18  _____

19     [20]  Solitary confinement is among the most frequently used psychological torture
techniques.  In D. Foster, Detention and Torture in South Africa: Psychological, Legal and

20  Historical Studies, Cape Town: David Philip (1987), Psychologist Foster listed solitary
confinement among the most common "psychological procedures" used to torture South

21  African detainees (at p. 69), and concluded that "[g]iven the full context of dependency,
helplessness and social isolation common to conditions of South African security law

22  detention, there can be little doubt that solitary confinement under these circumstances

23  should in itself be regarded as a form of torture" (at p. 136). See also: Matthew Lippman,
The Development and Drafting of the United Nations Convention Against Torture and

24  Other Cruel, Inhuman or Degrading Treatment or Punishment, 27 Boston College

25  International and Comparative Law Review, 27, 275 (1994); Tim Shallice, Solitary
Confinement—A Torture Revived? New Scientist, November 28, 1974; F.E. Somnier and

26  I.K. Genefke, Psychotherapy for Victims of Torture, British Journal of Psychiatry, 149,

27  323-329 (1986); and Shaun R. Whittaker, Counseling Torture Victims, The Counseling
Psychologist, 16, 272-278 (1988).

28     [21] See Haney, supra note 8.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                      PRSN-CH 00016

and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

29. Although these specific symptoms of psychological stress and the psychopathological reactions to isolation are numerous and well-documented, and certainly provide one index of the magnitude of the risk of harm this kind of experience presents, they do not encompass all of the psychological pain and dysfunction that such confinement can incur, the magnitude of the negative changes it may bring about, or even the full range of the risk of harm it represents. Among other things, such extreme deprivation of social contact can undermine an individual's social identity, destabilize his sense of self, and ultimately destroy his ability to function in free society.

30. Depriving people of contact with others for long periods of time is psychologically harmful and potentially destabilizing for another, related set of reasons. The importance of "affiliation"—the opportunity to have meaningful contact with others—in reducing anxiety in the face of uncertain or fear-arousing stimuli is long-established in social psychological literature.[22] In addition, one of the ways that people determine the appropriateness of their feelings—indeed, how we establish the very nature and tenor of our emotions—is through contact with others.[23]

---

[22] For example, see: Stanley Schachter, The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness. Stanford, CA: Stanford University Press (1959); Irving Sarnoff and Philip Zimbardo, Anxiety, Fear, and Social Affiliation, Journal of Abnormal Social Psychology, 62, 356-363 (1961); Philip Zimbardo and Robert Formica, Emotional Comparison and Self-Esteem as Determinants of Affiliation, Journal of Personality, 31, 141-162 (1963).

[23] For example, see: A. Fischer, A. Manstead, and R. Zaalberg, Social Influences on the Emotion Process, in M. Hewstone and W. Stroebe (Eds.), European Review of Social

-17-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00017

31.   Whatever else it represents, solitary confinement is a socially pathological environment that forces long-term inhabitants to adapt to the absence of meaningful contact with people. They have no choice but to develop their own socially pathological adaptations in order to function and survive. In the course of doing so, prisoners gradually change their patterns of thinking, acting, and feeling in order to cope with their largely asocial world and the impossibility of relying on social support or the routine feedback that comes from normal contact with others.

32.   Clearly, such adaptations represent "social pathologies" brought about by the atypical, abnormal, painful, and potentially harmful pathology of isolation. Although these adaptations are "functional" and may even be necessary under these extreme circumstances, certain kinds of short-term survival strategies can result in prisoners experiencing even more psychological pain and harm later on. A "downward spiral" may begin in which one dysfunctional adaptation leads to others. In his desperation, an isolated prisoner may adopt forms of coping that inadvertently make his situation worse rather than better. For example, some prisoners cope with the a-sociality of their daily existence by paradoxically creating even more. That is, they socially withdraw further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. Others move from initially being starved for social contact to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence.[24]

---

Psychology (pp. 171-202). Volume 14. Wiley Press (2004); C. Saarni, The Development of Emotional Competence. New York: Guilford Press (1999); Stanley Schachter and Jerome Singer, Cognitive, Social, and Physiological Determinants of Emotional State, Psychological Review, 69, 379-399 (1962); L. Tiedens and C. Leach (Eds.), The Social Life of Emotions. New York: Cambridge University Press (2004); and S. Truax, Determinants of Emotion Attributions: A Unifying View, Motivation and Emotion, 8, 33-54 (1984).

[24] For evidence that solitary confinement may lead to a withdrawal from social contact or an increased tendency to find the presence of people increasingly aversive or anxiety-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                 PRSN-CH 00018

33.   Over time, extreme adaptations made to this abnormal environment can become internalized—they move from being conscious strategies of survival or reactions to immediate conditions of confinement to more deeply ingrained ways of being. Prisoners may develop extreme habits, tendencies, perspectives, and beliefs that are difficult or impossible to relinquish once they are released. Although they may have been functional in isolation (or appeared to be so), they are typically acutely dysfunctional in the social world they are expected to re-enter. Yet they have been internalized so deeply that they persist and become disabling.

34.   Although the "core" psychological component of solitary confinement is social deprivation, and social deprivation is the source of the most intense psychological pain and greatest risk of harm, prison isolation units also typically deprive prisoners of much more than social contact. Isolated prisoners are typically subjected to extremely high levels of repressive control, enforced idleness and inactivity, reduced environmental stimulation, and a number of physical restrictions and deprivations that collectively exacerbate their psychological distress and can create even more lasting negative consequences. Indeed, most of the things that penologists know are beneficial to prisoners—such as increased participation in institutional programming, visits with persons from outside the prison, physical exercise, and so on[25]—are either functionally denied to prisoners in isolation or permitted on a greatly restricted basis. In addition to the direct pain and harm of isolation and the social pathologies that commonly develop in response, these other deprivations add to the negative psychological effects.

35.   For example, we know that people in general require a certain level of mental and physical activity in order to remain mentally and physically healthy. Simply put, human

---

arousing, see: Cormier, B., and Williams, supra note 12; Haney, supra note 6; H. Miller and G. Young, Prison Segregation: Administrative Detention Remedy or Mental Health Problem?, Criminal Behaviour and Mental Health, 7, 85-94 (1997); Scott and Gendreau, supra note 12; Toch, supra note 13; and Waligora, supra note 16.

[25] J. Wooldredge, Inmate Experiences and Psychological Well-Being, Criminal Justice and Behavior, 26, 235-250 (1999).

-19-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                    PRSN-CH 00019

beings need movement and exercise to maintain normal functioning. The greatly restricted opportunities for movement and exercise in isolation units—typically no more than an hour or so a day out of their cells—can negatively impact prisoners' well-being.

36.   Apart from the profound social, mental and physical restrictions and deprivations that solitary confinement imposes, prisoners housed in these units are subjected to prolonged periods of monotony and idleness. Many of them experience a form sensory deprivation—there is an unvarying sameness to the physical stimuli that surround them, they exist within the same limited spaces and are subjected to the same repetitive routines, and there is little or no external variation to the experiences they are permitted to have or can create for themselves. This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important related skills and capacities.[26]

37.   I hasten to add that not every isolated prisoner experiences all or even most of the range of adverse reactions that I have described above. But the nature and magnitude of the negative psychological consequences themselves underscore the stressfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the risk of serious psychological harm that is created by isolation and the broad range of severe stressors and deprivations that accompanies it. The devastating effects of the conditions of confinement typically found in prison isolation units are underscored by the very high numbers of suicide deaths and incidents of self-harm and self-mutilation that occur there. The years of sustained research on solitary confinement, the negative outcomes that have been documented across time and locality, and the consistency of these outcomes with what is known in the psychological literature about the harmful effects of isolation in general leave little doubt about its negative psychological effects. These effects are not only painful but can do real harm and inflict real damage that is sometimes severe and irreversible. Indeed, for some prisoners, the attempt to cope with

---

[26] For examples of this range of symptoms, see: Haney, supra note 10; Miller and Young, supra note 24; and Volkart, et al., supra note 19.

-20-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

isolated confinement sets in motion a set of cognitive, emotional, and behavioral changes that are long-lasting. They can persist beyond the time that prisoners are housed in isolation and lead to long-term disability and dysfunction.

## IV. THE EXACERBATING EFFECTS OF ISOLATION ON MENTAL ILLNESS

38.   Although prison isolation places all prisoners at serious risk of harm, its adverse psychological effects are expected to vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences) but also as a function of the characteristics of the prisoners subjected to it. A rare and unusually resilient prisoner might be able to withstand even harsh forms of solitary confinement with few or minor adverse effects, especially if the experience does not last for an extended period of time. Conversely, some prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement, and deteriorate even after brief exposure. Mentally ill prisoners are particularly at risk in these isolated environments and have been precluded from them by legal and human rights mandates precisely because of this. There are several reasons why this is so.

39.   For one, as I have noted, solitary or isolated confinement subjects prisoners to significantly more stress and psychological pain than other forms of imprisonment. Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in isolation are the antithesis of the kind of benign and socially supportive atmosphere that mental health clinicians seek to create within genuinely therapeutic environments. Not surprisingly, mentally ill prisoners are more likely to deteriorate and decompensate when they are subjected to the harshness and stress of prison isolation.

40.   Some of the deterioration and decompensation that mentally ill prisoners suffer in isolated confinement results from the critically important role that social contact and

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                    PRSN-CH 00021

social interaction play in maintaining psychological equilibrium. The esteemed psychiatrist Harry Stack Sullivan once summarized the clinical significance of meaningful social contact by observing that "[w]e can't be alone in things and be very clear on what happened to us, and we... can't be alone and be very clear even on what is happening in us very long—excepting that it gets simpler and simpler, and more primitive and more primitive, and less and less socially acceptable."[27] Social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality.

41.   Thus, the experience of isolation is psychologically destabilizing it undermines a person's sense of self or social identity and erodes his connection to a shared social reality. Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

> A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[28]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, so bizarre, and so impossible to make sense of that some prisoners create their own reality— they live in a world of fantasy instead of the intolerable one that surrounds them.

42.   Finally, many of the direct negative psychological effects of isolation mimic or parallel specific symptoms of mental illness. Even though the direct effects of isolation,

---

[27] Harry Stack Sullivan, The Illusion of Personal Individuality, Psychiatry, 12, 317-332 (1971), at p. 326.

[28] Compare, also, Margaret K. Cooke and Jeffrey H. Goldstein, Social Isolation and Violent Behavior, Forensic Reports, 2, 287-294 (1989), at p. 288.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                        PRSN-CH 00022

1  experienced in reaction to adverse conditions of confinement, are generally less chronic
2  than those that are produced by a diagnosable mental illness, they can add to and
3  compound a mentally ill prisoner's outward manifestation of symptoms as well as the
4  internal experience of their disorder. For example, many studies have documented the
5  degree to which isolated confinement contributes to feelings of lethargy, hopelessness,
6  and depression. For already clinically depressed prisoners, these acute situational effects
7  are likely to exacerbate their pre-existing chronic condition and lead to worsening of their
8  depressed state. Similarly, the mood swings that some prisoners report experiencing in
9  isolation would be expected to amplify the pre-existing emotional instability that prisoners
10 diagnosed with bi-polar disorder suffer. Prisoners who suffer from disorders of impulse
11 control would likely find their pre-existing condition made worse by the frustration,
12 irritability, and anger that many isolated prisoners report experiencing. And prisoners
13 prone to psychotic breaks may suffer more in isolated confinement due to conditions that
14 deny them the stabilizing influence of social feedback that grounds their sense of reality in
15 a stable and meaningful social world.

16     43. As I noted in passing above, widespread recognition of the heightened
17 vulnerability of mentally ill prisoners to the adverse psychological effects of isolated
18 confinement has led numerous corrections officials, professional mental health groups,
19 and human rights organizations to prohibit their placement in such units or, if it is
20 absolutely necessary (and only as a last resort) to confine them there, to very strictly limit
21 the duration of such confinement and to provide prisoners with significant amounts of out-
22 of-cell time and augmented access to care. For example, the American Psychiatric
23 Association ("APA") has issued a Position Statement on Segregation of Prisoners with
24 Mental Illness stating:

25         Prolonged segregation of adult inmates with serious mental illness,
26         with rare exceptions, should be avoided due to the potential for harm
           to such inmates. If an inmate with serious mental illness is placed in
27         segregation, out-of-cell structured therapeutic activities (i.e., mental
           health/psychiatric treatment) in appropriate programming space an
28

-23-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential
PRSN-CH 00023

1
2
3

'adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative custody staff to maximize access to clinically indicated programming and recreation for the individuals.[29]

4  The APA's position on this issue reflects the accepted fact that mentally ill prisoners are

5  especially vulnerable to isolation- and stress-related regression, deterioration, and

6  decompensation that worsen their psychiatric conditions and intensify their mental health-

7  related symptoms and maladies (including depression, psychosis, and self-harm).

8  44. This widely accepted fact about the heightened vulnerability of mentally ill

9  prisoners to isolated confinement is acknowledged in the standard operating procedures

10  that govern their admission and retention in such units. Specifically, mental health staff in

11  most prison systems with which I am familiar are charged with the responsibility of

12  screening prisoners in advance of their possible placement in isolation to identify those

13  who are mentally ill and to exclude them from such confinement. Moreover, they are

14  charged with the additional responsibility of regularly monitoring isolated prisoners with

15  the same intended purpose—to identify any prisoners who may be manifesting the signs

16  and symptoms of emerging mentally illness and to remove them from these harmful

17  environments.

18  45. Courts that have been presented with evidence on this issue have reached the

19  same conclusions about the vulnerability of the mentally ill to severe forms of prison

20  isolation. One such court noted that those prisoners for whom the psychological risks of

21  isolated confinement were "particularly"—and unacceptably—high included anyone

22  suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of

23  existing mental illness as a result of the conditions in [solitary confinement]."[30] The judge

24  elaborated, noting that the group of prisoners to be excluded from isolation should

25

26  [29] AM. PSYCH. ASSOC., POSITION STATEMENTS: SEGREGATION OF PRISONERS WITH MENTAL ILLNESS (2012), *available at* http://www.psychiatry.org/advocacy--

27  newsroom/position-statements.

28  [30] Madrid v. Gomez, 889 F.Supp. 1146, 1265 (N.D. Cal. 1995).

-24-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

include:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[31]

46.    In summary, the accumulated weight of the scientific evidence that I have cited and summarized above demonstrates the painful nature of isolated confinement, and the serious risk of significant psychological harm at which it places prisoners. When persons are deprived of normal social contact for extended periods of time they experience mental pain and suffering, are more susceptible to severe stress-related maladies and disorders, are subject to deterioration and dysfunction along a number of mental, emotional, and physical dimensions, and are placed at risk of even more serious harm, including the loss of their sanity and even their lives. The broad range of adverse effects that derive from social deprivation underscores the fundamental importance of meaningful social contact and interaction and, in essence, establishes these things as identifiable human needs. Over the long-term, meaningful social contact and interaction may be as essential to a person's psychological well-being as adequate food, clothing, and shelter are to his or her physical well-being. This appears to be true for prisoners in general, but especially true for mentally ill prisoners who are particularly vulnerable to the pains of isolated confinement and susceptible to its harmful effects.

## V.    THE    USE    OF    SOLITARY    CONFINEMENT    IN    THE    ARIZONA DEPARTMENT OF CORRECTIONS

47.    All other things being equal, the adverse psychological effects of solitary confinement should vary as a function of the severity of the conditions and the amount of

---

[31] Id.

Confidential                                          PRSN-CH 00025

time prisoners are confined in them. There are better and worse isolation units, including some that attempt to ameliorate the harsh conditions they impose and minimize their worst effects on prisoners. Moreover, prisoners vary in their resiliency, their ability to withstand the stress, pain, and harmfulness of this kind of confinement, and the degree to which they are able to recover after having been released. These variations qualify but do not contradict what is known about the suffering that isolated confinement inflicts and the serious risk of significant harm that it represents for all prisoners who are subjected to it.

48.   Based on the conditions of isolated confinement that I observed in the various ADC units that I inspected, the individuals I interviewed, and the documentary evidence that I have reviewed regarding those conditions (including ADC general policies and practices as well as those that pertained to nature and amount of available mental health care for isolated prisoners), I have concluded that the prisoners in these isolation units,[32] are at serious risk of significant harm due to their conditions of confinement.   This is especially true for those prisoners who suffer from mental illness.

**A. Summary of Expert Opinions**

**1. ADC's Use of Harsh Isolation Units and its Negative Impact on Mentally Ill Prisoners**

49.   The ADC has no written policy prohibiting prisoners who are suffering from what is traditionally referred to as serious mental illness (SMI) from being housed in what are traditionally referred to as solitary confinement or supermax-type units.[33]   Indeed, based on the tours that I conducted (discussed at greater length below), and ADC's own

---

[32] In defining isolation units I have followed the Court's definition of the sub-class in this matter; "All prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units:  Eyman—SMU I; Eyman—Browning Unit; Florence— Central Unit; Florence—Kasson Unit; or Perryville—Lumley Special Management Area." Order, No. CV12-0601-PHX-NVW, Doc. 372 (D. Az. Mar. 6, 2013), at 22 (granting class certification).

[33] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (10/17/12), at RFA# 1-2.

-26-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

records and documents, it is very clear that many such prisoners are currently housed in such units within the ADC.[34] Moreover, contrary to sound correctional and clinical practice, there is no written policy requiring that a face-to-face mental health evaluation be conducted before placing a prisoner in one of these units.[35]  In addition, there is apparently no written ADC policy that provides for ADC mental health staff to not only monitor the mental health of isolated prisoners but also take action when a severely mentally ill—or any—prisoner deteriorates in isolation (except under the extreme circumstance in which inpatient care is determined necessary).[36]

50.   Based on the numerous interviews that I conducted, as described below, I found a surprisingly high number of seriously mentally ill prisoners in every housing unit I toured. Many of them were housed among other isolated prisoners, rather than in ADC's designated mental health housing areas in the isolation units.  Too often the prisoners I spoke with were clearly suffering as a result of their isolated confinement yet they were receiving little or no meaningful psychological treatment. In my professional opinion, placing individuals with serious mental illness in ADC's isolation units poses an especially serious risk of significant harm. As I have noted, mentally ill prisoners are prone to deterioration and decompensation under isolated conditions. This deterioration and decompensation often takes the form of acting out and otherwise behaving in ways that constitute rule infractions. In these instances, this "bad" and troublesome behavior is the direct product of their mental illness and the ways that illness exacerbates the

---

[34] Id.; Shaw Dep., 135:21- 137:2, 168:5-7; MH Levels Statistical Summary, 4/15/13 (ADC083096-105); MH Levels Statistical Summary, 7/23/12 (ADC027759-27768); MH Levels Statistical Summary, 4/02/12 (ADC094442-51); MH Levels Statistical Summary, 10/3/11 (ADC094422-31); Medical and Mental Health Score Inmate Distribution by Complex for FY 2011 (PLT PARSONS-013204); Defendants' Response to Plaintiff Wells' First Set of Interrogatories, Ex. E, Inmates in Isolation or Detention, Data as of May 31, 2013 (ADC093618-733).

[35] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (10/17/12), at RFA ##7-10.

[36] Shaw Dep., 148:3-9.

-27-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   psychological and behavioral reactions they have to the pain and stress of isolated

2   confinement (in an environment that, as I have indicated, they should never have been

3   placed in in the first place. Punishing them for behavior that they cannot control, and that

4   has been caused in part by the decisions of corrections officials themselves, is wrong as a

5   matter of simple fairness. In addition, it is a singularly inappropriate way to respond to

6   mental illness and can result in the prisoner's further deterioration.

7       51.   It is further apparent that some of the seriously mentally ill prisoners in these

8   units, including those who are on psychotropic medications and those who are on mental

9   health watch, have been subjected to the use of chemical agents, a practice that is

10   explicitly permitted by ADC policy.[37]   More than merely permitted by policy, the use of

11   chemical agents on mentally ill prisoners occurs frequently.[38]   As I detail below, prisoners

12   in the isolation units I inspected repeatedly described either being subjected to chemical

13   spray themselves or witnessing the use of chemical spray on others. Even (perhaps

14   especially) those prisoners "in crisis" and on mental health watch were subjected to such

15   treatment.

16       52.   At the same time, prisoners with mental illness in the isolation units are exposed

17   to extreme levels of heat, regardless of their diagnosis and regardless of the types of

18   medications they take.  There is no ADC policy that limits the temperatures in the units

19   where prisoners taking psychotropic medications are housed.[39]   Moreover, because the

20   ADC has admitted that it does not even maintain lists of prisoners in isolation who have

21   mental health diagnoses, it is unlikely that adequate protections against heat injury for

22

23

---

24       [37] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of
25   Request for Admissions (10/17/12), at RFA##38-43;  Shaw Dep., 130:20-131:10; Fizer
     Dep., 194:4-10; McWilliams Dep., 173:1-3; Taylor Dep., 268:17-20.
26       [38] See e.g.,  Significant Incident Report No. 201207346 (ADC089328) (reporting
     incidents in which officers used chemical spray on prisoners with mental health scores of
27   4 or higher); Significant Incident Report No. 201110243 (ADC089163) (same).
         [39] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of
28   Request for Admissions (10/17/12), at RFA #33.

-28-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    mentally ill prisoners are or could be taken.[40]

2    53.   During my facility inspections in July 2013, I repeatedly heard from prisoners

3    that they experienced difficulty with the heat on the units and in the recreation areas.  For

4    many, being trapped in small, airless cells all day, every day, made their conditions of

5    confinement in isolation even more difficult to bear.  It was also abundantly clear from my

6    own observation that prisoners, staff, and others who accompanied us on the tour were

7    experiencing difficulties with the extreme heat on the units.  The incomplete temperature

8    data provided by defendants in this case confirmed the incredibly high temperature

9    readings at some facilities, including readings well over 90 degrees and some over 100

10   degrees.[41]  I found the fact that Florence complex "does not track indoor temperatures"—

11   even though it holds so many prisoners in isolation (including those who ADC considers

12   the most mentally ill, who are housed at Kasson)—to be extremely troublesome and very

13   dangerous.[42]  It is unconscionable that ADC makes no effort to monitor temperatures in

14   this complex, despite the risk of injury or death to prisoners taking psychotropic

15   medications.  Moreover, even those facilities that do track temperatures appear to lack

16   adequate measures to minimize the grave risks of injury and even death posed by heat-

17   related reactions to which the seriously mentally ill are susceptible.

18   54.   Although at first blush they may appear to be unrelated, it is my opinion that

19   these two practices—the use of chemical agents and the failure to monitor heat levels—

20   are joined by the underlying deliberate indifference that they both reflect. Not only has the

21   ADC taken the ill-advised step of housing large numbers of mentally ill prisoners in

22   isolated conditions that cause suffering and place their psychological well-being at risk,

23   but its officials also have chosen to adopt policies that place these prisoners in even

24

---

25   [40] Defendant Ryan's Answers to Plaintiff Verduzco's First Set of Request for Admissions (6/10/13), at RFA ## 52-55.

26   [41] See e.g., ASPC-Perryville, Lumley Unit (ADC141335-91); ASPC-Eyman-Browning, Daily Temperature Checks (ADC140213); ASPC-Eyman (untitled), Daily Temperature

27   Checks (ADC140248-50, ADC140260, ADC140386, ADC14038688).

28   [42] Defendants' First Supplemental Response to Plaintiff Sonia Rodriguez's First Set of Interrogatories (10/11/13), at No. 1.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                 PRSN-CH 00029

greater jeopardy. Both practices not only reflect deliberate indifference to the plight of the mentally ill in isolated confinement but also add to the feelings of vulnerability and helplessness from which mentally ill prisoners suffer in these units. Mentally ill prisoners are literally placed in situations and settings in which, because of the punitive actions (in the case of pepper spraying) and dangerously indifferent inaction (in the case of the failure to monitor and limit heat exposure) of corrections officials, the prisoners are—and know they are—in danger.

55. Both ADC's policy of subjecting seriously mentally ill prisoners, most of whom are on psychotropic medications, to chemical spray and its failure to protect prisoners on psychotropic medications from heat-related injury add to the grave risks of harm for prisoners with mental illness in the isolation units.

56. As I noted in passing above, during the course of my facility tours I interviewed scores of prisoners who are now confined in the ADC isolation units. Many of them were obviously suffering from serious mental health problems. As I discuss below, these prisoners describe symptoms of mental suffering, increased mental illness, suicidal thoughts and acts, and incidents of self-harm, including repeated acts of self-mutilation (the after-effects of which were often visibly apparent). I also reviewed the declarations of the named plaintiffs who represent the isolation sub-class. The problems described by all these prisoners are consistent with the types of symptoms and suffering that I would expect to find in a system with the kind of stark and extreme isolation conditions, policies, and practices I have observed in the ADC.

**2. Lack of Meaningful Treatment for Prisoners with Mental Illness in Isolation**

57. It is my opinion that the lack of meaningful mental health care in the ADC's isolation units places mentally ill prisoners at extreme risk of serious harm. As I mentioned above, it is the position of numerous corrections officials, courts, professional mental health and human rights organizations that prisoners with mental illness should be prohibited from placement in such units, and in the limited circumstances where such placement is absolutely necessary, strict limits must be placed on the duration of isolation

-30-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  and significant amounts of out-of-cell time and structured therapeutic activities must be
2  provided.

3      58.  It is clear that under ADC policy, the duration of time prisoners with mental
4  illness spend in the isolation units in itself creates significant risks of harm.  By policy all
5  death row prisoners are subject to isolation and all prisoners with a life sentence must
6  spend a minimum of 2 years in these units – regardless of their mental health status.[43]
7  Further, ADC does not appear to monitor the mean or median length of time prisoners
8  spend in isolation.[44]   And both Carson McWilliams, Northern Region's Operations
9  Director, and ADC's 30(b)(6) designee to testify on isolation, and Greg Fizer, Deputy
10  Warden of Florence Central, testified that a prisoner's length of stay in isolation is not a
11  factor in the decision to keep or release them from isolation.[45]  Indeed, Deputy Warden
12  Fizer testified that there is no limit to the amount of time a prisoner may stay in
13  isolation.[46]

14      59.  At the same time ADC's mental health programs within the isolation units are
15  wholly inadequate to meet the needs of mentally ill prisoners.  For the most part, these
16  programs appear to have been largely formulated only after this lawsuit was filed.[47]  The
17  gist of the programs, as detailed in ADC's program documents and based on witness
18  testimony and my own observations is that some – but not all – prisoners with mental
19  illness are now congregated in certain housing areas within the isolation units.
20  Supposedly, prisoners will be given opportunities to work toward gaining access to the
21  new outdoor recreation cages that have been built, allowing them some congregate
22  recreation and access to some recreation equipment, such as basketballs.  In some units,

---

23
24  [43] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of
Request for Admissions (10/17/12), at RFA## 25-26.
25  [44] Defendant Ryan's Response to Plaintiff Gamez's First Set of Requests for
Admission (9/6/13), at RFA## 5-6.
26  [45] McWilliams Dep., 152:15-25; Fizer Dep., 42:9-43:7.
27  [46] Fizer Dep., 42:21-23.
28  [47] See Memo to Charles L. Ryan from Robert Patton and Richard Pratt, re: Increase of
Mental Health for Max Custody, 4/30/12 (ADC050861-67).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                  PRSN-CH 00031

1   group programming has been made available through the use of treatment cages or the
2   outdoor recreation enclosures.  And some prisoners are supposed to have greater access to
3   one-on-one counseling.  There are slight variations in the actual and promised programs
4   that I detail in my inspection findings below.  (Some of these new programs were already
5   underway at the time of my inspections in July, 2013, but several had been promised but
6   were not yet in existence). None of them appear to come close to providing the nature and
7   amount of adequate out-of-cell time and necessary structured therapeutic activities that
8   mentally ill isolated prisoners require.

9       60.   Indeed, the actual operation of the programs underway in July, 2013 appeared to
10  be episodic and ad hoc at best.  During my inspections, I repeatedly spoke to prisoners
11  who had been to one or two group sessions just recently or who had started a group in the
12  past only to have it discontinued.  Many others said they wanted to participate in groups,
13  but none were being offered, or they had asked to participate but never received a
14  response from mental health staff.  Others thought that groups might be starting but they
15  were unsure what groups might be offered or how they could participate.  Very few
16  prisoners, even those in designated mental health units, had any clear idea of what the
17  program was or what they needed to do to successfully participate.  The one and only
18  group I was able to observe during my inspections, was the tail end of a session with
19  prisoners in the CB-1 unit at Florence.  The prisoners I spoke with were happy to be out of
20  their cells and liked the facilitator but seemed to have no idea what the group was actually
21  about or how it addressed their mental health needs.  It appears that the episodic and ad
22  hoc nature of mental health group programming in the isolation units that I witnessed in
23  July 2013 has continued.  In her deposition in September, Dr. Taylor testified to a recent
24  email from the Deputy Warden at Florence Central stating that the mental health programs
25  were not being done.[48]

26      61.   The same problems with patchwork treatment emerged when I inquired into the
27
28      [48] Taylor Dep., 160:18-25; 161:1-25.

-32-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

availability of one-on-one counseling. Some prisoners recalled having participated in one or two such sessions, only a few had had any more than that. Others indicated that they had to file HNRs to get a one-to-one appointment and that it often took months before they received a response for such a request; some said they received no response at all. Most prisoners reported that they had never had one-on-one counseling while in the isolation units. And no prisoner described receiving the type of consistent and in-depth therapeutic program that would be necessary to properly treat individuals with serious mental illness, especially ones housed under painful and stressful conditions of isolation.

62.   The total lack of a coherent mental health program in any of the isolation units is corroborated by testimony that I have reviewed from witnesses identified as knowledgeable about system-wide practices. For example, Dr. Pastor, designated by Corizon as its mental health expert for ADC, could not describe any mental health programming that occurs in the isolation units.[49]

63.   Beyond the lack of actual mental health treatment, there also appears to be an insufficient amount of out-of-cell time and little or no congregate or group time provided to mentally ill prisoners in all of the isolation units. Some of the programs provide more opportunities for group exercise or an opportunity to eat a meal in congregate settings, but even these are too limited. ADC policy and practice limits out-of-cell exercise to six hours a week.[50]   None of the prisoners with whom I spoke told me that they were receiving more than that minimal amount of recreation time and a number told me that they were not getting that much. This minimal amount of time out-of-cell, even if occasionally complemented by a group session or a meal with others, is not sufficient to ameliorate the adverse effects that confinement in the harsh ADC isolation units has on mentally ill prisoners.

64.   In addition to the inadequacy of care provided to prisoners in the formally

---

[49] Pastor Dep., 82:11-20; 189:13-17.
[50] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (10/17/12), at RFA# 11.

-33-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

PRSN-CH 00033

1   designated mental health "programs" that exist in certain isolation units, the other isolated

2   ADC prisoners—including many who are identified as mentally ill—are not receiving

3   proper mental health screening, monitoring, or care. This is apparent from the interviews I

4   conducted, witness testimony I reviewed, and ADC's own documentation. These serious

5   shortfalls are the result of both inadequate policies and chronic mental health

6   understaffing.[51]   It is my opinion that this understaffing is pervasive in the system and

7   poses a serious, ongoing risk for all prisoners in the isolation units.

8       65.   Problems with understaffing of mental health care positions in ADC are long-

9   standing. Former Mental Health Program Manager and Mental Health Services Monitor,

10  Dr. Shaw, testified that there were numerous mental health staffing shortages prior to

11  ADC's privatization of care on July 1, 2012.[52]  He also noted numerous such vacancies at

12  the time of his deposition in October 2012.[53]  In particular, Florence complex had no

13  psychiatrist as of August 2012 and Perryville, Eyman, and Florence all had less than half

14  their psychiatric provider full time equivalent (FTE) positions filled.[54]   Indeed, the

15  original medical contractor, Wexford Health Services, noted that "[s]taff shortages have

16  existed for so long that site-level employees have become complacent with operating

17  below industry standards."[55] Unfortunately, this problem persisted during Wexford's

18  tenure; there was no psychiatrist at Florence or Perryville, the statewide vacancy rate for

19  psychiatrists was 65%, and there was an astonishing 100% vacancy rate for psychiatric

20  physician assistants/nurse practitioners.[56]  The more recent staffing reports under Corizon

21  reflect some improvement but vacancy rates that are still troubling. The statewide vacancy

22  rates for psychiatrists was reported at 27%, with significantly higher vacancy rates of 50%

23

24       [51]  Arizona Monthly Staffing report, June 2013 (ADC121167); Memo to Joe Profiri,
    Wexford Psychiatric Provider Coverage, August, 13, 2012, (ADC027770-71); Shaw Dep.,
25  53:16-54:5, 86:16-88:5, 126:22-127:10, 139:4-143:17.
         [52]  Shaw Dep., 76:22-77; 78:19-22.
26       [53]  Id., 60:6-67:4.
27       [54]  Id., 76:22-77:1; 78:19-22; 126:22-127:10.
         [55]  ADC Meeting, November 7, 2012 (Power-Point presentation) (WEX0064).
28       [56]  Wexford Health Sources Vacancy Report, November 30, 2012 (ADC 49067).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   at Florence Complex where so many isolation sub-class members are housed.[57]   The

2   recent deposition of ADC's Mental Health Contract Monitor, Dr. Nicole Taylor, on

3   September 5, 2013, confirms that both psychiatrist positions and psychiatric nurse

4   practitioner positions remain unfilled.[58]

5       66.   The critical problems caused by understaffing mental health care providers in the

6   isolation units are obvious in the ADC auditing reports (known as "MGAR Reports") that

7   I reviewed.  Most recently, in September of 2013, ADC rated the Eyman complex with

8   red findings in four out of six key mental health compliance areas.[59]   The contract monitor

9   found serious deficiencies in referrals to psychiatrists and mid-level providers, especially

10  for prisoners with mental illness; serious deficiencies in updating mental health treatment

11  plans for SMI prisoners; serious deficiencies in mental health visits for prisoners with

12  mental health scores of MH-3 and above; and serious deficiencies in psychiatric

13  monitoring of prisoners on psychotropic medications.[60]   At Florence and Perryville the

14  monitor also found critical deficiencies in mental health visits for prisoners with mental

15  health scores of MH-3 and above; and serious deficiencies in psychiatric monitoring of

16  prisoners on psychotropic medications.[61] The fact that many prisoners do not receive their

17  psychiatric medications and are not provided their required face-to-face meetings with

18  psychiatrists has been repeatedly documented.[62]

19      67.   ADC's own findings indicate that basic, critical functions of the mental health

20  program in these facilities are broken.   These findings are consistent with my own

21  observations of the mental health care program during my prison tours.  A malfunctioning

22  mental health care delivery system creates even greater risks for isolated mentally ill

23

24      [57] Arizona Monthly Staffing Report, June 2013 (ADC 121167).
        [58] Taylor Dep., 131:25-:32:4; 141:22-42:6.
25      [59] September 2013 Eyman Complex (ADC154074-78).
        [60] Id.
26      [61] September 2013 Florence Complex (ADC154123-25); September 2013 Perryville
27  Complex (ADC154197-99).
        [62] Memo to Joe Profiri, Wexford Psychiatric Provider Coverage, August 13, 2012
28  (ADC027770-71).

-35-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

prisoners, whether they have been placed in mental health housing within the isolation unit or remain in its general population.  Indeed, mentally ill prisoners in the ADC's isolation units are placed in double jeopardy by the defective mental health care to which they have access—they are provided substandard mental health care inside a environment that warrants greatly enhanced services, making the exacerbation of their illness far more likely. The basic elements of a properly functioning mental health care delivery system— including medication monitoring, treatment planning, and regular provider visits—could ameliorate some of the anguish, depression, and mental deterioration that mentally ill prisoners suffer in isolation. The grossly inadequate mental health services mentally ill prisoners receive in the ADC preclude that from happening.

68.  I understand that ADC policy requires cell-front contacts with mental health staff for prisoners in the isolation units.  Unfortunately, these practices appear to be almost entirely unmonitored by ADC's contract monitors.  In the few monitoring reports that do review segregation policies and practices, notable deficiencies are recorded.  In Florence in September 2012 the ADC monitor noted that "the weekly and three times a week checks are not being completed as required."[63]  In Perryville, the ADC monitor noted that segregation rounds were being done but noted that there no Post Order identifying the level of segregation for each administrative segregation unit and the monitoring requirement for each unit could be located.[64]   In Eyman, the monitor noted:

> Review of charts and interviews with staff confirms that welfare rounds [in Browning and SMU I] are not being made to inmates in single-celled housing environments.... Inmates in these areas are provided observation checks by the POD officer every 60 minutes, plus meal deliveries twice per day.  Per NCCHC, this level of segregation would qualify as *extreme isolation*, requiring daily medical follow-up as well as <u>weekly</u> follow-up with mental health staff, as well [as] the subsequent documentation evidencing completion of these rounds.  This level of follow-up is not currently

---

[63] ASPC-Florence September 2012 Monitoring Report (ADC035262).
[64] ASPC-Perryville September 2012 Monitoring Report (ADC035479).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00036

1    being completed.[65]

2    These reports point to an alarming lack of mental health oversight in the isolation units.

3    For unknown reasons, however, ADC monitors have stopped reviewing this critical aspect

4    of mental health care for the highly vulnerable isolated population.   In more recent

5    monitor reports the segregation standards are simply absent.

6       69.   Nonetheless, the findings of ADC's own monitors in 2012 are entirely consistent

7    with my observations in July 2013.   During my facility inspections I talked to dozens of

8    prisoners about these cell-front visits and they uniformly reported that such visits were

9    rare and extremely brief; one prisoner characterized them as "fly byes."  Consistent with

10   these prisoner self-reports, the sparse documentation I saw in prisoner medical records

11   regarding these contacts was markedly rote and uninformative.  In addition, these kind of

12   non-confidential and very brief mental health contacts are of especially dubious value

13   when they are used to replace or substitute for actual and in-depth mental health

14   monitoring and care. Mentally ill prisoners cannot be expected to share meaningful,

15   sensitive, personal information with mental health staff cell-front without having first

16   established a trusting relationship (and, even then, the non-confidential nature of the

17   contact may create barriers that are difficult or insurmountable to overcome).  When this

18   kind of limited and compromised contact represents essentially the only mental health

19   contact that prisoners in isolation regularly have, it is of extremely limited or no value.

20      70.   Perhaps on the basis of these and the many other severe problems that plague the

21   ADC mental health delivery system, Dr. Taylor, the current mental health contract

22   monitor, recently testified that she was unable to state that ADC currently meets

23   constitutional requirements with regard to mental health care.[66]

24   **3.  Extreme Social Isolation and Harsh Conditions Put all Prisoners in Isolation at**

25   **Risk of Harm**

26   _____

27   [65]  ASPC-Eyman  September  2012  Monitoring  Report  (ADC035047)  (italics  in
     original).

28   [66] Taylor Dep., 277:13-25.

-37-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

71.   It is my opinion that the failure of the ADC to categorically exclude all prisoners who suffer from SMI from being confined in its isolation units is at odds with sound correctional and mental health practice. It places all such prisoners at serious risk of substantial harm.  It is also my opinion that the conditions of confinement in the isolation units that I toured and the ADC policies and practices that I reviewed and admissions of ADC regarding conditions of confinement in its isolation units (as reflected in the documents, materials, and admissions I have reviewed), constitute the type of conditions that my own experience and research, and the decades of scientific research and study done by others have found to adversely affect virtually everyone exposed to them, regardless of pre-existing mental illness.  As such, the conditions to which the ADC subjects its isolated prisoners places all of them at serious risk of significant psychological harm.

72.   These units are harsh and severe by any measure, and they subject prisoners to extreme forms of social isolation and other potentially debilitating deprivations. For example, as mandated by statewide policy, prisoners in ADC isolation units are afforded extremely limited out-of-cell time.  Official policy and practice allows for only 6 hours of exercise a week in three separate two hour blocks. This means that prisoners are essentially confined to their cells for 23-24 hours per day.[67]   The "every-other-day" configuration means that prisoners will spend an entire off day—half the days of the week—confined continuously inside their small cells. If their exercise time is cancelled, for whatever reason—which prisoners indicated was not uncommon—then their periods of continuous in-cell confinement are even longer. Moreover, it reduces their exercise time to no more than 4 hours per week, far below what is commonly regarded as the minimal amount of out-of-cell exercise time for isolated prisoners. Their "exercise" takes place in specially designed "enclosures" that are constructed of chain link fencing or steel

---

[67] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (10/17/12), at RFA## 11-12.

-38-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00038

1   mesh or concrete walls, in which the only "equipment" to which they may be allowed

2   access is a handball.[68]

3      73.   Prisoners who are housed in the Special Management Unit (SMU) and those who

4   are sentenced to death (which automatically results in their isolated confinement) are

5   denied access to the prison's educational programming.[69]   Indeed, access to any

6   programming or activity of any kind appears extremely limited in these units,[70] resulting

7   in widespread and debilitating idleness throughout these units. Because even the limited

8   amount of available programming in the "regular" ADC isolation units is provided by

9   television and, in the absence of any programming television is one of the very few

10  "distractions" isolated prisoners have with which to occupy time, those prisoners who are

11  unable to obtain a television have little or nothing to do, day in and day out, for the

12  duration of their time in isolation.

13     74.   The conditions of confinement in these units are stark and barren. The stark

14  conditions in isolation are further exacerbated by ADC's policies that allow for 24 hour

15  illumination in some isolation cells;[71] limited property, including lack of access to TVs or

16  radios;[72] infrequent, reduced calorie meals;[73] and the years and years that many prisoners

17  spend in such conditions.[74] Prisoners' only regular contact with other human beings is

18  almost entirely limited to the brief, routinized "interactions" that occur twice a day, when

19  they receive their meals (which, of course, they eat in their cells, with only very rare

20  exceptions for a small number of prisoners, as described below). The atmosphere in the

21  housing units themselves has a kind of "war zone" quality to it, with helmeted and flak

22

23      [68] Id. at RFA ##13-16.

24      [69] Id. at RFA ##25-26, 28.
        [70] Dep't Ord. 809, Earned Incentive Program, Jan. 11, 2011, (ADC014001-

25  ADC014004).
        [71] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of

26  Request for Admissions (dated 10/17/12), at RFA #21.

27      [72] Id. at RFA #22.
        [73] Id. at RFA## 31-32.

28      [74] Id. at RFA ##25-26.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                   PRSN-CH 00039

jacketed staff (and outside visitors) patrolling the areas outside the prisoners' cells. Not only does this extra paraphernalia add to the oppressive heat staff must contend with in these units, and makes it difficult to have remotely meaningful contact (because the bulky helmets and face masks are difficult to see through clearly or to hear prisoners who are trying to talk from behind the doors of their cells), but they also convey the unmistakable message to the prisoners that they are categorically regarded by staff as dangerous, untrustworthy, and poised to attack, and never to be approached person-to-person. Even the mental health staff members are outfitted in this garb.

75.   Prisoners reported—and it was consistent with my own observations in the course of my tours of the various ADC facilities—that there was little or no routine, meaningful contact with mental health staff. A number of prisoners seemed puzzled when I asked about how often mental health staff came by to check on them, many could not remember any such contacts, and others said that the only "contact" they had was when mental health staff sporadically and infrequently walked quickly through the units, without bothering to stop and engage any of them as they rapidly passed by. Opportunities for prisoners in these units to silently suffer and quietly deteriorate, without anyone noticing until their mental health problems become severe and perhaps irreversible, abound.

76.   The conditions of extreme social isolation and enforced idleness that I witnessed during my tours and which were described in the documents that I have reviewed are virtually identical to the worst kinds of isolated conditions that I have seen and studied in other correctional institutions. These harsh and severe conditions and forms of treatment create a serious risk of significant harm for all of the prisoners who are subjected to them. Indeed, ADC's own mental health practitioners appear to be fully aware of the inherent risks and potential harms that these conditions pose for prisoners. For example, the former psychiatrist supervisor at Perryville, Dr. Crews, testified that "a person who doesn't have mental illness being isolated for long periods could develop mental illness or

Confidential                                                                                              PRSN-CH 00040

mental illness symptoms from being isolated."[75]   I agree with Dr. Crews and have witnessed the damaging effects that such harsh and extreme isolation wreaks on prisoners' mental health and emotional well-being.

77.   A substantial number of ADC prisoners are being subjected to these harsh and dangerous conditions. Based on the documents that I have reviewed and the facilities I inspected, I estimate that approximately 3000 prisoners are housed in units in the ADC that impose this kind of isolated confinement.[76]   The fact that some minority of these prisoners may be housed with cellmates (i.e., are "double-celled") does not mitigate, and indeed may exacerbate, the psychological impact of their deprived conditions. The kind of forced and strained "interactions" that take place between prisoners who are confined nearly around-the-clock in a small cell hardly constitute meaningful social contact. In fact, under these harsh and deprived conditions, the forced presence of another person may become an additional stressor and source of tension (even conflict) that exacerbates some of the negative reactions brought about by this kind of segregated confinement. This is the primary reason that assaults (and sometime lethal violence) between cellmates is a serious problem in many isolation units. Especially for prisoners who cannot pick their cellmates—but often even for those who can—essentially constant, forced, inescapable, and unremitting contact with another person in such a small and enclosed space soon becomes intolerable; many prisoners report that it worsens (rather than ameliorates) the most negative aspects of isolated confinement.

78.   The serious risk of significant harm to which isolated prisoners are subjected is tragically manifested in the extremely high suicide rates in these units.  Prison researchers and correctional mental health experts are well-aware that a disproportionate number of suicides and incidents of self-harm take place in isolation units.  ADC's isolation units

---

[75] Crews Dep., 127:7-10.

[76] ADC Institutional Capacity Committed Population, October 31, 2013, *available at* http://www.azcorrections.gov/adc/PDF/count/10222012%20count%20sheet.pdf    (last visited Nov. 7, 2013).

-41-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   appear to be no exception. According to the testimony of ADC's Northern Regional

2   Operations Director and 30(b)(6) designee for the isolation units, Carson McWilliams,

3   there is a higher percentage of completed suicides in isolation units than any other in the

4   system.[77] Director McWilliams also noted that a significant portion of self-harm incidents

5   occur in the protective custody units (where prisoners live under conditions of isolated

6   confinement).[78] Despite the extremely high incidence of self-harm and completed suicides

7   in these units, staff members assigned to them apparently do not receive any additional

8   training on suicide prevention.[79]

9   79. ADC's discovery responses indicate that the prison system had six suicides in

10  2012.[80] The data provided by defendants is not entirely clear, but it appears that all or

11  almost all these suicides took place in the isolation units. The suicide of ▮ is listed as

12  "Perryville/Lumley" so it is unclear if the death took place in the Special Management

13  Unit at Lumley. And the suicide of ▮ is listed as occurring at "Florence/Browning"

14  which is not an accurate unit description since the Browning Unit is at Eyman. Thus, as I

15  say, it may well be that all of the suicides in the ADC in 2012 took place in one of its

16  isolation units. This year, as of October 21, 2013, there have been nine suicides. Of

17  particular concern is the fact that three of these suicides occurred at ASPC-Eyman, all

18  within only an eighteen–day period (between April 22 and May 10, 2013). A fourth

19  suicide occurred at Eyman on June 19, and a fifth on October 21.[81] [The discovery and

---

[77] McWilliams Dep., 169:25-170:4.
[78] Id., 167:14-168:20.
[79] Id., 169:13-17.
[80] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13), at No. 1.
[81] See Press Release, Arizona Department of Corrections, Inmate Death Notification (▮ 2013), *available at* http://www.azcorrections.gov/adc/news/▮13/▮ death_notify.pdf (last visited Nov. 5, 2013); Press Release, Arizona Department of Corrections, Inmate Death Notification (▮ ). *available at* http://www.azcorrections.gov/adc/news/▮13/▮ death_notify.pdf (last visited Nov. 5, 2013); Press Release, Arizona Department of Corrections, Inmate Death Notification (▮ 10. ), *available at* http://www.azcorrections.gov/adc/news/▮3/▮death_notify.pdf (last

-42-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    data available on ADC's suicides in 2013 do not indicate how many took place in the
2    isolation units. I have only seen particularized data for four deaths which indicate that
3    three suicides took place in SMU I, Browning and Rynnning, and one took place in
4    Lumley. The exact units where the five recent suicides in Eyman took place have not
5    been identified.] In any event, this is a shocking and disturbing record of suicidality—five
6    suicides at a single institution within just a little over a six-month period. It raises
7    profound questions about the policies, procedures and conditions that may have
8    contributed to the creation and maintenance of such a lethal environment.

9        80. If ADC has no further suicides this year, it will have an annual suicide rate of
10   22.5 per 100,000 prisoners, which is well above the national average of 16 per 100,000.
11   There appears to be a very high level of desperation and hopelessness among an unusually
12   large number of ADC prisoners, and the ADC itself does not appear to have adequate
13   procedures, policies, and mechanisms in place to address this problem. It is my opinion
14   that ADC's policy of placing such a large number of prisoners in its harsh and extreme
15   isolation units, its failure to exclude seriously mentally ill people from these units, and its
16   failure to regularly and meaningfully monitor the mental health status of all of the

17

18   ────────────────────────────────────────────────
     visited Nov. 5, 2013); Press Release, Arizona Department of Corrections, Inmate Death
19   Notification (               ),           *available        at*
     http://www.azcorrections.gov/adc/news/ 13/          DeathNotification.pdf (last
20   visited Nov. 5, 2013); Press Release, Arizona Department of Corrections, Pinal County
     Medical Examiner Releases Report on        Death (        ), *available at*
21   http://www.azcorrections.gov/adc/news/ 13/         death_findings.pdf  (last
     visited Nov. 5, 2013); Press Release, Arizona Department of Corrections, Inmate Death
22   Notification (               ),           *available        at*
     http://www.azcorrections.gov/adc/news/ 13/         death_notify.pdf     (last
23   visited Nov. 5, 2013); Press Release, Arizona Department of Corrections, Inmate Death
     Notification (               ),           *available        at*
24   http://www.azcorrections.gov/adc/news/ 13/         death_notify.pdf     (last
     visited Nov. 5, 2013); Press Release, Arizona Department of Corrections, Inmate Death
25   Notification (               ),           *available        at*
     http://www.azcorrections.gov/adc/news/ 13/         death_notify.pdf     (last
26   visited Nov. 5, 2013); and Press Release, Arizona Department of Corrections, Inmate
     Death    Notification   (               ),         *available        at*
27   http://www.azcorrections.gov/adc/news/ 13/         death_notify.pdf (last visited
     Nov. 5, 2013).
28

                                   -43-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   prisoners who are confined in such places all significantly contribute to the extremely
2   high suicide rate from which the system suffers.

3      81. Finally, it should be noted that ADC's placement of seriously mentally ill
4   prisoners in isolated confinement is not only harmful to them, but also jeopardizes the
5   well-being of other isolated prisoners and staff as well. Out-of-control mentally ill
6   prisoners whose psychiatric conditions may worsen in isolated confinement may become
7   assaultive to staff and to other prisoners. They frequently engage in loud, disruptive, and
8   otherwise noxious behavior (e.g., smearing themselves in feces) to which prisoners and
9   staff are exposed (and, in the case of prisoners, especially, from which they cannot
10  escape). This behavior can have a "ripple effect" throughout an entire housing unit,
11  increasing levels of tension and irritability of prisoners and staff, interfering with already
12  troubled sleep patterns among other isolated prisoners, and otherwise destabilizing the
13  atmosphere inside the housing unit. In addition, the acting out and non-compliant behavior
14  of mentally ill prisoners in isolation often precipitates forceful interventions by staff (e.g.,
15  the use of chemical agents) that adversely affect the well-being of everyone in the housing
16  unit.

17  **B. Institutional Inspections and Reviews**

18  **1. Perryville -- Lumley Special Management Unit (SMA)**

19     **a. Overview of Facility**

20     82. I toured Lumley SMA on July 18, 2013. During the inspection I was able to
21  observe all housing pod areas, designated treatment areas and recreation areas. I spoke
22  with a number of women prisoners at cell-front and conducted one-on-one confidential
23  interviews with selected prisoners. I also conducted selected medical record reviews.

24     83. The physical structure of SMA is highly unusual with two tiers of cells in four
25  "pods" designated A – D constructed to face outside with no internal courtyard of any
26  kind.[82] The housing unit is open to the elements with telephones and recreation cages

27

28  [82] See Photo of Perryville SMA Unit (ADC163920). Each of the four housing pod has

1  placed in the outside courtyards of the unit.[83]

2  84. Each cell is approximately          with a solid steel door.[84] The steel doors
3  make any direct or meaningful communication with the women inside the cells very
4  difficult. There is a window in the door and two narrow window slits at the back of the
5  cell.[85] In general, the lighting in the cells appeared quite dim. This meant that, on the day
6  that I toured the unit, it was not only difficult to converse with the women cell-front but
7  also difficult to even see inside some of the cells or to observed the women (or, for
8  example, easily assess their mental health condition). The cells are sparsely furnished with
9  a bed, desk, chair, sink/toilet combo, shelf, open closet structure and waste basket.[86]
10 Some prisoners at SMA are double-celled.

11 **b. SMA's Conditions of Confinement Place All Prisoners Housed There at Risk**
12 **of Harm**

13 85. Conditions of confinement in the Lumley SMA are stark and severe. The extreme
14 isolation, idleness, and deprivation place prisoners at serious risk of significant harm,
15 especially those prisoners who have pre-existing mental illness (or who may have
16 contracted mental illness in the course of their confinement there). The most problematic
17 and dangerous features of the harsh conditions of confinement in the SMA include being
18 housed nearly around-the-clock inside cells where the prisoners eat, sleep, and defecate.
19 SMA allows prisoners to recreate 6 days a week for one hour a day. Limited out-of-cell
20 time is also permitted for showers. I was told that a very limited number of SMA
21 prisoners are now permitted to take a meal in the dining hall. Otherwise, prisoners have
22 little or no access to meaningful out-of-cell programs or purposeful activity of any kind.

23

24

25 24 cells. Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13), at No. 10.

26   [83] See Photo of Perryville SMA Courtyard (ADC163916).
    [84] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13), at
27 No. 10.
    [85] See Photos of Perryville SMA Cell (ADC163886-88).
28   [86] See Photos of Perryville SMA Cell (ADC163886-88).

-45-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                          PRSN-CH 00045

1  Educational and vocational programs are largely unavailable; almost no one is permitted
2  to hold a job; visits are generally no-contact; interaction with staff is limited; and
3  property—including TVs, fans, and radios—is generally only available to those prisoners
4  who have money to pay for them. For a number of prisoners, such items are too expensive
5  and they are unable to purchase them.

6      86.   During my tour I was also told that out-of-cell recreation is available to women at
7  SMA in three stages.  In the first stage, women are only allowed to recreate in individual
8  cages.[87]  According to staff who accompanied us on the tour, this stage lasts a minimum
9  of 30 days.  Thereafter, if the prisoner is judged to be suitable to be progressed to stage 2,
10  she will be allowed to recreate with a small group of other prisoners in a larger cage that
11  contains a basketball hoop.[88]  Finally, prisoners who are judged suitable to be progressed
12  to stage 3 are allowed to recreate on the main yard with about 15 people at a time.  On the
13  day of my visit, there was a volleyball net, a few picnic tables, and a small shaded area in
14  this yard.[89]  Defendants indicated that the SMA prisoners at stage 1 are allowed playing
15  cards and sports balls, and at stages 2 and 3 they are allowed cards, table games, and
16  sports balls.[90]  I observed a few balls in the rec cages the day of my tour (although several
17  prisoners indicated that they had been placed there only in anticipation of our tour and
18  inspection).

19      87.   The overall "program" for SMA prisoners is nearly non-existent and wholly
20  inadequate. The women complained repeatedly about having nothing meaningful to do
21  and lacking any constructive way to even pass time. One of them told me, "there is no
22  program or anything—they have no teachers here. If we want a book, we have to bang on
23  our door, and they can give us a ticket for that." Another said: "we are dying back here,

24
25
26      [87] See Photo of Perryville SMA Stage 1 Recreation Cage (ADC163902).
        [88] See Photo of Perryville SMA Stage 2 Recreation Cage (ADC163917).
27      [89] See Photo of Perryville SMA Stage 3 Recreation Area (ADC163919).
        [90] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/25/13), at
28  No. 11.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

we are just locked down… There is no human contact here." The recreation areas to which they are given limited access are very sparse and, even at "level 3," do not provide the women with truly meaningful or productive activities in which to engage. Moreover, their access to even these largely barren concrete "yards" is limited not only by the time limits placed on their use, but also by the intense heat that beats down on the outside areas of the unit for much of the day during most of the year. Women complained also about the pepper spraying. One pregnant prisoner told me: "they pepper spray us for no reason. I've been sprayed once . . . I was having cramping after." She said that the officers do not shower the prisoners after they have been sprayed.

88. The combination of the extreme levels of isolation and deprivation that characterize the SMA, the lack of programming and insufficient out of cell time, the overall harsh and inhospitable conditions under which the prisoners live has placed them in jeopardy. There are no meaningful steps being taken to ameliorate the adverse psychological effects of the isolation and deprivation to which the women are subjected. The prisoners with whom I spoke expressed feelings of pain, desperation, and fears of deterioration that were completely understandable under the harsh conditions of isolated confinement that I observed.

c. **Excessively Harsh Conditions for Mentally Ill Prisoners and Lack of Appropriate and Meaningful Treatment**

89. During my tour of SMA I was struck by the large number of prisoners who appeared to be seriously mentally ill. Despite this obvious fact, there did not appear to be any coherent mental health program in place for any of the women at SMA. Indeed, the staff seemed to be confused about whether one existed and, if one did, what it might consist of. When we were first taken to "D pod" at SMA, staff indicated that it was where the "mental health program" was located, with "watch cells" on the first tier and prisoners with mental illness housed on the second. Later, however, staff clarified that D pod is just the pod where the mental health watch cells are located. It is not specifically designated as a dedicated "mental health program" area (and it appears that no area actually is). This

-47-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                      PRSN-CH 00047

1  may be because there really is no functioning mental health "program" in the SMA.

2  90. All of the "watch cells" on the first floor of "D pod" were full during my tour.
3  The cells were abysmal and the arrangement itself wholly inappropriate. The outward
4  configuration of the cells meant that it was difficult for someone standing outside, in the
5  bright light, to see into some of the dark cells. The cells were barren, with worn concrete
6  floors and blankets on the floor crunched up in a pile. In addition, large fans were placed
7  on the ground tier where the watch cells are located and where officers are posted, in an
8  (unsuccessful) attempt to compensate for the stifling heat. But the loud noise of the fans
9  ensured that it was not only difficult to see into some of the watch cells but also nearly
10  impossible to hear the prisoners inside (or, for that matter, the staff on the outside).

11  91. One of the women I interviewed in a watch cell,                              , told
12  me that she had been placed there after telling a staff member that she was afraid she was
13  going to hurt herself. She had arrived at the SMA the day before but had still not seen a
14  doctor.                was clad only in suicide smock, but complained of the oppressive
15  heat; I could see that she was perspiring. Another woman in the watch cells,
16                              , was wearing a red football helmet, ostensibly for her protection. She
17  told me that she had been at Perryville for about three and a half years, about two-thirds of
18  which she estimated she had spent in SMA.                said that conditions there were
19  getting worse not better, and that she had to "demand and demand help" before getting
20  any. She told me that she was on Tegretol and receives Haldol shots for her bi-polar
21  disorder, and that her mental health contact was limited to a once-a-month session with "a
22  psych." She has never attended any kind of group therapy session.

23  92. D pod is also the site of the only space designated for "treatment" at SMA. The
24  "treatment room" is an office with four individual cages aligned next to each other.[91]
25  According to ADC, each treatment cages is     long by     wide.[92]  ADC has stated

26
27  [91] See Photo of Perryville SMA Treatment Room (ADC163889).
28  [92] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13), at
    No. 12.

that group sessions and one-on-one counseling is provided to SMA prisoners.[93]   Although there are infrequent one-to-one contacts with mental health staff (the women I interviewed estimated these to occur not more than once a month), there did not appear to be any therapeutic groups being run in the unit, either to address the women's particular psychological problems or to even slightly ameliorate the debilitating effects of extreme isolation. When I was told that there were actual groups being run, I asked to see a schedule of group sessions. After persisting, I was provided with a one-page, typed note near the end of the day that said: "Dr. St. Clair recently rotated the mental health staff; new group schedules have not been established yet. Below is the previous schedule."[94]   It would appear that, at least at the time of my tour, there were in fact no groups being operated, as the women consistently reported. The note indicated that, at least during a previous time period, groups had been conducted. It was impossible to tell how regularly they actually were run, how long the groups were in existence, or how many women had once participated in them.

93.   This current failure to provide any enhanced mental health treatment for seriously mentally ill women at SMA is apparently not a recent problem. Former Mental Health Program Manager and Mental Health Services Monitor, Dr. Shaw, testified last year that the reason SMA had no "enhanced mental health treatment areas" at that time was because "I just didn't think about it. I forgot about it."[95]   Based on what I saw and heard during my July, 2013 tour of the facility, it appears that the women at SMA have continued to be forgotten.

94.   This lack of an operating mental health program, even for the sickest prisoners, was also reflected repeatedly in the interviews conducted on-site. I had asked to interview

---

[93]  Id.
[94]  Mental Health Note Re: Group Schedules ASPC-Perryville SMA (ADC139524).
[95]  Shaw Dep., 149:25-150:3; 155:20-23.   See also Memo to Charles L. Ryan from Robert Patton and Richard Pratt, re: Increase of Mental Health for Max Custody, 4/30/12 (ADC050861-67) (notably the SMA is not included in the programs discussed in this memo).

Confidential                                                                    PRSN-CH 00049

named plaintiff, Christina Verduzco, #205576, in a confidential setting but we were told that she was "non-transportable" due to her behavior so any interaction had to take place at cell-front. We found her in a cell tucked into a corner that had no direct sight lines. She indicated that it was hard to get the attention of staff in this corner cell so she often had to bang on the door and that she has even set fire to her cell in order to get officers to come to her cell in the past. Ms. Verduzco indicated that she is not getting the mental health treatment she needs and she knows that she is deteriorating badly there. She said, simply, "I need more help. I need more scenery. I need to talk to people." She said that instead of providing help to the prisoners, the SMA staff uses pepper spray to control them; she estimated that she had been pepper sprayed nearly a dozen times since she had been the unit.

95.   In my many years of interviewing prisoners, I have rarely met someone so desperately in need of mental health care. Yet Ms. Verduzco's obvious treatment needs appear to be going unmet in the SMA. She told me that she had not been to the treatment room for individual counseling in "a long time" and had never had a counseling session in which she was not in a cage and handcuffed. She indicated that mental health staff rarely come to her door to check on her. It was clear from my interaction with Ms. Verduzco and subsequent review of her records that she is seriously mentally ill and that her illness has been well documented by prison staff (including entries that described hearing voices, bizarre behavior, fecal smearing, suicidality and self-harm). In fact, Ms. Verduzco's long psychiatric history began at age 15 and includes a diagnosis of schizophrenia.[96] She hears voices,[97] is given a Haldol shot periodically, and also takes Cogentin and Depakote.[98] When I spoke with her, Ms. Verduzco said she was afraid to continue living in SMA, in part because she was afraid that she would continue to deteriorate there. But she said she had no idea when she would be released or what she could do to get out of SMA. During

---

[96] Verduzco Dep., 60:8, 66:1-2.
[97] Id., 68:7-11.
[98] Id., 6:25-7:1, 8:24; Christina Verduzco, Patient Profile Report, June 27, 2013 (ADC122736).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                           PRSN-CH 00050

1  our interview she said she had no TV, radio or fan and spends the day reading the Bible
2  and cleaning her room. She said that things were better for her when she was at the
3  mental health unit Flamenco and she very much wants to return there. In SMA, she is in
4  continuous emotional pain. She said: "I'm hurting in here, hurting in my head... I need to
5  get out of here. I need help."

6  96. I conducted a series of random, cell-front interviews in SMA and heard a number
7  of stories that were similar to Ms. Verduzco's. For example,

8  , told me that she had been at SMA for three months but never been to the
9  treatment room for individual counseling or any therapy. She stated that she suffers from
10  insomnia and anxiety attacks and was getting increasingly depressed in SMA. She is
11  taking Risperdal and Celexa but reported getting no actual treatment or therapy from the
12  mental health staff (except for her medications). Other prisoners also corroborated the
13  fact that mental health contact is rare or non-existent in the SMA. For example,

14  , who had also been at SMA for three months, told me that she
15  had had one counseling session that lasted about 35-45 minutes, conducted in the therapy
16  room, while she was kept un-cuffed inside a treatment cage.  indicated that
17  the session was somewhat helpful for her, but another scheduled session was cancelled.
18  She told me that the mental health staff is not on the unit very often. While at SMA she
19  has never been in a therapy group or been told about any other kind of programming
20  there. There are not even any cell-front programs that she knows of and she said there is
21  very little to do. She is trying to get a loaner TV and fan.  said that she takes
22  Zoloft and albuterol and that her medications are helpful.

23  arrived at SMA two weeks prior to my visit. She told me that she suffers from bi-polar
24  disorder, and had spent time in SMA for minor write-ups that really should not have
25  resulted in her being placed in isolation. For example, she indicated that she was given a
26  six month sentence in SMA for "being out of position" in the shower.  stated
27  that she had seen the therapist the day before I interviewed her and she told him that she
28  was "going nuts" alone in her room; all he said in response was that he would raise her

-51-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Tegretol dose. [redacted] recalled that during her previous stay at SMA there was at least one class that was offered in the "psych room"; it lasted about 6 weeks but ended when Dr. Blair left. She was unaware of any groups presently offered.

97. I conducted several in-depth interviews with women at the SMA. They described the painful nature of their isolated confinement and the psychological damage that it was doing to them. They also complained bitterly about the inadequate mental health care being provided in the unit. For example, I interviewed named plaintiff Sonia Rodriguez, #103830, a 40 year old mother of six. Ms. Rodriguez has a long history of mental health problems beginning as a youth and culminating in serious suicide attempts while she was incarcerated. Ms. Rodriguez was recently released from SMA to a close custody unit, and was able to describe the dramatic contrast in treatment. She was adamant that mental health care in SMA has deteriorated badly over the last several years. When she first returned to prison in 2008, she said that she often had mental health contacts. And recently, after being released from SMA, she is once again being seen more often by mental health staff.

98. Although Ms. Rodriguez reported that she thought her mental condition had improved since leaving SMA, the long period of time she had spent in isolation left her with many lingering psychological issues and problems. For example, Ms. Rodriguez reported serious problems with insomnia and nightmares. Her memory and concentration are clearly compromised. She reported feelings of anxiety, lethargy, mood swings and emotional numbing, amongst other symptoms. She indicated that visual and auditory hallucinations are common for her; she sees "ghosts" and they direct her towards violent acts. She is plagued with suicidal ideation. She has reported this to her counselor who said she would see about asking that the doctor give her more medication. Indeed, it was clear during my interview with her that Ms. Rodriguez was heavily medicated already, so much so that it appeared to slow her speaking and perhaps to interfere with her memory. At first she could not remember her current medications and only later in our session did she recall being placed on court-ordered Haldol shots. She indicated that she wished she

-52-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1 │ had group treatment sessions rather than just more medications to help her mental health
2 │ problems.

3 │      99.  I also interviewed                            a 30 year old married mother of three.
4 │ She has been incarcerated at SMA for several years during her entire current sentence as
5 │ well as during part of a previous sentence from 2002 to 2006.  She will be released in
6 │ 2015 and told me that she is worried that segregation is "all I know"; she feels she needs
7 │ practice being around people before returning to her family and community.            is
8 │ seriously mentally ill and described a long history of psychiatric problems dating back to
9 │ her childhood.  She indicated that she has been diagnosed bipolar with schizophrenia and
10 │ that she regularly hears two voices in her head.  These voices tell her to harm herself and
11 │ others.  She also told me that she has attempted suicide on multiple occasions and has a
12 │ history of cutting (including one tragic incident where, responding to the commands of
13 │ one of the voices she hears, she attempted to cut her unborn fetus out of her body).

14 │      100. Despite her very serious mental illness,            reported that she has had a
15 │ difficult time getting her medications and that she receives very little mental health
16 │ treatment in SMA.  She could recall receiving some counseling sessions in the D pod
17 │ office on the unit, where she said she sat in a cage and talked to mental health staff, but
18 │ nothing more than that.  She did not recall having had any group sessions, and complained
19 │ that the mental health care in SMA had gotten worse over time.  During my interview
20 │ with            , she reported multiple symptoms associated with long-term isolation,
21 │ including obsessive thoughts and revenge fantasies; anger; memory and concentration
22 │ problems; an inability to relate to others coupled with emotional numbing, depression and
23 │ anxiety and a general feeling of lethargy.            appears to be a very seriously
24 │ mentally ill prisoner whose continued well-being is being jeopardized by the severe
25 │ conditions of her isolated confinement and the inadequate mental health care that she
26 │ reported receiving.

27 │      101.                            is a 30 year old mother from Phoenix.  She is now in
28 │ SMA as a "protective segregation" prisoner and has been living in isolation for three and a

1  half years. She will be released in 9 years and fears that she will spend the entire time in

2  SMA.                is especially concerned that she will end up like other women she has

3  seen come into the unit and who eventually "pull out their hair and smear feces." She told

4  me, "I see girls come into SMA normal and leave losing their minds—it terrifies me."

5          talked about her own extreme isolation and the effects it was having on her. She

6  told me that coming to my interview was the first time that she had left her cell in over

7  two months, despite the fact that she has no TV or radio in her cell and relies only on

8  books to occupy her mind day in and day out.                reported that she did not have

9  a formal mental health diagnosis in the community, although she admitted to a long-term

10  struggle with bulimia and said that she had become addicted to meth before her

11  incarceration. Once in prison, she began to experience other serious psychological

12  problems. Although she is unclear about what her actual mental health diagnosis is now,

13  she reported that she takes a number of psychotropic medications, such as Risperdal,

14  Cogentin, and Zoloft.                appeared to be suffering and unstable, and she told me

15  that she knows she needs mental health care. However, she also talked at length about the

16  lack of adequate programming and treatment in SMA. She said that she has been taken to

17  the treatment cages in D pod, but only after she submitted a health needs request (HNR).

18  Even then, however, she said that it takes a long time—weeks or a month—before the

19  mental health staff responds. In fact, she represents a common pattern in SMA: Prisoners

20  who need help must requesting it by submitting an HNR, but then they are forced to wait a

21  long time before they get a response. In the meantime, they deteriorate further and many

22  of them eventually end up on suicide watch. As she put it, the women "lose it" while

23  waiting so long for their mental health appointment. She reported that this has happened

24  to her as well as to other prisoners.                corroborated the comments of several

25  other women with whom I spoke to the effect that mental health care in the SMA had

26  gotten worse over time. She reported that, in addition to the lack of any regular or group

27  counseling, there was so much staff turnover in the unit that she and the other women

28  found it very difficult to form trusting therapeutic relationships with any of the mental

-54-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  health providers, on the rare occasions when they did see them.

2  102. In addition to the inadequate mental health care that she described,
3  voiced a number of concerns about the adverse effects of the severe isolation and
4  conditions of deprivation to which she was being subjected. She reported numerous
5  symptoms including depression, anxiety, frequent headaches and nightmares, along with
6  emotional numbing, lethargy, moodiness and an inability to be around others. She said, "I
7  used to be happy and caring but now I just don't feel anything for people."

8  103.                                    is a 47 year old woman serving a life sentence for a
9  felony murder that occurred during a high speed car chase.                told me that she
10  had become addicted to methamphetamine and alcohol on the streets, and that she had
11  gone through a "dark period" in her life during which time she had made a very serious
12  suicide attempt. Her mental health problems worsened after she was arrested for her
13  present offense, and she received psychological counseling and psychotropic medications
14  (Seroquel and Celexa) in county jail awaiting trial. When she got to prison, however, the
15  quality of her mental health care declined. She suffers from depression and is taking
16  Risperdal. She was seen six months ago by mental health staff but rarely interacts with
17  them.                said that she believes the need for mental health care is great in SMA:
18  "You can't have a straight mind in here, given how awful it is." But also stated that the
19  mental health care is inadequate, and that "people fall through the cracks here." As she put
20  it, "someone sees you at your door—maybe once every two or three weeks" but only if
21  you are on the list of "high risk" prisoners, and even then the visits are perfunctory and
22  unhelpful—the staff members doing it go by quickly, she said, just to check you off the
23  list. If you tell the mental health staff you want to see someone for an actual counseling
24  session, because you are having a problem, you have to wait for long periods before it
25  happens. She said that because she is not considered at "high risk" for mental health
26  problems, she, too, has "fallen through the cracks." She said she has managed her
27  psychological symptoms as best she could, on her own, by adopting meditation and
28  Buddhism. Although this has helped some,                nonetheless acknowledged a

-55-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

PRSN-CH 00055

1    number of problems in isolation, including anxiety, irrational anger, and feelings of deep

2    depression that she regularly "fights to keep from going over the edge."

3    104. In summary, there is ample evidence that many seriously mentally ill prisoners

4    are confined in SMA, where they are subjected to very severe isolation and deprivation.

5    They remain there without the benefit of an adequate, functioning mental health program

6    to either address the women's pre-existing psychiatric problems or to provide them with

7    even a tiny measure of respite from the painful and potentially dangerous conditions of

8    confinement to which they are exposed. Many of the women with whom I spoke had long-

9    standing and apparently well-document psychiatric histories that often pre-dated their

10   imprisonment. Yet they were confined nearly around the clock under truly extreme

11   conditions, in small isolation cells where they were denied meaningful programming,

12   were not regularly and carefully monitored for signs of further deterioration, and did not

13   receive remotely adequate therapeutic contact. The combination of such harsh and

14   potentially debilitating conditions of confinement in the absence of adequate

15   programming and treatment placed these especially vulnerable women at very serious risk

16   of significant psychological harm.

17   105. My inspection of the SMA and the interviews I conducted with the women

18   housed there surfaced several other troubling issues. As I noted several times in passing

19   above, a number of the women reported that chemical spray was frequently used by unit

20   staff to subdue prisoners, including prisoners with serious mental illness and those who

21   were otherwise in extreme mental distress.    Christina Verduzco, #205576 stated

22   unequivocally that she had been sprayed with pepper spray by officers and indicated to me

23   that the use of chemical agents was commonplace at SMA.

24   corroborated this. She indicated that women get sprayed nearly every day at SMA and that

25   the staff targeted the women who are on mental health watch.   (Because

26   protective segregation cell is located on D pod, where the mental health watch cells are,

27   she is able to directly witness this).   Sonia Rodriguez, #103830 also felt that officers

28   mistreated women by using pepper spray at SMA; she said some of the officers are "Mace

-56-

1    happy."                          also observed that using chemical spray on the

2    women is common at SMA, even those women who are "on meds." And

3            felt that although the amount of chemical spray that was used on the unit

4    depended on which sergeant was on duty, she noted that it was not uncommon for some

5    women to be sprayed twice in one night. The prisoners' description of ADC's practices

6    are further supported by the documents I reviewed recording use of force incidents. For

7    example, at Perryville ADC records spraying of prisoners who merely held their food slots

8    open[99] or refused to relinquish her undergarments.[100]

9        106. Nearly every prisoner I spoke with at SMA complained about the extreme heat in

10   the unit. Indeed, it was clear during my inspection that everyone, including staff,

11   prisoners, and those accompanying me on the inspection were having difficulties coping

12   with the extreme heat. (Several prisoners also indicated to me that the cold water being

13   passed out on the unit during my inspection was not usually provided.) During my

14   interviews, several prisoners described heat-related symptoms and problematic behavioral

15   reactions to the extreme heat. Christina Verduzco, #205576, repeatedly talked about how

16   hot her cell was and explained that she sleeps on the floor to try to cool down. She

17   reported fainting from the heat several times recently and said that she does not go outside

18   because the heat makes her sick. She had no fan.                          similarly

19   noted that one of the reasons she had not left her cell in over two months is the heat. She

20   is heat sensitive and faints frequently even in her cell which is extremely hot with no air

21   circulation. She has a fan but it is breaking down and she fears the day it ceases to work.

22                          described the difficulties she has breathing in her hot cell,

23   especially due to her asthma, and informed me that her air conditioning did not work and

24   no one checked the temperature in her cell. She had no fan and asked the officers to open

25   her food slot to at least let air in but said that they refused.

26

27          [99] SIR No. 201211753, ASPC-Perryville, Lumley (ADC089376),

28          [100] SIR No. 201214634, ASPC-Perryville, Lumley (ADC089377).

                                   -57-

Confidential                                                                    PRSN-CH 00057

1  described similar problems breathing due to the heat.                                    , who
2  was seven months pregnant at the time of my interview with her, described the extreme
3  heat in her cell as unbearable. She had no fan and talked about how difficult it was to get
4  an officer's attention if you have a problem. She said she has been given disciplinary
5  tickets for banging on her door to try and get an officer to come to her door. These severe
6  conditions place many of the mentally ill and other prisoners in SMA at an additional risk
7  of harm—physical as well as mental. Many prisoners said they avoid going to outside
8  recreation areas because of the extreme heat, which adds to their isolation and chronic
9  idleness. But many also said that even their cells were unbearable because they were so
10 hot and lacked proper ventilation.

11 107. Intolerable conditions of confinement place the mental health of prisoners in
12 jeopardy and—when they press against the bounds of what prisoners can physically
13 tolerate—also place them at risk medically. The use of chemical sprays and the intolerable
14 levels of heat to which the women are exposed exacerbate already unjustifiably adverse
15 conditions of confinement. The ADC has done little or nothing to ameliorate the worst
16 effects of any of these conditions. As a result, the prisoners housed in the SMA remain at
17 serious risk of harm.

18 **2. Florence Central and Kasson**

19   **a. Overview of Facility**

20 108. I inspected Florence Central and Kasson units over two days on July 19 and
21 22, 2013. During the inspection I was able to tour all representative housing units and
22 designated treatment areas. I also interviewed numerous prisoners at cell-front and
23 conducted confidential, one-on-one interviews with a pre-selected list of prisoners. The
24 various units at Florence Central, including Kasson, have programmatic and architectural
25 differences that should be noted.

26 **Cell Block 1**

27 109. During my inspection Warden Lance Hetmer informed me that Cell Block 1
28 ("CB-1") is officially designated as a mental health program unit for maximum security

1    prisoners identified at level MH-3 and above in ADC's scale of mental health acuity.
2    According to Warden Hetmer, individuals in this program have high mental health acuity
3    but must be stable enough to participate in the program.  Group and one-on-one
4    counseling is reportedly available for CB-1 prisoners.  The groups are conducted in the
5    chow hall and the one-on-one sessions in the Psychiatric Associate's office located in the
6    health unit on the main yard.[101]  Prisoners participate in the group session unrestrained
7    and ADC also indicates that prisoners assigned to the "behavioral health program" at CB-
8    1 will not be restrained during 1:1 counseling sessions.  The Psychiatric Associate and
9    Psychiatric Technician are also supposed to tour CB-1 and speak with prisoners at cell
10   front to allow for a "more casual interaction and support for any issues being worked on in
11   groups, in addition to groups and one-on-one meetings."[102]

12   110. CB-1 has 120 single occupancy cells open steel bars at cell front.  One of the
13   wings at CB-1 is also designated as over-flow for maximum security prisoners who do not
14   participate in any CB-1 programming or recreation.  The cells are approximately 54
15   square feet or ▮▮▮▮' with shelving, a bed and a toilet/sink unit.[103]  The living space is
16   extremely constricted and the unit was quite hot on the day of my tour, although some
17   fans were operating on the tiers.  Some of the cells which face the front of the building
18   experience direct sunlight.[104]  Other cells face each other and a common area with
19   skylights.[105]

20   **Cell Block 2**

21   111. Cell Block 2 (CB-2) is a step-down program called "Walking 5" which allows
22   prisoners to lower their custody level through behavior and programs.  Prisoners in the

23

---

24   [101] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13),
25   at No. 12.
        [102] Id. at No. 12, p.17.
26   [103] See Defendants' Response to Plaintiff Wells' First Set of Interrogatories
27   (6/26/13), at No. 10; Photo of Florence CB-1 Cell (ADC154426).
        [104] Photo of Florence CB-1 Cell (front of building)(ADC154430).
28   [105] Photo of Florence CB-1 (ADC154429).

1    program have privileges uncommon in other parts of Florence Central: they are allowed

2    to walk without restraints; they have recreation on the main yard with 52 people; and they

3    take their meals in the chow hall. According to Warden Hetmer, this is not a mental

4    health program and he believes there are few prisoners in the program with MH-3 mental

5    health scores and above.

6      112. CB-2 has 120 single occupancy cells which are each 40 square feet in size,

7    ▮.[106] These cells are extremely small spaces.[107] The cells are all open bars in three tiers

8    on either side of a main courtyard.[108] This unit was stifling the day of my tour and

9    extremely dark with little natural light.

10   **Cell Block 3 and 4**

11      113. Cell Blocks 3 and 4 are identical physically and programmatically, according to

12    Warden Hetmer and Defense Counsel. During my inspection I toured Cell Block 3 (CB-

13    3). These units are essentially general population maximum custody with no special

14    mental health programming of any kind. CB-3 has 136 single occupancy cells each with

15    54 square feet (▮).[109] The cells have open bars with a bed, shelving, a table/stool and

16    a toilet/sink module.[110] There are no windows in the cells but some natural light comes

17    from grated windows in the front of the building.[111]

18   **Cell Block 5 and 7**

19      114. Cell Blocks 5 and 7 are identical physically and programmatically, according to

20    Warden Hetmer and Defense Counsel. I toured Cell Block 5 (CB-5) during my

21    inspection. I was told that CB-5 predominantly houses general population maximum

22    security but one of its wings, 5A, is used for protective segregation prisoners coming from

23

24    [106] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/25/13), at No. 10.

25      [107] Photos of Florence CB-2 Cells (ADC154424-25).

       [108] Photo of Florence CB-2 (ADC154423).

26    [109] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/25/13),

27    at No. 10.

       [110] Photos of Florence CB-3 Cells (ADC154447; ADC154450).

28      [111] Photo of Florence CB-3 Tier (ADC154448).

      

1    Alhambra. CB-5 houses a total of 152 prisoners in single occupancy cells that are 72.96

2    square feet (⬛⬛⬛⬛).[112]  The cell fronts are solid steel doors with a small window in

3    each door.[113]  Each cell has a concrete bed, stool/desk, and some shelving.[114]  The cells in

4    this unit do not have windows with direct views to the outside. Instead, each cell has a

5    concrete enclosure built out of the building's edifice that allows for natural light to come

6    into the cell to some extent.[115]  This unit was especially dark. A window at the end of

7    each wing was so encrusted with dirt and grime that very little light came into the tier.

8    Due to the solid doors and small windows this unit was also more thoroughly physically

9    isolating than some of the other units at Florence Central.

10   **Kasson**

11    115. The Kasson unit is the site of both the mental health watch area for the Florence

12    unit and a designated mental health program for high acuity maximum security prisoners

13    in Wing 1, as well as other isolation units. There are a total of four Wings at Kasson, each

14    with 64 prisoners. The cells are 61.8 square feet (⬛⬛⬛). All are single cells.[116]  Wing

15    1 has steel doors with windows installed in each door and a small, grill covered window at

16    the back of each cell. The housing units are arranged so that no cells face each other.[117]

17    There are no common areas in the housing areas, just a shower. I was informed during the

18    tour this unit previously served as death row and its design would seem to reflect this

19    function. Kasson's mental health watch cells are disturbingly hot and isolating.[118]

20

21

22    ———————————————
     [112] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/25/13),
23    at No. 10.
     [113] See Photo of Florence CB-5 (ADC154454).
24      [114] See Photo of Florence CB-5 (ADC154461).
     [115] See Photo of Florence CB-5 Edifice (ADC154466).
25      [116] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/25/13),
26    at No. 10.
     [117] See Photos of Florence Kasson Wing 1 Able Cell Block (ADC154433-34);
27    Photo of Florence Kasson Wing 1 Baker High Side Pod Area (ADC154531).
28      [118] See Photos of Florence Kasson Watch Cells (ADC154431-32).

Confidential                               PRSN-CH 00061

### b. Florence Central's Conditions of Confinement Place All Prisoners Housed There at Risk of Harm

116. Florence Central and Kasson unit vary in programming and building design, but these units all share the extreme isolation, idleness and deprivation that characterize isolation units in the ADC system and place prisoners at serious risk of significant harm. Some of the units, such as CB-1 and CB-2 have instituted opportunities for group recreation in the main yard.[119]   The Kasson mental health unit provides for a phased recreation which starts with individual cages and progresses to opportunities to participate in larger recreation enclosures that allow for several prisoners to recreate at the same time, with limited equipment.[120]   In all other units at Florence-Central, prisoners recreate in barren individual cages without the opportunity for group recreation or even equipment with which to interact.   During my many interviews at Florence Central prisoners expressed the appreciation for group recreation and the desire for more.  There is no doubt that group recreation is important and the increase in such opportunities recently implemented in Kasson and CB-1 for prisoners with mental illness is especially important. But there is also no question that the current level of recreation at Florence, three days a week for two hours a day, is insufficient to ameliorate the deep levels of isolation present in the Florence-Central and Kasson housing units.[121]   I repeatedly heard from prisoners about cancelled recreation across the various housing units at Florence.  Such cancellation is especially problematic in ADC's system because of the few days even allotted for recreation.  If recreation is cancelled once a week that means a prisoner will be trapped in his cell for all but two days and four hours in a week with the possibility of a few extra

---

[119] See Photo of Florence Central Main Yard (ADC155473-77).
[120] See Photos of Florence Kasson individual and group recreation cages (ADC154440-4; ADC154467-72).
[121] ADC Department Order 704.10, Inmate Exercise Enclosures, 1.1 (ADC012693); see also Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of Request for Admissions (10/17/12), at RFA## 11-12.

-62-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    minutes for showers on the unit. Any cancellation of recreation is thus a huge reduction
2    in out-of-cell time, and even interaction with staff. And there is no requirement in ADC
3    to make that recreation up.[122] For prisoners who are not in the special programs, such as
4    prisoners housed in CB-3, 4, 5, and 7, and especially for the many prisoners in those units
5    who suffer from mental illness, there is no possibility of group recreation and they are left
6    with insufficient out-of-cell time and even greater levels of social isolation.

7    117. Beyond the insufficient levels of recreation at Florence, the unit exhibited the
8    same dangerous and harsh conditions of confinement I identified at SMA above. For
9    prisoners who are not in the officially designated mental health programs in Kasson and
10   CB-1, there is virtually no programming or meaningful out-of-cell activities of any kind.
11   For the prisoners in the "Walking Five" program in CB-2 there is a daily opportunity to
12   eat in the chow hall with others – but all other Florence prisoners eat both meals alone in
13   their cells. And even for the CB-2 prisoners, who must have good records and behavior to
14   get into the program, there is little opportunity to interact other than the one meal.

15   118. The case of CB-2 prisoner,                          is instructive.
16   told me he had been in the CB-2 step down program for over a year. He was blunt in his
17   assessment: "This is lockdown. We are in our cells around-the clock except for 6 hours of
18   yard, and showers 3 times a week." The "step down" part of the program appears to be
19   restricted to the fact that he and the other step-down prisoners get to go to the chow hall
20   every day with those housed on their side of the building (although, in the morning, a sack
21   lunch is dropped off that they still must eat in their cell).             told me that there is
22   no other out-of-cell programming available in the unit except for GED, but only if you're
23   eligible—if you already have your GED, as he said he did, there is no educational
24   programming at all available.            was able to purchase a TV and said he passes
25   his time watching it. He told me that he had never been able to talk with mental health

26

27   _____
     [122] Defendant Ryan's First Supplemental Answers to Plaintiff Brislan's First Set of
28   Request for Admissions (dated 10/17/12), at RFA #17.

1    staff about how he is doing emotionally in lock-up during his entire time at CB-2 because

2    they only come to speak with those prisoners who are on medications; he does not take

3    any. There is no routine monitoring of prisoners like himself and no one has checked on

4    him in a year and a half. He complained that the heat in his cell was unbearable at times.

5    119. Another CB-2 prisoner,                      had been in the unit since

6    May of this year, although he had been in CB-4 about two and a half years before arriving

7    in the Walking Five program. He echoed             observation that mental health

8    staff are rarely at CB-2: "they just wait for someone to snap." Although he said he thought

9    they "throw away" the HNRs, if you do not persist, "you just rot." In contrast to CB-4 he

10    noted that CB-2 allowed some group recreation. Yet, as he complained, there were still no

11    programs being offered, other than some TV shows like mechanics and masonry which

12    tend to repeat over and over. He said that these programs were hard to learn from and that

13    they really did not teach anything useful, that you could use on the streets. Moreover, they

14    are only available if you own a TV. He said the "incentive" in the step down program

15    really boils down to "just the cafeteria."

16    120.                     is a Florida prisoner who said he had come to the ADC

17    on an interstate compact transfer. He has spent years in the isolation units in ADC and

18    told me that before being placed in CB-2 he had been housed in every unit in Florence

19    Central, including CB-1 before it was turned into a mental health program. Like all of

20    the CB-2 prisoners I spoke with,         told me that mental health staff did not come to

21    his cell to check on him or ask him how he was doing. He complained about the fact that

22    there was no programming available on the unit.

23    121. The accounts of day-to-day life inside these units—ones that are supposedly

24    designed to ameliorate the worst effects of isolation and provide prisoners with an

25    "incentive" to change and improve their behavior—underscore the draconian nature of the

26    overall regime. It imposes painful and potentially damaging hardships on isolated

27    prisoners (even those it is supposedly "rewarding"), continues to place even the better

28    behaved isolated prisoners at risk of psychological harm, and seriously jeopardizes the

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential            PRSN-CH 00064

1    well-being of the many mentally prisoners housed in them.

2    122. Prisoners in the "general population" maximum custody units, such as CB-3 and
3    CB-5 report a similar but even worse level of isolation, inactivity, and deprivation.
4    ███████████████ a prisoner on CB-3 for over three months reported that he does
5    not believe that any programs are available on this unit. He stated that the only time
6    prisoner on the unit get out of their cells is for recreation in a single cage three times a
7    week and showers three times a week. He has tried to get counseling and filed an HNR to
8    request a visit with mental health staff over a month ago but told me that he had never
9    gotten a response. ████████ also said that mental health staff come to the unit about
10   once a month and talk to prisoners at cell-front for about 5 minutes but they only ask you
11   about your medications and whether or not you are suicidal. He reported to me that he
12   takes lithium, Celexa and demeron.

13   123. Other prisoners, like ██████████████████, noted the lack of programming
14   on CB-3, the frequent recreation cancellation, and the lack of any counseling or therapy
15   on CB-3. He referred to his limited interactions with mental health staff as "fly bys." ███
16   ████, like other indigent prisoners, has almost no property and cannot afford a TV or
17   radio. Loaners are not available on his unit. Because he's indigent he also cannot
18   purchase food on the commissary to supplement the two meals they get a day. He never
19   has enough food. The recreation cages can be very hot; misters are frequently broken; and
20   no water is available. You can bring water out to recreation in a water bottle but the water
21   in the cells is warm. ████████ mostly reads to pass the time. Another CB-3 prisoner,
22   ██████████████, noted that being in units like Browning and CB-3 builds
23   resentment amongst prisoners because there is nothing to do. He says guys "snap" at
24   Browning; kill themselves; and cut themselves with razors.

25   124. ██████████, and ████████████ were both housed on the other
26   side of CB-1 but not located near nor part of the mental health program there. As a result
27   they had no access to programs and went to recreation in the small outdoor cages alone.
28   ████ noted that there was little human contact on his tier and mental health staff

-65-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential
PRSN-CH 00065

1    rarely visit. He said, "Our program is shower and cages."           told me that mental
2    health staff came on the unit no more than "once in a while" and then only to briefly
3    check on the people who were identified as mentally ill prisoners. He complained about
4    the lack of human contact in the cellblock: "counts, mail, chow—that's the only contact
5    we get." The heat in the cells and on the tier was stifling, and           noted that the
6    water being brought around by staff while we were there was not usually available. His
7    cell was at the end of the tier, along a row of other cells that also housed prisoners who
8    were not part of the mental health program. He said that, if they ever had an emergency,
9    they would have to kick the bars and have someone scream in order to get the attention of
10   the officers, who were located at quite a distance from them.

11       125. Scant opportunity for human interaction and little opportunity to engage in any
12   meaningful activity combine to make the isolation units at Florence an environment where
13   all prisoners are placed at serious risk of psychological harm.

14       **c. Excessively Harsh Conditions for Mentally Ill Prisoners and Lack of**
15       **Appropriate and Meaningful Treatment**

16       126. It is evident from my inspection of Florence, conversations with staff, and
17   witness testimony that ADC considers the mental health programs at Florence to be its
18   flagship programs in the isolation units. These programs have altered some of the
19   physical environment to lessen isolation, such as the larger windows in the doors at
20   Kasson.[123] They have also instituted improved recreation policies, such as yard time for
21   CB-1 and Kasson's construction of group recreation enclosures. At Kasson there has been
22   an attempt to formalize some of the program into written form – at least in a rudimentary
23   way (for example, in the Kasson program-related documents I was provided at the
24   facility).[124] And prisoners in these units do report that they prefer being there rather than
25   the other isolation units where no programming is present. But even these prisoners

26   _____

27   [123] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13),
     at No. 10.
28   [124] Kasson Mental Health Program 2013 (ADC139519-20).

1  complained about the lack of mental health treatment, the failure to provide meaningful

2  programming, and the extraordinary amount of idleness, as well as the isolation and harsh

3  environmental conditions to which they were subjected.

4      127. I am also convinced that some ADC staff recognize the crucial need and value of

5  these programs and do want to see them successfully implemented. Unfortunately, some

6  combination of lack of mental health staff, training, leadership, and other resources has

7  resulted in mental health programs at Florence that are highly fragmented, inconsistent

8  and ineffective. It appeared that much of the scant programming was ad hoc, recently put

9  together (perhaps in response to the lawsuit) and that much was in flux. The mental health

10  programs are nonetheless not remotely adequate to meet the needs of the many very

11  seriously disturbed prisoners housed in these extremely isolated conditions. Thus, even if

12  implemented as planned, these programs would be insufficient on their face to provide the

13  type of clinical support needed for seriously mentally ill prisoners. Below I outline

14  interviews I conducted at both CB-1 and Kasson which revealed the malfunction and

15  inadequacy of the programs.

16      128.                , is a prisoner in CB-1's mental health program. He had

17  been at the unit for about 2-3 months at the time of our interview and had not yet been to a

18  class.        told me that he had come from CB-4 and thought that CB-1 was better

19  than CB-4 because of the group recreation on the yard and because they are allowed to go

20  to the chow hall for dinner.        told me that the group session just started up

21  again after stopping for a while, although he had not yet been able to go to any groups.

22  He had been to see "Dr. Norman" for about two one-on-one counseling sessions and

23  indicated that "Dr. Norman" came on the tier and talked with the prisoners which he liked.

24  He also had a loaner TV which helps him pass the time. He believes his diagnosis is

25  bipolar with a mood disorder and he takes Tegretol, Celexa and Remeron. He also noted

26  that the heat was difficult to bear in the unit and air conditioning frequently stops working.

27      129.             had been at CB-1 for about two months at the time

28  of our interview.        was a youthful looking 18 year old who indicated that he

1  has been incarcerated "as an adult" since the age of 14. He has spent almost all of this
2  time in lockdown, including some time at CB-5. He takes lithium and Risperdal and
3  believes he has a PTSD diagnosis and may be bipolar.                told me he had
4  participated in an anger management group about three or four times during his
5  incarceration at CB-1, and had perhaps had two to three individual counseling sessions.
6  He told me a sad story about having been released earlier from prison, and dropped off at
7  a bus station in Phoenix. But, because he had no family and no money, he did not know
8  where to go. He walked for miles and miles to find the only person in Phoenix that he
9  knew. Unfortunately, he only lasted a few weeks on the streets before being re-arrested.
10 Even though he had been in prison for approximately 4 years,            still seemed
11 very naïve, immature, and vulnerable. Other than the brief amount of time he spends in
12 group—no more than a few hours a month, and his brief individual counseling sessions,
13 he has no real "program" in the unit.

14    130.                        is a prisoner in the Wing 1 mental health program at
15 Kasson. He told me that he's "doing alright" at Kasson and had been in Wing 1 for about
16 a month although he started in Wing 2 around April of this year. Prior to coming to
17 Kasson he said he was at CB-1 for over a year. He did not know what mental health
18 diagnosis he has but said that he is now taking Depakote (and had been taking Thorazine
19 and Wellbutrin in jail).                told me that his mental health program consists of
20 filling out "workbook" packets in his cell, and a group that he participates in on anger
21 management. The groups meet outside where, he said, it was hotter than the already very
22 hot housing unit we were in; worse still, he said, "we stand up in the cage" during the
23 entire group (there are no seats in them), which lasts for about an hour or so. Prisoners are
24 only allowed to go to one group per week and            said "it is not enough—
25 [there] is nothing else to do [and] we have no regularly scheduled individual contact."
26    explained that you have to explicitly request to see the psychologist, otherwise
27 they do not come to see you.            said he had been at CB-1 before coming here
28 and that he much preferred being there, where he felt that even the limited opportunities

-68-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  for treatment were better than in this unit. He reported that his only out-of-cell session
2  with a psychologist or psychiatrist pertained to his medications—"he didn't talk to me
3  about [my] problems at all." There are two televisions hung on the walls of the unit and
4  noted that they are turned on from 6:00 – 10:00 pm to show regular
5  television programs. He was not aware of any specific therapeutic programs shown on
6  these unit TVs.

7  131. The next prisoner I spoke to, had only been in the
8  Kasson mental health program for about a month when I interviewed him. He indicated
9  that he had a long history of incarceration in other isolation units in ADC, including SMU
10  I and Browning Unit. indicated that he wanted to go to CB-1, but was told
11  he would have to complete the program at Kasson first. However, he said, "there really
12  isn't a program here." He went on to explain that, in his experience, there is a lack of
13  mental health programming throughout the system: "I've been asking for years for some
14  programming and help for my bi-polar. They kept telling me they didn't have enough
15  resources or staff." He was hopeful, however, that even the very small amount of
16  programming at Kasson would be an improvement. In the month had spent
17  on the unit, "there was only one group" but others were apparently in the planning stage.
18  He expressed motivation to become involved in groups if they became available
19  (including a "Lifer's Group" that he heard was being planned). He said that there also are
20  "supposed to be individual sessions" but that he had only had one in the month he had
21  been there. said that someone from mental health comes by the tier
22  "making rounds" about 4 times a week, briefly checking on people as they pass by. But he
23  said that he knows the isolation units have a negative effect on people: "I have already lost
24  so much humanity. I have to strip naked every day and humiliate myself, or be humiliated.
25  And the little things you cannot control build up in you—the fact that the lights are too
26  bright, that you spend so much time in your cell, that the cells are infested with bugs and
27  mice. He told me frankly, "if you came in alright, you leave as a monster; and if you came
28  in as a monster, you leave as a nightmare."

1    132                        , has been in the Wing 1 Baker unit since around May

2    2013. He stated that he came to Kasson mental health after being placed on a mental

3    health watch. He seemed to appreciate being in the program but also indicated that he

4    recently stopped taking his medications (Risperdal and Cogentin).

5    appeared disoriented during our interview, but he indicated that he did participate in one

6    group—anger management—about once a week.

7    133. I spoke with another prisoner,                        , also housed in the

8    Kasson mental health program. There was a sign on his cell door stating that he was not

9    eligible to participate in group therapy, but he did not know why. He told me that he had

10   been to one group session in the past but that they were held in cages. He did not recall his

11   diagnosis or the particular medications he takes but told me he has seizures and takes

12   medications for that.         also told me that he'd previously been in other isolation

13   units such as CB-4 and CB-5, but he had gotten upset in CB-5 and kept slamming his head

14   against the wall so he was placed on watch. He had some protection concerns and was

15   worried about being kept safe. After he had been placed on mental health watch, staff

16   asked him if he wanted to go to the Kasson mental health unit and he agreed. But he said

17   there was no individual contact with the mental health staff being provided, and now he

18   was apparently prohibited from attending the groups, so he was not sure what was going

19   to happen to him. He was worried about what shape he would be in when he was released

20   from prison (which he believes is scheduled for March, 2014).

21   134. I conducted a long, confidential interview with                        , in a

22   mental health office in the Kasson unit. He was sitting in a treatment cage during the

23   interview.         told me he had been sent to prison for 2 years for a domestic

24   violence conviction. He described life-long mental health problems that included hearing

25   voices and told me that he had been in some mental health facilities before coming to

26   prison. He also said: "I see things differently. They give me strange feelings inside." His

27   mental health problems plagued him in prison, in the several different facilities in which

28   he was housed—"I was having mental health problems at all the prisons—hearing voices,

-70-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   seeing things." He was also very fearful of being attacked, and indicated that there were
2   times when he wanted to be in protective custody. He said he had been at Kasson for
3   about 4 months, was unclear about what medication he was on (he had been given a shot
4   that he said he thought might be Haldol), and said that he had been diagnosed paranoid
5   schizophrenic. He said he was willing to participate in therapy whenever he was asked to
6   do so, and has come out of his cell for group and for the individual session he had with the
7   doctor (whose name he could not recall). However, he said he continues to be fearful in
8   the unit—"I get real scared all the time—I stop moving, like I'm dead."                told
9   me that when he was placed on mental health watch he was mistreated: "They sprayed me
10  with gas—it was bad—I didn't get to take a shower until 3 days later." He mentioned
11  having been on suicide watch several times.                reported a number of adverse
12  psychological reactions to his isolated confinement. He said that he was anxious all the
13  time and often started crying for no apparent reason. In addition to the aforementioned
14  voices he hears, he told me: "I feel like my mind is gone, like there is an empty spot in my
15  brain" that prevents him from thinking properly or remembering things accurately. He
16  said he was bothered by the fact that he could not control his emotions and that he thought
17  about suicide relatively often (even though he was adamant in saying that he would not do
18  anything to harm himself). There were times in the course of the interview in which

19          became incoherent and rambling, to the point that it appeared he was unable to
20  control his thought process or what he was saying in response to my questions. His mental
21  health problems appeared to be very severe.

22          135. In addition, I conducted several additional, in-depth confidential interviews on a
23  separate day, in the Florence-Central visitation area. We were told that staff shortages
24  required that these interviews be conducted on a non-contact basis, through glass and over
25  the phone. It was difficult at times for me to hear the prisoners and vice versa. However,
26  the prisoners were candid and many of them talked at length about the harsh conditions to
27  which they were being subjected and the lack of adequate mental health programming that
28  they received.                    , is a 30 year old man who is housed in CB-2. He told

-71-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   me that he was finishing his second prison term, and was scheduled to be released in
2   about 8 months, after serving some 9 years. He said that he had done an extensive amount
3   of time in segregation as a result of many disciplinary "tickets"; he was only recently able
4   to work his way into CB-2, which he felt functioned more "like a regular yard" in
5   comparison to other lockup settings that he had been in, especially since he had gotten a
6   job as a building porter. He said that he had no prior mental health contact before coming
7   to prison, but is now taking a variety of psychotropic medications.

8        136.       said that, other than the medication, he receives no other therapy
9   (although he said "I would participate if I could"). He is, however, involved in a "re-
10  entry" class that meets each week in the education department. He said, that is the only
11  group available—"no other programs, not even AA or NA."      also said his
12  contact with any professional mental health staff of any kind is very limited—he had not
13  seen a psychiatrist about his medications for months, and has monthly "check-ins" with a
14  mental health staff member that last "maybe a minute," during which the clinician asks
15  him, "how are you doing?" And when      replies "fine," the clinician simply
16  leaves.      told me: "The psychologists here don't care. They are putting in time,
17  that's all."      reported suffering from a number of specific symptoms that many
18  persons in isolated confinement report experiencing, including upsetting nightmares,
19  feelings of anxiety that are at times overwhelming, ruminations (the tendency to become
20  obsessed with a particular thought or memory), chronic irritability and anger, and an
21  inability to concentrate or focus his attention.

22       137.          , is a 25 year old man who is now housed in CB-2. He was
23  one of the very few prisoners I interviewed who seemed guarded and reluctant to talk
24  about himself or his experiences in prison. He told me that he had come into prison a few
25  years ago, as a 21 year old, and would be getting out in less than 2 years. He has spent
26  about half of his time in prison in segregation. He said that the overall conditions in CB-2
27  are better than the other segregation units he has been in and he wanted "to hold on to
28  these privileges." However, he said that even in CB-2, there was very little to do: "I wish

Confidential

PRSN-CH 00072

1   they would have some things for us to do, to learn, [a] parenting group or something." He

2   takes a number of medications and said that "the only psych program is meds, [the mental

3   health staff] see me once in a blue moon—once every couple of months" for a couple of

4   minutes and then they are gone. "We have no therapy in here."        said he thought

5   he could tolerate the harsh environment of segregation until he was released. Other than

6   difficulties sleeping, ruminations, and an oversensitivity to stimuli in the unit—and his

7   ongoing frustration with the lack of activity or meaningful thing to do—he did not report

8   any additional isolation-related symptoms or concerns.

9       138.                   , is a 35 year old man, currently housed in CB-1, who told

10   me that he had been a successful businessman on the streets before getting involved in

11   criminal activity and being sent to prison for the first time. Although he, too, said that he

12   thought he could handle the stress of isolated confinement without suffering too many

13   adverse effects, he complained that the prison system had not helped him with the

14   psychological problems he began to experience once he was incarcerated. He takes Celexa

15   and Depakote now, but he complained that there is really no therapy program in CB-1

16   "other than the meds." He reported that he had been housed in CB-1 for about a year, and

17   that groups only started up a few months ago. He said they first started, then abruptly

18   stopped, and recently they appeared to be starting up again. He said that the groups only

19   last about 30-40 minutes, and prisoners are not permitted to attend more than one of them

20   per week. They are run by a staff member named "Norm," whom a number of prisoners

21   mentioned as doing his best to be helpful to the prisoners.          understanding was

22   that Norm was "not really a therapist," but a very well intentioned staff member. (As best

23   I can tell, "Norm" is likely Norman Behrend, who prison records indicate was hired at

24   Florence in 2012 as a psychiatric technician.)        was also concerned that the lack

25   of programming limited the prisoners' opportunities to work their way out of segregation:

26   "We get meds reviews every 3-4 months, but there's no programming in our unit. This

27   means that guys can't get their points down and get to a mainline. Some guys have been

28   here 5 years—we can't get out—participation in Norm's anger management class does not

Confidential        PRSN-CH 00073

count to reduce points."

139.                , is a 30 year old man who had many serious concerns and complaints; he appeared to be very adversely affected by his isolated confinement.       told me that he had incarcerated a number of times in the past, mostly for short prison terms. A considerable amount of his time in prison had been spent in segregation units of one kind or another. He said that his mental health problems included suffering from schizophrenia and that he was bi-polar. He described currently being on a number of psychotropic medications, including Haldol.       said that he is frustrated by the lack of therapy in CB-2 and that he has been trying hard to get into CB-1 where he heard there were programs. To date, he has been unsuccessful. In CB-2, he said, other than his medication, he has little or no contact with mental health staff. He told me: "this 'check in' stuff is new—people come by our cells every 3 months [and say] 'how are you doing, are you OK?' then they walk off—no therapy at all."

140.       reported that he hears voices every day, even when he is on his medications, that he suffers from ruminations, fantasizes about revenge, has lost the capacity to feel or care, is often deeply depressed (even to the point of thinking seriously about taking his own life), feels that he has deteriorated badly during his time in isolation, and worries that what he perceives as an increasing tendency to withdraw from others will handicap him on the streets once he is released.

141.                , is a 32 year old man who came into adult prison as a 17 year old. He said that was already experiencing mental health problems as a teenager but that they got worse when he came to prison. He said that he did some time in the SMU and that it had a profoundly destabilizing effect on him. When he was transferred to CB-4, he said he "freaked out" and had to be controlled with medications. He has finally worked his way to CB-1. He, too, complained about the lack of programming and absence of meaningful therapeutic contact. He said that the groups that have started to be run on the unit are relatively new, that prisoners are limited to one of them a week. Although they are supposed to last for an hour, he said, the custody staff cuts them short.

Confidential           PRSN-CH 00074

1    142.            told me he suffers from troubled sleep, feelings of anxiety and

2    nervousness, the sense that he is on the verge of an emotional breakdown or loss of

3    control, has developed a very heightened sense of paranoia, often ruminates about things,

4    and has problems with concentrating and thinking, mood swings, depression, and feelings

5    of overall deterioration.

6    143.                is a 41 year old prisoner who previously served time

7    in Ohio. He was in Florence before, having spent time in the Kasson unit and then in CB-

8    1 (which he said, at that time, had no mental health component). He was taking a variety

9    of psychotropic medications which, when he arrived at CB-1, prison staff changed to

10    effexor and something that he takes for anxiety (the name of which he could not recall).

11    Although CB-1 is now supposed to be a mental health program, he said, "there really isn't

12    much of a program, except rec and the fact that we don't have to get locked up in cuffs."

13    He told me there have been no groups in CB-1 "for weeks," even though they used to

14    have them. And: "I haven't seen any individual therapy—you see a psych every 6 months

15    for your meds." He said "some woman administrator came around about a week or two

16    ago talking about individual counseling, but it has never happened."

17    144.            reported suffering from headaches, and having constant problems

18    sleeping, as well as always feeling anxious, often on the verge of losing control. He also

19    has ruminations, fantasizes about revenge, is overly sensitive to certain stimuli, often

20    becomes irrationally angry, experiences problems thinking, mood swings, feelings of

21    depression, overall deterioration, and social withdrawal.

22    145.              is a 35 year old prisoner who is currently housed in

23    CB-1 in Florence. He told me that he came to prison as a minor, in 1997, and that this is

24    his third time in prison. When he was released from prison the last time, he said, it was

25    directly from isolation back to the community: "They released me to the streets from a

26    little cage… no program to prepare us to get out." He described being in CB-1 in 2011

27    when there was a riot over the conditions of confinement and the lack of treatment and the

28    fact that people with problems were being ignored in the unit. He was sent to Kasson "to

keep me away from everyone"—which meant that he was "in the middle of guys who were stark raving mad." He said, "I had no property, they sprayed me—I lost it." He spoke emotionally about what he feels is a continuing lack of concern for the mentally ill prisoners at Browning: "I have issues because of how many years I have been behind these bars, but there are other guys here [who] are just losing it, getting ignored also." He said that "we've had lots of outbursts in here over conditions—spraying, burning, throwing things—these things have been happening for years."

146. sees the current CB-1 program as "the only chance at programming we've had," and for that he is appreciative. He said it was good to get a chance to go outside, but he also noted that, other than that, "they are not really doing the programs" they are supposed to—"they don't have the staff, the groups get cancelled." When I asked him what his week has consisted of, this is what he told me: "Monday I did nothing except I worked as a pod porter. Tuesday I went to rec, and also to chow. Wednesday I did nothing. Thursday I went to rec and showered. And on Friday [today] I did nothing." told me that the only time you get individual contact with the mental health staff is when you explicitly request it (and, when you do, they try to comply).

147. He told me he was bothered often by headaches in isolation, and by nightmares or bad dreams. In addition, he said he is always nervous and anxious ("unless I'm mad"), that he often feels like he is on the verge of losing it, fantasizes about revenge all the time, often experiences problems thinking or concentrating, feels he is losing the ability to feel or care, has mood swings, feelings of depression and hopelessness.

148. It is my opinion that Kasson and CB-1 are poorly conceived and poorly run and do not meet the serious needs of the mentally ill prisoners they purport to treat. Although in some ways prisoners in these programs are better off than their counterparts who are left in the other isolation housing units (where there is for the most part no mental health treatment at all), they are still subject to overwhelmingly isolating conditions that place them at serious risk of harm.

149. At Kasson I also toured the mental health "watch cells" and found them to be

-76-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  extremely hot, filthy, and totally inappropriate for individuals suffering from extreme
2  mental duress. All of the cells were full during my tour. The cell-fronts were covered
3  with a plastic shield with holes drilled in the surface; strangely, however, there was glass
4  behind the plastic shield so that no air could get into the cells.[125] This additional level of
5  separation made it even more difficult to hear prisoners or to interact with them in a
6  meaningful way, and it added another layer of distance and remove—walling the prisoner
7  off even further from an already highly isolated unit—in a way that I found unsettling,
8  especially for a mental health unit whose residents were, by definition, in crisis. At the
9  time of my visit most prisoners were sleeping, one inmate was even on the ground with
10 his mattress covering his body. I could only see his feet sticking out from underneath.

11    150. The few interviews of the highly disturbed prisoners in these watch cells that I
12 was able to conduct underscored their desperate plight. I first spoke with
13 ▮▮▮▮▮▮▮▮▮▮.  ▮▮▮▮▮▮▮▮ was on a 30 minute watch when I interviewed him on
14 the unit. He told me that he became very depressed upon arriving at prison. Things
15 worsened for a while, but then he felt he was stabilized when he was sent to the Tucson
16 complex. However, when he was transferred to Florence, things deteriorated badly for
17 him and he now takes a Haldol shot. He said that he had been participating in group once
18 a week, inside the treatment cages in the outside rec area, but that there were no regular
19 one-on-one therapy sessions scheduled. He told me that individual contacts had to be
20 explicitly requested, that he thought the staff responded "pretty quickly," but that he had
21 never filed a request so did not know for certain.

22    151. During our interview ▮▮▮▮▮▮▮▮ appeared dazed and somewhat incoherent.
23 He kept pulling on his hair which was obviously damp from sweat around his face. He
24 complained about the heat and his complaints certainly seem justified. As I mentioned, the
25 watch cells have open bars on them that are covered with a plexi-glass material that
26 blocks any ventilation. ▮▮▮▮▮▮▮▮ showed me heat rash on his arms and told me that
27
28    [125] See Photos of Florence Kasson Watch Cells (ADC154431-2).

-77-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  the temperature in the watch cells was almost intolerable. He acknowledged that he was
2  not doing well in the watch cells and he believed he had been sent to watch for "acting
3  crazy". He has engaged in self-harm incidents before; a few months ago he swallowed
4  plastic pieces to hurt himself but, he said, his intent was not to kill himself. He was sent
5  to the hospital and then placed on watch after that. While on watch            told me
6  that the "psych doctors" come to visit him once a day and ask him if he's hearing voices
7  or wants to kill himself, but little else.

8  152. I spoke to another prisoner,                              , who was also in the watch
9  cells at Kasson. His thoughts were not entirely coherent and it was difficult to follow him
10 at times. He told me that he been in the watch cell for about 30 days (during which time
11 he had not been outside). He is wheelchair bound and said that had been raped by other
12 prisoners. There was also a previous suicide attempt after being placed on a 2nd floor tier
13 that made it impossible for him to leave his cell. It was clear that                was
14 desperate to get out of the watch cell, especially because it was not handicapped
15 accessible and it was very difficult for him to move around the cell from the bed to the
16 toilet. He told me: "I need help; I am desperate; I think they are tampering with my food."
17 He cried as he told me this.            was also concerned that he hadn't been able to
18 use a phone during his stay in the watch cell and his family had no idea where he was
19 housed now.            said he was especially concerned about his mental state—he
20 said he was being released from prison in just a few months (December, 2013)—but said
21 he was not doing well in the watch cells, did not know how to get out, and did not know
22 what he'd be like when he was released. Rather than trying to help him stabilize, he said,
23 the officers who oversaw the watch cells made fun of him and harassed him and wouldn't
24 take him out of the cell to shower. I later heard from another prisoner at Kasson,
25 , who had recently been in the watch cells, that there was a prisoner in a wheelchair
26 who was being harassed by officers there.            old me that the officers frequently
27 harassed the prisoners held on watch.

28 153. The inadequacy of the mental health programs at Florence is serious, but it is

-78-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    only part of the story. As in the other ADC isolation units I found numerous prisoners on
2    the other units—mostly identified through random cell-front interviews—who, although
3    they were not housed in units supposedly reserved for mentally ill prisoners, had obvious,
4    acute, and apparently untreated mental health needs. These prisoners were receiving little
5    or no treatment to address their mental health conditions, and little or no programming or
6    other activity to help ameliorate the potentially destructive effects of isolation (made more
7    dangerous by virtue of their psychological vulnerabilities). These isolation units are
8    severe in every respect. The cells are small, many of them dirty and dank and very
9    sparsely furnished, some of the units (such as CB-5A and 5B) had solid steel doors with
10    only a sliver of window on them, and opaque covering on the small exterior windows that
11    blocks light from coming in. The lack of any meaningful programming or appreciable out-
12    of-cell time means that these prisoners essentially live their entire lives in these small,
13    inhospitable (and, over time, seemingly intolerable) spaces. It is my opinion that the harsh
14    conditions of isolation that they are subjected to in the Florence isolation units are
15    exacerbating their pre-existing, untreated problems placing their mental health in grave
16    jeopardy and even placing those around them at serious risk.

17    154. Below I highlight several of the prisoners I encountered in these units who suffer
18    from serious psychological problems that are unaddressed and, except for medication,
19    untreated.

20    155.                  had also been at CB-3 for about six months at the
21    time of our interview. He said, "we have no program here—yard, shower, that's it."
22         reported taking Risperdal and said that he sees the doctor about his medication
23    about every six months. He has never received any counseling since coming to CB-3 but
24    noted that cell-front mental health checks had started recently; he estimated that staff had
25    checked on him about twice in the last two months. But he also told me that the cell-front
26    contact is brief and perfunctory: "Once a month, about a minute—'you OK? Are you
27    thinking about suicide? Your meds OK?' Then they walk off."

28    156.                had been at CB-5 for about a month at the time of

Confidential PRSN-CH 00079

1   our interview. ▊▊▊▊▊▊▊ told me he was barely 18 years old and he was afraid—he
2   had been trying to get into protective segregation but then realized it was a mistake and
3   has been trying to "sign myself out." He said he thought he was going to be denied
4   protection, so "I'll go back to the yard and get stabbed." He told me that he had a history
5   of mental health problems and had tried to commit suicide while in the county jail. He
6   was not sure of his diagnosis but told me that he believes he's severely depressed and
7   bipolar and he takes some medications but has been told he is not sick enough for a
8   mental health program. And "when I do ask for help [in here] they ignore me." At the
9   same time he told me that he was at Kasson on watch recently after a suicide attempt with
10  a razor in the shower; he demonstrated by showing me a substantial red scar on his wrist.
11  He has only seen a doctor through telepsychiatry, but has not received any treatment. ▊

12  ▊▊▊▊▊ stated that he has problems with officers on this unit denying him food because
13  he bangs on his cell window. During the course of our interview an officer came up to
14  bring him a sack lunch which he said was his first meal of the day. It was late morning at
15  the time and the other prisoners had received meals hours earlier.

16  157. ▊▊▊▊▊▊▊▊▊▊▊, told me: "I'm terrified I'm getting schizophrenia, but
17  no treatment." He repeatedly said that he felt like he was "losing it," was "trying to hold
18  on," and needed help. He said he "thought" he was taking Zoloft and Remeron but that he
19  still hears voices. He was on mental health watch at Kasson—he had become so desperate
20  that he said: "I thought I might as well kill myself." But after he stabilized he was brought
21  back to CB-5, where he receives no treatment: "[Mental health staff] haven't talked to me
22  for therapy, just for drugs, once in person, once on the TV.

23  158. ▊▊▊▊▊▊▊▊▊ has spent over 4 and a half years on lockdown. He reports
24  being at several units besides CB-5 at Florence Central and spending time in lockdown at
25  SMU. ▊▊▊▊ says that he was diagnosed as paranoid schizophrenic and suffered from
26  depression on the streets, where he was prescribed "lots of meds. He is taking Prozac now,
27  which he says helps him "a little." He's never had individual counseling that he can recall
28  but says that he has noticed a therapist walks through the unit about once a month. He,

-80-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

quality

1  too, described the contact as pro forma: "They just come to your door, [ask] 'are you
2  alright, do you feel like hurting yourself, do you feel like hurting anyone else?' It takes
3  about 1 minute for each person. They do the whole tier in 10 minutes." Even this pro
4  forma routine is relatively recent; it was not done on a monthly basis until a short time ago
5  Other than that,          said, he sees a doctor on TV about every six months. There are
6  no programs available for him at CB-5. He thinks there may be educational programs on
7  TV but he doesn't own one so cannot access. He told me that he will be released from
8  prison in about a year and a half and believes he will go directly from segregation to the
9  streets.

10  159.                          , had been at CB-5 for about 6 months when we spoke.
11  He spent about six months here last year as well; apparently for disciplinary reasons.
12          reported that he was diagnosed in the community as borderline schizophrenic
13  about ten years ago. At CB-5 he is given medications – Risperdal, Zoloft and demeron –
14  but he does not get one-to-one counseling or group programming. He recalls that mental
15  health staff have started coming by the prisoners' cells about once a month to check on
16  them but "they never talk to you about your problems." He reads and exercises in his cell
17  but other than the three recreation times they receive a week there is nothing to do. He
18  said, "You go to yard, or nothing."

19  160.                          , is an older prisoner on CB-5. He told me that he had
20  previously taken Zoloft for PTSD but said that he no longer took any mental health
21  medications.          was very distressed during my interview and mumbled something
22  about "feeling messed up" perhaps about his crime. He said that CO III counselors are
23  rarely on his unit but he'd noticed that mental health staff were recently coming to the unit
24  but that he did not talk to them, even though he was very worried about getting out of
25  prison after having spent 20 years inside. When I asked him why he had not talked with
26  anyone about these concerns he just smiled and said, "You know how they are," but
27  would not elaborate.

28  161.                          , reported being in CB-5 since about March 2013.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00081

1    He told me that since there is no program in the unit, he tries to "program himself"—
2    which consists of working out in his cell, watching TV, and lying on the floor. He
3    reported that he used to be on mental health medications when he was in the county jail
4    but, when he came into ADC, he was taken off them. He said he would like to "talk to
5    someone" here but did not seem to know how to do that. He said that CO IIIs and others
6    who he has asked for help ignore him.                emphasized that the heat on the unit
7    is terrible and makes it difficult to breath in is cell. He also told me that he will be released
8    soon and is worried that it will be difficult to transition back to the community after being
9    in an isolation unit. "I get anxiety attacks—I am really worried this time [when I get out]
10   because I haven't been around people for years."

11       162.                        , had been in CB-5 for about 30 days, as a protective
12   custody inmate. He said, "Yes, I asked to be, I'm on PC, but this is terrible." He is taking
13   Celexa and Vistaril and told me that there was no treatment available in the unit except for
14   medications. He said that the only doctor he has seen "on camera" and that there was
15   someone in the room with him during the "visit" but not another doctor. He said the
16   idleness was getting to him: "I've been here a month and haven't had yard yet."

17       163.                        , told me he had been on the CB-5 yard before. He said:
18   "The cells are awful, it's 90+ degrees—all we do is sweat. There is no program here. We
19   are locked down all the time, except 2 hours 3 times a week in the cages."
20   told me that he has a long psychiatric history dating back to the streets, including having
21   been hospitalized for psychiatric problems. During a prior period of incarceration he was
22   at the ADC psychiatric facility, at Flamenco. Now he is in a standard, very severe
23   isolation unit—housed in a cellblock that is especially grim and dark, where the cells in
24   which he spends virtually his entire daily life are small, worn, and dirty—and where no
25   mental health treatment is being provided.

26       164.                        told me he was being kept in the unit because he is
27   requesting protective custody. He said he had requested protective custody twice before
28   but was denied. He has asked again and is under consideration.                explained

-82-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                    PRSN-CH 00082

1 that he had come into the prison system as a teenager—15 years old—and been out to the
2 streets and back to prison a few times since then. He said that he was diagnosed as
3 schizophrenic when he was just 11 years old, and was put in a psychiatric ward. He is
4 currently on Thorazine and Cogentin. He said that the cellblocks were cleaned up in
5 anticipation of our visit

6 165. The conditions of confinement for mentally ill prisoners who are housed in the
7 formal mental health programs as well as the general population isolation units are
8 deplorable and harmful. But these conditions are further exacerbated by ADC's policy
9 and practice regarding the use of chemical restraints on mentally ill prisoners and those
10 taking psychotropic medications. After visiting and inspecting the records of prisoners
11 with serious mental illness at Florence's Kasson and CB Units, I found that correctional
12 staff frequently employed chemical spray on the prisoners, without regard to its
13 psychological as well as physical impact. In many instances the use of chemical spray
14 seemed to be an unnecessary and dangerous overreaction. For example, I reviewed
15 records from incidents in which officers used OC spray on an inmate for failing to return
16 his food tray,[126] refusing to submit to a face to face identification check,[127] tearing his
17 suicide mattress,[128] refusing to stop disposing of alcohol in his cell toilet,[129] refusing to
18 allow his property to be inventoried,[130] covering his cell windows,[131] or refusing to take
19 court ordered medication.[132] The use of spray in such a manner contravenes established
20 norms regarding the treatment of persons with mental illness.

21

22

23

---

[126] SIR No. 201204945, ASPC-Florence Kasson (ADC089321).
[127] SIR No. 201102416, ASPC-Florence Kasson (ADC089269); SIR No. 201108040, ASPC-Florence Central (ADC089288).
[128] SIR No. 201103500, ASPC-Florence Kasson (ADC089274).
[129] SIR No. 201208525, ASPC-Florence CB-3, (ADC089330).
[130] SIR No. 201209639, ASPC-Florence Central (ADC089332).
[131] SIR No. 201105476, ASPC-Florence Central, (ADC089281)
[132] SIR No. 201113031, ASPC-Florence Kasson (ADC089303).

-83-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

### 3. Eyman – SMU I and Browning Unit

#### a. Overview of Facility

166. I inspected the Eyman complex SMU I and Browning unit from July 23 through 25, 2013. Both facilities are extremely similar in physical structure. There are no outside facing windows in any of the Eyman cells. The only light available comes through gritty skylights in the ceiling outside the cells.[133] Some of these housing units are so completely cut off from the surrounding natural environment that there were times when I was passing through them that I had the distinct feeling that I was underground. The cells are a bare concrete box with metal stool, shelf, toilet/sink, and either a single or double slab for a bed. Each cell is quite small, although the cells at SMU I are typically narrower than the Browning cells                        ).[134] More than any other isolation units in the ADC system, the Eyman cells give a sense of being entombed in a small, concrete box.[135] The doors to the cells have no windows but are made of perforated steel. Some housing pods have an additional plastic shield covering over the doors for "enhanced security."[136] I was told that the plastic shield is for "throwers" – meaning inmates who try to project liquids out of their cells. I observed that numerous cell fronts in these units were coated with grime and other materials. Prisoners complained that these "enhanced security" cells were airless and especially hot. Indeed, many prisoners appeared to be sweating and in various states of undress as we walked through the units.

167. Browning and SMU I differ primarily in the populations held in isolation. In SMU I the isolation units hold general population maximum custody, detention, protective segregation, sex offenders, a small watch pod, and a mental health program. In Browning, there are general population maximum custody, the Behavioral Management Unit, mental

---

[133] See Photos of Eyman Housing Pod (ADC153358-9).
[134] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/26/13), at No. 10.
[135] See Photo of Eyman Cell Interior (ADC153360).
[136] See Photos of Eyman Cell Exterior (ADC153367).

-84-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   health units, and mental health watch cells. Despite these varying populations the
2   conditions of confinement on these units are uniformly harsh—shockingly so—and the
3   level of isolation, deprivation, and enforced inactivity places these prisoners at serious risk
4   of significant psychological harm.

## b. Eyman-SMU I and Browning's Conditions of Confinement Place All Prisoners Housed There at Risk of Harm

7   168. Like all of the ADC isolation units, Eyman-SMU I and Browning impose overall
8   conditions of confinement and operate with a set of policies and practices that deprive
9   prisoners of meaningful social contact and human interaction, subject them to profound
10  levels of deprivation, and enforce almost total idleness and inactivity on the prisoners
11  housed there. In addition to the psychological pain and despair that this kind of
12  environment generates, it places the mental health of even psychologically strong
13  prisoners in jeopardy and creates especially high risks of harm for those prisoners whose
14  mental illness makes them especially vulnerable.

15  169. In some ways, many of the Eyman-SMU I and Browning units impose even
16  greater levels of isolation and deprivation than those that exist in the other ADC isolation
17  units. This is largely because of the type of recreation allowed the majority of prisoners
18  housed in these units. For prisoners who are not part of the limited mental health
19  programming in the Eyman isolation units, and even for some that I spoke to who told me
20  they were supposed to be part of the mental health programs, recreation is limited to a
21  small, concrete enclosure attached to the housing pod. This enclosure is                    .[137]
22  The enclosure walls range from          feet high with a covering of metal mesh over the
23  top.[138] There are no views to a horizon or much of anything else from inside these small
24  boxes. A prisoner can see only a sliver of sky. In addition, the only piece of "equipment"
25  I saw on my tour was a small, blue handball (although in their admissions in this case

---

[137] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/25/13), at No. 11; See Photos of Eyman Recreation Enclosures (ADC153355, ADC153357).
[138] Id; Photo of Eyman Recreation Enclosure Roof (ADC153356).

ADC has indicated that no equipment is supposed to be available in the enclosures).[139] These enclosures had very little breeze and I was told no mister systems are installed, although prisoners are permitted to bring a water bottle with them.

170. I spoke with a number of prisoners who told me they often refused to go to recreation because it was simply "not worth it" to leave their cells and head outside into the sweltering heat. It is not surprising that the grim and oppressively hot conditions deterred a number of prisoners from going to the enclosures, even for the limited three times a week they were given the opportunity. But discouraging even limited recreation is bad policy and practice and it leads to bad outcomes, especially for prisoners with serious mental illness. Those prisoners who "refuse" recreation may do so for the sensible reason that the heat makes them ill or that being restrained and searched simply to walk a few yards to, as a number of them put it, "another box" where their only option is to pace back and forth or bounce a small ball, seems hardly worth the indignity of being shackled. But remaining inside an isolation cell around-the-clock, for an extended period of time, can also contribute to worsening mental health that can spiral into incidents of self-harm and decompensation—or acting out behavior that can extend their stay in isolation. In fact, the refusal to engage in recreation is itself a sign or indication that a prisoner is having mental health problems. Unfortunately, the recreation conditions at Eyman are so terrible that many prisoners "choose" to engage in unhealthy behavior that can indirectly place them at greater risk of harm.

171. The recreation afforded to even the limited number of prisoners in the mental health programs who are now able to participate in the outside rec enclosures and basketball court is insufficient. At the time of my inspection both SMU I and Browning had constructed individual recreation cages and a larger cage with a basketball hoop between Wings 1 and 2. There were approximately 10 individual cages with a tarp and

---

[139] Defendants' Response to Plaintiff Wells' First Set of Interrogatories (6/25/13), at No. 11.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00086

misters.  The basketball enclosure allowed three or four prisoners to recreate together.[140]
There was no tarp or misters in that enclosure but the prisoners I saw playing ball had
water bottles.[141]  Of course, these new recreation spaces are an improvement over the
concrete bunker enclosures that most isolation prisoners at Eyman had been restricted to
in the past.  One prisoner in an individual recreation cage told me that it had taken him
four months to be able to go outside and he was clearly elated; "you can see the sky and
workers and little things moving on the ground," was how he described the experience.
Yet only a very small number of prisoners on these isolation units have the opportunity to
use these new spaces.

172. In addition, just as was the case at Florence Central and at SMA, there are very
many seriously mentally ill prisoners who are confined in the Eyman isolation units and
yet are not in any of the officially designated mental health programs.  The level of out-of-
cell time—even for those who are in the mental health program—conforms to the ADC
norm, which limits them to the same two-hour time blocks that prisoners are afforded no
more than 3 days a week.  As I have explained above, this is starkly insufficient for any
group of prisoners who are as isolated and otherwise deprived and inactive as those in the
ADC isolation units. It is especially so for these seriously mentally ill prisoners.
Moreover, the 2 hours by 3 times a week outdoor recreation schedule represents a best-
case scenario; prisoners at Eyman, like their counterparts at the other ADC isolation units,
frequently told me that recreation is often cancelled.  Prisoners in the mental health
programs also told me that the outside recreation is not always offered; they are often only
given the option of using the concrete recreation pod in their unit.

173. The prisoners in these units are suffering.  They talked candidly about the
psychological pain that they are experiencing in response to the lack of human contact, the
material deprivations, and the profound levels of enforced idleness and inactivity to which

---

[140] See Photo of Eyman Individual Outdoor Recreation Enclosures (ADC153363).
[141] See Photo of Eyman Individual Outdoor Recreation Enclosures (ADC153362).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

they are subjected. They also expressed fear and anxiety over the anticipated psychological impact of their conditions and the way they were being treated, and complained repeatedly about the lack of mental health care they were afforded (even to those whose serious mental health problems were well-documented and long-standing). Below I discuss a few of the cell-front interviews I conducted at SMU I and Browning that illustrate some of the effects that life in these units are having on the prisoners.

174. , a Browning general population prisoner, summarized the general program in the isolation units throughout the prison. He told me that prisoners get 2 hours of recreation or shower every other day, which means that he is completely locked down in his cell in the days in between. On the days that it his turn to go to yard: "We go out and run in circles. There is a little ball out there, that's all. The emptiness and inactivity is wearing on him psychologically: "We have no program, no teacher, it takes a toll." Another man housed in the same unit, , described much the same thing. He told me that he had been here since the facility opened in 1996, and that he wanted "to break down and cry, it's so awful." He said that the recreation time that they are supposed to be offered is often not the amount they actually get; he estimates that about a quarter of the time rec is cancelled due to staffing shortages or other reasons, and that there are times when prisoners do not get outdoor rec "for a week or more."

, told me that he had been on lockdown, in one isolation unit or another in the ADC, since 1979! He said that he has been kept in lockdown for disciplinary infractions committed decades ago and that, even though he keeps trying to get into a step-down program that would allow him more human contact, he continues to be denied. This means, among other things, this means that has not had a contact visit, or touched a loved one or family member with affection, for 34 years. Other Browning prisoners echoed the same sentiments about the pain of the isolation they experienced, the lack of activity and programming, and the fact that "no one comes to check on us back here." As one prisoner put it, "this is really hard. It breaks people."

175. The conditions of confinement at the Eyman-SMU I units I saw were similarly

-88-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1   extremely harsh and severe, and prisoners repeatedly reported that there were having

2   adverse effects on their mental health and well-being.                     , for

3   example, described the program in SMU I as "really, 24/7 lockdown." He said that the

4   promised rec time rarely happens when or in the amounts it is supposed to, and that some

5   of the flagrantly mentally ill prisoners who are confined in the units "scream all night." He

6   said, "I haven't had human contact for years, but just shaking someone's hand on the

7   basketball court was priceless." He said that these conditions have "affected my mind—

8   my mind is distressed over it, it's awful, it's sick, it's painful to be in isolation."

9   176. Another SMU I prisoner,                 , described a cycle that is all

10  too common in extremely harsh isolation units like those that the ADC operates. He told

11  me that he has very serious mental health problems that date back to when he was placed

12  in a mental hospital at age 7 or 8. He said he hears voices and is always upset. He finds

13  isolation especially hard to deal with: "I can't take it." When he was in CB-5 in Central,

14  "I lost it, acting bizarrely, I flipped out. They gassed me and put me in Kasson suicide

15  watch for 10 days but it made me crazier." After suicide watch, he got no treatment, either

16  in groups or on a one-to-one basis. He arrived at SMU I a week before I interviewed him

17  and, despite his long-standing psychiatric problems and the fact that he had recently been

18  on suicide watch, no one from mental health had come to visit or evaluate him. When

19  mentally ill prisoners predictably react to the harshness of their environment, punishment-

20  oriented systems like the ADC respond with more punishment rather than with treatment,

21  sending the mentally prisoner into a downward spiral from which he or she may not

22  return, and the cycle of harsh treatment leading to deterioration that precipitates even

23  harsher treatment and more deterioration continues to repeat itself.

24  **c. Excessively Harsh Conditions for Mentally Ill Prisoners and Lack of**

25  **Appropriate and Meaningful Treatment**

26  177. Eyman and Browning both include mental health housing programs where some

27  prisoners with mental health issues have been clustered together in certain housing pods.

28

                                                    

These programs appear to be of very recent vintage in the ADC system.[142]   During my inspections I visited many of these housing units and talked to a number of the prisoners at cell front and during my longer, confidential interviews.   Both programs appear to be largely similar.   Prisoners in these units have access to the outside recreation enclosures, described above, based on behavior.   They also are given some access to group programming.   In order to facilitate these groups, indoor areas, such as the old officer dining room at Browning, were cleared out, and treatment cages were assembled.[143]   At the time of my tour SMU I had about eleven such cages and Browning had eight.   At Browning I also saw an individual treatment cage in an office near Wing 1 Easy Cluster. I was told that one-to-one counseling is conducted there and that officers post outside the small office during a session.

178. Beyond the recreation "phases" and the possibility of some group sessions and possibly counseling, the actual structure of these mental health programs and clinical goals, the program requirements, and the criteria by which prisoners are placed in the program and leave the program, are entirely unclear.   As in the other isolation units, the programs appeared to be functioning on a sporadic and ad hoc basis.   During my tour I asked for the group schedules for the mental health programs.   An Activity Schedule for August 2013 for Browning Unit was eventually produced.[144]   I toured Browning on July 24, so this schedule may not reflect the types of activities going on in the unit for that month, but the schedule appears in no way to reflect the level of group programming and activity reported to me by prisoner after prisoner in that unit.

179. At Browning I also inspected the Behavioral Management Unit (BMU).   The BMU predates the other mental health programs at Eyman.   I spoke with Dr. Shaw during the tour and he told me that the BMU is for prisoners with significant mental health and

---

[142] See Memo to Charles L. Ryan from Robert Patton and Richard Pratt, Increase of Mental Health for Max Custody, 4/30/12 (ADC050861-67).

[143] See Photos of Eyman Treatment Cages (ADC153369, ADC153389).

[144] ASPC-Eyman/Browning Unit Activity Schedule, 8/1/13 (ADC139516-18).

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                              PRSN-CH 00090

behavioral issues.   He explained that the program has three phases that incorporate different incentives, such as "consumables" (e.g., candy that prisoners receive for good behavior).  Each prisoner is supposed to have a behavior treatment plan.  There are no set time frames at the different phases of the program.  Custody staff and mental health staff are supposed to meet, and custody contributes a behavior review that goes into the mental health file.

180.  Despite the variations in their design and the very modest amenities some of them are provided, the prisoners I interviewed in all of these programs consistently reported no more than a paltry level of clinical programming on these units. In the BMU, for example, prisoners said that under the best circumstances, they received one group per week, and a single 20-30 minute individual session (held in a treatment cage inside an office on the unit). I also heard the now-common story that groups had "just" or "recently" started, or had been promised but had not yet begun. Thus, the Eyman prisoners reported that some groups had just started; prisoners who had been in isolation for some months reported going to a few groups earlier in the year and then having them stop; many prisoners reported that they were now signed up for a group but had not yet gone; many others reported that one-on-one counseling was either sporadic or non-existent, and others were still waiting for responses to HNRs they had submitted requesting help.  Some prisoners housed in the mental health units were not aware that they were in any "program" at all. The consistency of these reports within SMU I and Browning and across the other ADC isolation units is striking. The picture that emerges is of a currently very disorganized and incoherent mental health delivery system that does not have the focus or personnel to implement comprehensive and effective mental health programming for the vast number of isolated prisoners who clearly need it as they struggle inside ADC's otherwise barren isolation units.  Whether this effort is geared toward responding to this lawsuit or is a true recognition that current conditions are harming the prisoners whom ADC is charged with keeping safe is difficult to say. But it is ultimately secondary to the fact that, as they are currently operating, the programs are utterly inadequate and fail to meet the basic needs of

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00091

1  the many mentally ill prisoners who are in isolation and in desperate need of care.

2  181. Below I detail the many cell-front and some of the longer, confidential interviews
3  conducted during my inspection of Eyman. These examples provide a snapshot of my
4  findings rather than an exhaustive report of the many interactions I had with prisoners in
5  those units during my tours.

6  182. Even in the BMU, which is supposed to have the most well-structured and
7  elaborate mental health programming, prisoners repeatedly complained about the lack of
8  mental health contact.                                for example, told me he has a long
9  psychiatric history, is psychotic, and also gets into fights with other prisoners. He thought
10  he was being sent to the BMU to get help with those problems and to finally get the
11  treatment he needed. Instead, he said, "you are lucky if you get a group for 30 minutes" a
12  week, and there are no one-to-one contacts offered as part of the program (which is what
13  he thought he was being sent to BMU to receive). Other prisoners in what are labeled
14  "mental health programs" voiced similar complaints.                              , told me
15  simply, "the psych program here is no good." He went on to explain that the mental health
16  program only started about two months ago, and since then they have had only two
17  groups—"they put us in cages in the rec yard." He said the groups last "maybe 35
18  minutes" and, as he noted, they only happen once a month. Moreover, he was emphatic
19  that there were no regularly scheduled one-on-one mental health contacts. He said further
20  that "no one comes to check on us, except once every 3 months, and they do it cell front,
21  in front of everyone." A protective custody prisoner,                               , told
22  me that before he was incarcerated, he was under psychiatric care for anxiety. He has
23  sought treatment in prison but cannot get adequate care. "They say there is a psych
24  program here but I don't see anything happening." He told me it took 3 months for mental
25  health to even see him after he came to prison, despite him having submitted an HNR to
26  get help. When he was finally "seen," it was via the television system. He has had no
27  other professional mental health contact other than that. Similarly,                     ,
28          , described coming from the mental health program (such as it is) at Kasson, and

Confidential

PRSN-CH 00092

1  having been in the suicide watch cells there more than a dozen times by the time he came
2  to SMU I. Yet, he said he had been at this facility fully 5 months before being called out
3  to be seen by mental health (which, oddly enough, just happened for the first time this
4  week). He said that "no mental health person comes to see us or check on us," and even
5  upon coming out of suicide watch, "nobody comes to check on me after that." Finally,
6  there is the case of                              , who is a slightly built but articulate young
7  man who was placed in prison, this first time, because, he said, he violated the terms of
8  his SMI outpatient probation on the streets, something that was undoubtedly ordered out
9  of recognition of his mental health problems. He was approved to go to a minimum
10 security yard, serving a short sentence. However, he was denied entry into the Flamenco
11 facility and was sent to a mainline instead. He has diagnosed schizoaffective disorder and
12 he began to deteriorate—he said he has "auditory hallucinations, terrible mood swings,
13 and anxiety," and, in part because of this, he apparently got into a fight with another
14 prisoner (who may well have attacked him). He has been on a downward spiral since then.
15 He is in SMU I, "begging for treatment," but cannot get any. Instead, he said, the officers
16 put him on suicide watch—"It was horrible. I was desperate in watch. I really was losing
17 it. It traumatized me." He is still desperate to get out of this severe form of isolation,
18 where not treatment is forthcoming. He said: "They have no treatment plan, no therapy,
19 and no help."

20   183. I also conducted a set of longer and confidential interviews with a group of
21 prisoners whom I selected from Browning and SMU I. The results of those interviews are
22 summarized below.

23   184. I interviewed                              , a Browning prisoner who was seen in
24 the visiting area of the prison. However,              was so disturbed and at times
25 incoherent that I was unable to ask him all the questions about symptoms and reactions to
26 his isolated confinement that I ordinarily would have. I was nonetheless able to learn a
27 great deal about           and to observe how profoundly mentally ill he was.
28           told me that he had been taking psychotropic medications and receiving

-93-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    treatment for his mental problems since age 13. He has a long history of self-harm,
2    including banging his head against the wall, biting himself, and trying to gouge out his
3    own eyeballs. He has heard voices in the past (the last time he heard them, he said, was
4    when "the devil was on my body and mind") and he has a history of suicidality, which
5    apparently resulted in him being admitted to the Flamenco facility (on perhaps more than
6    one occasion).          had a difficult time remembering things or staying focused.
7    At one point he looked meaningfully at me and said, "I am not at ease. The world is on
8    my chest. I can't hold it." He talked about being afraid in the prison system and about
9    being victimized. He has learned to fear other people, he said, and has attacked his
10   cellmates because he becomes convinced that they are going to attack him.          is
11   a tragic example of the kind of prisoner who is so seriously mentally ill that he should
12   never be housed in a "regular" isolation unit. The stress and pain of isolation, especially in
13   the absence of intensive therapeutic contact and enhanced programming, is only likely to
14   worsen his condition and place him and possibly many others at risk.

15       185. Another Browning prisoner,                       is an older man doing a
16   relatively short (3 year) prison sentence, although he has been incarcerated before. He told
17   me that he never had mental health problems until he came to prison, but has had them
18   continuously since. He is certain that the prison is experimenting with people and that
19   prison officials somehow gave him Hepatitis C. He said that over his years in prison
20   (about 12 years, before his current term), the only regular psychiatric contact he has ever
21   had is through the tele-psychiatry medication checks that he gets every three months. In
22   addition, he said, about 6 months ago someone from the psych staff started to come by his
23   cell once a month. According to          , they "spend 30 seconds with you—'How are
24   you? Are you eating?' That's it." He said that there used to be a lot of physical abuse at
25   the prison—guards in special black uniforms used to beat prisoner with sticks—but it has
26   stopped. Now, he said, they pepper spray prisoners instead (including by blowing the
27   spray through the vents of the cells).

28       186.          described many problematic symptoms and reactions that are

-94-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    associated with long-term isolation. He told me that he has terrible headaches, is
2    constantly on edge and anxious, especially around people (for example, he said he was
3    afraid to come out of his cell for his interview with me), and he often feels like he might
4    be on the verge of an emotional breakdown. He also told me that he hears voices—they
5    speak to him out of the light socket, they constantly criticize him, and he cannot make
6    them stop. He is plagued by ruminations, a heightened sensitivity to lights, irrational anger
7    and irritability, problems concentrating, and the sense that he is losing the ability to feel or
8    care about things. Indeed, he said that he is often profoundly depressed, and no longer
9    wants to be around other people. He said, "I don't like anybody anymore. I can't trust
10    anyone. They are all out to get me."

11    187.          told me that he was going to be released from prison in about a week.

12    188. I interviewed Browning prisoner             , who is a 41-year-old
13    man with a long juvenile and adult prison history as well as a lengthy mental health
14    history, both of which began in California. He has a lifelong problem with suicidality. As
15    he put it, "I've tried a bunch of times to kill myself, since I was a kid." He told me that he
16    was a ward of the California Youth Authority ("CYA") and was treated with psychiatric
17    medications even back then. Shortly after he was released from CYA, he went to adult
18    prison and was quickly identified as having very serious mental health problems. He was
19    sent to the California Medical Facility at Vacaville, as a "Category J" prisoner (the
20    California prison system's most serious mental health designation at the time). When he
21    finally arrived in the Arizona prison system, he was given a long list of different
22    medications—"you name it"—and is now taking Haldol, Lithium, and Zoloft (which he
23    says sometimes work and sometime do not). He has been in the watch cells at the prison,
24    and told me that, on one occasion, he was there for 8 straight days and that during the
25    entire time no mental health professional came to see him. Aside from his medications, he
26    said that every 6 months or so he sees a doctor "who asks if I think about killing myself—
27    that's it." Otherwise,      said: "we get no counseling, no group, no nothing."

28    189.         reported a host of very serious negative reactions to his isolated

Confidential

PRSN-CH 00095

1   confinement, including constantly feeling anxious and on edge ("including when I sleep"),
2   feeling like he is going to have a breakdown and lose control of himself (including "times
3   when I do lose it"), ruminating over small things, being easily and irrationally angered all
4   the time, losing the ability to feel or care ("sometimes I think I am completely without
5   feelings now"), suffering from profound depression that he cannot make go away,
6   frequently having thoughts of suicide (which he does not share because he does not want
7   to be put in the watch cells—"I don't want the watch cells, you want to die there"), and
8   being very uncomfortable around other people all the time ("I don't leave my cell").

9   190. Browning prisoner        , told me that he had serious mental
10  problems before coming to prison, and that he was designated "SMI" (seriously mentally
11  ill), assigned a caseworker, and prescribed psychotropic medications. When he came to
12  prison, he had a series of suicide attempts and was placed in watch cells, which he
13  described as "terrible," in part because, he said, they spray you with pepper spray when
14  you are kept there. His feelings of desperation intensified when he came to SMU II at the
15  end of 2012. He estimated that, since then, he has engaged in self-harm, including
16  attempting suicide, more than 20 times. He described the "mental health program" at
17  Browning as a weekly group and a brief one-on-one counseling session with a clinician
18  that lasts about 20 minutes ("or, if you don't have an issue, 1 minute"), and takes place in
19  a cage inside the clinician's office.

20  191.       main negative reactions to isolation involve his continuing feeling of
21  being on the verge of being overwhelmed, of breaking down emotionally. He also
22  complained of ruminations and depression.

23  192. Another Browning inmate, Robert Gamez, #131401, came to his confidential
24  interview with me under "enhanced security," which meant that he was escorted by 4
25  officers, including a sergeant and a supervisor, was in leg irons, and had his restraints
26  connected to a "leash" that one of the officer held. He apparently is subject to this every
27  time he leaves his cell—including for showers and outdoor rec. It was a striking sight to
28  observe because Mr. Gamez is very small and slightly built (he said he weighs around 140

Confidential

1    pounds). He described a young life of parental abandonment, chaos and instability, being
2    around violence and drugs and gangs, and beginning his prison experience at a relatively
3    young age. After an initial stint in prison, in 2003 he returned at age 23 with a life
4    sentence, and was sent to isolation. He has been in isolation continuously since then, in
5    virtually all of the isolation units in the Arizona system. He complained about what he
6    said was excessive pepper-spraying in his present unit and said that it is used on prisoners
7    in the watch cells. Mr. Gamez told me that he personally has been to the watch cells and
8    that this has happened to him there. He is housed in one of the pods in which all of the
9    cells have plastic shields over the doors. Mr. Gamez's mental health problems have been
10   severe at times—he reported hearing voices, has made a number of suicide attempts, and
11   has been prescribed a broad range of psychotropic medications. He said that he "was
12   paranoid schizo and they put me on Thorazine" but the side effects were too drastic. Mr.
13   Gamez also told me that in all the time he has spent in prison isolation, despite his long-
14   standing and severe mental health problems, he has not had any therapeutic groups or one-
15   to-one counseling in the past. He said those things are "brand new" in his unit, and have
16   only recently begun.

17   193. Mr. Gamez reported suffering many very severe adverse reactions to isolated
18   confinement. They included troubled sleep, nightmares, constant anxiety, auditory
19   hallucinations (children's voices speaking to him, and others threatening him),
20   ruminations, fantasies of revenge, losing the ability to feel or care, difficulty concentrating
21   and focusing, concerns about his overall deterioration ("the environment takes over and
22   there's no coming back"), depression, and thoughts of suicide. He is convinced that he
23   "can't be around people anymore because of this"—because of the long-term isolation to
24   which he has been subjected.

25   194.                                    , is a profoundly mentally ill and obviously vulnerable
26   prisoner who is housed at Browning. He told me that he is currently incarcerated on a
27   burglary conviction, for which he received a 6-year term. He said that he has a long
28   history of mental health problems that date back to early childhood. He was hospitalized

-97-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    for these problems beginning at age 9 and "many times after that." He was deemed SMI

2    on the streets, and has taken a variety of psychotropic medications. He told me that he was

3    taking Seroquel and klonopin before coming to prison but they were discontinued once he

4    arrived because they are not on the prison formulary. Instead, he is now taking Thorazine,

5    Wellbutrin, Tegretol, "and something else." He told me that in the Behavioral

6    Management Unit (BMU) where he is currently housed they will take his property away

7    "if I don't drink my meds." He has attempted suicide many times, and he showed me

8    many serious scars on his body where he has cut himself, apparently very deeply

9    (including in his stomach), and told me that he has swallowed pencils and other objects.

10    He said that his mental health problems are well known by the ADP and "anytime I get

11    off the bus" coming into the prison system, he goes directly to a psych ward (including at

12    the Flamenco facility).     arrived at Browning in May 2012.

13    195.     said "the only reason they sent me here was because I was trying to

14    kill myself—I have no other disciplinary infractions. I get my points jacked up because of

15    suicide, not violence." However, he is having an extremely difficult time in isolation. He

16    told me, "I can't handle this stuff in my head, and it is getting worse. I'm going to kill

17    myself someday." He told me that he has been treated badly at the Browning facility. He

18    does not believe that he is getting enough mental health treatment or receiving treatment

19    in a way that he can benefit from. He said that during the one-on-one sessions with the

20    clinician, "the [correctional] staff sits outside the room" where the session takes place, and

21    that the "guards tell guys on the tier what I tell the doctor." He said that participation in

22    treatment—one group and a single one-on-one per week—is compulsory and that "you

23    have to go [or] they take your property away."     said he has been sprayed

24    with chemical agents multiple times since he has been in the BMU and has been on

25    suicide watch multiple times as well. The suicide watch typically lasts for about 8 days

26    and, he said, "they use mace in suicide watch all the time." He said the conditions in

27    suicide watch cells are horrible. The use of chemical sprays affects all of the prisoners on

28    watch, because it circulates to the other cells, and the watch cells are filthy: "There were

Confidential

feces and blood in these units until last week." He got out of the hospital just three weeks after his last suicide attempt. He said, "I was out of it, out of my mind, I'm schizophrenic and I lose it." However, after coming back from the hospital, he soon was placed on suicide watch again: "I got off suicide watch last week."

196.          described many symptoms and much psychological pain in isolation. He is bothered by headaches, troubled sleep, nightmares, constant anxiety, the feeling that he is on the verge of losing control, visual and auditory hallucinations, ruminations, fantasies of revenge, oversensitivity to certain stimuli (lights, and the perception that he can smell chemicals coming out of the vent in his cell), the sense that he has lost the capacity to feel positive emotion ("I think violently all the time and the place has done it"), deep depression, thoughts of suicide, a feeling of overall deterioration, and social withdrawal ("I tell people in my pod, leave me alone").

197.          said that he is scheduled to end his prison sentence next year "but before I get back to the streets I have to go to the state hospital to see if I can be released."

198.                          , is a 35-year-old Browning prisoner who came to the United States when he was around 10 or 11 years old, his mother was murdered when he was 14, and he was hospitalized for mental health problems by the time he was 18. He explained that in 2007 he was diagnosed as suffering from PTSD and that he is taking "a lot" of a medication whose name he could not recall. Other than the medication, however, "I haven't gotten any treatment. Once or twice they came to my cell, once they pulled me out—but the guard is standing right there"—within earshot of the interview—so          was not comfortable talking openly. He said he is currently in a "renouncer" pod for prisoners who wish to renounce their prior affiliation with a gang. "I was going crazy [in] here. I couldn't take it, even though I had a TV."

199.          told me that he has very troubled sleep, and is bothered by headaches. He is also bothered by ruminations, oversensitivity to stimuli (especially sound, "guys making noise all the time"), and feels that he is deteriorating badly overall in isolation.

-99-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1    200. I also interviewed a number of SMU I prisoners in the confidential setting of the
2    prison visiting room.

3    201. Jeremy Smith, #129438, is a 34-year-old SMU I prisoner who told me that he
4    came into the adult criminal justice system in Arizona as a 16-year-old. After serving his
5    first prison term he lived in another state for about five years before returning to Arizona
6    and coming back to ADC several years later. His mental health issues were first identified
7    during his first prison term; he had problems with depression and was placed on
8    psychotropic medications. He went to a mental hospital between prison terms, and was
9    diagnosed as bipolar; he was placed on lithium when he re-entered the prison system for a
10   second time. He moved back and forth between several ADC prisons, after asking for
11   protection and being denied, being accused of gang affiliations, and beginning a
12   debriefing process (that included 2 years in SMU I). Mr. Smith was returned to SMU I
13   just 3 weeks ago from Buckeye. He told me that in the unit where he lives now—what he
14   referred to as a "mental health cluster"—the cells have plexiglass shields on the outer
15   doors, and that, despite his own mental health problems, the other prisoners in the unit are
16   far more disturbed than he. When he was at this facility the last time, he said, "I
17   complained about the lack of programming, the lack of group activity, the lack of
18   confidential contact." He said that when he arrived this time, he immediately submitted an
19   HNR but has not yet been seen. He has heard that there are "going to be groups, etc." but,
20   he said, "I haven't seen anything."

21   202. Mr. Smith reported a number of problems and symptoms that many isolated
22   prisoners suffer, including constant problems with sleep, frequent bouts with anxiety, and
23   the feeling that he may be on the verge of breaking down or losing control, constantly
24   being preoccupied or ruminating ("I can't let things go"), fantasizing about revenge ("I'm
25   trying not to think about it"), being bothered by irrational anger, experiencing mood
26   swings, feeling that he is deteriorating overall, and experiencing social withdrawal ("I
27   don't want to be around people in here. People used to be my friends").

28   203.                                   , is a 51-year-old prisoner housed in SMU I and doing a

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential
PRSN-CH 00100

1   very long (flat 40-year) prison sentence which he began serving in 1986. He told me that
2   he was sent to SMU I back when it was first opened, and the he estimates he has spent
3   70% of his prison time in isolation. He said that he is a sex offender housed in a unit that
4   is primarily comprised of seriously mentally ill prisoners. Although he does not take
5   psychotropic medications and said that he had never been a mental patient in or out of
6   prison, he did acknowledge that "I have a number of suicide attempts." He said that he
7   does not participate in the groups that are held "every month or so" because "they are
8   useless, plus [staff] come and go here, they don't stick around." Although he does not
9   consider himself a mental patient, from what he has been able to observe, the seriously
10  mentally ill in his housing unit "aren't getting the help they need."

11  204.         said he finds isolated confinement to be a very stressful situation, and
12  reported suffering from feelings of anxiety often, as well as often having the sense that he
13  is on the verge of breaking down from the pressure of isolation. In addition,
14  reported experiencing a number of other isolation-related symptoms, including fantasizing
15  about revenge ("it's the only thing that keeps me going"), overreacting to certain stimuli
16  (especially the sound of other people talking—it "drives me nuts"), experiencing irrational
17  anger, and having problems concentrating.

18  205. Jackie Thomas #211267, a 28-year-old SMU I prisoner, described an early
19  troubled life that included mental health problems and receiving a variety of psychotropic
20  medications "when I was very young." He said he is "a cutter" and that his self-harming
21  behavior started when he was just 9 years old. He told me: "Nobody would love me or
22  care about me—the cutting makes the tension go away." (Mr. Thomas described a terribly
23  traumatic childhood in which his grandfather, who fathered him when he raped Mr.
24  Thomas's mother, then molested him as Mr. Thomas was growing up.) He has been
25  placed in mental institutions on 6 or 7 different occasions. Not long after he came into the
26  ADC in 2006, with a 10-year flat sentence, he was raped. When he was transferred to
27  another prison, he was beaten up and raped there as well. As a result, he had to be placed
28  in protective custody. He has been in SMU I for 7 years now. Mr. Thomas was very vocal

Confidential

about the lack of mental health care in SMU I: "They don't help you in here. I put in HNRs and they don't come. I go to group every Friday, I've been 2 times, in the cages with the therapist in the middle. I don't get any one-on-ones."  He said he used to get them, sporadically, "but then it just stopped," and now he gets "nothing." He said: "The staff here doesn't care about you—if you cut yourself, they just gas you." He said this is especially true in suicide watch cells where, if you are acting out, "they just gas you." Mr. Thomas said that he is schizophrenic and also has multiple personalities. His mental problems have resulted in him going to suicide watch "dozens of times," and he is currently prescribed several medications, including a Haldol shot. He explained: "The voices are in my head all the time. They tell me to cut myself. I can see ghosts and spirits, the dead, bugs and things that no one else can see."

206. Mr. Thomas is having a very difficult time in isolation. He reported suffering from headaches all the time, from troubled sleep and constant nightmares.  He is always anxious, and feels constantly on the verge of losing control of his emotions.  He has continuous hallucinations, and fantasies about revenge.  He ruminates (about taking his own life), constantly overreacts to stimuli (lights and smells), gets angry often, has problems thinking, feels he is becoming hardened by his experiences in isolation, has mood swings, deep depressions, and thoughts of suicide.  He feels he is deteriorating overall, and is now always uncomfortable being around people.

207. Mr. Thomas told me that he is scheduled to be released from prison in less than 2 years. He said: "I'm worried. I don't know what will happen to me. I will be homeless."

208. Mr. Thomas's comment that in his experience when mentally ill and other prisoners "act out" in response to their harsh conditions of confinement, the staff "just gasses you," and that this is especially true in the suicide watch cells, where desperate prisoners who are in various stages of psychiatric crisis are housed, underscores an issue that bears mention in concluding this discussion of Browning and SMU I. As I have mentioned in my analysis of conditions and practices at the other ADC isolation units that I toured, I heard repeatedly from prisoners, especially those with obvious mental illness,

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                                                    PRSN-CH 00102

1   that they are frequently subject to the use of chemical spray – often for reasons that can in

2   no way be justified, especially for the mentally ill.  The documents I reviewed confirm

3   that their experiences were not isolated incidents.  Instead, I found that correctional staff

4   frequently used chemical spray on prisoners for trivial reasons, regardless of the physical

5   or psychological consequences.  I reviewed records of prisoners who were sprayed for

6   covering a light fixture with a blanket,[145] refusing to relinquish blankets placed over their

7   heads,[146] refusing to surrender a suicide smock,[147] tampering with a colostomy bags,[148]

8   refusing to come out from under their bunks,[149] holding their food slots open,[150] or

9   refusing to take court-ordered medication.[151]

10  **VI.   CONCLUSION**

11       209. As I have noted repeatedly above, the adverse psychological effects of solitary or

12  isolated confinement and the serious risk of significant psychological harm that they pose

13  for prisoners has been well documented in the scientific literature and firsthand accounts.

14  Its dangers are also widely acknowledged by various human rights groups, professional

15  organizations, and judicial rulings amassed over the last half century. Indeed, in many

16  ways they replicate the considered judgments of similar commentators offered much

17  earlier in history, when more than a century ago the United States Supreme Court

18  characterized solitary confinement as an "infamous punishment," because "a considerable

19  number of prisoners fell, after even a short confinement, into a semi-fatuous condition,

20  from which it was next to impossible to arouse them . . . . "[152] Because, the Court noted,

21  "in most cases [the prisoners] did not recover sufficient mental acuity to be of any

22

23  _____

24  [145] SIR No. 201209956, ASPC-Eyman SMU-I (ADC089237).
    [146] SIR No. 201300585, ASPC-Eyman Browning (ADC089258).

25  [147] SIR No. 201204125, ASPC-Eyman Browning (ADC089205).
    [148] SIR No. 201203694, ASPC-Eyman Browning (ADC089203).

26  [149] SIR No. 201114325, ASPC-Eyman Browning (ADC089180).
    [150] SIR No. 201110353, ASPC-Eyman SMU I (ADC089163); SIR No. 201207726,

27  ASPC-Eyman SMU I (ADC089226).
    [151] SIR No. 201108721, ASPC-Eyman SMU I (ADC089158).

28  [152] In re Medley, 134 U.S. 160, 168 (1890).

-103-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1  subsequent service," the punishment of "solitary confinement was found to be too

2  severe."[153]

3       210. Some prison systems around the country have recognized the magnitude of the

4  risks and dangers that solitary confinement—even in its "modern" form—continues to

5  pose for the basic well-being of prisoners. They have taken steps to drastically limit (if not

6  virtually eliminate) its use on a long-term basis, to exclude certain groups of especially

7  vulnerable prisoners from being subjected to its potential harms, and to ameliorate its

8  harshness, painfulness, and damaging features as much as possible (by shortening the

9  length of stay, improving overall conditions of confinement, affording prisoners enhanced

10  programming and treatment to improve their chances to survive unscathed). The ADC has

11  done none of these things. Instead, it continues to expose a very large number of prisoners

12  to truly severe, extremely harsh and punitive isolation, and retains many of them under

13  these potentially conditions for very long periods of time.

14       211. For a variety of previously stated reasons, mentally ill prisoners are especially

15  vulnerable to the painful stressors of isolated confinement and the risk that they will incur

16  further psychological damage from placement in such units is especially high. Indeed, this

17  risk is so high—and so readily apparent—that it has led correctional officials and courts

18  across the country to exclude the mentally ill from being placed there in the first place. In

19  my professional opinion, and in the opinion of many others who have carefully studied

20  this issue, all prisoners with a diagnosis of severe mental illness should be categorically

21  excluded from long-term isolated housing, because they face a serious risk of significant

22  psychological harm in that setting.

23       212. My inspections of the ADC isolation units, my substantial cell front and one-on-

24  one confidential interviews, and the extensive documents that I have reviewed pertaining

25  to the policies, procedures, and conditions that are in operation in ADC's isolation units

26  confirm the fact that they do indeed impose "solitary confinement" on Arizona prisoners.

27

28       [153] Id.

-104-

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

These are precisely the kinds of isolated and isolating conditions that have been identified and described in the scientific literature as producing adverse effects. Indeed, in my experience, they represent an extremely harsh version of the kind of isolation that has been studied by researchers and condemned by human rights and professional organizations.

213. Contrary to sound correctional practice and the weight of psychological and psychiatric opinion, ADC currently houses seriously mentally ill prisoners in its isolation units. ADC's failure to have and to properly implement a policy that excludes these prisoners from these units places these prisoners at a heightened and unreasonable risk of harm.  In addition, as I have noted, conditions of such extreme isolation can do great damage to even previously healthy persons.  ADC's failure to devise and implement careful mental health monitoring policies for all prisoners subject to the extremely isolated conditions in their maximum security/isolation units, and ADC's failure to take meaningful steps to ameliorate conditions of extreme social isolation in those units, places all prisoners subject to such conditions at an unreasonable risk of harm.  The adverse consequences of exposure to these conditions can be extreme and even irreversible, including the loss of psychological stability, significantly impaired mental functioning, the inability to function in social settings and personal relationships, self-mutilation and harm, and even death.

214. Based on my experience studying these kinds of environments and their psychological effects for nearly four decades, and in providing guidance and advice to correctional systems and the federal courts about how best to address and ameliorate these problems in different states across the country, I can offer the strongly held opinion that the range of egregious conditions, practices, and policies and practices that I have described in the preceding pages can be remedied through system-wide relief that is ordered by the courts.

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00105

Executed on the 7th day of November 2013 in Santa Cruz, CA.

*Craig Haney Ph.D, J.D.*

Craig Haney, Ph.D, J.D.

-106-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential

PRSN-CH 00106

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email:      dpochoda@acluaz.org
            kflood@acluaz.org
            jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone:  (510) 280-2621
Email:      dspecter@prisonlaw.com
            ahardy@prisonlaw.com
            snorman@prisonlaw.com
            ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)*
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:      dfathi@npp-aclu.org
            afettig@npp-aclu.org
            aquereshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

-107-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                    PRSN-CH 00107

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
          dkiernan@jonesday.com
          scalderon@jonesday.com
          srauh@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
          tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
          jkmessina@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

-108-
CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

1

**ARIZONA CENTER FOR DISABILITY LAW**
Jennifer Alewelt (Bar No. 027366)
Asim Varma (Bar No. 027927
Sarah Kadar (Bar No. 027147)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:    jalewelt@azdisabilitylaw.org
            avarma@azdisabilitylaw.org
            skadar@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
Cathleen M. Dooley (Bar No. 022420)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:    jrico@azdisabilitylaw.org
            cdooley@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Confidential                                                        PRSN-CH 00109