# EXHIBIT 18

1   Daniel Pochoda (Bar No. 021979)
    Kelly J. Flood (Bar No. 019772)
2   James Duff Lyall (Bar No. 330045)*
    **ACLU FOUNDATION OF ARIZONA**
3   3707 North 7th Street, Suite 235
    Phoenix, Arizona 85013
4   Telephone: (602) 650-1854
    Email: dpochoda@acluaz.org
5           kflood@acluaz.org
            jlyall@acluaz.org
6
    *Admitted pursuant to Ariz. Sup. Ct. R. 38(f)
7
    *Attorneys for Plaintiffs Victor Parsons, Shawn Jensen,*
8   *Stephen Swartz, Dustin Brislan, Sonia Rodriguez,*
    *Christina Verduzco, Jackie Thomas, Jeremy Smith,*
9   *Robert Gamez, Maryanne Chisholm, Desiree Licci,*
    *Joseph Hefner, Joshua Polson, and Charlotte Wells, on*
10  *behalf of themselves and all others similarly situated*

11  **[ADDITIONAL COUNSEL LISTED BELOW]**

12
                    UNITED STATES DISTRICT COURT
13
                         DISTRICT OF ARIZONA
14

15  Victor Parsons; Shawn Jensen; Stephen Swartz;        No. CV 12-00601-PHX-NVW
    Dustin Brislan; Sonia Rodriguez; Christina            (MEA)
16  Verduzco; Jackie Thomas; Jeremy Smith; Robert
    Gamez; Maryanne Chisholm; Desiree Licci; Joseph
17  Hefner; Joshua Polson; and Charlotte Wells, on        **REBUTTAL REPORT OF**
    behalf of themselves and all others similarly         **CRAIG HANEY, Ph.D., J.D.**
18  situated; and Arizona Center for Disability Law,

19                    Plaintiffs,

20          v.

21  Charles Ryan, Director, Arizona Department of
    Corrections; and Richard Pratt, Interim Division
22  Director, Division of Health Services, Arizona
    Department of Corrections, in their official
23  capacities,

24                    Defendants.

25

26

27

28

1

# **TABLE OF CONTENTS**

2

I.      EXPERT QUALIFICATIONS

II.     NATURE AND BASIS OF EXPERT REBUTTAL OPINION

III.    THE TRUE NATURE OF "ISOLATED CONFINEMENT"

IV.     ISOLATED CONFINEMENT PLACES PRISONERS—ESPECIALLY
        MENTALLY ILL PRISONERS—AT GRAVE RISK OF SERIOUS
        PSYCHOLOGICAL HARM

V.      THE MISAPPLICATION OF THE "COLORADO STUDY" TO THE CASE
        AT HAND

VI.     GRAVE RISKS OF SERIOUS PSYCHOLOGICAL HARM IN THE ADC
        ISOLATION UNITS

VII.    MY METHODOLOGY

VIII.   CONCLUSION

**I. EXPERT QUALIFICATIONS**

1. I am a Professor of Psychology at the University of California, Santa Cruz, where I also currently serve as the Director of the Legal Studies Program, and the Director of the Graduate Program in Social Psychology. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards.

2. A more detailed description of my academic background and professional qualifications was set forth in paragraphs 3-8 of the November 7, 2013 Expert Report that I submitted in this case, and in the curriculum vitae that I appended thereto (as Appendix A).

**II. NATURE AND BASIS OF EXPERT REBUTTAL**

3. I was originally retained by counsel for the plaintiffs in Parsons v. Ryan to provide expert opinions on three inter-related topics, including a summary of existing scholarly knowledge and opinion about the negative psychological consequences of confinement in isolation or "supermax" prisons, an explanation of whether and how those negative consequences can be exacerbated for prisoners who are suffering from serious mental illness ("SMI") and, finally, the extent to which prisoners housed in the Arizona Department of Corrections (ADC), including those who suffer from SMI, are subjected to solitary-type confinement that may place them at a serious risk of psychological harm.

4. The expert opinions that I reached and expressed in my November 7, 2013 Expert Report were that scientific knowledge, based on numerous empirical studies conducted by researchers and clinicians from diverse backgrounds and perspectives, indicates that being housed in solitary or isolated confinement can produce a number of negative psychological effects and places prisoners at grave risk of psychological harm.

-3-

5.     In addition, I opined that the conclusions reached in these empirical studies are theoretically sound, based on the widely accepted proposition that the absence of meaningful social interaction and activity, and the other severe deprivations that are common under conditions of isolated or solitary confinement, are known to produce adverse psychological effects in contexts other than prison. Therefore, it makes perfect theoretical sense that conditions of isolation would produce similar outcomes when persons encounter them in correctional settings (as, in fact, the empirical literature indicates they do).

6.     I also explained that there is a widespread scholarly and professional consensus as well as sound theoretical reasons to expect that prisoners who suffer from SMI, in particular, would have a more difficult time tolerating the painful experience of isolation or solitary confinement because of their greater vulnerability to stressful, traumatic conditions and because some of the extraordinary conditions of isolation adversely affect the particular symptoms from which mentally ill prisoners suffer (such as depression) or directly aggravate other aspects of their pre-existing psychiatric conditions.

7.     Finally, I expressed the opinion that the isolation units in the Arizona Department of Corrections (ADC) clearly constitute precisely the kind of harsh and depriving conditions of isolated confinement that have been found to be potentially detrimental to all prisoners, especially to the seriously mentally ill, and to place them at substantial risk of serious psychological harm.     Further, the ADC's failure to categorically exclude prisoners who suffer from SMI from its isolation units is inconsistent with sound corrections and mental health practice.

8.     Counsel for plaintiffs have provided me with several reports subsequently filed by defendants' experts. They have asked me to read, consider, and respond to this additional information, focusing specifically on the two reports that appear to pertain most closely to my own opinions in this case—a "Confidential Expert Report" by Richard P. Seiter, Ph.D. (dated December 18, 2013) and another by Joseph V. Penn, M.D. (also dated December 18, 2013). I was also provided with documentation produced

-4-

with these reports. This documentation was not a full production of all the documents Drs. Seiter and Penn indicated they had reviewed and relied upon in forming their opinions. Just recently, additional documents were produced by Defendants but not in time for my review in this report. I reserve the right to supplement this report in order to include consideration of these and any other documents reviewed by Defendants' experts and produced after December 18, 2013. A list of the documents I have received from Plaintiffs' counsel since I submitted my original report on November 7, 2013 is attached here as Appendix A.

9. I have carefully read and considered the expert reports filed by Drs. Seiter and Penn. I have concluded that neither report affects any of my opinions or conclusions in this case. In fact, neither report really addressed in a serious and considered way any of the central opinions that I expressed or the conclusions that I reached. Both reports misstated or misconstrued what is commonly meant by "isolated confinement," and argued instead that conditions inside the ADC isolation units are "not really" isolation of the sort that is addressed in the empirical and clinical literature. In fact, they clearly are. Both reports also essentially ignored the substantial empirical literature and theoretical rationale concerning the harmful psychological effects of isolated confinement that I reviewed and discussed. And both failed to consider the widespread consensus that exists in the scholarly, mental health, and professional communities about the special vulnerability of the seriously mentally ill (SMI) to these harmful effects. This Rebuttal Report addresses each of those issues.

**III. THE TRUE NATURE OF "ISOLATED CONFINEMENT"**

10. I noted in my November 7, 2013 Expert Report that, for perhaps obvious reasons, total and absolute "solitary confinement"—literally complete isolation from any form of human contact—does not exist in prison and never has. Instead, as I noted, the term is generally used to refer to conditions of extreme (but not total) isolation from others. I defined it in a way that is entirely consistent with its use in the broader correctional literature, as:

> [S]egregation from the mainstream prisoner population in attached housing units or free-standing facilities where prisoners are involuntarily confined in their cells for upwards of 23 hours a day or more, given only extremely limited or no opportunities for direct and normal social contact with other persons (i.e., contact that is not mediated by bars, restraints, security glass or screens, and the like), and afforded extremely limited if any access to meaningful programming of any kind.[1]

This definition is similar to the one employed by the National Institute of Corrections (NIC), as cited by Chase Riveland in a standard reference work on solitary-type confinement that was sponsored and disseminated by the United States Department of Justice. Riveland noted that the NIC itself had defined solitary or "supermax" housing as occurring in a "freestanding facility, or a distinct unit within a freestanding facility, that provides for the management and secure control of inmates" under conditions characterized by "separation, restricted movement, and limited access to staff and other inmates."[2] Much more recently, the Department of Justice employed a similar definition, noting that "the terms 'isolation' or 'solitary confinement' mean the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others... An isolation unit means a unit where all or most of those housed in the unit are subjected to isolation."[3]

11.   Nonetheless, Drs. Penn and Seiter dispute these widely accepted definitions and

---

[1] Craig Haney, The Social Psychology of Isolation: Why Solitary Confinement is Psychologically Harmful, Prison Service Journal, 12 (January, 2009), at n.1, *available at* http://www.probono.net/prisoners/stopsol-reports/attachment.212648.

[2] Chase Riveland, Supermax Prisons: Overview and General Considerations. National Institute of Corrections. Washington DC: United States Department of Justice (1999), at p. 3, *available at* http://static.nicic.gov/Library/014937.pdf.

[3] United States Department of Justice, Letter to the Honorable Tom Corbett, Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation, May 31, 2013, at p. 5 (emphasis in original), *available at* http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf, citing also to Wilkinson v. Austin, 545 U.S. 209, 214, 224 (2005), where the United States Supreme Court described solitary confinement as limiting human contact for 23 hours per day, and; Tillery v. Owens, 907 F.2d 418, 422 (3d Cir. 1990), where the Third Circuit described it as limiting contact for 21 to 22 hours per day.

characterizations. For example, Dr. Seiter opined that the ADC did not impose extreme isolation on prisoners in its isolation units because there were some opportunities for prisoners to receive letters, communicate with one another (even while confined to their cells for approximately 23 hours per day), and to have televisions (Seiter Confidential Expert Report, December 18, 2013, circa p. 16). Similarly, Dr. Penn made the remarkable claim that: "The use of 'isolation' or 'short- or long-term segregation' does not occur within Arizona Department of Corrections, as there are opportunities for outside recreation, showers, and the like" (Penn Confidential Expert Report, December 18, 2013, p. 77). A moment's reflection demonstrates the fallacy of Dr. Penn's claim that a prison that houses inmates for all but the briefest time could or would constitutionally deprive them of any and all basic activities (such as showering) or completely prevent them from communicating with one another and the outside world (through letters). The fact that prisoners in the ADC isolation units are permitted to shower and can sometime manage to communicate with one another albeit on a very restricted and highly compromised basis (such as between cells, across a housing unit, or between caged or walled recreation areas) does not preclude them from being in isolation. Frankly, if the units that I observed in the ADC do not constitute "isolation" and "segregation," then isolation and segregation have rarely if ever existed at anytime in correctional history.

12. Moreover, in addition to the commonly accepted definitions that I cited above and the commonsense proposition that, no matter how draconian, isolation units must provide prisoners with the opportunity to engage in at least some basic activities, and rarely if ever can prevent all forms of communication, no court of which I am aware has ever accepted the extraordinary claim that the provision of recreation and showers or sporadic opportunities for restricted communication negates prison "isolation." As someone who now works for the Texas Department of Criminal Justice, Dr. Penn is likely familiar with Judge Justice's ruling in Ruiz v. Johnson [37 F. Supp. 2d 855 (1999)] to the effect that the administrative segregation units in the Texas prison system imposed "extreme deprivations which cause profound and obvious psychological pain and

-7-

1  suffering" and represented "virtual incubators of psychosis—seeding illness in otherwise
2  healthy inmates and exacerbating illness in those already suffering from mental
3  infirmities" (at 907). Although less directly relevant to his current employment, Dr. Penn
4  may also be aware of Judge Henderson's conclusion in Madrid v. Gomez [899 F. Supp.
5  1146 (1995)] that placing mentally ill prisoners in the security housing unit at Pelican
6  Bay State Prison was "the mental equivalent of putting an asthmatic in a place with little
7  air to breathe" and thus deprived them of "a minimal civilized level of one of life's
8  necessities" (at 1266). I testified as an expert witness in both of those cases, my
9  testimony was cited in the opinions, and I toured and inspected all of the correctional
10  facilities in question. I can attest that the administrative segregation units in Texas and
11  the Pelican Bay Security Housing Unit in California that were the focus of both federal
12  court opinions provided prisoners with "opportunities for outside recreation, showers, and
13  the like," and could not and did not preclude the receipt of letters or incidental
14  communication between cells, across housing units, or in rec cages. That did not stop
15  either court from characterizing these units as severe forms of "isolation" and
16  "segregation" and declaring that the practice of housing mentally ill prisoners inside them
17  was unconstitutional.[4]

18  13.     Very clearly, then, by the commonly accepted definitions of isolation, or
19  isolated or solitary confinement, the ADC units described in my November 7, 2013
20  Expert Report constitute "isolation" that is very often "extreme" in nature. Dr. Seiter's
21  observation that "I saw many inmates in dark cells asleep during the daytime hours I was
22  there" (Seiter Report, p. 18) reflects the tenor of pods or units in which these isolated
23  prisoners currently exist. The fact remains that ADC prisoners in these units eat, sleep,
24  and defecate within the confines of their small cells, and the overwhelming majority of

25
26  [4] See also Davenport v. DeRobertis, 844 F.2d 1310 (1988), where even before Madrid a federal court had observed, in connection with an Illinois state prison, that "the record shows, what anyway seems pretty obvious, that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total" (at 1313, emphasis added).
27
28

-8-

them have no contact with anyone that is not mediated by bars, restraints, security glass or screens, and the like. Many of them have no normal or meaningful social interactions with anyone on a regular basis and, therefore, are living in what can only be considered as "extreme social isolation." As I will discuss in the next section of this report, it is commonly understood by scientific researchers who have studied these issues and by professional organizations that have carefully considered them that persons exposed to such conditions and forms of treatment are at grave risk of suffering serious adverse psychological effects.

## IV. "ISOLATED CONFINEMENT" PLACES PRISONERS—ESPECIALLY SERIOUSLY MENTALLY ILL PRISONERS—AT GRAVE RISK OF SERIOUS PSYCHOLOGICAL HARM

14.   14. Drs. Seiter and Penn did not engage in any careful or serious way with the extensive scientific literature that documents the harmful nature of isolated and solitary confinement and that I discussed at length in paragraphs 18-37 of my November 7, 2013 Expert Report.  They rather asserted, with little or no justification or discussion of any kind, that this evidence simply does not exist. Thus, Dr. Penn wrote, without referencing any scientific literature whatsoever, that "there is no empirical data to suggest any cause and effect psychiatric and/or mental health impact from the limited use of higher custody levels. Specifically, there is no definitive empirical evidence for a cause and effect that the use of higher custody levels will cause post-traumatic stress disorder (PTSD) or psychic harm or injury" (p. 77).

15.   I will not repeat or reproduce all of the existing evidence that clearly contradicts Drs. Seiter and Penn. That evidence is discussed carefully and at some length in my November 7th, 2013 Report, in the above-referenced paragraphs, and it speaks for itself. However, it is important to note that Drs. Seiter and Penn are extreme outliers in the scientific, mental health, and even corrections community on this issue. If there were "no empirical data to suggest any cause and effect psychiatric and/or mental health impact"

1 from isolated or solitary confinement, why would every major human rights and mental

2 health organization in the United States as well as internationally have taken public

3 stands in favor of significantly limiting its use (if not abandoning it altogether)? These

4 organizations include major legal, medical, and health organizations, as well as faith

5 communities and international monitoring bodies.[5]

---

<sup>5</sup> See, e.g., Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Interim Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc A/66/268, ¶¶ 76-78 (Aug. 5, 2011) (asserting that solitary confinement for longer than 15 days constitutes torture, and that juveniles and people with mental illness should never be held in solitary confinement); AMERICAN ACADEMY OF CHILD AND ADOLESCENT PSYCHIATRY, SOLITARY CONFINEMENT OF JUVENILE OFFENDERS (2012), *available at* http://www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx (opposing "the use of solitary confinement in correctional facilities for juveniles," stating that "any youth that is confined for more than 24 hours must be evaluated by a mental health professional," and aligning AACAP with the United Nations Rules for the Protection of Juveniles Deprived of their Liberty, which includes among "disciplinary measures constituting cruel, inhuman or degrading treatment" "closed or solitary confinement or any other punishment that may compromise the physical or mental health of the juvenile concerned"); AMERICAN PSYCHIATRIC ASSOCIATION, POSITION STATEMENT ON SEGREGATION OF PRISONERS WITH MENTAL ILLNESS (2012), *available at* http://www.psych.org/File%20Library/Learn/Archives/ps2012 _PrisonerSegregation.pdf ("Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."); AMERICAN PUBLIC HEALTH ASSOCIATION, SOLITARY CONFINEMENT AS A PUBLIC HEALTH ISSUE, POLICY NO. 201310 (2013), *available at* http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462 (detailing the public-health harms of solitary confinement; urging correctional authorities to "eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others"; and asserting that "[p]unitive segregation should be eliminated"); MENTAL HEALTH AMERICA, SECLUSION AND RESTRAINTS, POLICY POSITION STATEMENT 24 (2011), *available at* http://www.nmha.org/positions/seclusion-restraints ("urg[ing] abolition abolition of the use of seclusion . . . to control symptoms of mental illnesses"); NATIONAL ALLIANCE ON MENTAL ILLNESS, PUBLIC POLICY PLATFORM SECTION 9.8, *available at* http://www.nami.org/Template.cfm?Section=NAMI_Policy_Platform&Template=/Content Management/ContentDisplay.cfm&ContentID=38253 ("oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses"); SOCIETY OF CORRECTIONAL PHYSICIANS, POSITION STATEMENT, RESTRICTED HOUSING OF MENTALLY ILL INMATES (2013), *available at* http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates ("acknowledg[ing] that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment," and recommending against holding these prisoners in segregated housing for more than four weeks); NEW YORK STATE COUNCIL OF CHURCHES, RESOLUTION OPPOSING THE USE OF PROLONGED SOLITARY CONFINEMENT IN THE CORRECTIONAL FACILITIES OF NEW YORK STATE AND NEW YORK CITY (2012), *available at* https://sites.google.com/site/nyscouncilofchurches /priorities/on-solitary-confinement; PRESBYTERIAN CHURCH (USA), COMMISSIONERS' RESOLUTION 11-2, ON PROLONGED

16. For example, in a 2006 report based in part on a series of fact-finding hearings that addressed a wide range of prison issues, the bipartisan Commission on Safety and Abuse in America's Prisons termed solitary and "supermax"-type units (of the sort to which I was referring in my Expert Report and that exist in the ADC) "expensive and soul destroying"6 and recommended that prison systems "end conditions of isolation."7 Later that same year, an international task force of mental health and correctional experts meeting in Istanbul issued a joint statement on "the use and effects of solitary confinement" in which they acknowledged that its "central harmful feature" is the reduction of meaningful social contact to a level that it is "insufficient to sustain health and well being."8 Citing various statements, comments, and principles that had been

SOLITARY CONFINEMENT IN U.S. PRISONS (2012), *available at* https://pc-biz.org/MeetingPapers/(S(em2ohnl5h5sdehz2rjteqxtn))/Explorer.aspx?id=4389 (urging all members of the faith to participate in work to "significantly limit the use of solitary confinement"); RABBINICAL ASSEMBLY, RESOLUTION ON PRISON CONDITIONS AND PRISONER ISOLATION (2012), *available at* http://www.rabbinicalassembly.org/story/resolution-prison-conditions-and-prisoner-isolation?tp=377 (calling on prison authorities to end prolonged solitary confinement, and the solitary confinement of juveniles and of people with mental illness); AMERICAN BAR ASSOCIATION, ABA CRIMINAL JUSTICE STANDARDS ON THE TREATMENT OF PRISONERS, STANDARDS 23-2.6-2.9, 23-3.8, 23-5.5 (2010), *available at* http://www.americanbar.org/publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html (limiting acceptable rationales for segregated housing and long-term segregated housing, stating that no prisoners with serious mental illness should be placed in segregation, requiring monitoring of mental-health issues in segregation, and requiring certain procedures for placement in long-term segregation, generally characterizing segregated housing as a practice of last resort, and requiring social interaction and programming for those placed in segregation for their own protection); NEW YORK STATE BAR ASSOCIATION, COMMITTEE ON CIVIL RIGHTS REPORT TO THE HOUSE OF DELEGATES: SOLITARY CONFINEMENT IN NEW YORK STATE 1-2, RESOLUTION (2013), *available at* http://www.nysba.org/WorkArea/DownloadAsset.aspx?id=26699 (calling on state officials to significantly limit the use of solitary confinement, and recommending that solitary confinement for longer than 15 days be proscribed).

⁶ Gibbons, John, and Katzenbach, Nicholas. Confronting Confinement: A Report of the Commission on Safety and Abuse in America's Prisons. New York: Vera Institute of Justice (2006), at p. 59, *available at* http://www.vera.org/sites/default/files/resources/downloads/Confronting_Confinement.pdf.

⁷ Id. at p. 57.

⁸ International Psychological Trauma Symposium, Istanbul Statement on the Use and Effects of Solitary Confinement. Istanbul, Turkey (December 9, 2007), *available at* http://www.univie.ac.at/bimtor/dateien/topic8_istanbul_statement_effects_solconfinment.pdf

previously issued by the United Nations—all recommending that the use of solitary confinement be carefully restricted or abolished altogether—the Istanbul group concluded that "[a]s a general principle solitary confinement should only be used in very exceptional cases, for as short a time as possible and only as a last resort." Notably, the specific recommendations they made about how such a regime should be structured and operated would, if adopted, end most forms of long-term isolated confinement.

17.    And, finally, out of recognition of the adverse mental health effects that occur in the course of segregated, solitary, or isolated confinement, the American Bar Association's Standards for Criminal Justice on the Treatment of Prisoners mandate that "[s]egregated housing should be for the briefest term and under the least restrictive conditions practicable."[9] Moreover, the ABA requires that the mental health of all prisoners in segregated housing "should be monitored" through a process that should include daily correctional staff logs "documenting prisoners' behavior," the presence of a "qualified mental health professional" inside each segregated housing unit "[s]everal times a week," weekly observations and conversations between isolated prisoners and qualified mental health professionals, and "[a]t least every [90 days], a qualified mental health professional should perform a comprehensive mental health assessment of each prisoner in segregated housing" (unless such assessment is specifically deemed unnecessary in light of prior individualized observations).[10] In addition, at intervals "not to exceed [30 days], correctional authorities should meet and document an evaluation of each prisoner's progress" in an evaluation that explicitly "should also consider the nature of the prisoner's mental health," and at intervals "not to exceed [90 days], a full

---

[9] AMERICAN BAR ASSOCIATION, ABA CRIMINAL JUSTICE STANDARDS ON THE TREATMENT OF PRISONERS, STANDARD 23-2.6(a) (2010), *available at* http://www.americanbar.org /publications/criminal_justice_section_archive/crimjust_standards_treatmentprisoners.html [hereinafter "ABA STANDARDS"].

[10] ABA Standards, 23-2.8(b).

classification review" should be conducted that addresses the prisoner's "individualized plan" in segregation with "a presumption in favor of removing the prisoner from segregated housing."[11]

18.   In short, the fact that Drs. Penn and Seiter fail or refuse to recognize the obvious potential harms and risks of isolated or segregated confinement in general (including in the kind of isolation units that prevail throughout the ADC in particular), places them directly at odds with numerous major scholarly, mental health, and professional organization that have considered these issues.

19.   The scientific and professional consensus with respect to the isolation of seriously mentally ill prisoners is even more categorical. Thus, the ABA flatly bans seriously mentally ill prisoners from being housed in segregation or isolation on a long-term basis. The Standards specifically state that "No prisoner diagnosed with serious mental illness should be placed in long-term segregated housing."[12] The ABA defines "long-term segregated housing" as any segregated housing "that is expected to extend or does extend for a period of time exceeding 30 days."[13] Similarly, the American Psychiatric Association ("APA") has issued a Position Statement on Segregation of Prisoners with Mental Illness against ever subjecting seriously mentally ill prisoners to "prolonged segregation" (which the Association defines as segregation lasting more than three to four weeks) except "with rare exceptions.") Thus, the APA has stated specifically:

> Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates.  If an inmate with serious mental illness is placed in segregation, out-of-cell structured therapeutic activities (i.e., mental health/psychiatric treatment) in appropriate programming space an adequate unstructured out-of-cell time should be permitted. Correctional mental health authorities should work closely with administrative

---

[11] ABA Standards, 23-2.9.

[12] ABA Standards, 23-2.8(a).

[13] ABA Standards2.3-1.0(o).

1

> custody staff to maximize access to clinically indicated programming and recreation for the individuals.[14]

2

3    20. Here, too, the apparent lack of concern that Drs. Seiter and Penn expressed over
4    the long-term segregation of seriously mentally ill prisoners—a practice that is
5    unfortunately widespread in the ADC—places them at odds with the consensus of
6    scholars, mental health professionals, and mainstream professional organizations.

7    21. It is worth noting that the scientific literature that they have overlooked or failed
8    to acknowledge documents the fact that solitary or isolated confinement (as defined and
9    understood in accord with the definitions that I set out in section "III" above) is
10   associated with a range of problematic symptoms that include: appetite and sleep
11   disturbances; anxiety, panic, and a sense of impending breakdown; hypersensitivity,
12   irritability, aggression, rage, and loss of control; ruminations and cognitive dysfunction;
13   paranoia and hallucinations; depression, hopelessness, self-mutilations or self-harm, and
14   suicidal ideation and behavior; and social withdrawal. As I have noted, the risk of
15   experiencing these painful and potentially dangerous symptoms is exacerbated in the case
16   of mentally ill prisoners.15

17

18   ## V.    THE MISAPPLICATION OF THE "COLORADO STUDY" TO THE CASE AT HAND

19

20   22. Dr. Seiter included a long excerpt from a single study—the so-called "Colorado

21   Study"16—in support of his position that "placement in Maximum Custody" in the ADC

22

23   [14] AM. PSYCH. ASSOC., POSITION STATEMENTS: SEGREGATION OF PRISONERS WITH
     MENTAL ILLNESS (2012), *available at* http://www.psychiatry.org/advocacy--
24   newsroom/position-statements.

25   [15] See paragraphs 18-46 of my November 7, 2013 Expert Report for a more comprehensive
     discussion of these issues.
26

27   [16] O'Keefe, et al. (2010). One Year Longitudinal Study of the Psychological Effects of
     Administrative Segregation. Colorado Springs, CO: Colorado Department of Corrections,
28   *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf.

-14-

does not "cause psychological damage to inmates" (p. 10). It appears to be the only basis for this opinion; he offers literally no other theoretical proposition or empirical fact to buttress it.[17] There are several reasons why the Colorado Study is a singularly inappropriate study on which to rely and should not serve as the basis for minimizing or ignoring the grave risk of "psychological damage to inmates" that occurs in isolation units like those at issue in this case.

23.     For one, the Colorado Study has been roundly criticized by a number of researchers from a variety of disciplines (psychology, psychiatry, anthropology, history, and law) as deeply flawed in its methodology. Many of them have concluded in published critiques that the study's methodological problems are so severe as to render its results uninterpretable. The serious methodological problems include: the inappropriate exposure of all groups to the key treatment variable (isolation); the continued cross-contamination of the general population and administrative segregation groups throughout the study (confounding the interpretation of any differences or similarities between them); the use of a convenience and patchwork sample rather than a representative group of participants; the failure to record (and, therefore, inability to quantify or code) the exact nature of the conditions of confinement (especially, the amount or degree of isolation) to which each participant or group of participants was exposed; employing a single, inexperienced research assistant identified as a department of corrections employee to collect all of the study data; problematic instances in which

---

[17] Dr. Seiter also mentioned a project conducted by the Liman Public Interest Program at the Yale Law School and the Association of Correctional Administrators was informing ADC policy and that this was evidence that it had "progressively moved forward" on its isolation policy (Seiter Report, p. 24). In fact, the Yale project has little or nothing to do with the issues in the present case. That project [reported in Metcalf et al., Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Policies (2013)] was not intended to identify "best practices" in isolation units across the nation. More importantly, it focused on a very narrow set of dimensions of actual practices in isolation units in the United States—"criteria for entry; the process of placement; the opportunities for review over time; and the availability of visitors" (Metcalf et al., p. 3) Nothing in the project or report addressed any central conditions of confinement issues, the psychological impact of isolation itself, or the placement of mentally ill prisoners in isolation.

1  the research assistant questioned the truthfulness of the prisoners' responses and required
2  them to "redo" the tests being administered; the total reliance on self-reported rating
3  scales that were created through the disaggregation and reconstruction/recombination of
4  subscales taken from other test batteries that had not been validated with prisoner
5  populations; and the failure to utilize even a basic interview with the study participants or
6  to make use of the behavioral observational data that were collected (that appeared at
7  odds with the prisoner self reports). These and other kinds of methodological problems
8  led well-known prison researchers David Lovell and Hans Toch to note in their critique
9  of the study that "[d]espite the volume of the data, no systematic interpretation of the
10  findings is possible."18 Many other published criticisms of the study's methodology
11  reached similar conclusions.19

12      24.   The study's numerous and serious methodological flaws notwithstanding, the
13  study's authors themselves have repeatedly taken public positions that explicitly
14  acknowledge the potentially harmful effects of prolonged prison isolation; most of them

---

16  [18] Appendix B, David Lovell & Hans Toch, Some observations about the Colorado
17  segregation study, *Correctional Mental Health Report*, May/June 2011, 3-4, 14 (PLTF-PARSONS 031798-99; 0317807-08).

18  [19] For example, see: Appendix B, Stuart Grassian & Terry Kupers, The Colorado study
19  versus the reality of supermax confinement, *Correctional Mental Health Report*, May/June 2011, 1-4 (PLTF PARSONS 031796; 031802-04); Lorna A. Rhodes & David Lovell, Is Adaptation the Right Question? Addressing the Larger Context of Administrative
20  Segregation: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation, *Corrections & Mental Health*, June 21, 2011, 1-9, *available at*
21  http://community.nicic.gov/cfs-
22  file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.19/Superma x-_2D00_-T-_2D00_-Rhodes-and-Lovell.pdf; Sharon Shalev & Monica Lloyd, If this be
23  method, yet there is madness in it: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation, *Corrections & Mental Health*, June
24  21, 2011, 1-7, *available at* http://community.nicic.gov/cfs-
file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.21/Superma x-_2D00_-T-_2D00_-Shalev-and-Lloyd.pdf; and Peter Scharff Smith, The effects of
25  solitary confinement: Commentary on One Year Longitudinal Study of the Psychological Effects of Administrative Segregation, *Corrections & Mental Health*, June 21, 2011, 1-11,
26  *available at* http://community.nicic.gov/cfs-
file.ashx/__key/CommunityServer.Components.PostAttachments/00.00.05.95.22/Superma
27  x-_2D00_-T-_2D00_-Smith.pdf.

28

-16-

have published articles, forwarded recommendations, and drafted position papers in favor of <u>limiting</u> the use of isolation altogether and <u>against</u> housing mentally ill prisoners inside these kinds of units. For example, Maureen O'Keefe, a researcher for the Colorado Department of Corrections and the primary author of the study, is on record as favoring significant reductions in the use of prison isolation (or "administrative segregation" as it is known in Colorado), and especially for the mentally ill. She is also very clear about what she termed a misuse or misinterpretation of the study's results:

> [W]e do not believe in any way and we do not promote the study as something to argue for the case of segregation <u>and especially not for the seriously mentally ill</u>... My interpretation is that people believe that this study sanctions administrative segregation for mentally ill and nonmentally ill alike... I do not believe that the conclusions lend to that and that is not the intended use of our study.[20]

Two of the study's other authors, Jeffrey Metzner and Jamie Fellner, have published an article concluding that "[i]solation can be harmful to any prisoner," that the potentially adverse effects of isolation include "anxiety, depression, anger, cognitive disturbances, perceptual distortions, obsessive thoughts, paranoia, and psychosis," and that these adverse effects are "especially significant for persons with serious mental illness."[21] In fact, their deep concerns over the harmfulness of isolated conditions of confinement led them to recommend that professional organizations "should actively support practitioners who work for changed segregation policies and they should use their institutional authority to press for a nationwide rethinking of the use of isolation" in the name of their "commitment to ethics and human rights."[22] Indeed, I know from personal

---

[20] Appendix C, Deposition of Maureen O'Keefe at 96, 101 (Oct. 25, 2013), Sardakowski v. Clements, No. 1:2012cv01326 (D. Colo. filed May 21, 2012) (Civil Action No. 12-CV-01326-RBJ-KLM) (emphasis added) (PLTF-PARSONS 031813-19).

[21] Jeffrey Metzner & Jamie Fellner, Solitary confinement and mental illness in U.S. prisons: A challenge for medical ethics, Journal of the Academy of Psychiatry and Law, 38, 104-108 (2010), at p. 104, *available at* http://www.hrw.org/sites/default/files/related_material/Solitary%20Confinement%20and%20Mental%20Illness%20in%20US%20Prisons.pdf.

[22] Id. at p. 107.

1    knowledge that Dr. Metzner was one of the primary drafters of the American Psychiatric

2    Association's position paper against the prolonged isolation of mentally ill prisoners (see

3    footnote 12 above).

4         25.   Finally, in addition to the serious methodological flaws that have been identified

5    in the Colorado Study, and the positions that virtually all of its authors have taken

6    acknowledging the harmful effects of isolation and opposing its use with mentally ill

7    prisoners in particular, the Colorado Department of Corrections itself has moved over the

8    last several years to both very significantly reduce the overall number of prisoners who

9    are housed in isolation units (again, termed "administrative segregation" there) and to

10   transfer all of their seriously mentally ill prisoners out of administrative segregation and

11   into a separate facility, known as the "Residential Treatment Program" (or "RTP").[23]

12        26.   Thus, the one reference that Dr. Seiter has used to support his position

13   referenced a badly flawed study in precisely the way that the study's primary author

14   (O'Keefe) has specifically advised it should not be used, to support a position that a

15   number of the study's other authors (e.g., Fellner and Metzner) have spoken against, but

16   also used it to defend policies and practices that the very department of corrections where

17   the study was done has explicitly abandoned.

18   ## VI.   GRAVE RISK OF SERIOUS PSYCHOLOGICAL HARM IN THE ADC
19            ISOLATION UNITS

20        27.   A fundamental flaw in the Penn and Seiter reports is that neither grapples in any

21   serious way with the plight of the thousands of isolated prisoners in the ADC by carefully

22   addressing or acknowledging what those prisoners are being subjected to and are

23   experiencing. Nor does either meaningfully focus on how the prisoners are being affected

25   [23] Memo to Wardens from Lou Archuleta, Interim Director of Prisons, Colorado DOC,
26   December 10, 2013 (PLTF-PARSONS-031299). See, also: Jennifer Brown, *Colorado
     Stops Putting Mentally Ill Prisoners in Solitary Confinement*, DENVER POST, Dec. 12,
27   2013, *available at* http://www.denverpost.com/news/ci_24712664/colorado-wont-put-
     mentally-ill-prisoners-solitary-confinement.

-18-

1 by their very severe conditions of confinement. Instead, both reports rely virtually

2 exclusively on what each author could infer from brief, passing observations, or has been

3 told by prison staff (exclusively from their perspective), or what is contained in official

4 documents produced by the ADC. However, these sources of information provide largely

5 idealized versions of these programs. Many of the verbal descriptions and official

6 documents refer to plans—things that are supposed to be implemented at some point in

7 the future inside various ADC facilities. Even with respect to programs that are already in

8 operation, it is impossible to know how and how effectively they operate on a day-to-day

9 basis without talking to the presumed beneficiaries of the programs—the prisoners

10 themselves. Yet neither doctor bothered to do this.

11 28. In this regard, I note that many of the programs that Drs. Penn and Seiter

12 described were not in operation at the time of our tours or, to the extent that they were in

13 existence at all, were operating on only sporadic and unpredictable basis. It appears that

14 many of the descriptions provided in the Penn and Seiter reports portray the programs

15 largely as they are supposed to work, rather than as they did at the time of my tours. In

16 fact, Dr. Penn repeatedly referred to programming space that is "under construction" or

17 things that "are planned for installation" but not yet in existence or underway, as late as

18 December, 2013, some 5 months after I, Dr. Stewart and other plaintiffs' experts toured

19 the ADC facilities.[24]

20 29. Moreover, even under the most idealized version of these programs, large

21 numbers of prisoners are explicitly excluded. Thus, Dr. Penn reported that: "As of July

22 2013, Dr. Taylor estimates that of all inmates designated as SMI, 70% participate in

---

[24] For example, in the case of the Lumley Special Management Unit, an "incentive program" was supposedly implemented, coincidentally, in August, the month after Dr. Stewart and I toured the unit. There are new training procedures that ADC supposedly "is implementing… with an anticipated start date of December 2013." (Penn Report, p. 76). Or, see Dr. Seiter's statement that "[i]n January 2014 ADC will begin to move inmates around to get the right inmates in the right cellblocks" (Seiter Report, p. 22). I am not exactly sure what he means by this, but these units have been in operation for years if not decades. It is not clear why they are only now moving the "right" inmates into the appropriate cellblocks (if, indeed, they are).

-19-

1  structured programming. (30% are not eligible because they are on death row; have

2  validated STG or management problems; are in detention - either disciplinary or have a

3  pending PC request; or are on mental health watch.)" (p. 45). I saw no evidence

4  documenting these figures and my observations in the course of my tours and interviews

5  in July, 2013 certainly did not suggest that the levels of participation were remotely this

6  widespread. Even if accurate, however, these figures mean that roughly a third of the

7  seriously mentally ill population is prohibited from participating in "structured

8  programming" of any kind. Note also that figures on percent of participation do not speak

9  to the larger issue of the nature and quality of the programs available in which to

10  participate (i.e., the duration or frequency of participation, the focus of the programming,

11  and its quality).

12      30.   In fact, however, even if the various programs described in the Penn and Seiter

13  reports operated exactly as described, they would not be remotely adequate to

14  compensate for or sufficiently ameliorate the harsh and deprived conditions of isolation

15  in which the prisoners are kept. The opportunity to supplement the highly restricted

16  recreation schedule (limited to no more than a few hours a week) with another hour or

17  two of counseling or group activity still leaves prisoners confined to their cells 21-22

18  hours per day (under the most generous calculations) and deprives them of

19  psychologically adequate conditions and treatment.   Thus, even in the best case

20  hypothetical scenarios posited by Drs. Seiter and Penn, the conditions of confinement in

21  the isolation units inflict serious risk of harm on all prisoners, and especially those with

22  mental illness.

23      31.   In addition, the fact that "[s]tate prisoners placed in higher custody levels have

24  the ability to request a mental health assessment to the extent they are experiencing

25  sequellae from isolation" (Penn Report, p. 77) does not distinguish ADC's isolation

26  policies and practices from any others (including those in which the placement of

27  mentally ill prisoners have been found to be unconstitutional), and it is a wholly

28  inadequate remedy to the serious risk of significant harm to which prisoners are subjected

in isolation units.  For one, prisoners in general are reluctant to proactively seek help in prison. Requesting psychological services or attention is typically seen as a sign of weakness; it is not something that most prisoners are inclined to do. That tendency is exacerbated when prisoners are skeptical about the nature and quality of the response they are likely to get, as they frequently are in isolation units (where tensions between prisoners and staff are highest and the presence of mental health staff is typically minimal).  Moreover, seriously disturbed prisoners are often unaware of their psychological problems and their process of deterioration; they are ill-equipped to seek help for symptoms that they do not necessarily realize they have.  Most importantly, both Drs. Seiter and Penn appear to rely on the possibility that some mental health care access and some mental health treatment in the isolation units will serve as adequate remedies to the suffering and unacceptably high risk of harm that isolated mentally ill prisoners experience. Providing such care after the fact is a mere palliative and it ignores one of the central issues in this case:  ADC's failure to exclude seriously mentally ill prisoners from the isolation units in the first place, which causes them to suffer, places them at grave risk of harm, and may cause irreversible damage. The supposed access to mental health care and programming is of course something to which seriously mentally ill prisoners are entitled. But they should receive it under conditions that do not simultaneously exacerbated their illness and put them at grave risk of future harm—that is, after they have been removed from the kind of extreme social isolation and sensory deprivation that exists in ADC's isolation units. This is why the American Bar Association, the American Psychiatric Association, and virtually every other professional organization that has seriously considered this issue has mandated the exclusion of seriously mentally ill prisoners from prolonged isolation.

32.   Finally, the reports by Drs. Penn and Seiter failed to meaningfully address (and appeared not to wholly grasp) a central issue in my report—the widespread nature and magnitude of the pain and suffering that prisoners in the isolation units in the ADC experience and the significant risk of harm to which they are exposed. A possible

explanation for this fundamental oversight may stem from the fact that, as I was surprised to learn, neither one of them ever bothered to talk to a single inmate in the Arizona prison system. Thus, when Dr. Seiter opined that "there is no evidence of psychological deterioration of inmates in this type housing" and asserted that "AS inmates often improve on psychological assessments and ratings" (Seiter Report, p. 11), he offered absolutely no evidence in support of this assertion. Given the fact that he did not talk to a single inmate, I cannot imagine how he could.

33.     It is frankly difficult for me to understand how Drs. Penn and Seiter could presume to reach conclusions about the nature and effect of segregation and isolation in the ADC without having bothered to talk to a single prisoner in the system. If they had, I believe that they would have seen and understood many of the same things that I did and that I described at length in my November 7, 2013 report, including the fact that, as I put it then, the ADC continues to expose a very large number of prisoners to truly severe, extremely harsh and punitive isolation, retains many of them under these potentially damaging conditions for very long periods of time, places all prisoners in these units at serious risk of significant harm due to their conditions of confinement, confines a surprisingly high number of seriously mentally ill prisoners in every isolated housing unit I toured, and many of the isolated prisoners were clearly suffering as a result of their isolated confinement. The literature that I have repeatedly cited and the widespread consensus among scholarly, mental health, and professional organizations indicates that such suffering is worse than "merely" painful but can be damaging and dangerous as well.

## VII.   MY METHODOLOGY

34.   I have been asked to comment briefly on the propriety of the methodology that I employed in evaluating and reaching conclusions about the various conditions of confinement in the ADC that I discussed in my November 7, 2013 Expert Report. I

should note that I am an academic psychology professor, trained in a distinguished research-oriented graduate program, and someone who regularly teaches graduate courses in research methods in the Ph.D. program at the University of California, Santa Cruz.

35. This education, training, and experience have taught me that the propriety, validity, or correctness of any particular methodology is determined by the context in which it is implemented and the purposes for which it is used. The methodology I employed in this case was entirely consistent with the approach I have taken in other cases and certainly provided me with a very sound basis on which to reach the conclusions that I did.

36. Specifically, I reviewed an extensive number of documents before, during, and after I visited the facilities in question; I toured and inspected a number of ADC facilities and all or representative examples of the isolation units in them; I spoke to staff members in the course of my tours (to the extent permitted by counsel for the defendants); and I conducted a number of interviews—cell front interviews as I passed through a number of the units and out-of-cell confidential interviews with a group of prisoners that were either named plaintiffs in the case or that I selected myself (consistent with the ground rules arrived at as a result of negotiations between the parties and decided upon by the court).

37. I have been conducting evaluations of conditions of confinement for several decades. I also am aware of the practices and approaches that have been used by other experts in prison litigation during that same time period, in different cases and jurisdictions across the country. I do not know of any case in which a substantially different or better methodology has been used. Frankly, I am aware of a number of instances in which less conscientious and in-depth approaches have been taken by experts. (Contrast my approach, for example, with that of Drs. Penn and Seiter who, as I have noted, opined about the effects of specific conditions of confinement on a group of prisoners whom they have never met.) In any event, my approach and methodology were conscientious, appropriate to the task at hand, and provided a sound basis for the conclusions that I reached.

## VIII.  **CONCLUSION**

38.   The reports by defendants' experts, Drs. Penn and Seiter, did not really address in any serious or careful way most of the opinions I expressed in my November 7, 2013 report. Both doctors used an idiosyncratic definition of "isolation"—one that is shared by few if any experts, commentators, or organizations knowledgeable about these issues—to in essence argue that solitary or isolated confinement does not exist in the ADC. In fact, the use of isolation—extreme, severe isolation—is widespread in the ADC. Both doctors also essentially ignored the scientific literature (again, a literature that is embraced by numerous scholarly, mental health, and other knowledgeable professional organizations) to conclude that the conditions of confinement in these units really pose no serious psychological risks to prisoners at all. Since they appear to believe that isolation does not exist in the ADC and that, in any event, it is not harmful and does not place prisoners at serious risk of harm, they express no concern over the placement of even seriously mentally ill prisoners in these units, even for very extended periods of time.

39.   As I have indicated, these are outlier positions that are not supported by the facts—the facts of the actual conditions of confinement in the ADC isolation units, the literature on the harmful effects of housing prisoners (especially the seriously mentally ill) in these places, and the evidence of palpable suffering and risk of harm that is occurring there (which they did not even attempt to assess through the interview of even a single prisoner).

40.   I have carefully reviewed and considered both of these reports. For the reasons I have stated in the above paragraphs, they have not altered the opinions I expressed in my November 7, 2013 Expert Report.

1   Executed on the __31st__ day of __January__ 2014 in Santa Cruz, CA.

Craig Haney, Ph.D., J.D.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Daniel Pochoda (Bar No. 021979)
Kelly J. Flood (Bar No. 019772)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF
ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email:    dpochoda@acluaz.org
            kflood@acluaz.org
            jlyall@acluaz.org

*Admitted pursuant to Ariz. Sup. Ct.
R. 38(f)

Donald Specter (Cal. 83925)*
Alison Hardy (Cal. 135966)*
Sara Norman (Cal. 189536)*
Corene Kendrick (Cal. 226642)*
**PRISON LAW OFFICE**
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Email:    dspecter@prisonlaw.com
            ahardy@prisonlaw.com
            snorman@prisonlaw.com
            ckendrick@prisonlaw.com

*Admitted *pro hac vice*

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Quereshi (Md. 28882)*
**ACLU NATIONAL PRISON
PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone: (202) 548-6603
Email:    dfathi@npp-aclu.org
            afettig@npp-aclu.org
            aquereshi@npp-aclu.org

*Admitted *pro hac vice*. Not admitted
in DC; practice limited to federal
courts.
**Admitted *pro hac vice*

1

2

3

4

5

6

Caroline Mitchell (Cal. 143124)*
David C. Kiernan (Cal. 215335)*
Sophia Calderón (Cal. 278315)*
Sarah Rauh (Cal. 283742)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone: (415) 875-5712
Email:    cnmitchell@jonesday.com
            dkiernan@jonesday.com
            scalderon@jonesday.com
            srauh@jonesday.com

7

*Admitted *pro hac vice*

8

9

10

11

12

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone: (832) 239-3939
Email:    jlwilkes@jonesday.com
            tfreeman@jonesday.com

13

*Admitted *pro hac vice*

14

15

16

17

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone: (212) 326-3498
Email:    kmamedova@jonesday.com
            jkmessina@jonesday.com

18

*Admitted *pro hac vice*

19

20

21

22

23

*Attorneys for Plaintiffs Shawn Jensen;
Stephen Swartz; Dustin Brislan; Sonia
Rodriguez; Christina Verduzco; Jackie
Thomas; Jeremy Smith; Robert Gamez;
Maryanne Chisholm; Desiree Licci; Joseph
Hefner; Joshua Polson; and Charlotte
Wells, on behalf of themselves and all others
similarly situated*

24

25

26

27

28

-27-

**ARIZONA CENTER FOR DISABILITY LAW**
Asim Varma (Bar No. 027927)
Sarah Kadar (Bar No. 027147)
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email:    jalewelt@azdisabilitylaw.org
             avarma@azdisabilitylaw.org
             skadar@azdisabilitylaw.org

J.J. Rico (Bar No. 021292)
**ARIZONA CENTER FOR DISABILITY LAW**
100 N. Stone Avenue, Suite 305
Tucson, Arizona 85701
Telephone:  (520) 327-9547
Email:    jrico@azdisabilitylaw.org
             cdooley@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability Law*

# **APPENDIX A**

## APPENDIX A

### *Documents received from Plaintiffs' Counsel after submission of initial expert report on November 8, 2013*

**ADC Staff Training Materials**

- Suicide and Symptoms of Mental Illness
  - o In-Service
    - ADC_S000317 2014 - Signs and Symptoms of Mentally Ill Inmates
    - ADC_S000318-000361 - 2014_Signs_and_Symptoms_of_Mentally_Ill_Inmates
  - o Pre-Service
    - ADC_S000362-000384 - 9.7a COTA Signs & Symptoms of Mental Disorders
    - ADC_S000385-000439 - 9.7a COTA Signs and Symptoms of Mental Disorders
    - ADC_S000440-000444 - COTA Signs & Symptoms of Mental Disorder
- Suicide Prevention
  - o In-Service
    - ADC_S000445 - 2014 Inmate Suicide Prevention
    - ADC_S000446-000515 - 2014_Inmate_Suicide_Prevention
  - o Pre-Service
    - ADC_S000516-000517 - 9.7 SP Risk Factor Cards
    - ADC_S000518-000534 - 9.7b Suicide Prevention
    - ADC_S000535-000553 - 9.7b Suicide Prevention LP
    - ADC_S000554-000555 - SP Risk Factor Cards

**Corizon Reports**

- ADC_M00001 - CONFIDENTIAL SPDR Report
- ADC203028 - CONFIDENTIAL Arizona - Clinical Data Report October 2013
- ADC203029 - CONFIDENTIAL Arizona - Dental Utilization Statistics October 2013
- ADC203030 - CONFIDENTIAL Arizona - Dental Wait Times Report October 2013
- ADC203031 - CONFIDENTIAL Arizona - Formal Grievances by Category October 2013
- ADC203032 - CONFIDENTIAL AZ - Health Needs Requests (HNR) Appt Report October 2013 pivot table
- ADC203033 - CONFIDENTIAL Arizona - Hepatitis C Report October 2013
- ADC203034 - CONFIDENTIAL Arizona - Hospitalization Statistics Report October 2013
- ADC203035 - Arizona - Informal Grievances by Category October 2013
- ADC203036 - Arizona - Inmate Wait Times Report October 2013
- ADC203037 - CONFIDENTIAL Arizona - Intake Report October 2013
- ADC203038 - CONFIDENTIAL Arizona - Med Mal Stats October 2013
- ADC203039 - CONFIDENTIAL AZ - Medical Transports Complex Report October 2013
- ADC203040 - CONFIDENTIAL AZ - Medical Transports Statewide Report October 2013

- ADC203041 - CONFIDENTIAL Arizona - Monthly Staffing Report October 2013
- ADC203042 - CONFIDENTIAL Arizona Statewide Grievances October 2013
- ADC203043 - CONFIDENTIAL CAG FAQ PBMS Report FY14 - October 2013
- ADC203044-203050 - Corizon AZ Emergency Transports by Complex Oct 2013
- ADC203051-203060 - Corizon AZ Medication Report Oct 2013
- ADC203061-203062 - Corizon AZ Inpatient Admits Oct 2013
- ADC203297 - CAG FAQ PBMS Report FY13 - June 2013
- ADC203348 - November 2013 Inmate Wait Times Report
- ADC203349 - CONFIDENTIAL November 2013 Dental Utilization-Statistics
- ADC203350 - CONFIDENTIAL November 2013 Dental Wait Time Reporting
- ADC203351 - November 2013 Hepatitis C Report
- ADC203352 - November 2013 Inmate Intakes by Complex

**Death Records**

- ██████████ : ADC138451-138455
- ██████████ : ADC138574-138578, ADC190930-191062 , ADC197201-197206
- ████████ : ADC197192-197198
- █████████ : ADC197256-197257
- █████████ : ADC192219-437, ADC138280-138284
- ██████████ : ADC192973, ADC138436-138440
- ████████████ : ADC138599-138603
- ████████ ADC193394-498, ADC193232-193393
- ██████████ : ADC138589-93
- █████████ : ADC197286-90
- ████████ : ADC138346-50, ADC194265-194282
- ████████ : ADC138619-138623
- █████████ : ADC197207-197211
- █████████ : ADC194468-194528

**Defendants' Expert Reports and Associated Productions**

- Confidential Expert Report of John Dovgan
- Confidential Expert Report of Lawrence Mendel
- Confidential Expert Report of Joseph Penn
- Confidential Expert Report of Richard Seiter
- Defendants' Expert Materials, Volume 1, January 17, 2014
- Defendants' Expert Materials, Volume 2, January 17, 2014
- Defendants' Expert Materials, Volume 3, January 17, 2014
- Defendants' Expert Materials, Volume 4, January 17, 2014

**Depositions**

- Deposition Transcript and Exhibits: Richard Pratt, 11/7/13
- Deposition Transcript and Exhibits: Charles Ryan, 11/8/13

**Disclosure Statements**

- Defendants' 11th Supplemental Disclosure Statement

**Grievances (plaintiffs and non-named plaintiffs)**

- ███████: ADC198954-199097
- ████: ADC199098-199125
- ████: ADC199126-144
- Brislan: ADC199145-56
- ███: ADC199157-64
- █████: ADC199165-214
- █████: ADC199215-22
- ████: ADC199223-320
- █████: ADC199321-33
- █████: ADC199334-43
- ███: ADC199344-52
- ████: ADC199353-65
- █████: ADC199366-89
- Gamez: ADC199390-557
- █████: ADC199558-78
- ████: ADC199579-89
- ███: ADC199590-98
- ████████: ADC199599-622
- █████: ADC199623-31
- ████: ADC199632-40
- ████: ADC199641-53
- ███: ADC199654-72
- ████: ADC199673-83
- ████: ADC199684-90
- ████: ADC199691-97
- ████: ADC199698-706
- ████: ADC199707-15
- ████: ADC199716-26
- █████: ADC199727-37
- ███: ADC199738-46
- █████: ADC199747-52
- █████: ADC199753-62

- ██████████ : ADC199763-76
- ██████ : ADC199777-86
- ██████ : ADC199787-97
- █████ : ADC199798-876
- ███████ : ADC199877-915
- ████ : ADC199916-37
- █████ : ADC199938-47
- Rodriguez: ADC199948-77
- ███████ : ADC199978-200000
- ██████ : ADC200001-18
- ███████ : ADC200019-30
- █████ : ADC200031-40
- ██████r: ADC200041-66
- ██████ : ADC200067-90
- ██████ : ADC200091-130
- █████ : ADC200131-39
- ██████ : ADC200140-48
- ███████ ADC200149-200158

**Master Files (non-named plaintiffs)**

- ████████████ : ADC195245
- ████████ : ADC195508-908
- █████████ : ADC195509-90
- █████████ : ADC168131-548
- █████████ : ADC168549-637
- █████████ : ADC168638-815
- ███████████ : ADC168816-55
- ██████████ : ADC168856-960
- ██████████ : ADC168961-9213
- ██████████ : ADC169214-397
- █████████ : ADC169398-542
- ██████████ : ADC169543-660
- ██████████ : ADC169661-818
- ███████████ : ADC169819-35
- █████████ : ADC169836-69
- ██████████ : ADC169870-919
- ██████████ : ADC169920-45
- █████████ : ADC169946-59
- ████████ : ADC169960-79
- ████████████ : ADC169980-70005
- █████████ : ADC170006-46
- ████████████ : ADC170047-56

**Medical records (non-named plaintiffs)**

- ███████████ : ADC194793-194981
- █████████████ : ADC194982-195088
- ███████████ : ADC171398-171492
- ████████ : ADC171878-173761
- ██████████ : ADC175644-175821
- ██████████ : ADC175947-176023
- ████████████ : ADC177710-177911
- █████████████ : ADC178043-178115
- █████████ : ADC179230-179289
- ███████████ : ADC179840-180046
- ████████████ : ADC180047-180102
- ████████████ : ADC180103-180339
- ██████████ : ADC180340-180399
- █████████████ : ADC180400-180606
- ███████████ : ADC180607-180806
- ███████████ : ADC181075-181269
- █████████ : ADC181270-181334
- ██████████ : ADC181335-181411
- ██████████ : ADC182980-183072
- ████████████ : ADC183073-183172
- ██████████ : ADC183354-183493
- █████████ : ADC183835-183920
- ██████████ ADC184032-184152
- ██████████ : ADC184153-184344
- ████████████ : ADC184494-184617
- ██████████ : ADC184872-185116
- █████████ : ADC185206-185535
- █████████████ : ADC185536-185674
- ████████████ : ADC185675-185798
- ███████████ : ADC185799-185892
- ██████████ ADC185893-186006
- ████████████ : ADC186956-187228
- ████████████ : ADC187229-187437
- ██████████ : ADC187438-188047
- ██████████ : ADC188048-188451
- █████████ : ADC189333-189348
- ███████████ : ADC189349-189434
- ██████████ : ADC190181-190460
- ████████████ : ADC190461-190638

**Miscellaneous**

- AGA_REVIEW_00022492 - Pratt Email to Taylor July 10, 2013
- ADC203027 - Arizona - Cert and Licensing Monthly Update October 2013
- ADC203063-203258 - Wells 2d Supp Resp - Rog 7
- ADC203259-203296 - Wells 2d Supp Resp - Rog 8
- ADC203353-203359 - Feraci Store Order History
- ADC_P000984 - ADC ID Badge re Suicide Warning Signs
- ADC_S000556 - MHclassificationbyGenderDec9
- PLTF-PARSONS-030744-54 – Gamez Grievance
- PLTF-PARSONS-030781-85 – Gamez Grievance
- PLTF-PARSONS-031179 – Death Notice for ███ , dated ███████
- PLTF-PARSONS-031180 - Memo Mental Health Qualifiers, Ad-Seg
- PLTF-PARSONS-031235 – Metcalf et al., "Administrative Segregation, Degrees of Isolation, and Incarceration: A National Overview of State and Federal Correctional Policies"
- PLTF-PARSONS-031299 – Archuleta Memo, Colorado Dept. of Corrections, re: Mental Health Qualifiers (M-Code)

**Named Plaintiffs' Records**

- ADC203298-203347 - Licci Updated Medical Records
- ADC_M000195-000206 - Joshua Polson's ENT Records
- ADC_P000580-000858 - AIMS REPORTS - ALL NAMED PLAINTIFFS (CONFIDENTIAL)

**NCCHS Accreditation Reports**

- ADC_P000888-000901 - Douglas 20130628 Report
- ADC_P000902-000915 - Perryville 20130628 Report.
- ADC_P000916-000919 - Perryville 20131011 Update Report
- ADC_P000920-000933 - Phoenix 20130613 Report
- ADC_P000934-000950 - Tucson 20130628 Report
- ADC_P000951-000959 - Tucson 20131108 Update Report
- ADC_P000960-000964 - Winslow 20131119 Update Report
- ADC_P000965-000973 - Yuma NCCHC - 2011-03-11 - update report
- ADC_P000974-000976 - Douglas 20131119 Update report
- ADC_P000977-000979 - Perryville 20131118 Update report
- ADC_P000980-000983 - Phoenix 20131122 Update report

**Photos**

- ADC165980-166048 - Florence - 2013-08-20 (redacted)
- ADC166049-166110 - Lewis - 2013-08-21 (redacted)
- ADC166111-166173 - Perryville - 2013-08-19 (redacted)

- ADC166174-166183 - Perryville-Lumley - 2013-08-19 (redacted)
- ADC166184-166215 - Tucson - 2013-08-22 (redacted)

**Plaintiffs' Expert Reports**

- Expert Report of Craig Haney, Ph.D., J.D.
- Expert Report of Pablo Stewart, M.D.
- Expert Report of Eldon Vail
- Expert Report of Brie Williams, M.D., M.S.

**Programs**

- ADC_P000859-000865 - Tucson HU-7 WIPP Time sheets
- ADC_P000866 - Eyman Special Mgmt Unit I Map as of 10-28-13
- ADC_P000867 - Eyman Mental Health Program Schedule
- ADC_P000882 - Eyman Weekend Recreation Schedule
- ADC_P000883-000886 - Phoenix-Baker - Introduction to Baker MH Program
- ADC_S000286-000291 - Central Unit Mental Health Programs & Schedule

**Resumes**

- ADC203360-203362 - Mark Jansen CV
- ADC203363-203364 - Mark Fleming CV
- ADC203365-203367 - Thomas Buenker CV
- ADC203368-203371 - William Smallwood CV

**Use of Force and Significant Incident Reports**

- ADC197317-197317 - Verduzco - UOF 11-B02-5191 - 2011-12-22
- ADC197318-197318 - Verduzco - SIR 12-03705 2012-03-25
- ADC197319-197319 - Verduzco - SIR 12-04264 2012-04-14
- ADC197320-197320 - Verduzco - SIR 12-04264 2012-04-14
- ADC197321-197322 - Verduzco - 2011-07-14 SIR11-8212
- ADC197323-197324 -Verduzco - 2011-10-28 SIR11-12792
- ADC197325-197356 -Verduzco - 2011-11-04 SIR11-13116
- ADC197357-197358 -Verduzco - 2011-11-28 SIR11-14066
- ADC197359-197360 -Verduzco - 2012-01-25 SIR12-0986
- ADC197361-197362 -Verduzco - 2012-02-05 SIR12-1451
- ADC197363-197366 - Verduzco - 2012-02-24 UOF 12-B02-0840
- ADC197367-197369 -Verduzco - 2012-03-25 IR 12-B02-1255
- ADC197370-197378 - Verduzco - 2012-03-29 UOF 12-B02-1324 re SIR 12-03705 (9)
- ADC197379-197380 -Verduzco - 2012-04-06 SIR12-4264.

- ADC197381-197382-Verduzco - 2012-04-14 IR 12-B02-1543
- ADC197383-197384 -Verduzco - 2012-05-21 IR 12-B02-2163
- ADC197385-197386 -Verduzco - 2012-07-03 IR 12-B02-2797
- ADC197387-197388 -Verduzco - 2012-07-04 SIR12-8297
- ADC197389 -Verduzco - 2012-08-18 IM Disciplinary
- ADC197390-197391 -Verduzco - 2012-08-18 IR 12-B02-3450
- ADC197392-197393 -Verduzco - 2012-10-18 SIR12-13061
- ADC197394-197395 -Verduzco - 2012-10-23 IR 12-B02-4360
- ADC197396-197398 -Verduzco - 2012-11-01 IM Disciplinary
- ADC197399-Verduzco - 2012-11-13 IM Disciplinary
- ADC197400-197401 - Verduzco - 2012-11-13 IR 12-B02-4628
- ADC197402-197402 - Thomas - 2011-04-08 IM Disciplinary re UOF 11-A08-04152
- ADC197403-197405 - Thomas - 2011-11-02 IR 11-A45-0045
- ADC197406-197409 - Thomas - 2011-11-02 SIR 11-13010
- ADC197410-197410 - Thomas - 2012-01-22 IM Disciplinary re UOF 12-A08-0423

# APPENDIX B

# CORRECTIONAL MENTAL HEALTH REPORT™

## PRACTICE • ADMINISTRATION • LAW

Vol. 13 No. 1      Pages 1–16      ISSN 1526-9515      May/June 2011

## The Colorado Study vs. the Reality of Supermax Confinement

by Stuart Grassian, M.D., J.D. and Terry Kupers M.D., M.S.P.

Just about everyone who has taken a serious look at long-term isolated confinement (as in supermaximum security or long-term administrative segregation) has concluded there is serious harm from long-term isolated confinement.[1] Most of the published research regarding inmate mental health in solitary has been based upon record review and clinical interview. That body of work is extensive, and it is supported by a plethora of related studies.

There are studies of the 19th American Penitentiary System, studies of the 19th–early 20th Century German medical literature, the extensive research resulting from the Korean War and KGB interrogation practices, the research regarding profound sensory deprivation precipitated by those concerns, as well as the literature regarding other situations of social and perceptual deprivation. There are also studies of medical situations, explorers, the experience of workers wintering over at polar work stations, and so forth. And then there are the many rigorous reports and declarations filed with the courts regarding the harmful effects of long-term isolated confinement, including many

*See CONFINEMENT, page 9*

## Psychological Effects of Administrative Segregation: The Colorado Study

by Jeffrey L. Metzner, M.D. and Maureen L. O'Keefe, M.A.

O'Keefe, Klebe and Stucker et al. (2010) have recently completed a significant research project entitled "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation," which was funded by the National Institute of Justice (NIJ). This brief article will highlight findings from this research, which are detailed in their 163-page public report that has been submitted to NIJ.

Controversy exists regarding the wide use of long-term lockdown housing units (i.e., 23 hours per day confinement in cells) with specific reference to mental health issues. For purposes of their paper, these authors referred to such units as administrative segregation (AS). They point out that critics have argued that the conditions of AS confinement exacerbate symptoms of mental illness and create mental illness where none previously existed.

Related, in part, to the scarcity of relevant research in this area that is not significantly associated with either bias or methodological flaws, this longitudinal study's primary goals and hypotheses were described as follows,

*Goal 1: To determine which, if any, psychological domains are affected, and in which direction, by the different prison environments.* A multitude of psychological dimensions were examined, drawing from those most often cited in the literature. The broad constructs of interest were depression/hopelessness, anxiety, psychosis, withdrawal and alienation, hostility and anger control, somatization,

hypersensitivity, and cognitive impairment. We hypothesized that offenders in segregation would develop an array of psychological symptoms consistent with the SHU syndrome [as described by Grassian and Friedman (1986)], with elevations across the eight constructs.

*Goal 2: To assess whether offenders with mental illness decompensate differentially from those without mental illness.* We were particularly interested in whether long-term segregation had a differential impact based on the presence of mental illness in offenders. We sought answers to the following questions: Does AS exacerbate symptoms in offenders with mental illness? Does AS create symptoms of mental illness in those who did not exhibit any at placement? It was hypothesized that offenders with and without mental illness would deteriorate over time, but the rate at which it occurred would be more rapid and more extreme for the mentally ill.

*Goal 3: To compare the impact of long-term segregation against the general prison setting and a psychiatric care prison.* In this study, the psychological and behavioral symptoms of offenders in AS were compared to similar offenders who were sent to San Carlos Correctional Facility (SCCF) or returned to the general prison population pursuant an AS

*See PSYCHOLOGICAL, next page*

This issue focuses exclusively on Administrative Segregation; primarily on the "Colorado Study."

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PSYCHOLOGICAL, from page 1

hearing. This study used a repeated measures design over the course of a year to explore whether psychological distress was attributable to the various prison environments. It was hypothesized that inmates in segregation would experience greater psychological deterioration over time than the comparison groups. [SCCF is a "psychiatric prison," which provides treatment that is less than a hospital level of care but more than a special needs unit such as is provided in a SNU, RTP, ICP, EOP, etc.].

This study also included an examination of individual characteristics such as mental health status, personality, and trauma history to determine if certain factors could predict patterns of change. The prediction analyses were exploratory in nature and we did not formulate a hypothesis about the variables that might predict differential rates of psychological decompensation (O'Keefe, Klebe and Stucker et al., 2010).

The study participants and methodology described by the authors included the following:

Study participants included male inmates who were placed in AS and comparison inmates in the general population (GP). Placement into AS or GP conditions occurred as a function of routine prison operations, pending the outcome of their AS hearing, without involvement of the researchers. All study participants classified to AS were waitlisted for and placed in the Colorado State Penitentiary (CSP). Inmates who returned to GP following an AS hearing comprised the comparison groups. [There were some differences between groups on demographics, institutional behavior, and needs]. Inmates in both of these study conditions (AS, GP) were divided into two groups—inmates with mental illness (MI) and with no mental illness (NMI). There are fewer inmates with mental illness than without, but because both subgroups were of equal interest to this study, separate groups enabled over-selection of inmates with mental illness.

A third comparison group was included. This group included inmates with severe mental health problems placed in SCCF [with patterns of prison misbehavior, as measured by disciplinary violations]. The purpose of the SCCF comparison group was to study inmates with serious mental illness and behavioral problems who were managed in a psychiatric prison setting.

A total of 302 male inmates were approached to participate in the study. Thirty refused to participate. Two more offenders were considered a passive refusal and were removed for inappropriate sexual behavior towards the researcher during the first testing session. An additional 23 offenders later withdrew their consent, although the data collected to the point of their withdrawal was used. In addition to refusals and withdrawals, 10 inmates released prior to the end of the study due to discretionary releases by the Parole Board and one participant death.

Five testing sessions were initially established at 3-month intervals, beginning with the date of consent and initial administration. Therefore, tests were scheduled at 3 months, 6 months, 9 months and 12 months after the baseline assessment. However, this schedule was problematic for the AS groups. When the study began, there was a 3-month average wait for inmates to be transferred to CSP due to a shortage of AS beds. While on the waitlist, AS inmates were held in a punitive segregation bed at their originating facility. It was determined that the primary goal was to study inmates in a single long-term segregation facility (CSP) to limit confounding variables and, therefore, the baseline measure should be collected upon placement into CSP. However, it was also recognized that significant changes could occur while

See PSYCHOLOGICAL, page 12

---

# CORRECTIONAL MENTAL HEALTH REPORT

Executive Editor: Fred Cohen, Esq.

Contributing Editors: Terry A. Kupers, M.D., M.S.P. James Knoll IV, M.D.

Managing Editor: Linda Mitchell

Publisher: Deborah J. Launer

Publisher: Mark Peel

*Correctional Mental Health Report* (ISSN 1526-9515) is published bimonthly by Civic Research Institute, Inc., 4478 U.S. Route 27, P.O. Box 585, Kingston, NJ 08528. Periodicals postage pending at Kingston, NJ and at additional mailing offices. Subscriptions: $165 per year in the United States and Canada. $30 additional per year elsewhere. Vol. 13 No. 1 May/June 2011. Copyright 2011 by Civic Research Institute, Inc. All rights reserved. POSTMASTER: Send address changes to Civic Research Institute, Inc., P.O. Box 585, Kingston, NJ 08528. *Correctional Mental Health Report* is a registered trademark owned by Civic Research Institute, Inc., and may not be used without express permission.

## Editorial Board

Kathryn A. Burns, Chief Clinical Officer, Cuyahoga Community Mental Health Board, Cleveland, OH

Jamie Fellner, Director, U.S. Program, Human Rights Watch

Craig Haney, Department of Psychology, University of California, Santa Cruz

Lindsay M. Hayes, Assistant Director, National Center on Institutions & Alternatives

Kirk Heilbrun, Ph.D., Professor, Law-Psychology Program, MCP Hahnemann University

Ron Jemelka, Ph.D., Research Director, Texas Health Quality Alliance

Jeffrey L. Metzner, M.D., Clinical Professor of Psychiatry, University of Colorado Health Sciences Center

James R.P. Ogloff, J.D., Ph.D., Director of Psychological Services, Forensicare Foundation Professor of Clinical Forensic Psychology, Monash University, Melbourne, Australia

Randy K. Otto, Ph. D., Department of Mental Health Law & Policy, Florida Mental Health Institute

Robert J. Powitzky, Ph.D., Chief Mental Health Officer, Oklahoma Department of Corrections

Charles L. Scott, M.D., Associate Clinical Professor of Psychiatry, University of California, Davis

Clarence J. Sundram, J.D., Former Chairman, New York State Commission on Quality of Care for the Mentally Disabled

Hans Toch, Professor, School of Criminal Justice, State University of New York at Albany

Affiliations shown for identification purposes only. Opinions expressed do not necessarily reflect the positions or policies of a writer's agency or association. In addition, at no time does Correctional Mental Health Report receive information from a Board Member not available to others.

The information in this publication is not intended to replace the services of a trained legal or health professional. Neither the editor, nor the contributors, nor Civic Research Institute, Inc. is engaged in rendering legal, psychological, health or other professional services. The editors, the contributors and Civic Research Institute, Inc. specifically disclaim any liability, loss or risk, personal or otherwise, which is incurred as a consequence, directly or indirectly, of the use and application of any of the contents of this publication.

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

# Some Observations About the Colorado Segregation Study

by David Lovell and Hans Toch

O'Keefe et al. (2010) have released a report claiming to deal with "psychological effects of administrative segregation." This is an ambitious undertaking because psychological effects of prison environments are difficult to describe. The difficulties arise because the same prison environment can affect different inmates differently, and because any given prisoner responds differently to different environments, or to the same environment under different circumstances. It is therefore important to understand the precise environmental conditions involved and the individual prisoners exposed to these conditions. (Toch, 1992)

## Who is in Administrative Segregation, and Why?

The O'Keefe study is set in Colorado, and the first observation to be made with respect to this setting is that "administrative segregation" in Colorado appears to be used with carefree promiscuity. At the time of the study, the Colorado system had a number of administrative segregation (AS) settings, by far the largest of which was a penitentiary with 756 beds and a hefty waiting list. The Colorado system had 20,000 prisoners. This means that fully 4% of the state's prison population was being administratively relegated to solitary confinement.

Colorado used a formal classification scheme for all prisoners except those being administratively segregated. In relation to these prisoners, the Report offers a boilerplate description of criteria used by administrators to the effect that the prisoners who were being segregated had been found to "display violent, dangerous, and disruptive behaviors." The study did not include information about how inferences relating to "violence, dangerousness, and disruptiveness" were drawn in Colorado, but the data raises some disquieting—and unanswered—questions about who was placed in AS, and why.

The study divides the inmates being studied into "mentally ill" (MI) and "non-mentally ill" (NMI) prisoners, and compares segregated MIs and NMIs to their presumptive counterparts in the general population. According to a table of group attributes, the segregated—and presumably, "violent, dangerous and disruptive"—NMIs had

averaged 13.2 disciplinary violations, compared to 16 violations for the non-segregated NMIs. Though the recorded prison misbehavior of these segregated inmates was thus less frequent, they stood out on another attribute: Over half (54%) of the AS NMI group was Hispanic, compared to 33% of the counterpart (non-segregated) group. Here an obstacle to interpretation is raised that crops up repeatedly throughout the manuscript. Readers find themselves swimming in a flood of psychometric data; every so often a clue drifts by, lacking, however, a tether to the context—to what was going on around the prisoners and staff while they carried out this study—we are left to guess what it might mean. In this case, we know that 45% of the CSP NMI groups had been identified as gang members, and we may guess that such attributions were probably responsible for the disproportionate presence of Hispanics in this group. What did these prisoners say about their assignment to AS, how did their accounts differ from those of non-affiliated participants or members of other groups, and how might their allegiance have affected their apparent resilience? We can only speculate, thereby doing justice neither to the efforts of the authors nor to our credibility as commentators.

As for the segregated MI group, 44% was designated as needing sex-offender treatment, and 34% as having needs related to "self-destructiveness." Despite the bald assertion that "Colorado does not have protective custody for inmates" (p. 8), these are designations that plausibly describe a great group of prisoners requiring protection, though hardly inmates who, in a safe setting, would become "violent, dangerous and disruptive." For many of them, AS might have provided refuge from general population, and for all we know (note the required qualification) the need for refuge might have triggered the behavior that led to AS as well as their willingness to tolerate its restrictions.

Despite a lower proportion of sex offenders among AS inmates in Washington state (14%, 20% among the mentally ill), administrators there classified fully one-third of AS inmates as protection cases (Lovell, 2010; Pacholke, 2010); furthermore, unlike Colorado, Washington

provides other formally designated protective custody units. Indeed, protection cases often found their way into AS to avoid being labeled "PC" and presumed snitches. To what extent similar processes affected the composition of Colorado's AS population, and the response of participants to living there, we can only guess.

## Counter-Intuitive Findings

Contrary to the expectations of the authors as well as many observers and students of supermax settings, the study's findings "were largely inconsistent with our hypotheses and the bulk of literature that indicates AS is extremely detrimental to inmates with and without mental illness" (p. viii). Leafing through the report, we encounter chart after chart in which groups of participants showed little change from the beginning to the end of the one-year study, or in which a slight pattern of change among CSP inmates was paralleled by their counterparts in general population, or in which the measured changes showed improvement rather than deterioration. Most of the tests were sliced into subscales and recombined into composites (one is tempted to say, like the mortgage-backed securities that brought down the bond market and our economy); these composites were intended to measure the various "constructs" (withdrawal, alienation, hostility, etc.) that have been held to characterize the harms of solitary confinement. With 14 measures, four or five measurement intervals, five groups, and 12 constructs, the possible data points are abundant. Hence the flood of data, and the difficulty of finding an empirical mooring for a response other than, it can't be true. Nevertheless, we will try.

The most flabbergasting claim in the Report is that the researchers had recorded an initial gain in "psychological well-being" among segregated prisoners. The authors do not describe the conditions under which this alleged "improvement" in "well-being" occurred. However, "when the study began, there was a three-month average wait period for inmates to be transferred ... due to a shortage of AS beds," and, "while on the waitlist, AS prisoners were being held in

*See SEGREGATION STUDY, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031798

*SEGREGATION STUDY, from page 3*

punitive segregation at their originating facility" (p. 19). Elsewhere (p. 9) the Report notes that punitive segregation cells in Colorado are completely stripped down, devoid of privileges, and strictly designed for short-term punitive placement. This circumstance may have a bearing on the fact that the O'Keefe study could claim to have found its "improvement ... between the first and second period" (p. viii). Another circumstance is the AS hearing itself which, in some systems perhaps less enlightened than Colorado's, can be an aversive experience in which inmates are told just why they have no excuse for being so rotten that they deserve nothing better than the hole. Also relevant is the fact that the first week of AS in Colorado offers commensurately punitive conditions, despite the fact that the AS prisoners have presumably done nothing for which they could be punished.

Conditions of confinement in the penitentiary in which the study took place are fully catalogued in the Report, but there are no inferences drawn—nor can any be readily inferred—about the "psychological effect" of the specific sets of deprivation that are described. We thus have no way of ascertaining to what extent the damage that is invariably done in segregation settings to vulnerable prisoners by isolation, enforced inactivity and sensory deprivation might be neutralized or ameliorated by some elements of the Colorado regime, such as outside windows, choice of television programming, art supplies, recreational games and puzzles, convenient desk lights the prisoner can control, "cognitive classes," monthly visits and weekly phone calls. It is conceivable, therefore, that for some undetermined subset of study participants, the measured improvement in psychosocial functioning can be attributed to the relative comforts of AS.

We have mentioned these contextual facts because the most salient counterintuitive finding reported by O'Keefe and her colleagues is the lack of significant differences in their measures of "psychological well-being" across confinement conditions and over time. The possibility that measured gains in psychosocial functioning reflect an improvement in circumstances, however, raises questions about just what the tests were measuring. These doubts are reinforced by two considerations: (1) patterns in the data suggesting substantial but undescribed diversity within the various groups being compared, which may reflect

weaknesses in the methods of analysis applied in this report; and (2) the occasional deviations from the predominant pattern of minimal change in status, or trends in AS participants mimicked by parallel changes among their GP counterparts.

## Grasping at Straws

The examples in this section are slim reeds in this river of data. On their own, they provide little hope of avoiding the interpretation that inmates fare much better than expected under AS conditions. We describe them here for two reasons. Given the enormous systematic effort and attention to detail represented by this study, the authors deserve better than a declaration that it must not be true. On the other hand, these examples illustrate our basic argument: inmates exhibit a variety of patterns over time that cannot be understood in average terms or without reference to what their prison settings mean to them. Consequently, despite the volume of data, no systematic interpretation of the findings is possible. All we have is questions.

**Slopes and Average Values.** One set of summary statistics is presented in Table 12 (p. 53). The values are not readily interpretable, since they are derived from composite measures of "constructs" such as anxiety. The components are subscales within different instruments; selection of subscales is supported by statistical measures of reliability and "convergent validity," i.e., correlations among results of the various subscales. Subscale values are standardized by centering the mean value across the sample on 0 and dividing by the standard deviation; and the composite scores represent means of the standardized subscales. So the mean value of .30 on anxiety for the CSP MI group is 0.3 standard deviations from the mean of the entire sample. Generously assuming that we understand these manipulations, we note that in general the standard deviations for the composite scores are much greater than the means. We infer that average scores mask considerable diversity among members of the same administratively defined groups (CSP NMI, CSP MI, GP NMI, etc.).

One method by which the authors assess whether different groups change in different ways over time is "slope analysis," in which the slope of scores on each measure is calculated for each participant, and tests are run to determine whether there are significant differences in slope between, for example, AS and GP inmates. Many of the charts, however, display climbing scores from one point to another, then a horizontal line,

followed by a decrease, or the reverse, or a V or inverted V pattern. Bear in mind that these patterns reflect average values within groups, so there is likely even more variety in patterns among individual inmates. What factors might trigger shifts in the trajectories of participants? We can only guess, but the authors might have asked the inmates and reported patterns of responses.

These two observations suggest that the authors' analysis of average values within the five groups may mask wild fluctuations in levels of despair, hostility, apathy, among individuals or groups—not necessarily the administratively defined ones. This defect could be remedied by a more fine-grained analysis that identifies varieties of patterns within and across groups. If restricted to the study's psychometric instruments and their derivatives, however, such an analysis would not settle doubts about whether the measures reflect what we care about when we question the systematic use of long-term solitary confinement. Reasons for doubt on this score are illustrated by several of the findings that deviated from the general pattern.

**Deviations From the Pattern.** From our reading, under the near-drowning conditions mentioned earlier, the clearest exception to the predominant pattern is the withdrawal-alienation construct among the NMI groups (Table 15, p. 60), in which a substantial deterioration of functioning (measured by increasing values) is reported for the CSP (AS) NMI group. In the Executive Summary the authors claim that "this finding was true for the two [CSP and GP] NMI groups, so it is not attributable to AS" (p. viii). The change, however, was rather greater for the CSP (AS) group: from –.31 to –.07, vs. from –.45 to –.32. These values represent movement towards the mean of the alienation-withdrawal construct value for total sample, 60% of whom were mentally ill; thus the CSP NMI group more closely resembled the mentally ill with respect to this construct at the end than at the start. The clinical significance of this change, however, is difficult to assess because of the degree to which the data have been cooked, as described above. In the case of withdrawal, the composite score derives from two subscales of the same instrument: i.e., perhaps 5 items in the 22-item Personality Assessment Screener, a short-form test based on the Personality Assessment Inventory. To assess how consequential it is to find an average movement from –.31 to –.07 would require psychometric expertise, an understanding of the PAS, and knowledge of

*See SEGREGATION STUDY, page 14*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031799

# What Should We Think About the Study on the Psychological Impact of Confinement at Colorado State Penitentiary? A Human Rights Perspective

by Jamie Fellner

The most troubling correctional development in recent decades may be the stunning expansion in the use of prolonged administrative segregation (AS), typically in super maximum security facilities. Unfortunately, Eighth Amendment litigation has been of little help for inmates enduring the harsh AS conditions of isolation and reduced opportunities for sensory stimulation and purposeful activities. Even when faced with contemporary and historical evidence that prolonged isolation can lead to serious psychological disturbances in previously healthy prisoners, the courts have deferred to prison officials who insist such confinement is necessary for prison safety and security. They have also trivialized the mental suffering of many, if not most, isolated inmates. The court in **Madrid v. Gomez**, 889 F. Supp. 1146 (N.D. CA 1995), concluded, for example, that the mental pain suffered by many inmates in the Secure Housing Unit of California's Pelican Bay State Prison did not "significantly exceed the kind of generalized psychological pain that courts have found compatible with Eighth Amendment standards."[1]

To date, the only consistent substantive bright spot in supermax litigation has been the protection of prisoners whose existing or prior mental illness puts them at high risk of serious injury to their mental health if confined in AS. In class action cases in at least 14 states, federal courts have either issued decisions or accepted settlements that prohibit or sharply limit prison officials' ability to place or keep mentally ill prisoners in isolated confinement.[2]

Given the cramped and unfriendly Eighth Amendment jurisprudence and the limited prospects for success challenging AS, it is little wonder that some prisoner rights lawyers and their psychiatric experts responded with angry concern to the publication of the results of research on the psychological effects of one year of confinement at Colorado's supermax prison, Colorado State Penitentiary (CSP).[3] They fear the research, which showed scant adverse psychological impact from CSP confinement, might undercut their efforts to reform and reduce

the use of AS. (See Metzner and O'Keefe for description of research and results.)[4] As someone who has long criticized the U.S. penchant for supermax prisons and has wished U.S. courts would acknowledge how easily the pursuit of safety and security can slide into cruelty, I am nonetheless not as dismayed by the study as are some. The study does not legitimate AS, either at CSP or elsewhere, and it certainly does not obviate human rights-based criticisms.

Before limning some of the reasons for my belief the study should not frustrate supermax reform efforts, I want to address doubts that may exist about the study's integrity. I was one of three outside members of the nine person advisory committee for the study; the other six were officials with the Colorado Department of Corrections. The committee communicated and met frequently from the very beginning of the project through its conclusion. Our discussions were extensive, open and no holds-barred. The principal researchers (the head of research at the Colorado Department of Corrections and a professor in the Department of Psychology of the University of Colorado) did their best to develop a sound research protocol that would overcome some of the problems with prior studies and that would permit a scientifically valid measurement of the psychological impact of a year's confinement at CSP—a difficult enterprise at best. If there are methodological flaws in the study, they do not reflect any effort by the researchers or the Colorado Department of Corrections to skew the results.

I leave it to others to debate whether the Colorado study used the best methodology to test its hypotheses, whether there are feasible alternative methodologies that might have better captured the study participants' psychological symptoms and trajectory, and whether such alternatives would have led to different results. (If the Colorado study had found serious psychological deterioration among CSP inmates, it would no doubt have been met with criticism, but presumably from different quarters.) Without dismissing concern about the methodology, the research results are worth considering

on their own terms. What does the study say—and what doesn't it say—about supermax confinement?

First, it is important to emphasize that the Colorado research did not seek to determine whether prolonged AS is necessary, whether other non-isolation based approaches to difficult or dangerous inmates might be equally if not more effective in terms of prison safety or security, or whether the specific conditions at CSP are consistent with the Eighth Amendment or human rights. It focused solely on psychological impact. I should also add that I do not endorse the actual conditions at CSP, how it is used, who is confined there (particularly the inclusion of mentally ill inmates), why, and for how long. Much of the criticism I have levied elsewhere against supermax prisons applies to CSP.[5]

## Impact on the Non-Mentally Ill

Turning to psychological impact, let us consider first the research finding that inmates who were included in the "non-mentally ill" group at CSP did not have a downward psychological trajectory. It would be a mistake to interpret this finding as proof AS does not harm healthy inmates. The study revealed that these inmates (like those diagnosed as mentally ill) were already highly symptomatic at the start of the study when they were sent to CSP, as revealed by their initial scores on multiple psychological and cognitive measures. Indeed, many already displayed "SHU syndrome" symptoms. (The study did not examine why they had those symptoms, e.g., did they develop them while in segregation prior to assignment to CSP? Did they enter prison with them?) For the most part the inmates retained elevated symptoms throughout the study. If the study had assessed the impact of one year's segregation on inmates who did not already have such symptoms, the results might well have been different. Other distinctive features of the study participants also limit the extent to which the findings can be generalized. For example, inmates who were illiterate were

*See HUMAN RIGHTS, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031800

Case 2:12-cv-00601-ROS   Document 1104-10   Filed 09/08/14   Page 45 of 62

HUMAN RIGHTS, from page 5

excluded, and people who cannot read and write may find segregation much harder to tolerate than others.

While all supermax prisons impose misery, each imposes its own version. The basic confinement model is the same—23 to 24 hours a day of solitary in-cell confinement (although double celling exists in some segregation units), as well as extensive security measures and surveillance. But there are significant differences in the physical conditions, privileges and programs at different facilities and the Colorado study raises the question of whether those differences might affect psychological impact.

CSP has a combination of features that was not present in the supermax prisons where experts concluded the conditions produced psychological deterioration among prisoners who had not previously been mentally ill. For example, the CSP cells have windows to the outside, the cell doors have windows through which prisoners can manage to see each other (and they apparently communicate in sign language), all prisoners except those at the lowest level of privileges have access to radio and television and can participate in educational and skills-enhancing programming, they have some access to telephone and visits, they can get books, newspapers, magazines, art supplies and games, and there does not appear to be the arbitrary and excessive use of force that creates a climate of tension and fear such as existed at Pelican Bay. Prisoners who follow the rules and engage in the requisite programs progress through CSP's "quality of life" level system and most have a realistic prospect of getting back to general population (if they are not discharged or released to parole first).[6]

In light of the Colorado study and in the absence of research on differences between supermax prisons, it is at least worth speculating whether CSP's particular version of supermax confinement may be less psychologically damaging than others. Supermax facilities that differ from CSP remain as vulnerable as before to charges they cause inmates to psychologically deteriorate.

## Impact on the Mentally Ill

What about prisoners who had diagnoses of mental illness when they were sent to CSP? The study indicates that overall 7% worsened, 20% improved, and the rest remained essentially unchanged over the course of the study. It is unfortunate that the study lacked the data to tell us the total length of time the CSP participants spent at the different quality

of life levels. It is reasonable to assume that those who spent the most time at level one (the harshest) were most symptomatic and may have shown more signs of deterioration than those who progressed to and spent more time at the higher levels.

The study captures symptoms reported at specific testing intervals, and does not reflect discrete episodes of distress that may have occurred and ended between testing. Apart from the self reported symptoms, DOC clinicians documented 22 self-harming ideation or behavior "crisis" events for 10 of the mentally ill CSP study participants over the research year (one inmate accounted for one-third of those events) and 11 of them had episodes of psychotic symptoms (one inmate accounted for half of those episodes), but the study does not indicate the precise nature, severity and duration of those episodes, nor does it indicate whether the inmates had similar crises prior to CSP confinement.[7]

That some already ill prisoners got worse at CSP will not surprise anyone familiar with prolonged administrative segregation. The small proportion who deteriorated may reflect the fact that relatively few of the mentally ill study participants at CSP had been designated by Department of Corrections clinical staff as having high mental health needs.[8] The CSP results might have been different if the CSP study group had included more acutely ill inmates.

Corrections officials should not take heart that some mentally ill inmates improved in segregation. It is well known that many mentally ill inmates find general population extremely stressful and have a difficult time coping (which can lead to the misconduct that lands them in AS in the first place). Solitary in-cell confinement may offer something of a refuge for them. But the housing alternatives for the mentally ill should not be general population or segregation. If inmates with serious mental health problems are going to be confined in prison, officials need to create facilities designed and staffed to respond to their unique needs and vulnerabilities. Operated to promote prison safety primarily through isolation and deprivation, supermax prisons are counter-therapeutic. Inmates with mental illness at CSP who improved during the study nevertheless remained symptomatic. "Improve," of course, is a relative term.

Most important, the fact that 70% of the mentally ill study participants at CSP remained unchanged over the course of the study year is striking evidence that CSP is no place for the mentally ill. Staying the

same means remaining mentally ill—highly symptomatic, illness unabated. The study does not attempt to determine if the absence of improvement is the result of the conditions of confinement, the nature, quantity and quality of mental health services provided to CSP inmates, or both. But the bottom line is that the preponderance of mentally ill inmates at CSP do not get better.

## The Human Rights Perspective

There are hermits who happily shun human contact. Most of us, however, are social beings who require meaningful interaction with others to be fully human. As humans, we also need contact with the natural world, sensory and intellectual stimulation, and the opportunity to engage in purposeful activities. Unfortunately, under current Eighth Amendment case law, prisoners "deserve" no more than the minimum civilized necessities—i.e., food, shelter, warmth, sanitation, and medical care. The fact that living in segregation cut off from other people and the natural world can cause utter misery, that it can be an experience akin to "living in a tomb," is of little constitutional moment absent the creation or exacerbation of mental illness.[9]

Grounded in humanistic principles, the human rights assessment of prolonged segregation is far more critical. The starting point is international human rights treaties. Under the International Covenant on Civil and Political Rights, corrections officials have a positive obligation to respect the humanity and inherent dignity of all prison inmates, even those deemed dangerous and difficult, and the primary purpose of incarceration must be the "reformation and social rehabilitation" of inmates.[10] Human rights treaties also prohibit officials from subjecting inmates to torture or other cruel, inhuman or degrading punishment or treatment.[11]

Although corrections professionals do not like the term, human rights authorities consider administrative segregation to be a form of solitary confinement, in recognition of the fact that its defining feature is in-cell confinement that isolates inmates from each other and staff. Solitary confinement does not automatically violate human rights: the human rights assessment depends on the specific conditions, the justification for them, their duration and the vulnerabilities and needs of individual prisoners. For example, harsh conditions of isolation which are acceptable for a month may be cruel when imposed for years. Denying a

See HUMAN RIGHTS, page 15

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031801

*CONFINEMENT, from page 1*

by the present authors: Drs. Grassian and Kupers.[2]

One of the most stunning and inescapable statistical facts regarding long-term segregation is that on average, 50% of completed suicides by inmates occur among the 2–8% of prisoners who are housed in isolated confinement.[3] This fact can mean only two things: either it demonstrates that segregation is psychologically toxic, or else it demonstrates that the more troubled inmates who need psychiatric help are instead placed in a psychiatrically punitive environment. Of course, it is both: the more psychologically troubled inmates have less control over their behavior, and the system's response to their unacceptable behaviors is to punish them with isolation. The troubled inmate then psychologically deteriorates in segregation.

The Colorado researcher's data itself includes quite a lot of psychiatric distress and quite a few psychotic and suicidal crises among the subjects with mental illness in administrative segregation during the study period. The researchers, however, chose to ignore these crises or dismiss them as insignificant. Perhaps because they deemed this tendency towards psychiatric crisis to be pre-existing, they did not conclude that the suicidal and psychotic crises that occurred in the course of their study reflected harmful effects of isolated confinement. Importantly, they made this determination without actually interviewing the prisoners or carefully reviewing their clinical charts. This is very odd, and certainly problematic in terms of clinical science.

We will comment further on about methodology but on the issue of a pre-existing inclination, consider a hypothetical young adult who attempted suicide as an adolescent, maybe after being jilted by a girlfriend, then entered prison, and, while doing a stint in administrative segregation, despaired of ever getting out of isolation and made a serious suicide attempt. Would we dismiss the suicide attempt as a pre-existing proclivity toward self-harm that was not caused by confinement in Ad Seg? Yet that is essentially what these researchers have done regarding the psychiatric symptoms and crises experienced by the subjects they studied.

Both of the authors offered feedback to the Colorado researchers about problems in their study, but our feedback was refused, ignored or rejected. Dr. Grassian was invited by the authors to participate in their presentation of this research at the 2010 American

Psychological Association (APA) Annual Meeting, and there he pointed out several seeming fatal flaws in their methodology. Yet the Colorado research team chose not to incorporate or respond to any of these concerns. Further, they refused to provide us with the raw data from their study.

The critique offered here is based upon the report itself, discussions held (with Dr. Grassian) publicly at the presentation at the APA Meeting, presentations and discussion at a conference on supermaximum security units held in Washington, D.C. on November 18, 2010, where Dr. Kupers and Dr. Metzner spoke, and on material gleaned from discovery in **Dunlap v. Zavaras**, USDistCt, Colorado, Civ. No. 09-CV-01196-CMA-MEH, including the transcript of the deposition of the lead author for the Colorado Study, Maureen O'Keefe, as well as e-mail memoranda between the authors and advisors generated from the beginning of the study period and included in discovery.

## Research Subjects, Control Group

The research authors argue that in this study, the Ad Seg group with mental illness—the group whose adjustment in Ad Seg is centrally at issue in the research—has a "comparison group": the group in general population (GP) with mental illness. The authors pride themselves on having thus obtained in this manner virtually a controlled study.[4] It should be noted however that the researchers excluded all potential subjects who could not read at an eighth grade level. They provide little information as to the number or percentage of potential subjects so excluded, nor of the likely explanations for this illiteracy (how many of these were simply non-English speakers; how many had significant cognitive limitations, etc.).

This omission is quite important. It has been well-documented that illiteracy and cognitive impairment are significant risk factors for psychiatric decompensation in solitary. Thus, the researchers excluded many of the most vulnerable individuals. Similarly, the authors properly excluded inmates who did not agree to participate in the study. Of course, they were right to respect inmates' right to consent, but again the excluded group likely includes many of the inmates suffering the most harm from isolated confinement.

## Data Collection and the Problem of Validation

In the Colorado study, the researchers had the subject inmates fill out self-report

rating scales. Usually the instructions for utilizing such scales include the recommendation that they not stand alone, but rather be integrated with clinical history and examination. The Colorado researchers, however, did not use any clinical data at all. While this methodology has certain advantages, including ease in accomplishing a study, it has the major difficulty of establishing validity. The question, of course, is whether these self-report scales are a valid measure of the subject inmates' *actual* psychiatric status. In the Colorado study, this is a very dubious proposition.

In general, the instruments employed were validated only for people in life situations extremely different from that of the subject inmates. The instruments have been validated for college students, most of whom were studying psychology, and for outpatients in psychotherapy. It is not surprising that subjects in these two groups filled out the self-reports reasonably thoughtfully and accurately—their self-reports thus being a valid, reasonably accurate, reflection of their clinical state.

But *inmates* are in *no* way similarly placed. In prison, revealing weakness is dangerous, potentially subjecting the inmate to harassment, possibly even to physical danger. Moreover, in deposition,[5] Ms. O'Keefe, the first study author, was asked what explanation was given the subject inmates as to the purpose of the study. In response, she revealed that the subjects were told that the research was intended to study how inmates were adjusting to prison life. She had no real answer to the follow-up questions—whether she really thought an inmate would think it wise to declare he was adjusting poorly. Anyone with a background in corrections knows that is *not* the kind of information an inmate would likely expose. It could harm him, even surreptitiously, for example at a parole hearing or in hearings to determine whether he could progress to higher levels in Ad Seg. At her deposition, Ms. O'Keefe also admitted[6] that if an inmate reported suicidal thinking, this would be reported to prison staff. Again, there is stigma attached to mental disorder and displaying weakness in prison, and there is the likelihood of being sent to a very restrictive observation setting, all of which contributes to unbalanced reporting.

There are other problems as well. For example, the graduate student, Alyusha, who actually met with the inmates is apparently

*See CONFINEMENT, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*CONFINEMENT, from page 9*

an attractive young woman, talking with inmates who had virtually no contact with any such young attractive women. Even the research group itself noted the likely distorting effect of this fact, referring to it as the "Alyusha Effect." The inmates were likely to be reluctant to reveal weakness to this attractive young woman.

Thus, it cannot be assumed that inmate self-reports are a valid means of assessing psychiatric status. It would not be surprising if these self-reports, in fact, bore little or no relationship at all to psychiatric status.

Perhaps in an attempt to bolster the credibility of the inmate self-reports, the researchers had custody officers and mental health clinicians fill out brief forms regarding the mental health of the subject inmates. However, by their own admission at public forums,[7] the authors acknowledged that these reports were of little value. They have no idea which staff members were selected to fill out the forms, or how the forms were completed. No specific instructions were provided and over half the forms were never filled out at all. Similarly with the forms filled out by the clinicians, the authors gave no guidelines or requirements as to how the forms would be filled out. They had no information whatsoever to suggest that the clinicians did more than they would normally do in a screening interview, that is, attempt to speak to the inmate through the cell door, either by talking through the crack at the edge of the door or else by opening up the food slot and bending down in an uncomfortable position to speak through the slot. Given the daily burden of routine paper work, it would not be surprising to find that the staff put minimal or no effort at all into checking off the researchers' forms.

And, indeed, the clinician forms found even less symptomatology than the forms completed by the inmates.

## The Authors Chose to Ignore Critical Sources of Data

The most important comparison groups are the two groups of inmates with mental illness (MI) diagnosis referred for disciplinary hearing—one group was then housed in Ad Seg and the other group was then housed in GP. Since both groups have psychiatric diagnoses, there are records of mental health contacts, including symptoms reflected in clinicians' notes, diagnoses,

medications prescribed, and so forth. The Colorado researchers failed to review any of this available data and, therefore, they cannot answer even a simple question such as "Did those in Ad Seg end up requiring more medication than those in GP?"

Indeed, at deposition, Ms. O'Keefe acknowledged that the study entirely failed to track the mental health history and records of the study inmates, including their medication history; for example, whether an inmate's need for medication increased during the study period. At an oral presentation of the report in Denver, it was pointed out by an ex-inmate that, as a result of the logistics of medication distribution, inmates actually receive prescribed medications much more consistently in Ad Seg than in GP. Ms. O'Keefe acknowledged that this issue, and the availability of mental health services in general, were not examined by the study group. However, she did acknowledge that the level of mental health services was greater at CSP than in GP, and that it was indeed possible that after transfer to CSP, inmates with mental illness required increased services and medication. That issue, however, was never examined.

In general, then, the study group chose to ignore major direct sources of information (mental health records, medication records, etc.) about how the inmates with mental illness fared during the study period.

## The Authors Chose to Ignore DOC Data That Squarely Contradicted Their Conclusions

Colorado DOC files record incidents of emergency psychiatric contact (e.g. suicidal or self-destructive behavior) and emergence of psychotic symptoms. Among the group of inmates with mental illness in Ad Seg (N = 59) there were 37 such episodes during the course of the study (an average of .62 episodes per inmate—almost two for every three inmates). Among the group of inmates with mental illness in GP (N = 33), on the other hand, there were only three (.09 per inmate–less than one for every 10 inmates). Could this have been random—i.e., not a reflection of some significant difference in the result? Statistically, the chance of that is entirely minute, approximately p = .0002; i.e., a chance of 1 in 5,000, an extremely small number. (In research, statistical significance requires only a probability of randomness of .05, i.e., as much as 1 in 20!) Thus, this objective data *squarely* contradicts the authors' conclusion that Ad Seg does not produce

significantly more psychiatric difficulties than does GP housing. The authors simply declined to perform this straightforward statistical analysis of data they actually reported, even after the oversight in their early public reports was explicitly pointed out by Dr. Grassian.

Additionally, this data is critical as a proper means of assessing validity of the self-reports: If the self-reports *were* a valid measure of psychiatric distress, we should see each crisis episode reflected in the inmate's corresponding self-report. If, in filling out his self-report, the inmate responds that he is doing just fine, then the self-reports are worthless. They are in no way a measure of psychiatric distress. It would have been quite easy for the authors to review these cases, a total of 37 recorded instances that would require simply a review of the corresponding self-report rating by the inmate during the time period at issue. Dr. Grassian explicitly pointed this out to the authors prior to their public presentation of the data and prior to their submission of the report. Yet the authors declined to perform this crucial check on their data.

There is irrefutable evidence that the study group *knew* there was a major problem with the validity of the self-report data. In 2008, Ms. Stucker sent an e-mail to Ms. O'Keefe expressing concern that an inmate subject in the study had just committed suicide. She then reviewed his self-report. In his self-report, he had revealed no evidence at all of any distress. Thus, at an early stage, Ms. O'Keefe was entirely aware of a major question about the validity of the inmates' self-report ratings. Evidently, the study group chose to do nothing at all to address this concern even though it would have been entirely possible to do so.

In the end, though, the authors could not escape the inevitable conclusions to be drawn from this data. As we stated in the introductory portion of this critique, statistical evidence demonstrates a dramatically increased incidence of suicide among prisoners in segregation. In this study, we see the very same result: Psychiatric crises, whether of suicidality or psychotic or other symptomatology, were dramatically more prevalent among the prisoners with mental illness placed in Ad Seg compared with those with mental illness housed in GP. Again, this can mean only that more disturbed inmates are the ones most likely

*See CONFINEMENT, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*CONFINEMENT, from page 10*

to be sentenced to Ad Seg, or that housing a group of psychiatrically impaired inmates in Ad Seg creates a much worse result than housing them in GP.

The Colorado researchers start by praising themselves for creating a comparison group (i.e., the only variable distinguishing the group with mental illness in Ad Seg from those with mental illness in GP is one variable: housing). Thus their report explicitly *excludes* the first possibility, that the mentally ill inmates sent to Ad Seg were a *different* group—a sicker group—than those housed in GP. In short, contrary to the researchers' conclusions, the study clearly demonstrates the second possibility: That Ad Seg housing is psychiatrically toxic.[8]

## Conclusion

When evaluating an inmate who has suffered some form of psychiatric deterioration during incarceration, there are several sources of data that can establish causation. Interview data, prison mental health records, and D.O.C. incident reports all provide important information about the circumstances surrounding the deterioration and the nature of the resulting psychiatric symptomatology. Over the course of years, we and others have described literally thousands of cases of individuals who decompensated in solitary confinement, recompensated when removed, and then decompensated when returned, in an endless revolving door.

The Colorado researchers elected not to talk to their subjects, nor to review records. They did paper and pencil tests but no clinical interview or even a researcher-conducted interview. Unfortunately, the results of this kind of stand-alone testing are such that the researchers can claim no harm from supermax confinement merely because the data is a scramble of numbers that mean almost anything to anyone who wants to interpret them.

There are a number of other methodological difficulties with the Colorado research report, but in the end, much of the 163-page final report consists of long and endless statistical dissections of the self-report data. Yet these minute dissections are entirely confounding and erroneous because the data they dissect does not in any meaningful manner reflect the psychiatric pathology they are supposed to be studying.

The Colorado research team did not find an absence of harm. Far from it. They found, not surprisingly, that many of the inmates who faced disciplinary sanctions for disruptive behavior were very damaged people with serious mental illness diagnoses and with very serious psychiatric problems. Their data also demonstrated emphatically that among those inmates with preexisting serious psychiatric problems, those who were placed in administrative segregation suffered far more psychiatric crises during the study period than those not placed in administrative segregation. The authors chose to ignore this glaring reality. Instead, relying only upon their very flawed methodology, they claim their study demonstrates that there was no change, or even some early improvement, in the psychological status of these inmates. In the process they ignored objective data that squarely contradicted their self-report data. This is entirely unacceptable.

Returning to the stunning statistic that, on average, 50% of completed suicides in corrections occur among the 2% to 8% of prisoners in any system who are in isolated confinement,[9] there are only two plausible explanations for this fact: Either administrative segregation causes psychiatric harm; and/or (*and* we believe "and" is the applicable word) the sentencing to Ad Seg is very often a tragic, punitive response to irrational and self-destructive behavior on the part of severely mentally ill inmates—just when a therapeutic response is urgently needed.

We need to think carefully about this. There are many very damaged people in the Colorado supermax under study. Quite a few suffer acute incidents of psychosis and commit suicide during the course of the study while others experience many disturbing symptoms, but because they are in isolated confinement, they are not being given the intense treatment their conditions require. Does it make any sense at all to conclude that supermax confinement does no harm?

### Endnotes

*Dr. Grassian is a Board-certified psychiatrist and was on the teaching staff of the Harvard Medical School continually from 1974 until 2002. He has had extensive experience evaluating the psychiatric effects of stringent conditions of confinement, and has served as an expert in a number of both individual and class-action lawsuits addressing this issue. His observations and conclusions regarding the psychiatric effects of such confinement have* been cited in a number of federal court decisions. Much of this work is described in "Psychiatric Effects of Solitary Confinement," published in the Washington University Journal of Law and Policy, 2006, vol. 22, pp. 325–383. Dr. Kupers is Institute Professor at The Wright Institute and practices psychiatry in Oakland. He provides expert testimony as well as consultation and staff training regarding the psychological effects of prison conditions including isolated confinement in supermaximum security units, the quality of correctional mental health care, and the effects of sexual abuse in correctional settings. He is the author of Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (1999), a coeditor of Prison Masculinities (2002), and Contributing Editor of Correctional Mental Health Report.

1. See Grassian, supra note 1 for references to the studies referred to in the text.

2. Scharff-Smith, P. (2006). The effects of solitary confinement on prison inmates: A brief history and review of the literature. In M. Tonry (Ed.), Crime and justice (Vol. 34, pp. 441–528). Chicago: University of Chicago Press. See also Amicus Brief to the Supreme Court of the United States. (2005). *Brief of professors and practitioners of psychology and psychiatry as amicus curiae in support of respondents.* Supreme Court of the United States, No. 04-495.

3. Mears, D.P. & Watson, J. (2006). Towards a fair and balanced assessment of supermax prisons. *Justice Quarterly*, 23(2), 232–270; Way, B., Miraglia, R., Sawyer, D., Beer, R., & Eddy, J. (2005). Factors related to suicide in New York state prisons. *International Journal of Law and Psychiatry*, 28(3), 207–221; Patterson, R.F. & Hughes, K. (2008). Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004, *Psychiatric Services*, 59(6), 676–682.

4. The authors point out that to be a controlled study, the study must randomly assign subjects to each group, whereas in this study, the subject inmates were assigned to Ad Seg or to GP by the Correctional staff, not by the study group.

5. Dunlap v. Zavaras, USDistCt, Colorado, Civ. No. 09-CV-01196-CMA-MEH. Deposition of Maureen O'Keefe, October 5, 2010, pages 136–137.

6. O'Keefe deposition, p. 137.

7. E.g., "Longitudinal Study of the Psychological Effects of Administrative Segregation", presentation at 2010 Annual Meeting of American Psychological Association, San Diego, August 14, 2010.

8. Ironically, in deposition, when Ms. O'Keefe was confronted with this massive discrepancy in crises among prisoners with mental illness in Ad Seg versus those in GP, she offered that maybe those in Ad Seg were a sicker group. Under the pressure of deposition, she seems to have momentarily forgotten that her study was founded upon a notion that there was a "control group," i.e., that the two groups were psychiatrically comparable! *O'Keefe deposition pp. 196–198.*

9. Op. cit. #4, Mears. ...

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031804

*PSYCHOLOGICAL, from page 2*

inmates were held in segregation at their originating facility. Therefore, a "pre-baseline" measure was collected as close to the AS hearing as possible, which meant that the CSP groups completed six test intervals rather than five. The time between the pre-baseline and baseline measure varied according to how long the inmate was on the wait-list. The median time between pre and baseline tests was 99 days. ...

Assessment tools were selected to comprehensively cover the variety of psychological constructs associated with AS [based on the literature]. The primary constructs assessed in this study were as follows: (1) anxiety, (2) cognitive impairment, (3) depression/hopelessness, (4) hostility/anger control, (5) hypersensitivity, (6) psychosis, (7) somatization, and (8) withdrawal/alienation. Additionally, malingering, self-harm, trauma, and personality disorders were assessed. ...

The 12 self-report instruments used in this study were: (1) Beck Hopelessness Scale, (2) Brief Symptom Inventory, (3) Coolidge Correctional Inventory, (4) Deliberate Self-Harm Inventory, (5) Personality Assessment Screener, (6) Prison Symptom Inventory [created for this study], (7) Profile of Mood States, (8) Saint Louis University Mental Status, (9) State-Trait Anxiety Inventory, (10) Structured Inventory of Malingered Symptomatology, (11) Trail Making Test, and (12) Trauma Symptom Inventory.

In addition to self-report assessments, ratings of psychological functioning were obtained from clinical staff and ratings of behavior in the housing unit were obtained from correctional staff. The Brief Psychiatric Rating Scale (BPRS) was completed by clinical staff and the Prison Behavior Rating Scale (PBRS) was completed by correctional staff.

Most assessments were collected at each testing period, although personality disorders, self-harm, and trauma history were not.

Lengthy appendices provide relevant information regarding the instruments used, strengths of their psychometric properties and descriptions of the composite scores used for analysis in this research.

The conditions of confinement at CSP included the following descriptions,

Colorado State Penitentiary (CSP) opened in 1993 as a 756-bed male AS facility in its entirety. CSP has six identical pods, or living units. Each day hall contains 15 to 16 offender cells separated onto two tiers with each tier having 7 or 8 cells, a shower, and a recreation room.

The cells in CSP are 80 square feet with 35 square feet of unencumbered floor space and contain a bunk, toilet, sink, desk, and stool. Each of these items is made of metal and is mounted to the wall or floor for security. Every cell has a 5" × 45" window on the exterior wall above the offender's bunk through which the offender can see outside. There is also a window on the cell door that faces the day hall. Depending on the pod, the window is either 3.5" × 20.5" or 5" × 15". Neither of these windows opens, which precludes the offender from receiving outside air while in his cell.

Per CSP policy, offenders wanting to participate in recreation are generally permitted at least one hour five times per week (as well as to shower for 15 minutes three times per week which generally coincides with an offer to exercise). The recreation room is a 90-square foot cell that contains a pull-up bar mounted to the wall. No other exercise equipment is allowed. The only opportunity offenders have to receive fresh outside air is through two 5" × 60" grated windows on the exterior wall of the recreation room. On the interior, a glass wall faces the V-shaped day hall, so the offender in recreation is fully visible. Though prohibited by the facility, an offender in the recreation room may call out exercises to other offenders who in turn workout in their cells.

*Interpersonal Communication.* Each cell has an intercom system through which correctional officers can contact each offender from the unit's control center. While the intercom system provides a means for correctional staff and offenders to communicate with each other relatively easily, it does not afford offenders the opportunity to communicate with one another. Many offenders at CSP have become skilled in sign language. Since each day hall is V-shaped and cell doors have windows, offenders are able to communicate with

each other using sign language. This aids in keeping the noise level down in the day hall and gives inmates the opportunity to speak to each other without the risk of staff overhearing. At times, however, many inmates simply yell through their cell door so that other offenders can hear. When this happens, the day hall can become very noisy.

Due to the safety concerns of the facility and the fact that moving an AS offender from his cell is staff intensive, offenders in AS receive many services at their cell door. At CSP, officers make rounds every 30 minutes to do a visual check into the cell of every offender. Mental health clinicians are required to do monthly rounds as well. In addition to rounds, offenders receive their library service and educational services at their cell door. Once a week, a librarian picks up library kites, or requests, and distributes books and magazines to offenders who put in a kite the previous week.

CSP also has an incentive based programming system. CSP's incentive-based programming consists of three quality of life (QOL) levels. Each level brings with it more privileges; however, these privileges must be earned by the offender through appropriate behavior and compliance with CSP rules. This program includes the opportunity to earn the privilege of having a television in their cell.

Findings reported by the authors included the following:

The results of this study were largely inconsistent with our hypotheses and the bulk of literature that indicates AS is extremely detrimental to inmates with and without mental illness. ... Consistent with other research, our study found that segregated offenders were elevated on multiple psychological and cognitive measures when compared to normative adult samples [references omitted]. However, there were elevations among the comparison groups too, suggesting that high degrees of psychological disturbances are not unique to the AS environment. The GP NMI group was the only one that was similar to the normative group on a number of scales.

In examining change over time patterns, there was initial improvement in psychological well-being across

*See PSYCHOLOGICAL, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031805

*PSYCHOLOGICAL, from page 12*

all study groups, with the bulk of the improvements occurring between the first and second testing periods, followed by relative stability for the remainder of the study. On only one measure—withdrawal—did offenders worsen over time, but this finding was only true for the two NMI groups, so it is not attributable to AS. Even given the improvements that occurred within the study timeframe, the elevations in psychological and cognitive functioning that were evident at the start of the study remained present at the end of the study.

Another hypothesis was that offenders with mental illness would deteriorate over time in AS at a rate more rapid and more extreme than for those without mental illness. Patterns indicated that the MI groups (CSP MI, GP MI, SCCF) tended to look similar to one another but were significantly elevated compared to the NMI groups (CSP NMI, GP NMI), regardless of their setting. ... As hypothesized there was a differential time effect for the MI and NMI groups on several composite measures (i.e., anxiety, hostility-anger control, hypersensitivity, somatization), but the interactions were in the opposite direction of our hypothesis; on average, the CSP NMI group did not change while the CSP MI group improved.

We stated that offenders in segregation would develop an array of psychological symptoms consistent with the SHU syndrome. As already discussed, all of the study groups, with the exception of the GP NMI group, showed symptoms that were associated with the SHU syndrome. These elevations were present from the start and were more serious for the mentally ill than non-mentally ill. In classifying people as improving, declining, or staying the same over time, the majority remained the same. There was a small percentage (7%) who worsened and a larger proportion (20%) who improved. Therefore, this study cannot attribute the presence of SHU symptoms to confinement in AS. The features of the SHU syndrome appear to describe the most disturbed offenders in prison, regardless of where they are housed. In fact, the group of offenders who were placed in a psychiatric care facility (SCCF) had the greatest degree

of psychological disturbances and the greatest amount of negative change.

Finally, in this study, we conducted some exploratory predictive analyses to determine if there were individual characteristics that could identify who may be at greater risk of psychological harm from segregation. There were no individual predictors that showed strong effects for predicting change. This could indicate that we did not have the correct predictors or that patterns of decompensation are individualized (i.e., not predictable), but it is more likely that the relative stability over time makes it difficult to predict change. A review of the findings warrants a discussion of plausible alternative explanations that might account for our results. The use of a repeated measures design enabled us to determine what change was occurring and in which direction. Even given the debate about whether or not harmful effects resulted from AS, it was never suggested that inmates might improve as this study found. The presence of comparison groups avoids an attribution error; the changes, improvements in this case (i.e., 20%), are not due to segregation. ...

Limitations of this study described by the authors included the following,

1. This study may not generalize to other prison systems, especially those that have conditions of confinement more restrictive and/or harsher than CSP.

2. There are likely other negative consequences of AS that were not studied in this project.

3. This study did not address the conditions required to *improve* inmates' mental well-being while in segregation. Although it is encouraging that many inmates with mental illness may not get worse in segregation, this study appears to indicate that many do not get better and remain symptomatic.

4. This study examined group averages. It was not designed to identify if certain individuals might be worsened by the conditions of AS: rather the purpose was to examine whether offenders on the whole, both mentally ill and non-mentally ill, are harmed by long-term segregation. Also, in the design of this study, a general linear trend in the data was assumed, which meant that the study

was not able to capture nonlinear changes over time that might have occurred. It is possible that a person in segregation could have had one or more brief episodes, possibly even severe episodes, of psychopathology that were not reflected in the data because testing occurred at three month intervals and that would not have been reflected in trend analyses of their psychological functioning. This study was not designed to assess brief changes in psychological functioning, however serious.

**COMMENT: This study was remarkable from several perspectives. Given the hypothesis that structured the research and the significant effort to minimize methodological problems identified in similar attempts to study this issue (based on a comprehensive literature review), it was remarkable that the Colorado Department of Corrections not only allowed this research but had active participation from the highest levels on the advisory board and facilitated the difficult data gathering procedures. It was clear that the policy makers wanted empirical data to guide future policies, procedures, and practices.**

**Equally remarkable were the findings of this study. At the Colorado State Penitentiary, which is a supermax facility, this study did not support the concept of a SHU syndrome that was caused by placement in a SHU environment. However, it is uncertain whether these findings are generalizable to prison environments other than at CSP. Even more surprising was the small percentage of inmates with a serious mental illness who demonstrated deterioration during their long-term supermax confinement. In fact, the group of offenders who were placed in a psychiatric care facility (SCCF) had the greatest degree of psychological disturbances and the greatest amount of negative change. What does this all mean?**

**The SCCF findings are significant and may explain some of the reported findings. The inmates sent to SCCF were those who were the most symptomatic from a psychiatric perspective (i.e., required the highest level of mental health care among the various research populations). If those inmates had been sent to AS in contrast to SCCF, it is very likely that the findings would have demonstrated a statistically**

*See PSYCHOLOGICAL, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031806

PSYCHOLOGICAL, from page 13

significant clinical deterioration for AS MI inmates, which would have been consistent with one of the study's hypotheses. Therefore, future studies should differentiate the MI groups based on needed level of mental health care.

Although this study indicated that only a small percentage of inmates with mental illness deteriorated in the AS environment, such results should not be interpreted to indicate that there is little harm associated with housing inmates with mental illness on a long-term basis in an AS environment. The clinical deterioration of any inmate is of concern and this study was unable to determine the factors predictive of such clinical deterioration. This is of particular concern in the context of the high incidence of suicides nationwide in AS environments as compared to general population housing units. This study was not designed to, and did not assess, the nature of the treatment provided to inmates with mental illness during the study period. This is a critical point because throughout the study inmates with mental illness demonstrated significant symptoms using the various study measurements as compared to the other inmate participants without mental illness. The study did not address whether the treatment was adequate or if adequate treatment was possible to provide in a 23 hour per day locked down setting.

The above issue can be better understood using an analogy involving an inmate

with very high blood glucose due to diabetes. It is possible that if such an inmate was placed in AS, his blood glucose would not get worse and, in fact remain the same. However, such an outcome would not be an acceptable one, since with proper treatment the inmate's blood glucose could be lowered to an acceptable range. If such an inmate's blood glucose remained high while in the AS environment due to access issues to adequate health care, few people would argue that the AS environment was not only detrimental but contributory to a standard of care violation if not a constitutional one. It is not hard to understand that adequate treatment for an inmate with mental illness is generally not possible in an AS environment if the 23 hour per day lockdown characteristic remains. Therefore, it would not be surprising that such inmates may not clinically deteriorate but likely would not get better (i.e., would remain symptomatic) in such environments.

It is also possible that inmates did clinically deteriorate between testing intervals but improved by the time the testing instruments were again administered. It is also possible that there was a Hawthorne effect that was a protective factor in minimizing clinical deterioration.

Regarding the presence or absence of a SHU syndrome, it is possible that the study's instruments were not sensitive to symptoms of the SHU syndrome although it is unlikely based on baseline data and the selection of the instruments as described in the 163-page report. Specifically, baseline data did demonstrate

symptoms consistent with the SHU syndrome but as previously explained the symptoms were not attributable to the AS environment. For reasons which include the limitations of the study as previously summarized by the authors, this project raises serious questions concerning causation relevant to inmates in an AS environment who demonstrate symptoms of a SHU syndrome. Specifically, this study essentially stated that such symptoms are not caused by the AS environment, at least in the Colorado State Penitentiary AS environment.

Finally, it would be an improper use of this study to state that it either advocates for the use of long term segregation or indicated that there is no harm in the use of such confinement. It is hoped that this study will facilitate further research into this very important area.

References

Grassian S, Friedman N. Effects of sensory deprivation in psychiatric seclusion and solitary confinement. International Journal of Law and Psychiatry 1986; [8]: 49–65.

O'Keefe ML, Klebe KJ, Stucker A, Sturm K, Leggett W: One Year Longitudinal Study of the Psychological Effects of Administrative Segregation. Funded by and submitted to the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice, October 31, 2010.

*Dr. Metzner was a member of the research project's advisory board.*

*Ms. O'Keefe was the principal investigator of the NIJ research project summarized in this report.* ∎

SEGREGATION STUDY, from page 4

the distribution of scores across the sample. Since none of these conditions obtains, we are left to guess.

Another slender observation, apparently leading in the other direction, concerns the changing scores of the two NMI groups (CSP and GP) on the Prison Behavior Rating Scale (PBRS), a British instrument adapted to Colorado and completed by corrections officers observing the behavior of inmates. For the two scores displayed (p. 56)—the anti-authority scale and especially the total PBRS scores—we see rapidly rising scores over the first part of the study for the GP group, which then leveled off, and an inverse pattern for the CSP group. In English: in terms of officer observations, the GP group deteriorated over the first six months, and the CSP group got better. We can only (and

here will not) speculate about why the GP NMI group deteriorated—or acted out more vociferously—after being returned to GP. About the CSP group, the authors later note (p. 78) that the decrease in scores,

... would be an indicator that staff may be perceiving improvements, but the significant differences were from the first to the second assessment when the majority of participants changed facilities, which suggests that this is perhaps a measurement error rather than a true improvement.

This comment brings us full circle, to our opening discussion of the baseline measures in punitive segregation; but it also epitomizes the methodological limitations of the Colorado study. Whether CSP inmates were happier once they moved from punitive segregation to the relative comforts of AS

(especially beyond the first, stripped-down week) is not considered; nor is there discussion of the extent to which, under the total surveillance conditions of AS, inmates learned to accommodate themselves to staff expectations. Perhaps the improvement was not a measurement error but a reflection of the fact that, on average, human beings can get used to anything. Should this give us any comfort?

**What Is Not Measured**

Pending a sophisticated assessment of this study's psychometric methodology, as well as more fine-grained analysis of distributions and patterns on those measures found to be robust, we offer one final argument. Colorado justifies the punitive regime into which AS inmates are first placed by calling it "Level 1" of an "Incentive" system. If the study's measures were the right ones to answer the

See SEGREGATION STUDY, next page

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

*SEGREGATION STUDY, from page 14*

right question, however, inmates would have no incentive to leave solitary confinement. Except for those (allegedly nonexistent) protection cases who prefer to remain segregated, it would be a matter of indifference to inmates whether they lived in solitary confinement or returned to GP. Clearly most prisoners are not indifferent to this choice; if they were, the entire deterrence regime for prisoner discipline would have no function. Clearly, most prisoners would prefer to live among others, and some go to great lengths to get themselves out of solitary. Either the methods employed in this study are ill suited to answering the important question about the effects of solitary confinement, or they are (on average) well suited to answering the wrong question, i.e., the question of adaptation.

In interviews with maximum custody inmates over the past 12 years, we have been struck by how calm, reasonable, and well-organized most of them have appeared. In this respect, our experience is consistent with a positive answer to the authors' question "whether prisoners are able to psychologically adapt to the

conditions of AS." We have suggested, however, several respects in which this interpretation is unfounded: first, that average values mask significant variations among inmates' responses; furthermore, the study's separation of psychometric measures from the social context blocks understanding of what the measures are telling us. Under both of these fault lines, we suspect, lies a fundamental gap in methodology: the exclusive reliance on the available psychometric measures of psychological states without reference to what the states are about. In the Washington studies, looking at participants chronologically often reveals a history of dramatic breakdowns and desperate measures in AS, which might not have been expected from how they looked and sounded in interviews (Lovell, 2008). These behaviors, and the beliefs and emotions that produced them, were not abstract instances of anger, depression, or whatever is measured by psychometric instruments: rightly or wrongly, they were *about something:* that yesterday the CO slammed my cuffport when he delivered the food tray; that last year I was forced to undergo an anal cavity search: that I've been knocked down in the

level system with no foreseeable prospect of release from AS; that I'm proud to go to the hole in solidarity with my brothers; that voices are coming at me through the security lamp in my cell; that I've got to get away from these four walls.

The Colorado study will be useful if it forces critics of supermax confinement to re-examine their assumptions and methods. But no general policy conclusions should be drawn from this study without an equally systematic examination, over time, of the diverse reasons for AS placement, the variety of prisoners' attitudes and what those attitudes are about.

#### References

Toch, Hans. 1992. Living in Prison: The Ecology of Survival. Washington DC: American Psychological Association (APA Books).

Lovell, David. 2010. A profile of Washington inmates on intensive management status. Olympia, Washington: Department of Corrections (unpublished report).

Pacholke, Dan. 2010. (Deputy Assistant Secretary, Division of Prisons, Washington Department of Corrections.) Personal communication.

Lovell, David . 2008. Patterns of disturbance in a supermax population. *Criminal Justice and Behavior,* 35(8): 985–204.   ∎

*HUMAN RIGHTS, from page 6*

mentally ill inmate access to valuable out-of-cell therapeutic interventions for a week may be tolerable, but may become inhumane when the denial persists for months. Existing human rights jurisprudence leaves little doubt that prolonged supermax confinement in the United States cannot be squared with respect for inmates' humanity. It can also violate the prohibition on cruel, inhuman or degrading treatment, and, depending on the specific circumstances, may even amount to torture.[12]

While human rights authorities recognize that solitary confinement can lead to psychological deterioration, the creation or exacerbation of mental illness is not a prerequisite for a human rights violation. Deep emotional pain suffices. There may be no way to measure empirically the misery produced by prolonged supermax confinement, but there is abundant testimony to the suffering many isolated inmates endure.[13] Even if, as the Colorado study suggests, CSP does not cause inmates confined there to psychologically deteriorate, that does not mean it passes muster under human rights law. Because

solitary confinement can be so painful—and can be literally unendurable (witness the high rate of suicide in segregation)—and because it too often fails to respect inmates' basic human dignity, human rights authorities are unanimous that it should an exceptional measure imposed only when necessary, only for so long as necessary and with the specific conditions entailing no more deprivation than is necessary. Even when solitary confinement is imposed consistent with these criteria, increased opportunities for social interaction—be it with staff, other inmates, or other people—should be provided to mitigate the impact of isolation. There is widespread agreement that prisoners with serious mental illness should never be subjected to solitary confinement. Finally, if legitimate considerations of prison safety and security mandate extended periods of solitary confinement, the conditions must be modified to even further ameliorate the isolation and to recognize the humanity of the person so confined.[14]

U.S. courts to date have not incorporated the human rights framework into their jurisprudence. But corrections officials should not wait for courts to tell them what to do. They remain obligated under treaties to which the United States is a party to protect

and respect the human rights of prisoners. I would hope the Colorado study spurs considerable reflection and policy changes both in the Colorado DOC and elsewhere.

#### References

1. **Madrid v. Gomez**, 889 F. Supp. 1146, 1265 (N.D. CA 1995).

2. Over the years, class action litigation in federal courts has prohibited or substantially limited or changed conditions of segregation confinement for mentally ill inmates in Alabama, Arizona, California, Connecticut, Florida, Indiana, Michigan, Mississippi, New Jersey, New Mexico, New York, Ohio, Wisconsin, and Texas.

3. O'Keefe ML, Klebe KJ, Stucker A, Sturm K, Leggett W. One Year Longitudinal Study of the Psychological Effects of Administrative Segregation. Funded by and submitted to the National Institute of Justice, Office of Justice Programs. U.S. Department of Justice, October 31, 2010.

4. Metzner JL and O'Keefe ML. Psychological Effects of Administrative Segregation: The Colorado Study. Correctional Mental Health Newsletter 2011.

5. Fellner J. Out of Sight: Super-Maximum Security Confinement in the United States. Human Rights Watch, 2000, available at http://www.hrw.org/en/reports/2000/02/01/out-sight-super-maximum-security-confinement-us; Fellner, J. Afterwords: A Few Reflections. Criminal Justice

*See HUMAN RIGHTS, next page*

© 2011 Civic Research Institute. Photocopying or other reproduction without written permission is expressly prohibited and is a violation of copyright.

PLTF-PARSONS-031808

Case 2:12-cv-00601-ROS   Document 1104-10   Filed 09/08/14   Page 53 of 62

**Correctional Mental Health Report**

Civic Research Institute, Inc.
4478 Route 27 P.O. Box 585
Kingston, NJ 08528



PRIVATE ADDRESS –
CONFIDENTIAL INFO

## SUBSCRIPTION INFORMATION

**Correctional Mental Health Report** is published six times annually. A basic one-year subscription is $165 plus $14.95 postage and handling. Non-exempt New Jersey and New York residents please add appropriate sales tax.

TO ORDER
Complete the information below and mail to:
Civic Research Institute
P.O. Box 585
Kingston, NJ 08528
or order online: www.civicresearchinstitute.com

☐ Enter my one-year subscription to **Correctional Mental Health Report** at $165 plus $14.95 postage and handling.

☐ Enter my order for **The Mentally Disordered Inmate and the Law, 2nd Edition** by Fred Cohen, LL.B., LL.M., for $220 plus $17.50 shipping and handling.

Name

Agency

Address

City

State  Zip Code

Phone Number

E-Mail Address

Purchase Order #

*HUMAN RIGHTS, from page 15*

and Behavior 85:1079-1087, 2008. Fellner J and Mariner J. Cold Storage: Super-Maximum Security Confinement in Indiana. Human Rights Watch, 1997, available at http://www.hrw.org/en/reports/1997/10/01/cold-storage.

6. Needless to say, there is much to criticize about CSP, starting with, of course, the fact that mentally ill inmates are confined there. Other notable objectionable features include the fact that there is no outdoor recreation. Inmates have "recreation" in an empty indoor cell on the tier, which has open vents to let in fresh air. Inmates are escorted in full restraints to and from the recreation cell.

7. There may have been incidents of self-harming behavior/ideation or psychotic symptoms that occurred without staff's knowledge and therefore are not included in the reported events.

8. The Colorado Department of Correction uses a five-level mental health classification system, with higher numbers corresponding to higher mental health needs. Inmates at level 3 are deemed to need mental health services. Most (70%) of the CSP mentally ill study participants were at level 3, 17% were at levels 4 and 5.

9. See, e.g., Fellner J and Mariner J. Cold Storage: Super-Maximum Security Confinement in Indiana. Human Rights Watch, 1997, available at http://www.hrw.org/en/reports/1997/10/01/cold-storage.

10. Article 10, International Covenant on Civil and Political Rights.

11. Article 7, International Covenant on Civil and Political Rights. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.

12. E.g., United Nations Human Rights Committee, General Comment 20, Article 7, Compilation of General Comments and General Recommendations Adopted by Human Rights Treaty Bodies, U.N. Doc. HRI/GEN/1/Rev.1 at 30 (1994), para. 6.; United Nations Human Rights Committee: Consideration of reports submitted by States parties under Article 40 of the Covenant, concluding observations of the Human Rights Committee, United States of America. New York: UNHRC, UN Doc. CCPR/C/USA/CO/3, 2006; United Nations Committee Against Torture: Consideration of reports submitted by States parties under Article 19 of the Convention, Conclusions and Recommendations of the Committee Against Torture, United States of America. New York: UN Committee Against Torture, UN Doc. CAT/C/USA/CO/2, 2006; Interim Report of the UN Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. UN General Assembly, New York: United Nations, UN Doc. A/63/ 175:18-21, 2008.

13. Reyes H: The worst scars are in the mind: psychological torture. International Review of the Red Cross 89:591-617, 2007.

14. In addition to sources cited above, see generally, Rodley NS and Pollard M. The Treatment of Prisoners under International Law, 3rd Ed., Oxford U. Press 2009; Nowak M. and McArthur E. The United Nations Convention against Torture: A Commentary, Oxford University Press, 2009; Shalev S. Sourcebook on Solitary Confinement, Mannheim Centre for Criminology, London School of Economics and Political Science, 2008, available at http://solitaryconfinement.org/uploads/sourcebook_web.pdf; The Istanbul Statement on the Use and Effects of Solitary Confinement, Adopted at the International Psychological Trauma Symposium 2007, available at http://www.solitaryconfinement.org/uploads/Istanbul_expert_statement_on_sc.pdf. ■

*Missing or damaged issues?*
Call Customer Service at 609-683-4450.

**Reprints:** Parties wishing to copy, reprint, distribute or adapt any material appearing in *Correctional Mental Health Report* must obtain written permission through the Copyright Clearance Center (CCC). Visit www.copyright.com and enter *Correctional Mental Health Report* in the "Find Title" field. You may also fax your request to 1-978-646-8700 or contact CCC at 1-978-646-2600 with your permission request from 8:00 to 5:30 eastern time.
ⓒ COPYRIGHT CLEARANCE CENTER

PLTF-PARSONS-031809

# **APPENDIX C**

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 12-CV-01326-RBJ-KLM
3   _____
4   DEPOSITION OF MAUREEN O'KEEFE
    October 25, 2013
5   _____
6   JAMES SARDAKOWSKI,
7   Plaintiff,
8   v.
9   CLEMENTS, et al.,
10  Defendants.
    _____
11
                    A P P E A R A N C E S
12
    For the Plaintiff:      LAURA L. ROVNER, ESQ.
13                          LAUREN L. FONTANA, ESQ.
                            MARY DEWEY, Student Attorney
14                          VIRGINIA THOMPSON, Student Attorney
                            ZACHARY WOODWARD, Student Attorney
15                          Sturm College of Law
                            2255 East Evans Avenue
16                          Denver, Colorado  80208
17  For the Defendants:     CHRISTOPHER W. ALBER, ESQ.
                            Office of the Attorney General
18                          1300 Broadway
                            10th Floor
19                          Denver, Colorado  80203
20
21
22
23
24
25

PLTF-PARSONS-031812

1           Deposition of MAUREEN O'KEEFE, the Witness
2     herein, called by the Plaintiff in the above-entitled
3     matter on Friday, the 25th of October, 2013, commencing
4     at the hour of 8:57 a.m., at 2255 East Evans Avenue,
5     Denver, Colorado, before Wendy Evangelista, Registered
6     Professional Reporter and Notary Public within and for
7     the State of Colorado, said deposition being taken
8     pursuant to Notice and the Federal Rules of Civil
9     Procedure.
10    _____
11                       I N D E X

                                              Page Number
12
      Examination by Ms. Rovner                        3
13
                       E X H I B I T S
14
      Exhibit Number                    Initial Reference
15

      55  A Longitudinal Study of Administrative        7
16        Segregation
17    56  Deposition of Maureen O'Keefe, 10/5/10       42
18    57  Research Summary Questions                   78
19    58  Research Consent Form, IRB#06-146            82
          Expires 11/27/2009
20
      59  Administrative Segregation Review            94
21
22
23
24
25

PLTF-PARSONS-031813

1   interpretation?

2       A    Yes.  When I talked earlier about criticisms

3   of the previous research and that we tried to build upon

4   those and expand the methodology is not to say that ours

5   is without fault and that there are no limitations of our

6   study.  And as well, you also asked, Why didn't you do

7   this, and, Why didn't you do that?  This is one study.

8   One study can never definitively answer any single

9   question.  Replication is absolutely critical.

10          This study is relevant to the types of

11  offenders that were in the study, that were subjected to

12  the conditions of confinement, that were present at CSP at

13  the time of the study.  And we do not believe in any way

14  and we do not promote the study as something to argue for

15  the case of segregation and especially not for the

16  seriously mentally ill.

17      Q    And why do you say "especially not for the

18  seriously mentally ill"?

19      A    I think the perception that is mistaken around

20  the country around the study is that we are really saying,

21  Go ahead; put the mentally in because it's not bad, so

22  lock up the mentally ill.  I guess that exception is

23  because we are not.  In particular, I'm just not saying

24  this applies to the mentally ill.

25      Q    So when you say replication is critical, are

1   there any plans underway to conduct a follow-up to your

2   study?

3        A    I am unaware.  But we have certainly

4   encouraged other researchers and states to take up the

5   challenge, and especially our opponents to the study.  I

6   think it would be fabulous if they were to take on a

7   replication study.

8        Q    Do you believe that some prisoners don't do

9   well in segregation and should be removed?

10       A    Yes.

11       Q    Who -- who would fall into that category?

12       A    I don't know who.

13       Q    What would make you come to that conclusion?

14       A    In our study, we found a small percentage of

15  offenders that we defined as those who got worse while

16  they were in segregation.  So those offenders, we weren't

17  able to type them.  We tried to do a prediction to type

18  them, but we were unable to.  And this is where clinical

19  staff are absolutely critical for being in a segregation

20  environment, is to be able to monitor and identify and to

21  intervene when those circumstances arise.

22       Q    So when you say that you couldn't type them,

23  does that mean you couldn't figure out why this particular

24  group of people got worse as opposed to the other people

25  in the study?  Is that what you mean by "type"?

PLTF-PARSONS-031815

1        A    Yes.  We could not say, for example, psychotic

2    inmates, as a rule, always got worse or depressed inmates,

3    as a rule, always got worse.

4        Q    And how did you -- what -- for lack of a

5    better word, what measuring stick did you use to determine

6    that they got worse?

7        A    I would probably need the study right in front

8    of me to be able to do that.  There's a section towards

9    the end of the results that talks about grouping them into

10   what we call positive, negative, and no-changers.  And so

11   based on some of their composite scores, maybe even a -- a

12   master composite, we were able to say, These offenders did

13   worse, the next set did not change at all, and then there

14   was another group who positively changed.  And so some of

15   the things we were looking at was a big change on one area

16   or smaller amounts of change across a number of

17   dimensions.

18       Q    Did you have any prisoners who withdrew from

19   this study?

20       A    Yes.

21       Q    Do you know about how many?

22       A    About 23.

23       Q    And do you know why they withdrew?

24       A    I don't believe we track that.  I believe we

25   tracked those who refused, and we asked them why they

1   refused.  But I don't know for sure whether we tracked the

2   reasons they withdrew.

3        Q    When you were at the point of designing and

4   conducting the study, did you have any discussions with

5   the advisory board about how the study might be used?

6        A    The only discussion I recall -- and it might

7   not have involved the advisory board -- was, as I had

8   said, when we talked with Mr. Zavares and some of the

9   executives about moving forward with the grant that we had

10   been awarded was that there was the potential to have --

11   to make some significant changes to the way we operated

12   our administrative segregation.  My speculation is that

13   that discussion probably continued into the first meeting

14   or two with the advisory board.

15        Q    But other than -- than that discussion with

16   Mr. Zavares, were there other discussions that took place

17   among the members of the advisory board over the course of

18   the study about how the results might be used?

19        A    Again, I think some of that early discussion

20   with Mr. Zavares may have bled into, like, our first

21   meeting or two.  And it may have been something that we

22   touched on.  It was not significant enough for me to

23   recall it.  So I wouldn't rule it out.  But in the sense

24   did we talk about it over the course of the study and all

25   of our meetings and what the repercussions or follow-up

1   were, no.

2          I think at the point that we did the

3   documentary with National Geographic -- and that was our

4   first peek at the data.  And we were completely floored

5   and just running analyses like mad, thinking, This can't

6   be; this can't be; what's going on?  We were more focused

7   at that point about making sure that we had our data right

8   and accurate.  We knew how we were analyzing it, looking

9   at the analytical strategies that -- and that was really

10  our focus of making sure this study was 100 percent on

11  track and not so much what the fallout was.

12         I mean, we didn't -- we expected changes if we

13  found that there was a negative effect.  We never dreamed

14  that there would be the reaction or the misinterpretation

15  of our study that has occurred until after we released it.

16  So we never speculated or imagined that what has happened

17  would happen.

18      Q    And what's -- what's the "this" that's

19  happened?

20      A    All the negative press that started

21  immediately after the release of our study.  And in fact,

22  before the release of our study, we invited Dr. Grassian

23  to commentate on our study at a presentation at the

24  American Psychological Association in San Diego a few

25  months before we finalized and released the study.  We

1   really wanted his honest feedback.  We sought his

2   participation, in a way, to try to improve our report

3   before we released it.

4            He was not willing to work with us at all.  In

5   fact, he was rather unprofessional and released our draft

6   findings to various stakeholders before they were final

7   and then perpetuated any number of negative blogs.  I

8   don't know how many were specific to Dr. Grassian.  But

9   many colleagues jumped on and were aware of the study even

10  before it had been released as a final version.

11       Q    And when you say that there's been a

12  misinterpretation of the results, how would you describe

13  the misinterpretation?

14       A    My interpretation is that people believe that

15  this study sanctions administrative segregation for

16  mentally ill and nonmentally ill alike.

17       Q    And you think that's wrong?

18       A    I do not believe that the conclusions lend to

19  that and that is not the intended use of our study.

20       Q    Do you know whether the Department of

21  Corrections shares your understanding of what the results

22  of the study are?

23       A    I do not.  I know that the individuals that

24  were on the stakeholder committee 100 percent understood

25  the purpose, the goals, what we found, what it meant.

PLTF-PARSONS-031819