Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone: (602) 650-1854
Email: dpochoda@acluaz.org
        jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone: (602) 274-6287
Email: skader@azdisabilitylaw.org
        avarma@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, <br><br> Plaintiffs, <br><br> v. <br><br> Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, <br><br> Defendants. | No. CV 12-00601-PHX-DJH <br><br> **PLAINTIFFS' TRIAL BRIEF** |

## I.      INTRODUCTION

The Supreme Court recently upheld an Eighth Amendment claim regarding "systemwide deficiencies in the provision of medical and mental health care that, taken as a whole, subject sick and mentally ill prisoners in California to 'substantial risk of serious harm' and cause the delivery of care in the prisons to fall below the evolving standards of decency that mark the progress of a maturing society." *Brown v. Plata*, 131 S. Ct. 1910, 1925 n.3 (2011) (internal citation omitted).

Plaintiffs bring similar claims against the Arizona Department of Corrections ("ADC"): Plaintiffs seek injunctive relief to correct systemwide deficiencies in ADC's provision of medical, mental health, and dental care, and in conditions of confinement in ADC's isolation units.  All prisoners in the Class, including the Named Plaintiffs, are placed at a substantial risk of serious harm by ADC's policies and practices, which have existed for years and continue to inflict needless suffering and death on prisoners within the ADC system.  Defendants' own internal reports, admissions, and case files reveal a constitutionally inadequate health care system and unconstitutional conditions of confinement.  Under these dangerous conditions, a nationally recognized correctional health expert found that in one six-month period, more than half of all deaths in ADC custody (excluding homicides and suicides) involved "grossly deficient" medical care [Declaration of Daniel C. Barr ("Barr Decl."), Ex. 1 (Second Supplemental Report of Robert L. Cohen, M.D. ("9/8/14 Cohen Report")) at 1-2]—an average of one every week. Defendants' policies and practices place all prisoners at a substantial risk of serious harm.

## II.     FACTUAL BACKGROUND

Health care at ADC has been in utter disarray for years.  In October 2011, Plaintiffs' counsel sent ADC a detailed demand letter describing numerous systemic problems in ADC's health care system and its isolation units.  Defendant Ryan requested three months to investigate, but denied any systemic problems.  Plaintiffs filed the Complaint in March 2012.  In July 2012, just months after the Complaint was filed

1 regarding ADC's provision of health care, ADC hired the lowest bidder, Wexford Health

2 Sources, to take over health care delivery.

3     Two months after Wexford assumed control, Defendants wrote a scathing letter to

4 Wexford cataloging numerous dangerous practices and systemic deficiencies throughout

5 the prisons.  [Barr Decl., Ex. 2 (ADC027854-69)]  Wexford responded, charging that

6 ADC's health care system was in "extremely poor condition," with "long-standing issues,

7 embedded" in ADC's policies and philosophy.  [Barr Decl., Ex. 2 (ADC027941-43)]  In

8 November 2012, Wexford gave ADC a detailed presentation that outlined serious,

9 systemic deficiencies that ADC had long tolerated and that persisted in the system, and

10 concluded that ADC's health-care system was "broken" and the "current class action

11 lawsuits are accurate."  [Doc. 593, Ex. 2 at WEXFORD000003, WEXFORD000130]

12 Wexford ultimately walked away from the multi-year, multi-million dollar contract after

13 realizing it would take "a very long time" to bring ADC's system up to the contractual

14 levels, and that "Director Ryan … didn't really understand what the baseline was."  [Barr

15 Decl., Ex. 3 (Neil A. Fisher, M.D. deposition dated Oct. 8, 2013 ) at 46:14-47:4]

16     In March 2013, without re-opening the bidding process, Defendants turned their

17 healthcare system over to a different for-profit corporation, Corizon.  [Barr Decl., Ex. 4

18 (Arthur Gross deposition dated Sept. 9, 2013 ("Gross Dep.")) at 40:16-41:14]  Despite the

19 change in the entity providing health care, the overwhelming evidence shows that

20 deficiencies persist under Corizon.  Defendants' own employees and agents have written

21 extensive reports detailing ongoing system-wide shortcomings in health care that continue

22 to place the lives and health of prisoners at substantial risk of serious harm.  Internal audit

23 reports (called "MGARs") written by Defendants' own employees show a continuing

24 pattern of serious, ongoing, and systemic deficiencies in the provision of health care and

25 in the conditions of confinement.  And the health care records confirm that breathtaking

26 lapses in the standard of care are systemic and commonplace, causing extraordinary and

27 unnecessary suffering and death.

28

III.   **PROCEDURAL HISTORY**

A.   **Plaintiffs' Class Action Complaint**

On March 22, 2012, fourteen prisoners[1] incarcerated at various ADC facilities and the Arizona Center for Disability Law ("ACDL") filed a class action complaint against Charles Ryan, ADC Director, and Richard Pratt, ADC Interim Division Director of Health Services, in their official capacities.  [Doc. 1]  Plaintiffs alleged that Defendants, through ADC policies and practices, provide prisoners with grossly inadequate medical care, dental care, and mental health care and subject prisoners to unconstitutional conditions of confinement in ADC's isolation units.  Plaintiffs also alleged that Defendants are aware of and deliberately indifferent to the fact that ADC's systemic deficiencies place all prisoners at substantial risk of serious harm, in violation of the Eighth Amendment.  To remedy this violation, Plaintiffs requested declaratory and injunctive relief addressing at a minimum healthcare staffing, access, screening, emergency responses, medications, supplies, chronic care, environmental conditions, mental health treatment, quality assurance, and conditions in isolation.

B.   **Defendants' Motion to Dismiss**

On July 19, 2012, Defendants moved to dismiss on three grounds:  failure to state a claim, failure to exhaust administrative remedies, and mootness.  [Doc. 50]  Defendants also argued that the plaintiffs lacked standing on some issues.[2]  [*Id.* at 5-7]

The Court rejected Defendants' arguments.  [Doc. 175]  The Court found that Plaintiffs had standing for all claims and had "alleged a multitude of facts that support

---

[1]  The 14 prisoners were Robert Gamez, Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Victor Parsons, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells.  Mr. Parsons and Mr. Brislan were later dismissed as Class representatives after they were released from custody.  [Doc. 372 (dismissing Victor Parsons); Doc. 1065 (dismissing Dustin Brislan)]  Mr. Parsons was re-incarcerated for a violation of parole and currently is housed at the Lewis prison.

[2]  *See* Defendants' Contested Issues of Law ("DCIL") 1 (claiming that it is "contested" whether the named plaintiffs had standing to even bring the Complaint).  For the Court's convenience, Plaintiffs have prepared a chart that shows where the parties' Contested Issues of Law are addressed in this trial brief.  [Exhibit A attached hereto]

their claim[s]."  [*Id.* at 4-5]   As for exhaustion, the Court noted that Defendants had signed a Tolling Agreement with Plaintiffs that waived all exhaustion requirements for the claims, but "chose not to mention the Tolling Agreement in their motion despite its obvious relevance."  [*Id.* at 7-8]   After Plaintiffs presented the Tolling Agreement, Defendants claimed that the Agreement should not be enforced because Charles Ryan signed on behalf of ADC, not the State.  [Doc. 91 at 8]  The Court held that the Tolling Agreement waived the exhaustion defense, despite Defendants' "case of buyer's remorse."  [*Id.*]

The Court also held that the dispute was not mooted by privatization, because under the law "[Defendant] Ryan has a continuing duty to ensure that those to whom he delegated functions or duties performed those duties appropriately," and that delegation "does not absolve Ryan of his obligation to ensure the provision of medical care is constitutionally adequate."  [*Id.* at 10]  The Court concluded that ADC "is still ultimately liable for any constitutional deprivation that occurs."  [*Id.*]  Defendants also requested a "six-to-nine month stay," which would "allow Wexford to perform under the contract and demonstrate that Plaintiffs' claims are *no longer valid*."  [Doc. 50 at 14 (emphasis added)] Unbeknownst to the Court, weeks before it rejected the stay, Defendants had already sent Wexford the scathing letter described above, describing serious, systemwide issues.

### C.    Class Certification

#### 1.    District Court Decision

On November 13, 2012, Plaintiffs moved for class certification [Docs. 245, 248], supported by "voluminous evidence."  [Doc. 372 at 4]  In response, and without much evidentiary support,[3] Defendants contended that Plaintiffs failed to show commonality and typicality under Rule 23(a)[4] or to satisfy Rule 23(b)(2).[5]  [Doc. 321 at 21-30]  After

---

[3]  *Parsons v. Ryan*, 754 F.3d 657, 663-64 (9th Cir. 2014) (noting Defendants' lack of evidence in opposition to Plaintiffs' motion for class certification).

[4]  *See* DCIL 28 (claiming that it is "contested" whether Class members meet the commonality and typicality requirements).

[5]  *See* DCIL 30 (claiming that it is "contested" whether the relief sought complies with 23(b)(2)).

conducting a "rigorous analysis," the Court rejected Defendants' arguments and granted class certification.  [*Id.* at 3-21]

The Court defined the Class as "[a]ll prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the ADC." [*Id.* at 22]  The Court certified ten practices: (1) failure to provide timely access to health care; (2) failure to provide timely emergency treatment; (3) failure to provide necessary medication and medical devices; (4) insufficient health care staffing; (5) failure to provide care for chronic diseases and protection from infectious disease; (6) failure to provide timely access to medically necessary specialty care; (7) failure to provide timely access to basic dental treatment; (8) extracting teeth that could be saved by less intrusive means; (9) failure to provide mentally ill prisoners medically necessary mental health treatment (i.e., psychotropic medication, therapy, and inpatient treatment); and (10) failure to provide suicidal and self-harming prisoners basic mental health care.[6]  [*Id.*]

The Court also certified a Subclass consisting of "[a]ll prisoners who are now, or will in the future be, subjected by the ADC to isolation, defined as confinement in a cell for 22 hours or more each day or confinement in the following housing units: Eyman–SMU 1; Eyman–Browning Unit; Florence–Central Unit; Florence–Kasson Unit; or Perryville–Lumley Special Management Area."  [*Id.* at 22]  With respect to the Subclass, the Court certified seven practices: (1) inadequate psychiatric monitoring because of chronic understaffing; (2) use of chemical agents against prisoners on psychotropic medications; (3) lack of recreation; (4) extreme social isolation; (5) constant cell illumination; (6) limited property; and (7) insufficient nutrition.[7]  [*Id.* at 23]

The Court denied Defendants' motion for reconsideration on March 22, 2013 [Doc. 395], and Defendants filed an interlocutory appeal with the Ninth Circuit.

---

[6]  Named Plaintiffs Jensen, Swartz, Brislan, Rodriguez, Verduzco, Thomas, Smith, Gamez, Chisholm, Licci, Hefner, Polson, and Wells were appointed as Class representatives.  [*Id.* at 23]
[7]  Named Plaintiffs Gamez, Swartz, Brislan, Rodriguez, Verduzco, Smith, and Polson were appointed as Subclass representatives.  [*Id.*]

### 2. Ninth Circuit Opinion

On June 5, 2014, the Ninth Circuit unanimously affirmed Judge Wake's "careful, thorough, and rigorous opinion" certifying the Class and Subclass. *Parsons v. Ryan*, 754 F.3d 657, 672 (9th Cir. 2014). Defendants had argued on appeal that Plaintiffs failed to show commonality because "a systemic constitutional violation [of the sort alleged here] is a collection of individual constitutional violations," that hinge on "the particular facts and circumstances of each case." *Id.* at 675. The court rejected that argument, explaining that what all Class members had in common was "their alleged exposure . . . to a substantial risk of serious future harm." *Id.* at 678. Although the "presently existing risk may ultimately result in different future harm for different inmates . . . every inmate suffers exactly the same constitutional injury" by being exposed to ADC's policies and practices. *Id.*

The court also determined that Plaintiffs met the typicality requirement, because "given that *every* inmate in ADC custody is highly likely to require medical, mental health, and dental care, each of the named plaintiffs is similarly positioned to all other ADC inmates with respect to a substantial risk of serious harm resulting from exposure to the defendants' policies and practices governing health care."[8] *Id.* at 686

Finally, the court found that the declaratory and injunctive relief sought by Plaintiffs "unquestionably satisfied" the requirements of Rule 23(b)(2) because "every inmate in the proposed class is allegedly suffering the same (or at least a similar) injury and that injury can be alleviated for every class member by uniform changes in statewide ADC policy and practice."[9] *Id.* at 689. The court noted that any eventual injunction would have to track violations established by the evidence at trial and meet the requirements of the Prison Litigation Reform Act of 1995 ("PLRA").[10] *Id.* at 689 n.35.

---

[8] *See* DCIL 13-16 (whether policies and practices expose "every class member to a substantial risk of serious harm"); *see* DCIL 27 (whether Named Plaintiffs lack standing ).
[9] *See* DCIL 29 (whether the class should be decertified because there is no proof that certified practices are systemwide).
[10] *See* DCIL 31 (claiming that it is "contested" whether the relief sought currently complies with the PLRA); *see also* DCIL 34 (claims must be proven at trial).

1          D.    **Defendants' *Daubert* Motion**

2          On July 28, 2014, the Court denied Defendants' motion to exclude the testimony of

3    all seven of Plaintiffs' experts.  [Doc. 1040]  The Court noted that Defendants only

4    challenged the experts' methodologies, not their qualifications or the relevance of their

5    opinions.   Moreover, Defendants' motion "isolate[d] but one aspect of the experts'

6    foundation for their opinions, statistical and sampling validity, and le[ft] untouched those

7    that rely on other evidence, including [ADC's] written policies, reports, business records,

8    and officials' deposition testimony."  [*Id.* at 3]  The Court pointed out that Plaintiffs'

9    experts' methodologies are similar to those that "have been accepted in other cases

10   challenging prison conditions"[11] and that Defendants failed to identify "anything which

11   suggests that a different but nonetheless sensible methodology for selecting files to review

12   would have materially altered the evidence before this court."[12]   [*Id.* (citation and

13   quotation marks omitted)]  Although it denied Defendants' motion without prejudice to

14   renewal at trial with respect to the statistical challenges, the Court found that those

15   challenges "cannot in any event bear the weight of excluding Plaintiffs' experts' opinions

16   entirely."  [*Id.* at 4]

17         In its order, the Court denied Defendants' request to limit an expert's testimony to

18   the facilities he or she toured because of "Defendants' strenuous objections to the

19   burdensome nature of the multiple prison tours, the Court's reduction of that burden by

20

---

21         [11] *See* DCIL 12 (claiming "statistically significant evidence and gross statistical
disparities" are necessary, but failing to acknowledge that, in *Plata*, the Supreme Court
22   upheld the evidentiary foundation of the district court's findings of constitutional
violations in California prisons without requiring statistical studies, and relying on some
23   of the same experts present in this case (131 S. Ct. at 1932-35)).
           [12] When Plaintiffs noted in their response that Defendants' experts had used
24   similar (or inferior) methodologies, had reviewed less data, and had not done any kind of
statistical study, Defendants triumphantly replied that "Defendants' experts' methods are
25   not at issue," because Plaintiffs had not filed a *Daubert* motion to preclude Defendants'
experts.  [Doc. 1026 at 17]  Defendants have never suggested (and cannot plausibly
26   suggest) that their own experts have presented "statistically significant evidence," and
thus by their own logic, their experts' methodologies are deficient or such evidence is not
27   required. *See* DCIL 12.  Moreover, Defendants have never suggested how Plaintiffs could
possibly have obtained a statistically significant sample given the restrictions that
28   Defendants urged, and the Court applied, to discovery and expert tours.

limiting the number of tours, and the experts' reliance on other evidence."  [*Id.* at 5-6]
The Court also permitted both of Plaintiffs' medical experts, Dr. Cohen and Dr. Wilcox,
to testify provided they opined on "differing issues." [*Id.* at 6]

**E.    Defendants' Motion for Summary Judgment**

On May 16, 2014, Defendants filed a motion for summary judgment on every
claim, and attached a 475-page statement of facts (containing 4,327 facts, most of which
were about the minutiae of the Named Plaintiffs' care) and approximately 40,000 pages of
exhibits.  [Doc. 895]  A month later, the Court ruled that this filing "greatly exceed[ed]
Local Rule 56.1(a)," and stated that it "considered striking Defendants' statement of facts
and exhibits for non-compliance with this rule," but ultimately elected to instruct
Plaintiffs to file "a targeted and focused response," because "[r]esponding to and
defeating [Defendants'] motion only requires presentation of a disputed material fact on
each claim." [Doc. 962]  The Court stressed that creating the response "will not require
controverting (***or even reading***) every fact asserted in Defendants' motion and statement
of facts." [*Id.* (emphasis added)]

On July 11, 2014, Plaintiffs filed their "targeted and focused response" and
disputed at least one material fact on each of the claims, in accordance with the Court's
order.  [Docs. 1018, 1020]  Plaintiffs did not concede any of the facts presented by
Defendants (contrary to Defendants' oft-repeated contention), but simply complied with
the Court's order.  On August 7, 2014, the Court denied Defendants' motion for summary
judgment in its entirety and declined to decertify the Class.  [Doc. 1065]

Once again, the Court rejected Defendants' argument that the Named Plaintiffs
lacked standing,[13] holding that "the 'injury in fact' is the exposure to the risk of harm left
unabated by Defendants' deliberate indifference." [*Id.* at 5]  The Court also rejected
"Defendants' focus on establishing only that the Named Plaintiffs received

---

[13]   *See* DCIL 1, 2 (claiming that it is "contested" whether the named plaintiffs had
standing now as well as the time they filed the complaint); DCIL 27 (whether the Class
should be decertified on the basis of the Named Plaintiffs' standing).

constitutionally adequate medical care," finding that information "relevant but not conclusive."[14]  [*Id.* at 6]  The Court found that in focusing on the individual experiences of the Named Plaintiffs, Defendants "continue[] to misconstrue the foundation upon which this case was certified and the governing legal standard controlling it."  [*Id.* at 4-5]  This action "never relied solely upon the experiences of the Named Plaintiffs."[15]  [*Id.* at 5]  In fact, "the Named Plaintiffs would no more be able to win their case by establishing that they had experienced deliberate indifference than Defendants can win by establishing they did not."[16]  [*Id.*]

The Court rejected Defendants' attempt to once again rely on their written policies as proof of constitutional care, because "Plaintiffs' claim is that despite ADC's policies, its practices are constitutionally deficient."[17]  [*Id.* at 8]

The Court also noted that it had already "rejected the notion" that ADC's conditions of confinement should be evaluated individually, rather than collectively.[18]  [*Id.* at 10]   Equally unavailing were Defendants' arguments regarding the *Monell* doctrine,[19] the "reasonable relationship" test from *Turner*,[20] the statute of limitations,[21]

---

[14]  *See* DCIL 3-6 (whether Named Plaintiffs received constitutionally adequate healthcare or were exposed to constitutionally acceptable conditions of confinement).

[15]  The Court found that Brislan was no longer an adequate representative, as he was not in prison, and dismissed him, but the Court allowed Verduzco, Gamez, Thomas, and Wells to remain as Class representatives, despite Defendants' argument that they were not adequate Class representatives.  [Doc. 895 at 1-2]  Nevertheless, Defendants claim in DCIL 32 that it is still a "contested issue" whether those four named plaintiffs are adequate representatives.

[16]  *See* DCIL 11 (whether Defendants are or were deliberately indifferent to Named Plaintiffs).

[17]  *See* DCIL 7, 8, 22 (framing issues as whether they represent "ADC policy"). DCIL 7 and 8 are not even partly "issues of law," as they simply deal with whether the certified practices "actually exist," which is a pure question of fact.  Plaintiffs contend, of course, that the policies and practices do exist.

[18]  *See* DCIL 18-19 (claiming that it is "contested" whether conditions of confinement should be evaluated individually or collectively).

[19]  DCIL 23 (claiming that it is "contested" whether *Monell* applies, despite the fact that *Monell* applies to suits against municipal entities, not state officials (*Los Angeles Cnty., Cal. v. Humphries*, 131 S. Ct. 447, 449 (2010))).

[20]  DCIL 24-25 (claiming that it is "contested" whether *Turner* applies, despite the fact that *Turner* is "not used . . . to evaluate Eighth Amendment claims of cruel and unusual punishment in prison, . . . because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment" (*Johnson v. California*, 543 U.S. 499, 511 (2005))).  Apparently recognizing this, Defendants now introduce DCIL 26,

1   whether deficiencies were "systemwide" and present at "all 10 facilities",[22] and their

2   attempt to subdivide Plaintiffs' claims.[23]  [*See* Doc. 895 at 2-5, 8, 27-33, 45]

3         **F.**    **Other Critical Rulings**

4         While this case has been pending, the Court has made several other critical rulings.

5   Many of those rulings addressed discovery, including capping the number and extent of

6   expert tours, depositions, and electronic and other discovery.   For the Court's

7   convenience, Plaintiffs have prepared a summary of the key rulings.   [*See* Exhibit B

8   attached hereto (Summary of Rulings)]  One ruling, which has been completely ignored

9   by Defendants, precluded certain testimony from fourteen of Defendants' non-report-

10  writing experts, who were improperly and inadequately disclosed after the discovery

11  deadline in contravention of the Court's scheduling orders.   [Doc. 815]   Despite the

12  Court's ruling, Defendants have continued to list the precluded testimony in their

13  disclosure statements and witness statements, and have refused to remove that testimony

14  even upon request.  [*See* Exhibit C attached hereto (Summary of Order); Barr Decl., Ex. 5

15  (9/17/14 email from D. Struck)]

16

17

18

19

---

20  claiming that there should be general judicial deference on prison operations "independent
    of *Turner*."  Plaintiffs contend that, as *Johnson* holds, "judicial deference" does not extend

21  to Eighth Amendment claims.  543 U.S. at 511; *see Spain v. Procunier*, 600 F.2d 189,
    193-194 (9th Cir. 1979) (Kennedy, J.) ("Mechanical deference to the findings of state

22  prison officials in the context of the eighth amendment would reduce that provision to a
    nullity in precisely the context where it is most necessary.").

23     [21] DCIL 33 (claiming that it is "contested" whether "any claims arising prior to
    March 22, 2010 are untimely").  Allegations of conduct occurring prior to the limitations

24  period are actionable if they are part of a "continuing violation" of a plaintiff's rights.
    *Sosa v. Hiraoka*, 920 F.2d 1451, 1455 (9th Cir. 1990).  When a civil rights plaintiff "seeks

25  injunctive relief against an ongoing violation, he or she is not barred from seeking
    relief . . . by the statute of limitations."  *Pickern v. Holiday Quality Foods Inc.*, 293 F.3d

26  1133 (9th Cir. 2002).  Here, Defendants' practices of exposing prisoners to a substantial
    risk of serious harm are ongoing and therefore are not barred by the statute of limitations.

27     [22] *See* DCIL 7, 8 (whether deficiencies are at "all 10 facilities"); DCIL 9, 29
    (whether deficiencies are "systemwide").

28     [23] *See* DCIL 34 (whether Plaintiffs have "abandoned" particular claims).

1   **IV.   GOVERNING LAW**

2         **A.      The Eighth Amendment Bars Inhumane Prison Conditions**

3         The Constitution does not permit inhumane prison conditions.  *Farmer v. Brennan*,

4   511 U.S. 825, 833 (1994).  Under the Eighth Amendment, prison officials are obligated to

5   ensure "that inmates receive adequate food, clothing, shelter, and medical care, and must

6   'take reasonable measures to guarantee the safety of the inmates."  *Id.* at 832.  The right to

7   adequate treatment includes the right to medical, dental and mental health care.  *Estelle v.*

8   *Gamble*, 429 U.S. 97, 103-104 (1976) (medical); *Doty v. Cnty. of Lassen*, 37 F.3d 540,

9   546 (9th Cir. 1994) (mental health); *Hunt v. Dental Dep't.*, 865 F.2d 198, 201 (9th Cir.

10  1989) (dental).

11        **B.      Deliberate Indifference to Substantial Risk of Serious Harm Violates**

12                 **the Eighth Amendment**

13        Prison conditions violate the Eighth Amendment when prison officials, acting with

14  deliberate indifference, expose prisoners to a substantial risk of serious harm.  *Farmer*,

15  511 U.S. at 828.  To establish a violation, a plaintiff  "need not show that a prison official

16  acted or failed to act believing that harm actually would befall an inmate; it is enough that

17  the official acted or failed to act despite his knowledge of a substantial risk of serious

18  harm."  *Id.* at 842.  Prison officials cannot escape liability merely by claiming that they

19  have carefully considered an issue; "[they] are also required to afford sufficient weight to

20  the constitutional rights of individuals.  The failure to treat constitutional provisions with

21  appropriate respect constitutes deliberate indifference to the rights [at stake]."  *Coleman v.*

22  *Wilson*, 912 F. Supp. 1282, 1319 (E.D. Cal. 1995) (quoting *Jordan v. Gardner*, 986 F.2d

23  1521, 1529 (9th Cir. 1993) (en banc)).

24        Deliberate indifference to a substantial risk of serious illness or injury violates the

25  Eighth Amendment and entitles a plaintiff to injunctive relief even if the prisoner is not

26  actually harmed as a result of the risk.  *See, e.g.*, *Helling v. McKinney*, 509 U.S. 25, 33

27  (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe,

28

1  life-threatening condition in their prison on the ground that nothing yet had happened to

2  them.").  The Supreme Court has explained that:

3  　　　　Because plaintiffs do not base their case on deficiencies
in care provided on any one occasion, this Court has no

4  occasion to consider whether these instances of delay—or any
other particular deficiency in medical care complained of by

5  the plaintiffs—would violate the Constitution under *Estelle v.
Gamble*, 429 U.S. 97, 104-105 (1976), if considered in

6  isolation. Plaintiffs rely on systemwide deficiencies in the
provision of medical and mental health care that, taken as a

7  whole, subject sick and mentally ill prisoners in California to
"substantial risk of serious harm" and cause the delivery of

8  care in the prisons to fall below the evolving standards of
decency that mark the progress of a maturing society.

9  *Farmer*, 511 U.S. 825, 834 (1994).

10  *Plata*, 131 S. Ct. at 1925 n.3.   Plaintiffs' Eighth Amendment claims of systemic

11  deficiencies are "of the same basic kind as the claims in *Helling*, *Farmer*, [and] *Plata*."

12  *Parsons*, 754 F.3d at 678.

13  **V.   EVIDENCE AT TRIAL**

14  　　　**A.   Plaintiffs Will Show that Defendants are Deliberately Indifferent in

15  　　　　　Their Provision of Medical, Mental Health, and Dental care.[24]**

16  　　　　The evidence at trial will demonstrate that ADC's statewide health care policies

17  and practices have caused unnecessary suffering and death, and put all its prisoners at

18  substantial risk of serious harm.  It will further show that Defendants have long known

19  about the risk—and about the devastating human toll that their policies have taken—and

20  yet have persisted in implementing and using the challenged practices and policies.

21  Among other deficiencies, ADC does not hire sufficient qualified staff; fails to provide

22  proper medication, appropriate chronic or specialty care, or adequate emergency

23  treatment; and does not abide by the treatment recommendations of specialists.[25]

24

---

25  　　　[24] *See* DCIL 22 (whether Defendants are deliberately indifferent); Plaintiffs'
Contested Issues of Law ("PCIL") 1 (whether Defendants are deliberately indifferent to

26  the substantial risk of serious harm faced by the Class).  Significantly, this Court denied
discovery of many of Defendants' emails in part because it was "inconceivable that the

27  managers of the State Department of Corrections do not have knowledge of the gross
levels of care."  [Doc. 446 (4/26/13 Tr.) at 20:1-4]

28  　　　[25] The Ninth Circuit has instructed that:

1.   **Deficiencies Common to All Health Care Claims Create a Substantial Risk of Serious Harm**

a.   **Staffing**

Prison facilities must have adequate staffing levels to deliver health care services to prisoners.   *See Madrid v. Gomez*, 889 F. Supp. 1146, 1257 (N.D. Cal. 1995). Furthermore, prison systems must have care provided by qualified personnel.   *See Toussaint v. McCarthy*, 801 F.2d 1080, 1112 (9th Cir. 1986).

The evidence at trial will show that ADC has a longstanding health care staffing crisis, which causes a substantial risk of serious harm.   ADC's Assistant Director of the Health Monitoring Bureau admits that "there are shortages of providers that need to be addressed"   [Barr Decl., Ex. 4 (Gross Dep.) at 97:22-23], and that as of June 2013, "the staffing patterns were insufficient.   They were at 53 percent of staffing positions."   [Barr Decl., Ex. 4 (Gross Dep.) at 115:7-9]   ADC's own monitoring reports reveal a system riddled with health care staff vacancies.   The staffing shortages endanger patients:   they lead to excessive delays in access to care, health care staff acting outside the scope of their licenses, failure to carry out providers' orders, and failure to review and file test results.

These dangerous conditions lead to suffering and, in some cases, death.   For example, a patient repeatedly complained of severe throat pain for months before he was adequately assessed, seven months after his initial complaint.   Even after he was properly diagnosed as having throat cancer, he received no cancer treatment for over three more months.   [Doc. 1104, Ex. 1 (11/8/13 Cohen Report) at 6-8]   Other patients died soon after

---

Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff.   Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems.   The medical staff must be competent to examine prisoners and diagnose illnesses.   It must be able to treat medical problems or to refer prisoners to others who can. . . .   These requirements apply to physical, dental, and mental health.

*Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (internal citations omitted), *abrogated on other grounds*, *Sandin v. Conner*, 515 U.S. 472 (1995).

1    being evaluated by inadequately trained nurses who failed to recognize and respond to

2    obvious life threatening emergencies.  [Barr Decl., Ex. 1 (9/8/14 Cohen Report) at 63-64]

3           Defendants claim that Plaintiffs must not only show deficient levels of staffing, but

4    also "constitutionally deficient wait times and/or constitutionally inadequate care."[26]  As a

5    legal matter, this is incorrect—a showing of grossly deficient staffing is enough.

6    Deliberate indifference is inferred when systemic and longstanding deficiencies in staffing

7    are discovered because those deficiencies create such a high risk of future injury.  *See*

8    *Ginest v. Bd. of Cnty. Comm'rs. of Carbon Cnty.*, 333 F. Supp. 2d 1190, 1198-99 (D.

9    Wyo. 2004); *see also Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980) ("systemic and

10   gross deficiencies in staffing" can show that the prisoner population is "effectively denied

11   access to medical care").  Regardless, the evidence will show that Defendants' grossly

12   deficient staffing has caused constitutionally deficient wait times and inadequate care.

### b.    Medication Delivery

14          Prison officials may not deprive prisoners of necessary medications and medical

15   devices.  *Prewitt v. Roos,* 160 Fed. Appx. 609, 611 (9th Cir. 2005) (failure to provide

16   medications and medical devices ordered by physicians violates Eighth Amendment).

17          The evidence will show that Defendants have a "profoundly dysfunctional" system

18   for prescribing and delivering necessary medications and medical devices, causing death

19   and harm to many and the substantial risk of serious harm to all.  [Barr Decl., Ex. 1

20   (9/8/14 Cohen Report) at 35-41; *see also* Doc. 1104, Ex. 4 (11/8/13 Wilcox Report) at 69-

21   72; Barr Decl., Ex. 6 (Second Supplemental Report of Todd Randall Wilcox, M.D.

22   "9/8/14 Wilcox Report")) at 40-44 (medication delivery is "disastrously inadequate")]

23   Some medical staff fail to prescribe critical medications.  For example, one prisoner died

24   after suffering for almost two months with severe pain from bone cancer.  He never

25   received appropriate pain medicine; instead, Defendants gave him ibuprofen, a stool

26   softener, and a muscle relaxant.  [Barr Decl., Ex. 1 (9/8/14 Cohen Report) at 9-12]

27

28          [26] DCIL 17.

1    Another prisoner died from sepsis secondary to delayed treatment of pneumonia.  Instead

2    of recognizing and treating his obvious sepsis (abnormal vital signs, shortness of breath,

3    chills, muscle aches and nausea), prison medical staff sent him back to his cell with

4    instructions to drink more fluid and purchase ibuprofen.  And even when his condition

5    was appropriately diagnosed several days later, the prison gave him the wrong antibiotic.

6    [*Id.* at 28-29]

7         Moreover, some prisoners with serious illnesses do not receive essential

8    medications, including patients with HIV, hypothyroid disease, and heart disease.  [Barr

9    Decl., Ex. 6 (9/8/14 Wilcox Report) at 40-43]   Prisoners also do not receive the

10   psychotropic medications that have been prescribed to control their mental illnesses.[27]

11   [Doc. 1104, Ex. 7 (11/8/13 Stewart Report) at 21-29]   Indeed, Defendants' own

12   monitoring reports document extensive medication delivery problems throughout the

13   system.

14                    **c.    Medical Records**

15        An adequate health records system is essential to providing adequate health care.

16   "The harm that flows to [prisoner] class members from inadequate or absent medical

17   records is manifest."   *Coleman,* 912 F. Supp. at 1314. Medical records that are

18   "inadequate, inaccurate and unprofessionally maintained" create "a grave risk of

19   unnecessary pain and suffering" in violation of the Eighth Amendment. *Cody v. Hillard,*

20   599 F. Supp. 1025, 1057 (D.S.D. 1984).

21        The evidence will show that medical records at ADC are poorly organized and

22   badly maintained.  Individual patient charts often lack documents that would be critically

23   important to a provider in delivering care.  [Doc. 1104, Ex. 1 (11/8/2013 Cohen Report) at

24   46; Doc. 1104, Ex. 7 (11/8/2013 Stewart Report) at 18-20]  Some records are so deficient

25   that there was "no way to track the care logically through the chart."  [Doc. 1104, Ex. 4

26

27   _____

28        [27] *See Gates v. Cook*, 376 F.3d 323, 342-43 (5th Cir. 2004) (injunction required monitoring and assessing levels of psychotropic medications).

(11/8/2013 Wilcox Report) at 45]   ADC's own monitoring reports corroborate that the records are often outdated, inaccurate, inconsistent, and disordered.

## 2. ADC's Medical Care Creates a Substantial Risk of Serious Harm[28]

### a. Excessive delays in access and outright denial of care

The Eighth Amendment requires that prisons "provide a system of ready access to adequate medical care." *Hoptowit*, 682 F.2d at 1253.   Prisoners should not experience unreasonable delays in receiving treatment. *Estelle*, 429 U.S. at 104.

The data, documents, and testimony presented at trial will prove that Defendants' system is rife with delays and denials of care.   Such delays can be and often are catastrophic: prisoners have died and become seriously ill as a result of delayed care.   One prisoner with a history of tongue cancer died because the cancer returned, but prison medical staff ignored his requests for help for months, failing to provide timely tests or treatment.   He was forced to wait a full eight months to see an oncologist, at which point he only had three weeks to live.   [Barr Decl., Ex. 1 (9/8/14 Cohen Report) at 4-5]   Another prisoner waited five months before prison staff biopsied the large and painful tumor in her breast.   [Doc. 1104, Ex. 4 (11/8/2013 Wilcox Report) at 24-25]   One prisoner died from metastatic cancer after having complained of painful, swollen testicles, inability to walk, and other serious symptoms for nearly a year; it took 11 months for Defendants to provide him with a CT scan, which showed extensive metastatic disease in his pelvis, lumbar spine, adrenal glands, and enlarged lymph nodes.   He died one month later.   [Barr Decl., Ex. 1 (9/8/14 Cohen Report) at 6-8]

### b. Failure to provide timely emergency treatment

Prisoners have a right to emergency medical treatment. *Casey v. Lewis*, 834 F. Supp. 1477, 1544 (D. Ariz. 1993) ("[T]he prison must provide an adequate system for responding to emergencies." (quoting *Hoptowit*, 682 F.2d at 1253)).   Prison medical staff must be trained to cope with emergencies. *Madrid*, 889 F. Supp. at 1257.

---

[28]  *See* DCIL 13 (whether ADC's medical care creates a risk of harm).

Yet the evidence to be presented at trial will show that Defendants systematically fail to provide timely emergency medical treatment, often with dire results.  Time and time again medical staff do not recognize emergent situations and fail to initiate emergency procedures—including such basic practices as immediately calling an ambulance when a prisoner is found "covered in blood and feces" with "three lacerations from his neck and one laceration to his inner write forearm above the wrist" and "incomprehensible speech."  [Doc. 1104, Ex. 4 (11/8/13 Wilcox Report) at 37]  When a prisoner was found hanging by the neck, there was a delay of fifteen minutes in removing the ligature from his neck.  The prisoner died.  [Doc. 1104, Ex. 8 (12/9/2013 Stewart Report) at 7]

Avoidable injury and death is the inevitable result.  One prisoner who had been begging for care on at least a dozen health needs request forms (HNRs) came to the medical clinic extraordinarily emaciated with shortness of breath and severe pain.  The nurse who saw him sent him back to his housing unit.  It was not until the next day that he was sent to the emergency room, where he was intubated for respiratory failure.  He died a month later from previously undetected metastatic cancer.  [Barr Decl., Ex. 1 (9/8/14 Cohen Report) at 8-9]  Another prisoner was diagnosed with a life threatening condition the day after he was admitted to an ADC prison: his blood tests revealed "panic values" for acute lymphocytic leukemia, a potentially life threatening but treatable illness.  Notwithstanding the blood test results, no emergency response was activated—even when the prisoner presented to medical staff with blood clots, bleeding, visual disturbances and abdominal pain.  He died within a month, having received essentially no medical care from the ADC.  [*Id.* at 12-14]

### c.     Failure to provide Chronic Care and Infectious Disease Prevention

Courts require prisons to provide ongoing treatment and disease management to prisoners with chronic conditions, for example, high blood pressure, asthma, epilepsy, end-stage renal disease, or diabetes.  *See, e.g.*, *Plata v. Schwarzenegger*, No. COI-1351

1   TEH, 2005 WL 2932253, *6 (N.D. Cal. Oct. 3, 2005) (renal failure and high blood

2   pressure).  Prison officials must protect prisoners from the risk of infectious diseases, such

3   as Hepatitis C, treatment-resistant staph infections (MRSA), and tuberculosis.  *Helling*,

4   509 U.S. at 33.

5       The evidence will show that ADC fails to provide medically necessary chronic care

6   to address ongoing medical needs or diseases.  ADC's failure to properly treat prisoners'

7   chronic illnesses exacerbates the prisoners' conditions, and leads to catastrophic and

8   permanent injury.  For example, one 50-year old prisoner was known to have chronic

9   heart disease, but when he reported experiencing chest pain to prison medical staff, the

10  clinician concluded (without necessary tests or a cardiology consultation) that the chest

11  pain was unrelated to his heart condition and sent him back to his cell.  Two months later,

12  he died of heart disease.  [Barr Decl., Ex. 1 (9/8/14 Cohen Report) at 45]  Poorly managed

13  diabetic patients are at severe risk of renal failure because ADC fails to adequately track

14  and monitor their conditions.  [Barr Decl., Ex. 6 (9/8/14 Wilcox Report) at 23]  ADC's

15  own internal monitoring reports also detail extensive system-wide failures to comply with

16  basic chronic disease treatment and monitoring protocols.

17      ADC fails to maintain a basic level of sanitation and standard nursing practices in

18  its prisons to prevent the spread of infectious diseases.  Many sections of ADC's prisons

19  are filthy and expose prisoners to serious, and sometimes fatal, communicable diseases.

20  *See Plata*, 2005 WL 2932253, at *14 (medical clinics must "meet basic sanitation

21  standards").

22          **d.**      **Failure to provide timely access to necessary specialty care**

23      If prison medical staff cannot treat certain medical conditions, they must "refer

24  prisoners to others who can" and such referrals must be "reasonably speedy."  *Casey*, 834

25  F. Supp. at 1544, 1546 (quoting *Hoptowit*, 682 F.2d at 1253).  The evidence will show

26  that Defendants have long failed to refer prisoners for specialty care or outside treatment,

27  or have done so only after extensive and unreasonable delays, often resulting in

28  unnecessary pain and suffering, permanent injuries or death.  The numerous cancer

1   patients who have waited months or years before seeing an oncologist provide a tragic

2   illustration of this ongoing problem, as do the HIV-positive and AIDS patients who were

3   denied access to infectious disease specialists and are dying from ADC's mismanaged

4   care. [*See, e.g.,* Barr Decl., Ex. 6 (9/8/14 Wilcox Report) at 3-8, 14, 31-34]

5   **3.    ADC's Dental Care Creates a Substantial Risk of Serious Harm[29]**

6   ADC's dental system creates a substantial risk of serious harm through its failure to

7   implement, monitor, or enforce effective dental policies and practices.   The system

8   fundamentally fails to properly identify and treat both urgent and routine dental issues of

9   prisoners.   As a result, prisoners experience extended and unnecessary periods of pain,

10  endure chewing difficulties, and risk losing teeth that could be saved.   Delay that causes

11  "pain" or "result[s] in permanent damage" is unconstitutional, and "repeated[]" failures to

12  provide dental care go beyond merely "isolated occurrence[s] of neglect."   *Hunt*, 865 F.2d

13  at 200-01.

14  The evidence will show that dental care at ADC is provided on a routine or urgent

15  basis.   Urgent care is supposed to be treated within 72 hours, but only a few defined

16  conditions qualify as "urgent," while everything else must wait—even conditions likely to

17  result in pain and further decay, such as broken teeth or lost restorations.   Unqualified

18  dental assistants decide whether prisoners' complaints qualify as urgent care, and triage

19  errors are rampant.   [Barr Decl., Ex. 7 (Second Supplemental Report of Jay D. Shulman,

20  DMD, MA, MSPH ("8/29/14 Shulman Report")) at 3-4]   Other patients are told that they

21  may have teeth pulled immediately if in pain, but must otherwise wait for any other type

22  of care.   As a result, many prisoners complaining of pain wait months for "routine care" in

23  an attempt to save their teeth.

24  Between 2010-2013, Plaintiffs' expert found that 30% of patients waited over four

25  months, and 10% waited more than ***seven months*** each time they needed routine care,

26  with wait times as long as 9-12 months at some facilities.   [Barr Decl., Ex. 7 (8/29/14

27

28  [29]  *See* DCIL 14 (whether ADC's dental care creates a risk of harm).

1     Shulman Report) at 4]   While some improvements have been made under Smallwood

2     Prison Dental Services ("SPDS"), Corizon's dental subcontractor, the scale of the

3     improvements is unclear, as SPDS uses a misleading and inaccurate method to calculate

4     routine wait times.   Although SPDS agrees that HNRs reporting pain are urgent care,

5     actual wait times for such HNRs continue to average nearly a week, which is over twice

6     as long as ADC acknowledges patients with pain should be waiting, and 10% of patients

7     in pain wait nearly a ***month*** on average.  [*Id.* at 3]

8          Compounding matters, ADC dental practices, while often decreasing ***reported*** wait

9     times, ultimately ***lengthen*** the amount of time that patients must wait before having issues

10    resolved.  Dental assistants, who are unqualified to provide clinical assessments, evaluate

11    and triage prisoners.  Prisoners who have urgent issues while waiting for routine care are

12    removed from the routine care waiting list and must restart the clock—by filing another

13    HNR and waiting again for treatment.  Prisoners with several restorable teeth needing

14    treatment face a Sisyphean task obtaining treatment before losing one or more teeth to

15    decay.  These practices are all symptoms of a system striving to reduce the number of

16    dental providers required to meet contractually-required wait time metrics.  Dental clinics

17    also fail to provide appropriate levels of periodontal care to address the population's needs

18    and prevent further tooth decay and loss—another symptom of understaffing.

19         The combined result of many of these policies and procedures is that prisoners lose

20    teeth that could have been restored.  Improper triage, cancellation of routine requests

21    when urgent issues are addressed, and understaffing all lengthen the amount of time

22    before prisoners can have ongoing decay addressed.  And ADC neither knows nor tracks

23    which prisoners are most likely to lose teeth that are not promptly treated, and thus cannot

24    assess or manage the effects of delays.  As a result, all prisoners face a substantial risk of

25    losing teeth that could have been saved.

26         SPDS claims numerous improvements in its dental services, and its employees

27    have been blunt about the weaknesses of the previous system, which was manual,

28    disorganized, and sloppy, placing prisoners at significant risk of harm.  But SPDS has not

1    changed clinical policies, and ADC dental clinics continue to operate under the same

2    flawed policies and procedures they have since 2010.  Moreover, now that ADC no longer

3    directly provides dental care, it has abdicated responsibility for it entirely.  Only one part-

4    time ADC employee has any responsibility for dental care, she rarely monitors clinical

5    care, and her suggestions fall on deaf ears.[30]

6         Defendants contest these allegations with reference to external standards by

7    insisting that they comply the NCCHC Oral Care Standard.  However, the NCCHC's

8    standards specify general standards (including timely care and systems of priorities for

9    care) that are both vague and not specifically auditable.  Nor does NCCHC audit care at

10   facilities, or require that facilities monitor themselves.  Thus, relying on NCCHC

11   standards or accreditation, as ADC does, fails to demonstrate that an institution meets the

12   appropriate standard of care.

13        A constitutional dental system bases treatment decisions on the clinical evaluation

14   of dentists, promptly sees patients in pain, establishes priorities for care that ensure that

15   patients receive timely care adequate to avoid the unnecessary loss of teeth, and engages

16   in ongoing monitoring to ensure policies and practices are followed.  ADC's system relies

17   heavily on unqualified dental assistants to gate access to dentist care, denies treatment to

18   patients in pain for days, weeks, or months, and engages in policies that create a

19   substantial risk that patients will lose teeth they otherwise would not.  Moreover, ADC has

20   turned a blind eye to the system's damaging policies and refused to engage in any

21   effective monitoring of dental care.

22

23

24

25

---

26   [30] *Compare* AGA_Review_00094913 (ADC's dental monitor says for triage,
     "dental assistants are not qualified and can cause more harm than good") [Barr Decl., Ex.

27   2] *with* Barr Decl., Ex. 8 (William Smallwood, D.D.S. deposition, dated Apr. 7, 2014) at
     143:21-25 (SPDS' CEO states that he does not think there are ***any*** instances in which

28   dental assistant triage does more harm than good) (emphasis added).

4.      **ADC's Mental Health Care Creates a Substantial Risk of Serious Harm**[31]

Prison officials violate the Eighth Amendment if their "mental health care delivery system" lacks  the following "six basic, essentially common sense, components:"

> (1) a systematic program for screening and evaluating inmates to identify those in need of mental health care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide.

*Coleman*, 912 F. Supp. at 1298 & n.10.   Exposure of prisoners who are taking psychotropic medications to temperatures exceeding 85 degrees Fahrenheit creates a substantial risk of serious injury or death, in violation of the Eighth Amendment.  *See Graves v. Arpaio*, No. CV-77-0479-PHX-NVW, 2008 WL 4699770, at *19 (D. Ariz. Oct. 22, 2008), *aff'd* 623 F.3d 1043 (9th Cir. 2010).

A multitude of sources, including ADC's own monitoring reports and the testimony of ADC employees, demonstrate that mental health services are entirely inadequate and create a grave risk of harm to prisoners with mental health needs.  ADC's own Mental Health Monitor has testified that mental health services do not meet constitutional requirements.  [Doc. 1104, Ex. 7 (11/8/2013 Stewart Report) at 11]

The evidence will show that ADC suffers from serious and chronic shortages of qualified staff—both mental health staff such as psychiatrists, and other health care staff essential to the delivery of mental health services, such as nursing and medical records staff.  These shortages have been repeatedly noted by ADC staff over a period of years, to no apparent effect.  As a result, mentally ill prisoners often go for months or years without seeing a psychologist.  Patient records are in disarray, and mental health treatment plans

---

[31]  *See* DCIL 15-16 (whether ADC's mental health care creates a risk of harm).

1   are outdated, inadequate, or missing altogether.   A dysfunctional medication system

2   results in prisoners failing to receive essential psychotropic medications, worsening their

3   mental illness.  Prisoners who do receive their medications are not monitored by qualified

4   mental health staff to ensure that they are not suffering serious and sometimes permanent

5   side effects.  And prisoners taking psychotropic medications that render them vulnerable

6   to heat injury or death are exposed to indoor temperatures sometimes exceeding 100

7   degrees Fahrenheit.

8          ADC does not have an effective mechanism for prisoners to make their mental

9   health needs known and to receive timely and appropriate treatment from qualified staff.

10  ADC's system relies almost entirely on medication (which it fails to provide reliably or

11  appropriately) and does not provide an adequate level of non-medication mental health

12  programming.  Nor does it provide inpatient mental health treatment to those who need it.

13  Custody staff routinely use chemical agents such as pepper spray on mentally ill prisoners

14  for trivial reasons, such as a prisoner's failure to show her hands or come to the cell front

15  when directed.  This reckless practice inflicts gratuitous suffering and risks aggravating

16  the prisoner's mental illness.  *See Thomas v. Bryant*, 614 F.3d 1288, 1310-11 (11th Cir.

17  2010) (use of chemical agents on prisoner with mental illness "constituted an extreme

18  deprivation sufficient to satisfy the objective prong" of the Eighth Amendment).[32]

19         ADC has a suicide rate substantially higher than other state prison systems.  Many

20  of these suicides are entirely preventable, and in a number of them, staff falsified records

21  to cover up staff wrongdoing.  [Barr Decl., Ex. 9 (Third Supplemental Expert Report of

22  Pablo Stewart, M.D. (8/29/14 Stewart Report")) at 21]   Despite the overwhelming

23  medical, mental health, and legal authority condemning the practice, ADC holds seriously

24  mentally ill prisoners in its isolation units, where prisoners are locked in their cells for all

25

26  _____

27  [32] *See also Coleman v. Brown*, No. CIV.S-90-520 LKK/DA(PC), 2014 WL
    1400964, at *7 (E.D. Cal. Apr. 10, 2014) (describing use of force, including pepper spray,
    on mentally ill prisoners as "horrific" and finding a continuing Eighth Amendment
28  violation).

but a few hours a week.[33]  The large majority of ADC's suicides occur in these units, where conditions of extreme social isolation and environmental deprivation aggravate existing mental illness, and create mental illness in the previously healthy.

## B.  Defendants are deliberately indifferent to the unconstitutional conditions of confinement in ADC's isolation units[34]

Plaintiffs are subject to extreme social isolation and lack of environmental stimulation in ADC's isolation units in violation of their Eighth Amendment rights.  *See Ruiz v. Johnson*, 37 F. Supp. 2d 855, 914-15 (S.D. Tex. 1999), *rev'd on other grounds*, 243 F.3d 941 (5th Cir. 2001), *adhered to on remand*, 154 F. Supp. 2d 975 (S.D. Tex. 2001) (finding prison officials "deliberately indifferent to a systemic pattern of extreme social isolation and reduced environmental stimulation" in segregation units).

The certified practices of extreme social isolation, inadequate psychiatric monitoring, use of chemical agents against prisoners on psychotropic medications, lack of recreation, constant cell illumination, limited property, and insufficient nutrition—alone and in combination—deprive prisoners of their basic human need for social interaction and environmental stimulation.  As the Supreme Court observed, "[s]ome conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need."[35]  *Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (internal quotation marks and emphasis omitted); *see also Scarver v. Litscher*, 371 F. Supp. 2d 986, 1001 (W.D. Wis. 2005) (conditions including 24-hour illumination, near-constant cell confinement, and infrequent human interaction "could have a mutually

---

[33]  There is a clear judicial consensus that the isolated confinement of prisoners with serious mental illness violates the Eighth Amendment.  *See, e.g., Casey*, 834 F. Supp. at 1548, 1550; *Coleman*, 912 F. Supp. at 1320-21; *Madrid*, 889 F. Supp. at 1265-66.

[34]  *See* DCIL 18, 20, 21 (whether conditions of confinement expose prisoners to substantial risk of serious harm); PCIL 2 (whether Defendants are deliberately indifferent to the substantial risk of serious harm faced by the Subclass).

[35]  *See* DCIL 19 (claiming it is "contested" whether *Wilson* permits conditions of confinement to be considered in combination).

1  enforcing effect causing the deprivation of a prisoner's basic human need for social

2  interaction and sensory stimulation").[36]

3      Courts have acknowledged the damaging effects of confinement in ADC's

4  isolation units.  *See, e.g.*, *Miller ex rel. Jones v. Stewart,* 231 F.3d 1248, 1252 (9th Cir.

5  2000) ("it is well accepted that conditions such as those present in [ADC's Browning

6  Unit] . . . can cause psychological decompensation to the point that individuals may

7  become incompetent"); *Comer v. Stewart*, 215 F.3d 910, 916 (9th Cir. 2000) ("we and

8  other courts have recognized that prison conditions remarkably similar to [Browning Unit]

9  can adversely affect a person's mental health"); *Koch v. Lewis*, 216 F. Supp. 2d 994, 1002

10  n.12 (D. Ariz. 2001) ("[d]etention in [Browning Unit] for five and one-half years borders

11  on cruel and unusual punishment.").

12      Despite these findings, ADC holds thousands of prisoners in its isolation units for

13  years at a time.  Under ADC policy, the vast majority of them are confined to their cells

14  for all but three two-hour periods per week for exercise, with some additional time to

15  shower.  In practice, even this minuscule opportunity to exercise can be cancelled, so

16  prisoners in isolation may have less out-of-cell time than even the bare minimum

17  suggested by policy.  Many of these prisoners exercise alone in cages or concrete

18  enclosures barely larger than their cells—too small to permit adequate exercise to preserve

19  health.  The inability to exercise and engage in normal movement poses particular risks

20  for prisoners in isolation who are older or suffer from chronic medical conditions and/or

21  physical disabilities and face a risk of increased morbidity and mortality as a result.[37]

22  [Doc. 1104, Ex. 19 (11/8/13 Williams Report) at 13-14]

23

24      [36] Thus, for example, the severe restrictions on property in ADC's isolation units
    are properly analyzed not as a freestanding Eighth Amendment claim, but rather as a
25  factor that combines with other conditions to deprive prisoners of a minimal level of
    social interaction and environmental stimulation.

26      [37] "Exercise is one of the most basic human necessities protected by the Eighth
    Amendment.  Like food, it is a basic human need protected by the Eight Amendment."
27  *Thomas v. Ponder*, 611 F.3d 1144, 1152 (9th Cir. 2010) (citation and quotation marks
    omitted); *see also Toussaint v. McCarthy*, 597 F. Supp. 1388, 1402, 1412 (N.D. Cal.
28  1984) (requiring a minimum of eight hours of outdoor exercise per week for prisoners in

The extreme isolation in these units is further exacerbated by ADC's policies that allow for 24 hour illumination in some isolation cells,[38] limited property, including lack of access to TVs or radios, and infrequent, reduced calorie meals.[39] There is little programming and few jobs available to prisoners in isolation and what is available is entirely inadequate.  Programming in the isolation units reaches only a small percentage of prisoners, is provided on a sporadic and often incoherent basis, and is entirely inadequate to relieve the extreme social isolation and environmental deprivation of the conditions of confinement, especially for the seriously mentally ill.

The dangers of housing human beings, especially those with mental illness, in such stark conditions are further exacerbated by the fact that ADC does not provide adequate psychiatric monitoring for prisoners in isolation.  Interactions with mental health staff—when they occur at all—are often limited to extremely brief, cell-front checks.  Few mentally ill prisoners in isolation have one-to-one counseling or access to mental health groups.  And ADC continues to subject mentally ill prisoners—even those on psychotropic medications—to the unnecessary use of chemical agents in the isolation units, creating unnecessary pain and substantial risk of serious harm.

### C.   Named Plaintiffs are Exposed to a Substantial Risk of Serious Harm

Despite rulings by this Court explaining that Defendants' focus on the Named Plaintiffs' individual past experiences "misconstrue[s] the foundation upon which this case was certified and the governing legal standard controlling it," [Doc. 1065 at 4-5], Defendants continue to concentrate myopically on the Named Plaintiffs' medical histories

---

segregation), *aff'd in part and rev'd in part on other grounds*, 801 F.2d 1080 (9th Cir. 1986).

[38] "There is no legitimate penological justification for requiring [prisoners] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (internal citation and quotation omitted); *see also Grenning v. Miller-Stout*, 739 F.3d 1235, 1238-39 (9th Cir. 2014) (exposure to 24-hour illumination for 13 days states Eighth Amendment claim).

[39] "Adequate food is a basic human need protected by the Eighth Amendment." *Keenan*, 83 F.3d at 1091 (citation and quotation omitted); *see also Graves*, 2008 WL 4699770, at *46 (D. Ariz. Oct. 22, 2008) (finding violation of pretrial detainees' constitutional right to adequate nutrition).

and have recycled their non-compliant summary judgment facts as "contested facts" for trial,[40] attempting to focus the Court's attention on specific facts of the Named Plaintiffs' care.  This attempt to plunge into the minutiae of individual encounters of years past in an effort to avoid the overwhelming evidence of systemwide deficiencies ignores the warnings of this Court[41] and the Ninth Circuit[42] against this approach.

Make no mistake—the Named Plaintiffs have experienced harm in the past due to Defendants' deliberate indifference,[43] and have been injured by systemwide deficiencies in medical, dental, and mental health care and conditions of confinement in isolation,[44] as repeatedly described in Plaintiffs' filings[45] and the expert reports.[46]  The suffering of individual prisoners are *examples* of how the systemwide risks have manifested, but the case does not rest entirely on those examples and instead turns largely on expert testimony and ADC's own documents and admissions.  The key issue in this case is whether the Class has been exposed to a substantial risk of serious harm,[47] not whether that risk resulted in a specific injury on a specific date in the past.  *See, e.g.*, *Helling*, 509 U.S. at 33.  Defendants' system was and is grossly deficient, and the Named Plaintiffs are subject

---

[40] Plaintiffs believe that the vast majority of Defendants' facts are not essential for trial.

[41] This Court cautioned in its summary judgment order that the action never relied solely on the named plaintiffs' experiences, and that neither Plaintiffs nor Defendants could win by proving or disproving individual instances of deliberate indifference. [Doc. 1065 at 5]

[42] The Ninth Circuit agreed that Defendants' view of the case as "a collection of individual constitutional violations" constitutes "a fundamental misunderstanding of *Wal-Mart* [*Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)], Eighth Amendment doctrine, and the plaintiffs' constitutional claims." *Parsons*, 754 F.3d at 676.

[43] *See* DCIL 11 (whether ADC was deliberately indifferent to the Named Plaintiffs).

[44] *See* DCIL 9 (whether the Named Plaintiffs have not been injured by systemwide deficiencies).  This is an issue of fact, but Plaintiffs address it here anyway.

[45] [*See*, e.g., Doc. 31 (Complaint), Doc. 235 (Motion for Class Certification), Doc. 1018 (Response to Motion for Summary Judgment)]

[46] [*See*, e.g., Doc. 1104, Ex. 1 (11/8/13 Cohen Report), Ex. 17 (11/7/13 Haney Report), Ex. 11 (11/8/13 Shulman Report), Ex. 7 (11/8/13 Stewart Report), Ex. 14 (11/8/13 Vail Report), Ex. 4 (11/8/13 Wilcox Report)]

[47] *See* DCIL 10 (whether the Named Plaintiffs are exposed, or have been exposed, to a substantial risk of serious harm).

1    to a substantial risk of serious harm, just like every other ADC prisoner.  *See Parsons*, 754

2    F.3d at 686.  Thus, the Named Plaintiffs clearly have standing.[48]

3         To the extent Defendants' arguments are based on care the Named Plaintiffs have

4    received since the filing of the Complaint,[49] such arguments should be viewed with great

5    suspicion.  One of Defendants' health care monitors revealed that after the Named

6    Plaintiffs filed their complaint, Defendant Pratt personally instructed ADC's facility-wide

7    monitors to "periodically review [the Named Plaintiffs'] medical records to ensure that

8    they were receiving adequate healthcare."   [Barr Decl., Ex. 10 (Mark T. Haldane

9    deposition dated Sept. 19, 2013) at 21:6-22:6]  Thus, any improvements in care for the

10   Named Plaintiffs should not be generalized to the rest of the Class, who are not being

11   individually monitored by Defendants.  Astoundingly, even with this special treatment,

12   the Named Plaintiffs have continued to receive inadequate healthcare,[50] and continue to be

13   exposed to a substantial risk of serious harm.[51]

14        **D.    Defendants' Alleged Remedial Measures Do Not Show Lack of**
15        **Deliberate Indifference or Moot This Case**

16        Defendants claim that they have resolved conditions that may have caused serious

17   risk of harm by privatizing the health care system and improving conditions in the

18   isolation units.  But the evidence will show that the substantial risk of serious harm to

19   prisoners persists despite any supposed efforts by Defendants to improve care and

20   conditions.  Indeed, Defendants' paltry attempts at improvements since 2012 have been

21   completely ineffective, and, in fact, "do not prove a lack of deliberate indifference, they

22   demonstrate it."  *Coleman,* 912 F. Supp. at 1319.

23        And even if Defendants' purported remedial measures had substantially improved

24   care and conditions, which is not the case here, "a defendant's voluntary cessation of a

---

[48]  *See* DCIL 2, 27 ((whether Named Plaintiffs have standing).
[49]  *See* DCIL 4 (whether Named Plaintiffs received adequate care after the filing of the Complaint).
[50]  *See* DCIL 11 (whether ADC is deliberately indifferent to the Named Plaintiffs).
[51]  *See* DCIL 10 (whether Named Plaintiffs are exposed to a substantial risk of serious harm).

1    challenged practice does not deprive a federal court of its power to determine the legality

2    of the practice." *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S.

3    167, 189 (2000) (citation omitted).  This Court has similarly made clear that "Defendants'

4    changes at the prison since the filing of this lawsuit . . . do not preclude an injunction."

5    [Doc. 815 at 2-3 (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289

6    (1982))]  It is nearly undisputed that health care and prison conditions were substandard

7    during at least a portion of the time this case has been pending, and Defendants are thus

8    liable.  Defendants' supposed recent attempts at improvement after being faced with this

9    lawsuit do not change that result.  Defendants cannot meet their "heavy burden" of

10   proving that the substantial risks here will not recur in the future, especially since the

11   inadequacies have persisted for years despite purported remedial efforts.  *Friends of the*

12   *Earth*, 528 U.S. at 190.

13   **VI.   REMEDIES**

14       If the Court finds liability, relief is governed by the PLRA, which provides that

15   prospective relief must be "narrowly drawn, extend[] no further than necessary to correct

16   the violation of the Federal right, and [be] the least intrusive means necessary to correct

17   the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A).  This standard is "nearly

18   identical" to the pre-PLRA standard for entry of injunctive relief in contested cases.

19   *Gilmore v. State of California*, 220 F.3d 987, 1006 (9th Cir. 2000).  Although Plaintiffs

20   requested certain injunctive and declaratory remedies in their complaint,[52] Defendants

21   must be given the first opportunity to propose remedies addressing the Court's findings of

22   constitutional  violations.[53]  *See  Lewis  v.  Casey*,  518  U.S.  343,  362  (1996)

23   ("[C]onsiderations of comity . . . require giving the States the first opportunity to correct

24

25

---

26       [52] The Court found that Plaintiffs' claims for injunctive and declaratory relief
     satisfied Rule 23(b)(2) because "the level of care and resources would be raised for all
27   inmates."  [Doc. 372 at 21]  *See* DCIL 30 (claiming that it is "contested" whether
     proposed declaratory and injunctive relief complies with Rule 23(b)(2)).
28       [53]  *See* DCIL 31 (whether proposed injunctive relief complies with PLRA).

1    the errors made in the internal administration of their prisons."); *Parsons*, 754 F.3d at 689

2    n.35 (noting that "prison officials must play a role in shaping injunctions").

3           Notwithstanding the PLRA's narrow tailoring requirement, the Court may order

4    prospective relief that does not "exactly map onto the requirements of the Eighth

5    Amendment."   *Graves v. Arpaio*, 623 F.3d 1043, 1050 (9th Cir. 2010).   The PLRA

6    authorizes the Court to grant relief that is "necessary to correct" any ongoing

7    constitutional violation.  *Id.*  For example, in *Graves*, the Ninth Circuit upheld prospective

8    relief ordering Sheriff Arpaio to house all detainees taking psychotropic medications in

9    temperatures not exceeding 85 degrees Fahrenheit, not just those taking psychotropic

10   medications affecting the body's ability to regulate heat.  *Id.* at 1049.  The court reasoned

11   that, because mental health screening and record-keeping were found to be inadequate,

12   Sheriff Arpaio did not know which pretrial detainees were taking which psychotropic

13   medications and, therefore, limiting relief to certain prisoners would be impractical and

14   would fail to correct the Eighth Amendment violation.  *Id.* at 1050.

15                                    **CONCLUSION**

16          Despite Defendants' claims that many issues of law remain "contested," most of

17   Defendants' issues of law have already been rejected by this Court, a consensus of other

18   courts, or both.   What remains to be decided is whether Defendants' deliberate

19   indifference exposes the Class and Subclass to a substantial risk of serious harm.  The

20   evidence at trial will show that ADC's provision of medical, mental health, and dental

21   care, and the conditions of confinement in ADC's isolation units, expose all prisoners in

22   the Class and Subclass at substantial risk of serious harm.  The systemwide deficiencies in

23   ADC's policies and practices have existed for years and will continue without the

24   intervention of this Court.  Plaintiffs seek injunctive relief in order to address these

25   problems and avert further needless suffering and death.

26

27

28

1    Dated:  September 19, 2014          **PERKINS COIE LLP**

2

3                                          By:    s/ Daniel C. Barr
                                              Daniel C. Barr (Bar No. 010149)
4                                             Amelia M. Gerlicher (Bar No. 023966)
                                              Kirstin T. Eidenbach (Bar No. 027341)
5                                             John H. Gray (Bar No. 028107)
                                              Matthew B. du Mée (Bar No. 028468)
6                                             Jerica L. Peters (Bar No. 027356)
                                              **PERKINS COIE LLP**
7                                             2901 N. Central Avenue, Suite 2000
                                              Phoenix, Arizona 85012
8                                             Telephone:  (602) 351-8000
                                              Email:    dbarr@perkinscoie.com
9                                                       agerlicher@perkinscoie.com
                                                        keidenbach@perkinscoie.com
10                                                      jhgray@perkinscoie.com
                                                        mdumee@perkinscoie.com
11                                                      jpeters@perkinscoie.com

12                                            Daniel Pochoda (Bar No. 021979)
                                              James Duff Lyall (Bar No. 330045)*
13                                            **ACLU FOUNDATION OF**
                                              **ARIZONA**
14                                            3707 North 7th Street, Suite 235
                                              Phoenix, Arizona 85013
15                                            Telephone:  (602) 650-1854
                                              Email:    dpochoda@acluaz.org
16                                                      jlyall@acluaz.org

17                                            *Admitted pursuant to Ariz. Sup. Ct.
                                              R. 38(f)

18                                            Donald Specter (Cal. 83925)*
                                              Alison Hardy (Cal. 135966)*
19                                            Sara Norman (Cal. 189536)*
                                              Corene Kendrick (Cal. 226642)*
20                                            Warren E. George (Cal. 53588)*
                                              **PRISON LAW OFFICE**
21                                            1917 Fifth Street
                                              Berkeley, California 94710
22                                            Telephone:  (510) 280-2621
                                              Email:    dspecter@prisonlaw.com
23                                                      ahardy@prisonlaw.com
                                                        snorman@prisonlaw.com
24                                                      ckendrick@prisonlaw.com
                                                        wgeorge@prisonlaw.com
25
                                              *Admitted *pro hac vice*
26

27

28

David C. Fathi (Wash. 24893)*
Amy Fettig (D.C. 484883)**
Ajmel Qureshi (Md. 28882)**
**ACLU NATIONAL PRISON PROJECT**
915 15th Street N.W., 7th Floor
Washington, D.C. 20005
Telephone:  (202) 548-6603
Email:    dfathi@npp-aclu.org
            afettig@npp-aclu.org
            aqureshi@npp-aclu.org

*Admitted *pro hac vice*.  Not admitted in DC; practice limited to federal courts.
**Admitted *pro hac vice*

Caroline Mitchell (Cal. 143124)*
Amir Q. Amiri (Cal. 271224)*
Dara Levinson (Cal. 274923)*
**JONES DAY**
555 California Street, 26th Floor
San Francisco, California 94104
Telephone:  (415) 875-5712
Email:    cnmitchell@jonesday.com
            aamiri@jonesday.com
            daralevinson@jonesday.com

*Admitted *pro hac vice*

John Laurens Wilkes (Tex. 24053548)*
Taylor Freeman (Tex. 24083025)*
**JONES DAY**
717 Texas Street
Houston, Texas 77002
Telephone:  (832) 239-3939
Email:    jlwilkes@jonesday.com
            tfreeman@jonesday.com

*Admitted *pro hac vice*

Kamilla Mamedova (N.Y. 4661104)*
Jennifer K. Messina (N.Y. 4912440)*
**JONES DAY**
222 East 41 Street
New York, New York 10017
Telephone:  (212) 326-3498
Email:    kmamedova@jonesday.com
            jkmessina@jonesday.com

*Admitted *pro hac vice*

Kevin Brantley (Cal. 251886)*
**JONES DAY**
3161 Michelson Drive, Suite 800
Irvine, California 92612
Telephone:  (949) 851-3939
Email:    kcbrantley@jonesday.com

*Admitted *pro hac vice*

*Attorneys for Plaintiffs Shawn Jensen;*
*Stephen Swartz; Sonia Rodriguez; Christina*
*Verduzco; Jackie Thomas; Jeremy Smith;*
*Robert Gamez; Maryanne Chisholm;*
*Desiree Licci; Joseph Hefner; Joshua*
*Polson; and Charlotte Wells, on behalf of*
*themselves and all others similarly situated*

**ARIZONA CENTER FOR DISABILITY
LAW**


By:   s/ Sarah Kader
      Sarah Kader (Bar No. 027147)
      Asim Varma (Bar No. 027927)
      5025 East Washington Street, Suite 202
      Phoenix, Arizona 85034
      Telephone:  (602) 274-6287
      Email:    skader@azdisabilitylaw.org
             avarma@azdisabilitylaw.org

      J.J. Rico (Bar No. 021292)
      Jessica Jansepar Ross (Bar No. 030553)
      **ARIZONA CENTER FOR
      DISABILITY LAW**
      100 N. Stone Avenue, Suite 305
      Tucson, Arizona 85701
      Telephone:  (520) 327-9547
      Email:    jrico@azdisabilitylaw.org
             jross@azdisabilitylaw.org

*Attorneys for Arizona Center for Disability*
*Law*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on September 19, 2014, I electronically transmitted the above

3

document to the Clerk's Office using the CM/ECF System for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

6

Michael E. Gottfried
Katherine E. Watanabe

7

Lucy M. Rand
Assistant Arizona Attorneys General

8

Michael.Gottfried@azag.gov
Katherine.Watanabe@azag.gov
Lucy.Rand@azag.gov

9

10

Daniel P. Struck
Kathleen L. Wieneke

11

Rachel Love
Timothy J. Bojanowski
Nicholas D. Acedo

12

Ashlee B. Fletcher
Anne M. Orcutt

13

Jacob B. Lee
STRUCK WIENEKE, & LOVE, P.L.C.

14

dstruck@swlfirm.com
kwieneke@swlfirm.com

15

rlove@swlfirm.com
tbojanowski@swlfirm.com

16

nacedo@swlfirm.com
afletcher@swlfirm.com

17

aorcutt@swlfirm.com
jlee@swlfirm.com

18

19

*Attorneys for Defendants*

20

s/ D. Freouf

21

22

23

24

25

26

27

28