# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; ) | No. CV12-00601- |
| Stephen Swartz; Dustin Brislan; ) | PHX-NVW (MEA) |
| Sonia Rodriguez; Christina Verduzco;) | |

Victor Parsons; Shawn Jensen;          )   No. CV12-00601-
Stephen Swartz; Dustin Brislan;        )   PHX-NVW (MEA)
Sonia Rodriguez; Christina Verduzco;)
Jackie Thomas; Jeremy Smith; Robert )
Gamez; Maryanne Chisholm; Desiree   )
Licci; Joseph Hefner; Joshua Polson;)
and Charlotte Wells, on behalf of      )
themselves and all others similarly )
situated; and Arizona Center for       )
Disability Law,                                        )
                                                              )
          Plaintiffs,                              )
     vs.                                                  )
                                                              )
Charles Ryan, Director, Arizona      )
Department of Corrections; and       )
Richard Pratt, Interim Division      )  30(b)(6) DEPOSITION
Director, Division of Health            )        OF
Services, Arizona Department of      )   WEXFORD HEALTH
Corrections, in their official            )    SOURCES, INC.
capacities,                                          )
                                                              )  Continuation of
          Defendants.                          )  Docket No. 436
                                                              )


NEIL A. FISHER, MD

(Topics 7-10)

October 8, 2013
9:03 a.m.
Phoenix, Arizona



Glennie Reporting Services
7330 North 16th Street
Suite A100
Phoenix, Arizona 85020-5275

                              Prepared by:
602.266.6535                  Carolyn T. Sullivan, RPR
www.glennie-reporting.com     Arizona CR No. 50528

Parsons v. Ryan
30(b)(6)  Deposition of Wexford Health Sources, Inc. Neil A. Fisher, M.D.  - 10/8/2013

Page 46

1    Dan Conn is the one who made with Mark Hale the final

2    decision.  So the exact date they made that decision, I

3    don't know.

4         Q.    BY MS. KENDRICK:  Do you remember roughly when

5    you were told?

6         A.    It was -- I wouldn't want to inaccurately

7    state.

8         Q.    It was after this presentation?

9         A.    It was definitely after this presentation.

10        Q.    Was it after Thanksgiving?

11        A.    It was after Thanksgiving.

12        Q.    Was it still in 2012 or was it in 2013?

13        A.    It either was December or January.

14        Q.    What reasons were you given for the pull-out?

15              MS. CLOMAN:  Form.

16              THE WITNESS:  I had been asked, along with

17   other members of the team that had spent considerable

18   time in Arizona, saying, can we do this contract so that

19   we can do it correctly, the way that Wexford does it.

20   And the idea behind the -- I heard every team member say

21   the same thing, that the amount of time that it would

22   take to bring this contract into an alignment was a very

23   long time frame.  We were talking typically a year out

24   from that date.  A year after this presentation.  That's

25   a very long period of time.

Parsons v. Ryan
30(b)(6)  Deposition of Wexford Health Sources, Inc. Neil A. Fisher, M.D.  - 10/8/2013

Page 47

1            Part of our concern was -- and our reason

2    for doing the slide presentation for our client to

3    understand what we found when we came into the situation.

4    We had a sense that our client, Director Ryan at this

5    time, didn't really understand what the baseline was.

6        Q.    BY MS. KENDRICK:  Was there a sense that

7    Wexford had been misled by its client as to the state of

8    the health care system that you assumed?

9            MS. CLOMAN:  Form.

10            MR. JELLISON:  Objection; foundation.  And I

11    want to add, I think this is going far afield of this

12    witness's 30(b)(6) responsibilities.  He's prepared to

13    talk about items 7, 8, 9, and 10 and about the clinical

14    aspects of the rest.  But I believe he was not designated

15    to answer these types of questions and that people like

16    Mr. Conn and Ms. Mullenix in fact did.

17            MS. CLOMAN:  Join.

18            MR. JELLISON:  If it's okay with you, we've

19    been going for about an hour.  Do you mind if we just

20    take a short break.

21            MS. KENDRICK:  Of course.

22            (A recess was taken from 10:07 a.m. to

23            10:14 a.m.)

24        Q.    BY MS. KENDRICK:  So, Dr. Fisher, one of the

25    topics you've been designated to speak about is No. 10,

Parsons v. Ryan
30(b)(6)  Deposition of Wexford Health Sources, Inc. Neil A. Fisher, M.D.  - 10/8/2013

Page 154

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA  )

3

4                I, CAROLYN T. SULLIVAN, a Certified

5    Reporter, Certificate No. 50528, in the State of Arizona,

6    do hereby certify that the foregoing witness was duly

7    sworn to tell the whole truth; that the foregoing pages

8    constitute a full, true, and accurate transcript of all

9    proceedings had in the foregoing matter, all done to the

10   best of my skill and ability.  Pursuant to request,

11   notification was provided that the deposition is

12   available for review and signature.

13

14                I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome.

17

18                WITNESS my hand this 15th day of October,

19   2013.

20

21

22                         Carolyn T. Sullivan, RPR
                           Arizona Certified
                           Reporter No. 50528
23

24

25

# EXHIBIT 4

                UNITED STATES DISTRICT COURT
                  DISTRICT OF ARIZONA

Victor Parsons; Shawn          )  No:
Jensen; Stephen Swartz;        )  CV12-00601-PHX-NVW
Dustin Brislan; Sonia          )  (MEA)
Rodriguez; Christina           )
Verduzco; Jackie Thomas;       )
Jeremy Smith; Robert Gamez;    )
Maryanne Chisholm; Desiree     )
Licci; Joseph Hefner; Joshua   )
Polson; and Charlotte Wells,   )
on behalf of themselves and    )
all others similarly           )
situated; and Arizona Center   )
for Disability Law,            )
              Plaintiffs,       )
     v.                        )
Charles Ryan, Director,        )
Arizona Department of          )
Corrections; and Richard       )
Pratt, Interim Division        )
Director, Division of Health   )
Services, Arizona Department   )
of Corrections, in their       )
official capacities,           )
              Defendants.       )
                               )

              (SUBJECT TO PROTECTIVE ORDER)
               DEPOSITION OF ARTHUR GROSS
                   September 9, 2013
                      9:22 a.m.
                   Phoenix, Arizona

                         Prepared by:
                         Marcella Daughtry, RPR
                         Arizona Certified
                         Reporter No. 50623

                         Prepared for:

                         (Copy)

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

Page 40

1      A     No.

2      Q     And you said in December was when Wexford

3  started talking about terminating the contract,

4  correct?

5      A     To the best of my knowledge.

6      Q     To your knowledge, was Wexford willing to stay

7  as long as needed until a new contractor came in?

8      A     Willing to stay, I think that was a

9  requirement of them exiting, as they had to remain

10 until an alternate vendor was contracted.

11     Q     So they didn't say something like, we are

12 pulling up stakes as of --

13     A     No, that was a requirement of them leaving, is

14 they had to stay until a substitute contractor was on

15 board.

16     Q     Did ADC reopen the previous request for

17 proposal when looking for the new contractor?

18     A     No.

19     Q     Do you know why not?

20     A     There's a term in the procurement rules and

21 regulations that allowed us to not necessarily open the

22 previous RFP but to go back to the other two finalists

23 and renegotiate with them.

24     Q     Did ADC approach both of the other bidders?

25     A     Yes.

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

Page 41

 1      Q     The other one was Centurion?

 2      A     Yes.

 3      Q     Did they offer a supplemental proposal?

 4      A     Yes.

 5      Q     Do you know who from the Department was

 6   reviewing the two supplemental proposals?

 7      A     The procurement office.

 8      Q     Were they -- was the procurement office

 9   responsible for selecting Corizon?

10            MR. STRUCK:  Form and foundation.

11            THE WITNESS:  No.

12      Q     BY MS. KENDRICK:  Who -- do you know who was

13   responsible?

14      A     That was Director Ryan's decision.

15      Q     Did you personally review the supplemental

16   proposals from Centurion and Corizon?

17      A     I'm going to answer that no.

18      Q     So I'm handing you what was previously labeled

19   as Exhibit 168.

20            MS. KENDRICK:  I have a copy for you,

21   Dan.

22      Q     BY MS. KENDRICK:  Are you familiar with this

23   document?

24      A     Yes.

25      Q     If you turn to the first page, in the first

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

Page 97

1    do a corrective action plan, would it be entered right

2    here in the report, or is that a separate document?

3        A    I would imagine it could be entered here.

4        Q    So the April, May and June corrective action

5    plans that you had referred to, those were separate

6    documents?

7        A    I believe they were.

8        Q    And did you review those?

9        A    I did not.

10       Q    Okay.  On the second page, there's a paragraph

11   that begins with 4/29/13 entered by Jen Fontaine.  She

12   describes that, "Florence has only one HCP," healthcare

13   provider, "and two mid-level providers at this time.

14   All units have numerous inmates overdue for chronic

15   care visits and referrals.  Inmates housed in IPC and

16   HU8 are not being followed as required due to the

17   vacant provider position at Central."

18              In your professional judgment, is this

19   something that necessitates a corrective action plan?

20              MR. STRUCK:  Form and foundation.

21              THE WITNESS:  This is the subject that I

22   discuss with Vickie Bybee on a weekly basis, and there

23   are shortages of providers that need to be addressed.

24   And since April, that has been addressed to the extent

25   of hiring more physicians to locum tenens and offer

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

Page 115

1    whether you recalled getting complaints.  And I asked:

2    Did he ask you that?

3        A    I've already testified -- this is through

4    June?

5        Q    Uh-huh.

6        A    I've already testified to this document

7    (indicating), that the staffing patterns were

8    insufficient.  They were at 53 percent of staffing

9    positions.

10       Q    Okay.  All right.  Thanks.

11                 Has Helena Valenzuela told you about

12   problems with delays and intake screening at the

13   Phoenix facility?

14       A    No, she has not.

15       Q    This was labeled as Exhibit 175 in a prior

16   deposition, and on the first column for notifications

17   entered by Helena Valenzuela on June 27th, she says

18   that the intake process is problematic and a serious

19   delay of inmates being moved or transferred out to

20   other facilities.  She says Corizon upper management at

21   the Phoenix complex have been previously and currently

22   made aware of this on several occasions and were

23   provided with suggestions for making improvements.  She

24   also -- it's hard to see with the copy, but there's an

25   X in the red column.

Parsons v. Ryan
Deposition of Arthur Gross - 9/9/2013

Page 132

1    STATE OF ARIZONA    )
                         )
2    COUNTY OF MARICOPA  )

3

4              I, Marcella L. Daughtry, a Certified

5    Reporter, Certificate No. 50623, in the State of

6    Arizona, do hereby certify that the foregoing witness

7    was duly sworn to tell the whole truth; that the

8    foregoing pages constitute a full, true, and accurate

9    transcript of all proceedings had in the foregoing

10   matter, all done to the best of my skill and ability.

11   Pursuant to request, notification was provided that the

12   deposition is available for review and signature.

13

14              I FURTHER CERTIFY that I am not related

15   to nor employed by any of the parties hereto, and have

16   no interest in the outcome.

17

18              WITNESS my hand this 23rd day of

19   September, 2013.

20

21                         _____

                           Marcella L. Daughtry, RPR
22                         Reporter No. 50623

23

24

25

GLENNIE REPORTING SERVICES
(602) 266-6535   www.glennie-reporting.com

# EXHIBIT 5

| | |
|---|---|
| **From:** | Dan Struck <DStruck@swlfirm.com> |
| **Sent:** | Wednesday, September 17, 2014 5:08 PM |
| **To:** | 'Caroline N Mitchell'; Eidenbach, Kirstin (Perkins Coie) |
| **Cc:** | Ashlee Fletcher; Anne Orcutt; Lucy Rand; Michael E. Gottfried; Nick Acedo; Parsons Team |
| **Subject:** | RE: Parsons v. Ryan: Joint Pretrial Statement Information Exchange |

Caroline,

We will be happy to speak to Kirstin tomorrow.    Kathy and Ashlee will be calling you and or Kirstin shortly, though about the facts section of the JPTS.

We are in the process of sending you counter designations and objections to the testimony of the witnesses whom we are not disputing can be designated pursuant to Rule 32.  (your first paragraph makes no sense as we did not represent to the court that there was any agreement to postpone the non objectionable designations, only the 21 deposition designations of the available witnesses)
As for the 1006 summaries you need to look no further than the MJS SOF for the backup, where the information is set forth with specificity and has been in your possession for months.

As you can see from our witness list, the vast majority of witnesses have been moved to the "unlikely to be called" section.   Many can be eliminated if you drop many of the objections to the facts that come straight from the medical records.
 As for your allegation that we are in "flagrant" violation of Judge Wake's order, you may need to go back and review the order.   The judge did not restrict defendants' ability to call any witness with respect to fact based testimony.

We have been dedicated to getting this document in final form and have been working diligently on getting the JPTS prepared.   Your allegation that we are not being cooperative is inaccurate and unfair.

Dan


STRUCK WIENEKE & LOVE
3100 West Ray Road, Suite 300   Chandler, Arizona 85226

**Daniel P. Struck**
Direct: (480) 420-1620
dstruck@swlfirm.com
www.swlfirm.com

**From:** Caroline N Mitchell [mailto:cnmitchell@JonesDay.com]
**Sent:** Wednesday, September 17, 2014 3:19 PM
**To:** Eidenbach, Kirstin (Perkins Coie)
**Cc:** Ashlee Fletcher; Anne Orcutt; Dan Struck; Lucy Rand; Michael E. Gottfried; Nick Acedo; parsonsdiscovery@prisonlaw.com
**Subject:** Re: Parsons v. Ryan: Joint Pretrial Statement Information Exchange

Dear Counsel,

We have not heard from you regarding Kirstin Eidenbach's proposal that we work together tomorrow toward finalizing the Joint Pre-Trial Conference Statement.  We also do not have the following from you:

1.  Your counterdesignations and objections for the deposition testimony.  We were perplexed by your representation to the Court that we had agreed to postpone designation of witnesses who are not the subject of your motion.  We made no such agreement and I followed up by email to remind you of the obligation to designate the witnesses who were not at issue.  As I mentioned in that same email last week, if we had received those yesterday for the witnesses not in dispute, I would have had resources to do all of the color coding.  I am attaching here an example of a color coded deposition.  Because we did not, I cannot commit to doing all of the color coding, although we are, of course, happy to do our fair share and color code all of our own designation.  Please provide an ETA for your counterdesignations and objections to Plaintiffs' designated testimony that was not the subject of your motion.

2.  Your response to our facts and law.  We need to discuss how to integrate ours and yours into the document so the Court can follow what issues the parties respectively believe to be the material question of fact and law that will control the trial.  As I noted, we believe that here, as in the summary judgment motion, you included many facts that should not be considered "material."  We recognize, however, that both sides take different views of the level of detail to be included in these statements.  While it is likely we cannot come to agreement on which of us has taken the correct approach, we can cooperate in preparation of a document that appropriately frames these facts and issues for the Court.  The sooner we do that, the more likely we are to achieve the Court's objective of filing an orderly, joint, pre-trial statement.

3.  When we last spoke, you pledged to provide us with information about the specific documents that each of your summaries purports to summarize, consistent with your obligation to do so under Rule 1006.  We have not received that.  Please provide an ETA.  We believe these summaries do not comport with Rule 1006, so it is important that we discuss that sooner rather than later.  We also need to know who the sponsoring witness is for each such exhibit.

4.  You said you would be working on reducing the number of witnesses on your witness list, which still weighs in at 299 witnesses.  Please let us know if you have made progress on that front, so that the parties can more accurately predict for the Court the reasonable length of the trial.  In addition to the sheer number of witnesses, the list is a flagrant violation of Judge Wake's order precluding the testimony of your non-report writing experts.  As Judge Wake found, you never made adequate disclosures for those witnesses, they are not qualified to be non-report writing experts to the extent they intend to testify about activity they undertook for purposes of this litigation, and they have been excluded by Judge Wake.  Including them seems to be an effort to take advantage of Judge Humetewa's lack of familiarity with that order.  As you know, we have not taken the depositions of those witnesses in their roles as experts.  We ask that you withdraw them immediately and revise any testimony that you intend to offer from them so it is consistent with Judge Wake's order (Dkt. No. 815).  If you will not do that, please let us know because we will bring a motion to enforce the Court's order promptly.

Finally, Plaintiffs have provided you with our objections to Defendants' proposed exhibits.  Please advise us when and if we will receive any responsive information from you to those objections.

We hope that it will be possible to work together cooperatively to resolve the outstanding issues and present the Court with a joint pretrial order that presents both sides' cases accurately.  That grows more difficult, if you do not accept our invitations to cooperate on these issues.

Thank you,

Caroline

Caroline Mitchell (bio)[jonesday.com]
JONES DAY® - One Firm Worldwide℠ [jonesday.com]
555 California Street, 26th Floor
San Francisco, CA  94104-1500
+1.415.875.5712
+1.415.875.5700
e-mail: cnmitchell@jonesday.com

==========

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege.  If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

This email has been scanned for email related threats and delivered safely by Mimecast.
For more information please visit http://www.mimecast.com[mimecast.com]

# EXHIBIT 6

Daniel Pochoda (Bar No. 021979)
James Duff Lyall (Bar No. 330045)*
**ACLU FOUNDATION OF ARIZONA**
3707 North 7th Street, Suite 235
Phoenix, Arizona 85013
Telephone:  (602) 650-1854
Email: dpochoda@acluaz.org
      jlyall@acluaz.org
*Admitted pursuant to Ariz. Sup. Ct. R. 38(f)

*Attorneys for Plaintiffs Shawn Jensen, Stephen Swartz, Dustin Brislan, Sonia Rodriguez, Christina Verduzco, Jackie Thomas, Jeremy Smith, Robert Gamez, Maryanne Chisholm, Desiree Licci, Joseph Hefner, Joshua Polson, and Charlotte Wells, on behalf of themselves and all others similarly situated*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

Sarah Kader (Bar No. 027147)
Asim Varma (Bar No. 027927)
**ARIZONA CENTER FOR DISABILITY LAW**
5025 East Washington Street, Suite 202
Phoenix, Arizona 85034
Telephone:  (602) 274-6287
Email: skader@azdisabilitylaw.org
      avarma@azdisabilitylaw.org

*Attorneys for Plaintiff Arizona Center for Disability Law*

**[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law, | No. CV 12-00601-PHX-NVW (MEA) |
| Plaintiffs, | **SECOND SUPPLEMENTAL REPORT OF TODD RANDALL WILCOX, M.D.** |
| v. | |
| Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities, | |
| Defendants. | |

TABLE OF CONTENTS

I.     Introduction ........................................................................................................... 1

II.    Responses to patient advocacy ............................................................................. 3

       A.    Responses to plaintiffs' counsel's advocacy ............................................ 3

       B.    Responses to my expressed concerns ........................................................ 9

III.   Consideration of additional supplemental evidence ........................................... 15

       A.    Building blocks ....................................................................................... 15

             1.    Staffing ........................................................................................ 15

             2.    Physical facilities ........................................................................ 15

       B.    Timely access to care ............................................................................. 16

             1.    Sick call ....................................................................................... 18

             2.    Chronic care ................................................................................ 22

             3.    Emergency care ........................................................................... 25

             4.    Inpatient care .............................................................................. 25

             5.    End of life care ............................................................................ 25

       C.    Exercise of professional medical judgment ........................................... 27

             1.    Medical records ........................................................................... 27

             2.    Nurses as primary care providers ............................................... 31

             3.    Specialty care .............................................................................. 31

             4.    Substandard care decisions ......................................................... 39

       D.    Delivery of ordered care ........................................................................ 40

             1.    Providers' orders ......................................................................... 40

             2.    Medication administration ........................................................... 40

             3.    Labs and other diagnostic tests ................................................... 44

       E.    Protection from preventable negative outcomes .................................... 44

             1.    Quality assurance ........................................................................ 44

IV.    Charts randomly selected by defendants ............................................................ 45

       A.    Completed specialty consultations .......................................................... 46

i

B.     Diabetics ................................................................................................................ 51

C.     Cancer ................................................................................................................... 57

D.     Patients who use canes and walkers ................................................................... 58

E.     Seizures ................................................................................................................ 62

F.     Scheduled specialty consults .............................................................................. 63

G.     Patients who use wheelchairs ............................................................................. 65

H.     Patients who are deaf ......................................................................................... 66

I.     Patients who are blind ....................................................................................... 66

J.     Heart disease ....................................................................................................... 68

K.     Pregnancy ............................................................................................................ 68

L.     Intake ................................................................................................................... 69

M.     Respiratory disorders ......................................................................................... 70

N.     MSRA ................................................................................................................. 70

O.     AIDS ................................................................................................................... 71

P.     Dialysis ................................................................................................................ 72

Q.     Hypertension ....................................................................................................... 72

R.     Outside medical transports ................................................................................. 75

S.     Hepatitis .............................................................................................................. 77

T.     HIV ...................................................................................................................... 79

U.     Hospital admissions ........................................................................................... 80

I, Todd Randall Wilcox, declare:

## I.     Introduction

1.      This is the fourth report I have written for this case.  My initial Report of November 8, 2013, sets forth my opinions regarding medical care in ADC, based on my tours and extensive document review.  My Rebuttal Report of January 31, 2014, responds to defense expert Dr. Mendel's conclusions.  My Supplemental Report dated April 2, 2014, analyzes all of the patient charts relied on by Dr. Mendel.[1]  The purpose of the present report is to update my opinions based on evidence regarding medical care provided in ADC through April 1, 2014, including 140 new patient charts randomly selected by ADC from their various lists of chronic care and other patient categories.

2.      To that end, I have carefully reviewed and considered the following updates to documents I relied on in my first three reports, in order to determine whether the more recent information changes the opinions I have expressed: (a) medical chart updates (through April 1, 2014) for all the patients whom I named in my prior reports and (b) ADC's own monitoring reports (MGARs) from October 2013 through March 2014.[2]  I have also reviewed three new sources of information: (c) advocacy letters written by plaintiffs' counsel regarding medical care concerns for ADC patients and the charts for those patients; (d) various emails provided to me by plaintiffs' counsel; and (e) a selection of patient charts chosen randomly by ADC from its own lists of cancer patients, diabetics,

---

[1] These reports were previously filed with the Court on June 18, 2014 (Doc. 946, Exhibits 1-3).

[2] These monthly compliance reports have limited utility as overall assessments of system performance, as I discuss at length in my initial report, and my opinion of their merit has not changed.  However, I continue to believe that they supply useful data in specific areas of concern.  I note that there were many more problems outlined in the monitors' reports than cited in this report; for space considerations, I have confined myself to the most relevant.

I also note that in preparing this report, unlike my initial report, I reviewed the MGAR audits for all prisons, and not just the five I toured.  I did this because it is my understanding that Dr. Cohen had an extremely large number of death reviews to evaluate and was unable to look at the MGARs from his five institutions.  It is my opinion that the MGAR findings relevant to the opinions I express in this report are broadly consistent across the ten institutions, as the findings I cite demonstrate.

pregnant patients, and other categories agreed on by the parties.  All of these documents are listed in Appendix A to this report.

3.      These documents confirm my views expressed in the three prior reports: that medical care in the Arizona prison system is systemically inadequate and places prisoners who require care at an intolerable risk of serious harm.  These records also provide further examples in which ADC administrators, when informed about specific deficits in care that are actively endangering specific patients, react with apparent indifference to the avoidable suffering of these patients and demonstrate an inability or an unwillingness to change course to provide the basic level of treatment that is required, even when that treatment is explicitly called to their attention.

4.      I note that I have now reviewed over 400 patient charts: approximately 144 charts, nearly all randomly selected by plaintiffs' counsel at my direction, for my first Report (Doc. 946-1 at Appendix C); 125 charts chosen for review by Dr. Mendel in rendering his opinions, for my Supplemental Report (Doc. 946-3 at 1); and now, 140 charts randomly selected by defendants from a range of treatment categories agreed on by the parties.  Each one of these extensive selections of patient charts leads me to the same conclusion: that medical care in ADC is in profound disrepair and places the lives and health of its patients at substantial risk of very serious harm.  The findings are consistent across the three categories.

5.      For convenience, I have structured Section III of this report using the same outline as my initial report.  Following that discussion, Section IV describes specific findings regarding the charts randomly selected for my review by ADC.

6.      First, however, Section II of this report discusses treatment concerns for some of the patients on whose behalf plaintiffs' counsel advocated during the course of this litigation, as well as patients whose dangerously sub-standard care I personally described to administrators and counsel for Corizon and ADC.  In these cases, plaintiffs identified specific urgent medical needs that required immediate attention.  In some cases, defendants' counsel advised plaintiffs' counsel in writing that the patients' care needs had

been addressed.  However, when I reviewed the updated medical charts I found that even after plaintiffs' counsel specifically requested care and defendants claimed to have provided it, many of the patients continued to have very serious unmet treatment needs.  I am very concerned that even when ADC is directly informed of immediate medical needs for very sick people, the barriers to care, including insufficient staffing, inadequate access to specialty care, and inordinate delays for diagnostic tests and treatment, are so entrenched that even these patients do not receive care.  These failures demonstrate a very broken system.

## II.    Responses to patient advocacy

7.      An essential element of a basic correctional healthcare system is the ability to respond to outside inquiries and identify and act on valid concerns.  Unfortunately, ADC lacks this ability, as I have seen in my review of the charts of patients for whom plaintiffs' counsel have written letters describing treatment deficits and requesting corrective action, as well as my review of chart updates for patients whom I have previously described to ADC and Corizon officials and attorneys as needing corrective intervention.

### A.    Responses to plaintiffs' counsel's advocacy

8.      Defendants' failure to treat ████████████████ ) has possibly shortened his life.  Mr. ████ had a testicle removed in May 2013 due to testicular cancer (ADC307595).  Following his surgery, he was supposed to have been evaluated by an oncologist for follow-up treatment.  He was initially seen a month after his surgery by an oncologist who recommended radiation therapy and then by a second oncologist in July 2013 who recommended chemotherapy and additional workup, including  a CT scan to determine if the cancer had spread (ADC307543).  On 8/1/13, an ADC provider ordered the CT scan (ADC307562), but it was not done.  The patient apparently started on chemotherapy in July 2013, but there are no records of such other than indirect references (ADC307584).

9.      On 8/16/13, the Prison Law Office sent an advocacy letter to counsel for the State noting that Mr. ███ cancer treatment had been inappropriately delayed.  PLTF-PARSONS-035956.  A response letter dated 9/4/13 indicated that "all the issues raised in your correspondence have been investigated and addressed as applicable."  PLTF-PARSONS-035961.

10.     The medical record demonstrates that is not true.  In fact, Mr. ███ treatment plan is so fragmented and poorly developed that even Corizon's own in-house oncologist (Dr. Kosierowski) wrote a comment in his chart in January 2014 (eight months after the cancerous tumor had been removed) that indicates that he is still unclear about the cell type of the cancer, chemotherapy has not yet been defined for this patient, tumor markers have not been noted, and he is unable to comment on how to treat him until he (and Corizon) have figured out the above information.[3]  Mr. ███ was supposed to have been evaluated for possible spread of his cancer and modification of his treatment plan as needed.  By the discovery cut-off of 4/1/14, eight months after the CT scan was ordered, it had not been done, though it is critical for developing a treatment plan.  This is simply an outrageous admission of system incompetence that documents cancer treatment for this patient that is shockingly below the standard of care and puts him at extreme risk of death.

11.     In addition, in November 2013, Mr. ███ was referred to a gastroenterologist for a screening colonoscopy, presumably to evaluate for the spread of his testicular cancer (ADC 307587).  Two weeks later, ADC denied the gastroenterology consult (ADC 307586).  Again, such denial of a routine workup for cancer in a patient with a known diagnosis is medically indefensible.

12.     ██████████████████) has been diagnosed with Stage III bladder cancer (ADC312060).  He has had significant surgery, including a colostomy as well as the placement of tubes into the kidney to decompress it and divert urine outside the body

---

[3] The original oncologists who saw Mr. ███ ordered that ADC find him a new oncologist to care for him in October 2013.  The patient was not seen again by oncology before the 4/1/14 discovery cut-off and apparently his entire treatment regimen was interrupted by this change in contracted oncologists.

-4-

1   (ADC312060, ADC312075).  On 9/13/13, the Prison Law Office sent an advocacy letter

2   to counsel for the State conveying concerns over this patient's advanced cancer issues and

3   reporting that he had not been appropriately seen by a urologist or treated for his cancer.

4   PLTF-PARSONS-035962.  A response dated 9/25/13 indicates that all appropriate care

5   had been completed.  PLTF-PARSONS-035965.

6          13.     This is not true.  Although Mr. ████████ chart documents his advanced

7   bladder cancer, I found no evidence of the necessary urology and oncology follow-ups in

8   the records that I saw.  In addition, I found multiple episodes where he developed

9   extremely high temperatures that were never appropriately worked up for someone with

10  indwelling catheter lines, indwelling intravenous fluid tubes, and cancer (see, for example,

11  ADC312080, ADC312096-97, ADC312099, ADC312134).  Cancer patients have

12  impaired immune systems.  Patients who have artificial tubes and catheters are at extreme

13  risk for infection because of the presence of those foreign bodies.  Fever is the most

14  common way to monitor cancer patients for the presence of infection and for this patient

15  to have all of these risk factors and develop high fevers that are never evaluated is just

16  incompetent medicine.  Mr. ████████ is very sick and I find his overall care to be well

17  below the standard of care.

18         14.     Another troubling cancer case involves ████████████████), who

19  has melanoma and heart problems.  On 8/20/13, the Prison Law Office wrote to

20  defendants' counsel asking them to address his urgent treatment needs, including

21  oncologist and cardiologist consults and a PET scan.  PLTF-PARSONS-035958.  In reply,

22  they were told that "all issues raised in your correspondence have been investigated and

23  addressed as applicable" on 9/11/13.  PLTF-PARSONS-035964.  On 11/8/13, the Prison

24  Law Office sent a second letter requesting that Mr. ████████ receive a PET scan and see

25  an oncologist as previously requested.  PLTF-PARSONS-035970.

26         15.     On 8/29/13, just over a week following the advocacy letter, "urgent"

27  oncology and PET scan appointments were ordered (ADC296802, ADC296818).[4]  The

28  
_____

[4] Following the 8/20/13 advocacy letter, an email found in Mr. ████████ file

orders were not followed, however, and repeat orders were submitted on 9/9/13, 9/16/13, 9/30/13, and 11/18/13 (ADC296814, ADC296812, ADC296811, and ADC286810).  Mr. ████ did not receive a PET scan until 11/27/13 and did not see an oncologist until 12/26/13, nearly a year after entering ADC (ADC296846, 296839) and more than four months after plaintiffs' counsel alerted defendants to his urgent medical needs.  These delays are excessive and dangerous to Mr. ████ health, and demonstrate an extraordinary indifference to his treatment.

16.     Other serious delays are also seen in Mr. ████ chart: an order was given on 9/16/13 for an ultrasound and the order was repeated on 9/30/13 and 11/18/13, but no documentation of the completion and disposition of this order is present in the chart.  (ADC296810-11).  An order was given for TED hose on 8/13/13 and repeated on 9/3/13 because it had not been issued (despite an earlier statement that it had) (ADC296815, ADC296820).  No further documentation was seen in the chart as to the fulfillment of this order.  An order was given for a dermatology consult on 5/24/13 for multiple atypical moles (ADC296821, ADC296850).  This was not fulfilled until 9/24/13, four months following the original order (ADC296811).  All of these delays violate the standard of care.

17.     In another case, the defendants failed to investigate a possible case of cancer.  Plaintiffs' expert Dr. Brie Williams identified serious problems with the health care provided ████ ) when reviewing charts last year.  According to the ACLU's 8/21/13 advocacy letter, she found laboratory results suggesting pancytopenia (a condition involving a drop in red and white blood cells and platelets that can be the result of leukemia or HIV) that had not been addressed in the medical record despite the clear-cut and obvious laboratory abnormalities (ADC311279; PLTF-PARSONS-035960).  On 7/19/13 a hematology consult was ordered but as of 8/21/13 it had not occurred.

_____

notes that "[t]he clinical provided does indicate that there is a problem with pharmacy supplying the meds timely" (ADC297021; see also ADC297018-297023 [following advocacy letter, several emails sent to various staff members pertaining to oncology follow-up without documented replies regarding current treatment regimens]).

18.     According to Mr. ███ chart, on 9/3/13, he was evaluated by 21st
Century Oncology with orders to complete a significant workup for his pancytopenia
(ADC311258).  The oncologist requested a panel of tests and diagnostic studies to be
completed with a follow-up to be done at 21st Century Oncology in one to two months
(*id.*).  Follow-up since then has been completely inadequate, and Mr. ███ has not
returned to the oncologist.  As of 4/1/14, there is no definitive etiology for why Mr.
███ has this very dangerous condition, and he needs urgently to be evaluated by a
hematologist/oncologist.

19.     The Prison Law Office wrote an advocacy letter to defendants' counsel on
11/25/13 for ███████ ), noting that he had reported significant rectal
bleeding and abdominal pain for many months and that his sick call requests had been
ignored.  PLTF-PARSONS-035975.  The 12/24/13 response indicated that the issue had
been investigated and that appropriate actions have been taken.  PLTF-PARSONS-
035985.

20.     In fact, appropriate actions were not taken, either before or after plaintiffs'
counsel's advocacy.  The medical chart included numerous Health Needs Requests
(HNRs) (ADC325871-77), as well as a 10/22/13 physician request for a CT scan that was
denied on 11/8/13 (ADC325783, ADC325886).  The patient was ultimately evaluated by
an outside provider in January 2014 who appropriately recommended a CT scan, a
colonoscopy, and an esophagogastroduodenoscopy (EGD), but these tests were either
seriously delayed or not provided at all: based on the chart, the CT scan was not done until
3/28/14 (ADC325753-55), and neither the colonoscopy nor the EGD was done as of the
4/1/14 discovery cut-off date (ADC325751).  These serious delays are below the standard
of care and expose Mr. ███ to needless pain and suffering as well as a serious risk of
harm from his undiagnosed, inadequately treated condition.

21.     ███████ ) has a cancerous lip lesion.  On 3/21/14, the
Prison Law Office sent a letter to counsel for the State requesting urgent medical care for

1    him.  PLTF-PARSONS-036000.  This advocacy letter included several HNRs and a letter

2    from Mr. ███████ attorney also requesting treatment.  PLTF-PARSONS-036001-19.

3        22.    Mr. ████████ attempts to get care, and the failure of ADC to provide it,

4    are clearly documented in his chart.  On 10/11/13, a nursing assessment referred Mr.

5    ████████ to a provider citing "possible cancer" (ADC301414-15).  Despite his HNRs

6    (ADC301507, 301506), no action was taken to address his possible cancer until he saw a

7    dentist in January 2014 who submitted a consult for the lesion (ADC301504, 301401).  He

8    was finally referred for a biopsy on 1/30/14, more than three months from the first

9    recognition by medical staff that he might have cancer (ADC301401).  The biopsy was

10   not performed until 2/28/14; carcinoma was found (ADC301461, 301410).  An urgent

11   surgical consult was sent on 3/5/14 but not acted on, and a second urgent surgical consult

12   had to be sent on 3/25/14 (four days after the Prison Law Office advocacy letter), with

13   additional request for diagnostic tests  (ADC301465,301457, 301456, 301455).  The

14   surgery had not been performed as of April 1, 2014, meaning that Mr. ████████ waited

15   at least six and a half months for surgery since the initial assessment of "possible cancer."

16   These delays are inexcusable and increase the chances that Mr. ████████ will face

17   serious harm from his grave condition.

18       23.    ADC is apparently incapable of providing care even in cases that are very

19   uncomplicated.  ████████████) has an advanced cataract in his right eye

20   (ADC311797).  This condition has been present for a number of years and he has been

21   evaluated by outside eye specialists who have recommended that the cataract be removed

22   (ADC311790, ADC311797).  The ADC in-house utilization review committee has denied

23   the requested surgery (ADC311817).  On 12/13/13, the Prison Law Office sent an

24   advocacy letter to counsel for the State regarding Mr. ██████ decreasing vision and the

25   failure to approve his cataract surgery.  PLTF-PARSONS-035980.  The response, on

26   3/11/14, stated that "all issues have been addressed as applicable."  PLTF-PARSONS-

27   035999.  I can find no evidence in the chart that that the patient has had his cataract

28

1    removed, however, which is a violation of the standard of care.  Despite defendants'

2    assurances, this issue has not been addressed.

3           24.    **Shawn Jensen (32465)** is one of the named plaintiffs in this case.  I have

4    interviewed him and reviewed his chart multiple times.  I have already detailed serious

5    concerns about his inadequate medical care in my prior reports.  Mr. Jensen has prostate

6    cancer, which is relatively straightforward and uncomplicated to treat.  As I described in

7    my Supplemental Report, at pages 22-28, all evidence I reviewed through the end of

8    March 2014 showed that Mr. Jensen is at an elevated risk of recurrence of prostate cancer,

9    that all laboratory evidence shows that Mr. Jensen's prostate cancer has returned, and that

10   more than one year after the likely recurrence was identified, Mr. Jensen still had not had

11   a reasonable treatment plan developed or implemented by a qualified specialist.

12          25.    Over an eight-month period, the Prison Law Office wrote three separate

13   advocacy letters in an attempt to get Mr. Jensen appropriate care for the likely recurrence

14   of his prostate cancer.  PLTF-PARSONS-035952-53, dated 7/1/13; PLTF-PARSONS-

15   035982-83, dated 12/13/13; PLTF-PARSONS-035996-98, dated 2/21/14.  In the

16   responses received prior to the discovery cut-off, Corizon's attorneys report that the issues

17   raised by the Prison Law Office "have been investigated and addressed," PLTF-

18   PARSONS-035954, and that "all issues have been addressed as applicable."  PLTF-

19   PARSONS-35992.

20          26.    Nothing could be further from the truth.  Not only can ADC and Corizon not

21   provide the appropriate care in a timely manner, as I described in the prior report, after

22   reviewing his medical file for the period through April 1, 2014, I am stunned that ADC

23   and Corizon are unwilling or unable to provide competent and timely health care for a

24   prisoner when it has been brought to their attention at the highest level on multiple

25   occasions.

26   **B.    Responses to my expressed concerns**

27          27.    I turn now to several of the patients whom I have met and shared with ADC

28   and Corizon specific concerns regarding their care.

28.     ███████████████████) is a patient with fistulizing Crohn's disease (severe inflammation of the bowel with episodes in which the intestinal wall breaks down and releases fecal matter into the body, a possibly life-threatening event) whom I met when I toured the Yuma facility in August 2013.  At that point in time I was very worried about his medical condition because he had been taken off Remicade, the most appropriate medication for his very serious condition.  I told ADC and Corizon officials and attorneys of my specific concerns, and repeated them in my November 2013 initial report.

29.     Sadly, the updated chart demonstrates that Mr. ████████ care has not improved.  He ultimately developed a recto-vesicular fistula from his unmanaged Crohn's disease in January 2014 (ADC323990).  He became septic and required admission to the hospital on 1/24/14, for a colostomy (ADC323990, ADC323931).  He apparently was transferred to a larger hospital to have his surgery performed and then transferred back to Yuma, where he has continued to have multiple complications related to his disease (ADC323981-ADC324017).  I can find no evidence in his record that he has been appropriately seen by a gastrointestinal specialist to manage his care, despite the clear need for it.  My opinion is supported by several specialty consults in his chart requesting specialized management (ADC324019-20).

30.     As a result of incompetent care, this patient remains at extraordinarily high risk for complications from his very severe disease process and he also is at a very high risk for death.  Managing him in Yuma, as I first told the ADC and Corizon officials nearly a year ago, is a recipe for disaster; he would most appropriately be housed in a medical unit close to a major city that has the medical resources and experience necessary to manage such a very profoundly sick patient.

31.     ███████████████████ is a young, insulin-dependent diabetic I met at Yuma in August 2013.  At that point his diabetic care was very poorly managed and he had several lab results in his chart that indicated potentially very serious problems – a compromised immune system, possibly an indicator of leukemia – that had neither been communicated to him nor followed with appropriate diagnostic review.  The updated

charts indicate that his diabetes still is under poor control and he continues to have

substantially abnormal laboratory values in other organ systems.  The most critical is his

very low white blood count, with an absolute neutrophil count of less than 1000 cells as of

1/7/14 (ADC301336).  As such, his immune system remains significantly compromised

and yet no workup or evaluation of this appears to have been done, even after I

specifically alerted ADC and Corizon officials and attorneys to this problem in August

2013 (and repeated the warning in my November 2013 Report).

32.     My attempt to obtain care for ███████████████████ ) was also

unsuccessful.  Mr. ██████ has end-stage liver disease that is being managed so poorly the

lack of appropriate treatment might shorten his life.   I saw him in early August 2013, at

which time he urgently needed to be seen by a hepatologist to manage his complex care,

which I told to Corizon and ADC officials and attorneys on the tour.   Nonetheless, he

continues to suffer from delayed specialist consultations and specialist recommendations

that have not occurred.

33.     There is an order dated 8/12/13 for Mr. ██████ to see a gastro-intestinal

specialist for management his liver disease (ADC297680), possibly in response to my

expressed concerns.  However, it took ADC two months to get him to the consultation,

which took place on 10/15/13 (ADC297674).  The nurse practitioner also ordered

appropriate tests and a request was submitted on 10/16/13 (ADC297670), but there is no

record of the study being completed.  He was seen on 9/20/13 by a general surgeon with

the recommendation for Mr. ██████ "to be admitted to Tempe St. Luke's to be seen by

multiple services for medical clearance" before surgery (ADC297673).  There is no record

of this ever happening.  One of his critical medications has been denied with no clear

reason for the denial (ADC297572).  He continues at grave risk and should be managed in

a medical setting closer to a major hospital system.

34.     ██████████████████ ) is another patient I met on my tour of the Yuma

facility in August 2013.  At the time I met him he had a significant wound of his right

lower leg that for an extended period of time had been utterly mistreated.  I was so

1   surprised by the grossly inadequate wound care as demonstrated by his chart and by

2   looking at the wound myself that I had him show his wound to Corizon's Dr. Winifred

3   Williams as well as the ADC and Corizon attorneys and prison officials who accompanied

4   me on my tour, and described for them exactly the problems with the care, both in person

5   and in my reports of November 2013 and January 2014.

6        35.    The updated records demonstrate that the State has made no meaningful

7   corrections to their potentially disastrous treatment of Mr. ███████ leg.  In a note dated

8   1/8/14 the staff indicate that they continue to apply Silvadene cream to the wound and

9   cover it with Duoderm (ADC283011) – the exact treatment I criticized in August 2013 as

10  being so far outside of the standard of care as to be dangerous to Mr. ███████ health.

11  The treatment is, predictably, failing: the wound appears to have grown in size since I last

12  saw it, to 8 x 6.5 centimeters on 1/8/14 (ADC283011).  I saw a note indicating that Mr.

13  ███████ is awaiting a wound consult from dermatology (ADC283010) but I see no

14  evidence that that was done in the records provided to me.

15       36.    The fact that ADC continued with a grossly inadequate treatment plan even

16  after I clearly described its inadequacies to them, and in the face of its utter failure to treat

17  the wound, is medically reprehensible to me.  Given the long duration of this wound and

18  its chronic infected state I would be surprised if Mr. ███████ could be treated with

19  anything short of an amputation.  That drastic and debilitating measure would not have

20  been necessary if ADC had reacted competently and appropriately to my expressed

21  concerns.

22       37.    When I met ███████████████) on my tour of Florence in 2013, he

23  had a large hepatic cyst that had gone untreated.  His personal physician had written a

24  letter to ADC on 7/8/13, which outlined a very comprehensive and reasonable treatment

25  plan for him.  It was clear when I reviewed his chart in 2013 that this letter had been

26  ignored and the treatment plan had not been implemented.  I informed prison

27  administrators and counsel for the State and Corizon at that time that Mr. ███████ was a

28

1    critical patient who needed immediate attention.  I also thoroughly described my concerns

2    in my November 2013 Report.

3         38.    My review of the updated record reveals that far from correcting Mr.

4    ████ care, ADC has maintained the same incompetent treatment.  Not surprisingly, Mr.

5    ████ developed complications from the cyst that necessitated hospitalization on 12/12/13

6    (ADC344490).  At that time it was discovered that he also had hepatocellular carcinoma

7    (ADC344554).  A consult for a surgical evaluation for his hepatic cyst was finally entered

8    into his chart on 1/22/14 (ADC344479).  He was not seen by a general surgeon until

9    2/20/14 (ADC344471) and despite recommendations for surgery for this hepatic cyst and

10   proven carcinoma, there is no evidence in the chart that the surgery has been completed.

11   This is another example of a case in which a treatment problem was made very clear to

12   ADC without effect: the significant and life-threatening delays in obtaining medically

13   necessary care continued.

14        39.    I met ████████████ ) on my 2013 tour of the Inpatient Care Unit at

15   the Tucson complex.  I was disturbed to find in his chart a "do not resuscitate" (DNR)

16   order that had not been properly executed in a way that conforms to standards of medical

17   practice.  I informed counsel for the State as well as Dr. Winifred Williams from Corizon

18   that I was extremely concerned that the DNR order appeared to have been signed under

19   coercive circumstances in which the patient was not fully informed and had not in fact

20   consented, and that it had been carried out in a way – with no provider or outside clinician

21   oversight -- that was medically inappropriate.

22        40.    As I note below, in the section on end of life care, I was disturbed to find in

23   Mr. ████ updated records that nothing has been fixed with respect to this issue. A

24   new DNR was signed by the patient with the same inadequacies – no clinician

25   involvement, no assurances of non-coercive decision-making (ADC345013).  Further, he

26   remains inadequately monitored in the Tucson inpatient unit.  I was also extremely

27   surprised at the paucity of clinician notes available in the record: it appears that he has

28   only been seen a few times by a provider between October 2013, when I met him, through

1  March 2014.  This ongoing lack of oversight of the care of this complex patient is grossly

2  inadequate and places him at serious risk of harm.

3       41.    I interviewed ████████████████████) on my visit to Yuma in August

4  2013.  At that time the management of his AIDS was well below the standard of care: he

5  was undergoing what can only be described as irresponsible healthcare that could shorten

6  his life.  I passed my concerns on to ADC and Corizon officials and attorneys on that tour.

7  I raised subsequent concerns about his care in my initial Report in November 2013 and

8  my Supplemental Report in April 2014.

9       42.    According to his chart Mr. ███████ was finally seen by an infectious

10  disease specialist on 3/19/14 (ADC307482).  The visit was of limited utility, however,

11  because the doctor noted he had access only to old labs from December 2013 showing a

12  CD4 count of 112 and a viral load of 933.  However, more recent labs had in fact been

13  drawn, even though the results were apparently not provided to the specialist: I found in

14  the chart labs dated 2/28/14, several weeks prior to the consultation, showing a CD4 count

15  of 78 and a viral load of 193 (ADC307508).  These labs show that Mr. ███████ was far

16  sicker than the information available to the infectious disease specialist indicated.

17       43.    The failure to communicate these more recent lab results places Mr.

18  ███████ at extreme risk.  His CD4 count is drastically low and certain medications are

19  required at the point that it drops below 100.  The fact that the most recent labs were not

20  communicated to the consultant and no additional infectious disease consultations are

21  documented in the chart mean that this patient's current medication regimen is not

22  appropriate, placing him at significant risk for infections, HIV disease progression, and

23  extreme complications from his disease.

24       44.    This patient's care continues to be well beneath the standard of care and it is

25  clear that his care is beyond the ability of the providers at Yuma.  His current regimen is

26  grossly inadequate and places him at extreme risk for untimely death; he must be seen by

27  an HIV specialist and managed exclusively by an HIV specialist with regular visits and

28  up-to-date labs.

1   **III.    Consideration of additional supplemental evidence**

2           This section follows the same outline as my initial Report of November 2013 and

3   should be read as a supplement to that Report.

4           **A.    Building blocks**

5                   **1.    Staffing**

6           45.    As before, I found widespread evidence of treatment failures described

7   throughout this report that in my experience often stem from inadequate staffing.  I saw no

8   evidence of increased staffing or improved availability of providers, nurses, or other

9   medical staff in my reviews of the updated medical charts.  Furthermore, I continued to

10  see evidence that the system utilizes underqualified staff to attempt to deliver care (see

11  Section III.C.2, below).

12          46.    The MGAR reports provide additional evidence of recent staffing

13  deficiencies.  ADC211517 (December 19, 2013) ("[p]hysician chart reviews have not

14  been completed at Winslow. There is no longer a physician at Winslow to complete chart

15  reviews"); ADC211318 (December 23, 2013) ("there are vacancies that impair the

16  adequacy of staff" at Perryville, including among medical records staff and nursing

17  assistants); ADC211371 (December 18 and 24, 2013) (at Phoenix, "positions of Director

18  of Nursing, psych techs, medical records, Facility Health Administrator are vacant

19  resulting in non[-]compliance" and Aspen unit "is non[-]compliant in the area of inmates

20  being medically evaluated on a timely basis as a result of inadequate staffing");

21  ADC211508 (December 27, 2013) (inadequate staffing in Winslow's Kaibab medical

22  unit, including vacancies for Medical Director,  mid-level provider, two RN positions and

23  29 security positions "leads to less than optimal healthcare for the inmate population");

24  ADC211175 (December 31, 2013) (in Eyman, staffing "levels do not appear adequate to

25  meet the need at the current time"); ADC211566 (December 31, 2013) (at Yuma, staffing

26  is not adequate "to meet the needs of the inmate population" including vacancies for

27  outside consult coordination and director of nursing).

28                  **2.    Physical facilities**

47.     I would not expect significant changes to the physical facilities for delivery of medical care in the six months from October 2013 through March 2014, and was not informed of any.  I did note one item in the recent MGAR reports that caused me some concern: in the Perryville infirmary, "[t]here currently is no call-light system that allows inmates to be within sight or hearing of a qualified health care professional at all times.  Corizon is currently considering installing a system."  ADC268575 (January 2014 audit).  The lack of an alert system in an inpatient setting is a serious concern because patients who are sick enough to be admitted into this type of unit frequently cannot get out of bed to advocate for their needs and if they are locked in a cell and bed-ridden, they need some ability to notify medical staff to prevent serious medical problems.

**B.     Timely access to care**

48.     The cases of delayed and denied care for potentially life-threatening conditions described above in Section II, sadly, are not anomalous.  Instead, they are entirely predictable result of the widespread treatment backlogs that defendants document in their own monitoring reports.  For example, ADC's January 2014 internal monitoring report on the Tucson complex noted 17 missed sick call lines and reported that "[t]otal backlog for the entire Complex for this audit period is as follows: HNRs [Health Needs Requests]- (444). CHARTS requiring Provider review - (209). NURSELINE backlog - (404). PROVIDER LINE backlog - (390)."  ADC268654.   By March 2014, the situation had actually deteriorated, with 24 missed sick call lines and "Provider line backlogs and Provider chart reviews . . . higher than they have been at Tucson Complex, since Corizon took over the Contract. . . . Total backlog for the entire Complex for this audit period is as follows:  HNRS -347, CHARTS requiring Provider review - 489, NURSELINE backlog - 206, PROVIDER LINE backlog (IMs awaiting to see a Provider) - 1028."  ADC269333.

49.     The human cost to such statistics throughout the State is severe.  In my updated chart reviews, I found ample evidence of patients who continue to suffer from delayed treatment, all of which is below the standard of care.  For example, two records I reviewed documented significantly delayed care for serious heart conditions in very

1  complex medical patients.  ⬛⬛⬛⬛⬛⬛⬛) experienced delayed care for his

2  arrhythmias and hypertension, placing him at risk for damage to internal organs, kidney

3  failure, loss of sight, and possibly death.  He was seen on 9/18/13, at which time a nurse

4  practitioner's request for cardiology consult was denied to allow for testing

5  (ADC295938).  The tests and follow-up appointments were delayed for several months

6  (ADC295937).  When he finally saw the cardiologist on 2/18/14, the cardiologist, noting

7  his very high blood pressure and history of irregular abnormal heartbeats, recommended

8  blood pressure monitoring, a beta-blocking medication, a cardiac work-up,

9  echocardiogram, and a Lexiscan stress test (ADC95946-47).  As of the 4/1/14 cut-off date,

10  none of those recommendations had been followed.

11        50.  ⬛⬛⬛⬛⬛⬛⬛) likewise had troubling delays in workup for his

12  serious heart problems.  On 9/23/13, a cardiologist appropriately recommended an

13  echocardiogram and a stress test (ADC307768-9).  These tests have still not been ordered

14  as of 4/1/14, more than six months later (ADC307761-63, ADC307758).  His treatment

15  for other ailments was also delayed.  On 12/19/13, an orthopedist evaluated him for

16  shoulder pain and recommended arthroscopy and repair (ADC307772-75).  Although his

17  nurse practitioner requested follow-up on the consult order (ADC307762), the file

18  contains no evidence that Mr. ⬛⬛⬛⬛ received further treatment for his shoulder by

19  4/1/14.

20        51.  Additional examples of inexcusable delays in medical care delivery include

21  ⬛⬛⬛⬛⬛⬛⬛).  After he was apparently involved in an altercation in the

22  prison, an order was written on 11/21/13 for a nasal x-ray (ADC295574).  It was not done

23  until 1/10/14, which is well beyond the window for any possible treatment of an acute

24  nasal fracture (ADC295573, ADC295590-91).   In addition, there are orders in his chart

25  for a test to monitor his Hepatitis C to be completed on 11/8/13 and 11/19/13

26  (ADC295567, ADC295566), but there is no evidence in the chart that these were ever

27  completed.  See also ⬛⬛⬛⬛⬛⬛⬛) (patient submitted HNR on 12/17/13

28  [ADC307535] requesting provider evaluation; states he is supposed to be seen monthly

but hasn't had evaluation in 6 months; no notation in updated chart that he was ever seen for this request); ████████████████████ ) (patient requested care for various urinary tract infections starting 9/3/13 [ADC294622-23] but despite being seen by clinicians several times [ADC294568], was not started on antibiotics until 9/24/13 [ADC294558]); ██████████████████ ) (patient suffered a wrist fracture on 8/31/13; emergency room providers appropriately requested orthopedist follow-up in one week later [ADC310378, ADC310391-92] but patient not seen for three weeks [ADC310393]; second follow-up requested for one month later apparently never happened); ████████████████████ ) (diabetic patient waited at least seven months for diabetic shoes, after filing HNR on 3/10/13 [ADC324684], getting an order for shoes on 6/28/13 [ADC324399], and re-order on 10/30/13 [ADC324397, ADC324414] but not clear whether ever received).

### 1.   Sick call

52.   In my initial report, I described a broken triage system in which patient needs are not timely or appropriately identified, assessed, and treated.  The cases described above demonstrate that the problems continue.  This conclusion is strongly supported by the reports from ADC's own monitors

53.   For example, on 12/2/13, an ADC monitor found more than 90 HNRs yet to be triaged in a single unit in Eyman, dating back over a week, two of which were emergencies.  AGA_Review_00113522-23.  Not only was the problem not fixed after it was pointed out – it grew worse.  As of December 10, "that pile has grown to over 200 HNRs." AGA_Review_00113522.  Many of these HNRs were even older than the ones previously discussed – some more than a month old -- and 17 "appear to have been reviewed by nursing staff" but "no charts were pulled and no [nursing line] was prepped" and "these HNRs look to have been added back into the pile without any follow-up." *Id.* Seven were marked as emergencies. *Id.*

54.   The next day, the same monitor found 47 HNRs in another Eyman unit that were more than two days old, 34 of which were marked as emergencies "or otherwise require rapid attention."  AGA_Review_00116455.  The monitor also found dozens of

1    patient charts "going on one week+ that have yet to be noted by nursing (some older)" and

2    noted that he had been told that "the AM meds did not go out on time, and the afternoon

3    meds may not have been delivered at all."  AGA_Review_00113523.

4           55.     In the updated MGAR reports, the ADC monitors found widespread failures

5    to comply with specific policy requirements meant to ensure timely care.  Perhaps the

6    most critical of these is the requirement that patients be triaged within 24 hours of

7    submitting an HNR.  The widespread violations of this requirement continue.   Indeed, in

8    some places, the HNR process might have broken down entirely: see ADC211243

9    (December 18 2013) (in Lewis, "on 12/18/13, a loose stack of HNRs was located with

10   dates ranging from 9/10/13 - 12/14/13.  There was no way in many cases to determine the

11   level of triage that may have occurred or i[f] a triage did occur"); ADC210481 (October

12   31, 2013) (in Aspen Unit at Phoenix, 50 HNRs were found in various areas of medical

13   room: "it appeared some were rescheduled and some not evaluated"); ADC269277

14   (March 28, 2014) (only 1 HNR as of 2014 in reviewed records at Phoenix).

15          56.     There is extensive data that HNRs, even when not lost, are not being timely

16   reviewed or processed in 24 hours.  ADC269186-87 (March 31, 2014) (22 out of 70 files

17   showed noncompliance at Lewis); ADC269155 (March 31, 2014) (11 out of 60 charts

18   showed noncompliance at Florence); ADC269124 (March 31, 2014) (15 out of 50 charts

19   noncompliant at Eyman); ADC269335 (March 30, 2014) (21 out of 80 charts

20   noncompliant at Tucson); ADC269279 (March 28, 2014) (45% noncompliance  at

21   Phoenix); ADC269398 (March 27, 2014) (16 out of 50 charts noncompliant at Yuma);

22   ADC269237-38 (March 27, 2014) (18 out of 50 charts noncompliant at Perryville);

23   ADC269009 (February 28, 2014) (25 of 80 charts noncompliant at Tucson); ADC268961

24   (February 28, 2014) (29% of charts noncompliant at Phoenix); ADC268838 (February 28,

25   2014) (28 out of 50 charts noncompliant at Eyman); (ADC269064 (February 13, 2014)

26   (15 out of 50 charts at Yuma noncompliant); ADC268655 (January 31, 2014) (35 out of

27   80 charts noncompliant at Tucson); ADC268583 (January 31, 2014) (25% noncompliance

28   at Phoenix); ADC268485 (January 31, 2014) (87.2% noncompliance at Lewis);

1   ADC268381 (January 29, 2014) (32 out of 50 records noncompliant at Eyman);

2   ADC268755 (January 23, 2014) (18 of 50 charts noncompliant at Yuma); ADC268430

3   (January 17, 2014) (17 of 60 charts noncompliant at Florence); ADC268722 (January 14,

4   2014) (30% noncompliance at Winslow); ADC211417 (December 31, 2013) (48 out of 80

5   charts noncompliant at Tucson); ADC211241 (December 31, 2013) (10 charts reviewed

6   per Lewis unit, revealing 30% noncompliance at EP/Sunrise, 40% noncompliance at Rast;

7   50% noncompliance at Bachman, 20% noncompliance at Buckley, 30% noncompliance at

8   Stiner, 50% noncompliance at Morey); ADC211146 (December 30, 2013) (44%

9   noncompliance at Eyman); ADC211122 (December 30, 2013) (25% noncompliance at

10   Douglas); ADC210382 (October 31, 2013) (76% noncompliance at Lewis);  ADC210260

11   (October 30, 2013) (42% noncompliance at Douglas); ADC210655 (October 29, 2013)

12   (16 of 50 charts at Yuma noncompliant); ADC210336-37 (October 29, 2013) (48%

13   noncompliance at Florence); ADC210289 (October 29, 2013) (42% noncompliance at

14   Eyman); ADC210433 (October 28, 2013) (26% noncompliance at Perryville);

15   ADC210525 (October 28, 2013) (25% noncompliance at Safford); ADC210548 (October

16   28, 2013) (44 of 80 charts noncompliance at Tucson).

17       57.   One reason why delays in care are so common might be that sick call (also

18   known as "nurse's line") is not always conducted five days a week, as required by internal

19   policies in the Arizona system.  ADC269105 (March 31, 2014) (13.25% noncompliance at

20   Winslow); ADC269186 (March 31, 2014) (at Lewis, 76 days missed out of a possible

21   140); ADC269275 (March 28, 2014) (45% noncompliance at Phoenix for March; in

22   Aspen Unit, "Inconsistent use of sick call line (appointment list) forms results in difficulty

23   to determine if sick call is being conducted five days a week"); ADC269237 (March 27,

24   2014) (3 out of 5 units noncompliant); ADC269007 (February 28, 2014) (14 missed sick

25   call lines at Tucson); ADC268931 (February 28, 2014) (4 missed sick call lines at

26   Perryville); ADC268899 (February 28, 2014) (67% noncompliance at Lewis);

27   ADC268838 (February 28, 2014) (at Eyman, sick call missed 12 days out of a possible

28   19);  ADC268582 (January 31, 2014) (Phoenix 45% noncompliant); ADC268485

1   (January 30, 2014) (25 lines held at Lewis out of a possible 125 in 18 days); ADC268381

2   (January 29, 2014) (in January at Eyman, sick call missed 6 days at Rynning Unit, 3 days

3   at Browning Unit, 15 days at SMU I, 10 days at Cook); ADC211241 (December 31, 2013)

4   (sick call only conducted 3 days a week on average at Lewis); ADC211146 (December

5   31, 2013) (31 sick call days missed among 3 Eyman units collectively);  ADC211337

6   (December 27, 2013) (40% of Phoenix sick-call lines noncompliant).

7           58.     In addition, significant numbers of patients are not referred to providers

8   when appropriate after the nurses triage their cases or, if they are referred, are not seen

9   within the required time frame.  ADC269340 (March 31, 2014) (8 out 46 charts not

10  compliant at Tucson); ADC269240-41 (March 31, 2014) (29 out of 50 charts not

11  compliant at Perryville);  ADC269190 (March 31, 2014) (33% noncompliance at Lewis);

12  ADC269281-82 (March 28, 2014) (24% noncompliance at Phoenix); ADC269403 (March

13  27, 2014) (12 out of 50 charts at Yuma not in compliance); ADC268839 (February 28,

14  2014) (50% noncompliance at Tucson); ADC269013 (February 28, 2014) (15 of 27

15  referrals at Tucson noncompliant); ADC268933 (February 28, 2014) (50% of charts at

16  Perryville noncompliant); ADC268871 (February 27, 2014) (15 out of 60 charts at

17  Florence noncompliant); ADC269068 February 18, 2014) (22 out of 50 charts at Yuma

18  noncompliant);  ADC268433 (January 31, 2014) (14 out of 60 charts at Florence not in

19  compliance); ADC268487 (January 31, 2014) (at Lewis, patients seen on average 16.9

20  days after referral); ADC268535 (January 31, 2014) (10 out of 50 charts at Perryville

21  noncompliant); ADC268659 (January 31, 2014) (17 out of 23 charts reviewed at Tucson

22  noncompliant);  ADC268383 (January 29, 2014) (11 out of 28 charts at Eyman not in

23  compliance); ADC268759 (January 23, 2014) (at Yuma, 18 of 50 charts reviewed not in

24  compliance); ADC268723 (January 14, 2014) (35% noncompliance at Winslow);

25  ADC211241(December 31, 2013) (26 out of 70 charts at Lewis noncompliant);

26  ADC211421 (December 31, 2013) (at Tucson, 12 out of 37 referrals noncompliant);

27  ADC211528 (December 31, 2013) (20 of 50 charts at Yuma not compliant); ADC211194

28  (December 27, 2013) (13 out of 60 charts reviewed at Florence not compliant);

1  ADC211288-89 (December 23, 2013) (34% noncompliance at Santa Cruz Unit,

2  Perryville); ADC210383 (October 31, 2013) (56% noncompliance at Lewis); ADC210436

3  (October 30, 2013) (28 out of 49 charts at Perryville were noncompliant); ADC210552-54

4  (October 29, 2013) (26 of 37 referrals at Tucson untimely).

5      59.    Nursing staff are required to review the health care records of newly

6  transferred patients within 12 hours of arrival.  This policy, if followed, is crucial to

7  maintain timely continuity of care.  The MGARs demonstrate that this important mandate

8  is routinely ignored, a finding consistent with the interruptions in care I have seen in

9  patient charts.  ADC268465 (January 31, 2014) (12 out of 60 intake charts noncompliant

10  at Florence); ADC268464 (January 31, 2014) (at Florence, 40 out of 60 intake charts

11  noncompliant); ADC268698 (January 30, 2014) (at Tucson, 15 out of 70 intake charts not

12  compliant); ADC268517 (January 30, 2014) (at Lewis, 28 of 67 intake charts not

13  compliant); ADC268415 (January 29, 2014) (only 28% of records reviewed for transfer

14  issues at Eyman); ADC211164 (December 31, 2013) (74% noncompliance at Eyman);

15  ADC211443 (December 30, 2013) (44% of charts showed noncompliance at Tucson);

16  ADC211210 (December 27, 2013) (49 out of 60 intake charts noncompliant at Florence);

17  ADC211304 (December 24, 2014) (49% noncompliance at Perryville).

18          **2.    Chronic care**

19      60.    Deficiencies in chronic care are often the clearest indicators of a

20  dysfunctional healthcare delivery system, since chronic care is something that can be

21  delivered appropriately in a large institutional setting only when resources are adequate

22  and policies and procedures are well planned, well understood, and well implemented.

23  This has clearly not been the case in Arizona prisons, and the updated records and

24  documents I reviewed show that it continues to be a grave problem.  Many of the cases I

25  discuss elsewhere in this report, under "Delays in care" and "Specialty care," involve

26  chronic care patients.  Other problems are described below.

27      61.    Serious chronic illnesses require regular provider visits, medications,

28  monitoring and regular diagnostic testing.  The updated medical records I reviewed

1  revealed, as before, that seriously ill patients do not receive necessary treatment,

2  monitoring or medications for their complex medical conditions.  As a result, some

3  patients suffer unnecessarily and all are at risk of serious harm.

4      62.      ████████████████), for example, is a diabetic with numerous

5  indicators that his diabetes is not well controlled, and yet no treatment regimen was

6  designed and implemented to bring him under better control and no follow-up was

7  ordered to monitor his progress toward reasonable diabetic control.  As such his diabetic

8  management plan is failing and he is at grave risk of serious, lasting harm.  One of the

9  serious risks he faces, given his current numbers, is renal failure.  However, no assessment

10 has been done of his renal function to determine whether he needs to be prescribed an

11 ACE inhibitor for his long-term renal safety.  See also ██████████████) (insulin-

12 dependent diabetic experiencing very poor management; only 17 pages of medical records

13 produced, but it is clear that his diabetes is still very poorly controlled, with a Hemoglobin

14 A1c level recorded at 10.9% on 10/18/13 [ADC303250], which is evidence of extremely

15 poor diabetic control); ████████████) (patient with HIV, hypertension, Hepatitis

16 C, and adult onset diabetes; necessary labs to monitor these chronic conditions ordered on

17 11/20/13, 12/12/13 and 1/25/14, but no test results from these collection dates in chart;

18 repeated failure to carry out crucial tests ordered by the clinicians for this patient with

19 multiple chronic conditions places him at serious risk for disease progression, undetected

20 complications of his diseases, and irreversible long term damage); ██████████

21 █████) (patient with HIV, Hepatitis C, diabetes, and hypertension has had multiple

22 chronic care appointments with labs and checks ordered [ADC317539-ADC317545] but

23 no lab results, tracking of vital signs, blood glucose checks, or the like in his chart).

24      63.      ████████████████), a hemophiliac, continues to struggle with the

25 management of his disease in ADC.  He has experienced multiple episodes of bleeding

26 and hematoma development.  The updated chart shows that he continues to live in a

27 general population setting and continues to be injured and in severe pain from his

28 hematomas on a regular basis.  He should be housed somewhere he can be protected in his

1  fragile condition, and also somewhere with a more advanced medical capability than
2  Yuma and access to more sophisticated medical care when he does bleed.

3       64.    Chronic care as measured by the MGARs continues to be dismal.  For one
4  thing, "[d]isease management guidelines have not been developed/implemented for all
5  ADC recognized chronic conditions."  ADC268848, ADC269134 (February and March
6  2014, Eyman).

7       65.    Additionally, although some patients have individual patient treatment
8  plans, the care they receive does not comply with those plans, as demonstrated by ADC
9  monitors' assessments of whether chronic care patients are seen by providers within the
10 time frames set by their treatment plans.  ADC269350 (March 31, 2014)  (47%
11 noncompliance at Tucson); ADC269164 (March 31, 2014) (18 of 60 charts noncompliant
12 at Florence); ADC269110 (March 30, 2014) (15% noncompliance at Douglas);
13 ADC269408 (March 28, 2014) (48% noncompliance at Yuma); ADC269203 (March 28,
14 2014) (44 of 70 charts noncompliant at Lewis); ADC269133 (March 28, 2014) (13 of 50
15 charts noncompliant at Eyman); ADC269253 (March 25, 2014) (27 of 50 charts
16 noncompliant at Perryville); ADC269289 (March 18, 2014) (16 of 37 charts noncompliant
17 at Phoenix); ADC268909 (February 28, 2014) (50% noncompliance at Lewis);
18 ADC268939 (February 26, 2014) (42% noncompliance at Perryville); ADC268847
19 (February 26, 2014) (30% noncompliance at Eyman); ADC268970 (February 25, 2014)
20 (15 of 34 charts noncompliant at Phoenix); ADC268877 (February 27, 2014) (23 of 60
21 charts noncompliant at Florence); ADC268765 (January 31, 2014) (24% noncompliance
22 at Yuma); ADC268593 (January 31, 2014) (14 of 32 charts noncompliant at Phoenix);
23 ADC268438 (January 31, 2014) (31 of 60 charts noncompliant at Florence); ADC268395
24 (January 31, 2014) (23 of 50 charts noncompliant at Eyman); ADC268667 (January 28,
25 2014) (42.5% noncompliance at Tucson); ADC268497 (January 27, 2014) (26 of 70
26 charts noncompliant at Lewis); ADC268542 (January 7, 2014) (19 of 50 charts
27 noncompliant at Perryville); ADC211477 (45% noncompliance at Tucson); ADC211231
28 (December 27, 2013) (32 of 60 charts noncompliant at Florence); ADC211380 (December

24, 2013) (9 of 35 charts noncompliant at Phoenix); ADC211329 (December 20, 2013)

(18 of 50 charts noncompliant at Perryville); ADC211184 (December 20, 2013) (38%

noncompliance at Eyman); ADC211279 (December 17, 2013) (77% noncompliance at

Lewis); ADC210972 (November 27, 2013) (86.3% of charts lack disease management

guidelines developed and implemented for chronic disease or other conditions; many

patients overdue for EKGs, foot exams, eye exams, etc.); ADC210969 (November 27,

2013) (38 of 88 charts noncompliant at Tucson); ADC210744 (November 27, 2013) (at

Eyman, one patient not seen since 1/25/12; another not seen since 2/7/12;  another not

seen since 10/6/11); ADC210784 (November 26, 2013) (32 of 60 charts noncompliant at

Florence); ADC210905 (November 15, 2013) (17 of 47 charts noncompliant at Phoenix);

ADC210868 (November 14, 2014) (50% noncompliant at Perryville); ADC210825

(November 12, 2013) (49% noncompliant at Lewis).

### 3.     Emergency care

66.     One of the more recent MGAR reports notes the serious risk involved with

medical emergency care at Eyman: "Security is not given instructions regarding

appropriate interventions for medical emergencies that may arise from a chronic

condition.  Education material is available through the Corizon corporate offices but the

process for discriminating [sic] this information has not been implemented."  ADC211168

(December 2013, Eyman).

### 4.     Inpatient care

67.     I did not see any additional information in the chart updates I reviewed that

related to inpatient care independent of other care concerns.

### 5.     End of life care

68.     In my November 2013 report, I described my alarming discovery in the

Tucson infirmary of two very sick prisoners who had signed sweeping waivers of all end-

of-life and palliative care under apparently coercive circumstances, at the direction of

nurses acting outside their scope of practice and without any independent review by a

physician or psychiatrist.  I found these two instances extremely concerning and indicative

1   of serious violations of these patients' rights and although the limitations of this litigation

2   kept me from performing a thorough investigation, I urged ADC to undertake one to

3   determine the scope of the problem.

4          69.     I had the opportunity to review an updated chart for one of the patients

5   whose waiver had caused me such concern: ▮▮▮▮▮▮▮▮▮▮▮▮▮) (I discuss this concern

6   in more detail above at Section II.B).  The updated chart shows that subsequent to my

7   discovery, a new "do not resuscitate" order (DNR) was done with Mr. ▮▮▮▮▮ dated

8   10/24/13 (ADC345013).  It is still entirely inadequate, however, since it is witnessed only

9   by an RN, with no indication at all that a higher-level provider was involved.  The

10  violation has not been repaired – it has been repeated.

11         70.     I now see further confirmation of my concerns in the latest MGAR reports:

12  the ADC monitors' findings show that ADC's end-of-life procedures are seriously and

13  systemically flawed.  The Tucson monitor appears to have followed up on my discovery,

14  reporting on 11/27/13 that she had audited 70 charts to see if "written evidence exist[s] in

15  the health record that terminally ill patients executing such documents have been provided

16  sufficient and appropriate information to make voluntary and informed decisions"

17  (ADC211011).  She found that 83% of the charts she reviewed were out of compliance

18  with ADC's standards.  Serious problems were also identified by monitors at other

19  institutions.  ADC210737 (Nov. 27, 2013) (at Douglas, "[t]he End of Life and [power of

20  attorney] Paperwork is provided by, and witnessed by the [custody staff] . . . . Health

21  Services Staff have no routine involvement with the presentation of 'end of life'

22  paperwork.  Correctional Staff in most cases have received minimal training in the

23  presentation, or implementation of this information"); ADC210935-36 (Nov. 21, 2013)

24  ("[w]hen 5 Phoenix Complex Corizon randomly chosen nurses working in various

25  medical areas were asked if they received an in-service training on end-of-life decisions,

26  they reported not receiving an in-service training on end-of-life decisions from Corizon");

27  ADC210962 (Nov. 25, 2013) (at Safford, "[e]nd of life decisions are not discussed with

28  Health Services Staff.  The paperwork is provided by the [custody staff], witnessed by

1   them, and then forwarded to the [medical records librarian] to input. . . . Correctional Staff

2   have not had a training class for approximately 18 months or so"); ADC210894 (Nov. 13,

3   2013) (at Perryville's Santa Cruz unit, "there were do[z]ens of advance directives and end

4   of life decision-making documents that go back at least to March 2012" and in the San

5   Pedro unit, "there are also stacks of these documents that are not filed in the medical

6   records"). The use of untrained staff, particularly untrained custody staff, for such a

7   sensitive and essential medical function is a gross abdication of responsibility by ADC's

8   medical authorities and a serious violation of these patients' rights to informed,

9   confidential, and non-coerced decision-making about their own lives and health.

10           **C.     Exercise of professional medical judgment**

11           71.    The chart updates and MGARs I reviewed demonstrate to me that it remains

12   as difficult for medical practitioners in ADC to exercise their professional medical

13   judgment as set forth in my prior reports. Medical records are just as chaotic and

14   incomplete, nurses appear to continue to perform inappropriate tasks outside their scope

15   of practice, and crucial specialty care consults remain extremely difficult to obtain and are

16   excessively delayed.

17           **1.     Medical records**

18           72.    Poor medical record-keeping and charting practices persist. The updated

19   records I reviewed are just as incomplete, illegible, and difficult to follow as the prior

20   ones. I provide several specific examples of charting failures in this section, but these are

21   merely illustrative and not comprehensive. The overwhelming majority of charts I

22   reviewed demonstrated evidence that the charting system in ADC overall is so flawed that

23   it cannot but interfere with care.

24           73.    Recent MGAR audits bear out my observations. For example, in Lewis, the

25   December 2013 auditor's report notes that "[c]urrent loose filing [in medical records] is

26   equal to approximately 10 inches. The staff in medical records are making noted

27   progress, but the loose filing in question contained records exceeding 5 months."

28   ADC211243.

74.     Medical Administration Records (commonly known as MARs) are a critical element of an adequate health care record and must be accurately maintained so that health care staff  know exactly what medications their patients have received and when. This enables clinical staff to track treatment efficacy, side effects, missed doses, refusals, and the like, and to take corrective action as needed.

75.     Disturbingly, the MARs are often missing or inadequately completed in ADC records.  For example, ███████████████), an HIV-positive patient, submitted at least two HNRs, on 10/28/13 and 12/3/13 (ADC302895-96), indicating that he was not receiving his HIV medication consistently.  This is a common theme within ADC and unfortunately there is no documentation in his medical record to show that the system administered his medications appropriately.  In fact, there are no MARs in this chart at all for the 10-month span of this medical records production.  Charting failures such as this make it nearly impossible to provide appropriate care, since providers and nurses have no data to rely on in determining what, if any, treatment has been provided. See also ███████████████) (MARs incomplete; impossible to determine whether he is actually being administered his HIV medication); ███████████████) (MARs so poor it is difficult to correlate his complaints with the actual administration of medication, but clear that this HIV-positive patient went without medication for approximately two months in late 2013 and early 2014 [ADC295224-35]); ███████████████) (on 12/23/13 [ADC307785], cardiology patient submitted "2nd" HNR reporting that he had not received his prescribed medication for almost two months; the provider noted the lapse in therapy [ADC307763-64] and no MARs were in the file, making it impossible for me or for Mr. ██████ healthcare providers to know whether any medications have been given).

76.     The MGAR audit findings provide further evidence that nursing staff routinely fail to complete MARs thoroughly and accurately.  ADC269307 (March 27, 2014) (at Phoenix, "a review of MARS show incomplete documentation, missing initials for medication administration"); ADC269172 (March 26, 2014) (at Florence, "[m]ultiple

MARS with refusals, missing documentation of administration"); ADC268945 (February 28, 2014) (at Perryville, "very few MARs contain start dates"); ADC268853 (February 27, 2014) (96% MARs noncompliant at Eyman); ADC268882 (February 27, 2014) (53% MARs noncompliant at Florence); ADC269026 (February 27, 2014) (8 of 30 MARs noncompliant at Tucson); ADC268547 (January 31, 2014) (45 of 250 MARs noncompliant at Perryville); ADC268704 (January 31, 2014) (86.67% noncompliance at Tucson); ADC268618 (January 31, 2014) (68 of 72 MARs noncompliant at Phoenix); ADC268807 (January 30, 2014) (34 of 50 MARs noncompliant at Yuma); ADC268398-99 (January 29, 2014) (at Eyman, "in a review of 50 handwritten MARs (10 from each yard), 1 (2%) was found to have met all the criteria of this competency"); ADC268742 (January 29, 2014) (over 50% noncompliance at Winslow); ADC268520 (January 28, 2014) (70 of 70 noncompliant at Lewis); ADC268566 (January 24, 2014) (42 of 50 noncompliant at Perryville); ADC268418 (January 23, 2014) (35 of 50 noncompliant at Eyman); ADC211243 (December 31, 2013) (over 37% of MARs did not reflect dose, route, frequency, start date, or nurse's signature at Lewis); ADC211149 (December 31, 2013) (92% did not have dose, route, frequency, start date, or nurse's signature at Eyman); ADC211217 (December 27, 2013) (23 of 60 MARs noncompliant at Florence); ADC211311 (December 26, 2013) (40 of 50 MARs noncompliant at Perryville); ADC211502 (December 26, 2013) (over 80% noncompliance at Winslow); ADC211364 (December 24, 2013) (56% noncompliance at Phoenix); ADC211559 (December 23, 2013) (31 of 81 MARs noncompliant at Yuma); ADC211169 (December 20, 2013) (56% noncompliance at Eyman); ADC210990 (November 27, 2013) (89 of 92 MARs noncompliant at Tucson); ADC210761 (November 27, 2013) (48% noncompliance at Eyman); ADC210803 (November 25, 2013) (11 of 50 MARs noncompliant at Florence); ADC211045 (November 25, 2013) (over 80% of MARs at Kaibab at Winslow did not have a diagnosis listed and over 70% of MARs noncompliant complex-wide); ADC210884 (November 22, 2013) (42 of 54 noncompliant at Perryville); ADC210844-47 (November 20, 2013) (100% noncompliance at Lewis); ADC211087 (November 14,

2013) (28 of 50 MARs noncompliant at Yuma); ADC210509 (October 31, 2013) (57 of 67 noncompliant at Phoenix); ADC210369 (October 30, 2013) (32% noncompliance at Florence); ADC210604 (October 30, 2013) (82 of 97 MARs noncompliant at Tuscon); ADC210706 (48 of 50 MARs noncompliant at Yuma); ADC210323-25 (October 30, 2013) (58% noncompliance at Eyman); ADC210280 (October 23, 2013) (45% noncompliance at Douglas); ADC210414 (October 22, 2013) (100% noncompliance at Lewis); ADC210466 (October 18, 2013) (51 of 54 MARs noncompliant at Perryville).

77. Numerous other examples of records that are not current, accurate, or chronologically maintained were uncovered in the ADC audits: ADC269256 (March 31, 2014) (25 of 50 records noncompliant at Perryville); ADC269210 (March 31, 2014) (35% noncompliance at Lewis); ADC269356 (March 29, 2014) (60% noncompliance at Tucson); ADC269112 (March 26, 2014) (35% noncompliance at Douglas); ADC268943 (February 28, 2014) (40% noncompliance at Perryville); ADC268974 (February 28, 2014) (approximately 4 inches of loose filing in medical records at Aspen unit in Phoenix); ADC269024 (February 27, 2014) (42 of 80 charts audited had "items out of place" in medical records at Tucson); ADC268881 (February 27, 2014) (40% noncompliant at Florence); ADC268852 (February 27, 2014) (20% noncompliant at Eyman); ADC268596 (January 31, 2014) (the George Ward at Phoenix had 0% compliance); ADC268443 (January 31, 2014) (24 of 60 records noncompliant at Florence); ADC268673 (January 30, 2014) (22 of 80 noncompliant at Tuscon); ADC268398 (January 29, 2014) (30% noncompliant at Eyman); ADC268546-47 (January 28, 2014) (at Perryville, "it is difficult to determine if charts had all the documentation [they] should without going through all the loose filing.  Based on my review the compliance rate was, at best, 40%"); ADC268729 (January 14, 2014) (25% noncompliance at Winslow); ADC211423 (December 31, 2013) (35% noncompliance at Tucson); ADC211489 (December 26, 2013) (4 of 10 records noncompliant at Winslow Kaibab Unit and 20% noncompliance prison-wide).  See also ADC211282 (December 24, 2013) (monitor could not find charts for 6 inmates who returned from hospital to Lewis after searching 3 times).

### 2.     Nurses as primary care providers

78.     I found additional examples in the updated charts of nurses acting outside the scope of nursing licensure.  For example, ██████████████████████) has an artificial heart valve.  On 1/4/14 he complained of sharp chest pain that radiated down his left arm. He was not evaluated for this concern until 1/24/14 and that evaluation was performed by a registered nurse (ADC 288417).  An RN is not competent to evaluate such a serious concern, particularly in a known cardiac patient, and the delay in assessing this patient's chest pain falls well outside the standard of care.  See also ████████████) (patient evaluated by a licensed practical nurse who did a full assessment for chest pain without consulting a practitioner [ADC 283313-14], completely outside the scope of the LPN's license).

### 3.     Specialty care

79.     Given the broad scope of diseases managed in ADC, timely specialty consults are necessary to ensure appropriate care for complex cases.  A specialty consult is thus a medical order by a medical provider for medically necessary care.  This all too often does not happen for Arizona prisoners, however; I frequently see referrals that are carried out only after lengthy delays or numerous repeated requests, or that are never carried out at all.

80.     Many of the cases noted above, in the "Timely access to care" and "Chronic care" sections, were not provided specialty consultations and diagnostic tests in a timely manner (or at all).  Additional examples are noted below.

81.     The updated charts demonstrate that patients requiring specialized care for HIV and AIDS continue to have no access, or insufficient access, to infectious disease specialists, and their treatment has suffered as a result.  ████████████), for example, was seen by an outside infectious disease specialist on 12/18/13 who noted that his HIV medications had failed to suppress his virus and that his medications were "very spotty in distribution" (ADC293705).  The specialist recommended labs be drawn and a critical follow-up be performed six weeks later to adjust his therapy.  There is no record of

1   a follow-up appointment.  The labs, completed almost a month later, continued to

2   document treatment failure, and also revealed he was at risk for liver failure and possibly

3   death (ADC293708-11).  These lab results were not signed off by any clinician for over

4   two months (*id.*), meaning that there is no record they were reviewed or incorporated into

5   his treatment for this time period.

6         82.    Similarly, ███████████████) has never achieved full suppression of

7   his HIV virus, despite the Corizon reports showing universal virus suppression in its HIV

8   population statewide, as I discuss in my Rebuttal Report.  Mr. ██████ was seen by an

9   infectious disease consultant on 11/20/13 who  requested a follow-up in three months

10   (ADC308478).  There is no evidence in the chart that the follow-up appointment has taken

11   place, despite a provider order for infectious disease consult on 1/25/14 (ADC308454),

12   and despite frequent HNRs from Mr. ██████ indicating that he has significant side effects

13   from his medications and requesting to see the infectious disease doctor (ADC308431-32,

14   ADC308436, ADC308438, ADC308446).  It is medically irresponsible and dangerous to

15   continue this patient on his current HIV medications that are not fully effective for an

16   indefinite period of time.

17         83.    ███████████████) is also HIV-positive.  Although his lab results from

18   late November 2013 demonstrate that he is experiencing some virologic failure

19   (ADC334873), he was not seen again until 1/28/14 (ADC334864), after he submitted a

20   request to be seen (ADC334885). There is no evidence in the chart that he was ever

21   evaluated by the infectious disease specialist as ordered by the physician's assistant in

22   November 2013 (ADC334865) and as medically indicated by his ongoing treatment

23   failure.  See also ███████████████) (HIV-positive patient with orders for an

24   infectious disease consult on 9/4/13, 9/9/13, 1/13/14, 2/12/14, and 3/22/14 [ADC363173-

25   ADC363176] with no success).

26         84.    ███████████████), also HIV-positive, has apparently not complied

27   with his medications for many months.  The chart shows clear barriers for him taking

28   medications under supervision because the timing of the pill line conflicts with his job

(ADC313755).  He is not allowed to keep these medications with him to take unsupervised.  It appears that as a result, his HIV regimen is failing.  In addition he has never been seen by an HIV specialist and he continues on an unsuccessful medication regimen therapy without the benefit of the expertise that is sorely needed. This is inappropriate therapy and it places the patient in danger of rapid disease progression and development of drug resistant virus that would complicate any future treatment options.

85.    There are multiple orders in Mr ███████ chart for labs to be drawn to monitor his HIV status (ADC313750-52), but I can find only one lab result (ADC313754, 313758-63).  This result, drawn in February 2014, demonstrates that his therapy is not successful.  Even with that abnormal lab result present in his chart there appears to be no effort to modify his therapy or to monitor it appropriately to allow effective treatment.

86.    I received only 11 pages of ██████████████ ) updated chart, but those pages provide additional examples of ongoing systemic issues for this HIV-positive patient.  For example, Mr. █████ was ordered to have a Rast test on 9/27/13 to determine his pattern of significant allergies (ADC302887).  He was supposed to be scheduled with a physician's assistant on 11/1/13 to go over the results, but a notation by one of the staff members indicated that the test had never been completed and therefore the patient was not seen (ADC302891).  There is no record over this ten-month period of time that the patient has ever been seen by a healthcare provider despite his ongoing significant illness.  There is evidence in his chart of an HIV telemedicine visit (ADC302890), but no note correlating to the findings of that visit is in the record, so for purposes of Mr. ██████ actual treatment, it is as if such a visit never took place.  This is profoundly irresponsible medicine.  He also had medication delivery and charting failures that are noted in the appropriate sections of this report.  See also ██████████████ ) (HIV-positive patient received order on 11/20/13 [ADC306028] for infectious disease consult for a viral load of 80 and a "low CD4"; as of the production date for this chart [4/1/14], no record of this consult being completed; significant departure from standard of care for patient with such troubling indicators to experience this delay in receiving attention from a specialist).

87. ▮▮▮▮▮▮▮) has progressed to AIDS.  As a result, he has a very compromised immune system and is at high risk for life-threatening complications.  He is sometimes noncompliant with care, making him a difficult patient to treat.  Nonetheless the deficits in his treatment are unacceptable and fall well below standard of care.  At a minimum, a patient who is this sick should be seen by an infectious disease specialist to design his treatment regimen, but I can find no evidence in the chart that anyone has pursued this avenue.

88. His CD4 count was 35 cells/microliter on 10/25/13, a disturbingly low level, but the result was not reviewed until 12/9/13 (ADC309835) and then again on 1/24/14 (ADC310100).  The standard of care for a patient with such lab results is Bactrim plus some prophylaxis for Mycobacterium Avium Complex (Azithromycin is commonly used).  He was ordered Bactrim, but no Azithromycin was ordered until 2/25/14 (ADC309884), despite the fact that it was clearly indicated as a result of that very low CD4 count four months earlier.  There are no MARs in the chart to confirm administration.  Given his advanced AIDS, Mr. ▮▮▮ must be managed by an HIV specialist.  However, there are no infectious disease consults ordered or completed in his chart.  Furthermore, he is on a full HIV cocktail (ADC309812), but there is no viral load ever ordered to determine treatment efficacy.  His treatment falls well below the standard of care and is yet another example of very poor HIV management at Yuma (see my discussion of ▮▮▮▮▮▮▮ in Section II above).

89. Patients are unable to access other types of specialists as well. ▮▮▮▮ ▮▮▮▮▮▮▮) has significant rheumatoid arthritis and is managed by a rheumatologist who, on 9/19/13,  recommended referral to an orthopedist, with a return rheumatology visit (ADC284909, ADC284918).  I can find no evidence in the chart that either of these appointments, which I agree are needed, was completed.  This apparent failure is confirmed by a clinical note filled out by someone whose signature I cannot read (ADC284909), who noted the lapse.  Although new consult requests were submitted, I found no evidence in the record that any have occurred.

90. ███████████████) has significant rectal pain from rectal prolapse and chronic hemorrhoids.  A surgery consult was ordered 9/18/13 (ADC295221), but it took over six months to schedule.  Noting his "excruciating pain" and rectal bleeding, the surgeon on 3/27/14 recommended surgical repair (ADC295217-20).  While awaiting his surgical consult, Mr. ██████ pain medication lapsed, perhaps for as long as two months (ADC295224-35).  He was subjected to months of unnecessary pain while awaiting treatment for a repairable condition.

91. █████████████████) has systemic lupus erythematosus, a serious and potentially fatal autoimmune disease.  He is a complicated patient and his care must be managed by a rheumatologist.  It is not.  He is being managed with chronic long-acting opiates for pain control and multiple medications for lupus control but despite that he has had significant end-organ damage; a rheumatologist is sorely needed to assess his current treatment regimen and make any necessary adjustments.

92. Mr. ██████ has been trying for at least five months to see a rheumatologist, apparently to no avail.  He submitted an HNR on 10/26/13 stating that his symptoms were worsening and asking when he would have his next rheumatologist appointment (ADC295509).  On 11/01/13, a nurse practitioner noted that several weeks earlier, a request for rheumatology consult had been submitted (although this record is not in the chart) (ADC295404).  On 12/24/13 (ADC295395), the consult was denied until a required lab test was completed.  A lab order was given at that time, but the draw was not completed until 1/13/14 (ADC295419), three weeks later.  On that same day, an additional request for the long-awaited specialty consult was submitted (ADC295407).  There is no record in the chart that the rheumatology consult ordered in October 2013 has ever taken place.  See also ███████████) (hand x-ray ordered 10/4/13 [ADC322612], but no results in chart); ████████████████) (reference to labs to monitor response to Methotrexate [ADC325304], but no results in chart); ████████████████) (delivered a baby on 7/27/13 and supposed to have a follow-up ob-gyn appointment on 9/5/13 [ADC326468], but no records in the chart that it ever happened).

93.     Another patient with recurrent urinary tract infections after an ileostomy waited more than eight months for a urology consult and might still be waiting. AGA_Review_00104795-797.  A urology consult had been submitted on 7/26/13 but was still pending as of 3/26/14.  *Id.*  His grievance made it all the way to the Director's level before action was taken to schedule an appointment for him.  *Id.*  As of 4/1/14, no appointment had been scheduled.  AGA_Review_00104795.

94.     The MGAR audits confirm the broad scope of the serious failures I saw in the provision of specialty consultations and necessary diagnostic tests (labs, x-rays, MRIs, ultrasounds, etc.).  The ADC monitors found serious delays in scheduling routine specialty consults and diagnostic tests.  ADC269346 (March 31, 2014) (27% of charts at Tucson noncompliant with timely routine consults); ADC269286  (March 31, 2014) (at Phoenix, 6 out of 11 charts noncompliant with timely routine consults); ADC269247 (March 31, 2014) (at Perryville, 127 out of 154 charts noncompliant with timely routine consults); ADC269159  (March 31, 2014) (at Florence, 19 out of 42 charts noncompliant with timely routine consults); ADC269108  (March 31, 2014) (at Douglas, 28% noncompliance for timely routine consults); ADC269194 (March 28, 2014) (at Lewis, 46 out of 70 charts noncompliant with timely routine consults); ADC269406 (March 28, 2014) (at Yuma, 15 out of 37 charts noncompliant with timely routine consults); ADC211579 (December 31, 2013) (16 out of 50 charts at Yuma noncompliant); ADC211274 (December 31, 2014) (at Lewis, 81% of charts showed untimely ordered tests/consults); ADC211471 (December 30, 2013) (36 out of 71 charts at Tucson noncompliant with timely orders for tests/consults); ADC211325 (December 29, 2013) (76% noncompliance at Perryville); ADC211229 (December 27, 2013) (40% noncompliance for timely tests/consult orders at Florence); ADC211381 (December 24, 2013) (13 out of 40 Phoenix charts noncompliant with labs/x-ray orders).

95.     The monitors also found that specialty consult reports are routinely reviewed late by providers.  This step is important for the orderly and timely progress of informed treatment decisions.  Without timely review of specialists' findings and

recommendations, there is a risk that care will not be appropriate, as I have too often seen in patient charts.  See ADC269344  (March 31, 2014) (73% noncompliance at Tucson); ADC269246 (March 27, 2014) (at Perryville, 39 out of 50 consult reports noncompliant); ADC269286  (March 25, 2014) (at Phoenix, 14 out of 31 consult reports noncompliant); ADC269194  (March 28, 2014) (at Lewis, 13 out of 20 consult reports noncompliant); ADC269128  (March 28, 2014) (at Eyman, 11 out of 47 consult reports noncompliant); ADC269072  (February 28, 2014) (at Yuma, 4 out of 21 consult reports noncompliant); ADC268937  (February 28, 2014) (at Perryville, 27 out of 50 consult reports noncompliant); ADC268904 (February 28, 2014) (at Lewis, 11 out of 24 consult reports noncompliant); ADC268968 (February 26, 2014) (at Phoenix, 12 out of 23 consult reports noncompliant); ADC268841 (February 26, 2014) (at Eyman, 11 out of 38 consult reports noncompliant); ADC268591 (January 31, 2014) (at Phoenix, 19 out of 29 consult reports noncompliant); ADC268435 (January 31, 2014) (at Florence, 8 out of 39 consult reports noncompliant); ADC268386 (January 31, 2014) (at Eyman, 15 out of 33 consult reports noncompliant); ADC268490 (January 30, 2014) (at Lewis,18 out of 34 consult reports noncompliant); ADC268539 (January 29, 2014) (at Perryville,15 out of 50 consult reports noncompliant); ADC268662 (January 28, 2014) (at Tucson, 66.7% of consult reports noncompliant); ADC211229 (December 27, 2013) (40% noncompliance at Florence); ADC211182 (December 20, 2013) (56% noncompliance at Eyman; ADC210490 (October 31, 2013) (at Phoenix, 19 out of 33 consult reports noncompliant); ADC210342-43 (October 30, 2013) (at Florence, 24 out of 42 reports noncompliant);  ADC210662 (October 30, 2013) (at Yuma, 3 out of 11 consult reports noncompliant); ADC210387 (October 29, 2014) (85% noncompliance at Lewis); ADC210557 (October 29, 2013) (at Tucson, 77.5% noncompliance); ADC210440 (October 18, 2013) (at Perryville, 34 out of 54 reports noncompliant).

96.     Patients are often not seen in a timely manner on return from hospital stays. This is a dangerous practice because patients are often extremely vulnerable and particularly in need of careful management after a return from an inpatient setting, where

1  they presumably lived in a more structured environment with enhanced healthcare

2  staffing.  ADC269347 (March 31, 2014) (67% noncompliance at Tucson); ADC269250

3  (March 27, 2014) (at Perryville, 5 hospital discharges not issued timely follow-ups

4  between 2/1/14 and 3/7/14); ADC269406 (March 28, 2014) (at Yuma, 4 out of 10 hospital

5  discharges not issued timely follow-up); ADC269196  (March 28, 2014) (49%

6  noncompliance at Lewis); ADC211472 (December 31, 2013) (41.2% noncompliance at

7  Tucson); ADC211327 (December 29, 2013) (at Perryville, 8 out of 19 inmates not issued

8  timely follow-up); ADC211276 (December 26, 2013) (37% noncompliance at Lewis).

9           97.     Urgent specialty consultations are also dangerously delayed, as I have noted

10  throughout this report.  The MGARs bear this out: they document widespread failures to

11  schedule urgent referrals within the general ADC standard of 30 days.  ADC269343

12  (March 31, 2014) (41% noncompliance at Tucson); ADC269285 (March 31, 2014) (18

13  out of 27 urgent consults noncompliant at Phoenix); ADC269243 (March 27, 2014) (79%

14  noncompliance at Perryville); ADC269158 (March 31, 2014) (16 out of 41 urgent

15  consults noncompliant at Florence); ADC269405 (March 28, 2014) (15 out of 20 urgent

16  consults noncompliant at Yuma); ADC269193  (March 28, 2014) (22 out of 42 urgent

17  consults noncompliant at Lewis, and "four previous urgent consults for January still not

18  scheduled"); ADC269071 (February 28, 2014) (14 out of 21 charts reviewed at Yuma

19  noncompliant); ADC268903  (February 28, 2014) (21 out of 41 urgent consults

20  noncompliant at Lewis); ADC268936  (February 27, 2014) 28 out of 36 urgent consults

21  noncompliant at Perryville); ADC268968  (February 26, 2014) (8 out of 9 urgent consults

22  noncompliant at Phoenix); ADC268873  (February 26, 2014) (35% noncompliance at

23  Florence); ADC268841 (February 26, 2014) (19 out of 38 urgent consults at Eyman

24  noncompliant); ADC268762  (January 31, 2014) (15 out of 16 charts noncompliant at

25  Yuma); ADC268591 (January 31, 2014) (4 out of 8 urgent consults noncompliant at

26  Phoenix); ADC268435 (January 31, 2014) (at Florence, 10 out of 40 charts

27  noncompliant); ADC268489  (January 27, 2014) (at Lewis, 42 out of 75 charts

28  noncompliant); ADC268538 (January 24, 2014) (at Perryville, 24 out of 34 urgent consult

1  requests noncompliant); ADC268385 (January 31, 2014) (at Eyman,16 out of 38 consults

2  not compliant); ADC211274-75 (December 31, 2014) (at Lewis, one prisoner had

3  "URGENT [consult] written 9/17/13 for [inmate with [history] of mastectomy and breast

4  cancer approved on 12/17/13"); ADC210662 (October 28, 2013) (at Yuma, 17 out of 25

5  urgent consults not scheduled within 30 days); ADC210265 (October 30, 2013) (at

6  Douglas, 1 out of 2 urgent consults scheduled to be seen within 30 days); ADC210386

7  (October 25, 2013) (39% of charts at Lewis showed untimely urgent consult scheduling);

8  ADC210439 (October 25, 2013) (at Perryville, 25 out of 58 urgent consults not scheduled

9  within 30 days); ADC210342 (October 30, 2013) (25% noncompliance at Florence);

10  ADC210622 (October 16, 2014) (at Winslow Apache Unit, only 50% of charts  showed

11  urgent consultations were being scheduled to occur within 30 days); ADC210556

12  (October 10, 2013) (at Tucson, 24 out of 33 urgent consults not scheduled within 30

13  days).

14                          **4.      Substandard care decisions**

15          98.     I found several additional examples in the updated charts of inadequate care

16  that exposed patients to a serious risk of harm. ██████████████) has an

17  artificial heart valve and as a result must take a blood thinner (Warfarin).  Patients with

18  artificial heart valves must have their anticoagulation levels monitored: to prevent serious

19  complications, the level of anticoagulation must be carefully tracked to ensure that their

20  medication is dosed at a therapeutic level.  In Mr. ██████ case, 11 of the 12

21  anticoagulation results showed his medication was not at a therapeutic level

22  (ADC288421), yet no dosage change is recorded, even though such an action is clearly

23  indicated according to their protocol *printed directly on the worksheets*.  This

24  management is clearly beneath the standard of care and places the patient at significant

25  risk for complications from his medical condition.

26          99.     ADC is well aware of Warfarin problems: I saw a quality assurance review

27  regarding "Adherence to Warfarin Protocol" at Tucson, the prison where Mr. ██████ was

28  housed, acknowledging that "[c]lients on this drug are at risk for potential bleeding,

1   hospitalization and death" and noting there is "[l]ack of Monitoring or inconsistent

2   Monitoring of clients on Warfarin."  AGA_Review_00111245.  The study was initiated

3   8/28/13, but there is no evidence of improvement in the extremely poor management of

4   Mr. ███████ case.

5       100.  ███████████████) has prostate cancer and had a Foley catheter placed

6   for urinary retention.  This should have been a short-term placement, but it was not

7   properly managed and as a result, the catheter remained in place for 18 months, which

8   caused his bladder to atrophy and made it impossible to remove the catheter.  ADC's

9   medical neglect means that a relatively simple problem has turned into a medical dilemma

10  that will probably force this patient to be dependent upon a catheter for the rest of his life.

11  This needless error greatly reduces his quality of life and increases his risks for serious

12  infection.

13      **D.    Delivery of ordered care**

14          **1.    Providers' orders**

15      101.  The failure to carry out provider orders is a common deficit in the care I

16  observed in my earlier reports and also saw throughout the patient charts.  I have noted

17  examples of this problem throughout this report.

18          **2.    Medication administration**

19      102.  The disastrously inadequate medication administration I described in my

20  prior reports has clearly not been fixed.  Named plaintiff **Maryanne Chisholm** is a

21  hypothyroid patient with clear indicators of medication interruption: she was seen to have

22  a nearly eight-fold increase in Thyroid Stimulating Hormone from 7/17/13 (ADC229702)

23  to 9/10/13 (ADC229700), which correlated to her statement that she was out of

24  Levothyroxine (ADC229687) and endangered her metabolic function, placing her at

25  substantial risk of serious harm through medication administration failures.  Additional

26  pharmacy errors in her psychiatric medications were also noted by her psychiatrist

27  (ADC229744).  See also ███████████████) (clear documentation of medication

28  interruption in January 2014 with chart notation on 1/28/14 that "orders from 1/10/14 not

-40-

processed. Re order meds," [ADC287340], but no notation in chart when this order was filled); ███████████████████ ) (HIV-positive patient who filed HNRs on 10/28/13 [ADC302896] and 12/3/13 [ADC302895] indicating that he was not receiving his HIV medication consistently from the pharmacy; no documentation in his medical record to show that the system was administering his medications appropriately); ████████████████ ███████ ) (on 12/23/13, cardiology patient submitted "2nd Request" HNR reporting that he had not received his prescribed medication for almost two months [ADC307785]; the provider noted the lapse in therapy [ADC307763] and no MARs were in the file, making it impossible for me or for Mr. ██████████ healthcare providers to know what, if any, medications he has been given); ████████████████ ) (patient submitted an HNR on 11/16/13 [ADC283006] requesting refill/renewal of her migraine medication prescription but despite the request, the order was allowed to expire on 12/9/13 and no new order was seen on MARs in her chart [ADC282991]); ████████████████ ) (ordered multiple medications after delivering baby but no indication in MARs that they were actually given [ADC326498-ADC326504]).

103.    The ADC auditors also continue to find widespread delays in delivering prescription medications.  ADC268473 (January 31, 2014) (21 of 31 charts show unreasonable delays at Florence); ADC268808 (January 30, 2014) (28 of 50 charts show unreasonable delays at Yuma); ADC268523 (January 28, 2014) (35 of 70 charts show unreasonable delays at Lewis); ADC211313 (December 26, 2013) (13 of 50 MARs showed unreasonable delays in prescription distribution at Perryville); ADC211560 (December 23, 2013) (at Yuma 107 of 142 prescriptions not renewed as of 12/17/13, and 11 prescriptions renewed after expiration date); ADC211261 (December 19, 2013) (71% of charts show unreasonable delays at Lewis); ADC210886 (November 22, 2013) (11 of 54 MARs show unreasonable delays at Perryville); ADC210511-12 (October 31, 2013) (MARs on 5 of 8 units demonstrated 62% noncompliance at Phoenix); ADC210417 (October 24, 2013) (71% MARs show unreasonable delays at Lewis).

104.     Disturbingly, they also found errors in prescribing medications that were not being reported, which makes it difficult for any system to self-correct.  ADC210993 (November 29, 2013) (71.5% noncompliance with forwarding medication errors to health administrator at Tuscon); ADC210748 (November 27, 2013) (at Eyman, "Nurse Bartruff reports that according to MARs, missing dosages are not being reported or documented as a med error"); ADC210325 (November 30, 2013) (at Eyman nurses are not reporting all medication errors); ADC210347 (November 30, 2013) (at Florence, "[t]he failure to administer the correct drug is part of the definition of a med error; therefore, all missed doses of medication would be technically defined as a med error to include dates left blank on MARs indicating the medication was not offered to the inmates. These med errors are not documented or forwarded to the [health administrator]").

105.     Refusals are not adequately documented in ADC.  In a prison system, there can be many reasons why medically necessary medications are not administered to prisoners, including lock-downs, emergencies, or patient refusal.  As such, it is necessary for staff to document adequately why a prisoner does not receive a prescribed medication so that quality assurance can be conducted or the prisoner can be seen to modify the unsuccessful therapy.  If the administration documentation is simply left blank, no meaningful inquiry can be undertaken.  Prisoners sometimes refuse medication and that is critical information for the providers to know, but the refusal has to be executed in a medically appropriate way with informed refusal and a signature to prove that the prisoner actually refused the therapy.  This does not routinely occur within ADC.  ADC269140 (March 26, 2014) (at Eyman, "[m]ultiple MARs documenting 'absent' and refused with no refusals located"); ADC269418 (March 26, 2014) (at Yuma, "[m]ultiple MARs show absent and refused medications.  Refusals on random audit could not be located.  Staff advised us that 3 'verbal refusals' were needed prior to an actual signature by inmate"); ADC211258 (December 19, 2013) (100% noncompliance at Lewis); ADC211291 (December 23, 2013) (at Perryville, "[i]n some cases where refusals were not in the chart, it was difficult to determine if the nurse did not get a refusal or if it just did not get filed.

1    Because of the volume of loose filing, in most cases I did not look outside the chart for

2    documentation. In 10 of 50 charts reviewed I was able to identify missing or misfiled

3    documentation. That would be a compliance rate of 80%. However, the amount of loose

4    filing and drop-filed documents that I did not quantify is significant").

5         106.    Prescriptions are consistently renewed after expiration dates, leading to

6    lapses in delivery of necessary medications to patients.  ADC269363 (March 31, 2014) (at

7    Tucson, 123 of 222 renewals noncompliant); ADC269218 (March 26, 2014) (at Lewis, 64

8    of 141 renewals noncompliant); ADC269140 (March 26, 2014) (57% noncompliance at

9    Eyman); ADC269172 (March 26, 2014) (34 of 65 renewals noncompliant at Florence);

10   ADC269261 (March 26, 2014) (36 of 71 renewals noncompliant at Perryville);

11   ADC269307 (March 26, 2014) (7 of 32 renewals noncompliant at Phoenix); ADC269418

12   (March 26, 2014) (63 of 130 renewals noncompliant at Yuma); ADC268831 (February

13   28, 2014) (8 of 11 renewals noncompliant at Douglas); ADC268887 (February 28, 2014)

14   (93 of 174 renewals noncompliant at Florence); ADC268918 (February 28, 2014) (108 of

15   160 renewals noncompliant at Lewis); ADC268947 (February 28, 2014) (16 of 84

16   renewals noncompliant at Perryville); ADC269031 (February 28, 2014) (262 of 395

17   renewals noncompliant at Tucson); ADC269086 (February 28, 2014) (248 of 301

18   renewals noncompliant at Yuma); ADC268362 (January 31, 2014) (7 of 12 renewals

19   noncompliant at Douglas); ADC268450 (January 27, 2014) (97 of 217 renewals

20   noncompliant at Florence); ADC268504-05 (January 27, 2014) (132 of 262 renewals

21   noncompliant at Lewis); ADC268549 (January 27, 2014) (32 of 154 renewals

22   noncompliant at Perryville); ADC268680-81 (January 27, 2014) (240 of 511 renewals

23   noncompliant at Tucson); ADC268775-76 (January 27, 2014) (227 of 271 noncompliant

24   at Yuma); ADC268402 (January 27, 2014) (218 of 437 renewals noncompliant at

25   Eyman); ADC268606 (January 21, 2014) (17 of 61 renewals noncompliant at Phoenix);

26   ADC211153 (December 31, 2013) (194 of 316 renewals noncompliant at Eyman);

27   ADC211429-30 (December 31, 2013) (142 of 318 renewals noncompliant at Tucson);

28   ADC211199-200 (December 30, 2013) (96 of 175 renewals noncompliant at Florence);

1   ADC211354 (December 30, 2013) (15 of 67 renewals noncompliant at Phoenix);

2   ADC211537 (December 30, 2013) (129 of 195 renewals noncompliant at Yuma);

3   ADC211219 (December 26, 2013) (36 of 50 renewals noncompliant at Florence);

4   ADC211503 (December 26, 2013) (5 of 24 renewals noncompliant at Winslow-Apache);

5   ADC211263 (December 19, 2013) (50% noncompliance at Lewis); ADC210994

6   (November 27, 2013) (22 of 88 charts noncompliant at Tucson); ADC210791 (November

7   26, 2013) (62 of 119 renewals noncompliant at Florence); ADC210871 (November 26,

8   2013) (24 of 146 renewals noncompliant at Perryville); ADC210977 (November 26,

9   2013) (134 of 289 renewals noncompliant at Tucson); ADC210850 (November 13, 2013)

10  (50% noncompliance at Lewis); ADC210924 (November 12, 2013) (17 of 45 renewals

11  noncompliant at Phoenix); ADC210804 (33 of 42 charts at Florence showed medication

12  dates not reviewed prior to expiration); ADC210512 (October 30, 2013) (45%

13  noncompliance at Phoenix); ADC210325 (October 30, 2013) (92% noncompliance at

14  Eyman); ADC210608 (October 17, 2013) (56.5% noncompliance at Tucson).

15              **3.      Labs and other diagnostic tests**

16          107.    Significant delays and failures to provide appropriate diagnostic testing are

17  described above, in the sections on "Timely access to care" and "Specialty care."

18          **E.      Protection from preventable negative outcomes**

19              **1.      Quality assurance**

20          108.    The Arizona prison system still lacks the data-gathering and analysis

21  functions essential to properly manage prison health care.  This is apparent from the lack

22  of improvement in treatment that I note throughout this report.  It is also evident from

23  ADC's own admissions: an Executive Consultant in the ADC Health Services Contract

24  Monitoring Bureau noted on December 20, 2013, that ADC's data on chronic disease

25  treatment "is suspect at best" and the data on average wait times is "not the most

26  accurate."  AGA_Review_00117056.  He was not aware of any data at all on "the

27  timeliness of emergency treatment," "the timely provision of medication," and "timeliness

28  of access to specialty care."  *Id.*  See also Section III.D.2, above (widespread failure to

report errors in medication administration).  It is simply not possible to have a self-correcting system without accurate data.

109.    Several quality improvement studies appear to have been initiated at the Tucson complex in August and September 2013, recognizing and attempting to address several of the problems I have been raising in my reports: "[p]oorly controlled blood sugars in Diabetic clients" (AGA_Review_00111248); "long delay for inmates to be seen by a provider" (AGA_Review_00111251); "[c]hronic disease care . . . inconsistent throughout the facility" (AGA_Review_00111255).  Two of the studies – diabetic blood sugar control and chronic disease -- were to have been completed by the beginning of October 2013, and I saw no resulting improvement in the charts I reviewed (see also the discussion of Mr. █████ case, above in Sections III.C.2 and III.C.4).

110.    Another essential aspect of quality assurance is the ability to respond promptly and appropriately to outside inquiries and complaints about care.  As I have already discussed in the opening section of this report, Arizona does a distressingly poor job of responding to the advocacy letters of plaintiffs' counsel as well as the concerns I have raised directly with State and Corizon officials about particularly at-risk patients.

## IV.    Charts randomly selected by defendants

111.    I reviewed 140 patient charts that were randomly selected by the State from a range of treatment categories agreed upon by the parties.[5]  The records are generally dated April 1, 2013, to April 1, 2014 (I disregarded any chart entries dated after April 1, 2014).  My discussion of these charts is organized around the categories by which they were produced.  When the chart contained evidence of deficiencies in other areas, I note that as well.

---

[5] I used the list produced by the State at ADC421025-28 as my guide to the charts they randomly selected.  I note that I never received six of the charts on the list: one listed under heart disease (█████████), one under Hepatitis C (█████████), one under hospital administration (█████████), one under monthly medical transports (█████████), one under respiratory disorders (█████████), and one under wheelchairs (█████████.  I understand from plaintiffs' counsel that these charts were not produced among the "random chart selection" documents.  I am confident that my review of the 140 charts that were produced provides ample data for my conclusions.

**A.    Completed specialty consultations**

112.    I reviewed 10 charts randomly selected by defendants as completed specialty consultations.  Nine of these 10 patients experienced significantly delayed specialty consults or diagnostic tests that placed them at risk of harm from complications or treatment failures, and several also demonstrated the type of systemic failures I discuss throughout this report.

113.    ███████████████) experienced a five-month delay in an ophthalmology consult regarding a suspected case of glaucoma, far too long for such a potentially dangerous condition that requires prompt treatment to improve the chances of success and to minimize damage and vision loss.  When she was finally seen in March 2014, five months after the initial referral (ADC407743-48), she was diagnosed with glaucoma.  The lengthy delay in obtaining the diagnosis may place her at risk for treatment failure and resulting blindness.

114.    In addition, her chart shows evidence of other system failures in medication ordering and administration: her glaucoma medication was not ordered until nearly two weeks after it was prescribed (ADC407727), and I cannot say that she actually received the medication because there is no MAR in her chart.

115.    ██████████████) is a pregnant woman with a history of leukemia who experienced inappropriate delays in basic obstetric monitoring that placed her at risk of pregnancy complications and the ability to plan the future of her pregnancy.

116.    On 3/3/14, a doctor ordered an obstetric ultrasound and Quad screening (a blood test for congenital abnormalities like Down's Syndrome and spina bifida) (ADC407666).  Several weeks later, Ms. ████ had an appointment with the same doctor to review the test results, but neither of the studies had been completed (ADC407664, ADC407660).  The ultrasound was finally completed on 3/21/14 (ADC407690), three weeks after the initial order, and the Quad screen was completed on 3/24/14, outside of the recommended 16-18 week gestation period (ADC407683).

117. ██████████████████) experienced serious care deficits, including inappropriate delays in treating a fracture in his hand and medication administration failures.

118. On 2/4/14, Mr. ██████ was sent to the emergency room after he slipped while exercising in his cell (ADC420269-75). He was diagnosed with an avulsion fracture to the 4th and 5th metacarpal bones. The recommendations from that visit were to be seen by an orthopedic surgeon five to six days following discharge. A consult request was sent the following day, 2/5/14 (ADC420255, ADC420267), for that appointment, but there is no documentation that it ever happened and he had not been seen by an orthopedist as of the 4/1/14 cut-off date. Several medication orders were given upon his return from the emergency room (ADC420244) but no MAR documentation is found in the chart to indicate that he received them.

119. In addition, he was subjected to significant delays and a nurse practicing outside of the scope of his or her license after he submitted an HNR on 11/29/13 (ADC420289) complaining of abdominal pain. He was not seen by a nurse for almost two weeks. At that time, he was told (and inappropriately diagnosed) by the RN that he had an umbilical hernia. There is no documentation of a provider's evaluation or diagnosis of this issue and no other notation of follow-up in the chart.

120. ██████████████████) is a 72 year-old man who underwent cataract removal surgery on 6/10/13 (ADC379730-34). A portion of the cataract remained in his eye and he required further surgery, but his follow-up care was marked by serious delays and immensely confused and disorganized treatment and charting, all of which present a danger to his health and his vision.

121. A provider note on 6/18/13 (ADC379720) indicates that he was scheduled for (further) retinal surgery. It did not happen, however, and several months later, on 8/28/13, Mr. ██████ was seen by a nurse practitioner who noted that no surgical consultation request had been sent (ADC379719). Another consult request notes that he was recommended for surgery by an ophthalmologist on 12/24/13 (ADC379723). On

12/27/13 (ADC379722), there is a handwritten note on a plain white sheet of paper that highlights the poor communication and system problems that exist with the ADC. This note documents the haphazard methods used by ADC for healthcare communications: the provider wrote a consult and the clerical staff "misread" the consult and did not schedule it as requested. The consult was ultimately delayed as a result. On 3/28/14 (ADC379721), a specialist appointment note indicates injections but does not mention surgery.

122.    ███████████████████) is a poorly controlled diabetic patient with history of a below-the-knee amputation and hypertension. His chart demonstrates several serious problems with his care, including repeated specialty consult requests for a prosthetic fitting that in over a year have never been approved, a failure to follow up on warning signs that his diabetes is dangerously out of control, apparent indifference in the face of other medical concerns, and documentation and medication administration failures similar to those I have seen in many other charts.

123.    First, regarding his access to specialty care, he made several requests for a prosthetic device for his amputation upon release, first noted on 2/5/13 (ADC408431). As of the 4/1/14 discovery cut-off date, nearly a year later, he still had not been approved for the device and the providers were continuing to submit requests for consult/approval (ADC408335, ADC408330).

124.    Second, his diabetes appears to be a serious concern, but he is receiving no meaningful intervention. Over the one-year period documented in his chart and prior to 4/1/14, he had only one HgA1c level drawn, on 12/18/13 (ADC408346), which indicates poorly controlled diabetes. Additionally his blood sugar levels rarely dropped below 200 over that same period of time, another troubling indicator of out-of-control diabetes in need of intervention (ADC408423). On 4/29/13, Mr. ███████ submitted an HNR complaining of dark discoloration (turning black) to one of his toes (ADC408440). As a diabetic this was concerning to him, as it should have been to medical staff. However, he was not seen by a provider for two weeks (ADC408338).

125.   Third, other medical complaints appear to have been simply ignored.  Over a period of several months Mr. ████ submitted HNRs to discuss his medication regimen, for shoulder pain, to inquire about his prosthesis plan of care and pharmacy/medication issues, and to seek care for a persistent cough (ADC408425, ADC408431-2, ADC408437-38).  There are no notations in the chart that indicate that he was not seen by a provider for any of these issues.  Mr. ████ was also seen by a nurse on 9/20/13 (ADC408336-7) regarding pain following an altercation.  The nurse noted that he would be referred to a doctor for evaluation and that an x-ray order was placed. However, no radiology studies are found in the chart and there is no documentation of him ever being seen by a provider for this complaint.

126.   Fourth, there are charting and medication administration failures.  I saw an order written on 9/30/13 for Trental (ADC408328).  However, there is no coinciding progress note for this order and no MAR data was found indicating that he received this medication – it is impossible to tell from the chart why he was prescribed this medication and whether he even got it.

127.   ████████████) was subjected to troubling delays in surgery for a fracture of his hand.  He apparently suffered the fracture and dislocation sometime before 11/6/13 (ADC379805), when he was evaluated by a provider and imaging studies were appropriately completed the following day (ADC379873).  Mr. ████ did not undergo surgery until 1/9/14 (ADC379846), two months later.  That is too long a delay for such a condition, and it might have actually been longer: on 2/19/14, a provider noted in the chart that the original injury in fact occurred on 9/1/13 (ADC379837).  There are no notations in the chart between that date and the first provider encounter in November 2013 to identify when the actual problem originated.

128.   His chart also shows documentation failures typical of ADC.  In September 2013, Mr. ████ was seen and diagnosed with abscesses to multiple sites (ADC379810). Orders were given for medication therapy (ADC379786) but no MAR was found in the chart indicating that the medications were given to him.

129.   ███████████████) is a stabbing victim who experienced motor function complications following the incident and significant delays in obtaining necessary specialty care that place him at risk of ongoing debilitating symptoms.

130.   On 12/8/13, he was stabbed in the neck (ADC407264).  He was sent to an emergency room for treatment, but I could find no documentation of this evaluation or any follow-up recommendations in the chart.  In the weeks following the stabbing, he submitted multiple HNRs complaining of problems with his eyes, including dizziness, lightheadedness, and pain (ADC407278, ADC407282-83, ADC407285-86).

131.   On 2/11/14 (ADC407269) he was evaluated by an optometrist who (he reported) told him that an optometrist is not "the kind of doctor" he needed because his nerves were "probably damaged from the stabbing" (ADC407281).  On 2/26/14, Mr. ███████ was evaluated by a doctor and orders for a CT scan and an ophthalmologist consult were given (ADC407258-59).  On 3/14/14, a handwritten note indicates that he required a neurologist and ophthalmologist consult that had been approved on 3/13/14 (ADC407254).  This was to be an "urgent" consult.  He finally had his orbital CT scan on 3/31/14 (ADC407267-68), over a month after the order.  As of the 4/1/14 discovery cut-off, he had not seen a neurologist or ophthalmologist.

132.   In addition to this delay, there was no MAR documentation to confirm medication orders given during the months of September 2013, December 2013, and February 2014 (ADC407252, ADC407254, ADC407256).  Additionally, a lab order was given on 5/16/14 (ADC407252), but no record of the lab draw or results appear in the chart.

133.   ███████████████) is a very poorly controlled diabetic patient.   She experienced dangerous delays in a requested specialty consultation for eye complications from her diabetes.

134.   A request for consultation with a retinal specialist was submitted in June 2013 and then repeated in September, October, and November 2013 as well as February and March 2014 (ADC407817, ADC407860, ADC407856, ADC407797, ADC407859,

1   ADC407854, ADC407849, ADC407766).  As of the 4/1/14 cut-off date – over nine

2   months since the initial request -- she had yet to see a specialist.

3       135.   ████████████████████)  has several serious conditions, including

4   cirrhosis of the liver (potentially dangerous scarring and malfunction of the liver) and

5   ascites (a build-up of fluid inside the abdomen).  Despite concerning lab reports that show

6   ineffective treatment for her cirrhosis, she had to wait almost 11 months for a needed

7   gastro-intestinal specialist consultation: the consultation appears to have been first

8   requested on 4/3/13 (ADC408181), and was requested eight more times  (ADC408214,

9   ADC408213, ADC408212, ADC408216, ADC408215, ADC408196, ADC408192-95,

10  and ADC408203) before she was finally evaluated on 3/19/14 (ADC408182-4).

11      136.   She also went a full month (November 2013) without one of her prescription

12  medications to address her gastro-intestinal problems (ADC408175).

13      **B.    Diabetics**

14      137.   I reviewed eight charts that defendants randomly selected from their list of

15  diabetic patients (referred to as "IDDM" on their master list).  Of the eight patients, at

16  least one is not diabetic.  Another patient is suspected of having diabetes but is not getting

17  any treatment for what seems to be poorly controlled diabetes.  Three others have minimal

18  indication in their charts that they are diabetic, although they have received diabetic

19  medications, and the absence of blood sugar and other testing is negligent.  Nearly all of

20  the charts in this category show evidence of the dangerously substandard practices and

21  procedures outlined throughout this report.

22      138.   ████████████████)  clearly does not have diabetes although defendants

23  included him in this group.  His chart reflects charting and medication administration

24  problems, though: with the exception of a few single days, there is essentially no record

25  that his prescribed medications have been administered (ADC420167- ADC420183).

26      139.   ████████████████)  was noted as having no history of diabetes at his

27  intake assessment (ADC 417074); however, later that same month he was suspected of

28  possibly having the disease although he had no confirmed diagnosis (ADC417085).   Labs

were ordered on 11/29/13 including a urine test to evaluate for possible diabetes-related kidney damage and an HgA1c.  The urine test was never completed and the HgA1c was not completed until 1/8/14.  The HgA1c result came back showing a level of 6.8%, which places this patient in the "diabetes" category diagnostically. This result calls for early intervention in the form of diet modification, exercise, initiation of metformin and continued surveillance over time.   However, there is no evidence that these results were ever discussed with the patient to implement the lifestyle modifications, and there is no order for metformin in the chart and no order for any follow-up care or testing.

140.   Mr. ███████ is receiving substandard care for his myriad conditions: in addition to the failure to intervene to address his elevated blood sugar, his chart demonstrates inadequate medication administration or charting (MARs indicating receipt of his hypertension medications are missing [see ADC417079-81]) and delays in noting physician orders (orders in the chart dated 1/25/14 for a Hepatitis C test, an electrocardiogram, a urine dip and urinalysis, and Accucheck [ADC417080] were not noted until 2/4/14.  In addition, this patient was ordered by the clinicians to be evaluated for Hepatitis C treatment (ADC417081) but there is no evidence in the chart that he has ever received the appropriate evaluation despite the evidence in the chart that he has Hepatitis C (ADC417097).

141.   ████████████ ) was included in the diabetes sample, although there is nothing in his chart that mentions him being a diabetic – no relevant history or diagnosis – except an order and a few MARs indicating prescription of metformin, a medication typically given for treatment of Type 2 diabetes.  In September 2013, he was ordered metformin for six months (ADC417323).  However, it was discontinued on 2/4/14 (ADC417326) but somehow continued to be prescribed for March; the patient refused the medication daily in March 2014 (ADC417366, ADC417356), insisting that he is not diabetic and has not been diagnosed as such (ADC417367).  His records offer to no explanation as to why he was placed on metformin initially and fail to account for his

1   insistence that he is not diabetic and an HgA1c level of 5.7 (indicating that he is likely not

2   diabetic) on 3/20/14 (ADC417345)

3        142.   His chart also demonstrates inadequately monitored uncontrolled

4   hypertension.  Although blood pressure checks were ordered for eight weeks on 7/20/13

5   (ADC417324), the order was "overlooked" and thus the checks were not completed.

6   Another order (ADC417323) requires blood pressure checks 2-3 times per week for 3-6

7   weeks, but there were only two readings recorded and they were both troublingly high

8   (205/101 and 153/98) (ADC417392).  Several progress notes record both Mr. ███

9   troubling blood pressure readings and the medical system's failure to address his care

10  appropriately: one note states "needs [blood pressure] checks-never happened [blood

11  pressure] is high. Has blood pressure this AM of 201/109" (ADC417329); another states

12  "[hypertension] uncontrolled, ran out of all [prescriptions] X 2 months. . . all

13  [prescriptions] restarted, follow-up in one month."  His blood pressure was 184/139 on

14  that day (ADC417331).

15       143.   Mr. ███ is not being properly monitored or treated for his admittedly

16  uncontrolled hypertension, with medication administration failures and diagnostic testing

17  failures.  When a patient has critically high blood pressures in the range that this patient

18  has and those blood pressures cannot be controlled by medication, it is imperative to have

19  the patient evaluated for other causes of high blood pressure.  To continue to tolerate these

20  excessively high blood pressures in this patient without additional intervention places him

21  at extreme risk for permanent organ damage (hemorrhagic stroke, retinal damage, renal

22  damage) as well as a significant risk for death.  It is also troubling that his providers

23  prescribed him diabetic medication without any expressed rationale, and failed to take

24  meaningful steps to make the determination as to whether he has diabetes, track his

25  condition, and provide any necessary treatment.  In addition, this patient has laboratory-

26  proven Hepatitis C (ADC417348) and there is no evidence in the chart that he has ever

27  been evaluated for this condition or possible treatment.

28

144.   I also note that included in Mr. ▆▆▆ chart is an administrative email that contains confidential information about other patients (ADC417337).  Because patients are required to be allowed to see their own healthcare records, Mr. ▆▆▆ could see this information regarding other patients, a clear violation of their privacy rights and an example of shoddy record-keeping on the part of ADC.

145.   ▆▆▆▆▆▆▆▆▆▆) is a 62 year-old woman with a history of non-insulin dependent diabetes as well as a serious cardiac condition (atrial fibrillation) for which she received a pacemaker in 2011.  While the chart shows nothing remarkable in terms of her diabetic care, it does point out dangerous delays in addressing her serious heart concerns that placed her at significant risk of harm.

146.   From at least August to December 2013, she complained of alarming symptoms ranging from chest pain to dizziness, numbness of the extremities, heart palpitations, difficulty breathing, and loss of consciousness (ADC416498, ADC416500, ADC416502, ADC416504, ADC416506).  I saw no meaningful response to these serious concerns.  On 12/3/13, an order was placed for some blood tests (ADC416474), which Ms. ▆▆▆ did not receive until 2/18/14 (ADC416576).

147.   There are several specialty consult requests related to Ms. ▆▆▆ heart condition.  A consult request dated 3/28/13 notes "pacemaker is loose, moves a lot in patient's chest, patient having palpitations daily. pacemaker is palpable [and] mobile- I can flip the pace maker" (ADC416572).  Surgery was requested by as early as October 2013 and approved in November 2013 (ADC416565).  On 1/14/14 (ADC416486), the cardiologist states that the pacemaker needs a cardiac revision as she is now in A-flutter, a condition that significantly impairs the flow of blood through the heart because the atria are quivering instead of contracting.  (There is no direct record of the cardiologist consultation in the chart, however.)

148.   After the January cardiology appointment, she was appropriately started on blood-thinning medication and given orders for weekly tests for one year to monitor the level of blood-thinning agents in her system (ADC416474).  This is crucial to minimize

1  life-threatening complications from her arrhythmia.  Her chart, however, records values

2  only four times: twice in February 2014 and twice in March 2014 (ADC416487) and all

3  four readings are below the therapeutic range necessary to minimize those life-threatening

4  complications.  According to the records, ADC did not ever treat her adequately with

5  blood thinning medications.  Not surprisingly, she continued to experience chest pain in

6  February 2014 (ADC416484).  In late March 2014, she was finally sent out for surgery for

7  the pacemaker revision, as noted in a return from hospital note in her records

8  (ADC416481, ADC416490).  There is no paperwork from the hospital and no orders for

9  wound care or staple removal in the chart.  The care for this patient's serious heart

10  condition was negligent and seriously endangered her health, with incompetent

11  medication management, excessive delays, horrendously inadequate charting, delayed lab

12  orders, and overall indifference to her treatment needs for almost a year.

13     149.  ▮▮▮▮▮▮▮▮▮▮▮) has diabetes, sarcoma, HIV, and Hepatitis C.  His

14  charting is so poor as to be extremely difficult to follow, but serious treatment deficits are

15  nonetheless apparent: inadequate monitoring for his possibly uncontrolled diabetes, lack

16  of diagnoses or treatment plans for his several chronic conditions, and significant

17  medication administration failures.

18     150.  Mr. ▮▮▮▮ has lab results showing an elevated HgA1c (uncontrolled

19  diabetes) as well as abnormal CD4 counts (possibly uncontrolled HIV) and a positive test

20  for the Hepatitis C virus (see ADC416289, ADC416293, ADC415975, ADC415979,

21  ADC415984, ADC415989).  Despite the danger signs, his diabetes is very poorly

22  monitored: I saw occasional blood sugar checks and a few HgA1c results, but as with

23  other diabetic patients in this group of charts, scarcely any notes from providers dealing

24  with his diabetes.  Regular monitoring for blood sugar levels is the foundation for

25  adequate diabetic care.

26     151.  The MARs are shoddy, with far too many missing crucial information, such

27  as the facility name and complete dates (*e.g.* ADC416074).  Some MARS have allergies

28  listed, some do not; some are missing start and stop dates and duration of the prescription;

1    multiple MARs exist for one medication and it is unclear why (e.g. one MAR listing HIV

2    medications is completely blank [ADC416316] while another MAR lists the same

3    medication for the same month with some entries signed off [ADC416316-320]); some

4    MARs containing medication and insulin orders are written but have no signatures

5    (ADC416369-375).  Others MARs have a note stating "See diabetic binder" across the

6    insulin entry while other MARs include the blood sugar readings on the MAR itself.

7    Other MARs just say "KOP" (keep on person, or self-administered medications) in the

8    beginning of the month with no other information (such as delivery of the medication)

9    recorded, leaving the reviewer to guess whether or not the patient received the medication.

10        152.    ████████████) is a 58 year-old man with diabetes, hypertension,

11   and obesity, among other chronic conditions.  Hs diabetes is reasonably well monitored:

12   all labs ordered during this time period have been done and results are in his chart

13   (ADC380991-1003).  However, although the monitoring has been done, it has not been

14   acted on appropriately: the blood sugar tests show frequent elevated sugar levels from

15   April to September 2013 and from October 2013 to March 2014.  His HgA1c levels were

16   also elevated (ADC381002, ADC380998, ADC380995, ADC380993).  With his medical

17   history and obesity, he should have been started on long-acting insulin to get his diabetes

18   under better control and reduce the harm to his health from the spiking sugar levels.

19        153.    His hypertension is being poorly monitoring and treated.  He takes blood

20   pressure medications but the only mention of monitoring that I saw in the chart was on

21   3/17/14 for blood pressure checks biweekly for two weeks (ADC380971).  There are no

22   checks in the chart for this time period.

23        154.    In addition, Mr. ████ has Hepatitis C with elevated liver function tests, an

24   elevated INR, and a critically low platelet count (ADC380997).  This is a very concerning

25   situation.  No appropriate workup of this has been done and he has not been considered

26   for treatment for his Hepatitis C, despite clear indications that he should be evaluated for

27   it.

28

155.    ███████████████) has a history of insulin-dependent diabetes.  She is being appropriately dosed with insulin and metformin, and two HgA1c results from October 2013 show her diabetes under control (ADC417178, ADC417186).  It is fortunate that her numbers are good, however, because she is still not being adequately monitored: an order in December 2013 for an HgA1c lab test and chronic care follow-up appointment (ADC417717) does not appear to have been completed.  Chronic care appointments are seen in the chart dated 5/1/13, 8/21/13, and 12/17/13, but the orders for her to be seen in January and March 2014 do not appear to have taken place (ADC417127, ADC417115).

### C.    Cancer

156.    I reviewed six charts chosen randomly by defendants from their list of cancer patients.  One patient in this group does not appear to have cancer, although he has suffered from inadequate care from other conditions.  Two of the six patients have been subjected to substandard cancer care through inadequate monitoring of their condition and inadequate preventive testing for possible recurrence.

157.    ███████████████) has no indication of cancer in his chart.

158.    ███████████████) has leukemia but I saw no meaningful treatment plan or discussion of the disease in his charts.  On 10/22/13, he had what appears to be a "chart consult" with Corizon's oncologist but the note is not signed and I'm not sure who exactly evaluated his case.  This clinician noted the disease and made recommendations for follow-up care (ADC378967).  I am unable to determine whether the recommendations made in the oncology note were followed and there is nothing included in the chart to verify that he ever saw an oncologist after this October visit.  This falls below the standard of care: a patient with leukemia should be far more closely followed, and should see an oncologist every six months with intermittent laboratory assessments reviewed by the oncologist because of the high risk of complications associated with his leukemia medications.

159.    He has also experienced a failure in carrying out a treatment order: an order for Acyclovir dated 3/19/14 does not appear to have been filled (ADC378886).

1    160.    ████████████████) is a 54 year-old woman who had a lumpectomy

2    on her right breast in 2011.  She was appropriately ordered mammograms and follow-up

3    consultations with the oncologist to monitor her condition at six-month intervals

4    (ADC406619).  The follow-up was not happening in a timely manner, however, in the

5    period I reviewed in the chart: one mammogram was at least five months late

6    (ADC406624, ADC406619, ADC406622, ADC406629), with the test due for April 2013

7    not performed until September 2013.   Fortunately, the findings showed no return of the

8    cancer, but if the cancer had recurred, the five-month delay might have significantly

9    impacted her health and chance of successful treatment.

10           **D.    Patients who use canes and walkers**

11   161.    I reviewed five charts randomly selected by defendants from their list of

12   patients who use canes and walkers.  Overall, I saw remarkably scant documentation of

13   disability evaluations and the provision of mobility aids to patients in these records,

14   making it difficult to assess the extent to which ADC provides necessary aids to patients

15   who require them.  It is clear, however, that in four of these five cases, it took too long to

16   provide the patients with appropriate mobility devices, exposing several of them to

17   significant risk of harm from falling.  In addition, two of the five charts document

18   substandard treatment for other health care concerns.

19   162.    ████████████████) has a back injury causing back pain and nerve

20   damage.  According to the chart, the injury apparently prevents him from walking

21   normally, causing pain and leg numbness and occasional falls, but it took approximately

22   10 months for him to get a cane.

23   163.    He started to file HNRs seeking treatment for his mobility problems in May

24   2013 and kept up a steady drumbeat of requests for many months, describing his pain,

25   falls and difficulties walking  (see ADC379387-91, ADC379385, ADC379381,

26   ADC379379, ADC379375, ADC379372, ADC379367).  Although his practitioner finally

27   ordered a cane over six months later on 11/25/13 (ADC379308), Mr. ██████ still did not

28   receive it, and he continued to raise the issue with his clinicians  (ADC379375,

1   ADC379372, ADC379367).  Finally, a note dated 3/4/14 indicates he was issued a quad

2   cane (ADC379308).  Mr. ███ suffered for far too long and was exposed to an

3   unreasonable risk of harm before his cane was finally delivered.

4         164.   ██████████) is a 72 year-old man with hypertension, obesity, and

5   a pacemaker, among other chronic conditions.  He had to wait two months for a

6   wheelchair, a delay which likely caused unnecessary suffering as well as exposure to the

7   risk of falling.

8         165.   According to his chart, he first notified an RN of his difficulty walking and

9   loss of breath and dizziness, which resulted in his inability to go to meals, in mid-April

10  2013.  He was referred to a provider for evaluation but not provided any temporary

11  accommodation (ADC379547).  It took over a month for him to be seen by the provider,

12  at which time it was noted that he had experienced at least four falls in the prior year;

13  according to his records, he had been denied a previous request for a walker with a seat

14  (ADC379545).  The reason for the denial is unclear, as is the date of the denial.  On

15  5/24/13, he was finally ordered a wheelchair for "decreasing endurance [] w/heart disease

16  [and] worsening arthritis."  He finally received the wheelchair on 6/13/13 (ADC379560).

17        166.   I am also very concerned about clearly inadequate monitoring regarding his

18  anti-coagulation therapy.  Mr. ███ is on Coumadin, a blood-thinner, for his atrial

19  fibrillation.  The levels of anti-coagulation agents in patients' blood must be carefully

20  monitored to ensure treatment efficacy and patient safety.  This is extremely poorly done

21  in Mr ███ case: his blood is tested often but the results are frequently not reviewed for

22  several weeks (see, for example, ADC379578: 7/25/13 lab showing elevated reading not

23  reviewed until 9/16/13) .  There are multiple lab results in the chart from mid-2013 to

24  March 2014, with most readings either below or above the acceptable range—both

25  situations are clinically risky.  Clinicians appropriately sought to adjust his medication

26  dosages, but this was extremely ineffective because the labs were reviewed so late and

27  because he often was given the medications to take himself and was not always notified of

28  adjustments.  For example, Mr ███ at one point was taking the wrong dosage of

1   Coumadin with no knowledge that his dosage had been adjusted some time before

2   (ADC379538).  In some ADC facilities they utilize a Coumadin worksheet to minimize

3   the type of chaos seen in this chart.  I could find no evidence of such a tool in use at this

4   facility.

5       167.    His medication levels were so dangerously high that on 1/30/14 he had to

6   be hospitalized.  Matters did not improve: the subsequent order to lower his medication

7   dosage was not appropriately noted (ADC379506, ADC379597), and thus Mr. ████

8   remained on a higher dosage for at least two weeks after the hospitalization

9   (ADC379597).  Moreover, no lab was drawn until three weeks later, at which time his

10  levels remained elevated (ADC379533).  Even then, a 2/27/14 provider order to yet again

11  lower his Coumadin dosage was not noted in his chart until 3/5/14 (ADC379504,

12  ADC379589).  This mismanagement is seriously endangering Mr. ████ health.

13      168.    In addition, two progress notes indicate that he is having problems with his

14  pacemaker and that he needs it adjusted but I saw no other orders to verify if it was done.

15  (ADC379544).  He further experienced delays in obtaining a hernia belt (belt ordered on

16  11/18/13 and received on 1/30/14 [ADC379548]) and surgery consult for the hernia (first

17  request for surgery consult completed November 2013 and the second February 2014

18  [ADC379522], but no evidence consult completed).

19      169.    ████████████ ) is a 75 year-old man with multiple chronic

20  problems, including peripheral neuropathy, Parkinson's, poor vision, decreased muscular

21  coordination, hypertension, asthma, and dizziness.  Records indicate that per nursing staff,

22  Mr. ████ was tripping over his quad cane and thus a walker was ordered (ADC379457).

23  He did not receive the walker for three weeks (ADC379472), which is an inappropriate

24  delay.

25      170.    Mr. ████ chart also shows serious problems with medication delivery

26  and documentation.  For example, on 10/22/13, he was ordered Sinemet for his

27  Parkinson's (ADC379453), but he apparently did not receive it and it was reordered on

28  1/10/14 (ADC379446).  Records do not reflect that he received it even then.  Indeed,

1  tracking which medications Mr. ▮▮▮▮ received and when is very difficult as critical

2  MARs are missing from the chart, including for December 2013 and February 2014, or

3  are incomplete (Sinemet not listed on March MAR [ADC379476]).

4      171.    ▮▮▮▮▮▮▮▮▮▮) has multiple chronic conditions, including

5  hypertension, past hip surgery, osteoporosis, and blood disorders (thrombocytopenia and

6  leukopenia).  She had to wait at least two months – and likely far longer -- for a

7  wheelchair in acceptable condition, an inappropriate delay and possibly a safety risk.

8      172.    Ms. ▮▮▮▮ submitted several HNRs because her wheelchair was

9  apparently in poor condition.  In her 10/19/13 HNR, she explained that her chair had a

10  ripped backrest and seat, broken armrests, and no foot rests (ADC407144).  The following

11  month, she submitted another HNR, describing her wheelchair as a "health hazard" and

12  requesting a replacement (ADC407143).  She was seen by nursing staff on 11/29/13, at

13  which time her chair was inspected and is noted to be "very poor quality"  (ADC407008).

14  On 12/5/13, she submitted another request, stating that she had been requesting a new

15  wheelchair for two years, and still had not received one  (ADC407142).   Apparently, she

16  received a "newer" wheelchair in December.  Assuming her wheelchair was in the state

17  she described it, as confirmed by nursing staff, it should have been replaced far sooner.

18      173.    I also have very serious concerns about Ms. ▮▮▮▮▮▮ care for her

19  thrombocytopenia (low platelet count) and leukopenia (low white cell count).  She

20  requires ongoing treatment from an oncologist for these conditions.  According to her

21  chart, she saw an oncologist on 9/24/13 (ADC407020).  The oncology report and orders

22  for that visit make treatment recommendations, including that she have a follow-up visit

23  in one to two months.  *Id.*  However, it also states that the clinic will no longer treat

24  prisoner patients and that Ms. ▮▮▮▮▮▮ must find a different oncologist (ADC407030).

25  There is no indication in this chart that Ms. ▮▮▮▮▮ has seen an oncologist since that

26  September visit, or even that a new appointment was requested.  In the meantime, her

27  platelet count lab values were very low and falling, and repeatedly classified by the lab as

28  "panic value result" (ADC407065, ADC407062, ADC407059, ADC407056).  Her platelet

count is so low as to border on the need for emergency transfusion.  The oncologist who did see her appropriately ordered a bone marrow biopsy and an abdominal ultrasound. While I see evidence that the abdominal ultrasound was completed and showed an enlarged spleen, I see no evidence that this critical finding (in light of her low platelet count) was ever acted upon or evaluated by anyone.  I cannot find evidence that she ever received a bone marrow biopsy in the chart.  It appears that this patient has critical abnormalities in her blood cell system that are well documented and she has been partially worked up and partially treated, but she is currently caught in limbo between the oncologists closing their practice to ADC patients, the inability of Corizon and ADC to treat her adequately on site, and the failure to arrange for new oncologists to take over her care.  She is in real danger; someone must resume her workup and care posthaste.

174.   Ms ████ was further ordered an urgent diagnostic scan on 9/10/13 due to the findings of a recent ultrasound and her gallstones (ADC407032); records do not show this scan was ever completed.

175.   ████████████) has a history of injuries that have left her with her right leg visibly shorter than her left (ADC407179).  She also has visible atrophy of her thigh and calf (ADC407155).   Despite clear evidence that she has a disability, I found no indication that she received any accommodation except an ace bandage (ADC407180), which she reports is not helping (ADC427231), or that she has been worked up to determine whether or what type of aids would be appropriate despite her request for a wheelchair (ADC407240).

**E.     Seizures**

176.   I reviewed 10 charts chosen randomly by defendants from their list of patients with seizure disorders.  In one case, it does not appear that the patient has seizures: ████████████) (hypertension listed as the only chronic care disorder at ADC382304; hypertension and hyperlipidemia listed as only chronic conditions at ADC382295).  In three cases, I found deficient care for either the seizure disorder or for another serious condition.

177.                █████████████ ) is prescribed an anti-seizure medication but he apparently does not receive it consistently.  For example, he had no medications for four days in December 2013 when an order expired and was not reordered promptly (ADC382204).  In addition, when he complained of chest pain on 7/18/13, he was evaluated by an LPN (ADC382158); although an EKG was done, it appears no clinician was contacted.  Patients with chest pain must be examined by a clinician; LPNs are not qualified to make these evaluations.

178.                █████████████ ) has multiple chronic conditions in addition to epilepsy.  On 1/15/14, he had a lab result that indicated uncontrolled diabetes (HgA1c reading of 9.3 in ADC419988).  He had not been previously diagnosed with diabetes.  The response to this very concerning lab result was far too slow: he was not noted as a new onset diabetic or ordered to have blood sugar tests until 2/13/14 (ADC419939).  There are no blood sugar results in his chart and no further HgA1c readings – in fact, no monitoring or treatment at all, which is negligent, given the seriousness of the January test result.

179.                █████████████ ) takes Tegretol as an anti-seizure medication, but I found no evidence that his blood is being tested for therapeutic dosing, a departure from the standard of care.  Further, although Mr. ██████ complained of chest pain and cramping on 6/17/13 (and noted that he had not had a chronic care visit since September 2012), I found no provider evaluation, or even a nursing note in response (ADC420906).

**F.    Scheduled specialty consults**

180.    I reviewed 10 charts randomly selected by defendants from their list of scheduled consults.  Of those, four charts showed deficiencies relating to access to specialty care, and in each case, the delays resulted in unnecessary suffering for the patients.  In some cases, the delays may have caused the patients to develop more advanced illness than had they been treated promptly, possibly unnecessarily endangering their lives.  Other systemic problems showed up in these charts as well.

181.                █████████████ ) experienced delays in the diagnosis and treatment of her breast cancer that might have severe negative effects on the efficacy of her treatment

1   or even her ability to survive the condition.  Time is of the essence in managing breast

2   cancer and her care was very slow compared to contemporary standards.  She had an

3   abnormal mammogram in September 2012 that showed an ill-defined nodule measuring

4   1.6 cm in the right breast (ADC418528, ADC381617).  Despite the abnormality, her chart

5   contains no evidence that she received a biopsy.  Failure to perform a biopsy of this

6   abnormal lesion is clinically substandard care.  She then mentioned a noticeable problem

7   on 8/28/13 (ADC418595, noting bleeding from her breast), but was not seen by a

8   specialist until 9/13/13 (ADC418558), at which point she was diagnosed with breast

9   cancer and recommended for a bilateral radical mastectomy and chemotherapy on an

10  urgent basis (ADC418542).  She did not have surgery for three more months, on 12/5/13

11  (ADC418524) which is an unacceptable delay for invasive ductal carcinoma and placed

12  her at significant risk for unnecessary progression and spread of her cancer.

13          182.  █████████████) is a 29 year-old man who experienced

14  unconscionable delays in cancer screening and treatment that might have endangered his

15  life and health.  He complained of testicular pain on 6/7/13 (ADC418740), stating that the

16  pain was getting worse.  There is a request in his chart dated 9/12/13 for radical

17  orchiectomy (surgical removal of his testicle) per urology recommendation

18  (ADC418718).  Almost five months later, on 2/6/14, Mr. █████ submitted another HRN

19  complaining of increased pain in his testicle (ADC418742).  On 3/17/14, he finally had a

20  surgical consult (ADC 418703), and he apparently had his testicle removed on 3/24/14

21  (ADC418712).   Unfortunately, a CT scan showed metastasis to his lungs and lymph

22  nodes.  If he had been treated earlier, it is possible they would have caught it before it

23  metastasized.  ADC's inadequate care has exposed him to a very serious risk of harm.

24          183.  █████████████) has a hydrocele, a fluid-filled sac surrounding the

25  testicle.  Mr. █████ submitted multiple HNRs complaining of pain and swelling in his

26  testicle, starting in May 2013 (ADC419926, ADC419923, ADC419918).  After several

27  referrals, he was finally seen by a urologist on 10/29/13, who recommended surgery to

28  remove the hydrocele (ADC419857).  It was almost five more months before he saw the

1  surgeon, on 3/9/14 for a pre-surgery visit (ADC419850-55), and as of 4/1/14, the surgery

2  had not been performed.  This delay of treatment unnecessarily subjected Mr. ███ to

3  many months of pain and discomfort.

4       184.   ███████████████) complained of chest pain on 6/7/13 and was seen

5  by a nurse only, not a provider.  He complained again of chest pain on 8/5/13 and was

6  seen by a nurse two days later (ADC382107, ADC382072).  Although there was a note

7  stating that a chest x-ray was done on 8/15/13 (ADC382071), I found no record of the

8  results, nor did I find any record that he had been evaluated by a provider regarding the

9  chest pain, as he should have been.

10      185.   ███████████████) is a 27 year-old woman who complained of

11  a lump on her breast on 12/27/13 (ADC418797); a provider noted the nodule as early as

12  1/13/14 (ADC418753).  However, it was not until 3/5/14 that a provider ordered an urgent

13  chest x-ray and mammogram (ADC418770, ADC418768).  Although the x-ray was done

14  on 3/6/14, the mammogram had not been done as of 4/1/14, an unreasonable delay.

15      **G.    Patients who use wheelchairs**

16      186.   I reviewed four charts randomly selected by defendants from their list of

17  patients who use wheelchairs.  These patients did not have common medical conditions

18  that resulted in their wheelchair use and for the most part I did not find any common

19  concerns with their care.  Two of the charts did contain evidence of the kind of systemic

20  concerns noted elsewhere in my reports, as I describe below.

21      187.   ███████████████) is a 73 year-old man being inadequately monitored

22  for serious conditions, placing him at risk of further complications and debilitating illness.

23  A note in the chart dated 3/12/13 (ADC382505) states that he returned from the hospital

24  after being diagnosed with diverticulosis, kidney stones, and acute pancreatitis.  Mr.

25  ███████ was not evaluated for these serious conditions until over two months later, on

26  5/29/13, and the provider at that time only noted the absence of hospital records and

27  ordered labs (ADC382509).

28

188.   In addition, a patient with Mr. ███████ history of mental illness and hypertension who is on several hypertension and heart medications should be monitored with regular vital signs taken, due to the risk of adverse interaction.  I saw hardly any vitals recorded in his chart, and no recognition that such monitoring is needed.

189.   ████████████████) complained of a possible stroke but was only evaluated by an LPN even though treatment and diagnosis for this condition is beyond the expertise and qualifications for a nurse (ADC421011, 420919-20).

**H.     Patients who are deaf**

190.   I reviewed three charts for deaf patients randomly selected by defendants from their own lists.  Deafness is a condition and not an illness, so I did not necessarily expect to find significant care needs in these charts.  One, however -- ███████████ ████████) --  is experiencing typically inadequate charting and medication administration. On several MARs in his chart I saw missing components (in particular, date issued and quantity), suggesting that either he did not get his medication or staff failed to document delivery (see, for example, ADC380158, ADC380156, ADC380131).  The numerous HNRs he has filed regarding medication lapses (see, for example, ADC380181, ADC380185, ADC380196, ADC380197) seems to indicate the former, which is further evidenced by a provider's note on a complaint resolution form dated 3/17/14, which identifies Corizon's staffing issues as the source of the medication lapse failures (ADC380196).

**I.     Patients who are blind**

191.   I reviewed three charts of patients randomly selected by the State from their list of blind patients.  All of these charts demonstrated extremely concerning failures by ADC to provide adequate treatment from appropriate professionals.

192.   ███████████████) appears on this list and is also a patient whose care I reviewed in my initial report and updated above, in Section III.C.3.  I will not repeat here the details of my concerns, except to note that he is an AIDS patient whose care is being seriously and dangerously mismanaged.

193.     ██████████████) is a 36 year-old man suffering from a self-inflicted gun-shot wound to the head resulting in significant speech and vision disabilities.  He is noted as blind, mute, and partially deaf (ADC378743).  His care is being mismanaged: he is prescribed ineffective pain medication and it is also unclear from the chart how he is communicating his needs to medical staff with these severe disabilities.

194.     Given Mr. ████████ major head trauma, it is likely he is in serious pain. The only pain medications he has been prescribed are ibuprofen and Tylenol, which are likely to be ineffective for the type of pain serious head trauma patients usually experience.

195.     I also saw a troubling note dated 9/16/13 wherein he explains to a psychological evaluator that he refused his telepsych appointments because he cannot speak and the officers would not allow his aide to attend the appointment with him (ADC378868).  This is a significant barrier to care and clearly it has not been addressed. It is also disturbing that a mental health chart review completed on 12/24/13 (ADC378864) documents that this patient does not have a complete treatment plan, has not appropriately consented to treatment, and no labs have been drawn to monitor the patient.

196.     ██████████████) is 63 years old and has complicated chronic conditions: she is blind, uses a wheelchair, and has diabetes and hypertension.  I was shocked to see her being treated by a certified nurse midwife (CNM).  This is a clear and dangerous violation of the nurse midwife's scope of practice – she is simply not competent to care for this complex patient who is clearly not pregnant.  CNMs may only manage care for healthy pregnant women.

197.     Sadly but predictably, the CNM did not render appropriate or effective care to Ms. ██████   For example, the CNM prescribed one dose of 0.1 mg of Clonidine to treat serious high blood pressure (ADC406414), a useless and ineffective gesture, and then did not order any follow-up monitoring for this patient's chronically and seriously elevated blood pressure.

198.   Ms. ███ was also subjected to inappropriate assessment and treatment by an LPN, who is not trained or qualified to provide such care (ADC406432).

**J.     Heart disease**

199.   I reviewed seven charts randomly chosen by defendants from their list of patients with heart disease.  In two charts, I found significant concerns with the cardiac care being provided.  In another chart, I found a medication delivery lapse typical of ADC's systemic failures in this area.

200.   ██████████████) is 64 years old, with a history of atrial fibrillation (abnormal heart rhythms) and hypertension.   He was not evaluated or monitored by a medical provider from May 2013 until February 2014 (ADC420719-21).  Not surprisingly, he was sent to the emergency room on February 20, 2014, due to his heart condition (ADC420720).

201.   ██████████████) has a history of hypertension and high cholesterol.   He has been prescribed medications for his conditions that are appropriate and necessary.  These medications were interrupted, however, when he moved to a different housing unit.  According to his chart, his cardiac care medications lapsed for almost three weeks, starting in September 2013 (ADC412339, ADC412342, ADC412327).  Additionally, he apparently did not receive his self-administered medications on several occasions in late 2013 and early 2014 (ADC412335, ADC412334, and ADC412333).

202.   ██████████████) appears to be receiving appropriate medical care currently.  However, it appears that she experienced an almost six-week delay in receiving mental health medication in October and November 2013 (ADC412469, ADC412468, ADC412458).

**K.     Pregnancy**

203.   The three randomly selected charts in this area -- ██████████████), ██████████████), ██████████████) -- were unremarkable.  This finding is consistent with my previous findings regarding care for pregnant patients.

1   When I visited the women's prison in Perryville last year, I reviewed of all the charts of

2   women who were or had recently been pregnant.  My concerns focused on delivery and

3   post-delivery matters that have not yet arisen for these three women: custody gatekeeping

4   when patients were ready to deliver their babies and wound care after delivery.  These

5   problems did not appear on these patient charts.

6       **L.    Intake**

7       204.    I reviewed 13 charts randomly selected by defendants for patients who were

8   processed through defendants' intake procedures.  In five of these charts, I found the

9   intake process was incomplete, usually because necessary lab tests were not ordered or

10  results were not reported.  In three cases, I found medication administration failures.  One

11  patient appears to have been placed in this category mistakenly: ███████████████████ )

12  is a transfer, not a new intake (ADC364935).

13      205.    Intake assessment should be a standardized process that assesses the overall

14  health of the arriving prisoner and establishes a baseline for future care.  A thorough

15  assessment is necessary at intake to ensure that continuity of care is maintained for

16  individuals with serious medical needs.  Failure to do a complete assessment in a timely

17  fashion subjects the prisoners to significant risk if their medical treatment plans are not

18  established as they enter the ADC system.

19      206.    ███████████████████ ) arrived at the Phoenix facility on or around

20  3/5/14 (ADC364907).  I found no results for any lab blood work, making this intake

21  assessment incomplete.  At intake, he received withdrawal medications and was placed on

22  the protocol for alcohol withdrawal, to be assessed twice a day for five days

23  (ADC364909-10).  I found documentation of the assessments in the chart for only one of

24  the five days (ADC364913).

25      207.    ███████████████████ ) arrived at the Phoenix facility on or around

26  3/14/14 (ADC364929).  His chart consists of only four pages and contains no labs

27  (ADC364929-32).

28

208. ████████████ ) arrived at the Phoenix facility in late February 2013.  Although labs were ordered (ADC365026), there are no results in his chart. Additionally, it appears that penicillin was ordered for him, but I found no corresponding MAR (ADC365029).

209. ████████████ ) had an incomplete intake assessment on 3/20/14 (ADC365042).  Although his intake labs were ordered that day, the results had not been reviewed as of the 4/1/14 discovery cut-off date (ADC365067).

210. ████████████ ) had an incomplete intake assessment dated 3/17/14 (ADC365074-75).  I found no intake labs ordered, nor did I find intake lab results. Although there are multiple practitioner orders for medications, there were no MARs included in the chart (ADC365079).

211. ████████████ ) has hypertension but his medications were provided only sporadically: there is no indication that he received the medications in September and October 2013, even though the order is on the MARs (ADC365238, ADC365242).

**M.     Respiratory disorders**

212.   I reviewed nine charts randomly selected by defendants from their list of patients with respiratory disorders.  They were all unremarkable, either because they presented no major concerns or because they contained too little relevant information to meaningfully evaluate care: ████████████ ) (chart is six pages), ████████ ████████████ ) (chart is 11 pages), ████████████ ) (no concerns before discovery cut-off date), ████████████ ), ████████████ ), ████████ ████████████ ), ████████████ ), ████████████ ), ████████ ████████████ ).

**N.     MRSA**

213.   I reviewed two charts randomly selected by defendants from their list of patients with MRSA.   I did not observe significant current medical care concerns in either chart: ████████████ ) and ████████████ ).

### O.     AIDS

214.   I reviewed three charts randomly selected by defendants from their list of patients with AIDS.  One chart demonstrated dangerously negligent care that is likely shortening the life expectancy of the patient.  The other two charts demonstrated adequate AIDS treatment but revealed other serious concerns regarding disease monitoring and patient privacy.

215.   Defendants produced the chart for ▮▮▮▮▮▮▮▮▮▮▮▮▮ ) in this category.  He is a patient I have discussed extensively in my reports, including in Section II.B, above.  I will not repeat the details of my concerns here, except to say that defendants have endangered his life by failing to correct the shocking inadequacies of his care even after I have repeatedly called those inadequacies to their attention.

216.   ▮▮▮▮▮▮▮▮▮▮▮▮▮ ) has HIV and is considered, according to her chart, to have an AIDS-defining illness of previous cervical cancer.  Several providers comment about her cervical cancer history in the chart, but there is no evidence that anyone has ever done an examination of her cervix, as would be appropriate given that she is HIV-positive as well as a cervical cancer survivor.  Both of these conditions are independently sufficient reasons to do a pelvic exam with close examination of the cervix.  The failure to perform this examination falls short of the standard of care.

217.   ▮▮▮▮▮▮▮▮▮▮▮ ) has a highly inappropriate document contained in his medical records.  It is an email from the ADC medical administration which contains a list of all patients who have HIV with low CD4 counts within the Arizona prison system (along with their identification numbers, locations, and birthdates) (ADC378544-46).  Given that Mr. ▮▮▮▮ has the right to see his own health care records, he would have access to this information.  The placement of this document in his chart is clearly a potential egregious violation of medical confidentiality.

///

///

///

**P.    Dialysis**

218.    I reviewed four charts randomly selected by defendants from their list of patients on dialysis.  Two of the charts raised serious concerns regarding treatment and monitoring for these fragile patients.

219.    ███████████████████) is a dialysis patient who has suffered from defendants' poor care.  Because he is an extremely complicated patient, he needs sophisticated and consistent care; it appears that his care has been spread over a number of providers who lack the ability to address his complex concerns and provide the consistency he needs.

220.    Mr. ████████ diabetes was very poorly controlled, as shown by his many instances of extremely elevated blood sugar levels (see e.g., ADC409014, ADC408964, ADC408962, ADC408846), which is a well-known precursor to the development of infection.  The failure to treat his out-of-control diabetes placed him at extreme risk for the development of a systemic infection, and likely contributed to the infection in his fistula (ADC408741).

221.    ███████████████) is a dialysis patient who also has had an episode of sepsis as a result of an infection of his hemodialysis access route (ADC410058).  I have reviewed several patients who have had an infection of the fistula or port catheter, which calls into question whether ADC's infectious disease protocols for dialysis patients are adequate.  Clearly this is not a large enough data set to form a final conclusion, but the fact that individuals on dialysis have had possibly avoidable life-threatening infections associated with their dialysis certainly raises very serious questions.

**Q.    Hypertension**

222.    I reviewed thirteen charts randomly selected by defendants from their list of patients diagnosed with hypertension.  Of these, I found significant deficiencies in seven charts.  One patient does not appear to have hypertension.

223.    ███████████████) was included in the set of records for patients with hypertension, but I found no evidence that he has been diagnosed with that condition.  He

1 does, however, have Hepatitis C, and defendants have failed to provide him with timely

2 treatment.  His chart indicates he has been waiting to be cleared for treatment since he was

3 first identified as a candidate on 7/30/13 (ADC380684).  As of his last chronic care

4 appointment on 3/12/14 (ADC380680), he is still "waiting for approval" for treatment

5 despite having undergone an ophthalmology exam (ADC380689-93) and a mental health

6 exam for clearance (ADC380697).  The ophthalmology exam was delayed and took place

7 only after three separate orders, dating back to 5/24/13 (ADC380686, ADC380694-695,

8 ADC380678).

9   224.  Mr. ▮▮▮▮ also experienced delays in receiving lab work.  Labs ordered

10 7/31/13 (ADC380679) were not completed until 10/22/13 (ADC380706-708), almost

11 three months later.  Additionally, on 11/6/13, lab orders were given (ADC380679) but his

12 blood was not drawn until nearly three months later, on 2/3/14 (ADC380705).

13   225.  ▮▮▮▮▮▮▮▮▮▮) has been receiving routine medication

14 management for his hypertension, except that his blood pressure was checked only five

15 times from April 2013 to April 2014 (ADC380728, ADC380730-32, ADC380734).  That

16 is inadequate monitoring for a hypertensive patient.

17   226.  On 7/23/13, Mr. ▮▮▮▮ submitted an HNR complaining of shortness of

18 breath and other breathing issues (ADC380750).  Although he should have been seen on

19 an urgent basis, he was not seen until  8/7/13 (ADC380732), two weeks later, and then

20 only by a nurse.  He appears to have been seen by his clinician on 8/12/13 (ADC380732),

21 which is three weeks from the date of his HNR – far too long to wait for such an urgent

22 allegation.

23   227.  ▮▮▮▮▮▮▮▮▮▮) has received treatment for his hypertension that is

24 subpar and poorly documented.  On 7/8/13, it is noted that he had been out of one of his

25 medications (Lisinopril) for a month (ADC380622-23).  The MAR for that month shows a

26 valid order for that medication from 5/24/13-11/20/13 (ADC380649).  However, the

27 charting area of that MAR is blank for Lisinopril administration, no further 2013 MARs

28 were provided, and no evidence of correction or discontinuation was in the chart.  On

1    3/6/14, Mr. ████ was transferred to a different facility (ADC380610).  Upon arrival he

2    submitted HNRs on 3/12/14 and 3/19/14 seeking hypertension medications  (ADC380658,

3    ADC380656), but he did not receive them as of the 4/1/14 discovery cut-off date.  On

4    3/24/14, he received a written reprimand for requesting to have his blood pressure

5    assessed (ADC380608), even though his blood pressure had not been checked in three

6    months (ADC380645).  The last time he saw a physician before the 4/1/14 discovery cut-

7    off date was 9/9/13 (ADC380613).

8        228.    In addition to his hypertension issues Mr. ████ has experienced delays in

9    other areas of care.  On 8/26/13, he was seen for a hemorrhoid and prescribed several

10   medications for which no MAR data is found indicating medication receipt (ADC380615-

11   16).  On that date, he also evaluated for a rash to his penis.  Orders were given for

12   him to be seen again by a provider two days later, but he was not seen for over two weeks

13   (ADC380614).

14       229.    ████████████████) has hypertension that is controlled with routine

15   treatment (ADC380809).  However, she is being inadequately monitored: there is no

16   indication in her chart that her blood pressure is being taken other than at her provider

17   visits in April and July 2013 (ADC380811-12).

18       230.    Ms. ████ has also been receiving inadequate treatment for her

19   hyperthyroidism.  Her thyroid stimulating hormone level was extremely low on 4/15/13

20   and again on 9/10/13 (ADC380822, ADC380817-8) indicating that her circulating thyroid

21   hormone level is very high.  There is also an order noted on 11/18/13 (ADC380809) for a

22   thyroid hormone level blood test but no results or proof of blood draws are found in the

23   chart.  On 7/18/13, her order for thyroid medication was inexplicably and significantly

24   decreased (ADC380810).  On 9/1/13 she submitted an HNR pointing out the dosing error

25   (ADC380847).  The error was finally fixed two weeks later (ADC380809).  Medication

26   management for a patient like this is only a temporizing measure, as she really needs to

27   have her thyroid evaluated with ultrasound and to be scheduled for a definitive treatment

28   to address her hyperthyroidism.  I see no indication in the chart that any of these necessary

1  steps have been undertaken.  The patient has hypertension that is "out of control"

2  (ADC380813) and she has episodes of mania (ADC380802).  Both of these conditions are

3  direct side effects of her hyperthyroid state and if the ADC would correct her

4  hyperthyroidism appropriately, these conditions would likely disappear as well.

5        231.  ████████████████) is a poorly controlled insulin-dependent diabetic

6  patient who also suffers from hypertension and heart disease.  He has experienced delays

7  in care and inadequate follow-up for his diabetes.  A chronic care note dated 6/12/13

8  records lab results (Hemoglobin A1c) that demonstrate poor control (ADC421835).

9  Although Mr. ████████ medications were adjusted (ADC421825-28), he continued to have

10 markedly elevated glucose levels (ADC421858-59, ADC421861-62, ADC421866).

11 Although he was referred to an endocrinologist for insulin adjustment and to bring his

12 diabetes under control on 9/27/13 (ADC421842), he was not seen until 12/20/13

13 (ADC421839-40), almost three months later.  As of 4/1/14, he had yet to have an

14 additional Hemoglobin A1c drawn to determine the effectiveness of the order changes

15 recommended by endocrinology.

16       232.  ████████████████) has hypertension and asthma.  On 8/2/13, Ms. ████████

17 was seen by a cardiologist who recommended a coronary angiogram (ADC415328-31).  A

18 consult request was submitted on 8/8/13 for the study (ADC415327).  Ms. ████████

19 submitted HNRs on 8/9/13 and 9/11/13 asking when the procedure would be taking place,

20 saying she was told by the cardiologist that "they needed to be done within 3 weeks" of

21 her 8/2/13 appointment (ADC415452, ADC415450).  On 9/19/13, seven weeks after her

22 cardiologist appointment, Ms. ████████ had an acute episode of chest pain for which she was

23 sent via ambulance to an emergency room where she finally had the angiogram

24 (ADC415293, ADC415312-26).

25       233.  The chart for ████████████████) contains another example of a licensed

26 practical nurse practicing outside the scope of that license (ADC420606-07).

27    **R.    Outside medical transports**

28

234.    I reviewed six charts randomly selected by defendants from their list of medical transports.  I found one case in which ADC's treatment deficiencies and inexcusable delays gravely endangered the health and perhaps the life of the patient.  I also found evidence of systemic concerns in another patient's chart.

235.    ███████████) is a 53 year-old woman with a past neck injury from a car accident (ADC302733).  Despite alarming symptoms of pain, numbness, and weakness in her hand and arm, it took seven months for her to get an MRI and over a month for it to be read and acted on.  By the time her MRI was read by a competent specialist, she had developed such severe compression on her spinal cord and such inflammation that the doctor ordered her to be put in a cervical collar immediately and sent to the emergency room because of the extreme risk of paralysis.  She was not sent to the emergency room for 10 more days.

236.    As early as June 2013, Ms. ██████ began to complain of disturbing symptoms such as back pain, hand and arm numbness, and loss of range of motion (ADC302814, ADC302805, ADC302797); a provider also noted muscle atrophy and weakness (ADC302733).  It took multiple HNRs and requests from Ms. ██████ as well as consult requests from providers over a period of seven months before she was sent for an MRI (ADC302699 [provider notes: "Consult rewritten for 3rd time for MRI of C-spine r/o nerve impingement. Will write consult for neuro-surgery after MRI to see if pt. is candidate for surgery or physical therapy"], ADC302733 [MRI consult request dated 1/9/14 with handwritten note "resubmit"], ADC302811, ADC302810, ADC302805-07, ADC302797).  The MRI, completed on 1/21/14, showed "Multiple severe spinal stenosis," "Cord edema," and "multi level severe neural foraminal narrowing" (ADC302730-31).

237.    Her medical provider does not appear to have viewed the results until 2/14/14 (ADC302731); despite the extremely ominous findings on that MRI it took the provider 12 days just to write a consult to a neurosurgeon that should have been done emergently (ADC302729).  The specialist saw her on 3/3/14 and ordered her to be

1    "Place[d] in collar immediately and bring to ER for on call surgeon to assess"

2    (ADC302727).  This order was not reviewed by a provider until ten days later, on 3/13/14

3    (*id.*).  She was finally taken to the hospital on 3/13/14, nearly two months after the MRI

4    was completed, for emergency surgery (ADC302705).  The emergency room

5    documentation confirms the delay: "MRI was obtained 2 months ago and recently

6    received the results showing severe cervical stenosis and cord compression prompting her

7    transfer to our care for evaluation" (ADC302710).

8        238.   She then experienced a distressing lack of follow-up care: her provider

9    failed to order dressing changes or neurological checks (ADC302660).  A note in her

10   chart dated 3/21/14 states that the incision site is at risk for infection and should be

11   monitored (ADC302686), but there is no record this happened (see ADC302784 [patient

12   complains of no follow up visit with surgeon that was recommended, no one looking at

13   her incision, no post-operation instructions]).

14       239.   ██████████████) was treated by a healthcare worker practicing outside

15   the scope of the license.  On 3/13/14, Ms. ██████ was evaluated for a history of a

16   subarachnoid hemorrhage (bleeding between the brain and the membrane that covers it)

17   and a syncopal episode which resulted in her hitting her head a few days earlier

18   (ADC307990).  The practitioner who evaluated this woman is a certified nurse midwife.

19   Ms. ██████ clinical issue has nothing to do with the pregnant state and she is not

20   pregnant.  As such, this nurse midwife is practicing adult ambulatory medicine which is

21   completely outside the scope of a CNM's training and practice.

22   **S.     Hepatitis C**

23       240.   I reviewed ten charts randomly selected by defendants for patient who had

24   been diagnosed with Hepatitis C.  Of these, I found that five of these patients had received

25   care that was significantly deficient.

26       241.   ██████████████) had blood work confirming his Hepatitis B and C

27   diagnosis on 10/24/13 (ADC412964).  However, there is no further work-up or treatment

28   noted for this condition found in the chart.  Additionally, Mr. ██████ failed to receive

-77-

1   appropriate care when he submitted an HNR on 9/19/13 complaining of increased gait

2   instability after he had a blow to his head (ADC412988).   There is no notation of an exam

3   by either a clinician or an RN in response.  This is particularly troubling in light of the

4   8/30/13 MRI report that documented a stroke (ADC142958-61).

5      242.  ████████████████████) tested positive for Hepatitis C antibodies and

6   had elevated liver enzymes on 10/31/13 (ADC413058, ADC413054).  Although she was

7   seen for a chronic care appointment on 11/14/13, no further treatment or studies to

8   determine the severity of her condition were noted (ADC413037).  Her provider ordered a

9   return visit in March 2014 (ADC413037) but there is no record that the follow-up

10  appointment took place.

11     243.  ████████████████) has Hepatitis C and his elevated liver function test

12  results signal disease progression.  He requested treatment when seen by his provider on

13  5/27/13 (ADC413274).  His provider referred him for a mental health evaluation to

14  determine whether he meets the mental health criteria for Hepatitis C treatment.  It does

15  not appear that Mr. ██████ has received any further work up for treatment, though he has

16  continued to have abnormal liver function test results (ADC413289).

17     244.  ██████████████) tested positive for Hepatitis C, but has normal liver

18  function test results and does not currently require treatment.  However, he has had poor

19  care related to his ulcerative colitis.  On 1/22/14, Mr. ██████ was seen by a

20  gastroenterologist for ulcerative colitis pain and rectal bleeding, who recommended Mr.

21  ██████ return for further treatment recommendations following a colonoscopy

22  (ADC413462-63).  Although a consultation request was submitted for the procedure three

23  weeks later on 2/7/14 (ADC413461), Mr. ██████ had not received the colonoscopy as of

24  4/1/14.

25     245.  ████████████████████) has not been well managed medically.  On 9/10/13,

26  she submitted an HNR seeking blood tests to determine the progress of her Hepatitis C

27  (ADC413138).  The disposition reported that her "last labs [were] a few months ago [and]

28  showed very good liver enzymes.  Doing fine" (*id.*).  However, the last noted values were

1   six months old, from a chronic care exam on 3/18/13 (ADC413098).  That was the last

2   noted reference to Hepatitis C treatment in chart until 2/10/14, when she apparently

3   refused her chronic care appointment (ADC413101), although I was not able to locate a

4   refusal form.

5   **T.    HIV**

6   246.   I reviewed six charts randomly selected by defendants from their list of

7   patients with HIV.  Two of the charts raised serious concerns with HIV treatment.

8   247.   ██████████████) experienced significant delays in care.  His chart is

9   brief and confusing.  It appears that he was housed in Kingman, a private prison, until he

10   transferred to ADC (Lewis) in early October 2013 (ADC413713).  Although his 9/17/13

11   labs from Kingman document that he has HIV, he was not seen by a provider at Lewis

12   until 2/7/14, four months after his arrival at Lewis.  At that time, the physician's assistant

13   noted that he had been diagnosed with HIV in 2011 and should see an infectious disease

14   specialist for medications (ADC413682).  The request for the referral, however, was not

15   completed until 3/3/14 (ADC413691), and as of 4/1/14, Mr. █████ had not seen the

16   specialist.

17   248.   ██████████████████) is HIV-positive but asymptomatic.  His care

18   has been grossly inconsistent and substandard.  For example, on 6/20/13, he submitted an

19   HNR stating that he had not been seen in the chronic care clinic for six months, and that

20   he is supposed to be seen every three months (ADC380586).  The response stated "While

21   this may be true, we haven't had a provider, and now I'm catching up" (*id.*).  It is

22   impossible to determine when he saw a provider in response to this HNR, as the dates are

23   cut off the progress notes that were provided (ADC380502-504).  In addition, he was

24   supposed to be seen for infectious disease HIV clinic, as ordered on 11/22/13

25   (ADC380498).  There is no evidence in the chart that this consult has ever been

26   completed.

27

28

249.    HIV medications must be taken regularly and on time, as missing doses can lead to development of drug resistance.  Mr. ███████ HIV medications were interrupted on at least one occasion (ADC380546, ADC380548, ADC380583).

**U.    Hospital admissions**

250.    I reviewed five charts randomly selected by defendants from their list of patients admitted to the hospital.  In two of these charts, I found profoundly mismanaged care that has endangered the lives of these patients.

251.    ████████████████) is a difficult patient with serious complications from Hepatitis C, decompensated cirrhosis, and end-stage liver disease.  He also has diabetes, atrial fibrillation, and chronic kidney disease.  His care has been dangerously mismanaged.  The complexity of his care clearly was a challenge to ADC and there are so many deficits in his treatment that an exhaustive write-up is beyond the scope of the present report.

252.    In summary, Mr. █████ liver disease is being mismanaged and he is presently having significant repetitive life-threatening complications from his medical conditions.  The most important of these are his ongoing gastrointestinal bleeds that are poorly managed and inadequately assessed.  He is in and out of the hospital as a result of these bleeds and it is clear that the continuity of care both entering and leaving the hospital is inadequate.  As such his care is seriously fragmented and it places him at extreme risk of injury or death.

253.    For example, I noted significant delays in obtaining emergency care for this patient.  One egregious example occurred on 8/28/13, when he was evaluated by an ADC provider for vomiting blood and black stools (ADC312867).  Emergency labs showed that he had a dangerously low hemoglobin level.  Mr. ████ should have been transferred immediately to the emergency room but instead was apparently sent back to his unit.  Three days later, on 8/31/13, he was found unresponsive and staff had to call 911 to have him taken to the hospital (ADC 312867).

254. There are numerous other examples of bad care in his chart: for example, practitioners functioning outside of their scope of licensure, including an LPN evaluating a significant gastrointestinal bleeding episode (ADC 312872-73).

255. Given the mismanagement of his underlying disease processes and multiple near misses with catastrophic medical outcomes, Mr ██ is lucky to be alive. It appears that he has been transferred to the infirmary at Florence. I very much hope that he receives additional attention to his very serious medical needs.

256. ███████████████ ) has multiple medical problems including diabetes, hypertension, and severe cirrhosis as a result of Hepatitis C infection. He is a complicated and fragile patient who requires sophisticated care and careful monitoring. Unfortunately, he has received neither in ADC. Instead, his chart demonstrates an extraordinary range of malpractice. As with Mr. ██, a listing of every serious medical error in his extensive chart would take an excessive amount of time. I provide here a summary and overview of my findings.

257. Mr. ██████ has been hospitalized several times and ultimately developed portal venous thrombosis. The clinicians at Tempe St. Luke's hospital started him on anticoagulation in February 2014 (ADC317689-91), which is a risky treatment for this condition because he is at a very high risk for bleeding, which the use of anti-coagulants increases. Nonetheless his care was handed off to ADC with clear-cut instructions to monitor his level of anticoagulation and to titrate his blood-thinning medication (Warfarin, also called Coumadin) based on regular blood tests (called INR) (ADC317702) – an essential practice if he is to be given this treatment. Unfortunately for Mr. ██████, the care within ADC is so fragmented that no reasonable monitoring of his INR occurred. What did occur was a significant overdosing of his Warfarin to the point that his blood was thinned so much that it presented a catastrophic medical risk to him on multiple occasions.

258.   On 3/9/14, he developed serious internal bleeding after being struck by a board while operating a table saw at the prison (ADC 317729).[6] He was admitted to the hospital once again and found to have an INR level greater than 10 (ADC 317729) (target level is 2-3). This is a life-threatening mistake on the part of ADC and it placed him at substantial risk for a massive hemorrhage. He was managed for this Warfarin overdose at the hospital and then discharged back to the care of ADC, where he was continued on Warfarin (ADC317596, ADC317608, ADC317659).

259.   The dangerous neglect of this patient's care continued and on 3/27/14, Mr. ████████ experienced another life-threatening bleeding episode. At that time he complained of dark stools and dizziness and was found to have a very low blood pressure (76/50) and elevated pulse (ADC 317789). He again had been overdosed on Warfarin (ADC 317789) and was once again taken to the hospital and found to have internal bleeding from his esophageal varices.

260.   This patient's care represents a sequence of errors that in some ways defines the systemic failures that exist within ADC. In one patient's chart, I found dangerous discontinuity of care, seriously inadequate disease monitoring, clear failures to complete physician orders, inappropriate assessments made by clinicians, egregious medication mismanagement, errors of judgment, errors of execution, and an absolute failure to learn from previous mistakes. This patient is lucky to be alive and if this sequence of care does not improve he will not be alive for long.

261.   I declare under penalty of perjury under the laws of the State of Arizona and the United States of America that the foregoing is true and correct.

_____
Todd Wilcox, M.D.

---

[6] I am also extremely concerned that this dangerously ill patient at risk for life-threatening bleed-outs was given a job involving the operation of table saws (ADC317608, ADC420436).

**APPENDIX A**
**List of Documents Reviewed for Second Supplemental Report**

**Advocacy Letters**

| | |
|---|---|
| PLTF-PARSONS-035952-035953 | 17.07.01 Jensen, Shawn 032465 |
| PLTF-PARSONS-035954 | 13.07.15 Corizon Response re Jensen |
| PLTF-PARSONS-035955 | 13.08.01 ███████████ |
| PLTF-PARSONS-035956 | 13.08.16 █████████ |
| PLTF-PARSONS-035957 | 13.08.20 Corizon Response re ██████ |
| PLTF-PARSONS-035958-035959 | 13.08.20 ██████████ |
| PLTF-PARSONS-035961 | 13.08.21 ████████ |
| PLTF-PARSONS-035961 | 13.09.12 Corizon Response re ███ |
| PLTF-PARSONS-035962 | 13.09.13 █████████ |
| PLTF-PARSONS-035963 | 13.09.13 ██████████ |
| PLTF-PARSONS-035946 | 13.09.16 Corizon Response re ██████ |
| PLTF-PARSONS-035965 | 13.09.30 Corizon Response re ███████ |
| PLTF-PARSONS-035966 | 13.10.15 Corizon Response re ████████ |
| PLTF-PARSONS-035967 | 13.11.01 ██████████ |
| PLTF-PARSONS-035968 | 13.11.01 █████████ |
| PLTF-PARSONS-035969 | 13.11.05 Corizon Response re ██████ |
| PLTF-PARSONS-035970 | 13.11.08 █████████ |
| PLTF-PARSONS-035971-035972 | 13.11.08 ██████████ |
| PLTF-PARSONS-035973 | 13.11.12 Corizon Response re ████ |
| PLTF-PARSONS-.35972 | 13.11.15 ██████████ |
| PLTF-PARSONS-035975-035976 | 13.11.25 █████████ |
| PLTF-PARSONS-035977 | 13.11.26 Corizon Response re ██████ |
| PLTF-PARSONS-035978-035979 | 13.12.06 ███████████ |
| PLTF-PARSONS-035980-035981 | 13.12.13 █████████ |
| PLTF-PARSONS-035982-035983 | 13.12.13 ██████████ |
| PLTF-PARSONS-035984 | 13.12.20 Corizon Response re ████████ |
| PLTF-PARSONS-035985 | 13.12.24 Corizon Response re ██████ |
| PLTF-PARSONS-035986-035987 | 14.01.10 ████████ ████ |
| PLTF-PARSONS-035988 | 14.01.10 ██████████ |
| PLTF-PARSONS-035989 | 14.01.15 Corizon Response re ███ |
| PLTF-PARSONS-035990 | 14.01.22 Corizon Response re ████ |
| PLTF-PARSONS-035991 | 14.01.28 Corizon Response re ████ |
| PLTF-PARSONS-035992 | 14.02.12 Corizon Response re Jensen |
| PLTF-PARSONS-035993-035994 | 14.02.20 ███████████ |
| PLTF-PARSONS-035995 | 14.02.21 Fletcher re Jensen |
| PLTF-PARSONS-035996-035998 | 14.02.21 Response to Finger re Jensen |

PLTF-PARSONS-031981-031985     Enclosed with 14.02.21 Response to Finger re Jensen
PLTF-PARSONS-035999           14.03.17 Corizon Response re ███████
PLTF-PARSONS-036000-036019     14.03.21 █████████████

**Emails**
AGA_Review_00104795
AGA_Review_00111245
AGA_Review_00111248
AGA_Review_00111251
AGA_Review_00111255
AGA_Review_00113522
AGA_Review_00116455
AGA_Review_00117056
AGA_Review_00117058

**Compliance Reports**
ADC154030-054048       Compliance Report – September 2013 – Douglas
ADC154049-154094      Compliance Report – September 2013 – Eyman
ADC154095-154146      Compliance Report – September 2013 – Florence
ADC154147-154181      Compliance Report – September 2013 – Lewis
ADC154182-154218      Compliance Report – September 2013 – Perryville
ADC154219-154257      Compliance Report – September 2013 – Phoenix
ADC154258-154278      Compliance Report – September 2013 – Safford
ADC154279-154346      Compliance Report – September 2013 – Tucson
ADC154347-154368      Compliance Report – September 2013 – Winslow
ADC354369-354421      Compliance Report – September 2013 – Yuma
ADC210260-210288      Compliance Report – October 2013 – Douglas
ADC210289-210335      Compliance Report – October 2013 – Eyman
ADC210336-210381      Compliance Report – October 2013 – Florence
ADC210382-210432      Compliance Report – October 2013 – Lewis
ADC210433-210478      Compliance Report – October 2013 – Perryville
ADC210479-210524      Compliance Report – October 2013 – Phoenix
ADC210525-210545      Compliance Report – October 2013 – Safford
ADC210546-210619      Compliance Report – October 2013 – Tucson
ADC210620-210653      Compliance Report – October 2013 – Winslow
ADC210654-210719      Compliance Report – October 2013 – Yuma
ADC210720-210742      Compliance Report – November 2013 – Douglas
ADC210743-210782      Compliance Report – November 2013 – Eyman
ADC210783-210823      Compliance Report – November 2013 – Florence
ADC210824-210866      Compliance Report – November 2013 – Lewis

| | |
|---|---|
| ADC210867-210902 | Compliance Report – November 2013 – Perryville |
| ADC210903-210945 | Compliance Report – November 2013 – Phoenix |
| ADC210946-210966 | Compliance Report – November 2013 – Safford |
| ADC210967-211034 | Compliance Report – November 2013 – Tucson |
| ADC211035-211063 | Compliance Report – November 2013 – Winslow |
| ADC211064-211120 | Compliance Report – November 2013 – Yuma |
| ADC211121-211144 | Compliance Report – December 2013 – Douglas |
| ADC211145-211189 | Compliance Report – December 2013 – Eyman |
| ADC211190-211239 | Compliance Report – December 2013 – Florence |
| ADC211240-211286 | Compliance Report – December 2013 – Lewis |
| ADC211287-211335 | Compliance Report – December 2013 – Perryville |
| ADC211336-211386 | Compliance Report – December 2013 – Phoenix |
| ADC211387-211410 | Compliance Report – December 2013 – Safford |
| ADC211411-211485 | Compliance Report – December 2013 – Tucson |
| ADC211486-211521 | Compliance Report – December 2013 – Winslow |
| ADC211522-211586 | Compliance Report – December 2013 – Yuma |
| ADC267460-267483 | Compliance Report – November 2013 – Douglas |
| ADC267484-267524 | Compliance Report – November 2013 – Eyman |
| ADC267525-267568 | Compliance Report – November 2013 – Florence |
| ADC267569-267612 | Compliance Report – November 2013 – Lewis |
| ADC267613-267648 | Compliance Report – November 2013 – Perryville |
| ADC267649-267693 | Compliance Report – November 2013 – Phoenix |
| ADC267694-267717 | Compliance Report – November 2013 – Safford |
| ADC267718-267785 | Compliance Report – November 2013 – Tucson |
| ADC267786-267816 | Compliance Report – November 2013 – Winslow |
| ADC267817-267871 | Compliance Report – November 2013 –Yuma |
| ADC267872-267895 | Compliance Report – December 2013 – Douglas |
| ADC267896-267940 | Compliance Report – December 2013 – Eyman |
| ADC267941-267991 | Compliance Report – December 2013 – Florence |
| ADC267992-268038 | Compliance Report – December 2013 – Lewis |
| ADC268039-268088 | Compliance Report – December 2013 – Perryville |
| ADC268089-268141 | Compliance Report – December 2013 – Phoenix |
| ADC268142-268167 | Compliance Report – December 2013 – Safford |
| ADC268168-268242 | Compliance Report – December 2013 – Tucson |
| ADC268243-268277 | Compliance Report – December 2013 – Winslow |
| ADC268278-268343 | Compliance Report – December 2013 – Yuma |
| ADC268344-268378 | Compliance Report – January 2014 – Douglas |
| ADC268380-268428 | Compliance Report – January 2014 – Eyman |
| ADC268429-268483 | Compliance Report – January 2014 – Florence |
| ADC268484-268532 | Compliance Report – January 2014 – Lewis |

| | |
|---|---|
| ADC268533-268580 | Compliance Report – January 2014 – Perryville |
| ADC268581-268628 | Compliance Report – January 2014 – Phoenix |
| ADC268629-268652 | Compliance Report – January 2014 – Safford |
| ADC268653-268720 | Compliance Report – January 2014 – Tucson |
| ADC268721-268752 | Compliance Report – January 2014 – Winslow |
| ADC268753-268820 | Compliance Report – January 2014 – Yuma |
| ADC268821-268836 | Compliance Report – February 2014 – Douglas |
| ADC268837-268867 | Compliance Report – February 2014 – Eyman |
| ADC268868-268897 | Compliance Report – February 2014 – Florence |
| ADC268898-268929 | Compliance Report – February 2014 – Lewis |
| ADC268930-268959 | Compliance Report – February 2014 – Perryville |
| ADC268960-268990 | Compliance Report – February 2014 – Phoenix |
| ADC268991-269004 | Compliance Report – February 2014 – Safford |
| ADC269005-269045 | Compliance Report – February 2014 – Tucson |
| ADC269046-269061 | Compliance Report – February 2014 – Winslow |
| ADC269062-269103 | Compliance Report – February 2014 – Yuma |
| ADC269104-269122 | Compliance Report – March 2014 – Douglas |
| ADC269123-269152 | Compliance Report – March 2014 – Eyman |
| ADC269153-269184 | Compliance Report – March 2014 – Florence |
| ADC269185-269235 | Compliance Report – March 2014 – Lewis |
| ADC269236-269273 | Compliance Report – March 2014 – Perryville |
| ADC267274-269316 | Compliance Report – March 2014 – Phoenix |
| ADC269317-269331 | Compliance Report – March 2014 – Safford |
| ADC269332-269378 | Compliance Report – March 2014 – Tucson |
| ADC269379-269395 | Compliance Report – March 2014 – Winslow |
| ADC269396-269433 | Compliance Report – March 2014 - Yuma |

**Healthcare Records**

| | |
|---|---|
| ADC262608-262632 | Chisholm, Maryanne 200825 - 20140124 to 20140401 |
| ADC262633-262636 | Chisholm, Maryanne 200825 – Rx 20140409 |
| ADC262637-262641 | Chisholm, Maryanne 200825 - ORC as of 20140409 |
| ADC262843-262844 | Jensen, Shawn 032465 – Rx 20140409 |
| ADC262845-262870 | Jensen, Shawn 032465 – ORC as of 20140409 |
| ADC262871-262914 | Jensen, Shawn 032465 – 20140124 to 20140401 V1 |
| ADC262915-262958 | Jensen, Shawn 032465 – 20140124 to 20140401 V2 |
| ADC262959-263026 | Licci, Desiree 150051 – 20140124 to 20140401 |
| ADC263027-263029 | Licci, Desiree 150051 – Rx 20140409 |
| ADC263030-263043 | Licci, Desiree 150051 – ORC as of 20140409 |
| ADC263172-263216 | Wells, Charlotte 247188 – 20140124 to 20140401 |
| ADC263203-263216 | Wells, Charlotte 247188 - ORC as of 20140409 |

4



ADC265909-265911        Wells, Charlotte 247188 – Rx 20140409
ADC282965-282979
ADC282980-283008
ADC283009-283021
ADC283306-283369
ADC284892-284967
ADC284968-285194
ADC285195-285222
ADC285337-285549
ADC285596-285620
ADC285621-285858
ADC286095-286126
ADC286220286343
ADC287328-287420
ADC288269-288275
ADC288407-288456
ADC288489-288739
ADC288740-288771
ADC290077-290280
ADC291124-291466
ADC291467-291656
ADC292101-292453
ADC292454-292629
ADC293695-293763
ADC294555-294622
ADC294948-295203
ADC295204-295257
ADC395369-395517
ADC295518-295530
ADC295565-295621
ADC295929-296038
ADC296287-296396
ADC296555-296611
ADC297080-297427
ADC297555-297755
ADC397845-398569
ADC298570-298817
ADC299951-300041
ADC301311-301394
ADC302886-302897



ADC303246-030262
ADC303984-304001
ADC304962-305296
ADC306018-306068
ADC306240-306248
ADC307432-307520
ADC307521-307536
ADC307748-307785
ADC307786-307968
ADC308353-308617
ADC309695-309745
ADC309796-310157
ADC310357-310482
ADC313747-313780
ADC316519-316647
ADC316846-316955
ADC317537-317588
ADC317791-317861
ADC322433-322512
ADC322606-322674
ADC323054-323069
ADC323141-323182
ADC323467-323486
ADC323921-324031
ADC324359-324731
ADC325300-325336
ADC326433-326511
ADC334858-334886
ADC344386-344734
ADC344875-345083
ADC345311-345333
ADC363168-363246
ADC378541-378627
ADC378628-378741
ADC406286-406399
ADC378742-378872
ADC406400-406556
ADC406611-406937
ADC378873-379187
ADC420186-420241

ADC379188-379261

ADC406938-406987

ADC406557-406610

ADC378262-379428

ADC406988-407153

ADC379429-379499

ADC407154-407250

ADC379500-379656

ADC379657

ADC379907

ADC407641-407721

ADC407722-407753

ADC379658-379659

ADC379660-379683

ADC407754-408170

ADC379684-379695

ADC408169-408321

ADC379696-379702

ADC408322-408442

ADC379891-379906

ADC420242-420291

ADC379703-379781

ADC379908-379911

ADC407251-407290

ADC379912-379914

ADC407291-407640

ADC379915-379925

ADC379782-379890

ADC379926-379931

ADC379932-380023

ADC380024-380236

ADC408443-408511

ADC411538-411792

ADC408512-408701

ADC408702-408937

ADC408938-409277

ADC409278-409502

ADC409503-409776

ADC409777-409950

ADC409951-410466

ADC410467-411001
ADC411002-411144
ADC411145-411537
ADC412373-412493
ADC412494-412505
ADC412506-412691
ADC412692-412933
ADC411793-412046
ADC412047-412289
ADC380237-380238
ADC412290-412372
ADC420707-420808
ADC380239-380337
ADC413019-413069
ADC413070-413270
ADC413271-413306
ADC413307-413443
ADC413442-413531
ADC413530-413604
ADC413605-413677
ADC412934-413013
ADC413014-413018
ADC413678-413715
ADC419623-419773
ADC380338-380491
ADC380492-380601
ADC413716-413839
ADC413840-413879
ADC312822-313141
ADC313142-313407
ADC313408-313602
ADC313603-313746
ADC301114-301183
ADC415084-415156
ADC317589-317790
ADC420340-420582
ADC306296-307314
ADC413880-414057
ADC414058-414313
ADC414314-414540





ADC414541-414771
ADC414772-414890
ADC414889-415014
ADC309157-309230
ADC415015-415083
ADC415462-415467
ADC419774-419803
ADC421818-421897
ADC380724-380797
ADC380798-380850
ADC415648-415611
ADC380851-380964
ADC415612-415738
ADC415157-415266
ADC380602-380675
ADC420292-420339
ADC415267-415461
ADC380676-380723
ADC420583-420706
ADC416668-417068
ADC417069-417111
ADC417112-417317
ADC420117-420185
ADC380965-381073
ADC415739-415966
ADC415967-416181
ADC416182-416465
ADC417318-417454
ADC416466-416667
ADC283042-283214
ADC299618-299950
ADC302623-302885
ADC303515-303619
ADC307969-308266
ADC308675-309119
ADC381074-381255
ADC381256-381523
ADC417455-417722
ADC417846–417919
ADC417920-417978



ADC417723-417845
ADC381531-381542
ADC417979-417987
ADC417988-418097
ADC418098-418315
ADC418316-418352
ADC381524-381530
ADC381543-381581
ADC420809-420868
ADC381608
ADC382119
ADC382120
ADC382131
ADC382132
ADC381620-381683
ADC381582-381594
ADC381684-381876
ADC381595-381602
ADC419804-419930
ADC381603-381607
ADC381877-382041
ADC418353-418398
ADC418399-418446
ADC418447-418596
ADC381609-381619
ADC418597-418683
ADC418684-418743
ADC382121-382130
ADC382042-382118
ADC418744-418803
ADC382280-382360
ADC419931-420116
ADC418408-418870
ADC418871-418977
ADC420869-420906
ADC382361-382477
ADC418978-419013
ADC419014-419128
ADC382133-382279
ADC419129-419389



ADC420907-421024
ADC419390-419543
ADC419544-419622
ADC382478-382630
ADC367404-367519
ADC367520-367680
ADC364902-364929
ADC364928-364932
ADC364933-364977
ADC364978-365011
ADC365012-365037
ADC35038-365070
ADC365071-365118
ADC365119-365325
ADC365326-365366
ADC365367-365383
ADC365384-365413

**Summaries of healthcare records**

PLTF-PARSONS- 036215-036219
PLTF-PARSONS- 036220-036221

**Defendants' list of randomly selected healthcare records**
ADC421025-28

11

# EXHIBIT 7

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Victor Parsons; Shawn Jensen; Stephen Swartz; Dustin Brislan; Sonia Rodriguez; Christina Verduzco; Jackie Thomas; Jeremy Smith; Robert Gamez; Maryanne Chisholm; Desiree Licci; Joseph Hefner; Joshua Polson; and Charlotte Wells, on behalf of themselves and all others similarly situated; and Arizona Center for Disability Law,

No. CV 12-00601-PHX-DJH

Plaintiffs,

v.

Charles Ryan, Director, Arizona Department of Corrections; and Richard Pratt, Interim Division Director, Division of Health Services, Arizona Department of Corrections, in their official capacities,

Defendants.

## SECOND SUPPLEMENTAL EXPERT REPORT OF:

JAY D. SHULMAN, DMD, MA, MSPH
9647 HILLDALE DRIVE
DALLAS, TEXAS 75231
TELEPHONE: (214) 923-8359

REGARDING
DENTAL CARE AT THE ARIZONA DEPARTMENT OF CORRECTIONS

AUGUST 29, 2014

JAY D. SHULMAN, DMD, MA, MSPH

# TABLE OF CONTENTS

**Page**

I.     Background ........................................................................................................... 1

II.    ADC's Failure to Monitor the Dental Program ................................................. 1

III.   The Recent Sample Confirms my Findings Regarding Systemic Problems within
       ADC ..................................................................................................................... 2

       A.     Methodology ............................................................................................ 2

       B.     Examples of Systemic Problems ............................................................ 6

IV.    Conclusion ......................................................................................................... 17

## I.      BACKGROUND

I was provided dental records of ADC prisoners who were treated after December 1, 2013, and the corresponding dental reports and other documents produced by Defendants relating to dental services at ADC prisons between September 27, 2013 and April 1, 2014.  For the reasons set forth below, these additional documents confirm my opinions as stated in my other reports.

## II.     ADC'S FAILURE TO MONITOR THE DENTAL PROGRAM

I discussed the October 2013 Oral Care MGARs in my Supplemental Report dated February 24, 2014 ("February Supplemental Report" or "First Supplemental Report").  [February Supplemental Report at 1]  Oral Care has not been evaluated using the MGARs up through March 2014 (the most recent reports before the close of discovery on April 1, 2014)—a lag of at least six months.  The October MGAR was the first time that oral care had been monitored in nine months.  As I explained in my February Supplemental Report (at 1):

> This itself is inadequate care because a well-functioning dental system needs consistent, comprehensive, and reliable monitoring to be successful.  Further, without consistent monitoring, the quality of dental care is likely to decline and any positive inertia that might have been gained can be lost easily.  That ADC might monitor dental care periodically does little to alleviate the risks I identified in my previous reports.

[*Id.*]  Not only has the frequency of monitoring been grossly deficient, but the MGAR measures themselves are largely unhelpful in ensuring a well-functioning dental system.  The MGARs are merely clerical reviews to the exclusion of any clinical measures that must be evaluated by a dentist.  As I previously explained, "the October MGARs do not indicate that ADC has eliminated the substantial risks of serious injury I previously identified.  ADC's inadequate monitoring, therefore, continues to be a serious problem with ADC dental care."  [*Id.*]

Compounding the inadequacies of the MGAR process, Smallwood Prison Dental Services ("SPDS") does not report wait times for urgent care as it does for intake exams and routine care.  ADC's oversight of urgent care wait times needs to amount to more than ad hoc statements.  Further, the non-dentist monitors are not clearly asked to monitor urgent care, and, even if they were, they lack the training to determine if a dental assistant's decision not to assign a prisoner to urgent care is appropriate, or indeed to assess what qualifies as urgent care.  The result is a situation where ADC has no insight into actual urgent care wait times.[1]

---

[1]  The MGAR asks whether "911s" are seen within 24 hours.  Based on emails and some MGARs, there appears to be confusion regarding whether 911 corresponds to "urgent" or "emergency."  The contract requires that emergency care be seen within 24 hours and urgent care within 72 hours, but dental emergencies, as defined under the contract, are extremely rare.  The sheer number of "emergencies" identified by the monitors suggest they are looking at what are actually urgent care HNRs.  [*E.g.*, AGA_Review_00103735-6]

III.    **THE RECENT SAMPLE CONFIRMS MY FINDINGS REGARDING SYSTEMIC PROBLEMS WITHIN ADC**

A.    **Methodology**

When Defendants sought permission to rely on dental wait times and utilization reports between October 2013 and March 2014, I requested a sample of the underlying reports and medical records in order to assess the policies, treatment, and wait times during that time period. In responding to Dr. Dovgan's December 2013 report, I previously assessed records involving treatment in October and November 2013 in my Rebuttal Expert Report.  Accordingly, to capture the remainder of the relevant time period, I requested the routine care list as it existed on the last day of the relevant time period (March 31, 2014) and a list of all patients seen between December 1, 2013 and March 31, 2014.  From the second list, I chose 80 names and requested that Defendants produce the underlying medical records.[2]  I chose names from each facility, looking for a mix of (a) patients seen for pain; (b) patients seen for routine care; (c) patients seen early in the relevant period (to observe follow-up care); and (d) patients seen late in the relevant period (to observe the most recent available information).

Defendants have emphasized their declining wait times under SPDS.  The lists I requested—the routine wait list as of March 31, 2014 and an appointment list with fields including both date of request and date seen—would have allowed me to directly evaluate their reported wait times using what would logically be all the underlying data.  However, I was told that neither of these lists was available in the format I requested.  In other words, SPDS has no ability to look back in time to recreate a routine care list, and cannot generate a report that includes both date of request and date seen.  That SPDS cannot or will not produce such lists makes it impossible for SPDS to audit its own data and for ADC to perform due diligence in monitoring SPDS.

Because of ADC's and SPDS's shortcomings in the ability to report data, this report focuses instead on the underlying records produced by Defendants.  I ultimately received 85 records containing both HNRs and corresponding progress notes.[3]

For each record, I followed the procedure I used previously in recording each prisoner's treatment over time.  [*See* Expert Report of J. Shulman, dated Nov. 8, 2013 ("Expert Report") at 9-10]  But because the purpose of this report is to assess more recent treatment, I recorded only treatment that would be reflected in SPDS reports, that is, treatment since March 4, 2013. Although my specific purpose is to assess the system during the expanded discovery period

---

[2] This number of records and the facilities were negotiated with Defendants based on available time and resources.  In my experience as an auditor in correctional and institutional care, as well as my previous review of approximately 360 ADC records, I feel that reviewing wait times based on paired HNRs and clinical notes from 80 dental records is sufficient to obtain a useful estimate of access to care.

[3] I did receive some additional dental records, but most were missing all the HNRs since at least December 1, 2013, and I was told that there were no HNRs in the records.  Because there were progress notes in the dental records, and dental visits are nearly always occasioned by an HNR that suggests that the HNRs have simply been lost.

(September 27, 2013 to April 1, 2014), care provided in earlier months is helpful context for assessing treatment provided later.  Moreover, in assessing Defendants' claim that their wait times have improved over time, it is useful to have as much information about SPDS's entire tenure as possible.

In addition to reviewing dental records, I analyzed the procedures recorded in the Dental Appointment Lists for December 2, 2013 through April 1, 2014 for Perryville [ADC366218-650], Safford [ADC366766-855], Eyman [ADC365549-766], Lewis [ADC365977-366217], and Yuma [ADC367186-367403].  Those reports should describe the specific procedures (by code) performed at each patient visit, and should reflect the underlying data used to create SPDS's utilization reports.

### Wait Time Computations

I reviewed the 85 newly provided dental records with analyzable data,[4] and combined those with the 134 records from my previous record set where treatment was provided in response to HNRs submitted after March 3, 2013.  I computed (as I did in my opening and first supplemental reports) the median (50th percentile) and other key percentile wait times for patients who submitted HNRs stating pain or requesting routine care.[5]  The following table shows these calculations as well as those from my earlier reports (in gray):

| Wait Times (in days) for Patients Submitting HNRs | | | | |
|---|---|---|---|---|
| | Expert Report (N=293) | First Supplemental Report (N=366) Combined Dataset | Records of Recent Treatment (N=224/89[6]) | |
| Date Range | 1/1/10 – 7/31/13 | 1/1/10 – 11/30/13 | After 3/3/13 | After 9/27/13 |
| **HNRs Stating Pain** | | | | |
| 50th Percentile[7] | 6 | 6 | 7 | 7 |
| 75th Percentile | 12 | 12 | 10 | 12 |
| 90th Percentile | 23 | 25 | 26 | 31 |

---

[4]  The 85 records contained 80 HNRs stating pain with corresponding clinical entries and 125 HNRs for routine care with corresponding clinical entries for March 3, 2013 to approximately July 28, 2014.  There were 62 pain HNRs and 81 HNRs for routine care with corresponding clinical entries from October 1, 2013 to July 28, 2014.

[5]  My methodology for calculating wait times is found in my Expert Report at 9-10.

[6]  This includes the 85 newly received records with HNRs and corresponding clinical entries, plus 134 records from my previous reviews where HNRs were submitted after March 3, 2013.  Of the 134 earlier records, there were 5 records where HNRs were submitted after September 27, 2013.

[7]  All medians are rounded to the nearest whole number.

| Wait Times (in days) for Patients Submitting HNRs | | | |
|---|---|---|---|
| | **Expert Report (N=293)** | **First Supplemental Report (N=366) Combined Dataset** | **Records of Recent Treatment (N=224/89[6])** |
| **HNRs for Routine Care** | | | |
| 50th Percentile | 78 | 83 | 74 | 71 |
| 70th percentile | 116 | 117 | 89 | 82 |
| 75th Percentile | | | 95 | 87 |
| 90th Percentile | 210 | 196 | 124 | 102 |

With regard to records of recent treatment under SPDS, the median wait time of 7 days for HNRs stating pain is **greater** than the 6 days reported in my original and supplemental reports.  These records also show that 25 percent of prisoners waited 10 or more days and 10 percent waited 26 days or more to be seen.  The most recent records, since October 1, 2013, show the same or slightly worse numbers, but are still nowhere near the 72 hours required for urgent care under the Corizon contract.  A significant reason for the increased median wait times is that prisoners are assigned to routine care rather than urgent care.  But even if I exclude the inappropriately triaged HNRs from my sample, the median wait time for HNRs that were properly triaged as urgent care is still 6 days for the most recent patients, with 25% of patients waiting over 9 days and 10% of patients waiting over 19 days in pain.[8]

For routine care, I originally reported the median wait time for a routine care appointment was 78 days; a full 42 percent of prisoners waited longer than the contractually-required 90 days, 30 percent waited were over 116 days, and 10 percent waited were over 210 days.  [*Id.* at 24]  Median wait time based on the combined dataset is 83 days, with 45 percent of prisoners waiting over 90 days, 30 percent over 117 days, and 10 percent over 196 days.  The recently provided records reveal that median wait times declined somewhat to 74 days for records since March 2013 and 71 days for records since October 2013.  However, 29% of patients since March 2013 and 22% of patients since October 2013 waited more than 90 days for care.

---

[8]  Dr. Smallwood testified that in Correctional Data Software ("CDS"), the wait time for urgent care requests starts when SPDS gets the request from nursing staff.  [Smallwood 4/17/14 Dep. at 14:21-15:1]  To the extent that nursing staff does not timely provide HNRs to dental staff, CDS will understate waiting time for urgent care.  While this method may be reasonable for determining whether SPDS is in compliance with its contract, it is inappropriate for evaluating whether inmate care is provided in a timely manner.  Moreover, to the extent dental assistants misclassify HNRs stating pain as routine care, wait times will be artificially deflated.

| Routine Wait Times (in months) as Reported by Smallwood (2013-2014) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | Average |
| **Douglas** | 1 | 1 | 1.2 | 1.2 | 1.2 | 1.2 | 1.5 | 1.2 |
| **Eyman** | 1.1 | 1.3 | 1.5 | 1.4 | 1.1 | 1.3 | 1.2 | 1.3 |
| **Florence** | 1.4 | 1.5 | 1.5 | 1.2 | 1.4 | 1.3 | 1.0 | 1.3 |
| **Lewis** | 1.3 | 1 | 1.6 | 1.4 | 1.3 | 1.2 | 1.1 | 1.3 |
| **Perryville** | 1.5 | 1.4 | 1.7 | 1.3 | 1.2 | 1.0 | 1.1 | 1.3 |
| **Phoenix** | 1.3 | 1.5 | 1.6 | 1.5 | 1.5 | 1.4 | 1.4 | 1.5 |
| **Safford** | 1.7 | 1.7 | 1.7 | 1.3 | 1.3 | 1.5 | 1.1 | 1.5 |
| **Tucson** | 1 | 1.1 | 1.3 | 1.0 | 1.0 | 1.1 | 1.0 | 1.1 |
| **Winslow** | 0.4 | 0.1 | 0.3 | 0.4 | 0.7 | 0.6 | 0.4 | 0.4 |
| **Yuma** | 1.3 | 1.3 | 1.2 | 0.9 | 0.7 | 0.7 | 0.6 | 1.0 |
| **Total** | 1.2 | 1.2 | 1.4 | 1.2 | 1.1 | 1.1 | 1.0 | 1.2 |

The table above summarizes ADC wait time reports for October 2013 through March 2014. Based on these numbers, the average of the monthly wait times system-wide for this period was 1.2 months, or 36 days. This is in contrast to the 71 days I computed by comparing HNRs to clinical notes.[9] This discrepancy arises in large part because of the way CDS calculates wait times. As Dr. Smallwood testified, CDS computes routine care wait times at a given point in time as "the average of everyone who is in the system who hasn't been seen." [Smallwood 4/4/14 Dep. at 73:22-25] To illustrate exactly what this means, he was asked in his deposition how he would calculate wait times in a situation where five patients are waiting for care, one is seen each day, and one was added to the list each day. On the morning of day 6, the list would look like this:

---

[9] My calculations are not directly comparable to the overall wait times, since I do not have enough records to evaluate month by month, facility by facility, but they strongly suggest that wait times are not in fact anywhere near 36 days. Since Dr. Smallwood's database contains the date of the HNR and the date of treatment, it is capable of calculating **actual** wait times as well as their distribution, or I could have performed such calculations had SPDS been able to provide the underlying data.

|  | **Date of Request** | **Days waiting** |
|---|---|---|
| Patient 1 | Day 1 | 5 |
| Patient 2 | Day 2 | 4 |
| Patient 3 | Day 3 | 3 |
| Patient 4 | Day 4 | 2 |
| Patient 5 | Day 5 | 1 |

The actual amount of time each patient waits for care is five days in this situation.  But CDS would say that the current wait time in this situation is three days.  That is, add up the amount of time each patient has been waiting and divide by the number of patients:

$$\frac{1+2+3+4+5}{5} = 3$$

This idiosyncratic methodology is not specified in the DSTM or Corizon contract. Worse, it is counterintuitive and inaccurate.  It does not address how long it takes for inmates to get treatment—presumably the metric the contracts intend to be monitored—rather, it expresses only the current experience of those who have not yet been treated and may not be treated for weeks or months.  Determining how long people must wait to be seen requires looking not at how long people who are currently waiting ***have been waiting on average***, but how long those who were ultimately treated ***actually had to wait***.  This is the calculation that I made and described above.[10]

Moreover, flawed methodology aside, the reported wait times also fail to take into account that when an inmate on the routine care list is seen for urgent care, the original HNR is taken out of the system.  [*Id.* at 75:23:25]  Furthermore, SPDS wait times do not provide a distribution, so ADC auditors cannot know the proportion of inmates whose care deviates markedly from the reported wait times.  Ultimately, the true time it takes an inmate to receive care is far longer than what Dr. Smallwood's novel wait time calculation would suggest.

## B.     Examples of Systemic Problems

I reviewed the recently provided records focusing on care provided by SPDS from March 3, 2013 through approximately July 29, 2014.  They show that the practices I described in my opening and supplemental reports persist, notwithstanding reported reductions in wait times.

---

[10]  While SPDS was unable to provide a routine care list as it existed during the discovery period, it did provide a "current" routine care list as of June 19, 2014.  A basic read of this list appears to show that the wait list at each facility was approximately three months long—that is, the patients at the top of the list, barring the outliers (those out to court, etc.) had been waiting about 75 to 90 days, even though reported wait times at most facilities were just over a month.

*Assigning Prisoners Stating Pain to Routine Care*

My calculations show that patients complaining of pain are often seen a week or more later rather than the 72 hours required by contract.  As I explained in my original report, some part of these lengthy delays likely results from insufficient staff to treat prisoners who are properly categorized as needing urgent care.  But most of the longer delays were caused by dental assistants who incorrectly triaged HNRs describing pain as routine care.  [Expert Report at 22]  Evaluation of dental HNRs at ADC is primarily the responsibility of dental assistants,[11] a practice that puts inmates at serious risk of dental injury.  [*Id.* at 18]  The following examples[12] illustrate this misclassification and the resulting preventable pain:

- **Redacted**       submitted an HNR in August 2013, four weeks after his arrival at ADC but before receiving an intake exam, stating that a tooth "was hurting real bad."  He was informed that he was placed on "the dental upcoming line" but an intake exam would have to be done first.  [ADC421128]  Despite his stated pain, he was not seen for an intake exam for another 34 days.[13]  He submitted another HNR in February 2014 stating, *inter alia*, that he had "two knots my on upper gum on the left side [and] right side."  [ADC421124]  A dentist would understand that this may be a lay person's description of a sinus tract (the point of a draining abscess); however, the dental assistant assigned him to "the dental upcoming line."  [*Id.*]  Although this implies that he was assigned to urgent care, he was not seen until 16 days later when he happened to have a serial extraction appointment.[14]

- **Redacted**        submitted an HNR in March 2014 stating that he had pain and difficulty eating.  [ADC421250]  He was informed, "You have been placed on the dental waiting list as of 1/9/14" (the date of his request for routine care) and was ultimately seen 20 days later, after a second HNR indicating he had been in pain for two weeks.  Several weeks later, he submitted an HNR stating (*inter alia*) that he had problems chewing and was informed that he was placed on the waiting list.  [ADC421248]  Eight weeks later, not having been seen, he submitted another HNR stating that his gums were bleeding and that he was in extreme pain.  [ADC421247]

---

[11]  I reviewed HNRs from more than 400 records and found only a handful were signed by a dentist.

[12]  These examples are based on HNRs submitted after March 3, 2013, when SPDS began providing inmate dental care.  Since the time between requests for care and treatment often span many months, selecting the records from the entire period provides points of comparison to reports and testimony provided by ADC and SPDS.

[13]  Mr. <sup>Redacted</sup>'s Panorex radiograph was taken on July 17, 2013, but he did not receive an intake exam until September 17, 2013.  [ADC421117]  According to Dental Procedure 770.1 ¶ 3.5, a patient who has not previously seen a dentist should be seen within 30 days after a Panorex is taken, which here would have been August 17, 2013, three days after his HNR.  [ADC010583]

[14]  Mr. <sup>Redacted</sup> also experienced a 10 day delay for a ***correctly*** triaged urgent care request in September 2013.  [ADC421127, ADC421117]

He was ultimately seen by a dentist for a pain evaluation over two months after his initial HNR.[15]

- **Redacted** submitted an HNR in June 2013 stating that a tooth with a cavity was very sensitive to hot and cold and was assigned to the routine care list. [ADC421378] She was not seen until more than three months later.[16] [ADC421373]

- **Redacted** submitted an HNR in July 2013 stating that he had been waiting almost a year to get two fillings and that it was hard to eat and drink. [ADC421435] He was informed that "he was on the list." His tooth was filled more than seven weeks later at a routine care appointment. [ADC421429] In December, he put in an HNR saying he had a hole in his tooth. Despite two interim HNRs that he was in pain and having difficulty eating, Mr. **Redacted** was not seen until almost three months later at a routine care appointment.[17] [ADC421428]

- **Redacted** reported that he needed a tooth pulled and was in "lots of pain." [ADC421554] He was informed that he was "added to the dental list." [*Id.*] Over a month later, he submitted an HNR describing pain in a cracked tooth as "unbearable." [ADC421553] He was seen two days later for this tooth, but the chart suggests that the original issue was with a different tooth that was not, and still has not been, addressed.

- **Redacted** reported in May 2013 that he needed dentures since he "ha[d] no teeth on top" and "4 on the bottom" and was informed that he needed an exam first and was "on the list." [ADC421583] He was examined more than a month later at his intake exam.[18] [ADC42157-8] A dentist would have realized that a patient with an edentulous maxilla and four mandibular teeth will have difficulty eating and should be "fast-tracked" for treatment. Unfortunately, a dental assistant, not a dentist, triaged the patient.

- **Redacted** reported in June 2013 that he had a tooth that was chipped and needed a filling. The cleaning was done six weeks later, and he filed another HNR indicating that his chipped tooth was sensitive to hot and cold, but was placed on the routine care list. [ADC421393] The tooth was filled almost two months later. [ADC421390]

---

[15] Although his HNRs mentioned problems chewing, Mr. **Redacted** was not assigned to urgent care or asked if he wanted a soft diet. The notes on the second HNR indicate that he was seen by nursing, but there is no note in the dental chart, and no medical notes were produced.

[16] Ms. **Redacted** also suffered an 8 day delay waiting for treatment following a *correctly* triaged urgent care HNR explaining that her gums were bleeding and very painful.

[17] Following this filling appointment, Mr. **Redacted** submitted an HNR stating that "the fill was not in ... it hurts & bleeds real bad. It hurts so bad I don't sleep or drink." [ADC421430] He was not seen for six days. [ADC421428-30]

[18] Mr. **Redacted**'s intake exam was not done within 30 days of intake. Mr. **Redacted**'s Panorex radiograph was taken on April 2, 2013, but the intake exam was not performed until June 12, 2013. [ADC421578]

8

- **Redacted** stated that he had a tooth that was sensitive to hot and cold that "hurts on occasion." [ADC421368]  Rather than scheduling an urgent care appointment, the dental assistant assigned him to routine care.  [*Id.*]  One month later, he submitted an HNR stating that a tooth has a major cavity that "started to hurt badly each time I eat and drink."  [ADC421367]  He refused to be seen by nursing because he "wanted to wait for dental," [ADC421362] but he was not seen by a dentist for another six weeks, and only after he submitted an HNR stating his painful tooth had "pussed up once getting swollen."[19]  [ADC421366]

Several of the above inmates had teeth that were sensitive to hot and cold, but were assigned to the routine care list.   Dentinal (tooth) sensitivity is pain brought on by such stimulating factors as heat, cold, sweet, sour, acid, or touch.   [Am. Ass'n of Endodontists, *Endodontics: Colleagues for Excellence* (Fall 2013) at 3]  Typically, the initial stages of dentinal sensitivity from decay or a lost filling are transient (and reversible) and are due to changes in temperature (i.e., sensitivity to hot and cold).   If left untreated (that is, the tooth is not filled), dentinal sensitivity may progress to an irreversible pulpitis.  In other words, the longer dentinal sensitivity persists the greater the likelihood that what initially may have been a reversible condition will develop into irreversible pulpitis requiring root canal or extraction.  The practice of placing broken or missing fillings on the routine care list is similarly problematic.  When a filling falls out or fractures, the filling must be replaced in a timely manner to protect the pulp of the tooth from the effects of dentinal sensitivity and to protect the structural integrity of the tooth from becoming impaired, making it vulnerable to fracturing during normal chewing.  Unfortunately, this often does not occur.[20]  Consequently, even a tooth in which the pulp is not exposed may develop irreversible pulpitis if the filling is not timely replaced or repaired.

ADC's practices, in addition to rarely placing temporary restorations at pain evaluations, and removing patients from the routine care list when they are seen on a pain evaluations, are unsurprising reactions to a system that does not have enough staff to both properly address urgent care issues and timely address the patients' other dental needs.   Unfortunately, ADC compounds the problems created by inappropriate dental assistant triage, resulting in preventable pain, tooth morbidity and mortality.

### *Dental Assistant Evaluations*

My previous reports described a policy that allows dental assistants to "review the inmate health history, perform an oral evaluation, and take dental radiographs, to assist in determining the severity of the dental condition."   [Dental Procedure 787 § 5.2]  In each of my record reviews, I found dental assistant evaluations in a small but significant percentage of encounters.

---

[19]  The tooth was finally filled on this visit, but the filling fell out, leaving a hole in the tooth that was "extremely sensitive and hurts."  [ADC421365]  He was seen eleven days later. [*Id.*]

[20]  For example, my analysis of the Appointment Lists from January through March 2014, found that only 48 temporary or sedative restorations (procedure code 2940) were placed in approximately 10,000 dentist visits (Lewis=9; Safford=0; Eyman=16; Yuma=1; and Perryville= 22).  This is an exceptionally small number given the large number of HNRs for lost or broken fillings.

[Expert Report at 19]  I opined that this policy gives far too much discretion to a dental assistant who is not a licensed provider—an opinion shared by Dr. Chu.[21]  [*Id.* at 20]

In my Expert Report (at 20), I documented 10 dental assistant evaluations that occurred after Dr. Chu recommended discontinuing the practice in December 2012.  Consistent with these past findings, I found five other instances of dental assistant evaluations in the records I recently reviewed.[22]

- **Redacted**        complained of a toothache and swelling around his eye and blurry vision [ADC42128] and was seen by a dental assistant in December 2013 who performed an examination, took an x-ray of #4, and concluded that there was extensive decay, an inflamed gum, some sensitivity to percussion, and no visible swelling.  Per telephonic order by a dentist, the dental assistant dispensed 30 Penicillin tablets.[23]  [ADC421283]

- **Redacted**        complained of a toothache and was scheduled for a pain evaluation.  [ADC421540]  He was seen by a dental assistant in October 2013 who performed an examination, communicated the results to a provider, and received authorization to dispense Penicillin and Ibuprofen.  [ADC421537]  In my opinion, the dentist who prescribed antibiotics based on the examination of an unqualified person failed to exercise independent professional judgment.

- **Redacted**        complained of a problem in a recent extraction site in July 2014 and was examined by a dental assistant who took an x-ray sua sponte, concluded that the "gum looks good," and advised the prisoner to submit an HNR if the problem persisted.  [ADC421598]  Because there is no indication that a dentist was ever consulted, the dental assistant apparently interpreted the x-

---

[21] Dr. Chu recommended in December 2012 that even a basic assessment was inappropriate because "dental assistants are not qualified to diagnose conditions and most importantly have difficulty accurately describing symptoms."  [AGA_Review_00090609 at ¶ 4]  In January 2013, she recommended that triage be completed by nurses—"dental assistants are not qualified and can cause more harm than good."  [AGA_Review_00094915]

[22] It is perplexing that the recommendations of ADC's only dental advisor have been ignored by ADC, Corizon, and Dr. Smallwood.

[23] The dentist relied on the dental assistant's examination and interpretation of the x-ray and concluded that there was a dental infection that warranted prescribing an antibiotic.  In my opinion, in relying on the examination and radiographic interpretation of an unqualified person, the dentist failed to exercise independent clinical judgment.  This is particularly problematic since Mr. [Redacted]'s HNR stated swelling around the eye and blurred vision—symptoms consistent with a canine fossa (infra-orbital space) abscess [*see* F.D. Fragiskos, *Oral Surgery*, Ch. 9 (Odontogenic Infections) 221-22 (Springer-Verlag 2007)]—and the inmate should have been examined by a dentist that day. Left untreated, the infection could have progressed into adjacent fascial spaces, which is a potentially life-threatening condition.  [*See* J. Craig Baumgartner, et al., *Ingles Endodontics*, Ch. 21 (Treatment of Endodontic Infections, Cysts, and Flare-ups) 2 (6th ed. 2008) (stating that infections of the midface are of special concern because of the possibility that they may result in a cavernous sinus thrombosis)]

ray and concluded (that is, made a clinical decision) that it was not necessary to consult a dentist.  The record also does not indicate that a dentist reviewed and acknowledged the dental assistant's clinical entry as required by Dental Procedure 787 § 5.3.  In my opinion, this constitutes the unlawful practice of dentistry and should be reported to the Arizona Board of Dental Examiners.

- **Redacted**          complained of a toothache in December 2013 [ADC421673] and was examined by a dental assistant who performed an examination, reviewed radiographs, reported sensitivity to percussion and no palatal swelling but slight buccal swelling, and diagnosed "deep DO caries approaching the pulp chamber."  [ADC421671]  The dental assistant dispensed Penicillin and Ibuprofen.  The record does not indicate that she received a provider's authorization to dispense medication.

As noted in the table below, in these five dental assistant evaluations, dental assistants took x-rays sua sponte for two prisoners, interpreted x-rays for four prisoners, performed percussion tests on three prisoners, dispensed medications to four prisoners, and made a diagnosis for four prisoners.  Contact with a provider was documented in only three cases.

| Inmate | Date | Page | *Sua sponte* x-rays | Tests Performed | Diagnosis | Provider Contact | Medication Dispensed | Acknowledged within 1 business day |
|--------|------|------|------|-----------------|-----------|------------------|----------------------|-----------------------------------|
| **Redacted** | 11/26/13 | ADC421283 | Yes | Percussion x-ray review | #4 Toothache | Yes | Penicillin per verbal order | Signed by dentist but not dated |
| **Redacted** | 10/1/13 | ADC421537 | No | Mobility Percussion x-ray review | #8,10 toothache | Yes | Penicillin per verbal order | Yes |
| Redacted | 7/29/14 | ADC421598 | Yes | x-ray review | "gum looks good" | No | No | No |
| **Redacted** | 12/5/13 | ADC421671 | No | Percussion x-ray review | Pulpitis Deep caries | No | Penicillin Ibuprofen | Signed by dentist but not dated |
| **Redacted** | 1/30/14 | ADC425298-300, ADC421769 | No | None | None | Yes | Yes | Not signed by dentist |

In my January rebuttal report, I found a noncompliance rate of 86 percent with ADC Procedure 787 § 5.3, which requires that records and x-rays of those inmates who received a dental assistant evaluation be reviewed and acknowledged by a dentist within 24 hours.  ADC Procedure 787 § 5.3 is both substantively flawed and almost universally not complied with.  [*E.g.*, Rebuttal Report at 12, 26-28]  With respect to the five occurrences of dental assistant evaluations described above, all clinical notes were noncompliant, three (60%) had no signature, one was signed but not dated, and the other was dated five days after the note. This consistent

noncompliance with its own policy is but one illustration of ADC's indifference to monitoring the dental program.

In the cases summarized in the Table above as well as in all dental assistant evaluations documented in my previous reports, I found that dental assistants wrote and signed clinical notes. But Dr. Smallwood testified—consistent with Arizona law—that dental assistants are not allowed to add clinical notes and sign charts. [Smallwood Dep. at 139:16-24; Ariz. Rev. Stat. § 32-1281(B) (only a licensed dental hygienist or dentist may perform "recording of clinical findings" and "examining the oral cavity and surrounding structures")]

### *The Prisoner's Dilemma*

The widespread practice of removing inmates from the routine care list when they are seen for an urgent care appointment magnifies the delay in receiving routine care while simultaneously deflating reported wait times. This practice appears nowhere in the DSTM and is not always explicitly stated when it occurs; however, it is widely applied and Dr. Dovgan defends it in his most recent report and declaration. [Dovgan Supplemental Report at 2] If the inmate attends the pain appointment, but refuses an offered extraction, he must go back on the routine care list to get a filling. Dental assistants will sometimes refuse to schedule pain evaluations in response to HNRs stating pain, advising prisoners to request a pain evaluation appointment only if "the tooth needs to be pulled." This is what I call the Prisoner's Dilemma: whether to request an urgent care appointment for pain at the risk of losing his or her place on the routine care list. I found several examples in more recent records:

- **Redacted** was told she was on the routine care list after requesting a cleaning and two cavities to be fixed in September 2013. [ADC421472-77] In November, with no intervening dental visit, she submitted an HNR regarding a toothache and was seen for a pain evaluation. In December, she submitted another HNR for fillings and a cleaning, noting in the HNR that the dentist had requested the HNR form before she could be scheduled. A subsequent HNR indicates she was not placed on the routine care list until this December HNR was filed, and she was ultimately seen in March, more than six months after the initial HNR in September 2013.

- **Redacted** had been on the routine care list for over two months when she was seen on a pain evaluation for a cracked tooth. Several days later, she submitted another HNR for routine care that was not addressed until September [ADC421527-32]—six months after the initial HNR.

- **Redacted** was on the routine care list since July 18, 2013. [ADC421756] Between July and early December, she was seen for three pain evaluations [ADC421757, ADC421755, ADC421754] and submitted three additional HNRs requesting fillings [ADC421753, ADC421752, 421756], but was not seen for routine care. The response to her fourth HNR for routine care was that she was "on the list as of 12/3/13 (the date of her recent HNR)." [ADC421751] It appears that she was removed from the routine care list because of her earlier pain evaluations.

### Avoidable Extractions

ADC's policies and practices lead to avoidable extractions for several reasons. First, unqualified individuals (i.e., dental assistants) triage HNRs and, as a result, prisoners who need treatment for pain may be assigned to routine care where the wait time is several months, rather than urgent care where treatment at least generally occurs within a week, if not within the contractually-required 72 hours. Further, the practice of removing prisoners who request an urgent care appointment from the routine care list (see, the Prisoner's Dilemma, *supra*) may further delay treatment. Depending on the initial condition of the tooth, the extent of the delay, and individual factors such as rate of disease progression, teeth that could have been restored relatively simply may become more complex or may not be restorable at all. Moreover, because ADC provides no priority level for treatment in between "urgent" and "routine" and does not require any documentation in patients' charts of the extent or pace of decay, it has no way of tracking which patients are most at risk from delay.

These triage issues are compounded by dental staff's willingness to make patients choose between an immediate extraction of a painful tooth or a filling in several months. Dentists should attempt to protect a patient's teeth whenever possible. It fundamentally violates basic standards of dental care to encourage patients in pain to accept a lesser alternative of a tooth extraction by telling them that it will take "months" to be scheduled for the clinically acceptable treatment of a filling. This occurs because of the scheduling and triaging policies of ADC as well as ADC's failure to exercise oversight and prevent such conduct.

Among the records I reviewed for this report, I found a clear example of this conduct. **Redacted** was seen for a pain evaluation in November 2013. The clinical note states "needs restorations; offered to extract #29," and the plan states, "I/M signed refusal to ext. #29; I/M told to put in another HNR for filling." [ADC421472-73] The reason for the refusal was that she would "[r]ather have the tooth filled." [ADC421473] That the inmate was asked to sign a refusal form makes it clear that extraction was the recommended treatment, despite the tooth being restorable according to the dentist's contemporaneous clinical judgment. These policies and practices are below the professional standard of care in the community and put inmates at a substantial risk of dental injury, in particular the loss of teeth.

### Treatment of Periodontal Disease

In my Rebuttal Report, I opined that ADC's staffing is inadequate to treat moderate to advanced periodontal disease, which puts inmates at substantial risk of dental injury, including preventable pain and loss of teeth. [Rebuttal Report at 19] This is consistent with Dr. Chu's statement that the treatment commonly employed to treat periodontal disease, "scaling and root planing ["SRP"]," is rarely done. [AGA_Review_00094915]

The appointment lists and SPDS utilization reports provided an opportunity to review the periodontal care SPDS provides to ADC prisoners.[24] My analysis of the procedures recorded in

---

[24] While the utilization reports track patient visits and numerous other metrics, they do not track scaling and root planing, despite Dr. Chu's concern over the issue. I did compare my findings from the appointment list regarding the frequency of other procedures with the

the recent Dental Appointment Lists for December 2, 2013 through April 1, 2014 for Perryville [ADC366218-366650], Safford [ADC366766-366855], Eyman [ADC365549-365766], Lewis [ADC365977-366217], and Yuma [ADC367186-367403] demonstrates that this deficiency in SRP persists through March 2013.[25]  This analysis is summarized in the Table below.

| Procedure | Yuma | Lewis | Safford | Eyeman | Perryville | Total |
|---|---|---|---|---|---|---|
| Dentist visits[26] | 2083 | 1203 | 716 | 1277 | 2034 | 9,456 |
| Dental hygienist visits | 0 | 607 | 16 | 741 | 836 | 2819 |
| Total visits | 2083 | 1810 | 732 | 2018 | 2870 | 12,275 |
| Scaling / root planing | 1 | 98 | 5 | 4 | 58 | 166 |

Of 12,275 clinic visits over a three month period, SPDS documented only 166 quadrants of SRP—substantially lower than I (and Dr. Chu) would expect.[27]  Strikingly, Yuma, Eyman, and Safford performed SRP procedures on only 1 (0.48 per 1,000 visits), 4 (1.98 per 1,000), and 5 (.68 per 1,000) quadrants, respectively.[28]  Even Lewis, which documented 98 quadrants in 1,810 patient visits (54.14 per 1000; or 112 times that of Yuma), performed far fewer SRP procedures than I would expect based on my experience managing institutional care and auditing correctional systems.

Addressing the periodontal treatment needs of ADC prisoners will require more dentists and dental hygienists.  SPDS does not have sufficient staffing to perform such treatment and keep dental wait times under control.  [Expert Report at 14]  One consequence of insufficient staffing is the inability to provide an appropriate scope of care. In my opinion, ADC's current level of staffing is inadequate to treat moderate to advanced periodontal disease, which is below the standard of care and puts inmates at a substantial risk of dental injury, including preventable pain and loss of teeth.

---

utilization reports, and found them consistent.  As the two reports are from the same database, this is to be expected and validates my methodology with respect to the root planning procedure.

[25]  In the process of converting a pdf file to an Excel spreadsheet, a small amount of data was lost; however, given the large number of data points, I believe the loss is not material to my analysis.  I analyzed treatment codes from 11,530 appointments and 9,991 visits.  Taking into account no shows and refusals, there were 9,991 actual patient visits.

[26]  Dentist and dental hygienist visits are based on January, February, and March 2014 reports.

[27]  Since the mouth has four quadrants, these numbers likely overstate the number of patients treated.

[28]  While it is not unusual to see variations in productivity over short periods, the length of the period (three months and 12,275 patient visits) and the striking difference between clinics (one SRP at Yuma and 98 at Lewis) is beyond peradventure.

### Treatment of Chewing Difficulty

In my opening report, I opined that ADC policy does not address timing or monitoring of prisoners waiting to receive dental devices, thus permitting inappropriate delays and problems in receiving a proper diet.  [Expert Report at 32]  This deficiency persists.  ADC policy towards prisoners with chewing difficulty remains unchanged.   This is further exacerbated by an inadequate number of dentists, which results in narrowing the scope of services provided to prisoners (*see, e.g.*, discussion of inadequate treatment of periodontal disease, *supra*).

The Table below shows the narrowed scope of services with respect to dentures.  First, given the number of extractions performed (2,462 over a 3-month period),[29] the number of dentures provided to prisoners is quite small.  This is most striking with partial dentures—where Yuma provided only one in 2,083 visits (0.5 per 1000 visits) compared to Lewis (9.1 per 1,000 visits).[30]   Yuma and Safford also provide the smallest number of dentures—11.0 and 14.0 per 1,000 dentist visits. This is consistent with inadequate staffing.

| Procedure | Yuma | Lewis | Safford | Eyman | Perryville | Total |
|---|---|---|---|---|---|---|
| Dentist visits | 2,083 | 1,203 | 716 | 1,277 | 2,034 | 9,456 |
| Dental hygienist visits[26] | 0 | 607 | 16 | 741 | 836 | 2,819 |
| Total visits | 2,083 | 1,810 | 732 | 2,018 | 2,870 | 12,275 |
| Dentures | 23 | 29 | 10 | 40 | 57 | 159 |
| Dentures per 1000 dentist visits | 11.0 | 24.1 | 14.0 | 31.3 | 28.0 | 16.8 |
| Partial dentures | 1 | 11 | 5 | 8 | 30 | 55 |
| Partial dentures per 1000 dentist visits | 0.5 | 9.1 | 7.0 | 6.3 | 14.7 | 5.8 |
| Extractions | 188 | 352 | 904 | 388 | 630 | 2,462 |

---

[29] I assume that the number of extractions (as well as other procedures performed) is generally representative of previous months' productivity.

[30] It is interesting that Yuma provided virtually no SRPs and partial dentures. Moreover, Yuma reported no dental hygienist visits.

15

The records below illustrate ADC's failure to address prisoners with chewing difficulties by offering a soft diet and expediting the fabrication of dentures for those whose chewing problems are substantial. This is illustrated by the following cases:

- **Redacted** submitted HNRs on three separate occasions stating pain and difficulty chewing and eating. [ADC421250; ADC421248; ADC421246] Despite having serial extractions, there is no documentation that he was informed that soft diet was available.

- **Redacted** submitted an HNR in May 2013 shortly after his admission stating that he needed dentures since had no teeth on the top and 4 on the bottom. He was informed that he had to be examined first [ADC421583], but it was another five weeks until his intake exam.[31] [ADC421578] At that time, he was told that he could have complete dentures made after his extractions. [Id.] However, he was not placed on the serial extraction list and was next seen after submitting an HNR for a toothache six months later. [ADC421578] Although he had only one remaining tooth, he still was not placed on the serial extraction list or prepared for dentures, and has not been seen since.[32]

### Staffing

Understaffing is a consistent theme of my findings in this report and my other reports. Staffing is the basic input for a functional dental system. Without adequate staffing, there simply is not enough capacity to see all inmates in a timely manner or give all inmates needed care. When prison dentists and staff are overworked and lack needed resources and assistance, it is inevitable that inmates are placed at a substantial risk of serious dental injury. What is more, to compensate for the lack of staffing, institutions with inadequate staffing often establish formal or informal practices as shortcuts. These practices, however, in turn exacerbate the problems of low staffing. Based on ADC's documents and the records I reviewed, including Dr. Chu's findings, ADC does this by permitting dental assistants to perform HNR triage and in-person triage of patients to compensate for the lack of dentists, who should be performing those tasks.

In my opening report, I opined that staffing was insufficient to provide timely care. In fact, dentist staffing largely declined from 1996 through 2013. [Expert Report at 11-12] I reviewed Corizon's staffing reports from September 2013 to March 2014. [ADC382964-77, ADC231854-64, ADC231867-77, ADC231878-88, ADC261802-12, ADC263357-67, ADC267354-64] As a preliminary matter, even ADC's and Corizon's own employees have had difficulty interpreting similar staffing reports and determining whether the information contained in them is as useful as it could be. [See AGA_Review_00107026] In any event, any recent staffing increases by Corizon do not negate my opinions about dental staffing. For one, recent

---

[31] Mr. **Redacted**'s intake exam was not done within 30 days of intake. His Panorex was taken on April 2, 2013 [ADC421578], but the intake exam was not performed until June 12, 2013 [ADC421578].

[32] Mr. **Redacted** last submitted an HNR in May 2014 stating he needed his last tooth pulled on an emergency basis because he had a bad toothache, but there are no clinical entries indicating he had been seen by late July when the record was copied. [ADC421581]

staffing increases make all the more clear how wholly deficient staffing was when the complaint was filed. Those staffing deficiencies placed inmates at a substantial risk of serious harm. Further, the contract does not require a sufficient number of contracted dental positions, nor does it ensure that those staff are utilized appropriately and trained and supervised effectively. So while a failure to meet contract standards is evidence that ADC falls *far* below needed staffing levels; meeting or approaching contract levels alone does not indicate that staffing is sufficient. Moreover, SPDS has not filled all the contracted positions for dental directors, dental hygienists, and dental assistants. And based on ADC's representative witness, the situation is even worse when considering hours ***actually*** worked [Jansen Dep. at 28:8-16]. The percent of contracted FTEs (operating fill rate) is substantially lower. For example, for September 2013, the Corizon contract authorized 20 dentists and 21.25 FTEs were hired, resulting in a percent fill of 106%. But the hours the 21.25 dentists yielded only 15.01 FTEs—for an operating fill rate of 75%. [Jansen Dep. at 44:10-16]  So based on hours worked (a partial surrogate for productivity), the dentist positions are understaffed despite the number of positions filled. By failing to maintain the contracted number of dental providers during this period, Corizon exacerbated the problems I attributed to inadequate staffing.

Seeing prisoners who complain of pain or have other dental issues in a timely manner requires an adequate number of dentists on staff—and more important, an adequate number of hours available to see patients. As described above, my record review documented a consistent pattern of delay in treating inmates consistent with inadequate staffing levels: SPDS is either unable to see the patients in a timely manner, or unable to keep track of all incoming requests and patients fall through the cracks. It may be that the recent focus on routine care has reduced capacity to address urgent care, which is not tracked or monitored by SPDS or ADC. Either way, by failing to timely treat urgent care, inmates with both urgent and routine needs have treatment deferred to the point that disease progression may make restoration problematic or infeasible. As a result, inmates suffer avoidable pain, tooth morbidity, and tooth mortality. While wait times have improved since March 2013, current staffing is still insufficient given the untimely care and limited scope of services I documented.

## IV.   CONCLUSION

Reviewing the recently provided records reinforces the opinions I have expressed in my prior reports.

# REFERENCES

Am. Ass'n of Endodontists, *Endodontics: Colleagues for Excellence, Endodontic Excellence* (Fall 2013), *available at* http://www.aae.org/uploadedfiles/publications_and_research/newsletters/endodontics_colleagues_for_excellence_newsletter/endodonticdiagnosisfall2013.pdf (accessed 8/23/14).

J.H. Clare, *Survey, comparison, and analysis of caries, periodontal pocket depth, and urgent treatment needs in a sample of adult felon admissions*, 1996. J Correctional Health Care (1998) at 89-102.

J. Craig Baumgartner, et al., *Treatment of Endodontic Infections, Cysts, and Flare-ups* (6th ed. 2008), *available at* http://online.statref.com.library-proxy.tamhsc.edu/Document.aspx?FxID=93&StartDoc=1&Offset=0&QueryID=-1&&SessionId=1D90874LPWUDKTRX#H&1&ChaptersTab&Dd-lGjDpdXOfDfIwDhkQvQ%3d%3d&&93 (accessed 8/25/14).

Fragiskos F.D., Odontogenic Infections. In Fragiskos FD, ed. Oral Surgery (Springer-Verlag 2007).

## ADDITIONAL MATERIALS REVIEWED

|  | Routine Care List |
|---|---|
|  | Transcript for Dr. Smallwood's second deposition 4/7/14 |
| ADC421029-1805 | Dental Records |
| ADC405666; ADC261688; ADC406132 | Wait times and utilization reports from October 2013 to March 2014 |
| ADC231878-88; ADC231867-77; ADC231854-64; ADC382964-77; ADC263357-67; ADC261802-12; ADC267354-64 | Staffing Reports from September 2013 to March 2014 |

# EXHIBIT 8

**Confidential - Subject to Protective Order**

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA


Victor Parsons; Shawn Jensen;    )
Stephen Swartz; Dustin Brislan;  )
Sonia Rodriguez; Christina       )
Verduzco; Jackie Thomas; Jeremy  )
Smith; Robert Gamez; Maryanne    )
Chisholm; Desiree Licci; Joseph  )
Hefner; Joshua Polson; and       )
Charlotte Wells, on behalf of    )
themselves and all others        )
similarly situated; and Arizona  )
Center for Disability Law,       )
                                 )
                Plaintiffs,      )
     v.                          ) Case No.
                                 ) CV12-00601-PHX-NVW (MEA)
Charles Ryan, Director,          )
Arizona Department of            )
Corrections; and Richard Pratt,  )
Interim Division Director,       )
Division of Health Services,     )
Arizona Department of            )
Corrections, in their official   )
capacities,                      )
                Defendants.      )
_____)


CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

DEPOSITION OF WILLIAM SMALLWOOD, D.D.S.

Phoenix, Arizona
April 7, 2014; 8:58 a.m.


Glennie Reporting Services, LLC
7330 North 16th Street
Suite A100
Phoenix, Arizona  85020-5275
                              Prepared by:
602.266.6535                  Janet Hauck, RPR
www.glennie-reporting.com     Arizona CR No. 50522

William Smallwood, D.D.S. - videotaped - 04/07/2014

143

1          MR. BOJANOWSKI:  Same objection.

2          THE WITNESS:  A very good dental assistant

3  makes a dentist.  Somebody like Kim at Douglas,

4  unbelievably good.  I can name many, many others that can

5  triage these as good as anybody.  Depends on the experience

6  and training.

7      Q.   BY MR. du MÉE:  Now, what part of it do you

8  agree with?

9          MR. BOJANOWSKI:  Same objection.

10          THE WITNESS:  Tell me the question again.  I

11  forget what she said.

12      Q.   BY MR. du MÉE:  She said, "Dental assistant

13  triage does more harm than good," and you said you don't

14  agree 100 percent.  So we've covered the part that you

15  don't agree with.  Now I'm asking what part of her

16  statement do you agree with?

17          MR. BOJANOWSKI:  Same objection.

18          THE WITNESS:  I don't think I did.  I don't

19  agree with that statement.  I believe that dental

20  assistants can bring value in triaging HNRs.

21      Q.   BY MR. du MÉE:  So you do not believe that

22  there are instances where dental assistant triage does

23  more harm than good?

24          MR. BOJANOWSKI:  Form.

25          THE WITNESS:  No, I don't.

181

```
 1   STATE OF ARIZONA      )
                           )
 2   COUNTY OF MARICOPA    )

 3

 4              I, JANET HAUCK, a Certified Reporter,

 5   Certificate No. 50522, in the State of Arizona, do hereby

 6   certify that the foregoing witness was duly sworn to tell

 7   the whole truth; that the foregoing pages constitute a

 8   full, true, and accurate transcript of all proceedings had

 9   in the foregoing matter, all done to the best of my skill

10   and ability.  Pursuant to request, notification was

11   provided that the deposition is available for review and

12   signature.

13

14              I FURTHER CERTIFY that I am not related to

15   nor employed by any of the parties hereto, and have no

16   interest in the outcome hereof.

17

18              WITNESS my hand this 14th day of April,

19   2014.

20

21

22   _____

23   Janet Hauck, RPR
     Arizona Certified
     Reporter No. 50522

24

25
```

# EXHIBIT 9

**Third Supplemental Expert Report of Pablo Stewart, M.D.**

*Parsons v. Ryan,* No. 2:12-cv-00601-DJH (D. Ariz.)

August 29, 2014

**Introduction**

I have been asked to review medical records and other documents covering the period from September 27, 2013 through April 1, 2014.  The documents provided to me are listed in Appendix A, attached hereto.

More specifically, I have been asked to consider whether these documents demonstrate any significant change in the delivery of mental health services in the Arizona Department of Corrections (ADC), or in conditions of confinement for prisoners with mental illness, such that I would change one or more of the opinions expressed in my previous reports.  See Expert Report of Pablo Stewart, M.D., November 8, 2013; Supplemental Expert Report of Pablo Stewart, M.D., December 9, 2013; Rebuttal Expert Report of Pablo Stewart, M.D., January 31, 2014; Second Supplemental Report of Pablo Stewart, M.D., February 24, 2014.[1]  I reserve the right to supplement or modify these opinions as additional information becomes available.

As explained more fully below, it is my opinion that the problems I identified in my previous reports persisted during the period between September 27, 2013 and April 1, 2014.  Accordingly, I stand by the opinions I have previously expressed in this case.

---

[1] These reports were attached to and incorporated by reference in my declaration submitted to the Court on June 18, 2014 as Doc. 947, Exhibits 1-4.

**Inadequate Staffing**

In my initial report I expressed the opinion that "pervasive and longstanding staffing shortages in ADC's health care system undermine the ability of clinicians to provide minimally adequate mental health care services." 11/8/13 Report at 11. Defendants' own monitoring reports (known as MGAR reports) continue to show shortages, both of mental health staff and of other health care staff that are essential to the delivery of mental health services, such as nurses and medical records staff:

> "There are vacancies with [] ongoing recruiting efforts in the areas of medical director, psychiatry, dental, and nursing." ADC 211268 (Lewis).

> "There are vacancies that impair the adequacy of staff," including nursing and medical records staff. ADC 211318 (Perryville).

> "San Pedro does not have a full time medical records librarian. It is very difficult to keep up with the filing, movement, and other activities when that position is filled only part-time." ADC 268943 (Perryville).

> "Positions of Director of Nursing, psych techs, medical records, Facility Health Administrator are vacant resulting in non compliance." ADC 211371 (Phoenix). See also AGA_Review 108408 (indicating that psychiatric director position is vacant at Phoenix and may have been vacant for more than 60 days).

> "Key positions yet to be filled include:  (1) Medical Director; (1) Psychiatric RN; (1) Psychologist; (3) Nursing Supervisors. … Although, nursing and Mental Health staff levels are improving, levels do not appear adequate to meet the need at the current time." ADC 211175 (Eyman).

> "There are vacancies that must be filled in order to meet the needs of the inmate population." ADC 211566 (Yuma).

2

"Per site staff, no psychiatry provider was scheduled to be on the unit for the foreseeable future."  ADC 210980 (Tucson).

"The Psyche Associate was also terminated which has added to the already heavy burden on nursing."  ADC 211508 (Winslow).

"The fact that there is not a [mental health] Clinician on site every day is a staffing issue that must be addressed to be in compliance with this performance measure."  ADC 422598 (Winslow).

"There are multiple compliance issues with Mental Health at the Douglas Complex.  The Psych Associate was terminated on 1/22/14.  Deborah Kinder will try to do her best, but clearly this Complex cannot be compliant without a Mental Health Provider."  ADC 268367 (Douglas).[2]

Arthur Gross, Assistant Director of ADC's Health Services Contract Monitoring Bureau, had this to say about mental health staffing at Eyman:

Eyman's SCD for [mental health] is 12 FTEs; and 8.5 positions are listed as being filled, with only 7.26 actually working … .  This level of coverage is unacceptable.  No wonder there are problems with [mental health] issues at Eyman.  2 more Psych Associates, 1 more [mental health] RN and 2 [mental health] Techs are projected to be in the future SCD at Eyman.  So 17 are projected for [mental health] coverage down the road, which doesn't truly address the underlining [sic] REAL problem.  Corizon can't fill the 12 FTEs they currently are recruiting to fill.  Yikes?!?!?!!!!"

AGA_Review 107026.

---

[2] Although I was told that prisoners with mental health needs are not housed at the Douglas, Winslow, and Safford complexes, this is apparently not true.  ADC 268367 (Douglas) ("We should not have MH 3 Inmates at our complex.  However we frequently are getting them in from other yards").

These staffing shortages result in needed services not being provided. ADC 211416 ("On 12/27 this auditor was there all day and Nurseline was not conducted. Nurse stated she had no time") (Tucson); 268381 ("Nurse's Lines (NL) were not run daily Monday-Friday during January, 2014 on any of the five ASPC-Eyman yards"); 268931 ("Nurse line is required to be staffed by a Registered Nurse. That has consistently not been the case at San Pedro for several months and from time to time on other yards") (Perryville). In addition, it is my opinion that many of the failures of mental health treatment described below are attributable, in whole or in part, to inadequate staffing.

In addition to these staffing shortages, ADC does not reliably verify that the health care staff it does have are licensed. At Lewis, the "Databease [sic] of all licensure staff indicates that there are 9 nursing staff, 4 [mental health] staff, 1 dental staff and 2 providers with noted licenses that are expired." ADC 210412. At Yuma, "some of the licenses of the medical staff were not current and up to date." ADC 211567.

**<u>Inadequate medical records</u>**

In my initial report, I noted that "[a]t every prison I visited, the records were disorganized to the point of being chaotic, and frequently incomplete, making it very difficult or impossible to follow the patient's history and course of treatment." 11/8/13 Report at 19. As I describe below, I found that this continues

to be true of the records I reviewed covering the period from September 27, 2013 to April 1, 2014.

In addition, the MGAR reports show continuing defects in ADC's medical records. At Lewis, "There is a significant backlog of loose filing with dates ranging from February 2013 – October 2013." ADC 210387. At Tucson, "there appears to be missing watch notes from inmate's chart as it is unclear when the inmate was placed on watch." ADC 269372. See also ADC 211291 ("significant loose filing") (Perryville); 211243 (loose filing "equal to approximately 10 inches" and "contained records exceeding 5 months") (Lewis); 268943 ("Many charts had misfiled documents") (Perryville); 269356 ("The loose/mis-filed paperwork appearing in the charts reflects a new trend that is beginning at our Complex") (Tucson). There are also deficiencies in the quality and completeness of information being recorded in the files. See ADC 268459 ("notes completed by an unlicensed Psychology Associate were not countersigned [and] many times were a photocopy. CB2, CB3, CB4, CB5 & CB7: The vast majority of notes done by the Psychology Associate were only ½ way completed notes") (Florence).

Particularly troubling are the significant deficiencies in medical records at ASPC-Phoenix, which is ADC's dedicated mental health facility. At Phoenix, "medical records in all areas require thinning and organizational evaluation." ADC 211371. See also ADC 268974 (noting "approximately 4 inches of loose filing" in medical records); ADC 269294 (noting that "Continuity of Care summary was loose and not filed; two unauthorized memos in medical record");

ADC 268583 ("medical record is highly disorganized to the point of preventing …

accurate information gathering"); 269280 (medical record "highly disorganized").

In addition, ADC Mental Health Monitor Nicole Taylor documented the

inadequate notes being written by the psychiatrists at the Phoenix complex:

> Please be advised that there are notes being written by the Psychiatrist at
> MTU that in my clinical opinion are inadequate.  Also, the notes by the
> other Psychiatrist that is providing services at Flamenco are severely
> lacking in information as there are typically only 4 lines written, and would
> be hard to defend if an issue arose.

AGA_Review 113242.  ADC's inability to maintain accurate, reliable medical

records poses a significant risk of harm to prisoners with mental illness.


**Inadequate medication system**

In my initial report, I described a number of significant and dangerous

deficiencies in ADC's medication system.  11/8/13 Report at 21-29.  These

deficiencies persisted throughout the period from September 27, 2013 to April 1,

2014.

In many cases, prisoners are not receiving their prescribed medication in a

timely fashion, or at all.  See ADC 211261 (71% of charts reviewed showed

"unreasonable delays in inmate receiving prescribed medications") (Lewis);

210886 (11 out of 54 MARs reviewed showed unreasonable delays in receiving

prescribed medication) (Perryville); 210804 (three prisoners did not receive

Haldol injection in a timely fashion) (Florence); 211365 (listing examples)

(Phoenix); 268776 ("Yuma has experienced a back log in renewing psyche medications").  At Perryville, ADC Monitor Barlund expressed concern that "with the [history] of weather delays and 'we're shortstaffed and can't fill your meds today' that there will be further delays in inmates receiving their meds." AGA_Review 105005.  See also AGA_Review 116456 (at Eyman, "the AM meds did not go out on time, and the afternoon meds may not have been delivered at all").

Due to the shortage of nurses to hand out medications to prisoners, not only are prisoners not receiving medication, but staff have apparently resorted to smuggling medication out of the prison and taking it home with them, or hiding medication:

> AGA_Review_110553 (Tucson: "I was at Main Point of Entry checking in four staff when I came upon CRN Ashly Paradis.  I went through her bag and found a gallon size ziplock bag full of Rincon watch swallow meds in small manilla [sic] envelopes addressed to each inmate[.] … Ashly advised that she was unable to pass out some of the watch swallows on Thursday night so instead of checking them back in she brought them home. … Medical staff confirmed meds were not passed out on 11/28/13").

> AGA_Review_113556 (Eyman:  "As a result of the issue of the [Director of Nursing] finding a large number of HNRs and medication in envelopes hidden in Meadows; yesterday I conducted an audit for such [.] … On SMU1 I found a stash of medication in drawers in the medication room that had no [inmate] identification on them.  Five had the medication name and dosage removed.  […] My audit of the Browning Unit produced a box with envelop[e]s containing medication that had not been passed and had not been disposed of properly.  They were in a box which I sealed and isolated after taking the attached photos."  [AGA_Review_113562-63]:



In many other cases, records are so deficient that it is simply impossible to tell if prisoners are receiving their medication.   Medication Administration Records (MARs) are not completed correctly and are often missing critically important information.   See ADC 268398-99 ("In a review of 50 handwritten MARs … 1 (2%) was found to have met all the criteria") (Eyman); 268945 ("At Perryville, very few MARs contain start dates"); 269307 ("A review of MARS show incomplete documentation") (Phoenix); 210466 (3 of 54 MARs reviewed completed in accordance with standard nursing practices) (Perryville); 210990 (3 out of 92 MARs reviewed completed in accordance with standard nursing practices) (Tucson); 210706 (48 out of 50 MARs reviewed NOT completed in accordance with standard nursing practices) (Yuma); 268618 (4 of 72 MARs reviewed completed in accordance with standard nursing practices) (Phoenix); 268520 (0 of 70 MARs reviewed completed in accordance with standard nursing practices) (Lewis).

There appear to be breakdowns at every stage of the medication process:

Medications are simply allowed to expire without renewal. ADC 268857 (Eyman); 210791 (Florence); 210909 (Phoenix); 211430 (Tucson); 268775-76 (Yuma); 268918 (Lewis). See also ADC 211248 (noting that SMI prisoner's "psych medications expired without follow-up in 2009") (Lewis).

Prisoner refusals of medication are not properly documented. 269140 (Eyman); 269172 (Florence).

Medication errors are not reliably reported. ADC 210325, 210748 (Eyman); 210347 (Florence); 210993 (Tucson).

The process for obtaining non-formulary drugs does not appear to be functional. ADC 210851, 211244, 268504 (Lewis); 211153 ("the Non formulary process still seems to escape employees when asked at some locations") (Eyman); 211430 ("The Non Formulary process continues to be a challenge") (Tucson); AGA-Review 106421 ("a centralized location for the Non Formularies in some units seems to be nonexistent or not accurately maintained").

ADC's pharmacy monitor documented significant deficiencies in medication practices at multiple complexes:

"Eyman continues to struggle with policy/procedures. On my visit (10-21-2013) it was evident that the facility is in need of intensive retraining in multiple areas concerning pharmacy." ADC 210299.

"I continue to alert the facility on medication issues/concerns/questions." ADC 210791 (Florence).

"Florence as with many of the facilities continues to struggle with policy and procedure. Documentation of clinic stock is inaccurate, Refrigerator/Room temperature logs continue to be incomplete, expired medication exists in refrigerators, vials opened and not dated." ADC 211200.

"As with previous months, I am concerned with the transfer of medication with the inmate."  ADC 210910 (Phoenix).

"Overall, of the 6 sites visited at Tucson, I witnessed the same procedural problems."  ADC 210977.

"I am still concerned with refills for active medication being filled in a timely manner."  ADC 268680-81 (Tucson).

"I am concerned with the significant drop in the timely renewal of medications."  ADC 211537 (Yuma).

"I am still concerned with refills for active medi[c]ation being refilled in a timely manner."  ADC 211245 (Lewis).

I agree with ADC Pharmacy Monitor Martin Winland when he writes that "it is my sincere hope that the new Corizon leadership will not tolerate such a haphazard approach to proper documentation of medication as I have witnessed previously."  AGA_Review 110551.


**Inadequate monitoring of prisoners taking psychotropic medication**

As was the case at the time of my initial report (11/8/13 Report at 29-32), prisoners on psychotropic medications are still not being seen by a psychiatrist, or even by a psychiatric mid-level provider, at least every three months.  ADC 422637, 211544-46, 211077-79, 210670-71 (Yuma); 422422-24, 211251-52, 210836-37, 210396-98 (Lewis); 422333, 211159-61, 210754, 210305 (Eyman); 422465, 210877-78 (Perryville); 422576-77, 211439-40 (Tucson).   Many

prisoners have gone far longer than three months without being seen.  See ADC 422423 ("This inmate is currently on a watch and has been on approximately 5 watches in the last year – inmate was not referred to psychiatry once in the last several watches/months") (Lewis).  As a result, some prisoners (including those with SMI) have had their psychotropic medications simply expire with no psychiatric follow-up; others have had their medications renewed without being seen by a psychiatrist.  Both are improper and dangerous practices.

**Inadequate monitoring and management of medication therapeutic levels and side effects**

In my initial report, I wrote that "ADC does not have an adequate system in place to monitor and manage medication side effects," and identified named plaintiff █████████ as one patient who was suffering side effects.  11/8/13 Report at 32.  As noted below, Mr. ██████ continues to suffer side effects that are not being adequately managed, as does named plaintiff ████████████.

**Inadequate access to care**

In my initial report I wrote that "ADC does not have a reliable means for prisoners to make their mental health needs known, and to have those needs met, in a timely manner by qualified staff."  11/8/13 Report at 33.  This continues to be true.  ADC's documents show breakdowns at every step of the access-to-care process.

Significant backlogs of HNRs continue to exist, and it appears that HNRs are sometimes simply forgotten.  See AGA_Review 113522 (pile of over 200 HNRs at Eyman); AGA-Review 113556 (Director of Nursing finds "a large number of HNRs and medication in envelopes hidden at Meadows") (Eyman); AGA-Review 116455 (noting HNRs at Eyman-SMU that have not been addressed by nursing; "of those 34 are marked as emergency or otherwise require rapid attention (I.e. requesting med refills, pain issues, etc)"; ADC 210481 ("I found over 50 HNRs in various areas of the medical room") (Phoenix); 211243 ("a loose stack of HNR's was located with dates ranging from 9/10/2013 – 12/14/2013") (Lewis).

Tucson alone had the following backlog in a single month:  HNRs 463; charts requiring provider review 364; nurse line backlog 360; provider line backlog 453.  ADC 211415.  In March 2014, the auditor for the Tucson complex wrote that "provider line backlogs, and Provider chart reviews are higher than they have been at Tucson Complex, since Corizon took over the Contract," and added that "it is HIGHLY recommended that a Regional request be made – to bring in reinforcements immediately, to address the entire Sick call issue, and to bring backlogs down for the providers at this Complex!"  ADC 269333.

HNRs requesting mental health services are not triaged within 24 hours of receipt.   ADC 269095 (Yuma); 268893, 268457, 210794 (Florence); ADC 268862, 268407, 211156 (Eyman); ADC 268986 (Phoenix); ADC 268509 (Lewis); ADC 211435 (Tucson); 210875 (Perryville).   Even multiple HNRs

sometimes do not result in the prisoner receiving timely care. ADC 268962 (Phoenix) ("this is the 3rd HNR for medication issues and has not been seen by provider"); 210834 (Lewis) ("Inmate referred 10/3 (5 HNRs submitted), not seen until 10/28").

Sick call is often canceled or does not occur as scheduled. ADC210546 (Tucson); 211337 (Phoenix); 211241 (Lewis); 268931 (Perryville); 269380 (Winslow); 211146 (Eyman).

Once patients are referred to a mental health provider, they are very rarely seen within seven days. This finding is remarkably consistent both across institutions and over time:

> **Yuma:** ADC 269096 (3 of 34 charts in compliance), 268787-88 (1 of 29 charts in compliance), 211542 (0 of 21 charts in compliance), 211074 (2 of 23 charts in compliance).

> **Tucson:** ADC 269037-38 (2 of 26 charts in compliance), 268688-89 (5 of 30 charts in compliance), 211435-36 (3 of 22 charts in compliance), 210980 (3 of 27 charts compliant).

> **Lewis:** ADC 268924-25 (3 of 25 charts in compliance), 268509-10 (1 of 22 charts in compliance), 211248 (3 of 11 charts in compliance), 210834 (0 of 15 charts in compliance).

> **Florence**: ADC 268893-94 (1 of 12 charts in compliance), 268458 (2 of 8 charts in compliance), 211203 (0 of 10 charts in compliance), 210794-95 (2 of 12 charts in compliance).

> **Eyman:** ADC 268863 (2 of 11 charts in compliance), 268408 (2 of 12 charts in compliance), 211156-57 (2 of 17 charts in compliance), 210752 (1 of 7 charts in compliance).

**Phoenix:**  ADC 268611-12 (2 of 7 charts in compliance).

**Perryville:** ADC 268953-54 (10 of 22 charts in compliance), 268555 (3 of 14 charts in compliance), 210875 (2 of 6 charts in compliance).

**Winslow**:  211493 (0 of 1 charts in compliance), 210626 (0 of 4 charts in compliance).

Many patients, including those with serious mental illness (SMI), have experienced extraordinarily long delays in seeing a psychiatrist, during which they were in extreme distress and/or at serious risk of suicide.  For example, a January 2014 note from Perryville describes a woman with SMI who "has been on Suicide/[mental health watch] approximately 7 times since 09/2013.  Inmate has not seen psychiatrist since 9/30/13.   Inmate should have been referred to psychiatry during the 09/2013-01/2014 time period but was not."  ADC 268555. At Yuma, a SMI prisoner "was referred to psychiatry on 10/29/14[sic], 1/14/14 & 1/15/14; however, inmate was not seen until 1/29/14." ADC 269096.   Another Yuma prisoner "was referred to psychiatry on 8/5/13; however inmate was not seen until 12/20/13."  ADC 268787-88.  At Lewis, an SMI prisoner "was referred to psychiatry his HNRs [sic] on 12/25/13 and 1/10/14; inmate still has not been seen [as of February 2014]."  ADC 268924-25.  At Eyman, "Inmate was referred on 11/6/13 via HNR.   In HNR, inmate reported his psych medications were ineffective and that he was 'going crazy.' … Inmate has still not been seen [as of December 2013]."  ADC 211156-57.  At Florence, a 2/28/14 note identifies a

14

prisoner who "was referred to psychiatry on 12/4/13, 12/30/13, 1/2/14 and 1/22/14 … ; however, inmate has never been seen."  ADC 268893-94.

Such delays occur even at ADC's dedicated mental health facility; an SMI patient "was referred to psychiatry on 2/12/14 & 2/11/14 in a Mental Health Clinician's note and on 2/3/14 via inmate's HNR.  However, inmate has never been seen by psychiatry."  ADC 268986-87 (Phoenix).

It is my understanding that, rather than taking steps to ensure that patients referred to a mental health provider are seen within seven days, ADC instead changed the standard to require only that such patients be seen within fourteen days.  As noted above, many patients are not seen even within this longer time period.


**Lack of mental health programming**

In my initial report, I expressed the opinion that "the ADC mental health care system relies almost exclusively on medication (which it fails to provide reliably or appropriately), and does not provide an appropriate level of non-medication mental health programming."  11/8/13 Report at 37.

After reviewing documents from September 27, 2013 through April 1, 2014, I stand by this opinion.  It remains the case that prisoners classified as MH-3 and above, including those classified as SMI, are not being seen by non-psychiatrist mental health staff as required by policy.  ADC 269427, 269097, 268788-89, 210669 (Yuma); 269268-69, 268954-55, 268556, 211299, 210876

(Perryville); 269230, 268511 (Lewis); 269146-47, 268863-64, 211158, 210753, 210303(Eyman); 268690-91, 211437 (Tucson); 268458-59 (Florence).

There are many examples of long and dangerous delays.  At Perryville, one prisoner "has not been seen by psychology staff since 1/27/2010;" another "has never been seen by a licensed mental health staff member."   ADC 269268-69. Other examples include ADC 268690-91 ("this SMI inmate (who is asking for help) was not seen in a timely manner") (Tucson); ADC 268511 ("the length of time this SMI inmate had to wait to be seen by psychology is clinically inappropriate") (Lewis); ADC 269427 (March 2014 note that SMI prisoner "has not been seen since 9/20/13") (Yuma).   See also AGA_Review 106272-74 (12/6/13 email exchange between Dr. Taylor and Mr. Musson, indicating that prisoner had not been seen by mental health since November 2012).   Many prisoners with mental illness, including those with SMI, have *never* been seen by psychology staff.

While I understand that ADC alleges that prisoners with mental illness are receiving individual therapy, this was not supported by the MGAR reports. "There was little to no documentation found in charts indicating that inmates are being seen for monthly individual therapy sessions."  ADC 268458-59 (Florence). Similarly in the Behavioral Health Unit at Tucson, "several charts audited indicated that inmates are not being seen for monthly individual therapy sessions." ADC 268690-91.  At Perryville, a 2/28/14 note indicated that one prisoner "has

not been seen for individual therapy per policy," and another "has not received an individual therapy session since 10/22/13."  ADC 268954.

Similarly, I understand that ADC claims that prisoners with mental illness are now participating in mental health treatment groups.  I did see some evidence of groups in some of the charts I reviewed (see below), but it does not appear that such groups are provided either consistently or to more than a small minority of prisoners with mental illness.  This is confirmed by the July 1, 2014 deposition of Carson McWilliams, ADC's Division Director of Prison Operations.   See McWilliams dep. at 28:20-25 (as of April 1, 2014, there is no programming for Seriously Mentally Ill prisoners in Florence-Central-CB4); 93:1-9 (25% of prisoners in Florence-Central-Kasson receive one hour a week of programming), 95:16-20 (prisoner could receive "zero hours a week [of programming] if you were on a waiting list"), 111:10-12 (no out of cell programs for Step I prisoners at Perryville-Lumley-SMA).  Mr. McWilliams also testified that what ADC calls "group" programming may actually occur with prisoners locked in their cells; "they're still doing the group, they're just not doing it together."  McWilliams dep. 148:25-150:12.


**Lack of inpatient care**

In my initial report, I wrote that "it appears that ADC lacks a reliable system to ensure that prisoners needing a higher level of mental health care are transferred in a timely fashion to appropriate facilities."  11/8/13 Report at 40.

Cited below are additional examples of patients who needed inpatient care but did not receive it (████████, ████████, ████████).

### Inadequate treatment plans

In my initial report, I wrote that "[t]he treatment plans I reviewed in ADC do not meet minimum standards," 11/8/13 Report at 44, and that "the treatment plans were often incomplete, with key information missing; out of date; or simply missing from the chart altogether."  11/8/13 Report at 45.

It appears that little has changed.  According to the MGAR reports, mental health treatment plans are still not being timely reviewed and updated.   ADC 269427, 268786, 211543, 210669 (Yuma); 269370 (Tucson); 269267, 268952 (Perryville); 269146, 268407, 211157 (Eyman); 269228 (Lewis).  Many prisoners, including those with SMI, were found to have treatment plans that were out of date, "incomplete and unacceptable," or simply had no treatment plan at all in the chart.

### Inadequate suicide prevention

I wrote in my initial report that "there are serious deficiencies in ADC's suicide prevention policies and practices."  11/8/13 Report at 51.  This continues to be true.   The MGARs from October 2013 through March 2014 show widespread noncompliance with the requirement that prisoners on watch be seen daily by medical or mental health staff.   See ADC 269372 (3 of 23 charts

compliant), 210986 (1 of 7 charts compliant) (Tucson); ADC 269270-71 (5 of 16 charts compliant), 210880 (1 of 9 charts compliant) (Perryville); ADC 269230 (2 of 18 charts compliant), 210839 (0 of 10 charts compliant) (Lewis); ADC 269181 (3 of 10 charts compliant) (Florence); ADC 269148 (1 of 16 charts compliant), 210757 (1 of 9 charts compliant) (Eyman); ADC 211082 (0 of 5 charts compliant) (Yuma).  See also ADC 269270-71 ("it was impossible to tell whether or not the inmate was seen per policy while on watch because the watch disposition form from when the inmate was placed on watch had no date or time written on the watch order.  Also, there appeared to be no note documenting when/why/how the inmate was placed on a watch") (Perryville).

Similarly, there is widespread noncompliance with the requirement that prisoners being discontinued from mental health watch are seen by a mental health clinician within specified time frames.   See ADC 422572 (2 of 23 charts compliant) (Tucson); 422330-31 (0 of 14 charts compliant) (Eyman); 422367 (1 of 9 charts compliant) (Florence); 422419 (3 of 16 charts compliant) (Lewis); 422461 (5 of 15 charts compliant) (Perryville); 422635 (4 of 8 charts compliant) (Yuma). This was true even at ADC's dedicated mental health facility.  ADC 422511 (3 of 14 charts compliant) (Phoenix).

Indeed, medical records are apparently so deficient that in some cases it was impossible to determine when the prisoner was removed from watch.  ADC 422573 (Tucson); 422512 (Phoenix).

Prisoners are placed on watch because they are believed to be at risk of self-harm or suicide or otherwise in a state of crisis.  Many of these prisoners are seriously mentally ill.  ADC's failure to ensure that such prisoners are seen by medical or mental health staff while on watch, and followed by mental health clinicians after they are removed from watch, creates a substantial risk of serious harm or death.

A November 26, 2013 email from Caroline Haack to Jeff Hood attaches a chart of "FY 13 Self Harm Inmates – OD/ingest category."  AGA Review 114506-07.  This chart describes numerous prisoners with Mental Health scores of 3, 4, or even 5 swallowing razor blades, glass, pieces of metal, and other foreign objects, as well as overdosing on pills.  Many prisoners had multiple such incidents; one prisoner had 10.  It is extremely concerning that ADC is unable to prevent these seriously mentally ill prisoners from engaging in such potentially lethal self-harm.

I reviewed records from three suicides that occurred between September 27, 2013 and April 1, 2014:

1.     ███████, ███-Mr. ███ was a 22-year-old male prisoner who hanged himself on ███. He was housed at ASPC-Eyman/SMU1 at the time of his death. Mr. ███ medical record is very sparse and does not contain a lot of mental health-related information.  His intake mental health evaluation noted that he had a depressed affect and a history of depression that was responsive to medications. These medications were listed as Prozac and Zoloft.  Despite his presentation and very significant psychiatric history, Mr. ███ was designated a "MH2" with no follow up with a psychiatrist scheduled. The next mental health note is for an anger management class. The medical record is difficult to follow but it appears that Mr. ███ experienced some difficulties in the anger

management classes. The psych autopsy indicated that during this same time frame he had escalating violations within the prison system. The combination of his difficulties in group and his increased prison violations should have triggered a psychiatric referral. The medical records indicated that he did not receive any psychiatric follow up at this time or at any time prior to his death.

The medical record then indicates that on 8/3/13, Mr. ███ had a very serious suicide attempt. This suicide attempt consisted of his overdosing on 405mg of Remeron and 36mg of Risperdal. Once again, Mr. ███ was denied access to a psychiatrist. What Mr. ███ received was an extremely cursory examination by a psychologist. The mental status examination performed by the psychologist omitted observations on suicidality, affect and thought process. There was not a risk assessment completed and no differential diagnosis was made. As mentioned above, there was no referral to a psychiatrist for possible medication management. Mr. ███ was placed on suicide watch but was removed after one day. His last contact with mental health occurred on 9/27/13. Although the mental status examination documented in this note is an improvement over the one completed after his suicide attempt of 8/3/13, there is still no diagnosis made or plans to refer Mr. ███ to a psychiatrist. He killed himself in his cell on ███.

There are many serious problems with the care that Mr. ███ received but none so glaring as the fact that I found no evidence that he was ever evaluated by a psychiatrist. Mr. ███ past history of medication-responsive depression and his recent, serious suicide attempt should have alerted staff that he was at a very high risk to kill himself. It is my firm opinion that his death was preventable.

In addition, review of the Administrative Investigation Report (AIR) reveals that security checks on Mr. ███ pod were not timely performed on the day of his death, but records were falsified to show that they had been performed on time. The officer who falsified the logs had previously received a write-up for fabricating records.

I have now reviewed several records in which staff falsified records in connection with a prisoner suicide. See 11/8/13 report at 52 (suicide of ███); 12/9/13 report at 8 (suicide of ███). I have never before encountered a system in which such fraudulent and possibly criminal behavior by staff is so widespread and is apparently tolerated by department leadership.

2. ███, ███-Mr. ███ was a 48-year-old male prisoner who hanged himself on ███. He was housed at ASPC-Eyman/Browning at the time of his death. A review of his medical record reveals that Mr. ███ had

21

very little contact with mental health. Most of his contacts during his 20-year commitment were medical. He suffered from a variety of serious medical conditions, including skin cancer, eczema, hypertension, history of head injury with a subsequent seizure disorder and right-sided partial hemiplegia. Over the years of his commitment, he presented with a variety of psychiatric symptoms to his medical MD's. These symptoms included being "moody and anxious," "paranoia-? Psychosis," and being "angry, loud, demanding." The medical MD's that were seeing Mr. ███ should have referred him for a psychiatric evaluation when he presented with these symptoms. I disagree with the ADC psych autopsy that Mr. ███ suicide was unpredictable and unavoidable from a mental health perspective.  As previously mentioned, his medical MD's should have initiated a referral for a psychiatric evaluation given his symptom presentation.  Also, it is a well-established medical fact that older men with multiple medical problems are at a much greater risk for self-harm than the general population. Although Mr. ███ was not elderly per se -- he was almost 49-years-old at the time of his death --  in my opinion, 49 is elderly for a prisoner and he had been on death row for approximately twenty years and had several serious medical problems that were clearly causing him significant distress and anxiety.  All of these risk factors should have been taken into consideration to help protect him from self-harm.


3.      ███████████, ███-Mr. ███ was a 38-year-old male prisoner who hanged himself on ███. He was housed at ASPC-Eyman/SMU1 at the time of his death. Mr. ███ has a long and complicated mental health and medical history. He was found to be hypothyroid and was started on low dose (0.05mg daily) thyroid replacement therapy. This dose was not changed over time. I could not locate any medical follow up or repeat laboratory tests in the medical record for this condition, which can have profound effects on an individual's mental functioning.

He carried the psychiatric diagnosis of Mood Disorder, NOS. He was begun on a combination of Haldol and Amantadine. This medication regimen is problematic given Mr. ███ history of having a seizure disorder. What is even more problematic is that his medications were abruptly discontinued in January 2013 without any follow up by a psychiatrist.

The next notable event for Mr. ███ is his submitting an HNR on 3/29/13 asking for help with psychosis. Mental health staff waited until 4/4/13 to follow up with him. A progress note from 4/5/13 documents that the patient stated "people are saying things" and staff find a noose. He is placed on suicide watch but his

medications are not restarted until 4/10/13. A progress note from 4/13/13 notes that the patient cut himself and he is placed on continuous watch. Mr. ██████ submitted HNR's on 5/7/13 and 5/19/13 requesting an increase of his Haldol for persistent psychotic symptoms. He was finally evaluated for these concerns on 6/17/13. At that time the psychiatrist continued Mr. ██████ medications of Haldol, Amantadine and Tegretol. Mr. ██████ submitted three additional HNR's (7/10/13, 7/16/13 and 7/26/13) requesting to see the psychiatrist.

He is placed on suicide watch on 8/14/13 after lighting his cell on fire, which resulted in him being evacuated to the hospital with smoke inhalation and second-degree burns. A progress note from 8/20/13 documents that the patient was experiencing trauma-related flashbacks and was noted to be psychotic. His mental health score was increased to MH-4, but incredibly, a psychiatrist did not see Mr. ██████ until 9/24/13. Mr. ██████ was noted to be experiencing flashbacks, poor mood and worsening medication-induced involuntary movements. He was started on Paxil 20mg QD and Cogentin 2mg BID is substituted for the amantadine.

The final psychiatric visit Mr. ██████ received prior to his death occurred on 10/23/13. It appears that he was experiencing worsening psychotic symptoms as well as increased flashbacks. The psychiatrist increased the Paxil but did not address the worsening psychotic symptoms. Also, the Amantadine was reintroduced and the Cogentin was discontinued. A psychiatric follow up appointment didn't occur as scheduled. Mr. ██████ was scheduled for a 30-day follow up but this did not happen. He hanged himself on ██████.

Several troubling issues arise out of this review. Mr. ██████ hypothyroidism was not properly addressed. He was started on low dose thyroid replacement therapy but I could not locate if this was ever followed up. His diagnosis was Mood Disorder, NOS yet he was begun on an antipsychotic medication. This means that either the diagnosis and/or the treatment was incorrect. Mr. ██████ repeatedly complained of flashbacks yet PTSD was never considered as a diagnosis. Though he displayed steadily escalating symptoms over the last several months of his life, at no time was he considered for transfer to a higher level of care such as an inpatient facility. This is especially egregious given that a noose was found in his cell, he cut himself, and he set his cell on fire. He also had a history of additional suicide attempts, including at least one by hanging. Any one of these events should have alerted staff to Mr. ██████ need for a higher level of psychiatric care than was available on the SMU1. It is my opinion that this suicide was completely preventable.

23

I have previously discussed the importance of psychological autopsies in cases of suicide, and ADC's failure to perform them in a timely manner, or in some cases at all.  This problem appears to persist unchanged.  A document dated March 6, 2014 shows that as of that date, psychological autopsies had not been performed on suicides that occurred in 2013, 2012, 2011, 2010, and even 2009. AGA_Review 108573-75.

**Inappropriate use of isolated confinement**

In my initial report I noted that ADC has no policy that bars the housing of prisoners with serious mental illness in isolated confinement.  11/8/13 Report at 59.  I saw nothing in the materials I reviewed from the September 27, 2013 – April 1, 2014 time period suggesting that this has changed.

The danger created by ADC's failure to exclude the SMI from isolation is aggravated by ADC's additional failure to monitor the mental health of prisoners placed in isolation.  For example, the medical records of prisoners being placed in segregation are sometimes not reviewed by mental health staff for contraindications.  ADC 210364 (Florence); 210318-19 ("Out of the 40 charts reviewed (37) were not in compliance") (Eyman).  At Eyman, "segregation rounds are not consistently done/documented three times weekly."  ADC 210320.  See also ADC 210593 (0 of 43 charts of segregated prisoners compliant with requirement for monitoring by medical or mental health staff) (Tucson); ADC

269427 (March 2014 note that SMI prisoner is "in lockdown and not seen since 1/6/14") (Yuma).

Finally, I note that of the ten suicides that occurred in ADC between the Corizon takeover in March 2013 and April 1, 2014, eight occurred in SMU I, Browning Unit, and Florence Central Unit, although these units collectively hold only a small percentage of ADC prisoners. This is further evidence of the extremely damaging and sometimes lethal effects of isolated confinement.

**Inappropriate use of chemical agents on the mentally ill**

In my initial report, I wrote that "[t]he use of chemical agents on prisoners with mental illness can be extremely harmful and is contraindicated with these patients." 11/8/13 Report at 60. More specifically, I noted that chemical agents were used against ████████████████ on at least three occasions, adding that ██ ████████ "is an extremely mentally ill individual, and the repeated use of chemical agents poses a grave risk of harm." 11/8/13 Report at 62. As noted below, ADC staff continue to use chemical agents against ███████████.

**Inappropriate use of psychiatry via videolink**

In addition to the problems with telepsychiatry noted in my earlier reports, it appears that ADC is unable to ensure timely care for patients who refuse treatment by telepsychiatry. AGA_Review 104913-14 (email exchange describing

staffing and other "barriers" to seeing "the roughly 100 refusals at Rynning and Cook") (Eyman).

## Chart reviews

I have been provided a list of  charts I reviewed for my initial and supplemental reports.  I selected every fifth chart from this list for a total of eight charts.   Because this random selection turned out not to include any female prisoners, I then selected one chart of a female prisoner at random, for a total of nine charts reviewed.

1.       ███████████, ████-I evaluated Mr. ██████ and reviewed his medical record on 7/22/13. At that time he was on watch status for "erratic behavior" and was noted to be experiencing worsening psychotic symptoms. There were numerous chart entries about his not receiving his medications for over a week. A review of his recent set of medical records reveals that in the months following my evaluation, Mr. ██████ remained on watch status and was referred to ASPC Phoenix due to the severity of his mental illness.  He was waiting for transfer to Phoenix for several weeks and was eventually taken off the referral list for reasons that are not apparent from the medical record.  At no time was a psychiatrist involved in the decision to refer Mr. ██████ to ASPC Phoenix and/or to remove him from the referral list. The October 2013 MAR lists his medications as Haldol 15mg QHS, Depakote 1500mg QHS, Buspar 20mg QHS and Cogentin 2mg QHS. Mr. ██████ had his medications properly renewed on 12/16/13 but went seven days without his medications. They were restarted on 12/23/13 and there is no explanation in the medical record why this occurred. For the six-month period of 10/1/13 through 3/31/14 Mr. ██████ was only seen by a psychology associate six times and a psychologist twice. Of note, he only saw a psychiatrist once during this six-month period even though he was noted to be symptomatic and was having problems with medication compliance.

2.     ███████████,  ██████-I evaluated Mr. ████████ and reviewed his medical record on 7/22/13. He was diagnosed with PTSD/Depression for which he was supposed to take Risperdal and Celexa. He reported that he had not received his medications for several months. His medical record was very disorganized and I could not determine which medications is prescribed or if he was receiving them. A review of his recent set of medical records reveals that Dr. Jaffe renewed Mr. ████████ Risperdal 1mg QHS and Celexa 20mg QHS on 5/16/13. I mention this only to point out that Dr. Jaffe documented that he prescribed these medications even though he had not assessed the patient in person. I could not find any evidence that mental health staff followed up with Mr. ████████ during the six-month period 10/1/13 through 3/31/14.  This is especially bothersome given the fact that there are multiple medication refusal forms in the medical record during this time frame. Finally, on 11/25/13, almost two weeks after Mr. ████████ medications expired, he was seen by a psychiatrist who discontinued his medications.   There are no subsequent mental health contacts in the medical record. This represents very poor psychiatric care. Mr. ████████ medications were renewed in the absence of an in-person evaluation and then he was completely ignored by the mental health staff. There are no documented medical record entries that staff attempted to determine why Mr. ██████ was refusing his medications or that they attempted to do anything about it.

3.     ████████████,  ██████-I evaluated Mr. ████████ and reviewed his medical record on 7/16/13. He was diagnosed with Psychotic Disorder, NOS and was described as being "loud and argumentative." He was prescribed high dose Haldol decanoate, 150mg q4weeks. I found him to be extremely psychotic, shouting and cursing at me. He actually ran full speed into the Plexiglas door of his cell while I was standing there. At that time I felt he represented a danger to himself and required immediate transfer to an inpatient psychiatric facility. A review of the recent set of medical records reveals that since my evaluation Mr. ████████ has continued to be in an extremely psychotic and manic state despite treatment with Haldol decanoate. During the period from 10/1/13 through 3/31/14 I noted at least two incidents where chemical agents were used against Mr. ████████ and at least one incident where he assaulted staff. Due to his inability to cooperate with his treatment, staff appropriately applied for an involuntary medication order. In this application, staff noted that Mr. ████████ presents with "tangential thought processes, verbally demanding and threatening to staff, no insight into his mental illness and need for treatment and poor judgment." This is

27

in addition to a documented assault on staff. Of particular note is that during this six-month period, I found only three incidences where Mr. ▇▇▇▇▇ was seen by mental health staff. All three of these clinical encounters occurred at the cell front. Psychology associates performed two of these encounters and a psychiatrist performed the third. Several points are demonstrated by this case: 1) Mr. ▇▇▇▇▇ is an extremely mentally ill individual who should be treated in a psychiatric hospital setting; 2) Staff did not make a sufficient attempt to engage him in the treatment process; 3) The psychiatrist continued with the same medication approach notwithstanding the lack of any clinical improvement. Mr. ▇▇▇▇▇ has suffered needlessly and staff has been put at risk due to this exceptionally poor psychiatric care.

4.   ▇▇▇▇▇▇▇▇, ▇▇▇▇-I reviewed his medical record on 7/15/13. I determined that he was a mental health patient who was being evaluated via a telemed psychiatrist. I also noted that the mental health diagnosis listed in the medical record was different from that listed by the telemed psychiatrist. It was apparent from my review that the telemed psychiatrist did not have access to Mr. ▇▇▇▇ medical record when he evaluated him. Also, I did not find a medication order from the telemed psychiatrist in the medical record. A review of the recent set of medical records reveals that Mr. ▇▇▇▇ is a patient on the Kasson Unit at the Florence complex. He was seen by a psychiatrist two days after my evaluation and was prescribed Lamictal 100mg daily and Remeron 15mg QHS. I could not determine from the medical record if this visit was via telemed or was an in-person visit. A psychiatrist did not see him again until 12/18/13. At that time Dr. French saw Mr. ▇▇▇▇ did not list a diagnosis but renewed his medications. He was next seen by a nurse practitioner on 3/12/14 when he was diagnosed with "Mood Disorder, NOS with Personality Disorder," and his medications were adjusted. Of note, during the period from 10/1/13 through 3/31/14 Mr. ▇▇▇▇ had 15 documented visits with psychology associates and attended 16 groups.

5.   ▇▇▇▇▇▇▇▇, ▇▇▇▇-I evaluated Mr. ▇▇▇▇ and reviewed his medical record on 7/16/13. The medical record indicated that his diagnosis is Psychosis, NOS and that his most recent treatment plan was over a year old; it was dated 5/20/12. It appeared from the medical record that his last dose of antipsychotic medication was administered 3/4/13. Upon my examination, he presented as extremely psychotic. That is, he was mute and posturing in an almost catatonic

state. The medical records that I reviewed covered the period of 11/4/13 through 4/1/14. On 11/4/13 Mr. ████ submitted an HNR that stated, "I need my medication. I need to see the Dr. It's an emergency. I take Risperdal, Remeron, Tegretol, Celexa. I hear voices that tell me to kill myself. I need help. I don't want to hurt myself. I sing all night and bang to stop the voices and everyone yells at me. I don't want this. Help me." A psych tech acknowledged receiving the HNR and documented that Mr. ████ was "no DTS/O." This is an amazing statement by an unqualified individual given the nature of the HNR. The next thing that occurred is that on 11/14/13 a nurse practitioner prescribed Tegretol 400mg BID. This medication order occurred in the absence of a comprehensive mental health progress note. A mental health staff attempted to complete a mental health evaluation on 11/21/13 that Mr. ████ refused. Starting on 12/26/13 and ending on 2/11/14, Mr. ████ received 33 cell front visits by members of the psychology staff that documented his extremely altered mental status. A psychiatrist did not evaluate him until 2/11/14. At that time, Mr. ████ was diagnosed with Psychosis, NOS. A PMRB meeting was held on 2/12/14 and recommended Mr. ████ for involuntary medication. The psychiatrist then prescribed Haldol decanoate 100mg Q4weeks. Starting on 2/12/14 and ending on 3/14/14, Mr. ████ received an additional 22 cell front visits by the psychology staff. The therapeutic efficacy of these multiple cell-front visits was not apparent from my review of the medical record. The psychiatrist saw him again on 3/26/14. At no time during this period did any member of the mental health staff consider referring Mr. ████ to an inpatient psychiatric facility. He suffered needlessly during this period. He should have been transferred to an appropriate psychiatric treatment facility instead of languishing in the SMU. Of note, Mr. ████ was left in a state of extremely debilitating psychosis from the time of my examination, 7/16/13, at least through 3/26/14. This represents exceedingly injurious psychiatric care.

6.     ████████████,     ████-I evaluated Mr. ████ and reviewed his medical record on 7/22/13. I noted that he carried the diagnosis of Mood Disorder, NOS. A 7/18/13 chart note indicated "IM reports he is out of psych meds and has been for four months." There was no apparent follow up to this note. I could not locate a MAR for July 2013 or any medication orders. Mr. ████ claimed that he has not seen a psychiatrist since his arrival at Lewis. This fact is confirmed in the medical record. A review of the recent set of medical records documents the chaotic nature of Mr. ████ psychiatric care. As noted above, I evaluated him

29

at Lewis on 7/22/13. Prior to his arrival at Lewis, he was housed at Tucson. While at Tucson, Mr. ████ was prescribed Risperdal 1mg QHS and Celexa 40mg QD. These medications were not continued when he was transferred to Lewis. Of note, these medications were not ordered to be discontinued; rather, their dispensing just fell through the cracks. Mr. ████ was sent back to Tucson where on 9/11/13 Dr. Harrison started him on Lithium 600mg QHS. There is no psychiatric progress note associated with this order. On 11/20/13 Mr. ████ submitted an HNR requesting to stop his Lithium. He was not seen for this request for over two weeks. On 12/5/13, Dr. Harrison evaluated Mr. ████ and discontinued his Lithium. There was no follow up to this 12/5/13 Tucson-based evaluation as Mr. ████ was transferred to Yuma. On 3/28/14, he submitted an HNR requesting "to see psych." A mental health associate saw him on 3/31/14 noting that Mr. ████ wanted to restart his medications. This case points out the difficulties patients experience when they are transferred between and among institutions. His medications did not follow him from Tucson to Lewis. Also, his psychiatric follow up did not occur when he was transferred from Tucson to Yuma.

7.  ████████, ████-I evaluated Mr. ████ and reviewed his medical record on 7/16/13. He is diagnosed with "Undifferentiated Schizophrenia" and was prescribed Haldol decanoate 50mg Q4weeks. Upon examination he was very sedated and unable to speak with me. Of note, he was housed in a lockdown unit at the Eyman complex.  It was my opinion that the harsh and isolated conditions of the lockdown unit were exacerbating Mr. ████ Schizophrenic condition. A review of the recent set of medical records reveals that Mr. ████ remains seriously mentally ill and that he is languishing in this lockdown setting. On 11/28/13 Mr. ████ was placed on 30-minute watch status due to his "giving away $40.00 worth of store, not eating, presents depressed. IM reported to be making statements that he wants to hang himself." He remained on this 30-minute watch until 12/10/13. At no time during this 13-day period did a psychiatrist evaluate him. There is no evidence from the medical record that the mental health staff even bothered to consult with a psychiatrist. Two separate medication orders for Haldol decanoate 50mg Q30days were written without an accompanying psychiatric progress note. One order was written on 12/4/13 and the other on 1/2/14. I cannot determine from the medical record if Mr. ████ was administered any Haldol secondary to these orders. A psychiatrist finally evaluated him on 1/28/14. This was a cell-front visit. The psychiatrist did not

make a diagnosis but only ordered Haldol decanoate 50mg Q4weeks. The next mental health contact was 3/9/14 when Mr. ████ refused his Haldol decanoate injection. The final psychiatric contact of the period occurred on 3/31/14 when Mr. ████ refused to speak with the psychiatrist at cell-front. Basically, Mr. ████ remained untreated from the time of my examination on 7/16/13 through 3/31/14. During this period he was noted to be suicidal, psychotic and suffering needlessly due to his conditions of confinement and the lack of proper psychiatric treatment.

8.      ████████, ████-I evaluated Mr. ████ and reviewed his medical record on 7/8/13.  At that time, he was experiencing problems with the timely delivery of his psychotropic medications. The MAR for May 2013 indicated that Mr. ████ was prescribed the antidepressants Prozac and Remeron. He was not aware that he was prescribed Remeron, as he had not been receiving this medication. Mr. ████ readily admitted to taking Prozac for over a year but he had not received this medication for over a week. Staff informed him "they ran out of it." A review of the recent set of medical records reveals that a significant portion of his medical records is dedicated to his multiple medical problems. Of note, from October 2013 through February 2014, Mr. ████ submitted eight HNR's outlining problems with his medications for his medical problems. A psychiatrist saw him on 11/19/13 and diagnosed him with "Depression/Anxiety." I must point out that there is no such diagnosis as "Depression/Anxiety" in the DSM. At that time the psychiatrist prescribed Prozac 40mg QAM and Remeron 15mg QHS. During the time period of October 2013 through February 2014, Mr. ████ was only seen four times by psychology associates and he attended two groups. A psychiatrist saw him again on 2/11/14 when Risperdal 1mg QHS was added to his medication regimen.

9.      ████████, ████-I previously evaluated Ms. ████ on 7/18/13 at  ASPC-Perryville. At that time I found her to be extremely psychotic. I noted her shouting incoherently at the walls of her cell. At the time of my evaluation, she was on a "constant watch" because she had been banging her head in her cell. A review of her medical record at that time revealed that her most current treatment plan was dated 9/19/11. I found a very brief psychiatric note written on 6/26/13, which corresponded to a medication order for Haldol decanoate 100mg Q4weeks. Ms. ████ had also been prescribed Celexa 20mg QHS, Cogentin 2mg BID and Tegretol 400mg QHS. She was very impaired and I felt strongly that she required

an inpatient level of care. The medical records provided for my review were from 10/19/13 through 4/1/14 so I am unable to evaluate her care in the period of time immediately following my evaluation. Of note is that Ms. ████ had a positive PPD and was placed in medical isolation for the months of September through December 2013. Throughout this period of isolation she was seen at cell-side and administered her monthly Haldol decanoate. The first mental health note is from 10/22/13 when she was seen by a LMSW. At that time her mental status exam was noted to be within normal limits. The same LMSW next saw her on 12/4/13 and recorded that Ms. ████ was anxious but otherwise stable. There is a reference to a 12/12/13 treatment plan but I could not locate it in the medical record. A psychiatrist saw her on 12/17/13 and renewed her previous medications. Her overall care consisted of a monthly check-in with the LMSW and her monthly Haldol decanoate injection. There is a "Mental Health Group Progress Note" dated 11/5/13. There were two separate group refusal forms dated 2/25/14 and 3/25/14. These three notes are the only references to Ms. ████ being assigned to a therapeutic group. Finally, I located a "Mental Health Treatment Plan-Outpatient" form in the medical record dated 2/28/14. This form stated her strengths/limitations were "unable to participate." It also listed her treatment goals as "attain/maintain stable mood" and "decrease/eliminate psychotic symptoms." Of note, a psychology associate prepared this treatment plan with no apparent input from psychiatry or nursing. I am unable to fully appreciate what Ms. ████ psychiatric condition actually is from my review of the medical records. What I was able to determine is that a psychiatrist only saw her every six months. She may have been assigned to a mental health group. Her only documented mental health contacts were with a LMSW on a monthly basis as well as seeing the psychiatric nurse on a monthly basis for her Haldol injection. A review of the MAR's demonstrated that she did have good medication compliance during this period. My overall opinion of this case is that the quality and appropriateness of her mental health care is seriously in doubt.

The mental health care received by these prisoners during this six-month period continues to fall below the standard of care.

I have also been provided a list of charts for patients who carry the SMI designation. For the first 60 charts, I selected every tenth one for a total of six charts. I then selected the last chart listed for an overall total of 7 charts.

1. ███████████, ████-Mr. ██████ is a 73-year-old male SMI patient who is housed at ASPC-Tucson, Rincon Unit. There are no mental health-related progress notes located in the medical record for the period of 9/27/13 through 3/31/14. What I did encounter in the medical record were a series of forms titled "Skin Integrity Assessment." This form is a weekly checklist of the following health-related parameters: General Physical Condition, Mental Status, Activity, Mobility, Incontinence, Nutrition and Existing (skin) Breakdown. These checklists were completed weekly on Mr. ██████ for the period of 9/27/13 through 3/31/14. Overall, Mr. ██████ general physical condition was listed as "fair-poor" and his mental status was listed as "confused." Of note, the "Admitting Diagnosis" listed on these forms was "Schizophrenia-Dementia." The only psychotropic medication that he received during this period was Buspar 30mg BID. He received this medication during the month of September 2013 and then it was not continued for the remainder of the period in question. There was no psychiatric progress note explaining anything about this medication. Mr. ██████ did not receive any documented mental health contacts during the period of 9/27/13 through 3/31/14. This is tremendously poor care of an apparently very ill elderly patient.

2. ███████████, ████-Mr. ██████ is a 29-year-old male SMI patient who is housed at ASPC-Tucson, Santa Rita Unit. A "Transfer Summary/Continuity of Care" form dated 9/24/13 listed his diagnoses as "Depression Disorder NOS, Anxiety Disorder NOS, hx Schiz, suicide attempt age 14 plus 2 other attempts." This transfer summary also listed Mr. ██████ medications as Zoloft 100mg QHS and Hydroxyzine 25mg QHS. The next document I encountered in the medical record was an Initial Mental Health Assessment. This initial mental health assessment was conducted at ASPC-Phoenix by a psychiatric technician and signed off by a psychologist. It listed the disposition as "No Mental Health services needed at this time." However, a medication order signed by Dr. Ramirez for Zoloft 100mg QHS and Hydroxyzine 25mg QHS was dated the same day, 9/25/13. Written below this order in bold

letters was the phrase "Bridge Orders." It is abundantly clear from the medical record that there was no coordination among the members of the mental health treatment team.  Mr. ███████ is then transferred to ASPC-Tucson where he is seen by a psychologist on 10/2/13. A psychiatrist finally evaluates him on 10/15/13. The psychiatrist wishes to change Mr. ███████ antidepressant medication from Zoloft to Paxil and notes "I/M seeks better relief of his anxiety with change to Paxil." The medication order reads, "Cont. Zoloft 100mg PO QHS until Paxil arrives, then stop Zoloft 100mg; start Paxil 40mg PO QHS." The MAR from October 2013 indicates that Paxil was eventually started on 10/18/13. Of note, the next psychiatric contact doesn't occur until 4/8/14, which is far too long for a patient starting a new medication.

3.    ███████████, █████-Mr. ██████ is a 42-year-old male SMI patient who is housed at ASPC-Yuma. His medical records are very disorganized and difficult to follow. A psychiatrist saw him on 9/18/13 and noted that he had a dysphoric mood and pressured speech and thought process. Mr. ██████ was prescribed Lithium 1200mg QHS for 90 days at that time. On 10/18/13, Mr. ██████ submitted an HNR stating "I need to see the physc Docter (sic) ASAP… I'm starting to lose it. Thank you. And I need to know how to get to the mental hospital." He was not seen for five days. On 10/23/13 Dr. Martinez noted "no new issues other than his insistence on being sent to a MH facility." Mr. ██████ submitted another HNR on 11/21/13 basically stating the same thing -- that he needed to see a psychiatrist ASAP because he was trying to stay out of trouble and that he was losing it. He was seen by a mental health associate on 11/26/13 who attempted to address some medication issues.  Of note, a mental health associate doesn't have the clinical expertise to deal with medication issues. Mr. ██████ submitted yet another HNR on 12/2/13 reiterating his problems with his medication and stating "my nortriptilin (sic) does not work…It make me violent." He was seen on 12/3/13 by a psychiatrist who diagnosed him with Bipolar Disorder and continued his Lithium at 1200mg QHS. A Lithium level obtained at that time was within normal limits. Mr. ██████ submitted two more HNR's, both on 1/6/14, again complaining about his medications. A psychiatrist saw him on 1/10/14 noting that Mr. ██████ ran out of Lithium 6 days ago. A review of the January MAR documents that he went without Lithium from 12/31/13 through 1/13/14. Finally, the last mental health progress note was dated 1/29/14. I did not find any other mental health contacts through 3/31/14. This case is a good illustration of the difficulties that patients in the ADC experience with their

medications, leading to needless suffering and risking aggravation of their mental illness.

4.　　　████, ████-Mr. ████ is a 33-year-old male SMI patient who in May 2013 was noted to have the diagnoses of Bipolar/Depression/Anxiety and was being treated with Lithium 300mg QHS. His medical records are extremely disorganized so it was difficult to determine exactly where he has been housed. It appears that as of 9/6/13 he was housed at ASPC-Tucson.  On that date, Mr. ████ was evaluated by Dr. Winsky who discontinued the Lithium and started Mr. ████ on Risperdal 1mg QHS for 180 days. Of note, a six-month follow up is too long when starting a patient on a new medication. On 9/12/13 he was referred to the MTU at ASPC-Phoenix. The reason for the referral was stated as "Inmate expressed a desire to break his patterns and know more about his mental health condition." As laudable as these goals are, I do not understand why this relatively stable patient was referred to the MTU knowing that there are hundreds of more seriously mentally ill individuals who drastically require treatment in a specialized mental health unit.  Between 9/25/13 and 11/8/13 Mr. ████ refused his Risperdal 1mg QHS ten times without there being any documented intervention by the staff. In fact he was seen by a psychologist on 10/7/13 and was described as being "pretty stable." Also, there was no mention of Mr. ████ poor medication compliance. Equally mysterious is a psychiatrist note dated 10/25/13 in which no mention is made of Mr. ████ poor medication compliance. The next psychiatrist note is from 12/16/13 which lists Mr. ████ diagnosis as Mood Disorder, NOS. At that time the psychiatrist, Dr. Akhtar, discontinued the Risperdal 1mg QHS. From the medical records, it appears that Dr. Akhtar is a psychiatrist at ASPC-Phoenix. I could not locate a comprehensive psychiatric intake assessment on Mr. ████ I did locate a very cursory note written by a psychology associate dated 12/17/13. I was able to locate three additional psychology associate notes dated 1/15/14, 2/18/14 and 3/18/14. Mr. ████ attended nine groups from 2/19/14 through 4/1/14. There were no psychiatric contacts documented in the medical record during this same period. This case points out three issues: 1) It is not clear why Mr. ████ was referred to ASPC-Phoenix given his relatively stable condition, 2) his poor medication compliance was not noted by any mental health staff, and 3) Between 12/16/13 through 4/1/14 he was only seen by a psychiatrist once and psychology associates three times; he never received a comprehensive psychiatric assessment.

5.  ███████████, ████-Mr. ██████ is a 57-year-old male SMI patient who also suffers from multiple medical problems. He was housed at ASPC-Tucson. His Initial Mental Health Assessment from June 2013 listed his diagnoses as Substance-Induced Psychotic Disorder versus Psychosis NOS.  On July 23, 2013 Mr. ██████ was evaluated by Dr. Winsky who prescribed Paxil 10mg QAM, Risperdal 3mg BID and Cogentin 0.5 mg BID.  All of these medications were ordered for 180 days. During the period of 9/27/13 through 3/31/14, Mr. ██████ was only seen by a psychologist on 10/4/13 and 12/19/13. He was only seen by Dr. Winsky once during this period. There is no evidence in the medical record that Mr. ██████ attended any groups. So for this six-month period, Mr. ██████ who is designated as an SMI patient, only had three contacts with anyone from the mental health staff.

6.  ███████████████, ████-Mr. ███████ is a 43-year-old male SMI patient who during the period of 9/27/13 through 3/31/14 was housed at ASPC-Phoenix. He was officially designated SMI on 9/19/13. His first documented visit with a psychiatrist occurred on 11/13/13.  At that time, Mr. █████████ Lithium was discontinued and he began treatment with the antidepressants Remeron, Celexa and Trazodone, the antipsychotic Trilafon and the antianxiety medication Buspar. Mr. █████████ submitted an HNR on 12/14/13 complaining of worsening nightmares. He was promptly seen by Dr. Akhtar on 12/16/14 who modified his medication regimen. He was seen by a nurse practitioner on 1/10/14 who discontinued his Remeron and Celexa and began Paxil. During the time frame of 9/27/13 through 3/31/14, Mr. ████████ had seven contacts with Psychology Associates and attended four groups. Finally, he was seen by a different nurse practitioner on 2/7/14.  This case further illustrates just how little treatment patient receive at ASPC-Phoenix, which ADC describes as its specialized mental health facility.  For this six-month period, Mr. █████████ had a total of 14 contacts with mental health staff. This works out to be approximately one mental health contact every two weeks. This represents a woefully inadequate level of treatment for a mental health facility.

7.  ███████████, ████-Mr. ███████ is a 57-year-old male SMI patient with a long history of psychosis and dementia. He had previously been treated with large doses (1500mg QHS) of the antipsychotic medication, Thorazine. Mr. ████████ SMI status was renewed on 8/27/13.  During the period of 9/27/13

through 3/31/14 he has been housed at ASPC-Tucson. Mr. ████████ received very cursory monthly visits from a psychologist for the months of October, November and December 2013. These brief monthly visits continued into 2014. These visits in 2014 were conducted by a psychology associate and documented that Mr. ████████ was not fully oriented and was disheveled and confused. He was placed on 10-minute watch status on 3/25/14 for making threatening statements. This was changed to 30-minute watch status on 3/26/14. On 3/27/14, a psychologist visited Mr. ████████ and noted that he was "rambling at times, disjointed presentation with flight of ideas." The note also included the statement "need chart." This clearly demonstrates that the psychologist saw Mr. ████████ without the benefit of the chart. Needless to say this is extremely poor practice especially given the patient's recent threatening statements. Mr. ████████ received a cell-front contact on 3/28/14 which documented his mental status as "confused, distractible, poor concentration, apathetic mood, detached affect and tangential thought structure." Remarkably, his watch status was discontinued on 3/31/14. At no time during this six-month period did a psychiatrist evaluate him. Of special concern is during this six-month period, no effort was made to treat his underlying psychiatric conditions. This is highly inadequate care.

The mental health care received by these prisoners during this six-month period falls below the standard of care.

**Inadequate mental health care of named plaintiffs**

I have been provided updated charts for the named plaintiffs in this case:

1. ████████████, ██████-As previously reported, I evaluated him on 7/16/13 and  7/19/13. I first saw him on the SMU where he was very agitated and questionably psychotic. I next saw him on the Flamenco Unit where his clinical condition remained unchanged and I encountered serious problems with his medical record. At that time, it was unclear whether he was assigned a psychiatric diagnosis and whether he was receiving any psychotropic medication. A review of his recent set of medical records reveals that mental health staff did not see him during the period 9/27/13 through his release on 12/11/13. Per his medical records, his most recent psychiatric visit occurred on 7/25/13. At that time, Dr. Cleary

diagnosed him as suffering from Mood Disorder, NOS and Antisocial Personality Disorder. Mr. ███████ prescribed medications were Neurontin 600mg BID, Inderal 10mg BID and Wellbutrin 100mg BID. I am unable to determine from the medical record if he in fact received these medications. His last contact with a psychologist occurred on 7/31/13. Of note, a nursing entry in the medical record on the evening of 7/31/13 reported that the "inmate began screaming, yelling and threatening at 1800 re: follow through of wasting syndrome diet." The nurse went on to state that Dr. Cleary would be contacted to obtain an order for a tranquilizer. There is no indication from the medical records if Dr. Cleary was contacted or if a tranquilizer was prescribed. There is also no apparent follow up to Mr. ███████ "screaming, yelling and threatening" outburst.


2.   ███████████, ██████ -As previously reported, Mr. ███████ suffers from both mental and medical illnesses. He was diagnosed with Psychotic Disorder, NOS and was prescribed Risperdal, Cogentin and Sertraline. He experienced heat-induced medication-related problems and requested that medications be discontinued. In fact his Risperdal and Cogentin were stopped on 6/27/13. No mental health follow up occurred to evaluate how he was doing without these medications. A review of the recent set of medical records reveals that Mr. ███████ submitted an HNR on 1/2/14 stating "I am experiencing severe anxiety attacks, irritation and depression." In response to this HNR he was seen by a psychology associate on 1/6/14 and 1/13/14. Mr. ███████ then submitted a very elaborate HNR on 1/29/14 explaining in great detail his mental health problems and his need for treatment. Staff apparently ignored this HNR and Mr. ███████ submitted a new HNR on 2/9/14 simply stating "Severe Depression-would like to enroll in a treatment plan." He was seen by a psychology associate on 2/10/14 who stated "I/M will be seen 1:1 approximately every two weeks with focus on anger management and depression." Mr. ███████ was next seen by a psychologist on 2/18/14 who diagnosed him with Psychotic Disorder, NOS and referred him to a psychiatrist. He was seen the next day, diagnosed with Depressive Disorder, NOS and started on Effexor 37.5mg QHS.  Of note, it took over six weeks for Mr. ███████ to be seen by a psychiatrist after he submitted his initial HNR. In addition, a review of his medical records reveals that Mr. ███████ was prescribed Remeron 15mg QHS from 10/19/13 through 3/7/14 and Zoloft 200mg QAM from 6/27/13 through 12/24/13. I did not find any mention of these medications in any of the mental health progress notes during this period. This represents extremely poor care and lack of coordination among the members of his treatment team.

3.  , ▆▆▆▆ -As previously reported, Mr. ▆▆▆▆ is an SMI prisoner who is diagnosed with "bipolar and PTSD." At the time of my last evaluation, I noted that Mr. ▆▆▆▆ experienced extended periods where he was not administered his prescribed psychotropic medications. A review of the recent set of medical records reveals that his lithium expired on 11/6/13. He was next seen by a psychology associate on 2/4/14 at which time Mr. ▆▆▆▆ was asking to be started on Wellbutrin. He was seen by a psychiatrist on 2/11/14 when he was diagnosed with Depressive Disorder and started on Remeron 15mg QHS. This dose was increased to 30mg on 2/20/14. A chart entry on 2/21/14 indicates that Mr. ▆▆▆▆ is refusing his Remeron because "he doesn't like the way it makes him feel." A psychologist saw him on 2/26/14 and described Mr. ▆▆▆▆ as being "depressed, anxious and mildly histrionic." Of concern is that the psychologist is apparently unaware that Mr. ▆▆▆▆ has been refusing his medication for the previous five days. He submitted an HNR on 3/1/14 once again requesting to be started on Wellbutrin. The response to this HNR is that the patient will be seen "on psych line on 3/19/14." Mr. ▆▆▆▆ is seen by a psychologist on 3/5/14. The psychologist is once again oblivious to the problems that Mr. ▆▆▆▆ is having with his medication. She also noted that "IM reports increased irritability, sleeping and vegetative symptoms." She then inexplicably states, "IM appears stable." Mr. ▆▆▆▆ then submits two HNR's on 3/13/14 and two HNR's on 3/17/14, all of which involve requests to be started on Wellbutrin. Of note, the response to all of these HNR's is to repeat that Mr. ▆▆▆▆ will be seen on 3/19/14. He is finally seen on 3/19/14 and prescribed Wellbutrin-SR 100mg BID. For reasons that are not readily apparent from the chart, the medication is not begun until 3/25/14. This case demonstrates a complete lack of coordination among the mental health treatment team. Also, it took over six weeks for Mr. ▆▆▆▆ to be finally prescribed the antidepressant Wellbutrin.

4.  ▆▆▆▆▆▆▆, ▆▆▆▆ -As previously reported Ms. ▆▆▆▆ has a long history of psychotic and mood symptoms for which she has been prescribed a variety of psychotropic medications. At the time of my previous evaluation, 7/18/13, she was diagnosed with Schizophrenia, paranoid type and was being prescribed five different psychotropic medications including two antipsychotics. At that time, I found her lying on her cell floor, extremely sedated and displaying prominent medication-induced side effects. A review of the recent set of medical

records reveals that she remains on a tremendous amount of antipsychotic medication. A 2/26/14 psychiatrist note documented her medications as Haldol decanoate 200mg q4weeks, Prozac 40mg BID, Prolixin 5mg BID, Geodon 80mg BID, Cogentin 3mg BID and Buspar 15mg BID. I cannot adequately express what an absurd amount of medication this represents. For example, the recommended dose of Haldol decanoate for the treatment of schizophrenia is 50mg q 4weeks. Ms. ███████ is prescribed four times that amount.  Prolixin and Geodon are both antipsychotics. This is even more medication than when I evaluated her last year. At that time she was displaying prominent medication-induced side effects. An Abnormal Involuntary Movement Scale (AIMS) was administered on 2/26/14. It purportedly documented that the patient was not displaying any involuntary movements. I seriously challenge the results of this finding. In addition, it is my firm opinion that this patient remains at serious risk for medication and heat-related problems.

5.     ████████████,    ██████-As previously reported Mr. ██████ has a long history of treatment for Bipolar Disorder with Lithium, Tegretol and Celexa. At the time of my evaluation, 7/16/13, he was not receiving any medication and was extremely agitated, having recently destroyed the sprinkler heads in two cells. He was housed in a lockdown cell, reinforced with Plexiglas at the Eyman Unit. Of note, he had not been evaluated by a psychiatrist by the time of my inspection of the unit.   A review of the recent set of medical records reveals that the first psychiatric evaluation documented in the medical record occurred on 1/24/14. At that time he was prescribed Lithium 900mg QHS and Paxil 40mg QHS. Mr. ██████ had a follow up psychiatric evaluation on 2/15/14 at which time he was diagnosed with Bipolar Disorder, NOS and his Paxil and Lithium were continued at their previous doses. His clinical condition was described as "less symptomatic." This is the extent of the medical records that were made available for my review. I find it amazing and very disturbing that a patient as ill as Mr. ██████ was not seen by a psychiatrist for over six months after my evaluation of 7/16/13.

6.     ██████████████,   ██████-As previously reported, Ms. ████████ is a chronically mentally ill woman who I evaluated on 7/18/13. I noted her to be extremely psychotic despite being prescribed Haldol decanoate, Depakote, Prozac and Cogentin. She had also suffered at least two serious bouts of dehydration requiring IV therapy and she was pepper sprayed twice for allegedly not following

the orders of the guards. A review of the recent set of medical records reveals that she continues to have problems at Perryville and was placed on suicide watch on several occasions. It is apparent from the medical record that her psychotic behavior was misinterpreted as being volitional.  Although she continued to receive the above-listed psychotropic medications, her diagnosis was felt to be that of a personality disorder. Due to the persistent difficulties she was experiencing at Perryville, she was eventually transferred to Arizona State Prison Complex Phoenix. She was admitted to the mental health program at ASPC Phoenix on 1/15/14. She was diagnosed with a Mood Disorder, Psychotic Disorder, NOS and Borderline Personality Disorder.  The medical records from ASPC Phoenix are extremely disorganized so I could only find two brief notes that indicated she was seen by a psychiatrist. One note was titled "Psychiatric Admission Note." This note was incomplete and unsigned.  The other note indicated she was seen for approximately 15 minutes. This "psychiatric follow up note" was not signed and did not list diagnoses but only her medications, which were Haldol decanoate 100mg Q2weeks, Prozac 40mg QAM, Depakote 750mg QHS and Cogentin 2mg BID. It is not clear from the medical records if Ms. ████████ was ever evaluated by a psychiatrist while she was at ASPC Phoenix. In fact, even the admitting medical orders were received via FAX. All the rest of her clinical contacts were with psychologists or psychological associates. It appears from the medical records that she was discharged from ASPC Phoenix around 2/11/14. In summary, this is a very ill woman who required inpatient psychiatric care when I evaluated her on 7/18/13. She suffered needlessly at the Perryville prison until she was transferred to the "George Unit" at ASPC Phoenix on 1/15/14. It is unclear from the medical records if she was ever seen by a psychiatrist while there. Finally, it is unclear from the medical record when she actually returned to Perryville. Her medications were renewed by a nurse practitioner at ASPC Phoenix on 1/16/14 and the Depakote dose was modified on 2/6/14. These are the most recent medication orders that I was able to find in her medical record. The overall handling of her case represents very poor care of a seriously mentally ill woman.


7.      ████████████, █████ -As previously reported I evaluated Mr. ████████ on 7/16/13. At that time I found him to be experiencing auditory hallucinations despite his being treated with Haldol decanoate. He also was suffering the medication-induced side effects of sedation and involuntary movements. A review of the recent set of medical records reveals that Mr. ████████ continued to suffer medication-induced side effects until he began to refuse his Haldol decanoate in

late September 2013. His medications were subsequently changed on 10/1/13. Even after this medication adjustment he continued to experience side effects. On 11/8/13 he was described as "anxious/hyperactive-constant movement." He continued to refuse medications and was not seen by a psychiatrist until 1/14/14 for an adjustment of his medications. Once again this medication adjustment did not resolve his difficulties and he again began to refuse medications. Mr. ██████ was seen by a psychiatrist on 3/14/14 when his medications were adjusted again. This case demonstrates inappropriately long waits to be seen by a psychiatrist as well as overall very poor medication management. This is especially problematic given that Mr. ██████ was suffering from medication-induced side effects.

8.    ██████████, ████-As previously reported I evaluated Mr. ████ on 7/22/13. At that time I noted that his last visit with a psychiatrist occurred on 1/21/13. During this six-month period, he spent a considerable amount of time on watch status for danger to self. At no time during this period was he seen by a psychiatrist. He also experienced problems with medication administration as he was told, "they were out of Risperdal." A review of the recent set of medical records reveals that the most recent Medication Administration Record (MAR) is for January 2014. This MAR documented that Mr. ████ was prescribed Tegretol 600mg QHS, Risperdal 1mg QHS, Cogentin 0.5mg QHS, Prozac 60mg QAM. There were actually two separate MAR's that listed Risperdal 1mg QHS. One listed the Risperdal as KOP and the other documented that he was administered Risperdal 1mg QHS every day of the month. During the period of 9/27/13-3/31/14 I located a psychology associate note dated 12/10/13. I also located two psychology notes dated 1/13/14 & 1/23/14. I also located a note, which documented that Mr. ████ refused to attend a Telepsychiatry visit in 2014 but the exact date is unreadable. This lack of documented psychiatric involvement is especially worrisome given the confusion over his Risperdal dosing and the fact that two of the medication orders were not accompanied by a progress note by a psychiatrist (i.e. Risperdal 1mg QHS dated 12/12/13 & Tegretol 600mg QHS dated 12/24/13.) Finally, I located an order discontinuing his Tegretol on 4/1/14.

9.    ██████████████, ████-As previously reported I evaluated Ms. ████████ on 7/18/13. She suffers from a variety of medical and psychiatric conditions. I especially noted that she experienced many problems in receiving her medications on a consistent basis. A review of the recent set of medical records

reveals that her problems with medications continued. She submitted an HNR on 10/1/13 stating she was experiencing side effects from Lamictal 200mg QD. She refused her Lamictal on 10/4/13. She was seen by a nurse practitioner on 10/8/13 who decreased her dose of Lamictal to 25mg QD. The next chart entry is 1/2/14 when Ms. ██████ again began refusing her Lamictal. This refusal continued through 1/6/14. She was seen by a nurse practitioner on 1/9/14 who finally discontinued her Lamictal. It is unclear from the medical record why it took over three months to address her very straightforward issues with her medications. At no time during this period was she evaluated by a psychiatrist.

The mental health care received by the named plaintiffs over this six-month period continues to fall below the standard of care.

**Inadequate monitoring and oversight**

In my initial report I wrote that "ADC's monitoring is deficient in significant respects." 11/8/13 Report at 72. Continuing deficiencies in monitoring and oversight are exemplified by the revised MGAR reports for March 2014. In many cases, the comments by the monitor have nothing at all to do with the item ostensibly being monitored. For example, for the Safford MGAR under "Mental Health," one performance measure reads "Are inmates currently on watch being seen daily by QMHP (including RNs on weekends and holidays)?" The monitor has written "N/A There are no SMI inmates on this complex" – a complete non-sequitur. ADC 422530. For the performance measure "Are reentry/discharge plans established no later than 30 days prior release [sic] for all inmates with a MH score of MH-3 and above?" the monitor writes "If an inmate is placed on a

Mental Health Watch they are transferred to a corridor facility ASAP."  ADC 422530.  Similarly nonsensical entries appear in the revised March 2014 MGAR reports for Douglas (ADC 422303).  The fact that such obvious errors occurred, and still had not been corrected by the time I received these documents nearly five months later, casts serious doubt on the integrity and reliability of the MGAR reports.

Similarly, the "Corrective Action Plans" appended to the MGARs are sometimes meaningless.  In the revised Tucson MGAR for March 2014, the "Corrective Action Plans" for two mental health performance measures consist of a verbatim restatement of the monitor's findings of noncompliance.  Compare ADC 422578 with ADC 422571-72 and 422573-75.  Needless to say, simply restating the fact of noncompliance is not a "corrective action plan."

Nicole Taylor, ADC Mental Health Monitor, testified in her August 1, 2014 deposition that several of the requirements set forth in the ADC Mental Health Technical Manual (MHTM) are simply not monitored.  8/1/14 Taylor deposition, pp. 71-72 (requirement that mental health staff visit SMI prisoner placed in maximum custody with 24 hours of notification); pp. 72-73 (requirement that mental health staff or medical staff with mental health training visit prisoners in maximum custody three times a week); p. 106 (requirement that mental health clinician meet with minor prisoner within two business days of the minor's arrival); pp. 128-32 (requirement that patients discharged from Men's Treatment Unit (MTU) or Women's Treatment Unit (WTU) are seen by a mental health

44

clinician within seven days).  With respect to other requirements, she testified she is unsure whether or how they are monitored.  8/1/14 Taylor deposition, pp. 32-33 (requirement that prisoner's medical record be reviewed within 12 hours of arrival at a new prison complex); pp. 135-36 (requirement that patients in MTU and WTU receive weekly structured activities); pp. 138-141 (requirement that arriving prisoner receive mental health assessment within two days).

## Conclusion

For all of these reasons, I stand by the opinions stated in my earlier reports. Based on my review of documents covering the period from September 27, 2013 through April 1, 2014, it remains my opinion that ADC's delivery of mental health services and its conditions of confinement for prisoners with mental illness fall below the standard of care and create a substantial risk of serious harm or death.

Dated this 29th day of August, 2014 at Coeur d'Alene Idaho.

PABLO STEWART, M.D.

# APPENDIX A

**Documents sent from plaintiffs' counsel to plaintiffs' witness Dr. Pablo Stewart since Feb. 24, 2014**

**MGAR Reports**
- ADC210260 – 210719 – Compliance Reports, October 2013
- ADC210720 – 211120 – Compliance Reports, November 2013
- ADC211121 – 211586 – Compliance Reports, December 2013
- ADC268344 – 268820 – Compliance Reports, January 2014
- ADC268821 – 269103 – Compliance Reports, February 2014
- ADC269104 – 269433 – Compliance Reports, March 2014

**Revised March 2014 MGAR Reports**
- ADC422286-422305 - 2014-03 Douglas (generated 8-8-14)
- ADC422308-422338 - 2014-03 Eyman (generated 8-8-14)
- ADC422339-422373 - 2014-03 Florence (generated 8-8-14)
- ADC422374-422428 - 2014-03 Lewis (generated 8-8-14)
- ADC422429-422470 - 2014-03 Perryville (generated 8-8-14)
- ADC422471-422516 - 2014-03 Phoenix (generated 8-8-14)
- ADC422517-422531 - 2014-03 Safford (generated 8-8-14)
- ADC422532-422582 - 2014-03 Tucson (generated 8-8-14)
- ADC422583-422600 - 2014-03 Winslow (generated 8-8-14)
- ADC422601-422642 - 2014-03 Yuma (generated 8-8-14)

**Death Records**

- ADC257108-ADC257114 -  ████████ - Psych Autopsy – Updated
- ADC257115-ADC257121 -  ████████ - Psych Autopsy
- ADC257122-ADC257123 -  ████████ - Psych Autopsy – Updated
- ADC257124-ADC257129 -  ████████ - Psych Autopsy
- ADC257130-ADC257134 -  ████████ - Psych Autopsy
- ADC257135-ADC257138 -  ████████ - Psych Autopsy
- ADC261275-ADC261281 -  ████████ - Psych Autopsy
- ADC261282-ADC261287 -  ████████ - Psych Autopsy
- ADC335130-335138 – Psych Autopsy - ████████
- ADC335139-335146 - Psych Autopsy - ████████
- ADC337515-337793 – Medical Records - ████████
- ADC338492-338584 - Medical Records - ████████
- ADC348660-348782 - MedRecs - ████████ - 2012-12-27 to 2013-12-27 - need COR
- ADC360321-360535 MedRecs - ████████ - 20121127 to 20131127
- ADC361548-361555 PsychAtpsy - ████████1
- ADC364157-364160 - ████████ - Mortality 2nd Review
- ADC364185-364188 - ████████ - Mortality 2nd Review
- ADC364245-364248 - ████████ - Mortality 2nd Review
- ADC364788-364791 - ████████ - Mortality 2nd Review

**Expert Reports**
- Pablo Stewart Expert Report dated November 8, 2013, with exhibits
- Pablo Stewart Supplemental Report dated December 9, 2013, with exhibits
- Pablo Stewart Rebuttal Report dated January 31, 2014, with exhibits

- Pablo Stewart Second Supplemental Report dated February 24, 2014, with exhibits

**Master Files**
- ADC332018-332032 MRF - ███████████████ - 2013-10-08 - 2014-04-01
- ADC332033-332040 MRF - ████████████████████ ████ - 2013-09-11 to 2014-04-01

**Medical Records**
- ADC269440-269644 - ████████████████████ – 2011-01-01 to 2013-12-18
- ADC270029-270207 - ████████████████████ – 2011-01-01 to 2013-08-26
- ADC282869-282949 - ████████████████ – 2013-11-25 to 2014-04-01
- ADC282950-282964 - █████████████ – 2013-07-23-2013-10-18
- ADC283022-283041 - ████████████████ – 2013-07-18 to 2013-09-10
- ADC284544-284704 - ███████████████ – 2014-09-03 to 2014-04-01
- ADC285261-285336 - █████████████████ – 2013-07-16 to 2013-09-25
- ADC285925-286053 - █████████████████ – 2013-07-22 to 2014-04-01
- ADC286054-286094 - ████████████████ – 2013-07-15 to 2013-12-11
- ADC286667-286711 - ████████████████████ – 2013-10-08 to 2014-04-01
- ADC287814-287918 - █████████████████ – 2013-11-25 to 2014-04-01
- ADC288111-288206 - █████████████████ – 2013-10-09 to 2014-04-01
- ADC288207-288268 - ██████████████████ – 2013-10-10 to 2014-04-01
- ADC288276-288349 - ███████████████ – 2013-07-19 to 2014-04-01
- ADC288350-288406 - █████████████████ – 2013-08-19 to 2014-04-01
- ADC288457-288488 - ████████████████ – 2013-07-19 to 2013-08-04
- ADC288772-288869 - ███████████████ – 2013-08-26 to 2014-04-01
- ADC288870-288913 - ██████████████████ – 2013-10-24 to 2014-04-01
- ADC288914-289055 - █████████████████ – 2013-10-10 to 2014-04-01
- ADC289549-289655 - ██████████████ – 2013-10-11 to 2014-04-01
- ADC289656-289737 - ███████████████ – 2013-08-19 to 2014-04-01
- ADC289738-289834 - █████████████████ – 2013-10-09 to 2014-04-01
- ADC290663-290717 - ██████████████████ – 2013-10-11 to 2014-04-01
- ADC290903-291036 - ███████████████ – 2013-07-18 to 2014-04-01
- ADC291657-291810 - ██████████████ – 2013-09-06 to 2014-04-01
- ADC291811-291843 - ████████████████████ – 2013-08-19 to 2014-04-01
- ADC292630-292678 - ████████████████████ – 2013-10-19 to 2014-04-01
- ADC292789-292893 - █████████████ - 20130819 to 20140401
- ADC293764-293794 - ██████████████ - 20131218 to 20140401
- ADC293795-293824 - ████████████ - 20130819 to 20131007
- ADC293861-293935 - █████████████████ - 20130819 to 20140401
- ADC294739-294806 - ███████████ 2013-09-13 to 2014-04-01
- ADC295289-295368 - ████████████████████████ - 2013-08-19 to 2014-04-01
- ADC295551-295564 - ███████████ - 2013-10-25 to 2014-04
- ADC296451-296499 - ██████████████ - 20130826 to 20140401
- ADC300255-300556 - ██████████████ - 2013-08-19 to 2014-04-01 - needs COR
- ADC302957-303023 - ████████████ - 2013-08-26 to 2014-04-01
- ADC303263-303351 - ███████████ - 2013-08-19 to 2014-04-01
- ADC303620-303812 - ███████████ - 2013-10-10 to 2014-04-01
- ADC308675-309119 - ██████████ - 2013-08-19 to 2014-04-01



- ADC309231-309283 - ■■■■■ - 2013-08-19 to 2014-04-01
- ADC309746-309795 - ■■■■■ 2013-09-13 to 2014-04-01
- ADC310695-310961 - ■■■■■ – 2013-08-09 to 2014-04-01
- ADC314498-314570 - ■■■■■ – 2013-10-08 to 2014-04-01
- ADC315039-315079 - ■■■■■ – 2013-10-10 to 2014-04-01
- ADC315692-315767 - ■■■■■ – 2013-08-19 to 2014-04-01
- ADC319007-319118 - ■■■■■ – 2013-08-26 to 2014-04-01
- ADC322537-322605 - ■■■■■ – 2013-07-15 to 2014-04-01
- ADC323070-323132 - ■■■■■ – 2013-07-22 to 2014-04-01
- ADC328895-329011 - ■■■■■ – 2013-08-19 to 2014-04-01
- ADC331528-331582 - ■■■■■ – 2013-80-19 to 2014-04-01
- ADC334267-334294 - MedRec - ■■■■■ - 20131011 to 20140305
- ADC346866-346964 - MedRecs - ■■■■■ - 20130718 to 20130805
- ADC344357-344385 - MedRecs - ■■■■■ - 20130708 to 20130925
- ADC361926-361988 MedRecs - ■■■■■ - 20131007 to 20140401
- ADC362482-362570 MedRecs - ■■■■■ - 2013 to 20140401
- ADC363369-363404 MedRecs - ■■■■■ - 20131009 to 20140401

## Mentally Ill Inmates Presentation
- ADC363856-363882 ADC Mentally Ill Offenders Presentation to ASCA 20140613

## Named Plaintiff AIMS Reports
- ADC363894-363919 Gamez, Robert 131401 - AIMS Report as of 2014-07-09
- ADC363972-363991 Polson, Joshua 187716 - AIMS Report as of 2014-07-09
- ADC363992-364025 Rodriguez, Sonia 103830 - AIMS Report as of 2014-07-09
- ADC364026-364049 Smith, Jeremy 129438 - AIMS Report as of 2014-07-09
- ADC364050-364071 Swartz, Stephen 102486 - AIMS Report as of 2014-07-09
- ADC364072-364090 Thomas, Jackie 211267 - AIMS Report as of 2014-07-09
- ADC364091-364112 Verduzco, Christina 205576 - AIMS Report as of 2014-07-09

## Named Plaintiff DI83 Records
- ADC364122 Gamez, Robert 131401 - DI83 IM Program Record as 2014-07-09
- ADC364126 Polson, Joshua 187716 - DI83 IM Program Record as of 2014-07-09
- ADC364127 Rodriguez, Sonia 103830 - DI83 IM Program Record as of 2014-07-09
- ADC364128 Smith, Jeremy 129438 - DI83 IM Program Record as of 2014-07-09
- ADC364129 Swartz, Stephen 102486 - DI83 IM Program Record as of 2014-07-09
- ADC364130 Thomas, Jackie 211267 - DI83 IM Program Record as of 2014-07-09
- ADC364131 Verduzco, Christina 205576 - DI83 IM Program Record as of 2014-07-09

## Named Plaintiff Medical Records
- ADC229674-229707 - Med Recs - Chisholm - 2013-02-13 to 3-17, 2013-07-16 to 2014-01-24
- ADC229708-229745 - Med Recs - Chisholm - 2013-02-13 to 3-17, 2013-07-16 to 2014-01-24
- ADC229746-229774 - Med Recs - Thomas, Jackie 211287 - 2013-07-16 to 2014-01-24_Part1
- ADC229775-229801 - Med Recs - Thomas, Jackie 211287 - 2013-07-16 to 2014-01-24_Part2
- ADC232054-232136 - Med Recs - Swartz, Stephen 102486 - 2013-08-27 to 2014-01-24
- ADC256786-ADC256879 - Med Recs - Verduzco, Christina 205576 - 2012-03-09 to 2012-06-10

- ADC256880-ADC257098 - Med Recs - Verduzco, Christina 205576 - 2013-07-16 to 2014-02-21
- ADC262605-262607 Brislan - ORC as of 2014-04-09
- ADC262642 Gamez - Dental (none) 2013-10-25 to 2014-04-01
- ADC262643-262713 Gamez - Med & MH Recs (No Dental) 2014-01-24 to 2014-04-01
- ADC262714-262785 Gamez - Med & MH Recs (No Dental)
- ADC262786-262789 Gamez - Med Recs Rx Through 2014-04-09
- ADC262790-262796 Gamez - ORC as of 2014-04-09
- ADC263044-263046 Polson - Med Recs Rx Through 2014-04-09
- ADC263047 Polson - ORC as of 2014-04-09
- ADC263048-263050 Rodriguez - 2014-01-24 to 2014-04-01 – Dental
- ADC263051-263070 Rodriguez - 2014-02-20 to 2014-04-01 - Med & MH Recs
- ADC263071-263074 Rodriguez - Med Recs Rx Through 2014-04-09
- ADC263075-263078 Rodriguez - ORC as of 2014-04-09
- ADC263079-263081 Smith - Med Recs Rx Through 2014-04-09
- ADC263082 Smith - ORC as of 2014-04-09
- ADC263083-263084 Swartz - 2013-06-05 to 2014-04-01 – Dental
- ADC263085-263100 Swartz - 2014-01-24 to 2014-04-01 - Med, MH & Rx
- ADC263101-263103 Swartz - Med Recs Rx Through 2014-04-09
- ADC263104-263112 Swartz - ORC as of 2014-04-09
- ADC263113-263115 Thomas - Med Recs Rx Through 2014-04-09
- ADC263116-263118 Thomas - ORC as of 2014-04-09
- ADC263119-263122 Verduzco - 2013-09-09 to 2014-04-01 – Dental
- ADC263123-263165 Verduzco - 2014-02-20 to 2014-04-01 - Med & MH
- ADC263166-263169 Verduzco - Med Recs Rx Through 2014-04-09
- ADC263170-263171 Verduzco - ORC as of 2014-04-09
- ADC263386-263421 Polson - 2014-01-24 to 2014-04-01 - Med, MH, Dental
- ADC263422-263448 Thomas - 2014-01-24 to 2014-04-01 Med, MH, Dental
- ADC265628-265668 Smith - Med, MH, Dental Recs - 2014-01-24 to 2014-04-01
- ADC286054-286094 - MedRec - Brislan, Dustin 164993 - 20130715 to 20131211 - needs COR

## Serious Mental Illness Records



- ADC293936-294158 - MedRec - ⬛⬛⬛⬛⬛⬛⬛⬛ - 20130401 to 20140401 - needs COR
- ADC297756-297844 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 20130620 to 20140401 - needs COR
- ADC300557-300692 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 2013-10-16 to 2014-04-01 - needs COR
- ADC306069-306136 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 2013-10-11 to 2014-04-01 - needs COR
- ADC307730-307747 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ 2013-04-01 to 2014-04-01 - needs COR
- ADC309284-309292 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 20130401 to 20140401 - needs COR
- ADC310158-310274 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 20130401 to 20140401- needs COR
- ADC311422-311597 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 20130401 to 20140401 - needs COR
- ADC311729-311771 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 20130401 to 20140401 - needs COR
- ADC312663-312821 - MedRec - ⬛⬛⬛⬛⬛⬛⬛ - 20130401 to 20140401 - needs COR



- ADC314770-314823 - MedRec - ████████████ - 20130401 to 20140401 - needs COR
- ADC314883-315038 - MedRec - ████████ - 20130401 to 20140401 - needs COR
- ADC315179-315226 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC316331-316348 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC316349-316505 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC316804-306845 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC316956-317094 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC317398-317472 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC317473-317515 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC318538-318758 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - needs COR
- ADC318766-318904 - MedRec - █████████ - 20130401 to 20140401 - needs COR
- ADC319130-319169 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - Vol 1 - needs COR
- ADC319170-319476 - MedRec - ████████ - 2013-04-01 to 2014-04-01 - Vol 2 - needs COR
- ADC319536-319715 - MedRec - ████████ - 20130401 to 20140401 - needs COR
- ADC319716-319802 - MedRec - ████████ - 20130401 to 20140401 - needs COR
- ADC320234 – Eymansample
- ADC320235 – Florencesample
- ADC320236 – Lewissample
- ADC320237 – Perryvillesample
- ADC320238 – Phoenixsample
- ADC320239 – Tucsonsample
- ADC320240 – Yumasample
- ADC321806-321883 MedRec - ████████ - 20140228 to 20140401 - need COR
- ADC322124-322230 - MedRec - ██████████ - 20130401 to 2014041 - need COR
- ADC322513-322521 MedRec - ██████████ - 20130819 to 20140401 - need COR
- ADC322522-322536 MedRec - █████████ - 20130401 to 20140401 - need COR
- ADC322675-322837MedRec - ██████████ - 20130528 to 20140401 - need COR
- ADC322965-323053 MedRec - █████████ - 20130401 to 20140401 - need COR
- ADC323133-323140 MedRec - ████████ - 20130401 to 20140401 - need COR
- ADC323487-323589 MedRec - █████████ - 20130401 to 20140401 - need COR
- ADC323590-323672 MedRec - ████████ - 20131105 to 20140401 - need COR
- ADC323673-323833 MedRec - ████████ - 20130401 to 20140401 - need COR



- ADC323834-323920 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC324078-324094 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC324105-324332 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC324333-324358 MedRec - ███████████ - 20140321 to 20140404 - need COR
- ADC324918-324993 MedRec - ███████████ - 20130925 to 20140401 - need COR
- ADC325890-326074 MedREc - ███████████ - 20130401 to 20140401 - need COR
- ADC326354-326432 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC326663-326685 MedRec - ███████████ - 201300827 to 20140401 - need COR
- ADC326686-326755 MedRec - ███████████ - 20130827 to 20140401 - need COR
- ADC326756-326876 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC326877-326936 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC326937-327077 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC327078-327100 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC327373-327434 MedRec - ███████████ - 20140129 to 20140401 - need COR
- ADC327435-327749 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC327794-327916 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC328256-328314 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC328315-328650 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC328651-328843 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC328844-328894 MedRec - ███████████ - 20130925 to 20140401 - need COR
- ADC329012-329245 MedRec - ███████████ 20140613082514
- ADC329652-329837 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC329838-330257 MedRec - ███████████ - 20130401 to 2014-04-01 - need COR
- ADC330258-330383 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC330384-330440 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC330773-330930 MedRec - ███████████ - 20131004 to 20140401 - need COR
- ADC330931-331042 MedRec - ███████████ - 20130723 to 20140401 - need COR
- ADC331292-331391 MedRec - ███████████ - 20130401 to 20140401 - Need COR
- ADC331392-331527 MedRec - ███████████ - 20130401 to 20140401 - need COR
- ADC331641-331780 MedRec - ███████████ - 20130916 to 20140401 - need COR
- ADC331781-331875 MedRec - ███████████ - 20140325 to 20140401 - need COR
- ADC331876-332006 MedRec - ███████████ - 20130530 to 20140401 - need COR

**Depositions**
- 2014.07.01 McWilliams Deposition Full Transcript
- 2014.07.24_Pratt Deposition Rough
- 2014.08.01 Nicole Taylor Deposition Full Transcript

**Mental Health Technical Manual**
- ADC215544-215610 ADC MH Technical Manual (revision 01-01-14)

**Emails**
- AGA_Review_00103442
- AGA_Review_00104219-20
- AGA_Review_00104273-74
- AGA_Review_00104913-14
- AGA_Review_00105004-05
- AGA_Review_00105127-28
- AGA_Review_00105165-68
- AGA_Review_00105220-21
- AGA_Review_00105510-12
- AGA_Review_00105517-19
- AGA_Review_00105683
- AGA_Review_00106052-55
- AGA_Review_00106118-19
- AGA_Review_00106272-75
- AGA_Review_00106292-93
- AGA_Review_00106421-23
- AGA_Review_00107026-28
- AGA_Review_00107316-17
- AGA_Review_00107945-48
- AGA_Review_00108069-71
- AGA_Review_00108277-82
- AGA_Review_00108408-10
- AGA_Review_00108572
- AGA_Review_00108573-75
- AGA_Review_00108862
- AGA_Review_00109142-45
- AGA_Review_00109899-901
- AGA_Review_00110551-54
- AGA_Review_00111243-44
- AGA_Review_00111252
- AGA_Review_00111293-98
- AGA_Review_00113242-43
- AGA_Review_00113281-87
- AGA_Review_00113394-95
- AGA_Review_00113522-53
- AGA_Review_00113556
- AGA_Review_00113560-64
- AGA_Review_00114261-64
- AGA_Review_00114506
- AGA_Review_00114507
- AGA_Review_00115280-81
- AGA_Review_00116455-56
- AGA_Review_00116581-83
- AGA_Review_00116722

**Suicide Reports**
- ADC422726-422731 ME ███████████████

- ADC422857-422865 ME█████████
- ADC422907-422911 ME█████████
- ADC423715-423838 - AIU2013-1541 -██████████
- ADC423967-424139 - AIU2013-1767 -███████████
  ADC424932-425000 - AIU2014-0150 -███████████

# EXHIBIT 10

```
                UNITED STATES DISTRICT COURT
                   DISTRICT OF ARIZONA

Victor Parsons; Shawn           )  No:
Jensen; Stephen Swartz;         )  CV12-00601-PHX-NVW
Dustin Brislan; Sonia           )  (MEA)
Rodriguez; Christina            )
Verduzco; Jackie Thomas;        )
Jeremy Smith; Robert Gamez;     )
Maryanne Chisholm; Desiree      )
Licci; Joseph Hefner; Joshua    )
Polson; and Charlotte Wells,    )
on behalf of themselves and     )
all others similarly            )
situated; and Arizona Center    )
for Disability Law,             )
              Plaintiffs,        )
      v.                         )
Charles Ryan, Director,          )
Arizona Department of            )
Corrections; and Richard         )
Pratt, Interim Division          )
Director, Division of Health     )
Services, Arizona Department     )
of Corrections, in their         )
official capacities,             )
              Defendants.        )
                                 )
```

```
              DEPOSITION OF MARK T. HALDANE, JD
                    September 19, 2013
                         9:00 a.m.
                     Phoenix, Arizona


                           Prepared by:
                           Marcella Daughtry, RPR
                           Arizona Certified
                           Reporter No. 50623

                           Prepared for:

                           (Copy)
```

Parsons vs Ryan
Deposition of Mark T. Haldane, JD - 9/19/2013

Page 21

1    named plaintiff in the Parsons litigation?

2        A    Has anyone -- I'm sorry.

3                MS. CLOMAN:  Form.

4                THE WITNESS:  Can you repeat that?  Did

5    any ADC employee?

6        Q    BY MR. du MÉE:  Yeah.  How did you find out?

7    I don't want to know anything that you talk to the

8    lawyers about, but other than that, how did you become

9    aware that these particular inmates were part of the

10   Parsons litigation?

11       A    I believe through Richard Pratt.

12       Q    And what did Mr. Pratt say to you?

13       A    I believe that it was that these inmates are

14   plaintiffs in Parsons versus Ryan and that, you know,

15   to be aware of that, and I periodically review their

16   charts.

17       Q    Why would -- why would it matter whether you

18   were aware that they were named plaintiffs or not?

19               MS. CLOMAN:  Form, foundation.

20               THE WITNESS:  I don't know.  You'd have

21   to ask him.  I imagine because the Department wants to

22   ensure that if -- I don't know.  I can't speculate as

23   to why somebody else thinks it's important.

24       Q    BY MR. du MÉE:  Why did you believe Mr. Pratt

25   informed you of that?  I'm not asking for Mr. Pratt's

Parsons vs Ryan
Deposition of Mark T. Haldane, JD - 9/19/2013

Page 22

1   opinion.  I want to know why you think he contacted

2   you.

3              MS. CLOMAN:  Form.

4              THE WITNESS:  I think because he wanted

5   us to periodically review those medical records to

6   ensure that they were receiving adequate healthcare.

7       Q    BY MR. du MÉE:  Now, I don't want to know

8   anything that you've said to the lawyers or that they

9   have said to you because those communications are

10  privileged, as I'm sure you know.  But you can tell me

11  when you met with a lawyer, which lawyer and for how

12  long.  So have you met with any lawyers to prepare for

13  your deposition today?

14      A    Yes.

15      Q    Who did you meet with?

16      A    (Indicating.)

17             MS. CLOMAN:  Let the record reflect he

18  is pointing to me, Courtney Cloman.

19             THE WITNESS:  Oh, I'm sorry.  That

20  wasn't audible, was it?

21      Q    BY MR. du MÉE:  When did you meet with

22  Ms. Cloman?

23      A    On Tuesday.

24      Q    And for how long did you meet with her?

25      A    I think about an hour and a half.

Parsons vs Ryan
Deposition of Mark T. Haldane, JD - 9/19/2013

Page 266

1    STATE OF ARIZONA    )
                          )
2    COUNTY OF MARICOPA )

3

4                   I, Marcella L. Daughtry, a Certified

5    Reporter, Certificate No. 50623, in the State of

6    Arizona, do hereby certify that the foregoing witness

7    was duly sworn to tell the whole truth; that the

8    foregoing pages constitute a full, true, and accurate

9    transcript of all proceedings had in the foregoing

10   matter, all done to the best of my skill and ability.

11   Pursuant to request, notification was provided that the

12   deposition is available for review and signature.

13

14                   I FURTHER CERTIFY that I am not related

15   to nor employed by any of the parties hereto, and have

16   no interest in the outcome.

17

18                   WITNESS my hand this 3rd day of October,

19   2013.

20

21                          _____

                            Marcella L. Daughtry
22                          Arizona Certified
                            Reporter No. 50623

23

24

25