# APPENDIX 1

## APPENDIX 1:  PLAINTIFFS' SECTION

**C.     STIPULATIONS AND UNCONTESTED FACTS AND LAW**

1.     The following material facts are admitted by the parties and require no proof:

| Defendants | |
|---|---|
| 1 | Charles Ryan is the Director for the Arizona Department of Corrections ("ADC"), and has been the Director since January 30, 2009.  [Defendants Corrected Statement of Undisputed Fact ("DSOF") ¶ 45] |
| 2 | Charles Ryan is ultimately responsible for the health care provided to inmates and for the conditions of their confinement.  [DSOF ¶ 46] |
| 3 | At the time this lawsuit was filed, Richard Pratt was the Interim Assistant Director for the ADC, following the retirement of Dr. Michael Adu-Tutu in February 2012.  [DSOF ¶ 49] |
| 4 | Art Gross took over as Assistant Director in October 2012.  [DSOF ¶ 50] |
| 5 | Pratt was renamed the Interim Assistant Director on March 1, 2013.  [DSOF ¶ 51] |
| **Healthcare Privatization** | |
| 6 | ADC's healthcare budged for fiscal year 2014 is $131,500,000: $125,000,000 paid to Corizon Inc. ("Corizon") and $6,500,000 devoted to monitoring and litigation costs.  [DSOF ¶ 55] |
| 7 | Arizona House Bill 2010 was approved by the Governor on September 3, 2009 and requires all correctional health services that are provided in a state owned and operated correctional facility to be privatized.  [DSOF ¶¶ 56-66] |
| 8 | Wexford Health Sources, Inc. ("Wexford") was initially awarded the contract and began its tenure on July 1, 2012.  [DSOF ¶¶ 68-69] |
| 9 | Wexford and ADC severed their relationship on November 8, 2012. [DSOF ¶ 79] |
| 10 | The contract was then awarded to Corizon.  [DSOF ¶ 82] |
| 11 | Despite privatization, ADC has the ultimate responsibility to provide constitutionally mandated health care.  [DSOF ¶ 93] |
| **ADC Contract Monitoring** | |
| 12 | The contract allows ADC to maintain oversight of Corizon through appoint a Contract Monitor and regular audits and reports.  [DSOF ¶ 97] |

| 13 | Each facility has a contract monitor that is responsible for ensuring Corizon's compliance with its duties relating to heath care under the contract.  [DSOF ¶ 101] |
|----|------|
| 14 | The contract monitor reviews multiple performance outcomes and measures. [DSOF ¶ 104] |
| 15 | Each month, ADC contract monitors evaluate a selected number of these performance measures at each facility.  [DSOF ¶105] |
| 16 | The contract monitors at each facility measure the same performance measures that are selected for that month.  [DSOF ¶ 106] |
| 17 | There are over 200 performance measures, 43 of which are sanctionable if non-compliant for that measurable quarter.  [DSOF ¶¶ 107-08] |
| 18 | The 43 sanctionable measures are measured every month at each facility, in conjunction with additional non-sanctionable selected measures for that particular month.  [DSOF ¶ 109] |
| 19 | The number of non-sanctionable performance measures varies from month to month.  [DSOF ¶ 111]. |
| 20 | The contract with Wexford required 100 percent compliance with the sanctionable performance measures.  [DSOF ¶ 112] |
| 21 | The contract with Corizon required less than 100 percent compliance with the sanctionable performance measures through the first four quarters of Corizon's tenure.  [DSOF ¶¶ 116-119] |
| | **Corizon Reporting** |
| 22 | Corizon is required to prepare and submit various reports, including: quarterly statewide Chronic Condition/DM Program Reports; monthly HNR Appointment Reports; monthly Inmate Formal Grievance Reports; monthly Inmate Wait Times Report; monthly statewide Intake Report; monthly Staffing Reports; and quarterly statwide Utilization Review Reports.  [DSOF ¶ 131] |
| | **ADC Medical Policies** |
| 23 | The contract requires Corizon to provide a "standardized program of routine, urgent and emergency healthcare" for all inmates at a level "equivalent or surpassing the community standard of care."  [DSOF ¶ 289] |
| | **ADC Suicide/Mental Health Policies** |
| 24 | Inmates identified as at a significant risk for suicide may be placed on a watch.  Watch types include Continuous Watch, One Officer to Multiple Inmates Continuous Watch and Interval Watch (30 minutes/10 minutes). [DSOF ¶ 493] |

78204-0001/LEGAL123450222.1

| 25 | Razors and razor blades are not approved for Thirty Minute Watches. [DSOF ¶ 531] |
|---|---|
| | **ADC Dental Policies** |
| 26 | Dentists classify all inmates according to their dental treatment needs through the visual exam or screening of x-rays as Class I (no further treatment needed), II (routine treatment needed), or III (immediate treatment needed). [DSOF ¶ 703] |
| 27 | ADC requires health care providers to obtain informed consent for examinations, treatments, and procedures.  [DSOF ¶ 717] |
| 28 | Obtaining informed consent compliant with ADC policy requires a health care provider to explain, in language the prisoner can understand, the procedure or treatment, the reason for it, the benefits, any risks and possible side effects, and the existence of any alternative treatment, and to document this discussion on the Consent to Treat Form.  [DSOF ¶¶ 718-21] |
| 29 | The Dental Services Technical Manual ("DSTM"), dated 1/1/2010, is the current policies and procedures manual to be followed by all dentists working at ADC.  [Deposition of William Smallwood, DDS, dated Aug. 20, 2013, at 45:19-46:8] |
| 30 | No ADC dental clinics operate under written policies applicable to clinical treatment that are different from the DSTM. [*Id.* at 53:15-54:17] |
| 31 | The DSTM establishes four levels of dental priorities.  [DSOF ¶ 734] |
| 32 | Priority 1 (Emergency Care) includes conditions requiring immediate assessment, such as postoperative uncontrolled bleeding, facial swelling of a lifethreatening nature or causing severe facial deformity, fracture of the mandible, maxilla, or zygomatic arch, avulsed dentition, extreme pain that is not responsive to dental treatment guidelines, and introral lacerations that require suturing to include the vermillion border of the lips.  [DSOF ¶ 735] |
| 33 | Priority 2 (Urgent Care) includes conditions such as fractured dentition with pulp exposure, acute dental abscess, an oral pathological condition that may severely compromise the general health of the inmate, and acute necrotizing ulcerative gingivitis.  [DSOF ¶ 736] |
| 34 | Priority 3 (Routine Care) includes conditions that require treatment to restore the form and function of an inmate's oral tissues and are not solely elective or cosmetic, such as caries, chronic periodontal conditions, non-restorable teeth, edentulous and partially edentulous patients requiring replacement, temporary, sedative, or immediate restorations, and non-functional broken prosthetic appliances (if the inmate qualifies), TMJ disorders, periodic examinations, gingival recession/root sensitivity, and routine dental prophylaxsis.  [DSOF ¶ 737] |

| 35 | Priority 4 (Exempt Conditions) are not treated at ADC and include fixed prosthodontics (crown and bridge), orthodontics, removal of asymptomatic third molars or impactions without pathology, treatment of discoloration, stains, and cosmetic defects, ridge augmentations, and vestibular extensions/implants. [DSOF ¶ 7348[A1]]  Dental assistants evaluate HNRs using the dental classification system (Dental Procedure 770.2). [DSOF ¶ 778] |
| 36 | Dental assistants perform clinical evaluations that include collecting and recording information regarding an inmate's complaint, reviewing the inmate's health history, performing an oral evaluation, and taking dental x-rays. [DSOF ¶¶ 780-81] |
| 37 | Dental assistants hired by SPDS/Wexford to work at ADC are not required to have any formal education other than a training course for dental assistants. |

### Administration of Dental Care

| 38 | Dental care at ADC is provided by Smallwood Prison Dental Services ("SPDS"), a private company owned by Dr. William Smallwood, who subcontracts with Corizon to provide dental care. [DSOF ¶ 804] |
| 39 | SPDS has been providing dental care at ADC since March 4, 2013 after taking over from Wexford, which provided dental care at ADC from July 1, 2012 to March 3, 2013. [DSOF ¶ 805] |
| 40 | The contract between Corizon and ADC and the contract between Smallwood and Corizon require that patients with urgent dental needs be seen within 72 hours, and patients with routine dental needs be seen within 90 days. [DSOF ¶¶ 792, 993-94] |
| 41 | SPDS, through the CDS software, calculates wait times based on the date a request is received in the dental clinic. [Deposition of William Smallwood, DDS, dated Apr. 7, 2014, at 14:21-15:1] |
| 42 | ADC's dental routine wait times are calculated by taking the average of the amount of time that all prisoner currently on the routine dental care list have been on the routine dental care list. [*Id.* at 73:11-75:9] |
| 43 | Dentists at ADC have discretion to remove an inmate from the routine care list if the inmate submits an HNR for pain and is seen for an urgent care appointment. [DSOF ¶ 1167] |
| 44 | A broken or lost filling is classified as routine care. [DSOF ¶ 1186] |
| 45 | ADC inmate population housed in ADC-operated facilities on July 31, 2013 was 33,213. [ADC Corrections at a Glance] |
| 46 | ADC inmate population housed in ADC-operated facilities on September 30, 2013 was 34,304. [ADC Corrections at a Glance] |
| 47 | ADC inmate population housed in ADC-operated facilities on March 31, 2014 was 34,444. [DSOF ¶ 2] |

| 48 | As of August 12, 2012, there were 24 FTE dentist and 32 dental assistant positions filled system-wide. [ADC016148-76] |
| 49 | As of September 30, 2013, Smallwood had hired 29.05 FTE dentists, 1.6 FTE dental hygienists, and 39.75 dental assistants, who worked 21.29 FTE, .98 FTE, and 33.88 FTE, respectively. [ADC382964] |
| 50 | As of March 31, 2014, Smallwood had hired 28.73 FTE dentists, 2.5 FTE dental hygienists, and 41.75 dental assistants, who worked 23.08 FTE, 1.34 FTE, and 39.26 FTE, respectively. [ADC267354] |

## Isolation

| 51 | ADC policy requires some prisoners to be automatically classified as maximum custody, including prisoners sentenced to death, prisoners sentenced to a life sentence for the first two years served, prisoners who are validated and un-renounced members of a "Security Threat Group" (STG), and prisoners with an internal risk score of 5. [*See* DSOF ¶ 1263]. |
| 52 | ADC prisoners may be housed in isolation "for upwards of 20 years." [Defendant Charles Ryan's Responses to Plaintiff Robert Gamez's First Set of Interrogatories, dated Sept. 16, 2013, Answer to Interrogatory No. 2] |
| 53 | No ADC policy requires exclusion of prisoners with serious mental illness from the isolation units. [Deposition of Ben Shaw, dated Oct. 3, 2012, 135:21-24, 136:9-137:2] |
| 54 | ADC isolation units hold hundreds of prisoners who have been diagnosed by ADC as suffering from serious mental illness (SMI). [Doc. 1028-1, Mitchell Decl. Ex. 39 at 19-20 (720 prisoners with SMI held in isolation at Eyman complex)] |

## Exercise

| 55 | Many prisoners in isolation are, at most, "afforded six hours of outdoor exercise weekly, generally in two hour blocks, three times per week." [*See* DSOF ¶ 1572] |

## Nutrition

| 56 | Prisoners in isolation are fed only twice a day. [*See* DSOF 1829] |

## 24-Hour Illumination

| 57 | Some prisoners in isolation are subjected to 24-hour illumination. [DSOF ¶¶ 1696, 1697] |
| 58 | Defendants use nocturnal lighting of significantly higher wattage than 7-watt bulbs in some isolation cells and units. [*See* DSOF ¶¶ 1733-34, 1784, 1789, 1793, 1798, 1803, 1805, 1809, 1811, 1816, 1818] |
| 59 | CB-Kasson Watch Pod cells have a box light affixed to the top of the wall in the cell above the cell door. [DSOF ¶ 1782] |

| | | |
|---|---|---|
| 60 | The Watch Cells are illuminated 24 hours.  [DSOF ¶ 1783] | |
| 61 | CB-Kasson non-watch cells have a box light affixed to the top of the wall in the cell above the cell door.  [DSOF ¶ 1792] | |
| **Chemical Agents** | | |
| 62 | ADC policy permits the use of chemical agents on prisoners who are taking psychotropic medications.   [Deposition of Carson McWilliams, dated Sept. 27, 2013, at 173:1-3] | |
| **Property** | | |
| 63 | Inmates may not possess any property item in excess of the total amount allowed.  [DSOF ¶ 1862] | |
| 64 | Cell property may be restricted upon determination by medical or administrative staff in order to prevent the inmate from engaging in self-harm.  [DSOF ¶ 1863] | |
| 65 | Access to the appliances may be restricted for maximum custody inmates based upon disciplinary sanction.  [DSOF ¶ 1864] | |
| **Health Needs Request Process** | | |
| 66 | ADC inmates may advise prison medical personnel of a non-emergency medical request or requests for appointments by submission of a form called a Health Needs Request  form.  [DSOF ¶ 1869] | |
| **Named Plaintiff Jensen** | | |
| 67 | Plaintiff Jensen's PSA on November 29, 2006 was 8.4.  [DSOF ¶ 2081] | |
| 68 | Plaintiff Jensen had labs drawn on January 19, 2007, which showed his PSA to be 7.7.  [DSOF ¶¶ 2086-87] | |
| 69 | On June 12, 2009, Jensen had labs drawn, which showed his PSA to be 9.1.  [DSOF ¶ 2089] | |
| 70 | A bone scan was conducted on March 30, 2010.  [DSOF ¶ 2115] | |
| 71 | Dr. Cord performed a prostatectomy on Plaintiff Jensen on July 15, 2010 at Mountain Vista Medical Center utilizing the Da Vinci robotic surgical method.  [DSOF ¶ 2117] | |
| 72 | On August 5, 2010, Plaintiff Jensen underwent a cystogram that showed his urinary catheter located anterior and outside the bladder.  [DSOF ¶¶ 2156-57] | |
| 73 | On June 23, 2011, Plaintiff Jensen was seen by Dr. Cord at Accurate Urology, who determined that Mr. Jensen needed urgent urological surgery and who had Mr. Jensen immediately transported to Mountain Vista Medical Center.  [DSOF ¶¶ 2254-57] | |

| 74 | At Mountain Vista Medical Center, Plaintiff Jensen underwent a cystoscopy, a transurealthral resection, and an incision of his bladder neck, all of which revealed a pinpoint bladder neck contracture.  [DSOF ¶¶ 2293-95] |
|----|----|
| 75 | Plaintiff Jensen was admitted to the emergency room at University Medical Center on August 28, 2011.  [DSOF ¶ 2287] |
| 76 | On February 9, 2012, Plaintiff Jensen was seen at University Physicians Hospital, where his cystoscopy demonstrated an almost complete occlusion of an anastomotic stricture.  [DSOF ¶¶ 2331-32] |
| **Named Plaintiff Swartz** | |
| 77 | Swartz waited more than 72 hours to receive dental care after submitting an HNR for intense pain needing treatment "ASAP."  [DSOF ¶¶ 907-908] |
| 78 | On another occasion, Swartz waited more than 72 hours until his scheduled appointment after filing a pain HNR.  [DSOF ¶ 923] |
| 79 | Swartz waited at least nine days for an exam schedule after submitting an HNR complaining of a cracked molar.  [DSOF ¶¶ 928-929] |
| 80 | Swartz was assaulted by several inmates, resulting in severe injuries to his face and jaw. |
| 81 | Swartz was given Narcan in connection with surgery following his facial injuries.  [DSOF ¶¶ 2492, 2494] |
| 82 | Swartz's request for an increase in tramadol dosage was not approved for five or six months.  [DSOF ¶ 2517] |
| 83 | Swartz made repeated requests for pain treatment and medication for his face and jaw. |
| 84 | ADC would not allow Swartz to request refills of pain medication before the pain medication ran out, even if that meant that Swartz would have a delay between the time one prescription ran out and another prescription was filled. |
| 85 | Swartz has swallowed metal multiple times while in ADC custody, including in 2011. |
| 86 | Swartz has been prescribed medications to treat his mental health symptoms. |
| 87 | During his incarceration in ADC, Mr. Swartz has on several occasions cut himself, swallowed foreign objects, and overdosed on pills.  [DSOF ¶¶ 2445, 2446, 2462, 2465, 2600, 2671] |
| 88 | During his incarceration in ADC, Mr. Swartz has been prescribed antipsychotic medication.  [DSOF ¶ 2689] |

| | **Named Plaintiff Brislan** |
|---|---|
| 89 | ADC's Health Services Technical Manual ("HSTM") [Defs' Ex. 137-37][A2] defines "clinical encounters" as interactions between inmates and health care providers that involve a treatment and/or exchange of confidential information." [Ex. 137-37 at ADC011215 and ADC010831] |
| 90 | The manual also requires that "[n]ecessary clinical encounters do not take place cell side, but must occur in an appropriate clinical setting." [*Id.* at ADC010956] |
| 91 | The majority of interactions between medical staff and Plaintiff Brislan were brief cell front visits and do not meet the ADC definition of "encounter." [*See e.g.*, ADC008454 (10 minutes); ADC008462 (7 minutes); ADC008468 (5 minutes); ADC008502 (5 minutes); ADC008527 (5 minutes); ADC008528 (1 minute); ADC008529 (2 minutes); ADC073662-63 (6 minutes each); ADC073665 (7 minutes); ADC073668 (9 minutes); ADC07672 (10 minutes); ADC073694 (5 minutes)] |
| 92 | During his incarceration in ADC, chemical agents have been used on Mr. Brislan on at least three occasions.  [DSOF ¶¶ 2795, 2811] |
| 93 | During his incarceration in ADC, Mr. Brislan has attempted suicide six or seven times.  [DSOF ¶ 2807] |
| | **Named Plaintiff Rodriguez** |
| 94 | On June 25, 2012, Rodriguez reported that she lost her inhaler and needed a new one "ASAP." She complained about difficulty breathing and appeared weak and shaky, with wheezy breathing.  [DSOF ¶¶ 2833-35] |
| 95 | Rodriguez was told to submit an HNR to request a replacement inhaler and was not given an inhaler immediately to take back to the yard.   [DSOF ¶ 2837] |
| 96 | Rodriguez again submitted an HNR asking for something to help with her shaking, and she was told simply that she would be scheduled on the waiting list.  [DSOF ¶¶ 2838-39] |
| 97 | Rodriguez has been threatened with pepper spray.  [DSOF ¶ 2887] |
| 98 | Rodriguez has been nearby when a neighboring inmate was sprayed with OC spray, and the spray went through the vent into Rodriguez's cell.   [DSOF ¶ 2886] |
| 99 | Rodriguez was housed in a cell with 24-hour lighting.  [DSOF ¶ 2889] |
| | **Named Plaintiff Smith** |
| 100 | Due to his hand injury, Mr. Smith's cellmate would type requests for Smith. [*See* DSOF ¶¶ 3098, 3100] |

| 101 | During his incarceration in ADC, Mr. Smith has been prescribed Lithium. [DSOF ¶¶ 3108, 3110, 3126] |
|---|---|
| | **Named Plaintiff Gamez** |
| 102 | On multiple occasions, Plaintiff Gamez has requested refills of nasal spray. [DSOF ¶ 3186] |
| 103 | Between March 22, 2010 and April 1, 2014, Plaintiff Gamez submitted 350 HNRs.  [DSOF ¶¶ 3183-85] |
| 104 | During his incarceration in ADC, Mr. Gamez has been subjected to 24-hour illumination.   [DSOF ¶ 3233] |
| | **Named Plaintiff Chisholm** |
| 105 | Chisholm submitted a dental-related HNR on December 23, 2011 stating:  "I lost a filling in my back left molar. Half of my tooth is open and exposed.  I am in pain. Please help." [*See* DSOF ¶ 878, ADC130551] |
| 106 | Chisholm was seen by Dr. Hanstad one week later (12/30/2011), when he diagnosed recurrent decay well below the gum line, and scheduled Chisholm for extraction of tooth #18. [*See* DSOF ¶ 879, ADC071375] |
| 107 | Chisholm refused extraction of tooth #18 on January 12, 2012. [*See* DSOF ¶ 881, ADC071375] |
| 108 | Chisholm submitted an HNR on August 13, 2012 indicating that she still required attention to her dental issues, and that she had not been scheduled for a cleaning in over 6 ½ years. [*See* DSOF ¶ 884, ADC130532] |
| 109 | Chisholm submitted an HNR on November 20, 2012 that said:  "I wrote an HNR back in March asking for help.  I now have 3 teeth at least that need to be rebuilt or filled.  I've been here roughly 7 years, and I've never had routine care.  Seriously, could I be seen now?  My HNR in August was not my original request.  It was a follow up to a March letter when I was told I'd be seen in 4-6 months.  It's been 8 months.  Help." [*See* DSOF ¶ 885, ADC071392] |
| 110 | An ADC representative could not find an HNR from March and requested that Chisholm provide a copy of the HNR to be "placed on the list as of that date." [*See* DSOF ¶ 886, ADC071392] |
| 111 | Chisholm submitted an HNR on April 18, 2011 in which she reported feeling numbness and tingling in her arms, legs, and face, and that she needed help. [*See* DSOF ¶ 3251, ADC130544] |
| 112 | On April 20, 2011, Chisholm was seen by Dr. Lockhart, but that appointment was for chronic condition follow-up care, and not in response to Chisholm's April 18, 2011 HNR.  [*See* ADC130682-83] |
| 113 | On December 14, 2011, Chisholm reported having shortness of breath and palpitations.  [*See* DSOF ¶ 3277, ADC130674] |

| 114 | On January 30, 2012, Chisholm reported discomfort in the middle of her chest and her left arm, which was provoked by exertion, emotion, and position. [*See* DSOF ¶ 3283, ADC130624] |
| 115 | On February 23, 2012, Chisholm complained of pain when breathing.  [*See* DSOF ¶ 3293, ADC130672] |
| 116 | Chisholm was deemed to have refused a dental cleaning on December 9, 2008 because the cleaning conflicted with a medical appointment that ADC scheduled on the same day.  [ADC130485] |

**Named Plaintiff Licci**

| 117 | In 2001, Licci had a nodule removed from her right thigh that was diagnosed as "dematofibrosarcoma protuberans, incompletely excised."  [ADC005724-26] |
| 118 | The Armed Forces Institute of Pathology, Department of Soft Tissue Pathology confirmed the diagnosis of "dematofibrosarcoma protuberans, incompletely excised."  [ADC005727] |
| 119 | On October 16, 2001, Licci was counseled by an ADC physician that she "will need to watch for recurrence."  [ADC005501] |
| 120 | On November 30, 2010, Dr. Lockhart reviewed Licci's labs and noted her ammonia levels were elevated.  [DSOF ¶ 3405] |
| 121 | On December 12, 2010, Licci submitted an emergency HNR complaining of intense stomach pain.  [ADC005915] |
| 122 | On May 18, 2011, Dr. Lockhart submitted an outside consult request to oncology.  [DSOF ¶ 3424] |
| 123 | On July 31, 2011, Licci submitted an HNR for trouble with nausea, not eating, and vomiting.  [DSOF ¶ 3436] |
| 124 | On August 8, 2011, Licci submitted an HNR for nausea.  [ADC005896] |
| 125 | On August 16, 2011, Licci was seen by Dr. Rodriguez for abdominal problems consisting of severe nausea and vomiting whenever she tried to eat. [ADC005438] |
| 126 | On August 30, 2011, Licci was seen for intractable nausea and vomiting. [DSOF ¶ 3444] |
| 127 | On September 6, 2011, Licci had an ultrasound of her abdomen at Insight Imaging.  [DSOF ¶ 3449] |
| 128 | On September 27, 2011, Licci was sent to St. Luke's Medical Center for a CT of her abdomen and pelvis.  [DSOF ¶ 3454] |
| 129 | The CT revealed a heterogenous enlarged uterus, soft tissue density mass at the region of the cervix, and bilateral enlarged cysts.  [ADC203298-99] |

-10-

| 130 | Licci also received a chest port placement while at St. Luke's. [DSOF ¶ 3455] |
| 131 | On September 29, 2011, Licci was sent to Affiliated Southwest Surgeons for a consultation. [DSOF ¶ 3456] |
| 132 | It was noted there was a cervical mass on the CT and an anterior submucosal mass on the rectal exam. [DSOF ¶ 3457] |
| 133 | A colonoscopy was recommended for further evaluation of colon and rectum. [DSOF ¶ 3458] |
| 134 | A GYN consult was also recommended. [DSOF ¶ 3459] |
| 135 | On October 6, 2011, Dr. Lockhart noted that Licci had not seen an oncologist yet. [ADC005430] |
| 136 | On October 18, 2011, Licci was seen by Dr. Enciso for a follow up to her CT of her abdomen and pelvis. [DSOF ¶ 3463] |
| 137 | The pelvic scan showed heterogeneous enlarged uterus and an enlarged ovarian cyst; both ovaries were within normal size. [DSOF ¶ 3464] |
| 138 | A request for a pelvic ultrasound was placed. [DSOF ¶ 3465] |
| 139 | On October 26, 2011, Licci had a pelvic ultrasound at Insight Imaging [DSOF ¶ 3466], which revealed an ovarian cyst. [ADC005774] |
| 140 | On November 22, 2011, Licci presented to medical with abdominal extension that occurred shortly after eating. [ADC005426] |
| 141 | On January 6, 2012, Dr. Lockhart noted that Licci had not seen an oncologist yet and followed up with the consult coordinator. [ADC005419-20] |
| 142 | On February 21, 2012, an outside consult was placed for an ultrasound of Licci's pelvis. [DSOF ¶ 3496] |
| 143 | On March 5, 2012, Licci was seen by PA R. Rodriguez. [DSOF ¶ 3502] |
| 144 | On May 29, 2012, Licci was seen for a follow up on her pelvic ultrasound. [DSOF ¶ 3514] |
| 145 | On September 9, 2013, Licci submitted an HNR noting there was a recent growth on the inside of her right thigh that was similar in color and close to her original tumor. [ADC203317] |
| 146 | On October 8, 2013, a consultation request was submitted for Licci to undergo LSC with possible total abdominal hysterectomy or total lap hysterectomy. [ADC203323] |
| 147 | On January 28, 2014, Licci had a total abdominal hysterectomy at Tempe St. Luke's Hospital. [ADC263002] |

-11-

| | |
|---|---|
| 148 | In 2001, Licci had a nodule removed from her right thigh that was diagnosed as "dematofibrosarcoma protuberans, incompletely excised." [ADC005724-26] |
| | **Named Plaintiff Hefner** |
| 149 | Hefner injured his eye on September 12, 2006.  He reported the injury and was seen by the doctor.  [DSOF ¶¶ 3601-02] |
| 150 | On March 26, 2011, Hefner was assaulted and suffered cuts and abrasions all over his body.  [DSOF ¶ 3697] |
| 151 | Hefner complained of pain in his left jaw, right lower back, left lower chest/rib area, pain with deep breathing, pain below right knee.   [DSOF ¶ 3700] |
| 152 | The doctor assessed swelling, abrasions on left side of the face, pain with palpation right flank and left lower chest, and abrasions and swelling right knee.  [DSOF ¶ 3701] |
| 153 | Hefner has gastroesophageal reflux disease (GERD) and needs a special diet.  [DSOF ¶ 3719] |
| 154 | Hefner testified that, in 2010, while in ADC custody, either Dr. Merchant or Dr. Macaboui, told him that he had a gastrointestinal problem and should avoid certain foods that will upset his stomach, such as peanut butter, beans, oily foods, coffee, sodas and spicy foods. [DSOF ¶ 3720] |
| 155 | Hefner was told that doctors no longer issue bed wedges for GERD.  [DSOF ¶ 3722] |
| | **Named Plaintiff Polson** |
| 156 | Although Polson was prescribed a soft diet on April 9, 2008, he submitted many HNRs stating that he was not receiving his soft diet.  [ADC006393; ADC006391;   ADC006382;   ADC006379;   ADC006377;   ADC006323; ADC006322; ADC006321; ADC123143; ADC123141; PLTF-PARSONS-027163; PLTF-PARSONS-027164; PLTF-PARSONS-027165; ADC123139] |
| 157 | Polson submitted an HNR on May 13, 2008, stating:  "I would like to go head and get partials and any other care that needs to be done with my teeth.  I have talked to my dentist on streets and she says partials would be best."  [DSOF ¶ 831] |
| 158 | Polson submitted an HNR on July 22, 2008, complaining of the delay in getting scheduled for dentures, and stated that he would like to get the denture process started "ASAP so I can eat regular foods."  [ADC006401] |
| 159 | Polson submitted an HNR on October 8, 2008, indicating he was not receiving his soft diet and had not eaten for a week, asked dental to please call the kitchen, and stated that he needed "every thing in my mouth fixed cavitys [sic] teeth pulled what ever."  [ADC006393] |

78204-0001/LEGAL123450222.1

| 160 | Polson submitted an HNR on November 1, 2008 that stated that the kitchen was not giving him his soft diet, and he could not eat everything that was being served. The HNR also stated that one of his front teeth "was dead broke off a copple [sic] days ago" and that he would like his teeth fixed as soon as possible "so I can get the partails [sic]." The HNR response states that Polson was placed on the routine care list. [ADC006391] |
| 161 | Polson submitted an HNR on February 18, 2009, stating that his diet had not been delivered properly since February 2, that he could not eat the food that was being served, and that he was "starving." [ADC006377] |
| 162 | On April 13, 2010, tooth #23 and #24 were extracted from Polson's mouth. [ADC006515] On April 22, 2010, Polson submitted an HNR complaining of pain, stated that the extractions were not healing well and were still bleeding, and reported that he was not receiving his proper diet. [ADC006344] On May 4, 2010, Polson's HNR was answered, and he was told to "be patient." [ADC006344] On May 13, 2010, Polson was seen for the pain complaint that he had submitted on April 22. [ADC006515] |
| 163 | On August 5, 2010, Polson submitted an HNR asking for his soft diet to be renewed. He was told that his diet was good until November 5, 2010, and was told to "send another request last week of October for renewal." [ADC006340] |
| 164 | On October 13, 2010, Polson submitted an HNR asking for his soft diet to be renewed. He was seen the next day, but the diet was not renewed because it did not expire until November 5, 2010. [ADC017272] |
| 165 | On November 16, 2010, Polson submitted three HNRs reporting that he had not had his soft diet for three days, because it was expired. Polson also stated that he could not take medications that needed to be taken with food. [ADC017267-69] On November 18, 2010, his diet was ordered. [*Id.*] |
| 166 | On November 18, 2010, Polson submitted an HNR, reporting that he was still not getting his soft diet. [ADC017266] The response stated that his diet order had been reissued on November 18, 2010. [*Id.*] |
| 167 | On November 27, 2010, Polson submitted an HNR, reporting that he was still not receiving his soft diet and that the officers would not give him his soft diet without a diet card. In response, an LPN told Polson that "All diet request need to made to chaplain [sic]." [ADC017325] |
| 168 | On October 24, 2011, Polson submitted an HNR stating that his mechanical soft diet would expire in November, and asked for the diet to be renewed. A dental assistant submitted a written response stating "Your partial was repaired and you are able to function. Therefore your [mechanical soft diet] will not be renewed." [ADC006284] |
| 169 | After Polson's October 24, 2011 HNR asking for the renewal of his soft diet, he was not seen by dental personnel until April 25, 2012, at which point a soft diet was ordered for 6 months. [ADC131378] |

-13-

| 170 | On May 9, 2012, Polson submitted an HNR and reported that the kitchen cancelled his soft diet. [ADC071780] On May 16, 2012, a dental assistant's note indicated that Polson "now ha[d] his card and is getting his diet." [ADC131378] |
| 171 | On February 11, 2013, Polson submitted an HNR and reported that his soft diet had been cancelled. [ADC071771] The soft diet was supposed to run through April 24, 2013. [ADC071751] On February 13, 2013, Polson's soft diet was reinstated. [ADC071767] |
| 172 | On February 15, 2013, Polson reported that his soft diet was not being prepared correctly, and the diet sheet was not always available. [ADC123143] The response claimed that the issue had been resolved. [ADC123142] |
| 173 | On March 8, 2013, Polson reported that his soft diet was not being prepared correctly, and that this was a recurring problem. [ADC123141] Polson received no response until May 15, 2013. [ADC123140] |
| 174 | On June 4, 2008, Polson submitted an HNR and stated that he had continuing severe ear pain. [ADC006406] The HNR response is dated June 16, 2008 and stated that Polson could "purchase Tylenol or Ibuprofen at the inmate store." [*Id.*] |
| 175 | On June 30, 2009, Polson submitted an HNR stating that he needs to "see a doctor for ear aches" and that his "ear aches bad." [ADC006371] The HNR response is dated July 17, 2009, and stated that an appointment would be scheduled with a health care provider. [*Id.*] |
| 176 | On July 19, 2009, Polson submitted an HNR complaining of "very bad ear aches right now." [ADC006359] |
| 177 | Polson was seen by a Licensed Practical Nurse (LPN) on July 21, 2009, for "ear pain" and the nurse observed, "unable to see ear drums due to wax build up" and Polson reported pain of "5 on a 10 scale." [DSOF ¶ 3091, ADC006198] |
| 178 | Polson was given Debrox ear drops, which treat wax buildup, not ear pain or ear infections, and instructed to follow up on the nurse's line in 7-10 days. [ADC006198] |
| 179 | Polson was seen again by an LPN on July 29, 2009, after he walked to the health unit. [ADC006195] |
| 180 | The nurse noted that Polson stated he had "ear pain in his left ear and both ears feel like water is stuck," and also observed that his left ear was "swollen, red ear drum seen, appears to be grossly intact" and right ear was "clear of wax, no redness, no c/o [complaints of] pain." [DSOF ¶ 3795, ADC006195] |
| 181 | The nurse called Dr. Wohler who prescribed "[ear drops] Neo/Poly susp otic 1% 4 drops four times a day x 10 days." [DSOF ¶ 3796, ADC006195] |

| 182 | Polson submitted another HNR on August 9, 2009, about his ear infection and was told he already had an appointment scheduled.   [DSOF ¶ 3798, ADC006365-66] |
| 183 | Polson submitted another HNR on August 14, 2009, noting that he was seen by a nurse 2-3 weeks ago and was given a 10-day prescription for antibiotics for his ear infection, but that the prescription had now expired.   Polson marked the HNR "URGENT" and stated "nothing is being done about my ears still hurting.  This is dangerous.  This is the second H&R I've put in.  When I was a kid I almost had to have tubes put in my ears." [ADC006360] |
| 184 | In response to this HNR, Polson was told two days later that a follow up appointment was scheduled for the Doctor's line.  [ADC006360] |
| 185 | On August 18, 2009, Polson was seen by a nurse who noted persistent ear ache primarily in his right ear. [ADC006194] |
| 186 | He was given antibiotics for his ears, but the prescription was marked "not refillable." [ADC130302] |
| 187 | Polson submitted another HNR marked "URGENT" on September 15, 2009, complaining of "severe ear aches again" that were "really bad." [ADC006358] |
| 188 | A day later, he was told he would be on the nurse's line.  [ADC006358] |
| 189 | Polson was not seen for his HNR marked "URGENT" until September 23, 2009, when a Physician's Assistant (PA) examined him and noted that he was complaining of a right ear ache.  [ADC006193] |
| 190 | Polson told the PA he has had "chronic ear infections since he was little." [DSOF ¶ 3806, ADC006193] |
| 191 | The PA observed that Polson's left ear had "no erythema seen in canal, TM clear," and that Polson's right ear has "tenderness… Red spot on superior TM [Tympanic Membrane], typical landmarks cannot be seen.  Dry white crust around external canal, slight impaired hearing." [DSOF ¶ 3807, ADC006193] |
| 192 | The PA also prescribed "Cipro Opth 4 drops in right ear twice a day x 14 days." [ADC006193] |
| 193 | Polson submitted another HNR on October 4, 2009, acknowledging he was seen by about his ear infection on September 23, 2009, but complaining he had not yet received his prescription ear drops.  [ADC006356-57] |
| 194 | Polson submitted an HNR marked "URGENT" on November 7, 2009, stating that he was "still having ear aches in my right ear and now in my left ear also," and stated that his "right ear has lost hearing." [ADC006354] |
| 195 | The same day he submitted his HNR, on November 7, 2009, Polson was seen by a nurse (LPN) to evaluate his complaints of ear pain.  [DSOF ¶ 3817, ADC006191] |

-15-

| 196 | Polson stated, "I've taken 2 sets of antibiotics for my ear and now my left ear is starting to hurt. I can't hear out of my right year." [DSOF ¶ 3818, ADC006191] |
| 197 | The nurse observed that his right ear has "erythema also dry white crust to upper canal. TM visible. Grey bulging matter." [DSOF ¶ 3819, ADC006191] |
| 198 | He was then referred to a health care provider to re-evaluate for need for more antibiotics (ABTs) or referral to an Ear, Nose and Throat (ENT) specialist. [DSOF ¶ 3820, ADC006191] |
| 199 | Despite this referral, Polson did not see a physician or an ENT specialist until over seven months later. [ADC006501-05] |
| 200 | Polson submitted another HNR on November 11, 2009, stating he was "pulled out on 11/6/09 by the nurse to check out my ear" but complaining he had not seen a doctor yet. [DSOF ¶ 3822, ADC006353] |
| 201 | He complained his ear "has no hearing now" and he has been through "two cycles of antibiotics ear drops and nothing has worked." [DSOF ¶ 3823, ADC006353] |
| **Named Plaintiff Wells** | |
| 202 | On October 14, 2009, Charlotte Wells received an intake examination, during which she presented with high blood pressure and chest pains. [DSOF ¶ 3987] |
| 203 | Her blood pressure was regularly monitored for the next month, but she did not see a doctor. [DSOF ¶¶ 3990-98, ADC006768] |
| 204 | On November 6, 2009, Wells submitted an HNR, explaining that she needed to see a doctor for her high blood pressure and pain radiating down her left arm and neck. [DSOF ¶ 3999, ADC007093] |
| 205 | On November 14, 2009, Wells submitted an HNR saying that she needed "some filing work done right away." [ADC007091] |
| 206 | Wells was not seen by a doctor until January 8, 2010. [DSOF ¶ 4002, ADC006698] |
| 207 | At her January 8 appointment, Wells complained of a fluttering heart and dizziness. [ADC006698] |
| 208 | Wells submitted another HNR on January 24, 2010, complaining of light-headedness and a fluttering heart. [ADC007092] |
| 209 | At no point between October 14, 2009 and February 14, 2010 was Wells referred to or examined by a cardiologist. |
| 210 | On February 15, 2010, Wells arrived at the ADC medical facility complaining of stabbing, throbbing chest pain. [DSOF ¶ 4030] |

| 211 | She was given nitroglycerine and taken to West Valley Hospital. [DSOF ¶ 4031] |
| 212 | On February 17, 2010, Wells underwent a cardiac catheterization. [DSOF ¶ 4032, ADC91649-50] |
| 213 | She was diagnosed with coronary artery disease, with an 80% occlusion of her left anterior descending artery, and had a stent placed there. [DSOF ¶ 4033, ADC91649-50] |
| 214 | Wells was discharged from West Valley Hospital on February 18, 2010. [DSOF ¶ 4035] |
| 215 | On February 19, 2010, an ADC doctor submitted a request to authorize an outside cardiology consultation for Wells. [DSOF ¶ 4044] |
| 216 | On February 20, 2010, Wells returned to the ADC medical unit complaining of chest pains and was seen by a nurse who gave her nitroglycerine. [DSOF ¶ 4037-38, 4041, ADC006688-89] |
| 217 | On February 23, 2010, Wells was seen by an ADC doctor for a follow-up visit regarding her chest pain. [DSOF ¶ 4045, ADC006687] |
| 218 | On March 5, 2010, that same ADC doctor, who was not a cardiologist, prescribed Nitrostat 0.4 mg for onset of chest pain. [DSOF ¶ 4050] |
| 219 | On March 6, 2010, Wells was seen at the ADC medical unit with complaints of numbness in her left arm. [DSOF ¶ 4053, ADC006685] |
| 220 | She was told to submit an HNR if the numbness continued. [DSOF ¶ 4055, ADC006685] |
| 221 | On March 9, 2010, Wells was seen at the ADC medical unit with complaints of stabbing pains in her left arm and neck and tightness in her chest. [ADC006684] |
| 222 | On March 19, 2010, Wells was examined by the same ADC doctor, who was not a cardiologist. [DSOF ¶ 4059, ADC006682] |
| 223 | On March 22, 2010, Wells submitted an HNR complaining of chest pain. [ADC007088] |
| 224 | On March 24, 2010, Wells was again examined by the same ADC doctor, who was not a cardiologist. [DSOF ¶ 4062, ADC006681] |
| 225 | On April 14, 2010, Wells submitted another HNR complaining of chest pain. [ADC007086] |
| 226 | On April 16, 2010, Wells was again examined by the same ADC doctor, who was not a cardiologist. [DSOF ¶ 4067, 6677-78] |
| 227 | On that same day, the ADC doctor submitted a second request for an outside cardiology consultation. [ADC006827] |

| 228 | The request was approved on April 22, 2010.  [ADC006827] |
| 229 | On April 26, 2010, Wells had an attack of angina and was given two doses of nitroglycerine.  [ADC006676] |
| 230 | On May 16, 2010, Wells submitted an HNR for symptoms including chest pain.  [ADC007085] |
| 231 | On June 8, 2010, Wells was seen at the ADC medical unit complaining of chest pain.  [ADC006668] |
| 232 | She was taken to West Valley Hospital, where her electrocardiogram came back abnormal.  [DSOF ¶¶ 4110, 4112] |
| 233 | On June 15, 2010, Wells – who had returned to ADC by that time – put in an HNR for chest pain, among other ailments.  [ADC007081] |
| 234 | On July 7, 2010, nearly five months after her cardiac catheterization, Wells was seen by the Affiliated Cardiologists of Arizona for an initial cardiac evaluation.  [DSOF ¶ 4131, ADC006745] |
| 235 | On July 29, 2010, Wells was seen by a dentist who advised her that per protocol, she could not undergo dental treatment for six months after her cardiac event.  [DSOF ¶ 949] |
| 236 | The dentist noted that she could be scheduled for a filling on tooth #13 sometime after August 15, 2010.  [DSOF ¶ 950] |
| 237 | Over a month later, on September 17, 2010, Wells was seen by a dentist but could not undergo treatment because she had uncontrolled blood pressure and was not feeling well.  [ADC198722] |
| 238 | Wells was cleared by medical to have dental treatment following review of her cardiologist's report, and she received a filling on tooth #13 on November 3, 2010, nearly a year after her initial request for a filling.  [ADC006855] |
| 239 | On December 19, 2010, Wells submitted an HNR for pain in the new filling as well as pain in a bottom tooth on the left side.  [ADC007064] |
| 240 | On January 24, 2011, Wells submitted a new HNR for fillings.  [DSOF ¶ 959] |
| 241 | On May 9, 2011, Wells had tooth #18 filled.  [DSOF ¶ 960] |
| 242 | On August 7, 2011, Wells submitted an HNR requesting fillings in two upper teeth.  [DSOF ¶ 965] |
| 243 | On September 16, 2012, Wells submitted an HNR regarding a broken tooth, stating that there may be a small air pocket exposing the nerve and asking that it be fixed before she went to court in November.  [ADC198925] |
| 244 | On June 9, 2013, Wells submitted an HNR requesting a filling on a bottom tooth.  [DSOF ¶ 972] |

-18-

| 245 | On August 8, 2013, Wells submitted an HNR regarding severe pain on an upper tooth.  [ADC198912] |
| 246 | On August 9, 2013, Wells was seen and complained of pain on tooth #13.  [DSOF ¶ 974] |
| 247 | The dentist determined that the pain was likely due to either traumatic occlusion or necrosis.  [DSOF ¶ 975] |
| 248 | Wells was given ibuprofen and told to return to the clinic for an extraction if her symptoms persisted.  [DSOF ¶ 976] |
| 249 | On August 29, 2013, Wells submitted an HNR for pain.  [DSOF ¶ 977] |
| **Named Plaintiff Verduzco** | |
| 250 | During her incarceration in ADC, chemical agents have been used on Ms. Verduzco on at least six occasions.  [DSOF ¶¶ 2951-3001] |
| **Named Plaintiff Thomas** | |
| 251 | During his incarceration in ADC, chemical agents have been used on Mr. Thomas on at least one occasion.  [DSOF ¶ 3080] |

2.     The following material facts, although not admitted, will not be contested at trial by evidence to the contrary:  N/A.

3.     The following issues of law are uncontested and stipulated to by the parties:

| 1 | This court has federal question jurisdiction over this case and it is properly venued in this Court.  28 U.S.C. §§ 1331, 1343; 28 U.S.C. § 1391(b). |
| 2 | It is law of the case that Defendants waived the exhaustion of remedy defense in the Tolling Agreement executed on November 7, 2011.  *See* Dkt. No. 175 at 6-9. |
| 3 | It is law of the case that ADC's duty to provide constitutionally adequate care to named plaintiffs and the plaintiff class is non-delegable and Defendants are "still ultimately liable for any constitutional deprivation that occurs."  *See* Dkt. No. 175 at 9-10. |
| 4 | It is law of the case that if Plaintiffs prove that Defendants have put the Plaintiffs at substantial risk of serious future harm to which Defendants are deliberately indifferent, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, then Plaintiffs have satisfied the requirement of commonality.  *Parsons v. Ryan*, 754 F.3d 657, 676-85 (9th Cir. 2014). |
| 5 | It is law of the case that if Plaintiffs prove that Defendants have put the Plaintiffs at substantial risk of serious future harm to which Defendants are deliberately indifferent, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and |

| | |
|---|---|
| | confinement, then they have satisfied the requirement of typicality. *Parsons*, 754 F.3d at 685-86. |
| 6 | It is law of the case that if Plaintiffs prove that there are uniform changes in statewide ADC policy and practices that would remedy the injury to the Plaintiffs class, the relief sought conforms to Federal Rule of Civil Procedure 23(b)(2). *Parsons*, 754 F.3d at 686-89. |
| 7 | It is law of that case that Plaintiffs have standing because they allege exposure to a substantial risk of serious future harm to which Defendants are deliberately indifferent. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."); *see also Parsons v. Ryan*, 754 F.3d at 676 (quoting *Helling*, 509 U.S. at 33). |
| 8 | It is law of the case that the Plaintiffs class is so numerous that joinder of all members is impracticable. *Parsons*, 754 F.3d at 674. |
| 9 | It is law of the case that Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff class pursuant to Federal Rule of Civil Procedure 23(a)(4). *Parsons*, 754 F.3d at 674. |
| 10 | This action is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(b)(1) and 23(b)(2). |
| 11 | The Eighth Amendment is violated when prison officials, acting with deliberate indifference, expose prisoners to a substantial risk of serious harm and injury. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that official acted or failed to act despite his knowledge of a substantial risk of serious harm and injury. *Id.* at 842. |
| 12 | "The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care. Prison officials show deliberate indifference to serious medical needs if prisoners are unable to make their medical problems known to the medical staff. Access to the medical staff has no meaning if the medical staff is not competent to deal with the prisoners' problems. The medical staff must be competent to examine prisoners and diagnose illnesses. It must be able to treat medical problems or to refer prisoners to others who can. Such referrals may be to other physicians within the prison, or to physicians or facilities outside the prison if there is reasonably speedy access to these other physicians or facilities. In keeping with these requirements, the prison must provide an adequate system for responding to emergencies. If outside facilities are too remote or too inaccessible to handle emergencies promptly and adequately, then the prison must provide adequate facilities and staff to handle emergencies within the prison. These requirements apply to physical, dental and mental health." *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982). |
| 13 | "Courts have focused on the presence or absence of six basic, essentially common sense, components of a minimally adequate prison mental health care delivery system. ...The six components are: (1) a systematic program for screening and evaluating inmates to identify those in need of mental health |

| | |
|---|---|
| | care; (2) a treatment program that involves more than segregation and close supervision of mentally ill inmates; (3) employment of a sufficient number of trained mental health professionals; (4) maintenance of accurate, complete and confidential mental health treatment records; (5) administration of psychotropic medication only with appropriate supervision and periodic evaluation; and (6) a basic program to identify, treat, and supervise inmates at risk for suicide." *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 & n. 10 (E.D. Cal. 1995). |
| 14 | Deprivation of social interaction and environmental stimulation can violate the Eighth Amendment.  See, e.g., Scarver v. Litscher, 371 F.Supp.2d 986, 1001 (W.D. Wis. 2005); Ruiz v. Johnson, 37 F.Supp.2d 855, 914-15 (S.D. Tex. 1999), rev'd on other grounds, 243 F.3d 941 (5th Cir. 2001); adhered to on remand, 154 F.Supp.2d 975 (S.D. Tex.  2001). |
| 15 | Some conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 305 (1991) (internal quotation marks and emphasis omitted). |
| 16 | Isolated confinement of prisoners with serious mental illness violates the Eighth Amendment. *See, e.g., Casey v. Lewis*, 834 F. Supp. 1477, 1548, 1550 (D. Ariz. 1993); ; Coleman v. Wilson, 912 F. Supp. 1282, 1320-21 (E.D. Cal. 1995); Madrid v. Gomez, 889 F. Supp. 1146, 1265-66 (N.D. Cal. 1995). |
| 17 | Sleep "undoubtedly counts as one of life's basic needs." *Harper v. Showers*, 174 F.3d 716, 720 (5th Cir. 1999). Moreover, "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." *Keenan v. Hall*, 83 F.3d 1083, 1090 (9th Cir. 1996) (internal citation and quotation omitted). |
| 18 | Use of chemical agents like pepper spray on mentally ill prisoners can violate the Eighth Amendment. *Thomas v. Bryant*, 614 F.3d 1288, 1310-11 (11th Cir. 2010) (use of chemical agents on prisoner with mental illness "constituted an extreme deprivation sufficient to satisfy the objective prong" of the Eighth Amendment); *Coleman v. Brown*, 2014 WL 1400964, at *7 (E.D. Cal. Apr. 10, 2014) (describing use of force, including pepper spray, on mentally ill prisoners as "horrific" and finding continuing Eighth Amendment violation). |
| 19 | "Adequate food is a basic human need protected by the Eighth Amendment. While prison food need not be tasty or aesthetically pleasing, it must be adequate to maintain health.*" Keenan*, 83 F.3d at 1091 (citation and quotation omitted); see also *Graves v. Arpaio*, 2008 WL 4699770, at *46 (D. Ariz. Oct. 22, 2008) (finding violation of pretrial detainees' constitutional right to adequate nutrition). |
| 19 | "Exercise is one of the most basic human necessities protected by the Eighth Amendment.  Like food, it is a basic human need protected by the Eight Amendment." *Thomas v. Ponder*, 611 F.3d 1144 (9th Cir. 2010) (citation and quotation marks omitted). |
| 20 | Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of |

|  | a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief. 18 U.S.C. § 3626 (a)(1).  This standard is "nearly identical" to the pre-PLRA standard for entry of injunctive relief in contested cases. *Gilmore v. State of California*, 220 F.3d 987, 1006 (9th Cir. 2000). |
|---|---|
| 21 | The court can award costs of suit and reasonable attorneys' fees and litigation expenses to a prevailing party pursuant to 42 U.S.C. § 1988. |

78204-0001/LEGAL123450222.1

**DEFENDANTS' SECTION**

**1.     The following material facts are admitted by the parties and require no proof:**

**The Parties.**

1.     Plaintiffs represent the class of all prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of ADC.

2.     At the time this lawsuit was filed, Defendant Richard Pratt was the Interim Assistant Director, following the retirement of Dr. Michael Adu-Tutu in February 2012.

3.     Art Gross took over as Assistant Director in October 2012.

4.     Pratt was renamed the Interim Assistant Director on March 1, 2013. Defendant Charles Ryan is the Director for the Department of Corrections, and has been the Director since January 30, 2009.

5.     Director Ryan ("Director") is ultimately responsible for the health care provided to inmates and for the conditions of their confinement.

6.     The Director delegates oversight of inmate healthcare to the Division Director of ADC's Health Services Contract Monitoring Bureau ("Assistant Director").

7.     The Arizona Department of Corrections ("ADC") has ten different facilities (or Arizona State Prison Complexes ("ASPC")): Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford, Tucson, Winslow, and Yuma.

8.     Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma are considered corridor facilities because of their proximity to Phoenix and Tucson.

9.     Douglas, Safford, and Winslow are not corridor facilities, and house healthier, low custody inmates.

10.     Florence and Eyman house death row inmates, Security Threat Groups ("STG") inmates, sex offenders, and some general population inmates.

11.     Lewis houses primarily protective custody inmates.

12.     ASPC-Perryville houses all female inmates.

13.     ASPC-Phoenix is the intake and reception center for all male inmates.

14.     The following facilities are currently accredited by The National Commission on Correctional Health Care ("NCCHC"):    Douglas, Florence, Lewis, Yuma, Phoenix, Perryville, Winslow, Safford, and Tucson.

15.     On March 31, 2014, ADC facilities total population was 34, 444:

Phoenix: 655 inmates.

Winslow:  1,731 inmates.

Douglas: 2,376 inmates.

Eyman: 5,128 inmates.

Florence: 4,028 inmates.

Lewis: 5,502 inmates.

Tucson:  4,998 inmates.

Safford:  1,713 inmates.

Perryville:  3,757 inmates.

Yuma:  4,556 inmates.

16.     Eyman, Florence, Lewis, Perryville, Phoenix, Tucson, and Yuma are considered corridor facilities because of their proximity to Phoenix and Tucson.

17.     Douglas, Safford, and Winslow are not corridor facilities, and house healthier, low custody inmates.

18.     Florence and Eyman house death row inmates, STG inmates, sex offenders, and some general population inmates.

19.     Lewis houses primarily protective custody inmates.

20.     All facilities, except Eyman, are in compliance with National Commission on Correctional Health Care ("NCCHC") standards and are accredited.

**ADC Healthcare.**

21.     It is the mission of ADC's Health Services Division to "provide constitutionally mandated health care to the offenders of the Arizona Department of

Corrections," and Health Services Staff "hold to the basic tenets of the modern Hippocratic Oath" as guiding principles.

22.     54. One of ADC's goals for FY 2013-2017 is to "provide cost effective constitutionally mandated correctional health care," which includes providing for the health care of the inmate population committed to the Department of Corrections" "in accordance with the laws of the state of Arizona and in accordance with the state constitution and the constitution of the United States."

23.     55. ADC's healthcare budget for fiscal year 2014 is $131,500,000: $125,000,000 paid to Corizon and $6,500,000 devoted to monitoring and litigation costs.

**Privatization**.

24.     On September 3, 2009, the Governor approved H.B. 2010.

25.     H.B. 2010 required ADC to "issue a request for information for the privatization of all correctional health services, including all medical and dental services, that are provided in a state owned and operated facility," by October 1, 2009.

26.     ADC was required to "award a contract to a private provider of correctional health services that will provide such services, including all medical and dental services, at a cost below the fiscal year 2007-2008 total cost to the state for such services."

27.     Wexford was initially awarded the contract, as it was determined to be the "best qualified bidder," which was not dictated by "price" but based on an overall evaluation of a number of factors; Wexford scored better than the other two bidders.

28.     Wexford began its tenure on July 1, 2012.

29.     After ADC issued its Cure Notice and Sanction Letter, Wexford was required to put together a plan of action and present it to ADC.

30.     Wexford never did this, however, and instead, during a November 7, 2012 presentation (which was intended for that purpose), Wexford representatives presented a PowerPoint criticizing ADC and its provision of health care.

31.     Wexford presented only parts of the PowerPoint, and it was designed as a "one-way communication; Wexford did not want a dialogue.

32.     Wexford refused to provide a copy of the PowerPoint to ADC.

33.     The PowerPoint was their response to the Cure Notice; it "was an exit strategy."

34.     There was no truth to the allegations in the PowerPoint.

35.     Following the presentation, the Director asked Wexford's CEO if he was interested in continuing the contract, and Wexford indicated that they were and would develop a plan of action.

36.     The next day, Wexford informed ADC that it wanted to sever the contract; ADC agreed because Wexford did not want to continue.

37.     Wexford wanted out because of this lawsuit.

38.     To ensure continuity of healthcare, ADC went back to Corizon and Centurion , who bid on the original contract, as possible vendor successors.

39.     Corizon was awarded the contract and began its tenure on March 4, 2013.

40.     The correctional health services contract (the "Contract") incorporates ADC's October 21, 2011 RFP No. ADOC12-001105 as well as the Contractor's proposals and supplemental proposals.

41.     The Contractor agrees to provide medical, dental, pharmaceutical, and mental health services at all Arizona state prison complexes.

42.     It also agrees to provide routine, urgent and emergency healthcare to all inmates and establish preventative healthcare practices.

43.     The Contract requires that the Contractor provide all inmates with constitutionally mandated care and must comply with all ADC orders, instructions and procedures.

44.     The Contractor also must comply with NCCHC standards for health and mental health services, "which address general areas of care and treatment, health records, administration, personnel and medical-legal issues."

45.     The Contract establishes specific requirements for, among other things: (1) urgent and emergency care; (2) timely access to care; (3) medical provider staffing;

-4-

(4) chronic illness and infectious disease care; (5) medical diets; (6) a telemedicine program; (7) segregated or isolated inmate care; (8) medication management; (9) dental care; (10) mental health services; (11) suicide prevention; and (12) responding to inmate grievances.

**ADC Contract Monitoring.**

46.     In order to ensure compliance with contractual requirements and ensure inmate safety and health, Corizon is responsible for "meeting specified quarterly performance outcomes and measures, by discipline, deemed crucial in measuring compliance with [ADC] expectations of service delivery…."

47.     Corizon is required to establish internal quality improvement programs and utilization management programs to help self-monitor their compliance with the Contract.

48.     The Contract also allows ADC to maintain oversight through appointing a Contract Monitor and regular audits and reports.

49.     The Health Services Contract Monitoring Bureau oversees contract compliance and quality/clinical care.

50.     The contract compliance component is responsible for ensuring that private vendors are fulfilling their contractual obligations with ADC.

51.     Corizon's performance is measured by evaluating performance measures on a daily basis.

52.     Each facility has a contract monitor that is responsible for ensuring Corizon's compliance with its duties relating to health care under the ADC-Corizon contract.

53.     The contract compliance monitors have years of clinical and correctional experience, and they go through orientation and training, including on-the-job training.

54.     The contract monitor conducts random and routine reviews, quarterly audits and meetings with Corizon staff (to:  (1) "review inmate access to care, compliance with NCCHC Standards, and adherence to required [ADC] policies, procedures and regulatory

directives" to assure that inmates' health service needs are adequately met, and (2) review the terms of the Contract to assure the needs of the State and ADC are adequately met.

55.     The contract monitor reviews multiple performance outcomes and measures, such as timeliness of providing medical services and mental health assessments and the accuracy of medical records.

56.     Each month, ADC contract monitors evaluate a selected number of these performance measures at each facility.

57.     The contract monitors at each facility measure the same performance measures that are selected for that month.

58.     There are over two hundred performance measures.

59.     Forty three (43) performance measures are sanctionable if non-compliant for that measurable quarter.

60.     These 43 sanctionable performance measures are measured every month at each facility, in conjunction with additional non-sanctionable selected performance measures for that particular month.

61.     Sanctionable performance measure results are computed based upon quarterly results tallied by the months in that specific quarter.

62.     The total number of non-sanctionable performance measures evaluated in a particular month varies from month to month.

63.     The contract with Wexford required 100 percent compliance with the sanctionable performance measures.

64.     During Wexford's tenure, it became clear that many of the performance measures were too subjective, making it difficult to determine compliance in a consistent manner.

65.     When Corizon took over, ADC re-tooled the performance measures so that they were more objective and measureable.

66.     Although the goal was still 100 percent compliance with every sanctionable performance measure, the performance measures were separated into three levels

(Level 1, 2, 3), and compliance threshold levels were created (less than 100 percent) based on the level of the performance measure.

67.     In March, April, May, and June 2013 (Quarter 1), each level required a minimum 75 percent compliance rate.

68.     In July, August, and September 2013 (Quarter 2), Level 1 performance measures required a minimum 75 percent compliance, Level 2 performance measures required a minimum 78 percent compliance, and Level 3 performance measures required a minimum 80 percent compliance.

69.     In October, November, and December 2013 (Quarter 3), the compliance levels were modified again: Level 1 performance measures required a minimum 80 percent compliance, Level 2 performance measures required a minimum 83 percent compliance, and Level 3 performance measures required a minimum 85 percent compliance.

70.     In January, February, and March 2014 (Quarter 4), the compliance levels were modified again: Level 1 performance measures required 85 percent compliance, Level 2 performance measures required 88 percent compliance, and Level 3 performance measures required 90 percent compliance.

71.     The Medical Green Amber Red Report, which is taken from DO 703 is a tool used to assess the performance outcomes and measures set forth in the contract.

72.     If a facility meets the performance measure's compliance level in a given month, it receives a green rating.

73.     If it does not meet the compliance level, the contract monitor assigns it either an amber or red rating.

74.     These ratings are memorialized in a document called the Monthly Green Amber Red ("MGAR").

75.     The Health Services Contract Monitoring Bureau, including the contract compliance monitors and the Assistant Director, review the MGARs for deficiencies.

76.     Any performance measure that does not meet the compliance level requires a corrective action plan.

77.     Contract monitors expect to receive corresponding corrective action plans within two weeks, and will either approve it or reject it and specify what more needs to be done.

78.     The monitors are responsible for determining, in their professional judgment, whether Corizon is complying with a specific performance measure.

79.     The quality/clinical care component of the Bureau is primarily responsible for overseeing the quality of care that is provided to ADC inmates, including medical care, dental care, and mental health care, and ensuring that certain standards are met.

80.     These employees focus on the clinical aspect of the care provided.

81.     ADC and Corizon representatives meet weekly for approximately one to two hours.

**Corizon Reporting.**

82.     Corizon is required to prepare and submit various reports, including: quarterly statewide Chronic Condition/DM Program Reports; monthly HNR Appointment Reports; monthly Inmate Formal Grievance Reports; monthly Inmate Wait Times Report; monthly statewide Intake Report; monthly Staffing Reports; and quarterly statewide Utilization Review Reports.

83.     Corizon is also required to submit additional or ad hoc reports that may be needed to respond to grievances, inquiries complaints or other questions raised by inmates or others.

84.     Corizon produces monthly reports, many of which are required under the contract with ADC.

85.     A description of the types and frequency of these reports is contained in **Exhibit R**.

86.     Graphs and charts which exhibit the statistical data contained in these reports from April 2013-April 2014 are memorialized in **Exhibit R**.

**ADC's Medical Policies.**

87.     The Health Services Technical Manual ("HSTM") provides "guidance for Health Services Division staff to ensure access to, and provision of, high quality and well organized Health Services to inmates that are incarcerated in facilities that are under the medical auspices of the Arizona Department of Corrections."

88.     The procedures for intake screening and inmate transfers are outlined in **Exhibit M**.  These policies and procedures comport with the applicable standard of care and are constitutionally adequate.

89.     Clinical encounters are conducted in private, without being observed or overheard by security personnel, to the extent safety and security can be maintained.

90.     Documented clinic inspections are conducted to ensure a clean and sanitary working environment; areas inspected include nurses stations, storage areas, exam rooms, pharmacy/medication rooms, x-rays, lab, medical records office, and other administrative clinic office areas.

**Health Needs Request ("HNR") Process.**

91.     ADC inmates (including maximum custody inmates) may advise prison medical personnel of non-emergency medical requests or requests for appointments by submission of a written form called a Health Needs Request ("HNR") form.

92.     After completion of the HNR, the inmate must drop the HRN in the appropriately labeled drop box located in the housing unit.

93.     A detailed description of the HNR processes and procedures is contained in **Exhibit M**.

**Access to Healthcare.**

94.     It is ADC practice and policy to provide all inmates with timely and effective health care.

95.     Upon arrival at each facility, inmates are given written information, in English and Spanish, about how to access emergency and routine medical, mental health, and dental services, including instruction regarding the purpose, use, and preparation of an

HNR form, the fee for service program, the grievance process for health-related complaints; this information is also given verbally during intake.

96.   Access to healthcare signs are posted throughout the complexes in both English and Spanish.

97.   Inmates are not denied care due to being indigent.

98.   The HSTM, Chapter 5, Section 3.1, sets forth ADC's policy for inmate access to necessary health care.

99.   All inmates access non-emergency health care by making an appointment, which is done by completing a non-emergency Health Needs Request (HNR).

100.   Completed HNRs are deposited in a labeled box and picked up daily by health staff.

101.   It is not the practice in the facilities to refuse requests for health care simply because the request is not on the approved form for such a request.

102.   Requests are not ignored simply because they are not made in an HNR form or because they are made on photocopies of an HNR form.

103.   Healthcare staff will also accept and resolve verbal requests for healthcare treatment.

104.   Healthcare staff will also accept and resolve HNR Forms that are filled out by another inmate.

105.   Nursing staff review and triage the HNR within four hours of receiving the HNR, and schedule the inmate for an appointment.

106.   Triaging of HNRs is performed to sort and classify the inmates' health requests to determine priority of need and the proper place for inmate care to be rendered.

107.   HNRs that indicate the inmate may have or be suffering from a condition that requires immediate attention will be scheduled to be seen the same day that the HNR is received.

108.   If the triaging nurse is able to acquire/provide/schedule an immediate response to the inmate's needs (e.g., medications update, blanket, diet comment, review of lab/x-ray report, or creating an inmate communique), he/she will do so.

109.   If the triaging nurse cannot determine what the inmate needs or cannot provide what the inmate requests, the inmate is seen within 24 hours.

110.   An HNR that requests only information may be returned to the inmate with the appropriate response without the need for making an appointment.

111.   At the discretion of the health services staff, and with consideration of time constraints and other inmates, at a given scheduled appointment more than one medical issue or complaint may be addressed or attended to; only one co-pay charge will be made for a single visit regardless of the number of issues addressed.

112.   Missed appointments can occur for a variety of reasons, including inmate refusal or security-generated complications.

113.   If an inmate misses a scheduled appointment, it is reviewed to determine whether it needs to be rescheduled; this review is performed on a comparative priority basis to determine whether the inmate should be seen prior to existing appointments or the appointment should be cancelled altogether.

114.   If medical staff is unable to see all inmates scheduled for an important on a given day, any inmates that were not seen are rescheduled to be seen as early as possible and at the next available appointment time.

115.   An inmate may cancel an appointment that was created by his HNR for limited medical attention on the Nurses' line (e.g., cold symptoms that have improved since submitting the HNR).

116.   HNR requests that have resulted in scheduling a physician/provider, mental health practitioner, and dental staff, and appointments initiated by nursing and/or a medical provider as follow up visits, counseling, additional procedures, lab testing, etc., cannot be cancelled by the inmate without coming to medical and completing a Refusal to Submit to Treatment form.

78204-0001/LEGAL123450222.1

117.   An inmate cannot cancel an appointment to address a serious medical condition without coming to the health unit and being informed of the impact of refusing care and treatment for the medical issue.

118.   Completion of a Refusal to Submit to Treatment form must be signed by the inmate and his signature witnessed by staff.

119.   If an inmate refuses to accept treatment and refuses to fill out a Refusal to Submit to Treatment form, his refusal is witnessed by staff and documented.

120.   HNRs requesting non-emergency mental health or dental services are referred to the relevant mental health or dental staff within twenty four hours of receipt of the HNR form.

121.   In the event an HNR requests a serious mental health or dental emergency, nursing staff is to contact available mental health or dental staff, including on-call staff, after-hours, weekends, and holidays.

122.   Mental health staff are required to review HNRs requesting mental health services upon receipt, and review HNRs requesting mental health services received during weekends/ and/or holidays no later than the next working day.

123.   Mental health staff are required to respond to HNRs requesting non-emergency mental health services within five working days.

124.   Mental health staff are required to respond to HNRs indicating serious mental health symptoms or complaints within twenty four hours by conducting a face-to-face evaluation.

125.   Dental staff are required to review HNRs requesting dental services upon receipt, and review HNRs requesting dental services received during weekends/ and/or holidays no later than the next working day.

126.   Dental staff are required to respond to HNRs requesting non-emergency dental services within five working days.

127.   Dental staff are required to respond to HNRs indicating serious dental symptoms or complaints within twenty four hours by conducting a face-to-face evaluation.

128.   The Contract requires that, within 72 hours after an inmate is incarcerated, medical staff must conduct an intake medical, dental and mental health assessment, assign each inmate a medical score and mental health score, and then develop treatment plans, as necessary for each inmate.

129.   Under the Contract, Corizon is responsible for ensuring all health service providers provide routine specialty care within 60 days, urgent care within 30 days and immediate emergency care.

**Staffing.**

130.   Under the Contract, Corizon is expected to "employ[s] sufficient staffing and utilize[s] appropriate resources to achieve contractual compliance."

131.   Corizon was required to propose a staffing plan to demonstrate how they will adhere to or exceed all applicable standards of care at each prison complex and health service unit.

132.   Corizon was also required to propose a staffing plan for onsite specialty services, such as dialysis, optometry and ultrasound.

133.   Corizon is required to develop safe nurse staffing patterns, according to the American Nurses Association Principles on Safe Staffing, based on the needs of each unit.

134.   Corizon is also required to have a physician on-call 24 hours a day, seven days a week, who must come onsite as needed to make assessments, write orders or provide care.

135.   The infirmary also must be supervised by an onsite RN 24 hours a day, seven days a week.

136.   Mental health practitioners also must be available at all institutions 24 hours a day, seven days a week.

137.   During after-hours, weekends and holidays, mental health practitioners must be available by telephone for emergency consultation and direction.

138.   The Contractor is also required to implement mental health practice guidelines based on nationally accepted standards and train staff on these guidelines.

139.   All staff are subject to ADC's review and approval, and Corizon is required to notify and consult the Warden and Contract Monitor before terminating any professional staff.

140.   All staff are required to receive training on basic life support, first aid, suicide prevention and recognizing signs and symptoms of mental disorders or chemical dependence.

141.   All primary care clinicians, including medical physicians, dentists, nurse practitioners, physician assistants, psychiatrists and PhD level psychologists, are also required to have annual peer reviews, as required by NCCHC standards.

**Health Services Fees.**

142.   Pursuant to A.R.S. § 31–201 and DO 1101, inmates are charged a $4.00 co-pay for each healthcare visit.

143.   The following inmates or medical visits by inmates, are exempt from paying this co-pay and fees for prescriptions, medication, or prosthetic devices: medical visits initiated by the medical or mental health staff of the department; medical visits to a physician by inmates who are referred by a physician assistant or nurse practitioner; any condition requiring regular examination, treatment, or follow up as determined and documented by medical staff; inmates who are undergoing follow-up medical treatment for chronic diseases; inmates at reception centers; juvenile inmates; pregnant inmates; seriously mentally ill inmates; developmentally disabled inmates who are housed in a special programs unit; inmates who are housed in unit 8 at the Florence prison facility; inmates who are inpatients at the Alhambra prison facility special programs psychiatric hospital or at the Flamenco prison facility mental health treatment unit; and all visits to

-14-

IPC (Inpatient Components, which function like a medical infirmary with overnight bed accommodations).

144.   No inmate is denied care due to lack of funds or being indigent.

**Nurse Line.**

145.   The nurse line is available for inmates for follow-up encounters as ordered by a provider, as well as routine services such as annual TB testing, vital sign checks, educational services, and wound care.

146.   The Contract requires Corizon to respond to inmate HNRs for non-emergency care (or sick call), allow inmates to sign-up for sick call seven days a week, and triage the sick call list every day.

**Diagnostic Follow-Up.**

147.   Medical staff are required to track important diagnostic reports and consultation requests.

148.   Diagnostic reports are reviewed by a provider, and signed, stamped, and dated prior to filing into the inmate's medical record.

149.   Nursing staff are required to follow through with orders from providers to assure that the order is completed as ordered.

150.   Laboratory staff follow-up on pending lab results with the laboratory contractor, forward lab results to the appropriate provider for review, and notify the provider immediately of any critical results.

151.   Radiology technologists are required to follow-up with the radiologist contractor if reports are not timely received.

**Telemedicine.**

152.   ADC provides telemedicine services in its major facilities to reduce the need for outside sendouts for medical attention, thus minimizing security issues and escort requirements.

153.   Telemedicine appointments are prescheduled each month, similar to offsite medical appointments.

154.   Appointments for telemedicine services may only be refused at the telemedicine location to permit full disclosure to the inmate by the medical specialist of the medical consequences of his refusal.

155.   Per the Contract, Corizon was required to develop a telemedicine program, according to NCCHC standards, and submit a plan to expand telemedicine services.

156.   ADC "has a long history of utilizing telemedicine services and has made significant investments in an infrastructure to support such services in each ASPC location."

157.   A telemedicine program is beneficial in a correctional setting because it decreases transportation costs, increases community and staff safety, and improves the quality, coordination and efficiency of health care services through improved access and availability of specialty services.

158.   The Contractor is also required to review its telemedicine plan semi-annually and submit reports, assessing efficiency, quality and inmate satisfaction and proposing revisions to the program.

**Emergency Care.**

159.   Staff is required to assess and render aid to all medical emergencies, including suicide attempts, within three minutes of becoming aware of a non-responsive inmate.

160.   In the event that an inmate is found non-responsive, in a state of medical emergency, or in the act of attempting suicide, staff must assess the situation and render in-cell aid as soon as possible.

161.   Within three minutes of responding to an emergency, staff must activate the Incident Command System ("ICS"), which notifies supervisory staff and medical responders, issue two loud orders for inmate response, conduct a visual sweep of the area to determine that no weapons are present or accessible, and, if an inmate's hands cannot be seen, staff must make an immediate judgment to determine whether the inmate's condition outweighs the potential risk involved in entering the cell.

78204-0001/LEGAL123450222.1

162.   All licensed nurses are trained in providing emergency nursing care to the patient in need of those services.

163.   Nurses are provided emergency response orders, which are step-by-step written instructions from a provider on providing emergency acute care to an inmate during a life-threatening event.

164.   Annual documentation and demonstration of skills and knowledge in regards to the Nursing Assessment/Procedures, Emergency Response Orders is required of all licensed nurses.

165.   The Chief of Security and shift commanders are given written instructions about the appropriate intervention for each medical emergency which may arise from a chronic condition existing in the institution.

166.   Correctional officers are required to receive health-related training every two years so that they can recognize when to refer an inmate to healthcare staff and to be able to provide emergency care until healthcare staff arrives.

167.   This training includes administration of first aid, recognizing the need for emergency care and intervention in life threatening situations (e.g., heart attack), recognizing acute manifestations of certain chronic illness (e.g., asthma, seizures), adverse reactions to medications, recognizing signs and symptoms of mental illness, knowledge of procedures for suicide prevention, appropriate referral of healthcare complaints, and procedures and precautions with respect to infectious and communicable diseases, and cardiopulmonary resuscitation.

168.   If a medical emergency is considered life threatening, 911 is immediately contacted.

169.   Security provides support and arranges for emergency transportation.

170.   Specific portions of the inmate's medical records are transported with the inmate during an emergency transportation.

171.   Emergency transport includes ground transportation or air transportation.

172.   ADC contracts with local hospitals for emergency care, trauma, intensive care, and routine hospitalized care for all anticipated medical conditions.

173.   Hospital admissions can be prescheduled, direct (for urgent situations), or emergent (emergency room).

174.   Once admitted and hospitalized, ADC medical staff monitors the inpatient care and can authorize additional procedures proposed by the hospital/specialist.

175.   Once discharged, the inmate is returned to an ADC health services unit and assessed; staff determine any continuity of care issues, identify any medications the inmate may have been sent back with, obtain new prescriptions, identify any follow-up with a provider and/or return visits to a specialist, and identify any special needs for continued recovery.

176.   The Contract requires Corizon to provide a "standardized program of routine, urgent and emergency healthcare" for all inmates at a level "equivalent or surpassing the community standard of care."

177.   The Contract requires Corizon to provide emergency medical or mental health care 24 hours a day, seven days a week and maintain continual onsite nursing staff, who "may contact medical, dental, and mental health practitioners by telephone for consultation and direction."

178.   The Contract also requires Corizon to establish a network of off-site medical providers and coordinate inmate transportation for emergency and non-emergency care.

179.   In Corizon's January 3, 2012 proposal, which is incorporated in the Contract, Corizon committed that "[i]n addition to the above specific personnel points, Corizon plans to enhance care and reduce avoidable out of facility emergency transfers by adding a Rapid Response Team (RRT) to ensure availability 24-hours per day, 7 days per week. The number of members of the RRT is customized by Complex to provide adequate facility coverage in each Complex."

180.   In the staffing plan for ASPC-Tucson, Corizon recognized "that the Tucson Complex is a high acuity corridor facility [and further] recognizing the physical and

security units outside the main fence, we are implementing two RRTs.  We will place one team in the Rincon unit to support the units within the main fence while also placing an RRT in the Whetstone unit to assure timely access to the three units outside the main security perimeter.  In addition to ensure adequate staffing for the special needs and medically vulnerable populations in the Manzanita units, Corizon will maintain evening shift licensed nurses services while utilizing the additional capacity of the Rapid Response Team from Whetstone to minimize out of facility transportations and enhance emergency response."

**Chronic Care.**

181.   A chronic condition is an illness or condition that affects an individual's well-being for an extended interval, and generally is not curable, but can be managed to provide optimum functioning within any limitations the condition imposes on the individual.

182.   Chronic conditions include diabetes, hypertension, cardiac disease, TB, asthma, seizure, HIV/AIDs, tuberculosis, hepatitis C, and cancer.

183.   Inmates are screened at intake for chronic conditions, and provided a treatment plan that includes the frequency of follow-up examinations, type and frequency of diagnostic testing, therapeutic medications and modalities, and patient education.

184.   There is no healthcare fee for chronic conditions examinations and treatment.

185.   Facilities are required to ensure the existence and use of a chronic condition tracking system by which inmates who have been identified as having a chronic condition can be scheduled regularly for various examination, evaluation and follow-up care.

186.   Inmates with chronic conditions are scheduled routinely for three to twelve months based upon their health status.

187.   Inmates with chronic or monitored conditions are required to be examined at least every six months; diabetic inmates are required to be seen at least once a quarter.

188.    Healthcare staff is required to reorder medications and treatment for inmates with chronic conditions in a timely manner to avoid interruption or unnecessary delay.

189.    All inmates over 55 years of age are offered an annual physical examination, and inmates with chronic or other monitored conditions are required to have an annual physical.

190.    The senior nursing staff member on each unit ensures that inmates with chronic conditions are scheduled to be examined and/or treated at least every six months by a medical provider.

191.    Physicians, physician's assistants, the director of nursing and nurses are required to re-order medications and treatments for inmates with chronic conditions in a timely manner so the inmates receive the necessary treatment for their chronic conditions without interruption or delay

192.    Inmates with chronic disease are provided information that is designed to increase their ability to monitor and manage their health status.

193.    Under the Contract, Corizon was required to develop and implement Chronic Condition Disease Management programs, identify chronically ill inmates, ensure these inmates are visited by a medical provider at least twice a year or more often as required, develop treatment plans for these inmates, and assign a case manager (such as a RN, behavioral health or other clinical staff) to work with inmates with complex, high cost conditions.

**Infirmary Care.**

194.    Inmates that require more definitive and supportive care than an inmate can receive in general housing areas are placed in specially designed and staffed areas known as IPC (Inpatient Components), which function like a medical infirmary with overnight bed accommodations, to provide for this level of care.

195.    Movement in and out of an IPC is controlled and directed by medical staff and is based upon medical condition; IPCs are not used for detention or other security purposes.

-20-

196.   All visits to an IPC are at no charge to the inmate.

197.   The level of care provided in an IPC includes: acute care (any combination of frequent observation, assistance with care activities, dressing changes, IV fluids or medications, self-care instructions, or pain management); complete care (unable to perform any self-care, needs to be turned, may need suctioning, oxygen-dependent, bowel and bladder care, tube feedings); supportive (able to perform own care but needs constant supervision and verbal cueing); and convalescent (can do own care but lacks stamina to function in general population).

198.   Nursing staff observe, visit, and assess IPC inmates on a daily basis, and a medical provider is required to visit an IPC inmate no more than every 72 hours.

**Specialty Care.**

199.   The rates that ADC can pay outside providers is set by statute; some providers refuse to accept the statutory rate, but this is not something ADC can control.

200.   Health Services Technical Manual Chapter 4, Section 3.0, Paragraph 8.1, sets forth ADC's policy regarding X-rays.

201.   The specific procedures for X-rays is set forth in **Exhibit M**.

202.   Inmates are prescheduled for offsite appointments and hospital visits.

203.   The detailed processes and policies utilized to facilitate these offsite appointments and hospital visits are outlined in **Exhibit M**.

**Terminal Care.**

204.   If an inmate is in need of terminal care, they are placed in an infirmary setting or taken to the hospital.

205.   All patients diagnosed terminally ill will have a care plan; physical measures, such as ice packs, heat, position changes and air mattresses will be used as needed to enhance the comfort of the inmate; medications will be given as ordered by the Health Care Provider to achieve maximum comfort for the inmate; and food and fluids will be provided as tolerated by the inmate.

78204-0001/LEGAL123450222.1

206.   Hospice care is provided for inmates who are in the last stages of a diagnosed terminal illness, and focuses on the achievements the patient is able to make in face of physical deterioration.

207.   Inmates become eligible for hospice care when they are diagnosed with a terminal disease and a prognosis of one year or less to live.

208.   All measures are taken to preserve the inmate's dignity while in terminal/hospice care.

**Medical Devices.**

209.   Orthoses, prosthetic devices, and mechanical aids are specialized mechanical devices used chronically to support or supplement joints or limbs, or are artificial devices to replace missing body parts.

210.   Appropriate but elective Orthoses, prostheses, and aids to impairment are those services/devices which are not essential to prevent significant deterioration in the essential health of an inmate, but nevertheless are reasonably expected to significantly improve the quality of life for the patient as it relates to a proven chronic or ongoing medical condition, and include, for example, dentures, dental prosthetics (partials), glasses, contact lenses, artificial eyes, artificial limbs, certain knee/ankle/foot braces, hernia support belts, hearing aids, special support hose, footwear, and suspenders.

211.   In determining whether to issue an elective medical device, medical considers the urgency of the need, time left on sentence, overall necessity, morbidity, mortality, functional disability and expected improvement, alternatives, risk/benefit, cost/benefit, and security concerns. authorized and not generally charged to the inmate.

212.   Medical aids issued as part of acute treatment for a limited medical condition such as casts, splints, ace wraps, and canes/crutches/braces, are routinely authorized and not generally charged to the inmate.

213.   Hardware that is an essential part of a medically necessary procedure such as heart valves, cardiac stent, and inter-occular lens implants, are routinely authorized and not generally charged to the inmate.

78204-0001/LEGAL123450222.1

214.   Inmates are not denied necessary medical devices because of lack of funds.

**Self-Catheterization and Colostomy Care.**

215.   ADC ensures all inmates who need to perform intermittent self-catheterization or maintain and manage a colostomy, have access to a semi-private area and have been provided the necessary supplies.

216.   Intermittent catheterization is the temporary placement of a catheter (tube) to remove urine from the body.

217.   This is usually done by placing the catheter through the urethra (the tube that leads from the bladder to the outside opening) to empty the bladder.

218.   The Correctional Registered Nurse Supervisor II ensures the Inmate's Unite Nursing Staff have instructed the inmate on proper technique of self-catheterization. (Health Services Technical Manual Ch. 6, 4.1.) The Unit Nursing Staff provides the inmate with adequate supplies to meet his/her specific needs.

219.   Inmates are afforded adequate supplies to meet their specific needs or those needs as ordered by an ADC Medical Provider.

220.   The policies and procedures regarding self-catheterization and colostomy care are detailed in **Exhibit M**.

**Medication Distribution.**

221.   ADC's policy on medication management and distribution provides for a consistent and uniform system of delivery of prescription medications to the inmate population.

222.   Health Services Technical Manual Chapter 5, Section 6.0, sets forth the policy to ensure that medications are delivered on a daily basis in a uniform and consistent manner throughout the Department, and that accountability is maintained in all phases of the delivery process.

223.   Prescription medications are administered to individuals only upon the order of a physician, dentist, psychiatrist, or other legally authorized individual.

224.   All prescriptions are tracked by the pharmacy.

225.   Prescriptions for chronic care conditions are automatically refilled.

226.   If an inmate is prescribed a medication for which there is no refill, a sticker is included with his prescription.

227.   That sticker can be submitted with an HNR request if that inmate feels he needs a refill of his prescription.

228.   Inmates who request a renewal of a prescription must be evaluated by a licensed practitioner who has the capability of prescribing medication.

229.   If an inmate simply needs a refill of a prescription that is still current, it is not necessary for that inmate to be seen by a medical provider.

230.   Under the Contract, Corizon is required to establish a medical delivery system that meet the following minimum time requirements: (1) new prescriptions and approved non-formulary medications ordered by 3:00 PM shall be available the next day by 2:00 PM; (2) refills shall be available 3-5 days prior to due date; (3) STAT medications and pharmaceutical supplies shall be available within 6 hours of placing order; and (4) emergency delivery of life sustaining medications within one hour of placing order.

231.   Corizon is responsible for ensuring "inmates are provided immediate access to pharmaceuticals not maintained onsite" and prescribing any needed medications or special needs orders.

232.   Per the Contract, Corizon was required to establish a Pharmacy and Therapeutics Committee, consisting of medical providers, nurses, and pharmacists, to review medication usage and make recommendations regarding changes to the drug formulary.

233.   Corizon is required to have a registered pharmacist conduct regular (at least quarterly) onsite audits of each facility health unit.

234.   Corizon is also required to conduct quarterly Pharmacy and Therapeutics Committee meetings to review formulary and non-formulary usage, prescribing practices, drug utilization review, education information, drug costs and other topics relevant to pharmacy operations.

235.   Corizon is also required to establish a system to provide urgent, necessary medication ordered after-hours, ensure continuation of chronic medications if delay would adversely affect inmate's health, and ensure medications are distributed according to provider's orders or approved nursing protocols.

236.   Corizon is required to document and maintain Medication Administration Records (MARs) that show the inmate's prescription, the prescribing practitioner, inmate's allergies, and the staff member delivering the medication, as well as a Keep-On-Person prescription log for all medications given to inmates

237.   Corizon is also required to have a non-formulary request process, track all non-formulary requests, complete and review quarterly medication audits and review trending non-formulary medication requests and usage.

**Infectious Diseases.**

238.   HSTM Ch. 2, Sec. 5.0, and DO 1102 provides the procedure for the surveillance, prevention, diagnosis and treatment of suspected or confirmed communicable diseases.

239.   Inmates with suspected or confirmed cases of communicable diseases are evaluated, placed in isolation if necessary, and treated, and other individuals in contact with the inmate are investigated and treated.

240.   Inmates deemed infectious remain isolated until treatment is completed and further evaluation and testing ensures they are no longer infectious.

241.   Staff treating and transporting the inmate follow careful procedures to ensure that they are not infected and to ensure that the disease is not further spread.

242.   Facility staff, health staff, and local and state agencies are notified of a suspected or confirmed case and coordinate together so that it can be contained and treated as quickly as possible.

243.   Health staff are trained in the management of communicable diseases, including preventative measures and contact investigation.

244.   There are specific precautions and procedures for controlling, managing, investigating, and treating airborne infections, waterborne and foodborne infections, tuberculosis, and HIV.

245.   All licensed nurses are required to be trained in identifying, screening, and providing appropriate treatment to inmates for lice, scabies, and ringworm.

246.   Inmates are screened for these ectoparasites at intake, and can be screened in the provider line.

247.   Several measures are taken if an inmate has an ectoparasite, including washing linens and clothing, washing mattress and bedding, discarding hygiene materials, isolating the inmate, and treatment.

248.   Nursing staff screen inmates for tuberculosis at intake or no later than 7 days from admission.

249.   Inmates with tuberculosis are immediately placed in airborne infection isolation, treated, and monitored.

250.   Medical staff treating inmates with tuberculosis wear particulate masks, cases are reported to the State Health Department within one working day of receipt of diagnosis, and staff conduct a contact investigation to identify all individuals who had contact with the diagnosed inmate.

251.   Communicable disease cases or suspected cases are reported to the local Health Department and the Arizona Department of Health Services.

252.   Per the Contract, Corizon was required to implement an Infection Control program, including surveillance, preventative techniques, and reporting and treatment of infections according to NCCHC standards, CDC guidelines, OSHA regulations, and local and state laws.

**Medical Sharp and Tool Control.**

253.   HSTM Ch. 2, Section 3.0 outlines the procedure for the safe and effective handling, control and disposal of potentially dangerous items and materials.

254.   Infectious waste is discarded in appropriately labeled containers.

-26-

**Smoking.**

255.   Smoking inside any enclosed area or building is prohibited.

256.   Smoking is prohibited 20 feet from any building entrance, and is limited to outside designated areas that do not subject normal traffic to second-hand smoke (e.g., smoking shall be prohibited near entrances to buildings).

257.   Smoking and the possession of tobacco and all smoking-related materials are totally prohibited by inmates assigned to reception centers, minors units, all detention units, and all medical units.

258.   General population inmates may only smoke outside of all buildings in approved areas.

259.   Maximum custody inmates are prohibited from smoking cigarettes.

260.   Maximum custody inmates are prohibited from smoking cigarettes for the legitimate penological reason of contraband control where maximum custody inmates on the most restricted status (restriction to cell, individual recreation, shower movement status) are not permitted to smoke.

261.   Permitting other maximum custody inmates on less restricted status to smoke and possess cigarettes leads to cigarettes becoming valued contraband functioning as currency among the inmate population.

262.   Restriction on smoking for all maximum security inmates therefore eliminates the potential for cigarettes functioning as inmate currency, prevents contraband exchange and prevents maximum security inmates from using cigarettes for gambling, bartering, debt payment or inmates with cigarettes holding positions of power over other inmates – all conduct prohibited in prison in order to preserve and control safety and security.

263.   All inmates are advised of the tobacco policies during orientation.

264.   ADC employees are required to enforce these smoking policies and post "no smoking" signs are conspicuously posted at every entrance and other areas where smoking is prohibited.

265.   Any person who smokes where prohibited is guilty of a petty offense and is subject to imposition of a fine of not less than $50 (and no more than $300), pursuant to A.R.S. § 36-601.01(k).

266.   Inmates who violate the smoking policy are subject to disciplinary action, including restricting future tobacco-related purchases from the inmate store.  Inmates may submit grievances related to smoking violations.

**Medical Care in Detention.**

267.   Health staff is notified within one hour after an inmate is placed in detention, and immediately if the inmate is injured or appears to be ill.

268.   Upon notification, nursing staff is required to immediately review the inmate's medical records to determine if any health issues exist that would be impacted by his detention status.

269.   If the inmate is injured or appears to be ill, nursing staff conducts an immediate hands-on assessment; otherwise, health staff will visit the inmate within twenty four hours of notification.

270.   SMI inmates are visited by mental health staff within 24 hours of notification, except on weekends and holidays when the inmate is seen by a nurse in consultation with a mental health staff.

271.   Mental health staff is required to follow-up with a face-to-face visit with the SMI inmate on the first working day following the inmate's placement in detention, and to ensure timely and appropriate follow-up mental health treatment upon the inmate's release from detention.

272.   Inmates with little or no contact with other individuals are monitored daily by health staff and at least once a week by mental health staff.

273.   Inmates who have limited contact with staff or other inmates are monitored three days a week by medical or mental health staff.

78204-0001/LEGAL123450222.1

274.   Inmates who are allowed periods of recreation or other routine social contact among themselves while in detention are checked weekly by medical or mental health staff.

**Medical Grievances.**

275.   Department Order 802 governs ADC inmate grievances and sets forth the procedures that inmates must follow to complete the prison administrative grievance process.

276.   DO 802 – effective as of July 13, 2009 – applies to all inmate grievances submitted after July 13, 2009 through the present.

277.   Any ADC inmate, regardless of disciplinary status, housing location, or classification, may use the Inmate Grievance System.

278.   This includes inmates in a complex detention unit, segregation unit, or suicide watch cell.

279.   A detailed description of the process and procedures for submitting medical grievances is outlined in **Exhibit M**.

280.   Plaintiff Jensen did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: Did not receive biopsy (for prostate cancer) recommended by prison doctor in January 2007 until October 2009, and did not have surgery until July 2010; did not receive chemotherapy medication prescribed by outside specialist for two months; staff performed medical procedures that they were not qualified to perform; Nurse's assistant improperly irrigated catheter in July 2010 following prostate surgery and he was not seen for three days; Given insufficient number of catheters forcing him to re-use old ones; Waited more than two years to have biopsy of mass on prostate because contracts with outside specialists were cancelled.

281.   Plaintiff Swartz did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: Waited months to receive neuropathic pain medication; received inadequate mental health care while on suicide watch; denied a filling for two years to fix a cracked molar (only offered extraction); Told to "be patient"

-29-

in response to HNRs; In September 2011, he swallowed metal spring and wire and staff joked, used a metal detector, and told him he would need to let it "pass"; x-ray the next day revealed metal in his stomach and prison doctor told him the same thing and did not refer him for an endoscopy; in December 2011 after transfer from Phoenix to Lewis, he had to file multiple HNRs and waited several weeks before receiving his psychotropic medications; not given interim formulary medication for facial injuries for six weeks pending approval of physician's prescription of Tramadol; in position of deciding between tooth extraction or saving tooth and enduring pain; only saw lower level mental health staff at his cell front and did not see a psychiatrist for over a year despite changes in medication; did not receive psychotherapy for more than two months in summer 2011 while on suicide watch; after swallowing glass and taken to hospital, not removed to inpatient unit for three months after hospital recommendation; complained about "unhygienic conditions" in suicide watch cell; mental health notes reflect he was "bitching about cleanliness – germs and disease"; able to acquire and use large staples, plastic wrap, piece of glass, concrete nail, spork, pens, paper clips, metal spring, steel bolt, and copper wires to hurt himself in suicide watch cell; psychotropic prescriptions renewed without any contact with a psychiatrist; attempted to commit suicide in isolation cell.

282.   Plaintiff Rodriguez did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: medication abruptly discontinued or changed and dosage adjusted without explanation or monitoring; lack of therapeutic treatment; medications switched multiple times from Risperdal to Haldol to treat psychosis but with no explanation for changes; prescribed high doses of Haldol without any documentation for basis of decision; have not received inpatient mental health care.

283.   Plaintiff Verduzco did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: after submitting HNR, told by staff she would be "put on the waiting list"; went months without seeing psychiatrist despite symptoms of severe psychological distress; have not received inpatient mental health care.

78204-0001/LEGAL123450222.1

284.   Plaintiff Thomas did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: improper cessation and initiation of, failure to administer, and use of ineffective psychotropic medications while on suicide watch; delays in follow up and psychiatric evaluation; no medical attention for November 2011 overdose; second-hand cigarette smoke has triggered asthma attacks: did not see a psychiatrist for almost a year despite being moved to suicide watch several times; did not see a psychiatrist for eleven months despite being placed on suicide watch; dental and physical state deteriorated after being put in isolation cell.

285.   Plaintiff Smith did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: Psychotropic medications abruptly discontinued and restarted at inappropriate times after lengthy delays and without proper evaluation by a psychologist; prescribed medication in April 2008 without explanation; prescribed Celexa in June 2008, but did not receive it for nearly a year; prescribed Lithium, but not seen by a doctor for three months to monitor; renewed after six months without seeing a doctor; submitted HNR in November 2009 reporting vomiting from Lithium, and was given tums; symptoms persisted and after submitting another HNR in January 2010 he was not seen by a doctor until March 2010; reported mental health problems on January 5, 2010 while housed in isolation, but was not seen because of shortage in staff.

286.   Plaintiff Gamez did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: delays in responses to HNRs; delays in receiving and abruptions in medication; inadequate monitoring, services and follow up visits for mental health; in August 2009, he submitted multiple HNRs for paranoia, anxiety, panic, and requested to be taken off of medications and out of isolation, but not seen for 5 months, not seen by a psychiatrist from 2007 to 2011 despite referrals from staff and multiple HNRs, and care managed by a nurse practitioner; told to "be patient" in response to HNRs; psychotropic medications abruptly started, stopped, and restarted; prescribed antipsychotic and anti-epileptic medications for off-label treatment of mood

disorder even though other drugs were more effective; second-hand cigarette smoke has triggered asthma attacks; did not see a psychiatrist from 2007 to 2011 despite deteriorating mental health condition; instead a nurse practitioner prescribed medication; did not see a psychiatrist while in SMU for two years; did not have blood regularly drawn to test for medication side effects.

287.   Plaintiff Chisholm did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: not referred to a cardiologist for eight months despite being diagnosed with hypertension and experiencing chest pains and shortness of breath; delays and interruptions in psychotropic medication; in April 2011, she reported experiencing a nervous breakdown and requested an adjustment of her medications, but did not see psychiatrist for a month and did not receive a follow up appointment; only offered tooth extraction for broken tooth and another tooth with a missing crown.

288.   Plaintiff Licci did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: despite multiple masses growing on her breasts, mouth, and arms and discomfort in cervix in 2010, requesting testing in December 2010, and a prison doctor referring her to an oncologist in April 2011, she was not sent for a CT scan until September 2011 or MRI until December 2011, nor was she ever seen by an oncologist; nothing in file indicates whether port-a-cath implanted in chest was properly flushed out in November 2011; despite multiple masses growing on her breasts, mouth, and Told by FHA that she was "hindering her own care" by filing grievances and HNRs regarding outside specialists; did not receive CT scan until September 2011 and MRI in December 2011 for masses in breasts, mouth, and arms, and discomfort in cervix, despite complaining and a prison doctor referral in December 2010.

289.   Plaintiff Hefner did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: in 2006 and 2008, he did not timely receive prescribed eye medication following eye surgery; requests for medical diet for

-32-

gastroesophageal reflux disease denied; request for medical diet (gastroesophageal reflux) denied.

290.    Plaintiff Polson did not submit a Director's-Level Appeal with respect to the following claims he raises in the Complaint: waited three years to receive partial dentures for missing teeth; waited five months to see a dentist for broken front tooth and it was not extracted until a year after it had broken; must file multiple HNRs and wait three to six weeks for antibiotics for ear infections; not fitted for dentures for broken teeth until April 2011 despite qualifying in April 2008; did not have blood regularly drawn to test for medication side effects.

291.    Plaintiff Wells did not submit a Director's-Level Appeal with respect to the following claims she raises in the Complaint: not evaluated by cardiologist for chronic chest pains, dizziness, and high blood pressure for four months; no follow-up appointment with cardiologist after receiving stent and reporting continued chest pains after returning from hospital; gynecologist evaluated her chest symptoms; in 2010, fillings in two teeth were broken and not repaired for months; dentist cracked adjacent tooth in November 2011 when those fillings were replaced and it has not been repaired; refused tooth extraction and endured pain for several months before her filling were replaced; but in the process, another tooth was cracked and she has not received treatment/repair.

**ADC Dental Care.**

292.    Dental care at ADC is provided by Smallwood Prison Dental Services ("SPDS"), a private company owned by Dr. William Smallwood, who subcontracts with Corizon to provide dental care.

293.    SPDS has been providing dental care at ADC since March 4, 2013 after taking over from Wexford, which provided dental care at ADC from July 1, 2012 to March 3, 2013.

294.    SPDS provides dental services to inmates in the states of Georgia (over 40,000 inmates), Florida (90,000 inmates), Virginia, and Arizona (36,000 inmates).

295.   In Dr. Smallwood's opinion, based upon his experience in employing over 400 dental professionals, managing dental care in over 110 prisons, and having responsibility for the dental care of over 160,000 inmates, there were no systemic problems with dental operations at ADC when SPDS took over from Wexford.

296.   The problems SPDS encountered when it took over from Wexford were not systemic and were fixed within a few months.

297.   In Dr. Smallwood's opinion, ADC's Dental Services Technical Manual is better than most states.

**Access to Dental Care.**

298.   Inmates at ADC submit a Health Needs Request (HNR) form to request dental care.

299.   HNRs are collected daily by nursing staff, who triage them and separate them by type of service requested.

300.   HNRs requesting dental care are given to dental staff.

301.   Dental assistants triage the HNRs and classify the inmate's request as urgent, routine, or exempt based on the priorities defined in the DSTM.

302.   Inmates must generally submit an HNR each time they desire dental treatment, but per ADC policy, appointments for serial extractions and prostheses are made by the dentist without the need for additional HNRs.

303.   Inmates are automatically appointed by the dentist for serial extractions and prostheses without submitting additional HNRs.

304.   Inmates at ADC are scheduled for appointments based on the priorities defined in the DSTM.  Inmates with urgent care needs are scheduled first, then inmates on the routine care list.

305.   Inmates on the routine care list are generally seen in the order in which they submit their HNRs, but the order may vary slightly based on security issues.

306.   Dental clinics will often schedule inmates by yard to maximize efficiency and minimize security concerns.

307.   Dentists at ADC practice quadrant dentistry, meaning that multiple teeth in one quadrant of the mouth can be treated in a single appointment if clinically appropriate.

308.   Inmate refusals of dental appointments and no shows are documented in their dental charts.

**ADC Dental Policies.**

309.   At intake, inmates are educated on proper oral hygiene and review a video designed for that purpose.

310.   Inmates are also instructed on how to access dental care within ADC.

311.   Within seven days of entering ADC, all inmates receive a panorex x-ray or bite wing x-rays; a dental exam consisting of either the screening of the x-rays or visual evaluation by a dentist or hygienist; and oral hygiene instruction.

312.   Dentists classify all inmates according to their dental treatment needs through the visual exam or screening of x-rays as Class I (no further treatment needed), II (routine treatment needed), or III (immediate treatment needed).

313.   Class III inmates who received only a screening of x-rays at intake are seen by a dentist within 30 days at the receiving facility.

314.   Class I and II inmates who request treatment at the receiving facility will be seen by the dentist within three months from the date of initial screening.

315.   During the first appointment at the receiving facility, the dentist will chart all required treatment, outline the treatment plan in sequential order, determine the extent of treatment required, take and record a dental/medical history on the dental chart, record all existing restoration and missing teeth on the dental chart, and place a color-coded label on the chart to indicate whether an inmate is classified as Class I, II, or III.

316.   If a Class II or III inmate refuses treatment at the initial appointment, the inmate will have to submit a request for any further treatment.

317.   Each dental clinic maintains a list of inmates requesting full or partial dentures and found by a dentist to be in need of them.

78204-0001/LEGAL123450222.1

318.   Dentures are provided according to a priority system, with first priority given to inmates requiring full dentures in order to be able to chew, and second priority given to inmates requiring partial dentures due to not being able to properly chew because of a large number of missing or non-occluding teeth.

319.   Each complex maintains a schedule of on-call dentists for emergency dental care.

320.   If a dental emergency arises outside of regular clinic hours, health care staff will notify the on-call dentist to arrange for the provision of necessary dental treatment.

321.   Outside dental treatment for a dental emergency does not require prior approval from the Statewide Dental Director.

322.   Dental program managers participate on the Central Office Continuous Quality Improvement (CQI) Committee, which meets quarterly to review CQI reports and activities.

323.   Dental staff also participate on the monthly CQI committees at each complex.

324.   Each dentist is peer reviewed using a sample of inmate charts following the procedures outlined in HSTM Chapter 1, Section 5.1.  Inmates may submit grievances regarding their dental treatment utilizing the medical grievance system outlined in HSTM Chapter 1, Section 8.0 and DO 802.

325.   ADC requires health care providers to obtain informed consent for examinations, treatments, and procedures.

326.   The health care provider must explain the procedure/treatment/test in language and terms the inmate can understand.

327.   The explanation must include what is to be done and the reason for doing the procedure/test/treatment, and the benefits of the treatment must be explained as well as any risks and possible side effects.

328.   The provider must also explain the existence of any alternative test, procedure, or treatment.

329.   The provider must document the discussion on the Consent to Treat Form and have the inmate sign the completed Consent to Treat Form before two witnesses documenting that the inmate understands what has been explained to him or her.

330.   The completed Consent to Treat Form is filed in the inmate's Health Record File.

331.   The informed consent requirement is waived if an emergency requires immediate medical intervention for the safety of the inmate or if a court order to treat has been obtained.

332.   The clinical goals of the dental care program are that inmates are free of acute infection and acute active dental disease, have sufficient masticatory function so that eating and general health are adequately maintained, and have knowledge of basic oral hygiene to be able to practice self-care and prevention.

333.   Upon entry into ADC, each inmate receives a dental screening by a dentist or qualified health care staff trained by the dentist within seven days of admission.

334.   Within 30 days of admission, each inmate receives either a panorex x-ray or full mouth series of x-rays.

335.   Inmates re-admitted to the system who have not been examined within the last six months will have a complete dental examination within 30 days of arrival and the examining dentist will determine the need for dental x-rays.

336.   All dental x-rays are reviewed by a dentist.

337.   Inmates who were not examined by a dentist at the intake facility will be examined by a dentist at the receiving facility within 30 days of admission.

338.   If an inmate refuses the initial or re-admission x-rays or examination, a Refusal of Treatment form shall be completed.

339.   The initial oral examination includes at a minimum review of medical history, hard and soft tissue exam as delineated by the dental chart, periodontal probing of selected teeth, development and documentation of a treatment plan, and assignment of an appropriate priority classification.

-37-

340.   An emergency oral examination includes at a minimum review of medical history, completion of a soft and hard tissue examination, charting of emergent conditions and evident pathology, and updating of classification and treatment plan status, if applicable.

341.   All entries in the dental chart will be made under the authority and responsibility of the dentist.

342.   The DSTM establishes four levels of dental priorities.

343.   Priority 1 (Emergency Care) includes conditions requiring immediate assessment, such as postoperative uncontrolled bleeding, facial swelling of a life-threatening nature or causing severe facial deformity, fracture of the mandible, maxilla, or zygomatic arch, avulsed dentition, extreme pain that is not responsive to dental treatment guidelines, and introral lacerations that require suturing to include the vermillion border of the lips.

344.   Priority 2 (Urgent Care) includes conditions such as fractured dentition with pulp exposure, acute dental abscess, an oral pathological condition that may severely compromise the general health of the inmate, and acute necrotizing ulcerative gingivitis.

345.   Priority 3 (Routine Care) includes conditions that require treatment to restore the form and function of an inmate's oral tissues and are not solely elective or cosmetic, such as caries, chronic periodontal conditions, non-restorable teeth, edentulous and partially edentulous patients requiring replacement, temporary, sedative, or immediate restorations, and non-functional broken prosthetic appliances (if the inmate qualifies), TMJ disorders, periodic examinations, gingival recession/root sensitivity, and routine dental prophylaxsis.

346.   Priority 4 (Exempt Conditions) are not treated at ADC and include fixed prosthodontics (crown and bridge), orthodontics, removal of asymptomatic third molars or impactions without pathology, treatment of discoloration, stains, and cosmetic defects, ridge augmentations, and vestibular extensions/implants.

347.   All inmates are classified according to the dental classification system upon initial examination.

348.   The priority classification is re-evaluated and updated, if necessary, at each dental visit.

349.   The scheduling of dental appointments is based on the current relative priority of the inmate's dental condition within the dental classification system.

350.   DSTM Dental Procedure 770.4 sets forth procedures for chart review and continuity of dental treatment when an inmate moves from one facility to another.

351.   A dentist performing a chart review upon transfer should evaluate the medical record problem list to determine if any high priority dental procedures are in process and/or if any medical holds relating to dental treatment are in place; evaluate the treatment plan and if the inmate is undergoing prosthetics, serial extractions, or root canal, schedule the inmate for continuing treatment; and evaluate the dental history to see if premedication is indicated.

352.   If the preliminary dental screening indicates an urgent status, the inmate should be appointed as soon as possible.

353.   If the intake dental examination has not been done, or if the inmate has not been clinically examined by a dentist, the inmate is scheduled to see the dentist within 30 days of arrival.

354.   If the inmate has not been seen/treated for an outstanding routine care HNR at the previous facility, the inmate's name should be inserted on the routine care waiting list at the receiving facility by the date of submission of the HNR.

355.   Inmates requesting dental treatment of a non-emergent nature may request a dental appointment by submitting an HNR.

356.   Inmates undergoing continuation of treatment, such as root canal therapy, prosthetics, or serial extractions should be re-appointed by the dentist.

357.   Inmates requiring routine dental work, such as fillings, are required to submit an HNR for each visit if they wish to continue treatment.

358.   A complete health history must be taken before administration of dental x-rays.

359.   All dental staff must hold a current Basic Life Support Certificate by the American Red Cross or equivalent.

360.   Each dental clinic must maintain a medical emergency kit.

361.   All dental staff must have current CPR certification.

362.   Medical emergency drills are held annually at each dental facility, including monitoring vital signs, administration of oxygen, administration of CPR, administration of $CO_2$ enriched air, administration of medication, coordination with medical staff, and review of responsibilities assigned to each staff member.

363.   A medical hold should be initiated when the following dental procedures are initiated: reduction of fractured facial bones, endodontic treatment, prosthetics, and any other condition requiring continued observation or follow-up by the dentist.  The pertinent treatment is recorded on the Problem List and Continuous Progress Notes in the dental chart, and dental staff notifies the medical records department to enter the information into AIMS.

364.   DSTM Dental Procedure 771.5 establishes the criteria used to determine an inmate's eligibility for dental prostheses and the priorities by which they will be provided.

365.   An inmate is eligible for a full denture under the following circumstances: medically compromised patients who as a result of missing teeth are exhibiting a significant medical condition that can be ameliorated by return to adequate masticatory function (first priority); patients needing full upper or lower dentures or both as a result of extractions performed as part of an ongoing treatment plan or who have lost teeth while in ADC (second priority); and inmates who entered ADC with missing teeth and are edentulous upper and/or lower (third priority).

366.   A partial denture will only be provided if an inmate's occlusion score is 15 or less and the inmate does not have active caries, moderate or severe periodontal disease, mobility of abutments, or inadequate oral hygiene.

367.     Partial dentures are provided under the following circumstances: medically compromised patients who as a result of missing teeth are exhibiting a significant medical condition that would be ameliorated by return to adequate masticatory function (first priority); inmates who qualify as a result of extractions performed as part of an on-going treatment plan or who have lost teeth while in ADC (second priority); inmate who entered ADC with missing teeth (third priority).

368.     A complete dental scaling is performed before impressions are taken for construction of a partial denture.

369.     Specifics regarding the dental policies and procedures regarding dentures and chewing difficulty are outlined in **Exhibit N**.

370.     Specifics regarding obtaining informed consent from inmates for dental procedures are outlined in **Exhibit N**.

371.     ADC's policies and practices regarding dental x-rays are contained in **Exhibit N**.

**Dental Assistant Triage.**

372.     At ADC, dental assistants review HNRs and assign them a priority using Dental Procedure 770.2.

373.     While ADC Dental Procedure 770.2 does not specifically use the word "pain," all dental assistants at ADC are trained that an HNR stating "pain" or any synonym for pain, such as ouch, hurt, abscess, or swelling, should be classified as urgent care.

374.     A complete description of  ADC's policies and procedures regarding "pain" are outlined in **Exhibit N**.

375.     ADC has a pattern and practice of placing a pain HNR on the urgent care list.

376.     New dental assistants receive on-the-job training with an experienced dental assistant and the dentist on how to triage HNRs.

377.   Dental assistants also receive training on security, provision of dental care in a correctional setting, infection control, the ADC Dental Services Technical Manual, and CDS.

378.   The likelihood of a dental assistant being in the dental clinic without a dentist present is extremely low.

379.   If a dental assistant is unsure whether to classify an HNR as urgent care, he or she will ask the supervising dentist.

380.   Dentists spot-check HNRs to check whether dental assistants are properly classifying HNRs regarding pain as urgent care.

381.   Dentists review HNRs as part of the treatment they provide to the inmates when they come in for their appointments.

382.   If there is a problem with a dental assistant incorrectly classifying an HNR as urgent or routine care, the dentist will see the HNR when the inmate is seen for his or her appointment and can counsel the dental assistant on the appropriate procedure.

383.   Dental assistants receive a formal annual evaluation by the supervising dentist which includes an evaluation of attendance, infection control, and triage of HNRs.

384.   Neither Dr. Smallwood nor Dr. Hanstad have ever seen an HNR that should have been classified as urgent care but was instead classified as routine care.

385.   Arizona Administrative Code Section R4-11-701(B) provides that "a dental assistant may perform the following procedures and functions under the general supervision of a licensed dentist: (1) Train or instruct patients in oral hygiene techniques, preventive procedures, dietary counseling for caries and plaque control, and provide pre- and post-operative instructions relative to specific office treatment; (2) Collect and record information pertaining to extraoral conditions; and (3) Collect and record information pertaining to existing intraoral conditions."

386.   Arizona law does not prohibit a dental assistant from classifying a patient's dental needs as either urgent or routine.  Ariz. Adm. Code § R4-11-702 (limitations on procedures or functions performed by a dental assistant under supervision).

387.   Arizona Administrative Code Section R4-11-702 provides that a dental assistant shall not perform the following procedures or functions: (1) A procedure which by law only licensed dentists, licensed dental hygienists, or certified denturists can perform; (2) Intraoral carvings of dental restorations or prostheses; (3) Final jaw registrations; (4) Taking final impressions for any activating orthodontic appliance, fixed or removable prosthesis; (5) Activating orthodontic appliances; or (6) An irreversible procedure.

388.   General supervision as used in the Arizona dental regulations and statutes means that the dentist is not required to be physically present.

389.   Direct supervision requires that the dentist be physically present.

390.   Dr. Shulman agrees that general supervision means the dentist does not have to be physically present in the clinic with the dental assistant, and direct supervision requires that the dentist is physically present and directing the dental assistant.

391.   A dentist is almost always present at each ADC dental clinic during clinic hours.

392.   On the rare occasion that a dentist is not present, each complex maintains an on-call roster of dentists who can be reached by the dental assistant for a telephonic consultation.

393.   Dr. Shulman only found seven charts out of the 300 charts he reviewed in which a dentist was not physically present during a dental visit.

394.   If the dentist is not present, the dentist may nonetheless make a diagnosis and prescribe antibiotics by telephone if appropriate based on the information collected and conveyed by the dental assistant.

395.   In this situation, the dentist is the one authorizing any medication and making clinical decisions by proxy.

396.   This is common in private practice and is within the standard of care.

397.   If the dentist is not present to render treatment or is unable to render a diagnosis based on the information conveyed by the dental assistant, the patient can be

-43-

stabilized and scheduled for follow-up with the dentist when he or she returns to the clinic.

398.   Arizona law permits dental assistants to collect information pertaining to intraoral conditions, which includes looking inside the patient's mouth and taking x-rays.

399.   Dental assistants can look in the mouth to see if there is an obvious problem, such swelling or a large hole in a tooth.

400.   Dental assistants can also look for swelling on the outside of an inmate's cheek.

401.   The information collected from an intraoral review and x-ray may be conveyed to the dentist by the dental assistant.

402.   The dental assistant can describe what he or she observes on an x-ray and in a patient's mouth to the dentist, but may not interpret x-rays or diagnose the patient.

403.   A dental assistant is permitted to record clinical findings in the chart.

404.   Dr. Shulman concedes that he is not critical of dental assistants taking and recording an inmate's health history.

405.   ADC policy regarding dental assistant triage complies with Arizona law.

406.   In practice, dental assistants at ADC work within the boundaries of Arizona law.

407.   Dentists at ADC are all licensed in Arizona.

408.   Dentists at ADC would be subject to disciplinary action by the Arizona Dental Board of Examiners if they permitted dental assistants to act outside the scope of Arizona law.

409.   ADC policy is also consistent with the American Dental Association's (ADA) literature regarding dental assistant job functions.

410.   The ADA states that dental assistants may perform the following work: assisting the dentist during a variety of treatment procedures; taking and developing dental radiographs (x-rays); asking about the patient's medical history and taking blood pressure and pulse; serving as an infection control officer, developing infection control protocol

and preparing and sterilizing instruments and equipment; helping patients feel comfortable before, during, and after dental treatment; providing patients with instructions for oral care following surgery or other dental treatment procedures, such as the placement of a restoration (filling); teaching patients appropriate oral hygiene strategies to maintain oral health (e.g., tooth brushing, flossing and nutritional counseling); taking impressions of patients' teeth for study casts (models of teeth); performing office management tasks that often require the use of a personal computer; communicating with patients and suppliers (e.g., scheduling appointments, answering the telephone, billing and ordering supplies); and helping to provide direct patient care in all dental specialties, including orthodontics, pediatric dentistry, periodontics and oral surgery.

411.   Having dental assistants triage HNRs is similar to what occurs in private practice when a patient calls to schedule an appointment.

412.   When a patient calls a dental office for an appointment, the patient never talks to a dentist.

413.   The patient is generally greeted by a front office employee with little to no formal dental training or a dental assistant who, using his or her training, knowledge, and experience, determines whether to schedule the patient for an appointment on an urgent or routine basis.

414.   Dr. Shulman's selection of 300 dental requests resulted in only 14% having been "triaged" by a dental assistant.

415.   There is no need to have a dentist at ADC make triage decisions that are routinely made by dental assistants or front office employees in private practice.  Having dental assistants at ADC triage HNRs is within the standard of care.

416.   Dr. Shulman concedes that he did not find any instances of harm in any of the 300 charts he reviewed as a result of a dental assistant taking an x-ray or communicating.

**Lost or Fractured Restorations.**

417.   A broken or lost filling is classified as routine care.

-45-

418.   Lost or fractured restorations do not, in the absence of pain, swelling, or other signs of infection, require treatment on an expedited basis.

419.   Similarly a broken filling without pulp exposure is not an urgent care issue.

420.   If there is also pain, swelling, or other signs of infection present, the tooth should be evaluated as urgent care.

421.   If there is no pain, swelling, or other signs of infection associated with the missing or fractured restoration, the patient should be seen as routine care.

422.   If an inmate with a lost or fractured filling who has been placed on the routine care list begins experiencing pain or swelling while waiting, he or she can submit an HNR for pain and will be seen according to urgent care guidelines.

423.   A tooth with a missing or fractured restoration will not generally suffer harm if left untreated for months, or even in some cases, years.

424.   A lost or fractured restoration does not necessarily place a tooth at greater risk of decaying or becoming non-restorable in a matter of a few months.

425.   ADC policy dictates that inmates are seen within 90 days for routine care requests.

426.   Current wait times for routine dental treatment are 45 days or less.

427.   Lost fillings are not likely to result in irreversible pulpitis over a period of 90 days and almost certainly not within only 45 days.

**Removal From Routine Care List After Urgent Care Appointment.**

428.   Dentists at ADC have discretion to remove an inmate from the routine care list if the inmate submits an HNR for pain and is seen for an urgent care appointment.

429.   If the inmate is removed from the routine care list, the inmate is instructed by the dentist to submit a new HNR if he or she wishes to be placed back on the routine care list.

430.   This practice is used to prioritize care such that an inmate who is seen for an urgent care appointment is not seen again for a routine care appointment ahead of another inmate on the routine care list who has not been seen at all.

431.    A dentist may also decide in his or her clinical discretion to keep an inmate on the routine care list despite being seen for an urgent care appointment.

432.    This practice is reasonable and relies on the discretion of the dentist to determine the fair and clinically appropriate prioritization of dental treatment to inmates.

433.    SPDS allows facilities the discretion to permit an inmate to have more than one HNR at a time.

434.    If an inmate is seen for an urgent care appointment and provided antibiotics to reduce swelling, the inmate does not need to resubmit an HNR to receive treatment for the tooth; the dentist schedules the inmate for follow-up treatment.

435.    If an inmate is required to submit a new HNR to be placed back on the routine care list, he or she will have to wait at most six weeks under current average wait times to receive the routine treatment previously requested.

436.    Waiting six weeks for routine dental care is certainly reasonable and within the standard of care.

437.    It is highly unlikely that any dental decay present will progress to the point that a restorable tooth becomes non-restorable within a matter of weeks or even months while an inmate waits his or her turn on the routine care list.

**Extraction Policy.**

438.    From April 2013 through March 2014, ADC inmates submitted 46,112 HNRs, resulting in 60,440 dental appointments and 6,342 refusals of dental care.

439.    During this period, dentists at ADC performed 10,263 fillings, 11,275 simple extractions, and 2,330 surgical extractions.

440.    There were also 7,339 cleanings performed and 1,298 full and partial dentures completed.

441.    Dr. Shulman admits that he did not consider the number of fillings performed in his analysis of whether ADC has an extraction-only policy.

442.    Whether a tooth should be extracted is a matter of clinical judgment.

443.   Dr. Shulman agrees that determining whether to fill or extract a tooth is a matter of clinical judgment by the dentist.

444.   Conditions in which a tooth cannot be restored include cavities well below the gum line, periapical pathology in a patient who cannot have root canal therapy, severe periodontitis, severe mobility, and acute inflammation in the area that is destructive to the apex of the tooth.

445.   Dentists at ADC will save a tooth if it can be saved.

446.   Dr. Shulman did not find any individual dentists at ADC who had a policy of only extracting teeth as opposed to filling them.

447.   It is easier to fill a tooth than to extract it.

448.   Individual dentists have latitude to make clinical decisions based on their knowledge, skill, and judgment.

449.   While one dentist may recommend extraction, another dentist may decide to fill the tooth; neither is below the standard of care.

450.   The standard of care is what a reasonable and prudent dentist would do in a like or similar situation.

451.   It is not malpractice for a dentist to extract a tooth when the dentist determines that the long-term prognosis of a tooth is poor.  \

452.   If an inmate has meth mouth, extractions are usually required.

453.   Every dental case is different, and a number of factors influence whether a tooth becomes non-restorable, including oral health care, the inmate's past history, and how often he or she has been to the dentist in the past.

454.   Dr. Shulman has never attempted to verify the level of tooth decay in teeth that were extracted by examining x-rays.

455.   Dr. Shulman opines that teeth were extracted that could have been saved, but he makes this assertion without having reviewed the patient's x-rays.

456.   Making a determination as to whether a tooth is restorable without viewing x-rays is itself below the standard of care.

-48-

457.   Whether a tooth is restorable is a matter of clinical discretion that can only be adequately assessed with x-rays and an oral examination.

458.   Dr. Shulman agrees that a dentist should review x-rays to determine whether to fill or extract a tooth.

459.   In some cases, it may also be necessary to review a pre-operative intraoral photograph of a tooth to determine whether it was properly extracted.

460.   Dr. Shulman concedes that he cannot say whether any teeth that were extracted in his records review should have been filled.

461.   Dr. Shulman concedes that he did not review charts for the purpose of determining whether a tooth should have been extracted or filled.

462.   Dr. Shulman did not generally evaluate whether the dentist's treatment was appropriate, only whether the appointment was timely.

463.   When reviewing charts of inmates who had extractions, Dr. Shulman accepted the validity of the dentist's treatment plan.

464.   Dr. Shulman concedes that he cannot determine whether a shorter wait time would have prevented an extraction.

465.   Dr. Shulman concedes that ADC does not have an extraction-only policy.

466.   Dr. Dovgan found no evidence that ADC has a de facto "extraction-only" policy.

**Dental Emergencies and After-Hours Dental Care.**

467.   True dental emergencies are rare.

468.   Inmates experiencing dental emergencies are generally transported to local hospitals.

469.   Most ADC complexes have only a few dental emergencies a year, and the most common dental emergencies at ADC are broken jaws.

470.   Other dental emergencies include uncontrolled bleeding and airway restriction.

471.   Inmates requiring emergency dental care are generally brought to the medical or dental clinic by security staff and do not submit HNRs.

472.   Most dental clinics at ADC are open Monday through Friday from 8:00 to 5:00.

473.   HNRs are collected seven days a week.

474.   After dental clinic hours, nursing staff review dental HNRs.

475.   If an inmate submits an HNR on a weekend indicating pain and/or swelling, the inmate can be evaluated by nursing staff using dental protocols.

476.   Nursing staff is trained on protocols for dental emergencies.

477.   Each complex also maintains an on-call schedule for dentists outside clinic hours.

478.   Having nursing staff evaluate after-hours pain complaints using dental protocols is within the standard of care.

479.   Dr. Shulman is "not at all" critical of nursing staff triaging dental HNRs and treating inmates for pain under a standing order when a dentist is not present.

**Dental Standard of Care.**

480.   While the delivery of dental care in a prison is somewhat different than in a private dental office, the standard of care in prison is the same as in private practice.

481.   Dr. Shulman agrees that the quality of care should be the same in a correctional setting as in private practice.

482.   The National Commission on Correctional Health Care (NCCHC) publishes standards for the proper management of a correctional health services delivery system.

483.   Correctional facilities that comply with these standards may be accredited by the NCCHC through an external peer review process.

484.   The NCCHC standard for oral care states: "Oral care under the direction and supervision of a dentist licensed in the state is provided to each inmate.  Care is timely and includes immediate access for urgent or painful conditions.   There is a system of

-50-

1    established priorities for care when, in the dentist's judgment, the inmate's health would

2    otherwise be adversely affected."

3        485.    The NCCHC also establishes requirements for dental intake screening and

4    examinations and recommendations for treatment of urgent care.  (ADC policy regarding

5    intake procedures complies with NCCHC oral care standard P-E-06.)

6        486.    All ADC dental clinics are in compliance with ADC policy and NCCHC

7    compliance indicators for intake procedures.

8        487.    Dr. Shulman concedes that inmates at ADC have access to basic dental care.

9    **Timeliness of Dental Care.**

10       488.    Under the Contract, Smallwood is required to have dental practitioners

11   available 24 hours a day, seven days a week, including after-hours and weekend for

12   emergency consultation and direction.

13       489.    Inmates with emergency dental needs must be seen within 24 hours.

14       490.    Inmates with urgent dental needs must be seen within 72 hours.

15       491.    Inmates with routine dental needs must be seen within 90 days of receipt of

16   an HNR.

17       492.    Dr. Shulman agrees that there are timelines for emergency, urgent, and

18   routine care in the contract which are enforced against the dental contractor.

19       493.    A wait time of three months for routine dental care is becoming the industry

20   standard in correctional dentistry.

21       494.    Dr. Shulman agrees that waiting 90 days for treatment of a tooth with no

22   major pathology or for a routine cleaning is acceptable.

23       495.    Dr. Shulman is unaware of any specific standard of care for wait times for

24   routine dental treatment.

25       496.    Dr. Shulman is not aware of any literature or studies that provide guidance

26   as to an appropriate wait time for routine dental care.

27

28

497.   In September, 2013, the longest average wait time for routine dental care statewide was 1.7 months at Phoenix and Perryville, and the shortest wait time for routine dental care was 0.5 months at Winslow.

498.   The latest wait time reports available for March 2014 show that average wait times for routine dental care ranged between 0.6 and 1.5 months statewide.

499.   SPDS inherited a backlog of dental requests from Wexford.

500.   Within less than two months, SPDS brought wait times for routine dental treatment within contract compliance at 8 out of 10 complexes, and in less than four months, SPDS brought wait times for routine dental treatment within contract compliance at all 10 complexes.

501.   Dr. Shulman toured ADC just months after SPDS took over and was still clearing the backlog it inherited from Wexford.

502.   SPDS eliminated the backlog of inmates needing care it inherited from Wexford within a reasonable time.

503.   Dr. Shulman reviewed dental HNRs covering a period of 41 months, 93% of which was for a time that a dental provider other than Corizon/Smallwood was providing dental care to ADC inmates.

504.   Dr. Shulman's sample came from HNRs filed between 2009 and June 2013, with only the last 3 months involving Smallwood's provision of dental care and the addition of dental staff that has increased the involvement of dentists and hygienists in inmate care.

505.   In September 2013, the longest average intake wait time was 0.9 months at Safford, and three complexes had no wait at all for intakes.

506.   By March 2014, the longest average intake wait time was 0.7 months at Lewis, and again three complexes had no wait for intakes.

507.   ADC's guidelines for routine care and intake wait times are similar to or even better than would be found in private practice.

508. The average wait time for an urgent-type issue in private practice is approximately 5.4 days.

509. Private dental offices generally schedule cleanings six months in advance.

510. Wait times for dental treatment may be extended due to inmates being away at court, inmate refusals of care, inmate health issues that prevent provision of dental care, and security issues.

511. Extended wait times for dental treatment at ADC are usually occasioned by an inmate being out to court or experiencing medical issues, such as heart problems, that preclude dental treatment prior to medical clearance.

512. There are always about three or four inmates on the dental wait list who are out to court.

513. These inmates are noted in CDS.

514. An inmate who is out to court is out of ADC custody and cannot be brought into the dental clinic for treatment.

515. Inmates who are out to court remain on the wait list and are included in average wait times.

516. Inmates who are out to court are usually gone for weeks or months.

517. Inmates who miss appointments due to security issues remain on the wait list and are included in average wait times.

518. If an inmate has an urgent dental issue during a facility lock-down the facility health administrator in conjunction with nursing and security staff can determine whether the inmate should be brought to the dental clinic for treatment.

519. Even if wait times for routine dental care were longer than the contract requirement of 90 days, there would likely be no resulting harm, because a restorable tooth will not become non-restorable in a matter of weeks or even months.

520. 709 of the 801 HNRs Dr. Dovgan reviewed were seen in accordance with ADC guidelines for routine and urgent care.

521. Dr. Shulman concedes that the standard of care in the correctional industry for emergency dental care is 24 hours or less.

522. Dr. Shulman concedes that a timeframe of 72 hours for urgent care is standard in the correctional industry.

523. Dr. Shulman concedes that a timeframe of 72 hours for urgent care is reasonable.

524. In Dr. Shulman's sample of 300 charts from 2009 to 2013, the median wait time for urgent care was six days.

525. Dr. Shulman concedes that he did not analyze the median wait time for urgent care under SPDS.

526. Dr. Dovgan did not find any inmates who experienced irreparable harm as a result of a delay in receiving dental treatment.

527. Dr. Shulman has not identified any inmates who experienced irreparable harm as a result of a delay in receiving dental treatment.

528. Dr. Shulman concedes that whether a long wait time is a problem depends on the nature of the particular tooth.

529. A few HNRs being treated outside guidelines is to be expected in a system as large as ADC.

530. SPDS has an appropriate number of dentists, dental hygienists, and dentist assistants to properly treat all inmates within the ADC guidelines as evidenced by average wait times for dental treatment.

531. SPDS uses CDS, a proprietary software program for managing patient requests, appointments, and treatment.

532. A complete overview of the CDS software is outlined in **Exhibit N**.

533. CDS provides SPDS a real-time view of current dental wait times at all ADC complexes statewide.  This allows SPDS to shift dentists, dental assistants, and dental hygienists to other facilities to meet inmate demand for dental treatment.

534.   Dr. Shulman concedes that there is a healing period required after extractions.

535.   Dr. Shulman believes an 8.5 month period for making dentures is not out of the ordinary as a removable partial denture typically requires 5-7 office visits, and three months of delay was due to the lab.

536.   Dr. Shulman is not willing to criticize the opinion of dentists at ADC regarding the restorability of teeth.

**Dental Staffing.**

537.   The ratio of dentists to inmates is not determinative of appropriate dental staffing at a correctional facility.

538.   Dr. Shulman concedes that there is no recognized standard of care that sets a specific staffing ratio of dentists to inmates.

539.   Multiple factors affect dental staffing needs at a correctional facility, including type of facility, inmate population, demand for dental services, proximity of other dental facilities, and security level.

540.   CDS offers a real-time picture of wait times at each facility, and allows the dental directors to move staff to facilities with longer wait times.

541.   SPDS hired dental hygienists in approximately June 2013.

542.   If a dental hygienist is not available at a facility, the dentists perform cleanings.

543.   Dental hygienists at ADC can provide gross debridement, scaling and root planning, take bite wing x-rays, and enter SOAP notes.

544.   Low wait times for dental treatment at all complexes statewide, coupled with the results of quality assurance reviews and peer reviews, shows that the current staffing level is sufficient to meet the dental needs of the ADC population.

545.   Dr. Shulman bases his opinion that the ratio of dental providers to inmates at ADC is too high on past wait times he observed in his records review of seven months or longer for routine care and seven or eight days for urgent care.

546.   However, Dr. Shulman concedes that wait times for routine care under SPDS were all less than 60 days at all ADC complexes statewide for August through November 2013.

**Dental Monitoring.**

547.   In Dr. Shulman's opinion, determining whether clinical practices are meeting the standard of care has two components: (1) having dentists' work reviewed by another dentist, and (2) an assessment of the timeliness of dental care.

548.   Dr. Chu is ADC's dental monitor.

549.   ADC also employs facility contract monitors at each complex who evaluate contract compliance using the MGAR tool, which includes oral care metrics.

550.   The ADC facility contract monitors evaluate contract compliance.

551.   Dr. Chu evaluates clinical dentistry.

552.   Dr. Shulman concedes that Dr. Chu's monitoring activities, including chart reviews, should be part of any dental quality assurance program.

553.   The oral care MGARs track compliance with the contract regarding the following metrics: provision of oral hygiene and preventive oral care education at intake; oral examination by a dentist within 30 days; wait times for routine dental care; evaluation of 911's within 24 hours of HNR submission; development and documentation of dental treatment plans in the medical record; conduct of daily inventories for all dental instruments before the first patient and after the last; monthly checks of expiration dates; flagging of expired medications within 30 days of expiration and disposal upon expiration; x-rays taken of the tooth/teeth that are addressed during an emergency (911) visit; maintenance of a dental wait time log/report; maintenance of the MSDS binder; provision of medications that are prescribed by the dentist; timeliness of equipment repairs; timeliness of fulfillment of orders for materials/supplies; completion of dental chart entries with military time and signature over name stamp; completion of treatment plan section C and priority section D of the dental chart; posting of x-ray certification/registration certificates in the dental clinic; weekly spore testing logs for the

-56-

1   autoclaves; and availability of a mechanism for immediate notification of a positive spore

2   count.

3   554.   ADC monitors the timeliness of dental intakes and dental treatment on a

4   monthly basis.

5   555.   ADC also monitors dental utilization statistics, including the numbers and

6   types of dental procedures performed, the numbers of HNRs for dental treatment

7   submitted, and the number of dental treatment refusals on a monthly basis.

8   556.   ADC also reviews dental staffing on a regular basis.

9   557.   Dr. Chu performs site visits at ADC dental clinics.

10   558.   During her site visits, Dr. Chu performs chart audits, reviews intakes and x-

11   rays, inspects the facilities, and interviews staff.

12   559.   Dr. Chu also reviews the adequacy and quality of the dental equipment and

13   coordinates purchase of new equipment, including over $300,000 worth of new equipment

14   purchased by ADC since SPDS took over the contract.

15   560.   Mr. Pratt implemented certain recommendations of ADC's contract monitor

16   for dental, Dr. Chu, as stated in her December 13, 2012 email to him, and was involved in

17   the decision to replace Wexford with Corizon and its subcontractor Smallwood to improve

18   dental care.

19   561.   Dr. Chu communicates with Dr. Smallwood approximately every other

20   week regarding issues she has with the clinics she monitors.

21   562.   Dr.   Chu   has   contacted   Dr.   Hanstad   regarding   clinical   practices

22   approximately 30 times.

23   563.   Dr. Chu monitors complaints of ADC inmates regarding their dental care

24   and soft food diets through the inmate grievance process.

25   564.   ADC inmates are also permitted to submit complaints regarding dental care

26   at ADC to the Arizona Board of Dental Examiners, but no complaints were submitted in

27   the last five years by inmates regarding dental care at ADC.

28

565.   Dr. Hanstad and Dr. Weekly perform quarterly and annual peer reviews of the dentists in their regions.

566.   These peer reviews include chart audits to assess the quality of care provided.

567.   Dr. Smallwood and the regional directors monitor productivity of dentists and the numbers and types of dental procedures performed by each dentist.

568.   In addition, Dr. Smallwood and the regional directors monitor wait times for routine and urgent care and will reallocate staff if necessary to address inmate demand.

569.   This is particularly true for dental hygienists, who travel to dental clinics in their region to perform cleanings based on inmate request volumes.

570.   CDS allows for real-time monitoring of inmate requests for dental care; wait times; compliance with ADC policy guidelines for intake, routine, and urgent care wait times; dental procedures performed; treatment refusals; and current wait lists.

571.   CDS also includes alerts when an inmate has been on the routine care list for 90 days or longer or has been waiting for urgent care for 72 hours or longer.

572.   Dr. Chu, Mr. Pratt, the ADC contract monitors, and Mark Jansen from Corizon all have access to CDS to monitor wait times and other dental statistics.

**Suicide and Mental Health Watch.**

573.   Any staff member who becomes aware of an inmate who is at risk of a suicidal gesture/acute mental health issue to notify the shift commander or mental health staff so appropriate measures to protect the inmate can be initiated.

574.   Inmates are placed on suicide watch when their behavior is self-destructive, the inmate is displaying suicidal behavior, or the inmate attempts suicide and/or has a documented history of attempting suicide and there are warnings indicating an impending suicide attempt, or the inmate verbally threatens to commit suicide and/or to cause self-inflicted wounds.

575.   Only a licensed mental health provider is authorized to cancel or remove a suicide watch.

576.   Inmates are placed on mental health watch when an inmate is demonstrating acute signs or symptoms of significant mental disorder but is not acting in a manner indicating significant suicide risk.

577.   Only a licensed mental health provider is authorized to cancel or remove a mental health watch.

578.   When an inmate remains on a watch, a staff member on each shift is assigned the responsibility of conducting the timed watch.

579.   Watch cells are approved by a mental health professional, and generally have no fixtures, appliances, or bars which could be used with the inmate's clothing in a self-harm attempt.

580.   Inmates are stripped searched, and all objects that may be used as a weapon for self-harm are removed.

581.   A combination of health services staff, security staff, and mental health staff visually check the inmate for his welfare at ordered specified intervals.

582.   All visits by health staff are documented, and the medical staff member performing a welfare check ensures that the inmate responds verbally or is seen moving purposefully.

583.   All watch cell are cleaned at least weekly or when the inmate comes off watch.

584.   Corizon is required to provide comprehensive mental health services, including suicide and mental health watches, initial and ongoing evaluations and assessments, development and periodic review of individual treatment plans, psychiatric services, psychotropic medication evaluations, administration and follow-ups, individual and group psychotherapy, specialized psycho-educational groups and other special programs, psychological autopsies, discharge and transitional planning, proper documentation, and consultation with medical, support and custodial staff on treatment and programming concerns.

585.   All staff receive training in the identification and management of suicidal inmates.

586.   A detailed account of the type, length, and variety of suicide prevention training ADC staff undergo is contained in **Exhibit S**.

**Mortality Rates.**

587.   The United States Department of Justice, Bureau of Justice Statistics collects data from each state Department of Corrections, as well as the Federal Bureau of Prisons as to each inmate death in custody.

588.   Survey reports are received, the data is verified, and mortality rates are calculated as a national average, and periodically published, based upon calendar year data.

589.   To permit comparison based upon the different size of state and federal corrections departments, that Bureau of Justice Statistics calculates a mortality rate, based upon the number of deaths per 100,000 prisoners.

590.   Mortality rates are calculated by multiplying the number of deaths in custody by 100,000 and then dividing by the mid-year or end-year state prison population, based upon available data.  The BJS recognizes that while there is no sampling error, there may be random error with a small number of deaths in custody, less than 100, as well as various short-term fluctuations and irregularities.

591.   While ADC operates on a fiscal year, it also collects and reports on the number of deaths in custody that occur, as part of its ADC Report of Inmate Assault Data, as of June 30, 2013, which contains a full year worth of data.

592.   The following is a comparison of the number of deaths in ADC custody from the fiscal year ending June 30, 2005, the ADC mortality rate calculated using the BJS methodology set forth in DSOF ¶ 680 above, and the reported BJS Nationwide Prison Mortality Rate, for all causes of death, reported for the years ending from December 31, 2005 to December 31, 2011.

**Use of Force.**

593.   Force is used only after every other reasonable attempt to neutralize the real or potential danger has been considered and determined ineffectual.

594.   The use of force is reserved for situations where no other reasonable alternative is available to prevent escape, imminent death, serious bodily harm, or the taking of hostages.

595.   The use of force is never used as punishment or retaliation.

596.   Staff only uses physical force when persuasion, counseling, warnings, and direct order are found to be insufficient to obtain cooperation from the inmate.

597.   Unless there is an imminent threat of danger to staff, inmates and/or property, planning should be considered prior to placing staff into a situation where the use of force is possible or likely.

598.   Correctional staff restrict the use of reactionary/planned less-than-lethal physical force to situations when it is necessary to maintain control and order or prevent the commission of a crime, prevent suicide or serious self-inflicted injury, protect against another's use or attempted use of unlawful physical force, protect a third person against another's use or attempted use of unlawful physical force, prevent an inmate from taking a hostage or causing serious bodily harm to another person, and maintain control or restore order, including the use of physical force to move an unwilling inmate.

599.   Less-than-lethal physical force may also be used to ensure compliance with Department Orders and/or written instructions, and to ensure the health, hygiene, and well-being of an inmate.

600.   In mental health care facilities, correctional staff must notify and/or request intervention by mental health staff if the inmate or staff are not in imminent danger.

601.   Less-than-lethal physical force is deployed on a progressive continuum, from the least amount of force possible to the maximum level permitted, commensurate with the circumstances of the incident.

78204-0001/LEGAL123450222.1

602.   When possible, staff should use progressive force as follows: psychological (physical presence of officer, body language, verbal and non-verbal communications; aerosol sprays (Oleoresin Capsicum, "OC"); stun devices (taser); non-lethal weapons/munitions (bean bags, knee-knockers, sting balls, flash bangs, CS/OC grenades and projectiles); service dogs; cell extraction teams; and lethal force.

603.   When utilizing progressive force, staff must consider: (1) each situation is different and generally the escalation for use-of-force should be planned; and (2) situations may not always allow for the straight-line progression when force is initiated.

604.   In all applications involving the use of force, patience is emphasized and consideration must be given to alternative solutions, such as waiting the inmate out, before initiating or escalating the use of force.

605.   Only a warden, deputy warden, or designee may authorize a use of force when the sole reason for the use of force is due to the inmate refusing to move to another location and the inmate is not harming themselves or others, and is not in possession of a weapon.

606.   When a use of force is planned, staff must ensure that they have used every reasonable effort possible to resolve the situation, and a shift commander or supervisor is present.

607.   In a planned use of force, staff must consider the physical and mental characteristics of the inmate (including mental health score), the inmate's mental impairment, proximity of the inmate to weapons, the seriousness of the offense, availability of other options, and any other exigent circumstances.

608.   Chemical agents may be used to avoid the use of additional force, to prevent injury to employees and inmates, or to stop imminent danger to staff or inmates.

609.   Staff using OC spray must complete ADC approved training before using OC spray.

610.   After chemical agents are deployed, the inmate cannot be detained in the contaminated area, if decontamination procedures are not effective, medical is notified for

-62-

further evaluation, all affected areas must be decontaminated to remove and neutralize any chemical agents, hard non-porous surfaces must be cleaned with water, food and water exposed to contamination must be disposed of, and all items of cloth material are aired out.

611.    Decontamination procedures are employed as soon as possible following the use of chemical agents on an inmate.

612.    Cell extractions are only conducted after all other methods to remove the inmate from the cell have been exhausted, including verbal commands, chemical agents, stun devices, and a service dog.  Prior to scheduling a planned cell extraction in a mental health unit or for a known mental health inmate, the shift commander contacts mental health staff or a psychologist for special handling instructions, if any, unless the situation dictates otherwise.

613.    All planned use-of-force incidents must be video recorded from the onset of the incident that initiated the action, and should capture the inmate's refusal to follow staff orders, all attempts to persuade the inmate to comply with staff orders and avoid the use of force, and all actions taken by staff to include initial entry to the cell, control of the inmate, escorting the inmate to medical for examination and/or treatment, administration of treatment, and escorting the inmate back to his cell or another secure area.

614.    The video recordings are retained for a minimum of one year.

615.    Within three days after a use-of-force incident, the use of force is evaluated by a review committee.

616.    A use-of-force report is created for each use-of-force incident.

617.    ADC employs the use of a pressurized H2O canister device similar to a fire extinguisher to gain compliance from Mental Health inmates who will not respond to orders issued by correctional personnel to uncover the inmate's head or body so that the correctional personnel can complete a safety and welfare check to determine that the inmate is alive, breathing and not injured.

78204-0001/LEGAL123450222.1

618.   In circumstances where a Mental Health inmate refuses repeated verbal orders to uncover his or her body or head so that correctional personnel can determine the inmate's safety and welfare, the pressurized H2O canister device is deployed upon the inmate.

619.   The uncomfortable but non-lethal deployment of a strong stream of water most often simply annoys the inmate to the point that the inmate will uncover his or her body or head in order that a safety and welfare check can be completed.

620.   As above with the use of chemical agents, a supervisor must authorize the use of the H2O canister device and the use of the canister is videotaped.

621.   Additionally, the use of the H2O canister must be documented in an Incident Report.

**Classification.**

622.   ADC employs a custody classification system in order to safely manage the inmate population, reasonably restricting activity for those inmates who constitute a risk to self, the public, prison personnel or other inmates based upon analysis of the inmate's crime, time to serve, institutional behavior and/or membership in a security threat group (STG).

623.   ADC custody classification employs an objective, standardized rating system that is based on factual data gathered from factual documentation.

624.   The custody classification assessment is based on an in-depth interview, and a detailed evaluation of court documents and information acquired from other agencies concerning the inmate's background and criminal history.

625.   ADC has four custody levels: minimum, medium, close, and maximum.

626.   ADC does not recognize or use the term "isolation cell."

627.   The word "isolation" implies that an inmate has no ability to communicate, interact, or socialize with other humans and does not leave his or her cell.

628.   While depending on custody classification level, some ADC inmates are required to remain in their cells for an average of approximately 22 hours per day because

-64-

of the risk the inmates presents to self, the public, prison personnel or other inmates, this applies only to certain inmates that are classified as maximum or close custody and certain inmates who are on detention status.

629.   The appropriate general nomenclature in the ADC system used to define inmates who are confined to their cells on average, approximately 22 hours a day, is "maximum custody inmates" or "maximum custody cells."

630.   Maximum custody inmates represent the highest risk to the public and staff and require frequent monitoring.

631.   Certain criteria require an inmate to be classified as maximum custody, including inmates sentenced to death, inmates sentenced to a life sentence for the first two years served, inmates who are validated and un-renounced members of a Security Threat Group ("STGs"), and inmates with an internal risk score of 5.

632.   Generally, an inmate can be classified as "maximum custody" if they committed a serious underlying offense (e.g.., first degree murder), if they committed violent, disruptive, or riotous acts while incarcerated, if they escaped or attempted to escape, or if they pose a serious threat to the security of the institution.

633.   An inmate's classification can be increased whenever the inmate's behavior or new information becomes known that indicates increased security measures are appropriate to ensure the safety of the public, staff, and/or other inmates.

634.   Upon formal classification review and except for condemned row inmates, an inmate's classification can also be decreased if inmate behavior and information indicates that the inmate is likely to successfully be assigned to a less secure environment and is not a threat to the safety of the public, staff, and/or other inmates at the recommended level of supervision.

635.   To become eligible for a custody reduction, a validated STG member must either successfully renounce STG membership and debrief or satisfactorily complete the STG Step-Down Program.

636.    Inmates approved for maximum custody are reviewed 180 days from maximum custody approval and annually thereafter, unless the approval for maximum custody was an override, in which case the inmate's classification is reviewed every 180 days.

637.    Eyman-SMU 1 Unit, Eyman-Browning Unit, and Florence-Central Unit house all of the male-general population inmates that are classified as maximum custody.

638.    Perryville-Lumley Special Management Unit houses all of the female-general population inmates that are classified as maximum custody.

639.    Several other units are used to house exclusively non-general population inmates classified as maximum custody (e.g., protective custody, sexual offenders, and mental health inmates), including Eyman-Rynning Unit, Phoenix-B Ward, Phoenix-Flamenco King, and Lewis-Rast PS.

640.    The most dangerous male maximum custody inmates are housed in Eyman-Browning Unit, which is exclusively death row and STG inmates.

641.    Adult male inmates sentenced to life imprisonment are housed at Eyman-SMU 1 Unit, Eyman-Browning Unit, and Florence-Central Unit (including Kasson Unit).

642.    SMU 1 is exclusively for maximum custody sex offenders or protective custody inmates.

643.    Validated STG members are generally assigned to Eyman-Browning Unit.

644.    All female maximum custody inmates are housed at Perryville-Lumley.

645.    Mental health staff is notified before an inmate is placed in a maximum custody cell, and the inmate is evaluated within 72 hours of being placed in a maximum custody cell.

646.    Under the Contract, medical staff are required to monitor inmates daily and qualified health professionals must monitor these inmates at least once a week.

647.    Medical or qualified mental health professionals are required to monitor limited contact inmates three days a week.

-66-

648.   All other segregated inmates must be "checked weekly by medical or a qualified mental health professional."

649.   Rounds are performed by qualified health care professionals and documented.

**Detention.**

650.   Inmates may be placed in detention status as necessary to ensure the safe, secure, and orderly operation of a facility, to ensure the integrity, and pending completion, of an ongoing investigation, while determining eligibility for protective segregation, for observation status to identify, minimize, and intervene in the possibility of self-destructive behaviors, pending institutional review and classification placement (such as pending transfer to a higher custody level), pending revocation of parole, work furlough, home arrest, or temporary, mandatory, or provisional release, or to fulfill disciplinary sanctions.

651.   Not all inmates who receive a disciplinary sanction and thus are placed on "detention status" are required to be moved to a maximum custody cell; instead, they may be allowed to stay in their existing cell with limited privileges while their disciplinary sanction is carried out.

652.   Inmates on detention status are offered showers and a shave three different days each week.

653.   Inmates on detention status are offered exercise outside their cell for at least two hours on three different days of each week.

654.   Inmates on detention status have access to personal property and access to commissary purchases, except when precluded by disciplinary sanctions, as outlined in DO 909.

655.   Inmates on detention status can have visits by counseling/mental health staff upon request or as needed.

656.   Inmates on detention status have telephone privileges, except when precluded by disciplinary sanctions.

657.   The Warden/Deputy Warden, in conjunction with an investigation, may restrict or curtail the above items (except meals) and all other inmate contact when objective evidence demonstrates such items or contact would impede or nullify an investigation, cause the destruction of evidence, or lead to the commission of a crime or violation of facility rules.

658.   Detention logs for inmates on detention status track acceptance/refusal of scheduled meals, shower times, exercise times, and telephone times.

659.   Correctional officers conduct a general sanitation inspection of all areas in the unit during each shift, and sanitation deficiencies are corrected as quickly as possible.

660.   Correctional officers conduct random, periodic welfare checks, in addition to checks at specifically timed intervals.

**Maximum Custody Housing Assignment.**

661.   Maximum custody inmates (except death row inmates, inmates convicted of first degree murder in their first 180 days review period, and validated non-debriefed STG members) may be celled with another inmate if they meet certain criteria.

662.   Staff considers the following in determining whether to cell two maximum custody inmates together: history of institutional violence, the inmates' convictions, disciplinary history, STG related, and physical and mental conditions.

**Telephone Privileges.**

663.   Generally, maximum custody inmates are allowed to place one telephone call per week, up to fifteen minutes in duration.

664.   Generally, inmates on detention status are allowed one call of ten minutes per week.

665.   Maximum custody inmates participating in ADC's Maximum Custody Population Management Step Program as provided by Director's Instruction #326 are afforded increased telephone privileges as they progress through the three step behavioral modification program.

**Visitation.**

666.    Generally, maximum custody inmates are permitted non-contact visitations.

667.    A non-contact visit is a visit between an inmate and visitor conducted with a barrier between them, thereby preventing any physical contact. Generally, maximum custody inmates are allowed one, 2-hour non-contact visit per week.

668.    Maximum custody inmates participating in ADC's Maximum Custody Population Management Step Program as provided by Director's Instruction #326 are afforded increased visitation privileges as they progress through the three step behavioral modification program.

**Programming and Maximum Custody Management.**

669.    ADC's management of its maximum custody inmates has evolved greatly over the last several years.

670.    ADC has added programs, initiated individual and group programming in housing units, improved recreation facilities, built new and larger recreation facilities to allow side by side individual recreation and group recreation, expanded privileges, implemented expanded inmate worker programs, expanded out of cell time, and created a behavioral incentive step program to reinforce positive inmate behavior, leading to increased privileges and for some, progression back to general population.

671.    A chronological account of ADC' progress and evolution is outlined in **Exhibit P**, with the most recent development titled Director's Instruction #326.

672.    Director's Instruction #326 is progressive and in line with similar states undergoing modification of conditions of confinement for maximum custody inmates, programs and movement of high risk inmates.

673.    Director's Instruction #326 officially went into in effect on March 27, 2014 – although many programs were already running prior to issuance of the Instruction.

674.    Director's Instruction #326 serves to facilitate a process that requires inmates in maximum custody to work through a program utilizing a step system providing

the opportunity to participate in jobs, programs and other out of cell activities. (Attachment U, Director's Instruction #326, Purpose).

675.   Director's Instruction #326 culminates from changes that began in 2009 as ADC embarked on increasing maximum custody inmates' out of cell time and programming.

676.   Pursuant to Director's Instruction #326, ADC maximum custody inmates who demonstrate program compliance and positive behavior may progress from controlled housing to open privilege based housing where inmates may move outside a cell without restraints.

677.   Inmates classified to maximum custody units are assigned to specific housing areas using a system of steps for managing the inmates in the least restrictive ways necessary to carry out ADC's Mission.

678.   This applies to general population maximum custody inmates as well as specialty maximum custody population inmates:  mental health, validated STG, Step Down Program for STG, inmates who debrief from STG, sex offenders, protective custody, and condemned row.

679.   In the Step Program, maximum custody inmates start at a base level and progress through the three step program by actively participating in a variety of offered programs, obeying facility rules, socializing well with inmates and personnel, not engaging in self harm, demonstrating positive work ethic, not engaging in STG activity and genuinely showing interest in self-improvement.

680.   Within five days of arrival to maximum custody, inmates are reviewed by an Assessment Team consisting of a Correctional Officer III, security supervisor and Associate Deputy Warden or designee to determine appropriate maximum custody housing location.

681.   The review includes analysis of a face to face inmate interview, the maximum custody placement instrument; seriousness of incident resulting in maximum

custody placement; inmate interview demeanor and attitude; AIMS and file review; special security concerns and mental health review conducted within 72 hours of arrival.

682. The inmate is then assigned a maximum custody housing location that based upon the above review factors, allows the inmate to begin with the appropriate three level step system to afford the inmate appropriate privileges and out of cell time while at the same time protecting the safety and security of the inmate, facility personnel and other inmates.

683. Advancement through the step levels and movement to a less controlled housing location requires the inmate to complete all programs identified in the Step Program Matrixes for each housing location.

684. Maximum custody inmates must follow all program requirements on a daily basis for a minimum of 30 consecutive days in order to qualify for advancement to the next step.

685. Inmates in the step program must comply with the following requirements to remain eligible for step advancement: grooming and hygiene in accordance with Department Order 704, Inmate Regulations; shower two times per week; remain compliant with medication orders if prescribed by a mental health provider; participate in designated classes/programs; refrain from creating excessive noise, banging or yelling at others; refrain from disrespectful or insulting behavior along with the use of profanity; refrain from throwing any substance at facility personnel or other inmates; and maintain cell cleanliness in accordance with Department Order 704, Inmate Regulations.

686. Any violations of the above requirements or engaging in assault, destruction of property or other behavior determined by the Program Team to require corrective action may result in forfeiture of time in Step I and placement back to the beginning of Step 1.

687. Inmates in Steps II and III must also comply with the above requirements and also complete programs and requirements provided in the Step Program Matrixes.

688.  The Program Team meets monthly to review any potential step advancement/regression cases and may convene prior to the monthly meeting to determine regression or removal from the Step Program.

689.  Inmates who complete Step III for a minimum of 30 consecutive days, without incident, may be eligible for consideration for custody reduction or placement in a less controlled housing location.

690.  Under Director's Instruction #326, ASPC-Eyman, Browning Unit has the least amount of out of cell activities and ASPC-Florence, Central Unit has the most.

691.  Browning Unit houses the maximum custody population that includes the most problematic and security threat inmates:  condemned row, validated STG and STG Step Down inmates (who have their own step down program).

692.  The progression for general population, to include general population mental health inmates, starts at ASPC-Eyman, Browning Unit and ends at ASPC-Florence, Central Unit.

693.  Maximum custody sex offender progression begins at ASPC-Eyman, SMU I and ends at ASPC-Eyman, Rynning Unit (with most, if not all, maximum custody inmates at Rynning Unit in Step III of the program).

694.  Maximum custody protective custody progression begins at ASPC-Eyman, SMU I and ends at ASPC-Lewis, Rast Unit (with most if not all, maximum custody inmates at Rast Unit in Step III of the program).

695.  All maximum custody male condemned row inmates or validated  STG members are housed at ASPC-Eyman, Browning Unit.

696.  All maximum custody female inmates are housed at Yard 30 at ASPC-Perryville, Lumley Unit.

697.  Location of the step assignments were decided based upon physical plant of the facilities hosting maximum custody units and recreation facilities.

698.  As of April 2014, there were 291 Eyman-Browning maximum custody inmates participating in Step I of DI 326; 278 Eyman-SMU I maximum custody inmates

1   participating in Step I of DI 326; 58 Florence – Central maximum custody inmates

2   participating in Step I of DI 326; and 32 Perryville-Lumley (female) maximum custody

3   inmates participating in Step I of DI 326.  (**Exhibit T**)

4        699.   As of July 2014, there were 297 Eyman-Browning maximum custody

5   inmates participating in Step I of DI 326; 307 Eyman-SMU I maximum custody inmates

6   participating in Step I of DI 326; 530 Florence – Central maximum custody inmates

7   participating in Step I of DI 326; and 44 Perryville-Lumley (female) maximum custody

8   inmates participating in Step I of DI 326.  (**Exhibit T**)

9        700.   As of September 3, 2014, there were 326 Eyman-Browning maximum

10   custody inmates participating in Step I of DI 326; 231 Eyman-SMU I maximum custody

11   inmates participating in Step I of DI 326; 301 Florence – Central maximum custody

12   inmates participating in Step I of DI 326; and 43 Perryville-Lumley (female) maximum

13   custody inmates participating in Step I of DI 326.  (**Exhibit T**)

14        701.   As of April 2014, there were 148 Eyman-Browning maximum custody

15   inmates participating in Step II of DI 326; 196 Eyman-SMU I maximum custody inmates

16   participating in Step II of DI 326; 155 Florence – Central maximum custody inmates

17   participating in Step II of DI 326; and 11 Perryville-Lumley (female) maximum custody

18   inmates participating in Step II of DI 326. (**Exhibit T**)

19        702.   As of July 2014, there were 84 Eyman-Browning maximum custody

20   inmates participating in Step II of DI 326; 97 Eyman-SMU I maximum custody inmates

21   participating in Step II of DI 326; 70 Florence – Central maximum custody inmates

22   participating in Step II of DI 326; and 19 Perryville-Lumley (female) maximum custody

23   inmates participating in Step I of DII 326. (**Exhibit T**)

24        703.   As of September 3, 2014, there were 81 Eyman-Browning maximum

25   custody inmates participating in Step II of DI 326; 169 Eyman-SMU I maximum custody

26   inmates participating in Step II of DI 326; 40 Florence – Central maximum custody

27   inmates participating in Step II of DI 326; and 26 Perryville-Lumley (female) maximum

28   custody inmates participating in Step II of DI 326. (**Exhibit T**)

704.   As of April 2014, there were 349 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 353 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 138 Florence – Central maximum custody inmates participating in Step III of DI 326; and 18 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326. (**Exhibit T**)

705.   As of July 2014, there were 323 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 585 Eyman-SMU III maximum custody inmates participating in Step III of DI 326; 226 Florence – Central maximum custody inmates participating in Step III of DI 326; and 14 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326. (**Exhibit T**)

706.   As of September 3, 2014, there were 346 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 535 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 364 Florence – Central maximum custody inmates participating in Step III of DI 326; and 85 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326. (**Exhibit T**)

707.   As of April 2014, there were 349 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 353 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 138 Florence – Central maximum custody inmates participating in Step III of DI 326; and 18 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326. (**Exhibit T**)

708.   As of July 2014, there were 323 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 585 Eyman-SMU III maximum custody inmates participating in Step III of DI 326; 226 Florence – Central maximum custody inmates participating in Step III of DI 326; and 14 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326. (**Exhibit T**)

709.   As of September 3, 2014, there were 346 Eyman-Browning maximum custody inmates participating in Step III of DI 326; 535 Eyman-SMU I maximum custody inmates participating in Step III of DI 326; 364 Florence – Central maximum custody

inmates participating in Step III of DI 326; and 85 Perryville-Lumley (female) maximum custody inmates participating in Step III of DI 326. (**Exhibit T**)

710.    As of April, 2014, there were 68 Eyman-Browning maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 74 Eyman-SMU I maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 172 Florence – Central maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; and 15 Perryville-Lumley (female) maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326. (**Exhibit Q**)

711.    As of August 2014, there were 22 Eyman-Browning maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 88 Eyman-SMU I maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; 241Florence – Central maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326; and 15 Perryville-Lumley (female) maximum custody inmates participating in Work Incentive Pay Plan jobs under DI 326. (**Exhibit Q**)

712.    Since 2004, correctional officers posted in maximum custody housing units have been specifically trained on tactical communication to ensure that correctional personnel are able to effectively communicate with those inmates that have the lesser contact with inmates and personnel without a barrier between them as compared to general population inmates; ensure that correctional personnel recognize verbal and non-verbal cues from inmates that indicate ensuing safety and security concerns; ensure that correctional personnel verbally control an escalating situation in order to quell the escalation by means of verbal communication; and ensure that correctional personnel engage in conflict resolution between inmates.

713.    Additionally since 2004, correctional officers posted in maximum custody housing units have also been trained in flexible supervision strategies as well as officer role in influencing behavior to enable correctional personnel to supervise inmates effectively and adjust supervision and treatment of inmates based upon inmate individual personality and behavior in order to get positive results from the inmates.

-75-

714.    Furthermore since 2008, correctional personnel posted in maximum custody housing units have been trained in crisis intervention and conflict resolution to ensure the ability of correctional personnel to use skill sets beyond command and control tactics to include effective verbal communication; continuous supervision of behaviors and detection of cues indicative of ensuing self-harm, assaults, unexpected medical emergencies and inmate dissention; and utilization of communication response tools to manage a crisis, keep order and teach inmates accountability – all leading to a more constructive correctional environment.

715.    In January 2014, ADC initiated training of Correctional Officer IIIs working in maximum and close custody housing unit in group dynamics in order to further develop skills for these personnel to conduct quality inmate programs in ADC maximum custody housing units to include:  giving groups and individuals increasing responsible tasks; facilitating communication; managing group conflict and tension; establishing group agreement; facilitating the learning process; effectively communicating; facilitating group discussions and exercises; enhancing problem solving skills; encouraging inmate participation; and control of inmates engaging in intimidation or class disruption.

**Restrictive Status Housing.**

716.    In addition to Steps I, II and III, each maximum custody housing unit also contains a designated housing area for Restrictive Status Housing Program (RSHP) inmates.

717.    Inmates who commit one of ADC's Forbidden Three Acts may be placed in RSHP by the RSHP Independent Review Committee, Complex Warden, receiving Complex Warden, and/or Regional Operations Director.

718.    The Forbidden Three Acts include serious assaults on staff, serious inmate on inmate assaults with weapons and multiple inmates assaulting an inmate with a serious injury.

719.    Inmates placed in RSHP are reviewed by mental health staff within 72 hours of placement.

720.     RSHP inmates are reviewed by the Program Team at a minimum of every 30 days for program participation and step progression.

721.     RSHP inmate property is limited to hygiene items, towel, wash cloth; two jumpsuits, two sets of underwear and socks (clean set exchange provided after every shower); legal materials; religious materials; reading and writing materials; one pair each of shower shoes and deck shoes.

722.     RSHP inmate property and privileges are earned back by demonstration of positive behavior and participation in mandatory programs.

723.     Visitation is restricted for the first 30 days and restrictions may be extended based upon disciplinary violation sanctions or program non-compliance.

724.     Phone calls are restricted for the first 90 days but inmates are still permitted to send and receive letters.

725.     RSHP inmates are offered recreation a minimum of six hours per week and must shower three times per week like all other maximum custody inmates.

726.     RSHP has three steps, requiring a minimum stay in Step I for 30 days, Step II for 60 days and Step III for 30 days.

727.     RSHP inmates may revert back to a prior step or stay in a current step for more than the minimum period of time for violation of program rules.

728.     Step II property and privileges are increased to possession of a television in cell (loaner if available); non-contact visits (once per month for two hours); and limited commissary (new hygiene and food purchase only).

729.     Step III property and privileges are increased to two non-contact visits per month for two house each; one phone call per month for 15 minutes; and increased commissary.

**Step Program Incentives.**

730.     The step program incentives and programming for ASPC-Eyman Browning Unit are outlined in **Exhibit P**.

78204-0001/LEGAL123450222.1

731.    The step program incentives and programming for ASPC-Eyman SMU-1 Unit are outlined in **Exhibit P**.

732.    The step program incentives and programming for ASPC-Florence Central Unit are outlined in **Exhibit P**.

733.    The step program incentives and programming for ASPC-Florence Kasson are outlined in **Exhibit P**.

734.    The step program incentives and programming for ASPC-Perryville Lumley are outlined in **Exhibit P**.

**Cell Cleanliness.**

735.    Cell sanitation is very important to promote hygiene, prevent spread of illness and disease, promote favorable living conditions, and protect safety and security for inmates and ADC personnel.

736.    All living areas are inspected daily by staff to promote these objectives.

737.    Correctional personnel make daily cell inspections to promote these objectives.

738.    Inmates are required to sweep and neatly maintain their cells.

739.    A detailed list of items provided to inmates and when cells and common areas are cleaned is contained in **Exhibit P**.

**Cell Configuration.**

740.    Maximum custody inmates represent the highest safety and security risk to the public, other inmates and facility personnel because they have the greatest risk of violence, predatory conduct, assaultive conduct or escape.

741.    Because of maximum custody inmates' criminal and institutional history as described above, prison officials must assign these inmates to the most secure and closely monitored housing units, providing the highest level of monitoring and controlled movement.

78204-0001/LEGAL123450222.1

742.   The following ADC prison complexes operate maximum custody inmate housing units within the complex: ASPC-Eyman, ASPC-Florence, ASPC-Lewis, ASPC-Perryville, and ASPC-Phoenix.

743.   ASPC-Lewis houses male protective custody inmates only, and ASPC-Phoenix houses mental health inmates.

744.   Many of ADC's "maximum custody" cells have double bunks and house two inmates in one cell, thereby providing the inmates with constant opportunity for interaction with another inmate.

745.   While cell configurations among the complexes vary based upon year built and design, all maximum custody cells provide sufficient ventilation (either through open cell fronts fixed with metal bars, perforated metal cell front doors or individual cell ventilation).

746.   Additionally, all maximum custody housing units and cell configurations provide exposure to natural light via in-cell windows, cell fronts that face windows or skylights in the housing units.

747.   Moreover, all maximum custody cells provide inmates the opportunity to see others and to speak to other inmates, correctional personnel, medical personnel, and programming personnel through either a perforated steel cell front, a vision panel in the door or cell wall or an open cell front – metal bar configuration.

748.   All ADC maximum custody cells provide sufficient space for inmates to engage in stretching, tai chi or yoga in their cells and such exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.

749.   All ADC maximum custody cells provide sufficient space for inmates to engage in cardiovascular exercise, including, but not limited to, marching in place, jogging in place, jumping an imaginary rope or doing "burpees" or "up-downs" in their cells and such exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.

750.    All ADC maximum custody cells provide sufficient space for inmates to engage in strength training, including, but not limited to, pushups, sit-ups, planks, triceps dips, lunges, squats, etc. – all plyometric exercises often performed by non-incarcerated individuals in their own homes.

751.    Such in-cell strength training exercise is permitted as long as the activity does not disrupt operations or risk the safety or security of the inmate(s) residing in the cell.

752.    Cell configurations for ADC's maximum custody units are as follows. and are represented by photographs of cells and cell fronts in ASPC-Eyman, ASPC-Florence and ASPC-Perryville.

753.    A detailed description of the configuration of the maximum custody units is contained in **Exhibit P**.

**Out of Cell Time.**

754.    The amount of time that an ADC maximum custody inmate is permitted to be out of his or her cell varies widely depending upon the inmate's classification, custody level and reason(s) for his or her placement in a particular maximum custody unit.

755.    Depending on classification and program status, maximum custody inmates are permitted to leave their cells, as more specifically set forth below, for numerous reasons including not limited to shower time, out of cell recreation, programming opportunities, medical appointments, communal chow service, commissary trips, visitation and inmate job assignments.

756.    Work opportunities are offered to all inmates, including select inmates in maximum custody.

757.    In addition to personal telephone calls and visits, maximum custody inmates are permitted legal calls and legal visits where the inmate has ongoing criminal or civil litigation matters.

758.   Per ADC Department Order 902, Inmate Legal Access to the Courts, ADC inmates including maximum custody inmates are permitted 30 minute outgoing collect call legal calls as well as telephone access for court ordered telephonic hearing.

759.   Legal calls are not monitored or recorded.

760.   Legal calls for telephonic court hearings are paid for by ADC.

761.   Inmates can request legal calls 24 hours in advance by submitting a Legal/Emergency Telephone Call Request form and upon approval the phone calls shall be scheduled.

762.   Legal phone calls may be denied or suspended only due to security concerns and may not be denied as a form of discipline.

763.   Incoming legal calls from attorneys may also be facilitated but ADC personnel must first contact the inmate to determine if the inmate wishes to receive the call and the inmate must complete the Legal/Emergency Telephone Call Request form to accept or refuse an attorney initiated legal call.

764.   Attorney visits for ADC inmates, including maximum custody inmates, are permitted where the attorney requests the visit at least 48 hours in advance of the visit (waivers of this advance request period may be waived in emergency situations).

765.   Attorney visits are permitted subject to security clearance of the attorney or attorney's agent.  Attorney visits may be contact visits or non-contact visits depending on the custody level of the inmate or any other safety or security concerns that may preclude a contact visit.

**Recreation and Hygiene.**

766.   Maximum custody inmates are afforded six hours of outdoor exercise weekly, generally in two hour blocks, three times per week.

767.   The two-hour block, three times per week schedule facilitates efficient operations and scheduling so that each maximum custody inmate is provided equal opportunity for meaningful out of cell recreation time considering the number of maximum custody inmates that ADC incarcerates.

768. Inmates housed in mental health units at the Lumley and Alhambra Units are afforded the same number of hours weekly for exercise as general population inmates – one hour in duration, six times a week.

769. However, inmates that are on mental health or suicide watch may be offered less than six hours per week of out of cell recreation time at the clinical discretion of the mental health provider in order to protect the health and safety of the particular inmate.

770. If recreation must be cancelled for legitimate operational or safety and security reasons such as a staffing shortage, inclement weather or facility emergency lockdown, recreation time will be made up for those inmates who missed recreation if time permits.

771. A detailed list of the policies, procedures, and items provided during recreation is contained in **Exhibit P**.

772. A detailed description of each of the recreation yards at the maximum custody units is contained in **Exhibit P**.

773. ADC maximum custody inmates (including detention status) are offered showers (and shave for males) three days each week.

774. A detailed description of ADC's policies and practices regarding inmate showers is contained in **Exhibit P**.

**Social Interaction.**

775. ADC maximum custody inmates have ample opportunity for daily human interaction. A detailed account of all the ways maximum custody inmates engage in human interaction is contained in **Exhibit P**.

**Cell Illumination.**

776. Run and dormitory lights are turned on no later than 6:30 am and turned off no later than 10:00 p.m., daily.

777. Some maximum custody cells have night security lights in the cells that can be controlled by the inmate or by staff.

778.   Some maximum custody cells have night security lights that cannot be controlled by inmates.

779.   Other maximum custody cells have no security lights located in-cell, but have night security lighting running along the cell runs that provide correctional officers sufficient light to perform safety and security checks while also allowing inmates to sleep.

780.   The in-cell constant night security lights used for nighttime lighting of maximum custody cells (non-watch cells) are low-level, 7-watt bulbs that enhance security at the facility, yet are dim enough to provide an adequate sleeping environment for the inmates.

781.   The nightlights are very different from the much brighter security lights and the regular fluorescent lights that are used in the cells during the day. nightlights emit light that is comparable to a nightlight that persons may use in their home.

782.   The use of low-level nightlights is standard practice for correctional facilities across the country.

783.   The level of illumination used is the minimum amount necessary to sufficiently address security concerns and to allow correctional staff to observe inmates during the night and regular sleeping hours.

784.   Specifically, the nightlights enable correctional personnel to observe the wellbeing of an inmate at night, including detecting illness, medical emergency, ensuring suicide precautions, and detecting physical or sexual assaults, and ensure that inmates are not attempting to escape or engage in other illicit activities, such as use or exchange of contraband.

785.   The level of illumination used also permits correctional personnel to make regularly required security checks, as described above, without having to turn on the daytime fluorescent lighting (and wake sleeping inmates) each time a security check is made.

786.   Security checks are performed at frequent and random intervals throughout the day and night to monitor and protect the safety and security of the inmates and the

facility, and officers must be able to observe skin and detect whether an inmate appears to be breathing.

787.   In short, some cell illumination during sleeping hours is essential to adequately check safety and security of inmates.

788.   While flashlights are used in some instances to conduct security checks, it is more efficient and desirable to employ illumination either in-cell or on the cell runs to enable officers to perform regular safety and security checks during sleeping hours.

789.   The sole use of flashlights to conduct night time safety and security checks enables inmates to detect when officers are making rounds and thus plan instances of assault, contraband use/exchange, and escape plans around those security checks.

790.   Additionally, an officer may have to stop and shine a flashlight in a cell for extended time in order to confirm the safety and security of an inmate.

791.   Further, a flashlight alternative runs the risk of creating conflict between inmates and staff because inmates may view the use of a flashlight as harassment.  The current illumination practice eliminates staff discretion and control over how long to shine the light and how often to do so.

792.   Maximum custody watch cells require illumination at a higher wattage than the 7-watt nightlights in order to allow officers to maintain a visual on the inmates for safety and security reasons.

793.   The wattage of lighting in all maximum custody cells allows inmates to sleep while enabling correctional officers to perform appropriate safety and security checks.

794.   In addition, inmates are permitted to cover their eyes with small cloths if they wish to when they sleep as long as correctional personnel conducting safety and welfare checks are able to see flesh and determine that the inmate is breathing.

795.   Specifics regarding security lighting for each of ADC's maximum custody units is contained in **Exhibit P**.

**Food Service.**

796.   DO 912 addresses health and sanitation requirements and restricted diets and "ensures that inmates are provided nutritious meals."

797.   The goal for ADC's food service is "to have a quality food service program that provides the most nutritious, appetizing and cost effective meal possible."

798.   The Contract Food Service Staff is required to provide "regular and restricted diets that are nutritionally adequate, regularly monitored and compatible with the needs of inmates."

799.   A detailed account of how food is prepared, when it is delivered, and ADC's policies and procedures regarding food preparation is contained in **Exhibit P**.

**Property.**

800.   All inmates are authorized to possess property as outlined in the Inmate Property List.  Inmates in maximum custody are permitted to have appliances such as televisions, cassette players, and headphones.

801.   Inmates may not possess any property item in excess of the total amount allowed.

802.   Cell property may be restricted upon determination by medical or administrative staff in order to prevent the inmate from engaging in self-harm.

803.   Access to these appliances may be restricted for maximum custody inmates based upon disciplinary sanction.

804.   Restricting access to these appliances constitutes a reasonable behavioral modification sanction as the restriction is based upon a formal disciplinary sanction finding and is limited in time.

805.   Maximum custody inmates participating in ADC's Director's Instruction #326 Maximum Custody Population Management Step Program as are afforded increased property allowances as they progress through the three step behavioral modification program.

806.   Property afforded to inmates place on watch status is an individualized determination made by mental health personnel and correctional personnel depending on the circumstances requiring the watch status.

807.   Property restrictions may be imposed in order to eliminate inmate access to property items that the inmate may use for purposes of self-harm or a weapon used as against mental health, medical or correctional personnel.

**Grievance Procedure (Non-Medical).**

808.   The Inmate Grievance System for non-medical issues has five levels: (1) the inmate must first try to resolve his issue through informal means, such as discussion with staff in the area most responsible for the complaint or by the submission of Inmate Letters (2) if the inmate is unable to resolve the issue through informal means, within ten working days after he becomes aware of the specific issue, he may submit an Informal Complaint or an Inmate Letter to his assigned CO III; (3) if the inmate is not satisfied with the Response of the CO III, within five working days from receipt of the Response he may submit a Formal Grievance to which the Deputy Warden responds; (4) if the inmate is not satisfied with the Deputy Warden's Response, within five working days from receipt of the Response he may submit an Inmate Grievance Appeal to the Warden; and (5) if the inmate is not satisfied with the Warden's Response to the Grievance Appeal, he may Appeal to the ADC Director within five working days from the receipt of the Response.

809.   Under ADC policy, an inmate must appeal to the Director to exhaust the non-medical grievance procedure, and the failure to properly appeal through to the Director's Decision constitutes a failure to exhaust available administrative remedies.

810.   Plaintiff Swartz did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Complained about "unhygienic conditions" in suicide watch cell and mental health notes reflect he was "bitching about cleanliness – germs and disease." (¶ 84)

- Acquired and used staples, plastic wrap, glass, concrete nail, spork, pens, paper clips, metal spring, steel bolt, and copper wires to hurt himself in suicide watch cell.
- No supervision of medication administration in isolation cell.
- Attempted to commit suicide in isolation cell.

811.   Former ADC inmate Dustin Brislan did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Spent several weeks in a frigid suicide cell with no mattress.
- Placed in suicide watch cell with broken glass and given a razor blade during another stay, which he used to cut himself.
- Attempted to commit suicide in isolation cell.

812.   Plaintiff Rodriguez did not submit an Appeal to the Director with respect to the following claims she raises in the Complaint:

- Excessive use of pepper spray and prolonged isolation in SMU and suicide watch cell.
- Suicide smock barely comes to top of thighs so that legs are exposed to cold air.
- Pepper sprayed when delusional or hallucinating while in suicide watch cell.

813.   Plaintiff Verduzco did not submit an Appeal to the Director with respect to the following claims she raises in the Complaint:

- Forced to endure cold temperatures while in suicide watch cell (short smock with cold air), no way to turn off the lights, subjected to safety checks every 10-30 minutes, minimal human contact, and cannot go outside, brush her

teeth, or bathe regularly; conditions in SMU include extended isolation, limited exercise, limited therapeutic treatment, excessive pepper spray.

- Suicide smock barely comes to top of thighs so that legs are exposed to cold air.

- Pepper sprayed in suicide watch cell after jerking awake when awoken by staff on "safety check" for allegedly attempting to assault an officer.

- Pepper sprayed when delusional or hallucinating while in suicide watch cell, and then dragged to shower, stripped naked, and sprayed with cold water, then left naked to wait for a new vest and blanket.

- Mental health worsened in isolation cell.

814. Plaintiff Thomas did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Exposed to prolonged periods of isolation while in SMU.

- Unable to sleep because of 24-hour lighting in isolation cell.

- Lost 30 pounds while in isolation cell because of inadequate nutrition.

- Mental and physical state deteriorated after being put in isolation cell.

815. Plaintiff Smith did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Extreme isolation in SMU; denied transfer out of SMU despite renouncing gang membership.

- Cannot eat food he is given in isolation cell because it is tampered with by kitchen workers who target him.

- Mental health worsened in isolation cell.

816. Plaintiff Gamez did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Mental health worsened in isolation cell.

817. Plaintiff Chisholm did not submit an Appeal to the Director with respect to the following claims she raises in the Complaint:

- Subjected to three aggressive room searches in October 2011 and February 2012 (and confiscated a book of art and art supplies).

818. Plaintiff Polson did not submit an Appeal to the Director with respect to the following claims he raises in the Complaint:

- Minimal human contact in suicide watch cells.

**Dismissed Plaintiffs.**

819. Plaintiff Parsons was dismissed from this lawsuit on March 6, 2013, and Plaintiff Brislan was dismissed from this lawsuit on August 7, 2014.

**Shawn Jensen.**

820. A description of Jensen's background is contained in Exhibit D.

821. A detailed account of the treatment provided to Jensen during his incarceration at ADC is contained in **Exhibit D**.

822. The medical, dental, and mental health care Jensen received was constitutionally adequate and within the applicable standard of care.

**Charlotte Wells.**

823. A description of Wells' background and disciplinary history while incarcerated at ADC is contained in **Exhibit L**.

824. A detailed account of the treatment provided to Wells during her incarceration at ADC is contained in **Exhibit L**.

825. The medical, dental, and mental health care Wells received was constitutionally adequate and within the applicable standard of care.

-89-

1  **Sonia Rodriguez.**

2  826.   A description of Rodriguez's background and disciplinary history while

3  incarcerated at ADC is contained in **Exhibit G**.

4  827.   A detailed account of the treatment provided to Rodriguez during her

5  incarceration at ADC is contained in **Exhibit G**.

6  828.   The medical, dental, and mental health care Rodriguez received was

7  constitutionally adequate and within the applicable standard of care.

8  829.   The conditions of confinement Rodriguez experienced during her

9  incarceration at ADC were constitutionally adequate.

10  **Christina Verduzco.**

11  830.   A description of Verduzco's background and disciplinary history while

12  incarcerated at ADC is contained in **Exhibit K**.

13  831.   A detailed account of the treatment provided to Verduzco during her

14  incarceration at ADC is contained in **Exhibit K**.

15  832.   The medical, dental, and mental health care Verduzco received was

16  constitutionally adequate and within the applicable standard of care.

17  833.   The conditions of confinement Verduzco experienced during her

18  incarceration at ADC were constitutionally adequate.

19  **Jackie Thomas.**

20  834.   A description of Thomas's background and disciplinary history while

21  incarcerated at ADC is contained in **Exhibit J**.

22  835.   A detailed account of the treatment provided to Thomas during his

23  incarceration at ADC is contained in **Exhibit J**.

24  836.   The medical, dental, and mental health care Thomas received was

25  constitutionally adequate and within the applicable standard of care.

26  837.   The conditions of confinement Thomas experienced during his incarceration

27  at ADC were constitutionally adequate.

28

**Maryanne Chisholm.**

838.   A description of Chisholm's background and disciplinary history while incarcerated at ADC is contained in **Exhibit A**.

839.   A detailed account of the treatment provided to Chisholm during her incarceration at ADC is contained in **Exhibit A**.

840.   The medical, dental, and mental health care Chisholm received was constitutionally adequate and within the applicable standard of care.

**Desiree Licci.**

841.   A description of Licci's background and disciplinary history while incarcerated at ADC is contained in **Exhibit E**.

842.   A detailed account of the treatment provided to Licci during her incarceration at ADC is contained in **Exhibit E**.

843.   The medical, dental, and mental health care Licci received was constitutionally adequate and within the applicable standard of care.

**Robert Gamez.**

844.   A description of Gamez's background and disciplinary history while incarcerated at ADC is contained in **Exhibit B**.

845.   A detailed account of the treatment provided to Gamez during his incarceration at ADC is contained in **Exhibit B**.

846.   The medical, dental, and mental health care Gamez received was constitutionally adequate and within the applicable standard of care.

847.   The conditions of confinement Gamez experienced during his incarceration at ADC were constitutionally adequate.

**Jeremy Smith.**

848.   A description of Smith's background and disciplinary history while incarcerated at ADC is contained in **Exhibit H**.

849.   A detailed account of the treatment provided to Smith during his incarceration at ADC is contained in **Exhibit H**.

850.   The medical, dental, and mental health care Smith received was constitutionally adequate and within the applicable standard of care.

851.   The conditions of confinement Smith experienced during his incarceration at ADC were constitutionally adequate.

**Joseph Hefner.**

852.   A description of Hefner's background and disciplinary history while incarcerated at ADC is contained in **Exhibit C**.

853.   A detailed account of the treatment provided to Hefner during his incarceration at ADC is contained in **Exhibit C**.

854.   The medical, dental, and mental health care Hefner received was constitutionally adequate and within the applicable standard of care.

**Joshua Polson.**

855.   A description of Polson's background and disciplinary history while incarcerated at ADC is contained in **Exhibit F**.

856.   A detailed account of the treatment provided to Polson during his incarceration at ADC is contained in **Exhibit F**.

857.   The medical, dental, and mental health care Polson received was constitutionally adequate and within the applicable standard of care.

858.   The conditions of confinement Polson experienced during his incarceration at ADC were constitutionally adequate.

**Stephen Swartz.**

859.   A description of Swartz's background and disciplinary history while incarcerated at ADC is contained in **Exhibit I**.

860.   A detailed account of the treatment provided to Swartz during his incarceration at ADC is contained in **Exhibit I**.

861.   The medical, dental, and mental health care Swartz received was constitutionally adequate and within the applicable standard of care.

78204-0001/LEGAL123450222.1

862.    The conditions of confinement Swartz experienced during his incarceration at ADC were constitutionally adequate.

**2.    The following material facts, although not admitted, will not be contested at trial by evidence to the contrary:**

**3.    The following issues of law are uncontested and stipulated to by the parties:**

1.    This court has federal question jurisdiction over this case and it is properly venued in this Court. 28 U.S.C. §§ 1331, 1343; 28 U.S.C. § 1391(b).

2.    Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief. 18 U.S.C. § 3626 (a)(1). This standard is "nearly identical" to the pre-PLRA standard for entry of injunctive relief in contested cases. *Gilmore v. State of California*, 220 F.3d 987, 1006 (9th Cir. 2000).

78204-0001/LEGAL123450222.1