# EXHIBIT A

# SECOND SUPPLEMENTAL REPORT OF ROBERT L. COHEN, M.D.

*Parsons, et al. v Ryan, et al.*

No. 2:12-cv-00601-NVW

SEPTEMBER 8, 2014

Robert L. Cohen, M.D.

1.      For this Second Supplemental Report, I reviewed medical records for two groups of ADC patients: I reviewed updated medical records, through April 1, 2014, for 42 ADC patients that I discussed in my November 2013 and February 2014 reports (Dkt. 945-1, Exs. 1 and 3), and also reviewed medical records for 59 prisoners who died either in, or very shortly after release from, ADC custody during the six month period from September 27, 2013 and April 1, 2014.[1]   These records comprised tens of thousands of pages.[2]

2.      As I found in my previous reports,[3] regrettably, the medical records I have reviewed expose a gravely dysfunctional system.  As was true last year, when I first visited ADC prisons, the prison health care system in the ADC fails to deliver timely, adequate health care to prisoners with serious medical concerns.  Consequently, ADC prisoners are subject to an unreasonable risk of harm, endure unnecessary pain and suffering, and in some cases may suffer premature death.

3.      Among the 59 prisoners who died during the six month period, I found that

---

[1] As in my First Supplemental Report, I have again focused on the records for the prisoners whose deaths were not classified by ADC, or did not appear to me to be, accidental deaths, suicides or homicides. In each of these 59 cases I was provided with medical records for approximately one year prior to the death, and for most, an autopsy report.  For ten of the prisoners, I also received a report prepared by the ADC's Inspector General's Office.  Three of the 42 patients whose files I reviewed for my first reports were among the 59 patients who died during the relevant period.  Thus, I reviewed a total of 98 records for this report.

[2] A complete list of the documents that I reviewed for purposes of preparing this expert report is attached as Appendix A.

[3] My first three reports are dated November 8, 2013, January 31, 2014, and February 24, 2014. These reports were attached as Exhibits 1-3, respectively to my sworn declaration, dated June 15, 2014, submitted to the Court as Dkt. 945.

more than half received care that was grossly deficient, undoubtedly resulting in their unnecessary suffering and possibly contributing to their deaths.  In three other cases, there may have been deficient care, but the records were simply too incomplete for me to render an opinion.  Shockingly, the mortality reviews for the ADC deaths almost uniformly endorse the care provided as adequate, even in cases involving appalling care, revealing once again that the system's death review process is utterly ineffectual.

4.     Of the 42 sets of records for those patients discussed in my earlier reports, I found severe deficiencies in care in 32 (76%) of them.   This is an extraordinarily high percentage, especially considering that ADC was on notice that these specific patients had received deficient care after my November 2013 report was filed.

5.     The problems I found in these two subsets of records are similar to and of the same magnitude as those I described in my earlier reports. Indeed, I believe the care that ADC's medical delivery system remains as dysfunctional as it was when I first visited the ADC prisons a year ago.

6.     Many of the cases I discuss below demonstrate shockingly poor care for patients suffering from various serious medical problems.   They also vividly illustrate the ongoing patterns of delayed and inadequate care: failure to provide timely access to care, failure to provide timely emergency treatment, failure to provide necessary medication and medical devices, failure to provide care for chronic diseases, and failure to provide timely access to specialty care.

7.     Many of the systemic failures illustrated in this report are rooted primarily

in a failure to hire sufficient qualified physicians, mid-level providers and nurses to treat the number of sick people in the system, with the result that lower level clinicians often examine and treat patients who require treatment from a more highly trained clinician. Moreover, as shown repeatedly in the defendants' Mortality Reviews, gross errors in diagnosis and treatment are repeatedly endorsed as meeting the "community standard of care," making it clear that the health care directors set a very low bar for acceptable performance.  Over and over, I found cases where medical staff either did not know what care a patient required, or apparently did not care.

8.     All medical systems will, from time to time, provide care that is substandard, often due to human error or miscommunications.  The problem cases that I found in the ADC system, however, are of an entirely different magnitude from those encountered in a typical health care system.  In these cases, as illustrated below, patients with obvious and serious medical needs are routinely ignored, over and over, causing unconscionable suffering and, in some cases, unnecessary death.  If these types of cases were discovered in a hospital or nursing care facility, the institution would undoubtedly lose its license.

### Failure to Provide Timely Access to Care

9.     In a functioning prison health care system, prisoners must be able to communicate their health care needs, have those needs timely reviewed and triaged, and access a primary care provider as appropriate, given the urgency of the medical need.

10.    The ADC has no reliable system for ensuring that patients with serious

medical needs can make their health care problems known to staff, or for ensuring that patients are able to see appropriate providers for their serious medical concerns.  This was vividly shown in a series of medical charts for prisoners who died of cancer during the period from 9/27/13-4/1/14.  These charts show that, even when the sickest patients seek attention for symptoms that should alert any competent medical staff to the need for prompt care, the sick call requests are ignored, prison nurses fail to refer patients to primary care providers (PCPs), PCPs fail to refer patients to necessary specialists and fail to order and/or review critical diagnostic tests, and when care is delivered, it is often grossly delayed, and these delays mean that patients are subjected to prolonged and unnecessary suffering.  Additionally, in some cases, medical staff  exhibit a clear bias against their patients, documenting their belief that the patients are faking symptoms, when they are in fact close to death. In short, the ADC's "access to care" system is a disaster.

11.    For example, ███████████ experienced extraordinary diagnosis and treatment delays.  He had been diagnosed with tongue cancer in 2003 and treated with chemotherapy and radiation.  Ten years after he had gone into remission, he alerted prison medical staff on 4/9/13 to the recurrence of nodules in the place where his cancer had been.  (ADC352004).   Although a PET scan that would have confirmed the cancer diagnosis was ordered immediately, he did not receive it for four months. (ADC352013, ADC352141).  And although an MRI identified a lesion in July, it was not biopsied until 9/11/13.  (ADC352115).

4

12.     Mr. ███ repeatedly submitted HNRs ("health needs request" or sick call request), alerting staff that his throat pain was so severe he was missing meals, and that he was experiencing dizzy spells.  (ADC352052-352053, 352055).   Medical staff failed to follow up.

13.     Mr. ███ was not seen by an outside oncologist until 12/12/13, eight months after he sought care.  (ADC352429).  During the intervening period, his weight dropped from 149 lbs. to 111 lbs.  (ADC352006, ADC352416).  He was six feet tall.

14.     When he finally saw the oncologist, the prison failed to provide critical diagnostic test results to the specialist. As stated in the oncology note of 12/18/13, this information was required to start chemotherapy for rapid control of the tumor. (ADC352426).  Mr ███ died ███ weeks later, on ███, and at that point, weighed just 83 lbs.  (ADC422773).  There are no records indicating that his records were ever provided by prison medical staff to oncology, or that Mr. ███ ever received chemotherapy.

15.     The case of ███████████, also involves inexcusable delays in the diagnosis and treatment of a fast acting cancer. Mr.███████ placed an HNR about his mouth pain on 10/13/13.  (ADC337336). He was noted to have a large tumor on his right chin, 10-15 cm in size, and he was referred to an oral surgeon for biopsy. Despite the size of this mass and clear concern for cancer, he was not seen by the oral surgeon until almost one month later, at which time the mass was biopsied.  (ADC337381, ADC337314, ADC337380-381).

5

16.     On 11/26/13, while awaiting the final pathology report, because the mass was, to observation, clearly cancerous, Dr. Rumsey placed an order for referral to oncology "ASAP." (ADC337353).   The biopsy report, received 12/05/13, showed cancer. (ADC337309).

17.     Mr. ████ was found bleeding in his prison infirmary bed on 12/█/13. An ambulance was called to transport him to an outside hospital. (ADC337356). There are no further entries in the medical record.  According to ADC's database, he died ████ ████    There is no evidence in the medical records provided that Mr. ████ was ever seen by a specialist. There are no medical, radiology, or surgical oncology consultations in the medical record. No follow-up treatment was provided at ADC for the next 3 weeks. This is an inexcusable failure to treat a fast acting potentially fatal cancer.

18.     ████ was likewise subjected to critical appalling delays in treatment that left him untreated for horrible pain and resulted in his death.  A 56 year old man with hepatitis C, mental illness, asthma and chronic kidney disease, he passed away on ████ at an outside hospital from complications of metastatic cancer, a year after reporting symptoms, without ever receiving cancer treatment or even a diagnosis.

19.     Mr ███ complained of a swollen scrotum in ████, 2012.  He was seen and the provider, PA Nick Salyer, requested an ultrasound of the scrotum because it was enlarged, painful, tender, and the provider was concerned about two serious problems, cancer and abscess. (ADC339582-339583, 339592)  The ultrasound was denied. (ADC339591).

6

20.     During the following nine months, Mr. ▮▮▮ submitted numerous HNRs pleading for treatment for his very painful testicle.   (ADC339672-339674, ADC339669, ADC339666, ADC339664).

21.     Despite these requests, he was not scheduled to see a PCP until September, 2013, when Nurse Practitioner Ende noted his right testicle was three times the normal size, with an unusual hardened area on the left side of the penis. (ADC339571).  NP Ende noted the 12/17/12 request for an ultrasound which had been denied, with a recommendation to evaluate clinically.  In fact, almost 10 months later, this was the first time, despite Mr. ▮▮▮ multiple plaintive HNR's, that any practitioner had evaluated his grossly swollen testicle.  NP Ende ordered blood tests and re-requested diagnostic tests. (ADC339571).

22.     During the next two months, Mr. ▮▮▮ continued to complain of severe pain and to lose weight.  In response, he received only ibuprofen.  (ADC339569-339570, ADC339568).  Lab studies were ordered, but done late, and then not reviewed. (ADC339596-339600).

23.     On 10/23/13 Mr. ▮▮▮ submitted an HNR stating:  "I've been suffering with multiple pains throughout my body.  I can't move my arm (right) above my shoulder.  I can't walk. I need a wheelchair to go to medical. When am I going to see a doctor? I've been getting worse. My body is breaking down as the days pass." (ADC339662).

24.     On 11/5/13 he finally went to an outside hospital for the CT scan of his

abdomen and pelvis, two months after it was ordered.  (ADC339588).  The scan showed

extensive metastatic disease involving Mr. ███ ribs, pelvis, lumbar spine, adrenal

glands, and extensive enlarged lymph nodes.  (ADC339588-589).

     25.    Mr. ███ died at the outside hospital ████████ (ADC339561), on

████, of complications of metastatic cancer that had been undiagnosed for one year,

despite Mr. ████ many pleas for help and his very obvious symptoms.  Dr. Kenneth

Merchant completed the Mortality review the next day, while the autopsy report was still

pending.  He stated that the care received by Mr. ██████ met community standards

without negative findings.  (ADC364823)  Virtually ignoring a patient's severe pain from

a fatal cancer for a year may have met Corizon's standards, but it surely did not meet any

existing community standard.

     26.    ████████████ died at age 54 of metastatic lung cancer.  While

his death was likely not preventable, it is remarkable and horrifying that, during the four

months from his interdepartmental transfer on ████ to his death on ██████, he was

almost completely neglected, and the medical staff ignored his severe wasting, constant

pain, shortness of breath, and coughing up blood, and accused him of faking his

symptoms.

     27.    Mr. ██████ was 6'2" tall, and weighed 114 lbs. when he arrived at ASP-

Eyman, from Phoenix complex.  (ADC356797).   Within a week of his arrival, he sought

treatment for pain, and during his four months in this prison, he submitted at least a dozen

HNR's begging for treatment for severe pain.  (ADC356892-906).

28.     When an emergency was called for Mr. ██████ in mid-December, he was evaluated by an LPN, who did not take his vital signs.  The LPN administered a steroid injection, based on a phone order from a Physician's Assistant, and ordered him returned to his housing unit, despite Mr. ██████ pleas to be sent to a hospital.  The LPN's note indicates she believed Mr. ██████ was faking his breathing distress.  (ADC356813).

29.     He returned to the prison emergency treatment area in a wheelchair two days later, so short of breath he was unable to speak.  (ADC356812).  He was again sent back to his housing area.  Finally, the next day, he was sent to the emergency room, where he was intubated for respiratory failure.  At that point, he weighed 99 lbs. (ADC356810).  He died one month later of previously undetected metastatic lung cancer. (ADC364792-794).

30.     In his mortality review, PA Salyer concluded that Mr. ██████ care met the community standard of care.  (ADC364795).   Based on his extreme wasting and complaints of pain, he should have been evaluated for infection or cancer.  This would have included an endoscopy/colonoscopy, chest x-ray and if needed, CT scan of the chest/abdomen/and pelvis, and further laboratory workup infections, especially tuberculosis and fungal infection.  A source for his pain should have been identified. None of those tests were ever done.  Moreover, the prison nurse concluded that a clearly very ill patient was faking symptoms when he was only a few days from death.  That the PA could conclude this care met the community standard is unfathomable.

31.     Another cancer patient, ██████████ was 48 years old when he

died on ███      Mr. ███ was in severe and unrelenting pain for months and suffered

greatly, receiving virtually no care.  Although Mr. ███ filed numerous HNRs,

Corizon ignored them, failed to diagnose and treat him, and then concluded, erroneously,

that his care "met community standards." (ADC364156).

32.     Mr. ███ had his admission examination on ███. (ADC348422425).

Although his initial lab results were abnormal and suggestive of possible cancer, there is

no indication that anyone every reviewed these results – there is no signature on the page,

and no comments in the medical record. (ADC3486623).

33.     In the two months after his arrival, Mr. ███ submitted at least six

HNRs, begging for treatment for his crippling pain that interfered with his sleep and

breathing.  (ADC348650-657).  Mr. ███ was treated only with ibuprofen and a

muscle relaxant.  (ADC348445, ADC348443).

34.     Complaints of severe pain should be seen urgently; back pain even at rest

or at nighttime is a warning sign for more dangerous etiologies.  The presence of severe

pain for several months indicated the need for an MRI or CT scan of the lower back.

Corizon never considered or recommended this basic evaluation of severe, incapacitating

back pain, unresponsive to pain medication and muscle relaxants.

35.     Mr. ███ filed yet another HNR, this time about a "boil" on his back on

9/27/13.  (ADC348651).  He was referred by a nurse for provider evaluation, but no

evaluation took place, and the mass was biopsied on 10/23/13 only after Mr. ███ was

hospitalized at an outside hospital.  (ADC348441-348442; 348557)  It was metastatic

skin cancer.  (ADC348519).  Appropriate medical care would have included early biopsy when it was first identified, yet Corizon medical staff never pursued this.

36.     On 10/16/13 laboratory studies showed abnormalities that were strongly suggestive of an underlying serious medical problem, particularly possible cancer involving the bone.  (ADC348617-348618).  This should have warranted an urgent workup with imaging and further lab testing, but no one ordered them.

37.     On 10/16/13, Mr. ██████ was brought emergently to the health unit.  He was noted to be disoriented and confused, and having trouble breathing, sitting and standing due to severe pain.  Corizon staff finally decided he should be sent to the hospital.  (ADC348437).

38.     Mr. ██████ was critically ill when he arrived at University of Arizona Hospital on 10/20/13.  He was diagnosed with widely metastatic cancer in his lung, liver, and bones.  The tumor had caused a spinal fracture and nerve root compression, and a rib fracture.  (ADC348577, ADC348541-543).  The lung mass was so extensive that it compressed the vein providing outflow of blood from the head and neck back to the heart, causing facial swelling. (ADC348522).   Mr. ██████ condition deteriorated rapidly. His wife chose to discontinue life support on ██████ (ADC348458), because his condition was terminal.

39.     The Mortality Report prepared by Medical Director Dr. Lucy Burciaga finds that Mr. ██████ treatment met the community standard. (ADC364156).   This is false.  The report fails to note the fact that Mr. ██████ suffered for almost ██ months

11

with severe pain from bone cancer without treatment beyond ibuprofen  and stool softener(ADC348638), a mattress wedge (ADC348640), and the muscle relaxant baclofen.  (ADC348636).  The report fails to note that there were multiple abnormalities – incapacitating pain with loss of the ability to walk, a mass on his back, significant laboratory abnormalities, and swelling of his face, all of which were attributed to common back pain, even though an x-ray obtained at ADC by Corizon did not show any degenerative disc disease. It ignores the fact that had medical staff pursued appropriate diagnostic workup for his cancer, Mr. ███████ could have been received appropriate pain control and might have been a candidate for palliative chemotherapy and radiation.

40.     All of the many diagnostic procedures listed in the Mortality Review are procedures that occurred at the hospital, not at ADC.  The purpose of the Mortality Review is to identify problems, and develop policies, procedures, and educational programs which will decrease the likelihood of the identified errors happening again.  Dr. Burciaga's assessment will have the opposite effect.

41.     When 35 year old ████████████, was admitted to the ADC on ███████/13, he told the medical staff he thought he might have leukemia, and his initial lab tests were consistent with acute lymphocytic leukemia, a potentially life threatening, but treatable illness.  (ADC356658-659, ADC356686,  ADC356766-356767).   Indeed, the lab that performed the blood test, called the facility, spoke with a prison RN and faxed the results because the results exceeded "Panic Values" for these tests, indicating probable acute leukemia.  (ADC356677-356678, ADC356762-763). Mr. ███████ died

12

within a month, having received essentially no medical care from the ADC.

42.     Although a request for Hematology/Oncology consultation was submitted to Corizon on ████/13, there is no record that the consultation request was ever approved by Corizon, and the consultation was never scheduled.  (ADC356677-356678).

43.     The acute leukemia made Mr. ████ very sick.  He submitted an HNR on ████/13 complaining of a fever, blood clots the size of golf balls in his legs, terrible pain, and a severe headache.  (ADC356776).  There was no response to these complaints in the record.  Whenever patients with concern for acute leukemia have these types of symptoms, they are considered complications related to leukemia until proven otherwise.  A careful and comprehensive evaluation should have been undertaken to evaluate for central nervous system involvement and infection. Mr. ████ received no such care.

44.     When seen a week later, with a low-grade fever and rapid heart rate again raising concern about a possible infection, he reported he had not eaten for three days due to pain.  (ADC351681).  He required care on an emergency basis at this point, but instead, received only some IV fluids and pain medication, based upon an NP's phone order.  (*Id.*)  This failure to provide basic treatment to a critically ill person with leukemia is astonishing and terrifying.

45.     Two weeks after his initial CBC indicated leukemia, Mr. ████ was seen emergently and sent to the hospital with severe pain and very low blood pressure.  (ADC356679-356680).  When he arrived at the University of Arizona Medical Center on ████/14, he was critically ill and was immediately admitted to the Intensive Care Unit.

13

Despite aggressive therapy provided by the hospital, it was too late, and he died ████

weeks later. (ADC356751-752, ADC356689, ADC356696-697, ADC356706,

ADC356689).

46.    Mr. ████████ was diagnosed with a life threatening condition the day after

he was admitted to ADC.  Multiple Corizon staff were directly informed by clinical

laboratory staff that Mr. ████████ probably had acute leukemia and needed an emergency

hematology/oncology consultation.  Mr. ███████ had multiple painful and frightening

complications of his leukemia – blood clots, bleeding, visual disturbances, and abdominal

pain.  He received almost no treatment for ██ days, until he was emergently transported

to University of Arizona Medical Center.  He arrived at the hospital barely breathing.

The callous indifference to his serious and ultimately fatal medical problem demonstrated

by multiple Corizon staff is incomprehensible.

47.    The type of leukemia Mr. ███████ had is often fatal.  But Mr. ███████

was young, and his 5 year survival rate was probably close to 50% had he been treated

emergently, beginning ████/13, when lab staff called Corizon medical staff and told

them they believe Mr. ██████ had leukemia.

48.    ████████████████ was diagnosed with metastatic stomach cancer

while incarcerated. Though incomplete, his medical records clearly document that his

diagnosis of his gastric cancer was significantly delayed, and that he endured several

months of suffering without any treatment. Mr. ██████ submitted HNRs in August,

September, and October 2013, each time urgently begging for medical care and each time

noting that he was having trouble swallowing food, that he could not eat, and that he had

lost over 20 pounds. (ADC327368-369, ADC327301-02).  His HNR of 10/1/13 stated "I

think I have some kind of blockage but without a doctor examining me, who knows? I

have been to the nurses 3 times and still no Doctor! Need seen NOW! No one has even

examined me! 'EMERGENCY'."  (ADC327302).

49.    No appointment was scheduled.  On 10/21/13, Mr. ████ submitted a

grievance stating "I believe I should have been sent to the hospital for testing that would

show what is wrong with me. Medical, on the other hand, would rather prescribe me

antacids and laxatives rather than spend the money it would cost to find out what is

wrong. . . .." (ADC 034910).  On 10/13/13, Mr. ████ was sent to the outside hospital.

(ADC327305).  An endoscopy test performed on 10/27/13 showed the cancer had spread

through his stomach and esophagus and was so extensive that only palliative radiation

therapy was offered.  (ADC327332-340, ADC327355).

50.    Mr. ████ own writings describe his experience clearly and precisely.

When a 57-year-old man complains of difficulty swallowing, inability to keep food

down, and abdominal pain, these are "alarm symptoms," and should lead directly and

urgently to diagnostic testing. Instead, for two months Mr. ████ received no

meaningful tests and no pain management. Medical and nursing staff ignored his life-

threatening symptoms and allowed him to waste away, all the while suffering tremendous

pain.  The ADC commuted his sentence based on his medical condition on ████, and

he died shortly thereafter.

15

51.      ████████████ was admitted to ADC on ████. He had insulin dependent diabetes, Hepatitis C, and previously had his right leg amputated below the knee.  Starting on 11/█/13, Mr.█████ submitted two HNRs describing severe pain and pleading for help (ADC351105-106), and over the next three weeks, he was seen several times by nurses and nurse practitioners, none of whom performed an adequate work up despite consistently abnormal vital signs and lab values.   (ADC351122-388).

52.      Ultimately, he was admitted to the University of Arizona Medical Center on 11/█/13, where he was found to be severely, critically, and terminally ill, suffering from an untreated urinary tract infection with sepsis, an overwhelming infection. (ADC351122).  His chest x-ray showed cancer on his bones and collapse of his lower lungs on both sides.   A CT scan of his abdomen showed multiple pulmonary nodules, a large liver cancer, and multiple bony metastatic lesions from his cancer.  (ADC351127) He died on ████ after ██ weeks of treatment in the hospital.  (ADC351122-388).

53.      ████████████ was extremely ill and spent almost four weeks unsuccessfully seeking basic access to medical care and relief of severe pain of metastatic cancer.  He was denied access to basic medical treatment, to x-ray treatment, and to diagnostic laboratory treatment.  Instead, Corizon staff treated Mr.██████ with increasing doses of ineffective medications, all of which likely contributed to his kidney failure.  (ADC351052, 351047, 351049).   He was denied access to emergency care for weeks, although he presented with serious symptoms of unremitting pain, slurred speech, fever, elevated pulse, shortness of breath, abdominal pain, and coughing up blood.

16

54.     The Mortality Review, prepared by Dr. Burciaga, classified his care as

Code 2, "Diagnosis not timely."  (ADC364200). This classification does not begin to

describe the errors that occurred in Mr. ███ case.  He was inaccurately diagnosed,

subjected to treatment delays, received inappropriate treatment, and was denied basic

medical care.  Dr. Burciaga's minimalist critique of care demonstrates the ongoing failure

of the Mortality Review system at ADC to identify serious, and life-threatening lapses in

medical care

55.     ███████ arrived at ASP-Florence on ████, having been

housed at a private prison and then hospitalized for metastatic cancer of the esophagus.

He died ██ days after his arrival at Florence.

56.     During his short stay in Florence prison, the prison medical staff callously

failed to treat Mr. ███ extreme pain.  █████ returned from the hospital to

Florence Infirmary on the evening of ████.  At 0345 early in the morning of █████,

PA R. Brower, wrote:  "Pt arrived from hospital with significant medicinal needs and

NPO [nothing by mouth].  Pt. per hospital note requires IV medication for pain,

Morphine sulfate 2 mg via IV q4hours prn pain.  Wrote script for 7 days."

(ADC338146).  There is no evidence in the progress note that R. Brower examined Mr.

███ or even spoke to him.  R. Brower's admission note and Infirmary Admission Orders

identify Mr. ███ admitting diagnosis as "Bilateral DVT (Deep vein thrombosis) and A

Fib (Atrial fibrillation, an irregular heartbeat)."  R. Brower never indicated that he was

aware that Mr. ███ has been diagnosed with inoperable, untreatable gastric cancer, and

that the metastatic cancer was the source of his pain. (ADC338068, ADC338122-338124).

57.    Seven hours later, at 1100, 10 hours after he arrived in the infirmary, an RN, Laura Norris wrote: "IM screaming he is in pain wants medication.  Medication for pain morphine ordered and waiting for it to be delivered.  Called HCP on call. Per Brower (PA) no new orders given, have to wait for medication due to NPO status." (ADC338146)  However, pain medication can be administered intramuscularly, and absolutely should have been in this instance.

58.    Later that same day, ▆▆▆▆▆ the following note was inscribed under the heading New Problem: "Inmate screaming due to pain.  Medication arrived at 1300.  Given morphine 1400.  Reports no pain at 1600." (ADC338142).  During the next five days, no mention is made of Mr. ▆▆▆▆ pain status.  Before his death on ▆▆▆▆, he was only seen once by a physician, by Dr. LaVoy on ▆▆▆▆ (ADC338085).

59.    As I have already described in November 2013 Report, ▆▆▆▆▆▆▆ ▆▆▆▆ received extremely poor care for his eventually fatal lung cancer.  (Dkt. 945-1, Exh. 1 at  28).  His care was riddled with delays, nonexistent or exceedingly substandard cancer treatment, and woefully inadequate pain management.   His records clearly demonstrate that ADC does not have a fast-track system for obtaining medications, referrals, and diagnostic workups for patients with potentially life-threatening illnesses, including patients with newly diagnosed cancer such as Mr. ▆▆▆▆.

60.    Mr. ▆▆▆▆ was hospitalized for chest pain, and discharged with a

18

diagnosis of small cell lung cancer on 6/27/13. ADC357905. On that same date, a prison provider ordered narcotic pain medications and referred him "ASAP" for a PET scan and oncology follow-up. (ADC357860, ADC357882). When seen by the physician, he was also prescribed stronger pain medication (morphine). (ADC357882, ADC357885).

61.     Mr. ████ did not receive the morphine prescribed to him. (ADC357881). On 7/7/13, Mr. ████ filed an HNR stating, "To Dr. Anderson. I'm the guy with cancer, you said you'd see me last week and you didn't. I need to see you Monday. My pain medication has stopped working. I need to increase the dosage or something. Saturday, when I came to get my meds, I sat out on the floor crying it hurt so bad. When I got back to my room I sat on my bed crying for 3 hours. I'm hurting. I need to see you and get something to stop the pain." (ADC358246).

62.     Although a physician reviewed his chart on 7/8/13 (unclear if he was actually seen), the physician did not follow up on the pending PET scan, oncology consultation, or morphine prescription that Mr. ████ had not received. (ADC358246). This physician's behavior failed to meet the minimum standard of care, caused Mr. ████ to suffer from unnecessary cancer-related pain, and increased the risk that his cancer would spread. Mr. ████ continued to suffer from extreme pain, almost daily, until his death, but his pain was never adequately treated. (ADC357876-879, ADC358063, ADC358058, ADC358056, ADC358055, ADC358051, ADC358043).

63.     Mr. ████ did not receive the "ASAP" PET scan until almost one month after it was requested, on 7/22/13. (ADC357904). The PET scan showed that he

19

likely had cancer in his right lung, in addition to a left lung mass, although full results of this PET scan report are missing (it only includes page 1 of 2).  *Id.*  He was hospitalized again on 7/29/13, where he saw an oncologist and neurologist who recommended standard cancer treatment, including radiation therapy, for his now metastatic cancer to the brain.  (ADC357923, ADC357925-27, ADC357933, ADC357928).  Over the next several weeks, Mr. ███████ clearly expressed that he wished to aggressively treat his cancer, and declined hospice care.  (ADC357869, ADC357865, ADC358059). Nonetheless, Mr. ███████ did not receive the oncology appointment requested "ASAP" until 9/10/13, three months after it was requested, and he was never provided with radiation therapy for treatment of his brain metastases.  (ADC358053).

64.     Mr. ███████ died on ███████ (ADC364812).   Despite all of the obvious failures in Mr. ███████ care, the mortality review done on Mr. ███████ death concluded that he received appropriate care.  (ADC364815).

65.     Two cases involving young patients who died of endocarditis (inflammation of the inner layer of the heart) also reveal the gross barriers to patients' access to care.  Both cases are characterized by a failure to recognize serious symptoms of medical distress, and a failure to provide treatment for a treatable disease.

66.     ███████████████ was 34 years old when he died from endocarditis on ████████  He sought medical care twice over the ten day period before his death.  He had unexplained rapid pulse, unexplained abdominal pain, and an unexplained tender calf. The RN who evaluated him on two occasions, wrote down that she did not believe that he

was actually experiencing the symptoms he complained of to her, and did not refer him to a physician.  (ADC356939).  What the RN viewed as faking was actually Mr. ███ describing the symptoms of early sepsis. (ADC364799).

67.    Three and a half days later, on ███, Mr. ███ was found lying on his back, unresponsive.  (ADC356936).  He was taken by ambulance to the LCMC Hospital, where he was unstable, apparently having suffered a heart attack, and was flown to Flagstaff Medical Center where he died ███

68.    Mr. ███ was extremely ill when he left ASPC Winslow on ███.  He had endocarditis, infection of the heart valve, and an abscess in his heart. He had sustained a heart attack.  Although medical staff at Winslow did send him to the Emergency Room on one occasion, they failed to listen to serious complaints, they ignored his abnormal vital signs, his leg pain, and his abdominal pain, and treated him callously because they did not believe his symptoms.  (*Id.*, ADC364796).

69.     Infectious endocarditis with cardiac abscess and multiple valve involvement can be fatal, and it is possible that Mr. ███ would not have survived even if nursing staff had taken his complaints seriously, credited his consistently abnormal signs, symptoms, and vital signs, and referred him back for emergency evaluation on 3/9, 3/11, 3/20, or 3/25.  However, the failure to provide any treatment sealed his fate.  In any case, Elsie Stowell, RN, assigned the mortality review by Corizon, should have reflected on the consequences of accusing a patient of faking their symptoms.

70.    ███ had been in ADC custody for only one month at

21

the time of her death on ▮▮▮▮   She was 23 years old, and had a history of mitral valve

endocarditis, that had damaged her heart for which she had a valve replacement.

(ADC364201, ADC351391-392).

71.     When Ms. ▮▮▮▮ was screened upon arrival, the NP noted a rapid heart

rate, that she had a prosthetic heart valve, and that she had very recently used heroin.  The

NP failed to refer Ms. ▮▮▮▮ for a chronic care visit, or request her old medical records,

which were required to evaluate her complex medical status.  (ADC351426).

72.     Ms. ▮▮▮▮ was seen on an emergency basis for breathing problems and a

cough about two weeks before her death.  (ADC351423-425).  She had a low grade fever,

a rapid pulse, and had lost six lbs. in a two week period.  (ADC351424)  The Physician's

Assistant ordered diagnostic tests, including a chest x-ray, EKG and blood tests.

(ADC351416) The blood tests were never done. The EKG obtained on ▮▮▮▮ was

abnormal.  (ADC351457, ADC351456).  No explanation for the fever, rapid heart rate or

chest pain was considered, and no physician consult was obtained.

73.     A week later, Ms. ▮▮▮▮ was found unresponsive in her cell early in the

morning.  She had a very rapid pulse, and a very low temperature of 95.  According to

records (ADC351419), she was incoherent, disoriented, inappropriately responding,

drooling, and experiencing right-sided weakness. She died ▮▮ days later.

74.     According to her autopsy report, Ms. ▮▮▮▮ died from complications of

endocarditis and IV drug abuse.  (ADC422762).  She told the medical staff that she had

injected heroin on ▮▮▮▮.  (ADC351394)  She complained of irregular rapid heart rate

22

on ████████ (ADC351474).  She was not seen in response to that HNR, but was seen

emergently one week later.  She had symptoms of chest pain, weight loss, very rapid

heartbeat, a cough, and shortness of breath, and she was sent back to her housing unit

with a plan for follow-up in two weeks.  (ADC351423-425).  Her symptoms were

extremely serious and, with her history of recent IV drug use, strongly suggestive of

endocarditis.   She was not seen by a physician, and no one ordered blood tests that

would have indicated infection and/or endocarditis.   A patient with an artificial valve in

her heart, recent injection drug use, fever, very rapid heart rate, chest pain, and weight

loss must be assumed to have endocarditis unless proven otherwise.

75.    Prisoners discussed in my first report were also denied timely medical

attention.  The updated records I reviewed showed the same extreme and deliberate

delays in treating ██████████████, metastatic kidney cancer that I described in my

November 2013 Report. (Dkt. 945-1, Exh. 1 at 29 – 31).  After waiting more than four

months to receive critical tests to diagnose his cancer, Mr. █████ was hospitalized on

9/16/13 for removal of his kidney.  (*Id.* at 29, ADC291940-943).  By that time his cancer

had spread, and he was unable to bear weight on his right leg because his hip was riddled

with cancer.  (ADC292009).

76.    On 9/17/13, the oncologist recommended chemotherapy and palliative

radiation therapy to his right hip.  (ADC291937).  On 9/23/13, a urologist recommended

radiation therapy to his pelvis as well as early release.  (ADC291930).  The urologist

further stated that his life expectancy was less than 6 months and that he was wheelchair

23

bound. *Id.* As noted in my previous report, a request for early release was submitted on 9/30/13. (Dkt. 945-1, Exh. 1 at 31).

77.    Mr. ▉▉▉ did not begin receiving chemotherapy until 10/18/13, one month after the oncologist's recommendation. (ADC291928). He reported continued uncontrolled pain on 10/23/13 (ADC291890), 10/27/13 (ADC291888), and 10/28/13 (ADC291888), but he never received radiation therapy for his hip pain. This represents grossly inadequate pain management. Mr. ▉▉▉ was released from prison on ▉▉▉. (ADC291883).

78.    Other prisoners who were denied timely access to care include ▉▉▉ ▉▉▉ (unqualified LPN evaluated patient for chest pain, but no evaluation of patient or review of EKG by physician even though results showed inadequate blood supply to the heart [ADC318502, ADC318456]); and ▉▉▉ (six month delay before patient received treatment for Hodgkin's Lymphoma [ADC296311, ADC 296319]).

**Failure to Provide Timely Emergency Treatment**

79.    Emergency care is a critical component in a correctional health care system, where prisoners are entirely dependent upon the prisons' correctional and medical staff to recognize and respond to their emergency needs. A functioning system has the capacity both to identify when emergency care is required, and then to deliver that care expeditiously, either onsite, or through transportation to emergency services offsite.

80.    Reported medical emergencies should always be evaluated by a physician, registered nurse, or mid-level provider. Too often, in the ADC, I found cases where

24

critical initial evaluations were performed by practical nurses, who lacked the training and expertise to recognize the need for an emergency response.  In other cases, higher level clinicians simply ignored obvious signs of medical crisis.

81.    The cases that I reviewed reveal a pattern of failures both to identify emergencies, and to deliver timely emergency care.  Medical staff, regularly fail to accurately assess the seriousness of symptoms, fail to order the necessary diagnostic tests and to respond when patients have critically abnormal ("panic") lab values, fail to address alarmingly abnormal vital signs, fail to refer patients to a higher level of provider, and fail to provide basic, necessary emergency care to very sick patients.  As a result, patients are harmed, and all patients in the system are at serious risk of harm.

82.    The medical staff's handling of three cases involving Systemic Inflammatory Response Syndrome (SIRS) and sepsis illustrates the appalling deficiencies in ADC's medical emergency response. Remarkably, staff repeatedly failed to identify these conditions and to provide necessary care, contributing to, and likely causing, the deaths of three young men.

83.    The Systemic Inflammatory Response Syndrome (SIRS) is present when a person has two or more of the following signs and symptoms: Body temperature less than 96.8 or greater than 100.4, Heart rate greater than 90 beats per minute, Respiratory rate greater than 20 breaths per minute, White Blood Cell count less than 4000 cells/mm or greater than 12,000 cells/mm.  When SIRS is present, doctors and nurses should suspect that this complex of symptoms is being caused by an extremely serious infection usually

detectable on culture of the blood, called sepsis.  Prompt identification of the possibility

of sepsis, even before the source of the infection is known, is critical.  If not treated

promptly, sepsis often develops into septic shock, a condition in which the blood pressure

falls dramatically and often irreversibly, with consequent high mortality.  The recognition

of SIRS allows for the earlier treatment of sepsis, and the prevention of septic shock.

84.     The recognition of SIRS has been a fundamental principle of clinical

medicine for more than 10 years.  Knowledge of and recognition of SIRS saves lives.

Since patients with SIRS have a great risk of harboring an underlying infection which can

cause sepsis , shock, and death, it is important that SIRS be recognized and that the

clinical response be appropriate and timely  The standard of care includes obtaining vital

signs, obtaining the results of emergency laboratory and radiological tests.  Treatment to

prevent the progression from sepsis to septic shock requires   immediate and aggressive

intravenous fluid administration, diagnostic workup to identify the underlying cause of

the sepsis, broad-spectrum antibiotics, and when required, medications to maintain

adequate blood pressure. Treatment must be provided immediately, as every hour of

delay in treatment increases the risk of death in these patients.

85.     ███████████████  death at 27 years old was directly related to

delayed treatment for SIRS.  On 12/11/13, ██████████  submitted a health needs

request form (ADC339819) for a chief complaint that states "Emergency; I got a fever,

headaches, throwing up, diarrhea, acid reflux, sweating a lot, nonstop muscle aches." He

saw a nurse, who documented vital signs that met SIRS criteria. (ADC339702). The

patient received none of the recommended testing and treatment on the initial day of presentation, and care was delayed for at least 5 days.

86.    Over the following five days, Mr. ███████ was seen by an LPN and by an RN, neither of whom recognized his clear signs of SIRS.  (ADC339702-704).  On 12/15/13, Dr. Williams, without seeing the patient, ordered acetaminophen and IV fluids, but the nurse could not find a vein to administer the fluids.  Mr. ███████ should have been hospitalized at this encounter, but he was not.  (ADC339706-707).

87.    The following day, Mr. ███████ continued to have very abnormal vital signs.  An order was placed by a physician for intravenous medications, but was not given due to inability to obtain IV access. (ADC339697)  At this point, Mr. ███████ was in septic shock, his blood pressure was extremely low, and he clearly had a life-threatening medical emergency requiring hospitalization, intravenous antibiotics, and medications to raise blood pressure.  Instead, he was encouraged to drink fluids while the nursing staff again attempted to administer intravenous fluids at the prison. (ADC339709-710).

88.    One hour later, as his condition predictably deteriorated, he was finally transferred to the hospital where he was immediately placed in the ICU.  He died of cardiac arrest on ████.  (ADC339738-740). At autopsy, Mr. ███████ was found to have died from complications of pneumonia and endocarditis, infections of the lung and the lining of the heart, confirming the consequences of the failure to aggressively treat his bacterial infection.    (ADC422978).

89.     Deborah Kinder, a Nurse Practitioner who was assigned the Mortality Review for Corizon/ADC, agreed that there were significant delays in diagnosis and treatment, and failure of clinical reasoning.  Ms. Kinder initially checked off the box which said "Preventable" with regard to the events leading up to Mr. ███████ death from sepsis. She subsequently changed it to "Not Preventable" and initialed her change. (ADC364836-364839).  I disagree.  Mr. ██████ would very likely have lived had he received appropriate emergency care when he first presented with symptoms of SIRS on 12/11/13.

90.     ████████████ was 31 years old when he died of overwhelming sepsis secondary to delayed treatment of pneumonia while a prisoner of the ADC. (ADC364181).  When he saw medical staff on █████, he had extremely abnormal vital signs (including a temperature of 103.1), and complained of  shortness of breath, associated with feeling cold, chills, muscle aches, and nausea. (ADC337443).   Although these are all obvious signs of sepsis and SIRS, the LPN who saw Mr. ████ failed to recognize the medical emergency, diagnosed him with the flu, and did not order a physician follow-up. (ADC337443).   Mr. ████ was told to drink more fluids, and to purchase ibuprofen to lower his temperature.  (ADC337444).

91.     Mr. ████ deteriorated over the next several days, but was still not referred for physician or nurse practitioner follow-up.  (ADC337437-337438).  On █████, he complained of being unable to breathe, and had a very high temperature, pulse and respirations.  (ADC337435-337436).  He was finally sent to an outside hospital, where he

was diagnosed with pneumonia.  He was prescribed an antibiotic and inappropriately returned to prison.  (ADC337428, ADC337476) .

92.     Unfortunately, his condition deteriorated even further.  On ███████, at ADC, he had an extremely low oxygen level, was bleeding from his rectum, and was near death.  (ADC337432-433, ADC337430).  Mr. ████ was readmitted to the Southeast Arizona Medical Center.  His condition was critical.  (ADC337463-464).  He died ████ days later from complications of influenza pneumonia. The delay of four days in recognizing and treating Mr. ██████ SIRS may have caused his death.  (ADC422723).

93.     Ms. Kinder also performed this mortality review.  She found no problems with the care received by Mr. ████ at ADC.  (ADC364181-364184).  There is no mention of the delay in identifying his life-threatening pneumonia, the failure to recognize and treat for a serious infection when Mr. ████ first showed symptoms of sepsis on ████, and the inappropriate discharge from the hospital on █████.   The purpose of the Mortality Review is to identify failures in practice and policy, and develop new procedures, policies, and educational programs to decrease the likelihood of these failures in care of the patient.  The review should have identified the need to train LPNs, RNs, Nurse Practitioners, and physicians in the importance of recognition and treatment of the SIRS syndrome.

94.     Failure to recognize and treat SIRS also contributed to the death of ████ ████████████ on █████.  The last month of Mr. ████████ life was characterized by completely inappropriate medical care day in and day out. On September 11 and 12,

29

2013 Mr. ▮▮▮▮ was found to have grossly abnormal vital signs, indicating ongoing SIRS. (ADC336053).  The SIRS was probably sepsis due to a urinary tract infection. (ADC336053).

95.    Mr. ▮▮▮▮ should have been immediately treated with IV fluids, had labs and blood cultures done, and antibiotics started. He should have been seen immediately by a nurse practitioner or physician and transported to the hospital. Instead, when the nurse practitioner on call was notified, she instructed the nurse to "continue to monitor," in other words to do nothing. (ADC336053).   Although a prison physician saw Mr. ▮▮▮▮ on 9/13/13, and noted abnormal vital signs, she also failed to start fluids and antibiotics and failed to send Mr. ▮▮▮▮ to the hospital.  (ADC336048).  Mr. ▮▮▮▮ was not started on antibiotics for his urinary tract infection until 9/19/13, a full eight days after the first signs and symptoms of infection.   (ADC336171).

96.    Two weeks later Mr. ▮▮▮▮ again developed signs of severe sepsis. On 10/3/13, he was seen by the same physician who saw Mr. ▮▮▮▮ on 9/13/13 and failed to recognize and treat sepsis. (ADC336030-031).  She did not seek further diagnostic testing or administer life-saving IV fluids or intravenous antibiotics. Mr. ▮▮▮▮ became progressively more confused and continued to complain of pain. (ADC336031).

97.    In the hours before his death on ▮▮▮▮ Mr. ▮▮▮▮ was noted by a nurse to be "in bed, in respiratory distress, gasping for air. Yelling out" (ADC336020). He was found unresponsive and pronounced dead a few hours later.  ADC medical staff repeatedly and consistently failed to provide basic care to Mr. ▮▮▮▮  Their

negligence likely directly resulted in his death.

98.     The Corizon/ADC medical staff  regularly fail to recognize the need for and to provide emergency care in response to other conditions, as well, even in cases where outside providers alert staff to the need for an emergency response.

99.     For example, ███████████████, was noted to have hepatitis C at his medical intake evaluation on ██████.  (ADC335167.)  Six months later, when he sought medical care because he was short of breath, had chest pain when he breathed, and was spitting up blood, medical staff noted these danger signs but failed to have him evaluated urgently by a clinician at an emergency room, as was clearly indicated, particularly for a patient with hepatitis C.  (ADC335162).   Instead, staff obtained telephone orders for treatment of a suspected pneumonia. (ADC335152).

100.    It is clear that Mr. █████ was mistreated. When he came to the nursing unit on █████, he was extremely ill.  His symptoms of chest pain, shortness of breath, coughing up blood, suggested a serious, potentially life threatening condition, involving his heart and lungs.   (ADC335162-164).  He required an emergency evaluation by a physician.  No physician examined him.  He sought care two more times the next day. (ADC335164).  All three times, he was sent back to his cell without follow-up.  His condition was allowed to deteriorate dramatically.  He suffered, without diagnosis or treatment for more than 36 hours, before an ambulance was ordered at 9:00 AM on █████ to take him to the hospital. He died at the hospital the ███████████ (ADC335159-161**).**  The autopsy showed that he died of aortic dissection.  Emergency

evaluation of his chest pain and shortness of breath could have provided him with life

saving treatment for this serious condition.  ADC422648

     101.    ████████████ was diagnosed with advanced diffuse lymph cancer on

August, 2013. (ADC339832, 339833). He was 45 years old at the time of his death on

████████

     102.    On ██████, a few days before Mr. ██████ final hospitalization, he was

found to have a very elevated calcium level, which is a common complication of cancer,

called hypercalcemia of malignancy. It can cause weakness, lethargy, confusion and

coma, and warrants immediate treatment to prevent these complications. After finding

this value, the laboratory called an ADC nurse to report a "panic value." (ADC340107).

Dr. Lucy Burciaga did not even acknowledge this abnormal lab result in her progress

note when she saw Mr. ██████ the next day. (ADC340107).

     103.    Mr. ██████ should have been sent to the hospital for emergency treatment on

██████ but instead was held in the prison medical ward. Because his high calcium level

was disregarded, he did not receive appropriate treatment.  Indeed, he received no

treatment for this condition until he was sent to the hospital on ██████, four days later,

for scheduled chemotherapy.  (ADC310131).  He died ██████ later on ████████

     104.    I cannot determine if this delay in hospitalization hastened Mr. ██████ death.

However, I can say unequivocally that this knowing failure to treat a patient with

critically elevated abnormal calcium levels represents a failure of access to essential

emergency medical care.

105.    ████████████████, was a 57 year-old man with a history of depression and anxiety, alcoholic cirrhosis, hypothyroidism, and chronic obstructive pulmonary disease (COPD). Mr. ████ died while an inmate in ADC custody on ████.  (ADC348732).  The cause or causes of his death are not disclosed in the medical records produced by defendants, but his death certificate lists his death as natural and indicates that he died of end stage renal disease. (ADC422691)

106.    While the medical records are incomplete, Mr. ████ clearly did not receive necessary emergency care when he required it. He was admitted to ADC on ████ and three days later was seen by an LPN for shortness of breath. He was given a paper bag, presumably for anxiety. (ADC348775).  The visit was charted as a "mental health sick call." Mr. ████ shortness of breath was noted, but no medical evaluation or referral to a qualified provider was made. A mental health referral was made. (ADC348774-775)

107.    On ████, a clinical nursing associate (CNA) obtained vital signs for Mr. ████  The CNA noted that Mr. ████ had a dangerously low blood oxygen level that mandated an emergency evaluation by a physician for life-threatening respiratory failure. (ADC348734).  Mr. ████ did not receive one, and he died a few hours later. (ADC348732).

108.    ████████████████ died suddenly at the age of 40 in ADC custody. Corizon medical staff failed to provide him with access to emergency medical care when he reported symptoms of a heart attack.  He had well-documented risk factors including a history of hypertension, and being an active smoker for thirty years.  (ADC350461,

33

ADC350469, ADC350472).  Mr. ████ should have been sent to an Emergency Room for blood tests and serial EKG's to determine if he was having a heart attack.  Instead he was given one aspirin and sent back to his cell.

109.   Mr. ████ was in his usual state of health until 9/16/13 when he reported chest pain. An Emergency Response Orders form for chest pain (ADC350484) was filled out which described the pain as exceptional, occurring with exercise, tight/squeezing in nature, radiating to his teeth and jaw, associated with shortness of breath, and having a "heavy" quality. (ADC350484).  This exertional chest pain had been present for 3-4 days. The pain did not occur at rest, only with activity. These are classic and well-known symptoms of Acute Coronary Syndrome, which is caused by inadequate blood supply to the heart, and heralds an impending heart attack.

110.   The next day, 9/17/13, Mr. ████ was seen by PA Underwood, who obtained the current history of heavy chest pain with exertion, radiating to his jaw.  He also documented the past history of heavy cigarette smoking, the death of Mr. ████ grandfather from a heart attack at age 50, and new history of possible elevated cholesterol. (ADC350482).   Mr. Underwood read the EKG done on 9/16/13 as normal, although it was in fact abnormal.   (ADC350521-522).  Failing to recognize the severity of Mr. ████ condition, he ordered laboratory studies and a cardiac chronic care visit in March, 2014, six months from the date of examination and ordered a low dose 81 mg aspirin to be taken daily. (ADC350482).  He did not order a stress test to determine if Mr. ████ had coronary artery disease.

34

111.    PA Underwood's treatment plan was dangerous and inappropriate.  Mr. ███ had classic symptoms of Acute Coronary Syndrome, and needed an emergency evaluation of his heart by a physician.  He needed laboratory and EKG evaluation in an emergency room setting that could care for him in the event he was having or about to have a heart attack.  Coronary artery disease is common, and causes exactly the kind of chest pain Mr. ███ experienced.  It can be treated with medication, cardiac stent, or coronary artery bypass.  These treatments will prevent heart attacks from occurring.  Instead, Mr. ███ received no emergency cardiology evaluation, no laboratory evaluation for his cholesterol and was scheduled for follow-up in six months.

112.    ███ later, on ███, Mr. ███ was found on the floor of his cell, and he died later the same day.  (ADC350481, ADC359379).   According to his autopsy, he died of a heart attack.  (ADC422738).

113.    Among those prisoners discussed in my initial reports, several did not receive adequate emergency care.  See e.g., ███ (patient was not referred to an emergency room after he fell and hit his head twice despite prescription for blood thinners and related increased risk of intracranial bleeding [ADC346253, ADC346247]) ███ (inappropriately treated with oral medications when he should have been hospitalized immediately for treatment of severe edema and fluid in the lungs, especially considering his end stage kidney disease [ADC361587-88])

**Failure to Provide Necessary Medications and Devices**

114.    The "profoundly dysfunctional" system for prescribing and delivering

35

necessary medications and medical devices that I described in my November 2013 report remains in place (Dkt. 945-1, Exh. 1 at 40) and patients continue to be at significant risk of harm.  The cases that I reviewed revealed a continuing failure to conform to standard prescribing practices, including a failure to provide medications timely, failure to prescribe medications that are clearly indicated, and a failure to properly monitor medications.

115.    ███████████████, had heart disease and his medications were grossly mishandled. He had been prescribed propranolol, a beta blocker medication, for this disease on 9/25/12 and on 2/21/13, his prescription order was renewed for another year. (ADC336240, 336241). According to the AIU (Administrative Investigative Unit) Report (see ADC423439-430), he had been taken off his propranolol in Feb 2013 because he was hospitalized for taking an overdose of the medication.  Mr. ██████ propranolol was again ordered discontinued on 10/15/13. (ADC336214)  He died ██████ ████ later. There is a note stating that he had not been taking the medication for six months (ADC336218), but there are no medication administration records (MAR) in the medical file produced by defendants that confirm this – the record provided does not include any MAR's for the period 2/2013 through 9/2013. Abrupt discontinuation of propranolol for a person with coronary artery disease can be extremely dangerous. Sudden withdrawal in patients with underlying coronary disease can lead to chest pain, a heart attack, or sudden death. This can occur even in patients who have no previous history of coronary symptoms.

36

116.     Additionally, the AIU report of their interview with Von Marshik reveals that Mr. Von Marshik placed four nurses on suspension immediately following the death of Mr. ████    One of the nurses, Deborah Walbert, was "cleared."  However, three of the suspended nurses left Corizon employ following the investigation of the death of Mr. ████: Linda Penrod, Kesha Johnson, and Margie Parkerson.  (ADC 433303-423304) Nurses Penrod and Johnson both resigned, according to Von Marshik, because they did not want to work under new policies established by Corizon.  Von Marshik reported that Ms. Parkerson, LPN, had inappropriately given Mr. ████ propranolol, and he stated that she was fired for this action.  According to the October 2013 Medical Administration Record, Mr. ████ was being prescribed propranolol, 80 mg twice a day. (336241)

117.     The medical records provided by ADC are inadequate to fully understand the care given to Mr. ████ prior to his death. However the abrupt discontinuation of propranolol on 10/15/13 may have caused Mr. ████ death ████ ███ later.  Four nurses were suspended, two left their jobs, and one was fired, following Mr. ████ death.

118.     His autopsy report found that he had died of heart disease [hypertensive cardiovascular disease].  (ADC422662).

119.     ████████████, is another prisoner who was at serious risk of harm due to poor medication practices.  As I described in my November 2013 Report, Mr. ████ has multiple serious medical problems, including uncontrolled diabetes, diabetic retinopathy with prior laser treatment, high cholesterol, and heart disease with a

prior heart attack.  (Dkt. 945-1, Exh. 1, Report App. C at 1-2).  On 11/26/13, an

ophthalmologist diagnosed Mr. ███████ with open angle glaucoma, a condition in which

the pressure inside the eye is too high, and ordered a medication, Lumigan, to treat him.

(ADC294841-43).  Corizon medical staff noted that the ophthalmologist had identified

glaucoma requiring treatment, but did not order the required medication until over six

weeks later on 1/10/14.  (ADC294843, ADC294815).  On 1/17/14, Mr. ███████ wrote an

urgent Health Needs Request (HNR), informing the facility that he had been waiting 54

days for the medication to treat his glaucoma and that his vision was deteriorating.

(ADC294943).  This is an alarming length of time to have lapsed without appropriate

treatment.

120.    In my November 2013 Report, I described the harmful practice of changing

a  patient's medication without first seeing or advising the patient.  (Dkt. 945-1, Exh. 1 at

44).  ADC has continued this practice.

121.    ███████████████ has insulin dependent diabetes, and had received

gabapentin for the past seven years to treat his painful diabetic nerve pain.  On 8/9/13, he

was transferred to another facility and Nurse Practitioner Lawrence Ende cut Mr.

███████ dose of gabapentin in half.  ADC346844-346845.  There are no progress notes

explaining why NP Ende cut Mr. ███████ medications, and it is clear that he was not

advised of this decision before it occurred.  (ADC346860).   Nurse Practitioner Ende had

been prescribing Mr. ███████ the original dose of gabapentin at his previous facility, and

was therefore aware of his chronic nerve pain.  (ADC346537).  Patients with chronic

38

painful conditions on stable doses of effective and safe medications should not have their medications abruptly and capriciously reduced.

122.    Named plaintiff Joshua Polson, 187716, had been receiving pain medication for arthritis, and the treatment was arbitrarily, abruptly discontinued without explanation.  Nursing staff were aware that he was repeatedly requesting ibuprofen for pain beginning on 7/22/13, yet it took six HNRs over almost three months before it was re-ordered on 10/11/13.  (ADC232182-189, ADC232157).  Pain medications should not be discontinued arbitrarily without discussion with the patient.

123.    Named plaintiff Stephen Swartz, 102486, suffered an assault in February of 2010 that resulted in multiple facial fractures requiring reconstructive surgery.  He suffered residual chronic left sided facial pain, for which he was prescribed tramadol.  Mr. Swartz submitted HNRs in on 9/7/13, 9/15/13, and 10/23/13 requesting renewal of his tramadol in anticipation of its expiration date on 10/24/13.  (ADC232122, ADC 232120, ADC232117).  He explained that he was requesting it early because he wanted to avoid the lapse in pain treatment that had occurred previously, when a tramadol prescription written on 6/26/13 was not dispensed until 7/21/13.  (ADC232122).

124.    Mr. Swartz's tramadol was stopped on 10/24/13.  There was no order in the records to discontinue the tramadol, or a reason why this should be considered.  (ADC232097).  He requested the medication on 11/4/13, 11/13/13, 12/4/13, 12/23/14, and 12/24/13.  (ADC232113-14, ADC232064,  ADC232063).  On 2/7/14, Nurse Practitioner Taylor noted that tramadol was discontinued in October of 2013, and

that the patient continued to suffer from severe eight out of ten (ten being the worst pain ever experienced) left-sided facial pain.  At that time, the tramadol prescription was renewed, but at half the prior dose.  (ADC263086-087).  It is unacceptable that Mr. Swartz was left in severe pain unnecessarily for more than three months despite repeated requests for his pain medication.

125.    Additional examples of medication failures include ███████████ (prescribed inadequate dose of anti-coagulation therapy for atrial fibrillation until he suffered from a stroke on 9/10/13 [ADC303062, ADC303124-26]); ███████████ (failure to prescribe anti-coagulation therapy when discharged from hospitalization due to severe heart failure, worsening of his COPD, and atrial fibrillation [ADC300900-20, ADC300717-18, 300738-47, 200989-92]); ███████████ (despite multiple requests for refills, he was denied GERD medication and allowed to remain in constant abdominal pain for two months [ADC362824, ADC362835-6]); ███████████ (patient waited nearly two months for cream to treat a rash [ADC343801, ADC343831]); ███████████ (frequent seizures in June 2013 due to failure to provide seizure medications [Dkt. 945-1, Exh. 1, Report App. C at 28]; the problem continued into August 2013 when patient missed more than 10 doses [ADC362921]); ███████████ (patient did not receive pain medication for 15 days despite two HNRs requesting renewal [ADC363530, ADC363534, ADC363413]); Hefner, 203653 (ten day delay before named plaintiff received renewal of eye-drops after cataract surgery [ADC122294, ADC232226]); ███████████ (non-formulary pain medication that had been effective for neuropathy

40

was discontinued without explanation or effective alternative [ADC334756, ADC334732, ADC334707 ADC334709]); ███████████ (patient with End Stage Liver Disease, low platelet count and recent bleeds prescribed aspirin, which was absolutely contraindicated [ADC338987, ADC339061, ADC339071].).

126.   In the records I reviewed for this report, I found two examples of exceptionally callous disregard for the treatment needs of prisoners with disabilities, where medical staff failed to prescribe/deliver medically necessary physical accommodations.

127.   The first example is ███████████, a 47 year old man with a history of hepatitis C, depression, and multiple orthopedic injuries including right foot amputation with prosthesis.  After my prior review of his medical records from May 2012 to April 2013, I described an eleven month delay in evaluating Mr. ██████ for a new prosthesis.  (Dkt. 945-1, Exh. 1, Report App. C at 26-27).  My review of his more recent records indicates the delay was even more extreme than previously described – he had actually been waiting three years for his new prosthesis.  (ADC287155 [medical note stating that his prosthesis "has been broken since 2011… limps and hops to ambulate]).

128.   While he waited, Mr. ██████ ongoing pain and inability to walk became so debilitating that, on 8/21/13, his nurse practitioner requested a wheelchair.  (ADC 287162).  In October 2013, a nurse practitioner referred him for a new prosthesis (ADC287155), but this referral was sent back with a request for additional information on 11/1/13.  The nurse practitioner did not respond to the request until 12/27/13.  (ADC

287155).  It is shocking that although Mr. ███████ had been attempting to have the prosthesis replaced since 2011, and the nurse practitioner requested a wheelchair because of the non-functioning prosthesis, no referrals were placed before October 2013.  As of 4/1/14, it appears Mr. ███████ had still not received the wheelchair and had experienced two falls related to malfunction of his defective prosthesis.  (ADC 287133).

129.   To make matters worse, Mr. ███████ was removed from the mental health group, which had previously helped his depression, because of his prosthetic leg. (ADC287205-206).  When he requested to speak to mental health staff about returning to the group in HNRs dated January 1 and, 2014, he was advised the "sidewalk [to access the building] is currently under construction to provide ADA accessibility.  You will be re-evaluated for participation after completion."  (ADC287206).  This is a horrendous excuse and represents a deliberate denial of appropriate mental health treatment because of his disability.

130.   The second example, also discussed in my first report, is the improper treatment provided to Mr. ███████████ for his mobility impairment.  Mr. ███████ used a walker, but even with this device it was very difficult for him to walk.  He was changed from directly observed therapy seizure medications that needed to be administered in the infirmary to "keep on person" because of the length of time it took him to get from his block to the infirmary.  (ADC316117, ADC316139).  Also due to his disability, he had a difficult time getting from his housing area to the meal hall without the use of a wheelchair.

131.    On 6/13/13, Mr. ████ was found on the ground after a fall while using his walker.  (ADC316140).  A wheelchair was supposed to be requested after this event, but the official request was not placed until 7/22/13.  (ADC316156).  On that same date, after Mr. ████ missed 11 of 19 meals because he could not safely use his walker, the clinician comments:  "[He is] requesting a layover SNO [sic].  This will be denied.  Plan: Resigned to missing meals.  Will continue to keep records."  (ADC316132).  Mr. ████ suffered from poor nutrition and falls due to the lack of access to appropriate assistive devices for the disabled.  The additional six months of records show he was not provided a wheelchair during that period.

**Failure to Provide Care for Chronic Diseases**

132.    The records that I reviewed for this report show the same failure to monitor and manage prisoners with chronic and serious diseases that I described in my November 2013 report.  (Dkt. 954-1, Exh. 1 at 22-26).  An effective chronic disease program identifies patients with chronic illnesses, monitors them, and manages their condition as necessary.  ADC patients with serious chronic illnesses are poorly managed, if managed at all.  Critical prescriptions lapse, patients' deterioration goes unnoticed, patients receive dangerous medication combinations, critical vital signs are not recorded, and consult referrals are ignored, among other things.

133.    For example, ████████████, had a 25 year history of diabetes mellitus, proteinuria, stage VI kidney disease, and mild anemia of chronic disease, and was admitted to an outside hospital for urgent initiation of dialysis in November, 2013.

43

(ADC349005).  On admission he was described as confused and was thought to have dementia, secondary to early Alzheimer's disease or to his kidney failure.  His condition was clearly deteriorating. He was discharged to the prison on 11/14/13, with a temporary venous catheter.  (ADC349007-009).

134.    During his initial dialysis sessions, Mr. ███████ was described as confused and agitated, and requiring frequent direction and orientation.  (ADC349016, 349017, 349005, 348990).   On 11/23/13,  it was noted that he needed frequent direction and orientation in order to cooperate with dialysis. (ADC348990).

135.    A temporary venous catheter for dialysis is a very large diameter catheter, unlike the usual intravenous line, and it is dangerous for a disoriented person to be left with such a device unattended. Mr. ███████ bled to death when the cap from this large board dialysis catheter was dislodged.  (ADC335112). Mr. ███████ was clearly significantly impaired, and the failure to closely monitor him at this critical juncture in his treatment, when he started dialysis, represents a major error by the medical and nursing staff.

136.    The mortality review concluded that delirious and demented patients need to be monitored frequently, particularly if they have indwelling catheters. The review stated that they should "watch demented patients carefully" and "place demented patients in housing where they are easily and constantly watched."  (ADC355110-355113).  I agree with both of the statements.  Given the horrific outcome in this case, however, I would expect to see a far more developed plan for corrective action, involving training

and perhaps additional staffing.

137.    ▮▮▮▮▮▮▮▮▮▮ required treatment and management for his chronic heart disease.  A 50 year old man, he had had a previous heart attack, and had coronary artery stents in place, hypertension and chest pain.  The "care" he received when he complained of chest pain was grossly deficient.

138.    When Mr. ▮▮▮▮▮ twice reported to ADC staff in November, 2013 that he had chest pain, no EKG was obtained, no emergency consultation was obtained, and no cardiology consultation was obtained.  (ADC340281-282).  Without the benefit of an EKG, the clinician who saw Mr. ▮▮▮▮▮ the second time, on ▮▮▮▮, concluded that his chest pain was not related to his heart.  (ADC340281-282).

139.    There are no clinical notes in his file after ▮▮▮▮▮  On ▮▮▮▮ Mr. ▮▮▮▮▮ was found unresponsive on his cell floor.  (ADC364846).  He was taken to the hospital, where he was pronounced dead hours later.  (*Id.*)

140.    The autopsy report concluded that Mr. ▮▮▮▮▮ died of heart disease.  A cardiology consultation could definitely have yielded evaluation of Mr. ▮▮▮▮▮ cardiac status, identified a problem, such as a clotted stent, and resolved it.  The failure to provide minimal care to a patient known to have coronary artery disease with accelerating chest pain is a serious systemic failure.

141.    PA Salyer's mortality review determined there were no deficiencies in Mr. ▮▮▮▮▮ care.  (ADC364847).  I disagree.  Remedial action must be taken to educate staff about the management of medical and cardiac emergencies.

142.    ██████████████████ suffered from Chronic Obstructive Pulmonary Disorder (COPD), sarcoidosis (a lung disease) and pulmonary hypertension.  His record reveals a delayed workup of his sarcoidosis, no evidence of a workup for his hypertension, and delayed transfers to the hospital when he was in respiratory distress.  ADC247261-262, ADC347299, ADC347302, ADC347400, ADC347404, ADC347457).

143.    ██████████████ (discussed below at para. 161), suffered from AIDS and coccidioidomycosis, a fungal infection.  He had several AIDS-related conditions, including multiple pneumocystis pneumonia and cytomegalovirus infections, indicating advanced, complex AIDS disease.  (ADC350648-650).  Although his T-cell count fell and viral load rose steadily throughout 2013, Mr. ██████ medication regimen was never modified to address his obvious deterioration.  (ADC350792-799).  Additionally, Mr. ██████ should have been taking anti-fungal medication (diflucan) and closely monitored for his coccidioidomycosis.  According to his records, his anti-fungal medication apparently ran out in September, 2013, and he was never monitored for the fungal infection.  (ADC350802; 350758; 350800).

144.    ██████████████, was treated for insulin dependent diabetes and hypertension.  According to the Mortality Review, he died of a drug overdose on ██████.  (ADC364233).  However, the toxicology tests performed following his death were negative.  (ADC364233).  According to his autopsy, Mr. ██████died of heart disease (severe atherosclerotic cardiovascular disease).  ADC422824.

145.    While his medical records are sparse, it is clear that from September to

46

December 2013, Mr. ███████ placed a series of requests for medical care after his brand of insulin was changed, complaining of dizziness, shortness of breath and unsteadiness. (ADC338371, 338370, 338369, 338368, 338366 and 338364).  He believed that the symptoms were due to the change in his insulin.  Although he was seen in the chronic care clinic on 11/6/13 and 12/11/13, there is no evidence that these significant complaints were ever addressed.

146.   ████████████, died at 68 on ██████ after an extended hospital stay.  Before his hospitalization and while being treated for chronic illnesses  at Florence, including diabetes, hepatitis C, and chronic low blood pressure, he suffered a series of at least four falls involving injury in April and May 2013.  (ADC355698, 355694, 355874, 355693) The frequency of the falls strongly suggests he required a level of clinical support, nursing observation, and assistance with the activities of daily living (which include changing positions, getting out of bed or chair, going to the bathroom) that was not provided to him at the health unit at ADC/Florence, and is likely related to the understaffing I have described throughout the system.

147.   The Corizon mortality review identifies the multiple medical problems endured by Mr. ██████.  The review does note that multiple falls occurred in May, 2014, but it does not address the causes of the falls, and does not identify approaches to minimize falls in prisoner patients who are very weak, and require substantial assistance with their activities of daily living.

148.   Many of the prisoners that I previously described suffered from preventable

and predictable symptoms as a result of the ongoing substandard care they received, even though my previous reports placed Defendants on notice of serious treatment deficiencies.

149.    For example, I found the same patterns of grossly deficient chronic care in ██████████████████ updated records.  (See Dkt. 945-1, Exh. 1, Report App C at 2-3).  Mr. ████ is a 77 year old man with multiple, complex medical issues including diabetes, coronary heart disease with bypass surgery, ischemic heart failure, chronic obstructive pulmonary disease (COPD) and atrial fibrillation.  On November 18 and 22, 2013, when there were clear signs that he had low blood oxygen, nursing staff failed to refer him for evaluation to a qualified medical professional.  (ADC300981).  The nurses, who were not trained to examine and diagnose the complications of heart and lung disease, failed to examine his heart, and on both occasions inappropriately diagnosed congestive heart failure as a lung problem.  (ADC300981).  They further inappropriately initiated treatment for a lung infection, which delayed the correct diagnosis of heart failure.  *Id.*  The nursing staff cannot substitute for physician or physician assistant care, and they cannot be given responsibility to diagnose and manage complex medical conditions.

150.    Not surprisingly, Mr. ████ condition deteriorated and on 12/2/13, he was sent by ambulance and admitted to the hospital for severe heart failure, worsening of his COPD, and a new diagnosis of atrial fibrillation.  He was admitted to the intensive care unit during this hospitalization for severe and life threatening symptoms.

(ADC300900-300920).  After he was discharged from the hospital on 12/11/13, prison medical staff created an unnecessary risk of stroke by failing to provide critically necessary anti-coagulation therapy.  (ADC300717-18, ADC300738-47, ADC300989-92).

151.    On 1/28/14, he was found on the floor after fainting with low oxygen levels and was again taken urgently to the hospital.  He was admitted to the hospital to treat severe heart failure and coronary disease, and received coronary bypass surgery. (ADC300736-737, ADC300782-800).  Following discharge from the hospital on 2/11/14, he was not scheduled for follow-up with the cardiac surgeons or cardiologists (ADC300793), which is medically indicated in a patient who has just had extensive surgery and required cardiology consultation for management of his  heart failure.

152.    Another example is the substandard chronic care provided to ███████ ███████████.  Mr. ███████ blood pressure had been completely uncontrolled when I previously reviewed his records and the updated medical records I reviewed covering the period from July 2013 through March 2014 confirm that prison staff did nothing to address his out of control hypertension during that period.  Uncontrolled blood pressure can result in heart failure, stroke, aneurysm, and kidney failure, among other things.

153.    Although many chronic care notes indicate that Mr. ███████ had "poorly controlled" blood pressure, very little was done to adjust his medications.  When changes were made, they were inappropriate.  For example, when his blood pressure was high. A prison doctor increased his medications to twice the maximum recommended dose. (ADC346028-30).  The higher dose had no therapeutic benefit and puts the patient at risk

for various side effects and toxicities.  The fact that this physician was ordering medications outside of their recommended dosing ranges is highly troubling, as is the fact that the pharmacy dispensed this dose without double-checking with the physician. Equally disturbing, at a later visit, a prison doctor prescribed a combination of medications for high blood pressure that should not be used together because they increase the risk of high potassium, which can be fatal. (ADC346238).

154.    When Mr. ▇▇▇▇▇ was seen for follow-up in August and October 2013, his blood pressure continued to be uncontrolled, but his physicians still did nothing to address it.  (ADC346256-257, ADC346027-032).  Mr. ▇▇▇▇▇ was at significant risk for strokes and other cardiovascular events, and at this point, since his physicians were unable to control his blood pressure, they should have referred him to a cardiologist, but did not.

155.    Also, Mr. ▇▇▇▇▇ has a history of a pulmonary embolism and blood clotting disorder, and was at risk of developing additional clots.  (ADC346236).  He required a blood thinner for this disorder, which he received, but his physicians failed to monitor his blood levels to ensure he was receiving the benefits of the medication. (ADC346252, ADC346275, 346276, 346278, 346279). All of the lab values measuring his blood's clotting ability were in the sub-therapeutic range, and thus not providing any protection against future blood clots travelling to the lung.  Moreover, due to his uncontrolled blood pressure, Mr. ▇▇▇▇▇ was at a much higher risk of having a stroke (brain bleed) while he was prescribed a blood thinner.  Thus, blood pressure control was

even more imperative, which, as described above, was obviously not achieved.

156.    Finally, Mr. ███ fell and hit his head on two occasions.  On 12/12/13,
he blacked out and woke up on the floor bleeding from a cut above his eye.
(ADC346253).  The second incident was on 2/17/14; nursing staff treated him for a
superficial abrasion, but nothing else was done.  (ADC346247).  The workup in both
cases was inappropriate.  At a minimum, Mr. ███ should have been observed by a
physician or been sent to the emergency room and received a CT scan or MRI of the head
to rule out intracranial bleeding.  Instead, he was not evaluated by a physician on either
occasion.

157.    ███████, has received haphazard care for his hypertension that
puts him at significant risk of harm, including death.  This is consistent with the
discussion in my previous report.  (Dkt. 945-1, Exh. 1, Report, App C, at 5-6).  On
9/13/13, Mr. ███ was seen for his diabetes and hypertension; at this visit, his blood
pressure was high, and appropriately documented as 'poor control'.  At this point, his
blood pressure has been uncontrolled for months.  He was started on different blood
pressure medications, but only referred for 90-day follow-up, which is
inappropriate.  (ADC363593).  The standard of care for patients with uncontrolled blood
pressure is to see them frequently (at least every few weeks) and aggressively adjust his
medications to get it under control.

158.    Over the next six months, his blood pressure continued to be
uncontrolled.  The NP also ordered blood pressure checks over a period of weeks, but it

appears most of the checks were not done.

159.    On 2/18/14 Mr. ███████ blood pressure was high, and his pulse was low.  The provider did not seek a cause for the low pulse rate, no EKG was obtained, and there was no physical examination of Mr. █████ for signs of heart failure, or neurological symptoms.  Without considering the slow heart rate, the provider doubled his medications, including his diltiazem, a medication which can lower heart rate. This is a dramatic and dangerous escalation of anti-hypertensive medication dosage.  There are no further notes in the medical record.  Mr. █████ has also received substandard care for his Hepatitis C – his providers failed to order basic diagnostic tests to see he had active Hepatitis C after laboratory results showed a positive Hepatitis C antibody and abnormal liver function.  ADC346347-348, ADC363598, ADC363601

160.    ████████████, received essentially no chronic care for his pituitary tumor and elevated intraocular pressure, despite these serious medical conditions  being clearly listed in his problem list.  (Dkt. 945-1, Exh. 1 at 19, ADC362956).  Mr. ████ filed an HNR on 7/24/13, stating: "I am having vision problems, vision loss, seeing spots, headaches, eye issues with my right eye. Lots of pressure and eye aches. Can you please help me(?).  My vision is getting worse/blurred Right eye, cloudy" (ADC345169), and on September 4,  stating: "I am having vision problems. My right eye is losing sight, blacking out sight, lots of pressure, headaches, pain. Please! Sight is cloudy, dark or none at all. I need help. Thank you."  (ADC345163).

161.    Two weeks later, on 9/13/13, medical staff responded to this second request

stating: "You are still on the list to be seen. And you must understand that the

optometrist gets to each yard maybe once every 6 weeks. Thank you for your

patience." (ADC345163). This is highly inappropriate; headaches and vision loss in a

patient with a known pituitary tumor and ocular hypertension can represent a number of

emergent conditions, including increased intracerebral pressure or increased ocular

pressure (glaucoma) which can result in permanent vision loss. Mr. ███ complaints

needed to be evaluated urgently. Simply stating that the patient is in queue for a routine

eye exam is not an appropriate response.

162.    In my November 2013 Report, I described an "extremely disturbing"

failure to address lab results in April 2013 showing that ███████████ HIV

infection was worsening. (Dkt. 945-1, Exh. 1 at 24). The additional records I reviewed

only confirm my previous assessment that Mr. ███████ HIV was inappropriately

treated while he was in custody. After his April 2013 laboratory results showed that his

condition was deteriorating, his next HIV laboratory results from 8/16/13 (ADC362002-

003) and 9/12/13 (ADC361998-99) met the criteria for an AIDS diagnosis and indicated

he was at increased risk for numerous opportunistic infections. He was not seen by a

clinician to review these results, and he was not referred to an infectious disease

specialist as he should have been given his worsening HIV/AIDS and the lack of local

expertise.

163.    On 10/8/13, an "urgent" telemedicine consultation was ordered for

infectious disease consultation (ADC361993); on 11/29/13 a follow-up order was written

for staff to check on status of this order.  (ADC361993).  This consult should have been

scheduled when the deteriorating laboratory situation was first noted in April, not months

later.

164.    Predictably, Mr. ████████ developed a life-threatening opportunistic

infection that required emergent hospitalization on 12/9/13.  On that date, Mr. ████████

complained to staff of severe weakness, inability to walk, difficulty breathing, and

constipation.  (ADC361994-95).  He was seen by a physician's assistant who

appropriately sent him to the emergency room for evaluation.  *Id.*  Mr. ████████ was

hospitalized at St. Luke's Tempe from 12/9/13 through 12/31/13, where he was found to

have a viral brain infection that results from his compromised immune

system/AIDS.  (ADC362019-24).  Mr. ████████ had not been evaluated by a clinician or

infectious disease specialist between his April 2013 laboratory results and 12/9/13.  He

might have been spared this hospitalization had staff properly identified his uncontrolled

HIV disease sooner and treated it with appropriate medications in consultation with an

HIV specialist.

165.    There were further examples in the updated records demonstrating that

chronic care patients continued to be very poorly managed.  See, e.g., ████████████

(prescribed unsafe combination of insulins to treat his poorly controlled diabetes

[ADC294870, ADC294815]); ████████████ (suffered a stroke on 9/10/13 after receiving

inadequate anti-coagulation therapy [ADC303051-052, ADC303057, ADC303110]);

████████████ (failure to timely evaluate, monitor, and treat potentially life-

threatening complications related to advanced kidney disease [ADC361587-90]; █████████ ████ (has had Hepatitis C since 2004, and requested treatment multiple times, but had not received any tests required to begin treatment as of April 1, 2014 [ADC287211, ADC287214]); ███████████████, (first requested treatment for Hepatitis C in 2011, and received two diagnostic tests indicating high risk of end-stage liver disease or liver cancer, but no treatment or further evaluations provided [ADC269894, ADC269984, ADC322866); ██████████████ (even though blood pressure was significantly elevated, patient was assessed as having fair blood pressure control; patient required treatment but instead there was no change in his medications and follow-up was scheduled three months later [ADC363126])

### Failure to Provide Access to Timely Specialty Care

166.   ADC has not addressed their ineffective system for ensuring that prisoners receive specialty care when needed that I described in my November 2013 report.  (Dkt. 945-1, Exh. 1 at  26 – 32).  In my review of the updated records, I again found notable failures to refer prisoners for specialty services when they are clearly indicated.  And for those prisoners who were referred to specialty care, I again found dangerous delays before they received their appointments, if they ever received the appointments at all.

167.   For example, █████████████████ who suffered from AIDS and disseminated coccidioidomycosis (aka Valley Fever), and waited many months for an ordered appointment with an Infectious Disease consultant.  Ultimately, Mr. ████████ suffered a stroke and died before the consult was provided.

55

168.    Mr. ███ nurse practitioner noted on 5/2/13 that the patient had a significant increase in his AIDS viral load, and required an infectious disease consult. (ADC350763).  Indeed, Mr. ███ viral load was quite high, and his T cell count was very low, which was potentially life-threatening, signifying an urgent need for modification of his medication regime.  Multiple subsequent progress notes reference the pending consult.  (ADC350760, 350761, 350766, 350767.)

169.    During the six months following his 5/2/13 referral to the ID consult,  Mr. ███ T-cell count continued to drop, and his health deteriorated further.  On 11/25/13, after falling a few days earlier, he became unresponsive and was sent to the emergency department for possible seizure.  (ADC350746).  Two days later he had a massive stroke, on 11/27/13, and never recovered consciousness. (ADC350736, 350738, 350745).   He died ███ months later, on ███. (ADC350552).  Had he received an effective infectious disease consultation, it is very likely that he could have received more effective anti-viral treatment for AIDS, which would have prevented or delayed the deterioration of his immune system.

170.    ███ was admitted to ADC on 8/16/13, and experienced a case of five-month delay of necessary consultation and surgery for a patient with a known enlarged aneurysm.

171.    Mr. ███ had his intake medical examination performed on 7/17/13. (ADC355990-991).  Medical staff failed to obtain the history of an aortic aneurysm, and failed to review the medical transfer form and CTA scan forwarded to them by Corizon

from Mohave County Adult Detention that documented the aneurysm. (ADC355996-355998).

172.    An aortic aneurysm is a bulge in the aorta (blood vessel) which can lead to life-threatening complications should it burst. When the diameter of an aortic aneurysm exceeds a certain size, the risk of bursting becomes so great that urgent surgical correction is necessary because of the high risk of life-threatening rupture of the aneurysm. Despite the medical transfer form, the Corizon problem list on 7/16/13 or 7/17/13 did not mention the aortic aneurysm.  (ADC355984).

173.    On 7/23/13, the week after his admission to ADC Tucson, Mr. █████ placed an HNR to see a doctor to address his aortic aneurysm. (ADC356134). On 7/29/13, Will Holder, NP, referred him for a cardiac evaluation for an abnormal EKG. The consult was never approved by Corizon and no cardiology consultation occurred. (ADC356063, 356093).  On 8/19/13, Mr. █████ was seen in chronic care clinic for high blood pressure. His history of  aortic aneurysm was noted and the nurse practitioner indicated on his consultation request that "the inmate is quite worried about rupture of aneurysm." (ADC356097).

174.    On █████, almost 5 months after his admission, and more than 3 months after the placement of the referral, he was seen at the University of Arizona Medical Center in the cardio-thoracic surgery clinic. He was admitted for urgent surgery. (ADC356076-356091).  I did not receive the hospital records, or any medical records dated after █████ but according to the very brief autopsy report, Mr. █████ died

during his surgery. (ADC422889).  It is clear that the five month delay from admission at

ADC to his surgical consultation placed him at increasing risk for rupture of an enlarging

aortic aneurysm.

175.   ███████████   died from internal bleeding.  He had multiple

serious medical problems, including chronic renal failure requiring hemodialysis,

hepatitis C, and severe hypertension. While in custody, Mr. █████ had repeated episodes

of internal bleeding requiring hospitalization. (7 hospitalizations in the 6 months prior to

his death). (ADC354099-354106, 354110-354113, 354129-354141, 354458-354460,

354461-354463, 354053-354056, 353938-353941). Although the hospital recommended

multiple specialty consults to investigate the cause of the bleeding, those appointments

were not scheduled.  Consequently, the source of Mr. █████ internal bleeding was never

identified, and therefore never managed.

176.   Mr. █████ autopsy ascribed his death to complications of colitis.

(ADC422829).  A mortality review done by ADC/Corizon concluded that Mr. █████ had

inadequate care at ADC. (ADC335114-335117).  In sum, Mr. █████ had a severe acute

medical problem, recurrent massive gastrointestinal bleeding. He should have been

monitored closely following his discharge from the hospital on 9/5/13. Instead, medical

staff provided him with no follow-up care.

177.   ███████████   is a 72 year old man with hypothyroidism, diabetes,

hypertension and left eyelid ectropion (rolling out of the eyelid).   As I previously noted

in my first report, the left eyelid ectropion is potentially dangerous because of risk for

infection and corneal abrasions.  (Dkt. 945-1, Exh. 1 at 27).  I noted that surgical

correction was first recommended in January 2012 with referral to ophthalmology for

surgical correction and evaluation for diabetic retinopathy.  There were multiple delays in

the referral and consultation process; the patient was finally seen and received the surgery

on 3/24/14, more than 2 years following initial recommendation.  ADC305372-75.

Although he received the surgery on this date, there is no indication of evaluation for

diabetic retinopathy in the note (*id*.); this evaluation requires a different procedure than

the surgery where a physician must inspect the back of the eye for evidence of diabetic

changes.  Additionally, the patient was supposed to be seen back in ophthalmology clinic

three weeks after the surgery and there are no notes indicating the patient was ever

scheduled for or presented to this visit.  (ADC305373, 305365).

178.    In my November 2013, I noted that ███████████████, had blood in

his urine, a serious symptom suggestive of cancer in the bladder or kidney, and had been

waiting since 4/13/13 for a urology consultation.  (Dkt. 945-1, Exh. 1, Report App. C at

16-17).  I also noted that he was hospitalized on 4/11/13, for this problem, and while in

the hospital a catheter was placed in his bladder.  ADC316168-316172.

179.    Mr. ██████ was finally seen by a urologist on 8/5/13, nearly 4 months

after he should have been evaluated.  ADC316150, ADC316127-128.  In the meantime,

he had multiple infections resulting from the catheter that remained in place.

(ADC316190, ADC316192).  Although the providers attempted to remove the catheter

multiple times, the patient refused because of his poor mobility and inability to get to the

bathroom in time with his walker.  (ADC316151, ADC316158-316159, ADC316193, ADC316197, ADC316199).   On 8/5/13, the urologist recommended a return visit for cystoscopy (ADC316127), a mandatory procedure for the evaluation of blood in the urine.  According to the records provided to me, this procedure was never performed.  I also note that he a received a CT scan of his abdomen during this hospitalization, which showed a left kidney mass.  ADC316170, ADC316172.   The left kidney mass shown on the CT scan, along with having significant amounts of blood in his urine, mandated follow-up imaging to determine if this significant abnormality was a cancer. This imaging was also never completed according to the records provided me.

180.   Consistent with my November 2013 Report, named plaintiff Joseph Hefner, 203653, continued to have difficulties obtaining necessary and appropriate access to specialty care.  (Dkt. 945-1, Exh. 1 at  20).  Mr. Hefner had surgery for removal of a cataract on 6/13/13.  ADC122307.  After his surgery, the physicians appropriately submitted another ophthalmology consult for follow-up, which was reviewed 7/16/13 and returned on 3/3/14 with the comment that it was cancelled and Mr. Hefner should be re-evaluated and the consult re-submitted if necessary.  ADC262826.  In a patient who has had a history of chronic iritis and recent cataract surgery, follow-up ophthalmology  consult  was a prudent request and should not have been denied, eight months after the initial consult request.

181.   Additional examples of failures to provide access to specialty care include █████████████ (no referral to endocrinology despite diabetes resistant to usual insulin

titrations [ADC294810, ADC294870], and five month delay for follow-up with
ophthalmologist to treat retinopathy [ADC294841-843]); ▮▮▮▮▮▮▮▮ (no referral to
orthopedist to treat broken back [ADC318480, ADC318458-59, ADC318485]); ▮▮▮▮▮▮
▮▮▮▮ (no referral to cardiologist despite extensive surgery and heart failure
[ADC300793]); ▮▮▮▮▮▮▮▮▮ (at least a two year delay for a urology consult for
decreased urine flow, and at least a four month delay for a dermatology consult for skin
cancer [ADC347202, ADC347199, ADC347180, ADC347192, ADC347, ADC347179-
80, ADC347188]); ▮▮▮▮▮▮▮ (no referral to oncology or urology even though lab
results measuring growth of prostate cancer increased four-fold [ADC343862,
ADC362599], no documentation indicating that patient received dermatology
appointment after being referred on 9/10/13 [ADC362592], and patient was
inappropriately denied surgical consultation follow-up after an abnormal myelogram
[ADC343830, ADC343843, ADC362639]); ▮▮▮▮▮▮▮ (patient was at risk of
blindness from untreated ocular hypertension due to failure to provide follow-up checks
of the intraocular pressure as recommended by the optometrist [ADC345115]); ▮▮▮▮▮
▮▮▮ (patient waited at least six months to begin receiving chemotherapy and radiation
therapy after medical staff became aware that his untreated tonsillar cancer was spreading
[ADC290376, ADC290367]).

182.    Basic medical care for prisoners with significant complex medical illness
requires regular and timely access to off-site medical specialists. Corizon maintains data
on every request for consultation.  Each consult is requested and approved locally,

61

followed by approval or denial at the Arizona Regional center.  Practitioners and

Administrators at each facility should be provided with current information regarding the

status of each consult they have submitted:  has it been received, has it been approved,

what level of urgency was determined, has it been scheduled, and has it taken place.   It is

clear from reviewing these records that practitioners do not know this information, that

approval or denial of consult requests can take weeks or months, and that scheduling can

be delayed even further.  Practitioners may not know that a consult occurred, and may not

be aware of the consultant's findings and recommendations.  The prisoners who need

these specialty consultations are the sickest patients in the ADC. This information is

required to provide them minimally adequate medical care.  My review shows that the

current system fails to provide timely specialty care, and fails to alert practitioners that

their patients are not receiving the care they requested on their behalf, with terrible but

often preventable consequences.

### Failure to Adequately Staff Prisons with Sufficient Registered Nurses,   Mid-levels and Physicians

183.    In my November 2013 report I described the "alarmingly low" clinical

staffing allocation that is directly related to the lengthy appointment backlogs and

treatment delays.  (Dkt. 945-1, Exh. 1 at 13-17).  Another symptom of this chronic

understaffing is that underqualified nurses and mid-level providers are left to diagnose,

manage, and treat complex patients, without adequate supervision, because there are not

enough physicians, nurse practitioners and physician's assistants.  These are extremely

dangerous practices, and, as illustrated in the examples below, often result in disastrous

consequences.

184.    See, for example: ███████████ (LPN noted that patient was faking his breathing distress, administered a steroid injection based on a phone order by a PA, and sent him back to his housing unit without taking any vital signs; three days later he was sent to the hospital where he died of previously undetected metastatic lung cancer [ADC356810, ADC356813, ADC364792-94]; ███████████ (nurses and nurse practitioners failed to adequately evaluate patient despite abnormal vital signs and lab values; he died from complications related to metastatic cancer the following month [ADC350953 - ADC350972, ADC351122 - ADC351388]); ███████████ (RN accused patient of faking on two occasions when he was actually experiencing symptoms of early sepsis [ADC364798]); ███████████ (PA failed to consider fever, rapid heart rate, chest pain, and abnormal EKG when treating patient who died from complications of endocarditis two weeks later [ADC351423-25, ADC351456-57]; ███████████ (leukemia patient evaluated only by an RN and LPN in response to signs of infection when he should have received emergency care from a physician [ADC356681]); ███████████ (LPN evaluated patient for chest pain, but no evaluation of patient or review of EKG by physician even though results showed inadequate blood supply to the heart [ADC318502, ADC318456]); ███████████ (LPN, RN, and NP failed to recognize clear signs of SIRS [ADC339702-09]); ███████████ (LPN diagnosed patient with flu and did not order a physician follow-up despite obvious signs of sepsis and SIRS [ADC337443]); ███████████ (CNA noted profoundly low blood oxygen saturation

level indicating possible life-threatening respiratory failure, but patient was not evaluated by a physician [ADC348734]; ███████████ (nurses misdiagnosed congestive heart failure as a lung problem and patient was hospitalized for severe and life-threatening heart related symptoms two weeks later [ADC300981, ADC300900-20]); ████████ ███████ (no evaluation by a physician, only by nurses, after patient with uncontrolled blood pressure fell and hit his head [ADC346247]; ████████████ (patient with history of severe angina and hospitalization for stent was only evaluated by an unqualified LPN in response to complaint of chest pain on 2/20/14 [ ADC363128-29]).

### Records Reviewed Support Finding of Systemic Deficiencies

185.    The extraordinary level of dysfunction documented in these records reveals a profoundly broken system in which very sick patients cannot access competent and timely care, and suffer greatly as a result.

186.     I understand that defendants may assert that these cases described here are merely isolated instances of care lapses for a handful of unfortunate patients that do not reflect on the system as a whole.

187.    This is simply wrong.  This is the second review that I have performed of every natural death that occurred during an extended period.  During both periods, I found that the patients received markedly deficient care in more than half of the cases. Patients with life-threatening symptoms were evaluated by unqualified practical nurses, ignored, accused of lying about their symptoms, denied access to necessary specialists, denied necessary diagnostic tests, forced to endure excruciating cancer pain without

treatment, misdiagnosed, and allowed to deteriorate to the point of death.  It is shocking to find more than one or two such cases in a system, and finding this level of suffering in more than half of the records I reviewed is extraordinary.  This degree of harm to patients can result only from a health care system that is profoundly broken.

188.    Death matters.  Though it comes to all of us, death is different.  A medical system must carefully review each death in order to evaluate its practice, criticize its practice, make small or dramatic systemic changes in its policies and practices, and compliment, or sanction staff members whose work has been found to be deficient, or worse.  The mortality reviews conducted by ADC/Corizon demonstrate an abject failure to honestly reflect on their work, and correct obvious, significant failures of process, practice, and personnel.

**APPENDIX A**
**List of Documents Reviewed for Second Supplemental Report**

**Medical Records**

| | |
|---|---|
| ADC122290-122321 | Hefner, Joseph 203653 – 20130301 to 20130715 V1 |
| ADC122322-122337 | Hefner, Joseph 203653 – 20130301 to 20130715 V2 |
| ADC198148-198178 | Swartz, Stephen 102486 – RX and ORC |
| ADC198179-198473 | Swartz, Stephen 102486 – 20110101 to 20130826 |
| ADC222056-222074 | Hefner, Joseph 203653 – ORC through 20140127 |
| ADC222125-222133 | Swartz, Stephen 102486 – ORC through 20140427 |
| ADC231990-323053 | Hefner, Joseph 203653 – Rx through 20140220 |
| ADC232054-232136 | Swartz, Stephen 102486 – Rx through 20140220 |
| ADC232142-232207 | Polson, Joshua 187716 – 20130716 to 20140130 V2 |
| ADC232142-232207 | Polson, Joshua 187716 – 20130716 to 20140130 V3 |
| ADC232142-323207 | Polson, Joshua 187716 – 20130716 to 20140130 V1 |
| ADC232233-232234 | Polson, Joshua 187716 – Rx through 20140220 |
| ADC262799-262820 | Hefner, Joseph 203653 – 20140124 to 20140401 |
| ADC262822-262823 | Hefner, Joseph 203653 – Rx through 20140409 |
| ADC262824-262842 | Hefner, Joseph 203653 – ORC as of 20140409 |
| ADC263044-263046 | Polson, Joshua 187716 – Rx through 20140409 |
| ADC263083-263084 | Swartz, Stephen 102486 – 20130605 to 20140401 |
| ADC263085-263100 | Swartz, Stephen 102486 – 20140124 to 20140401 |
| ADC263101-263103 | Swartz, Stephen 102486 – Rx through 20140409 |
| ADC263104-263112 | Swartz, Stephen 102486 – ORC as of 20140409 |
| ADC263386-263421 | Polson, Joshua 187716 – 20140124 to 20140401 |
| ADC269645-269857 | ████████████████████████████████████ |
| ADC269858-270028 | ████████████████████████████████████ |
| ADC270608-271046 | ██████████████████████████████████████ |
| ADC271047-271397 | ██████████████████████████████████████ |
| ADC271398-271651 | █████████████████████████████████████ |
| ADC271652-272123 | ██████████████████████████████████████ |
| ADC272124-272547 | ████████████████████████████████ |
| ADC272548-272655 | ██████████████████████████████████ |
| ADC272944-273023 | ██████████████████████████████████ |
| ADC287104-287327 | ██████████████████████████████████████ |
| ADC290281-290387 | ████████████████████████████████████████ |
| ADC290388-290550 | ████████████████████████████████████████ |
| ADC290551-290662 | ████████████████████████████████████████ |
| ADC291844-292100 | ██████████████████████████████████ |



ADC294807-294947
ADC295531-295550
ADC296039-296113
ADC296287-296396
ADC298970-299328
ADC300693-301017
ADC301018-301113
ADC303024-303245
ADC303447-303464
ADC305359-305408
ADC308618-308674
ADC316019-316109
ADC316110-316247
ADC318029-318078
ADC318079-318207
ADC318208-318362
ADC318363-318485
ADC318486-318537
ADC322863-322946
ADC323183-323466
ADC327101-327372
ADC334706-334758
ADC335147-335185
ADC335186-335516
ADC335517-335739
ADC335740-335983
ADC335984-336209
ADC336210-336261
ADC336262-336305
ADC336306-336539
ADC336540-336761
ADC336762-336982
ADC336989-337196
ADC337197-337292
ADC337293-337336
ADC337337-337398
ADC337399-337514
ADC337794-338050
ADC338051-338218
ADC338219-338416



| | |
|---|---|
| ADC338417-338491 | [redacted] |
| ADC338585-338712 | [redacted] |
| ADC338713-338835 | [redacted] |
| ADC338836-338981 | [redacted] |
| ADC338982-339116 | [redacted] |
| ADC339117-339374 | [redacted] |
| ADC339375-339544 | [redacted] |
| ADC339545-339684 | [redacted] |
| ADC339685-339822 | [redacted] |
| ADC339823-340080 | [redacted] |
| ADC340081-340272 | [redacted] |
| ADC340273-340335 | [redacted] |
| ADC340612-341648 | [redacted] |
| ADC341919-343268 | [redacted] |
| ADC343269-343796 | [redacted] |
| ADC343797 | [redacted] |
| ADC343798-343966 | [redacted] |
| ADC343967-344064 | [redacted] |
| ADC344065-344356 | [redacted] |
| ADC344735-344797 | [redacted] |
| ADC344798-344836 | [redacted] |
| ADC344837-344873 | [redacted] |
| ADC344875-345083 | [redacted] |
| ADC345084-345212 | [redacted] |
| ADC345213-345310 | [redacted] |
| ADC345334-345553 | [redacted] |
| ADC345554-345790 | [redacted] |
| ADC345791-346024 | [redacted] |
| ADC346025-346234 | [redacted] |
| ADC346235-346336 | [redacted] |
| ADC346337-346528 | [redacted] |
| ADC346529-346839 | [redacted] |
| ADC346840-346842 | [redacted] |
| ADC346843-346865 | [redacted] |
| ADC346965-347075 | [redacted] |
| ADC347076-347175 | [redacted] |
| ADC347176-347246 | [redacted] |
| ADC347247-347378 | [redacted] |
| ADC347379-347548 | [redacted] |
| ADC347589-347775 | [redacted] |

ADC347776-348046
ADC348047-348415
ADC348416-348659
ADC348660-348782
ADC348861-348961
ADC348962-348965
ADC348966-349027
ADC349028-349215
ADC349216-349352
ADC349353-349460
ADC349461-349801
ADC349802-350019
ADC350020-350287
ADC350288-350458
ADC350459-350536
ADC350537-350727
ADC350728-350811
ADC350812-350924
ADC350925-351120
ADC351121-352388
ADC351386-351477
ADC351478-351566
ADC351567-351737
ADC351738-351992
ADC351993-352070
ADC352071-352291
ADC352292-352375
ADC352376-352500
ADC352501-352711
ADC352712-352955
ADC352956-353190
ADC353191-353309
ADC353310-353502
ADC353503-353541
ADC353542-353578
ADC353579-353781
ADC353782-353782
ADC353784-354041
ADC354042-354235
ADC354236-354533



ADC354534-354580
ADC354581-354767
ADC354768-354945
ADC354946-355144
ADC355145-355260
ADC355261-355352
ADC355353-355417
ADC355418-355675
ADC355676-355979
ADC355980-355981
ADC355982-356147
ADC356148-356421
ADC356422-356490
ADC356512-356656
ADC356657-356785
ADC356786-356920
ADC356921-357031
ADC357032-357292
ADC357293-357299
ADC357300-357584
ADC357585-357854
ADC357585-357854
ADC358004-358015
ADC358016-358257
ADC358258-358260
ADC358261
ADC358261-358393
ADC358394-358592
ADC358592-358824
ADC358825-358851
ADC358852-359013
ADC359014-359175
ADC359179-359478
ADC359479-357574
ADC359621-359711
ADC359712-359852
ADC359853-360093
ADC360536-360729
ADC360730-360855
ADC360856-361112



ADC361113-361538
ADC361556-361821
ADC361989-362030
ADC362031-362348
ADC362349-362481
ADC362571-362762
ADC362763-362862
ADC362863-362954
ADC362955-362993
ADC363114-363167
ADC363247-363368
ADC363405-363535
ADC363536-363575
ADC363576-363649
ADC363650-363779
ADC364217-364220
ADC364519-364584
ADC364585-364783
ADC371775-372077
ADC372078-372569
ADC372570-373177
ADC373178-373771
ADC373772-374407
ADC374408-375061
ADC375062-375080
ADC375081-375396
ADC375397-377155
ADC377156-378368



**Mortality Reviews**

ADC335106-335109
ADC335110-335113
ADC335114-335117
ADC335118-335121
ADC335122-335125
ADC335126-335129
ADC359561-359594
ADC359575-359578
ADC359579-359582






ADC359583-359586
ADC359587-359590
ADC359595-359598
ADC359599-359602
ADC359603-359606
ADC361539-361542
ADC361543-361547
ADC364133-364138
ADC364137-364140
ADC364141-364144
ADC364149-364152
ADC364153-364156
ADC364157-364160
ADC364161-364164
ADC364169-364172
ADC364173-364176
ADC364177-364180
ADC364181-364184
ADC364189-364192
ADC364193-364196
ADC364197-364200
ADC364201-364204
ADC364205-364208
ADC364209-364212
ADC364213-364216
ADC364217-364220
ADC364221-364224
ADC364225-364228
ADC364229-364232
ADC364233-364236
ADC364237-364240
ADC364241-364424
ADC364249-364252
ADC364253-364256
ADC364257-364260
ADC364261-364264
ADC364265-364268
ADC364784-364787
ADC364792-364795
ADC364796-364799

ADC364800-364803
ADC364804-364807
ADC364808-364811
ADC364812-364815
ADC364816-364819
ADC364820-364823
ADC364824-364827
ADC364828-364831
ADC364832-364835
ADC364836-364839
ADC364840-364843
ADC364844-364847



**Autopsies and AIU Reports**

ADC422643-422650
ADC422651-422660
ADC422661-422670
ADC422671-422674
ADC422683-422686
ADC422687-422690
ADC422691-422694
ADC422695-422699
ADC422700-422704
ADC422705-722711
ADC422712-422716
ADC422717-422719
ADC422720-422725
ADC422726-422731
ADC422732-422736
ADC422737-422751
ADC422752-422756
ADC422757-422761
ADC422762-422765
ADC422766-422770
ADC422771-422774
ADC422775-422778
ADC422779-422793
ADC422794-422801



ADC422802-422812
ADC422813-422817
ADC422818-422827
ADC422828-422832
ADC422833-422842
ADC422843-422846
ADC422847-422856
ADC422866-422869
ADC422870-422874
ADC422875-422879
ADC422880-422881
ADC422882-422886
ADC422887-422891
ADC422892-422896
ADC422897-422900
ADC422901-422908
ADC422912-422913
ADC422914-422917
ADC422918-422920
ADC422921-422924
ADC422925-422928
ADC422929-422933
ADC422934-422938
ADC422939-422942
ADC422943-422946
ADC422947-422951
ADC422952-4229*56
ADC422957-422961
ADC422962-422966
ADC422967-422971
ADC422972-422980
ADC422981-422984
ADC422985-422989
ADC422990-422993
ADC422994-423133
ADC423134-423282
ADC423283-423714
ADC423839-423966
ADC424140-424191
ADC424192-424298



ADC424299-424467
ADC424468-424616
ADC424691-424803
ADC424804-424931



**Plaintiffs' Production**

PLTF-PARSONS-035782
PLTF-PARSONS-035783-035785
PLTF-PARSONS-035786
PLTF-PARSONS-035787-035789
PLTF-PARSONS-035790-035790
PLTF-PARSONS-035793-035794
PLTF-PARSONS-035795-035796
PLTF-PARSONS-035797-035798
PLTF-PARSONS-035799
PLTF-PARSONS-035800-035802
PLTF-PARSONS-035803
PLTF-PARSONS-035804-035805
PLTF-PARSONS-035806-035807
PLTF-PARSONS-035808-035809
PLTF-PARSONS-035810-035811
PLTF-PARSONS-035812
PLTF-PARSONS-035813-035814
PLTF-PARSONS-035815
PLTF-PARSONS-035816-035818
PLTF-PARSONS-035819
PLTF-PARSONS-035820
PLTF-PARSONS-035821
PLTF-PARSONS-035822
PLTF-PARSONS-035823
PLTF-PARSONS-035824
PLTF-PARSONS-035825
PLTF-PARSONS-035826
PLTF-PARSONS-035827
PLTF-PARSONS-035828-035829
PLTF-PARSONS-035830
PLTF-PARSONS-035831-035832
PLTF-PARSONS-035833-035835
PLTF-PARSONS-035836



PLTF-PARSONS-035837-035839
PLTF-PARSONS-035840-035841
PLTF-PARSONS-035842
PLTF-PARSONS-035843
PLTF-PARSONS-035844
PLTF-PARSONS-035845-035846
PLTF-PARSONS-035847
PLTF-PARSONS-035848-035852
PLTF-PARSONS-035853-035854
PLTF-PARSONS-035855
PLTF-PARSONS-035856-035858
PLTF-PARSONS-035859
PLTF-PARSONS-035860-035861
PLTF-PARSONS-035862
PLTF-PARSONS-035863-035865
PLTF-PARSONS-035866-035867
PLTF-PARSONS-035868-035869
PLTF-PARSONS-035870
PLTF-PARSONS-035871-035872
PLTF-PARSONS-035873
PLTF-PARSONS-035874-053878
PLTF-PARSONS-035789-035882
PLTF-PARSONS-035883
PLTF-PARSONS-035884-035892
PLTF-PARSONS-035893
PLTF-PARSONS-035894
PLTF-PARSONS-035895
PLTF-PARSONS-035896
PLTF-PARSONS-035897-035898
PLTF-PARSONS-035899
PLTF-PARSONS-035900
PLTF-PARSONS-035901
PLTF-PARSONS-035902
PLTF-PARSONS-035903-035915
PLTF-PARSONS-035906
PLTF-PARSONS-035907-035908
PLTF-PARSONS-035909
PLTF-PARSONS-035910-035913
PLTF-PARSONS-035914-035915
PLTF-PARSONS-035916



PLTF-PARSONS-035917
PLTF-PARSONS-035918-305919
PLTF-PARSONS-035920
PLTF-PARSONS-035921-035926
PLTF-PARSONS-035927-035928
PLTF-PARSONS-035929-035930
PLTF-PARSONS-035931-035932
PLTF-PARSONS-035933-035936
PLTF-PARSONS-035937
PLTF-PARSONS-035938-035942
PLTF-PARSONS-035943
PLTF-PARSONS-035944-035945
PLTF-PARSONS-035946-035947
PLTF-PARSONS-035948-035949
PLTF-PARSONS-035950
PLTF-PARSONS-035951

