# APPENDIX 1

# APPENDIX 1

# PLAINTIFFS' UNCONTESTED FACTS AND THE

# PARTIES' UNCONTESTED LAW

**C.   STIPULATIONS AND UNCONTESTED FACTS AND LAW**

1.   The following material facts are admitted by the parties and require no proof:

| | **Defendants** |
|---|---|
| 1 | Charles Ryan is the Director for the Arizona Department of Corrections ("ADC"), and has been the Director since January 30, 2009. [Defendants Corrected Statement of Undisputed Fact ("DSOF") ¶ 45] |
| 2 | Charles Ryan is ultimately responsible for the health care provided to inmates and for the conditions of their confinement. [DSOF ¶ 46] |
| 3 | At the time this lawsuit was filed, Richard Pratt was the Interim Assistant Director for the ADC, following the retirement of Dr. Michael Adu-Tutu in February 2012. [DSOF ¶ 49] |
| 4 | Art Gross took over as Assistant Director in October 2012. [DSOF ¶ 50] |
| 5 | Pratt was renamed the Interim Assistant Director on March 1, 2013. [DSOF ¶ 51] |
| | **Healthcare Privatization** |
| 6 | ADC's healthcare budget for fiscal year 2014 is $131,500,000: $125,000,000 paid to Corizon Inc. ("Corizon") and $6,500,000 devoted to monitoring and litigation costs. [DSOF ¶ 55] |
| 7 | Arizona House Bill 2010 was approved by the Governor on September 3, 2009 and requires all correctional health services that are provided in a state owned and operated correctional facility to be privatized. [DSOF ¶¶ 56-66] |
| 8 | Wexford Health Sources, Inc. ("Wexford") was initially awarded the contract and began its tenure on July 1, 2012. [DSOF ¶¶ 68-69] |
| 9 | Wexford and ADC severed their relationship on November 8, 2012. [DSOF ¶ 79] |
| 10 | The contract was then awarded to Corizon. [DSOF ¶ 82] |
| 11 | Despite privatization, ADC has the ultimate responsibility to provide constitutionally mandated health care. [DSOF ¶ 93] |

| | **ADC Contract Monitoring** |
|---|---|
| 12 | The contract allows ADC to maintain oversight of Corizon through appointment of a Contract Monitor and regular audits and reports. [DSOF ¶ 97] |
| 13 | Each facility has a contract monitor that is responsible for ensuring Corizon's compliance with its duties relating to heath care under the contract. [DSOF ¶ 101] |
| 14 | The contract monitor reviews multiple performance outcomes and measures. [DSOF ¶ 104] |
| 15 | Each month, ADC contract monitors evaluate a selected number of these performance measures at each facility. [DSOF ¶105] |
| 16 | The contract monitors at each facility measure the same performance measures that are selected for that month. [DSOF ¶ 106] |
| 17 | There are over 200 performance measures, 43 of which are sanctionable if non-compliant for that measurable quarter. [DSOF ¶¶ 107-08] |
| 18 | The 43 sanctionable measures are measured every month at each facility, in conjunction with additional non-sanctionable selected measures for that particular month. [DSOF ¶ 109] |
| 19 | The number of non-sanctionable performance measures varies from month to month. [DSOF ¶ 111]. |
| 20 | The contract with Wexford required 100 percent compliance with the sanctionable performance measures. [DSOF ¶ 112] |
| 21 | The contract with Corizon required less than 100 percent compliance with the sanctionable performance measures through the first four quarters of Corizon's tenure. [DSOF ¶¶ 116-119] |
| | **Corizon Reporting** |
| 22 | Corizon is required to prepare and submit various reports, including: quarterly statewide Chronic Condition/DM Program Reports; monthly HNR Appointment Reports; monthly Inmate Formal Grievance Reports; monthly Inmate Wait Times Report; monthly statewide Intake Report; monthly Staffing Reports; and quarterly statewide Utilization Review Reports. [DSOF ¶ 131] |
| | **ADC Medical Policies** |
| 23 | The contract requires Corizon to provide a "standardized program of routine, urgent and emergency healthcare" for all inmates at a level "equivalent or surpassing the community standard of care." [DSOF ¶ 289] |

| | **ADC Suicide/Mental Health Policies** |
|---|---|
| 24 | Inmates identified as at a significant risk for suicide may be placed on a watch. Watch types include Continuous Watch, One Officer to Multiple Inmates Continuous Watch and Interval Watch (30 minutes/10 minutes). [DSOF ¶ 493] |
| 25 | Razors and razor blades are not approved for Thirty Minute Watches. [DSOF ¶ 531] |
| | **ADC Dental Policies** |
| 26 | Dentists classify all inmates according to their dental treatment needs through the visual exam or screening of x-rays as Class I (no further treatment needed), II (routine treatment needed), or III (immediate treatment needed). [DSOF ¶ 703] |
| 27 | ADC requires health care providers to obtain informed consent for examinations, treatments, and procedures. [DSOF ¶ 717] |
| 28 | Obtaining informed consent compliant with ADC policy requires a health care provider to explain, in language the prisoner can understand, the procedure or treatment, the reason for it, the benefits, any risks and possible side effects, and the existence of any alternative treatment, and to document this discussion on the Consent to Treat Form. [DSOF ¶¶ 718-21] |
| 29 | The Dental Services Technical Manual ("DSTM"), dated 1/1/2010, is the current policies and procedures manual to be followed by all dentists working at ADC. [Deposition of William Smallwood, DDS, dated Aug. 20, 2013, at 45:19-46:8] |
| 30 | No ADC dental clinics operate under written policies applicable to clinical treatment that are different from the DSTM. [*Id.* at 53:15-54:17] |
| 31 | The DSTM establishes four levels of dental priorities. [DSOF ¶ 734] |
| 32 | Priority 1 (Emergency Care) includes conditions requiring immediate assessment, such as postoperative uncontrolled bleeding, facial swelling of a life-threatening nature or causing severe facial deformity, fracture of the mandible, maxilla, or zygomatic arch, avulsed dentition, extreme pain that is not responsive to dental treatment guidelines, and intraoral lacerations that require suturing to include the vermillion border of the lips. [DSOF ¶ 735] |
| 33 | Priority 2 (Urgent Care) includes conditions such as fractured dentition with pulp exposure, acute dental abscess, an oral pathological condition that may severely compromise the general health of the inmate, and acute necrotizing ulcerative gingivitis. [DSOF ¶ 736] |

| | |
|---|---|
| 34 | Priority 3 (Routine Care) includes conditions that require treatment to restore the form and function of an inmate's oral tissues and are not solely elective or cosmetic, such as caries, chronic periodontal conditions, non-restorable teeth, edentulous and partially edentulous patients requiring replacement, temporary, sedative, or immediate restorations, and non-functional broken prosthetic appliances (if the inmate qualifies), TMJ disorders, periodic examinations, gingival recession/root sensitivity, and routine dental prophylaxis.  [DSOF ¶ 737] |
| 35 | Priority 4 (Exempt Conditions) are not treated at ADC and include fixed prosthodontics (crown and bridge), orthodontics, removal of asymptomatic third molars or impactions without pathology, treatment of discoloration, stains, and cosmetic defects, ridge augmentations, and vestibular extensions/implants.  [DSOF ¶ 738]  Dental assistants evaluate HNRs using the dental classification system (Dental Procedure 770.2).  [DSOF ¶ 778] |
| 36 | Dental assistants perform clinical evaluations that include collecting and recording information regarding an inmate's complaint, reviewing the inmate's health history, performing an oral evaluation, and taking dental x-rays.  [DSOF ¶¶ 780-81] |
| | **Administration of Dental Care** |
| 37 | Dental care at ADC is provided by Smallwood Prison Dental Services ("SPDS"), a private company owned by Dr. William Smallwood, who subcontracts with Corizon to provide dental care.  [DSOF ¶ 804] |
| 38 | SPDS has been providing dental care at ADC since March 4, 2013 after taking over from Wexford, which provided dental care at ADC from July 1, 2012 to March 3, 2013.  [DSOF ¶ 805] |
| 39 | The contract between Corizon and ADC and the contract between Smallwood and Corizon require that patients with urgent dental needs be seen within 72 hours, and patients with routine dental needs be seen within 90 days.  [DSOF ¶¶ 792, 993-94] |
| 40 | SPDS, through the CDS software, calculates wait times based on the date a request is received in the dental clinic.  [Deposition of William Smallwood, DDS, dated Apr. 7, 2014, at 14:21-15:1] |
| 41 | ADC's dental routine wait times are calculated by taking the average of the amount of time that all prisoner currently on the routine dental care list have been on the routine dental care list.  [*Id.* at 73:11-75:9] |
| 42 | Dentists at ADC have discretion to remove an inmate from the routine care list if the inmate submits an HNR for pain and is seen for an urgent care appointment.  [DSOF ¶ 1167] |
| 43 | A broken or lost filling is classified as routine care.  [DSOF ¶ 1186] |
| 44 | ADC inmate population housed in ADC-operated facilities on July 31, 2013 was 33,692.  [ADC Corrections at a Glance] |

-4-

| | | |
|---|---|---|
| 45 | ADC inmate population housed in ADC-operated facilities on September 30, 2013 was 34,304.  [ADC Corrections at a Glance] | |
| 46 | ADC inmate population housed in ADC-operated facilities on March 31, 2014 was 34,444.  [DSOF ¶ 2] | |
| 47 | As of August 12, 2012, there were 24 FTE dentist and 32 dental assistant positions filled system-wide.  [ADC016148-76] | |
| 48 | As of September 30, 2013, Smallwood had hired 29.05 FTE dentists, 1.6 FTE dental hygienists, and 39.75 dental assistants, who worked 21.29 FTE, .98 FTE, and 33.88 FTE, respectively.  [ADC382964] | |
| 49 | As of March 31, 2014, Smallwood had hired 28.73 FTE dentists, 2.5 FTE dental hygienists, and 41.75 dental assistants, who worked 23.08 FTE, 1.34 FTE, and 39.26 FTE, respectively.  [ADC267354] | |
| **Isolation[1]** | | |
| 50 | ADC isolation units hold hundreds of prisoners who have been diagnosed by ADC as suffering from serious mental illness (SMI).  [Doc. 1028-1, Mitchell Decl. Ex. 39 at 19-20 (720 prisoners with SMI held in isolation at Eyman complex)] | |
| **24-Hour Illumination** | | |
| 51 | Some prisoners in isolation are subjected to 24-hour illumination.  [DSOF ¶¶ 1696, 1697] | |
| 52 | Defendants use nocturnal lighting of significantly higher wattage than 7-watt bulbs in some isolation cells and units.  [*See* DSOF ¶¶ 1733-34, 1784, 1789, 1793, 1798, 1803, 1805, 1809, 1811, 1816, 1818] | |
| 53 | CB-Kasson Watch Pod cells have a box light affixed to the top of the wall in the cell above the cell door.  [DSOF ¶ 1782] | |
| 54 | The Watch Cells are illuminated 24 hours.  [DSOF ¶ 1783] | |
| 55 | CB-Kasson non-watch cells have a box light affixed to the top of the wall in the cell above the cell door.  [DSOF ¶ 1792] | |
| **Chemical Agents** | | |
| **Property** | | |
| 56 | Inmates may not possess any property item in excess of the total amount allowed.  [DSOF ¶ 1862] | |

---

[1] Defendants Contend: Defendants object to Plaintiffs' use of the term isolation, because Defendants contend it does not exist at ADC.

| | | |
|---|---|---|
| 57 | Cell property may be restricted upon determination by medical or administrative staff in order to prevent the inmate from engaging in self-harm. [DSOF ¶ 1863] |
| 58 | Access to the appliances may be restricted for maximum custody inmates based upon disciplinary sanction. [DSOF ¶ 1864] |
| **Health Needs Request Process** ||
| 59 | ADC inmates may advise prison medical personnel of a non-emergency medical request or requests for appointments by submission of a form called a Health Needs Request form. [DSOF ¶ 1869] |
| **Named Plaintiff Jensen** ||
| 60 | Plaintiff Jensen's PSA on November 29, 2006 was 8.4. [DSOF ¶ 2081] |
| 61 | Plaintiff Jensen had labs drawn on January 19, 2007, which showed his PSA to be 7.7. [DSOF ¶¶ 2086-87] |
| 62 | On June 12, 2009, Jensen had a PSA ordered and on June 22, 2009 Jensen had the labs drawn, which showed his PSA to be 9.1. [DSOF ¶ 2089] |
| 63 | A bone scan was conducted on March 30, 2010. [DSOF ¶ 2115] |
| 64 | Dr. Cord performed a prostatectomy on Plaintiff Jensen on July 15, 2010 at Mountain Vista Medical Center utilizing the Da Vinci robotic surgical method. [DSOF ¶ 2117] |
| 65 | On August 5, 2010, Plaintiff Jensen underwent a cystogram that showed his urinary catheter located anterior and outside the bladder. [DSOF ¶¶ 2156-57] |
| 66 | On June 23, 2011, Plaintiff Jensen was seen by Dr. Cord at Accurate Urology, who determined that Mr. Jensen needed urgent urological surgery and who had Mr. Jensen immediately transported to Mountain Vista Medical Center. [DSOF ¶¶ 2254-57] |
| 67 | At Mountain Vista Medical Center, Plaintiff Jensen underwent a cystoscopy, a transurethral resection, and an incision of his bladder neck, all of which revealed a pinpoint bladder neck contracture. [DSOF ¶¶ 2293-95] |
| 68 | Plaintiff Jensen was admitted to the emergency room at University Medical Center on August 28, 2011. [DSOF ¶ 2287] |
| 69 | On February 9, 2012, Plaintiff Jensen was seen at University Physicians Hospital, where his cystoscopy demonstrated an almost complete occlusion of an anastomotic stricture. [DSOF ¶¶ 2331-32] |
| **Named Plaintiff Swartz** ||
| 70 | Swartz waited more than 72 hours to receive dental care after submitting an HNR for intense pain needing treatment "ASAP." [DSOF ¶¶ 907-908] |

| | |
|---|---|
| 71 | Swartz was assaulted by several inmates, resulting in severe injuries to his face and jaw. |
| 72 | Swartz was given Narcan in connection with surgery following his facial injuries. [DSOF ¶¶ 2492, 2494] |
| 73 | Swartz's request for an increase in tramadol dosage was not approved for five or six months. [DSOF ¶ 2517] |
| 74 | Swartz made repeated requests for pain treatment and medication for his face and jaw. |
| 75 | Swartz has swallowed metal multiple times while in ADC custody, including in 2011. |
| 76 | Swartz has been prescribed medications to treat his mental health symptoms. |
| 77 | During his incarceration in ADC, Swartz has been prescribed antipsychotic medication. [DSOF ¶ 2689] |
| **Dustin Brislan** | |
| 78 | ADC's Health Services Technical Manual ("HSTM") [Doc. 886a at 137-37] defines "clinical encounters" as interactions between inmates and health care providers that involve a treatment and/or exchange of confidential information." [*Id.* at ADC011215 and ADC010831] |
| 79 | The manual also requires that "[n]ecessary clinical encounters do not take place cell side, but must occur in an appropriate clinical setting."  [*Id.* at ADC010956] |
| 80 | During his incarceration in ADC, chemical agents have been used on Mr. Brislan on at least three occasions. [DSOF ¶¶ 2795, 2811] |
| 81 | During his incarceration in ADC, Mr. Brislan has attempted suicide six or seven times. [DSOF ¶ 2807] |
| **Named Plaintiff Rodriguez** | |
| 82 | On June 25, 2012, Rodriguez reported that she lost her inhaler and needed a new one "ASAP." She complained about difficulty breathing and appeared weak and shaky, with wheezy breathing. [DSOF ¶¶ 2833-35] |
| 83 | Rodriguez again submitted an HNR asking for something to help with her shaking, and she was told simply that she would be scheduled on the waiting list. [DSOF ¶¶ 2838-39] |
| 84 | Rodriguez has been threatened with pepper spray. [DSOF ¶ 2887] |
| 85 | Rodriguez has been nearby when a neighboring inmate was sprayed with OC spray, and the spray went through the vent into Rodriguez's cell. [DSOF ¶ 2886] |

-7-

| | |
|---|---|
| 86 | Rodriguez was housed in a cell with 24-hour lighting. [DSOF ¶ 2889] |
| **Named Plaintiff Smith** | |
| 87 | Due to his hand injury, Mr. Smith's cellmate would type requests for Smith. [*See* DSOF ¶¶ 3098, 3100] |
| 88 | During his incarceration in ADC, Mr. Smith has been prescribed Lithium. [DSOF ¶¶ 3108, 3110, 3126] |
| **Named Plaintiff Gamez** | |
| 89 | On multiple occasions, Plaintiff Gamez has requested refills of nasal spray. [DSOF ¶ 3186] |
| 90 | Between March 22, 2010 and April 1, 2014, Plaintiff Gamez submitted 350 HNRs. [DSOF ¶¶ 3183-85] |
| **Named Plaintiff Chisholm** | |
| 91 | Chisholm submitted a dental-related HNR on December 23, 2011 stating: "I lost a filling in my back left molar. Half of my tooth is open and exposed. I am in pain. Please help." [*See* DSOF ¶ 878, ADC130551] |
| 92 | Chisholm was seen by Dr. Hanstad one week later (12/30/2011), when he diagnosed recurrent decay well below the gum line, and scheduled Chisholm for extraction of tooth #18. [*See* DSOF ¶ 879, ADC071375] |
| 93 | Chisholm refused extraction of tooth #18 on January 12, 2012. [*See* DSOF ¶ 881, ADC071375] |
| 94 | Chisholm submitted an HNR on August 13, 2012 indicating that she still required attention to her dental issues, and that she had not been scheduled for a cleaning in over 6 ½ years. [*See* DSOF ¶ 884, ADC130532] |
| 95 | Chisholm submitted an HNR on November 20, 2012 that said: "I wrote an HNR back in March asking for help. I now have 3 teeth at least that need to be rebuilt or filled. I've been here roughly 7 years, and I've never had routine care. Seriously, could I be seen now? My HNR in August was not my original request. It was a follow up to a March letter when I was told I'd be seen in 4-6 months. It's been 8 months. Help." [*See* DSOF ¶ 885, ADC071392] |
| 96 | An ADC representative could not find an HNR from March and requested that Chisholm provide a copy of the HNR to be "placed on the list as of that date." [*See* DSOF ¶ 886, ADC071392] |
| 97 | Chisholm submitted an HNR on April 18, 2011 in which she reported feeling numbness and tingling in her arms, legs, and face, and that she needed help. [*See* DSOF ¶ 3251, ADC130544] |

| | | |
|---|---|---|
| 98 | On April 20, 2011, Chisholm was seen by Dr. Lockhart, but that appointment was for chronic condition follow-up care, and not in response to Chisholm's April 18, 2011 HNR. [*See* ADC130682-83] |
| 99 | On December 14, 2011, Chisholm reported having shortness of breath and palpitations. [*See* DSOF ¶ 3277, ADC130674] |
| 100 | On January 30, 2012, Chisholm reported discomfort in the middle of her chest and her left arm, which was provoked by exertion, emotion, and position. [*See* DSOF ¶ 3283, ADC130624] |
| 101 | On February 23, 2012, Chisholm complained of pain when breathing. [*See* DSOF ¶ 3293, ADC130672] |
| 102 | Chisholm was deemed to have refused a dental cleaning on December 9, 2008 because the cleaning conflicted with a medical appointment that ADC scheduled on the same day. [ADC130485] |
| **Named Plaintiff Licci** | | |
| 103 | In 2001, Licci had a nodule removed from her right thigh that was diagnosed as "dermatofibrosarcoma protuberans, incompletely excised." [ADC005724-26] |
| 104 | The Armed Forces Institute of Pathology, Department of Soft Tissue Pathology confirmed the diagnosis of "dermatofibrosarcoma protuberans, incompletely excised." [ADC005727] |
| 105 | On October 16, 2001, Licci was counseled by an ADC physician that she "will need to watch for recurrence." [ADC005501] |
| 106 | On November 30, 2010, Dr. Lockhart reviewed Licci's labs and noted her ammonia levels were elevated. [DSOF ¶ 3405] |
| 107 | On December 12, 2010, Licci submitted an emergency HNR complaining of intense stomach pain. [ADC005915] |
| 108 | On May 18, 2011, Dr. Lockhart submitted an outside consult request to oncology. [DSOF ¶ 3424] |
| 109 | On July 31, 2011, Licci submitted an HNR for trouble with nausea, not eating, and vomiting. [DSOF ¶ 3436] |
| 110 | On August 8, 2011, Licci submitted an HNR for nausea. [ADC005896] |
| 111 | On August 16, 2011, Licci was seen by Dr. Rodriguez for abdominal problems consisting of severe nausea and vomiting whenever she tried to eat. [ADC005438] |
| 112 | On August 30, 2011, Licci was seen for intractable nausea and vomiting. [DSOF ¶ 3444] |

| | |
|---|---|
| 113 | On September 6, 2011, Licci had an ultrasound of her abdomen at Insight Imaging. [DSOF ¶ 3449] |
| 114 | On September 27, 2011, Licci was sent to St. Luke's Medical Center for a CT of her abdomen and pelvis. [DSOF ¶ 3454] |
| 115 | The CT revealed a heterogenous enlarged uterus, soft tissue density mass at the region of the cervix, and bilateral enlarged cysts. [ADC203298-99] |
| 116 | Licci also received a chest port placement while at St. Luke's. [DSOF ¶ 3455] |
| 117 | On September 29, 2011, Licci was sent to Affiliated Southwest Surgeons for a consultation. [DSOF ¶ 3456] |
| 118 | It was noted there was a cervical mass on the CT and an anterior submucosal mass on the rectal exam. [DSOF ¶ 3457] |
| 119 | A colonoscopy was recommended for further evaluation of her colon and rectum. [DSOF ¶ 3458] |
| 120 | A GYN consult was also recommended. [DSOF ¶ 3459] |
| 121 | On October 6, 2011, Dr. Lockhart noted that Licci had not seen an oncologist yet. [ADC005430] |
| 122 | On October 18, 2011, Licci was seen by Dr. Enciso for a follow up to her CT of her abdomen and pelvis. [DSOF ¶ 3463] |
| 123 | The pelvic scan showed heterogeneous enlarged uterus and an enlarged ovarian cyst; both ovaries were within normal size. [DSOF ¶ 3464] |
| 124 | A request for a pelvic ultrasound was placed. [DSOF ¶ 3465] |
| 125 | On October 26, 2011, Licci had a pelvic ultrasound at Insight Imaging [DSOF ¶ 3466], which revealed an ovarian cyst. [ADC005774] |
| 126 | On November 22, 2011, Licci presented to medical with abdominal extension that occurred shortly after eating. [ADC005426] |
| 127 | On January 6, 2012, Dr. Lockhart noted that Licci had not seen an oncologist yet and followed up with the consult coordinator. [ADC005419-20] |
| 128 | On February 21, 2012, an outside consult was placed for an ultrasound of Licci's pelvis. [DSOF ¶ 3496] |
| 129 | On March 5, 2012, Licci was seen by PA R. Rodriguez. [DSOF ¶ 3502] |
| 130 | On May 29, 2012, Licci was seen for a follow up on her pelvic ultrasound. [DSOF ¶ 3514] |

-10-

| | | |
|---|---|---|
| 131 | On September 9, 2013, Licci submitted an HNR noting there was a recent growth on the inside of her right thigh that was similar in color and close to her original tumor. [ADC203317] |
| 132 | On October 8, 2013, a consultation request was submitted for Licci to undergo LSC with possible total abdominal hysterectomy or total lap hysterectomy. [ADC203323] |
| 133 | On January 28, 2014, Licci had a total abdominal hysterectomy at Tempe St. Luke's Hospital. [ADC263002] |
| 134 | Duplicate: Left blank |
| | **Named Plaintiff Hefner** |
| 135 | Hefner injured his eye on September 12, 2006. He reported the injury and was seen by the doctor. [DSOF ¶¶ 3601-02] |
| 136 | On March 26, 2011, Hefner was assaulted and suffered cuts and abrasions all over his body. [DSOF ¶ 3697] |
| 137 | Hefner complained of pain in his left jaw, right lower back, left lower chest/rib area, pain with deep breathing, pain below right knee. [DSOF ¶ 3700] |
| 138 | The doctor assessed swelling, abrasions on left side of the face, pain with palpation right flank and left lower chest, and abrasions and swelling right knee. [DSOF ¶ 3701] |
| 139 | Hefner has gastroesophageal reflux disease (GERD) and needs a special diet. [DSOF ¶ 3719] |
| 140 | Hefner testified that, in 2010, while in ADC custody, either Dr. Merchant or Dr. Macaboui, told him that he had a gastrointestinal problem and should avoid certain foods that will upset his stomach, such as peanut butter, beans, oily foods, coffee, sodas and spicy foods. [DSOF ¶ 3720] |
| 141 | Hefner was told that doctors no longer issue bed wedges for GERD. [DSOF ¶ 3722] |
| | **Named Plaintiff Polson** |
| 142 | Although Polson was prescribed a soft diet on April 9, 2008, he submitted many HNRs stating that he was not receiving his soft diet. [ADC006393; ADC006391; ADC006382; ADC006379; ADC006377; ADC006323; ADC006322; ADC006321; ADC123143; ADC123141; PLTF-PARSONS-027163; PLTF-PARSONS-027164; PLTF-PARSONS-027165; ADC123139] |
| 143 | Polson submitted an HNR on May 13, 2008, stating: "I would like to go head and get partials and any other care that needs to be done with my teeth. I have talked to my dentist on streets and she says partials would be best." [DSOF ¶ 831] |

-11-

| | | |
|---|---|---|
| 144 | Polson submitted an HNR on July 22, 2008, complaining of the delay in getting scheduled for dentures, and stated that he would like to get the denture process started "ASAP so I can eat regular foods." [ADC006401] |
| 145 | Polson submitted an HNR on October 8, 2008, indicating he was not receiving his soft diet and had not eaten for a week, asked dental to please call the kitchen, and stated that he needed "every thing in my mouth fixed cavitys [sic] teeth pulled what ever." [ADC006393] |
| 146 | Polson submitted an HNR on November 1, 2008 that stated that the kitchen was not giving him his soft diet, and he could not eat everything that was being served. The HNR also stated that one of his front teeth "was dead broke off a copple [sic] days ago" and that he would like his teeth fixed as soon as possible "so I can get the partails [sic]." The HNR response states that Polson was placed on the routine care list. [ADC006391] |
| 147 | Polson submitted an HNR on February 18, 2009, stating that his diet had not been delivered properly since February 2, that he could not eat the food that was being served, and that he was "starving." [ADC006377] |
| 148 | On April 13, 2010, tooth #23 and #24 were extracted from Polson's mouth. [ADC006515] On April 22, 2010, Polson submitted an HNR complaining of pain, stated that the extractions were not healing well and were still bleeding, and reported that he was not receiving his proper diet. [ADC006344] On May 4, 2010, Polson's HNR was answered, and he was told to "be patient." [ADC006344] On May 13, 2010, Polson was seen for the pain complaint that he had submitted on April 22. [ADC006515] |
| 149 | On August 5, 2010, Polson submitted an HNR asking for his soft diet to be renewed. He was told that his diet was good until November 5, 2010, and was told to "send another request last week of October for renewal." [ADC006340] |
| 150 | On October 13, 2010, Polson submitted an HNR asking for his soft diet to be renewed. He was seen the next day, but the diet was not renewed because it did not expire until November 5, 2010. [ADC017272] |
| 151 | On November 16, 2010, Polson submitted three HNRs reporting that he had not had his soft diet for three days, because it was expired. Polson also stated that he could not take medications that needed to be taken with food. [ADC017267-69] On November 18, 2010, his diet was ordered. [*Id.*] |
| 152 | On November 18, 2010, Polson submitted an HNR, reporting that he was still not getting his soft diet. [ADC017266] The response stated that his diet order had been reissued on November 18, 2010. [*Id.*] |
| 153 | On November 27, 2010, Polson submitted an HNR, reporting that he was still not receiving his soft diet and that the officers would not give him his soft diet without a diet card. In response, an LPN told Polson that "All diet request need to made to chaplain [sic]." [ADC017325] |

| | | |
|---|---|---|
| 154 | On October 24, 2011, Polson submitted an HNR stating that his mechanical soft diet would expire in November, and asked for the diet to be renewed. A dental assistant submitted a written response stating "Your partial was repaired and you are able to function. Therefore your [mechanical soft diet] will not be renewed." [ADC006284] | |
| 155 | After Polson's October 24, 2011 HNR asking for the renewal of his soft diet, he was not seen by dental personnel until April 25, 2012, at which point a soft diet was ordered for 6 months. [ADC131378] | |
| 156 | On May 9, 2012, Polson submitted an HNR and reported that the kitchen cancelled his soft diet. [ADC071780] On May 16, 2012, a dental assistant's note indicated that Polson "now ha[d] his card and is getting his diet." [ADC131378] | |
| 157 | On February 11, 2013, Polson submitted an HNR and reported that his soft diet had been cancelled. [ADC071771] The soft diet was supposed to run through April 24, 2013. [ADC071751] On February 13, 2013, Polson's soft diet was reinstated. [ADC071767] | |
| 158 | On February 15, 2013, Polson reported that his soft diet was not being prepared correctly, and the diet sheet was not always available. [ADC123143] The response claimed that the issue had been resolved. [ADC123142] | |
| 159 | On March 8, 2013, Polson reported that his soft diet was not being prepared correctly, and that this was a recurring problem. [ADC123141] Polson received no response until May 15, 2013. [ADC123140] | |
| 160 | On June 4, 2008, Polson submitted an HNR and stated that he had continuing severe ear pain. [ADC006406] The HNR response is dated June 16, 2008 and stated that Polson could "purchase Tylenol or Ibuprofen at the inmate store." [Id.] | |
| 161 | On June 30, 2009, Polson submitted an HNR stating that he needs to "see a doctor for ear aches" and that his "ear aches bad." [ADC006371] The HNR response is dated July 17, 2009, and stated that an appointment would be scheduled with a health care provider. [Id.] | |
| 162 | On July 19, 2009, Polson submitted an HNR complaining of "very bad ear aches right now." [ADC006359] | |
| 163 | Polson was seen by a Licensed Practical Nurse (LPN) on July 21, 2009, for "ear pain" and the nurse observed, "unable to see ear drums due to wax build up" and Polson reported pain of "5 on a 10 scale." [DSOF ¶ 3091, ADC006198] | |
| 164 | Polson was given Debrox ear drops, which treat wax buildup, not ear pain or ear infections, and instructed to follow up on the nurse's line in 7-10 days. [ADC006198] | |
| 165 | Polson was seen again by an LPN on July 29, 2009, after he walked to the health unit. [ADC006195] | |

-13-

78204-0001/LEGAL123450222.2

| | | |
|---|---|---|
| 166 | The nurse noted that Polson stated he had "ear pain in his left ear and both ears feel like water is stuck," and also observed that his left ear was "swollen, red ear drum seen, appears to be grossly intact" and right ear was "clear of wax, no redness, no c/o [complaints of] pain." [DSOF ¶ 3795, ADC006195] |
| 167 | The nurse called Dr. Wohler who prescribed "[ear drops] Neo/Poly susp otic 1% 4 drops four times a day x 10 days." [DSOF ¶ 3796, ADC006195] |
| 168 | Polson submitted another HNR on August 9, 2009, about his ear infection and was told he already had an appointment scheduled. [DSOF ¶ 3798, ADC006365-66] |
| 169 | Polson submitted another HNR on August 14, 2009, noting that he was seen by a nurse 2-3 weeks ago and was given a 10-day prescription for antibiotics for his ear infection, but that the prescription had now expired. Polson marked the HNR "URGENT" and stated "nothing is being done about my ears still hurting. This is dangerous. This is the second H&R I've put in. When I was a kid I almost had to have tubes put in my ears." [ADC006360] |
| 170 | In response to this HNR, Polson was told two days later that a follow up appointment was scheduled for the Doctor's line. [ADC006360] |
| 171 | On August 18, 2009, Polson was seen by a nurse who noted persistent ear ache primarily in his right ear. [ADC006194] |
| 172 | He was given antibiotics for his ears, but the prescription was marked "not refillable." [ADC130302] |
| 173 | Polson submitted another HNR marked "URGENT" on September 15, 2009, complaining of "severe ear aches again" that were "really bad." [ADC006358] |
| 174 | A day later, he was told he would be on the nurse's line. [ADC006358] |
| 175 | Polson was not seen for his HNR marked "URGENT" until September 23, 2009, when a Physician's Assistant (PA) examined him and noted that he was complaining of a right ear ache. [ADC006193] |
| 176 | Polson told the PA he has had "chronic ear infections since he was little." [DSOF ¶ 3806, ADC006193] |
| 177 | The PA observed that Polson's left ear had "no erythema seen in canal, TM clear," and that Polson's right ear has "tenderness… Red spot on superior TM [Tympanic Membrane], typical landmarks cannot be seen. Dry white crust around external canal, slight impaired hearing." [DSOF ¶ 3807, ADC006193] |
| 178 | The PA also prescribed "Cipro Opth 4 drops in right ear twice a day x 14 days." [ADC006193] |
| 179 | Polson submitted another HNR on October 4, 2009, acknowledging he was seen by about his ear infection on September 23, 2009, but complaining he had not yet received his prescription ear drops. [ADC006356-57] |

-14-

78204-0001/LEGAL123450222.2

| | | |
|---|---|---|
| 180 | Polson submitted an HNR marked "URGENT" on November 7, 2009, stating that he was "<u>still </u>having ear aches in my right ear and now in my left ear also," and stated that his "right ear has lost hearing." [ADC006354] |
| 181 | The same day he submitted his HNR, on November 7, 2009, Polson was seen by a nurse (LPN) to evaluate his complaints of ear pain. [DSOF ¶ 3817, ADC006191] |
| 182 | Polson stated, "I've taken 2 sets of antibiotics for my ear and now my left ear is starting to hurt. I can't hear out of my right year." [DSOF ¶ 3818, ADC006191] |
| 183 | The nurse observed that his right ear has "erythema also dry white crust to upper canal. TM visible. Grey bulging matter." [DSOF ¶ 3819, ADC006191] |
| 184 | He was then referred to a health care provider to re-evaluate for need for more antibiotics (ABTs) or referral to an Ear, Nose and Throat (ENT) specialist. [DSOF ¶ 3820, ADC006191] |
| 185 | Despite this referral, Polson did not see a physician or an ENT specialist until over seven months later. [ADC006501-05] |
| 186 | Polson submitted another HNR on November 11, 2009, stating he was "pulled out on 11/6/09 by the nurse to check out my ear" but complaining he had not seen a doctor yet. [DSOF ¶ 3822, ADC006353] |
| 187 | He complained his ear "has no hearing now" and he has been through "two cycles of antibiotics ear drops and nothing has worked." [DSOF ¶ 3823, ADC006353] |
| | **Named Plaintiff Wells** |
| 188 | On October 14, 2009, Charlotte Wells received an intake examination, during which she presented with high blood pressure and chest pains. [DSOF ¶ 3987] |
| 189 | Her blood pressure was regularly monitored for the next month, but she did not see a doctor. [DSOF ¶¶ 3990-98, ADC006768] |
| 190 | On November 6, 2009, Wells submitted an HNR, explaining that she needed to see a doctor for her high blood pressure and pain radiating down her left arm and neck. [DSOF ¶ 3999, ADC007093] |
| 191 | On November 14, 2009, Wells submitted an HNR saying that she needed "some filing work done right away." [ADC007091] |
| 192 | Wells was not seen by a doctor until January 8, 2010. [DSOF ¶ 4002, ADC006698] |
| 193 | At her January 8 appointment, Wells complained of a fluttering heart and dizziness. [ADC006698] |

-15-

78204-0001/LEGAL123450222.2

| | | |
|---|---|---|
| 194 | Wells submitted another HNR on January 24, 2010, complaining of light-headedness and a fluttering heart. [ADC007092] |
| 195 | At no point between October 14, 2009 and February 14, 2010 was Wells referred to or examined by a cardiologist. |
| 196 | On February 15, 2010, Wells arrived at the ADC medical facility complaining of stabbing, throbbing chest pain. [DSOF ¶ 4030] |
| 197 | She was given nitroglycerine and taken to West Valley Hospital. [DSOF ¶ 4031] |
| 198 | On February 17, 2010, Wells underwent a cardiac catheterization. [DSOF ¶ 4032, ADC91649-50] |
| 199 | She was diagnosed with coronary artery disease, with an 80% occlusion of her left anterior descending artery, and had a stent placed there. [DSOF ¶ 4033, ADC91649-50] |
| 200 | Wells was discharged from West Valley Hospital on February 18, 2010. [DSOF ¶ 4035] |
| 201 | On February 19, 2010, an ADC doctor submitted a request to authorize an outside cardiology consultation for Wells. [DSOF ¶ 4044] |
| 202 | On February 20, 2010, Wells returned to the ADC medical unit complaining of chest pains and was seen by a nurse who gave her nitroglycerine. [DSOF ¶ 4037-38, 4041, ADC006688-89] |
| 203 | On February 23, 2010, Wells was seen by an ADC doctor for a follow-up visit regarding her chest pain. [DSOF ¶ 4045, ADC006687] |
| 204 | On March 5, 2010, that same ADC doctor, who was not a cardiologist, prescribed Nitrostat 0.4 mg for onset of chest pain. [DSOF ¶ 4050] |
| 205 | On March 6, 2010, Wells was seen at the ADC medical unit with complaints of numbness in her left arm. [DSOF ¶ 4053, ADC006685] |
| 206 | She was told to submit an HNR if the numbness continued. [DSOF ¶ 4055, ADC006685] |
| 207 | On March 9, 2010, Wells was seen at the ADC medical unit with complaints of stabbing pains in her left arm and neck and tightness in her chest. [ADC006684] |
| 208 | On March 19, 2010, Wells was examined by the same ADC doctor, who was not a cardiologist. [DSOF ¶ 4059, ADC006682] |
| 209 | On March 22, 2010, Wells submitted an HNR complaining of chest pain. [ADC007088] |
| 210 | On March 24, 2010, Wells was again examined by the same ADC doctor, who was not a cardiologist. [DSOF ¶ 4062, ADC006681] |

-16-

78204-0001/LEGAL123450222.2

| | | |
|---|---|---|
| 211 | On April 14, 2010, Wells submitted another HNR complaining of chest pain. [ADC007086] |
| 212 | On April 16, 2010, Wells was again examined by the same ADC doctor, who was not a cardiologist. [DSOF ¶ 4067, 6677-78] |
| 213 | On that same day, the ADC doctor submitted a second request for an outside cardiology consultation. [ADC006827] |
| 214 | The request was approved on April 22, 2010. [ADC006827] |
| 215 | On April 26, 2010, Wells had an attack of angina and was given two doses of nitroglycerine. [ADC006676] |
| 216 | On May 16, 2010, Wells submitted an HNR for symptoms including chest pain. [ADC007085] |
| 217 | On June 8, 2010, Wells was seen at the ADC medical unit complaining of chest pain. [ADC006668] |
| 218 | She was taken to West Valley Hospital, where her electrocardiogram came back abnormal. [DSOF ¶¶ 4110, 4112] |
| 219 | On June 15, 2010, Wells – who had returned to ADC by that time – put in an HNR for chest pain, among other ailments. [ADC007081] |
| 220 | On July 7, 2010, nearly five months after her cardiac catheterization, Wells was seen by the Affiliated Cardiologists of Arizona for an initial cardiac evaluation. [DSOF ¶ 4131, ADC006745] |
| 221 | On July 29, 2010, Wells was seen by a dentist who advised her that per protocol, she could not undergo dental treatment for six months after her cardiac event. [DSOF ¶ 949] |
| 222 | The dentist noted that she could be scheduled for a filling on tooth #13 sometime after August 15, 2010. [DSOF ¶ 950] |
| 223 | Over a month later, on September 17, 2010, Wells was seen by a dentist but could not undergo treatment because she had uncontrolled blood pressure and was not feeling well. [ADC198722] |
| 224 | Wells was cleared by medical to have dental treatment following review of her cardiologist's report, and she received a filling on tooth #13 on November 3, 2010, nearly a year after her initial request for a filling. [ADC006855] |
| 225 | On December 19, 2010, Wells submitted an HNR for pain in the new filling as well as pain in a bottom tooth on the left side. [ADC007064] |
| 226 | On January 24, 2011, Wells submitted a new HNR for fillings. [DSOF ¶ 959] |
| 227 | On May 9, 2011, Wells had tooth #18 filled. [DSOF ¶ 960] |

-17-

| | |
|---|---|
| 228 | On August 7, 2011, Wells submitted an HNR requesting fillings in two upper teeth.  [DSOF ¶ 965] |
| 229 | On September 16, 2012, Wells submitted an HNR regarding a broken tooth, stating that there may be a small air pocket exposing the nerve and asking that it be fixed before she went to court in November.  [ADC198925] |
| 230 | On June 9, 2013, Wells submitted an HNR requesting a filling on a bottom tooth.  [DSOF ¶ 972] |
| 231 | On August 8, 2013, Wells submitted an HNR regarding severe pain on an upper tooth.  [ADC198912] |
| 232 | On August 9, 2013, Wells was seen and complained of pain on tooth #13.  [DSOF ¶ 974] |
| 233 | The dentist determined that the pain was likely due to either traumatic occlusion or necrosis.  [DSOF ¶ 975] |
| 234 | Wells was given ibuprofen and told to return to the clinic for an extraction if her symptoms persisted.  [DSOF ¶ 976] |
| 235 | On August 29, 2013, Wells submitted an HNR for pain.  [DSOF ¶ 977] |
| **Named Plaintiff Verduzco** | |
| 236 | During her incarceration in ADC, chemical agents have been used on Ms. Verduzco on at least six occasions.  [DSOF ¶¶ 2951-3001] |
| **Named Plaintiff Thomas** | |
| 237 | During his incarceration in ADC, chemical agents have been used on Mr. Thomas on at least one occasion.  [DSOF ¶ 3080] |

    2.    The following material facts, although not admitted, will not be contested at trial by evidence to the contrary:  N/A.

    3.    The following issues of law are uncontested and stipulated to by the parties:

| | |
|---|---|
| 1 | This court has federal question jurisdiction over this case and it is properly venued in this Court.  28 U.S.C. §§ 1331, 1343; 28 U.S.C. § 1391(b). |

| 2 | Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.  18 U.S.C. § 3626 (a)(1).  This standard is "nearly identical" to the pre-PLRA standard for entry of injunctive relief in contested cases. *Gilmore v. State of California*, 220 F.3d 987, 1006 (9th Cir. 2000). |
|---|---|